IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

——————————————— x
                               :

HANSYORG BLATTNER, Derivatively  :  CIVIL ACTION NO.
on Behalf of ORACLE CORPORATION, :
                               :
       Plaintiff,            :
                               :
      vs.                :  SHAREHOLDER DERIVATIVE
                               :  COMPLAINT FOR:
LAWRENCE J. ELLISON, JEFFREY O.  :  BREACH OF FIDUCIARY DUTY;
HENLEY, DONALD L. LUCAS, MICHAEL :  NEGLIGENT BREACH OF FIDUCIARY
J. BOSKIN, JACK F. KEMP, JEFFREY :  DUTY AND GROSS MISMANAGEMENT;
BERG, RICHARD A. McGINN, and KAY :  AND UNJUST ENRICHMENT AND
KOPLOVITZ,                   :  MISUSE OF CORPORATE ASSETS
                               :
       Defendants,          :
                               :
      and                  :  DEMAND FOR JURY TRIAL
                               :
ORACLE CORPORATION, a Delaware   :
Corporation,                 :
                               :
      Nominal Defendant. :
——————————————— x

## NATURE OF CASE AND SUMMARY OF ACTION

    1.   This is a shareholders derivative action brought on behalf of nominal defendant Oracle Corporation ("Oracle" or the "Company"), seeking to remedy defendants' breaches of fiduciary duty, negligence, abuse of control, misconduct, waste of corporate assets and other violations of state law.

    2.   This action arises in connection with defendants' breaches of fiduciary duty, negligence, misconduct and abuse of control that occurred in relation to the illegal insider trading by certain directors and officers of the Company which occurred between 12/19/00 and 1/31/01, when the price of Oracle common stock was trading above $30 per share and when the senior officers and

directors of the Company were in possession of material adverse information. As alleged herein, prior to the Company's 3/1/01 warning that earnings per share for fiscal 3Q:01 would be substantially below Company guidance (affirmed only weeks prior to this disclosure) and that Oracle would miss revenue projections by as much as $200 million, these insiders sold nearly $1 billion worth of their Oracle stock – including the Company's CEO and Chairman of the Board, Lawrence J. Ellison, who between 1/22/01 and 1/31/01 sold over 29 million shares of his personally held Oracle stock (his first sales in approximately 6 years) to realize illicit gains of over $894 million.

3.    At no time prior to 3/1/01 did defendants ever disclose that Oracle would miss its 3Q:01 revenue or earnings forecasts, and in fact, just days before this shocking disclosure, Company executives appeared at an investor conference at which they presented bullish reports and reaffirmed positive guidance, and the disclosure was made only one week after Jeff Henley, Oracle's CFO and a member of its Board of Directors, appeared at the AppsWorld Conference in New Orleans, where he met personally with JP Morgan H&Q analyst Jim Pickrel and continued to guide him to expect solid results for 3Q:01. It was only on 3/1/01 that Oracle revealed that it, like many of its competitors, was being affected by the slowdown in software sales, and that it would miss 3Q:01 forecasts and that 4Q:01 was uncertain. Immediately upon making these adverse disclosures, the price of Oracle shares plummeted, falling to a yearly low of $15.75 per share – a decline of approximately

50% from the price at which the insiders dumped nearly $1 billion worth of their shares.

4.    In violation of their duties to both the Company and its shareholders, defendants failed to disclose the fact that Oracle was not *"more immune to economic factors than others"* as defendant Henley had boasted in 12/00, but rather, was suffering from the same market conditions which were affecting its competitors and other enterprise software sellers, and that it was experiencing a slowdown in demand for its products as many of its key dotcom customers faced bankruptcy and as the Internet sector faced enormous constriction. Rather than disclose that demand for Oracle products and services was beginning to wain, defendants continued to issue materially misleading statements - such as Henley also stating in 12/00 that *"[a]ll tech companies are not the same"* - in order to artificially inflate the value of Oracle common stock long enough to allow certain senior officers and directors of the Company to sell close to $1 billion worth of their privately held Oracle stock while in possession of the undisclosed material adverse information described herein. In addition to the illegal and improper nature of these actions, as a direct result of defendants' wrongful and illegal course of conduct, the Company is now subject to several shareholder class action law suits which allege securities fraud relating to the illegal insider trading and violations of federal securities laws. Regardless of the outcome of these suits, the result is that defendants have caused irreparable harm to the Company's reputation which will undoubtedly

- 2 -

negatively impact its ability to attract investments and raise capital going forward.

5.   The Individual Defendants herein (as defined in ¶8, below), who are directors and/or officers of Oracle, participated in this conspiracy in order to profit from their illegal insider stock sales and/or to obtain the financial and social benefits of such positions for themselves and also to enrich and further the personal and business interests of all defendants identified herein.

**PARTIES**

6.   Plaintiff Hansyorg Blattner, at all times relevant to the allegations raised herein has been, and continues to be, an owner and holder of Oracle common stock.

7.   Nominal defendant Oracle is a Delaware corporation with its principal executive offices located at 500 Oracle Parkway, Redwood Shores, California 94065. According to  the Company's recent press releases, Oracle purports to be the world's second largest software company.  The Company provides databases and relational servers, application development and decision support tools, and enterprise business applications.  Oracle's software runs on network computers, personal digital assistants, set-top devices, work-stations, PCs, minicomputers, mainframes and powerful super computers. For FY:00, Oracle reported annual sales of more than $10 billion.   In addition, Oracle markets itself as the Company that *"provides the software that powers the Internet*."  The Company's common stock is traded on the Nasdaq National Market

System under the symbol "ORCL." Currently there are approximately 5.58 billion shares of Oracle common stock issued and outstanding.

8. The defendants, referred to herein as the "Individual Defendants," are officers and/or directors of Oracle and hold positions with Oracle as indicated below in ¶¶9-16.

9. Defendant Lawrence J. Ellison ("Ellison") is, and at all times relevant to the allegations herein was, the Chairman of the Board of Directors and Chief Executive Officer of the Company, which he co-founded in 1977. Between 1/22/01 and 1/31/01, Ellison sold over 29 million shares of his personally held Oracle stock (his first sales in approximately 6 years), at prices above $30 per share, to realize illicit gains of over $894 million. Moreover, because of defendant Ellison's positions of trust and leadership at Oracle, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and via reports and other information provided to him in connection therewith.

