EFiled:  Dec  2 2004  2:12PM EST
Filing ID 4710267

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| IN RE ORACLE CORP. DERIVATIVE LITIGATION | ) ) ) ) | Consolidated C.A. No. 18751 |

OPINION

Date Submitted:  September 3, 2004
Date Decided:  November 24, 2004
Date Revised:  December 2, 2004

Robert D. Goldberg, Esquire, Victor Battaglia, Esquire, BIGGS & BATTAGLIA, Wilmington, Delaware; Karen L. Morris, Esquire, R. Michael Lindsey, Esquire, MORRIS & MORRIS, LLC, Wilmington, Delaware; Joseph J. Tabacco, Jr., Esquire, Nicole Lavallee, Esquire, Elizabeth Guarnieri, Esquire, BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO, San Francisco, California; Dario de Ghetaldi, Esquire, COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI, LLP, Millbrae, California; Robert B. Weiser, Esquire, Robin Winchester, Esquire, Eric L. Zagar, Esquire, SCHIFFRIN & BARROWAY, Bala Cynwyd, Pennsylvania, *Attorneys for Plaintiffs.*

Kenneth J. Nachbar, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Alan N. Salpeter, Esquire, Javier H. Rubinstein, Esquire, Sheri L. Drucker, Esquire, MAYER, BROWN, ROWE & MAW, LLP, Chicago, Illinois; Donald M. Falk, Esquire, John Nadolenco, Esquire, Christopher P. Murphy, Esquire, Shirish Gupta, Esquire, MAYER, BROWN, ROWE & MAW, LLP, Palo Alto, California, *Attorneys for Defendants Lawrence J. Ellison and Jeffrey O. Henley.*

Allen M. Terrell, Jr., Esquire, Brock Czeschin, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Jordan Eth, Esquire, MORRISON & FOERSTER, San Francisco, California, *Attorney for Oracle Corporation.*

David C. McBride, Esquire, Christian Wright, Esquire, Adam Poff, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; James G. Kreissman, Esquire, SIMPSON, THACHER & BARTLETT, Palo Alto, California, *Attorneys for the Special Litigation Committee of Nominal Defendant Oracle Corporation*

**STRINE, Vice Chancellor**

This derivative action involves a claim that two of the top officers at Oracle Corporation breached their fiduciary duty of loyalty to the company by selling stock in the company at a time when they possessed material, adverse, nonpublic information about the company.  The plaintiffs thus raise a claim under the venerable case of *Brophy v. Cities Service Co.*[1]  Defendant Lawrence J. Ellison is Oracle's largest stockholder and was its Chairman of the Board and Chief Executive Officer at the time of the events relevant to this case.  Defendant Jeffrey O. Henley was Oracle's Chief Financial Officer and director at the time of the complaint.

Ellison and Henley are alleged to have sold large amounts of Oracle stock in January 2001 — albeit amounts that were only a small percentage of their total Oracle holdings — while in possession of information that, according to the plaintiffs, suggested that Oracle would be unlikely to meet its publicly-announced revenue and earnings projections for that quarter, which was to end on February 28, 2001.  Those projections — the "Market Estimates" — had indicated that Oracle would increase its FY 2001 third quarter "3Q 01" license revenues "about 25%" over the comparable quarter in the previous year, "3Q 00," and would earn 12 cents per share.[2]  As it turned out, Oracle fell far short of those projections, delivering license revenue growth of only 5% and earnings of only 10 cents per share[3] — results that moved Oracle's stock price sharply downward. According to the plaintiffs, Ellison and Henley both possessed material financial

---

[1] 70 A.2d 5 (Del. Ch. 1949).

[2] DX 83.  Both parties have submitted extensive evidence.  For ease of reference, Plaintiffs' and Defendants' exhibits will be referred to as "PX ___" and "DX ___," respectively.  Similarly, the charts summarizing the evidence that both parties submitted will be referred to as "PC ___" and "DC ___."

[3] DX 87.

information before their January 2001 trades that should have led them to recognize that Oracle would not meet the Market Estimates.  Having sold shares at prices materially in excess of Oracle's market price after Oracle disclosed that it would not meet the Market Estimates, Ellison and Henley allegedly reaped ill-gotten gains that the plaintiffs say should be returned to Oracle.

The case is now before the court on a summary judgment motion.  After a review of the massive record, I conclude that Ellison and Henley are entitled to summary judgment.  In keeping with prior Delaware precedent, I conclude that Ellison and Henley can only be held liable if they acted with scienter, by trading, in whole or in part, because they possessed adverse, nonpublic information that made it likely that Oracle would fall materially short of the Market Estimates.  Contrary to the plaintiffs, I conclude that no rational trier of fact could find that:  1) Ellison or Henley possessed material, nonpublic financial information as of the time of their trades; or 2) Ellison or Henley acted with scienter, by consummating trades in part because they believed, on the basis of the nonpublic information they had received, that Oracle would materially fall short of the Market Estimates.  As a result, I find that even if *Brophy v. Cities Service Co.* remains good law, this case should be dismissed.

The grounds for this decision are fully set forth in the later pages of this opinion but can be summarized as follows:

- The conservative bias of Oracle's financial projection system, which resulted in estimates of earnings and license revenue growth that were more likely to be low than high.  There is no evidence to cast doubt on the integrity of Oracle's estimation process.  Within this

process, the estimates of Oracle executive Jennifer Minton were historically the most accurate and given the most weight;

- Oracle's best estimates of its 3Q 01 results at the time of Henley's and Ellison's trades, which continued to predict that the company would either exceed or meet the Market Estimates;

- The lack of any record evidence that Henley or Ellison had been informed as of the time of their trades by any subordinate in the company that the company was not in a position to meet or even exceed the Market Estimates;

- The reality that well over a majority of Oracle's quarterly income is generated within the last month of the quarter, and that most of the last month's revenue is generated in the last week of the quarter.

- The undisputed evidence that Oracle's 3Q 01 prospects weakened substantially in the last month of the quarter (February 2001), the month following the completion of trading by Henley and Ellison, largely due to customers refusing to close deals in the final days of the quarter;

- The evidence that even with that weakening, Oracle's internal estimates indicated that it could possibly meet or almost meet the 12 cents estimate in the Market Estimates as late as February 12, 2001;

- The uncontradicted evidence that lower level Oracle executives were surprised and dismayed at the rapid deterioration in their units' results in the last few days of February 2001;

- The absence of any apparent exigency or rational motive that would have led Ellison or Henley — who owned huge amounts of Oracle stock — to sell small portions of their Oracle holdings because they thought Oracle's performance was declining, and the presence of other legitimate, unsuspicious reasons that explain the timing of their sales.

Taken together, the record simply will not support a rational inference of wrongdoing, even given the plaintiff-friendly standard that applies on a motion for summary judgment. At best, the plaintiffs have pointed to the existence of financial

information that might have led a rational insider at Oracle at various points in January

2001 to believe that Oracle might not meet the Market Estimates, if they had thought

about the information in the manner that the plaintiffs now do (which there is no evidence

that Ellison or Henley did) and had the benefit of hindsight (which Ellison and Henley

did not).  Of course, the reality is that public companies often possess intraquarter

information that suggests that meeting quarterly projections is not certain or may even be

doubtful.  That is inherent in the nature of projections, which are not warranted

guarantees.  In fact, the record indicates that Oracle had previously succeeded in meeting

quarterly estimates in quarters when the company's information, as of the second month

of the quarter, was bleaker than that possessed in January 2001 as to the likely results of

3Q 01.

　　　　Most important, the undisputed evidence is that Ellison and Henley were presented

with their subordinates' best estimates of 3Q 01 performance throughout January 2001

and that every projection until January 29, 2001 — when Henley was long done trading

and Ellison was nearly done — predicted that Oracle would exceed the Market Estimates.

Even the January 29, 2001 projections showed Oracle earning 11.58 cents per share and

having license revenue growth of 24%, which given Oracle's practice of rounding up and

its revenue estimate of "about 25%" growth, were projections that, if achieved, still

would have met the Market Estimates exactly.  Put bluntly, although Ellison and Henley

had less reason to be confident that the company would meet the Market Estimates as of

the end of January 2001, there is no rational basis to question their stated belief that they

thought they would because that belief was based on the best advice of their subordinates,

which indicated that the company was positioned to do so.  In other words, there simply existed no nonpublic information as of the relevant dates that reliably predicted that Oracle would fall materially short of the Market Estimates.

In sum, after receiving huge amounts of documentary evidence and taking several depositions, the plaintiffs have failed to turn up evidence that supports a rational inference that Ellison or Henley abused their positions of trust at Oracle by exploiting material, adverse financial information in order to sell their stock at artificially inflated prices.  Absent such evidence, the plaintiffs have no triable claim under *Brophy*.

## I.  Factual Background

### A.  A Comment On The Record

The evidentiary record developed in this case is massive.  The current motion practice followed previous motion practice regarding whether the recommendation of an Oracle special litigation committee ("SLC") that this case should be dismissed was entitled to deference under the *Zapata* standard.[4]  In an opinion that did not reach the merits of that recommendation, this court held that the exacting standards of independence that apply in the special litigation context were not met.[5]

The reality is that the SLC Report was highly influential to the way this case later proceeded.  For one thing, the plaintiffs have substantially changed their earlier

---

[4] *In re Oracle Corp. Derivative Litig.,* 824 A.2d 917 (Del. Ch. 2003).
[5] *Id*. at 947.

arguments, popping up new ones to replace the ones whacked by the SLC.[6]  For another, the plaintiffs reduced the focus of their attack by dropping their claims against certain other Oracle directors who sold during 3Q 01 and targeting Ellison and Henley exclusively.

Having started with a ponderous record of evidence compiled with the SLC, the parties then expanded it further.  Although given extra pages to write their brief, the plaintiffs' lawyers granted themselves even more pages by filing an affidavit of one of their number, which was simply a brief by another name containing additional arguments that did not fit within their 80 page answering brief.  I struck the submission as an affidavit but permitted it to be treated as an additional brief and gave the defendants a corresponding additional brief.  More onerously, the plaintiffs submitted an unwieldy array of appendices, broken down into four varieties, totaling over forty volumes.

The defendants, by modest contrast, confined themselves to submitting a smaller, but still very substantial, number of pages to support their motion for summary judgment. Taken together, the plaintiffs' and defendants' submissions come close to an all-evidence dump of discovery.

In approaching this record, my focus is where I told the plaintiffs it would and must be:  on what information Ellison and Henley possessed at the relevant times.  That

---

[6] A reading of my prior opinion is suggestive of the differences.  *See In re Oracle Corp. Derivative Litig,* 824 A.2d 917 (Del. Ch. 2003).  The defendants have abandoned those theories that did not pan out after the SLC developed an extensive factual record and additional discovery was taken.  Oddly, as this case was being argued at the summary judgment stage, a federal complaint relying upon theories more like the original complaint in this case was reinstated by the United States Court of Appeals for the Ninth Circuit. *Nursing Home Pension Fund, Local 144 v. Oracle Corp., et al.,* 380 F.3d 1266 (9th Cir. 2004).  This opinion, of course, addresses only the arguments made in this case in the summary judgment briefs.

focus is designed to illuminate whether there is evidence from which a rational fact-finder could conclude:  1) that Ellison or Henley possessed material, nonpublic information at the time of their trades in 3Q 01; or 2) that their possession of material, nonpublic information motivated, in whole or part, their trades in 3Q 01.   As I will explain again later, I am focused on the evidence that exists regarding what Ellison and Henley knew, believed, and did before their trades in 3Q 01 and not on what the plaintiffs, in litigation-inspired hindsight, argue that Ellison and Henley should have done, but did not do, to analyze the information they received before their trades.

## B.  Overview of Oracle Corporation

Oracle is the second largest software company on Earth.   It specializes in developing, making, selling, distributing, and servicing computer software that helps businesses, government agencies, and other complex organizations manage themselves.

The company was co-founded in 1977 by defendant Larry Ellison who continued to be its CEO during the events giving rise to this lawsuit.  By the end of its FY 2000 (which ended on May 31, 2000), Ellison and Oracle could look back on the company's first year with revenues in excess of $10 billion and operating income of over $3 billion.[7] That achievement topped off an impressive period of growth, with Oracle's FY 00 results showing strong growth over the revenue and operating income of $5.7 billion and $1.26 billion it achieved in FY 97.[8]

---

[7] *See* DX 77 at 10.
[8] *Id.*

This strong performance enabled Oracle to effect a two-for-one stock split in FY 00 and to see the value of its common stock increase sharply in the market, such that the mean of its low and high price for the last quarter of FY 00 had reached $37.74.[9]  As Oracle's largest stockholder, holding over 1.39 billion shares — let's underscore that — *1.39 billion shares*! — or 24% of Oracle's common stock, Ellison was one of the world's wealthiest persons.[10]  By FY 00, Ellison was taking most of his annual compensation in options, having given up most of his salary and bonus income.

By this time period, Defendant Henley had also amassed considerable personal wealth as Oracle's CFO and Executive Vice President.  In FY 00, Henley received total cash compensation of over $2.1 million plus options for a million Oracle shares.  Perhaps more pertinently, Henley also owned a large amount of Oracle stock — over 15 million shares on a split-adjusted basis.  Although this is insubstantial compared to Ellison, it is substantial relative to most millionaires, as those shares then had a value between $400 and $500 million.

As of the end of FY 00, therefore, Oracle — as well as Ellison and Henley — were riding high.  The company was thriving and its key executives were benefiting from that success.

On the horizon, however, Oracle faced the challenge of continuing to increase its revenues and operating income in the face of a slowing economy in 2000 and the bursting of the dot.com bubble.  Because many of its products are expensive, Oracle had to prove

---

[9] DX 81 at 9 of 54.
[10] *See* DX 79 at 9568.  Oracle effected a two for one stock split on October 12, 2000.  Thus, the 696,356,050 shares shown in DX 79 as of August 21, 2000 became 1.39 billion shares soon thereafter.

that it could continue to sell in a market when procurement budgets at both businesses and government agencies might narrow substantially in the short-term.  And because many dot.coms had gone bust, that sector was not positioned to continue as a growth vehicle for Oracle sales or even as a consistent source of on-going revenues.

### C.  Oracle's Sources Of Revenue

The most important driver of Oracle's profitability is its software licensing business.  In FY 00, licensing was responsible for 44% of the company's total revenues.[11]

The reason that licensing is important is that Oracle's other revenues are largely derivative of a customer's original decision to buy a license to use Oracle software.  Thus, in FY 00, Oracle derived 29% of its revenues from support services it provided to users of its software, 22% from training personnel who consult with users of its software, and 5% from providing education about the use of its software.[12]

Because licensing is so important to Oracle's business, it is the focal point of the plaintiffs' claims.  Therefore, it has also occupied the bulk of the defendants' response and will be a major focus of this opinion.

### D.  Oracle's License Revenues

The decision to invest in a major software system made by Oracle (its database product and/or its enterprise software) is no small matter for businesses and government.  These systems are expensive and will be used during a multi-year period (or so it is hoped).

---

[11] DX 81 at 11 of 54.
[12] DX 81 at 5 of 54.

These realities resulted in a pattern of revenue receipt by Oracle that is important to understand.  First of all, Oracle's license revenues tend to be lowest in the first quarter of any fiscal year, increase in the second and third quarters, and peak in the last quarter.

Second and most important, Oracle's license revenues tend to come in within the last month of each quarter, a so-called "hockey stick effect."  The analyst community is well aware of this phenomenon, and the words of one analyst well capture the writings of many who covered Oracle:  "[E]asily 50% of license revenues historically have been done in the final month of the quarter, with much of that coming in the final week of the quarter."[13]  In point of fact, that analyst statement underestimated the extent of the hockey-stick effect for Oracle.  That effect was, as I will next portray, even more pronounced.

The reason for the effect is well-understood.  Purchasers of software harbor a belief, perhaps borne of experience or superstition, that sellers will cut the best deal near the end of a quarter because they are counting on the sale to make their quarterly projections.  As a result, purchasers hold out until the end, trying to extract the last concessions before signing a binding deal.  This leads to the last-minute booking of many sales when times are good, and the potential that many deals might fall through right before quarter's end or slip into later quarters if buyers are experiencing budget pressure.  To the extent that the negative scenario is the one that pans out, there is the obvious risk that Oracle will fail to meet its quarterly earnings projection.

---

[13] DX 144 at 1110-11; *see also* DX 142, DX 143, DX 147 (reflecting analysts' awareness of the fact that Oracle's revenues tended to come in very near the end of quarters and that the ultimate numbers for any quarter were heavily dependent on that end-period).

To highlight the importance of this effect and to make later references clearer, it is useful to describe Oracle's primary license generating units. As of FY 00, Oracle's license sales force in North America was divided into three divisions. Oracle Service Industries ("OSI") handled sales to government agencies, educational institutions, and companies in the financial services, telecommunications, utilities, and health care industries. Oracle Product Industries ("OPI") sold to businesses that make products. Northern American Sales ("NAS") sold to customers not within OPI's and OSI's domain, including customers with revenues of less than $500 million annually, which included most of Oracle's dot.com clients. Taken together, OSI, OPI and NAS generated most of Oracle's license revenue, with other sources of revenues coming from Oracle sales abroad.

Now that OPI, OSI and NAS have some meaning, I return to the hockey-stick effect's importance at Oracle. Illustrative of that phenomenon is the following chart, which shows the extent to which the last month of a quarter's revenues dominate Oracle's quarterly revenues. The units other than OSI, OPI, and NAS all reflect license sales units for areas other than North America:

**Percentage of Oracle Quarterly Revenue by Month for Major Business Units (FY 01)[14]**

| Business Unit | Month 1 | Month 2 | Month 3 |
|---|---|---|---|
| OSI | 7% | 10% | 83% |
| NAS | 11% | 11% | 78% |
| OPI | 17% | 7% | 76% |
| Latin America | 17% | 29% | 53% |
| EMEA | 19% | 21% | 60% |
| Japan | 25% | 27% | 48% |
| APAC | 15% | 17% | 68% |

The third month of each quarter was also the month that delivered the most revenue for Oracle's other major revenue generating units, support and consulting, though the effect is less pronounced. Given all divisions' dependence on third month revenues, over 50% of Oracle's total revenues came in within the third month of a quarter during FY 01, as the following chart shows:

**Average Percentage of Oracle Quarterly Revenue by Business Unit and Month (FY01)[15]**

| Business Unit | Month 1 | Month 2 | Month 3 |
|---|---|---|---|
| License | 15% | 16% | 69% |
| Support | 32% | 31% | 37% |
| Consulting | 33% | 27% | 40% |
| Total | 24% | 24% | 52% |

This depiction is not atypical and reflects the continuation and deepening of a pattern that had persisted at Oracle for several years.

