Westlaw.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

⌐

Court of Chancery of Delaware,
New Castle County.
In re ORACLE CORP DERIVATIVE LITIGATION
**C.A.No. 18751.**

Submitted: May 28, 2003.
Decided: June 13, 2003.
Revised: June 17, 2003.

Shareholders brought derivative action alleging insider trading by chief executive officer (CEO), chief financial officer (CFO), and two directors. Special litigation committee (SLC) moved for dismissal. The Court of Chancery, New Castle County, Strine, Vice Chancellor, held that ties among SLC members, university where they were tenured professors, and CEO and directors were so substantial that they caused reasonable doubt about the members' independence.

Motion denied.

West Headnotes

**[1] Corporations** ⌐⌐212
101k212 Most Cited Cases
Special litigation committee (SLC) bore the burden of persuasion on motion to dismiss shareholder derivative action and was required to convince superior court that there was no material issue of fact calling into doubt its independence.

**[2] Corporations** ⌐⌐310(1)
101k310(1) Most Cited Cases
The question of independence turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind.

**[3] Corporations** ⌐⌐206(1)
101k206(1) Most Cited Cases
In order to prevail on its motion to terminate the shareholder derivative action, the special litigation committee (SLC) was required to persuade superior court that: (1) committee members were independent; (2) that they acted in good faith; and (3) that they had reasonable bases for their recommendations.

**[4] Corporations** ⌐⌐213

101k213 Most Cited Cases
If the special litigation committee (SLC) meets burden of persuasion on motion to dismiss shareholder derivative action, superior court is free to grant motion or may, in its discretion, undertake its own examination of whether corporation should permit the suit to proceed in the best interests of the company.

**[5] Corporations** ⌐⌐213
101k213 Most Cited Cases
Superior court must deny special litigation committee's (SLC) motion to terminate shareholder derivative action, if there is a material factual question causing doubt about whether the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation; to grant the motion, the court needs to be convinced on the basis of the undisputed factual record, that the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation.

**[6] Corporations** ⌐⌐206(1)
101k206(1) Most Cited Cases
Members of corporation's special litigation committee (SLC) could lose independence without being essentially subservient to officers and directors under investigation for insider trading; whether the members were under the domination and control of the interested parties was not the central inquiry in the independence determination necessary for ruling on SLC's motion to terminate shareholder derivative action.

**[7] Corporations** ⌐⌐310(1)
101k310(1) Most Cited Cases
A director may be compromised and lose independence, if he is beholden to an interested person; "beholden" does not mean just owing in the financial sense, and it can also flow out of personal or other relationships to the interested party.

**[8] Corporations** ⌐⌐206(1)
101k206(1) Most Cited Cases
Assessing the independence of corporation's special litigation committee (SLC) required examination of whether the SLC could independently make the difficult decision entrusted to it: whether the chief executive officer (CEO), chief financial officer (CFO), and two directors should face suit for insider trading-based allegations of breach of fiduciary duty.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) member, university where member was tenured professor, and director were so substantial that they caused reasonable doubt about the member's independence and ability to impartially consider whether director should face suit for insider trading; director was a fellow professor, member had been student of director and served with him as senior fellow at think tank, and a person in member's position would find it difficult to assess director's conduct without pondering his own association with director and their mutual affiliations.

**[10] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) members, university where they were tenured professors, and director who was major benefactor were so substantial that they caused reasonable doubt about the members' independence and ability to impartially consider whether director should face suit for insider trading; the director was an alumnus, had recently donated $50,000 to university's law school after member made a speech at director's request, and served as advisory board chair of think tank where member was senior fellow, the members were aware of the importance of large contributors although they were not responsible for fundraising, their purported ignorance of director's donations was entitled to little weight, and even though the director's contributions were a very small proportion of university's endowment and annual donations, the contributions would not grow by callous indifference to alumni.

**[11] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) members, university where they were tenured professors, and chief executive officer (CEO) were so substantial that they caused reasonable doubt about the members' independence and ability to impartially consider whether CEO should face suit for insider trading; CEO was very wealthy, was publicly considering extremely large contributions to university when members were being added to board, and headed a medical research foundation that was a source of nearly $10 million in funding to university, university's rejection of CEO's child for admission did not keep CEO from making public statements about consideration of huge donation, and although members claimed ignorance, an inquiry into CEO's

connections with university should have been conducted before the SLC was finally formed and, at the very least, should have been undertaken in connection with its report.

**[12] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
Connections among special litigation committee (SLC) members, university where they were tenured professors, and chief executive officer (CEO) and directors would weigh on the mind of a reasonable member and generate a reasonable doubt about the SLC's impartiality in deciding whether to level the serious charge of insider trading; the connection would be on the mind of the SLC members in a way that generated an unacceptable risk of bias and suggested material considerations other than the best interests of the corporation.

**[13] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
Members of corporation's special litigation committee (SLC) could lack independence in seeking to terminate shareholder derivative suit against officers and directors for insider trading, even though nothing indicated that either member acted out of any conscious desire to favor the officers and directors or to do anything other than discharge their duties with fidelity; a conclusion that the SLC was not independent meant that members were not situated to act with the required degree of impartiality and did not mean not that the two accomplished professors lacked good faith and moral probity.

**[14] Corporations** ⟲**206(1)**
101k206(1) Most Cited Cases
The independence inquiry concerning directors on corporation's special litigation committee (SLC) recognizes that persons of integrity and reputation can be compromised in their ability to act without bias when they must make a decision adverse to others with whom they share material affiliations.

**\*920** Robert D. Goldberg, Esquire, Biggs & Battaglia, Wilmington, Delaware; Lee D. Rudy, Esquire and Robert B. Weiser, Esquire, Schiffrin & Barroway, LLP, Bala Cynwyd, Pennsylvania; Samuel Rudman, Esquire and Douglas Wilens, Esquire, Cauley, Geller, Bowman & Rudman, LLP, Boca Raton, Florida, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorney for the Individual Defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917                                                                        Page 3
824 A.2d 917
**(Cite as: 824 A.2d 917)**

David C. McBride, Esquire, Adam W. Poff, Esquire, and Christian Douglas Wright, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; George M. Newcombe, Esquire and James G. Kreissman, Esquire, Simpson Thacher & Bartlett, LLP, Palo Alto, California, Attorneys for Nominal Defendant Oracle Corporation.

OPINION

STRINE, Vice Chancellor.

[1] In this opinion, I address the motion of the special litigation committee ("SLC") of Oracle Corporation to terminate this action, "the Delaware Derivative Action," and other such actions pending in the name of Oracle against certain Oracle directors and officers. These actions allege that these Oracle directors engaged in insider trading while in possession of material, non-public information showing that Oracle would not meet the earnings guidance it gave to the market for the third quarter of Oracle's fiscal year 2001. The SLC bears the burden of persuasion on this motion and must convince me that there is no material issue of fact calling into doubt its independence. This requirement is set forth in *Zapata Corp. v. Maldonado* [FN1] and its progeny. [FN2]

FN1. 430 A.2d 779 (Del.1981).

FN2. *E.g.*, *Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch.1985).

[2] The question of independence "turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind." [FN3] That is, the independence test ultimately "focus[es] on impartiality and objectivity." [FN4] In this case, the SLC has failed to demonstrate that no material factual question exists regarding its independence.

FN3. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del.Ch.2001) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del.2002), *cert. denied*, 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003).

FN4. *Id.*

During discovery, it emerged that the two SLC members--both of whom are professors at Stanford University--are being asked to investigate fellow Oracle directors who have important ties to Stanford, too. Among the directors who are accused by the derivative plaintiffs of insider trading are: (1) another Stanford professor, who taught one of the SLC members when the SLC member was a Ph.D. candidate and who serves as a senior fellow and a steering committee member alongside that SLC member at the Stanford Institute for Economic Policy Research or "SIEPR"; (2) a Stanford alumnus who has directed millions of dollars of contributions to Stanford during recent years, serves as Chair of SIEPR's Advisory Board and has a conference center named for him at SIEPR's facility, and has contributed nearly $600,000 to SIEPR and the Stanford Law School, both parts of Stanford with which one of the SLC members is closely affiliated; and (3) Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal **\*921** foundation and large donations indirectly through Oracle, and who was considering making donations of his $100 million house and $170 million for a scholarship program as late as August 2001, at around the same time period the SLC members were added to the Oracle board. Taken together, these and other facts cause me to harbor a reasonable doubt about the impartiality of the SLC.

It is no easy task to decide whether to accuse a fellow director of insider trading. For Oracle to compound that difficulty by requiring SLC members to consider accusing a fellow professor and two large benefactors of their university of conduct that is rightly considered a violation of criminal law was unnecessary and inconsistent with the concept of independence recognized by our law. The possibility that these extraneous considerations biased the inquiry of the SLC is too substantial for this court to ignore. I therefore deny the SLC's motion to terminate.

*I. Factual Background*
*A. Summary of the Plaintiffs' Allegations*
The Delaware Derivative Complaint centers on alleged insider trading by four members of Oracle's board of directors--Lawrence Ellison, Jeffrey Henley, Donald Lucas, and Michael Boskin (collectively, the "Trading Defendants"). Each of the Trading Defendants had a very different role at Oracle.

Ellison is Oracle's Chairman, Chief Executive Officer, and its largest stockholder, owning nearly twenty-five percent of Oracle's voting shares. By virtue of his ownership position, Ellison is one of the wealthiest men in America. By virtue of his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

managerial position, Ellison has regular access to a great deal of information about how Oracle is performing on a week-to-week basis.

Henley is Oracle's Chief Financial Officer, Executive Vice President, and a director of the corporation. Like Ellison, Henley has his finger on the pulse of Oracle's performance constantly.

Lucas is a director who chairs Oracle's Executive Committee and its Finance and Audit Committee. Although the plaintiffs allege that Lucas's positions gave him access to material, non-public information about the company, they do so cursorily. On the present record, it appears that Lucas did not receive copies of week-to-week projections or reports of actual results for the quarter to date. Rather, his committees primarily received historical financial data.

Boskin is a director, Chairman of the Compensation Committee, and a member of the Finance and Audit Committee. As with Lucas, Boskin's access to information was limited mostly to historical financials and did not include the week-to-week internal projections and revenue results that Ellison and Henley received.

According to the plaintiffs, each of these Trading Defendants possessed material, non-public information demonstrating that Oracle would fail to meet the earnings and revenue guidance it had provided to the market in December 2000. In that guidance, Henley projected--subject to many disclaimers, including the possibility that a softening economy would hamper Oracle's ability to achieve these results--that Oracle would earn 12 cents per share and generate revenues of over $2.9 billion in the third quarter of its fiscal year 2001 ("3Q FY 2001"). Oracle's 3Q FY 2001 ran from December 1, 2000 to February 28, 2001.

