# EXHIBIT A

1   MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2   WILLIAM S. LERACH (68581)
    MARK SOLOMON (151949)
3   DOUGLAS R. BRITTON (188769)
    401 B Street, Suite 1700
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)
          - and -
6   SANFORD SVETCOV (36561)
    SHAWN A. WILLIAMS (213113)
7   100 Pine Street, Suite 2600
    San Francisco, CA  94111
8   Telephone:  415/288-4545
    415/288-4534 (fax)
9
    Lead Counsel for Plaintiffs
10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13
    In re ORACLE CORPORATION SECURITIES )   Master File No. C-01-0988-MJJ
14  LITIGATION                           )
    _____    )   CLASS ACTION
15                                        )
    This Document Relates To:            )   PLAINTIFFS' *EX PARTE* APPLICATION
16                                        )   FOR AN ORDER ENJOINING
        ALL ACTIONS.                      )   DEFENDANTS TO CEASE ALTERING
17  _____    )   EVIDENCE, DIRECTING DEFENDANTS
                                              TO PRESERVE EVIDENCE AND
18                                            GRANTING PLAINTIFFS
                                              PARTICULARIZED DISCOVERY TO
19                                            PRESERVE EVIDENCE

20                                            DATE:       N/A
                                              TIME:       N/A
21                                            DEPT:       Honorable Martin J. Jenkins

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS OF ACCOUNTING FRAUD . . . . 2

    A.   Oracle Improperly Converted $228 Million of Customer Overpayments
          and Falsely Reported It as 2Q01 Revenue . . . . . . . . . . . . . . . . . . . 2

    B.   Plaintiffs' Allegations Have Now Been Confirmed by an Oracle Employee
          Who Has Also Warned of Imminent Destruction of Evidence . . . . . . . . . 3

         1.   A New Witness and Former Oracle Manager Confirms the SAC . . . . 3

         2.   New Witnesses Warn of Destruction, Alteration or Spoliation of
             Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   Internal Oracle Documents Corroborate Witness Reports . . . . . . . . . . . 6

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   The Facts Justify an Order to Preserve Evidence . . . . . . . . . . . . . . . . 7

    B.   Particularized Discovery is Warranted By the Facts . . . . . . . . . . . . . . 9

         1.   Deposition Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         2.   Deposition Topics . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         3.   Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1

# TABLE OF AUTHORITIES

2

3

**CASES** <span style="float:right">**Page**</span>

4

*In re Flir Sys., Inc. Sec. Litig.,*
   [2000-2001 Transfer Binder], Fed. Sec. L. Rep.
   (CCH) ¶91,308 (D. Or. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5

6

*In re Pacific Gateway Exch., Inc. Sec. Litig.,*
   No. C 00-1211 PJH (JL), 2001 U.S. Dist. LEXIS 18433
   (N.D. Cal. Oct. 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7

8

*Powers v. Eichen,*
   961 F. Supp. 233 (S.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . 8

9

*SG Cowen Sec. Corp. v. United States District Court*
   *for the Northern District of California,*
   189 F.3d 909 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10

11

*Vezzetti v. Remec, Inc.,*
   No. 99CV0796L (JAH), 2001 U.S. Dist. LEXIS 10462
   (S.D. Cal. July 20, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12

13

**STATUTES , RULES AND REGULATIONS**

14

15 U.S.C.
   §78u-4(b)(3)(C)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   §78u-4(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 10

15

16

Federal Rules of Civil Procedure
   30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs bring this *ex parte* motion pursuant to Civil Local Rules 7-10(a), 65-1(a), and the

2    Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. §78u-4(b)(3)(B)), seeking

3    an order directing defendant Oracle Corp. ("Oracle" or the "Company") to (1) cease and desist the

4    destruction or alteration of evidence; (2) answer particularized discovery to determine the extent of

5    the alteration of documents and the extent of the loss of evidence; (3) take all necessary measures

6    to preserve the integrity of all documents (including electronic communications); and (4) give the

7    Court an accounting of such measures.

8    This extraordinary relief is warranted because plaintiffs have recently learned from a former

9    Oracle manager, in contact with current Oracle employees, that after plaintiffs filed their Second

10   Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC") on October

11   11, 2002, Oracle initiated destruction or alteration of electronic evidence that would support

12   plaintiffs' allegations of accounting fraud.

13   **I.    INTRODUCTION**

14   This is a securities fraud class action on behalf of persons who purchased the publicly traded

15   securities of Oracle between December 14, 2000 and March 1, 2001 (the "Class Period"). The

16   October 11, 2002 SAC includes new allegations of serious accounting irregularities within Oracle

17   that resulted in the overstatement of the Company's 2Q01 revenues by approximately $228 million.

18   The allegations of accounting fraud, on their own, reveal massive and deliberate conversion

19   of unearned revenue in violation of Generally Accepted Accounting Principles ("GAAP"). These

20   allegations also provide context for plaintiffs' allegations that defendants' statements during the Class

21   Period that Oracle was not being hurt by the slowing economy, and that Oracle would continue to

22   enjoy sequential earnings growth and would report 3Q01 of $0.12 earnings per share ("EPS"), were

23   false when made.  In addition, the overstatement of $228 million in revenue explains Oracle's

24   purported financial success in the two quarters following the release of its faltering 11i suite of

25   software.

26   Since October 11, 2002, new witnesses have disclosed facts confirming the allegations of the

27   SAC. More importantly, a former employee has disclosed that Oracle has already begun to destroy

28   evidence critical to plaintiffs' claims.  Specifically, plaintiffs have been informed that Oracle has

1   directed Mike Quinn, an Oracle manager in charge of revenue recognition, and members of the

2   Company's cash collections staff and accounts receivable staff to hurriedly adjust invoices, refund

3   cash and "clean up the On Account problem" alleged in the SAC. In furtherance of this clean-up,

4   the Company has revived an old database consisting of customer receipts relevant to plaintiffs'

5   allegations, retrieved data from that database, and plans to shut it down again when the alterations

6   are completed. Some or all of that alteration may already have been accomplished.

7       In light of the foregoing facts and the details provided below, plaintiffs seek an Order from

8   the Court enjoining Oracle to cease altering evidence, directing Oracle to preserve evidence, and

9   allowing plaintiffs limited particularized discovery aimed at ensuring that evidence is preserved or

10   recovered if recently altered.

11  **II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS OF ACCOUNTING FRAUD**

12

13       **A.    Oracle Improperly Converted $228 Million of Customer Overpayments and Falsely Reported It as 2Q01 Revenue**

14       The SAC alleges that Oracle overstated its 2Q01 revenues by more than $228 million. ¶36.[1]

15   In support of their allegations of falsity, plaintiffs submit the first-hand confidential witness account

16   of a former financial analyst ("CW46") for a global recovery audit firm responsible for servicing its

17   clients, some of whom are Oracle customers. ¶27(tt). CW46 reviewed invoices, purchase orders

18   and shipping documents on behalf of his/her clients to uncover payment errors and recover

19   inadvertent payments. Specifically, based on analysis by CW46, plaintiffs allege that between 1991-

20   2001 at least 16 Oracle customers had inadvertently overpaid Oracle invoices, but that Oracle did

21   not inform its customers of overpayment or refund their money. Instead, Oracle maintained a fund

22   of its customer overpayments as unapplied cash on account. ¶36(c).

23       Plaintiffs also allege that on November 17, 2000, in a series of approximately 46,000

24   transactions, Oracle converted $228 million of such customer overpayments held in its unapplied

25   cash account to revenue by creating phony sales invoices called "debit memos" and clearing the debit

26   memos with money held in the unapplied cash account. ¶¶35-43. CW46 reviewed 760 of these

27

28  [1]    All "¶" references are to the SAC.

1    November 17 transactions, each with varying dollar amounts. The dollar value totaled $14.5 million.

2    ¶37(a).

3        Plaintiffs further allege that Oracle credit collections analysts confirmed the issuance of the

4    phony debit memos and said they were created to "clean up [Oracle's] unapplied account" consisting

5    of customer overpayments. ¶37. A former Oracle credit collections analyst, CW48, corroborated

6    that on November 17, 2000 the Company executed a huge sweep of old cash, all with debit memos.

7    ¶38(f).

8        In addition, plaintiffs allege that a named statistics expert analyzed the 760 transactions

9    uncovered by CW46 and determined that they provide a sufficient and reasonable sample to infer

10   that the population of transactions exceeds 46,000 and the average dollar value of the transaction

11   exceeds $4,970. Thus, the total value of the broader population exceeds $228 million. ¶¶39-40.

12   **B.    Plaintiffs' Allegations Have Now Been Confirmed by an Oracle Employee Who Has Also Warned of Imminent Destruction of**
13   **Evidence**

14       **1.    A New Witness and Former Oracle Manager Confirms the SAC**

15

16       Subsequent to the filing of their SAC, on October 25, 2002, plaintiffs interviewed CW49,

17   a former Oracle manager for cash collections. CW49 was responsible for all Oracle collections

18   activity for the United States and reported to Mike Quinn, who was responsible for revenue

19   recognition at the Company, and reported to Jennifer Minton, Oracle's Senior Vice President of

20   Finance and Operations. CW49 corroborated plaintiffs' allegations of improper conversion of

21   customer overpayments. CW49 further confirmed that Oracle routinely accumulated customer

22   overpayments, that customers were not informed of those overpayments and that Oracle held

23   customer overpayments in its "unapplied cash account." In addition, CW49 reported that in 2Q01

24   ending November 30, 2000, Senior Accounts Receivable Manager Greg Meyers had been directed

25   by Jennifer Minton, Oracle's Senior Vice President of Finance and Operations, to "clean up" the

26   unapplied cash accounts. According to CW49, Meyers did so by ordering the issuance of debit

27   memos which were essentially "fictitious invoices" and that Mike Quinn, who was in charge of all

28   revenue recognition at Oracle, applied the money from the unapplied account to revenue.

1    CW49 also confirmed that on November 17, 2000, 46,800 "debit memos" were created and

2    $230 million in unapplied cash was moved from Oracle's unapplied cash account. Thus, CW49

3    independently corroborated the analysis of plaintiffs' statistics expert. CW49 further related that

4    some of the critical documents tracking the unapplied cash transactions are the Activity Balance

5    Account sheets which exist for each customer and the Billing Histories of each customer (similar

6    to the excerpts attached as Exs. 40 and 41 to the Corrected Appendix to the SAC).

7            **2.**     **New Witnesses Warn of Destruction, Alteration or Spoliation of Evidence**

8        In a follow-up interview, on October 31, 2002, CW49 reported that a former colleague and

9    current Oracle employee contacted him and stated that, since the filing of the SAC, Oracle had also

10   assembled an "On Account Team" directed by Mike Quinn to solve the "On Account" issue. CW49

11   reported that Quinn has put in place an "action plan" that would imminently alter certain electronic

12   transactions and customer invoices which would otherwise have supported plaintiffs' claims. The

13   plan resulted in a flurry of meetings and messages directed by Quinn between October 21, 2001 and

14   October 30, 2001. The purpose of the plan was to direct cash collections personnel and accounts

15   receivable personnel to clean up the debit memos that were created in November 2000, plus any

16   debit memos created between 1998 to the present which were above $15,000. Notes from some of

17   those meetings given to CW49 by Oracle employees state:

18           October 21 Monday: Mgr meeting – explanation of on account problem and
19           company's suit to pay back money. *Saying not rev[enue] recognized and everything will be okay.*[2] Lawsuit holds no water because this is a recent issue.

20           October 22 Tuesday: Quinn sends ss [spreadsheet] to mgrs be cut up [amongst]
21           mgmt team to resolve items that had been reserved. Create a plan to resolve and get out of reserve by Friday. *Collections meets with AR to agree how to adjust up*
22           *invoices and how to send over details.*

23           October 23 Wednesday: Collections mgrs breakup workload amongst staff and tell
        them to finish by cob [close of business]. SS [spreadsheet] sent to Quinn who sends
24           back with his notes and says this isn't good enough. These explanations will not due [sic]. Quinn meets with mgrs and lights into them.

25           *Quinn* wants to figure out why the items were reserved and *can't tell if the*
26           *item was a revenue impact or not. Will not refund any item that impacts revenue,*
        *adjust up invoice for revenue impacting items.*

27

28     [2]    Here, as elsewhere, emphasis is added and citations are omitted unless otherwise noted.

1

2
        [October 24, 25, 28, 29:  Oracle prohibited all collections personnel from making outbound calls but instead work on Quinn action items.]

3
        October 30 Wednesday:  Quinn sent back ss [spreadsheet] with items that needed additional cleanup and staff began working on.  Collections mgrs meet and agreed upon all notes to be sent to Quinn.

4

5
(A copy of these notes is attached as Exhibit A to the Declaration of Ken Keatly in Support of

6
Plaintiffs' *Ex Parte* Application for an Order Enjoining Defendants to Cease Altering Evidence,

7
Directing Defendants to Preserve Evidence and Granting Plaintiffs Particularized Discovery to

8
Preserve Evidence ("Keatly Decl.")).

9
        Among the evidence alterations reported by the current employee to CW49, one includes the

10
deletion of historical transaction notes pertaining to Oracle customers who have made overpayments.

11
The change would be executed by logging into the 11i "accounts receivable workbench" application,

12
pulling up the "receipts/receipts," form and deleting the historical receipts notes input by a credit

13
corrections analyst concerning the last transaction on specified accounts.  Thus, for example, if the

14
last receipt note for Oracle client Eli Lilly indicated "Move to On Account," Oracle intends to delete

15
that historical note and change it to indicate "refund customer" or something to a similar effect.

16
According to CW49, these receipt notes only retain the last note taken on the account, the historical

17
notes evidencing improper revenue recognition will not be retrievable.

18
        The Oracle employee informed CW49 of a second specific measure Oracle intended to take

19
which would alter documents relevant to plaintiffs' allegations.  In order to create the appearance that

20
customer payments were accurately applied, CW49 reported that defendants planned to review all

21
invoices for specific customers which had been previously written off as bad debts.  Defendants will

22
then upwardly adjust those invoices and apply an overpayment check on hand to that purportedly

23
adjusted invoice.  This action would thus create the false appearance that Oracle had properly applied

24
overpayments to an open invoice.  Because the specific customer would not know of the written off

25
bad debt, nor of the overpayments in Oracle's unapplied account, those alterations can be made

26
without contacting customers and only Oracle would be privy to information regarding the

27
alterations.

