MAYER
BROWN
ROWE
& MAW

February 23, 2005

**VIA FACSIMILE**

Magistrate Judge Joseph C. Spero
United States District Court for
 the Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112

Main Tel (650) 331-2000
Main Fax (650) 331-2060
www.mayerbrownrowe.com

**Lee H. Rubin**
Direct Tel (650) 331-2037
Direct Fax (650) 331-4537
lrubin@mayerbrownrowe.com

Re:   *Oracle Securities Litigation*
      No. C-01-0988 MJJ (JCS)

### DEFENDANTS' SUPPLEMENTAL PROPOSED DISCOVERY PLAN

Dear Magistrate Spero:

Pursuant to your order of February 8, 2005 ("Order"), the parties submitted a Joint Discovery Plan on February 23, 2005. In that plan, there were a few instances in which Defendants' position was not clearly expressed. As a result, Defendants submit this letter, which annotates the Joint Discovery Plan, as a supplement to Defendants' independent submission.

**Discovery to be taken from Defendants**
**Regarding Product Functionality Problems**

*In the February 23, 2005 submission, in the section on pages 6 through 10, a sentence on page 10 became garbled in word processing; Defendants have submitted the entire section, with the revised sentence highlighted in bold text.*

The Revised Second Amended Complaint ("RSAC") raises two categories of allegations about Suite 11i. First, it sets forth allegedly false statements about the integration of Suite 11i. (See RSAC at ¶¶ 50, 51, 58, 63 & 68.) Next, the RSAC alleges that Suite 11i was encumbered with significant "bugs," or defects—including in the CRM modules that were part of Suite 11i. (See, e.g., RSAC ¶¶ 52 & 53) According to the RSAC, these "bugs" resulted in lost sales, postponed sales, and vast expenditures in order to remediate problems with the Suite 11i software. (See, e.g., RSAC ¶¶ 54) As we understand Plaintiffs' claims, both from our reading of the RSAC and through the meet and confer process, Oracle knew or willfully blinded itself to the fact that, at the time it announced its earnings and revenue forecasts in the third quarter of FY2001, it could not possibly achieve those forecasted results because of the integration problems and because of the slowdown in sales and increase in expenses associated with the "bugs" facing Suite 11i. (See, e.g., RSAC ¶¶ 82)

Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  Manchester  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

The Honorable Joseph C. Spero
February 23, 2005
Page 2

Plaintiffs have sought broad discovery from virtually every corner of Oracle, claiming that relevant information concerning sales activity and Suite 11i defects may reside all the way down to the lowest levels of the sales force or technical support staff. (*see e.g.,* Doc. Req. Nos. 20, 22, 23-26; December 15, 2004, Dep. Notice at 3). Recently, after being urged by Defendants to offer some reasonable limitation on the scope of the document search that reflects the allegations in the case and does not impose an unreasonable burden on Defendants, Plaintiffs have proposed some finite categories of files that should be searched for responsive documents. While discussions are ongoing, Defendants believe that even Plaintiffs' current proposals are far too broad and do not properly reflect either the allegations in the RSAC or takes into account the unreasonable burden that would be placed on Oracle from such a far-reaching discovery expedition.

In response, Defendants have proposed producing two categories of information. In the first category, Defendants will produce: all three release versions of Oracle's Suite 11i software so that Plaintiffs may examine the software itself; high level design documents for the 11i Suite; and bug reports that specifically refer to integration or interoperability. In the second category, Defendants will produce documents within the files of the group of current and former employees whose files are most likely to contain discoverable information, as outlined above, that refer to lost or deferred sales of any Oracle product, including Suite l1i, during 3Q01, as well as any material expenditures involving Suite 11i or other Oracle products—such as refunds, rebates or remediation. Given the nature of Plaintiffs' allegations concerning the general presence of bugs in Suite 11i—all of which appear to be tied to alleged knowing misstatements to the public about the forecast itself—the categories of discoverable documents proposed by Defendants will provide Plaintiffs with the information that genuinely bears on their case. Also, as we explain more fully below, the wide range of Suite 11i bugs that Oracle was required to address in Suite 11i—information that was well known the public—is a vastly over-inclusive category of discovery that has no meaningful connection to the RSAC. Moreover, any marginal relevance of documents related to Suite 11i "bugs" generally is far outweighed by the enormous burden that would be imposed on Oracle by gathering and producing literally hundreds of thousands of documents related to all manner of technical support for its software during this period.

