# EXHIBIT 6

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 31 2005

GREGORY C. LANGHAM
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 01-cv-01451-REB-CBS

(Consolidated with Civil Action Nos. 01-cv-01472-REB-CBS, 01-cv-01527-REB-CBS, 01-cv-01616-REB-CBS, 01-cv-01799-REB-CBS, 01-cv-01930-REB-CBS, 02-cv-00333-REB-CBS, 02-cv-00374-REB-CBS, 02-cv-00507-REB-CBS, 02-cv-00658-REB-CBS, 02-cv-00755-REB-CBS, 02-cv-00798-REB-CBS, 04-cv-00238-REB-CBS)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

ORDER GRANTING LEAD PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF DOCUMENTS FROM DEFENDANT
QWEST COMMUNICATIONS INTERNATIONAL, INC.

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on "Lead Plaintiffs' Motion to Compel Production of Documents from Defendant Qwest Communications International, Inc." (filed February 28, 2005) (doc. # 574 [*filed under seal*]). Pursuant to the Order of Reference dated August 14, 2001 and the memorandum dated March 1, 2005, the motion was referred to the Magistrate Judge. The court has reviewed the motion, the Opposition filed by Qwest Communications International, Inc. ("Qwest") on March 21, 2005 (doc. # 593 [*filed under seal*]), Plaintiffs' Reply (filed April 5, 2005) (doc. # 612), Qwest's Supplemental Authority (filed April 15, 2005) (doc. # 633 [*filed under seal*]), the arguments of counsel presented at hearings held on March 1, 2005 and April 18, 2005, the case file, the exhibits, and the applicable law and is sufficiently advised in the premises.

Statement of the Case

This action was brought by shareholders of Qwest against Qwest, Qwest's outside auditor Arthur Anderson LLP, and certain current and former officers and directors of Qwest. Plaintiffs have alleged that between May 24, 1999 and July 28, 2002, Defendants made various false and misleading statements concerning the business and financial conditions of Qwest, and/or undertook a course of action that violated federal securities laws. Plaintiffs seek to represent a class of similarly-situated investors. The Fifth Consolidated Amended Complaint ("Fifth Amended Complaint") (filed February 6, 2004) (doc. # 315) asserts claims for violation of sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and Rule 10b-5 and sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77k and § 77o. (See Fifth Amended Complaint at pp. 195-200, ¶¶ 404-428). The Fifth Amended Complaint reiterated claims against Defendants Qwest, Nacchio, Anschutz, Szeliga, Woodruff, Tempest, Smith, Slater, and Arthur Andersen LLP.

In late 2001 and early 2002, the Securities and Exchange Commission ("SEC") was investigating Qwest's conduct during the time period relevant to this civil action. (See Fifth Amended Complaint at ¶ 174) The SEC was investigating "Qwest's accounting policies, practices and procedures in 2000 and 2001, including revenue recognition and accounting treatment of (i) sales of optical capacity assets (often referred to as Indefeasible Rights of Use or "IRUs"), particularly sales to customers from whom the company agreed to purchase optical capacity; (ii) the sale of equipment by Qwest to customers from which Qwest bought Internet services or to which Qwest contributed equity financing, including equipment sales to KMC and Calpoint; and (iii)

2

Qwest Dex, particularly changes in the production schedules and lives of some directories." (Fifth Amended Complaint at p. 69). Qwest disclosed some otherwise privileged information to the SEC in response to the SEC's investigation

Pursuant to Fed. R. Civ. P. Rules 34 and 37, Plaintiffs ask the court to order Qwest to produce documents in response to Request Nos. 2 and 27 of Plaintiffs' First Request for Production of Documents. (See Exhibit A to Plaintiffs' Motion ([*filed under seal*]).[1] In declining to produce the material requested in Requests No. 2 and 27, Qwest asserts the attorney-client privilege and the work product doctrine. Plaintiffs now "seek an order requiring Qwest to produce: (1) documents Qwest produced to governmental agencies investigating Qwest, but which Qwest has refused to produce to Plaintiffs under claims of attorney-client privilege and/or the attorney work-product doctrine; and (2) a report prepared by Qwest's outside counsel, Boies, Schiller & Flexner LLP ("the Report"), which Qwest is also withholding from production under a claim of attorney-client privilege and the attorney work-product doctrine, along with all supporting documents referenced in or used to compile the Report." (Plaintiffs' Motion at p. 1 [*filed under seal*])

