# EXHIBIT 7

92040AS1.TXT

1

```
 1     IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

 2              IN AND FOR NEW CASTLE COUNTY

 3   IN RE ORACLE CORP.        : CONSOLIDATED
     DERIVATIVE LITIGATION     : C.A. No. 18751
 4

 5                         - - -

 6                              Chancery Court Chambers
                                New Castle County Courthouse
 7                              Wilmington, Delaware
                                Thursday, September 2, 2004
 8                              9:00 a.m.

 9                         - - -

10   BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

11                         - - -

12        DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                          VOLUME I
13                        - - -

14

15

16

17

18

19

20

21

22
                    CHANCERY COURT REPORTERS
23          500 North King Street - Suite 11400
              Wilmington, Delaware 19801-3759
24                     (302) 255-0525
```

2

```
 1   APPEARANCES:

 2                    ROBERT D. GOLDBERG, ESQ.
                      Biggs & Battaglia
                            Page 1
```

9204OAS1.TXT

11  before the market estimate began.

12                      MR. de GHETALDI:  Yes.

13                      THE COURT:  And it was fairly strong,

14  wasn't it?

15                      MR. de GHETALDI:  Yes, it was.

16                      Now, I'm not going to speak on the

17  law, Your Honor, but it's my understanding that we do

18  not have to show that there was a material difference

19  between the information that they gave to the market.

20  What we need to show is a weakening in their business

21  that they were aware of and that caused greater risk

22  to their ultimate --

23                      THE COURT:  We'll talk about that.

24  Keep going with what they knew and when they knew it.


0186


1                      MR. de GHETALDI:  All right.

2                      THE COURT:  Has Mr. Ellison met

3  Mr. Nugent, by the way?

4                      MR. de GHETALDI:  I'm not sure.

5                      THE COURT:  He never met Mr. Minton.

6  He wasn't aware of the subordinate -- the superior

7  relationship.  So, he testified he never met

8  Mr. Minton ever, I think.

9                      MR. de GHETALDI:  Mr. Nugent.

10                      THE COURT:  I think Mr. Ellison said

11  he never melt Mr. Minton or he might --

12                      MR. de GHETALDI:  Winton.

13                      THE COURT:  Oh, Winton.  He met

14  Miss Minton.  He knew her well.  Mr. Winton -- is
                            Page 162

9204OAS1.TXT

15 there any reason to believe Mr. Ellison was on more
16 familiar terms with Mr. Nugent?
17                    MR. de GHETALDI:  No.  Mr. Nugent was
18 an area vice president for NAS.
19                    So, I want to focus on a couple of
20 points about what it was that the defendants looked
21 at.  When he was first interviewed by the SLC in
22 2002, in May, Mr. Ellison told them that he relies
23 primarily on actual sales and pipeline data rather
24 than focusing on what he called the mood ring

0187

1 forecast.  But then in the second interview --
2                    THE COURT:  What year did the mood
3 ring -- was that '77?
4                    MR. de GHETALDI:  Right around there.
5                    The second interview, in late
6 September, 2002, the SLC specifically questioned him
7 about that comment.  And he said, well, he relies on
8 the actuals, but those numbers are of limited value
9 in evaluating the company's prospects of meeting
10 revenue and earnings targets because -- back to the
11 hockey stick. At his deposition, Mr. Ellison told me
12 that he would look at how much has actually been sold
13 in order to forecast.  He also said that how much was
14 left to go was discussed at the weekly EMC meetings.
15                    There's been some argument by the
16 defendants that these actuals were not a total
17 Gestalt at these EMC meetings, and the evidence shows
18 they were very much a part of it.
                           Page 163

9204OAS1.TXT

19          THE COURT:  I guess I don't -- if you
20  ask anybody the same question 1,700 times -- and I'm
21  not saying you did that, but the SLC did.  When
22  Mr. Ellison was using the term "actuals" and things
23  like that, in some ways he was talking -- as I
24  understand it -- he was talking about the application

188

1  of past experience to the current pipeline number and
2  saying -- because I think he said something like --
3  there was some point where he said, "That's not like
4  a projection, that's an actual thing."
5          what he was talking about is, this is
6  what we've kind of historically taken down from a
7  pipeline of this size.  And so that he would take a
8  look at the pipeline and then he'd say, "You know,
9  what are we historically taking down of a pipeline?
10  I'm going to take that historical figure and I'm
11  going to look at what's in the pipeline and, to me,
12  you know, that's going to be my comfort zone."  And
13  then he said -- of course, you know, which I think is
14  perfectly obvious -- if you're off to a good start
15  and actually booked a sizable amount towards your
16  number -- for example, it makes perfect sense for
17  someone -- maybe I'm not a natural plaintiff's
18  lawyer, although I did some cases, but that makes
19  perfect sense for me to say we put a big one up on
20  the board.  That gives me a certain level of comfort.
21          MR. de GHETALDI:  Makes sense to me,
22  too.

Page 164

92040AS1.TXT

0237

```
 1  estimate, which resulted in a number which exceeds,
 2  meets or does not materially fall short of the market
 3  estimate.
 4              And I'm asking you, in a case where
 5  you're accusing people of intentional wrongdoing, who
 6  received those forecasts from her, how that possibly
 7  supports your case.
 8              MR. de GHETALDI:  Because it shows
 9  declining trends in the business.
10              THE COURT:  It does.  But it also
11  shows a subordinate who is fatefully trying to take
12  into account information, and she's still telling the
13  bosses that they're on track to meet the market
14  estimates.  And you have not one shred of paper or
15  evidence that Mr. Sanderson, Mr. Roberts, or
16  Mr. Nussbaum ever spoke up at those meetings and said
17  Minton was crazy.
18              MR. de GHETALDI:  That's true.
19              THE COURT:  So what's your evidence?
20              MR. de GHETALDI:  What we have, Your
21  Honor, is a number of different declining trends.  We
22  were starting to look at the first one.  We're
23  looking at actual results.  We're going to look at
24  forecasts, we're going to look at pipeline, we're
```

0238

```
 1  going to look at conversion issues, both actual and
                          Page 207
```

9204OAS1.TXT
2  forecast.  And we're going to see differences --
3  negative differences -- in all of those trends in
4  Q3 '01.  And so we're only just beginning here.
5              THE COURT:  Well, let's get to what
6  actually went to Henley and Ellison.  I've had -- I
7  understand these things and I read them in the
8  record.  I want to get to the pipeline reports and
9  the upside reports.
10             MR. de GHETALDI:  Let's, if I could,
11  first of all, show the Court just a few short clips
12  about actual results and Mr. Ellison's testimony
13  about those points.  If we could start at that,
14  please.
15             This is from the first SLC interview
16  with Mr. Ellison in May of 2002.  And in the
17  interview says that, "Ellison noted that the actual
18  sales numbers from Q3 FY '01, which were very strong
19  at that point in the quarter, indicated that the time
20  he sold was the perfect time to sell."
21             Go to the next.
22             "Answer:  The individual sales
23  managers would know approximately how much we had
24  sold.  So we'd have that information.  Was it in the

0239

1  packets?  No, it was not.
2              "Question:  But it was something that
3  was discussed at the meeting?
4              "Answer:  It was something -- how
5  much we had -- how much we had left to go, yes."

Page 208