**EXHIBIT 9**



```
 1  MAYER, BROWN, ROWE & MAW LLP
    Donald M. Falk (SBN 150256)
 2  Lee H. Rubin (SBN 141331)
    Shirish Gupta (SBN 205584)
 3  Two Palo Alto Square, Suite 300
    Palo Alto, California 94306
 4  Telephone:   (650) 331-2030
    Facsimile:   (650) 331-2060
 5  lrubin@mayerbrownrowe.com

 6  MAYER, BROWN, ROWE & MAW LLP
    Alan N. Salpeter (admitted pro hac vice)
 7  Javier Rubinstein (admitted pro hac vice)
    Vincent P. Schmeltz III (admitted pro hac vice)
 8  190 South LaSalle Street
    Chicago, IL  60603-3441
 9  Telephone:   (312) 782-0600
    Facsimile:   (312) 701-7711
10  jrubinstein@mayerbrownrowe.com

11  Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
    J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
12
    ORACLE CORPORATION
13  Dorian Daley (SBN 129049)
    James C. Maroulis (SBN 208316)
14  500 Oracle Parkway, Mailstop 5OP7
    Redwood Shores, California 94065
15  Telephone:   (650) 506-5200
    Facsimile:   (650) 506-7114
16  jim.maroulis@oracle.com
```

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| IN RE ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-0988-MJJ (Consolidated) |
|---|---|
| This Document Relates To: ALL ACTIONS. | **DEFENDANTS' SUPPLEMENTAL RESPONSES TO FIRST SET OF INTERROGATORIES** Judge Martin J. Jenkins |

Pursuant to Federal Rule of Civil Procedure 33, Defendants Oracle Corporation ("Oracle"), Lawrence, J. Ellison ("Ellison"), Jeffrey O. Henley ("Henley") and Edward J. Sanderson ("Sanderson") (collectively "Defendants") hereby supplement their responses to Plaintiffs' First Set of Interrogatories to Defendants Oracle, et al. ( the "Interrogatories").

## GENERAL RESPONSES AND OBJECTIONS

A. Defendants hereby incorporate the General Responses and Objections listed in their response, served on February 14, 2005.

## SPECIFIC RESPONSES AND OBJECTIONS

Without waiving or limiting each of the above general responses and objections and subject thereto, Defendants respond to Plaintiffs' specific interrogatories as follows:

## INTERROGATORY NO. 1:

State all facts upon which you based your statement made during Oracle's March 15, 2001 third quarter financial results conference call that "I think it was the economy that really did us in."

## RESPONSE TO INTERROGATORY NO. 1:

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory No. 1 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted. Defendants are willing to meet and confer concerning this interrogatory.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants state that the statement "I think it was the economy that really did us in" was based on the circumstances surrounding the sudden drop-off in deal conversions that occurred in the last few days of 3Q01. *See* NDCA-ORCL 050620-50621 and 050651.

1  "Despite the fact that its revenues tended to come in quite close to the end of quarters, Oracle had successfully met its earnings projections in every quarter from 1998 through 2Q 01." *In re Oracle Corp. Deriv. Litig.*, C.A. No. 18751 (Del. Ct. Chancery – December 2, 2004 Opinion) ("Strine Op."). In the two quarters immediately following the release of Suite 11i (1Q01 and 2Q01), Oracle produced record-breaking financial results. In 1Q01, Oracle's net income rose by 111% compared to 1Q00, yielding split-adjusted earnings of more than 8 cents per share, two cents above Oracle's projection. NDCA-ORCL 01092-1216. Oracle's second quarter in FY01 was an even greater success, with net income rising by 62% compared to 2Q00. NDCA-ORCL 01509-1645.

Coming off two historic quarters, Oracle's sales divisions began the quarter by internally forecasting robust growth in 3Q01 consistent with Oracle's public guidance. Indeed, Oracle's internal financial reports, including its 3Q01 Upside Reports, Pipeline Reports and Big Deal Reports, as well as its monthly update reports, such as its monthly Flash Reports and Red/Grey Financial Reference Books, all of which Defendants produced as part of their Initial Disclosures, continued to show robust growth until the last few days of the quarter, when reports began coming in that customers were delaying purchases due to the economy.

