EXHIBIT 3

TO

(SCHMELTZ DECLARATION)

Westlaw.

824 A.2d 917                                                                                              Page 1

824 A.2d 917
**(Cite as: 824 A.2d 917)**

▷
824 A.2d 917

Court of Chancery of Delaware, New Castle County.
In re **ORACLE** CORP DERIVATIVE
LITIGATION
C.A.No. 18751.

Submitted: May 28, 2003.
Decided: June 13, 2003.
Revised: June 17, 2003.

Shareholders brought derivative action alleging insider trading by chief executive officer (CEO), chief financial officer (CFO), and two directors. Special litigation committee (SLC) moved for dismissal. The Court of Chancery, New Castle County, Strine, Vice Chancellor, held that ties among SLC members, university where they were tenured professors, and CEO and directors were so substantial that they caused reasonable doubt about the members' independence.

Motion denied.

West Headnotes

**[1] Corporations 101** ⟜212
101k212 Most Cited Cases
Special litigation committee (SLC) bore the burden of persuasion on motion to dismiss shareholder derivative action and was required to convince superior court that there was no material issue of fact calling into doubt its independence.

**[2] Corporations 101** ⟜310(1)
101k310(1) Most Cited Cases
The question of independence turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind.

**[3] Corporations 101** ⟜206(1)
101k206(1) Most Cited Cases

In order to prevail on its motion to terminate the shareholder derivative action, the special litigation committee (SLC) was required to persuade superior court that: (1) committee members were independent; (2) that they acted in good faith; and (3) that they had reasonable bases for their recommendations.

**[4] Corporations 101** ⟜213
101k213 Most Cited Cases
If the special litigation committee (SLC) meets burden of persuasion on motion to dismiss shareholder derivative action, superior court is free to grant motion or may, in its discretion, undertake its own examination of whether corporation should permit the suit to proceed in the best interests of the company.

**[5] Corporations 101** ⟜213
101k213 Most Cited Cases
Superior court must deny special litigation committee's (SLC) motion to terminate shareholder derivative action, if there is a material factual question causing doubt about whether the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation; to grant the motion, the court needs to be convinced on the basis of the undisputed factual record, that the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation.

**[6] Corporations 101** ⟜206(1)
101k206(1) Most Cited Cases
Members of corporation's special litigation committee (SLC) could lose independence without being essentially subservient to officers and directors under investigation for insider trading; whether the members were under the domination and control of the interested parties was not the central inquiry in the independence determination necessary for ruling on SLC's motion to terminate shareholder derivative action.

**[7] Corporations 101** ⟜310(1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101k310(1) Most Cited Cases
A director may be compromised and lose independence, if he is beholden to an interested person; "beholden" does not mean just owing in the financial sense, and it can also flow out of personal or other relationships to the interested party.

**[8] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Assessing the independence of corporation's special litigation committee (SLC) required examination of whether the SLC could independently make the difficult decision entrusted to it: whether the chief executive officer (CEO), chief financial officer (CFO), and two directors should face suit for insider trading-based allegations of breach of fiduciary duty.

**[9] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) member, university where member was tenured professor, and director were so substantial that they caused reasonable doubt about the member's independence and ability to impartially consider whether director should face suit for insider trading; director was a fellow professor, member had been student of director and served with him as senior fellow at think tank, and a person in member's position would find it difficult to assess director's conduct without pondering his own association with director and their mutual affiliations.

**[10] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) members, university where they were tenured professors, and director who was major benefactor were so substantial that they caused reasonable doubt about the members' independence and ability to impartially consider whether director should face suit for insider trading; the director was an alumnus, had recently donated $50,000 to university's law school after member made a speech at director's request, and served as advisory board chair of think tank where member was senior fellow, the members were aware of the importance of large contributors although they were not responsible for fundraising, their purported ignorance of director's donations was entitled to little weight, and even though the director's contributions were a very small proportion of university's endowment and annual donations, the contributions would not grow by callous indifference to alumni.

**[11] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Ties among special litigation committee (SLC) members, university where they were tenured professors, and chief executive officer (CEO) were so substantial that they caused reasonable doubt about the members' independence and ability to impartially consider whether CEO should face suit for insider trading; CEO was very wealthy, was publicly considering extremely large contributions to university when members were being added to board, and headed a medical research foundation that was a source of nearly $10 million in funding to university, university's rejection of CEO's child for admission did not keep CEO from making public statements about consideration of huge donation, and although members claimed ignorance, an inquiry into CEO's connections with university should have been conducted before the SLC was finally formed and, at the very least, should have been undertaken in connection with its report.

**[12] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Connections among special litigation committee (SLC) members, university where they were tenured professors, and chief executive officer (CEO) and directors would weigh on the mind of a reasonable member and generate a reasonable doubt about the SLC's impartiality in deciding whether to level the serious charge of insider trading; the connection would be on the mind of the SLC members in a way that generated an unacceptable risk of bias and suggested material considerations other than the best interests of the corporation.

**[13] Corporations 101 ⚙︎206(1)**
101k206(1) Most Cited Cases
Members of corporation's special litigation committee (SLC) could lack independence in seeking to terminate shareholder derivative suit against officers and directors for insider trading, even though nothing indicated that either member

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acted out of any conscious desire to favor the officers and directors or to do anything other than discharge their duties with fidelity; a conclusion that the SLC was not independent meant that members were not situated to act with the required degree of impartiality and did not mean not that the two accomplished professors lacked good faith and moral probity.

