824 A.2d 917

824 A.2d 917
**(Cite as: 824 A.2d 917)**

Page 15

Although it is not represented on the Scientific Advisory Board, Stanford has nonetheless been the beneficiary of grants from the Ellison Medical Foundation-to the tune of nearly $10 million in paid or pledged funds. Although the Executive Director of the Foundation asserts by way of an affidavit that the grants are awarded to specific researchers and may be taken to another institution if the researcher leaves, FN24 the grants are conveyed under contracts between the Foundation and Stanford itself and purport by their terms to give Stanford the right (subject to Foundation approval) to select a substitute principal investigator if the original one becomes unavailable. FN25

> FN24. *See* Sprott Aff. ¶¶ 7-8.
>
> FN25. *See, e.g.,* Pls.' Ex. H, at DID 000035-DID 000036 (stating that if any of the principal researchers are unable to carry out funded project, Stanford may nominate a replacement researcher, subject to the approval of the Foundation).

*933 During the time Ellison has been CEO of Oracle, the company itself has also made over $300,000 in donations to Stanford. Not only that, when Oracle established a generously endowed educational foundation-the Oracle Help Us Help Foundation-to help further the deployment of educational technology in schools serving disadvantaged populations, it named Stanford as the "appointing authority," which gave Stanford the right to name four of the Foundation's seven directors. FN26 Stanford's acceptance reflects the obvious synergistic benefits that might flow to, for example, its School of Education from the University's involvement in such a foundation, as well as the possibility that its help with the Foundation might redound to the University's benefit when it came time for Oracle to consider making further donations to institutions of higher learning.

> FN26. The other three directors are named by Oracle. *See* Help Us Help Foundation, *About Us* (last visited June 5, 2003), *at* http://www.helpushelp.org/pages/AboutUs.html#board.

Taken together, these facts suggest that Ellison (when considered as an individual and as the key executive and major stockholder of Oracle) had, at the very least, been involved in several endeavors of value to Stanford.

Beginning in the year 2000 and continuing well into 2001-the same year that Ellison made the trades the plaintiffs contend were suspicious and the same year the SLC members were asked to join the Oracle board-Ellison and Stanford discussed a much more lucrative donation. The idea Stanford proposed for discussion was the creation of an Ellison Scholars Program modeled on the Rhodes Scholarship at Oxford. The proposed budget for Stanford's answer to Oxford: $170 million. The Ellison Scholars were to be drawn from around the world and were to come to Stanford to take a two-year interdisciplinary graduate program in economics, political science, and computer technology. During the summer between the two academic years, participants would work in internships at, among other companies, Oracle.

The omnipresent SIEPR was at the center of this proposal, which was put together by John Shoven, the Director of SIEPR. Ellison had serious discussions and contact with SIEPR around the time Shoven's proposal first surfaced. FN27 Indeed, in February 2001, Ellison delivered a speech at SIEPR-at which he was introduced by defendant Lucas. In a CD-ROM that contains images from the speech, Shoven's voice-over touts SIEPR's connections with "some of the most powerful and prominent business leaders." FN28

> FN27. Shovan's proposal for the Ellison Scholars Program was dated October 2000. *See* Pls.' Ex. H, at DID 0000181.
>
> FN28. CD-ROM: SIEPR (on file as Weiser Aff. Ex. 2); *see also* SLC's Supplemental Br. at 5 (identifying the CD-ROM's video clip as that of a speech

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

given by Ellison at SIEPR in February 2001).

As part of his proposal for the Ellison Scholars Program, Shoven suggested that three of the four Trading Defendants-Ellison, Lucas, and Boskin-be on the Program board. In the hypothetical curriculum that Shoven presented to Ellison, he included a course entitled "Legal Institutions and the Modern Economy" to be taught by Grundfest. Importantly, the Shoven proposal included a disclaimer indicating that listed faculty members may not have been consulted, and Grundfest denies that he was. The circumstances as a whole make that denial credible, although there is one confounding factor.

*934 Lucas, who was active in encouraging Ellison to form a program of this kind at Stanford, testified at his deposition that he had spoken to Grundfest about the proposed Ellison Scholars Program "a number of years ago," FN29 Lucas seems to recall having asked Grundfest if he would be involved with the yet-to-be created Program, but his memory was, at best, hazy. At his own deposition, Grundfest was confronted more generically with whether he had heard of the Program and had agreed to teach in it if it was created, but not with whether he had discussed the topic with Lucas. FN30

> FN29. Lucas Dep. at 25.

> FN30. *See* Grundfest Dep. at 517-18.

Candidly, this sort of discrepancy is not easy to reconcile on a paper record. My conclusion, however, is that Grundfest is being truthful in stating that he had not participated in shaping the Shoven proposal, had not agreed to teach in the Program, and could not recall participating in any discussions about the Program.

That said, I am not confident that Grundfest was entirely unaware, in 2001 and/or 2002 of the possibility of such a program or that he did not have a brief conversation with Lucas about it before joining the Oracle board. Nor am I convinced that the discussions about the Ellison Scholars Program were not of a very serious nature, indeed, the record evidence persuades me that they were serious. To find otherwise would be to conclude that Ellison is a man of more than ordinary whimsy, who says noteworthy things without caring whether they are true.

I say that because Ellison spoke to two of the nation's leading news outlets about the possibility of creating the Ellison Scholars Program. According to the *Wall Street Journal*, Ellison was considering the possibility of donating $150 million to either Harvard or Stanford for the purpose of creating an interdisciplinary (political science, economics, and technology) academic program. FN31 And, according to *Fortune*, Ellison said in an interview with *Fortune* correspondent Brent Schlender: "[O]ne of the other philanthropic things I'm doing is talking to Harvard and Stanford and MIT about creating a research program that looks at how technology impacts [sic] economics, and in turn how economics impacts the way we govern ourselves." FN32 It is significant that the latter article was published in mid-August 2001-around the same time that the SLC members were considering whether to join the Oracle board and within a calendar year of the formation of the SLC itself. Importantly, these public statements supplement other private communications by Stanford officials treating the Ellison Scholars Program as an idea under serious consideration by Ellison.

