EXHIBIT 4

TO

(SCHMELTZ DECLARATION)

Westlaw.

867 A.2d 904                                                                Page 1

867 A.2d 904
**(Cite as: 867 A.2d 904)**

**H**
867 A.2d 904

Court of Chancery of Delaware,New Castle County.
In re ORACLE CORP., Derivative Litigation.
**C.A. No. 18751.**

Submitted: Sept. 3, 2004.
Decided: Nov. 24, 2004.
Revised: Dec. 2, 2004.

**Background:** Minority shareholders brought
breach of fiduciary duty of loyalty action against
corporation's chief financial officer (CFO) and chief
executive officer (CEO), arising from stock trades
made by CFO and CEO.

**Holdings:** The Court of Chancery , New Castle
County , Strine, Vice Chancellor, held that:

(1) CFO did not possess material, adverse
information at the time he made stock trades;

(2) CEO did not possess material, adverse
information at the time he made stock trades; and

(3) neither CFO nor CEO acted with scienter.

So ordered.

West Headnotes

**[1] Corporations 101 ⟶307**
101k307 Most Cited Cases
For information to be "material," for purposes of
determining whether a corporate fiduciary
possessed material, nonpublic company information
and used that information improperly by making
trades, there must be a substantial likelihood that
the nonpublic fact would have assumed actual
significance in the deliberations of a person

deciding whether to buy, sell, vote, or tender stock;
in other words, the nonpublic information must be
of a magnitude that it would, upon disclosure, have
significantly altered the total mix of information in
the marketplace.

**[2] Corporations 101 ⟶307**
101k307 Most Cited Cases
Corporation's chief financial officer (CFO) did not
possess material, adverse information at the time he
made stock trades of corporation's shares, for
purposes of minority shareholders' claims that CFO
breached his duty of loyalty by selling stock based
on non-public, insider information; at best, CFO
possessed intraquarter data that might have cast
doubt on the corporation's ability to achieve
projections that it did not warrant would come true
and that it accompanied with cautionary statements,
and corporation's best estimate of its performance
indicated that it would exceed the market estimates
for earnings and revenue growth by healthy margins.

**[3] Corporations 101 ⟶307**
101k307 Most Cited Cases
Corporation's chief executive officer (CEO) did not
possess material, adverse information at the time he
made stock trades of corporation's shares, for
purposes of minority shareholders' claims that CEO
breached his duty of loyalty by selling stock based
on non-public, insider information; at best, CEO
possessed intraquarter data that might have cast
doubt on the corporation's ability to achieve
projections that it did not warrant would come true
and that it accompanied with cautionary statements,
and corporation's best estimate of its performance
indicated that it would exceed the market estimates
for earnings and revenue growth by healthy margins.

**[4] Corporations 101 ⟶307**
101k307 Most Cited Cases
Neither corporation's chief financial officer (CFO)
nor its chief executive officer (CEO) acted with
scienter by consummating stock trades after
receiving nonpublic information that corporation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                     Page 2

867 A.2d 904
**(Cite as: 867 A.2d 904)**

might fall short of its market estimates, for purposes of minority shareholders' claims that officers breached their duty of loyalty by selling stock based on non-public, insider information; CFO sold only 7-percent of his corporate position, CEO sold only 2-percent of his corporate position, and trades were made in accordance with nonsuspicious financial planning standards.

**\*905** Robert D. Goldberg , Esquire, Victor Battaglia , Esquire, Biggs & Battaglia , Wilmington, Delaware; Karen L. Morris , Esquire, R. Michael Lindsey , Esquire, Morris & Morris, LLC , Wilmington, Delaware; Joseph J. Tabacco, Jr. , Esquire, Nicole Lavallee , Esquire, Elizabeth Guarnieri , Esquire, Berman, Devalerio, Pease, Tabacco, Burt & Pucillo , San Francisco, California; Dario de Ghetaldi , Esquire, Corey, Luzaich, Pliska, De Ghetaldi & Nastari, LLP , Millbrae, California; Robert B. Weiser , Esquire, Robin Winchester , Esquire, Eric L. Zagar , Esquire, Schiffrin & Barroway, Bala Cynwyd, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar , Esquire, Morris, Nichols, Arsht & Tunnell , Wilmington, Delaware; Alan N. Salpeter , Esquire, Javier H. Rubinstein , Esquire, Sheri L. Drucker , Esquire, Mayer, Brown, Rowe & Maw, LLP , Chicago, Illinois; Donald M. Falk , Esquire, John Nadolenco , Esquire, Christopher P. Murphy , Esquire, Shirish Gupta , Esquire, Mayer, Brown, Rowe & Maw, LLP, Palo Alto, California, Attorneys for Defendants Lawrence J. Ellison and Jeffrey O. Henley.

Allen M. Terrell, Jr. , Esquire, Brock Czeschin , Esquire, Richards, Layton & Finger , Wilmington, Delaware; Jordan Eth , Esquire, Morrison & Foerster, San Francisco, California, Attorney for Oracle Corporation.

David C. McBride , Esquire, Christian Wright , Esquire, Adam Poff , Esquire, Young Conaway Stargatt & Taylor, LLP , Wilmington, Delaware; James G. Kreissman , Esquire, Simpson, Thacher & Bartlett, Palo Alto, California, Attorneys for the Special Litigation Committee of Nominal Defendant Oracle Corporation.

OPINION

STRINE, Vice Chancellor.
This derivative action involves a claim that two of the top officers at Oracle Corporation breached their fiduciary duty of loyalty to the company by selling stock in the company at a time when they possessed material, adverse, nonpublic information about the company. The plaintiffs thus raise a claim under the venerable case of *Brophy v. Cities Service Co.* FN1 Defendant Lawrence J. Ellison is Oracle's largest stockholder and was its Chairman of the Board and Chief Executive Officer at the time of the events relevant to this case. Defendant Jeffrey O. Henley was Oracle's Chief Financial Officer and director at the time of the complaint.

FN1. 70 A.2d 5 (Del.Ch.1949).

Ellison and Henley are alleged to have sold large amounts of Oracle stock in January 2001-albeit amounts that were only a small percentage of their total Oracle holdings-while in possession of information that, according to the plaintiffs, suggested that Oracle would be unlikely to meet its publicly-announced revenue and earnings projections for that quarter, which was to end on February 28, 2001. Those projections-the "Market Estimates"-had indicated that Oracle would **\*906** increase its FY 2001 third quarter "3Q 01" license revenues "about 25%" over the comparable quarter in the previous year, "3Q 00," and would earn 12 cents per share. FN2 As it turned out, Oracle fell far short of those projections, delivering license revenue growth of only 5% and earnings of only 10 cents per share FN3-results that moved Oracle's stock price sharply downward. According to the plaintiffs, Ellison and Henley both possessed material financial information before their January 2001 trades that should have led them to recognize that Oracle would not meet the Market Estimates. Having sold shares at prices materially in excess of Oracle's market price after Oracle disclosed that it would not meet the Market Estimates, Ellison and Henley allegedly reaped ill-gotten gains that the plaintiffs say should be returned to Oracle.

FN2. DX 83. Both parties have submitted extensive evidence. For ease of reference,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                      Page 3

867 A.2d 904
**(Cite as: 867 A.2d 904)**

> Plaintiffs' and Defendants' exhibits will be referred to as "PX_____" and "DX_____," respectively. Similarly, the charts summarizing the evidence that both parties submitted will be referred to as "PC_____" and "DC_____."

FN3. DX 87.

The case is now before the court on a summary judgment motion. After a review of the massive record, I conclude that Ellison and Henley are entitled to summary judgment. In keeping with prior Delaware precedent, I conclude that Ellison and Henley can only be held liable if they acted with scienter, by trading, in whole or in part, because they possessed adverse, nonpublic information that made it likely that Oracle would fall materially short of the Market Estimates. Contrary to the plaintiffs, I conclude that no rational trier of fact could find that: 1) Ellison or Henley possessed material, nonpublic financial information as of the time of their trades; or 2) Ellison or Henley acted with scienter, by consummating trades in part because they believed, on the basis of the nonpublic information they had received, that Oracle would materially fall short of the Market Estimates. As a result, I find that even if *Brophy v. Cities Service Co.* remains good law, this case should be dismissed.

The grounds for this decision are fully set forth in the later pages of this opinion but can be summarized as follows:

The conservative bias of Oracle's financial projection system, which resulted in estimates of earnings and license revenue growth that were more likely to be low than high. There is no evidence to cast doubt on the integrity of Oracle's estimation process. Within this process, the estimates of Oracle executive Jennifer Minton were historically the most accurate and given the most weight;

Oracle's best estimates of its 3Q 01 results at the time of Henley's and Ellison's trades, which continued to predict that the company would either exceed or meet the Market Estimates;

The lack of any record evidence that Henley or Ellison had been informed as of the time of their trades by any subordinate in the company that the company was not in a position to meet or even exceed the Market Estimates;

The reality that well over a majority of Oracle's quarterly income is generated within the last month of the quarter, and that most of the last month's revenue is generated in the last week of the quarter.

