FN111. The arguments the defendants make have been found potentially to have vivid color by this court. *See Goldman v. Isaacs,* 2001 WL 1671439 (Del.Ch. Dec.17, 2001) (*sua sponte* asking counsel to brief the question of whether *Brophy* has continued vitality in light of the emergence of a comprehensive federal regime to control improper inside trading). In other matters, this court has been reluctant to have equity fill non-existant gaps in the federal regulation of securities markets. *E.g., RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 312454, at *10 n. 45 (Del.Ch. Mar.7, 2001)(declining to create a state law cause of action for market manipulation to cover short-selling that was permissible under federal law and noting that equity "does not create remedies where the parties' behavior is already closely regulated by the law") (citing 27A Am.Jur.2d *Equity* § 113 (1996) ). Notably, the abolition of *Brophy* would not preclude a recovery by the corporation for *actual* harm to itself caused by illicit insider trading by a fiduciary, but the existence and extent of such damage would have to be proven.

If *Brophy* survives, the defendants contend that it must be interpreted as a context-specific application of loyalty principles. Thus, a *Brophy* claim can be sustained only if the trading insider can be said to have engaged in conscious wrongdoing by executing trades, in whole or in part, because the insider knowingly possessed material, nonpublic information. This reading of *Brophy,* the defendants contend, is consistent with that articulated in all the Delaware cases that apply *Brophy.*

**\*929** The plaintiffs strongly disagree with this line of reasoning. They contend that *Brophy* fulfills a distinct purpose by providing corporations themselves with a potent remedy against the improper use of company information. The federal regime generates monetary remedies that go to injured buyers or sellers or to the U.S. government, but not the corporation whose information has been

usurped by a faithless fiduciary and whose business has been disrupted by the tumult and expense that often accompanies inside trader cases involving top fiduciaries. Thus, the subsequent emergence of a federal system addressing insider trading should not, say the plaintiffs, lead this court to abandon the well-established precedent of *Brophy,* a precedent that is grounded in settled principles of restitution and that provides a simple-to-calculate remedy. FN112

FN112. Notably, the American Law Institute continues to embrace *Brophy* in § 5.04 of its Principles of Corporate Governance and Structure (Proposed Final Draft, Mar. 31, 1992). *See* Douglas M. Branson, *Choosing the Appropriate Default Rule-Insider Trading Under State Law,* 45 Ala. L.Rev. 753, 761-768 (1994). As a respected commentator notes, there is some efficiency to the ALI approach. *See* Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition,* 52 Wash. & Lee L.Rev. 1189, 1252-57 (1995) . Professor Bainbridge argues that, under the ALI regime, a company has a property right in information, and damage sustained by the company through misuse of information is remedied through disgorgement. As he sees it, the property right coupled with penalty for misuse permits the company to disseminate information freely throughout the company for proper use, thereby maximizing potential productivity by creating a disincentive for its misuse. Provision of a simple remedy, equivalent to any ill-gotten gains, is arguably more socially useful than imprecise, case-by-case assessment of actual damage to the company.

Indeed, the plaintiffs argue that *Brophy* should be strengthened and not abandoned. Rather than simply ordering disgorgement when a fiduciary has knowingly traded on inside information, this court should treat insider trading as a self-dealing transaction and require the fiduciary to prove that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

his trades were entirely fair to the corporation. If the court concludes that the insider had material information at the time of his trades, the insider should be required to disgorge his trading profits to the corporation regardless of whether he acted with scienter, in the sense that he traded, in whole or in part, because he knowingly possessed material, inside information.

In the pages that follow, I address these arguments in the following manner. Initially, I determine whether summary judgment is appropriate even if *Brophy* remains good law. In the course of that exercise, I first outline what I find to be the elements of a *Brophy* claim. I then evaluate the sufficiency of the plaintiffs' claim by comparing those elements to the factual record submitted to me.

Because that analysis results in the conclusion that the defendants are entitled to summary judgment, I decline their invitation for me to conclude that *Brophy* is an outdated precedent that ought to be abandoned. The important policy question the defendants have raised can be left to a later case in which the answer to that question is outcome-determinative. Because the defendants prevail under a reasoned application of *Brophy,* it is unnecessary to make a broad ruling with sweeping effect.

### V. *The Elements Of A Brophy Claim*

Much of the plaintiffs' argument, as will become clear, is grounded in the notion that a corporate insider is strictly liable to return any trading profits if: 1) the insider possessed information that cast some *930 doubt on the company's ability to meet its public earnings and revenues projections, and 2) the company later failed to meet those projections. That is so, the thrust of the plaintiffs' submissions suggest, even if the insider subjectively believed the company would meet its projections and even if the company's best estimate of its performance suggested that the company would meet, exceed, or fall immaterially short of the projections.

The policy basis for this argument is not particularly clear. I suppose it rests in the notion that corporate insiders ought to be extremely scrupulous about trading in their company's shares. Of course, given the possibility for criminal liability for insider trading, a disgorgement remedy to the trading public, FN113 and a treble-profits (or loss avoided) disgorgement civil penalty to the United States Treasury at the instance of the SEC FN114-not to mention possible liability under a traditional application of *Brophy* and the threat of reputational self-destruction-it is by no means obvious that the existing legal and ethical regime less than optimally deters the wrongful exploitation of inside information by corporate fiduciaries.

FN113. 15 *U.S.C.* § 78t-1.

FN114. 15 *U.S.C.* § 78u-1(a)(2).

To go down the road the plaintiffs would have Delaware law travel would be to recklessly risk upsetting carefully balanced policy judgments that undergird our law and federal law. There are many reasons why that is a probable result. Here, I note only a few. I begin with the idea that many sophisticated commentators believe that it is a good idea that corporate insiders own company stock because having, as Ross Perot would say, "skin in the game" will tend to align their interests with those of the public stockholders. FN115 For legitimate reasons, directors and officers who own options and stock will at times have to, or find it useful to, sell or buy shares. One can acknowledge that there is an ongoing debate regarding whether, on balance, corporate compensation schemes involving equity have been either prudently designed or sized without obscuring equally obvious points: the use of equity as a compensation tool is a legitimate choice under our law and Delaware statutory law permits and its common law creates incentives for stockholders to serve as directors and officers. FN116

FN115. *See, e.g.,* R. Franklin Balotti & Charles M. Elson, *Equity Ownership and the Duty of Care: Convergence, Revolution, or Evolution?,* 55 Bus. Law. 661, 665 (2000); Steve Thel, *The Genius*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

of Section 16: Regulating the Management of Publicly Held Companies, 42 Hastings L.J. 391, 412 & nn. 63-64 (1991); Daniel R. Fischel, The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware's Corporation Law, 76 Nw. U.L.Rev. 913, 919 (1982) (noting option compensation plans as one example of market mechanisms designed to align manager and shareholder interest).

FN116. There are many cases in which greater credence has been given to the judgment of directors because their equity interests aligned them with the interests of the other stockholders. E.g., Unitrin v. American General Corp., 651 A.2d 1361, 1380-81 (Del.1995) (courts cannot presume that stockholding directors with large equity stakes place their interests in their offices above their "own best economic interests"); In re Pennaco Energy, Inc., 787 A.2d 691, 709 (Del.Ch.2001) (finding it unlikely that large shareholders would vote against their interests as shareholders in order to secure severance packages for change of control); In re IXC Communications, Inc. v. Cincinnati Bell, Inc., 1999 WL 1009174, at *6-7 (Del.Ch. Oct.27, 1999) (finding that directors with large stock holdings would likely have interests aligned with shareholders).

To subject corporate insiders to a possible disgorgement remedy under our law whenever a court, in hindsight, concludes *931 that the insiders should, under some type of due care standard, have suspected that their company would later miss the mark, would cabin the breadth of discretion afforded to Delaware companies to design their own compensation systems and-perhaps worse-raise the barriers that already dissuade large, but not controlling, stockholders from serving on company boards. The plaintiffs admit that their argument depends on treating insider trades as a form of self-dealing. The reasons for this are obvious, and include the plaintiffs' wish to escape another

common feature of corporate charters that is authorized by our law: the exculpatory provisions sanctioned by 8 Del. C. § 102(b)(7).

By construing all insider trading as self-dealing, the plaintiffs can argue with a straight face that a trading fiduciary ought to be held strictly responsible for trading profits made at a time when the court concludes that a more careful fiduciary would have refrained from trading, not necessarily because the fiduciary possessed material information in the traditional sense, but because the fiduciary possessed information that cast some doubt on the company's ability to meet its projections. In the nomenclature of § 102(b)(7), the trading fiduciary would have, in the plaintiffs' view, received an "improper personal benefit" and (given the redundancies pervading § 102(b)(7)) breached her "duty of loyalty" through self-dealing.

For law professors, the good news is that a blind trip down this windy road would not just raise epistemologically difficult questions under § 102(b)(7). It would also create a plaintiff-friendly scheme of insider trading enforcement under state law that would be based on strict liability or negligence principles, and that would be in competition with a federal regime that requires proof of scienter, i.e., an illicit state of mind. The resulting policy clash might provide good fodder for academic writing. It might also fuel further legislative developments, as what was understood by Congress to be a narrow and fixed "Delaware carve-out" FN117 for traditional fiduciary duty claims turns out to be an expanding excavation site that unsettles the structure of federal securities law. FN118 *932 By way of example, a common law rule of the kind that the plaintiffs advocate would tend to discourage companies from providing forward-looking estimates to the market, a disincentive that leans in precisely the opposite direction from recent federal initiatives. FN119 In its current and traditional form, Brophy's recognition of a scienter-based derivative claim is not out of step with federal law. But the evolution of a non-scienter, insider trading-based type of derivative action would create policy incongruence.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN117. *See* 15 *U.S.C.* § 77p(d)(1)(B); Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions,* 57 Vand. L.Rev. 133, 144 n. 40 (2004) ("The Delaware carve-out permits shareholder class action suits in state court in two kinds of cases: (1) a purchase or sale transaction where one side is the issuer or an affiliate, and the other side is exclusively holders of the issuer's equity securities, and (2) recommendations or other communications 'with respect to the sale of securities of the issuer' made to equity holders by or on behalf of the issuer or an affiliate concerning (a) voting, (b) acting in response to a tender or exchange offer, or (c) exercising dissenters' or appraisal rights.") (internal quotation marks and citations omitted); Richard A. Rosen, *The Statutory Safe Harbor for Forward-Looking Statements After Two And A Half Years: Has it Changed The Law? Has It Achieved What Congress Intended?* 76 Wash. U.L.Q. 645, 680-81 (1998) (noting that it is evident that the Delaware carve-out was "designed to preserve remedies where directors have recommended a vote or acceptance of a tender offer ... or where shareholders must vote on a transaction ..." and indicating that federal preemption legislation did not reach derivative actions).

