EXHIBIT 21

08:56am EST 21-Feb-01 Punk, Ziegel & Co. (Gary Abbott 508-480-6799) ORCL
ORACLE-CUTTING Q3 EPS ESTIMATES

PUNK, ZIEGEL & COMPANY GARY ABBOTT 508-480-6799

Oracle Apps World Notes;
Customer Buying Urgency Not In New Orleans;
Cutting Q3 EPS Estimates
*          .We are lowering our EPS estimates because we are not
getting a sense of urgency from customers about their immediate
spending plans for both Oracle's database and application software.
*          We are lowering our Q3, FY01 and FY02 EPS estimates. Our
new estimates are $0.11, $0.48, and $0.57, respectively. Our previous
EPS estimates were $0.12, $0.51, and $0.61.
*          When we downgraded ORCL shares after the Q2 results on
12/15/00, we cited potential delays of customer purchases in a
weakening business environment and difficult competitive pressures.
These risk factors continue to be firmly in place and we believe the
near-term risks outweigh the near-term opportunities.
We are visiting with Oracle customers and partners at its Apps World
conference in New Orleans. The conference began on Monday 2/19/01 and
runs through Friday 2/23/01.While the focus of this conference is
targeted at Oracle's application customers, the Company's application
sales pull a very significant proportion of its database business,
so this conference provides a good proxy for the overall health of
the Company and the environment.
Given that it is late in Oracle's fiscal third quarter, we had
expected to see customers lined up to buy software. To our surprise,
this hasn't been the case. In addition, we have asked customers
whether Oracle is pushing a hard sell at this conference and this
doesn't appear to be the case. As such, Apps World may turn out to be
a distraction during an important period in the Company's quarter.
In the past, we have suggested that Oracle's marketing message has
resonated well with customers. In a word, Oracle's message can be
summed up as "integration." This message continues to be popular and
it is hitting two distinct types of customer audiences.
Large organizations, principally the Fortune 100 companies and
certain parts of the federal government, are buying into the notion
of using the Internet to streamline costs. Oracle has been
advertising that it has saved over $1 billion over the past year by
using its software and these claims have gotten the Company a lot of
attention and a lot of very large deals. However, these large deals
come and go and if the economy stays uncertain, we believe these
types of deals may sit on the horizon for a prolonged period.
Ironically, as Oracle is quick to point out, its software brings a
high ROI, which would be of extreme interest to large companies
during poor economic conditions. As such, one might expect Oracle's
application message to resonate even louder when times are bad.
Unfortunately, we believe the opposite is the case because
implementation periods span multiple years. One Fortune 50 customer
we engaged on this subject validated our assertion with the admission
that their Applications 11i implementation is being done in a phased
rollout to occur over the next five years. On the one hand, the
sooner a company gets started with the rollout, the sooner the
savings will begin to accrue. However, it's a real lot of money that
these Fortune 100 companies are looking at spending (upwards of $100
million in some cases) with Oracle and if the economic environment
continues to be weak, we wouldn't be surprised to see some of these
prospective customers wait a quarter or two (or more) before they get

on board. Even capital spending gets cut in bad environments.
Oddly enough, the other constituency that Oracle seems to be reaching
with its integration message is mid-market companies. In this case,
many of these companies want to have integrated ERP, CRM, Supply
Chain, and Procurement applications. However, a best-of-breed
approach is less feasible for this constituency because of the high
integration costs. Where many of these businesses are simpler, as it
tends to be the case in smaller, mid-market companies, Oracle offers
a comprehensive package of applications that does the job. This is
where we believe Oracle should be focusing more of its efforts
because this is the market where the technological differentiation is
less important than functional capability. Interestingly, Oracle
talks about these customers as being important, but the real focus,
in our opinion, is on the largest companies and it is using its
integration message to sell very large software licenses to companies
that are buying promises of $1 billion or more in savings. Thus, if
these very large deals slip, there may not be a line of mid-market
companies waiting at the door to make up the difference.

Another interesting observation that we have made has to do with the
mixed perceptions of Applications 11i. The Applications 11i suite was
officially released several months ago, but software bugs hampered
its adoption. Today, the Company claims that 180+ companies have gone
live on the software and that about 2,500 additional companies are
working on current upgrades to the new version. While we have not
been able to check with all 180 of the live customers, we have spoken
to four of them. Of these four, three were integrator partners and
one was a division of a large company. All of these customers had
severe difficulties with their implementations. In fact, one of them
was implementing 30 seats in one office on a Sun Solaris platform and
they found Oracle's advice to be incorrect and had to work around
the "fixes" that Oracle provided directly. While this was the worst
report, in our opinion, it gives us some cause for concern,
especially where the Company is guiding analysts to 60-plus percent
license revenue growth rates for the next few quarters. However, to
be fair, we did talk to a number of customers who are currently
implementing the software and were making satisfactory progress by
their own accounts. On balance, the best we can say is that we are
getting mixed signals on Applications 11i, which gives us another
cause for caution.

After taking all of the qualitative customer data that we have
collected into account, we believe the near-term risk outweighs the
near-term opportunity. As a result, we are lowering our revenue and
EPS forecasts for Q3, FY01 and FY02 in order to reflect the risks. We
are lowering our Q3 revenue and EPS estimates from $3.07 billion and
$0.12 to $2.83 billion and $0.11. We are also lowering our FY01 and
FY02 revenue and EPS estimates. Our FY01 estimates are being reduced
from $12.03 billion and $0.51 to $11.51 billion and $0.48. Our FY02
estimates are being reduced from $14.42 billion and $0.61 to $13.65
billion and $0.57.
We maintain our Market Performer rating.
First Call Corporation, a Thomson Financial company.
All rights reserved.   888.558.2500
]

EON

EXHIBIT 22

IDG Network:   Login  Register



**Attend the World's Largest
Storage Networking Event**

**COMPUTERWORLD** An IDG company   QuickLink   ● Search │ Computerworld

| Home | News | Topics | Print Edition | Services | Subscribe | Events | In Depth | XML Fee

# Oracle Users Slowly Easing Toward 11i Suite

Some waiting until software more stable, easier to implement

News Story by Marc L. Songini

FEBRUARY 26, 2001 (COMPUTERWORLD) - Many of Oracle Corp.'s users are eager to upgrade to its new 11i software, which promises a fully integrated suite of Web-enabled enterprise resource planning (ERP) and customer relationship management (CRM) applications. But at the Oracle AppsWorld conference here last week, some said they plan to take their time before making the switch.



Despite assurances from Oracle, conference attendees cited ongoing concerns about technical glitches in the software, as well as other issues, such as the internal business process changes that would accompany an upgrade.

"My sense in talking to various users is that they want to [upgrade to 11i] as soon as they can, but with caution," said Rocky Bertz, a project manager at Greenwood Village, Colo.-based CH2M Hill Cos. and treasurer of the Oracle Applications Users Group.

Bertz said his firm, which provides manufacturing and technology project management services, doesn't plan to go live with 11i until next year.

Oracle executives, however, said the latest versions of 11i are stable and that implementing the new suite is becoming easier. In fact, an updated 11i release became available just last week, and for users who don't need to customize the applications, upgrading is relatively simple, said Mark Jarvis, chief marketing officer at Oracle.

## Conflicting Reports

At its first-ever U.S. AppsWorld conference, Oracle announced that since 11i was released eight months ago, 180 users, including London-based Barclays Bank PLC, Compaq Computer Corp. and Englewood, Colo.-based Agilera.com Inc., have gone live with it.

Cindy Pence, director of material and logistics at Tropian Inc., a Cupertino, Calif.-based manufacturer of radio circuit components, is among the Oracle customers who have gone live with 11i. Within a 90-day period, Tropian implemented Oracle financial, procurement, inventory and self-service modules, she said. The software will cost less than $100,000, and the implementation costs will be less than $200,000, she added.

### E-Business Suite 11i

- Was released eight months ago

- Includes a full set of Web-enabled ERP and CRM business applications

- Has 180 users

- Has 2,500 ongoing implementations

- Includes new code (45% of the software)

In her 15 years in the field, Pence said, it was the easiest implementation she has ever done. More modules that handle order entry and tracking are slated to go live within the next year.

"Sure, there were some bugs, but no showstoppers," she said. "We had decided that we would rather take the risk of working through any potential bugs in 11i vs. having to deal with a future upgrade to gain that [desired] functionality."

Some users, however, are being cautious by either testing or slowly phasing in the software one piece at a time.

"Unfortunately, the early releases of the 11i software indeed had too many [technical] issues that are still being resolved," said Joel Flemming, global program leader at Honeywell Sensing and Control in Freeport, Ill. But Oracle has been quick to help Honeywell address the glitches that it has found, he noted.

The Honeywell Inc. subsidiary has been upgrading its procurement and financial software and other application modules from Oracle's 10.7 suite to 11i, Flemming said.

Woodcliff Lake, N.J.-based Ingersoll-Rand Co. is moving to completely standardize

on 11i throughout its far-flung manufacturing operations. The company is already running 11i modules in some of its businesses, said Steven Wright, a member of an IT implementation team at Ingersoll-Rand, but it will add new installations only gradually, allowing time for the technology to mature.

Wright said he expects Ingersoll-Rand's Oracle ERP and CRM initiative to take five to seven years.



Copyright © 2005 Computerworld Inc. All rights reserved. Reproduction in whole or in part in any form or medium without express written perm Computerworld Inc. is prohibited. Computerworld and Computerworld.com and the respective logos are trademarks of International Data Grou

# EXHIBIT 23

1 of 1 DOCUMENT

Copyright 2001 The Dallas Morning News
The Dallas Morning News

February 28, 2001, Wednesday THIRD EDITION

**SECTION:** BUSINESS; Pg. 1D

**LENGTH:** 647 words

**HEADLINE:** I2 blames customized software;
Nike spat highlights contracts' complexity

**SOURCE:** Technology Writer

**BYLINE:** Leah Beth Ward

**BODY:**

In a rare case of public finger pointing, i2 Technologies Inc. and one of its biggest clients - Nike Inc. - traded accusations over the cause of a software problem that forced the shoemaker to predict lower-than-expected quarterly earnings.

I2, based in Farmers Branch, said Tuesday that Nike ignored the software firm's advice to implement a more standard type of apparel industry supply-chain software rather than one customized for Nike.

The fracas erupted Monday after the close of trading when Nike, based in Beaverton, Ore., said its third-quarter sales would be as much as $ 100 million below previous estimates.

Nike blamed i2 for creating "complications" that resulted in product shortages and excesses as well as late deliveries.

Shares of both companies skidded Tuesday. Already a volatile stock, i2 was down $ 7.94, or more than 22 percent, to $ 27.56. More than 29 million shares changed hands, nearly three times i2's average daily volume. Nike shares fell $ 9.57 to $ 39.60, or 19.5 percent.

Analysts and other experts say the incident highlights the complexity of putting much-heralded e-commerce software into practice at a large company with a multifaceted supply chain.

"It's the nature of the beast on something like this," said Dr. Leon Kappelman, professor and director of the Information Systems Research Center in the College of Business at the University of North Texas.

"And when you get right down to it, it's a people problem," Dr. Kappelman said. "Somebody did not manage the risk."

I2 spokeswoman Sue LaDow said the two companies are not parting ways over the matter.

I2 is about 2 1/2 years into a $ 400 million, five-year engagement with Nike. She said the software implementation in question is "only a slice" of the entire project.

But i2 isn't willing to take all the blame.

Ms. LaDow said the software company had proposed an apparel industry template with pre-configured software settings to forecast demand and automate the supply chain. She said Nike wanted a more customized product, which required i2 to write new software code.

THE DALLAS MORNING NEWS, February 28, 2001

"We probably didn't insist strongly enough on using our industry templates," she said.

Nike officials backtracked somewhat on Tuesday by calling the software problem partly self-inflicted.

"Most of the problems are behind us now," i2 founder and chairman Sanjiv Sidhu said Tuesday afternoon on CNBC.

He said the fashion industry presents more challenges, in part because of the variations in size, color and styles that make forecasting demand difficult.

Karen Peterson, an analyst with Gartner Group, called fashion industry supply chains highly complex.

"I think there was a learning curve on i2's part," she said. "I don't think i2 or any of its competitors have done this before."

Brad Whitt, an analyst with Southwest Securities who follows i2, said he was not surprised that the project ran into difficulty.

"But I was surprised that Nike would come flying out and say it cost them $ 100 million in revenue," he said.

Some analysts viewed i2's stock tumble as a reason to buy. David Garrity, an analyst with Dresdner Kleinwort Wasserstein, said the market overreacted to the problems.

He said the benefits of wringing inefficiencies out of supply chains in all industries is too compelling to drop software sector stocks.

"The magnitude of Nike's shortfall [34 cents for the third quarter compared with previous expectations of 50 cents] underscores the substantial role that supply chain issues play in many organizations' operations," Mr. Garrity wrote in a report issued Tuesday.

I2 had company in the rough-and-tumble tech market Tuesday. Shares of other firms, including Oracle Corp., Commerce One Inc. and Ariba Inc., fell on analyst reports that worried about the effect of the slowing U.S. economy on corporate spending on technology.

**LOAD-DATE:** March 1, 2001

EXHIBIT 24

1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  WILLIAM S. LERACH (68581)
   MARK SOLOMON (151949)
3  DOUGLAS R. BRITTON (188769)
   401 B Street, Suite 1600
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
     – and –
6  SHAWN A. WILLIAMS (213113)
   WILLOW E. RADCLIFFE (200087)
7  ELI R. GREENSTEIN (217945)
   JENNIE LEE ANDERSON (203586)
8  MONIQUE C. WINKLER (213031)
   100 Pine Street, Suite 2600
9  San Francisco, CA 94111
   Telephone: 415/288-4545
10 415/288-4534 (fax)

11 Lead Counsel for Plaintiffs

12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15 In re ORACLE CORPORATION        )  Master File No. C-01-0988-MJJ
   SECURITIES LITIGATION           )
16 ──────────────────────────────  )  CLASS ACTION
                                   )
17 This Document Relates To:       )  1199 SEIU GREATER NEW YORK
                                   )  PENSION FUND'S RESPONSES AND
18    ALL ACTIONS.                 )  OBJECTIONS TO DEFENDANTS' THIRD
                                   )  SET OF INTERROGATORIES TO
19 ──────────────────────────────  )  PLAINTIFFS

20

21

22

23

24

25

26

27

28

1   information and documents which are not in 1199 SEIU Greater New York Pension Fund's

2   possession, custody or control.

3       Subject to and without waiving the general and specific objections set forth herein, 1199

4   SEIU Greater New York Pension Fund incorporates its response to Interrogatory No. 22 above.

5   INTERROGATORY NO. 24:

6       Identify each individual, including securities brokers, financial advisors, or analysts, involved

7   in executing or implementing Transactions involving Oracle Securities on Your behalf between June

8   1, 2000 and June 1, 2001.

9   RESPONSE TO INTERROGATORY NO. 24:

10       1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

11   above as set forth herein.

12       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

13   grounds that it is vague, ambiguous, harassing, overly broad, unduly burdensome and seeks

14   information that is neither relevant nor reasonably calculated to lead to the discovery of admissible

15   evidence.

16       1199 SEIU Greater New York Pension Fund further objects to the terms "financial advisors,"

17   "analysts" and "implementing" as vague and ambiguous.

18       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

19   that it seeks to impose upon 1199 SEIU Greater New York Pension Fund a duty to seek out

20   information and documents which are not in 1199 SEIU Greater New York Pension Fund's

21   possession, custody or control.

22       Subject to and without waiving the general and specific objections set forth herein, 1199

23   SEIU Greater New York Pension Fund incorporates its response to Interrogatory No. 22 above.

24   INTERROGATORY NO. 25:

25       For each securities fraud lawsuit in which You filed a complaint, sought to be a lead plaintiff

26   or sought to be a class representative, please identify the lawsuit by name (including the title or

27   caption, the docket number or file number, the court or forum); subject matter (including the claims

28   asserted); class nature (including whether it was commenced as a purported class action and certified

1199 SEIU GREATER NEW YORK PENSION FUND'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFF - C-01-0988-MJJ    - 11 -

1  as a class action); You or Your counsel's involvement (including whether You sought to be or were

2  named as a lead plaintiff or appointed as a class representative, the name of all counsel who

3  represented You in the lawsuit and any sanctions, fines, costs, or fees were imposed upon You

4  during the lawsuit); and resolution (including whether You received any payment and the payment

5  amount).

6  RESPONSE TO INTERROGATORY NO. 25:

7      1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

8  above as set forth herein.

9      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

10  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome

11  without reasonable limitation in its scope and seeks information that is neither relevant nor

12  reasonably calculated to lead to the discovery of admissible evidence.

13      1199 SEIU Greater New York Pension Fund further objects to the terms "lawsuit," "subject

14  matter," "class nature," "involvement," and "resolution" as vague and ambiguous.

15      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

16  it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work

17  product doctrine.

18      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

19  it seeks disclosure of confidential information and/or information subject to non-disclosure pursuant

20  to a court order.

21      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

22  that it seeks to impose upon 1199 SEIU Greater New York Pension Fund a duty to seek out

23  information and documents which are not in 1199 SEIU Greater New York Pension Fund's

24  possession, custody or control.

25      1199 SEIU Greater New York Pension Fund further objects to this interrogatory as unduly

26  burdensome to the extent that the interrogatory is duplicative of prior interrogatories served by

27  defendants and responded to by plaintiffs and contradicts the parties' prior agreements regarding

28  such interrogatories.

1199 SEIU GREATER NEW YORK PENSION FUND'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFF - C-01-0988-MJJ          - 12 -

1    Subject to and without waiving the general and specific objections set forth herein, 1199

2    SEIU Greater New York Pension Fund responds that in addition to the cases identified in 1199 SEIU

3    Greater New York Pension Fund's First Supplemental Responses to Defendants' Second Set of

4    Interrogatories to Plaintiffs (as modified during the March 30, 2005 meet and confer), since June

5    2000 it filed a complaint and/or motion be appointed a lead plaintiff or class representative in the

6    following suits brought pursuant to the Private Securities Litigation Reform Act of 1995:

7       *Selinger v. Armstrong, et al.,*          No. 00-CIV-9301 (S.D.N.Y.)
                                                    (motion for lead plaintiff);

8       *Billing v. Credit Suisse First Boston*    No. 01-CV-2014 (WHP (S.D.N.Y.)
        *Corp.*                                    (complaint and motion for lead plaintiff)
9

10   INTERROGATORY NO. 26:

11       Identify all public offerings in connection with which You solicited or received an allocation

12   of stock.

13   RESPONSE TO INTERROGATORY NO. 26:

14       1199 SEIU Greater New York Pension Fund incorporates the General Objections above as if

15   set forth herein.

16       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

17   grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome

18   without reasonable limitation in its scope and seeks information that is neither relevant nor

19   reasonably calculated to lead to the discovery of admissible evidence.

20       1199 SEIU Greater New York Pension Fund further objects to the phrases "public offerings"

21   and "solicited or received an allocation of stock" as vague and ambiguous.

