EXHIBIT 38

# Morgan Stanley | *Online*

PO Box 5050, Sandy, UT 84070
(800) 688-6896

Page 1 of 3
05/02/05 01:49 PM

| | | |
|---|---|---|
| Acct Info: | DZUNG VAN CHU &<br>THANHNHAN NGUYEN JT TEN | From: 10/18/1995<br>To: 12/31/2004 | Acct #:<br>Phone: |

## Trade Details

| Security Type | Trans Date | Type | Symbol | Security | Qty | Unit Price | Comm | Amount |
|---|---|---|---|---|---|---|---|---|
| Stocks | 10/05/2001 | Sell | ORCL | ORACLE CORP | 2,900.00000 | $13.6600 | $2.03 | $39,610.64 |
| Stocks | 10/05/2001 | Sell | ORCL | ORACLE CORP | 3,600.00000 | $13.6710 | $2.52 | $49,211.43 |
| Stocks | 10/05/2001 | Sell | ORCL | ORACLE CORP | 4,000.00000 | $13.6720 | $3.75 | $54,682.42 |
| Stocks | 10/05/2001 | Sell | ORCL | ORACLE CORP | 4,500.00000 | $13.6700 | $3.15 | $61,509.79 |
| Stocks | 10/05/2001 | Sell | ORCL | ORACLE CORP | 5,000.00000 | $13.6500 | $3.50 | $68,244.22 |
| Stocks | 08/29/2001 | Buy | ORCL | ORACLE CORP | 7,000.00000 | $13.5100 | $9.80 | $94,579.80 |
| Stocks | 08/29/2001 | Buy | ORCL | ORACLE CORP | 2,000.00000 | $13.5300 | $3.75 | $27,063.75 |
| Stocks | 08/29/2001 | Buy | ORCL | ORACLE CORP | 10,000.00000 | $14.1900 | $14.95 | $141,914.95 |
| Stocks | 08/29/2001 | Buy | ORCL | ORACLE CORP | 1,000.00000 | $13.4900 | $1.40 | $13,491.40 |
| Stocks | 08/27/2001 | Sell | ORCL | ORACLE CORP | 500.00000 | $15.0000 | $0.70 | $7,499.05 |
| Stocks | 08/27/2001 | Sell | ORCL | ORACLE CORP | 500.00000 | $15.0010 | $1.65 | $7,498.59 |
| Stocks | 08/27/2001 | Sell | ORCL | ORACLE CORP | 7,000.00000 | $14.9900 | $9.80 | $104,916.70 |
| Stocks | 08/27/2001 | Sell | ORCL | ORACLE CORP | 2,000.00000 | $14.9800 | $2.80 | $29,956.20 |
| Stocks | 08/24/2001 | Buy | ORCL | ORACLE CORP | 200.00000 | $15.0500 | $1.03 | $3,011.03 |
| Stocks | 08/24/2001 | Buy | ORCL | ORACLE CORP | 2,000.00000 | $14.9900 | $6.25 | $29,986.25 |
| Stocks | 08/24/2001 | Buy | ORCL | ORACLE CORP | 3,000.00000 | $14.9700 | $8.70 | $44,918.70 |
| Stocks | 08/24/2001 | Buy | ORCL | ORACLE CORP | 4,800.00000 | $15.0400 | $13.92 | $72,205.92 |
| Stocks | 06/29/2001 | Sell | ORCL | ORACLE CORP | 5,400.00000 | $19.8200 | $7.56 | $107,016.87 |
| Stocks | 06/29/2001 | Sell | ORCL | ORACLE CORP | 2,100.00000 | $19.8500 | $3.89 | $41,679.72 |
| Stocks | 06/29/2001 | Sell | ORCL | ORACLE CORP | 2,500.00000 | $19.8300 | $3.50 | $49,569.84 |
| Stocks | 06/28/2001 | Buy | ORCL | ORACLE CORP | 9,500.00000 | $19.0500 | $13.30 | $180,988.30 |
| Stocks | 06/28/2001 | Buy | ORCL | ORACLE CORP | 500.00000 | $19.0600 | $1.65 | $9,531.65 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 600.00000 | $18.2400 | $0.42 | $10,943.21 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 700.00000 | $18.2300 | $0.49 | $12,760.08 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 1,100.00000 | $18.2700 | $0.77 | $20,095.56 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 11,000.00000 | $18.2800 | $8.65 | $201,064.64 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 700.00000 | $18.2600 | $0.49 | $12,781.08 |
| Stocks | 06/27/2001 | Sell | ORCL | ORACLE CORP | 5,900.00000 | $18.2500 | $4.13 | $107,667.28 |
| Stocks | 05/22/2001 | Buy | ORCL | ORACLE CORP | 9,000.00000 | $18.4300 | $12.60 | $165,882.60 |
| Stocks | 05/22/2001 | Buy | ORCL | ORACLE CORP | 10,000.00000 | $17.7200 | $14.95 | $177,214.95 |
| Stocks | 05/22/2001 | Buy | ORCL | ORACLE CORP | 1,000.00000 | $18.4400 | $2.35 | $18,442.35 |
| Stocks | 04/17/2001 | Sell | ORCL | ORACLE CORP | 1,000.00000 | $16.2700 | $14.95 | $16,254.50 |
| Stocks | 04/12/2001 | Buy | ORCL | ORACLE CORP | 1,000.00000 | $15.6900 | $14.95 | $15,704.95 |
| Stocks | 03/12/2001 | Sell | ORCL | ORACLE CORP | 5,005.00000 | $15.4375 | $14.95 | $77,247.16 |
| Stocks | 03/07/2001 | Sell | ORCL | ORACLE CORP | 2,033.00000 | $18.5625 | $0.00 | $37,736.30 |
| Stocks | 02/21/2001 | Buy | ORCL | ORACLE CORP | 1,962.00000 | $23.6250 | $0.00 | $46,350.70 |
| Stocks | 02/13/2001 | Sell | ORCL | ORACLE CORP | 1,000.00000 | $23.8125 | $0.00 | $23,811.70 |
| Stocks | 01/23/2001 | Buy | ORCL | ORACLE CORP | 10,000.00000 | $31.7500 | $14.95 | $317,514.95 |
| Stocks | 01/12/2001 | Sell | ORCL | ORACLE CORP | 1,000.00000 | $33.6250 | $14.95 | $33,608.92 |
| Stocks | 01/11/2001 | Buy | ORCL | ORACLE CORP | 1,000.00000 | $33.6875 | $14.95 | $33,702.45 |
| Stocks | 06/17/1999 | Sell | ORCL | ORACLE CORP | 1,000.00000 | $33.2500 | $14.95 | $33,233.94 |
| Stocks | 06/16/1999 | Buy | ORCL | ORACLE CORP | 1,000.00000 | $33.2500 | $14.95 | $33,264.95 |
| Stocks | 01/30/1998 | Sell | ORCL | ORACLE CORP | 500.00000 | $23.5000 | $34.00 | $11,715.60 |
| Stocks | 01/29/1998 | Buy | ORCL | ORACLE CORP | 500.00000 | $22.6875 | $34.00 | $11,377.75 |
| Stocks | 12/05/1997 | Sell | ORCL | ORACLE CORP | 370.00000 | $31.0000 | $34.00 | $11,435.61 |

We are pleased to provide the summary of account activity that you requested. This report is for information purposes only. This report does not reflect all the activity in your account. This report does not constitute the Firm's record of your account and is not part of your account statement. This report was obtained from sources considered reliable; however, the accuracy of the data is not guaranteed.

Morgan Stanley Online and Morgan Stanley are service marks of Morgan Stanley Dean Witter & Co. Services are offered through Morgan Stanley DW Inc., member SIPC.

EXHIBIT 39

**Exhibit 39, a copy of account statements for Dzung Chu, has been lodged with the Court separately under seal pursuant to the Revised Stipulated Protective Order Governing Confidentiality, entered by the Court on Jan. 11, 2005**

EXHIBIT 40

Pages 1 - 161

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

IN RE:                              )
                                    )  Case No. C01-0988 MJJ
ORACLE SECURITIES LITIGATION        )
                                    )  Tuesday
_____      )  March 1, 2005
                                    )  11:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

COPY

**APPEARANCES:**

**For Plaintiff:**              LERACH, COUGHLIN, STOIA, GELLER
                                   Rudman & Robbins LLP
                                100 Pine Street
                                Suite 2600
                                San Francisco, California 94111
                        BY:     **MARK SOLOMON, ESQ.**
                                **SHAWN A. WILLIAMS, ESQ.**
                                **MONIQUE WINKLER, ESQ.**
                                **WILLOW RADCLIFFE, ESQ.**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

```
 1   APPEARANCES:   (CONTINUED)

 2

 3   For Defendant:            MAYER, BROWN, ROWE & MAW
                               190 South LaSalle Street
 4                             Chicago, Illinois 60603-3441
                          BY:  ALAN N. SALPETER, ESQ.
 5                             JAVIER H. RUBINSTEIN, ESQ.
                               LEE H. RUBIN, ESQ.
 6                             ELI GREENSTEIN, ESQ.
                               SHIRISH GUPTA, ESQ.
 7

 8

 9   Also Present:             James C. Maroulis, Esq.
                               Senior Corporate Counsel
10                             Oracle Corporation

11

12                             Andy Rudolph
                               Forensic Accountant
13                             Lerach, Coughlin, Stoia, Geller,
                                  Rudman & Robbins, LLP
14

15

16                         —   —   —   —

17

18

19

20

21

22

23

24

25
```

1    **THE COURT:**  Yes.

2    **MR. SOLOMON:**  And I just want to add, this is the

3    first time today I have ever heard a suggestion that the people

4    that are relevant in this case should be limited to employees

5    during the class period.  I have never heard that before.

6    **THE COURT:**  I don't even know that that was the

7    import of his comment, but in any event it certainly won't be

8    the limitation.

9    All right.  The area according to the files to be

10   searched is the 53 individuals identified by the defendants,

11   plus the area vice-presidents' files in all three sales

12   consulting divisions identified in the letter.

13   The parties are directed to -- with respect to any

14   other individual files that in addition to these may, based on

15   specific information learned by plaintiff's counsel, have

16   discoverable information to meet-and-confer on those requests

17   for file reviews.

18   And, obviously, we are going to have to have some

19   kind of a process for if, I would love to say or when, that

20   process breaks down and we will get to that at the end.

21   Okay.  Second, the second area is discovery to be

22   taken from defendants under economy and the impact on sales and

23   the -- sales revenue and earnings.

24   It seems to me you have got an agreement on the

25   subject matter, okay, and now we have an order to the times to

1 │ be searched, right?

2 │       Product functionality.  This is the question of the

3 │ scope of the discovery on the bugs essentially with 11i or any

4 │ customers or problems with 11i.

5 │       It seems to me that just my initial reaction to this

6 │ is that on one level defendants are correct.  This is not a

7 │ case about were there bugs in the software.  On another level

8 │ if the number of problems, even if there weren't integration

9 │ problems, rose to some level, it would make those statements

10 │ which are focused on integration false in yet another respect.

11 │ And that is to say, the product doesn't really work in a

12 │ material way.

13 │       I mean, because embedded in those statements, and

14 │ some of them directly, is this is a good product.  It works and

15 │ some of its features are that it doesn't have integration or

16 │ interoperability problems.

17 │       I think most of the discovery has to focus on those

18 │ last couple of issues, but some level of investigation into

19 │ more generally.  What were the dimensions of the other sorts of

20 │ problems with the software I think is appropriate.

21 │       Given that view it has to -- it probably is at a

22 │ pretty high level, not on the ground.  Because it's going to

23 │ have to rise to a very high level to directly implicate these

24 │ statements.

25 │       I don't think by learning every defect that any

1  customer found with the product advances the ball.  So I don't
2  -- I don't think we can go quite that broadly.

3          Part of -- I guess I wanted to talk about whether or
4  not some of the problems with the dimensions of the search for
5  just general bugs in the software is solved by the fact that we
6  have limited the number of file we are going into.

7          **MR. RUBINSTEIN:**  Your Honor --

8          **THE COURT:**  In other words, if I asked you to produce
9  every document in the files of the people that you are
10 searching related to any bugs in the software, is that much
11 different a project than searching these files for anything
12 else?

13         **MR. RUBINSTEIN:**  Your Honor, I think it would
14 because, obviously, this was a massive and complex piece of
15 software and so to expand to all bugs for any purpose I think
16 would dramatically expand the discovery inquiry.  I think that
17 the way --

18         **THE COURT:**  Why is that?  Wait.  You go to an area
19 vice-president and you search his files.  How does it change
20 that search if you are also looking for any comments in there
21 about bugs and patches?

22         **MR. RUBINSTEIN:**  Because there may be hundreds of
23 thousands of bugs, many of which are not of any significance.
24 So what we are proposing is --

25         **THE COURT:**  I don't want to get -- you are not

# EXHIBIT 46

Not Reported in F.Supp.
1993 WL 623310 (C.D.Cal.), Fed. Sec. L. Rep. P 98,092
(Cite as: 1993 WL 623310 (C.D.Cal.))

Page 2



**Motions, Pleadings and Filings**

United States District Court, C.D. California.
In re QUARTERDECK OFFICE SYSTEMS, INC.
SECURITIES LITIGATION.
**No. CV 92-3970-DWW(GHKx).**

Sept. 30, 1993.

DAVID W. WILLIAMS, District Judge.

NATURE OF ACTION
*1 Named plaintiffs are Mrs. Harriet Roth and Mr. Abraham S. Elias. Mrs. Roth purchased 300 shares of stock in Quarterdeck Office Systems, Inc. ("Quarterdeck") on October 4, 1991. Mr. Elias purchased 100 shares of stock in Quarterdeck on September 26, 1991. Defendants are Quarterdeck, its officers and directors, including outside directors Casilli, LaHaye and Morgan and three venture captial firms, Genesis Capital, Peregrine Ventures and Firebird Partners which own 17%, 17.1% and 4% of Quarterdeck stock, respectively.

On June 11, 1991, Quarterdeck offered securities to the public for the first time in its Initial Public Offering ("IPO"). In the four quarters following the IPO, Quarterdeck experienced positive results in the form of increased net sales and earnings per share. On July 1, 1992, Quarterdeck issued a press release stating that it anticipated that net sales and earnings would decline and that revenues and earnings would be below analyst expectations for the quarter. The stock market reacted to this press release and the price of Quarterdeck's stock dropped 57%.

The next day, July 2, 1992, plaintiffs had their attorneys file a securities fraud action against defendants on behalf of themselves and others, except defendants, who had purchased securities between June 11, 1991 and July 2, 1992. Subsequently, Milberg, Weiss, Bershad, Hynes & Lerach, the firm that currently represents plaintiffs, was associated in

as co-lead counsel. Since the filing of the initial complaint, plaintiffs amended their complaint once as of right, the court dismissed their first amended complaint with leave to amend pursuant to defendant's motion under Fed.R.Civ.P. 12(b)(6) and the court dismissed the second amended complaint *sua sponte* under Fed.R.Civ.R. 8(a). The court denied defendants' subsequent motion to dismiss the third amended complaint, although the court conceded that there might be support for any early motion for summary judgment.

Plaintiffs' third amended complaint asserts two claims for relief under the federal securities laws. Plaintiffs' first claim, brought under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, alleges that the prospectus and registration statement that defendants filed before the IPO contained material misstatements and omissions. Plaintiffs' second claim, brought under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78 and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, alleges that defendants misrepresented and concealed Quarterdeck's then current and future financial condition, management, earnings, future business prospects and products throughout the class period. Plaintiffs also allege violations of California Corporations Code § § 24501 and 25501, based on the same conduct.

NATURE OF MOTION
Plaintiffs bring this motion to certify this case as a class action, pursuant to Fed.R.Civ.P. 23 ("Rule 23"). Defendants oppose the motion for class certification on the grounds that (1) the named plaintiffs lack standing to represent the class in the § 11 claim; (2) the named representatives are inadequate to represent the class' interests; and (3) the claims of the named plaintiffs are atypical. The court heard oral argument on the motion on September 20, 1993 and took the matter under submission.

DISCUSSION
I. STANDARDS FOR CLASS ACTION UNDER RULE 23(a)

*2 "The district court is given broad discretion to determine the maintainability and the conduct of class

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

1993 WL 623310 (C.D.Cal.), Fed. Sec. L. Rep. P 98,092
**(Cite as: 1993 WL 623310 (C.D.Cal.))**

actions." *Kassover v. Computer Depot, Inc.,* 691 F.Supp. 1205, 1213 (D.MN1987); *accord, Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir.1975). In a class action, the burden is on the plaintiff to establish a prima facie showing that the prerequisites in Rule 23 are met. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). "For a plaintiff to obtain class certification, the court must find: (1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). "[T]wo additional requirements must be met to certify a class pursuant to Rule 23(b)(3): (5) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (6) a class action is superior to other means of adjudicating the controversy." *In re United Energy Corporation Solar Power Modules Tax Shelter Investments Securities Litigation,* 122 F.R.D. 251, 253 (C.D.CA1988). Failure to meet any one of the requirements of Rule 23(a) destroys the class action. *Rutledge,* 511 F.2d 668.

A. § 11 CLAIM

1. Standing of Named Defendants

Defendants' first argument in opposition to class certification is that the named plaintiffs lack standing to bring a class under § 11 because they have not shown that their stock can be traced to the registration statement. Thus, defendants contend that plaintiffs cannot assert a § 11 claim for themselves and cannot represent the class on this claim. Plaintiffs counter this argument with the allegation that standing under § 11 is an inappropriate consideration in a motion for class certification and that they make sufficient allegations of tracing to support their § 11 claim.

Addressing the procedural issue first, it is true that this court will not decide the merits of plaintiffs' claims on a motion for class certification. *Hanon,* 976 F.2d at 509. However, this court is " 'at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case' " *Id.* In the instant case, plaintiffs' standing or lack thereof relates to the typicality of their claims and whether they can adequately represent the absent plaintiffs as required under Rule 23, so it is a proper subject to

consideration.

2. Requirements under § 11

"In order to have a valid § 11 cause of action, [the plaintiff] must plead and prove that his stock was issued pursuant to the particular registration statement alleged to be defective." *Abbey v. Computer Memories, Inc.,* 634 F.Supp. 870, 872 (N.D.Cal.1986).

In the instant case, plaintiffs assert, on the basis of information and belief, that the stock that the named plaintiffs purchased was "issued pursuant to Quarterdeck's June 11, 1991 Registration Statement." Third Amended Complaint, Para. 2. Plaintiffs admit that they did not purchase their stock at the IPO. *See* Roth Depo. p. 134, 137; Elias Depo. p. 34. Thus, they cannot trace their stock directly to the registration statement. However, plaintiffs argue that they need only show that "it is more probable than not that [their] shares are traceable to the registration statement." Reply pp. 29-30. On this basis, plaintiffs assert that because 97% of the shares outstanding when plaintiffs purchased their shares were issued pursuant to the registration statement, [FN1] the probability favors a finding that plaintiffs' shares were registered shares. *Id.*

3. Application

*3 Plaintiffs' statistical argument has been rejected by numerous courts addressing the issue. [FN2] The court in *Abbey,* 634 F.Supp. at 874, addressed a fact pattern that is virtually identical to the facts before this court. In *Abbey,* the plaintiff purchased 9,000 shares one week after the offering that formed the basis of his § 11 claim. The company offered 2 million shares of common stock, adding to the 9 million shares of common stock already outstanding. Based on the fact that he purchased the stock within one week of the offering and the fact that 18 percent of the shares outstanding after the offering were new shares, the plaintiff argued that it was more probable than not that his shares were newly registered shares. The court rejected the plaintiff's argument, stating: "[Plaintiffs'] argument is inconsistent with the existing precedent.... Courts have uniformly interpreted § 11 as requiring more than a showing that a plaintiff's stock 'might' have come from the relevant offering." *Id.* at 874-875. Accordingly, the court granted defendants' motion for summary judgment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' situation is analogous to the plaintiff's situation in *Abbey* because plaintiffs attempt to use statistical analysis to show that their shares "might" have been registered shares. This speculative basis for standing, without more, is insufficient for the purposes of § 11. *See* cases cited in fn. 2 *supra.* Plaintiffs' lack of standing to bring the § 11 claim indicates that their claims are not typical of the claims alleged by the class and that they could not adequately represent the class on this basis. Further, lack of standing would be a unique defense which would absorb a considerable amount of plaintiffs' time and divert attention from the other claims. [FN3]

Accordingly, the court denies certification of named plaintiffs as class representatives on this basis.

Although named plaintiffs' lack of standing provides adequate grounds for denying certification since it indicates that their claims are atypical and that they are unable to represent the class adequately, the court will apply the factors of Rule 23(a).

**B. APPLICATION OF RULE 23(a) TO § 10(b) AND § 11**

1. Numerosity of the Class

Where the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied. *Orantes-Hernandez v. Smith,* 541 F.Supp. 351 (C.D.Cal.1982). In the instant case, plaintiffs allege that Quarterdeck has 19.8 million shares of common stock outstanding, that an average of 287,100 shares are traded daily on NASDAQ and that 7.7 million shares were traded on July 1, 1992, alone, when defendants issued their press release. Defendants do not counter this allegation, nor do they contend that the potential class is not sufficiently numerous. Given the nature of this action and the uncontested allegations above, it is fair to conclude that the potential class is numerous and that its size would render joinder impracticable.

2. Questions of Law or Fact Common to the Class

**\*4** "Class relief is 'particularly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' " *General Telephone Company of the Southwest v.* *Falcon,* 457 U.S. 147, 155 (1982). Defendants do not contest that there are questions of law and fact common to the class. A reading of the facts section of the third amended complaint supports plaintiffs' allegation that there are such common allegations of fact and law. *See* Third Amended Complaint; Motion, p. 1.

