MAYER, BROWN, ROWE & MAW LLP
Donald M. Falk (SBN 150256)
Lee H. Rubin (SBN 141331)
Shirish Gupta (SBN 205584)
Two Palo Alto Square, Suite 300
Palo Alto, California 94306
Telephone:    (650) 331-2000
Facsimile:    (650) 331-2060
lrubin@mayerbrownrowe.com

MAYER, BROWN, ROWE & MAW LLP
Alan N. Salpeter (admitted *pro hac vice*)
Javier Rubinstein (admitted *pro hac vice*)
Vincent P. Schmeltz III (admitted *pro hac vice*)
71 South Wacker Drive
Chicago, IL  60606
Telephone:    (312) 782-0600
Facsimile:    (312) 701-7711
jrubinstein@mayerbrownrowe.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, AND EDWARD J. SANDERSON

ORACLE CORPORATION
Dorian Daley (SBN 129049)
James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone:    (650) 506-5200
Facsimile:    (650) 506-7114
jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Documents Relates To:<br><br>ALL ACTIONS. | Case No. C-01-0988-MJJ (JCS)<br>(Consolidated)<br><br>**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    September 13, 2005<br>Time:    9:30 a.m.<br>Place:   Courtroom 11<br>         Honorable Martin J. Jenkins |

**DECLARATION OF STEFAN BOEDEKER**

I, STEFAN BOEDEKER, declare and state that:

1. I am the Managing Director of the Economics and Statistics practice at Navigant Consulting ("Navigant"), a specialized independent consulting firm providing litigation, financial, healthcare, energy, and operational consulting services to government agencies, legal counsel, and large companies. My office is located at 633 West 5th Street, 60th Floor, Los Angeles, CA 90071. Prior to joining Navigant, I held partner level positions at Deloitte & Touche LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP. I was responsible for the Economics and Statistics practice at all three firms. I also worked as a statistician for the German Government for three years before moving to the United States to attend graduate school.

2. I am an economist and a statistician. I received a Bachelor of Science in Statistics and a Bachelor of Arts in Business Administration from the University of Dortmund in Dortmund, Germany in 1986. I received a Masters of Science in Statistics from the University of Dortmund in 1988 and a Masters of Arts in Economics from the University of California, San Diego in 1992. I also finished all of the Ph.D. requirements in Economics at the University of California, San Diego except for my dissertation. My work focuses on the application of economic, statistical, and financial models to a variety of areas, such as providing solutions to business problems, supporting complex litigation, and drafting economic impact studies. As head of the Economics and Statistics practice at Navigant, I have performed analysis on stock return data on numerous occasions in both litigation and research contexts. A copy of my curriculum vitae is attached as Appendix A to my Declaration.

3. I have been retained by counsel for Defendants Oracle Corporation ("Oracle"), Lawrence J. Ellison, Jeffrey O. Henley, and Edward J. Sanderson (collectively "Defendants") to assist in analyzing: (1) Plaintiffs' methodology for identifying and segregating the claimed price

**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

effects of Oracle's alleged misleading statements; (2) trading in Oracle securities during the proposed class period (December 14, 2000 through March 1, 2001) by putative class representatives Local 144 Nursing Home Pension Fund (now known as 1199 SEIU Greater New York Pension Fund), Drifton Finance Corporation, Robert D. Sawyer, Dzung Chu, and Ryan Kuehmichel; and (3) the prevalence of certain types of securities traders in the putative class.

4. In preparing my Declaration, I reviewed the information set forth in Appendix B. The relevant portions of the trading records and deposition transcripts I reviewed can be found as exhibits to the Declaration of Vincent P. Schmeltz III in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

## I. PLAINTIFFS HAVE OFFERED NO METHODOLOGY FOR IDENTIFYING, SEGREGATING, AND MEASURING THE CLAIMED PRICE EFFECTS OF ORACLE'S ALLEGED MISLEADING STATEMENTS.

5. Plaintiffs have at various times suggested that the fraud they allege caused Oracle's stock price to drop $2.62, "nearly $4," or "50% from its Class Period high of $35."[1] Plaintiffs, however, have not offered any methodology to identify, segregate, and measure, on a class-wide basis, any price effect of the alleged fraud. That it would even be possible to do so cannot be assumed in this case.

