Tab 6

benefits when stock prices rise and suffers when prices fall, just as would be the case for an investor purchasing stock directly in the spot market. Of course, the short position to the contract, as the seller, would have the exact opposite payoffs as those shown in Exhibit 21.4.

The data displayed in Exhibit 21.3 contain other information useful to investors. First, recognize that the spot and all of the futures contract prices listed finished higher than they had been the day before; this can be seen from the positive entries in the "Change" column in comparison with the "Last" prices. This suggests that, although they depend on other factors as well, the futures contract prices are strongly linked to the prevailing level of the underlying spot index. Second, notice that the contract prices increase the farther into the future the expiration date occurs. That is, although all nine closing prices listed (i.e., the spot and the eight futures contracts) were set on the same day and correspond to the same S&P index share, the cost of that share gets increasingly more expensive the farther forward in time the delivery date is set. We will see later that this relationship is common for some securities but not for others. Finally, the display also lists the *open interest* and *trading volume* for each contract. Open interest is the number of outstanding contracts, while trading volume is the number of those contracts that changed hands that day. Thus, it appears in this case that the nearest-term contract (i.e., March 2002) is the most abundant and that about 15 percent (= 78,043 ÷ 511,244) of the total number of S&P contracts in existence were traded on February 8, 2002.

**The Language and Structure of Option Markets**

An **option contract** gives its holder the right—but not the obligation—to conduct a transaction involving an underlying security or commodity at a predetermined future date and at a predetermined price. Unlike the forward contract, the option gives the long position the right to decide whether or not the trade will eventually take place. On the other hand, the seller (or *writer*) of the option must perform on his side of the agreement if the buyer chooses to exercise the option. Thus, the obligation in the option market is inherently one-sided; buyers can do as they please, but sellers are obligated to the buyers under the terms of the agreement. As a consequence, two different types of options are needed to cover all potential transactions: a **call option**—the right to buy the underlying security—and a **put option**—the right to sell that same asset.

**Option Contract Terms**   There are two prices that are important in evaluating an option position. The exercise, or striking, price is the price the call buyer will pay to—or the put buyer will receive from—the option seller if the option is exercised. The exercise price (represented here as X) is to an option what the contract price (i.e., $F_{0,T}$) is to a forward agreement. The second price of interest is the price that the option buyer must pay to the seller at Date 0 to acquire the contract itself. To avoid confusion, this second price is typically referred to as the option premium. A basic difference between options and forwards is that an option requires this up-front premium payment from buyer to seller while the forward ordinarily does not. This is because the forward contract allowed both the long and short positions to "win" at Date $T$ (depending on where $S_T$ settled, relative to $F_{0,T}$), but the option agreement will only be exercised in the buyer's favor; hence the seller must be compensated at Date 0, or she would never agree to the deal. Notice also that although a premium payment will be required for both puts and calls, it is quite likely that these two prices will differ. In the analysis that follows, we will define the Date 0 premium to acquire an option expiring at Date $T$ as $C_{0,T}$ for a call and $P_{0,T}$ for a put. For example, in lieu of a long position in a bond forward contract, the investor in the previous example could have paid $20 (= $C_{0,T}$) at Date 0 for a call option that would have given him the right to buy the bond for $1,000 (= X) at Date $T$, but not required him to do so if $S_T < $1,000.

Options can be designed to provide a choice of when the contract can be exercised. European options can only be exercised at maturity (Date $T$), while American options can be executed any time up to expiration. For a European-style call option, the buyer will only exercise when the expiration date market value of the underlying asset that could be purchased is greater than the exercise price. On the other hand, a European-style put option will only be rationally exer-

cised when the Date $T$ price of the asset that could be sold is lower than $X$. (The decision to exercise an American-style contract is more complex and will be considered in a later chapter.)

**Option Valuation Basics**    Given these parameters, the Date 0 premium for an option can be divided into two components: intrinsic value and time premium. Intrinsic value represents the value that the buyer could extract from the option if she exercised it immediately. For a call, this is the greater of either zero or the difference between the price of the underlying asset and the exercise price (i.e., max $[0, S_0 - X]$). For a put, intrinsic value would be max $[0, X - S_0]$ as $X$ would now represent the proceeds generated from the asset's sale. An option with positive intrinsic value is said to be in the money, while one with zero intrinsic value is out of the money. For the special case where $S_0 = X$, the option is at the money. The time premium component is then simply the difference between the whole option premium and the intrinsic component: ($C_{0,T}$ − max $[0, S_0 - X]$) for a call and ($P_{0,T}$ − max $[0, X - S_0]$) for a put. The buyer is willing to pay this amount in excess of the option's immediate exercise value because of her ability to complete the transaction at a price of $X$ that will remain in force until Date $T$. Thus, the time premium is connected to the likelihood that the underlying asset's price will move in the anticipated direction by the contract's maturity.

Although a more complete discussion of valuing option premiums will be deferred until Chapter 23, several basic relationships can be seen now. First, because the buyer of a call option is never obligated to exercise, the contract should always at least be worth its intrinsic value. (The situation for put option prices or when the underlying asset pays a dividend can be more complicated and will be discussed later.) In any event, neither a call nor a put option can be worth less than zero. Second, for call options having the same maturity and based on the same underlying asset, the lower the exercise price, the higher will be the contract's intrinsic value and, hence, the greater its overall premium. Conversely, put options with higher exercise prices are more valuable than those with lower striking prices for the same reason. Third, increasing the amount of time until any option expires will increase the contract's time premium because it allows the price of the underlying security more opportunity to move in the direction anticipated by the investor (i.e., up for a call option, down for a put option). Finally, because they provide investors with more choices about exercising the agreement, American-style options are at least as valuable as otherwise comparable European-style contracts.

**Option Trading Markets**    Like forwards and futures, options trade both in over-the-counter markets and on exchanges. When exchange-traded, just the seller of the contract is required to post a margin account because he is the only one obligated to perform on the contract at a later date. Also, options can be based on a wide variety of underlying securities, including futures contracts or other options. Exhibit 21.5 lists the underlying assets and exchanges where a number of the most popular option contracts trade.

**Interpreting Option Price Quotations: An Example**    Exhibit 21.6 shows data for a variety of call and put options on the S&P 500 index as of February 8, 2002. All the contracts listed expire in March 2002, making them comparable to the S&P 500 futures contract just considered. However, unlike the futures contracts, for which there was a single contract price for a given expiration month, Exhibit 21.6 indicates that there are several March 2002 options having different exercise prices. In fact, the display lists bid and ask premium quotes for both puts and calls having striking prices ranging from 995 to 1,175.[2]

---

[2]Recall that an investor buys a security from a dealer—in this case, the options exchange—at the ask price and sells securities to the dealer at the bid price. The difference in these prices, which is the *bid-ask spread*, represents part of the compensation to the exchange for making a market in these contracts.

Tab 7

market disruption caused by a large number of stop loss orders, exchanges have, on occasion, canceled all such orders on certain stocks and not allowed brokers to accept further stop loss orders on those issues.

A related type of stop loss tactic for short sales is a *stop buy order*. An investor who has sold stock short and wants to minimize any loss if the stock begins to increase in value would enter this conditional buy order at a price above that at which the investor sold the stock short. Assume you sold a stock short at 50, expecting it to decline to 40. To protect yourself from an increase, you could put in a stop buy order to purchase the stock using a market buy order if it reached a price of 55. This conditional buy order would hopefully limit any loss on the short sale to approximately $5 a share.

**Margin Transactions**   On any type of order, an investor can pay for the stock with cash or borrow part of the cost, leveraging the transaction. Leverage is accomplished by buying on mar-gin, which means the investor pays for the stock with some cash and borrows the rest through the broker, putting up the stock for collateral.

As shown in Exhibit 4.8, the dollar amount of margin credit extended by members of the NYSE has increased consistently since 1992 and exploded in late 1999–2000 prior to a decline in late 2000 when the overall market value fell dramatically. Exhibit 4.9 relates this debt to the

 **NYSE MEMBER FIRM CUSTOMERS' MARGIN DEBTS, BILLION $, 1992–2000**



Source: Goldman Sachs.

**EXHIBIT 4.9**   *NYSE MARGIN DEBT AS A PERCENT OF U.S. MARKET CAPITALIZATION (1993–2000)*



Source: Goldman Sachs.

market value of stocks and the increase is still clear but not as sharp. Again, there is a decline at the end of 2000. The interest rate charged on these loans by the investment firms is typically 1.50 percent above the rate charged by the bank making the loan. The bank rate, referred to as the *call money rate,* is generally about 1 percent below the prime rate. For example, in July, 2002, the prime rate was 4.75 percent, and the call money rate was 3.50 percent.

Federal Reserve Board Regulations T and U determine the maximum proportion of any transaction that can be borrowed. This *margin requirement* (the proportion of total transaction value that must be paid in cash) has varied over time from 40 percent (allowing loans of 60 percent of the value) to 100 percent (allowing no borrowing). As of July 2002, the initial margin requirement specified by the Federal Reserve was 50 percent, although individual investment firms can require higher rates.

After the initial purchase, changes in the market price of the stock will cause changes in the *investor's equity,* which is equal to the market value of the collateral stock minus the amount borrowed. Obviously, if the stock price increases, the investor's equity as a proportion of the total market value of the stock increases; that is, the investor's margin will exceed the initial margin requirement.

Assume you acquired 200 shares of a $50 stock for a total cost of $10,000. A 50 percent initial margin requirement allowed you to borrow $5,000, making your initial equity $5,000. If the stock price increases by 20 percent to $60 a share, the total market value of your position is

$12,000 and your equity is now $7,000 or 58 percent ($7,000/$12,000). In contrast, if the stock price declines by 20 percent to $40 a share, the total market value would be $8,000 and your investor's equity would be $3,000 or 37.5 percent ($3,000/$8,000).

This example demonstrates that buying on margin provides all the advantages and the disadvantages of leverage. Lower margin requirements allow you to borrow more, increasing the percentage of gain or loss on your investment when the stock price increases or decreases. The leverage factor equals 1/percent margin. Thus, as in the example, if the margin is 50 percent, the leverage factor is 2, that is, 1/.50. Therefore, when the rate of return on the stock is plus or minus 10 percent, the return on your equity is plus or minus 20 percent. If the margin declines to 33 percent, you can borrow more (67 percent) and the leverage factor is 3(1/.33). When you acquire stock or other investments on margin, you are increasing the financial risk of the investment beyond the risk inherent in the security itself. You should increase your required rate of return accordingly.[21]

The following example shows how borrowing by using margin affects the distribution of your returns before commissions and interest on the loan. When the stock increased by 20 percent, your return on the investment was as follows:

1. The market value of the stock is $12,000, which leaves you with $7,000 after you pay off the loan.
2. The return on your $5,000 investment is:

$$\frac{7,000}{5,000} - 1 = 1.40 - 1$$
$$= 0.40 = 40\%$$

In contrast, if the stock declined by 20 percent to $40 a share, your return would be as follows:

1. The market value of the stock is $8,000, which leaves you with $3,000 after you pay off the loan.
2. The return on your $5,000 investment is:

$$\frac{3,000}{5,000} - 1 = 0.60 - 1$$
$$= -0.40 = -40\%$$

You should also recognize that this symmetrical increase in gains and losses is only true prior to commissions and interest. Obviously, if we assume a 6 percent interest on the borrowed funds (which would be $5,000 × .06 = $300) and a $100 commission on the transaction, the results would indicate a lower increase and a larger negative return as follows:

$$20\% \text{ Increase: } \frac{\$12,000 - \$5,000 - \$300 - \$100}{5,000} - 1$$
$$= \frac{6,600}{5,000} - 1 = 1.32 - 1.00$$
$$= 0.32 = 32\%$$
$$20\% \text{ Decline: } \frac{\$8,000 - \$5,000 - \$300 - \$100}{5,000} - 1$$
$$= \frac{2,600}{5,000} - 1 = 0.52 - 1.00$$
$$= -0.48 = -48\%$$

---

[21]For a discussion of the investment environment in early 2000, see Greg Ip, "Margin Debt Set a Record in January, Sparking Fresh Fears Over Speculation," *The Wall Street Journal*, 15 February 2000, C1, C2.

In addition to the initial margin requirement, another important concept is the **maintenance margin**, which is the required proportion of your equity to the total value of the stock; the maintenance margin protects the broker if the stock price declines. At present, the minimum maintenance margin specified by the Federal Reserve is 25 percent, but, again, individual brokerage firms can dictate higher margins for their customers. If the stock price declines to the point where your equity drops below 25 percent of the total value of the position, the account is considered undermargined and you will receive a **margin call** to provide more equity. If you do not respond with the required funds in time, the stock will be sold to pay off the loan. The time allowed to meet a margin call varies between investment firms and is affected by market conditions. Under volatile market conditions, the time allowed to respond to a margin call can be shortened drastically.

Given a maintenance margin of 25 percent, when you buy on margin you must consider how far the stock price can fall before you receive a margin call. The computation for our example is as follows: If the price of the stock is $P$ and you own 200 shares, the value of the position is $200P$ and the equity in the account is $200P - \$5,000$. The percentage margin is $(200P - 5,000)/200P$. To determine the price, $P$, that is equal to 25 percent (0.25), we use the equation:

$$\frac{200P - \$5,000}{200P} = 0.25$$
$$200P - 5,000 = 50P$$
$$P = \$33.3$$

Therefore, when the stock price declines to $33.33 (from the original cost of $50), the equity value is exactly 25 percent; so if the stock goes below $33.33, the investor will receive a margin call.

To continue the previous example, if the stock declines to $30 a share, its total market value would be $6,000 and your equity value would be $1,000, which is only about 17 percent of the total value ($1,000/$6,000). You would receive a margin call for approximately $667, which would give you equity of $1,667, or 25 percent of the total value of the account ($1,667/$6,667).

**Exchange Market Makers**    Now that we have discussed the overall structure of the exchange markets and the orders that are used to buy and sell stocks, we can discuss the role and function of the market makers on the exchange. These people and the role they play differ among exchanges. For example, on U.S. exchanges these people are called **specialists**; on the TSE they are a combination of the *Saitori* and regular members. Most exchanges do not have a single market maker but have competing dealers such as the Nasdaq Stock Market. On exchanges that have central market makers, these individuals are critical to the smooth and efficient functioning of these markets.

As noted, a major requirement for a good market is liquidity, which depends on how the market makers do their job. Our initial discussion centers on the specialist's role in U.S. markets, followed by a consideration of comparable roles on exchanges in other countries.

**U.S. Markets**    The specialist is a member of the exchange who applies to the exchange to be assigned stocks to handle.[22] The typical specialist will handle about 15 stocks. The minimum capital requirement for specialists was raised in 1998 to $1 million or the value of 15,000 shares of each stock assigned, whichever is greater.

---

[22]Each stock is assigned to one specialist. Most specialists are part of a specialist firm where partners join together to spread the work load and the risk of the stock assigned to the firm. As of mid-2002, a total of 460 individual specialists were in 10 specialist firms—seven that traded equities and three that only traded Exchange Traded Funds (ETFs).

Tab 8

Copyright 2002 The Financial Times Limited
Financial Times (London,England)

**August** 31, 2002 Saturday
London Edition 1

**SECTION:** FT MONEY - PERSONAL FINANCE ; Pg. 3

**LENGTH:** 686 words

**HEADLINE:** I look for 40% annual returns: ONLINE INVESTING ALPESH B. PATEL: Have you nerves of steel? Then you might profit from swing trading just as I do

**BYLINE:** By **ALPESH** B **PATEL**

**BODY:**

You may not have heard of swing trading even though it is steadily growing more popular. As a veteran swing trader, I consider that the case for it is compelling.

Swing traders typically look for rapid gains from holding a stock for a few days or weeks, such as the recent 30 per cent gains in Invensys, Corus and MMO2. They try to identify stocks with short-term price momentum, not value stocks that usually take many months to rise to greater valuations. Although they may trade the same stocks as longer-term investors, it is the time frame that varies.

Swing traders are attracted to the approach for several reasons. First there is the profit motive. I expect average annual returns of 15 to 20 per cent from my long-term investments. That is typical of a solid value-stock portfolio over the long term. But from swing trading I would be disappointed with average annual returns below 40 per cent.

Of course greater returns bring greater risks, and active trading consumes more time than long-term "buy and hold" investing. But then again, if you had bought British Airways in early November you would have seen a 100 per cent return by mid-March, and then be back to a 0 per cent return if you had held on until July.

The swing trader tries to capture the profit then run; the buy-and-hold operator tends to ignore shorter-term market gyrations. Another big plus for swing trading is the flexibility it offers. The skills needed are the same regardless of financial instrument or asset. If I want to profit from an anticipated move in Vodafone, I could buy the stock or use contracts for difference, universal stock futures, spread bets, options, or covered warrants (soon to be launched). Whichever I choose, I still monitor the stock to anticipate a rise.

But there's yet another strong point in favour of swing trading. You do not need to monitor the markets constantly. You can research your stocks outside market hours, which makes swing trading compatible with a day job.

Swing trading essentially has three phases:

* Picking the stock that is likely to rise over the coming weeks. Most online swing traders including me will use charting to signal likely rises, and online courses teach such techniques.

* Monitoring the position. Constant monitoring is not vital and many online swing traders will either phone brokers or use handheld PDA's, pagers or text messaging to keep tabs on the stock price.

* The exit phase. The closer the share price is to your profit objective - or to the loss you have set at which you will sell - the more closely you need to monitor the price.

Which types of stock are the most interesting for a swing trader? Look at their price charts online and see if the price moves in smooth waves. Popular stocks will be Vodafone, Prudential and Standard Chartered. But make no mistake; swing trading is not for everyone. The sceptics and those lacking in confidence should not swing.

Sceptics will quote statistics such as: "If you had invested Dollars 10,000 in the S&P 500 from 1980 to 2000, you would have Dollars 185,080; but if you missed the best 50 days through trying to time the market you would have only Dollars 33,886." If you don't believe in a trading style then you should not follow it, whether that is swing trading or some other style.

I prefer a mixed portfolio with some core longer-term holdings as well as a swing trading portfolio. That way my aim is to outperform a longer-term only portfolio, but also have a better return on my time than a time consuming shorter-term only portfolio.

For a would-be swing trader lacking in confidence, the solution is education and practice. If the large number of online swing trading courses is any indicator, then many investors are gaining confidence in swing trading.

Few investment topics will stir such heated debate as that between swing or short-term traders and long-term value investors. Just visit the useful Motley Fool bulletin board to read some of them. But as long as markets gyrate there will be those who believe (correctly) that it is possible to profit from swing trading.

Tab 9

cause they "stole the spread"—the difference between the bid and the ask—from Nasdaq market makers. These new day traders were satisfied to make profits as low as one-sixteenth of a point (called *teenies*—about 6 cents a share) on each trade, but to make such tiny profits worth their while, they had to make very frequent and very large trades. Over the next decade, additional rulings by the SEC, as well as advances in technology and the Internet made day trading accessible to amateur traders, and day trading shops sprang up across the country.

Day trading entered its heyday during the dot-com boom. Day traders were credited with (or accused of) the extreme volatility that ruled the market in those days. The dot-com crash weeded out a large majority of the amateurs, but day trading is still very much on the scene. Because of the somewhat negative connotation associated with the term "day trader," most such traders now prefer to be called simply "active traders."

## Swing Trading

The swing trader is a day trader with a little more patience and a longer time horizon. While the classic day trader may make 50 or 100 trades a day for teenies and closes his or her positions by the end of the day, the swing trader makes several trades a week and looks for profits of several points a share. The typical swing trader holds his or her positions for 1 to 5 days but not usually over a weekend.

## Position Trading

A position trader is simply a swing trader with a longer time horizon, usually holding a position for 10 days or so. Position trading is virtually indistinguishable from short-term momentum or technical investing.

### Using Direct Access Brokers

Because they need instantaneous executions, active traders, as a rule, make their trades through a direct-access broker. Such brokers offer special trading software that enables a trader to place trades directly

Tab 10

## STRANGLE

When you hear the term *strangle,* you typically don't conjure a pleasant thought. You probably see one person's hands around someone else's throat (not generally a PC image). In this case, focus on the "around" portion of that thought. The distance between the two strike prices is the critical aspect of a strangle.

A long strangle is similar to a straddle in that it is not dependent on a certain directional move in the underlying. For the strategy to be profitable, an extreme move in the underlying either up or down is necessary. The composition of the strangle strategy is also similar to a straddle, in that it is composed of a put and a call, and you either buy or sell both options with the same expiration. The major difference between the strangle and the straddle is that with the strangle you are buying or selling out-of-the-money options.

A long strangle is composed of the purchase of the same number of calls and puts that have the same expirations, but different strike prices. A short strangle requires the sale of the same number of calls and puts that have the same expirations, but different strike prices. The short strangle is used to take advantage of an underlying that is about to experience very low volatility. It is preferable in these strategies that when taking a position, it is timed with a reverse in the activity of the underlying.

The long strangle is best suited for a market that is about to experience very high volatility, as an extreme swing in the price of the underlying is necessary for the long strangle to be profitable. (The short strangle gives the trader a price range within which its position is comfortably profitable.)

The risk/reward aspects of the strangle is similar to the straddle in that it offers limited risk and unlimited return. First, let's take a look at the long strangle.

### Long Strangle

| | |
|---|---|
| **Composition:** | Long call at $K_2$ and long put at $K_1$ |
| **Max Profit:** | Unlimited to the upside, limited by the price of the stock to the downside. |
| **Max Loss:** | Debit |
| **Breakeven Points:** | $K_1$ − Debit; $K_2$ + Debit |
| **Example:** | Long 1 YHOO Oct 110 put at $6.125 |
| | Long 1 YHOO Oct 185 call at $6.50 |
| | = Long YHOO Oct 110/185 strangle at $12.625 |

As the P&L graph of the YHOO stock options illustrates, the price of the Oct 110 put is $6.125 and the price of the 185 call is $6.50, therefore you would pur-

107



chase the YHOO Oct 110/185 strangle for a net debit of $12.625 (or $1,262.50 for a one-lot spread). As with all long options positions, you know your maximum risk is the amount you paid for the position.

The determination of the breakeven points of the position is done in the same manner as with the straddle. For the put, you simply subtract the amount you paid for the entire position ($12.625) from the strike price of the put ($110) to determine that your breakeven on the downside is $97.375. Your breakeven for the upside is $197.625. Here you would add the $12.625 of premium to the call's $185 strike.

Let's say at expiration YHOO ended up at $119. This would mean that your loss would be the entire $12.625 (or $1,262.50) of premium that you paid for the position. Because at $119 the long call would be out-of-the-money and the long put also would be out-of-the-money, both would be worthless. You were looking to take advantage of a severe move in YHOO blowing through one of your breakeven points, but instead it sat still right in between your two strikes.

Let's look at another scenario. What if the YHOO price rallied and at expiration was at $209—exactly the move you were hoping to take advantage of? What would your profit be? $11.375 (or $1,137.50) would be your net profit. Hardly seems worthwhile, with such a great move (more than 50 percent in the underlying), does it? Perhaps the short strangle is a better risk/reward play on this one.

Let's break down the example given above to see where the profit comes from. First, at $209, the long put would expire worthless. The 185 call, however, would be in-the-money by 24 points. Therefore, your net profit would be $11.375 (or $1,137.50) ($24.00 − $12.625 cost of the position × 100).

### EXERCISE THREE

By answering the following questions, you can see where your points of concern are in the example of buying a strangle. We'll again refer to the QRx Market Window showing the prices of YHOO. You are long the YHOO Oct. 90/210 strangle. Answer the following questions:

1. What would the P&L graph of this position look like?

2. What would it cost to purchase the YHOO Oct 90/210 strangle?

3. What would be the breakeven points of your position?

4. What is your profit or loss if YHOO stock rallies to $225?

5. What is your profit or loss if YHOO stock moves to only $212?

6. What is your profit or loss if YHOO falls to $75?




## Short Strangle

Just as the short straddle posed a problem for the trader if the stock suddenly made a move out of a price range, so too will the short strangle cause a sleepless night or two.

| **Composition:** | Short call at $K_2$ and Short put at $K_1$ |
|---|---|
| **Max Profit:** | Credit |
| **Max Loss:** | Unlimited |
| **Breakeven Points:** | $K_1$ − Credit; $K_2$ + Credit |
| **Example:** | Short 1 SPX (S&P 500) Nov 950 put at $16.625 Short 1 SPX Nov 980 call at $20 = Short SPX Nov 950/980 strangle at $36.625 |

As the P&L graph of the SPX index options illustrates, the price of November 950 put is $16.625 and the price of the 980 call is $20.00, therefore you would collect $36.625 for the sale of the SPX Nov 950/980 strangle (or $3,662.50 for a one-lot spread). In this example, you know your maximum reward is the amount you received for selling the position. Opposite of the long strangle, the short strangle is a position that requires the underlying market to remain still, with as little movement as possible.



