1   MAYER, BROWN, ROWE & MAW LLP
    Donald M. Falk (SBN 150256)
2   Lee H. Rubin (SBN 141331)
    Shirish Gupta (SBN 205584)
3   Two Palo Alto Square, Suite 300
    Palo Alto, California 94306
4   Telephone:    (650) 331-2000
    Facsimile:    (650) 331-2060
5   lrubin@mayerbrownrowe.com

6   MAYER, BROWN, ROWE & MAW LLP
    Alan N. Salpeter (admitted *pro hac vice*)
7   Javier Rubinstein (admitted *pro hac vice*)
    Timothy S. Bishop (admitted *pro hac vice*)
8   Vincent P. Schmeltz III (admitted *pro hac vice*)
    71 South Wacker Drive
9   Chicago, IL  60606-4637
    Telephone:    (312) 782-0600
10  Facsimile:    (312) 701-7711
    jrubinstein@mayerbrownrowe.com
11
    Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
12  J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

13  ORACLE CORPORATION
    Dorian Daley (SBN 129049)
14  James C. Maroulis (SBN 208316)
    500 Oracle Parkway, Mailstop 5OP7
15  Redwood Shores, California 94065
    Telephone:    (650) 506-5200
16  Facsimile:    (650) 506-7114
    jim.maroulis@oracle.com
17
    Attorneys for Defendant ORACLE CORPORATION
18

19              **UNITED STATES DISTRICT COURT**
       **NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**
20

21  | IN RE ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-0988-MJJ (JCS) (Consolidated) |
    |---|---|
    | | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
    | This Document Relates To: | Date:      September 13, 2005 |
    | | Time:      9:30 a.m. |
    | ALL ACTIONS. | Place:     Courtroom 11 |
    | | Honorable Martin J. Jenkins |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

ARGUMENT ...........................................................................................................................6

I.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INVESTOR-,
     TIME- AND TRANSACTION-SPECIFIC INQUIRIES INTO LOSS
     CAUSATION, KNOWLEDGE, AND RELIANCE PREDOMINATE OVER
     COMMON ISSUES .....................................................................................................6

     A.   Plaintiffs Have Not Met Their Burden To Show That Loss Causation Can
          Be Proved On A Manageable Class-Wide Basis .......................................................7

          1.   Plaintiffs' allegations and class certification motion do not even
               purport to satisfy the requirements of *Dura* ....................................................7

          2.   Plaintiffs' failure to identify corrective disclosures that caused
               Oracle's stock price to decline means Plaintiffs cannot satisfy
               *Dura* with class-wide evidence ........................................................................9

          3.   Plaintiffs have not and cannot come forward with any alternative
               methodology to segregate price effects of alleged misstatements
               and other events, as *Dura* and Rule 23 require ...........................................11

     B.   Plaintiffs Have Not Met Their Burden To Show That Each Investor's Lack
          Of Knowledge Of Matters Defendants Allegedly Misstated Can Be Proved
          On A Class-Wide Basis.........................................................................................12

          1.   Many investors knew the relevant facts underlying plaintiffs'
               forecast claim ..................................................................................................13

               a.   Many investors were aware that an economic downturn
                    could affect Oracle's financial results and that this would
                    not be apparent until the very end of 3Q01 .....................................14

               b.   Many investors were aware of Suite 11i product issues .................15

          2.   The Design Claim ..........................................................................................16

     C.   Plaintiffs Have Not Met Their Burden To Show That Each Investor's
          Reliance On Alleged Misstatements And Omissions Can Be Proved On
          A Class-Wide Basis .............................................................................................17

i

1

**TABLE OF CONTENTS-Continued**

2

Page

3

4

      1.     Putative class members who did not rely on the integrity of Oracle's market price must be individually identified and then must individually prove reliance ................................................................ 17

5

6

      2.     The proposed class is full of traders who did not rely on the integrity of the market in Oracle stock, whose reliance may not be presumed but must be proved individually ..................................... 18

7

8

      3.     Proposed class representatives must individually prove reliance .............. 19

9

II.    THE PROPOSED CLASS REPRESENTATIVES ARE ATYPICAL AND INADEQUATE TO REPRESENT ABSENT CLASS MEMBERS ................................. 19

10

11

    A.    1199 SEIU, A Professional Securities Fraud Plaintiff, Would Be Preoccupied With Individual Standing And Knowledge Issues ........................... 20

12

13

    B.    Chu Has A Poor Understanding Of This Suit, Cannot Direct His Lawyers, And Would Be Preoccupied With Individual Knowledge, Reliance, And Standing Issues ................................................................................................. 22

14

15

    C.    Sawyer, Who Is Ignorant About This Case, Would Be Preoccupied With Individual Injury, Causation, and Reliance Issues ................................... 23

16

17

    D.    Kuehmichel Would Be Preoccupied With Individual Injury, Knowledge, And Reliance Issues ................................................................. 23

18

    E.    Drifton Has A Poor Understanding Of This Suit, Is Unwilling To Direct Its Lawyers, And Would Be Preoccupied With Individual Injury, Knowledge, and Reliance Issues ................................................................. 24

19

20

CONCLUSION ................................................................................................................. 25

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page**

*Abrahamson* v. *Fleschner*, 568 F.2d 862 (2d Cir. 1977) ................................................................23

*Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591 (1997).......................................................1, 17, 19

*Baan Co. Sec. Litig., In re*, 271 F. Supp. 2d 3 (D.D.C. 2002) ........................................................22

*Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000) ..........................22

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) ........................................................................17, 19

*Blades* v. *Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) .................................................................2

*Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723 (1975)......................................................8

*Burkhalter Travel Agency* v. *MacFarms Int'l Inc.,* 141 F.R.D. 144 (N.D. Cal. 1991).............19, 20

*Congregation of the Passion* v. *Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir. 1986)................21

*Cox* v. *Bateman Eichler, Hill Richards, Inc.*, 765 F. Supp. 601 (N.D. Cal. 1990) ........................21

*Critical Path, Inc. Sec. Litig., In re*, 156 F. Supp. 2d 1102 (N.D. Cal. 2001) ..............................24

*Daou Sys., Inc. Sec. Litig., In re*, 411 F.3d 1006 (9th Cir. 2005) ...............................................9, 11

*Dukes* v. *Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) ..................................................2

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 125 S. Ct. 1627 (2005) ...........................1, 7, 8, 9, 10

*Frigitemp Corp.* v. *Fin. Dynamics Fund, Inc.*, 524 F.2d 275 (2d Cir. 1975) ...............................13

*Ganesh LLC* v. *Computer Learning Centers, Inc.*, 183 F.R.D. 487 (E.D. Va. 1998)....................18

*Gariety* v. *Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004).......................................................2

*General Tel. Co.* v. *Falcon*, 457 U.S. 147 (1982).........................................................................19

*Georgine* v. *Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996), aff'd, 521 U.S. 591
    (1997)....................................................................................................................19

*Glenn K. Jackson, Inc.* v. *Roe*, 273 F.3d 1192 (9th Cir. 2001) ......................................................13

*Gurary* v. *Winehouse*, 190 F.3d 37 (2d Cir. 1999) .......................................................................12

*Hanon* v. *Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ........................................2, 17, 20, 21

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

**TABLE OF AUTHORITIES-Continued**

Page

*Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403 (N.D. Ill. 1987) ................................................21

*Keirnan* v. *Homeland, Inc.*, 611 F.2d 785 (9th Cir. 1980)..........................................19

*Kline* v. *Wolf*, 702 F.2d 400 (2d Cir. 1983) ...................................................................20

*Lindsey* v. *Normet*, 405 U.S. 56 (1972) .......................................................................17

*Miles* v. *Merrill Lynch & Co.*, No. 04-8026 (2d Cir. June 30, 2005) ..............................2

*Moeller* v. *Taco Bell Corp.*, 220 F.R.D. 604 (N.D. Cal. 2004)........................................22

*Moore* v. *PaineWebber*, 306 F.3d 1247 (2d Cir. 2002) ...................................................6

*Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig., In re*, 693 F.2d 847
    (9th Cir. 1982)....................................................................................................1

*Newton* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)...............1, 7

*O'Brien* v. *Continental Ill. Nat'l Bank & Trust Co.*, 593 F.2d 54 (7th Cir. 1979) ........................21

*Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815 (1999) .............................................................18

*Rochelle* v. *Marine Midland Grace Trust Co.*, 535 F.2d 523 (9th Cir. 1976) ..............................23

*Seagate Tech. II Sec. Litig., In re*, 843 F. Supp. 1341 (N.D. Cal. 1994) ........................................20

*Shields* v. *Smith*, 1991 WL 319032 (N.D. Cal. Nov. 4, 1991)........................................21

