# Exhibit (B)

SHEET 1   PAGE 1

```
                                            Pages 1 - 161
                        UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
                BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE
IN RE:                                )
                                      )   Case No. C01-0988 MJJ
ORACLE SECURITIES LITIGATION          )
                                      )   Tuesday
                                      )   March 1, 2005
                                      )   11:00 a.m.

                          TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:         LERACH, COUGHLIN, STOIA, GELLER
                           Rudman & Robbins LLP
                        100 Pine Street
                        Suite 2600
                        San Francisco, California 94111
                  BY:   MARK SOLOMON, ESQ.
                        SHAWN A. WILLIAMS, ESQ.
                        MONIQUE WINKLER, ESQ.
                        WILLOW RADCLIFFE, ESQ.


                  (APPEARANCES CONTINUED ON FOLLOWING PAGE)








Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse
```

PAGE 2

```
APPEARANCES: (CONTINUED)

For Defendant:    MAYER, BROWN, ROWE & MAW
                  190 South LaSalle Street
                  Chicago, Illinois 60603-3441
             BY:  ALAN N. SALPETER, ESQ.
                  JAVIER H. RUBINSTEIN, ESQ.
                  LEE H. RUBIN, ESQ.
                  ELI GREENSTEIN, ESQ.
                  SHIRISH GUPTA, ESQ.


Also Present:     James C. Maroulis, Esq.
                  Senior Corporate Counsel
                  Oracle Corporation


                  Andy Rudolph
                  Forensic Accountant
                  Lerach, Coughlin, Stoia, Geller,
                     Rudman & Robbins, LLP
```

PAGE 3

```
                         PROCEEDINGS
MARCH 1, 2005                                11:00 a.m.

          THE CLERK: Calling Case C01-0988, In Re Oracle
Securities Litigation. Counsel --
          THE COURT: Do you have the sheet? Do you have a
sheet with these people's names on it, the cards?
          THE CLERK: Yes. I will print it out.
          THE COURT: All right. Why don't you all state your
appearances, please?
          MR. SOLOMON: Mark Solomon, your Honor, appearing on
behalf of plaintiffs.
          MR. WILLIAMS: Shawn Williams on behalf of plaintiff.
Good morning, your Honor.
          THE COURT: Good morning.
          MR. GREENSTEIN: Good morning, your Honor. Eli
Greenstein on behalf of the plaintiffs.
          MS. WINKLER: Monique Winkler on behalf of the
plaintiffs.
          MS. RADCLIFFE: And Willow Radcliffe on behalf of the
plaintiffs.
          THE COURT: Welcome.
          MR. SALPETER: Good morning, your Honor. I'm Alan
Salpeter from Mayer, Brown in Chicago for Oracle.
          THE COURT: Welcome.
```

PAGE 4

```
          MR. RUBINSTEIN: Good morning, your Honor. Javier
Rubinstein on behalf of Oracle also from Mayer, Brown.
          THE COURT: Welcome.
          MR. RUBINSTEIN: Thank you.
          MR. MAROULIS: Good morning, your Honor. James
Maroulis from Oracle Corporation for Oracle.
          MR. RUBIN: And Lee Rubin also from Mayer, Brown.
          THE COURT: All right.
          MR. SOLOMON: Can we also just add we also have Andy
Rudolph with us, who is our in-house forensic accountant.
          THE COURT: Welcome. Good. All right. We are here
pursuant to Judge Jenkins' order of February 7th referring us
in the matter of preparation of a discovery plan.
          I have reviewed in detail the parties' submissions.
I take as my text for the preparation of the plan the outline
presented in your February 23rd joint letter as supplemented by
the Mayer, Brown letter clarifying certain aspects of their
position.
          And what I want to do is I want to go through in the
order you have presented them the issues and come up with an
order that I will ask you all to draft reflecting whatever
agreements or rulings we come to today.
          We don't have endless amounts of time today so we are
going to try to move pretty quickly, but let's start on Page 1
with the -- or Page 1, 2, and 3, which is the whose files
```

### PAGE 53

1  declaration establishes that the two have nothing to do with
2  each other.
3      MR. WILLIAMS: Well, the one point there that I would
4  like to address is that it appears the 12601 account is the bad
5  debt reserve account and that --
6      MR. RUBINSTEIN: We agree.
7      THE COURT: Well, that's right, but he's saying that
8  the bad debt reserve account has nothing to do with the debit
9  memos.
10     MR. WILLIAMS: Well, but our investigation thus far,
11 and even a review of these documents show that bad debt reserve
12 -- withdrawn.
13     The monies that were applied to the debit memos came
14 from the bad debt reserve, which is where the unapplied cash
15 went to when it came in.
16     And I have to admit, your Honor, that the information
17 that we have is limited, but we do have people who have said
18 that's what it is.
19     The documents show on their face that the accounts,
20 the 25005 account and the 12601 account are, indeed, related.
21     MR. SOLOMON: In fact, your Honor, they have been
22 described as slush funds, cookie jars.
23     MR. RUBINSTEIN: Your Honor, they are going to get
24 the audit trial for all these debit memos. They will be able
25 to see for themselves.

