# EXHIBIT B

CHAPTER 17

# SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES

**Nicholas I. Crew, PhD**

**Patrick G. Goshtigian, CFA, MBA**

**Marnie A. Moore, MBA**

**Atulya Sarin, PhD**

## CONTENTS

17.1 Introduction  17.1
17.2 Federal Securities Acts  17.2
  (a) Securities Act of 1933  17.2
  (b) Securities Exchange Act of 1934  17.2
  (c) Securities Litigation Reform Act of 1995  17.3
17.3 Alternative Damages Measures  17.5
  (a) Section 11 of the 1933 Act  17.6
  (b) Section 12 of the 1933 Act  17.6
  (c) Section 9 of the 1934 Act  17.6
  (d) Section 16 of the 1934 Act  17.6
  (e) Section 10(b) of the 1934 Act and Rule 10b-5  17.6
  (f) Section 21D(e) of the 1995 Act (Limitation on Damages)  17.9
17.4 Estimating a Security's True Value  17.9
  (a) Constructing a Value Line  17.10

  (b) Implementation Issues in Using Regression Analysis to Estimate Damages  17.12
  (c) Errors in Examining the Effect of Litigation-Related Events  17.15
17.5 Damages Methodology  17.15
  (a) Estimating the Number of Damages Shares  17.15
  (b) Extensions of the Basic Model  17.20

NOTES  17.21

LIST OF CASES  17.22

BIBLIOGRAPHY  17.23

**17.1 INTRODUCTION.** This chapter discusses estimation of damages for equities under the Federal Securities Acts. The chapter first presents the portions of the Acts relevant to damages calculations and reviews the legal measure of damages prescribed by these Acts. The chapter then examines the two major concerns of damages estimation in security fraud cases: First, how to calculate the value of the

---

The authors revised this chapter from its predecessor in the previous edition (Chapter 44, *Litigation Services Handbook*, Second Edition). The authors of the earlier chapter were Harinda de Silva, Nancy Lo, and Tara Nells.

security absent the alleged fraud and secondly, how to calculate damages during the class period (i.e., the time between the alleged fraud and disclosure).[1]

**17.2  FEDERAL SECURITIES ACTS.**   The Securities Acts of 1933,[2] the Securities Exchange Act of 1934,[3] and the Securities Litigation Reform Act of 1995[4] constitute the federal regulatory instruments of interstate securities transactions. Together, the laws attempt to ensure that the investing public has sufficient information to enable it to rely on the integrity of the securities market while also protecting issuers against abusive litigation.

**(a) Securities Act of 1933.**   The 1933 Act regulates the registration requirements and initial distribution of a security.

*(i) Section 11—Civil Liabilities on Account of False Registration Statement.*   Section 11 provides cause of action to a security's purchaser if the issuer's registration statement falsifies or omits a material fact.[5] A material fact is any information a rational investor would use to make a well-informed investment decision. Plaintiffs may charge the issuer, its directors, or any party that prepared or certified the registration statement (or any report or valuation related to the statement), such as accountants, appraisers, or underwriters. One way defendants may avoid liability is by proving that at the time of acquisition, the plaintiff knew of the untruth or omission.[6]

*(ii) Section 12—Civil Liabilities Arising in Connection with Prospectuses and Communications.*  Section 12(1) allows the purchaser cause of action against any person who offers or sells a security in violation of Section 5, which prohibits the sale or delivery of unregistered securities.[7] Section 12(2) prohibits selling securities through distribution of a prospectus or oral communication that omits or falsifies material facts via interstate commerce or the mails.[8] Similar to Section 11, defendants may avoid liability by proving that the purchaser knew of the untruth or omission. The seller can avoid liability by proving that it did not know, or could not have known, of the omission or untruth.

**(b) Securities Exchange Act of 1934.**   The 1934 Act addresses security transactions in the aftermarkets (i.e., securities traded after the initial public offering [IPO]). It requires periodic filings with the Securities and Exchange Commission (SEC), and deems unlawful activities such as fraudulent transactions, insider trading, market manipulation, omitted material information, and/or misstatements in filed documents.

*(i) Section 9—Prohibition against Manipulation of Security Prices.*   Section 9 prohibits any person from engaging in any action that gives a false or misleading appearance with respect to the market for the security.[9] Plaintiffs may have cause of action if any of the following manipulations have occurred:

○ Creating a false or misleading appearance of active trading in any registered security or with respect to the market for any security
○ Misrepresenting the price of a security through a series of transactions in any security to induce the purchase or sale of the security by others

- Broker-dealers circulating information intended to manipulate a security's price
- Abusing the trading of options to induce the security's purchase or sale[10]

*(ii) Section 16—Directors, Officers, and Principal Stockholders.*   To prevent the unfair use of information by persons that have access to privileged information, Section 16(b) prohibits an issuer's directors, officers, or principal stockholders from realizing a profit from the sale or purchase of the security of less than six months, unless they acquired the security in good faith. Recovery of such profits under Section 16(b) requires that the defendant sell and buy the security within a six-month period. Rule 10b-5 addresses insider sales outside the six-month period.

*(iii) Rule 10b-5—Employment of Manipulative and Deceptive Devices.*   Rule 10b-5, promulgated under Section 10(b) of the Securities Exchange Act of 1934, deems it unlawful to make

> use of any means or instrumentality of interstate commerce, or of the mails or of any
> facility of any national securities exchange, a) to employ any device, scheme, or artifice to defraud, b) to make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or c) to engage in any act,
> practice, or course of business which operates or would operate as a fraud or deceit
> upon any person, in connection with the purchase or sale of any security.[11]

**(c) Securities Litigation Reform Act of 1995.**   The 1995 Reform Act creates and redefines provisions of the 1933 and 1934 Acts. The new and amended provisions aim towards reducing abusive litigation on issuers, while improving the quality of information provided to investors. Specifically, Section 101 adds three provisions to the Acts related to the certification filed with the complaint, the appointment of the lead plaintiff, and the disclosure of settlement terms to the class. In addition, it adds two paragraphs regarding the requirements for a securities fraud action. Section 102 adds a safe harbor provision for forward-looking statements made by companies. Section 105 amends the Acts to require that the loss resulted from the fraud. It adds Section 201 and Section 301 to the 1934 Act. The former section addresses proportionate liability while the latter establishes new requirements for auditor fraud detection and disclosure.

