LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (68581)
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
– and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
JENNIE LEE ANDERSON (203586)
MONIQUE C. WINKLER (213031)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION |
| ALL ACTIONS. | |

| | |
|---|---|
| DATE: | November 1, 2005 |
| TIME: | 9:30 a.m. |
| COURTROOM: | The Honorable Martin J. Jenkins |

# TABLE OF CONTENTS

Page

I. Oracle Corporation Cannot Credibly Contest that Common Questions of Law and Fact Predominate Over Individual Questions ....1

A. Contrary to Defendants' Assertion, *Dura* Nowhere Requires a "Corrective Disclosure" ....3

B. Defendants' Unsupported Expectation of Individual Damages Issues Cannot Defeat Class Certification ....4

C. Oracle and Its Expert Ignore Detailed Disclosures Revealing Oracle's True Financial Condition ....6

II. The Proposed Class Representatives Are Adequate to Represent the Class and Their Claims Are Typical ....9

A. SEIU 1199 Is an Adequate Class Representative ....10

B. Mr. Kuehmichel Is an Adequate Class Representative ....11

C. Drifton Finance Corporation Is an Adequate Class Representative ....12

D. Robert Sawyer Is an Adequate Class Representative ....13

E. Dzung Chu Is an Adequate Class Representative ....14

III. The Proposed Class Representatives Are Typical of the Class and Are Not Subject to Unique Defenses ....15

A. Each Proposed Class Representative Lost a Substantial Amount on Their Oracle Investments ....15

B. Virtually All Large Institutions Use Investment Advisors – This Practice Does Not Subject Them to Unique Defenses ....16

C. Sophisticated Trading Strategies Do Not Defeat Typicality ....17

1. Mr. Chu Relied on the Integrity of the Market When Trading in Oracle Securities ....18

2. Mr. Kuemichel and Drifton Both Relied on the Integrity of the Market When Trading in Oracle Securities ....19

IV. Defendants Bear the Burden of Rebutting the Presumption of Reliance and Cannot Do So Here ....20

A. Plaintiffs Are Not Required to Show Lack of Knowledge of Fraudulent Scheme ....20

B. Defendants' Own Exhibits Negate a Truth-on-the-Market Defense and Contain Their Continuing False Assurances that Served to Drown Out Any So-Called Truth ....22

**TABLE OF AUTHORITIES**

**Page**

*Allapattah Servs., Inc. v. EXXON Corp.*,
333 F.3d 1248 (11th Cir. 2003) ....................5

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................1

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)....................17

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)....................20

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ....................5, 15, 20

*Cameron v. E.M. Adams & Co.*,
547 F.2d 473 (9th Cir. 1976) ....................2

*Dukes v. Wal-Mart Stores, Inc.*,
222 F.R.D. 137 (N.D. Cal. 2004)....................7, 8, 12, 21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. __, 125 S. Ct. 1627 (2005).................... *passim*

*Eisen v. Carlisle*,
417 U.S. 156 (1974)....................2

*Feldman v. Motorola, Inc.*,
No. 90 C 5887,
1993 U.S. Dist. LEXIS 14631 (N.D. Ill. Oct. 14, 1993)....................17

*Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*,
524 F.2d 275 (2d Cir. 1975)....................22

*Glenn K. Jackson Inc. v. Roe*,
273 F.3d 1192 (9th Cir. 2001) ....................22

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999)....................22

*Hanon v. Dataproduct Corp.*,
976 F.2d 497 (9th Cir. 1992) ....................16, 17, 20

*In re Activision Sec. Litig.*,
No. C-83-4639 AMHP,
1985 U.S. Dist. LEXIS 19901 (N.D. Cal. May 10, 1985) ....................15

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991)....................14

**Page**

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) ....24

*In re Applied Micro Circuits Corp. Sec. Litig.*, No. 01CV0649 K (AJB), 2003 U.S. Dist. LEXIS 14492 (S.D. Cal. July 10, 2003) ....20, 21

*In re Bank One Sec. Litig.*, No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 9, 2002) ....14

*In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419 (N.D. Cal. Aug. 5, 2004).... *passim*

*In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102 (N.D. Cal. 2001) ....11

*In re D.J. Orthopedics, Inc. Sec. Litig.*, No. 01-CV-2238-k (RBB), 2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov. 16, 2003) ....11

*In re Daou Systems*, No. 02-56989, 2005 U.S. App. LEXIS 14945 (9th Cir. Feb. 2, 2005) ....2, 4

*In re Epitope, Inc. Sec. Litig.*, No. 92-759-RE, 1992 U.S. Dist. LEXIS 22705 (D. Or. Nov. 30, 1992)....9, 10

*In re Immune Response Sec. Litig.*, No. 01CV1237 J (WMc), 2005 U.S. Dist. LEXIS 12602 (S.D. Cal. June 7, 2005)....4

*In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004) ....10, 12, 20, 21

*In re Insurance Mgmt. Solutions Group, Inc. Sec. Litig.*, 206 F.R.D. 514 (M.D. Fla. 2002)....14

*In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002) ....4

*In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785 (S.D. Cal. 1990)....15

*In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005)....4

**Page**

*In re Parmalat Sec. Litig.*,
No. 04 MD 1653 (LAK),
2005 U.S. Dist. LEXIS 12554 (S.D.N.Y June 28, 2005) ....................................................4

*In re Seagate Tech. II Sec. Litig.*,
843 F. Supp. 1341 (N.D. Cal. 1994) ....................................................................................20

*In re Terayon Communications Sys., Inc. Sec. Litig.*,
No. C 00-01967 MHP,
2003 U.S. Dist. LEXIS 2852 (N.D. Cal. Feb. 24, 2003) ......................................13, 14, 18

*In re Unioil Sec. Litig.*,
107 F.R.D. 615 (C.D. Cal. 1985).............................................................................................5

*In re VISA Check/Mastermoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001), *cert. denied*, 125 S. Ct. 2277 (2005)................................3, 5

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ..........................................................................................16

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...............................................................................................4, 9

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) ..................................................................................................23

*Livid Holdings Ltd. v. Solomon Smith Barney, Inc.*,
No. 03-35374,
2005 U.S. App. LEXIS 15815 (9th Cir. Aug. 2, 2005) .........................................................4

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)...................................................................................................5, 6

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ......................................................................21, 23, 24

*Schneider v. Traweek*
No. CV 88-0905 RG (Kx),
1990 U.S. Dist. LEXIS 15596 (C.D. Cal. Aug. 7, 1990)...................................................15

*Serafimov v. Netopia, Inc.*,
No. C-04-03364 RMW,
2004 U.S. Dist. LEXIS 25184 (N.D. Cal. Dec. 3, 2004)...................................................17

*Soliman v. Philip Morris, Inc.*,
311 F.3d 966 (9th Cir. 2002) ..................................................................................................22

*Weinberger v. Jackson*,
102 F.R.D. 839 (N.D. Cal. 1984)...........................................................................................15

**Page**

*West v. Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002) ....................6

*Yamner v. Boich*,
No. C-92-20597 RPA,
1994 U.S. Dist. LEXIS 20849 (N.D. Cal. Sept. 15, 1994) ....................15

*Zimmerman v. Bell*,
800 F.2d 386 (4th Cir. 1986) ....................21

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78j(b) ....................1, 5

Federal Rules of Civil Procedure

Rule 8 ....................3, 4, 9
Rule 8(a)(2) ....................1
Rule 9(b) ....................2, 3, 9
Rule 23 ....................14
Rule 23(b)(3) ....................1, 3
Rule 23(c)(1) ....................2
Rule 23(c)(2) ....................6

**SECONDARY AUTHORITIES**

2 A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed. 2002),
§4:26 ....................2

5 J. Moore, *Federal Practice* (2005),
§23.45[5][a] ....................21

## I. Oracle Corporation Cannot Credibly Contest that Common Questions of Law and Fact Predominate Over Individual Questions

A class action is proper under Fed. R. Civ. P. 23(b)(3) if questions of law and fact common to the members of the class predominate over questions only affecting individual members, and the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). The predominance test is readily met in cases alleging securities fraud. *Id*. at 625.

