**EXHIBIT A**

1   BOUTIN DENTINO GIBSON DI GIUSTO HODELL INC.
    MICHAEL E. CHASE (214506)
2   555 Capitol Mall, Suite 1500
    Sacramento, California 95814
3   Telephone: (916) 321-4444
    Fax: (916) 441-7597
4

5        -and-

6   ARNALL GOLDEN GREGORY LLP
    HENRY R. CHALMERS (Georgia Bar No. 118715)
7   (Admitted *pro hac vice*)
    171 17th Street, N.W.
8   Suite 2100
    Atlanta, Georgia 30307
9   Telephone: 404-873-8646
    Fax: 404-873-8647
10

11  *Counsel for Non-Party PRG-Schultz, USA, Inc.,*
    *f/k/a Profit Recovery Group*
12

13                  UNITED STATE DISTRICT COURT

14                  EASTERN DISTRICT OF CALIFORNIA

15

16  | In re ORACLE CORPORATION SECURITIES LITIGATION | ) | No. 2:05-MC-0427 GEB PAN (Master File No. C-01-0988-MJJ pending in N.D. Cal.) |
    |---|---|---|
    | ——————————— | ) | **CLASS ACTION** |
    | This Document Relates To: ALL ACTIONS | ) | NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA |
    |  | ) | DATE: August 10, 2005<br>TIME: 9:00 a.m.<br>COURTROOM: 25 |

                                    -1-
NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT
   RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA
1906923v1

COMES NOW non-party PRG-Schultz, USA, Inc., f/k/a Profit Recovery Group, ("PRG") and, in opposition to Plaintiffs' Motion to Compel (Plaintiffs' "Motion"), shows the Court as follows:

## INTRODUCTION

PRG is not a party to this lawsuit, nor is there any allegation that PRG has acted improperly. Plaintiffs' Motion concerns only a Subpoena that Plaintiffs served on PRG, demanding documents relating to claims made against Defendant Oracle Corporation ("Oracle") by Oracle's customers. PRG, however, was not subpoenaed in its capacity as a customer of Oracle. Rather, Plaintiffs subpoenaed PRG to produce documents regarding numerous *other* Oracle customers in an apparent attempt to avoid Northern District of California Magistrate Judge Joseph C. Spero's March 10, 2005 Amended Order Setting A Discovery Plan (the "Discovery Plan"), which limited Plaintiffs to subpoenaing documents from no more than 100 non-party Oracle customers, 93 of whom Plaintiffs had already subpoenaed. Thus, instead of limiting itself to seven (7) additional subpoenas, as apparently contemplated by the Discovery Plan, Plaintiffs are improperly using their Subpoena on PRG to perform an "end-around" the Discovery Plan and to force PRG to act as its surrogate in compiling information regarding more than seven (7) additional Oracle customers.

Plaintiffs' Subpoena also seeks to force non-party PRG to undertake an incredibly burdensome and expensive exploration for documents, which, if enforced to its extreme, would require extensive, costly, and time-consuming restoration of electronic data from archival computer tapes and significant disruption of PRG's business. Furthermore, PRG likely does not even retain or possess most of the documents demanded in Plaintiffs' Subpoena, so the probable outcome of the burdensome exploration PRG would be forced to undertake would be a disappointing and largely unhelpful fraction of the documents Plaintiffs hope to find.

To prevent this type of gamesmanship and undue burden on a non-party, and as explained in greater detail below, Plaintiffs' Motion to Compel should be denied. Alternatively, if the Court is inclined to grant Plaintiffs' Motion, any resulting production should be limited to those

-2-

documents that are both likely to exist and reasonably obtainable (*i.e.,* the documents reflected in Exhibits A, B and C to the Declaration of Clinton McKellar, Jr., which documents will contain all of the relevant and necessary information Plaintiffs need to pursue their claims against Oracle). Plaintiffs also should be required to reimburse PRG for any expenses and lost employee time or productivity it incurs in the course of retrieving documents for Plaintiffs to use in their lawsuit.

## BACKGROUND FACTS

A. **PRG's Business And Auditors.**

PRG is a global recovery audit and cost containment company that investigates and pursues, on behalf of its clients, recovery, from the clients' vendors, of inadvertent overpayments and under-deductions (collectively, "overpayments"). (Declaration of Clinton McKellar, Jr. ["McKellar Dec."] ¶ 3.) PRG employs "auditors" to investigate potential overpayments for its clients and, where found, to assert demands ("claims") against the clients' vendors for reimbursement. (Id. ¶¶ 4, 6.) In the course of conducting an audit, the auditors generally compile information regarding the claims they make on behalf of a client, which information includes, among other things, the vendor's identity, the amount of each claim, and the amount recovered from the vendor. (Id. ¶ 7.) This information ultimately is included in a Report that is given to the client, and copies of which are placed in PRG's storage facilities. (Id. ¶ 7 and Exs. A and B [samples of the two types of Reports issued by PRG].)

