# Exhibit A

1 | MILBERG WEISS BERSHAD
HYNES & LERACH LLP
2 | WILLIAM S. LERACH (68581)
MARK SOLOMON (151949)
3 | DOUGLAS R. BRITTON (188769)
401 B Street, Suite 1700
4 | San Diego, CA 92101
Telephone: 619/231-1058
5 | 619/231-7423 (fax)
       - and -
6 | SANFORD SVETCOV (36561)
SHAWN A. WILLIAMS (213113)
7 | 100 Pine Street, Suite 2600
San Francisco, CA 94111
8 | Telephone: 415/288-4545
415/288-4534 (fax)
9
Lead Counsel for Plaintiffs
10

RECEIVED

DEC  9 2002

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

11
UNITED STATES DISTRICT COURT

12
NORTHERN DISTRICT OF CALIFORNIA

13

14 | In re ORACLE CORPORATION SECURITIES ) Master File No. C-01-0988-MJJ
LITIGATION )
                                                  ) CLASS ACTION
15 | ————————————————————— )
This Document Relates To:                  ) PLAINTIFFS' [PROPOSED] *REVISED*
16 |                                             ) SECOND AMENDED COMPLAINT FOR
       ALL ACTIONS.                        ) VIOLATIONS OF THE FEDERAL
17 | ————————————————————— ) SECURITIES LAWS

18 |                                               DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

## SUMMARY OF THE ACTION

1.    This is a securities fraud class action on behalf of persons who purchased the publicly traded securities of Oracle Corporation ("Oracle" or the "Company") between December 14, 2000 and March 1, 2001 (the "Class Period").   The action is brought against Oracle and one of its founders, Chief Executive Officer and Board of Directors Chairman, Lawrence J. Ellison ("Ellison"), Executive Vice President and Chief Financial Officer, Jeffrey O. Henley ("Henley"), and Executive Vice President, Edward J. Sanderson ("Sanderson"), for violations of the federal securities laws for making false and misleading public statements concerning the Company's financial results for its second quarter of fiscal year 2001 ("2Q01"), ending November 30, 2000, and false and misleading statements concerning operations, products and finances for the third quarter of fiscal year 2001, ending February 28, 2001 ("3Q01").[1]

2.    Oracle sells software for enterprise information management.  The Company's main products include database management systems and enterprise business applications.

3.    Since its inception in 1977, Oracle has focused on becoming the principal vendor of high-end database management systems, and has been the leader in the database management market since the mid-1980s.  While enterprise database sales remain Oracle's core business, in 1999 the Company viewed applications, including Customer Relationship Management ("CRM") software, as offering Oracle the strongest growth prospects over the next several years.  According to Confidential Witness ("CW") 45, a former Oracle Senior Vice President of Sales, although Oracle was clearly the dominant company selling database software, by the beginning of the Company's fiscal 2001 (June 2000), the database market had become substantially saturated and the only room for growth was in applications.

4.    Indeed, a recent independent study by AMR Research has concluded that the applications software and services market will reach $264 billion in 2005, up from less than $100 billion in 2000.  The study revealed that CRM software is expected to grow to $37 billion in 2005, up from less than $14 billion in 2000.  In order for Oracle to enter the applications and CRM

---

[1]    Oracle's fiscal year 2001 ("FY01") ran from June 1, 2000 to May 31, 2001.  Oracle's 3Q01 was the period from December 1, 2000 to February 28, 2001.

1   software market and compete with Siebel Systems, Inc. (which already owned 21% of the CRM
2   market), i2, SAP, PeopleSoft, and Ariba, which at that time offered so-called "best of breed"
3   applications and CRM software, Oracle's strategy was to offer customers a purportedly complete and
4   fully integrated package of applications (including a CRM component) - its 11i Applications Suite -
5   that would manage all aspects of a customer's business, including financials, manufacturing, sales
6   force, logistics, e-commerce and suppliers.

7        5.       The risk associated with Oracle's strategy was the alienation of applications and CRM
8   vendors who had, throughout the 1990s, been partners with Oracle in driving 25% of Oracle's core
9   database sales by recommending to their customers that Oracle database products be used with their
10   applications software. Once Oracle entered the applications market, however, these partners became
11   competitors and would no longer recommend Oracle's database products.  In fact, Rick Berquist, a
12   senior vice president at PeopleSoft was quoted as saying, "'I will not help Oracle make a single dime
13   that I don't have to.'"  Pl. Ex. 18.[2]

14        6.       It was therefore imperative for Oracle to get out in front of its competitors to grab
15   applications market share and thereby maintain its revenue and earnings growth momentum.  Prior
16   to the Class Period, Oracle had enjoyed 11 straight quarters of sequential growth or level earnings.
17   However, eight confidential witnesses say that in its rush to release its new 11i Applications Suite,
18   including CRM, in May 2000 and to influence customers to forego purchases of individual
19   applications modules from its competitors, Oracle cut short the technical development and testing
20   of 11i and prematurely released the software suite even though it was still plagued by defects
21   ("bugs") in integrating the various modules of the suite with other systems.  In truth, the 11i suite
22   was extremely "buggy" (defect-ridden) and some modules and interfaces had not even been
23   developed.

24        7.       Further undermining Oracle's strategy, in the early summer of 2000, the United States
25   economy began to decline and hardest hit were Oracle's Internet customers who had made up 10%-
26   12% of its licensing sales revenue.  By September 2000, many of those customers were no longer

27   _____
    [2]       Copies of the documents incorporated by reference in this Complaint were separately filed
28   by plaintiffs in their Corrected Appendix of Exhibits and are identified as Plaintiffs' Exhibits ("Pl.
    Ex. __"). Pl. Ex. 42 is attached to this *Revised* Second Amended Complaint.

1   in business or were scrambling for funds to survive. In addition, Oracle's database customers were

2   cutting their information technology expenditures to brace for an unstable economy, which resulted

3   in fewer database sales. Witnesses also confirmed that Oracle extended deep discounts in order to

4   fend off emerging database competitor IBM, whose products were cheaper than Oracle's.

5        8.     In order to mask the fact that sales of Suite 11i were not growing as expected in the

6   second quarter of 2001 (September 1 - November 30, 2000), and to give investors the impression

7   that sales were accelerating, defendants created phony sales invoices and improperly recognized

8   revenue from past customer credits and overpayments it had held in reserve without informing its

9   customers. According to CW46, a former Financial Analyst for a global audit recovery firm working

10   on behalf of Oracle customers, Oracle withheld customer's overpayments and credits due to at least

11   16 of its clients between 1991 and 2000. Oracle held the money in what it called its "unapplied

12   account." On November 17, 2000, Oracle executed more than 46,000 sham invoice transactions

13   converting the reserved overpayments to revenue totaling approximately $228 million. As a result,

14   on December 14, 2000, Oracle falsely reported 2Q01 revenues of $2.66 billion and EPS of $0.11,

15   beating Wall Street analysts' consensus earnings estimate by $0.01, causing the Company's stock

16   price to increase from $27.50 on December 14, 2000 to $32 on December 18, 2000. Without the

17   sham revenues, however, Oracle would only have earned $0.085 per share ($228M ÷ 5.6 billion

18   shares).

19        9.     In addition to the December 14, 2000 announcement of false 2Q01 revenues and

20   earnings, and in the face of a declining U.S. economy and 11i defects which had already slowed

21   sales, defendants boldly asserted that Oracle was not being hurt by the slowing economy and that in

22   3Q01 Oracle would continue to have sequential earnings per share ("EPS") growth and would report

23   $0.12 EPS and revenue of $2.9 billion based upon projected 75% applications sales growth and 25%

24   database sales growth. These false statements caused Oracle's share price to be artificially inflated

25   to highs of more than $34 during the Class Period.

26        10.     Although defendants represented that the Company's revenues and earnings would

27   continue to grow, Oracle's sales in the first half of 3Q01 were severely impacted by the weakening

28   United States economy and the defects in the 11i software. CW44, a former Oracle Financial

1  Analyst in Oracle's Corporate and Planning Analysis Organization, who was responsible for
2  analyzing the global forecasts and distributing them to senior management, is one of many witnesses
3  that confirmed that through the summer and fall of 2000, the slowing economy had resulted in order
4  delays and sales cancellations. In fact, several large deals were lost in December 1999 and January
5  2000, including the State of Michigan ($50-100M), Bell South ($36M), Telia ($35-40M), and ADT
6  ($10M), totaling approximately $186 million.

7     11.    In addition to these lost and delayed deals, according to CW1, CW13, CW18, CW21,
8  CW27 and CW41, the defects in 11i caused several other customers to either delay planned
9  purchases of 11i until Oracle could fix the problems or cancel deals altogether. For example, JDS
10  Uniphase, The Principal Financial Group, Health Net, and BellSouth each began costly
11  implementation of 11i and cancelled either some or all of their implementation projects because of
12  the instability of the 11i software. Several more customers, including Citibank, Nantucket Nectars,
13  Alliance Coal, and Motorola delayed their purchases or implementation of 11i until Oracle could fix
14  the problems.

15     12.    In January and February 2001, as the United States economy continued to slide,
16  defendants repeated that Oracle's 3Q01 growth estimates were easily achievable, because Oracle's
17  pipeline was "never stronger," "its database and application sales were rapidly growing" and that the
18  slowing economy was having no impact on Oracle's performance.

19     13.    Each of these statements was false and misleading. As reported by numerous
20  confidential witnesses, even as early as July 2000, the pipeline for all of Oracle's products had begun
21  to deteriorate and the slowing economy had dramatically impacted sales in all segments of Oracle's
22  business in all of the United States' geographic regions and had not recovered. By December 2000,
23  the declining sales were so widespread that defendants had no reasonable basis for their statements
24  that Oracle was not hurt by the slowing economy or for its extravagant financial projections for
25  3Q01.

