1   quarters. CW36 believed that Ellison and Henley knew by January and February 2001 that the

2   quarter was going to miss.

3          (k)    CW30, a Project Accountant Escalation Manager, reported that Ellison kept

4   track of every deal through an internal website created to monitor each customer's progression of

5   sales or technical issues. CW30 reports that the system could be reviewed 24 hours a day, 7 days

6   a week, and functioned as an early warning system that a customer was going to cancel an order.

7          (l)    CW40, a former Oracle financial analyst responsible for tracking Oracle's

8   consulting engagements and record project revenues, reports that the number of consulting deals

9   between January 2001 and February 2001 went to zero and resulted in her being laid off in March

10   2001.

11          (m)    CW7, the former Oracle Vice President of Finance, disclosed from his high-

12   level management vantage point within the Company that when he heard defendants' projections of

13   database growth of 20%-25% for 3Q01, he believed it to be "high." In fact, according to CW7, by

14   mid-December, the sales forecast for the quarter looked "really bad" and that, because of the

15   economic downturn, the Company had barely made 2Q forecasts. CW7 reported that in the ordinary

16   course, given the information available and the fact that database was a core and mature business,

17   defendants would have known that growth would be negative or flat. CW7 further stated that

18   defendants would have known at least six weeks prior to the end of 3Q01 that application growth

19   would miss by 50%.

20        49.    <u>Defendants Admit Knowledge of the Adverse Effect of the Economy</u>: In addition to

21   the numerous former employees from various segments of Oracle's business who disclosed that the

22   economic slowdown had severely impacted product and consulting sales and revenue earnings

23   growth entering 3Q01, defendants admit that they, and Ellison in particular, were able to see every

24   aspect of sales in every segment of the Company, worldwide, on a continuing basis. Ellison knew

25   that pipelines for both applications and database sales could not and would not support publicly

26   projected earnings growth. A strong inference of knowledge is based upon the following

27   combination of facts that confirm defendants knew well before March 2001 that sale of its products

28   would not meet expectations:

1    (a)    Oracle Sales Online: Oracle markets and sells a Sales Online Application as

2  part of its 11i E-Business Suite.  According to CW31 and CW32, Application Sales Consultants,

3  Oracle also used the Sales Online Application internally to manage its own worldwide sales.  CW47

4  also confirmed that Oracle Sales Online, which is part of the 11i CRM suite is the forecasting tool

5  that Ellison "brags about" and allows him to view all sales and choreograph the sales force.  Oracle's

6  own data sheet describing the product confirmed that defendants knew exactly what the status of

7  sales were in the quarter.  The data sheet describes Oracle Sales Online (11i) as follows:

8    Complete Views of Customers

9    Oracle Sales Online provides sales professionals with complete customer
     overviews at each stage of the sales process.

10    *    *    *

11    Global Forecast Reporting

12
13    Oracle Sales Online consolidates divisional forecasts within multiple
     currencies to provide sales executives with a global view of their company revenue
     forecast.  Senior executives can view global roll-ups of sales forecasts across
14    geographic regions, currencies, sales organizations, and product lines....

15    *    *    *

16    Integration with Oracle Business Intelligence System

17    Oracle Sales Intelligence provides sales teams with a real-time, enterprise
     *view of sales to help them meet quotas,* assess current performance, and make
18    continuous improvements.

19  Pl. Ex. 11 at 2-3.

20    (b)    On or about February 6, 2001, Oracle published its CRM Technical

21  WhitePaper in which Oracle admitted that *all* of its direct sales representatives were using Oracle

22  Sales Online for pipeline management and forecasting, the same system that confidential witnesses

23  report reflected a severe slowdown in sales:

24    Oracle employs more than 7,000 direct sales representatives in 60 countries
     and in seven global business units.  All Oracle sales reps are using Oracle Sales
25    Online for customer management, pipeline management, forecasting, and external
     financial reporting....

26
     Oracle's financial organization also uses this application to prepare reports for
27    management and for analyst calls.  The company does business in 25 local currencies,
     with one reporting currency (U.S. dollars).  After e-mail, Sales Online is the most-
28    used application at Oracle.

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                    - 37 -

1   Pl. Ex. 38 at 39.

2          (c)    Oracle's CRM Technical WhitePaper also advertised the capabilities of Suite

3   11i CRM, and challenged customers to examine whether they could adequately manage their global

4   forecast with their existing software:

5          Global Sales Forecast

6          Can you state your exact global sales forecast, up to the minute?...covering
       all geographies, all lines of business, all products, all services, all customers, all
7      partners – and including all licenses, product renewals, support contracts, Web-based
       sales, call center telebusiness, direct business, mail catalogs, and business through
8      partners and other channels?  Can the forecast reflect management judgements as
       well as the estimates of the sales reps?  Can you review opportunity data and identify
9      which opportunities your sales organizations are committed to?  Can you see multiple
       views of that information – one by manager and one by salesperson?

10         The Oracle CRM suite enables you to do these things.

11  *Id.* at 10.

12         (d)    On February 13, 2001, defendant Sanderson gave a presentation at the

13  Goldman conference where he admitted the defendants had a global view of the sales forecasts

14  around the world.

15         For example, in the sales area, in the sales automation area, I can now – Larry
       can look at, for example, our forecast on a global basis, our forecast around the world
16     up to the minute at any level of detail that you want to see....

17         And if we go back in five minutes later and look at what our forecast is, it's
       different.  Because some rep around he world has changed the forecast.

18

19                                    *    *    *

20         Now I can see every deal out there that my reps around the world are working.

21  Pl. Ex. 12 at 13-14.

22         (e)    Ellison Admits Knowledge:  On February 21, 2001, Larry Ellison appeared

23  at the AppsWorld Conference in New Orleans, Louisiana to promote the 11i suite of software and

24  its capabilities. Defendant Ellison told attendees that Oracle had internally implemented the 11i E-

25  Business Suite and went to a Global database to manage sales.  Ellison specifically told attendees

26  that defendants knew everything about Oracle sales and finances globally up to the last hour:

27         We have one customer database.  We have one way of billing a customer.
       We have one set of support processes.  We have one way of filling out expense

28

PLAINTIFFS  [PROPOSED]  REVISED  SECOND  AMENDED  COMPLAINT  FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                    - 38 -

1    reports. All of our information is on one database. We know exactly how much we
     have *sold* in the last hour around the world and we're paying less to know more.

2    Pl. Ex. 3 at 14:04:29.

3            (f)    Defendants' Admissions in March 15, 2001 Conference Call: On March 15,

4    2001, defendants held a transcribed conference call for analysts and investors during which they

5    admitted facts reported by plaintiffs' confidential sources as existing prior to and during the Class

6    Period, namely: (1) the economy had a negative impact on the Company's applications and database

7    sales; (2) the pipeline reporting system was "real-time" giving management a global view of sales;

8    and (3) the dot.com sales shortfall was 66%. Pl. Ex. 13. Defendant Henley acknowledged:

9            I'd stand by what we said that we knew that the dot-coms would have an affect. But
10           clearly, I think it was the economy that really did us in.

11           Since the Americas represent over 50 percent of the worldwide license
     revenues, the impact on the total company license growth was obviously very
12   significant.

13           As Larry said on the March 1 conference call, the crack[s] started to appear
     in the last four days of the quarter. At first, it showed in our general business dot-com
14   mid-market forecast, which came down each of the last four days.

15   *Id.* at 4. But, CW1 and CW2 said that this is the same sector that was down a huge percentage even

16   before the Class Period. ¶47(c)-(e), (g), (j)-(k), (o).

17           And in the applications space, clearly, I think part of the reason we did so poorly was
     because of the slowdown in the U.S. economy.

18                                     *    *    *

19           [T]his pipeline system is real-time. We give constant updates as we did with Q3.
20   But I think the conversion rates were much less than normal in Q3, we have to
     assume something like that will probably happen again ....

21   Pl. Ex. 13 at 5-6. This confirmed plaintiffs' witnesses who said the pipeline is real-time. This also

22   corroborates witnesses who saw much earlier that the conversion rates were slipping badly. ¶47(c),

23   (h).

24           How − you know, if pipeline is X, how much of it − will we convert 60
25   percent of the pipeline, 30 percent of the pipeline, 40 percent of the pipeline − we had
     to change that variable in light of the slower economy. So, it's just changing one
26   number − but the actual pipeline management was very accurate, albeit misleading,
     because of the changing, you know, the changing economy.

