# Exhibit 3

In Re Oracle Securities Litigat...

SHEET 1   PAGE 1

1

1                                    Pages 1 - 161
2              UNITED STATES DISTRICT COURT
3            NORTHERN DISTRICT OF CALIFORNIA
4      BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE
5  IN RE:
6  ORACLE SECURITIES LITIGATION          )  Case No. C01-0988 MJJ
7  _____           )  Tuesday
                                         )  March 1, 2005
8                                           11:00 a.m.
9              TRANSCRIPT OF PROCEEDINGS
10
11 APPEARANCES:
12 For Plaintiff:       LERACH, COUGHLIN, STOIA, GELLER,
                           Rudman & Robbins LLP
13                         100 Pine Street
                           Suite 2600
14                         San Francisco, California 94111
                        BY: MARK SOLOMON, ESQ.
15                         SHAWN A. WILLIAMS, ESQ.
                           MONIQUE WINKLER, ESQ.
16                         WILLOW RADCLIFFE, ESQ.
17
18         (APPEARANCES CONTINUED ON FOLLOWING PAGE)
19
20
21
22
23
24 Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                     Official Reporter - US District Court
25                   Computerized Transcription By Eclipse

PAGE 2

2

1 APPEARANCES:   (CONTINUED)
2
3 For Defendant:       MAYER, BROWN, ROWE & MAW
                          190 South LaSalle Street
4                         Chicago, Illinois 60603-3441
                       BY: ALAN N. SALPETER, ESQ.
5                         JAVIER H. RUBINSTEIN, ESQ.
                          LEE H. RUBIN, ESQ.
6                         ELI GREENSTEIN, ESQ.
                          SHIRISH GUPTA, ESQ.
7
8
9 Also Present:       James C. Maroulis, Esq.
                         Senior Corporate Counsel
10                        Oracle Corporation
11
12                     Andy Rudolph
                       Forensic Accountant
13                     Lerach, Coughlin, Stoia, Geller,
                          Rudman & Robbins, LLP
14
15
16
17
18
19
20
21
22
23
24
25

PAGE 3

3

1                    P R O C E E D I N G S
2 MARCH 1, 2005                              11:00 a.m.
3
4         THE CLERK:  Calling Case C01-0988, In Re Oracle
5 Securities Litigation.  Counsel --
6         THE COURT:  Do you have the sheet?  Do you have a
7 sheet with these people's names on it, the cards?
8         THE CLERK:  Yes.  I will print it out.
9         THE COURT:  All right.  Why don't you all state your
10 appearances, please?
11        MR. SOLOMON:  Mark Solomon, your Honor, appearing on
12 behalf of plaintiffs.
13        MR. WILLIAMS:  Shawn Williams on behalf of plaintiff.
14 Good morning, your Honor.
15        THE COURT:  Good morning.
16        MR. GREENSTEIN:  Good morning, your Honor.  Eli
17 Greenstein on behalf of the plaintiffs.
18        MS. WINKLER:  Monique Winkler on behalf of the
19 plaintiffs.
20        MS. RADCLIFFE:  And Willow Radcliffe on behalf of the
21 plaintiffs.
22        THE COURT:  Welcome.
23        MR. SALPETER:  Good morning, your Honor.  I'm Alan
24 Salpeter from Mayer, Brown in Chicago for Oracle.
25        THE COURT:  Welcome.

PAGE 4

4

1         MR. RUBINSTEIN:  Good morning, your Honor.  Javier
2 Rubinstein on behalf of Oracle also from Mayer, Brown.
3         THE COURT:  Welcome.
4         MR. RUBINSTEIN:  Thank you.
5         MR. MAROULIS:  Good morning, your Honor.  James
6 Maroulis from Oracle Corporation for Oracle.
7         MR. RUBIN:  And Lee Rubin also from Mayer, Brown.
8         THE COURT:  All right.
9         MR. SOLOMON:  Can we also just add we also have Andy
10 Rudolph with us, who is our in-house forensic accountant.
11        THE COURT:  Welcome.  Good.  All right.  We are here
12 pursuant to Judge Jenkins' order of February 7th referring us
13 in the matter of preparation of a discovery plan.
14        I have reviewed in detail the parties' submissions.
15 I take as my text for the preparation of the plan the outline
16 presented in your February 23rd joint letter as supplemented by
17 the Mayer, Brown letter clarifying certain aspects of their
18 position.
19        And what I want to do is I want to go through in the
20 order you have presented them the issues and come up with an
21 order that I will ask you all to draft reflecting whatever
22 agreements or rulings we come to today.
23        We don't have endless amounts of time today so we are
24 going to try to move pretty quickly, but let's start on Page 1
25 with the -- or Page 1, 2, and 3, which is the whose files

PAGE 5
```
                                                            5
1 issue.
2            I guess what I need to understand is the difference
3 between the two proposals.  I don't understand Oracle's
4 proposal.  The -- I can't say that.  Let me withdraw that.
5            I guess I don't understand the dimensions of the
6 plaintiff's proposal.  As I understand the plaintiff's
7 proposal, that the plaintiff's propose that with respect to the
8 documents that are relevant, in other words the subject matters
9 that we define later in the form that we define later, they
10 would like the five executives files to be searched, all of
11 area vice-presidents in the sales -- and I don't even know
12 whether that's a department in Oracle or not, but in sales, the
13 regional managers in the three divisions that they set forth to
14 be -- to be searched for files.  And then they may come up with
15 some others at some point that they want to be filed.
16           Is that correct as I understand it?  Is my
17 understanding correct, Mr. Solomon?
18           MR. SOLOMON:  Your Honor, that's a sort of at least
19 we need that stuff, but we also need to approach this in an
20 organizational way.
21           In other words, there are divisions within Oracle.
22 We don't have an organizational chart, unfortunately, that
23 details out in a sort of tree fashion the divisions.  We would
24 like that and, apparently, one doesn't exist and one didn't
25 exist or, apparently, if one did exist, it's not there now.
```

PAGE 6
```
                                                            6
1            And so we can't do it -- we can't approach this at
2 least at this stage in the way that ideally we would with an
3 organizational chart.
4            Having said that, we do need the files of these
5 layers of people within divisions of Oracle, including sales,
6 including service, as we have set out in our letter.
7            Ideally we wouldn't go on this main basis because we
8 think that it unduly restricts what would be available.
9            Having said that, we want it on an at least basis.
10 Why do we go beyond the second level that they resist?  We go
11 to that level because the manager level, that's where you are
12 going to find a wealth of documents --
13           THE COURT:  I don't want to get there yet.  I don't
14 want to get there yet because I don't -- I want to figure out
15 whose files you are going to search today.  So I'm not going to
16 go with some sort of generalized description of anything here.
17 It is going to be very specific because I want you to know what
18 you are going to get and I want them to know what to look for.
19           Now, it is possible that there will be other files
20 searched later on.  I'm sure depositions will be quite
21 illuminating in some ways and in that way in particular, but I
22 want to be very specific now.
23           So I guess I don't understand precisely what you are
24 asking.
25           MR. SOLOMON:  Okay --
```

PAGE 7
```
                                                            7
1            MR. RUBINSTEIN:  Your Honor?
2            THE COURT:  Yes.
3            MR. RUBINSTEIN:  We prepared a chart that would,
4 based on the letter --
5            THE COURT:  What is that?
6            MR. RUBINSTEIN:  To identify the positions of both
7 parties.
8            THE COURT:  I have got the letter.  I just don't
9 understand what it says.
10           MR. SOLOMON:  Okay.  Let me try and help, your Honor.
11 If you look at Page 3 of our letter, you will see we talk about
12 the --
13           THE COURT:  At least, the speakers group.  Okay.
14 That's the five named executives, is that right?
15           MR. SOLOMON:  Right.  Go ahead.
16           MR. WILLIAMS:  If I may, your Honor?
17           THE COURT:  Yes.  Sure.
18           MR. WILLIAMS:  The speakers group is a group that was
19 initially defined by defendants and they ultimately expanded it
20 to go beyond the, you know, Larry Ellison, Jeff Henley, Ed
21 Sanderson and a couple of other individuals.  It ultimately
22 expanded to about 40 people.
23           THE COURT:  So what you are talking about there is
24 who?
25           MR. WILLIAMS:  We are talking about a list that they
```

