PAGE 61

61

1    The only question is we had understood there were
2 some additional item of metadata that we, based upon our
3 electronic discovery experience, didn't regard as within that
4 common universe. And if they wanted that data, we would have
5 to talk to our vendors and experts about how -- whether there's
6 additional costs that would attend that and, frankly, in the
7 first instance why they need it.
8    And so I think we have an agreement in principle
9 essentially that would produce electronic documents in
10 searchable format. We are not going to strip it of anything
11 that typically accompanies it in terms of the information that
12 Mr. Williams described.
13    So the only issue that I had understood come out of
14 our meeting on the 18th was whether additional types of
15 metadata above and beyond the sort of typical categories that
16 are imported when you do a TIF file that they would want. And
17 we would want to know, number one, why they wanted it and if
18 they wanted it, we would probably ask them to pay for it.
19    THE COURT: Let's get precise here. You are going to
20 produce all e-mails that are within the scope of the search.
21    MR. RUBINSTEIN: Correct.
22    THE COURT: And you are going to have -- you are
23 going to have it in searchable electronic format. And it's
24 going to include sender, recipient, blind and carbon copies,
25 date the e-mail was sent, e-mail box from whom the document was

PAGE 62

62

1 produced, information about whether it was forwarded or
2 responded to.
3    In addition, are you going to have the date and time
4 the e-mail was opened, deleted or forwarded?
5    MR. RUBIN: Your Honor, my understanding is that that
6 would be within the common realm of metadata.
7    And so the only -- the only point I would make today
8 is that only if we were told that takes some additional
9 substantial cost to include that I would say we would want to
10 talk to the plaintiffs about it, but I believe that information
11 typically would be included.
12    THE COURT: Okay.
13    MR. WILLIAMS: With regard to the e-mails, your
14 Honor. The only other issue there is the attachments.
15    Many times, almost all times, if you produce
16 documents or e-mails in TIF format, when they have attachments
17 to them you aren't able to click on them and open them. And
18 that's part of the reason why we wanted this -- some of these
19 in native format.
20    I'm not sure how we resolve that today, but, for
21 instance --
22    THE COURT: Well, they have got to be able to open
23 the attachment.
24    MR. RUBIN: Just as with a paper file, my experience
25 with discovery is if there is an e-mail that's relevant and has

PAGE 63

63

1 an attachment, then the attachment is also produced. And so we
2 would also produce the --
3    THE COURT: Good. You have to produce the
4 attachment --
5    MR. WILLIAMS: The thing is --
6    THE COURT: -- in electronic format attached to the
7 e-mail.
8    MR. WILLIAMS: Right behind the e-mail.
9    THE COURT: Right.
10    MR. RUBIN: I know that we can accomplish that.
11    THE COURT: Good.
12    MR. WILLIAMS: With regard to some of the
13 spreadsheets in native format, I think we had come close to
14 reaching an agreement on that.
15    And correct me if I'm wrong, but one reason is that
16 those spreadsheets have formulas embedded in them that if you
17 produce them in TIF format or hard copy, you just can't see
18 them or understand them.
19    And I think their agreement was they would do that so
20 long as we agreed on some way to lock the information so that
21 there would be no chance of alteration, right?
22    MR. RUBIN: That's correct. This is the one category
23 that we said as to documents we had already gathered and
24 produced in paper format, there were some concerns about the
25 readability of the paper. And we said we would go back and do

PAGE 64

64

1 what we could to get the Excel spreadsheets in searchable
2 format with the agreement that they can't be altered.
3    THE COURT: Yes, yes. Of course. So you are going
4 to produce spreadsheets in electronic format and the parties
5 are going to agree on a method for locking and protecting to
6 prevent alteration.
7    MR. WILLIAMS: Just with regard to the documents that
8 have already been produced, we talked about this with
9 defendants. Lots of them are illegible. Lots of them.
10    I wouldn't say nearly all, but a vast -- a high
11 percentage of the spreadsheets not only are they not in native
12 format, but they are illegible.
13    I don't know if it makes sense for us to -- I think
14 they should produce them in electronic forms if they have them
15 because I don't know if it makes sense for us to go through
16 everybody single document. Give them every single Bates number
17 and then to let them produce it again. Then we have to go
18 through every single one of those documents again.
19    They have those in electronic format--
20    THE COURT: I don't understand that it's limited to
21 the future. They are going to produce any spreadsheets in
22 electronic format, right?
23    MR. RUBIN: Spreadsheets, exactly.
24    THE COURT: Past the ones you have already got paper
25 copies of. The ones you haven't got paper copies of yet, those

SHEET 9   PAGE 65

**65**

1 will be produced in electronic format, the spreadsheets.
2          MR. RUBIN: Right.
3          MR. WILLIAMS: And just -- go ahead, I'm sorry. If
4 there are spreadsheets attached to an e-mail, hopefully, you
5 will attach the e-mail so we don't have to figure out which
6 spreadsheet this pertains to.
7          THE COURT: Attachments go with the e-mail. Okay.
8          E-mails, spreadsheets, obviously they are producing a
9 fair amount of paper. Is that it?
10         MR. WILLIAMS: I'm sorry, your Honor. I apologize.
11         THE COURT: The balance of them, the e-mail and
12 spreadsheets is going to be produced in paper? Or are we still
13 in this area of disagreement?
14         MR. WILLIAMS: The balance being on paper?
15         THE COURT: There are spreadsheets, right? Okay.
16 Those are electronic. There are e-mails. Those are also
17 electronic.
18         What about -- are there any other documents being
19 produced other than e-mails and spreadsheets I suspect?
20         MR. WILLIAMS: Well, Word documents, for example.
21 You know, memoranda in Word document. We would want that in
22 native format because we can see when it was last modified and
23 last changed.
24         Again, that's -- that's held in native format, so I
25 don't know what kind of burden would be associated with that.

PAGE 66

**66**

1          MR. RUBIN: To the extent that there have been Word
2 documents and e-mails have already been collected and produced
3 in paper format, our position is they have them and that's
4 where we should stand unless they have an individual question
5 of illegibility and we will talk to them about that.
6          In terms of a going-forward basis as to Word
7 documents, if there are Word documents when we search files, we
8 would take the same position. We will produce it
9 electronically.
10         THE COURT: Why not produce any documents you find in
11 the search from now until the end of the case in native format.
12         MR. RUBIN: That's our position.
13         THE COURT: Okay.
14         MR. RUBIN: From here on out. The only --
15         THE COURT: Got it. Got it. I got it.
16         MR. RUBIN: But for e-mails and Word documents
17 already produced in paper other than the spreadsheets, we are
18 keeping in paper.
19         THE COURT: When you say "already produced," have you
20 produced all the documents that you have searched? I mean,
21 have you produced all the documents that are the subject of
22 that limitation?
23         MR. RUBIN: We produced 50,000 pages of documents.
24 Those were documents that were produced to the plaintiffs in
25 the derivative action, plus documents that were used in summary

PAGE 67

**67**

1 judgment or that were otherwise responsive to our Rule 26
2 disclosure.
3          And then in addition, your Honor, based upon the
4 prior ruling of the Court concerning all documents produced to
5 SLC.
6          Simpson Thacher gathered all documents in hard copy.
7 So our position is as to all of that --
8          THE COURT: That's been produced.
9          MR. RUBIN: To comply with Court order, we will
10 produce the additional underlying documents that were gathered
11 by the SLC and we will produce those in paper because they were
12 already gathered in paper and the cost would be enormous to go
13 back and try to produce those electronically.
14         However, responding to their document requests on a
15 going-forward basis, when we do the searches of the 80, 90
16 files and if there are any individual requests, those we will
17 produce electronically.
18         THE COURT: So to spit that back to make sure I
19 understand that. If you produce anything in the future, it's
20 all going to be in native format or these other formats for
21 spreadsheets or e-mails that we have talked about, except for
22 the documents that Simpson Thacher gathered that were viewed by
23 the Special Litigation Committee, which will be produced in
24 paper.
25         MR. RUBIN: Right, plus the 50,000 documents --

PAGE 68

**68**

1          THE COURT: Plus the ones that have already been
2 produced.
3          MR. RUBIN: We are not going to reproduce those
4 electronically, other than spreadsheets.
5          MR. SOLOMON: E-mails?
6          MR. WILLIAMS: With the e-mails attached to the
7 spreadsheets.
8          MR. SOLOMON: Why not? Why not e-mails?
9          MR. RUBIN: Let me put it this way. If their was an
10 e-mail that wasn't attached in our hard copy production, we
11 would certainly -- if there is an one off e-mail, we can
12 through that into the electronic mix.
13         But as a general matter we are not going back -- our
14 position is we shouldn't have to go back to the 50,000 pages we
15 produced and produce every e-mail electronically.
16         THE COURT: Well, you are not going to go back and
17 produce past e-mails electronically even in the TIF format?
18 You are going to in the TIF format?
19         MR. RUBIN: Let me give you an example.
20         THE COURT: I have got an e-mail that you have
21 already produced to them. You are going to go back and give
22 them an electronic copy of that?
23         MR. RUBIN: No. That's what we don't think we should
24 be required to do because in those cases it would be an
25 enormous burden.

