Exhibit 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE ORACLE SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS.

No. C-01-0988 MJJ (JCS)

**ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL PRODUCTION
OF DOCUMENTS  [Docket No. 368]**

On October 7, 2005, the parties filed a Joint Letter Brief regarding Defendants' document production [Docket No. 368].  The Court treats the Letter Brief as a motion by Plaintiffs to compel the production of documents (the "Motion").  A hearing was held on October 18, 2005, at 11:00 a.m., before the undersigned.  Counsel for all parties appeared.

Good cause appearing and for the reasons stated on the record, IT IS HEREBY ORDERED that the Motion is GRANTED.  Within thirty (30) days from today's date, Defendants shall produce all of the following:

1.      All electronic information, including electronic images of documents, relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $100,000 or greater.

2.      All paper documents relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $1,000,000 or greater.

3.      This Order is without prejudice to Plaintiffs' right to come to this Court and seek additional production of documents and electronic information related to the debit memos, upon a showing of good cause.

1    IT IS SO ORDERED.

2

3    Dated: October 19, 2005

4                                      _____

5                                      JOSEPH C. SPERO
                                       United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

2

# Exhibit 5



**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS** LLP

SAN DIEGO · SAN FRANCISCO
LOS ANGELES · NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
PHILADELPHIA · SEATTLE

October 7, 2005.                    VIA E-FILING AND FACSIMILE

The Honorable Joseph C. Spero, Magistrate Judge
United States District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re:    *In re Oracle Corp. Sec. Litig.*, Master File No. C-01-0988-MJJ (N.D. Cal.)

Dear Judge Spero:

Plaintiffs and defendants submit this joint letter pursuant to this Court's orders of August 12, 2005 and September 29, 2005.

*Plaintiffs' Position.* Plaintiffs continue to seek the unsanitized "audit trail" (*i.e.*, paper and electronic source documents and materials that Oracle is required to retain by law and that this Court, in narrowing discovery, ordered defendants to produce over six months ago). Following the August 12, 2005 hearing, plaintiffs provided defendants with a detailed list of the types of documents the Amended Order Setting a Discovery Plan ("Order") requires defendants to produce. See Ex. 1 (ordering the production of all documents relating to the debit memo transactions, including all the "changes that occurred for them, the transactions that they arise from" and "documents of the so-called on account clean-up"). They include, for example, invoices, correspondence, and cash receipts journals. Ex. 2. The parties met and conferred on August 23, 2005, September 14, 2005 (face to face) and September 19, 2005.

Defendants have continued to reject plaintiffs' interpretation of the Order that defendants produce all documents reflecting "a complete history of [the debit memo] transactions." Ex. 1. Instead, defendants offered only to create a *new* document – likely in spreadsheet form – that they say will include supposedly preexisting electronic data about the history and accounting impact, if any, of the debit memos – not source documents relating to the transactions themselves. In addition, defendants advised that Oracle may not have preserved many of the purchase orders, order forms, invoices, customer correspondence, and contracts related to the underlying transactions – indeed, these are the very documents they told the Court they would produce. See Ex. 1. Oracle says even though it has electronically imaged some purchase orders and orders, it refuses to electronically search for them or photocopies of checks to and from customers and bank statements they admit are in storage. When plaintiffs reminded defendants again that the Court ordered and they had agreed to produce all 46,000 debit memos and underlying documents, defendants responded that the number of transactions they would agree to search for was "well south of 1,000." Defendants still have not produced debit memos themselves.

Defendants also specifically refused, their denial notwithstanding, *even to discuss* the production of standard Oracle reports, ledgers, and journals that would disclose the audit trail and accounting treatment of the debit memos from inception to finalization in Oracle's public financial records via the general ledger, *e.g.*, account status reports, receipt history reports, and billing history reports. See Ex. 2.

Attempting to compromise, on September 12, 2005, plaintiffs proposed that defendants initially produce all of the documents relating to and underlying, a population of only 10,000 of the debit memos – less than one quarter of the total, as well as all documents related to the credit memos Oracle issued. Ex. 3. After two additional meet and confers, defendants rejected this proposal as well, claiming that they would be willing to talk further after plaintiffs reviewed the new document they offered to create. However, despite the lapse of eight weeks since the August 12, 2005 conference, defendants have yet to produce even this document.

In light of defendants' continued intransigence and refusal to reasonably compromise, plaintiffs ask the Court to order the defendants produce the complete audit trail of paper and electronic documents pertaining to the 46,000 debit memos within five business days.

*Defendants' Position.* Since the August 12, 2005 hearing, Oracle has spent a substantial amount of time examining the burden and cost that would be required to produce the categories of documents that Plaintiffs have demanded. Oracle has determined that some categories of documents – for example, copies of checks sent by customers – would be extremely expensive to locate and produce and would be of minimal, if any, relevance to the claims in the Complaint. Oracle has made two compromise proposals, which Plaintiffs have rejected. Exs. 4 & 5. Plaintiffs offered a compromise position in late September, offering that Oracle begin by producing all documents relating to 10,000 of the transactions referenced in the debit memos. Defendants could not agree to that proposal because substantial burden problems remain if Oracle were to collect, for example, 10,000 cancelled checks. Because Plaintiffs have admitted that they cannot



Honorable Joseph C. Spero
October 7, 2005
Page Two

be sure what documents they need until they have received more information regarding the underlying transactions, Oracle believes that the best way to proceed is to have the Company continue with its plan to produce a massive amount of data concerning the underlying transactions, and Plaintiffs can then review the data and see if they need additional information. Oracle will start producing the data today.

Since August, Oracle has focused its efforts on preparing and producing a vast quantity of accounting data concerning the transactions associated with the debit memos, which includes detail of the sub-ledger entries for those underlying transactions as well as a number of the other items that Plaintiffs have requested. This is a massive undertaking, requiring the time and effort of programmers and accounting personnel. From this effort, Oracle is prepared to start by making a rolling production of accounting data for all transactions underlying (1) all of the debit memos with a dollar value of $1 million or more (68 DMs) and (2) a random sample of debit memos, generated using an optimal allocation methodology, from all remaining debit memos (720 DMs). These debit memos represent just under 50% of the total dollar value of all debit memos. This sample will allow Plaintiffs to test the entire population of debit memos to a 95% confidence interval, with a 5% error rate. Meanwhile, Oracle continues programatically to generate similar accounting detail for the remaining debit memos (approximately 45,000).

Plaintiffs' previous letter contained a number of inaccuracies that we correct here only to ensure that the record is accurate. First, Plaintiffs complain that Oracle is offering to create "new" documents. To the contrary Oracle – a database company – has offered to produce certain information that is stored only as electronic data. While Plaintiffs' letter appears to complain about this data, Plaintiffs steadfastly have asserted that they *want* Oracle to produce this data. Second, Plaintiffs wrongly claim that Oracle has refused to produce "source documents," even though Oracle has repeatedly explained that the "debit memos" are simply accounting entries that are recorded and stored electronically and that there are no separate documents that can be produced. Third, Plaintiffs wrongly suggest that Oracle has somehow destroyed or failed to preserve documents. That is simply untrue. The reality here is that Plaintiffs have requested documents (some of which date back to the early 90's) that were not retained by Oracle in the normal course of business and, thus, were discarded long before the filing of this lawsuit.

