# Exhibit 39

```
M A Y E R
B R O W N
R O W E
& M A W
```

June 3, 2005

**VIA FACSIMILE**

Jennie L. Anderson
Lerach Coughlin Stoia Geller
Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111

Mayer, Brown, Rowe & Maw LLP
190 South La Salle Street
Chicago, Illinois 60603-3441

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

Vincent Paul (Trace) Schmeltz III
Direct Tel (312) 701-8531
Direct Fax (312) 706-8146
tschmeltz@mayerbrownrowe.com

Re:   In re Oracle Securities Litigation

Dear Jennie:

I would like to thank you for graciously extending our deadlines for producing redacted copies of depositions (and the log detailing those redactions) from the derivative lawsuits captioned *In re Oracle Corp. Derivative Litigation*, Consolidated C.A. No. 18751, in the Delaware Court of Chancery and *Oracle Cases*, Judicial Council Coordination Proceeding No. 4180, Superior Court Case No. 417511, in San Mateo County Superior Court. We will produce the redacted depositions on Tuesday, June 7, 2005, and the log detailing these redactions on Thursday, June 9, 2005.

Very truly yours,

Vincent Paul (Trace) Schmeltz III

cc:   James C. Maroulis
      Lee H. Rubin

Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles Manchester New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

# Exhibit 40



**LERACH**
**COUGHLIN**
**STOIA**
**GELLER**
**RUDMAN**
**& ROBBINS** LLP

SAN DIEGO · SAN FRANCISCO
LOS ANGELES · NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
PHILADELPHIA · SEATTLE

Jennie L. Anderson
JennieA@lerachlaw.com

May 18, 2005

**VIA FACSIMILE**

Vincent P. Schmeltz, III, Esq.
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, IL 60603-3441
312/706-8146 (fax)

Re:   *In re Oracle Corp. Sec. Litig.*
Master File No. C-01-0988-MJJ

Dear Trace:

This letter will confirm my voicemail messages of May 16, 2005 and today regarding defendants' failure to provide a source log for all documents produced, as required by the Amended Order Setting A Discovery Plan. Plaintiffs have yet to receive a source log for any document produced by defendants in this action. In addition, plaintiffs have not yet received a privilege log for documents produced by defendants approximately four months ago. Please produce these logs immediately.

Very truly yours,

Jennie Lee Anderson

JLA:caw
cc:  Lee Rubin, Esq

T:\CasesSF\Oracle3\Corres\Schmeltz 5-18-05jla.doc

# Exhibit 41

MAYER
BROWN
ROWE
& MAW

May 19, 2005

**VIA EMAIL AND MAIL**

Shawn A. Williams
Lerach Coughlin Stoia Geller
Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111

Mayer, Brown, Rowe & Maw LLP
190 South La Salle Street
Chicago, Illinois 60603-3441

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

Vincent Paul (Trace) Schmeltz III
Direct Tel (312) 701-8531
Direct Fax (312) 706-8146
tschmeltz@mayerbrownrowe.com

Re:   In re Oracle Corporation Securities Litigation

Dear Shawn:

Pursuant to Section II.C of the Court's March 10, 2005 Amended Order Setting a Discovery Plan, I have enclosed a Source Log for documents Bates labeled NDCA-ORCL 1-144691.  Defendants will continue to provide supplemental logs as those are compiled.

Very truly yours,

Vincent Paul (Trace) Schmeltz III

cc      Jennie L. Anderson
        James C. Maroulis
        Lee H. Rubin

Enclosure

Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  Manchester  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

Exhibit 42

Lee, Peter (4/9/03)

page 26



page 26

NDCA-ORCL 290253

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Exhibit 43

**ORACLE**

LEGAL DEPARTMENT

500 Oracle Parkway
MCS Sup‑
Redwood Shores
California 94065

phone 650.506.5200
fax 650.506.7114

December 28, 2004

**FIRST CLASS MAIL**

Ford Motor Company
Legal Department
3 Parkland Blvd. #300
Dearborn, Michigan 48126

Re:     **In re Oracle Corporation Securities Litigation**

Dear Oracle Customer:

I recently learned that the plaintiffs in the *In re Oracle Corporation Securities Litigation* have issued subpoenas to a large number of Oracle customers, including your company. In the event that you have not seen or received the subpoena, I have enclosed a copy of the document requests in the subpoena. On behalf of Oracle, I extend my apologies for any inconvenience this may cause you. Oracle intends to vigorously oppose every subpoena, just as it is opposing the entire lawsuit.

Nonetheless, the subpoena may have legal consequences to you before such time as Oracle can be heard by a court. You may want to consult with your legal counsel as soon as possible, as the Federal Rules of Civil Procedure that govern the subpoena afford you only *fourteen days from the date you first receive the subpoena from the plaintiffs* to assert any objections you might have to the subpoena.

In the meantime, please feel free to contact me at (650) 506-4517 to discuss this matter.

Sincerely,

James C. Maroulis
Senior Corporate Counsel

enclosure

FORD MOTOR COMPANY
RECEIVED
CLAIMS UNIT

JAN 0 7 2005

OFFICE OF THE
GENERAL COUNSEL

** TOTAL PAGE.03 **



January 11, 2005

**VIA U.S. MAIL**

Mayer, Brown, Rowe & Maw LLP
190 South La Salle Street
Chicago, Illinois 60603-3441

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

Michael Jagiello
Lucent Technologies
600 Mountain Avenue, Room 3A504
Murray Hill, NJ 07924

**Gina M. Diomedi**
Direct Tel (312) 701-8765
Direct Fax (312) 706-8162
gdiomedi@mayerbrownrowe.com

Re:     *In re Oracle Corporation Securities Litigation,*
        No. C. 01-0988 (N.D. Cal.) Subpoena Issued to
        Lucent Technologies

Dear Mr. Jagiello:

I write in reference to the subpoena duces tecum that has been served upon Lucent Technologies by plaintiffs in the above-referenced litigation. On January 4, 2005, the Court held a telephonic hearing regarding Oracle Corporation's ("Oracle") expedited request for a protective order requiring Plaintiffs to withdraw their third-party subpoenas. The Court did not rule on Oracle's request during that hearing, and stated that the Court would not stay the response/objection dates for the subpoenas. The Court, however, authorized Oracle to bring a motion for protective order. A copy of Oracle's Motion for Protective Order, which was filed with the Court yesterday, is attached. We have requested an expedited hearing on the motion.