10. Defendant Jeffrey O. Henley ("Henley") is, and at all times relevant to the allegations herein was, Chief Financial Officer, Executive Vice President and a director of the Company. On or about 1/4/01, Henley sold 1 million shares of his personally held Oracle stock, at prices above $32 per share, to realize

illicit gains of over $32.3 million.   Moreover, because of
defendant Henley's positions of trust and leadership, he knew the
adverse non-public information about Oracle's business, finances
and present and future business prospects via access to internal
corporate documents (including the Company's operating plans,
budgets and forecasts and reports of actual operations compared
thereto), conversations and connections with other corporate
officers and employees, attendance at management and Board of
Directors' meetings and via reports and other information provided
to him in connection therewith.

　　　11.   Defendant Donald L. Lucas ("Lucas") is, and at all times
relevant to the allegations herein was, a director of the Company.
In addition, Lucas is also Chairman of the Executive Committee and
Chairman of the Finance and Audit Committee, as well as a member of
the Compensation Committee and Nominating Committee.   On or about
1/3/01, Lucas sold 150,000 shares of his personally held Oracle
stock, at prices above $30 per share, to realize illicit gains of
over $4.6 million.   Moreover, because of defendant Lucas' position
of trust and leadership, he knew the adverse non-public information
about Oracle's business, finances and present and future business
prospects via access to internal corporate documents (including the
Company's operating plans, budgets and forecasts and reports of
actual operations compared thereto), conversations and connections
with other corporate officers and employees, attendance at Board of
Directors' meetings and via reports and other information provided
to him in connection therewith.

- 5 -

12.   Defendant Michael J. Boskin ("Boskin") is, and at all times relevant to the allegations herein was, a director of the Company.  In addition, Boskin is also Chairman of the Compensation Committee and a member of the Audit Committee and Nominating Committee.  On or about 1/17/01, Boskin sold 150,000 shares of his personally held Oracle stock, at prices above $33 per share, to realize illicit gains of over $5.0 million.  Moreover, because of defendant Boskin's position of trust and leadership, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and via reports and other information provided to him in connection therewith.

13.   Defendant Jack F. Kemp ("Kemp") is, and at all times relevant to the allegations herein was, a director of the Company. Kemp is a member of no committees of the Company, however, because of defendant Kemp's board membership, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of

- 6 -

Directors' meetings and via reports and other information provided to him in connection therewith.

14. Defendant Jeffrey Berg ("Berg") is, and at all times relevant to the allegations herein was, a director of the Company. In addition, Berg is also a member of the Audit Committee. Moreover, because of defendant Berg's position, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and via reports and other information provided to him in connection therewith.

15. Defendant Richard A. McGinn ("McGinn") is, and at all times relevant to the allegations herein was, a director of the Company. Defendant McGinn is a member of no Company committees, however, because of defendant McGinn's position of trust and leadership, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings

and via reports and other information provided to him in connection
therewith.

16. Defendant Kay Koplovitz ("Koplovitz") is, and at all
times relevant to the allegations herein was, a director of the
Company. In addition, defendant Koplovitz is also a member of the
Nominating Committee. Moreover, because of defendant Koplovitz's
position of trust and leadership, she knew the adverse non-public
information about Oracle's business, finances and present and
future business prospects via access to internal corporate
documents (including the Company's operating plans, budgets and
forecasts and reports of actual operations compared thereto),
conversations and connections with other corporate officers and
employees, attendance at Board of Directors' meetings and via
reports and other information provided to her in connection
therewith.

17. By reason of their positions as officers, directors
and/or fiduciaries of Oracle and because of their ability to
control the business and corporate affairs of Oracle, the
defendants owed Oracle and its shareholders fiduciary obligations
of fidelity, trust, loyalty and due care, and were and are required
to use their utmost ability to control and manage Oracle in a fair,
just, honest and equitable manner, and were and are required to act
in furtherance of the best interests of Oracle and its shareholders
so as to benefit all shareholders equally and not in furtherance of
their personal interest or benefit. Each director and officer of
Oracle owes to Oracle the fiduciary duty to exercise due care and

- 8 -

diligence in the administration of the affairs of Oracle and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, services, management, projections and forecasts so that the market price of the Company's common stock would be based on truthful and accurate information.

18. The Individual Defendants, because of their positions of control and authority as directors or officers of Oracle, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Oracle, each of the defendants had access to adverse non-public information about the financial condition, operations and future business prospects of Oracle, including, without limitation, the fraud which the Individual Defendants caused Oracle to engage in.

19. At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Oracle, and was at all times acting within the course and scope of said agency.

20. To discharge their duties, the officers and directors of Oracle were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

financial affairs of Oracle.  By virtue of such duties, the officers and directors of Oracle were required, among other things, to:

(a)  manage, conduct, supervise and direct the business affairs of Oracle in accordance with the laws of the State of Delaware, federal law, state and federal rules and regulations and the charter and bylaws of Oracle;

(b)  neither violate nor knowingly permit any officer, director or employee of Oracle to violate applicable federal laws, rules and regulations and state law;

(c)  establish and maintain systematic and accurate books and records of the business and affairs of Oracle and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said books and records;

(d)  maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Oracle's financial statements and information would be accurate;

(e)  exercise reasonable control and supervision over the public statements made to the securities markets and over trading in Oracle stock by the officers and employees of Oracle;

(f)  remain informed as to the status of Oracle's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices and make such disclosures as are necessary to comply with state and federal securities laws; and

(g)   supervise the preparation and filing of any audits, reports or other information required by law from Oracle and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Oracle and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

21.   During all relevant times hereto, each of the defendants occupied positions with Oracle or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Oracle, its operations, finances, financial condition, services, and future business prospects. Because of these positions and such access, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to disclose material adverse information regarding Oracle or abstain from trading on such information so as to profit from its misuse.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

22.   In committing the wrongful acts alleged herein, the defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.   In

- 11 -

addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

23. During all relevant times hereto, the defendants, and each of them, initiated a course of conduct which was designed to and did: (i) inflate the value of Oracle common stock by issuing false and materially misleading statements which were designed to and which did artificially inflate the price of Oracle long enough to allow several directors and senior officers to sell nearly $1 billion worth of their privately held Oracle common stock while in possession of material adverse undisclosed information; and (ii) maintain the Individual Defendants' executive and directorial positions at Oracle, and the profits, power and prestige which the Individual Defendants enjoyed as a result of those positions, in spite of these defendants' violations of law and other fiduciary breaches (as set forth herein). In furtherance of this plan, conspiracy and course of conduct, defendants, and each of them, took the actions as set forth herein.