License revenue was typically even more compressed, with most coming in within the last week of the quarter, not just the last month, as this chart addressing FY 01 shows:

---

[14] DC 4.
[15] DC 2.

**Percentage of Quarterly License Sales by Week for OSI, NAS and OPI (FY 01)[16]**

| Week of Quarter | Percentage of Quarterly Sales | Cumulative Percentage of Quarterly Sales |
|---|---|---|
| Weeks 1-4 | 6% | 6% |
| Weeks 5-8 | 6% | 12% |
| Week 9 | 4% | 16% |
| Week 10 | 9% | 25% |
| Week 11 | 3% | 28% |
| Week 12 | 6% | 34% |
| Week 13 (or second to last week of quarter)[17] | 12% | 46% |
| Week 14 (or last week of quarter) | 54% | 100% |

In part as a result of its dependence on last month, and even last week revenues, Oracle's public disclosures as of FY 00 and 01 warned investors that "the Company's quarterly results are difficult to predict until the end of the quarter, and delays in product delivery or closing of sales near the end of a quarter have historically caused and could cause quarterly revenues and net income to fall significantly short of anticipated levels."[18]

E.  Oracle's Internal Forecasting System

Like most major American corporations, Oracle had in place systems designed to help its top management both project future performance and keep track of how well the company was doing in meeting those projections.  During the time period relevant to this case, it is fair to say that the American equity markets were quite sensitive to the quarter to quarter performance of corporations, and tended to react negatively if a corporation

---

[16] DC 5.

[17] Because 2Q 01 contained 15 weeks instead of 14, the last two entries average the penultimate weeks' results (week 14 in 2Q, but week 13 in other quarters of 2001) and the final weeks' results (week 15 in 2Q, but week 14 in other quarters of 2001).

[18] DX 80 at 87326-27; *see also* DX 78 at 83491; DX 80 at 87325; DX 77 at 86914.

generated quarterly results markedly out of line with the expectations the market harbored.  Whether or not this was economically productive for our nation is not a question I must answer, but the existence of this incentive scheme is a reality that it is relevant to acknowledge.

Like other companies, Oracle was sensitive to the incentive to meet analyst expectations and to avoid unpleasantly surprising them.  Therefore, it developed processes to develop earnings and revenue projections and monitor progress towards meeting them.  Within Oracle, many executives had responsibilities for elements of those processes.  But two executives were of paramount importance.  One was defendant Henley, who as CFO, had the key say in exactly what estimates Oracle would provide to analysts about the upcoming quarter.  The other was Oracle's Controller, Jennifer Minton, who worked within Oracle's Financial Planning and Analysis Group.

Although Oracle assembles data about its financial performance in a number of ways, it has one "primary internal forecasting document."[19]  That document is the so-called "Upside Report" that Minton prepares each Friday and circulates each Monday to a select group of Oracle executives on its "Executive Management Committee" or "EMC," a group that included Ellison and Henley.

The Upside Reports are the key documents that Henley uses to prepare for his quarterly conference call with market analysts that covers prior quarter results and provides his estimate of how Oracle will perform in the coming quarter.  Most important,

---

[19] Second Amended Complaint ¶ 32.

embedded within the Upside Reports is the best estimate that Minton has as to how Oracle will perform in the current quarter.

Because Upside Reports are the key forecasting tool of Oracle, an explanation of how they are prepared and what they contain is pertinent.  The Upside Reports are generated on a ground up basis, from projections of revenues and costs from each of Oracle's revenue and cost-generating units.  These projections estimate how each unit is likely to perform in terms of revenue generation and spending.  Minton takes those projections — which are given to her each Wednesday evening — and develops a "Forecast Projection" that aggregates the figures received from the various units into company-wide figures.

That Forecast Projection is not, however, Oracle's best estimate of its performance.  Instead, that best estimate is generated by Minton.  She takes the unit-level input she receives and uses her judgment based on other input she receives in oral conversations with other Oracle executives and from other data to come up with Upside adjustments.  These adjustments — which despite their name can be positive or negative for each unit — reflect Minton's estimate as to how each unit is likely to perform.  After Minton's Upside Adjustments are applied to the Forecast Projection, what results is a "Potential Projection."

The term Potential Projection is a misnomer, as the Potential Projection did not, as one might expect, represent an estimate of what Oracle might achieve if things went optimally well, i.e., a best case scenario.  Instead, the Potential Projection was the Financial Planning & Analysis Unit's (and Minton's) best estimate of how the current

15

quarter was likely to turn out.[20]  Historically, the Potential Projections were the internal indicator that came closest to accurately predicting Oracle's eventual performance.  By contrast, the raw Forecast Projection from the units was more inaccurate and often underestimated the actual results.[21]  Within Oracle top management, the unanimous sense was that the sales units tended to be overly conservative in forecasting, believing that it was better to exceed the unit's forecast by a good deal than it was to fail to meet a forecast given to the CEO and CFO.  For this reason, it was not unusual for Minton to adjust the unit forecasts upward.  Even these revisions tended to remain conservative (probably for similar reasons).  Relying on these revisions, Oracle had time and again met or exceeded its guidance.  For these reasons, Henley and Ellison had no prior experiences that warned that they should expect overly aggressive forecasts from the sales units — or from Minton, for that matter.

For all these reasons, I therefore refer to Potential Projections as the Best Estimates because that more accurately describes their intended purpose.

While the Upside Reports were the primary forecasting document for Oracle, they were supplemented by two other types of documents that bear mention.  The first are "Pipeline Reports."  These Reports contained detailed information from the sales units regarding the size of the Pipeline containing Oracle's developing License deals, information that included the value of the License deals that the sales units reasonably believed that they might close in the current quarter.  Notably, the Pipeline Reports

---

[20] Second Amended Complaint ¶ 32.
[21] *E.g.,* DC 34 (indicating that Minton's Best Estimate was more accurate than the Forecast Projections for each of the five quarters preceding 3Q 01 and that both were more conservative than the actual results for those quarters).

contained a variety of trend and comparative data.  Of special relevance was a

comparison of the Pipeline data (including the conversion ratio) for the same quarter in

the previous fiscal year to the current quarter.  Although Oracle at times also looked at

current quarters in comparison to the immediately previous quarter, the record is clear

that as of 3Q 01, the Pipeline Reports themselves compared the current quarter to the

same quarter in the previous year, as that was the comparison that Oracle insiders felt had

the most predictive utility.  Thus, contained within the Pipeline Reports were historical

conversion ratios, which illustrated the percentage of the Pipeline that was converted into

actual revenue in the same quarter of the prior year and indicated how much revenue

Oracle could earn in the current quarter if it converted at the prior year's level.

Like the Upside Reports, Henley and Ellison regularly received the Pipeline

Reports.  Although he later suggested something a bit different in his deposition, in his

original interview with the SLC, Ellison said he placed greater weight on Oracle's

Pipeline — which was built based on sales unit input about possible sales — than on the

Best Estimates in the Upside Reports.

It is also clear that Minton used the Pipeline estimates as part of her formulation of

the Best Estimates in the Upside Reports. The estimated Pipeline, along with Pipeline

conversion rates from the same quarter in previous years, factored into her adjustments to

the projections made by the sales units.  Likewise, this information was something that

Henley took into account as he considered how Oracle was performing.

"Flash Reports" are the other documents worth noting.  As Ellison told the SLC in

his first interview, he also examined actual sales results from each month to get a sense of

how Oracle was doing against public expectations.  The Flash Reports were produced on a monthly basis and presented updated actual results of the months within quarters. These appear to have been produced at irregular times (e.g., the 7th of one month, the 17th of the next).  Like the Pipeline Reports, they provided comparative information illustrating how the most recent month had turned out compared to the same month in the previous fiscal year.  The Flash Reports also showed how Oracle's quarter-to-date results compared to its quarterly estimate.

### F.  The Flow Of Information Leading To The Various Reports

The reports that have been mentioned constitute the key information that flowed to Ellison, Henley and the other most senior executives at Oracle, that is, those executives who were on the EMC.  These reports, however, reflect a myriad of discussions at less senior levels, particularly among sales executives below the Executive Vice President level.

As might be expected, during any quarter, there is a good deal of back and forth between executives at all levels.  What ultimately goes to the EMC, however, is distilled into the Upside, Pipeline, and Flash Reports, which serve as the primary material discussed at the EMC level.  No doubt the lower level discussions play an influential role in shaping the Reports that actually go to the EMC and the concerns expressed at the lower level often manifest themselves in discussion at the EMC.  But the mere fact that an executive below the EMC level had doubts or hopes about a particular sales target does not mean that those feelings were transmitted to the EMC members, including Ellison and Henley.

Additionally, it should not be assumed that the documents that went to the EMC were studied to death by Ellison and Henley.  The full Upside Reports were distributed at the beginning and then collected at the end of EMC meetings.[22]  Not every member of the EMC even gets a full copy, although Ellison and Henley did.  But the important point is that the sort of painstaking retrospective analyses that plaintiffs' counsel have performed on various data within the Upside Reports is quite dissimilar to the use made of those reports by EMC members at the time.  The same is also true of the Pipeline Reports and the Flash Reports.  In the same vein, the plaintiffs' micro-focus on particular sales units is inconsistent with top management's key focus, which was on the company's overall performance.

G.  Oracle's Success In Meeting Its Earnings Projections

Despite the fact that its revenues tended to come in quite close to the end of quarters, Oracle had successfully met its earnings projections in every quarter from 1998 through 2Q 01.  Although in several quarters, Oracle started off weakly, its end of quarter performance was always strong enough to push it to the estimated level of earnings.

H.  The 3Q 01 Guidance Oracle Gave The Market On December 14, 2000

In early December 2000, Henley began to develop the projections that Oracle would make for the coming quarter, 3Q 01.  He used various sources of information, including Oracle's results for the previous quarter, the most recent Upside and Pipeline Reports, and information he gleaned from discussions with the sales unit heads.

---

[22] Ellison Dep. at 122; Minton Dep. at 149-152; Henley Dep. at 85-86.

On December 11, 2000, Henley received the last Upside Report he would receive before giving guidance to the market. In that Report, Minton estimated that Oracle would earn 12.82 cents per share in 3Q 01.[23] Moreover, by that time, Oracle had closed the single largest licensing deal in its history — the $60 million Covisint Transaction — early in December. That gave Oracle a strong start for the quarter and that revenue was included in the December 11 Upside Report. And, as of that time, the December 11, 2000 Pipeline Report was showing total company Pipeline growth of 52%.[24]

Henley decided that Oracle should estimate that it would earn 12 cents per share in 3Q 01. He explained his rationale in an e-mail to Ellison and others on December 12, 2000 that was intended to set forth the talking points he would use with market analysts:

> The average split-adjusted EPS improvement for the last 3 years from Q2 to Q3 was one cent per share. We think that probably makes sense again this year. Due to holidays Q3 is usually not much different than Q2 and then there is a spike in Q4. We have no reason to believe that this year should be any different (keep expectations low enough to beat by a penny).[25]

In the same e-mail, Henley outlined his thinking on the relationship between overall economic conditions and Oracle's own prospects. He noted that while the economy was slowing, Oracle itself made e-business software products that were a high priority for its customers and certain of Oracle's product lines were at significant stages of maturity that, if things turned out well, might generate more growth.[26] All in all, therefore, Henley was intent on providing the market with an optimistic report, projecting a healthy quarter, but

---

[23] DX 22.

[24] DX 35.

[25] DX 105.

[26] *Id.* It bears mentioning that in earlier stages of this case, the plaintiffs made problems with some of these products a focal point of their case. They have since entirely abandoned that tack and this opinion therefore does not dilate on the facts relating to these products.

using the de rigueur technique of providing an estimate that he believed Oracle would exceed by a reasonable margin.

Two days later, on December 14, 2000, Oracle actually held its conference call for analysts to discuss its results for 2Q 01, as well as the company's expectations for the upcoming third quarter, i.e., 3Q 01.  The two major participants from Oracle were Ellison and Henley.

Near the beginning of the call, Henley reviewed the previous quarter's results and provided some specific projections as to how Oracle would do in 3Q 01.  These projections were preceded by the usual cautionary statements and were not made as promises.

The overall tenor of Ellison and Henley was optimistic.  Although the American economy as a whole, and certain segments of the computer industry in particular, were beginning to experience a slowdown, Ellison and Henley expressed their belief and hope that Oracle could weather those developments and continue to increase its revenues and profits.

Specifically, Henley indicated that he expected that Oracle would enjoy total license revenue growth of "about 25 percent" in 3Q 01 over the comparable quarter in FY 00.[27]  In terms of earnings per share, Henley indicated that Oracle traditionally earned about a penny more per share in the third quarter than in the second quarter and that he expected that trend to continue.  Because Oracle had earned 11 cents per share in 2Q 01,

---

[27] DX 83 at 31705.

he said that "12 cents would be a reasonable number at this point."[28]  Henley then went on to give some views about 4Q 01, while digressing to indicate that 3Q 01 was a bit harder to predict on the database side than the later quarter, but that the "pipeline, we have for Q3, looks very exciting at this point."[29]

After Henley finished his remarks, Ellison made a few comments.  In particular, Ellison "reiterate[d] what Jeff said, [that] the pipelines really are astounding."[30]  In keeping with that theme, Ellison later indicated that Oracle was "off to a great start in Q3" and had a "pretty fantastic, you know, first half of December" and that it looked like Oracle was "going to have a very, very strong Q3."[31]

Near the end of the call, Ellison and Henley got into a discussion with an analyst regarding whether the company was expecting to improve the "linearity" of its financial results.[32]  This was a reference to the previously discussed fact that a large percentage of Oracle's revenues were booked within the last month of the quarter, and in fact in the last days.  Ellison and Henley indicated their hope that this phenomenon would decrease once purchasers recognized that Oracle would not cut sweet deals simply to close contracts before the end of quarters but that the previous quarter did not display any more linearity than the corresponding quarter a year before.

---

[28] DX 83 at 31706.
[29] DX 83 at 31706.
[30] DX 83 at 31708.
[31] DX 83 at 31711-12.
[32] DX 83 at 31724.

I.  <u>Henley Sells Oracle Shares On January 4, 2001</u>

As of 3Q 01, Henley owned over 15 million Oracle shares.  Although that number was large, it was smaller than it could have been had Henley not taken steps to diversify his asset base.  Specifically, in keeping with common beliefs regarding prudent investing, Henley had sold large amounts of Oracle stock during each year since 1997.  Those sales included sales of 1.5 million Oracle shares in 1Q 01 and 2Q 01.

When selling shares, Henley had to abide by Oracle's internal policies, which were designed to prevent the reality or the perception of illicit insider trading.  Those policies generally prevented insiders from trading within the last two weeks of each quarter and for the first few days of each quarter.  Moreover, Oracle requires that trades by certain insiders be cleared by the company's General Counsel, Daniel Cooperman, and Henley himself.[33]  Together, Henley and Cooperman also share information about the company, so that they can identify any period of time during which they believe that there may exist material, nonpublic information and during which trading by insiders should be halted.  According to Henley's affidavit, he has ordered a halt to trading among Oracle insiders at least twice, once when he thought the company would not meet its quarterly earnings target and another time when the company was pondering a large acquisition.

Henley, however, testified that as a matter of practice trades were usually only directly cleared by Cooperman.  Cooperman would send Henley an e-mail of requests to

---

[33] DX 151.

trade and Henley would let Cooperman know if he believed there was a problem.  But Henley says that he rarely, if ever, directly dealt with anyone seeking permission to trade.

On December 18, 2000 — four days after the 3Q 01 earnings call — Henley sought clearance from Cooperman to sell additional shares, to further diversify his portfolio.  Cooperman gave the clearance.  But Henley did not trade.

Rather, according to Henley — who acts as his own financial advisor — he decided to wait until the new year so as to push the income tax consequences of the sale further out.  On January 3, 2004, Henley sought and again obtained clearance to trade from Cooperman.[34]  The next day he exercised options for and immediately sold one million shares in the market at an average price of $32.31, generating proceeds of $31,138,451.80.[35]

The same day that these trades took place, Henley prepared an e-mail in advance of an Oracle Finance Committee meeting scheduled for January 8, 2001.  In his e-mail, Henley noted that "all data since the [3Q 01 analysts] call point to more economic softening so there is risk of slippage in deals.  Offsetting this is stronger than normal approval activity in December, the Covisint deal is already in, and checks with the 3 U.S. execs saying they aren't as yet hearing of slippage from their managers (although it's still early in the quarter). . . . Net, net we still feel good about 3Q [2001] but the economy is a wildcard that nobody can fully predict with 2 long months to go."[36]

---

[34] Henley Aff. ¶ 52.
[35] Henley Aff. ¶ 53.  The same day Henley also gave 15,600 shares of Oracle stock to the University of California at Santa Barbara.  *Id.*
[36] DX 106.

As of January 4, 2001, Henley was unaware of the actual December 2000 results and the Best Estimate in the Upside Reports continued to predict that Oracle would exceed its earnings and revenue projections for 3Q 01.  There is no evidence as of this date that any Oracle executive had told Henley that they did not expect the company to meet the Market Estimates.  And as of January 4, 2001, the most recent Upside Report, issued in pre-reform Scrooge fashion on December 25, 2000, estimated that Oracle would earn 12.7 cents per share in 3Q 01 with license revenue growth of 33%.[37]

### J.   The January 15 Upside and Pipeline Reports And The January 17 Flash Report

Throughout January, the record indicates that Henley pressed his EMC colleagues hard about their projections.  He wanted to make sure that they were confident in their projections given the weakening state of the overall economy and the disappearance of many dot.coms to which Oracle had previously made sales.  In this endeavor, Henley was aided by Jennifer Minton, who acted as the point person and filter for Henley in working with the sales units.  At the EMC meetings, Henley regularly asked the heads of the sales units whether they were standing by their forecasts and whether the overall economic climate was adversely affecting their sales prospects.  There is no evidence in the record that suggests that Henley or Ellison — or Minton — were ever informed by their EMC colleagues that the projections they were presenting were not their best estimates or not achievable.

---

[37] DX 24.