The plaintiffs allege that this guidance was materially misleading and became even more so as early results for the quarter came in. To start with, the plaintiffs assert that the guidance rested on an untenably **922 rosy estimate of the performance of an important new Oracle product, its "Suite 11i" systems integration product that was designed to enable a business to run all of its information systems using a complete, integrated package of software with financial, manufacturing, sales, logistics, and other applications features that were "inter-operable." The reality, the plaintiffs contend, was that Suite 11i was riddled with bugs and not ready for prime time.

As a result, Suite 11i was not in a position to make a material contribution to earnings growth.

In addition, the plaintiffs contend more generally that the Trading Defendants received material, non-public information that the sales growth for Oracle's other products was slowing in a significant way, which made the attainment of the earnings and revenue guidance extremely difficult. This information grew in depth as the quarter proceeded, as various sources of information that Oracle's top managers relied upon allegedly began to signal weakness in the company's revenues. These signals supposedly included a slowdown in the "pipeline" of large deals that Oracle hoped to close during the quarter and weak revenue growth in the first month of the quarter.

During the time when these disturbing signals were allegedly being sent, the Trading Defendants engaged in the following trades:
. On January 3, 2001, Lucas sold 150,000 shares of Oracle common stock at $30 per share, reaping proceeds of over $4.6 million. These sales constituted 17% of Lucas's Oracle holdings.
. On January 4, 2001, Henley sold one million shares of Oracle stock at approximately $32 per share, yielding over $32.3 million. These sales represented 7% of Henley's Oracle holdings.
. On January 17, 2001, Boskin sold 150,000 shares of Oracle stock at over $33 per share, generating in excess of $5 million. These sales were 16% of Boskin's Oracle holdings.
. From January 22 to January 31, 2001, Ellison sold over 29 million shares at prices above $30 per share, producing over $894 million. Despite the huge proceeds generated by these sales, they constituted the sale of only 2% of Ellison's Oracle holdings.

Into early to mid-February, Oracle allegedly continued to assure the market that it would meet its December guidance. Then, on March 1, 2001, the company announced that rather than posting 12 cents per share in quarterly earnings and 25% license revenue growth as projected, the company's earnings for the quarter would be 10 cents per share and license revenue growth only 6%. The stock market reacted swiftly and negatively to this news, with Oracle's share price dropping as low as $15.75 before closing at $16.88--a 21% decline in one day. These prices were well below the above $30 per share prices at which the Trading Defendants sold in January 2001.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Oracle, through Ellison and Henley, attributed the adverse results to a general weakening in the economy, which led Oracle's customers to cut back sharply on purchases. Because (the company claimed) most of its sales close in the late days of quarters, the company did not become aware that it would miss its projections until shortly before the quarter closed. The reasons given by Ellison and Henley subjected them to sarcastic rejoinders from analysts, who noted that they had only recently suggested that Oracle was better-positioned than other companies to continue to deliver growth in a weakening economy.

### B. *The Plaintiffs' Claims in the Delaware Derivative Action*

The plaintiffs make two central claims in their amended complaint in the Delaware *923 Derivative Action. First, the plaintiffs allege that the Trading Defendants breached their duty of loyalty by misappropriating inside information and using it as the basis for trading decisions. This claim rests its legal basis on the venerable case of *Brophy v. Cities Service Co.* [FN5] Its factual foundation is that the Trading Defendants were aware (or at least possessed information that should have made them aware) that the company would miss its December guidance by a wide margin and used that information to their advantage in selling at artificially inflated prices.

FN5. 70 A.2d 5 (Del.Ch.1949).

Second, as to the other defendants--who are the members of the Oracle board who did not trade--the plaintiffs allege a *Caremark* [FN6] violation, in the sense that the board's indifference to the deviation between the company's December guidance and reality was so extreme as to constitute subjective bad faith.

FN6. *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996).

### C. *The Various Litigations*

Oracle's failure to meet its earnings and revenue guidance, and the sales by the Trading Defendants, inevitably generated a spate of lawsuits. Several derivative actions were filed in the state and federal courts of California. Those actions are, in substance, identical to the Delaware Derivative Action. Those suits have now all been stayed in deference to the SLC's investigation and the court's ruling on this motion.

Federal class actions were also filed, and the consolidated complaint in those actions formed the basis for much of the amended complaint in the Delaware Derivative Action. By now, the "Federal Class Action" has been dismissed for failure to state a claim upon which relief can be granted for the third time; this time the order addressing the second amended complaint dismissed the Federal Class Action with prejudice. [FN7]

FN7. *See In re Oracle Corp. Sec. Litig.,* No. C 01-0988 MJJ, slip op. at 2 (N.D.Cal. Mar. 24, 2003).

### D. *The Formation of the Special Litigation Committee*

On February 1, 2002, Oracle formed the SLC in order to investigate the Delaware Derivative Action and to determine whether Oracle should press the claims raised by the plaintiffs, settle the case, or terminate it. Soon after its formation, the SLC's charge was broadened to give it the same mandate as to all the pending derivative actions, wherever they were filed.

The SLC was granted full authority to decide these matters without the need for approval by the other members of the Oracle board.

### E. *The Members of the Special Litigation Committee*

Two Oracle board members were named to the SLC. Both of them joined the Oracle board on October 15, 2001, more than a half a year after Oracle's 3Q FY 2001 closed. The SLC members also share something else: both are tenured professors at Stanford University.

Professor Hector Garcia-Molina is Chairman of the Computer Science Department at Stanford and holds the Leonard Bosack and Sandra Lerner Professorship in the Computer Science and Electrical Engineering Departments at Stanford. A renowned expert in his field, Garcia-Molina was a professor at Princeton before coming to Stanford in 1992. Garcia-Molina's appointment at Stanford represented a homecoming of some sort, because he obtained both his undergraduate and graduate degrees from Stanford.

*924 The other SLC member, Professor Joseph Grundfest, is the W.A. Franke Professor of Law and Business at Stanford University. He directs the University's well-known Directors' College [FN8] and the Roberts Program in Law, Business, and Corporate Governance at the Stanford Law School. Grundfest is also the principal investigator for the Law School's Securities Litigation Clearinghouse.

Immediately before coming to Stanford, Grundfest served for five years as a Commissioner of the Securities and Exchange Commission. Like Garcia-Molina, Grundfest's appointment at Stanford was a homecoming, because he obtained his law degree and performed significant post-graduate work in economics at Stanford.

> FN8. In the interests of full disclosure, I spoke at the Directors' College in spring 2002.

As will be discussed more specifically later, Grundfest also serves as a steering committee member and a senior fellow of the Stanford Institute for Economic Policy Research, and releases working papers under the "SIEPR" banner.

For their services, the SLC members were paid $250 an hour, a rate below that which they could command for other activities, such as consulting or expert witness testimony. Nonetheless, during the course of their work, the SLC members became concerned that (arguably scandal-driven) developments in the evolving area of corporate governance as well as the decision in *Telxon v. Meyerson,* [FN9] might render the amount of their compensation so high as to be an argument against their independence. Therefore, Garcia-Molina and Grundfest agreed to give up any SLC-related compensation if their compensation was deemed by this court to impair their impartiality.

> FN9. 802 A.2d 257 (Del.2002).

**F.** *The SLC Members Are Recruited to the Board*
The SLC members were recruited to the board primarily by defendant Lucas, with help from defendant Boskin. [FN10] The wooing of them began in the summer of 2001. Before deciding to join the Oracle board, Grundfest, in particular, did a good deal of due diligence. His review included reading publicly available information, among other things, the then-current complaint in the Federal Class Action.

> FN10. *See* Grundfest Dep. at 466-69; Garcia-Molina Dep. at 15-16.

Grundfest then met with defendants Ellison and Henley, among others, and asked them some questions about the Federal Class Action. The claims in the Federal Class Action are predicated on facts that are substantively identical to those on which the claims in the Delaware Derivative Action are based. Grundfest received answers that were consistent

enough with what he called the "exogenous" information about the case to form sufficient confidence to at least join the Oracle board. Grundfest testified that this did not mean that he had concluded that the claims in the Federal Class Action had no merit, only that Ellison's and Henley's explanations of their conduct were plausible. Grundfest did, however, conclude that these were reputable businessmen with whom he felt comfortable serving as a fellow director, and that Henley had given very impressive answers to difficult questions regarding the way Oracle conducted its financial reporting operations. [FN11]

> FN11. The plaintiffs claim that Grundfest prejudged the Trading Defendants' culpability in a manner equivalent to that of the Chairman of the HealthSouth special litigation committee, as discussed in the recent *Biondi v. Scrushy,* 820 A.2d 1148 (Del.Ch.2003) decision. The two situations are not reasonably comparable. In *Biondi,* the HealthSouth SLC Chairman publicly announced his conclusion that the HealthSouth CEO, who was the target of the SLC's investigation, had not acted with the required *scienter.* He did so in a company press release in advance of the SLC's own investigation. Here, Grundfest simply made a judgment that Ellison and Henley had given a plausible accounting for themselves and were, in general, reputable businessmen with whom he was comfortable serving as a fellow director. I find credible Grundfest's contention that he took their statements for what they were, statements by persons with a self-interest in exculpation. That said, it would have been a better practice for the Report to have identified that Grundfest had inquired about the Federal Class Action in determining whether to join Oracle's board. *Cf.* Report at VII-1 ("The interviews commenced in April 2002 and were completed by early November 2002.").

**\*925** G. *The SLC's Advisors*
The most important advisors retained by the SLC were its counsel from Simpson Thacher & Bartlett LLP. Simpson Thacher had not performed material amounts of legal work for Oracle [FN12] or any of the individual defendants before its engagement, and the plaintiffs have not challenged its independence.

> FN12. Some six years before the SLC investigation began, Simpson Thacher had

824 A.2d 917
**(Cite as: 824 A.2d 917)**

performed a modest amount of legal work for Oracle. Simpson Thacher also represents Cadence Design Systems, a company of which Trading Defendant Donald Lucas is a director, and had billed Cadence less than $50,000 for that work. In 1996-1997, Simpson Thacher also billed Cadence for $62,355 for certain legal advice. The SLC determined that the Cadence work was not material to Simpson Thacher and the plaintiffs have not challenged that determination.

National Economic Research Advisors ("NERA") was retained by the SLC to perform some analytical work. The plaintiffs have not challenged NERA's independence.

### H. *The SLC's Investigation and Report*

The SLC's investigation was, by any objective measure, extensive. The SLC reviewed an enormous amount of paper and electronic records. SLC counsel interviewed seventy witnesses, some of them twice. SLC members participated in several key interviews, including the interviews of the Trading Defendants.

Importantly, the interviewees included all the senior members of Oracle's management most involved in its projection and monitoring of the company's financial performance, including its sales and revenue growth. These interviews combined with a special focus on the documents at the company bearing on these subjects, including e-mail communications.