28

1    CW49 also learned from speaking with the Oracle current employee that the following are

2  some Oracle employees involved in carrying out the action plan of cleaning up the unapplied cash

3  and debit memos:

| | |
|---|---|
| Ann Maria Adao | Sam Johannes |
| Justin Backs | Sajam Kumar |
| Krithika Bhat | Molly Littlefield |
| Raul Campos | Neil Menon |
| Joan de la Crux | Greg Meyers |
| Omid Fardanesh | Mike Quinn |
| Ian Hatada | Ryan Roberts |
| Kim Henderson | |

### C.    Internal Oracle Documents Corroborate Witness Reports

In addition to Exhibit A (the meeting notes), the following documents, Exhibits B-D attached

to the Keatly Decl., obtained by plaintiffs support information disclosed by CW49 and establish that

the Company has in fact taken and continues to take measures that are likely compromising the

integrity of relevant evidence and confirm that the Company has already revived an old database

confirming customer receipts.

Exhibit B is an e-mail from Ryan Roberts to several Oracle managers, each in charge of what

appear to be separate teams.  The e-mail states:

> Attached is our new working list. I have broken it out from the list and sorted by dollar (so I could get back the ones we have not yet worked on). They are listed out for you by your name. Please do not resort these. *I have to get them back in the same order I am sending them to you.* Each of you has between 50-52 items. Feel free to meet with your teams tonight or tomorrow morning to get them assigned. *Let's do the same quality work on these that we have done with the others.* My goal is to be done by 4:30 tomorrow so we can get the In Focus and go over them. Once complete, I will forward to Mike and let him know *we are ready to take action.*

(Emphasis in original and added).

Exhibit C is an e-mail from Omid Fardanesh to Kim Henderson, Oracle's Senior Systems

Analyst for North America Finance and Operations.  The e-mail confirms that the Company is doing

a reconciliation of its "On Account" records and has reactivated the "query component of the old

Proforma site" to complete the project:

> *Here in Collections we are doing a reconciliation of our "On Account" which consists of Receipts we have received.* The problem we are running into some of the Checks reference a PFR number. I know that recently we deactivated the site that allowed us to search on a PFR number to find out why the [Pro]forma was done.

*I am hoping to see if there is any way we can get access to that data even if possible to reactivate the site for a week or so till we are done with this project.*

In response, Henderson wrote that she had reactivated the database but would only leave it active until November 1, 2002:

> Hi Omid –
>         I've reactivated the query component of the old Proforma site. I had to restart our old database that had the proforma table in it. I will leave it up until Friday, November 1st and then shut it down again. *I do not want to leave the old database up one second longer than it needs to be.*

Exhibit D is an e-mail from Mike Quinn to Greg Meyers confirming that Meyers has disabled the ability to move customer receipts "On Account" to its 12601 account:

>         Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc receipt write off has been turned off.

>         Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts. Please research and provide an explanation of the accounting involved.

## III.   ARGUMENT

### A.   The Facts Justify an Order to Preserve Evidence

15 U.S.C. §78u-4(b)(3)(B) provides in relevant part:
In any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of a party that particularized discovery is necessary to *preserve evidence* or to prevent undue prejudice to that party.

Although the stay provision was intended to prevent unnecessary imposition of discovery costs on defendants, the PSLRA also imposes a duty on any party to a securities class action with actual notice of the allegations in a complaint to preserve all relevant evidence in its custody or control and thus makes it "illegal for a party who receives actual notice of the litigation to destroy or alter evidence." *Powers v. Eichen,* 961 F. Supp. 233, 236 (S.D. Cal. 1997); 15 U.S.C. §78u-4(b)(3)(C)(1). Accordingly, the statute also provides a means to obtain relief from the stay where "'particularized discovery is necessary to preserve evidence or prevent undue prejudice to a party.'" *See SG Cowen Sec. Corp. v. United States District Court for the Northern District of California,* 189 F.3d 909, 911-13 (9th Cir. 1999).

1    Consistent with that provision, courts have allowed discovery to proceed in a limited fashion

2    where a party has made a showing that evidence may be lost or destroyed resulting in prejudice to

3    that party. In *In re Pacific Gateway Exch., Inc. Sec. Litig.*, No. C 00-1211 PJH (JL), 2001 U.S. Dist.

4    LEXIS 18433 (N.D. Cal. Oct. 15, 2001), Judge Hamilton found that personal computers of Pacific

5    Gateway employees may have been reformatted or reprogrammed in such a way that would

6    overwrite or erase relevant data from their hard drives and granted a partial lifting of the stay of

7    discovery and allowed plaintiff to take Rule 30(b)(6) depositions of the custodian of records, serve

8    preservation subpoenas, and image computer laptops. *Id.*; *see also Blumenthal v. Glinsky*, C-01-

9    01474-WHA, Order Granting Plaintiff's Motion to Seek Particularized Discovery Prior to

10   Appointment of Lead Plaintiff (N.D. Cal. May 1, 2001) (permitting plaintiffs to take discovery upon

11   a showing that documents relevant to Northpoint Communications, Inc. would be sold or destroyed

12   pursuant to events occurring in its bankruptcy proceedings) (attached hereto as Exhibit 1).

13   In *Newby v. Enron Corp.*, No. H-01-3624, pending in the Northern District of Texas,

14   plaintiffs asserted that Arthur Andersen, Enron Corp.'s ("Enron") outside auditor, had disposed of

15   significant electronic and paper documents relevant to Enron's engagement in violating the PSLRA

16   mandate to preserve evidence, and sought particularized discovery aimed at preserving and

17   recovering evidence. The court lifted the stay of discovery and allowed plaintiffs to take depositions

18   limited to issues of document and data retention, storage, deletion, and restoration.   Order

19   Prohibiting the Destruction of Evidence, Granting Limited Discovery, and Providing Other Relief

20   Regarding Arthur Andersen, No. H-01-3624 (N.D. Tex. Jan. 23, 2002) (attached hEreto as Exhibit

21   2).

22   Other courts have also lifted the PSLRA discovery stay to ensure the preservation of evidence

23   when circumstances suggest that documents may be lost or destroyed. In *In re Flir Sys., Inc. Sec.*

24   *Litig.*, [2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶91,308 (D. Or. 2000), plaintiffs sought

25   to lift the discovery stay to depose a third party witness said to have information relating to improper

26   accounting practices alleged in plaintiffs' complaint. The witness had previously refused to disclose

27   information because defendant threatened to sue if he did so.  The court found that defendants'

28   efforts to silence the witness would result in undue prejudice and granted plaintiffs' motion. *See also*

1  *Vezzetti v. Remec, Inc.*, No. 99CV0796L (JAH), 2001 U.S. Dist. LEXIS 10462 (S.D. Cal. July 20,

2  2001) (granting plaintiffs' *ex parte* application for leave to serve document production subpoenas on

3  non-parties).

4  **B.     Particularized Discovery Is Warranted by the Facts**

5  In this case, immediate relief is necessary to ensure the preservation of documents critical

6  to plaintiffs' proof, discovery of what has been done to date that would have deleted or compromised

7  the integrity of those documents, and recovery, if possible, of any lost or destroyed evidence.

8  Plaintiffs have asserted specific exceptional circumstances under which a lift of the automatic stay

9  is warranted to preserve evidence and avoid undue prejudice.   Thus, pursuant to 15 U.S.C.

10  §78u-4(b)(3)(B) and Civil Local Rules 7-10(a) and 65-1(a), plaintiffs respectfully request that the

11  Court issue an order directing Oracle (a) to cease and desist all conduct which would alter relevant

12  evidence; (b) to answer particularized discovery aimed at preserving and recovering evidence; and

13  (c) to order Oracle to provide the Court with an immediate accounting of the steps taken to preserve

14  evidence or to alter or destroy evidence.

15  **1.     Deposition Witnesses**

16
| | |
|---|---|
| Ann Maria Adao | Sam Johannes |
| Justin Backs | Sajam Kumar |
| Krithika Bhat | Molly Littlefield |
| Raul Campos | Neil Menon |
| Joan de la Cruz | Greg Meyers |
| Omid Fardenesh | Mike Quinn |
| Ian Hatada | Ryan Roberts |
| Kim Henderson | |

20  **2.     Deposition Topics**

21
22  (a)     The identity of any and all individual measures taken to preserve documents, including electronic data, concerning Oracle's unapplied cash, debit memos, and customer overpayments.

23
24  (b)     Location of all electronic and paper documents and correspondence relating to customer invoices and overpayments.

25  (c)     Identity of all individuals involved in creating and applying debit memos to unapplied cash in November 2000.

26
27  (d)     Any and all "projects" or measures taken between October 11, 2002 to the present to reconcile Oracle's "On Account," or "unapplied cash."

28

1       (e)     Any measures taken between October 11, 2002 to the present related to refunding customers, adjusting customer invoices, or adjusting credit analyst notes for all customers.

2

3       (f)     Identify and produce a Person Most Knowledgeable ("PMK") of all computer systems, including a description of hardware, operating systems and software, used by Oracle to generate, store, restore or retrieve electronic data and documents, including electronic mail including,

4 but not limited to, systems in Oracle's finance and operations department, collections, and accounts receivable department.

5

6       (g)     All processes and procedures involved in the creation, storage, retention, restoration and retrieval of electronic data and documents, including electronic mail.

7       (h)     The description, number, and location of media upon which electronic data and documents, including electronic mail, were and currently are stored or maintained

8 .

9       (i)     All steps undertaken to preserve documents after this lawsuit commenced and after October 11, 2002, including the preservation of hard-copy documents, electronic documents, files and hard drives of employees who have since left the Company.

10

11       (j)     Identify and produce a PMK of Oracle's "on account," its "unapplied cash" account, its "reserve" account, its "12601" account, and its "5160101" refund account.

12       (k)     Identify and produce a PMK of Oracle's pro forma site.

13       (l)     Identify and produce a PMK of Oracle's past and current document preservation policies.

14

      **3.**    **Documents**

15

16       (a)     All correspondence (including electronic) between and among the members of the credit collections group and accounts receivable, including, but not limited to, the individuals described above from October 11, 2002 to the present.

17

18       (b)     Any and all documents and communications generated between October 11, 2002 - present concerning November 17, 2000 debit memos.

19       (c)     All documents and communications relating to all transactions in the Company's 25005 account between November 1, 2000 – November 30, 2000 and October 11, 2002 -

20 present.

21       (d)     All documents relating to transactions in the Company's 12601 account between November 1, 2000 – March 30, 2001 and October 1, 2002 – present.

22

23       (e)     All documents and communications relating to any "On Account" clean up or reconciliation of Oracle's On Account between October 1, 2002 – present.

24       (f)     All documents and communications concerning any "receipt write offs" of 5160101 refunds from October 11, 2002 – present.

25

26       (g)     All documents and communications containing the reactivation of Oracle's pro forma site.

27       (h)     All documents and communications concerning Oracle's customer activity detail 12601 spreadsheets.

28

# Exhibit 1

Received

MAY 0 2 2001

Milberg Weiss

FILED

2001 MAY -1  PM 3: 34

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
N'N DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANK BLUMENTHAL, On Behalf of Himself
and All Others Similarly Situated,

        Plaintiff,

v.

MICHAEL P. GLINSKY and ELIZABETH A.
FETTER,

        Defendants.

No. C 01-01474 WHA

ORDER GRANTING PLAINTIFF'S
MOTION TO SEEK PARTICULARIZED
DISCOVERY PRIOR TO
APPOINTMENT OF LEAD PLAINTIFF

On April 13, Judge Thomas E. Carlson of the United States Bankruptcy Court for the
Northern District of California granted an *ex parte* motion in the bankruptcy case *In re
NorthPoint Communication Group, Inc.*, No. 01-30127-TEC, brought by plaintiffs in this case
to seek "relief from the provisions of 11 U.S.C. 362(a) to seek discovery against NorthPoint as
a non-party in *Blumenthal* action or against NorthPoint as a non-party to any consolidated
action that includes the *Blumenthal* action, subject to any limitations on such discovery deemed
appropriate by the court with jurisdiction over the *Blumenthal* action or any consolidated
action." Plaintiffs have now moved this Court for permission to take such discovery and to
obtain relief from the anti-discovery provisions of the Private Securities Litigation Reform Act
of 1995. 15 U.S.C. 78u-4(b)(3)(B). Good cause having been shown, the Court PERMITS the
requested discovery so long as it is conducted under the aegis of the bankruptcy court and under
Judge Carlson's supervision.

1    Plaintiff's counsel are advised that the advance discovery being taken by counsel for Mr.

2    Blumenthal will not necessarily aid them with respect to the selection of lead plaintiff and lead

3    counsel and, correspondingly, that counsel should not necessarily expect to be reimbursed for

4    their time spent on the discovery.

5

6    **IT IS SO ORDERED.**

7

8    Dated:  May 1, 2001.

9    _____
     WILLIAM ALSUP
10   UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
for the
Northern District of California
May 1, 2001


* * CERTIFICATE OF SERVICE * *



Case Number:3:01-cv-01474


Blumenthal

   vs

Glinsky

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  May 1, 2001, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

      Reed R. Kathrein, Esq.
      Milberg Weiss Bershad Hynes & Lerach LLP
      100 Pine Street
      Ste 2600
      San Francisco, CA  94111

      William S. Lerach, Esq.
      Milberg Weiss Bershad Hynes & Lerach LLP
      600 W Broadway Ste 1800
      One America Plaza
      San Diego, CA  92101

      Darren J. Robbins, Esq.
      Milberg Weiss Bershad Hynes & Lerach LLP
      600 W Broadway Ste 1800
      One America Plaza
      San Diego, CA  92101

      Andrew L. Barroway, Esq.
      Schiffrin & Barroway LLP
      Three Bala Plaza East
      Suite 400
      Bala Cynwyd, PA  19004

      David Kessler, Esq.