***Defendants' Proposed Document Categories Relate Directly To Plaintiffs' Claims --*** The RSAC alleges a handful of purportedly "false" statements about Oracle's 11i Suite of software that deal with the "integration" or "interoperability" of Oracle's software. In order for the Court to resolve any disputes related to the proper scope of Suite 11i related to discovery, Defendants believe it is necessary for the parties and the Court to have a common understanding of these terms. To this end, Defendants explain below what the 11i Suite is and the market into which it was introduced.

Oracle introduced a suite of business software in May 2000 known as Suite 11i. The software consisted of over 50 separate application modules. Customers had the option of purchasing one or more of the modules. Each module fell under one of two broad categories: either Enterprise Resource Planning ("ERP") or Customer Relationship Management ("CRM").

The Honorable Joseph C. Spero
February 23, 2005
Page 3

ERP modules addressed the "back office" functions of a company, e.g., procuring and paying for supplies and manufacturing goods or developing services – activities that generally are not visible to the customer. CRM modules addressed the "front office" functions of a company, e.g., marketing, sales and servicing.

What was unique about Oracle's 11i software was that it was designed to be an integrated suite of modules. "Integrated," when used in the context of describing Suite 11i, meant that every application in the suite was engineered around a unified global customer and product database. See Oracle Corporation Technical White Paper, "Customer Relationship Management" (cited in paragraph 63 of the RSAC). In other words, there was only one database, and each item of information concerning customers and products was stored in only one place in the database. Each module in the Suite was designed to be able to find and read that data because there was a single data schema identifying the location of each item of information in the database and all the data was written in the same computer language. Furthermore, if one module updated an item of information in the database, the update would be instantly available to every other module since they were all working off the same database and using the same language.

Oracle's integrated modular approach was in sharp contrast to the prevailing industry practice which was commonly referred to as "best of breed." In such an installation, the customer chooses software from different vendors for different business functions based upon its assessment of which vendor's software performs each function the best. Since the software has been developed by different vendors who generally use different computer programming technology, databases and database schemas, it is necessary for the customer to hire consultants to "integrate" the software from the different vendors. This integration process can be very time-consuming and expensive. Generally, the integrator has to write extensive customized computer code to cause data from one database to transfer to other databases and be readable by the other applications. In addition, it usually is necessary to devise new computer programs to update the information in each database when an item in one databases is changed by one of the applications. It was in this context that Oracle executives made statements regarding "integration" and "interoperability"—setting Suite 11i apart from the existing "best of breed" approach.

Oracle never represented to the public that Suite 11i would have no defects. It is common knowledge that complex business software, particularly new releases installed in new business environments, will have a substantial number of defects or "bugs" that will have to be corrected before a customer can go live. If the software is not performing according to specifications, the fix will be paid for by Oracle. If the customer requests changes in the software to accommodate its business practices, the customer generally pays extra for the customization.

An Oracle customer can experience several different types of problems when installing the software. First, a module may not perform the function assigned to it according to its specifications. For example, a module responsible for adding customer charges might add one

Mayer, Brown, Rowe & Maw LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 4

and one and incorrectly show three, or a button on a computer screen might not work. The problem is in the programming that constitutes the module.

Second, a module might not function in a manner that is consistent with the way the owner does business. Here, the module performs according to its specifications, but does not properly process the owner's transactions. In this case, either the owner must change its business practices to conform to the business logic underlying the software or the software has to be changed to perform according to the owner's business process. If the software is changed, the changes may affect other functions of the software and its integration with other software.

Third, there can be a defect in the integration programming that is intended to enable Oracle and non-Oracle software to exchange information. Finally, there can be a defect in the programming that Oracle used to store information in the common database and/or enable modules to find and read data in the database.