II.     Standard of Review

Fed. R. Civ. P. 26(b) permits discovery "regarding any matter, *not privileged*, that is relevant to the claim or defense of any party" and discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1) (emphasis added). See also *Williams v. Board of County*

3

*Commissioners*, 192 F.R.D. 698, 702 (D. Kan. 2000) (request for discovery should be considered relevant if there is any possibility the information sought may be relevant to a claim or defense). By excluding "privileged" information from the broad parameters of pre-trial discovery, Rule 26 attempts to strike a balance between conflicting interests. Privileges further the administration of justice and "should not be set aside lightly." *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) *See also McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991) ("protections of the work-product privilege are important and should not be set aside lightly"). However, privileges also have the effect of withholding relevant information from the finder of fact, and for that reason should be narrowly construed. *Montgomery v. Leftwich, Moore & Douglas*, 16 F.R.D. 224, 225 (D.D.C. 1995). The Supreme Court has "warned that testimonial privileges 'are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" *In re Grand Jury Subpoena*, 397 F.3d 964, 984 (D.C. Cir. 2005) (Henderson, J., concurring) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974).

The parameters of the attorney-client privilege are well-established  *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (noting that the attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law"). The attorney-client privilege protects communications between a client and an attorney, made in order to obtain or deliver legal assistance, that were intended by the participants to be confidential. *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 624 (D. Colo. 1998). *See also Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002)

4

(identifying the essential elements of the attorney-client privilege).

The party resisting discovery on grounds of privilege bears the burden of coming forward with facts that would sustain the claimed privilege. *See Resolution Trust Corp. v. Heiserman*, 151 F.R.D. 367, 373 (D. Colo. 1993) ("[t]he burden of proving the attorney-client privilege rests on the party raising that privilege"). *See also Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 643 (S.D.N.Y. 1991) (a government agency asserting the attorney-client privilege has the same obligation to establish all elements of the asserted privilege). The party withholding information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege. *National Union Fire Ins. Co. of Pittsburgh v. Midland Bancor*, 159 F.R.D. 562, 567 (D. Kan. 1994). *See also* Fed. R. Civ. P. 26(b)(5) (the party claiming privilege must present sufficient information to permit the opposing party to assess the applicability of the privilege).

The work-product doctrine protects from discovery materials obtained or prepared in anticipation of litigation, as well as the attorney's thought processes, opinions, conclusions and legal theories. *Religious Technology Center v. F.A.C.T.Net*, 945 F. Supp. 1470, 1480 (D. Colo. 1996). *See also* Fed.R.Civ.P. 26(b)(3) (providing that while a party may, only upon a proper showing of substantial need, obtain documents and tangible things prepared in anticipation of litigation or for trial "the court shall protect against disclosure of the mental impression, conclusions, opinions or legal theories of an attorney or other representative of the party concerning the litigation"). The doctrine seeks to protect the adversary system and "rests on the

belief that such promotion of adversary preparation ultimately furthers the truth finding process." *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697, 699 (D. Colo. 1992) (quoting *Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F.R.D. 84, 99 (E.D.N.Y. 1981)). In considering whether a document is prepared in anticipation of litigation or in the ordinary course of business, a court should consider: (1) the nature of the document; (2) the nature of the litigation; (3) the relationship between the parties; (4) the involvement of counsel; and (5) the time when the document was created. *Kidwiler*, 192 F.R.D. at 542. The work-product doctrine must be applied in a commonsense manner and on a case-by-case basis. *St. Paul Reinsurance Company, Ltd. v. Commercial Financial Corp.*, 197 F.R.D. 620, 630 (N.D. Iowa 2000).