Specifically, the February 5, 12, and 19 Upside Reports[1] showed quarterly earnings of $0.12 or $0.11 per share, consistent with Oracle's public guidance, and well within range of achieving that guidance. The lowest of these reports predicted earnings per share of $0.1123 EPS, less than three-tenths of a cent short of the level needed, with rounding, to meet the unchanged public projection. *See* NDCA-ORCL 00389-422 and 00436-456.

The February 5, 2001 Pipeline Report[2] revealed 32% pipeline growth, well above Oracle's 25% growth estimate on December 14, 2000. NDCA-ORCL 00524-534. Using the 3Q00 conversion rate of 53%, the Pipeline Report still projected that Oracle would easily meet its quarterly performance targets, as it would have at any recent historical conversion rate.

---

[1] Upside Reports have been produced to Plaintiffs at NDCA-ORCL 00001-503.
[2] Pipeline Reports have been produced to Plaintiffs at NDCA-ORCL 00504-534.

2
DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES CASE NO. C-01-0988-MJJ

The Flash Report[3] issued on February 8, 2001, which reported actual results for the first two months of 3Q01, showed License revenue growth of 25%—directly in line with Oracle's projection of 25% License revenue growth. NDCA-ORCL 00545. Likewise, the Red/Grey Book[4] showed that net income for the first two months of 3Q01 was up 72% from Oracle's net income reported for the first two months of 3Q00.

In the last week of the quarter, the Upside Reports were generated daily. The Report generated on February 26 showed an EPS forecast of 11.19 cents (a .04 cent decrease from the prior week). NDCA-ORCL 00454; see also Strine Op. at 34. On the last day of the quarter, however, Oracle's projections plummeted 10% to 10.07 cents EPS. NDCA-ORCL 00488.

As Vice Chancellor Strine recognized, "The undisputed evidence [is] that Oracle's 3Q 01 prospects weakened substantially in the last month of the quarter (February 2001), the month following the completion of trading by Henley and Ellison, largely due to customers refusing to close deals in the final days of the quarter." Strine Op. at 3. Oracle's "Big Deal" Reports[5] also showed the strength of Oracle's business until the last three days of 3Q01. "Big Deal Reports" are prepared near the end of each quarter, tracking the volume of deals of License deals in North America over $500,000. Through Monday, February 26, 2001, Oracle already had closed "big deals" at nearly *triple* the rate of 3Q00. Only on February 27, 2001 did the trajectory of Big Deals begin to plummet, sinking from a positive 192% on February 26 to a *negative* 1% on February 28 due to the massive number of last-minute customer decisions not to close significant license transactions. Compare NDCA-ORCL 00554 and 00558. Some of the customers had relayed that their last-minute decisions to defer signing contracts with Oracle was because of their concerns with the economy and their own finances. See NDCA-ORCL 03454-3456, 03458-3459 and 03460-3461. See also, NDCA-ORCL 050660 and 050638. Indeed, in at least five of the deferrals, the contracts had been fully negotiated and purchase orders were in front of the

---

[3] Flash Reports have been produced to Plaintiffs at NDCA-ORCL 00535-548.
[4] Red/Grey Books have been produced to Plaintiffs at NDCA-ORCL 00561-01772.
[5] Big Deal Reports have been produced to Plaintiffs at NDCA-ORCL 00550-560.

3
DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF

customers' top executives for approval. *See* NDCA-ORCL 03454-3456, 050622, 050663-050664 and 050667-50668.