[14] **Corporations 101** ⟐206(1)
101k206(1) Most Cited Cases
The independence inquiry concerning directors on corporation's special litigation committee (SLC) recognizes that persons of integrity and reputation can be compromised in their ability to act without bias when they must make a decision adverse to others with whom they share material affiliations.

*920 Robert D. Goldberg, Esquire, Biggs & Battaglia , Wilmington, Delaware; Lee D. Rudy , Esquire and Robert B. Weiser , Esquire, Schiffrin & Barroway, LLP , Bala Cynwyd, Pennsylvania; Samuel Rudman , Esquire and Douglas Wilens , Esquire, Cauley, Geller, Bowman & Rudman, LLP, Boca Raton, Florida, Attorneys for Plaintiffs.
Kenneth J. Nachbar , Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorney for the Individual Defendants.
David C. McBride , Esquire, Adam W. Poff , Esquire, and Christian Douglas Wright , Esquire, Young Conaway Stargatt & Taylor, LLP , Wilmington, Delaware; George M. Newcombe , Esquire and James G. Kreissman , Esquire, Simpson Thacher & Bartlett, LLP, Palo Alto, California, Attorneys for Nominal Defendant Oracle Corporation.

OPINION

STRINE, Vice Chancellor.
[1] In this opinion, I address the motion of the special litigation committee ("SLC") of Oracle Corporation to terminate this action, "the Delaware Derivative Action," and other such actions pending in the name of Oracle against certain Oracle directors and officers. These actions allege that these Oracle directors engaged in insider trading while in possession of material, non-public information showing that Oracle would not meet the earnings guidance it gave to the market for the third quarter of Oracle's fiscal year 2001. The SLC bears the burden of persuasion on this motion and must convince me that there is no material issue of fact calling into doubt its independence. This requirement is set forth in *Zapata Corp. v. Maldonado* FN1 and its progeny. FN2

> FN1. 430 A.2d 779 (Del.1981).
>
> FN2. *E.g., Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch.1985).

[2] The question of independence "turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind." FN3 That is, the independence test ultimately "focus[es] on impartiality and objectivity." FN4 In this case, the SLC has failed to demonstrate that no material factual question exists regarding its independence.

> FN3. *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1232 (Del.Ch.2001) (emphasis in original), *rev'd in part on other grounds,* 817 A.2d 149 (Del.2002), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003).
>
> FN4. *Id.*

During discovery, it emerged that the two SLC members-both of whom are professors at Stanford University-are being asked to investigate fellow Oracle directors who have important ties to Stanford, too. Among the directors who are accused by the derivative plaintiffs of insider trading are: (1) another Stanford professor, who taught one of the SLC members when the SLC member was a Ph.D. candidate and who serves as a senior fellow and a steering committee member alongside that SLC member at the Stanford Institute for Economic Policy Research or "SIEPR"; (2) a Stanford alumnus who has directed millions of dollars of contributions to Stanford during recent years, serves as Chair of SIEPR's Advisory Board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917                                                                                                           Page 4
824 A.2d 917
**(Cite as: 824 A.2d 917)**

and has a conference center named for him at SIEPR's facility, and has contributed nearly $600,000 to SIEPR and the Stanford Law School, both parts of Stanford with which one of the SLC members is closely affiliated; and (3) Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal *921 foundation and large donations indirectly through Oracle, and who was considering making donations of his $100 million house and $170 million for a scholarship program as late as August 2001, at around the same time period the SLC members were added to the Oracle board. Taken together, these and other facts cause me to harbor a reasonable doubt about the impartiality of the SLC.

It is no easy task to decide whether to accuse a fellow director of insider trading. For Oracle to compound that difficulty by requiring SLC members to consider accusing a fellow professor and two large benefactors of their university of conduct that is rightly considered a violation of criminal law was unnecessary and inconsistent with the concept of independence recognized by our law. The possibility that these extraneous considerations biased the inquiry of the SLC is too substantial for this court to ignore. I therefore deny the SLC's motion to terminate.

### I. *Factual Background*

#### A. *Summary of the Plaintiffs' Allegations*

The Delaware Derivative Complaint centers on alleged insider trading by four members of Oracle's board of directors-Lawrence Ellison, Jeffrey Henley, Donald Lucas, and Michael Boskin (collectively, the "Trading Defendants"). Each of the Trading Defendants had a very different role at Oracle.

Ellison is Oracle's Chairman, Chief Executive Officer, and its largest stockholder, owning nearly twenty-five percent of Oracle's voting shares. By virtue of his ownership position, Ellison is one of the wealthiest men in America. By virtue of his managerial position, Ellison has regular access to a great deal of information about how Oracle is performing on a week-to-week basis.

Henley is Oracle's Chief Financial Officer, Executive Vice President, and a director of the corporation. Like Ellison, Henley has his finger on the pulse of Oracle's performance constantly.

Lucas is a director who chairs Oracle's Executive Committee and its Finance and Audit Committee. Although the plaintiffs allege that Lucas's positions gave him access to material, non-public information about the company, they do so cursorily. On the present record, it appears that Lucas did not receive copies of week-to-week projections or reports of actual results for the quarter to date. Rather, his committees primarily received historical financial data.

Boskin is a director, Chairman of the Compensation Committee, and a member of the Finance and Audit Committee. As with Lucas, Boskin's access to information was limited mostly to historical financials and did not include the week-to-week internal projections and revenue results that Ellison and Henley received.