> FN31. *See* David Bank, *Oracle CEO Ellison Will Decide Which School Gets Millions, Wall St. J.*, June 11, 2001, available at 2001 WL-WSJ 2866209 (" Mr. Ellison, chairman and chief executive officer of Oracle Corp., said he is deciding between Harvard University and Stanford University as the site for an interdisciplinary center he has dubbed PET, for politics, economics and technology.").

> FN32. Brent Schlender, *Larry Ellison: The Playboy Philanthropist, Fortune,* Aug.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 17

824 A.2d 917
**(Cite as: 824 A.2d 917)**

13, 2001, *available at* http://www.fortune.com/fortune/print/0,15935,370710,00.html.

Ultimately, it appears that Ellison decided to abandon the idea of making a major donation on the Rhodes Scholarship model to Stanford or any other institution. At least, that is what he now says by affidavit. According to Shoven of SIEPR, the Ellison Scholars Program idea is going nowhere now, and all talks with Ellison have ceased on that front.

Given the nature of this case, it is natural that there must be yet another curious *935 fact to add to the mix. This is that Ellison told the *Washington Post* in an October 30, 2000 article that he intended to leave his Woodside, California home-which is worth over $100 million-to Stanford upon his death. FN33 In an affidavit, Ellison does not deny making this rather splashy public statement. But, he now (again, rather conveniently) says that he has changed his testamentary intent. Ellison denies having "bequeathed, donated or otherwise conveyed the Woodside property (or any other real property that I own) to Stanford University." FN34 And, in the same affidavit, Ellison states unequivocally that he has no intention of ever giving his Woodside compound (or any other real property) to Stanford. FN35 Shortly before his deposition in this case, Grundfest asked Ellison about the Woodside property and certain news reports to the effect that he was planning to give it to Stanford. According to Grundfest, Ellison's reaction to his inquiry was one of "surprise." FN36 Ellison admitted to Grundfest that he said something of that sort, but contended that whatever he said was merely a "passing" comment. FN37 Plus, Ellison said, Stanford would, of course, not want his $100 million home unless it came with a "dowry"-*i.e.*, an endowment to support what is sure to be a costly maintenance budget. FN38 Stanford's Vice President for Development, John Ford, claimed that to the best of his knowledge Ellison had not promised anyone at Stanford that he would give Stanford his Woodside home. FN39

FN33. *See* Mark Leibovich, *The Outsider,*

*His Business and His Billions,* Wash. Post, Oct. 30, 2000, *available at* 2000 WL 25425247.

FN34. Ellison Aff. ¶ 15.

FN35. *See id.*

FN36. *See* Grundfest Dep. at 520.

FN37. *See id.*

FN38. *See id.* at 520-21.

FN39. *See* Ford Aff. ¶ 9.

In order to buttress the argument that Stanford did not feel beholden to him, Ellison shared with the court the (otherwise private) fact that one of his children had applied to Stanford in October 2000 and was not admitted. FN40 If Stanford felt comfortable rejecting Ellison's child, the SLC contends, why should the SLC members hesitate before recommending that Oracle press insider trading-based fiduciary duty claims against Ellison? FN41

FN40. I mention this fact only with the greatest of reluctance. Ellison and the SLC injected this into the record, despite the fact that Stanford itself would have been legally prohibited from disclosing it. Because it is an argument advanced by the SLC, I must address it, although that necessarily furthers the intrusion on the privacy of Ellison's child.

FN41. *See* SLC's Reply Br. at 31-32.

But the fact remains that Ellison was still talking very publicly and seriously about the possibility of endowing a graduate interdisciplinary studies program at Stanford during the summer *after* his child was rejected from Stanford's undergraduate program. FN42

FN42. *See* David Bank, *Oracle CEO*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 18

824 A.2d 917
**(Cite as: 824 A.2d 917)**

*Ellison Will Decide Which School Gets Millions, Wall St. J.,* June 11, 2001, *available at* 2001 WL-WSJ 2866209; Brent Schlender, *Larry Ellison: The Playboy Philanthropist, Fortune,* Aug. 13, 2001, *available at* http://www.fortune.com/fortune/print/0,15935,370710,00.html.

### C. *The SLC's Argument*

The SLC contends that even together, these facts regarding the ties among Oracle, the Trading Defendants, Stanford, and the SLC members do not impair the SLC's independence. In so arguing, the SLC places great weight on the fact that none *936 of the Trading Defendants have the practical ability to deprive either Grundfest or Garcia-Molina of their current positions at Stanford. Nor, given their tenure, does Stanford itself have any practical ability to punish them for taking action adverse to Boskin, Lucas, or Ellison-each of whom, as we have seen, has contributed (in one way or another) great value to Stanford as an institution. As important, neither Garcia-Molina nor Grundfest are part of the official fundraising apparatus at Stanford; thus, it is not their on-the-job duty to be solicitous of contributors, and fundraising success does not factor into their treatment as professors.

In so arguing, the SLC focuses on the language of previous opinions of this court and the Delaware Supreme Court that indicates that a director is not independent only if he is dominated and controlled by an interested party, such as a Trading Defendant. FN43 The SLC also emphasizes that much of our jurisprudence on independence focuses on economically consequential relationships between the allegedly interested party and the directors who allegedly cannot act independently of that director.