The undisputed evidence that Oracle's 3Q 01 prospects weakened substantially in the last month of the quarter (February 2001), the month following the completion of trading by Henley and *907 Ellison, largely due to customers refusing to close deals in the final days of the quarter;

The evidence that even with that weakening, Oracle's internal estimates indicated that it could possibly meet or almost meet the 12 cents estimate in the Market Estimates as late as February 12, 2001;

The uncontradicted evidence that lower level Oracle executives were surprised and dismayed at the rapid deterioration in their units' results in the last few days of February 2001;

The absence of any apparent exigency or rational motive that would have led Ellison or Henley-who owned huge amounts of Oracle stock-to sell small portions of their Oracle holdings because they thought Oracle's performance was declining, and the presence of other legitimate, unsuspicious reasons that explain the timing of their sales.

Taken together, the record simply will not support a rational inference of wrongdoing, even given the plaintiff-friendly standard that applies on a motion for summary judgment. At best, the plaintiffs have pointed to the existence of financial information that might have led a rational insider at Oracle at various points in January 2001 to believe that Oracle might not meet the Market Estimates, if they had thought about the information in the manner that the plaintiffs now do (which there is no evidence that Ellison or Henley did) and had the benefit of hindsight (which Ellison and Henley did not). Of course, the reality is that public companies often possess intraquarter information that suggests that meeting quarterly projections is not certain or may even be doubtful. That is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inherent in the nature of projections, which are not warranted guarantees. In fact, the record indicates that Oracle had previously succeeded in meeting quarterly estimates in quarters when the company's information, as of the second month of the quarter, was bleaker than that possessed in January 2001 as to the likely results of 3Q 01.

Most important, the undisputed evidence is that Ellison and Henley were presented with their subordinates' best estimates of 3Q 01 performance throughout January 2001 and that every projection until January 29, 2001-when Henley was long done trading and Ellison was nearly done-predicted that Oracle would exceed the Market Estimates. Even the January 29, 2001 projections showed Oracle earning 11.58 cents per share and having license revenue growth of 24%, which given Oracle's practice of rounding up and its revenue estimate of " about 25%" growth, were projections that, if achieved, still would have met the Market Estimates exactly. Put bluntly, although Ellison and Henley had less reason to be confident that the company would meet the Market Estimates as of the end of January 2001, there is no rational basis to question their stated belief that they thought they would because that belief was based on the best advice of their subordinates, which indicated that the company was positioned to do so. In other words, there simply existed no nonpublic information as of the relevant dates that reliably predicted that Oracle would fall materially short of the Market Estimates.

In sum, after receiving huge amounts of documentary evidence and taking several depositions, the plaintiffs have failed to turn up evidence that supports a rational inference that Ellison or Henley abused their positions of trust at Oracle by exploiting material, adverse financial information in order to sell their stock at artificially inflated prices. Absent such evidence, the plaintiffs have no triable claim under *Brophy.*

**\*908** I. *Factual Background*

A. *A Comment On The Record*

The evidentiary record developed in this case is massive. The current motion practice followed previous motion practice regarding whether the recommendation of an Oracle special litigation committee ("SLC") that this case should be dismissed was entitled to deference under the *Zapata* standard. FN4 In an opinion that did not reach the merits of that recommendation, this court held that the exacting standards of independence that apply in the special litigation context were not met. FN5

> FN4. *In re Oracle Corp. Derivative Litig.,* 824 A.2d 917 (Del.Ch.2003).

> FN5. *Id.* at 947.

The reality is that the SLC Report was highly influential to the way this case later proceeded. For one thing, the plaintiffs have substantially changed their earlier arguments, popping up new ones to replace the ones whacked by the SLC. FN6 For another, the plaintiffs reduced the focus of their attack by dropping their claims against certain other Oracle directors who sold during 3Q 01 and targeting Ellison and Henley exclusively.

> FN6. A reading of my prior opinion is suggestive of the differences. *See In re Oracle Corp. Derivative Litig.,* 824 A.2d 917 (Del.Ch.2003). The defendants have abandoned those theories that did not pan out after the SLC developed an extensive factual record and additional discovery was taken. Oddly, as this case was being argued at the summary judgment stage, a federal complaint relying upon theories more like the original complaint in this case was reinstated by the United States Court of Appeals for the Ninth Circuit. *Nursing Home Pension Fund, Local 144 v. Oracle Corp., et al.,* 380 F.3d 1226 (9th Cir.2004). This opinion, of course, addresses only the arguments made in this case in the summary judgment briefs.

Having started with a ponderous record of evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                                                                        Page 5

867 A.2d 904
**(Cite as: 867 A.2d 904)**

compiled with the SLC, the parties then expanded it further. Although given extra pages to write their brief, the plaintiffs' lawyers granted themselves even more pages by filing an affidavit of one of their number, which was simply a brief by another name containing additional arguments that did not fit within their 80 page answering brief. I struck the submission as an affidavit but permitted it to be treated as an additional brief and gave the defendants a corresponding additional brief. More onerously, the plaintiffs submitted an unwieldy array of appendices, broken down into four varieties, totaling over forty volumes.

The defendants, by modest contrast, confined themselves to submitting a smaller, but still very substantial, number of pages to support their motion for summary judgment. Taken together, the plaintiffs' and defendants' submissions come close to an all-evidence dump of discovery.

In approaching this record, my focus is where I told the plaintiffs it would and must be: on what information Ellison and Henley possessed at the relevant times. That focus is designed to illuminate whether there is evidence from which a rational fact-finder could conclude: 1) that Ellison or Henley possessed material, nonpublic information at the time of their trades in 3Q 01; or 2) that their possession of material, nonpublic information motivated, in whole or part, their trades in 3Q 01. As I will explain again later, I am focused on the evidence that exists regarding what Ellison and Henley knew, believed, and did before their trades in 3Q 01 and not on what the plaintiffs, in litigation-inspired hindsight, argue that Ellison and Henley should have done, but did not do, to analyze the information they received before their trades.

**\*909 B.** *Overview of Oracle Corporation*

Oracle is the second largest software company on Earth. It specializes in developing, making, selling, distributing, and servicing computer software that helps businesses, government agencies, and other complex organizations manage themselves.

The company was co-founded in 1977 by defendant Larry Ellison who continued to be its CEO during the events giving rise to this lawsuit. By the end of its FY 2000 (which ended on May 31, 2000), Ellison and Oracle could look back on the company's first year with revenues in excess of $10 billion and operating income of over $3 billion. FN7 That achievement topped off an impressive period of growth, with Oracle's FY 00 results showing strong growth over the revenue and operating income of $5.7 billion and $1.26 billion it achieved in FY 97. FN8

>    FN7. *See* DX 77 at 10.

>    FN8. *Id.*

This strong performance enabled Oracle to effect a two-for-one stock split in FY 00 and to see the value of its common stock increase sharply in the market, such that the mean of its low and high price for the last quarter of FY 00 had reached $37.74. FN9 As Oracle's largest stockholder, holding over 1.39 billion shares-let's underscore that-*1.39 billion shares* !-or 24% of Oracle's common stock, Ellison was one of the world's wealthiest persons. FN10 By FY 00, Ellison was taking most of his annual compensation in options, having given up most of his salary and bonus income.

>    FN9. DX 81 at 9 of 54.

>    FN10. *See* DX 79 at 9568. Oracle effected a two for one stock split on October 12, 2000. Thus, the 696,356,050 shares shown in DX 79 as of August 21, 2000 became 1.39 billion shares soon thereafter.

By this time period, Defendant Henley had also amassed considerable personal wealth as Oracle's CFO and Executive Vice President. In FY 00, Henley received total cash compensation of over $2.1 million plus options for a million Oracle shares. Perhaps more pertinently, Henley also owned a large amount of Oracle stock-over 15 million shares on a split-adjusted basis. Although

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this is insubstantial compared to Ellison, it is substantial relative to most millionaires, as those shares then had a value between $400 and $500 million.

As of the end of FY 00, therefore, Oracle-as well as Ellison and Henley-were riding high. The company was thriving and its key executives were benefiting from that success.

On the horizon, however, Oracle faced the challenge of continuing to increase its revenues and operating income in the face of a slowing economy in 2000 and the bursting of the dot.com bubble. Because many of its products are expensive, Oracle had to prove that it could continue to sell in a market when procurement budgets at both businesses and government agencies might narrow substantially in the short-term. And because many dot.coms had gone bust, that sector was not positioned to continue as a growth vehicle for Oracle sales or even as a consistent source of on-going revenues.

### C. *Oracle's Sources Of Revenue*

The most important driver of Oracle's profitability is its software licensing business. In FY 00, licensing was responsible for 44% of the company's total revenues. FN11

FN11. DX 81 at 11 of 54.

The reason that licensing is important is that Oracle's other revenues are largely **\*910** derivative of a customer's original decision to buy a license to use Oracle software. Thus, in FY 00, Oracle derived 29% of its revenues from support services it provided to users of its software, 22% from training personnel who consult with users of its software, and 5% from providing education about the use of its software. FN12

FN12. DX 81 at 5 of 54.