FN118. Arguably, the case of *Malone v. Brincat,* 722 A.2d 5 (Del.1998), already represents an expansion of the Delaware carve-out, because it theoretically permits recovery by stockholders against directors who make knowingly false disclosures that are not in connection with a request for stockholder action or a stockholder's sale or purchase of stock. Under *Malone,* the possibility of a "holder's" recovery thus exists, an outcome that is in tension with federal law. As a practical matter, this state's unusual approach to the certification of class actions in disclosure cases, *see Gaffin v. Teledyne,* 611 A.2d 467, 474

(Del.1992) (holding that because individual reliance predominates over other issues, no class may be certified in a common law fraud claim involving the stockholders of a corporation as a proposed class), serves to limit the utility of *Malone* to plaintiffs' lawyers.

FN119. *E.g.,* 15 *U.S.C.* §§ 77z-2(c)(2) and 78u-5(c)(2) (creating a safe harbor for certain forward-looking statements).

Although there is no doubt that corporate insiders ought to be careful about trading in their own companies' stock, there is more than tolerable doubt that they should be subjected to an enforcement regime that provides them with no predictable basis for determining when it is safe to trade. But, that is precisely the regime that would exist if corporate insiders were strictly liable to return profits if their companies fail to meet market estimates after their trades are completed and if the insiders can be said to have possessed information casting some doubt on their companies' ability to meet the market at the time that they traded. If companies actually provide the market with good estimates that are not unreasonably low-balled, it will of course often be the case that the companies' actual attainment of the estimates will be in some doubt, due to the normal vagaries of doing business in a dynamic marketplace. The rule that the plaintiffs advocate will inevitably operate not simply to deter trading in quarters that turn out poorly but also to deter trades in quarters when it turns out that the company hit the mark, but where that accomplishment was not entirely free from doubt before the quarter ended. That is, because a strict liability or negligence regime would place insiders at substantial personal risk based on events that transpire after their trading activities, insiders would be discouraged from trading whenever it was other than a sure thing that the company would more or less exactly meet its market estimates. FN120 In other words, this regime would involve many of the same problems of hindsight bias that have led the corporate law to eschew a simple negligence regime and to enable corporations to insulate directors even from liability for gross negligence. FN121 Because the cases that would be tried would obviously only involve

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

situations when the insider's corporation deviated markedly from expected performance, fact finders might be more inclined than is empirically justified to conclude that the insiders possessed*933 information that enabled them reliably to predict, before-the-fact, what the after-the-fact outcome would be.

> FN120. To extend the implication further, if an insider *bought* when she had information that might suggest that the company would exceed company estimates, that purchase would also be wrongful and require disgorgement. To be fair, plaintiffs might argue that insiders merely need to bend over backwards, by refraining from selling when prospects are somewhat cloudy and refraining from buying when prospects are somewhat sunny. But, the distinction between partly sunny and partly cloudy is inherently subjective, complicating the retrospective analysis that plaintiffs suggest.

> FN121. William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care With Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem,* 96 Nw. U.L.Rev. 449, 454-55 (2002) (citing Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. The Business Judgment Rule: Differences in Hindsight Bias,* 73 Or. L.Rev. 587, 588 (1994)).

For all these reasons, I would not find the common law evolution that the plaintiffs advocate a sensible one even if I were entitled to consider the question without giving any consideration to previous decisions of this court. The adoption of what can only be seen as a strict liability or negligence-based liability regime to govern insider trading would inhibit legitimate conduct and is unnecessary in light of the strong federal regulatory regime that addresses wrongful and knowing insider trading. FN122

> FN122. A great deal of academic energy has been expended trying to justify and delimit legal prohibitions on insider trading. There is, however, little, if any, disagreement that insider trading should only be prohibited when the trading party acts with scienter, in the sense that the trader should have known she was breaching a duty to some party. *See, e.g.* Alan Strudler & Eric W. Orts, *Moral Principle in the Law of Insider Trading,* 78 Tex. L.Rev. 375, 384 (1999) (treating the scienter requirement as an assumable element of insider trading). The state law of fiduciary duty is important in this analysis because it is easy to conclude that a corporate officer should not exploit nonpublic information to make a profit for herself. *See, e.g.,* Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition,* 52 Wash. & Lee L.Rev. 1189 (1995) (concluding that state law fiduciary duty principles provide a strong rationale for prohibition of insider trading in that they serve to protect property rights). As scholarly work illustrates, the fact that a corporate insider breached a duty to the corporation does not indisputably translate into a conclusion that she has also wronged the person with whom she traded. Rather, (surprisingly) strenuous efforts at reasoning characterize attempts to prove the soundness of this connection. Alan Strudler & Eric W. Orts, *Moral Principle in the Law of Insider Trading,* 78 Tex. L.Rev. 375 passim (1999).
>
> As a practical matter, the existence of the legal prohibition on trading by corporate fiduciaries who possess material, nonpublic corporate information, in itself, makes any violation by a fiduciary a wrong not only to the corporation (whose information she used for improper, personal purposes), but also to the persons with whom she trades. Because the other parties are induced to buy and sell on the promise that they will not be in a market tilted towards insiders who have large

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

informational advantages, an insider who knowingly exploits nonpublic information to make a profit is on notice of the unfairness of her actions towards her trading partners.

And, of course, even a common law court must give due deference to prior precedent, even as it retains the authority, subject to appellate review and legislative intervention, to update the common law in light of new experience. As to the question the plaintiffs now present, the relevant Delaware authority is entirely contrary to their position. In a recent decision, I summarized what I understood and still understand to be the rule of *Brophy*:

> *Delaware law has long held–see* Brophy v. Cities Service, Inc.–*that directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits. This doctrine is not designed to punish inadvertence, but to police intentional misconduct.* As then-Vice Chancellor Berger noted, *Brophy* is rooted in trust principles that provide "that, if a person in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit." Or as then-Vice Chancellor Hartnett put it, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *That is, Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly*__*934__ *on proof that the selling defendants acted with scienter.* FN123

> FN123. *Guttman v. Huang,* 823 A.2d 492, 505 (Del.Ch.2003) (emphasis added) (quoting respectively from *Rosenberg v. Oolie,* 1989 WL 122084, at \*3 (Del.Ch. Oct.16, 1989) (internal quotation marks and citations omitted) and *Stepak v. Ross,* 1985 WL 21137, at \*5 (Del.Ch. Sept.5, 1985) (citations omitted)).

Distilled to its essence, therefore, a plaintiff seeking to prevail on a *Brophy* claim ultimately must show

that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information. To anyone familiar with federal insider trading law, these elements will not look unusual as they more or less track the key requirements to recover against an insider under federal law.

The basic elements, as might be expected, are easier to state than to apply. The federal courts have struggled to shape the basic concepts of materiality and scienter into standards that trial courts can apply to decide actual cases. To that ongoing endeavor, I now turn, beginning with what the concept of materiality means in the context of this case.

### VI. *The Materiality Of Intraquarter Data*

[1] The definition of materiality used by Delaware courts is identical to that used by federal courts. For information to be material, there must be a " substantial likelihood" that the nonpublic fact " would have assumed actual significance in the deliberations" of a person deciding whether to buy, sell, vote, or tender stock. FN124 In other words, the nonpublic information must be of a magnitude that it would, upon disclosure, have "significantly altered the 'total mix' of information in the marketplace." FN125

> FN124. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

> FN125. *Id.*

Materiality is intrinsically a contextual concept that requires consideration of the nature of the supposedly material information that was not public knowledge and of the other information that was known to the market. Here, what is contextually

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

important is that the plaintiffs are arguing that intraquarter operating results, projections, and Pipeline estimates in Henley's and Ellison's possession were material because that information was inconsistent with the Market Estimates Oracle had released on December 14, 2000.

In determining whether the information that Henley and Ellison had access to when they decided to trade is material, it is important to bear in mind the federal disclosure policies that address intraquarter financial information. An experienced securities practitioner described these policies succinctly and well in academic commentary:

Issuers ordinarily do not have to disclose operating results as a quarter progresses-for example, declining sales or reverse trends, changes in product mix or margins, delays in new product introductions, etc.-unless it is necessary to correct a prior statement inaccurate at the time it was made. Financial information is normally disclosed quarterly-as is a company's views of known trends and uncertainties-in the MD & A section of its Forms 10-K and 10-Q. No rule requires the routine reporting of mere changes, or anticipated changes, in operating results during a quarter. A *935 number of cases have said that there is no duty to make intraquarter disclosures, even if results are below a company's own, and the market's, expectations.

Strong policy reasons support this rule. It takes time for a company to generate accurate and reliable information regarding current performance, to analyze the information meaningfully. Requiring disclosure of such information is therefore tantamount to requiring disclosure of internal projections that will constantly change as the quarter progresses. That information is inherently transitory and fragmentary, even if it is in some metaphysical sense 'current' or 'unknown.' FN126

FN126. Richard A. Rosen, *The Statutory Safe Harbor for Forward-Looking Statements After Two And A Half Years: Has it Changed The Law? Has It Achieved What Congress Intended?,* 76 Wash. U.L.Q. 645, 668 (1998).