22

23

24

25

26

27

28

1199 SEIU GREATER NEW YORK PENSION FUND'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFF - C-01-0988-MJJ          - 13 -

EXHIBIT 25

5-13-05

1 │ LERACH COUGHLIN STOIA GELLER
   │   RUDMAN & ROBBINS LLP
2 │ WILLIAM S. LERACH (68581)
   │ MARK SOLOMON (151949)
3 │ DOUGLAS R. BRITTON (188769)
   │ 401 B Street, Suite 1600
4 │ San Diego, CA 92101
   │ Telephone: 619/231-1058
5 │ 619/231-7423 (fax)
   │   – and –
6 │ SHAWN A. WILLIAMS (213113)
   │ WILLOW E. RADCLIFFE (200087)
7 │ ELI R. GREENSTEIN (217945)
   │ JENNIE LEE ANDERSON (203586)
8 │ MONIQUE C. WINKLER (213031)
   │ 100 Pine Street, Suite 2600
9 │ San Francisco, CA 94111
   │ Telephone: 415/288-4545
10│ 415/288-4534 (fax)

11│ Lead Counsel for Plaintiffs

RECEIVED
MAY 14 2005
ALAN N. SALPETER

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15│ In re ORACLE CORPORATION          )  Master File No. C-01-0988-MJJ
   │ SECURITIES LITIGATION            )
16│ ─────────────────────────        )  CLASS ACTION
   │                                  )
17│ This Document Relates To:        )  1199 SEIU GREATER NEW YORK
   │                                  )  PENSION FUND'S SECOND
18│     ALL ACTIONS.                  )  SUPPLEMENTAL RESPONSES TO
   │                                  )  DEFENDANTS' SECOND SET OF
19│ ─────────────────────────        )  INTERROGATORIES TO PLAINTIFFS

20

21

22

23

24

25

26

27                          CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

28

1  compound and will count as two interrogatories for purposes of the limitations imposed by the Court

2  in this action. With these understandings and subject to and without waiving the general and specific

3  objections set forth herein, 1199 SEIU Greater New York Pension Fund responds that Turner

4  Investment Partners, Inc. and Congress Asset Management made investment decisions and/or bought

5  Oracle Securities on its behalf during the Class Period. Documents reflecting Turner Investment

6  Partners, Inc.'s investment guidelines and investment philosophy are found at PLF Class 001-005.

7  INTERROGATORY NO. 4:

8       For each lawsuit in which You have been a party since 2001, please Identify the lawsuit by

9  name (including the title or caption, the docket number or file number, the court or forum); subject

10  matter (including the claims asserted); class nature (including whether it was commenced as a

11  purported class action and certified as a class action); Your or Your counsel's involvement

12  (including whether You sought to be or were named as a lead Plaintiff or appointed as a class

13  representative, the name of all counsel who represented You in the lawsuit and any sanctions, fines,

14  costs, or fees were imposed upon You or Your counsel during the lawsuit); and resolution (including

15  whether You received any payment and the payment amount).

16  RESPONSE TO INTERROGATORY NO. 4:

17       1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

18  above as set forth herein.

19       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

20  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome

21  without reasonable limitation in its scope, and seeks information that is neither relevant nor

22  reasonably calculated to lead to the discovery of admissible evidence.

23       1199 SEIU Greater New York Pension Fund further objects to the interrogatory on the

24  grounds that the terms "lawsuit," "subject matter," "class nature," "involvement" and "resolution"

25  are vague and ambiguous.

26

27

28  1199 SEIU GREATER NEW YORK PENSION FUND'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER   - 11 -

1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent it seeks disclosure of confidential information and/or information subject to non-disclosure pursuant to a court order.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent that it seeks to impose upon 1199 SEIU Greater New York Pension Fund a duty to seek out information and documents which are not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

After clarification by defendants, plaintiffs understand that defendants have narrowed the definition of the term "You" to include solely 1199 SEIU Greater New York Pension Fund. Plaintiffs further understand that defendants have narrowed their instructions to the extent that they request 1199 SEIU Greater New York Pension Fund to "Identify," they seek a general description. Finally, plaintiffs understand defendants to have narrowed this request to seek only the identification of those actions brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") where 1199 SEIU Greater New York Pension Fund filed an action and/or sought to be a class representative or a lead plaintiff since 2000. With these understandings and subject to and without waiving the general and specific objections set forth herein, 1199 SEIU Greater New York Pension Fund responds that other than this action, since 2000 it has filed a complaint and/or motion be appointed a lead plaintiff or class representative in the following class action suits brought pursuant to the PSLRA:

| Selinger v. Armstrong, et al. | No. 00-CIV-9301 (S.D.N.Y.) (motion for lead plaintiff – not appointed) |
|---|---|
| In re Nortel Networks Corp. Sec. Litig. | No. 01-CV-1855 (RMB) (S.D.N.Y.) (complaint) |
| In re Calpine Corp. Sec. Litig. | No. C-02-1200-SBA (N.D. Cal.) (complaint) |

| | |
|---|---|
| *Carpe v. Aquila, Inc., et al.* | No. 02-0388-cv-W2 (W.D. Mo.) (motion for lead plaintiff – appointed; motion for class certification – certified as class representative) |
| *In re Capital One Sec. Litig.* | No. 02-1069-A (E.D. Va.) (motion for lead plaintiff – appointed) |
| *Waldbaum v. Provident Financial Group, Inc., et al.* | No. C-1-03-166 (S.D. Ohio) (motion for lead plaintiff – appointed) |
| *Gallow v. Broadwing, Inc., et al.* | No. C-1-02-795 (S.D. Ohio) (motion for lead plaintiff – appointed) |
| *Fischbein v. Marsh & McLennan Cos., et al.* (now referred to as *In re Mutual Funds Inv. Litig.,* MDL No. 15863) | No. 03-CV-09157-PKC (S.D.N.Y.) (complaint and motion for lead plaintiff – appointed) |
| *Carpenters Health & Welfare Fund, et al. v. Coca-Cola Co., et al.* | No. 1:00-cv-2838WBH (N.D. Ga.) (motion for lead plaintiff – appointed; motion for class certification – pending) |
| *In re Waste Management, Inc. Sec. Litig.* | No. H-99-2183 (S.D. Tex.) (motion for lead plaintiff – not appointed) |
| *In re Total Renal Care Sec. Litig.* | No. CV-99-1745-CBM (RCx) (C.D. Cal.) (motion for lead plaintiff – not appointed) |
| *In re Microstrategy, Inc. Sec. Litig.* | No. 00-473-A (E.D. Va.) (motion for lead plaintiff – appointed; stipulation for class certification – approved and certified as class representative) |
| *Local 144 Nursing Home Pension Fund v. Proctor & Gamble Co.* | No. C-1-00-0221 (S.D. Ohio) (complaint; motion for lead plaintiff – appointed) |
| *In re Honeywell Int'l, Inc. Sec. Litig.* | No. 2:00cv03605 (DRD) (D.N.J.) (motion for lead plaintiff – appointed; motion for class certification – granted and certified as representative) |
| *In re Rite Aid Corp Sec Litig.* | No. 99-CV-1349 (E.D. Pa.) (motion for lead plaintiff – not appointed) |
| *Local 144 Nursing Home Pension Fund v. Computer Associates Int'l, Inc.* | No. 02-CV-2513 (E.D.N.Y.) (complaint; motion for lead plaintiff – appointed) |

<u>INTERROGATORY NO. 5:</u>

Identify any Communication made by any Defendant during the purported Class Period that You claim to be materially false or materially misleading.

EXHIBIT 26

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4

      In re ORACLE CORPORATION          )   Master File No.

5     SECURITIES LITIGATION             )   C-01-0988-MJJ

      _____    )   Class Action

6

7

8

9

10

                    DEPOSITION OF JACQUES FUHRER

11

                    _____

12

                         Thursday, May 5, 2005

13

                         (Pages 1 - 317)

14

15

16

17

18

19

20

21

22

23

24          REPORTED BY:  MARY HOGAN, CM, CSR 5386

25

**5/5/2005 Fuhrer, Jacques (Drifton)**

1              A.    What do you understand by on your behalf?

2              Q.    How about -- I'll simplify it.

3              A.    Yes.

4              Q.    I understand where you're going.

5              A.    Yes.

6              Q.    Have you ever made any trades in

7     securities not through Drifton Finance Corporation?

8              A.    No.  I only traded under Drifton.

9              Q.    In your entire life you have only traded

10    securities through Drifton Finance Corporation?

11    9:59A      A.    No.

12             Q.    Is that --

13             A.    No, no, no.  Sometimes I do an investment

14    outside Drifton.

15             Q.    Okay.  When you do a transaction, an

16    investment outside of Drifton --

17             A.    Yes.

18             Q.    -- how do you make that transaction?

19             A.    I give an order and then I buy it and if

20    I want, I sell it.

21             Q.    Who do you give the order to?

22             MR. BRITTON:  Objection to form.  I think

23    you've got a time issue here.

24             If you want to lay a foundation, because

25    we've got a real communication problem going on, so

1           can you rephrase the question and put a time period in

2           it, please?

3    10:00A              MR. YOUNT:  I would like an answer to the

4           pending question and I'll come back and clean up the

5           time period once we've sorted this out.

6                  A.    Yes, but this has nothing to do with my

7           other case.

8                       MR. BRITTON:  You can answer the

9           question.

10                 A.    Yes.  This has nothing to do with what

11          I'm here for.

12                      MR. BRITTON:  He can -- if you can answer

13          the question, if you remember, you can answer the

14          question.

15                 A.    Yes.

16                      MR. BRITTON:  If you don't understand it,

17          ask him to rephrase it.

18                 A.    Yes.  Can you please, because I don't

19          understand what you mean.

20          BY MR. YOUNT:

21                 Q.    Okay.  You have now said twice that you

22          made securities transactions other than through

23          Drifton Finance Corporation?

24                 A.    Yes.

25                 Q.    Is that correct?

5/5/2005 Fuhrer, Jacques (Drifton)

```
 1                      and he traveled, and then I talked to his assistant.
 2                              Q.    Outside of those two individuals --
 3                              A.    No.
 4                              Q.    -- James Bul --
 5                              A.    No, no.
 6                              Q.    -- James Bul's associate, did you speak
 7                      with anyone else in an effort to get securities --
 8                              A.    No.
 9                              Q.    -- information --
10                              A.    No.
11                              Q.    -- in the period 2000-2001?
12                              A.    No.
13                              Q.    In the period 2000-2001, did you receive
14                      or read reports from any analyst firms?
15                              A.    It happened that I read them but I
16                      wouldn't be able to give you the names.
17                              Q.    Well, let me see if I can refresh your
18                      recollection by giving you some names.
19     11:09A                   Donaldson, Lufkin, Jenrette, did you read
20                      their reports?
21                              A.    They used to send it to me, yes.
22                              Q.    Did you read them?
23                              A.    Yes.
24                              Q.    That was during 2000-2001?
25                              A.    Yes.
```

5/5/2005 Fuhrer, Jacques (Drifton)

1              Q.    And during 2000-2001 did you receive or

2        read reports from William Blair and Company?  William

3        Blair and Company?

4              A.    I don't know them.

5              Q.    During 2000-2001 did you receive or read

6        reports from Witt Soundview?

7              A.    No, I don't know this.  What are they?

8        Are they brokers?

9              Q.    As your attorney has explained, the

10       questions come from me to you.

11                   MR. BRITTON:  Question, answer.

12             A.    Oh, I see.  I think we had --

13       BY MR. YOUNT:

14             Q.    At a break I'll fill you in, but in the

15       interest of disclosure, yes, they are other analyst

16       firms.

17  11:10A           MR. BRITTON:  Lawyers don't like to be

18       asked questions during depositions.

19       BY MR. YOUNT:

20             Q.    In 2000-2001 did you receive or read

21       reports from Morgan Stanley Dean Witter?

22             A.    It happens that I read these things but

23       not -- they were not sent to me, but if I saw them

24       lying around, I picked them up and I read them.

25             Q.    But Morgan Stanley Dean Witter was one of

1                    the firms whose reports you remember seeing in the

2                    period 2000-2001?

3                         A.    No, not at that period, but it happens

4                    that I read their reports, like Merrill Lynch, Barron

5                    Stern, Smith & Barney.

6                              They all write reports but I cannot

7                    remember when I read them and which date and which

8                    article.

9                              But I know this, these brokers, and I

10                   know that every month they have a stock they recommend

11                   very strongly and then they say they have a hold, to

12                   sell, and, you know.

13   11:11A              Q.    Do you follow those recommendations?

14                         A.    Of course.   No, because by experience I

15                   see that they have been often wrong.

16                              Like say I can give an example.   I have

17                   read the last month a lot about General Motors, that

18                   they were going to get into trouble, that they had a

19                   lot of -- I mean, they had a big debt, a pension they

20                   had to pay for their workers and the stock dropped,

21                   and then suddenly two days ago somebody comes and he

22                   wants to buy 10, 20 percent of the stock and the stock

23                   jumps.

24                              You see, it's -- you cannot rely on this,

25                   what the analysts, they say.

```
 1                         Can you, when you go through the list,
 2              put a complete question in for each one, because I
 3              think it will help bridge that gap.
 4                         MR. YOUNT:  I'm not going to agree to
 5              your characterizations about his answers earlier.
 6                         MR. BRITTON:  Okay.
 7                         MR. YOUNT:  But I will accommodate you.
 8                         MR. BRITTON:  I appreciate that.
 9              BY MR. YOUNT:
10                    Q.    In the period 2000-2001 did you read or
11              receive The Street.com?
12                    A.    No.
13                    Q.    In the period 2000-2001 did you read or
14              receive the Bloomberg News?
15                    A.    Of course, sometimes I -- I don't receive
16              it to me, but I remember that I've read some articles
17              which Bloomberg have written.
18   12:16P           Q.    I'm sorry.  Did you finish your answer?
19                    A.    Yes, but I don't remember for what -- on
20              what articles it was.  The name is very common to me.
21                    Q.    Could you have seen those articles in the
22              Bull Session's web page?
23                    A.    No.
24                    Q.    Did you read -- during 2000-2001 did you
25              receive or read Business Week or Business Week Online?
```

```
 1                          A.    No.  You mean on the computer?

 2                          Q.    I'll break it up.  Did you -- during

 3              2000-2001 did you receive or read Business Week, the

 4              magazine?

 5                          A.    Sometimes I read it.

 6                          Q.    During 2000-2001 did you read or receive

 7              Business Week Online, which is the computer version of

 8              Business Week?

 9                          A.    Never.

10                          Q.    During 2000-2001 did you read or receive

11              the San Francisco Chronicle?

12                          A.    Never.

13   12:17P                 Q.    During 2000-2001 did you read or receive

14              Forbes?

15                          A.    Never.

16                          Q.    During 2000-2001 did you read or receive

17              Forbes.com?

18                          A.    Never.

19                          Q.    During 2000-2001 did you read or receive

20              the New York Times?

21                          A.    Never.

22                          Q.    During 2000-2001 did you read or receive

23              Investors Business Daily?

24                          A.    Never.

25                          Q.    During 2000-2001 did you read or receive
```

1           Fortune.com?

2                   A.    Never.

3                   Q.    During 2000-2001 did you read or receive

4           Dow Jones Business News Service?

5                   A.    Never.

6                   Q.    During 2000-2001 did you read or receive

7           Computer World Magazine?

8                   A.    Never.

9    12:18P          Q.    Just to clarify at this point on the

10          record, you have already testified that during

11          2000-2001 you watched CNBC, is that correct?

12                  A.    Yes, for the news.  Yes.

13                  Q.    And during 2000-2001 did you also watch

14          CNN?

15                  A.    I see CNN every day.  I mean, when I look

16          at the TV, sometimes I want to have the news and

17          it's -- wherever you are, you have CNN.

18                         Yesterday night I looked at CNN while I

19          was here.

20                  Q.    During 2000-2001 did you watch Fox News?

21                  A.    No.  We don't have that in Europe.

22    12:19P          Q.    During 2000-2001 and aside from the Bull

23          Session website did you go on the internet to find

24          securities or investing information?

25                  A.    No.

**5/5/2005 Fuhrer, Jacques (Drifton)**

1          Q.     Did you go on the internet to see Yahoo?

2          A.     No, no, I never do that because it's --

3     I'm not very well at the -- with the computer.

4          Q.     Other than the television, perhaps we

5     have already discussed, did you watch any other

6     television networks to obtain securities or investing

7     information during 2000 or 2001?

8          A.     I watch, but it's not in the one of

9     America.

10              It's the one of France.  You see, they

11     have -- every Saturday morning they have a -- you

12     know, what happened in the week, and CNBC, CNBS, they

13     do it as well on Sunday and on Saturday so it happens

14     that I watch that.

15   12:20P     Q.     What is the name of the channel you watch

16     in France that you mentioned?

17          A.     Oh, you know, I mean, it comes there.

18     It's economy.

19              You know, they have economy news and then

20     they speak about the stock market but there is nothing

21     to do with --

22          Q.     Do you remember what the name of the

23     program is?

24          A.     No, I don't.

25          Q.     Do you remember what channel in France it

117

5/5/2005 Fuhrer, Jacques (Drifton)

1      comes in on?

2              A.     No.   When I am in Paris and I happen to

3      look at the television and it's there, I watch it, but

4      I don't remember.

5              Q.     During 2000-2001 did you receive or read

6      information disseminated by Oracle itself?

7              A.     If I -- can you repeat?

8              Q.     Yes.   During 2000-2001 did you receive or

9      read information disseminated by Oracle?

10  12:21P        A.     What do you mean, disseminated?

11             Q.     Okay.   Distribute?

12             A.     By Oracle?

13             Q.     Yes.

14             A.     You know, I read the news which they send

15      out on the -- on the computer, but just a brochure or

16      a letter, I did not.

17                    Every other day there was a news coming

18      from Oracle, that they would do a sale or, you know,

19      some kind of news.

20                    Sometimes it's important and most of the

21      time it's not important.

22             Q.     And this news, would it come to you

23      through your Bull Session website or did you obtain it

24      in another way?

25             A.     I obtained it in another way but I don't

118

5/5/2005  Fuhrer, Jacques (Drifton)

1          remember how I obtained it.

2                    Q.    Do you remember if you obtained it on

3          your computer?

4                    A.    No, not really on the computer.  No, no.

5          I must have read it somewhere.  Whatever came out on

6          Oracle I read.

7    12:22                 If you buy the Wall Street on the -- Wall

8          Street consists in two parts.

9                         And if you have the second part on the

10         first page underneath, you have all the firms which

11         are concerned and which were -- where there was an

12         article written in the newspaper, you can have it in

13         short.

14                        So whenever I look at it and I see

15         Eriksson, Page 7, I take Page 7 and I look where I can

16         read it, you see.

17                   Q.    When you say Wall Street you're talking

18         about the Wall Street Journal?