3. Typicality of Class Representatives' Claims

a. The Standard

"A plaintiff's claim meets [the typicality] requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory. The test generally is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Schwartz v. Harp,* 108 F.R.D. 279, 282 (C.D.Cal.1985).

b. Application

In the instant case, the complaint describes the claims of all potential plaintiffs as arising from the same conduct by the defendants. Further, the legal grounds for recovery are the same in each instance. However, defendants challenge the typicality of the named plaintiffs' claims on the grounds that defendants have a unique defense against named plaintiffs' based on their § 11 claims, that they possess experience in the stock market that may defeat their claims of reliance and that defendants lack understanding of the grounds for bringing the action. The presence of these unique defenses is an adequate ground for denying a motion to certify a class action if class representation will suffer because the named plaintiffs are preoccupied with combatting unique defenses. *Hanon,* 976 F.2d at 508.

(i) Defense to § 11 Claim

As discussed in the standing section of this memorandum, *supra,* the primary obstacle to class certification is that the named plaintiffs' lack standing to bring a § 11 claim on behalf of themselves or the class. Further, if named plaintiffs were certified as class representatives, defendants would have a unique defense against the named plaintiffs' § 11 claims because they lack standing since they did not purchase their stock at the IPO and they do not

Not Reported in F.Supp.                                                                                                          Page 5
1993 WL 623310 (C.D.Cal.), Fed. Sec. L. Rep. P 98,092
(Cite as: 1993 WL 623310 (C.D.Cal.))

adequately trace their stock. Given the importance of the § 11 claim and the fact that the defense against named plaintiffs might dominate, named plaintiffs cannot be certified as class representatives for this claim.

### (ii) Experience in Stock Market

Defendants contend that the named plaintiffs' prior experience as representatives in other securities actions and their general exposure to the stock market render their claims atypical. The Ninth Circuit addressed a similar issue in *Hanon*. In *Hanon*, the named plaintiff was a sophisticated investor in securities who had only purchased ten shares of stock in the defendant company and in seven other similar companies at the same time and who had previously brought four separate derivative suits against publicly-held corporations. In affirming the district court's refusal to certify the plaintiff as a class representative, the court found that the plaintiff's unique background and factual situation would subject him to unique defenses regarding his reliance on the integrity of the market. *Hanon, 976 F.2d at 508.* The court cited Hanon's extensive prior securities litigation experience, his relationship with his lawyers, his practice of buying a small number of shares in a corporation and his uneconomical purchase of only ten shares. *Id.*

**\*5** In the instant case, both Mrs. Roth and Mr. Elias are named plaintiffs in other securities actions. Further, both appear to be knowledgeable about and have considerable experience in the stock market. (Roth Depo. pp. 12-13, 25-29, 34; Elias Depo. pp. 21-39). Mr. Elias, in particular, is also very skilled in computers putting him in a somewhat different class from the typical investor in Quarterdeck stock. In addition, although the plaintiffs in this case purchased more shares than the plaintiff in *Hanon,* they only represent 400 shares between them. Thus, plaintiffs' background and experience make their claims atypical and support denying the motion for class certification.

### (iii) Named Plaintiffs' Knowledge of Claims

Defendants attack plaintiffs' lack of knowledge about their claims as grounds for denying certification. In support of their contentions, defendants point to discrepancies between plaintiffs' understanding of their claims and the way they are articulated in the complaint. *See* Roth Depo. pp. 70-72 (where Mrs.

Roth attributed an earnings projection of 71 cent per share to the company rather than an analyst, as the complaint stated); Elias Depo. pp. 50-53 (where Mr. Elias stated that the basis for his claims is that the insiders at Quarterdeck dumped their stock without telling the public of problems in the company and did not mention the other bases listed in the Complaint). Plaintiffs' lack of knowledge is not decisive as regards the typicality of their claim, but it is more relevant to the discussion of the adequacy of their representation of the class. *See* discussion *infra.*

### 4. Adequacy of Representation by Named Plaintiffs

"The adequacy of representation requirement of Rule 23 is comprised of two factors: 1) that the representative party's attorney be qualified, experienced and generally able to conduct the litigation; and 2) that the suit not be collusive and plaintiffs' interests not be antagonistic to those of the remainder of the class." *In re United Energy Corp., 122 F.R.D. at 257.* "In determining adequacy, the court must scrutinize the ability of the named representatives to represent the interest of the class fairly and adequately." *Id.* (citing *In re Diasonics Securities Litigation, 599 F.Supp. 447, 452 (N.D.Cal.1984); accord, Rutledge, 511 F.2d at 673.*

#### a. Qualifications of Plaintiffs' Counsel

Counsel for plaintiffs have provided a copy of their firm resumes in support of their competency to pursue this action on behalf of the plaintiffs. *See* Opp.Exhs. C & D. Defendants do not dispute the qualifications of plaintiffs' counsel.

#### b. Named Plaintiffs' Ability to Represent the Class

Defendants attack plaintiffs' ability to adequately represent the class on the grounds of their lack of knowledge about the case and their abdication of their role as fiduciaries for the class to their attorneys. "A plaintiff subject to unique defenses, especially as to his credibility and his demonstrated lack of familiarity with the suit, is an inadequate class representative." *Kassover, 691 F.Supp. at 1213.* In *Kassover,* the named plaintiff's deposition showed that he was not familiar with important aspects of the litigation; that he had no facts to support important allegations in the complaint; and that plaintiff relied solely on his attorney's direction of the case, creating a potential conflict of interest. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*6** In the case at hand, the named plaintiffs are not familiar with the changes in the various amended complaints filed on behalf of the class. For instance, they were unaware that defendants who signed the registration statement were dropped as defendants and allowed to join the plaintiffs' class in the third amended complaint (Roth Depo. 143:21-144:3 and 153:4-154:20; Elias Depo. 17:10-20); they were unaware whether the net worth of the defendants would be sufficient to provide the amount of damages requested (*Id.*); and they relied on investigations by counsel to support their claims. Mrs. Roth also stated that she would leave the conduct of the litigation to her attorneys to vigorously pursue the case. (Roth Depo. 148:25- 149:7) The named plaintiffs are true "stand-in" parties, selected by lawyers to fill a required role. They both live on the East Coast while their lawyers are based in San Diego, California. Neither had any participation in the decision to drop certain defendants or whether the class received any consideration from the dropped defendants or whether their net worth would make them a lucrative source of damages, if proven liable. Neither seemed to even care. (Roth Depo. pp. 148; Elias Depo. pp. 68, 69). Finally, neither plaintiff named current co-lead counsel, Milberg, Weiss, as their counsel, indicating that they were unsure to whom they were delegating the responsibility for pursuing the action. (Roth Depo. 58:18-59:22; Elias Depo. 72:3-6). The named plaintiffs' lack of knowledge and failure to actively pursue this case is analogous to the plaintiff's behavior in *Kassover* and provides additional grounds for denying plaintiffs' motion for certification.

c. Adverse or Conflicting Interests

Defendants do not allege and it does not appear that the named representatives have interests that conflict or are antagonistic to the interests of the class.

II. STANDARDS FOR CLASS CERTIFICATION RULE 23(b)(3)

This order does not discuss the second part of the two part test for class certification found in Rule 23 because named plaintiffs failed to meet the typicality and adequacy of representation prongs of Rule 23(a). *See* Fed.R.Civ.P. 23(b) (stating: "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied" and if one of three other tests are satisfied). *See also Rutledge*, 511 F.2d at 673 (stating, "It is now recognized that the failure of

any one of Rule 23's requirements destroys the alleged class action").

CONCLUSION

This Court denies plaintiffs' motion for class certification because (a) plaintiffs lack standing to represent the class on the § 11 claim; (b) plaintiffs are merely "stand-in" parties holding a pitifully few shares of stock who volunteer (as in prior litigation) to represent large but unidentified holders of stock who need more adequate representation and (c) because plaintiffs have failed to satisfy the typicality prong of Rule 23(a).

**\*7** The action is ORDERED dismissed.

> FN1. Plaintiffs do not dispute that thousands of unregistered shares were on the market under Rule 144 (17 C.F.R. § 230.144) at the time that they purchased their shares.

> FN2. *Kirkwood v. Taylor,* 590 F.Supp. 1375 (D.Minn.1984) (summary judgment granted after rejecting three tracing methods because they merely supported a finding that plaintiff's stock might have been registered); *Lorber v. Beeber,* 407 F.Supp. 279 (S.D.N.Y.1975) (dismissed, finding that "it is insufficient that stock 'might' have been issued pursuant to a defective statement and stating that a plaintiff must show that it actually was so issued"); *MacFarland v. Memorex Corp.,* 493 F.Supp. 631 (N.D.Cal.1980) (dismissed, stating that "alleging or proving ... that stock, purchased in the open market, might have been issued pursuant to the registration statement [was insufficient]") (cited in *Abbey,* 634 F.Supp. 870).

> FN3. "[A] named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.' " *Hanon,* 976 F.2d at 508 (internal citations omitted).

1993 WL 623310 (C.D.Cal.), Fed. Sec. L. Rep. P 98,092

**Motions, Pleadings and Filings** (Back to top)

2:92cv03970                 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7
1993 WL 623310 (C.D.Cal.), Fed. Sec. L. Rep. P 98,092
**(Cite as: 1993 WL 623310 (C.D.Cal.))**

(Jul. 02, 1992)                                   END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 41

S.D.N.Y./NYNY
01-cv-3857
Scheindlin, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second
Circuit, held at the Thurgood Marshall United States Courthouse, Foley Square, in the
City of New York, on the 30ᵗʰ day of June, two thousand and five,

Present:

      Hon. John M. Walker, Jr.,
            *Chief Judge,*
      Hon. Pierre N. Leval,
            *Circuit Judge,*
      Hon. Adrian G. Duplantier,
            *District Judge.*˙



---

John G. Miles, et al.,

                  Plaintiffs-Appellees,

        v.                                04-8026

Merrill Lynch & Co., et al.,

                  Defendants-Appellants.

---

Defendants petition for permission to appeal, pursuant to Fed. R. Civ. P. 23(f), the district court's order
granting plaintiffs' motion for class certification. Upon due consideration, it is ORDERED that the
petition is GRANTED. The parties are directed to brief, in addition to any issues they seek to argue,
the following issues:

    (1)      Whether the Second Circuit's "some showing" standard, *see In re Visa
             Check/MasterMoney Antitrust Litigation,*280 F.3d 124, 134-35 (2d Cir. 2001);
             *Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 293 (2d Cir. 1999),

---

     ˙The Honorable Adrian G. Duplantier, Senior Judge of the U. S. District Court for the
Eastern District of Louisiana, sitting by designation.

is consistent with the 2003 amendments to Fed. R. Civ. P. 23; and

(2)    Whether the presumption of reliance established in *Basic v. Levinson*, 485 U.S. 224 (1988), was properly extended to plaintiffs' claims against the non-issuer defendants and to the market manipulation claims.

The Clerk is directed to schedule this appeal and assign it to a merits panel in the normal course.

FOR THE COURT:
Roseann B. MacKechnie, Clerk

By: _____
Oliva M. George, Deputy Clerk

USCA SAO-CC

EXHIBIT 42

Not Reported in F.Supp.2d
2005 WL 88969 (N.D.Cal.)
(Cite as: 2005 WL 88969 (N.D.Cal.))

Page 2



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
In re VERISIGN, INC. Securities Litigation.
**No. C 02-02270 JW(PVT).**

Jan. 13, 2005.

Alfred Glenn Yates, Jr., Law Office of Alfred G. Yates Jr, P.C, Pittsburgh, PA, Andrew M. Schatz, Schatz & Nobel, Hartford, CT, Bernard M. Gross, Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Darren J. Robbins, William S. Lerach, Jeffrey W. Lawrence, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Mark S. Willis, Steven J. Toll, Joshua Seth Devore, Adam T. Savett, Lisa M. Mezzetti, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC, Nancy A. Kulesa, Schatz & Nobel, P.C., Hartford, CT, Randi D. Bandman, Shirley H. Huang, Lerach Coughlin Stoia & Robbins LLP, San Francisco, CA, Marc L. Godino, Braun Law Group, P.C., Los Angeles, CA, Christopher T. Heffelfinger, Berman Devalerio Pease & Tabacco, P.C., San Francisco, CA, for Plaintiff.

David Malcolm Furbush, Meredith N. Landy, O'Melveny & Myers LLP, Menlo Park, CA, Dhairat H. Shah, Ioana Petrou, Lori E. Romley, Jessica Anne Hoogs, Noah Daniel Boyens, O'Melveny Myers LLP, San Francisco, CA, Amy Freeman, Mark Wayne Robertson, O'Melveny & Myers, Los Angeles, CA, for Defendant.

Simon Bahne Paris, Spector, Roseman & Kodroff, P.C., Philadelphia, PA, Dennis J. Herman, Lerach Coughlin Stoia & Robbins LLP, San Francisco, CA, Patrick J. Coughlin, Shana Eve Scarlett, Lerach Coughlin Stoia & Robbins LLP, San Francisco, CA, for Movant.

ORDER DENYING DEFENDANTS' MOTION FOR

PARTIAL SUMMARY JUDGMENT AND
MOTION FOR
SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE SUMMARY ADJUDICATION

WARE, J.

## I. INTRODUCTION

*1 Plaintiffs initiated this securities class action lawsuit on behalf of themselves and of a proposed class of persons and entities that acquired VeriSign Corporation's ("VeriSign") common stock between January 25, 2001 and April 25, 2002, inclusive (the "Class Period"). There are four lead plaintiffs in this case: Sheet Metal Workers' Local Union No. 19 Pension Fund ("Sheet Metal"), Wilson Telephone Company, Inc. ("WTC"), Oregon Telephone Company ("OTC"), and Raymond Donnelly ("Donnelly") (collectively, the "Lead Plaintiffs"). [FN1] All four Lead Plaintiffs allegedly "suffered significant losses in connection with ... transactions in VeriSign stock during the Class Period[.]" (Plaintiffs' Consolidated Second Amended Class Action Complaint, hereinafter Second Amended Complaint, Docket Item No. 217, at 6:17-18.)

> FN1. Originally, there were six lead plaintiffs. However, two of the original six lead plaintiffs have since withdrawn from this lawsuit. Plaintiff StoneRidge Investment Partners, LLC ("StoneRidge") withdrew on April 19, 2004. See (Plaintiffs' Notice of Withdrawal of Plaintiff StoneRidge Investment Partners, LLC, Docket Item No. 196). More recently, on December 22, 2004, Plaintiff Ralph Michael ("Michael") withdrew as lead plaintiff and proposed class representative. See (Plaintiffs' Notice of Withdrawal of Ralph Michael, Docket Item No. 414). Thus, for the purposes of resolving this motion, this Court disregards as moot any arguments regarding StoneRidge and/or Michael.

Plaintiffs bring this action against VeriSign and four of its executives (collectively, the "Defendants") for violations of § § 11 and 15 of the Securities Act of 1933 ("Securities Act"), § § 10(b) and 20(a) of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2005 WL 88969 (N.D.Cal.)
(Cite as: 2005 WL 88969 (N.D.Cal.))

Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, which was promulgated under § 10(b) of the Exchange Act. Plaintiffs allege that, during the Class Period, Defendants knowingly disseminated false and misleading information about VeriSign's business operations, financial status, and future earnings prospects--and thereby artificially inflated VeriSign's stock price. Plaintiffs claim that they relied upon these misrepresentations, acquired VeriSign stock at inflated prices, and were damaged thereby. Presently before this Court is Plaintiffs' Motion for Partial Summary Judgment and Motion for Summary Judgment, or in the Alternative, Summary Adjudication (hereinafter Plaintiffs' Motion, Docket Item No. 286). This Court finds it appropriate, pursuant to Civil L.R. 7-1(b), to take Plaintiffs' Motion under submission, without oral argument, for decision based upon the papers filed by the parties. For the reasons set forth below, this Court grants Plaintiffs' Motion.

## II. BACKGROUND

VeriSign is a leader in providing Internet "trust services"--services that verify and authenticate information transmitted over the Internet. Such services enable consumers to safely transmit personal financial information (such as credit card numbers) over the Internet to complete commercial transactions.

On March 7, 2000, VeriSign announced that it would issue $21 billion in new stock to acquire Network Solutions, Inc. ("Network Solutions") and turn it into a wholly-owned subsidiary. Network Solutions operated the official registry of Internet domain names, such that anyone who wanted to register a website under the .com, .net, or .org domains had to register through Network Solutions. Network Solutions charged each website listed on its registry at least $6/year.

Although some industry analysts supported this acquisition, others questioned whether VeriSign was paying too much. This skepticism allegedly placed pressure on VeriSign "to show that it was growing at a rate greater than could have been realized by either VeriSign or Network Solutions as a stand-alone company." (Second Amended Complaint at 2:3-5.)

*2 Not long after VeriSign acquired Network Solutions, the Internet boom went bust. VeriSign's business was hit: the demand for Internet "trust services" and for new Internet domain names declined. VeriSign's stock price fell from $196/share (on the day it acquired Network Solutions) to $75/share (on January 24, 2001, the day before the Class Period).

Thereafter, Plaintiffs allege, Defendants employed "an assortment of schemes, artifices, and devices to mislead investors about both the amount and source of revenues earned by [VeriSign]." (Second Amended Complaint at 2:19-20.) In particular, Plaintiffs allege that Defendants artificially inflated VeriSign's earnings--and stock price--via improper reporting and accounting practices. For example, Plaintiffs allege that Defendants inflated VeriSign's earnings by improperly reporting revenue generated from "round trip" transactions. "Round trip" transactions are transactions wherein VeriSign would invest cash in small, private, start-up businesses ("affiliates") that otherwise could not afford VeriSign's services. In exchange for VeriSign's investment, the affiliates would purchase VeriSign's products/services. VeriSign, in turn, would report these purchases as revenue.

Furthermore, Plaintiffs allege that Defendants artificially inflated VeriSign's earnings by improperly accounting for VeriSign's investments in affiliates. VeriSign used an accounting method known as the "cost method" to account for its investments in its affiliates. The "cost method" permitted VeriSign to report at least $12 million in revenues on its financial statements during the Class Period. However, Plaintiffs allege that the "equity method"-- not the "cost method"--was the proper method of accounting for VeriSign's investments in affiliates. According to Plaintiffs, the "equity method" is proper when an investor exerts "significant influence" over its investments. Because Plaintiffs claim that VeriSign exerted "significant influence" over its affiliates, Plaintiffs claim that the "equity method" was proper. The "equity method" would not have permitted VeriSign to report *any* of the revenues received from its affiliates.

Plaintiffs allege even further that Defendants artificially inflated VeriSign's earnings by improperly encouraging VeriSign's sales force to engage in a process known as "scrubbing." "Scrubbing" is a method of double-counting: salespersons in one division would report their own sales *and* the sales of other salespersons in other departments, as if they were their own.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs claim that these practices and others led VeriSign to issue materially false and misleading statements about VeriSign's financial status. Defendants allegedly knew that its business was flagging, yet they artificially inflated VeriSign's revenues anyway. Plaintiffs claim that they relied upon these misrepresentations to their detriment.

## III. STANDARDS

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*3** A movant for summary judgment who does not have the ultimate burden of persuasion at trial has the initial burden of producing evidence negating an essential element of the non-movant's claims or showing that the non-movant does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000). If the movant does not satisfy its initial burden, the non-movant has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the movant does satisfy its initial burden of production, then the non-movant may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Id.* at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citing *Anderson,* 477 U.S. at 255); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *T.W. Elec. Serv. v. Pac. Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987).

## IV. DISCUSSION

Defendants' Motion rests upon issues of standing.

Their argument is twofold. First, Defendants argue that the Lead Plaintiffs, generally, lack standing to base their claims upon any misrepresentation made *after* the date of their last stock purchase. Second, Defendants argue that Plaintiff Sheet Metal, specifically, lacks standing to bring actions under § § 10(b) and 20(a) of the Exchange Act because it is neither a "purchaser" nor a "seller" as defined under that Act. This Court rejects both arguments.

### A. The Lead Plaintiffs Have Standing

Article III of the United States Constitution requires that federal courts exercise jurisdiction only over justiciable "cases" or "controversies." U.S. CONST. art. III, § 2. Standing is one doctrine that is used to determine whether a justiciable "case" or "controversy" exists. Standing requires that litigants have personal stakes in the matter that they are litigating. This ensures that litigants present their cases sharply. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (a plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult ... questions"). In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the United States Supreme Court noted that standing contains three elements:

**\*4** First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) 'actual or imminent, not 'conjectural' or 'hypothetical[']'.... Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be 'fairly ... trace [able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court.' ... Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

(Citations omitted). Defendants argue that the Lead Plaintiffs fail to satisfy the second of these three elements--the causation requirement.

Specifically, Defendants argue that any misrepresentation made *after* the Lead Plaintiffs' last purchase of VeriSign stock could not possibly have caused them any injury. As Defendants put it, "It is axiomatic that none of the Lead Plaintiffs could have possibly been misled into purchasing VeriSign stock

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2005 WL 88969 (N.D.Cal.)
(Cite as: 2005 WL 88969 (N.D.Cal.))

by misrepresentations made *after* they purchased their stock. Nor could the market price of the stock at the time of their purchase have been artificially inflated by an alleged misrepresentation that occurred after their purchase." (Defendants' Reply in Support of Motion for Partial Summary Judgment and Motion for Summary Judgment, or in the Alternative, Summary Adjudication, hereinafter Defendants' Reply, Docket Item No. 325, at 2:10-13.) Plaintiffs OTC, WTC, and Donnelly last purchased VeriSign stock on December 18, 2001, and Plaintiff Sheet Metal last purchased VeriSign stock on December 31, 2001. Defendants contend that misrepresentations made after said dates could not have caused injury to said Plaintiffs. Thus, Defendants conclude, "[b]ecause the Lead Plaintiffs do not satisfy [the standing doctrine's causation] requirement, they cannot represent absent class members for such a claim." (Defendants' Reply at 2:6-7 .)

Defendants' argument is a non sequitur. Their starting point is sound, but their conclusion is not. As a matter of logic, it is true that misrepresentations made *after* a person's purchase of stock could not possibly have induced that person to purchase that stock. However, as a matter of law, it does not follow that such a person "cannot represent absent class members for such a claim." Simply because certain class members were injured by misrepresentations that came *after* the Lead Plaintiffs had already acquired VeriSign stock does not mean that the Lead Plaintiffs cannot represent the class. Defendants' argument conflates Article III's standing requirements with Fed. R. Civ. P. 23's class action requirements.