### A. Oracle Stock Price Returns Mirrored Those Of The NASDAQ-100.

6. It is a well established principle of financial economics that any effort to identify, segregate, and measure the price effect of an alleged fraud must control for market-driven price movements unrelated to the alleged fraud. But during the proposed class period, Oracle's stock

---

[1] Revised Second Amended Complaint, ¶ 75; Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Motion for Class Certification and Corrected Memorandum in Support Thereof in Light of *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, at 5.

2

**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

price movements generally mirrored those of the broader market as measured by the NASDAQ-100, an index of stock performance for companies similar to Oracle.

7. The NASDAQ-100 Composite Index measures the performance of the 100 largest non-financial firms (by market capitalization) listed on the NASDAQ Stock Market. The Index predominantly reflects the performance of high technology companies like Oracle. Exhibit 1 shows the daily opening and closing prices for the NASDAQ-100 Index and for Oracle stock during the four months that encompass the proposed class period.

8. During the proposed class period—from the December 14, 2000 open to the March 1, 2001 close—Oracle's stock performance roughly matched that of the NASDAQ-100 index. Oracle's stock price fell 26.9%, while the NASDAQ-100 Index fell 28.3%.

9. Indeed, within the proposed class period Oracle's stock generally followed the NASDAQ-100 as it rose and fell. At the start of the proposed class period, the NASDAQ-100 stumbled after heavily weighted component Microsoft reported an earnings shortfall.[2] But within a week, Oracle stock and the NASDAQ-100 were trading largely in tandem. From the December 19 close to the January 19 close, when Oracle's stock price peaked, Oracle's stock price rose 12.9% while the NASDAQ-100 rose 10.7%. The NASDAQ-100 peaked five days later on January 24, and from that date's close through the March 1 close Oracle's stock dropped 28.9% while the NASDAQ-100 fell 27.8%.

10. Given that Oracle's stock price largely moved in tandem with the broader market during the proposed class period, one cannot assume that Plaintiffs will be able to identify, segregate, and measure price effects of the alleged fraud on a class-wide basis.

---

[2] *See, e.g.,* "Microsoft Under $50; Shares Fall $6.31, Taking NASDAQ, Dow Down with Them" *Seattle Times,* 16 December 2000 (Appendix C, Tab 1). I have compiled this article and the other publicly-available documents cited in this declaration in Appendix C.

3

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

### B. There Is No Obvious Relationship Between Oracle Stock Price Movements And The Alleged Fraud.

11. Another well-accepted principle of financial economics is that any effort to identify, segregate, and measure the price effect of an alleged fraud must control for price movements resulting from events unrelated to the fraud. The need to do so in this case—and the difficulty of the task—is confirmed by examining price movements on just a few days of the proposed class period.

12. Plaintiffs allege that on February 8, 2001, two analyst reports communicated to the public false or misleading statements made by Oracle management regarding Oracle's financial projections for the quarter ending February 28, 2001 and the effect of a general economic downturn on Oracle's results.[3] But February 8, Oracle's stock price fell $.57 (2.0%) from the previous day close and remained essentially unchanged relative to the NASDAQ-100, which fell 2.2%. No inflation from the alleged misstatements is apparent.

13. Plaintiffs allege that on February 9, 2001, an Oracle spokesperson made false and misleading statements about the prospects for Oracle's earnings growth, the contribution of Suite 11i sales to that growth, and the effect of the economic slowdown on Oracle.[4] That same day, however, an analyst published a report maintaining a "strong buy" recommendation, but opining that the demise of Oracle's dot-com customers would limit Oracle's earnings growth.[5] Oracle's stock price fell $3.56 (13.1%) from the previous day's close. In these circumstances, I see no easy way to confidently attribute a price impact to the alleged misstatements of February 9.

---

[3] Revised Second Amended Complaint, ¶ 65(a), (b).

[4] Revised Second Amended Complaint, ¶ 65(c).

[5] Morgan Stanley Dean Witter, "Oracle: Getting Through Q3 in Good Shape," 9 February 2001 (Appendix C, Tab 2).

4

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

### B. There Is No Obvious Relationship Between Oracle Stock Price Movements And The Alleged Fraud.

11. Another well-accepted principle of financial economics is that any effort to identify, segregate, and measure the price effect of an alleged fraud must control for price movements resulting from events unrelated to the fraud. The need to do so in this case—and the difficulty of the task—is confirmed by examining price movements on just a few days of the proposed class period.