109

Nondirection Dependent Strategies: Straddles and Strangles

| Bid | Ask | Strike | Bid | Ask |
|---|---|---|---|---|
| 90.63 | 90.94 | RMBS | | |
| 52.25 | 54.50 | 40.00 | 1.75 | 2.25 |
| 51.25 | 53.50 | 41.25 | 1.94 | 2.44 |
| 50.25 | 52.50 | 42.50 | 2.00 | 2.94 |
| 49.13 | 51.38 | 43.75 | 2.19 | 3.13 |
| 48.25 | 50.50 | 45.00 | 2.44 | 3.38 |
| 47.13 | 49.38 | 46.25 | 2.56 | 3.50 |
| 46.13 | 48.38 | 47.50 | 2.81 | 3.75 |
| 45.13 | 47.38 | 48.75 | 3.00 | 4.00 |
| 44.25 | 46.50 | 50.00 | 3.38 | 3.75 |
| 42.50 | 44.75 | 52.50 | 4.00 | 5.00 |
| 40.63 | 42.88 | 55.00 | 4.50 | 5.50 |
| 38.88 | 41.13 | 57.50 | 5.13 | 6.63 |
| 37.25 | 39.50 | 60.00 | 5.88 | 7.38 |
| 35.63 | 37.88 | 62.50 | 6.63 | 8.13 |
| 34.00 | 36.25 | 65.00 | 7.50 | 9.00 |
| 32.38 | 34.63 | 67.50 | 8.38 | 9.88 |
| 31.00 | 33.25 | 70.00 | 9.38 | 10.63 |
| 29.63 | 31.88 | 72.50 | 10.13 | 12.13 |
| 28.25 | 30.50 | 75.00 | 11.00 | 13.00 |
| 26.88 | 29.13 | 77.50 | 12.13 | 14.13 |
| 25.75 | 28.00 | 80.00 | 13.38 | 15.38 |
| 24.63 | 26.88 | 82.50 | 14.75 | 16.75 |
| 23.50 | 25.75 | 85.00 | 16.13 | 18.13 |
| 22.25 | 24.50 | 87.50 | 17.38 | 19.38 |
| 21.25 | 23.50 | 90.00 | 18.75 | 20.75 |
| 20.13 | 22.38 | 92.50 | 20.13 | 22.38 |
| 19.50 | 21.50 | 95.00 | 21.63 | 23.88 |
| 18.50 | 20.50 | 97.50 | 23.13 | 25.38 |
| 17.63 | 19.63 | 100.00 | 24.75 | 27.00 |
| 16.75 | 18.75 | 102.50 | 26.38 | 28.63 |
| 15.75 | 17.75 | 105.00 | 27.88 | 30.13 |
| 15.13 | 17.13 | 107.50 | 29.63 | 31.88 |
| 14.50 | 16.50 | 110.00 | 31.50 | 33.75 |
| 13.88 | 15.88 | 112.50 | 33.63 | 35.88 |
| 13.13 | 15.13 | 115.00 | 35.38 | 37.63 |
| 12.38 | 14.38 | 117.50 | 37.25 | 39.50 |
| 11.75 | 13.75 | 120.00 | 39.13 | 41.38 |
| 11.25 | 13.25 | 122.50 | 41.00 | 43.25 |
| 10.75 | 12.75 | 125.00 | 43.00 | 45.25 |
| 10.00 | 11.50 | 130.00 | 47.00 | 49.25 |
| 9.13 | 10.63 | 135.00 | 51.13 | 53.38 |
| 8.25 | 9.75 | 140.00 | 55.13 | 57.38 |
| 7.50 | 9.00 | 145.00 | 59.38 | 61.63 |
| 6.88 | 8.38 | 150.00 | 63.75 | 66.00 |
| 6.25 | 7.75 | 155.00 | 68.13 | 70.38 |
| 5.50 | 7.00 | 160.00 | 72.50 | 74.75 |
| 5.13 | 6.63 | 165.00 | 77.00 | 79.25 |

The determination of the breakeven points of the position is done in the same manner as with the straddle. For the put, you simply subtract the amount you received for the entire position ($36.625) from the strike price of the put ($950) to determine that your breakeven on the downside is $913.375. Your breakeven for the upside is $1,016.625. Here you would add the $36.625 premium you collected to the call's 980 strike.

Let's step through the example of a short Rambus (RMBS) Nov 70/110 strangle. There is 90 days until expiry. (You thought the Yahoo prices were difficult to prove a long strangle profitable? Wait until you see these prices. Note the QRx Market Window with the Rambus option chain.)

Because you are short the strangle, your maximum profit is the amount you collected when you sold the position. In this case, selling on the bids, you would take in a premium of $23.875 (price of the Nov 110 call is $14.50 and price of the Nov 70 put is $9.375). This is a reasonable amount to collect, it seems, as the stock would have to move more than 49 percent before there was risk of exposure to loss of the premium collected.

Your breakeven for the upside is $133.875 ($110 + $23.875). Your breakeven for the put is $46.125 (70 − $23.875). As with the strangle, you have unlimited risk exposure to the upside and extreme exposure to the downside. Anywhere the market rallies above $110, you begin giving back some of the premium you initially took in for the sale of the strangle.

At $133.875, your breakeven, you have given back all of your premium and begin experiencing a loss on the next uptick. You would be assigned on your short call and would be required to buy the underlying at the market price to make delivery on it. Anywhere below $70, your short put goes in-the-money, and you begin giving up the premium that you initially took in for the sale of the put, all the way down to $46.125. Anywhere below this figure and you begin experiencing a loss.

If the stock ends up at $110 (a 21 percent move) at expiration, both options expire worthless and you get to keep the entire premium you collected when you sold the strangle. In fact, this would be true if the stock lands anywhere between $70 and $110 at expiration.

## EXERCISE FOUR

Let's perform the same analysis as in Exercise Three with an example of selling a strangle. We'll refer to the QRx Market Window for prices in CIEN stock options. You are short the CIEN Oct 120/200 strangle. Answer the following questions:

1. What would the P&L graph of this position look like?

2. For how much could you sell the CIEN Oct 120/200 strangle?

3. What would be the points of breakeven of the position?

4. What is your profit or loss if CIEN rallies to $195?

5. What is your profit or loss if CIEN stock moves to $207 at expiration?

6. What is your profit or loss if at expiration CIEN falls to $95?

| Bid | Ask | Strike | Bid | Ask |
|-----|-----|--------|-----|-----|
| 160.13 | 160.38 | CIEN | | |
| | | Oct00 | | |
| 82.50 | 83.50 | 80.00 | 1.25 | 1.50 |
| 78.00 | 79.00 | 85.00 | 1.63 | 1.88 |
| 73.63 | 74.63 | 90.00 | 2.13 | 2.50 |
| 69.50 | 70.50 | 95.00 | 3.00 | 3.38 |
| 65.25 | 66.25 | 100.00 | 3.63 | 4.00 |
| 61.38 | 62.38 | 105.00 | 4.75 | 5.13 |
| 57.63 | 58.63 | 110.00 | 5.75 | 6.25 |
| 54.00 | 55.00 | 115.00 | 7.13 | 7.63 |
| 50.13 | 51.13 | 120.00 | 9.13 | 9.25 |
| 46.63 | 47.63 | 125.00 | 10.00 | 10.50 |
| 43.38 | 44.38 | 130.00 | 11.63 | 12.38 |
| 40.63 | 41.63 | 135.00 | 13.50 | 14.25 |
| 37.75 | 38.75 | 140.00 | 15.63 | 16.38 |
| 34.88 | 35.88 | 145.00 | 17.75 | 18.50 |
| 32.50 | 33.50 | 150.00 | 20.13 | 21.13 |
| 30.13 | 31.13 | 155.00 | 22.63 | 23.63 |
| 27.88 | 28.88 | 160.00 | 25.25 | 26.25 |
| 25.88 | 26.88 | 165.00 | 28.25 | 29.25 |
| 24.00 | 25.00 | 170.00 | 31.25 | 32.25 |
| 21.63 | 22.63 | 175.00 | 34.00 | 35.00 |
| 20.00 | 20.75 | 180.00 | 37.13 | 38.13 |
| 18.25 | 19.00 | 185.00 | 40.50 | 41.50 |
| 16.25 | 17.00 | 190.00 | 43.38 | 44.38 |
| 14.75 | 15.50 | 195.00 | 46.88 | 47.88 |
| 13.63 | 14.38 | 200.00 | 50.75 | 51.75 |
| | | Jan01 | | |

## ANSWERS TO EXERCISES

### EXERCISE ONE:

1.



59.875   90.125

15.125

Tab 11

THOMSON FINANCIAL

# Program Trading – A Bit of Clarity

Program trading has received a considerable amount of press recently, with consistent concerns being raised about the increasing levels of program trading as a percentage of overall trading volume.  In a continuation of our series of articles designed to explain some of the numerous trading strategies that affect common stock volume levels, program activity will be defined, but more importantly, it will be put in context of the continuing evolution of equity markets as a whole. While recognizing that program activity is here to stay, it will be a manageable component of equity trading, and as a result, its impact on institutional shareholder positions can be measured with considerable consistency.

**Program Trading - Defined**
Program trading, as defined by the New York Stock exchange, involves "the purchase or sale of a basket of at least 15 stocks with a total value of $1 million or more."

The NYSE definition does not provide much insight, and clearly, just looking at the 15-stock/$1 million qualification, it is obvious that increasing amounts of trading volume will satisfy that requirement due to the improvements in trading efficiencies and increasing electronic trading volume levels. The problem lies in the fact that this data, when reported to the NYSE by member firms, serves as the basis for the "percent of weekly volume" program figure that is reported on a weekly basis. It is also the figure that receives so much attention in the press. As a result, the increases over time give the appearance that more and more institutional shareholder activity is being shifted to program trading.  If we dig a bit deeper into the definitions and the numbers, however, we can find some perspective about the actual totals and their trends over time.

**Program Trading - Measurement**



As the graph above clearly indicates, reported program activity as measured and reported by the NYSE has increased sharply over the past fifteen years. Over the past year or so, reported program activity has consistently been above 50% of total volume.

The problem lies in the numerator of the program trading percentage calculation. The NYSE counts each buy and sell program order individually, and it then divides the total by the single-counted NYSE total volume



**THOMSON FINANCIAL**

(completed, two-sided transactions). The reported program-activity percentage, therefore, essentially doubles the amount of actual program activity when compared to the single-counted total volume levels. As a result, over time, while program activity has increased significantly, it has not moved into the majority. When program activity is reported as a percentage of twice total volume (TTV) NYSE volume, the percentage declines considerably.



**Program vs. Electronic Trading – One and the Same?**
In many instances, program trading and electronic trading figures are considered interchangeable, but while a program trade is an electronic one, an electronic order is not necessarily part of a program trade.

Since decimalization began in early 2001, electronic trading has increased in significant fashion due to collapsing bid/ask spreads and the lack of significant amounts of stock being available at any given price levels. As a result, the average order on the NYSE has dropped from over 1,100 shares prior to decimalization to about 400 shares per trade today.  That decline has made electronic buying and selling significantly more attractive as transaction costs have declined and as block activity has dropped from over 50% of volume to just over 30% of volume.

As a result, institutional investors have increased their use of statistically oriented trading systems that allow them to move large amounts of stock in the most efficient manner possible. Some algorithms seek to capture the average price for the day. Others increase and decrease their participation based on volume levels in the market. These strategies arguably improve the execution of the order, and some may determine which stocks to buy and sell. Algorithmic trading will continue to increase short of a shift away from penny increments in trading, and some of this electronic institutional activity will be included in program trading figures, but it does mean that the decision to buy or sell the stock was removed from the portfolio or mutual fund manager.

**Program Activity – The Impact of Exchange Traded Funds (ETFs)**
According to Barclays Global Investors, Exchange Traded Funds (ETFs) took in $9 billion in net new assets during the first quarter of 2005. That increase in assets is on top of an explosive increase of almost 50% in 2004. Assets in ETFs should hit $230 billion before the end of the second quarter of 2005.  While retail investors are flocking to these investments as inexpensive alternatives to traditional mutual fund investments, more and more hedge funds are using these investments to place rapid bets on overall market moves. With certain index arbitrage strategies, for example, index futures, ETFs and the underlying stocks are traded against each other to exploit price discrepancies. As the market for ETFs increases, program trading that includes ETFs in their strategies will increase.



**THOMSON FINANCIAL**

**Program Activity – Where Is the Increase?**
If one considers the trend line for overall program trading levels, it is clearly to the upside, as noted above. However, the increases are largely due to more sophisticated trading models allowing for faster execution of trades that can profit from minute differences in prices. In addition, most of the blips in the trend are event-driven and can be easily explained.



In June of 2004, investors were stunned by news that reported program trading activity accounted for 70.1% of the NYSE total volume as traditionally measured. A record at the time, the increase occurred due to re-balancing of various Russell indices. A similar increase should be expected in June of 2005.  In late March of 2005, a similar increase occurred after Standard & Poor's altered their indices to better account for the impact of insider positions and their respective "free float" calculations.

While the event-driven increases are clearly significant, the impact covered a significant portion of the entire market, and the impact on individual stocks, while occasionally dramatic, was monitored with relative ease.

**Table 1: NYSE Annual Reported Volume**

| Years | Share Volume (Millions) | Reported Trades (Thousands) | Average Trade Size |
|---|---|---|---|
| **2003** | 352,397.80 | 722,753 | 488 |
| **2002** | 363,135.90 | 545,556 | 666 |
| **2001** | 307,509.30 | 339,105 | 907 |
| **2000** | 262,477.70 | 211,040 | 1,187 |
| **1999** | 203,914.20 | 169,169 | 1,205 |

**Table 2: NYSE Annual Distribution of Trades**

| Year | 100-2,099 | 2,100-4,999 | 5,000-9,999 | 10,000-24,999 |
|---|---|---|---|---|
| **2003** | 92.25% | 4.34% | 1.85% | 1.15% |
| **2002** | 89.18% | 5.72% | 2.66% | 1.76% |
| **2001** | 84.90% | 7.60% | 3.90% | 2.60% |
| **2000** | 79.90% | 9.60% | 5.50% | 3.70% |
| **1999** | 80.50% | 9.50% | 5.54% | 3.50% |

**Table 3: NYSE Block Transactions (10,000+ Shares)**

| Year | Transactions | % of Reported Volume |
|---|---|---|
| 2003 | 5,300,900 | 37.0% |
| 2002 | 6,267,100 | 44.4% |
| 2001 | 5,892,000 | 48.1% |
| 2000 | 5,529,200 | 51.7% |
| 1999 | 4,195,700 | 50.2% |



**THOMSON FINANCIAL**

Second, if we consider the five-year tables (NYSE data, latest available), the longer-term trends are clear:

❖ Table One:          Overall volume levels have increased sharply
❖ Table Two:          Reported transactions have shifted toward smaller increments
❖ Table Three:        Reported block transactions, in percentage terms, have declined

The key here is that while program activity has increased, it has not necessarily replaced "traditional" institutional participation in the market.  Volume levels have increased sharply during this period due to smaller transactions, but block trades (>10,000 shs per transaction) remain near the five million-trade per annum level.



Third, if we consider the chart above, overall volume levels reported by the NYSE between 2003 and 2005, after the surge in volume between 1999 and 2002, have been stagnant at best, and one could argue that they have declined. While decimalization proponents argued the shift to pennies would increase overall volume levels, the increase has not necessarily materialized. With stagnant volume, the denominator in the equation will affect the reported percentage of program activity. In this instance, it has contributed to the increase in reported program activity levels.

**Program Activity – Looking Forward: Regulation SHO**
Regulation SHO is a groundbreaking change in securities trading that will eliminate the "uptick" rule on short sales. On Monday, May 2nd, 2005, Regulation SHO was implemented by the Securities and Exchange Commission (SEC) for a pilot list of 1000 stocks in the Russell 3000.  The SEC chose the stocks randomly while giving consideration to liquidity, volatility, market-depth and market venue of the securities.

By eliminating the uptick rule, short sellers will no longer have to wait for a price increase to sell a stock short. Opponents of the regulation argue Regulation SHO will increase price pressure during periods when a stock is declining. We have already seen evidence of the impact of Regulation SHO in various sectors, including energy and financials, and we expect the impact will become more significant as programs and trading algorithms adapt to this significant change in the trading landscape.



**THOMSON FINANCIAL**

**Program Trading – Implications for Investor Relations**

The universe of program trading is a very complex one, and program activity is without question here to stay.  It will continue to increase as a percentage of overall volume levels, but it offers a number of actionable components for Investor Relations Professionals. Among them:

❖ Follow brokerage activity on a timely basis. Volume levels may increase with the presence of program activity, but the most active program traders are a familiar lot on a continuous basis. Program activity, as a result, can be separated from "true" brokerage activity and trading that will have an impact on shareholder positions.

❖ Maintain contact with investors recognizing the presence of identified program trades, sector moves and technical factors that may have an impact on program trading levels on a stock specific basis.

❖ Recognize that the proliferation of Exchange Traded Funds and other investment vehicles will have an impact on program activity, but investors in those funds, both retail and institutional, are part of your shareholder base.

❖ Monitor weightings within various indices. Equity index re-balancings will remain the most significant source of fluctuations in reported program activity. By monitoring projected shifts, management can be better informed regarding the impact of the changes.

❖ Watch regulatory developments. The implementation of Reg SHO is in its infancy, and it may be altered going forward. In addition, should program trading levels continue to increase, it is possible that the definition of program trading may be changed to better reflect equity markets.  Should market and stock volatility increase in material fashion, program-trading curbs and other restrictions may be altered in significant fashion.

**Conclusion**

Institutional investors and portfolio managers will continue to make individual, stock specific buy and sell decisions, and position changes begin with a stock trade. It may be a brokered trade on the floor of an exchange, an electronic transaction or part of a program. Regardless of the execution or venue, knowledge of the common stock trading that has an impact on the shareholder base will help develop a tailored, effective Investor Relations message to shareholders, prospects and management.

---

Program Activity – A Bit of Clarity is the third of a series of articles designed to explain some of the numerous investment strategies that can affect stock trading without having a meaningful impact on a stock's institutional shareholder base.

To learn more about Program Activity or how Thomson Financial can help you achieve your IR objectives, please contact Peter Nash at 630-645-9100x13.

**Contact us at:**
www.thomson.com/financial
tfcorporate@thomson.com

**North America:** 800.262.6000
**Europe:** +44.207.369.7199
**Asia:** +852.2533.5564



Tab 12

Copyright (c) 1994 Columbia Law School
Columbia Business Law Review

1994

**1994 COLUM. BUS. L. REV. 1**

**LENGTH:** 23682 words

ARTICLE: THE UNCERTAIN CASE FOR REGULATING PROGRAM TRADING

**NAME:** Richard A. Booth *

**BIO:** (c) 1994. All Rights Reserved.

* Professor of Law, University of Maryland School of Law. A.B., University of Michigan 1973; J.D. Yale Law School 1976.

**SUMMARY:**
 ... When the stock market collapsed in October of 1987 many suspected that the mysterious practice of "program trading" -- the use of computer-aided trading strategies designed to exploit discrepancies between the prices of various derivative instruments and the underlying stock -- was at fault. ... The standard criticism of program trading is that it increases stock price volatility which makes individual investors reluctant to invest in the stock market. ... Because circuit breakers' imperfectly coordinate trading restrictions on the stock and futures exchanges, when a circuit breaker is in force, futures prices could move further out of line with stock prices thereby increasing the incentive to set up a program trade. ...  The SEC argued that the 8% margin required to buy or sell a stock index future siphons investors from the stock market to the futures market. ... Second, the primary argument against program trading has been that program trading is bad for the small investor, and is, in turn, also bad for the stock market (which depends on the small investor for significant liquidity), and is therefore bad for business (which depends on the market for equity capital). ...  Although the specialist is often the primary short-term victim of a program, if indeed program trading adds to volatility, as it must at some level, the specialist, as the consummate active trader, also stands to gain when prices bounce back, as they invariably will if programs are based solely on technical market factors, as they often are. ...

**TEXT:**

 [*1]  I. INTRODUCTION

    When the stock market collapsed in October of 1987 many suspected that the mysterious practice of "program trading" -- the use of computer-aided trading strategies designed to exploit  [*2]  discrepancies between the prices of various derivative instruments and the underlying stock -- was at fault.  n1a Yet, none of the numerous studies of the 1987 crash found that program trading caused the collapse, and only two even suggested that it was an aggravating factor.  n1 In fact, the two studies that found program trading to be an aggravating factor observed that the strategy helps to keep the stock market and futures market aligned with one another, thereby rendering both markets more stable than they otherwise would be. Nevertheless, the Securities and Exchange Commission (SEC) and the New York Stock Exchange (NYSE or Exchange) sought to suppress or to discourage program trading. In early 1990, after the October 1989 mini-crash, the NYSE asked member firms to refrain voluntarily from program trading after many firms had urged the NYSE to take such action.  n2 The Chairman of the SEC  [*3]  warned that although the short-term trading strategies underlying program trading are profitable, they may not be in the best interests of the investors employing them.  n3 In fact, the SEC blamed futures-related trading strategies for the mini-crashes of October 1989 and November 1991.  n4 Representative Dingell, concurred with the SEC and likened stock index futures to cockroaches.  n5

    [*4]  Aside from the intense campaign of rhetoric against program trading, the SEC and the NYSE took three steps designed to control the strategy. First, the NYSE adopted a rule restricting program trading in a falling market.

n6 Second, the SEC changed a key interpretation of Rule 10a-1 of the Securities Exchange Act to the same effect. n7 Third, the SEC pressured Congress to transfer authority over margin requirements for stocks and commodities to the Federal Reserve Board (FRB) n8 and to transfer authority over stock-index futures from the Commodities Futures Trading Commission (CFTC) to the SEC. n9 Consequently, [*5] two ranking members of the Senate Agriculture Committee asked the CFTC to investigate reductions in margin requirements for stock-index futures. n10

Although critics argue that program trading has elevated investment strategies involving uninformed, continual stock trading over holding stocks long-term, n11 in fact, just the opposite is true. While program trading does lead to trading stocks without regard to their "fundamental" value, n12 such trading is not a symptom of risk-seeking behavior. Instead, program trading is the outgrowth of more conservative investment strategies which will benefit the vast majority of investors -- especially in the long run. In addition, program trading creates more trading opportunities for active stock traders because program trading increases stock price volatility. That is, the more stock prices move up or down, the more chances there are to profit from trading stocks.

In spite of these benefits of program trading, the NYSE and the SEC remain opposed to the strategy. The NYSE's opposition is particularly odd, given that program trading generates significant income for the Exchange by accounting for about twelve percent of Exchange trading volume. n13 The usual explanation [*6] offered by the NYSE for this curious position is that program trading scares away small investors from investing in stocks. n14 However, the real reason, may be that program trading and the financial futures that make program trading possible have made the jobs of specialists more difficult and less profitable. Specialists mediate trading on the floor of the NYSE and traditionally have held the real power at the Exchange. Each specialist is assigned a group of stocks and the specialist's job is to buy and sell these stocks to counteract temporary imbalances in supply and demand and thus prevent wide swings in stock prices. In return, the specialist receives the exclusive right to make a market in the assigned stocks. This monopoly includes privileged access to information about outstanding orders for the stock. Because program trading arbitrages market-wide discrepancies between stock and futures prices, buying and selling stocks with little regard given to their fundamental values, specialists undoubtedly find it more difficult to maintain balanced positions than prior to the advent of program trading.

Program trading thus competes with the specialist system by profiting on some, but not all, of the same pricing imbalances that until recently were the exclusive province of the specialists. In addition, program trading may be more efficient than the specialist system. n15 Thus, it is arguable that in today's high trading volume markets, the role of specialist as a trader of last resort is superfluous. Although it may once have been important for specialists to be ready to execute trades when a buyer or seller could not be found, today's high volume markets significantly decrease the chance of such an event occurring. Therefore, much of the criticism directed at program trading [*7] may stem from a desire to protect the long-established specialist system. n16

This article argues that program trading benefits the stock market and that discouraging market participants from employing the strategy is unwise. Part II discusses the background of the current controversy, and outlines the mechanics of program trading and the problems that it has allegedly caused. Part III describes the role of financial futures as vehicles for hedging as well as for speculation. Part IV outlines the misguided efforts that have been made to control program trading. Part V analyzes the benefits of a system of financial markets in which program trading is largely unrestricted. Finally, Part VI discusses the specialist system and the reasons why program trading presents a particular challenge to it.

## II. BACKGROUND: MECHANICS AND PROBLEMS OF PROGRAM TRADING

In the months preceding the stock market crash of October 1987, there was increasing concern about violent stock price swings, particularly those swings that accompanied so-called "triple witching hours" -- quarterly Friday afternoons when many options, futures, and options on futures expire simultaneously. n17 Initially, the reasons for the price swings were not well understood. However, it became gradually apparent that the volatility resulted from using trading strategies that involved (1) buying stock index futures and simultaneously selling the underlying stocks (or vice versa) when the futures price had become too low (or high) relative to the underlying stocks' prices; (2) maintaining this position until the futures expired, when the prices of the futures and underlying stock [*8] are necessarily the same; n18 and then (3) "unwinding" the transaction by reversing the positions, that is, selling the future and buying back the stock with the proceeds of the future sale (or vice versa). n19 Because this strategy depends on capitalizing on occasional price discrepancies between the stock and futures markets, many traders

tended either to buy or to sell the stocks underlying the stock index futures on the same day. Hence, not only did the stock market's volume increase on such days, but the vast majority of trades were either "buys" or "sells" which meant that on expiration Fridays, the market would tend to rise or fall dramatically.

When the market crashed in October 1987, program trading was only beginning to be understood as the source of this volatility. Shortly before the crash, the New York Stock Exchange had adopted a rule requiring that, on "triple witching" days, all computer assisted trades be announced and executed at least thirty minutes before closing. n20 The rule's rationale was to allow the market to accommodate futures-related trades before closing prices were set. The rule appeared to be effective. Traders seemed to have given up waiting until expiration day to unwind their positions. As a result, although a few periods of excess volatility were observed in the few days before a "triple witching" hour, the pre-rule periods of extremely concentrated buying and selling were largely eliminated. n21

   [*9]  Nonetheless, program trading was immediately suspected as the cause of the 1987 crash,  n22 and it remained the prime suspect even after a series of official and unofficial studies failed to find any distinct causal connection between program trading and the crash.  n23 Although the stock and futures markets did not move to prohibit program trading, both markets instituted a system of circuit breakers that would, in the event of dramatic price movements, (1) limit access to computerized execution of stock trades for program trading purposes, and (2) would limit or halt trading in the stock and futures markets for short periods.  n24

In October 1989, the market again plunged nearly 200 points. Many, including the SEC, again charged program trading with causing the fall, although, one could credibly argue that the newly instituted circuit breakers exacerbated the fall's magnitude.  n25 Nevertheless, the securities industry decried program  [*10]  trading. Many brokerage houses announced that they would voluntarily refrain from program trading for their proprietary and customer accounts.  n26 However, brokerage firms began gradually to reinstate the practice,  n27 and when the market stumbled in November of 1991, the SEC once again blamed program trading.  n28

The standard criticism of program trading is that it increases stock price volatility which makes individual investors reluctant to invest in the stock market. Underlying this complaint is a vague feeling that the stock market's structure has changed dramatically. That is, one can no longer purchase a stock without worrying that its price will immediately fall dramatically. In fact, many market professionals and investors view program trading as a suspicious throwback to the 1920s when the manipulative schemes then rampant in the stock market caused high price volatility.  n29

To be sure, investing is different now than it used to be. Because modern traders pursue more varied strategies, some of which (like program trading) are unrelated to the fundamental value of the stocks involved, it is more difficult for a traditional investor to discern the market behavior of other investors and to discern what factors will tend to move prices in a certain direction. However, it is quite apparent that program trading and volatility (assuming there is a causal connection between the two) have, in fact, generated new, unique investment opportunities without destroying any old opportunities. Thus, both large and small investors are better off than before. To understand why, one must first understand the mechanics of program trading.