*Soliman* v. *Philip Morris Inc.*, 311 F.3d 966 (9th Cir. 2002) .........................................13

*Tardiff* v. *Knox County*, 365 F.3d 1 (1st Cir. 2004).........................................................2

*Unger* v. *Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ...................................................2

*Verisign, Inc. Sec. Litig., In re*, 2005 WL 88969 (N.D. Cal. Jan. 13, 2005)..................................21

*Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991) ........................................8

*Visa Check/MasterMoney Antitrust Litig., In re*, 280 F.3d 124 (2d Cir. 2001) ............................18

*Welling* v. *Alexy*, 155 F.R.D. 654 (N.D. Cal. 1994)........................................................21

*West* v. *Prudential Sec., Inc.*, 282 F.3d 935 (7th Cir. 2002) ...........................................1

*Zimmerman* v. *Bell*, 800 F.2d 386 (4th Cir. 1986)................................................1, 13

iv

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

**TABLE OF AUTHORITIES-Continued**

**Page**

*Zinser* v. *Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) .............................................1

*Zlotnick* v. *TIE Communications*, 836 F.2d 818 (3d Cir. 1988) .....................................................18

**Statute and Rule:**

15 U.S.C. § 78j(b) ..............................................................................................................21

Fed. R. Civ. P. 23 .................................................................................................................2

**Miscellaneous:**

Don DeVitto, Irrational Markets (2001) .............................................................................18

Allison Gordon, *The "Day Trading" Phenomenon*, 30 Sw. U.L. Rev. 353 (2001) ......................18

5 Moore's Federal Practice § 23.45[5][a] (3d ed. 2005) ....................................................3

Report of the Judicial Conf., Comm. on Rules of Prac. & Proc. (Sept. 2002)................................1

SEC, *Day Trading: Your Dollars at Risk*, www.sec.gov/investor/pubs/daytips.htm ....................18

v

INTRODUCTION

Plaintiffs' perfunctory motion and refusal to take the opportunity afforded by this Court to address the standards laid down in *Dura Pharm., Inc.* v. *Broudo*, 125 S. Ct. 1627 (2005), show that they regard class certification as a rubber stamp. It is not. Only "certain" securities fraud actions lend themselves to class adjudication. *Amchem Prods.* v. *Windsor*, 521 U.S. 591, 625 (1997). In others, including this one, certification is inappropriate because individual issues of injury, causation, knowledge, or reliance predominate over questions common to the class. *E.g.*, *West* v. *Prudential Sec.*, 282 F.3d 935, 938 (7th Cir. 2002) ("Causation is the shortcoming in this class certification"); *Newton* v. *Merrill Lynch*, 259 F.3d 154, 179 (3d Cir. 2001) (certification denied where claims "require individual treatment to determine actual injury"); *Zimmerman* v. *Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("knowledge" of true facts "var[ied] from shareholder to shareholder," precluding certification). Plaintiffs—who "bear the burden" to demonstrate that Rule 23 is satisfied—have not even attempted to show how liability could be established here on a class-wide basis. *Dalkon Shield Prods. Liab. Litig.*, 693 F.2d 847, 854 (9th Cir. 1982).

The standards applied at the class certification stage are searching. "[T]he trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser* v. *Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001). A "critical" issue is whether "the issues likely to be presented at trial * * * are susceptible of class-wide proof" or instead will require individualized proof at odds with class adjudication. Rule 23, 2003 Advisory Comm. Notes; see Report of the Judicial Conf., Comm. on Rules of Prac. & Proc. 8, 10 (Sept. 2002) ("issues bearing on certification" include "whether the evidence on the merits is common to the members of the proposed class [and] whether the issues are susceptible to class-wide proof"). Plaintiffs' cursory arguments ignore the important changes to Rule 23 that took effect in 2003 and the case law that has developed since.

Contrary to Plaintiffs, "any doubt as to the propriety of certification" results in <u>denial</u> of certification, not in resolving doubt "in favor of certifying the class." Pl. Mem. 5. By eliminating the provision for "conditional certification," the 2003 amendments to Rule 23 command that when a court "is not satisfied that the requirements of Rule 23 have been met" it "should refuse

certification until they have been met." 2003 Adv. Comm. Notes. As this Court has recognized, "[c]onditional certification is no longer proper" and "[i]f a court is not fully satisfied, certification should be refused." *Dukes* v. *Wal-Mart Stores*, 222 F.R.D. 137, 143 (N.D. Cal. 2004).

Also contrary to Plaintiffs (Pl. Mem. 2 n.3), this Court's inquiry is not limited to the pleadings but includes review of "merits" issues necessary to judge whether Rule 23 is satisfied. See 2003 Adv. Comm. Notes, *supra* (distinguishing "evaluation of the probable outcome on the merits," which is impermissible, from inquiry "into the merits, limited to those aspects relevant to making the certification decision," which is essential); *Hanon* v. *Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (court may "'consider evidence which goes to the requirements of Rule 23'" though it "'relate[s] to the underlying merits'"); *Dukes*, 222 F.R.D. at 144.

The effect of the 2003 amendments to Rule 23, coupled with the Rule 23(f) interlocutory appeal provision added in 1998, is to require more definitive and fully-considered class certification rulings, including making any factual findings necessary to the ruling. Though the Ninth Circuit has not had occasion to address the effect of the 2003 Rule 23 amendments, other courts have consistently recognized that greater rigor and deeper inquiry is now required in evaluating plaintiffs' claims to have met Rule 23's requirements. *E.g.*, *Unger* v. *Amedisys Inc.*, 401 F.3d 316, 319, 321 (5th Cir. 2005) ("a careful certification inquiry is required and findings must be made based on adequate admissible evidence to justify class certification"; certification reversed where district court "applied too lax a standard of proof"); *Blades* v. *Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005) ("in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case," including "expert disputes concerning the import of evidence"); *Gariety* v. *Grant Thornton*, 368 F.3d 356, 365-66 (4th Cir. 2004); *Tardiff* v. *Knox County*, 365 F.3d 1, 4-5 (1st Cir. 2004); *Miles* v. *Merrill Lynch*, 04-8026 (2d Cir. June 30, 2005) (granting Rule 23(f) petition to consider whether district court's use of weak standard to evaluate class certification "is consistent with the 2003 amendments to Fed. R. Civ. P. 23").[1] Ignoring this

---

[1]  Unpublished opinions and orders are attached as exhibits to the accompanying Declaration of Vincent P. Schmeltz III, as are discovery materials and certain other factual sources cited in this brief. For the sake of brevity we cite Schmeltz Declaration Exhibits "SD Ex. __."

2

recent change in the legal landscape, Plaintiffs cite only cases that predate the 2003 rule changes in urging a lax standard for certifying securities class actions. Pl. Mem. 5-6 & n.5.

With these searching standards in mind, we demonstrate below that Plaintiffs fail to satisfy three mandatory requirements of Rule 23—that common questions predominate over individualized issues and that the proposed class representatives are adequate and typical representatives of absent class members. We show in Part I that given the allegations, issues, and evidence in this case, particularized questions of loss causation, knowledge, and reliance would predominate at trial and make class adjudication hopelessly unmanageable. Specifically, Plaintiffs do not show how they would satisfy on a class-wide basis the new requirements for proof of loss causation laid down by the Supreme Court in *Dura*. Plaintiffs' failure to identify "corrective disclosures" of alleged misstatements or any methodology to segregate their supposed price effects from the price effects of other factors clearly distinguish this case from other Section 10(b) cases in which class certification has been granted. In addition, the unique nature of Plaintiffs' claims and the publicity afforded the facts underlying those claims would make it necessary to conduct an individual inquiry at trial into each claimant's knowledge of matters allegedly misstated. And because numerous plaintiffs—including, extraordinarily, most of the proposed class representatives—engaged in trading that did not rely on the integrity of Oracle's market price, adjudicating reliance would require individualized inquiry into trading strategies.

We further demonstrate in Part II that each of the five proposed class representatives is unfit to exercise fiduciary responsibility for absent class members. They are variously disqualified by dishonesty, a long-running role as "professional plaintiffs" for the Lerach law firm, lack of interest in or basic knowledge about this suit, incapacity or unwillingness to direct their counsel, and the need to litigate individualized defenses such as lack of standing, injury, or reliance.