### PAGE 54

1      THE COURT: Right. That's right. You will find out,
2  but not by going into the 2002, 3, 4, 5 investigation directly.
3  You are going to look at every piece of paper that has to do
4  with these debit memos up and down and if it goes through the
5  accounts that you suspect it is going through, well, then, that
6  will be one thing. If it isn't, then it isn't. Isn't that the
7  answer? Why isn't that the answer?
8      I mean, if it turns out that none of this money
9  passes through the 12601 account, why isn't that the answer?
10     MR. WILLIAMS: If it gives -- if they give us
11 everything on the 25005 account, then very --
12     THE COURT: They are not going to give you everything
13 on the 2500. They are giving you 46,000 debit memos and the
14 entire audit trail of them. Why doesn't that give you what you
15 need?
16     MR. WILLIAMS: I hope it gives us what we need, but I
17 don't know what it is.
18     THE COURT: Okay. We will find out. Okay. I
19 understand. I understand. We will find out.
20     So with respect to the accounting allegations, the
21 subject matter is all of the documents regarding the on account
22 clean up in the 2000 -- in the relevant time period, all the
23 documents regarding or related to the 46,000 debit memos and
24 all documents related to the accounting treatment of those
25 memos.

### PAGE 55

1      Okay. Insider trading, you have got an agreement on
2  the subject matter.
3      The special litigation committee. You know,
4  obviously that's an issue -- it strikes me as an issue that we
5  are not going to resolve here today if you are really going to
6  pursue it.
7      So my suggestion on that is that the issue is
8  reserved. I'm obviously not going to allow you to have
9  discovery into it over their objection at the moment. You need
10 to decide whether it's useful to bring a motion on that
11 subject.
12     The one thing I would ask is whether or not the
13 defendants intend to produce all of the underlying documents
14 that the special litigation committee reviewed from whatever
15 source. And I'm not saying you produce them as a package,
16 saying these are the SLC documents, but are all of those
17 underlying documents going to be produced?
18     MR. RUBINSTEIN: I can tell your Honor this, and I
19 hope this is responsive: That we are not -- all of the
20 documents that they have requested and that are responsive to
21 their request are being produced, including the documents that
22 were seen by the SLC.
23     And so, in other words, where I disagree -- where we
24 would object is to tying the relevance of a document to simply
25 the fact that the SLC may have asked for it whether it has

### PAGE 56

1  anything to do with the case or not. I mean, we are not saying
2  that just because the SLC got an underlying record from Oracle
3  means they don't get it. Of course not.
4      THE COURT: Why not produce them all?
5      MR. RUBINSTEIN: I'm sorry?
6      THE COURT: Why not produce them all?
7      MR. RUBINSTEIN: I'm not saying there are any that we
8  are withholding.
9      THE COURT: I understand. I'm asking you the
10 question. Are there any you are withholding?
11     MR. RUBINSTEIN: I'm not aware of any --
12     THE COURT: How about if I say you can't withhold
13 any. What's wrong with that?
14     MR. RUBINSTEIN: Because if, for instance, there were
15 document that the SLC saw that they haven't asked for or that
16 the Court rules is beyond the scope of discovery --
17     THE COURT: Well, that's an issue, but what is it?
18     MR. RUBINSTEIN: I'm not in a position to say. I
19 don't have anything in my mind right now where I'm saying, oh,
20 there is a document --
21     THE COURT: I understand. This is too technical. We
22 need to get practical here. It's a relevance screen.
23     The Special Litigation Committee was investigating
24 the allegations of the complaint, right?
25     MR. RUBINSTEIN: Correct.