*(i) Section 101—Private Securities Litigation Reform.*   Section 101, a new provision added to the 1933 and 1934 Acts, aims to reduce abusive litigation by imposing new requirements to the plaintiff class that, in effect, authenticate the plaintiff's intentions. Section 101 adds Section 27 of the 1933 Act and Section 21D of the 1934 Act. Each of these new provisions requires that the plaintiff file a certification with the complaint, appoint a lead plaintiff, and disclose settlement proceedings. In addition, it adds increased requirements for plaintiffs to file a claim to the 1934 Act.[12]

*Certification Filed with Complaint.*   Section 27(a)(2) of the 1933 Act and Section 21D(a)(2) of the 1934 Act require that each plaintiff serving as a representative party of the plaintiff class must file a sworn certification with the complaint. The certification requires the plaintiff to: (a) review and authorize the complaint, (b) declare that the plaintiff did not make the purchase at the direction of counsel,

(c) provide testimony at deposition and trial, (d) disclose all transactions of the plaintiff in the security, (e) state that the plaintiff will not receive additional monies beyond the pro rata share of recovery, unless approved or ordered by the court, and (f) disclose all matters in the last three years in which the plaintiff has served as a representative party of a plaintiff class. This last provision aims to deter the "professional plaintiff."[13]

*Appointment of Lead Plaintiff.*   Section 27(a)(3) of the 1933 Act and Section 21D(a)(3) of the 1934 Act require that the court appoint a lead plaintiff to represent the best interests of the plaintiff class. The plaintiff has the responsibility to give early notice to all potential members of the plaintiff class of the action taken against the defendant company. Within 60 days of the required (widely published) notice, any member of the class may request from the court to be appointed as the lead plaintiff.[14] Prior to the 1995 Reform Act, the plaintiff in the first complaint filed became the lead plaintiff. The new provision gives the plaintiffs with a higher financial stake in the security, such as institutional investors, more control over the litigation.

*Disclosure of Settlement Terms to Class Members.*   Improved information on the settlement terms enables plaintiffs to better decide whether to vote for or against the settlement. Section 27(a)(7) of the 1933 Act and Section 21D(a)(7) of the 1934 Act require that the communication to plaintiffs report the settlement amount of damages both in an aggregate and on a per-share basis. Also, if counsel seeks an award of attorneys' fees or costs, counsel must disclose the amount on a per-share basis and include a brief explanation of the charges.[15]

*(ii) Requirements for Securities Fraud Actions.*   Additional sections added to the 1934 Act target abusive litigation by increasing plaintiff requirements in filing suit against security defendants. We discuss two of the additional sections, Section 21D(b)(1) and (2), below.

*Misleading Statements and Omissions.*   Section 21D(b)(1) of the 1934 Act requires that for actions taken against issuers for making misleading statements (or omitting material facts), the complaint must clearly state why the statement is misleading (or why the omitted information is material).[16]

*Required State of Mind.*   As stated in Section 21D(b)(2), for each misstatement or omission of material fact made by the defendant, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for the plaintiffs to collect any awarded damages. Plaintiffs must justify each allegation addressed in the complaint with the defendant's intentions and the facts explaining the reason for the false statement or omission and the defendant's intentions.[17]

*(iii) Section 102—Safe Harbor for Forward-Looking Statements.*   The Securities Reform Act of 1995 creates a new provision of the 1933 and 1934 Acts that restricts plaintiffs' causes of action regarding management's plans for the future. Section 27A of the 1933 Act and Section 21E of the 1934 Act states that a defendant is not liable in any private action based on an untrue statement or omission of a material fact if the statement or omission was made in a forward-looking statement, written or

oral. Issuers or any party directed by the issuer making the statement must clearly identify it as a forward-looking statement, and it should be accompanied by "meaningful cautionary" language outlining factors that could cause the forward-looking statement to change materially.[18] A forward-looking statement includes management plans for future operations, forecasted economic performance, and projections of revenues and earnings.[19]

*(iv) Section 105—Loss Causation.*  Section 105 amends Section 12(b) of the 1933 Act and Section 21D(b)(4) of the 1934 Act to require plaintiffs to show the defendant's actions caused the loss in the security's value. Plaintiffs must provide proof that the defendant's false statements or omissions caused the price at which the plaintiff purchased the stock to be artificially inflated. If the plaintiff cannot demonstrate loss causation, the plaintiff cannot recover any of the depreciation in the security's value.[20]

*(v) Section 201—Proportionate Liability.*  The 1995 Reform Act adds Section 21D(g) to the 1934 Act. This addition states that plaintiffs cannot coerce peripheral defendants into settlements. Only those who knowingly committed a violation of the securities law are liable.[21] For instance, the defendants are liable if they knew of the false statement or the omission, and also knew that investors were reasonably likely to rely on the misrepresentation or omission.[22]

*(vi) Section 301—Auditor Fraud Detection and Disclosure.*  Section 301 of the 1995 Reform Act adds Section 10A(a) to the 1934 Act. It requires that the audit performed by an independent public accountant shall include: "(1) procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts; (2) procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein; and (3) an evaluation of whether there is substantial doubt about the ability of the issuer to continue as a going concern during the ensuing fiscal year."[23] If the audit reveals fraud, the accountant has a responsibility to report the illegal acts to the appropriate parties.[24]

**17.3  ALTERNATIVE DAMAGES MEASURES.**  To deter violations of the federal securities acts, each law contains a different measure of recovery for investors damaged by fraudulent behavior. The goal is to make the plaintiff whole, either by undoing the tainted transaction or monetarily compensating for losses stemming from the infraction. Plaintiffs who prevail on the merits of their securities litigation may recover based on rescission, profits, or unspecified damages, by statute or court rulings, depending on the circumstance. Plaintiffs file most federal securities claims under Sections 11 and 12 of the 1933 Act and Section 10(b) of the 1934 Act. While the 1933 Act expressly states the damages methodology, the 1934 Act lacks distinct provisions for calculating damages, leaving the appropriate measure of damages to the court's discretion. Some of these measures use the plaintiff's injury as a benchmark to measure damages, whereas others consider the defendant's gain in the transaction. The Reform Act of 1995 includes additional guidelines on estimating damages.

**17 • 6     SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES**

**(a) Section 11 of the 1933 Act.**   Section 11 provides three alternative measures of damages. The plaintiff may recover the difference between the amount paid for the security and

1. The value of the security at the time the plaintiff brought the suit;
2. The price at which the seller sold the security prior to the suit; or
3. The price at which the seller sold the security after the plaintiff filed the suit, if the resulting damages are less than that calculated under (1.) above.

Damages do not include price declines attributable to factors other than the misrepresentations in the registration statement. Maximum damages recovered cannot exceed the price at which the seller offered the securities to the public.

**(b) Section 12 of the 1933 Act.**   If the court finds the issuer liable under Section 12, and the plaintiff still owns the security, a rescission remedy returns the plaintiff to his pre-transaction position. Rescission entitles the purchaser to consideration paid plus interest less any income received under tender of the security.[25] If the purchaser no longer owns the security, courts will award rescissionary damages, computed as the amount tendered at the time of purchase, reduced by the resale price and by income received on the security.