Defendants mischaracterize the Supreme Court's ruling in *Dura Pharms., Inc. v. Broudo*, 544 U.S. __, 125 S. Ct. 1627 (2005), and challenge the clear predominance of common questions in this action. They contend that *Dura* requires plaintiffs to plead and prove a "'corrective disclosure'. . . readily traced to the fraud"[1] to establish loss causation. Defs' Opp. at 9.[2] Bootstrapped to that argument, defendants contend that absent a "corrective disclosure," plaintiffs' class certification motion must provide a detailed methodology for proving loss causation and damages in order to have a §10(b) class certified. *See* Defs' Opp. at 7 ("[p]laintiffs proffer no alternative methodology by which injury could be traced class-wide"). *Dura*, however, does not mention, let alone require, a "corrective disclosure" and does not address class certification. In fact, the Solicitor General in its amicus brief supporting the *Dura* defendants, parted company on this issue, explicitly urging that "the fraud can be revealed by means other than a corrective disclosure." Declaration of Shawn A. Williams in Support of Plaintiffs' Reply in Further Support of Their Motion for Class Certification ("Williams Decl."), Ex. A at 19-20.

*Dura* does not require a "corrective disclosure" to be proven or pled. That term is not even mentioned. *Dura* simply requires that the revelation of the true financial condition of the company cause a loss in value of the shares. *Dura*, 125 S. Ct. at 1634. But the court acknowledged that loss causation can be pled with a "short and plain statement" in compliance with Fed. R. Civ. P. 8(a)(2)

---

[1] Here, as elsewhere, citations and footnotes have been omitted and any emphasis added, unless otherwise indicated.

[2] "Defs' Opp." refers to Defendants' Opposition to Plaintiffs' Motion for Class Certification.

providing defendants with fair notice of what the relevant economic loss might be and "some indication" of the causal connection with the fraud. *Id.*; *accord In re Daou Systems*, No. 02-56989, 2005 U.S. App. LEXIS 14945, at *47 (9th Cir. Feb. 2, 2005). Thus, under *Dura*, Fed. R. Civ. P. 9(b) specificity linking a corrective disclosure to each false statement is not required. The Supreme Court also specifically declined to address the form, content or quantum of proof at trial. *Daou*, 2005 U.S. App. LEXIS 14945, at *47 ("We need not, and do not, consider other proximate cause or loss-related questions.").

Both defendants and their purported expert inexplicably ignore revelations alleged in Plaintiffs' Revised Second Amended Complaint for Violations of Federal Securities Laws ("Complaint") that alerted the market to Oracle Corporation's ("Oracle" or the "Company") true financial condition that had been concealed or misrepresented by the fraud. These revelations of fraud caused a 20% drop in Oracle's stock price, sufficiently and plainly establishing the causal connection between plaintiffs' economic loss and the fraud alleged. Defendants seek to have a trial of "the probable outcome of the merits" by injecting expert testimony at this class certification stage. But, under the Notes of the Advisory Committee on 2003 Amendments of Fed. R. Civ. P. 23(c)(1), an evaluation of the probable outcome "is not properly part of the certification decision." *See Eisen v. Carlisle*, 417 U.S. 156, 177 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.").

The 2003 Advisory Note limits the inquiry to identifying the "issues that actually will be presented at trial" and "determin[ing] how the case will be tried" to assess whether the issues are "susceptible of class-wide proof." Advisory Note, Fed. R. Civ. P. 23(c)(1). Challenges based on causation do "not bar predominance satisfaction" because causation relates to the "right of a class member to recover," rather than "underlying common issues of the defendant's liability." 2 A. Conte & H. Newberg, *Newberg on Class Actions*, §4:26, at 241 (4th ed. 2002); *see*, *e.g.*, *Cameron v. E.M. Adams & Co*., 547 F.2d 473, 477 (9th Cir. 1976) (transaction causation established class-wide if misrepresentations are shown to be material, "individual issues of reliance do not hinder the predominance of the common question"). Common issues "predominate when liability

can be determined on a class-wide basis, even when there are some individualized damages issues." *In re VISA Check/Mastermoney Antitrust Litig*., 280 F.3d 124, 139 (2d Cir. 2001), *cert. denied*, 125 S. Ct. 2277 (2005). As discussed below, each of Oracle's contentions lacks legal or factual support and must be rejected.

### A. Contrary to Defendants' Assertion, *Dura* Nowhere Requires a "Corrective Disclosure"

Defendants' opposition to plaintiffs' motion for class certification rests entirely on the faulty premise that *Dura* requires plaintiffs' complaint to allege a so-called "corrective disclosure" that is "directly attributable" to each alleged false statement in order to demonstrate that class action treatment is proper under Fed. R. Civ. P. 23(b)(3). *See* Defs' Opp. at 7, 11. Defendants concede, as they must, that the predominance of class-wide issues is readily apparent in securities class actions. Defendants assert that this case is unique. They say "[w]hat distinguishes this case from Section 10(b) suits in which loss causation may be addressed on a class-wide basis is that Plaintiffs allege no 'corrective disclosure.'" Defs' Opp. at 7.

Nowhere in *Dura* does the court require a corrective disclosure attributable to a specific misrepresentation. The Court instead speaks in terms of the relevant truth, *i.e.*, the true state of the company's financial condition making its way to the market, removing inflation in the stock price. 125 S. Ct. at 1631-32. The *Dura* defendants and their industry *amici* urged the Supreme Court to require proof and Rule 9(b) pleading of an ***explicit*** corrective disclosure linking any subsequent stock decline to a previous misrepresentation. But the Supreme Court applied Fed. R. Civ. P. 8, not 9(b), and expressly declined to go that far: "We need not, and do not, consider other proximate cause or loss-related questions." *Dura*, 125 S. Ct. at 1633-34. The Supreme Court never adopted a specific corrective disclosure requirement, in part because one of Dura's own *amici*, the Solicitor General, agreed that a corrective disclosure test was "mistaken." As the Solicitor General explained, inflation in the price attributable to fraud might be reduced by "events rather than words." *See* Williams Decl., Ex. A at 20. The government also provided an example that fits the Oracle fraud exactly:

> If, for example, the misrepresentation is that the financial condition of the company is such that it would be immune from a particular downturn in the economy, and if

> there is such a downturn and the company is affected, ***those events*** will reveal ***to the public that the representation is untrue***.

*Id.* at 20. Moreover, requiring a corrective disclosure would allow wrongdoers to "immunize themselves" from fraud liability by "refusing to admit" falsity or by delaying or misdirecting the public from fraud with partial disclosures and half truths. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994).

Defendants' interpretation of *Dura* has also been flatly rejected by the Ninth Circuit in *Daou*, 2005 U.S. App. LEXIS 14945. In *Daou*, defendants contended and the district court ruled that because there was no specific announcement or negative public statement concerning *Daou's* improper accounting at the time of the decline in *Daou's* stock price, plaintiffs' allegation that the false financials caused their loss was not sufficiently linked to their damages to adequately plead loss causation. *Daou*, 2005 U.S. App. LEXIS 14945, at **46-47. The Ninth Circuit reversed, holding that plaintiffs' allegations that *Daou's* stock price fell "after defendants began to reveal figures showing the company's ***true financial condition***," *e.g.*, deteriorating margins and significant earnings projections shortfall, was sufficient under *Dura* and Fed. R. Civ. P. 8 to provide defendants "some indication" that the stock drop was causally related to concealed information. *Id.* at *45; *accord Livid Holdings Ltd. v. Solomon Smith Barney, Inc.*, No. 03-35374, 2005 U.S. App. LEXIS 15815, at *16 (9th Cir. Aug. 2, 2005); *see also In re Parmalat Sec. Litig.,* No. 04 MD 1653 (LAK), 2005 U.S. Dist. LEXIS 12554 (S.D.N.Y June 28, 2005) ("corrective disclosure" not necessary where subject of the misrepresentation and omissions caused loss); *accord In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002); *In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005); *In re Immune Response Sec. Litig.*, No. 01CV1237 J (WMc), 2005 U.S. Dist. LEXIS 12602, at **94, 96 (S.D. Cal. June 7, 2005). Oracle's "corrective disclosure" theory is wrong under *Dura*.