PRG's auditors also are required to enter into PRG's client management system ("CMS") information regarding every claim that is made against a vendor on behalf of a PRG client. (Id. ¶ 10.) The CMS database is a complete compilation of all such information, and the database may be subjected to searches for relevant information regarding such claims. A search for claims asserted against Oracle on behalf of PRG's clients that were entered into the CMS database in 2000 and 2001 revealed 70 claims against Oracle on behalf of 36 PRG clients, with a net return of $1,632,964. (Id. ¶ 13 and Ex. C [a redacted copy of a spreadsheet containing the results of the search].)

-3-

PRG does not require its auditors to retain or deliver to PRG any of the documents they gather or create in the course of researching the claims or preparing the Reports. (Id. ¶¶ 5, 8.) PRG also no longer employs many of the auditors who may have made claims against Oracle on behalf of PRG clients during the "relevant time period" established in the Discovery Plan and set forth in Plaintiffs' Subpoena -- June 1, 2000 through June 1, 2001. (Id. ¶ 19; Declaration of Henry R. Chalmers ["Chalmers Dec."] Ex. 1 ["Discovery Plan"] at 7 and Ex. 2 ["Subpoena"] at 4.) Thus, it is highly likely that most, if not all, of the documents containing additional information relating to the claims listed in Exhibits A, B and C to the Declaration of Clinton McKellar, Jr. no longer exist or are beyond PRG's possession, custody or control.

### B. This Lawsuit.

Plaintiffs filed this class action lawsuit in the Northern District of California, alleging that Oracle violated federal securities laws by making false and misleading public statements regarding its financial performance. (See generally Plaintiffs' Revised Second Amended Complaint for Violations of the Federal Securities Laws [Plaintiffs' "Second Amended Complaint"].) Plaintiffs primarily contend that Oracle misrepresented its expected future earnings to boost its stock price. (See generally Plaintiffs' original Complaint for Violations of the Federal Securities Laws; Plaintiffs' First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws.) In their Second Amended Complaint, however, Plaintiffs added an allegation that Oracle also converted to "revenue" more than $228 million in overpayments it had received from its customers, which funds it previously had been holding "on account." (Second Amended Complaint ¶¶ 36 et seq.) In other words, when Oracle's customers overpaid Oracle for its products, rather than returning the excess payments to the customers, Oracle allegedly retained the funds in a holding account. Then, on or about November 17, 2000, Oracle allegedly converted on its books some or all of the funds in the holding account to

-4-

"revenue" by issuing 46,000 "debit memo transactions" (referred to by Plaintiffs as "fake invoices"), presumably relating to 46,000 separate instances of overpayment. (Id.)[1]

Plaintiffs have subjected Oracle to extensive discovery, and Oracle contends that it has produced nearly 300,000 pages of documents in response. Plaintiffs also have engaged in aggressive and far reaching *non-party* discovery, apparently subpoenaing documents regarding alleged overpayments from at least 93 of Oracle's former and current customers. (Discovery Plan at 7.) Magistrate Judge Spero stayed all such discovery on non-parties on February 5, 2005, (id.), but subsequently lifted the stay in his March 3, 2005 Discovery Plan "subject to the limitations imposed [in the Discovery Plan]." (Id.) The Discovery Plan then addresses the conditions under which discovery could be had from the following four categories of non-parties: (i) "Oracle's current and former customers," (ii) "analysts and news services," (iii) "Oracle's auditors and accountants," and (iv) "confidential witnesses." (Id. at 7-9.) The Discovery Plan also limits Plaintiffs to no more than seven (7) additional subpoenas on Oracle's current and former non-party customers. (Id. at 7.)