26     14.    In addition to and contemporaneous with the false revenue and earnings growth
27  forecasts, defendants falsely and repeatedly assured investors that Oracle's new 11i suite applications
28  product worked and required no programming systems integration to implement. In truth, the new

11i suite, which was supposed to drive both 25% database and 75% applications sales growth in 3Q01, was plagued by defects, connection failures, and customer rejection, and needed thousands of "patches" (repairs) just to work.

15.    Ellison and the other individual defendants actually knew that the 11i suite was fraught with severe technical problems, including serious gaps in its CRM modules, and required expensive systems integration work to implement. Industry commentators stated in March 2001 and even a year later in February 2002, that Suite 11i was "[t]he buggiest software"ever sold by Oracle and that Oracle's 11i defects remain "real and current." Pl. Exs. 16, 27. On August 6, 2001, Ellison admitted to *The Wall Street Journal* that he knew about the 11i software defects: "'It's a complex product ... and it's very hard to discover all the bugs while testing. The whole software-applications industry goes through this painful birthing process. *Mea culpa*. It's true.'" Pl. Ex. 1.

16.    Defendants also knew that 3Q01 sales would not meet public revenue and earnings projections. In fact, they frequently admit knowledge before, during, and after the Class Period. In June 2000, Ellison admitted that he is a hands-on manager who "'love[d] getting involved in every detail of the business.'" Pl. Ex. 2. In addition, the Company promoted 11i and its Oracle Sales Online application as giving senior executives a global view of sales and revenue forecasts, including the ability to assess current sales performance against targets. On February 21, 2001, only eight days before Oracle admitted that the slowing economy and weak sales would impact 3Q01 earnings and revenues, Ellison also bragged that he specifically kept track of Oracle sales on a single internal database that covered not only the United States, but the entire world: "All of our information is in one database. We know exactly how much we have sold in the last hour around the world ...." Pl. Ex. 3 at 14:04:29.

17.    Then, in a March 1, 2001 press release, Oracle revealed that defendants' prior assurances of Oracle's continuing "strong" revenue and EPS growth (Pl. Ex. 4), including defendants' assurances on February 23, 2001, only six days earlier, that demand remained strong were inaccurate. Instead, Oracle admitted that:

•      Oracle would post sequential EPS *declines* for the first time in eight years.

•      Database growth would be *flat* or *negative*.

1     •   Applications growth would be only two-thirds of what Ellison had projected just days

2    before.

3      18.    On March 1, 2001, defendants also revealed that Oracle had missed its $0.12 EPS

4  forecast, earning only $0.10 per share. With 5.6 billion Oracle shares outstanding, Oracle's two-cent

5  per share "miss" represented a $112 million earnings shortfall, 17% less than defendants' forecast.

6  Oracle's $2.67 billion in 3Q01 revenues also fell short of the $2.9 billion forecast by $233 million,

7  an 8% miss.

8      19.    These disclosures had a dramatic, negative effect on the market, causing Oracle's

9  stock to decline from $19.50 to $16.88 per share on March 2, 2001, on record volume of more than

10  224 million shares. Pl. Ex. 5. This was the third largest one-day trading volume in United States

11  market history. Defendants' misleading of the market wiped out over $90 billion in Oracle's market

12  capitalization as its stock fell 50% from its Class Period high of $34.56 per share on January 19,

13  2001, when the truth about Oracle, its operations and finances was disclosed.

14                             **INSIDER TRADING**

15      20.    Defendants Ellison and Henley did not suffer the same fate as investors. Taking

16  advantage of the inflation in Oracle stock and prior to the March 1 failure to meet earnings forecasts,

17  Ellison sold more than 29 million shares of his Oracle stock for proceeds of almost $900 million

18  between January 22-31, 2001, at artificially inflated prices of $30-32 per share, one of the largest

19  insider trading incidents in United States market history. These stock sales were dramatically out

20  of line with Ellison's prior trading history, as he had not sold any of his shares for five years prior

21  to these sales. Moreover, as reported by Ellison in his Form 4 filed with the SEC on February 9,

22  2001, 23 million of the 29 million shares sold by Ellison during the Class Period were options that

23  he acquired for a mere $0.23 per share. Pl. Ex. 28.

24      21.    As reported in Henley's Form 4 filed with the SEC on February 9, 2001, on January

25  4, 2001, Henley sold one million shares of his Oracle stock at the artificially inflated price of $32

26  per share for proceeds of $32.3 million. 793,772 of these shares were options which Henley acquired

27  at only $1.04 per share. The other 206,228 shares were also options which Henley exercised at only

28  $1.69 per share. Pl. Ex. 29.

22.     Ellison's insider trading was suspiciously timed shortly after defendants' false statements on January 5 and 8, 2001 that pushed the stock to over $30 per share. This was also only one month before Oracle missed its financial forecasts on March 1, 2001 when the stock dropped to $16.88. Similarly, Henley sold on January 4, 2001, only two weeks after his false forecasts on December 14-15, 2000, and less than two months before Oracle missed those forecasts on March 1, 2001.

23.     As shell-shocked Oracle shareholders watched their shares crumble in value, the financial media began to question how Ellison could, after five years of not selling any Oracle shares, sell almost $900 million of his own stock only one month before Oracle fell seriously short of its 3Q01 forecasted results. Even though Ellison and Henley retained more than 90% of their shares, they did not incur the same large losses as investors who bought at $30 or more per share. Even at the post-stock-drop price of $16.88, defendants incurred no losses on stock-holdings they acquired at $0.23 to $1.69 per share. Even corporate-friendly news companies like *Upside Today* were outraged and published an article following Oracle's March 1, 2001 report entitled, "*The verdict: Did Oracle dupe investors?*" (questioning the veracity of Oracle's statements to its shareholders). Pl. Ex. 6.

24.     A summary of defendants Ellison and Henley's Class Period stock sales (adjusted for stock splits) follows:

| | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| L. Ellison | 01/22/01 | 3,100,000 | $32.010 | $99,231,000 |
| | 01/23/01 | 5,100,000 | $31.640 | $161,364,000 |
| | 01/24/01 | 4,900,000 | $30.730 | $150,577,000 |
| | 01/25/01 | 3,825,000 | $30.140 | $115,285,500 |
| | 01/26/01 | 4,225,000 | $30.090 | $127,130,250 |
| | 01/29/01 | 1,082,000 | $30.030 | $32,492,460 |
| | 01/29/01 | 815,000 | $30.220 | $24,629,300 |
| | 01/29/01 | 1,500,000 | $30.490 | $45,735,000 |
| | 01/30/01 | 352,000 | $30.540 | $10,750,080 |

| | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 01/30/01 | 1,560,000 | $30.440 | $47,486,400 |
| | 01/30/01 | 25,576 | $30.250 | $773,674 |
| | 01/30/01 | 1,000,000 | $30.830 | $30,830,000 |
| | 01/30/01 | 300,000 | $30.210 | $9,063,000 |
| | 01/31/01 | 1,300,000 | $30.350 | $39,455,000 |
| | Class Period totals | 29,084,576 | | $894,802,664 |
| J. Henley | 01/04/01 | 206,228 | $32.310 | $6,663,227 |
| | 01/04/01 | 793,772 | $32.310 | $25,646,773 |
| | Class Period totals | 1,000,000 | | $32,310,000 |

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a), 78t-1 and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

26.     Venue is proper in this district pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred in this district.

## CONFIDENTIAL SOURCES

27.     The allegations of falsity and actual knowledge pled herein are made on information and belief and are supported by the first-hand accounts of 48 confidential witnesses, including new witnesses. These 48 witnesses are comprised of former Oracle employees and some of its customers, each of whom were interviewed by plaintiffs' investigators since March 2, 2001. Each of the employees was employed at Oracle between summer 2000 and the end of the Class Period and provided facts from numerous departmental and geographic vantage points within the Company:

(a)     Confidential Witness #1 ("CW1") is a former Oracle Account Manager for sales of Oracle database products and CRM products. CW1 was responsible for sales in the General Business West department (sales to customers that generate up to $100 million in revenue per year). CW1 was a part of a six-team group consisting of ten sales representatives each and responsible for the western United States. The General Business West teams sold database products, applications products and 11i CRM modules. In addition, General Business West was responsible for Oracle's "Dot Com" customers. CW1 also worked on the same floor at Oracle's Redwood Shores headquarters as account managers and sales representatives for the "Named Account" Group (customers who generate $100 – $500

1    million in revenue per year) and "Majors" Group (customers that generate $500 million or more in revenue per year).

3    (b)    Confidential Witness #2 ("CW2") is a former Oracle Director of E- Business Consulting Services responsible for sales and consulting in the northwest region of the United States consisting of Oregon, Washington, Utah, Idaho and Colorado. CW2 primarily sold consulting services for database and applications products.  Consulting services, according to CW2, included implementation of Internet business applications, including 11i CRM modules.  CW2 reported that he had visibility into all sales in his territory because product sales triggered sales in the Company's consulting business. CW2 personally used and accessed Oracle's internal (CRM) database pipeline system which was used to monitor and forecast sales for both product and consulting services. According to CW2, Oracle's pipeline database reflected every sales opportunity that sales representatives were required to enter in the database, together with the price of the deal, and percentage likelihood the deal would close. CW2 added that the CRM pipeline database also reflected the percentage of deals booked against the number forecast.

10    (c)    Confidential Witness #3 ("CW3") is a former Oracle Corporate Account Manager in Major Accounts (accounts whose customers generate more than $500 million per year).  Working out of Oracle's Boston headquarters, CW3 was responsible for Major Accounts in New England, New York, New Jersey and Pennsylvania, the Eastern Majors Sales Organization.

13    (d)    Confidential Witness #4 ("CW4") is a former Oracle Staff Consultant in the Company's I-Services Vertical Group working out of Oracle's Atlanta facility.  CW4 was responsible for consulting and building Internet applications for companies in the southeast region of the United States.