27

28   Pl. Ex. 13 at 38.

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                           - 39 -

1       (g)    At the same March 15, 2001 taped conference call, Ellison admitted:

2     Again, the impression I got – again, this is Larry – and I was involved in an awful lot
of these deals and looking at them both during, you know, the closed cycle and after
3     the fact, as a post mortem.  And it seemed to be very broad based.  It seemed to be
extremely broad based and caused by just a general lack of confidence in the
4     economy, where executives wanted to be, you know, to be very conservative in their
expenditures.

5

6 *Id.* at 38.

7       (h)    <u>Defendants' Admissions in Delaware Answer</u>:  In their Answer filed on

8 February 8, 2002 (Pl. Ex. 14), to the complaint in a Delaware state court derivative suit, defendants,

9 including Oracle, Ellison and Henley, made the following judicially binding admissions:

10         (i)    "Defendants admit that Oracle maintained one or more systems for

11 monitoring the pipeline and certain closed deals, which was updated regularly and to which Mr.

12 Ellison had access." *Id.* ¶34.

13         (ii)    "Defendants admit that Oracle sales representatives regularly prepared

14 and submitted sales reports." *Id.* ¶35.

15         (iii)    "Defendants admit that consulting practice directors regularly reported

16 to upper management as to the status of their business, and that Mr. Scott and the Individual

17 Defendants [including Ellison and Henley] were privy to such information." *Id.* ¶62.

18         (iv)    "Defendants admit that Oracle's finance department generated reports

19 concerning Oracle's financial performance, to which the Individual Defendants were privy." *Id.* ¶94.

20     50.    <u>December 14, 2000 False Statement Concerning Functionality of 11i</u>:  During the

21 December 14, 2000 transcribed conference call, defendant Ellison made the following false

22 statements concerning the functionality of 11i:

23     *[Y]ou can buy our complete E-Business Suite, where all the pieces are designed
and engineered to fit together, and no systems integration is required. It's up and*
24     *running in months.  You get the savings in months.  It costs you less, and it takes
less time to install.*

25 Pl. Ex. 7 at 11.

26

27

28

51.   <u>December 15, 2000 False Statement Regarding Functionality of 11i</u>: On December 15, 2000, Ellison was interviewed by Dylan Ratigan and again made false statements about the functionality of 11i:

> *There's no systems integration required.  No software modifications required to use our E-Business Suite.*

Pl. Ex. 15 at 2.

52.   <u>Reasons Why Statements Concerning Functionality of 11i Were False</u>:  Defendant Ellison's statements that "you can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required" were false and misleading for the following reasons provided by no less than 17 witnesses:

(a)   CW10, a former 11i CRM Marketing and Development Strategist, reported that Oracle faced its own integration and compatibility issues integrating 11i with non-Oracle products and with Oracle products. CW10 confirmed that the integration problems were related to the deficiencies of the Applications Program Interface ("API").

(b)   CW11, a former Oracle Procurement Manager and Senior CRM Consultant, reported that in November 2000 Oracle had not yet developed an API for the CRM module and, as a result, the various components of the CRM module could not communicate with one another.

(c)   CW11, the former Procurement Manager, confirmed that because 11i API codes were not written, Oracle could not determine whether 11i's modules would be compatible because without establishing communication between the modules, Oracle could not even test for compatibility. Indeed, CW11 reported that the API codes had not even been completed in January 2001. Thus, the statement that the Suite was pre-integrated, interoperable and did not require any programming or systems modification was false when made.  According to CW8, the former Worldwide Consulting Practice Director, the gaps in the software became immediately evident during implementation of customer sites when consultants would attempt the integration of various applications, especially the CRM.

(d)   According to CW8, it was clear that the Company had not done any testing of the interfacing capabilities so that the application could work together.  Although Oracle

1   advertised that CRM applications chosen by a customer could be "snapped together," according to

2   CW8 the interface capability was "just not there." In addition, many of the "mega patches" released

3   to fix individual applications ended up "breaking" interface capability with others, and Oracle's

4   development organization had to produce interface fixes for the integration effort at customer sites.

5   CW8 stated that once deployed at a customer site, various modules would not share data, or could

6   not find data required to perform applications that were dependent upon the integration of various

7   functions. CW8 indicated that there were literally hundreds of integration problems between

8   different applications, which had to be resolved during the installation process at customer sites for

9   CRM modules through his tenure with the CRM group.

10          (e)     CW26, a former consultant in Oracle's Southern Internet Service Group

11  responsible for customer installations and implementation, corroborated CW8 and reported that

12  during the fall of 2000, he was involved in an implementation of 11i at Chevron which required

13  hundreds of patches. In addition, CW26 reported that the installation of patches would affect other

14  areas of the application, which would then require the problem to be escalated to Oracle's

15  development organization. CW26 also confirmed, as reported by CW8, that the CRM module of 11i

16  was extraordinarily problematic.

17          (f)     Problems with the implementation of 11i, and particularly the CRM module,

18  are illustrated by difficulties at BellSouth which had begun integrating the 11i suite into its digital

19  subscriber line ("DSL") business in the summer of 2000. BellSouth intended to implement 11i into

20  six separate business units, but wanted a successful implementation into its digital subscriber line

21  business unit before implementing it into other units. CW11, a former Procurement Manager and

22  Senior CRM Consultant, reported that the BellSouth deal was so important to the Company that

23  Oracle was willing to pay anything to keep the deal alive. However, according to CW11, the entire

24  project was in chaos through at least January 2001. CW11 reported that the biggest problem was

25  that CRM modules could not communicate with one another due to the lack of an API interface.

26  Oracle sent nearly 100 consultants and engineers to BellSouth locations to write API codes to

27  attempt to get the various modules to interface with one another.

28

1      (g)    CW24, a former Oracle senior technical analyst who specifically handled

2  technical support requests for Oracle consultants at BellSouth, reported that the implementation of

3  BellSouth was "a disaster" and that the software problems were so substantial that they would have

4  to be referred to the original software developers at Oracle's Redwood Shores headquarters.

5      (h)    CW12, the former Practice Director for Consulting Services for the southeast,

6  corroborated CW11's account and reported that BellSouth intended to implement 11i into six

7  business units, but deferred doing so until it could successfully implement it in its DSL business unit.

8  CW12 confirmed that 11i and "had huge gaps" in the CRM module and that Oracle "oversold" 11i's

9  capabilities and readiness to BellSouth. During implementation, serious problems with 11i's "base

10  code" caused persistent implementation delays through the end of 2000.  The problems with

11  implementation, according to both CW11 and CW12, resulted in Oracle sending a so-called "swat

12  team" of nearly 100 consultants, headed by Senior Vice President John Wheeler, to BellSouth to fix

13  the problems.  CW12 reported that the BellSouth implementation was not completed until January

14  2001 and that BellSouth had deferred implementation in six other business units.

15      (i)    CW11 and CW12 were corroborated by CW13, a former Oracle Technology

16  Director.  He said Oracle had expected to close at least two of the additional business units at

17  BellSouth in 3Q01, which would have been $40 million in combined revenue.  However, the only

18  one that did close was a small transaction for an accounts receivable product at BellSouth's

19  Birmingham facility.  CW12 reported that the other project that did not close, valued at $36 million,

20  was another unit at BellSouth's Atlanta Facility – The Virtual Private Network.

21      (j)    CW29 also corroborated witness accounts regarding expected large deals at

22  Bell South which failed to close and implementation and integration problems at BellSouth. CW29

23  stated that the implementation at BellSouth required thousands of patches and that when he was

24  terminated in March 2001, the system at BellSouth was still not completely functional. According

25  to CW29, these problems resulted in the termination of Senior Vice President John Wheeler and the

26  cancellation of additional sales to Bell South.

27      (k)    CW8 disclosed that Oracle's development organization and the vice presidents

28  heading the CRM group devised a scheme where the CRM consultants worked at an Oracle office

1  to put together certain demonstration screens which would appear to be functional. At a local Oracle
2  office closest to the client's facility, the consultants utilized patches created by the development
3  organization that would allow certain screens for a given application on the client's list to "come up
4  and work" in a limited fashion.  The consultants rigged these demonstrations to appear to be
5  operating in a full-blown database, but in actuality were only a limited version of a limited group of
6  screens processing limited data.  According to CW8, the customers were not told of the limited
7  nature of these pre-prepared demonstrations, or that other screens of the application were still riddled
8  with bugs and deficiencies and would not work until the development organization completed
9  additional patchwork.