PAGE 8
```
                                                            8
1 provided, and a list is attached as the very last exhibit of
2 the letter.
3            THE COURT:  So you are talking about everybody that
4 they listed as the files to be searched.
5            MR. WILLIAMS:  Exactly.  Exactly.  And we had no
6 input in that.
7            THE COURT:  Fine.
8            MR. WILLIAMS:  Now, we have asked for more than that.
9            THE COURT:  Right.
10           MR. WILLIAMS:  And the basis of that is because we
11 have no organizational charts, but we do have some documents
12 that they have produced thus far.
13           Now, some of those documents which appear to be for
14 only one organization, I think it's O.S.I. -- I'm sorry,
15 O.P.I., it does indicate that on a weekly basis there were
16 e-mails with forecast packages.
17           THE COURT:  I understand.  I understand.  I'm not
18 there yet.  I'm not there yet.
19           I just want to know who the people are you are
20 talking about.  You are talking about the area -- I understand
21 now what you mean by speakers.  You mean people who they want
22 to search.
23           THE COURT:  Sure.  Plus, so this is the difference,
24 area vice-presidents and regional managers in each of the three
25 sales and consulting.
```

SHEET 2    PAGE 9

PAGE 11

9

1        MR. WILLIAMS: That's right.
2        THE COURT: How many people is that, the plus?
3        MR. RUBINSTEIN: When we add up the number -- we have
4 attempted to calculate the number of people that they have
5 within the categories listed here on Page 2 of their letter,
6 all of the various designations --
7        THE COURT: I don't want you to do that. On Page 3
8 it says, "and the area vice-presidents and regional managers in
9 O.P.I., O.S.I. and N.A.S." How many is that?
10        MR. RUBINSTEIN: I don't think we have a precise
11 number on that, but, I mean, it's going to be -- hold on one
12 second, your Honor.
13        (Brief pause.)
14        THE COURT: How many area vice-presidents are there
15 in this organization?
16        MR. RUBINSTEIN: According to what I have here 33.
17        THE COURT: 33 total?
18        MR. RUBIN: Yes, your Honor, but this is an
19 approximation.
20        THE COURT: About 33 AVP's?
21        MR. RUBIN: Right. And regional managers,
22 approximately 134.
23        THE COURT: Okay.
24        MR. RUBIN: And each of the sales, and it appears
25 they identify regional -- yes. So those are the two.

PAGE 10

10

1        And then they have -- plaintiffs have at various
2 times made mention of sales reps.
3        THE COURT: I want to just deal with what they are
4 actually asking for.
5        MR. RUBIN: 144 and 33, would be an additional 168
6 people in addition to the 53 that we have offered.
7        THE COURT: All right. And the -- okay. And now you
8 can explain to me the substance. Why do you need to get beyond
9 what they have offered?
10        MR. WILLIAMS: Well, first reason is that the list of
11 people that they offered, we have know idea who they are and
12 what information is likely to be found in their files. And
13 that's because we have no organizational chart, and I'm not
14 sure --
15        THE COURT: You don't know nothing -- you know
16 something about them. You know that --
17        MR. WILLIAMS: Titles.
18        THE COURT: Well, and they are all of the direct
19 reports to the people charged in the complaint, right?
20        MR. WILLIAMS: At least. That's --
21        THE COURT: And I guess the forecasting department,
22 is included in that list, okay.
23        MR. WILLIAMS: Well, the --
24        THE COURT: What you are saying is you don't know
25 exactly who. Okay. Fine.

11

1        MR. WILLIAMS: I can add just a little bit to that.
2 When you say or they say these are all the people in the
3 forecasting department, that's not accurate because we do know
4 that --
5        THE COURT: I didn't think it was all, but I assumed
6 it was some group.
7        Okay. But why is information from the area
8 vice-presidents important to you?
9        MR. WILLIAMS: Okay. Now, and we have just learned
10 this over the last couple weeks and I have talked to defendants
11 about this. The area vice-presidents are on the documents that
12 they have produced thus far that have communication with
13 customers. And the communications that we have with the
14 customers, at least on the surface level which we have seen
15 thus far, is whether or not -- what are the chances that this
16 customer is going to buy?
17        What are the problems, if any, that a customer or
18 potential customer is having with a product or with a potential
19 sale?
20        And those area vice-presidents, the communications
21 are coming through the regional managers. Now, that's what we
22 have gleaned thus far based on a very narrow set of documents
23 and that's what our proposal was based on.
24        THE COURT: So your view is that in order to get at
25 the customer communications which will indicate the things that

PAGE 12

12

1 you want to prove as a matter of liability, you need to search
2 AVP files because they come through the regional managers to
3 the area vice-presidents.
4        MR. WILLIAMS: That's what it appears, your Honor,
5 yes.
6        THE COURT: Let me ask you two questions about that.
7 Why do you need the regional managers then?
8        MR. WILLIAMS: Because the regional managers, again,
9 based on the same documents were in weekly meetings during
10 which each regional manager had to report -- I guess conference
11 call. I don't know if it ever ended up on paper, but in a
12 conference call what the status of certain sales were. And
13 that's on the face of the documents that we have seen thus far,
14 although the document we have seen thus far are just e-mails
15 stating things like, "Be prepared" -- these are e-mails to the
16 regional managers. "Be prepared to talk about all sales or
17 potential sales at this amount."
18        THE COURT: E-mails from who?
19        MR. WILLIAMS: E-mails from what it appears to be
20 members of maybe the area vice-presidents or their assistants
21 setting up conference calls.
22        THE COURT: I see. Okay. And what about the
23 argument that, you know, when you get down to a certain level,
24 you may find information about customers in particular
25 instances, but you won't find anything about anything that got

**13**

1 to any of the people who spoke.
2           MR. WILLIAMS: I recognize that that's an argument
3 that's going to be made, but until we are able to see those
4 documents, we don't even know what the information is that
5 could have, should have or would have been known by the people
6 that spoke in the company.
7           And you will probably remember that Mr. Ellison
8 during the entire class period represented that he knew
9 everything about every level of the company saying that he
10 choreographed the --
11           THE COURT: I understand that. I have got to tell
12 you that doesn't get very far with me. I'm sure he is a
13 hands-on manager, but the difference between being a hands-on
14 manager and knowing everything that 40,000 people are doing is
15 a long way.
16           MR. WILLIAMS: I think that's right, but we are not
17 asking for 40,000 people. I think the number that we are
18 talking about here is -- what did you say 168?
19           THE COURT: It's going to end up being a couple
20 hundred.
21           MR. WILLIAMS: A couple hundred people.
22           THE COURT: Yeah. Well, that's a couple hundred
23 people. Okay. All right. Thank you.
24           Well, let me -- I want to give Oracle on chance to
25 respond because I'm inclined to give them the area

**15**

1 that that information is insufficient, well, they can make that
2 argument. We don't think it is.
3           And, in fact, I think it's also important to point
4 out that this issue was already litigated once, admittedly not
5 in a way that would be binding on this Court, but in the
6 related shareholder derivative litigation this exact issue was
7 litigated and the California and Delaware courts agree to the
8 same speakers minus, what? In other words, the direct reports.
9           And we think that that is -- it properly balances the
10 needs of discovery, what the plaintiffs really needs to be able
11 to prove their case, and at the same time takes into account
12 the burden. There is, obviously, a significant burden shift
13 from 53 to, you know, a couple hundred or even more.
14           THE COURT: I'm not saying that. I asked you about
15 33 additional people, the AVPs.
16           MR. RUBINSTEIN: Well, again, the AVP documents --
17 for instance, it seems to us that one way to perceive this --
18 again the AVP communicates to their superior. And then if the
19 plaintiffs want to say, well, that document then gives me a
20 reason why I need to see the documents from this particular
21 AVP, I think that would be a more reasonable way to proceed.
22           It just seems to me that when you get two layers
23 down, that the marginal cost or the marginal benefit is more
24 than outweighed by the incremental burden of having to do the
25 additional searching.

**14**

1 vice-presidents in the group and have their files searched.
2 What do you think about that?
3           MR. RUBINSTEIN: Your Honor, the area
4 vice-presidents -- to the extent that the area vice-presidents
5 would have communicated to the direct reports which -- of the
6 speakers which are within, encompassed within the group that we
7 are talking about, the plaintiffs would get those documents to
8 the extent that they are otherwise responsive.
9           And the purpose of limiting, of going one level below
10 the speakers is precisely to give the plaintiffs the
11 opportunity to argue that there was information that perhaps
12 was reported to the speakers orally.
13           But there is -- it serves another threshold, being a
14 relevance screen, to screening information that was of such
15 significance that it might have been communicated to the
16 speakers.
17           THE COURT: I understand. That's my problem, is I
18 don't really know how to draw that line.
19           MR. SALPETER: Well, I think at a minimum what would
20 make sense, we are offering to produce documents. We have
21 given them the exact names of the people that are within the
22 scope that we are proposing. It's 53 individuals.
23           It seems to us that it is at a minimum reasonable for
24 the plaintiffs to review the documents that are produced within
25 that scope and then if the plaintiffs want to come back and say

**16**

1           THE COURT: All right. I understand that. Let me
2 say this. I always think these discovery disputes are put in
3 the hands of the person least qualified to resolve them when
4 they are put in the hands of a judge because I can't -- there
5 is no way that I know any one-tenth of what anyone in this room
6 knows about exactly what you are talking about, where the
7 marginal utility of the additional search is insignificant as
8 compared to the main liability issues in the case.
9           Nonetheless, I have to make some rather gross calls
10 and so I'm going to do that. It seems to me that the issue is
11 not just things that were communicated, but the underlying
12 facts on the ground that are separate and apart from -- that
13 are a separate element from exactly what the speakers knew, and
14 so I'm inclined to have some measured discovery beyond the
15 speakers group.
16           So my preliminary and first ruling will be that the
17 files to be searched are the -- did you say 53 individuals?
18           MR. RUBINSTEIN: That's correct, your Honor.
19           THE COURT: The 53 individuals that the defendants
20 have identified, plus the area vice-presidents' files in the
21 three sales and consulting divisions listed in the letter.
22 Okay.
23           MR. WILLIAMS: Can I add just one more point, your
24 Honor?
25           THE COURT: Yes.