PAGE 69

```
69
 1         The search has already been done.  We have already
 2 extracted the document.  The SLC in the derivative litigation
 3 the decision was made to only deal with paper.  So the document
 4 has been copied, and only a paper copy has been provided.
 5         So what we would have to do --
 6         THE COURT:  You don't have an audit trail for your
 7 document productions?  You don't know where the electronic file
 8 is?
 9         MR. RUBIN:  Well, the electronic files are there, but
10 what it would require us to do is to go back into those
11 electronic files and then pinpoint the documents that have
12 already been produced.
13         The search of it would be a substantial undertaking
14 and, frankly, it would not, in our view, materially advance the
15 ball given where we are.
16         We have just taken a practical view that, they say
17 they want searchable documents.  Now that we are sort of at the
18 starting gate in terms of new documents, we said, sure, we will
19 produce those in searchable format.
20         But we believe it's an unfair burden, your Honor,
21 given that -- you know, the decision was made by derivative
22 plaintiffs and the --
23         THE COURT:  What do I care about that?
24         MR. RUBIN:  No, no.  I'm saying in terms of our
25 burden, because I just --
```

PAGE 70

```
70
 1         THE COURT:  Just because you made a mistake --
 2 putting it from the way they will say it.  Just because you
 3 made a mistake and the derivative plaintiffs made a mistake in
 4 figuring out how to prosecute an action, does that mean they
 5 should --
 6         MR. RUBIN:  No, I'm just asking the Court to weigh
 7 the burdens, that's all.  We have 50,000 documents already
 8 produced, probably another 20,000 or 30,000.  So there may be
 9 80,000 documents that come from the derivative case that the
10 Court has now ordered all those to be produced.  That's how I
11 understand the Court's ruling.
12         THE COURT:  Essentially.
13         MR. RUBIN:  What we would have to do then is take
14 that entire, all those 80,000 documents.
15         THE COURT:  I understand.  But you are going to
16 search 90 people's files, electronic files, and you are going
17 to produce many hundreds of thousands, probably millions of
18 pieces of paper, don't you think?
19         MR. RUBIN:  Some of it may well overlap with the hard
20 copies.
21         THE COURT:  And you are trying to argue with me that
22 searching for the 50,000 pages -- it's not 50,000 pages.  It's
23 the e-mails and spreads sheets.
24         Searching for the e-mails and spreadsheets in the
25 50,000 pages is such an enormous burden?
```

PAGE 71

```
71
 1         MR. RUBIN:  Well, it's also all the forecast reports,
 2 the --
 3         THE COURT:  It's 50,000 pages?
 4         MR. RUBIN:  In other words, it would be a different
 5 process than searching.
 6         THE COURT:  Of course, it's a different process than
 7 searching, but it seems to me it's dwarfed by what you are
 8 going to undertake to comply with this order anyway.  If it
 9 adds ten percent, I don't think it's a big deal.
10         MR. RUBIN:  Well, it's a big deal -- all I'm saying
11 is it's a big deal in terms of it -- in terms of it being time
12 consuming.  I actually also think the documents may be more
13 than what the Court may believe.
14         But certainly in terms of time, if you have to go
15 back and identify each individual document that we produced by
16 paper and try to find that document to be sure we cover the
17 landscape, that's a very time-consuming process.
18         When we search in the future, what we are going to
19 do, as the Court, I'm sure, is aware is are going to come up
20 with some search terms, interoperability integration, forecast,
21 sales, loss --
22         THE COURT:  Sure, I know.
23         MR. RUBIN:  And that is a process that fortunately in
24 the world of electronics we can get a read.  We can get a list
25 and then we pick from that what is responsive.
```

PAGE 72

```
72
 1         The prior process would require matching up each
 2 paper document that's already been provided and trying to go
 3 become into the electronic files and pinpoint it and find it.
 4 I think the cost may be more than what the Court is conceiving.
 5         MR. WILLIAMS:  Very quickly, your Honor --
 6         THE COURT:  No.  Nothing more on that.
 7         Here is what you are going to produce.  You are going
 8 to produce, on a going-forward basis all documents will be
 9 produced in native format that you uncover.
10         And the only exception to that is with respect to the
11 documents reviewed by the Special Litigation Committee, those
12 are going to be produced in paper.
13         Okay.  Now, with respect to those documents reviewed
14 by the Special Litigation Committee and with respect to the
15 paper that's already been produced, you are going to go back
16 through them and you are going to produce e-mails in an
17 appropriate electronic searchable format that we have been
18 discussing.
19         And you are going to produce the spreadsheets also in
20 electronic format that we have been discussing.  Obviously, the
21 parties are going to need to meet-and-confer and agree upon a
22 method for locking those spreadsheets so that they can't be
23 altered, the electronic versions of those.
24         MR. RUBIN:  Your Honor, in light of the costs that
25 could attend the retrieval of electronic e-mail searches, we
```

SHEET 10  PAGE 73

**Page 73**

1 would ask that the Court consider some sharing of costs on
2 that, at least on that portion. Because the electronic
3 retrieval for going forward we are not asking for any, we are
4 not asking for any cost sharing --
5      THE COURT: How many e-mails are there?
6      MR. RUBIN: I think the fair number of the documents
7 are e-mails.
8      THE COURT: What's a fair number?
9      MR. RUBIN: I'm turning to my colleague. 25 to
10 30,000.
11     THE COURT: Pages of e-mails?
12     MR. RUBIN: That was a fair -- that was a substantial
13 bulk of the production between the reports --
14     THE COURT: No, no, no. It's a fair point.
15     MR. SOLOMON: Your Honor, my position would be really
16 to reiterate what you said. I don't think that we should be
17 penalized or punished --
18     THE COURT: All right. I was being devil's advocate.
19 I want you to actually argue the point though.
20     Why isn't it fair policy that there be some -- they
21 are not asking you to share the cost of the searching for any
22 documents going forward, which is going to be the vast bulk of
23 those documents.
24     They are just saying with respect to the ones that
25 they have already produced in paper format, if you want another

**PAGE 74**

1 copy why not split the cost.
2      MR. SOLOMON: Your Honor, the minute this suit was
3 filed, they were on ample notice that this sort of information
4 ought to be preserved and that it would be required to be
5 produced. The PSLRA itself requires for the preservation of
6 electronic as well as other evidence.
7      THE COURT: It is preserved. The searching for it.
8      MR. SOLOMON: And, undoubtedly, if it is their
9 position that going forward they ought to be producing that
10 sort of information at no cost to plaintiffs, I don't
11 understand logically how it can be that we are not entitled to
12 that -- to the electronic evidence that has not been produced
13 but ought to have been produced.
14     THE COURT: The PSLRA did not eliminate the Federal
15 Rules of Civil Procedure.
16     MR. SOLOMON: Your Honor, the document request did
17 request the electronic information. It was their decision,
18 independent decision not to produce it in the first place.
19     We are being asked to now go back and share the costs
20 of repairing, that I think is unfair.
21     THE COURT: Well, no, no, no, no. That's not right.
22 That's not right, is it?
23     MR. RUBIN: No.
24     THE COURT: Isn't it the case -- it may be very well
25 that they decided to produce it in paper format. They decided

**PAGE 75**

1 to produce in paper format because it was less expensive
2 because they already collected it, all right? That's
3 presumably why they did it. I guess I'm not hearing anything
4 differently for that per you, right?
5      MR. SOLOMON: They elected to do it, correct, your
6 Honor. It's not the way we asked for it.
7      THE COURT: Before you asked for it, it had already
8 been collected in paper format.
9      MR. SOLOMON: Correct.
10     THE COURT: So once you asked for it, you got it in
11 paper format.
12     MR. SOLOMON: Once we asked for it in both electronic
13 and paper formats --
14     THE COURT: They gave it to you in paper format.
15     MR. SOLOMON: That's correct.
16     THE COURT: They are saying we don't want to also
17 give it to you in electronic format because it's too expensive
18 unless you want to share the costs.
19     MR. SOLOMON: That's right. That's exactly what they
20 are saying and we disagree. We think that it's unfair and it's
21 inappropriate. If it's not called for in future requests, we
22 don't see why should it be for documents already produced.
23     I actually want to -- your Honor, do you mind if I
24 make one other point --
25     THE COURT: I mind a great deal. I want to finish

**PAGE 76**

1 ruling on this piece and then you can say something.
2      I'm not sure on the cost sharing. I'm not sure. It
3 sort of depends on what you are talking about. So I would
4 undertake letter briefing, okay, and you can make a proposal if
5 you want. Defendants can make a proposal on that and you can
6 respond by letter and then I will decide it, okay? So you can
7 also put that in the order in terms of cost sharing.
8      MR. SOLOMON: If I may, your Honor? If I could go
9 back --
10     THE COURT: One second. Let me write it down so I
11 don't lose my place here.
12     (Brief pause.)
13     Okay. Go ahead.
14     MR. SOLOMON: Thank you, your Honor. I just want to
15 be absolutely clear that with respect to the electronic
16 production that is going to be forthcoming in any event, that
17 that is understood to include the electronic documentation
18 concerning our accounting allegations.
19     In other words, the debit, the 46,000. I want to be
20 absolutely sure that that is included.
21     MR. RUBIN: I guess I'm not understanding the
22 question. In terms of a going-forward production?
23     MR. SOLOMON: Yes.
24     THE COURT: Yes, yes, yes. Okay.
25     MR. SOLOMON: Okay. Thank you.