Notwithstanding that neither party is seeking a ruling, if the Court nevertheless is prepared to rule on this issue, Oracle respectfully requests the opportunity to file a motion for protective order regarding those categories of documents that would be unduly burdensome to produce. Oracle is willing to agree to an expedited briefing schedule for this motion.

Finally, Defendants respectfully request that the Court provide some guidance as to what the Court would like to see in a two-page discovery letter. While Defendants believe that the parties should work together to develop a joint submission in which each side's position is fully explained and responded to, Plaintiffs believe that this two-page letter simply should be two one-page position papers submitted together. Accordingly, Plaintiffs have refused to exchange drafts of their one-page letter or even to disclose what positions they plan to take in their letter. We would appreciate receiving the Court's clarification on this issue.

Respectfully submitted,

/s/ Shawn A. Williams
Shawn A. Williams
Counsel for Plaintiffs

/s/ Vincent P. Schmeltz III
Vincent P. Schmeltz III
Counsel for Defendants

S:\CasesSD\Oracle3\Corres\Spero_Joint_160705 ms.doc

# Exhibit 6

:s 1 - 21

United States District Court
Northern District of California
Before The Honorable Joseph C. Spero, Judge

In re: Oracle
Securities Litigation,            )
                                  )
        Plaintiff,                )
                                  )
                                  )        No. C01-0988 JCS
                                  )

                                San Francisco, California
                                Tuesday, October 18, 2005

                    Reporter's Transcript of Proceedings

Appearances:

For Plaintiff:          Lerach Coughlin Stoia
                        Geller Rudman & Robbins
                        655 West Broadway, Suite 1900
                        San Diego, California  92101-3301
                   By:  Mark Solomon, Esquire
                        Jennie Lee Anderson, Esquire
                        Monique Winkler, Esquire

For Defendant:          Mayer, Brown, Rowe & Maw
                        71 South Wacker Drive
                        Chicago, Illinois  60606
                   By:  Lee Rubin, Esquire
                        Vincent P. Schmeltz III, Esquire
                        Alan Salpeter, Esquire

Also Present            James C. Maroulis, Esquire
                        Oracle Corporation

                        James Feldman, CPA, ABV, MBA
                        Forensic Accountant

Reported By:            Sahar McVickar, RPR, CSR No. 12963
                        Official Reporter, U.S. District Court
                        for the Northern District of California

                    (Computerized Transcription By Eclipse)

1   Tuesday, October 18, 2005                           11:00 a.m.
2                       P R O C E E D I N G S
3              THE CLERK:  Judge, I have counsel by phone.

                            Page 1

9   "Further the deposition in evidence sought in the letter
10  request would ultimately be needed for trial," on the basis
11  that that hadn't been shown.
12             On page 4, line -- let me see, where is that, line
13  10, I would replace the words "they will look to her to provide
14  testimony in support of their case with respect to," with the
15  words "Ms. Kammer has knowledge of," okay?  But other than
16  that, I think the letter is fine.
17             Anyone want to make any comments?
18             MR. SCHMELTZ:  Absolutely.
19             Vincent Schmeltz on behalf of the defendants.
20             The only thing I would ask, I think that someone,
21  and it may not be the plaintiffs, is going to ask for
22  Ms. Kaymer's testimony.  I mean, she has specific knowledge in
23  the case.  And we have put that in our papers.  I won't state
24  on the record that issue again, since it's in our papers that
25  are filed under seal.  I think someone will ask for the

                            Page 3

1   testimony.  It may be the defendants, if the testimony goes the
2   way we hope it will.
3              THE COURT:  Okay.
4              MR. SCHMELTZ:  So I would ask for that modification.
5              THE COURT:  I'm not going to give that modification.
6              MR. SCHMELTZ:  I have nothing.
7              THE COURT:  All right.  Then that is the order of
8   the Court.  I'll ask counsel who are requesting the letter to
9   prepare a letter in the form that I've authorized, and I will
10  enter an order authorizing it, and you can prepare a proposed
11  form of order as well, and we'll get that out.  Now, on to the
12  real fight.
13             My concerns here are as follows:  Number one, I'm

                            Page 3

5              THE CC        wonder what the best way to do that
6   is, if he's really      g to hear.  We'll see how it works.
7              MR. Salpeter?
8              MR. SALPETER:  Yes, good morning.
9              THE COURT:  I will ask my deputy to call the case.
10             THE CLERK:  Calling case C01-0988.  In re:  Oracle
11  Securities Litigation.
12             MR. SOLOMON:  Mark Solomon representing plaintiffs.
13             MS. ANDERSON:  Jennie Lee Anderson representing
14  plaintiffs.
15             MS. WINKLER:  Monique Winkler representing
16  plaintiffs.
17             MR. FELDMAN:  James Feldman representing plaintiffs.
18             MR. RUBIN:  Lee Rubin representing defendants.
19             MR. MAROULIS:  James Maroulis for Oracle
20  Corporation.
21             MR. SCHMELTZ:  Vincent Schmeltz, from Mayer Brown,
22  representing defendants.
23             MR. SALPETER:  And Alan Salpeter, Your Honor, on the
24  phone.
25             THE COURT:  Thank you very much.

1              There are two matters in front of the Court.  The
2   first is the letter requests, or the request for the issuance
3   of letters by the Court to the Ministry of Justice in Denmark.
4   My reaction to that is that the letter is basically okay with
5   the exception of a couple of things.
6              On page 4 of the letter, line 2, I would delete the
7   words "this court." and on lines 3 and 4, I would delete the
8   last sentence that reads -- of the paragraph that reads,

                            Page 2

14  concerned that during the course of setting up the very
15  detailed discovery plan in this case, the defendants argued and
16  obtain a narrower scope of discovery in exchange for a
17  commitment that all of the documents regarding all of these
18  debit memos, including all the underlying documents would be
19  committed.  And that, to my mind, is clear as day in the
20  transcript that that was the position taken at that time.  And
21  you are changing your position.
22             Now, there may be good reasons to change your
23  position, and maybe I'll buy that, but one of the things that
24  occurs to me is, and it's a somewhat simple-minded reaction,
25  and it's for that reason maybe worth questioning, is why

1   shouldn't I just hold you to your position?  You bought off on
2   this at the earlier stage.  You bought off on it for very good
3   reasons, because we were arguing about a much broader scope of
4   discovery.  And the fact that you find it inconvenient at the
5   moment to live up to it, that's question number one.
6              Question number 2 is for the plaintiffs.  I'm never
7   going to believe that every canceled check, that every canceled
8   check on 10,000 debit memos are relevant to this case.  You are
9   never going to be able to convince me of that.  So doesn't that
10  mean that we need some dramatic compromise?  You both have to
11  answer those questions.
12             My suggestion would be as follows, that in
13  Solomonic -- that's probably too self-aggrandizing, in the way
14  that I tell you that judges can rule on these things, that is,
15  from 30,000 feet because I don't have anywhere near the
16  knowledge, I would propose the following order in the case:
17  That the defendants produce all information stored in
18  electronic form regarding all 45,000 debit memos in all