If you have any questions or wish to discuss this matter, please do not hesitate to contact either me (my number is above) or Jim Maroulis, Oracle Corporation's in-house counsel, at (650) 506-4517.

Sincerely,

Gina M. Diomedi

cc:     Jim Maroulis
        Javier Rubinstein

Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles Manchester New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

# Exhibit 44

Pages 1 - 32

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

IN RE ORACLE SECURITIES          )
LITIGATION,                      )
                                 )      
_____  )      NO. C 01-0988 MJJ
                                 )

                                    San Francisco, California
                                    Friday, February 4, 2005


### TRANSCRIPT OF PROCEEDINGS

__APPEARANCES__:


For Plaintiffs:          Lerach, Coughlin, Stoia, Geller,
                            Rudman & Robbins
                         100 Pine Street, Suite 2600
                         San Francisco, California  94111
                    BY:  **SHAWN A. WILLIAMS**
                         **WILLOW E. RADCLIFFE**
                         **ELI GREENSTEIN**


For Defendant:           Mayer, Brown, Rowe & Maw
                         190 South La Salle Street
                         Chicago, Illinois  60603-3441
                    BY:  **LEE RUBIN**
                         **VINCENT P. SCHMELTZ III**


                         Oracle Corporation
                         Legal Department
                         500 Oracle Parkway
                         Redwood Shores, California  94065
                    BY:  **JAMES C. MAROULIS**
                         Senior Corporate Counsel


Reported By:             Leo T. Mankiewicz, CSR 5297 RMR, CRR
                         Official Reporter

LEO T. MANKIEWICZ, CSR, RMR, CRR
Official Reporter - U.S. District Court - (415) 861-2336

1    <u>Friday, February 4, 2005</u>

2                                                    9:39 a.m.

3          THE CLERK:  Calling case C 01-0988, In re: Oracle

4    Security Litigation.

5          MR. WILLIAMS:  Good morning, your Honor.  Sean

6    Williams, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins,

7    for plaintiffs.

8          THE COURT:  Mr. Williams.

9          MR. RUBIN:  Good morning, your Honor.  Lee Rubin

10   with the law firm of Mayer, Brown, Rowe & Maw, on behalf of

11   Oracle and the individual defendants, Ellison, Henley and

12   Sanderson, and with me is my colleague, Trace Schmeltz, also

13   from Mayer, Brown, and Jim Maroulis from Oracle.

14         MR. WILLIAMS:  I also have Eli Greenstein and Willow

15   Radcliffe, from Lerach, Coughlin.

16         THE COURT:  Everybody have a seat.  I have a few

17   things to say.

18         I understand that in litigation that has the kinds

19   of stakes that are at stake in this matter, that there is a

20   great deal of pressure on counsel to take positions that have

21   an arguable basis in law, but if they were sitting squarely in

22   the middle between the parties, they wouldn't be the positions

23   they take.  You know, they press the edge of the envelope.

24   They do it for a lot of reasons.  One, because it's part of the

25   culture, two, because there's client pressures, et cetera.

1    I will tell you, I will not tolerate it in discovery

2    in this matter.  I think that this motion, and not the filing

3    of the motions but the positions taken with respect to the

4    motion, exemplify the kind of extremist positions by both sides

5    that I'm not going to put up with.

6        So here's what I have to say about the motion.

7        Number one.  Discovery is out of control, and we're

8    going get some control.  There's no discovery plan in this

9    case, in terms of sequence, in terms of subject matters, and in

10   a case of this magnitude, that, to my mind, is completely

11   intolerable, and so we're going to remedy that.

12       Number two.  I think it's transparent that 26(b)(2)

13   gives the Court the power to limit any or all discovery

14   methods, based on a measure of the burdens and benefits of

15   those discovery methods, and that that includes third party

16   discovery.

17       Number three.  I think there's no question that the

18   plaintiffs are going to be allowed to conduct discovery to

19   discover relevant materials on all of the allegations of the

20   revised Second Amended Complaint -- is that what it is?

21       MR. WILLIAMS:  That's correct.

22       THE COURT:  -- revised Second Amended Complaint.

23   That includes the defects in the 11i Suite, at or before the

24   time of the allegations of misrepresentations, within some

25   reasonable time period.  It includes the impact of the economic

1    downturn on the complete range of Oracle's products.

2        Now, that doesn't mean they get to discover every

3    single customer's thoughts about what they were going to buy;

4    and it certainly doesn't mean that you've got to get every

5    single invoice for every single product across the range, but

6    there will be some reasonable amount of discovery into the

7    impact on sales of the downturn in the economy; and of course,

8    the revenue recognition issue.

9        It also is transparent that the subpoenas in the

10   case contain categories which, when you read them to a judge,

11   the judge looks at you and says, who are you kidding?  Category

12   number 1, I want all documents -- all documents -- regarding

13   all Oracle products.  What is that about?