24. The Individual Defendants engaged in a conspiracy, common enterprise or common course of conduct which involved the dissemination of false and materially misleading statements which created the false expectation that Oracle was performing in accordance with Company sponsored expectations - expectations which were reinforced by senior management of the Company as late as one week prior to Oracle's shocking 3/1/01 3Q:01 revenue and earnings

disappointment and 4Q:01 forecast revision. *The purpose of these affirmative misrepresentations and willful non-disclosures was to allow Company insiders, several of whom are also named as defendants herein, to sell almost $1 billion of their privately held Oracle common stock before the Company was forced to reveal its true financial condition and before the price of Oracle common stock declined over 26% in the single trading day of 3/2/01, as a result of those belated disclosures.* Defendants' conduct was in clear violation of federal and state securities laws and constituted a direct breach of the fiduciary duties owed to the Company's public shareholders as well as deceit, unjust enrichment and abuse of control.   In addition, the egregious nature of defendants' illicit conduct has harmed, and will continue to harm, the reputation, credibility and future prospects of the Company.

25.   The defendants accomplished their conspiracy, common enterprise or common course of conduct which allowed them to sell nearly $1 billion of their privately held Oracle common stock through the issuance of the false and materially misleading financial statements, public comments, private one-on-one discussions with securities analysts and press releases to the public, which manipulated, misrepresented and failed to disclose the true facts regarding Oracle's revenues and earnings and its prospects for future financial performance.   Each defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein.

26. Each of the defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

27. Each of the defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute misconduct and deceit upon Oracle and its shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

28. Plaintiff brings this action derivatively in the right and for the benefit of Oracle to redress injuries suffered, and to be suffered, by Oracle as a direct result of the breaches of fiduciary duty, violations of law, abuse of control, gross mismanagement, unjust enrichment and constructive fraud, as well as the aiding and abetting thereof, by the defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

29. Plaintiff will adequately and fairly represent the interests of Oracle and its shareholders in enforcing and prosecuting its rights.

- 14 -

30.   Plaintiff is and was an owner of the stock of Oracle during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

31.   Plaintiff has not made any demand on the present Board of Director of Oracle to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)   Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

(b)   Directors of Oracle, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Oracle's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(c)   In order to bring this suit, all of the directors of Oracle would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(d)   The acts complained of constitute violations of the fiduciary duties owed by Oracle's officers and directors and these acts are incapable of ratification;

(e)   Each of the directors of Oracle authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made

- 15 -

available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

      (f)   The directors of Oracle cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves or other directors and officers responsible for the misconduct alleged in this Complaint, in that, *inter alia*, the Board of Directors is totally dominated by defendant Ellison, who co-founded the Company, who currently owns and controls approximately 25% of its voting stock as Oracle's largest single shareholder, and who hand-picked the other members of the Board (the Individual Defendants), all of whom are personally beholden to Ellison for their positions and who each were directly involved in the misconduct alleged, or who recklessly or negligently disavowed such knowledge, and who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.[1]   This

---

[1]As further evidence of defendant Ellison's control and domination over the Board of Directors, according to the Company's FY:01 Proxy Statement, filed with the SEC on 9/11/00, defendant Ellison is a member of the three-person Executive Committee (along with defendants, Lucas and Henley), which Committee is generally vested with all the powers of the Board of Directors, except that the Executive Committee cannot take action beyond certain financial limits, liquidate the Company, sell all or substantially all of the Company's assets, merge the Company with another company where the Company is not the surviving entity, or take any other action not permitted to be delegated to a committee under Delaware law or the Company's Bylaws.   Moreover, *despite the significant power and authority of the Executive Committee, this Committee did not meet*

domination of the Board of Directors by Ellison and the Individual Defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept plaintiff's demands;

(g)   Any suit by the directors of Oracle to remedy these wrongs would likely expose the Individual Defendants and Oracle to further violations of the securities laws which would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(h)   Oracle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Oracle any part of the damages Oracle suffered and will suffer thereby;

(i)   If the directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of federal and California law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal

---

a *single time during FY:00, and during that same period acted nine times by unanimous written consent.* Moreover, as the sole member of the Company's Planning Committee, Ellison is also authorized to approve stock option awards, subject only to certain limitations.

liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants;

(j) Each member of the Oracle Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their cooperation with the other members of the Board of Directors, and their participation and acquiescence in the wrongdoing set forth herein and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action[2];

---

[2]According to the Company's FY:01 Proxy Statement, filed with the SEC on 9/11/00, the Company currently pays defendants Kemp, Berg, McGinn and Koplovitz an annual retainer of $40,000 each. Defendants Boskin and Lucas currently are paid annual retainers of $100,000 and $160,000, respectively, in connection with their additional board committee duties. Non-employee members of the Board also receive directors' fees of (1) $1,500 for each regularly scheduled Board meeting attended, (2) $3,000 for each meeting of the Finance and Audit Committee attended, and (3) $2,000 per day for each special meeting or committee meeting attended. Non-employee members of the Board also participate in the Company's 1993 Directors' Stock Option Plan, which currently provides for the following grants of options to purchase common stock of the Company to non-employee members of the Board: options to purchase 60,000 shares of common stock as of the date an individual becomes a non-employee director; options to purchase 30,000 shares of common stock on May 31st of each year provided such director has served on the Board for at least six months; and in lieu of the latter option grant, options to purchase 90,000 shares of common stock on May 31st of each year to the director (or directors) who serves as chairman of either the Executive Committee or the Finance and Audit Committee (or both), provided such director has served in such capacity for at least one year, and options to purchase 75,000 shares of common stock on May 31st of each year to the director who serves as chairman of the Compensation Committee, provided such director has served as a member of such committee for at least one year.

- 18 -

(k)   Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment; and

(l)   If Oracle's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Oracle.   However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Oracle against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Oracle, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   If there is no directors' and officers' liability insurance at all then the defendant directors will not cause Oracle to sue them, since they will face a large uninsured liability.

- 19 -

32.  The directors also receive substantial compensation for serving on the Board of Directors, the various committees thereof and as chairs of those committees.

33.  Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants have failed and refused to seek to recover for Oracle for any of the wrongdoing alleged by plaintiff herein.