By mid January, Oracle began to have a sense as to how its first month of 3Q 01 had progressed.  On January 15, Upside and Pipeline Reports were produced that showed less bullishness on the part of Minton and line sales units.  The Upside Report's Best Estimate for 3Q 01 earnings was 12.11 cents per share and its Best Estimate of License Revenue Growth was 29%.[38]  Although this represented some slippage from the December 11 Pipeline Report, which estimated earnings of 12.82 cents per share and License Revenue growth of 33%, it still forecasted results exceeding the Market Estimates.

In keeping with the previous comments about Henley's and Minton's inquiries into the confidence that the sales units had in their projections, the downward revisions in the revenues Best Estimate resulted from input from the sales units about their experience in the quarter to date and their expectations about the rest of the quarter.  For example, on January 11, David Winton, the finance director of Oracle's NAS unit sent an e-mail to Jennifer Minton, maintaining that important unit's forecast of $346 million in revenue for 3Q 01 but reducing its best case estimate downwards from $376.8 to $360 million.[39]  In his e-mail, Winton attributed the revision to:  Pipeline growth that was not "as we had anticipated" and that was "slightly down" from "December end reporting;" a lack of big deals that could drive revenues past $360 million; and a slow down in technology

---

[38] DX 25.
[39] DX 107.

spending by customers.[40]   Nonetheless, Winton ended his e-mail by indicating he thought NAS was "still . . . tracking to end Q3 @ $354-$355 [million]."[41]

Even with this softening of sales unit expectations, the January 15 Pipeline Report depicted Pipeline growth of 34% 3Q 00,[42] which exceeded the 25% public projection for license revenue growth.  The January 15 Pipeline Report also indicated that if Oracle could convert 51% of the Pipeline — the same percentage as in 3Q 00 — into actual revenues, it would achieve sales of more than $200 million in excess of public estimates.[43]  A conversion ratio of 51% was not a historical anomaly that had only occurred at Oracle in 3Q 00; Oracle had performed above that level for the 7 previous quarters.[44]

On January 17, the so-called Flash Report for the first month of 3Q 01 came out and was circulated to Ellison, Henley and Minton, among others.  The Flash Report summarized the actual results for December, indicating that:

> The license revenues growth rate was 35% in USD, 25 points better than the 10% growth we experienced in December FY00 over December FY99. However, excluding the $60 million Covisint license deal, the USD growth rate would have been only 6%.  Excluding Covisint, OPI license revenue growth would have been (85%).[45]

---

[40] *Id.*

[41] *Id.*

[42] DX 36.

[43] *Id.* at 3441; *see* DC 23.

[44] DC 24.

[45] DX 40.  In their brief, the plaintiffs argue that the staffer who prepared the report, Larry Garnick, incorrectly calculated license growth without Covisint as 6% when it should have been 1% in U.S. dollars.  *See* Ellison Dep. at 319; Garnick Dep. at 34-37.

The Flash Report highlighted that the Covisint transaction was significant, indicating that meeting the Market Estimates would have been more difficult without the Covisint revenue.  In the Flash Report, the recipients were also informed that Oracle's "December license results represent[ed] 19% of the total forecast for Q3 FY01.  In FY00 and FY99, December represented 16% and 19%, respectively, of the quarter total."[46]

As of mid January, 2001, the record contains evidence of concerns at the sub-EMC level regarding the effect of the dot.com bust and of the economic slowdown on Oracle's likely sales for 3Q 01 — that is, of the same concerns that caused Henley and Minton to ask questions about the sales units' confidence in their numbers.  What is lacking altogether, however, is any evidence that Ellison or Henley were informed at the EMC meeting that Oracle was not on track to meet the Market Estimates.  Indeed, as of the January 15 Upside Report, Oracle's North American-based sales units (NAS, OPI, and OSI) had not revised their unit-level license revenue forecasts for 3Q 01.  Those forecasts were exactly the same as the December 11, 2000 forecasts before the Market Estimates were made.[47]  Although Minton had reduced her upside adjustments to the December 11, 2000 OSI and OPI forecasts by this point, her adjustments still resulted in license revenues and earnings above the Market Estimates.

### K.  Ellison Begins Trading

In mid January, the trades that most inspire this lawsuit began to take place.  For over a year, Ellison's personal financial advisor, Philip Simon, had been urging Ellison to

---

[46] DX 40.
[47] *Compare* DX 22 at 2990 (12/11/00 Upside Report), *with* DX 24 at 3192 (12/25/00), *and* DX 25 at 3345 (1/15/00).  These all show identical forecasts indicating that OSI, NAS, and OPI would deliver $225 million, $346 million, and $150 million in license revenues respectively.

diversify his stock portfolio, which was overwhelmingly weighted towards Oracle.

Likewise, Simon had advised Ellison that he should exercise 22 million Oracle options

that would reach their ten year expiration date in August 2001.  Simon believed that it

was prudent for Ellison to exercise his options and sell some of his Oracle stock to:  1)

pay taxes on the option gains, 2) pay down some personal debt, and 3) diversify his stock

portfolio.

Ellison did not act with alacrity on Simon's advice.  He dilly-dallied until January

2001 when he decided to exercise his options and sell some shares.  By January 2001,

Ellison had only three trading windows left (including 3Q 01) under Oracle's trading

policies to exercise his valuable, in-the-money options; otherwise, they would expire

worthless.  At the time Ellison decided to sell, Simon was on vacation.  When Simon

returned on January 19, Ellison instructed him to exercise the options and to sell some of

his stock.  That same day Ellison obtained clearance from Cooperman to sell Oracle

shares but did not clear his trades separately with Henley.

Ellison's goal was to sell 40 million shares, a hefty number by any standard and

one in excess of the 22 million exercised options, but which if achieved would have

disposed of only around 3% of Ellison's Oracle holdings.  Because of the volume

involved, Ellison instructed that his trades not exceed 15% of any single day's trading

and that no shares be sold below a price of $30.  Simon was instructed not to sell in February even though Ellison was cleared to trade in the first two days of that month.[48]

Beginning on January 22, 2001 and ending on January 31, 2001, Simon sold 29 million shares for Ellison at an average price of $30.76.  The 29 million shares were fewer than the 40 million that Ellison had set as a goal and had been cleared to sell, and comprised 2.09% of his total Oracle holdings.  Because of the various trading limitations involving price, daily volume, and duration that Ellison had imposed, Simon was unable to sell all 40 million shares.  Nonetheless, Ellison's sales generated gross proceeds of approximately $895 million.[49]

## L.  The January 22 Upside Report

On the day Simon began trading for Ellison, the January 22 Upside Report was issued.  The Best Estimate in that Report predicted that Oracle would earn 12.06 cents per share in 3Q 01 and have license revenue growth of 29%.[50]  Again, the sales unit forecasts for NAS, OSI, and OPI remained unchanged from their levels on December 11, 2000.[51]

Again, throughout this period, Henley and Minton continued to ask the sales units about the confidence they had in their numbers.

---

[48] Ellison initially received clearance to trade from January 19, 2001 to January 26, 2001.  PX 10.  Having not met his target, he sought and received a second approval extending the period during which he could trade.  PX 12.

[49] Second Amended Complaint ¶ 88.

[50] DX 26.

[51] *Id.* at 3552.

## M.  The January 29 Upside Report

January 31 was the last day that Ellison sold Oracle stock during 3Q 01.  Ellison's trades that day, and on January 30, followed a January 29 Upside Report that predicted as a Best Estimate that Oracle would earn less than 12.0 cents per share in 3Q 01.  The January 29 Best Estimate was 11.58 cents per share,[52] a number that, under Oracle's past practice, would have been rounded up to 12.0 cents per share for reporting purposes.  Nonetheless, the Best Estimate was below 12.0 cents and the Best Estimate of license revenue growth was reduced to 24%.[53]

Thus, the January 29 Upside Report indicated that Oracle might not meet the Market Estimates it gave to analysts.  Nonetheless, there is no evidence that anyone at Oracle informed Ellison that Oracle could not meet its Market Estimates or would fall materially short of them.  As important, there is no evidence that Ellison's last trades in January 2001 were influenced in any manner by the January 29 Upside Report and it would be odd if they were, as the Best Estimate in that Report still had Oracle projected to meet the Market Estimates more or less exactly.  In this respect, it is important to note that the unit-level forecasts made by NAS, OPI, and OSI remained unchanged from their December 11, 2000 levels, although by this time Minton was applying a negative adjustment to the OSI forecast.[54]

In his deposition, Henley acknowledged that the January 29 Upside Report was of concern to him.  This was not because it contained information that indicated that Oracle

---

[52] DX 27.
[53] *Id.*
[54] DX 27 at 3612.

would surely miss its Market Estimates, but because for the first time in his view, it appeared that Oracle would face "more of a horse race" to beat those Estimates.[55] Henley, however, noted that it was not unusual for Oracle to be in this situation, as it had experienced several quarters when its Best Estimate suggested a horse race but when Oracle later met or exceeded market expectations.[56]

### N. The Immediate Post-Sales Period Financial Estimates

By February 1, 2001, all the trades challenged in this case were completed. On February 5, an Upside Report as well as the first Pipeline Report since January 15, 2001 were issued. The February 5 Upside Report's Best Estimate for earnings was now only 11.29 cents per share and for license revenue growth was 20%, both figures that were below the Market Estimates.[57] The February Pipeline Report, meanwhile, showed a reduction from 34% to 32% from the January 15 Pipeline Report.[58] For the first time, the NAS, OSI, and OPI unit-level forecasts were reduced below December 11, 2000 levels.[59]

Consistent with this softening, the February 8 Flash Report indicated that Oracle's internal forecasts were running 8% behind where they needed to be to generate the 23% license revenue growth the Report indicated market analysts now expected. At the same time, the Flash Report indicated that Oracle had achieved 25% license revenue growth in the quarter to date ("QTD") — i.e., in December and January — and that "QTD license results represent 36% of the total forecast for Q3 FY 01. In FY 00 and FY 99, January

---

[55] Henley Dep. at 266-67.
[56] *Id.*
[57] DX 28.
[58] *Compare* DX 37, *with* DX 36.
[59] *Compare* DX 28 at 3750, *with* DX 27 at 3612.

QTD represented 33% and 38%, respectively, of the quarter total."[60]  As with the earlier January Flash Report, the February Flash Report made clear that absent the Covisint transaction, Oracle's overall QTD revenue growth would have been only 8% rather than 25% and that the OPI unit (that made the Covisint sale) would have had license revenue growth of negative 63%.

None of this information, however, was provided to Ellison until after his trading activity was already completed.

### O.   A Key Analyst Issues An Updated Report On The Prospects For Oracle's 3Q 01

The plaintiffs place weight on a February 9, 2001 report put out by Chuck Phillips, who was then a senior analyst at Morgan Stanley.  The report was entitled "Getting Through Q3 in Good Shape."[61]  In that report, Phillips opined that Oracle's business strategy of focusing on delivering integrated enterprise software products that helped organizations meet all their computing needs was a sound one, but noted that Oracle, like other companies, faced a drop-off in revenue from dot.com customers, many of whom had not survived 2000.  As a result, Phillips thought that Oracle would suffer a "temporary dip in database license growth."[62]  Although Phillips' "earning number this quarter remain[ed] unchanged at $ 0.12 per share," he reduced his license revenue growth by $40 million, to a figure of 18.5% growth over 3Q 00 levels.[63]  While his earnings figure stayed the same, Phillips noted that his reduction in license revenue expectations

---

[60] DX 41.
[61] PX 131.
[62] *Id.* at 2.
[63] *Id.* at 3.

probably eliminated "any earnings upside" for the quarter.[64]  Overall, Phillips noted that "3Q 01 should be an OK quarter for Oracle — in a period when most technology companies aren't having OK quarters — followed by a better quarter in 4Q 01."[65]

After Phillips released his report, Oracle's stock price dropped by more than 13%.[66]

### P.  The February 12, 19, and 26 Upside Reports

On February 12, the Upside Report raised its Best Estimate to 11.58 cents per share with license revenue growth of 21%.[67]  By February 19, the Upside Report's Best Estimate declined to 11.23 cents per share with license revenue growth of 19%.[68]  The NAS, OSI, and OPI unit level forecasts were also changing during this period, largely in tandem with the Best Estimate.

In the last week of each quarter, Oracle generates daily Upside Reports.  On February 26, the Upside Report's Best Estimate was down to 11.19 cents a share, a number that was still within striking distance of 12 cents per share.[69]

Regrettably for Oracle, that was not as bad as things would get.

### Q.  The End Of Quarter Developments, AKA, The Bottom Falls Out

Shortly before 1:00 a.m. on Monday, February 26, 2001, the head of Oracle's important NAS unit, George Roberts, sent an e-mail to Ellison, Henley, Minton, and other top managers stating:

---

[64] *Id.*
[65] *Id.* at 2-3.
[66] Fischel Aff. ¶ 12.
[67] DX 29.
[68] DX 31.
[69] DX 32.

> On Friday John Nugent told me that he had 10mm of forecasted business fall out of the forecast in the West area. It was not one or two deals but over 70 separate transactions slipped. The mix of accounts was 70% new economy and 30% brick and mortar. The top reason given by the companies was capital preservation.[70]

This reduction contributed to Minton adjusting the NAS unit's projected license revenue from $346 million as of January 29, 2001,[71] and from $320-325 million as of mid February, to only $300 million in the February 26 Upside Report.[72]  In his e-mail, Roberts included an e-mail from one of his own subordinates, Nick Classik, which he had received over the weekend and which stated in part:

> *The past 6 business days our forecast has dropped to the point that I know that our organization will have put . . . Oracle . . . in a bad spot.  . . . Thursday afternoon, it looked like our forecast would be in the low $60's m.   After netting everything thru Friday night we will off an addl $10m and are looking at a quarter number in the low 50's.  I am aware of the impact this news has to Oracle and I am sorry that we have created such a problem.   This is my organization and I am responsible for a forecast to you – I failed.  From the 2-16[-01] forecast to the 2-23[-01] forecast we had 78 field deals, by 47 different reps totaling $14.9m move out of the quarter. The last month of the quarter I go over deal, line by line item with the managers weekly.  This has been successful in the past as it gives me the oppt to get accurate info to provide upper management and build a reliable forecast.  George, you have been a great supporter for my team and myself. In my 6 years with Oracle this is the most difficult news I have had to deliver as a forecast, especially this late in the quarter, is a personal commitment and I have let you and Oracle down.  I am sorry.[73]*

Henley and Ellison both responded to Roberts' e-mail.  Henley's response was terse:

---

[70] DX 134.
[71] DX 27 at 3612.
[72] DX 32 at 4262.
[73] DX 134 (emphasis added).

This has been the "economy risk" we've been facing all quarter.  You really don't see it until the end of the quarter when people have to sign the dotted line and they are more cautious so things start slipping.[74]

Meanwhile, Ellison asked Roberts whether the "deals have slipped into Q4 or have they simply disappeared?"[75]  Roberts asked his subordinate Classik for his thoughts. Classik replied:

> NET — lost to competition 5%, firm q4 projects 25%, delayed until economic or business conditions are clearer 70%.  We had 5 POs cut that Presidents pulled until April as they wanted to see what their q1 would look like.  The uncertainty of their business and outlooks for the year has caused many clients to delay until they better understand what directions 2001 will take.  We can't commit this 70% as April results and the business climate will have to determine.[76]

In another e-mail that day, Henley implied that Oracle still had a chance to meet its market projections for earnings because of improved expense reductions.[77]  By the next day, that hope was dashed as Minton informed him that Oracle's so-called "Big Deals" estimate had dropped "From 40% growth [over 3Q 00] to 25% in one day"[78] — i.e., from February 26 until February 27.  Henley was not as shocked as Minton, informing her "like I said to Larry it can change quickly so this isn't a surprise to me."[79]

On February 27 and 28, Minton traded e-mails with Sarah Kopp of Oracle's OIS unit regarding OIS's likely revenues.  In the course of those e-mails, OIS reduced its

---

[74] DX 132.
[75] DX 133.
[76] DX 133.
[77] DX 131.
[78] DX 136.
[79] *Id.*

estimates for quarterly revenues by approximately $100 million in a day and a half, as deals slipped into the future or away altogether.[80]

By the last day of the quarter, the Best Estimate in the final Upside Report for 3Q 01 estimated earnings at 10.07 cents per share, with License Revenue growth of only 7%.[81] That represented a major decline from the previous day's Upside Report which had a Best Estimate of earnings at 10.9 cents and License Revenue growth of 10%, with total revenues over $115 million in excess of the succeeding day's Upside Report.[82]

### R.  The Market Reacts Negatively To Oracle's 3Q 01 Performance

On March 1, 2001, Oracle previewed that its final performance in 3Q 01 would not meet the market estimates.  It announced that it would likely earn only 10 cents per share on license revenue growth of 2%, compared to 12 cents per share and about 25% license revenue growth in the Market Estimates.[83]  In the earnings press release, Ellison attributed the results to customer decisions to "delay their IT spending based on the economic slowdown in the United States. . . .  The problem is the U.S. economy."[84]

Ellison and Henley held a conference call with analysts that same day.  In that call, both Ellison and Henley attributed the failure to meet the Market Estimates to a decline in business from dot.coms and, most important, to a general economic slowdown that

---

[80] DX 135 & DX 60 (summarized in DC 35).

[81] DX 34.

[82] *Compare* DX 33, *with* DX 34.

[83] *See* DX 87 (announcing a 6% in constant dollars increase including a 4% negative currency impact). The 4% highlights the distinction between results measured in constant dollars, building in currency and inflation adjustments, and results measured in U.S. dollars.  This distinction can affect the calculation by several percentage points, and can create confusion if overlooked.  Here, the 6% figure in constant dollars signifies a 2% increase in U.S. Dollars.  *See* PC 30.  The guidance for license revenue of about 25% was in U.S. dollars and is therefore appropriately compared to the 2% actual revenue increase in U.S. dollars.