The SLC also asked the plaintiffs in the various actions to identify witnesses the Committee should interview. The Federal Class Action plaintiffs identified ten such persons and the Committee interviewed all but one, who refused to cooperate. The Delaware Derivative Action plaintiffs and the other derivative plaintiffs declined to provide the SLC with any witness list or to meet with the SLC.

During the course of the investigation, the SLC met with its counsel thirty-five times for a total of eighty hours. In addition to that, the SLC members, particularly Professor Grundfest, devoted many more hours to the investigation.

In the end, the SLC produced an extremely lengthy Report totaling 1,110 pages (excluding appendices and exhibits) that concluded that Oracle should not pursue the plaintiffs' claims against the Trading Defendants or any of the other Oracle directors serving during the 3Q FY 2001. The bulk of the Report defies easy summarization. I endeavor a rough attempt to capture the essence of the Report in understandable terms, surfacing some implicit premises that I understand to have undergirded *926 the SLC's conclusions. Here goes.

Having absorbed a huge amount of material regarding Oracle's financial condition during the relevant period, the flow of information to top Oracle executives, Oracle's business and its products, and the general condition of the market at that time, the SLC concluded that even a hypothetical Oracle executive who possessed all information regarding the company's performance in December and January of 3Q FY 2001 would not have possessed material, non-public information that the company would fail to meet the earnings and revenue guidance it provided the market in December. Although there were hints of potential weakness in Oracle's revenue growth, especially starting in mid-January 2001, there was no reliable information indicating that the company would fall short of the mark, and certainly not to the extent that it eventually did.

Notably, none of the many e-mails from various Oracle top executives in January 2001 regarding the quarter anticipated that the company would perform as it actually did. Although some of these e-mails noted weakening, all are generally consistent with the proposition that Oracle executives expected to achieve the guidance. At strongest, they (in the SLC's view) can be read as indicating some doubts and the possibility that the company would fall short of the mark by a small margin, rather than the large one that ultimately resulted. Furthermore, the SLC found that the plaintiffs' allegations regarding the problems with Suite 11i were overstated and that the market had been adequately apprised of the state of that product's performance. And, as of that quarter, most of Oracle's competitors were still meeting analysts' expectations, suggesting that Oracle's assumption that general economic weakening would not stymie its ability to increase revenues in 3Q FY 2001 was not an unreasonable one.

Important to this conclusion is the SLC's finding that Oracle's quarterly earnings are subject to a so-called "hockey stick effect," whereby a large portion of each quarter's earnings comes in right at the end of the quarter. In 3Q FY 2001, the late influx of revenues that had often characterized Oracle's performance during its emergence as one of the companies with the largest market capitalization in the nation did not materialize; indeed, a large amount of product was waiting in Oracle warehouses for shipment for deals

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Oracle had anticipated closing but did not close during the quarter.

 Thus, taking into account all the relevant information sources, the SLC concluded that even Ellison and Henley--who were obviously the two Trading Defendants with the most access to inside information--did not possess material, non-public information. As to Lucas and Boskin, the SLC noted that they did not receive the weekly updates (of various kinds) that allegedly showed a weakening in Oracle's performance during 3Q FY 2001. As a result, there was even less of a basis to infer wrongdoing on their part. [FN13]

> FN13. As part of its analysis, the SLC assumed that Lucas and Boskin possessed the same information base as Ellison and Henley--that of a hypothetical fully informed executive. Nonetheless, the Report also made specific findings as to Lucas and Boskin that emphasized that they were differently situated in terms of informational access.

 In this same regard, the Report also noted that Oracle insiders felt especially confident about meeting 3Q FY 2001 guidance because the company closed a large transaction involving Covisint in December--a transaction that produced revenue giving the company a boost in meeting its guidance. Although the plaintiffs in this case argue that the Covisint transaction **927** was a unique deal that had its origins in earlier quarters when the economy was stronger and that masked a weakening in Oracle's then-current performance, the reality is that the transaction was a real one of economic substance and that the revenue was properly accounted for in 3Q FY 2001. Combined with other indications that Oracle was on track to meet its guidance, the SLC concluded that the Covisint transaction supported their conclusion that the Trading Defendants did not possess material, non-public information contradicting the company's previous guidance. [FN14]

> FN14. The SLC also noted that the Trading Defendants had sold their shares during a permissible trading window under Oracle's internal policies. These policies generally discouraged trading in the last month of a quarter and channeled trading into periods after the market had absorbed SEC filings.

 Moreover, as the SLC Report points out, the idea

that the Trading Defendants acted with *scienter* in trading in January 2001 was problematic in light of several factors. Implicitly the first and foremost is the reality that Oracle is a functioning business with real products of value. Although it is plausible to imagine a scenario where someone of Ellison's wealth would cash out, fearing the imminent collapse of a house of cards he had sold to an unsuspecting market, this is not the situation that Ellison faced in January 2001.

 As of that time, Oracle faced no collapse, even if it, like other companies, had to deal with a slowing economy. And, as the SLC points out, Ellison sold only two percent of his holdings. A good deal of these sales were related to options that he had held for over nine years and that had to be exercised by August 2001. [FN15] In view of Oracle's basic health, Ellison's huge wealth, and his retention of ninety-eight percent of his shares, the SLC concluded that any inference that Ellison acted with *scienter* and attempted to reap improper trading profits was untenable.

> FN15. There was also evidence in the Report that Ellison's financial advisor had been hounding him for some time to sell some shares and to diversify. The taxes due on the expiring options were also large and provided a rationale for selling, as did Ellison's and his financial advisor's desire for Ellison to reduce some debt. Although these were motives for Ellison to obtain cash, the SLC concluded that Ellison had no compelling need for funds that supported an inference of *scienter*.

 The same reasoning also motivated the SLC's conclusions as to Henley, who sold only seven percent of his stake in Oracle. Both Ellison and Henley stood to expose a great deal of their personal wealth to substantial risk by undertaking a scheme to cash out a small portion of their holdings and risking a greater injury to Oracle, a company in which they retained a far greater stake than they had sold. As important, these executives stood to risk their own personal reputations despite the absence of any personal cash crunch that impelled them to engage in risky, unethical, and illegal behavior. [FN16]

> FN16. As with Ellison, both Boskin and Lucas had cash needs, in their cases related to residences, but nothing in the record created by the SLC indicates any exigency.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

Page 9

Although Lucas and Boskin sold somewhat larger proportions of their Oracle holdings--sixteen percent and seventeen percent respectively--these proportions, the SLC concluded, were of the kind that federal courts had found lacking in suspicion. As with Ellison and Henley, the SLC identified no urgent need on either's part to generate cash by trading (illegally) on non-public, material information.

Of course, the amount of the proceeds each of the Trading Defendants generated was extremely large. By selling only two percent of his holdings, Ellison generated nearly a billion dollars, enough to flee to a *928 small island nation with no extradition laws and to live like a Saudi prince. But given Oracle's fundamental health as a company and his retention of ninety-eight percent of his shares, Ellison (the SLC found) had no need to take desperate-- or, for that matter, even slightly risky--measures. The same goes for the other Trading Defendants; there was simply nothing special or urgent about their financial circumstances in January 2001 that would have motivated (or did motivate, in the SLC's view) the Trading Defendants to cash out because they believed that Oracle would miss its earnings guidance. And, of course, the SLC found that none of them possessed information that indicated that Oracle would, in fact, miss its mark for 3Q FY 2001.

For these and other reasons, the SLC concluded that the plaintiffs' allegations that the Trading Defendants had breached their fiduciary duty of loyalty by using inside information about Oracle to reap illicit trading gains were without merit. The SLC also determined that, consistent with this determination, there was no reason to sue the other members of the Oracle board who were in office as of 3Q FY 2001. Therefore, the SLC determined to seek dismissal of the Delaware Derivative Action and the other derivative actions.

## II. *The SLC Moves to Terminate*
Consistent with its Report, the SLC moved to terminate this litigation. The plaintiffs were granted discovery focusing on three primary topics: the independence of the SLC, the good faith of its investigative efforts, and the reasonableness of the bases for its conclusion that the lawsuit should be terminated. Additionally, the plaintiffs received a large volume of documents comprising the materials that the SLC relied upon in preparing its Report.

## III. *The Applicable Procedural Standard*
[3][4] In order to prevail on its motion to terminate the Delaware Derivative Action, the SLC must

persuade me that: (1) its members were independent; (2) that they acted in good faith; and (3) that they had reasonable bases for their recommendations. [FN17] If the SLC meets that burden, I am free to grant its motion or may, in my discretion, undertake my own examination of whether Oracle should terminate and permit the suit to proceed if I, in my oxymoronic judicial "business judgment," conclude that procession is in the best interests of the company. [FN18] This two-step analysis comes, of course, from *Zapata*.

> FN17. *Zapata v. Maldonado*, 430 A.2d 779, 788-89 (Del.1981); *Katell v. Morgan Stanley Group*, 1995 WL 376952, at *5 (Del.Ch. June 15, 1995).

> FN18. *Zapata*, 430 A.2d at 789.

In that case, the Delaware Supreme Court also instructed this court to apply a procedural standard akin to a summary judgment inquiry when ruling on a special litigation committee's motion to terminate. In other words, the Oracle SLC here "should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that [it] is entitled to dismiss as a matter of law." [FN19] Candidly, this articulation of a special litigation committee's burden is an odd one, insofar as it applies a procedural standard designed for a particular purpose--the substantive dismissal of a case--with a standard centered on the determination of when a corporate committee's business decision about claims belonging to the corporation should be accepted by the court.

> FN19. *See id.* at 788.

[5] As I understand it, this standard requires me to determine whether, on the *929 basis of the undisputed factual record, I am convinced that the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation. If there is a material factual question about these issues causing doubt about any of these grounds, I read *Zapata* and its progeny as requiring a denial of the SLC's motion to terminate. [FN20]

> FN20. *See Lewis v. Fuqua*, 502 A.2d 962, 966 (Del.Ch.1985); *Kaplan v. Wyatt*, 484 A.2d 501, 506-08 (Del.Ch.1984), *aff'd*, 499 A.2d 1184 (Del.1985). Importantly, the granting of the SLC's motion using the Rule 56 standard does not mean that the court has made a determination that the claims the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SLC wants dismissed would be subject to termination on a summary judgment motion, only that the court is satisfied that there is no material factual dispute that the SLC had a reasonable basis for its decision to seek termination. *See Kaplan v. Wyatt,* 484 A.2d 501, 519 (Del.Ch.1984) ("[I]t is the Special Litigation Committee which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action."), *aff'd,* 499 A.2d 1184 (Del.1985).

In this case, the plaintiffs principally challenge the SLC's independence and the reasonableness of its recommendation. For reasons I next explain, I need examine only the more difficult question, which relates to the SLC's independence.