Schiffrin & Barroway, LLP
Three Bala Plaz East
Suite 400
Bala Cynwyd, PA   19004

Richard W. Wieking, Clerk

BY: _____
     Deputy Clerk

# Exhibit 2

United States Courts
Southern District of Texas
ENTERED

JAN 2 3 2002

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, } | Civil Action No. H-01-3624 (Consolidated) |
| Plaintiffs, } | CLASS ACTION |
| vs. } | |
| ENRON CORP., et al., } | |
| Defendants } | |

## ORDER PROHIBITING THE DESTRUCTION OF EVIDENCE, GRANTING LIMITED DISCOVERY, AND PROVIDING OTHER RELIEF REGARDING ARTHUR ANDERSON

IT IS HEREBY ORDERED:

(1) Arthur Andersen shall segregate, preserve and protect all writings, recordings, and electronically stored material (FRE 1001) in its possession, custody or control concerning Enron Corporation, including but not limited to, documents, correspondence, e-mails or other communications or evidence related to audit examinations, quarterly reviews, tax-related services, or consulting engagements on behalf of enron Corporation, or any Enron-related entities. Enron-related entities shall include Special Purpose Entities and any affiliates, subsidiaries, partnerships, or joint ventures in which, to Arthur Andersen's knowledge, Enron Corporation or any Enron-related entity participated (hereinafter collectively "Enron-related entities") (all such materials and evidence collectively to be referred to as "Enron-related Materials"). Arthur Andersen shall also preserve and protect all writings, recordings and electronically stored material relating to Arthur Andersen's



destruction or deletion of Enron-related materials, to Arthur Andersen's investigation of the destruction or deletion of Enron-related materials by or at the discretion of Arthur Andersen employees or agents, and to Arthur Andersen's efforts to recover or reconstruct Enron-related materials which had been previously destroyed, discarded or deleted.

(2)     Arthur Andersen shall report to the Court and to whomever is appointed as lead plaintiff(s) and lead counsel, within 20 days of entry of this order, the following:

(a)     By category or subject matter, the Enron-related materials currently in Arthur Andersen's possession, custody or control;

(b)     The steps taken to protect, preserve and segregate Enron-related materials;

(c)     The efforts taken to identify specific Enron-related materials that were destroyed or deleted by document type, category or subject matter as appropriate;

(d)     The efforts to find, identify, recover, reconstruct and/or recreate any Enron-related materials which were destroyed or deleted or are otherwise missing from Arthur Andersen's physical or electronic files;

(e)     The documents and/or the categories of documents that were destroyed that have now been recovered, reconstructed and/or recreated by electronic means or otherwise, including the current location of such materials and the manner in which such materials were recovered, reconstructed or recreated;

(f)     The efforts made to find, identify, recover, reconstruct and/or recreate files in the personal possession of Arthur Andersen's former or present employees.

(3)     The PSLRA discovery stay is lifted for the limited purpose of allowing Plaintiffs' counsel to conduct depositions of the following Arthur Andersen-related individuals. These

00035904                                    2

depositions may be noticed immediately, but shall not be taken until immediately following the filing and service of the report referenced in Paragraph 2.

(a) Thomas H. Bauer, Partner, Houston. Placed on administrative leave.

(b) David B. Duncan, Lead Partner in Charge of the Enron engagement, Houston. Fired on 1/15/02.

(c) Michael M. Lowther, former partner, Houston. Placed on administrative leave.

(d) Michael C. Odom, former risk management partner, Houston. Was sent e-mail by Nancy Temple, an Anderson lawyer, and "reminded" of "documentation and retention policy." Placed on administrative leave.

(e) Stephen Goddard, Jr., former managing partner, Houston. Placed on administrative leave.

(f) Nancy Temple, author of October 12, 2001 e-mail regarding destruction of documents.

Each deposition shall last up to eight (8) hours and be limited to document and data retention, storage, removal, deletion, destruction, and attempts to restore or recover deleted or destroyed materials. No documents need be produced in connection with these depositions. These depositions will not preclude further depositions of these individuals when documents relating to Arthur Andersen's destruction of evidence is made available to Plaintiffs' counsel, or as is otherwise ordered by the Court.

(4) Arthur Andersen will update the Court and whoever is appointed as lead counsel as to Items 2(a)-(f), on a periodic basis, as agreed to by the parties or as ordered by the Court.

(5) Within five (5) days of the entry of this Order (or at such other time as the parties may agree), Arthur Andersen will make its expert available to the experts retained by plaintiff(s) for the purpose of enabling such experts to conduct their own evaluation of Arthur Andersen's efforts with

0003390c                                        3

respect to the matters referred to in Paragraph 2 above. Within ten (10) days of the entry of this Order, Plaintiffs' counsel (accompanied by their experts) will be permitted to make a thorough inspection of the four (4) Arthur Andersen document storage facilities identified by counsel for Arthur Andersen at the January 22, 2002 hearing, to enable Plaintiffs' counsel to satisfy themselves as to the security and safety of the evidence stored at those locations. If there are additional evidence storage facilities of Arthur Andersen, a similar inspection of each of them shall take place.

(6) Nothing herein shall be construed to require Arthur Andersen to undertake any action that is inconsistent with or will interfere with or impede any governmental investigation.

(7) The rights of all parties to seek additional information are preserved.

(8) Nothing reported by any party pursuant to or in connection with this Order shall constitute a waiver of the attorney-client work product or any other applicable privilege.

(9) Arthur Andersen shall distribute a copy of this Order to all Arthur Andersen partners promptly upon its entry.

Signed at Houston, Texas, this 23rd day of January, 2002.

Melinda Harmon
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

1

## DECLARATION OF SERVICE BY FACSIMILE

2

I, the undersigned, declare:

3

4       1.      That declarant is and was, at all times herein mentioned, a citizen of the United States

5   and a resident of the County of Alameda, over the age of 18 years, and not a party to or interest in

6   the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco,

7   California 94111.

8       2.      That on November 11, 2002, declarant served by facsimile the PLAINTIFFS' *EX*

9   *PARTE* APPLICATION FOR AN ORDER ENJOINING DEFENDANTS TO CEASE ALTERING

10  EVIDENCE, DIRECTING DEFENDANTS TO PRESERVE EVIDENCE AND GRANTING

11  PLAINTIFFS PARTICULARIZED DISCOVERY TO PRESERVE EVIDENCE to the parties listed

12  on the attached Service List.

13      3.      That there is a regular communication by facsimile between the place of origin and

14  the places so addressed.

15      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th

16  day of November, 2002 at San Francisco, California.

17

18                                                  _____
                                                         Mary Grace Halatsis
19

20

21

22

23

24

25

26

27

28  G:\CASES\Oracle3\JGC80442.brf

PLAINTIFFS' EX PARTE APPL FOR AN ORDER DIRECTING DEF TO PRESERVE
EVIDENCE & GRANTING PARTICULARIZED DISCOVERY- C-01-0988-MJJ

# EXHIBIT B

1  MILBERG WEISS BERSHAD
     HYNES & LERACH LLP
2  WILLIAM S. LERACH (68581)
   MARK SOLOMON (151949)
3  DOUGLAS R. BRITTON (188769)
   401 B Street, Suite 1700
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
           - and -
6  SANFORD SVETCOV (36561)
   SHAWN A. WILLIAMS (213113)
7  100 Pine Street, Suite 2600
   San Francisco, CA  94111
8  Telephone:  415/288-4545
   415/288-4534 (fax)
9
   Lead Counsel for Plaintiffs
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13

14  In re ORACLE CORPORATION SECURITIES )   Master File No. C-01-0988-MJJ
    LITIGATION                          )
                                        )   CLASS ACTION
15  ———————————————————————————————————— )
    This Document Relates To:           )   DECLARATION OF KEN KEATLY IN
16                                      )   SUPPORT OF PLAINTIFFS' *EX PARTE*
         ALL ACTIONS.                   )   APPLICATION FOR AN ORDER
17  ———————————————————————————————————— )   ENJOINING DEFENDANTS TO CEASE
                                            ALTERING EVIDENCE, DIRECTING
18                                          DEFENDANTS TO PRESERVE
                                            EVIDENCE AND GRANTING
19                                          PLAINTIFFS PARTICULARIZED
                                            DISCOVERY TO PRESERVE EVIDENCE
20
                                            DATE:      N/A
21                                          TIME:      N/A
                                            DEPT:      Honorable Martin J. Jenkins
22

23

24

25

26

27

28

1       I, Ken Keatly, declare as follows:

2       1.      I am an employee of L. R. Hodges & Associates, Ltd. ("LRH&A"), Solana Beach,
3    California, San Diego County.  LRH&A is a private investigative agency duly licensed by the
4    California State Bureau of Security and Investigative Services. LRH&A has been hired by Milberg
5    Weiss Bershad Hynes & Lerach LLP to investigate facts related to *In re Oracle Corporation*
6    *Securities Litigation*, Master File No. C-01-0988-MJJ (N.D. Cal.). I have personal knowledge of the
7    facts set forth below and, if called as a witness, could and would competently testify thereto.

8       2.      On October 3, 2002, I contacted a former Oracle manager of cash collections, CW49,
9    by telephone and explained that the nature of my call was related to matters occurring at Oracle
10   Corporation during calendar years 2000 and 2001.  I then briefly described some of the issues and
11   claims alleged in the above-captioned case.   CW49 expressed his/her interest in having a
12   conversation, but that he/she would have to schedule another time to do so.

13      3.      Between October 3, 2002 and October 25, 2002, I made several attempts to again
14   contact CW49 without success.  On October 25, 2002, CW49 contacted me via telephone and
15   expressed his willingness to speak with me at that time.  During our conversation, CW49 indicated
16   that he was employed at Oracle before, during, and after the Class Period (December 14, 2000 -
17   March 1, 2001) and was a manager of cash collections for the United States.  CW49 also stated that
18   during his tenure at Oracle he reported to Mike Quinn who was in charge of all revenue recognition
19   at Oracle, who reported to Jennifer Minton, Oracle's Senior Vice President of Finance.

20      4.      CW49 further stated that during the Class Period Oracle had a long-standing problem
21   of accumulating cash from customer overpayments and that in any given quarter Oracle had
22   approximately $130 million in unapplied cash in its Unapplied Cash account.  CW49 further stated
23   that some of the overpayments in the Unapplied Cash account were several years old.

24      5.      CW49 further stated that Oracle customers were ignorant of the existence of the
25   unapplied cash, because Oracle would only refund overpayments to customers upon a written request
26   by the customer.

27      6.      CW49 stated that during the Class Period Oracle also had a long-standing practice of
28   inappropriate use of customer's overpayments and unapplied cash by doing so-called "auto

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01-0988-MJJ                                                    - 1 -

1   adjustments" of customer overpayments in its Unapplied Cash account and applying the money to its

2   bad debt accounts, thereby lowering the Company's reported bad debt.

3        7.     CW49 further stated that during Oracle's 2Q01 ending November 2000, Senior

4   Accounts Receivable Manager Greg Meyers had been under pressure from Jennifer Minton, Oracle's

5   Senior Vice President of Finance and Operations, to "clean up" the unapplied cash accounts and with

6   the approval of Mike Quinn who was in charge of revenue recognition at the Company and Tom

7   Williams, a former Controller at Oracle who, at the time, was serving as a consultant to Minton,

8   created "debit memos" or "fictitious invoices," which resulted in approximately $40 million in

9   customer overpayments in its unapplied cash account being booked as revenue.

10       8.     CW49 further stated that at that time he expressed his concern about recognizing

11   revenue on the basis of unapplied cash to his superiors, including Quinn. Quinn responded that

12   CW49 should not worry about the matter because it was none of CW49's concern.

13       9.     On October 31, 2002, I met with CW49 face-to-face at the offices of Milberg Weiss

14   Bershad Hynes & Lerach LLP ("Milberg Weiss") in San Francisco, California. Present at that

15   meeting were attorneys from Milberg Weiss – Mark Solomon (via teleconference), Shawn Williams

16   and Ronald Hoffman, of counsel to Milberg Weiss.

17       10.    During that meeting, CW49 again stated that Oracle's policy of not returning

18   overpayments to customers resulted in the accumulation of unapplied cash. CW49 further stated that

19   the Company "solved" this problem by creating "debit memos" or phony invoices then applying

20   customers' unapplied cash to those invoices and booking it as revenue in 2Q01 ending November 30,

21   2000. In addition, CW49 stated that 46,800 items totaling $230 million had been applied as revenue

22   on November 17, 2000.

23       11.    CW49 also stated that among the 42 collections analysts in the Collections

24   Department, Raul Campos and Neil Menon at varying times were dedicated to managing the

25   Unapplied Cash account. In addition, CW49 stated that he had obtained and brought certain

26   documents with him to the meeting and that he was willing, on his own volition, to share them with

27   me.

28

1      12.     CW49 again explained that in addition to booking unapplied cash as revenue, Oracle
2   had used the unapplied cash as a way of reducing its bad debt in order to inflate reported earnings on
3   its income statement.  CW49 explained that at the end of a month, Oracle would run an "auto-
4   adjustment" that would take money out of the Unapplied Cash account and would transfer it to the
5   Reserve for Bad Debt account. CW49 said that by debiting the Unapplied Cash account Oracle would
6   decrease the amount in that account on the Balance Sheet. CW49 explained that the balancing entry
7   is a credit to the Bad Debt Expense account, which decreases Bad Debt Expense (on the Income
8   Statement), and the reduction in expense inflates net income.

9      13.     CW49 then stated that Oracle knew that people had become suspicious about the
10  Unapplied Cash account.  CW49 stated that he had recently had additional conversations with a
11  former colleague who is currently an Oracle employee. CW49 then stated that the former colleague
12  informed him/her that Oracle has directed personnel in the collections department to alter electronic
13  records, that once altered will appear as though the unapplied cash had not been booked as revenue
14  in November 2000. The former colleague told CW49 that the internal goal is to clean up all debit
15  memos that were issued from 1998 forward that are above $15,000.

16     14.     In addition, CW49 stated that during the conversation the former colleague indicated
17  that there had been a meeting to direct cash collection personnel to begin cleaning up debit memos
18  that were issued in November 2000. The former colleague also informed CW49 that while the cash
19  collections department was directed to clean up the debit memos, they were told that they would not
20  handle any other matters except cleaning up the unapplied cash and it would have to be done in a very
21  short period of time.