Only problems of this latter type actually relate to the integration and interoperability statements in the RSAC. Thus, Defendants have agreed to allow Plaintiffs to ***actually read and test the code for the Suite 11i software*** and review the technical manuals that describe how the software is supposed to function in order to determine whether it was integrated and interoperable. Defendants will also provide high level design documents demonstrating that the 11i Suite was designed to be integrated and interoperable. And, rather than producing all bugs for Oracle's software—a massive undertaking that is unlikely to lead the discovery of evidence that has any meaningful connection to this case—Defendants will produce the bug reports that specifically refer to integration or interoperability.

***General Discovery Into "Bugs" Is Not Relevant —*** The release of Suite 11i—like any such massive effort—was publicly recognized to be far from flawless, well before 3Q01. For example, in October 2000 there was a meeting of Oracle users that several Oracle senior executives attended. At that meeting, customers complained about the number of bugs and patches that were required to fix the bugs in Oracle's first version of 11i, which was released in May 2000. Ron Wohl, Oracle's Executive Vice President, Applications Development, acknowledged that there were a significant number of bugs in the initial release, stated that version 2 which was released in October 2000 would substantially reduce the number of bugs in the ERP modules and that version 3, which was scheduled for release in January 2001, would substantially reduce the number of bugs in the CRM modules.

Notwithstanding public knowledge of bugs in Oracle's 11i software, many customers purchased the software during the first three quarters of Oracle's fiscal year 2001 (June 2000 to March 1, 2001). Oracle had record profits in the first, second and third quarters of fiscal year 2001, driven in significant part by sales of modules of Suite 11i. By the beginning of 3Q01, 43 customers had gone live with one or more modules of Suite 11i, indicating that the software "worked" in the configurations that they had set. In addition, Oracle Latin America went live with many of the 11i modules in November 2000. By January 2001, the number of go lives had

Mayer, Brown, Rowe & Maw LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 5

increased to 120. By that time, Oracle had gone live worldwide with substantially the entire 11i Suite.

Given that Plaintiffs do not claim—nor could they—that Defendants falsely represented that Suite 11i was "bug-free" or problem-free, and that the RSAC seeks to link the bug-related problems in Suite 11i to lost sales or additional expenses, there is no basis for broad discovery into all bugs and alleged defects in Suite 11i encountered during this period. **Indeed, since many customers were purchasing Suite 11i prior to and during 3Q01 despite public information about bugs in Suite 11i, the only way in which those Oracle employees who are alleged to have made false statements could have known that the existence of bugs might affect Oracle's sales is if they received some indication from existing or potential customers that the bugs might affect their purchasing decisions.** The enormous amount of communications concerning customer problems that were part of Oracle's day-to-day business as a software manufacturer/installer and that were not linked to potential lost sales opportunities are completely irrelevant to the forecasting case. To the extent these documents have any marginal relevance to this case, it is far outweighed by the enormous burden that would be placed on Oracle to collect and produce these documents. Accordingly, Oracle proposes to produce documents that refer to bugs in Suite 11i (not limited to integration) to the extent that the documents directly refer to a lost or deferred sale (or material expenditure) or directly speaks to the bugs' impact on Oracle sales forecasts.

**Timing of Depositions**

*At page 22, subheading (a), the joint submission suggests that Defendants are only inclined to complete a 30(b)(6) deposition on electronic systems by the end of March 2005. At subheading (c), it suggests that Defendants have agreed to produce the files of any former Oracle employee on 30 days notice.*

**Timing for 30(b)(6) Depositions.** Defendants have agreed to produce a 30(b)(6) witness on accounting and Oracle's electronic systems by March 30, 2005. Defendants have agreed to schedule 30(b)(6) depositions for forecasting and Suite 11i interoperability issues on mutually agreeable dates.

**Production of files belonging to Oracle's former employees.** Plaintiffs have never requested that Defendants consider this proposal. Defendants agree to consider reasonable requests for the production of documents during the course of this litigation, but do not accede to a blanket request for production.

Mayer, Brown, Rowe & Maw LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 6

**Discovery of Absent Class Members**

*At page 31, Plaintiffs seek an order foreclosing discovery from absent class members.*

**Defendants' Position:**  Defendants are not currently seeking discovery from absent class members, but reserve their right to do so, should the need arise.

Sincerely,

/s/ Lee H. Rubin
Lee H. Rubin

cc      Vincent Paul Schmeltz III
        James C. Maroulis