For purposes of the Motion before the court, the parties do not dispute that the information sought by Plaintiffs was protected by the attorney-client and work-product privileges. Plaintiffs argue that, by voluntary production to the SEC, Qwest waived any protections that might otherwise extend to the documents for which Qwest claims the attorney-client or work-product privilege. Plaintiffs correctly note that generally, divulging attorney-client communications to a third party will result in a waiver of the attorney-client privilege. *See In re: M & L Business Machine Co., Inc.*, 161 B.R. 689, 693 (D. Colo. 1993) ("Generally, the attorney-client privilege is lost if the substance of the confidential communication is disclosed to a third party, even inadvertently"); *Sedillos v. Board of Education of School Dist. No. 1*, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by '[a]ny voluntary disclosure

6

by the client' of an otherwise privileged confidential communication") (citations omitted).

Similarly, the protection afforded by the work product doctrine may be lost by disclosure to third parties, or by taking actions inconsistent with the privilege. *United States ex rel. [Redacted] v. [Redacted]*, 209 F.R.D. 475, 479-80 (D. Utah 2001).

> A "primary function" of the work product doctrine "is to prevent a current or potential adversary in litigation from gaining access to the fruits of counsel's investigative and analytical effort, and strategies for developing and presenting the client's case. Therefore, a waiver may occur when a party discloses work product in a manner that "increase[s] the likelihood that a current or potential opponent in the litigation would gain access to the documents in question."

*United States ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554, 560 (C.D. Cal. 2003) (internal citations omitted). *See also In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, 294 (6th Cir. 2002) ("client may waive the [work product] privilege by conduct which implies a waiver of the privilege or a consent to disclosure") (citations omitted); *Gottlieb v. Q.T. Wiles*, 143 F.R.D. 241, 246 (D. Colo. 1992) (disclosures to outsiders may result in a waiver of the attorney-client privilege or work product doctrine).

III. Analysis

A. Documents Produced by Qwest to the SEC

During the hearing held April 18, 2005 in open court, Qwest confirmed that

> [b]etween February 2002 and October 21, 2004 (when Qwest settled the SEC's investigation of the Company), Qwest produced over 8,000,000 pages of documents to the SEC ("Government Production"). Over 220,000 pages of the Government Production were subject to claims of privilege but produced to the SEC pursuant to non-waiver agreements ("Limited Waiver Material").

> With the exception of the Limited Waiver material, Qwest produced the entire Government Production to Lead Plaintiffs. The Limited Waiver Material that was produced to the SEC but withheld from Lead Plaintiffs was identified on Qwest's privilege logs to Lead Plaintiffs.
> ... Although Qwest produced some privileged material to the government pursuant to non-waiver agreements, it also withheld from production to the government over 390,000 pages of documents based on the attorney-client and/or work product privileges.
> These documents have not been produced to the Lead Plaintiffs either, although they are identified on privilege logs, or will be shortly, provided to the SEC and to Lead Plaintiffs.

Declaration of Terence C. Gill, Exhibit 2 to Qwest's Opposition to Lead Plaintiffs' Motion to Compel, at ¶ 13-15, *[filed under seal]*).

Plaintiffs rely on *In re: M & L Business Machine Co., Inc.*, 161 B.R. 689 (D. Colo. 1993) in arguing that "a party who discloses otherwise privileged information to a government agency for its own benefit waives the attorney-client privilege in other proceedings." (Plaintiffs' Motion at p. 5 *[filed under seal]*). In that case, the Bank of Boulder's adversary was challenging transfers that were allegedly improper under the Bankruptcy Code. The United States Attorney's criminal investigation was targeting putative defendants who allegedly had violated federal banking statutes. *In re: M & L,* 161 B.R. at 694. The District Court recognized a limited waiver of the attorney-client privilege based on the Bank's "substantial steps to ensure that its disclosures to the U.S. Attorney would be kept confidential," and the lack of "evidence that the Bank's cooperation was for the purpose of obtaining some benefit for itself." *In re: M & L ,* 161 B.R. at 696.