The last-minute e-mail traffic confirms that the sudden drop-off in closings surprised Oracle executives.[6] A string of e-mails during the last 72 hours of 3Q01 also confirms that the Defendants and other senior Oracle executives did not suspect that Oracle might miss its quarterly forecast until the dramatic fall-off in big-deal conversions in that period. See also, Strine Op. at 34-37. Just before 1 a.m. on Monday, February 26, George Roberts (the EVP of NAS) sent the first in the series to Ellison, Henley, Minton, Catz and David Winton (the NAS finance director). Roberts explained in his e-mail that:

> On Friday John Nugent told me that he had 10mm of forecasted business fall out of the forecast in the West area. It was not one or two deals but over 70 separate transactions slipped. The mix of accounts was 70% new economy and 30% brick and mortar. The top reason given by the companies was capital preservation.
>
> I spent the weekend reviewing the numbers, pipeline and upside deals to see if we could still find a way to the 320mm [Feb. 26 Forecast Projection for NAS]. However based on the continual erosion of the pipeline and forecast this quarter I am reducing my forecast by 20mm. This puts the forecast at 300mm with a best case of 305mm.

NDCA-ORCL 03462. Roberts also forwarded an e-mail that he had received from Nick Classick, the sales executive in charge of the NAS west region, apologizing for the sudden collapse within NAS (*id.*):

> Thursday afternoon it looked like our forecast would be in the $60's m[illion]. After netting everything thru Friday night we will off an addl $10 m[illion] and are looking at a quarter number in the low 50's. I am aware of the impact this news has to Oracle and I am sorry that we have created such a problem. This is my organization and I am responsible for a forecast to you—I failed.

Classick explained exactly what had happened (*id.*):

---

[6] The suddenness of the change is succinctly captured in the comments and actions of the CEO of Siebel Systems, Tom Siebel, who did not see any signs of an impending collapse until February of 2001. *See* NDCA-ORCL 050676-50680.

4
DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES; CASE NO. C-01-0988 MJJ

> From the 2-16 forecast to the 2-23 forecast, we had 78 field deals, by 47 different reps totaling $14.9 m[illion] move out of the quarter. The last month of the quarter I go over deals line by line item with the managers weekly. This has been successful in the past as it gives me the oppt to get accurate info to provide upper management and build a reliable forecast.

Classick contrasted the shock of the current quarter with his prior experience (*id.*):

> In my 6 years with Oracle this is the most difficult news I have had to deliver as a forecast, especially this late in the quarter, is a personal commitment and I have let you and Oracle down. I am sorry.

Jeff Henley responded to Roberts' e-mail by noting that "[t]his has been the 'economy risk' we've been facing all quarter. You don't really see it until the end of the quarter when people have to sign the dotted line and they are more cautious so things start slipping." NDCA-ORCL 03458. Ellison responded next, asking: "George, do you think that these deals have slipped into Q4 or have they simply disappeared?" NDCA-ORCL 03460. Classick replied (*id.*):

> NET—lost to competition 5%, firm q4 projects 25%, delayed until economic or business conditions are clearer 70%. We had 5 POs cut that Presidents pulled until April as they wanted to see what their q1 would look like. The uncertainty of their business and outlooks for the year has caused many clients to delay until they better understand what directions 2001 will take. We can't commit this 70% as April results and the business climate will have to determine.

NAS was not alone. A long series of e-mails to Minton from Sarah Kopp of OSI on February 27 and 28 revealed a rapid deterioration in OSI's conversion of significant transactions during the final 48 hours of the quarter – losing more than $100 million in deals in just 36 hours. *See* NDCA-ORCL 03463-3481.

**INTERROGATORY NO. 2:**

State all facts upon which you based your statement made during Oracle's March 15, 2001 third quarter financial results conference call that "[r]ight up to the end of the quarter ... [Oracle]