According to the plaintiffs, each of these Trading Defendants possessed material, non-public information demonstrating that Oracle would fail to meet the earnings and revenue guidance it had provided to the market in December 2000. In that guidance, Henley projected-subject to many disclaimers, including the possibility that a softening economy would hamper Oracle's ability to achieve these results-that Oracle would earn 12 cents per share and generate revenues of over $2.9 billion in the third quarter of its fiscal year 2001 ("3Q FY 2001"). Oracle's 3Q FY 2001 ran from December 1, 2000 to February 28, 2001.

The plaintiffs allege that this guidance was materially misleading and became even more so as early results for the quarter came in. To start with, the plaintiffs assert that the guidance rested on an untenably *922 rosy estimate of the performance of an important new Oracle product, its "Suite 1li" systems integration product that was designed to enable a business to run all of its information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

systems using a complete, integrated package of software with financial, manufacturing, sales, logistics, and other applications features that were "inter-operable." The reality, the plaintiffs contend, was that Suite 11i was riddled with bugs and not ready for prime time. As a result, Suite 11i was not in a position to make a material contribution to earnings growth.

In addition, the plaintiffs contend more generally that the Trading Defendants received material, non-public information that the sales growth for Oracle's other products was slowing in a significant way, which made the attainment of the earnings and revenue guidance extremely difficult. This information grew in depth as the quarter proceeded, as various sources of information that Oracle's top managers relied upon allegedly began to signal weakness in the company's revenues. These signals supposedly included a slowdown in the "pipeline" of large deals that Oracle hoped to close during the quarter and weak revenue growth in the first month of the quarter.

During the time when these disturbing signals were allegedly being sent, the Trading Defendants engaged in the following trades:
- On January 3, 2001, Lucas sold 150,000 shares of Oracle common stock at $30 per share, reaping proceeds of over $4.6 million. These sales constituted 17% of Lucas's Oracle holdings.
- On January 4, 2001, Henley sold one million shares of Oracle stock at approximately $32 per share, yielding over $32.3 million. These sales represented 7% of Henley's Oracle holdings.
- On January 17, 2001, Boskin sold 150,000 shares of Oracle stock at over $33 per share, generating in excess of $5 million. These sales were 16% of Boskin's Oracle holdings.
- From January 22 to January 31, 2001, Ellison sold over 29 million shares at prices above $30 per share, producing over $894 million. Despite the huge proceeds generated by these sales, they constituted the sale of only 2% of Ellison's Oracle holdings.

Into early to mid-February, Oracle allegedly continued to assure the market that it would meet its December guidance. Then, on March 1, 2001, the company announced that rather than posting 12 cents per share in quarterly earnings and 25% license revenue growth as projected, the company's earnings for the quarter would be 10 cents per share and license revenue growth only 6%. The stock market reacted swiftly and negatively to this news, with Oracle's share price dropping as low as $15.75 before closing at $16.88-a 21% decline in one day. These prices were well below the above $30 per share prices at which the Trading Defendants sold in January 2001.

Oracle, through Ellison and Henley, attributed the adverse results to a general weakening in the economy, which led Oracle's customers to cut back sharply on purchases. Because (the company claimed) most of its sales close in the late days of quarters, the company did not become aware that it would miss its projections until shortly before the quarter closed. The reasons given by Ellison and Henley subjected them to sarcastic rejoinders from analysts, who noted that they had only recently suggested that Oracle was better-positioned than other companies to continue to deliver growth in a weakening economy.

### B. *The Plaintiffs' Claims in the Delaware Derivative Action*

The plaintiffs make two central claims in their amended complaint in the Delaware *923 Derivative Action. First, the plaintiffs allege that the Trading Defendants breached their duty of loyalty by misappropriating inside information and using it as the basis for trading decisions. This claim rests its legal basis on the venerable case of *Brophy v. Cities Service Co.* FN5 Its factual foundation is that the Trading Defendants were aware (or at least possessed information that should have made them aware) that the company would miss its December guidance by a wide margin and used that information to their advantage in selling at artificially inflated prices.

FN5. 70 A.2d 5 (Del.Ch.1949).

Second, as to the other defendants-who are the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

members of the Oracle board who did not trade-the plaintiffs allege a *Caremark* FN6 violation, in the sense that the board's indifference to the deviation between the company's December guidance and reality was so extreme as to constitute subjective bad faith.

> FN6. *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996).

### C. *The Various Litigations*

Oracle's failure to meet its earnings and revenue guidance, and the sales by the Trading Defendants, inevitably generated a spate of lawsuits. Several derivative actions were filed in the state and federal courts of California. Those actions are, in substance, identical to the Delaware Derivative Action. Those suits have now all been stayed in deference to the SLC's investigation and the court's ruling on this motion.

Federal class actions were also filed, and the consolidated complaint in those actions formed the basis for much of the amended complaint in the Delaware Derivative Action. By now, the "Federal Class Action" has been dismissed for failure to state a claim upon which relief can be granted for the third time; this time the order addressing the second amended complaint dismissed the Federal Class Action with prejudice. FN7

> FN7. *See In re Oracle Corp. Sec. Litig.,* No. C 01-0988 MJJ, slip op. at 2 (N.D.Cal. Mar. 24, 2003).