Put another way, much of our law focuses the bias inquiry on whether there are economically material ties between the interested party and the director whose impartiality is questioned, treating the possible effect on one's personal wealth as the key to the independence inquiry. Putting a point on this, the SLC cites certain decisions of Delaware courts concluding that directors who are personal friends of an interested party were not, by virtue of those personal ties, to be labeled non-independent. FN44

FN43. *E.g., In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 355.

FN44. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 WL 1481002, at *11 (Del.Ch. Sept. 29, 2000) (stating that an allegation of a fifteen-year professional and personal relationship between a CEO and a director does not, in itself, raise a reasonable doubt about the director's independence); *In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 354 n. 18 ("Demand is not excused, however, just because directors would have to sue 'their family, friends and business associates.' " (quoting *Abrams v. Koether,* 766 F.Supp. 237, 256 (D.N.J.1991)).

More subtly, the SLC argues that university professors simply are not inhibited types, unwilling to make tough decisions even as to fellow professors and large contributors. What is tenure about if not to provide professors with intellectual freedom, even in non-traditional roles such as special litigation committee members? No less ardently-but with no record evidence that reliably supports its ultimate point-the SLC contends that Garcia-Molina and Grundfest are extremely distinguished in their fields and were not, in fact, influenced by the facts identified heretofore. Indeed, the SLC argues, how could they have been influenced by many of these facts when they did not learn them until the post-Report discovery process? If it boils down to the simple fact that both share with Boskin the status of a Stanford professor, how material can this be when there are 1,700 others who also occupy the same position?

### D. *The Plaintiffs' Arguments*

The plaintiffs confronted these arguments with less nuance than was helpful. Rather than rest their case on the multiple facts I have described, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs chose to emphasize barely plausible constructions of the evidence, such as that Grundfest was lying when he could not recall being asked to participate in the Ellison Scholars Program. From these more extreme arguments, however, one can distill a reasoned core that emphasizes what academics might call the " thickness" of the social and institutional connections among *937 Oracle, the Trading Defendants, Stanford, and the SLC members. These connections, the plaintiffs argue, were very hard to miss-being obvious to anyone who entered the SIEPR facility, to anyone who read the *Wall Street Journal, Fortune,* or the *Washington Post,* and especially to Stanford faculty members interested in their own university community and with a special interest in Oracle. Taken in their totality, the plaintiffs contend, these connections simply constitute too great a bias-producing factor for the SLC to meet its burden to prove its independence.

Even more, the plaintiffs argue that the SLC's failure to identify many of these connections in its Report is not an asset proving its independence, but instead a fundamental flaw in the Report itself, which is the document in which the SLC is supposed to demonstrate its own independence and the reasonableness of its investigation. By failing to focus on these connections when they were obviously discoverable and when it is, at best, difficult for the court to believe that at least some of them were not known by the SLC-*e.g.*, Boskin's role at SIEPR and the fact that the SIEPR Conference Center was named after Lucas-the SLC calls into doubt not only its independence, but its competence. If it could not ferret out these things, by what right should the court trust its investigative acumen?

In support of its argument, the plaintiffs note that the Delaware courts have adopted a flexible, fact-based approach to the determination of directorial independence. This test focuses on whether the directors, for any substantial reason, cannot act with only the best interests of the corporation in mind, and not just on whether the directors face pecuniary damage for acting in a particular way.

E. *The Court's Analysis of the SLC's Independence*

Having framed the competing views of the parties, it is now time to decide.

I begin with an important reminder: the SLC bears the burden of proving its independence. It must convince me.

[6] But of what? According to the SLC, its members are independent unless they are essentially subservient to the Trading Defendants-*i.e.*, they are under the "domination and control" of the interested parties. FN45 If the SLC is correct and this is the central inquiry in the independence determination, they would win. Nothing in the record suggests to me that either Garcia-Molina or Grundfest are dominated and controlled by any of the Trading Defendants, by Oracle, or even by Stanford. FN46

> FN45. *See, e.g., In re Walt Disney Co. Derivative Litig.*, 731 A.2d at 355.
>
> FN46. This is not to say that the facts could not be simply read as providing a basis for a professor interested in promotion within the University to be less than aggressive as an SLC member. Even tenured professors and department chairs sometimes seek different chairs, duties, or even to climb to positions like Provost, which chart the path towards a university presidency. I do not consider this factor to be of weight here, however, but note it.

But, in my view, an emphasis on "domination and control" would serve only to fetishize much-parroted language, at the cost of denuding the independence inquiry of its intellectual integrity. Take an easy example. Imagine if two brothers were on a corporate board, each successful in different businesses and not dependent in any way on the other's beneficence in order to be wealthy. The brothers are brothers, they stay in touch and consider each other family, but each is opinionated and strong-willed. A derivative action is filed targeting a transaction involving one of the brothers. The other brother is put *938 on a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

special litigation committee to investigate the case. If the test is domination and control, then one brother could investigate the other. Does any sensible person think that is our law? I do not think it is.

And it should not be our law. Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. *Homo sapiens* is not merely *homo economicus*. We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among us who direct their behavior as best they can on a guiding creed or set of moral values. FN47

> FN47. In an interesting work, Professor Lynn Stout has argued that there exists an empirical basis to infer that corporate directors are likely to be motivated by altruistic impulses and not simply by a concern for their own pocketbooks. *See* Lynn A. Stout, *In Praise of Procedure: An Economic and Behavioral Defense of Smith v. VanGorkom and the Business Judgment Rule*, 96 Nw. U.L.Rev. 675, 677-78 (2002).

Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation. FN48 Some things are "just not done," or only at a cost, which might not be so severe as a loss of position, but may involve a loss of standing in the institution. In being appropriately sensitive to this factor, our law also cannot assume-absent some proof of the point-that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk.