Because licensing is so important to Oracle's

business, it is the focal point of the plaintiffs' claims. Therefore, it has also occupied the bulk of the defendants' response and will be a major focus of this opinion.

### D. *Oracle's License Revenues*

The decision to invest in a major software system made by Oracle (its database product and/or its enterprise software) is no small matter for businesses and government. These systems are expensive and will be used during a multi-year period (or so it is hoped).

These realities resulted in a pattern of revenue receipt by Oracle that is important to understand. First of all, Oracle's license revenues tend to be lowest in the first quarter of any fiscal year, increase in the second and third quarters, and peak in the last quarter.

Second and most important, Oracle's license revenues tend to come in within the last month of each quarter, a so-called "hockey stick effect." The analyst community is well aware of this phenomenon, and the words of one analyst well capture the writings of many who covered Oracle: " [E]asily 50% of license revenues historically have been done in the final month of the quarter, with much of that coming in the final week of the quarter. " FN13 In point of fact, that analyst statement underestimated the extent of the hockey-stick effect for Oracle. That effect was, as I will next portray, even more pronounced.

FN13. DX 144 at 1110-11; *see also* DX 142, DX 143, DX 147 (reflecting analysts' awareness of the fact that Oracle's revenues tended to come in very near the end of quarters and that the ultimate numbers for any quarter were heavily dependent on that end-period).

The reason for the effect is well-understood. Purchasers of software harbor a belief, perhaps borne of experience or superstition, that sellers will cut the best deal near the end of a quarter because

867 A.2d 904                                                                                    Page 7

867 A.2d 904
**(Cite as: 867 A.2d 904)**

they are counting on the sale to make their quarterly
projections. As a result, purchasers hold out until
the end, trying to extract the last concessions before
signing a binding deal. This leads to the
last-minute booking of many sales when times are
good, and the potential that many deals might fall
through right before quarter's end or slip into later
quarters if buyers are experiencing budget pressure.
To the extent that the negative scenario is the one
that pans out, there is the obvious risk that Oracle
will fail to meet its quarterly earnings projection.

To highlight the importance of this effect and to
make later references clearer, it is useful to describe
Oracle's primary license generating units. As of
FY 00, Oracle's license sales force in North
America was divided into three divisions. Oracle
Service Industries ("OSI") handled sales to
government agencies, educational institutions, and
companies in the financial services,
telecommunications, utilities, and health care
industries. Oracle Product Industries ("OPI") sold
to businesses that make products. Northern
American Sales ("NAS") sold to customers not
within OPI's and OSI's domain, including customers
with revenues of less than $500 million annually,
which included most of Oracle's dot.com clients.
Taken together, OSI, OPI and NAS generated most
of Oracle's *911 license revenue, with other sources
of revenues coming from Oracle sales abroad.

Now that OPI, OSI and NAS have some meaning, I
return to the hockey-stick effect's importance at
Oracle. Illustrative of that phenomenon is the
following chart, which shows the extent to which
the last month of a quarter's revenues dominate
Oracle's quarterly revenues. The units other than
OSI, OPI, and NAS all reflect license sales units for
areas other than North America:

**Percentage of Oracle Quarterly Revenue by Month**
**for Major Business Units (FY 01)** [FN14]

| Business Unit | Month 1 | Month 2 | Month 3 |
|---------------|---------|---------|---------|
| OSI           | 7%      | 10%     | 83%     |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                                   Page 8

867 A.2d 904
**(Cite as: 867 A.2d 904)**

| | | | |
|---|---|---|---|
| NAS | 11% | 11% | 78% |
| OPI | 17% | 7% | 76% |
| Latin America | 17% | 29% | 53% |
| EMEA | 19% | 21% | 60% |
| Japan | 25% | 27% | 48% |
| APAC | 15% | 17% | 68% |

FN14. DC 4.

The third month of each quarter was also the month that delivered the most revenue for Oracle's other major revenue generating units, support and consulting, though the effect is less pronounced. Given all divisions' dependence on third month revenues, over 50% of Oracle's total revenues came in within the third month of a quarter during FY 01, as the following chart shows:

**Average Percentage of Oracle Quarterly Revenue by Business Unit and Month (FY01)** [FN15]

| Business Unit | Month 1 | Month 2 | Month 3 |
|---|---|---|---|
| License | 15% | 16% | 69% |
| Support | 32% | 31% | 37% |
| Consulting | 33% | 27% | 40% |
| Total | 24% | 24% | 52% |

FN15. DC 2.

This depiction is not atypical and reflects the continuation and deepening of a pattern that had persisted at Oracle for several years.

License revenue was typically even more compressed, with most coming in within the last week of the quarter, not just the last month, as this chart addressing FY 01 shows:

**Percentage of Quarterly License Sales by Week for OSI, NAS and OPI (FY 01)** [FN16]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

| Week of Quarter | Percentage of Quarterly Sales | Cumulative Percentage of Quarterly Sales |
|---|---|---|
| Weeks 1-4 | 6% | 6% |
| Weeks 5-8 | 6% | 12% |
| Week 9 | 4% | 16% |
| Week 10 | 9% | 25% |
| Week 11 | 3% | 28% |
| Week 12 | 6% | 34% |
| Week 13 (or second to last week of quarter) FN17 | 12% | 46% |
| Week 14 (or last week of quarter) | 54% | 100% |

FN16. DC 5.

FN17. Because 2Q 01 contained 15 weeks instead of 14, the last two entries average the penultimate weeks' results (week 14 in 2Q, but week 13 in other quarters of 2001) and the final weeks' results (week 15 in 2Q, but week 14 in other quarters of 2001).

In part as a result of its dependence on last month, and even last week revenues, Oracle's public disclosures as of FY 00 and 01 warned investors that "the Company's quarterly results are difficult to predict until the end of the quarter, and delays in product delivery or closing of sales near the end of a quarter have historically caused and could cause quarterly revenues and net income to fall significantly short of anticipated levels." FN18

FN18. DX 80 at 87326-27; *see also* DX 78 at 83491; DX 80 at 87325; DX 77 at 86914.

**\*912** E. *Oracle's Internal Forecasting System*

Like most major American corporations, Oracle had in place systems designed to help its top management both project future performance and keep track of how well the company was doing in meeting those projections. During the time period relevant to this case, it is fair to say that the American equity markets were quite sensitive to the quarter to quarter performance of corporations, and tended to react negatively if a corporation generated quarterly results markedly out of line with the expectations the market harbored. Whether or not this was economically productive for our nation is not a question I must answer, but the existence of this incentive scheme is a reality that it is relevant to acknowledge.

Like other companies, Oracle was sensitive to the incentive to meet analyst expectations and to avoid unpleasantly surprising them. Therefore, it developed processes to develop earnings and revenue projections and monitor progress towards meeting them. Within Oracle, many executives had responsibilities for elements of those processes. But two executives were of paramount importance. One was defendant Henley, who as CFO, had the key say in exactly what estimates Oracle would provide to analysts about the upcoming quarter. The other was Oracle's Controller, Jennifer Minton, who worked within Oracle's Financial Planning and Analysis Group.

Although Oracle assembles data about its financial performance in a number of ways, it has one " primary internal forecasting document." FN19 That document is the so-called "Upside Report" that Minton prepares each Friday and circulates each Monday to a select group of Oracle executives on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

its "Executive Management Committee" or "EMC," a group that included Ellison and Henley.

FN19. Second Amended Complaint ¶ 32.

The Upside Reports are the key documents that Henley uses to prepare for his quarterly conference call with market analysts that covers prior quarter results and provides his estimate of how Oracle will perform in the coming quarter. Most important, embedded within the Upside Reports is the best estimate that Minton has as to how Oracle will perform in the current quarter.

Because Upside Reports are the key forecasting tool of Oracle, an explanation of how they are prepared and what they contain is pertinent. The Upside Reports are generated on a ground up basis, from projections of revenues and costs from each of Oracle's revenue and cost-generating units. These projections estimate how each unit is likely to perform in terms of revenue generation and spending. Minton takes those projections-which are given to her each Wednesday evening-and develops a "Forecast Projection" that aggregates the figures received from the various units into company-wide figures.

That Forecast Projection is not, however, Oracle's best estimate of its performance. Instead, that best estimate is generated by Minton. She takes the unit-level input she receives and uses her judgment based on other input she receives in oral conversations with other Oracle executives and from other data to come up with Upside adjustments. These adjustments-which despite their name can be positive or negative for each unit-reflect Minton's estimate as to how each unit is likely to perform. After Minton's Upside Adjustments are applied to the Forecast Projection, what results is a "Potential Projection."