Congress, the SEC, and the federal courts have continually sought to strike an appropriate balance regarding the appropriate disclosure policy towards forward-looking information such as projections. Wishing to encourage responsible forward-looking disclosure, Congress created a safe harbor for projections and other forward-looking statements in the Private Securities Litigation Reform Act of 1995. FN127 In general, that safe harbor insulates an issuer of securities for liability for a forward-looking statement if it: a) was accompanied by meaningful cautionary language, b) was immaterial, or c) was made without scienter. FN128 That is, the safe harbor represented a codification of concerns that motivated judicial recognition of the "bespeaks caution" doctrine, a doctrine that raised the bar for plaintiffs in securities cases premised on the failure of companies to perform in accordance with past predictions when those predictions had been accompanied by meaningful cautionary statements. FN129 Because, by their very nature, predictions of the future are less certain than statements about past events, courts have been less apt to find forward-looking statements material and have been more dubious of claims that it was reasonable for investors to rely upon such statements in making trading decisions. FN130 At the same time, neither statutory nor judge-made federal disclosure law has insulated defendants absolutely from any liability for making forward-looking statements to the market, recognizing that a blank-check of that kind could injure investors and promote less than optimally careful forward-looking disclosures. FN131

FN127. Pub.L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); *see Rosen,* 76 Wash. U. L.Q. at 646-660 (summarizing the federal statutory provisions comprising the safe harbor).

FN128. *Id.* at 652.

FN129. *E.g., In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,* 7 F.3d 357, 364 (3d Cir.1993), *cert. denied,* 510

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

FN130. *E.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos. Inc.,* 75 F.3d 801, 811 (2d. Cir.1996) (optimistic forward-looking statements that company would perform well are the type of puffery that bespeak caution and are generally not actionable).

FN131. *E.g.,* 15 *U.S.C.* § 77z-2(c)(1)(B) (permitting plaintiff to plead a claim if it sets forth facts that show that the forward-looking statement was made with actual knowledge that it was false or misleading); § 78u-5(c)(1)(B) (same) ; *United States v. Smith,* 155 F.3d 1051, 1065 (9th Cir.1998) ("We have never held-nor even hinted-that forward-looking information or intra-quarter data cannot, *as a matter of law,* be material. Nor has any court for that matter, at least to the best of our knowledge.") (emphasis in original).

This case, of course, involves a slightly, but importantly, different question than is **\*936** presented when plaintiffs seek damages by alleging that a forward-looking statement was itself materially misleading. Here, the plaintiffs allege that Henley and Ellison injured Oracle, not by making the original Market Estimates, but by selling stock while they possessed information suggesting that Oracle would miss those Estimates. That is, this case falls into the category of cases that arise when companies or their insiders, having no general obligation to update their quarterly estimates, engage in market activity that invokes the so-called "disclose or abstain" rule requiring companies and their insiders to either disclose new information or to abstain from market transactions in the companies' shares.

A well-reasoned decision addressing a case of that kind is *Shaw v. Digital Equipment Corp.,* FN132 which was issued by the United States Court of Appeals for the First Circuit. In *Shaw,* the plaintiffs had bought preferred shares of Digital

Equipment Corp. or "DEC" during a mid-quarter offering. In their complaint, the plaintiffs alleged that "DEC had in its possession as of the March 21 offering date nonpublic information concerning the company's ongoing quarter-to-date performance, indicating that the company would suffer unexpectedly large losses for that quarter." FN133 Despite allegedly possessing that information, DEC "failed, in connection with the March public offering, to disclose [these] material factual developments foreboding disastrous quarter-end results." FN134 Notably, the prospectus for the offering was filed only 11 days before the end of the quarter that ended so poorly. FN135

FN132. 82 F.3d 1194 (1st Cir.1996).

FN133. 82 F.3d at 1207.

FN134. *Id.*

FN135. *Id.* at 1211.

In addressing the plaintiffs' appeal of the dismissal of their claim under Section 11 of the Securities Act of 1933-which imposes liability when a registration statement, among other things, omits material facts-the Court of Appeals found it "helpful to conceptualize DEC (the corporate issuer) as an individual insider transacting in the company's securities, and to examine the disclosure obligations that would then arise." FN136 A central purpose of the disclose or abstain rule was to prevent insiders from profiting from the "inherent trading advantage they have over the rest of the contemporaneously trading market by reason of their superior access to information," and this purpose applied equally to an issuer that sought to sell its own shares. FN137

FN136. 82 F.3d at 1203.

FN137. *Id.* at 1203-04 (citations omitted).

The court then went on to determine what, if any, duty DEC had as an issuer to either disclose the intraquarter data it possessed or to abstain from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

selling shares. It rejected the defendants' argument that "there can never be a duty to disclose internally known, pre-end-of-quarter financial information, because any inferences about the quarter that might be drawn from such information could be rendered unreliable by later developments in the same quarter, such as a sudden surge of profitable sales." FN138 Noting that the Supreme Court had rejected so-called bright line approaches to materiality determinations in the analogous context of preliminary merger discussions, the court held that the question of whether intraquarter information " must be disclosed (assuming *937 the existence of a duty), poses a classic materiality issue: given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?" FN139

FN138. *Id.* at 1210.

FN139. 82 F.3d at 1210.

On the other hand, the court took into account the reality that businesses will often possess interim results that might be read to cast doubt on the company's ability to meet market expectation:

[W]e reject any bright-line rule that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market. Far from it. Reasonable investors understand that businesses fluctuate.... There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated. The market takes this risk of variability into account in evaluating the company's prospects based on the available facts concerning the issuer's past historical performance, its current financial condition, present trends and future uncertainties. But ... the ability of market observers to evaluate a company depends on the information publicly available to them. If, as plaintiffs allege here, the issuer is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information, it is consistent with basic statutory policies favoring disclosure to require inclusion of that information in the registration statement. FN140

FN140. *Id.* at 1210.

The court then went on to clarify that the plaintiff could meet its burden under this formulation by showing that the defendant possessed "information about the company's quarter-to-date performance (e.g., operating results) indicating *some substantial likelihood* that the quarter would turn out to be an *extreme departure* from publicly known trends and uncertainties...." FN141

FN141. 82 F.3d at 1211 (emphasis added).

Although the opinion in *Shaw* reinstated the plaintiffs' complaint, it did so on a narrow basis and the court took pains to emphasize two elements of its reasoning that limited the ability of future plaintiffs to successfully plead claims. First, the court indicated that when the connection between the interim results and the later events that the interim results "purportedly forewarned" was " sufficiently remote in time or causation," the information could be deemed immaterial as a matter of law. FN142 Second and relatedly, the court indicated its view that the plaintiffs' claims had vitality only insofar as they alleged that DEC had failed to disclose hard information (i.e., actual intraquarter results) rather than soft information (i.e., updated projections). FN143 It appears that there was no allegation that DEC possessed updated projections at the time of its public offering that contradicted any previous projection to the market.

FN142. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

FN143. *Id.* at 1211 n. 21.

**\*938** In its later decision in *Glassman v. Computervision Corp.*, FN144 the First Circuit applied both of these principles in upholding the denial of a motion to file a second amended complaint. The affirmance was based in part on the deficiency of the complaint's allegation that an offering prospectus was materially misleading because it failed to disclose that the company's early quarter results lagged behind its undisclosed internal projections. The court held that the "mere fact that intraquarterly results lagged behind internal projections does not, without more, require disclosure." FN145 Rather, the plaintiffs had to allege that as of its public offering the company possessed "hard mid-quarter results that would have predicted a material departure in the end-of-quarter results." FN146 By this formulation, the court meant that the plaintiff had to meet the exacting *Shaw* standard. FN147 Because the plaintiffs only pointed to seven weeks of intraquarter data in an industry where "mid-quarter results were not particularly predictive," the Court found that the proposed complaint failed to point to a material omission of fact. FN148

FN144. *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir.1996).

FN145. *Id.* at 631 (citing *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir.1994), *cert. denied*, 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995)).

FN146. *Id.* at 632.

FN147. *Id.* at 626 n. 11 (quoting *Shaw's* discussion of soft information coupled with adequate cautionary language).

FN148. *Id.* at 632.

With some appropriate tailoring, the *Shaw* standard articulates a sound framework for the determination of materiality by this court under *Brophy*. For starters, the Delaware courts, like federal policymakers and judges, have been chary about

requiring the disclosure of information that does not provide any reliable insight into firm value. The more tentative and soft the information, the more reluctant our courts have been to deem it material. FN149 That is, the courts of this state premise their materiality determinations on a rational investor standard, which assumes that investors understand the normal fluctuation of markets and grasp the difference between representations of historical fact and estimates of future results. Furthermore, our courts have long recognized that it is possible to make reliable determinations of materiality on the basis of a paper record, when no rational fact finder could differ with the court's conclusion. FN150

FN149. The United States Supreme Court has held that "materiality will depend at any given time upon a balancing of both the indicated probability that [an] event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968)). In a range of contexts, Delaware courts have applied a similar balance and have been reluctant to require disclosure of information that does not bear reliably on firm value, particularly soft information such as projections of performance or estimates of value. *E.g.*, *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1289 (Del.1989) ; *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at \*17 (Del.Ch. Mar.7, 1991) ; *Goodwin v. Live Entertainment, Inc.*, 1999 WL 64265, at \*12 (Del.Ch.), *affd*, 741 A.2d 16 (Del.1999) ; *In Re Siliconix Inc. Shareholders Litig.*, 2001 WL 716787, at \*10 (Del.Ch. June 19, 2001).

FN150. *See, e.g., In re Frederick's of Hollywood, Inc. Shareholders Litig.*, 2000 WL 130630 (Del.Ch. Jan.31, 2000) (resolved pursuant to a 12(b)(6) motion to dismiss); *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974 (Del.Ch. Sept.27, 1999),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

*affd,* 750 A.2d 1170 (Del.2000) (resolved pursuant to a 12(b)(6) motion to dismiss); *Goodwin v. Live Entertainment, Inc.,* 1999 WL 64265 (Del.Ch. Jan.25, 1999), *affd,* 741 A.2d 16 (Del.1999) (resolved on a motion for summary judgment); *Loudon v. Archer-Daniels-Midland Co.,* 1996 WL 74730 (Del.Ch. Feb.20, 1996), *affd,* 700 A.2d 135 (Del.1997) (resolved pursuant to a 12(b)(6) motion to dismiss).