19                   A.    Yes, the Wall Street Journal in Europe.

20         It's similar to the one of here.

21                        They are not always the same articles,

22         but whatever is important is printed in the Wall

23         Street.

24                   Q.    And did you understand the Wall Street

25         journal was pre-printing press releases by Oracle

5/5/2005 Fuhrer, Jacques (Drifton)

```
1                        MR. BRITTON:  He doesn't know what
2           waiving the privilege means.
3                   A.    I don't know what it means.
4                        MR. BRITTON:  If you were sitting here
5           telling me that you wanted him to waive the
6           attorney-client privilege when he has a communications
7           problem, we're going to end the deposition now and
8           I'll move for a protective order.
9                        This is outrageous, what you're doing
10          today.
11                       MR. YOUNT:  He's volunteering.
12                       MR. BRITTON:  You asked the client "what
13          did your attorney tell you."
14                       MR. YOUNT:  We'll move on.
15                       MR. SCHMELTZ:  You've got one lawyer
16          standing up, another lawyer freaking out.  Clearly  --
17                       MR. STEINMEYER:  You have asked questions
18          I've never heard in my life, I don't think you have
19          ever heard.  It's outrageous.
20                       MR. SCHMELTZ:  This is over the top.
21          What happened -- hang on.
22                       MR. BRITTON:  Go ahead.
23                       MR. SCHMELTZ:  What's happened here is
24          the witness has answered questions where it has
25          appeared he has wanted to waive the privilege.
```

```
 1                      My colleague has asked questions that

 2            were appropriate if your client was going to waive the

 3            privilege.

 4                      If we need to square this out and get it

 5            figured out, we can do that.

 6                      There is no need to have one of your

 7            colleagues standing up.

 8                      I understand you're frustrated.  We don't

 9            need to go to war over this.

10                      We can take a break, we can talk about

11            this.  It's not -- this is not some outrageous devious

12            scheme and we need to make that very clear.

13                      If there is a communication issue we can

14            solve that.

15                      If your client wants to waive the

16            privilege, he can do that, and we can talk about that.

17    1:05P             MR. YOUNT:  That's all I'm saying.  I'm

18            not trying to --

19                      MR. BRITTON:  Listen, listen, let me say

20            for the record -- let me speak.  Let me speak.

21                      There is an obvious communications issue.

22            We have dealt with it now for four hours and it's been

23            a topic of a lot of questions.

24                      There is obviously an individual that's

25            lost a lot of money here that doesn't understand the
```

153

**5/5/2005 Fuhrer, Jacques (Drifton)**

1          U. S. legal system, doesn't understand that he is

2          protected by privileges.

3                              MR. SCHMELTZ:  I would encourage you to

4          take a break and explain that to him.

5                              MR. BRITTON:  That's fine.  That's fine,

6          but you will not get attorney-client communication

7          today, and if I have to end the deposition now and

8          move for a protective order, I will.

9                              MR. STEINMEYER:  We can come back and do

10         it in French or Flemish.

11                             We'll get interpreters.  He's struggling

12         to do this in English, okay?

13                             MR. YOUNT:  None of this was communicated

14         to us in advance.

15                             If this had been communicated to us in

16         advance, we could have made arrangements so that we

17         had an interpreter.

18                             MR. STEINMEYER:  You know what?  In

19         America, and with probably anyone else but yourself,

20         it wouldn't be a big deal.

21                             They would recognize it, recognize the

22         issue, and deal with it and not try and take

23         advantage.

24  1:07P             A.    What does it mean, waive?  Explain me, so

25         I know immediately.

5/5/2005 Fuhrer, Jacques (Drifton)

```
1               because they got complaints in and they were looking
2               for more victims.
3                    Q.   Do you know how many shares of Oracle
4               stock Mr. Ellison sold?
5                    A.   Wasn't it 900 million?
6                    Q.   Do you know what percentage of his
7               holdings that was?
8                    A.   Oh, that must be a few percent.  I've --
9               that's what I've been told.
10                        I mean, he had much more, but he hadn't
11              sold any stocks for five years, and then suddenly he
12              speaks good about his company and encouraging people
13              to buy it, and then at the same time he sells it.
14                        It comes over funny for somebody who lost
15              money.
16                        If I would have made money, I wouldn't
17              care, you see, but I was a victim.
18                        And then you analyze it, because I mean,
19              it gives you a bad feeling that you lose money, and
20              then when you think that it came not honestly to you,
21              then you -- you react differently.
22     2:37P         Q.   If you had known at the time Mr. Ellison
23              made his trades that he was trading the stock he
24              traded and it was the first time that he had traded in
25              five years, would you have changed any of your
```

**5/5/2005 Fuhrer, Jacques (Drifton)**

1          investments in Oracle?

2                              MR. BRITTON:  Objection to form.  Go

3          ahead.

4                    A.    I had already bought the stock then.  It

5          was too late for me when I learned it.

6                         I learned it after it had dropped but I

7          had already the stock because I bought it when he said

8          that it was the time to buy.

9                    Q.    Okay.  What I'm asking you is if you had

10         learned it earlier when he made the trades and before

11         the stock dropped --

12                   A.    Yes.

13                   Q.    -- would you have closed out your

14         positions in Oracle securities?

15                             MR. BRITTON:  Objection to form.

16                   A.    Yes.  Can you repeat what if --

17                             MR. YOUNT:  Can the court reporter repeat

18         that back?

19    2:38P                    (Question read)

20                   A.    Yes, I think so.  I would have been

21         frightened, you see, because when you hear somebody

22         speaking so good about the company, you see that it

23         goes the other way, and then on top of it you hear

24         that he's been accused of lying or not really telling

25         the truth, then you get scared.

1          yesterday, so --

2                    Q.    You can put that to the side for now.

3                    A.    Yes.

4                    Q.    Do you remember how long it was after the

5          second time you heard Mr. Ellison speak and when

6          Oracle disclosed its third quarter earnings and

7          Oracle's stock price fell?

8                    A.    I don't.  That I don't know.

9                    Q.    I wanted to try and narrow it down here.

10         Was it a matter of days?

11                   MR. BRITTON:  Objection to form, calls

12         for speculation.

13                   A.    I am not sure, so I don't -- I cannot

14         recall.

15                   I remember having seen him the first

16         time.

17                   I remember having seen him the second

18         time, but I don't know, remember how short and how

19         close it was.

20    2:52P         Q.    Who has Drifton Finance Corporation sued

21         in this lawsuit?

22                   A.    I don't understand.

23                   Q.    Who are the people, who are entities that

24         Drifton Finance Corporation has sued in this lawsuit?

25                   A.    Who?

**5/5/2005 Fuhrer, Jacques (Drifton)**

```
 1                    Q.    Yes.
 2                    A.    I mean, it's Ellison, and then he has the
 3             two vice presidents, one vice president, and then
 4             another one.
 5                          We are suing three people.  I don't know
 6             the name by heart, you see.
 7                    Q.    Are you suing any entities?  Are you
 8             suing any firms?
 9                    A.    No.  We're just suing three men, three
10             people, Ellison, his vice president, and then as well
11             a vice president, because I said two vice presidents.
12             I remember that.  I saw that in the complaint.
13   2:53P           Q.    By the way, when was the first time you
14             saw a complaint in this lawsuit?
15                    A.    The complaint is -- I saw the complaint
16             when they made a complaint to the Court after the
17             three times it was dismissed.
18                          Then the last I remember, the last
19             complaint, when they took it to court and when it was
20             accepted.
21                    Q.    So prior to then you had never seen a
22             complaint in this case?
23                          MR. BRITTON:  Objection to form, assumes
24             facts not in evidence.
25                    A.    Yes.  I think yes, I did.
```

```
 1              BY MR. YOUNT:

 2                      Q.    Okay.

 3                      A.    But yes, yes, but I don't recall.  I

 4              mean, it's always the same and it's always -- I mean,

 5              so I don't go through it, you see.  I leave it to my

 6              lawyers.

 7                      Because I told them my story and they saw

 8              that it's coincidence with what happened, so I can't

 9              do this.  It's their work.

10                      Because I was after them.  It took a long

11              time until the first one, the second one and the third

12              one, so I had given up hope that the fourth time it

13              would be accepted.

14   2:54P             Q.    Whom does Drifton Finance Corporation

15              seek to represent in this action?

16                      A.    Whom does seek to represent?  Oh, me,

17              myself, and I am a plaintiff, so it means that I am

18              representing the small shareholders as well.

19                      Q.    Shareholders in what?

20                      A.    I mean in the same -- who have been the

21              victims of this -- I will not call it fraud because

22              nothing has been proved, you see, but who thinks that

23              they have lost money not in a very nice way.

24   2:55P             Q.    You mentioned that you represent the

25              small investors, I think.
```

176

1                        And what -- in what were those investors

2              investing?

3                        A.    They were in Oracle shares and they lost

4              money and they must have -- I mean, it's not me who

5              made the complaint.

6                        I think they were the first one who made

7              a complaint and then they went to lawyers.

8                        I suppose they went to the same lawyers

9              as I did and they told their story and it's how the

10             lawyers discovered the fraud, if it was a fraud.

11                       I'm not saying that I name it a fraud.

12             It has to be proved that it is a fraud with witnesses

13             and people who can testify that it is a fraud.

14                       I can only say what I heard and I can

15             only say how things have ended.

16   2:56P               Q.    When I use the word, use the term Class

17             Period, do you understand what I'm saying?

18                       A.    No.   I mean, I've been told what it was,

19             but I forgot.

20                       I know that I'm one of the main

21             plaintiffs, so I asked what is it, so they said you

22             are important and you are the --

23                       MR. BRITTON:   Be careful not to describe

24             what we talked about.

25                       A.    No, no, no, no, but if they call me

```
1                    A.    Yes, yes, because one, I have read, did
2            sell as well some of his shares at the same time, got
3            rid of a lot of shares, shares which he paid a dollar
4            or a dollar twenty, or not even dollar, and he sold
5            them at 30 or 32, made a big profit before the stock
6            price collapsed.
7                    Q.    What did the two individuals you are
8            suing in addition to Ellison do wrong?
9                    A.    What they did wrong?  They must have done
10           something.  I don't recall.  I must have read it but I
11           forgot.
12   3:00P           Q.    What does Drifton Finance Corporation
13           seek to obtain through --
14                   A.    Didn't one of them -- I remember.  Didn't
15           they -- I think there was some money which some
16           customers did overpay or something, 240 million, and
17           they put that and they calculated that in the -- in
18           the profits of the quarter, just to make it -- make
19           inflate, to make the profits come out bigger.
20                   Q.    Who is it that did that?
21                   A.    I think some of these -- one of these
22           three, one of these three men.
23                         I mean, I don't know what his particular
24           job was, but I heard that the lawyers were after these
25           three men.
```

5/5/2005 Fuhrer, Jacques (Drifton)

1              A.    No, but the more I talk about it, you

2        know, I am not angry, but I remember things.

3              Now it comes to me, front of me, and then

4        you analyze this thing, I mean, because if your CEO --

5        I was so confident in what he said.

6        BY MR. YOUNT:

7              Q.    If you had known of the flaws in Suite

8        11-I would you have made the options trades you made

9        in Oracle securities in 2000-2001?

10   3:56P      A.    What do you think?

11             Q.    I'm interested in what you think.

12             A.    Of course not.

13             Q.    I think we talked about this earlier but

14       outside of training in Oracle securities, if I

15       remember your testimony correctly, you said you made a

16       very small number of trades in securities other than

17       Oracle?

18   3:57P      A.    Yes.

19             Q.    In the period 2000-2001?

20             A.    Yes.

21             Q.    Is that correct?

22             A.    It were this --

23             MR. BRITTON:  Can you read the question

24       back?

25             (Question read)

211

```
 1                    survived.

 2    5:34P                Q.     If Mr. Ellison had said that Oracle's

 3                    projections were uncertain because projections in

 4                    their business are difficult to make and the tools

 5                    that they have to make projections are speculative,

 6                    would you still have made the transactions in Oracle

 7                    securities --

 8                         A.     No.

 9                         Q.     -- that you made during the Class Period?

10                         MR. BRITTON:   Objection to form, calls

11                    for speculation.

12                         A.     Of course not.  I would have waited until

13                    I got more information.

14                         If he had warned me, be careful, if he

15                    tells me you have to be careful because we don't know,

16                    I have to listen to him.

17                         To whom am I going to listen to?  An

18                    analyst from -- from I don't know who, who's pushing

19                    me to buy that?

20                         I trusted him.  I mean, you know, if you

21                    want advice and you want some guidance you must know

22                    from whom you are going to take that advice and whom

23                    you are going to follow.

24                         I said it to you before and you always

25                    try to make me say something else, but this is -- if
```

1          he had said we have to be careful, and I know that the

2          climate of the economy was dangerous, I would have

3          waited.  Nobody pushed me to do it.

4    5:35P          MR. BRITTON:  I want to note for the

5          record that this line of questioning that depends upon

6          what was disclosed in the SEC filings is improper in

7          light of his testimony that he doesn't recall seeing

8          any SEC filings or reading them at this point in time.

9                  So given that and given our time

10         constraints, I want to make sure that at 6:30 we are

11         going to cut out of here because our flight leaves at

12         8:15 and we will miss the flight.

13                 I know Trace has some questions he wants

14         with the documents.

15                 You may want to be more efficient with

16         what you're asking so you can get all your questions

17         in today.

18                 MR. SCHMELTZ:  Just as long as we're

19         making a record, I also want to be clear that our

20         deposition has been hampered today not by any untoward

21         actions, but we have a language barrier --

22         A.      Of course, of course.  I'm --

23                 MR. SHCMELTZ:  It takes us a little

24         longer to communicate to you and you to us and I think

25         that we all understand that, and I think if we're

**5/5/2005  Fuhrer, Jacques (Drifton)**

```
 1                    BY MR. YOUNT:

 2                         Q.    Have you ever talked to any other members

 3              of the proposed Class?

 4                         A.    Me?

 5                         Q.    Yes.

 6                         A.    No, never.

 7                         Q.    Do you have any idea of how many members

 8              there are in the Class?

 9                         A.    Yes.  I have been told there are 5, 5 or

10              6.

11                         Q.    I think maybe you misunderstood me.  I'm

12              asking how many members are in the Class, not how many

13              Class representatives there are.

14    5:57P               A.    How many members in the Class?

15                         Q.    Yes.

16                         A.    What is the Class?  What do we understand

17              by Class?

18                         Q.    I --

19                         A.    You mean all the people?  I mean all the

20              victims, the shareholders?  Is that what you mean?

21                         Q.    If that's what you understand by Class?

22                         A.    Yes.

23                         Q.    Then you should answer the question

24                         A.    Oh, no, I don't know.

25                         Q.    Okay.
```

292

5/5/2005 Fuhrer, Jacques (Drifton)

1              A.    No, I have not been told.  I didn't ask
2        it.
3              Q.    To your --
4              A.    The less the better.
5              Q.    To your knowledge, does the Class include
6        individuals who purchased Oracle stock on December 14
7        2000?
8              A.    I didn't discuss this.
9              Q.    Do you know if the Class includes people
10       who bought debt securities in Oracle?
11             A.    We did not discuss this thing.
12             Q.    Do you know if the Class includes people
13       who bought put options?
14             A.    We didn't discuss it.  We just discussed
15       my case, and I've been told that I am one of the main,
16       main witnesses, you know, to come in front of you.
17  5:58P       Q.    Do you understand that people who sold
18       Oracle stock during the Class Period should be members
19       of the Class?
20             A.    I --
21             MR. BRITTON:  Objection to form, calls
22       for a legal conclusion.
23             A.    I am not so -- how should I say?  I don't
24       know that.
25             You know, I'm not an expert in this, in

293

**5/5/2005  Fuhrer, Jacques (Drifton)**

1          dealings with this, class actions.

2                    If I was a lawyer I would have experience

3          in it, I would have an idea.

4     BY MR. YOUNT:

5          Q.    Are people who made money on Oracle

6     securities during the Class Period in the Class?

7          A.    If there are people, I don't know.  I

8     don't know whether there are people who made money.

9          Q.    If there are -- assume that there are.

10         A.    Yes.

11         Q.    Are those people in the Class?

12                  MR. BRITTON:  Objection to form, calls

13        for a legal conclusion.

14         A.    No, I don't -- you know, you are asking

15        me questions where I have no -- not at all any notion

16        of.

17    BY MR. YOUNT:

18         Q.    I understand.  Are people -- do you think

19        the people who knew about the problems with Suite 11

20        should be in the Class?

21  5:59P                 MR. BRITTON:  Objection to form, calls

22        for a legal conclusion.

23         A.    People who knew of the problems should be

24        in the Class?  k.

25                    What do you understand about that?

294

```
1                        spoke to me several times.

2    6:05P                        MR. BRITTON:  You can talk about --

3                        A.    I told you it was asking here.

4              BY MR. YOUNT:

5                        Q.    I want you to take out this document

6              which I believe is Exhibit 1, which is your

7              certification of named plaintiffs pursuant to federal

8              securities laws.

9                        A.    Yes, that's correct, I signed that.

10                       Q.    Did you create this document?

11                       A.    Did I?

12                       Q.    Create this document?

13                       A.    I think so, yes.

14                       Q.    On your computer, you typed this?

15                       A.    Oh, if I typed this?

16                       Q.    Yes.

17                       A.    I didn't.  No, I didn't.  I didn't.  I

18             would never be able to write this down.

19   6:06P              Q.    Okay.  Did you check the accuracy of this

20             document?

21                       A.    Yes, I read it and I signed it.  I would

22             never sign it, if I wouldn't have read it.

23                       Q.    Including the third page?

24                       A.    Yes.

25                       Q.    Schedule A, security transactions?
```

**5/5/2005 Fuhrer, Jacques (Drifton)**

1          A.   Yes, except that there are some faults

2     now that you discovered, so I mean, you have to check

3     with -- if they exist in the original.

4          But they send me -- often it happened

5     that they send me, which afterwards was cancelled --

6     you know, the secretaries are not always very, very

7     good, and it was the secretaries who did the work.

8          Q.   What did you understand the purpose of

9     this document to be when you signed it?

10          A.   Huh?

11          Q.   When you signed this document?

12          A.   This one?

13          Q.   Yes.

14          A.   Okay.

15          Q.   Exhibit 1, we're talking about,

16     Certification of Named Plaintiffs.

17          What did you understand the purpose of

18     the document to be?

19          A.   That means that I will not accept any

20     money.  I don't ask for money to do the -- for do the

21     work which I --

22     6:07P          Q.   I'm not asking you what it says.  I want

23     to understand what you, what the purpose of the

24     document was, what your understanding of the purpose

25     of the document was.

1          high and the put is 17 and a half, so the stock must

2          have been around 22 and a half or 25.

3   6:15P          Q.    So what are you trying to accomplish with

4          that trade?

5                  A.    With this, it's what I get out of the

6          call.

7                  I can put it with the put and I can put

8          the premium of the put together with the call, 35.

9          Together my premium would be doubled.

10                 Q.    So what do you anticipate the stock price

11         is going to do?

12                 A.    No, I -- because by -- by selling a put,

13         I thought that the stock would be the same.

14                 By selling a call which is much higher

15         and selling a put which is much lower, you combine the

16         two, and if the stock remains the same, you get -- you

17         get a double -- how do you say?  How did I say it?

18                 MR. BRITTON:  Premium.

19         BY MR. YOUNT:

20                 Q.    Double premium?

21                 A.    Double premium.

22                 Q.    So would there ever be a time that you

23         would short a put without shorting a call or vice

24         versa?