The Lead Plaintiffs' individual standing is a threshold issue. (Defendants' Reply at 2:4-6); *accord O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)* ("[I]f none of the named plaintiffs purporting to represent a class establishes a requisite of a case or controversy with the defendant, none may seek relief on behalf of herself or himself or any other member of the class") *and Lierboe v. State Farm Mut. Auto. Ins. Co., 350 F.3d 1018, 1022 (9th Cir.2003)*. In the class action context, Article III standing simply requires that the class representatives satisfy standing individually. No more is required. "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." Alba Conte & Herbert Newberg, Newberg on Class Actions § 2:5 (4th

ed.2002). *See Cornett v. Donovan,* 51 F.3d 894, 897 n. 2 (9th Cir.1995) ("Thus, if the representative parties do not have standing, the class does not have standing"). Once the class representatives individually satisfy standing, that is it: standing exists. "The presence of individual standing is sufficient to confer the right to assert issues that are common to the class, speaking from the perspective of any standing requirements." Alba Conte & Herbert Newberg, Newberg on Class Actions § 2:5 (4th ed.2002). Whether the class representatives may *then* represent the claims of the class is a separate inquiry. *Id.* That inquiry is governed by Fed. R. Civ. P. 23.

*5 The Lead Plaintiffs allege that Defendants' misrepresentations, which were made prior to their individual acquisitions of VeriSign stock, artificially inflated VeriSign's stock price. The Lead Plaintiffs allege that *they* relied upon Defendants' misrepresentations, acquired VeriSign stock at artificially inflated prices, and were damaged thereby. (Second Amended Complaint at 62:21-63:2.) In Lead Plaintiffs' words, *they* "suffered significant losses in connection with their transactions in VeriSign stock during the Class Period." (Second Amended Complaint at 6:17-18.) Lead Plaintiffs seek, *inter alia,* damages to redress *their* losses. This is sufficient to establish standing.

For purposes of this motion, Defendants do not dispute that the Lead Plaintiffs *themselves* were injured in fact, or that *their* injury is fairly traceable to Defendants' alleged misrepresentations, or that *their* injury would be redressed by the relief that they seek. Instead, Defendants argue that the Lead Plaintiffs do not have standing because some putative class members were injured by misrepresentations made after the Lead Plaintiffs had already acquired VeriSign stock. Defendants would have this Court place the cart before the horse. To find standing, this Court need only find (as it does) that the Lead Plaintiffs satisfy threshold individual standing. The typicality of the Lead Plaintiffs' claims to the putative class is governed by Fed. R. Civ. P. 23. Because this Court finds that the Lead Plaintiffs have individually satisfied Article III standing, it denies Defendants' Motion against them.

B. Plaintiff Sheet Metal Has Standing

The second part of Defendants' Motion is directed specifically against Plaintiff Sheet Metal. Defendants argue that § 10(b) of the Exchange Act protects only

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2005 WL 88969 (N.D.Cal.)
(Cite as: 2005 WL 88969 (N.D.Cal.))

those "participants in securities transactions who make investment decisions." (Defendants' Motion at 10:3.) Defendants argue that Sheet Metal "does not have standing to bring a 10(b) claim ... because it did not make any investment decision to acquire or sell VeriSign securities ..." (Defendants' Motion at 8:20-23.) According to Defendants, Sheet Metal delegated complete decision-making authority to its investment managers, ·and so played "absolutely no part in the decision of its investment managers to purchase VeriSign." (Defendants' Motion at 11:11-12.) Defendants heavily rely upon a Seventh Circuit decision, _Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., 800 F.2d 177 (7th Cir.1986),_ to support their argument.

In _Congregation,_ plaintiff Congregation of the Passion, Holy Cross Province ("Congregation"), a religious organization, entrusted millions of dollars to an investment advisor to manage. Congregation conferred upon the investment advisor the "full discretion to develop and implement a prudent portfolio strategy[.]" _Congregation, 800 F.2d at 178-79._ The investment advisor used his discretion to place a number of high-risk orders with over thirty dealers. The dealers merely executed the transactions, and never offered any investment advice. The investment advisor ultimately depleted the millions of dollars entrusted to him, and Congregation sued both him and the dealers for violating § 10(b) of the Exchange Act. The Seventh Circuit affirmed summary judgment for the dealers. The court held that, under the Exchange Act, the dealers owed no duty to disclose any information to Congregation because Congregation had transferred "full authority to make investment decisions" to its investment advisor. _Id._ at 181. Defendants argue that, like Congregation, Sheet Metal transferred "full authority to make investment decisions" to its investment managers. Thus, Defendants conclude, Sheet Metal does not have standing to bring a claim under § 10(b) of the Exchange Act. This argument fails for two reasons.

1. There Is A Genuine Issue of Material Fact

**\*6** First, even if this Court assumed _arguendo_ that _Congregation_ is binding authority in this District, Defendants still have not persuaded this Court that there is no genuine issue of material fact. Undoubtedly, Defendants have satisfied their _initial_ burden of producing evidence that negates an essential element of Plaintiffs' claims. _Nissan Fire &_

_Marine Ins. Co., 210 F.3d at 1102_ ("A moving party without the ultimate burden of persuasion at trial ... has ... the initial burden of production ... on a motion for summary judgment.... In order to carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."). To support their argument that Sheet Metal did not make any investment decisions, Defendants excerpt, _inter alia,_ portions from William Doms's _[FN2]_ deposition that suggest that Sheet Metal transferred "full authority to make investment decisions" to its investment managers. For example, Doms testified that he did not know that Sheet Metal had purchased VeriSign stock until after this litigation had commenced. (Huang Decl. Ex. A 129:7-19.) Furthermore, Doms testified that neither he nor Sheet Metal ever discussed VeriSign or other specific stock purchases/sales with Sheet Metal's investment managers. (Huang Decl. Ex. A 127:8-25, 128:4-15.)

> FN2. William Doms is Sheet Metal's administrator. (Huang Decl. Ex. A 9:10-12.)

Plaintiffs respond by excerpting different portions from the same deposition that suggest that Sheet Metal actually "retained ... discretion and provided ... parameters" for Sheet Metal's investment managers to follow. (Plaintiffs' Opposition to Defendants' Motion, Docket Item No. 303, at 12:18- 19.) For example, Doms testified that Sheet Metal's investment managers only exercised discretion within the guidelines set by Sheet Metal. (Huang Decl. Ex. A 138:7-9) ("StoneRidge [one of Sheet Metal's investment managers] is given the authority to manage within the guidelines that [Sheet Metal's] trustees set ..."). Furthermore, Doms testified that Sheet Metal's trustees monitored its assets on a quarterly basis to ensure that Sheet Metal's investment managers stayed within the guidelines. (Huang Decl. Ex. A 124:17-24, 152:12-13, 153:2-8.) At least one court in this District has distinguished _Congregation_ on similar grounds. _Cox v. Bateman Eichler, Hill Richards Inc., 765 F.Supp. 601, 608 n. 3 (N.D.Cal.1990)_ (J. Patel) (_see infra_ Part IV .B.2. for a further discussion of _Cox_ ).

In analyzing a motion for summary judgment, this Court must draw all reasonable inferences in favor of the non-movant, including questions of credibility and of the weight to be accorded to particular

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence. _Masson, 501 U.S. at 520_. Drawing all reasonable inferences in favor of Plaintiffs, this Court finds that Defendants' motion for summary judgment must fail. Plaintiffs have raised a triable issue of fact. In _Congregation,_ Congregation apparently retained only the authority to increase/decrease the investment fund and ultimately to dismiss the investment advisor. _Congregation, 800 F.2d at 181._ Plaintiffs have factually distinguished _Congregation._ Plaintiffs contend that Sheet Metal's delegation of authority to its investment managers was much more restricted than Congregation's delegation of "full authority" to its investment advisor. Because this issue can potentially affect the outcome of this case, it is material.

### 2. _Congregation_ Is Not Binding Authority in this District

*7 Defendants' Motion suffers from a second infirmity: _Congregation_ is not binding authority in this District. Notably, Defendants do not cite any authority from this District or the Ninth Circuit to support their claim that "entities that entirely abdicate their investment decisions to third-parties ... cannot bring federal securities claims because they do not have standing as purchasers or sellers." (Defendants' Motion at 8.) In fact, as mentioned above, _supra_ Part IV.B.1., at least one court in the Northern District of California has expressly distinguished _Congregation._ In _Cox v. Bateman Eichler, Hill Richards Inc., 765 F.Supp. at 608 n. 3,_ Judge Patel distinguished _Congregation_ on grounds similar to those advanced by Plaintiffs here. Judge Patel noted that, unlike Congregation, which gave its investment advisor the "full discretion to develop and implement a prudent portfolio strategy," the plaintiff in _Cox_ had "set forth specific guidelines and gave express instructions on the permissible scope of investments." _Id._ Judge Patel concluded that, "Because [the plaintiffs] did not 'relinquish [ ] total control over investment decisions,' [_Congregation_ ] do[es] not govern." _Id._ The same reasoning can be applied here.

Furthermore, Plaintiffs cite multiple cases from this District that seem to undercut _Congregation'_ s legal authority. In _In re Terayon Communications Sys., Inc. Sec. Litig.,_ 2003 U.S. Dist. LEXIS 2852, at *12 (N.D.Cal. Feb. 24, 2003), Judge Patel (as Chief Judge of the Northern District of California) found a class representative adequate, despite the fact that he became aware that he had owned Terayon stock after his broker had already sold it. Judge Patel observed

that:

> It is inevitable that some, if not most, investors rely on the advice of brokers and other specialists wholly or in part. Indeed, a large number of class members in any securities class action are likely to fall in this category. The fact that an investor seeking to be a class representative is in this category does not disqualify him; in fact, he is probably representative of a large number of class members.

_Id._ Similarly, in _In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 22 (N.D.Cal.1986),_ Judge Aguilar found a class representative adequate, despite the fact that "she was a passive investor who made no decision to purchase Pizza Time stock herself but rather relied on the purchase decision of a stockbroker."

Defendants reply by arguing that this caselaw is inapposite. Defendants observe that _Terayon_ and _Pizza Time Theatre_ did not involve motions for summary judgment on the issue of standing; they involved motions for class certification. (Defendants' Reply at 7:8-20.) This observation, however, actually undermines Defendants' argument. As Defendants themselves note, standing issues are resolved _before_ class certification. "When a class has not yet been certified ..., standing must be determined based on the individual standing of the lead plaintiffs. This is a _threshold_ issue which must be addressed before a court may even consider the Rule 23 class certification requirements." (Defendants' Reply at 2:3-6.) _Terayon_ and _Pizza Time Theatre_ certified classes. Under Defendants' very own logic, then, the fact that Judges Patel and Aguilar resolved the issue of class certification suggests that there were no standing problems in appointing passive investors as class representatives.

### V. CONCLUSION

*8 For the reasons stated above, this Court denies Defendants' Motion for Partial Summary Judgment and Motion for Summary Judgment, or in the Alternative, Summary Adjudication.

2005 WL 88969 (N.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

5:02cv02270 (Docket) (May. 09, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2005 WL 88969 (N.D.Cal.)
**(Cite as: 2005 WL 88969 (N.D.Cal.))**

EXHIBIT 43



Not Reported in F.Supp.2d                                                                Page 1
2003 WL 22118979 (S.D.N.Y.)
**(Cite as: 2003 WL 22118979 (S.D.N.Y.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Dr. Stanley C. GRANDON, for himself and the
Grandon Family Irrevocable Trust,
and Michael Cafferty, as Trustee for the Grandon
Family Irrevocable Trust, on
behalf of themselves and all others similarly situated,
Plaintiffs,
v.
MERRILL LYNCH AND CO., INC., and Merrill
Lynch, Pierce, Fenner & Smith, Inc.,
Defendants.
**No. 95 Civ. 10742(SWK).**

Sept. 11, 2003.

Upon motion for certification of putative class in action against nationwide broker-dealer for violations of Section 10(b) and Rule 10b-5 and breach of fiduciary duties based on allegations that broker-dealer charged undisclosed, excessive markups on purchases of municipal securities by public, retail customers, the District Court, Kram, J., held that class action was not an appropriate vehicle since determination of excessiveness would require individualized assessment of the circumstances surrounding each transaction, and there was no showing that claims for equitable relief predominated over the claims for monetary relief.

Motion denied.

West Headnotes

**Federal Civil Procedure** ⬤━187
170Ak187 Most Cited Cases
Class action was not an appropriate vehicle for bringing action against nationwide broker-dealer for violations of Section 10(b) and Rule 10b-5 and breach of fiduciary duties based on allegations that broker-dealer charged undisclosed, excessive markups on purchases of municipal securities by public, retail customers; determination of excessiveness would require individualized

assessment of the circumstances surrounding each transaction, and there was no showing that claims for equitable relief predominated over the claims for monetary relief. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.(b)(2),(3).
Lovell Stewart Halebian LLP, New York, New York, By: Christopher Lovell, Gary S. Jacobson, Jonathan Kord Lagemann, New York, New York, Louis F. Burke P.C., New York, New York, for Plaintiffs.

Sidley Austin Brown & Wood LLP, New York, New York, By: A. Robert Pietrzak, for Defendants.

*OPINION AND ORDER*

KRAM, J.

*1 Before the Court is Plaintiffs' motion for certification of the class pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3). For the reasons set forth below, the motion for class certification is denied.

## BACKGROUND [FN1]

> FN1. As indicated below, the facts of this long-standing litigation were set forth in several previous opinions. Familiarity with these decisions, the procedural history of this matter, and the facts of the case are presumed. Only those facts necessary to this decision are included.

1. Factual Background

Merrill Lynch and Co., Inc. is the New York-based parent company of Merrill, Lynch, Pierce, Fenner & Smith, Inc., (collectively, "Merrill Lynch") a registered broker-dealer with offices throughout the United States. *See* Second Amended Complaint ("Compl.") ¶¶ 7-10. Plaintiffs Dr. Stanley Grandon ("Grandon") and Michael Cafferty, trustee for the Grandon Family Irrevocable Trust (the "Trust"), purchased municipal securities from Merrill Lynch. Com pl. ¶¶ 5-6.

On November 22, 1994, Merrill Lynch sold Grandon 90,000 municipal bonds at a price listed as 92.47, totaling $83,223.00, and 30,000 municipal bonds at a price listed as 92.47, totaling $27,741.30. Compl. ¶

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48(a). These bonds were described as "Michigan Public Power Agency Rev Ref Belle River PJ-A OID Mar 93, 5.2%, Jan 1 04 bonds." *Id.* Grandon alleges that the price charged was approximately 4.6% above the true market price of the bonds. Compl. ¶ 48(b).

On January 19, 1995, Grandon and the Trust purchased 60,000 municipal bonds from Merrill Lynch at a price listed as 87.04, totaling $52,227.00. Compl. ¶ 45(a). These bonds bore the notation "Southfield MI Pub Ses Facs Nov 93, 4.25%, May 1 04." *Id.* Grandon alleges that the price charged for these bonds was approximately 3.0% to 6.3% above the true market price. Compl. ¶ 45(a).

On August 25, 1995, Grandon purchased 45,000 municipal bonds from Merrill Lynch at a price listed as 97.414, totaling $44,246.78. Compl. ¶ 41(a). These bonds bore the description "Garden City MI Sew Disp Sys Ser B LT MBIA July 95, 5.5%, Nov. 1 11, Interest from 7/1/95, First Coupon 11/1/95" (the "Garden City Bonds"). *Id.* Grandon alleges that the price Merrill Lynch charged for these bonds was approximately 3.7% to 9.74% above the true market price. Compl. ¶ 41(b). Interest rates declined between Grandon's August 25, 1995 purchase and the August 31, 1995 month-end statement. Compl. ¶ 43(a). Plaintiffs claim that as a result of the interest rate decline, the price of the Garden City Bonds should have increased, and that because the price Merrill Lynch charged Grandon bore no reasonable relation to the true market price, the price of the Garden City Bonds was reported by Merrill Lynch as 88.78 on August 31, 1995. *Id.* Plaintiffs also claim that the fees and markups on the sale of the Garden City Bonds to Grandon were approximately three times larger than fees charged for comparable equity transactions. Compl. ¶ ¶ 23, 26(b), 27(b). Plaintiffs also claim that Merrill Lynch sent them confirmation statements, yet failed to disclose any of the aforementioned markups. Compl. ¶ 28.

II. Procedural Background

On July 22, 1997, this Court dismissed Plaintiffs' First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Merrill Lynch was under no statutory or regulatory duty to disclose markups on municipal securities. *See Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 1997 WL 411924, *5-7 (S.D.N.Y. July 22, 1997) ("*Grandon I*"). On June 19, 1998, the Second Circuit vacated *Grandon I,* and held, *inter alia,* that "there exists an implied duty to disclose markups on municipal securities when those markups

are excessive." *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 193 (2d Cir.1998) ("*Grandon II*" ). The Second Circuit left it to this Court to determine whether the previous complaint stated a claim for fraudulent undisclosed markups under Section 10(b) and Rule 10b-5. By opinion dated November 1, 1999, this Court again dismissed the previous complaint, on the grounds that "plaintiffs fail[ed] to state a claim for fraudulent undisclosed markups." *Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 1999 WL 993653, *4 (S.D.N.Y. Nov.1, 1999) ("*Grandon III*" ). This Court, however, allowed Plaintiffs to file a second amended complaint in order to conform to the standards set forth in *Grandon II.*

*2 On November 17, 1999, Plaintiffs submitted the Second Amended Complaint, which contained three causes of action. In the first cause of action, Plaintiffs alleged that Merrill Lynch committed securities fraud by charging hidden, excessive markups on municipal bond transactions, in violation of Section 10(b) and Rule 10b-5. *See* Compl. ¶ ¶ 57-60. In the second cause of action, Plaintiffs alleged that Merrill Lynch misrepresented the markups by disclosing a $4.85 "Processing Fee" while simultaneously leaving blank a box on the confirmation statements marked "Markup/Markdown," thereby implying that the only compensation Merrill Lynch received was the $4.85 fee. *See* Compl. ¶ ¶ 27-29, 62(a). In the third cause of action, Plaintiffs alleged two claims arising under state law, breach of contract and breach of fiduciary duty. *See* Compl. ¶ ¶ 64-68.

Merrill Lynch moved to dismiss the Second Amended Complaint, and by opinion dated July 18, 2001, this Court dismissed only the second cause of action and the breach of contract portion of the third cause of action. *See Grandon v. Merrill Lynch & Co.,* No. 95 Civ. 10742, 2001 WL 826092 (S.D.N.Y. July 20, 2001) ("*Grandon IV*" ). Therefore, the surviving causes of action currently before the Court are Section 10(b) and Rule 10b-5 claims, and a breach of fiduciary duty claim, each premised on the allegation that Merrill Lynch charged undisclosed, excessive markups on Plaintiffs' municipal bond purchases.

Plaintiffs now seek certification of "a class of persons who were public, retail customers of [ ] Merrill Lynch who purchased Class Bonds through or from [Merrill Lynch] between July 22, 1994, and December 20, 1995, inclusive." [FN2] Pls.' Mem. in Support of Mot. for Class Certification, dated November 12, 2002, at 1. ("Pls.' Mem."). Class Bonds are defined as municipal bonds which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. In the Second Amended Complaint, Plaintiffs reserved their right to amend the class definition in connection with their motion for class certification.

"(1) are subject to the rules of the Municipal Securities Rulemaking Board, (2) are interest paying non-accretion bonds (i.e., bonds which pay interest and are not "zero coupon bonds"), (3) are AA- or higher rated (by Standard & Poors Corp.) or are insured municipal bonds, (4) have not been deeply discounted (i.e., trade at $80.00 per bond or more, (5) have recently been issued (i.e., within two years of the transaction), (6) were publicly issued in a total face amount of $7,500,000 or greater in cost.... Compl. ¶ 39. Furthermore, the definition includes only retail customer transactions involving a par value of $20,000 or more. See Pls.' Mem. at 1, n. 1.

DISCUSSION

I. Standard of Law

Federal Rule 23 of Civil Procedure sets forth the requirements for bringing and maintaining a class action in federal court. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 133 (2d Cir.2001) (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). The Second Circuit has directed district courts to liberally interpret Rule 23, *see Korn v. Franchard Corp.,* 456 F.2d 1206, 1208-09 (2d Cir.1972), however, a court may not grant certification unless it is satisfied, after "rigorous analysis," that the Rule 23 criteria have been met. *See Dodge v. County of Orange,* 208 F.R.D. 79, 87 (S.D.N.Y.2002) (quoting *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Plaintiffs bear the burden of establishing each requirement for class certification. *See Pecere v. Empire Blue Cross and Blue Shield,* 194 F.R.D. 66, 69 (E.D.N.Y.2000).

*3 The district court must accept all of the allegations in the pleadings as true on a motion for class certification, *see Shetter Realty Corp. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978), and avoid conducting a preliminary inquiry into the merits. *See In re Indep. Energy Holdings PLC Sec. Litig.,* No. 00 Civ. 6689, 2002 WL 1059086, *1, n. 5 (S.D.N.Y. May 28, 2002) (citations omitted).

Nonetheless, the decision whether to certify a class "may involve some considerations related to the factual and legal issues that comprise the plaintiff's cause of action." *Pecere,* 194 F.R.D. at 69 (quoting *D'Alauro v. GC Servs. Ltd.,* 168 F.R.D. 451, 454 (E.D.N.Y.1996)); *see also Daniels v. City of New York,* 198 F.R.D. 409, 413, n. 5 (S.D.N.Y.2001) (the court need not rely on bare allegations but "may consider the range of proof necessary to support class certification").

In order to qualify for class certification, a plaintiff must first satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). Additionally, a plaintiff must also demonstrate that the class fits under at least one of the three subdivisions of Rule 23(b). *See Visa Check,* 280 F.3d at 133.