12. Plaintiffs allege that on February 8, 2001, two analyst reports communicated to the public false or misleading statements made by Oracle management regarding Oracle's financial projections for the quarter ending February 28, 2001 and the effect of a general economic downturn on Oracle's results.[3] But February 8, Oracle's stock price fell $.57 (2.0%) from the previous day close and remained essentially unchanged relative to the NASDAQ-100, which fell 2.2%. No inflation from the alleged misstatements is apparent.

13. Plaintiffs allege that on February 9, 2001, an Oracle spokesperson made false and misleading statements about the prospects for Oracle's earnings growth, the contribution of Suite 11i sales to that growth, and the effect of the economic slowdown on Oracle.[4] That same day, however, an analyst published a report maintaining a "strong buy" recommendation, but opining that the demise of Oracle's dot-com customers would limit Oracle's earnings growth.[5] Oracle's stock price fell $3.56 (13.1%) from the previous day's close. In these circumstances, I see no easy way to confidently attribute a price impact to the alleged misstatements of February 9.

---

[3] Revised Second Amended Complaint, ¶ 65(a), (b).

[4] Revised Second Amended Complaint, ¶ 65(c).

[5] Morgan Stanley Dean Witter, "Oracle: Getting Through Q3 in Good Shape," 9 February 2001 (Appendix C, Tab 2).

4

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

14. On January 3, 2001, Oracle's stock experienced its greatest one day gain of the proposed class period, when it rose $5.63 (21.3%) above the previous day's close. Plaintiffs allege no false or misleading statement on January 3. Rather than being the result of the alleged fraud, the gains are more likely attributable to an unexpected Federal Reserve interest rate cut.[6]

15. On February 2, 2001, Oracle's stock price fell $2.31 (7.7%) from the previous day's close. Plaintiffs claim no revelation of the alleged fraud on February 2. It is unclear to what the losses might be attributable, but there is no reason to believe they are attributable to the alleged fraud.

16. These few examples show that identifying, segregating, and measuring the price effect of the alleged fraud will require disentangling confounding information and controlling for movements in the broader market and numerous industry- and company-specific events unrelated to the fraud. There is no reason to assume that Plaintiffs will develop a methodology capable of doing so on a class-wide basis.

## II. TRADING PRACTICES OF PUTATIVE CLASS REPRESENTATIVES

### A. 1199 SEIU Greater New York Pension Fund

17. As deposition testimony has revealed, 1199 SEIU Greater New York Pension Fund ("1199 SEIU") conferred complete investment discretion over its funds to investment management firms.[7] During the proposed class period, one of those investment management firms, Turner Investment Partners ("Turner"), purchased Oracle stock on 1199 SEIU's behalf. Exhibit 2 shows Turner's transactions in Oracle securities on behalf of 1199 SEIU during the proposed class period.

---

[6] On the same day, the NASDAQ-100 appreciated 18.8%. Mark Lewis, "Trader Wrapup: Rate Cut Boosts Tech, Banks," *Forbes.com*, 3 January 2001 (Appendix C, Tab 3).

[7] *See* Deposition of Robert Turner, at 43-48, and Deposition of Gregg O'Keefe, at 45-46.

5

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

18. Turner's transaction history indicates that it followed a "buy and hold" investment strategy for 1199 SEIU's assets. The buy and hold strategy is a passive investment strategy. Buy and hold investors generally seek to capitalize on long-term appreciation and thus ignore short-term fluctuations in either the stock market or the economy as a whole.[8]

**B. Ryan Kuehmichel**

19. Ryan Kuehmichel purchased Oracle stock and sold "short call options" on Oracle stock during the proposed class period. Exhibit 3 shows Kuehmichel's transactions in Oracle securities during the class period, and related transactions.

20. A "short call option" is a type of "derivative" security, the value of which depends on the performance of an underlying security. A "call option" gives the holder of the option the right—but not the obligation—to buy a specified number of shares before a specified date (the "expiration date"), at a specified price (the "strike price"). When a trader sells (or "writes") a call option, he or she opens up a "short call option" position. This is a "short position" because the person writing the call option contract can expect to gain on the transaction if the price of the underlying security *declines*. Conversely, the holder of the option (the "optionee") can expect a gain on the transaction only if the price of the underlying security increases. If the market price of the underlying security rises above the strike price, the optionee can exercise the option by requiring the option writer to sell the underlying security for the strike price.[9]

21. Kuehmichel sold short call options to "hedge"—*i.e.* reduce the risk of adverse price movement in—his Oracle stock purchases and to make short-term profits from the *declining*

---

[8] *See*, generally, Frank Reilly and Keith Brown, *Investment Analysis and Portfolio Management*, Thomson South-Western, 2003, at 653-654, 809 (Appendix C, Tab 4).