[*11]  A. The Mechanics of Program Trading

   "Program trading" is a generic term encompassing a variety of computer assisted trading strategies; however, the term is used most often to refer to "index arbitrage."  n30 Stripped of complications, index arbitrage involves simultaneously buying a stock index future and selling the underlying stocks (or vice versa). A stock-index future gives the holder the cash equivalent of the right to buy the stocks in an index (such as the Standard & Poors 500) when the contract expires. The contracts are settled in cash, unlike other commodities contracts (e.g., pork bellies or concentrated orange juice futures), which require that the commodity be delivered on a specified date.  n31

   When an S&P 500 futures contract (SP) expires, the holder is entitled to cash equal to 500 times the value of the S&P 500 index.  n32 For example, suppose that the S&P 500 stock index  [*12]  stands at $ 450 while the SP is trading for $ 460.  n33 A trader can sell one SP for $ 230,000 (500 times $ 460) and buy the stocks comprising the index for $ 225,000. When the contract expires, the trader can simply sell the stock, use the proceeds to pay the purchaser of the futures contract, and keep the $ 5000 difference (less expenses). The strategy's success is independent of whether the stocks comprising the index rise or fall in value, individually or collectively, between the time the trader acquires the position and the time when the futures contract expires. The trader locked in a $ 5000

return upon acquiring the position because the prices of the S&P 500 and the SP will be identical when the SP contract expires.

In reality, of course, stock-index futures arbitrage is significantly more complex than this example suggests. Because futures contracts do not settle until the expiration date, it is necessary to use other funds to buy the underlying stock. Thus, one's investment calculus must factor in the cost of borrowing and the length of time until expiration, as well as the interim dividends that one may receive from the underlying stocks. n34 One must also consider the interest cost involved in maintaining the required margin on the sold futures contract. Finally, one must also consider the cost of brokerage commissions generated when one first buys and sells the underlying stocks, and in selling the future (as well as buying back a future if the transaction is unwound early). n35 If the trade involves buying [*13] futures and selling stock these considerations are essentially reversed.

A further complexity of stock-index futures arbitrage involves determining what stocks to buy or sell in order to replicate the index's performance. Although most trades avoid this problem by purchasing or selling all the stocks that comprise an index, it can be cheaper to trade a representative sample, especially in the case of the S&P 500 which contains 500 different stocks. n36 Although most trades do in fact involve the purchase or sale of all the stocks in an index, in the case of the S&P 500, such trades must be quite large. Each of the S&P 500 stocks affects the index's overall value based on the proportion that its issuing company's total value bears to the sum of all 500 issuing companies' total values. As a result, if a trader purchases in 100-share minimum lot sizes, the trader must purchase a very large number of shares of stocks that are heavily weighted in the index. n37 For example, one would need to buy about 700 shares of Exxon (the largest capitalization stock on the NYSE) for every 100 shares of Kodak (which ranks fiftieth in terms of total capitalization) in order to match the performance of the S&P 500 with respect to those stocks. n38 Thus, some traders construct a portfolio of stocks that will closely track the index's performance. Because such a portfolio may not precisely track the performance of the index, such a strategy introduces an [*14] element of risk to program trading, which is otherwise nearly risk-free. n39

Moreover, because at any given moment there are several different index-futures contracts trading with different expiration dates, different trading opportunities may arise simultaneously (though in most cases the contract with the longest to run will carry the greatest price discrepancy between stock and future). n40 There are also several different stock indices upon which futures are traded. The Major Market Index (MMI), for example, includes only 20 different stocks. Although it is much cheaper and easier to execute index arbitrage strategies using MMI futures, it is also much less likely that trading opportunities [*15] will arise with respect to that index (though the smaller sample represented by the index suggests that it may be more volatile than the S&P 500.) Finally, index arbitrage may also be carried out using options on futures. An option on a future gives the holder the right (but not the obligation) to buy or sell the future itself. The price (or "premium") of an option, however, is non-refundable and thus makes this method of stock index arbitrage somewhat more expensive than arbitrage using ordinary futures.

B. The Supposed Problems with Program Trading

The central complaint about program trading is that it increases market volatility, which may be broadly defined as the likely range of security prices in a given time interval. That is, program trading causes stock prices to fluctuate more than they otherwise would, the concern being that the more volatile the market, the less attractive it is to risk-averse individual investors. However, the evidence concerning whether volatility is increasing and whether it is connected to program trading is in conflict. n41

[*16] 1. Measuring Volatility

Volatility can be measured in many ways, and may appear to be increasing or decreasing depending on how it is measured. A threshold problem is that volatility must be measured with respect to some period of time. In other words, one must choose whether to measure volatility intraday, daily, weekly, monthly, yearly, or over some other period of time. n42 The period chosen is important because, although stock prices may change quite dramatically over a relatively short period, prices may consistently revert to some constant average over a longer period. Recent studies suggest that stock prices do tend to be "mean-reverting" in the sense that the percentage return on individual stocks tends to approach a market average return. n43 Although this is unsurprising considering that most investors are well-diversified, n44 it does suggest that the market may be inefficient to the extent that an investor who buys stocks with high returns and sells stocks with low returns (assuming returns can be accurately measured) may be able to outperform the market. To the extent that stocks are mean-reverting, traders may view volatility as a source

of potentially profitable trading opportunities. Volatility causes stocks to become temporarily [*17] over-valued or under-valued. Because mean-reversion tends to assure that, over time, overvalued stocks will fall and undervalued stocks will rise, volatility coupled with meanreversion enables those who have bought undervalued stocks or sold overvalued stocks to profit. n45 Indeed, recent news stories seem to suggest that investors have become much more tolerant of volatility and now tend to view relatively large downward price swings as buying opportunities. n46

Another difficulty with measuring volatility is determining which stocks' volatility should be examined. That is, one may measure the volatility of the whole market, of an individual stock, or of a group of stocks. Most existing volatility studies are problematic, partly because they focus on the volatility of the market as a whole or on a broad index, but ignore the volatility of individual stocks. n47 Studying volatility solely at the market, or even index level, may prevent a sound analysis of program trading's merits because program trading often involves the purchase or sale of a relatively small group of stocks chosen to replicate the performance of the index which underlies the futures contract. In fact, the NYSE defines program trading for reporting purposes as any simultaneous purchase or sale of fifteen or more stocks worth an aggregate of one million dollars or more. n48 Moreover, determining individual stocks' volatility is necessary because sophisticated traders are likely to vary the stocks they use in program trades in order to keep their underlying strategy secret, or because the index future arbitrage model they use suggests that a new [*18] combination of stocks will replicate the index more accurately. At a minimum, program traders may need to alter their portfolios when the group of stocks which compose the index changes.

On the other hand, measuring volatility at the market or index level for the purposes of volatility studies may be necessary because firms that engage in program trading are not required to report the identity of the stocks they trade, but only the aggregate dollar value of the stocks involved in a particular program trade. Accordingly, it is hard to know exactly which stocks are bought or sold as part of a program. n49 Consequently, it is difficult, if not impossible, for persons other than specialists to determine whether program trading is actually connected with the volatility of any given stock.

Nevertheless, many market observers believe that program trading does cause some market movements. n50 Yet, even if program trading is positively correlated with increased volatility, this does not necessarily mean that program trading causes increased volatility. Instead, conventional traders may watch the futures market for indications of price trends as the futures market tends to lead the stock market. Thus, even in the absence of program trading, the stock market may react to the futures market. Such a dynamic has been named the "billboard effect." n51 Therefore, program trading may be viewed simply as an effort to anticipate price movements that would occur whether or not program trading were allowed.

However, even if one believes that the stock market would react to the futures market in the absence of program trading, it may still be possible that program trading contributes to volatility. After all, program traders buy and sell the stocks in [*19] an index not for their intrinsic value but because the stocks are collectively a surrogate for the whole market. Thus, program trading may cause the prices of the stocks comprising an index to move in response to general perceptions about the market rather than in response to individual stocks' underlying values. And even if stocks tend to move with the market anyway (as they do), it stands to reason that program trading, as an added cause of such movement, causes them to move more dramatically than they previously did.

Moreover, program trading may cause disproportionately large price movements in particular stocks. While most program traders buy or sell all of the stocks in an index as part of a program, many buy smaller portfolios of stocks designed to replicate the market. n52 Thus, when a sell-side program trade hits the stock market, it is not necessarily the case that all stocks in an index are sold; instead it may be that a select few that fit one trader's theory of how to replicate the market are sold and that their prices are driven down disproportionately. In other words, because some program traders treat a few stocks in an index as a surrogate for the entire index or the market, these stocks bear the brunt of program trading. Thus, the investor who has bought stock in General Motors believing it is undervalued may be justifiably annoyed when its price plummets not because GM shares were overvalued, but because GM was chosen by some program traders as a surrogate for a portion of an index that had become overvalued relative to its futures contract. To a stock investor, it must seem as if the futures tail is wagging the stock-market dog. n52a

2. Traditional Investing and Volatility

Metaphors aside, one might thus conclude that program trading harms traditional investors and traders because investors presumably dislike volatility. However, there is reason to believe that traders actually prefer volatility and that investors are -- or should be -- indifferent to volatility.  n52b

[*20]  An active trader may prefer more volatile stocks because the prospect of larger and more frequent price changes implies that there will be an increased number of profitable trading opportunities. To illustrate, consider the options market. It is generally recognized that the value of a stock option increases as the volatility of the underlying stock increases.  n53 The higher a stock's volatility, the greater the chance that relatively large upward and downward price swings will occur during the option's lifetime, thereby increasing the probability that the option will become exercisable by being "in the money." The greater probability an option has to be exercised, the higher the option's price will be.

Options differ from stocks in that options have a limited life. That is, options expire on a certain date and are thereafter worthless. Thus, one who invests in options must worry not only about the price of the underlying stock but also about how quickly it changes. Although an investor in stock need not theoretically worry about how quickly a stock rises to its supposedly correct value (or falls, in the case of a short seller), many investors will, in fact, be concerned about timing. For example, an investor who has bought on margin, or borrowed a portion of the stock's purchase price will be obligated to pay interest as long as the loan remains outstanding. In addition, even investors who use their own money must bear the implicit cost of returns they might receive from other investments. Thus, although stock does not expire in the same sense as an option, investors in stock have legitimate reasons to prefer that stock price movements occur sooner rather than later. Therefore, investors in stock, and particularly active stock traders, may share a preference for volatility with investors in options, and for similar reasons.

In contrast, passive investors or investors who are not active stock traders are likely to be largely indifferent to a stock's volatility. To such investors, the fact that stock prices may move up and down quickly is irrelevant unless they happen to buy or sell at just the wrong time. As long as stock prices tend to rise over the long run, as they historically have, investors with fairly long time horizons should not be greatly concerned  [*21]  about interim stock price movements. Even if such passive investors occasionally buy or sell at the wrong moment, assuming their portfolios are adequately diversified, the chances are that they will gain from market movements as often as they will lose.  n54

Moreover, if investors were truly afraid of program trading, one would expect them to avoid stocks that are included in indexes. However, investors appear to prefer stocks that are included in the S&P 500 relative to others. Studies show that when a stock is added to the S&P 500, it enjoys an immediate and significant increase in price.  n55 The added value is apparently the result of the fact that being included in an index means that the subject stock will be purchased by portfolio-oriented investors, regardless, to some extent, of fundamentals. In other words, a stock's inclusion in an index increases demand for that stock because some investors will buy it, possibly as part of a program trading strategy, no matter what turn the fortunes of the company take.  n56 Consequently, the  [*22]  stock's price will rise. Therefore, it becomes more difficult to argue that on balance program trading harms investors.

Nevertheless, it is possible that investors merely tolerate the greater volatility incident to program trading because the benefits of a stock's inclusion in an index outweigh the ill effects. That is, it could be that program trading causes the market to fall more often than it causes it to rise. The facts, however, indicate otherwise. As the SEC staff report on the 1987 crash notes, the most common type of index arbitrage has involved the sale of futures and the purchase of stocks.  n57 In other words, program trading leads to stock price increases somewhat more often than decreases. Yet, this effect itself calls for some explanation. One possibility is that it may be due to rules against short selling on the exchanges. Program trades involving stock sales sometimes cannot be executed if the trader does not already own the stock and if, because of market conditions, the stock cannot be sold short, i.e., if more than a few of the stocks to be sold are trading on a downtick.  n58 The slight upward bias may also be due to the fact that a program trade that involves buying stock carries with it the prospect of receiving dividends while the position remains open and thus of reducing the net cost of the trade or increasing its return (which is the same thing). Similarly, the need to reimburse stock lenders for dividends missed also tends to discourage traditional short selling.  n59 Incidentally, the fact that program trading tends to lead to more price increases than decreases may further explain why inclusion of a stock in an index leads to an immediate increase in price for the stock.

In sum, although it is possible that program trading increases stock market volatility, it is far from clear that investors dislike volatility. Active traders are likely to prefer volatility, and longer term investors should be

indifferent or even predisposed [*23] to volatility because program trading tends, on average, to raise stock prices. This conclusion regarding investor preferences is supported by studies indicating that investors prefer those stocks that are most likely to be involved in program trading strategies. Even if program trading does cause the market to "crash" occasionally, the fact remains that the market has readily recovered after each of the events for which program trading has been held responsible.

III. THE ROLE OF FUTURES IN THE FINANCIAL MARKETS

Although it is unclear what harm, if any, program trading causes, it is clear that program trading is capable of roiling the stock market. Although most investors may not or should not object to increased volatility, it is worthwhile to ask whether program trading serves any important purpose.

Program trading exists because of the arbitrage opportunities presented by stock index futures and similar derivative products. As long as such instruments exist, they may become mispriced relative to the stock market. Thus, as long as stock index futures are traded, there will also be program trading or a similar arbitrage strategy.

It has been proposed that stock index futures be eliminated or, at the minimum, that their use be restricted. n60 Because stock index futures are nothing more than a way of investing, short term, in the market as a whole, many investors and stock market professionals tend to view such a tactic as naked gambling. n61 That is, some investors view a stock index future as [*24] simply a bet on whether the market as a whole will go up or down. If one's investment strategy is to buy stocks solely of companies with strong financials and which run strong businesses, then investing in the market as a whole seems little better than betting on horses. Taken to the extreme, such investors would argue that stock index futures only serve to disrupt the stock market. However, this position is clearly implausible. If futures amount to gambling on the direction of near term market movements, then it is difficult to believe that futures trading would have much more effect on stock trading than would the latest results from Aqueduct. There is, of course, another side to the story, and it offers a powerful argument in favor of stock index futures.

A. Diversification and the Efficient Market

Investing in the market as a whole is a rational investment strategy. n62 Common sense counsels against putting all of one's eggs in one basket. Indeed, the law of trusts requires a trustee to diversify investments on behalf of a trust. n63 Thus, it would seem that the rational investor should diversify and not buy or [*25] sell a single stock without regard to the transaction's effects on an investor's portfolio.

However, common sense and the law only hint at the logic of portfolio diversification. Diversification allows an investor to achieve, for a fraction of the risk, the same return that might be expected on a single stock. After all, the price of a stock reflects what traders think about the prospects of the issuer -- not the company's "true value." At any given time the price of a stock will reflect an estimate of the average of all possible outcomes the issuing company may face. Thus, if one buys a single stock, its true earnings will often differ from what the market predicted. However, if one buys many stocks, the aggregate outcome for all of the companies will be much closer to the predicted average, because some companies will do better than expected and some will do worse. Even an investor who picks a single stock based on top-notch advice has only a slim chance of being right. But if an investor can buy the stocks of several companies with greater assurance of receiving the expected return, the investor would be irrational to do otherwise. n64

[*26] To illustrate, imagine two companies whose stock prices move inversely to each other. One company makes guns and the other makes butter. In the event of war, the gun stock pays a dividend of 10 percent and the butter stock pays nothing. In the event of peace, the gun stock pays nothing and the butter stock pays 10 percent. If there is a 50 percent chance that there will be war and a 50 percent chance that there will be peace, each stock will earn 10 percent half of the time and zero the other half of the time, giving each stock an expected return of five percent. A rational, risk-averse investor will opt to put half of his or her money in each of the stocks, thus ensuring a return of five percent, the same return as that of a single stock, but without the risk that actual returns may vary. In other words, diversification enables the investor to enjoy the same return but without the risk. n65

In the real world, there are few, if any, stocks that move inversely with each other. n66 Rather, most stocks are positively correlated to some extent with the market. That is, when the market as a whole rises, most individual stocks rise (and vice versa). However, the logic of diversification is still valid. An investor who invests in a single

company may gain or lose if company-specific events cause the price of its stock to rise or fall relative to the market; but, in the long run, a single-company investor will only receive a rate of return equal to the market average. By investing in a well-diversified portfolio an investor can be ensured of constantly receiving a market return. Studies indicate that one can eliminate 98 percent of company-specific risk by purchasing a portfolio of as few as 32 stocks.  n67 By buying a portfolio of 200 to 300 stocks an investor  [*27]  can eliminate virtually all company-specific risk.  n68 Thus, it has been suggested that the rational investor should "buy the market" by investing in an index fund.  n68a Thus, through diversification an investor can obtain the same return with less risk as one can get by buying individual stocks.

Efficient market theory also supports this conclusion. It is well established that the stock market is quite efficient. Studies indicate that it is impossible (even for very sophisticated investors) to beat the market consistently without access to inside information.  n69 This is not to say that no one ever beats the market or that money cannot be consistently made by investing in stock. Rather, it is only to say that the number of investors who make more than the average rate of return is about equal to what one would expect as a matter of chance. Just as one would expect that a few gamblers in a thousand would manage to come up with ten heads in a row in a coin flipping contest, one would also expect a few stock investors to realize aboveaverage returns.

On reflection, the proposition that the market is efficient is unsurprising. The market includes many sophisticated investors who compete to analyze publicly available information. Thus, market prices quickly reflect what is known about a company. Moreover, the "market" is the traders who compose it, and the market rate of return is nothing more than the average of what thousands of well-informed traders earn on their individual investments. In short, the idea that sophisticated traders can  [*28]  consistently beat the market is equivalent to the idea that everyone can do better than average.

In sum, the powerful logic behind diversification, coupled with an efficient market, make a strong case for buying and holding an unmanaged portfolio consisting of numerous stocks. In contrast, an investor who trades in individual stocks chosen by fundamental analysis designed to identify undervalued companies incurs unnecessary risks that are uncompensated by the market. Because diversification can eliminate the unique risks associated with investing in individual companies, the market pays no additional return to those who assume such risks.

To be sure, the vast majority of very large and very small investors do buy the market. In fact, the very large and the very small investor are, in the end, one and the same. For the most part, truly small investors invest either in mutual funds or through a pension plan. However, mutual funds, pension plans and other institutional investors are almost by necessity index funds.  n70 With vast amounts to invest, these funds cannot invest in a few selected stocks without taking controlling positions in the issuing companies. Consequently, each fund is sufficiently diversified so that virtually the only risk it assumes is market risk (though this can be significant if, for example, a fund times a shift in or out of stock incorrectly).  n70a Thus, for all practical purposes, these investors have opted out of choosing investments by trying to predict each firm's behavior and fortunes.  n71

[*29]  B. The Futures Market and Portfolio Management

Investing in a stock portfolio is one thing; investing in an index future is quite another. Whereas the portfolio investor has invested money in real shares in real companies, the futures investor has arguably done no more than bet on the general price movements of stocks. However, such a view of index trading is far too narrow. Although some may invest or speculate in index futures as stand-alone instruments, risk-averse portfolio investors may find futures to be a useful tool for controlling risk. Portfolio investors can use index futures to adjust their exposure to the stock market without buying or selling individual stocks in transactions that could disrupt the market in those stocks. n72

For example, suppose that researchers at a large mutual fund are convinced that the stock market is about to fall. In order to decrease exposure such a downturn, the fund could sell a portion of its portfolio invested in stocks. However, this decision to sell may, in fact, induce the market downturn, particularly if the fund sells stocks weighted heavily in a market index. Selling such stocks would drive down both the price of the shares and the market as a whole even though the sales have little or nothing to do with the fund's view of the future fortunes of companies whose stock the fund sells.

Another strategy to avoid a market downturn is to sell stock index futures. This would, in effect, enable a fund to lock in current market values and allow the fund to sell individual stocks over time without fear that the sales will

possibly even trigger a greater than anticipated decline in prices. In short, index futures are both a convenient method of selling a portion of a portfolio and a way for large investors to avoid telegraphing their views about the market.  n73 Consequently, small investors  [*30]  in the stocks that the fund would have sold if it had no other way to hedge should be grateful for index futures; otherwise, they might well bear the brunt of price declines unrelated to the particular stocks sold. But the story is not over. When the mutual fund sells index futures instead of the underlying stock, the sale creates downward price pressure in the futures market. As the price of the future drops, opportunities for program trading arise, thereby causing arbitrageurs to buy futures while selling stocks. As a result, a strategy designed to avoid selling stocks directly in the stock market may ultimately cause a stock sell-off, although the particular stocks that are sold may differ from those that the fund initially would have sold. This seemingly arbitrary result may actually be a blessing in disguise. If the mutual fund itself had sold the stock, other traders might have misunderstood the sales as evidence that the sold stocks were overvalued. By instead selling an index future, the fund effectively delegates to arbitrageurs the task of deciding which stocks should be sold.  n74

   [*31]  It is not, however, a foregone conclusion that a barrage of program trades will follow a sale of futures. The result of the futures sale depends on whether it generates pricing imbalances between the two markets. If the sale of the futures is accompanied by a stock market decline, program trades will not be triggered. On the other hand, if the stock market remains buoyant, program trades are more likely to follow. It is when a selling mutual fund's expectations of a falling stock market turn out to be erroneous that the conditions are created for program trades that, in turn, send the market down. This is why program trading creates trading opportunities in the stock market. If program trading can cause the market to gyrate primarily when stocks' fundamental values remain intact -- when no economic event affects perceptions of value -- then, stock traders can make money with less risk by buying or selling the stocks whose prices are forced down or up by program trades.

   To summarize, stock index futures and other derivative products enable one to invest in a stock portfolio without picking individual stocks. Thus, these products are (or can be) conservative investment tools. Because less money is wasted in efforts to pick individual stocks,  n75 the growing use of futures and other derivative instruments should be applauded. One natural implication of indexing, however, is that trading strategies that ignore fundamental value, such as program trading, are bound to arise.  n76

## [*32]  IV. REGULATORY REACTION TO PROGRAM TRADING

   There have been numerous efforts since October 1987 to regulate the practice of program trading. First, both the stock exchanges and the futures exchanges adopted so-called "circuit breakers" designed to allow the markets to "cool off" after a big move by limiting or suspending trading for short periods of time.  n77 Second, the NYSE adopted a rule that restricts sales as part of a program trade when the market has dropped in one trading day more than 50 points from its opening value. The SEC also re-interpreted its existing rules more restrictively to prohibit many program trades when the market for an individual stock is down by even one-eighth of a point.  n78 Third, serious efforts have been made to persuade Congress to transfer authority over margin regulation for stock index futures away from the exchanges to either the SEC or the Federal Reserve Board and to transfer authority over stock index futures from the CFTC to the SEC.  n79

## [*33]  A. Circuit Breakers

   In reaction to the 1987 crash, both the stock and futures exchanges adopted so-called "circuit breakers" at the behest of a Presidential commission established to study the crash (the "Brady Commission").  n80 Circuit breakers allow the markets to "cool off" after a big price drop by limiting or suspending trading for a period of time depending on the size of the drop.  n81 Circuit breakers are comparable to the traditional "limit-up" and "limit-down" rules that apply in the futures markets. That is, most futures contract prices are allowed to fluctuate only within a narrow pre-determined range on any given day. If a contract closes "limit-up" or "limit-down" the range is progressively expanded for the following days' trading until the market finds a new clearing price.  n82

   [*34]  Circuit breakers differ significantly from traditional price limits. First, the most easily tripped circuit breakers restrict particular trading methods rather than completely halting trading. Second, depending on the magnitude of the market move triggering the circuit breaker, an intra-day trading halt of up to two hours may be imposed. Once this cooling off period has passed there are no limits on subsequent price movements other than the next circuit breaker. In contrast, a traditional limit in the futures market applies for a full trading day and involves no suspension of trading.

Six levels of circuit breakers are currently in place. First, and least restrictive, the SP may not open at a price more than five points higher than the previous day's close. n83 Second, when in the course of a trading day the Dow Jones Industrial Average (DJIA) moves more than 50 points either up or down relative to the previous day's close, access to the NYSE DOT is restricted for purposes of executing program trades. n84 Third, when the SP falls 12 points, it may not trade at a lower price for 30 minutes. DOT orders in connection with program trades are routed to a "sidecar" where the orders are matched only with each other, and imbalances reported to the specialist after five minutes. n85 If there is a significant order imbalance, trading will be halted and new price indications must be disseminated. Fourth, when the SP is down 20 points (roughly, 166 points on the DJIA), a one-hour limit on further declines is imposed. n86 Fifth, when the SP is down 30 points, further declines during the day are prohibited. Plus, if the DJIA is also down 250 points, a coordinated one-hour trading halt in both stocks and futures is imposed. n87 Finally, and most restrictively, [*35] if the SP falls another 20 points after the first coordinated halt, further declines during the day are prohibited. In addition, if the DJIA falls another 150 points, trading is halted for an additional two hours. n88 Thereafter, further declines in the SP are prohibited for that trading day.