### STATEMENT OF FACTS

Plaintiffs seek certification of a class of every purchaser of publicly traded Oracle securities during the 2½ months from December 14, 2000 through March 1, 2001. Pl. Mem. 1. Plaintiffs allege—and defendants vigorously deny—that Oracle on December 14, 2000 reported financial results for the second quarter of fiscal 2001 ("2Q01") that were inflated by improperly

3

1  recognized revenue from past customer credits and overpayments (RSAC ¶¶ 35-43) ("Accounting

2  Claim"); that Oracle executives made misstatements during the putative class period concerning

3  the amount of Oracle's expected third quarter 2001 ("3Q01") earnings, because their earnings

4  prediction did not reflect the slowing economy and alleged technical problems with Oracle's

5  Suite 11i software (*id.* ¶¶ 45-75) ("Forecast Claim"); and that Oracle executives made false

6  statements about the integrated and interoperable design of the Suite 11i software. *Id.* ¶¶ 14-15,

7  50-59, 63-72 ("Design Claim"); see Feb. 4, 2005 Letter from S. Williams to Court, at 2.

8       Plaintiffs assert that Oracle's March 1, 2001 announcement of lower-than-expected 3Q01

9  earnings disclosed the alleged fraud, causing a one-day decline in the price of Oracle stock, and

10 "inflicting billions of dollars of damage on plaintiffs and the Class." RSAC ¶ 75 & Ex. 4.

11 Oracle's announcement, however, said nothing at all about either its 2Q01 accounting or the

12 integration and interoperability of Suite 11i. RSAC Ex. 4. In fact, Oracle has never restated its

13 2Q01 financial results or conceded in any way that Suite 11i was not integrated and interoperable.

14      As to 3Q01 earnings, Oracle's March 1, 2001 announcement stated that its "internal sales

15 forecast looked good up until the last few days of the quarter," when "a substantial number of our

16 customers decided to delay their IT spending based on the economic slowdown in the U.S."

17 RSAC Ex. 4. That Oracle's financial results remained in doubt until the very end of each quarter

18 was no surprise to investors. Oracle disclosed this "hockey stick effect"—caused by the

19 propensity of Oracle's customers to wait until the very end of a quarter to place their orders to

20 garner price concessions—in SEC filings, and it was documented by analysts and the media. See,

21 *e.g.*, SD Ex. 14 at 15 (1/16/01 10-Q) (Oracle's revenues "are relatively difficult to forecast * * *

22 due to various factors, including the * * * size and timing of individual license transactions, the

23 closing of which tend to be delayed by customers until the end of a fiscal quarter as a negotiating

24 tactic. * * * Accordingly, the Company's quarterly results are difficult to predict until the end of

25 the quarter, and delays in product delivery or closing of sales near the end of a quarter have

26 historically caused and could cause quarterly revenues and net income to fall significantly short

27 of anticipated levels"); SD Ex. 5 (11/6/00 news report) (Oracle "has a history of erratic results

28 and back-end loaded quarters"); SD Ex. 17 (2/8/01 analyst report) (the "full impact of the current

4

macro environment may not be evident until the end of the quarter, as revenue is typically back-end loaded for Oracle"). Oracle's SEC filings disclosed too that "a weakening of the economy may result in decreased revenues or lower revenue growth rates." SD Ex. 14 at 15 (1/16/01 10-Q).

Plaintiffs seek appointment of five class representatives: 1199 SEIU Greater New York Pension Fund ("1199 SEIU" or "Fund"), Drifton Finance Corporation ("Drifton"), Robert Sawyer, Ryan Kuehmichel, and Dzung Chu. Discovery has shown that each of them is subject to particularized defenses that would become the focus of trial, making them atypical of the class, and has also revealed characteristics or conduct that make them inadequate class representatives.

1199 SEIU, Drifton, and Sawyer all submitted false PSLRA certifications under oath, omitting or misstating relevant trades and, in SEIU's case, its past efforts to be named a representative party in litigation. SD Ex. 26 at 300-01 (Fuhrer Dep.); SD Ex. 32 at 148-51 (Sawyer Dep.); SD Ex. 31 at 63-67, 178-81, 184 (Chobor Dep.). 1199 SEIU, a labor union pension fund, is a professional securities fraud plaintiff that has brought 17 such suits in recent years, represented in "all of them" by Lerach Coughlin or its predecessor firm Milberg Weiss. SD Ex. 31 at 34-35, 49-54 (Chobor Dep.). SEIU's representative could describe no due diligence that 1199 SEIU engaged in before bringing this suit, and did not know if this action was the Fund's or the Lerach firm's idea. *Id.* at 73-74.

Chu, Drifton, and Sawyer are unaware of or misunderstand basic allegations of their complaint. SD Ex. 29 at 31-32, 52-53, 80-82, 65-66, 193-94 (Chu Dep.); SD Ex. 26 at 174-77, 179, 292-94 (Fuhrer Dep.); SD Ex. 32 at 53-55, 62-63, 219-21, 225-30 (Sawyer Dep.). Chu and Drifton—hampered in addition by poor English and confessed lack of interest—cannot plausibly manage and control their attorneys' conduct of the litigation. SD Ex. 29 at 49-52 (Chu Dep.); SD Ex. 26 at 40-41, 152-54, 175-76, 292-94 (Fuhrer Dep.). The less Drifton's principal knows about the suit, he admitted, "the better." SD Ex. 26 at 293 (Fuhrer Dep.). Furthermore, 1199 SEIU delegated investment responsibility to outside investment managers, raising doubt that it has standing to bring this suit. SD Ex. 31 at 168 (Chobor Dep); SD Ex. 30 at 43-48 (Turner Dep.); SD Ex. 27 at 45-46 (O'Keefe Dep.). Chu is subject to individual standing questions too because his

5

1    wife, who is not a proposed representative, traded Oracle shares in his account. SD Ex. 29 at 128-

2    30, 132, 135-37, 142-44, 155-57, 175, 196-97 (Chu Dep.).

3           The proposed class representatives have other serious deficiencies. Sawyer, Kuehmichel,

4    and Drifton may have suffered no injury from their class period trading. Their complex trading

5    strategies will require individualized attention to that issue at trial. Boedeker Decl. ¶ 23, 28-34.

6    1199 SEIU, Kuehmichel, and Drifton will be subject to individualized inquiry about their

7    knowledge of the matters Oracle allegedly misstated, because of their admitted exposure to

8    numerous sources of relevant information. SD Ex. 30 at 77-89, 118, 121-23 (Turner Dep.); SD

9    Ex. 28 at 35-38, 133-34 (Kuehmichel Dep.); SD Ex. 26 at 68-70, 114-19 (Fuhrer Dep.). Most of

10   the proposed class representatives engaged in atypical trading strategies that did not rely on the

11   integrity of Oracle's market price or the absence of fraud—such as short trading, day trading, and

12   swing trading. Boedeker Decl. ¶¶ 17-34. As a result, their individual reliance on the alleged fraud

13   would be an issue at trial. In short, not one of the five proposed class representatives is qualified

14   for appointment to that fiduciary role.

## ARGUMENT

16   **I.     CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INVESTOR-, TIME-**
17   **AND TRANSACTION-SPECIFIC INQUIRIES INTO LOSS CAUSATION, KNOWLEDGE, AND RELIANCE PREDOMINATE OVER COMMON ISSUES.**

18           Plaintiffs' perfunctory assertion that common issues predominate rests on the proposition

19   that alleging a "common course of conduct" suffices to show that "the issues of law and fact

20   which flow from that wrongful activity" predominate. Pl. Mem. 13-15. Alleging a "common

21   course of conduct," however, does not satisfy Rule 23(b)(3). A "common course of conduct is not

22   enough to show predominance, because a common course of conduct is not sufficient to establish

23   liability of the defendant to any particular plaintiff." *Moore* v. *PaineWebber*, 306 F.3d 1247, 1255

24   (2d Cir. 2002). Plaintiffs rotely assert (Pl. Mem. 13-14) that a common course of conduct to

25   inflate the price of Oracle stock "affect[s] all members of the class in the same manner" and is

26   sufficient to establish "liability." But Plaintiffs have not supported that bare assertion with

27   concrete allegations, explanation, or evidence, and accordingly have not met their burden to show

28

6

that Section 10(b) liability can be established class-wide. To the contrary, we demonstrate below, investor-, time-, and transaction-specific inquiries into loss causation, knowledge, and reliance are necessary to determine liability to each putative class member.

### A.    Plaintiffs Have Not Met Their Burden To Show That Loss Causation Can Be Proved On A Manageable Class-Wide Basis.

Plaintiffs' motion for class certification rests on a view of loss causation that has since been rejected by the Supreme Court in *Dura*. That decision held that Section 10(b) plaintiffs must segregate stock price effects caused by alleged fraud from those caused by other factors, in order to show that it was fraud and not other events that caused their losses. 125 S. Ct. at 1631-32. Plaintiffs have not even tried to—and cannot—satisfy *Dura*'s requirements on a class-wide basis.