PAGE 125

125

1 integration of the various parts of the 11i Suite with each
2 other. You know, with the data base part of the suite, you
3 know, with each other, et cetera, et cetera.
4        If that's what you believe the false statement is,
5 that's what you get discovery into.
6        MR. RUBINSTEIN: Again, I think that --
7        THE COURT: Okay. Okay. We have got it. That's
8 done.
9        MR. RUBINSTEIN: Okay.
10       THE COURT: Okay. And then in terms of the timing of
11 the production, you just cooperate with the third parties and
12 work with them. I'm going to be very sensitive to their
13 concerns in terms of that, and so I expect you to cooperate.
14       How about the time period is June 1, 2000 to June 1,
15 2001?
16       MR. WILLIAMS: For non-parties?
17       THE COURT: Everybody. Everything.
18       MR. WILLIAMS: You know, we originally had asked for
19 a much broader period than that and in the meet-and-confers
20 what we said is, look, we are perfectly willing to come down to
21 say when the Form 10K was filed for fiscal year 01, and that
22 was in August, and it makes sense because the fiscal year ended
23 on June 30.
24       So if we stopped production of responsive documents
25 at June 1st, your Honor, we cannot capture even the entire next

PAGE 126

126

1 quarter. It would just stop right in the middle.
2        And the defense is going to be -- and we have seen it
3 in the derivative action, in Judge Strine's opinion that there
4 is a hockey stick effect which Oracle relies on on a
5 quarter-to-quarter basis and that happens in the last month of
6 the quarter.
7        So if we are restricting discovery to end before that
8 last month of the quarter --
9        THE COURT: Well, except the quarter that ends
10 June 30, 01 itself isn't at issue in this case. It's the prior
11 quarters.
12       So the only reason I go out is to capture documents
13 that may have additional relevance to what happened before.
14       MR. WILLIAMS: I agree with that, your Honor, but,
15 again, one of the things that Larry Ellison said when the miss
16 in our quarter is that a lot of these deals were pushed out to
17 the next quarter. Not lost, but pushed out to the next
18 quarter. And they also said that a lot of the deals ended up
19 closing in the final month of the quarter.
20       So one could -- one would imagine that, say, for
21 instance --
22       THE COURT: So the miss in the third quarter of 01,
23 which is -- ends in what, March?
24       MR. RUBINSTEIN: The Q3 ended on February 28.
25       THE COURT: So?

PAGE 127

127

1        MR. RUBINSTEIN: But the statements that Mr. Ellison
2 made were right at the end of the third quarter. And so what
3 happens later --
4        MR. WILLIAMS: To the end of the fourth quarter it
5 should be.
6        MR. RUBINSTEIN: Doesn't matter. Again, the
7 relevance of any -- of any later created documents would be
8 only with respect to matters that refer back to Q3 itself. I
9 think the Court is right that Q4 is not an issue in this case.
10       THE COURT: What do you think about my time period?
11       MR. RUBINSTEIN: We could accept that.
12       THE COURT: Okay. That's the time period. June 1,
13 2000 to June 1, 2001 and documents that refer to events during
14 that period which may have been generated at a later time.
15       15, analysts and media organization. You have
16 already got that, right?
17       MR. WILLIAMS: Think so, your Honor.
18       THE COURT: On all these ones where I say you have
19 got agreement, make sure you put that scope in the order.
20 Auditors and accountants.
21       MR. RUBINSTEIN: Your Honor, we would suggest that
22 the scope be the same as the scope we have already worked out.
23       THE COURT: Right. Why shouldn't it be that?
24       MR. SOLOMON: Are you talking about the conference,
25 your Honor?

PAGE 128

128

1        THE COURT: Yes, sir.
2        MR. SOLOMON: The reason is, your Honor, that -- and
3 I think we have cited a case or there is abundant law to this
4 effect; that is, where you have accounting allegations in a
5 securities fraud case, typically I think this doesn't take us
6 outside of the typical arena, you would need all of the work
7 papers to get an overall understanding and comprehension of
8 just what went on with the financial statements at issue.
9        For example, we have the accounting allegations
10 concerning the end of November 2000 adjustments. They claim
11 that there was no impact on the financial statements. We
12 obviously need to look at what the auditors examined with
13 respect to that issue apart from anything else.
14       Also, there was forecasting allegations in our case.
15 What accountants -- what auditors do when they are auditing
16 companies, as I'm sure you are familiar, is they look at
17 internal controls. They look at management integrity. We need
18 all that stuff. That is clearly relevant to this case. In
19 order to --
20       THE COURT: Indulge me a little bit. Why is that
21 relevant to this case?
22       MR. SOLOMON: Well, there is going to be a defense --
23 there's a number of defenses we know about. One is they don't
24 even hit the financial statements.
25       If it did hit the financial statements, the defense