**(c) Section 9 of the 1934 Act.**   There has been no case law on the measure of damages under Section 9 of the 1934 Act.[26] In *Piper v. Chris-Craft Industries, Inc.,* however, the Supreme Court's language suggests that if a court finds liability, it should compute damages as the difference between the security's transaction price and the price absent the manipulative act (Kaufman, 1992, 5).[27]

**(d) Section 16 of the 1934 Act.**   Section 16(b) provides that the plaintiff recover the profit the defendant realized in connection with insider trading abuses. It does not expressly define profits, and in the event of multiple sales and purchases at different prices, the issue of profit calculation becomes ambiguous. In *Smolowe v. Delendo Corp.,* the court chose to calculate profits by matching the highest sale price to the lowest purchase price, matching the next highest sale price to the next lowest purchase price, and so on (Kaufman, 1992, 12).[28]

**(e) Section 10(b) of the 1934 Act and Rule 10b-5.**   The courts have not reached consensus on the appropriate measure of damages under Section 10(b) and Rule 10b-5. Section 10(b) contains no statutory remedy (Thorup, 1990, 23), and because most companies choose to settle Rule 10b-5 cases rather than risk the possibility of financial ruin in litigation, few court decisions on the measure of damages exist (Mullaney, 1977, 277). The Supreme Court ruled in *Affiliated Ute Citizens of Utah v. United States* that Section 28(a) of the 1934 Act provides the "correct measure of damages" (Lee, 1987).[29] Section 28(a) states that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of" (Mullaney, 1977, 280).[30] The courts have interpreted Section 28(a) to bar punitive damages;[31] to support the doctrine limiting the class of plaintiffs under Rule 10b-5 to actual buyers and sellers;[32] and

*(iii) Cover.*   Under the cover remedy, the defrauded seller receives the difference between the highest value the security achieved within a reasonable time after the disclosure of the fraud and the consideration received upon sale of the security. The leading case applying the cover measure is *Mitchell v. Texas Gulf Sulphur* (Lee, 1987, 1277). The defendant, Texas Gulf Sulphur, made an initial press statement denying rumors of an ore discovery; in a later press statement, however, the company admitted that it had made a valuable finding. The Tenth Circuit held that "the measure of damages used should award the reasonable investor the amount it would have taken him to invest in the TGS market within a reasonable period of time after he became informed of the [correct release]. . . . The award proposed would permit one to 'cover' by reinvestment and suffer neither loss nor forced sale."[37] The court viewed cover as an appropriate alternative when the defendant does not receive a windfall profit and the rescissionary measure is improper.

*(iv) Rescission.*   Rescission involves the restoration of the counterparties to their pre-transaction positions. True rescission involves the return of the security in exchange for the purchase price (plus interest); however, if the holder has already sold the security, the court may use the financial equivalent of rescission (i.e., rescissionary damages). Rescissionary damages equal the value of the security that would have been returned, estimated as either the market value at the time of the suit or the highest intervening market value (Thorup, 1990, 40).[38] The courts generally restrict rescission to cases with privity (i.e., direct dealings) between the plaintiff and the defendant, or where a breach of fiduciary duty or unjust enrichment occurs (Thorup, 1990, 40).[39]

*(v) Restitution.*   In contrast to monetary damages, restitution, sometimes called *windfall profits, disgorgement,* or *unjust enrichment,* focuses on the defendant's gain rather than on the plaintiff's loss. Unlike rescission, restitution does not require privity between the counterparties (Lee, 1987, 1284). In *Affiliated Ute Citizens of Utah v. United States,* the Supreme Court approved the restitutional measure, citing *Janigan v. Taylor,* for subsequent resale of the stock. The First Circuit Court of Appeals held in Janigan that "[I]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them" (Thompson, 1985, 235).[40] This ruling follows from the interpretation that federal securities laws attempt both to compensate defrauded parties and to deter fraudulent acts (Thompson, 1995, 236).[41]

*(vi) Consequential Damages.*   Plaintiff may pursue consequential damages—costs the plaintiff incurred as a result of the fraud—in connection with general, rescissionary, or restitutional damages. Examples of consequential damages established in the case law include dividends on stock sold by a defrauded investor, dividends on stock that the plaintiff would have purchased absent the fraud, brokerage fees incurred in the fraudulent transaction, and expenses related to repurchasing the security that the defrauded investor had sold (Lee, 1987, 1276). The courts have usually imposed two restrictions on consequential damages: (1) The plaintiff must establish a causal relationship between the expense and the fraud; and (2) consequential damages cannot duplicate the recovery from other damages measures (Lee, 1987, 1277). In general, the latter restriction does not bind when the court adopts the out-of-the-pocket rule or restitution as the measure of damages (Dobbs, 1973, sec. 9.3).

**(f) Section 21D(e) of the 1995 Act (Limitation on Damages).**  Plaintiffs and defendants have presented numerous variations of damages partly attributed to the stock price fluctuating widely for a period of time following the curative disclosure. Section 21D(e) of the 1995 Reform Act seeks to reduce the variation of damages by allowing a look-back period. Section 21D(e) stipulates that damages may not exceed "the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[42]

**17.4   ESTIMATING A SECURITY'S TRUE VALUE.**  To implement the out-of-pocket measure, analysts must estimate the security's true value absent the fraud or misrepresentation. To do this, they have developed financial valuation models that employ publicly available information.

The analyst must estimate the security's true value for the plaintiffs' class period, which typically extends from the date a fraud or misrepresentation occurs to the date the company makes a final curative public disclosure. During the class period, a plaintiff buys the stock at "too high" a price in a buyer's suit, and sells the stock at "too low" a price in a seller's suit. Examples of buyers' suits include 10b-5 claims in which the plaintiff alleges that it purchased stock at an inflated price owing to the company's concealment of material, adverse information—such as low expected earnings or a decline in the value of investment assets. Examples of a sellers' suit include 10b-5 claims in which the plaintiff alleges that it sold stock at a depressed price because of the company's failure to disclose material, positive information—such as an impending merger agreement or a large natural resource discovery.

Plaintiffs' class periods vary in length from a few days to several years. Plaintiffs may allege single or multiple occurrences of fraud or misrepresentation. A simple case may involve a single incident of fraud lasting only a few days before the company issues a corrective public disclosure. More complicated cases may involve multiple occurrences of fraud or misrepresentation over several years with partial disclosures of curative information and a final corrective disclosure at the end of the class period.

In theory, a true-value line represents the path that a stock price would have followed absent the alleged fraud. The difference between the actual stock price and the true value on a given day represents the amount of excess or shortfall in that day's price that is due to the alleged fraud and is referred to as inflation. In Exhibit 17-1, investors who purchased shares in the class period and still held shares at the end of the class period would be damaged by the amount of inflation at the time of purchase. In Exhibit 17-2, investors who purchased shares before the class period and sold shares during the class period are damaged by the amount of "negative" inflation. However, because the true-value line is unknown and must be estimated with a valuation model, some of the difference between the actual stock-price line and the estimated true-value line may result from nonfraud-related events the valuation model did not capture.

**17 • 10     SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES**



**Exhibit 17-1.   Example of a Simple Fraud in Which the Company Makes a Material, Positive Misrepresentation at Beginning of Class Period. (For illustrative purposes, actual prices and true-value line have been smoothed.)**



**Exhibit 17-2.   Inflation in a Seller's Suit. (For illustrative purposes, actual prices and true-value line have been smoothed.)**

**(a) Constructing a Value Line.**   One might think first to estimate the true value of a security from the bottom up (i.e., using accounting information such as asset value, earnings data, and other data that relates accounting information to share prices). Fischel (1982) noted, however, that such information is inherently speculative. Instead, economists have developed statistical techniques to control for factors such as the market, industry, and firm specific factors that likely influence a stock's

price. In the following sections, we explain methods that analysts can use to control for these factors and estimate the value line.