### B. Defendants' Unsupported Expectation of Individual Damages Issues Cannot Defeat Class Certification

Defendants nevertheless contend that without "corrective disclosures," specifically tied to the misrepresentations, the calculation of damages will require individual analysis of the stock price impact of each omission and misstatement and each investor's purchases during the class period.

Defs' Opp. at 11-12. Apart from the fact that no corrective disclosure is required, liability here will be determined by concededly class-wide issues of falsity, materiality, and scienter. Thus, even if there are individual damages and causation issues, they do not defeat the predominance of common issues or prevent class certification. *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (the amount of damages is invariably an individual question but does not defeat class action treatment). In addition to overlooking *Blackie*, defendants ignore cases throughout the country that have rejected the notion that individualized issues of damages can defeat class certification. *See VISA Check/Mastermoney*, 280 F.3d at 139 ("[c]ommon issues may predominate when liability can be determined on a class-wide basis, even where there are some individualized damage issues"); *Allapattah Servs., Inc. v. EXXON Corp.*, 333 F.3d 1248 (11th Cir. 2003) (individualized issues of damages do not prevent a finding that common issues in the case predominate); *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 622 (C.D. Cal. 1985) (common nucleus of misrepresentations predominate over individual questions of damages). Moreover, here loss causation and damages would remain a predominantly class-wide issue based on proof of: (a) defendants' misrepresentations; omissions, or other fraudulent conduct; (b) a resulting inflation in stock price; (c) purchase by class members at the inflated price; and (d) an event study establishing a causal connection between defendants' misconduct and plaintiffs' economic loss. *See* Declaration of Bjorn I. Steinholt in Support of Plaintiffs' Reply in Further Support of Their Motion for Class Certification ("Steinholt Decl.").

Oracle has not offered the Court any factual basis for the assertion that individual damages issues will arise resulting in multiple mini-trials, nor has it offered any applicable authority for its contention that this proposed class should not be certified. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187-88 (3d Cir. 2001), is wholly inapposite. In that case, plaintiffs sought to certify a §10(b) class, with each class member alleging that Merrill Lynch failed to disclose to its investors that it had not used "reasonable efforts to maximize the economic benefit to the client[s] in each transaction." *Newton*, 295 F.3d at 173. Because *Newton* did not involve an omission or misrepresentation that affected the value of a security in an efficient market, plaintiffs were not entitled to the presumption of reliance. *Id.* at 175, 190. To show economic loss, each member would have had to establish that a better price was obtainable for each trade executed on his

behalf. *Id*. at 178. In fact, the *Newton* court acknowledged that: "the facts of this case do not resonate with those typical of securities violations under Rule 10b-5." *Id*. at 173. The court confirmed that in "class actions based on 'fraud-on-the-market' . . . the alleged conduct itself causes economic injury." *Newton*, 295 F.3d at 188.[3]

### C. Oracle and Its Expert Ignore Detailed Disclosures Revealing Oracle's True Financial Condition

Defendants are also wrong in seeking to conduct a damages trial by improperly offering expert testimony at the certification stage. Their expert, Mr. Stefan Boedeker ("Mr. Boedeker"), asserts that without a corrective disclosure, plaintiffs will not be able to prove that Oracle's stock price movements are related to the alleged fraud. Defs' Opp. at 8-9. This is a legal theory rejected in *Dura* – not market expertise. Stock price can be affected by events, not just disclosures. Plaintiffs are entitled to and will demonstrate through expert testimony of their own at trial that Oracle's stock price was artificially inflated by defendants' fraudulent statements, omissions and conduct throughout the Class Period (between December 14, 2000 and March 1, 2001). Plaintiffs will also prove at trial that Oracle's stock price dropped 20% on March 1, 2001, upon revelation of the true financial health of Oracle that had been misrepresented and concealed by the fraud. *See* Steinholt Decl., ¶¶5-9.

Although the Complaint does not currently allege any revelations of Oracle's true financial conditions prior to March 1, 2001, to account for the drop in Oracle's stock price from the $34 Class Period high to $21, the March 1, 2001, 20% price decline, upon partial revelation of the truth, indicates that 20% of the stock price was attributable to the fraud. Contrary to defendants' assertion, plaintiffs are not required to offer damages experts at this stage. *See* Advisory Note, Fed. R. Civ. P. 23(c)(2). Rather, the parties agreed, and this Court's Order set March 3, 2006 as the date for the exchange of expert reports. *See* Williams Decl., Ex. B at 7.

---

[3] Defendants' reliance on *West v. Prudential Sec., Inc.*, 282 F.3d 935 (7th Cir. 2002), is similarly misplaced. There, too, plaintiffs were not entitled to the presumption of reliance because it was never shown that the alleged false statements were ever made public. *Id.* at 93.

In any event, Mr. Boedeker fails to acknowledge the very disclosures he claims are lacking. For example, Mr. Boedeker ignores the March 1, 2001 disclosures that caused Oracle's stock price to drop 20% per share on a record 224 million shares traded. ¶75;[4] Ex. 5. Mr. Boedeker says ***nothing*** of Oracle's admission that in truth, the slowing economy was hurting Oracle's sales – contrary to defendants' assurances otherwise only days earlier. ¶70 ("Oracle was not seeing an impact on its results due to the slowing down in the United States economy."); *see* March 1, 2001 press release, "Oracle Announces Preliminary Third Quarter Earnings Results" ("A substantial number of our customers decided to delay . . . based on the economic slowdown. . . . The problem is the U.S. economy."); ¶¶74, 78; Ex. 4.

Mr. Boedeker says ***nothing*** of Oracle's disclosure that applications sales, *i.e.* 11i, which plaintiffs allege had been hampered by the slowing economy and product defects, fell miserably short of defendants' projections by 33%. Ex. 4. Even this disclosure itself was a half-truth. Only 14 days later, Oracle disclosed that 3Q01 applications sales actually missed by ***66%***. ¶77. Yet, defendants had falsely assured investors earlier that 11i applications would grow 75% in the quarter. ¶65(b).

And, Mr. Boedeker says ***nothing*** about the March 1, 2001 disclosure of the fact that the Company would miss earnings projections by $0.02 per share, the first Oracle earnings miss in several years. ¶¶75, 76. All of these revelations were at the core of the Company's financial condition and caused the Company's stock price to plummet. *Id.* Oracle has proffered no evidence even suggesting that the March 1, 2001 loss was related to anything other than the fraud alleged.

At bottom, Mr. Boedeker's declaration not only improperly invites a battle of the experts, but it lacks any analytical value as it inexplicably ignores the very revelations that plaintiffs allege to indicate loss causation and economic loss. This Court has previously and specifically declined to engage in a statistical duel of the merits defendants suggest here. *See Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004). Indeed, plaintiffs need only show an inference that a

---

4 All paragraph references ("¶") and exhibit references ("Ex."), refer to the Complaint, unless otherwise indicated.

common question exists as to class-wide economic loss. *Id*. at 153 (no greater showing required on a motion for class certification).

Oracle complains that because it did not specifically admit to the accounting fraud and 11i defects, loss causation cannot be proved class-wide. Defs' Opp. at 9-10. As *Dura* author Justice Breyer noted at the oral argument on January 12, 2005, the truth "might come out in many different ways," not simply through an announcement by a corporate executive that "I'm a liar." Williams Decl., Ex. C at 38-39.

Defendants seek to divide and isolate the fraud scheme alleged into separate components. That rewrites the Complaint which alleges that there was a single scheme designed to conceal and misrepresent Oracle's true financial conditions. ¶¶4-19. The scheme had several elements, but all were aimed at this objective: conceal that the economy was hurting Oracle's results (¶¶7, 9-10), conceal that product defects were hurting Oracle's results (¶¶6, 9-10, 15), conceal that Oracle's financial results were not as represented or forecast. ¶8.