### C.   Plaintiffs' Subpoenas To PRG.

On December 14, 2004, Plaintiffs served PRG with a subpoena in its capacity as one of Oracle's current or former customers, demanding that PRG produce documents relating to overpayments PRG itself made to Oracle (the "first subpoena"). PRG produced documents in response to the first subpoena. On April 25, 2005, Plaintiffs served PRG with a second subpoena (the "Subpoena"), which is the subject of Plaintiffs' pending Motion. The Subpoena contains two demands for production:

---

[1] Plaintiffs' allegations regarding the "46,000 debit memo transactions" are premised on information allegedly received from "confidential witness 46" ("CW46"), whom Plaintiffs contend is a former PRG employee. (See Second Amended Complaint ¶¶ 36-41.) The information Plaintiffs solicited from CW46 is not consistent with the information available to PRG. In an attempt to clarify this apparent discrepancy, and to determine the location of, and likely burdensomeness of any resulting search for, such documents, counsel for PRG requested that Plaintiffs' counsel reveal CW46's identity and facilitate a discussion between CW46 and PRG personnel. Plaintiffs' counsel has refused to cooperate with this request.

REQUEST NO. 1:

All documents concerning any overpayment or duplicate payment to Oracle relating to Oracle's 46,000 debit memo transactions created on or about November 17, 2000, made by any person or entity to whom you provided services, including but not limited to recovery auditing services.

REQUEST NO. 2:

All documents relating to your actual or attempted recovery of monies paid to Oracle, including but not limited to refunds, credits or reimbursement, on behalf of any person or entity to whom you provided services, including but not limited to recovery auditing services, and relating to Oracle's 46,000 debit memo transactions created on or about November 17, 2000.

The Subpoena restricts its scope to June 1, 2000 through July 1, 2001 - the "relevant time period" established by Magistrate Judge Spero in the Discovery Plan. (Subpoena at 4; Discovery Plan at 7.)

Importantly, whereas Plaintiffs' first subpoena demanded that PRG produce documents regarding PRG's own alleged overpayments in its capacity as an Oracle customer, Plaintiffs' second Subpoena seeks only to use PRG as a conduit through which to obtain documents regarding alleged overpayments to Oracle by other, non-party entities (*i.e.*, PRG's clients). Thus, the Subpoena does not fit within any of the four categories of non-party discovery contemplated by Magistrate Judge Spero in the Discovery Plan, and its enforcement would allow Plaintiffs to succeed in foisting onto PRG the task of working to ensure Plaintiffs receive information regarding many more than the 100 non-party Oracle customers contemplated by the Discovery Plan.

Most importantly, however, Plaintiffs' Subpoena will impose an enormous and expensive burden on PRG if interpreted and enforced to its extreme. As discussed below, PRG can produce the documents sampled in Exhibits A, B and C to the Declaration of Clinton McKellar, Jr. with a reasonable amount of effort and expense. (McKellar Dec. ¶¶ 15, 16.) Anything more than that, however, would be incredibly burdensome and costly, requiring several months of restoring archival tapes, building excess-capacity servers, conducting time-consuming computer searches, manually reviewing unknown amounts of e-mails and attachments, and scanning the globe for

-6-

former PRG auditors who may or may not have information regarding the potential location of documents. (Id. ¶¶ 18-25; Andrews Dec. ¶¶ 4-18.) Furthermore, even if PRG ultimately were able to find additional documents, those documents would be largely redundant of the information available in the documents sampled in Exhibits A, B and C and most likely would be outside of PRG's possession, custody or control in any event. (McKellar Dec. ¶¶ 19, 23, 25; Andrews Dec. ¶ 18.)

Producing the documents demanded in Plaintiffs' Subpoena also could cause PRG to breach the terms of confidentiality agreements it has entered into with its clients, wherein PRG promised not to disclose to any third parties (such as Plaintiffs and Oracle) documents or information regarding the clients' businesses. (McKellar Dec. ¶¶ 26, 27.)

PRG notified Plaintiffs of its objections to the Subpoena in a letter from counsel dated May 6, 2005. (Declaration of Henry R. Chalmers at Ex. 3.) (Plaintiffs' Declaration of Jennie Lee Anderson includes this and other correspondence between counsel, but omits to include a letter from PRG's counsel to Ms. Anderson dated May 26, 2005. A copy of that letter is attached to the Declaration of Henry R. Chalmers as Exhibit 4.) Thereafter, counsel for PRG and Plaintiffs conferred in good faith regarding the Subpoena, but were not able to reach a resolution. Thus, Plaintiffs filed the instant Motion.[2]

### D. **PRG's Opposition To Plaintiffs' Motion To Compel.**

PRG respectfully requests that the Court deny Plaintiffs' Motion to Compel on the ground that it violates the letter and/or the spirit of Magistrate Judge Spero's Discovery Order and on the ground that it is unduly burdensome. In the alternative, PRG respectfully requests that, if the Court is inclined to grant Plaintiffs' Motion, it (1) limit any resulting production to (a)