15    (e)    Confidential Witness #5 ("CW5") is a former Oracle Practice Director for state and local governments. CW5 was responsible for consulting services on state and local government contracts in Oracle's nine-state Mountain Desert region. During the Class Period, CW5 participated in weekly conference call meetings which were attended by all of Oracle's State and Local Practice Managers in the entire nation.

18    (f)    Confidential Witness #6 ("CW6") is a former Oracle Sales Administrative Assistant in Oracle's New York City office. CW6 provided support for Regional Managers Bob Seelandt and Steve Frank by maintaining their sales spreadsheets and travel schedules. According to CW6, both Seelandt and Frank were responsible for state and local government sales in New England, New York and New Jersey.  CW6 also accessed Oracle's CRM pipeline projections for her region. CW6 also personally used the 11i timesheets module and 11i CRM module.

22    (g)    Confidential Witness #7 ("CW7") is a former Oracle Vice President of Finance responsible for finance operations of technical support, education, development, and marketing.  As a Vice President of Finance, it is reasonable to infer that he had high-level management insight into all aspects of Oracle's finances and operations affecting finances.

25    (h)    Confidential Witness #8 ("CW8") is a former Oracle Practice Director for Oracle's Worldwide CRM Consulting Group. CW8 was part of a specialized group of four Practice Directors and two Senior Practice Directors that managed various teams of consultants as "virtual groups" which specialized in all of the applications that make up Oracle's CRM module.  The Worldwide CRM Consulting Group was deployed to provide assistance to Oracle sales teams worldwide for demonstrations of Oracle's CRM products to prospective customers, as well as to perform implementation support once deals were closed.

CW8 also worked in conjunction with sales teams to facilitate potential CRM deals in the pipeline by performing demonstrations at customer sites.

(i)      Confidential Witness #9 ("CW9") is a former Oracle Senior Practice Director in charge of Business Development Consultants for Higher Education customers in the southeastern United States. CW9 was specifically responsible for installation, customization and implementation of database and application products, including the 11i applications suite which included the troubled CRM module.

(j)      Confidential Witness #10 ("CW10") is a former Oracle 11i CRM Marketing and Development Strategist who reported to Senior Vice President of CRM, Mark Barrenechea, who reported directly to defendant Larry Ellison. CW10 was responsible for engineering and development of a CRM module that would be appropriate for large telecommunications companies such as AT&T or BellSouth.

(k)      Confidential Witness # 11 ("CW11") is a former Oracle Procurement Manager and Senior CRM Consultant responsible for installation and implementation of Oracle CRM applications. CW11 was responsible for CRM projects in the southern United States. During the Class Period, CW11 worked specifically on the implementation of 11i CRM suite at Oracle's largest CRM customer, BellSouth.

(l)      Confidential Witness #12 ("CW12") is a former Oracle Practice Director for Consulting Services responsible for implementation of projects at telecommunications and utilities customers in the southeastern United States. During the Class Period, CW12 was primarily working at BellSouth. At BellSouth, CW12 was responsible for implementation of 11i and the CRM module.

(m)      Confidential Witness #13 ("CW13") is a former Oracle Technology Director. CW13 was responsible for performing data analysis and creating "conversion solutions" for prospective Oracle customers, including writing proposals based upon customers' specific data requirements. During the Class Period, CW13 was specifically involved in developing CRM integration strategies for large telecommunications companies, including BellSouth and a Swedish telecommunications company, Telia AB.

(n)      Confidential Witness #14 ("CW14") is a former Systems Analyst at GE Capital Commercial Equipment Financing Group. CW14 was responsible for overseeing the conversion from the Oracle 10.7 product to the Oracle 11i application. CW14 was also a part of the support team at GE Capital responsible for researching the conversion process prior to actual conversion and implementation to 11i, which began in January 2001.

(o)      Confidential Witness #15("CW15") is a former Oracle Consultant and Third Party Consulting Service Provider. Prior to the Class Period, CW15 worked as an Oracle Consultant responsible for installation and implementation of Oracle software products. During the Class Period, CW15 worked as a third-party consultant, working with Oracle sales staff to cultivate sales of 11i and the CRM module which were then referred to Oracle. As a third-party consultant, CW15 would be guaranteed the follow-on consulting engagement.

(p)      Confidential Witness #16 ("CW16") is a former Oracle Staff Consultant and Consulting Director for Oracle's Application Service Provider Services responsible for creating business models based on the specification and capabilities of Oracle 11i. These business models were used by Oracle consultants during demonstrations of 11i at customer sites. During the Class Period, CW16 worked specifically with Oracle sales personnel on business models for Motorola and Health Net, both of which at the time were considering upgrades to the 11i suite.

(q)     Confidential Witness #17 ("CW17") is a former Oracle Applications User Group Executive Vice President and CRM expert. CW17 is also a former Applications and CRM expert for Eaton Corporation, where CW17 was responsible for Oracle's databases and applications which were purchased by Eaton.

(r)     Confidential Witness #18 ("CW18") is a former Oracle Managing Principal Consultant responsible for developing and presenting e-business and CRM strategies for Oracle customers.

(s)     Confidential Witness #19 ("CW19") is a former Oracle Finance Director and Manager of Revenue Accounting responsible for managing revenue recognition issues for the support group in the Americas. In addition to managing revenue recognition on support agreements and contracts, CW19 personally used the 11i CRM suite internally at Oracle, which had been implemented in September 2000, to consolidate accounting functions. CW19 also accessed Oracle's CRM Oasis sales pipeline database, Oracle's internal Financial Analyzer and conversed with product sales personnel about market demand.

(t)     Confidential Witness #20 ("CW20") is a former Oracle Principal Consultant responsible for installation and implementation of Oracle products, specifically 11i, in the Central Region and worked out of the Company's Boston headquarters, which also housed consultants responsible for the Eastern and Southern Regions.

(u)     Confidential Witness #21 ("CW21") is a former Oracle Senior Consultant in the Performance Architecture Group responsible for installation, implementation and configuration of Oracle 11i at customer sites primarily in Southern California.

(v)     Confidential Witness #22 ("CW22") is a former Oracle Senior Director in Oracle's Consulting Organization responsible for managing a group of 20 consultants, primarily in the San Francisco Bay Area, who performed demonstrations and implementation of Oracle 11i CRM modules.

(w)     Confidential Witness #23 ("CW23") is a former Oracle Senior Consultant responsible for installation and implementation of Oracle products, specifically 11i, in the eastern United States. CW23 describes his duties during the Class Period as mainly "fixing problems" with the 11i module and teaching customers how to use the system. CW23 spent a large part of February 2001 testing Oracle applications at General Electric – a large Oracle customer.

(x)     Confidential Witness #24 ("CW24") is a former Senior Technical Analyst responsible for providing technical support for all of Oracle's consultants in the southeastern United States who were implementing Oracle 11i and other Oracle products. CW24 also specifically handled support requests from Oracle consultants at BellSouth and from BellSouth employees themselves.

(y)     Confidential Witness #25 ("CW25") is a former Oracle Senior Principal Consultant primarily responsible for installation and implementation of Oracle applications, including 11i, for state and local governments in Ohio and Michigan.

(z)     Confidential Witness #26 ("CW26") is a former Consultant in Oracle's Southern Internet Service Group, a group of consultants, managers and vice presidents performing installation and implementations at customer sites for those customers that were transitioning from server-based operations to using the Internet for both database and applications. CW26 specifically worked on projects involving upgrades from Oracle 10.7 applications to 11i applications.

1       (aa)   Confidential Witness #27 ("CW27") is a Hewlett-Packard Strategic
Procurement Specialist responsible for research and purchase of Oracle applications for
2   implementation at Hewlett-Packard.

3       (bb)   Confidential Witness #28 ("CW28") is a former Oracle CRM Program
Director responsible for managing the Senior North American Sales Force of more than 25
4   salespeople. CW28 was also responsible for developing and authoring Solution Plans to
achieve revenue and profit margin projections. CW28 was also a training advisor for Oracle
5   sales force and implementation consultants.

    (cc)   Confidential Witness #29 ("CW29") is a former Oracle CRM e- Commerce
6   Practice Manager responsible for installation and implementation of Oracle applications,
specifically 11i CRM at BellSouth during the Class Period.

7
    (dd)   Confidential Witness #30 ("CW30") is a former Oracle Project Account
8   Escalation Manager responsible for establishing and managing relationships with Oracle
customers and represented senior management to clients. CW30 was also responsible for
9   long term business relationships with customers and providing customers with a conduit for
executive level communication.

10
    (ee)   Confidential Witness #31 ("CW31") is a former Oracle Applications Sales
11  Specialist working out of Florida and responsible for sales to 50 East Coast Oracle
customers, half of whom purchased Oracle 11i.

12
    (ff)   Confidential Witness #32 ("CW32") was a former Oracle Senior Sales
13  Consultant responsible for supporting the 11i CRM Direct Sales group and creating
demonstrations of CRM products for account executives worldwide.

14
    (gg)   Confidential Witness #33 ("CW33") is a former Oracle Client Services
15  Director responsible for senior level business development and selling the full spectrum of
Oracle Consulting and Implementation Services Solutions to Fortune 500 companies. CW33
16  was responsible for "strategic accounts" in New England.

17      (hh)   Confidential Witness #34 ("CW34") is a former Oracle Senior Principal
Consultant and Technical Manager with first-hand experience installing and upgrading
18  Oracle 10.7 applications to 11i.

19      (ii)   Confidential Witness #35 ("CW35") is a former Oracle Business Solutions
Architect responsible for business development and return on investment analysis, focusing
20  primarily on supply chain management and CRM, working out of Oracle's Virginia office.

21      (jj)   Confidential Witness #36 ("CW36") is a former Oracle Sales Manager in
General Business responsible for sales and support of 20 customers in the New York area
22  and cultivating new business for database and applications sales.

23      (kk)   Confidential Witness #37 ("CW37") is a former Oracle Channel Manager who
worked with Oracle distributors' partners and third-party resellers.