10          (l)      According to CW1, a former Account Manager at Oracle, Ellison's positive
11 statements about 11i E-Business Suite allowing companies to compete in today's markets were not
12 supported by what the sales force actually experienced.  When Oracle introduced 11i in May 2000,
13 the software was by no means ready to go to market, and even in November 2000 when the supposed
14 full suite was released, customers still complained that it was buggy and incomplete.  CW1 reported
15 that members of her sales group – technical sales representatives – responsible for demonstrating the
16 product to prospective customers reported to CW1 that the CRM module alone was "so anemic it
17 was pathetic" and that Oracle should not even bother continuing to sell it.  CW1 reported that
18 customers who purchased 11i and the CRM module had such bad implementation problems that they
19 would not buy licenses for any other Oracle products.  Indeed, customers were angry that they had
20 paid so much for a product that did not work.  CW1 reported that as sales continued to slow
21 throughout 2Q and 3Q, customers who had purchased 11i "wouldn't even talk to me."

22          (m)      According to CW4, an Oracle Staff Consultant, Oracle had difficulty
23 implementing 11i internally as well.  CW4 reported that the Company implemented the "time and
24 expense" module of 11i in late 2000 and early 2001.  CW4 reported that the program often locked
25 up and a white screen filled with hieroglyphics would appear rendering the system useless.
26 According to CW4, everyone complained about the system and employees frequently asked "how
27 can we sell this thing [11i] if we're having trouble with it ourselves!"

28

1       (n)  CW6, a former Sales Administrative Assistant in the New York Office,

2    corroborated CW4's account and reported that the internal implementation of the time-billing and

3    expense application "was always down."  CW5, a former Practice Director in state and local

4    governments, further reported that Oracle frantically tried to rectify the problem and it got marginally

5    better in May 2001, but that she too often heard Oracle employees complaining, "how can we sell

6    this thing if it doesn't work at our own company?"

7       (o)  CW19, a former Oracle Finance Director and Manager of Revenue

8    Accounting, reported that Oracle had implemented 11i CRM internally in order to consolidate

9    accounting functions and that the software "had an increasingly excessive number of bugs" and

10   stated that the problems amounted to "months of hell." CW39, a former Practice Manager in New

11   York, reported that internal implementation of time and billing did not work and caused major

12   accounting problems. CW31, CW36 and CW38 reported also that the time and expense reporting

13   application used internally was flawed and caused serious delays in customer billing.  CW39

14   reported that he used the time and expense reporting system internally because management

15   demanded that people use it, but that it was so buggy it caused serious accounting problems.

16      (p)  CW34, a former senior principal consultant responsible for implementation

17   of 11i upgrades, reported that Oracle had forced many of its internal groups to use 11i, but that the

18   software was so buggy that it was of no use.  CW34 specifically noted the bugginess of the travel

19   application of 11i. He further reported that any savings that the Company attributed to 11i was really

20   from staff reductions because their software did not work.

21      (q)  CW9, a former Oracle Senior Practice Director, stated that "it's true" 11i CRM

22   module was incomplete as of the end of 2000 and early 2001 and that the I-Procurement B2B

23   Internet purchasing system was entirely missing.  CW9 reported that this fact was widely known

24   within the Company.

25      (r)  CW15, a former Oracle Consultant, reported that 11i suite released in

26   November 2000 was so bug-ridden that customers would have to be crazy to consider an

27   implementation. CW15 reported that Oracle sales personnel deliberately misled customers regarding

28

1   the functionality of 11i and the ease in which it could be implemented, and simply left it to the

2   consultants to "clear up the mess in the implementation process."

3            (s)     CW25, a former Oracle Senior Principal Consultant, reported that

4   conceptually 11i represented a major advance in design and architecture, but that the product "simply

5   didn't work." CW25 characterized Oracle's positive statements about the product as false – "not just

6   selling a car without tires, they sold it without wheels!"

7            (t)     The incompleteness of and incapabilities of the 11i suite were so apparent that

8   CW8 reported that during the fall of 2000, Larry Ellison made a personal visit to customer sites to

9   allay concerns about the software's instability. CW8, a former Practice Director for Worldwide

10   CRM, reported that AmeriCredit in Dallas purchased the CRM and financial applications, but that

11   integration between the two was so problematic that the excessive amount of hours that consultants

12   spent trying to implement 11i significantly eroded Oracle's profit margins. Ultimately, AmeriCredit

13   pulled the plug and refused to pay for consulting integration work done through 3Q01. CW8 further

14   reported that in fall 2000, potential customers Telecom of New Zealand and Foster's of Australia

15   were so concerned about the instability of 11i and the CRM that Ellison was scheduled to meet

16   personally with each company in order to provide them with the necessary assurances.

17     53.     Corroborating these numerous confidential witness accounts, in March 2001,

18   InformationWeek.com published the article, "*Apps Made Easy*?" Walter Stokes, a database

19   administrator for Electronic Data Systems called 11i "'the buggiest software I've ever seen come out

20   of Oracle ....'" Pl. Ex. 16 at 2. Even a year later, in February 2002, eWeek.com published an article

21   titled, "*Oracle 11i Still Bugging Users*," noting that Oracle's "Family Pack," which patches dozens

22   of known bugs at one time, often breaks more than it fixes and that Oracle's 11i problems "are real

23   and current."

24            "The 11i quality problems ... are causing companies to delay purchases, product rollouts and upgrades, and in some cases, consider alternatives for new

25            installations ...."

26   Pl. Ex. 27.

27

28

54.   <u>Customer Difficulties with the 11i Suite Stopped Major Sales</u>: Numerous witnesses disclosed that as a result of the integration problems experienced by Oracle in implementing the 11i suite, several major sales expected in the third quarter fell through:

(a)   <u>Telia AB-Sweden</u>: During the fall of 2000, Telia AB, a Swedish telecommunications company, was negotiating a deal to buy 11i for approximately $35-$40 million. The deal was managed by Oracle Senior Vice President Gary Moore. A former Oracle Technology Director (CW13), who was involved in and on location in Stockholm, said Telia AB had been negotiating with Oracle to purchase the 11i suite CRM module and Oracle Financials. However, Telia AB had also been waiting to see a United States telecommunications company commit to Oracle products, applications and consulting services before doing so themselves. By January 2001, on the heels of the failures at BellSouth, the Telia AB deal completely fell through.

(b)   <u>Hewlett-Packard</u>: CW27, a Hewlett-Packard Strategic Procurement Specialist responsible for implementation of 11i software at Hewlett-Packard, reported that Hewlett-Packard began the upgrade to 11i suite in January 2001 and that it was unusually buggy and required numerous patches. CW27 further reported that the upgrade required a huge data conversion to make the system operable. Consistent with that, CW15 and CW32 reported about Oracle overselling 11i and disguising problems with the software. CW27 stated that Oracle had not disclosed during its sales presentations that implementation required data conversion. Rather, they had falsely advertised 11i suite being pre-integrated and interoperable out-of-the-box, meaning that the system had the ability to use the parts of another system without conversion. Because the software was unusually buggy and required numerous patches, and the data conversion requirement, Hewlett-Packard decided to stop the upgrade to the 11i suite.

(c)   <u>JDS Uniphase</u>: CW41, an Information Technology Specialist at JDS Uniphase Corporation ("JDS"), informed plaintiffs that JDS went live with Oracle's Field Sale module in January 2001. That witness states that even that module has hundreds of bugs. Moreover, Oracle promised JDS that the Field Sales module would work off-line, allowing sales people to use the software even when they were not connected to the Internet. However, the software did not work off-line. Further, not until after Oracle installed the software did they inform JDS of the truth that

1   it would not work on the existing JDS 3i system.  Because of these compatibility issues, JDS also

2   deferred upgrading to the 11i suite until there was demonstrable functionality.

3       (d)   The Principal Financial Group: CW18, a former Oracle Managing Principal

4   Consultant responsible for developing and presenting e-business and CRM strategies for Oracle

5   customers, reports that, like JDS, a deal that Oracle had begun in 3Q01 with The Principal Financial

6   Group also fell through because Oracle had promised certain features of 11i suite that just were not

7   substantiated.  Defendant Ellison would have had specific knowledge about the progress of this

8   account because of its value of more than $1 million in product sales alone.

9       (e)   Nantucket Nectars: Nantucket Nectars purchased Oracle's 11i E-Business

10  Suite in December 2000.  However, before implementation of the 11i Suite, the soft drink maker also

11  got cold feet after hearing of implementation problems at other company sites.  Nantucket decided

12  to wait to upgrade to 11i Suite, giving Oracle time to "work out the kinks" of the troubled software.