In Re Oracle Securities Litigat.

SHEET 3    PAGE 17

17

1          MR. WILLIAMS:  Only that I think that that's a fair
2 place to begin.
3          Starting with the list that they have provided, there
4 are a number of people who are not on that list who are clearly
5 -- whose files are clearly relevant to the forecasting issues.
6          I think beginning with the 53 that they have provided
7 to the Court is -- it's not really a fair position to begin
8 because it's a group that is -- was chosen -- I don't know why
9 they chose this group.
10          THE COURT:  I know why they chose this group.  They
11 chose this group because this is a securities fraud case and
12 you have to prove the knowledge of the people who actually
13 spoke, and these are the people from whom they get their
14 information.  That's why they chose this group.
15          If you have an additional forecaster that's
16 important, tell me.  We will talk about it.  Who is it?
17          MR. WILLIAMS:  Well, his -- for instance, John
18 Nugent.  Okay.  John Nugent is --
19          THE COURT:  How do you spell Mr. Nugent's name?
20          MR. WILLIAMS:  N-U-G-E-N-T.
21          THE COURT:  Okay.
22          MR. WILLIAMS:  He's not on that list.  He was a
23 person who defendants relied on or at least was a significant
24 individual in the derivative action going directly to the
25 forecasting issue.

PAGE 18

18

1          THE COURT:  Who is he?
2          MR. WILLIAMS:  I don't know his position, your Honor,
3 but he did have --
4          THE COURT:  Well, what did he do?  Why was he
5 important?
6          MR. WILLIAMS:  I think he either worked on pipeline
7 reports or provided information regarding forecasts to either
8 Jennifer Minton, Larry Ellison or Jeff Henley.  And I think
9 defendants are in a much better position to answer that
10 question, but he's an important individual.
11          THE COURT:  Okay.  Who else?
12          MR. WILLIAMS:  Do you know what position Brett Fuller
13 is?  He's on the list that you gave us, although you say that
14 he's vice-president of IT and ERP applications.
15          So he goes directly to the products that are at issue
16 in the case and it appears that he was a direct report to -- I
17 wish I could understand --
18          THE COURT:  Right.  You will eventually.  I'm sure.
19 You know, it gets unpacked slowly, but there is no hiding it.
20          Okay.  Wait.  Fuller, Nugent.  Anyone else?  Let's
21 get the list.
22          MR. WILLIAMS:  I should say that my list of people
23 who aren't on their list goes into the product issues, and I
24 don't know if you want to address that now because I think what
25 we are talking about with O.S.I., O.P.I. and N.A.S. is really

PAGE 19

19

1 the forecasting and sales portion.  It doesn't touch
2 necessarily on the product problems that are another area of
3 the case which the list that they have provided does not
4 address at all.
5          THE COURT:  Okay.  Who have you got?
6          MR. WILLIAMS:  Well, we have got Charles Rozwat.  We
7 have got Gary Roberts.
8          THE COURT:  Wait, wait.  I'm going to write these
9 down.  Charles Rozwat.
10          MR. RUBINSTEIN:  They are on our list.
11          MR. WILLIAMS:  Rozwat is on your list?
12          MR. RUBINSTEIN:  Sure.
13          MR. WILLIAMS:  Show me where he is on the list.
14 Sergio Giacolletto.
15          THE COURT:  Spell that for me.
16          MR. WILLIAMS:  G-I-A-C-O-L-L-E-T-T-O.
17          MR. RUBINSTEIN:  Rozwatt reports to Ellison.
18          THE COURT:  Okay.  Sergio Giacolletto.
19          MR. WILLIAMS:  Giacolletto.
20          THE COURT:  Okay.
21          MR. WILLIAMS:  John Wheeler, who is a person that is
22 named in the complaint isn't on their list at all.
23          MR. RUBINSTEIN:  And Jack Wheeler wasn't included
24 because he's Europe.
25          MR. WILLIAMS:  So?

PAGE 20

20

1          MR. RUBINSTEIN:  I thought that we -- what we are
2 talking about is the three U.S. organizations.  What this
3 letter encompasses are the direct reports from the three,
4 O.P.I., O.S.I. and N.A.S.
5          MR. WILLIAMS:  My last comment to the Court was that
6 my list goes beyond those people who were involved necessarily
7 in the forecast, but also in to the product problems.
8          And, certainly, Sergio Giacolletto was a person who
9 had information about the product problems and the limitation
10 problems with the software.
11          THE COURT:  Okay.  Who else?
12          MR. WILLIAMS:  I said John Wheeler, who is a person
13 that's named in the complaint.
14          THE COURT:  Who is he?
15          MR. WILLIAMS:  John Wheeler is a senior
16 vice-president of -- I don't know the area, but he's a person
17 that's named in the complaint who is responsible for handling
18 the Bell South CRM implementation issues and he's a guy name in
19 the complaint.
20          THE COURT:  Okay.
21          MR. WILLIAMS:  I have Greg Meyers and Neil Menon,
22 both individuals named in the complaint who were participants
23 in what we allege to be the improper revenue recognition on the
24 debit memos.  These are people that are named specifically in
25 the complaint.

PAGE 21

21

1      THE COURT: Okay.
2      MR. WILLIAMS: We have got Gary Roberts. Gary
3 Roberts appears to be the senior vice-president of global IT.
4 Again, directly related to the product issues.
5      Now, again, I have to say, your Honor, a lot of what
6 we have been able to glean thus far is based on our
7 investigation and the documents that they have given us, which
8 were documents that they produced in the derivative action, and
9 in the derivative action the product integration and
10 implementation issues were not at issue.
11      Therefore, our knowledge is very limited when it
12 comes to that. Because we don't have any real organizational
13 charts, it's difficult to make a reasonable and comprehensive
14 suggestion to the Court on those issues.
15      MR. RUBIN: Your Honor --
16      THE COURT: Wait, wait. I just want to make sure
17 he's done with his list.
18      MR. WILLIAMS: Brad Scott, another person named
19 directly in the complaint, not on their list. And he was, I
20 think, director of global CRM. Forgive me if I don't have the
21 title exactly right because they didn't supply it for us.
22      Michael Quinn, not on their list and he's another
23 person who was a participant in what we allege to be the
24 improper revenue recognition related to the debit memos that
25 were created on November 17th.

PAGE 22

22

1      THE COURT: Okay.
2      MR. WILLIAMS: Michael Rocha, R-O-C-H-A, senior
3 vice-president of platform technologies, you know, another
4 person responsible or at least was in a position to know facts
5 regarding the implementation and integration of 11i at customer
6 sites.
7      Again, these are just not random people that we have
8 chosen. These are --
9      THE COURT: I didn't think they were.
10      MR. WILLIAMS: -- people whose names appear on
11 documents that are on, that show certain problems with
12 integration, implementation or on forecasting issues.
13      Ray Lane, Ray Lane and Ron Cuneo. Ray Lane, at least
14 at the time, was -- I guess they called him Ellison's number
15 two, but I don't know what his exact title was.
16      There is just -- there are a whole host of people who
17 appear to have responsive information that are not on the list.
18      So, really, if we understood how the list was created
19 and what, you know, direct reports were flowed from those, from
20 this list that they have created, it might be a little bit
21 easier.
22      THE COURT: Okay. I don't -- you know, I understand
23 you don't understand their organization. I don't understand
24 that last comment. I know exactly how this list was prepared.
25 Okay.