PAGE 77

1    THE COURT: All right. Is anybody hungry? How about
2 we take a quick break just so our blood sugar doesn't get too
3 low. We are making reasonably good progress.
4    You have got by my count only a couple of more
5 difficult issues to go through. There are lots of -- there are
6 a dozen or so more issues, but only a few that are complicated.
7    But what I would like to do is take a half hour, get
8 a quick bite. Come back here at 1:15. How does that sound?
9    (Whereupon at 12:45 p.m. proceedings
10    were adjourned for noon recess.)
11    THE CLERK: We are back on the record in Case
12 C01-0988, In Re Oracle Securities Litigation.
13    THE COURT: Okay. We were at timing of document
14 production.
15    I guess I don't understand there to be much of a
16 dispute on this. The date for production of plaintiff's
17 documents and defendant's -- plaintiff's non-class
18 certification documents and defendant's documents of March 21,
19 05.
20    MR. RUBINSTEIN: The only issue there is the
21 documents we have, obviously, gathered. And I think we could
22 add to that the documents that we referred to concerning the
23 SLC, that we can get by March 21st.
24    The issue is that, obviously, with respect to new
25 documents that we have talked about here today, obviously, it's

PAGE 78

1 hard for us to give a precise time as far as production, but we
2 will do that on a rolling basis.
3    THE COURT: I won't do that. I need a date.
4    MR. RUBINSTEIN: For completion of all document
5 production?
6    THE COURT: Well, for completion of the documents
7 that are being allowed to be produced under this discovery
8 plan, yes.
9    MR. RUBINSTEIN: Judge, could we get rolling
10 production and all to be completed by May 1?
11    THE COURT: Where are we at? March 1? So that's 60
12 days?
13    MR. RUBINSTEIN: Yes.
14    THE COURT: Any problem with that?
15    MR. WILLIAMS: If that's as fast as they can do it, I
16 don't know if there is much of a problem.
17    MR. RUBINSTEIN: We are not saying we are going to
18 wait until May 1. Obviously, it's going to be rolling.
19    THE COURT: Okay.
20    MR. WILLIAMS: The only issue, that will probably
21 affect deposition schedules and things going --
22    THE COURT: Okay. But we got a little time
23 presumably and we will get to the implications of that when we
24 get to the deposition time limits.
25    Production by defendants to be concluded with respect

PAGE 79

1 to the documents within the scope of this order by May 1.
2 That's fine. Plaintiffs by -- well, you have got a smaller
3 issue, and, also, you have the class cert, but you can conclude
4 yours by March 21.
5    MR. WILLIAMS: I think we can, your Honor.
6    THE COURT: Okay. Expert discovery. Why don't we
7 set a date for certain -- I mean, you have a trial date, right?
8 Do you have a trial date?
9    MR. RUBINSTEIN: I believe we do. Isn't it September
10 11th.
11    MR. WILLIAMS: I don't think he gave us a specific
12 trial date, did he? I think he said --
13    MR. RUBINSTEIN: I thought it was September 11, 06.
14    THE COURT: He set it on 9/11?
15    MR. RUBINSTEIN: I think he did. Okay.
16    THE COURT: Well, you know, that's -- I guess it --
17 my preference has always been to get everything lined up, but
18 is there any reason not to set expert discovery deadlines?
19    MR. WILLIAMS: No reason not to, your Honor. And it
20 wasn't a real contentious issue between us. I think we can
21 probably agree on expert --
22    THE COURT: Those dates that they have suggested,
23 they are all 2006 dates obviously.
24    March for opening reports. Rebuttal reports on
25 April 3rd. And then a month and a half to complete the

PAGE 80

1 discovery.
2    Do those seem rational for now?
3    MS. RADCLIFFE: Only with the opening reports due
4 about a week after the close of discovery based on their
5 schedule being a little tight.
6    THE COURT: Well, that just means you have to conduct
7 your discovery earlier.
8    Okay. Experts. We will adopt the schedule in the
9 letter.
10    Production source log. I don't understand why this
11 is --
12    MR. WILLIAMS: It looks like we may have agreed.
13    THE COURT: Oh, great. Do you agree?
14    MR. RUBIN: That's our position on a going-forward
15 basis. We are prepared to identify sources.
16    THE COURT: So you haven't agreed. It's the past.
17    MR. WILLIAMS: It's the past.
18    THE COURT: Okay. You have to produce a production
19 source log for all documents.
20    Privileged log, it sounds like there's an agreement
21 more or less. 30 versus 45, right?
22    MR. WILLIAMS: 45 is fine. Privilege. 45 days after
23 the production where the documents are withheld.
24    Authentication, I'm not even going to address, but I
25 assume by the time it matters everybody is not going to want to

SHEET 11   PAGE 81

**81**

1  spend a lot of time in trial having Judge Jenkins yell at them
2  for not having stipulated to authentication.
3              Depositions.  Okay, you have your lists and I propose
4  that the lists of the authorized depositions be the ones you
5  want right now.  Everything that everybody has asked for, they
6  are within the numbers that he asked for?  Why not?
7              MR. RUBINSTEIN:  Judge, the only concern we had is
8  that maybe we miscounted, but I believe that the number that
9  the plaintiffs have exceeds the number that Judge Jenkins
10 permitted.
11             THE COURT:  Oh, does it?
12             MR. RUBINSTEIN:  Correct me if I'm wrong.
13             MR. WILLIAMS:  I haven't counted them, your Honor,
14 but if it exceeds that number, we obviously we can't go above
15 the number that Judge Jenkins has already given us and if we
16 have to go back to him then, or to you, then we can do that at
17 that time.
18             MR. RUBINSTEIN:  In addition, the plaintiff's
19 position does say that this is a non-exclusive list.  So it
20 seems to us that they get 65, and they will tell us who their
21 65 are.
22             THE COURT:  Take your 65.  We will put them in the
23 order.  Okay?  And, obviously, if you need more, that issue
24 will get addressed.
25             MR. WILLIAMS:  Okay.

PAGE 82

**82**

1              THE COURT:  So everybody put their 65 witnesses in
2  the order.
3              MR. RUBIN:  Your Honor, I just wanted to go back on
4  the production source log for a moment.
5              THE COURT:  Yes, sir.
6              MR. RUBIN:  I assume that the Court intends to order
7  that to be reciprocal.
8              THE COURT:  Absolutely.
9              MR. WILLIAMS:  With the deponents, your Honor, one of
10 the things that -- a lot of these deponents, we just want to be
11 able to get documents from their files at Oracle prior to us
12 having to take their deposition.
13             So, for instance, if there is an individual that's
14 not on the list, the initial list we agree on, we want to take
15 the deposition of this person, they are a former employee, we
16 want to be able to ask Oracle for the responsive documents from
17 that person's files.
18             THE COURT:  Let's talk about that because it comes in
19 to with the timing.
20             Under timing, you have got 30(b)(6) depositions, and
21 I didn't actually see an issue in that.
22             Everybody agrees that there is going to be
23 depositions regarding preservation, accounting, forecasting and
24 Suite 11i.  I don't know what you mean by electronic systems,
25 but from the clarifying letter it sounded like there wasn't a

PAGE 83

**83**

1  disagreement on the subject matter on the 30(b)(6) depositions
2  or when they were going to be taken.
3              MR. WILLIAMS:  We have actually been working well
4  together on that.  The problematic issues were related to scope
5  which, hopefully, we will resolve today.
6              THE COURT:  Okay.  So the 30(b)6 motion -- the 30(b)6
7  depositions timing is not an issue, is that right?  Everybody
8  agree with that?
9              MR. WILLIAMS:  I think we were able to work on
10 timing, your Honor.
11             THE COURT:  Okay.
12             MR. WILLIAMS:  Mr. Rubin just raised an issue, I
13 guess to me, and maybe we should raise it to the Court.
14             With regard to the accounting on 30(b)6, I guess it's
15 his impression now that that's been resolved.  I don't think
16 so.
17             I think even though the Court has ordered them to
18 produce a certain amount of accounting documents, we certainly
19 are able to have a 30(b)6 witness to discuss the accounting
20 procedures and policies within the realm that the Court has
21 ordered.
22             THE COURT:  Okay.  Well, let's talk about timing
23 first.  30(b)6 depositions are going to be concluded by
24 March 30th, all right?
25             The scope of the 30(b)6 depositions now --

PAGE 84

**84**

1              MR. RUBIN:  Your Honor?
2              THE COURT:  Yes, sir.
3              MR. RUBIN:  Let me go back in a moment of sober
4  reality.  March 30th we think might be a little optimistic or
5  aggressive.  So we would propose April 15, a couple of
6  additional weeks just to be sure that we get in all the Rule
7  30(b)6 witnesses with scheduling.
8              We don't actually know all of them, who the witnesses
9  are going to be.  We have identified most of them, but not all.
10             MR. WILLIAMS:  We are not going to object, your
11 Honor.
12             THE COURT:  Great.  April 15th.  Admirable
13 cooperation going on here.
14             The scope -- I figured I beat a dead horse so many
15 times, every time I can say the opposite, I always say it.
16             30(b)(6).  Scope.  Okay.  Accounting is one of them,
17 preservation -- what's preservation, is that electronic
18 systems?
19             MR. WILLIAMS:  Yeah, that's part of that, your Honor.
20 And I think we made some headway there.
21             What the agreement initially was, they were going to
22 produce documents relating to the manner in which -- the manner
23 in which Oracle preserved the documents and then we would do a
24 30(b)6 off of that, off of that production if there was
25 anything we didn't understand about the preservation of

1 documents.
2          And correct me if that's not your understanding.
3          MR. RUBIN: We had indicated to plaintiffs that we
4 thought that our document protection policies and other written
5 material would provide the information they were looking for.
6 But if they choose, we are certainly prepared to offer an
7 organizational representative if they want to inquire --
8          THE COURT: On document preservation, that's fine.
9          On the accounting issues. Is there an issue on the
10 accounting issues?
11         MR. RUBIN: I just was making the point to
12 Mr. Williams in a side bar moment that the scope that the Court
13 has already ruled upon related to the accounting will control
14 the 30(b)6 depositions.
15         THE COURT: Of course. Of course. The subject
16 matter is for discovery, right not just for documents. That's
17 right.
18         Okay. And then there is forecasting. No issue on
19 that, right? There will be a 30(b)6 on forecasting. I mean, I
20 guess that's a reasonably broad subject, but it will be how you
21 do your forecasting and how you came up with the numbers that
22 are the forecasts in this case.
23         Is there any issue on forecasting?
24         MR. WILLIAMS: I don't think we ever had an issue on
25 that.