                            Page 4

19  underlying transactions, anything stored in ...
20  and that we set a date that that we retain ...  produce
21  all documents regarding the -- that are not in ...  ic form
22  regarding the debit memos in the underlying transactions only
23  for debit memos over $1 million, and that we set a date for
24  that; and that lastly, if after reviewing all this evidence the
25  plaintiffs can convince me that there is a good reason why they

                                                                    6

1   should get more of the hard documentation regarding --
2   presumably they are the underlying transactions, well, then,
3   we'll take that up at the time.  That is my suggestion.
4       Who wants to go first?  I guess why don't I ask
5   plaintiffs to speak to this first.
6       We are done at 11:30 because I'm in the middle of a
7   criminal matter.
8       MR. SOLOMON:  First of all, I have to agree that
9   being Solomonic is the appropriate thing to do.  If I didn't
10  say that, someone would say I should have said it.
11      And secondly, if your suggestion, as I understand
12  it, is without prejudice for us to come back and make that sort
13  of showing, then I think that's something we can live with, and
14  it will move the discovery process.
15      THE COURT:  Yes, it is.  You wouldn't be able to
16  just ask for it, you would have to be able to make sure --
17      MR. SOLOMON:  Absolutely.  I would submit on that
18  basis subject to what they have to say.
19      THE COURT:  Sure.
20      Mr. Rubin?
21      MR. RUBIN:  Yes, thank you, Your Honor.
22      THE COURT:  Yeah.
23      MR. RUBIN:  Just briefly.
                    Page 5

---

                                                                    7

1       MR. SALPETER:  Thank you.
2       MR. RUBIN:  Okay.
3       Can you hear me, Mr. Salpeter?
4       MR. SALPETER:  Yes.
5       MR. RUBIN:  Your Honor, let me just very briefly
6   tell you what Oracle has been doing internally to try to get
7   our hands around this electronic production, which I will
8   frankly tell you has been far more difficult than we had
9   anticipated.  And that is not withstanding the fact that there
10  is the idea that we are a database company and, of course, you
11  should be able to do this.
12      The fact is we are doing something artificially
13  here.  This is not something that Oracle would do in the normal
14  course, to look back fifteen years and pull the transactions.
15  I want to assure the Court that from the moment we left the
16  courtroom and my colleagues did on August 12, we have spent
17  lots and lots of hours with our IT people and accounting people
18  to figure out the most practical and efficient way and feasible
19  way that this could be done.
20      I know the Court has read the correspondence and
21  looked at the different proposals that we have offered, and I
22  appreciate the Court's proposal.  One of the things we
23  discovered in the last two weeks is the following:  We
24  essentially created a script, just like we have for the
25  production we already gave.  The production we've already

1   provided was November 17th and forward.  Now we are trying to
2   do the more difficult process of going backwards, that is,
                    Page 6

---

3   looking at the original transactions that are associated with
4   the debit memos, 1991 -- customer payment for an invoice in
5   1991, money comes in $100 more than what was paid, and
6   following all the accounting entries; debit accounts
7   receivable, debit to cash, debit to sales tax, trying to follow
8   it all the way through.
9       So I just wanted to visually show you; (holding up
10  chart) this, for example, is one debit memo.  I think it's --
11  I'm sorry, this is one debit memo.  Page 1 through 16, the
12  original transaction was August 31st, 1995.  And these are all
13  the transactions, all of the accounting entries related to this
14  one debit memo.
15      THE COURT:  So that document represents the success
16  of your script.  That is to say, you have now pulled together
17  all of the electronic entries regarding the underlying
18  transactions.
19      MR. RUBIN:  Regarding one of the 46,000.
20      MR. SCHMELTZ:  Just to be very clear, it also
21  presents one of the problems we have had.  It is a success in
22  that we were able to pull a lot of information.  It presents a
23  problem in that we have to use in some cases a fuzzy matching
24  logic to find -- there's not a key number that ties, so we use
25  a fuzzy logic like an exclamation point in a westlan search.

                                                                    9

1   And it pulls more data than we need for the transaction.  There
2   is some amount of human intervention --
3       THE COURT:  Sure.
4       MR. SCHMELTZ:  -- for these.  We need to go back and
5   do the research.  Is it I search for Spero with an exclamation
6   point after the "R"?  Is it this Spero or a different Spero?
7       MR. RUBIN:  Right.
                    Page 7

---

8       MR. SCHMELTZ:  With that caveat.
9       MR. RUBIN:  We had initially thought, when we
10  thought at the time -- when we were here at the time of
11  discovery conference in February, and we thought even as of the
12  time we were here in August, that we would with some work be
13  able to to create a script that essentially programmatically
14  ran the electronic data for these 46,000 debit memos going
15  backwards.
16      At least half of the debit memos in the samples that
17  we have run in this first tranche of approximately 700 that
18  includes the 1 million that you are focusing on, plus
19  additional ones under 100,000 to a million, we found that over
20  half require manual intervention; that is, we are not --
21  because there is no link, as Mr. Schmeltz said, we don't have a
22  customer receipt number that follows through, then we have to
23  basically use, like, Westlaw search methods.  If we were
24  searching for your name, we would say S-p-e, exclamation point,
25  and we get a lot of data coming back.  So then we have to sort

                                                                    10

1   out, well, which particular transaction matches this particular
2   debit memo going backwards.
3       All that being said, Your Honor, what we would like
4   to propose today is the following:  There are 780 debit memos
5   of $100,000 or more, and there are 780 of the 46,000.  And --
6       THE COURT:  780 debit memos of 1 million?
7       MR. RUBIN:  100,000 or more.  There are about 68
8   that are 1,000,000 or more.  And then when you drop down to
9   100,000 --
10      THE COURT:  It's 780.
11      MR. RUBIN:  It's about 780.
12      This is what we would propose:  That we produce all
                    Page 8

0510183CS.txt

13 of the electronic data and underlying the manual
14 intervention, like I said, even as to those, pi        at least
15 half, so it's going to take us a little time, but we'll produce
16 all those and then provide those to the plaintiffs as you
17 proposed, have them look at that data, and, again, picking up
18 on your suggestion without prejudice they would then come back.
19        So this would give them, just to give you an idea of
20 the amounts, the amount of all the debit memos taken together
21 is $690 million.  Those 780 debit memos would constitute
22 $520 million, so you -- basically, with those debit memos you
23 would have about 80-something, 85 percent of the total amount.
24        We would then provide that, let them look at that
25 data.  In our meet and confer discussions, it's been quite-

                                                                11

1 clear that they have even said there certainly is data that we
2 may not need, we don't have enough visibility.  Let them
3 examine all the electronic data which simply by itself would
4 require a lot of work.  We'll produce that to them as quickly
5 and as soon as we can and then allow them -- if they can -- if
6 they have an indication that they need more, then we can talk
7 about it.
8        But that, we believe, given the difficulties and the
9 complexities that we have faced, we think it's a very sensible
10 and fair place to start.  Once you start getting much beyond
11 that, Your Honor, we are really, and I'm not one for hyperbole,
12 but you really starting to talk about months of work, even as
13 to the electronic data because of the manual intervention that
14 would need to take place in order to match up these
15 transactions.
16        THE COURT:  You have in front of you a debit memo
17 that was done successfully, how much people time did it take to
                          Page 9

0510183CS.txt

23 memos and produce those to them.
24        THE COURT:  How quickly?
25        MR. RUBIN:  Let me have the Court's indulgence for a
                                                                13