14       That is an example, just one, of somebody saying,

15   "I'm going to start from the most all-encompassing and extreme

16   position I can do and I'll work back from it, because I know

17   they won't give me that."  That's not what's going to happen

18   here.  We're not going to do that anymore.  It is as

19   inappropriate, I think, as the defendants taking the position

20   that there cannot be full discovery into the defects of the 11i

21   Suite because this is a misrepresentation case.  Both are

22   totally inappropriate.

23       So here's what my tentative ruling is going to be.

24   I'm going to order you to a discovery conference.  The

25   discovery conference will have lead trial counsel for the

plaintiff and lead trial counsel for the defendant, and anybody
else you want to bring, and me, and we're going to come up with
a discovery plan, and that discovery plan will include what
kinds of discovery you're going to have and from whom. I want
witness names, to the extent you have them by now, of course;
when those are going to happen, you know, not the date of the
deposition, but during this period of time, when the documents
of a particular type are going to be sought and produced;
subject matter limitations, the full range of appropriate
discovery plan.

In a case of this magnitude, the judge pressed you
into a year of discovery instead of some longer period. You're
going to have to come up with a rational way of doing it.

What I propose to do is have you each propose to
each other comprehensive discovery plans, and then have lead
trial counsel sit down and discuss them in person, see if they
can hammer it out. Then we'll all meet. Then you'll give me a
letter that says, these are the competing discovery plans,
these are the issues that we've worked out, these are the
issues that are left, and here's our positions on them, and
why. I would want that to be a joint letter. And then we'll
have a discovery conference, and out of that discovery
conference will come an order, and that will be the blueprint
for discovery in the case.

I need to figure out precisely what we do about

1       these subpoenas in the meantime.

2               Can I ask counsel for plaintiff to tell me what the

3       current status is of the third party subpoenas in terms of

4       production and responses?

5               MR. WILLIAMS:  Sure, your Honor.  We've gotten

6       production of documents from approximately 12 different

7       non-parties.  Many of those that have produced have been

8       analysts.  So not necessarily customers who may have had

9       problems with --

10              THE COURT:  Some customers, some analysts.

11              MR. WILLIAMS:  Right, more analysts than customers.

12      A few customers.  Many of those customers who have not produced

13      have indicated that they are prepared to produce, but were

14      actually awaiting the outcome of the hearing in front of your

15      Honor today.

16              THE COURT:  Right.

17              MR. WILLIAMS:  We've had substantial

18      meet-and-confers with many of those customers, and --

19              THE COURT:  How many customers have you had

20      meet-and-confers with, who have not produced?

21              MR. WILLIAMS:  Most of them have not produced.  So I

22      would say --

23              THE COURT:  But how many have you met with?

24              MR. WILLIAMS:  Approximately how many have we met

25      with?  We telephone conferenced at least 15 to 20, 25, and

1    letter correspondence with many more than that.  I'd be

2    negligent to try to give you a number --

3              THE COURT:  Okay, got it.

4              MR. WILLIAMS:  -- your Honor, but I should say that,

5    again --

6              THE COURT:  And they're objecting?

7              MR. WILLIAMS:  They've all issued standard

8    objections, and the ones that we've talked to, we have narrowed

9    substantially the requests that you've actually referred to.

10             THE COURT:  No, I knew you would.  I'm not saying

11   you wouldn't.  I didn't say that you weren't, at the end of the

12   day, unreasonable.  I wouldn't want to say that, either.  I

13   know how the game is played, and we're just not going to play

14   it that way.  Okay, thank you very much.  Have a seat.

15             What I would do is, I would stay the enforcement of

16   the subpoenas pending our discovery conference in the matter.

17   I would also require that in the future, before you bring any

18   discovery matter to the attention of the Court, that you have a

19   meet-and-confer in person by the trial counsel -- lead trial

20   counsel; that out of that come, if there is still a dispute, a

21   joint letter to the Court that sets forth in detail the issues

22   and each side's substantive positions, and the -- any -- and

23   each side's final proposed resolution, and would require that

24   you have that on 10 days' notice by either side.

25             Don't abuse that privilege, because that also will

1   not be looked on favorably, but that you can -- but that if you

2   can insist, that within the next 10 days, for example, if

3   there's an issue which you have had substantive meet-and-confer

4   discussions but they have not reached a resolution and you

5   think it's right to bring to the Court, then the predicate to

6   that is have a meet-and-confer with the trial counsel and a

7   letter to the Court, and then we'll -- and then we can address

8   it from there.

9        Now, who would be taking that, that is still

10  somewhat up in the air.  At the moment it would be Judge

11  Jenkins, but we haven't quite figured that out.  He didn't

12  refer me all discovery, but I'm trying to figure out what he

13  precisely wants to do about that.  But for the moment, we are

14  going to -- I am going to have a discovery conference, so that

15  would be certainly the next step, and issue a discovery order.

16       You know, I know that someone filed a motion for a

17  special master on discovery.  I didn't really read it in

18  detail, but this probably preempts it for the moment.  We'll

19  see how it goes.  It depends how it goes.  I mean, at some

20  point I'm happy to meet with you all frequently.  On the other

21  hand, if it becomes an intolerable burden on the Court, then I

22  have no hesitancy but to have you go to a special master.

23       But that's the reason for making lead trial counsel

24  sit down every time, because I want you to work it out, and I

25  want the person who's going to try the case think about whether

1    or not they actually need this little piece of evidence for

2    their trial.

3           You know, it's really interesting, there's a

4    securities case going on upstairs in the civil -- I know in

5    that case, because I had touched the discovery, that there were

6    many millions of pages of evidence produced.  You know, there

7    won't be a thousand pieces of evidence introduced in the trial,

8    and so it's very interesting.  Part of problem is, these cases

9    never try, so you don't have quite the track record with them,

10   but that's my thought.