34.  Plaintiff has not made any demand on shareholders of Oracle to institute this action since such demand would be a futile and useless act for the following reasons:

     (a)  Oracle is a publicly traded company with thousands of holders of record;

     (b)  Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

     (c)  Making demand on all shareholders would force plaintiff to incur huge expenses assuming all shareholders could be individually identified.

<b>DEFENDANTS' WRONGFUL COURSE OF CONDUCT</b>

**A.   Background and Overview of the Action.**

35.  By late 9/00, the beginning of the Company's fiscal 2Q:01, the market for Internet-business related products and services was suffering a severe decline.  Internet companies which had gone public only years or months before were unable to generate revenues strong enough to make them profitable, and venture

capitalists and investors had little interest in investing more money into the same companies who were proving that their business models would result in little more than bankruptcy. In fact, by 2Q:01 many of Oracle's best dotcom database customers' money raising problems had reached crisis proportions, and by the end of 2Q:01 at least thirty of the Company's "sizeable" Internet database customers were already out of business. The materially impaired condition of the dotcom sector and the rapid disappearance of Oracle's database customers was of critical importance to Oracle, who derived approximately 12% of its FY:00 database license revenue from these Internet companies.

36. In addition to the evisceration of at least thirty of Oracle's significant Internet database customers, also by the inception of 2Q:01, the majority of Oracle's surviving Internet customers were scrambling to maintain their business amidst volatile market conditions. While Oracle had "powered" 93% of all Internet initial public offerings in FY:00, many of these companies' ability to fund themselves and to sustain their operations was in doubt, and as a result, many if not all had begun to cut back information technology orders. From their frequent conversations with their customers and other Oracle employees, management of Oracle knew that even the Company's core customers were cutting information expenditures and that these spending reductions would cause Oracle's future revenues to decline.

37. Despite the adverse market conditions and the severe cutbacks in database, enterprise and front-office software

expenditures by its customers, at no time did Oracle revise or adjust its revenue and earnings projections for the 3Q:01 or 4Q:01. Instead, and to the contrary, Oracle adopted the public position that its enterprise and database businesses were "unfazed" by slowing personal-computer sales, the impaired condition of its current and likely potential customers and the general downshifting in the U.S. economy. Instead, by the end of 12/00, when Oracle released results for 2Q:01, Oracle's CFO, defendant Henley, publicly distinguished Oracle from other tech companies who were by then being adversely affected by negative market conditions and told analysts and investors that "[a]ll tech companies are not the same" and that "[w]e're much more immune to economic factors than others." At the end of 2Q:01, Oracle also stated that:

- 3Q:01 projections, including $0.12 EPS, 75% growth in applications revenue, database revenue growth of 15%-20%, and overall revenues north of $2.87 billion, were easily attainable.

- Oracle's pipeline was "never stronger" and their applications growth was "accelerating," as enough customers were accelerating their purchases to offset any declines resulting from the few customers who were cutting back or reducing orders.

- Oracle's database and applications sales were rapidly growing and Oracle would see no impact on its 3Q:01 results as a result of the slowing economy.

38.   Unbeknownst to investors, however, these statements were false and materially misleading in that by the inception of 3Q:01, Oracle was already experiencing the negative effects of the slowdown in demand for enterprise and database software products, much the same as its competitors, and Oracle was no more "immune" from these adverse market conditions than any other software

- 22 -

company. Rather than disclose these adverse conditions, which by the inception of 3Q:01 were *already* adversely affecting Oracle, certain of the senior officers and directors of the Company, including Ellison, Henley, Lucas and Boskin, each a director and each a defendant herein, rushed to the market to dump tens of millions of shares of Oracle common stock at artificially inflated prices, thereby reaping illicit gains of nearly $1 billion, before the market learned of the true condition of Oracle.

39. It was only on 3/1/01 that the truth about the Company was belatedly disclosed, when at that time, Oracle admitted that 3Q:01 EPS would come in at least 17% below Company guidance, that database-license revenue would come in flat at best (well below the 20% growth defendants had forecast only weeks before), that overall sales would come in $200 million below forecasts – demonstrating only 9% growth compared to the 20% Street expectation – and that the growth in Oracle's applications business of enterprise and front-office software would be at least 25% below expectations. This disclosure, however, shocked the market, causing Oracle's stock to decline to as low as $15.75 per share before closing at $16.88 per share on 3/2/01, the first trading day following the release of Oracle's 3Q:01 results. The net effect of defendants' illegal course of conduct was to inflict billions of dollars of damage on Oracle's public shareholders, as over *$90 billion* in market capitalization disappeared since the time the insiders liquidated their personally held Oracle stock, the price of which had fallen over 50% from a high of $35 per share reached in 1/01.

B. **Substantive Allegations.**

40. On or about 12/14/00, subsequent to the release of its 2Q:01 results, defendants Ellison and Henley held a conference call for analysts, money and portfolio managers, institutional investors and large Oracle shareholders to discuss Oracle's 2Q:01 and projected 3Q:01 results, and its prospects. During this conference call - and in the follow-up one-on-one conversations with analysts - defendants Ellison and Henley stated:

- Oracle would report 3Q:01 EPS of $0.12, a 33% increase over 3Q:00.

- Customers were favoring Oracle's fully integrated software suites versus piecing together different systems from different vendors, and that increase in demand for Oracle's suite offering would more than offset any slowdown in overall marked demand for enterprise or database software products.

- Oracle's application business of enterprise and front-office software products was expected to grow 75% in 3Q:01.

- Database sales were expected to grow at least 20% in 3Q:01.

- Overall licensing growth of 25% was expected in 3Q:01.

- Total 3Q:01 revenue growth of 15%-20% was conservative.

- No programming systems integration work was "necessary" to implement the 11i Suite.

41. As anticipated by defendants, these strong projections of phenomenal 3Q:01 growth had the effect of artificially inflating the price of Oracle shares, and in the days immediately after these bullish predictions were made shares of Oracle stock increased 17.9%, reaching a high of $32.44 on 12/18/00 - adding nearly $28 billion to Oracle's market capitalization.

- 24 -

42.   By the second week of 1/01, a report of an economic
slowdown began to put downward pressure on Oracle's shares.  At
this time, Oracle repeatedly denied that the economic slowdown
highlighted in this report was having any impact on its business.
Thus, on 1/11/01,  defendant Ellison directed Oracle spokeswoman
Stephanie Aas to publicly rebut any suggestion that the economic
slowdown would negatively impact Oracle.  At that time, Ms. Aas
told analysts and reporters that *Oracle had seen no signs that its
business was being hurt by the economic slowdown*.  Additionally,
Ms. Aas specifically *denied that Oracle's customers had notified
the Company of any reported cuts to their information technology
budgets*.