[84] *Id.*

resulted in a large number of deals getting deferred at the very end of the quarter.  Henley indicated on the call that Oracle had felt "very good about our quarter" as late as Friday February 23, 2001 but that they started to "see a few cracks" that day.[85]  By the end of the quarter, a "significant amount of deals . . . were deferred."[86]

Henley was participating on a cell phone and thus Ellison fielded most of the questions.  At one point, Morgan Stanley analyst Charles Phillips asked him whether Oracle was ahead of where it expected to be entering into February.  Ellison answered yes and indicated that "[w]e were well ahead of our numbers at the end of January.  And the pipeline looked terrific, you know, going into February."[87]

This statement was erroneous.  Although Oracle's quarter-to-date internal forecasts (including the Pipeline) as of the end of January showed that the company would likely come close to, if not meet, the Market Estimates, they did not show results "well ahead" of expectations.  In general, however, what Ellison stressed was the large number of sales that were deferred at the end of the quarter, a phenomenon he attributed to the reluctance of potential customers to make large financial commitments to new IT expenditures in the face of a weakening economy.  Ellison's essential bullishness about Oracle comes through in the call transcript and the lengthy call finished with Ellison answering a question about the Pipeline by indicating that Oracle's "pipeline building looks normal."[88]  Henley jumped in at that point and indicated that it was too soon to know whether that was so and that Oracle would be in a better position to comment on

---

[85] PX 104 at 81614.
[86] *Id.*
[87] *Id.* at 81621.
[88] *Id.* at 81629.

that issue at a later call that was less hastily convened, as the March 1 call was simply designed to give the market the "best quick" update about 3Q 01 Oracle could give.[89] This echoed Henley's earlier statements about the uncertainty Oracle faced as a result of general economic conditions.

Although the 10 cents per share Oracle expected to earn in 3Q 01 exceeded the company's 3Q 00 performance and was the best third quarter in the company's history, the market was not pleased.  Oracle's stock price dropped approximately 21% in one day.[90]

On March 15, 2000, Oracle released final figures for 3Q 01, which were generally in line with its March 1, 2001 press release.  Earnings were 10 cents per share and license revenue growth was 5%.[91]

## II.   Summary Of The Plaintiffs' Claims

The plaintiffs bring two types of claims against Ellison and Henley.

First and most important, they assert that there is evidence from which a rational fact-finder could conclude that Ellison and Henley injured Oracle as a company by: 1) possessing nonpublic, material information demonstrating that Oracle would miss its Market Estimates for 3Q 01; and 2) deciding to sell shares of stock in whole or in part because of their knowledge of this negative information.  This type of claim is a state version of a federal insider trading claim and has its origins in Delaware law in the

---

[89] *Id.*
[90] Second Amended Complaint ¶ 75.
[91] PC 30 (indicating that final license growth in U.S. dollars was 5% as opposed to 2% in the March 1 pre-announcement).

venerable case of *Brophy v. Cities Service Co.*[92]  As the plaintiffs see it, *Brophy* and its

progeny apply a form of entire fairness analysis to sales of stock by corporate fiduciaries.

If the court concludes that the selling fiduciary should, with the exercise of reasonable

prudence, have recognized that there was a risk that his company would not meet its

public projections, then that fiduciary is bound to restore to the company the excess

profits he made (as a state law remedy).  That is, because of the selling fiduciary's self-

interest, the absence of scienter is argued to be irrelevant to the resolution of a disloyalty

claim rooted in *Brophy*.  In the alternative, the plaintiffs also argue that there is sufficient

evidence of scienter on both Henley's and Ellison's part for their *Brophy* claim to

withstand this motion for summary judgment.

Second, the plaintiffs argue that Ellison and Henley are liable to Oracle under a

breach of contract theory because their sales supposedly violated certain Options

contracts that they signed with Oracle — as the undisputed record indicates — after they

had completed all their trades.  Remarkably, the plaintiffs press this claim even though it

has been twice dismissed by Judge John G. Schwartz of the California Superior Court,

who is presiding over a derivative case that overlaps with this one.  The plaintiffs in this

litigation are actively cooperating with the California plaintiffs in a joint effort to obtain

relief.  The same lawyer who argued the breach of contract theory to Judge Schwartz

made the bulk of the summary judgment argument before me in this case.  For the

plaintiffs to ask me to assess the viability of a claim made derivatively on behalf of

Oracle by them in California — that rests on California law — that was dismissed by

---

[92] 70 A.2d 5 (Del. Ch. 1949).

Judge Schwartz the first time without prejudice — and that was dismissed by him the second time with prejudice after the plaintiffs' amended complaint failed to demonstrate to his satisfaction the viability of the claim — is to ask me to act as an appellate court over Judge Schwartz.  Indeed, the plaintiffs ask me to conclude that Judge Schwartz was "mistaken" in his legal reasoning and therefore that I should "reconsider the issue" he previously decided adversely to them.[93]

Because the plaintiffs here are obviously acting in concert with the California plaintiffs and using the very same lawyers who are litigating the derivative case in California, because there is no reason to believe that Judge Schwartz did not fairly consider this claim, and because the California plaintiffs have a full and fair opportunity to appeal Judge Schwartz's ruling after a final judgment in the California action, there is no principled basis for me to engage in a fresh trial-court examination of the plaintiffs' contract claim without violating principles of comity and inviting inter-state judicial conflicts that present a real threat of inconsistent rulings about identical issues affecting identically situated parties.  The public policy of this State seeks to avoid the unseemliness, unfairness, and inefficiency that results when different courts adjudicate identical claims.[94]  At various times in this case, the plaintiffs have attempted to bypass this court and get a ruling in California.  In this instance, they got not one, but two rulings

---

[93] Plaintiffs' Br. at 87-88.

[94] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281, 283 (Del. 1970); *see also Issen & Settler v. GCS Enterprises, Inc.*, 1981 WL 15131, at *5 (Del. Ch. Sep. 29, 1981) (explaining that the same issues of wasteful duplication and possible inconsistency apply in determining whether to lift a stay); *Maldonado v. Flynn*, 417 A.2d 378, 381 (Del. Ch. 1980) (discussing how similar principles ground the doctrine of res judicata).

in California dismissing their contract claims, and they are stuck with the dismissal order until it is reversed on appeal by a California court.

### III.  Summary Judgment Standard

To prevail on this motion, Ellison and Henley must show that there are no material, disputed issues of fact and that they are entitled to judgment as a matter of law.[95]  In examining the record, I must draw every reasonable inference in the plaintiffs' favor.[96]  If upon such an examination, I conclude that a rational finder of fact could determine, based on the record, that the plaintiffs have adduced evidence that supports a conclusion that Ellison and Henley breached their fiduciary duties then I must deny their motion for summary judgment.[97]

Specifically, as I next explain, under *Brophy* there are two critical determinations that must be made on this motion about each of the defendants.  First, is there record evidence that would buttress a rational determination that either Ellison or Henley possessed material, nonpublic information at the time of their trades?  Second, is there record evidence that would support a rational finding that either Ellison or Henley decided to sell Oracle shares, in whole or part, because they possessed material, nonpublic information suggesting that Oracle would not meet its Market Estimates and that its stock price would fall?  Before making these determinations, I must back-track and explain why I perceive these to be the key inquiries.  That endeavor begins next.

---

[95] *E.g., Acro Extrusion Corp. v. Cunningham*, 810 A.2d 345, 347 (Del. 2002).
[96] *Id.*
[97] *Cerberus Int'l, Ltd. v. Apollo Mgmt. L.P.*, 794 A.2d 1141, 1149-50 (Del. 2002).

## IV.  The Parties' Battle Over *Brophy*

The plaintiffs' claims against Ellison and Henley have their origins in this court's decision in *Brophy v. Cities Service Co*.[98]  In that case, a derivative action was filed on behalf of Cities Service against the confidential secretary of one of the company's directors.  After learning that the company intended to repurchase shares of its stock, the secretary bought shares for his own account in advance of the company and profited when the company's repurchase program — which the secretary, but not the public, knew was coming — drove up the company's stock price.[99]

The derivative plaintiff argued that a constructive trust in favor of Cities Service should be placed on the defendant's trading profits.  In response, the defendant claimed that he should not be liable to the company because his trading activities did not cause the company to suffer a loss — i.e., that the corporation could not recover unless it proved that it was damaged by the defendant's trading activity.  This court, per Chancellor Harrington, rejected the defendant's argument and based its reasoning on principles of restitution.  A fiduciary in the defendant's position, the court held, could not use corporate "information for his own personal gain."[100]  When that fiduciary breaches his duty not to use the corporation's confidential information for personal profit, the court held that the appropriate remedy was disgorgement of the ill-gotten gains to the corporation.[101]  In so ruling, the court relied on the Restatement of Restitution.[102]

---

[98] *Brophy v. Cities Service Co*., 70 A.2d 5 (Del. Ch. 1949).
[99] *Id.*
[100] *Id*. at 8.
[101] *Id*.
[102] *Id*. (citing Restatement (First) of Restitution § 200 cmt. a (1937)).

Since *Brophy* was decided, it has been cited frequently by the courts of this State. But the *Brophy* doctrine has, to my knowledge, never been applied by this court to support a final judgment awarding restitution to an issuer. It has, however, been cited as an important precedent by courts in other states, such as New York, which have adopted its teaching.[103]

The parties in this case warmly disagree about the continued vitality of *Brophy* and the precise contours of a *Brophy* claim under Delaware law. For their part, Ellison and Henley contend that *Brophy* should no longer form part of Delaware's common law of corporations. *Brophy* and its key progeny in New York,[104] they note, were decided before the emergence of a potent federal securities law regime designed to discourage improper trading by corporate insiders.[105] A comprehensive array of federal statutes now addresses insider trading and subjects corporate insiders to: 1) the possibility of criminal convictions,[106] 2) the disgorgement of trading profits to sellers or buyers who suffer losses,[107] and 3) civil penalties to the Treasury of the United States in the amount of three

---

[103] *Diamond v. Oreamuno*, 248 N.E.2d 910 (N.Y. 1969); *see also* Restatement (Second) of Agency § 388 cmt. c (1958) (noting that a corporate officer who profits from misuse of corporate information holds the trading profits in "constructive trust for the principal," i.e., the company).

[104] *See Diamond*, 248 N.E.2d at 913-14 (noting absence of an adequate federal remedy in justifying its embrace of *Brophy*).

[105] Some states rejected the *Brophy* approach and have required derivative plaintiffs relying on insider trading claims to show actual injury to the corporation. *See Schein v. Chasen*, 313 So.2d 739, 746 (Fla. 1975) ("We adhere to previous precedent established by the courts in this state that actual damage to the corporation must be alleged in the complaint to substantiate a stockholders' derivative action.").

[106] *E.g.*, 15 *U.S.C.* § 78ff.

[107] 15 *U.S.C.* § 78t-1. Such an action may be brought as a private right of action under SEC Rule 10(b)(5), 17 C.F.R. § 240.10b-5. *See* 15 *U.S.C.* § 78j(b) (codifying §10(b) of the 1934 Act); 15 *U.S.C.* § 78t-1 (granting an explicit right of private action under Rule 10b-5 pursuant to the Insider Trading and Securities Fraud Enforcement Act of 1988); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196-97 (1976) (noting that courts had long implied the well-established right of private action under Rule 10b-5); *Kardon v. National Gypsum*, 69 F. Supp. 512 (E.D. Pa. 1946) (first implying a right of private action for damages under Rule 10b-5). It may also proceed as a class action. 15 *U.S.C.* § 78u-4. Other federal

times their illicit trading profits.[108]  As a result, the defendants contend that *Brophy* is no

longer a necessary or appropriate part of our common law.[109]  *Brophy's* perpetuation,

defendants argue, risks subjecting corporate insiders to duplicative liability, by having

this court heap a restitution award to their companies on top of disgorgement to traders

and the payment of a multiple of their trading profits to the Treasury of the United

States.[110]  Moreover, it increases litigation costs unnecessarily by encouraging duplicative

state law suits whose deterrent value is not worth the cost, due to the strong federal

disincentive to the wrongful exploitation of corporate information.[111]

    If *Brophy* survives, the defendants contend that it must be interpreted as a context-

specific application of loyalty principles.  Thus, a *Brophy* claim can be sustained only if

the trading insider can be said to have engaged in conscious wrongdoing by executing

trades, in whole or in part, because the insider knowingly possessed material, nonpublic

---

statutes also restrict improper insider trading in certain circumstances.  *See, e.g.,* 15 *U.S.C.* § 78p(b) (codifying § 16(b) of the 1934 Act which allows corporations to recover short-swing profits).
[108] 15 *U.S.C.* § 78u-1.
[109] In fact, federal judicial interpretations of Rule 10(b)(5) often root culpability for use of inside information in the user's status as a fiduciary, construing such misappropriations as a breach of fiduciary duty that is deceptive and therefore proscribed by Rule 10(b)(5).  *E.g., U.S. v. O'Hagan,* 521 U.S. 642, 652 (1997); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 937 (9th Cir.); *cert. denied,* 124 S. Ct. 433 (2003).
[110] In this very situation, they note, the defendants already face a suit for disgorgement by a class of *Oracle* stockholders under §§ 10(b) and 20(a) of the 1934 Act.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp., et al.,* 380 F.3d 1226 (9th Cir. 2004).
[111] The arguments the defendants make have been found potentially to have vivid color by this court.  *See Goldman v. Isaacs,* 2001 WL 1671439 (Del. Ch. Dec. 17, 2001) (*sua sponte* asking counsel to brief the question of whether *Brophy* has continued vitality in light of the emergence of a comprehensive federal regime to control improper inside trading).  In other matters, this court has been reluctant to have equity fill non-existant gaps in the federal regulation of securities markets.  *E.g., RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 312454, at *10 n.45 (Del. Ch. Mar. 7, 2001)(declining to create a state law cause of action for market manipulation to cover short-selling that was permissible under federal law and noting that equity "does not create remedies where the parties' behavior is already closely regulated by the law") (citing 27A Am. Jur. 2d *Equity* § 113 (1996).  Notably, the abolition of *Brophy* would not preclude a recovery by the corporation for *actual* harm to itself caused by illicit insider trading by a fiduciary, but the existence and extent of such damage would have to be proven.

information.  This reading of *Brophy*, the defendants contend, is consistent with that articulated in all the Delaware cases that apply *Brophy*.

The plaintiffs strongly disagree with this line of reasoning.  They contend that *Brophy* fulfills a distinct purpose by providing corporations themselves with a potent remedy against the improper use of company information.  The federal regime generates monetary remedies that go to injured buyers or sellers or to the U.S. government, but not the corporation whose information has been usurped by a faithless fiduciary and whose business has been disrupted by the tumult and expense that often accompanies inside trader cases involving top fiduciaries.  Thus, the subsequent emergence of a federal system addressing insider trading should not, say the plaintiffs, lead this court to abandon the well-established precedent of *Brophy*, a precedent that is grounded in settled principles of restitution and that provides a simple-to-calculate remedy.[112]

Indeed, the plaintiffs argue that *Brophy* should be strengthened and not abandoned.  Rather than simply ordering disgorgement when a fiduciary has knowingly traded on inside information, this court should treat insider trading as a self-dealing transaction and require the fiduciary to prove that his trades were entirely fair to the

---

[112] Notably, the American Law Institute continues to embrace *Brophy* in § 5.04 of its Principles of Corporate Governance and Structure (Proposed Final Draft, Mar. 31, 1992).  *See* Douglas M. Branson, *Choosing the Appropriate Default Rule-Insider Trading Under State Law*, 45 Ala. L. Rev. 753, 761-768 (1994). As a respected commentator notes, there is some efficiency to the ALI approach.  *See* Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition*, 52 Wash. & Lee L. Rev. 1189, 1252-57 (1995).  Professor Bainbridge argues that, under the ALI regime, a company has a property right in information, and damage sustained by the company through misuse of information is remedied through disgorgement.  As he sees it, the property right coupled with penalty for misuse permits the company to disseminate information freely throughout the company for proper use, thereby maximizing potential productivity by creating a disincentive for its misuse.  Provision of a simple remedy, equivalent to any ill-gotten gains, is arguably more socially useful than imprecise, case-by-case assessment of actual damage to the company.

corporation.  If the court concludes that the insider had material information at the time of

his trades, the insider should be required to disgorge his trading profits to the corporation

regardless of whether he acted with scienter, in the sense that he traded, in whole or in

part, because he knowingly possessed material, inside information.

In the pages that follow, I address these arguments in the following manner.

Initially, I determine whether summary judgment is appropriate even if *Brophy* remains

good law.  In the course of that exercise, I first outline what I find to be the elements of a

*Brophy* claim.  I then evaluate the sufficiency of the plaintiffs' claim by comparing those

elements to the factual record submitted to me.

Because that analysis results in the conclusion that the defendants are entitled to

summary judgment, I decline their invitation for me to conclude that *Brophy* is an

outdated precedent that ought to be abandoned.  The important policy question the

defendants have raised can be left to a later case in which the answer to that question is

outcome-determinative.  Because the defendants prevail under a reasoned application of

*Brophy*, it is unnecessary to make a broad ruling with sweeping effect.

## V.  The Elements Of A *Brophy* Claim

Much of the plaintiffs' argument, as will become clear, is grounded in the notion

that a corporate insider is strictly liable to return any trading profits if:  1) the insider

possessed information that cast some doubt on the company's ability to meet its public

earnings and revenues projections, and 2) the company later failed to meet those

projections.  That is so, the thrust of the plaintiffs' submissions suggest, even if the

insider subjectively believed the company would meet its projections and even if the

company's best estimate of its performance suggested that the company would meet, exceed, or fall immaterially short of the projections.

The policy basis for this argument is not particularly clear. I suppose it rests in the notion that corporate insiders ought to be extremely scrupulous about trading in their company's shares. Of course, given the possibility for criminal liability for insider trading, a disgorgement remedy to the trading public,[113] and a treble-profits (or loss avoided) disgorgement civil penalty to the United States Treasury at the instance of the SEC[114] — not to mention possible liability under a traditional application of *Brophy* and the threat of reputational self-destruction — it is by no means obvious that the existing legal and ethical regime less than optimally deters the wrongful exploitation of inside information by corporate fiduciaries.

To go down the road the plaintiffs would have Delaware law travel would be to recklessly risk upsetting carefully balanced policy judgments that undergird our law and federal law. There are many reasons why that is a probable result. Here, I note only a few. I begin with the idea that many sophisticated commentators believe that it is a good idea that corporate insiders own company stock because having, as Ross Perot would say, "skin in the game" will tend to align their interests with those of the public stockholders.[115] For legitimate reasons, directors and officers who own options and stock

---

[113] 15 *U.S.C.* § 78t-1.

[114] 15 *U.S.C.* § 78u-1(a)(2).