### IV. *Is the SLC Independent?*
#### A. *The Facts Disclosed in the Report*
In its Report, the SLC took the position that its members were independent. In support of that position, the Report noted several factors including:
. the fact that neither Grundfest nor Garcia-Molina received compensation from Oracle other than as directors;
. the fact that neither Grundfest nor Garcia-Molina were on the Oracle board at the time of the alleged wrongdoing;
. the fact that both Grundfest and Garcia-Molina were willing to return their compensation as SLC members if necessary to preserve their status as independent;
. the absence of any other material ties between Oracle, the Trading Defendants, and any of the other defendants, on the one hand, and Grundfest and Garcia-Molina, on the other; and
. the absence of any material ties between Oracle, the Trading Defendants, and any of the other defendants, on the one hand, and the SLC's advisors, on the other.

Noticeably absent from the SLC Report was any disclosure of several significant ties between Oracle or the Trading Defendants and Stanford University, the university that employs both members of the SLC. In the Report, it was only disclosed that:
. defendant Boskin was a Stanford professor;
. the SLC members were aware that Lucas had made certain donations to Stanford; and
. among the contributions was a donation of $50,000 worth of stock that Lucas donated to Stanford Law School after Grundfest delivered a speech to a venture capital fund meeting in

response to Lucas's request. It happens that Lucas's son is a partner in the fund and that approximately half the donation was allocated for use by Grundfest in his personal research.

#### B. *The "Stanford" Facts that Emerged During Discovery*
In view of the modesty of these disclosed ties, it was with some shock that a series of other ties among Stanford, Oracle, and the Trading Defendants emerged during discovery. Although the plaintiffs have embellished these ties considerably **\*930** beyond what is reasonable, the plain facts are a striking departure from the picture presented in the Report.

Before discussing these facts, I begin with certain features of the record--as I read it--that are favorable to the SLC. Initially, I am satisfied that neither of the SLC members is compromised by a fear that support for the procession of this suit would endanger his ability to make a nice living. Both of the SLC members are distinguished in their fields and highly respected. Both have tenure, which could not have been stripped from them for making a determination that this lawsuit should proceed.

Nor have the plaintiffs developed evidence that either Grundfest or Garcia-Molina have fundraising responsibilities at Stanford. Although Garcia-Molina is a department chairman, the record is devoid of any indication that he is required to generate contributions. And even though Grundfest heads up Stanford's Directors' College, the plaintiffs have not argued that he has a fundraising role in that regard. For this reason, it is important to acknowledge up front that the SLC members occupy positions within the Stanford community different from that of the University's President, deans, and development professionals, all of whom, it can be reasonably assumed, are required to engage heavily in the pursuit of contributions to the University.

This is an important point of departure for discussing the multitude of ties that have emerged among the Trading Defendants, Oracle, and Stanford during discovery in this case. In evaluating these ties, the court is not faced with the relatively easier call of considering whether these ties would call into question the impartiality of an SLC member who was a key fundraiser at Stanford [FN21] or who was an untenured faculty member subject to removal without cause. Instead, one must acknowledge that the question is whether the ties I am about to identify would be of a material concern to two distinguished,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tenured faculty members whose current jobs would not be threatened by whatever good faith decision they made as SLC members.

> FN21. *Compare In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *6-*7 (Del.Ch. Mar. 27, 2002) (concluding that a university president who had solicited a $25 million contribution from a corporation's President, Chairman, and CEO was not independent of that corporate official in light of the sense of "owingness" that the university president might harbor with respect to the corporate official), *and Lewis v. Fuqua*, 502 A.2d 962, 966-67 (Del.Ch.1985) (finding that a special litigation committee member was not independent where the committee member was also the president of a university that received a $10 million charitable pledge from the corporation's CEO and the CEO was a trustee of the university), *with In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 359 (Del.Ch.1998) (deciding that the plaintiffs had not created reasonable doubt as to a director's independence where a corporation's Chairman and CEO had given over $1 million in donations to the university at which the director was the university president and from which one of the CEO's sons had graduated), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

With this question in mind, I begin to discuss the specific ties that allegedly compromise the SLC's independence, beginning with those involving Professor Boskin.

### 1. *Boskin*

Defendant Michael J. Boskin is the T.M. Friedman Professor of Economics at Stanford University. During the Administration of President George H.W. Bush, Boskin occupied the coveted and important position of Chairman of the President's Council of Economic Advisors. He returned to Stanford after this government **931** service, continuing a teaching career there that had begun many years earlier.

During the 1970s, Boskin taught Grundfest when Grundfest was a Ph.D. candidate. Although Boskin was not Grundfest's advisor and although they do not socialize, the two have remained in contact over the years, speaking occasionally about matters of public policy.

Furthermore, both Boskin and Grundfest are senior fellows and steering committee members at the Stanford Institute for Economic Policy Research, which was previously defined as "SIEPR." According to the SLC, the title of senior fellow is largely an honorary one. According to SIEPR's own web site, however, "[s]enior fellows actively participate in SIEPR research and participate in its governance." [FN22]

> FN22. Stanford Institute for Economic Policy Research, *SIEPR Staff and Researchers: Senior Fellows* (last visited June 4, 2003), *at* http:// siepr.stanford.edu/people/srfellows.html.

Likewise, the SLC contends that Grundfest went MIA as a steering committee member, having failed to attend a meeting since 1997. The SIEPR web site, however, identifies its steering committee as having the role of "advising the director [of SIEPR] and guiding [SIEPR] on matters pertaining to research and academics." [FN23] Because Grundfest allegedly did not attend to these duties, his service alongside Boskin in that capacity is, the SLC contends, not relevant to his independence.

> FN23. Stanford Institute for Economic Policy Research, *Insider SIEPR: Steering Committee* (last visited June 4, 2003), *at* http:// siepr.stanford.edu/about/steering.html.

That said, the SLC does not deny that both Boskin and Grundfest publish working papers under the SIEPR rubric and that SIEPR helps to publicize their respective works. Indeed, as I will note later in this opinion, Grundfest, in the same month the SLC was formed, addressed a meeting of some of SIEPR's largest benefactors--the so-called "SIEPR Associates." The SLC just claims that the SIEPR affiliation is one in which SIEPR basks in the glow of Boskin and Grundfest, not the other way around, and that the mutual service of the two as senior fellows and steering committee members is not a collegial tie of any significance.

With these facts in mind, I now set forth the ties that defendant Lucas has to Stanford.

### 2. *Lucas*

As noted in the SLC Report, the SLC members admitted knowing that Lucas was a contributor to Stanford. They also acknowledged that he had

donated $50,000 to Stanford Law School in appreciation for Grundfest having given a speech at his request. About half of the proceeds were allocated for use by Grundfest in his research.

But Lucas's ties with Stanford are far, far richer than the SLC Report lets on. To begin, Lucas is a Stanford alumnus, having obtained both his undergraduate and graduate degrees there. By any measure, he has been a very loyal alumnus.

In showing that this is so, I start with a matter of some jousting between the SLC and the plaintiffs. Lucas's brother, Richard, died of cancer and by way of his will established a foundation. Lucas became Chairman of the Foundation and serves as a director along with his son, a couple of other family members, and some non-family members. A principal object of the Foundation's beneficence has been Stanford. The Richard M. Lucas Foundation has given $11.7 million to Stanford since its 1981 founding. Among its notable contributions, the Foundation funded the establishment of the Richard M. Lucas Center *932 for Magnetic Resonance Spectroscopy and Imaging at Stanford's Medical School. Donald Lucas was a founding member and lead director of the Center.

The SLC Report did not mention the Richard M. Lucas Foundation or its grants to Stanford. In its briefs on this motion, the SLC has pointed out that Donald Lucas is one of nine directors at the Foundation and does not serve on its Grant Review Committee. Nonetheless, the SLC does not deny that Lucas is Chairman of the board of the Foundation and that the board approves all grants.

Lucas's connections with Stanford as a contributor go beyond the Foundation, however. From his own personal funds, Lucas has contributed $4.1 million to Stanford, a substantial percentage of which has been donated within the last half-decade. Notably, Lucas has, among other things, donated $424,000 to SIEPR and approximately $149,000 to Stanford Law School. Indeed, Lucas is not only a major contributor to SIEPR, he is the Chair of its Advisory Board. At SIEPR's facility at Stanford, the conference center is named the Donald L. Lucas Conference Center.

From these undisputed facts, it is inarguable that Lucas is a very important alumnus of Stanford and a generous contributor to not one, but two, parts of Stanford important to Grundfest: the Law School and SIEPR.

With these facts in mind, it remains to enrich the factual stew further, by considering defendant Ellison's ties to Stanford.

### 3. Ellison

There can be little doubt that Ellison is a major figure in the community in which Stanford is located. The so-called Silicon Valley has generated many success stories, among the greatest of which is that of Oracle and its leader, Ellison. One of the wealthiest men in America, Ellison is a major figure in the nation's increasingly important information technology industry. Given his wealth, Ellison is also in a position to make--and, in fact, he has made--major charitable contributions.

Some of the largest of these contributions have been made through the Ellison Medical Foundation, which makes grants to universities and laboratories to support biomedical research relating to aging and infectious diseases. Ellison is the sole director of the Foundation. Although he does not serve on the Foundation's Scientific Advisory Board that sifts through grant applications, he has reserved the right--as the Foundation's sole director--to veto any grants, a power he has not yet used but which he felt it important to retain. The Scientific Advisory Board is comprised of distinguished physicians and scientists from many institutions, but not including Stanford.

Although it is not represented on the Scientific Advisory Board, Stanford has nonetheless been the beneficiary of grants from the Ellison Medical Foundation--to the tune of nearly $10 million in paid or pledged funds. Although the Executive Director of the Foundation asserts by way of an affidavit that the grants are awarded to specific researchers and may be taken to another institution if the researcher leaves, [FN24] the grants are conveyed under contracts between the Foundation and Stanford itself and purport by their terms to give Stanford the right (subject to Foundation approval) to select a substitute principal investigator if the original one becomes unavailable. [FN25]

FN24. *See* Sprott Aff. ¶¶ 7-8.

FN25. *See, e.g.,* Pls.' Ex. H, at DID 000035-DID 000036 (stating that if any of the principal researchers are unable to carry out funded project, Stanford may nominate a replacement researcher, subject to the approval of the Foundation).

*933 During the time Ellison has been CEO of Oracle, the company itself has also made over

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$300,000 in donations to Stanford. Not only that, when Oracle established a generously endowed educational foundation--the Oracle Help Us Help Foundation--to help further the deployment of educational technology in schools serving disadvantaged populations, it named Stanford as the "appointing authority," which gave Stanford the right to name four of the Foundation's seven directors. [FN26] Stanford's acceptance reflects the obvious synergistic benefits that might flow to, for example, its School of Education from the University's involvement in such a foundation, as well as the possibility that its help with the Foundation might redound to the University's benefit when it came time for Oracle to consider making further donations to institutions of higher learning.