22     15.     CW49 gave plaintiffs a typewritten timeline of meetings at the Company between
23  October 21-30, reported to him by this former colleague, attached hereto as Exhibit A.

24     16.     The current employee further informed CW49 that the Company was in the process
25  of defining five approaches it would take on the debit memos issued in November of 2000.  One of
26  the five methods would be to log onto Oracle's 11i accounts receivable "workbench" application and
27  pull up the "receipts/receipts" form and then to delete from the historical receipt notes that describe
28  the last transaction for a particular entry. CW49 explained that if the last receipt note for the Oracle

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01-0988-MJJ                                                          - 3 -

1  customer indicated "move to On Account" that it would be possible to delete the historical note and
2  change it to say "refund customer."

3      17.    Another method that the former colleague informed CW49 was being utilized involved
4  Oracle reviewing all invoices for a specific customer which had previously been written off as a bad
5  debt and then upwardly adjusting those invoices and applying overpayments to the adjusted invoice.

6      18.    A third method related by this former colleague which was being contemplated by
7  Oracle is to erase the debit memo altogether.

8      19.    CW49 also stated that critical documents and reports that track the unapplied cash
9  issue are the Activity Balance Account reports and Billing History, each of which exists for all
10  customers.

11      20.    The former colleague further informed CW49 that among the 31 cash collectors and
12  five managers in cash collections, 75% of the cash collections department is doing nothing but this
13  "clean-up" project.

14      21.    CW49 also gave me a stack of documents which were approximately two inches thick
15  which included Exhibits A-D to this Declaration.

16      22.    Attached are true and correct copies of the following exhibits:

17  Exhibit A:    Typewritten notes from meetings conducted within Oracle between October 21, 2002 and October 30, 2002;

18
19  Exhibit B:    E-mail correspondence between Oracle's Senior Systems Analyst and Omid Farendesh which suggest that they were in the process of doing a reconciliation of their "On Account" records, and that in order to do so,
20  the company has revised an old database;

21  Exhibit C:    E-mail from Ryan Roberts which appears to confirm a distribution of items to be worked on by teams in the Collections Department to be
22  forwarded to Mike Quinn for action to be taken; and

23  Exhibit D:    E-mail from Mike Quinn to Greg Myers which appears to confirm that the ability to move monies through the "On Account" had been disabled.

24      I declare under penalty of perjury under the laws of the State of California that the foregoing
25  is true and correct. Executed this 11th day of November 2002, at San Diego California.

26

27                      KEN KEATLY
28

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01 0988-MJJ         - 4 -

REDACTED

October        21        Monday          Mgr meeting - explination of on account problem and company's suite to pay back money.  Saying not rev recognized and everything will be okay.  Lawsuit holds no water because this is a recent issue

October        22        Tuesday          Quinn sends ss to mgrs be cut up amoungts mgt team to resolve items that had been reserved.  Create a plan to resolve and get out of reserve by Friday. Collections meets with AR to aggree how to adjust up invoices and how to send over details

October        23        Wednesday        Collections mgrs breakup workload amoungst staff and tell them to finish by cob.  SS sent to quinn who sends back with his notes and says this isn't good enough. These explinations will not due.  Quinn meets with mgrs and lights into them.
                        Quinn wants to figure out why the items where reserved and can't tell if the item was a revenue impact or not.  Will not refund any item that impacts revenue, adjust up invoice for revenue impacting items.

October        24        Thursday          No calls, collectors work all day on clean up (majority of staff)

October        25        Friday  No calls, collectors work all day on clean up (majority of staff)

October        26        Saturday          N/A

October        27        Sunday            N/A

October        28        Monday            System down resolving items off of ss.  No calls, collectors work all day on clean up (majority of staff)
October        29        Tuesday          No calls, collectors work all day on clean up (majority of staff)

October        30        Wednesday        Quinn sent back ss with items that needed additional cleanup and staff began working on.  Collections mgrs meet and aggreed upon all notes to be sent to quinn
October        31        Thursday

                        mgrs meet everyday to review ss notes and quality to pass to quinn
                        mgrs consistantly meet to review notes and cleanup so mike will approve
                        refund, adjust up invoice, obtain hard copy from iron myt, rebill
                        revenue impact or none impacting

                        no one on ones
                        no collections calls
                        just responding to inbound calls

**Subject:** [Fwd: PFR]

**To:** "Backs,Justin" <JUSTIN.BACKS@oracle.com>,
"Adao,Anne Marie" <ANNE.MARIE.ADAO@oracle.com>,
"Hatada,Ian" <IAN.HATADA@oracle.com>,
"littlefield,Molly" <MOLLY.LITTLEFIELD@oracle.com>,
"Roberts,Ryan" <RYAN.ROBERTS@oracle.com>



**From:** Kim Henderson <kim.henderson@oracle.com>                    Thu 6:30 PM
**Subject:** Re: PFR
**To:** Omid Fardanesh <Omid.Fardanesh@oracle.com>

```
Hi Omid-

I've reactivated the query component of the old Proforma site.  I had to
restart our old database that had the proforma table in it.  I will leave it
up until Friday, November 1st and then shut it down again.  I do not want to
leave the old database up one second longer than it needs to be.  This is
because I don't want people to become confused and begin inputting
information into the old database believing it is production again.  It
could be a nightmare!

To get to the query (the images don't work), navigate to
http://revenue-management.us.oracle.com/html/ar/proforma_complete_query.html.

If you complete your project ahead of time, please let me know.

Thank you,

Kim

Omid Fardanesh wrote:

> Hi Kim,
>
> Here in Collections we are doing a reconciliation for our "On Account"
> which consist of Receipts we have received. The problem we are running
> into some of the Checks reference a PFR number.  I know that recently we
> deactivated the site that allowed us to search on a PFR number to find
> out why the Performa was done.  I am hoping to see if there is any way
> we can get access to that data even if possible to reactivate the site
> for a week or so till we are done with this project.
>
> Please let me know what you can do.
> Thanks,
> Omid
```

Kimberly Henderson <kim.henderson@oracle.com>
Senior Systems Analyst
North America Finance & Operations
ORACLE

**Subject:** New List
    **To:** "Hatada,Ian" <IAN.HATADA@oracle.com>, "Backs,Justin" <JUSTIN.BACKS@oracle.com>,
       "Fardanesh,Omid" <OMID.FARDANESH@oracle.com>,
       "littlefield,Molly" <MOLLY.LITTLEFIELD@oracle.com>,
       "Adao,Anne Marie" <ANNE.MARIE.ADAO@oracle.com>

Attached is our new working list.  I have broken it out from the list and sorted by dollar (so I could get back to the ones we have not yet worked on).  They are listed out for you by your name.  Please do not resort these.  **I have to get them back in the same order I am sending them to you.**  Each of you has between 50-52 items.  Feel free to meet with your teams tonight or tomorrow morning to get them assigned.  Let's do the same quality work on these that we have done with the others.  My goal is to be done by 4:30 tomorrow so we can get the In Focus and go over them.  Once complete, I will forward to Mike and let him know we are ready to take action.  If you have questions, let me know.

Thanks,

Ry

| | |
|---|---|
| Manager workbook for project completion.xls | **Name:** Manager workbook for project completion.xls<br>**Type:** EXCEL File (application/msexcel)<br>**Encoding:** base64<br>**Download Status:** Not downloaded with message |

Ryan Roberts <Ryan.Roberts@oracle.com>

REDACTED

Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc reciept write off has be turned off.

Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts. Please research and provide an explanation of the accounting involved.

Thanks for your help in this. If you have any questions, lets discuss immediately.

Mike

| | Name: Greater_Than_100K in 1260151 Version 3.xls |
|---|---|
| Greater_Than_100K in 1260151 Version 3.xls | Type: Microsoft Excel Worksheet (application/vnd.ms-excel) |
| | Encoding: base64 |
| | Download Status: Not downloaded with message |

REDACTED

10/21/2002 7:40

## DECLARATION OF SERVICE BY FACSIMILE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Alameda, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.      That on November 11, 2002, declarant served by facsimile the DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR AN ORDER ENJOINING DEFENDANTS TO CEASE ALTERING EVIDENCE, DIRECTING DEFENDANTS TO PRESERVE EVIDENCE AND GRANTING PLAINTIFFS PARTICULARIZED DISCOVERY TO PRESERVE EVIDENCE to the parties listed on the attached Service List.

3.      That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of November, 2002 at San Francisco, California.

Mary Grace Halatsis

G:\CASES\Oracle3\MGH80152.dec

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION- C-01-0988-MJJ

- 6 -

ORACLE III (LEAD)
Service List - 11/11/02
Page   1


COUNSEL FOR PLAINTIFF(S)

Shawn A. Williams
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
  415/288-4545
  415/288-4534 (fax)

William S. Lerach
Mark Solomon
Douglas R. Britton
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
401 B Street, Suite 1700
San Diego, CA  92101-5050
  619/231-1058
  619/231-7423 (fax)


COUNSEL FOR DEFENDANTS

Alan N. Salpeter
Javier H. Rubinstein
MAYER, BROWN, ROWE & MAW
190 South LaSalle Street
Chicago, IL  60603-3441
  312/782-0600
  312/701-7711 (fax)

Steven O. Kramer
Jamie E. Wrage
MAYER, BROWN, ROWE & MAW
350 South Grand Avenue
Suite 2500
Los Angeles, CA  90071-1503
  213/229-9500
  213/625-0248 (fax)

Donald M. Falk*
MAYER, BROWN, ROWE & MAW
555 College Avenue
Palo Alto, CA  94306
  650/331-2000
  650/331-2060 (fax)

Lauren G. Segal*
ORACLE CORPORATION
500 Oracle Parkway
Mail Stop 50P7
Redwood City, CA  94065
  650/506-5200
  650/506-7114 (fax)


* Denotes via personal service



# EXHIBIT C

vol/it

# 269

1    MAYER, BROWN, ROWE & MAW
      Donald M. Falk (SBN 150256)
2    555 College Avenue
      Palo Alto, California 94306
3    Telephone:   (650) 331-2030
      Facsimile:    (650) 331-2060

**Received**

**NOV 15 2002**

**Milberg Weiss**

4

5    MAYER, BROWN, ROWE & MAW
      Steven O. Kramer (SBN 79626)
      Christopher P. Murphy (SBN 120048)
6    350 South Grand Avenue, 25th Floor
      Los Angeles, California 90071-1503
7    Telephone:   (213) 229-9500
      Facsimile:    (213) 625-0248

8

9    Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
      J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

10   ORACLE CORPORATION
      Dorian Daley (SBN 129049)
11   Lauren G. Segal (SBN 150826)
      500 Oracle Parkway
12   Mailstop 5OP7
      Redwood City, California 94065
13   Telephone:   (650) 506-5200
      Facsimile:    (650) 506-7114

14

15   Attorneys for Defendant ORACLE CORPORATION

16             UNITED STATES DISTRICT COURT

17    NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

18

| | |
|---|---|
| IN RE ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-0988-MJJ (Consolidated) |
| | **DECLARATION OF MICHAEL QUINN** |
| This Document Relates To: | Date:   N/A<br>Time:   N/A<br>Place:   Ctrm. 11<br>         Honorable Martin J. Jenkins,<br>         United States District Judge |
| ALL ACTIONS. | |

I, Michael Quinn, declare as follows:

1.      I am Vice President of Americas Revenue Accounting at Oracle Corporation. I have worked at Oracle since June 29, 1998.

2.      I make this Declaration in opposition to the Plaintiffs' Ex Parte Application for an Order Directing Oracle to Preserve Evidence and Granting Particularized Discovery.

3.      I have personal knowledge of the matters set forth below.

4.      In 2000, my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications. As part of that conversion, it was determined that the previous functionality of assigning "on account" notations to unassigned cash receipts, once they were to be applied, was no longer necessary, and it was thus required that all existing "on account" flags that had accumulated in our Unapplied Cash Account (25005) be reversed through a series of offsetting debit/credit transactions within Account 25005, and thus would have no impact on Oracle's financial statements. I assigned Greg Myers, who reported to me, to serve as Project Manager for this project.

5.      Earlier this year, I also was personally assigned by Thomas Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collection staff had, over time, assigned to an accounts receivable reserve account known as Account 12601. That project is still ongoing.

6.      Currently I cannot fully respond to the false allegations contained in plaintiffs' Ex Parte Application because I am traveling on business in Brazil, and have been out of the country ever since plaintiffs' Application was filed. I can, however, categorically deny right now that neither I nor anyone else at Oracle to the best of knowledge, has altered, deleted or destroyed any evidence. If given the opportunity, I would be eager to provide a complete, point-by-point response to plaintiffs' false accusations so that I could dispel them once and for all. Because of the accelerated schedule for our response, however, I will focus my testimony solely upon plaintiffs' false accusation that Oracle has engaged in, or is likely to engage in, the destruction of evidence.

7.   Plaintiffs accuse Oracle of "destroy[ing] evidence critical to plaintiffs' claims" in connection with our recent investigation to determine the proper source and disposition of cash receipts previously allocated by the collections staff into Oracle's accounts receivable reserve account. These accusations are completely *false*. At no time have I ever directed anyone, nor have I ever been directed, to alter or destroy any Oracle records or evidence whatsoever. To my knowledge, no evidence has been altered or destroyed.

8.   Our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account (Account 12601) has nothing to do with the approximately 46,000 debit memo transactions that occurred on November 17, 2000, and that plaintiffs refer to in their Application. Nor will our ongoing work in any way "alter" transactions that took place in the past. It is certainly true that *new* accounting entries likely will be made in some cases, but such new entries will leave a clear and traceable audit trail that will preserve the accounting history relating to these transactions. The project that plaintiffs refer to as the "action plan" was (and is) intended to move the receipts out of the reserve account and into their proper location.

9.   Plaintiffs mischaracterize the nature and the scope of this action plan by selectively referring only to the last few sentences of an email that I sent to my team describing the purpose of this investigation. See Ex. D to Keatly Decl. A complete copy of the email is attached hereto as Exhibit A. I articulated the specific objectives of the investigation in the first page that plaintiffs leave out. These stated objectives confirm that I never instructed anyone at Oracle to alter or destroy any historical records or evidence. To the contrary, I explained to my team that the purpose of this investigation was to gather and analyze historical data, *not* to destroy it.