Unlike the Bank's disclosures in *In re: M & L,* Qwest's disclosures to the SEC were intended to benefit Qwest in the SEC investigation. (*See* Transcript of April 18,

8

2005 hearing at p. 16). In the SEC investigation, Qwest provided certain documents to the SEC while simultaneously withholding other documents pursuant to the attorney-client and work-product privileges.

"The attorney-client privilege cannot be used as both a sword and a shield." *Sedillos*, 313 F. Supp. 2d at 1093 (citation omitted). While the Tenth Circuit has not specifically addressed the issue, many courts have declined to recognize a limited, or selective, waiver of the attorney-client and work-product privileges. "[T]he privilege does not protect against the manipulation of selecting a particular opponent for selective disclosure – most probably for the discloser's own benefit." *In re Subpoena Duces Tecum*, 738 F.2d 1367, 1375 (D.C. Cir. 1984). *See also Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 n. 5 (2nd Cir. 2003) ("This Court has previously rejected a 'limited waiver' rule that would preserve attorney-client privilege even after documents had been disclosed to a third party such as the SEC") (citations omitted); *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, 294 (6th Cir. 2002) (disallowing selective waiver); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1431 (3d Cir. 1991) ("Westinghouse waived the attorney-client privilege and the work-product doctrine when it disclosed otherwise protected documents to the SEC and to the DOJ"); *In re M & L*, 161 B.R. at 695 (stating that the attorney-client privilege must be applied to "prevent litigants from selectively asserting the privilege as a tactical tool for their own benefit"); *Gottlieb*, 143 F.R.D. at 252 (considering benefit of previous disclosure to discloser in concluding that neither attorney-client nor work product privilege precluded production of documents).

Notwithstanding the confidentiality agreement between Qwest and the SEC regarding the produced documents, Qwest's voluntary choice to disclose certain documents to the SEC while withholding others indicates a waiver of the attorney-client and work-product privileges as to the disclosed documents. *See In re Columbia/HCA*, 293 F.3d at 294 (after corporation disclosed work product to two government agencies investigating allegations against it, it could not rely on confidentiality agreement to salvage work product protections) (quoting *Westinghouse Elec. Corp.*, 951 F.2d at 1431); *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697, 700 (D. Colo. 1992) ("a waiver of the [work product] privilege occurs despite any agreement between the parties to keep the information confidential").

Under the specific circumstances of this case surrounding the disclosure of certain privileged documents to the SEC, the court concludes that Qwest has waived the attorney-client and the work-product privileges for the 220,000 documents that Qwest produced to the SEC in the course of the SEC's investigation.

**B.     Memorandum Prepared by Boies, Schiller & Flexner, LLP**

In early 2002, the law firm of Boies, Schiller & Flexner LLP ("BSF") was retained to represent Qwest in connection with the SEC's investigation. In furtherance of this representation, BSF prepared a draft and a final memorandum, dated March 21, 2002 and March 29, 2002 respectively, that contained an analysis of matters related to the SEC investigation ("BSF Memo" [*submitted in camera*]).

Plaintiffs argue that Qwest has waived any attorney-client or work-product

10

privilege as to the BSF Memo in two ways. First, Plaintiffs argue that Qwest waived any attorney-client or work-product privilege as to the BSF Memo when Qwest's then-Controller, Brian Treadway, disclosed the contents of the BSF Memo to Qwest's then-auditor, Mark Iwan, of Arthur Andersen. Alternatively, Plaintiffs argue that Qwest waived any attorney-client or work-product privilege as to the BSF Memo when it produced to Plaintiffs a memorandum written by Iwan that contained a summary of the conclusions of the BSF Memo (Exhibit F to Plaintiffs' Motion [*filed under seal*]). The court agrees.