5
DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES; Case No. C-01-0988 MJJ

1    [h]adn't seen any indication of an erosion in our internal forecast or heard of significant issues in
2    regular conversations with the U.S. sales and management."
3    **RESPONSE TO INTERROGATORY NO. 2:**
4    Defendants incorporate each of their General Objections as though fully set forth herein.
5    Subject to and without waiving these objections, Defendants state that the statement that "[r]ight
6    up to the end of the quarter ... [Oracle] [h]adn't seen any indication of an erosion in our internal
7    forecast or heard of significant issues in regular conversations with the U.S. sales and
8    management" was based on Oracle's forecasting documents, including its 3Q01 Upside Reports
9    and Pipeline Reports, as well as its monthly update reports, such as its Big Deal Reports, Flash
10   Reports and Monthly/Quarterly Financial Reference Books, all of which Defendants produced as
11   part of their Initial Disclosures.
12   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**
13   Defendants incorporate each of their General Objections as though fully set forth herein.
14   Subject to and without waiving these objections, Defendants incorporate Supplemental Response
15   to Interrogatory Number 1 as if it were set forth herein.
16
17   **INTERROGATORY NO. 3:**
18   State all facts upon which you based your statement made during Oracle's March 15, 2001
19   third quarter financial results conference call that "if you look at our numbers after the second
20   month in Q3, we were well ahead and had [a] very strong pipeline."
21   **RESPONSE TO INTERROGATORY NO. 3:**
22   Defendants incorporate each of their General Objections as though fully set forth herein.
23   Subject to and without waiving these objections, Defendants state that the statement that "if you
24   look at our numbers after the second month in Q3, we were well ahead and had [a] very strong
25   pipeline" was based on Oracle's forecasting documents, including its 3Q01 Upside Reports and
26   Pipeline Reports, as well as its monthly update reports, such as its Big Deal Reports, Flash
27   Reports and Monthly/Quarterly Financial Reference Books, all of which Defendants produced as
28   part of their Initial Disclosures.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants incorporate Supplemental Response to Interrogatory Number 1 as if it were set forth herein.

Further answering, Defendants state that, among other things, Mr. Ellison had the following, specific, objective evidence on which to base the foregoing statement. In December 2000, Oracle closed the single largest licensing deal in its history — the $60 million Covisint transaction. As Vice Chancellor Strine recognized in his December 2004 decision in *In re Oracle Derivative Litigation*, the Covisint deal "gave Oracle a strong start for the quarter and that revenue was included in the December 11 Upside Report. And, as of that time, the December 11, 2000 Pipeline Report was showing total company Pipeline growth of 52%." Op. at 20. The Vice Chancellor also went on to state that the Covisint deal "generated real revenue ... that Ellison knew would help Oracle make the mark." Op. at 77. Finally, "[w]ith Covisint, Oracle had clearly dropped enough revenue in the license bucket to be on the way to filling it at the end of the quarter." Op. at 80.

Mr. Ellison's understanding as to the strength of Oracle's prospects after the first two months of the quarter was also supported by several reports in February 2001. For example, the February 5, 2001 Pipeline Report reported 32% pipeline growth, well above Oracle's 25% growth estimate on December 14, 2000. NDCA-ORCL 00524-534. Applying the 3Q00 conversion rate of 53%, the February 5, 2001 Pipeline Report still projected that Oracle would easily meet its quarterly performance targets, as it would have at any recent historical conversion rate.[7] The February 8, 2001 Flash Report and the Red/Grey Book reporting actual results for the first two months of the quarter provided further support for this statement—reporting License revenue growth of 25%—directly in line with Oracle's projection of 25% License revenue growth—and an increase in net income of 72% over the first two months of 3Q00. *See, e.g.,* NDCA-ORCL

---

[7] Indeed, as Vice Chancellor Strine found, "in 3Q 01 the Pipeline was, at all relevant times, sufficient for Oracle to either exceed, meet, or not fall materially short of the Market Estimates, assuming historical conversion rates." Op. at 85 n.176.

7
DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES; CASE NO C-01-0988-MJJ

00545 (Flash Report); NDCA-ORCL 00561-01772 (Red/Grey Books). Finally, through Monday, February 26, 2001, Oracle had closed "big deals" at nearly *triple* the rate of 3Q00.