### D. *The Formation of the Special Litigation Committee*

On February 1, 2002, Oracle formed the SLC in order to investigate the Delaware Derivative Action and to determine whether Oracle should press the claims raised by the plaintiffs, settle the case, or terminate it. Soon after its formation, the SLC's charge was broadened to give it the same mandate as to all the pending derivative actions, wherever they were filed.

The SLC was granted full authority to decide these matters without the need for approval by the other members of the Oracle board.

### E. *The Members of the Special Litigation Committee*

Two Oracle board members were named to the SLC. Both of them joined the Oracle board on October 15, 2001, more than a half a year after Oracle's 3Q FY 2001 closed. The SLC members also share something else: both are tenured professors at Stanford University.

Professor Hector Garcia-Molina is Chairman of the Computer Science Department at Stanford and holds the Leonard Bosack and Sandra Lerner Professorship in the Computer Science and Electrical Engineering Departments at Stanford. A renowned expert in his field, Garcia-Molina was a professor at Princeton before coming to Stanford in 1992. Garcia-Molina's appointment at Stanford represented a homecoming of some sort, because he obtained both his undergraduate and graduate degrees from Stanford.

*924 The other SLC member, Professor Joseph Grundfest, is the W.A. Franke Professor of Law and Business at Stanford University. He directs the University's well-known Directors' College FN8 and the Roberts Program in Law, Business, and Corporate Governance at the Stanford Law School. Grundfest is also the principal investigator for the Law School's Securities Litigation Clearinghouse. Immediately before coming to Stanford, Grundfest served for five years as a Commissioner of the Securities and Exchange Commission. Like Garcia-Molina, Grundfest's appointment at Stanford was a homecoming, because he obtained his law degree and performed significant post-graduate work in economics at Stanford.

> FN8. In the interests of full disclosure, I spoke at the Directors' College in spring 2002.

As will be discussed more specifically later, Grundfest also serves as a steering committee

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

member and a senior fellow of the Stanford Institute for Economic Policy Research, and releases working papers under the "SIEPR" banner.

For their services, the SLC members were paid $250 an hour, a rate below that which they could command for other activities, such as consulting or expert witness testimony. Nonetheless, during the course of their work, the SLC members became concerned that (arguably scandal-driven) developments in the evolving area of corporate governance as well as the decision in *Telxon v. Meyerson*, FN9 might render the amount of their compensation so high as to be an argument against their independence. Therefore, Garcia-Molina and Grundfest agreed to give up any SLC-related compensation if their compensation was deemed by this court to impair their impartiality.

> FN9. 802 A.2d 257 (Del.2002).

### F. *The SLC Members Are Recruited to the Board*

The SLC members were recruited to the board primarily by defendant Lucas, with help from defendant Boskin. FN10 The wooing of them began in the summer of 2001. Before deciding to join the Oracle board, Grundfest, in particular, did a good deal of due diligence. His review included reading publicly available information, among other things, the then-current complaint in the Federal Class Action.

> FN10. *See* Grundfest Dep. at 466-69; Garcia-Molina Dep. at 15-16.

Grundfest then met with defendants Ellison and Henley, among others, and asked them some questions about the Federal Class Action. The claims in the Federal Class Action are predicated on facts that are substantively identical to those on which the claims in the Delaware Derivative Action are based. Grundfest received answers that were consistent enough with what he called the "exogenous" information about the case to form sufficient confidence to at least join the Oracle board. Grundfest testified that this did not mean that he had concluded that the claims in the Federal Class Action had no merit, only that Ellison's and Henley's explanations of their conduct were plausible. Grundfest did, however, conclude that these were reputable businessmen with whom he felt comfortable serving as a fellow director, and that Henley had given very impressive answers to difficult questions regarding the way Oracle conducted its financial reporting operations. FN11

> FN11. The plaintiffs claim that Grundfest prejudged the Trading Defendants' culpability in a manner equivalent to that of the Chairman of the HealthSouth special litigation committee, as discussed in the recent *Biondi v. Scrushy*, 820 A.2d 1148 (Del.Ch.2003) decision. The two situations are not reasonably comparable. In *Biondi*, the HealthSouth SLC Chairman publicly announced his conclusion that the HealthSouth CEO, who was the target of the SLC's investigation, had not acted with the required *scienter*. He did so in a company press release in advance of the SLC's own investigation. Here, Grundfest simply made a judgment that Ellison and Henley had given a plausible accounting for themselves and were, in general, reputable businessmen with whom he was comfortable serving as a fellow director. I find credible Grundfest's contention that he took their statements for what they were, statements by persons with a self-interest in exculpation. That said, it would have been a better practice for the Report to have identified that Grundfest had inquired about the Federal Class Action in determining whether to join Oracle's board. *Cf.* Report at VII-1 ("The interviews commenced in April 2002 and were completed by early November 2002.").

**\*925** G. *The SLC's Advisors*

The most important advisors retained by the SLC were its counsel from Simpson Thacher & Bartlett LLP. Simpson Thacher had not performed material

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 8

824 A.2d 917
**(Cite as: 824 A.2d 917)**

amounts of legal work for Oracle FN12 or any of the individual defendants before its engagement, and the plaintiffs have not challenged its independence.

> FN12. Some six years before the SLC investigation began, Simpson Thacher had performed a modest amount of legal work for Oracle. Simpson Thacher also represents Cadence Design Systems, a company of which Trading Defendant Donald Lucas is a director, and had billed Cadence less than $50,000 for that work. In 1996-1997, Simpson Thacher also billed Cadence for $62,355 for certain legal advice. The SLC determined that the Cadence work was not material to Simpson Thacher and the plaintiffs have not challenged that determination.