> FN48. *See, e.g.,* Margaret M. Blair & Lynn A. Stout, *Trust, Trustworthiness, and the Behavioral Foundations of Corporate Law*, 149 U. Pa. L.Rev. 1735, 1780 (2001) ("[T]here is reason to believe that trust may pay an important role in the success of many business firms."); Edward B. Rock & Michael L. Wachter, *Islands of Conscious Power: Laws, Norms, and the Self-Governing Corporation*, 149 U. Pa. L.Rev. 1619, 1640 (2001) ("[T]he myriad transactions that take place inside the firm are largely (but not entirely) protected by a ... governance mechanism ... that is almost entirely not legally enforceable.").

For all these reasons, this court has previously held that the Delaware Supreme Court's teachings on independence can be summarized thusly:
> At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity. FN49

> FN49. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del.Ch.2001) (footnotes omitted) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del.2002), *cert. denied*, 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003).

[7] This formulation is wholly consistent with the teaching of *Aronson*, which defines independence as meaning that "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." FN50 As noted by Chancellor Chandler recently, a director may be compromised if he is beholden to an interested person. FN51 Beholden in this sense does not *939 mean just owing in the financial sense, it can also flow out of "personal or other relationships" to the interested party. FN52

> FN50. *Aronson v. Lewis*, 473 A.2d 805,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

816 (Del.1984).

FN51. *See Orman v. Cullman,* 794 A.2d 5, 24 (Del.Ch.2002).

FN52. *See id.* at 24 n. 47 (citing *Aronson,* 473 A.2d at 815); *see also Parfi Holding,* 794 A.2d at 1232 n. 55 (citing definitions of beholden as meaning "[o]wing something ... to another" and "under obligation").

Without backtracking from these general propositions, it would be less than candid if I did not admit that Delaware courts have applied these general standards in a manner that has been less than wholly consistent. Different decisions take a different view about the bias-producing potential of family relationships, not all of which can be explained by mere degrees of consanguinity. FN53 Likewise, there is admittedly case law that gives little weight to ties of friendship in the independence inquiry. FN54 In this opinion, I will not venture to do what I believe to be impossible: attempt to rationalize all these cases in their specifics. FN55 Rather, I undertake what I understand to be my duty and what is possible: the application of the independence inquiry that our Supreme Court has articulated in a manner that is faithful to its essential spirit.

FN53. *Compare Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) (CEO's brother-in-law could not impartially consider demand to sue him), *and Mizel v. Connelly,* 1999 WL 550369, at *4 (Del.Ch. Aug. 2, 1999) (grandson could not impartially determine whether company should accept demand that required company to sue his grandfather for rescission of an interested transaction), *with Seibert v. Harper & Row, Publishers, Inc.,* 1984 WL 21874, at *3 (Del.Ch. Dec. 5, 1984) (a director was not disabled from considering a demand where the director's cousin was a fellow director and a corporate manager).

FN54. *E.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 WL 1481002, at *11-*12 (Del.Ch. Sept. 29, 2000).

FN55. I readily concede that the result I reach is in tension with the specific outcomes of certain other decisions. But I do not believe that the result I reach applies a new definition of independence; rather, it recognizes the importance (*i.e.,* the materiality) of other bias-creating factors other than fear that acting a certain way will invite economic retribution by the interested directors.

### 1. *The Contextual Nature of the Independence Inquiry Under Delaware Law*

In examining whether the SLC has met its burden to demonstrate that there is no material dispute of fact regarding its independence, the court must bear in mind the function of special litigation committees under our jurisprudence. Under Delaware law, the primary means by which corporate defendants may obtain a dismissal of a derivative suit is by showing that the plaintiffs have not met their pleading burden under the test of *Aronson v. Lewis,* FN56 or the related standard set forth in *Rales v. Blasband.* FN57 In simple terms, these tests permit a corporation to terminate a derivative suit if its board is comprised of directors who can impartially consider a demand. FN58

FN56. 473 A.2d 805 (Del.1984).

FN57. 634 A.2d 927 (Del.1993).

FN58. This is a simplified formulation of a more complex inquiry. One way for a plaintiff to impugn the impartiality of the board is to plead particularized facts creating a reasonable doubt that the board complied with its fiduciary duties. In that circumstance, the danger is that the board might be influenced by its desire to avoid personal liability in a lawsuit in which the plaintiffs have stated a claim under a heightened pleading burden. For a more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917                                                                                                                Page 22
824 A.2d 917
**(Cite as: 824 A.2d 917)**

thorough discussion of *Aronson* and *Rales*, see *Guttman v. Huang*, 823 A.2d 492 (Del.Ch.2003).

Special litigation committees are permitted as a last chance for a corporation to control a derivative claim in circumstances when a majority of its directors cannot *940 impartially consider a demand. By vesting the power of the board to determine what to do with the suit in a committee of independent directors, a corporation may retain control over whether the suit will proceed, so long as the committee meets the standard set forth in *Zapata*.

In evaluating the independence of a special litigation committee, this court must take into account the extraordinary importance and difficulty of such a committee's responsibility. It is, I daresay, easier to say no to a friend, relative, colleague, or boss who seeks assent for an act (*e.g.*, a transaction) that has not yet occurred than it would be to cause a corporation to sue that person. This is admittedly a determination of so-called "legislative fact," but one that can be rather safely made. FN59 Denying a fellow director the ability to proceed on a matter important to him may not be easy, but it must, as a general matter, be less difficult than finding that there is reason to believe that the fellow director has committed serious wrongdoing and that a derivative suit should proceed against him. FN60

FN59. *See* Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L.Rev. 364, 402-03 (1942); Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502-03 (2002).