**\*913** The term Potential Projection is a misnomer, as the Potential Projection did not, as one might expect, represent an estimate of what Oracle might achieve if things went optimally well, i.e., a best case scenario. Instead, the Potential Projection was the Financial Planning & Analysis Unit's (and

Minton's) best estimate of how the current quarter was likely to turn out. FN20 Historically, the Potential Projections were the internal indicator that came closest to accurately predicting Oracle's eventual performance. By contrast, the raw Forecast Projection from the units was more inaccurate and often underestimated the actual results. FN21 Within Oracle top management, the unanimous sense was that the sales units tended to be overly conservative in forecasting, believing that it was better to exceed the unit's forecast by a good deal than it was to fail to meet a forecast given to the CEO and CFO. For this reason, it was not unusual for Minton to adjust the unit forecasts upward. Even these revisions tended to remain conservative (probably for similar reasons). Relying on these revisions, Oracle had time and again met or exceeded its guidance. For these reasons, Henley and Ellison had no prior experiences that warned that they should expect overly aggressive forecasts from the sales units-or from Minton, for that matter.

FN20. Second Amended Complaint ¶ 32.

FN21. *E.g.,* DC 34 (indicating that Minton's Best Estimate was more accurate than the Forecast Projections for each of the five quarters preceding 3Q 01 and that both were more conservative than the actual results for those quarters).

For all these reasons, I therefore refer to Potential Projections as the Best Estimates because that more accurately describes their intended purpose.

While the Upside Reports were the primary forecasting document for Oracle, they were supplemented by two other types of documents that bear mention. The first are "Pipeline Reports." These Reports contained detailed information from the sales units regarding the size of the Pipeline containing Oracle's developing License deals, information that included the value of the License deals that the sales units reasonably believed that they might close in the current quarter. Notably, the Pipeline Reports contained a variety of trend and comparative data. Of special relevance was a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                                           Page 11

867 A.2d 904
**(Cite as: 867 A.2d 904)**

comparison of the Pipeline data (including the conversion ratio) for the same quarter in the previous fiscal year to the current quarter. Although Oracle at times also looked at current quarters in comparison to the immediately previous quarter, the record is clear that as of 3Q 01, the Pipeline Reports themselves compared the current quarter to the same quarter in the previous year, as that was the comparison that Oracle insiders felt had the most predictive utility. Thus, contained within the Pipeline Reports were historical conversion ratios, which illustrated the percentage of the Pipeline that was converted into actual revenue in the same quarter of the prior year and indicated how much revenue Oracle could earn in the current quarter if it converted at the prior year's level.

Like the Upside Reports, Henley and Ellison regularly received the Pipeline Reports. Although he later suggested something a bit different in his deposition, in his original interview with the SLC, Ellison said he placed greater weight on Oracle's Pipeline-which was built based on sales unit input about possible sales-than on the Best Estimates in the Upside Reports.

It is also clear that Minton used the Pipeline estimates as part of her formulation of the Best Estimates in the Upside *914 Reports. The estimated Pipeline, along with Pipeline conversion rates from the same quarter in previous years, factored into her adjustments to the projections made by the sales units. Likewise, this information was something that Henley took into account as he considered how Oracle was performing.

"Flash Reports" are the other documents worth noting. As Ellison told the SLC in his first interview, he also examined actual sales results from each month to get a sense of how Oracle was doing against public expectations. The Flash Reports were produced on a monthly basis and presented updated actual results of the months within quarters. These appear to have been produced at irregular times (e.g., the 7th of one month, the 17th of the next). Like the Pipeline Reports, they provided comparative information illustrating how the most recent month had turned out compared to the same month in the previous

fiscal year. The Flash Reports also showed how Oracle's quarter-to-date results compared to its quarterly estimate.

F. *The Flow Of Information Leading To The Various Reports*

The reports that have been mentioned constitute the key information that flowed to Ellison, Henley and the other most senior executives at Oracle, that is, those executives who were on the EMC. These reports, however, reflect a myriad of discussions at less senior levels, particularly among sales executives below the Executive Vice President level.

As might be expected, during any quarter, there is a good deal of back and forth between executives at all levels. What ultimately goes to the EMC, however, is distilled into the Upside, Pipeline, and Flash Reports, which serve as the primary material discussed at the EMC level. No doubt the lower level discussions play an influential role in shaping the Reports that actually go to the EMC and the concerns expressed at the lower level often manifest themselves in discussion at the EMC. But the mere fact that an executive below the EMC level had doubts or hopes about a particular sales target does not mean that those feelings were transmitted to the EMC members, including Ellison and Henley.

Additionally, it should not be assumed that the documents that went to the EMC were studied to death by Ellison and Henley. The full Upside Reports were distributed at the beginning and then collected at the end of EMC meetings. FN22 Not every member of the EMC even gets a full copy, although Ellison and Henley did. But the important point is that the sort of painstaking retrospective analyses that plaintiffs' counsel have performed on various data within the Upside Reports is quite dissimilar to the use made of those reports by EMC members at the time. The same is also true of the Pipeline Reports and the Flash Reports. In the same vein, the plaintiffs' micro-focus on particular sales data units is inconsistent with top management's key focus, which was on the company's overall performance.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
(Cite as: 867 A.2d 904)

Page 12

FN22. Ellison Dep. at 122; Minton Dep. at 149-152; Henley Dep. at 85-86.

### G. Oracle's Success In Meeting Its Earnings Projections

Despite the fact that its revenues tended to come in quite close to the end of quarters, Oracle had successfully met its earnings projections in every quarter from 1998 through 2Q 01. Although in several quarters, Oracle started off weakly, its end of quarter performance was always strong enough to push it to the estimated level of earnings.

### *915 H. The 3Q 01 Guidance Oracle Gave The Market On December 14, 2000

In early December 2000, Henley began to develop the projections that Oracle would make for the coming quarter, 3Q 01. He used various sources of information, including Oracle's results for the previous quarter, the most recent Upside and Pipeline Reports, and information he gleaned from discussions with the sales unit heads.

On December 11, 2000, Henley received the last Upside Report he would receive before giving guidance to the market. In that Report, Minton estimated that Oracle would earn 12.82 cents per share in 3Q 01. FN23 Moreover, by that time, Oracle had closed the single largest licensing deal in its history-the $60 million Covisint Transaction-early in December. That gave Oracle a strong start for the quarter and that revenue was included in the December 11 Upside Report. And, as of that time, the December 11, 2000 Pipeline Report was showing total company Pipeline growth of 52%. FN24

FN23. DX 22.

FN24. DX 35.

Henley decided that Oracle should estimate that it would earn 12 cents per share in 3Q 01. He explained his rationale in an e-mail to Ellison and others on December 12, 2000 that was intended to

set forth the talking points he would use with market analysts:
The average split-adjusted EPS improvement for the last 3 years from Q2 to Q3 was one cent per share. We think that probably makes sense again this year. Due to holidays Q3 is usually not much different than Q2 and then there is a spike in Q4. We have no reason to believe that this year should be any different (keep expectations low enough to beat by a penny). FN25

FN25. DX 105.

In the same e-mail, Henley outlined his thinking on the relationship between overall economic conditions and Oracle's own prospects. He noted that while the economy was slowing, Oracle itself made e-business software products that were a high priority for its customers and certain of Oracle's product lines were at significant stages of maturity that, if things turned out well, might generate more growth. FN26 All in all, therefore, Henley was intent on providing the market with an optimistic report, projecting a healthy quarter, but using the de rigueur technique of providing an estimate that he believed Oracle would exceed by a reasonable margin.

FN26. Id. It bears mentioning that in earlier stages of this case, the plaintiffs made problems with some of these products a focal point of their case. They have since entirely abandoned that tack and this opinion therefore does not dilate on the facts relating to these products.

Two days later, on December 14, 2000, Oracle actually held its conference call for analysts to discuss its results for 2Q 01, as well as the company's expectations for the upcoming third quarter, i.e., 3Q 01. The two major participants from Oracle were Ellison and Henley.

Near the beginning of the call, Henley reviewed the previous quarter's results and provided some specific projections as to how Oracle would do in 3Q 01. These projections were preceded by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

usual cautionary statements and were not made as promises.

The overall tenor of Ellison and Henley was optimistic. Although the American economy as a whole, and certain segments of the computer industry in particular, were beginning to experience a slowdown, **\*916** Ellison and Henley expressed their belief and hope that Oracle could weather those developments and continue to increase its revenues and profits.

Specifically, Henley indicated that he expected that Oracle would enjoy total license revenue growth of " about 25 percent" in 3Q 01 over the comparable quarter in FY 00. FN27 In terms of earnings per share, Henley indicated that Oracle traditionally earned about a penny more per share in the third quarter than in the second quarter and that he expected that trend to continue. Because Oracle had earned 11 cents per share in 2Q 01, he said that "12 cents would be a reasonable number at this point." FN28 Henley then went on to give some views about 4Q 01, while digressing to indicate that 3Q 01 was a bit harder to predict on the database side than the later quarter, but that the "pipeline, we have for Q3, looks very exciting at this point." FN29

> FN27. DX 83 at 31705.

> FN28. DX 83 at 31706.

> FN29. DX 83 at 31706.

After Henley finished his remarks, Ellison made a few comments. In particular, Ellison "reiterate[d] what Jeff said, [that] the pipelines really are astounding." FN30 In keeping with that theme, Ellison later indicated that Oracle was "off to a great start in Q3" and had a "pretty fantastic, you know, first half of December" and that it looked like Oracle was "going to have a very, very strong Q3." FN31

> FN30. DX 83 at 31708.