**\*939** As to one feature of *Shaw* and the gloss put on it in *Computervision.* however, I must differ slightly in order to be faithful to our law. As I understand Delaware law, the fact that information is "soft" (e.g., a prediction of future results) rather than "hard" (e.g., historical fact) is relevant to, but not entirely dispositive of, the materiality determination. FN151 To be concrete, assume that ABC Corporation had made a public estimate that it would earn $250 million in profits for the coming quarter. During the second month of that quarter, the company announced a special share buy-back program. By that time, its internal estimates were that the company would earn $425 million for the quarter. If the company made no disclosure of that new estimate, I assume that a substantial materiality question would arise under Delaware law. Federal courts other than the First Circuit have issued decisions that also suggest that a serious materiality question would be raised in those circumstances. FN152

> FN151. *Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116, 127-29 (Del.Ch.1986) (discussing the treatment of soft information under Delaware law and holding that it may or may not be material depending on circumstances).

> FN152. *E.g., Helwig v. Vencor, Inc.,* 251 F.3d 540, 554-562 (6th Cir.2001) (emphasizing the need for a context-specific application of materiality principles, even as to so-called soft information).

Thus, I conclude that there is, for Delaware law

purposes, no bright line between soft and hard information in this context. As noted, however, the differences between *Shaw's* teaching and Delaware law are slight. The reason why this is so is that I am skeptical that there will be many cases when a materially significant alteration in company projections is made without any connection to a change in certain "hard" facts. Usually, a downward or upward move in projections will directly result from the processing of "hard information" about the business. This could include an actual diminution or increase in the sales opportunities available to the company as measured by some objective internal standard (e.g., in this case, the size of Oracle's Pipeline). Therefore, it is not apparent to me that the line drawn by *Shaw* between hard and soft information will be outcome-determinative in many cases.

Whether that is so or not, what is more important is that Delaware law does not require this court to make a binary decision about materiality based on a characterization of information as soft or hard. The relative firmness of the information is simply one factor in the overall determination of materiality, albeit an important one.

By contrast, however, *Shaw's* requirement that the plaintiff must demonstrate that intraquarter information is material in the sense that its existence creates a "substantial likelihood" of an "extreme departure" from projected results is a sensible one that reflects concerns that Delaware law shares. FN153 If a company makes good faith estimates of its performance and is subject to the expected variations in results of an operating business in a market economy, one would expect that its intraquarter results and projections will often involve some deviation from the original quarterly projections. To find information material simply because it might cast some doubt on the company's ability to meet its projections more or less exactly would unduly**\*940** chill trading by issuers and insiders (not to mention issuers' willingness to provide guidance at all), for reasons I noted earlier in deciding that scienter is a critical element under *Brophy.* Such a finding is also unnecessary in view of the inherent imprecision of forward-looking estimates and the correspondingly greater caution

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
(Cite as: 867 A.2d 904)

that rational investors should use in relying upon such estimates to make investment decisions. Too low a bar under state law would also tend to disrupt the federal quarterly reporting regime and to generate an incentive for prolix disclosures that are more fulsome in their cautionary language, but no more informative or reliable. Indeed, the estimates might become even more unreliable as companies submit lower estimates that they are certain to make instead of more reasonable, but less certain, estimates.

FN153. 82 F.3d at 1211.

Therefore, it is only when the intraquarter information makes it likely that the company will either outperform or underperform its projections in some markedly unexpected manner that the materiality threshold is satisfied. In so concluding, I reject the plaintiffs' argument that there should be a more plaintiff-friendly standard of materiality in the *Brophy*-insider trading context than in a situation when this court is weighing the sufficiency of a corporate disclosure document. Like *Shaw* and other courts, I do not believe that the definition of materiality changes based on that distinction. As *Shaw* points out, the disclose or abstain doctrine applies to issuers as well as to corporate insiders who wish to trade. FN154

FN154. 82 F.3d at 1203-04.

In determining whether corporate insiders are liable under *Brophy* because they allegedly possessed material, inside information, the court is engaged in an analytical exercise identical to that required to determine whether an issuer that sold or bought stock should be liable because it failed to disclose material information or to determine whether a director should be liable for failing to disclose a material fact in a corporate disclosure seeking a vote or tender. The only principled manner in which to hold a defendant liable in any of these contexts is to evaluate the information in his possession, compare it to what the market knew, and identify if any of the non-disclosed information would have been of consequence to a rational

investor, in light of the total mix of public information. If the question of what information should have been disclosed cannot be answered with some reasonable precision in a case governed by *Brophy*, then it is difficult to conceive how a defendant can be fairly held liable for wrongful insider trading under our law. For reasons of this kind, *Shaw* makes clear that under federal law, the same standard of materiality applies under §§ 11 and 12 of the 1933 Act as to insider trading claims under § 10 of the 1934 Act. FN155

FN155. *Shaw,* 82 F.3d at 1217.

A. *The Informational Mix Preceding Trading By Henley And Ellison*

To evaluate whether Ellison and Henley possessed material, adverse information at the time they decided to trade, I must initially address the informational mix in the market that pre-existed their trades. In this mix, the most important factor is the expectations created by the Market Estimates provided by Oracle that Oracle would earn 12 cents per share and achieve License Revenue growth of about 25% in 3Q 01. But those expectations must be viewed through the mind of a hypothetical rational investor. Such a rational investor would have known that a projection is, at best, a good faith estimate of how a company *941 might perform in the future; it is by no means a warranty that can be blindly relied upon. Indeed, because Oracle accompanied the Market Estimates with caveats and cautionary statements, rational investors were on notice that the Market Estimates were precisely the sort of information that, when made in the manner Oracle made them, "bespeaks caution," regardless of whether they were optimistic in tone. In this respect, it is notable that Oracle had expressly cautioned investors that the company's ability to predict quarterly revenues was compromised by the hockey-stick effect. FN156

FN156. DX 80 at 87326-27.

Nor would a rational investor have been ignorant of the slowing American economy and the possibility

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

that this might dampen Oracle's performance. Although Ellison and Henley had noted in December that Oracle had not yet suffered (in the sense that it continued to produce record results and impressive growth) as a result of the overall economy or because of the mudslide in the dot.com sector, the risk that economic conditions could worsen to an extent that would adversely affect Oracle was known to the market and disclosed by Oracle in 2Q 01 and 3Q 01. Any reasonable investor would know that a weakening economy could have the effect of causing procurement officers to defer discretionary spending, including spending on the kind of expensive products that Oracle sells.

Put summarily, this case does not involve a situation when corporate insiders possessed information that demonstrated that historical facts regarding a company were materially false. At best, it involves a scenario when Oracle insiders possessed intraquarter data that might have cast doubt on the company's ability to achieve projections that it did not warrant would come true and that it accompanied with cautionary statements. As a result, any intraquarter information that simply made it less likely that Oracle would hit its predicted results is, necessarily, less likely to significantly affect the informational mix because, from the get-go, the market knew that it was more than a theoretical possibility that Oracle would fall short of expectations, it was at all times a highly plausible scenario.

### B. Undisputed Facts That Bear On The Materiality Of The Information That Henley And Ellison Possessed Before They Began Trading

With this baseline in mind, it is useful to set forth a few of the undisputed facts that influence whether the intraquarter data available to Ellison and Henley at key times was material. Any rational fact-finder would have to bear these facts in mind in determining if there existed, at any time before the challenged trades, information that created a substantial likelihood that Oracle would markedly depart from the Market Estimates.

I begin with the fact that what I have called Minton's Best Estimates in the Upside Reports were regarded as of the relevant time as the most accurate financial prediction of how Oracle would perform in a quarter. This is undisputed and this fact makes it improbable that material, adverse facts existed at a time when Minton was projecting that Oracle would exceed, meet, or not materially fall short of the Market Estimates.

In this respect, it is also relevant that Minton was not noted for being aggressive, but for being conservative. Likewise, the sales unit forecasts (i.e., the Forecast Projections), if anything, had tended to be unduly pessimistic, as the sales units preferred to deliver pleasant surprises rather than unexpected disappointments. Therefore,**\*942** there was no reason for either Ellison or Henley to believe that their subordinates were providing them with unreasonable estimates of how 3Q 01 might turn out. To the contrary, they had every reason to expect that they would tend to be conservative. As important, there is no rational basis to infer that Minton or others involved in the forecasting process at Oracle would intentionally overlook rather than diligently attempt to identify information that might cast doubt on Oracle's ability to meet the Market Estimates. As we shall see, the reality is that Minton did in fact adjust her Best Estimates based on her assessment of new facts, as did Oracle's sales units. FN157

> FN157. The plaintiffs have argued that the traditionally less accurate and traditionally too conservative Forecast Projections made by the sales units were actually a better predictor than Minton at times in FY 01. This is, at best, an observation made in hindsight and not one that anyone at Oracle shared in 3Q 01 or, apparently, shares now. Moreover, it is clear that Minton was a better predictor, by a wide margin, than the sales units when all recent experience before 3Q 01 is rationally taken into account. As important, it is clear that neither Minton nor the sales units foresaw the disastrous drop-off that occurred in the last days of 3Q 01. If the Forecast

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Projections from January for 3Q 01 had held, Oracle would have outperformed its actual license revenue results for the quarter by a very wide margin. As the January 2001 Upside Reports indicate, the Forecast Projections throughout all of January estimated that Oracle would earn license revenues of over $1.25 billion-or approximately 20% growth over 3Q 01-and that it would earn either 10.6 or 10.7 cents per share, which Oracle would round up to 11 cents. DX 25-27. Put bluntly, the traditionally less accurate, and traditionally too conservative Forecast Projection was predicting throughout January that Oracle would nearly make the Market Estimates, a fact that itself suggested, because of the historic conservatism of those projections, that Oracle could in fact meet the Market Estimates. The fact that Oracle only achieved 5% growth when the Forecast Projections were estimating 20% growth and Minton was estimating even higher growth throughout January undercuts any rational inference that the early quarter results were viewed by anyone within Oracle as predictive of an end-of-quarter debacle.