25                 A.    I would sell a put, without selling a

EXHIBIT 27

**6/6/2005  O'Keefe, Gregg**

```
 1                                    PAGES 1 - 158

 2                                    EXHS. 1 - 17

 3               IN THE UNITED STATES DISTRICT COURT

 4               NORTHERN DISTRICT OF CALIFORNIA

 5    * * * * * * * * * * * * * * * *

 6    In Re:  Oracle Corporation     *

 7               Securities Litigation *  Master File

 8    THIS DOCUMENT RELATES TO        *  C-01-0988-MJJ

 9    ALL ACTIONS                     *

10    * * * * * * * * * * * * * * * *

11         Video Deposition of Gregg A. O'Keefe, CFA

12                   Monday, June 6, 2005

13                   Goodwin Procter LLP

14               Exchange Place - 15th Floor

15                     53 State Street

16               Boston, Massachusetts 02109

17    -----------  J. Edward Varallo, RMR, CRR  ----------

18                    Court Reporter

19       Farmer Arsenault Brock LLC, Boston, Mass.

20                    REPORTING FOR

21                 LiveNote World Service

22      221 Main Street - San Francisco, California 94105

23               415.321.2311  Fax 415.321.2301
```

```
1    me -- 3(d)(i)(1) gives Congress Asset Management

2    complete discretion in the investment and

3    reinvestment of common or preferred stocks or

4    securities that are convertible into such stock.  Do

5    you see that?

6        A.   Yes.

7        Q.   And were Congress Asset Management's

8    investments in Oracle securities on behalf of Local

9    144, did those investments fall under 3(d)(i)(1)?

10       A.   Yes.

11       Q.   So it's fair to say that with respect to

12   investments in Oracle securities, Congress Asset

13   Management had complete discretion on the investment

14   and reinvestment in those stocks?  Let me back up.

15   Bear with me.  I want to read how bad that was.

16            MR. BRITTON:  I can tell you it was pretty

17   bad.

18            MR. SCHMELTZ:  I don't need to hear it

19   from you.

20   BY MR. SCHMELTZ:

21       Q.   So is it fair to say that Congress Asset

22   Management had complete discretion to invest in

23   Oracle securities unimpeded by Local 144?

24       A.   Yes.
```

**6/6/2005  O'Keefe, Gregg**

1    Q.    Did Congress Asset Management ever seek

2    written approval by the trustees of Local 144 to

3    invest in Oracle?

4    A.    No.

5    Q.    Did anyone from Congress Asset Management

6    other than by the issuance of reports discuss

7    investments in Oracle securities with Local 144 or

8    its trustees?

9    A.    Not to my knowledge.

10        MR. BRACERAS:  Objection.

11        MR. BRITTON:  Objection, calls for

12   speculation.

13   BY MR. SCHMELTZ:

14   Q.    As you sit here today do you know one way

15   or the other whether or not the discretionary

16   investment management agreement between Local 144

17   and Congress Asset Management invested all rights of

18   stock ownership in Congress Asset Management?

19   A.    Could you repeat that question?

20   Q.    Do you know as you sit here today whether

21   or not the investment management agreement

22   essentially gave the rights of stock ownership or

23   the control of the rights of stock ownership to

24   Congress Asset Management?

**6/6/2005  O'Keefe, Gregg**

1   the ways in which you get comfortable with the

2   stock, analyzing ratios, looking at the --

3        A.    Yes.

4        Q.    -- balance sheet, et cetera?

5        A.    Yes.

6        Q.    And is it fair to say that Congress Asset

7   Management had CAM research perform research in

8   Oracle securities in the 2000/2001 time frame?

9        A.    Yes.

10       Q.    And do you know what type of research they

11   would have performed?

12       A.    Listening to conference calls.

13       Q.    What do you mean by listening to

14   conference calls?

15       A.    Typically corporations might have a

16   quarterly or annual or semiannual conference call

17   for analysts.  If they had them, they would listen

18   to those.  Looked at their quarterly filings with

19   the SEC, 10-K's, 10-Q's type of thing; looked at the

20   annual report; looked at Wall Street research.

21       Q.    By Wall Street research, what do you mean?

22       A.    Well, research provided by the Merrill

23   Lynch, Smith Barneys of the world; then look at any

24   other independent research or articles they might

**6/6/2005 O'Keefe, Gregg**

1    come across.

2        Q.    By independent research, what do you mean?

3        A.    Not associated with a brokerage firm, such

4    as Value Line, Standard & Poor's, Sachs Research,

5    something of that nature.

6        Q.    I am going to have the court reporter hand

7    you what's been marked as Exhibit 5.  I'm going to

8    ask you, sir, if you recognize the document marked

9    Congress Asset Exhibit 5, which for the record is

10   Bates-labeled CONG 0040 to 0041.

11       A.    Yes.

12       Q.    What do you recognize that document to be?

13       A.    A write-up of an Analyst Day Oracle had on

14   October 10, 2000, prepared by our Martine Elie,

15   which was our research associate at the time.

16       Q.    Martine is one of the two people, Martine

17   Elie and Justin Amand, that you referenced earlier?

18       A.    That's correct.

19       Q.    And do you know where this document Bates-

20   label CONG 40 to 41 came from?  In other words,

21   where did you guys find this document to produce it?

22       A.    In a file.

23       Q.    In a file with Martine Elie?

24       A.    Yeah.  She happens to be on maternity

**6/6/2005 O'Keefe, Gregg**

1      Q.    First Union Securities?

2      A.    I don't recall.

3      Q.    Deutsche Banc Alex. Brown?

4      A.    I don't recall.

5      Q.    Bank of America?

6      A.    I don't recall.

7      Q.    JPMorgan?

8      A.    Don't recall.

9      Q.    Did Congress Asset Management or CAM

10    research subscribe to any periodicals that focused

11    on securities?

12     A.    Yes.

13     Q.    What periodicals during 2000/2001 did CAM

14    subscribe to?

15     A.    Value Line.

16     Q.    What else?

17     A.    Standard & Poor's stock sheets.

18     Q.    What else?

19     A.    Bloomberg, The Wall Street Journal,

20    Investor's Daily, BusinessWeek, Forbes.

21     Q.    Anything else you recall?

22     A.    That's all I recall.

23     Q.    How about any specific investor websites?

24    Do you subscribe to any investor websites or

**6/6/2005  O'Keefe, Gregg**

```
 1    typically use any --
 2         A.    This time frame?
 3         Q.    2000/2001.
 4         A.    No.
 5         Q.    Would you have anticipated that CAM
 6    research would have reviewed articles about Oracle
 7    securities in any of these periodicals during
 8    2000/2001?
 9         A.    Yes; if they came across them, yeah.
10         Q.    Did CAM research receive information
11    disseminated by securities issuers, so press
12    releases or things like that?
13               MR. BRACERAS:  Objection.
14         A.    Press releases from Oracle?
15         Q.    For example, yes.
16         A.    Yes.
17         Q.    And would it be fair to say that CAM
18    research would review those press releases as they
19    came in?
20         A.    Yes.
21         Q.    I hand you what's been marked as Exhibit
22    9.  Exhibit 9 is Bates-labeled CONG 36.  Sir, do you
23    recognize this document?
24         A.    Yes.
```

1     had brought it below that level.

2              MR. SCHMELTZ:  I didn't understand that

3     earlier answer.  That makes sense.  Thanks.

4     BY MR. SCHMELTZ:

5        Q.   And does the sale on August 15, 2001 --

6     Well, let me ask this:  Do you know on December 12,

7     2000, one way or the other why Congress Asset

8     Management was purchasing 3,200 shares of Oracle

9     Corp. stock with any certainty other than it was

10    either to adjust the percentage?

11       A.   Those would be the reasons.

12       Q.   And they're the same reasons listed at

13    page 15 of Congress Asset Exhibit 2.  Is that right?

14              MR. BRITTON:  Does that have a Bates

15    number?

16              MR. SCHMELTZ:  CAM.com 15.

17       A.   We're talking about the buy on 12/12/2000?

18       Q.   Yes.

19       A.   And what are you referring to on 15?  I'm

20    not --

21       Q.   I guess I'm trying to understand if

22    there's anything on CAM.com 15 that would

23    indicate --

24       A.   I don't see any reference to 2-1/2 percent

**6/6/2005  O'Keefe, Gregg**

1    on this page.  But I can tell you that if we

2    purchased Oracle and for instance Oracle didn't move

3    and the rest of the stocks went up and it was less

4    than 2-1/2 percent, it could have been added to on

5    12/12 to bring it back up to 2-1/2 percent.

6        Q.    Okay.

7        A.    Our target is 2-1/2 percent.

8        Q.    If Oracle was performing and was at or

9    above 2-1/2 percent as of 12/12, what reasons would

10   you be adding 3,200 shares of the stock?

11           MR. BRACERAS:  Objection.  If there were

12   any reasons.

13           MR. SCHMELTZ:  Clearly the witness has

14   testified, I think, that if it were below 2-1/2,

15   they would bring it up to 2-1/2.

16   BY MR. SCHMELTZ:

17       Q.    If it were at or above 2-1/2, what types

18   of reasons would you add to it, to a stock, to any

19   stock?

20           MR. BRACERAS:  Objection.

21       Q.    I just want to understand your investment

22   discipline.

23       A.    It would be a unique circumstance,

24   I think.

**6/6/2005 O'Keefe, Gregg**

1       Q.    So although at CAM.com 15 it discusses a

2    5 percent cap, it is your testimony that the more

3    typical holding for Congress Asset Management in the

4    large cap product is 2-1/2 percent?

5       A.    Originally.

6             MR. BRACERAS:   Objection.

7       A.    Originally.

8       Q.    When you say "originally" --

9       A.    When we purchase the security.  And then

10   if it does well, it might become 3 percent of the

11   portfolio in a quarter.

12      Q.    In other words, it might grow?

13      A.    It might grow.

14      Q.    Not that you would purchase more but it

15   might grow to that?

16      A.    Yes.

17      Q.    And if it would grow to 5 percent, you'd

18   start trimming it back?

19      A.    That's correct.

20      Q.    There wouldn't be incremental purchases to

21   bring it up to 5 percent?

22      A.    No, no.  And there might be an instance

23   where it's 2.4 percent and you buy it and it goes to

24   2.6.  You know, we're not rigid as far as 2.5.

**6/6/2005 O'Keefe, Gregg**

1       Q.    Understood.

2             And so on August 15, 2001, it indicates a

3       sale of 29,000 shares of Oracle stock.  Do you know

4       one way or the other why you would have sold that

5       stock on August 15, 2001?

6       A.    I believe that was when the so-called

7       Internet bubble burst approximately and the market,

8       we wanted to reduce our exposure to technology, and

9       Oracle, being one of the technology holdings, would

10      have been sold.

11      Q.    Does the IPC keep any meeting notes,

12      meeting minutes from its regular weekly meetings?

13      A.    At that particular time?  I don't believe

14      we did.

15      Q.    Would the decision on 12/12/2000 to buy an

16      additional 3,200 shares have been discussed in the

17      IPC weekly meeting?

18      A.    No.

19      Q.    Why not?

20      A.    That's a portfolio-level decision.

21      Q.    When you say a portfolio-level decision

22      what do you mean?

23      A.    I mean that if I'm in charge of a

24      portfolio and the stock is on the buy list, is in

1   the model that we're trying to hold and I have cash

2   available, I look at securities that are less than

3   2-1/2 percent and make a decision personally to

4   bring it up to 2-1/2 percent.  We wouldn't go

5   through each account and say, you know, geez, XYZ

6   account is low on Oracle, let's bring it up at the

7   IPC level.

8       Q.    So that although there's a little bit of

9   room for discretion, is it fair to say that it is

10  essentially a programmed trade, hey, we're not at

11  2-1/2 percent, bring it up to 2-1/2 percent?

12      A.    Yeah, but I don't think I'd call it a

13  programmed trade, but there is individual portfolio

14  manager discretion to bring it up to 2-1/2 percent.

15  There's no reason that he would have to, he or she

16  would have to.  There's no written rule that says it

17  must be 2-1/2 percent.  It's just when you're fully

18  invested and cash becomes available and you want to

19  invest that cash, you look for opportunities, what

20  you believe are opportunities.

21      Q.    So if it's on the approved list and

22  there's cash available and it's under 2-1/2 percent,

23  that would be one of the limited opportunities you'd

24  have as an investment manager, as a portfolio

**6/6/2005 O'Keefe, Gregg**

1       Q.    Was it Congress Asset Management's view

2    that the tech sector would also be subject to the

3    rise and fall of the economy?

4       A.    Yes.

5       Q.    That's true as of mid to late 2000.

6    Right?  That was your view mid to late 2000?

7       A.    (Witness nodded.)

8       Q.    Sir?

9       A.    Yes.

10      Q.    I hand you what's been marked Exhibit 12.

11   For the record, this is a research report from

12   BlueStone Capital Research dated December 7, 2000.

13   Sir, if you would direct your attention to the

14   bottom paragraph on that first page, this research

15   report says that "IT spending is part of capital

16   spending and therefore subject to cutbacks when

17   economic growth slows."  Do you see that sentence?

18      A.    Yes.

19      Q.    In December of 2000, was that Congress

20   Asset Management's view of the IT sector as well?

21   Of IT spending in the tech sector as well.

22            MR. BRITTON:  Objection to form,

23   foundation.

24      A.    I don't recall.

6/6/2005 O'Keefe, Gregg

```
 1   away here.
 2              THE VIDEOGRAPHER:   The time is 1:17.
 3   We're off the record.
 4              (Short recess taken.)
 5              THE VIDEOGRAPHER:   The time is 1:26.
 6   We're on the record.
 7   BY MR. SCHMELTZ:
 8       Q.    Prior to March of 2001, did you or
 9   Congress Asset Management have an understanding of
10   problems with forecasting revenue in the tech
11   sector?
12       A.    Yes.
13       Q.    What did you understand those problems to
14   be?
15       A.    It's a difficult thing to try to do.
16       Q.    And why is that, if you know?
17       A.    Just because of the nature of the
18   business.
19       Q.    If you'd look back at Exhibit 11 for me,
20   in the last paragraph it notes that "Often software
21   companies experience what's called hockey stick
22   earnings."
23       A.    Mm-hmm.
24       Q.    Do you understand what hockey stick
```

**6/6/2005 O'Keefe, Gregg**

1    earnings are?

2        A.    Yes.

3        Q.    What do you understand them to be?

4        A.    It would mean in a specific quarter, say,

5    that ended in March, January-February would

6    typically be slow and then March would be a very

7    good month.

8        Q.    And so given the nature of earnings in the

9    tech sector, it's fair to say that Congress Asset

10   Management understood that companies like Oracle

11   could have a shortfall at the end of the quarter

12   that they didn't anticipate.  Right?

13           MR. BRITTON:  Objection to form.

14       A.    They could have a shortfall.  Clearly,

15   anticipation, I guess.  I don't -- I don't know.

16       Q.    This article in Exhibit 11 notes that

17   "Should major customers decide for whatever reason

18   not to buy software or equipment, the shortfall is

19   more pronounced in a way that a lackluster month

20   wouldn't be for an auto company."  Do you see that

21   sentence?

22           MR. BRACERAS:  Where are you?

23           MR. SCHMELTZ:  I'm sorry.  This is the

24   bottom paragraph of Exhibit 11.

**6/6/2005  O'Keefe, Gregg**

1           MR. BRACERAS:  First page?

2           MR. SCHMELTZ:  First page.  Bottom

3     paragraph, first page.

4      A.    Yeah, I see that.

5      Q.    What do you understand that sentence to

6     mean?

7           MR. BRITTON:  Objection to form,

8     foundation.

9      A.    It's basically talking about that hockey

10    stick where auto companies don't necessarily see a

11    hockey stick, but because of the sales cycles with

12    this type of product....

13     Q.    So a shortfall in the last month of a

14    quarter is more pronounced on a tech company than --

15     A.    Yes, yes.

16     Q.    And this is something that Congress Asset

17    Management was certainly aware of prior to March of

18    2001.  Right?

19     A.    Yes.

20          MR. BRITTON:  Objection to form,

21    foundation.