For purposes of this motion, the Court assumes without deciding that the requirements of Rule 23(a) are satisfied. *See In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 66 (S.D.N.Y.2002). Nevertheless, it is clear for the reasons set forth below that certification of this case under either Rule 23(b)(2) or Rule 23(b)(3) is inappropriate.

II. Analysis

A. Rule 23(b)(3)

Rule 23(b)(3) requires "that the questions of law or fact common to the members predominate over any questions affecting only individual members, and that a class action is superior to other methods for the fair and efficient adjudication of the controversy."

1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Visa Check,* 280 F.3d at 136 (internal quotation marks omitted). "Because Rule 23(b)(3) requires that common issues predominate, courts deny certification where individual issues of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fact abound." *Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125, 139 (S.D.N.Y.2003) (citations omitted).

Plaintiffs' burden on this motion is to establish that common proof will predominate at trial with respect to the essential elements of liability of the underlying causes of action. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001) (determining whether putative class should be certified requires examination of underlying cause of action); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y.1996). Frequently, the predominance requirement is not met where the resolution of individual claims for relief would require individualized inquiries. *See, e.g., Newton,* 259 F.3d at 172 (affirming denial of class certification where individual issues predominate in securities litigation under Section 10(b) and Rule 10b-5); *Binder v. Gillespie,* 184 F.3d 1059, 1063-66 (9th Cir.1999) (upholding class decertification where presumption of reliance and loss unavailable), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000); *Dunnigan,* 214 F.R.D. at 139 (finding individualized proof of liability in ERISA litigation predominates because of need to individually evaluate whether defendant's delay in making benefit determination was unreasonable); *Augustin v. Jablonsky,* No. 99 Civ. 3126, 2001 WL 770839, *13 (E.D.N.Y. Mar.8, 2001) (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592-93 (D.Conn.2000) (finding individualized proof of breach, causation, and trespass predominate where commonality was not contested).

a. Section 10(b) Claim

**\*4** To establish liability under Section 10(b) and Rule 10b-5, "[a] plaintiff must allege 'that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused [plaintiff] injury." ' *Caiola v. Citibank,* 295 F.3d 312, 321 (2d Cir.2002) (alteration in original) (quoting *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993)). Here, Plaintiffs claim that in violation of Section 10(b) and Rule 10b-5, Merrill Lynch charged undisclosed, excessive markups on purchases of Class Bonds by public, retail customers.

In *Grandon II,* the Second Circuit held that "a private action under the antifraud provision of

Section 10(b) and Rule 10b-5 exists against broker-dealers who charge undisclosed, excessive markups on municipal bonds." *Grandon II,* 147 F.3d at 193. Therefore, an implied duty to disclose markups on municipal securities exists when those markups are "excessive." *Id.* "The markup on a security is the difference between the price charged to the customer and the prevailing market price." *Grandon II,* 147 F.3d at 189 (quoting *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1469 (2d Cir.1996)). In general, a markup is excessive "when it bears no reasonable relation to the prevailing market price." *Grandon II,* 147 F.3d at 190 (quoting *Bank of Lexington & Trust Co. v. Vining Sparks Sec., Inc.,* 959 F.2d 606, 613 (6th Cir.1992)).

There are no fixed categories or numeric standards used by Courts determine whether any particular markup is excessive. *See id.* Indeed, the Municipal Securities Rule Making Board ("MSRB")   [FN3] "expressly refused to adopt a specific percentage guideline for a reasonable markup, 'in view of the heterogenous nature of municipal securities transactions and municipal securities dealers." ' *Id.* (quoting MSRB Interpretations of Rule G-30, "Report on Pricing," (Sept. 26, 1980), MSRB Manual (CCH) ¶ 3646, at 5158) ("MSRB 'Report on Pricing" ')); *see also Press v. Chemical Inv. Servs. Co.,* 166 F.3d 529, 535 (2d Cir.1999) (*"Press II"* ) (the SEC "advocates not setting bright-line markup thresholds, but, rather, considering each transaction individually, in light of all relevant circumstances"). Instead, "[w]hether a markup is excessive must be determined on a case-by-case basis." *Grandon II,* 147 F.3d at 190 (citing *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1033 (4th Cir.1997)). Such a determination "begin[s] with the factors set forth under MSRB Rule G-30." *Id.* This rule requires that the retail prices charged for municipal securities--including any markdown or markup--be "fair and reasonable, taking into consideration all relevant factors." *Id.* (quoting MSRB Rule G-30, MSRB Manual (CCH) ¶ 3646, at 5157). The MSRB factors to consider are:

> FN3. The MSRB is a self-regulating organization created by Congress in 1975, and supervised by the Securities Exchange Commission ("SEC"). *See Grandon II,* 147 F.3d at 190. The MSRB is the primary regulatory authority in the municipal securities market. *See id.*

**\*5** (1) the best judgment of the broker, dealer or municipal securities dealer as to the fair market

value of the securities at the time of the transaction; (2) the expense involved in effecting the transaction; (3) the fact that the broker, dealer, or municipal securities dealer is entitled to a profit; (4) the total dollar amount of the transaction; (5) the availability of the security in the market; (6) the price or yield of the security; and (7) the nature of the professional's business. *Id.* (quotations omitted); *see also* <u>Press II, 166 F.3d at 535</u>.

In <u>Sloan v. C.C. Collings & Co., No. 85 Civ. 3315, 1986 WL 8829 (E.D.Pa. Aug.13, 1986)</u>, where the plaintiffs alleged that they were charged excessive markups and markdowns on their purchases and sales of municipal securities, the district court denied class certification under <u>Rule 23(b)(3)</u>. The court found that deciding whether the prices charged were excessive "must proceed in an individual basis for each municipal security purchased by each proposed class member at each specific point in time." <u>Sloan, 1986 WL 8829, at *1</u>.

Each class member in the instant action must prove that the markup charged by Merrill Lynch on their purchase of a Class Bond was excessive. Such a determination, beginning with the MSRB factors, will turn on an individualized assessment of the circumstances surrounding each transaction.

First, the prevailing market price of each Class Bond at the time it was purchased must be determined. The prevailing market price "generally means 'the price at which dealers trade with one another, i.e., the current inter-dealer market." ' <u>Grandon II, 147 F.3d at 189</u> (quoting <u>Alstead, Dempsey & Co., Inc.</u>, Exchange Act Release No. 34-20825, 47 S.E.C. 1034, 1035, 1984 WL 50800, * 1 (Apr. 5, 1984)). As indicated above, the markup on a security is the difference between the price charged to the customer and the prevailing market price. Therefore, prevailing market price is a central component for determining whether the markup was excessive. *See id.* ("key issue" in markup cases "has always been how to determine 'prevailing market price' ").

"In defining the prevailing market price of a security for purposes of calculating a dealer's markup, the SEC distinguishes between dealers who are market makers [FN4] and those who are not, between markets that are competitive and those that are not, and between controlling dealers that make significant purchases in the interdealer market and those that do not." <u>First Jersey, 101 F.3d at 1469</u>. To evaluate the purchase of a Class Bond in such a fashion requires

an individualized assessment of each bond purchase at the time it occurred.

> FN4. A market maker is a dealer "who with respect to a security holds himself out ... as being willing to buy and sell such security for his own account on a regular or continuous basis." <u>15 U.S.C. § 78c(a)(38)</u>.

For example, if a dealer is a market maker for a particular municipal bond, markups on such a security "may be computed on the basis of the contemporaneous prices charged by the firm or other market makers in actual sales to other dealers or, if no such prices are available on the basis of representative asked quotations." *Id.* (quotation omitted). However, if a dealer is not a market maker at the time of purchase, and absent countervailing evidence, the SEC has announced that

> **\*6** a dealer's contemporaneous cost is the best evidence of the current market. That standard, which has received judicial approval, reflects the fact that prices paid for a security by a dealer in actual transactions closely related in time to his retail sales are normally a highly reliable indication of prevailing market price.

<u>Grandon II, 147 F.3d at 189</u> (quotation omitted). If there are no contemporaneous purchases by the dealer, other contemporaneous inter-dealer transactions are examined as evidence of the prevailing market price. *See* <u>In re Application of First Honolulu Sec., Inc.</u>, Exchange Act Release No. 34-32933, 51 S.E.C. 695, 1993 WL 380039, *2 (Sept. 21, 1993)</u>.

Second, the yield on each Class Bond must be calculated in order to demonstrate the excessiveness of a markup because yield "is the 'most important' factor in determining whether the price (including the markup) of a municipal security is fair and reasonable." <u>Grandon II, 147 F.3d at 190</u> (quotation omitted). The yield is first calculated, and then assessed against the yields of municipal securities with similar characteristics trading at the time. *See* <u>In re Mark David Anderson</u>, SEC Release No. ID-203, 2002 WL 771432, *18 (SEC ALJ Apr. 30, 2002)</u>. The yield on a Class Bond should be "comparable to the yield on other securities of comparable quality, maturity, coupon rate, and block size then available in the market." <u>Grandon II, 147 F.3d at 190</u> (quoting MSRB "Report on Pricing" at 5160). This analysis requires an individualized assessment of each Class Bond purchased by a class member.

Plaintiffs contend that they do not require yield

Not Reported in F.Supp.2d
2003 WL 22118979 (S.D.N.Y.)
(Cite as: 2003 WL 22118979 (S.D.N.Y.))

Page 6

information to compute markups, and instead would use that information to check for anomalies in the computed results. *See* Affidavit of Robert W. Lowry, dated November 12, 2002, at ¶ 32. However, as stated above, yield is the most important factor in determining whether the price charged by Merrill Lynch for a class member's purchase of a Class Bond was fair and reasonable. *Grandon II,* 147 F.3d at 190.

Plaintiffs alternatively claim that they will be able to compute yields from the class wide database they will develop. *See* Declaration of Professor Michael J. Barclay, dated January 21, 2003, at ¶ 18. Plaintiffs fail to address if and whether the database will compare the yield on each Class Bond to the yields of similar municipal securities. Such a comparison, which requires an individualized inquiry, is crucial to determining whether a markup is either fair and reasonable or excessive.

Third, the existence of a variety of maturity dates for municipal bonds also requires an individualized assessment of each Class Bond purchase. The usual practice is for the markup to be greater on a bond with a longer maturity than on a bond with a shorter maturity, "because the markup does not affect the yield on the longer-term bond as it does not short-term bond." *Mark David Anderson,* 2002 WL 771432 at *10. As a result, the same markup for two municipal bonds with different maturities could result in the markup for the longer-term bond being viewed as fair and reasonable while the markup for the shorter-term bond being deemed excessive.

*7 Furthermore, if a municipal bond has a call feature, [FN5] the maturity date will be uncertain, which affects the pricing. The MSRB has reminded dealers to consider call features in pricing municipal bonds:

> FN5. A call feature on a municipal bond gives the issuer the right to redeem the bonds at face value before the stated maturity date.

[A] municipal securities dealer in pricing securities on the basis of yield to a specific call feature should take into account the possibility that the call feature may not be exercised. Accordingly, the price to be paid by a customer should reflect this possibility and the resulting yield to maturity should bear a reasonable relationship to yields on securities of similar quality and maturity.
MSRB, *Interpretive Notice on Pricing of Callable Securities* (Aug. 10, 1979), MSRB Manual (CCH) ¶

3646 at 5158.

Fourth, the total dollar amount of the transaction needs to be considered because broker profits and transaction costs can be spread over a purchase of a larger number of bonds. The general practice is the lower the dollar amount of the trade, the higher the percent of a reasonable markup. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 955 F.Supp. 499, 519 (D.Md.1997) (dealer properly charged lowest markups on highest dollar volume transactions), *aff'd,* 132 F.3d 1017 (4th Cir.1997).

Plaintiffs argue that the class definition, which only includes Class Bond transactions of $20,000 or more, permits a generalized assessment of the markup charged on each purchase. However, this does not render all Class Bond transactions homogeneous for purposes of the MSRB rules. In a regulatory proceeding, an NASD Panel rejected an expert witness' opinion that the maximum allowable markdown would be the same whether a transaction involved $25,000 or $1 million in bonds. *See Dep't of Enforcement v. McLaughlin, Piven, Vogel Secs., Inc.,* No. C02980073, 1999 WL 33261821 (NASD Hearing Panel Sept. 1, 1999). The Panel found the opinion of the expert witness "patently at odds" with Rule G-30, which lists the total amount of the transaction as a relevant factor in determining a fair and reasonable markdown. *Id.* Accordingly, the total dollar amount of the transaction also requires the individual assessment of each class member's purchase of a Class Bond.

Fifth, the services rendered by Merrill Lynch to its customers and the fact that Merrill Lynch is entitled to earn a reasonable profit also require an individualized assessment of each purchase.
> [M]unicipal securities dealers often expend considerable time, effort, and money providing services to a customer, and this ought to be taken into account in considering the fairness and reasonableness of prices in given transactions. These services include researching credits, maintaining markets in, and current information about issues previously sold to customers, and other similar activities.
MSRB "Report on Pricing" at 5161. Determining whether the markup charged on a transaction is excessive necessitates a careful review of the work performed by the professional on behalf of a client. *See Press II,* 166 F.3d at 535 ("This was not a complex transaction, yet there were efforts expended on the part of appellees. They had to ... identify the appropriate instrument to purchase, transfer the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

instrument to Press, and complete corresponding paperwork.").

**8** Plaintiffs contend that individual questions do not predominate, and whether Merrill Lynch charged undisclosed, excessive markups on Class Bond transactions is subject to generalized proof, thus satisfying their burden under Rule 23(b)(3). Instead of addressing the individual MSRB factors, Plaintiffs argue that whether Merrill Lynch charged undisclosed, excessive markups can be proven by simply comparing those markups with the markups Merrill Lynch charged on equity transactions of similar size and value.

Plaintiffs claim that Merrill Lynch followed a firm-wide systematic policy to charge higher markups for Class Bonds than it charged for equity transactions of similar dollar amount. *See* Pls.' Mem. at 12. This policy allegedly violated regulatory and industry standards that mandate markups on municipal bonds be significantly lower than markups on equity securities. *See id.* at 11; *see also* Pls.' Reply Mem., dated Jan. 22, 2003, at 3. Therefore, Plaintiffs argue that "[i]n order to show that the markups are excessive, Plaintiffs will have to show that the markups taken by Merrill Lynch on Class Bonds are greater than those taken on equity transactions of comparable value. This comparison will be made from class members' markups calculated from the data in Defendants' equity transaction databases and will involve straightforward comparisons." Reply Affidavit of Robert W. Lowry, dated January 22, 2003 ("Lowry Reply Aff."), at ¶ 14.

Whether a markup on a municipal bond is excessive cannot be determined *solely* by comparing it with markups on an equity transactions of similar value and size. Instead, courts have repeatedly stated that determining whether markups charged on municipal bond transactions are excessive or reasonable is accomplished by analyzing the circumstances surrounding the transaction using the MSRB factors. *See, e.g., Press II,* 166 F.3d at 535; *Grandon II,* 147 F.3d at 190-91; *Banca Cremi,* 132 F.3d at 1033; *Bank of Lexington,* 959 F.2d at 613; *S.E.C. v. Rauscher Pierce Refsnes, Inc.,* 17 F.Supp.2d 985, 997 (D.Az.1998); *S.E.C. v. Feminella,* 947 F.Supp. 722, 729 (S.D.N.Y.1996). Because municipal bonds are not homogenous, such an inquiry requires an individualized assessment of each purchase.

Even if the excessiveness of a markup could be determined solely by comparison with equity transactions of similar size and value, such a comparison would still require an individualized inquiry. In *Grandon II,* the Second Circuit noted that "[i]t [ ] seems to be accepted that proper markups for municipal bonds are 'significantly lower than those for equity securities.' ' *Id.* at 191 (quoting *In re Staten Sec. Corp.,* Exchange Release Act No. 34-18628, 47 S .E.C. 766, 1982 WL 32504, *1 (Apr. 9, 1982)). However, it is not a per se rule that markups for municipal bonds are *always* significantly lower than markups for equity securities. Instead, courts and the SEC have repeatedly used words such as "generally," "customary" or "usually" to describe this policy. *See, e.g .,* *Feminella,* 947 F.Supp. at 728-29 (noting proper markups on municipal debt securities "usually are smaller than those on equity securities"); *First Honolulu,* 1993 WL 380039 at *2 ("It is well-recognized that a significantly lower markup is customarily charged in the sale of debt securities than in transactions of the same size involving common stock...."); *In re Powell & Assoc., Inc.,* Exchange Act Release No. 34-18577, 47 S.E.C. 746, 1982 WL 32339, *1 (Mar. 22, 1982) ("[m]arkups on municipal bonds are generally a good deal lower" than markups on equity securities); *In re Edward J. Blumenfeld,* Exchange Act Release No. 34-16437, 18 S.E.C. 1379, 1979 WL 169982, *2 (Dec. 19, 1979) ("Markups on municipal bonds are generally lower than those for equity securities."). Therefore, a situation could arise where a markup on a municipal bond transaction is not lower than the markup on an equity transaction of similar size and value but is, under the circumstances, not excessive.

**9** Plaintiffs rely on three cases to support their contention that certification is proper for actions involving markups on securities. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912 (3d Cir.1992); *Farley v. Baird, Patrick & Co., Inc.,* No. 90 Civ. 2168, 1992 WL 321632 (S.D.N.Y. Oct. 28, 1992); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 122 F.R.D. 177 (E.D.Pa.1988). All three cases are inapposite to the situation at hand because none involve certification of a class who purchased municipal bonds.

Both *Hoxworth* and *Farley* considered certification of a class of individuals who had purchased and sold equity securities. The process of determining whether a markup for a transaction involving equity securities is excessive is entirely different from making such a determination as to municipal bonds. Markups for equity securities generally should not exceed five percent of the prevailing market price. *See Grandon II,* 147 F.3d at 191. However, the SEC has categorically stated that this "five-percent policy does

not apply to municipal securities." *Id.* (quoting *In re Staten Sec. Corp.,* 1982 WL 32504, at *1, n. 7). Instead, whether a markup on a municipal bond is excessive is determined by looking at all surrounding circumstances, including, but not limited to, the customary practice that markups on municipal bonds are significantly lower than those for equity securities.

*Ettinger* is also distinguishable. That case involved only one type of security, a zero-coupon bond, and the defendant was the issuer. *See Ettinger,* 122 F.R.D. at 179. Here, the purported class are individuals who purchased a wide array of municipal bonds. Moreover, Merrill Lynch was not the issuer of any such bonds.

Deciding whether the markups charged by Merrill Lynch on purchases of Class Bonds by class members requires an individualized assessment of each transaction. Accordingly, the Court finds that with regard to the Section 10(b) and Rule 10b-5 claims, individual fact issues will predominate over the common issues and class certification is therefore inappropriate.

b. Fiduciary Duty Claim

To the extent that the state law claims for breach of fiduciary duty are premised on the same excessive markup theory as the federal securities claims, those claims also do not satisfy the predominance requirement.

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989). Accordingly, New York's choice of law rules govern the claim for breach of fiduciary duty, which is premised on diversity and supplemental jurisdiction. "In tort cases ... New York applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999) (citation omitted). The purpose of this "interest analysis" is "to determine which of two competing jurisdictions has the greater interest in having its laws applied in the litigation." *Padula v. Lilarn Prop. Corp.,* 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (N.Y.1994). When plaintiffs and defendants are domiciled in different states, as invariably would be the case in a purported nationwide class action, the state in which the tort allegedly took place has the greatest interest, and its law is usually applied. *See Lee,* 166 F.3d at

545 (conduct regulating rules usually require application of law of place of tort).

*10 The fiduciary duties of securities brokers are materially different in each of the fifty states. *See, e.g., Patsos v., First Albany Corp.,* 433 Mass. 323, 330-336, 741 N.E.2d 841, 848-851 (Mass.2001); *Carr v. CIGNA Secs.,* 95 F.3d 544, 547 (7th Cir.1996); *Marchese v. Nelson,* 809 F.Supp. 880, 893-94 (D.Ut.1993). This variation and lack of uniformity indicate that a uniform substantive law for breach of fiduciary duty cannot be applied to the claims of this purported class. "Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable," and common issues of law do not predominate over those affecting individual members of the class. *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1019 (7th Cir.2002). Courts have refused to certify class actions where the substantive law of multiple states must be applied, and nothing in this case compels a different result. *See, e.g., Kaczmarek v. Int'l Bus. Machs. Corp.,* 186 F.R.D. 307, 312-13 (S.D.N.Y.1999). Therefore, individual fact issues will predominate over the common issues with respect to the claim for breach of fiduciary duty. Accordingly, Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3).

2. Superiority

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). If a class were to be certified here, the Court would be required to conduct a series of mini-trials in order to determine, for each retail customer of Merrill Lynch who purchased a Class Bond, whether Merrill Lynch charged an undisclosed, excessive markup. "Under these circumstances, a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims." *Dunnigan,* 214 F.R.D. at 142 (citation omitted). Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating that a class action is superior to other methods of adjudication.

B. Rule 23(b)(2)

Plaintiffs also seek class certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate

Not Reported in F.Supp.2d
2003 WL 22118979 (S.D.N.Y.)
**(Cite as: 2003 WL 22118979 (S.D.N.Y.))**

Page 9

final injunctive relief with respect to the class as a whole." Where a plaintiff seeks monetary damages along with injunctive or declaratory relief, certification is appropriate when the equitable relief sought predominates over the claims for monetary relief. *See Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 20 (2d Cir.2003) (citing *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 164 (2d Cir.2001)); *see also* Fed.R.Civ.P. 23(b)(2) advisory committee's note (explaining that this subdivision "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

**\*11** To evaluate whether injunctive or declaratory relief predominates, the Second Circuit requires the district court to conduct an ad-hoc determination. *See Robinson,* 267 F.3d at 164. Before certifying the class under Rule 23(b)(2), the Court "should, at a minimum, satisfy itself [that] (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* The Second Circuit has also warned that "insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary relief." *Id.*

 In support of class certification under Rule 23(b)(2) Plaintiffs only argue that in the Second Amended Complaint they "sought declaratory relief as well as damages." [FN6] Pls. Mem. at 21. That by itself does not demonstrate that the claim for equitable relief predominates over the claim for monetary relief. Accordingly the Court declines to certify the putative class under Rule 23(b)(2).