[9] *See*, generally, John Hull, *Options, Futures, and Other Derivatives*, Fourth Edition, Prentice-Hall, 2000, at 5-9, 151-166 (Appendix C, Tab 5); Reilly and Brown, *Investment Analysis and Portfolio Management*, at 868-869 (Appendix C, Tab 6).

6

share price of Oracle stock. Selling short call options earned Kuehmichel a profit of $12,063 over the proposed class period, an amount that quite possibly exceeds any losses he suffered on his Oracle stock purchases as a result of the alleged fraud.

### C. Robert Sawyer

22. Robert Sawyer bought and sold large quantities of Oracle stock on a near-daily basis for most of the proposed class period and on one occasion sold call options on Oracle stock. Sawyer's deposition testimony indicates that he intended to pursue a buy and hold strategy, but he frequently had to sell to satisfy or avert margin calls.[10] Exhibit 4 lists Sawyer's transactions in Oracle securities during the proposed class period.

23. During the proposed class period, Sawyer sold 41,600 more shares of Oracle stock than he purchased. Any stock price inflation during the proposed class period, therefore, would almost certainly have benefited Sawyer, on balance. Accordingly, it is highly unlikely that Sawyer suffered any injury as a result of the alleged fraud.

### D. Dzung Chu

24. Dzung Chu—and his wife—bought and sold Oracle stock during the proposed class period.[11] Exhibit 5 lists the Chus' transactions in Oracle securities.

25. Chu testified at his deposition that he and his wife followed different investment strategies in trading Oracle stock.[12] Consistent with that testimony, the Chus' trading records

---

[10] "Margin traders" purchase securities with borrowed money. If the shares in the margin trader's portfolio decrease in value, the investor's equity relative to borrowings similarly falls. *See, generally*, Reilly and Brown, *Investment Analysis and Portfolio Management*, at 127-130 (Appendix C, Tab 7). A "margin call" occurs when the brokerage requires the margin trader to sell shares in order to re-balance equity and borrowings. Margin calls can force a trader to sell shares, regardless of his belief in the fundamental value of those shares. *See* Deposition of Robert Sawyer, at 68, 109, 138-39, 148-51.

[11] Chu and his wife, Thanhnhan Nguyen JT Ten, had a joint investment account. *See* Deposition of Dzung Chu, at 155.

7

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

exhibit two different trading strategies: "swing trading" and "position trading." A swing trader, like a "day trader," trades securities on very short-term price momentum. While day traders hold a stock anywhere from a few seconds to a few hours, swing traders hold stocks for several days, if necessary, to capture a gain from market movement.[13] As is the case with day traders, swing traders often use technical analyses to identify stocks. These traders are not interested in the fundamental value of a stock or the integrity of its market price, but rather, in the stock's short-term pricing trends and trading patterns.

26. Like swing trading, position trading is an "active" investment strategy, involving ongoing buying and selling of stock in order to exploit near-term price momentum. Position traders, however build positions in securities and have slightly longer investment horizons.[14]

27. My analysis indicates that the majority of the Chus' trading in Oracle—and in other companies' stocks—exhibits swing trading characteristics. The Chus often purchased shares on one day and sold them the next trading day. Exhibit 6 graphs the frequency of the Chus' trades.

E. **Drifton Finance Corporation**

28. Drifton Finance Corporation ("Drifton") bought and sold put and call options on Oracle stock and bought Oracle stock to satisfy exercised put options during the proposed class period. Drifton did so, it appears, pursuant to a "short strangle" option trading strategy. Exhibit 7

---

(… cont'd)

[12] According to Chu, his wife had a habit of buying a stock one day and selling the stock the next day, *id.* at 156-57, while he preferred to hold stock in "good companies" a little longer. *See id.* 167-69.

[13] *See* Alpesh Patel, "Have You Nerves of Steel? Then You Might Profit From Swing Trading Just as I do," *Financial Times*, 31 August 2002 (Appendix C, Tab 8).

[14] *See, generally,* David Brown and Kassandra Bentley, *All About Stock Market Strategies*, McGraw-Hill 2002, at 172 (Appendix C, Tab 9).

8

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

lists Drifton's transactions in Oracle securities during the class period and related transactions before and after the proposed class.