Circuit breakers are designed to restrict program trading in volatile markets by restricting access to computerized trading systems. n88a Nevertheless, it is still theoretically possible to execute program trades using noncomputerized orders executed in person. n88b Beyond making access to markets inconvenient, circuit breakers do little to discourage program trading. Because the profit in program trading is locked in when the initial trades occur, it makes little difference that one is unable to unwind a program trade because the markets are temporarily closed. Although circuit breakers could significantly discourage program trading by closing the markets for days, thereby making the cost of maintaining a position more expensive, the most drastic circuit breaker halts trading for only two hours. n89

In fact, circuit breakers may even subtly encourage program trading. Because circuit breakers' imperfectly coordinate trading restrictions on the stock and futures exchanges, when a circuit breaker is in force, futures prices could move further out of line with stock prices thereby increasing the incentive to set up a program trade. Obviously, such pricing imbalances could occur should one market that is open move while the other is closed. Trading halts on the stock exchanges are tied to the DJIA, whereas they are tied on the futures exchanges to the S&P 500. The DJIA and the S&P 500 do not move in perfect lockstep. The S&P 500 may rise or fall by more or less than [*36] the DJIA because the DJIA is less diversified than the S&P 500, because the DJIA is not weighted to reflect the relative capitalization of component companies, and because the DJIA includes only very large capitalization stocks that tend to move more slowly than does the market as a whole. And even if both markets are closed, prices may change -- implicitly -- as traders anticipate reopening.

These pricing discrepancies may create situations where program trading becomes more profitable than normal. For example, if an index future is trading "limit-down," so that its price may drop no further, and the stock market remains open and continues to fall, the widening gap between the artificially fixed futures price and the falling stock market price will make it even more attractive to buy the stock and sell the future. Ordinarily, such a trade would not be possible because there would be no buyers when the future is trading limit-down. However, if for some reason the futures market reverses and begins to rise, thereby attracting futures buyers, program trades that couple stock market purchases with futures market sales will become particularly attractive. Such a series of events may not harm the stock market, but would likely dampen a futures market recovery since would-be futures buyers would anticipate that program trading would drive the futures market back down and stay out of the market. As a result, circuit breakers may effectively continue to inhibit trading even after they are lifted.

Needless to say, if the market trips one of the more drastic circuit breakers and one or both of the markets are closed, program trading will be precluded. But this solution may be self-defeating. If the futures market is trading limit-down and the stock market remains open and continues to fall, program trading could theoretically rescue the stock market if further futures market sales were possible. Indeed, such a rescue would seem to be a likely scenario because: (1) trading halts in the stock market depend on trading halts in the futures market, (2) the futures market tends to move faster than the stock market, (3) the temporary unavailability of the futures market makes the stock market riskier, and (4) traders in individual stocks are more likely to overreact to precipitous declines than diversified investors. Thus, circuit breakers may preclude program trading in precisely those situations in which the strategy is most desirable, and they may even exacerbate the situation.

 [*37]  Circuit breakers also create a number of other problems related to, but distinctly, from their interaction with program trading. First, the widely followed Dow Jones Industrial Average triggers circuit breakers even though

it is not the subject of any index future. This suggests that circuit breakers may have been designed more for their psychological effect than anything else since the DJIA is the most unscientific of any of the readily available market indices.  n90 Although it is rare that there is a significant percentage difference between the movement of the DJIA and the movement of the S&P 500, the fact that there may be unusual situations where one market is restricted or closed while the other market remains open may be more worrisome than the possibility that such situations could easily arise.  n91

Second, circuit breakers may be difficult to enforce. Halting trading in one market may simply induce traders to seek other markets. A significant portion of program trading is already conducted offshore.  n92 Moreover, it is perfectly legal to trade stocks off-exchange, (although it is illegal in the United States to trade futures except on an exchange).  n93 This may explain why circuit breakers are in most cases tripped first on the futures exchanges and tripped only later on the stock exchanges if stock prices follow suit. Because stocks are in this sense more thinly traded on exchanges than futures, stock market volatility is less accurately measured based on exchange prices. Thus, stock exchange officials will need to witness somewhat  [*38]  more dramatic price changes before they can be as confident as futures exchange officials that a trading halt is justified.

Third, it is difficult to know which instruments should be subjected to a trading halt. For example, if officials halt trading in the SP, would-be SP traders may resort to the S&P 100 or the Major Market Index as substitutes.  n94 Similarly, if trading is halted in stocks, would-be stock traders may trade options on those stocks instead. Thus, it seems unlikely that circuit breakers will work effectively over periods of time long enough to allow traders to seek other markets.

Fourth, and most serious, assuming that circuit breakers can be enforced, they are likely to become a self-fulfilling prophecy. If traders become worried that the market may trip a circuit breaker, they are likely to try to sell before officials suspend trading. Thus, trading motivated by a desire to beat the circuit breaker may cause the market to drop faster and farther than it otherwise would.  n95

On the other hand, circuit breakers may induce new forms of trading in distressed markets. If it is recognized that circuit breakers are likely to be tripped by selling motivated primarily by a desire to beat a trading halt, then traders may emerge to take advantage of the bargain prices created. For example, an investor might place a standing order with his or her broker to buy certain stocks or futures once the market reopens after a trading halt if no significant company-specific news relating to underlying values has been reported. While a trader could place such an order even in the absence of a circuit breaker by defining his or her own parameters, the circuit breaker may be vital to such trading because it provides a widely known benchmark that may reassure such "distress traders" that other distress traders will also come to market. In other words, circuit breakers may function not so much as a method of easing the market down to a new level, as they do a signal to persons who might be thought of as back-up specialists to enter the market. In fact, a circuit breaker may work, in part, precisely because it  [*39]  causes the market to fall further than it otherwise would, thus creating opportunities to profit when the market springs back.

Both the negative and positive effects of circuit breakers have been observed. Most dramatically, on July 24, 1990, the SP fell 12 points and tripped a circuit breaker that halted trading at lower levels for 30 minutes. But, trading resumed at higher levels after 16 minutes. On that day, the SP fell six points in the first hour after trading opened and another five points during the next four minutes, thereby triggering the limit-down restriction. After trading resumed, the entire five point drop evaporated within ten minutes and the SP closed that afternoon about six points down (though it did in fact trade below the level at which the limit had been earlier imposed). Although some see this event as evidence of the wisdom of circuit breakers, others view the circuit breaker as the cause.  n96

In the end, it is difficult to say whether circuit breakers help or harm the market. However, if they help the market by inducing mini-crashes and signaling distress traders to action, then circuit breakers also carry significant costs that must also be acknowledged and weighed.  n97

[*40]  B. Regulating Short Sales

In 1988, the New York Stock Exchange adopted a rule that prohibits the sale of a stock as part of a program trade when the market is down more than 50 points during the trading day unless the last move in the stock in question was upward.  n98 In 1990, the SEC re-interpreted Rule 10a-1 of the Securities Exchange Act governing short sales to restrict such sales when the last price move in any individual stock was downward (a "downtick").  n99 These new rules are mutations of the existing law governing short selling, known as the "tick test." The tick test

dictates that one cannot sell a stock short unless the stock's last price was upward or an "uptick." n100 The underlying rationale of the tick test is that traders should not be able collectively to drive further down a stock whose price is already depressed, a tactic known as a "bear raid." n101 The idea behind the new rule is basically the same. Although the new rule may seem sensible to the casual observer and consistent with established practice, it makes little sense, given the original rationale, to restrict sales of stocks where those sales are part of a portfolio-based strategy. Moreover, the existing rule against short selling is itself quite indefensible. n102 The avowed [*41] purpose of the rule against short selling is to keep a stock from falling as fast as it would if traders were free to speculate on the downside. On reflection, however, it is unclear why a stock exchange would want to prevent stock prices from falling given that traders can profit when prices fall as well as rise.

The specialist system may be one reason why stock exchanges may favor rising or at least stable prices. For each listed stock on the NYSE there is one specialist who must stand ready to buy and sell the stock when no one else will. n103 Specialists differ somewhat from market makers in the over-the-counter (OTC) market whose only goal is to balance long and short positions continuously. n104 Although specialists perform a similar function, they must sometimes invest heavily in the companies in which they make markets. Thus, specialists may have a strong interest in seeing prices rise (or fall if they have been required to sell short). n105 Neither specialists nor market makers exist on futures exchanges, where trades are made by open outcry. On the other hand, specialists, as active traders, may also have an interest in higher levels of volatility. That is, given that specialists are obligated to trade against the market -- buy when prices are down and sell when prices are up -- they stand to make greater profits if market prices jump around more. Specialists are, however, strictly regulated and closely monitored precisely to insure that they keep the markets deep and continuous. Thus, it is highly unlikely that a specialist who allowed a stock to gyrate more than necessary could escape detection. n106

[*42]  A second reason why stock exchanges may prefer that prices rise is that so-called "small investors" typically hold long positions and therefore benefit from rising prices. As small investors account for less and less market volume, the exchanges frequently express concern that such investors are discouraged from trading because of the market presence of sophisticated professional traders including institutions (and program traders) who may be able to trade on more favorable terms. Again, the truly small investor is one who invests in, say, a mutual fund. However, these investors are not the ones that worry regulators and exchange officials. Rather, in this context, "small investor" refers to relatively wealthy individuals who manage their own portfolios, trade with some frequency, and are often poorly diversified (unlike the well-diversifed mutual fund investor). The rules against short selling effectively subsidize these small investors. And because the rules artificially reduce the risk that any given stock will fall in price, they encourage poorly diversified small investors to engage in more stock picking and trading than they otherwise would.  n107

[*43]  A third reason for restrictions on short sales is that listed companies have a strong interest in keeping stock prices high. A high stock price will enable companies to raise more capital when issuing equity. Perhaps more importantly, a high stock price may positively affect its ability to borrow. Moreover, because managers often receive a large portion of their compensation in the form of stock options, they naturally prefer high stock prices when they exercise their options. In addition, when the takeover market is active, companies desire a high stock price because, other things equal, the higher the price of a company's stock, the more expensive it is to acquire. Finally, managers may derive psychic benefits from high stock prices and may be personally offended when the price of their stock falls. In short, there are several reasons why managers of listed companies dislike short selling in their company's stock. Because companies pay to have their stock listed on an exchange, it stands to reason that they are an important constituency whose wishes the governing body of the exchange will heed to some extent. n108

A fourth (and related) reason for the rules restricting short selling is found in the structure of the securities industry itself. Many of the biggest and most influential firms engage in both investment banking and broker-dealer operations. Other things equal, such a firm is bound to prefer high and rising stock prices because they rely on both underwriting and brokerage business to make profits. n109 Indeed, in recent years,  [*44]  underwriting has become more important to such firms because small investors have become more reluctant to invest and because large investors are able to negotiate more favorable commission rates, thereby reducing the profitability of brokerage. As a result, investment banks must stay on good terms with potential issuers. However, it is difficult to attract an issuer's underwriting business when an analyst on the trading side of the business has been so uncomplimentary to a potential issuer as to recommend selling its stock, let alone selling it short. Such recommendations may have repercussions for the brokerage business as well. Company management will be less enthusiastic about talking to an analyst who has been critical of the company's performance, thus cutting off an important source of information for

trading purposes. As a result, most analysts are reluctant to issue negative reports about companies they follow. Finally, because analysts may have contacts within the companies they follow, many brokerage firms make analysts somewhat responsible for generating underwriting business. In short, few analysts dare to advise investors to sell. Thus, there are any number of forces, ranging from the law to industry structure, that effectively require one in the securities business to be an eternal optimist.

Still, what is so wrong with stacking the deck in favor of stability and rising prices? Plenty. First, if the market cannot be trusted to set accurate prices, it will not rise as far as it otherwise might. Rules that keep prices artificially high create an enhanced risk that market prices are inaccurate at any given time. The more risk a trader must bear, the less a trader will pay for a security. Thus, any rule that enhances risk will lower prices at least marginally. Second, rules designed to keep stock prices artificially high may accelerate a crash. If prices are not allowed to fall freely when believed by traders to be too  [*45]  high, they are more likely to fall dramatically once given the opportunity to do so.

If stock market rules do tend to keep stock prices artificially high, program trading may have been, in some sense, the cause of one or more of the recent crashes. To see why, consider the mechanics of futures trading. There are no rules against selling short on the futures exchanges (other than the recently imposed circuit breakers). A rule against short selling would be inconsistent with the concept of a futures exchange; that is, for every trade there must be a party who sells ("goes short") and a party who buys ("goes long"). In the end, any futures trading system that gives an edge to those who believe prices will rise over those who believe they will fall would be self-defeating. One of the most important functions of a futures market is to allow one who anticipates buying a commodity to lay off the risk that prices will rise. Without traders who are willing to "speculate" on the possibility that prices will fall, fewer buyers would be able to hedge and the futures markets will have lost a principal reason to exist.  n110

The very nature of the futures market creates difficulties for the stock market. If futures prices fall faster than stock prices, because there is no artificial brake on the process, or at least none that is triggered so quickly as the current NYSE rules against short selling, then it stands to reason that in periods of falling stock prices, a discrepancy will arise between futures and their underlying stocks. A program trader can then lock in  [*46]  a profit by buying a future and selling the underlying stock. Because the futures market responds quickly to changed conditions, whereas the stock market lags behind, program trading will tend to subvert any rule the stock exchange establishes to slow the process.  n111

 [*47]  Indeed, even in the absence of program trading, trading in stock index futures may still influence prices on stock exchanges because (1) stock prices do not always perfectly reflect fundamental value; (2) individual stocks tend to move with the market; and (3) most investors are, quite rightly, more concerned with the market as a whole than they are with the fortunes of individual companies. Therefore, savvy stock investors may monitor futures prices for an indication of overall trends. When the price of the future begins to fall, the decline may be read as a signal to sell stocks. This phenomenon has come to be known as the "billboard effect."  n112

The billboard effect, however, should not be overestimated. The futures markets cannot completely avoid the effect of stock market rules. Stock index futures act as a hedge against possible movements of the stock market. However, stock market rules dictate in part what the stock market actually does. Therefore, futures traders must constantly factor into their estimate of the correct futures price the effect of stock market rules that slow down the adjustment of the stock market.

To its credit, the SEC expressed reservations about the NYSE's new rule regarding short selling in connection with program trading.  n113 Nevertheless, the SEC thereafter decided  [*48]  that one of its existing rulings governing short selling should be changed to restrict program trades further. Thus, in 1990, the SEC warned that program trades involving sales of stock that the trader does not own may run afoul of the existing rules regarding short selling.  n114 Prior to that time, the rules governing short selling had been interpreted not to apply to program trades for the very good reason that by selling stock and buying a future, the short position was in effect covered. Thus, there can be little doubt that the revised interpretation has little to do with any dangers inherent in short selling; rather, it apparently has more to do with discouraging program trading in any way possible.

## C. Margin Regulation

Margin regulation was the arena for the third and final effort by the SEC to regulate stock index futures. In late 1990, the SEC began a new offensive in Congress arguing that the size of the downpayment required to buy or sell a

stock index future was too low and that changes in the requirements were too frequent.  n115 As of 1988, to buy or sell a stock index future, one was required to deposit about 8% of the contract's value if one is a hedger (12% if one is a speculator) and maintain this "margin" level day-to-day as the contract's value fluctuates.  n115a In contrast, to buy stock, one must deposit 50% of the stock's purchase price, in cash or eligible securities. Additional deposits are required only if the equity in the account drops below 25 percent. Thus, at first glance, the margin required for a stock index future does appear to be low when compared to the margin required for stock. In reality, however, margin requirements for stocks and futures are not so dissimilar if one looks at the total amount of cash required to back up a trade. The total deposit, considering buyer and seller combined, required to trade a future is about 16% for hedgers (24%  [*49]  for speculators), while the effective deposit required to buy stock is 25%. Thus, there is little reason to believe that easy credit leads to a significantly higher level of activity in the futures market than in the stock market.  n116

Nevertheless, the SEC suggested that it is unfair for commodities exchanges to have lower margin requirements than the stock exchanges. The SEC argued that the 8% margin required to buy or sell a stock index future siphons investors from the stock market to the futures market.  n117 Although arguments from equality often appear convincing,  n118 this one is unsound. The purpose of margin is not to protect investors from risk, but to protect exchanges from investor insolvency.  n119 It is only natural, then, that margin requirements for stock index futures are lower than they are for stock. An investor who buys a stock index future which represents a portfolio of 20 to 500 different stocks is, by definition, well diversified.  n120 The only risk such an investor takes is the risk that the market as a whole will rise or fall, whereas the investor in a single stock bears additional, and significant, company-specific risk.

The real inequality inherent in margin rules is in the treatment of investors who own stock in a single company compared to those who hold a diversified portfolio. The individual stock investor assumes significantly greater (and unnecessary) risk; the probability that any single stock will fall dramatically is in addition to the risk of a fall for the market as a whole. Indeed,  [*50]  the portfolio investor assumes only about one-third to one-half of the risk faced by the investor in an individual stock. Yet, the portfolio investor who avoids company-specific risk must still put up the same 50 percent margin as the individual company investor.  n121 Thus, the problem is not that futures exchange margin requirements are too low, but that the margin requirements on the stock exchanges for well-diversified investors are too high, at least by comparison. Diversified investors should be able to put up just half the margin required of non-diversified investors.  n122 And, the 24% total margin now required (for speculators) to buy a stock index future, given that both buyer and seller must post it, is in fact just about half of the 50 percent margin required to buy stock.

The real question is why stock exchanges insist on so much more margin than the futures exchanges. One possible answer is that high margin requirements, like the rules against short selling, keep stock prices artificially high or keep them from falling quickly.  n123 Again, the reason that the exchanges prefer high and stable stock prices can be traced to exchanges' supposed concern for the "small" investor's continued patronage and to exchanges catering to the interests of listed companies that pay for the privilege of having their stock listed.

High margin requirements effectively operate as a subsidy to poorly diversified small investors by keeping better diversified investors from trading as much as they might.  n124 Moreover,  [*51]  high margin requirements together with unduly restrictive rules about short selling (which artificially reduce the risk that any given stock will fall in price), encourage poorly diversified small investors to engage in more stock picking and trading than they otherwise would. But, high margin requirements may also exacerbate the effects of a crash. As the SEC itself noted in its study of the 1987 crash, high margin requirements may have kept investors from buying as vigorously as they might have in response to the low prices that prevailed after the crash.  n125

High margin rules also insulate issuers from pressure to borrow, thereby decreasing the amount of debt present on their balance sheets. An investor in a stock who seeks more leverage than the company's capital structure offers can create personal leverage by borrowing part of the stock's purchase price. From the investor's point of view, the principal disadvantage to this approach is that the company can usually borrow at better rates. Thus, although personal borrowing can provide investors with greater leverage, investors are likely to prefer issuer-created leverage. n126 By restricting margin, stock exchange rules reduce the pressure that investors can bring to bear on companies that are reluctant to borrow. Again, the exchanges have an interest in catering to the needs of listed companies. n126a

Sensing perhaps that there is no correct amount of required margin, the SEC has also argued that frequent changes in margin requirements may be as dangerous as relatively low margins. n126b It is true that margin requirements for stock index futures change frequently in order to track stock market [*52] volatility. But if anything that is good news, for frequent changes show that someone is minding the store. And because increases in required margin make trading in stock index futures less attractive, if futures trading does increase stock market volatility, the process naturally self-regulates: as stock market volatility increases, futures trading becomes more expensive and declines. n127

The SEC has also argued that margin increases may cause insolvencies among futures traders and clearing houses in precisely those situations in which credit should be easy to get. It is difficult to believe, however, that the futures exchanges would ignore the risks that rules and rule changes create for member firms. Moreover, it is unlikely that a government agency, could or would hold daily hearings on margin requirements and react with daily decisions when conditions call for it. It is also unlikely that the futures exchanges review margin requirements more often than is necessary. n128 In short, even if the exchanges sometimes err in setting margin requirements, there is no reason to think that the SEC or another agency would do better.

Nevertheless, because the stock and futures markets are linked, the SEC has argued that it should have the authority to regulate margin in both markets. However, the SEC has never directly regulated margin requirements in the stock market. The Federal Reserve Board (FRB) has the authority to set initial [*53] margin requirements and has delegated to the stock exchanges the authority to set margin maintenance requirements. n129 In the commodities markets, the exchanges have (until recently) had complete authority to set margin requirements.

Although this scheme may appear arbitrary today, it may have made sense when established in 1934. Initially, the FRB acquired regulatory authority because it was thought margin regulation could be employed to prevent excessive use of credit for stock market speculation. But, the FRB promptly delegated the authority to regulate maintenance margin back to the exchanges on the theory that once the amount of credit extended has been set, it is up to the lender to keep track of whether the security for it is adequate. n130

So, who should regulate margin? If the true purpose of margin requirements is to assure that trades will be honored, there is no reason to believe that the exchanges would fail to do the job as well as it can be done. The SEC's goal in seeking increased power to regulate margin, however, was to control volatility by regulating speculative trading of stock index futures. But, it is hardly clear that volatility is harmful, and there is certainly no consensus as too how much volatility is tolerable. Moreover, margin regulation has never been used as a way to manage market forces actively. If the state of margin regulation in the stock markets is any indication of the changes that the SEC may have been considering for the futures markets, giving the SEC jurisdiction over stock index futures was likely to do more harm than good. Instead of lobbying Congress for authority over stock index futures margin, the SEC would have been better advised to look more closely at why the stock exchanges require as much margin as they do. n131 In the end, [*54] and for reasons that remain unclear, the SEC gave up its quest for authority over margin for stock index futures and Congress, in the Futures Trading Practices Act of 1992, conferred that authority on the Federal Reserve Board which delegated it back to the CFTC. n131a

V. THE BENEFITS OF PROGRAM TRADING

Whether program trading should be specially regulated or completely banned ultimately depends on balancing the benefits of program trading against any harm which it may cause. To this it can almost certainly be said that program trading's benefits outweigh its possible harms.

First, program trading serves to keep futures prices in line with the prices of their underlying stocks (and vice versa). Arguably, this benefit begs the question, because if there were no futures markets, there would be nothing to keep in line. n132 On the other hand, if the stock or futures market is imperfect (perhaps as result of trading rules that create artificial price pressures), then two linked markets are probably better than [*55] one. In other words, competition between the markets may well generate the most accurate pricing possible.

Second, the primary argument against program trading has been that program trading is bad for the small investor, and is, in turn, also bad for the stock market (which depends on the small investor for significant liquidity), and is therefore bad for business (which depends on the market for equity capital). However, the premise that program trading is bad for the small investor is flawed. Evidence suggests that program trading benefits investors, ironically, for the very reason advanced to decry the strategy as being harmful. Though it may seem curious to

suggest that volatility benefits investors, support for this proposition is not difficult to find. The stock market is now well above its level preceeding the 1987 crash and the smaller but still dramatic sell-offs of 1989 and 1991. n133 The long term investor has thus made a significant return and the active trader has had remarkable trading opportunities.

Whether or not volatility is beneficial, increasing volatility is merely an effect of other, positive changes in investing patterns. As portfolio-oriented investors give up the chase for undervalued stocks, thre are fewer traders who seek to identify such stocks on the basis of fundamental research or otherwise. Thus, the active trader will find that his or her information becomes more valuable. That is, now that many very large and very small investors have, in effect, left the trading market, a larger proportion of the remaining traders focus on company-specific information. Better guessers should do better than ever because those institutions that formerly bought and sold shares not because of their intrinsic value, but because of their fit in a portfolio, will no longer be a drag on the price movements of stock.

Increasing volatility in the stock market is consistent with the presence of fewer value traders.  n134 Given that so many institutional investors now take the broad view and invest in portfolios rather than in individual stocks, the effect is as if the supply of stock is itself smaller. If most traders buy and sell [*56] not on the basis of fundamental values but, rather, in order to track an index, then the entry or exit of a few traders who do focus on fundamental values will have an enhanced effect on price.  n134a Moreover, because institutions increasingly eschew stock-picking strategies, the institutional contribution to trading volume in a given stock these days will be somewhat random and thus undependable, from the viewpoint of a value-oriented trader, for any cushioning effect it might once have had. In other words, although in earlier times traders could depend on institutions to provide and absorb stock on the basis of a few ticks up or down, that is no longer so much the case. Needless to say, these changes have also made life more difficult for stock exchange specialists who also benefitted greatly from institutional supply and demand.  n135

Institutional investors seem to have noticed this trend. Because many mutual funds have so much money to invest that they cannot put it all into a few selected stocks without taking controlling positions in the issuing companies, they are by necessity virtual index funds. Recently, however, one group of funds indicated that it would lift its self-imposed limitations on positions in individual companies.  n136 The change in policy was thought to mean that the fund might play a bigger role in takeover contests. Indeed if a fund has a relatively large position in a single company presumably it must take more interest in a bid for the company. The change in policy is also consistent, however, with the possibility that there are more opportunities in trading and that funds in general are overdiversified. That is, investment opportunities may well arise if too many funds "buy the market" and ignore fundamental value because they are convinced that they cannot out-perform the market. The effect is an example of the so-called "efficiency paradox," which arises, at least in theory, when many investors, because they believe in the efficient market, stop looking for misvalued stocks, with the result that stocks become misvalued and investment opportunities are created.  n137

 [*57]  In short, the market-wide focus of most large investors has effectively eliminated them from that stratum of trading in which the price of a stock is set with regard to fundamentals. Such separation is in a way unremarkable. The market only functions because different traders have different opinions of the value of a stock. It follows that there is not a single "correct" price for a share of stock but rather many opinions as to the correct price, the interplay of which establishes a sort of moving consensus, that is, an equilibrium. But if different sets of traders value stock for different reasons, it would seem to follow that more than one equilibrium price may exist. Thus what may be evolving is a market with two or more distinguishable prices for the same stock. This suggests that the tendency of individual stocks to follow the market may be somewhat weaker than before. That is, stocks may be more volatile because investors (mainly institutional investors), who formerly saw to it that individual stocks moved more or less in lock-step, now ignore the movements of individual stocks and simply do not react when a stock price appears to be out of line.  n138 Program trading (by others) thus arguably allows investors to buy and sell what they thought they were buying and selling all along, namely, shares in the fortunes of individual companies. In short, now that investors know more precisely what they are buying, they are presumably better off.