What distinguishes this case from Section 10(b) suits in which loss causation may be addressed class-wide is that Plaintiffs allege no "corrective disclosure" at all as to their Accounting and Design Claims, and fail to show how they intend to prove, on a manageable class basis, that the corrective disclosure they do allege with regard to the Forecast Claim caused them injury. Furthermore, as economist Stefan Boedeker explains in the accompanying declaration, Plaintiffs proffer no alternative methodology by which injury could be traced class-wide to Oracle's alleged misstatements, and it is unlikely that such a methodology exists. With no class-wide methodology to prove loss causation, that issue would require individual mini-trials incompatible with class adjudication. See *Newton*, 259 F.3d at 187-88 (denying certification of Section 10(b) class where determining loss causation "would require proof of the circumstances surrounding each trade"); *West*, 282 F.3d at 938-40 (decertifying securities fraud class where plaintiffs' expert failed to "exclude other potential sources of price movement" than the alleged fraud).

**1. Plaintiffs' allegations and class certification motion do not even purport to satisfy the requirements of *Dura*.** Prior to the Supreme Court's decision in *Dura*, the Ninth Circuit took an "'inflated purchase price' approach to proving causation and loss" (125 S. Ct. at 1632), according to which it was enough for an investor to show that a stock price was inflated by fraud at the time he bought the stock. *Dura* held this approach was "wrong, both in respect to what a plaintiff must prove" and what it "must allege." *Id.* at 1629. After *Dura*, to establish liability each

7

1    Section 10(b) claimant must show <u>in addition</u> to artificial inflation at the time of his purchase that

2    he suffered "economic loss" caused by the alleged fraud. *Id.* at 1631-32. Thus, if the price of the

3    stock declines (as Oracle's price generally declined during the latter half of the period in issue), a

4    plaintiff must prove that the "lower price" reflects "the earlier misrepresentation" and not

5    "changed economic circumstances, changed investor expectations, new industry-specific or firm-

6    specific facts, conditions, or other events, which taken separately or together account for some or

7    all of that lower price." *Id.* at 1632. The longer the period at issue—here, not days or weeks but

8    allegedly up to 2½ months—"the more likely that other factors caused the loss." *Ibid.* The proof

9    *Dura* requires may not be "conjectural" or "speculative," to avoid "throw[ing] open to the trier of

10   fact * * * hazy issues" of causation. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 734-

11   35, 742-46 (1975); *Virginia Bankshares* v. *Sandberg*, 501 U.S. 1083, 1105-06 (1991).

12        As Defendants described in their Motion to Strike Plaintiffs' Motion for Class Certifi-

13   cation, Plaintiffs' complaint and class certification motion—filed before the Supreme Court

14   decided *Dura*—rest solely on the Ninth Circuit's incorrect view of loss causation. See RSAC ¶ 84

15   (common question is whether defendants "artificially inflated the prices of Oracle's publicly

16   traded securities and the extent of and appropriate measure of damages"); Pl. Mem. 10 (there is "a

17   common nucleus of operative facts pertaining to defendants' scheme to artificially inflate and

18   maintain the price of Oracle securities"). When this Court gave Plaintiffs the opportunity to

19   redress this fatal defect, they filed nothing. Plaintiffs chose to rest instead on the contention that

20   *Dura* addresses only pleading standards (Pls. Resp. to Mot. to Strike 3-6)—a position

21   contradicted by the Supreme Court when it described its "holding" that Section 10(b) plaintiffs

22   must "prove" loss causation by segregating factors that impact stock price. 125 S. Ct. at 1634.

23        In consequence, Plaintiffs have done <u>nothing</u> to explain how at trial they could satisfy—

24   on a class-wide basis or otherwise—*Dura*'s requirement that they "*prove* proximate causation and

25   economic loss" attributable to a Defendants' alleged misstatements by segregating "the tangle of

26   factors affecting price." *Dura*, 125 S. Ct. at 1632, 1634 (emphasis original). As economist Stefan

27   Boedeker explains, "Plaintiffs have offered no methodology for identifying, segregating, and

28   measuring the claimed price effects" of the alleged misstatements "and there is no reason to

8

1   assume they will be able to do so." Boedeker Decl. ¶ 41. Plaintiffs' <u>total failure</u> to address how

2   they could prove loss causation at trial on a basis common to each class member, and in

3   compliance with *Dura*'s requirements, demands denial of class certification on that basis alone.

4       **2.   Plaintiffs' failure to identify corrective disclosures that caused Oracle's stock**

5   **price to decline means Plaintiffs cannot satisfy *Dura* with class-wide evidence.** In many

6   Section 10(b) suits in which a class is certified the requirements of *Dura* can be satisfied because

7   a "corrective disclosure" reveals a fraud, a decline in stock price follows, no other events explain

8   that drop, and plaintiffs' claim of injury is limited to the amount of that price decline. See 125 S.

9   Ct. at 1631-32 (loss causation may be shown where "the relevant truth ma[de] its way into the

10  market place," causing "economic loss" readily traced to fraud). This case is totally different.

11      ● Plaintiffs' Accounting Claim alleges that Oracle reported false 2Q01 financial results

12  by improperly recognizing revenue from customer credits and overpayments. But Plaintiffs

13  identify <u>no</u> occasion when the supposed "truth" about these revenues "ma[de] its way into the

14  market place," causing Oracle's stock price to decline. *Dura*, 125 S. Ct. at 1631-32. To the

15  contrary, Oracle has never restated 2Q01 earnings and vigorously disputes that its 2Q01 revenues

16  were inflated by improper revenue recognition. As the Ninth Circuit has recognized, after *Dura*,

17  price declines occurring before "the true nature of [defendant's] financial condition" was

18  disclosed "cannot be considered causally related to [defendant's] allegedly fraudulent accounting

19  methods." *In re Daou Sys. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005). In the absence of <u>any</u>

20  evidence that the alleged falsity of Oracle's 2Q01 financial results was disclosed to the market

21  and caused a stock price drop, loss causation cannot be proved on a class basis or otherwise. And

22  if Plaintiffs believe the "truth" did reach the market, they were obliged to so demonstrate in their

23  class certification motion, and to describe the method by which they intend to show, class-wide,

24  that this information and not other market factors caused a price decline in Oracle's stock (and

25  when). *Dura*, 125 S. Ct. at 1632. Plaintiffs made no effort to meet that requirement.

26      ● Plaintiffs' Design Claim asserts that Oracle misrepresented that the separate software

27  applications comprising Suite 11i were designed to be integrated and interoperable and, as a

28  result, did not require the costly and time-consuming system integration effort that generally is

9

1  necessary to install software purchased from different vendors that does not share a common

2  design. RSAC ¶¶ 50-51, 58, 63. Under Rule 23 and *Dura*, Plaintiffs must show not only that these

3  alleged misstatements caused stock price inflation—which they have failed to do—but also that

4  revelation(s) to the market that these statements were false caused a decline in price. *Dura*, 125 S.

5  Ct. at 1631-32. Oracle, however, has always denied that its statements during the proposed class

6  period that Suite 11i was integrated and interoperable were false, and hence has made no

7  "corrective statement"; and Plaintiffs point to no other "revelation" to the market that the

8  statements in question were false. As with their Accounting Claim, if Plaintiffs believe the "truth"

9  reached the market, they should have demonstrated when and how and proffered a method to

10  show class-wide that this truthful information and not other events caused Oracle's stock price to

11  decline. *Dura*, 125 S. Ct at 1632. As with their Accounting Claim, Plaintiffs have not done so.