SHEET 17  PAGE 129

**129**

1 would be the defendants didn't know about it for whatever
2 reasons.
3        And one of the reasons they will say the defendants
4 didn't know about it was because the auditors passed on it.
5        Why did the auditors pass on it? Again, there will
6 be examinations in the audit work papers of what management
7 representations were as to -- in other words, to get a picture
8 of whether or not management knew, whether they should have
9 known, what the accountants thought about the accounting
10 treatment or if they knew about it, how it affected the
11 financial statements ultimately all needs to be examined in the
12 context of Oracle's overall financial statements.
13        And our experts and auditors and courts have
14 concluded time and again the only way to do that is to get all
15 of the papers. Is that difficult? No. They are always
16 organized by the auditors.
17        Very simply, they are ready to be produced right now,
18 I would anticipate --
19        THE COURT: I'm sure they are on a disk.
20        MR. SOLOMON: -- or they could be very quickly.
21        MR. RUBINSTEIN: Your Honor, going back to a comment
22 I believe you made earlier today.
23        This is not an accounting case in which there is some
24 allegation about overarching policies. It's about a particular
25 event that occurred on a particular date involving a finite

PAGE 130

**130**

1 series of transactions.
2        We have agreed to have the outside auditors produce
3 documents that relate to the accounting treatment of those
4 debit memos. I don't think there is any disagreement there.
5        THE COURT: Right.
6        MR. RUBINSTEIN: The rest of it I, frankly, just
7 don't understand.
8        And there is no allegation in this complaint about a
9 lack of internal controls as it relates to the forecasting
10 process.
11        I mean, I just think that this -- this is just way
12 far afield. And to the extent that there are work papers that
13 relate specifically to this debit memo, I don't have a problem
14 with that. But I think anything else is just a fishing
15 expedition and this is not like every other accounting case.
16 It's a very narrow issue. Either it hit revenue or it didn't.
17        And the audit trail we have agreed to produce that
18 and what the accounting treatment was, that's fine. But I
19 think it ought to be restricted to that issue because that's
20 what's been pled.
21        MR. SOLOMON: And, your Honor, ultimately the
22 auditors had to sign off on the fiscal year, not just the
23 quarter in question, and how material the events were that we
24 alleged, to what extent they were known and to what extent the
25 auditors signed off on them with knowledge is all relevant to

PAGE 131

**131**

1 our case.
2        THE COURT: Well, you get all of that by getting
3 every scrap of paper in that audit that has anything to do with
4 the 49,000 debit memos, isn't it?
5        MR. SALPETER: 46.
6        THE COURT: Whatever. 2000 debit memos between us
7 friends . . .
8        MR. SOLOMON: One element to the case, your Honor.
9 Another elements to the case is the forecasting. Expenses,
10 expenses in relation to 11i are all embraced within those
11 allegations.
12        THE COURT: Yes. They didn't audit the forecasts.
13        MR. SOLOMON: No, but certainly the auditors would
14 have looked at the quality of their forecasting function.
15 That's a function of the auditors, and they will have done
16 that. They will do that in every case in which they audit.
17        THE COURT: Why don't I add that? Okay. Why don't I
18 do that? We will say that the auditors have to produce
19 everything in their files related to the 49,000 -- to the
20 accounting treatment of the 49,000 -- related to the 49,000
21 debit memos and any audit of the forecasting function at
22 Oracle.
23        MR. SOLOMON: All right. And what about the
24 expenses?
25        THE COURT: Does that work? Does that work? I mean,

PAGE 132

**132**

1 if it did, audit the forecasting function, it's probably
2 relevant.
3        MR. SOLOMON: The expenses, your Honor, and their
4 financial function.
5        THE COURT: Well, if you -- if the auditors raise
6 that the forecasting function was flawed in the following six
7 ways and you continued to rely on the false forecasting in
8 making these projections, maybe it's relevant. I don't know.
9        MR. RUBINSTEIN: Your Honor, the problem I have with
10 that, it's not been pled. There is no theory in this case that
11 there was a failure of control and that there was some
12 fundamental flaw in the forecasting process.
13        THE COURT: Well, it's an underlying. The allegation
14 is that you forecast -- well, maybe you are right.
15        The allegation is that you forecast -- well, the
16 allegation is that you forecast wrongly, right, is that you
17 made forecasts when, in fact, you knew the forecasts were
18 inaccurate.
19        They were inaccurate, you knew, because the economy
20 was, as you knew, was having a greater impact on sales and, in
21 addition, you knew that the 11i wasn't going as well as you
22 were representing in your forecasts it would go.
23        If the forecasting function was audited, why wouldn't
24 that audit have something do with -- why wouldn't it -- an
25 auditor looking at that, maybe they came up with it and maybe