*(i) Market-Wide Information.*   To account for economy-wide information, experts commonly use the *market model* approach. The market model of finance theory (Fama, 1976), based on the capital asset pricing model (CAPM; Sharpe, 1964; Lintner, 1965), provides a reasonable basis for estimating a value line in many securities litigation cases. The market model statistically relates the returns on a stock to the returns on a broad-based portfolio of stocks (i.e., the market) through the following equation:

$$R_{i,t} = \alpha + \beta \cdot R_{m,t} + \epsilon_t, \tag{1}$$

where $R_{i,t}$ is the total return on the stock, and $R_{m,t}$ is the total return of the market index.[43] Common measures of the market include the Standard & Poor's 500 stock index and the NYSE composite index, market-value–weighted indexes composed of, respectively, 500 leading listed and over-the-counter stocks and all New York Stock Exchange–listed stocks.

The parameters of the model (which the analysis will estimate) are $\alpha$ and $\beta$.[44] The coefficient beta ($\beta$) measures the systematic risk of a stock (i.e., risk that one cannot diversify away by holding a broad-based portfolio of stocks). Beta represents the average percentage change in return on the stock for a one percent change in return on the market index. Thus, stocks with risk similar to the market have betas equal to one, while stocks that are more sensitive to market fluctuations have higher betas and stocks that are less sensitive to market fluctuations have lower betas. See Section 17.4(b) and Chapter 7 for more discussion on regression analysis.

In equation (1), $\epsilon_t$ (the residual term) represents the residual risk. This is the portion of the security's daily price change remaining unexplained by changes in the broad market and results, generally, from company-specific events.

The courts have recognized the use of a market index to exclude losses resulting from external market forces (Kaufman, 1992, Ch. 9, p. 27).[45] In other words, the plaintiff's recovery cannot exceed the losses caused by the fraud or misrepresentation, so will exclude losses created by market risk acceptable to the plaintiffs on an *ex ante* basis. The analysis should also exclude losses caused by factors unrelated to the fraud, when the market index does not adequately reflect those losses. The following sections discuss some of these factors.

*(ii) Industry-wide Information.*   In addition to market-wide information, the effects of industry-wide information, such as technological innovations, changes in demand, the level of competition within the industry, and regulatory announcements, can affect stock prices. An extension of the market model, known as a *factor model*, can capture the effects of this industry-wide information. A factor model may include returns of a relevant industry index and the market return as dependant variables. For example, a two-factor model of returns could be:

$$R_{i,t} = \alpha + \beta_1 \cdot R_{m,t} + \beta_2 R_{Ind, t} + \epsilon_t \tag{2}$$

where $R_{Ind, t}$ is the industry return. In some cases, the analysis could include returns of additional factors, such as other industries or sub-industries. As in the single factor market model, the residual term $\epsilon_t$ represents the portion of the security's return which the model's factors cannot explain and, in a well-specified model, results from firm-specific information and events.

*(iii) Firm-Specific Information and Event Analysis.*  As discussed above, in addition to general factors, various firm-specific events such as contract awards, patent filings, product announcements, partnership arrangements, strikes, and earnings affect an individual security's prices. The residual term $\epsilon_i$ in equations (1) and (2) captures these effects. The analysis can measure the effects of this information from the security's residual daily price changes obtained from the market model. This technique is called an *event analysis* or *event study*. Cornell and Morgan (1990, 903–904) propose the event-study approach to estimate the value line. On disclosure dates only, this approach replaces actual returns with returns estimated from a market model. The declines on the disclosure dates are thereby limited to those attributable to the fraud. Cornell and Morgan, however, note that this approach will understate damages if additional information leaks on nondisclosure dates.

Research indicates that security prices respond rapidly to the announcement of new information. Stock prices capture the effect of new information within hours (if not minutes) of the announcement of news. Given the speed with which a security price adjusts for new information, an event analysis focuses on the residual daily price change on the day of the newswire release. An event study may include one or both of the adjacent days if the analyst believes a leak occurred, or if the release of information came after the close of trading. In many cases, analysts should examine intraday security price movements. Event analysis permits one to identify which residual daily price changes are significant in the statistical sense that they exceed normal fluctuations for the security. This identification provides a basis for assessing which events likely have materially affected the security's price. As a result, event analysis usually can explain most of the significant residual daily price changes (that market and industry information cannot explain).

Next, the analysis separates the litigation-related price effects of firm-specific information from other causes of price change. Simultaneous announcements can create a major difficulty in extracting these separate effects. Supporting materials, such as analysts' reports and news articles, often can help assess the relative importance attached to information. By using the market model to account for market and industry information, and event analysis to identify the material firm-specific events, one can obtain an unbiased assessment of the effects of litigation-related events on a per share basis. (See Chapter 7, Section 7.6(e) for discussion of indicator variables, which is the technique to implement event studies.)

**(b) Implementation Issues in Using Regression Analysis to Estimate Damages.**  Implementing the linear regression model for estimating a stock's true value requires that the analyst address the following issues.

*(i) Data Periodicity.*  Securities cases typically use daily rates of return. Analysts can use daily data for popular market indexes and actively traded common stocks to construct industry indexes. When one cannot obtain a daily index for a particular asset class because of data limitations, one may appropriately estimate a weekly or monthly model, and modify the results to calculate daily damages estimates.

*(ii) Which Data Period to Use in the Estimation—Preclass Period, Within-Class Period, or Post-class Period?*  In selecting an appropriate sample period, we exclude the plaintiff's class period (i.e., from the date of the fraud to its disclosure), as well as other time periods when the fraud has tainted prices. For example, uncertainty related to po-

tential securities litigation may affect stock prices in the postclass period. Thus, whereas analysts commonly use data from the preclass period for estimating a true value line, including data from the postclass period depends on how disclosure of the fraud may have affected stock prices.

*(iii) How Many Observations to Include in the Sample Period?*   The analyst should consider the trade-off between including a sufficient number of observations for statistically reliable parameter estimates and using a shorter sample period to reduce the effect caused by changes, if any, in parameters over time. Changes in a company's operating or financial policy—such as selling off or purchasing a business line or increasing the debt ratio—or changes in regulatory policies that affect the company may cause the parameters of the market model or factor model to change over time. The possibility of a change in the statistical relationship between the returns on the stock and returns on the independent variables over time suggests that the models may under- or overstate damages, particularly if a structural change occurs within the plaintiffs' class period. This problem increases in importance for securities cases involving longer class periods of several months or years.

*(iv) Whether to Backcast or Forecast the Value Line?*   The analysis estimates the true return on the stock during the class period by substituting the actual values of the index variables along with the estimated parameters into equation (1) or (2). This yields a predicted return absent the fraud or misrepresentation. The analysis then uses this estimated true return to estimate the true price (the true-value line).

Two basic approaches for using the true returns to obtain the value line are *backcasting* and *forecasting*. The forecasting method obtains the value line from the true returns by forecasting prices forward using the security's actual reported price the day before the class period starts. Since this price comes from a period before the class period, it reflects no effects of fraud or misrepresentation. Thus, using the clean price on the day prior to the start of the class period, equation (3) provides the estimate of the true-value on the first day of the class period, denoted by $P_1$:

$$P_1 = P_0(1 + R_1), \qquad (3)$$

where $P_0$ is the security's price the day before the class period starts, $R_1$ is the true return on day 1 of the class period.[46] The estimate of the true-value on the second day of the class period, denoted by $P_2$, is:

$$P_2 = P_1(1 + R_2), \qquad (4)$$

where $P_1$ is the price obtained from equation (3) above.