In March, however, Oracle was forced to admit missed earnings, revenue, and growth forecasts, particularly in its applications and license business. Oracle also admitted that the economy did impact sales. ¶¶72-82. Although product defects were not acknowledged, it is reasonable to infer from other allegations of the Complaint that false statements about robust sales served to conceal the Suite 11i defects that were in fact impacting sales. Numerous witnesses confirmed as much and identified specific sales lost due to defects. And, defendant Larry Ellison later admitted, "mea culpa," that there were defects. ¶15.

Equally important, the missed revenue-earnings-growth forecasts revealed that the true overall financial condition of Oracle was not as represented. That overall financial health included Oracle's historical financial performance, particularly in the quarter just preceding the failed forecasts. ¶8. A company's historical financial results are a key piece of information considered by investors in assessing the veracity of a company's forecasts of future performance. When the forecasts fail, it is reasonable for investors to conclude that the historical results too are not as represented.

Defendants cannot separate prior financial results simply because they never ***confess*** the falsity of historical results. To do so would allow the wrongdoer to evade liability simply by withholding, delaying, or misdirecting the cause of the failed forecast. The Ninth Circuit has emphasized that wrongdoers cannot be allowed to "immunize" themselves by requiring explicit one-to-one "corrective disclosure" that a price decline is linked to a specific falsehood. *In re Worlds of Wonder*, 35 F.3d 1407, 1422 (9th Cir. 1994). Equally important, the "corrective disclosure" regime defendants assert is nothing but Fed. R. Civ. P. 9(b) particularity in disguise, a regime that *Dura* was asked to adopt – but did not. Under *Dura*, Fed. R. Civ. P. 8 controls and simply requires "some indication" of the causal link between defendants' fraud and plaintiffs' loss. 125 S. Ct. at 1634. The price decline on the missed forecasts and failed economy are explicit disclosures of ***part*** of the fraud and meet Fed. R. Civ. P. 9(b), but these revelations also provide "some indication" – by plausible and solid inferences – that Oracle's overall finances and business, including its historical results, application sales, and product defects, were concealed by the scheme. As such, the overall scheme is linked to the price decline and loss suffered.

In short, the various misstatements on different subjects – economy, product integration, forecasts, sales demand – were not discrete acts by random individuals – they were part of a single centrally designed scheme by Oracle's top leaders to conceal and delay revelation of Oracle's true financial health (enabling them to pocket $900 million – while investors lost billions). It bears remembering when Oracle fell 20% – there were 5.6 billion shares outstanding – causing a $30 billion loss in one day. Many investors paid $30 or more for their shares – reduced to $16. But defendants Ellison and Jeffrey Henley paid only $0.23, or $1 per share, respectively. ¶¶20-23. Thus, while investors suffered real losses, defendants Ellison and Henley were still ahead $15 or more per share (hundreds of millions of dollars) – even at the $16 stock price.

## II. The Proposed Class Representatives Are Adequate to Represent the Class and Their Claims Are Typical

As plaintiffs demonstrated in their motion, it is defendants' burden to establish that the proposed class representatives are inadequate to represent the class. *In re Epitope, Inc. Sec. Litig.*, No. 92-759-RE, 1992 U.S. Dist. LEXIS 22705, at *10 (D. Or. Nov. 30, 1992). They must prove that

the proposed class representatives have either chosen incompetent counsel or that they have interests that conflict with the class. *Id.* They have done neither. In fact, defendants say nothing about class counsel and their challenges to the proposed class representatives appear to be more of an afterthought rather than a serious challenge. Defendants offer no objection concerning 1199 SEIU Greater New York Pension Fund ("SEIU 1199") or Ryan Kuehmichel's ("Mr. Kuehmichel") adequacy, and assert in conclusory fashion that the others are inadequate, but with little (if any) reference to hours and hours of deposition testimony. Defs' Opp. at 19-25. Contrary to defendants' unsupported conclusions, the proposed class representatives are intimately familiar with this case and are motivated to protect the interests of the class. They are adequate and should be certified.[5]

**A. SEIU 1199 Is an Adequate Class Representative**

Defendants have effectively conceded SEIU 1199's adequacy. Defs' Opp. at 20. Despite nearly 16 hours of deposition testimony, defendants have not made a single credible argument about why it should be denied class representative status. Defs' Opp. at 21-23. Nor could they: SEIU 1199's representative, John Chobor ("Mr. Chobor"), made it very clear that SEIU 1199 has a thorough understanding of the case and is diligently prosecuting this action on behalf of the fund, its beneficiaries, and the class, who "all stand in the same shoes." Chobor Depo. Tr. at 259:18-19. Mr. Chobor knew all of the defendants by name, correctly described the Class Period, thoroughly discussed the statements that are alleged to be false, and described why they were false. *Id.* at 7, 10, 188-94. There is no antagonism or disabling conflict between SEIU 1199 and the members of the

---

[5] Defendants malign plaintiffs' credibility for minor clerical errors in their lead plaintiff certifications. Defs' Opp. at 20, 22. Defendants' attacks are frivolous. It is well-settled that such minutia do not prohibit certification. *See In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419 (N.D. Cal. Aug. 5, 2004) (finding that omitting trading information from a certification does not raise "serious questions about Crossen's credibility that would give rise to a unique defense"); *In re Initial Public Offering Sec. Litig. ("IPO")*, 227 F.R.D. 65, 98-99 (S.D.N.Y. 2004) (same). Like *CV Therapeutics*, the errors here were simply inadvertent mistakes in the loss schedules that were prepared based on the information that the lead plaintiffs had in their possession at the time; and in the case of SEIU 1199, the unintended omission of a ***single*** case from its submission that listed seven other cases. *See* Deposition Transcript of John Chobor ("Chobor Depo. Tr."). at 63-67. (All deposition transcripts are identified by the deponents' last name followed by "Depo. Tr.") The second case cited by defendants did not involve a lead plaintiff motion until ***after*** SEIU 1199 filed its certification in this case. Williams Decl., Ex. D.

class that it seeks to represent. Defendants' silence about SEIU 1199's involvement in the case and its understanding of the allegations speaks volumes about SEIU 1199's adequacy.

Defendants argue that SEIU 1199 should be disqualified as a "professional plaintiff[]" that is somehow conspiring with lead counsel to serve its "own interests." Defs' Opp. at 21. Nonsense. Courts have repeatedly rejected this kind of inflammatory argument for institutional investors that are pursuing these actions on behalf of their beneficiaries. *See In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1112 (N.D. Cal. 2001) ("institutional investors 'do not represent the type of professional plaintiff [the PSLRA] seeks to restrict'"); *In re D.J. Orthopedics, Inc. Sec. Litig.*, No. 01-CV-2238-k (RBB), 2003 U.S. Dist. LEXIS 21534, at **19-20 (S.D. Cal. Nov. 16, 2003) (rejecting "professional plaintiff" argument for institutional investor because "professional plaintiff" prohibition "applies only to lead plaintiffs, not to class representatives"). While defendants have chosen to ignore it, Mr. Chobor testified that SEIU 1199 is pursuing these actions ***because the Department of Labor mandates it***. Chobor Depo. Tr. at 55. In fact, Mr. Chobor explained at his deposition that the Department of Labor considers it "best practice" for institutions to pursue securities litigation and that Bart Lawson, who originated the action for SEIU 1199 (formerly Local 144 Nursing Home Pension Fund), maintained a relationship with lead counsel that was (and is) strictly professional. Chobor Depo. Tr. at 62-63. SEIU 1199 is pursuing this action because it is in the best interests of their beneficiaries. SEIU 1199 is clearly adequate and should be certified. Defendants' authority is inapposite. Defs' Opp. at 21. Each case was issued before Congress passed the Private Securities Litigation Reform Act ("PSLRA") and not one involved an institutional investor. *Id.*