---

[2] Plaintiffs' counsel requested that counsel for PRG secure PRG's consent to jurisdiction in the Northern District of California for purposes of this Motion, because that is where the underlying action is pending. Counsel for PRG agreed to discuss the request with PRG, but PRG's general counsel was out of town at the time, and before counsel for PRG could discuss the request with PRG's general counsel, Plaintiffs filed this Motion in the Eastern District of California. Within days thereafter, counsel for PRG received and conveyed to Plaintiffs' counsel PRG's consent. Counsel for PRG then suggested that Plaintiffs withdraw their Motion and refile it, with PRG's consent, in the Northern District. Plaintiffs, however, declined PRG's suggestion. Thus, the Motion remains before this Court.

-7-

1  an un-redacted copy of Exhibit C to the Declaration of Clinton McKellar, Jr., which will contain
2  extensive information regarding all claims made against Oracle by PRG on behalf of PRG's
3  clients, and (b) all versions of Exhibits A and B to the Declaration of Clinton McKellar, Jr.
4  involving claims made against Oracle by PRG on behalf of PRG's clients during a relevant time
5  period, and (2) require Plaintiffs to reimburse non-party PRG for the expense and lost employee
6  work time it incurs in the course of gathering and producing documents to Plaintiffs.

## ARGUMENT AND CITATION OF AUTHORITIES

### A. Plaintiffs' Subpoena Violates The Court's Discovery Plan.

The Discovery Plan governing this case places certain restrictions on Plaintiffs' use of subpoenas on non-parties and apparently contemplates only four categories of non-parties on which Plaintiffs may serve such subpoenas after March 10, 2005: (i) "Oracle's current and former customers," (ii) "analysts and news services," (iii) "Oracle's auditors and accountants," and (iv) "confidential witnesses." (Discovery Plan at 7-9.) Plaintiffs previously subpoenaed documents from PRG in its capacity as one of "Oracle's current or former customers" (through the "first subpoena"), and PRG produced documents regarding its own payments to Oracle as an Oracle customer in response thereto. (McKellar Dec. ¶ 28.) Plaintiffs' second and current Subpoena does not seek documents from non-party PRG in this capacity, nor in any of the other four capacities set forth in the Discovery Plan. Rather, it seeks documents from PRG in its capacity as a business that performed services for selected other non-party Oracle customers relating to their claims against Oracle and other vendors. Thus, the Subpoena appears to go beyond the Discovery Plan's "limitations." Accordingly, Plaintiffs' Motion to Compel should be denied.

The Subpoena also violates the spirit and apparent intention of the Discovery Plan by attempting to circumvent the Discovery Plan's limits regarding discovery regarding non-party Oracle customers. In essence, the Subpoena demands that PRG serve as a conduit through which

Plaintiffs hope to receive documents regarding numerous additional Oracle customers, which documents Plaintiffs are barred from seeking directly from those very customers. Plaintiffs were given permission to serve an enormous number of subpoenas (100) on non-party Oracle customers. (Discovery Plan at 7.) Now that Plaintiffs have nearly exhausted their generous supply of non-party customer subpoenas (having issued at least 93, thus far), they are attempting to perform an "end-around" the Discovery Plan by using PRG to secure documents for them regarding far more than seven (7) non-party Oracle customers.

If Magistrate Judge Spero believed that Plaintiffs needed documents regarding more than 100 non-party Oracle customers, then presumably he would have permitted Plaintiffs to serve more than 100 subpoenas on non-party Oracle customers. He clearly did not, though, and Plaintiffs' attempt to circumvent that limit by forcing PRG to gather and produce those documents instead is inconsistent with the Discovery Plan. Thus, Plaintiffs' Subpoena appears to be an attempt to get around the limitations Magistrate Judge Spero set forth in the Discovery Plan by obtaining indirectly from non-party PRG that which Plaintiffs are prohibited from seeking directly from Oracle's customers. For this reason, the Motion to Compel should be denied.

**B.    Plaintiffs' Subpoena Demands That PRG Breach Confidentiality Agreements With Its Clients.**

Most, if not all, of the information Plaintiffs are demanding is subject to confidentiality agreements between PRG and its clients. (McKellar Dec. ¶ 26.) These confidentiality agreements generally prohibit PRG from disclosing to any third parties information or documents regarding its clients' businesses. (McKellar Dec. ¶ 26.) Producing documents regarding PRG's clients to Plaintiffs would likely breach these confidentiality agreements. (McKellar Dec. ¶ 26.)