24
    (ll)   Confidential Witness #38 ("CW38") is a former Oracle Practice Manager
25  responsible for sales and support for Oracles' 11i products on the East Coast and
management of all aspects of the implementation projects, including customizing
26  applications, integration of new hardware and technical troubleshooting.

27      (mm)   Confidential Witness #39 ("CW39") is a former Oracle Practice Manager
responsible for sales of Oracle consulting services used to educate corporate executive on the
28  value of e-business. The Oracle service run by CW39 provided seminars for chief executive

officers, chief information officers and chief financial officers of companies generating more that $500 million in revenue per year.

(nn)   Confidential Witness #40 ("CW40") is a former Oracle Financial Analyst responsible for tracking and maintaining Oracle consulting engagements and recording project revenues. CW40 was responsible for invoicing clients and submitted weekly forecasts as compared to actual revenue to management.

(oo)   Confidential Witness #41 ("CW41") is a former Information Technology Specialist at JDS Uniphase responsible for implementation of Oracle's field sales module at JDS Uniphase.

(pp)   Confidential Witness #42 ("CW42") is a former Director of Information Systems for Hostcentric, Inc. in Houston, Texas. CW42 was responsible for overseeing installation and implementation of Oracle 11i suite at Hostcentric.

(qq)   Confidential Witness #43 ("CW43") is a former Oracle Senior Technical Consultant based in Toronto, Canada and responsible for implementation of 11i CRM module and integrations into existing ERP systems.

(rr)   Confidential Witness #44 ("CW44") is a former Oracle Financial Analyst in the corporate financial planning and analysis organization which was responsible for rolling up forecasts and budgets on a worldwide basis using information which was input into the OASIS database and Oracle Financial Analyzer program. CW44 was also responsible for distributing rolled-up forecasts to Ellison, Sanderson and Henley.

(ss)   Confidential Witness #45 ("CW45") is a former Oracle Senior Vice President of Sales in the state and local government sector and was responsible for all sales related to business in that sector.

(tt)   Confidential Witness #46 ("CW 46") is a former Financial Analyst for a global recovery, audit and cost containment firm, and was responsible for servicing clients of the firm by reviewing their invoices, purchase orders and shipping documents to uncover payment errors and recover inadvertent payments. As a financial analyst, CW46 reviewed the billing and payment histories of 17 separate Oracle customers and spoke directly with Oracle employees concerning customer overpayment and credits.

(uu)   Confidential Witness #47 ("CW47") is a former Oracle Vice President of Field Sales responsible for Oracle's large account sales in the western half of the United States and reported to defendant Sanderson.

(vv)   Confidential Witness #48 ("CW48") is a former Oracle collections analyst at Oracle's credit collection facility in Rocklin, California.

(ww)   Confidential Witness #49 ("CW49") is a former Senior Manager of Global Process of Oracle's collections group in Rocklin, California and was employed at Oracle before during and after the Class Period. CW49 was in charge of all customer collections activity in the Americas. CW49 reported to Mike Quinn, Oracle's Vice President of Revenue Accounting who in turn reported to Jennifer Minton, Oracle's Senior Vice President of Finance.

## THE PARTIES

28.    (a)    Lead Plaintiffs are Local 144 Nursing Home Pension Fund, UFCW Local 56 Retail Meat Pension Fund, Drifton Finance Corporation, and Robert D. Sawyer, all of whom purchased Oracle publicly traded securities during the Class Period and were damaged thereby.

(b)    Plaintiffs Oleg "Alex" Trepetin, Thomas Wright, Dzung Chu, Ryan Kuehmichel, Misop Lessard, and Ke Wan purchased Oracle publicly traded securities during the Class Period and were damaged thereby.

29.    Defendant Oracle supplies software for business information management. During the Class Period, Oracle had approximately 5.6 billion shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ National Market System.

30.    Defendant Lawrence J. Ellison was, during the Class Period, Chief Executive Officer and Chairman of Oracle's Board of Directors.

31.    Defendant Jeffrey O. Henley was, during the Class Period, Executive Vice President and Chief Financial Officer and a Director of the Company.

32.    Defendant Edward J. Sanderson was, during the Class Period, Executive Vice President, Consulting and Latin American Division of Oracle.  He described himself as being responsible for all products, the entire 13,000 member consulting organization, and all business-to-business ("B2B") initiatives.

33.    Defendants Ellison, Henley and Sanderson (collectively "Individual Defendants") ran Oracle as "hands-on" managers dealing with important issues at the Company, including new product development, marketing of Oracle products, performance and sales of Oracle's database, applications and e-business products.  In fact, Ellison admits he micro-manages the Company and that he tracks all sales through a single global database.  In June 2000, Ellison stated, "'I love running the business now .... I love getting involved in every detail of the business.  I was never interested in the sales force before.  Now we control the sales force or choreograph the sales force by using computers. It's all programmed.'"  Pl. Ex. 2.

34.    Defendants were personally familiar with Oracle's diminished revenue prospects as 3Q01 progressed, as they continually monitored Oracle's sales and revenues via the Company's live

1   global CRM database of pipeline, sales and financial activity called "Oracle Sales Online." During

2   his February 21, 2001 keynote address at the AppsWorld conference in New Orleans, Louisiana,

3   Ellison bragged about the worldwide capability of the database:

4      We have one customer database. We have one  way of billing a customer.
  We have one set of support processes. We have one way of filling out expense

5   reports. All of our information is on one database. *We know exactly how much we
have sold in the last hour around the world* and we're paying less to know more.

6   Pl. Ex. 3 at 14:04:29.

7
       **FALSE AND MISLEADING STATEMENTS**

8           **DURING THE CLASS PERIOD**

9     35. <u>False and Misleading Statement</u>:  In a December 14, 2000 press release, Oracle

10   announced $2.66 billion in revenues and earnings of $0.11 per share for its 2Q01, ending November

11   30, 2000, and falsely stated (falsity in bold throughout):

12      *Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales
Up 66%, Database Sales Up 19% ....*

13
   *Today, Oracle Corporation announced that second quarter net income*

14   *increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7
billion.*

15   Pl. Ex. 30.

16     36. <u>Reasons Why 2Q01 Revenue and Earnings Were False and Misleading</u>:  A witness,

17   CW46, has reported that Oracle's 2Q01 reported revenues and earnings were false when made, and

18   were the result of the improper conversion of more than $228 million of customer cash "On

19   Account" to revenue in 2Q01.  As a result, the Company was able to disguise the slowdown in

20   product sales reported by plaintiffs' other witnesses, evident on Oracle's internal global database, and

21   falsely report revenue and earnings growth and thus maintain its streak of 11 straight quarters of EPS

22   growth.  CW46 described Oracle's improper 2Q01 accounting as follows:

23     (a)  CW46 is a former financial analyst for a global recovery audit and cost

24   containment company that offers its clients software and auditing services to review sales databases,

25   related invoices, purchase orders and shipping documents to uncover billing or payment errors.

26   CW46's company also pursues recovery of inadvertent overpayments and earns its fees contingent

27   on recovery.

28

1    (b)    As a financial analyst, CW46 was responsible for examining the billing

2  histories and accounts payable records of client companies to identify and reclaim lost profits

3  resulting from overpayments to their vendors.  Pursuant to his/her duties, CW46 obtained from

4  Oracle billing histories for the following clients that were also Oracle customers:

5  Hewlett-Packard          Motorola                                    Texas Instruments
   General Motors            SBC, Southwestern Bell and affiliates        Sprint and affiliates
6  Cargill                  Dupont Photomask                            Phillips Petroleum Company
   Pharmacia                Eli Lilly & Company                          Pacificare Health Systems
7  Household Finance         First Hawaiian Bank                          Cummings Engine Company
   Kemet Electronics

8
9    (c)    CW46's review of those client billing histories, some of which ranged from

10  1991-2001 and detailed the invoice, date, amount, balance due, and cash applied to the invoice,

11  revealed that each of the above clients – Oracle customers – inadvertently overpaid Oracle invoices

12  or made double payments on Oracle invoices during that period.  According to CW46, Oracle did

13  not inform its customers of the overpayments, and did not refund the customers' overpayments.

14  Instead, Oracle maintained a fund of its customers' overpayments as unapplied cash "ON A"

15  (meaning "On Account").

16    (d)    CW46 reported that s/he spoke with Ryan Roberts, an Oracle collection

17  manager, about this practice who confirmed that Oracle usually did not refund money and then only

18  did so at the request of the customer.

19    37.    According to CW46, his/her continued review of these 16 customer account billing

20  histories revealed that each and every account history examined listed identical transactions on

21  November 17, 2000.  Each transaction had a corresponding transaction number beginning with the

22  prefix "550" followed by "ON A."  In response to an inquiry as to what the November 17, 2000

23  "550" transactions on the billing histories were, Raul Campos, an Oracle collections analyst,

24  confirmed the following in a fax:

25    All invoices that start with "550" are actually debit memos #'s [rather than
       invoices for real sales]. These were created to clean up our unapplied account at the
       time.  They were more than likely overpayments. *Pl. Ex. 42.*

26    (a)    In reviewing the customer billing histories, CW46 uncovered 760 of the "550"

27
28  type debit memos/invoices that were created on November 17, 2000.  Each was numbered between

1  55000387 to 55046825. CW46 confirms that his/her review of pages in Oracle's "Financials"

2  documents called "Implementing Document Sequences" and "Automatic and Manual Sequences,"

3  indicates that Oracle kept these customer billing records in sequence. By subtraction (46,825 - 387),

4  this range sequence reveals there were a total of 46,438 debit memos or phony invoices created on

5  that date reflecting customer overpayments in Oracle's unapplied cash account. The mean debit

6  memo among the 760 memos uncovered by CW46 was for $19,103 with the smallest being $1.81

7  and the highest being $4,847,389. The 760 memos total $14.5 million.

8            (b)      According to CW46, the financial impact of a "550" debit memo was the same

9  as the creation of an actual invoice for a real product sale. In these 760 instances, however, there

10  were no real sales. Each transaction created a phony sales invoice which was then cleared or

11  satisfied from unapplied cash "On Account."