13      (f)   Alliance Coal: Alliance Coal, LLC, an Oracle customer that had been using

14  Oracle's 10.7 application, has decided to wait to attempt an upgrade to 11i suite.  Oracle has

15  announced, however, that it will no longer support 10.7.

16      (g)   New York City: A former Oracle Sales Administrative Assistant (CW6)

17  reported that during December 2000, Oracle had been projecting to close a deal with the New York

18  City Housing Authority.  That deal also failed to close, and although Ellison in the March 1, 2001

19  conference call stated that the deals that did not close in the quarter were merely delayed for a few

20  days, the New York City Housing Authority did not close in 4Q01 either.  CW6 also confirmed that

21  business in the state and local government division had been very slow throughout this time frame,

22  and that he accessed the pipeline projections by using Oracle Sales Online and it reflected the same

23  thing.

24      (h)   GE Capital: A former Systems Analyst at GE Capital (CW14) reported that

25  in November 2000, GE Capital decided to purchase and implement the 11i Suite.  GE Capital started

26  the implementation process in early January 2001.  CW14 stated that the implementation from the

27  beginning was exceptionally difficult because of an unusual number of bugs with the 11i suite

28  software.  CW14 reported that never before had Oracle released an application that was not

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                    - 48 -

1  compatible with its own databases. Each of the problems was documented and submitted to Oracle.

2  Though GE Capital could download patches directly from Oracle's Technical Support website, often

3  the patches would "fix" too much and cause other errors. CW14 stated that 11i suite was rushed to

4  market and GE Capital should have waited. Plaintiffs are informed that the conversion process at

5  GE Capital completely failed in April 2001, requiring a completely fresh installation.

6          (i)      Motorola: CW16, a former Oracle Staff Consultant responsible for creating

7  business models base on 11i's specifications and capabilities, reported in February 2001 that Oracle

8  sales representatives prepared a demonstration of the 11i suite for Motorola. CW16 reported that

9  the demonstration angered Motorola representatives who walked out on the demonstration instead

10  of taking on the risky and expensive challenge documented by other companies who had difficulty

11  with 11i suite upgrades and conversions.

12          (j)      Health Net: CW21, a former Oracle Senior Consultant, informed plaintiffs

13  that Oracle confronted huge integration problems with Health Net in Los Angeles, an account

14  managed by Executive Vice President John Wheeler. In March 2001, implementation difficulties

15  had risen to a level where Health Net was so angered by the fact that it was millions of dollars over

16  budget that they were withholding payments for Oracle's consulting services and ultimately cancelled

17  parts of the implementation project.  CW16, who also worked on the Health Net account

18  corroborated CW21. CW16 reported that the project was extremely costly and that there were "huge

19  problems with implementation" and that "the 11i applications just did not work, there were too many

20  problems."

21          (k)      Citibank: According to CW25, a former Senior Principal Consultant, reported

22  even Citibank, one of the early purchasers of 11i suite and frequently cited as one of Oracle's

23  references that have purchased and implemented the product, has given up on parts of its

24  implementation.  Citibank had originally intended to use 11i suite in its services division, which

25  creates software to support thousands of other bank customers. Even as late as April 2001, Citibank

26  has not decided where to implement it.

27          (l)      Eaton Corporation:  CW17 is a former Vice President of the Oracle

28  Applications User Group.  CW17 is also a former Applications and CRM Expert for Eaton

1  Corporation. According to CW17, the upgrade to 11i suite at Eaton Corporation was a nine-month

2  disaster of problematic integration and implementation. CW17 reported that while some of the

3  individual modules were good, they were lacking in the area of integration and the modules did not

4  integrate into a "working system." CW17 further reported that the upgrade required thousands of

5  patches to fix bugs.

6  (m)  Hostcentric: CW42 reported that Hostcentric, a Houston, Texas information

7  technology company, began installation and implementation of 11i as part of Oracle's Authorized

8  Application Provider program. CW42 reported that the implementation of 11i (the standard suite

9  – requiring no customization) began in May 2000, but after 12 months of applying patches, the only

10  module that was successfully implemented was the financials. CW8 corroborated CW42's account

11  and reported that the integration problems at Hostcentric were so severe that Oracle sent more than

12  30 consultants and even research and development engineers to Hostcentric to try to get the

13  applications "working together." CW8 reported that Ellison knew of these integration problems and

14  visited Hostcentric, personally assuring Hostcentric that Oracle would "make this right" and get the

15  software integrated. According to CW42, the implementation of the other modules in the suite,

16  including the CRM application, failed and the entire implementation project was stopped in June

17  2001.

18  55.  Defendants Knew of Customer Problems with 11i Suite Implementation: Defendants'

19  knowledge of Suite 11i defects is confirmed by several witnesses, and by defendants' admissions in

20  their Delaware Answer, which are binding as judicial admissions:

21  (a)  According to CW15, Oracle records and stores all problems suffered by all

22  of its customers on a database consisting of all of the technical assistance requests ("TAR")

23  submitted by its field consultants for technical support as they encounter problems at customer sites.

24  These TAR reports must be submitted when Oracle's Metalink web page does not have a solution

25  to the problem that can be downloaded from the website. Plaintiffs are further informed by a former

26  Oracle consultant (CW15) that every implementation is given a number and that all of the TARs for

27  a specific customer can be accessed by the number. Plaintiffs are informed that in some cases it was

28

1   impossible to get a solution to a TAR. Instead, Oracle would admit to its consultants in the field that

2   the product was released prematurely and that "nothing could be done."

3       (b)    CW8 confirmed that Oracle management knew that 11i was not ready – most

4   modules did not work – and Oracle did not want customers to know it. Indeed, from the time of

5   release in May 2000 through at least January 2001, the CRM group, as well as other consulting

6   groups, were continuously notified by the Company in e-mail memos that although certain modules

7   of 11i had been released they did not work, and consultants were instructed "DO NOT INSTALL."

8   These memos would "flat out tell you – the product does not work; don't install it." Usually, the

9   memos identified dates when "mega patches" for identified applications were scheduled to be

10  released, so the consulting groups were on notice to "drag their feet" and "stall however we could"

11  until the patches were actually deployed.

12      (c)    Defendants' admissions in the Delaware derivative suit (Pl. Ex. 14) confirm

13  that they had actual knowledge of the 11i defects. In their February 8, 2002 Answer in the Delaware

14  case, they made the following judicially binding admissions:

15          (i)    "Defendants admit that, as with all software, Oracle's 11i Suite

16  required certain patches and bug fixes, including consolidated patches." *Id.* ¶56.

17          (ii)   "Defendants ... admit that consultants typically utilized Technical

18  Assistance requests [TAR's] to obtain assistance in resolving problems experienced by Oracle

19  customers." *Id.* ¶66.

20          (iii)  "Defendants admit that Oracle had several consultants working with

21  Bell South, most of whom were not working on Bell South's Custom APIs." *Id.* ¶74.

22          (iv)   "Defendants admit that Motorola has not upgraded to 11i Suite." *Id.*

23  ¶85.

24      56.    Knowledge of 11i Defects: In summary, as detailed above, nearly 20 witnesses, all

25  former Oracle sales or consultant personnel in different regions, reported declining sales due to the

26  economy during late 2000 to early 2001. ¶47. This was known to them based on their own sales

27  experiences and based on their review of regional and Company-wide databases reporting declining

28  sales. It is reasonable to conclude that these declining sales were also reflected on the global

1  database updated daily that Ellison and the other defendants admitted they monitored.  At the same

2  time, another 15 former employee witnesses reported that Oracle's flagship 11i product was

3  encountering integration problems, that big sales were being lost as a result and defendants knew it.

4  Indeed, defendants later admitted that big sales were lost due to the economy, and Ellison admitted

5  he was aware of the bugs.  When he said, "'[m]ea culpa,'" it means "it's my fault."  Thus, when

6  defendants stated in December that the economy was not hurting Oracle sales and, based on that,

7  defendants reaffirmed growth, revenue and earnings forecasts, such statements and forecasts were

8  knowingly false when made.

9        57.    Nevertheless, defendants' false statements drove Oracle stock from below $25 in early

10  December to over $30.  On January 4, 2001, defendant Henley sold 1 million shares of his Oracle

11  stock at $32 per share and pocketed $32.3 million.