PAGE 23

23

1      MR. RUBIN: Your Honor?
2      THE COURT: Any problem with these additional dozen
3 files?
4      MR. RUBIN: Your Honor, perhaps with some no, but
5 perhaps with others yes just based upon on just conferring
6 after hearing the names.
7      I just want to back up for a moment. When we met a
8 week ago that Friday, the 18th I believe it was, we -- the
9 defendants said to the plaintiffs, these are our categorical
10 cuts, these speakers group. Then if there are individuals --
11 and we had already identified some -- come to us. It doesn't
12 have to be a detailed proffer. Just tell us. What is your
13 interest in these individuals? We will confer. We may not
14 agree to some of them. On some we may say, you know, this
15 person is just too far afield. This is one off e-mail and we
16 are not prepared to search entire files, but come to us and
17 identify names. All we asked for was some showing, some
18 proffer of why you would want this additional name.
19      At the time the plaintiffs oddly resisted that kind
20 of dialogue. So we have always envisioned exactly what the
21 Court said. We would have a categorical cut in which we would
22 identify groups of employees, speakers group and now the Court
23 has ruled that the Court wants area vice-presidents included.
24      But in terms of these individual names, we haven't
25 even gone through the first step and we, frankly, are just not

PAGE 24

24

1 prepared to respond on an individual basis as to each of these
2 names of who we would be prepared to agree to and who not.
3      And we just think that that process that we propose
4 of coming to us, sending us a list and here already based on
5 the discovery we have gotten are the people that we have
6 identified as additional individuals whose files we want to
7 search, come to us, give us that list. We will analyze it,
8 look at who they are, what role they play. And we will come
9 back and my strong suspicion is we would agree on some, perhaps
10 most, but we may not agree on all. Then at that point if we
11 needed a short intervention from this Court, we would, but,
12 hopefully, we wouldn't.
13      So this is not the time or the place. We have always
14 envisioned that process taking place, but it doesn't make sense
15 to put the Court in the position and, frankly, to put the
16 defendants in the position of responding now in these
17 individual requests.
18      THE COURT: Can you respond to any of the
19 individuals?
20      MR. RUBINSTEIN: Well, one, I can say Ray Lane was
21 not employed by Oracle in the third quarter of 01. So that, I
22 can respond to that right now.
23      MR. WILLIAMS: I will reply. Well, he was there in
24 the second quarter of 01 and that is clearly relevant to our
25 case.

In Re Oracle Securities Litigat

SHEET 4   PAGE 25

25

1      THE COURT: We are getting second quarter 01
2 documents, so.
3      MR. RUBINSTEIN: Your Honor, also let me respond on
4 the question of work charts. When he -- I'm sorry?
5      THE COURT: He just completely rebutted your argument
6 and you are just going to rest?
7      MR. RUBINSTEIN: He was not employed by the company
8 in the third quarter. I cannot give the precise termination
9 date.
10      THE COURT: Were you listening to what he was saying?
11      MR. RUBINSTEIN: I can't give the Court the exact --
12      THE COURT: Then your answer is "I don't know."
13      MR. RUBIN: And that's just my point, your Honor. We
14 are not saying categorically --
15      THE COURT: Okay. Well, I will tell you. I don't
16 want fights about this. I wanted this resolved today. I
17 expected you people to know your company and for this dialogue
18 to happen now if it didn't happen before. It should have
19 happened before.
20      MR. RUBIN: Frankly, your Honor --
21      THE COURT: Hey, forget it. You know, you both --
22 both sides have been unreasonable in this process, as I said.
23 The last time I thought both sides had taken an unnecessarily
24 harsh and adversarial view and I expect it to stop.
25      So I blame you both. You are never going to convince

PAGE 26

26

1 me it's all their fault because you didn't -- you said give me
2 the names and they said no. I won't believe that. I simply
3 won't believe that, and I'm sure that that's not precisely the
4 way it happened.
5      In any event, in any event, I wanted to get rid of
6 this mess now. I want to have as few disputes as possible. I
7 don't want them -- how many people are on your laundry list?
8      MR. WILLIAMS: We don't have a laundry list, your
9 Honor.
10      THE COURT: How many people are on your list?
11      MR. WILLIAMS: It's precisely about the 160 that
12 defendants represented to you, and we got that list from the
13 documents they provided to us. That's our universe of
14 knowledge on who is there.
15      THE COURT: Well, I'm not giving you all the regional
16 managers, but who is your list of people who obviously will
17 have knowledge that you need?
18      MR. WILLIAMS: Oh, this list is -- at least 13 of --
19 14 people that obviously have information.
20      THE COURT: All right. When we are done today, you
21 can all stay and talk about those 13.
22      MR. SOLOMON: Your Honor, may I just interject?
23      THE COURT: Yes.
24      MR. SOLOMON: As you can imagine, that is an ongoing
25 process, a review of production.

PAGE 27

27

1      THE COURT: Yes.
2      MR. SOLOMON: And I just want to add, this is the
3 first time today I have ever heard a suggestion that the people
4 that are relevant in this case should be limited to employees
5 during the class period. I have never heard that before.
6      THE COURT: I don't even know that that was the
7 import of his comment, but in any event it certainly won't be
8 the limitation.
9      All right. The area according to the files to be
10 searched is the 53 individuals identified by the defendants,
11 plus the area vice-presidents' files in all three sales
12 consulting divisions identified in the letter.
13      The parties are directed to -- with respect to any
14 other individual files that in addition to these may, based on
15 specific information learned by plaintiff's counsel, have
16 discoverable information to meet-and-confer on those requests
17 for file reviews.
18      And, obviously, we are going to have to have some
19 kind of a process for if, I would love to say or when, that
20 process breaks down and we will get to that at the end.
21      Okay. Second, the second area is discovery to be
22 taken from defendants under economy and the impact on sales and
23 the -- sales revenue and earnings.
24      It seems to me you have got an agreement on the
25 subject matter, okay, and now we have an order to the times to

PAGE 28

28

1 be searched, right?
2      Product functionality. This is the question of the
3 scope of the discovery on the bugs essentially with 11i or any
4 customers or problems with 11i.
5      It seems to me that just my initial reaction to this
6 is that on one level defendants are correct. This is not a
7 case about were there bugs in the software. On another level
8 if the number of problems, even if there weren't integration
9 problems, rose to some level, it would make those statements
10 which are focused on integration false in yet another respect.
11 And that is to say, the product doesn't really work in a
12 material way.
13      I mean, because embedded in those statements, and
14 some of them directly, is this is a good product. It works and
15 some of its features are that it doesn't have integration or
16 interoperability problems.
17      I think most of the discovery has to focus on those
18 last couple of issues, but some level of investigation into
19 more generally. What were the dimensions of the other sorts of
20 problems with the software I think is appropriate.
21      Given that view it has to -- it probably is at a
22 pretty high level, not on the ground. Because it's going to
23 have to rise to a very high level to directly implicate these
24 statements.
25      I don't think by learning every defect that any

29

1 customer found with the product advances the ball. So I don't
2 -- I don't think we can go quite that broadly.
3         Part of -- I guess I wanted to talk about whether or
4 not some of the problems with the dimensions of the search for
5 just general bugs in the software is solved by the fact that we
6 have limited the number of file we are going into.
7         MR. RUBINSTEIN: Your Honor --
8         THE COURT: In other words, if I asked you to produce
9 every document in the files of the people that you are
10 searching related to any bugs in the software, is that much
11 different a project than searching these files for anything
12 else? --
13         MR. RUBINSTEIN: Your Honor, I think it would
14 because, obviously, this was a massive and complex piece of
15 software and so to expand to all bugs for any purpose I think
16 would dramatically expand the discovery inquiry. I think that
17 the way --
18         THE COURT: Why is that? Wait. You go to an area
19 vice-president and you search his files. How does it change
20 that search if you are also looking for any comments in there
21 about bugs and patches?
22         MR. RUBINSTEIN: Because there may be hundreds of
23 thousands of bugs, many of which are not of any significance.
24 So what we are proposing is --
25         THE COURT: I don't want to get -- you are not

30

1 answering my question. You are definitely not answering my
2 question.
3         It seems to me, and I am ignorant on the subject,
4 that if you go and have to search through the guy's files for
5 documents, it doesn't add much to also pull out all the bug
6 files especially when you are only going down two levels.
7         I'm not asking you to go down to the customer rep
8 level who had daily interactions with the customers to get the
9 bug files. I'm not asking you for -- you know, you have
10 offered some high level bug reports, and I think that's fine,
11 but, you know, within the context of the files that I'm talking
12 about does it add very much to say, just produce the bug files?
13 Maybe it does.
14         MR. RUBINSTEIN: I think it does, but it depends on
15 who you are talking about.
16         THE COURT: They are talking about the 80-some-odd
17 people that --
18         MR. RUBINSTEIN: If you are talking about people who
19 are within the product development organization and we expand
20 to all bugs, I feel confident in saying that the scope would be
21 dramatic. It would be massive.
22         THE COURT: Okay. So included in the group that we
23 are now going to search are folks who you think that, you know,
24 they have a certain amount of information that you can search
25 for the things other than that, the bug problems.