1          THE COURT: Okay. Now, 11i. 11i interoperability.
2          MR. WILLIAMS: And if I may interrupt, your Honor?
3          THE COURT: Please.
4          MR. WILLIAMS: I think that the interoperability
5 there is -- you know, it's accurate, but probably too narrow.
6          THE COURT: I thought you might say that.
7          MR. WILLIAMS: If I may, your Honor. I don't want to
8 kind of go down a road that we have already been around, but as
9 we were talking over the lunch hour or lunch 20 minutes, we
10 were kind of talking about what your order was earlier on that
11 issue, and I don't know if anyone recalled it specifically
12 enough to have a definitive conclusion.
13         But I understood your Honor to have a long discussion
14 about the integration and interoperability and how even if
15 there are bugs that don't necessarily relate directly to
16 integration and interoperability, that those bugs at some point
17 do -- do rise to a level that the product does not work.
18         And, indeed, we have statements, false statements in
19 the complaint where, I think it was either Sandy Sanderson or
20 George Roberts who said that both the supply chain management,
21 SCM, and the CRM are working, and I think your Honor picked
22 occupy that as well.
23         But as you went further down into your, quote,
24 unquote, order on the subject, your order sounded much narrower
25 than your earlier commentary on it and I don't want the parties

1 later to fight about what you meant.
2          THE COURT: Okay. Let's go back to what I said and
3 what I should have said.
4          The documents that are being produced on the
5 functionality are as follows, and it should guide the scope of
6 the 30(b)6 depositions.
7          Obviously, you are going to produce the three
8 versions of 11i in the code so that plaintiff can contest it
9 anyway they want.
10         They are going to -- you are going to produce the
11 design documents and technical memos.
12         Okay. You are going to produce bug reports that in
13 any way reference integration and interoperability, right?
14 That's included in your things. So that certainly is within
15 the scope.
16         In addition, you are going to produce documents
17 regarding any lost, deferred sales or sales with respects to
18 which there was a material expense with respect to any product
19 before the relevant time period. Materiality being defined as
20 we stated.
21         In addition, I guess the piece that is missing is you
22 did say that we could come up with a high level, some kind of
23 high level documents which are relevant to the scope of
24 problems with the program and I'm not -- you know, without
25 characterizing them, problems with the program on a more global

1 basis that got to the folks in, for example, what you say is
2 the original speakers group, but some way of capturing the bug
3 problem other than integration issues.
4          I guess I had never -- I have neglected to get
5 closure on what that is.
6          MR. RUBINSTEIN: Well, I think what I would like to
7 do, and with the Court's permission, is to basically try to
8 craft an order that reflects what your Honor just said because
9 I don't -- I can't identify what the actual document would be,
10 but I think I understand what the Court's order is and I don't
11 know whether the Court is comfortable proceeding with an order
12 in which the category is described that way.
13         THE COURT: That's not a bad idea. What you are
14 talking about is an order that says, you are going to produce
15 documents that describe the scope and dimension of the bug
16 problems with the program other than, sufficient to, that kind
17 of language.
18         MR. RUBINSTEIN: Okay.
19         THE COURT: Sufficient to describe the scope and
20 dimension of the bug problems with the program other than
21 integration and interoperability.
22         And, obviously, with respect to each of these things,
23 you have the opportunity to have an examination of someone on
24 them.
25         MR. WILLIAMS: Maybe what we will have to do is see

SHEET 12   PAGE 89

89

1  if we can hammer out an agreement on what that should be and if
2  we can't agree, we will just submit something separate and have
3  the Court iron it out.
4           I do want to address one more issue, your Honor --
5           THE COURT: Yes.
6           MR. WILLIAMS: -- with regard to the materiality.
7           We talked about materiality and I guess a materiality
8  cut-off of $500,000 and I really think that that might narrow
9  things too much.
10          The $500,000 deals -- I can't stand here and say that
11 I know which ones they are, but one of the arguments that they
12 have made is that Oracle has thousands and thousands of
13 customers and that's probably true. It is true.
14          How many of those are above 500,000 we don't know.
15 They did have, quote, unquote, big deal reports, but they were
16 a small number and those don't encompass all the customers who
17 were buying the product whose businesses were impacted by the
18 fact that the product didn't work.
19          And I think if we just use that $500,000 number,
20 which is a big number, it's a big sale, we are not going to get
21 what we are looking for.
22          And, finally --
23          THE COURT: Of course, you won't get what you are
24 looking for, but, okay, but let's talk about what you need.
25          I mean, you are trying to get enough information

PAGE 90

90

1  about, frankly, issues with customers other than integration,
2  right?
3           MR. WILLIAMS: Sure.
4           THE COURT: And trying to prove that those problems
5  with the customers are so large that notwithstanding the fact
6  that there isn't an actionable representation that there are no
7  bugs in this, or that there are insignificant bugs in it, or
8  trivial bugs or anything like that, that by virtue of the fact
9  that the program has so many flaws, that that means that when
10 you say this is a program that you can buy off the shelf and
11 you don't have to have any integration programming involved,
12 you are really violating that. You are really making that a
13 false statement.
14          MR. WILLIAMS: I think you are, right.
15          THE COURT: That's a pretty high level of problem and
16 I'm wondering how we get into that.
17          One of the ways I'm thinking about getting into it is
18 you say, well, what are the problems that the big players are
19 having with this program? I mean, aren't you going to capture
20 -- you aren't going to get -- you are right. You are not going
21 to get every customer, but aren't you going to capture in the
22 machinations between Oracle and one of its bigger customers or
23 50 of its bigger customers are whatever they are, maybe it's
24 not a thousand, but aren't you going to capture in that the
25 dimensions of the bug problem?

PAGE 91

91

1           Those are the people who are going to be all over the
2  program, right? They are the people -- the big consumers of
3  the product are the ones who are going to have giant in-house
4  technical staff all over the product and all over Oracle. They
5  are the people who are going to be the ones for whom Oracle is
6  going to have to spend money and time and who are going to
7  have, frankly, their own records and we will get to that.
8           But isn't -- aren't you going to capture the most
9  important problems that way?
10          MR. WILLIAMS: The answer is maybe. The answer is
11 maybe. And that's because some of those big customers were
12 buying, say, the entire 11i Suite. Some of the smaller
13 customers were buying only certain modules. And let's say, for
14 example, CRM.
15          Now, a $500,000 threshold might be interesting for
16 the forecast, but with regard to customers, some of these
17 customers were buying just the CRM. And I don't know how much
18 it costs. I don't think it was a half million dollars, but we
19 know that just the implementation of this -- of the attempted
20 implementation of the CRM shut down entire businesses.
21          And I don't know -- so the impact to that business
22 might be greater than $500,000 even though they didn't pay
23 $500,000 for the software.
24          So to begin, it's difficult to say let's have this
25 $500,000 cut-off because a lot of the problems -- I mean, this

PAGE 92

92

1  was a brand new software. They were trying to sell it to
2  anybody, not just the big companies. And what we allege in the
3  complaint is that the big companies were afraid to buy it
4  because they may have heard of some of the smaller companies
5  that had big problems with it.
6           So when we get to that $500,000 cut-off, we may only
7  get a small sliver of what is important for the case. And
8  maybe we should just come with -- agree on a number that's
9  lower than $500,000. I'm not saying I want everything --
10          THE COURT: Why don't I do this? Let's leave it the
11 way it is. If it turns out you are right, well, then you are
12 going to be back here. If you are right that you are not
13 getting a good sense of the dimensions of this problem by what
14 we have ordered, well, then, it was the wrong order and we will
15 fix it.
16          MR. WILLIAMS: Okay.
17          THE COURT: We will fix it. I think that's right.
18          Okay. So substantive witness depositions, meaning
19 other depositions other than 30(b)6, will start in May I guess.
20          With respect to the files that Oracle has regarding
21 any current or former Oracle employee, that's going to be on
22 the list of 65. That's the issue you were raising, I think,
23 and those you want to have before you begin the depositions,
24 and they may or may not be within the scope of the files we
25 have ordered reviewed.