1 moment, so I don't overstate.
2        We think we can accomplish it 30 days from today.
3        THE COURT:  Including the paper document?
4        MR. RUBIN:  Yes.
5        THE COURT:  Mr. Solomon?
6        MR. SOLOMON:  Thank you, Your Honor.
7        The problem we have, Your Honor, is that we do need
8 the audit trail.  What is being suggested does not amount to an
9 audit trail.  It's certainly not something that an auditor can
10 rely on without looking at the source documents.
11        THE COURT:  Wait, wait, wait.  Stop.
12        If you get all the electronic documents on all debit
13 memos over $100,000, okay, I don't know whether their format is
14 that or not, frankly, I don't particularly care.  But if you
15 get all the electronic information that they have on the debit
16 memos, $100,000 or more and all of the paper documents on
17 documents over $1 million or more, and you get all that in 30
18 days, how about that?
19        MR. SOLOMON:  When we are talking about electronic,
20 I want to include image documents.  That would be important,
21 Your Honor.
22        THE COURT:  okay.
23        MR. SOLOMON:  And if we understand that and we get
24 all the paper documents --
25        THE COURT:  Well, okay, image documents, yes, of
                                                                14

18 narrow this -- t.
19        MR. RU       .his particular one I believe was about
20 an hour and a half or two hours.
21        MR. SCHWELTZ:  For that one, like I said, there is
22 still some errors in that one, but for a typical one it can
23 take anywhere from twenty minutes to two hours.
24        THE COURT:  So you think about 50 percent of the
25 debit memos -- well, are the larger ones more difficult?
                                                                12

1        MR. RUBIN:  Not necessarily.  Sometimes --
2        THE COURT:  Are there more underlying transactions
3 with the larger debit memos so you are going to have more --
4        MR. RUBIN:  I think it's random.  I think you could
5 find some difficult ones at 150,000 and some easy ones at
6 1 million, and vice-versa.
7        MR. SCHWELTZ:  You have --
8        THE COURT:  Let's have one lawyer.
9        MR. RUBIN:  So there is some randomness.  I think
10 there might be some smaller ones that create the same kinds of
11 difficulties.  Some of the million-dollar ones may be simple,
12 some might be complex.  So I'm clearly speaking on averages.
13 Some may be ten minutes, but like this one, which Mr. Schweltz
14 said still contains errors, it could well take over two hours
15 to try to find the right link or try to find the common
16 thread --
17        THE COURT:  Did you talk about -- maybe I missed it,
18 did you talk about the paper documents that I was interested
19 in?
20        MR. RUBIN:  The paper documents, that's fine, Your
21 Honor.  So the paper documents over a million, we will find all
22 the paper documents related to the 1 million and over debit
                          Page 10

0510183CS.txt

1 course.  I mean, one way or the other those are going to be
2 included.
3        MR. SOLOMON:  We don't want something that they have
4 created with a "trust-me-to-the-source" type explanation.
5        THE COURT:  Some of it is going to be.  I mean, it's
6 a database.  And then they'll have to have some explanation for
7 how it was put together so it's a sufficiently reliable
8 indication of what is in the database.  They have to preserve
9 the database so you can test that if it ever needs to be
10 tested.  They have to authenticate it themselves and that, you
11 know, so it is real data.  But some of it is taken based on
12 those sorts of assurances, I suppose.
13        But so that if you have all the electronic
14 information on debit memos of $100,000 or more, including
15 images; second, all paper documents, I mean -- by debit memos,
16 I mean debit memos and the underlying transactions, paper docs
17 on the debit memos and underlying transactions of $1 million or
18 more, and you did that within 30 days, and it's without
19 prejudice to applying for more, how does that work?
20        MR. SOLOMON:  It works for me in terms of us getting
21 information that we can work with and move the case forward,
22 your Honor, and I appreciate that.  As long as I'm welcome when
23 we come back for follow-up, then we can live with it.
24        THE COURT:  Well, it depends on your showing.  You
25 are welcome if you make a good showing, you are unwelcome if
                                                                15

1 you make a bad showing.
2        Seriously, at some point it becomes such minutia.
3 And I'm not reluctant to have them spend a thousand hours
4 preparing what the Court has suggested in terms of the
5 electronic data, I am reluctant to have them spend 45,900 hours
                          Page 12

6    or 25,000 hours previously -- there's no American

7    showing to do that.

8         A note is being passed, so I think I'.    t.

9         You want to say something, I'll give you a chance.

10   No? Okay.

11        Have I missed something?

12        MR. SOLOMON: Do you mind if I confer with my

13   colleague?

14        THE COURT: Go ahead.

15        Did you want to add something?

16        MR. RUBIN: No.

17        THE COURT: We're fine so far?

18        MR. RUBIN: Yes.

19        (Counsel Confer.)

20        MR. SOLOMON: Thank you, Your Honor.

21        Three things, I think. We need to look at entire

22   customers as a block. Because so many transactions are

23   interrelated, we want to be sure that we are getting with

24   respect to that limited production at least the entire customer

25   history within the debit transactions.

Page 13                                          16

1         Number two, we would want to include all credit

2    memos. We understand there is around 1000 of them. This is

3    supposedly overpayments that were repaid after October of 2000.

4    And I think this is probably for when we come back, Your Honor,

5    but we don't want to simply ignore the 40,000-odd transactions

6    that are under the $100,000. We want at some stage some

7    sampling, I think. But with those comments and caveats, we go

8    along with the program.

9         THE COURT: Well, I don't know what it means. I

10   don't know what you mean by "credit memos." Are those included

Page 13

---

12        MR. SOL        yes, in a sense.

13        THE COUR..    No, no, I'm asking you.

14        MR. RUBIN: Yes.

15        THE COURT: So the answer is yes.

16        MR. RUBIN: To the extent they are credit memos

17   associated with the 785, it would be reflected.

18        THE COURT: So any credit memos associated with the

19   underlying transactions of these 780-odd, those would be

20   included in the electronic and ultimately, I suppose, in the

21   paper for the larger ones.

22        With respect to customers, I don't know how that

23   breaks out. I mean, maybe -- I don't know how that breaks out.

24   What he is saying is, you know, if you've got a certain

25   customer that is a database customer with the debit memo, does
                                                            17

1    that mean -- and you produce that, will there be other debit

2    memos for those customers that aren't produced, smaller ones,

3    perhaps?

4         MR. RUBIN: This has always been an exercise in

5    producing the transactions related to the debit memos that

6    customers paid Oracle in 1998, and that transaction didn't end

7    up being --

8         THE COURT: But I don't know how the -- would there

9    be multiple debit memos for any given customer such that there

10   might be some that aren't included in the 780, even though

11   you've got one or two?

12        MR. RUBIN: There could be. So there could be a

13   $50,000 debit memo that relates to --

14        THE COURT: Why do you need the smaller one?

15        MR. SOLOMON: Just to show, Your Honor, how

Page 14

---

16   ultimately -- having looked at one account that everybody seems

17   to have focused on, which is Household, it becomes apparent

18   that regardless of the dollar amount, you need to know the

19   transaction in order to ultimately demonstrate whether that

20   amount was on account and whether that amount was properly

21   taken into revenue or not.