11          So those are my thoughts.  I'm happy to talk to --

12   hear anything either of you have to say.  This is defendants'

13   motion, so why don't you go first.

14                 MR. RUBIN:  Okay.  Your Honor, do you prefer that --

15                 THE COURT:  Wherever you're comfortable.

16                 MR. RUBIN:  I'm just stay right here, then, if

17   that's okay.

18                 THE COURT:  No problem.

19                 MR. RUBIN:  Well, your Honor, we, in terms of what

20   the Court has advised, or preliminarily advised that it intends

21   to do, we certainly -- we believe that that's the appropriate

22   step to take in terms of the specific issue we're here before

23   the court today, on the stay of enforcement of the subpoenas

24   until further notice, and until the Court takes the steps that

25   it thinks is appropriate and that we concur in to try to

1    sequence discovery and to try to put some orderly framework

2    around how this process should proceed.

3         As the Court is aware, that was our principal

4    concern when we saw, before the plaintiff had even obtained our

5    initial disclosures, that more than a hundred subpoenas had

6    been sent out on all manner of issues, and to the extent, you

7    know, directly addressing the Court's concern about defendants,

8    some of defendants' positions, I do want to correct any

9    mis-impression.

10        We certainly -- we certainly do not believe -- and

11   if we've been heard to say this, I want to correct it -- that

12   there will be no third party discovery in this case.  That was

13   obviously not our position, and it's never been our position.

14        Our position has simply been that there are some

15   important threshold discovery and scope issues that should be

16   resolved between the parties first, and that those decisions,

17   whether they can be resolved by agreement or we have to seek

18   court intervention, will then naturally dictate the appropriate

19   scope of third party subpoenas, and obviously, even with that,

20   there are going to be some issues, as the Court portends,

21   about, do you need this particular thing or do you need that.

22        And we expect that, but it makes no sense to have a

23   hundred subpoenas in a hundred district courts around the

24   country deciding these complex issues on relevance, and scope,

25   where this is the place that the case resides, where it rests,

1    and this is the court that should be making those decisions in

2    the first instance.

3           So having a discovery conference, sequencing, and

4    allowing this court to take on some of the larger issues, I

5    think will allow --

6           THE COURT:  Don't misunderstand me, though.  By

7    sequencing, I think you're actually incorrect, they don't have

8    wait until they got a bunch of discovery from Oracle to get

9    third party discovery.  I certainly would never force somebody,

10   in this compacted schedule, to do that.

11          Now, having said that, I certainly am cognizant of

12   the burdens on third parties, and it's got to be tailored third

13   party discovery, but I'm not going to go along with any

14   position that says, thou shalt automatically do it in the

15   following sequence.  When you get to your discovery conference,

16   don't think that you can sell that to me, okay?

17          MR. RUBIN:  No, no, I understand, and I was really

18   principally speaking about these larger issues, and I know the

19   Court made mention of one.

20          THE COURT:  I know you were, but you said,

21   "sequence," so I wanted to make sure that I wasn't

22   misunderstood.  And I appreciate that.  That's fine.  Of course

23   there's going to be third party discovery.

24          MR. RUBIN:  And in terms of, I raised one issue in

25   terms of Suite 11i, and I think we'll have an opportunity at

1    our discovery conference, in the kind of procedure that the

2    court has laid out, to have this bubble up, so to speak, and

3    percolate, so that the issues can be more finely examined.

4         The Suite 11i issue, your Honor, is a somewhat

5    complex one, but one that I do think deserves the Court's

6    attention.  When one looks at the Complaint in this case,

7    obviously our position, and even today, is if there are

8    documents in Oracle's files or documents in third parties'

9    files, ultimately, that specifically talk about a lost sale or

10   an issue relating to something that would impact the quarter

11   and it also interacts with Suite 11i's performance, and

12   someone's reluctance to go forward with the sale because of

13   experience they've had with other modules or other information

14   they may have seen, we're -- we obviously understand that's

15   relevant, but that's a very big difference from, as the Court

16   pointed out, PowerPoint presentations inside a company about

17   whether they're going to buy Oracle or SAP that never even came

18   close to the question of whether Oracle even knew of the

19   concerns about Suite 11i, knew that there was a consideration

20   of a purchase.

21        So there's a continuum there -- and this is the only

22   point we're making -- that there's a place there where it has

23   to rationally act.  In any case, you can say, well, there's

24   something out there, there's some concern in that document,

25   even internal, that never reached Oracle, that could lead to --

THE COURT: Absolutely correct. Absolutely correct. It is where on the continuum that we're going to lash out, but I will tell you, they're going to get discovery into whether -- into the problems that people were having with 11i. They're going to get discovery into it, independent of whether or not there was a sale involved. Now -- because it goes to whether or not their allegations that the representations concerning 11i were false because it was a buggy program, okay?

There are lots of components to that. One is, did Oracle know about the problems? Number two is, did it cause anything? Was there a lost sale as a result of this? Right? And therefore, do you have a cause of action?

But one of the things was, is it false? So you're going to get substantive discovery into -- and it's not going to be endless discovery into every problem everybody had internally or around the world with Oracle's suite, of course. But I will tell you, I'm not going to go along with the position that it has to be universally tied to a particular sale that was dropped because of it, or something like that.

MR. RUBIN: Well, obviously -- I understand the Court's position and, you know, we would only ask that as this -- as we proceed, that the Court --

THE COURT: I'm going to think about it a lot, but I don't want you going into this conference thinking that because this is a securities fraud case, you're going to be able to

1    sell me on the position that you only get to talk about things

2    that have to do with Oracle's knowledge.  That's not what

3    discovery in a securities fraud case is limited to.  There's

4    also the question of whether or not the statements were true or

5    false, and there will be some discovery into that.