43.   On 1/16/01, Edward J. "Sandy" Sanderson, Jr., a Vice
President of the Company, discussed Oracle's future with Joe
Bousquin of *TheStreet.com* following Oracle's "B2B Day" at its
Redwood Shores executive offices.  During that interview, Sanderson
confirmed that Oracle's 3Q:01 was tracking according to plan -
including Oracle's orders from customers - stating: "Our pipelines
are strong."  The statements made by Sanderson and published in
*TheStreet.com* had the immediate effect of sending Oracle shares
even higher, to over $34 per share on 1/17/01.

44.   With Oracle shares trading well above $30 per share, and
knowing that this artificial inflation could not be sustained
beyond the release of 3Q:01 results, between 1/22/01 and 1/31/01,
defendant Ellison raced to the market to dump over 29 million
shares of his personally held Oracle stock for prices as high as

- 25 -

$32 to reap illicit proceeds of over $894 million.   While 29 million shares may only represent a fraction of Ellison's holdings, he cleverly calculated  that the sale of this amount would be enough to allow him to reap almost $1 billion, yet not too much where he would scare other investors into liquidating their positions, thereby jeopardizing the remainder of his holdings.

45.  On 2/9/01, Oracle shares fell 13%, leading other computer software-related stocks lower, as rumors circulated that Oracle's 3Q:01 earnings would suffer as economic growth continued to slow. Defendants immediately sought to halt the decline in the price of Oracle stock and directed spokeswoman Jennifer Glass to issue the following statements:

> *"We haven't changed our projections at all"*....
> *"This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy."*

46.  On 2/13/01, Sanderson appeared at an analyst conference hosted by Goldman Sachs at which he too affirmatively rebutted speculation that Oracle's 3Q:01 would fall short of Company sponsored projections.  Immediately following the conference, Joe Bousquin of *TheStreet.com*, issued a report, dated 2/13/01, which reiterated Oracle's Q3:01 guidance and explained that Oracle was not being affected by adverse market conditions and that the Company was actually seeing an acceleration of new purchases:

> *As an example, [Sanderson] said one recent deal he's involved in wasn't scheduled to close until Oracle's fourth quarter, which ends in May.  Instead, that deal should now close shortly.*

- 26 -

*"I met with the COO and he decided he wanted to do it in February* [instead of May]," Sanderson said.

\*          \*          \*

*Sanderson said its database and application software businesses are strong.*

*"Actually, our pipelines around applications and database have never been stronger,"* Sanderson said.

47.   On 2/13/01, George Roberts, Oracle's Executive Vice President of North American Sales, discussed Oracle's 3Q:01 earnings and revenue projections as well as the general state of its business at the Robertson Stephens Technology Conference in San Francisco.   Here, again, Roberts confirmed that Oracle's previous guidance of 3Q:01 EPS was on target and that the Company was poised to report earnings of $0.12 when it announced 3Q:01 results in the upcoming two weeks. According to Roberts, "[Oracle was then] seeing *accelerating* applications growth."

48.   In response to these statements and confirmation of Oracle's "strong" application and database business, and the fact that, according to Oracle, those lines of business "[had] never been stronger," Oracle shares spiked 12%, trading above $25 per share on 2/14/01.

49.   Between 2/21 - 23/01, defendants Ellison and Henley again met with **analysts**, money and portfolio managers, institutional investors and large Oracle shareholders at the AppsWorld Conference in New Orleans, Louisiana where they again confirmed that Oracle was poised to meet  its 3Q:01 projected results, and that its business remained solid and its prospects unchanged.   During the

- 27 -

meetings - and in the follow-up one-on-one conversations with analysts - defendants Ellison and Henley stated:

- Oracle would report fiscal 3Q:01 EPS of $0.12.

- Applications sales were accelerating during fiscal 3Q:01 and would continue to do so through the end of FY:01.

- Oracle's margins were materially expanding and could be expected to continue to do so through the end of FY:01.

- Oracle was experiencing rapid growth in its server licensing business.

- Oracle would report 3Q:01 revenue of in line with previous guidance.

- Oracle would report FY:01 EPS of $0.49 - $0.12 in fiscal 3Q:01 and $0.18 in fiscal 4Q:01.

- Oracle was seeing no impact on its business or operations as a result of any purported slowdown in the U.S. economy.

## ORACLE'S TRUE FINANCIAL CONDITION IS BELATEDLY DISCLOSED

50.  On 3/1/01, Oracle shocked the market by revealing for the first time that, contrary to prior assurances by defendants of Oracle's continuing "strong" revenue and EPS growth, including defendants' assurances less than two weeks earlier that demand remained strong, Oracle would post revenue and EPS *far below the guidance given by defendants*. According to defendants, EPS would come in at least 17% below Company guidance, database-license revenue would come in flat at best (well below the 20% growth defendants had forecast only weeks before), overall sales would come in $200 million below forecasts - demonstrating only 9% growth compared to the 20% Street expectation - and the growth in Oracle's applications business of enterprise and front-office software would be at least 25% below expectations.

- 28 -

51. This disclosure shocked the market, causing Oracle's stock to decline to as low as $15.75 per share before closing at $16.88 per share on 3/2/01, the first trading day following the release of Oracle's 3Q:01 results. The net effect of defendants' illegal course of conduct was to inflict billions of dollars of damage on Oracle's public shareholders, as over $90 billion in market capitalization disappeared since the time the insiders liquidated their personally held Oracle stock, the price of which had fallen over 50% from a high of $35 per share reached in 1/01.