[115] *See, e.g.*, R. Franklin Balotti & Charles M. Elson, *Equity Ownership and the Duty of Care: Convergence, Revolution, or Evolution?*, 55 Bus. Law. 661, 665 (2000); Steve Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L.J. 391, 412 & nn.63-64 (1991); Daniel R. Fischel, *The "Race to the Bottom" Revisited: Reflections on Recent Developments*

will at times have to, or find it useful to, sell or buy shares.  One can acknowledge that there is an ongoing debate regarding whether, on balance, corporate compensation schemes involving equity have been either prudently designed or sized without obscuring equally obvious points:  the use of equity as a compensation tool is a legitimate choice under our law and Delaware statutory law permits and its common law creates incentives for stockholders to serve as directors and officers.[116]

To subject corporate insiders to a possible disgorgement remedy under our law whenever a court, in hindsight, concludes that the insiders should, under some type of due care standard, have suspected that their company would later miss the mark, would cabin the breadth of discretion afforded to Delaware companies to design their own compensation systems and — perhaps worse — raise the barriers that already dissuade large, but not controlling, stockholders from serving on company boards.  The plaintiffs admit that their argument depends on treating insider trades as a form of self-dealing. The reasons for this are obvious, and include the plaintiffs' wish to escape another common feature of corporate charters that is authorized by our law:  the exculpatory provisions sanctioned by 8 *Del. C.* § 102(b)(7).

---

*in Delaware's Corporation Law*, 76 Nw. U. L. Rev. 913, 919 (1982) (noting option compensation plans as one example of market mechanisms designed to align manager and shareholder interest).

[116] There are many cases in which greater credence has been given to the judgment of directors because their equity interests aligned them with the interests of the other stockholders. *E.g.*, *Unitrin v. American General Corp.*, 651 A.2d 1361, 1380-81 (Del. 1995) (courts cannot presume that stockholding directors with large equity stakes place their interests in their offices above their "own best economic interests"); *In re Pennaco Holdings, Inc.*, 787 A.2d 691, 709 (Del. Ch. 2001) (finding it unlikely that large shareholders would vote against their interests as shareholders in order to secure severance packages for change of control); *In re IXC Communications, Inc. v. Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6-7 (Del. Ch. Oct. 27, 1999) (finding that directors with large stock holdings would likely have interests aligned with shareholders).

By construing all insider trading as self-dealing, the plaintiffs can argue with a straight face that a trading fiduciary ought to be held strictly responsible for trading profits made at a time when the court concludes that a more careful fiduciary would have refrained from trading, not necessarily because the fiduciary possessed material information in the traditional sense, but because the fiduciary possessed information that cast some doubt on the company's ability to meet its projections.  In the nomenclature of §102(b)(7), the trading fiduciary would have, in the plaintiffs' view, received an "improper personal benefit" and (given the redundancies pervading §102(b)(7)) breached her "duty of loyalty" through self-dealing.

For law professors, the good news is that a blind trip down this windy road would not just raise epistemologically difficult questions under §102(b)(7).  It would also create a plaintiff-friendly scheme of insider trading enforcement under state law that would be based on strict liability or negligence principles, and that would be in competition with a federal regime that requires proof of scienter, i.e., an illicit state of mind.  The resulting policy clash might provide good fodder for academic writing.  It might also fuel further legislative developments, as what was understood by Congress to be a narrow and fixed "Delaware carve-out"[117] for traditional fiduciary duty claims turns out to be an expanding

---

[117] *See* 15 *U.S.C.* § 77p(d)(1)(B); Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation:  Acquisition-Oriented Class Actions*, 57 Vand. L. Rev. 133, 144 n.40 (2004) ("The Delaware carve-out permits shareholder class action suits in state court in two kinds of cases:  (1) a purchase or sale transaction where one side is the issuer or an affiliate, and the other side is exclusively holders of the issuer's equity securities, and (2) recommendations or other communications 'with respect to the sale of securities of the issuer' made to equity holders by or on behalf of the issuer or an affiliate concerning (a) voting, (b) acting in response to a tender or exchange offer, or (c) exercising dissenters' or appraisal rights.") (internal quotation marks and citations omitted); Richard A. Rosen, *The Statutory Safe Harbor for Forward-Looking Statements After Two And A Half Years:  Has it Changed The Law?  Has It*

excavation site that unsettles the structure of federal securities law.[118]  By way of

example, a common law rule of the kind that the plaintiffs advocate would tend to

discourage companies from providing forward-looking estimates to the market, a

disincentive that leans in precisely the opposite direction from recent federal

initiatives.[119]  In its current and traditional form, *Brophy's* recognition of a scienter-based

derivative claim is not out of step with federal law.  But the evolution of a non-scienter,

insider trading-based type of derivative action would create policy incongruence.

Although there is no doubt that corporate insiders ought to be careful about trading

in their own companies' stock, there is more than tolerable doubt that they should be

subjected to an enforcement regime that provides them with no predictable basis for

determining when it is safe to trade.  But, that is precisely the regime that would exist if

corporate insiders were strictly liable to return profits if their companies fail to meet

market estimates after their trades are completed and if the insiders can be said to have

possessed information casting some doubt on their companies' ability to meet the market

at the time that they traded.  If companies actually provide the market with good

---

*Achieved What Congress Intended?*  76 Wash. U. L. Q. 645, 680-81 (1998) (noting that it is evident that the Delaware carve-out was "designed to preserve remedies where directors have recommended a vote or acceptance of a tender offer . . . or where shareholders must vote on a transaction . . . " and indicating that federal preemption legislation did not reach derivative actions).

[118] Arguably, the case of *Malone v. Brincat*, 722 A.2d. 5 (Del. 1998), already represents an expansion of the Delaware carve-out, because it theoretically permits recovery by stockholders against directors who make knowingly false disclosures that are not in connection with a request for stockholder action or a stockholder's sale or purchase of stock.  Under *Malone*, the possibility of a "holder's" recovery thus exists, an outcome that is in tension with federal law.  As a practical matter, this state's unusual approach to the certification of class actions in disclosure cases, *see Gaffin v. Teledyne*, 611 A.2d. 467, 474 (Del. 1992) (holding that because individual reliance predominates over other issues, no class may be certified in a common law fraud claim involving the stockholders of a corporation as a proposed class), serves to limit the utility of *Malone* to plaintiffs' lawyers.

[119] *E.g.*, 15 *U.S.C.* §§ 77z-2(c)(2) and 78u-5(c)(2) (creating a safe harbor for certain forward-looking statements).

estimates that are not unreasonably low-balled, it will of course often be the case that the

companies' actual attainment of the estimates will be in some doubt, due to the normal

vagaries of doing business in a dynamic marketplace. The rule that the plaintiffs

advocate will inevitably operate not simply to deter trading in quarters that turn out

poorly but also to deter trades in quarters when it turns out that the company hit the mark,

but where that accomplishment was not entirely free from doubt before the quarter ended.

That is, because a strict liability or negligence regime would place insiders at substantial

personal risk based on events that transpire after their trading activities, insiders would be

discouraged from trading whenever it was other than a sure thing that the company would

more or less exactly meet its market estimates.[120]  In other words, this regime would

involve many of the same problems of hindsight bias that have led the corporate law to

eschew a simple negligence regime and to enable corporations to insulate directors even

from liability for gross negligence.[121]  Because the cases that would be tried would

obviously only involve situations when the insider's corporation deviated markedly from

expected performance, fact finders might be more inclined than is empirically justified to

conclude that the insiders possessed information that enabled them reliably to predict,

before-the-fact, what the after-the-fact outcome would be.

---

[120] To extend the implication further, if an insider *bought* when she had information that might suggest that the company would exceed company estimates, that purchase would also be wrongful and require disgorgement. To be fair, plaintiffs might argue that insiders merely need to bend over backwards, by refraining from selling when prospects are somewhat cloudy and refraining from buying when prospects are somewhat sunny. But, the distinction between partly sunny and partly cloudy is inherently subjective, complicating the retrospective analysis that plaintiffs suggest.

[121] William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care With Delaware Public Policy:  A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 454-55 (2002) (citing Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. The Business Judgment Rule:  Differences in Hindsight Bias*, 73 Or. L. Rev. 587, 588 (1994)).

For all these reasons, I would not find the common law evolution that the plaintiffs advocate a sensible one even if I were entitled to consider the question without giving any consideration to previous decisions of this court.  The adoption of what can only be seen as a strict liability or negligence-based liability regime to govern insider trading would inhibit legitimate conduct and is unnecessary in light of the strong federal regulatory regime that addresses wrongful and knowing insider trading.[122]

And, of course, even a common law court must give due deference to prior precedent, even as it retains the authority, subject to appellate review and legislative intervention, to update the common law in light of new experience.  As to the question the plaintiffs now present, the relevant Delaware authority is entirely contrary to their position.  In a recent decision, I summarized what I understood and still understand to be the rule of *Brophy*:

---

[122] A great deal of academic energy has been expended trying to justify and delimit legal prohibitions on insider trading.  There is, however, little, if any, disagreement that insider trading should only be prohibited when the trading party acts with scienter, in the sense that the trader should have known she was breaching a duty to some party.  *See, e.g.* Alan Strudler & Eric W. Orts, *Moral Principle in the Law of Insider Trading*, 78 Tex. L. Rev. 375, 384 (1999) (treating the scienter requirement as an assumable element of insider trading).  The state law of fiduciary duty is important in this analysis because it is easy to conclude that a corporate officer should not exploit nonpublic information to make a profit for herself. *See, e.g.*, Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition*, 52 Wash. & Lee L. Rev. 1189 (1995) (concluding that state law fiduciary duty principles provide a strong rationale for prohibition of insider trading in that they serve to protect property rights).  As scholarly work illustrates, the fact that a corporate insider breached a duty to the corporation does not indisputably translate into a conclusion that she has also wronged the person with whom she traded.  Rather, (surprisingly) strenuous efforts at reasoning characterize attempts to prove the soundness of this connection.  Alan Strudler & Eric W. Orts, *Moral Principle in the Law of Insider Trading*, 78 Tex. L. Rev. 375 passim (1999).

   As a practical matter, the existence of the legal prohibition on trading by corporate fiduciaries who possess material, nonpublic corporate information, in itself, makes any violation by a fiduciary a wrong not only to the corporation (whose information she used for improper, personal purposes), but also to the persons with whom she trades.  Because the other parties are induced to buy and sell on the promise that they will not be in a market tilted towards insiders who have large informational advantages, an insider who knowingly exploits nonpublic information to make a profit is on notice of the unfairness of her actions towards her trading partners.

> *Delaware law has long held — see Brophy v. Cities Service, Inc. — that directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits.  This doctrine is not designed to punish inadvertence, but to police intentional misconduct.*  As then-Vice Chancellor Berger noted, *Brophy* is rooted in trust principles that provide "that, if a person in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit."  Or as then-Vice Chancellor Hartnett put it, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information."  *That is, Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter.*[123]

Distilled to its essence, therefore, a plaintiff seeking to prevail on a *Brophy* claim ultimately must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.  To anyone familiar with federal insider trading law, these elements will not look unusual as they more or less track the key requirements to recover against an insider under federal law.

The basic elements, as might be expected, are easier to state than to apply.  The federal courts have struggled to shape the basic concepts of materiality and scienter into standards that trial courts can apply to decide actual cases.  To that ongoing endeavor, I now turn, beginning with what the concept of materiality means in the context of this case.

---

[123] *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (emphasis added) (quoting respectively from *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del. Ch. Oct. 16, 1989) (internal quotation marks and citations omitted) and *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985) (citations omitted)).

## VI.  <u>The Materiality Of Intraquarter Data</u>

The definition of materiality used by Delaware courts is identical to that used by federal courts.  For information to be material, there must be a "substantial likelihood" that the nonpublic fact "would have assumed actual significance in the deliberations" of a person deciding whether to buy, sell, vote, or tender stock.[124]  In other words, the nonpublic information must be of a magnitude that it would, upon disclosure, have "significantly altered the 'total mix' of information" in the marketplace."[125]

Materiality is intrinsically a contextual concept that requires consideration of the nature of the supposedly material information that was not public knowledge and of the other information that was known to the market.  Here, what is contextually important is that the plaintiffs are arguing that intraquarter operating results, projections, and Pipeline estimates in Henley's and Ellison's possession were material because that information was inconsistent with the Market Estimates Oracle had released on December 14, 2000.

In determining whether the information that Henley and Ellison had access to when they decided to trade is material, it is important to bear in mind the federal disclosure policies that address intraquarter financial information.  An experienced securities practitioner described these policies succinctly and well in academic commentary:

> Issuers ordinarily do not have to disclose operating results as a quarter progresses — for example, declining sales or reverse trends, changes in product mix or margins, delays in new product introductions, etc. — unless

---

[124] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).
[125] *Id.*

it is necessary to correct a prior statement inaccurate at the time it was made. Financial information is normally disclosed quarterly — as is a company's views of known trends and uncertainties — in the MD&A section of its Forms 10-K and 10-Q. No rule requires the routine reporting of mere changes, or anticipated changes, in operating results during a quarter. A number of cases have said that there is no duty to make intraquarter disclosures, even if results are below a company's own, and the market's, expectations.

Strong policy reasons support this rule. It takes time for a company to generate accurate and reliable information regarding current performance, to analyze the information meaningfully. Requiring disclosure of such information is therefore tantamount to requiring disclosure of internal projections that will constantly change as the quarter progresses. That information is inherently transitory and fragmentary, even if it is in some metaphysical sense 'current' or 'unknown.'[126]

Congress, the SEC, and the federal courts have continually sought to strike an appropriate balance regarding the appropriate disclosure policy towards forward-looking information such as projections. Wishing to encourage responsible forward-looking disclosure, Congress created a safe harbor for projections and other forward-looking statements in the Private Securities Litigation Reform Act of 1995.[127] In general, that safe harbor insulates an issuer of securities for liability for a forward-looking statement if it: a) was accompanied by meaningful cautionary language, b) was immaterial, or c) was made without scienter.[128] That is, the safe harbor represented a codification of concerns that motivated judicial recognition of the "bespeaks caution" doctrine, a doctrine that raised the bar for plaintiffs in securities cases premised on the failure of companies to

---

[126] Richard A. Rosen, *The Statutory Safe Harbor for Forward-Looking Statements After Two And A Half Years: Has it Changed The Law? Has It Achieved What Congress Intended?*, 76 Wash. U. L. Q. 645, 668 (1998).
[127] Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); *see Rosen*, 76 Wash. U. L.Q. at 646-660 (summarizing the federal statutory provisions comprising the safe harbor).
[128] *Id.* at 652.

perform in accordance with past predictions when those predictions had been accompanied by meaningful cautionary statements.[129]  Because, by their very nature, predictions of the future are less certain than statements about past events, courts have been less apt to find forward-looking statements material and have been more dubious of claims that it was reasonable for investors to rely upon such statements in making trading decisions.[130]  At the same time, neither statutory nor judge-made federal disclosure law has insulated defendants absolutely from any liability for making forward-looking statements to the market, recognizing that a blank-check of that kind could injure investors and promote less than optimally careful forward-looking disclosures.[131]

This case, of course, involves a slightly, but importantly, different question than is presented when plaintiffs seek damages by alleging that a forward-looking statement was itself materially misleading.  Here, the plaintiffs allege that Henley and Ellison injured Oracle, not by making the original Market Estimates, but by selling stock while they possessed information suggesting that Oracle would miss those Estimates.  That is, this case falls into the category of cases that arise when companies or their insiders, having no general obligation to update their quarterly estimates, engage in market activity that invokes the so-called "disclose or abstain" rule requiring companies and their insiders to

---

[129] *E.g., In re Donald J. Trump Casino Sec. Litig. — Taj Mahal Litig*., 7 F.3d 357, 364 (3d Cir. 1993), *cert. denied*, 510 U.S. 1178 (1994).

[130] *E.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos. Inc.,* 75 F.3d 801, 811 (2d. Cir. 1996) (optimistic forward-looking statements that company would perform well are the type of puffery that bespeak caution and are generally not actionable).

[131] *E.g.,*15 *U.S.C.* § 77z-2(c)(1)(B) (permitting plaintiff to plead a claim if it sets forth facts that show that the forward-looking statement was made with actual knowledge that it was false or misleading)*; § 78u-5(c)(1)(B)* (same)*; United States v. Smith,*  155 F.3d 1051, 1065 (9th Cir. 1998) ("We have never held — nor even hinted — that forward-looking information or intra-quarter data cannot, *as a matter of law*, be material.  Nor has any court for that matter, at least to the best of our knowledge.") (emphasis in original).

either disclose new information or to abstain from market transactions in the companies' shares.

A well-reasoned decision addressing a case of that kind is *Shaw v. Digital Equipment Co.*,[132] which was issued by the United States Court of Appeals for the First Circuit.  In *Shaw*, the plaintiffs had bought preferred shares of Digital Equipment Corp. or "DEC" during a mid-quarter offering.  In their complaint, the plaintiffs alleged that "DEC had in its possession as of the March 21 offering date nonpublic information concerning the company's ongoing quarter-to-date performance, indicating that the company would suffer unexpectedly large losses for that quarter."[133]  Despite allegedly possessing that information, DEC "failed, in connection with the March public offering, to disclose [these] material factual developments foreboding disastrous quarter-end results."[134]  Notably, the prospectus for the offering was filed only 11 days before the end of the quarter that ended so poorly.[135]

In addressing the plaintiffs' appeal of the dismissal of their claim under Section 11 of the Securities Act of 1933 — which imposes liability when a registration statement, among other things, omits material facts — the Court of Appeals found it "helpful to conceptualize DEC (the corporate issuer) as an individual insider transacting in the company's securities, and to examine the disclosure obligations that would then arise."[136] A central purpose of the disclose or abstain rule was to prevent insiders from profiting

---

[132] 82 F.3d 1194 (1st Cir. 1996).
[133] 82 F.3d at 1207.
[134] *Id.*
[135] *Id.* at 1211.
[136] 82 F.3d at 1203.

from the "inherent trading advantage they have over the rest of the contemporaneously trading market by reason of their superior access to information," and this purpose applied equally to an issuer that sought to sell its own shares.[137]

The court then went on to determine what, if any, duty DEC had as an issuer to either disclose the intraquarter data it possessed or to abstain from selling shares. It rejected the defendants' argument that "there can never be a duty to disclose internally known, pre-end-of-quarter financial information, because any inferences about the quarter that might be drawn from such information could be rendered unreliable by later developments in the same quarter, such as a sudden surge of profitable sales."[138]  Noting that the Supreme Court had rejected so-called bright line approaches to materiality determinations in the analogous context of preliminary merger discussions, the court held that the question of whether intraquarter information "must be disclosed (assuming the existence of a duty), poses a classic materiality issue:  given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?"[139]

On the other hand, the court took into account the reality that businesses will often possess interim results that might be read to cast doubt on the company's ability to meet market expectation:

---

[137] *Id*. at 1203-04 (citations omitted).
[138] *Id*. at 1210.
[139] 82 F.3d at 1210.