> FN26. The other three directors are named by Oracle. *See* Help Us Help Foundation, *About Us* (last visited June 5, 2003), *at* http:// www.helpushelp.org/pages/AboutUs.html# board.

Taken together, these facts suggest that Ellison (when considered as an individual and as the key executive and major stockholder of Oracle) had, at the very least, been involved in several endeavors of value to Stanford.

Beginning in the year 2000 and continuing well into 2001--the same year that Ellison made the trades the plaintiffs contend were suspicious and the same year the SLC members were asked to join the Oracle board--Ellison and Stanford discussed a much more lucrative donation. The idea Stanford proposed for discussion was the creation of an Ellison Scholars Program modeled on the Rhodes Scholarship at Oxford. The proposed budget for Stanford's answer to Oxford: $170 million. The Ellison Scholars were to be drawn from around the world and were to come to Stanford to take a two-year interdisciplinary graduate program in economics, political science, and computer technology. During the summer between the two academic years, participants would work in internships at, among other companies, Oracle.

The omnipresent SIEPR was at the center of this proposal, which was put together by John Shoven, the Director of SIEPR. Ellison had serious discussions and contact with SIEPR around the time Shoven's proposal first surfaced. [FN27] Indeed, in February 2001, Ellison delivered a speech at SIEPR-- at which he was introduced by defendant Lucas. In a CD-ROM that contains images from the speech,

Shoven's voice-over touts SIEPR's connections with "some of the most powerful and prominent business leaders." [FN28]

> FN27. Shovan's proposal for the Ellison Scholars Program was dated October 2000. *See* Pls.' Ex. H, at DID 0000181.

> FN28. CD-ROM: SIEPR (on file as Weiser Aff. Ex. 2); *see also* SLC's Supplemental Br. at 5 (identifying the CD-ROM's video clip as that of a speech given by Ellison at SIEPR in February 2001).

As part of his proposal for the Ellison Scholars Program, Shoven suggested that three of the four Trading Defendants--Ellison, Lucas, and Boskin--be on the Program board. In the hypothetical curriculum that Shoven presented to Ellison, he included a course entitled "Legal Institutions and the Modern Economy" to be taught by Grundfest. Importantly, the Shoven proposal included a disclaimer indicating that listed faculty members may not have been consulted, and Grundfest denies that he was. The circumstances as a whole make that denial credible, although there is one confounding factor.

**\*934** Lucas, who was active in encouraging Ellison to form a program of this kind at Stanford, testified at his deposition that he had spoken to Grundfest about the proposed Ellison Scholars Program "a number of years ago," [FN29] Lucas seems to recall having asked Grundfest if he would be involved with the yet-to-be created Program, but his memory was, at best, hazy. At his own deposition, Grundfest was confronted more generically with whether he had heard of the Program and had agreed to teach in it if it was created, but not with whether he had discussed the topic with Lucas. [FN30]

> FN29. Lucas Dep. at 25.

> FN30. *See* Grundfest Dep. at 517-18.

Candidly, this sort of discrepancy is not easy to reconcile on a paper record. My conclusion, however, is that Grundfest is being truthful in stating that he had not participated in shaping the Shoven proposal, had not agreed to teach in the Program, and could not recall participating in any discussions about the Program.

That said, I am not confident that Grundfest was entirely unaware, in 2001 and/or 2002 of the possibility of such a program or that he did not have a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

Page 14

brief conversation with Lucas about it before joining the Oracle board. Nor am I convinced that the discussions about the Ellison Scholars Program were not of a very serious nature, indeed, the record evidence persuades me that they were serious. To find otherwise would be to conclude that Ellison is a man of more than ordinary whimsy, who says noteworthy things without caring whether they are true.

I say that because Ellison spoke to two of the nation's leading news outlets about the possibility of creating the Ellison Scholars Program. According to the *Wall Street Journal,* Ellison was considering the possibility of donating $150 million to either Harvard or Stanford for the purpose of creating an interdisciplinary (political science, economics, and technology) academic program. [FN31] And, according to *Fortune,* Ellison said in an interview with *Fortune* correspondent Brent Schlender: "[O]ne of the other philanthropic things I'm doing is talking to Harvard and Stanford and MIT about creating a research program that looks at how technology impacts [sic] economics, and in turn how economics impacts the way we govern ourselves." [FN32] It is significant that the latter article was published in mid-August 2001--around the same time that the SLC members were considering whether to join the Oracle board and within a calendar year of the formation of the SLC itself. Importantly, these public statements supplement other private communications by Stanford officials treating the Ellison Scholars Program as an idea under serious consideration by Ellison.

> FN31. *See* David Bank, *Oracle CEO Ellison Will Decide Which School Gets Millions,* Wall St. J., June 11, 2001, *available at* 2001 WL-WSJ 2866209 ("Mr. Ellison, chairman and chief executive officer of Oracle Corp., said he is deciding between Harvard University and Stanford University as the site for an interdisciplinary center he has dubbed PET, for politics, economics and technology.").

> FN32. Brent Schlender, *Larry Ellison: The Playboy Philanthropist, Fortune,* Aug. 13, 2001, *available at* http:// www.fortune.com/fortune/print/0,15935,370 710,00.html.

Ultimately, it appears that Ellison decided to abandon the idea of making a major donation on the Rhodes Scholarship model to Stanford or any other

institution. At least, that is what he now says by affidavit. According to Shoven of SIEPR, the Ellison Scholars Program idea is going nowhere now, and all talks with Ellison have ceased on that front.

Given the nature of this case, it is natural that there must be yet another curious **\*935** fact to add to the mix. This is that Ellison told the *Washington Post* in an October 30, 2000 article that he intended to leave his Woodside, California home--which is worth over $100 million--to Stanford upon his death. [FN33] In an affidavit, Ellison does not deny making this rather splashy public statement. But, he now (again, rather conveniently) says that he has changed his testamentary intent. Ellison denies having "bequeathed, donated or otherwise conveyed the Woodside property (or any other real property that I own) to Stanford University." [FN34] And, in the same affidavit, Ellison states unequivocally that he has no intention of ever giving his Woodside compound (or any other real property) to Stanford. [FN35] Shortly before his deposition in this case, Grundfest asked Ellison about the Woodside property and certain news reports to the effect that he was planning to give it to Stanford. According to Grundfest, Ellison's reaction to his inquiry was one of "surprise." [FN36] Ellison admitted to Grundfest that he said something of that sort, but contended that whatever he said was merely a "passing" comment. [FN37] Plus, Ellison said, Stanford would, of course, not want his $100 million home unless it came with a "dowry"--*i.e.,* an endowment to support what is sure to be a costly maintenance budget. [FN38] Stanford's Vice President for Development, John Ford, claimed that to the best of his knowledge Ellison had not promised anyone at Stanford that he would give Stanford his Woodside home. [FN39]

> FN33. *See* Mark Leibovich, *The Outsider, His Business and His Billions,* Wash. Post, Oct. 30, 2000, *available at* 2000 WL 25425247.

> FN34. Ellison Aff. ¶ 15.

> FN35. *See id.*

> FN36. *See* Grundfest Dep. at 520.

> FN37. *See id.*

> FN38. *See id.* at 520-21.

> FN39. *See* Ford Aff. ¶ 9.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

In order to buttress the argument that Stanford did not feel beholden to him, Ellison shared with the court the (otherwise private) fact that one of his children had applied to Stanford in October 2000 and was not admitted. [FN40] If Stanford felt comfortable rejecting Ellison's child, the SLC contends, why should the SLC members hesitate before recommending that Oracle press insider trading-based fiduciary duty claims against Ellison? [FN41]

> FN40. I mention this fact only with the greatest of reluctance. Ellison and the SLC injected this into the record, despite the fact that Stanford itself would have been legally prohibited from disclosing it. Because it is an argument advanced by the SLC, I must address it, although that necessarily furthers the intrusion on the privacy of Ellison's child.

> FN41. See SLC's Reply Br. at 31-32.

But the fact remains that Ellison was still talking very publicly and seriously about the possibility of endowing a graduate interdisciplinary studies program at Stanford during the summer *after* his child was rejected from Stanford's undergraduate program. [FN42]

> FN42. See David Bank, *Oracle CEO Ellison Will Decide Which School Gets Millions,* Wall St. J., June 11, 2001, *available at* 2001 WL-WSJ 2866209; Brent Schlender, *Larry Ellison: The Playboy Philanthropist,* Fortune, Aug. 13, 2001, *available at* http://www.fortune.com/fortune/print/0,15935,370710,00.html.

### C. The SLC's Argument

The SLC contends that even together, these facts regarding the ties among Oracle, the Trading Defendants, Stanford, and the SLC members do not impair the SLC's independence. In so arguing, the SLC places great weight on the fact that none **\*936** of the Trading Defendants have the practical ability to deprive either Grundfest or Garcia-Molina of their current positions at Stanford. Nor, given their tenure, does Stanford itself have any practical ability to punish them for taking action adverse to Boskin, Lucas, or Ellison-- each of whom, as we have seen, has contributed (in one way or another) great value to Stanford as an institution. As important, neither Garcia-Molina nor Grundfest are part of the official fundraising apparatus at Stanford; thus, it is not their on-the-job duty to be solicitous of contributors, and fundraising success does not factor into their treatment as professors.

In so arguing, the SLC focuses on the language of previous opinions of this court and the Delaware Supreme Court that indicates that a director is not independent only if he is dominated and controlled by an interested party, such as a Trading Defendant. [FN43] The SLC also emphasizes that much of our jurisprudence on independence focuses on economically consequential relationships between the allegedly interested party and the directors who allegedly cannot act independently of that director. Put another way, much of our law focuses the bias inquiry on whether there are economically material ties between the interested party and the director whose impartiality is questioned, treating the possible effect on one's personal wealth as the key to the independence inquiry. Putting a point on this, the SLC cites certain decisions of Delaware courts concluding that directors who are personal friends of an interested party were not, by virtue of those personal ties, to be labeled non-independent. [FN44]

> FN43. *E.g.,* In re Walt Disney Co. Derivative Litig., 731 A.2d at 355.

> FN44. *See, e.g.,* Crescent/Mach I Partners, L.P. v. Turner, 2000 WL 1481002, at *11 (Del.Ch. Sept. 29, 2000) (stating that an allegation of a fifteen-year professional and personal relationship between a CEO and a director does not, in itself, raise a reasonable doubt about the director's independence); In re Walt Disney Co. Derivative Litig., 731 A.2d at 354 n. 18 ("Demand is not excused, however, just because directors would have to sue 'their family, friends and business associates.' " (quoting Abrams v. Koether, 766 F.Supp. 237, 256 (D.N.J.1991)).