10.   *None* of these instructions was (or is) intended by me, either directly or indirectly, to "alter" or "delete" any historical transactions or records. Instead, the process is solely intended to make sure that cash receipts are properly moved to the account where they belong. Any such movements will clearly be reflected by an audit trail that will preserve the history of these and earlier transactions.

11.    Plaintiffs' witnesses also are wrong when they claim that either I or anyone else at Oracle instructed personnel to alter or delete historical transaction notes on Oracle's A/R system. To begin with, no such instruction has been given to any employee involved in the project or otherwise. That is not to say, though, that comment entries might not be changed to ensure that the comments accurately reflected the current status of the transaction in question.

12.    More importantly, however, *all* of the 12601 transactions (from the original cash receipt transactions through the final positive miscellaneous receipt transactions) from August 2000 up through the period immediately preceding the recent 12601 project have been electronically *preserved*, including *all* of the most recent comments associated with those transactions. We ran a report of all 12601 transactions from August 2000 through October 2002 before we began our project. These transactions, including all comments associated with those transactions, have been fully and independently preserved to this day. Accordingly, plaintiffs' assertion that any electronic "evidence" has been destroyed in connection with our ongoing project is categorically *false*.

13.    It is also important to point out that the "comments" that plaintiffs' witnesses refer to have absolutely no accounting significance whatsoever.  As explained above, if any 12601 transactions are to be modified as a result of our ongoing project, complete accounting entries will be created that preserve a full audit trail, and will not affect any historical transactions whatsoever.

14.    Plaintiffs also claim that one of the "methods" that Oracle currently is using to address the cash receipt reserve issue is to "erase the debit memo's all together." (Keatly Decl. ¶ 18) That is also false.  It is impossible for any user of the Accounts Receivable System to alter or erase source documentation or accounting entries that have already posted to the general ledger. Even if a transaction is reversed, there will always be a clear audit trail.

15.    Finally, I would like to point out a number of factual errors in the statements contained in Mr. Keatly's Declaration.  First of all, I do not, and have never, reported directly to Jennifer Minton. See App. p. 1, ¶ 1, p. 3, ¶ 1. During the past few years I have reported to Thomas Williams, Oracle's Vice President of North America Finance (and who is certainly *not*

1  a consultant (see App. p. 1 ¶ 7)).  Mr. Williams in turns reports directly to Jennifer Minton and

2  has done so for the last four years.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       I declare under penalty of perjury under the laws of the United States of America that

2  the above is true and correct and that this Declaration was executed on November 14, 2002 in

3  Sao Paulo, Brazil.

4

5                                   MICHAEL QUINN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**From:** MICHAEL.QUINN [MICHAEL.QUINN@oracle.com]
**Sent:** Monday, October 21, 2002 7:24 AM
**To:** ryan.roberts@oracle.com; greg.myers@oracle.com
**Cc:** thomas.williams@oracle.com; michael.quinn@oracle.com
**Subject:** Re: Unapplied Cash Project

Ryan, Greg,

Below is the action plan for addressing the problems surrounding the unapplied cash issues that you guys worked on last week.

There are three deliverables:

- We need to provide an update to the Audit Committee (a subcommittee of Oracle's Board of Directors) in regards to what Revenue Impact this process of taking unapplied cash receipts to the reserve will have on our financial statements.  In addition, we need to provide what impact this process has had on revenue in each of the last 8 quarters.  The update will be provided to the Audit Committee THIS WEDNESDAY.
- We need to clean up the ENTIRE problem prior to the end of October by moving cash receipts to the proper buckets (unapplied, customer overpayments, or on account), as appropriate
- We need to establish new policies and procedures to ensure this never happens again

What needs to be done:

- For items currently "On Account," we need to continue to work through each item >$10,000  to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place.  This comprises 523 items, totalling $18.5m, which represents approximately 72% of the $25.8m in On Account.  THIS MUST BE DONE BY END OF DAY TUESDAY.
- For items in the "Reciepts Write Off All" tab of the spreadsheet titled "12601_Detail", we need to review each item over $10,000 to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place.  This comprises 149 Items, totalling $3.6m, which represents approximately 60% of the $6.3m in Receipts Write Off.  THIS MUST BE DONE BY END OF DAY TUESDAY.
- For items in the Miscellaneous Offset Report, August-00 Through September-02, we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place.  I do not have the full report (Greg please send to this group), however based upon looking at the August, October and November reports in the 12601_Detail spreadsheet, this should cover over 80% of the total.

Greg, for the Miscellaneous Offset Report, I need you to add the Date the item was moved to 12601.  We need to be able to accumulate the error by quarter.  Please rerun the report to provide the date.  Ryan, this should not stop work on these items, we can add the date once the new report is available.

Ryan, for each of the items bulleted above, we need to focus 100% today and tomorrow on

getting through ALL of this work. I like what you did on the items >$100k, we should continue to follow this method. I have attached a revised version of that spreadsheet to include a couple additional columns and some formatting. Please incorporate those columns and their contents into your work. I have attached that spreadsheet titled as "Greater than 100k in 1260151 Version 3."

Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc reciept write off has been turned off.

Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts. Please research and provide an explanation of the accounting involved.

Thanks for your help in this. If you have any questions, lets discuss immediately.

Mike

# EXHIBIT D

1   MAYER, BROWN, ROWE & MAW
    Donald M. Falk (SBN 150256)
2   555 College Avenue
    Palo Alto, California 94306
3   Telephone:   (650) 331-2030
    Facsimile:   (650) 331-2060
4
    MAYER, BROWN, ROWE & MAW
5   Steven O. Kramer (SBN 79626)
    Christopher P. Murphy (SBN 120048)
6   350 South Grand Avenue, 25th Floor
    Los Angeles, California 90071-1503
7   Telephone:   (213) 229-9500
    Facsimile:   (213) 625-0248Attorneys for Defendants ORACLE CORPORATION,
8   LAWRENCE
    J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
9
    ORACLE CORPORATION
10  Dorian Daley (SBN 129049)
    Lauren G. Segal (SBN 150826)
11  500 Oracle Parkway
    Mailstop 5OP7
12  Redwood City, California 94065
    Telephone:   (650) 506-5200
13  Facsimile:   (650) 506-7114

14  Attorneys for Defendant ORACLE CORPORATION

15              UNITED STATES DISTRICT COURT

16  NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

17

18  IN RE ORACLE CORPORATION              Case No. C-01-0988-MJJ
    SECURITIES LITIGATION                 (Consolidated)
19
                                          **DECLARATION OF GREG MYERS**
20

21
                                          Date:     N/A
22  _____        Time:     N/A
                                          Place:    Ctrm. 11
23  This Document Relates To:                       Honorable Martin J. Jenkins,
                                                    United States District Judge
24  ALL ACTIONS.

25

26

27

28
                                          DECLARATION OF GREG MYERS
                                          CASE NO. C-01-0988-MJJ

1

2       I, Greg Myers, declare as follows:

3   **Introduction**

4       1.      I am Senior Manager, Accounts Receivable, Global Process Owner, at Oracle

5   Corporation.  I have been employed at Oracle since August 11, 1997.

6       2.      I make this Declaration in opposition to the Plaintiffs' Ex Parte Application for

7   an Order Directing Oracle to Preserve Evidence and Granting Particularized Discovery.

8       3.      In 2000, I reported to Michael Quinn (as I still do today) and was involved in the

9   conversion of Oracle's accounting systems over to Oracle's new 11i applications.  As part of

10  that conversion, it was determined that the previous functionality of assigning "on account" no-

11  tations to unassigned cash receipts, once they were to be applied, was no longer necessary, and

12  it was thus required that all existing "on account" flags that had accumulated in our Unapplied

13  Cash Account (25005) be reversed through a series of offsetting debit/credit transactions within

14  Account 25005, and thus would have no impact on Oracle's financial statements.  I was as-

15  signed by Mr. Quinn to serve as Project Manager for this project.

16      4.      Earlier this year, I was also involved in an investigation into the disposition of

17  unassigned cash receipts that Oracle's collection staff had, over time, assigned to an accounts

18  receivable reserve account known as Account 12601.  Mr. Quinn serves as project manager for

19  this project, and I am involved in an advisory role, helping to facilitate the project by providing

20  data and training assistance.

21      5.      At the present time, it is difficult for me to fully respond to the false allegations

22  contained in plaintiffs' Ex Parte Application, due to the fact that I am traveling on business in

23  Ireland, and have been out of the country ever since plaintiffs' Application was filed.  I can,

24  however, categorically deny right now that neither I nor anyone else at Oracle to the best of

25  knowledge, has altered, deleted or destroyed any evidence. If given the opportunity, I will be

26  most anxious to fully respond and dispel each of plaintiffs' false accusations once and for all.

27  Due to the press of time, however, I will focus my testimony solely upon plaintiffs' false accu-

28  sation that Oracle has engaged in, or is likely to engage in, the destruction of evidence.

6.     Plaintiffs accuse Oracle of "destroy[ing] evidence critical to plaintiffs' claims" in connection with our recent investigation to determine the proper source and disposition of cash receipts previously allocated by the collections staff into Oracle's accounts receivable reserve account. These accusations are completely *false*. At no time have I ever directed anyone, nor have I ever been directed, to alter or destroy any Oracle records or evidence whatsoever. To my knowledge, no evidence has been altered or destroyed.

7.     Our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account (known as Account 12601) has nothing to do with the approximately 46,000 debit memo transactions that occurred on November 17, 2000, and that plaintiffs refer to in their Application. Nor will our ongoing work in any way "alter" transactions that took place in the past. It is certainly true that *new* accounting entries likely will be made in some cases, but such new entries will leave a clear and traceable audit trail that will preserve the accounting history relating to these transactions.

8.     Plaintiffs state in their Ex Parte Application that "the purpose of the plan was to direct cash collections personnel and accounts receivable personnel to clean up the debit memos that were created in November 2000, plus any debit memo's created between 1998 to the present which were above $15000." (Pg 4 ll. 16-17)  This is entirely untrue.

9.     Plaintiffs' witnesses also are wrong when they claim that Oracle has instructed its personnel to alter or delete historical transaction notes on Oracle's AR system.  To begin with, no such instruction has been given to any employee involved in the project or otherwise. That is not to say, though, that comment entries might not be changed to ensure that the comments accurately reflected the current status of the transaction in question.

10.    More importantly, *all* of the 12601 transactions (from the original cash receipt transactions through the final positive miscellaneous receipt transactions) from August 2000 up through the period immediately preceding the recent 12601 project have been electronically *preserved*, including *all* of the most recent comments associated with those transactions. Accordingly, plaintiffs' assertion that any electronic "evidence" has been destroyed in connection with our ongoing project is categorically *false*.

1    11.    It is also important to point out that the "comments" that plaintiffs' witnesses re-

2  fer to have absolutely no accounting significance whatsoever. As explained above, if any

3  12601 transactions are to be modified as a result of our ongoing project, complete accounting

4  entries will be created that preserve a full audit trail, and will not affect any historical transac-

5  tions whatsoever.

6    Plaintiffs also claim that one of the "methods" that Oracle currently is using to address

7  the cash receipt reserve issue is to "erase the debit memo's all together." (Keatly Decl. ¶ 18)

8  That is simply false. It is impossible for any user of the Accounts Receivable System to alter or

9  erase source documentation or accounting entries that have already posted to the general ledger.

10  Even if a transaction is reversed, there will always be a clear audit trail in the accounting and in

11  the Application. Thus, Mr. Keatly's suggestion (at ¶ 13 of his Declaration) that Oracle has di-

12  rected personnel in the collections department to alter electronic records so that it will appear as

13  though the unapplied cash had not been booked as revenue in November 2000, is utterly ab-

14  surd.

15    I declare under penalty of perjury under the laws of the United States of America that

16  the above is true and correct and that this Declaration was executed on November 14, 2002 in

17  Dublin, Ireland.

18

19                                          GREG MYERS

20

21

22

23

24

25

26

27

28

3

# EXHIBIT E

v<sup>a</sup>lid

# 291

1  MAYER, BROWN, ROWE & MAW
   Donald M. Falk (SBN 150256)
2  555 College Avenue
   Palo Alto, California 94306
3  Telephone:    (650) 331-2030
   Facsimile:    (650) 331-2060
4
   MAYER, BROWN, ROWE & MAW
5  Steven O. Kramer (SBN 79626)
   Christopher P. Murphy (SBN 120048)
6  350 South Grand Avenue, 25th Floor
   Los Angeles, California 90071-1503
7  Telephone:    (213) 229-9500
   Facsimile:    (213) 625-0248
8
   Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
9  J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

10 ORACLE CORPORATION
   Dorian Daley (SBN 129049)
11 Lauren G. Segal (SBN 150826)
   500 Oracle Parkway
12 Mailstop 5OP7
   Redwood City, California 94065
13 Telephone:    (650) 506-5200
   Facsimile:    (650) 506-7114
14
   Attorneys for Defendant ORACLE CORPORATION
15

16            UNITED STATES DISTRICT COURT

17   NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

18

| 19 | IN RE ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-0988-MJJ (Consolidated) |
|---|---|---|
| 20 | | **DECLARATION OF KIMBERLY HENDERSON** |
| 21 | | |
| 22 | | |
| 23 | This Document Relates To: | Date:    N/A  Time:    N/A  Place:    Ctrm. 11 |
| 24 | ALL ACTIONS. | Honorable Martin J. Jenkins, United States District Judge |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1        I, Kimberly Henderson, declare as follows:

2        1.      I am a Senior Systems Analyst in Oracle Corporation's North America Finance

3   and Operations Division.  I have been employed at Oracle since September 28, 1992.

4        2.      I make this Declaration in opposition to the Plaintiffs' Ex Parte Application for

5   an Order Directing Oracle to Preserve Evidence and Granting Particularized Discovery.