"It is well settled that there is no confidential accountant-client privilege under federal law." *In re Grand Jury Proceedings*, 658 F.2d 782, 784 (10th Cir. 1981) (citations omitted). *See also United States v. Wainwright*, 413F.2d 796, 803 (10th Cir. 1969) (accountant-client privilege is not recognized in federal court) (citations omitted). Disclosures to a third party or disclosures inconsistent with the privilege may result in a waiver of the attorney-client or work-product privilege. *In re: M & L*, 161 B.R. at 693; *Sedillos*, 313 F. Supp. 2d at 1093; *United States ex rel. [Redacted] v. [Redacted]*, 209 F.R.D. at 479-80.

Arthur Andersen LLP is a named Defendant in the Fifth Amended Complaint. The record supports Plaintiffs' position that Treadway disclosed to Iwan in March 2002 the contents of the March 21, 2005 draft of the BSF Memo and the conclusions in the March 29, 2005 final version of the BSF Memo. (*See* Exhibit 5 to Qwest's Opposition at pp. 2072-2078 [*filed under seal*]; Exhibit E to Plaintiffs' Motion at p. 191 [*filed under seal*]; Exhibit F to Plaintiffs' Motion [*filed under seal*]). The Iwan Memo that has

11

previously been produced to Plaintiffs does reveal the substances of the BSF Memo. (*See* Exhibit F to Plaintiffs' Motion [*filed under seal*]). "The attorney-client privilege is lost if the client discloses the substances of an otherwise privileged communication to a third party." *United States v. Ryans*, 903 F.2d 731, 741 n. 13 (10th Cir. 1990) (citations omitted). The court concludes that Qwest has waived the attorney-client privilege and the work-product privilege as to fact work product for the BSF Memo.

As to the "underlying materials" for the BSF memo sought by Plaintiffs, the court's *in camera* review of the BSF Memo leads the court to conclude that such "underlying materials" would have already been produced in the voluminous discovery in this case. Upon the present record before the court, the court declines to order that "underlying materials" be produced, absent further request made by Plaintiffs with additional specificity.

Accordingly,

IT IS ORDERED that "Lead Plaintiffs' Motion to Compel Production of Documents from Defendant Qwest Communications International, Inc." (filed February 28, 2005) (doc. # 574) is GRANTED:

    a.    Qwest shall produce to Plaintiffs the 220,000 documents referenced in the privilege log that Qwest produced to the SEC in the course of the SEC's investigation

    b.    Qwest shall produce to Plaintiffs the BSF Memo.

DATED at Denver, Colorado this 31st day of May, 2005.

BY THE COURT:

Craig B. Shaffer
United States Magistrate Judge

1. Plaintiffs' Request No. 2 asks for "[a]ll documents you produced to, or received from, the SEC, the DOJ, the U.S. Congress, or any attorney general concerning any civil, criminal, administrative, or other investigation or action." Qwest's Response to Request No. 2 stated

> Qwest expressly reasserts General Objections 1, 2, 4 and 7. Additionally Qwest objects to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Qwest states that it has already produced all non-privileged documents previously produced to the United States Securities and Exchange Commission, the United States Department of Justice, the New York Attorney General, and the Congress of the United States, either formally or informally, through June 30, 2003 (the "Government Production through June 30, 2003"). Qwest states further that is will supplement this production by producing all non-privileged documents previously produced to the United States Securities and Exchange Commission, the United States Department of Justice, the New York Attorney General, and the Congress of the United States, either formally or informally, through December 31, 2003 (the "Government Production through December 31, 2003").

Plaintiffs' Request No. 27 asks for "[a]ll documents relating to any advice by outside counsel, including, but not limited to, any analysis, investigation or report concerning Qwest's financial condition, financial reporting or financial accounting, including, but not limited to, any investigation by any outside counsel in or around the first quarter of 2002. Qwest's Response to Request No. 27 stated

> Qwest expressly reasserts General Objections 1, 2, 3 and 4. Additionally, Qwest objects to this request as it calls for the production of information or documents that were prepared for, or in anticipation of, litigation, constitute work product, contain or reflect attorney-client communications, or is otherwise privileged.

13