Throughout this time, Mr. Ellison held Oracle's Executive Management Committee accountable for giving him the most accurate possible estimates of Oracle's progress toward the public projections—and he based his statements about the progress of 3Q01 on the information he received. As Vice Chancellor Strine found, it was an "undisputed fact that Ellison and Henley actively questioned [their] subordinates about their numbers. . . . If, after creating an environment in which hard questions about estimates were continually asked by EMC members and by members of [Jennifer] Minton's team in a culture in which conservative projecting was the rule, Ellison and Henley received — as they did — Best Estimates suggesting that Oracle would meet the Market Estimates, the idea that material, adverse information existed simultaneously with those Estimates is less, not more, tenable." Op. at 70.

**INTERROGATORY NO. 4:**

Identify each of the "very, very large deals [that] didn't sign" referenced by you in the March 15, 2001 third quarter financial results conference call.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants will, in lieu of a written response, produce responsive documents pursuant to Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 5:**

State all facts upon which you based your statement made during Oracle's March 15, 2001 third quarter financial results conference call that "in the applications space, clearly, I think part of the reason we did so poorly was because of the slowdown in the U.S. economy."

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 5 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants incorporate Supplemental Response to Interrogatory Number 1 as if it were set forth herein.

**INTERROGATORY NO. 6:**

Identify each contract that you indicated during the March 15, 2001 third quarter financial results conference call "slipped as a result of key executives delaying decisions to sign the deals when they represented the final signature."

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants will, in lieu of a written response, produce responsive documents pursuant to Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 7:**

State all facts upon which you based your statement made during Oracle's March 15, 2001 third quarter financial results conference call that "the conversion rates were much less than normal in Q3."

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants state that the statement that "the conversion rates were much less than normal in Q3" was based on Oracle's forecasting documents, including its 3Q01 Upside Reports and Pipeline Reports, as well as its monthly update reports, such as its Big Deal Reports, Flash Reports and Monthly/Quarterly Financial Reference Books, all of which Defendants produced as part of their Initial Disclosures.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants respond as follows:

The December 11 Pipeline Report projected a conversion rate of 53% (identical to the rate in 3Q00). NDCA-ORCL 00505. Oracle's public projection, on the other hand, correlated to a far more conservative 42% conversion rate. Applying the 3Q00 conversion rate to the 3Q01 pipeline as of December 11, 2000 would have yielded earnings of $0.16 per share, well above the $0.12 per share projected on December 14, 2000.

As it turns out, Oracle's actual License revenues for 3Q01 were $1,108,917,000, reflecting a conversion rate of 37% of the December 11 pipeline, 17 percentage points ("pp") below the average conversion rate for the preceding seven quarters, and 7 pp lower than *any* conversion rate within the preceding seven quarters. NDCA-ORCL 00505 and 01916. Had Oracle experienced even the conservative 42% conversion rate, it would have generated sufficient income to report EPS of 12 cents.

Oracle's actual License revenues for 3Q01 reflected a conversion rate of 41% based on the January 15 pipeline. NDCA-ORCL 00515 and 01916. This again was 13 pp lower than the average conversion rate for the preceding seven quarters and 7 pp lower than *any* conversion rate

in the preceding two years. NDCA-ORCL 00522. Had Oracle repeated any of these historic conversion rates in 3Q01, Oracle would have met its quarterly performance forecasts. *See* NDCA-ORCL 00515.

**INTERROGATORY NO. 8:**

Identify each of the 83 customers that you stated were "live" on 11i as of December 14, 2000.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants will, in lieu of a written response, produce responsive documents pursuant to Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 9:**

Identify each of the 165 customers which George Roberts, Oracle Executive Vice President of North American Sales, stated during the February 13, 2001 Robertson Stephens Technology Conference in San Francisco were "live" on 11i as of February 13, 2001.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 9 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 10:**

Identify each customer you indicated during Oracle's March 1, 2001 pre-announcement conference call "decided to delay their IT spending."

**RESPONSE TO INTERROGATORY NO. 10:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 10 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 11:**

Identify each of the 47 "reps" referenced in the Nick Classik e-mail to George Roberts cited in the Delaware Chancery Court Opinion in *In re Oracle Deriv. Litig.*, Consolidated C.A. No. 18751, 2004 Del. Ch. LEXIS 177 at *55-56 (Del. Ch. Nov. 24, 2004).