National Economic Research Advisors ("NERA") was retained by the SLC to perform some analytical work. The plaintiffs have not challenged NERA's independence.

### H. *The SLC's Investigation and Report*

The SLC's investigation was, by any objective measure, extensive. The SLC reviewed an enormous amount of paper and electronic records. SLC counsel interviewed seventy witnesses, some of them twice. SLC members participated in several key interviews, including the interviews of the Trading Defendants.

Importantly, the interviewees included all the senior members of Oracle's management most involved in its projection and monitoring of the company's financial performance, including its sales and revenue growth. These interviews combined with a special focus on the documents at the company bearing on these subjects, including e-mail communications.

The SLC also asked the plaintiffs in the various actions to identify witnesses the Committee should interview. The Federal Class Action plaintiffs identified ten such persons and the Committee interviewed all but one, who refused to cooperate. The Delaware Derivative Action plaintiffs and the other derivative plaintiffs declined to provide the SLC with any witness list or to meet with the SLC.

During the course of the investigation, the SLC met with its counsel thirty-five times for a total of eighty hours. In addition to that, the SLC members, particularly Professor Grundfest, devoted many more hours to the investigation.

In the end, the SLC produced an extremely lengthy Report totaling 1,110 pages (excluding appendices and exhibits) that concluded that Oracle should not pursue the plaintiffs' claims against the Trading Defendants or any of the other Oracle directors serving during the 3Q FY 2001. The bulk of the Report defies easy summarization. I endeavor a rough attempt to capture the essence of the Report in understandable terms, surfacing some implicit premises that I understand to have undergirded *926 the SLC's conclusions. Here goes.

Having absorbed a huge amount of material regarding Oracle's financial condition during the relevant period, the flow of information to top Oracle executives, Oracle's business and its products, and the general condition of the market at that time, the SLC concluded that even a hypothetical Oracle executive who possessed all information regarding the company's performance in December and January of 3Q FY 2001 would not have possessed material, non-public information that the company would fail to meet the earnings and revenue guidance it provided the market in December. Although there were hints of potential weakness in Oracle's revenue growth, especially starting in mid-January 2001, there was no reliable information indicating that the company would fall short of the mark, and certainly not to the extent that it eventually did.

Notably, none of the many e-mails from various Oracle top executives in January 2001 regarding the quarter anticipated that the company would perform as it actually did. Although some of these e-mails noted weakening, all are generally consistent with the proposition that Oracle executives expected to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

achieve the guidance. At strongest, they (in the SLC's view) can be read as indicating some doubts and the possibility that the company would fall short of the mark by a small margin, rather than the large one that ultimately resulted. Furthermore, the SLC found that the plaintiffs' allegations regarding the problems with Suite 11i were overstated and that the market had been adequately apprised of the state of that product's performance. And, as of that quarter, most of Oracle's competitors were still meeting analysts' expectations, suggesting that Oracle's assumption that general economic weakening would not stymie its ability to increase revenues in 3Q FY 2001 was not an unreasonable one.

Important to this conclusion is the SLC's finding that Oracle's quarterly earnings are subject to a so-called "hockey stick effect," whereby a large portion of each quarter's earnings comes in right at the end of the quarter. In 3Q FY 2001, the late influx of revenues that had often characterized Oracle's performance during its emergence as one of the companies with the largest market capitalization in the nation did not materialize; indeed, a large amount of product was waiting in Oracle warehouses for shipment for deals that Oracle had anticipated closing but did not close during the quarter.

Thus, taking into account all the relevant information sources, the SLC concluded that even Ellison and Henley-who were obviously the two Trading Defendants with the most access to inside information-did not possess material, non-public information. As to Lucas and Boskin, the SLC noted that they did not receive the weekly updates (of various kinds) that allegedly showed a weakening in Oracle's performance during 3Q FY 2001. As a result, there was even less of a basis to infer wrongdoing on their part. FN13

> FN13. As part of its analysis, the SLC assumed that Lucas and Boskin possessed the same information base as Ellison and Henley-that of a hypothetical fully informed executive. Nonetheless, the Report also made specific findings as to Lucas and Boskin that emphasized that they were differently situated in terms of informational access.

In this same regard, the Report also noted that Oracle insiders felt especially confident about meeting 3Q FY 2001 guidance because the company closed a large transaction involving Covisint in December-a transaction that produced revenue giving the company a boost in meeting its guidance. Although the plaintiffs in this case argue that the Covisint transaction *927 was a unique deal that had its origins in earlier quarters when the economy was stronger and that masked a weakening in Oracle's then-current performance, the reality is that that the transaction was a real one of economic substance and that the revenue was properly accounted for in 3Q FY 2001. Combined with other indications that Oracle was on track to meet its guidance, the SLC concluded that the Covisint transaction supported their conclusion that the Trading Defendants did not possess material, non-public information contradicting the company's previous guidance. FN14

> FN14. The SLC also noted that the Trading Defendants had sold their shares during a permissible trading window under Oracle's internal policies. These policies generally discouraged trading in the last month of a quarter and channeled trading into periods after the market had absorbed SEC filings.