FN60. The parties have not cited empirical social science research bearing on any of the factual inferences about human behavior within institutional settings upon which a ruling on this motion, one way or the other, necessarily depends.

The difficulty of making this decision is compounded in the special litigation committee context because the weight of making the moral judgment necessarily falls on less than the full board. A small number of directors feels the moral gravity-and social pressures-of this duty alone.

For all these reasons, the independence inquiry is critically important if the special litigation committee process is to retain its integrity, a quality that is, in turn, essential to the utility of that process. As this Court wrote recently:

> One of the obvious purposes for forming a special litigation committee is to promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors. By forming a committee whose fairness and objectivity cannot be reasonably questioned ... the company can assuage concern among its stockholders and retain, through the SLC, control over any claims belonging to the company itself.
> * * *
> *Zapata* presents an opportunity for a board that cannot act impartially as a whole to vest control of derivative litigation in a trustworthy committee of the board-*i.e.*, one that is not compromised in its ability to act impartially. The composition and conduct of a special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity. FN61

FN61. *Biondi v. Scrushy*, 820 A.2d 1148, 1156 & 1166 (Del.Ch.2003).

[8] Thus, in assessing the independence of the Oracle SLC, I necessarily examine the question of whether the SLC can independently make the difficult decision entrusted to it: to determine whether the Trading Defendants should face suit for insider trading-based allegations of breach of fiduciary duty. An affirmative answer by the SLC to that question would have potentially huge negative consequences*941 for the Trading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 23

824 A.2d 917
**(Cite as: 824 A.2d 917)**

Defendants, not only by exposing them to the possibility of a large damage award but also by subjecting them to great reputational harm. To have Professors Grundfest and Garcia-Molina declare that Oracle should press insider trading claims against the Trading Defendants would have been, to put it mildly, "news." Relatedly, it is reasonable to think that an SLC determination that the Trading Defendants had likely engaged in insider trading would have been accompanied by a recommendation that they step down as fiduciaries until their ultimate culpability was decided.

The importance and special sensitivity of the SLC's task is also relevant for another obvious reason: investigations do not follow a scientific process like an old-fashioned assembly line. The investigators' mindset and talent influence, for good or ill, the course of an investigation. Just as there are obvious dangers from investigators suffering from too much zeal, so too are dangers posed by investigators who harbor reasons not to pursue the investigation's targets with full vigor.

The nature of the investigation is important, too. Here, for example, the SLC was required to undertake an investigation that could not avoid a consideration of the subjective state of mind of the Trading Defendants. Their credibility was important, and the SLC could not escape making judgments about that, no matter how objective the criteria the SLC attempted to use.

Therefore, I necessarily measure the SLC's independence contextually, and my ruling confronts the SLC's ability to decide impartially whether the Trading Defendants should be pursued for insider trading. This contextual approach is a strength of our law, as even the best minds have yet to devise across-the-board definitions that capture all the circumstances in which the independence of directors might reasonably be questioned. By taking into account all circumstances, the Delaware approach undoubtedly results in some level of indeterminacy, but with the compensating benefit that independence determinations are tailored to the precise situation at issue. FN62

FN62. The recent reforms enacted by Congress and by the stock exchanges reflect a narrower conception of who they believe can be an independent director. These definitions, however, are blanket labels that do not take into account the decision at issue. Nonetheless, the definitions recognize that factors other than the ones explicitly identified in the new exchange rules might compromise a director's independence, depending on the circumstances. *See* Self-Regulatory Organizations; Notice of Filing of Proposed Rule Change and Amendment No. 1 Thereto by the New York Stock Exchange, Inc. Relating to Corporate Governance, 68 Fed.Reg. 19,051, 19,053 (Apr. 17, 2003) ("It is not possible to anticipate, or explicitly provide for, all circumstances that might signal potential conflicts of interest, or that might bear on the materiality of a director's relationship to a listed company. Accordingly, it is best that boards making 'independence' determinations broadly consider all relevant facts and circumstances. In particular, when assessing the materiality of a director's relationship with the company, the board should consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation. Material relationships can include commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships, among others." ); Self-Regulatory Organizations; Notice of Filing of Proposed Rule Change and Amendment No. 1 Thereto by the National Association of Securities Dealers, Inc. Relating to Proposed Amendments to NASD Rules 4200 and 4350 Regarding Board Independence and Independent Committees, 68 Fed.Reg. 14,451, 14,452 (Mar. 25, 2003) (" 'Independent director' means a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship, which, in the opinion of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.").

**\*942** Likewise, Delaware law requires courts to consider the independence of directors based on the facts known to the court about them specifically, the so-called "subjective 'actual person' standard." FN63 That said, it is inescapable that a court must often apply to the known facts about a specific director a consideration of how a reasonable person similarly situated to that director would behave, given the limited ability of a judge to look into a particular director's heart and mind. This is especially so when a special litigation committee chooses, as was the case here, to eschew any live witness testimony, a decision that is, of course, sensible lest special litigation committee termination motions turn into trials nearly as burdensome as the derivative suit the committee seeks to end. But with that sensible choice came an acceptance of the court's need to infer that the special litigation committee members are persons of typical professional sensibilities.

FN63. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1167 (Del.1995).

*2. The SLC Has Not Met Its Burden to Demonstrate the Absence of a Material Dispute of Fact About Its Independence*

[9] Using the contextual approach I have described, I conclude that the SLC has not met its burden to show the absence of a material factual question about its independence. I find this to be the case because the ties among the SLC, the Trading Defendants, and Stanford are so substantial that they cause reasonable doubt about the SLC's ability to impartially consider whether the Trading Defendants should face suit. The concern that arises from these ties can be stated fairly simply, focusing on defendants Boskin, Lucas, and Ellison in that order, and then collectively.