> FN31. DX 83 at 31711-12.

Near the end of the call, Ellison and Henley got into a discussion with an analyst regarding whether the company was expecting to improve the "linearity" of its financial results. FN32 This was a reference to the previously discussed fact that a large percentage of Oracle's revenues were booked within the last month of the quarter, and in fact in the last days. Ellison and Henley indicated their hope that this phenomenon would decrease once purchasers recognized that Oracle would not cut sweet deals simply to close contracts before the end of quarters but that the previous quarter did not display any more linearity than the corresponding quarter a year before.

> FN32. DX 83 at 31724.

*I. Henley Sells Oracle Shares On January 4, 2001*

As of 3Q 01, Henley owned over 15 million Oracle shares. Although that number was large, it was smaller than it could have been had Henley not taken steps to diversify his asset base. Specifically, in keeping with common beliefs regarding prudent investing, Henley had sold large amounts of Oracle stock during each year since 1997. Those sales included sales of 1.5 million Oracle shares in 1Q 01 and 2Q 01.

When selling shares, Henley had to abide by Oracle's internal policies, which were designed to prevent the reality or the perception of illicit insider trading. Those policies generally prevented insiders from trading within the last two weeks of each quarter and for the first few days of each quarter. Moreover, Oracle requires that trades by certain insiders be cleared by the company's General Counsel, Daniel Cooperman, and Henley himself. FN33 Together, Henley and Cooperman also share information about the company, so that they can identify any period of time during which they believe that there may exist **\*917** material, nonpublic information and during which trading by insiders should be halted. According to Henley's affidavit, he has ordered a halt to trading among Oracle insiders at least twice, once when he thought

867 A.2d 904
**(Cite as: 867 A.2d 904)**

the company would not meet its quarterly earnings target and another time when the company was pondering a large acquisition.

> FN33. DX 151.

Henley, however, testified that as a matter of practice trades were usually only directly cleared by Cooperman. Cooperman would send Henley an e-mail of requests to trade and Henley would let Cooperman know if he believed there was a problem. But Henley says that he rarely, if ever, directly dealt with anyone seeking permission to trade.

On December 18, 2000-four days after the 3Q 01 earnings call-Henley sought clearance from Cooperman to sell additional shares, to further diversify his portfolio. Cooperman gave the clearance. But Henley did not trade.

Rather, according to Henley-who acts as his own financial advisor-he decided to wait until the new year so as to push the income tax consequences of the sale further out. On January 3, 2004, Henley sought and again obtained clearance to trade from Cooperman. FN34 The next day he exercised options for and immediately sold one million shares in the market at an average price of $32.31, generating proceeds of $31,138,451.80. FN35

> FN34. Henley Aff. ¶ 52.

> FN35. Henley Aff. ¶ 53. The same day Henley also gave 15,600 shares of Oracle stock to the University of California at Santa Barbara. *Id.*

The same day that these trades took place, Henley prepared an e-mail in advance of an Oracle Finance Committee meeting scheduled for January 8, 2001. In his e-mail, Henley noted that "all data since the [3Q 01 analysts] call point to more economic softening so there is risk of slippage in deals. Offsetting this is stronger than normal approval activity in December, the Covisint deal is already in, and checks with the 3 U.S. execs saying they

aren't as yet hearing of slippage from their managers (although it's still early in the quarter).... Net, net we still feel good about 3Q [2001] but the economy is a wildcard that nobody can fully predict with 2 long months to go." FN36

> FN36. DX 106.

As of January 4, 2001, Henley was unaware of the actual December 2000 results and the Best Estimate in the Upside Reports continued to predict that Oracle would exceed its earnings and revenue projections for 3Q 01. There is no evidence as of this date that any Oracle executive had told Henley that they did not expect the company to meet the Market Estimates. And as of January 4, 2001, the most recent Upside Report, issued in pre-reform Scrooge fashion on December 25, 2000, estimated that Oracle would earn 12.7 cents per share in 3Q 01 with license revenue growth of 33%. FN37

> FN37. DX 24.

*J. The January 15 Upside and Pipeline Reports And The January 17 Flash Report*

Throughout January, the record indicates that Henley pressed his EMC colleagues hard about their projections. He wanted to make sure that they were confident in their projections given the weakening state of the overall economy and the disappearance of many dot.coms to which Oracle had previously made sales. In this endeavor, Henley was aided by Jennifer Minton, who acted as the point person and filter for Henley in working with the sales **918** units. At the EMC meetings, Henley regularly asked the heads of the sales units whether they were standing by their forecasts and whether the overall economic climate was adversely affecting their sales prospects. There is no evidence in the record that suggests that Henley or Ellison-or Minton-were ever informed by their EMC colleagues that the projections they were presenting were not their best estimates or not achievable.

By mid January, Oracle began to have a sense as to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                 Page 15

867 A.2d 904
**(Cite as: 867 A.2d 904)**

how its first month of 3Q 01 had progressed. On January 15, Upside and Pipeline Reports were produced that showed less bullishness on the part of Minton and line sales units. The Upside Report's Best Estimate for 3Q 01 earnings was 12.11 cents per share and its Best Estimate of License Revenue Growth was 29%. FN38 Although this represented some slippage from the December 11 Pipeline Report, which estimated earnings of 12.82 cents per share and License Revenue growth of 33%, it still forecasted results exceeding the Market Estimates.

> FN38. DX 25.

In keeping with the previous comments about Henley's and Minton's inquiries into the confidence that the sales units had in their projections, the downward revisions in the revenues Best Estimate resulted from input from the sales units about their experience in the quarter to date and their expectations about the rest of the quarter. For example, on January 11, David Winton, the finance director of Oracle's NAS unit sent an e-mail to Jennifer Minton, maintaining that important unit's forecast of $346 million in revenue for 3Q 01 but reducing its best case estimate downwards from $376.8 to $360 million. FN39 In his e-mail, Winton attributed the revision to: Pipeline growth that was not "as we had anticipated" and that was " slightly down" from "December end reporting;" a lack of big deals that could drive revenues past $360 million; and a slow down in technology spending by customers. FN40 Nonetheless, Winton ended his e-mail by indicating he thought NAS was "still ... tracking to end Q3 @ $354-$355 [million]." FN41

> FN39. DX 107.
>
> FN40. *Id.*
>
> FN41. *Id.*

Even with this softening of sales unit expectations, the January 15 Pipeline Report depicted Pipeline growth of 34% 3Q 00, FN42 which exceeded the 25% public projection for license revenue growth.

The January 15 Pipeline Report also indicated that if Oracle could convert 51% of the Pipeline-the same percentage as in 3Q 00-into actual revenues, it would achieve sales of more than $200 million in excess of public estimates. FN43 A conversion ratio of 51% was not a historical anomaly that had only occurred at Oracle in 3Q 00; Oracle had performed above that level for the 7 previous quarters. FN44

> FN42. DX 36.
>
> FN43. *Id.* at 3441; *see* DC 23.
>
> FN44. DC 24.

On January 17, the so-called Flash Report for the first month of 3Q 01 came out and was circulated to Ellison, Henley and Minton, among others. The Flash Report summarized the actual results for December, indicating that:

> The license revenues growth rate was 35% in USD, 25 points better than the 10% growth we experienced in December FY00 over December FY99. However, excluding the $60 million Covisint license deal, the USD growth rate would have been only 6%. Excluding Covisint, **\*919** OPI license revenue growth would have been (85%). FN45

> FN45. DX 40. In their brief, the plaintiffs argue that the staffer who prepared the report, Larry Garnick, incorrectly calculated license growth without Covisint as 6% when it should have been 1% in U.S. dollars. *See* Ellison Dep. at 319; Garnick Dep. at 34-37.

The Flash Report highlighted that the Covisint transaction was significant, indicating that meeting the Market Estimates would have been more difficult without the Covisint revenue. In the Flash Report, the recipients were also informed that Oracle's "December license results represent[ed] 19% of the total forecast for Q3 FY01. In FY00 and FY99, December represented 16% and 19%, respectively, of the quarter total." FN46

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

FN46. DX 40.

As of mid January, 2001, the record contains evidence of concerns at the sub-EMC level regarding the effect of the dot.com bust and of the economic slowdown on Oracle's likely sales for 3Q 01-that is, of the same concerns that caused Henley and Minton to ask questions about the sales units' confidence in their numbers. What is lacking altogether, however, is any evidence that Ellison or Henley were informed at the EMC meeting that Oracle was not on track to meet the Market Estimates. Indeed, as of the January 15 Upside Report, Oracle's North American-based sales units (NAS, OPI, and OSI) had not revised their unit-level license revenue forecasts for 3Q 01. Those forecasts were exactly the same as the December 11, 2000 forecasts before the Market Estimates were made. FN47 Although Minton had reduced her upside adjustments to the December 11, 2000 OSI and OPI forecasts by this point, her adjustments still resulted in license revenues and earnings above the Market Estimates.