Relatedly, the record is devoid of any basis to suspect that Minton or others involved in preparing relevant information for the EMC were somehow accomplices in an ingenious scheme to facilitate unfair insider trades by Ellison and Henley. There is no evidence that any subordinate Oracle executives, particularly Minton, provided Henley and Ellison with false or doctored estimates that suggested at relevant times that Oracle would meet the mark, in order to provide cover for the trades when the subordinates in fact believed that Oracle would not meet its estimates. There is no piece of evidence that rationally supports the idea that a deep conspiracy of this kind existed and the plaintiffs do not even suggest it.

Given that there is no rational basis on this record to question the good-faith of Minton and others involved in the financial reporting process, the undisputed fact that Ellison and Henley actively questioned these subordinates about their numbers does little to help the plaintiffs. If, after creating an environment in which hard questions about estimates were continually asked by EMC members and by members of Minton's team in a culture in which conservative projecting was the rule, Ellison and Henley received-as they did-Best Estimates suggesting that Oracle would meet the Market Estimates, the idea that material, adverse information existed simultaneously with those Estimates is less, not more, tenable.

Furthermore, it is not rationally disputable that Oracle's quarterly performance was predominantly determined by its third month performance, and that the third *943 month was itself heavily dependent on performance within the last week of the quarter. For this reason, there is no rational way to infer from the record that anyone involved at high levels in examining Oracle's ability to make its quarterly estimates placed substantial weight on first month performance within quarters. Although it is clear that the EMC examined first month results when they came out, they did not quake with fear if the first month lagged a bit behind expectations because that had happened in the past in quarters when Oracle had gone on to exceed expectations. Oracle insiders did not view second month results as a reliable predictor of final quarterly performance for similar reasons. In fact, for the three quarters immediately preceding 3Q 01-4Q 00, 1Q 01, and 2Q 01-Oracle's first two months in each quarter trailed its projections for total company revenue. But in each quarter Oracle met or exceeded its quarterly forecast.

Also indisputable is that Oracle's primary check on how a quarter was proceeding was a comparison of the current quarter to the same quarter in the previous year. Although Oracle executives at times looked at data for other quarters earlier in the same year, Oracle's key financial reports (e.g., the Upside and Pipeline Reports) contained comparisons to the same quarter in the previous year. This was not coincidental but reflected the substantial emphasis given by Oracle to comparisons to the same quarter in the prior year. As to 3Q 01, this meant that experience in 3Q 00 was given great weight.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

Another undisputed fact is that Minton, and the EMC, were necessarily reliant on an examination of Oracle's Pipeline as a primary tool in evaluating likely end-of-quarter performance. The analysis is easier to state than to accomplish in a reliable way: look at what's in the Pipeline and attempt to determine how much of the Pipeline would be converted into actual revenue, using a combination of past experience and intuition gleaned from discussions with the sales units about their expectations. In performing this analysis, 3Q 00 conversion rates were indisputably very influential to Minton and others, including Ellison and Henley. Notably, this is an exercise that looks forward using Pipeline and other data and not one that looks backwards at early quarter sales. The key guess is what success Oracle will have in landing the sales prospects in its Pipeline.

Lastly, there is no evidence in the record that indicates that Ellison, Henley or any other Oracle insider believed that the Company's long-run prospects were poor. During all of 3Q 01, Oracle expected 4Q 01 to be a very strong quarter. FN158

> FN158. *See* DX 23 at 3021 (12/13/00); DX 166 at 3566 (1/19/01); DX 30 at 4122 (2/16/01).

*C. A Defendant-Specific Examination Of Materiality*

Having these foundational facts in mind, I turn to two key questions: Did Henley possess material, adverse information at the time of his trades on January 4, 2001? Did Ellison possess material, adverse information at any time during his trading from January 22 through January 31, 2001?

> 1. *Did Henley Possess Material, Adverse Information At The Time He Traded?*

Henley traded on January 4, 2001. The undisputed record shows that he delayed trading until the new year for sensible tax planning reasons.

[2] At the time he traded, the most recent Best Estimate that Minton had provided**944** estimated

that Oracle would earn 12.7 cents per share and achieve 33% License Revenue growth for 3Q 01. FN159 At that time, Henley had not received the Flash Report for December 2000, which was not circulated until January 17, 2001. But he did know that Oracle had landed its largest deal ever in December 2000, giving it a sizable chunk of revenue that would help the company meet the Market Estimates.

> FN159. DX 24.

The plaintiffs' claim that Henley possessed material, adverse information comes very close to failing the straight face test and comes nowhere near avoiding summary judgment. Their argument reduces to the notion that Henley possessed the material fact that Oracle's Pipeline had been reduced to 34% by December 25, 2000 from 52% earlier in December and that this drop was unprecedented. This argument is unfounded. For starters, in both 1Q 01 and 2Q 01, Oracle's Pipeline dropped in the first two months but Oracle made each quarter. Plaintiffs attempt to characterize the drop as a dramatic red flag because it happened in two weeks, rather than over a longer period as in other quarters. But while the plaintiffs dilate on this quirk of timing, they provide no evidence that anyone at Oracle was similarly concerned. Plaintiffs' contention seems to be that someone at Oracle *should* have been concerned, but they do not combine that with any evidence that suggests that what was in Oracle's Pipeline on December 25 was insufficient to enable the company to achieve the Market Estimates.

Similarly, this decline in the Pipeline is not made material when considered in concert with the plaintiffs' contention that the reduction showed a narrowing in Oracle's so-called "growth gap." The plaintiffs derive this term from Henley, who in earlier quarters had asked Minton to provide him with information about the relationship between Oracle's Pipeline and License Revenue projections to see if there was a relation between the two that would help the company predict its results. The concept was that Oracle would more comfortably achieve its projections if its Pipeline growth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

exceeded its projected License Revenue growth by a large margin. The undisputed record indicates, however, that Henley did not continue to ask for reporting on this factor, as it did not, in his judgment, correlate to Oracle's actual outcomes in any reliable manner. The plaintiffs have failed to produce any evidence that this factor was actually considered in 3Q 01 or that it was considered by Oracle insiders to, or in fact does, reliably predict Oracle's end-of-quarter performance. Indeed, there is no evidence that the correlation has any empirically reliable significance. As the defendants point out, the growth gap in 3Q 01 was positive, in the sense that Pipeline growth rate exceeded the Market Estimates. In prior successful quarters-including 3Q 00-the growth gap had been worse than 3Q 01 and Oracle made its quarter. FN160 The plaintiffs' emphasis on these factors underscores the post-hoc nature of their arguments, which depend predominantly on their formulation (after thousands of hours of research and after abandoning many other theories they pressed earlier) of ways at looking at information that differ from the manner in which Oracle's key financial executives processed information in 3Q 01. To a large extent, the plaintiffs are saying that if Minton and others at Oracle had been as smart as the plaintiffs' lawyers are (and had the benefit of hindsight and two years of processing information) they could have predicted, as of January 4, 2001, that Oracle**\*945** would fall short of the Market Estimates for 3Q 01 by a large margin.

FN160. PC 22.

That contention, however, cannot be accepted by a rational, impartial reader of this record. What the record does reveal without rational contradiction is that the primary measures that Oracle used to project its performance are inconsistent with the proposition that Henley possessed material, adverse information as of January 4, 2001. The company's Best Estimate of its performance indicated that Oracle would exceed the Market Estimates for earnings and License Revenue growth by healthy margins. Using historical conversion rates from 3Q 00 for Pipeline Conversion, Oracle's Pipeline was sufficient to enable the company to have easily

exceeded the License Revenue Market Estimate of about 25%.

Furthermore, the fact that Minton reduced her Best Estimates and the Pipeline over time suggests that Oracle had a responsible financial forecasting system that was actively taking into account new information. When a system results in a Best Estimate that the Company would exceed its Market Estimates by a nice margin and when the plaintiffs cannot point to any materially significant fact (e.g., loss of a large contract) that compromised the integrity of the Best Estimate, no rational mind can conclude that material, nonpublic information existed.

In sum, on the record before me, there is no basis for a rational fact-finder to conclude that Henley possessed material, adverse information on January 4, 2001 that created a substantial likelihood that Oracle would not meet the Market Estimates for 3Q 01. Therefore, it is of course even more certain that the record would not support an inference that Henley had information that created a substantial likelihood that Oracle's results would markedly depart from the Market Estimates, and thus the plaintiffs have failed to meet their burden under *Shaw.*

### 2. Did Ellison Possess Material, Adverse Information At The Time Of His Trades?

Ellison began trading on January 22 and continued trading until January 31, 2001. As a result, he had access to several weeks of additional data beyond that available to Henley on January 4.

In determining whether Ellison possessed material, adverse information, it is useful, however, to begin with some data that the plaintiffs try to pin on Henley as well: the actual Oracle results for December 2000.

I reiterate my finding that the plaintiffs have failed to provide a rational basis for concluding that Henley had access to the Flash Report containing Oracle's actual December results as of his trades because that Report was not distributed until

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

January 17, 2001. Nonetheless, even assuming that he had access to the Flash Report, or the information contained in it, nothing in that Report, as I will next discussed, constituted material, adverse information.

### a. *The December Results*

The plaintiffs place great weight on Oracle's December 2000 performance, which they believed presaged a quarter that would fall well short of the Market Estimates. What is most striking about this belief is that there is absolutely no evidence that anyone at Oracle perceived the December results as predicting any debacle of that kind.

As described earlier, the Flash Report for December indicated that the Covisint transaction was quite important for that month. That transaction brought in $60 million in revenue for Oracle and was the company's biggest deal ever, although by no means its first big deal. Critical to the ***946** plaintiffs' argument is the proposition that Oracle insiders should have *totally disregarded* that transaction and looked at the data they were receiving as if it did not contain *any of* the Covisint revenue.

From that perspective, the plaintiffs contend, Oracle's outlook for 3Q 01 looked bleak. As the December Flash Report indicates:
> The license revenues growth rate was 35% in USD, 25 points better than the 10% growth we experienced in December FY00 over December FY99. However, excluding the $60 million Covisint license deal, the USD Growth Rate would have been only 6%. FN161

FN161. DX 40.