22    BY MR. SCHMELTZ:

23     Q.    And it is certainly true that if articles

24    like this TheStreet.com article in Exhibit 11 were

EXHIBIT 28

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
      In re ORACLE CORPORATION
 4    SECURITIES LITIGATION
                        Master File No. C-01-0988-MJJ
 5    This Document Relates To:
 6         ALL ACTIONS.
      _____/
 7
 8
 9                      ---oOo---
10                     CONFIDENTIAL
11           DEPOSITION OF RYAN KUEHMICHEL
12              Friday, June 10, 2005
13                      ---oOo---
14
15              SHEILA CHASE & ASSOCIATES
                     REPORTING FOR:
16               LiveNote World Service
               221 Main Street, Suite 1250
17           San Francisco, California  94105
                 Phone: (415)  321-2300
18                 Fax:  (415)  321-2301
19
20
21
22    Reported by:
      LORRIE L. MARCHANT, CSR, RPR
23    CSR No. 10523
24
25
```

1       1       Q.    Do you recall any of the analyst companies that

2       put out reports about Oracle that you read?

3               A.    I do not.

4               Q.    Would you have read analyst reports from any of

5       the sort of major investment houses like Goldman Sachs,

6       Merrill Lynch, Solomon Smith Barney?

7               MR. BRITTON:   Objection to form.   Asked and

8       answered.

9               You can answer.   Don't guess.   Only if you

10      know.

11              THE WITNESS:   I don't know who the analysts

12      were.   I don't recall.

13              BY MR. SCHMELTZ:   Q.   Would you have given any

14      more credibility to any one analyst over another?

15              A.    I don't believe so, no.

16              Q.    How frequently would you say you read analyst

17      reports in the relevant time period about Oracle?

18              A.    Once a month probably.

19              Q.    Do you remember any of the topics of those

20      analyst reports?

21              A.    Well, I'm sure that some of them involved the

22      economy and Oracle's resilience within a down-turning

23      economy.   I'm sure that some of them involved the new

24      product that they were putting out, the 11i.   And I'm

25      sure that at least one of them involved the fact that

1    1   Mr. Ellison said he had up-to-date information as of

2        yesterday in terms of what his company was doing.

3            Q.   Anything else?

4            A.   I don't know if this is an analyst or not, but

5        there was a big article in Forbes at about that time

6        that said Mr. Ellison was closing all of his deals by

7        inviting the big customers up to his house for lunch and

8        wringing their handshakes out of them.

9                 And that's my exaggeration there.  But in terms

10       of he was the man in charge of closing the deals, that's

11       pretty much what the article conveyed.

12           Q.   And do you remember approximately the date of

13       that Forbes article?

14           A.   I do not.  I thought it was pretty good that I

15       remembered it at all.

16           Q.   I agree with that.  Now, you mentioned Forbes.

17       Are there any other periodicals -- either printed

18       periodicals or online periodicals -- that you recall

19       reading in particular that you recall reading about

20       Oracle?

21           A.   During that time period, I read Business Week

22       every week; I read Forbes every week; I read a magazine

23       called Bloomberg's that I think is now out of business

24       every month; I read Smart Money, which is a publication

25       of the Wall Street Journal -- and I think that's a

**6/10/2005 Kuehmichel, Ryan**

1    1   monthly also -- I read just about everything that came

2        in front of me, except Fortune.  I hate that magazine.

3            Q.   Do you read any articles on the online

4        periodical, TheStreet.com?

5            A.   Tell me the principal of the company.  What was

6        his name?

7            Q.   I don't know.

8            A.   I believe so, yes, kind of, a balding,

9        hyperactive guy.

10           Q.   I think you may be right.

11           A.   I don't remember his name, but I think so, yes.

12       Actually, they were -- they put him on CNN or CFN or

13       something like that.

14           Q.   Did you read the daily publication, The Wall

15       Street Journal?

16           A.   Sometimes, but not too often.  Mostly when I

17       was traveling and they gave me a free one at the

18       airport.

19           Q.   Did you ever visit any trading Web sites, like

20       Raging Bull or MSNBC?

21           A.   No.

22           Q.   Did you ever participate in any trading chat

23       rooms?

24           A.   I did not.

25           Q.   Did you receive at any time or read the

1    1    San Francisco Chronicle?

2         A.    No, sir.

3         Q.    Did you watch television for securities

4    information?

5         A.    I did.

6         Q.    Did you watch C- -- CNBC?

7         A.    I did.

8         Q.    Did you watch Fox news ever?

9         A.    I don't like Fox news; so, no, never.

10        Q.    Did you watch CNNFN?

11        A.    I did.

12        Q.    What other news programs, financial news

13   programs did you watch?

14        A.    I used to like that Louis Rukeyser thing, but

15   as I understand it, PBS thought he was no longer viable,

16   and they shifted him over to one of the others.  So I

17   figured if PBS didn't like him, I shouldn't like him

18   either.

19        Q.    Did you have occasion to read information

20   disseminated by securities issuers like SEC reports?

21        A.    I knew I had access to them, but I didn't read

22   them.

23        Q.    So is it fair to say you didn't read 10Ks or

24   10-Qs --

25        A.    Very fair.

37

1    1        Q.    What press releases do you recall obtaining

2         from Oracle?

3              A.    Well, for that period, everything that Oracle

4         issued I pretty much read.  So I don't remember the

5         byline on top or --

6              Q.    When you say "for that period," you mean --

7         can -- can we narrow it down?  Do you mean the

8         third quarter of 2001? fiscal 2001?

9              A.    Can you tell me the dates of that third quarter

10        again?

11             Q.    Yeah, December '00 to February '01.

12             A.    Yes, sir.

13             Q.    And during the relevant time period, which was

14        June '00 to June '01?

15             A.    Yes, sir.

16             Q.    Did you ever participate in or review

17        transcripts of investor teleconference calls?

18             A.    I read some of them.  I wouldn't listen to them

19        ever.

20             Q.    Do you recall if you read investor conference

21        call transcripts for the second quarter of Oracle's

22        fiscal '01, which --

23             A.    I do not.

24             Q.    How about the third quarter?

25             A.    I do not recall.

**6/10/2005 Kuehmichel, Ryan**

1    1       A.   Yes, sir.

2            Q.   And in this paragraph the company makes the

3       comment that the company's revenues in general and its

4       license revenues in particular are relatively difficult

5       to forecast and vary from quarter to quarter due to

6       various factors, including the relatively long sales

7       cycles for company's products, size, and timing of

8       individual license transaction -- excuse me,

9       transactions, the closing of which tended to be delayed

10      by customers until the end of a fiscal quarter as a

11      negotiating tactic.

12           Do you see that?

13           A.   Yes, sir.

14           Q.   I want to focus you on what is under

15      Romanette ii:

16               "The size and timing of individual

17               license transactions, the closings of which

18               tend to be delayed by customers until the

19               end of a fiscal quarter as a negotiating

20               tactic."

21           Prior to March 2001 did you have any

22      understanding that in the software business customers

23      would delay entering into licenses for products until

24      the end of the quarter as a negotiating tactic?

25           A.   I believe I knew that, yes, sir.

**6/10/2005 Kuehmichel, Ryan**

1    1    Q.   And did you understand the impact that that

2         might have on the revenues of the software company like

3         Oracle Corporation?

4         A.   It would mean that on the last day of the

5         quarter they could be made or broken, if I understand

6         your question correctly.

7         Q.   And do you have an understanding as to whether

8         or not any kind of business software could predict

9         whether or not a company would be made or broken on the

10        very last day of their quarter?

11        A.   Do I have an understanding ...

12        Q.   As to whether or not any kind of business

13        software could predict whether a company would be made

14        or broken on the very last day of the quarter.

15        A.   It could not.

16        Q.   I'm going to ask you to look, if you would, at

17        Oracle Exhibit 9 with me.

18             For the record, this is a document that's a

19        report -- analyst's report by William Blair & Company

20        dated January 17, 2001.

21             I'll ask you to turn -- hang on.

22             Sorry.  I'm a step ahead of myself here.  I

23        apologize.

24             This document -- at page 2, sir -- in the

25        middle of the page, there's a heading called

1    1    wasn't working properly or didn't work properly?

2         A.    No, sir.

3         Q.    Sir, do you know who Ron Wohl is?

4         A.    I do not, but apparently I should have.

5         Q.    I'll represent to you that Ron Wohl is a -- an

6    executive with Oracle Corporation.

7              Exhibit 10, for the record, is entitled

8    "Ask Oracle Q&A Session OAUG Fall Conference October 24,

9    2000."

10             Sir, we've talked about OAUG earlier in the

11   deposition.  It's the Oracle applications users group?

12        A.    I don't think we did talk about it, but I could

13   be mistaken.

14        Q.    I just asked if you had surfed their Web site?

15        A.    Okay.  I did not.

16        Q.    Okay.  Oracle applications users group is a

17   group of, not surprisingly, people who use Oracle's

18   applications.  And as this document notes, it's a

19   conference in October of 2000.  That's prior to the time

20   that you purchased Oracle stock; isn't that right?

21        A.    That is correct.

22        Q.    If you look at the last page of this document,

23   there's a question asked at this Oracle application

24   users group conference in October of 2000.

25             The question:

**6/10/2005 Kuehmichel, Ryan**

1    1               "There are common themes here --

2                    patching and support.  You will never be

3                    successful if you keep having to support

4                    buggy software.  If you have buggy software

5                    at the beginning, what can you do to fix

6                    testing and the QA function.  It's broken.

7                    You need true end users doing the testing."

8                    The answer by Ron Wohl --

9         A.    May I --

10        Q.    "We have too many bugs and too many patches."

11              Do you see that question and answer, sir?

12        A.    Yes.

13        Q.    Was that information that you were aware of

14    prior to buying Oracle stock?

15              MR. BRITTON:  Objection to the form.

16    Foundation.

17              THE WITNESS:  May I ask what QA is?

18              MR. SCHMELTZ:  Q.  Quality assurance function.

19        A.    I did not have this information.

20        Q.    If you had had this information prior to

21    January of 2001, would you have purchased Oracle

22    software?

23        A.    No, sir.

24        Q.    Excuse me, Oracle stock.

25        A.    No, sir.

1    1    Q.   Does it appear to you from this document that

2         that information was publicly available?

3              MR. BRITTON:  Objection to the form.  Calls for

4         speculation.

5              THE WITNESS:  I don't know.

6              BY MR. SCHMELTZ:  Q.  Do you know whether or

7         not members of -- do you know whether or not people who

8         use Oracle applications are members of the public?

9         A.   I'm sure they are.

10        Q.   I'm going to hand you what's been marked as

11        Kuehmichel Exhibit 11.  This is an article from

12        Computerworld.com, and it's dated October 30, 2000, in

13        the byline.

14             This is a report, sir, about the Oracle

15        application users group conference from which we just

16        read an excerpt -- the transcript of which we just read

17        an excerpt.

18        A.   So this is a review of the transcript?

19        Q.   This is a review of the conference.

20        A.   Okay.

21             MR. BRITTON:  I object to this entire line on

22        foundation grounds.

23             Go ahead.

24             BY MR. SCHMELTZ:  Q.  Sir, have you heard of

25        Computerworld before?

**6/10/2005 Kuehmichel, Ryan**

1    1       A.   I do not recognize it as -- no.  Is it a

2        magazine?  Is it a Web site?

3             MR. BRITTON:  Just wait for the question.

4             BY MR. SCHMELTZ:  Q.  The line at the bottom is

5        "WWW.computerworld.com."  It's at a minimum a story off

6        that Web site.

7             A.   No, sir.

8             Q.   And in that middle paragraph, it notes that

9                  "Attendees at the OAUG conference ·

10                 complained about a lack of reliable

11                 information about the status of the

12                 applications of flurry of bug patch -- bug

13                 fix patches, malfunctioning modules, and

14                 the difficulty in getting help from Oracle

15                 Corp.'s customer service organization."

16            Do you see that paragraph, sir?

17            A.   I do, sir.

18            Q.   Were you aware of any of this information prior

19       to March 2001?

20            MR. BRITTON:  Objection to the form.

21       Foundation.

22            THE WITNESS:  I was not.

23            BY MR. SCHMELTZ:  Q.  Had you had this

24       information, would you have bought Oracle securities?

25            A.   I may have.  This is not much more than a

6/10/2005 Kuehmichel, Ryan

1   1   synopsis and really doesn't help with a lot of specific

2       information.

3           Q.   Would it have concerned you that Oracle had

4       released about 5,000 patches for 11i by October 30,

5       2000?  That's in that same paragraph on the first

6       page -- the last sentence of that second paragraph.

7           A.   Yes.

8           Q.   That would have concerned you?

9           A.   Yes.

10          Q.   Would it have impacted your decision to buy

11      Oracle software?

12          A.   Quite likely, it would.

13          Q.   Do you know one way or the other whether or not

14      this is publicly available information?

15          A.   I do not.

16          MR. BRITTON:  Objection to the form.  Calls for

17      speculation.  Foundation.

18          BY MR. SCHMELTZ:  Q.  Let me hand you what's

19      been marked as Kuehmichel 12.  If you look at page 2 of

20      this document in that first full paragraph, if you'd

21      read that to yourself for a second, sir, and let me know

22      when you're done.

23              In the meantime, for the record, this is a

24      December 12, 2000, "JP Morgan Securities, Inc., Equity

25      Research Bulletin."

**6/10/2005 Kuehmichel, Ryan**

1    1       A.    I have read it.

2            Q.    Do you understand -- do you have any

3       understanding about who JP Morgan Securities, Inc., is?

4            A.    Yes, sir.  I know the firm.

5            Q.    This is the type of analyst report that you

6       expect to see on Yahoo from time to time, isn't it?

7            A.    Yes, sir.

8            Q.    Do you know one way or the other whether as of

9       December 2000 you had seen this particular bulletin on

10      Yahoo?

11           A.    I had not seen it.

12           Q.    I note here that JP Morgan says it

13                 "-- believes Oracle's 11i E-business

14                 Suite continues to have bugs, thereby

15                 limiting the number of notable customer

16                 references for the new product and that

17                 JP Morgan continues to expect most large

18                 customers will wait another two quarters or

19                 so before purchasing the product as

20                 confirmed by Oracle at its last analyst

21                 meeting."

22                 Do you have an understanding one way or the

23      other -- did you have an understanding one way or the

24      other before March of 2001 that JP Morgan understood

25      Oracle to be confirming that its large customers would

**6/10/2005 Kuehmichel, Ryan**

1    1    wait to purchase its software for another

2         two customers -- two quarters?

3                   MR. BRITTON:  Objection.  Foundation.

4                   THE WITNESS:  I did not have that

5         understanding.

6                   BY MR. SCHMELTZ:  Q.  Do you see that here in

7         this document?

8         A.    I do.

9         Q.    Do you have an understanding as to whether or

10        not a JP Morgan Securities, Inc., Equity Research

11        Bulletin would be public information?

12                  MR. BRITTON:  You can answer.

13                  THE WITNESS:  It would appear to be public

14        information.

15                  BY MR. SCHMELTZ:  Q.  Had you known that Oracle

16        was saying that its large customers would wait another

17        two quarters before purchasing its product as of

18        December 2000, would that have impacted your decision to

19        buy Oracle securities?

20        A.    It would have led me to have to make a decision

21        as to whether the company in its press releases was

22        telling me the truth or whether the company, when

23        talking to these analysts, was telling the truth, and in

24        that fashion, it would have led me to rethink what I

25        did.

**6/10/2005 Kuehmichel, Ryan**

1    1      Q.    When you say "in that fashion," what do you
2      mean?
3           A.    I would have been getting different stories
4      from different folks -- both of whom purport to be
5      experts in this field.
6           Q.    Do you see that, in this JP Morgan bulletin,
7      JP Morgan is stating that Oracle confirmed that its
8      large customers would wait out?
9           A.    Strange that they would say that to an analyst
10      and print out a press release that said something
11      different, wouldn't you say?
12                But, yes, I see it.
13           Q.    You certainly purchased securities after this
14      December 12th, 2000, bulletin was --
15           A.    Yes, sir.
16           Q.    Do you have any understanding one way or the
17      other as to -- strike that.
18                Would you expect that the information contained
19      in an analyst report like this one in Exhibit 12 would
20      be reflected in the price of Oracle securities?
21                MR. BRITTON:  Objection to the form.  Calls for
22      improper opinion.
23                THE WITNESS:  I don't know the answer to that.
24                BY MR. SCHMELTZ:  Q.  What information would
25      you need to come up with an answer?

**6/10/2005 Kuehmichel, Ryan**

1    1             I could not have known that those things were

2         untrue either at the time that those came out or at the

3         time that this came out if, in fact, they are true.

4             Q.   So if you had known prior to January 2001 that

5         a substantial number of Oracle's customers would decide

6         to delay their IT spending such that Oracle wouldn't

7         meet its forecasts, you would have still bought the

8         stock; is that right?

9             A.   No, sir.  I don't think that's what I said.

10        My --

11            Q.   I thought -- I thought you said if I had known

12        and accepted this as fact, I'd probably would have made

13        the purchases exactly as I did.

14            A.   Yes.  That's -- I did say that.

15            Q.   And so then I'm reading from the press release

16        here in Exhibit 13, and I'm saying had you known that a

17        substantial numb- -- prior to January of 2001 -- prior

18        to January 2001, if you had known that a substantial

19        number of Oracle's customers would decide to delay their

20        IT spending such that Oracle wouldn't meet its earnings

21        forecast, you still would have bought the stock?

22            A.   Oh, no, I would not.  Perhaps I misunderstood

23        the question.

24            Q.   Taking everything in this press release --

25            A.   Sorry.

EXHIBIT 29

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                           -oOo-

4     In re ORACLE CORPORATION

5     SECURITIES LITIGATION

6                           Master File No. C 03-05665 MHP

7     This Document Relates To:

8          ALL ACTIONS.

9     _____/

10                          -oOo-

11                       CONFIDENTIAL

12               DEPOSITION OF DZUNG CHU

                 Monday, June 13, 2005

13                          -oOo-

              SHEILA CHASE & ASSOCIATES

14                     REPORTING FOR:

                 LiveNote World Service

15             221 Main Street, Suite 1250

                 San Francisco, CA 94105

16             Telephone: (415) 321-2311

                    Fax: (415) 321-2301

17                          -oOo-

      Reported by:

18    KELLIE A. ZOLLARS, CSR, RPR, CRR

      CSR License No. 5735

6/13/2005 Chu, Dzung

1       A.   No.

2       Q.   So Electroglass was your first job after you

3   moved to California?

4       A.   No.   Sorry.   Fairchild.   I worked for

5   Fairchild before that.   As a tester.

6       Q.   Did you have any educational background in

7   electronics or software, hardware chip development

8   before arriving in California?

9       A.   Yes, but only what I learned in college.

10      Q.   In Ohio?

11      A.   Yes.

12      Q.   Would it be fair to say that the remainder of

13   your training has been on the job?

14      A.   That's correct.   Companies would send me out

15   to take courses.   If I were expected to work on the

16   sort of machine, then I need to learn about it.

17      Q.   At Xilnx does your job require you to speak

18   English during the day?

19      A.   Yes, absolutely.

20      Q.   And do you -- I would assume you don't have a

21   translator at your job at Xilnx, correct?

22      A.   That's right.

23      Q.   Okay.

24           How would you rate or describe your English

25   skills?   From excellent to good to fair to poor.

1              MS. WINKLER:  Objection to the form of the

2      question.

3              THE WITNESS:  Do I need to answer?

4              MS. WINKLER:  Yes.

5              MR. RUBIN:  Let me just -- oh, go ahead.

6              THE WITNESS:  Good.

7              That's my second language.

8              BY MR. RUBIN:

9          Q.  Would you consider yourself more proficient in

10     Vietnamese than English?

11         A.  Yes.  Because I was born in Vietnam, and

12     that's my native language.

13             Likewise, if I were born in the United

14     States, then English would be my native language.

15         Q.  Right.  But I was asking you -- I understand

16     that you were born in Vietnam and spent your first 19

17     years there.  But I'm asking you do you believe you're

18     more proficient in the Vietnamese language than the

19     English language.

20             MS. WINKLER:  Objection.  Asked and answered.

21             THE WITNESS:  I think so.  I think that's

22     correct.

23             BY MR. RUBIN:

24         Q.  Okay.  And let me just explain to you,

25     Mr. Chu, from a process vantage point, since we sort

**6/13/2005 Chu, Dzung**

1    information, and instruct Mr. Chu not to answer with

2    respect to any information he obtained from his

3    counsel.

4           THE WITNESS:  Then I don't answer that

5    question?

6           MR. RUBIN:  Okay.  Well, perhaps we should go

7    off the record.  I mean, obviously, I understand --

8           THE REPORTER:  Hold on.

9           MR. RUBIN:  Yeah, let's go off the record.

10          THE VIDEOGRAPHER:  Shall we then?

11          Off the record at 11:23.

12          (Recess taken 11:23 to 11:30.)

13          THE VIDEOGRAPHER:  On record at 11:39.

14          BY MR. RUBIN:

15     Q.   Okay.  Mr. Chu, good morning still.

16          I wanted to pick up where we left off.  I was

17   asking about the circumstances that led you to become

18   a representative of the potential class in this

19   particular lawsuit.  Do you recall that question?

20     A.   Yes, I remember.

21     Q.   Okay.  And tell me, if you can, did there come

22   a point in time where you had any contact, either in

23   person or by telephone, with anybody associated with

24   Ms. Winkler's firm concerning becoming a class

25   representative?

**6/13/2005 Chu, Dzung**

1    A.   Yes.

2    Q.   Okay.   And when was that?

3    A.   At first I received letters informing me that

4  the suit will go ahead.   I heard something about it

5  was rejected in the lower court but the higher court

6  approved, and I was proceeding -- the suit was

7  proceeding.

8    Q.   Okay.   Before the higher court approved the

9  suit, as you described it, had you already -- had the

10  decision already been made that you would be a class

11  representative?

12          MS. WINKLER:   Objection to the form of the

13  question.

14          THE WITNESS:   I don't remember.   I remember

15  meeting with the lawyer.   She informed me that I would

16  be a plaintiff in the case.

17          BY MR. RUBIN:

18    Q.   Which lawyer did you meet with?

19    A.   This lawyer.   Monique.

20    Q.   Okay.   When did that meeting take place?

21    A.   I don't quite remember, but I just remember

22  meeting three times with her.

23    Q.   Okay.   And can you place those three meetings

24  by date?

25    A.   I remember the first meeting was with her and

**6/13/2005 Chu, Dzung**

1    one of her colleagues at a restaurant.

2            She handed me a folder, a binder, that had

3    the forms that I signed directing her firm to

4    represent me in the suit against this company.

5            MS. WINKLER:  There's no question pending.

6            MR. RUBIN:  I think he might just be

7    finishing the answer.

8            THE WITNESS:  No, that's all.

9            BY MR. RUBIN:

10       Q.   Okay.  At what city was that restaurant

11   located in?

12       A.   In San Jose.  Downtown San Jose.

13       Q.   Other than Ms. Winkler and yourself, who else

14   was in attendance?

15       A.   Her associate.

16       Q.   What was his or her name?

17       A.   First name is Ely.  If I am not mistaken.

18       Q.   Okay.

19            At that meeting do you recall whether you had

20   an opportunity to read or review a copy of the lawsuit

21   that was filed?

22       A.   Yes, I was shown the copy of the suit against

23   Oracle.

24       Q.   Okay.  And so -- and if during this deposition

25   I refer to that document as the complaint, will you

1    understand what I'm talking about?

2        A.   Yes.  I read it.

3             (Exhibit No. 2 was marked for

4    identification.)

5             MR. RUBIN:  I'll just keep it for a minute.

6        Q.   You said there were three meetings?

7        A.   That's right.

8        Q.   Was this the first of the three meetings?

9        A.   That's right.

10       Q.   Okay.  How long did this meeting last?

11       A.   For about two hours.

12       Q.   Without getting into the content of your

13   discussions, did you provide any suggestions or input

14   concerning the complaint?

15       A.   What do you mean by that?

16       Q.   Well, for example, did you make any

17   suggestions concerning the language that was used in

18   the complaint?  That something should be changed or

19   something should be added or something should be

20   deleted from the complaint that you saw?

21       A.   No, I did not.

22       Q.   Okay.  Was it your understanding at the time

23   of this meeting at the restaurant in San Jose that the

24   complaint had already been filed with the Court?

25       A.   That's right.

6/13/2005 Chu, Dzung

1      MS. WINKLER:  Objection to the form of the

2    question.

3      THE WITNESS:  If I'm not mistaken, two or

4    three months later we had a second meeting.

5      BY MR. RUBIN:

6      Q.  Okay.  And at the time of the first meeting

7    had it already been determined that you were going to

8    be a representative of the potential class of this

9    case?

10      MS. WINKLER:  Objection to the form of the

11    question.

12      THE WITNESS:  I think in the first meeting I

13    knew that I was a lead plaintiff, that I would be

14    giving testimonies.

15      BY MR. RUBIN:

16      Q.  And you said at the time of the first meeting

17    you understood that?

18      A.  I think so, yes.

19      Q.  Okay.  And then there was a third meeting?

20      A.  Yes.

21      Q.  And when was that?  To the best of your

22    memory.

23      A.  It was at the same location, at Starbucks.

24      Q.  Okay.  How long ago?

25      A.  About last week, I think.

**6/13/2005 Chu, Dzung**

1    any interface --

2         THE INTERPRETER:  Customers don't need to do

3    what?

4         THE WITNESS:  (In English) Not the interface

5    application.  I don't know what -- something like

6    that.

7         MR. RUBIN:  Well, if you are going to speak

8    English, you should direct it here.  He's not going to

9    translate English.

10        THE WITNESS:  (In English) Yes.

11        Like I say, I read on this second amended --

12   before I don't know; but, you know, after that, like,

13   Larry or whoever, you know, that the company say the

14   product doesn't have any problem at all; but since the

15   customer use it and I find out, you know, that Bell

16   South, they have lots of problem.  They send about 100

17   people down there to fix the bug, you know.  That's

18   why I learned bug here.  And, of course, always have

19   bugs, right?  Patch, whatever, to make the customer

20   happy.  That's it.  And beside the Bell, different

21   company have problem too.  But before that I don't

22   know.  After I received from my lawyer say that's the

23   problem.

24        BY MR. RUBIN:

25        Q.  I see.  So before reading the complaint you

6/13/2005 Chu, Dzung

1    were not aware of any --

2        A.    (In English) No, nothing at all.  I just

3    listen on the TV.  On the Bloomberg I remember Larry

4    Ellison is on there, down to Louisiana, he talking

5    with Bill Clinton at that time, talking about the

6    product's too good.  And still say the product not

7    having problem yet.  But after I read this one, you

8    know, and they say they have problem -- he admit, you

9    know, mea culpa, that means it's my fault, after he

10   say that in the meeting.  So, you know, in here, so.

11       Q.   Right.

12           So let me break that down a little bit.

13   Before reading this complaint were you aware of any --

14   let me go ahead and finish my question.  Were you

15   aware of any statements made by Ellison or anybody

16   else at Oracle about the function or the operation of

17   Suite 11i?

18       A.   No.  Nothing.  But I only --

19       Q.   Okay.  All right.

20           So you were not aware of any before this?

21       A.   No.

22       Q.   Were you aware of any statements -- before

23   reading the complaint, were you aware of any

24   statements made by Ellison or anybody else at Oracle

25   about the effect of the economy on Oracle's sales?

**6/13/2005 Chu, Dzung**

1        I think I can do better than that.

2        Mr. Chu, have there been -- have you had any

3    discussions, without getting into what those were

4    specifically; but have you had discussions on the

5    subject of how to proceed with this lawsuit?

6        A.   No.   No, this is just what came out of me.

7        No one asked me to say anything.

8        Q.   I understand.   But I'm asking a different

9    question.   Whether Mr. Chu has shared ideas -- don't

10   tell me the ideas -- has shared ideas with his lawyers

11   about how to proceed with the case.

12       So, for example, the kinds of allegations to

13   make, who to depose, the kind of information to

14   obtain, those kinds of things.

15       MS. WINKLER:   Objection to the form of the

16   question.

17       THE WITNESS:   No.

18       BY MR. RUBIN:

19       Q.   Do you understand whether you have the right

20   or the ability to direct your lawyers who to depose

21   and what kinds of information to seek, and other kinds

22   of strategic or tactical decisions to make in the

23   course of the case?

24       MS. WINKLER:   Object to the form of the

25   question.

**6/13/2005 Chu, Dzung**