> FN6. Plaintiffs make no reference to class certification under Rule 23(b)(2) in their reply memorandum.

## CONCLUSION
 For the reasons set forth above, Plaintiffs' motion for class certification is denied. The parties are hereby ordered to appear for a pre-trial conference on October 1, 2003 at 10:30 a.m.

 SO ORDERED.

2003 WL 22118979 (S.D.N.Y.)

 **Motions, Pleadings and Filings (Back to top)**

• 2002 WL 32595526 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion for Class Certification (Nov. 12, 2002)

• 2002 WL 32595523 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Motion for Leave to Amend Answer (Sep. 18, 2002)

• 2001 WL 34611473 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion for Reconsideration (Aug. 20, 2001)

• 2001 WL 34611471 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion for Reconsideration of That Portion of the Memorandum Decision and Order Dated July 20, 2001 Which Dismissed Certain Omission and Artifice Claims in Plaintiffs' Second Cause of Action (Aug. 03, 2001)

• 2000 WL 34403285 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Jul. 12, 2000)

• 2000 WL 34403281 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Apr. 10, 2000)

• 1999 WL 33885530 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion for Reconsideration (Nov. 24, 1999)

• 1999 WL 33885529 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Protective Motion for Reconsideration of a Portion of the Memorandum Decision and Order Dismissing the Amended Class Action Complaint (Nov. 09, 1999)

• 1998 WL 34279896 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Further Opposition to Defendants' Supplemental Memorandum in Support of their Motion to Dismiss the Amended Class Action Complaint (Dec. 22, 1998)

• 1998 WL 34279895 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22118979 (S.D.N.Y.)
**(Cite as: 2003 WL 22118979 (S.D.N.Y.))**

Page 10

Amended Class Action Complaint (Sep. 25, 1998)

• 1996 WL 33649667 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (Nov. 26, 1996)

• 1996 WL 33649666 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (Jul. 15, 1996)

•              1:95cv10742              (Docket) (Dec. 20, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 44

Not Reported in F.Supp.2d                                                                            Page 2
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
**(Cite as: 1999 WL 16320 (N.D.Cal.))**



**Motions, Pleadings and Filings**

United States District Court, N.D. California.
Joan RYAN, et al., Plaintiffs,
v.
CARL CORPORATION, et al., Defendants.
**No. C97-3873 FMS.**

Jan. 13, 1999.

TENTATIVE ORDER RE: CLASS
CERTIFICATION

SMITH, J.

INTRODUCTION
*1 Defendants moved for an order denying class
certification under Federal Rule of Civil Procedure
23 ("Rule 23") on September 30, 1998. Plaintiffs
filed a counter-motion seeking certification of a
plaintiff class, including two subclasses, on October
30, 1998. These motions require the Court (1) to
determine whether plaintiffs have established a *prima
facie* showing of each of Rule 23(a)'s certification
prerequisites, and (2) to decide whether appropriate
grounds for a class action exist under Rule 23(b).

BACKGROUND
The four plaintiffs in this case--Jim Tunney, Arlie
Russel Hochshield, Lyn Hejinian, and Ronald
Silliman--are authors of, and owners of registered
copyrights in, articles that were published in
magazines. Each of the articles was copied and
delivered to a third party by defendant UnCover, a
document retrieval and delivery business. UnCover
paid copyright fees to the publishers of the collected
works, but not to plaintiffs. Plaintiffs claim that their
copyrights in the individual articles were thereby
infringed.

In an Order Granting Summary Adjudication, filed
October 13, 1998, the Court determined that when an
author conveys a limited right to a publisher to

publish a copyrighted article as part of a collected
work, the author retains the exclusive right to
authorize reproductions of the article that are made
separate and apart from the collected work, unless the
license to the publisher provides otherwise. The
parties have now moved the Court to decide whether
the action may proceed as a class action on behalf of
the authors, with plaintiffs serving as the
representatives of the class.

I. The Defendants

UnCover, a partnership owned by defendants CARL
Corporation and Dialog Corporation (collectively
"UnCover"), is a for-profit company that functions
like a private interlibrary loan service. UnCover
maintains an internet database that contains the titles,
but not the text, of about eight million articles from
about seventeen thousand periodicals. UnCover's
customers, mostly libraries and some individuals, can
search the database by title, author, periodical title,
and subject. When a customer requests an article, an
UnCover representative goes to a library that carries
the periodical and copies the article. The article is
then electronically stored by UnCover, so that later
orders for the same article can be filled without a
return trip to the source library. The article is then
sent to the customer who placed the order. The fee
charged depends on how quickly the customer needs
the article.

UnCover attempts to obtain the permission of the
publisher of the collective work containing an
ordered article, [FN1] but generally does not seek the
permission of the author, either before or after the
article is delivered. UnCover does have an agreement
with the National Writers Union ("NWU"), through
which UnCover pays copyright fees to some authors
who register with the NWU. In the time period
relevant to this litigation, UnCover made payments to
authors pursuant this agreement for 461 out of
approximately 701, 289 article deliveries. Other than
this agreement, UnCover makes no attempt to obtain
the permission of the authors whose works they
reproduce and sell.

> FN1. The process by which UnCover solicits
> and obtains the approval of publishers was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
**(Cite as: 1999 WL 16320 (N.D.Cal.))**

discussed in the Court's October 13, 1998 Order. It is not directly at issue for purposes of the pending motion.

## II. The Plaintiffs and Irvin Muchnick

### A. Jim Tunney

*2 Jim Tunney resides in Carmel-by-the-Sea, California. He is a freelance author and co-author of a book entitled *Impartial Judgment*. Tunney registered a copyright in the book, the effective date of which is February 28, 1990. An excerpt from the book was published in the November 1988 issue of *Referee* magazine under the title of "Tour of Duty." Tunney alleges that UnCover reproduced and sold at least one copy of this article without his permission and without compensation.

### B. Arlie Russel Hochshield

Arlie Russel Hochshield resides in San Francisco, California. She is a freelance author and the author of a book entitled *The Time Bind: When Work Becomes Home and Home Becomes Work*. Hochshield is the owner of a copyright in that book, registered June 18, 1997. *The Nation* magazine published an excerpt from the book in its May 26, 1997 issue under the title "Time in the Balance." Hochshield alleges that UnCover reproduced and sold at least one copy of this excerpt without her permission and without compensation.

### C. Lyn Hejinian and Ronald Silliman

Lyn Hejinian is a freelance author and resides in Berkeley, California. Ronald Silliman is a freelance author who resides in Paoli, Pennsylvania. Together with two other authors, they wrote a book entitled *Leningrad: American Writers in the Soviet Union*. They are joint owners of a copyright in the book, registered April 11, 1995. An excerpt of the book, entitled "Leningrad," was published in the April 1991 issue of *Socialist Review*. Hejinian and Silliman allege that UnCover reproduced and sold at least one copy of this excerpt without their permission and without compensation.

### D. Irvin Muchnick

Irvin Muchnick is the former Assistant Director of the NWU. Although not a party to the case, he is discussed in this section because UnCover has

challenged class certification, in part, due to Muchnick's involvement in the litigation. UnCover states that Muchnick became familiar with UnCover's business practices while negotiating the agreement between UnCover and NWU discussed in the prior section. Muchnick later interviewed for employment at UnCover, but was not selected for the position.

Several months later, Muchnick contacted each of the plaintiffs, informed them that their work was listed on UnCover's index, and asked if they would be interested in bringing or joining this suit. Muchnick is currently serving as a litigation consultant to plaintiffs' counsel.

## III. The Proposed Class

On the issues of liability and injunctive relief, plaintiffs seek certification of a national plaintiff class of:

> All authors who at the time of filing of Plaintiffs' Second Amended Complaint, owned a registered copyright in at least one work that was created and first published after January 1, 1978, and which work was reproduced and distributed by defendants on or after October 22, 1994 and before October 9, 1998.

On the issue of damages, plaintiffs seek division of the class into two subclasses as follows:

> *3 Subclass 1: All authors who are members of the general class and who own at least one registered copyright with an effective registration date that is earlier than the commencement of an act of reproduction and distribution of the registered work committed by defendants, or, that was registered within three months after the first date of publication of the work;

> Subclass 2: All authors who are members of the general class and who own at least one registered copyright with an effective registration date that is later than the commencement of an act of reproduction and distribution of the registered work committed by defendants, and, that was not registered within three months after the first publication of the work.

The reason for the proposed subclasses on the issue of damages is section 412 of the Copyright Act. "Section 412 bars an award of statutory damages or attorneys' fees for 'any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the first publication of the work." ' *Oddo v. Ries,* 743 F.2d 630, 634 (9th Cir.1984) (quoting 17 U.S.C. § 412(2)).

Plaintiffs' first proposed subclass consists of authors within the general class who are entitled to statutory damages and attorneys' fees because their copyrights were registered before the commencement of the alleged infringement by UnCover, or within the statutory three month grace period. Conversely, plaintiffs' second proposed subclass consists of authors within the general class who, under section 412, are not entitled to statutory damages and attorneys' fees. Members of the second subclass would only be entitled to collect their actual damages plus UnCover's profits not taken into account in calculating actual damages. *See* 17 U.S.C. § 504(b); *Oddo,* 743 F.2d at 634-635.

## DISCUSSION

I. Evidentiary Burden and Standard for Class Certification

The burden of proving that a class is appropriate rests with the proponent of the class. *In re Northern Dist. of California Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 854 (9th Cir.1982); *Shields v. Smith,* 1992 WL 295179, at *3 (N.D.Cal.1992). The party seeking to maintain the action as a class suit must make a *prima facie* showing of each of the four certification prerequisites and must demonstrate that appropriate grounds for a class action exist. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). Failure to carry this burden as to any one of the requirements precludes the maintenance of the lawsuit as a class action. *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir.1975).

Class certification is governed by Rule 23, which provides for a two-step procedure. First, subsection (a) of Rule 23 sets out four conjunctive requirements that must be met in all class actions:

(1) the class [must be] so numerous that joinder of all members is impracticable, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties [must] fairly and adequately protect the interests of the class.

**\*4** If these requirements are met, the proponent must still show that it has met one of the four disjunctive

prerequisites of subsection (b) of Rule 23. Under this subsection, the court must find either: (1) that the prosecution of individual actions would create a risk of inconsistent verdicts that would establish incompatible standards of conduct for defendant; (2) that adjudication of individual claims would be dispositive of the claims of non-party class members, or substantially impede the ability of non-party class members to pursue their own claims; (3) that the defendant acted or refused to act on grounds generally applicable to the class, so that declaratory or injunctive relief is appropriate with respect to the entire class; or (4) that common questions of law or fact predominate and that a class action is superior to other available methods of adjudication. Fed.R.Civ.P. 23(b)(1)-(3).

Before finding that a lawsuit may proceed as a class action, a determination must be made whether the class action allegations meet the requirements of Rule 23. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992). Because the early resolution of the class certification question requires some degree of speculation, however, the court is only required to form a "reasonable judgment" on each certification requirement. In formulating this judgment, the court may consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties. *Blackie,* 524 F.2d at 900-01 & n. 17. The court may not, however, consider the merits of plaintiffs claims in its effort to determine whether the use of the class device is appropriate. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-178 (1974).

II. Analysis

A. Summary of Conclusions

Having reviewed all of the parties submissions on the issue of class certification, the Court has determined that the most equitable resolution to the pending motions within the framework of Rule 23 is as follows:

(1) the case will be bifurcated pursuant to Federal Rule of Civil Procedure 42(b), such that the issues of liability and injunctive relief will be tried first, followed by a trial on the issue of damages if liability is established;

(2) the proposed main class is certified pursuant to Rule 23(b)(2) only on the issues of liability and injunctive relief; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
(Cite as: 1999 WL 16320 (N.D.Cal.))

Page 5

(3) a decision on class certification on the issue of damages is stayed pending the resolution of the liability phase of the case.

The rationale for these decisions is set out below.

B. Bifurcation

The Court has broad discretion to bifurcate the trial of liability and damages issues under Federal Rule of Civil Procedure 42(b). *See Arthur Young & Co. v. United States Dist. Court,* 549 F.2d 686, 697 (9th Cir.1977). In the case at bar, it is premature to make the requisite determinations under subparts (a) and (b) of Rule 23 to certify the damages subclasses proposed by plaintiffs. It is too soon to determine whether the issue of damages is incidental to injunctive relief and thus certifiable under Rule 23(b)(2), or whether the class device is a superior method of adjudicating damages, and thus certifiable under Rule 23(b)(3). There is also a question as to whether the subclasses individually meet the numerosity requirement of 23(a). These issues can best be addressed after a decision has been reached on the issue of liability. *See Piva v. Xerox Corp.,* 70 F.R.D. 378, 390 (N.D.Cal.1975).

*5 Concerns of judicial economy also militate in favor of deferring certification of the damages subclasses until after liability has been determined. There is scant authority on class certification in copyright infringement cases, and plaintiffs' application raises issues of first impression. These should be addressed only if necessary, and based on a more fully developed factual record. Accordingly, this case shall be bifurcated such that the issues of liability and injunctive relief are tried in the first phase, and the issue of damages will be tried in the second phase. *See Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 458-459 (N.D.Cal.1994); *Piva,* 70 F.R.D. at 390; *see generally* 1 H. Newberg, Class Actions § 4.14 (1992). Determination of liability will include a decision as to whether any infringement was willful. Certification of the damages subclasses is postponed until after a decision is reached on liability.

C. Class certification in copyright cases

The central dispute about class certification in this case is whether the class device is appropriate for a copyright infringement action of this kind. UnCover argues that infringement suits inevitably raise so many questions unique to the individual copyrights

held by the plaintiffs, that treatment as a class would be unmanageable and inappropriate. UnCover points out that each of the named plaintiffs, as well as every member of the proposed class, has a separate copyright and a separate agreement with a different publisher for his or her own article. Plaintiffs point to the standardized procedure by which UnCover copies, saves, and distributes all articles to support their contention that this dispute is best resolved as a class action.

The parties have cited to three published opinions in which federal courts have addressed the propriety of certifying a plaintiff class in a copyright infringement action. In the two cases in which the courts denied class certification, the courts found that the plaintiffs had alleged that the defendants had engaged in a general scheme of copyright infringement, but that there were no common elements that plaintiffs would be forced to prove in separate actions. *See Estate of Berlin v. Stash Records, Inc.,* 1996 WL 374176,*2 (S.D.N.Y.1996) (basing the decision on a lack of typicality); *WB Music Corp. v. Rykodisc, Inc.,* 1995 WL 631690,*6 (E.D.Pa.1995) (basing the decision on the failure of the plaintiffs to establish predominance). In the case in which class certification was granted, although the court noted that the claims of each plaintiff and class member were based on separate copyrights, the decision to certify the class turned on the fact that the "gravamen" of the dispute was the negotiation of a single licensing agreement between the defendant and a third party acting on behalf of all proposed class members. *David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. 752, 757 (S.D.N.Y.1988) (certifying the class under Rule 23(b)(1)).

*6 Although there are few reported cases in this area, the trend appears to be to deny certification if the plaintiffs are suing a "habitual infringer" but have little else in common, and to certify a class if there is a single issue on which the litigation centers. Certification is more likely if there are circumstances that counter-balance the fact that the claim of each class member is necessarily based on a separate copyright. It is within this framework that the requirements of Rule 23 are applied.

D. 23(a) Requirements

1. Numerosity

Rule 23(a)(1) requires that the size of the proposed

Not Reported in F.Supp.2d                                                    Page 6
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
(Cite as: 1999 WL 16320 (N.D.Cal.))

class be so large that joinder of all class members is impracticable. There is no set numerical cut-off. _Welling v. Alexy,_ 155 F.R.D. 654, 656 (N.D.Cal.1994) (citing examples of approved class with fourteen members and case in which certification was denied for class of more than 300).

During the relevant time period, the chairman and CEO of defendant Carl Corporation, Ward Shaw, stated that approximately 560,160 different articles were reproduced and sold by UnCover. (Decl. of Ward Shaw in Opp. to Prelim. Inj., ¶ 29) (hereinafter "Shaw Decl."). Because the class only includes authors who have registered their copyrights, not every author of the 560,160 different articles is a member of the proposed class. Working with a sample of 41,048 of these articles, Shaw determined that a copyright was registered for approximately 200 of the articles in the sample--approximately 0.49% of the sample. (Shaw Decl. ¶ 34). Applying this percentage to the total number of articles delivered by defendants yields a total of approximately 27,448 authors.

Based on Shaw's estimate, the proposed main class of authors is likely to have 27,448 members. In evaluating numerosity, courts may rely on estimates and common-sense assumptions, _see Scholes v. Stone, McGuire & Benjamin,_ 143 F.R.D. 181, 184 (N.D.Ill.1992), _aff'd sub nom. Scholes v. Lehmann,_ 56 F.3d 750 (7th Cir.1995), particularly when the members of the plaintiff class are scattered throughout the country, _see Riordan v. Smith Barney,_ 113 F.R.D. 60, 62 (N.D.Ill.1986). As a threshold matter, plaintiff have established numerosity.

2. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the members of the proposed class. This requirement is construed permissively; it is much less stringent than the predominance requirement of Rule 23(b)(3). _Hanlon v. Chrysler Corp_., 150 F.3d 1011, 1019 (9th Cir.1998). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." _Id._

In the case at bar, plaintiffs essentially are challenging a standard business procedure followed by UnCover in copying and distributing articles without the permission of the authors. Plaintiffs have alleged that when UnCover receives a first-time request for an article in its database, an UnCover representative copies the article from a library that has the work in its collection. UnCover then stores the article electronically and faxes it to the person making the request. Any subsequent requests for that article are handled by accessing the electronically stored copy of the article. UnCover generally secures the permission of the publisher of the collected work in which the article is published. Except for UnCover's arrangement with the NWU, however, Kristen Rasmussen, Senior Publisher Relations Coordinator for UnCover, has admitted that UnCover never seeks the permission of the article's author, nor would they enter into a licensing agreement with an author who indicated such an interest. (Decl. of Daniel Reidy in Support of Pl's. Mot. for Class Cert., Exh. A, Transcript of Kristen Rasmussen's Deposition of August 12-13, 1998 at 339:11-22) (hereinafter "Rasmussen Depo.").

*7 Any claim by a member of the proposed class charging that this practice infringed his or her copyright would share this common core of salient facts. _See Hanlon,_ 150 F.3d at 1019-1020 (finding commonality based on the defendant's alleged conduct in defectively designing a product, despite potentially divergent avenues of redress for class members); _cf. Harris v. Palm Springs Alpine Estates Inc.,_ 329 F.2d 909, 914 (9th Cir.1964) (misrepresentations stemming from a "common course of conduct" are sufficient to satisfy Rule 23(a)(2)).

Furthermore, the primary legal issues in this case are common to all members of the proposed class. Those issues are: (1) when an author conveys the right to a publisher to publish a copyrighted article as part of a collected work, who has the right to authorize reproductions of that article separate and apart from the collected work?; (2) does reproduction of such an article, separate and apart from the collected work, without the permission of the author, constitute an infringement of the author's copyright regardless of whether the person reproducing the article has secured the permission of the publisher of the collected work?; (3) if such reproduction constitutes infringement, is it willful? [FN2]

> FN2. The Court has already granted summary adjudication as to the first of these three issues, finding that section 201(c) of the Copyright Act, 17 U.S.C. § 201(c),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dictates that only the author may authorize such reproductions. *See* Order Granting Summary Adjudication, filed October 13, 1998. The second and third questions have yet to be answered.

Because the plaintiffs have demonstrated the existence of common issues of both fact and law shared by all members of the proposed class, the commonality requirement is satisfied.

### 3. Typicality

Rule 23(a)(3) requires that a plaintiff seeking to be a class representative have claims or defenses typical of other class members. Claims and defenses are typical if they stem from the same event, practice, or course of conduct that forms the basis of the class claims and are based on the same legal or remedial theory. *Jordan v. Los Angeles County,* 669 F.2d 1311, 1321 (9th Cir.), *vacated on other grounds,* 459 U.S. 810 (1982). Like commonality, the test of typicality is not a stringent one. *WB Music Corp. v. Rykodisc, Inc.,* 1995 WL 631690,*3 (finding typicality even where the proposed copyright infringement class failed to meet the Rule 23(b) requirements).

Like the members of the proposed main class, the named plaintiffs are all authors who allegedly have had their work copied and sold without their permission at least once by the defendants. They have also alleged registered copyrights in their work. Defendants raise the following as obstacles to a finding of typicality: (1) that plaintiffs are freelance writers, while most of the authors of articles sold by UnCover are academics who publish in scientific, technical and medical journals ("SMT journals"), and welcome wide distribution of their work without payment; (2) that plaintiffs' articles were not copyrighted themselves, but were excerpts from copyrighted books, while most articles delivered by UnCover are not book excerpts; (3) that no one has a typical claim, because every claim is based on an individual copyright; and (4) that the plaintiffs' claims will be subject to unique defenses.

**\*8** As to the first claim, UnCover conceded at oral argument on this motion that academics who publish in SMT journals do not generally register their copyrights. Rather it is authors who publish in the commercial press, like the named plaintiffs, who register their copyrights. Such a result is somewhat intuitive--if the goal of academics is to have their

work widely disseminated without concern of payment, it seems unlikely that they would waste the time and money necessary to register a copyright. Because the class is limited to authors who have registered their copyrights, authors who publish in SMT journals are not likely class members and pose no threat to typicality. If, as the litigation progresses, it becomes apparent that a significant number of academics who publish in SMT journals are in fact members of the class, the Court may create appropriate subclasses pursuant to Rule 23(c)(4) to protect the interests of all class members. *Blackie v. Barrack,* 524 F.2d at 909.

Neither does UnCover's second argument, that the named plaintiffs do not have copyrights in the articles that were copied, but rather have registered copyrights to books from which the articles were excerpted, defeat typicality. Although members of the proposed class may have copyrights in an article rather than a book, the Court is not persuaded that this difference will be material to the litigation.