29. I have described a "call option" above. A "put option" follows the converse pattern—it gives the holder the right to *sell* a certain quantity of an underlying security to the writer of the option, at the strike price, up to the option's expiration date.[15] In a "short strangle," as long as the stock price remains between the strike prices of the put and call options until expiration, neither option will be exercised and the option writer will realize his maximum profit (*i.e.*, the premium earned from the sale of both options).[16] However, if the price of the underlying security moves above the call option strike price or below the put option strike price, the option writer stands to lose money. In that situation, the option writer has two alternatives: (1) allow the option to be exercised (which would require the option writer to sell at a below-market price or buy at an above-market price); or (2) repurchase the option in order to prevent the optionee from exercising the rights to the underlying security.[17]

30. Drifton wrote options (1) prior to the proposed class period with expiration dates during the proposed class period; (2) during the proposed class period with expiration dates during the proposed class period; and (3) during the proposed class period with expiration dates after the proposed class period. If one believes plaintiffs' claim that the alleged fraud caused

---

[15] For example, if Drifton wrote a put option on Oracle common stock with a strike price of $25 per share and the Oracle share price dropped below the strike price between the purchase date and the expiration date, the optionee could require Drifton to purchase the stock from her at $25 per share. If the Oracle share price remained above the strike price throughout the term of the option, the writer would realize a gain equal to the original option premium, provided the writer did not buy back the put option before the expiration date. *See,* generally, Hull, *Options, Futures, and Other Derivatives*, at 5-9, 151-166 (Appendix C, Tab 5); Reilly and Brown, *Investment Analysis and Portfolio Management*, at 868-869 (Appendix C, Tab 6).

[16] *See* Deposition of Jacques Fuhrer, at 308.

[17] *See,* generally, Anthony Saliba, *The Options Workbook,* Dearborn Trade, 2001, at 107-111 (Appendix C, Tab 10).

9

DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)

Oracle's stock price to be higher than it otherwise would have been during the proposed class period, the alleged fraud potentially affected returns on each group of options.

31. For all of the options in the first group, Oracle's stock price remained above put option strike prices and below call option strike prices. If anything, therefore, the alleged fraud—and the alleged resulting price inflation—benefited Drifton with respect to these options by keeping Oracle's stock price above the put option strike prices.

32. The potential impact of the alleged fraud on the options in the second group is less certain. Before the expiration dates, Oracle's stock price fell below the strike price for some, but not all, of the put options that Drifton wrote (meaning that Drifton had to either buy back those options or allow option holders to exercise those options). But if the inflationary price effect of the alleged fraud when Oracle's stock price fell below the strike prices was the same as or greater than when Drifton wrote the options, any losses are attributable to price movements unrelated to the alleged fraud. And, of course, Plaintiffs have offered no view on and no method to determine whether the alleged fraud's price effect increased, decreased, or stayed the same between when Drifton wrote put options and when Oracle's stock price fell below the strike prices for those options.

33. For the third group of options, Oracle's stock price fell below all of the put option strike prices before the expiration dates. To the extent that this resulted from a decrease in the inflationary price effect of the alleged fraud (because of a revelation of the alleged fraud or otherwise), however, it benefited Drifton by preventing Oracle's stock price from exceeding the strike prices on call options Drifton sold during the proposed class period. In other words, the alleged fraud would have allowed Drifton to realize gains on the call options it wrote. Those gains must be set off against any losses on the put options Drifton wrote that resulted from the

10

alleged fraud. The net impact of the alleged fraud on the third group of Drifton option trades is thus uncertain.

34. Calculating the impact, if any, of the alleged fraud on Drifton's option and related trading would be no simple task and would be subject to dispute. One would have to first construct a but-for-the-alleged-fraud stock price for every actual stock price during the proposed class period. Next one would have to use that price to construct but-for-the-alleged-fraud option prices for every combination of strike price and expiration date that traded during the proposed class period. Then one would have to determine at what combinations of strike prices and expiration dates Drifton would have traded options in the absence of the alleged fraud, in light of the but-for stock and option prices. Finally, one would have to compare the returns of Drifton's hypothetical options trading to those of its actual trading. Plaintiffs have offered no methodology for undertaking this analysis, and there is no reason to believe they will be able to do so.