Traders are also better off because two very different activities, market-wide investing and company-specific investing, are  [*58]  now conducted separately. One can look to the market price of a single stock for better information about what traders are thinking about it, and one can look to the futures market for better information, uncluttered by the shifting fortunes of particular companies, about the market. For years, the two activities were

conducted in the same arena with little or no way of knowing whether activity in a given stock had to do with portfolio adjustments or shifting opinions as to the value of that stock. Now it is clearer which is which.

Third, it is arguable that before the advent of stock index futures, institutions and long term investors effectively subsidized short term traders by reducing the risk that the market would move much in reaction to changes in the fortunes of particular companies. In effect the short term trader was the beneficiary of a considerable drag on the movement of stock prices due to their inclusion in portfolios and the tendency of institutions to buy up stocks whose prices softened. It is thus particularly interesting that in a 1989 speech the former chairman of the SEC, David Ruder, urged the bigger brokerage houses to refrain from engaging in split-second trading strategies because such restraint would be for the greater good of the market.  n139 Although that is the way things were before stock index futures, the markets are probably better off, even if only slightly, with the present state of affairs.

Program trading may also be seen as part of the continuous process of subdividing investment vehicles into their component parts.  n140 Presumably an investor will pay more for precisely  [*59]  the investment he or she wants than for one that is merely a close substitute. It thus stands to reason that a wider variety of investment vehicles is better.

As a result of the subdivision process, stocks have become more like options. What program trading does is separate out from the price movement of a stock the part that is attributable to the market as a whole. It has long been known that the prices of all stocks tend to move with one another because to some extent stocks are like commodities. The correlation of most equities' performance with that of the market as a whole makes owning stock in general more and less attractive from time to time. Again, studies indicate that about half of the movement of a stock's price is attributable to such market wide forces.  n141 Program trading, in that it focuses only on market-wide price movement may ironically, cause some stock prices to move as if they are no longer connected to the market as a whole. Thus a share of stock has become something like an option without the premium or the expiration date.

This mutated form of stock (hereinafter "new stock") fills a gap in the spectrum of investments. Whereas the investor in an option must be willing to lose the price paid for the option if the underlying stock has not appreciated (or depreciated) sufficiently by the time the option expires, the investor in new stock will still have the stock (and possibly dividends) even if its value does not increase (or decrease) as much as expected.

The comparison of new stock to options reinforces the idea that investors (or at least traders) may be better off because of increasing volatility in the stock market. Options are more valuable the more volatile the underlying stock, because the more volatile the underlying stock price, the greater the chances that it will move "into the money" at some point during the life of the option.  n142 Hence, investors prefer options on more  [*60]  volatile stocks. To be sure, unlike an option trader, a stock trader still risks the entire value of the stock for an indeterminate period (though some of the apparent risk may be eliminated because index funds continue to buy many stocks no matter what their fundamentals look like). Thus, despite temporary and dramatic fluctuations in value, it may be that underlying risk has not increased and may even have decreased. A value-oriented investor should therefore rejoice: there are many more opportunities now to buy low and sell high than there used to be.  n143

Arguably the subdivision of investment vehicles has deprived investors of the ability to invest in the bundle of rights that formerly characterized stock, forcing them to choose between boring index funds and roller coaster options. The simple answer is that an investment equivalent to what might be called "old stock" can still be achieved by buying a combination of "new stock" and an index fund. An investor can mix and match the two in whatever proportion may be desired, and can fine tune risk and return combinations that formerly were only available through much riskier strategies.

These observations and speculations suggest that in a round-about way the crash of October 1987 is indeed related to program trading in the sense that both are an outgrowth of a long term shift to portfolio-oriented investing and away from focusing on fundamental values. But even if so related to program  [*61]  trading, the crash may well have been a unique event caused by the sudden recognition of these new patterns of investing. Perhaps stock traders were simply not prepared, the first time, for the power of program trading in a major market movement, and they declined to buy back shares as quickly as they should have.  n144 If so, the same event would seem unlikely to recur even though in some sense it might be fair to say that program trading was the cause. It may be, then, that regulators and the brokerage industry are fighting the previous war in trying to curtail the practice of program trading.

## VI. PROGRAM TRADING AND THE SPECIALIST SYSTEM

Stock exchanges are not pure auction markets. Rather they are a hybrid of an auction market and a made market. In a true auction market, trades would be accomplished by buyers and sellers meeting on the exchange floor and negotiating prices with each other without intermediaries. In a made market, the market maker or dealer quotes prices at which he or she will buy or sell a given security or commodity. Thus, buyers and sellers need not be simultaneously present in order for a trade to occur. In addition, whereas an auction market will only work if the volume of trading in a security or commodity is substantial, trading in securities with small trading volumes is possible in a made market.  n145

Although much of the trading on the floor of the New York Stock Exchange is accomplished by buyers and sellers settling on a price auction-style, much trading is also accomplished by buyers and sellers dealing with specialists who stand ready to buy and sell at quoted prices when there are no buyers or sellers in the crowd.  n146 In contrast to the stock exchanges, the  [*62]  futures exchanges are true auction markets operating on an "open outcry" system.  n147 All trading takes place on the floor ("in the pit") between buyers and sellers acting for their own accounts or as agents for others.

One argument in favor of the specialist system may be found in the sheer number of stocks that are traded on an exchange. Because the stocks of more than 2,000 companies are traded on the NYSE,  n148 it would be logistically impossible to organize NYSE trading on an "open outcry" system with a pit for each stock.

Another (and oft-cited) argument in favor of the specialist system is that the specialist is responsible for smoothing out the market. If trading were solely open-outcry, prices might fluctuate more dramatically than they do when mediated by a specialist. For example, if an investor desires to sell a stock and gives a broker an order to sell at the current market price, under open-outcry trading, the selling price will depend on the highest price another investor is willing to pay at the time. If shortly thereafter another investor instructs a broker to buy shares in the same stock, the order can be filled at whatever price someone in the crowd is willing to sell.

For example, the first investor might end up selling at $ 46 while the second investor might end up buying at $ 50 even though the two transactions are executed back to back. Clearly both investors will be better off if they happen to come to the market at the same time and trade at $ 48. Under the specialist system, if they miss each other by a few seconds, a trade at $ 48 is still possible. And even if the trades arrive too far separated in time to be matched with each other, the specialist might buy at $ 47 and sell at $ 49. Everyone, including the specialist, comes out ahead. This example also demonstrates how a specialist's presence may serve to narrow spreads and give the investor so-called "best execution," which is often cited by the exchanges as another reason for the wisdom of the specialist system.  n149

The concept is simple and seemingly sensible. The problem is it may be too sensible. It is at least arguable that there is no  [*63]  need to assign the right or duty to narrow spreads to a single official market maker. Buying low and selling high should be its own reward. Thus it would seem difficult to justify conferring a monopoly right to serve as a specialist. Moreover, this argument presumably holds with greatest force for the most heavily traded stocks, which, coincidentally, are those that are involved in program trades. One need only look to the OTC market to see that it is easy to attract several market makers to specialize in a given stock. Indeed, the average NASDAQ National Market System stock has seven market makers while some of the more actively traded NASDAQ stocks have twenty or more market makers.  n150 Moreover, those stocks are (with a few exceptions) more thinly traded than NYSE stocks. In other words, there is no reason to think that competitive market makers would not fill the gap left by specialists. At least some exchanges have recognized the desirability of competition on the floor and competitive market makers have been set up. However, no major United States exchange has yet announced plans to do away with appointed specialists altogether.  n151

On the other hand, OTC market makers have been criticized for not honoring their quotes (and not even answering the phone) during difficult times such as the 1987 crash,  n152 a far more reprehensible failure than the alleged failure of specialists to support the market as actively as possible. Although specialists are supposedly charged with the duty to ease the market down to its equilibrium level in times of falling markets, few believe that they can or should support market prices at artificially high levels even temporarily.  n153

 [*64]  Moreover, and perhaps more important, the specialist system allows for so-called price improvement. That is, even though the specialist could in theory take up an order at the then current quote, assuming that there are

no matching public orders pending, the specialist will often "stop" such orders in hopes of allowing execution between the quotes. Indeed, the DOT system also allows for electronic orders contingent on such execution, that is, sell-plus and buy-minus orders, and much of program trading as it is currently practiced involves such orders precisely because the stock and the futures markets are now so effectively linked that the kinds of pricing discrepancies that were seen in the mid to late 1980s simply do not arise anymore. n153a The point for present purposes is that price improvement is not available in the OTC market under current practice. Indeed, some OTC market makers who make markets in NYSE traded stocks actually offer rebates to brokers for sending orders to them rather than the NYSE precisely because such orders may be executed at the quotes and thus at a greater overall profit to the market maker than is typically exacted by stock exchange specialists. This has suggested to some commentators that spreads on the NYSE may be wider than necessary though there is no evidence that such is the case. In any event, the practice of "payment for order flow" as it has come to be known is highly controversial in that it depends on investors receiving less than best execution, that is, paying more or receiving less than they might if the trade were executed on the exchange. n153b

Although the NASD has recently announced that it plans to consider adopting rules that would require some level of effort toward price improvement on the part of OTC market makers, the fact remains that at present price improvement is available  [*65]  only on the exchanges and in large measure only because trading there is mediated by specialists. That is, it is difficult to see how any system of competing market makers can reliably offer price improvement given that the market maker who facilitates it must forego a profitable trade. It is only because the NYSE reposes responsibility for maintaining a tight market in a single specialist that price improvement is possible. Theoretically, of course, it should be possible to construct an automated trading system that would allow orders to be executed in a fashion similar to the way they are handled under the specialist system. That is, an order would be executed if matched with another order or otherwise executed at a quoted price if not withdrawn. Still, no such system is in place and none seems to have been developed, perhaps because it would require the owner (or someone very like a specialist) to risk his or her own capital in connection with trades at the quotes. n153c If such a system would look very much like the system that is in place at the NYSE what would be the point?

Another potential justification for the specialist system can be found in recent scholarship regarding stock prices. There is mounting evidence that stock prices tend to be mean-reverting. Studies suggest that much stock price movement may be attributable to "noise trading" (trading in response to signals that turn out to be erroneous) or "liquidity trading" (trading in response to portfolio decisions or extraneous needs for cash or trading that results from imbalances in supply and demand and not from inside information about fundamental value). n153d If a significant amount of trading is attributable to such technical factors, prices should fluctuate around some mean, and traders who can trade very quickly and cheaply can profit by trading  [*66]  against the market. If stock prices are mean reverting, then specialists may have a legitimate role to play in smoothing out prices. Consequently, the idea that a specialist could perform a valuable service by "leaning against the wind," at least in a normally fluctuating market, may make sense. n154

Finally, it might be argued that even if the benefits of the specialist system are uncertain, the system creates no real harm to the markets. That position is probably a bit too generous.  [*67]  The specialist system must generate a cost to the market, because no one would serve as a specialist if doing so were not lucrative. That is, if specialists make money, it must be at the expense of other traders and investors. In other words, specialists must siphon off some returns that investors would otherwise enjoy. But the fact that specialists make money at what they do is not inconsistent with the possibility that other traders benefit even more. In short, the fact that it is profitable to be a specialist is hardly damning as long as specialists take the responsibility and risk commensurate with the return enjoyed.

It is, however, arguable that the specialist system contributed to the 1987 crash precisely because of a general failure of individual specialists, together with other traders, to recognize liquidity trading when they saw it. Prior to the crash, many institutional investors engaged in portfolio insurance programs that involved disciplined sales of stock index futures after predetermined drops in the stock market.  n155 The idea was that by selling futures contracts investors could lock in the lower price and hedge against loss from further decreases. These sales may have depressed the price of futures and may have triggered program trades involving purchases of relatively underpriced futures and sales of relatively overpriced stock. Selling activity on the stock market may then have been misperceived by specialists as being motivated by inside information or other news regarding fundamental values that was not yet widely disseminated.  n156 According to this theory, specialists were reluctant to support prices because they failed to recognize that admittedly substantial selling activity was motivated by portfolio insurance

rather than any hard information about fundamental values. If specialists had recognized the situation for what it was, they would have had a strong incentive to buy at the depressed prices generated by such selling. [*68] But specialists who focus on one or a few stocks are in a singularly bad position to recognize such broad selling patterns, and they can ill afford to take the chance that sales of a given stock are part of a bigger picture when such sales might well be the product of stock specific forces such as rampant insider trading. Although there may be a good deal of truth in this story, it is stretching it to say that the specialist system was at fault for the crash. The fact, if it is a fact, that specialists generally misperceived the nature of the trading that was going on during the crash simply means that the system failed to respond to an unforeseen event. So what? Moreover, nothing nearly so dramatic has happened since, suggesting that one of the merits of the system is that specialists can learn.

It should come as no surprise that there has recently been significant scholarly attention to the role of specialists in shaping the law relating to securities markets. It has been suggested that specialists as a group are the primary victim of insider trading and that their interests have been behind the intense campaign against such practices. n157 It has also been suggested that the presence of specialists leads investors to desire regulation that requires corporations to disclose information publicly when to do so may be wealth decreasing for the corporation. n158 Finally, several commentators have characterized the report of the presidential commission that studied the [*69] 1987 crash (the "Brady Report") as an effort by the New York Stock Exchange to protect its turf. n159 Because specialists dominate the NYSE power structure, it is presumably specialists who are most concerned about preserving their positions. n160

It is fairly clear why specialists might seek to discourage program trading. Because program trading involves the purchase and sale of many different stocks without regard to fundamental values, the job of the specialist becomes more difficult. The specialist must seek to maintain an orderly market. n161 The specialist must also decide whether trading activity merits changing the prevailing quotes for a stock. In some cases, program trading may be motivated by price discrepancies that will be repaired on the futures exchanges, while in other cases program trading will signal that a general change in stock prices is in order. If the specialist guesses incorrectly, he or she may be stuck with a big inventory in specialty stocks because it is often the specialist who must buy or sell one or more of the stocks involved in a program trade. n162 In addition, the specialist's difficulties are compounded by the fact that [*70] guesswork is the only means to know whether a particular trade is part of a program trade.

It seems clear that ultimately, much of the profit from program trading comes out of the pockets of stock market specialists. When stocks are overpriced relative to futures, it is the specialist who must often buy stock and lower the price. When stocks are underpriced relative to futures it is the specialist who must sell stock and raise the price. Either way the specialist loses. There is simply no way that a specialist can make money from handling program trades. In fact, there would seem to be no way that a specialist can fail to lose money in connection with program trading. On the other hand, it is also possible that specialists may make more money, over the long haul, as a result of program trading. Although the specialist is often the primary short-term victim of a program, if indeed program trading adds to volatility, as it must at some level, the specialist, as the consummate active trader, also stands to gain when prices bounce back, as they invariably will if programs are based solely on technical market factors, as they often are.

What should be done? Nothing. In many ways, program trading and the specialist system compete with each other. Although it is widely recognized and legally mandated that specialists seek to maintain orderly markets, program trading performs the same function -- keeping the stock and futures markets in line with each other -- but without monopoly licensing. Thus it seems that the wiser course is to allow the two to compete unless and until the markets evolve in such a way that a clear winner in this struggle can be declared.

VII. CONCLUSION

In the debate over program trading, the ultimate question is whether the benefits of stock index futures outweigh the harms they cause. Unless such derivative products are regulated or outlawed, the potential for pricing discrepancies between the derivative and the underlying security will always exist, and when the discrepancy becomes sufficiently large to make arbitrage profitable, traders will exploit the potential. This is not to say that only professional traders can benefit from stock-index futures. In fact, stock index futures have a considerable benefit for conservative investors. It would thus be unthinkable to abolish or severely limit such instruments. In any event, such [*71] measures are unnecessary, as any possible dangers of program trading have been vastly over-estimated. In fact, program trading appears to be highly beneficial for the stock market as a whole, although program trading and

the financial futures that make it possible have made more difficult the lives of the specialists who mediate trading on the NYSE floor.

**FOOTNOTES:**

n1a *See* JEFFREY D. MILLER, PROGRAM TRADING: THE NEW AGE OF INVESTING 1-29 (1989).

n1 There were no less than seven studies of the crash commissioned. *See* REPORT OF THE PRESIDENTIAL TASK FORCE ON MARKET MECHANISMS, CCH SPECIAL REPORT NO. 1267 (Jan. 8, 1988) [hereinafter BRADY REPORT]; SEC DIV. OF MARKET REGULATION, THE OCTOBER 1987 MARKET BREAK, CCH SPECIAL REPORT NO. 1271 (Feb. 1988) [hereinafter SEC REPORT]; U.S. COMMODITY FUTURES TRADING COMM'N, DIV. OF ECONOMIC ANALYSIS AND DIV. OF TRADING AND MKTS., FINAL REPORT ON STOCK INDEX FUTURES AND CASH MARKET ACTIVITY DURING OCTOBER 1987 (Jan. 1988) [hereinafter CFTC FINAL REPORT]; U.S. GEN. ACCOUNTING OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, FINANCIAL MARKETS: PRELIMINARY OBSERVATIONS OF THE OCTOBER 1987 CRASH (Jan. 1988) [hereinafter GAO REPORT]; MERTON H. MILLER ET AL., PRELIMINARY REPORT OF THE COMMITTEE OF INQUIRY APPOINTED BY THE CHICAGO MERCANTILE EXCHANGE TO EXAMINE EVENTS SURROUNDING OCTOBER 19, 1987 (Dec. 22, 1987) [hereinafter CME REPORT]; NICHOLAS DEB. KATZENBACH, AN OVERVIEW OF PROGRAM TRADING AND ITS IMPACT ON CURRENT MARKET PRACTICES (Dec. 21, 1987) (A Study Commissioned by the New York Stock Exchange) [hereinafter KATZENBACH REPORT]; WELLS FARGO INVESTMENT ADVISORS, ANATOMY OF A DECLINE: THE ROLE OF INDEX-RELATED TRADING IN THE MARKET'S RECORD FALL (Nov. 9, 1987) [hereinafter WELLS FARGO REPORT]. *See also* U.S. COMMODITY FUTURES TRADING COMM'N, DIV. OF ECONOMIC ANALYSIS AND DIV. OF TRADING AND MKTS., INTERIM REPORT ON STOCK INDEX FUTURES AND CASH MARKET ACTIVITY DURING OCTOBER 1987 (Nov. 9, 1987) [hereinafter CFTC INTERIM REPORT]; U.S. COMMODITY FUTURES TRADING COMM'N, DIV. OF TRADING AND MKTS., ANALYSIS OF TRADING IN THE CHICAGO BOARD OF TRADE'S MAJOR MARKET INDEX FUTURES CONTRACT ON OCTOBER 20, 1987 (Jan. 4, 1988) [hereinafter MMI REPORT].

n2 For a time, many firms did cease program trading activity. *See Stock Firms are Ending Index Arbitrage, Urging NYSE to Restrict Program Trading*, 21 Sec. Reg. & L. Rep. (BNA) No. 43, at 1627 (Nov. 3, 1989) (reporting that the NYSE was being encouraged to take positive action regarding program trading). Many prominent firms soon returned to program trading. *See, e.g.*, William Power, *Kidder to Resume Program Trading After Six-Month Halt*, WALL ST. J., May 22, 1990, at C25 (noting that Bear Stearns had been first to resume practice in December 1989 but that Merrill Lynch had no plans to resume as of date of story). *See infra* note 29, for a list of firms currently engaging in program trading. *Cf.* James A. White, *Wall Street is Giving Big Clients Its Program-Trading Firepower*, WALL ST. J., May 1, 1991, at C1 (reporting that Wall Street firms were providing their computerized trading technology to institutional investors).

n3 *See* David Ruder, *Securities Market Stability -- October 1989*, Fall 1989 NW. RPTR., at 6. *Cf. Markey Says Industry Needs More than Circuit Breakers to Restore Confidence*, 20 Sec. Reg. & L. Rep. (BNA) No. 16, at 597 (Apr. 22, 1988) (reporting that Representative Markey cited lack of market movement brakes and risk of large market declines as the reasons that individual investors are staying away from the market); *Ruder Says Markets Are Still Volatile; Proxmire to Push for Reform Legislation*, 20 Sec. Reg. & L. Rep. (BNA) No. 21, at 795 (May 27, 1988) (reporting that SEC chairman disagreed with the rest of President's Working Group on Financial Markets and testified that continuous high volatility in the markets was keeping away individual investors and reducing their confidence in the market); *Ruder Warns*

*Government Must Address Small Investor Concerns over Volatility*, 20 Sec. Reg. & L. Rep. (BNA) No. 20, at 760 (May 20, 1988) (reporting that SEC chairman encouraged Congress to increase investor confidence in stability and resiliency of the market after the 1987 crash).

n4 *See* Kevin G. Salwen, *Report by SEC Lashes Chicago Futures Marts*, WALL ST. J., May 25, 1990, at C1; Floyd Norris, *Market Place: S.E.C.'s Analysis of Nov. 15 Plunge*, N.Y. TIMES, Jan. 9, 1992, at D8. *Cf.* William Power & Craig Torres, *Stocks Drop as Salomon Clerk Errs*, WALL ST. J., Mar. 26, 1992, at C1 (reporting stock market has become vulnerable to powerful computer driven trading strategies); William Power, Michael Siconolfi, and Kevin G. Salwen, *Clerk's Error Stirs Worry on Street*, WALL ST. J., Mar. 27, 1992, at C1 (reporting accidental consequences when traders rely on computer driven trading strategies and procedures).

n5 David A. Vise, *Why Won't Wild Swings in Markets Just Go Away*, THE WASHINGTON POST, Oct. 18, 1989, at F1.

n6 Kevin G. Salwen, *Big Board Votes to Curb Some Program Trades*, WALL ST. J., Feb. 5, 1988, at A4. Ironically, the rule has been blamed for increasing volatility. *See* Kevin G. Salwen & Craig Torres, *Tighter Rein: New Securities Rules From Big Board, Feds Are Altering Market*, WALL ST. J., Nov. 8, 1990, at A1; Floyd Norris, *Market Place: Arbitrage Curb's Effect on Volatility*, N.Y. TIMES, Aug. 7, 1990, at D8.

n7 *See* William Power & Kevin G. Salwen, *SEC Is Warning Index Traders on Uptick Rule*, WALL ST. J., April 26, 1990, at C1.

n8 *See* Kevin G. Salwen & Scott McMurray, *Futures Shock: Tight Rein If SEC Reigns*, WALL ST. J., May 17, 1990, at C1 (discussing margin regulation and uptick rule and noting preference for rising markets).

n9 *See SEC to Seek Emergency Powers to Restore Fair, Orderly Markets*, 20 Sec. Reg. & L. Rep. (BNA) No. 22, at 831 (June 3, 1988); Kevin G. Salwen, *SEC, Seeking Hostile Takeover of CFTC's Power to Regulate Financial Markets, Is Favored to Win*, WALL ST. J., Apr. 20, 1990, at A16 (indicating a persisting worry that stock index futures cause increased volatility in the stock market). *See also Give Fed Greater Overall Role overseeing Markets, Brady Study Says*, 20 Sec. Reg. & L. Rep. (BNA) No. 2, at 47 (Jan. 15, 1988); *Brady Urges Congress to Act if Industry Fails, Greenspan Opposes New Fed Role*, 20 Sec. Reg. & L. Rep. (BNA) No. 5, at 174 (Feb. 5, 1988); *One Regulator is Needed For Markets, Brady Stresses at Senate Ag Hearing*, 20 Sec. Reg. & L. Rep. (BNA) No. 11, at 416 (Mar. 18, 1988); *House Panel Approves Bill to Let SEC Restrict Computer-Driven Trading*, 21 Sec. Reg. & L. Rep. (BNA) No. 45, at 1691 (Nov. 17, 1989); *NYSE Panel Calls for Mandatory Trading Halts in Crisis, Single Regulator*, 22 Sec. Reg. & L. Rep. (BNA) No. 24, at 896 (June 15, 1990); Nathaniel C. Nash, *Brady Sees Bigger Role for SEC*, N.Y. TIMES, Mar. 16, 1990, at D1; Floyd Norris, *Market Place; Who Should Set Margin Levels?*, N.Y. TIMES, July 11, 1990, at D1. *See generally* Scott McMurray, *CBOE Fines Susquehanna For Intermarket Trades*, WALL ST. J., May 1, 1990, at C1 (suggesting that fine may have been motivated by political pressure to increase enforcement efforts). *But see Breeden Says SEC Should Not Have Emergency Power to Shut Down Markets*, 21 Sec. Reg. & L. Rep. (BNA) No. 39, at 1491 (Oct. 6, 1989); *Breeden Opposes Letting SEC Limit, Halt Program Trading*, 21 Sec. Reg. & L. Rep. (BNA) No. 42, at 1591 (Oct. 27, 1989). For an account of several unsuccessful SEC efforts to augment its jurisdiction, see Jonathan R. Macey, *The SEC Dinosaur Expands Its Turf*, WALL ST. J., Jan. 29, 1992, at A12.

n10 Kevin G. Salwen & Jeffrey Taylor, *Senators Question Cut in Margins on Index Futures*, WALL ST. J., June 23, 1992, at C1.