12        ● Plaintiffs' Forecast Claim alleges that Oracle misstated expected 3Q01 earnings and the

13  effect on those earnings of Suite 11i performance issues and a slowing economy. Plaintiffs assert

14  that Oracle's March 1, 2001 earnings warning was a corrective disclosure, causing a one-day

15  price decline of a few dollars. RSAC ¶ 75; Pl. Mem. 5; Pls. Resp. to Mot. to Strike 5. Yet

16  nowhere do Plaintiffs attempt to show that this price decline was due to Oracle's earnings report

17  rather than changed "economic circumstances" or "investor expectations, new industry-specific or

18  firm-specific facts," or "other events" unrelated to the alleged fraud. Nor, if they believe the

19  decline was due to the earnings announcement, do Plaintiffs explain whether alleged prior

20  inflation in the stock price was constant throughout the putative class period or instead varied,

21  which would require minute-by-minute analysis. *Dura*, 125 S. Ct. at 1632. Thus, even with

22  respect to this claim, Plaintiffs offer no method by which to show that a corrective disclosure

23  actually caused class-wide injury.[2]

---

24  [2]   Though they have now abandoned this position, Plaintiffs alleged in their complaint that
Defendants' conduct caused Oracle's price to decline far more than the few dollars drop that

25  followed Oracle's March 1 statement on 3Q01 earnings. Plaintiffs attributed to Defendants'
alleged misstatements a decline of more than $17 in Oracle's stock price "from its Class Period

26  high of $34.56 per share on January 19, 2001" to $16.88 on March 2, 2001. RSAC ¶¶ 19, 75.
Plaintiffs have identified <u>no</u> corrective disclosures beginning January 19 to explain that prolonged

27  price decline. Pointing to a supposed corrective disclosure on March 1, 2001 obviously does

28

(cont'd)

**3. Plaintiffs have not and cannot come forward with any alternative methodology to segregate price effects of alleged misstatements and other events, as *Dura* and Rule 23 require.** Absent corrective disclosures causing price declines directly attributable to alleged misstatements—of the sort alleged in most Section 10(b) actions—Plaintiffs have to demonstrate that some other methodology can be used to segregate, class-wide, any stock price impact of Defendants' alleged fraud. Plaintiffs have identified no such methodology, and Stefan Boedeker explains there is no reason to assume that one exists. A few examples of factors that would confound any effort to trace the effects of the alleged fraud across the entire proposed class period illustrate the gaping hole in Plaintiffs' theory that issues of loss causation would be common:

● From December 14, 2000 through March 1, 2001 Oracle's stock performance matched that of the broader market, falling 26.9% while the NASDAQ-100 Index fell 28.3%. Within the proposed class period Oracle's stock generally followed the NASDAQ-100. Between the December 19 and January 19 market closes, Oracle's price rose 12.9% to its peak, while the NASDAQ-100 rose 10.7%. The NASDAQ-100 peaked on January 24. From then through March 1 Oracle's stock dropped 28.9% while the NASDAQ-100 fell 27.8%. Boedeker Decl. ¶¶ 6-10. Oracle's stock price movement throughout the putative class period is thus largely accounted for by broader market movements, not any alleged misstatements.

● Plaintiffs allege that on February 8, 2001, analysts publicized misstatements made by Oracle regarding its financial projections for 3Q01 and the effect of the economic downturn on Oracle's results. But on that day when inflationary misstatements supposedly reached the market, Oracle's stock price <u>fell</u> $0.57 (2.0%) and remained basically unchanged relative to the NASDAQ-100, which fell 2.2%. Boedeker Decl. ¶ 12.

---

(… cont'd)

nothing to prove loss causation as to price declines that occurred weeks and months earlier. See *Daou Sys.*, 411 F.3d at 1027 (prior to revelation of the truth, "any loss suffered" is not "causally related" to alleged fraud). Nor have Plaintiffs offered any clue how they could prove on a class-wide basis that the entire class-period price decline, or any part of it, was caused by Defendants' alleged fraud rather than other factors. With no evidence whatever that Plaintiffs can prove loss causation class-wide as to the entire class-period price decline, Plaintiffs should not be permitted to seek relief for that price decline in a class action format.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

● Plaintiffs allege that on February 9, 2001, Oracle misstated its prospects for earnings growth, Suite 11i sales expectations, and the effect of the economic slowdown. That same day an analyst report reiterated a "strong buy" recommendation on Oracle, but opined that the demise of Oracle dot-com customers would limit earnings growth. Oracle's stock fell $3.56 (13.1%) from the previous day's close. Boedeker Decl. ¶ 13.

● On January 3, 2001, Oracle's stock rose $5.63 (21.3%). Plaintiffs allege no misleading statement that day, which also saw a Federal Reserve interest rate cut. Boedeker Decl. ¶ 14.

● On February 2, 2001, Oracle's stock fell $2.31 (7.7%), but Plaintiffs claim no revelation of the alleged fraud that day. Boedeker Decl. ¶ 15.

These examples—which could be multiplied throughout the proposed class period—show that identifying and segregating any price effect of the alleged fraud, as *Dura* requires, would be a substantial (and uncertain) time- and transaction-specific task. Plaintiffs have proffered no evidence to show how they could obviate the need for mini-trials on the issue of loss causation by using some class-wide methodology to "disentangl[e] confounding information and contro[l] for movements in the broader market and numerous industry- and company-specific events unrelated to the fraud." Boedeker Decl. ¶ 16. And given the obstacles to segregating the price effects of confounding factors over a lengthy period, there is "no reason to assume that Plaintiffs will develop a methodology capable of doing so." *Ibid.*

Plaintiffs' failure to present <u>any</u> evidence to show that, in light of the specific claims and allegations they have made, they could prove loss causation on a class-wide basis in the manner required by *Dura* and Rule 23 requires denial of their motion for class certification.

**B.     Plaintiffs Have Not Met Their Burden To Show That Each Investor's Lack Of Knowledge Of Matters Defendants Allegedly Misstated Can Be Proved On A Class-Wide Basis.**

To recover under Section 10(b), each claimant must prove that he traded in securities without knowledge of alleged omissions and in ignorance that alleged misrepresentations were false, *i.e.*, prove he was unaware of the "truth" that was allegedly misstated. See *Gurary* v. *Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) (a Section 10(b) plaintiff must show that "she engaged

12

in a securities trade in ignorance of the fact that the price was affected by" alleged fraud); *Zimmerman*, 800 F.2d at 390 ("individual class members must demonstrate that the [truthful] information was not otherwise available to them"). A plaintiff alleging fraud "cannot say that he has been deceived" where he has "ready access to the information involved." *Frigitemp Corp.* v. *Fin. Dynamics Fund*, 524 F.2d 275, 282 (2d Cir. 1975). This basic principle of fraud law has consistently been recognized by the Ninth Circuit. *E.g.*, *Soliman* v. *Philip Morris*, 311 F.3d 966, 975-76 (9th Cir. 2002); *Glenn K. Jackson, Inc.* v. *Roe*, 273 F.3d 1192, 1201 n.2 (9th Cir. 2001).

In most securities fraud cases proof of lack of knowledge of the alleged fraud poses no barrier to class certification: the facts allegedly misstated or withheld are known only by the defendant and are not available to investors until defendants make a corrective disclosure or another revelation of the fraud occurs. This case is very different because, as we show below, the facts underlying Plaintiffs' claims of fraud were widely publicized and available to investors. Assessing which investors knew those facts and so have no claim is an individualized task that would require countless mini-trials. In those circumstances, questions about each claimants' knowledge predominate and class certification is inappropriate. See 5 Moore's Federal Practice § 23.45[5][a], at 23-218 (3d ed. 2005) (predominance requirement not satisfied where "class members may have had varied sources and amounts of information apart from the nondisclosures of the defendants"); *Zimmerman*, 800 F.2d at 390 (denying class certification where "the extent of knowledge of the omitted facts * * * will vary from shareholder to shareholder").[3]

**1. Many investors knew the relevant facts underlying plaintiffs' forecast claim.** Plaintiffs allege Defendants must have known Oracle's earnings forecasts were overstated because they knew about the downturn in the economy, including the collapse of the dot-com industry, and Suite 11i performance issues. But in this case, unlike most securities cases, the information that Plaintiffs claim should have put Defendants on notice that the Company's

---

[3]  The individualized inquiry into whether particular investors have no claim because they knew the relevant facts is separate from the common inquiry into whether the "market" knew of those matters, *i.e.*, the "truth on the market" defense, which is not at issue at this class certification stage of the litigation.

earnings forecasts were unreasonable was widely disseminated to the public. Unless Plaintiffs concede that Oracle's market price fully reflected the truth about Oracle's financial condition and business prospects (which Oracle expects to prove at the appropriate time), it will be necessary to determine which investors in the putative class had knowledge of the facts upon which Plaintiffs base their claims, independently assessed Oracle's forecast, and reached their own conclusions.

*a. Many investors were aware that an economic downturn could affect Oracle's financial results and that this would not be apparent until the very end of 3Q01.* The media, investment analysts, and Oracle all acknowledged the risk to Oracle's earnings from the post-"Bubble" economic downturn. For example:

● During the relevant time period, Oracle consistently warned that "[a] softening of demand for computer software caused by a weakening of the economy may result in decreased revenues or lower revenue growth rates." SD Ex. 14 at 15 (1/16/01 10-Q); SD Ex. 1 at 12 (10/16/00 10-Q).

● By December 2000, many analysts noted the challenges the economy posed to Oracle. *E.g.*, SD Ex. 7 (12/12/00 analyst report) ("Oracle could face challenges in both the database and applications markets that may not affect this quarter's results, but could have longer-term impact"), SD Ex. 8 (12/15/00 analyst report) ("Whether Oracle can stay unscathed in slowing macro environment is the open question"); see also, *e.g.*, SD Exs. 6, 9, 10.