PAGE 133

```
 1  they didn't, that there were these failings in your forecasting
 2  function. Maybe they brought it to management's attention and
 3  said, "You are not properly accounting for this. You are not
 4  properly accounting for that," and so -- or you didn't. And
 5  you say, "We had it audited. We have got a validated
 6  forecasting function and we followed it, and the auditor signed
 7  off on it."
 8       I don't know. Are we talking about anything? Is
 9  there anything --
10       MR. RUBINSTEIN: No, no, no.
11       MR. SOLOMON: Your Honor --
12       THE COURT: Do the auditors do this?
13       MR. SALPETER: No, because this --
14       MR. SOLOMON: Your Honor, the --
15       THE COURT: Stop. One at a time.
16       MR. SALPETER: This is way beyond the scope of the
17  audit here. The audit is --
18       THE COURT: Okay.
19       MR. SALPETER: -- addressed to the financial
20  statements.
21       THE COURT: That's fine. Did the auditors and
22  accountants here not audit the forecasting functions? You tell
23  me that and you don't get discovery into it.
24       MR. RUBINSTEIN: I'm not aware of any.
25       THE COURT: That's a little different.
```

PAGE 134

```
 1       MR. SOLOMON: The fact that we are having this
 2  discussion, I think, reinforces my point that I think we need
 3  all of the work papers.
 4       THE COURT: No, it doesn't. That is truly the cart
 5  before the horse.
 6       MR. SALPETER: Your Honor --
 7       MR. SOLOMON: Thanks for putting it that way.
 8       THE COURT: In any event --
 9       MR. SALPETER: Your Honor, can I make one other
10  point?
11       Their allegation isn't that the forecasting process
12  was flawed. It's that Ellison and Henley knew that the
13  12-cent per share forecast wouldn't be met because of these
14  negative things; the economy, 11i, et cetera, right? That's
15  the core of their case.
16       THE COURT: Let me ask you this: What if they can
17  prove the first half and not the second? What if they prove
18  that Ellison knew that the forecast wasn't being met. Okay,
19  just bear with me. I don't expect you to agree with that.
20       And the reason is not because of what they have
21  alleged in the complaint. The reason is because the auditors
22  advised him that his forecasting method was flawed.
23       Can they put on this case?
24       MR. SALPETER: Not on this complaint.
25       THE COURT: You can't put that on this complaint.
```

PAGE 135

```
 1  There is a knowing misrepresentation of a forecast. He makes a
 2  forecast knowing it's false and the reason he knows it's false
 3  is not the reason that they give. He can't do that?
 4       MR. SALPETER: That's not their case.
 5       THE COURT: Stop there.
 6       MR. SALPETER: It's a hypothetical that is so far
 7  afield from really what we are talking about here.
 8       I mean, their case and all these derivative cases
 9  have all alleged essentially the same thing. Not that the
10  forecasting process was bad or flawed, but that once the
11  forecast was made of 12 cents a share Henley and Ellison knew
12  they weren't going to meet it.
13       THE COURT: Okay.
14       MR. SALPETER: I mean, your hypothetical is
15  interesting, but it's not --
16       THE COURT: It is.
17       MR. SALPETER: It's interesting, and I would like to
18  think about it some more before I answer it, but it is not our
19  case. In fact, it's not even a fifth cousin once removed to
20  this case.
21       THE COURT: So you are giving discovery of the --
22  your forecasting methods and what went into the forecastings
23  that were made public and they are going to look at those.
24       MR. SALPETER: Right. And then they are going to
25  come back if they find some major flaw that they think should
```

PAGE 136

```
 1  be caught by auditors or outsiders, they are going to come back
 2  and they will be waving their arms and making an impassioned
 3  argument to you about why they should go further.
 4       But on the base of this complaint, they really
 5  shouldn't be getting into what the auditors have done beyond
 6  the narrow scope that has been --
 7       THE COURT: I have got to tell you, my predilection
 8  with respect to is unlike with the customers, where I'm
 9  sensitive to the relationship concerns.
10       My general work in the past has been, you know, what
11  do I care about the work papers? Have them.
12       My concern about the work papers is I don't want it
13  to be a fishing expedition. I don't want this to be an excuse
14  to look for 75 other flaws and amend the complaint for 75 other
15  flaws that they haven't yet discovered in the financial records
16  in the company.
17       So I don't want to get into all of the audit. It's
18  not pled and we are not going to get into it.
19       On the other hand, with respect to the auditing of
20  the forecast model, is that a big deal?
21       MR. SALPETER: I don't think it was done. I don't
22  think it was ever done.
23       THE COURT: Fine.
24       MR. RUBINSTEIN: It's a bit academic.
25       THE COURT: Here is what you do. Here is what you
```