Similarly, for the remaining days, the estimate of the true value at time $t$ is

$$P_t = P_{t-1}(1 + R_t). \qquad (5)$$

With backcasting, the true-value line results from working backwards using the true returns and the security's actual price on the day after the class period ends. This price contains no effect of fraud and misrepresentations because the class period, by definition, ends with full disclosure. Equation (6) gives the (estimated) true value on the last day of the class period, denoted by $P_T$:

$$P_T = \frac{P_{T+1}}{(1 + R_{T+1})}. \qquad (6)$$

where $P_{T+1}$ is the security's price the day after the class period ends, and $R_{T+1}$ is the security's true return. Once the analysis computes $P_T$, that price and $R_T$ imply the price $P_T - 1$ and so, using the recursive backcasting relationship:

$$P_{t-1} = \frac{P_t}{(1 + R_t)} . \tag{7}$$

Both backcasting and forecasting present potential problems to consider. One can use the forecasting model to predict $P_{T+1}$ (the price the day after the class period ends) with the forecasting equation:

$$P_{T+1} = P_T(1 + R_{T+1}). \tag{8}$$

Only by chance will that estimate of the true price $P_{T+1}$ equal the actual reported price on the day after the class period ends. Similarly, if the analysis uses $P_1$ and $R_1$ to estimate $P_0$ (the true price on the day before the class period starts) with the backcasting equation, only by chance will the estimated true price equal the actual reported price. In other words, by simply backcasting and forecasting without other adjustments, the model will provide estimates of true values inconsistent with observed prices outside of the class period. This can lead to misestimates of damages. In particular, multiple occurrences of fraud throughout the class period make backcasting inappropriate for estimating the value line. Exhibit 17-3 illustrates how a backcasted value line incorrectly attributes the full value of the fraud to the beginning of the class period, overstating damages.

The event analysis approach can help address these problems by examining days on which the difference in the actual price and true price differs and ascertaining whether these changes relate to fraud or other events. A chronology of relevant events, using publicly available data sources such as news releases and analysts' reports, can enable the expert to decide whether to adjust the value line to account for nonfraud related company-specific events.



**Exhibit 17-3.   An Example of How Backcasted Value Line May Overstate Damages When Multiple Concealments of Material, Negative Information Occur During the Class Period**

**(c) Errors in Examining the Effect of Litigation-Related Events.** Failure to remove all factors that affect share price can over- or underestimate the affect of litigation-related events. An overestimate results from erroneously concluding that litigation-related information had a price effect, when in fact some other event caused the price change. Overestimates are present in every securities case because large price declines precipitate securities litigation and such declines can result from many causes, which become difficult to isolate. Hence, the plaintiff may opt to include losses unrelated to the cause of action but also indistinguishable from those that are related. Underestimates can arise when other events obscure the price effects of litigation-related information. They could lead one to erroneously conclude there was no price effect, when in fact there was one. In these cases, much of the price decline results from unfavorable economy-wide, industry-wide, or nonlitigation related, firm-specific information. Analysis can detect such effects, not detectable in the raw prices, after it removes the effects of other factors.

**17.5 DAMAGES METHODOLOGY.** Once analysts have established the value-line, they have measured total damages to the class. For a class action suit involving buyers, damages per share equal the difference between the actual purchase price and the true purchase price absent the fraud (given by the true-value line) less the difference between the true sales price (again given by the true-value line) and the actual sales price. Mathematically, one can express this as

$$(P_B - \hat{P}_B) - (P_S - \hat{P}_s), \qquad (9)$$

where $P_B$ is the class member's actual purchase price, $\hat{P}_S$ is the true price on the date of purchase, $P_S$ is the actual sale price on the date of sale, $\hat{P}_S$ and is the true price on the date of sale. The first term in this expression represents the loss incurred from purchasing the security at an inflated price. The second term offsets these damages with the gain (if any) from selling the security at an inflated price.

For class action suits involving sellers where the fraud depressed or pushed down the stock price, one can rewrite equation (9) as

$$(\hat{P}_S - P_S) - (\hat{P}_B - P_B). \qquad (9')$$

In this equation, damages is the loss from selling the security at an alleged deflated price offset by any gains from purchasing the security at a price less than the true value. Total damages for a member of a class equals the damages per share multiplied by the number of shares traded by that member. Total damages for the class are the sum of damages incurred by each class member.

Although this describes how to theoretically calculate damages, in practice, it requires knowledge of the exact trading behavior and shares traded by each class member. Because trades frequently occur in street name (i.e., the broker's name), identifying the trading patterns of individual security owners is costly, usually impossible. Hence, analysts must use a model to estimate the number of damaged shares.

**(a) Estimating the Number of Damaged Shares**

*(i) Introduction to the Basic Model.* Analysts can estimate the number of damaged shares with a proportional trading model or a variant of it. Employing some simplifying

assumptions, such models seek to estimate the trading pattern of shares during the class period using more readily observable data (such as daily volume and shares outstanding). The idea of a *trading cohort* helps clarify this type of model. A trading cohort is a group of shareholders who purchase shares at the same time. Most 10b-5 cases assume that the *same time* means the *same day*. The analysis lumps together into a single cohort all nonclass members who purchased shares prior to the class period, regardless of the day they purchased shares. In its simplest form, the proportional trading model assumes that the trading volume each day comprises traders from each cohort in proportion to their relative numbers. This model makes no attempt to use data for specifically identifiable trades even when one can identify them.

Exhibits 17-4 through 17-9 illustrate a hypothetical example. This example assumes a class period of eight days. Exhibit 17-4 provides the daily volume and float.[47] On the day prior to the class period, cohort 0 holds 100 outstanding shares. As illustrated in Exhibit 17-5, on the first day of the class period, cohort 1 purchases shares equal to the daily volume of 12 shares, which they purchase from cohort 0. On the second day of the class period, cohort 2 purchases 8 shares equal to the daily volume on that day. The proportional trading model makes the assumption that these shares come from cohorts 0 and 1 in proportion to the holdings of cohorts 0 and 1: 88/100 from cohort 0 and 12/100 from cohort 1. Exhibit 17-6 depicts the end of day holdings for each cohort after applying the trading pattern calculated in Exhibit 17-5. The exhibits demonstrate that, with the equal proportion model, of the eight shares that cohort 2 purchases, approximately 7.04 shares come from cohort 0 and 0.96 shares from cohort 1. The ratio of trades made by cohort 0 on day 2 to cohort 0 holdings at the end of day 1 [7.04/88 = 0.08] equals the ratio of day 2 cohort 1 trades to cohort 1 holdings at the end of day 1 [0.96/12]. In other words, cohort 0 and cohort 1 each sold 8 percent of their holdings to cohort 2.