### B. Mr. Kuehmichel Is an Adequate Class Representative

As with SEIU 1199, defendants essentially concede Mr. Kuehmichel's adequacy. Defs' Opp. at 23-24. They do not challenge Mr. Kuehmichel's involvement in the case or his knowledge of the allegations. *Id.* Nor could they. Mr. Kuehmichel has been intimately involved in the litigation, has responded to all discovery served upon him, and has produced all of his records concerning Oracle in this litigation. Kuehmichel Depo. Tr. at 15-19, 22. In fact, he demonstrated his willingness to serve the class' interest by traveling from Boise, Idaho to Palo Alto, California to appear for his deposition

where he testified, at length, about the case, including allegations about 11i (*id.* at 34, 120-27, 136), the economy (*id.* at 34, 55-56, 99), Oracle's fraudulent accounting in 2Q01 (*id.* at 116-117), and its baseless forecasts for 3Q01 (*id.* at 34-35, 39-40, 42). He knew that he was participating in this case because he purchased his shares at the same time that defendant Ellison sold his, and he is pursuing it "for all the little guys like me who didn't have a lot of money but bought the stock anyhow." *Id.* at 43:6-8, 154, 159. Mr. Kuehmichel is dedicated and has gone out of his way to protect the interests of the class. Mr. Kuehmichel is clearly adequate.

Defendants claim Mr. Kuehmichel's "individual knowledge" will become a focus at trial because he knew about general economic principles facing technology companies (*i.e.*, the so-called "hockey stick effect"), or that he would have issues with reliance because he would not have bought his stock had he known of facts that were in the public domain. Defs' Opp. at 23-24. But defendants do not cite a single case to support either argument. Disqualifying plaintiffs based on what they knew and did not know would be an impermissible inquiry into the merits of the litigation. *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 144 (N.D. Cal. 2004); *IPO*, 227 F.R.D. at 110 n.339 (a determination of "whether [publications] placed investors on inquiry notice [was] a task better left to the trier of fact"). Such contentions are unsupportable. *See* discussion at §IV.A, *infra*.

**C. Drifton Finance Corporation Is an Adequate Class Representative**

Through its principal, Jacques Fuhrer ("Mr. Fuhrer"), Drifton Finance Corporation ("Drifton") has been intimately involved in the case for the last four years. Fuhrer Depo. Tr. at 150-51, 176-77. Like the other proposed representatives, Drifton has a thorough understanding of the case and has continuously worked with counsel "to defend all the small shareholders who have incurred some losses." Fuhrer Depo. Tr. at 289:21-22. Mr. Fuhrer responded completely to defendants' numerous discovery demands, produced all documents in his possession concerning Oracle, and he even flew from his home in Belgium to Palo Alto, California for his deposition. *Id.* at 5, 11, 159, 297-98. Defendants' attacks on Mr. Fuhrer's adequacy are baseless. His actions demonstrate his adequacy.

As with Mr. Chu, defendants attack Mr. Fuhrer's English skills because they have no legitimate basis for disqualification. Defs' Opp. at 24. Defendants cite only three pages of a 316-

page deposition (entirely in English) to support this disingenuous argument. *Id.* Mr. Fuhrer is, in fact, fluent in English and has a sound understanding of the case. He demonstrated knowledge of the allegations about the effect of the economy on Oracle's business and its forecasts (Fuhrer Depo. Tr. at 160-62), allegations concerning Suite 11i (*id.*), and about stock sales by defendant Ellison (*id.* at 160-64). Mr. Fuhrer's knowledge far exceeds that of the general nature of the allegations. *In re Terayon Communications Sys., Inc. Sec. Litig.*, No. C 00-01967 MHP, 2003 U.S. Dist. LEXIS 2852, at *10 (N.D. Cal. Feb. 24, 2003).[6]

**D. Robert Sawyer Is an Adequate Class Representative**

Like the other lead plaintiffs, Robert Sawyer ("Mr. Sawyer") has been involved in this litigation since day one. Sawyer Depo. Tr. at 24. He has reviewed the pleadings, spoken with his lawyers about the case, responded to numerous discovery demands, and traveled from his home in Cincinnati, Ohio to Chicago, Illinois for deposition where he demonstrated his knowledge of the case in a seven-hour deposition. *Id.* at 1, 7, 10-16, 49-50, 52-53, 62-63, 124-26, 179, 245. Mr. Sawyer testified that he filed this lawsuit because he "was damaged due to misleading comments by defendant Larry Ellison specifically and Oracle" – including statements about the quality of 11i, that the Company was "immune to the economic downturn," and that "sales were doing great." Sawyer Depo. Tr. at 124-26; 62:2-17, 179:21-24. In fact, Mr. Sawyer testified that defendants' false statements "definitely cause[d] the price to be higher and stay higher." *Id.* at 207:17-208:5.

Not only is Mr. Sawyer well informed, but he is also highly motivated. After defendant Ellison sold his stock, Mr. Sawyer telephoned Oracle Investor Relations to find out why. *Id.* at 53. As with the other proposed representatives, Mr. Sawyer's knowledge about this lawsuit more than

---

6 Defendants distort Mr. Fuhrer's deposition testimony in support of an unwarranted disqualification. Defs' Opp. at 24. Their statements that Mr. Fuhrer "did not read the Complaint" and does not know the composition of the proposed class are false. *Id.* Mr. Fuhrer testified that he reviewed "a document which they have given to the Court ***as a complaint***" (Fuhrer Depo. Tr. at 16:22-23) and that he is pursuing the case "to defend all the small shareholders who have incurred some losses." Fuhrer Depo. Tr. at 289:21-22. Contrary to defendants' assertion, Mr. Fuhrer has not "abdicated all responsibility in the suit to counsel" and is not pursuing "a strategy of not asking questions of his counsel." Defs' Opp. at 22, 24 *compare* Fuhrer Depo. Tr. at 292. A nine-hour deposition proves otherwise.

satisfies the requirement to be aware of the general nature of the allegations. *Terayon*, 2003 U.S. Dist. Lexis 2852, at *10.

**E. Dzung Chu Is an Adequate Class Representative**

As with Mr. Fuhrer, defendants attack Dzung Chu's ("Mr. Chu") English skills because they have no other legitimate objection. Defs' Opp. at 5, 22. There is nothing in Fed. R. Civ. P. 23 that requires a class representative to have a threshold level of English proficiency and defendants offer nothing to suggest otherwise. *Id.* Mr. Chu is a Vietnamese American who speaks English as a second language. While he elected to provide sworn deposition testimony in his native Vietnamese language, Mr. Chu has communicated effectively with plaintiffs' counsel and even answered some of his deposition questions in English. Chu Depo. Tr. at 7, 65-66. Mr. Chu is a technical support professional at a Silicon Valley technology company (Xilinx, Inc.) and his duties require English proficiency. Federal Rule of Civil Procedure 23 simply does not discriminate between potential class representatives based on speculative language barriers. Ironically, even though defendants attack Mr. Chu's ability to understand and communicate in English, they inconsistently contend that Mr. Chu may have already known about Oracle's fraud from his review of analyst reports and research on the Internet, both of which are written in English. Defs' Opp. at 15.

Defendants' only substantive challenge to Mr. Chu's adequacy is his alleged "unfamiliarity" with certain undefined "aspects" of the case. Defs' Opp. at 22. Defendants have ignored Mr. Chu's deposition transcript. They do not specify the "aspects" of the case Mr. Chu is unfamiliar with because his deposition testimony confirms that he understands the general nature of the allegations of the Complaint, including Oracle's false financial forecasts (Chu Depo. Tr. at 63-64); Oracle's false statements concerning the functionality of Suite 11i (including specific customer problems) (*id.* at 64-70, 84); and false statements made by Stephanie Aas regarding the United States economy (*id.* at 92-93). Chu also illustrated general awareness of the accounting allegations. *Id.* at 96. Mr. Chu's deposition testimony confirms that he is "aware of the general nature of the allegations, and . . . ha[s] some familiarity with the underlying legal principles." *Terayon*, 2003 U.S. Dist. LEXIS 2852, at *10; *see also In re Insurance Mgmt. Solutions Group, Inc. Sec. Litig.*, 206 F.R.D. 514, 517 (M.D. Fla. 2002); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 156 (N.D. Cal. 1991); *In re Bank One*

*Sec. Litig.*, No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709, at *19 (N.D. Ill. May 9, 2002). Mr. Chu is an adequate representative.