Plaintiffs incorrectly argue that the Revised Stipulated Protective Order Governing Confidentiality ("Protective Order") in this case addresses all of the confidentiality concerns of PRG and its clients. To the contrary, while the Protective Order governs the use or dissemination of material *after* it is produced in the case, it does not in any way address PRG's contractual obligation to its clients not to disclose that information to Plaintiffs or other third parties in the

-9-

first place. The mere act of producing the clients' documents to Plaintiffs alone arguably would breach the confidentiality agreements, regardless of whether Plaintiffs and Oracle thereafter maintain the documents in conformity with the Protective Order. PRG has sought permission from its clients to produce their confidential documents, but the clients have not given their consent. (McKellar Dec. ¶ 27.) This is further reason to deny Plaintiffs' Motion.

C. **Plaintiffs' Subpoena Is Unduly Burdensome.**

Notwithstanding the foregoing, if so ordered, PRG can produce extensive information regarding all of the claims it made against Oracle on its clients' behalves without undue burden if such production is reasonably limited to the information represented in the sample documents in Exhibits A, B and C of the Declaration of Clinton McKellar, Jr. Those documents would give Plaintiffs all the information necessary to pursue their claims against Oracle. Plaintiffs may argue, however, that they should be entitled to force non-party PRG to search for more documents, even if those documents are unlikely to exist or would be largely redundant of the information contained in Exhibits A, B and C, and regardless of the enormous burden and disruption of business such a demand would place on PRG. Thus, if Plaintiffs' Motion to Compel is not denied, any resulting Order should reasonably limit PRG's production to the documents represented in Exhibits A, B and C regarding claims against Oracle during a relevant time period and should require that Plaintiffs reimburse PRG for the costs associated with the production.

 1. **The Financial Burden Of Any Production Should Be Shifted From Non-Party PRG To Plaintiff.**

Where a non-party must incur significant burden or expense to comply with a subpoena for documents, the demanding party should be required to reimburse the responding non-party for those expenses. See <u>United States v. Columbia Broad. Sys., Inc.</u>, 666 F.2d 364, 371 (9th Cir. 1982) ("Although party witnesses must generally bear the burden of discovery costs, the rationale for the general rule is inapplicable where the discovery demands are made on non-parties. Nonparty witnesses are powerless to control the scope of litigation and discovery and

-10-

1  should not be forced to subsidize an unreasonable share of the costs of a litigation to which they
2  are not a party."); Compaq Computer Corp. v. Packard Bell Elecs., Inc., 163 F.R.D. 329, 339
3  (N.D. Cal. 1995) (ordering the demanding party to reimburse the responding non-party "at a
4  reasonable hourly rate for its employees', including in-house paralegals' time, in searching for,
5  reviewing for privileged material and producing responsive documents."); High Tech Med.
6  Instrumentation, Inc. v. New Image Indus., Inc., 161 F.R.D. 86, 88 (N.D. Cal. 1995) ("The Ninth
7  Circuit has long held that nonparties subject to discovery requests deserve extra protection from
8  the courts."); United States v. CBS, Inc., 103 F.R.D. 365, 367 (C.D. Cal. 1984) (requiring
9  demanding party to reimburse responding non-party for, among other things, the costs of
10 supplies, equipment, altering existing working space to make it useable, hiring additional
11 personnel, and paying permanent personnel for their work in producing documents).

      2.    **Exhibits A, B And C.**

13 In the course of auditing a client to identify and pursue reimbursement of overpayments
14 to vendors, PRG's auditors compile information regarding the claims they make on behalf of the
15 client. (McKellar Dec. ¶ 7.) That information includes, among other things, the name of the
16 vendor (such as "Oracle"), the amount of each claim, and the amount actually recovered from the
17 vendor on each claim. This information ultimately is included as part of a Narrative Audit
18 Report (for commercial accounts) or a Management Report (for retail accounts) that is given to
19 the client, and copies of which are placed into PRG's storage facilities. (Id.) (Narrative Audit
20 Reports and Management Reports are referred to herein collectively as "Reports.") True and
21 correct copies of sample Reports are attached to the Declaration of Clinton McKellar as Exhibits
22 A and B.

23 If so ordered, PRG could produce copies of all Reports in its possession regarding the
24 claims that it made against Oracle on behalf of its clients. This would require a relatively modest
25 expenditure of time and expense, totaling approximately two to three (2-3) weeks of PRG
26 employee time. (McKellar Dec. ¶ 16.) Although Magistrate Judge Spero defined the "relevant

-11-

NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA
1906923v1

time period" as June 1, 2000 through June 1, 2001, PRG could produce all relevant Reports from a larger time period (such as all of 2000 and 2001), if necessary.