12           (c)      CW46 then obtained from the employee in charge of tracking unposted

13  customer cash receipts, Neil Menon, from the Company's Rocklin, California office, a spreadsheet

14  detailing unapplied cash receipts which confirmed that Oracle's "unapplied cash" is in fact money

15  received from customers which had not been credited to the customer accounts.

16           (d)      CW46 reported that the effect of Oracle's conversion from "On Account" cash,

17  which consisted of overpayments, to these phony invoices is the same as standard accounting

18  practices for creating and clearing an invoice. According to Oracle's own internal "Accounting for

19  Transactions" instructions, accounting for transactions for applications invoices, a payment on the

20  invoice (receivable) creates the following journal entry (DR Increase Receivables - CR Increases

21  Revenue). CW46 reported that all 760 of the November 17, 2000 "550" debit memo transactions

22  followed this same transaction sequence for satisfying open invoices. Thus DR (increase)

23  receivables and CR (increase) revenues.

24       38.      CW46 further identified specific instances of inadvertent overpayments by customers

25  that Oracle was holding in its unapplied cash account for which a "550" phony invoice was created

26  on November 17, 2000, and the funds from the prior overpayment in the unapplied cash account

27  applied to satisfy the phony invoice.

28

1      (a)    For example, CW46 reported that when reviewing the Oracle billing and

2  receipt history for Eli Lilly ("Lilly"), a major pharmaceutical company, s/he encountered an unusual

3  invoice dated November 17, 2000. The debit memo/invoice number was 55033928. The amount

4  of the debit invoice was for $15,582.55. Pl. Ex. 31. According to CW46, his/her investigation

5  revealed that the same exact amount was overpaid by Lilly to Oracle on June 23, 1997. Lilly's billing

6  history also revealed that Oracle created a $15,582.55 credit for the overpayment on June 23, 1997,

7  but did not notify Lilly of the credit and did not refund the money. Pl. Ex. 32. On November 17,

8  2000, however, Oracle created the phony "550" invoice and applied the 1997 overpayment to satisfy

9  the phony invoice and booked the $15,582.55 as revenue. CW46 inquired about the transaction and

10  Oracle Credit Analyst, Marisa Christie, confirmed that the November 17, 2000 transaction

11  "55033928" – "ON A," was, in fact, an On Account "debit memo" (not an invoice for a real sale) and

12  that no money was actually due from Lilly. When CW46 asked how the debit memo/invoice was

13  cleared or satisfied, Christie stated that $15,582.55 had been "on reserve" and that Adam Hahn, head

14  of all Oracle Credit Managers, had authorized creation of the debit memo for that amount even

15  though Lilly had not made a new purchase.

16      (b)    While researching the account history of Household International

17  ("Household"), CW46 uncovered yet another series of November 17, 2000 transactions which

18  illustrated how Oracle retained an inadvertent overpayment of invoices dated October 1994 and

19  never refunded or notified Household of the overpayment. Pl. Ex. 33. On November 17, 2000,

20  Oracle created phony "550" debit memo/invoice No. 55040598, then applied the $76,645.04 money

21  it held from the overpayment to satisfy the phony invoices on November 17, 2000. Pl. Ex. 34.

22      (c)    CW46 contacted Oracle to inquire about the Household transaction and spoke

23  with Oracle's Kate Schwermann who told him/her that the debit memos/invoices were not amounts

24  actually due, but she would not clarify how the invoices had been satisfied. CW46 then contacted

25  Kevin Russ, an Oracle credit analyst to further inquire about additional November 17 debit memos

26  55043990 (Pl. Ex. 39) and 5504461 (Pl. Ex. 40), and how they were satisfied. Both of these

27  appeared to originate from Household payment adjustments which were credited in 1990 but not

28  refunded. Pl. Ex. 41. Russ confirmed that the November 17, 2000 debit memo 5504461 totaling

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ    - 18 -

1   $45,000 was satisfied by check #94073. CW46 reported, however, that check #94073 was issued

2   on January 4, 1991. CW46 further researched the transaction and determined that the January 4,

3   1991 check from Household was an inadvertent overpayment. Oracle never informed Household

4   and had not refunded the money. Russ did not confirm how 5504390 was satisfied though it was

5   clear from Ex. 39 that Oracle had applied the $25,000 cash it held On Account. Therefore,

6   Household's unapplied cash remained at Oracle for nearly 10 years, then it was used to satisfy a

7   phony invoice and booked as revenue.

8           (d)     CW46's review of the billing histories for Phillips Petroleum revealed 10

9   separate "550" phony invoices on November 17, 2000 totaling more than $105,300 which the

10  Company then converted to revenue.

11          (e)     CW48, a former Collections Analyst at Oracle's Rocklin, California facility

12  corroborates the account of CW46. CW48 confirmed that Oracle retained funds actually belonging

13  to its customers and that the "ON A" entries in customer billing histories identified customers'

14  "unapplied cash." CW48 further confirmed that the unapplied cash resulted from customer double

15  payments or overpayment of invoices and that Oracle's policy was to refund that money only as "the

16  last resort." CW48 also reported that certain specific large resellers, including Avnet and Pioneer

17  Standard Electronics had very large amounts of On Account – "unapplied cash" – owed to them.

18          (f)     In addition, CW48 further confirmed that on November 17, 2000, the

19  Company executed a "huge sweep of old cash" and all of the debit memos all began with "550"

20  identification numbers. When asked if the November 17 transactions could have been 46,000 in

21  number, CW48 confirmed that a batch of 40 thousand plus transactions would be a reasonable

22  estimate.

23          (g)     Further corroborating CW46's account is the report of CW19, a former Oracle

24  Finance Director and Manager of Revenue Accounting responsible for revenue recognition on

25  support agreements. According to CW19, because Oracle incurred significant costs related to

26  excessive technical problems with Suite 11i, many support agreements turned into money losing

27  engagements for Oracle. CW19, while prefacing his comments with "I really shouldn't be talking

28

1  about this," confirmed that "we had a fund we could pull from" to compensate for Oracle's money

2  losing engagements.

3      39.    A statistics expert, Dr. M. Laurentius Marais, has reviewed the 760 debit

4  memos/invoices and the information reported by CW46 in order to determine what they reveal about

5  the average dollar amount of the broader population of transactions from which they were drawn.

6  Dr. Marais has previously offered expert testimony in the area of mathematical and statistical

7  analysis in at least 20 matters, including expert testimony on behalf of President Bush in *Gore v.*

8  *Harris*, No. 00-2808, Circuit Court of the Second Judicial Circuit, Leon County, Florida, Civil

9  Division. Pl. Ex. 35.

10      40.    Marais has determined from his application of generally accepted mathematical and

11  statistical principles to the 760 transactions he reviewed that they provide a reasonable basis for the

12  following inference: The average dollar amount of the broader population of transactions exceeds

13  $4,970 and, hence, that the total value of the broader population of transactions exceeds $228

14  million, based upon a population of 46,000 sequential debit memos. Marais has further concluded,

15  based upon mathematical and statistical sampling theory, that this inference could be incorrect only

16  if the 760 transactions discovered by CW46 were among a set of especially unrepresentative samples

17  which number fewer than 1% of all possible samples from the broader population. Thus, under a

18  selection mechanism of pure chance, *i.e.,* simple random selection, the incorrectness of the inference

19  of above $228 million would have a probability of less than 1%.

20      41.    Corroborating CW46's account of numerous customer credits unapplied to invoices,

21  and Dr. Marais' analysis, are Oracle's balance sheet entries in its Form 10-Q filed with the SEC for

22  1Q01, ending August 31, 2000, which reported more than $1.26 billion in "Customer Advances and

23  Unearned Revenue." Pl. Ex. 36. Further corroborating CW46's account is the precipitous reduction

24  in Oracle's balance sheet for the same category reported on its Form 10-Q filed with the SEC for its

25  2Q01, ending November 30, 2000, which reported only $1.05 billion in Customer Advances and

26  Unearned Revenue, a reduction of $215 million - almost equal to Dr. Marais' $228 million

27  determination. Pl. Ex. 37.

28

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ    - 20 -

1          (a)      *Additional corroboration of CW46's information is provided by CW49, a*

2    *former Oracle Senior Manager of Global Process in Oracle's Rocklin, California office. CW49*

3    *reported to Mike Quinn, Vice President of Revenue Accounting. CW49 was in charge of all of*

4    *Oracle's customer collections activities in the Americas. CW49 also supervised the credit analysts*

5    *in the Rocklin, California office, including Marisa Christie who confirmed to CW46 that money*

6    *applied to the debit memo #55033928 was indeed money that had been "on reserve" in Oracle's*

7    *"On Account." See ¶38(a).*

8          (b)      *Specifically, CW49 disclosed that before, during and after the Class Period,*

9    *Oracle had a long-standing problem of accumulating cash from customer overpayments and*

10    *maintaining that cash in its "unapplied cash" account. CW49 corroborated the accounts of*

11    *CW46 and CW48 and disclosed that Oracle did not inform customers of their overpayments or*

12    *that Oracle was keeping those overpayments. Instead, Oracle would only refund customer*

13    *overpayments upon a written request by the customer. CW49 reported that this practice resulted*

14    *in Oracle having approximately $130 million in customer unapplied cash in its unapplied cash*

15    *account in any given quarter, and that some of the overpayments in the unapplied cash account*

16    *were several years old. According to CW49, among the 42 collections analysts in Oracle's*

17    *collections department, Raul Campos and Neil Menon at various times were dedicated to*

18    *managing Oracle's unapplied cash account, again corroborating CW46.*

19          (c)      *In addition, CW49 further corroborated CW46, CW48 and Marais, and*

20    *reported that during Oracle's 2Q01, ending November 2000, Senior Accounts Receivable*

21    *Manager Greg Myers had been under pressure from Jennifer Minton, Oracle's Senior Vice*