12        58.    <u>Oracle Repeats False Statements Regarding Functionality of and Demand for 11i</u>:

13  On January 8, 2001, defendant Sanderson visited the offices of Salomon Smith Barney and made the

14  following false statements (in bold) to securities analysts, which were repeated in a report issued by

15  Salomon Smith Barney:

16        *** The suite is pre-integrated and fully interoperable out of the box***, helping to lower consulting costs and time-to-value.

17                   *   *   *

18        *Oracle sees robust demand for both its database and applications business.* Specifically, *Sanderson noted demand* for ERP *is surprisingly robust* while advanced planning and scheduling, CRM, and SCM products are also performing well.  *Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets.  Sanderson noted two trends driving demand for databases is demand for the 11i applications that are typically bundled with the database as well as applications of other vendors that rely on the functionality of the Oracle database.*

23  Pl. Ex. 17.

24        59.    <u>Reasons Why Sanderson's Statements Were Knowingly False When Made</u>:

25        (a)    Sanderson's statement that the 11i suite is pre-integrated and fully

26  interoperable out of the box was knowingly false when made.  As detailed above, numerous

27  witnesses reported that the Company's new flagship software suite was encountering massive

28  integration problems and that, as a result, large sales were being lost and other prospective buyers

1   were deferring purchases until Oracle could demonstrate that the product worked. ¶54(q)-(aa). For

2   example, CW11 and CW12 reported that the 11i suite was released without the critical API interface

3   necessary for the different modules to communicate with one another and work together.

4   Notwithstanding the countless bugs which required thousands of patches to fix, the missing API

5   interface alone required the Company to send nearly 100 consultants to BellSouth to write API

6   codes. ¶52(a)-(c), (f).

7          (b)     Sanderson's statement that Oracle was seeing robust and sustained demand

8   for database products – despite industry-wide concern over contracting IT budgets, was also

9   knowingly false when made. Again, as detailed above, numerous witnesses, all former Oracle sales

10  or consulting personnel in different regions, reported declining sales due to the economic slowdown

11  during late 2000 to early 2001. For example, CW1 and CW2 reported that the economic slowdown

12  not only impacted sales opportunities in the pipeline, but it also increased pricing competition which

13  compressed margins on the Company's core database products.  In addition, Oracle was losing

14  significant market share in its database products, because with the release of 11i Oracle was in direct

15  competition with "best of breed" applications providers which had previously driven 25% of Oracle's

16  database sales. Pl. Ex. 18.  These facts were known to the witnesses based on their review of and

17  entries into regional and worldwide databases reporting declining sales and detailed the status of

18  each site around the world "in the last hour." Thus, it is reasonable to conclude that these declining

19  sales were also reflected on the global database updated daily that Sanderson, Ellison and Henley

20  admitted they monitored.

21         60.    Oracle Repeats False Statement that Weak Economy Was Not Affecting the

22  Company:  On January 11, 2001, defendants directed Oracle spokeswoman Stephanie Aas to

23  publicly rebut any suggestion that the economic slowdown would negatively impact Oracle. Ms. Aas

24  falsely told analysts and reporters the following (in bold) which was published in a *Bloomberg News*

25  article on Thursday, January 11, 2001:

26         Company spokeswoman Stephanie Aas today said *Oracle has yet to see any
       signs that its business is being hurt by the economic slowdown* or reported cuts to
27     information-technology budgets.

28

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                          - 53 -

1

"Obviously the economy is a wild card. So if we went into a recession or there is a sharp downturn [in the economy], we could be impacted.... *But we're not seeing it now.*"

2

3

Pl. Ex. 19.

4    61.    <u>Reasons Why Statement in ¶60 Was False</u>: The statement that Oracle had yet to see

5    any signs that its business was being hurt by the economic slowdown was false when made. As

6    reported in detail by at least 15 witnesses from various segments within the Company and multiple

7    geographic regions, the impact of the slowing economy resulted in fewer potential sales in the

8    pipeline; compressed profit margins on its core database products; and weak demand for the

9    Company's new 11i software suite. ¶¶47, 52. Indeed, witnesses report that declining sales in

10   database, applications and consulting plagued the Company since June 2000. Such facts were known

11   to the witnesses based upon their review of and entries into the Company's regional and worldwide

12   databases which detailed the status of each sale around the world "in the last hour." Thus, it is

13   reasonable to conclude that the declining sales reported by the witnesses were reflected on the global

14   database that Ellison and the other defendants admittedly monitored.

15   62.    Nevertheless, by January 19, 2001, defendants' false and misleading statements had

16   the desired effect as the price of Oracle shares spiked from $31.80 to $34.56. Defendant Ellison

17   wasted no time as he intended to immediately profit from his insider trading activity and on Monday,

18   January 22, 2001 began his eight-day sale of 29 million shares of stock for nearly $900 million.

19   63.    <u>False and Misleading Statement</u>: On or about February 6, 2001, Oracle made the

20   following false statements specifically concerning Oracle's CRM module in its technical WhitePaper

21   written by Mark Barrenechea:

22    *Oracle's CRM suite is both complete and integrated .... No systems integration is required to install the Oracle CRM suite.*

23

24    *In fact, systems integration labor usually runs many times the cost of the software or the hardware needed to run the system – and the customer gets to pay for it. To install the Oracle CRM suite, no systems integration is required. And because the CRM suite consists of true Internet applications, every application works in every country, every major language, and every major currency.*

25

26   Pl. Ex. 38 at 6-7.

27

28

64.   <u>Reasons Why Statements from Oracle's CRM Technical WhitePaper Were Knowingly False and Misleading</u>: As reported by CW8, CW12, CW32 and CW45 and others in ¶52 above, Oracle's, 11i including the CRM module, was fraught with bugs and instabilities which required hundreds of patches to fix. Even a year later, Oracle still had not fixed the software. In February 2002, eWeek.com published an article reporting that 11i's problems remained "real and current" and the "Family Pack" patches still break other things. Pl. Ex. 27.

(a)   According to CW8, Oracle knew that the CRM module was not complete and integrated and could not be installed without any systems integration. In fact, in order to sell the CRM, Oracle consultants "rigged" customer demonstrations of the CRM just to give potential customers the appearance that the software actually worked. ¶52(k). In fact, even through January 2001 Oracle warned its own CRM consulting group not to install certain modules of 11i, including CRM, because they did not work. CW9 reported that even in early 2001 the I-Procurement application of the CRM was entirely missing and the Company had not developed the API. CW1 reported that the CRM was "so anemic that it was pathetic" and that the Company should "not even bother" selling it. According to CW45, 11i and CRM "just plain did not work."

(b)   In addition to individual CW accounts, the Company was experiencing troubled and failing implementations at customer sites around the country including at BellSouth, Hostcentric, Health Net, AmeriCredit, and others.

65.   <u>Oracle Repeats False Statements About the Economy and 3Q01 Growth Forecasts</u>: During February 2001, defendants' falsehoods continued. They: (1) claimed that the Company was on track to meet its forecasts, was seeing rapid adoption and implementation of its e-business software and thus was not feeling the effects of the economic downturn; and (2) that 11i suite worked and was pre-integrated and interoperable out-of-the-box. These statements were consistently repeated by Ellison, Henley and Sanderson as they endeavored to convince the public and potential customers that while it may have been true that other technology and computer related companies would suffer from the slowdown in demand for computer and PC products, Oracle would thrive:

(a)   On February 7, 2001, analyst First Union Securities, Inc. visited Oracle headquarters and met with Oracle Management, including defendant Henley. During that meeting,

1   Henley falsely stated that: (1) Oracle was not seeing the effects of the economy; (2) database revenue

2   would grow 15%-20% year-over-year; (3) applications revenue would grow 75% year-over-year; (4)

3   the applications sales and revenue pipeline were strong.  Defendant Henley's false statements (in

4   bold) were conveyed to the market in a February 8, 2001 First Union analyst report, as follows:

5          On February 7th, we met with management of Oracle, including CFO Jeff
          Henley at Oracle Headquarters. We note the following points regarding our meeting:

6                                    *    *    *

7                  * *Oracle is not seeing the effects of a slowing economy at this point*, but
          next several weeks will be critical.

8

9                                    *    *    *

10                 * *Management reiterates guidance of 15-20% y/y database revenue growth
          and 75% y/y applications revenue growth for FQ301*.

11  Pl. Ex. 20.

12          (b)    On February 7, 2001, Deutsche Banc Alex. Brown also visited Oracle

13  headquarters and spoke with defendant Henley and Oracle management for a mid-quarter update.