31

1         MR. RUBINSTEIN: Yes.
2         THE COURT: But they will have a dramatic amount of
3 information different --
4         MR. RUBINSTEIN: That's correct.
5         THE COURT: -- if you expand it to all bugs.
6         MR. RUBIN: And just to refine what Mr. Rubinstein
7 said further, I think the additional category that you have
8 included today, AVPs would probably implicate that in the
9 greatest fashion.
10         THE COURT: I assumed that that's what he was talking
11 about.
12         Yes, sir?
13         MR. WILLIAMS: If I may, your Honor, and it's really
14 a question for defendants. --
15         We know that the CRM module was one of the primary
16 modules that was problematic in implementation and integration.
17         Now, I think, it appears to me that there was a CRM
18 consulting organization and their files or people from those
19 files would necessarily have even high level -- you know, if
20 you want to call them bug reports for purposes of this
21 discussion regarding the implementation at customer sites where
22 we allege that even demonstrations for sales purposes were
23 being faked.
24         Now, I don't know if the N.A.S., O.P.I. and O.S.I.
25 are going to include that organization. I don't have the

32

1 answer to that, but the CRM consulting organization would be --
2 would have a good amount of responsive and relevant documents
3 on that issue.
4         MR. RUBINSTEIN: I can respond to that.
5         THE COURT: Yes, please.
6         MR. RUBINSTEIN: Included within our group of
7 speakers are the people who had development responsibility for
8 the modules such as CRM, and so those people would have
9 responsibility in the areas that Mr. Williams just commented
10 on.
11         THE COURT: Let me ask you a different question. Is
12 there a way at getting a -- on a fairly high level the
13 plaintiffs an idea of the dimensions of the bug problems not
14 related to integration or interoperability?
15         Are there, you know, high level reports that would
16 have gone to senior management about those subjects?
17         I mean, that's my -- you know, I want them to get, in
18 the first instance, documents related to the dimensions and
19 scope of the problem so that if it's of a certain dimension and
20 scope will allow some further discovery.
21         MR. RUBINSTEIN: I think the answer is that there
22 would be, although I think that the key will be to -- and this
23 is what I need to go back and look at, is being able to
24 segregate or distinguish the bugs that had -- that were
25 significant and those -- from those that were minor.

SHEET 5   PAGE 33

33

1        But I think the answer to your question, your Honor,
2 is I believe yes.
3        THE COURT:  I don't know that it is even segregating.
4 It may just be that at some level there are high level reports
5 about the dimensions of the problem that executive
6 vice-presidents that are in charge of the areas received
7 telling them about the dimensions of the problem, you know.
8 And if those say, "This is a catastrophe.  This software
9 doesn't work.  We have got to get the development guys back
10 in," is one thing.
11        If they say, "Eh, there are minor problems," then
12 it's something else.
13        MR. RUBINSTEIN:  I also just wanted to reiterate that
14 one of the categories of documents that we are willing to
15 produce regardless of the type of bug is any bugs in which
16 there was a connection drawn by a customer saying that as a
17 result of whatever the problem was --
18        THE COURT:  With any product.
19        MR. RUBINSTEIN:  Well, with respect to 11i, that --
20        THE COURT:  It didn't say that in the letter.
21        MR. RUBINSTEIN:  That they were going to return or
22 that they wanted to defer their purchase of the software.
23        That is not restricted in terms of the type of bug,
24 but the only restriction there would be that it would have to
25 be a document that talked about a bug that was of such

PAGE 34

34

1 magnitude that a customer was saying that they were going to
2 defer the purchase or they were going to want to return the
3 product.
4        THE COURT:  Or they wanted a refund or rebate or they
5 wanted to you spend X money or had to spend X money fixing it.
6 How do you -- my question -- yeah, go ahead.
7        MR. SOLOMON:  That would be nice, but I think you
8 already indicated that isn't the case or that's not all of the
9 case.
10        I just want to remind everybody, including in
11 particular you, your Honor, of what the Ninth Circuit said.
12 And that is, "Plaintiffs allege that Oracle released the 11i
13 Suite in May 2000 without sufficient technical development and
14 the numerous defects in the program soon became apparent.
15 Around that same time the national economy began to decline.
16 Plaintiffs allege the growing customer awareness of the defects
17 in the 11i Suite and the declining economy had hurt Oracle's
18 sales by the second quarter of Oracle's fiscal year,
19 September 1 to November 30 year 2000."
20        THE COURT:  Yeah, I have got to tell you.  I take as
21 my text the Revised Second Amended Complaint, not the Ninth
22 Circuit's casual language about it.
23        It's fine, but so I also I understand that.  You made
24 your point and I'm going to give you some eye level inquiries
25 into dimensions of the problem, but the focus of the discovery

PAGE 35

35

1 in terms of problems is going to be into the integration, the
2 specific things that were represented.
3        It seems to me that at some level if it gets -- if
4 you can find information that suggests the bug problem was so
5 great that it, in effect, is an integration problem, you can't
6 work the software, you can't integrate properly, you can't
7 visit operate with other perhaps, other data bases or even with
8 other Oracle modules, then it becomes a serious problem, but we
9 are not there yet.
10        MR. WILLIAMS:  I have one additional comment very
11 quickly, your Honor.
12        It appears that internally at the company there were,
13 you know, CRM customer escalations.  And what it appears to be
14 is when a customer had a problem and as the problem grew more
15 significant and escalated through Oracle, and it appears that
16 they may have even had what's called daily work lists and
17 communications with customers in the CRM escalations process.
18 So that might be a beginning to get --
19        THE COURT:  No, that's an end.  You know, this is a
20 software company that has customers who they communicate with,
21 I'm sure -- you know, frankly, we are a federal government and
22 we are a software customer and we have bugs and our staff is in
23 daily communication with the providers, and I'm sure those
24 things get recorded and escalated all through, you know, but
25 that's not what we are going to go through here.  That actually

PAGE 36

36

1 is on the ground.  What I mean by on the ground is those.
2        What I want to get is something that shows you the
3 dimensions of the problem as it is important to the securities
4 fraud allegations and if it turns out that it is -- it is of
5 the sort that you think it is, well, then fine.  You are going
6 to get further down the chain.  There is no question about
7 that.
8        MR. WILLIAMS:  I was trying to address your Honor's
9 question.
10        THE COURT:  I got it.
11        Question for Oracle:  What is -- I guess, I mean, I
12 want to solve this problem right now at least in some measure.
13 I don't quite know what the proposal is.
14        It says:  "Documents regarding any lost or deferred
15 sales or with respect to which there was a material expense of
16 any product" -- and it said "any product."  Didn't even say
17 11i, but I assumed you went 11i -- "in the third quarter of
18 01."
19        Now, my two questions are these.  One is:  How are we
20 going to deal with the level of materiality?
21        MR. RUBINSTEIN:  With regard to expense?
22        THE COURT:  Expense.  I mean, presumably if there is
23 a loss or deferred sales, that's material in this world.  It
24 may or may not ultimately be material, but with respect to the
25 documents if it's a loss or a deferred sale in that quarter,

PAGE 37

37

1 you are going to -- get tied to a bug -- well, actually, yours
2 isn't even tied to a bug. Your proposal was any documents
3 regarding lost or deferred sales period during the third
4 quarter, is that right?
5       MR. RUBINSTEIN: As to 11i, correct.
6       THE COURT: As to 11i. And any material -- or any
7 material expenses with respect to any such product.
8       MR. RUBINSTEIN: Your Honor, with regard to the
9 question as to how should we define the level of materiality, I
10 can give the Court a -- the answer I could give which actually
11 would correspond to the company's definition as well in certain
12 reports to be $500,000.
13       Toward the end of every quarter Oracle would begin to
14 track what it termed "big deals" and it -- the dividing line
15 was $500,000, and we think that that would be an appropriate
16 dividing line as well.
17       THE COURT: And I've got to say that your letter
18 says, "Lost or deferred sales of any Oracle product including
19 11i."
20       Are you trying to -- that's what you are sticking
21 with, right?
22       MR. RUBINSTEIN: Yes.
23       THE COURT: Okay.
24       MR. WILLIAMS: Your Honor, just to --
25       THE COURT: I see the term expenditures -- no, no.

PAGE 38

38

1 That's right. Okay. Why the third quarter? Why not for the
2 entire period that whatever we decide is the relevant time
3 period?
4       MR. RUBINSTEIN: With respect to lost or deferred
5 sales?
6       THE COURT: Yes. Why not documents regarding lost or
7 deferred sales of any product during the relevant time period
8 or any material expenses with such product during the period of
9 time.
10       MR. RUBINSTEIN: Because the only -- the relevance of
11 the lost or deferred sales would be to tying it to the forecast
12 case, which the plaintiffs are asserting. And the only
13 forecast case that has been made is with respect to the third
14 quarter.
15       THE COURT: I see. So they can't show the trend
16 beginning in the three months before?
17       MR. RUBINSTEIN: Correct.
18       THE COURT: They can't. You don't -- your
19 forecasting is narrow? It just focuses on exactly what's
20 happening there?
21       MR. RUBINSTEIN: Compared to the prior year.
22       THE COURT: It has nothing to do with what happened
23 in the previous quarter?
24       MR. RUBINSTEIN: Correct.
25       THE COURT: They don't take it into account?