1  What do you think about that?
2  MR. RUBINSTEIN: I think what we would have to do is
3  take it on a -- as the depositions are noticed and as
4  plaintiffs give us the list of documents that they want, we
5  would, obviously --
6  THE COURT: The list of documents they want is here.
7  All right. This is the scope of what they get. They will
8  flesh it out in demands, but it will be within the scope.
9  MR. RUBINSTEIN: If it's within the scope and they
10 want the documents in advance, I think -- I don't think we have
11 a problem with that.
12 THE COURT: You may ask for something else and they
13 may agree or disagree. You will come to somebody, me or Judge
14 Jenkins, if there is a problem.
15 But the question is timing. You know, will you --
16 leaving aside the scope, okay. Leaving aside the scope because
17 the Court approved scope is in this order. There may be other
18 things that may work. May be other things that don't work, but
19 the timing is that you will agree to search those files and
20 produce them on 30 days' notice as long as they are on the
21 witness list that's going to be deposed. They are going to
22 have a list of 65 people.
23 MR. RUBINSTEIN: I just want to make sure I
24 understand. So once the plaintiffs identify who they want to
25 depose --

1  THE COURT: It's going to be in the order.
2  MR. RUBINSTEIN: It will be in the order. Then we
3  will be required to produce the documents in the files of those
4  people.
5  THE COURT: Yes, yes.
6  MR. RUBINSTEIN: Within 30 days, although I don't
7  know --
8  THE COURT: Within 30 days of a request for them.
9  There may be some period of time in advance of their
10 depositions.
11 MR. RUBINSTEIN: That's actually what I was thinking.
12 What if we agreed to produce them at least seven days in
13 advance of the deposition itself.
14 MR. WILLIAMS: Well, sure, that's fine. I mean, if
15 it turns out to be 20 boxes of documents, we might have an
16 issue. But I think seven days is fair.
17 THE COURT: It won't be. It won't be seven boxes of
18 documents.
19 MR. WILLIAMS: I think that's fair, if we had seven
20 days.
21 On the same issue, defendants have indicated that
22 they want to depose some of -- well, maybe all of the
23 confidential witnesses and, obviously, that's fine, but we
24 should get -- any of those confidential witnesses who are
25 former employees of the company, we should get all of the

1  responsive documents from those people's files as well. We
2  shouldn't have to wait until they notice the deposition.
3  THE COURT: Well, what about seven days in advance of
4  the deposition? Okay? Why not? Okay.
5  So with respect to any witnesses, either side, that
6  are current or former Oracle employees, seven days in advance
7  of their deposition Oracle will produce documents from their
8  files.
9  Now, the scope of the production will be what you
10 have requested that's within the scope the Court permits or
11 whatever else you can agree to or whatever else you can
12 convince some good natured judge of.
13 Okay. The open issues on this, I'm not sure I
14 understand. You don't get to -- can't you work out how long
15 the depositions are going to be?
16 MR. WILLIAMS: I think we can work that out, your
17 Honor. Just with the basic understanding that some of them,
18 obviously, are going to require more than seven hours.
19 MR. RUBINSTEIN: What we would suggest is that,
20 obviously, the presumptive limit of the federal rules would
21 apply and if on a witness-by-witness basis if the plaintiffs
22 believe they need more than that or if we feel we need more
23 than that as to any witness, we will meet-and-confer.
24 THE COURT: Don't mess around on this issue. This is
25 one that's particularly irritating to the Court. Both sides,

1  asking too much or offering too little. It is a no win
2  situation.
3  MR. WILLIAMS: Your Honor, there is an issue that
4  might fit in here that isn't in our letter that I want to
5  address.
6  THE COURT: Okay.
7  MR. WILLIAMS: I know that we have had a dispute
8  recently about 30(b)6 witnesses being deposed in their
9  individual capacity and we don't have a problem with -- with,
10 say, for instance we are going to depose one person and it
11 turns out to be a person that they designate as a 30(b)6
12 witness.
13 We don't have to accept that as the substantive
14 deposition of that witness, but if, you, know, they don't want
15 to produce the witness twice, we are happy with that. We can
16 deal with that, but we need the documents from their files at
17 the time of the 30(b)(6) deposition.
18 MR. RUBIN: That's what we said, your Honor.
19 THE COURT: Fine.
20 MR. RUBIN: It came up with one of the 30(b)6
21 witnesses. We said as long as you have this particular
22 deponent's documents, there is no reason that we would need to
23 bring them back twice.
24 THE COURT: Fine. Good. Customer discovery. I'm
25 still . . . I'm not sure --

SHEET 13   PAGE 97

**97**

1   MR. RUBINSTEIN: Your Honor, we were going to propose
2 maybe one way to cut through this is, we are certainly willing
3 to abide by the Court's scope ruling with respect to
4 third-party discovery as well.
5       I mean, we think that the scope ought to be what the
6 Court has ruled and, really, the only issue that I think then
7 the parties are still at odds about is the number.
8       THE COURT: Let me see if that works. Just thinking
9 out loud. Maybe I won't. Just let me look.
10      That means with regard to the economy, they go to the
11 customers and you define the scope, which is documents related
12 to cancelled sales from Oracle, et cetera, et cetera, that are
13 a result of the down turn in the economy. That's the scope
14 from the economy perspective. That's in here.
15      MR. WILLIAMS: It might be slightly broader than
16 that, your Honor.
17      THE COURT: It says documents concerning the United
18 States economy and its impact or potential impact on Oracle's
19 revenues, earnings and expenses on its potential impact and
20 customer purchasing decisions and services in general,
21 purchasing of products, specifically purchasing of products and
22 services from Oracle.
23      For example, if customers communicated to Oracle that
24 the products in general were -- I guess the products in general
25 weren't being ordered due to tight end budgets or slowing

PAGE 98

**98**

1 economy. I mean, I'm not sure that that's very narrow when it
2 come to going to a customer.
3       You have got to go to a customer -- I guess with
4 respect to Oracle, it's -- I don't know how you interpret that.
5 What does that mean? They get to ask from Oracle any documents
6 that refer to the impact of the economy on customer purchasing
7 decisions.
8       MR. RUBINSTEIN: Well, if the request is coming to
9 Oracle itself or from Oracle, then, clearly, it would only be
10 documents in which a customer is communicating that to Oracle.
11      THE COURT: Right. Or internal memos about that
12 subject or that kind of stuff.
13      MR. RUBINSTEIN: Right.
14      THE COURT: And we have cabined it by having it just
15 these files are being searched.
16      MR. RUBINSTEIN: Sure.
17      THE COURT: So you go out to a customer and you ask
18 that same question, aren't you asking for the world? Every
19 piece of paper on how they made their decisions?
20      MR. RUBINSTEIN: We would suggest that it should be
21 the same type of documents being communications to Oracle about
22 -- as opposed, I think we have seen from some of the objections
23 that the customers are going to have some problems with purely
24 internal documents that were never communicated.
25      THE COURT: Let me just make sure I understand what

PAGE 99

**99**

1 you are saying.
2       What you are saying is that the scope ought to be
3 with respect to the economy, the subject matter insofar as its
4 contained in the communication to or from Oracle?
5       MR. RUBINSTEIN: Yes.
6       THE COURT: Yes?
7       MR. WILLIAMS: I think that that's too narrow, but I
8 honestly am going to say I'm not sure I quite understand
9 defendant's proposal that it be the same as the request from
10 the company.
11      But we do think that we have substantially narrowed
12 the area that we are seeking discovery from non-parties based
13 on your Honor's comments back on February 4th.
14      Now, with regard to the economy, I would say that we
15 are interested in the -- say, for instance, we take a customer.
16 We want to know whether or not their IT budgets were shrinking
17 during that period for application software products. Not
18 for -- you know, because is that, indeed, was what Oracle said
19 was not going to effect their company.
20      Now, certainly, we want communications as well with
21 Oracle.
22      THE COURT: Why does it matter if it wasn't
23 communicated to Oracle?
24      MR. WILLIAMS: I'm sorry, your Honor?
25      THE COURT: Why does it matter if it wasn't

PAGE 100

**100**

1 communicated to Oracle?
2       MR. WILLIAMS: Because Oracle represented that these
3 -- that their customers were not --
4       THE COURT: But you have to prove that that was made
5 recklessly.
6       MR. WILLIAMS: Exactly.
7       THE COURT: And how are you going to do that if there
8 is no communications from the customers to Oracle suggesting
9 that their IT budgets are shrinking?
10      MR. WILLIAMS: Well, for example, now if internally
11 at a customer members of the, I guess, procurement or IT
12 department are discussing the separate proposals that were
13 given to them, say, either by SAP, IT or Oracle and they are
14 discussing amongst themselves that this is -- we cannot afford
15 what Oracle is selling right now because our budgets are
16 shrinking.
17      Therefore, when Oracle shows up on Tuesday for this
18 presentation, you know, either we have to communicate that to
19 them in one way or another or let's just cancel it all together
20 because we can't afford what they are buying.
21      Now, it's hard for me to anticipate what the
22 documents are going to say and, certainly, the communications
23 to Oracle are important, but I do think that it's important for
24 us to get probably a narrower area of communications within
25 these customers that discuss the limited budgets for IT