22        THE COURT: But you are going to get the

23   transaction. You just might not get other transactions with

24   the same customers. I mean, your theory is that maybe there

25   are transaction that are related.
                                                            18

1         MR. SOLOMON: Correct, Your Honor, what may affect a

2    customer's AR balance, at any point in time.

3         THE COURT: I guess that's right, but why it's

4    significant in this case I'm not entirely sure. But I don't

5    know. I'm not going to go into that. If you put some showing

6    that I've got customer A, and our account's experts say they

7    cannot do the following evaluation without the rest of the

8    debit memo information on that customer, well, then, we'll

9    revisit that.

10        MR. SOLOMON: Okay.

11        THE COURT: And the other transactions, if you guys

12   can work out a sampling on them, that would be great. I think

13   you proposed a sampling at some point.

14        MR. SOLOMON: One caveat or additional comment, in

15   Household Oracle refunded 15 debit memos in one lump sum, so

16   what I'm saying is regardless of the dollar amount, clearly,

17   those 15 transactions need to be fully accounted for.

18        THE COURT: Do you know what he's referring to?

19        MR. RUBIN: That could be the case with any

20   particular transaction. I don't know specifically with

Page 15

---

21   Household, but the point is that we are starting with an amount

22   that is clearly more than material to the claim, that

23   $228,000,000 of revenue was --

24        THE COURT: Well, I understand, but depending on how

25   they are lumped together and paid or not paid and assigned,
                                                            19

1    take three or four of them together, I don't know.

2         Here is what we are going to do, nobody has enough

3    information to convince me one way or another whether these

4    distinctions you are making are important or not at this point,

5    so we are not going to make them at this point. If at some

6    point they are important and you can't work them out, we'll

7    work them out then. For the moment, that will be the order of

8    the Court. No more argument, no more distinction, no more note

9    passing.

10        Within 30 days from today, I want for Oracle to

11   produce the following: All electronic information, including

12   imaging, on the debit memos and the transactions that underlie

13   those debit memos or relating to the debit memos that are over

14   $100,000 in value.

15        Second, on or before the same time period, produce

16   with respect to debit memos that are over $1 million, a million

17   dollars or more, all paper documents relating to those debit

18   memos in the underlying transactions. This order will be

19   without prejudice to the plaintiffs making an application to

20   the Court for some additional productions with respect to

21   debit memos.

22        Thank you. All right, thank you very much.

23        MR. SOLOMON: Did you mention 30 days?

24        THE COURT: Thirty days from today.

25        MR. RUBIN: I just want to clarify, on the

Page 16                                          20

1  electronic data you said imaging?

2      THE COURT:  Well, if there are imaged     ents,

3  those are included in the "all electronic information."

4      MR. RUBIN:  If they are imaged but not hard copies

5  in storage.

6      THE COURT:  No, no, hard copies in storage all apply

7  to million dollars or more.  Got it?  Great.  I knew you could

8  work through this.

9      MR. SALPETER:  Thank you very much.

10          (Proceedings adjourned at 11:31 a.m.)

11

12

13              ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

                                  ...then District of California, hereby
certify that the       g proceedings were reported by me, a
certified shorthand ... orter, and were thereafter transcribed
under my direction into typewriting; that the foregoing is a
full, complete and true record of said proceedings as bound by
me at the time of filing.  The validity of the reporter's
certification of said transcript may be void upon disassembly
and/or removal from the court file.


                    _____
                    Sahar McVickar, RPR, CSR No. 12963
                         October 18, 2005

CERTIFICATE OF REPORTER

I, Sahar McVickar, official Court Reporter for the

Exhibit 7



**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**

SAN DIEGO • SAN FRANCISCO
LOS ANGELES • NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
PHILADELPHIA • SEATTLE

Willow E. Radcliffe

November 7, 2005

<u>VIA FACSIMILE</u>

Vincent P. Schmeltz, III ("Trace"), Esq.
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL 60606

Re:   *In re Oracle Corporation Sec. Litig.*
      Master File No. C-01-0988-MJJ (N.D. Cal.)

Dear Trace:

I write regarding our conversation of earlier today wherein you confirmed that it is defendants' position that with the exception of those documents the Court ordered produced on October 19, 2005 and possibly certain documents related to the Securities and Exchange Commission's investigation of Oracle Corporation, defendants have produced all documents responsive to the Court's March 10 Order. If there are any other responsive documents that defendants will be producing absent a Court order please advise us immediately.

Very truly yours,

Willow E. Radcliffe

WER:krh
cc:   Mark Solomon
      Shawn Williams

# Exhibit 8

1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | WILLIAM S. LERACH (68581)
MARK SOLOMON (151949)
3 | DOUGLAS R. BRITTON (188769)
401 B Street, Suite 1700
4 | San Diego, CA 92101
Telephone: 619/231-1058
5 | 619/231-7423 (fax)
– and –
6 | SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
7 | ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
8 | San Francisco, CA 94111
Telephone: 415/288-4545
9 | 415/288-4534 (fax)

10 | Lead Counsel for Plaintiffs

11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA

14 | In re ORACLE CORPORATION ) Master File No. C-01-0988-MJJ
SECURITIES LITIGATION )
15 | _____ ) CLASS ACTION
)
16 | This Document Relates To: ) PLAINTIFFS' FIRST SET OF REQUESTS
) FOR PRODUCTION OF DOCUMENTS TO
17 | ALL ACTIONS. ) DEFENDANTS ORACLE, *ET AL.*
)
18 | _____ )

19

20

21 | PROPOUNDING PARTY:          Plaintiffs

22 | RESPONDING PARTY:           Defendants Oracle Corporation, Lawrence Ellison,
                                Jeffery O. Henley, and Edward Sanderson
23 | SET NUMBER:                 One

24

25

26

27

28

1  TO:    ALL PARTIES AND THEIR COUNSEL OF RECORD HEREIN

2         Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiffs in the above-captioned

3  action, by counsel, hereby request that responding parties produce and permit plaintiffs' counsel to

4  inspect and to copy those documents specified herein which are, as of the date of service hereof, in

5  the possession of, or in any way subject to the control of, defendants Oracle Corporation, Lawrence

6  Ellison ("Ellison"), Jeffery O. Henley ("Henley") and Edward Sanderson ("Sanderson") within 30

7  days of service of the Request at the offices of Lerach Coughlin Stoia Geller Rudman & Robbins

8  LLP, 100 Pine Street, Suite 2600, San Francisco, California, 94111, or at such other place which

9  shall be agreed upon by counsel for the parties. Defendants shall produce said documents as they are

10 kept in the usual course of business or shall organize and label them to correspond with the

11 categories in the request. Defendants are further required to supplement the responses.

12 I.    DEFINITIONS

13        Unless otherwise stated, the terms set forth below are defined as follows:

14        (a)    "Oracle" or the "Company" refers to defendant Oracle Corporation and its

15 parents, subsidiaries, divisions, affiliates, operating units, controlling persons, controlled persons,

16 officers, directors, employees, representatives, or agents.

17        (b)    "Individual Defendants" refers to Ellison, Henley, Sanderson and any

18 employees, implied or express agents, attorneys, or other persons or entities acting in conjunction

19 with them or on their behalf.