6         You know, it also doesn't make sense to go too far

7    with that discovery.  It doesn't make sense to do -- Oracle

8    doesn't have a hundred customers, they've got a million

9    customers, buying their -- and it wouldn't make sense to go out

10   and get a hundred thousand customers to tell you all about

11   every bug they ever discovered.  Some focused discovery into

12   the nature of the problems some customers were having seems

13   appropriate, and you guys have to figure out what that means.

14        MR. RUBIN:  Right, and the only -- I understand the

15   Court's position.  The only thing I would add to that is that

16   we obviously have two vectors sort of impacting at the same

17   time, the issue of knowledge and how broad the scope should be

18   in terms of how far away you get from the speaker, the person

19   who was alleged to have made the false statement, because of

20   course, the securities fraud statute does require a state of

21   mind --

22        THE COURT:  Of course.

23        MR. RUBIN:  -- of either specific intent or some

24   kind of a deliberate disregard, and then the underlying

25   falsity, and the nature of the complaint is that these -- the

1  underlying falsity with respect to product performance and

2  forecasting all intertwine, which ended in a, quote, "corrected

3  disclosure" with the earnings statement.  That is the

4  fundamental principle that we believe should guide or govern

5  the parameters of the case.

6          Now --

7          THE COURT:  It does only in a very general sense,

8  because I'm not going to make them prove the predicate, which

9  they'll have to prove as a foundation at trial, for the

10  admissibility of a customer's testimony on bugs, for example.

11  At trial, it may be that Judge Jenkins will say, I'm not going

12  to let this guy testify as to these problems he had with this

13  unless you can prove that he actually sent a letter to Oracle

14  about it or had communications with someone at this level or it

15  got to a decision maker, or what it is, but -- and at my level,

16  I'm not going to make them prove all of that predicate.

17          Now, at some point, you're right, it becomes too

18  remote, but there's going to be some general discovery into the

19  nature of the problems customers were having.  They're going to

20  have to tie it up to prove their case.  There's no question

21  they're going to have to tie it up, but it's not a predicate to

22  getting some general discovery into the nature of the problems.

23          MR. RUBIN:  Right, and obviously, our concern is

24  that we just want to be sure that we continue ultimately to

25  litigate a securities fraud case and not a product liability

1    case, and there is a worry that if it were -- and I don't hear

2    the Court saying this -- but that if it were without

3    parameters, and completely open-ended, again going back to the

4    example of a PowerPoint presentation internally that never got

5    anywhere, but they were just thinking about buying an Oracle

6    product, that you would -- and had discussions about, is it too

7    buggy, have we heard too much about a problem, that ultimately

8    we would be asked to gather lots of documents, ultimately take

9    lots of depositions that couldn't possibly ever see its way

10   into the courtroom.

11        So we'll be asking the other side to listen to it,

12   and ultimately, if we can't, for you to listen to us, that some

13   reasonable constraints have to be put on those kinds of --

14        THE COURT:  Well, it may be that's just limitations

15   on amount or number, because it's -- we're going to be -- it's

16   going to be very difficult to establish other kinds of

17   substantive parameters.  It may be that all you can say is,

18   well, you can't go after 300 customers, but you can get 50

19   customers.  And that's just off the top of my head.

20        MR. RUBIN:  Well, and your Honor, I mean, this goes

21   to the point about sequencing, and I understand that you're not

22   going to have a hard and fast rule about first party discovery

23   first, but we do think, again, as a matter of efficiency,

24   understanding what was coming into Oracle in terms of the input

25   that they were getting, it makes sense to start there and go

1    backwards to customers as opposed to starting with customers

2    first.

3              THE COURT:  Too complicated.  Too complicated, it

4    will take too long, there's not enough time, so we're not going

5    to do it that way.  I don't think that we're going to have

6    extensive, detailed depositions of third parties at the

7    beginning of the case.  I don't think that's going to happen.

8    I think that needs to wait until much later on when you figure

9    out who's really important, but there's going to be some level

10   of third party discovery at the beginning, even on this kind of

11   an issue.

12             So work it out.  It's not going to be -- it's not

13   going to be hundreds and hundreds and hundreds of customers,

14   just because you think they're important.  It's going to be

15   focused.  But it's going to be -- and you know, I'm trying to

16   couch my comments in as general as I can --

17             MR. RUBIN:  I understand.

18             THE COURT:  -- and I just want to make sure you

19   appreciate it, so when you get together, you'll do it, because

20   I don't want -- I'll tell you, the single most disturbing

21   document that I read in this record was the letter from someone

22   internally at Oracle to a customer saying, "We're going to

23   resist all of these subpoenas just like we're resisting the

24   case."  That is -- I guarantee you, that won't happen here.

25   That bespeaks an attitude that I find completely inappropriate,

1    as inappropriate as a hundred subpoenas to customers that say,

2    give us all your documents about Oracle.  That's the extreme

3    that I'm talking about.  Everybody's going to have to

4    compromise.

5            MR. RUBIN:  Okay.

6            THE COURT:  We'll get there.  We'll get there.

7            MR. RUBIN:  That's fine, your Honor.  I mean, just

8    in terms of that, I just want to say that we had concerns that

9    there was a misleading impression being created about what the

10   status of the proceedings were.  So I just want you to read

11   that letter in that setting, but --

12           THE COURT:  I know exactly what that letter was.  It

13   was a marketing tool.  That's fine.  You're entitled to have

14   marketing tools.  You're entitled to comfort your customers

15   that, "I'm sorry, you're in the middle of a litigation that's

16   not of your making."  I don't have any problem with what you've

17   done.  That one sentence drove me crazy.