52. Each of the statements made by defendants between 12/00 and 3/1/01 were false and materially misleading when issued, and were known to be false or were recklessly or negligently disregarded as such, for the following reasons:

(a) It was false to claim that demand for Oracle's products was not being adversely affected by adverse market conditions, when Oracle knew or disregarded that many of its former customers were going out of business or adopting defensive business strategies which no longer included making large investments in enterprise and/or database software products and that, as a result, Oracle's customers were becoming increasingly unable to pay for Oracle's products;

(b) Growth in Oracle's business-application software line would be only two-thirds of the growth stated by defendants;

(c) Growth in Oracle's database software, the Company's "cash cow," would be **zero** as compared to the 20%-25% growth stated by the defendants;

- 29 -

(d)   Revenue would not meet or exceed Company guidance for 3Q:01 as the Company was experiencing a revenue shortfall of at least $200 million for the quarter;

(e)   Of the customers who were not scaling back on their software purchases, many Oracle customers were refusing to upgrade to Oracle's new system 11i due to the instability of this product. As these customers had become aware, certain pieces of the new Oracle system were suffering from giant gaps, including gaps in its CRM modules that defendants failed to correct with  code patches;

(f)   Customers were also not ordering Oracle's new 11i software because they were aware that substantial programming systems integration work was required to implement the 11i Suite into their existing Oracle systems and applications, thereby rendering the Suite undesirable to Oracle's customers; and

(g)   As a result of (a) through (f) above, it was impossible for defendants to achieve 3Q:01 EPS and revenue of $0.12 and $2.9 billion, respectively.

53.   In addition to the foregoing, immediately following the announcement of Oracle's 3Q:01 results, the financial press reported on the inconsistencies that existed between the guidance given, as late as the prior week, and the actual results announced, as follows:

- *SmartMoney.com* (3/2/01):

CHIEF EXECUTIVE Larry Ellison has been known to make outrageously bold statements from time to time, some of which have come back to haunt him. Unfortunately, that trait seems to have rubbed off on the folks who work with him.

- 30 -

Back in December, Oracle Chief Financial Officer Jeff Henley said the enterprise-software company was unfazed by slowing personal-computer sales and a downshifting U.S. economy in general. "All tech companies are not the same," Henley said after Oracle had issued a solid second-quarter earnings report. "We're much more immune to economic factors than others."

If by "more immune" he meant "more oblivious to," we'd agree. After the close on Thursday, the world's second-biggest software company (after Microsoft) issued its first earnings warning of the new millennium.... That news, and the lack of future guidance, caused a slew of analysts to lower earnings estimates, downgrade Oracle's stock, or both.

Shortly after Henley ate his words, investors cut their losses, sending shares plunging 21%, to $16.88 on Friday. Not that the sell-off was unprecedented; investors had already sent the stock down 38% between Jan. 19 and the close of trading Thursday.

*      *      *

"This is a really tough quarter," says Mark Murphy, an analyst at FAC\Equities. While he says he expected Oracle to issue an earnings warning, he didn't anticipate that the revenue results would be as gruesome as they turned out to be.

Murphy doesn't hold out much hope for Oracle shares in the short term, either. During bad times such as the mid-1980s, the company has traded at a price-to-earnings ratio of less than 18 - far lower than today's still-lofty P/E of 33. Murphy doesn't think Oracle's multiple will fall to 18, but he wouldn't be surprised if it touched 23, which would make for a $12 stock based on Murphy's revised earnings estimates.

- *Reuters* (3/01/01):

''We're seeing a very substantial slowdown in the U.S. economy that is making people cautious in all of their spending, including spending for software,'' Oracle Chairman and Chief Executive Larry Ellison told Reuters.

Oracle said its formerly bullish forecasts began to crumble when senior executives in the United States were reluctant to give final approvals as Oracle pushed to close sales for its fiscal third quarter, which ended on Wednesday.

*     *     *

"As long as the economy doesn't get worse, we think we're going to be just fine.  We think we're better equipped to deal with the slowdown than any other company on earth," Ellison said.

[Credit Suisse First Boston] Analyst [Brent] Thill, however, sees more disappointment to come.

He said the software industry has been in a slump for the past six months but stock prices haven't bottomed out yet.

Thill said he would not be surprised if shares of some software companies slide another 15 percent to 25 percent.

"I don't know what's going to fix this," [Mark] Verbeck [Senior Analyst, Epoch Partners] said.

• *TheStreet.com* (3/1/01):

After saying for months that its business wasn't feeling the impact of an economic slowdown, Oracle said Thursday that revenue and earnings would fall short of consensus estimates for its just-ended fiscal third quarter.  The culprit?  Last-minute deals falling through because of the economy, stupid.

*     *     *

Company executives were bullish in their estimates up and down Wall Street in the days leading up to the warning.  Not only did Oracle executives give bullish presentations at investment conferences two weeks ago, the company sharpened its horns at its AppsWorld users' conference last week in New Orleans.

"I had dinner with Jeff Henley at the New Orleans event," said Jim Pickrel, an analyst at J.P. Morgan H&Q, who had a buy rating on the stock as of Thursday evening. "Any chance he had to introduce a hedge clause into the conversation, he [didn't take].  Things change fast, and I'm certainly not ruling out the scenario as they laid it out, but that still creates surprise."  (J.P. Morgan H&Q hasn't done underwriting for Oracle.)

There will likely be a lot of sore ears on Wall Street Friday as investors demand to know how company officials could have so thoroughly failed to detect

- 32 -

imminent problems.  Henley, Oracle's CFO for a decade,
sounded a *mea culpa* in an interview with *TheStreet.com.*

## INSIDER TRADING

54.  During the relevant period, Oracle insiders exercised and
sold the following amounts of their Oracle stock while in
possession of material adverse information about Oracle's business,
operations and financial condition which they knew had not been
disclosed to the public:

| DATE | INSIDER | | ACTION | SHARES | PRICE ($) | VALUE ($) |
|---|---|---|---|---|---|---|
| 12/27/00 | Ellison, Lawrence J. | CEO | Exercised | 815,000 | 0.23 | 187,450 |
| 1/22/01 - 1/29/01 | Ellison, Lawrence J. | CEO | Exercised | 22,232,000 | 0.23 | 5,113,360 |
| 1/22/01 - 1/31/01 | Ellison, Lawrence J. | CEO | Sold | 29,084,576 | 30.03 - 32.01 | 894,802,664 |
| 1/30/01 - 1/31/01 | Nussbaum, Jay | VP | Exercised | 90,000 | 3.79 | 341,100 |
| 1/30/01 - 1/31/01 | Nussbaum, Jay | VP | Sold | 90,000 | 30.00 - 31.44 | 2,762,400 |
| 1/17/01 | Boskin, Michael J. | D | Exercised | 150,000 | 1.44 | 216,000 |
| 1/17/01 | Boskin, Michael J. | D | Sold | 150,000 | 33.58 | 5,037,000 |
| 1/4/01 | Cooperman, Daniel | O | Exercised | 5,000 | 4.44 | 22,200 |
| 1/4/01 | Cooperman, Daniel | O | Sold | 5,000 | 33.00 | 165,000 |
| 1/4/01 | Henley, Jeffrey O. | VP | Exercised | 1,000,000 | 1.04 - 1.69 | 1,174,048 |
| 1/4/01 | Henley, Jeffrey O. | VP | Sold | 1,000,000 | 32.31 | 32,310,000 |
| 1/3/01 | Lucas, Donald L. | D | Exercised | 150,000 | 3.69 | 553,500 |