> [W]e reject any bright-line rule that an issuer engaging in a public offering
> is obligated to disclose interim operating results for the quarter in progress
> whenever it perceives a possibility that the quarter's results may disappoint
> the market.  Far from it.  Reasonable investors understand that businesses
> fluctuate . . . .  There is always some risk that the quarter in progress at the
> time of an investment will turn out for the issuer to be worse than
> anticipated.  The market takes this risk of variability into account in
> evaluating the company's prospects based on the available facts concerning
> the issuer's past historical performance, its current financial condition,
> present trends and future uncertainties.  But . . . the ability of market
> observers to evaluate a company depends on the information publicly
> available to them.  If, as plaintiffs allege here, the issuer is in possession of
> nonpublic information indicating that the quarter in progress at the time of
> the public offering will be an extreme departure from the range of results
> which could be anticipated based on currently available information, it is
> consistent with basic statutory policies favoring disclosure to require
> inclusion of that information in the registration statement.[140]

The court then went on to clarify that the plaintiff could meet its burden under this formulation by showing that the defendant possessed "information about the company's quarter-to-date performance (e.g., operating results) indicating *some substantial likelihood* that the quarter would turn out to be an *extreme departure* from publicly known trends and uncertainties. . . ."[141]

Although the opinion in *Shaw* reinstated the plaintiffs' complaint, it did so on a narrow basis and the court took pains to emphasize two elements of its reasoning that limited the ability of future plaintiffs to successfully plead claims.  First, the court indicated that when the connection between the interim results and the later events that the interim results "purportedly forewarned" was "sufficiently remote in time or

---

[140] *Id*. at 1210.
[141] 82 F.3d at 1211 (emphasis added).

causation," the information could be deemed immaterial as a matter of law.[142]  Second

and relatedly, the court indicated its view that the plaintiffs' claims had vitality only

insofar as they alleged that DEC had failed to disclose hard information (i.e., actual

intraquarter results) rather than soft information (i.e., updated projections).[143]  It appears

that there was no allegation that DEC possessed updated projections at the time of its

public offering that contradicted any previous projection to the market.

    In its later decision in *Glassman v. Computervision Corp*.,[144] the First Circuit

applied both of these principles in upholding the denial of a motion to file a second

amended complaint.  The affirmance was based in part on the deficiency of the

complaint's allegation that an offering prospectus was materially misleading because it

failed to disclose that the company's early quarter results lagged behind its undisclosed

internal projections.  The court held that the "mere fact that intraquarterly results lagged

behind internal projections does not, without more, require disclosure."[145]  Rather, the

plaintiffs had to allege that as of its public offering the company possessed "hard mid-

quarter results that would have predicted a material departure in the end-of-quarter

results."[146]  By this formulation, the court meant that the plaintiff had to meet the

exacting *Shaw* standard.[147]  Because the plaintiffs only pointed to seven weeks of

intraquarter data in an industry where "mid-quarter results were not particularly

---

[142] *Id.*

[143] *Id.* at 1211 n.21.

[144] *Glassman v. Computervision Corp*., 90 F.3d 617 (1st Cir. 1996).

[145] *Id.* at 631 (citing *In re World of Wonder Secs. Litig*., 35 F.3d 1407, 1419 (9th Cir. 1994), *cert. denied*, 516 U.S. 868 (1995)).

[146] *Id.* at 632.

[147] *Id*. at 626 n.11 (quoting *Shaw*'s discussion of soft information coupled with adequate cautionary language).

predictive," the Court found that the proposed complaint failed to point to a material omission of fact.[148]

With some appropriate tailoring, the *Shaw* standard articulates a sound framework for the determination of materiality by this court under *Brophy*.  For starters, the Delaware courts, like federal policymakers and judges, have been chary about requiring the disclosure of information that does not provide any reliable insight into firm value. The more tentative and soft the information, the more reluctant our courts have been to deem it material.[149]  That is, the courts of this state premise their materiality determinations on a rational investor standard, which assumes that investors understand the normal fluctuation of markets and grasp the difference between representations of historical fact and estimates of future results.  Furthermore, our courts have long recognized that it is possible to make reliable determinations of materiality on the basis of a paper record, when no rational fact finder could differ with the court's conclusion.[150]

As to one feature of *Shaw* and the gloss put on it in *Computervision*, however, I

---

[148] *Id.* at 632.

[149] The United States Supreme Court has held that "materiality will depend at any given time upon a balancing of both the indicated probability that [an] event will occur and the anticipated magnitude of the event in light of the totality of the company activity."  *Basic Inc. v. Levinson*, 485 U.S. 222, 238 (1988) (quoting *SEC v. Texas Gulf Sulphur Co*., 401 F.2d 833, 849 (2d Cir. 1968)).  In a range of contexts, Delaware courts have applied a similar balance and have been reluctant to require disclosure of information that does not bear reliably on firm value, particularly soft information such as projections of performance or estimates of value.  *E.g.*, *Barkan v. Amstad Indus., Inc.*, 567 A.2d 1279, 1289 (Del. 1989); *Van De Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991); *Goodwin v. Live Entertainment, Inc.*, 1999 WL 64265, at *12 (Del. Ch.), *aff'd*, 741 A.2d 16 (Del. 1999); *In Re Siliconix Inc. Shareholders Litig.*, 2001 WL 716787, at *10 (Del. Ch. June 21, 2001).

[150]*See, e.g., In re Frederick's of Hollywood, Inc. Shareholders Litig.*, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) (resolved pursuant to a 12(b)(6) motion to dismiss); *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974 (Del. Ch. Sept. 27, 1999), *aff'd*, 750 A.2d 1170 (Del. 2000) (resolved pursuant to a 12(b)(6) motion to dismiss); *Goodwin v. Live Entertainment, Inc.*, 1999 WL 64265 (Del. Ch. Jan. 28, 1999), *aff'd*, 741 A.2d 16 (Del. 1999) (resolved on a motion for summary judgment); *Loudon v. Archer-Daniels-Midland Co.*, 1996 WL 74730 (Del. Ch. Feb. 20, 1996), *aff'd*, 700 A.2d 135 (Del. 1997) (resolved pursuant to a 12(b)(6) motion to dismiss).

must differ slightly in order to be faithful to our law.  As I understand Delaware law, the fact that information is "soft" (e.g., a prediction of future results) rather than "hard" (e.g., historical fact) is relevant to, but not entirely dispositive of, the materiality determination.[151]  To be concrete, assume that ABC Corporation had made a public estimate that it would earn $250 million in profits for the coming quarter.  During the second month of that quarter, the company announced a special share buy-back program.  By that time, its internal estimates were that the company would earn $425 million for the quarter.  If the company made no disclosure of that new estimate, I assume that a substantial materiality question would arise under Delaware law.  Federal courts other than the First Circuit have issued decisions that also suggest that a serious materiality question would be raised in those circumstances.[152]

Thus, I conclude that there is, for Delaware law purposes, no bright line between soft and hard information in this context.  As noted, however, the differences between *Shaw's* teaching and Delaware law are slight.  The reason why this is so is that I am skeptical that there will be many cases when a materially significant alteration in company projections is made without any connection to a change in certain "hard" facts.  Usually, a downward or upward move in projections will directly result from the processing of "hard information" about the business.  This could include an actual diminution or increase in the sales opportunities available to the company as measured by

---

[151] *Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116, 127-29 (Del. Ch. 1986) (discussing the treatment of soft information under Delaware law and holding that it may or may not be material depending on circumstances).

[152] *E.g.*, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554-562 (6th Cir. 2001) (emphasizing the need for a context-specific application of materiality principles, even as to so-called soft information).

some objective internal standard (e.g., in this case, the size of Oracle's Pipeline). Therefore, it is not apparent to me that the line drawn by *Shaw* between hard and soft information will be outcome-determinative in many cases.

Whether that is so or not, what is more important is that Delaware law does not require this court to make a binary decision about materiality based on a characterization of information as soft or hard.  The relative firmness of the information is simply one factor in the overall determination of materiality, albeit an important one.

By contrast, however, *Shaw*'s requirement that the plaintiff must demonstrate that intraquarter information is material in the sense that its existence creates a "substantial likelihood" of an "extreme departure" from projected results is a sensible one that reflects concerns that Delaware law shares.[153]  If a company makes good faith estimates of its performance and is subject to the expected variations in results of an operating business in a market economy, one would expect that its intraquarter results and projections will often involve some deviation from the original quarterly projections.  To find information material simply because it might cast some doubt on the company's ability to meet its projections more or less exactly would unduly chill trading by issuers and insiders (not to mention issuers' willingness to provide guidance at all), for reasons I noted earlier in deciding that scienter is a critical element under *Brophy*.  Such a finding is also unnecessary in view of the inherent imprecision of forward-looking estimates and the correspondingly greater caution that rational investors should use in relying upon such estimates to make investment decisions.  Too low a bar under state law would also tend

---

[153] 82 F.3d at 1211.

to disrupt the federal quarterly reporting regime and to generate an incentive for prolix disclosures that are more fulsome in their cautionary language, but no more informative or reliable.  Indeed, the estimates might become even more unreliable as companies submit lower estimates that they are certain to make instead of more reasonable, but less certain, estimates.

Therefore, it is only when the intraquarter information makes it likely that the company will either outperform or underperform its projections in some markedly unexpected manner that the materiality threshold is satisfied.  In so concluding, I reject the plaintiffs' argument that there should be a more plaintiff-friendly standard of materiality in the *Brophy*-insider trading context than in a situation when this court is weighing the sufficiency of a corporate disclosure document.  Like *Shaw* and other courts, I do not believe that the definition of materiality changes based on that distinction.  As *Shaw* points out, the disclose or abstain doctrine applies to issuers as well as to corporate insiders who wish to trade.[154]

In determining whether corporate insiders are liable under *Brophy* because they allegedly possessed material, inside information, the court is engaged in an analytical exercise identical to that required to determine whether an issuer that sold or bought stock should be liable because it failed to disclose material information or to determine whether a director should be liable for failing to disclose a material fact in a corporate disclosure seeking a vote or tender.  The only principled manner in which to hold a defendant liable in any of these contexts is to evaluate the information in his possession, compare it to

---

[154] 82 F.3d at 1203-04.

what the market knew, and identify if any of the non-disclosed information would have been of consequence to a rational investor, in light of the total mix of public information. If the question of what information should have been disclosed cannot be answered with some reasonable precision in a case governed by *Brophy*, then it is difficult to conceive how a defendant can be fairly held liable for wrongful insider trading under our law. For reasons of this kind, *Shaw* makes clear that under federal law, the same standard of materiality applies under §§ 11 and 12 of the 1933 Act as to insider trading claims under § 10 of the 1934 Act.[155]

A. <u>The Informational Mix Preceding Trading By Henley And Ellison</u>

To evaluate whether Ellison and Henley possessed material, adverse information at the time they decided to trade, I must initially address the informational mix in the market that pre-existed their trades. In this mix, the most important factor is the expectations created by the Market Estimates provided by Oracle that Oracle would earn 12 cents per share and achieve License Revenue growth of about 25% in 3Q 01. But those expectations must be viewed through the mind of a hypothetical rational investor. Such a rational investor would have known that a projection is, at best, a good faith estimate of how a company might perform in the future; it is by no means a warranty that can be blindly relied upon. Indeed, because Oracle accompanied the Market Estimates with caveats and cautionary statements, rational investors were on notice that the Market Estimates were precisely the sort of information that, when made in the manner Oracle made them, "bespeaks caution," regardless of whether they were optimistic in tone. In

---

[155] *Shaw*, 82 F.3d at 1217.

this respect, it is notable that Oracle had expressly cautioned investors that the company's
ability to predict quarterly revenues was compromised by the hockey-stick effect.[156]

Nor would a rational investor have been ignorant of the slowing American
economy and the possibility that this might dampen Oracle's performance. Although
Ellison and Henley had noted in December that Oracle had not yet suffered (in the sense
that it continued to produce record results and impressive growth) as a result of the
overall economy or because of the mudslide in the dot.com sector, the risk that economic
conditions could worsen to an extent that would adversely affect Oracle was known to the
market and disclosed by Oracle in 2Q 01 and 3Q 01. Any reasonable investor would
know that a weakening economy could have the effect of causing procurement officers to
defer discretionary spending, including spending on the kind of expensive products that
Oracle sells.

Put summarily, this case does not involve a situation when corporate insiders
possessed information that demonstrated that historical facts regarding a company were
materially false. At best, it involves a scenario when Oracle insiders possessed
intraquarter data that might have cast doubt on the company's ability to achieve
projections that it did not warrant would come true and that it accompanied with
cautionary statements. As a result, any intraquarter information that simply made it less
likely that Oracle would hit its predicted results is, necessarily, less likely to significantly
affect the informational mix because, from the get-go, the market knew that it was more

---

[156] DX 80 at 87326–27.

than a theoretical possibility that Oracle would fall short of expectations, it was at all times a highly plausible scenario.

B. Undisputed Facts That Bear On The Materiality Of The Information That Henley And Ellison Possessed Before They Began Trading

With this baseline in mind, it is useful to set forth a few of the undisputed facts that influence whether the intraquarter data available to Ellison and Henley at key times was material. Any rational fact-finder would have to bear these facts in mind in determining if there existed, at any time before the challenged trades, information that created a substantial likelihood that Oracle would markedly depart from the Market Estimates.

I begin with the fact that what I have called Minton's Best Estimates in the Upside Reports were regarded as of the relevant time as the most accurate financial prediction of how Oracle would perform in a quarter. This is undisputed and this fact makes it improbable that material, adverse facts existed at a time when Minton was projecting that Oracle would exceed, meet, or not materially fall short of the Market Estimates.

In this respect, it is also relevant that Minton was not noted for being aggressive, but for being conservative. Likewise, the sales unit forecasts (i.e., the Forecast Projections), if anything, had tended to be unduly pessimistic, as the sales units preferred to deliver pleasant surprises rather than unexpected disappointments. Therefore, there was no reason for either Ellison or Henley to believe that their subordinates were providing them with unreasonable estimates of how 3Q 01 might turn out. To the contrary, they had every reason to expect that they would tend to be conservative. As

important, there is no rational basis to infer that Minton or others involved in the

forecasting process at Oracle would intentionally overlook rather than diligently attempt

to identify information that might cast doubt on Oracle's ability to meet the Market

Estimates.  As we shall see, the reality is that Minton did in fact adjust her Best Estimates

based on her assessment of new facts, as did Oracle's sales units.[157]

Relatedly, the record is devoid of any basis to suspect that Minton or others

involved in preparing relevant information for the EMC were somehow accomplices in

an ingenious scheme to facilitate unfair insider trades by Ellison and Henley.  There is no

evidence that any subordinate Oracle executives, particularly Minton, provided Henley

and Ellison with false or doctored estimates that suggested at relevant times that Oracle

would meet the mark, in order to provide cover for the trades when the subordinates in

fact believed that Oracle would not meet its estimates.  There is no piece of evidence that

rationally supports the idea that a deep conspiracy of this kind existed and the plaintiffs

do not even suggest it.

---

[157] The plaintiffs have argued that the traditionally less accurate and traditionally too conservative
Forecast Projections made by the sales units were actually a better predictor than Minton at times in FY
01.  This is, at best, an observation made in hindsight and not one that anyone at Oracle shared in 3Q 01
or, apparently, shares now.  Moreover, it is clear that Minton was a better predictor, by a wide margin,
than the sales units when all recent experience before 3Q 01 is rationally taken into account.  As
important, it is clear that neither Minton nor the sales units foresaw the disastrous drop-off that occurred
in the last days of 3Q 01.  If the Forecast Projections from January for 3Q 01 had held, Oracle would have
outperformed its actual license revenue results for the quarter by a very wide margin.  As the January
2001 Upside Reports indicate, the Forecast Projections throughout all of January estimated that Oracle
would earn license revenues of over $1.25 billion — or approximately 20% growth over 3Q 01 — and
that it would earn either 10.6 or 10.7 cents per share, which Oracle would round up to 11 cents.  DX 25-
27.  Put bluntly, the traditionally less accurate, and traditionally too conservative Forecast Projection was
predicting throughout January that Oracle would nearly make the Market Estimates, a fact that itself
suggested, because of the historic conservatism of those projections, that Oracle could in fact meet the
Market Estimates.  The fact that Oracle only achieved 5% growth when the Forecast Projections were
estimating 20% growth and Minton was estimating even higher growth throughout January undercuts any
rational inference that the early quarter results were viewed by anyone within Oracle as predictive of an
end-of-quarter debacle.

Given that there is no rational basis on this record to question the good-faith of Minton and others involved in the financial reporting process, the undisputed fact that Ellison and Henley actively questioned these subordinates about their numbers does little to help the plaintiffs.  If, after creating an environment in which hard questions about estimates were continually asked by EMC members and by members of Minton's team in a culture in which conservative projecting was the rule, Ellison and Henley received — as they did — Best Estimates suggesting that Oracle would meet the Market Estimates, the idea that material, adverse information existed simultaneously with those Estimates is less, not more, tenable.

Furthermore, it is not rationally disputable that Oracle's quarterly performance was predominantly determined by its third month performance, and that the third month was itself heavily dependent on performance within the last week of the quarter.  For this reason, there is no rational way to infer from the record that anyone involved at high levels in examining Oracle's ability to make its quarterly estimates placed substantial weight on first month performance within quarters.  Although it is clear that the EMC examined first month results when they came out, they did not quake with fear if the first month lagged a bit behind expectations because that had happened in the past in quarters when Oracle had gone on to exceed expectations.  Oracle insiders did not view second month results as a reliable predictor of final quarterly performance for similar reasons.  In fact, for the three quarters immediately preceding 3Q 01 — 4Q 00, 1Q 01, and 2Q 01 — Oracle's first two months in each quarter trailed its projections for total company revenue.  But in each quarter Oracle met or exceeded its quarterly forecast.

Also indisputable is that Oracle's primary check on how a quarter was proceeding was a comparison of the current quarter to the same quarter in the previous year. Although Oracle executives at times looked at data for other quarters earlier in the same year, Oracle's key financial reports (e.g., the Upside and Pipeline Reports) contained comparisons to the same quarter in the previous year. This was not coincidental but reflected the substantial emphasis given by Oracle to comparisons to the same quarter in the prior year. As to 3Q 01, this meant that experience in 3Q 00 was given great weight.