More subtly, the SLC argues that university professors simply are not inhibited types, unwilling to make tough decisions even as to fellow professors and large contributors. What is tenure about if not to provide professors with intellectual freedom, even in non-traditional roles such as special litigation committee members? No less ardently--but with no record evidence that reliably supports its ultimate point--the SLC contends that Garcia-Molina and Grundfest are extremely distinguished in their fields and were not, in fact, influenced by the facts identified heretofore. Indeed, the SLC argues, how could they have been influenced by many of these

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

facts when they did not learn them until the post-Report discovery process? If it boils down to the simple fact that both share with Boskin the status of a Stanford professor, how material can this be when there are 1,700 others who also occupy the same position?

### D. The Plaintiffs' Arguments

The plaintiffs confronted these arguments with less nuance than was helpful. Rather than rest their case on the multiple facts I have described, the plaintiffs chose to emphasize barely plausible constructions of the evidence, such as that Grundfest was lying when he could not recall being asked to participate in the Ellison Scholars Program. From these more extreme arguments, however, one can distill a reasoned core that emphasizes what academics might call the "thickness" of the social and institutional connections among *937 Oracle, the Trading Defendants, Stanford, and the SLC members. These connections, the plaintiffs argue, were very hard to miss-- being obvious to anyone who entered the SIEPR facility, to anyone who read the *Wall Street Journal, Fortune,* or the *Washington Post,* and especially to Stanford faculty members interested in their own university community and with a special interest in Oracle. Taken in their totality, the plaintiffs contend, these connections simply constitute too great a bias-producing factor for the SLC to meet its burden to prove its independence.

Even more, the plaintiffs argue that the SLC's failure to identify many of these connections in its Report is not an asset proving its independence, but instead a fundamental flaw in the Report itself, which is the document in which the SLC is supposed to demonstrate its own independence and the reasonableness of its investigation. By failing to focus on these connections when they were obviously discoverable and when it is, at best, difficult for the court to believe that at least some of them were not known by the SLC-- *e.g.,* Boskin's role at SIEPR and the fact that the SIEPR Conference Center was named after Lucas--the SLC calls into doubt not only its independence, but its competence. If it could not ferret out these things, by what right should the court trust its investigative acumen?

In support of its argument, the plaintiffs note that the Delaware courts have adopted a flexible, fact-based approach to the determination of directorial independence. This test focuses on whether the directors, for any substantial reason, cannot act with only the best interests of the corporation in mind, and not just on whether the directors face pecuniary

damage for acting in a particular way.

### E. The Court's Analysis of the SLC's Independence

Having framed the competing views of the parties, it is now time to decide.

I begin with an important reminder: the SLC bears the burden of proving its independence. It must convince me.

[6] But of what? According to the SLC, its members are independent unless they are essentially subservient to the Trading Defendants--*i.e.,* they are under the "domination and control" of the interested parties. [FN45] If the SLC is correct and this is the central inquiry in the independence determination, they would win. Nothing in the record suggests to me that either Garcia-Molina or Grundfest are dominated and controlled by any of the Trading Defendants, by Oracle, or even by Stanford. [FN46]

> FN45. *See, e.g., In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 355.

> FN46. This is not to say that the facts could not be simply read as providing a basis for a professor interested in promotion within the University to be less than aggressive as an SLC member. Even tenured professors and department chairs sometimes seek different chairs, duties, or even to climb to positions like Provost, which chart the path towards a university presidency. I do not consider this factor to be of weight here, however, but note it.

But, in my view, an emphasis on "domination and control" would serve only to fetishize much-parroted language, at the cost of denuding the independence inquiry of its intellectual integrity. Take an easy example. Imagine if two brothers were on a corporate board, each successful in different businesses and not dependent in any way on the other's beneficence in order to be wealthy. The brothers are brothers, they stay in touch and consider each other family, but each is opinionated and strong-willed. A derivative action is filed targeting a transaction involving one of the brothers. The other brother is put *938 on a special litigation committee to investigate the case. If the test is domination and control, then one brother could investigate the other. Does any sensible person think that is our law? I do not think it is.

And it should not be our law. Delaware law should

not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. *Homo sapiens* is not merely *homo economicus.* We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among us who direct their behavior as best they can on a guiding creed or set of moral values. [FN47]

> FN47. In an interesting work, Professor Lynn Stout has argued that there exists an empirical basis to infer that corporate directors are likely to be motivated by altruistic impulses and not simply by a concern for their own pocketbooks. *See* Lynn A. Stout, *In Praise of Procedure: An Economic and Behavioral Defense of Smith v. VanGorkom and the Business Judgment Rule,* 96 Nw. U.L.Rev. 675, 677-78 (2002).

Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation. [FN48] Some things are "just not done," or only at a cost, which might not be so severe as a loss of position, but may involve a loss of standing in the institution. In being appropriately sensitive to this factor, our law also cannot assume-- absent some proof of the point--that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk.

> FN48. *See, e.g.,* Margaret M. Blair & Lynn A. Stout, *Trust, Trustworthiness, and the Behavioral Foundations of Corporate Law,* 149 U. Pa. L.Rev. 1735, 1780 (2001) ("[T]here is reason to believe that trust may pay an important role in the success of many business firms."); Edward B. Rock & Michael L. Wachter, *Islands of Conscious Power: Laws, Norms, and the Self-Governing Corporation,* 149 U. Pa. L.Rev. 1619, 1640 (2001) ("[T]he myriad transactions that take place inside the firm are largely (but not entirely) protected by a ... governance mechanism ... that is almost

entirely not legally enforceable.").

For all these reasons, this court has previously held that the Delaware Supreme Court's teachings on independence can be summarized thusly:

> At bottom, the question of independence turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity. [FN49]

> FN49. *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1232 (Del.Ch.2001) (footnotes omitted) (emphasis in original), *rev'd in part on other grounds,* 817 A.2d 149 (Del.2002), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003).

[7] This formulation is wholly consistent with the teaching of *Aronson,* which defines independence as meaning that "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN50] As noted by Chancellor Chandler recently, a director may be compromised if he is beholden to an interested person. [FN51] Beholden in this sense does not *939 mean just owing in the financial sense, it can also flow out of "personal or other relationships" to the interested party. [FN52]

> FN50. *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

> FN51. *See Orman v. Cullman,* 794 A.2d 5, 24 (Del.Ch.2002).

> FN52. *See id.* at 24 n. 47 (citing *Aronson,* 473 A.2d at 815); *see also Parfi Holding,* 794 A.2d at 1232 n. 55 (citing definitions of beholden as meaning "[o]wing something ... to another" and "under obligation").

Without backtracking from these general propositions, it would be less than candid if I did not admit that Delaware courts have applied these general standards in a manner that has been less than wholly consistent. Different decisions take a different view about the bias-producing potential of family relationships, not all of which can be explained by mere degrees of consanguinity. [FN53] Likewise, there is admittedly case law that gives little weight to ties of friendship in the independence inquiry. [FN54] In this opinion, I will not venture to

do what I believe to be impossible: attempt to rationalize all these cases in their specifics. [FN55] Rather, I undertake what I understand to be my duty and what is possible: the application of the independence inquiry that our Supreme Court has articulated in a manner that is faithful to its essential spirit.

> FN53. *Compare Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) (CEO's brother-in-law could not impartially consider demand to sue him), *and Mizel v. Connelly,* 1999 WL 550369, at *4 (Del.Ch. Aug. 2, 1999) (grandson could not impartially determine whether company should accept demand that required company to sue his grandfather for rescission of an interested transaction), *with Seibert v. Harper & Row, Publishers, Inc.,* 1984 WL 21874, at *3 (Del.Ch. Dec. 5, 1984) (a director was not disabled from considering a demand where the director's cousin was a fellow director and a corporate manager).

> FN54. *E.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 WL 1481002, at *11-*12 (Del.Ch. Sept. 29, 2000).

> FN55. I readily concede that the result I reach is in tension with the specific outcomes of certain other decisions. But I do not believe that the result I reach applies a new definition of independence; rather, it recognizes the importance (*i.e.,* the materiality) of other bias-creating factors other than fear that acting a certain way will invite economic retribution by the interested directors.

### 1. The Contextual Nature of the Independence Inquiry Under Delaware Law

In examining whether the SLC has met its burden to demonstrate that there is no material dispute of fact regarding its independence, the court must bear in mind the function of special litigation committees under our jurisprudence. Under Delaware law, the primary means by which corporate defendants may obtain a dismissal of a derivative suit is by showing that the plaintiffs have not met their pleading burden under the test of *Aronson v. Lewis,* [FN56] or the related standard set forth in *Rales v. Blasband.* [FN57] In simple terms, these tests permit a corporation to terminate a derivative suit if its board is comprised of directors who can impartially

consider a demand. [FN58]

> FN56. 473 A.2d 805 (Del.1984).

> FN57. 634 A.2d 927 (Del.1993).

> FN58. This is a simplified formulation of a more complex inquiry. One way for a plaintiff to impugn the impartiality of the board is to plead particularized facts creating a reasonable doubt that the board complied with its fiduciary duties. In that circumstance, the danger is that the board might be influenced by its desire to avoid personal liability in a lawsuit in which the plaintiffs have stated a claim under a heightened pleading burden. For a more thorough discussion of *Aronson* and *Rales,* see *Guttman v. Huang,* 823 A.2d 492 (Del.Ch.2003).

Special litigation committees are permitted as a last chance for a corporation to control a derivative claim in circumstances when a majority of its directors cannot **\*940** impartially consider a demand. By vesting the power of the board to determine what to do with the suit in a committee of independent directors, a corporation may retain control over whether the suit will proceed, so long as the committee meets the standard set forth in *Zapata.*

In evaluating the independence of a special litigation committee, this court must take into account the extraordinary importance and difficulty of such a committee's responsibility. It is, I daresay, easier to say no to a friend, relative, colleague, or boss who seeks assent for an act (*e.g.,* a transaction) that has not yet occurred than it would be to cause a corporation to sue that person. This is admittedly a determination of so-called "legislative fact," but one that can be rather safely made. [FN59] Denying a fellow director the ability to proceed on a matter important to him may not be easy, but it must, as a general matter, be less difficult than finding that there is reason to believe that the fellow director has committed serious wrongdoing and that a derivative suit should proceed against him. [FN60]

> FN59. *See* Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process,* 55 Harv. L.Rev. 364, 402-03 (1942); Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations,* 27 Del. J. Corp. L. 499, 502-03 (2002).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN60. The parties have not cited empirical social science research bearing on any of the factual inferences about human behavior within institutional settings upon which a ruling on this motion, one way or the other, necessarily depends.

The difficulty of making this decision is compounded in the special litigation committee context because the weight of making the moral judgment necessarily falls on less than the full board. A small number of directors feels the moral gravity--and social pressures--of this duty alone.

For all these reasons, the independence inquiry is critically important if the special litigation committee process is to retain its integrity, a quality that is, in turn, essential to the utility of that process. As this Court wrote recently:

One of the obvious purposes for forming a special litigation committee is to promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors. By forming a committee whose fairness and objectivity cannot be reasonably questioned ... the company can assuage concern among its stockholders and retain, through the SLC, control over any claims belonging to the company itself.