6        3.      On or about October 24, 2002, Omid Fardanesh of Oracle's Collections staff

7   contacted me about reinstating access to a Proforma web site that we had previously used to

8   generate proforma invoices for certain customers.  Mr. Fardanesh informed me that he wanted

9   to be able to look up old proforma invoices in order to research issues relating to certain "On

10  Account" transactions that he was researching.  I informed him that I could reinstate the site for

11  one week, but wanted to shut it down as soon as he was finished in order to eliminate the possi-

12  bility of anyone gaining access to it, since the Site was no longer being used by the Company.

13       4.      I turned on the database services and provided Mr. Fardanesh with the exact web

14  address string to be able to access the query page of the site only.  He was not given the string

15  needed to insert or update information within the database.  On Friday, November 1, 2002, I

16  contacted Mr. Fardanesh to confirm that he was done using the site to gather his information.

17  He indicated that he was finished, and I then turned off the database and moved the query file

18  to another location in the web server so it would not be easily accessible.

19       5.      Since November 1, 2002, I have not been asked to turn on the Proforma web site

20  for any other employee, and have not done so.

21       6.      Although the database is offline right now, I have the ability to turn the database

22  on and grant access to the table holding the Proforma information at any time.

23       7.      To the best of my knowledge, no data was altered, destroyed or manipulated

24  during the one week the Proforma database was activated.

25

26

27

28

2                 DECLARATION OF KIMBERLY HENDERSON
                   CASE NO. C-01-0988-MJJ

1    I declare under penalty of perjury under the laws of the United States of America that

2    the above is true and correct and that this Declaration was executed on November 14, 2002 in

3    Redwood City, California.

*Kimberly Henderson*

KIMBERLY HENDERSON

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3        DECLARATION OF KIMBERLY HENDERSON
         CASE NO. C-01-0988-MJJ

# EXHIBIT F

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| vic | GENERAL ELECTRIC COMPANY | 5-Feb-01 | 15852109 | 38390.14 | 30-Apr-02 | 14,304.17 | Receipt was meant to pay consulting Invoice# 6113016 which received a credit for $34,443.48 (CM# 6123846) on 31-May-01 /Credit was for labor (most likely incorrect billing rate or wrong number of hours billed). | No new invoices on this project--it is closed. We have several outstanding invoices for other lines of business that cash can be applied to. |
| vic | AUTOMOTIVE FINANCIAL | 7-Jun-01 | 10353 | 17230.1 | 5-Apr-02 | 14,123.03 | Invoice#1389913 was credited in full due to BAD INFO RECD- SALES REP/CUST (amt credited matches RES amt). New deal never booked, no open invoices | Contace sales rep to book new deal or process refund. |
| vic | INDIGOPOOLCOM | 18-Mar-02 | 3117 | 13885 | 29-May-02 | 13,885.00 | Check references Inv #1554168 (Schluberer license inv) . which was for $3,030,560.00. | Need to have Iron Mountain pull copy of the check--Harris batch 10924 item 43 |
| vic | NEW YORK LIFE INTERNATIONAL INV | 25-Sep-01 | 90055038 | 192005.66 | 30-Apr-02 | 13,854.56 | Check referenced INV'S 1514643 AND 1514644, which were both CM'd due to Admin Error//Check was then randomly applied to inv#'s 1533533 & 1533468(both of which were supposed to be CM'd per call notes). | Need to unapply full amt of check and either apply to outstanding invoices or refund. |
| vic | HEWLETT PACKARD COMPANY | 10-Apr-01 | 3326305 | 965537.45 | 5-Apr-02 | 13,800.00 | Invoice #6118387 received a credit for exact amt of RES (CM#6122279) | Inv# 6148373 just came due for same project. Collector for cc. R70 needs to f/u w/ client to see if cash can be applied to this invoice or if they want it refunded. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| vic | REYNOLDS & REYNOLDS COMPANY | 11462 | 38085.79 | 19-Sep-01 | 29-Aug-02 | 13,706.55 | Invoice # 1430775 was written off as UNCOLLECTABLE | Need to take out of RES and have AR adjust invoice up by $13,706.55 to apply cash. |
| vic | SONY ELECTRONICS | 820136 | 77903.81 | 11-Dec-00 | 30-Apr-02 | 13,590.16 | Inv# 6111042 rcd two credits totaling $21,108.56. RES amt plus amts applied randomly to inv#'s 99815471 & 1560969 equal $21,108.56. | Take out of RES and apply to remaining balance of inv# 1485853, which is showing up as 468 days past due. |
| vic | NORTH COAST LOGIC | 52404 | 20612.5 | 11-Dec-01 | 8-May-02 | 13,520.50 | Check sent in by ALLEN MAXWELL SILVER INC/Sent for Northcoast Logic/Check ref. North Coast Logic inv# 138085, which is invalid. However, several invoices were auto-swept and credited as UNCOLLECTABLE (inv#'s 1380654-1380859) | Take cash out of RES and have AR adjust invoices up to apply cash. |
| vic | Leo Burnett Limited | 135146 | 229500 | 29-Jan-01 | 30-Apr-02 | 13,500.00 | No remittance information. Pulled billing hist and couldn't find CM's/invoices to match RES amt. | Need to have Iron Mountain pull copy of the check--Harris batch 9724 item 20 |
| vic | DEFENSE SUPPLY CENTER | | 13341.6 | 13-Feb-02 ACH 02/13/02 | 28-Apr-02 | 13,341.60 | Wire references inv# 6136298, which matches up perfectly. System shows $0 balance but doesn't show how balance was reduced to $0 because no payments or credits have been applied. | Need to have AR research why cash can't be applied to invoice. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ky | COMEDY CENTRAL | 28-Nov-01 | 30078245 | 14906.03 | 30-Apr-02 | 13,316.33 | Unapplied amount due to Credit Memo on Invoice #40079330, Invoice was sent to third party in 10 '01, payment was received on 11 '01. See OKS CM 7183898 <14,906.03>. Premature decision to send to 3rd party. If 3rd party (dont know whom) pursued debt th | AR needs to adjust up invoice to post the available cash. |
| ky | Soluclent LLC | 30-Sep-01 | 62256 | 219644.35 | 8-May-02 | 13,306.35 | Unapplied due to overpayment on OCC order | Will contact OCC and customer regarding a refund. |
| ky | US TREASURY DEPARTMENT | 30-Apr-02 ACH 04/30/02 | | 13281.02 | 12-May-02 | 13,281.02 | Reference OKS # 4974067 was rebilled on Order # 664508. | AR needs to pull receipt from reserve and post the cash to 1586009. Old Order # 4974067-2. Rebill order # 6646508. Jody Jenkin. |
| ky | US TREASURY DEPARTMENT | 30-Apr-02 ACH 04/30/02 | | 13281.01 | 12-May-02 | 13,281.01 | Reference OKS # 4974067 was rebilled on Order # 664508. | AR needs to pull receipt from reserve and post the cash to 1586009. Old Order # 4974067-3. Rebill order # 6646508. Jody Jenkin. |
| ky | Purdue Pharma | 18-Jul-01 | 71061 | 74246.4 | 5-Apr-02 | 13,190.40 | SUP Invoice 1389847 was credit memo'd due to 3rd Party collections-AMS. See SUP CM 7173347 <13,190.40>. See Lic invoice 1389846. 3rd party submission was premature and client paid for support from the get go. | AR needs to adjust up invoice to post the available cash. |
| ky | Pioneer Standard Electronics | 7-Feb-00 | 606254 | 88514.05 | 26-Mar-02 | 13,156.46 | Invoices applied to other checks. Also, invoice 1228591 was partially RMA'd. | AR needs to adjust up invoice to post the available cash. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ky | Maintenance Warehouse | 8-Jun-99 | 9909978 | 26303.93 | 5-Apr-02 | 13,151.97 | Invoice 40014556 was credit memo/rebilled-See CM 7095544 <26,303.93> OVERBILLED. Rebill order 473270. invoice 40039351: 13,151.96. | AR needs to adjust up invoice to post the available cash. |
| ky | lproperty.com | 30-Oct-01 | 2041 | 219747.1 | 28-Apr-02 | 13,090.59 | Client was referred to legal In Dec '01-Money had to be reserved until further notice from legal counsel. | Inv. 6108735 has a balance of 45,747.10 but need Legal's counsel. |
| Amber y | Interpublic Group of Companies Inc. | 12-Feb-02 | 291585 | 13037.84 | 10-Apr-02 | 13,037.84 | Duplicate payment for contract 3520904. | Contact customer and request were to apply funds |
| Amber y | Los Angeles County Dept of Health Services | 19-Oct-00 | 8480671 | 157719.84 | 5-Apr-02 | 12,993.75 | Cash applications due to proforma issued for the wrong amount. See notes on Inv. #40023650 | Need to contact customer for remittance information or request over night copy from Iron Mountain. |
| Amber y | Verizon | 8-Jan-01 | 73333663 | 29418.44 | 30-Apr-02 | 12,977.96 | Balance is due to random cash applications on check. | Need to contact customer for remittance information or request over night copy from Iron Mountain. |
| Amber y | Thomcomp Inc | 16-Apr-02 | 286040 | 12975 | 12-May-02 | 12,975.00 | Random duplicate payment for contract 4690811 was issued. | Need to contact customer for remittance information or request over night copy from Iron Mountain. |
| Amber y | MSX International | 8-Apr-02 | 187109 | 49051.6 | 8-Apr-02 | 12,962.23 | Invoice 40130133 was credit memo'd due to termination of contract. | Adjust up invoice to apply funds, credit was processed in error. |
| Amber y | General Electric Aircraft Engines | 25-Oct-99 | 30410313 | 567906.69 | 30-Apr-02 | 12,931.70 | Balance is due to random cash applications against check. | Need to contact customer for remittance information or request over night copy from Iron Mountain. |
| Amber y | HK Syastems | 31-Aug-00 | 150604 | 267311.29 | 5-Apr-02 | 12,676.12 | Payment has been misapplied. Payment does not tie out to current invoices applied or credit memos | Need to contact customer for remittance information or request over night copy from Iron Mountain. |

| | Company | Date | Number | Amount | Date | Amount | Description | Notes |
|---|---|---|---|---|---|---|---|---|
| Amberly | Equitrac Corporation | 20-Mar-01 | 26108 | 12643.5 | 5-Apr-02 | 12,643.50 | Credit of invoice 40047324 | Credit memo processed because thr original PO was closed and had no funding available. Need to adjust up invoice 40047324 and apply money. |
| Tyler | State of Maryland | 9-Jan-02 | 2880526 | 12338.63 | 14-Apr-02 | 12,338.63 | Payment references CSI 1015003 which came from order 5305391. That order was paid by both the end user, Marland Department of mental Health, and the reseller Daly Computers. | Refund State of Maryland |
| Tyler | Altera Healthcare Corporation | 26-Jun-01 | 598327 | 21811.68 | 28-Apr-02 | 12,203.84 | Invoice on remittance was rebilled as order 6613165. That order was credited due to service termination... | Have AR adjust credit memo #7186391 up. |
| Tyler | Level 3 Communications | 30-Jul-01 | 3076273 | 52522.69 | 30-Apr-02 | 12,122.69 | Invoice 6127295 was credited. | Invoice 6127295 should be rebilled and this payment applied to it. The credit was a PA credit, working with ASF to rebill. |
| Tyler | Scoreboard Inc | 30-Jan-02 | 7716 | 12043.06 | 27-Aug-02 | 12,043.06 | Credit 7194953 was done in error. | Have AR adjust credit up. |
| Tyler | City of Columbus | 21-May-01 | 200082 | 9154.75 | 5-Apr-02 | 12,042.50 | Remittance information references invoice 9560874 for X-QTR ARR SUPP in the amount of 12,042.50. That invoice has already paid by check 48815300 | Refund City of Columbus |
| Tyler | Rush Presbeterian Saint Lukes Medical Center | 9-May-01 | 1360670 | 12000 | 19-May-02 | 12,000.00 | This order is marked for a support renewal payment. | 2002 renewal payments for invoices 40161648 and 40206622 made on another check. Must work with client and field to apply this to future invoices for support renewal. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tyler | CATALYST INTERNATIONAL INC | 6-Aug-02 | 58228 | 11968.05 | 6-Aug-02 | 11,968.05 | Invoice 40089848 was sent to AMS our third party collections agency and then credited. AMS got the client to pay and took their commission. | AR needs to adjust up invoice, then credit remainder. |
| Tyler | ORACLE CORPORATION | 26-Jan-01 | ACH 01/26/01 | 27038.58 | 3-May-02 | 11,717.21 | Reserved due to credit memo rebill for OCC order | Will contact OCC to find out new order number |
| Cyndy | STATE OF ARIZONA | 31-May-00 | 5478618 | 120582 | 30-Apr-02 | 11,535.51 | Reserved due to funds being saved for Support Extension | JIM @602.240.2076 FOR a copy of the check. Once I receive the remittance I will make a determination on how to apply the funds. |
| Cyndy | UNILEVER UK | 27-May-01 | 80589 IC | 145570.62 | 5-Apr-02 | 11,459.80 | They paid inv 6114252 in full, but we w/o $13,656.10 and applied credit to inv. 6114858. They then paid reamaining inv's in full, except they short paid something by $2,196.30. The company was not billed again for anything. Reserved due to invalid remit | REFUND CUSTOMER. |
| Cyndy | DEFENSE LOGISTICS AGENCY | 31-Jul-01 | ACH 07/31/01 | 27200 | 28-Apr-02 | 11,300.00 | These do not look like dup. Payments. Per wire 7-31-01 for $27200.00 this was to pay inv 6122777 and partially applied to inv 1474877. Inv 6122777 was pd with a wire dated 5-24-01 for $27310.78 intended for inv 6120281. Inv 6120281 was pd with wire date | Invoices applied incorrectly will contact Jeff Tenebaum for additional wire info. Sent email to Jeff. T. for wire inf. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cyndy | CONNEXUS ENERGY | 12-Jun-01 | 281316 | 11246.4 | 5-Apr-02 | 11,246.40 | Inv #0063640, order # 514085 for $45,450.00 and 40081199, order # 3831617 for $11,246.40 were credit memo'd and to be rebilled. The rebill order # 6519638, inv #1481506 was only for $25,304.40. The company paid us $48,404.25 ck # 255773, of which $25,304 | No open invoices. Will submit a check refund. |
| Cyndy | BRIDGELOGIX | 8-Aug-00 | 2379 | 16010.58 | 30-Apr-02 | 11,210.58 | Reserved due to unapplied Royalty Funds a/p Contact dstroup@bridgelogix.com. | Contacting Royalty to alert to unapplied funds. Ryan working with Jake on all royalties. |
| Cyndy | SNELLING & SNELLING INC | 13-May-02 | 5858 | 11202.57 | 13-May-02 | 11,202.57 | Reserved due to invalid remittance information.- Oracle Supp. Renew Actual remittance only lists Po# 0000020662 | I'm with A/P @ 972.239.7575 for check remittance. |
| Cyndy | DANKA OFFICE IMAGING COMPANY | 11-Dec-01 | 479725 | 11200 | 30-Apr-02 | 11,200.00 | Inv 1443815 and 1450721 were credit memo'd and sent to third party. | Sent a note to cash apps to adjust up the invoices and apply the funds. I also asked Raul to first reverse the receipt write off. |
| Cyndy | TYSON FOODS INC | 27-Mar-01 | 1341167 | 141254.75 | 30-Apr-02 | 10,804.40 | Inv# 40074398 was cm'd w/ cm# 7215832 and 7221110 but invoice was paid in full. The two cm's equal 10,840 | Contact AR to have them adjust up invoice 40074398 by 10,840.40 |
| CJ | State of Hawaii | 16-Jan-01 | 1301097 | 12776.49 | 5-Apr-02 | 10,688.20 | Due to credit memo #74068 on invoice 1333852. | Contacted customer (AP @ 808.847.1535) to verify where to apply funds to open invoices. |
| CJ | JET PROPULSION LABORATORY | 12-Oct-00 | 5040860 | 909826.55 | 5-Apr-02 | 10,512.00 | Invoice overpaid. | Contact customer to apply funds to open invoices. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CJ | ALCOA | 1-Aug-02 | ACH 08/01/02 | 18092.99 | 13-Sep-02 | 10,458.74 | Invoice credit memo'd due to invoice adjustments | Contacted AR to have invoice 5188553 & 9984549I adjusted up, apply this amount to these invoices. |
| CJ | LIMITED | 2-Oct-01 | 30884 | 10575 | 30-Apr-02 | 10,439.48 | Check was to be applied to invoice 1517482 in full not a partial pmt. Invoice and check are the exact amount | Apply check #30884 to invoice 1517482. |
| CJ | JPI PARTNERS INC | 31-Aug-01 | 140360 | 13516.44 | 30-Apr-02 | 10,358.40 | Duplicate payment. No open invoices and no credits given to this customer. | Need to contact Iron Mountain for check remit. |
| CJ | GEORGIA DEPT OF HUMAN RESOURCES | 11-Sep-01 | 385187 | 10153.2 | 30-Apr-02 | 10,153.20 | Invoice 629928540 was migrated to new system on 12/00. Invoices refernced on ck 385187 (1473834, 1483950, 1488469, 1497577, 1505138-40, 1505144, 1508999, 1509036, 1509055-56). This ck is dup pmt. | Refund migration payment. |
| CJ | CONAGRA INC | 16-Jun-00 | 10015443 | 181389.01 | 30-Apr-02 | 10,117.07 | No remittance information. | Contact sales rep to book new order, if no order booked, contact customer for refund. |
| CJ | BRADFORD EXCHANGE | 27-Mar-01 | 3205 | 32925.44 | 30-Apr-02 | 10,107.82 | Credit memo'd invoice, new order booked, paid in full. | Contact sales rep to book new order, if no order booked, contact customer for refund. |