**RESPONSE TO INTERROGATORY NO. 11:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 11 as overbroad and unlikely to lead to the

1  discovery of admissible evidence. Defendants further object to this interrogatory as unduly
2  burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 12:**

Identify each of the 78 "field deals" which moved out of the quarter as referenced in the Nick Classik e-mail cited in the opinion of the Delaware Chancery Court in *In re Oracle Deriv. Litig.*, Consolidated C.A. No. 18751, 2004 Del. Ch. LEXIS 177 at *55 (Del. Ch. Nov. 24, 2004).

**RESPONSE TO INTERROGATORY NO. 12:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 12 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 13:**

Identify each of the 70 transactions which "slipped" in the "West Area" referenced in the February 26, 2001 e-mail from George Roberts to Ellison, Henley and Jennifer Minton cited in the opinion of the Delaware Chancery Court in *In re Oracle Deriv. Litig.*, Consolidated C.A. No. 18751, 2004 Del. Ch. LEXIS 177 at *54 (Del. Ch. Nov. 24, 2004).

**RESPONSE TO INTERROGATORY NO. 13:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 13 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Defendants incorporate each of their General Objections as though fully set forth herein. Subject to and without waiving these objections, Defendants are in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide supplemental responses to this Interrogatory.

**INTERROGATORY NO. 14:**

Identify each entity that conveyed to Oracle in Oracle's third fiscal quarter 2001 that it could not or would not purchase Oracle software licenses or services in Oracle's third fiscal quarter 2001 due to the United States economy, preservation of capital or information technology spending.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object to Interrogatory Number 14 as overbroad and unlikely to lead to the discovery of admissible evidence. Defendants further object to this interrogatory as unduly burdensome to respond in the time allotted, but are willing to meet and confer.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

Defendants incorporate each of their General Objections as though fully set forth herein. Defendants further object on the grounds that Interrogatory Number 14 requests information that is beyond the knowledge of the Speakers and their direct reports. Plaintiffs' inquiries regarding information known to other individuals but not known to the Individual Defendants is not an appropriate line of inquiry. To the extent that Interrogatory Number 14 seeks information known

1  to the Speakers, Defendants object on the grounds that Interrogatory Number 14 is repetitive and
2  duplicative, in whole or in part, of Interrogatories Number 4 and Number 6.

4  Dated: February 28, 2005

MAYER, BROWN, ROWE & MAW LLP

By: /s/ Lee H. Rubin
Lee H. Rubin
Attorneys for Defendants Oracle Corporation, Lawrence J. Ellison, Jeffrey O. Henley and Edward J. Sanderson

# PROOF OF SERVICE

I, Thelma Tannis, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is: Two Palo Alto Square, Suite 300, 3000 El Camino Real, Palo Alto, California 94306.

On February 28, 2005, I served the foregoing document(s) described as:

**DEFENDANTS' SUPPLEMENTAL RESPONSES TO FIRST SET OF INTERROGATORIES**

[X] By transmitting via facsimile the document(s) listed above (exclusive of exhibits) to the fax number(s) set forth below on this date.

[X] By placing the document(s) listed above in a sealed envelope with postage prepaid, via First Class Mail, in the United States mail at Palo Alto, California addressed as set forth below.

William S. Lerach
Mark Solomon
Douglas Britton
LERACH, COUGHLIN, STOIA,
 GELLER, RUDMAN & ROBBINS LLP
401 B Street, Suite 1700
San Diego, CA 92101
Fax: (619) 231-7423

Sanford Svetcov
Shawn A. Williams
Willow E. Radcliffe
LERACH, COUGHLIN, STOIA,
 GELLER, RUDMAN & ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Fax: (415) 288-4534

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 28, 2005 at Palo Alto, California.

*Thelma Tannis*
Thelma Tannis

PROOF OF SERVICE