Moreover, as the SLC Report points out, the idea that the Trading Defendants acted with *scienter* in trading in January 2001 was problematic in light of several factors. Implicitly the first and foremost is the reality that Oracle is a functioning business with real products of value. Although it is plausible to imagine a scenario where someone of Ellison's wealth would cash out, fearing the imminent collapse of a house of cards he had sold to an unsuspecting market, this is not the situation that Ellison faced in January 2001.

As of that time, Oracle faced no collapse, even if it, like other companies, had to deal with a slowing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

economy. And, as the SLC points out, Ellison sold only two percent of his holdings. A good deal of these sales were related to options that he had held for over nine years and that had to be exercised by August 2001. FN15 In view of Oracle's basic health, Ellison's huge wealth, and his retention of ninety-eight percent of his shares, the SLC concluded that any inference that Ellison acted with *scienter* and attempted to reap improper trading profits was untenable.

> FN15. There was also evidence in the Report that Ellison's financial advisor had been hounding him for some time to sell some shares and to diversify. The taxes due on the expiring options were also large and provided a rationale for selling, as did Ellison's and his financial advisor's desire for Ellison to reduce some debt. Although these were motives for Ellison to obtain cash, the SLC concluded that Ellison had no compelling need for funds that supported an inference of *scienter*.

The same reasoning also motivated the SLC's conclusions as to Henley, who sold only seven percent of his stake in Oracle. Both Ellison and Henley stood to expose a great deal of their personal wealth to substantial risk by undertaking a scheme to cash out a small portion of their holdings and risking a greater injury to Oracle, a company in which they retained a far greater stake than they had sold. As important, these executives stood to risk their own personal reputations despite the absence of any personal cash crunch that impelled them to engage in risky, unethical, and illegal behavior. FN16

> FN16. As with Ellison, both Boskin and Lucas had cash needs, in their cases related to residences, but nothing in the record created by the SLC indicates any exigency.

Although Lucas and Boskin sold somewhat larger proportions of their Oracle holdings-sixteen percent and seventeen percent respectively-these proportions, the SLC concluded, were of the kind that federal courts had found lacking in suspicion. As with Ellison and Henley, the SLC identified no urgent need on either's part to generate cash by trading (illegally) on non-public, material information.

Of course, the amount of the proceeds each of the Trading Defendants generated was extremely large. By selling only two percent of his holdings, Ellison generated nearly a billion dollars, enough to flee to a *928 small island nation with no extradition laws and to live like a Saudi prince. But given Oracle's fundamental health as a company and his retention of ninety-eight percent of his shares, Ellison (the SLC found) had no need to take desperate-or, for that matter, even slightly risky-measures. The same goes for the other Trading Defendants; there was simply nothing special or urgent about their financial circumstances in January 2001 that would have motivated (or did motivate, in the SLC's view) the Trading Defendants to cash out because they believed that Oracle would miss its earnings guidance. And, of course, the SLC found that none of them possessed information that indicated that Oracle would, in fact, miss its mark for 3Q FY 2001.

For these and other reasons, the SLC concluded that the plaintiffs' allegations that the Trading Defendants had breached their fiduciary duty of loyalty by using inside information about Oracle to reap illicit trading gains were without merit. The SLC also determined that, consistent with this determination, there was no reason to sue the other members of the Oracle board who were in office as of 3Q FY 2001. Therefore, the SLC determined to seek dismissal of the Delaware Derivative Action and the other derivative actions.

II. *The SLC Moves to Terminate*

Consistent with its Report, the SLC moved to terminate this litigation. The plaintiffs were granted discovery focusing on three primary topics: the independence of the SLC, the good faith of its investigative efforts, and the reasonableness of the bases for its conclusion that the lawsuit should be terminated. Additionally, the plaintiffs received a large volume of documents comprising the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 11

824 A.2d 917
**(Cite as: 824 A.2d 917)**

materials that the SLC relied upon in preparing its Report.

### III. *The Applicable Procedural Standard*

[3] [4] In order to prevail on its motion to terminate the Delaware Derivative Action, the SLC must persuade me that: (1) its members were independent; (2) that they acted in good faith; and (3) that they had reasonable bases for their recommendations. FN17 If the SLC meets that burden, I am free to grant its motion or may, in my discretion, undertake my own examination of whether Oracle should terminate and permit the suit to proceed if I, in my oxymoronic judicial "business judgment," conclude that procession is in the best interests of the company. FN18 This two-step analysis comes, of course, from *Zapata*.

>   FN17. *Zapata v. Maldonado*, 430 A.2d 779, 788-89 (Del.1981) ; *Katell v. Morgan Stanley Group*, 1995 WL 376952, at *5 (Del.Ch. June 15, 1995).

>   FN18. *Zapata*, 430 A.2d at 789.

In that case, the Delaware Supreme Court also instructed this court to apply a procedural standard akin to a summary judgment inquiry when ruling on a special litigation committee's motion to terminate. In other words, the Oracle SLC here "should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that [it] is entitled to dismiss as a matter of law." FN19 Candidly, this articulation of a special litigation committee's burden is an odd one, insofar as it applies a procedural standard designed for a particular purpose-the substantive dismissal of a case-with a standard centered on the determination of when a corporate committee's business decision about claims belonging to the corporation should be accepted by the court.

>   FN19. *See id.* at 788.