As SLC members, Grundfest and Garcia-Molina were already being asked to consider whether the company should level extremely serious accusations of wrongdoing against fellow board members. As to Boskin, both SLC members faced another layer of complexity: the determination of whether to have Oracle press insider trading claims against a fellow professor at their university. Even though Boskin was in a different academic department from either SLC member, it is reasonable to assume that the fact that Boskin was also on faculty would-to persons possessing typical sensibilities and institutional loyalty-be a matter of more than trivial concern. Universities are obviously places of at-times intense debate, but they also see themselves as communities. In fact, Stanford refers to itself as a "community of scholars." FN64 To accuse a fellow professor-whom one might see at the faculty club or at inter-disciplinary presentations of academic papers-of insider trading cannot be a small thing-even for the most callous of academics.

FN64. *See* Stanford University, *Stanford Facts 2003* (last modified Apr. 3, 2003), available at http:// www.stanford.edu/home/sta nford/facts/faculty.html.

As to Boskin, Grundfest faced an even more complex challenge than Garcia-Molina. Boskin was a professor who had taught him and with whom he had maintained contact over the years. Their areas of academic interest intersected, putting Grundfest in contact if not directly with Boskin, then regularly with Boskin's colleagues. Moreover, although I am told by the SLC that the title of senior fellow at SIEPR is an honorary one, the fact remains that Grundfest willingly accepted it and was one of a select number of faculty who attained that status. And, they both just happened to also be steering committee members. Having these ties, Grundfest**\*943** (I infer) would have more difficulty objectively determining whether Boskin engaged in improper insider trading than would a person who was not a fellow professor, had not been a student of Boskin, had not kept in touch with Boskin over the years, and who was not a senior fellow and steering committee member at SIEPR.

In so concluding, I necessarily draw on a general

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 25

824 A.2d 917
(Cite as: 824 A.2d 917)

sense of human nature. It may be that Grundfest is a very special person who is capable of putting these kinds of things totally aside. But the SLC has not provided evidence that that is the case. In this respect, it is critical to note that I do not infer that Grundfest would be less likely to recommend suit against Boskin than someone without these ties. Human nature being what it is, it is entirely possible that Grundfest would in fact be tougher on Boskin than he would on someone with whom he did not have such connections. The inference I draw is subtly, but importantly, different. What I infer is that a person in Grundfest's position would find it difficult to assess Boskin's conduct without pondering his own association with Boskin and their mutual affiliations. Although these connections might produce bias in either a tougher or laxer direction, the key inference is that these connections would be on the mind of a person in Grundfest's position, putting him in the position of either causing serious legal action to be brought against a person with whom he shares several connections (an awkward thing) or not doing so (and risking being seen as having engaged in favoritism toward his old professor and SIEPR colleague).

[10] The same concerns also exist as to Lucas. For Grundfest to vote to accuse Lucas of insider trading would require him to accuse SIEPR's Advisory Board Chair and major benefactor of serious wrongdoing-of conduct that violates federal securities laws. Such action would also require Grundfest to make charges against a man who recently donated $50,000 to Stanford Law School after Grundfest made a speech at his request. FN65

> FN65. As noted, Lucas has contributed $149,000 to the Law School, $424,000 to SIEPR, and millions more to other Stanford institutions.

And, for both Grundfest and Garcia-Molina, service on the SLC demanded that they consider whether an extremely generous and influential Stanford alumnus should be sued by Oracle for insider trading. Although they were not responsible for fundraising, as sophisticated professors they undoubtedly are aware of how important large contributors are to Stanford, and they share in the benefits that come from serving at a university with a rich endowment. A reasonable professor giving any thought to the matter would obviously consider the effect his decision might have on the University's relationship with Lucas, it being (one hopes) sensible to infer that a professor of reasonable collegiality and loyalty cares about the well-being of the institution he serves.

In so concluding, I give little weight to the SLC's argument that it was unaware of just how substantial Lucas's beneficence to Stanford has been. I do so for two key reasons. Initially, it undermines, rather than inspires, confidence that the SLC did not examine the Trading Defendants' ties to Stanford more closely in preparing its Report. The Report's failure to identify these ties is important because it is the SLC's burden to show independence. In forming the SLC, the Oracle board should have undertaken a thorough consideration of the facts bearing on the independence of the proposed SLC members from the key objects of the investigation.

*944 The purported ignorance of the SLC members about all of Lucas's donations to Stanford is not helpful to them for another reason: there were too many visible manifestations of Lucas's status as a major contributor for me to conclude that Grundfest, at the very least, did not understand Lucas to be an extremely generous benefactor of Stanford. It is improbable that Grundfest was not aware that Lucas was the Chair of SIEPR's Advisory Board, and Grundfest must have known that the Donald L. Lucas Conference Center at SIEPR did not get named that way by coincidence. And, in February 2002-incidentally, the same month the SLC was formed-Grundfest spoke at a meeting of "SIEPR Associates," a group of individuals who had given $5,000 or more to SIEPR. FN66 Although it is not clear if Lucas attended that event, he is listed-in the same publication that reported Grundfest's speech at the Associates' meeting-as one of SIEPR's seventy-five "Associates." FN67 Combined with the other obvious indicia of Lucas's large contributor status (including the $50,000 donation Lucas made to Stanford Law School to thank Grundfest for giving a speech) and Lucas's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obviously keen interest in his alma mater, Grundfest would have had to be extremely insensitive to his own working environment not to have considered Lucas an extremely generous alumni benefactor of Stanford, and at SIEPR and the Law School in particular.

> FN66. See *Joseph Grundfest Talks About Enron and Auditing Process Ethics,* SIEPR Persp., Spring 2002, at 9, 9, available at http://siepr.stanford.edu/about/newsletter_spring2002.pdf.