> FN47. *Compare* DX 22 at 2990 (12/11/00 Upside Report), *with* DX 24 at 3192 (12/25/00), *and* DX 25 at 3345 (1/15/00). These all show identical forecasts indicating that OSI, NAS, and OPI would deliver $225 million, $346 million, and $150 million in license revenues respectively.

### K. *Ellison Begins Trading*

In mid January, the trades that most inspire this lawsuit began to take place. For over a year, Ellison's personal financial advisor, Philip Simon, had been urging Ellison to diversify his stock portfolio, which was overwhelmingly weighted towards Oracle. Likewise, Simon had advised Ellison that he should exercise 22 million Oracle options that would reach their ten year expiration date in August 2001. Simon believed that it was prudent for Ellison to exercise his options and sell some of his Oracle stock to: 1) pay taxes on the option gains, 2) pay down some personal debt, and 3) diversify his stock portfolio.

Ellison did not act with alacrity on Simon's advice. He dilly-dallied until January 2001 when he decided to exercise his options and sell some shares. By January 2001, Ellison had only three trading windows left (including 3Q 01) under Oracle's trading policies to exercise his valuable, in-the-money options; otherwise, they would expire worthless. At the time Ellison decided to sell, Simon was on vacation. When Simon returned on January 19, Ellison instructed him to exercise the options and to sell some of his stock. That same day Ellison obtained clearance from Cooperman to sell Oracle shares but did not clear his trades separately with Henley.

Ellison's goal was to sell 40 million shares, a hefty number by any standard and one in excess of the 22 million exercised options, but which if achieved would have disposed of only around 3% of Ellison's *920 Oracle holdings. Because of the volume involved, Ellison instructed that his trades not exceed 15% of any single day's trading and that no shares be sold below a price of $30. Simon was instructed not to sell in February even though Ellison was cleared to trade in the first two days of that month. FN48

> FN48. Ellison initially received clearance to trade from January 19, 2001 to January 26, 2001. PX 10. Having not met his target, he sought and received a second approval extending the period during which he could trade. PX 12.

Beginning on January 22, 2001 and ending on January 31, 2001, Simon sold 29 million shares for Ellison at an average price of $30.76. The 29 million shares were fewer than the 40 million that Ellison had set as a goal and had been cleared to sell, and comprised 2.09% of his total Oracle holdings. Because of the various trading limitations involving price, daily volume, and duration that Ellison had imposed, Simon was unable to sell all 40 million shares. Nonetheless, Ellison's sales generated gross proceeds of approximately $895 million. FN49

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

FN49. Second Amended Complaint ¶ 88.

L. *The January 22 Upside Report*

On the day Simon began trading for Ellison, the January 22 Upside Report was issued. The Best Estimate in that Report predicted that Oracle would earn 12.06 cents per share in 3Q 01 and have license revenue growth of 29%. FN50 Again, the sales unit forecasts for NAS, OSI, and OPI remained unchanged from their levels on December 11, 2000. FN51

FN50. DX 26.

FN51. *Id.* at 3552.

Again, throughout this period, Henley and Minton continued to ask the sales units about the confidence they had in their numbers.

M. *The January 29 Upside Report*

January 31 was the last day that Ellison sold Oracle stock during 3Q 01. Ellison's trades that day, and on January 30, followed a January 29 Upside Report that predicted as a Best Estimate that Oracle would earn less than 12.0 cents per share in 3Q 01. The January 29 Best Estimate was 11.58 cents per share, FN52 a number that, under Oracle's past practice, would have been rounded up to 12.0 cents per share for reporting purposes. Nonetheless, the Best Estimate was below 12.0 cents and the Best Estimate of license revenue growth was reduced to 24%. FN53

FN52. DX 27.

FN53. *Id.*

Thus, the January 29 Upside Report indicated that Oracle might not meet the Market Estimates it gave to analysts. Nonetheless, there is no evidence that anyone at Oracle informed Ellison that Oracle could not meet its Market Estimates or would fall materially short of them. As important, there is no

evidence that Ellison's last trades in January 2001 were influenced in any manner by the January 29 Upside Report and it would be odd if they were, as the Best Estimate in that Report still had Oracle projected to meet the Market Estimates more or less exactly. In this respect, it is important to note that the unit-level forecasts made by NAS, OPI, and OSI remained unchanged from their December 11, 2000 levels, although by this time Minton was applying a negative adjustment to the OSI forecast. FN54

FN54. DX 27 at 3612.

In his deposition, Henley acknowledged that the January 29 Upside Report was of concern to him. This was not because it *921 contained information that indicated that Oracle would surely miss its Market Estimates, but because for the first time in his view, it appeared that Oracle would face "more of a horse race" to beat those Estimates. FN55 Henley, however, noted that it was not unusual for Oracle to be in this situation, as it had experienced several quarters when its Best Estimate suggested a horse race but when Oracle later met or exceeded market expectations. FN56

FN55. Henley Dep. at 266-67.

FN56. *Id.*

N. *The Immediate Post-Sales Period Financial Estimates*

By February 1, 2001, all the trades challenged in this case were completed. On February 5, an Upside Report as well as the first Pipeline Report since January 15, 2001 were issued. The February 5 Upside Report's Best Estimate for earnings was now only 11.29 cents per share and for license revenue growth was 20%, both figures that were below the Market Estimates. FN57 The February Pipeline Report, meanwhile, showed a reduction from 34% to 32% from the January 15 Pipeline Report. FN58 For the first time, the NAS, OSI, and OPI unit-level forecasts were reduced below December 11, 2000 levels. FN59

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

FN57. DX 28.

FN58. *Compare* DX 37, *with* DX 36.

FN59. *Compare* DX 28 at 3750, *with* DX 27 at 3612.

Consistent with this softening, the February 8 Flash Report indicated that Oracle's internal forecasts were running 8% behind where they needed to be to generate the 23% license revenue growth the Report indicated market analysts now expected. At the same time, the Flash Report indicated that Oracle had achieved 25% license revenue growth in the quarter to date ("QTD")-i.e., in December and January-and that "QTD license results represent 36% of the total forecast for Q3 FY 01. In FY 00 and FY 99, January QTD represented 33% and 38%, respectively, of the quarter total." FN60 As with the earlier January Flash Report, the February Flash Report made clear that absent the Covisint transaction, Oracle's overall QTD revenue growth would have been only 8% rather than 25% and that the OPI unit (that made the Covisint sale) would have had license revenue growth of negative 63%.

FN60. DX 41.

None of this information, however, was provided to Ellison until after his trading activity was already completed.

O. *A Key Analyst Issues An Updated Report On The Prospects For Oracle's 3Q 01*

The plaintiffs place weight on a February 9, 2001 report put out by Chuck Phillips, who was then a senior analyst at Morgan Stanley. The report was entitled "Getting Through Q3 in Good Shape." FN61 In that report, Phillips opined that Oracle's business strategy of focusing on delivering integrated enterprise software products that helped organizations meet all their computing needs was a sound one, but noted that Oracle, like other companies, faced a drop-off in revenue from dot.com customers, many of whom had not survived 2000. As a result, Phillips thought that Oracle

would suffer a "temporary dip in database license growth." FN62 Although Phillips' "earning number this quarter remain[ed] unchanged at $ 0.12 per share," he reduced his license revenue **\*922** growth by $40 million, to a figure of 18.5% growth over 3Q 00 levels. FN63 While his earnings figure stayed the same, Phillips noted that his reduction in license revenue expectations probably eliminated "any earnings upside" for the quarter. FN64 Overall, Phillips noted that "3Q 01 should be an OK quarter for Oracle-in a period when most technology companies aren't having OK quarters-followed by a better quarter in 4Q 01." FN65

FN61. PX 131.

FN62. *Id.* at 2.

FN63. *Id.* at 3.

FN64. *Id.*

FN65. *Id.* at 2-3.

After Phillips released his report, Oracle's stock price dropped by more than 13%. FN66

FN66. Fischel Aff. ¶ 12.

P. *The February 12, 19, and 26 Upside Reports*

On February 12, the Upside Report raised its Best Estimate to 11.58 cents per share with license revenue growth of 21%. FN67 By February 19, the Upside Report's Best Estimate declined to 11.23 cents per share with license revenue growth of 19%. FN68 The NAS, OSI, and OPI unit level forecasts were also changing during this period, largely in tandem with the Best Estimate.

FN67. DX 29.

FN68. DX 31.

In the last week of each quarter, Oracle generates daily Upside Reports. On February 26, the Upside

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

Report's Best Estimate was down to 11.19 cents a share, a number that was still within striking distance of 12 cents per share. FN69

FN69. DX 32.

Regrettably for Oracle, that was not as bad as things would get.

Q. *The End Of Quarter Developments, AKA, The Bottom Falls Out*

Shortly before 1:00 a.m. on Monday, February 26, 2001, the head of Oracle's important NAS unit, George Roberts, sent an e-mail to Ellison, Henley, Minton, and other top managers stating:

On Friday John Nugent told me that he had 10mm of forecasted business fall out of the forecast in the West area. It was not one or two deals but over 70 separate transactions slipped. The mix of accounts was 70% new economy and 30% brick and mortar. The top reason given by the companies was capital preservation. FN70

FN70. DX 134.