The plaintiffs also point out that the 6% figure was wrong and that the correct number was 1%. There is evidence that Ellison was aware of the error. FN162 From this, the plaintiffs argue that Ellison should have realized that Oracle was going to fall miserably short of the mark, because December had been a dismal month that portended a poor overall quarter.

FN162. *See* Ellison Dep. at 319.

The problem with their argument is that it is not rationally supported by record evidence.

[3] For starters, the plaintiffs can't play pretend. As much as they would like to imagine otherwise, they need to accept that the Covisint transaction occurred and that it generated real revenue that counted towards Oracle's achievement of the Market Estimates. It was solid revenue that Ellison knew would help Oracle make the mark.

Counting that real revenue, Oracle's total license revenue for December 2000 constituted $240 million or approximately 18% of the $1.31 billion license revenue forecasted in its Market Estimates. FN163 A figure of 18% was not a disturbing one that was out of line with past experience. FN164 As discussed, the third month of each quarter was the most important one.

> FN163. $1.31 billion is derived mathematically from applying the Market Estimate of 25% forecasted license revenue increase to 3Q 00's actual license revenue of $1,048,445,000. *See* PC 1.

> FN164. *See* DX 40. The Flash Report actually informed Ellison and Henley that a higher figure–19%–had been achieved. The 19% figure in the Flash Report compared favorably with the 16% in FY 00 and the 19% in FY 99. *Id.* Thus, the text of the Flash Report actually gives less reason to conclude that Ellison and Henley thought Oracle would not make its quarterly numbers as of that time.

First months of quarters were not regarded by Oracle insiders as an accurate predictor of final quarterly performance and the plaintiffs have adduced no rational evidence suggesting that an accurate prediction of Oracle's final quarterly performance can be made from first month results. In 3Q 00, for example, Oracle's December license revenues constituted only 17% of its estimated quarterly license revenues. FN165 Yet, Oracle

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

went on to achieve its estimate for that quarter.

> FN165. The actual percentage of quarterly revenue contributed by December revenue is disputed. As noted above, the January 17, 2001 Flash Report that Ellison and Henley saw indicates that December 2001 revenue was 19% of projections, and that the actual percents of projections for FY 00 and FY 99 were 16% and 19% respectively. The plaintiffs show the FY 00 as 17%. PC 1; DeGhetaldi Aff. Ex. 6. I have conservatively chosen to use the 17% number, but the distinction matters little; the point is that nothing about the 19% (or 18%) figure provided any cause for alarm when compared to Decembers in previous third quarters.

**\*947** The prior December was not aberrational as far as Oracle "first months of quarters" went. For the 22 quarters preceding 3Q 01, Oracle had, on average, achieved 14.5% of its license revenue in the first months of quarters. FN166 That percentage is identical to Oracle's December 2000 license revenue as a percentage of the Market Estimates, excluding Covisint entirely. But, of course, to exclude Covisint entirely is to ignore reality. Although it was Oracle's biggest deal, Oracle had landed big contracts before. To account for that, any reliable analysis of the contributions of past first months as a predictor of performance in 3Q 01 would also have to exclude any very large transactions that happened in those quarters, too; otherwise, the total exclusion of Covisint would be entirely unprincipled.

> FN166. The plaintiffs submitted an affidavit by Professor Daniel Fischel of the University of Chicago Law School. In his affidavit, Fischel opines that Oracle was not on track to meet the Market Estimates because of its December 2000 performance. In coming to that conclusion, Fischel excluded Covisint altogether and appears to have performed no close examination of Oracle's Pipeline

during relevant periods in 3Q 01, which if converted at 3Q 00 rates would have enabled the company to meet the Market Estimates. In concert with excluding Covisint, Fischel made no effort to determine if there were other large transactions in other quarters that should also have been excluded in order for him to take large, non-recurring transactions into complete account. Moreover, Fischel notes that over the prior 22 quarters, the average first month contribution to the quarter's revenue is 14.5%, but that historically December revenue contributes 21% to the quarter's revenue. But, he provides no reliable analysis indicating why Oracle's non-Covisint revenue should be divided by 0.21 (implying that Oracle was substantially off track to meet its estimates) rather than 0.145 (a calculation that shows Oracle nearly precisely on pace to meet its Market Estimates). *See* Fischel Aff. ¶ 11, Fischel Dep. at 96-100. Fischel, conceded that he had no reliable basis to conclude that third quarters were different from other Oracle quarters in terms of when revenue would be generated in the years before 3Q 01. Fischel Dep. at 96-100. All of this is unsurprising given that the hockey-stick effect had been deepening, rendering first and second months even less important and predictive. PC 6. As discussed elsewhere, what was most important to Oracle's 3Q 01 was its ability to have a strong third month, a capacity that would be determined by its Pipeline. But, even if one looks only at prior Decembers in third quarters, no rational inference of materiality arises. Fischel ignored that Oracle's Best Estimates suggested that the Pipeline would be sufficient, if converted at the 3Q 00 rate, to meet the Market Estimates. Furthermore, Fischel ignored the fact that for Oracle to meet the Market Estimates, it simply had to attain the same contribution from the last month of the quarter as it achieved in 3Q 00, and that if it attained the same contribution from the last month

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

of the quarter as it achieved on average in the last two Decembers, it would have achieved 97.5% of the Market Estimates, an immaterial shortfall. DeGhetaldi Aff. Ex. 6 (if calculated based on the last three years, it would be 95%). Stated simply, Fischel provides no reliable evidence from which one can rationally infer that the defendants possessed material information as of the time of their trades. He blinded himself to the relevant forward-looking data that existed in 3Q 01 and makes a predictive leap from the December 2000 results that is unwarranted.

For the sake of completeness, it is worth noting that even if half of the Covisint deal was excluded, Oracle still achieved 16% of the Market Estimates' license revenue projection-a percentage almost identical to that achieved in December of 3Q 00, a quarter when Oracle hit the target. This assumption-which I viewed to be unwarranted as a matter of business reality and law-demonstrates that Oracle's December performance was not out of line with recent experience during quarters when it met its quarterly projections.

In sum, the record indisputably indicates that Oracle in fact achieved 18% of **948** the license revenue growth projected for 3Q 01 in December 2000, a level of success that was consistent with its performance in preceding quarters in which it managed to meet its revenue target. And, even without Covisint, Oracle's December 2000 performance equaled the average of first months for the preceding 22 quarters. Thus, the December 2000 results are precisely the sort of intraquarter data that courts have considered immaterial, as they did not create any substantial likelihood that Oracle would fall short of the Market Estimates. FN167

> FN167. Federal courts have found that early quarter results are less likely to be material than late quarter results, for the reason that early results are less likely to be predictive of the ultimate quarterly performance. *E.g., Glassman v. Computervision Corp.,* 90 F.3d 617, 632

(1st Cir.1996) (finding no duty to disclose negative information "only seven weeks into the quarter-and where mid-quarter results were not particularly predictive"); *In re Number Nine Visual Technology Corp. Securities Litig.,* 51 F.Supp.2d 1, 24 (D.Mass.1999) (discussing the relevance of the timing factor to the materiality inquiry). That precedent is particularly apt here given the extreme back-loading of Oracle's quarterly revenue.

Lastly, it should be unsurprising that the December 2000 results were not of great concern to Ellison, Henley, or Minton. With Covisint, Oracle had clearly dropped enough revenue in the license bucket to be on the way to filling it at the end of the quarter. What Oracle insiders were most concerned with was how the last month of the quarter would turn, a forward-looking emphasis that led them to focus on the Pipeline and whether the Pipeline could be converted in a manner that would enable Oracle to meet the Market Estimates. As I shall next reiterate, at all relevant times, the forward-looking assessments made by Minton did not suggest that Oracle would fall short of the Market Estimates in any material manner. There is no evidence that Minton or any other Oracle executive so much as hinted to Ellison (or Henley) that Oracle might fall far short of what the market expected from the company in 3Q 01.

### b. *Did The Less Optimistic Best Estimates Produced By Minton Constitute Material Information In Ellison's Possession?*

The plaintiffs combine their reliance on the December Flash Report with other evidence from January 2001 that indicated that Oracle's business was somehow softening in a materially significant manner, and argue that the resulting jambalaya constitutes a substantial informational stew. To the plaintiffs' mind, the fact that Minton was revising her Best Estimates downward during January 2001 in response to new information she was learning from the sales units indicates that there existed information within Oracle that reliably indicated that the company would not meet the Market

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

Estimates.

Earlier in the opinion, the key ingredients of this argument were identified. They include e-mails and oral statements by sales executives to Minton that expressed less optimism about the quarter, which were then followed by adjustments in Pipeline and Best Estimates.

The problem with this argument is both simple and insurmountable. Although Oracle insiders, including Ellison and Henley, received input that suggested that Oracle was unlikely to have a blow-out quarter in which it exceeded the Market Estimates by a large margin, they were not receiving input-based on identifiable facts such as the size of Oracle's Pipeline-that suggested that Oracle would fall materially short of the Market Estimates.

**\*949** At the time Ellison gave the instruction to his broker to trade-January 19, 2004-Minton's latest Best Estimate was that Oracle would earn 12.11 cents per share and achieve License Revenue Growth of 29%. FN168 As noted, there is no rational basis to infer that Minton's Best Estimate was made in anything other than good faith. And there is no doubt that Minton was considered the most accurate estimator within Oracle.

FN168. DX 25 (1/15/01) Upside Report.