```
1              THE WITNESS:  I don't understand the
2    question.
3              BY MR. RUBIN:
4         Q.  Do you understand that in your position -- do
5    you have the ability or the right to request of your
6    lawyers that they do certain things in connection with
7    the lawsuit?
8         A.  You're asking me about my lawyer?  What right?
9         Q.  Your right.
10        A.  Are you asking me do I have the right to ask
11   my lawyer --
12             (In English) To do something for me.
13             THE INTERPRETER:  To do something for me.
14             BY MR. RUBIN:
15        Q.  Do you have the right to ask your lawyer to
16   take a particular approach to the case?  To seek
17   particular documents?  To do -- to do something that
18   you think is appropriate in pursuing this case against
19   Oracle?
20        A.  No.
21             MS. WINKLER:  Objection to the form of the
22   question.
23             MR. RUBIN:  Okay.  Let's go ahead and break
24   for lunch.
25             THE VIDEOGRAPHER:  Off the record at 12:31.
```

**6/13/2005 Chu, Dzung**

1      Q.   And is it your understanding that Mr. Ellison

2   made representations about Suite 11i to the effect

3   that the product was essentially plug and play?

4      A.   I don't recall, but I did read it somewhere.

5      Q.   Okay.

6      A.   No.   I read it in here (indicating).

7      Q.   Do you know what the complaint alleges about

8   any representations that Mr. Ellison made with respect

9   to Suite 11i?

10      A.   I know that, if I'm not mistaken, Larry

11   Ellison said his product does not have any problem.

12   When the customer used it for 11i, after that I read

13   they found that customers everywhere had problems.

14   Like Bell South, they have a big problem.   They sent a

15   hundred people down to help customers.   And that was

16   just an example.

17      Q.   So your understanding of the complaint is that

18   it alleges that Mr. Ellison represented that there

19   were no problems with Suite 11i, correct?

20      A.   That's right.

21      Q.   Okay.

22          Are you familiar with the term

23   "interoperability" or "integration"?

24      A.   The first word, what is it?

25      Q.   Interoperability.

6/13/2005  Chu, Dzung

1     A.  No, I don't understand that.

2     Q.  Integration?

3     A.  Yes.

4     Q.  And do you understand that -- do you

5  understand that word has any significance in

6  connection with this complaint?

7     A.  No.  But I know that the word integration has

8  something related to this complaint.

9     Q.  And what is the relationship?

10    A.  That the plug and play, like you mentioned

11  integration -- using for customers -- the product,

12  Oracle's product, should be able to integrate well

13  with the customer side.

14    Q.  So your understanding is that in connection

15  with this complaint, that integration means the

16  ability of an Oracle product to integrate with a

17  customer's product?

18        MS. WINKLER:  Objection to the form of the

19  question.

20        THE WITNESS:  Are you asking whether it

21  should be compatible with Suite 11i product?

22        BY MR. RUBIN:

23    Q.  Well, here's my question.  Is it your

24  understanding that when integration is referred to in

25  this complaint, that it refers to Suite 11i's ability

**6/13/2005 Chu, Dzung**

1    to integrate with software -- application software

2    that -- or database that the company already has

3    before it buys 11i?

4         MS. WINKLER:  Objection to the form of the

5    question.

6         THE WITNESS:  That's correct.

7         BY MR. RUBIN:

8    Q.  Have you ever heard of the acronym or the

9    abbreviation CRM?

10   A.  Yes.  When I read this, I think I saw it.

11   Q.  And what does it mean?

12   A.  (In English) I believe -- I don't know, but I

13   read CRM on the book here.  Communication something.

14   Q.  Okay.  So you think it means communication

15   something?

16   A.  (In English) Something like that.  I don't

17   know.  But it's in here.  I saw the abbreviation CRM.

18   Q.  And do you have any understanding whether CRM

19   relates in any way to Suite 11i?

20   A.  No, I don't know.

21   Q.  Okay.  And have you ever heard of the acronym

22   or the abbreviation ERP?

23   A.  No.

24   Q.  What is your understanding of what Oracle

25   makes?  What products does Oracle make?

1    information that you hear or you might sell based upon

2    information you hear.  What were your primary sources

3    of information about stock?

4        A.   (In English) How can get primary source?

5             MR. RUBIN:  Maybe Andy can help here.

6             (Interpreter speaking to witness in

7    Vietnamese.)

8             THE WITNESS:  Like I said earlier,

9    information from --

10            (In English) Company.

11            (Through Interpreter) -- company releases.

12   From guidance.

13            (In English) You know, any financial people

14   get from the company.

15            (Through Interpreter) financial people from

16   the company.

17            THE WITNESS:  No.  Financial people get from

18   the company, like, you know, Levinson met with the

19   financial people.  Tell them, assure them the guidance

20   be on line with the target for the quarter.

21            BY MR. RUBIN:

22       Q.   So you're describing stock analysts?

23       A.   Yeah.  I mean stock --

24       Q.   Companies like Morgan Stanley --

25       A.   Or Deutsch Bank or whatever.

1        Q.   And they go to meetings or gather

2    information --

3        A.   Yeah.

4        Q.   -- about the company?

5        A.   They come to see the company CEO, ask them how

6    you think about the quarter.  I think, yeah,

7    something.

8        Q.   And do you subscribe to any of those

9    particular analyst report publications?

10            THE WITNESS:  Ask him again, make sure.

11            BY MR. RUBIN:

12       Q.   Do you subscribe -- do you receive at home or

13   at work any analyst reports that are prepared by

14   various investment banks or...

15       A.   I receive them for free.

16       Q.   Okay, you receive them for free.  But whose do

17   you receive?

18       A.   I don't remember.  I receive different things.

19       Q.   Are they from investment banking houses or

20   brokers?

21       A.   I don't remember.

22       Q.   Okay.  Did you read those reports that you

23   received for free as part of your effort to educate

24   yourself about what investments to make?

25       A.   I seldom read them.  I only looked on the

6/13/2005 Chu, Dzung

1    Internet.

2         Q.   Okay.  So in terms of -- and the Internet

3    would make reference to or quote some of these analyst

4    reports from time to time; is that correct?

5         A.   Yes, correct.

6         Q.   And that's true today even, correct?

7         A.   Yes.

8         Q.   And did you have a particular favorite website

9    or websites that you tended to review more than others

10   in terms of looking for stock advice?

11        A.   I looked at all sorts of websites.  Mostly

12   Yahoo at that time.

13        Q.   Yahoo and?

14        A.   (In English) That's all.

15             THE INTERPRETER:  That's all.

16             THE WITNESS:  Back then there was just Yahoo,

17   there was no Google.

18             BY MR. RUBIN:

19        Q.   Right.  Back in 2001.

20        A.   (In English) Yeah, right.

21        Q.   Right.

22             Who do you use now?  Google?

23        A.   Google.

24             (In English) Or Chula Vista, I think.  At

25   that time, yeah, Chula Vista.

1          Am I right about that?

2      A.   (In English) Yeah.  Bought on the 16th, yeah.

3          (Sotto voce discussion between Mr. Rubin and

4      the reporter.)

5          MR. RUBIN:  Okay.

6          THE INTERPRETER:  I believe he said yes.

7          BY MR. RUBIN:

8      Q.   "Yes"?  Okay.

9          And tell me if you can, do you recall whether

10     the 17th and 18th were a weekend?

11     A.   I don't remember.  You can look on the

12     calendar.

13     Q.   Okay.  But you sold all 10,000 shares on the

14     19th.  Correct?

15     A.   Yes, that's what it says here.

16     Q.   And what event or events occurred that caused

17     you to sell all 10,000 shares that you had indicated

18     that you had purchased for long-term value growth?

19     What caused you to sell them three days later?

20     A.   I think my wife sold these.  I didn't.

21     Q.   You think your wife sold this stock?

22     A.   Yes.

23     Q.   So would it be fair to say that there are

24     occasions reflected in these account summaries where

25     you made the decision to sell the stock and other

1    times where your wife made the decision to sell the

2    stock?

3         A.   Yes.

4         Q.   Okay.  And did you -- did she consult with you

5    before she sold the stock?

6         A.   I don't remember.

7         Q.   But you had indicated earlier that you had

8    made the decision to purchase the stock, right?

9              MS. WINKLER:  Objection to the form of the

10   question.

11             THE WITNESS:  No, I didn't say that.

12             BY MR. RUBIN:

13        Q.   I thought you had testified that you had --

14   that you had been motivated or that you had been

15   persuaded to purchase the stock because the company

16   had good earnings and looked like it was a gold mine,

17   and that's why you thought it was a good idea to buy

18   the stock.  Did I misunderstand you?

19             MS. WINKLER:  Objection to the form of the

20   question.

21             THE WITNESS:  I said that generally before I

22   buy I would consult with my wife or my wife would

23   consult with me; but I think these here are my wife

24   sold them, I didn't sell them.

25             BY MR. RUBIN:

1       Q.  And do you know, sitting here today, why she

2    sold them?

3       A.  How would I know?

4       Q.  Okay.  But would it be your testimony that

5    would have been inconsistent with the strategy that

6    you had for holding on to the ███ stock?

7            MS. WINKLER:  Objection to the form of the

8    question.

9            THE WITNESS:  I remember buying ███ stocks

10   that I kept for a long time.

11           (In English) But I don't think you have it

12   here.

13           BY MR. RUBIN:

14      Q.  But they weren't these?

15      A.  Yeah, I have some here I bought for at

16   least --

17      Q.  But not these?

18      A.  Not these, yeah.

19      Q.  So do you know why you bought these?

20           Or do you know why you sold them?

21      A.  I can't remember.

22      Q.  Okay.

23           All right.  Let's look at a trade that you

24   made ████████████ on June 20th.

25      A.  (In English) 59?

**6/13/2005 Chu, Dzung**

1    the next day; correct?

2         A.   (In English) Yes, I think this was the period

3    of time when my wife was doing the day trading.

4         Q.   So you would acknowledge that this pattern is

5    consistent with somebody who's doing day trading,

6    right?

7         A.   (In English) This is my wife.  I think so.  I

8    don't do it.

9         Q.   Okay.  So this is your wife?

10        A.   (In English) This is my wife.

11        Q.   So she's doing day trading?

12        A.   (In English) Yeah, she doing day trading.  It

13   look like it.

14        Q.   Okay.

15        A.   I didn't do it.  I put long term when I bought

16   it.  You know, the stock got a guidance good, I leave

17   in there.  But it looks like she's doing mostly in

18   this time day by day, yes.

19        Q.   I'm sorry?

20        A.   (In English) My wife do this stuff here, yeah.

21        Q.   Okay.  Did you -- before reviewing this, were

22   you aware that your wife was doing day trading?

23        A.   Yes.

24        Q.   Okay.  So when you answered my questions

25   earlier, you just specifically were answering the

**6/13/2005 Chu, Dzung**

1        Q.  Well, she was buying too, wasn't she?

2        A.  (In English) Yeah.  I think so.  My wife, she

3    use the Internet at that time.  She buy and sold same

4    day too.

5        Q.  And did she report to you --

6        A.  No.

7        Q.  -- afterwards what she did?

8        A.  Yeah.  Sometimes she don't tell me nothing

9    until I find out later.  Too late already.

10       Q.  And you looked at the account later on?

11       A.  Yeah.

12       Q.  Okay.  Did you ever tell her that you thought

13   it was appropriate, inappropriate to day trade?

14       A.  I told her be careful.  You know, some day you

15   make money, some day you lose money.  That's why I can

16   give her advice.

17       Q.  What were the reasons that she was -- well,

18   strike that.

19           What was she relying on in deciding when to

20   buy or sell on the same day or the next day?

21       A.  I think she watch TV, like Bloomberg, CNBC,

22   whatever the news on the TV.  Or she look in the

23   Internet too.

24       Q.  Was she -- is it your testimony that she was

25   also deciding when to buy and sell based on particular

**6/13/2005 Chu, Dzung**

1    events in the news?

2        A.   Yeah.   Look like on this month here she look

3    like do it all the time.

4        Q.   So, like ▮▮▮▮ would it be -- is it your

5    understanding that she would buy ▮▮▮▮ based upon what

6    was in the news and then sell it the same day based on

7    what was in the news?

8        A.   I don't know.

9        Q.   It's more likely, isn't it, that she was just

10   waiting to see if there was any slight movement,

11   right?

12       A.   (In English) I don't know.

13           MS. WINKLER:   Objection to the form of the

14   question.

15           BY MR. RUBIN:

16       Q.   Isn't that typically what a day trader does?

17       A.   (In English) I don't know.

18       Q.   I'm sorry?

19       A.   (In English) I don't know.

20       Q.   Well, you told me a few minutes ago that a day

21   trader watches the --

22       A.   (In English) I didn't say that.

23       Q.   -- stock movement.

24       A.   (In English) I didn't say that.

25           I didn't say that.

**6/13/2005 Chu, Dzung**

1      Q.   You didn't say that a day trader -- I believe

2   you testified that you're not a day trader, you're at

3   work, because what a day trader does, they watch the

4   stock movement all day.

5      A.   (In English) Yeah, the people who do day

6   trader, they maybe watch it daily.

7      Q.   Is it your understanding that was what your

8   wife was doing?

9      A.   (In English) I don't know.  I don't think so.

10  Maybe she listened on the news, or whatever, you know,

11  she -- because I working ███████ she can ask me is it

12  good stock here?  ██████████████████████████████

13  So she can buy ██████ Anything wrong?  No.  So she

14  buy, she buy.  But ████ I don't know.  We don't work

15  in the company then we don't know it.

16          So, you know, my wife she have crazy -- like

17  I told you, she's a crazy girl.  Why is she trading in

18  day.

19      Q.   How about June 22nd, ████████████████ in the

20  same account statement.  It looks like somebody in

21  your account purchased ████ --

22      A.   (In English) Yeah.  This is -- I can tell you

23  this is my wife trading here.

24      Q.   Okay.

25      A.   I don't do it.

1       And you bought -- it looks like either you or

2    your wife purchased ▉▉▉ on July 10, ▉▉▉ shares.

3    And then the same day sold ▉▉▉ shares.  And that's

4    another example of trading within the same day,

5    correct?

6       MS. WINKLER:  Objection to the form of the

7    question.

8       THE WITNESS:  (In English) Yes.  That's my

9    wife, I know.

10      BY MR. RUBIN:

11    Q.  You know that's your wife.

12      Do you have a specific memory of the trade?

13    A.  (In English) She liked the day trading.  I

14    believe so.

15    Q.  Okay.

16    A.  (In English) I never, you know, sell in one

17    day.  I always hold it until come out earning,

18    whatever; but this looks like it's her trend.  My

19    wife's trend.

20    Q.  Okay.  Looking through this document do you

21    remember any trades that were --

22    A.  (In English) I bought it.

23    Q.  That were yours?  That was your decision to

24    buy?

25    A.  (In English) Oracle.  I make the decision to

1    buy that one.

2         Q.  Is Oracle on here?

3         A.  (In English) Yeah.  But not on this --

4         Q.  No.  I'm talking about on this account

5    statement.

6         A.  (In English) No.

7         Q.  I promise I'll give you every opportunity to

8    talk about your Oracle purchase.  It's coming up.

9         A.  (In English) Sometimes she call me to get

10   advice; but like I told you, ███  we have hold for a

11   long time too, but it's not showing here.  I remember

12   we went on vacation Back East, yeah, the stock went

13   up, we didn't sell it.  But when it go down a little

14   bit we sold it.  But I don't know this timing.

15        Q.  So do you see anything on here that you can

16   recall was a stock purchase or stock sale decision

17   made by you?

18        A.  (In English) I don't remember.  But sometimes

19   like I told you, she can call me to sell.  Sometimes

20   she makes her own decision to sell.

21        Q.  Who did most of the trading on this account,

22   you or your wife?

23        A.  (In English) Mostly my wife.

24        Q.  Okay.  What percentage would you attribute to

25   each of you?

1       A.   (In English) 80 percent.

2       Q.   80 to 20?

3       A.   (In English) Yeah.

4       Q.   And how would your wife execute the trades?

5    By telephone?  By Internet?

6       A.   (In English) Buying and selling, I think by

7    Internet at that time.

8       Q.   By?

9       A.   (In English) By Internet.

10      Q.   Through Morgan Stanley?

11      A.   (In English) Yes.

12      Q.   And how did you execute trades?

13      A.   (In English) When I stay home and I watch it

14   on the Internet too; but mostly working, I just

15   closely looking and that's it.  I mean --

16      Q.   No.  But when you did execute trades --

17      A.   (In English) Internet too.

18      Q.   Internet.

19      A.   (In English) Yeah, mostly Internet.

20      Q.   Did you have any representative or agent at

21   Morgan Stanley who you dealt with on a regular basis?

22      A.   (In English) No.

23      Q.   Anybody at Morgan Stanley give you any

24   investment advice?

25      A.   (In English) No.

### 6/13/2005 Chu, Dzung

1        MR. RUBIN:  Okay.  Was the document -- was

2    the account statement for month end August 31, 2000,

3    marked as 5?  Is that right?

4        MS. WINKLER:  That was 6.

5        MR. RUBIN:  Okay.

6        THE WITNESS:  This is 6.

7        MR. RUBIN:  Excuse me.  Just indulge me for

8    one second.

9        All right.  So let me mark...  That's

10   Exhibit 7.

11       (Exhibit 7 was marked for identification.)

12       BY MR. RUBIN:

13   Q.   Okay.  Mr. Chu, do you have Exhibit 7 before

14   you?

15   A.   (In English) Yes.

16   Q.   Okay.  This is a 7-page document with Bates

17   stamp range from Morgan Stanley 96 to Morgan Stanley

18   103.  And the caption of the document is Account

19   Statement For Month Ending January 31, 2001, for your

20   and your wife's joint account; is that correct?

21   A.   Yes.

22   Q.   Okay.  Okay.  So let me first -- let me direct

23   your attention to page 0099.

24       Okay?

25       And you see about the third item down

1   January 13, 2001, you bought Oracle Corporation stock,

2   a thousand shares.  It says you bought.  I'm just

3   simply reading from the document, I'm not -- I have

4   questions for you about who purchased it.  But do you

5   see the line I'm referring to?

6       A.  Are you talking about '01 something?

7       Q.  Yes.

8       A.  (In English) This is my wife bought it.  The

9   first one.  I bought the second one.

10      Q.  All right.  So let's take a step back.  On

11  January 17, 2001, your wife purchased Oracle stock?

12      A.  (In English) Uh-huh.