UnCover also argues that because the claims of each member of the proposed class are based on individual copyrights, no member has a claim that is typical of the class as a whole. This argument neglects the fact that litigation of this case will likely center around UnCover's uniform practice of copying and selling copyrighted articles without securing the authors' permission. Because of the centrality of common issues, the issues unique to individual copyrights are reduced in importance and do not interfere with a finding of typicality. *Compare David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. at 756-757 (finding typicality where individual copyright issues were "collateral to the gravamen of th[e] dispute") *with Estate of Berlin v. Stash Records, Inc.,* 1996 WL at *2 (questions unique to individual copyrights precluded a finding of typicality where there were no common issues unifying the class).

Finally, UnCover suggests that the named plaintiffs may be subject to unique defenses, not typical of the members of the class. The existence of such defenses will render a plaintiff's claims atypical if they become the focus of the litigation. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). UnCover has identified no defense that threatens to overwhelm the suit. UnCover first argues that someone acting at plaintiffs' behest ordered the articles from UnCover that "caused" the injuries claimed in the complaint. By asking someone to order their articles from

Not Reported in F.Supp.2d
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
(Cite as: 1999 WL 16320 (N.D.Cal.))

Page 8

UnCover, plaintiffs neither authorized UnCover to copy and sell their articles without permission, nor lost their standing to sue for the alleged infringement. *See* Order Granting Summary Adjudication at 6-7, filed October 13, 1998.

**\*9** UnCover's citation to *Hanon v. Dataproducts Corp.* is similarly unpersuasive. In *Hanon,* the Ninth Circuit found typicality lacking, in part because the plaintiff had " 'bought' a securities lawsuit by making an 'uneconomical purchase of only ten shares of stock' in the defendant company." UnCover's Mem. in Supp. of Mot. to Deny Class Cert. at 9 *citing Hanon,* 976 F.2d at 508. This was relevant to prove that the plaintiff, an "experienced" securities plaintiff, had not relied on the integrity of the market in purchasing shares of the defendant company--a viable defense in a securities suit. *Id.* UnCover has pointed to no similar defense that would be available in this copyright infringement action.

UnCover's second alleged unique defense is that this litigation was "stirred up" by Irvin Muchnick, whose relationship to the case was discussed above. It is conceded that Mr. Muchnick did contact plaintiffs and inform them of UnCover's practices. Plaintiffs claim that Mr. MuChnick is a long-time authors' rights activist, concerned about protecting authors from infringement, who simply notified plaintiffs to see if UnCover's practice bothered them. UnCover, however, views Mr. Muchnick as a spurned applicant for a job at UnCover, intent on inciting litigation for personal gain. Regardless of which is correct, Mr. Muchnick is not a plaintiff, and UnCover has provided no authority for the proposition that Muchnick's involvement in the case creates a defense to plaintiffs' claims of infringement.

In sum, UnCover has failed to demonstrate either a viable defense that is unique to the named plaintiffs or a defense that will overwhelm the litigation. The typicality requirement is met with respect to the main class.

4. Adequacy of Representation

Rule 23(a)(4) requires a plaintiff seeking to certify a class to demonstrate that, as the representative of the class, she will fairly and adequately protect the interests of the class. Parties are generally considered to be adequate class representatives if there are no conflicts of interest between the representatives and other class members and if the Court is persuaded that

counsel for the representatives will vigorously pursue the action. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982); *Hanlon v. Chrysler Corp.,* 150 F.3d at 1020. UnCover has not challenged the ability or dedication of plaintiffs' counsel, and the Court is satisfied that this portion of the requirement is met.

UnCover's major challenge concerns the potential conflicts that exist between authors who publish in SMT journals and freelance authors, represented by the named plaintiffs. As discussed above in the section relating to typicality, UnCover has conceded that authors who publish in SMT journals are not likely to be part of the class. For now, the Court perceives no significant conflict.

UnCover also challenges the named plaintiffs familiarity with this suit. The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim, *Burkhalter Travel Agency v. MacFarms Int'l, Inc.,* 141 F.R.D. 144, 153-54 (N.D.Cal.1991), and will be deemed inadequate only if she is "startlingly unfamiliar" with the case. *Greenspan v. Brassler,* 78 F.R.D. 130, 133-34 (S.D.N.Y.1978). It is not necessary that a representative "be intimately familiar with every factual and legal issue in the case," rather, it is enough that the representative understand the gravamen of the claim. *In re Worlds of Wonder § .. Litig.,* 1990 WL 61951, at \*3 (N.D.Cal.1990). Those courts that have found representatives inadequate have done so because the plaintiffs knew nothing about the case and completely relied on counsel to direct the litigation. *See Welling v. Alexy,* 155 F.R.D. 654, 659 (N.D.Cal 1994) (finding that plaintiff was inadequate because he showed a "complete lack of interest in the conduct of the case"); *Koenig v. Benson,* 117 F.R.D. 330, 337 (E.D.N.Y.1987) (finding plaintiff inadequate because of "alarming unfamiliarity" with lawsuit). The Court has reviewed the declarations submitted by plaintiffs and their depositions provided by UnCover, and is satisfied that plaintiffs are sufficiently familiar with their claims to adequately represent the members of the proposed class.

E. 23(b) Requirements

**\*10** Because all of the requirements of Rule 23(a) have been met, the Court must next consider whether the suit is appropriate for treatment as a class action under any of the four categories of class actions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
(Cite as: 1999 WL 16320 (N.D.Cal.))

described by Rule 23(b). Plaintiffs seek certification under three of the four categories--Rules 23(b)(1)(A), 23(b)(2), and 23(b)(3).

1. Rule 23(b)(1)(A)

Plaintiffs contend that the proposed class would best be certified under Rule 23(b)(1)(A), which states that an action may be maintained as a class action if:

the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class....

The Ninth Circuit has adopted a very conservative view of certification under this provision. *Mateo v. M/S KISO,* 805 F.Supp. 761, 772 (N.D.Cal.1991). It is not enough that separate actions might lead to "different legal rules governing the same conduct," or that "defendants might be held liable in some actions but not in others." *McDonnell-Douglas Corp. v. United States Dist. Court for the Cent. Dist. of California,* 523 F.2d 1083, 1086 (9th Cir.1975). *See also In re Activision Sec. Litig.,* 621 F.Supp. 415, 436-437 (N.D.Cal.1985). Rather, "incompatible standards of conduct" means that by following one judgment, the defendant must violate another. *See McDonnell-Douglas Corp.,* 523 F.2d at 1086. Accordingly, a claim for damages alone can never satisfy Rule 23(b)(1)(A). *See id.; Mateo,* 805 F.Supp. at 773.

In the case at bar, the rights of each member of the proposed class are governed by individual copyrights. Moreover, there is not a single agreement or contract at issue that would require UnCover to act uniformly with respect to every member of the proposed class. *Contrast David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. 754-755. Thus, although plaintiffs in this case are asking for an injunction barring UnCover from selling their articles without prior permission, the issuance of injunctions in some cases and denial in others would not create the kind of dilemma for UnCover that is necessary to justify certification under Rule 23(b)(1)(A). UnCover could simply refrain from delivering articles of plaintiffs who had succeeded in securing an injunction, and continue to offer for sale the articles of authors who were unsuccessful. Certification of the proposed class under this subsection is not appropriate.

2. Rule 23(b)(2)

Rule 23(b)(2) states that a class may be certified if:

"the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...."

UnCover's decision to copy and sell articles without seeking prior permission from, or paying a copyright fee to, the authors of the articles, appears to have been based on UnCover's belief that Section 201(c) of the Copyright Act, codified at 17 U.S.C. 201(c), authorized the publishers of collective works to copy the individual articles, separate and apart from the collective works, without the permission of the author. Because UnCover sought to secure the permission of the publishers when copying articles for sale, UnCover apparently believed that there was no reason to secure the permission of the authors.

**\*11** Although erroneous, UnCover's view of Section 201(c) led it to act on grounds that were in fact generally applicable to every member of the proposed class. Because of the uniformity of UnCover's practice, if the Court were to award injunctive relief in this action, it would be applicable to every member of the proposed main class. [FN3] As a result, certification of the main class under Rule 23(b)(2) for a determination of liability and injunctive relief is appropriate. *See Piva v. Xerox Corp.,* 70 F.R.D. at 389- 390; *see also Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780- 781 (9th Cir.1986).

> FN3. The two subclasses are only proposed to deal with differences in the claims for money damages. As a result, they are not relevant to the claim for an injunction.

Certification is not defeated simply because plaintiffs also request damages for their alleged injuries. The presence of claims for money damages does not preclude certification of the class under Rule 23(b)(2). *See Linney v. Cellular Alaska Partnership,* 151 F.3d 1234, 1240 (9th Cir.1998); *Probe v. State Teachers' Retirement System,* 780 F.2d at 780; *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 450 (N.D.Cal 1994). Claims for money damages must not predominate, however. *See Probe,* 780 F.2d at 780; *see generally* 1 H. Newberg, Class Actions § 4.14 (1992).

Although the amount and relative importance of

Not Reported in F.Supp.2d
1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871
**(Cite as: 1999 WL 16320 (N.D.Cal.))**

monetary damages available to the members of the two proposed subclasses may vary widely, the injunctive relief sought is likely of importance to every member of the main class. Plaintiffs charge that UnCover is operating its business in violation of their copyrights. The injunctive relief plaintiffs have requested would definitively determine the propriety of UnCover's practices with respect to all members of the class and would, if granted, require UnCover to implement some means of obtaining the permission of class members before distributing their works. Monetary relief does not therefore predominate.

Even if the claims for monetary damages cannot be said to be incidental to the claim for injunctive relief, and thus certifiable under Rule 23(b)(2), *see Probe, 780 F.2d at 780*, it would be within the Court's power to certify the main class only for injunctive relief, *see Fed.R.Civ.P. 23(c)(4)(A)*. Because consideration of the issue of certifiability of the proposed damages subclasses would be premature at this stage of the proceedings, the interests of justice are best served in this action by certifying the proposed main class under Rule 23(b)(2) for a determination of liability and injunctive relief, and delaying a decision on the certification of the damages subclasses. [FN4] *See Piva, 70 F .R.D. at 390*.

> FN4. Also pending before the Court are Joan Ryan's motion to intervene in this action as a representative of subclass two, and plaintiffs' motion to amend their complaint to include Ryan as that representative. Because certification of the damages subclasses will only be addressed if plaintiffs are successful in establishing liability, Ryan's motion to intervene and plaintiffs' motion to amend are denied without prejudice.

## CONCLUSION

For the foregoing reasons, the proceedings in this action are BIFURCATED--the issues of liability and injunctive relief will be addressed in the first phase, and the issue of damages will be addressed, if necessary, in a second phase. Plaintiffs' motion for class certification as to the main class is GRANTED pursuant to Rule 23(b)(2) for purposes of liability and injunctive relief. The class SHALL be composed of:

> **\*12** all authors who as of the date of this order, owned a registered copyright in at least one work that was created and first published after January 1, 1978, and which work was reproduced and distributed by defendants on or after October 22, 1994 and before October 9, 1998.

Defendants' motion to deny class certification is DENIED with respect to the issues of liability and injunctive relief. The balance of plaintiffs' motion for class certification and defendants' motion to deny class certification is STAYED pending a determination of liability. Joan Ryan's motion to intervene and plaintiffs' motion to file a second amended complaint are DENIED WITHOUT PREJUDICE.

This is a tentative order. The parties MAY appear on February 5, 1999 at 10:00 a.m. to address any perceived mistakes of fact or law in this tentative order. No written briefing will be accepted. The parties will have twenty minutes each for their presentations.

SO ORDERED.

1999 WL 16320 (N.D.Cal.), 1999 Copr.L.Dec. P 27,871

**Motions, Pleadings and Filings (Back to top)**

4:97CV03873 _____ (Docket)
(Oct. 22, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 45

Not Reported in F.Supp.                                                                   Page 2
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
**(Cite as: 1996 WL 393662 (D.Or.))**



**Motions, Pleadings and Filings**

United States District Court, D. Oregon.
MURPHY, et al.
v.
HOLLYWOOD ENTERTAINMENT
CORPORATION, et al.
**No. CIV. 95-1926-MA (LEAD).**

May 9, 1996.
Milberg Weiss Bershad Hynes & Lerach LLP,
William S. Lerach, Blake Harper, Travis Downs, III,
and Kim Miller, San Diego, Cal.;   Stoll Stoll Berne
Lokting & Schlacter P.C., N. Robert Stoll, Gary
Berne, and Keith Ketterling, Portland, Ore.;   and
Cohen, Milstein, Hausfeld & Toll, Steven Toll and
Lisa Mezzetti, Washington, D.C., for Plaintiffs.

Stoel Rives LLP, Barnes Ellis, Lois Rosenbaum, and
Per Ramfjord, Portland, Ore., for Defendants
Hollywood Entertainment Corp., Mark Wattles, Dean
Croft and Donald Ekman.

Perkins Coie, Paul Fortino, Portland, Ore.;   and
Morrison & Foerster LLP, Melvin Goldman, Paul
Friedman, and Craig Martin, San Francisco, Cal., for
Defendants Montgomery Securities and Alex. Brown
& Sons Inc.

MARSH, District Judge.

**\*1** Plaintiffs filed three separate actions on behalf of
themselves and a class of investors who purchased
common stock of Hollywood Entertainment
Corporation from June 20, 1995 to December 5,
1995.   Plaintiffs allege that the company,
underwriters and several company insiders knowingly
or recklessly issued false and/or misleading
statements about the company's financial condition
which inflated the stock price during the latter half of
1995. Plaintiffs allege that several corporate insiders

sold off large blocks of stock at inflated prices and
that, once the true information about the company's
financial condition came to light, the stock price
plummeted.   Plaintiffs   contend   that   earnings
projections were ill-founded because;   (1) average,
existing stores, were not generating claimed revenues
and were more costly to operate than reported;   (2)
newly opened stores were generating profits below
that reported and were experiencing costs 30% higher
than represented;   (3) several acquired stores were
listed as "new;"   (4) four acquired stores were omitted
from a same-store-sales calculation to give the
appearance of profitable growth;   (5) a 3rd quarter
1995 revenue shortfall was attributed to fewer new
movie releases when defendants knew that the
shortfall was due to a general decline in demand for
its products;   and (6) videotape inventory was not
depreciated   according   to   Generally   Accepted
Accounting Principles, inflating earnings for the latter
part of 1994 and the first three quarters of 1995.
Plaintiffs allege that "truth" first came out during the
1st week of December 1995 in an issue of Forbes
which discussed "some of the accounting artifices
used by the defendants."   Plaintiffs contend that more
truthful admissions came when defendants met with
securities analysts on Dec. 5, 1995 and disclosed the
reduced earnings expectations.

By agreement of the parties, these three actions were
consolidated   and   plaintiffs   filed   a   consolidated
complaint on February 9, 1996.   Although the initial
complaint filed in *Flecker* asserted a single claim for
securities fraud under § 10(b) of the 1934 Securities
and Exchange Act, the consolidated complaint
includes four claims;   (1) violation of § 11 of the
1933 act against all defendants;   (2) violation of §
12(2) and 15 as against all defendants;   (3) violations
of 10(b) of the 1934 Act as against all defendant and
(4) 20a control person liability as against the
individual Hollywood defendants only.   All claims
relate to a fourth, secondary stock offering of 2
million shares of common stock registered June 29,
1995.   Following the June 1995 stock offering,
Hollywood had a total 16.5 million shares
outstanding from a two year period since going
public.

Flecker purchased 10,000 shares of Hollywood

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
**(Cite as: 1996 WL 393662 (D.Or.))**

common stock on October 11, 1995 at $23 15/16 per share; Murphy purchased 100 shares on October 10, 1995 at $23 3/4 per share; and Shrock purchased 100 shares on September 15, 1995 at $33 per share. By the end of the proposed class period (December 5, 1995), the stock value dropped to 7 3/8.

All defendants now seek dismissal of plaintiffs' § 11 and § 12 claims of the 1933 Securities Act on the basis that the 1933 Act does not extend to aftermarket transactions under the reasoning of *Gustafson v. Alloyd Co., Inc.*, 115 S.Ct. 1061 (1995). Defendant Underwriters also seek dismissal of the 1933 Act claims on the basis that they are not direct "sellers" as contemplated under *Pinter v. Dahl*, 486 U.S. 622 (1988). The Underwriter defendants seek dismissal of plaintiffs' 1934 Act 10(b) claims on the basis that, under *Central Bank v. First Interstate Bank*, 114 S.Ct. 1439 (1994) and *In Re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir.1994), plaintiffs have failed to plead fraud with the requisite particularity as to their role in the alleged misrepresentations and omissions.

*2 Finally, plaintiffs seek to certify this as a class action under Fed.R.Civ.P. 23(a) and 23(b)(3). Defendants Oppose class certification on the basis of unique defenses and adequacy of class representatives. In addition, defendants seek to exclude short sellers, in-and-out traders and broker-to-broker transactions. For the reasons which follow, defendants' motions to dismiss plaintiffs' 1933 Act claims are Granted; Underwriter defendants' motion to dismiss the 1934 Act claim as against them is DENIED. Plaintiffs' motion to certify the class is GRANTED as to the 1934 Act § 10(b) and 20(a) claims with Flecker and Schrock as class representatives.

## STANDARDS

A motion to dismiss for failure to state a claim is proper only if it appears beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle him to relief. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *In Re Wells Fargo Sec. Litig.*, 12 F.3d 922, 925 (9th Cir.1993), *cert. denied*, 115 S.Ct. 295 (1994).

## DISCUSSION

1. *Dismissal of the 1933 Act Claims*

I start with the general proposition set forth by Thomas Lee Hazen in his *Treatise on the Law of Securities Regulation*, (3rd Ed.), 1995 West Publishing, in which he explains that the focus of the 1933 Securities Act is the "initial, primary and secondary distribution of securities," with limited exceptions for certain private transactions. Hazen explains that it is the registration and initial distribution of securities which triggers 1933 Act coverage; by contrast, it is the "widely held" and "actively traded" securities which come within the protection of the 1934 Securities and Exchange Act. [FN1] *See also Central Bank of Denver*, 114 S.Ct. at 1444 (noting the '33 Act regulates initial securities distributions while the '34 Act "for the most part regulates post-distribution trading").

> FN1. There are several material distinctions between 1933 and 1934 Act claims noted by Hazen at § 1.7, p. 75-78. Among these differences are; (1) only purchasers have standing under the '33 Act whereas both purchasers and sellers having standing under the '34 Act; (2) no reliance is required for § 11 or 12 claims under the '33 Act whereas reliance is required by § 10(b); (3) sections 11 and 12 apply to misleading registration materials only whereas § 10(b) applies to material misrepresentations and/or omissions in any public release authorized or traceable to the company; and (4) Section 11 includes an express damage provision with three alternative computations, Section 12 is limited to rescissionary remedies whereas § 10(b) permits "actual" damages proximately caused by the violation and § 20(a) allows the disgorgement of insider profits.

Section 11 of the 1933 Act provides an express private right of action for material misstatements and/or omissions included within a registration statement. Section 15 provides for control person liability for any person liable under § 11. Section 12(2) of the 1933 Act is somewhat broader in that it provides an express private action for any material misstatement or omission made in connection with the sale or offer for sale of a security "by means of a prospectus or oral communication."

In *Gustafson,* the Supreme Court held that § 12(2) of the 1933 Act could not provide a basis for liability where the sale contract did not constitute a "prospectus." The parties had agreed that the phrase

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
(Cite as: 1996 WL 393662 (D.Or.))

"or oral communication [is] restricted to oral communications that relate to a prospectus." _Gustafson, 115 S.Ct. at 1065._ The Court first examined the parties' contract and determined that because the document did not include information which must also be included in a registration statement, it was not a prospectus within the definition of § 10. In examining the contract under Section 12(2), the Court noted that "liability imposed by § 12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place." _Id. at 1067._ Further, in discussing the legislative history of the 1933 Act, the Court noted, as does Hazen, that its "primary" _[FN2]_ coverage relates to disclosure obligations relative to "new" "public offerings." _Id. at 1068._ 1072. [FN3]

> FN2. The one exception noted related to § 17(a) covering fraudulent schemes, which the Court described as a "major departure from the limitation of the 1933 Act to new offerings." _Id. at 1069-70, citing United States v. Naftalin,_ 441 U.S. 768, 777-78 (1979). However, unlike § 12(2), section 17 contains no express private right of action, nor does it include the limiting "prospectus" language.

> FN3. "Congress contemplated that § 12(2) would apply only to public offerings by an issuer (or a controlling shareholder). The House Report states: '[t]he bill affects only new offerings of securities.... It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering." _Id._ at 1072.

**\*3** Ultimately, the Court concluded that the contract at issue was not a "prospectus" because it did not relate to a "public" offering of securities by an issuer or controlling shareholder. Thus, the Court's actual holding was premised upon a public/private distinction rather than the question presented here of the coverage of 12(2) for sales direct from an offering versus after-market transaction. However, the Court's dicta provides strong support for finding a clear dividing line on shares purchased pursuant to an offering-- either initial or secondary--as cognizable for private remedies under either the 1933 and/or 1934 Act and shares purchased in the aftermarket with a private right of action existing only under the 1934 Act.

The few district courts which have confronted this issue since _Gustafson_ have drawn just such a line. In _Stack v. Lobo,_ 903 F.Supp. 1361 (N.D.Cal.1995), the court rejected 12(2) claims where the plaintiffs purchased their shares in the aftermarket and alleged no facts to give rise to an inference that their purchases were somehow "traceable to" an initial public offering. [FN4] The court rejected plaintiffs' § 11 claims on the basis that plaintiffs failed to identify any misrepresentations or omissions included within the registration statement. _See also, Weinstein v. Media Vision Tech. Sec. Litig.,_ 1995 WL 787549, *1-2 (N.D.Cal.1995) (noting Gustafson "strongly suggests" that 12(2) plaintiffs cannot have purchased shares in the aftermarket).