### III. THE PUTATIVE CLASS INCLUDES MANY TRADERS WHO TRADED WITHOUT REGARD FOR THE INTEGRITY OF ORACLE'S STOCK PRICE.

**A. Program Traders**

35. Of the 4.1 billion publicly-available shares, approximately 2.3 billion, or 56% of the float, were held by institutional investors at the beginning of the class period.[18] Exhibit 8 shows the reported holdings of institutional investors as of September 30, 2000; December 31, 2000; and March 31, 2001. As this exhibit demonstrates, between September 30, 2000 and December 31, 2000, 479 institutions increased their holdings of Oracle stock by 169.7 million shares in total. Between December 31, 2000 and March 31, 2001, 482 institutions increased their holdings of Oracle stock by 171.5 million shares in total.

---

[18] The float is calculated as the shares outstanding (5.58 billion), less insider holdings (1.45 billion).

11

36. Many institutions engage in "program trading."[19] "Program trading" refers to a trading system that uses computer programs to execute trades automatically upon the occurrence of a certain event (*e.g.*, a stock falling below a certain percentage of a portfolio).[20] "Program traders" do not consider the underlying fundamentals of a stock—such as profit or revenue growth—when increasing or decreasing their position in a particular stock. Instead, they make trades in order to satisfy some predetermined criteria. Here, one of the firms that traded on behalf of 1199 SEIU (although not in the proposed class period), Congress Asset Management, exhibited the characteristics of a "program trader" when it purchased Oracle common stock in order to keep Oracle at 2.5% of 1199 SEIU's total holdings.[21] Given the prevalence of institutions among Oracle's shareholders, it is likely that many of the transactions in Oracle stock during the class period were program trades.

### B. Day and Swing Traders

37. During the class period, Oracle stock traded on high volume and with considerable volatility. Volume averaged 49 million shares per day, and the price moved, on average, 7.6% between its high and low during each trading session.

38. This share turnover and price volatility indicates that meaningful numbers of active, short-term traders, like the day traders and swing traders I have already discussed, traded Oracle stock during the proposed class period. Such traders purchased and sold Oracle stock without regard for the company's fundamentals or the integrity of its stock price. Rather, such traders purchased and sold in reliance on short-term momentum.

---

[19] *See, e.g.,* Thomson Financial, "Program Trading – A Bit of Clarity," June 2005 (Appendix C, Tab 11).

[20] *See, e.g.,* Richard A. Booth, "The Uncertain Case For Regulating Program Trading," *Columbia Business Law Review* 1, 1-17, 1994 (Appendix C, Tab 12).

[21] *See* Deposition of Gregg O'Keefe at 84-88.

12

**C. Short Sellers**

39. A "short seller" is a type of trader who sells borrowed stock at the market price. The short seller expects that the market price will decline so that she can repay the borrowed stock, or "cover the short," with stock purchased at a future, lower price. The premise behind short selling is that the market price overstates the true value of the stock. And the timing of covering purchases depends on the relationship of the short sale price to the market price, not whether either reflects the fundamental value of the stock.[22]

40. Exhibit 9 is a table showing the short interest in Oracle stock (*i.e.* the number of shares shorted) as of the 15th of each month during the proposed class period. As this exhibit demonstrates, on December 15, 2000 short interest in Oracle stock stood at 56.2 million. Short interest fell to 48.6 million by January 15, 2001 and continued down to 32.8 million on February 15, before rising slightly to 33.8 million on March 15. These changes in short interest demonstrate that a significant number of purchasers during the proposed class period were short sellers purchasing Oracle stock to cover shorts, especially between December 15 and February 15, when traders covered at least 23.4 million short sales.

**IV. CONCLUSION**

41. Three conclusions emerge from the analyses presented in this report. First, Plaintiffs have offered no methodology for identifying, segregating, and measuring the claimed price effects of Oracle's alleged misleading statements, and there is no reason to assume they will be able to do so. Second, the putative class members pursued disparate trading strategies, some of which cast doubt on whether they relied on the integrity of market prices or suffered injuries as a result of the alleged fraud and whether their reliance or injury could be assessed on a class-wide

---

[22] *See,* generally, Reilly and Brown, *Investment Analysis and Portfolio Management*, at 126 (Appendix C, Tab 13).

13

basis. Third, the proposed class likely contains numerous traders who traded Oracle stock without regard for the integrity of market prices.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate and that this Declaration was executed on July 27, 2005 in Los Angeles, California.

                         /s/ Stefan Boedeker
                         Stefan Boedeker
                         Managing Director
                         Navigant Consulting

*Filer's Attestation: Pursuant to General Order No. 45, Section X(B), Shirish Gupta hereby attests that the signatory's concurrence in the filing of this document has been obtained.*

14

**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**