n11 *See* Ruder, *supra* note 3.


n12 The term "fundamental value" refers to the underlying value of a stock as a share of an income-producing value. This value is distinct from the trading price of that stock which can be affected by any number of factors (sometimes called "technical" factors) that arise as a result of market dynamics. The distinction parallels the distinction between fundamental and technical analysis. *See* BURTON G. MALKIEL, A RANDOM WALK DOWN WALL STREET 101-182 (4th ed. 1985). The notion of fundamental value should not, however, be taken to suggest that there is one "true" value for the stock in question. For example, the fair value of any given share of stock may be 10 in a quiet market, 15 if the company is involved in a merger, and 20 if the company is the target of a hostile takeover. *See* PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATION § 7.22 (Am. Law. Inst.) (Proposed Final Draft March 31, 1992).


n13 During the year 1993, program trading accounted for 11.9 percent of the volume on the NYSE. WALL ST. J., Jan. 13, 1994, at C1. Program trading as a percentage of market volume has increased each year since 1989 when statistics first began to be kept and when it accounted for 9.9 percent of volume. NEW YORK STOCK EXCHANGE, FACT BOOK 20 (1993). It is arguable that the impact of program trading should be measured as a percentage of twice total volume (TTV) because every trade has two sides. That is, for every sale there is a purchase. NEW YORK STOCK EXCHANGE, FACT BOOK 20 (1993). On the other hand, it is also arguable that programs in some sense cause the other side of the trade to occur.


n14 *See, e.g.*, NEW YORK STOCK EXCHANGE, MARKET VOLATILITY AND INVESTOR CONFIDENCE, June 7, 1990.


n15 Dale Arthur Oesterle, Donald Arthur Winslow & Seth C. Anderson, *The New York Stock Exchange and Its Out Moded Specialist System: Can the Exchange Innovate to Survive?*, 17 J. CORP. L. 223 (1992); James L. Cochrane, Brian McNamara, James E. Shapiro, & Michael J. Simon, *The Structure and Regulation of the New York Stock Exchange*, 18 J. CORP. L. 57 (1992); Dale Arthur Oesterle, *On the Business of Defending NYSE Specialists*, 18 J. CORP. L. 79 (1992); Seth C. Anderson, *A "Free Market" Response to Cochrane et al. and the Status Quo*, 18 J. CORP. L. 91 (1992).


n16 On the other hand, it is also possible that program trading may have the effect of creating trading opportunities and that it may demonstrate the merits of the specialist system.


n17 *See* SEC REPORT, *supra* note 1, at 1-7; SEC, Roundtable on Index Arbitrage (July 9, 1986). *See also* Richard E. Rustin & Pamela Sebastian, *Some Options Trading Raises New Questions on Market's Fairness*, WALL ST. J., July 11, 1984, at A1; Pamela Sebastian, *Linked Deals in Stocks and Futures Contracts Roil Prices, Critics Say*, WALL ST. J., Oct. 22, 1985, at A1; Steven F. Schwartz, *Programmed for Chaos?: Was Automated Trading a Big Factor in the Blowoff?*, BARRON'S, Sept. 15, 1986, at 13.


n18 The price of a stock index future and its underlying stock is the same when the stock index future expires because the very definition of a stock index future is the right to cash equal to the right to buy or sell the stocks in the index at the stock market price on the expiration date.

n19 A stock index future is a contract to buy or sell a portfolio of stocks matching those in the index at a particular date in the future. Prior to the expiration date the value of the futures contract can, and usually does, vary from the value of the index, but when the contract expires its value is, by definition, equal to the value of the underlying stocks.

n20 *See* SEC REPORT, *supra* note 1, at 1-8. The rule was later changed to provide for settlement on opening rather than closing, and the futures markets obliged by adopting a coordinated procedure.

n21 *See id.* Triple witching volatility probably would have vanished independently because it is possible to unwind a program trade at any time before expiration when the future's market value equals its theoretical value. *See* SEC REPORT, *supra* note 1, at 1-4. Because of the high costs associated with maintaining an open position, program traders have every incentive to unwind at the earliest possible time. In all likelihood, then, triple-witching volatility was largely attributable to traders (or computer programmers) who did not completely understand the strategy. This lends credence to the idea that the 1987 crash may have been attributable to a widespread failure of understanding on the part of traders.

n22 Before the avalanche of crash reports, the most popular explanation for the crash was the so-called "cascade scenario" which explained the crash as resulting from an initial decline in prices that lead to sales of index futures (triggered by portfolio insurance schemes). The sales of index futures then lead to lower prices on the futures exchanges which triggered program trades involving the purchase of index futures and the simultaneous sale of stocks. This lead to still lower prices on the stock exchanges and a repetition of the entire process. *See* SEC REPORT, *supra* note 1, at 1-9; John C. Coffee, Jr., *Stock Market Needs Anti-Dumping Rules*, WALL ST. J., Aug. 16, 1988, at A28.

n23 However, the Brady Report and the SEC Report did conclude that program trading exacerbated the crash. *See* BRADY REPORT, *supra* note 1, at 69; SEC REPORT, *supra* note 1, at xiii. Program trading continues to be cited quite often as a reason for stock market moves. *See, e.g.,* Douglas R. Sease, *Programs Lift Stocks; Dollar Rises*, WALL ST. J., Sept. 25, 1991, at C1; Douglas R. Sease, *Stocks Fall as Programs Kick in Late*, WALL ST. J., Oct. 23, 1991, at C1; Douglas R. Sease & Michael R. Sesit, *Stocks Ride 'Programs' to a Gain*, WALL ST. J., Nov. 27, 1991, at C1.

n24 *See infra* text accompanying notes 80-97.

n25 *See supra* note 6. For an explanation of how a circuit breaker might have caused a mini-crash, see Ian Ayres, *Back to Basics: Regulating How Corporations Speak to the Market*, 77 VA. L. REV. 945, 981-83 (1991); Eben Shapiro, *Circuit Breakers: Maybe They Work, Maybe They Don't*, N.Y. TIMES, July 29, 1990, C7; *See also* Kevin G. Salwen & Craig Torres, *Tighter Rein: New Securities Rules from Big Board, Feds Are Altering Market*, WALL ST. J., Nov. 8, 1990, at C1; Floyd Norris, *Market Place: Arbitrage Curb's Effect on Volatility*, N.Y. TIMES, Aug. 7, 1990, at D8. *But see* NYSE, THE RULE 80A INDEX ARBITRAGE TICK TEST, May 31, 1991 (finding no statistical evidence of any such "magnet effect").

n26 *See* sources cited *supra* note 2.

n27 *See* sources cited *supra* note 2.

n28 *See* sources cited *supra* note 6.

n29 For an articulation of this sentiment, see Louis Lowenstein, *Is Speculation "The Essential Native Genius of the Stock Market"?*, 92 COLUM. L. REV. 232 (1992) (reviewing WALTER WERNER & STEVEN T. SMITH, WALL STREET (1991)).

n30 *See* SEC REPORT, *supra* note 1, at 1-1 - 1-5; Brandon Becker, Jeffrey P. Burns, Anthony Ain & Karen Burgess, *Market Oversight Developments Since 1987*, 12TH ANNUAL NORTHWEST SECURITIES LAW INSTITUTE (1992) (reporting that 50.9% of program trades on the NYSE were connected with index arbitrage). Broadly defined, "program trading" includes any trading strategy that involves tracking the value of many stocks or other securities at a given time. These include asset allocation strategies, portfolio insurance and index substitution. *See id.* at 1-1 - 1-5. So-called "dividend capture" strategies, which are popular with some Japanese investors, might also be classified as a form of program trading. The Wall Street Journal recently began reporting weekly figures for program trading and identifying the firms engaged in the practice. *See Program Trading*, WALL ST. J., Dec. 13, 1991, at C5. (Information regarding program trading, which was not formerly available, was required to be reported by trading firms and assembled by the exchanges under legislation growing out of the 1987 crash.) Firms engaging in program trading currently include Merrill Lynch, Morgan Stanley, Nomura Securities, Kidder Peabody, First Boston, Paine Webber, Susquehanna, Goldman Sachs, Salomon Brothers, UBS Securities, Walsh Greenwood, Thomas Williams, Bear Stearns, Shearson Lehman and LIT America. *Id.* According to the NYSE figures, program trading accounts for a substantial proportion of NYSE volume. For example, in the week ended November 29, 1991, program trades constituted 15.9% of exchange volume or an average of 25.3 million shares per day. Of that, approximately half is attributable to index arbitrage. Program trading is defined as the simultaneous purchase or sale of at least 15 different stocks with a total value of $ 1 million or more. *Id.*

n31 Although a futures holder can theoretically seek delivery of the underlying commodity, in practice, delivery is rare.

n32 *See generally* ROBERT W. KOLB, UNDERSTANDING FUTURES MARKETS (2d ed. 1988). *See also* SEC REPORT, *supra* note 1, at 1-3 - 1-4.

n33 Ordinarily the price of a stock index future is higher than the price of the underlying stock. *See* KOLB, *supra* note 32; SEC REPORT, *supra* note 1, at 1-1; CHICAGO MERCANTILE EXCHANGE, USING S&P 500 STOCK INDEX FUTURES AND OPTIONS (1988).

n34 If the trade involves the purchase of stock as in the example, the dividends received in the interim enhance the return. Thus, it follows that a smaller discrepancy between the price of the future and the underlying stock will suffice to trigger a trade and thus that there will be more trades involving the purchase of stock than there are involving the sale of stock.

n35 Brokerage commissions can be extraordinarily low in connection with program trading. For example, a $ 25 million trade involving the purchase or sale of all 500 stocks in the S&P 500 can be set up for about $ 2500 in stockside commissions (if the trades are handled over the NYSE's Designated Order Turnaround (DOT) system) and about $ 160 in futures-side commissions. (With the S&P 500 index at a level of 400, such a trade would involve the purchase or sale of 125 SP contracts). The DOT system, which is now officially called SuperDOT as a result of enhancements, had 201 subscribers as of 1992. NEW YORK

STOCK EXCHANGE, FACT BOOK 22 (1993). Curiously, it is not required that one be a member of the Exchange in order to have direct access to the system though presumably one must gain access through a member.

n36 A study covering the period January 15 through July 13, 1990, during which time there were 2, 659 S&P 500 index arbitrage trades reported, found that on the average each (relevant) trade involved 280 stocks. When considered in terms of dollar amount, 7.7 percent of trading involved fewer than seventy stocks. When considered in terms of trading events, however, 22.4 percent of program trades involved fewer than seventy stocks. *See* George Sofianos, *Index Arbitrage Profitability*, J. DERIV. 6, 17 (Fall 1993). These figures may be skewed to the low side, however, because program trades are only required to be reported when they involve at least fifteen stocks with a value of one million dollars or more. That is, it is possible that some trades go unreported if they involve less than $ 1 million worth of stock or fewer than 15 different stocks. Given that a single SP future represents about $ 250,000 worth of stock, it is at least conceivable that there is some small scale program trading that goes on.

n37 *See* KOLB, *supra* note 32.

n38 Rankings as of December 31, 1992. *See* NEW YORK STOCK EXCHANGE, FACT BOOK 35 (1992).

n39 *See* KATZENBACH REPORT, *supra* note 1, at 12. The only risk - if indeed it even exists - is the risk that one or the other of the markets might be closed or otherwise unavailable (for example, because of newly imposed regulations of some sort). Aside from minimizing commissions, another possibly even more important reason for trading in round lots is that odd lot trades are executed automatically at the then current quote. A round lot trade, even over the DOT, may be "stopped" by the specialist to afford an opportunity to execute it "between the quotes." In other words, if the order is to buy the stock in question and the current quote is 10 bid, 10-1/2 asked, the specialist may hold up the trade on the chance that another order to sell at the market may come in and both may be executed at 10-1/4. In any event, the stopped order is guaranteed the quoted price as of the time it is stopped. Thus, in the example, the order to buy must be filled at 10-1/2 at the most. In addition to the change that the order may be executed between the quotes, a round lot DOT order may also be entered as a "sell plus" or "buy minus" order, that is, contingent on its being able to be executed between the quotes or an uptick or downtick, respectively. *See* Joel Hasbrouck, George Sofianos & Deborah Sosebee, *New York Stock Exchange Systems and Trading Procedures*, NYSE WORKING PAPER No. 93-01, April 27, 1993. Because index arbitrage tends to force the stock and futures markets back into line with each other very quickly, program trading opportunities have become increasingly sparse and trades relying on execution between the quotes have become much more important. Another reason for buying fewer than all the stocks in the S&P 500 is that a few stocks in the index (such as MCI) are not listed on the New York Stock Exchange and therefore cannot be traded on the DOT system. Yet another reason for not trading all the stocks in an index (at least where the program involves the sale of stock) is that at any given moment some of those stocks will be trading on a downtick and short sales will thus be prohibited.

Aside from eliminating the risk that a substitute portfolio may not track the index perfectly, another reason for buying all (or nearly all) the stocks in an index is that one can take advantage of the lower margin requirements for hedgers. On the CME, the rule is that one must own at least eighty percent of the underlying stocks to qualify as a hedger.

n40 *See* SEC REPORT, *supra* note 1, at 1-4 n.10.

n41 *See generally* Dean Furbush & Annette Poulsen, *Harmonizing Margins: The Regulation of Margin Levels in Stock Index Futures*, 74 CORNELL L. REV. 873, 887-91 (1989); Lawrence Harris, *The Dangers of Regulatory Overreaction to the October 1987 Crash*, 74 CORNELL L. REV. 927 (1989); Clifford W. Smith, Jr., *Market Volatility: Causes and Consequences*, 74 CORNELL L. REV. 953 (1989). *See also* Henry T. C. Hu, *New Financial Products, the Modern Process of Financial Innovation, and the Puzzle of Shareholder Welfare*, 69 TEX L. REV. 1273, 1302-05 (1991) (discussing substantial increase in turnover of NYSE stocks since 1967); Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell & Jeffrey M. Netter, *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*, 77 VA. L. REV. 1017, 1047-48 (1991) (setting forth volatility of daily return of S&P Index from 1964 to 1989 -- standard deviation ranged from low of .0033 in 1963 to high of .0200 in 1987). For more technical analyses of volatility and the effect of program trading on it, *see* Dean Furbush, *Program Trading and Price Movement: Evidence from the October 1987 Market Crash*, 18 FIN. MGMT. 68 (1989); Sanford J. Grossman, *Program Trading and Market Volatility: A Report on Interday Relationships*, 44 FIN. ANALYSTS J. 18 (1988) (finding no relationship between program trading and volatility); Sanford Grossman, *An Analysis of the Implications for Stock and Futures Price Volatility of Program Trading and Dynamic Hedging Strategies*, 61 J. BUS. 275 (1988); Lawrence Harris, *S&P 500 Cash Stock Price Volatilities*, 44 J. FIN. 1155 (1989). *See also* KATZENBACH REPORT, *supra* note 1; NEW YORK STOCK EXCHANGE, *Market Volatility and Investor Confidence*, June 7, 1990; James F. Gammill & Terry A. Marsh, *Trading Activity and Price Behavior in the Stock and Stock Index Futures Markets in October 1987*, 2 J. ECON. PERSP. 25 (1988).

n42 *See generally*, NEW YORK STOCK EXCHANGE, MARKET VOLATILITY AND INVESTOR CONFIDENCE, June 7, 1990; Mark B. Garman & Michael J. Klass, *On the Estimation of Security Price Volatility from Historical Data*, 53 J. BUS. 67 (1980).

n43 *See* Eugene T. Fama & Kenneth R. French, *Permanent and Temporary Components of Stock Prices*, 96 J. POL. ECON. 246 (1988); James M. Poterba & Lawrence H. Summers, *Mean Reversion in Stock Prices: Evidence and Implications*, 22 J. FIN. ECON. 27 (1988).

n44 If investors focus on diversified portfolios and largely ignore firm specific factors in making investment decisions, that is, as many have argued, one stock is a good substitute for another, it stands to reason that stocks will tend to be similarly priced. In other words, stocks will be similarly priced if their prices are based primarily on their value as a part of a portfolio rather than that of the issuing company. On the other hand, when portfolio-oriented trading drives the price of a stock too far from its fair price as a firm specific investment, traders who focus on individual stocks will likely step in and correct the situation. In the end, then, one would expect stocks to bounce between these two pricing approaches, but that is perfectly consistent with the notion that when a stock gets out of line it tends to revert to the market mean.

n45 *See* Michael J. Barclay, *Comment on Macey, Mitchell & Netter*, 74 CORNELL L. REV. 836 (1989) (outlining evidence that bimonthly Saturday trading on the Tokyo Stock Exchange siphons off volatility from surrounding days making prices less volatile on days around Saturdays).

n46 *See* Douglas R. Sease, Earl C. Gottschalk, Jr. & James A White, *After the Fall: Is the Market's Decline a Buying Opportunity or a Troubling Omen*?, WALL ST. J., Nov. 13, 1991, at A1; Michael R. Sesit, *Heard On the Street: Stocks' Drop Isn't Swaying Many Minds*, WALL ST. J., Nov. 18, 1991, at C1; George Anders, *Heard on the Street: Portfolio Strategists Don't Plan Retreat from Stock Market*, WALL ST. J., Nov. 19, 1991, at C1; Jonathan Clements, Earl C. Gottschalk, Jr. & Georgette Jasen, *Individuals Stay Cool After Plunge*, WALL ST. J., Nov. 19, 1991, at C1; Douglas R. Sease, *Dow's Drop Seen as Temporary Setback: Damage to Stocks Viewed as Limited*, WALL ST. J., Nov. 25, 1991, at C1.

n47 *See* Garman & Klass, *supra* note 42.


n48 *See supra* note 29.


n49 Although stock exchange specialists seem able to recognize individual trades that are part of programs, they are not in a position to compare notes with the other 400 or so specialists to determine which orders are part of the same program. Moreover, because there may be several programs being executed at any given moment, it would be extremely difficult to group the orders accurately. In all likelihood, one would need to gather information over time during which the programs could well change. The problem is analogous to code-breaking, but it is complicated by the fact that none of the traders who place the orders have the goal of communicating with each other. In short, it is highly unlikely that anyone will be in a position to decode an incoming program trade.


n50 *See supra* note 22.


n51 *See infra* note 113.


n52 *See* KATZENBACH REPORT *supra* note 1.


n52a *See, e.g.*, Martin Mayer, *Market Madness -- Formulas Matter, Not Profits*, WALL ST. J., Apr. 4, 1994, at A12.


n52b *See* NEW YORK STOCK EXCHANGE, MARKET VOLATILITY AND INVESTOR CONFIDENCE, June 7, 1990.


n53 *See* JAMES H. LORIE, PETER DODD & MARY HAMILTON KIMPTON, THE STOCK MARKET THEORIES & EVIDENCE 150 (2d ed. 1985).


n54 *Cf.* Ayres, *supra* note 25, at 985-96; Karen Slater, *Your Money Matters: Long Haul Investing: Riding Out the Risk in Stocks*, WALL ST. J., Dec. 16, 1991, at C1. *See generally*, Thomas Lee Hazen, *The Short-Term/Long-Term Dichotomy and Investment Theory: Implications for Securities Market Regulation and For Corporate Law*, 70 N.C. L. REV. 137 (1991).


n55 *See* Lawrence Harris & Eitan Gurel, *Price and Volume Effects Associated with Changes in the S&P 500 List*, 41 J. FIN. 815 (1986); Andrei Shleifer, *Do Demand Curves for Stock Slope Down?*, 41 J. FIN. 579 (1986). The authors indicate that one might think of the added value as compensation for the added volatility that goes with being subject to program trading. However, markets do not operate on principles of fairness -- at least not such simplistic ones. *See also* Laurie Simon Bagwell, *Dutch Auction Repurchases: An Analysis of Shareholder Heterogeneity*, 47 J. FIN. 71 (1992). The author points out that the very existence of options and the premia paid for them suggest that there are a large number of investors who disagree with market prices. Indeed, option premiums may be a way of measuring the extent of disagreement; the higher the premium, the greater the disagreement because the more investors disagree, the more valuable become instruments that allow one to hedge against or take advantage of such discrepancies.

n56 *See generally* Richard A. Booth, *Discounts and Other Mysteries of Corporate Finance*, 79 CALIF. L. REV. 1055 (1992) (discussing effects of demand on stock prices); Lynn A. Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value and Corporate Law*, 99 YALE. L. J. 1235 (1990); Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 HARV. L. REV. 503 (1991).

n57 S.E.C. CRASH REPORT, *supra* note 1, at 1-4. More recent figures indicate that program trading has been quite evenly split between the buy side and the sell side with a slight bias in most years to the buy side. NEW YORK STOCK EXCHANGE, FACT BOOK 20 (1993). The bias may be due to the fact that sell side programs are sometimes not able to be executed because too many of the stocks are trading on down ticks.

n58 *See infra* text accompanying notes 100-103.

n59 *See* ROBERT W. HAMILTON, FUNDAMENTALS OF MODERN BUSINESS: A LAWYER'S GUIDE § 18.17 (1989).

n60 *See Regan Calls for Banning Index Arbitrage as First Reform*, 20 Sec. Reg. & L. Rep. (BNA), No. 19, at 723 (May 13, 1988). One might as well question the desirability of the New York Stock Exchange's Designated Order Turnaround (DOT or SuperDOT) system which allows for the electronic delivery of orders to the floor, given that program trading would be much more difficult (though not impossible) without it. Of course, DOT was more or less mandated by Congress in the comprehensive 1975 legislation designed to establish a national market system. The idea was to give better service to small investors. *See* Norman S. Poser, *Restructuring the Stock Markets: A Critical Look at the SEC's National Market System*, 58 N.Y.U. L. REV. 883 (1981). On the other hand, the NYSE has taken steps to facilitate program trading (perhaps because it generates substantial commissions) by incorporating a feature into DOT that allows for sending simultaneous orders in a list of stocks to the floor. *See* SEC REPORT, *supra* note 1, at 7-15 - 7-49, 8-8 - 8-10, 9-12 - 9-17).

n61 The idea that investors do not care about particular stocks is quite disturbing to some. *See* Ruder, *supra* note 3, at 6; Louis Uchitelle, *Futures Trading; Does Chicago Run Wall Street?*, N.Y. TIMES, Apr. 22, 1990, (magazine), at 30; Whitehill, *A Sound Argument Why the American Law Institute Should Defer Adoption of Part VI of its Corporate Governance Project*, NAT. LEGAL CENTER WHITEPAPER 9-10 (May 4, 1990); William H. Donaldson & Craig Torres, *Big Board Facing Serious Erosion as Market for Stocks, Chief Warns*, WALL ST. J., Mar. 13, 1991, at C1; Leslie Wayne, *New Boss, New Directions for a Venerable Institution*, N.Y. TIMES, Dec. 30, 1990, at C5 (setting forth views of NYSE president William Donaldson).

n62 *See* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 405-28 (3d ed. 1986); John Langbein & Richard Posner, *Market Funds and Trust Investment Law* (pts. 1 & 2), 1976 AM. BAR. FOUND. RES. J. 1, 1977 AM. BAR FOUND. RES. J. 1. *See also* Harvey E. Bines, *Modern Portfolio Theory and Investment Management Law: Refinement of Legal Doctrine*, 76 COLUM. L. REV. 721 (1976); Robert C. Pozen, *Money Managers and Securities Research*, 51 N.Y.U. L. REV. 923 (1976); John M. Salmonowitz, Note, *Broker Investment Recommendations and the Efficient Capital Market Hypothesis: A Proposed Cautionary Legend*, 29 STAN L. REV. 1077 (1977).

n63 RESTATEMENT (SECOND) OF TRUSTS §  228 (1959). *See generally* Jeffrey N. Gordon, *The Puzzling Persistence of the Constrained Prudent Man Rule*, 62 N.Y.U. L. REV. 52 (1987).

n64 POSNER, *supra* note 62, at 405-10. *See also* Jonathan Clements, *Index Funds Emerge as Hot Turf of 1990*, WALL ST. J., May 18, 1990, at C1; Tom Herman, *Your Money Matters: Matching the Bond Market, Not Beating It*, WALL ST. J., July 26, 1989, at C1; James A. White, *Just What the Street Needs -- A New Index*, WALL ST. J., Mar. 26, 1992, at C1. It is this logic that has led most institutional investors to an essentially passive strategy. *See infra* note 69. The importance of diversification explains the seemingly curious focus of the financial press on market averages and indices. Although someone unfamiliar with portfolio theory might consider the attention paid to such indices as the Dow Jones Industrial Average to be, at best, evidence of an acute fascination with statistics for their own sake or, at worst, evidence of a tendency in the media to reduce useful news about individual stocks to worthless information about stocks generally, in fact the overwhelming attention paid to indices and indeed the proliferation of indices and investment products based on them is convincing evidence of investors' intuition of the importance of diversification. On the other hand, it seems unlikely that in a world in which a wide variety of derivative investment vehicles are available, there is no additional return to be wrung from company-specific investing. Presumably, derivative instruments will often trade at prices that differ from the value of underlying stocks. (If they did not, who would care about them?) In turn, it will often be possible to make a greater return on the underlying stocks. *See* LORIE, DODD & KIMPTON, *supra* note 53, at 144-53. *See also* Craig Torres, *Mathematicians Race to Develop New Kinds of Trading Instruments*, WALL ST. J., Oct. 18, 1991, at C1; *Survey: Frontiers of Finance*, ECONOMIST, Oct. 9, 1993.

n65 The example is based on an explanation appearing in VICTOR BRUDNEY & MARVIN CHIRELSTEIN, CORPORATE FINANCE 1151-54 (2d ed. 1979). *See also* MALKIEL, *supra* note 12, at 193-96 (using example of an umbrella company and a resort).

n66 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 113-114; MALKIEL, *supra* note 13, at 196-199; POSNER, *supra* note 62, at 406-407.