● Oracle consistently warned that for 3Q01 "the economy is a wild card," and that the company "could be impacted"  by "a sharp downturn." *E.g.*, SD Ex. 13. Media outlets reported these and similar concerns. See, *e.g.*, SD Exs. 11, 12.

● A February 2001 report by Morgan Stanley "questioned how long Oracle could sustain its database momentum" when "30 of Oracle's sizeable dot-com database customers have gone out of business." SD Ex. 18. Defendant Ellison stated that "a stock market-led drop in consumer confidence could hurt software sales." SD Ex. 20. During the proposed class period, doubts about Oracle's performance were widely disseminated in analyst and news reports. *E.g.*, SD Exs. 16, 19, 21, 23.

14

● The "hockey stick effect"—the back-end loading of Oracle's quarterly earnings because customers wait until the very end of a quarter to place their orders in an effort to squeeze price concessions from Oracle—as well as the difficulty that this phenomenon created in trying to estimate Oracle's earnings, was public information. Oracle explicitly disclosed it in SEC filings, and it was widely reported in the press and by analysts. See *supra*, pp. 4-5; SD Exs. 5, 14, 17.

Any investor who reviewed these reports or news articles—or countless others to the same effect—could not claim ignorance of the risks to Oracle from the economy, the risk that Oracle could miss its earnings prediction, and the uncertain situation Oracle faced in accurately forecasting its results. The proposed class representatives illustrate the practical difficulty this inquiry would entail at trial. Ryan Keuhmichel testified that he looked at analyst reports pertaining to Oracle, read articles about Oracle, and understood the "hockey stick effect." SD Ex. 28 at 34-36, 133-34. Proposed class representative Dzung Chu admitted that his sources of stock information included analyst reports and the Internet. SD Ex. 29 at 116-18. Robert Turner of Turner Investments, through which 1199 SEIU invested, testified that his firm's personnel would have reviewed analyst reports about Oracle and admitted that he understood the "hockey stick" effect and would be skeptical if a software company like Oracle could accurately predict midway through its quarter that it was on track to make earnings. SD Ex. 30 at 82-87, 121-23. Fact-intensive inquiries necessary to determine what each of these proposed class representatives knew, and when, would be multiplied many times over for each class member, making a class trial unthinkable.

*b. Many investors were aware of Suite 11i product issues.* In October 2000, at an Oracle Applications User Group ("OAUG") conference attended by actual and potential customers, competitors, software specialists, securities analysts, and reporters, several participants complained about the "bugginess" of the early release of Suite 11i software, and Oracle stated that it was working towards fixing these problems. SD Ex. 2. The transcript of the conference was published on the OAUG's web site and its substance was reported in various publications and reflected in analyst reports. *E.g.*, SD Exs. 3, 4. One analyst stated that, in part because of bugs, "most large customers will wait another 2 quarters, or so, before purchasing" Suite 11i, "as

15

1  confirmed by Oracle at its last analyst meeting." SD Ex. 7 (12/12/00 J.P. Morgan). Later during

2  the proposed class period, some attendees at Oracle's February 2001 "AppsWorld Conference"

3  expressed well-publicized concerns about continuing technical glitches with Suite 11i and caution

4  about upgrading to the new software too quickly. SD Ex. 22 (2/26/01 ComputerWorld).

5      Accordingly, many investors were informed that the Suite 11i software had bugs, reached

6  their own assessments of Oracle's financial prospects based upon that knowledge, and acted

7  accordingly. These putative class members—who could be identified only through individual

8  inquiry—would be unable to satisfy the Section 10(b) element of lack of knowledge.

9      **2. The Design Claim.** Plaintiffs' Design Claim asserts that Oracle misrepresented that the

10  separate software applications comprising Suite 11i were designed to be integrated and

11  interoperable and, as a result, did not require the costly and time-consuming system integration

12  necessary to install software purchased from different vendors. RSAC ¶¶ 50-51, 58, 63. The

13  statements at issue concern the basic design of the Oracle software, not whether there would be

14  "bugs" in the millions of lines of computer code that implement this design. Plaintiffs do not and

15  cannot point to <u>any</u> Oracle statement that the software would be "bug" free. Oracle maintains that

16  evidence of software bugs is completely irrelevant in determining the truth of the design-related

17  statements at issue. Magistrate Judge Spero agreed, observing that this should not be a case about

18  whether there were bugs in the software. SD Ex. 40 at 28.

19      If software bugs were relevant to Plaintiffs' Design Claim—which they are not—Oracle

20  would be entitled to inquire at trial of every member of the putative class whether they had

21  knowledge of bugs from publicly available information. As shown above, it was no secret that

22  Suite 11i had bugs, as would be expected of the most comprehensive, complex, and ambitious

23  business software ever developed. Investors would have obtained that information from speaking

24  with their stock brokers, reading the newspapers and general interest magazines, reading articles

25  in software industry publications, reading analyst reports, or even using 11i software at their

26  workplace. Indeed, proposed class representative Chu admitted that one of the companies at

27  which he worked used Suite 11i and that he saw e-mails alerting staff to the difficulties the

28  company was having with the software. SD Ex. 29 at 234. Whether or not the Forecast Claim can

16

be tried on a class basis, the Design Claim clearly cannot if Plaintiffs attempt to rely on evidence of bugs in Suite 11i. Individual inquiry into the knowledge of putative class members concerning bugs in Suite 11i would predominate.

### C. Plaintiffs Have Not Met Their Burden To Show That Each Investor's Reliance On Alleged Misstatements And Omissions Can Be Proved On A Class-Wide Basis.

Plaintiffs contend that proof of "reliance" will be common to the class because, under the fraud-on-the-market theory, reliance on misstatements concerning a security traded on an efficient market may be presumed. Pl. Mem. 14. In *Basic Inc.* v. *Levinson*, however, the Supreme Court held that the presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged" misconduct and a plaintiff's "decision to trade at a fair market price." 485 U.S. 224, 248-49 (1988). Here, the proposed class is full of day and swing traders, short sellers and other gamblers who traded "without relying on the integrity of the market" and who may not presume reliance. *Id.* at 249. Identifying putative class members who are not entitled to the presumption of reliance and so must prove reliance individually itself requires individualized factual inquiry.

**1. Putative class members who did not rely on the integrity of Oracle's market price must be individually identified and then must individually prove reliance.** Defendants would be entitled at trial to show, on a trade-specific basis, that particular traders in Oracle securities did not rely on the integrity of the market in Oracle stock, would have purchased regardless of the alleged misstatements, and that their reliance therefore cannot be presumed but must be individually proved. See *Lindsey* v. *Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense"); *Amchem*, 521 U.S. at 613 (class action may not "'abridge * * * any substantive right'").

The Ninth Circuit recognizes that when an investor's "reliance on the integrity of the market would be subject to serious dispute," it requires "litigation [of] a defense unique to him." *Hanon*, 976 F.2d at 508-09. After the 2003 amendments to Rule 23, there is no doubt that the need to litigate particularized defenses like inapplicability of the presumption of reliance is a

17

1   barrier to class certification. *Supra*, pp. 1-2; see *Ortiz* v. *Fibreboard*, 527 U.S. 815, 845 n.20

2   (1999); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001).

3       **2. The proposed class is full of traders who did not rely on the integrity of the market**

4   **in Oracle stock, whose reliance may not be presumed but must be proved individually.**

5   Plaintiffs have not excluded from the proposed class day traders, swing traders, short sellers, or

6   program traders whose trading did not assume market integrity. See Boedeker Decl. ¶¶ 35-40. A

7   significant portion of trading in Oracle was attributable to day and swing traders—speculators on

8   short-term movements in the price of the stock—who were not concerned with the integrity of the

9   market in Oracle stock or the reasons for price changes. *Id.* ¶¶ 37-38; see Allison Gordon, *The*

10  *"Day Trading" Phenomenon*, 30 Sw. U.L. Rev. 353, 354 (2001) (day trading has "nothing to do

11  with value," only "momentum"); SEC, *Day Trading: Your Dollars at Risk*, www.sec.gov/

12  investor/pubs/daytips.htm (day traders simply "hope that their stocks will continue climbing or

13  falling in value for the seconds to minutes they own the stock"); Don DeVitto, Irrational Markets

14  108 (2001) (for momentum investors "value or worth" is "not a consideration"). Institutional

15  investors' "program trades," which were also common during the period at issue, executed

16  automatically on the occurrence of an event such as a stock falling below a certain percentage of a

17  portfolio and likewise were made without regard to the underlying fundamentals of the stock.

18  Boedeker Decl. ¶¶ 35-36.

19      Short sellers sold borrowed stock, betting that the market price overstated the value of the

20  stock and making covering purchases based on the relationship between the sale and market

21  prices of the stock, not based on whether either reflected its true value. *Id.* ¶¶ 39-40. Many

22  proposed class members were short sellers buying Oracle stock to cover short positions. *Id.* ¶ 40.