To continue the illustration, on day three of the class period, cohort 3 purchases 5 shares from cohorts 0, 1, and 2. As the exhibit shows, cohort 3 purchases 4.05 shares from cohort 0, 0.55 shares from cohort 1, and 0.4 shares from cohort 2. Again, notice that the ratio of shares traded by cohort 0 at the end of day 3 to shares held by cohort 0 on day 2 [4.05/80.96 = 0.05] equals the ratio of day 3 trades by cohort 2 to day 2 cohort 2 holdings [0.4/8 = 0.05].

| Day | Date | Adjusted Float (Shares) | Adjusted Volume (Shares) |
|---|---|---|---|
| 0 | 01/13/97 | 100 | 10 |
| 1 | 01/14/97 | 100 | 12 |
| 2 | 01/15/97 | 100 | 8 |
| 3 | 01/16/97 | 100 | 5 |
| 4 | 01/17/97 | 100 | 10 |
| 5 | 01/18/97 | 100 | 12 |
| 6 | 01/19/97 | 100 | 10 |
| 7 | 01/20/97 | 100 | 10 |
| 8 | 01/21/97 | 100 | 10 |
| Retained | 01/22/97 | 100 | 10 |

Exhibit 17-4.   Hypothetical Volume and Float for Simplified Example of the Proportional Trading Model

Using the proportional trading assumption, the analysts can calculate a matrix of cohort trades corresponding to damaged shares for the class period as shown in Exhibit 17-5. The last row of this table contains the retained shares. These are the remaining shares not sold by the cohort during the class period.

To complete this simplified damages calculation, one must calculate damages per share. Exhibit 17-7 shows the true price and actual price for this example. Using this and equation (9) for calculating damages per share provided above, Exhibit 17-8 provides the damages per share for each cohort. Notice that the damages per share depends on the day that the cohort sells shares. For example, members of cohort 2 who sell on day 3 of the class period suffer $0.10 per share damages

| Day | Cohort | | | | | | | | |
|-----|--------|--------|--------|--------|--------|--------|--------|--------|---------|
|     | 0      | 1      | 2      | 3      | 4      | 5      | 6      | 7      | 8       |
| 1   | (12.00) | 12.00  | —      | —      | —      | —      | —      | —      | —       |
| 2   | (7.04)  | (0.96) | 8.00   | —      | —      | —      | —      | —      | —       |
| 3   | (4.05)  | (0.55) | (0.40) | 5.00   | —      | —      | —      | —      | —       |
| 4   | (7.69)  | (1.05) | (0.76) | (0.50) | 10.00  | —      | —      | —      | —       |
| 5   | (8.31)  | (1.13) | (0.82) | (0.54) | (1.20) | 12.00  | —      | —      | —       |
| 6   | (6.09)  | (0.83) | (0.60) | (0.40) | (0.88) | (1.20) | 10.00  | —      | —       |
| 7   | (5.48)  | (0.75) | (0.54) | (0.36) | (0.79) | (1.08) | (1.00) | 10.00  | —       |
| 8   | (4.93)  | (0.67) | (0.49) | (0.32) | (0.71) | (0.97) | (0.90) | (1.00) | 10.00   |
| Retained | (44.41) | (6.06) | (4.39) | (2.89) | (6.42) | (8.75) | (8.10) | (9.00) | (10.00) |

*Notes:* (1) Negative numbers (denoted by parentheses) indicate sales and positive numbers indicate buys.
(2) Cohort 0 holds 100 shares initially.

**Exhibit 17-5.  Trading Pattern for Proportional Trading Model with Hypothetical Example**

| Day | Cohort (Number of Shares) | | | | | | | | |
|-----|--------|-------|------|------|-------|-------|-------|-------|-------|
|     | 0      | 1     | 2    | 3    | 4     | 5     | 6     | 7     | 8     |
| 1   | 88.00  | 12.00 | —    | —    | —     | —     | —     | —     | —     |
| 2   | 80.96  | 11.04 | 8.00 | —    | —     | —     | —     | —     | —     |
| 3   | 76.91  | 10.49 | 7.60 | 5.00 | —     | —     | —     | —     | —     |
| 4   | 69.22  | 9.44  | 6.84 | 4.50 | 10.00 | —     | —     | —     | —     |
| 5   | 60.91  | 8.31  | 6.02 | 3.96 | 8.80  | 12.00 | —     | —     | —     |
| 6   | 54.82  | 7.48  | 5.42 | 3.56 | 7.92  | 10.80 | 10.00 | —     | —     |
| 7   | 49.34  | 6.73  | 4.88 | 3.21 | 7.13  | 9.72  | 9.00  | 10.00 | —     |
| 8   | 44.41  | 6.06  | 4.39 | 2.89 | 6.42  | 8.75  | 8.10  | 9.00  | 10.00 |

*Note:* Cohort 0 holds 100 shares initially.

**Exhibit 17-6.  Cohort Holdings at the End of Day**

| Day | Date | Actual Price | True Value |
|-----|------|--------------|------------|
| 0 | 01/13/97 | $13.00 | $13.00 |
| 1 | 01/14/97 | 18.00 | 15.00 |
| 2 | 01/15/97 | 18.60 | 15.50 |
| 3 | 01/16/97 | 18.00 | 15.00 |
| 4 | 01/17/97 | 16.80 | 14.00 |
| 5 | 01/18/97 | 15.60 | 13.00 |
| 6 | 01/19/97 | 14.40 | 12.00 |
| 7 | 01/20/97 | 13.20 | 11.00 |
| 8 | 01/21/97 | 12.00 | 10.00 |
| 9 | 01/22/97 | 9.00 | 9.00 |

Exhibit 17-7.  Hypothetical Actual Price and True-Value for Simplified Example

while investors who sell on day 6 of the class period suffer $0.70 per share damages. In some instances, equation (9) computes negative damages per share, indicating that the inflation per share caused by the fraud on the sale date exceeded that on the purchase date. In such instances, analysts typically assign damages of zero. For example, cohort 1 members who sold on day 2 purchased with $3.00 of inflation and sold with $3.10 of inflation, benefiting from the fraud by $0.10 per share. In this case, for purposes of calculating damages, the expert typically sets damages per share to zero.

The last row of Exhibit 17-8 shows the damages for retained shares. (Shares both purchased and sold during the class period are called *in-and-out* shares.) For retained shares, damages arise only from inflation at the time of purchase since by the end of the class period the fraud is fully revealed.

Combining Exhibits 17-5 and 17-8, the expert computes damages by multiplying the number of shares traded with the corresponding damages per share. Exhibit 17-9 illustrates the total damages calculation. The exhibit shows the breakdown between retained damages and in-and-out damages. In this example, the in-and-out shares also incur damages. If the inflation is a constant during the class period, in-and-out damages would be zero.

*(ii) Adjustments to Basic Model.*    In practice, to implement the model discussed in the previous section, analysts make several adjustments to volume and float. The example assumed that all of the reported daily volume on a given day was purchased by that day's cohort; however, for several reasons (discussed directly below), analysts adjust the daily volume that the cohort purchases on a given day.

*Specialist and Intraday Trading.*    The analysis usually reduces reported volume to account for double counting resulting from the role of specialists and market makers in the marketplace. Atkins and Dyl (1997) have shown that approximately 50 percent of the daily Nasdaq trading volume results from market maker trading. Similarly, Gould and Kleidon (1994) attributed approximately 58 percent of a Nasdaq security's trading volume to market maker activity.