**III. The Proposed Class Representatives Are Typical of the Class and Are Not Subject to Unique Defenses**

As plaintiffs demonstrated in their motion, plaintiffs satisfy the typicality requirement if their claims arise from the same event or course of conduct that gives rise to claims of the class and are based on the same legal theory. *Schneider v. Traweek*, No. CV 88-0905 RG (Kx), 1990 U.S. Dist. LEXIS 15596, at *21 (C.D. Cal. Aug. 7, 1990). Contrary to defendants' assertion, case law is clear that "differences in the amount of damage, the size or manner of [stock] purchase, the nature of the purchaser, and even the specific document influencing the purchase will not render a claim atypical in most securities cases." *Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D. Cal. 1984). Defendants' challenges fail here because the claims of all plaintiffs arise from defendants' scheme of false and misleading representations.

**A. Each Proposed Class Representative Lost a Substantial Amount on Their Oracle Investments**

Defendants contend that several of the proposed representatives are atypical because (while defendants are not sure) they "may" have individual damages issues. Defs' Opp. at 19, 23. The Ninth Circuit has long held that individual damages issues, to the extent they may exist, do not prevent class certification where, as here, common questions, particularly common liability issues, predominate over individual questions. *See Blackie*, 524 F.2d at 905. Indeed, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Id.*; *In re Activision Sec. Litig.*, No. C-83-4639 AMHP, 1985 U.S. Dist. LEXIS 19901, at *36 (N.D. Cal. May 10, 1985). As the Court stated in *In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785 (S.D. Cal. 1990), "'it would defy common sense to find that class certification is defeated by the possibility of individual questions appertaining to one of the elements of one of the case's causes of action.'" *Id.* at 806-07. In other words, issues regarding damages "do not have relevance in determining class certification." *Yamner v. Boich*, No. C-92-20597 RPA, 1994 U.S. Dist. LEXIS 20849, at *15 (N.D. Cal. Sept. 15, 1994).

**B. Virtually All Large Institutions Use Investment Advisors – This Practice Does Not Subject Them to Unique Defenses**

Defendants contend that SEIU 1199 lacks standing to bring a claim against the defendants because its Oracle shares were purchased by an outside investment manager. Defs' Opp. at 21. Nothing in the securities laws, however, holds that an institutional investor which delegates investment authority to professional advisors is not a purchaser or seller of securities, as defendants argue. In fact, the same theory was flatly rejected in *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003), where the court recognized that the fact that an institutional investor "relied on the advice of highly sophisticated investment managers" does not deprive it of standing or otherwise make it atypical or subject it to unique defenses. *Id.* at 281. Institutional investors "are likely to use advisors, to invest conservatively in securities they consider undervalued by the market." *Id.* at 282. Thus, *WorldCom* recognized that a rule precluding investors from delegating investment decisions to advisors would, in effect, bar large, sophisticated institutional plaintiffs from serving as class representatives. *Id.* Such a rule would undermine the PSLRA's stated purpose to "'increase the likelihood that institutional investors will serve as lead plaintiffs.'" *Id.*

Defendants' also theorize that SEIU 1199 is atypical because its investment advisors could not have been deceived by Oracle's false statements. Defs' Opp. at 21-22. This argument defies common sense and has been rejected by the Ninth Circuit. *Hanon v. Dataproduct Corp.*, 976 F.2d 497, 506 (9th Cir. 1992) ("Sophisticated investors are as entitled to rely on the fraud-on-the-market theory as anyone else."). In fact, delving into what SEIU 1199 or its investment advisors knew or did not know would be an impermissible inquiry on the merits, and their depositions defeat the suggestion. *See* discussion at §IV.A, *infra*. But even if it were permissible, both of SEIU 1199's investment advisors testified that they reviewed only publicly available information when purchasing Oracle's shares. Turner Depo. Tr. at 97, 100, 102, 107; O'Keefe Depo. Tr. at 63-64, 65, 69, 80, 82. Gregg O'Keefe testified that the purchase of Oracle stock in December 2000 was based on a

mechanical adjustment of the percentages in SEIU 1199's portfolio, and not on any non-public information that the firm possessed concerning Oracle. O'Keefe Depo. Tr. at 84, 88-89.[7]

**C. Sophisticated Trading Strategies Do Not Defeat Typicality**

Defendants assert that Mr. Chu, Mr. Kuehmichel and Drifton are not typical because they engaged in options and other sophisticated trading that did not rely on the integrity of the market price. Defs' Opp. at 19, 23-24. Defendants are simply wrong. As the Declaration of Michael Marek ("Marek Decl.") explains, options traders rely on the integrity of the market because the underlying stock price sets the value of the option. *See* Marek Decl., ¶¶5-10. In fact, Judge Illston recently rejected defendants' very contention, holding that "investors who trade options are entitled to the fraud-on-the-market presumption because the value of options is directly related to the value of common stock." *CV Therapuetics*, 2004 U.S. Dist. LEXIS 17419, at 6; *see also Hanon*, 976 F.2d at 506 (fraud-on-the-market applies where "[t]he purchase price of the stock was set by the market"). A plaintiff's trading history, strategies, and activities are nevertheless irrelevant to class certification issues. *See*, *e.g.*, *Serafimov v. Netopia, Inc.*, No. C-04-03364 RMW, 2004 U.S. Dist. LEXIS 25184, at **16-19 (N.D. Cal. Dec. 3, 2004) (holding that a day trader was not rendered atypical under Fed. R. Civ. P. 23 and collecting cases); *Feldman v. Motorola, Inc.*, No. 90 C 5887, 1993 U.S. Dist. LEXIS 14631, at *19 (N.D. Ill. Oct. 14, 1993) ("different traders may use market information differently, all the while relying on it"). Mr. Chu, Mr. Kuehmichel and Drifton all relied on the integrity of the market when purchasing Oracle's securities, and their claims are typical of the claims of the class. *See* Marek Decl., ¶¶5-10.

---

7 *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000), relied upon by defendants for their contention that investment managers cannot be deceived, is contradicted by the testimony here. Defs' Opp. at 22. *Baffa* is also distinguishable. There, the court denied a sophisticated broker's motion to intervene as a class representative where the broker "had access to ***more*** information than other investors in the putative class" in a case where the information that rendered the statements at issue misleading "could be deduced" from the company's United States Securities and Exchange Commission filings. *Id.* at 59. The same access is not evident here.

**1. Mr. Chu Relied on the Integrity of the Market When Trading in Oracle Securities**

Defendants contend that Mr. Chu is atypical under Fed. R. Civ. P. 23 because his purported "swing trading" patterns "expose[] [him] to a reliance defense." Defs' Opp. at 23; Declaration of Stefan Boedeker in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Boedeker Decl.") at 7-8. Swing trading (or even day trading) does not render a plaintiff atypical. *See CV Therapuetics*, 2004 U.S. Dist. LEXIS 17419, at 8 (rejecting argument that "day trading activities render [plaintiff] atypical" because defendants had not established that plaintiff "focused on 'technical price movements' [instead of] fundamentals and on defendants' statements in deciding when to buy or sell"). Even if it did, defendants have not satisfied their burden of establishing that Mr. Chu was a swing trader. Indeed, even under their expert Mr. Boedeker's definition of the term, Mr. Chu is not a swing trader. His largest purchase of 10,000 shares occurred during the heart of the Class Period on January 23, 2001, and he held the stock for two months until the truth about Oracle's business began to be revealed. Boedeker Decl., Ex. 5. *Id*. Mr. Chu did not, as Mr. Boedeker claims, purchase the stock "for several days, if necessary" to capture short term price movements. *Id.* Defendants' reliance defense theory is pure speculation and should be rejected.