PRG's auditors also are required to enter into PRG's client management system ("CMS") information regarding every claim that is made against a vendor on behalf of a PRG client. (Id. ¶ 10.) The CMS database contains a complete compilation of all such information, and PRG may conduct searches in the CMS database to retrieve information regarding all claims made on clients' behalves against Oracle.[3] (Id. ¶ 11.)

PRG recently conducted a search in its CMS database for claims made against Oracle on behalf of PRG clients that were entered in 2000 and 2001. The results of that search are set forth on a spreadsheet, a redacted version of which is attached to the Declaration of Clinton McKellar, Jr. as Exhibit C.[4] The search reveals that, during those two years (encompassing the entire "relevant time period" and more), PRG entered a total of 70 claims against Oracle on behalf of 36 different PRG clients, with a net amount recovered on all 70 claims of $1,632,964. (Id. ¶ 13 and Ex. C.) The un-redacted spreadsheet also shows the amount of each individual claim against Oracle, the client on whose behalf the claim was asserted, and whether the claim was successful or not. (See id.) If so ordered, PRG could produce an un-redacted copy of Exhibit C without any significant burden or expense. PRG also could produce an un-redacted spreadsheet for a larger period of time if so ordered.

---

[3] One caveat is that the only date parameter capable of being searched is the date on which the claims were entered into the CMS system. (McKellar Dec. ¶ 11.) Thus, it is not possible for PRG to search its CMS database to extract all claims that were asserted against Oracle during the "relevant time period." (Id.) Similarly, it is not possible for PRG to search its CMS database to extract all claims that were made against Oracle based on overpayments that occurred during a certain time period. (Id.) Such a search capability simply is not available.

[4] In footnote 5 on page 6 of their Motion to Compel, Plaintiffs state that PRG admits that a search in the CMS database "produces wildly unpredictable and unreliable results." This is incorrect. Searches in the CMS database produce reliable and complete results. (McKellar Dec. ¶ 12.)

NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA

1906923v1

Production of the documents represented by Exhibits A, B and C to the Declaration of Clint McKellar, Jr. would provide Plaintiffs with all the information they need regarding claims made against Oracle for overpayments. Furthermore, producing these documents would require only a modest expenditure of time and expense by PRG, totaling approximately two to three (2-3) weeks of PRG employee time, which, in turn, would require only a modest reimbursement burden on Plaintiffs. (Id. ¶ 16.)

### 2. Any Production Beyond Exhibits A, B and C Would Be Unreasonably Burdensome.

Requiring PRG to produce documents beyond those represented in Exhibits A, B and C would impose a tremendous burden and expense on PRG, significantly disrupt PRG's business, and likely result in the production of information largely redundant of that supplied in the Exhibits. The only other documents that possibly could have been created or received by PRG relating to claims against Oracle would be documents acquired by PRG's individual auditors in the course of performing their audits and e-mails involving PRG employees. (McKellar Dec. ¶¶ 18, 20, and 21.)

With regard to documents acquired by PRG's auditors, the auditors keep those documents with them at the client site while they are performing their audits, and not at PRG. (Id. ¶ 19.) There is no PRG requirement that an audit's claim documents be retained beyond the period necessary to close out the audit, so auditors generally do not turn any of those documents over to PRG nor retain them for themselves. (Id. ¶ 19.) Thus, it is highly likely that most, if not all, of the documents so acquired prior to 2002 (*i.e.*, prior to the date of the "46,000 debit memo transactions" and the close of the "relevant time period") have been discarded by the auditors.

To confirm this, however, would require an overwhelming investment of time and expense. Even if some of these documents still existed, PRG would not know their location, nor does PRG have a list of all of the auditors who may have accumulated these documents while asserting claims against Oracle on behalf of PRG's clients. (Id. ¶ 20.) Thus, any attempt to

-13-

locate these documents (assuming they even still exist, which is unlikely) would require PRG to undertake the following, laborious and prohibitively-expensive, six-step process:

    (a)    Constructing a list of such auditors;

    (b)    Contacting each such auditor to determine whether the auditor remembers what he or she did with the relevant documents created or gathered many years ago;

    (c)    If the auditor does remember what he or she did with the relevant documents, determining whether the auditor discarded the documents or retained them somewhere else;

    (d)    If the auditor retained them, determining whether the auditor remembers where they were retained or sent;

    (e)    If the auditor can remember whether and where the documents may have been retained or sent, determining whether the documents are in PRG's possession, custody or control; and

    (f)    If the documents are in PRG's possession, custody or control, searching for the documents. (Id. ¶ 21; Andrews Dec. ¶ 4.)