22    *President of Finance and Operations, to "clean up" the unapplied cash account. With the*

23    *approval of Mike Quinn, Oracle's Vice President of Revenue Accounting, and Tom Williams, a*

24    *former Controller at Oracle and consultant to Minton, on November 17, 2000, Myers initiated the*

25    *creation of 46,800 "debit memos" or "fictitious invoices" which resulted in $230 million being*

26    *improperly recognized as revenue in 2Q01.*

27          (d)      *CW49 further disclosed that at that time (November 2000), he voiced his*

28    *concern to his superiors, including Quinn, about recognizing revenue on the basis of customers'*

1    *unapplied cash. Quinn then told CW49 that he/she should not worry about the matter because*

2    *it was none of CW49's concern.*

3             *(e)       In addition, defendants' Exhibits 57-74 attached to their Request for*

4    *Judicial Notice in Support of their Motion to Dismiss the Second Amended Consolidated*

5    *Complaint, ("defs' RJN") further corroborate CW46 and CW49's account that the "debit/credit*

6    *transactions" in fact credited Oracle's revenue in 2Q01. Indeed, they confirm that on November*

7    *17, 2000 Oracle entered a "credit" to "revenue" in a series of 18 customer "on account"*

8    *transactions, totaling more than $5 million.*

9             *(f)       In addition, Exhibit 55 to defs' RJN, an Oracle "Summary Data Report,"*

10   *confirms that on November 17, 2000, there were in fact 46,811 debit memos created in Oracle's*

11   *customer advances and unearned revenue account (25005). Further, in defendants' Exhibit 56*

12   *to defs' RJN, an Oracle "General Ledger Summary Report for November 17, 2000," Oracle*

13   *acknowledges that as much as $692 million was similarly transferred in account 25005.*

14        42.       Oracle's recognition of the $228 million as revenue was a violation of Generally

15   Accepted Accounting Principles ("GAAP"), because Oracle had not earned the revenue it was

16   reporting and was not entitled to retain the overpayments it had previously received from its

17   customers. The most fundamental concept for revenue recognition under GAAP is that revenue must

18   be both earned and realizable prior to recognition. "Earned" refers to the requirement that an entity

19   should have accomplished what it must do to be entitled to the income. *See* Financial Accounting

20   Standards Board ("FASB") Statement of Concepts No. 5, ¶¶83-84.   Thus, for 2Q01, Oracle

21   improperly recorded $228 million in revenue to which it was not entitled.   In fact, Oracle owed its

22   customers refunds for that amount.

23        43.       As a result of Oracle's improper conversion of customer credits to revenue as reported

24   by CW46, Oracle overstated 2Q01 revenue by more than $228 million, which represented 8.5% of

25   its total reported revenues in the quarter.   Based on 5.6 billion diluted shares outstanding, the

26   after-tax effect would represent $0.025 per share.   Thus, instead of reporting $0.11 per share as

27   forecast, the Company would have reported only $0.085 per share. ·

28

44.   <u>Scienter</u>: As alleged in ¶¶16, 34, 49(d) and 79, defendants Ellison, Sanderson and Henley admitted that they micro-managed and were aware of all aspects of Oracle's business, sales and earnings, which supports a strong reference that they were aware of and authorized the recognition of $228 million in revenue in 2Q01 – a substantial component of Oracle's quarterly earnings, without which the Company would have missed its forecast.

45.   <u>False Statements that Slowing Economy Did Not Affect Oracle</u>: In addition to the false financial results, on December 14 and 15, 2000, Henley made false statements (in bold) to the market that the slowing of the overall economy would not hurt Oracle's third quarter financial results, as follows:

(a)   In a December 14, 2000, transcribed telephone conference call with analysts, portfolio manager and investors, Henley falsely stated:

And then lastly ... [about] the economy ... *[a]t this point, we see no impact or slowing in our business.  We have seen no slowing of our business.*

Pl. Ex. 7 at 4.

(b)   In a December 14, 2000 statement quoted in a *Bloomberg* article, Henley falsely stated:

*"The economy is slowing .... It's just not having a negative impact on our business."*

Pl. Ex. 8

(c)   In a December 15, 2000 interview with *Radio Wall Street*, Henley falsely stated:

*[T]he economy right now even though it's slowing doesn't seem to be affecting us. We see no difference in demand for our upcoming third fiscal quarter.*

\*   \*   \*

*[S]o far we look pretty hard at indicators.  We're seeing no softening in our business.*

Pl. Ex. 9 at 1-2.

(d)   In a December 15, 2000 interview with *Bloomberg*, Ellison falsely stated:

*The economic slowdown isn't hurting Oracle, said Oracle Chief Executive Larry Ellison, because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs and boost efficiency.*

1   Pl. Ex. 10.

2        46.    <u>False Statements Regarding 3Q01 Forecasts</u>:  In the December 14, 2000 transcribed

3   conference call (Pl. Ex. 7), Henley also made false statements (in bold) to the market that Oracle

4   would enjoy third quarter 2001 earnings of $0.12 EPS, and growth of 75% in sales of applications,

5   20%-25% in database sales, 25% in licensing and 15%-20% in service, as follows:

6        [S]o the numbers I'm going to give you here, *for database* ... we're thinking, you
        know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar
7        growth, or *20-to-25*.  Applications, we're thinking *75, or potentially better*.  You'd
        have to add five points to that.

8                                    *    *    *

9        *So I would assume, 12 cents would be a reasonable number at this point.  I don't*
10       *think history is going to be a lot different, here.*

11                                   *    *    *

12       *The good news about applications, this quarter, is that every part of the*
        *little sub-markets that we're in, we're strong. And every geography, (we're) strong,*
13       *Europe, Asia, U.S. So there's nothing that we – no weakness in our applications*
        *business and the pipelines at every one of these geographies looks astounding for*
14       *this next quarter.*

15   *Id.* at 7-8, 11.

16        47.    <u>Reasons Why No Impact from Declining Economy Statements and 3Q01 Forecasts</u>

17   <u>Were False When Made</u>:  Oracle's revenue and earnings forecast for 3Q01 and Ellison and Henley's

18   statements (interrelated with those forecasts) that Oracle was not seeing any impact or slowing in

19   Oracle's business due to the slowing economy were false when made.  The following accounts of at

20   least 15 sales and consulting personnel from various departments and regions within the Company

21   confirm that, in truth, the impact of the slowing economy had dramatically slowed all segments of

22   Oracle's business, including sales of database and applications, and therefore would adversely impact

23   the 3Q01 revenue and earnings forecasts upon which those sales depended:

24        (a)    CW44, a former Oracle Financial Analyst in Corporate Planning and Analysis,

25   who was responsible for synthesizing global forecasts and budgets from the Company's internal

26   database and distributing them to senior management, reported that by October 2000, market

27   conditions had negatively impacted the software tech industries, and that Oracle was experiencing

28   sales cancellations and delays in orders "in the same manner as everyone else."  CW44 further

1    reported that the impact of market conditions were typically factored into the overall sales forecast
2    and frequently resulted in management adjustments to the sales forecast.

3          (b)      CW13, a former Oracle Technology Director, reported that the economic
4    slowdown impacted Oracle's earnings opportunities beginning in September of 2000. As a result
5    of the dot.com crash and general slowdown in tech spending among large companies, Oracle
6    suffered from greatly reduced revenue opportunities because customers were not willing to invest
7    their limited dollars in Oracle 11i software which had yet to be proven in the marketplace.

8          (c)      CW1, a former Account Manager who was responsible for database and CRM
9    sales for the western United States, reported that during October-November 2000, when media
10   reports of an economic slowdown in the United States became increasingly noticeable, the symptoms
11   of that slowdown were already being felt and well known within Oracle. The impact of the
12   economic slowdown had begun to affect the Company's pipelines and revenues as early as July 2000.
13   CW1 reported that among the many factors evidencing the slowdown in her region were: (1) a
14   dramatic reduction in the pipeline for new sales and sales to Oracle's existing customers in
15   comparison to fiscal 2000; (2) customers in the dot.com sales sector of Oracle were going out of
16   business and defaulting on their debts to Oracle, and thus not buying any new product; (3) the
17   reduction in the rate at which the Company was converting prospective deals in the pipeline to actual
18   sales; and (4) competition from other database companies caused Oracle to give deep discounts on
19   its products, thus reducing revenues.

20         (d)      Specifically, CW1 reported that, by way of comparison, her General Business
21   Group for the western United States had a banner year in fiscal 2000, which was fueled by sales to
22   dot.com customers and had been 200%-300% above quota. However, in fiscal 2001 (beginning in
23   June 2000), General Business sales and revenues declined dramatically and continued to do so
24   through February 2001. She added that Oracle management monitored each salesperson's progress
25   toward meeting sales quotas, which were based on 20% projected growth of database sales in FY01,
26   through a live video board at Oracle's Redwood Shores headquarters which listed and tracked sales
27   for all sales teams in the western United States.

28

1    (e)   CW1 reported that the effect of the slowdown in the economy was evident
2  from the facts indicated on the live video board. By August 2000, the video board indicated that
3  over 90% of the sales force in General Business West were severely below quota, and some sales
4  persons were as low as 20%. Indeed, CW1 reports that by February 2001, she had only reached 40%
5  of her own $2.4 million quota.

6    (f)   CW3, a former Oracle Corporate Account Manager in the Company's Boston
7  office responsible for sales in Major Accounts (up to $500 million) in New England, New York,
8  New Jersey and Pennsylvania, reported that the Boston office had a similar video monitor as the one
9  reported by CW1. That database was also updated daily and identified each sales representative in
10  the region (50 sales reps for eastern Majors) and their sales percentage toward attaining annual
11  quotas. CW3 reported that the average sales representative's annual quota was $2 million and that
12  even after the end of the Class Period in May 2001, near the end of the fiscal year, most sales reps
13  had only reached 50%. Indeed, CW3 reported that some sales representatives did not make a single
14  sale in 3Q01. CW3 said that some salespersons found solace in the knowledge that other sales
15  representatives even in good territories were not selling anything either.