14  During the meeting, Henley and Oracle management made the following false statements: (1)

15  management had not seen any weakness in its business; and (2) in 3Q01, Oracle would report

16  application growth of 75%, Database growth of 20%-25%, licensing growth of 25% and service

17  growth of 15%-20%.  On February 8, 2001, Deutsche Banc issued a report conveying to the market

18  the false statements (in bold) made by defendant Henley on February 7, 2001, as follows:

19          VISIT WITH MANAGEMENT.  Yesterday, we checked in with Oracle for
          a mid-quarter update with CFO Jeff Henley and VPs in the server and applications
20         development organizations.

21         PERSPECTIVE ON THE MACRO ENVIRONMENT.  *According to
          management, it has yet to see macro-related weakness in its business*....
22

23         ... *Barring a severe economic downturn, management sees continued
          growth driven by strong demand* in key segments such as supply chain, customer
24         relationship management and collaboration.

25         NO CHANGE TO OUTLOOK, RECENT GUIDANCE.  *Mr. Henley
          reiterated that the company's outlook and guidance were unchanged for F3Q'01*
26         (Feb).

27  Pl. Ex. 21.

28

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                        - 56 -

1        (c)     On February 9, 2001, defendant Oracle caused spokeswoman Jennifer Glass

2 to issue the following false statement (in bold) concerning the effect of the slowdown in the economy

3 on Oracle projections conveyed to the market. Glass's false statements were repeated in a *Bloomberg*

4 *News* article on the same day:

> 5    Oracle is still upbeat about its prospects for earnings growth, which will be
> fueled by a new suite of Internet-friendly business software dubbed Oracle 11i,
> 6    spokeswoman Jennifer Glass said.
>
> 7    *"We haven't changed our projections at all," Glass said. "This slowdown
> is going to provide new opportunities for Oracle as companies need to streamline
> 8    and be more strategic about the technology they buy."*

9 Pl. Ex. 22.

10        66.    <u>Reasons Why Statements Concerning the Effect of the Economy and Growth</u>

11 <u>Projections Were Knowingly False When Made</u>: The statements that Oracle had not seen any effects

12 of the slowing economy and that the Company would still report record database and applications

13 growth were false when made for the following reasons:

14        (a)     As reported in detail by numerous witnesses from various segments within

15 the Company and multiple geographic regions, the impact of the slowing economy had already

16 resulted in fewer potential sales in the pipeline, compressed profit margins on Oracle's core database

17 products and weakened demand for the Company's new 11i software suite. ¶47. Indeed, these

18 witnesses reported that declining sales in database, application and consulting plagued the Company

19 since June 2000. Such facts were known to the witnesses based upon their review of and entries into

20 the Company's regional and worldwide databases which detailed the status of each sale around the

21 world "in the last hour." Thus, it is reasonable to conclude that the declining sales reported by the

22 witnesses were reflected on the global database that Ellison and the other defendants admittedly

23 monitored.

24        (b)     In addition to the impact of the economy on Oracle's product sales, the

25 functional instability of 11i had already resulted in several large lost deals in December 2000 and

26 January 2001, early in the third quarter. The lost deals included the State of Michigan ($50-$100M),

27 BellSouth ($36M), Telia ($35-$40M), and ADT ($10M). These deals alone add up to nearly $186

28 million in lost revenue. Confidential witnesses also identified at least 10 more deals that were lost

1  to 11i's defects, including a $1M deal to The Principal Financial Group, and deals with Foster's, New

2  Zealand Telecom, Federal Express, Mutual of Omaha and GE. In fact, even though the Company

3  was relying upon sales of 11i to fuel growth and claimed that the software would "help companies

4  cut costs in tough times," 11i actually cost its early purchasers millions in installation and

5  implementation costs in addition to lost business.

6      67.    Despite functionality problems encountered in Oracle's internal implementation and

7  countless troubled or failed customer implementations, defendants continued to falsely represent

8  that 11i needed no integration and was "literally plug and play" and would fuel future growth.

9      68.    <u>False Statement Regarding 11i Integration and Functionality</u>: On February 21, 2001,

10  defendant Ellison gave a keynote address at the Oracle AppsWorld Conference in New Orleans in

11  which he made the following false statement (in bold) concerning the implementation and integration

12  of the 11i suite:

13      We were the first company to use this eBusiness suite and in the very first year we
    put it in, we saved $1 billion.

14

    \*   \*   \*

15

16      In fact, we recommend that you start with, you try a component of the suite and then
    you add it in. Now the nice thing is it's like Lego blocks. Once you have one piece
    in, *the other pieces just snap together. There's no systems integration required.*

17      *The key thing is, you can install just one piece and then again install another*
    *piece. No systems integration. You just basically turn it on or snap it together....*

18      *Plug and play. It is absolutely, all the pieces within the suite are literally plug and*
    *play.*

19  Pl. Ex. 3 at 13:33:31, 14:54:52.

20      69.    <u>Reason Why Statement in ¶68 Was False</u>: Notwithstanding Ellison's inconsistent

21  representations regarding 11i throughout the Class Period, whether a customer purchased the

22  complete Suite or a customer purchased it in pieces, the software did not work. Thus, the statement

23  in ¶68 was false for the following reasons:

24      (a)    As reported in detail by at least 14 witnesses, 11i was encountering massive

25  integration problems. According to CW8, CW32 and CW33, the CRM module alone was so buggy,

26  Oracle's own specialists could not get it to work and resorted to "rigging" customer demonstrations.

27  Indeed, Ellison later admitted that he was aware of the bugs, explaining that "'[i]t's a complex

28

1   product ... *[m]ea culpa*. It's true.'"  In addition, Ellison claimed that the Company had saved $1

2   billion by implementing its own 11i software internally.  But, many witnesses (CW2, CW7, CW8,

3   CW17, CW28, CW33, CW35, and CW36) stated Ellison's claim was just a Wall Street marketing

4   gimmick and that the 11i suite didn't work internally any better than externally.  Instead, these

5   witnesses stated the major portion of the savings came from firing more than 2,000 employees.

6         (b)    The lack of a working 11i suite had also taken a toll on Oracle's applications

7   business as well as its core database business.  With the shipment of the 11i suite, a purported

8   integrated applications solution, Oracle placed its product in direct competition with "best of breed"

9   application sellers like Siebel Systems, Inc., Ariba, Inc. and PeopleSoft, Inc.  These companies had

10  driven 25% of Oracle's core database sales throughout the 1990's by recommending Oracle databases

11  to their software customers. Pl. Ex. 18. IBM, which had stopped competing with the same software

12  companies in 1999, has now gained market share against Oracle.  Indeed, as of May 2001, IBM has

13  signed 59 alliances with application makers such as Siebel, Ariba, and PeopleSoft – all Oracle rivals.

14  Many had worked with Oracle for years, but were happy to align with a company they don't compete

15  with.  "'I will not help Oracle make a single dime that I don't have to,'" said Rick Berquist, a senior

16  vice president at PeopleSoft. *Id.*

17        (c)    Shortly after the Class Period, market analysts confirmed that in the first six

18  months of its release through the summer and fall of 2000, the 11i suite product required an

19  incredible 5,000 patches (repairs), leading one industry expert to call it "'the buggiest software I've

20  ever seen come out of Oracle ....'"  *See* Steve Konicki and Jennifer Maselli, *Apps Made Easy?*,

21  InformationWeek.com News (Mar. 12, 2001), *available at*

22  http://www.informationweek.com/828/entapps.htm. Pl. Ex. 16.

23      70.   <u>Oracle Reiterates False Growth Forecasts</u>:  On February 21-23, 2001, Ellison and

24  Henley met with analysts, money and portfolio managers, institutional investors and large Oracle

25  shareholders at the AppsWorld Conference in New Orleans, Louisiana to discuss Oracle's 3Q results,

26  its business and its prospects.  They falsely stated that:

27      •    Oracle would report EPS for 3Q01 of $0.12.

28      •    Oracle would report Q3 revenue of $2.9 billion.

1       •    Oracle was not seeing an impact on its results due to the slowdown in the

2       United States economy.

3     71.    <u>False Statement</u>: On February 21, 2001, Deutsche Banc issued an analyst report

4 which repeated defendant Henley's false statements (in bold) made at the AppsWorld Conference:

5           CFO Jeff Henley gave a brief presentation to the financial community, but
offered no commentary on the current quarter (company is in its quiet period) and no
6       change to guidance. ***Management still expects growth in applications license
revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and***
7       ***66% reported in the first two fiscal quarters.***

8 Pl. Ex. 23. In their February 8, 2002 Answer to the revised Amended Shareholder Derivative

9 Complaint pending in the Delaware Chancery Court, defendants admitted that Messrs. Ellison and

10 Henley appeared at the AppsWorld Conference between February 21-23, 2001, and that Mr. Henley

11 reaffirmed Oracle's financial projections. Pl. Ex. 14, ¶125.