PAGE 39

39

1       MR. RUBINSTEIN: There is a seasonality in Oracle's
2 business --
3       THE COURT: I'm sure that there is, but there's also
4 other things than seasonality, isn't there?
5       MR. RUBINSTEIN: The forecast documents themselves,
6 the forecast reports themselves that were given to the speakers
7 would provide -- and, in fact, the forecasts themselves that
8 were given to the street, the guidance, was year on year
9 growth.
10       THE COURT: I appreciate that, but I don't think you
11 can say to me with a straight face that the sophisticated
12 forecasters at Oracle ignored the previous quarters' sales.
13       MR. RUBINSTEIN: I wouldn't say they ignored them,
14 but because of the seasonality of the business --
15       THE COURT: They are less relevant.
16       MR. RUBINSTEIN: Yeah. The sequential quarter
17 comparisons were less relevant than the year-on-year
18 comparisons.
19       THE COURT: I got it. Any other comments on this
20 area?
21       MR. WILLIAMS: There is an important area of that,
22 your Honor, because even if they were comparing the third
23 quarter of --
24       THE COURT: You have already won that issue. Don't
25 worry about it.

PAGE 40

40

1       MR. RUBIN: May I say one more thing, your Honor?
2       THE COURT: No. I'm done with this.
3       With respect to the documents concerning product
4 functionality, I'm going to adopt the defendant's version of
5 the subject matter, which was with some modifications.
6       The defendants are going to produce, as I understand
7 it, all of the versions of 11i. And by "all of the versions" I
8 mean the code, is that right, for all the versions?
9       MR. RUBINSTEIN: Through Version 3, correct.
10       THE COURT: Through Version 3.
11       MR. WILLIAMS: Through Version 3?
12       MR. RUBINSTEIN: Including.
13       THE COURT: Through and through.
14       MR. RUBINSTEIN: Yes, through and including Version
15 3.
16       THE COURT: Right. And you are also going to produce
17 high level design documents. Is that a term of art?
18       MR. RUBINSTEIN: Yes, as well as the technical
19 manuals.
20       THE COURT: And technical manuals for the 11i.
21       MR. RUBINSTEIN: Correct.
22       THE COURT: In addition, you are going to produce
23 documents regarding any lost or deferred sales of any product
24 or any material expense with respect to any product such as
25 rebates, refunds, or other expense for the period -- for the

SHEET 6   PAGE 41

**PAGE 41**

1 relevant period of time.  And we will get to the relevant
2 period of time later.
3          Revenue earnings and forecastings is agreed to,
4 right?
5          MR. RUBINSTEIN:  Generally.
6          MR. WILLIAMS:  Generally, yes.
7          THE COURT:  Agreed to as to the subject matter, the
8 issue is to be the search.
9          MR. WILLIAMS:  That was the open issue.
10          THE COURT:  Right.
11          MR. RUBINSTEIN:  Your Honor, with respect to the
12 previous ruling, with respect to the materiality threshold?
13          THE COURT:  It's $500,000.  500k materiality.  My
14 mistake.  I meant to insert that.
15          MR. SOLOMON:  Your Honor, I guess all I would say to
16 that is, you know, with what -- potentially revisit that as we
17 go along, but based on the information now I understand.
18          THE COURT:  Sure.  It takes a showing to revisit it
19 obviously, but I don't -- you know, this is a learning process
20 for me, too.
21          So revenue and earnings forecasting is an agreed to
22 subject matter, and I have made a ruling as to the search and
23 that will have whatever indications it has.
24          The accounting allegations.  I guess I don't
25 understand why the plaintiffs think they need all of these

**PAGE 42**

1 accounting documents.  The accounting allegations -- this is
2 only in one very small respect, and not an unimportant respect,
3 but in one very small respect an accounting allegation in the
4 case.
5          This isn't, you know, broad based revenue recognition
6 problems in a variety of areas.  This is, on November 17th you
7 executed 46,000 false invoices from the -- you know, to convert
8 revenue from unapplied to revenue, convert money from unapplied
9 to revenue in the amount of $228 million.
10          I don't understand why you need all of their
11 accounting documents.
12          MR. WILLIAMS:  Well, I think that we had reached an
13 agreement at least or close to an agreement -- and correct me
14 if I'm wrong, defendants -- with regard to the work papers for
15 the entire year of fiscal 2001.
16          And that's really an integration issue not with the
17 product, but with the work papers themselves and being able to
18 understand the work papers.
19          THE COURT:  Is that right?
20          MR. RUBINSTEIN:  No.
21          MR. WILLIAMS:  I thought that we had come very close
22 to an agreement on that at least.  If your position is
23 different, maybe it is. . .
24          MR. RUBINSTEIN:  We agreed to produce work papers as
25 they relate to this debit memo issue.

**PAGE 43**

1          MR. WILLIAMS:  I don't think that that's correct and
2 I don't think that the law supports that.
3          I think it's just generally being able to understand
4 the work papers for the year, you need the full set of work
5 papers.  I understood that we were close to an agreement on
6 that.
7          THE COURT:  I guess not.  So you are going to have to
8 justify yourself.
9          MR. WILLIAMS:  With regard to the integration of the
10 work papers?
11          THE COURT:  Yeah.  Well, we are not -- the work
12 papers, we haven't even gotten to the accountants yet, but I
13 was talking about the accounting allegations in general.  You
14 have asked for all their policies, documents, system documents,
15 general ledger, monthly credit memos, miscellaneous reports,
16 accounting reserves, not to mention the 2002 internal.
17          MR. WILLIAMS:  I will begin with the general ledger,
18 your Honor.
19          We need the general ledger because it's clearly -- as
20 we allege, these debit memos were created and money was taken
21 from this unapplied cash account and taken down to revenue.
22          The general ledger is, that's the beginning of
23 understanding these transactions.  And where they -- I guess
24 all the T's of the transaction; where the money -- where the
25 money came from, where it went, and the accounts in which it

**PAGE 44**

1 spread through.  Now --
2          THE COURT:  Well, if you get every piece of paper or
3 every record that is on these 46,000 debit memos or any piece
4 of paper that is related to those 46,000 debit memos, why isn't
5 that enough?
6          MR. WILLIAMS:  I didn't understand that to be the
7 position.
8          MR. RUBINSTEIN:  That is our position.  That's
9 exactly what we are offering.
10          MR. RUBIN:  There has never been a dispute about
11 that.
12          MR. WILLIAMS:  So that includes the general ledger?
13          THE COURT:  It includes pieces of the general ledger.
14 Can you imagine what Oracle's general ledger looks like?
15          MR. WILLIAMS:  I'm sure that --
16          THE COURT:  You are not going to read it.  You are
17 going to want 46,000 out of two trillion entries, something
18 like that.  I mean, it's a tiny little bit.
19          MR. SOLOMON:  Your Honor, obviously, we have to trace
20 this up to the financial statements.  If they can meaningfully
21 or usefully segregate out revenue items, A/R out items and
22 reserves, that would be meaningful and that has to include the
23 unapplied cash accounts.
24          If they can meaningfully do that, that wouldn't be
25 easy for them I don't think.

Debra L. Pas, CSR, CRR
Official Reporter - U.S. District Court
(415) 431-1477

PAGE 45

45

1          THE COURT: I'm not saying that it's easy. But it
2 may be easier -- preferable, I don't know that it's easier than
3 just loading up a truck with them. It may be preferable.
4          But what they have to do -- and I use different
5 language than the one you did, and I do it on purpose. With
6 respect to the 46,000 debit memos that are alleged in the
7 complaint, I would want them to produce every piece of paper or
8 every computer record that relates to that. And that means if
9 they -- all the changes that occurred for them, the
10 transactions that they arise from, if they go up a level or
11 down a level, they have to trace those transactions so you have
12 a complete history of those transactions.
13          That's what you are talking about, right?
14          MR. WILLIAMS: That is what I'm talking about and,
15 again, we understand that --
16          THE COURT: Okay.
17          MR. WILLIAMS: -- it touches other accounts. So the
18 debit memos, it's just not one transaction that hit -- that
19 touched the debit memo and was created. There were other
20 accounts which were implicated by the creation of the debit
21 memos and the application or the movement of that money to
22 revenues, and I would expect that we are going to --
23          THE COURT: Well, I don't know. You will see what it
24 is. You will get all the documents about it. It will touch
25 other accounts. It won't. But whatever has to do with --

PAGE 46

46

1 okay. So the other things other than that, you are going to
2 produce all documents of the so-called on account clean up, all
3 right?
4          MR. RUBINSTEIN: That is what these debit memos are.
5 It's going to be all the audit trail and which is, obviously,
6 related to these 46,000.
7          THE COURT: And, obviously, any documents regarding
8 the accounting treatment by any of the memos including all
9 policy documents on such -- on those accounting treatments.
10 You know, there may be internal systems on the kind of
11 accounting treatment they were given. There may be internal
12 policies, et cetera, et cetera.
13          Anything that touches on the accounting treatment of
14 those debit memos, is that what you are intending?
15          MR. RUBINSTEIN: Yes, yes.
16          THE COURT: Let's talk a little bit about the 2002
17 internal investigation. I guess my concern is this, and this
18 is again for you.
19          At the end of the day the motion was denied. It
20 seems to me that the reason the motion was denied was because
21 of the things that are contained in the declarations with
22 respect to that investigation which basically said, it doesn't
23 have anything to do with the 46,000 debit memos.
24          And as I understand your response, it's limited to,
25 well, it had to do with stuff during the class period.