PAGE 101
101

1  purchases, especially because that's exactly what was -- the
2  questions that were raised to Oracle, the Oracle defendants,
3  and their response was, "That will not affect us." The IT --
4  IT budgets shrinking is not going to affect Oracle because this
5  is a product that's going to help those people save money.
6          THE COURT: My issue is not that it's entirely
7  irrelevant. I think it is -- certainly has some peripheral
8  relevance to the question of whether or not the economy was
9  affecting Oracle's sales.
10          But it's a question of degree, right? It's the Rule
11 26 proportionality question.
12          What you are asking for is if there are -- is
13 internal documents at the customers which make specific
14 reference to their purchasing less Oracle software because of
15 the financial fortunes of the particular company, you know,
16 that might be reasonably narrow.
17          I mean, those will be memoranda which say, "We are
18 not going to purchase as much software from Oracle this year
19 because the company is experiencing a down turn in sales or
20 revenues or whatever it is."
21          I mean, that might be fairly narrow. And it is --
22 the other thing I was going to say to you is the fewer
23 customers you bother with this stuff, the more likely I am to
24 give it to you, too.
25          But what's wrong with that? Having a certain number

PAGE 102
102

1  of customers that produce documents which specifically refer to
2  reducing or eliminating purchases from Oracle on the basis of
3  the fortunes of that particular company -- the declining
4  fortunes of the particular company, as well as communications
5  to Oracle on that subject?
6          MR. RUBINSTEIN: Well, I think, first of all, if we
7  are assuming -- if it's communicated to Oracle, we don't have a
8  problem with that.
9          If it was something that was never communicated to
10 Oracle, then what plaintiffs are really going to be doing is
11 conducting an inquiry into the purchasing decisions and the
12 internal deliberative process of the customer, which I am doing
13 to predict that if it is something that was not issued outside
14 of the company, that there may well be objections which we have
15 seen, in fact, from customers.
16          And, again, I think that the relevance is, I think,
17 very limited in that, again, it's not something that Oracle
18 would have known. Unless, of course, if it was something that
19 was communicated orally, plaintiffs are going to get that.
20          THE COURT: Well, or not. See, the problem here is
21 cart and horse, and to a certain extent it is they want these
22 documents so that they can start investigating communications
23 you are talking about.
24          They want to ask the people at the customer and they
25 want to ask your people, "Weren't you told at some point that

PAGE 103
103

1  Company I was reducing its purchases this quarter because the
2  economy was hurting it?"
3          And they want to look at the documents to see that
4  and then they want to ask you the question about it.
5          There may be an oral statement that's not reflected
6  in the documents. I'm not sure -- I'm not willing to cut it
7  off so completely. It's just communications, because I think
8  this is discovery and discovery goes more broadly than that.
9  It's an investigation.
10          I am willing to leave -- have it a fairly narrow
11 category of internal documents and I am willing to -- we are
12 not having 200 customers produce that amount of information.
13          But it seems to me there is some relevance and, you
14 know, maybe the plaintiffs have made their bed they are going
15 to lie in it. They have got 95 subpoenas out. Maybe that's
16 it. Maybe they don't get to do any other customer subpoenas.
17          But I think I have to give them some measure of what
18 was the customer thinking.
19          MR. RUBINSTEIN: Well, again, not to belabor the
20 point, we think that the Court would be doing that by including
21 within the scope communications to and from Oracle addressing
22 those exact issues, and which doesn't strike me as something
23 that would be unreasonable in that presumably at some point if
24 a customer was going to inform Oracle that it was not going to
25 purchase something, that would be something that would be

PAGE 104
104

1  communicated.
2          And so I think at a minimum it would be reasonable to
3  start there and only if it turns out that there just aren't any
4  documents like that, that then we would turn and expand that
5  scope.
6          We also, obviously, are very much concerned about the
7  scope as it relates to the number of customers that the
8  plaintiffs are intending to issue these subpoenas to. We think
9  that even 95 is just far too broad, and that we think that --
10 now, I don't know if the Court wants to address that second?
11          THE COURT: Not yet. Not yet.
12          MR. RUBINSTEIN: Okay.
13          THE COURT: Let's get the -- I have got it in mind,
14 but I want to talk about subject matter.
15          MR. SALPETER: Your Honor, can I say one thing about
16 that since I haven't spoken yet today?
17          THE COURT: I was going to say. . .
18          MR. SALPETER: Alan Salpeter.
19          THE COURT: What's your name?
20          MR. SALPETER: Alan Salpeter.
21          THE COURT: Just kidding.
22          MR. SALPETER: All of this discovery that we are
23 talking about today ultimately is going to evolve into a trial
24 of this case or disposition before trial. And I wonder
25 ultimately whether what a customer says but doesn't communicate

SHEET 14   PAGE 105

**105**

1 to Oracle is going to have any even marginal relevance at an
2 ultimate trial in this case.
3         THE COURT: Ultimately? You are probably correct.
4 You are undoubtedly right.
5         I mean, it seems very unlikely that Judge Jenkins
6 will allow in the trial untethered information about customer
7 experience. I think that that's right.
8         But the question now is in investigating the customer
9 experience, that may or may not have been communicated to
10 Oracle but was communicated -- but wasn't communicated, whether
11 or not they are not permitted, to some extent, to start at the
12 back end and say, "There was this problem, was it
13 communicated?"
14         MR. SALPETER: It just seemed to me so marginal and
15 so on the edge here of what is potentially relevant and
16 ultimately usable at the trial, because ultimately this case is
17 going to come down to what Jeff Henley and Larry Ellison were
18 thinking about when they were speaking publicly.
19         And if you parse through the statements they made, it
20 was that the economy isn't affecting us yet. Everybody knows
21 what was going on in the economy. Everybody knew about the
22 bubble bursting and the internet company problems.
23         What they were saying, and they were very careful
24 about what they said, was that we are not seeing it hitting our
25 business yet.

PAGE 106

**106**

1         So the fact that the customer might be saying, you
2 know, we are starting to feel the pain of what's going on in
3 the economy, if that's not communicated to Oracle --
4         THE COURT: No, no. We are agreeing. We are
5 agreeing as a matter of ultimate relevance.
6         I think we are agreeing as a matter of ultimate
7 relevance, but in terms of investigation I need to give them a
8 little more leeway than I would if it was my case for one thing
9 and that I would if it was a trial.
10         You know, I know everybody is going to try security
11 class actions now because defendants are now winning, right?
12 And you won't settle it and we will all go to trial, and Judge
13 Jenkins needs another securities trial. He hasn't done enough
14 of them, but when you get there, it will be a very focused
15 trial.
16         It's really interesting. I don't know how much of
17 the Clarent trial you caught, but it's extremely focused
18 inquiry once you get there when they really try the case, and
19 this isn't that.
20         MR. SALPETER: Is there anything you can do to narrow
21 it beyond simply the customer, you know, discussing the pain of
22 the economy? I mean, can we put some --
23         THE COURT: I was going to say, decisions -- here is
24 what I wrote down for discussion purposes.
25         With respect to the economy. Obviously,

PAGE 107

**107**

1 communications with Oracle regarding increases or decreases in
2 purchases from Oracle due to the economy. That's the
3 communications.
4         With respect to other documents. Other documents
5 referring specifically to decisions to purchase or not purchase
6 from Oracle because of the economy. It's got to specifically
7 refer to a decision that is based on -- to purchase or not
8 purchase from Oracle because of the economy.
9         And you get that in that that may lead places. It
10 may not lead places, but it gets you some measure and then the
11 only question -- and my guess is that that is something that a
12 customer could more readily search for than every piece of
13 paper on their purchasing decisions and that kind of stuff.
14 That will be a smaller group of folks at least. Okay. That's
15 my thought on the economy.
16         In terms of product problems. I don't want you to go
17 into bugs with the customers. I don't want you to go into
18 anything bugs other than interoperability and integration,
19 okay?
20         I think that you are going to get these high level in
21 the first instance issues about the dimensions of the problems
22 other than the integrations problems. If you can convince me
23 that that's such a level that you need customer inquiries, we
24 will get to that.
25         But to start with, I don't want any investigation of

PAGE 108

**108**

1 just sort of everybody's problems with the Oracle software.
2         On the other hand, with respect to integration
3 problems with the software, I don't know, that might be all
4 right as a subject matter. Documents from customers regarding
5 integration problems with the Oracle software.
6         Yes, sir?
7         MR. WILLIAMS: I think that that's fine, your Honor,
8 with a couple of caveats.
9         THE COURT: Yes.
10         MR. WILLIAMS: For our document requests, I think
11 that we can -- and based on what your Honor is saying, we can
12 eliminate the word "bugs."
13         However, when your Honor uses the term "integration,"
14 I know that that term is going to be one that people latch onto
15 and it's too narrow, especially with the customers because the
16 customers -- what the customers are experiencing is
17 implementation, and the implementation is directly related to
18 the integration and interoperability and problems associated
19 with gaps or bugs. So I can imagine --
20         THE COURT: Yes, gaps or bugs, meaning integration,
21 interoperability, gaps and bugs.
22         MR. WILLIAMS: I can imagine if I ask the customer
23 about its implementation experience, what they are going to
24 respond with is, well, this -- the product had an enormous
25 amount of bugs. There was no way I could implement it because

PAGE 109

109

1 of the bugs that were associated with it. And it was certainly
2 not integrated and interoperable because the software code was
3 not written yet to make those modules speak to one another.
4     Now, maybe we can fashion a request that is
5 satisfactory to everyone, but I think as soon as you ask these
6 customers about their experience with the implementation of 11i
7 or any of its individual modules, the response is going to be
8 without us asking for it, there were a huge amount of bugs in
9 the software and we couldn't do what Oracle said we could do
10 with it once we bought it.
11     THE COURT: Yeah. And, therefore?
12     MR. WILLIAMS: You are saying you don't want us to
13 ask about bugs, and I'm trying to understand how --
14     THE COURT: What I want you to ask about is a
15 specific category of failings in the software. That is to say,
16 the failings that, in fact, there were -- I mean, the
17 representations in the complaint are that the -- it requires no
18 integration, right? You can ask about problems they had with
19 respect to 11i, with respect to integration.
20     MR. RUBINSTEIN: And, your Honor, with respect to
21 what the meaning of integration, the complaint itself refers to
22 a white paper in -- it's at Paragraph 63 of the Revised Second
23 Amended Complaint.
24     "And the white paper defines what Oracle means by
25 integration in the context of Suite 11i."