20        (c)    "Defendants" refers to Oracle and the Individual Defendants and their

21 predecessors, successors, parents, subsidiaries, divisions, or affiliates, and their respective officers,

22 directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar

23 positions or performing similar functions.

24        (d)    "Document" or "documents" has the same meaning as Fed. R. Civ. P. 34 and

25 includes, in the broadest sense possible, but is not limited to, any written, printed, typed, photostated,

26 photographed, recorded, or otherwise reproduced or stored communication or representation,

27 whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination

28 thereof.  This definition includes copies or duplicates of documents contemporaneously or

1  subsequently created which have any notes or other markings. Without limiting the generality of the

2  foregoing, "document" or "documents" includes, but is not limited to, correspondence, memoranda,

3  notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements,

4  working papers, accounts, analytical records, reports and/or summaries of investigations, trade

5  letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers,

6  booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes

7  or minutes of meetings, or other communications of any type, including inter- and intra-office

8  communications, questionnaires, surveys, charts, graphs, photographs, photographic recordings,

9  films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data

10  processing or word processing equipment, including e-mail, and all other data compilations from

11  which information can be obtained (by translation, if necessary, by you through detection devices

12  into usable form), including, but not limited to, electromagnetically-sensitive stored media such as

13  floppy disks, hard disks, and magnetic tapes, and any preliminary versions, drafts, or revisions of

14  any of the foregoing.

15     (e)    "Communication" or "communications" refers to every manner or means of

16  disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries, or otherwise),

17  whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

18     (f)    "Concerning" means relating to, referring to, describing, discussing,

19  evidencing, regarding or constituting.

20     (g)    "Refer" or "relate" or "referring" or "relating" means all documents which

21  explicitly or implicitly, in whole or in part, were received in conjunction with, or were generated as a

22  result of, the subject matter of the request, including, but not limited to, all documents which reflect,

23  record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate,

24  analyze, review, report on, comment on, impinge upon, or impact the subject matter of the request.

25     (h)    "You" or "your" refers to the defendants upon whom this request is served

26  and all officers, directors, employees, representatives, or agents acting on behalf of each of the

27  responding defendants.

28

1          (i)     "CRM" refers to Oracle's Customer Relationship Management software
2    products and services.

3          (j)     "11i" refers to Oracle's 11i Suite of software products and services, including
4    all of its individual modules such as CRM.

5          (k)     "GE Capital" refers to GE Capital Corporation and its parents, subsidiaries,
6    divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

7          (l)     "BellSouth" refers to BellSouth Corporation and its parents, subsidiaries,
8    divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

9          (m)     "Telia AB" refers to Telia AB – Sweden or TeliaSonera AB and its parents,
10   subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or
11   agents.

12         (n)     "JDS Uniphase" refers to JDS Uniphase Corporation and its parents,
13   subsidiaries, division, affiliates, domestic and foreign offices, operating units, partners, officers,
14   directors, employees, representatives, or agents.

15         (o)     "Hewlett-Packard" refers to Hewlett-Packard Company and its parents,
16   subsidiaries, division, affiliates, domestic and foreign offices, operating units, partners, officers,
17   directors, employees, representatives, or agents.

18         (p)     "Nantucket Allserve" refers to Nantucket Allserve, Inc. and its parents,
19   subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or
20   agents.

21         (q)     "Motorola," refers to Motorola, Inc. and its parents, subsidiaries, divisions,
22   affiliates, operating units, officers, directors, employees, representatives, or agents.

23         (r)     "Health Net" refers to Health Net, Inc. and its parents, subsidiaries, divisions,
24   affiliates, operating units, officers, directors, employees, representatives, or agents.

25         (s)     "Now Foods" refers to Now Foods, Inc. and its parents, subsidiaries,
26   divisions, affiliates, operating units, officers, directors, employees, representatives, or agents.

27

28

1       (t)    "Telecom New Zealand" refers to Telecom New Zealand Limited and its

2 parents, subsidiaries, divisions, affiliates, operating units, officers, directors, employees,

3 representatives, or agents.

4       (u)    "Foster's Group" refers to Foster's Group Limited and its parents,

5 subsidiaries, divisions, affiliates, operating units, officers, directors, employees, representatives, or

6 agents.

7       (v)    "Principal Financial Group" refers to The Principal Financial Group, Inc. and

8 its parents, subsidiaries, divisions, affiliates, operating units, officers, directors, employees,

9 representatives, or agents.

10       (w)    "Person" or "persons" refers to any natural person, proprietorship, public or

11 private corporation, partnership, joint venture, trust, association, company, firm, government or

12 governmental entity (including any government agency, board, authority, commission, or political

13 subdivision or department thereof), or any other form of business or legal entity, organization, or

14 arrangement.

15       (x)    "Customer" or "customers" is used in the broadest possible sense, including

16 all members of all target markets.

17       (y)    "SEC" refers to the United States Securities and Exchange Commission.

18       (z)    "Financial statements" includes, without limitation, the following (whether

19 audited or unaudited, and whether, final, interim, pro forma, complete or partial): consolidated and

20 non-consolidated balance sheets, statements of earnings, revenues, profits and losses, additional

21 paid-in capital, retained earnings, source and application of funds, cash flow statements, projections,

22 notes to each of such statements, and any and all other statements and notes that pertain to the

23 applicable defendant's past or present financial condition, including accountants' workpapers.

24       (aa)    "Meeting" refers to the contemporaneous presence of any natural persons,

25 whether or not such presence was by chance or prearranged, and whether or not the meeting was

26 formal or informal, occurred in connection with some other activity, or was by telephone or

27 teleconferencing.

28

1  (bb)   "Board" refers to Oracle's Board of Directors and any committee or
2  subcommittee thereof.

3  (cc)   "E&Y" means Ernst & Young, LLP and any of its subsidiaries, divisions,
4  subdivisions, affiliates, predecessors, successors, officers, directors, board of directors or committees
5  thereof, employees, representatives or agents, including, but not limited to, attorneys, accountants,
6  investment advisors or bankers, and any other person acting or purporting to act on its behalf and all
7  other entities operated or controlled by E&Y or by any direct or indirect subsidiary or affiliate
8  thereof.

9  (dd)   "AA" means Arthur Andersen LLP and any of its subsidiaries, divisions,
10  subdivisions, affiliates, predecessors, successors, officers, directors, board of directors or committees
11  thereof, employees, representatives or agents, including, but not limited to, attorneys, accountants,
12  investment advisors or bankers, and any other person acting or purporting to act on its behalf and all
13  other entities operated or controlled by AA or by any direct or indirect subsidiary or affiliate thereof.

14  (ee)   "SLC" means the Special Litigation Committee described in Oracle's Form
15  10-K for the fiscal year ended May 31, 2002 filed with the SEC.

16  (ff)   The connectives "and" and "or" shall be construed either disjunctively or
17  conjunctively as necessary to bring within the scope of the document request all responses that
18  otherwise might be construed to be outside of its scope.

19  (gg)   The use of the singular shall be deemed to include the plural, and the use of
20  one gender shall include all others, as appropriate in the context.

21  II.   INSTRUCTIONS

22  (a)    In responding to these requests, furnish all responsive documents available at
23  the time of production, including documents in the possession of your agents and representatives.