18           MR. RUBIN:  Okay.  Well, in any event, your Honor,

19   other than that, we, in terms of the ultimate relief for

20   purposes of today, the stay of the enforcement subpoenas until

21   we move through the process that the Court has described, that

22   we would endorse that.

23           THE COURT:  Okay.  Mr. Williams?

24           MR. WILLIAMS:  Thank you, your Honor.  I think that

25   it's an excellent idea for the parties to get together, sit

1    down and then come before the Court to actually shape discovery

2    in all facets of the relevant material that we are entitled to

3    get, and it's a great idea.

4            The second thing I'd really want to address is the

5    number of subpoenas.  We sent out approximately a hundred.

6    Defendants believe, obviously, that that's way over-broad, but

7    we agonized over that 100, and each of them has a basis in fact

8    that --

9            THE COURT:  I know, I know.

10           MR. WILLIAMS:  We'll have an opportunity --

11           THE COURT:  I don't have a preconceived notion of

12    what the right number is, and the numbers themselves was not my

13    issue, and that's only because I lack sufficient information to

14    know whether or not the number is significant.  I don't know

15    how many customers might possess relevant information and

16    whether or not this is just a tiny pinprick or whether this is

17    a blunderbuss in terms of numbers.  What concerned me was the

18    details.

19           MR. WILLIAMS:  The breadth of --

20           THE COURT:  Yeah.

21           MR. WILLIAMS:  Which, again, I indicated that we've

22    narrowed somewhat.

23           THE COURT:  Right.

24           MR. WILLIAMS:  But I do want to say that with regard

25    to the number, it really is an important issue because

1    previously Oracle has argued that, you know, if we are able to
2    find one, 10, 20, 40 customers, that's just a small percentage
3    of their customer base, and therefore, that wouldn't prove that
4    any of these facts were material, and I think we have to keep
5    that in mind when we're going forward with non-party discovery;
6    obviously, keeping it narrow to those people -- those entities
7    that may have responsive information for the period in which
8    we're looking for --
9              THE COURT:   You know, I think that's right, to a
10   limited extent.   It seems to me, in a case like this, you know,
11   Mr. Rubin is correct to a certain extent.   The most important
12   documents into proving that Oracle had a problem with the
13   functionality of this software, and knew about it at the
14   relevant period of time, are Oracle documents.   You know,
15   you're hoping to find thousands of e-mails from thousands of
16   customers that say, "What about this?"   And that will be the
17   most important -- much more important than any individual
18   customer's particular one concern, right?   Or any hundreds,
19   because they'll be directly in Oracle, and there will be many
20   more of them if you find what you think you're going to find.
21              This stuff is the next level out, the next ring out,
22   and so it is, while relevant, I don't know that it's the piece
23   that is -- by which you are going to show that there were
24   widespread industry customer problems by taking a deposition of
25   a hundred, because you can never get to the number that is

1    anything more than a pinprick, right?  I mean, because there

2    are so many Oracle customers, it strikes me -- knowing nothing

3    about this, of course, but speculating -- that there are so

4    many, that that might be quite a difficult task.  We're not

5    going to survey all the customers, right?

6            MR. WILLIAMS:  I agree, and I think your Honor --

7            THE COURT:  But I don't have a preconceived notion

8    about the number.  I don't have a preconceived notion about the

9    number.  I just don't.  So you're fine on that, fine in the

10   sense that you can work it out and make your arguments to me.

11   If you can't....

12           MR. WILLIAMS:  I agree, your Honor, but I think with

13   regard to the customers, your Honor hit it on the head when he

14   said that falsity is truly an issue here that plaintiffs are

15   entitled to discover, and with regard to those customers, when

16   those customers internally -- and I actually pulled the

17   hypothetical to the defendants to explain why we thought we

18   needed this information.  Internally, if a customer has

19   purchased this software on the basis of a statement that it's

20   pre-integrated and interoperable out of the box, and internally

21   their IT staff is discussing the fact that, hey, these modules

22   can't talk to one another; not only do they not talk to one

23   another, but the software code hasn't even been written yet in

24   order to allow them to talk to one another, that's information

25   that we think is only going to be discoverable from the third

1    parties.

2              Again, keeping it --

3         THE COURT:  Well, you're going to have an expert

4    witness testify about the software as it existed at the time

5    and they'll tell you the same thing.

6         MR. WILLIAMS:  Possibly.

7         THE COURT:  Possibly?

8         MR. WILLIAMS:  If we can get the software as it

9    existed five years ago, and that it's --

10        THE COURT:  Okay, all's you need is two customers on

11   that.  I mean, the problem -- your argument is correct, but

12   it's -- how far it goes in scope is the question, how far out,

13   how many customers --

14        MR. WILLIAMS:  Do we need to say that --

15        THE COURT:  -- to know that there is evidence that

16   there is a problem with the software, right.  Some, yeah.

17        MR. WILLIAMS:  Your Honor, I'd be happy -- happy --

18   if we could only depose or get evidence from one customer that

19   could testify about the specific technological problems, if I

20   knew that the opposition wouldn't be that, "Well, that's just

21   one customer."

22        THE COURT:  Well, okay, two.  I don't know what the

23   number is.  I told you, I don't know what the number is.

24        MR. WILLIAMS:  With regard to the stay of the

25   subpoenas, I just wanted to see if your Honor could provide a

little bit more detail on how we should speak to the non-parties who were actually waiting for a ruling today and what we should tell them.

THE COURT:  Okay, well, my idea is that you tell them that the Court has temporarily stayed the subpoenas, and that you'll keep them apprised of what the Court does next, and just write them a letter.

MR. WILLIAMS:  And, I --

THE COURT:  Would you want to say something else to them?

MR. WILLIAMS:  Well, I'd like to give them a time frame.  I know your Honor indicated a discovery conference.