- 33 -

| DATE | INSIDER | | ACTION | SHARES | PRICE ($) | VALUE ($) |
|------|---------|---|--------|--------|-----------|-----------|
| 1/3/01 | Lucas, Donald L. | D | Sold | 150,000 | 30.98 | 4,647,000 |
| 12/19/00 - 12/21/00 | Giacoletto, Sergio | VP | Exercised | 60,000 | 4.07 | 244,200 |
| 12/19/00 - 12/21/00 | Giacoletto, Sergio | VP | Sold | 60,000 | 29.00 - 33.00 | 1,864,660 |
| 12/19/00 | Rozwat, Charles | VP | Exercised | 100,000 | 3.79 | 379,000 |
| 12/19/00 | Rozwat, Charles | VP | Sold | 100,000 | 32.00 | 3,200,000 |

55.   The nature and timing of these insider sales was highly suspicious given their proximity to the release of significantly disappointing 3Q:01 results, and the fact that they occurred during the time that Oracle stock had been artificially inflated by the false and materially misleading statements made by defendants.

56.   As evidenced by the foregoing, the Individual Defendants breached their fiduciary duties to Oracle, committed gross mismanagement, abused their control of Oracle, and have been unjustly enriched, by, *inter alia*, knowingly, willfully, and/or intentionally:

(a)   causing Oracle to engage in the misconduct set forth herein;

(b)   failing to supervise adequately and concealing from the public the true facts concerning the operations of Oracle and the true effects the downturn in the Internet economy was having and would continue to have on Oracle;

(c)   failing to supervise adequately the employees and officers of Oracle and failing to instruct them to act with honesty

- 34 -

and integrity in order to preserve and enhance Oracle's reputation in the business community;

(d)  exposing Oracle to potential liability, lost earnings, lost future earnings and lost goodwill as a result of their misrepresentations and their attempt to conceal the damage to Oracle;

(e)  failing to institute legal action against those responsible for causing Oracle to engage in the deceptive practices in violation of state and federal securities laws and thereby exposing Oracle to liability and other financial injury resulting therefrom;

(f)  causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing Oracle to liability in the above-mentioned securities litigation;

(g)  failing to ensure that Oracle's public statements conformed with the federal and state laws; and

(h)  engaging in a fraud upon the investment community by making false and materially misleading statements concerning the true financial and operational condition of the Company by drafting or disseminating or approving of the public dissemination of Oracle's press releases and other public statements, as well as reports and SEC filings, which were materially false and misleading and failed to disclose adverse information about, *inter alia*, the Company's financial condition and exposure to risk of loss and

actual losses related to the slowdown in demand for enterprise or database related software or services.

57.   The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Oracle, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Oracle and the financial benefits that flow therefrom.

58.   In order to facilitate and to attempt to conceal their wrongdoing, the defendants have caused Oracle to maintain an inadequate system of internal financial and accounting controls such that Oracle's assets have not been reasonably safeguarded against misuse.

59.   Oracle's Board of Directors operated as a collective entity through periodic meetings held either in person or telephonically where the Board discussed matters affecting its business and reached collective and consensual decisions as to what action to take.

60.   As a result of the Individual Defendants' wrongful and illegal actions, including their abuse of control and their unjust enrichment, defendants' violations of state and federal securities laws, and the failure to maintain a system of internal financial and accounting controls adequate to ensure the preservation of the Company's assets (including both tangible and intangible assets),

Oracle has suffered considerable damage to and drastic diminution in value of its tangible and intangible assets.

61.  Oracle will expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include but are not limited to:

(a)  Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)  Costs and legal fees for defending Oracle, its officers and its directors against private litigation arising from the illegal and improper conduct alleged herein.

<u>**FIRST CAUSE OF ACTION**</u>

**Against All Defendants**
**<u>for Intentional Breach of Fiduciary Duty</u>**

62.  Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 61 above, as though fully set forth herein.

63.  The Individual Defendants knowingly, willfully, and/or intentionally disregarded the fact that they were engaged in a scheme to gain control over the Company by issuing false and materially misleading statements to investors and analysts.  The Individual Defendants knew that if they disclosed the facts set forth above concerning Oracle's earnings, and the true effects that the slowdown in demand for Oracle products and services was having on the Company, the disclosures would have impaired the value of Oracle stock and would have prevented Ellison, Henley, Lucas and Boskin, as well as the other non-director insiders, from selling

tens of millions of shares of Oracle common stock and reaping nearly $1 billion in illicit proceeds.

64. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Oracle's operations, financial condition and earnings. The Individual Defendants instead concealed their wrongdoing and, as a result thereof, disseminated false and misleading statements and reports about Oracle.

65. As a result of the foregoing misleading reports and statements made in violation of federal and state securities laws, Oracle is the subject of major law suits by defrauded investors, has had its reputation in the business community tarnished and has been damaged in an as yet uncertain amount.

66. The Individual Defendants, in their roles as executives and directors of Oracle, participated in the acts of mismanagement alleged herein, and knowingly, willfully, and/or intentionally disregarded adverse facts known to them, and did nothing to reveal them. They thereby breached their fiduciary duties of care, loyalty, accountability and disclosure to Oracle and its shareholders and have exposed Oracle to liability from, *inter alia*, shareholder suits brought on behalf of purchasers of Oracle shares.

67. The Individual Defendants each owed a fiduciary duty to Oracle to monitor Oracle's accounting and disclosure procedures and to ensure that they were performed in a competent and professional manner. These defendants failed to fulfill that fiduciary duty and

permitted Oracle to violate the law through misrepresenting Oracle's operations and future prospects and by providing false and misleading revenues and earnings guidance to investors.