Another undisputed fact is that Minton, and the EMC, were necessarily reliant on an examination of Oracle's Pipeline as a primary tool in evaluating likely end-of-quarter performance. The analysis is easier to state than to accomplish in a reliable way: look at what's in the Pipeline and attempt to determine how much of the Pipeline would be converted into actual revenue, using a combination of past experience and intuition gleaned from discussions with the sales units about their expectations. In performing this analysis, 3Q 00 conversion rates were indisputably very influential to Minton and others, including Ellison and Henley. Notably, this is an exercise that looks forward using Pipeline and other data and not one that looks backwards at early quarter sales. The key guess is what success Oracle will have in landing the sales prospects in its Pipeline.

Lastly, there is no evidence in the record that indicates that Ellison, Henley or any other Oracle insider believed that the Company's long-run prospects were poor. During all of 3Q 01, Oracle expected 4Q 01 to be a very strong quarter.[158]

---

[158] *See* DX 23 at 3021 (12/13/00); DX 166 at 3566 (1/19/01); DX 30 at 4122 (2/16/01).

### C.  A Defendant-Specific Examination Of Materiality

Having these foundational facts in mind, I turn to two key questions:  Did Henley possess material, adverse information at the time of his trades on January 4, 2001?  Did Ellison possess material, adverse information at any time during his trading from January 22 through January 31, 2001?

### 1.  Did Henley Possess Material, Adverse Information At The Time He Traded?

Henley traded on January 4, 2001.  The undisputed record shows that he delayed trading until the new year for sensible tax planning reasons.

At the time he traded, the most recent Best Estimate that Minton had provided estimated that Oracle would earn 12.7 cents per share and achieve 33% License Revenue growth for 3Q 01.[159]  At that time, Henley had not received the Flash Report for December 2000, which was not circulated until January 17, 2001.  But he did know that Oracle had landed its largest deal ever in December 2000, giving it a sizable chunk of revenue that would help the company meet the Market Estimates.

The plaintiffs' claim that Henley possessed material, adverse information comes very close to failing the straight face test and comes nowhere near avoiding summary judgment.   Their argument reduces to the notion that Henley possessed the material fact that Oracle's Pipeline had been reduced to 34% by December 25, 2000 from 52% earlier in December and that this drop was unprecedented.  This argument is unfounded.  For starters, in both 1Q 01 and 2Q 01, Oracle's Pipeline dropped in the first two months but

---

[159] DX 24.

Oracle made each quarter.  Plaintiffs attempt to characterize the drop as a dramatic red flag because it happened in two weeks, rather than over a longer period as in other quarters.  But while the plaintiffs dilate on this quirk of timing, they provide no evidence that anyone at Oracle was similarly concerned.  Plaintiffs' contention seems to be that someone at Oracle *should* have been concerned, but they do not combine that with any evidence that suggests that what was in Oracle's Pipeline on December 25 was insufficient to enable the company to achieve the Market Estimates.

Similarly, this decline in the Pipeline is not made material when considered in concert with the plaintiffs' contention that the reduction showed a narrowing in Oracle's so-called "growth gap."  The plaintiffs derive this term from Henley, who in earlier quarters had asked Minton to provide him with information about the relationship between Oracle's Pipeline and License Revenue projections to see if there was a relation between the two that would help the company predict its results.  The concept was that Oracle would more comfortably achieve its projections if its Pipeline growth exceeded its projected License Revenue growth by a large margin.  The undisputed record indicates, however, that Henley did not continue to ask for reporting on this factor, as it did not, in his judgment, correlate to Oracle's actual outcomes in any reliable manner.  The plaintiffs have failed to produce any evidence that this factor was actually considered in 3Q 01 or that it was considered by Oracle insiders to, or in fact does, reliably predict Oracle's end-of-quarter performance.  Indeed, there is no evidence that the correlation has any empirically reliable significance.  As the defendants point out, the growth gap in 3Q 01 was positive, in the sense that Pipeline growth rate exceeded the Market Estimates.  In

prior successful quarters — including 3Q 00 — the growth gap had been worse than 3Q 01 and Oracle made its quarter.[160]  The plaintiffs' emphasis on these factors underscores the post-hoc nature of their arguments, which depend predominantly on their formulation (after thousands of hours of research and after abandoning many other theories they pressed earlier) of ways at looking at information that differ from the manner in which Oracle's key financial executives processed information in 3Q 01.  To a large extent, the plaintiffs are saying that if Minton and others at Oracle had been as smart as the plaintiffs' lawyers are (and had the benefit of hindsight and two years of processing information) they could have predicted, as of January 4, 2001, that Oracle would fall short of the Market Estimates for 3Q 01 by a large margin.

That contention, however, cannot be accepted by a rational, impartial reader of this record.  What the record does reveal without rational contradiction is that the primary measures that Oracle used to project its performance are inconsistent with the proposition that Henley possessed material, adverse information as of January 4, 2001.  The company's Best Estimate of its performance indicated that Oracle would exceed the Market Estimates for earnings and License Revenue growth by healthy margins.  Using historical conversion rates from 3Q 00 for Pipeline Conversion, Oracle's Pipeline was sufficient to enable the company to have easily exceeded the License Revenue Market Estimate of about 25%.

Furthermore, the fact that Minton reduced her Best Estimates and the Pipeline over time suggests that Oracle had a responsible financial forecasting system that was

---

[160] PC 22.

actively taking into account new information.  When a system results in a Best Estimate that the Company would exceed its Market Estimates by a nice margin and when the plaintiffs cannot point to any materially significant fact (e.g., loss of a large contract) that compromised the integrity of the Best Estimate, no rational mind can conclude that material, nonpublic information existed.

In sum, on the record before me, there is no basis for a rational fact-finder to conclude that Henley possessed material, adverse information on January 4, 2001 that created a substantial likelihood that Oracle would not meet the Market Estimates for 3Q 01.  Therefore, it is of course even more certain that the record would not support an inference that Henley had information that created a substantial likelihood that Oracle's results would markedly depart from the Market Estimates, and thus the plaintiffs have failed to meet their burden under *Shaw*.

2.  <u>Did Ellison Possess Material, Adverse Information<br> At The Time Of His Trades?</u>

Ellison began trading on January 22 and continued trading until January 31, 2001. As a result, he had access to several weeks of additional data beyond that available to Henley on January 4.

In determining whether Ellison possessed material, adverse information, it is useful, however, to begin with some data that the plaintiffs try to pin on Henley as well: the actual Oracle results for December 2000.

I reiterate my finding that the plaintiffs have failed to provide a rational basis for concluding that Henley had access to the Flash Report containing Oracle's actual

75

December results as of his trades because that Report was not distributed until January 17, 2001.  Nonetheless, even assuming that he had access to the Flash Report, or the information contained in it, nothing in that Report, as I will next discussed, constituted material, adverse information.

### a.  The December Results

The plaintiffs place great weight on Oracle's December 2000 performance, which they believed presaged a quarter that would fall well short of the Market Estimates.  What is most striking about this belief is that there is absolutely no evidence that anyone at Oracle perceived the December results as predicting any debacle of that kind.

As described earlier, the Flash Report for December indicated that the Covisint transaction was quite important for that month.  That transaction brought in $60 million in revenue for Oracle and was the company's biggest deal ever, although by no means its first big deal.  Critical to the plaintiffs' argument is the proposition that Oracle insiders should have *totally disregarded* that transaction and looked at the data they were receiving as if it did not contain *any of* the Covisint revenue.

From that perspective, the plaintiffs contend, Oracle's outlook for 3Q 01 looked bleak.  As the December Flash Report indicates:

> The license revenues growth rate was 35% in USD, 25 points better than the 10% growth we experienced in December FY00 over December FY99. However, excluding the $60 million Covisint license deal, the USD Growth Rate would have been only 6%.[161]

---

[161] DX 40.

The plaintiffs also point out that the 6% figure was wrong and that the correct number was 1%. There is evidence that Ellison was aware of the error.[162] From this, the plaintiffs argue that Ellison should have realized that Oracle was going to fall miserably short of the mark, because December had been a dismal month that portended a poor overall quarter.

The problem with their argument is that it is not rationally supported by record evidence.

For starters, the plaintiffs can't play pretend. As much as they would like to imagine otherwise, they need to accept that the Covisint transaction occurred and that it generated real revenue that counted towards Oracle's achievement of the Market Estimates. It was solid revenue that Ellison knew would help Oracle make the mark.

Counting that real revenue, Oracle's total license revenue for December 2000 constituted $240 million or approximately 18% of the $1.31 billion license revenue forecasted in its Market Estimates.[163] A figure of 18% was not a disturbing one that was out of line with past experience.[164] As discussed, the third month of each quarter was the most important one.

First months of quarters were not regarded by Oracle insiders as an accurate predictor of final quarterly performance and the plaintiffs have adduced no rational

---

[162] *See* Ellison Dep. at 319.

[163] $1.31 billion is derived mathematically from applying the Market Estimate of 25% forecasted license revenue increase to 3Q 00's actual license revenue of $1,048,445,000. *See* PC 1.

[164] *See* DX 40. The Flash Report actually informed Ellison and Henley that a higher figure — 19% — had been achieved. The 19% figure in the Flash Report compared favorably with the 16% in FY 00 and the 19% in FY 99. *Id.* Thus, the text of the Flash Report actually gives less reason to conclude that Ellison and Henley thought Oracle would not make its quarterly numbers as of that time.

evidence suggesting that an accurate prediction of Oracle's final quarterly performance can be made from first month results. In 3Q 00, for example, Oracle's December license revenues constituted only 17% of its estimated quarterly license revenues.[165] Yet, Oracle went on to achieve its estimate for that quarter.

The prior December was not aberrational as far as Oracle "first months of quarters" went. For the 22 quarters preceding 3Q 01, Oracle had, on average, achieved 14.5% of its license revenue in the first months of quarters.[166] That percentage is

---

[165] The actual percentage of quarterly revenue contributed by December revenue is disputed. As noted above, the January 17, 2001 Flash Report that Ellison and Henley saw indicates that December 2001 revenue was 19% of projections, and that the actual percents of projections for FY 00 and FY 99 were 16% and 19% respectively. The plaintiffs show the FY 00 as 17%. PC 1; DeGhetaldi Aff. Ex. 6. I have conservatively chosen to use the 17% number, but the distinction matters little; the point is that nothing about the 19% (or 18%) figure provided any cause for alarm when compared to Decembers in previous third quarters.

[166] The plaintiffs submitted an affidavit by Professor Daniel Fischel of the University of Chicago Law School. In his affidavit, Fischel opines that Oracle was not on track to meet the Market Estimates because of its December 2000 performance. In coming to that conclusion, Fischel excluded Covisint altogether and appears to have performed no close examination of Oracle's Pipeline during relevant periods in 3Q 01, which if converted at 3Q 00 rates would have enabled the company to meet the Market Estimates. In concert with excluding Covisint, Fischel made no effort to determine if there were other large transactions in other quarters that should also have been excluded in order for him to take large, non-recurring transactions into complete account. Moreover, Fischel notes that over the prior 22 quarters, the average first month contribution to the quarter's revenue is 14.5%, but that historically December revenue contributes 21% to the quarter's revenue. But, he provides no reliable analysis indicating why Oracle's non-Covisint revenue should be divided by 0.21 (implying that Oracle was substantially off track to meet its estimates) rather than 0.145 (a calculation that shows Oracle nearly precisely on pace to meet its Market Estimates). See Fischel Aff. ¶ 11, Fischel Dep. at 96-100. Fischel, conceded that he had no reliable basis to conclude that third quarters were different from other Oracle quarters in terms of when revenue would be generated in the years before 3Q 01. Fischel Dep. at 96-100. All of this is unsurprising given that the hockey-stick effect had been deepening, rendering first and second months even less important and predictive. PC 6. As discussed elsewhere, what was most important to Oracle's 3Q 01 was its ability to have a strong third month, a capacity that would be determined by its Pipeline. But, even if one looks only at prior Decembers in third quarters, no rational inference of materiality arises. Fischel ignored that Oracle's Best Estimates suggested that the Pipeline would be sufficient, if converted at the 3Q 00 rate, to meet the Market Estimates. Furthermore, Fischel ignored the fact that for Oracle to meet the Market Estimates, it simply had to attain the same contribution from the last month of the quarter as it achieved in 3Q 00, and that if it attained the same contribution from the last month of the quarter as it achieved on average in the last two Decembers, it would have achieved 97.5% of the Market Estimates, an immaterial shortfall. DeGhetaldi Aff. Ex. 6 (if calculated based on the last three years, it would be 95%). Stated simply, Fischel provides no reliable evidence from which one can rationally infer that the

identical to Oracle's December 2000 license revenue as a percentage of the Market Estimates, excluding Covisint entirely.  But, of course, to exclude Covisint entirely is to ignore reality.  Although it was Oracle's biggest deal, Oracle had landed big contracts before.  To account for that, any reliable analysis of the contributions of past first months as a predictor of performance in 3Q 01 would also have to exclude any very large transactions that happened in those quarters, too; otherwise, the total exclusion of Covisint would be entirely unprincipled.

For the sake of completeness, it is worth noting that even if half of the Covisint deal was excluded, Oracle still achieved 16% of the Market Estimates' license revenue projection — a percentage almost identical to that achieved in December of 3Q 00, a quarter when Oracle hit the target.  This assumption — which I viewed to be unwarranted as a matter of business reality and law — demonstrates that Oracle's December performance was not out of line with recent experience during quarters when it met its quarterly projections.

In sum, the record indisputably indicates that Oracle in fact achieved 18% of the license revenue growth projected for 3Q 01 in December 2000, a level of success that was consistent with its performance in preceding quarters in which it managed to meet its revenue target.  And, even without Covisint, Oracle's December 2000 performance equaled the average of first months for the preceding 22 quarters.  Thus, the December 2000 results are precisely the sort of intraquarter data that courts have considered

---

defendants possessed material information as of the time of their trades.  He blinded himself to the relevant forward-looking data that existed in 3Q 01 and makes a predictive leap from the December 2000 results that is unwarranted.

immaterial, as they did not create any substantial likelihood that Oracle would fall short of the Market Estimates.[167]

Lastly, it should be unsurprising that the December 2000 results were not of great concern to Ellison, Henley, or Minton.  With Covisint, Oracle had clearly dropped enough revenue in the license bucket to be on the way to filling it at the end of the quarter.  What Oracle insiders were most concerned with was how the last month of the quarter would turn, a forward-looking emphasis that led them to focus on the Pipeline and whether the Pipeline could be converted in a manner that would enable Oracle to meet the Market Estimates.  As I shall next reiterate, at all relevant times, the forward-looking assessments made by Minton did not suggest that Oracle would fall short of the Market Estimates in any material manner.   There is no evidence that Minton or any other Oracle executive so much as hinted to Ellison (or Henley) that Oracle might fall far short of what the market expected from the company in 3Q 01.

b.  <u>Did The Less Optimistic Best Estimates Produced By Minton Constitute Material Information In Ellison's Possession</u>?

The plaintiffs combine their reliance on the December Flash Report with other evidence from January 2001 that indicated that Oracle's business was somehow softening in a materially significant manner, and argue that the resulting jambalaya constitutes a substantial informational stew.  To the plaintiffs' mind, the fact that Minton was revising

---

[167] Federal courts have found that early quarter results are less likely to be material than late quarter results, for the reason that early results are less likely to be predictive of the ultimate quarterly performance.  *E.g., Glassman v. Computervision Corp.,* 90 F.3d 617, 632 (1st Cir. 1996) (finding no duty to disclose negative information "only seven weeks into the quarter — and where mid-quarter results were not particularly predictive"); *In re Number Nine Visual Technology Corp. Securities Litig.,* 51 F. Supp. 2d 1, 24 (D. Mass. 1999) (discussing the relevance of the timing factor to the materiality inquiry). That precedent is particularly apt here given the extreme back-loading of Oracle's quarterly revenue.

her Best Estimates downward during January 2001 in response to new information she was learning from the sales units indicates that there existed information within Oracle that reliably indicated that the company would not meet the Market Estimates.

Earlier in the opinion, the key ingredients of this argument were identified.  They include e-mails and oral statements by sales executives to Minton that expressed less optimism about the quarter, which were then followed by adjustments in Pipeline and Best Estimates.

The problem with this argument is both simple and insurmountable.  Although Oracle insiders, including Ellison and Henley, received input that suggested that Oracle was unlikely to have a blow-out quarter in which it exceeded the Market Estimates by a large margin, they were not receiving input — based on identifiable facts such as the size of Oracle's Pipeline — that suggested that Oracle would fall materially short of the Market Estimates.

At the time Ellison gave the instruction to his broker to trade — January 19, 2004 — Minton's latest Best Estimate was that Oracle would earn 12.11 cents per share and achieve License Revenue Growth of 29%.[168]  As noted, there is no rational basis to infer that Minton's Best Estimate was made in anything other than good faith.  And there is no doubt that Minton was considered the most accurate estimator within Oracle.

Likewise, the most current Pipeline estimate showed 34% growth over 3Q 00.[169] The Pipeline Report specifically identified the conversion rate from 3Q 00 and indicated

---

[168] DX 25 (1/15/01) Upside Report.
[169] DX 36.  The record suggests that Ellison did not receive the January 15, 2001 Pipeline Report, but Pipeline information was contained in the Upside Reports.  *See* Ellison Dep. at 304.

that if that same rate — 51% — were to be achieved within 3Q 01, then Oracle would

exceed the Market Estimate for License Revenue growth by a large margin.  The Pipeline

Report also indicated a sales unit estimated conversion rate of 47%, a lower figure than

Minton used.  Even when using that more pessimistic number, Oracle was on track to

meet the Market Estimate of "about 25% growth" by falling immaterially short of exactly

25%.[170]  This lower figure is in keeping with the actual conversion ratio for 2Q 01, which

the plaintiffs have argued is a relevant comparison.[171]  But, there are two fundamental

flaws in their reliance on this figure.  First, there is no evidence that Ellison, Henley, or

Minton gave substantive weight to prior quarter conversion ratios in 3Q 01.  Rather, the

evidence is clear that the key financial executives looked primarily to 3Q 00 as the best

predictor for what percentage of the Pipeline Oracle would convert in 3Q 01.  Second, as

noted above, even if the lower 2Q 01 conversion rate was applied to the January 15, 2001

Pipeline, Oracle was on track to produce License Revenue growth of "about 25%."

Put bluntly, as of the time Ellison actually instructed his broker to begin selling

shares, Oracle's Best Estimate was that it would meet the Market Estimates and the most

current Pipeline Report (which he did not see) also supported that proposition.