* * *

*Zapata* presents an opportunity for a board that cannot act impartially as a whole to vest control of derivative litigation in a trustworthy committee of the board--*i.e.,* one that is not compromised in its ability to act impartially. The composition and conduct of a special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity. [FN61]

FN61. *Biondi v. Scrushy,* 820 A.2d 1148, 1156 & 1166 (Del.Ch.2003).

[8] Thus, in assessing the independence of the Oracle SLC, I necessarily examine the question of whether the SLC can independently make the difficult decision entrusted to it: to determine whether the Trading Defendants should face suit for insider trading-based allegations of breach of fiduciary duty. An affirmative answer by the SLC to that question would have potentially huge negative consequences *941 for the Trading Defendants, not only by exposing them to the possibility of a large damage award but also by subjecting them to great reputational harm. To have Professors Grundfest and Garcia-Molina declare that Oracle should press insider trading claims against the Trading Defendants would have been, to put it mildly, "news." Relatedly, it is reasonable to think that an SLC determination that the Trading Defendants had likely engaged in insider trading would have been accompanied by a recommendation that they step down as fiduciaries until their ultimate culpability was decided.

The importance and special sensitivity of the SLC's task is also relevant for another obvious reason: investigations do not follow a scientific process like an old-fashioned assembly line. The investigators' mindset and talent influence, for good or ill, the course of an investigation. Just as there are obvious dangers from investigators suffering from too much zeal, so too are dangers posed by investigators who harbor reasons not to pursue the investigation's targets with full vigor.

The nature of the investigation is important, too. Here, for example, the SLC was required to undertake an investigation that could not avoid a consideration of the subjective state of mind of the Trading Defendants. Their credibility was important, and the SLC could not escape making judgments about that, no matter how objective the criteria the SLC attempted to use.

Therefore, I necessarily measure the SLC's independence contextually, and my ruling confronts the SLC's ability to decide impartially whether the Trading Defendants should be pursued for insider trading. This contextual approach is a strength of our law, as even the best minds have yet to devise across-the-board definitions that capture all the circumstances in which the independence of directors might reasonably be questioned. By taking into account all circumstances, the Delaware approach undoubtedly results in some level of indeterminacy, but with the compensating benefit that independence determinations are tailored to the precise situation at issue. [FN62]

FN62. The recent reforms enacted by Congress and by the stock exchanges reflect a narrower conception of who they believe can be an independent director. These definitions, however, are blanket labels that do not take into account the decision at issue. Nonetheless, the definitions recognize that factors other than the ones

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
(Cite as: 824 A.2d 917)

explicitly identified in the new exchange rules might compromise a director's independence, depending on the circumstances. *See* Self-Regulatory Organizations; Notice of Filing of Proposed Rule Change and Amendment No. 1 Thereto by the New York Stock Exchange, Inc. Relating to Corporate Governance, 68 Fed.Reg. 19,051, 19,053 (Apr. 17, 2003) ("It is not possible to anticipate, or explicitly provide for, all circumstances that might signal potential conflicts of interest, or that might bear on the materiality of a director's relationship to a listed company. Accordingly, it is best that boards making 'independence' determinations broadly consider all relevant facts and circumstances. In particular, when assessing the materiality of a director's relationship with the company, the board should consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation. Material relationships can include commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships, among others."); Self-Regulatory Organizations; Notice of Filing of Proposed Rule Change and Amendment No. 1 Thereto by the National Association of Securities Dealers, Inc. Relating to Proposed Amendments to NASD Rules 4200 and 4350 Regarding Board Independence and Independent Committees, 68 Fed.Reg. 14,451, 14,452 (Mar. 25, 2003) (" 'Independent director' means a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship, which, in the opinion of the company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.").

**\*942** Likewise, Delaware law requires courts to consider the independence of directors based on the facts known to the court about them specifically, the so-called "subjective 'actual person' standard." [FN63] That said, it is inescapable that a court must often apply to the known facts about a specific director a consideration of how a reasonable person similarly situated to that director would behave, given the limited ability of a judge to look into a particular director's heart and mind. This is especially so when a special litigation committee

chooses, as was the case here, to eschew any live witness testimony, a decision that is, of course, sensible lest special litigation committee termination motions turn into trials nearly as burdensome as the derivative suit the committee seeks to end. But with that sensible choice came an acceptance of the court's need to infer that the special litigation committee members are persons of typical professional sensibilities.

FN63. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1167 (Del.1995).

### 2. *The SLC Has Not Met Its Burden to Demonstrate the Absence of a Material Dispute of Fact About Its Independence*

[9] Using the contextual approach I have described, I conclude that the SLC has not met its burden to show the absence of a material factual question about its independence. I find this to be the case because the ties among the SLC, the Trading Defendants, and Stanford are so substantial that they cause reasonable doubt about the SLC's ability to impartially consider whether the Trading Defendants should face suit. The concern that arises from these ties can be stated fairly simply, focusing on defendants Boskin, Lucas, and Ellison in that order, and then collectively.

As SLC members, Grundfest and Garcia-Molina were already being asked to consider whether the company should level extremely serious accusations of wrongdoing against fellow board members. As to Boskin, both SLC members faced another layer of complexity: the determination of whether to have Oracle press insider trading claims against a fellow professor at their university. Even though Boskin was in a different academic department from either SLC member, it is reasonable to assume that the fact that Boskin was also on faculty would--to persons possessing typical sensibilities and institutional loyalty--be a matter of more than trivial concern. Universities are obviously places of at-times intense debate, but they also see themselves as communities. In fact, Stanford refers to itself as a "community of scholars." [FN64] To accuse a fellow professor-- whom one might see at the faculty club or at inter- disciplinary presentations of academic papers--of insider trading cannot be a small thing-- even for the most callous of academics.

FN64. *See* Stanford University, *Stanford Facts 2003* (last modified Apr. 3, 2003), *available at* http:// www.stanford.edu/home/stanford/facts/facul ty.html.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

As to Boskin, Grundfest faced an even more complex challenge than Garcia-Molina. Boskin was a professor who had taught him and with whom he had maintained contact over the years. Their areas of academic interest intersected, putting Grundfest in contact if not directly with Boskin, then regularly with Boskin's colleagues. Moreover, although I am told by the SLC that the title of senior fellow at SIEPR is an honorary one, the fact remains that Grundfest willingly accepted it and was one of a select number of faculty who attained that status. And, they both just happened to also be steering committee members. Having these ties, Grundfest (**\*943** I infer) would have more difficulty objectively determining whether Boskin engaged in improper insider trading than would a person who was not a fellow professor, had not been a student of Boskin, had not kept in touch with Boskin over the years, and who was not a senior fellow and steering committee member at SIEPR.

In so concluding, I necessarily draw on a general sense of human nature. It may be that Grundfest is a very special person who is capable of putting these kinds of things totally aside. But the SLC has not provided evidence that that is the case. In this respect, it is critical to note that I do not infer that Grundfest would be less likely to recommend suit against Boskin than someone without these ties. Human nature being what it is, it is entirely possible that Grundfest would in fact be tougher on Boskin than he would on someone with whom he did not have such connections. The inference I draw is subtly, but importantly, different. What I infer is that a person in Grundfest's position would find it difficult to assess Boskin's conduct without pondering his own association with Boskin and their mutual affiliations. Although these connections might produce bias in either a tougher or laxer direction, the key inference is that these connections would be on the mind of a person in Grundfest's position, putting him in the position of either causing serious legal action to be brought against a person with whom he shares several connections (an awkward thing) or not doing so (and risking being seen as having engaged in favoritism toward his old professor and SIEPR colleague).

[10] The same concerns also exist as to Lucas. For Grundfest to vote to accuse Lucas of insider trading would require him to accuse SIEPR's Advisory Board Chair and major benefactor of serious wrongdoing-- of conduct that violates federal securities laws. Such action would also require Grundfest to make charges against a man who recently donated $50,000 to Stanford Law School after Grundfest made a speech at his request. [FN65]

> FN65. As noted, Lucas has contributed $149,000 to the Law School, $424,000 to SIEPR, and millions more to other Stanford institutions.

And, for both Grundfest and Garcia-Molina, service on the SLC demanded that they consider whether an extremely generous and influential Stanford alumnus should be sued by Oracle for insider trading. Although they were not responsible for fundraising, as sophisticated professors they undoubtedly are aware of how important large contributors are to Stanford, and they share in the benefits that come from serving at a university with a rich endowment. A reasonable professor giving any thought to the matter would obviously consider the effect his decision might have on the University's relationship with Lucas, it being (one hopes) sensible to infer that a professor of reasonable collegiality and loyalty cares about the well-being of the institution he serves.

In so concluding, I give little weight to the SLC's argument that it was unaware of just how substantial Lucas's beneficence to Stanford has been. I do so for two key reasons. Initially, it undermines, rather than inspires, confidence that the SLC did not examine the Trading Defendants' ties to Stanford more closely in preparing its Report. The Report's failure to identify these ties is important because it is the SLC's burden to show independence. In forming the SLC, the Oracle board should have undertaken a thorough consideration of the facts bearing on the independence of the proposed SLC members from the key objects of the investigation.

**\*944** The purported ignorance of the SLC members about all of Lucas's donations to Stanford is not helpful to them for another reason: there were too many visible manifestations of Lucas's status as a major contributor for me to conclude that Grundfest, at the very least, did not understand Lucas to be an extremely generous benefactor of Stanford. It is improbable that Grundfest was not aware that Lucas was the Chair of SIEPR's Advisory Board, and Grundfest must have known that the Donald L. Lucas Conference Center at SIEPR did not get named that way by coincidence. And, in February 2002-- incidentally, the same month the SLC was formed-- Grundfest spoke at a meeting of "SIEPR Associates," a group of individuals who had given $5,000 or more to SIEPR. [FN66] Although it is not clear if Lucas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

attended that event, he is listed--in the same publication that reported Grundfest's speech at the Associates' meeting--as one of SIEPR's seventy-five "Associates." [FN67] Combined with the other obvious indicia of Lucas's large contributor status (including the $50,000 donation Lucas made to Stanford Law School to thank Grundfest for giving a speech) and Lucas's obviously keen interest in his alma mater, Grundfest would have had to be extremely insensitive to his own working environment not to have considered Lucas an extremely generous alumni benefactor of Stanford, and at SIEPR and the Law School in particular.

> FN66. *See Joseph Grundfest Talks About Enron and Auditing Process Ethics,* SIEPR Persp., Spring 2002, at 9, 9, *available at* http:// siepr.stanford.edu/about/newsletter_spring2 002.pdf.