# EXHIBIT G

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (68581)
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
  – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS ORACLE, *ET AL.* |
| ALL ACTIONS. | |

PROPOUNDING PARTY:          Plaintiffs

RESPONDING PARTY:           Defendants Oracle Corporation, Lawrence Ellison, Jeffery O. Henley, and Edward Sanderson

SET NUMBER:                 One

1  TO:    ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN

2          Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiffs in the above-captioned

3  action, by counsel, hereby request that responding parties produce and permit plaintiffs' counsel to

4  inspect and to copy those documents specified herein which are, as of the date of service hereof, in

5  the possession of, or in any way subject to the control of, defendants Oracle Corporation, Lawrence

6  Ellison ("Ellison"), Jeffery O. Henley ("Henley") and Edward Sanderson ("Sanderson") within 30

7  days of service of the Request at the offices of Lerach Coughlin Stoia Geller Rudman & Robbins

8  LLP, 100 Pine Street, Suite 2600, San Francisco, California, 94111, or at such other place which

9  shall be agreed upon by counsel for the parties.  Defendants shall produce said documents as they are

10  kept in the usual course of business or shall organize and label them to correspond with the

11  categories in the request.  Defendants are further required to supplement the responses.

12  **I.     DEFINITIONS**

13          Unless otherwise stated, the terms set forth below are defined as follows:

14          (a)    "Oracle" or the "Company" refers to defendant Oracle Corporation and its

15  parents, subsidiaries, divisions, affiliates, operating units, controlling persons, controlled persons,

16  officers, directors, employees, representatives, or agents.

17          (b)    "Individual Defendants" refers to Ellison, Henley, Sanderson and any

18  employees, implied or express agents, attorneys, or other persons or entities acting in conjunction

19  with them or on their behalf.

20          (c)    "Defendants" refers to Oracle and the Individual Defendants and their

21  predecessors, successors, parents, subsidiaries, divisions, or affiliates, and their respective officers,

22  directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar

23  positions or performing similar functions.

24          (d)    "Document" or "documents" has the same meaning as Fed. R. Civ. P. 34 and

25  includes, in the broadest sense possible, but is not limited to, any written, printed, typed, photostated,

26  photographed, recorded, or otherwise reproduced or stored communication or representation,

27  whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination

28  thereof.  This definition includes copies or duplicates of documents contemporaneously or

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ                                                                                     - 1 -

1   subsequently created which have any notes or other markings. Without limiting the generality of the

2   foregoing, "document" or "documents" includes, but is not limited to, correspondence, memoranda,

3   notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements,

4   working papers, accounts, analytical records, reports and/or summaries of investigations, trade

5   letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers,

6   booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes

7   or minutes of meetings, or other communications of any type, including inter- and intra-office

8   communications, questionnaires, surveys, charts, graphs, photographs, photographic recordings,

9   films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data

10   processing or word processing equipment, including e-mail, and all other data compilations from

11   which information can be obtained (by translation, if necessary, by you through detection devices

12   into usable form), including, but not limited to, electromagnetically-sensitive stored media such as

13   floppy disks, hard disks, and magnetic tapes, and any preliminary versions, drafts, or revisions of

14   any of the foregoing.

15           (e)    "Communication" or "communications" refers to every manner or means of

16   disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries, or otherwise),

17   whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

18           (f)    "Concerning" means relating to, referring to, describing, discussing,

19   evidencing, regarding or constituting.

20           (g)    "Refer" or "relate" or "referring" or "relating" means all documents which

21   explicitly or implicitly, in whole or in part, were received in conjunction with, or were generated as a

22   result of, the subject matter of the request, including, but not limited to, all documents which reflect,

23   record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate,

24   analyze, review, report on, comment on, impinge upon, or impact the subject matter of the request.

25           (h)    "You" or "your" refers to the defendants upon whom this request is served

26   and all officers, directors, employees, representatives, or agents acting on behalf of each of the

27   responding defendants.

28

1         (i)    "CRM" refers to Oracle's Customer Relationship Management software

2 products and services.

3         (j)    "11i" refers to Oracle's 11i Suite of software products and services, including

4 all of its individual modules such as CRM.

5         (k)    "GE Capital" refers to GE Capital Corporation and its parents, subsidiaries,

6 divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

7         (l)    "BellSouth" refers to BellSouth Corporation and its parents, subsidiaries,

8 divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

9         (m)    "Telia AB" refers to Telia AB – Sweden or TeliaSonera AB and its parents,

10 subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or

11 agents.

12         (n)    "JDS Uniphase" refers to JDS Uniphase Corporation and its parents,

13 subsidiaries, division, affiliates, domestic and foreign offices, operating units, partners, officers,

14 directors, employees, representatives, or agents.

15         (o)    "Hewlett-Packard" refers to Hewlett-Packard Company and its parents,

16 subsidiaries, division, affiliates, domestic and foreign offices, operating units, partners, officers,

17 directors, employees, representatives, or agents.

18         (p)    "Nantucket Allserve" refers to Nantucket Allserve, Inc. and its parents,

19 subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or

20 agents.

21         (q)    "Motorola," refers to Motorola, Inc. and its parents, subsidiaries, divisions,

22 affiliates, operating units, officers, directors, employees, representatives, or agents.

23         (r)    "Health Net" refers to Health Net, Inc. and its parents, subsidiaries, divisions,

24 affiliates, operating units, officers, directors, employees, representatives, or agents.

25         (s)    "Now Foods" refers to Now Foods, Inc. and its parents, subsidiaries,

26 divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

27

28

1         (t)    "Telecom New Zealand" refers to Telecom New Zealand Limited and its

2 parents, subsidiaries, divisions, affiliates, operating units, officers, directors, employees,

3 representatives, or agents.

4         (u)    "Foster's Group" refers to Foster's Group Limited and its parents,

5 subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or

6 agents.

7         (v)    "Principal Financial Group" refers to The Principal Financial Group, Inc. and

8 its parents, subsidiaries, divisions, affiliates, operating units, officers, directors, employees,

9 representatives, or agents.

10        (w)    "Person" or "persons" refers to any natural person, proprietorship, public or

11 private corporation, partnership, joint venture, trust, association, company, firm, government or

12 governmental entity (including any government agency, board, authority, commission, or political

13 subdivision or department thereof), or any other form of business or legal entity, organization, or

14 arrangement.

15        (x)    "Customer" or "customers" is used in the broadest possible sense, including

16 all members of all target markets.

17        (y)    "SEC" refers to the United States Securities and Exchange Commission.

18        (z)    "Financial statements" includes, without limitation, the following (whether

19 audited or unaudited, and whether, final, interim, pro forma, complete or partial): consolidated and

20 non-consolidated balance sheets, statements of earnings, revenues, profits and losses, additional

21 paid-in capital, retained earnings, source and application of funds, cash flow statements, projections,

22 notes to each of such statements, and any and all other statements and notes that pertain to the

23 applicable defendant's past or present financial condition, including accountants' workpapers.

24        (aa)    "Meeting" refers to the contemporaneous presence of any natural persons,

25 whether or not such presence was by chance or prearranged, and whether or not the meeting was

26 formal or informal, occurred in connection with some other activity, or was by telephone or

27 teleconferencing.

28

1      (bb)    "Board" refers to Oracle's Board of Directors and any committee or
2 subcommittee thereof.

3      (cc)    "E&Y" means Ernst & Young, LLP and any of its subsidiaries, divisions,
4 subdivisions, affiliates, predecessors, successors, officers, directors, board of directors or committees
5 thereof, employees, representatives or agents, including, but not limited to, attorneys, accountants,
6 investment advisors or bankers, and any other person acting or purporting to act on its behalf and all
7 other entities operated or controlled by E&Y or by any direct or indirect subsidiary or affiliate
8 thereof.

9      (dd)    "AA" means Arthur Andersen LLP and any of its subsidiaries, divisions,
10 subdivisions, affiliates, predecessors, successors, officers, directors, board of directors or committees
11 thereof, employees, representatives or agents, including, but not limited to, attorneys, accountants,
12 investment advisors or bankers, and any other person acting or purporting to act on its behalf and all
13 other entities operated or controlled by AA or by any direct or indirect subsidiary or affiliate thereof.

14      (ee)    "SLC" means the Special Litigation Committee described in Oracle's Form
15 10-K for the fiscal year ended May 31, 2002 filed with the SEC.

16      (ff)    The connectives "and" and "or" shall be construed either disjunctively or
17 conjunctively as necessary to bring within the scope of the document request all responses that
18 otherwise might be construed to be outside of its scope.

19      (gg)    The use of the singular shall be deemed to include the plural, and the use of
20 one gender shall include all others, as appropriate in the context.

21 **II.    INSTRUCTIONS**

22      (a)    In responding to these requests, furnish all responsive documents available at
23 the time of production, including documents in the possession of your agents and representatives.

24      (b)    This is a continuing request for the production of documents. If, after making
25 your initial production, you obtain or become aware of any further documents responsive to this
26 request, you are required to produce such additional documents to plaintiffs.

27      (c)    You are requested to produce all documents described below that are in your
28 custody or under your control in the form and in the same order within each file in which they are

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ                                                                          - 5 -

1  located prior to production. The file folders, boxes, binders, or other containers in which such

2  documents are found are also requested to be produced intact, including the title, labels, or other

3  description of each such folder, box, binder, or container.

4        (d)    If you claim any form of privilege, whether based on statute or otherwise, as a

5  ground for not producing any document, state the following:

6           (i)    the date of the document;

7           (ii)    the name, the present or last known residential and business addresses,

8  the telephone numbers, and the title or position and the occupation of those individuals who

9  prepared, produced, reproduced, or who were recipients of, said documents;

10           (iii)    a description of the document sufficient to identify it without revealing

11  the information for which the privilege is claimed;

12           (iv)    each and every fact or basis upon which you claim any such privilege;

13           (v)    the location of the document; and

14           (vi)    the custodian of the document.

15        (e)    Notwithstanding the assertion of your objection, any requested document

16  which you object to furnishing but which nevertheless contains non-objectionable information which

17  is responsive to any request must be produced, but that portion of the document for which the

18  objection is asserted may be withheld provided that the above-requested information is furnished.

19        (f)    Each document requested herein is requested to be produced in its entirety and

20  without deletion or excisions, regardless of whether you consider the entire document to be relevant

21  or responsive to these requests. If you have redacted any portion of a document, stamp the word

22  "REDACTED" on each portion of the document which you have redacted. Redactions should be

23  included on the privilege log described in Instruction (d).