[5] As I understand it, this standard requires me to determine whether, on the *929 basis of the undisputed factual record, I am convinced that the SLC was independent, acted in good faith, and had a reasonable basis for its recommendation. If there is a material factual question about these issues causing doubt about any of these grounds, I read *Zapata* and its progeny as requiring a denial of the SLC's motion to terminate. FN20

>   FN20. *See Lewis v. Fuqua*, 502 A.2d 962, 966 (Del.Ch.1985) ; *Kaplan v. Wyatt*, 484 A.2d 501, 506-08 (Del.Ch.1984), *aff'd*, 499 A.2d 1184 (Del.1985). Importantly, the granting of the SLC's motion using the Rule 56 standard does not mean that the court has made a determination that the claims the SLC wants dismissed would be subject to termination on a summary judgment motion, only that the court is satisfied that there is no material factual dispute that the SLC had a reasonable basis for its decision to seek termination. *See Kaplan v. Wyatt*, 484 A.2d 501, 519 (Del.Ch.1984) ("[I]t is the Special Litigation Committee which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action."), *aff'd*, 499 A.2d 1184 (Del.1985).

In this case, the plaintiffs principally challenge the SLC's independence and the reasonableness of its recommendation. For reasons I next explain, I need examine only the more difficult question, which relates to the SLC's independence.

### IV. *Is the SLC Independent?*

#### A. *The Facts Disclosed in the Report*

In its Report, the SLC took the position that its members were independent. In support of that position, the Report noted several factors including:
• the fact that neither Grundfest nor Garcia-Molina received compensation from Oracle other than as directors;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

- the fact that neither Grundfest nor Garcia-Molina were on the Oracle board at the time of the alleged wrongdoing;
- the fact that both Grundfest and Garcia-Molina were willing to return their compensation as SLC members if necessary to preserve their status as independent;
- the absence of any other material ties between Oracle, the Trading Defendants, and any of the other defendants, on the one hand, and Grundfest and Garcia-Molina, on the other; and
- the absence of any material ties between Oracle, the Trading Defendants, and any of the other defendants, on the one hand, and the SLC's advisors, on the other.

Noticeably absent from the SLC Report was any disclosure of several significant ties between Oracle or the Trading Defendants and Stanford University, the university that employs both members of the SLC. In the Report, it was only disclosed that:
- defendant Boskin was a Stanford professor;
- the SLC members were aware that Lucas had made certain donations to Stanford; and
- among the contributions was a donation of $50,000 worth of stock that Lucas donated to Stanford Law School after Grundfest delivered a speech to a venture capital fund meeting in response to Lucas's request. It happens that Lucas's son is a partner in the fund and that approximately half the donation was allocated for use by Grundfest in his personal research.

### B. The "Stanford" Facts that Emerged During Discovery

In view of the modesty of these disclosed ties, it was with some shock that a series of other ties among Stanford, Oracle, and the Trading Defendants emerged during discovery. Although the plaintiffs have embellished these ties considerably *930 beyond what is reasonable, the plain facts are a striking departure from the picture presented in the Report.

Before discussing these facts, I begin with certain features of the record-as I read it-that are favorable to the SLC. Initially, I am satisfied that neither of the SLC members is compromised by a fear that support for the procession of this suit would endanger his ability to make a nice living. Both of the SLC members are distinguished in their fields and highly respected. Both have tenure, which could not have been stripped from them for making a determination that this lawsuit should proceed.

Nor have the plaintiffs developed evidence that either Grundfest or Garcia-Molina have fundraising responsibilities at Stanford. Although Garcia-Molina is a department chairman, the record is devoid of any indication that he is required to generate contributions. And even though Grundfest heads up Stanford's Directors' College, the plaintiffs have not argued that he has a fundraising role in that regard. For this reason, it is important to acknowledge up front that the SLC members occupy positions within the Stanford community different from that of the University's President, deans, and development professionals, all of whom, it can be reasonably assumed, are required to engage heavily in the pursuit of contributions to the University.

This is an important point of departure for discussing the multitude of ties that have emerged among the Trading Defendants, Oracle, and Stanford during discovery in this case. In evaluating these ties, the court is not faced with the relatively easier call of considering whether these ties would call into question the impartiality of an SLC member who was a key fundraiser at Stanford FN21 or who was an untenured faculty member subject to removal without cause. Instead, one must acknowledge that the question is whether the ties I am about to identify would be of a material concern to two distinguished, tenured faculty members whose current jobs would not be threatened by whatever good faith decision they made as SLC members.

FN21. *Compare In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *6-*7 (Del.Ch. Mar. 27, 2002) (concluding that a university president who had solicited a $25 million contribution from a corporation's President, Chairman, and

CEO was not independent of that corporate official in light of the sense of "owingness" that the university president might harbor with respect to the corporate official), *and Lewis v. Fuqua,* 502 A.2d 962, 966-67 (Del.Ch.1985) (finding that a special litigation committee member was not independent where the committee member was also the president of a university that received a $10 million charitable pledge from the corporation's CEO and the CEO was a trustee of the university), *with In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 359 (Del.Ch.1998) (deciding that the plaintiffs had not created reasonable doubt as to a director's independence where a corporation's Chairman and CEO had given over $1 million in donations to the university at which the director was the university president and from which one of the CEO's sons had graduated), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

With this question in mind, I begin to discuss the specific ties that allegedly compromise the SLC's independence, beginning with those involving Professor Boskin.