> FN67. See *id.* at 15. Notably, Lucas is not listed as a "[n]ew donor," which suggests that he attained the rank of SIEPR Associate in a previous year or years, as well. See *id.*

Garcia-Molina is in a somewhat better position to disclaim knowledge of how generous an alumnus Lucas had been. Even so, the scope of Lucas's activities and their easy discoverability gives me doubt that he did not know of the relative magnitude of Lucas's generosity to Stanford. FN68 Furthermore, Grundfest comprised half of the SLC and was its most active member. His non-independence is sufficient alone to require a denial of the SLC's motion. FN69

> FN68. Professor Garcia-Molina denied in his deposition any specific knowledge of whether any of the Trading Defendants were donors to Stanford. He might well have told the truth despite the fact that there was evidence of it around Stanford's (admittedly large) campus and in the news at the same time as he was joining Oracle's board. As I have discussed, however, the purported ignorance of the SLC does not give me confidence, given the objective and discoverable facts available to the SLC members at the time. Even if I was convinced that Garcia-Molina was totally unaware of, for example, Lucas's status as an important alumni contributor-which I am not-that would not help the SLC, because Grundfest clearly was and the Report acknowledges both SLC members' knowledge that Lucas had made contributions. Moreover, Garcia-Molina clearly knew Boskin was a fellow professor, and the objective circumstances cause me to doubt that Garcia-Molina did not also suspect that Ellison was, if not already a major donor, then, at the very least, a major target for Stanford's development officers.

> FN69. See *In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 354 ("[U]nder *Aronson* 's first prong-director independence-for demand to be futile, the Plaintiffs must show a reasonable doubt as to the disinterest of at least half of the directors."); *Beneville v. York,* 769 A.2d 80, 82 (Del.Ch.2000) (concluding that "[w]hen one member of a two-member board of directors cannot impartially consider a stockholder litigation demand" demand is excused); *In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

*945 In concluding that the facts regarding Lucas's relationship with Stanford are materially important, I must address a rather odd argument of the SLC's. The argument goes as follows. Stanford has an extremely large endowment. Lucas's contributions, while seemingly large, constitute a very small proportion of Stanford's endowment and annual donations. Therefore, Lucas could not be a materially important contributor to Stanford and the SLC's independence could not be compromised by that factor.

But missing from that syllogism is any acknowledgement of the role that Stanford's solicitude to benefactors like Lucas might play in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the overall size of its endowment and campus facilities. Endowments and buildings grow one contribution at a time, and they do not grow by callous indifference to alumni who (personally and through family foundations) have participated in directing contributions of the size Lucas has. Buildings and conference centers are named as they are as a recognition of the high regard universities have for donors (or at least, must feign convincingly). The SLC asks me to believe that what universities like Stanford say in thank you letters and public ceremonies is not in reality true; that, in actuality, their contributors are not materially important to the health of those academic institutions. This is a proposition that the SLC has not convinced me is true, and that seems to contradict common experience.

Nor has the SLC convinced me that tenured faculty are indifferent to large contributors to their institutions, such that a tenured faculty member would not be worried about writing a report finding that a suit by the corporation should proceed against a large contributor and that there was credible evidence that he had engaged in illegal insider trading. The idea that faculty members would not be concerned that action of that kind might offend a large contributor who a university administrator or fellow faculty colleague (e.g., Shoven at SIEPR) had taken the time to cultivate strikes me as implausible and as resting on an narrow-minded understanding of the way that collegiality works in institutional settings.

[11] In view of the ties involving Boskin and Lucas alone, I would conclude that the SLC has failed to meet its burden on the independence question. The tantalizing facts about Ellison merely reinforce this conclusion. The SLC, of course, argues that Ellison is not a large benefactor of Stanford personally, that Stanford has demonstrated its independence of him by rejecting his child for admission, and that, in any event, the SLC was ignorant of any negotiations between Ellison and Stanford about a large contribution. For these reasons, the SLC says, its ability to act independently of Ellison is clear.

I find differently. The notion that anyone in Palo Alto can accuse Ellison of insider trading without harboring some fear of social awkwardness seems a stretch. That being said, I do not mean to imply that the mere fact that Ellison is worth tens of billions of dollars and is the key force behind a very important social institution in Silicon Valley disqualifies all persons who live there from being independent of him. Rather, it is merely an acknowledgement of the simple fact that accusing such a significant person in that community of such serious wrongdoing is no small thing.

Given that general context, Ellison's relationship to Stanford itself contributes to my overall doubt, when heaped on top of the ties involving Boskin and Lucas. During the period when Grundfest and Garcia-Molina were being added to the Oracle board, Ellison was publicly considering making extremely large contributions to Stanford. Although the SLC denies *946 knowledge of these public statements, Grundfest claims to have done a fair amount of research before joining the board, giving me doubt that he was not somewhat aware of the possibility that Ellison might bestow large blessings on Stanford. This is especially so when I cannot rule out the possibility that Grundfest had been told by Lucas about, but has now honestly forgotten, the negotiations over the Ellison Scholars Program.

Furthermore, the reality is that whether or not Ellison eventually decided not to create that Program and not to bequeath his house to Stanford, Ellison remains a plausible target of Stanford for a large donation. This is especially so in view of Oracle's creation of the Oracle Help Us Help Foundation with Stanford and Ellison's several public indications of his possible interest in giving to Stanford. And, while I do not give it great weight, the fact remains that Ellison's medical research foundation has been a source of nearly $10 million in funding to Stanford. Ten million dollars, even today, remains real money.