This reduction contributed to Minton adjusting the NAS unit's projected license revenue from $346 million as of January 29, 2001, FN71 and from $320-325 million as of mid February, to only $300 million in the February 26 Upside Report. FN72 In his e-mail, Roberts included an e-mail from one of his own subordinates, Nick Classik, which he had received over the weekend and which stated in part:

FN71. DX 27 at 3612.

FN72. DX 32 at 4262.

*The past 6 business days our forecast has dropped to the point that I know that our organization will have put ... Oracle ... in a bad spot.... Thursday afternoon, it looked like our forecast would be in the low $60's m. After netting everything thru Friday night we will off an addl $10m and are*

looking at a quarter number in the low 50's. I am aware of the impact this news has to Oracle and I am sorry that we have **\*923** created such a problem. *This is my organization and I am responsible for a forecast to you-I failed.* From the 2-16[-01] forecast to the 2-23[-01] forecast we had 78 field deals, by 47 different reps totaling $14.9m move out of the quarter. *The last month of the quarter I go over deal, line by line item with the managers weekly. This has been successful in the past as it gives me the oppt to get accurate info to provide upper management and build a reliable forecast. George, you have been a great supporter for my team and myself. In my 6 years with Oracle this is the most difficult news I have had to deliver as a forecast, especially this late in the quarter, is a personal commitment and I have let you and Oracle down. I am sorry.* FN73

FN73. DX 134 (emphasis added).

Henley and Ellison both responded to Roberts' e-mail. Henley's response was terse:

This has been the "economy risk" we've been facing all quarter. You really don't see it until the end of the quarter when people have to sign the dotted line and they are more cautious so things start slipping. FN74

FN74. DX 132.

Meanwhile, Ellison asked Roberts whether the " deals have slipped into Q4 or have they simply disappeared?" FN75 Roberts asked his subordinate Classik for his thoughts. Classik replied:

FN75. DX 133.

NET-lost to competition 5%, firm q4 projects 25%, delayed until economic or business conditions are clearer 70%. We had 5 POs cut that Presidents pulled until April as they wanted to see what their q1 would look like. The uncertainty of their business and outlooks for the year has caused many clients to delay until they better understand what

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

directions 2001 will take. We can't commit this 70% as April results and the business climate will have to determine. FN76

FN76. DX 133.

In another e-mail that day, Henley implied that Oracle still had a chance to meet its market projections for earnings because of improved expense reductions. FN77 By the next day, that hope was dashed as Minton informed him that Oracle's so-called "Big Deals" estimate had dropped "From 40% growth [over 3Q 00] to 25% in one day" FN78-i.e., from February 26 until February 27. Henley was not as shocked as Minton, informing her "like I said to Larry it can change quickly so this isn't a surprise to me." FN79

FN77. DX 131.

FN78. DX 136.

FN79. *Id.*

On February 27 and 28, Minton traded e-mails with Sarah Kopp of Oracle's OIS unit regarding OIS's likely revenues. In the course of those e-mails, OIS reduced its estimates for quarterly revenues by approximately $100 million in a day and a half, as deals slipped into the future or away altogether. FN80

FN80. DX 135 & DX 60 (summarized in DC 35).

By the last day of the quarter, the Best Estimate in the final Upside Report for 3Q 01 estimated earnings at 10.07 cents per share, with License Revenue growth of only 7%. FN81 That represented a major decline from the previous day's Upside Report which had a Best Estimate of earnings at 10.9 cents and License Revenue **\*924** growth of 10%, with total revenues over $115 million in excess of the succeeding day's Upside Report. FN82

FN81. DX 34.

FN82. *Compare* DX 33, *with* DX 34.

R. *The Market Reacts Negatively To Oracle's 3Q 01 Performance*

On March 1, 2001, Oracle previewed that its final performance in 3Q 01 would not meet the market estimates. It announced that it would likely earn only 10 cents per share on license revenue growth of 2%, compared to 12 cents per share and about 25% license revenue growth in the Market Estimates. FN83 In the earnings press release, Ellison attributed the results to customer decisions to "delay their IT spending based on the economic slowdown in the United States.... The problem is the U.S. economy." FN84

FN83. *See* DX 87 (announcing a 6% in constant dollars increase including a 4% negative currency impact). The 4% highlights the distinction between results measured in constant dollars, building in currency and inflation adjustments, and results measured in U.S. dollars. This distinction can affect the calculation by several percentage points, and can create confusion if overlooked. Here, the 6% figure in constant dollars signifies a 2% increase in U.S. Dollars. *See* PC 30. The guidance for license revenue of about 25% was in U.S. dollars and is therefore appropriately compared to the 2% actual revenue increase in U.S. dollars.

FN84. *Id.*

Ellison and Henley held a conference call with analysts that same day. In that call, both Ellison and Henley attributed the failure to meet the Market Estimates to a decline in business from dot.coms and, most important, to a general economic slowdown that resulted in a large number of deals getting deferred at the very end of the quarter. Henley indicated on the call that Oracle had felt " very good about our quarter" as late as Friday February 23, 2001 but that they started to "see a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

few cracks" that day. FN85 By the end of the quarter, a "significant amount of deals ... were deferred." FN86

> FN85. PX 104 at 81614.

> FN86. *Id.*

Henley was participating on a cell phone and thus Ellison fielded most of the questions. At one point, Morgan Stanley analyst Charles Phillips asked him whether Oracle was ahead of where it expected to be entering into February. Ellison answered yes and indicated that "[w]e were well ahead of our numbers at the end of January. And the pipeline looked terrific, you know, going into February." FN87

> FN87. *Id.* at 81621.

This statement was erroneous. Although Oracle's quarter-to-date internal forecasts (including the Pipeline) as of the end of January showed that the company would likely come close to, if not meet, the Market Estimates, they did not show results "well ahead" of expectations. In general, however, what Ellison stressed was the large number of sales that were deferred at the end of the quarter, a phenomenon he attributed to the reluctance of potential customers to make large financial commitments to new IT expenditures in the face of a weakening economy. Ellison's essential bullishness about Oracle comes through in the call transcript and the lengthy call finished with Ellison answering a question about the Pipeline by indicating that Oracle's "pipeline building looks normal." FN88 Henley jumped in at that point and indicated that it was too soon to know whether that was so and that Oracle would be in a better position to comment on that issue at a later call that was less hastily convened, as the March 1 ***925** call was simply designed to give the market the "best quick" update about 3Q 01 Oracle could give. FN89 This echoed Henley's earlier statements about the uncertainty Oracle faced as a result of general economic conditions.

> FN88. *Id.* at 81629.

> FN89. *Id.*

Although the 10 cents per share Oracle expected to earn in 3Q 01 exceeded the company's 3Q 00 performance and was the best third quarter in the company's history, the market was not pleased. Oracle's stock price dropped approximately 21% in one day. FN90

> FN90. Second Amended Complaint ¶ 75.

On March 15, 2000, Oracle released final figures for 3Q 01, which were generally in line with its March 1, 2001 press release. Earnings were 10 cents per share and license revenue growth was 5%. FN91

> FN91. PC 30 (indicating that final license growth in U.S. dollars was 5% as opposed to 2% in the March 1 pre-announcement).

## II. *Summary Of The Plaintiffs' Claims*

The plaintiffs bring two types of claims against Ellison and Henley.

First and most important, they assert that there is evidence from which a rational fact-finder could conclude that Ellison and Henley injured Oracle as a company by: 1) possessing nonpublic, material information demonstrating that Oracle would miss its Market Estimates for 3Q 01; and 2) deciding to sell shares of stock in whole or in part because of their knowledge of this negative information. This type of claim is a state version of a federal insider trading claim and has its origins in Delaware law in the venerable case of *Brophy v. Cities Service Co.* FN92 As the plaintiffs see it, *Brophy* and its progeny apply a form of entire fairness analysis to sales of stock by corporate fiduciaries. If the court concludes that the selling fiduciary should, with the exercise of reasonable prudence, have recognized that there was a risk that his company would not meet its public projections, then that fiduciary is bound to restore to the company the excess profits

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

he made (as a state law remedy). That is, because of the selling fiduciary's self-interest, the absence of scienter is argued to be irrelevant to the resolution of a disloyalty claim rooted in *Brophy*. In the alternative, the plaintiffs also argue that there is sufficient evidence of scienter on both Henley's and Ellison's part for their *Brophy* claim to withstand this motion for summary judgment.

FN92. 70 A.2d 5 (Del.Ch.1949).