Likewise, the most current Pipeline estimate showed 34% growth over 3Q 00. FN169 The Pipeline Report specifically identified the conversion rate from 3Q 00 and indicated that if that same rate-51%-were to be achieved within 3Q 01, then Oracle would exceed the Market Estimate for License Revenue growth by a large margin. The Pipeline Report also indicated a sales unit estimated conversion rate of 47%, a lower figure than Minton used. Even when using that more pessimistic number, Oracle was on track to meet the Market Estimate of "about 25% growth" by falling immaterially short of exactly 25%. FN170 This lower figure is in keeping with the actual conversion ratio for 2Q 01, which the plaintiffs have argued is a relevant comparison. FN171 But,

there are two fundamental flaws in their reliance on this figure. First, there is no evidence that Ellison, Henley, or Minton gave substantive weight to prior quarter conversion ratios in 3Q 01. Rather, the evidence is clear that the key financial executives looked primarily to 3Q 00 as the best predictor for what percentage of the Pipeline Oracle would convert in 3Q 01. Second, as noted above, even if the lower 2Q 01 conversion rate was applied to the January 15, 2001 Pipeline, Oracle was on track to produce License Revenue growth of "about 25%."

FN169. DX 36. The record suggests that Ellison did not receive the January 15, 2001 Pipeline Report, but Pipeline information was contained in the Upside Reports. *See* Ellison Dep. at 304.

FN170. *See Id.*

FN171. As previously noted, in 2Q 01, Oracle achieved 74% of its revenue in the last month. PC 6. Thus, the plaintiffs' emphasis on 2Q 01 undercuts their insistence that December 2000 and January 2001 had predictive significance.

Put bluntly, as of the time Ellison actually instructed his broker to begin selling shares, Oracle's Best Estimate was that it would meet the Market Estimates and the most current Pipeline Report (which he did not see) also supported that proposition.

Ellison's broker actually began to trade on January 22. That day Minton produced another Best Estimate. Again, that Estimate indicated that Oracle would earn 12.06 cents and achieve license revenue growth of 29%, both beating the Market Estimate. FN172

FN172. DX 26 (1/22/01) Upside Report.

On January 29, Minton produced her final Best Estimate for January. For the first time, that Estimate projected that Oracle would not earn a full 12 cents per share, but instead would earn 11.58

867 A.2d 904
**(Cite as: 867 A.2d 904)**

cents per share. For reporting purposes, however, the 11.58 cents per share would be rounded up to 12 cents. In keeping with her revision to earnings, Minton reduced her Best Estimate of license revenue growth to 24%-an Estimate that falls squarely within the definition of "about 25%" FN173 in the Market Estimate. The January 29 Best Estimate was generated on a Monday. That day and the following two **\*950** days ending January 31 completed Ellison's trading.

> FN173. The term "about 25%" bespeaks caution because it implies a range. I need not decide how capacious that range is because 24% is so clearly within it.

It bears emphasis that throughout the entirety of January, Oracle's sale units did not reduce the estimates they provided to Minton-these held firm throughout the month-and they continued to provide her with a basis to believe that the Market Estimates would be met. That is, although the sales units became less bullish as they knew more about how the quarter was shaping up, they did not provide input that suggested that Oracle would not be able to make its numbers. Oracle's best predictor, Minton, took this input seriously and applied her judgment to produce reduced Best Estimates that reflected her evaluation of the additional information she gleaned as the month progressed. But her increased pessimism has to be kept in perspective. Minton did not come to believe that Oracle would fall materially short of the Market Estimates. She came to believe that Oracle would more or less achieve the Market Estimates exactly. FN174

> FN174. *See* DX 25-27.

Given this record, it is impossible for a rational mind to infer that Ellison possessed material, adverse information at the time he instructed his broker to sell shares on January 19, or at the time when he actually sold shares from January 22 to January 31, 2001. As of those dates, Oracle's estimated Pipeline, if converted at reasonable rates consistent with past relevant experience at the

company, was sufficient for the company to meet the Market Estimates. As of those dates, Oracle's most accurate predictor of company performance was estimating that the company would achieve the Market Estimates. As of those dates, there is no evidence that any Oracle executive told Ellison or Henley that the company would fall materially short of the Market Estimates.

Because there is no rational basis to infer that Ellison possessed material, nonpublic information at the time he traded, he is entitled to summary judgment on the plaintiffs' *Brophy* claim.

### 3. *The Post-February Events And Information Buttress The Conclusion That Ellison and Henley Are Entitled To Summary Judgment*

On this record, there is no rational basis to infer that Ellison was aware of the actual results for January 2001 until after he had finished trading. The January Flash Report was not circulated until February 8, 2001.

By February 8, 2001, another Minton Estimate had been produced. The February 5 Best Estimate predicted that Oracle would earn 11.29 cents per share and achieve license revenue growth of $1.26 billion. FN175 While this was short of the Market Estimates, it was not short by much. Moreover, a Pipeline Report came out the same day. Although the Pipeline growth was down to 32% from the prior January 15 Pipeline Report, the Pipeline was sufficient that, if converted at the 3Q 00 rate, Oracle would still have exceeded the Market Estimates. FN176

> FN175. DX 28.

> FN176. The plaintiffs argue that the steep decline in the Pipeline from December to January was itself material. But Oracle's Pipeline had also dropped in the first two months of 1Q 01 and 2Q 01 and Oracle made each quarter. PC 77; *see also* DC 37. Most important, in 3Q 01 the Pipeline was, at all relevant times, sufficient for

Oracle to either exceed, meet, or not fall materially short of the Market Estimates, assuming historical conversion rates.

The January Flash Report reported the actual results for the first two months of the quarter. Again, the plaintiffs want to look at that Report as if Covisint did not exist. But it did. With Covisint, Oracle had achieved 33% of the license revenue **951** needed to meet the Market Estimate. In 3Q 00, Oracle produced 67% of its revenue in the third month. FN177 If Oracle did the same in 3Q 01, its first two month results were sufficient to enable it to meet the Market Estimates. FN178 And if Oracle produced at a lower level in the third month-such as 64.5%, the average of the last two years' performance in the last month of a third quarter FN179-Oracle would have reached 97.5% of the Market Estimates, hardly a material shortfall. FN180 Even assuming that Ellison had digested the January results before they were actually provided to him-an assumption for which there is no rational basis-the January Flash Report does not support an inference of materiality. This is especially so when the very next Best Estimate-created on February 12, 2001-increased, projecting Oracle would earn 11.58 cents and produce $1.265 billion in License Revenue-figures that meet the Market Estimate as to earnings and, with a 21% forecasted increase in license revenue, would arguably fall within the range implied by "about 25%," and certainly would not miss it materially.

FN177. PC 1; *see also* DiGhetaldi Aff. Ex. 6.

FN178. In the prior quarter, 2Q 01, Oracle generated 74% of its license revenue in the last month. DC 1; PC 1. It did so again in 4Q 01. And in 1Q 01, it generated 66%. *Id.* All of these figures demonstrate that achieving 67% of the 3Q 01 Market Estimates in February 2001 would have been fully consistent with prior experience.

FN179. DiGhetaldi Aff. Ex. 6.

FN180. In the prior 22 quarters, Oracle

had generated an average of 32% of its quarterly revenue in the first two months. Regan Aff. Ex. K. at 61722-27. Again, this shows that it would not have taken any unprecedented last month performance for Oracle to have met the Market Estimates.

What happened in the rest of the quarter is quite telling. Minton's Best Estimate on February 26 had become more pessimistic, projecting earnings of 11.19 cents and license revenue of $1.257 billion. FN181 These figures fell short of the Market Estimates but not by a material amount as to earnings (less than a full penny) and not drastically as to license revenue growth (20% as compared to " about 25%").

FN181. DX 32.

In the few days that remained in the quarter, however, the bottom fell out. As discussed previously, Oracle's sales units drastically reduced their estimates, as prospective customers deferred spending decisions because of a softening economy. The e-mail communications and other evidence of angst over this at the sales units is unrebuttedly unfeigned. Within a day or so, Minton had to reduce her estimate down to 10.07 cents based on a correspondingly dramatic reduction in estimated license revenue. Even with that reduction, Oracle would have a record quarter but would fall materially short of the Market Estimates. But no rational person could infer from this record that Oracle could have or did predict this seismic shift in its quarterly fortunes. Given the historically conservative approach of the Oracle sales units and Minton to projecting performance, it is implausible that either source of information wished to sandbag top management. The sales units' apologetic communications reflect their embarrassment at their failure to foresee the last-minute erosion.

The unprecedented nature of what happened is highlighted by Oracle's plummeting Pipeline Conversion Rate for 3Q 01-which ultimately came in at levels well below any Oracle had recently experienced. FN182 Had Oracle converted the Pipeline as estimated in early February even at **952**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

the 2Q 01 rate the plaintiffs suggest-as opposed to the 3Q 00 rate that Oracle executives actually focused on-then Oracle would have been within range of the Market Estimates. FN183

> FN182. *See* Defendants' Oral Argument Charts, S71-S75 (derived from PC 52 & 53).

> FN183. *Id.*

In the end, the plaintiffs ask me to adopt a Monday-morning quarterback approach to materiality. Because 3Q 01 went bad, it must have been reasonably foreseeable at the time. But there is no basis for a rational mind to accept that proposition. Minton didn't see it coming. The Oracle sales units didn't see it coming. And there is no evidence that Henley or Ellison saw it coming. Not only that, as Oracle points out, other companies in the same industry ended up in a similar predicament in the same general time period, and attributed their failure to meet market expectations to last-minute customer decisions not to close end-of-quarter deals. Although the plaintiffs say that Oracle should have foreseen that it would be hit by this phenomenon eventually, they have not pointed to information that reliably foretold that Oracle's sales units would be faced with a last-minute wave of customer reluctance in the final days of 3Q 01. FN184

> FN184. The fact that the defendants finish trading a full month before 3Q 01 distinguishes this case from those involving defendants who had very late quarter information that the company was trailing its estimates. *E.g., SEC v. Truong,* 98 F.Supp.2d 1086, 1100 (N.D.Cal.2000) (finding that where the company had frozen head count and implemented an expense control program because the outlook for the quarter was behind plan eight days before quarter's end, the evidence raised a jury issue of materiality " because a reasonable investor could consider it material that [the company] was

behind plan so late in the quarter").