13      Q.  And what specifically -- is there something in

14  the document or some memory you have otherwise that

15  leads you to the conclusion that your wife made the

16  purchase of Oracle stock on January 17th?

17      A.  (In English) I think she bought the same day,

18  she sold the next day.  I remember 1,000 shares, she

19  bought that.  One of the stock.  Yeah.  And she sold

20  next day, something.

21      Q.  So is it the fact that it was sold the next

22  day that leads you to the conclusion it was your

23  wife's purchase?

24      A.  (In English) Yes.  That's her habit.

25      Q.  Because that's her pattern?

1     A.  (In English) Yeah, pattern.

2     Q.  Okay.  Do you remember discussing Oracle stock

3 with her in any manner prior to her January 17th

4 purchase?

5     A.  (In English) I don't remember.  But she told

6 like on the day of the Bill Clinton down to Louisiana

7 she told me she watch TV and talking about Bill

8 Clinton with Larry Ellison on the convention meeting

9 down to Louisiana at that moment.  That's what tell

10 when she bought it, Oracle second of this one.

11     Q.  So your recollection is that she spoke to you

12 about learning of the information coming out of the

13 New Orleans conference --

14     A.  (In English) Yes.

15     Q.  -- prior to her purchase of this stock?

16     A.  (In English) Yes.

17     On the second one.  Not on this one I don't

18 think.

19     Q.  I'm sorry?

20     A.  (In English) Not on the first one.

21     Q.  Not on the thousand dollar purchase?

22     A.  (In English) The next one.

23     Yeah, on the 10,000.  Yeah, she talk to me

24 she bought 10,000 on the second one with me.

25     Q.  So the 10,000 purchase was your wife's also?

1    to tell you what she had done, correct?

2        A.  (In English) Yeah.  On this one, yeah.

3        Q.  Okay.  And, now, two days before this purchase

4    she had just sold ██████████████ -- ██████ shares of

5    ████████████████ for approximately the same price,

6    correct?  Just on that same page.

7        A.  (In English) Uh-huh.

8        Q.  Just the first entry.  January 24th.

9        A.  (In English) Uh-huh.

10       Q.  Correct?

11       A.  (In English) She sold ████ yeah.

12       Q.  And, in fact, if you look back, during this

13   month she had bought and sold ██████████ ███████

14   shares of ████████████ on two occasions, and then

15   after those two transactions then had purchased Oracle

16   stock; is that right?

17       A.  (In English) Yeah.  After she bought and sold,

18   yeah, the ████ the same month.

19       Q.  And it's your testimony that it was

20   specific -- that the decision by your wife to purchase

21   Oracle stock was based upon the reports of what Larry

22   Ellison said at the New Orleans conference, correct?

23           MS. WINKLER:  Objection to the form of the

24   question.

25           THE WITNESS:  (In English) Yeah.  Because I

1   heard she told me she see Bill Clinton on the

2   conference center that day talking about that, yeah.

3        BY MR. RUBIN:

4        Q.  And that's what she told you after she had

5   purchased the stock?

6        A.  (In English) I don't know.  But she told me,

7   you know, during we have Oracle -- well, maybe later

8   on, I think January.  I don't know when Louisiana

9   happened on the convention center, but she mentioned

10  she did see Bill Clinton on the conference center.

11       Q.  Do you remember whether she called you at work

12  the day that she had purchased the stock?

13       A.  (In English) No, I think she called me -- she

14  let me know after I find out one week later.  You

15  know, because this is -- we keep it.  I told her keep

16  it.  Don't sell in one day no more.  Take about a two

17  month after that -- well, the end of the month, after

18  we come out waiting, and we start to sell it.

19       Q.  So your testimony is that you learned of her

20  purchase of Oracle stock about a week later?

21       A.  (In English) Yeah.

22       Q.  And it was --

23       A.  (In English) When I went to look on the

24  website, yeah.  I go to the website and look.

25       Q.  And you asked her about the purchase?

6/13/2005 Chu, Dzung

1        A.   (In English) Yeah.

2        Q.   Because she had held it?

3        A.   (In English) Yeah.

4        Q.   And is it that conversation in which she told

5    you her reasoning for buying the stock?

6        A.   (In English) Yeah.

7             MS. WINKLER:   Objection to the form of the

8    question.

9             THE WITNESS:   Yeah.

10            BY MR. RUBIN:

11       Q.   Is that correct?

12       A.   (In English) Because the guidance from Larry

13   Ellison at that time talking good about the product,

14   everything like that.

15            BY MR. RUBIN:

16       Q.   Okay.  And what did you say to her when she

17   told you that?

18       A.   (In English) Oracle is a good company; you

19   know, it's a big company.  It's not small like

20   different company.  So I think we save that one.  I

21   could buy any Sun, Cisco, you know.  She go for the

22   big one, yeah.

23       Q.   Prior to that -- prior to her purchase of

24   Oracle stock had you ever considered buying Oracle

25   stock yourself?

**6/13/2005 Chu, Dzung**

1     Q.  Okay.

2          All right.  If you would, turn to Morgan

3  Stanley 106.

4          It looks -- and I draw your attention to two

5  items, one on February 16 and one on February 26.  And

6  according to this statement you sold, or either you or

7  your wife sold 1,000 shares of Oracle stock on

8  February 16th; is that right?

9     A.  Yes.

10     Q.  Okay.  And then you sold another 1,962 shares

11  on February 26th; is that right?

12     A.  Yes.

13     Q.  Okay.  Now, do you recall who made the

14  decision to sell the approximately 3,000 shares of

15  Oracle stock during February?  Was that you or your

16  wife?  Or did you make the decision jointly?

17     A.  I think my wife did.

18     Q.  Your wife made the decision to sell?

19     A.  Yes.

20     Q.  Did she discuss the sale with you before

21  making the sale of the Oracle stock in February?

22     A.  I think she did not discuss with me, but I

23  think she said that Oracle had bad news or something

24  like that.

25          (In English) That's why she sell some stock.

1    March 12th, did you discuss with your wife whether to

2    sell Oracle stock?  Did you discuss it at any time

3    between those two dates?

4            MS. WINKLER:  Objection to the form of the

5    question.

6            THE WITNESS:  No, I don't remember.

7            BY MR. RUBIN:

8       Q.  At the time that you learned that Mr. Ellison

9    had sold hundreds of millions -- excuse me, hundreds

10   of thousands of shares, were you aware that

11   Mr. Ellison had retained the vast majority of his

12   stock?

13           MS. WINKLER:  Objection to the form of the

14   question.

15           THE WITNESS:  I know that he sold 200 million

16   shares, and that's a lot.  A billion dollars worth.

17           BY MR. RUBIN:

18      Q.  Do you mean 200,000 shares?

19      A.  No, 290 million shares.  Close to a billion

20   dollars, I remember.

21      Q.  Well, if he sold -- I think with all due

22   respect, Mr. Chu, your math is wrong.  Because if he

23   sold 290 million shares, that would only be about $3 a

24   share.

25      A.  That was his price option.  If he sold out to

6/13/2005 Chu, Dzung

1    the market, it would be market value, right?

2        Q.   Right.   And didn't you understand that he sold

3    at the time when the price of the stock was in the

4    high 20s or 30s?

5            MS. WINKLER:   Objection to the form of the

6    question.

7            THE WITNESS:   I don't know.   I know that I

8    read in an article it said something about that.

9            BY MR. RUBIN:

10       Q.   Okay.   So -- so, sitting here today, do you

11   understand how much -- how much, whatever the number

12   is, whether it's 290 million or 290,000, what percent

13   of Mr. Ellison's holdings did he sell in January 2001?

14           What is your understanding, sitting here

15   today, of what percentage of his total holdings of

16   Oracle stock he sold?

17           MS. WINKLER:   Objection to the form of the

18   question.

19           THE WITNESS:   I don't know.   I know that he

20   sold 290 million shares.   Not 290,000.

21           BY MR. RUBIN:

22       Q.   Okay.   So how much -- okay.   So I'll assume

23   for purposes of this deposition, without stipulating

24   to that, that that is the case.   How much total -- how

25   much in total or in the aggregate did Mr. Ellison have

1           THE INTERPRETER:  "I don't know."

2           MR. RUBIN:  He said "I don't know"?

3           THE INTERPRETER:  He said "I don't know."

4           BY MR. RUBIN:

5       Q.  All right.  Let me hand you now -- it's 10.

6           Do you have it back?

7           THE REPORTER:  Yeah, I have one.

8           MR. RUBIN:  Is that for month ending

9    April 30th, right?  We're going to mark that as 10.

10          On the top.

11          THE REPORTER:  Yes.

12          MR. RUBIN:  Okay.

13          (Exhibit 10 was marked for identification.)

14          BY MR. RUBIN:

15      Q.  This is a document Bates stamp range Morgan

16   Stanley 116 to 129.  And I'll represent to you that it

17   was produced by Morgan Stanley Dean Witter as your

18   account statement for month ending April 30th, 2001.

19   Do you recognize that document?

20      A.  Yes.

21      Q.  Okay.  And, Mr. Chu, it would save time, but I

22   want to be sure that this is accurate, otherwise we'll

23   go through the transactions one by one.  Would it be

24   fair to say that any trades that -- in which stock is

25   bought or sold within a day or two you would testify

**6/13/2005 Chu, Dzung**

1    on each and every occasion that those trades were

2    those of your wife and not you?

3           MS. WINKLER:  Objection to the form of the

4    question.

5           THE WITNESS:  Yes.

6           BY MR. RUBIN:

7       Q.  All right.  Let me draw your attention to

8    April 18, 2001.  It's page 119.

9           THE INTERPRETER:  109?

10          MR. RUBIN:  119.

11      Q.  Okay.  Down at the bottom of the page, on

12   April 18th, you'll see in the second to the bottom

13   there's a purchase of Oracle stock, 1,000 shares at

14   15.69 a share.

15          Okay.  And do you recall the circumstances

16   behind the purchase of Oracle stock on April 18th?

17      A.  I think she did it.

18      Q.  Okay.  Did she discuss -- do you remember

19   having any discussion prior to April 18, 2001, of her

20   purchase of Oracle stock?

21          MS. WINKLER:  Objection to the form of the

22   question.

23          This purchase?

24          MR. RUBIN:  Yeah.  This purchase.  I'm sorry.

25   Yeah.  This particular purchase.

6/13/2005 Chu, Dzung

1    journal that I received from my client.

2         MR. RUBIN:  And is it bound?

3         MS. WINKLER:  No.

4         MR. RUBIN:  So -- well, we might need to look

5    at it because it's confusing.  That page.

6         Q.  Okay.  Mr. Chu, have you ever used any Oracle

7    product?

8         A.  Yes, in -- at work.

9         Q.  Okay.  What kind of -- which product have you

10   used?

11        A.  11i.

12        MR. RUBIN:  Okay.

13        THE WITNESS:  (In English) They're using 11i

14   right now.

15        THE INTERPRETER:  They are using 11i right

16   now.  He testified in English.

17        BY MR. RUBIN:

18        Q.  You use 11i right now?

19        A.  (In English) Yeah.  In the application we use

20   11i right now.

21        Q.  And how long has Xilnx had 11i?

22        A.  I don't know, but I remember long time ago.

23        Q.  Okay.  And do you remember as between -- you

24   were working for Xilnx in 2001, correct?

25        A.  (In English) Yeah.  No.  10 years ago so --

1        Q.   Yeah.  So 1995?

2        A.   (In English) 2000, yeah.

3        Q.   But you were already working for Xilnx as of

4    2001 --

5        A.   (In English) Oh, yeah.

6        Q.   -- correct?

7        A.   (In English) Yeah.

8        Q.   Had Xilnx acquired Suite 11i at the time that

9    this lawsuit was filed?

10       A.   (In English) Do we use it?  I don't

11   remember --

12       Q.   Yeah.  Had you purchased it?

13       A.   (In English) Did Xilnx purchase?  I don't

14   know, but I think we have it there, 11i.  I don't know

15   when, but we do have a lot of problem I heard, too.

16   But I don't pay attention, you know.

17       Q.   Do you know which components of Suite 11i you

18   have at Xilnx?

19       A.   (In English) Mostly they use for your record.

20   Like looking back on your -- like right now I use how

21   to show my record in the company, like to file my

22   personal -- you know, my -- for the use right now on

23   the database.  Yeah, that's all.

24       Q.   And what has been your experience with Suite

25   11i?

# EXHIBIT 30

1              IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4     In re ORACLE CORPORATION

5     SECURITIES LITIGATION

6                          Master File No. C-01-0988-MJJ

7     This Document Relates To:

8          ALL ACTIONS.

9     --------------------------/

10

11                    ---oOo---

12                  CONFIDENTIAL

13      30(B)(6) DEPOSITION OF ROBERT E. TURNER

14              Tuesday, June 14, 2005

15                    ---oOo---

16                  TSG REPORTING

17                  REPORTING FOR:

18             LiveNote World Service

19           221 Main Street, Suite 1250

20          San Francisco, California 94105

21             Phone:  (415) 321-2311

22             Fax: (415) 321-2301

23

24    Reported by:

25    BONNIE PRUSZYNSKI, RMR

1     Q    If you will, sir, look at Section 1(a)

2  at the bottom of that page.

3     A    Okay.

4     Q    That paragraph, the trustees of the

5  pension fund grant the investment manager full

6  discretion and authority to manage, invest and

7  reinvest the investment account assets.

8        Do you see that?

9     A    I do.

10    Q    What did it mean to you to have full

11  discretion and authority to manage, invest and

12  reinvest the investment account assets on behalf

13  of the fund?

14    A    To make investment buy-sell decisions

15  within the portfolio.

16    Q    Anything else?

17    A    To do so at our discretion.

18    Q    Do you recall one way or the other

19  whether trustees of the pension fund or anyone

20  else on behalf of the pension fund advised

21  Turner Investment Partners of investments it

22  should make?

23    A    I don't think that ever happened.

24    Q    Do you recall one way or the other

25  whether trustees of the pension fund or anyone

1    else on behalf of the pension fund advised

2    Turner Investment Partners of investments it

3    should not make?

4         A    If they did, which clients can do,

5    then we restrict the investment of those

6    securities.

7              Occasionally a client will say, you

8    know, no tobacco stocks in the portfolio, no

9    firearms, no alcohol.  If that is the case, then

10   we will restrict those based on the client's

11   direction.

12        Q    Section 1(c) on the next page, Bates

13   page labeled Turner 0006, in this paragraph, the

14   trustees of the fund promulgate some guidelines.

15             Sir, are you familiar with these

16   guidelines?

17        A    Not specifically, no.

18        Q    Is it fair to say that you have

19   reviewed the guidelines at some point?

20        A    Yes.  Over the history of the

21   relationship, I would have.

22        Q    Do you know one way or the other if at

23   any point Turner Investment has objected to any

24   of the guidelines propounded by the trustees of

25   the fund?

6/14/2005 Turner, Robert E

1        A      I do not know that.

2        Q      Section 1(c) also provides that

3    neither the union nor its trustees have

4    investment management authority over the fund,

5    over the funds invested by the investment

6    manager; isn't that right?

7        A      That's correct.

8        Q      What did that mean to you, sir?

9        A      It means that we have the

10   decision-making authority within the portfolio

11   we manage.

12       Q      Turn with me, if you will, sir, to

13   Turner 0007.

14              This describes -- at the bottom there

15   is a section, section number three, and it

16   describes the duties and powers of investment

17   managers; is that correct?

18       A      That's correct, yes.

19       Q      3(b) discusses the investment

20   manager's power to provide investment advice and

21   recommendations with respect to the investment

22   account assets.

23              How did Turner accomplish this on

24   behalf of the fund?

25              Let me say it differently.  How did

1    Turner exercise this power on behalf of the

2    fund?

3              MR. MC TIGUE:  Objection to the form.

4        A    Without commenting specifically on

5    this, we have the authority to make buy-sell

6    decisions within the portfolio.

7        Q    With specific reference to Oracle

8    Securities, did anyone from the fund ever

9    recommend that Turner Investment invest in

10   Oracle Securities?

11       A    Not that I recall, no.

12       Q    Did anyone from the fund ever question

13   Turner Investment's actual investment in Oracle

14   Securities at any point?

15       A    Personally, I do not recall that.  As

16   I mentioned previously, I do not interact with

17   the clients.

18       Q    Do you know if Turner Investment

19   Partners interacts directly with the fund or

20   with a consultant on behalf of the fund?

21       A    That I don't know either.

22       Q    Who would know that?

23       A    The head of -- our client service

24   team.

25       Q    Who is the most senior member of the

1    client service team, sir?

2         A    Glenn Dever.

3         Q    On Turner 8, under Section D(i)(1), it

4    states that the investment manager has complete

5    discretion to -- essentially to purchase, sell,

6    exchange, convert or otherwise trade in any and

7    all common or preferred stocks or securities.

8    that are convertible into such stock.

9              Do you see that?

10        A    I do.

11             MR. MC TIGUE:  Objection to form.

12        Q    And would Oracle Corporation

13   securities have fallen under the investment

14   manager's authority of section D(i)(1)?

15        A    It would have.

16        Q    And that authority does not require

17   Turner Investment to seek written approval of

18   the trustees before making such investments,

19   does it?

20             MR. BRITTON:  Objection to form.

21        A    If you could just ask that question

22   again, because I wasn't -- I understand the

23   question but in terms of the nature of the

24   response, I need to understand how you asked

25   that.

**6/14/2005 Turner, Robert E**

1     Q      The authority granted by D(i)(1) does

2  not require Turner Investment to seek prior

3  approval if from the fund before making such

4  investments, does it?

5          MR. MC TIGUE:  Objection to form.

6     A      That's correct.  We did not have to

7  seek prior approval.

8     Q      And the authority granted by D(i)(1)

9  does not require the investment manager to seek

10  approval before selling securities that fall

11  within its parameters, does it?

12          MR. MC TIGUE:  Objection to form.

13    A      That's correct.

14    Q      Pages seven and eight, labeled Turner

15  11 to Turner 12, this section grants the

16  investment manager the right to vote the proxy

17  for stock that it's invested in; isn't that

18  right?

19    A      Yes.

20    Q      Do you know one way or the other

21  whether the AFL-CIO proxy guidelines put any

22  restriction on Turner Investment's ability to

23  vote Oracle Securities proxy?

24          MR. MC TIGUE:  Objection to form.

25      Calls for speculation.

48