> FN4. The district court's reference to 12(2)'s application solely to "initial" public offerings is clearly in error since § 11 and 12 apply to unexempted stock registered and issued with a prospectus. There is no dispute in this case that the 1933 Act applies to "offerings," which would include both initial and secondary offerings. _See In Re Software Toolworks,_ 50 F.3d 615 (9th Cir.1995) (sustaining section 11 and 12 claims as applied to a secondary public stock offering), _cert. denied,_ 116 S.Ct. 274 (1995). Other courts have made similar, apparently semantic errors in concluding that § 12(2) applies solely "initial" public offerings. _See e.g. Glamorgan Coal, Corp. v. Ratner's Group plc,_ 1995 U.S.Dist. LEXIS, *3 (S.D.N.Y.1995). I agree with Judge Ware of the Northern District of California that § 12(2) "applies only to a transaction which requires a prospectus to be delivered." _In Re Valence Technology,_ 1996 WL 37788 (N.D.Cal.1996).

In _Levitan v. A Pea in the Pod, Inc.,_ CV 3:94-CV-0247-D (N.D.Texas 1995), the court noted that the period of an initial public offering is extended 90 days under § 4(3) of the 1933 Act and thus, because plaintiffs purchased their shares within 90 days of the IPO, their claims under § 12(2) remained viable. _See also Weinstein,_ 1995 WL 787549, *2. This 90 day period, however, does not apply to secondary offerings, which are subject to a 40 day prospectus delivery requirement which, in any event, does not apply to aftermarket trading. § 4(3)(B); 17 C.F.R. § 230.174(b).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In this case, there is no question that the named plaintiffs purchased their shares in the aftermarket. Although plaintiffs argue that they might be able to provide evidence of "tracing" their shares to the public offering following discovery, from the face of the complaint, all purchases were ordinary after-market, broker transactions. None of the plaintiffs' purchases required the delivery of a prospectus.

While I am hesitant to read too much into the dicta of any decision, the Supreme Court's broad discussion about the limits of the 1933 Act to "offerings" leads me to the same conclusion reached by the other courts that have confronted the issue of § 12(2)'s application to standard after-market transactions. Based on the foregoing, I find that as after-market purchasers, plaintiffs lack standing to maintain a claim under § 12(2) of the Securities Act of 1933. [FN5]

> FN5. Based on this holding, I need not reach the Underwriters' alternative claim that they are not "sellers" under *Pinter*.

*4 The parties have not cited, nor have I been able to find any authority directly on the issue of whether *Gustafson's* broad dicta regarding the breadth and limitations of § 12(2) of the 1933 Act could be extended to other provisions of the 1933 Act such as §§ 11 and 15. Sections 11 and 15 relate to falsehoods included within registration statements rather than a prospectus. However, section 11 limits its application to sales conducted "by means of a prospectus" indicating a connection to a prospectus delivery requirement. Further, as part of the 1933 Act, sections 11 and 15 fall within the Court's discussion of the '33 Act's general limited application to "new offerings." As the law now stands, I see no material distinction between § 11 and 15 claims and those raised under § 12(2) from the standpoint of the standing of after-market purchasers. Thus, in the absence of further authority, I find that dismissal of plaintiffs' § 11 and 15 claims under the 1933 Act is also appropriate.

The final issue raised by the plaintiffs relative to the 1933 Act claims is that even if they lack standing, these claims should not be dismissed because, once certified, others within class will have standing to assert such claims. Both parties have cited non-controlling authority relative to a class representative's ability to maintain a claim over which

he lacks standing. I find these cases either factually or legally distinguishable or that they fail to provide sufficient analysis for the conclusions reached. While I agree with plaintiffs that any potential 1933 Act claimants' misrepresentation and/or fraudulent claims would be factually "typical" of plaintiffs' 1934 Act claims, *see Software Toolworks*, 50 F.3d at 626 (treating allegations under 11 and 12(2) as sufficient for allegations under 10(b)), whether a pool of qualified plaintiffs exists to assert § 11 and 12(2) claims is entirely speculative at this point in the litigation and I decline to allow claims to proceed based upon such speculation. [FN6]

> FN6. I emphasize that this is speculation relates to standing and not the merits of the claims. I recognize that I cannot reject a claim included within a request for class certification based upon some question regarding a speculative proof as to the underlying merits of a claim. *See Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976).

Accordingly, plaintiffs' first and second claims under § 11 and § 12(2) of the 1933 Act are dismissed.

## 2. *The Underwriters' Motion against the 10(b) Claim*

Both parties have accurately set forth the Fed.R.Civ.P. 9(b) pleading standards which apply to fraud claims filed under 10(b) of the 1934 Act and thus, I will not repeat information which appears in a plethora of district court CCH cases. The crux of the dispute relative to the fraud claims against the underwriters is whether their role in the alleged fraudulent statements has been pled with the requisite particularity. [FN7] Under the Supreme Court's decision in *Central Bank of Denver*, aiding and abetting liability under 10(b) is no longer a viable theory of liability. [FN8]

> FN7. I specifically reject any arguments that the complaint fails to state a claim under the "bespeaks caution" doctrine identified in *In re Worlds, of Wonder Sec. Lit.*, 35 F.3d 1407 (9th Cir.1994), *cert. denied*, 116 S.Ct. 185 (1995). If plaintiffs establish that defendants knew that reported earnings were inflated and costs artificially depressed, reasonable minds could disagree as to whether the challenged statements included enough cautionary language or risk

Not Reported in F.Supp.                                                                        Page 6
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
(Cite as: 1996 WL 393662 (D.Or.))

disclosure to render the challenged statements not misleading. Accordingly, dismissal on this point is inappropriate. *See e.g. Freedman v. Louisiana-Pacific Corp.,* 1996 U.S.Dist. LEXIS 2336, *22-24 (D.Or., Feb. 14, 1996) (Judge Jones finding a genuine issue of material fact precluded dismissal under "bespeaks caution" doctrine). The Ninth Circuit's recent decision in *In Re Stac Electronics Securities Litigation,* 1996 U.S.App. LEXIS 10340 (9th Cir. May 7, 1996) is not to the contrary. Unlike the cautions in *Stac* relative to new product development, there were no cautions in the Hollywood prospectus that past costs and earnings might be wrong so as to inflate future earnings projections.

I also reject the suggestion that the alleged misrepresentations constitute "general statements of optimism" since the earnings projections implied that defendants had a reasonable basis for their beliefs. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 501 (9th Cir.1992), *citing In Re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943 (1990).

FN8. Primary liability under § 10(b) requires: (1) a misstatement or omission of material fact; (2) scienter; and (3) a proximately caused injury. *Basic v. Levinson,* 485 U.S. 224, 231 (1988). Materiality has been held to generally constitute a factual question since it depends upon the inferences a reasonable shareholder would draw from a given set of facts. *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994), *cert. denied,* 116 S.Ct. 58 (1995). Under *GlenFed,* scienter may be alleged generally. 42 F.3d at 1546.

Several courts following *Central Bank* have held that the Court's decision also precludes the application of "conspiracy" or "scheme" allegations under § 10(b) to collateral participants. *In Re Valence,* 1996 WL 37788, *10 (citations omitted). However, any person or entity who directly participates in an alleged violation of § 10(b), even if that person falls within the category of professionals usually deemed "collateral" participants, may still be liable as a "primary violator" under § 10(b). *Central Bank,* 114 S.Ct. at 1454. In *Software Toolworks,* the Ninth

Circuit reversed a district court's summary judgment award in favor of underwriters and accountants where certain claims were premised upon evidence of the defendants' direct participation in drafting offering documents which contained allegedly fraudulent representations. *Id.* at 625. The court found that where the Underwriters and accountants were part of a "joint effort," plaintiffs could rely upon circumstantial evidence giving rise to a "reasonable inference" that certain sales were fabricated and that the Underwriters knew or should have known of the fraud. *Id.* However, where the underwriters were not alleged to have been a direct participant in the drafting process, the court upheld summary judgment based upon the lack of "direct" evidence that the Underwriters knew of the specific promotions and sales forming the basis for plaintiff's fraud claims. *Id.* at 622-23.

*5 It is against this backdrop that the pleadings as they relate to the underwriters must be examined under Fed.R.Civ.P. 9(b).

In *In Re GlenFed, Inc. Securities Litig.,* 42 F.3d 1541 (9th Cir.1994) (en banc), the court explained that Rule 9(b) as applied to a § 10(b) Securities and Exchange Act fraud pleading required that plaintiffs specifically identify: "what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.* at 1548. To satisfy this requirement, the court noted that "this can be done most directly by pointing to inconsistent contemporaneous statements or information." *Id.* However, the court expressly recognized that this "direct" method was not and should not be the exclusive means of providing the requisite specificity. *Id.* at n. 9. To illustrate, the court explained that if a defendant sold the plaintiff a house located atop a landfill and assured the plaintiff that the house was in perfect shape, these facts alone would satisfy 9(b) since "in perfect shape" and "built on a landfill" are plainly inconsistent. *Id.* It is only when there is no plain reason to assume that the defendant knew that his or her representation was a false one when made do the heightened, "why the disputed statement was untrue when made" pleading standards are triggered.

Two decisions have helped to clarify the 9(b) pleading requirements as applied to § 10(b) claims following *GlenFed.* In *Fecht v. The Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied,* 116

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-00988-SI   Document 297-6   Filed 07/29/05   Page 56 of 66

Not Reported in F.Supp.                                                                    Page 7
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
(Cite as: 1996 WL 393662 (D.Or.))

S.Ct. 1422 (1996), the court expressly recognized that a plaintiff may rely upon circumstantial evidence to explain "the how and why the statement was misleading when made." In *Fecht*, plaintiffs alleged that positive statements about defendants' expansion program were false and misleading since defendants knew at the time that new stores were losing money. In addition, the fact that the "true" information came out just shortly after the optimistic statements coupled with evidence of insider sales of stock at allegedly inflated prices all tended to support, circumstantially, plaintiffs' attempt to draw an inference of both knowledge and materiality. The court held such allegations sufficient since the statements of optimism were clearly inconsistent with contemporaneous conditions. *Id.* at 1083. In *Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir.1996), the court applied *Fecht* to reverse a district court's dismissal of a complaint under 9(b) where the plaintiffs alleged that defendants made optimistic statements and assurance regarding a new product under factual circumstances which should have counseled caution. The court emphasized that 9(b) was intended to require pleading of fraud with a specificity sufficient for a defendant to prepare an answer. *Id.*

The alleged false statements at issue in this case regarding projected earnings based upon existing and new store sales revenue differ from *Fecht* only in degree. Although there is no allegation that Hollywood stores were losing money, plaintiffs claim that Hollywood stores were not generating the revenue disclosed and that profit was falsely reported based upon underestimated costs. As in *Fecht,* plaintiffs -rely upon the shortness of the time frame between the optimistic statements and the revised, reduced earnings estimates as well as significant insider stock sales at what was the peak of Hollywood stocks' price. All of these alleged facts provide circumstantial evidence to explain how and why the alleged misstatements were false when made.

**\*6** As for the Underwriters' role in the alleged fraud, plaintiffs do not allege the existence of any contemporaneous "smoking gun" type of documents which would demonstrate that the Underwriter defendants knew they were selling a landfill when they sold Hollywood securities. However, plaintiffs do allege that the underwriter defendants had a "close association" with Hollywood which gave them "constant access" to the individual Hollywood defendants and all relevant, non-public information about the company. Plaintiffs further allege that the

underwriter defendants were "direct participants" in the alleged wrongdoing by their role in coordinating the offering, drafting disputed offering documents and conducting a due diligence investigation. [FN9] This is sufficient to bring the complaint within the scope of allegations similar to those sustained by the Ninth Circuit in *Software Toolworks.* Whether plaintiffs will be able to produce evidence relative to the underwriters' role that will establish that the underwriters were directly involved in the creation of the disputed documents in a manner analogous to the underwriters and accountants in *Software Toolworks* is an issue best addressed on summary judgment. Strictly from a pleading standpoint, I find that plaintiffs have alleged fraud with respect to the underwriters with the requisite particularity. [FN10] Plaintiffs' claims are not limited to accounting fraud and thus, the underwriters' claimed reliance upon certified accounting statements does not bar the maintenance of plaintiffs' claims under 10(b). Further, whether the underwriters' reliance upon expertised portions of the financial statements was reasonable as a matter of law is an issue best addressed on summary judgment. *See Software Toolworks,* 50 F.3d at 623.

> FN9. I recognize that an underwriter's role in the registration process will vary from case to case. *See generally,* Hazen, Vol. 1, § 2.1.

> FN10. I do agree with the Underwriter defendants that mere participation in a "scheme" that includes the issuance of false financial statements (see Plaintiffs' Opposition to Underwriters' Motion to Dismiss, p. 15) would fail under *Central Bank.* Plaintiffs must prove what they have alleged in their complaint and other responding papers--that is that the underwriters were direct, knowing participants in the drafting of documents which included material misstatements and/or omissions.

### 3. *Class Certification*

Class certification under Fed.R.Civ.P. 23(a) and (b)(3) requires the following: (1) numerosity; (2) commonality; (3) typicality; (4) adequacy of representation; and (5) that questions of law or fact common to the class members predominate over any individual questions and that a class action is superior to other available methods of adjudication. Plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
**(Cite as: 1996 WL 393662 (D.Or.))**

bear the burden of establishing that the requirements of <u>Rule 23</u> are met. <u>*Hanon,* 976 F.2d at 508</u>. Securities fraud claims have been found to be particularly appropriate for class action treatment, <u>*Blackie,* 524 F.2d at 903</u>. However, I must nevertheless conduct a "rigorous analysis" of the proposed class representatives, <u>*Hanon,* 976 F.2d at 508</u>, while carefully avoiding a review of the merits of the underlying action. <u>*Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178 (1974)</u>.

Defendants do not dispute that plaintiffs meet the numerosity, commonality and common questions of law and fact elements of the class certification criteria. Defendants also raise no issue with respect to the adequacy of proposed class counsel, manageability of a class action or that other methods of adjudication would be superior to class certification. Thus, my analysis will focus upon typicality and the adequacy of named class representatives.

**\*7** Typicality focuses upon the nature of the injury and, pertinent here, whether the named plaintiffs are subject to unique defenses. <u>*Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992)</u>. The defendants contend that each named plaintiff is subject to unique defenses which raises a challenge to both typicality and the adequacy of representation.

As to Murphy, defendants note that Murphy is an attorney who has been as named plaintiff in 17 class actions, including this one, since 1989. From his deposition testimony, it appears as if at least 14 of the prior cases involved claims of securities fraud and in each instance he was represented by the Cohen, Milstein firm. Murphy purchased his Hollywood shares based on a "cold call" from a broker and conducted no independent research on the company prior to executing his purchase. Murphy first consulted an attorney about filing this action on December 3, three days prior to the proposed close of the class period.

Schrock purchased his shares of Hollywood after reading a Dean Witter brochure which described about 20 different stocks. Schrock purchased the shares on the recommendation of his broker. Flecker also purchased his shares on a broker's recommendation. However, unlike Murphy and Schrock, Flecker sold 5,000 shares on December 1, 1995, within the proposed class period and sold the remaining 5,000 shares on December 15, 1995, just

after the class period. Three months later, Flecker purchased 11,000 shares of Hollywood stock.

In their depositions, each plaintiff indicated that he had reviewed the complaint, but deferred to counsel regarding the general management of the litigation. Defendants contend that plaintiffs have too little familiarity and/or control over the case such that they have abdicated authority to their attorneys and thus, are not adequate class representatives.

As part of the "proximate causation" element necessary to sustain a § 10(b) claim, plaintiffs must establish that they relied upon the alleged misrepresentation. One way plaintiffs can establish reliance is through the fraud on the market theory asserted here. *See* <u>*Basic v. Levinson,* 485 U.S. 224 (1988)</u>. Reliance on the market creates a rebuttable presumption of reliance upon the allegedly fraudulent statements or omissions. <u>*Id.* at 224</u>. Defendants argue that fraud on the market reliance is rebutted as to Murphy based upon his status as a frequent plaintiff in securities fraud actions.

In *Hanon,* the Ninth Circuit held that a court may refuse to certify a plaintiff who may be subject to unique defenses, including a claim that the plaintiff purchased shares to "buy a lawsuit" rather than in reliance upon the integrity of the market. <u>*Hanon,* 976 F.2d at 508</u>. The court upheld the refusal to certify a proposed class representative given his "extensive experience . in prior securities litigation, his relationship with his lawyers," evidence that the plaintiff had a practice of buying minimal number of shares of stock in various companies and the fact that plaintiff only purchased 10 shares of stock in the defendant company. *See also* <u>*Welling v. Alexy,* 155 F.R.D. 654, 658-59 (N.D.Cal.1994)</u> (plaintiff who participated in 13 prior securities actions with same attorneys and demonstrated a "level disinterest" in outcome denied class representative status).

**\*8** In this case, Murphy has a significant History of securities litigation which has occurred with the same Washington, DC law firm that represents him in this case. Although one hundred shares of stock represents a roughly $2400 investment, his prior history is significant enough to raise serious questions relative to the rebuttal of the presumption of reliance which arises with the fraud on the market theory. Thus, applying *Hanon* and *Welling,* I find that Murphy is an inappropriate class representative.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241
**(Cite as: 1996 WL 393662 (D.Or.))**

As for Flecker's continued stock transactions during and after the proposed class period, I agree with Judge Jones' opinion in *Freedman* that such issues relate to damages and are insufficient to preclude class certification. *Freedman*, 1996 U.S.Dist. LEXIS 2336, *57, *citing Blackie v. Barrack, 524 F.2d at 908-910; see also Welling, 155 F.R.D. at 661-62* (allowing in-out trader to act as class representative). Further, I find that Flecker and Schrock, have demonstrated a sufficient, albeit limited, understanding of this action and have satisfied me of their intent to meaningfully participate in its management.

To the extent that Flecker and Schrock indicated that they relied directly upon their broker rather than upon anything they read about Hollywood, reliance upon a broker does not render plaintiff's claims atypical. *In Re Proxima, 1994 WL 374306, *19 (S.D.Cal.); Guenther v. Pacific Telecom, 123 F.R.D. 333, 337 (D.Or.1988).* Further, defendants bear the burden of rebutting reliance. *Kaplan, 49 F.3d at 1376.*

As for defendants' request that short sellers and broker-to-broker transactions be excluded from the proposed class, I have reviewed the parties' experts' theories and find that like the "in and out" sellers, this is an issue which relates to damages rather than typicality and thus, reject such a categorical exclusion. Further, I anticipate that any conflicts of this kind will be peripheral to the main proceeding and "substantially outweighed by the class members' common interests." *Blackie, 524 F.2d at 909.*

## CONCLUSION

Based on the foregoing, Hollywood defendants' motion to dismiss plaintiffs' first and second claims under the 1933 Act (# 31) is GRANTED; the Underwriters' motion to dismiss the 1934 Act claims (# 33) is DENIED; and plaintiff's motion for class

certification (# 18-1, -2) is GRANTED as to claims 3 and 4 of the consolidated complaint as follows:

1. The class certified by this order shall include all persons who purchased common stock of Hollywood Entertainment Corporation between June 20, 1995 and December 5, 1995, inclusive (the "Class Period"), but shall exclude defendants, members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors and assigns of any such excluded party;

2. Plaintiffs Steve Flecker and Ken Schrock are designated as Class Representatives;

3. Plaintiffs' counsel, Stoll Stoll Berne Lokting & Schlachter P.C., Milberg Weiss Bershad Hynes & Lerach LLP, and Cohen Milstein Hausfeld & Toll, are appointed as Class counsel; and

*9 4. Counsel for all parties shall submit a form of notice to the Class within 60 days of the date of this order. Defendants shall provide plaintiffs with the names, addresses or record holders of Hollywood common stock during the Class Period and, if available, in a computer readable form.

IT IS SO ORDERED.

1996 WL 393662 (D.Or.), Fed. Sec. L. Rep. P 99,241

### Motions, Pleadings and Filings (Back to top)

· 3:95cv01926 (Docket) (Dec. 07, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 47

Not Reported in F.Supp.
1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
**(Cite as: 1992 WL 103686 (N.D.Cal.))**

Page 2



**Motions, Pleadings and Filings**


United States District Court, N.D. California.
BULL
v.
CHANDLER, et al.
**No. C-86-5710 MHP.**

March 12, 1992.

Opinion

<u>PATEL</u>, District Judge.

*1 Plaintiff filed this action alleging securities fraud on October 3, 1986.  On April 9, 1987, the court issued an order which dismissed with leave to amend plaintiff's Second Amended Complaint.  Plaintiff filed his Third Amended Complaint on April 30, 1987.  The case is now before the court on various defendants' motions to dismiss, motions for summary judgment and the defendants' joint motions for sanctions.  Having considered the arguments and authorities submitted by the parties the court GRANTS the motions for summary judgment and DENIES the motion for sanctions.

*BACKGROUND*

 Plaintiff brought this action to recover damages in connection with his purchase of interests in certain securities. <u>[FN1]</u>  The allegations focus mainly on defendant Linda Cline Chandler ("Chandler"), a broker, who allegedly misrepresented to plaintiff the nature of the risk and quality of his investments. Defendant Elizabeth S. Roberts ("Roberts"), who allegedly provided research support to Chandler, is also charged with liability for the alleged misrepresentations.  Plaintiff also claims that the various brokerage firms which employed Chandler and Roberts over the course of their relationship with him are liable for fraud. <u>[FN2]</u>  The foregoing claims have been pled as violations of section 10(b) of the

Securities Exchange Act of 1934, <u>15 U.S.C. § 78j(b)</u>, and Rule 10b-5 promulgated thereunder, <u>17 C.F.R. § 240.10b-5</u>.  Plaintiff also alleges that all defendants are liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), <u>18 U.S.C. § 1962</u>.  In addition, several pendent state claims for fraud, negligence and breach of fiduciary duty are alleged.