n67 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 21-24; James H. Lorie, *Diversification: Old and New*, 1 J. PORT. MGMT. 25 (Winter 1978). Witness the fact that there is hardly ever a significant difference between the movement of the Dow Jones Industrials (which contains only thirty five stocks which are not even weighted according to capitalization) and the Standard & Poors 500 (which, of course, contains 500 stocks and which is weighted according to capitalization). *See* Lowenstein, *Analysts Take Stock of Dow Jones Industrials as Market Indicator*, WALL ST. J., July 26, 1989, at A1. *See also* Douglas R. Sease & Robert Steiner, *Rallying Dow Outpaces Market: Is It a Leader or Out on a Limb?*, WALL ST. J., Apr. 20, 1992, at C1; Douglas R. Sease, *Abreast of the Market: Divergence of Industrial Average and S&P 500 Foreshadows Correction in Stocks, Some Argue*, WALL ST. J., July 13, 1992, at C1. The fact that most company-specific risk can be eliminated with a fairly small portfolio has not been lost on investment advisers, particularly because a smaller portfolio means lower management expenses. *See* James A. White, *Your Money Matters: For This Top Money Manager, A Handful of Stocks is Enough*, WALL ST. J., Dec. 10, 1991, at C1; James A. White, *Pension Funds Think Less May Be More*, WALL ST. J., Oct. 23, 1991, at C1. *But see* POSNER, *supra* note 62, at 405-10.

n68 *See* HARVEY E. BINES, THE LAW OF INVESTMENT MANAGEMENT P7.08 (1978).

n68a *See* JEFFREY D. MILLER, PROGRAM TRADING: THE NEW AGE OF INVESTING 31-77 (1989).

n69 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 55-87.

n70 *See* Jayne W. Barnard, *Institutional Investors and the New Corporate Governance*, 69 N. C. L. REV. 1135 (1991); John C. Coffee, Jr., *Liquidity Versus Control: The Institutional Investor as a Corporate Monitor*, 91 COLUM. L. REV. 1277 (1991); Ronald J. Gilson & Reinier Kraakman, *Reinvesting the Outside Director: An Agenda for Institutional Investors*, 43 STAN. L. REV. 863 (1991); Edward B. Rock, *The Logic and (Uncertain) Significance of Institutional Shareholder Activism*, 79 GEO. L. J. 445 (1991). *But see* James A. White, *Pension Funds Think Less May Be More*, WALL. ST. J., Oct. 23, 1991, at C1 (adequate diversification may be had with fewer stocks).

n70a This is not to say that all rational investors should aim for the same rate of return. There are many different market rates of return depending on the level of risk one takes.

n71 *See* Jonathan Clements, *Mutual Funds With Low Turnover Find Penny Saved Is Penny Earned*, WALL. ST. J., May 17, 1990, at C1; Karen Slater, *Your Money Matters: Long-Haul Investing: Riding Out the Risk in Stocks*, WALL. ST. J., Dec. 16, 1991, at C1. *See also* Craig Torres & William Power, *Sliding Market: Big Board Is Losing Some of Its Influence Over Stock Trading*, WALL. ST. J., Apr. 17, 1990, at A1 (describing trend toward indexing among institutional investors); Barbara Donnelly, *Stock Investors Pay High Price For Liquidity*, WALL ST. J., Apr. 28, 1987, at A1.

n72 This use of stock index futures is an example of another form of program trading called "tactical asset management." When stock index futures or the stocks themselves are sold after a pre-determined decline in the market, the strategy is known as portfolio insurance. On the variety of uses of derivative products, *see* SEC REPORT, *supra* note 1, at 1-1 -- 1-5.

n73 This function of futures contributes directly to the so-called "billboard" effect. As the SEC noted in its crash report, the futures market has become an important price discovery mechanism, particularly for those investors who are focused on portfolios. *See* SEC REPORT, *supra* note 1, at 3-6 to 3-9.

n74 Indeed, if a mutual fund that is less than fully indexed needs to liquidate a portion of its portfolio, it will need to sell the stocks that it holds, thus causing disproportionate price pressure on those stocks. Even if the fund sells stocks that it has determined are the least desirable, the price pressure on those stocks will be disproportionate to the fund's opinion of them if any part of the decision to sell arises because of asset allocation concerns. Stock index futures, and the program trading that follows, may thus be seen as a way of (appropriately) diffusing the impact of such investment decisions. Implicit in this view, however, is the idea that traders and, perhaps most important, stock exchange specialists can distinguish program trading on the fundamentals, which they ordinarily seem able to do.

It might be argued that program trading as it is currently practiced is little more than a service to the mutual fund industry. Although one might think that a long term investor would find it more economical to invest in stocks rather than futures which expire in no more than nine months, the commissions on a futures trade can be as little as 1/150 of the commissions involved in buying all of the stocks in the S&P 500. Moreover, the spread between the buy price and the sell price of a future on the same index is even smaller in proportion to the aggregate spread of the bid and ask prices of the underlying stocks.

Ironically, one of the justifications often given by NYSE officials for the restrictions on program trading in volatile markets (that is, the rule restricting use of the DOT for program trading when the market is up or down more than 50 points) is that the rule helps assure investors that market prices are the product of

fundamental factors and not technical pressures such as those that arise from program trading. Though that may well be true, it may also be true that program trading itself helps to signal traders what the source of selling pressure really is.

n75 The investment is an investment in equity generally. Thus a stock index future is in a very real sense a commodity. *See* Chicago Mercantile Exchange v. SEC, 883 F.2d 537 (7th Cir. 1989), *cert. denied*, 490 U.S. 936, 110 S.Ct. 3214, 110 L.Ed. 2d 662 (1990) (prohibiting trading of so-called "index participations" that had been approved by the SEC on grounds that such contracts were more in the nature of futures and thus required to be approved by the CFTC).

n76 *See* SEC REPORT, *supra* note 1, at 3-17 to 3-18. Even the New York Stock Exchange, the bastion of stock-picking investors, implicitly recognized the value of portfolio investing by eventually introducing a "market basket" for trading. The idea of a stock exchange traded market basket was propounded by the SEC in its report on the 1987 crash as a way of allowing trading directly in portfolios of stocks and allowing program trades to be executed wholesale. *See* William Power, *Floor Fight: Brokers Gird for War Over Plan for S&P 'Basket'*, WALL ST. J., July 24, 1989, at C1. The idea is an interesting one in that, like the stock that underlies it, a market basket has no expiration date. Thus, those traders who are attracted to stock index futures as investments should have been pleased to have an alternative. Indeed, there have been several longer term products, such as the Nikkei Warrant traded on the American Stock Exchange, that have proven quite popular with investors.

However, the NYSE market basket was a dismal failure. It failed in part because it was introduced so long after a very liquid market in futures had been established and in part because it was extraordinarily expensive (14,596 times the S&P 500 or about $ 5 million per contract), since it contained all 500 stocks weighted according to capitalization. The market basket's price was so high that on many days no contracts were even traded. Fewer than 300 such contracts ever changed hands before the market basket was abandoned. Thus, it was cheaper for an individual investor to design a portfolio using fewer stocks than the entire S&P 500.

The late introduction and the poor design of the market basket was due to NYSE specialists' resistance to something they believed would divert trading from the traditional trading post and create a two-tier market in which big investors could execute orders bypassing exposure to individual investors. *See infra* note 108. There also may have been another flaw: if the basket's price were allowed to diverge from the stocks that compose it, this would have been a new form of program trading based on the discrepancies. If the prices did not diverge, the contract would be equivalent to an indexed mutual fund which can often be purchased for no commission. In any event, the market basket failed.

n77 *See infra* text at notes 80 - 97.

n78 *See infra* text at notes 98 - 114.

n79 *See infra* text at notes 111 - 132. In addition, Congress enacted the Market Reform Act of 1990 (Pub. L. No. 101-432, 104 Stat. 963 (1990), (hereinafter the MRA) which amended Exchange Act § 12 to expand and clarify the power of the SEC to order trading halts. The MRA also amended § 13 to authorize the SEC to create a system for larger trader reporting and the SEC has proposed regulations that would establish such a system. In addition, the MRA amended § 17 to authorize the SEC to collect information for the purpose of studying the overall financial exposure of broker-dealers that are owned by holding companies with additional operations and the SEC has proposed rules in this connection as well. The MRA amended § 17 still further to strengthen SEC authority to develop coordinated clearance and settlement procedures. And the MRA amended § 9 of the Exchange Act to provide the SEC with additional authority to

adopt rules to prevent manipulation and (during periods of "extraordinary volatility") to regulate any practice that has been found to contribute to volatility. No such rules have been proposed. (This provision came to be known as the "program trading" section although it does not specifically mention the practice.) Finally, the MRA requires the various regulatory agencies with authority over the financial markets to report to Congress annually.

n80 *See generally* BRADY REPORT, *supra* note 1.

n81 *See Working Group on Markets Endorses Circuit Breakers for Large DJIA Drops*, Federal Securities and Corporate Development, 20 Sec. Reg. & L. Rep. (BNA), No. 20, May 20, 1988, at 759; *SEC, CFTC Approve Coordinated Trading Halts in Volatile Markets*, Federal Securities and Corporate Development, 20 Sec. Reg. & L. Rep. (BNA), No. 41, Oct. 21, 1988, at 1580. For the circuit breaker rules themselves, *see* 2 New York Stock Exchange Guide (CCH), para. 2080B, Rule 80B (1990); Chicago Mercantile Exchange Rule 4002(I) (1991). *See also* Securities Exchange Act § 11(1)-(4); 15 U.S.C. § 78(k)(1)-(4) (added by Market Reform Act of 1990 and giving SEC explicit authority to mandate circuit breakers).

n82 *See* KOLB, *supra* note 32. Curiously, unlike most other futures contracts, the S&P 500 was not subject to price-movement limits prior to the crash. *See* SEC REPORT, *supra* note 1 at 3-23; Scott McMurray, *CBOT to Impose Daily Price Limits on Some Contracts*, WALL ST. J., Nov. 24, 1987, at A2; *Chicago Merc Says CFTC Cleared Daily Price Limit*, WALL ST. J., Mar. 28, 1988, at A24. This may have reflected a belief that the contract was more liquid than it turned out to be.

n83 Chicago Mercantile Exchange Rule 4002(I) (1991). *See* Rule Changes Relating to Market Circuit-Breaker Proposals, Exchange Act Release No. 28,580, 55 Fed. Reg. 45,895 (Oct. 25, 1990); Exchange Act Release No. 28,694, 55 Fed. Reg. 52,119 (Dec. 12, 1990); Exchange Act Release No. 29,868, 56 Fed. Reg. 56,535 (Oct. 28, 1991).

n84 New York Stock Exchange Rule 80A, 2 N.Y.S.E. Guide (CCH) P2080A (Oct. 18, 1990) [*hereinafter* NYSE Rule 80A]. *See* Rule 80A Limitations on Trading, Exchange Act Release No. 29,854, 56 Fed. Reg. 55,963 (Oct. 24, 1991).

n85 *Id.*

n86 Chicago Mercantile Exchange Rule 4002(I) (1991).

N87 *Id.*; NYSE Rule 80A, *supra* note 84. *See* Rule Changes Relating to Market Circuit-Breaker Proposal, Exchange Act Release No. 26,218, 53 Fed. Reg. 44,137 (Oct. 26, 1988).

n88 *Id.*

n88a The idea behind the low level circuit breakers, that is, the ones that do not close the markets, is that they will increase investor confidence in the accuracy of prices by removing any distortions that may come from program trading.

n88b *See* JEFFREY D. MILLER, PROGRAM TRADING: THE NEW AGE OF INVESTING 95-131 (1989).

n89 Longer halts are possible if the exchanges or regulators choose to impose them. Although it has always been possible for the President and the SEC to close the exchanges (at least theoretically), under the Market Reform Act of 1990, that authority was expanded considerably. *See supra* note 79.

n90 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 33-54.

n91 *See supra* note 66. One way such a situation could arise is if one of the companies in the DJIA fell precipitously in price because of company specific news. Indeed, it has been suggested that the 1989 mini-crash was prompted by the withdrawal of a takeover bid for United Airlines.

n92 *See* Becker, Burns, Ain & Burgess, *supra* note 30, at 4-3 (reporting that during 1991, 15.5% of program trades were executed in foreign markets but that weekly figures during that year ranged from 2.6% to 43.2%). *See also* Harris, *supra* note 41, at 935-39; Jonathan R. Macey, Mark Mitchell & Jeffrey Netter, *Restrictions on Short Sales: An Analysis of the Uptick Rule and Its Role in View of the October 1987 Stock Market Crash*, 74 CORNELL L. REV. 799, 827-29 (1989); Stanley W. Angrist, *Overseas Trading in Futures is Surging*, WALL ST. J., Oct. 15, 1990, at C1.

n93 *See* Commodity Exchange Act, 7 U.S.C.A. § 6 (West Supp. 1993); 17 C.F.R. §§ 32-33 (1993); Chicago Mercantile Exch. v. SEC, 833 F.2d 537 (7th Cir. 1989); John H. Stassen, *Quiche or Pizza? It Does Make a Difference*, 19 REV. SEC. & COM. L., Oct. 8, 1986, at 231.

n94 *See generally* SEC REPORT, *supra* note 1, at 3-1 - 3-34.

n95 Even in stable markets, circuit breakers add a new risk in investing in stock and futures that may prevent the market from rising as far as it might, although this effect may be minimal.

n96 *See* Ayres, *supra* note 25, at 981-83. *See also According To Chicago Federal Reserve Economist, Circuit Breakers Have Costs*, 22 SEC. REG. & L. REP. (BNA), No. 40, Oct. 12, 1990, at 1465; Shapiro, *Circuit Breakers: Maybe They Work, Maybe They Don't*, N.Y. TIMES, July 29, 1990, at F7; *Staff Report Says Circuit Breakers Did Not Hurt Markets in '89 Declines*, 22 SEC. REG. & L. REP. (BNA), No. 22, June 1, 1990, at 821; *Shock Absorbers Did Not Curb Volatility in Oct. 1989 Market Swings, Report Says*, 22 SEC. REG. & L. REP. (BNA), No. 20, May 18, 1990, at 774; Scott McMurray, *Traders Say Curbs Enacted Since the Crash Have Steepened Stock Market's Plunge*, WALL ST. J., Apr. 15, 1988, at C57. *But see* NYSE, THE RULE 80A ARBITRAGE TICK TEST, May 31, 1991 (finding no statistical evidence of any such "magnet effect").

n97 Whether or not circuit breakers are a good idea in general, the question remains at what level they should kick in. The rules (except for Rule 80A) were adopted on October 19, 1988 when the DJIA stood at 2137.27. Rule 80A was adopted on July 30, 1990 when the DJIA stood at 2917.33. On February 15, 1994, the DJIA closed at 3928.27, or 83.80 and 34.65 percent above those respective levels. In other words, at the time it was adopted, Rule 80A could be triggered by a 1.71 percent change in the Dow, whereas as of

February 15, 1994 it could be triggered by a change of only 1.27 percent. Arguably, the trigger point for the various circuit breakers should be adjusted as market prices change. To leave them static operates (at least in a rising market) as an ever tightening restriction on program trading. On the other hand, Rule 80A has been triggered less frequently with each passing year. It was triggered 23 times in 1990 (in the period following July 30), 20 times in 1991, and 16 times in 1992. NYSE, FACT BOOK 21 (1992).

The only other circuit breaker that has ever been tripped is the sidecar which was triggered twice in 1991 and once in 1992. *Id.*

Rule 80A does not apply to market on close orders on expiration Fridays.

n98 N.Y.S.E. Rule 80A, 2 N.Y.S.E. Guide (CCH) P2080A, at 2658 (July 1993).

n99 Sec. Exch. Act Rule 10a-1, 17 C.F.R. § 240.10a-1 (1992). *See* William Power & Kevin G. Salwen, *SEC Is Warning Index Traders on Uptick Rule*, WALL ST. J., Apr. 26, 1990, at C1.

n100 Sec. Exch. Act Rule 10a-1, *supra* note 99. The NASD has recently adopted a similar rule for the OTC market. *See* Anne Newman & Kevin G. Salwen, *Traders, Brokers Clear Short-Sale Rule; NASDAQ Composite Index Gains 0.13%*, WALL ST. J., Mar. 26, 1992, at C6.

n101 Short sellers, like bearers of bad news, have never been terribly popular. An old ditty pretty well sums it up: "He who sells what isn't his'n, must buy it back or go back to prison." "Shorts," as they are often called in the industry, are probably even less popular nowadays. *See generally* Jonathan R. Macey, Mark Mitchell & Jeffrey Netter, *Restrictions on Short Sales: An Analysis of the Uptick Rule and Its Role in View of the October 1987 Stock Market Crash*, CORNELL L. REV. 799 (1989). *See also* Susan Antilla, *Wall Street: A Fast-and-Loose 'Short Buster,'* N.Y. TIMES, Aug. 2, 1992, at C3.

n102 For a thorough critique of the current rule, see Macey, Mitchell & Netter, *supra* note 101.

n103 *See generally* SEC REPORT, *supra* note 1, at 4-1 - 4-4.

n104 *See* Harold S. Bloomenthal, *The Case of the Subtle Motive and the Delicate Art - Control and Domination in Over-the-Counter Securities Markets*, 1960 DUKE L. J. 196. For a notable case in which the role of market makers is analyzed, see Chasins v. Smith, Barney & Co., Inc., 438 F.2d 1167 (2nd Cir. 1970).

n105 *See* KOLB, *supra* note 32. *See also* John C. Coffee, Jr., *Stock Market Needs Anti-Dumping Rules*, WALL ST. J., Aug. 16, 1988, at A28.

n106 Congress arguably exacerbated the problems inherent in the specialist system when it effectively outlawed in 1975 members on the floor of an exchange from trading for their own accounts. *See* Sec. Exch. Act § 11, 15 U.S.C. § 78k, 17 C.F.R. 240.11a-1. Acting on the theory that the stock exchanges are a sort of public trust, Congress decided that it was inappropriate for anyone to own a seat on an exchange for the primary purpose of proprietary trading. The rule against proprietary trading was designed to thwart efforts by investment companies in the early 1970s to avoid fixed brokerage commission rates by acquiring their own exchange seats. *See* Richard W. Jennings & Harold Marsh, Jr., SECURITIES REGULATION: CASES AND MATERIALS 558-572 (6th ed. 1987). *See also* Jeffrey L. Steele & Bettina M. Lawton, *Soft Dollar*

*Practices*, 19 REV. SEC. & COM. REG., No. 17. at 207 (October 8, 1986) (describing ways in which broker-dealers continue to favor bigger customers). One side effect of the rule, however, is that no one on the exchange floor can compete with a specialist by second-guessing pricing decisions. *See* William Power, *Big Board at Age 200, Scrambles to Protect Grip on Stock Market*, WALL ST. J., May 13, 1992, at A1.

A bill that would do away with the prohibition against proprietary trading has recently been proposed, and the SEC has indicated its conditional support for it. *See* Kevin G. Salwen, *Bill Would Divert Floor Trades Away From Independent Brokers*, WALL ST. J., May 15, 1991, at C1.

The SEC has been highly critical of "dual trading" on the futures exchange, where members may trade for their own account or the accounts of others. While dual trading does create the potential for conflicts of interest, to prohibit dual trading effectively forces traders to choose one or the other and would presumably reduce market liquidity.


n107 *See* William Power, *Small Investor Continues to Give Up Control of Stocks*, WALL ST. J., May 11, 1992, at C1; Robert Steiner, *200 Years Later, Small Investors Find Clout at America's Premier Exchange*, WALL ST. J., May 13, 1992, at C1. *See also* William H. Donaldson & Craig Torres, *Big Board Facing Serious Erosion as Market for Stocks, Chief Warns*, WALL ST. J., Mar. 13, 1991, at C1; Leslie Wayne, *New Boss, New Directions for a Venerable Institution*, N.Y. TIMES, Dec. 30, 1990, at C5. For an excellent analysis of the competing interests of large shareholders (who are less in need of disclosure and more interested in volume discounts) and small shareholders (who may be interested in equal access to the market), see Barbara Ann Banoff, *Regulatory Subsidies, Efficient Markets, and Shelf Registration: An Analysis of Rule 415*, 70 VA. L. REV. 135 (1984). For a contrary view, see Saul S. Cohen, *The Death of Securities Regulation*, WALL ST. J., Jan. 17, 1991, at A10.


n108 Indeed complaints by listed companies were cited as an important reason for NASDAQ's recent adoption of a rule against short selling. *See* Anne Newman & Kevin G. Salwen, *Traders, Brokers Clear Short-Sale Rule; NASDAQ Composite Index Gains 0.13%*, WALL ST. J., Mar. 26, 1992, at C6. It may be too that listed companies encourage rules that favor small shareholders because many scattered small shareholders are less able to organize any kind of voting campaign and are thus less likely to complain about or meddle in management. *See* Mark J. Roe, *That Menace, the Small Shareholder*, WALL ST. J., May 21, 1992, at A12.


n109 *See* Eric N. Berg, *If the News is Bad, Silence the Messenger*, N.Y. TIMES, May 15, 1990, at D1; Anne B. Fisher, *How Good Are Wall Street's Security Analysts?*, FORTUNE, Oct. 1, 1984, at 130; William Power, *Wall Street Research Faulted By Big Institutional Investors*, WALL ST. J., July 31, 1991, at C1; Michael Siconolfi, *At Morgan Stanley, Analysts Were Urged to Soften Harsh Views*, WALL ST. J., July 14, 1992, at A1; Susan Antilla, *Market Place; Analysts: The Gang That Couldn't Pick Straight*, N.Y. TIMES, Aug. 10, 1992, at D1. *See also* Quentin Hardy, *Nomura Analysts Break Tradition By Giving Investors The Bad News*, WALL ST. J., Feb. 26, 1992, at C1. For a case study in the conflict between underwriting and analysis, *see* In the Matter of Merrill Lynch, Pierce, Fenner & Smith, Inc., et al., 13 SEC Docket 646, 661, Exchange Act Release No. 14,149 (Nov. 9, 1977).


n110 Admittedly, the futures exchanges might prohibit short sales by speculators, but not by hedgers. That is, exchanges could require those who sell a future to own the underlying commodity when they sell. Because hedgers are indifferent to price changes, (precisely because they have hedged) short sales for hedging purposes do not constitute a bet that prices will fall. In fact, futures exchanges' margin rules recognize this distinction by requiring speculators to make larger margin deposits than hedgers. Were it not for speculators, however, hedging would be much more expensive, if not impossible. A speculator makes money, in effect, by managing risk for those who actually own the underlying commodity. Like other market participants, speculators are risk-averse. Indeed, few can accurately be called "speculators" in the usual sense

of the word. The vast majority of speculative trading is relatively low-risk arbitrage based on price imbalances between various contracts. Few traders themselves "go to bed with a position," that is, maintain a position overnight. In short, very little trading represents naked betting on the direction of the market. But whatever one calls it -- arbitrage or speculation or just plain trading -- it cannot be separated from hedging.

n111 It is only rational that individual stock prices react more slowly to changing conditions marketwide because there are 500 different stocks in the S&P 500 (not all traded on the NYSE), and it takes time for traders to enter orders affecting all 500 stocks. In addition, communications between traders, not to mention specialists and market makers, are imperfect. Given that marketwide factors cause about half of the average stock's price movements, traders cannot assume that the dynamics of trading in an individual stock will dictate that stock's price. Each trade is merely an ambiguous signal of where the market price should be. Yet each and every trade of an SP contract is in a sense a new reflection of the market. In short, a stock exchange cannot hope to catch up.

In addition, one of the functions of the specialist system is to match orders that come to the floor at different times and to execute such orders between the quotes if possible. Oddly, then, one benefit of exchange trading is that it is slower than other methods, but an accompanying disadvantage is that individual stock prices may lag behind what the futures market indicates.

For both these reasons, the stock market naturally lags behind the futures market except in the crucial sense that the value of the future ultimately depends on what the stock market thinks is the value of each company in the underlying index.

In practice, the specialist helps to facilitate many of the trades in the crowd (1) because orders to buy and sell do not magically match up in quantity and (2) because buyers and sellers (or rather their brokers) cannot always wait at a post until a trade is executed. Thus, a specialist will batch tentative orders at the post sometimes for several minutes until a trade can be executed. In the end, the specialist often does not financially participate in such trades.

A calculation helps to show why the exchange works as it does. There are 1366 seats on the NYSE of which about 400 belong to specialists. *See* NYSE, FACT BOOK 73 (1992); SEC REPORT, *supra* note 1, at 4-1. Thus in very round terms there are about 1000 brokers on the floor (floor brokers) who can handle a trade in about 2000 listed stocks. Assuming that volume is about 300 million shares per day and that about one-third of that is at the opening or closing of the market (which is probably well below the actual figure), there are about 200 million shares that change hands during the trading day, averaging out to about 100,000 shares per listed stock. Assuming further that the average batched trade involves about 5000 shares (which is also likely to be on the low side), it is likely that there are about twenty times a day when an average stock actually trades. (It seems likely that this calculation would hold for bigger and smaller than average stocks as well because orders in such stocks are likely to be bigger and smaller, respectively.) Thus, given that the trading day lasts from 9:30 a.m. to 4:00 p.m., or 390 minutes, one would not expect a trade to occur much more often than every 20 minutes or so.