23  Like day, swing, and program traders, short sellers do not rely on the integrity of the market price

24  and so do not enjoy a presumption of reliance. See, *e.g.*, *Zlotnick* v. *TIE Communications*, 836

25  F.2d 818, 820 (3d Cir. 1988); *Ganesh LLC* v. *Computer Learning Centers*, 183 F.R.D. 487, 491

26  (E.D. Va. 1998) (refusing to certify class including many short sellers; "the Court cannot presume

27  that a short-seller who discounted the market price at the time of the short sale later reversed his

28  strategy and relied on the market price when the time to cover arrived"). Only individualized

18

1   inquiry will reveal whether each putative class member engaged in any of these trading strategies,

2   and, as to any claimant who did, individual mini-trials will be necessary for the claimant to try to

3   establish individual reliance.

4         **3. Proposed class representatives must individually prove reliance.** Unlike in most

5   securities fraud cases, where evidence of the need to litigate reliance individually is absent, here

6   <u>the proposed class representatives</u> engaged in trading that did not rely on the integrity of the

7   market price. Kuehmichel and Drifton Finance traded "short call options," betting Oracle's stock

8   price would fall and earning Kuehmichel, and perhaps Drifton, significant profits. Boedeker Decl.

9   ¶¶ 20-21, 28-34. Sawyer bought and sold large quantities of Oracle stock on a near daily basis. *Id.*

10   ¶ 22. Chu (or his wife) engaged in swing trading to make profits from short-term price

11   momentum. *Id.* ¶¶ 24-27. These trades did not rely on market integrity or the absence of alleged

12   fraud, as Oracle would be entitled to show, trade-by-trade, at trial. See *Keirnan* v. *Homeland,*

13   *Inc.*, 611 F.2d 785, 789 (9th Cir. 1980) (investor who "attached [no] significance to the omitted

14   facts" would have acted no differently "if he had known the truth"). The need to delve into

15   individual reliance precludes "proceeding with a class action, since individual issues" then

16   "overwhel[m] the common ones." *Basic*, 485 U.S. at 242.

17         Where "[n]o one set of operative facts establishes liability" as to each class member, "[n]o

18   single proximate cause applies equally to each potential class member," and "defenses" depend

19   on "facts peculiar to each plaintiff's case," Rule 23(b)(3) is not satisfied. *Georgine* v. *Amchem*

20   *Prods.*, 83 F.3d 610, 628 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997). That is the case here.

21   Common issues predominate, class adjudication is unmanageable, and no class may be certified.

22   **II.   THE PROPOSED CLASS REPRESENTATIVES ARE ATYPICAL AND**
23           **INADEQUATE TO REPRESENT ABSENT CLASS MEMBERS.**

24         Rule 23(a)'s "adequacy" inquiry ensures that class representatives "possess the same

25   interest and suffer the same injury as [absent] class members." *Amchem*, 521 U.S. at 625-26;

26   *Burkhalter Travel* v. *MacFarms Int'l*, 141 F.R.D. 144, 154 (N.D. Cal. 1991). "Typicality" looks

27   to whether "the named plaintiff's claim and the class claims are so interrelated that the interests of

28   the class members will be fairly and adequately protected in their absence." *General Tel. Co.* v.

19

1   *Falcon*, 457 U.S. 147, 157 n.13 (1982). Plaintiffs fall far short of meeting these requirements. A

2   less well qualified, more atypical set of class representatives—each with multiple issues that will

3   have to be litigated individually—is hard to imagine.

4        To begin with, a proposed class representative's "integrity" and "honesty" are key to

5   whether it can adequately represent the class. *In re Seagate II Sec. Litig.*, 843 F. Supp. 1341, 1346

6   n.2 (N.D. Cal. 1994); *Kline* v. *Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983). 1199 SEIU, Drifton,

7   and Sawyer have each shown that they lack these attributes. Each signed under oath and

8   submitted to this Court a false Private Securities Litigation Reform Act ("PSLRA") certification.

9   Each omitted and/or misstated trades made during the class period in its certification, and 1199

10  SEIU also appears to have omitted from its disclosure cases in which it sought to be a

11  representative party. SD Ex. 26 at 300-01 (Fuhrer Dep.); SD Ex. 32 at 148-51 (Sawyer Dep.); SD

12  Ex. 31 at 63-67, 178-81, 184 (Chobor Dep.). This lack of candor—under oath and to comply with

13  a clear legal command—render these plaintiffs unfit to "exercise fiduciary duties on behalf of the

14  class." *Burkhalter*, 141 F.R.D. at 154.

15       We further demonstrate below that each proposed class representative will need to litigate

16  weaknesses particular to their own claims, including what they knew about Suite 11i and the

17  potential effect of the economy on Oracle, whether they relied on what Oracle said or did not say,

18  and whether they have standing. Preoccupied with these "unique defenses which threaten to

19  become the focus of the litigation," each proposed representative has interests "antagonistic to

20  those of the class" that render him atypical of absent class members and that will prevent his

21  adequate representation of their interests. *Hanon,* 976 F.2d at 508.

22   **A.    1199 SEIU, A Professional Securities Fraud Plaintiff, Would Be Preoccupied**
         **With Individual Standing And Knowledge Issues.**
23

24       1199 SEIU's "extensive experience in prior securities litigation" refutes any notion that it

25  is "typical" of the class. *Hanon*, 976 F.2d at 508. In recent years, 1199 SEIU or its predecessor

26  labor union pension fund filed a complaint and/or sought appointment as lead plaintiff in at least

27  <u>seventeen</u> different securities fraud lawsuits. SD Ex. 24 at 13; SD Ex. 25 at 12-13. Lerach

28  Coughlin, or its predecessor firm Milberg Weiss, served as 1199 SEIU's counsel in "<u>all of them</u>."

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**

SD Ex. 31 at 34-35, 49-54 (Chobor Dep.) (emphasis added). Congress in the PSLRA took aim at "professional plaintiffs" who repeatedly partner with the same "entrepreneurial trial lawyers" to file abusive class action lawsuits in case after case. H.R. Conf. Rep. No. 104-369, at 32 (1995); H.R. Rep. No. 104-50, at 16 (1995). Courts too have frequently held atypical proposed class representatives who are "professional plaintiffs." *E.g.*, *Hanon*, 976 F.2d at 506; *Welling* v. *Alexy*, 155 F.R.D. 654, 658-59 (N.D. Cal. 1994); *Shields* v. *Smith*, 1991 WL 319032, at *4 (N.D. Cal. Nov. 4, 1991). Confirming the problems with a long-running partnership between a professional plaintiff like 1199 SEIU and the Lerach firm, an 1199 SEIU trustee was unable to describe at his deposition whether the Fund engaged in any due diligence before bringing this suit, or whether the suit was the Fund's or the law firm's idea. SD Ex. 31 at 73-74 (Chobor Dep.). To all appearances, the Fund and the Lerach firm formed precisely the sort of partnership to further their own interests that the courts and Congress have concluded makes a plaintiff unfit to represent a class.

   That is by no means 1199 SEIU's only disqualifying feature. The Fund conferred complete investment discretion on Turner Investment Partners and Congress Asset Management, exposing the Fund to the defense that it lacks standing to sue under Section 10(b). See *Congregation of the Passion* v. *Kidder Peabody*, 800 F.2d 177, 181 (7th Cir. 1986); *Cox* v. *Bateman Eichler Hill Richards, Inc.*, 765 F. Supp. 601, 608 n.3 (N.D. Cal. 1990); *In re Verisign, Inc.*, 2005 WL 88969, at *7 (N.D. Cal. Jan. 13, 2005). Lacking <u>any</u> role in its investment choices, 1199 SEIU was not manipulated or deceived "in connection with the purchase or sale of any security" (15 U.S.C. § 78j(b)), or "induced to buy or sell" by fraud. *O'Brien* v. *Continental Bank*, 593 F.2d 54, 58 (7th Cir. 1979); see SD Ex. 31 at 168 (Chobor Dep.); SD Ex. 30 at 43-48 (Turner Dep.); SD Ex. 27 at 45-46 (O'Keefe Dep.). The Fund's need to litigate its standing will divert it from issues common to the class and renders it an inadequate class representative. See *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D. Ill. 1987) (a "unique defense that precludes a plaintiff from representing a class is lack of standing").