Also, the expert should reduce reported daily volume to account for intraday trades. Since the expert usually assumes that damages per share are constant

| Class Period Day on Which Cohort Sells | Cohort | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 1 | — | — | — | — | — | — | — | — |
| 2 | — | — | — | — | — | — | — | — |
| 3 | — | $0.10 | — | — | — | — | — | — |
| 4 | $0.20 | 0.30 | $0.20 | — | — | — | — | — |
| 5 | 0.40 | 0.50 | 0.40 | $0.20 | — | — | — | — |
| 6 | 0.60 | 0.70 | 0.60 | 0.40 | $0.20 | — | — | — |
| 7 | 0.80 | 0.90 | 0.80 | 0.60 | 0.40 | $0.20 | — | — |
| 8 | 1.00 | 1.10 | 1.00 | 0.80 | 0.60 | 0.40 | $0.20 | — |
| Retained | 3.00 | 3.10 | 3.00 | 2.80 | 2.60 | 2.40 | 2.20 | $2.00 |

*Note:* For retained shares, the damages at sale is zero. Therefore, damages per share for retained shares is the actual price of purchase less the true value of purchase.

**Exhibit 17-8.   Damages per Share for Hypothetical Example**

| Day | Cohort | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 1 | — | — | — | — | — | — | — | — |
| 2 | — | — | — | — | — | — | — | — |
| 3 | — | $0.04 | — | — | — | — | — | — |
| 4 | $0.21 | 0.23 | $0.10 | — | — | — | — | — |
| 5 | 0.45 | 0.41 | 0.22 | $0.24 | — | — | — | — |
| 6 | 0.50 | 0.42 | 0.24 | 0.35 | $0.24 | — | — | — |
| 7 | 0.60 | 0.49 | 0.29 | 0.48 | 0.43 | $0.20 | — | — |
| 8 | 0.67 | 0.54 | 0.32 | 0.57 | 0.58 | 0.36 | $0.20 | — |
| Retained | 18.17 | 13.60 | 8.66 | 17.96 | 22.74 | 19.44 | 19.80 | $20.00 |

*Note:* The estimated damages for each cohort on a particular day is equal to the shares traded on that day (from Exhibit 17-5) and the damages per share (from Exhibit 17-8).

**Exhibit 17-9.   Estimated Damages Based on Proportional Trading Model for Hypothetical Example**

within a day, traders who buy and sell within the same day generally do not suffer any damages resulting from fraud. Their gains from inflation at sale just offset their losses due to inflation at purchase.

*Institutions.*   The presence of institutions may require reduction in the float. Index funds and other institutions may not trade a particular security during the class period. As such, the shares they hold should not count in the float—defined as the shares available to trade.

The presence of other factors requires adjustments to the float and to the daily volume.

*Short Sales.*   In a short sale transaction, an investor sells shares borrowed from another investor. At a later date, the short sale investor buys the shares and returns them to the original owner. The short interest for a given security represents the aggregate short position of investors. When the short interest increases (i.e., short sellers sell more shares short), short sellers have in effect increased the float because the shares they sell are "borrowed" and resold. Similarly, decreases in the short interest reduce float. Also, when the short position decreases, analysts often adjust the daily volume to reflect that short sellers have made some of the purchases on that day. Short sellers, who speculate that a stock price will decrease, generally exclude themselves from the plaintiff class alleging that fraud caused price inflation. Occasionally, the court will exclude them.

*Buybacks and Offerings.*   When a company buys back shares, the float decreases by the amount of the buyback. If the reported daily volume includes the buyback, then the analyst should reduce the float. A securities offering increases the float. If the reported daily volume does not include the shares in the offering, the reported daily volume should increase to reflect that the cohort on the day of the offering also purchased the shares in the offering. Again, to the extent that some investors buy and sell the shares on the offering day (often called *flipping* shares), the volume arising from buying and selling in the same day should not count as part of the cohort purchase for that day.

*Insiders.*   Insiders are not considered part of the class, and their purchases should not count in either the float or the volume. When insiders sell, the float increases. The shares they held become available for trading. When insiders purchase, the float decreases. Also, on days when insiders purchase, the expert should reduce the volume in calculating the volume purchased by the damaged cohort. Insiders are not part of the damaged cohort.

**(b) Extensions of the Basic Model.**   Some theories and evidence indicate that the proportional trading model overestimates damages. (See Koslow, 1991; Beaver, Malernee, and Keeley, 1997.) This overestimation arises from the proportional trading assumption—that daily volume consists of sales from existing cohorts in proportion to their holdings. Several extensions to the basic model relax this assumption.

*(i) Accelerated Trading Model.*   One extension is the accelerated trading model. This model assumes that cohorts that have recently purchased are more likely to trade than cohorts who purchased earlier. In other words, the recent purchaser is more likely to sell than one who purchased less recently. Consider, for example, the significant number of purchasers who buy to hold. Instead of assuming a constant trading proportion applies to each cohort, the accelerated trading model allows the trading proportion to vary by cohort.

One way to operationalize this model assumes that damaged shares within the class period are more likely to trade than shares purchased before the class period (i.e. cohort 0). Exhibit 17-10 shows that, for the example above, with an acceleration factor of 3.0, the accelerated trading model reduces damages by approximately 30 percent.

| | Cohort | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Day** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** |
| 1 | — | — | — | — | — | — | — | — |
| 2 | — | — | — | — | — | — | — | — |
| 3 | — | $0.12 | — | — | — | — | — | — |
| 4 | $0.42 | 0.58 | $0.28 | — | — | — | — | — |
| 5 | 0.66 | 0.75 | 0.44 | $0.61 | — | — | — | — |
| 6 | 0.52 | 0.55 | 0.35 | 0.65 | $0.56 | — | — | — |
| 7 | 0.50 | 0.51 | 0.34 | 0.70 | 0.81 | $0.44 | — | — |
| 8 | 0.46 | 0.46 | 0.31 | 0.69 | 0.90 | 0.65 | $0.42 | — |
| Retained | 5.25 | 4.96 | 3.53 | 9.17 | 14.75 | 14.81 | 17.40 | $20.00 |

*Note:* Total Damages: 103.56.

**Exhibit 17-10.   Estimated Damages Based on Accelerated Trading Model for Hypothetical Example**

*(ii) Multi Trader.*   Another extension to the basic proportional trading model is the multitrader model. This model assumes that the propensity to trade differs among traders. The two-trader model supposes two types of trader—those who trade frequently (*active traders*) and those who don't trade as frequently (*inactive traders*). Active traders account for a larger proportion of the volume than do inactive traders. As a result, active traders trade and retrade more often. A particular cohort consists of both active and inactive traders, but an active trader is less likely to retain shares than an inactive trader. For example, if we employ a two-trader model and assume that active traders hold 20 percent of the float but account for 75 percent of the volume, and inactive traders hold 80 percent of the float but only account for 25 percent of the volume, estimated damages decline substantially.

**NOTES**

1. Editors' note: From this point forward, we drop the adjective *alleged* from the phrase *alleged fraud*. For the damages study to become important in court, plaintiffs must have already proved the fraud. If the plaintiff fails to prove fraud, the damages study derived with the methods of this chapter, becomes moot.