Defendants also suggest that Mr. Chu's standing is somehow in doubt because his wife was involved in the execution of the trades in Oracle stock. Defs' Opp. at 23. Defendants cite no authority to support such a theory. Mr. Chu and his wife held their Oracle stock in a ***joint*** investment account and suffered economic loss when their Oracle shares declined in value due to defendants' fraud. Mr. Chu's wife consulted with him shortly after purchasing 10,000 Oracle shares on January 23, 2001, and they jointly made the decision to hold the shares. Chu Depo. Tr. at 155, 171-72. Mr. Chu also testified that it was his decision to sell most of his Oracle shares in March 2001. Chu Depo. Tr. at 186:18. None of these facts even remotely give rise to unique standing defenses. In fact, Judge Patel held that a potential class representative is not rendered atypical even if he delegates absolute trading and decision making responsibility to a third-party. *Terayon*, 2003 U.S. Dist. LEXIS 2852, at **10-12.

### 2. Mr. Kuemichel and Drifton Both Relied on the Integrity of the Market When Trading in Oracle Securities

Contrary to defendants' assertion, both Mr. Kuehmichel and Mr. Fuhrer relied on the integrity of the market even in trading options. Defs' Opp. at 23. Both plaintiffs purchased Oracle stock based on defendants' false and misleading statements. Kuemichel Depo. Tr. at 55-56, 73; Fuhrer Depo. Tr. at 135. These purchases alone belie defendants' contention that they are atypical. *See CV Therapeutics*, 2004 U.S. Dist. LEXIS 17419, at *7 ("While the motivations behind short-selling may be inconsistent with the assumptions underlying the fraud on the market theory . . . a plaintiff may still be entitled to the presumption of reliance if he makes ordinary purchases of common stock and sustains losses on these holdings."). Mr. Kuehmichel purchased 2,000 shares on January 23, 2001 (the same day that defendant Ellison sold his shares), 2,000 shares on February 2, 2001, and 1,000 shares on February 12, 2001. He testified that he did so based on defendants' statements that Oracle was "doing well in an economy that was not doing so well, [and] that they had a new product that was going to carry them into the 21st century that would be the gold standard for all enterprise-type software." Kuemichel Depo. Tr. at 55:24-56:3, 73; Boedeker Decl., Ex. 3. Likewise, Drifton, through Mr. Fuhrer, purchased 90,000 shares of Oracle stock on February 16, 2001 based on defendants' misrepresentations. Boedeker Decl., Ex. 7. Mr. Fuhrer testified that "I entered the stock market buying this stock and I believed in him, what he was saying, and it turned out to be just the opposite." Fuhrer Depo. Tr. at 135.

Both representatives also purchased their options based on the integrity of the market. As Judge Illston recognized in the *CV Therapuetics* case, "investors who trade options are entitled to the fraud-on-the-market presumption because the value of options is directly related to the value of common stock." *CV Therapuetics*, 2004 U.S. Dist. LEXIS 17419, at *6; *see also* Marek Decl., ¶¶5-10. Even if an options trader believes that the market will decline (which the plaintiffs here did not believe), he/she is not atypical unless defendants establish plaintiffs' "core investment strategy" was to "bet against" the stock. *CV Therapeutics*, 2004 U.S. Dist. LEXIS 17419, at *8. Plaintiffs in this case were certainly not betting against Oracle's stock. Kuehmichel Depo. Tr. at 55-56; Fuhrer Depo. Tr. at 205-06. As discussed above, they believed in Oracle because of defendants'

misrepresentations. Similar to the plaintiff in *CV Therapuetics*, Mr. Kuehmichel's testimony shows that he sought to profit from his investment in Oracle stock and to manage the risk of investment by also participating in call option transactions. Kuehmichel Depo. Tr. at 56, 78-79. Plaintiffs' options trading simply does not render them atypical.

## IV. Defendants Bear the Burden of Rebutting the Presumption of Reliance and Cannot Do So Here

Under the well established fraud-on-the-market theory of liability, plaintiffs are entitled to a presumption of reliance based upon their allegations that defendants artificially inflated the price of Oracle stock by issuing false and misleading statements and by failing to disclose material facts. *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *see also Blackie*, 524 F.2d at 905. Under the fraud-on-the-market theory because reliance is presumed, plaintiffs need not prove that each plaintiff personally relied on the misstatements or omissions. *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1354 (N.D. Cal. 1994). The "defense of non-reliance is not a basis for denial of class certification." *Hanon*, 976 F.2d at 509.

Thus, defendants are incorrect in asserting that plaintiffs are required to show that each investor traded in Oracle securities without knowledge of the "'truth' that was allegedly misstated." Defs' Opp. at 12. That is defendants' burden at trial.

### A. Plaintiffs Are Not Required to Show Lack of Knowledge of Fraudulent Scheme

Defendants do not cite a single case since *Basic* adopted the fraud-on-the-market presumption of reliance that requires plaintiffs to prove that they were "unaware of the 'truth' that was allegedly misstated." Defs' Opp. at 12-13. Defendants' own authority expressly prohibits such a factual inquiry at the class certification stage. *See*, *e.g.*, *In re Applied Micro Circuits Corp. Sec. Litig.*, No. 01CV0649 K (AJB), 2003 U.S. Dist. LEXIS 14492, at **11-12 (S.D. Cal. July 10, 2003) (a motion for class certification is an inappropriate forum for making a factual determination regarding the efficiency or inefficiency of the market during the class period); *IPO*, 227 F.R.D. at 110 n.339 (a determination of "whether [publications] placed investors on inquiry notice [was] a task better left to the finder of fact"). Defendants also disregard this Court's recent holding that it is impermissible to "advance a decision on the merits to the class certification stage" by asking this

Court to rule on what is essentially an affirmative fact-specific truth on the market defense. *Dukes,* 222 F.R.D. at 144.[8]

In *Applied Micro*, defendants argued that the market for the company's shares was not efficient, and thus plaintiffs could not rely on the fraud-on-the-market theory. 2003 U.S. Dist. LEXIS 14492, at *10. Defendants then argued that without the fraud-on-the-market theory, plaintiffs could not rely on the presumption of reliance, and therefore "each purported class member must make an individualized showing of reliance." *Id.* The court declined to make the factual determination urged by defendants, noting that it was not necessary to reach the merits of the action in determining that the class should be certified. *Id.* at **11-12.

Similarly, in *IPO*, defendants opposed class certification claiming individualized inquiry into investors' knowledge of facts allegedly misstated or withheld would be necessary. *Id.* at 109-10. Defendants contended that "pervasive press reports" would have put readers "on notice to inquire further," and, as a result, a "subjective inquiry into each claimant's state of mind" would have to be performed to determine "which purchasers knew what, and when." *Id.* In rejecting this theory, the court held it was a class-wide issue for trial:

> [T]he question of whether publicly available information "would have made any reader aware of the allegations here" ***presents an important class-wide common issue***. . . . Furthermore, ***differences among class members in terms of access to publicly available information*** (*e.g.,* whether certain investors actually saw all publicized materials, or whether they had access to sophisticated investment advice in interpreting the releases) ***are insufficient to defeat certification or rebut plaintiffs' presumed reliance***.[9]

---

[8] Although defendants state in a footnote that the "'truth on the market' defense . . . is not at issue at this class certification stage of the litigation," defendants' citation to and purported analysis of media and analyst reports belie this representation. Defs' Opp. at 13, n.3 & 13-16. Indeed, defendants argue that "the facts underlying Plaintiffs' claims of fraud were widely publicized and available to investors." *Id*. at 13. Under the truth-on-the-market doctrine, "a defendant can escape liability for a false statement – or one that reveals less than the full truth – by showing that the market was not affected by the misrepresentation because the truth of the matter was known already and had been factored into market prices." *Provenz v. Miller*, 102 F.3d 1478, 1492 n.4 (9th Cir. 1996).