Before PRG even could begin performing steps (b) through (f), above, it would have to construct a list of auditors who may have asserted claims against Oracle on behalf of PRG's clients (*i.e.*, step (a), above). (Andrews Dec. ¶¶ 4, 5.) That would require PRG to:

    (i)    Retrieve all e-mail communications within PRG during the Relevant Time Period;

    (ii)    Segregate out those e-mails that refer to "Oracle"; and

    (iii)    Have PRG employees review each of the e-mails to determine whether it actually relates to a claim asserted against Oracle and, if so, to determine whether it also identifies the auditor who made the claim.

Only then could PRG even begin to undertake steps (b) through (f), above. (Id. ¶ 5.)

-14-

1   To perform the actions involved in step (a) alone would require an enormous amount of
2   PRG's resources and employee time, would impose a tremendous expense on PRG, and would
3   significantly disrupt PRG's ability to conduct its business, all before PRG even could begin
4   attempting to perform steps (b) through (f). (Id.)

5   First, PRG would have to locate the archival, backup tapes on which all e-mail traffic for
6   much of the relevant time period has been stored. These e-mails no longer reside on PRG's
7   computer system and, therefore, must be restored. (Id. ¶¶ 7, 8, and 9.) This search would be
8   made more difficult by the fact that some of the e-mails will reside on archival tapes created by a
9   company that PRG acquired in or around 1999, but whose operations PRG did not fully assume
10  until several years later. (Id. ¶ 7.) The location, condition, and accessibility of those archival
11  tapes is unknown. (Id.) Second, PRG would then have to restore onto its computer system the
12  software necessary to conduct searches of the archive tapes it was able to locate, because PRG no
13  longer uses the software that was used when the e-mails were created. (Id. ¶ 8.) Third, PRG
14  would have to load the archival tapes onto PRG's computer system so that they could be
15  subjected to searches. This may involve loading as many as 30-40 archival tapes, all of which
16  would take a tremendous amount of time and employee involvement. (Id. ¶ 9.) Fourth, PRG
17  actually would have to build a new server and install it from scratch in order to create a platform
18  into which to restore the data that resides on the archival tapes. (Id. ¶ 10.) PRG would have to
19  undertake this expensive and time-consuming task because it does not currently have sufficient
20  resources to load that much data onto its existing computer system. (Id.) Building the server and
21  loading the tapes easily could take more than two (2) solid weeks to perform and could require
22  PRG to divert as many as three (3) employees full time from their other job responsibilities in
23  order to perform and monitor this task. (Id.)

24  Fifth, only then would PRG be in a position to *begin* the filtering process by entering the
25  relevant search terms and performing the resulting searches. This would take at least one full
26  week of 24-hour days, during which PRG would have to have an employee monitor the search
27  performance to ensure that it proceeds properly. (Id. ¶ 11.) Performing these searches would be

-15-

1  extraordinarily disruptive to PRG's business. PRG relies heavily on the searching capabilities of
2  its computer system to perform the company's business. (Id. ¶ 12.) For example, PRG is
3  constantly performing searches of current client data for information to be used by various PRG
4  employees in the performance of their job duties. (Id.) To the extent those searching capabilities
5  are used instead to perform searches of archival e-mail for Plaintiffs' benefit, those searching
6  capabilities will not be available for PRG's business purposes. (Id.) The extent of business and
7  financial damage this might impose on PRG is difficult to determine at this time, but the threat is
8  real. (Id.)
9       Sixth, assuming all of the preceding actions could be performed, the end result would be
10 files filled with e-mail traffic referring in some way to "Oracle." (Id. ¶ 13.) It is impossible to
11 determine at this time how large those files might be. (Id.) Seventh, what is known, however, is
12 that PRG employees would then have to review each individual e-mail and each individual
13 attachment to each individual e-mail to determine whether it actually relates to a claim asserted
14 against Oracle and, if so, whether it also identifies the auditor who made the claim. (Id. ¶ 14.)
15      It is highly likely that many of the e-mails and attachments in the files would be "false
16 positives," or e-mails that contain the word "Oracle" in them, but that have absolutely nothing to
17 do with claims asserted against Oracle for overpayments by PRG clients. (Id. ¶ 15.) For
18 example, any search for e-mail referring to "Oracle" would also produce e-mail regarding PRG's
19 own internal use of Oracle software. (Id.) Such searches also would produce "spam" e-mail
20 advertisements for Oracle-related products. (Id.)
21      Those e-mails and attachments that ultimately are found to be relevant and attributable to
22 an identifiable auditor could be placed in a new file, which PRG employees would then use to
23 *begin* performing steps (b) through (f), above. (Id. ¶ 16.) Even then, though, the chance of
24 finding relevant documents in PRG's possession, custody or control would be incredibly slim,
25 because only a small fraction of the auditors employed during the relevant time period are still
26 PRG employees and therefore capable of being compelled to cooperate. (McKellar Dec. ¶ 19.)
27
28

NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT
RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA
1906923v1

It is difficult at this time to determine precisely how much burden and expense PRG would incur in performing the actions necessary for step (a). It is highly likely, though, that merely to perform the actions necessary for step (a), alone, would require six (6) to twelve (12) weeks and at least several hundred employee work hours. (Id. ¶ 17.) More importantly, performing these actions would cause an enormous disruption of PRG's business operations and would force PRG to expend significant amounts of money, all for no likely gain.[5] (Id. ¶ 17.)

In summary, any order requiring production of documents beyond those set forth in **Exhibits A, B and C** to the Declaration of Clinton McKellar, Jr. would require exponentially more time to perform, would impose an enormous financial and manpower burden on PRG, would cause a tremendous disruption of PRG's business, and likely would not result in the discovery of any additional, relevant information. Therefore, if the Court is inclined to grant Plaintiffs' Motion, the Court should limit the resulting production to all versions of Exhibits A, B and C to the Declaration of Clinton McKellar, Jr. involving claims made against Oracle on behalf of PRG's clients during a relevant time period.

## CONCLUSION

For the reasons set forth above, non-party PRG respectfully requests that the Court deny Plaintiffs' Motion to Compel. If, however, the Court is inclined to grant Plaintiffs' Motion, PRG respectfully requests that the Court (1) limit any resulting production to (a) an un-redacted copy

---

[5] Plaintiffs' Subpoena also is impermissibly vague. Plaintiffs demand the PRG find and produce documents from the "relevant time period" (June 1, 2000 through July 1, 2001) concerning alleged overpayments by PRG's clients to Oracle "relating to Oracle's 46,000 debit memo transactions created on or about November 17, 2000." (Subpoena at 4, 5.) The 46,000 debit memo transactions presumably were performed internally by Oracle and concerned certain customer overpayments selected exclusively by Oracle. Thus, the identity of which customer overpayments were subject to the debit memo transactions and which were not appears to be solely within the knowledge of Oracle, and perhaps the other parties to this lawsuit. PRG has no way of knowing which of its clients' claims against Oracle were subject to the debit memo transactions and which were not. (PRG notified Plaintiffs that their subpoena was objectionably vague and ambiguous, but Plaintiffs merely referred PRG to the pleadings in this case for supposed clarification.) Thus, even if PRG were to undertake the unreasonably burdensome process of trying to restore and search for documents regarding its clients' alleged overpayments to Oracle, PRG would have no way to determine whether any given document related to one of the debit memo transactions, or whether it had nothing to do with the debit memo transactions.

-17-

1 of Exhibit C to the Declaration of Clinton McKellar, Jr., which will contain extensive
2 information regarding all claims made against Oracle by PRG on behalf of PRG's clients, and (b)
3 all versions of Exhibits A and B to the Declaration of Clinton McKellar, Jr., involving claims
4 made against Oracle by PRG on behalf of PRG's clients during a relevant time period, and (2)
5 require Plaintiffs to reimburse PRG for the expense and lost employee work time it incurs in the
6 course of gathering and producing documents to Plaintiffs.

ARNALL GOLDEN GREGORY LLP
HENRY R. CHALMERS (Georgia Bar No. 118715)

/s/ Henry R. Chalmers
HENRY R. CHALMERS

171 17th Street, N.W.
Suite 2100
Atlanta, Georgia 30307
Telephone: 404-873-8646
Fax: 404-873-8647

BOUTIN DENTINO GIBSON DI GUISTO HODELL INC.
MICHAEL E. CHASE (214506)
555 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 321-4444
Fax: (916) 441-7597

Counsel for Non-Party PRG-Schultz, USA, Inc., f/k/a Profit Recovery Group

-18-

NON-PARTY PRG-SCHULTZ, USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PROFIT RECOVERY GROUP-SCHULTZ, INC.'S PRODUCTION OF DOCUMENTS IN COMPLIANCE WITH SUBPOENA
1906923v1