16    (g)   According to CW1, evidence that the economic slowdown had slowed
17  demand for Oracle products was also shown by Oracle's CRM Pipeline forecasting system which,
18  according to CW2, the former E-Business Consulting Services Director, encompassed every deal or
19  potential deal in the Company's sales pipeline. According to CW1, in addition to her own experience
20  and working in close proximity to other sales personnel in the Named Accounts and Majors Groups
21  at the Redwood Shores headquarters, after May 2000, sales representatives in her region would go
22  days at a time without entering any potential sales opportunity into the pipeline system, whereas
23  during FY2000, the sales representatives would enter at least one deal each day. CW1 disclosed that
24  by the summer 2000, the telephones in General Business West "went dead." CW1 reported that even
25  existing customers informed the sales staff that because of budgetary constraints and tightened belts,
26  they were not making any new purchases.

27    (h)   In addition to fewer potential deals entered into the pipeline, CW1 reported
28  that the ratio of deals in the CRM pipeline forecasting system that actually closed had dropped

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                              - 26 -

1  commensurate with the reduction of prospective sales coming into the pipeline. The decline in

2  closed sales was also easily viewed on the video monitor. CW1 reported that Oracle sales managers

3  used the percentage of deals likely to close to make their own forecasts which were incorporated into

4  sales projections by Oracle executive management.

5          (i)      According to CW1 and CW3, the slowdown in the economy also negatively

6  impacted the pricing of Oracle's database products, and Microsoft's database became more

7  competitive because it was cheaper then Oracle's. Because customers were consistently speaking

8  of tighter budgets, Oracle had to offer huge discounts in order to "catch" sales from going to its

9  competitors, like Microsoft and IBM whose databases are priced at 1/5 that of Oracle's. For

10  example, CW1 reported several deals that had been entered into the pipeline at six-figure levels were

11  reduced to $10,000 in order to keep Oracle sales from going to a database competitor. Thus,

12  according to CW1 and CW3, not only had the potential for new deals suffered from the impact of

13  the slowing economy, but the deals that did close represented average dollar values significantly

14  lower than originally entered into the pipeline compared to what Oracle had experienced in fiscal

15  2000.

16          (j)      CW2, a former Oracle Director of E-Business Consulting Services for 11i

17  applications in the northwest region, confirmed that there was a significant and deep decline in sales

18  beginning in the summer of 2000 (corroborating CW1's account) and trending downward through

19  3Q01 in the northwest region. CW2 further stated that because all of the consulting sales in his

20  region were triggered by product sales, his consulting group was aware of virtually all products sales

21  as well as consulting sales in the region. CW2 reported that the downturn in the economy

22  compounded a significant drop in demand for 11i suite sales, which slowed throughout FY01 and

23  completely "fizzled out" by November/December 2000. According to CW47, the former Vice

24  President of Field Sales, 2Q01 "was the time of the pipeline collapse" for Oracle's business and for

25  3Q01 and 4Q01 "very little remained in the pipeline in the western states territory."

26          (k)      CW8, a former Practice Director for Oracle's Worldwide CRM Consulting

27  Group, corroborated the account of CW2 and reported that the performance of the consulting

28  organization is a mirror image of sales activity and directly related to product sales, and that by

2Q01, because of the slowing economy, business in the entire consulting organization was so slow that the Company implemented a hiring freeze.

(l)     According to CW45, a former Senior Vice President of State and Local Government Sales, by May 2000, due to the lack of 4Q00 sales opportunities in the pipeline, Oracle's internal FY01 plan for that business sector was reduced by 20%. CW45 reported that despite the need to rapidly sell 11i to maintain revenue and earnings growth, sales and installation of 11i during the summer of 2000 slowed to only a very few. In addition to the slowdown in the economy, CW45 reported that Suite 11i and CRM "just plain did not work." CW45 stated that one of the key factors that illustrated slow applications sales was the lack of backlog in the consulting organization. CW45 reported that beginning in June 2000, backlog in the entire Oracle service industries consulting business was only 37 days compared to an average of 90 days in prior quarters. This fact was telling of the state of product sales because the "rule of thumb" at Oracle was that consulting work on an applications sale would result in a revenue ratio of 4:1 meaning that a $5 million sale of applications should result in $20 million for the consulting organization for implementation services.

(m)     CW45 reported that sales were so slow that the consulting organization missed its 2Q01 projections by at least 30% (corroborating CW2 and CW8), and that the depression in consulting was due to lack of demand for Oracle's new 11i release which the Company was banking on to capture new market share and sustain future growth.

(n)     CW39, a former Oracle Practice Manager responsible for East Coast sales and support for the 11i product, reported that from his viewpoint, the slowdown in sales began at the end of 2000 and that by January 2001 "everything had stopped."

(o)     CW2 further reported that by fall of 2000, the downturn in the economy had impacted the Company's dot.com sector, which according to CW1 had been performing at 200%-300% above quota in fiscal 2000. CW2 reported that by January 2001, it was well known within the Company that the dot.com business had slowed severely and many of those customers failed to pay their bills altogether. CW2 reported the revenue and earnings miss in 3Q01 should have been easy to call because beginning in 1Q01, all internal sales trends were downward, including product sales, consulting sales and consulting revenue, and they continued down through 3Q01. According to

1   CW2, consulting sales had missed Q1 and Q2 sales projections. CW8 and CW45 corroborated
2   CW2's account of the slowdown in consulting sales and disclosed that the Worldwide CRM
3   Consulting Group missed its 2Q projected sales target by 20%-30%. In addition, CW8 identified
4   several large deals the Company expected to close between July 2000 and March 2001 that did not
5   close, including deals with Federal Express, Mutual of Omaha, Foster's Beer, Telecom New Zealand
6   and GE in New York.

7          (p)     CW33, a former Oracle Client Services Director responsible for business
8   development to Fortune 500 companies in New England, reported that he also recognized a dramatic
9   slowdown in sales in September and October 2000. CW33 reported that because of the severe sales
10  slowdown, there is no doubt that defendants knew that Oracle was not going to make its 3Q
11  projected growth earnings.

12         (q)     CW4, a former Oracle Staff Consultant responsible for consulting sales and
13  services in the southeast region based in Atlanta, reported that the economic slowdown which
14  affected sales of products had likewise resulted in a severe slowdown of consulting work in his
15  region. CW4 explained that typically there would only be two to three people "on the bench"
16  (meaning an employee who was in-between projects), but as early as 1Q01, there were several dozen
17  consultants on the bench in his region alone. CW4 further stated that the Company's internal
18  database "Oracle Resource Browser," used for listings of managers that needed consultants for their
19  products installations across the country and internationally, revealed the slowdown in consulting
20  work and had dwindled to only one or two listings when typically it would advertise at least 40
21  opportunities.

22         (r)     CW20, a former Oracle Principal Consultant based in Chicago, Illinois,
23  responsible for sales in the central region of the United States, corroborated CW2's, CW8's, and
24  CW45's accounts of slowing consulting sales. He also reported that the internal consulting database,
25  Oracle's Resource Request Browser, was a good indication of a sales slowdown in the Company
26  because service listings meant more consultants on the bench and less opportunities available being
27  posted. Indeed, CW20 reported that consulting services were typically needed by customers after
28  the customer had purchased Oracle databases and applications and that, therefore, the slowdown in

1    consulting would be preceded by a slowdown in product sales.  CW20 also reported that the

2    slowdown in product sales and the consulting work had become evident in the consulting database

3    by September 2000 when there were only 20 jobs listed.  By January 2001, the listings resource

4    browser "dropped to a couple here or there."  CW20 reported that in January 2001, in addition to

5    consultants sitting on the bench, central region consultants were being laid off because of a

6    slowdown in sales.

7            (s)     CW16, a former Oracle Staff Consultant in California, corroborated CW2,

8    CW8, CW45 and CW20, and reported that Oracle's consulting business which was directly tied to

9    product sales "dried up in September 2000." Because of slow sales, the organization that she worked

10   in, Oracle's Application Provider Services Organization, had been reduced from 50 to 20 consultants

11   by December 2000.  CW16 also reported business was so slow in her organization that she too

12   accessed the Oracle Resource Request Browser (as had CW4 and CW20), but by January 2001, there

13   were only two to ten postings and by March 2001, there were no postings at all.  Indeed CW21, a

14   former Oracle Senior Consultant in Southern California, reported that by October 2000, he was only

15   working 50% of the time, and the rest of the time he was "on the bench." CW23, a former Oracle

16   senior consultant, corroborates the accounts of CW4, CW16 and CW20 and reported that demand

17   for support extended to the period after the Class Period and that during March and April 2001, he

18   spent weeks at a time "on the bench."

19           (t)     CW43, a former Oracle Senior Technical Consultant based in Toronto,

20   confirmed that even in Canada there was a dramatic drop in consulting for CRM products in

21   November 2000.  Indeed, he reported that in September 2000 there were calls for support everyday,

22   but after November 2000, there was nothing.

23           (u)     In addition to crippling sales in multiple geographic regions, the slowing

24   economy also impacted sales in entire vertical segments within Oracle. For example, CW5, a former

25   Oracle Practice Director responsible for sales of consulting services to state and local governments

26   for the Mountain Desert Region of the United States, reported that by fall of 2000, product sales

27   personnel in her region had become so desperate to make sales that they were "backstabbing"

28   consulting sales personnel in order to meet their own quotas.  Specifically, CW5 reported that

1    product sales personnel were giving away consulting services for free in order to close deals. CW5

2    reported that product sales and consulting sales were slow in her region and throughout the Company

3    and that by fall 2000, none of the Oracle Consulting Practice Managers across the country were

4    making their quotas. Indeed, CW5 reported that she participated in weekly conference calls which

5    included all of Oracle's state and local government Practice Managers nationwide and disclosed that

6    each consistently reported declining sales. This is corroborated by the report of CW8 and CW45,

7    who reported that consulting services missed Q2 forecasts by 20%-30%.