12     72.    <u>Reasons Why February 21-23 Forecasts Were False</u>: Defendants' statements in ¶¶70-

13 71 were false when made for the same reasons (witness accounts, admissions) pled in detail above.

14 ¶¶47-48. As also detailed above (¶¶52, 54), defendants knew throughout Q2 and Q3 that:

15 (1) Oracle's new software 11i suite was broken and needed massive integration and implementation

16 work to be functional; (2) potential customers were increasingly reluctant to risk upgrading to the

17 software because of high implementation costs related to bugs and poor integration; (3) the slowing

18 United States economy was severely impacting all business sectors at Oracle; and (4) demand for

19 Oracle products was weak due to poor functionality of the 11i suite and the economy.

20     73.    Even as late as the morning of March 1, 2001, defendants' false statements continued

21 to reach the market as BlueStone Capital issued an analyst report based upon management's

22 statement of the week prior: "[M]anagement indicated last week that Oracle had not experienced

23 any slowdown in business this quarter" and "Oracle's business continues to grow; the current pipeline

24 is as strong as it has ever been, according to management." Pl. Ex. 24.

25     74.    Later that same day, March 1, 2001, Oracle revealed that contrary to prior assurances

26 by defendants of Oracle's continuing "strong" revenue and EPS growth, including defendants'

27 assurances only eight days earlier that demand remained strong, Oracle would in fact post revenue

28 and EPS *declines*. In a March 1, 2001 press release (Pl. Ex. 4), Oracle stated:

1        •      Oracle would post sequential EPS declines.

2        •      Database growth would be *flat* to slightly *negative*.

3        75.    These disclosures shocked the market, causing Oracle's stock to decline in one day

4    from $19.50 on March 1 to $16.88 per share on March 2, 2001, on record volume of more than 224

5    million shares, inflicting billions of dollars of damage on plaintiffs and the Class. Defendants' fraud

6    has reduced Oracle's market capitalization by over $90 billion as Oracle stock has fallen 50% from

7    its Class Period high of $35 per share as the truth about Oracle, its operations and finances reached

8    the market.

9                        **POST CLASS PERIOD ADMISSIONS**

10       76.    Thereafter, on March 15, 2001, Oracle issued a press release announcing 3Q01

11   revenue of $2.67 billion, $233 million and 8% less than the $2.9 billion forecast.  Oracle also

12   announced EPS of only $0.10, 17% and $112 million less than the $0.12 earnings forecast. Pl. Ex.

13   25. Defendants also held a conference call with securities analysts and attempted to explain how

14   Oracle's quarterly results could be so far below what defendants publicly projected.  Defendants

15   admitted that despite strong results in Europe, Asia and other international geographies there was

16   an enormous slowdown in the Americas, particularly the United States. Pl. Ex. 13.

17       77.    Defendants also acknowledged that as opposed to the 75% applications growth

18   projection, applications grew only 25% (a 66% miss) and slid from $279 million in 2Q01 to $249

19   million in 3Q01. As opposed to a 25% projected database growth, database grew a mere 6% (a 76%

20   miss). As opposed to a 25% projected license growth, license revenues grew only 6%. Pl. Ex. 26.

21   Defendants conveniently claimed that the "cracks" did not really begin to show until the last four

22   days of the quarter (in a lame attempt to explain their false claims uttered on February 23, 2001, only

23   six days before the end of the quarter). Defendants also attempted to distance themselves from the

24   pipeline reporting systems that they had so strongly asserted would support their aggressive earnings

25   results. Instead of referring to their business as being immune from the slowdown in the economy

26   and providing new opportunities, management now admitted the economy was a "wildcard" and that

27   the Company's performance in the future would be in line with United States economic performance.

28

78.     On April 12, 2001, Oracle filed its Form 10-Q for 3Q01 with the Securities and Exchange Commission ("SEC"). In that filing, defendants admitted what they had been denying all along. The Form 10-Q reads that the "slowdown in license revenues in the third quarter of fiscal 2001 was primarily due to uncertainty related to economic conditions in the United States of America, that negatively impacted demand for the Company's systems and business application products." Pl. Ex. 26 at 12.

79.     On March 15, 2001, defendants held a transcribed conference call for investors (Pl. Ex. 13), during which Ellison and Henley attempted to explain the reasons for the financial shortfall and made the following admissions:

> [Jeff Henley]: I'd stand by what we said that we knew that the dot-coms would have an affect. But clearly, I think it was the economy that really did us in.
>
> Since the Americas represent over 50 percent of the worldwide license revenues, the impact on the total company license growth was obviously very significant.
>
> As Larry said on the March 1 conference call, the crack started to appear in the last four days of the quarter. At first, it showed in our general business dot-com mid-market forecast, which came down each of the last four days.

*Id.* at 4. CW1 and CW2 reported that this is the same sector that was down a huge percentage even before the Class Period.

> [Jeff Henley:]  And in the applications space, clearly, I think part of the reason we did so poorly was because of the slowdown in the U.S. economy.

                        *     *     *

> [T]his pipeline system is real-time. We give constant updates as we did with Q3. But I think given that the conversion rates were much less than normal in Q3, we have to assume that something like that will probably happen again ....

*Id.* at 5-6. Thus, Henley confirmed and corroborated plaintiffs' witnesses (CW1 and CW31) who said the pipeline was maintained on a continuing real-time basis. Henley also corroborated the witness (CW1) who saw much earlier that the conversion rates were slipping badly.

> [Jeff Henley:]  [W]ell, first of all, if you segmented the dot-com number in the third quarter in terms of the affect on the Americas license – first of all, the dot-com[s] dropped 66 percent  year-over-year.... So it was obviously huge.

                        *     *     *

1    **Larry Ellison:** It's both, I mean it – you know, because database is a much
     bigger than apps number, it had more total dollar effect. But it affected both. And
2    we had – we did a lot of apps business with dot-coms. That all went away too.

3                                              *   *   *

4    And you know, CRM ... is global. Right now, the entire sales force is on CRM.

5                                              *   *   *

6    I was involved in an awful lot of these deals ....

7    (referring to deals that did not close)

8    We always sell portions of the suite, as well as the whole suite. We've never said you
     have to take the whole thing at once. We've never really ... sold it that way.

9    Pl. Ex. 13 at 14, 17, 20, 38-40.

10       80.    In the March 15, 2001 press release, Oracle acknowledged that its revenues from

11   3Q01 application software sales increased only 25% over the same quarter in 2000 to $249 million,

12   and that its database sales revenues grew only 6% to $823 million. Pl. Ex. 25. Thus, using simple

13   arithmetic, Oracle's revenues from application sales in 3Q00 were some $200 million, and were

14   about $775 million from database sales.

15       81.    Oracle had, however, projected 75% applications growth for 3Q01 which would have

16   produced $350 million in revenues. But actual revenue was only $249 million. The difference, $101

17   million, accounts for nearly one-half of the $233 million revenue shortfall for the quarter ($2.9

18   billion projected, $2.67 billion actual). Oracle also projected a 25% database revenue increase,

19   which at $775 million in 3Q00 would have produced $970 million in revenues in 3Q01. Since actual

20   revenues were only $823 million (only 6% growth), the difference is $147 million and accounts for

21   the rest of the revenue shortfall.

22       82.    Sanderson had previously claimed that 11i applications sales would also serve to

23   drive database sales growth in 3Q01. ¶58. That view was consistent with analyst reports that 25%

24   of Oracle's database sales had historically been driven by application software makers like Siebel,

25   Ariba and PeopleSoft, whose products were built to run on Oracle databases. They would promote

26   Oracle database sales in selling their applications. Pl. Ex. 18. With the 11i suite, however, Oracle

27   was now competing with Siebel, et al., and had to promote database sales itself when pitching the

28

1   11i application. Accordingly, it is reasonable to conclude that the combined effect of the defects and

2   integration problems and the slowing economy dramatically reduced sales of the 11i suite. Thus,

3   the defects and the economy were the main reasons for the revenue shortfalls in both applications

4   and database sales, and for the accompanying 17% earnings miss.