47

1          I'm not sure why I care what happened during the
2 class period if it's not actually on the 46,000 debit memos.
3          MR. WILLIAMS: I'm not sure if you mean not actually
4 on the 46,000 debit memos, but I understand their position to
5 be that whatever happened in late 2002 had absolutely nothing
6 to do with the creation and whatever happened to those debit
7 memos, and I think that that's just wrong. And on the face of
8 the declarations that they submitted in support of their
9 opposition it shows that it's wrong.
10          If you just look at that one e-mail from Michael
11 Quinn --
12          THE COURT: Let's see it. Tell me where it is.
13 Point me to an exhibit tab.
14          MR. WILLIAMS: Exhibit number or letter C.
15          THE COURT: Okay.
16          MR. WILLIAMS: That's the declaration itself. And
17 then the document that I'm referring to now is directly behind
18 it.
19          THE COURT: Got it.
20          MR. WILLIAMS: Well, if you just begin with the
21 declaration, if you look at Paragraph 4 of the declaration, he
22 says: "In 2000 my staff participated in the conversion of" --
23          THE COURT: Paragraph 4, there are numbers?
24          MR. WILLIAMS: Yes. Paragraph 4 of the declaration
25 of Michael Quinn.

PAGE 48

48

1          THE COURT: I see.
2          MR. WILLIAMS: I don't need to read it out loud if
3 your Honor wants to just take a look at it.
4          (Brief pause.)
5          THE COURT: Okay. Yes.
6          MR. WILLIAMS: That's directly related to the 25005
7 on account. That is the -- those are the -- that's the account
8 from which we allege the unapplied cash which was applied to
9 the debit memos during our class period came from.
10          The next paragraph he explains this, I guess, other
11 project which related directly again to the same unassigned
12 cash receipts.
13          THE COURT: Yeah, and they are still doing it.
14          MR. WILLIAMS: Right, and it goes to this account,
15 12601.
16          THE COURT: Well, but he says that that
17 investigation, the 2000 and whatever this is, 2, 3, 4, 5
18 investigation has nothing to do with the debit memos, the
19 transactions that occurred on the 17th of November in 2000.
20          MR. WILLIAMS: That's right. He says that, but then
21 if you look at the e-mail that is attached to it --
22          THE COURT: Okay. Now, look at the e-mail, which is
23 an e-mail dated in 2002. Got it.
24          MR. WILLIAMS: It's right behind it. And now Michael
25 Quinn is the same person, your Honor, we allege in the

SHEET 7   PAGE 49

**49**

1 complaint directed or was a participant in the direction of
2 this on account clean up that resulted in the creation of these
3 debit memos, okay?
4          THE COURT: Which you are going to get. You are
5 going to get that bit, right? You are going to get the on
6 account clean up.
7          MR. WILLIAMS: At least for that period, and I know
8 your Honor hasn't discussed the relevant period yet.
9          But when you get down into these bullet points here,
10 he says, "We need to provide an update to the audit committee
11 to" --
12          THE COURT: You have to read slowly.
13          MR. WILLIAMS: "We need to provide an update to the
14 audit committee in regards to what revenue impact this process
15 of taking unapplied cash receipts to the reserve," which is the
16 unapplied cash from the 25005 account, "which we allege the
17 debit memos were satisfied from those funds in that unapplied
18 cash account. In addition, we need to provide what impact this
19 process has had on revenue in each of the last eight quarters,"
20 which goes right back to our class period, "including the
21 second quarter of fiscal 01 during which we allege that the
22 overstatement of revenue occurred."
23          Then he goes on to say, "Well, we need to establish
24 new policies and procedures to ensure that this never happens
25 again."

PAGE 50

**50**

1          Now, the timing of this as it was back in 02 when we
2 filed it was extremely suspicious in that we had filed our
3 complaint alleging these allegations, these accounting
4 allegations about 11 days before this particular e-mail. And
5 we have -- about 11 days before this particular e-mail.
6          And one of our confidential witnesses told us that
7 once that complaint was filed, this was the type of action that
8 was being taken to address what we had alleged and alter
9 documents that would have touched upon the facts that we
10 allege.
11          THE COURT: I know, but that's already been
12 litigated.
13          MR. WILLIAMS: It really hasn't, your Honor.
14          THE COURT: He denied it.
15          MR. WILLIAMS: Well, okay. But it hasn't been
16 litigated because I think he denied it -- If I recall correctly
17 in a footnote when he denied -- when he dismissed our complaint
18 saying that, you know, because he was dismissing the complaint,
19 that these -- discovery into these facts was no longer
20 necessary. I think he just said it was moot.
21          We never addressed it or talked about it at all. And
22 so we think that it's -- now that we are entitled to discovery,
23 it's the proper time to discuss the details of it and why
24 either the documents are there or the documents that we think
25 will help us to prove our case are no longer there.

PAGE 51

**51**

1          THE COURT: Well, I have got to tell you. Reading
2 the declarations it was not my impression that any documents
3 were altered or destroyed, and I don't want to go into that.
4          The only question is whether or not in my mind
5 information on the current investigation, that is to say --
6 obviously, there is the 2000 investigation and that you are
7 getting. That's the on account clean up and they are going to
8 produce that.
9          The question is whether or not the ongoing
10 investigation, which is reflected in Mr. Quinn's declaration,
11 which has the account number of 12601, has documents in it that
12 in any way refer or relate to the 46,000 debit memos.
13          And it does seem to me that there might be documents
14 there because he does talk about impact of revenue on the last
15 eight quarters, so that goes back into the relevant period.
16          It seems to me that if you establish new policies and
17 procedures that it never happens again, that may be relevant.
18 Why isn't that stuff relevant?
19          MR. RUBINSTEIN: The reason it is not relevant is
20 because the November 17, 2000 transaction had nothing to do
21 with the 12601. It had nothing to do with the movement of
22 unapplied cash to the bad debt reserve account. The 12601
23 investigation involved the --
24          THE COURT: You know, you say that, but look at the
25 e-mail. The e-mail says exactly the opposite of that.

PAGE 52

**52**

1          MR. RUBINSTEIN: No, no. It has nothing to do with
2 the debit memo transactions which they say were used to
3 recognize revenue. It involves two entirely distinct
4 inquiries.
5          THE COURT: I see. The on account clean-up process
6 and the debit memos were not taking unapplied cash receipts --
7          MR. RUBINSTEIN: To the bad debt reserve account.
8          THE COURT: To the bad debt reserve account.
9          MR. RUBINSTEIN: Correct. The on account clean-up
10 involved offsetting transactions entirely within 25005. It
11 never moved anywhere else. That's why the two are totally
12 unrelated.
13          Now, it turns out that the investigation regarding
14 the bad debt reserve account happened to be going on when the
15 plaintiffs amended their complaint with respect to the 25005,
16 but there is no connection whatsoever between those two events.
17          In other words, the 12601 investigation, the bad debt
18 reserve account, the investigation that looked at the practice
19 of moving unapplied cash into that bad debt reserve account had
20 nothing to do with the November 17 debit memo at all and the
21 claims in this case are tied exclusively to the recognition or
22 the alleged recognition of revenue from those debit memos.
23          And, again, the plaintiffs are going to get all the
24 documents that relate to the debit memos and audit trail, but
25 the 12601 -- and as the Quinn and there's also -- the

PAGE 53

53

1 declaration establishes that the two have nothing to do with
2 each other.
3          MR. WILLIAMS: Well, the one point there that I would
4 like to address is that it appears the 12601 account is the bad
5 debt reserve account and that --
6          MR. RUBINSTEIN: We agree.
7          THE COURT: Well, that's right, but he's saying that
8 the bad debt reserve account has nothing to do with the debit
9 memos.
10          MR. WILLIAMS: Well, but our investigation thus far,
11 and even a review of these documents show that bad debt reserve
12 -- withdrawn.
13          The monies that were applied to the debit memos came
14 from the bad debt reserve, which is where the unapplied cash
15 went to when it came in.
16          And I have to admit, your Honor, that the information
17 that we have is limited, but we do have people who have said
18 that's what it is.
19          The documents show on their face that the accounts,
20 the 25005 account and the 12601 account are, indeed, related.
21          MR. SOLOMON: In fact, your Honor, they have been
22 described as slush funds, cookie jars.
23          MR. RUBINSTEIN: Your Honor, they are going to get
24 the audit trial for all these debit memos. They will be able
25 to see for themselves.