PAGE 110

110

1     So I agree with the Court that the way to solve the
2 problem is to be precise so that the customer knows what it is
3 being asked to produce.
4     THE COURT: Okay. Why doesn't that work?
5     Yes, go ahead.
6     MR. WILLIAMS: If I may approach, we have actually
7 broken out for you the statements regarding 11i and what can be
8 done with it.
9     THE COURT: I read it. I read it.
10     MR. WILLIAMS: I just want to point out --
11     THE COURT: I have already decided on the scope. I
12 have already decided on the scope of the 11i problems that we
13 are investigating. The question is applying it to the
14 customers.
15     MR. WILLIAMS: I think that's right. But what your
16 Honor just said was that what Ellison and Henley said, well,
17 it's preintegrated and interoperable, but they said much more
18 than that.
19     They said that, you know, you can implement it in a
20 certain amount of time. It's up and running fast and it works.
21 And those are things that if you ask the customer, "Well, did
22 you try to implement it?" "Yes." "What happened?" "Well,
23 there were so many bugs," they might say, "that we couldn't
24 implement it."
25     THE COURT: And I agree with that. I know that's

PAGE 111

111

1 part of the statement and I'm giving you some level of
2 investigation into that. It's coming from Oracle. It's not
3 coming from the customers.
4     I'm not going to bother the third parties with stuff
5 unless you show me that you have -- that this is an important
6 area of investigation where you are really likely to get
7 admissible evidence from the customers and you haven't yet.
8     You may once you get the documents from Oracle, but
9 we are going to start with Oracle and because it's going to
10 have to be a lot more than just "there were lots of bugs."
11 It's going to have to be a lot more than lots of bugs, because
12 there is no -- the thing that rings true to me is that this
13 case was not about that this was a buggy software or there were
14 lots of bugs. There are lots -- you know, that doesn't make a
15 securities fraud case. Or that, "This is a good software. Buy
16 it and it will work."
17     You know, if it was so buggy that it couldn't
18 possibly work, then that would be a false statement to the
19 market. But just the fact that there are a bunch of bugs or a
20 lot of customers had problems with it, I'm not sure that that
21 proves it.
22     However, however, I'm going to let you investigate
23 the dimensions of it. I'm going to start with Oracle's
24 documents. If you come up with evidence that it is of a
25 sufficient level that you can reasonably when you go to the

PAGE 112

112

1 customers, we are going to find the kinds of things that are
2 going to help us in an admissible fashion prove our case, then
3 you are going to get it.
4     MR. RUBINSTEIN: But -- sorry.
5     THE COURT: Let him finish.
6     MR. WILLIAMS: Now, two things.
7     One, how would you propose doing that? And if your
8 Honor would allow me today to make a representation to you
9 based on the documents that we have seen thus far to satisfy
10 you that we may find what I think we are going to find when we
11 go to these customers about this, I would be happy to do that
12 today.
13     We have brought just a couple of the documents we
14 have seen from Oracle. Obviously, we don't want to violate any
15 protective order that's in place, but I think that we can make
16 that representation right now.
17     THE COURT: You cannot. I guarantee you cannot. You
18 had your chance. That's what this is. You wrote me a letter.
19 You gave it in detail. You gave your positions. You told me
20 why. You don't have it.
21     Whatever you have got, it is insufficient. I suggest
22 you go to Oracle first and only on the level that I have talked
23 about, because I'm very skeptical as to whether or not you can
24 make a securities case out of this.
25     Maybe you can. I'm going to give you an opportunity

SHEET 15   PAGE 113

**113**

1 to try, but right now you are not going to get those documents.
2           Okay, let's keep going. Documents that refer to
3 integration problems with 11i can be sought from the customers.
4           On the accounting issues I guess this is separate and
5 apart from the documents that are going to be produced by the
6 accountants, which is a separate question from the customers.
7 Any documents relating to those 49,000 debit memos, period.
8           MR. WILLIAMS: I think that's fair.
9           THE COURT: Whatever the transactions are that those
10 involve.
11           MR. WILLIAMS: That's fair.
12           MR. SOLOMON: That's fair, your Honor.
13           THE COURT: Okay. That seems to me the scope of what
14 you are going to get from the customers.
15           The next question is how many. You know, my sort of
16 -- I want to get you enough customer information so that you
17 will be able to have -- you can't prove this case through
18 customer information, right, because it's not a scientific. It
19 won't show materiality, right? It's not an amount that is
20 going to be significant except for the giant people, which you
21 are going to get anyways.
22           But the customer information going out 200, 400
23 customers is not how you are going to prove ultimately that
24 this was of a sufficient quantity that it was reckless to
25 represent otherwise. You know, 10, 20, 200, 400. You are

PAGE 114

**114**

1 going to get anecdotal information. I'm not saying it's
2 irrelevant, but it's anecdotal.
3           How many customers does Oracle have?
4           MR. RUBINSTEIN: Thousands.
5           THE COURT: Thousands. You know, thousands and
6 thousands and thousands. Pick a number, 10,000 customers. If
7 you put 200 of them in, 200 out of a 10,000 is relatively a
8 small percentage and by itself is going to be a difficult time
9 proving the dimensions of the problem through the customers.
10           What you get to is investigation the customers to
11 find the kinds of problems that you think are there, and then
12 communications to Oracle that would put -- have some level of
13 notice of the kinds of problems and then the internal documents
14 to Oracle are going to be the key.
15           So this is important, but not as important as the
16 internal documents to Oracle.
17           So it seems to me is that it matters -- that whether
18 it's 50 or 100 or 200 or 300, you know, that extra delta
19 doesn't buy you very much. Because whatever it is, it's not
20 going to be a scientifically sample of all their customers
21 because it's so small. Don't you think that?
22           MR. WILLIAMS: Well, statistically you may be right,
23 your Honor.
24           THE COURT: That's what we are talking about.
25           MR. WILLIAMS: They have got thousands of customers.

PAGE 115

**115**

1 We know that their own representations in December of 2000,
2 they said they had 83 customers live on 11i.
3           In January of 2000 they said -- January 2001, I'm
4 sorry, they said they had 160 customers live on 11i.
5           And based on what we have seen thus far, I'm not sure
6 what live means, but even if we -- we don't want 400 customers.
7 We don't want 300. We probably don't even want 200, but we
8 think that there is something between what we have done already
9 and a few more that we do need. And that is within what they
10 have said were live on 11i.
11           For example, in February or -- the January and
12 February of 2001 they said they had 2500 companies implementing
13 11i currently. We obviously don't want that. Nobody wants
14 that.
15           And so what we -- and I really believe that we have
16 been extremely, extremely reasonable with the cut that we have
17 made as to the documents or non-parties' customers that we
18 ought to get discovery from. They said 160 live on 11i in
19 January of 2001.
20           THE COURT: Your 93 you think would capture most of
21 those?
22           MR. WILLIAMS: I think it would capture most of
23 those. We were talking about it over the last couple weeks
24 and, in fact, just yesterday.
25           You know, probably 15 more that we haven't subpoenaed

PAGE 116

**116**

1 yet. And it's not because we thought they were less important.
2 It was because, you know, we just hadn't gotten to do those
3 before, you know, defendants had an opposition in. We didn't
4 think it was proper to continue sending them out while they had
5 this opposition in front of the Court. But there are at least,
6 you know, 15 to 20 more that we think that we need to send out.
7           Then if your Honor or -- we can -- we are prepared to
8 say, look, if we want any more that, we will tell you who we
9 want to subpoena. You let us know what you think, whether or
10 not you think it's relevant. If we have a dispute, we will go
11 to the Court and you can get a protective order before we send
12 out anything.
13           So I think that we have been very reasonable on that
14 issue.
15           THE COURT: Okay. Why not -- let me just put this in
16 your lap, because you won't like it. No, no. I do it on
17 purpose so I can figure out whether I'm messing up.
18           Why don't I tell them that they can do these four
19 categories, they can seek documents within these four
20 categories: From the 93 customers and 7 more and then they are
21 done. Without some extraordinary showing to the Court, they
22 are done.
23           MR. RUBINSTEIN: Well, the reason that I guess I have
24 a problem with it is because it ultimately involves a process
25 where customers are being subpoenaed without much inquiry into