24  (b)    This is a continuing request for the production of documents. If, after making
25  your initial production, you obtain or become aware of any further documents responsive to this
26  request, you are required to produce such additional documents to plaintiffs.

27  (c)    You are requested to produce all documents described below that are in your
28  custody or under your control in the form and in the same order within each file in which they are

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ

1 located prior to production. The file folders, boxes, binders, or other containers in which such

2 documents are found are also requested to be produced intact, including the title, labels, or other

3 description of each such folder, box, binder, or container.

4      (d)    If you claim any form of privilege, whether based on statute or otherwise, as a

5 ground for not producing any document, state the following:

6         (i)    the date of the document;

7         (ii)    the name, the present or last known residential and business addresses,

8 the telephone numbers, and the title or position and the occupation of those individuals who

9 prepared, produced, reproduced, or who were recipients of, said documents;

10         (iii)    a description of the document sufficient to identify it without revealing

11 the information for which the privilege is claimed;

12         (iv)    each and every fact or basis upon which you claim any such privilege;

13         (v)    the location of the document; and

14         (vi)    the custodian of the document.

15      (e)    Notwithstanding the assertion of your objection, any requested document

16 which you object to furnishing but which nevertheless contains non-objectionable information which

17 is responsive to any request must be produced, but that portion of the document for which the

18 objection is asserted may be withheld provided that the above-requested information is furnished.

19      (f)    Each document requested herein is requested to be produced in its entirety and

20 without deletion or excisions, regardless of whether you consider the entire document to be relevant

21 or responsive to these requests. If you have redacted any portion of a document, stamp the word

22 "REDACTED" on each portion of the document which you have redacted. Redactions should be

23 included on the privilege log described in Instruction (d).

24 III.    RELEVANT TIME PERIOD

25      All requests herein refer to the period June 1, 2000 to June 30, 2001 ("relevant time period"),

26 unless otherwise specifically indicated, and shall include all documents that relate, in whole or in

27 part, to such period even though dated, prepared, or received prior to or subsequent to that period.

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ

1  ## IV.    DOCUMENT REQUESTS

2  REQUEST NO. 1:

3        All documents and communications relating to the actual and forecasted sales and orders for

4  Oracle's e-business applications products, including, but not limited to, 11i and any and all pipeline

5  reports and upside reports relating to the same.

6  REQUEST NO. 2:

7        All documents and communications relating to the actual and forecasted sales and orders for

8  Oracle's database products, including, but not limited to, Oracle 8i and any and all pipeline reports

9  and upside reports relating to the same.

10  REQUEST NO. 3:

11        All documents and communications relating to actual and forecasted sales and orders for the

12  CRM module, and any and all upside reports and pipeline reports relating to the same.

13  REQUEST NO. 4:

14        All documents and communications relating to any sales discounts or rebates offered or given

15  to any Oracle customer or potential customer between June 1, 2000 and March 31, 2001 on Oracle's

16  database or applications products.

17  REQUEST NO. 5:

18        All documents and communications relating to Oracle's sales staff 3Q01 and/or FY01 sales

19  quotas and/or goals, including, but not limited to, documents concerning any particular sales

20  person's progress toward meeting sales quotas and/or goals.

21  REQUEST NO. 6:

22        All documents and communications relating to the United States economy and its impact on

23  sales of Oracle's database and applications products, including, but not limited to, order

24  cancellations, order or purchase delays, and discounts offered on Oracle products or services.

25  REQUEST NO. 7:

26        All documents and communications relating to competition from IBM or Microsoft or any

27  other database or applications provider for product market share, including, but not limited to, win-

28  loss reports.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ

REQUEST NO. 8:

All documents and communications relating to any and all sales or revenue analyses and/or forecasts for Oracle's sales and consulting organizations, including OSI, NAS, or OPI, including, but not limited to: Upside Reports, Flash Reports, Pipeline Reports, Big Deal Reports, OASIS Reports, White Books/Board of Directors Quarterly Results, Red/Grey Books/Monthly Financial Reference Books, Green Books/Americas Reporting Packages, Blue Books/Subsidiary Kepy Performance Measures, Yellow Books/Product Revenue Reporting Packages, Oatmeal Books/Consulting Performance Packages, Executive Committee Worldwide Forecasts, Approvals for 2000 Forecast Reports, Investor Relations Projection Models and summaries of interviews conducted by Simpson Thacher & Barlett LLP.

REQUEST NO. 9:

All documents and communications relating to sales pipeline projections or forecasts for Oracle's database and applications products, including, but not limited to, all entries into Oracle Sales On-Line, Oasis or any Oracle database.

REQUEST NO. 10:

All documents and communications relating to actual or forecasted conversion ratios of potential sales in Oracle pipelines to sales or consulting contracts in any of its business divisions, including, but not limited to, OSI, OPI and NAS.

REQUEST NO. 11:

All documents and communications related to customers' purchases or prospective purchases of Oracle database and applications products and services, including, but not limited to, bid proposals, bids delivered, bids won and bids lost.

REQUEST NO. 12:

All documents and communications relating to all plans, proposals, negotiations, contracts or agreements, or potential sales of Oracle database or applications products or services between Oracle and Telecom New Zealand, Foster's Group, Hewlett-Packard, JDS Uniphase, Principal Financial Group, Nantucket Allserve, GE Capital, Motorola, Health Net, and Now Foods.

**REQUEST NO. 13:**

All documents and communications relating to any negotiations, proposals, agreements, contracts or functionality problems between Oracle and BellSouth regarding 11i, including, but not limited to, the CRM module or any of its other individual applications or modules.

**REQUEST NO. 14:**

All documents and communications relating to or analyzing demand from Oracle's Internet or "dot- com" customers for Oracle database and/or application products.

**REQUEST NO. 15:**

All documents and communications relating to Oracle's 3Q01 projections of 75% application growth; 20-20% database growth; 25% licensing growth and 15-20% service growth.

**REQUEST NO. 16:**

All documents and communications concerning or relating to any formal or informal investigation, inquiry, proceeding, sanction, or complaint brought against the Company or the Individual Defendants by the SEC or any federal or state administrative or governmental agency, including any communications with such agency.

**REQUEST NO. 17:**

All documents showing the organizational structure, and positions of employees of Oracle.

**REQUEST NO. 18:**

All documents and communications relating to the systems integration work necessary to implement 11i or any of its individual modules.

**REQUEST NO. 19:**

All documents and communications relating to the ability of 11i or any of its individual modules to work with non-Oracle database products.

**REQUEST NO. 20:**

All documents and communications relating to "bugs" or "gaps" in 11i, including, but not limited to, the CRM module or any of its other individual modules.

**REQUEST NO. 21:**

All documents and communications relating to the timing of the release of 11i, including, but not limited to, each subsequent version of 11i, for example, 11i.5 and 11i5.3.

**REQUEST NO. 22:**

All documents and communications relating to the development and/or the completion of an Application Programming Interface ("API") for the CRM modules, including, but not limited to, the development of an API for any specific customer, including, but not limited to, BellSouth.

**REQUEST NO. 23:**

All documents and communications relating to "patches," "mega patches" or "family pack" fixes, released for 11i or any of its individual modules or versions and/or customer requests for the same.

**REQUEST NO. 24:**

All documents and communications relating to customer or potential customer complaints, concerns or dissatisfaction with the functionality, implementation or integration of 11i or any of its individual modules, including, but not limited to, the CRM module.