THE COURT:  We should talk about time frame.  I don't know whether it's appropriate to communicate the time frame to them, because the time frames often slip, but we should talk about a time frame.

When can you do a discovery conference?

MR. WILLIAMS:  We can -- well, with each other or with the Court?

THE COURT:  Well, there's going to be a series of things.  You're going to have to go home and draft a detailed proposal for a discovery plan.  Then, each of you -- and then you have to give it to each other, and then you have to meet. Meaning -- I don't know who the lead trial counsel is.  Whoever they are, maybe you two will meet, and go over it.  And then

1    you have to give me a joint letter, and then we have to have a

2    discovery conference.  If you can do that in a week, I can see

3    you in a week.  If you can't, then we can we can pick some

4    other time.

5        MR. WILLIAMS:  I'd like to do it in a week, but we

6    do have at least one deposition scheduled for next week Friday.

7    We have currently pending before Judge Jenkins a letter brief

8    that at least defendants have filed with regard to 11i, and it

9    may be now that that is, you know, withdrawn based on the --

10       THE COURT:  Yeah, we're not going to do any

11   discovery issues until we have this discovery conference.

12       MR. WILLIAMS:  So I'd like to see if we can get it

13   done next week.

14       THE COURT:  I can do it next Thursday.  It means a

15   lot of work for you all between now and Thursday, but, you know

16   you, there must be dozens of lawyers on this case.

17       MR. WILLIAMS:  Maybe at Meyer (sic), Brown, but not

18   at Lerach, Coughlin.

19       MR. RUBIN:  Mayer, Brown.  Not in Palo Alto, your

20   Honor.

21       THE COURT:  Why don't you go to the Chicago office.

22       MR. RUBIN:  We have some Chicago support, too.

23       THE COURT:  Good.  How many lawyers are there in the

24   firm now?

25       MR. RUBIN:  About 1200, including our --

1          THE COURT:  My God.

2          MR. RUBIN:  -- including the -- Mr. Platt lost his

3     place in the name, and our new London colleagues have taken

4     their place, I think about 1200, but only a few of those, your

5     Honor, only a small number --

6          THE COURT:  I'm just kidding.  I'm just kidding.

7     I'm not one of those who says, oh, you've got lots of lawyers.

8          MR. RUBIN:  Just to be realistic, your Honor, we

9     want to proceed efficiently, as well.  I don't know, if we're

10     talking about putting the documents together which requires a

11     lot of internal discussions about how we want to propose it, I

12     think plaintiffs will have to do the same thing, exchanging it,

13     and then having a truthful discussion between Mr. Williams and

14     myself, I think we would be talking about coming back before

15     the Court in a couple of weeks' time, not next week.

16          And that's true, your Honor, we're -- as you go into

17     your -- what I understand to be your knowledge of law firm

18     staffing, the Lead trial counsel, with capital L, is a senior

19     partner in Chicago named Alan Saltpeter.

20          So to the extent that the Court wants, from our

21     side, Mr. Saltpeter to participate in that conference, I'm sure

22     that others of us would participate, as well, then we would

23     also need to know his schedule, and I don't know if

24     Mr. Williams is designated as the lead trial counsel in that

25     sense --

1        MR. WILLIAMS:  I'm one of them.

2        THE COURT:  Yeah, who's heading the trial team?

3        MR. WILLIAMS:  Mark Solomon.

4        THE COURT:  I mean, that's what I mean.  You know,

5   we're all partners and we're all going to work hard together

6   and we're all going to take our piece, but whoever is running

7   the team is who I want there.

8        MR. RUBIN:  So we would have to confer with him

9   about what his schedule is for an actual meeting, which I

10  understand would precede any meeting with the Court.

11       THE COURT:  We, I'm willing to allow a little bit of

12  time so that that can be done, but I'm not willing to adjust

13  the schedule for his schedule or for Mr. Solomon's schedule.

14  This is going to happen immediately.

15       And let me just look at the week of the 21st, which

16  is -- no -- so I should be looking at the week of the 14th.

17       MR. RUBIN:  Could we propose, your Honor, coming in

18  on the 28th or the 1st, and that would give everybody ample

19  opportunity to exchange their documents and have a meeting,

20  which I'm sure Mr. -- I'm sure we could get Mr. Saltpeter and

21  Mr. Solomon together by then.

22       MR. WILLIAMS:  I just don't have a -- what day of

23  the week is your Honor proposing?

24       THE COURT:  Well, it can't be a Friday.

25       MR. WILLIAMS:  Okay.

1      THE COURT:  It is possible we could do it on the

2  1st, which is a little more than three weeks from now.

3      MR. RUBIN:  March 1, your Honor?

4      THE COURT:  How does that look?

5      MR. WILLIAMS:  And that is what day of the week?

6      THE COURT:  That's a Tuesday.

7      MR. WILLIAMS:  That's a Tuesday.

8      THE COURT:  I would propose that we start about

9  11:00 o'clock in the morning.  I've got a criminal calendar at

10  9:30.  If it doesn't explode, I should be done by 11:00.

11      MR. RUBIN:  Okay, well, your Honor, what we can do

12  is immediately after this, I'll touch base with Mr. Saltpeter,

13  get clearance on that date, and then -- or we can take a short

14  break now and I can contact him --

15      MR. WILLIAMS:  And I should to the same, your Honor.

16      THE COURT:  Well, let's work back.  Here's the

17  proposal.  March 1, we're going to have a discovery conference,

18  March 1.  Okay?  I need the joint letter, which has the -- to

19  the extent there are competing discovery plan proposals, you

20  know, a description of the agreed-upon provisions and a

21  description of the disputes, any party's position on them.