68. The Individual Defendants owed a fiduciary duty to supervise the issuance of Oracle's public statements and filings to ensure that they conformed with federal and state law. The defendants breached their fiduciary duty by failing to properly supervise and monitor Oracle's business practices and the adequacy of its internal financial controls and by allowing misleading statements and filings to be made and disseminated. As a result of this failure, including the failure to disclose on a timely basis materially adverse information about Oracle's condition, these defendants have caused Oracle to be subject to law suits filed by purchasers of Oracle securities who suffered losses as a result of the defendants' misconduct.

69. The defendants each further owed a fiduciary duty to Oracle and to Oracle's stockholders to seek redress from those whose conduct has and will cause the Company to expend its assets and whose conduct has otherwise precipitated the securities law class actions. The defendants have not done so.

70. The conduct outlined herein was not due to an honest error of judgment, but rather, to the Individual Defendants' bad faith and was done knowingly, willfully and/or intentionally.

71. The defendants have breached and/or aided and abetted breaches of fiduciary duties owed to Oracle and its shareholders.

- 39 -

72. As a direct result of the defendants' conduct and Oracle's disclosure procedures, Oracle has suffered and will continue to suffer damages in the form of liability to, *inter alia*, purchasers of Oracle stock in securities law suits and damage to Oracle's reputation and goodwill.

73. The Individual Defendants' conduct constituted an abuse of their ability to control and influence Oracle for which they are legally responsible.

74. As a result of the tortious conduct described above, the Individual Defendants have made, or aided and abetted the making of, numerous misrepresentations to and concealed material facts from Oracle and its shareholders despite the defendants' fiduciary duties to, *inter alia*, disclose the true facts regarding their stewardship of Oracle and defendants' true intentions, and thus have committed and/or aided and abetted constructive fraud.

75. The public representations discussed above were false and materially misleading as earlier alleged.

76. For the purpose of gaining control over Oracle and/or attempting to conceal their wrongdoing long enough to sell nearly $1 billion worth of their privately held Oracle stock while in possession of material adverse information and during the time when shares of the Company continued to trade at artificially inflated levels, and to continue receiving the substantial benefits and salaries associated with their positions, and with the intent to deceive shareholders, the defendants employed the above-detailed conspiracy to defraud. As a part of this conspiracy, these

defendants actively made or concealed, and/or participated in the making of or aided and abetted the making or perpetration of the concealment of, numerous omissions and misrepresentations of facts regarding Oracle to shareholders, as more fully set forth above. Said representations and statements were untrue and the defendants did not believe them to be true when made, or knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations. Said acts by the defendants were fraudulent, oppressive and malicious.

77. As a direct and proximate result of the foregoing, plaintiff and other shareholders reasonably relied upon the honesty and integrity of the Individual Defendants as corporate officers and directors and were induced to act upon such misrepresentations, and have been damaged, entitling Oracle's shareholders to compensatory and punitive damages.

78. As a direct result of the defendants' conduct and Oracle's disclosure procedures, Oracle has suffered and will continue to suffer damages in the form of liability to, *inter alia*, purchasers of Oracle stock in securities law suits and damage to Oracle's reputation and goodwill.

### SECOND CAUSE OF ACTION

#### Against All Defendants for Negligent Breach of Fiduciary Duty and Gross Mismanagement

79. Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 78 above, as though fully set forth herein.

80. Each of the defendants engaged in and/or aided and abetted the aforesaid conduct without exercising the reasonable and ordinary care which he or she, as a fiduciary, owed to Oracle and its shareholders, and has thereby negligently breached and/or aided and abetted breaches of fiduciary duties to Oracle and its shareholders.

81. As detailed more fully herein, the defendants each have and had a duty to Oracle and its shareholders to prudently supervise, manage and control Oracle's operations.

82. The defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of Oracle in a manner consistent with the operations of a publicly held corporation.

83. By subjecting Oracle to the unreasonable risk of liability by engaging in the fraud described herein and/or by concealing this fraud and its effect on Oracle's profitability, the Individual Defendants breached their duties of due care and diligence in the management and administration of Oracle's affairs and in the use and preservation of Oracle's assets.

84. The Individual Defendants caused the Company to engage in this misconduct and were aware of the problems and probable losses associated therewith. During the course of the discharge of their duties, these defendants knew or should have known of the unreasonable risks, yet these defendants caused Oracle to engage in this scheme which these defendants knew had an unreasonable risk of

material loss to Oracle, thus breaching their duties to both Oracle and its shareholders. As a result, the Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Oracle and its assets by causing it to perpetrate a fraud which the Individual Defendants knew would likely lead to material and substantial restatements and losses.

85. As a direct result of the defendants' conduct and Oracle's disclosure procedures, Oracle has suffered and will continue to suffer damages in the form of liability to, *inter alia*, purchasers of Oracle stock in securities law suits and damage to Oracle's reputation and goodwill.

**THIRD CAUSE OF ACTION**

**Unjust Enrichment and Misuse
of Corporate Assets**

86. Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 85 above, as though fully set forth herein.

87. As a result of the foregoing conduct, defendants have caused Oracle to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars or even billions of dollars in damages, as well as significant legal defense fees.

88. As a result of defendants' conduct described above, and as a result of the huge profits realized in illegal insider trading, many of the defendants have been unjustly enriched at the expense of Oracle and/or have aided and abetted the unjust enrichment of the remaining Individual Defendants.

- 43 -

89. Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Oracle. A constructive trust for the benefit of Oracle and its shareholders should be imposed thereon.

90. As a direct result of the defendants' conduct and Oracle's disclosure procedures, Oracle has suffered and will continue to suffer damages in the form of liability to, *inter alia*, purchasers of Oracle stock in securities law suits and damage to Oracle's reputation and goodwill.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Oracle, demands judgment as follows:

A. Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to Oracle, abused their control, grossly mismanaged Oracle, unjustly enriched themselves and committed constructive fraud;

B. Requiring the Individual Defendants to pay Oracle the amounts by which the Company has been damaged by reason of the conduct complained of herein;

C. Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.   Granting such other and further relief as this Court may deem just and proper.

Dated:  March 12, 2001

TAYLOR & McNEW LLP

By:

R. Bruce McNew
3711 Kennett Pike, Suite 210
Greenville, DE  19807
Telephone:  302/655-9200

ATTORNEYS FOR PLAINTIFF

OF COUNSEL:

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

CAULEY, GELLER, BOWMAN
  & COATES, LLP
STEVEN E. CAULEY
11311 Arcade Drive, Suite 200
Little Rock, AR  72212
Telephone:  501/312-8500

- 45 -