Ellison's broker actually began to trade on January 22.  That day Minton produced

another Best Estimate.  Again, that Estimate indicated that Oracle would earn 12.06 cents

and achieve license revenue growth of 29%, both beating the Market Estimate.[172]

---

[170] *See Id.*

[171] As previously noted, in 2Q 01, Oracle achieved 74% of its revenue in the last month.  PC 6.  Thus, the plaintiffs' emphasis on 2Q 01 undercuts their insistence that December 2000 and January 2001 had predictive significance.

[172] DX 26 (1/22/01) Upside Report.

On January 29, Minton produced her final Best Estimate for January.  For the first time, that Estimate projected that Oracle would not earn a full 12 cents per share, but instead would earn 11.58 cents per share.  For reporting purposes, however, the 11.58 cents per share would be rounded up to 12 cents.  In keeping with her revision to earnings, Minton reduced her Best Estimate of license revenue growth to 24% — an Estimate that falls squarely within the definition of "about 25%"[173] in the Market Estimate.  The January 29 Best Estimate was generated on a Monday.  That day and the following two days ending January 31 completed Ellison's trading.

It bears emphasis that throughout the entirety of January, Oracle's sale units did not reduce the estimates they provided to Minton — these held firm throughout the month — and they continued to provide her with a basis to believe that the Market Estimates would be met.   That is, although the sales units became less bullish as they knew more about how the quarter was shaping up, they did not provide input that suggested that Oracle would not be able to make its numbers.  Oracle's best predictor, Minton, took this input seriously and applied her judgment to produce reduced Best Estimates that reflected her evaluation of the additional information she gleaned as the month progressed.  But her increased pessimism has to be kept in perspective.  Minton did not come to believe that Oracle would fall materially short of the Market Estimates.

---

[173] The term "about 25%" bespeaks caution because it implies a range.  I need not decide how capacious that range is because 24% is so clearly within it.

She came to believe that Oracle would more or less achieve the Market Estimates exactly.[174]

Given this record, it is impossible for a rational mind to infer that Ellison possessed material, adverse information at the time he instructed his broker to sell shares on January 19, or at the time when he actually sold shares from January 22 to January 31, 2001.  As of those dates, Oracle's estimated Pipeline, if converted at reasonable rates consistent with past relevant experience at the company, was sufficient for the company to meet the Market Estimates.  As of those dates, Oracle's most accurate predictor of company performance was estimating that the company would achieve the Market Estimates.  As of those dates, there is no evidence that any Oracle executive told Ellison or Henley that the company would fall materially short of the Market Estimates.

Because there is no rational basis to infer that Ellison possessed material, nonpublic information at the time he traded, he is entitled to summary judgment on the plaintiffs' *Brophy* claim.

### 3.  The Post-February Events And Information Buttress The Conclusion That Ellison and Henley Are Entitled To Summary Judgment

On this record, there is no rational basis to infer that Ellison was aware of the actual results for January 2001 until after he had finished trading.  The January Flash Report was not circulated until February 8, 2001.

By February 8, 2001, another Minton Estimate had been produced.  The February 5 Best Estimate predicted that Oracle would earn 11.29 cents per share and achieve

---

[174] *See* DX 25-27.

license revenue growth of $1.26 billion.[175]  While this was short of the Market Estimates, it was not short by much.  Moreover, a Pipeline Report came out the same day.  Although the Pipeline growth was down to 32% from the prior January 15 Pipeline Report, the Pipeline was sufficient that, if converted at the 3Q 00 rate, Oracle would still have exceeded the Market Estimates.[176]

The January Flash Report reported the actual results for the first two months of the quarter.  Again, the plaintiffs want to look at that Report as if Covisint did not exist.  But it did.  With Covisint, Oracle had achieved 33% of the license revenue needed to meet the Market Estimate.  In 3Q 00, Oracle produced 67% of its revenue in the third month.[177]  If Oracle did the same in 3Q 01, its first two month results were sufficient to enable it to meet the Market Estimates.[178]  And if Oracle produced at a lower level in the third month — such as 64.5%, the average of the last two years' performance in the last month of a third quarter[179] — Oracle would have reached 97.5% of the Market Estimates, hardly a material shortfall.[180]  Even assuming that Ellison had digested the January results before they were actually provided to him — an assumption for which there is no rational basis

---

[175] DX 28.

[176] The plaintiffs argue that the steep decline in the Pipeline from December to January was itself material.  But Oracle's Pipeline had also dropped in the first two months of 1Q 01 and 2Q 01 and Oracle made each quarter.  PC 77; *see also* DC 37.  Most important, in 3Q 01 the Pipeline was, at all relevant times, sufficient for Oracle to either exceed, meet, or not fall materially short of the Market Estimates, assuming historical conversion rates.

[177] PC 1; *see also* DiGhetaldi Aff. Ex. 6.

[178] In the prior quarter, 2Q 01, Oracle generated 74% of its license revenue in the last month.  DC 1; PC 1.  It did so again in 4Q 01.  And in 1Q 01, it generated 66%.  *Id.*  All of these figures demonstrate that achieving 67% of the 3Q 01 Market Estimates in February 2001 would have been fully consistent with prior experience.

[179] DiGhetaldi Aff. Ex. 6.

[180] In the prior 22 quarters, Oracle had generated an average of 32% of its quarterly revenue in the first two months.  Regan Aff. Ex. K. at 61722-27.  Again, this shows that it would not have taken any unprecedented last month performance for Oracle to have met the Market Estimates.

— the January Flash Report does not support an inference of materiality.  This is especially so when the very next Best Estimate — created on February 12, 2001 — increased, projecting Oracle would earn 11.58 cents and produce $1.265 billion in License Revenue — figures that meet the Market Estimate as to earnings and, with a 21% forecasted increase in license revenue, would arguably fall within the range implied by "about 25%," and certainly would not miss it materially.

What happened in the rest of the quarter is quite telling.  Minton's Best Estimate on February 26 had become more pessimistic, projecting earnings of 11.19 cents and license revenue of $1.257 billion.[181]  These figures fell short of the Market Estimates but not by a material amount as to earnings (less than a full penny) and not drastically as to license revenue growth (20% as compared to "about 25%").

In the few days that remained in the quarter, however, the bottom fell out.  As discussed previously, Oracle's sales units drastically reduced their estimates, as prospective customers deferred spending decisions because of a softening economy.  The e-mail communications and other evidence of angst over this at the sales units is unrebuttedly unfeigned.  Within a day or so, Minton had to reduce her estimate down to 10.07 cents based on a correspondingly dramatic reduction in estimated license revenue.  Even with that reduction, Oracle would have a record quarter but would fall materially short of the Market Estimates.  But no rational person could infer from this record that Oracle could have or did predict this seismic shift in its quarterly fortunes.  Given the historically conservative approach of the Oracle sales units and Minton to projecting

---

[181] DX 32.

performance, it is implausible that either source of information wished to sandbag top management.  The sales units' apologetic communications reflect their embarrassment at their failure to foresee the last-minute erosion.

The unprecedented nature of what happened is highlighted by Oracle's plummeting Pipeline Conversion Rate for 3Q 01 — which ultimately came in at levels well below any Oracle had recently experienced.[182]  Had Oracle converted the Pipeline as estimated in early February even at the 2Q 01 rate the plaintiffs suggest — as opposed to the 3Q 00 rate that Oracle executives actually focused on — then Oracle would have been within range of the Market Estimates.[183]

In the end, the plaintiffs ask me to adopt a Monday-morning quarterback approach to materiality.  Because 3Q 01 went bad, it must have been reasonably foreseeable at the time.  But there is no basis for a rational mind to accept that proposition.  Minton didn't see it coming.  The Oracle sales units didn't see it coming.  And there is no evidence that Henley or Ellison saw it coming.  Not only that, as Oracle points out, other companies in the same industry ended up in a similar predicament in the same general time period, and attributed their failure to meet market expectations to last-minute customer decisions not to close end-of-quarter deals.  Although the plaintiffs say that Oracle should have foreseen that it would be hit by this phenomenon eventually, they have not pointed to

---

[182] *See* Defendants' Oral Argument Charts, S71-S75 (derived from PC 52 & 53).
[183] *Id.*

information that reliably foretold that Oracle's sales units would be faced with a last-minute wave of customer reluctance in the final days of 3Q 01.[184]

Before concluding my discussion of materiality, it is worth considering the nature of the disclosure Oracle would have had to make in late January if it wished to inform the market of the information that the plaintiffs find material.  That disclosure would have told the public that while Oracle still expected to meet the Market Estimates for earnings per share and license growth, it had to remind the public that the economy was weakened, that Oracle's pipeline (while still sufficient to enable Oracle to achieve the Market Estimates using the 3Q 00 conversion rate) was down from December levels and that there was less reason to believe that Oracle could materially exceed the Market Estimates, and that Oracle's ability to make its quarter would, as always, largely be determined by its last month performance.  This would have been a very odd disclosure, indeed.  And if that sort of disclosure would have been material, then Oracle insiders possessed material, nonpublic information in several prior quarters during which it was unclear from Oracle's early quarter performance whether it would make the quarter and, despite that, it later did.  To hold that material, nonpublic information exists whenever it appears, based on early quarter results and estimates of sales pipelines, that there is some uncertainty about whether a company will hit its public earnings and revenue estimates would do little to protect investors and do much to impede the ability of corporations to

---

[184] The fact that the defendants finish trading a full month before 3Q 01 distinguishes this case from those involving defendants who had very late quarter information that the company was trailing its estimates. *E.g., SEC v. Truong*, 98 F. Supp. 2d 1086, 1100 (N.D. Cal. 2000) (finding that where the company had frozen head count and implemented an expense control program because the outlook for the quarter was behind plan eight days before quarter's end, the evidence raised a jury issue of materiality "because a reasonable investor could consider it material that [the company] was behind plan so late in the quarter").

consummate transactions and prevent insiders from having fair opportunities to buy and

sell shares.  For reasons just like this, *Shaw* adopted a materiality standard that requires a

demonstration that the nonpublic information reliably showed that the company would

depart from public expectations in an extreme way.  In this case, at the time of the trades,

there was no nonpublic information that demonstrated that Oracle would depart from the

Market Estimates in any way.

VII.    The Plaintiffs Have Also Failed To Produce Sufficient Evidence Of Scienter
        To Avoid Summary Judgment

In the briefs, the parties engage an interesting debate under federal law.  That

debate centers on what is required to prove scienter under the federal securities law.[185]

Some precedent suggests that the plaintiff must show that the defendant not only

knowingly possessed material information,[186] but also convince the fact-finder that the

material information actually motivated, in whole or in part, the defendant's trading.[187]

Other precedent is sympathetic to the view that if a defendant trades while in knowing

possession of material, nonpublic information, then a violation is proven.[188]  Other cases

elide this divide, by requiring a finding that the trades were motivated, in whole or in

---

[185] For an interesting discussion of the debate about this issue, see Allan Horwich, *Possession Versus Use: Is There a Causation Element in The Prohibition on Insider Trading*, 52 Bus. Law 1235 (1997).

[186] In its history, the SEC has argued on both sides of this debate, but in recent decades it has argued that trading while in knowing possession of material, nonpublic information is, in itself, a violation of Rule 10(b)(5).  *See SEC v. Adler,* 137 F.3d 1325, 1332-39 (11th Cir. 1998) (describing and addressing the SEC's long-standing position to this effect).

[187] *E.g.*, *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (describing traditional insider trading liability as, "Rule 10b-5 [is] violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information"); *Dirks v. SEC*, 463 U.S. 646, 664 n.23 (1983) ("[V]iolation may be found only where there is intentional or willful conduct designed to deceive or defraud investors.").

[188] *E.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) (trading while in "knowing possession" sufficient to violate federal law) (citing *U.S. v. Teicher,* 987 F.2d 112, 120 (2d. Cir. 1993)) (containing strong dictum in favor of the view that knowing possession is sufficient to prove a violation).

part, by the nonpublic information but also concluding that in civil cases an inference of such motivation arises from knowing possession,[189] an inference that supports a jury verdict to that effect or the denial of a summary judgment motion by the defendant.  This interesting back-and-forth is important under the federal securities laws, especially because of recent reforms that require that even a complaint state with particularity facts giving rise to a strong inference that the defendant acted with scienter.[190]

Here, these complexities are not as important for an obvious reason.  There is no rational basis to conclude that Henley or Ellison possessed material, adverse information at any relevant time.  If there is something like "less than zero" outside of Elvis Costello's music, then there is even less reason to infer that Henley or Ellison "knowingly" possessed material, adverse information.  The record is wholly devoid of any basis to suspect that either of them believed that Oracle would materially fall short of the Market Estimates as of the time of their trades.  To the contrary, there is every reason to conclude that each thought Oracle would, at the times relevant to their respective trading decisions, hit the target.

The plaintiffs, of course, make much of what they see as inconsistencies or inaccuracies in Ellison's testimony.  Although Ellison's deposition and interview testimony reveals at times a lack of precision, the only rational inference that can be drawn from his testimony is that he was at times over-bullish.  Importantly, despite a vast record, there is no evidence that could suggest to a rational mind that Ellison was a false

---

[189] *SEC v. Adler,* 137 F.3d 1325, 1340-42 (11th Cir. 1998); *SEC v. Lipson,* 278 F.3d 656, 661 (7th Cir. 2002).
[190] 15 *U.S.C.* § 78u-4(b)(2).

optimist whose sunny outlook masked a genuinely darker view of Oracle's future.  When considered in isolation or along with the other testimonial and documentary evidence, Ellison's testimony does not rationally suggest scienter.  His overall story coheres and his failure to remember certain details with precision at all times is understandable.

Nor do the objective facts about Henley and Ellison's trades create any rational inference of scienter.  As to Henley, his trades were timed to occur early in a quarter, at a time when Oracle's Best Estimate was that it would beat the Market Estimates.  His trades were in keeping with a pattern of diversification and his decision to trade in a new calendar (and therefore tax) year was motivated by proper, non-suspicious financial considerations.  Finally, Henley sold only 7% of his Oracle position, leaving him a huge stake in the company.[191]

As to Ellison, the picture is only clouded by his huge wealth.  Because Ellison's ownership interest in Oracle was so substantial, his sales generated nearly a billion dollars in proceeds even though they involved only 2% of his Oracle shares.[192]  Although it is difficult to slight nearly a billion dollars, that figure must be considered in the context of Ellison's remaining net worth, which was many, many times more enormous, and in light of the reality that Oracle was not Webvan or Enron — Oracle made and still

---

[191] *See Guttman v. Huang*, 823 A.2d 492, 503 n.20 (Del. Ch. 2003) (finding that the fact that defendant retained the bulk of his shares cuts against inference of scienter); *Rattner v. Bidzos,* 2003 WL 22284323, at *12 (Del. Ch. Sept. 30, 2003) (holding that the size of sales is relevant to determining whether directors who traded faced a sufficient likelihood of liability under *Brophy* and could be considered in determining whether directors were disinterested for demand excusal purposes).

[192] *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened.") (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

makes real products that sell for real profits.  There is therefore no rational basis to believe that, by making large sales when he did, Ellison was fleeing disaster or seeking to make an unfair buck at the expense of the trading public.  Rather, the record is clear that Ellison had only three windows left (including 3Q 01) to exercise a large number of options.  The record is also clear that Ellison's financial advisor had been urging him to sell some shares to pay down debt for some time and that Ellison had tarried.

The plaintiffs try to turn that delay into a rational basis for suspicion about Ellison's motives.  But their argument comes across as the ravings of conspiracy theorists, who weave tales out of nothing.[193]   In their brief, the plaintiffs actually suggest that the limited number of windows left for Ellison to exercise his options was not a rational motivating factor because Ellison, if necessary, could have simply let them expire worthless.  That is silly.

Likewise, the plaintiffs try to take Ellison's words out of context by claiming that he lacks credibility because he testified that he was not motivated by a desire to reduce debt in deciding to sell.  What Ellison indicated was quite sensible:  he had a large number of expiring options that would, when exercised, trigger a huge tax liability and require him to sell shares.  Because he would have to enter the market to sell in order to exercise his options, it was a prudent time to finally take his financial advisor's advice to diversify his holdings and to reduce some debt while he was in the market.  Therefore, Ellison has advanced entirely reasonable, non-suspicious reasons for his trades.

---

[193] I do not fault the plaintiffs' able and articulate counsel, as zealous advocates, for making this strained argument, but neither do I shrink from candidly describing its force.

Furthermore, the precise timing of Ellison's trades — coming immediately after his advisor returned from vacation and within the middle of a quarter when he was least likely to possess material information — is not suggestive in any manner of scienter.

In sum, however wealthy Ellison is and however envious that may make some, the fact remains that Ellison sold only 2% of his Oracle holdings.[194]  Ellison remained the person with more equity at stake in Oracle than anyone anywhere.  Plaintiffs continually emphasize the nearly $1 billion that he made on the sale, but ignore the roughly $18.9 billion in equity that he lost in the ensuing share price collapse.[195]  The idea that he would jeopardize his own reputation and that of Oracle by trying to make illicit trading profits does not rationally emerge as a possible inference from this record, especially when the Best Estimates and Pipeline Reports he was receiving did not give him any rational basis to suspect that Oracle would fall materially short of the Market Estimates.

For all these reasons, I do not believe that a rational mind could draw an inference of scienter from this record regarding either Henley or Ellison.  Therefore, for this independent reason, the plaintiffs' *Brophy* claim must be dismissed.

## VIII.  Conclusion

The defendants have demonstrated their entitlement to summary judgment.  The plaintiffs' claims are therefore dismissed with prejudice, with the exception that their

---

[194] *See Guttman v. Huang*, 823 A.2d 492, 503 n.20 (Del. Ch. 2003); *Rattner v. Bidzos,* 2003 WL 22284323, at *12 (Del. Ch. Sept. 30, 2003).

[195] Ellison sold 29 million of his 1.39 billion shares leaving him with approximately 1.361 billion shares. He sold the 29,084,576 shares for $894,786,059 in gross proceeds, an average of 30.76 per share.  On March 2, 2001, Oracle closed at $16.87 per share, $13.89 below Ellison's average sale price.  Multiplied by the 1.361 billion shares he still owned, this drop amounted to $18.9 billion.  Even measuring from the $21.37 close on March 1 before the announcement of the quarter's results, the $4.5 drop in share price equated to a $6.1 billion dollar one-day loss in equity value.

breach of contract claim is dismissed without prejudice to the prosecution of that claim in the pending California derivative action.  Each side to bear its own costs.

**IT IS SO ORDERED.**