> FN67. *See id.* at 15. Notably, Lucas is not listed as a "[n]ew donor," which suggests that he attained the rank of SIEPR Associate in a previous year or years, as well. *See id.*

Garcia-Molina is in a somewhat better position to disclaim knowledge of how generous an alumnus Lucas had been. Even so, the scope of Lucas's activities and their easy discoverability gives me doubt that he did not know of the relative magnitude of Lucas's generosity to Stanford. [FN68] Furthermore, Grundfest comprised half of the SLC and was its most active member. His non-independence is sufficient alone to require a denial of the SLC's motion. [FN69]

> FN68. Professor Garcia-Molina denied in his deposition any specific knowledge of whether any of the Trading Defendants were donors to Stanford. He might well have told the truth despite the fact that there was evidence of it around Stanford's (admittedly large) campus and in the news at the same time as he was joining Oracle's board. As I have discussed, however, the purported ignorance of the SLC does not give me confidence, given the objective and discoverable facts available to the SLC members at the time. Even if I was convinced that Garcia-Molina was totally unaware of, for example, Lucas's status as an important alumni contributor--which I am not--that would not help the SLC, because Grundfest clearly was and the Report

acknowledges both SLC members' knowledge that Lucas had made contributions. Moreover, Garcia-Molina clearly knew Boskin was a fellow professor, and the objective circumstances cause me to doubt that Garcia-Molina did not also suspect that Ellison was, if not already a major donor, then, at the very least, a major target for Stanford's development officers.

> FN69. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 354 ("[U]nder *Aronson* 's first prong--director independence--for demand to be futile, the Plaintiffs must show a reasonable doubt as to the disinterest of at least half of the directors."); *Beneville v. York,* 769 A.2d 80, 82 (Del.Ch.2000) (concluding that "[w]hen one member of a two-member board of directors cannot impartially consider a stockholder litigation demand" demand is excused); *In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

**\*945** In concluding that the facts regarding Lucas's relationship with Stanford are materially important, I must address a rather odd argument of the SLC's. The argument goes as follows. Stanford has an extremely large endowment. Lucas's contributions, while seemingly large, constitute a very small proportion of Stanford's endowment and annual donations. Therefore, Lucas could not be a materially important contributor to Stanford and the SLC's independence could not be compromised by that factor.

But missing from that syllogism is any acknowledgement of the role that Stanford's solicitude to benefactors like Lucas might play in the overall size of its endowment and campus facilities. Endowments and buildings grow one contribution at a time, and they do not grow by callous indifference to alumni who (personally and through family foundations) have participated in directing contributions of the size Lucas has. Buildings and conference centers are named as they are as a recognition of the high regard universities have for donors (or at least, must feign convincingly). The SLC asks me to believe that what universities like Stanford say in thank you letters and public

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

ceremonies is not in reality true; that, in actuality, their contributors are not materially important to the health of those academic institutions. This is a proposition that the SLC has not convinced me is true, and that seems to contradict common experience.

Nor has the SLC convinced me that tenured faculty are indifferent to large contributors to their institutions, such that a tenured faculty member would not be worried about writing a report finding that a suit by the corporation should proceed against a large contributor and that there was credible evidence that he had engaged in illegal insider trading. The idea that faculty members would not be concerned that action of that kind might offend a large contributor who a university administrator or fellow faculty colleague (*e.g.*, Shoven at SIEPR) had taken the time to cultivate strikes me as implausible and as resting on an narrow-minded understanding of the way that collegiality works in institutional settings.

[11] In view of the ties involving Boskin and Lucas alone, I would conclude that the SLC has failed to meet its burden on the independence question. The tantalizing facts about Ellison merely reinforce this conclusion. The SLC, of course, argues that Ellison is not a large benefactor of Stanford personally, that Stanford has demonstrated its independence of him by rejecting his child for admission, and that, in any event, the SLC was ignorant of any negotiations between Ellison and Stanford about a large contribution. For these reasons, the SLC says, its ability to act independently of Ellison is clear.

I find differently. The notion that anyone in Palo Alto can accuse Ellison of insider trading without harboring some fear of social awkwardness seems a stretch. That being said, I do not mean to imply that the mere fact that Ellison is worth tens of billions of dollars and is the key force behind a very important social institution in Silicon Valley disqualifies all persons who live there from being independent of him. Rather, it is merely an acknowledgement of the simple fact that accusing such a significant person in that community of such serious wrongdoing is no small thing.

Given that general context, Ellison's relationship to Stanford itself contributes to my overall doubt, when heaped on top of the ties involving Boskin and Lucas. During the period when Grundfest and Garcia-Molina were being added to the Oracle board, Ellison was publicly considering making extremely large contributions to Stanford. Although the SLC denies

*946 knowledge of these public statements, Grundfest claims to have done a fair amount of research before joining the board, giving me doubt that he was not somewhat aware of the possibility that Ellison might bestow large blessings on Stanford. This is especially so when I cannot rule out the possibility that Grundfest had been told by Lucas about, but has now honestly forgotten, the negotiations over the Ellison Scholars Program.

Furthermore, the reality is that whether or not Ellison eventually decided not to create that Program and not to bequeath his house to Stanford, Ellison remains a plausible target of Stanford for a large donation. This is especially so in view of Oracle's creation of the Oracle Help Us Help Foundation with Stanford and Ellison's several public indications of his possible interest in giving to Stanford. And, while I do not give it great weight, the fact remains that Ellison's medical research foundation has been a source of nearly $10 million in funding to Stanford. Ten million dollars, even today, remains real money.

Of course, the SLC says these facts are meaningless because Stanford rejected Ellison's child for admission. I am not sure what to make of this fact, but it surely cannot bear the heavy weight the SLC gives it. The aftermath of denying Ellison's child admission might, after all, as likely manifest itself in a desire on the part of the Stanford community never to offend Ellison again, lest he permanently write off Stanford as a possible object of his charitable aims—as the sort of thing that acts as not one, but two strikes, leading the batter to choke up on the bat so as to be even more careful not to miss the next pitch. Suffice to say that after the rejection took place, it did not keep Ellison from making public statements in *Fortune* magazine on August 13, 2001 about his consideration of making a huge donation to Stanford, at the same time when the two SLC members were being courted to join the Oracle board.

As an alternative argument, the SLC contends that neither SLC member was aware of Ellison's relationship with Stanford until after the Report was completed. Thus, this relationship, in its various facets, could not have compromised their independence. Again, I find this argument from ignorance to be unavailing. An inquiry into Ellison's connections with Stanford should have been conducted before the SLC was finally formed and, at the very least, should have been undertaken in connection with the Report. In any event, given how public Ellison was about his possible donations it is difficult not to harbor troublesome doubt about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

whether the SLC members were conscious of the possibility that Ellison was pondering a large contribution to Stanford. In so concluding, I am not saying that the SLC members are being untruthful in saying that they did not know of the facts that have emerged, only that these facts were in very prominent journals at the time the SLC members were doing due diligence in aid of deciding whether to sign on as Oracle board members. The objective circumstances of Ellison's relations with Stanford therefore generate a reasonable suspicion that seasoned faculty members of some sophistication-- including the two SLC members--would have viewed Ellison as an active and prized target for the University. The objective circumstances also require a finding that Ellison was already, through his personal Foundation and Oracle itself, a benefactor of Stanford.

Taken in isolation, the facts about Ellison might well not be enough to compromise the SLC's independence. But that is not the relevant inquiry. The pertinent question is whether, given *all* the facts, the SLC has met its independence burden.

*947 When viewed in that manner, the facts about Ellison buttress the conclusion that the SLC has not met its burden. Whether the SLC members had precise knowledge of all the facts that have emerged is not essential, what is important is that by any measure this was a social atmosphere painted in too much vivid Stanford Cardinal red for the SLC members to have reasonably ignored it. Summarized fairly, two Stanford professors were recruited to the Oracle board in summer 2001 and soon asked to investigate a fellow professor and two benefactors of the University. On Grundfest's part, the facts are more substantial, because his connections--through his personal experiences, SIEPR, and the Law School--to Boskin and to Lucas run deeper.

[12] It seems to me that the connections outlined in this opinion would weigh on the mind of a reasonable special litigation committee member deciding whether to level the serious charge of insider trading against the Trading Defendants. As indicated before, this does not mean that the SLC would be less inclined to find such charges meritorious, only that the connections identified would be on the mind of the SLC members in a way that generates an unacceptable risk of bias. That is, these connections generate a reasonable doubt about the SLC's impartiality because they suggest that material considerations other than the best interests of Oracle could have influenced the SLC's inquiry and judgments.

[13] Before closing, it is necessary to address two concerns. The first is the undeniable awkwardness of opinions like this one. By finding that there exists too much doubt about the SLC's independence for the SLC to meet its *Zapata* burden, I make no finding about the subjective good faith of the SLC members, both of whom are distinguished academics at one of this nation's most prestigious institutions of higher learning. [FN70] Nothing in this record leads me to conclude that either of the SLC members acted out of any conscious desire to favor the Trading Defendants or to do anything other than discharge their duties with fidelity. But that is not the purpose of the independence inquiry.

> FN70. *Lewis v. Fuqua*, 502 A.2d at 964-65 (noting that a non-independence finding should not be equated with a determination that an SLC member acted improperly).

[14] That inquiry recognizes that persons of integrity and reputation can be compromised in their ability to act without bias when they must make a decision adverse to others with whom they share material affiliations. To conclude that the Oracle SLC was not independent is not a conclusion that the two accomplished professors who comprise it are not persons of good faith and moral probity, it is solely to conclude that they were not situated to act with the required degree of impartiality. *Zapata* requires independence to ensure that stockholders do not have to rely upon special litigation committee members who must put aside personal considerations that are ordinarily influential in daily behavior in making the already difficult decision to accuse fellow directors of serious wrongdoing.

Finally, the SLC has made the argument that a ruling against it will chill the ability of corporations to locate qualified independent directors in the academy. This is overwrought. If there are 1,700 professors at Stanford alone, as the SLC says, how many must there be on the west coast of the United States, at institutions without ties to Oracle and the Trading Defendants as substantial as Stanford's? Undoubtedly, a corporation of Oracle's market capitalization could have found prominent academics willing to serve as *948 SLC members, about whom no reasonable question of independence could have been asserted.

Rather than form an SLC whose membership was free from bias-creating relationships, Oracle formed a committee fraught with them. As a result, the SLC

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917
824 A.2d 917
**(Cite as: 824 A.2d 917)**

has failed to meet its *Zapata* burden, and its motion to terminate must be denied. Because of this reality, I do not burden the reader with an examination of the other *Zapata* factors. In the absence of a finding that the SLC was independent, its subjective good faith and the reasonableness of its conclusions would not be sufficient to justify termination. Without confidence that the SLC was impartial, its findings do not provide the assurance our law requires for the dismissal of a derivative suit without a merits inquiry.

### V. *Conclusion*

The SLC's motion to terminate is DENIED. IT IS SO ORDERED.

824 A.2d 917

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.