24  **III.**    **RELEVANT TIME PERIOD**

25      All requests herein refer to the period June 1, 2000 to June 30, 2001 ("relevant time period"),

26  unless otherwise specifically indicated, and shall include all documents that relate, in whole or in

27  part, to such period even though dated, prepared, or received prior to or subsequent to that period.

28

## IV.    DOCUMENT REQUESTS

REQUEST NO. 1:

All documents and communications relating to the actual and forecasted sales and orders for Oracle's e-business applications products, including, but not limited to, 11i and any and all pipeline reports and upside reports relating to the same.

REQUEST NO. 2:

All documents and communications relating to the actual and forecasted sales and orders for Oracle's database products, including, but not limited to, Oracle 8i and any and all pipeline reports and upside reports relating to the same.

REQUEST NO. 3:

All documents and communications relating to actual and forecasted sales and orders for the CRM module, and any and all upside reports and pipeline reports relating to the same.

REQUEST NO. 4:

All documents and communications relating to any sales discounts or rebates offered or given to any Oracle customer or potential customer between June 1, 2000 and March 31, 2001 on Oracle's database or applications products.

REQUEST NO. 5:

All documents and communications relating to Oracle's sales staff 3Q01 and/or FY01 sales quotas and/or goals, including, but not limited to, documents concerning any particular sales person's progress toward meeting sales quotas and/or goals.

REQUEST NO. 6:

All documents and communications relating to the United States economy and its impact on sales of Oracle's database and applications products, including, but not limited to, order cancellations, order or purchase delays, and discounts offered on Oracle products or services.

REQUEST NO. 7:

All documents and communications relating to competition from IBM or Microsoft or any other database or applications provider for product market share, including, but not limited to, win-loss reports.

1  REQUEST NO. 8:

2       All documents and communications relating to any and all sales or revenue analyses and/or

3  forecasts for Oracle's sales and consulting organizations, including OSI, NAS, or OPI, including, but

4  not limited to: Upside Reports, Flash Reports, Pipeline Reports, Big Deal Reports, OASIS Reports,

5  White Books/Board of Directors Quarterly Results, Red/Grey Books/Monthly Financial Reference

6  Books, Green Books/Americas Reporting Packages, Blue Books/Subsidiary Kepy Performance

7  Measures, Yellow Books/Product Revenue Reporting Packages, Oatmeal Books/Consulting

8  Performance Packages, Executive Committee Worldwide Forecasts, Approvals for 2000 Forecast

9  Reports, Investor Relations Projection Models and summaries of interviews conducted by Simpson

10 Thacher & Barlett LLP.

11 REQUEST NO. 9:

12      All documents and communications relating to sales pipeline projections or forecasts for

13 Oracle's database and applications products, including, but not limited to, all entries into Oracle

14 Sales On-Line, Oasis or any Oracle database.

15 REQUEST NO. 10:

16      All documents and communications relating to actual or forecasted conversion ratios of

17 potential sales in Oracle pipelines to sales or consulting contracts in any of its business divisions,

18 including, but not limited to, OSI, OPI and NAS.

19 REQUEST NO. 11:

20      All documents and communications related to customers' purchases or prospective purchases

21 of Oracle database and applications products and services, including, but not limited to, bid

22 proposals, bids delivered, bids won and bids lost.

23 REQUEST NO. 12:

24      All documents and communications relating to all plans, proposals, negotiations, contracts or

25 agreements, or potential sales of Oracle database or applications products or services between Oracle

26 and Telecom New Zealand, Foster's Group, Hewlett-Packard, JDS Uniphase, Principal Financial

27 Group, Nantucket Allserve, GE Capital, Motorola, Health Net, and Now Foods.

28

1   REQUEST NO. 13:

2       All documents and communications relating to any negotiations, proposals, agreements,

3   contracts or functionality problems between Oracle and BellSouth regarding 11i, including, but not

4   limited to, the CRM module or any of its other individual applications or modules.

5   REQUEST NO. 14:

6       All documents and communications relating to or analyzing demand from Oracle's Internet

7   or "dot- com" customers for Oracle database and/or application products.

8   REQUEST NO. 15:

9       All documents and communications relating to Oracle's 3Q01 projections of 75% application

10  growth; 20-20% database growth; 25% licensing growth and 15-20% service growth.

11  REQUEST NO. 16:

12      All documents and communications concerning or relating to any formal or informal

13  investigation, inquiry, proceeding, sanction, or complaint brought against the Company or the

14  Individual Defendants by the SEC or any federal or state administrative or governmental agency,

15  including any communications with such agency.

16  REQUEST NO. 17:

17      All documents showing the organizational structure, and positions of employees of Oracle.

18  REQUEST NO. 18:

19      All documents and communications relating to the systems integration work necessary to

20  implement 11i or any of its individual modules.

21  REQUEST NO. 19:

22      All documents and communications relating to the ability of 11i or any of its individual

23  modules to work with non-Oracle database products.

24  REQUEST NO. 20:

25      All documents and communications relating to "bugs" or "gaps" in 11i, including, but not

26  limited to, the CRM module or any of its other individual modules.

27

28

1  REQUEST NO. 21:

2      All documents and communications relating to the timing of the release of 11i, including, but

3  not limited to, each subsequent version of 11i, for example, 11i.5 and 11i5.3.

4  REQUEST NO. 22:

5      All documents and communications relating to the development and/or the completion of an

6  Application Programming Interface ("API") for the CRM modules, including, but not limited to, the

7  development of an API for any specific customer, including, but not limited to, BellSouth.

8  REQUEST NO. 23:

9      All documents and communications relating to "patches," "mega patches" or "family pack"

10  fixes, released for 11i or any of its individual modules or versions and/or customer requests for the

11  same.

12  REQUEST NO. 24:

13      All documents and communications relating to customer or potential customer complaints,

14  concerns or dissatisfaction with the functionality, implementation or integration of 11i or any of its

15  individual modules, including, but not limited to, the CRM module.

16  REQUEST NO. 25:

17      All documents and communications relating to technical errors or performance failures of

18  11i, including, but not limited to, any of its individual modules, including, but not limited to, all

19  technical assistance requests.

20  REQUEST NO. 26:

21      All documents relating to the functionality and/or "bugs" in the 11i software applications or

22  modules implemented at Oracle, including, but not limited to, the "timesheets" module and the

23  "travel and expense" module.

24  REQUEST NO. 27:

25      All documents and communications supporting, or relating to Oracle's claim that it had

26  already saved $1 billion through the internal implementation of its applications software.

27

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ                                                                          - 10 -

1  REQUEST NO. 28:

2      All documents and communications relating to Oracle's monthly reconciliation of accounts
3  receivable to the general ledger.

4  REQUEST NO. 29:

5      All documents and communications relating to Oracle's credit memos and monthly credit
6  memo registers including, but not limited to, those relating to customer overpayments.

7  REQUEST NO. 30:

8      All documents and communications relating to review or investigation conducted by you,
9  E&Y, AA or the SLC concerning Oracle's accounting, revenue recognition and financial reporting
10 for FY01.

11 REQUEST NO. 31:

12     All documents and communications concerning the preparation and filing of Oracle's Second
13 and Third quarter fiscal 2001 Forms 10-Q, including, but not limited to, all documents and
14 communications relating to its line item "cash advances and unearned revenue."

15 REQUEST NO. 32:

16     All documents and communications relating to credit or debit memos created in November,
17 2000, including, but not limited to, their impact on Oracle revenues and earnings.

18 REQUEST NO. 33:

19     All documents and communications relating to the Activity Detail in 12601_ Detail
20 spreadsheet, including, but not limited to, all versions of that spreadsheet including the spreadsheet
21 titled, "Greater Than 100K in 1260151 Version 3.xls."

22 REQUEST NO. 34:

23     All documents and communications relating to Oracle's *pro forma* website used to generate
24 *pro forma* invoices for customers.

25 REQUEST NO. 35:

26     All documents and communications relating to the conversion of Oracle's internal accounting
27 systems to 11i.

28

1    REQUEST NO. 36:

2         All documents and communications relating to the disposition of unassigned cash receipts

3    assigned to any Oracle reserve account, including, but not limited to, account 12601 and/or customer

4    overpayments.

5    REQUEST NO. 37:

6         All documents and communications relating to any miscellaneous offset report generated

7    between August 1, 2000 and December 31, 2000 or between August 1, 2002 and December 31,

8    2002.

9    REQUEST NO. 38:

10        All documents and communications relating to any miscellaneous receipt write-off occurring

11   between August 1, 2000 and December 31, 2000 and/or occurring between September 1, 2002 and

12   March 31, 2003.

13   REQUEST NO. 39:

14        All documents and communications relating to any effort or actions to reconcile Oracle's

15   "On Account," or "unapplied cash," including, but not limited to, Unapplied Cash Account (25005).

16   REQUEST NO. 40:

17        All documents and communications relating to any measures taken from October 1, 2002 to

18   the present related to refunding customers, adjusting or reconciling customer invoices, or adjusting

19   credit analyst notes for all customers, including, but not limited to, any "receipt write-offs" or

20   5160101 refunds.

21   REQUEST NO. 41:

22        All documents and communications between and among the members of Oracle's Credit

23   Collections Group and accounts receivable department, discussing the November 2000 credit and/or

24   debit memos, on account cleanup, invoice adjustments, including during the relevant time period and

25   between October 1, 2002 and March 31, 2003.

26   REQUEST NO. 42:

27        All documents and communications generated during the relevant time period and from

28   October 1, 2002 to the present relating to November 17, 2000 debit memos and/or unapplied cash.

REQUEST NO. 43:

All documents and communications relating to transactions in Oracle's 25005 account occurring between November 1, 2000 and November 30, 2000 and between October 11, 2002 and March 31, 2003.

REQUEST NO. 44:

All documents and communications relating to any "On Account" clean up or reconciliation of Oracle's "On Account" during the relevant time period and/or between October 1, 2002 and March 31, 2003.

REQUEST NO. 45:

All documents and communications created during or relating to the relevant time period concerning any "receipt write-offs" or 5160101 refunds.

REQUEST NO. 46:

All documents and communications concerning Oracle's customer activity detail 12601 spreadsheets.

REQUEST NO. 47:

All documents and communications distributed to or prepared, received or reviewed by any member of the SLC relating to the SLC investigation of claims in the Delaware Derivative Action, the California Derivative Action, and the Federal Securities Action.

REQUEST NO. 48:

All documents relating to any meetings of the Board or any committees thereof (including the SLC) or any committees or groups which reported to the Board (including the executive management committee), including all Board packets, documents, or other materials reviewed by the board, any of its committees, or any groups reporting to the Board, all notes taking during any such meetings, and all documents memorializing any such meetings.

1   DATED: December 9, 2004

2

3

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
ELI R. GREENSTEIN

4

5

_____
                SHAWN A. WILLIAMS

6

7

8

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

9

10

11

12

13

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
MARK SOLOMON
DOUGLAS R. BRITTON
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

14   Lead Counsel for Plaintiffs

15   T:\CasesSF\Oracle3\REQ00016380.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ

- 14 -

1    <u>DECLARATION OF SERVICE BY MAIL AND FACSIMILE</u>

2    I, the undersigned, declare:

3    1.    That declarant is and was, at all times herein mentioned, a citizen of the United States

4    and employed in the City and County of San Francisco, over the age of 18 years, and not a party to

5    or interest in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San

6    Francisco, California 94111.

7    2.    That on December 9, 2004, declarant served the **PLAINTIFFS' FIRST SET OF**

8    **REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS ORACLE, ET AL.**

9    by depositing a true copy thereof in a United States mailbox at San Francisco, California in a sealed

10   envelope with postage thereon fully prepaid and addressed to the parties listed on the attached

11   Service List.  Declarant also served the parties by facsimile.

12   3.    That there is a regular communication by mail between the place of mailing and the

13   places so addressed.

14   I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th

15   day of December, 2004, at San Francisco, California.

16

17   _____
     KAREN HEINZ

18

19

20

21

22

23

24

25

26

27

28

ORACLE III (LEAD)
Service List - 12/9/2004   (201-064-1)
Page 1 of 1

### Counsel For Defendant(s)

Donald M. Falk
Lee H. Rubin
Shirish Gupta
Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
  650/331-2000
  650/331-2060 (Fax)

Alan N. Salpeter
Javier H. Rubinstein
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street, Suite 3900
Chicago, IL 60603-3441
  312/782-0600
  312/701-7711 (Fax)

Dorian Daley
James C. Maroulis
Oracle Corporation
500 Oracle Parkway, Mail Stop 50P7
Redwood City, CA 94065
  650/506-5200
  650/506-7114 (Fax)

### Counsel For Plaintiff(s)

William S. Lerach
Mark Solomon
Douglas R. Britton
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
  619/231-1058
  619/231-7423 (Fax)

Sanford Svetcov
Shawn A. Williams
Willow E. Radcliffe
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
  415/288-4545
  415/288-4534 (Fax)

# EXHIBIT H

**On Account/Receipt Write Off Summary**

(Amount)= Addition to account 12601

| Period | On Account Contribution | Receipt Write Off Contribution | Total Write Off | Account 12601 Actual | Delta by Period |
|---|---|---|---|---|---|
| Feb01-May-01 | (21,743,404.44) | 0.00 | (21,743,404.44) | (21,742,181.19) | (1,223.25) |
| Jun01-Dec01 | 6,762,073.69 | 0.00 | 6,762,073.69 | 6,772,814.59 | (10,740.90) |
| Jan02-May02 | 583,225.78 | (5,651,198.54) | (5,067,972.76) | (6,378,115.55) | 1,310,142.79 |
| Jun02-Aug02 | (12,201,346.46) | (407,152.12) | (12,608,498.58) | (11,577,963.78) | (1,030,534.80) |
| Sum Activity | (26,599,451.43) | (6,058,350.66) | (32,657,802.09) | (32,925,445.93) | 267,643.84 |

**Misc Cash Receipt Summary**

(Amount)= Addition to account 12601

| Period | Misc Cash Receipt | Account 12601 Actual | Delta by Period |
|---|---|---|---|
| Aug-00 | (3,562,205.88) | (3,562,205.88) | 0.00 |
| Oct-00 | (15,819,640.13) | (15,819,640.13) | 0.00 |
| Nov-00 | (4,965,173.73) | (4,965,173.73) | 0.00 |