### 1. *Boskin*

Defendant Michael J. Boskin is the T.M. Friedman Professor of Economics at Stanford University. During the Administration of President George H.W. Bush, Boskin occupied the coveted and important position of Chairman of the President's Council of Economic Advisors. He returned to Stanford after this government *931 service, continuing a teaching career there that had begun many years earlier.

During the 1970s, Boskin taught Grundfest when Grundfest was a Ph.D. candidate. Although Boskin was not Grundfest's advisor and although they do not socialize, the two have remained in contact over the years, speaking occasionally about matters of public policy.

Furthermore, both Boskin and Grundfest are senior fellows and steering committee members at the Stanford Institute for Economic Policy Research, which was previously defined as "SIEPR." According to the SLC, the title of senior fellow is largely an honorary one. According to SIEPR's own web site, however, "[s]enior fellows actively participate in SIEPR research and participate in its governance." FN22

> FN22. Stanford Institute for Economic Policy Research, *SIEPR Staff and Researchers: Senior Fellows* (last visited June 4, 2003), *at* http://siepr.stanford.edu/people/srfellows.html.

Likewise, the SLC contends that Grundfest went MIA as a steering committee member, having failed to attend a meeting since 1997. The SIEPR web site, however, identifies its steering committee as having the role of "advising the director [of SIEPR] and guiding [SIEPR] on matters pertaining to research and academics." FN23 Because Grundfest allegedly did not attend to these duties, his service alongside Boskin in that capacity is, the SLC contends, not relevant to his independence.

> FN23. Stanford Institute for Economic Policy Research, *Insider SIEPR: Steering Committee* (last visited June 4, 2003), *at* http://siepr.stanford.edu/about/steering.html.

That said, the SLC does not deny that both Boskin and Grundfest publish working papers under the SIEPR rubric and that SIEPR helps to publicize their respective works. Indeed, as I will note later in this opinion, Grundfest, in the same month the SLC was formed, addressed a meeting of some of SIEPR's largest benefactors-the so-called "SIEPR Associates." The SLC just claims that the SIEPR affiliation is one in which SIEPR basks in the glow of Boskin and Grundfest, not the other way around, and that the mutual service of the two as senior fellows and steering committee members is not a collegial tie of any significance.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 14

824 A.2d 917
**(Cite as: 824 A.2d 917)**

With these facts in mind, I now set forth the ties that defendant Lucas has to Stanford.

### 2. *Lucas*

As noted in the SLC Report, the SLC members admitted knowing that Lucas was a contributor to Stanford. They also acknowledged that he had donated $50,000 to Stanford Law School in appreciation for Grundfest having given a speech at his request. About half of the proceeds were allocated for use by Grundfest in his research.

But Lucas's ties with Stanford are far, far richer than the SLC Report lets on. To begin, Lucas is a Stanford alumnus, having obtained both his undergraduate and graduate degrees there. By any measure, he has been a very loyal alumnus.

In showing that this is so, I start with a matter of some jousting between the SLC and the plaintiffs. Lucas's brother, Richard, died of cancer and by way of his will established a foundation. Lucas became Chairman of the Foundation and serves as a director along with his son, a couple of other family members, and some non-family members. A principal object of the Foundation's beneficence has been Stanford. The Richard M. Lucas Foundation has given $11.7 million to Stanford since its 1981 founding. Among its notable contributions, the Foundation funded the establishment of the Richard M. Lucas Center*932 for Magnetic Resonance Spectroscopy and Imaging at Stanford's Medical School. Donald Lucas was a founding member and lead director of the Center.

The SLC Report did not mention the Richard M. Lucas Foundation or its grants to Stanford. In its briefs on this motion, the SLC has pointed out that Donald Lucas is one of nine directors at the Foundation and does not serve on its Grant Review Committee. Nonetheless, the SLC does not deny that Lucas is Chairman of the board of the Foundation and that the board approves all grants.

Lucas's connections with Stanford as a contributor go beyond the Foundation, however. From his own personal funds, Lucas has contributed $4.1 million to Stanford, a substantial percentage of which has been donated within the last half-decade. Notably, Lucas has, among other things, donated $424,000 to SIEPR and approximately $149,000 to Stanford Law School. Indeed, Lucas is not only a major contributor to SIEPR, he is the Chair of its Advisory Board. At SIEPR's facility at Stanford, the conference center is named the Donald L. Lucas Conference Center.

From these undisputed facts, it is inarguable that Lucas is a very important alumnus of Stanford and a generous contributor to not one, but two, parts of Stanford important to Grundfest: the Law School and SIEPR.

With these facts in mind, it remains to enrich the factual stew further, by considering defendant Ellison's ties to Stanford.

### 3. *Ellison*

There can be little doubt that Ellison is a major figure in the community in which Stanford is located. The so-called Silicon Valley has generated many success stories, among the greatest of which is that of Oracle and its leader, Ellison. One of the wealthiest men in America, Ellison is a major figure in the nation's increasingly important information technology industry. Given his wealth, Ellison is also in a position to make-and, in fact, he has made-major charitable contributions.

Some of the largest of these contributions have been made through the Ellison Medical Foundation, which makes grants to universities and laboratories to support biomedical research relating to aging and infectious diseases. Ellison is the sole director of the Foundation. Although he does not serve on the Foundation's Scientific Advisory Board that sifts through grant applications, he has reserved the right-as the Foundation's sole director-to veto any grants, a power he has not yet used but which he felt it important to retain. The Scientific Advisory Board is comprised of distinguished physicians and scientists from many institutions, but not including Stanford.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.