Of course, the SLC says these facts are meaningless because Stanford rejected Ellison's child for admission. I am not sure what to make of this fact, but it surely cannot bear the heavy weight the SLC gives it. The aftermath of denying Ellison's child

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

Page 28

824 A.2d 917
**(Cite as: 824 A.2d 917)**

admission might, after all, as likely manifest itself in a desire on the part of the Stanford community never to offend Ellison again, lest he permanently write off Stanford as a possible object of his charitable aims-as the sort of thing that acts as not one, but two strikes, leading the batter to choke up on the bat so as to be even more careful not to miss the next pitch. Suffice to say that after the rejection took place, it did not keep Ellison from making public statements in *Fortune* magazine on August 13, 2001 about his consideration of making a huge donation to Stanford, at the same time when the two SLC members were being courted to join the Oracle board.

As an alternative argument, the SLC contends that neither SLC member was aware of Ellison's relationship with Stanford until after the Report was completed. Thus, this relationship, in its various facets, could not have compromised their independence. Again, I find this argument from ignorance to be unavailing. An inquiry into Ellison's connections with Stanford should have been conducted before the SLC was finally formed and, at the very least, should have been undertaken in connection with the Report. In any event, given how public Ellison was about his possible donations it is difficult not to harbor troublesome doubt about whether the SLC members were conscious of the possibility that Ellison was pondering a large contribution to Stanford. In so concluding, I am not saying that the SLC members are being untruthful in saying that they did not know of the facts that have emerged, only that these facts were in very prominent journals at the time the SLC members were doing due diligence in aid of deciding whether to sign on as Oracle board members. The objective circumstances of Ellison's relations with Stanford therefore generate a reasonable suspicion that seasoned faculty members of some sophistication-including the two SLC members-would have viewed Ellison as an active and prized target for the University. The objective circumstances also require a finding that Ellison was already, through his personal Foundation and Oracle itself, a benefactor of Stanford.

Taken in isolation, the facts about Ellison might well not be enough to compromise the SLC's independence. But that is not the relevant inquiry. The pertinent question is whether, given *all* the facts, the SLC has met its independence burden.

*947 When viewed in that manner, the facts about Ellison buttress the conclusion that the SLC has not met its burden. Whether the SLC members had precise knowledge of all the facts that have emerged is not essential, what is important is that by any measure this was a social atmosphere painted in too much vivid Stanford Cardinal red for the SLC members to have reasonably ignored it. Summarized fairly, two Stanford professors were recruited to the Oracle board in summer 2001 and soon asked to investigate a fellow professor and two benefactors of the University. On Grundfest's part, the facts are more substantial, because his connections-through his personal experiences, SIEPR, and the Law School-to Boskin and to Lucas run deeper.

[12] It seems to me that the connections outlined in this opinion would weigh on the mind of a reasonable special litigation committee member deciding whether to level the serious charge of insider trading against the Trading Defendants. As indicated before, this does not mean that the SLC would be less inclined to find such charges meritorious, only that the connections identified would be on the mind of the SLC members in a way that generates an unacceptable risk of bias. That is, these connections generate a reasonable doubt about the SLC's impartiality because they suggest that material considerations other than the best interests of Oracle could have influenced the SLC's inquiry and judgments.

[13] Before closing, it is necessary to address two concerns. The first is the undeniable awkwardness of opinions like this one. By finding that there exists too much doubt about the SLC's independence for the SLC to meet its *Zapata* burden, I make no finding about the subjective good faith of the SLC members, both of whom are distinguished academics at one of this nation's most prestigious institutions of higher learning. FN70 Nothing in this record leads me to conclude that either of the SLC members acted out of any conscious desire to favor the Trading Defendants or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 A.2d 917

824 A.2d 917
(Cite as: 824 A.2d 917)

Page 29

to do anything other than discharge their duties with fidelity. But that is not the purpose of the independence inquiry.

> FN70. *Lewis v. Fuqua,* 502 A.2d at 964-65 (noting that a non-independence finding should not be equated with a determination that an SLC member acted improperly).

[14] That inquiry recognizes that persons of integrity and reputation can be compromised in their ability to act without bias when they must make a decision adverse to others with whom they share material affiliations. To conclude that the Oracle SLC was not independent is not a conclusion that the two accomplished professors who comprise it are not persons of good faith and moral probity, it is solely to conclude that they were not situated to act with the required degree of impartiality. *Zapata* requires independence to ensure that stockholders do not have to rely upon special litigation committee members who must put aside personal considerations that are ordinarily influential in daily behavior in making the already difficult decision to accuse fellow directors of serious wrongdoing.

Finally, the SLC has made the argument that a ruling against it will chill the ability of corporations to locate qualified independent directors in the academy. This is overwrought. If there are 1,700 professors at Stanford alone, as the SLC says, how many must there be on the west coast of the United States, at institutions without ties to Oracle and the Trading Defendants as substantial as Stanford's? Undoubtedly, a corporation of Oracle's market capitalization could have found prominent academics willing to serve as *948 SLC members, about whom no reasonable question of independence could have been asserted.

Rather than form an SLC whose membership was free from bias-creating relationships, Oracle formed a committee fraught with them. As a result, the SLC has failed to meet its *Zapata* burden, and its motion to terminate must be denied. Because of this reality, I do not burden the reader with an examination of the other *Zapata* factors. In the absence of a finding that the SLC was independent, its subjective good faith and the reasonableness of its conclusions would not be sufficient to justify termination. Without confidence that the SLC was impartial, its findings do not provide the assurance our law requires for the dismissal of a derivative suit without a merits inquiry.

### V. *Conclusion*

The SLC's motion to terminate is DENIED. IT IS SO ORDERED.

Del.Ch.,2003.
In re Oracle Corp. Derivative Litigation
824 A.2d 917

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.