Second, the plaintiffs argue that Ellison and Henley are liable to Oracle under a breach of contract theory because their sales supposedly violated certain Options contracts that they signed with Oracle-as the undisputed record indicates-after they had completed all their trades. Remarkably, the plaintiffs press this claim even though it has been twice dismissed by Judge John G. Schwartz of the California Superior Court, who is presiding over a derivative case that overlaps with this one. The plaintiffs in this litigation are actively cooperating with the California plaintiffs in a joint effort to obtain relief. The same lawyer who argued the breach of contract theory to Judge Schwartz made the bulk of the summary judgment argument before me in this case. For the plaintiffs to ask me to assess the viability of a claim made derivatively on behalf of Oracle by them in California-that rests on California law-that was dismissed by Judge Schwartz the first time without prejudice-and that was dismissed by him the second time with prejudice after the plaintiffs' amended complaint failed to demonstrate**\*926** to his satisfaction the viability of the claim-is to ask me to act as an appellate court over Judge Schwartz. Indeed, the plaintiffs ask me to conclude that Judge Schwartz was "mistaken" in his legal reasoning and therefore that I should "reconsider the issue" he previously decided adversely to them. FN93

FN93. Plaintiffs' Br. at 87-88.

Because the plaintiffs here are obviously acting in concert with the California plaintiffs and using the very same lawyers who are litigating the derivative case in California, because there is no reason to

believe that Judge Schwartz did not fairly consider this claim, and because the California plaintiffs have a full and fair opportunity to appeal Judge Schwartz's ruling after a final judgment in the California action, there is no principled basis for me to engage in a fresh trial-court examination of the plaintiffs' contract claim without violating principles of comity and inviting inter-state judicial conflicts that present a real threat of inconsistent rulings about identical issues affecting identically situated parties. The public policy of this State seeks to avoid the unseemliness, unfairness, and inefficiency that results when different courts adjudicate identical claims. FN94 At various times in this case, the plaintiffs have attempted to bypass this court and get a ruling in California. In this instance, they got not one, but two rulings in California dismissing their contract claims, and they are stuck with the dismissal order until it is reversed on appeal by a California court.

> FN94. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.,* 263 A.2d 281, 283 (Del.1970); *see also Issen & Settler v. GCS Enterprises, Inc.,* 1981 WL 15131, at \*5 (Del.Ch. Dec. 7, 1981) (explaining that the same issues of wasteful duplication and possible inconsistency apply in determining whether to lift a stay); *Maldonado v. Flynn,* 417 A.2d 378, 381 (Del.Ch.1980) (discussing how similar principles ground the doctrine of res judicata).

III. *Summary Judgment Standard*

To prevail on this motion, Ellison and Henley must show that there are no material, disputed issues of fact and that they are entitled to judgment as a matter of law. FN95 In examining the record, I must draw every reasonable inference in the plaintiffs' favor. FN96 If upon such an examination, I conclude that a rational finder of fact could determine, based on the record, that the plaintiffs have adduced evidence that supports a conclusion that Ellison and Henley breached their fiduciary duties then I must deny their motion for summary judgment. FN97

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

FN95. *E.g., Acro Extrusion Corp. v. Cunningham,* 810 A.2d 345, 347 (Del.2002).

FN96. *Id.*

FN97. *Cerberus Int'l, Ltd. v. Apollo Mgmt. L.P.,* 794 A.2d 1141, 1149-50 (Del.2002).

Specifically, as I next explain, under *Brophy* there are two critical determinations that must be made on this motion about each of the defendants. First, is there record evidence that would buttress a rational determination that either Ellison or Henley possessed material, nonpublic information at the time of their trades? Second, is there record evidence that would support a rational finding that either Ellison or Henley decided to sell Oracle shares, in whole or part, because they possessed material, nonpublic information suggesting that Oracle would not meet its Market Estimates and that its stock price would fall? Before making these determinations, I must back-track and explain why I perceive these to be the key inquiries. That endeavor begins next.


IV. *The Parties' Battle Over Brophy*

The plaintiffs' claims against Ellison and Henley have their origins in this court's \*927 decision in *Brophy v. Cities Service Co.* FN98 In that case, a derivative action was filed on behalf of Cities Service against the confidential secretary of one of the company's directors. After learning that the company intended to repurchase shares of its stock, the secretary bought shares for his own account in advance of the company and profited when the company's repurchase program-which the secretary, but not the public, knew was coming-drove up the company's stock price. FN99

FN98. *Brophy v. Cities Service Co.,* 70 A.2d 5 (Del.Ch.1949).

FN99. *Id.*

The derivative plaintiff argued that a constructive

trust in favor of Cities Service should be placed on the defendant's trading profits. In response, the defendant claimed that he should not be liable to the company because his trading activities did not cause the company to suffer a loss-i.e., that the corporation could not recover unless it proved that it was damaged by the defendant's trading activity. This court, per Chancellor Harrington, rejected the defendant's argument and based its reasoning on principles of restitution. A fiduciary in the defendant's position, the court held, could not use corporate "information for his own personal gain." FN100 When that fiduciary breaches his duty not to use the corporation's confidential information for personal profit, the court held that the appropriate remedy was disgorgement of the ill-gotten gains to the corporation. FN101 In so ruling, the court relied on the Restatement of Restitution. FN102

FN100. *Id.* at 8.

FN101. *Id.*

FN102. *Id.* (citing Restatement (First) of Restitution § 200 cmt. a (1937)).

Since *Brophy* was decided, it has been cited frequently by the courts of this State. But the *Brophy* doctrine has, to my knowledge, never been applied by this court to support a final judgment awarding restitution to an issuer. It has, however, been cited as an important precedent by courts in other states, such as New York, which have adopted its teaching. FN103

FN103. *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969); *see also* Restatement (Second) of Agency § 388 cmt. c (1958) (noting that a corporate officer who profits from misuse of corporate information holds the trading profits in "constructive trust for the principal," i.e., the company).

The parties in this case warmly disagree about the continued vitality of *Brophy* and the precise contours of a *Brophy* claim under Delaware law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

For their part, Ellison and Henley contend that *Brophy* should no longer form part of Delaware's common law of corporations. *Brophy* and its key progeny in New York, FN104 they note, were decided before the emergence of a potent federal securities law regime designed to discourage improper trading by corporate insiders. FN105 A comprehensive array of federal statutes now addresses insider trading and subjects corporate insiders to: 1) the possibility of criminal convictions, FN106 2) the disgorgement of trading *928 profits to sellers or buyers who suffer losses, FN107 and 3) civil penalties to the Treasury of the United States in the amount of three times their illicit trading profits. FN108 As a result, the defendants contend that *Brophy* is no longer a necessary or appropriate part of our common law. FN109 *Brophy's* perpetuation, defendants argue, risks subjecting corporate insiders to duplicative liability, by having this court heap a restitution award to their companies on top of disgorgement to traders and the payment of a multiple of their trading profits to the Treasury of the United States. FN110 Moreover, it increases litigation costs unnecessarily by encouraging duplicative state law suits whose deterrent value is not worth the cost, due to the strong federal disincentive to the wrongful exploitation of corporate information. FN111

> FN104. *See Diamond,* 301 N.Y.S.2d 78, 248 N.E.2d at 913-14 (noting absence of an adequate federal remedy in justifying its embrace of *Brophy* ).

> FN105. Some states rejected the *Brophy* approach and have required derivative plaintiffs relying on insider trading claims to show actual injury to the corporation. *See Schein v. Chasen,* 313 So.2d 739, 746 (Fla.1975) ("We adhere to previous precedent established by the courts in this state that actual damage to the corporation must be alleged in the complaint to substantiate a stockholders' derivative action.").

> FN106. *E.g.,* 15 *U.S.C.* § 78ff.

> FN107. 15 *U.S.C.* § 78t-1. Such an action may be brought as a private right of action under SEC Rule 10(b)(5), 17 C.F.R. § 240.10b-5. *See* 15 *U.S.C.* § 78j(b) (codifying § 10(b) of the 1934 Act); 15 *U.S.C.* § 78t-1 (granting an explicit right of private action under Rule 10b-5 pursuant to the Insider Trading and Securities Fraud Enforcement Act of 1988); *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196-97, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (noting that courts had long implied the well-established right of private action under Rule 10b-5); *Kardon v. National Gypsum,* 69 F.Supp. 512 (E.D.Pa.1946) (first implying a right of private action for damages under Rule 10b-5). It may also proceed as a class action. 15 *U.S.C.* § 78u-4. Other federal statutes also restrict improper insider trading in certain circumstances. *See, e.g.,* 15 *U.S.C.* § 78p(b) (codifying § 16(b) of the 1934 Act which allows corporations to recover short-swing profits).

> FN108. 15 *U.S.C.* § 78u-1.

> FN109. In fact, federal judicial interpretations of Rule 10(b)(5) often root culpability for use of inside information in the user's status as a fiduciary, construing such misappropriations as a breach of fiduciary duty that is deceptive and therefore proscribed by Rule 10(b)(5). *E.g., U.S. v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ; *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 937 (9th Cir.); *cert. denied,* 540 U.S. 966, 124 S.Ct. 433, 157 L.Ed.2d 311 (2003).

> FN110. In this very situation, they note, the defendants already face a suit for disgorgement by a class of *Oracle* stockholders under §§ 10(b) and 20(a) of the 1934 Act. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp., et al.,* 380 F.3d 1226 (9th Cir.2004).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.