Before concluding my discussion of materiality, it is worth considering the nature of the disclosure Oracle would have had to make in late January if it wished to inform the market of the information that the plaintiffs find material. That disclosure would have told the public that while Oracle still expected to meet the Market Estimates for earnings per share and license growth, it had to remind the public that the economy was weakened, that Oracle's pipeline (while still sufficient to enable Oracle to achieve the Market Estimates using the 3Q 00 conversion rate) was down from December levels and that there was less reason to believe that Oracle could materially exceed the Market Estimates, and that Oracle's ability to make its quarter would, as always, largely be determined by its last month performance. This would have been a very odd disclosure, indeed. And if that sort of disclosure would have been material, then Oracle insiders possessed material, nonpublic information in several prior quarters during which it was unclear from Oracle's early quarter performance whether it would make the quarter and, despite that, it later did. To hold that material, nonpublic information exists whenever it appears, based on early quarter results and estimates of sales pipelines, that there is some uncertainty about whether a company will hit its public earnings and revenue estimates would do little to protect investors and do much to impede the ability of corporations to consummate transactions and prevent insiders from having fair opportunities to buy and sell shares. For reasons just like this, *Shaw* adopted a materiality standard that requires a demonstration that the nonpublic information reliably showed that the company would depart from public expectations in an extreme way. In this case, at the time of the trades, there was no nonpublic information that demonstrated that Oracle would depart from the Market Estimates in any way.

**\*953** VII. *The Plaintiffs Have Also Failed To Produce Sufficient Evidence Of Scienter To Avoid Summary Judgment*

In the briefs, the parties engage an interesting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904
**(Cite as: 867 A.2d 904)**

debate under federal law. That debate centers on what is required to prove scienter under the federal securities law. FN185 Some precedent suggests that the plaintiff must show that the defendant not only knowingly possessed material information, FN186 but also convince the fact-finder that the material information actually motivated, in whole or in part, the defendant's trading. FN187 Other precedent is sympathetic to the view that if a defendant trades while in knowing possession of material, nonpublic information, then a violation is proven. FN188 Other cases elide this divide, by requiring a finding that the trades were motivated, in whole or in part, by the nonpublic information but also concluding that in civil cases an inference of such motivation arises from knowing possession, FN189 an inference that supports a jury verdict to that effect or the denial of a summary judgment motion by the defendant. This interesting back-and-forth is important under the federal securities laws, especially because of recent reforms that require that even a complaint state with particularity facts giving rise to a strong inference that the defendant acted with scienter. FN190

FN185. For an interesting discussion of the debate about this issue, see Allan Horwich, *Possession Versus Use: Is There a Causation Element in The Prohibition on Insider Trading,* 52 Bus. Law 1235 (1997).

FN186. In its history, the SEC has argued on both sides of this debate, but in recent decades it has argued that trading while in knowing possession of material, nonpublic information is, in itself, a violation of Rule 10(b)(5). *See SEC v. Adler,* 137 F.3d 1325, 1332-39 (11th Cir.1998) (describing and addressing the SEC's long-standing position to this effect).

FN187. *E.g., United States v. O'Hagan,* 521 U.S. 642, 651-52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (describing traditional insider trading liability as, "Rule 10b-5 [is] violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information");

*Dirks v. SEC,* 463 U.S. 646, 664 n. 23, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (" [V]iolation may be found only where there is intentional or willful conduct designed to deceive or defraud investors.").

FN188. *E.g., In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 143 (S.D.N.Y.1999) (trading while in "knowing possession" sufficient to violate federal law) (citing *U.S. v. Teicher,* 987 F.2d 112, 120 (2d. Cir.1993)) (containing strong dictum in favor of the view that knowing possession is sufficient to prove a violation).

FN189. *SEC v. Adler,* 137 F.3d 1325, 1340-42 (11th Cir.1998) ; *SEC v. Lipson,* 278 F.3d 656, 661 (7th Cir.2002).

FN190. 15 *U.S.C.* § 78u-4(b)(2).

Here, these complexities are not as important for an obvious reason. There is no rational basis to conclude that Henley or Ellison possessed material, adverse information at any relevant time. If there is something like "less than zero" outside of Elvis Costello's music, then there is even less reason to infer that Henley or Ellison "knowingly" possessed material, adverse information. The record is wholly devoid of any basis to suspect that either of them believed that Oracle would materially fall short of the Market Estimates as of the time of their trades. To the contrary, there is every reason to conclude that each thought Oracle would, at the times relevant to their respective trading decisions, hit the target.

The plaintiffs, of course, make much of what they see as inconsistencies or inaccuracies in Ellison's testimony. Although Ellison's deposition and interview testimony reveals at times a lack of precision, the only rational inference that can be drawn from his testimony is that he was at times **\*954** over-bullish. Importantly, despite a vast record, there is no evidence that could suggest to a rational mind that Ellison was a false optimist whose sunny outlook masked a genuinely darker view of Oracle's future. When considered in isolation or along with the other testimonial and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904                                                                                                    Page 49

867 A.2d 904
**(Cite as: 867 A.2d 904)**

documentary evidence, Ellison's testimony does not rationally suggest scienter. His overall story coheres and his failure to remember certain details with precision at all times is understandable.

[4] Nor do the objective facts about Henley and Ellison's trades create any rational inference of scienter. As to Henley, his trades were timed to occur early in a quarter, at a time when Oracle's Best Estimate was that it would beat the Market Estimates. His trades were in keeping with a pattern of diversification and his decision to trade in a new calendar (and therefore tax) year was motivated by proper, non-suspicious financial considerations. Finally, Henley sold only 7% of his Oracle position, leaving him a huge stake in the company. FN191

> FN191. *See Guttman v. Huang,* 823 A.2d 492, 503 n. 20 (Del.Ch.2003) (finding that the fact that defendant retained the bulk of his shares cuts against inference of scienter); *Rattner v. Bidzos,* 2003 WL 22284323, at *12 (Del.Ch. Sept.30, 2003) (holding that the size of sales is relevant to determining whether directors who traded faced a sufficient likelihood of liability under *Brophy* and could be considered in determining whether directors were disinterested for demand excusal purposes).

As to Ellison, the picture is only clouded by his huge wealth. Because Ellison's ownership interest in Oracle was so substantial, his sales generated nearly a billion dollars in proceeds even though they involved only 2% of his Oracle shares. FN192 Although it is difficult to slight nearly a billion dollars, that figure must be considered in the context of Ellison's remaining net worth, which was many, many times more enormous, and in light of the reality that Oracle was not Webvan or Enron-Oracle made and still makes real products that sell for real profits. There is therefore no rational basis to believe that, by making large sales when he did, Ellison was fleeing disaster or seeking to make an unfair buck at the expense of the trading public. Rather, the record is clear that Ellison had only three windows left (including 3Q 01) to

exercise a large number of options. The record is also clear that Ellison's financial advisor had been urging him to sell some shares to pay down debt for some time and that Ellison had tarried.

> FN192. *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y.1999) (" Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened.") (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)).

The plaintiffs try to turn that delay into a rational basis for suspicion about Ellison's motives. But their argument comes across as the ravings of conspiracy theorists, who weave tales out of nothing. FN193 In their brief, the plaintiffs actually suggest that the limited number of windows left for Ellison to exercise his options was not a rational motivating factor because Ellison, if necessary, could have simply let them expire worthless. That is silly.

> FN193. I do not fault the plaintiffs' able and articulate counsel, as zealous advocates, for making this strained argument, but neither do I shrink from candidly describing its force.

Likewise, the plaintiffs try to take Ellison's words out of context by claiming that he lacks credibility because he testified that he was not motivated by a desire to reduce debt in deciding to sell. What Ellison indicated was quite sensible: he had a large number of expiring options that would, when exercised, trigger a huge **955** tax liability and require him to sell shares. Because he would have to enter the market to sell in order to exercise his options, it was a prudent time to finally take his financial advisor's advice to diversify his holdings and to reduce some debt while he was in the market. Therefore, Ellison has advanced entirely reasonable, non-suspicious reasons for his trades. Furthermore, the precise timing of Ellison's trades-coming immediately after his advisor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

867 A.2d 904

867 A.2d 904
**(Cite as: 867 A.2d 904)**

returned from vacation and within the middle of a quarter when he was least likely to possess material information-is not suggestive in any manner of scienter.

In sum, however wealthy Ellison is and however envious that may make some, the fact remains that Ellison sold only 2% of his Oracle holdings. FN194 Ellison remained the person with more equity at stake in Oracle than anyone anywhere. Plaintiffs continually emphasize the nearly $1 billion that he made on the sale, but ignore the roughly $18.9 billion in equity that he lost in the ensuing share price collapse. FN195 The idea that he would jeopardize his own reputation and that of Oracle by trying to make illicit trading profits does not rationally emerge as a possible inference from this record, especially when the Best Estimates and Pipeline Reports he was receiving did not give him any rational basis to suspect that Oracle would fall materially short of the Market Estimates.

> FN194. *See Guttman v. Huang,* 823 A.2d 492, 503 n. 20 (Del.Ch.2003) ; *Rattner v. Bidzos,* 2003 WL 22284323, at *12 (Del.Ch. Sept.30, 2003).

> FN195. Ellison sold 29 million of his 1.39 billion shares leaving him with approximately 1.361 billion shares. He sold the 29,084,576 shares for $894,786,059 in gross proceeds, an average of 30.76 per share. On March 2, 2001, Oracle closed at $16.87 per share, $13.89 below Ellison's average sale price. Multiplied by the 1.361 billion shares he still owned, this drop amounted to $18.9 billion. Even measuring from the $21.37 close on March 1 before the announcement of the quarter's results, the $4.5 drop in share price equated to a $6.1 billion dollar one-day loss in equity value.

For all these reasons, I do not believe that a rational mind could draw an inference of scienter from this record regarding either Henley or Ellison. Therefore, for this independent reason, the plaintiffs' *Brophy* claim must be dismissed.

VIII. *Conclusion*

The defendants have demonstrated their entitlement to summary judgment. The plaintiffs' claims are therefore dismissed with prejudice, with the exception that their breach of contract claim is dismissed without prejudice to the prosecution of that claim in the pending California derivative action. Each side to bear its own costs.

**IT IS SO ORDERED.**

Del.Ch.,2004.
In re Oracle Corp.
867 A.2d 904

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.