```
 1    comments from Wall Street analysts, comments

 2    from industry experts.

 3        Q    Did you have a conclusion in late 2000

 4    whether or not companies in the sector that you

 5    had followed for 17 or 18 years were going to be

 6    immune to the cyclicality of the economy?

 7              MR. BRITTON:  Objection to form.

 8        A    You know, I would say no real

 9    conclusion.  If I recall, in late 2000, the

10    economy was still growing at an okay rate.  It

11    had not yet fallen into a recession at that

12    point.

13        Q    So, when you invested in Oracle

14    Securities, did you have an understanding -- let

15    me restate that.

16              When you invested in Oracle's stock,

17    did you have an understanding one way or the

18    other as to whether or not Oracle would be

19    subject to the cyclicality of the economy?

20              MR. BRITTON:  Objection to form,

21         foundation.

22        A    That I don't recall.

23        Q    Would it have been an analysis that

24    you would have undertaken?

25        A    Yes.
```

1        Q       And do you have that analysis in

2    writing anywhere?

3        A       No.

4        Q       Do your analysts prepare written

5    reports?

6        A       No.

7        Q       How is the information conveyed that

8    the analysts gathered?

9        A       Verbally between the analyst and the

10   portfolio managers.

11       Q       Do analysts keep notes on the

12   companies that they track?

13       A       If we visit with the company, we will

14   keep notes.

15               And we instituted a policy, probably

16   two-and-a-half years ago, where daily we comment

17   in a formal morning meeting about transactions,

18   and those notes are kept.

19               So, over the last two-and-a-half years

20   if the company was bought or sold, there would

21   be a notation regarding that.

22       Q       So, in 2000-2001, how often did you

23   meet with your investment team?

24       A       Daily.

25       Q       Is this the same policy you have just

**6/14/2005  Turner, Robert E**

1    described with respect to notes?

2          A       The notes were not taken at that time.

3          Q       Did any of the analysts in your tech

4    sector group keep a file on Oracle in 2000-2001?

5          A       Not that I am aware of.

6                  MR. BRITTON:   Objection.

7    BY MR. SCHMELTZ

8          Q       Did you keep documents relating to

9    Oracle in 2000-2001?

10         A       No.

11         Q       You mentioned earlier that you would

12   review a company's public comments; is that

13   accurate?

14         A       That's correct, yes.

15         Q       Do you recall reviewing any of

16   Oracle's public statements or comments regarding

17   it's earnings in late 2000, early 2001?

18         A       No.

19         Q       Would you have reviewed Oracle's

20   earnings announcements in its second quarter of

21   fiscal 2001?

22         A       I would have, yes.

23         Q       Would you have reviewed Oracle's

24   guidance or its earnings in its third quarter of

25   its fiscal year 2001?

**6/14/2005 Turner, Robert E**

1      A      I would have, yes.

2      Q      Would you have reviewed Oracle's

3    10-Q's in its fiscal year 2001?

4      A      Likely not.

5      Q      Would you have reviewed an Oracle 10-K

6    in either 2000 or 2001?

7      A      Again, likely not.

8      Q      Would you have attended any investor

9    teleconferences for Oracle's fiscal 2001?

10     A      That I don't recall.

11     Q      When I talk about Oracle's fiscal year

12   2001, do you understand Oracle has a fiscal year

13   that runs June to June?

14     A      Yes, I am aware of that.

15     Q      Do you need to change any of your

16   answers to my earlier questions on clarification

17   of what I meant by fiscal 2000?

18     A      No.   No.

19     Q      You mentioned that you read reports

20   from Wall Street analysts.

21            What companies did you, did Turner

22   receive analyst reports from, if you recall, in

23   2000-2001?

24     A      I don't recall specifically, but it

25   would have been a broad list.

1          We have access to First Call, which

2     pretty much lists all brokerage research.

3          Q     And how broadly would you have read

4     the brokerage research that was available on

5     First Call?

6          A     Fairly broadly.

7          Q     Would you have focused on the tech

8     sector during 2000-2001 or just generally?

9          A     Tech sector.

10         Q     Is it fair to say then that you would

11    have -- strike that.

12         Do you recall having been broadly read

13    as to Oracle, itself, in 2000-2001?

14         A     Not specifically.

15         Q     Did you pay more attention to

16    analyst's reports from brokers with whom Turner

17    had a relationship; in other words, did you pay

18    more attention to those analyst's reports than

19    you did to analysts reports for brokers you

20    didn't have a relationship with?

21         A     First of all, we have a fairly

22    extensive brokerage relationship, so any of the

23    major, recognizable brokerage firms we would

24    have had a relationship with.

25         And then I think naturally you are

```
 1    going to read those more closely those, those

 2    that you have a familiarization with, other than

 3    those we do not.

 4        Q    Did you receive research reports from

 5    Goldman Sachs during 2000-2001?

 6        A    Yes.

 7        Q    Would you have reviewed those with

 8    respect to tech sector companies?

 9        A    Yes.

10        Q    Did you receive analyst's reports from

11    Morgan Stanley Dean Witter during that time

12    frame?

13        A    That's correct, yes.

14        Q    Would you have reviewed those with

15    respect to tech sector companies?

16        A    Yes.

17        Q    How about Solomon Smith Barney?

18        A    Yes.

19        Q    Have you heard of a company called

20    Punk Ziegel and Company?

21        A    I have.

22        Q    Did you ever receive analyst reports

23    from Punk Ziegel in 2000-2001?

24        A    Not that I recall.

25        Q    How about Deutsche Bank Alex Brown,
```

**6/14/2005 Turner, Robert E**

1      did you receive analyst reports from Deutsche

2      Bank Alex Brown in 2000-2001?

3          A      Yes.

4          Q      Did you review them with respect to

5      tech sector companies?

6          A      Yes.

7          Q      Did you receive analyst reports from

8      Bank of America in 2000-2001?

9          A      Yes.

10         Q      Did you review them with respect to

11     tech sector companies?

12         A      Yes.

13         Q      Did you receive analyst reports from

14     J.P. Morgan during 2000-2001?

15         A      Yes.

16         Q      Did you review them with respect to

17     tech sector companies?

18         A      Yes.

19         Q      Did you receive analyst reports from

20     William Blair and Company during 2000-2001?

21         A      I don't believe so.

22                No.  Let me clarify that.

23                We currently do not receive reports

24     from William Blair.  We potentially could have

25     during that time frame.  I recall generally that

83

1    we stopped receiving research a period of time

2    ago, but I really can't frame that time we would

3    have stopped receiving research from William

4    Blair.

5        Q    If you had been receiving research

6    from William Blair in 2000-2001, would you have

7    reviewed it with respect to tech sector

8    companies?

9        A    Yes.

10           MR. BRITTON:  Object to the form.

11   BY MR. SCHMELTZ

12       Q    Have you ever heard of a firm called

13   Witt Soundview?

14       A    Yes.

15       Q    Did you receive research reports from

16   Witt Soundview in 2000-2001?

17       A    Yes.

18       Q    Would you have reviewed those with

19   respect to tech sector companies?

20       A    Yes.

21       Q    Have you heard of a firm called First

22   Albany Corporation?

23       A    Yes.

24       Q    And did you receive analyst reports

25   from First Albany Corporation in 2000-2001?

1      A      Perhaps.

2             And, again, it's one of these that has

3      not been a major relationship, and whether we

4      were receiving information at that point in

5      time, I can't really recall specifically.

6      Q      But if you had been, it's fair to say

7      you would have reviewed it for mention of tech

8      sector companies; right?

9      A      Yes.

10     Q      Have you heard of a firm called

11     Warburg Dillon Reade?

12     A      Yes.

13     Q      In 2000-2001, did you receive analyst

14     reports from Warburg Dillon Reade?

15     A      As with First Albany and William

16     Blair, perhaps, but it was a relationship I

17     wasn't particularly familiar with.

18     Q      Again, it's fair to state if you did

19     receive them, you would have reviewed them with

20     respect to tech sector?

21     A      Yes.

22     Q      Did you receive analyst reports from

23     CIBC World Markets in 2000-2001?

24     A      In all likelihood, yes.  It would be

25     in some of that latter categories of not

6/14/2005 Turner, Robert E

1    recalling when the relationship was developed or

2    not.

3         Q     Have you ever heard of a firm

4    called -- one more with CIBC, with respect to

5    CIBC World Markets.

6               Is it fair to say if you had received

7    their research reports, you would have reviewed

8    them with respect to tech sector companies?

9         A     Yes.

10        Q     Have you ever heard of a firm called

11   Bluestone Capital Research?

12        A     No.

13        Q     Have you ever heard of a firm called

14   the Gardner Group?

15        A     Yes.

16        Q     Did you receive analyst reports from

17   the Gardner Group in 2000-2001?

18        A     Again, it's in that latter category.

19   We do receive research now.  I can't recall

20   specifically when that was offered.

21        Q     And if you had received them you would

22   have reviewed them for the tech sector.

23        A     Exactly, yes.

24        Q     Have you heard of a firm called AMR

25   Research?

```
1        A      I have heard of them.

2        Q      Did you receive reports from AMR

3   Research in 2000-2001?

4        A      Not that I recall.

5        Q      Have you heard of U.S. Bancorp?

6        A      Yes.

7        Q      Did you receive analyst reports from

8   U.S. Bancorp in 2000-2001?

9        A      Again, in that latter category, I know

10   they had a relationship with Piper Jaffray.  I

11   can't really call whether we had a relationship

12   at that time or not.

13       Q      If you had received analyst reports

14   from U.S. Bancorp you would have reviewed them

15   with respect to tech sector companies?

16       A      That's correct, yes.

17       Q      And you mentioned Piper Jaffray.  Did

18   you receive analyst reports from Piper Jaffray

19   in 2000-2001?

20       A      In all likelihood we would have, yes.

21       Q      And did you review those or would you

22   have reviewed those with respect to tech sector

23   companies?

24       A      Yes.

25       Q      How about the First Union Securities?
```

6/14/2005 Turner, Robert E

1        A      In all likelihood we received research

2     and I would have reviewed it.

3        Q      What, if any, periodicals did Turner

4     Investment Partners subscribe too in 2000-2001

5     relating to investment?

6        A      It would have likely been just the

7     general sort of periodicals, Barrons, Wall

8     Street Journal, Fortune, Forbes, perhaps

9     Business Week.

10       Q      Were there any online periodicals

11    Turner would have subscribed to in 2000-2001?

12       A      I will say probably not.  I just don't

13    recall any.

14       Q      Did the individuals in your technology

15    group utilize the internet to perform research

16    in 2000-2001?

17       A      Modestly, perhaps.  Perhaps Tara

18    Hedlund as a newer employee did, personally, I

19    did not use the internet.

20       Q      Did Turner receive information

21    disseminated by securities issuers themselves?

22       A      The companies?

23       Q      Yes.

24       A      We would have, yes.

25       Q      Would you have received press releases

1    from Oracle Corporation during 2000-2001?

2         A      The likelihood is yes, but it would

3    have been through First Call, because First Call

4    distributes that information.  I would say it

5    would be likely that we didn't receive them

6    directly.

7         Q      If you received information from

8    securities issuers through First Call, would you

9    have reviewed information relative to the

10   companies for whom you had invested in?

11             MR. BRITTON:  Objection to form.

12        A      Perhaps, not as thoroughly as the

13   comments from the brokerage firms.

14        Q      Do you recall one way or the other

15   whether or not you read information disseminated

16   by Oracle Corporation through First Call in

17   2000-2001?

18        A      No.

19             (Turner Investment Exhibit 9 marked

20        for identification as of this date.)

21   BY MR. SCHMELTZ

22        Q      I'm going to hand you what I have

23   marked as Turner Investment Exhibit 9.

24             I am one shy of exhibits.

25             For the record, my document is Bates

**6/14/2005  Turner, Robert E**

1              Do you see that?

2      A     Yes.

3      Q     Did you have any understanding in late

4   2000, as to whether or not Oracle was having

5   problems delivering on its E-Business software?

6      A     I don't recall.

7      Q     Do you recall that Oracle's E-Business

8   software was a fairly new release by late 2000?

9      A     No.

10     Q     Do you recall any conversation or

11  noise in the market about Oracle's E-Business

12  software being buggy?

13     A     No.

14     Q     Would that have been an issue that you

15  would have been concerned about in late 2000,

16  early 2001?

17     A     It would have been a data point that

18  would have been considered.  All pieces of

19  public information we try to consider in our

20  decision-making process.

21     Q     Did you have an understanding as to

22  whether or not Oracle's customers were satisfied

23  with its E-Business software in late 2000, early

24  2001?

25             MR. BRITTON:  Objection to form.

```
1              THE VIDEOGRAPHER:  Going off record at
2       13:52.
3              (Recess taken)
4              THE VIDEOGRAPHER:  Coming back on
5       record, beginning of tape four, at 13:53.
6   BY MR. SCHMELTZ
7       Q    Sir, do you have an understanding of
8   the difficulty of forecasting earnings for many
9   software companies?
10      A    Yes.
11             MR. BRITTON:  Objection to form.
12  BY MR. SCHMELTZ
13      Q    And what's your understanding?
14      A    Really, any projection, whether it's
15  software or hardware, machinery sales, it's just
16  difficult.
17      Q    Why?
18      A    Because the future is never perfectly
19  clear.
20      Q    Do you have an understanding, with
21  respect to software companies, with the concept
22  of the hockey stick effect?
23      A    I may not use that exact phrase, but
24  my understanding is software companies have the
25  bulk of their sales toward the end of the
```

1    quarter, if that's what you are referring to.

2        Q    It is.

3            And why is that, sir?

4            MR. BRITTON:  Objection to form, calls

5        for speculation.

6        A    It seems that the buyers have learned

7    that they can get discounts if they hold out

8    until the end of the quarter.

9        Q    Did you have an understanding one way

10   or the other as to whether that hockey stick

11   effect made it difficult for software companies

12   to track their revenues vis-a-vis their earnings

13   projections through the course of a quarter?

14           MR. BRITTON:  Objection, calls for

15       speculation.  Incomplete hypothetical.

16       A    I would say it's generally been a

17   pattern in software, where the bulk of the sales

18   do happen at the end of the quarter.  So, when

19   you say --

20       Q    I can, I can rephrase.  I don't want

21   to cut you off, but I can help you out.

22       A    Go ahead, yeah.

23       Q    So, if a software company were to say

24   midway through its quarter, we think we are on

25   track to make our earnings, given what you know

```
1    about the hockey stick, what would you

2    anticipate?  How much credibility would you put

3    into that statement?

4              MR. BRITTON:  Objection to form, vague

5         and ambiguous, incomplete hypothetical.

6         Calls for speculation.

7         A    Credibility with some skepticism,

8    acknowledging that it's hard to tell at that

9    point during the quarter.

10             MR. SCHMELTZ:  I'm going to hand you

11        what I will mark as Deposition Exhibit 13.

12             (Turner Investment Exhibit 13 marked

13        for identification as of this date.)

14             MR. SCHMELTZ:  For the record, this is

15        a December 12, 2000 J.P. Morgan Securities,

16        Inc. Equity Research document.

17        Q    Take a look at this and let me know if

18   you recognize this document, sir?

19        A    Okay.  I have read the document, but I

20   don't recognize it.

21        Q    It's fair to say that this J. P Morgan

22   Securities Inc. Equity Research Bulletin is the

23   type of bulletin that Turner Investment Partners

24   would have had access to through First Call?

25             MR. BRITTON:  Objection, foundation.
```