 In March 1981, plaintiff attended an investment seminar given by Chandler and thereafter met with Chandler in her officer at Sutro & Co. ("Sutro"). Because he was employed as an engineer at Apple Computer Inc., plaintiff held stock options in Apple valued at about $1.5 million.  After advising Chandler of his general lack of sophistication and experience in financial matters, plaintiff explained that he wished advice on how to invest up to a third of the value of his Apple stock options in low-risk investments which were more stable than Apple. Chandler told plaintiff that she and Sutro would employ their collective expertise to diversify his investment portfolio by investigating opportunities consistent with plaintiff's investment goals, that she would direct plaintiff to the best investments, and that she would obtain for him a twenty-three percent return on all of his investments.  Plaintiff trusted and relied on Chandler to advise him not only with respect to investment opportunities but also regarding tax and personal financial matters.

 Plaintiff met with Chandler on April 23, 1981 to discuss a $2000 investment in American Home Properties-80 ("AHP-80").  Chandler advised plaintiff to invest his IRA funds in this limited partnership, representing that it would yield a twenty-three percent return once it matured in three to five years.  Chandler asked plaintiff if he had read the prospectus which she had provided to him. Plaintiff replied that he had not read the prospectus.  Chandler responded that plaintiff's failure to read the prospectus was not a problem because she would explain to him everything he needed to know.  From this first transaction onwards, plaintiff accepted Chandler's reassurances, received but failed to read the prospectuses provided to him by Chandler, and relied exclusively on Chandler's representations in deciding which securities to purchase.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
(Cite as: 1992 WL 103686 (N.D.Cal.))

**\*2** Over the course of the next three years, plaintiff invested in over forty limited partnerships, solely on the strength of Chandler's recommendations. In the first year, plaintiff invested over $180,000 in seven different ventures. Beginning in April 1982, however, plaintiff became unwilling to continue to sell off his Apple stock to fund further investments, and so at Chandler's suggestion, continued to invest by purchasing on margin. All investments made after April 12, 1982, plaintiff purchased on margin. Chandler did not tell plaintiff that the margin interest rate would reduce his return on margin investments. Plaintiff's final investment based on Chandler's advice was on December 19, 1983.

Chandler and Roberts, who was providing Chandler with research and investment analysis, were employed by Sutro from the beginning of Chandler's relationship with plaintiff until May 31, 1983; by Van Kasper from March 26, 1983 through August 26, 1983; and from August 26, 1983 through October, 1984 by their own company, CRI. It is alleged without specificity that the various firms that employed the individual defendants "knew or recklessly failed to discover" that the investments sold to the plaintiff by their employee, Chandler, were unsuitable for him and that purchasing on margin was also unsuitable. Plaintiff complains that Chandler falsely represented (1) that the investments were suitable to plaintiff's objective of investing in low risk securities and that the high-risk nature of the investments was not explained to plaintiff, (2) that plaintiff would receive a twenty-three percent return on his investments, and (3) that it was suitable for plaintiff to purchase on the margin after April 1982.

Plaintiff failed to discover that his investments were unsuitable to meet his objectives until October 1984 when he decided to get a "second opinion" on the appropriateness of his investments. At this time plaintiff had no expectation that an analysis of individual investments would be "useful" because they were not expected to mature, at the outside, for another two years. Plaintiff was informed by a broker for another firm that the investments were "inappropriate." A certified public accountant subsequently hired for an independent evaluation informed plaintiff that he had $80,000 in deductions in excess of projected income for 1984 and write-offs in excess of $500,000 after 1986 and concluded that plaintiff had more tax write-off than he could use.

Two years after the CPA's report, plaintiff brought

this action. His complaint has been amended four times in attempts properly to plead violations of federal securities laws. Defendants now move to dismiss plaintiff's Third Amended Complaint with prejudice, or in the alternative, for summary judgment. Defendants also request Rule 11 sanctions.

## DISCUSSION

The court informed plaintiff's counsel when he last appeared on the motion to dismiss plaintiff's Second Amended Complaint that this was his final opportunity to plead plaintiff's claims. Now three times as long, the complaint remains woefully inadequate. Defendants have moved for summary judgment and support their motions with substantial evidentiary submissions. Plaintiffs has responded by submitting a three-page declaration. The court finds that the entire matter may be disposed of on the motions for summary judgment. In the interest of economy, the court will address only those motions and not the motions to dismiss.

### I. Summary Judgment

**\*3** Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n. 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not reply on the pleadings but must present specific facts creating a genuine issue of material fact); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. Anderson, 477 U.S. at 249. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. T.W. Elec. Serv., 809 F.2d at 631.

Defendants move for summary judgment on the claims arising under section 10(b) on four grounds.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN3] First, they argue that many of the claims are time barred. Second, assuming for purposes of the motions that plaintiff's allegations of misrepresentation or omission are true, defendants contend that plaintiff cannot prove a violation of the securities laws because he did not justifiably rely on such representations. Third, defendants maintain that the cost of trading on the margins is too obvious to require disclosure. Finally, defendants argue that if the section 10(b) claims are dismissed, the RICO claims must also fail. Each Ground will be addressed in turn.

A. *The Statutes of Limitations*

Until June 1991, there was no uniform statute of limitations period for claims raised under the Securities Exchange Act of 1934, 15 U.S.C. § 78(a) et seq. Then, in *Lampf, Pleva, Lipland, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773 (1991), the Supreme Court held that the statute of limitations of section 13 of the Securities and Exchange Act of 1933, 15 U.S.C. § 77m, applies to section 10(b) claims. Congress subsequently amended section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, to restore the pre-*Lampf* status of the statute of limitations. The Congressional amendment purports to be retroactive to include cases that were commenced on or before June 19, 1991, one day before the Supreme Court's decision in *Lampf.*

The question of the retroactivity of *Lampf* or of the new statute is academic since under either standard plaintiff fails to meet the statute of limitations. Therefore, the court will apply the pre-*Lampf* standard which requires that the court look to the most analogous statute of limitations of the forum state. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29 (1976); *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369, 1369-70 (9th Cir.1988). The applicable statute in this case is the California statute of limitations for common law fraud, which is three years. *Davis*, 839 F.2d at 1369-70.

**\*4** Although the court must refer to state law to determine the length of the limitations period, federal law determines when the period begins to run. *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 876 (9th Cir.1984). Under federal law, in an action arising under section 10(b), the period begins to run on the date the plaintiff discovered or reasonably should have discovered the fraud. *Davis*,

839 F.2d at 1370. As a rule, on a motion for summary judgment, the moving party has the burden of showing that there are no material issues of fact regarding notice. *Id.* Contrary to plaintiff's contention, however, that burden is not impossible to meet. Although notice is a question of fact, inquiry notice is evaluated by an objective standard. Where, as here, the evidence demonstrates that the plaintiff should have discovered the fraud, the issue may be resolved on summary judgment. *Id.*

1. *The Section 10(b) Claims Against Chandler and Roberts*

The transactions complained of begin with plaintiff's purchase of an interest in AHP-80 on April 13, 1981 and continued over the next two and a half years until the last transaction, a purchase of an interest in Horizon Kachina on December 19, 1983. Chandler and Roberts are charged with complicity in all the transactions over this period. This action was brought on October 3, 1986. Therefore, if plaintiff was on notice of the alleged fraud as of the date of each purchase, the claims against Chandler and Roberts arising from all transactions prior to October 3, 1983 are time-barred. Having reviewed the submissions of the parties, the court concludes that there is no material issue of disputed regarding notice. At the time of each transaction, plaintiff was on inquiry notice that the fraud, if any, had been committed.

The declaration of Linda Cline Chandler and the three volumes of accompanying exhibits demonstrate that prior to each transaction, Chandler gave a copy of the prospectus or offering document to the plaintiff and that by this signature plaintiff affirmed having read and relied upon the documents. [FN4] Most if not all of the offering documents expressly warned against reliance upon any information other than that provided in the prospectus. Most if not all of these documents stated that the investments were illiquid, were without a market, and were designed as tax shelters, but disclaimed any assurance of tax benefit and disclaimed any assurance of cash distribution. Defendants argue that when plaintiff received these documents, signed the subscription agreements and invested, he was on inquiry notice of any fraud because the statements in the offering memoranda were in direct contradiction to the misrepresentations he claims were made by Chandler.

In response to this argument plaintiff submitted a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
(Cite as: 1992 WL 103686 (N.D.Cal.))

declaration stating merely that he could not understand the offering materials and that Chandler assured him that he need not read the materials because she would explain all the pertinent information. Bull Dec. at 2. On the basis of this statement, plaintiff argues that Chandler actively concealed her fraud and that he is entitled to the benefit of equitable tolling. Neither the pleading nor plaintiff's evidentiary submission is adequate to entitle him to the benefit of equitable tolling.

**\*5** In order to invoke the doctrine of fraudulent concealment and to be entitled to equitable tolling of the statute of limitations the plaintiff must establish that he had neither actual nor constructive notice of the facts constituting his claim for relief. *See Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir.1987). Silence or passive conduct does not establish fraudulent concealment, rather there must be a showing of some affirmative effort by the defendants to mislead or to conceal the fraud. *Id.* at 1416.

Here plaintiff had constructive notice of the fraud as early as the date of his first investment. The statements in the offering materials were in direct contradiction to the statements of suitability (*i.e.,* low risk and high return) allegedly made by Chandler. Moreover, plaintiff does not state that Chandler did anything to prevent him from reading the offering materials. In fact he lets stand uncontradicted Chandler's declaration that throughout their association she continued to provide him with offering materials prior to his purchase of interests. The fact that plaintiff's general request for status reports on his investments were met by Chandler's repeated assertions that he could not hope to see results for three to five years cannot constitute lulling, since these representations were true.

Plaintiff's reliance on the result in *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434 (9th Cir.1984) (per curiam), is misplaced. In that case, the plaintiff acted on the advice of a broker and invested in short positions in order to capitalize on a falling market. The market, however, remained constant. The broker continued to advise in favor of short positions. The plaintiff sued for violations of section 10(b) and violations of California law. The court ruled that under California law, the statute of limitations may be tolled by a broker's reassurances and that determination was a disputed question of fact. *Id.* at 1436-37.

*Vucinich* is not analogous for two reasons. First, in *Vucinich* the assurances were directly related to the misrepresentation. Further, the plaintiff presented evidence that the investment scheme was highly speculative and improper absent fuller disclosure. By contrast, in this case, the alleged lulling related only to the expected date of return, not to either the amount of return or the nature of the risk. Second, the issue here is not a question of state law but rather a question of federal tolling. In this circuit, an investor is not permitted to rely on the assurances of a broker in the face of constructive notice of a fraud. *Volk,* 816 F.2d at 1416.

For the foregoing reasons, plaintiff is precluded from relying on the doctrine of fraudulent concealment and summary judgment is GRANTED in favor of Chandler and Roberts for failure to conform with the statute of limitations. Accordingly, the claims against Chandler and Roberts arising from transactions dating prior to October 3, 1983 are DISMISSED. The result is that plaintiff has satisfied the statute of limitations for the section 10(b) claims against Chandler and Roberts with respect to only five of the transactions for which liability is alleged: Horizon Resources Irvine (10/12/83); Horizon Resources Kachina (19/28/83), Lake Shore Partners (11/9/83), Cable TV Fund 11(c) (11/9/83), and Stonewood Apartments Ltd. (12/19/83).

*2. The Section 10(b) Claims Against Sutro, Van Kasper and CRI*

**\*6** Plaintiff alleges that Sutro, Van Kasper & Co. ("Van Kasper"), and Chandler-Roberts, Inc. ("CRI") are liable for violating section 10(b) and Rule 10b-5. Sutro's relationship with plaintiff only lasted while it employed Chandler and Roberts, until May 31, 1983; Van Kasper's relationship with plaintiff only lasted while it employed Chandler and Roberts, from May 31, 1983 until August 26; and CRI's relationship with plaintiff only lasted while it employed Chandler and Roberts from August 26, 1983 onwards. Therefore, the statute of limitations ran as to all the section 10(b) claims against Sutro and Van Kasper, and as to most of the section 10(b) claims against CRI for the reasons that it ran for most of the claims raised against Chandler and Roberts. Further, plaintiff neither alleges nor submits any evidence tending to show that Sutro, Van Kasper or CRI engaged in any type of active concealment of the alleged fraud. Indeed, plaintiff signed documents specifically

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
**(Cite as: 1992 WL 103686 (N.D.Cal.))**

indicating to the brokerages that his income, outside counsel in the form of accountants and attorneys, and investing experience qualified him to invest in these high risk partnerships. Accordingly, the statute of limitations bars all claims arising under section 10(b) against Sutro and Van Kasper, and all claims arising under section 10(b) against CRI, excepting the last five indicated above. [FN5]

### 3. *Breach of Fiduciary Duty and Negligence Claims*

Finally, the pendent state law claims for breach of fiduciary duty and negligence and negligent supervision are also time-barred. A two year statute of limitations applies to these claims. *See Vucinich, 739 F.2d at 1436.* For the same reasons as state above, plaintiff is not entitled to the benefit of any equitable tolling. He was on notice of any negligence or breach as of the date of investment, by which time he had signed the subscription agreements. Accordingly, all of these pendent state claims are DISMISSED as time-barred.

### B. *Justifiable Reliance*

The Ninth Circuit has recognized that justifiable reliance is an integral element of a claim for fraud under section 10(b) of the Securities Exchange Act of 1934. *See Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 961-62 (9th Cir.1990); see also In re Rexplore, Inc. Securities Litigation, 671 F.Supp. 679, 682 (N.D.Cal.1987), aff'd in part and rev'd in part, 886 F.2d 1109 (9th Cir.1989)* (elements of claim under section 10(b) are misrepresentation or omission of a material fact in connection with the purchase or sale of a security, justifiable reliance on the misrepresentation or omission, and scienter).

Defendants [FN6] argue that, as a matter of law, plaintiff cannot prove justifiable reliance. The Chandler declaration and its accompanying exhibits clearly demonstrates that, before every investment, plaintiff was given a copy of the offering materials for each investment by his broker. The court has examined each of the exhibits and finds that in every case, the materials disclosed that the investment involved at least a substantial if not high risk ot principal and that notice of the risk was plainly printed in capital letters and/or italics on the cover page of each document; that the materials set out suitability requirements; that many of the materials expressly stated that although the purpose of the investment was to achieve a tax benefit, no such

benefit was guaranteed; that there was no market for the security and none was expected to develop; that no return or beneficial result could be expected in less than three years; and that no representations about the investment should be relied upon other than those made on the offering materials or by the general partner. In short, the offering materials were fairly standard for limited partnerships organized for the purpose of sheltering income from taxes. On this motion it is not disputed that the materials, at least with respect to the risk and other disclaimers on the front pages, were not understandable to a person of average intelligence and ability, despite any lack of sophistication of financial investments. In any event, plaintiff in his declaration merely states that he did not read the documents.

*7 In addition to the warnings, in order for the plaintiff's subscriptions to be accepted he was required to and did fill out and sign forms demonstrating his suitability as an investor. The questions on the forms, which reflected the stated requirements, included a certain level of income, [FN7] the names of an attorney and accountant or financial advisor, the quality of the plaintiff's experience and sophistication in various types of investments and various other questions designed to insure the suitability of the investor. Whether filled out by Chandler or not, plaintiff signed these forms and attested to their truth in so doing.

Defendants contend that, assuming for the purposes of argument that Chandler [FN8] made the misrepresentations as alleged, plaintiff could not have justifiably relied on them because he was provided by Chandler with information which stood in direct contradiction to those misrepresentations. Further, plaintiff signed subscription agreements affirming that he had read the offering materials and was aware of the risks involved. In the face of this evidence, plaintiff claims only that he read neither the offering materials nor the documents he signed and relied exclusively on Chandler's representations. Plaintiff's averments are insufficient to survive summary judgment.

Justifiable reliance must be evaluated in light of the facts surrounding the transaction. *In re Rexplore, 671 F.Supp. at 684.* In determining whether reliance was justified, several factors must be considered, including but not limited to the plaintiff's experience and sophistication in financial investing; the duration of the relationship between the plaintiff and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-00988-SI   Document 297-6   Filed 07/29/05   Page 65 of 66

Not Reported in F.Supp.                                                    Page 7
1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
(Cite as: 1992 WL 103686 (N.D.Cal.))

defendant; the availability of relevant and truthful information; the presence of absence of a fiduciary relationship; the concealment of or the opportunity to discover the fraud; which party initiated or expedited the transaction; and the specificity of the misrepresentations. *Id.; Kennedy,* 814 F.2d at 804; *Zobrist,* 708 F.2d at 1516 (and cases cited therein).

The evidence submitted, viewed in the light most favorable to plaintiff, does not allow any of these factors to weigh in his favor. Although plaintiff alleges a lack of sophistication, he signed documents indicating a sufficient level of experience and sophistication. Plaintiff had no history of a long-standing relationship with either Chandler or any of the brokerages when he allegedly placed his financial well-being in Chandler's hands. Accordingly, he cannot rely on his precipitous trust of the broker to justify his complete reliance on her representations and his failure to read the offering materials. Relevant information was not only freely available but was provided to plaintiff by the very person he claims to have defrauded him. Plaintiff ignored the truth that was in his hands and under his nose. There was no fiduciary relationship between plaintiff and Chandler. She had no discretion to trade on his account; rather plaintiff approved all transactions. As discussed above with respect to fraudulent concealment, there is no evidence that Chandler or any of the defendants did anything to conceal the true facts from plaintiff; in fact Chandler provided plaintiff with reliable information which was in direct contradiction to her alleged misrepresentations. Plaintiff had every opportunity to discover the fraud. Plaintiff initiated most, if not all of the transactions and certainly initiated the first by contacting Chandler after the first seminar. Finally, the misrepresentations alleged, excepting the promise of a twenty-three percent return, were highly unspecific. Plaintiff disputes none of these facts. Moreover, the idea that even an unsophisticated investor would rely on a representation that a return of twenty-three percent could be guaranteed on a low risk investment stretches the bounds of credibility.

**\*8** The evidence before the court demonstrates a complete absence of justifiable reliance. Assuming that the alleged misrepresentations were proven, a reasonable jury could not but reach the conclusion that plaintiff, without reason or justification, recklessly placed blind faith in Chandler and stuck his head in the sand, by ignoring the contradictions between the offering materials and her

representations. *See Kennedy,* 814 F.2d at 805; *Zobrist,* 708 F.2d at 1518; *Teamsters,* 762 F.2d at 529-30. The federal securities laws are not an insurance policy for investors who trust their financial well-being to salespersons who have no legal duty to look out for their best interests. Plaintiff's attempts to establish a fiduciary relationship fail because Chandler had no discretion to trade on his account and because there is no evidence to support the claim that Chandler acted as an investment advisor. Accordingly, plaintiff's surviving claims under section 10(b) fail because plaintiff cannot meet his burden on the element of justifiable reliance.

*C. Margin Purchases*

Section 10(b) cannot be violated by failure "to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1220 (9th Cir.1980). Defendants were not required to disclose that a margin account involved greater risk and less net income because these facts fall within the category of the universally known. *Newman v. L.F. Rothschild, Unterberg, Towbin,* 651 F.Supp. 160, 164 (S.D.N.Y.1986). Further, plaintiff has not submitted any evidence in support of the allegation that he was not informed of the terms of a margin account. Accordingly, the claims arising from nondisclosure of the terms of a margin account must be DISMISSED.

*D. The RICO Claims*

The Supreme Court has adopted a uniform statute of limitations for claims arising under RICO of four years from the date of transaction. *See Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156 (1987). Thus, for the reasons discussed in part A all RICO claims arising from transactions dating before October 3, 1982 are time-barred. The remaining RICO claims must fail because, as discussed in part B, plaintiff cannot prove the predicate acts of securities fraud as alleged. Accordingly, summary judgment is GRANTED on plaintiff's RICO claims.

*II. Sanctions*

Defendants have not demonstrated to the satisfaction of the court that the complaint is so frivolous as to be "legally unreasonable." *See Zaldivar v. Los Angeles,* 780 F.2d 823, 832 (9th Cir.1986). Not every failed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567
**(Cite as: 1992 WL 103686 (N.D.Cal.))**

pleading justifies Rule 11 sanctions. While plaintiff's submission fall far short of establishing the claims alleged, it is not clear that his claims were unfounded. Accordingly, defendants' motion for sanctions is DENIED.

### CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are GRANTED and the action is dismissed in its entirety. Defendants' motion for sanctions is DENIED.

**\*9** IT IS SO ORDERED.

FN1. Some of the purchases were of public offerings, some were California intrastate offerings and some were private placements. *See* Appendix A to Chandler's Memo in Support of Summary Judgment.

FN2. Plaintiff has not squarely pled any violation of section 20 of the Securities Exchange Act for controlling person liability, nor has he pled liability as an aider or abettor. However, because there are factual allegations, which, if broadly read, may indicate a claims for such liability, the defendants have addressed these allegations and the court will rule on them as if they had been pled.

FN3. Defendants submitted three sets of memoranda, each of which incorporated the arguments and submissions of the other two.

FN4. This information is summarized in Appendix B to Chandler's Memo in Support of Summary Judgment.

FN5. Plaintiff has not expressly alleged Sutro's, Van Kasper's or CRI's liability as a controlling person or an aider or abettor under the federal securities laws, although in plaintiff's opposition to defendants' motion to dismiss plaintiff mistakenly and belatedly claims the right to amend to so plead. Even aside from this fatal pleading defect, such claims would be barred by the statute of limitations.

FN6. The arguments with respect to justifiable reliance will be discussed in terms of the section 10(b) claims which survived summary judgment on the statute of limitations defense. Therefore, they affect only Chandler, Roberts and CRI. However, the discussion is equally applicable to the claims which were dismissed for failure to comply with the limitations period.

FN7. It is interesting to note that on the suitability forms plaintiff reported annual income in excess of $200,000 a year. This is substantially more than the $48,000 a year income which he alleged in his complaint.

FN8. The references to the import of Chandler's misrepresentations apply equally to Roberts and CRI.

1992 WL 103686 (N.D.Cal.), Fed. Sec. L. Rep. P 96,567

**Motions, Pleadings and Filings (Back to top)**

• 3:86CV05710 ____(Docket) (Oct. 03, 1986)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.