It bears noting that this informal mediation of trading creates some interesting dynamics on the floor. First, trading is not totally anonymous. Floor brokers may represent many different brokerage houses and thus must identify themselves to the specialist and fellow traders in terms of whom they represent. Thus it is quite possible for the specialist to pick up on patterns of buying or selling from a particular source. And the specialists tend to be quite open about who has expressed interest and which way in a given stock. This is no doubt reassuring to floor brokers who may even relay such intelligence over the phone to their customers. Second, a floor broker is strongly induced to be up front with the specialist about how much stock he or she is trying to buy or sell. Finally, though it has more to do with technology than professional courtesy, now that limit orders (at least those that are close to the market) are displayed on a computer screen, there is little effort to hide this information from floor brokers who care to look at it.

n112 *See generally* SEC REPORT, *supra* note 1, at 3-6 - 3-9; H.J. Maidenberg, *Market Place: Futures Index Tells Future*, N.Y.TIMES, July 15, 1986, at D12.

n113 One Commissioner pointed out, however, that an exchange ought to be free to make its own mistakes. *See* Salwen, *supra* note 6. It is revealing that the SEC assumed a hands off attitude in connection with the NYSE's unilateral trading restrictions but asserted itself vigorously when the issue was whether the NYSE's traditional one-share-one-vote should be repealed. Ultimately, the Commission sought to force all exchanges to adopt similar rules. *See* Richard A. Booth, *Federalism and the Market for Corporate Control*, 69 WASH. U. L. Q. 411 (1991).

n114 *See* Liquidation of Index Arbitrage Positions, Sec. Exch. Act Rel. No. 27938, 55 Fed. Sec. L. Rep. 17949 (April 23, 1990); Power & Salwen, *supra* note 7; NYSE FACT BOOK 73 (1992); SEC REPORT, *supra* note 1, at 4-1.

n115 *See* Salwen & Taylor, *supra* note 10.

n115a *See* SEC REPORT, *supra* note 1, at 3-19 - 3-22.

n116 *See generally* Furbush & Poulsen, *supra* note 41; Jerry W. Markham, *Federal Regulation of Margin in the Commodity Futures Industry -- History and Theory*, 64 TEMPLE L. REV. 59 (1991). For example, an investor who buys $ 1000 worth of stock must put down $ 500 of his own money and may borrow the rest. Thereafter, he need not pay more as long as the equity in the account remains at least 25 percent or, viewed from the other end, the loan remains at most 75 percent of the total value of the account. In other words, our investor need pay more unless the $ 1000 in stock falls to $ 666.66.

n117 *See* Floyd Norris, *Market Place: Who Should Set Margin Levels?*, N.Y. TIMES, July 11, 1990, at D1.

n118 *See* Peter Westen, *The Empty Idea of Equality*, 95 HARV. L. REV. 537 (1982).

n119 *See generally* Furbush & Poulsen, *supra* note 41; Markham, *supra* note 116. The idea is that an investor should have enough equity in an account so that if the account's value falls by some percentage there will still be enough value left to sell the securities or commodities in the account and settle up with the lender or the other party to the trade.

n120 *See* Furbush & Poulsen, *supra* note 41; Markham, *supra* note 116.

n121 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 35-41.

n122 *See supra* note 40. The question is, why do hedged investors need to maintain any margin at all? One answer may be that it is difficult to know who is fully hedged. If a portfolio investor has bought a selection of stocks designed to match the S&P 500, but has not precisely replicated the index, then the possibility exists, however remote it may be, that the portfolio will diverge significantly in value from the index. Moreover, there is always some residual liquidity risk. It is always possible that the markets will break down as they did in October 1987 and that even a fully hedged investor may default because of inability to buy or sell the underlying securities.

n123 Prohibiting borrowing beyond a certain level reduces the needs to sell when prices dip a bit. *See* SEC REPORT, *supra* note 1, at 5-11 -- 5-13 (reporting that after the 1987 crash there were four times the number of liquidations for failure to meet margin call in stock accounts as in commodities accounts).

n124 Failure to recognize the difference between the two kinds of investors effects a subsidy to undiversified investors because the portfolio investor must put up more equity than the risk requires. More remarkably, few, if any, investment companies buy stock on margin, and margin is prohibited in connection with pension funds, individual retirement accounts and similar investments. *See* Furbush & Poulsen, *supra* note 41, at 881-87. High margin also restricts demand for, and thus the supply of, stock, which also tends to keep prices higher.

n125 *See* SEC REPORT, *supra* note 1, at 5-11 -- 5-13.

n126 *See* Franco Modigliani & Merton H. Miller, *The Cost of Capital, Corporation Finance and the Theory of Investment*, 48. AM. ECON. REV. 261 (1958).

n126a Moreover, to the extent that high margin requirements discourage debt financing, they also help assure that more stock will be issued and available for trading.

n126b As the SEC staff noted in its report, margin requirements for the SP were increased after the crash but then subsequently decreased again so that as of late 1988 they stood at about 8% for hedgers and 12% for speculators. *See* SEC REPORT, *supra* note 1, at 3-19 - 3-22. As of late 1991, they stood at about 6% and 14%, respectively. *See* Becker, Burns, Ain & Burgess, *supra* note 30, at 41.

n127 In fact, the exchanges have voluntarily increased margin levels somewhat. *See* NYSE INFO. MEMO. 87-36, Oct. 26, 1987; *Amex Raises Margin Requirements for Broad Market Stock Index Options*, 19 SEC. REG. & L. REP. (BNA) No. 43, at 1655 (Oct. 30, 1987). *But see SEC, CFTC Commissioners Oppose Higher Margins for Stock Index Futures*, [Jan.-June] 20 SEC. REG. & L. REP. (BNA) No. 8, at 288 (Feb. 26, 1988); *Fed Favors Delegation of Margin Setting Authority to Exchange SROs*, [Jan.-June] 20 SEC. REG. & L. REP. (BNA) No. 21, at 800 (May 27, 1988). *See generally* Furbush & Poulsen, *supra* note 41; Markham, *supra* note 116; Roberta Karmel, *Margin, Limits and Market Volatility*, N.Y. L. J., Feb. 18, 1988, at 1. The fact that margin requirements can change on a moment's notice is a risk that is factored into the value of a stock index future. *See* Furbush & Poulsen, *supra* note 41.

n128 One way to verify this idea empirically is to compare how often investors fail to meet margin calls in stocks versus how often they fail to do so in commodities or specifically in financial futures. Because margin is adjusted daily in commodities such comparisons are difficult. Nevertheless, following the 1987 crash, there were far fewer margin calls and far fewer defaults in the commodities markets. *See* SEC REPORT, *supra* note 1, at 5-11 - 5-13.

n129 These margin maintenance requirements are subject to review by the SEC. *See* Sec. Exch. Act § 19, 15 U.S.C. §  78s (1993).

n130 *See* Furbush & Poulsen, *supra* note 41, at 875-81; Markham, *supra* note 116. The FRB presumably cares little about the solvency of speculators as long as they do not enjoy too much credit. By contrast, exchanges care little about credit allocation, but are concerned with the possibility that margin calls will drive down the price of stock. It remains to be seen what might concern the SEC, if it took a more active role in setting margin requirements.

n131 A flaw in current regulatory structure is that it prohibits cross margining, i.e., using buying power in one market to back up investments in another. Margin requirements across options and futures markets have been merged to a modest extent, but as yet nothing has been done to coordinate stock markets with other markets. *See* Becker, Burns, Ain & Burgess, *supra* note 30, at 4-42 -- 4-45. A practical problem is that the clearing and settlement procedures of the various markets are so dissimilar that it is difficult to translate an investor's margin position in one market in terms of another. *See* Becker, Burns, Ain & Burgess, *supra* note 30, at 4-45 -- 4-46. The price of a solution may be high indeed. The danger is that cross margining will be allowed only if a single agency can decide margin levels for all markets and that the solution will be made with less solicitude for the real dangers that margin supposedly prevents, an assessment that each exchange is uniquely qualified to make.

n131a *See Fed Delegates Authority to CFTC to Set Margin on Stock Index Futures*, 25 SEC. REG. & L. REP. (BNA), No. 15, Apr. 16, 1993, at 563.

n132 In addition, arbitrage between the stock and options markets tends to keep the prices of individual stocks in line with each other. On the other hand, it can also be argued that inter-market competition is sometimes destructive. For example, competition (in the form of litigation) over new financial products has sometimes prevented those products from ever being introduced. *See, e.g.*, Chicago Mercantile Exchange v. SEC, 883 F.2d 537 (7th Cir. 1989), *cert. denied*, 496 U.S. 936 (1990) (prohibiting trading of so-called "index participations" even though they had been approved by the SEC, because the "index participations" were more in the nature of futures and thus required to be approved by the CFTC). The problem, however, would seem to be one of inept or excessive regulation rather than one of inter-market competition.

n133 On February 24, 1994, the Dow Jones Industrial Average closed at 3839.90. *See, e.g., Market Indicators*, N.Y. TIMES, Feb. 25, 1994, at D7.

n134 It is also consistent with a smaller supply of stock. *See supra* notes 54-55.

n134a *See* Martin Mayer, *Market Madness -- Formulas Matter, Not Profits*, WALL ST. J., Apr. 4, 1994, at A12.

n135 *See, e.g.*, Michael Siconolfi, *Stockbrokers Prospered in Second Quarter, But Specialist Firms Saw Profit Plunge*, WALL ST. J., Sept. 1, 1992, at C1.

n136 *See* James A. White, *Pension Funds Think Less May Be More*, WALL ST. J., Oct. 23, 1991, at C1. *See supra* note 69.

n137 The efficiency paradox can be stated as follows: if the stock market is efficient and thus unbeatable, investors will cease efforts to beat it by doing research; but when everyone quits doing research,

research will again be profitable. *See generally* Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 VA. L. REV. 549, 622-26 (1984). The efficiency paradox is not a paradox at all but just what one would expect in a well-functioning market, a continuous process adjusting supply to demand or investment to marginal profit -- in other words, an equilibrium process. Program trading stems from more familiar investment strategies that have become the rule at least *de facto* with institutional investors. The 1987 crash itself may have been real world example of the efficiency paradox.

n138 If this effect is present, then the price and volume of options should be up and spreads should be narrower because options are more valuable in a more volatile market. Similarly, spreads for stocks should be somewhat enhanced (which may be the case even though the market as a whole may be less volatile). Another way to verify this effect is to look at the beta coefficients for individual stocks. Beta is a direct measure of the tendency of a stock to move with the market.

n139 Ruder, *supra* note 3.

n140 *See* Hu, *supra* note 41. *See also* Thomas Russo & Anthony Vinciguerra, *Financial Innovation and Uncertain Regulation: Selected Issues Regarding New Product Development*, 69 TEX. L. REV. 1431 (1991); Becker, Burns, Ain & Burgess, *supra* note 30, at 4-49 - 4-55; Lee, *What's With the Casino Society?*, FORBES, Sept. 22, 1986, at 150 (reporting that about 600 new financial products had been introduced since 1980); Robert Steiner, *New Amex Spiders Mimic S&P Index*, WALL ST. J., Mar. 12, 1992, at C1. *See also* HAMILTON, *supra* note 59, at 456-57 (describing stripping of treasury securities to create zero coupon bonds). For an account of the competition between markets as well as nations in connection with the introduction of new derivative instruments, see Craig S. Smith & Kevin L. Dunn, *Tokyo Exchange Pushes to Halt U.S. Sales of Nikkei Warrants*, WALL ST. J., Apr. 26, 1990, at C1; Scott McMurray, *Chicago Merc Can Claim Win In Futures Fight*, WALL ST. J., Oct. 17, 1990, at C1.

If diversification means not putting one's eggs in one basket, breaking financial products into component parts is like figuring out how to separate an egg. If no one had ever figured it out there would be no meringues or hollandaise. But the fact that we can separate eggs hardly means that we can no longer scramble them.

n141 *See supra* note 122.

n142 *See* LORIE, DODD & KIMPTON, *supra* note 53, at 144-53; Jonathan Fuerbringer, *In Options Trading, Volatility is a Virtue*, N.Y. TIMES, Jan. 26, 1992, at C5. I once overheard a revealing conversation between two men in the observation room at the Chicago Mercantile Exchange in which one said to the other, "It's pretty dull down there right now. There's not enough uncertainty. Prices are too stable."

n143 These observations about the sources of value for options and stock raise the question why futures are valuable given that with a future, downside potential is limited. The simple answer is that they are cheaper to trade (and enough so that on the buy side it even makes up for lost dividends). Beyond this, investors may find different trading practices (including margin requirements) advantageous. Perhaps most important, index futures spare the investor the cost of assembling a portfolio. Moreover, trading in futures has a smaller impact on the market than trading in an equivalent amount of stock. *See* SEC REPORT, *supra* note 1, at 3-4 - 3-6. Lastly, stock index futures were available first, and once a market is liquid, it is difficult to draw traders into less active markets, absent distinct benefits. This may in part explain why the NYSE Market Basket, a vehicle for trading the entire S & P 500 at once, was such a dismal failure. *See* Becker, Burns, Ain & Burgess, *supra* note 30, at 4-49 - 4-50. *See also* Craig S. Smith & Kevin L. Dunn, *Tokyo*

*Exchange Pushes to Halt U.S. Sales of Nikkei Warrants*, WALL ST. J., Apr. 26, 1990, at C1; Scott McMurray, *Chicago Merc Can Claim Win In Futures Fight*, WALL ST. J., Oct. 17, 1990, at C1.

n144 *See* Ayres, *supra* note 25, at 975-83.

n145 Thus it is only natural that the stock market has arranged itself into several tiers with the most actively traded stocks being traded on exchanges and the more thinly traded stocks being traded over the counter with the intermediation of market makers.

n146 *See generally* SEC REPORT, *supra* note 1, at 4-1 - 4-72. The SEC found that in a sample of 67 stocks, specialist proprietary activity in specialty stocks (that is, not including handling of limit orders) accounted for 11.7% of purchases and sales during the period January through September 1987. Because each trade is both a purchase and a sale, specialists are thus involved in twice that number of trades or about 24% of all transactions. *See* SEC REPORT, *supra* note 1, at 4-5 - 4-7.

n147 *See generally* KOLB, *supra* note 32.

n148 *See* NEW YORK STOCK EXCHANGE, FACT BOOK 32 (1992).

n149 *See* JENNINGS & MARSH, *supra* note 106, at 566-70.

n150 *See* HAMILTON, *supra* note 59, at 436.

n151 However, the Toronto Stock Exchange recently announced that it was considering shutting down its trading floor and adopting a fully automated execution system -- and that it would retain specialists (called "registered traders") who would continue to make markets. *See* Michael T. Malloy & Larry M. Greenberg, *Toronto May Shut Down Trading Floor*, WALL ST. J., Jan. 9, 1992, at C1. A similar system is already in place in London, Paris, Belgium and Spain. *See also* Neil Behrmann & Stanley W. Angrist, *Men vs. Machines in Bund-Trading Duel*, WALL ST. J., Dec. 20, 1990, at C1; Gerald T. Nowak, *A Failure of Communication: An Argument for the Closing of the NYSE Floor*, 26 U. MICH. J. L. REF. 485 (1993).

n152 *See* SEC REPORT, *supra* note 1, at 9-1 - 9-32.

n153 *See* David D. Haddock, *An Economic Analysis of the Brady Report: Public Interest, Special Interest, or Rent Extraction?*, 74 CORNELL L. REV. 841 (1989); Christopher L. Culp, *Stock Index Futures and Financial Market Reform: Regulatory Failure or Regulatory Imperialism?*, 13 GEO. MASON U.L.REV. 517 (1991); Thomas E. Headrick, *Expert Policy Analysis and Bureaucratic Politics: Searching for the Causes of the 1987 Stock Market Crash*, 14 L. & POL. 313 (1992).

n153a *See* Hasbrouck, Sofianos & Sosebee, *supra* note 39. *See also supra* notes 39 and 111. Recent figures indicate that a quarter to a third of all trades executed on the floor of the NYSE benefit from price improvement.

n153b *See generally* Andrew M. Klein, *Payment for Order Flow: Issues and Chronology, in* ALI-ABA, BROKER DEALER REGULATION (1994).

n153c For a summary of the variety of proprietary trading systems currently in operation or development, see SEC, DIVISION OF MARKET REGULATION, MARKET 2000: AN EXAMINATION OF CURRENT EQUITY MARKET DEVELOPMENTS (Jan. 1994). *See also* Jonathan Macey & Hideki Kanda, *The Stock Exchange as a Firm: The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges*, 75 CORNELL L. REV. 1007 (1900); Michael B. Sundel & Lystra G. Blake, *Good Concept, Bad Executions: The Regulation and Self-Regulation of Automated Trading Systems in United States Futures Markets*, 85 NW. L. REV. 748 (1991).

n153d *See* Reinier H. Kraakman, *Taking Discounts Seriously: The Implications of Discounted Share Prices as an Acquisition Motive*, 88 COLUM. L. REV. 891 (1988).

n154 Perhaps the specialist's responsibility for handling "limit orders" -- orders to buy or sell when the price of a stock reaches some specified level -- is an argument for specialists. For example, an investor trying to protect gains in a stock that is trading for $ 40 per share might place a limit order instructing that the stock be sold if the price falls to $ 35 or less. Although the $ 35 price is not guaranteed, once the price limit is reached the order becomes a market order and the investor receives the best available price; more importantly, exchange rules require that such orders be executed before any other orders are filled. *See* SEC REPORT, *supra* note 1, at 4-1 - 4-4. *See generally* JOEL SELIGMAN, THE TRANSFORMATION OF WALL STREET (1982); Norman S. Poser, *Restructuring the Stock Markets: A Critical Look at the SEC's National Market System*, 56 N.Y.U. L. REV. 883 (1981); Walter Werner, *Adventure in Social Control of Finance: The National Market System for Securities*, 75 COLUM. L. REV. 1233 (1975).

Thus, one argument for the specialist system is that someone needs to be responsible for such limit orders. In exchange for this responsibility the specialist is granted exclusive access to brokers' limit order books. This has often been said to be a very lucrative privilege. *But see* Tom Herman & William Power, *Big Board Delays 'Show and Tell' Plan for Investors to See Buy, Sell Order Books*, WALL ST. J., Nov. 14, 1991, at C26.

However, this argument does not withstand scrutiny. While the specialist is responsible for seeing to it that limit orders are executed first, this does not justify giving the specialist monopoly access to the information in the book. Keeping the book and assuring that the trades ordered in it are executed first is a function that need not be combined with a license to trade for one's own account. Indeed, computers could easily execute limit orders automatically. Moreover, there is no apparent reason why the limit order book must be kept secret. To the contrary, there is every reason to think that information about orders "away from the market" would be very useful to traders generally and would tend to make the markets more efficient. On the other hand, there may be reasons why traders prefer to keep their plans secret. If so, it is unclear why such considerations do not also argue for keeping information about short sales secret. Such information, however, must be publicized. It may be that traditional biases against short selling explain the difference. But in the final analysis, whether or not the limit order book is disclosed is a completely independent issue because there is no inherent reason why the book must be kept by the specialist. Indeed pressure has been building to grant other traders access to the book. *Id.*

n155 *See* Ayres, *supra* note 25, at 975-83.

n156 *See* Gerard Gennotte & Hayne Leland, *Market Liquidity, Hedging, and Crashes*, 80 AM. ECON. REV. 999 (1990); Sanford Grossman, *An Analysis of the Implications for Stock and Futures Price Volatility of Program Trading and Dynamic Hedging Strategies*, 61 J. BUS. 275 (1988); Joseph Grundfest, *When*

*Markets Crash: The Consequences of Information Failure in the Market for Liquidity* (unpublished manuscript); C. Jacklin, A. Kleidon & P. Pfleiderer, *Underestimation of Portfolio Insurance and the Crash of 1987* (unpublished manuscript).

n157 *See* Dennis W. Carlton & Daniel R. Fischel, *The Regulation of Insider Trading*, 35 STAN. L. REV. 857 (1983); David D. Haddock & Jonathan Macey, *Regulation on Demand: A Private Interest Model with an Application to Insider Trading Regulation*, 30 J. L. & ECON. 311 (1987); David D. Haddock & Jonathan Macey, *A Coasian Model of Insider Trading*, 80 NW. U. L. REV. 1449 (1986). *See also* HENRY MANNE, INSIDER TRADING AND THE STOCK MARKET (1966); Frank Easterbrook & Daniel Fischel, *Trading on Inside Information*, 36 THE LAW SCHOOL RECORD (UNIV. OF CHICAGO) 10 (1990); Richard Booth, *Insider Trading, Better Markets*, WALL ST. J., June 28, 1991, at A12; *Bunny Capers*, WALL ST. J., Apr. 23, 1990, at A14 (editorial). Excessive regulation of insider trading may actually cause increasing volatility in the stock market. If it is true that the only way one can beat the market is with inside information, then vigorous of insider trading will drive law abiding traders to strict (or stricter) portfolio trading. It is ironic that it is the stock exchange specialists who are up in arms over both practices. *See* Uchitelle, *supra* note 61.

n158 *See* Ayres, *supra* note 25, at 992-95 (discussing specialists as performing palace guard function and noting that without mandatory disclosure specialists would likely capture significant additional returns by virtue of ability to trade for a longer time on news affecting share values).

n159 *See* Haddock, *supra* note 153; Roberta Romano, *The Politics of the Brady Report: A Comment*, 74 CORNELL L. REV. 865 (1989). *See also* Roberta Karmel, *The Rashomon Effect in the After the Crash Studies*, 21 REV. SEC. & COM. REG., No. 12 (1988), at 101.

n160 *See* Greg Jarrell, *Change at the Exchange: The Causes and Effects of Deregulation*, 27 J. L. ECON. 273 (1984); Craig Torres, *Big Brokerage Houses Zero In on Specialist Firms*, WALL ST. J., July 2, 1991, at C1; William Power, *Big Board at Age 200, Scrambles to Protect Grip on Stock Market*, WALL ST. J., May 13, 1992, at A1. *See also* William H. Donaldson and Craig Torres, *Sliding Market: Big Board Facing Serious Erosion as Market for Stocks, Chief Warns*, WALL ST. J., Mar. 13, 1991, at C1; Leslie Wayne, *New Boss, New Directions for a Venerable Institution*, N.Y. TIMES, Dec. 30, 1990, at C5; Craig Torres & William Power, *Big Board Is Losing Some of Its Influence Over Stock Trading*, WALL ST. J., Apr. 17, 1990, at A1. *See also* Robert Steiner & Kevin G. Salwen, *Stock Specialists Often Keep Best Quotes to Themselves*, WALL ST. J., May 8, 1992, at C1.

n161 SEC REPORT, *supra* note 1, at 3-17. *See generally* SEC REPORT, *supra* note 1, at 4-1 - 4-72.

n162 *See supra* note 148; Uchitelle, *supra* note 61. Specialists are likely also deprived of opportunities to profit because program trading makes the market move more quickly to a new equilibrium price. Diversified investors are not likely to care much about capturing marginal gains that might be available from market equilibration, but they may be quite in favor of having the market react quickly because other things equal a faster market assures that the stock prices are always a little more accurate than they otherwise would be.

Tab 13

**Limit Orders**   The individual placing a **limit order** specifies the buy or sell price. You might submit a bid to purchase 100 shares of Coca-Cola stock at $50 a share when the current market is 60 bid–60.25 ask, with the expectation that the stock will decline to $50 in the near future.

You must also indicate how long the limit order will be outstanding. Alternative time specifications are basically boundless. A limit order can be instantaneous ("fill or kill," meaning fill the order instantly or cancel it). It can also be good for part of a day, a full day, several days, a week, or a month. It can also be open-ended, or good until canceled (GTC).

Rather than wait for a given price on a stock, your broker will give the limit order to the specialist, who will put it in a limit-order book and act as the broker's representative. When and if the market reaches the limit-order price, the specialist will execute the order and inform your broker. The specialist receives a small part of the commission for rendering this service.

**Short Sales**   Most investors purchase stock ("go long") expecting to derive their return from an increase in value. If you believe that a stock is overpriced, however, and want to take advantage of an expected decline in the price, you can sell the stock short. A **short sale** is the sale of stock that you do not own with the intent of purchasing it back later at a lower price. Specifically, you would borrow the stock from another investor through your broker, sell it in the market, and subsequently replace it at (you hope) a price lower than the price at which you sold it. The investor who lent the stock has the proceeds of the sale as collateral. In turn, this investor can invest these funds in short-term, risk-free securities. Although a short sale has no time limit, the lender of the shares can decide to sell the shares, in which case your broker must find another investor willing to lend the shares.[20]

Three technical points affect short sales. First, a short sale can be made only on an *uptick trade*, meaning the price of the short sale must be higher than the last trade price. This is because the exchanges do not want traders to force a profit on a short sale by pushing the price down through continually selling short. Therefore, the transaction price for a short sale must be an uptick or, without any change in price, the previous price must have been higher than its previous price (a zero uptick). For an example of a zero uptick, consider the following set of transaction prices: 42, 42.25, 42.25. You could sell short at 42.25 even though it is no change from the previous trade at 42.25 because that prior trade was an uptick trade.

The second technical point concerns dividends. The short seller must pay any dividends due to the investor who lent the stock. The purchaser of the short-sale stock receives the dividend from the corporation, so the short seller must pay a similar dividend to the lender.

Finally, short sellers must post the same margin as an investor who had acquired stock. This margin can be in any unrestricted securities owned by the short seller.

**Special Orders**   In addition to these general orders, there are several special types of orders. A *stop loss order* is a conditional market order whereby the investor directs the sale of a stock if it drops to a given price. Assume you buy a stock at 50 and expect it to go up. If you are wrong, you want to limit your losses. To protect yourself, you could put in a stop loss order at 45. In this case, if the stock dropped to 45, your stop loss order would become a market sell order, and the stock would be sold at the prevailing market price. The stop loss order does not guarantee that you will get the $45; you can get a little bit more or a little bit less. Because of the possibility of

---

[20]For a discussion of negative short-selling results, see William Power, "Short Sellers Set to Catch Tumbling Overhead Stocks," *The Wall Street Journal*, 28 December 1993, C1, C2. For a discussion of short-selling events, see Carol J. Loomis, "Short Sellers and the Seamy Side of Wall Street," *Fortune*, 22 July 1996, pp. 66–72; and Gary Weiss, "The Secret World of Short Sellers," *Business Week*, 5 August 1996, pp. 62–68. For a discussion of short selling during 2000–2001, see Allison Beard, "Short Selling Goes from Strength to Strength," *Financial Times*, 16 March 2001, p. 29.

**EXHIB**

300

250

200

Billion $

150

100

50

0
Ja
92

Source: Goldm