   1199 SEIU is also atypical because it is subject to an individualized challenge that Turner and Congress—sophisticated investment advisors—could not have been deceived by Oracle's

21

1   alleged misstatements. They had ready access to information about the risks to Oracle of a

2   slowing economy, the "hockey stick effect" that made earnings unpredictable, and bugs in Suite

3   11i, and incorporated that information into independent analysis of Oracle's worth based on news

4   and opinion from many different sources. SD Ex. 30 at 77-89, 118, 121-23 (Turner Dep.); SD Ex.

5   27 at 65-66, 76-77, 102, 109-111 (O'Keefe Dep.). See *Baffa* v. *Donaldson, Lufkin & Jenrette*, 222

6   F.3d 52, 59-60 (2d Cir. 2000) (professional trader with "access to more information than other

7   investors in the putative class" was "atypical"). In light of <u>all</u> the individual issues that beset 1199

8   SEIU, in addition to its dishonesty in its PSLRA certification, class representative status should

9   be denied.

10          **B.      Chu Has A Poor Understanding Of This Suit, Cannot Direct His Lawyers,
                      And Would Be Preoccupied With Individual Knowledge, Reliance, And
11                    Standing Issues.**

12          A putative class representative who is "startlingly unfamiliar" with the complaint or lacks

13   interest in the conduct of the suit is not adequate; he cannot "serve the necessary role of checking

14   the otherwise unfettered discretion of counsel in prosecuting the suit." *Moeller* v. *Taco Bell*

15   *Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004); *Welling*, 155 F.R.D. at 659. Chu, who has limited

16   facility in English, neither read nor had any opportunity to contribute to the complaint and was

17   unfamiliar with some of its basic terminology. SD Ex. 29 at 31-32, 52-53, 80-82. His description

18   of his meetings with counsel suggest that the case and his role in it were presented to him as a *fait*

19   *accompli. Id.* at 49-52, 60 (counsel presented Chu with the already-filed SAC and "informed [me]

20   that I would be a [lead] plaintiff in the case"). Unsurprisingly, therefore, Chu lacks knowledge

21   about aspects of the case. *E.g.*, *id.* at 65-66 (before Chu read the Complaint he knew "nothing at

22   all" about many allegations), 193-94 (insisting Ellison sold 290 million—rather than 29 million—

23   shares in January 2001). And, critically, Chu was not aware he had the right—much less duty—to

24   share ideas with his counsel or to manage and control their conduct. *Id.* at 76-77. Appointing Chu

25   a class representative, though he possesses neither "the ability [n]or the incentive" to control this

26   litigation and has abdicated all responsibility to his lawyers, would not be "consistent with the

27   spirit and intent of the PSLRA." *In re Baan Co. Sec. Litig.*, 271 F. Supp. 2d 3, 14 (D.D.C. 2002).

28

22

1   Chu's claim suffers from other individualized problems. He was not the sole trader on his

2   account. His wife also traded, with short-term goals. SD Ex. 29 at 128-30, 132, 135-37, 142-44,

3   155-57, 175, 196-97; Boedeker Decl. ¶ 25. Short term swing trading in his account exposes Chu

4   to a reliance defense (*supra*, Part I.C), and his wife's trading raises doubts about his standing

5   (*supra*, Part II.A)—both issues that would have to be litigated individually as to Chu.

6         **C.    Sawyer, Who Is Ignorant About This Case, Would Be Preoccupied With**
               **Individual Injury, Causation, And Reliance Issues.**

7

8       Sawyer, too, is an atypical and inadequate class representative. Because he sold 41,600

9   more shares than he bought during the class period, Sawyer almost certainly suffered no injury

10  from the fraud plaintiffs allege. Boedeker Decl. ¶ 23. Any price inflation that harmed Sawyer as a

11  purchaser would have benefited him more as a seller. No injury means no claim, and no claim

12  means Sawyer is not an adequate class representative. *Rochelle* v. *Marine Midland Trust Co.*, 535

13  F.2d 523, 528 (9th Cir. 1976); *Abrahamson* v. *Fleschner*, 568 F.2d 862, 878-79 (2d Cir. 1977).

14      Sawyer's unfamiliarity with this lawsuit also disqualifies him. Sawyer thinks he is suing

15  Oracle and perhaps Ellison, but no one else; believes the class period began when Ellison first

16  sold Oracle securities and ended when he stopped; and does not know what his allegations about

17  Oracle's 2Q01 results or 3Q01 forecasting are. SD Ex. 32 at 53-55, 62-63, 219-21. He also faces

18  unique reliance defenses. Actual and anticipated margin calls drove his class period trading, while

19  a change of brokerage accounts prevented him from selling some or all of his Oracle holdings in

20  the last weeks of the class period. *Id.* at 68, 86-90, 109, 115-16, 156-59.

21        **D.    Kuehmichel Would Be Preoccupied With Individual Injury, Knowledge, And**
               **Reliance Issues.**

22

23      Kuehmichel, a sophisticated options trader, regularly read Business Week, Forbes,

24  Bloomberg, Smart Money, and "just about everything that came in front of me," reviewed analyst

    reports, studied Oracle's investor teleconferences and press releases, watched financial news

25  television, and understood that because of the "hockey stick effect," "on the last day of the

26  quarter [Oracle] could be made or broken," making forecasting speculative. SD Ex. 28 at 35-38,

27  133-34. His individual knowledge would thus be a focus at trial. *Supra*, Part I.B.

28

23

So would his reliance, since Kuehmichel testified at his deposition that he would not have bought Oracle stock had he known certain facts that were, however, in the public domain. SD Ex. 28 at 140-47, 151. And Kuehmichel sold "call options" that assume the market overvalued Oracle stock. Boedeker Decl. ¶¶ 19-21; see *In re Critical Path*, 156 F. Supp. 2d 1102, 1109-10 (N.D. Cal. 2001) (it is a "poor choice to appoint a class representative who engaged in a trading practice premised on the belief the stock would fall"); *supra*, Part I.C. He made significant profits on those call options during the proposed class period, so that whether he was injured at all—or to the contrary helped by the alleged fraud—would also be in issue at trial. Boedeker Decl. ¶ 21.

### E. Drifton Has A Poor Understanding Of This Suit, Is Unwilling To Direct Its Lawyers, And Would Be Preoccupied With Individual Injury, Knowledge, And Reliance Issues.

Drifton is subject to similar individualized problems that make it atypical. Its principal, Jacques Fuhrer, read reports about Oracle from securities analysts, read Bloomberg News, watched financial television, and read Oracle news releases, making his knowledge of allegedly misstated matters an issue for trial. SD Ex. 26 at 68-70, 114-19. Drifton also failed to exercise basic due diligence, casting doubt on its reliance on alleged misstatements. Thus, though Ellison's sale of Oracle stock in January 2001 (RSAC ¶¶ 20-24) was publicly disclosed, Drifton claims it would have closed its positions had it learned of those sales, and it would not have bought the stock had Ellison said what Oracle's public SEC filings said. SD Ex. 26 at 163-64, 211, 271-72. And Drifton's complex trading strategies will make the uncertain question whether it suffered any injury from the alleged fraud a contested question at trial. Boedeker Decl. ¶¶ 28-34.

Furthermore, Fuhrer's poor English and lack of understanding of the "U.S. legal system" caused, his counsel admitted, "a communication problem," making it difficult to see how he can supervise counsel. SD Ex. 26 at 40-41, 152-54. His profound lack of understanding of his suit—he did not read the Complaint or know that Oracle is a defendant, what Henley or Sanderson are alleged to have done, or who is in the proposed class—suggest that Drifton has abdicated all responsibility in the suit to counsel. *Id.* at 174-77, 179, 292-94. In fact, Fuhrer pursues a deliberate strategy of *not* asking questions of his counsel because "[t]he less the better," an

24

1  ostrich-like approach that makes Drifton totally inadequate as a fiduciary of absent class members

2  *Id.* at 293.

3         Not one of the proposed class representatives fulfills Rule 23(a)'s requirements of

4  typicality and adequacy. Appointment of any of them would disserve absent class members, who

5  are entitled to vigorous representation. Plaintiffs have had four years to identify suitable class

6  representatives. Because they have failed, their class certification motion should be denied.

7                                    **CONCLUSION**

8         Plaintiffs' Motion for Class Certification should be denied.

9

10 DATED:   July 29, 2005                 MAYER, BROWN, ROWE & MAW LLP

11                                        By:/s/ Lee H. Rubin

12                                        Lee H. Rubin
                                          Attorneys for Defendants Oracle Corporation,
                                          Lawrence J. Ellison, Jeffrey O. Henley and
13                                        Edward J. Sanderson

14 *Filer's Attestation: Pursuant to General Order No. 45, Section X(B), Shirish Gupta hereby attests*

15 *that the signatory's concurrence in the filing of this document has been obtained.*

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION; CASE NO. C-01-0988-MJJ (JCS)**