2. Securities Act of 1933, Section 1 *et seq.*, 15 USC Section 77a *et seq.*

3. Securities Exchange Act of 1934, Section 1 *et seq.*, 15 USC Section 78a *et seq.*

4. *Securities Litigation Reform,* Report 104-369, November 28, 1995.

5. 15 USC Section 77k(a).

6. Ibid.; *McFarland v. Memorex Corp.*

7. 15 USC Section 77(e).

8. 15 USC Section 77l(2).

9. 15 USC Section 78i(e).

10. 15 USC Section 78i(a), (b), and (c).

11. 17 CFR 240, 10b-5.

12. *Securities Litigation Reform,* Report 104-369, and *Joint Explanatory Statement of the Committee of Conference,* November 28, 1995.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ibid.

17. Ibid.

18. Ibid.

19. *The Private Securities Litigation Reform Act of 1995,* Pillsbury Madison & Sutro.

20. *Securities Litigation Reform,* Report 104-369, and *Joint Explanatory Statement of the Committee of Conference,* November 28, 1995.

21. *The Private Securities Litigation Reform Act of 1995,* Pillsbury Madison & Sutro.

22. *Securities Litigation Reform,* Report 104-369, and *Joint Explanatory Statement of the Committee of Conference,* November 28, 1995.

23. Ibid.

24. "Securities Litigation Reform Act Effective Immediately," *World Reports,* Volume VIII, No. 2 – July 1996.

25. 15 USC Section 77l(2).

26. 15 USC Section 78i(e).

27. 430 U.S. 1, 51 L.Ed.2d 124, 97 S.Ct. 926 (1977).

28. *Smolowe v. Delendo Corp.*

29. 406 U.S. 128 (1972) at 155.

30. 15 USC Section 78bb(a) (1970).

31. See, e.g., *Green v. Wolf Corp.*

32. See, e.g., *Blue Chip Stamps v. Manor Drug Stores,* at 734–35.

33. See, e.g., *Byrnes v. Falkner, Dawkins & Sullivan.*

34. *Estate Counseling Serv., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*

35. See also, *Harris v. American Investment Co.*

36. See also, *In re Fortune Systems Securities Litigation.*

37. 446 F.2d at 105.

38. *Myzel v. Fields,* at 742.

39. *Mitchell v. Texas Gulf Sulphur Co.,* at 105.

40. 344 F.2d at 786.

41. See, e.g., *Nelson v. Serwold.*

42. Securities Litigation Reform, Report 104-369, November 28, 1995.

43. The total return includes price appreciation and dividends.

44. These parameters are typically estimated through regression analysis.

45. See, e.g., *Rolf v. Blyth, Eastman Dillon & Co., Inc.* at 49.

46. If dividends are paid, the equation should be modified to reflect that $R_1$ is the total return, including dividends.

47. The float is defined as the shares available for trading or equivalently is the total shares held by all the cohorts at any point in time.

## LIST OF CASES

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972).

*Arrington v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 651 F. 2d 614, 621 (9th Cir. 1981).

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975).

*Byrnes v. Falkner, Dawkins & Sullivan,* 550 F.2d 1303, 1313–14 (2d Cir. 1997).

*Estate Counseling Serv., Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 303 F. 2d 527, 533 (10th Cir. 1962).

*Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir. 1968).

*Harris v. American Investment Co.,* 523 F.2d 220, 225 (8th Cir. 1975) *cert. denied,* 423 U.S. 1054 (1976).

*In re Fortune Systems Securities Litigation,* 89 F.R.D. 104 (N.D. Cal. 1987).

*Janigan v. Taylor,* 344 F.2d 781 (1st Cir.), *cert. denied,* 382 U.S. 879 (1965).

*McFarland v. Memorex Corp.,* 96 F.R.D. 357 (N.D. Cal. 1982).

*Mitchell v. Texas Gas Sulfur,* 446 F.2d 90, 105 (10th Cir.), *cert. denied,* 404 U.S. 920 (1987).

*Myzel v. Fields,* 386 F.2d.

*Piper v. Chris-Craft Industries,* 430 US 1, 51 L.ED.2d 124, 97 S.Ct. 926 (1977).

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 (CA-2 1978).

*Smolowe v. Delendo Corp.,* 136 F. 2d 231, 239 (CA-2 1943).

## BIBLIOGRAPHY

Atkins, A.B., and E.A. Dyl. 1997. Market structure and reported trading volume: NASDAQ versus the NYSE. *The Journal of Financial Research* (Fall).

Beaver, W.H., J.K. Malernee, and M.C. Keeley. 1997. Stock trading behavior and damage estimation in securities cases. Cornerstone Research.

Bodie, A., A. Kane, and A.J. Marcus. 1993. *Investments.* 2nd ed. Homewood, IL: Irwin.

Cornell, B., and R.G. Morgan. 1990. Using finance theory to measure damages in fraud on the market cases. *UCLA Law Review* 37 (5): 883–924.

Dobbs, D.B. 1973. *Handbook on the Law of Remedies.* St. Paul, MN: West Publishing Co.

Easterbrook, F.H., and D.R. Fischel. 1985. "Optimal damages in securities case. *University of Chicago Law Review* 52 (3): 611–652.

Fama, E.F., L. Fisher, M. Jensen and R. Roll. 1969. The adjustment of stock prices to new information. *International Economic Review* 10 (February): 1–21.

Fama, E.F. 1976. *Foundations of Finance.* New York: Basic Books.

Fischel, D.R. 1982. Use of modern finance theory in securities fraud cases involving actively traded securities. *The Business Lawyer* 38 (1): 1–20

Gould, J.F., and A.W. Kleidon. 1994. Market maker activity on NASDAQ: Implications for trading volume. *Stanford Journal of Law, Business & Finance.*

Kaufman, M.J. 1992. *Securities Litigation: Damages.* Deerfield, IL: Clark Boardman Callaghan.

Koslow, J. 1991. Estimating aggregate damages in class-action litigation under Rule 10b-5 for purposes of settlement. *Fordham Law Review* 59 (5): 811–842.

Lee, C.F. 1993. *Statistics for Business and Financial Economics.* New York: Heath.

Lee, R.B. 1997. The measure of damages under Section 10(b) and Rule 10b-5. *Maryland Law Review* 46 (Summer): 1266–92.

Lintner, J. 1965. Security prices, risk, and maximal gains from diversification. *Journal of Finance* (December): 587–615.

Mullaney, T.J. 1977. Theories of measuring damages in security cases and the effects of damages on liability. *Fordham Law Review* 46: 277–94.

Sharpe, W.F. 1964. Capital asset prices: A theory of market equilibrium under conditions of risk. *Journal of Finance* 19 (September): 425–42.

Sharpe, W.F., and G.J. Alexander. 1990. *Investments.* 4th ed. Englewood Cliffs, N.J.: Prentice-Hall.

**17 ○ 24**    **SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES**

Thompson, R.D. 1985. The measure of recovery under Rule 10b-5: A restitution alternative to tort damages. *Securities Law Review* 17: 213–62.

Thorup, R.A. 1990. Theories of damages: Allowability and calculation in securities fraud litigation. *Securities Regulation Law Journal* 18 (1): 23–52.

Wonnacott, R.J., and T.H. Wonnacott. 1979. *Econometrics*. 2nd ed. New York: John Wiley & Sons.