[9] In rejecting defendants' argument, the *IPO* court expressly distinguished *Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986), relied upon by defendants here, because it "***pre-dated the fraud on the market presumption of reliance*** created in *Basic*, and concerned a situation where the alleged fraud was ***explicitly*** revealed by numerous publications." *IPO*, 227 F.R.D. at 111 n.342 (second emphasis

*Id.* at 110-111. For the same reasons, this Court should reject defendants' assertion that plaintiffs must show that each investor lacked knowledge of the fraud prior to class certification.

**B. Defendants' Own Exhibits Negate a Truth-on-the-Market Defense and Contain Their Continuing False Assurances that Served to Drown Out Any So-Called Truth**

At trial, plaintiffs will prove that the analyst and news reports cited by defendants actually repeated and bolstered defendants' false statements, further misleading the market rather than revealing the "truth" as claimed by defendants:

- On December 15, 2000, Morgan Stanley Dean Witter reported that: "[t]he company expects 100 [11i] implementations to go live by January and over 1,000 implementations are now underway," "Oracle . . . gave indication of a ***robust pipeline dominated by Fortune 500 clients***," and "Oracle management feels that the demand environment for enterprise software will remain in tact." Declaration of Vincent P. Schmeltz III in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Schmeltz Decl."), Ex. 8.

- The December 15, 2000 Banc of America Securities report stated: "***management believes the number of [11i] live customers could be in the hundreds*** by February 2001." Schmeltz Decl., Ex. 9.

- In its December 15, 2000 report, Goldman Sachs & Co. stated: "***Oracle management indicated it has seen no effects of a slower economy*** on its business." Schmeltz Decl., Ex. 10.

- On January 11, 2001, Bloomberg News reported that: "[c]ompany spokeswoman Stephanie Aas today said ***Oracle has yet to see any signs that its business is being hurt by the economic slowdown*** or reported cuts to information-technology budgets." Schmeltz Decl., Ex. 13.

- The February 8, 2001 Deutsche Bank Alex. Brown, Inc. report stated: "***[a]ccording to management, it has yet to see macro-related weakness in its business***," and "Mr. Henley reiterated that the company's outlook and guidance were unchanged for F3Q'01 (Feb)." Schmeltz Decl., Ex. 17.

---

only in original). The *IPO* court also found *Frigitemp Corp. v. Fin. Dynamics Fund, Inc.,* 524 F.2d 275 (2d Cir. 1975) to be inapposite because the defendants in *Frigitemp* did nothing to induce the plaintiffs' belief that caused plaintiffs to give up their shares, and the truth was peculiarly within the knowledge of the plaintiffs. *IPO*, 227 F.R.D. at 111 n.343. Defendants' reliance on 5 J. Moore, *Federal Practice* §23.45[5][a] (2005), is likewise misplaced because the cited section relies on *Zimmerman*. Similarly inapposite are the remaining cases cited by defendants. *Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999), addressed the securities fraud claims of a single plaintiff, not a class, on summary judgment. Neither of the Ninth Circuit cases cited by defendants, *Soliman v. Philip Morris, Inc.*, 311 F.3d 966 (9th Cir. 2002), and *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192 (9th Cir. 2001), was a class action or even involved claims of securities fraud. The latter discussed the elements of a negligent misrepresentation claim, not fraud. 273 F.3d at 1201 n.2.

Moreover, the reports relied upon by the defendants also included the ***analysts' own positive opinions and projections***. Like the statements in the preceding paragraph, these statements confirm that the misleading effect was not nullified. *Provenz*, 102 F.3d at1376. For example, the December 15, 2001 Morgan Stanley Dean Witter report included the statements: "[t]he PC downturn . . . should not impact business at Oracle," "[s]uccess in the apps business is leading to more large deals," "[d]eal sizes in the applications business have been increasing," and "11.03 was released in November to resolve [issues with 11i]." Schmeltz Decl., Ex. 8. The December 15, 2001 Banc of America Securities report glowingly stated: "[w]e continue to be quite optimistic about Oracle's B2B infrastructure sector," and "Oracle's market opportunity and suite-based approach remain robust." Schmeltz Decl., Ex. 9. In its February 8, 2001 report, Goldman Sachs and Co. stated: "[w]e think applications is doing fine," and "[o]verall we think estimates are OK for the quarter." Schmeltz Decl., Ex. 16. The February 8, 2001 Deutsche Bank Alex. Brown, Inc. report stated: "E-business software remains a top corporate IT priority, and we believe Oracle is in the midst of a strong product cycle with its 11i applications suite." Schmeltz Decl., Ex. 17. An investor reading these positive reports would certainly not walk away with knowledge that Oracle was having major problems with its business and would miss its 3Q01 financial projections.

Further, the so-called statements of "truth" relied upon by defendants here were far too limited in circulation to counteract defendants' widely disseminated falsehoods and positive reassurances.[10] *Provenz*, 102 F.3d at 1492-93; *Kaplan v.Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994). For example, defendants rely on trade publications (Exs. Schmeltz Decl., Exs. 18 and 22), a transcript of a Q&A session that took place at an Oracle Applications User Group Conference (Schmeltz Decl., Ex. 2), regional newspapers (Schmeltz Decl., Exs. 12 and 23), and an online news service (Schmeltz Decl., Ex. 19), all of which likely have small audiences. Indeed, defendants have made no showing regarding the distribution of ***any of the material*** upon which they rely. *Provenz*,

---

[10] Several of the so-called "truthful" statements cited by defendants, including those found in Schmeltz Decl., Exs. 2, 5-7, ***precede*** the Class Period and therefore cannot serve to counterbalance defendants' false statements made months later. *Kaplan*, 49 F.3d at 1378.

102 F.3d at 1492-93 (defendants must prove the "truth" entered the market with a degree of credibility and ***intensity*** sufficient to completely nullify the misleading effect of their statements). Moreover, the news reports relied upon by Oracle (Schmeltz Decl., Exs. 5, 11-12, 19 and 25) amount to no more than speculative scrutiny by the press – insufficient to prove defendants' "truth on the market" theory. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

In sum, defendants' purported "truthful" information did not enter the market with a degree of credibility and intensity sufficient to nullify the misleading effect of defendants' false statements. To the contrary, the false assurances drowned out any so-called truth.

DATED: August 12, 2005

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
MARK SOLOMON
DOUGLAS R. BRITTON

/s/ Shawn A. Williams
SHAWN A. WILLIAMS

401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
ELI R. GREENSTEIN
JENNIE LEE ANDERSON
MONIQUE C. WINKLER
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\BRF00023314.doc

DECLARATION OF SERVICE BY U.S. MAIL & FACSIMILE
PURSUANT TO NORTHERN DISTRICT LOCAL RULE 23-2(c)(2)

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.      That on August 12, 2005, declarant served by facsimile and U.S. Mail the PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION to the parties listed on the attached Service List and this document was forwarded to the following designated Internet site at:

http://securities.lerachlaw.com/

3.      That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of August, 2005, at San Francisco, California.

/s/ Ruth A. Cameron
RUTH A. CAMERON

ORACLE III (LEAD)
Service List - 8/3/2005 (201-064-1)
Page 1 of 1

**Counsel For Defendant(s)**

Donald M. Falk
Lee H. Rubin
Shirish Gupta
Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
650/331-2000
650/331-2060(Fax)

Alan N. Salpeter
Javier H. Rubinstein
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606
312/782-0600
312/701-7711(Fax)

Dorian Daley
James C. Maroulis
Oracle Corporation
500 Oracle Parkway, Mail Stop 50P7
Redwood City, CA 94065
650/506-5200
650/506-7114(Fax)

**Counsel For Plaintiff(s)**

William S. Lerach
Mark Solomon
Douglas R. Britton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
619/231-1058
619/231-7423(Fax)

Sanford Svetcov
Shawn A. Williams
Willow E. Radcliffe
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
415/288-4545
415/288-4534(Fax)