8              (v)      CW37, a Channel Manager who worked with Oracle distributors and third

9    parties regarding sellers, reported that even in the distributor channel there was a slowdown in

10   business in December 2000, which developed into a complete collapse by February 2001. In fact,

11   according to CW37, sales had become so scarce that competition among Oracle's sales staff was such

12   that the distributor channel deals were being stolen by the direct sales group.

13             (w)     CW5 also reported that during 3Q01, Oracle was eagerly anticipating a large

14   deal with the State of Michigan Human Services Department to close. In fact CW5 reported that the

15   State of Michigan deal was "probably the biggest deal nationwide" in the state and local government

16   vertical during the quarter. However, CW5 reported that the deal "folded in the last week of

17   December." CW25, a former Oracle Senior Principal Consultant, corroborated the account of CW5

18   and reported that Oracle had been cultivating this deal with the State of Michigan and that Oracle

19   hoped to earn between $50-$100 million in combined product sales, consulting services and database

20   sales. However, the deal fell through at the end of December 2000. CW25 states that failure of this

21   deal to close was well known throughout the state and local government vertical.

22             (x)      Sales in the education vertical dropped as well. CW9, the former Oracle

23   Senior Practice Director, was responsible for sales of all of Oracle's software and services to Oracle's

24   higher education customers in the southeastern region of the United States. He reported that sales

25   to education customers in January 2001 dropped to zero. Because there was no business, he was

26   fired in February 2001.

27             (y)      *According to CW45, a former Oracle Senior Vice President of state and*

28   *local government sales, the federal government portion of Oracle's public sector sales, of which*

1  *CW45 was also cognizant, did not close one major deal between June and December 2000.* The

2  slowing economy also manifested itself in increasingly limited earnings opportunities that were

3  visible in all of Oracle's major revenue sources, including product sales, consulting and support.

4  CW19, a former Oracle Finance Director and Manager of Revenue Accounting, reported that he

5  regularly tracked product sales in Oracle's CRM Oasis System and read spreadsheets that reported

6  information using Oracle's Financial Analyzer, which generated various sales forecasting reports and

7  recognized in December 2000 that product and consulting sales were weak.

8          (z)     CW22, a former Oracle Senior Consulting Director, reported that the

9  consulting business for Northern California, including the Bay Area, declined significantly in

10  September 2000, and that going into 3Q01 there were very limited deals in the pipeline and no likely

11  prospects for large deals. Indeed, CW22 reported that by the end of 2Q01, there was no question that

12  Oracle would miss 3Q01 forecasted growth projections.

13          (aa)    CW26, a former consultant in the Company's Southern Internet Services

14  Division, reported that in the southern region, Oracle's consulting business slowed tremendously in

15  1Q01, which indicated to him that 11i sales were not "taking hold." CW26 reported that from his

16  perspective, the general downturn in the economy, dot.com failures, and rumors about the instability

17  of 11i significantly impacted sales.

18      48.    <u>By December 2000, Defendants Knew that Sales Were in Serious Decline Due to the</u>

19  <u>Slowing Economy and that 3Q01 Forecasts Were Overstated</u>: Based on the reports of numerous

20  witnesses, all of whom were former sales account and consulting employees of Oracle in various

21  regions, it was known throughout the Company that sales were declining in the second half of 2000

22  due to the slowing economy. The witness accounts were confirmed by admissions made by the

23  individual defendants. Ellison and Sanderson admitted that they had actual knowledge of Oracle

24  sales because they monitored the Company's worldwide sales database on a daily basis. Thus,

25  because the database disclosed the declining sales, Ellison and Sanderson actually knew that the

26  economy was severely affecting sales and revenues, and that the pipeline was suffering from the lack

27  of new sales. Specifically:

28

1    (a)    CW1, the former Western Account Manager, stated that the live video sales
2    board monitored by management revealed that at the end of 2Q01 (November 30, 2000) in the
3    specialized dot.com group, many representatives were only at 20% of quota.  In fact, according to
4    CW1, management knew that the economic slowdown had severely impacted its dot.com customers
5    and many of them could not pay their outstanding bills to Oracle.  According to CW1, in order to
6    salvage some of the revenue lost from dot.com customer defaults, Oracle began reversing
7    commissions paid to its own sales staff on accounts that customers did not pay.  The process by
8    which the Company revised commissions was called "credit backs."  CW1 reported that in late
9    summer 2000, members of the dot.com sales staff suffered increasing numbers of "credit backs."
10   CW1 also reported that by the end of 1Q01, the reduction in deals in the pipeline was clearly
11   apparent to management as sales reps would go several days without "piping" a single deal and that
12   "prospective" deals were few and farther between.

13    (b)    CW1 added that General Business West's Group sales forecasts fell
14   continuously through 1Q01 and even missed Q1 projected forecast by 35%.  In addition to weak
15   prospects for new sales, CW1 reported that Oracle's existing customers were dramatically reducing
16   their purchases and after Q1 the sales slowdown "spread like wildfire."  CW1 reported that
17   management monitored all of those trends through the Company's CRM system for sales forecasting
18   and management, the same CRM tool it was selling to customers, namely 11i Oracle Sales Online.
19   According to CW1, the system is live and updated as events occur.  The forecasting element also
20   extends beyond the current period into future quarters, further identifying the status of sales
21   performance versus projections.

22    (c)    CW2, the former Oracle Director of E-Business, corroborated CW1.  CW2
23   reported that he had access to virtually all product and consulting sales in the northwest territory
24   through Oracle's internal CRM system which the Company used to monitor and forecast sales for
25   both product and consulting services.  According to both CW1 and CW2, the CRM pipeline key
26   indicators of performance: (1) number of deals pending; (2) number of deals closed; and (3) dollar
27   value closed through the first three quarters of 2001 showed severe and continuous declines in
28   product sales.

1        (d)    CW2 further stated that for Q1 and Q2, consulting sales in his region missed

2    projections by 7% and that product sales missed by 20%. CW2 explained that because invoicing of

3    consulting services occurs when different stages of performance are completed, by the first week of

4    a quarter defendants knew with relative certainty whether the consulting organization would meet

5    revenue projections. Moreover, according to CW2 and corroborated by CW1, by 2Q01 it was well

6    known within Oracle that many of the Company's dot.com customers had slowed in payment or

7    failed to pay altogether. Indeed, on March 15, 2001, defendants admitted that the dot.com business

8    reported sales down 66% for 3Q01. *See* ¶79.

9        (e)    CW8, a former Practice Director for Worldwide CRM Consulting, reported

10   that practice directors were required to ensure that all sales information related to each individual

11   deal had been input into spreadsheets at the end of each week and finalized on Mondays. Each

12   "practice" group submitted a weekly report in the spreadsheet format to upper management. These

13   reports were all sent to Brad Scott, Consulting Group Vice President. The CRM group report was

14   incorporated into an overall consulting organization report which was then sent upward to executive

15   management.

16       (f)    CW8 reported that by the beginning of 3Q01, it was evident to him that "there

17   was no way that we were going to make our projections." CW8 was certain that the CRM group

18   missed its projected target by at least 20%-30% in 2Q01, that business in the pipeline for 3Q01

19   looked even worse and that the CRM business was so slow throughout that he held no hope that any

20   such rebound would occur in February or even later. According to CW19, a former Oracle Finance

21   Director and Manager of Revenue Accounting, going into 3Q01 he reviewed the pipeline

22   information in Oracle's own CRM system and Excel spreadsheets, and spoke directly with sales

23   personnel. To him, product sales and consulting sales were weak. If the slippage of sales and

24   revenues was evident to so many sales and consulting employees based on their own experience and

25   review of the databases, it is reasonable to infer it was evident to senior management, including the

26   defendants.

27       (g)    CW45, a former Senior Vice President of Sales, reported that the consulting

28   organization had been functioning below plan all of FY01 and that as early as June 2000 Oracle's

1    entire backlog for its consulting business was a meager 37 days. CW45 reported that the Company

2    had averaged a backlog of 90 days or more of contracted work for its consulting organization, and

3    as early as June 2000 there were consultants "on the bench" everywhere. CW45 also reported that

4    by December 2000 the pipeline for the consulting business clearly indicated that the business sector

5    could not meet 3Q01 expectations.

6           (h)      CW28, a former CRM Program Director, reported that because sales for CRM

7    were so soft, defendants knew in February 2001 that they were not on track to meet 3Q01

8    projections. CW28 stated that Ellison's statement on March 1, 2001 that he did not know until the

9    last few days of the quarter is a "bold faced lie" and that defendants had access to a "revenue

10   recognition" system which enables management to see on a daily basis what revenue was booked on

11   closed sales and what was still in the pipeline. CW28's account is confirmed by defendants'

12   admissions that sales and pipeline information was available to defendants at all times via Oracle

13   Sales Online

14          (i)      According to CW19, a former Oracle Finance Director and Manager of

15   Revenue Accounting, Ellison "dug his own grave" by bragging publicly about how informed he was

16   about the status of Oracle's pipeline and financial condition and then claiming that he knew nothing

17   until the last four days of the quarter.

18          (j)      CW32, a former Oracle Senior Sales Consultant for 11i sales, reported that

19   in January 2001 a large deal valued at approximately $10 million with ADT did not close. CW32

20   reports that the activity in this prospective sale, as well as all other sales activity, including every

21   customer contact or action, was reported to management through Oracle Sales Online. According

22   to CW31, a former Oracle Applications Sales Specialist in Florida who was responsible for at least

23   25 customers, Oracle Sales Online was used by all of the sales staff to report and track quarterly sales

24   against forecasts and gave management complete sales numbers in the pipeline at all times. CW36,

25   a former Oracle Sales Manager in New York, reported that through the sales automation database,

26   Ellison was able to sit at his desk and see how each region was doing against the sales plan. CW36

27   reported that this system was the same one that was the basis for projections for the last eight

28