5                          **CLASS ACTION ALLEGATIONS**

6          83.    This is a class action on behalf of purchasers of Oracle publicly traded securities

7   between December 14, 2000 and March 1, 2001, excluding defendants (the "Class"). Excluded from

8   the Class are officers and directors of the Company as well as their families and the families of the

9   defendants. Class members are so numerous that joinder of them is impracticable.

10         84.    Common questions of law and fact predominate and include whether defendants:

11  (a) violated the 1934 Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly

12  disregarded that their statements were false; and (d) artificially inflated the prices of Oracle's publicly

13  traded securities and the extent of and appropriate measure of damages.

14         85.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions

15  would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of

16  the Class. A class action is superior to other available methods for the fair and efficient adjudication

17  of this controversy.

18                          **FIRST CLAIM FOR RELIEF**

19                  **For Violation of §10(b) of the 1934 Act**
                    **and Rule 10b-5 Against All Defendants**

20         86.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

21         87.    Throughout the Class Period, defendants, in pursuit of their scheme and continuous

22  course of conduct to inflate the market price of Oracle securities, knowingly or recklessly made

23  materially false or misleading statements or failed to disclose material facts necessary to make the

24  statements made, in light of the circumstances under which they were made, not misleading.

25         88.    During the Class Period, defendants, and each of them, carried out a plan, scheme,

26  and course of conduct using the instrumentalities of interstate commerce and the mails, which was

27  intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price

28

1  of Oracle securities; (b) deceive the investing public, including plaintiffs and other Class members,

2  as alleged herein; and (c) cause plaintiffs and other members of the Class to purchase Oracle's

3  securities at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct,

4  defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the 1934 Act

5  and Rule 10b-5, 17 C.F.R. §240.10b-5. All defendants are sued either as primary participants in the

6  wrongful and illegal conduct charged herein or as controlling persons as alleged below.

7       89.     In addition to the duties of full disclosure imposed on defendants as a result of their

8  affirmative false and misleading statements to the investing public, defendants had a duty to

9  promptly disseminate truthful information with respect to Oracle's operations and performance that

10  would be material to investors in compliance with the integrated disclosure provisions of the SEC,

11  so that the market price of the Company's securities would be based on truthful, complete and

12  accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R.

13  §229.10, *et seq*.).

14       90.     Defendants had actual knowledge of the misrepresentations and omissions of material

15  facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and

16  disclose such facts, even though such facts were available to them.

17       91.     As a result of the dissemination of the materially false and misleading information

18  and failure to disclose material facts as set forth above, the market price of Oracle's securities was

19  artificially inflated during the Class Period. In ignorance of the fact that the market price of Oracle's

20  publicly traded securities was artificially inflated, and relying directly or indirectly on the false and

21  misleading statements made knowingly or with deliberate recklessness by defendants, or upon the

22  integrity of the market in which the securities traded, plaintiffs and other members of the Class

23  purchased Oracle securities during the Class Period at artificially high prices and were damaged

24  thereby.

25       92.     Had plaintiffs and the other members of the Class and the marketplace known of the

26  true facts, which were not disclosed by defendants, plaintiffs and the other members of the Class

27  would not have purchased or otherwise acquired their Oracle securities during the Class Period, or

28

1  if they had acquired such securities during the Class Period, they would not have done so at the

2  artificially inflated prices which they paid.

3   93.   By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule

4  10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act
### Against Defendant Oracle and the Individual Defendants

94.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

95.   The Individual Defendants acted as control persons of Oracle within the meaning of §20(a) of the 1934 Act as alleged herein. By virtue of their executive positions, Board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's global database, internal reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

96.   In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

97.   Oracle controlled each of the Individual Defendants.

98.   By reason of such wrongful conduct, the Individual Defendants and Oracle are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

# THIRD CLAIM FOR RELIEF

## For Violation of §20A of the 1934 Act
## Against Defendants Ellison and Henley

99.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

100.    While Oracle securities traded at artificially inflated and distorted prices, defendants Ellison and Henley personally profited by selling 30,084,576 shares of their holdings in Oracle securities while in possession of adverse, material non-public information about Oracle, pocketing over $900 million in illegal insider trading proceeds, as detailed above.

101.    By contrast, plaintiffs purchased on the same day, as follows:

(a)     Plaintiff Oleg "Alex" Trepetin and members of the Class traded contemporaneously with defendant Henley by purchasing Oracle securities at artificially inflated prices on January 4, 2001 and were damaged thereby.

(b)     Plaintiff Thomas Wright and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 22, 2001 and were damaged thereby.

(c)     Plaintiff Dzung Chu and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 23, 2001 and were damaged thereby.

(d)     Lead Plaintiff UFCW Local 56 Retail Meat Pension Fund and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 24, 2001 and were damaged thereby.

(e)     Lead Plaintiff UFCW Local 56 Retail Meat Pension Fund and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 25, 2001 and were damaged thereby.

(f)     Plaintiff Ryan Kuehmichel and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 26, 2001 and were damaged thereby.

(g)     Plaintiff Misop Lessard and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 29, 2001 and were damaged thereby.

(h)     Plaintiff Ke Wan and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 30, 2001 and were damaged thereby.

(i)     Plaintiff Oleg "Alex" Trepetin and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 31, 2001 and were damaged thereby.

102. These plaintiffs and all the other members of the Class who purchased Oracle securities contemporaneously with the sales of Oracle securities by the Individual Defendants:

(a) have suffered substantial damages in that they paid artificially inflated prices for Oracle securities as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein described; and

(b) would not have purchased Oracle securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by defendants' false and misleading statements.

103. As a result of the wrongful conduct alleged herein, these plaintiffs and other members of the Class have suffered damages.

104. By reason of the foregoing, defendants Ellison and Henley violated §20A of the 1934 Act and are liable to these plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchase of Oracle securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiffs and other members of the Class damages together with interest thereon;

C. Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

D. Awarding plaintiffs and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

1

## JURY DEMAND

2     Plaintiffs demand a trial by jury.

3    DATED:  December 9, 2002

MILBERG WEISS BERSHAD
4                                     HYNES & LERACH LLP
WILLIAM S. LERACH
5    MARK SOLOMON
DOUGLAS R. BRITTON

6

7                                                               by SAN

8                                            MARK SOLOMON

9    401 B Street, Suite 1700
San Diego, CA  92101
10   Telephone:  619/231-1058
619/231-7423 (fax)

11   MILBERG WEISS BERSHAD
12                                     HYNES & LERACH LLP
SANFORD SVETCOV
13   SHAWN A. WILLIAMS
100 Pine Street, Suite 2600
14   San Francisco, CA  94111
Telephone:  415/288-4545
15   415/288-4534 (fax)

16   Lead Counsel for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28   G:\Cases SF\Oracle3\KRH80532.cpt

PLAINTIFFS  [PROPOSED]  REVISED  SECOND  AMENDED  COMPLAINT  FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                - 69 -

# DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 100 Pine Street, 26th Floor, San Francisco, California 94111.

2.     That on December 9, 2002, declarant served the PLAINTIFFS' (PROPOSED) *REVISED* SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof via Federal Express at San Francisco, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of December, 2002, at San Francisco, California.

TAMARA J. LOVE

PLAINTIFFS [PROPOSED] REVISED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ

ORACLE III (LEAD)
Service List - 12/09/02
Page   1

COUNSEL FOR PLAINTIFF(S)

Shawn A. Williams
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
  415/288-4545
  415/288-4534 (fax)

William S. Lerach
Mark Solomon
Douglas R. Britton
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
401 B Street, Suite 1700
San Diego, CA  92101-5050
  619/231-1058
  619/231-7423 (fax)

COUNSEL FOR DEFENDANTS

Alan N. Salpeter
Javier H. Rubinstein
MAYER, BROWN, ROWE & MAW
190 South LaSalle Street
Chicago, IL  60603-3441
  312/782-0600
  312/701-7711 (fax)

Steven O. Kramer
Jamie E. Wrage
MAYER, BROWN, ROWE & MAW
350 South Grand Avenue
Suite 2500
Los Angeles, CA  90071-1503
  213/229-9500
  213/625-0248 (fax)

Donald M. Falk
MAYER, BROWN, ROWE & MAW
555 College Avenue
Palo Alto, CA  94306
  650/331-2000
  650/331-2060 (fax)

Lauren G. Segal
ORACLE CORPORATION
500 Oracle Parkway
Mail Stop 50P7
Redwood City, CA  94065
  650/506-5200
  650/506-7114 (fax)