PAGE 54

54

1          THE COURT: Right. That's right. You will find out,
2 but not by going into the 2002, 3, 4, 5 investigation directly.
3 You are going to look at every piece of paper that has to do
4 with these debit memos up and down and if it goes through the
5 accounts that you suspect it is going through, well, then, that
6 will be one thing. If it isn't, then it isn't. Isn't that the
7 answer? Why isn't that the answer?
8          I mean, if it turns out that none of this money
9 passes through the 12601 account, why isn't that the answer?
10          MR. WILLIAMS: If it gives -- if they give us
11 everything on the 25005 account, then very --
12          THE COURT: They are not going to give you everything
13 on the 2500. They are giving you 46,000 debit memos and the
14 entire audit trail of them. Why doesn't that give you what you
15 need?
16          MR. WILLIAMS: I hope it gives us what we need, but I
17 don't know what it is.
18          THE COURT: Okay. We will find out. Okay. I
19 understand. I understand. We will find out.
20          So with respect to the accounting allegations, the
21 subject matter is all of the documents regarding the on account
22 clean up in the 2000 -- in the relevant time period, all the
23 documents regarding or related to the 46,000 debit memos and
24 all documents related to the accounting treatment of those
25 memos.

PAGE 55

55

1          Okay. Insider trading, you have got an agreement on
2 the subject matter.
3          The special litigation committee. You know,
4 obviously that's an issue -- it strikes me as an issue that we
5 are not going to resolve here today if you are really going to
6 pursue it.
7          So my suggestion on that is that the issue is
8 reserved. I'm obviously not going to allow you to have
9 discovery into it over their objection at the moment. You need
10 to decide whether it's useful to bring a motion on that
11 subject.
12          The one thing I would ask is whether or not the
13 defendants intend to produce all of the underlying documents
14 that the special litigation committee reviewed from whatever
15 source. And I'm not saying you produce them as a package,
16 saying these are the SLC documents, but are all of those
17 underlying documents going to be produced?
18          MR. RUBINSTEIN: I can tell your Honor this, and I
19 hope this is responsive: That we are not -- all of the
20 documents that they have requested and that are responsive to
21 their request are being produced, including the documents that
22 were seen by the SLC.
23          And so, in other words, where I disagree -- where we
24 would object is to tying the relevance of a document to simply
25 the fact that the SLC may have asked for it whether it has

PAGE 56

56

1 anything to do with the case or not. I mean, we are not saying
2 that just because the SLC got an underlying record from Oracle
3 means they don't get it. Of course not.
4          THE COURT: Why not produce them all?
5          MR. RUBINSTEIN: I'm sorry?
6          THE COURT: Why not produce them all?
7          MR. RUBINSTEIN: I'm not saying there are any that we
8 are withholding.
9          THE COURT: I understand. I'm asking you the
10 question. Are there any you are withholding?
11          MR. RUBINSTEIN: I'm not aware of any --
12          THE COURT: How about if I say you can't withhold
13 any. What's wrong with that?
14          MR. RUBINSTEIN: Because if, for instance, there were
15 document that the SLC saw that they haven't asked for or that
16 the Court rules is beyond the scope of discovery --
17          THE COURT: Well, that's an issue, but what is it?
18          MR. RUBINSTEIN: I'm not in a position to say. I
19 don't have anything in my mind right now where I'm saying, oh,
20 there is a document --
21          THE COURT: I understand. This is too technical. We
22 need to get practical here. It's a relevance screen.
23          The Special Litigation Committee was investigating
24 the allegations of the complaint, right?
25          MR. RUBINSTEIN: Correct.

In Re Oracle Securities Litigat...

57

1          THE COURT: Okay. Good. I expect you to produce
2 every piece of paper -- every underlying document that they
3 reviewed. That's what I want you to produce.
4          You don't have to segregate them as SLC documents,
5 because that would impinge on the issues that you are concerned
6 about, but that's a fair relevance screen, what your SLC
7 thought was relevant. You know, that may be the best relevance
8 screen.
9          I want to use it as a tool for practically getting at
10 important things in the case without impinging on the issue of
11 whether or not there are protections for the work of the
12 committee.
13          MR. RUBINSTEIN: One objection, though, that we would
14 want to preserve, obviously, is the privilege and work product
15 objections that we have asserted.
16          THE COURT: Of course. That's why I used the word
17 "underlying documents." You are not waiving your privilege to
18 any work product documents. I don't want you to produce any
19 privileged or work product documents.
20          The underlying documents are not privileged and they
21 are not work product.
22          And so what I would say with respect to the Special
23 Litigation Committee is that the issue of whether or not the
24 work of the committee and the documents produced by the
25 committee or the memos to the committee regarding its work are

58

1 protected by privilege or by work product is reserved and you
2 can fight about it or not fight about it. We will see what's
3 important.
4          But to the extent that preexisting -- maybe that's
5 the way to use the term. To the extent that there were
6 preexisting Oracle documents reviewed by the committee in
7 connection with their work -- in other words, documents are not
8 generated for the committee, preexisting Oracle documents.
9          And, you know, with computer records that may mean
10 they ran a program and produced it. That's a preexisting
11 document in my view. If there are preexisting documents, why
12 don't we have all those produced and then -- you know, that
13 will get the underlying information out, you know, whether or
14 not somebody on the committee thought it was an important
15 thought to have about this problem and the dimensions of the
16 problem, you know. I don't know that that's very useful in the
17 securities case, maybe it is, but we will reserve that.
18          Is this making sense? Is that a distinction we can
19 draw?
20          MR. RUBINSTEIN: I think so, your Honor, yes.
21          MR. SOLOMON: And, your Honor, I would just add, we
22 will, I would imagine, make a motion, an appropriate motion for
23 the report in that we believe that the privilege was clearly
24 waived by the parties in the Delaware action, but that's
25 something likely to sway the defendants.

59

1          THE COURT: And, also, you may or may not find it
2 useful. Do you have a copy of it?
3          MR. SOLOMON: No. We don't have a copy of it, but we
4 believe that there was express waiver.
5          THE COURT: But it may or may not be ultimately
6 particularly useful evidence.
7          MR. SOLOMON: Given how conflicted they were, I'm
8 sure that's the case, your Honor.
9          THE COURT: So reserve on the Special Litigation
10 Committee except produce all the underlying preexisting
11 documents that were reviewed by the committee. That will not
12 constitute a waiver of any attorney-client privilege or work
13 product objections and those are preserved.
14          Okay. I guess I had two questions: The first is for
15 the plaintiff.
16          Why do you need all of the material that goes into a
17 native electronic document?
18          And, second, with respect to the defendants, why not
19 produce all of the future documents you are going to produce in
20 native form? I mean, presumably you have collected a certain
21 amount and you are producing them, but you are going to go back
22 and review files. I assume they are just not paper files.
23 They are electronic files. Why not produce those in native
24 form?
25          Okay. Those are my two questions. Okay. Let me

60

1 start with plaintiff.
2          MR. WILLIAMS: It appears that based on their
3 representations we can probably reach an agreement on those
4 issues. I think that in their letter for the first time they
5 gave a detailed position on some of that stuff.
6          And with regard to at least the e-mail, I think that
7 we can agree to accept e-mail in TIF format so long as the
8 necessary metadata is included in there. I know they listed
9 several items of metadata that would be included in there, but
10 we would want to make sure we added to that list the and time
11 that an e-mail was opened, whether or not it was -- date and
12 time that it was deleted, and forwarded. I think they may have
13 had the forwarding information in there.
14          THE COURT: Okay. E-mails. How are we doing on
15 e-mails?
16          MR. RUBIN: That's correct, your Honor. We have
17 agreed on a going forward basis for documents that we are going
18 to be producing pursuant to the search that the Court has
19 outlined today; that we will agree to produce those in
20 searchable format.
21          In terms of metadata, the only -- the only unresolved
22 issue that I believe can be worked out is that we have said for
23 that -- for what we understand to be the common realm of
24 metadata we are, obviously, not going to strip it of things
25 that are usually in.