PAGE 117

117
1  whether or not they really are reasonably likely to lead to
2  discovery of admissible evidence. And I will give the Court an
3  example of what I mean.
4           The Court is already requiring us to produce
5  information regarding communications with customers that fall
6  into the category that the Court has defined to be at least
7  sufficiently relevant to be likely or reasonably likely to lead
8  to the discovery of admissible evidence.
9           It seems to us that if you are going to get that
10 information, that would give them the ability -- it would give
11 plaintiffs the ability to be able to make a good cut at which
12 customers are reasonably likely without at the same time -- and
13 we --
14          THE COURT: I agree with that. I agree with that
15 completely, but when they do that, they are going to come up
16 with 200 people, 200 customers.
17          MR. RUBINSTEIN: Well, I honestly don't know why 30
18 of their choosing is not --
19          THE COURT: What's the difference between 30 and 90?
20          MR. RUBINSTEIN: It makes a big difference to Oracle
21 in terms of the impact that it has on Oracle's relationship
22 with its customers.
23          THE COURT: Because it's 90 instead of 30, right?
24 But there is no -- you haven't given me a principal reason why
25 90 is not a -- why 90 is the right number or 30 is not the

PAGE 118

118
1  right number other than, "We like it better. It hurts us
2  less."
3           MR. RUBINSTEIN: Well, it hurts us less and I think
4  that it adopts a view that I think is consistent with the
5  approach the Court has taken in other situations, where after
6  they have subpoenaed 30 customers, which I think is quite a
7  large number, then at that point they ought to be able to -- if
8  they think that's not enough, then at least they will be able
9  to make a showing at that point as to why not.
10          As opposed to now where I think we are in a situation
11 where we are pulling numbers out, I mean, of necessity, and I
12 think that especially after the plaintiffs are going to get
13 whatever documents they are going to get, I think it's going to
14 make the process much more likely to be -- to really to satisfy
15 the objective of discovery here.
16          THE COURT: You know, I disagree. I think it's going
17 to lead to more litigation and delay. I want to get this done
18 now, and I think --
19          MR. RUBINSTEIN: Well, the problem we have is if
20 there is a finite cut-off, I'm almost confident -- I'm rather
21 confident that plaintiffs are going to come back and say, "Your
22 Honor, we need more now."
23          THE COURT: They have to ask and then I can say no.
24 But you have suggested the same thing anyways. You have the
25 exact same proposal, except your number is 30 instead of 90.

PAGE 119

119
1  Yours is as every bit as arbitrary as theirs, and their number
2  is nearly 200.
3           So I don't -- you know, I don't know. How did you
4  come up with the particular companies that you have subpoenaed
5  thus far?
6           MR. WILLIAMS: We came up with them through Oracle's
7  representations about who was using live or implementing 11i.
8           Our confidential witnesses who were at Oracle at the
9  time who told us that they were either trying to sell, sold or
10 been rejected by certain customers about 11i. Most of them
11 came from there.
12          We also have some documents that were provided to us
13 that show that during that period Oracle had either tried to
14 through a proposal or a bid to searching customers for, you
15 know, significant amounts of money that were still pending
16 during that quarter or around that quarter. That's how we came
17 up with our group of customers who may have responsive
18 information regarding either implementation or whether or not
19 they were actually going to buy Oracle products in the quarter
20 because of, you know, financial reasons in the economy.
21          We didn't -- it wasn't arbitrary. I should mention
22 that we asked -- in the last couple of weeks we have asked
23 Oracle to tell us which customers were the 160 that you say
24 were live on 11i. We haven't gotten a response. We want to
25 know which ones they were.

PAGE 120

120
1           THE COURT: But where does that leave you?
2           MR. WILLIAMS: I'm not saying --
3           THE COURT: Therefore what?
4           MR. WILLIAMS: The reason I'm saying that is because
5  you are asking me whether -- I think you are trying to figure
6  out whether or not it's an arbitrary number and why we
7  subpoenaed these people.
8           THE COURT: It is an arbitrary number. I'm trying to
9  figure out how arbitrary. It is how much information went into
10 the choice.
11          Or whether or not we should just -- because part of
12 my concern is that we are going to end up with another
13 arbitrary number. It will -- I expect it will be three months
14 from now, and it will be -- you know, they will still want more
15 than you will want to give.
16          Why not just narrow the categories of documents as I
17 have, which is very narrow, set a number, say that you have
18 already subpoenaed them and we will be done. That absent some
19 special showing that there is admissible evidence in the hands
20 of these -- of other customers and that I believe that it's
21 fair to require it to be produced, which is unlikely -- and I
22 guess I have said that for the record, and that's what I
23 mean -- that they are done.
24          I mean, it seems to me that we are going to end up
25 with some kind of fairly arbitrary cut-off one way or the other

SHEET 16   PAGE 121

**121**

1 and the question of whether we should do it now or three months
2 from now just means that it will delay the discovery that much
3 longer and there will be somebody -- I want to get it underway.
4 I want to get it all done with. That's part of my goal here,
5 is to get this lined up so everybody knows what the marching
6 orders are for the next 18 months and we will get it all done.
7     I hear you. I understand the question. I think if I
8 was Oracle I would be very wary of the fact that my customers
9 are being subpoenaed into a securities action over a stock fall
10 of $3 or something, or whatever it was during that -- after the
11 announcement was made. I would be wary of that.
12     On the other hand, I can't say that the customer
13 information isn't relevant and I can't say that they can't get
14 -- that they have to wait. I don't want -- because I don't
15 think it really adds to the problem in any material way or to
16 the exclusion of the problem by waiting.
17     I think that we will end up with another set of
18 arbitrary numbers. Everybody is proposing arbitrary numbers
19 now and we will have arbitrary numbers with extra reasons
20 attached in three months and it will be three months later.
21     I don't want to wait so long. That discovery was
22 served last year. I want to get it underway.
23     MR. SALPETER: Can I suggest another arbitrary
24 number?
25     THE COURT: Yes.

PAGE 122

**122**

1     MR. SALPETER: Fifty. Because I think the
2 disruption, the ultimate disruption to these customers and to
3 the relationship between Oracle and the customer is something
4 that the Court ought to take into account.
5     THE COURT: I do, I do.
6     MR. SALPETER: Particularly given how marginal this
7 is. It has potentially some relevance. We think it's
8 borderline. They are making a case that it's stronger.
9     We would like to see 30. They would like to see 93
10 plus seven. Whatever number we pick is going to be arbitrary,
11 but I would like to try to limit the amount of disruption to
12 the relationships.
13     These are customers who got a product that they said
14 was a buggy, lousy product, maybe defective in design, and now
15 we are going to add insult to injury by dragging them into this
16 securities litigation, having their deposition taken, their
17 documents sought.
18     THE COURT: These are the documents. We are not
19 talking about their depositions yet.
20     MR. SALPETER: Okay. Documents. I stand corrected.
21     THE COURT: But I want to make sure that's right.
22 They are not on the list of witnesses. You are going to have
23 to ask if you want those extra.
24     MR. SOLOMON: We want to see the documents and make a
25 reasonable choice before we go around talking to people live.

PAGE 123

**123**

1 Absolutely. We have met and conferred, your Honor, with 73 of
2 these potential witnesses already.
3     MR. SALPETER: Well, they should be able to pick the
4 best 30 or best 50, the ones they think will make their case --
5     THE COURT: Or the best 93.
6     MR. SALPETER: -- out of because --
7     THE COURT: They all seem. I mean, it's hard for me
8 to distinguish. You know, if they had gotten out 200 numbers,
9 you would be out -- 200 subpoenas, you would be out asking for
10 93 or 100.
11     MR. SALPETER: Well, because I -- you know there is
12 an inspector to discovery that is pure infliction of pain and
13 that ought to be limited frankly.
14     THE COURT: I know and I'm trying to limit it.
15     MR. SALPETER: I made my pitch for a different
16 number.
17     THE COURT: Okay. 93 plus seven more. That's it.
18 You better have a very good reason if you want to go beyond
19 that.
20     And the 93 are the ones you have already got out, so
21 and narrow to these subject matters.
22     MR. RUBINSTEIN: Your Honor, I did want to go back to
23 one question.
24     The Court talked about limiting the scope, it was for
25 third parties regarding bugs to integration.

PAGE 124

**124**

1     THE COURT: Yes.
2     MR. RUBINSTEIN: And I think it's important to be
3 clear and for the parties to be clear about what that means.
4     And in particular there is in the plaintiff's letter
5 a suggestion that integration might mean the ability of Oracle
6 products to be integrated with non-Oracle products, which it
7 seemed -- maybe we have reached agreement. I was not there.
8     But with regard to the meet-and-confer that occurred
9 last week, it's my understanding that that is not what is meant
10 and that that is not what the plaintiffs will define
11 integration to mean. I just want to make sure that that is
12 clear.
13     THE COURT: Is it clear?
14     MR. WILLIAMS: Your Honor, until we actually -- I
15 mean, this is the point I was raising earlier about using the
16 words "integration" and "implementation."
17     THE COURT: I understand that, but there is a false
18 representation alleged in this case. It is that these products
19 require no integration.
20     That means a particular thing, does it not? It means
21 that these different modules can be integrated with each other.
22     MR. WILLIAMS: I believe that that is what the
23 representation is.
24     THE COURT: Fine. And that is the scope of the
25 order. That is what we mean by "integration." It is the