**REQUEST NO. 25:**

All documents and communications relating to technical errors or performance failures of 11i, including, but not limited to, any of its individual modules, including, but not limited to, all technical assistance requests.

**REQUEST NO. 26:**

All documents relating to the functionality and/or "bugs" in the 11i software applications or modules implemented at Oracle, including, but not limited to, the "timesheets" module and the "travel and expense" module.

**REQUEST NO. 27:**

All documents and communications supporting, or relating to Oracle's claim that it had already saved $1 billion through the internal implementation of its applications software.

1  **REQUEST NO. 28:**

2      All documents and communications relating to Oracle's monthly reconciliation of accounts

3  receivable to the general ledger.

4  **REQUEST NO. 29:**

5      All documents and communications relating to Oracle's credit memos and monthly credit

6  memo registers including, but not limited to, those relating to customer overpayments.

7  **REQUEST NO. 30:**

8      All documents and communications relating to review or investigation conducted by you,

9  E&Y, AA or the SLC concerning Oracle's accounting, revenue recognition and financial reporting

10  for FY01.

11  **REQUEST NO. 31:**

12      All documents and communications concerning the preparation and filing of Oracle's Second

13  and Third quarter fiscal 2001 Forms 10-Q, including, but not limited to, all documents and

14  communications relating to its line item "cash advances and unearned revenue."

15  **REQUEST NO. 32:**

16      All documents and communications relating to credit or debit memos created in November,

17  2000, including, but not limited to, their impact on Oracle revenues and earnings.

18  **REQUEST NO. 33:**

19      All documents and communications relating to the Activity Detail in 12601_ Detail

20  spreadsheet, including, but not limited to, all versions of that spreadsheet including the spreadsheet

21  titled, "Greater Than 100K in 1260151 Version 3.xls."

22  **REQUEST NO. 34:**

23      All documents and communications relating to Oracle's *pro forma* website used to generate

24  *pro forma* invoices for customers.

25  **REQUEST NO. 35:**

26      All documents and communications relating to the conversion of Oracle's internal accounting

27  systems to 11i.

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ                                              - 11 -

1   REQUEST NO. 36:

2      All documents and communications relating to the disposition of unassigned cash receipts

3  assigned to any Oracle reserve account, including, but not limited to, account 12601 and/or customer

4  overpayments.

5   REQUEST NO. 37:

6      All documents and communications relating to any miscellaneous offset report generated

7  between August 1, 2000 and December 31, 2000 or between August 1, 2002 and December 31,

8  2002.

9   REQUEST NO. 38:

10      All documents and communications relating to any miscellaneous receipt write-off occurring

11  between August 1, 2000 and December 31, 2000 and/or occurring between September 1, 2002 and

12  March 31, 2003.

13   REQUEST NO. 39:

14      All documents and communications relating to any effort or actions to reconcile Oracle's

15  "On Account," or "unapplied cash," including, but not limited to, Unapplied Cash Account (25005).

16   REQUEST NO. 40:

17      All documents and communications relating to any measures taken from October 1, 2002 to

18  the present related to refunding customers, adjusting or reconciling customer invoices, or adjusting

19  credit analyst notes for all customers, including, but not limited to, any "receipt write-offs" or

20  5160101 refunds.

21   REQUEST NO. 41:

22      All documents and communications between and among the members of Oracle's Credit

23  Collections Group and accounts receivable department, discussing the November 2000 credit and/or

24  debit memos, on account cleanup, invoice adjustments, including during the relevant time period and

25  between October 1, 2002 and March 31, 2003.

26   REQUEST NO. 42:

27      All documents and communications generated during the relevant time period and from

28  October 1, 2002 to the present relating to November 17, 2000 debit memos and/or unapplied cash.

1  REQUEST NO. 43:

2      All documents and communications relating to transactions in Oracle's 25005 account

3  occurring between November 1, 2000 and November 30, 2000 and between October 11, 2002 and

4  March 31, 2003.

5  REQUEST NO. 44:

6      All documents and communications relating to any "On Account" clean up or reconciliation

7  of Oracle's "On Account" during the relevant time period and/or between October 1, 2002 and

8  March 31, 2003.

9  REQUEST NO. 45:

10      All documents and communications created during or relating to the relevant time period

11  concerning any "receipt write-offs" or 5160101 refunds.

12  REQUEST NO. 46:

13      All documents and communications concerning Oracle's customer activity detail 12601

14  spreadsheets.

15  REQUEST NO. 47:

16      All documents and communications distributed to or prepared, received or reviewed by any

17  member of the SLC relating to the SLC investigation of claims in the Delaware Derivative Action,

18  the California Derivative Action, and the Federal Securities Action.

19  REQUEST NO. 48:

20      All documents relating to any meetings of the Board or any committees thereof (including

21  the SLC) or any committees or groups which reported to the Board (including the executive

22  management committee), including all Board packets, documents, or other materials reviewed by the

23  board, any of its committees, or any groups reporting to the Board, all notes taking during any such

24  meetings, and all documents memorializing any such meetings.

25

26

27

28

1   DATED:  December 9, 2004

2                                          LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
3                                          SHAWN A. WILLIAMS
                                           WILLOW E. RADCLIFFE
4                                          ELI R. GREENSTEIN

5

6                                                       SHAWN A. WILLIAMS

7                                          100 Pine Street, Suite 2600
                                           San Francisco, CA  94111
8                                          Telephone:  415/288-4545
                                           415/288-4534 (fax)

9                                          LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
10                                         WILLIAM S. LERACH
                                           MARK SOLOMON
11                                         DOUGLAS R. BRITTON
                                           401 B Street, Suite 1700
12                                         San Diego, CA  92101
                                           Telephone:  619/231-1058
13                                         619/231-7423 (fax)

14                                         Lead Counsel for Plaintiffs

15   T:\CasesSF\Oracle3\REQ00016380.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
ORACLE *ET AL.* - C-01-0988-MJJ                                        - 14 -

## DECLARATION OF SERVICE BY MAIL AND FACSIMILE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.      That on December 9, 2004, declarant served the **PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS ORACLE, ET AL.** by depositing a true copy thereof in a United States mailbox at San Francisco, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.  Declarant also served the parties by facsimile.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th day of December, 2004, at San Francisco, California.

_____
KAREN HEINZ

Service List – 12/9/2004  (201-064-1)

Page 1 of 1

## Counsel For Defendant(s)

Donald M. Falk
Lee H. Rubin
Shirish Gupta
Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
  650/331-2000
  650/331-2060(Fax)

Dorian Daley
James C. Maroulis
Oracle Corporation
500 Oracle Parkway, Mail Stop 50P7
Redwood City, CA 94065
  650/506-5200
  650/506-7114(Fax)

Alan N. Salpeter
Javier H. Rubinstein
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street, Suite 3900
Chicago, IL 60603-3441
  312/782-0600
  312/701-7711(Fax)

## Counsel For Plaintiff(s)

William S. Lerach
Mark Solomon
Douglas R. Britton
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
  619/231-1058
  619/231-7423(Fax)

Sanford Svetcov
Shawn A. Williams
Willow E. Radcliffe
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
  415/288-4545
  415/288-4534(Fax)