22      I mean, that will be my text, right?  That will be

23  the prep that I'll do, rather than reading the Complaint, is to

24  read that.  So you put in that what your argument is about what

25  you need or what you think the other side needs.  So a detailed

1    description of the dispute.

2            I need that -- well, let's work backwards.  Let

3    pretend for the moment you're going to get it to me on the

4    22nd, February 22nd.  That means that realistically you

5    probably ought to have the meeting so you can get that done by,

6    I don't know, two weeks from today, or something, right?  The

7    18th?  And I appreciate everybody has schedules, but I want to

8    get the discovery in the case going right away, so I want to

9    have this right away.

10            So when you talk to your folks -- and we'll take a

11    five-minute break so you can -- about this, encourage them to

12    do whatever they need to do make sure that these dates work,

13    because I wouldn't want to put it out any further.  I'm likely

14    to tighten it up rather than put it out any further.  So I

15    encourage you to carry that message to them.  I'm not

16    completely inflexible, but I resist moving it out any further.

17            MR. WILLIAMS:  Your Honor, are you requiring that

18    the lead trial counsel also be at the meeting among the parties

19    prior to coming to the conference?

20            THE COURT:  Yes, and I'll just stay the subpoenas

21    pending the discovery conference, and presumably will address

22    it in the order that comes out of that discovery conference,

23    but the stay is for the moment until a discovery conference.

24    Let me see what happens.

25            MR. RUBIN:  Does the Court intend to issue an order

1   ·on the subpoenas?

2            THE COURT:   Yeah, I mean, it will be -- it will have

3   the dates and stuff.

4            MR. RUBIN:   Okay, on the subpoena, on the temporary

5   stay.

6            THE COURT:   Yes, it will say subpoenas are stayed

7   pending discovery conference, here's the discovery conference

8   schedule, something like that.

9            All right.   So is there anything we need to discuss

10  before you get on the phone?

11           MR. RUBIN:   I don't think so, your Honor.

12           THE COURT:   Mr. Williams?

13           MR. WILLIAMS:   No, I just wanted to be clear that

14  your Honor did indicate earlier that you and Judge Jenkins are

15  working out whether or not all discovery is going to be before

16  you?

17           THE COURT:   Well, I don't know what to do about

18  that.   You filed various things with him.   There's no hearings

19  on any of them until March.   I think you've got a March 4th

20  hearing on your request for a special master or something like

21  that.   The other things, you're filing some letter briefs with

22  him.   I'm going to send him a copy of this order and tell him

23  I've set this.   I assume that pending this, he won't ask you to

24  actually appear and argue on anything.

25           MR. WILLIAMS:   I should say that, you know, we

1   have -- plaintiffs have a response to a letter that defendants

2   filed a couple of days ago, and we are supposed to respond by

3   the end of the day today.

4           THE COURT:  Has to be ready.

5           MR. WILLIAMS:  It is ready, actually.

6           THE COURT:  It's probably a piece of what we're

7   dealing with on the 1st, too.

8           MR. WILLIAMS:  I just want to make sure that he

9   doesn't believe that that's the only thing sitting there.  It

10  makes sense to probably stay all of those issues until --

11          THE COURT:  Well, if I could, I would.  I don't feel

12  like I can, but go ahead and file your letter.  I will tell him

13  what we're doing, and so there won't be any issues, but -- and

14  then maybe he'll issue an order following that, but for the

15  moment, why don't you go ahead and do that.

16          If I can get ahold of him today -- I don't know what

17  his trial schedule is today -- then I may be able to take care

18  of it today, but I might not be able to.

19          So why don't you just finish up the letter, and put

20  it in.  It's a useful piece, because you're going to need to

21  discuss it anyways, and probably have some issues left in there

22  to put in the letter to me.  So it's not altogether useless,

23  but -- I hesitate to stop anything that isn't actually in front

24  of me, that he hasn't actually given me to act on.

25          MR. RUBIN:  Well, procedurally what he had set up,

1    as the Court may know, is letter briefs, and then he was going

2    to be a gatekeeper for whether -- he was going to decide it.

3           THE COURT:  If nobody calls, nothing happens.  No, I

4    know.  Got it.  Okay, so why don't you go make your calls and

5    we'll reconvene in five minutes' time.

6           MR. RUBIN:  Thank you, your Honor.

7           THE COURT:  Okay.

8        (Court in recess from 10:24 a.m. to 10:40 a.m.)

9           THE CLERK:  We are back on the record in case

10   C 01-0988, In re: Oracle Securities Litigation.  Counsel?

11          THE COURT:  Okay, so?

12          MR. WILLIAMS:  Your Honor, I have confirmed dates.

13   March 1 is good for plaintiffs.

14          THE COURT:  Okay.

15          MR. WILLIAMS:  March 18 appears to be good for

16   plaintiffs, as well.

17          MR. RUBIN:  February 18th.

18          MR. WILLIAMS:  I'm sorry, February 18th.

19          MR. RUBIN:  March 1 is fine to appear before the

20   Court, your Honor, for Mr. Saltpeter.

21          THE COURT:  All right, and then the meet, just have

22   it by the 18th, figure out what works.

23          MR. RUBIN:  And as I said to Mr. Williams, we're

24   still working on which date we could get together, but we'll

25   work it out.  We will be here at 11:00 a.m. on March 1st.

1                THE COURT:  That's right, 11:00 a.m.  Great.  All

2       right, anything else?

3                MR. WILLIAMS:  No, your Honor.

4                THE COURT:  Thank you.

5                MR. RUBIN:  That's it.  Thank you, your Honor.

6                THE COURT:  All right, take care.

7                                              10:40 a.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, LEO T. MANKIEWICZ, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in Case No. C 01-0988 MJJ,   In re Oracle Securities Litigation, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Friday, February 18, 2005