# Exhibit 24

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington D.C., 20549

----------------

FORM 10-K

{X}ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended May 31, 2001

OR

{_}TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

Commission file number: 0-14376

Oracle Corporation
(Exact name of registrant as specified in its charter)

Delaware                                          94-2871189
(State or other jurisdiction of                (I.R.S. employer
incorporation or organization)                identification no.)

500 Oracle Parkway
Redwood City, California 94065
(Address of principal executive offices, including zip code)

(650) 506-7000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, par value $0.01 per share
Preferred Stock Purchase Rights
(Title of class)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days. YES {X} NO {_}

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to
this Form 10-K. {_}

The aggregate market value of the voting stock held by non-affiliates of the
registrant as of July 31, 2001 was $77,328,221,237. This calculation does not
reflect a determination that persons are affiliates for any other purposes.

*ORACLE CORP DE*                                    *Filing Date: 06/30/01*

Number of shares of common stock outstanding as of July 31, 2001:
5,598,702,163.

Documents Incorporated by Reference:

Part III--Portions of the registrant's definitive proxy statement to be issued
in conjunction with registrant's annual stockholders' meeting to be held on
October 15, 2001.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

ORACLE CORPORATION

FISCAL YEAR 2001 FORM 10-K ANNUAL REPORT

Table of Contents

|  |  | Page |
|---|---|---|
| **PART I.** | | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 8 |
| Item 3. | Legal Proceedings | 8 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 8 |
| **PART II.** | | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 9 |
| Item 6. | Selected Financial Data | 9 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 10 |
| Item 7a. | Quantitative and Qualitative Disclosures About Market Risk | 20 |
| Item 8. | Financial Statements and Supplementary Data | 21 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 21 |
| **PART III.** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 22 |
| Item 11. | Executive Compensation | 22 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 22 |
| Item 13. | Certain Relationships and Related Transactions | 22 |
| **PART IV.** | | |
| Item 14. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 22 |
|  | Signatures | 52 |

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Oracle Corporation:

We have audited the accompanying consolidated balance sheets of Oracle
Corporation, a Delaware corporation and subsidiaries as of May 31, 2001 and
2000, and the related consolidated statements of operations, stockholders'
equity and cash flows for each of the three years in the period ended May 31,
2001. These financial statements and the schedule referred to below are the
responsibility of the Company's management. Our responsibility is to express
an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally
accepted in the United States. Those standards require that we plan and
perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on
a test basis, evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting principles used
and significant estimates made by management, as well as evaluating the
overall financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in
all material respects, the financial position of Oracle Corporation and
subsidiaries as of May 31, 2001 and 2000, and the results of their operations
and their cash flows for each of the three years in the period ended May 31,
2001, in conformity with accounting principles generally accepted in the
United States.

Our audits were made for the purpose of forming an opinion on the basic
financial statements taken as a whole. The schedule listed under Item 14(a)2
is presented for purposes of complying with the Securities and Exchange
Commission's rules and is not a part of the basic financial statements. This
schedule has been subjected to the auditing procedures applied in our audits
of the basic financial statements and, in our opinion, fairly states in all
material respects the financial data required to be set forth therein in
relation to the basic financial statements taken as a whole.

                              ARTHUR ANDERSEN LLP

San Jose, California
June 18, 2001

24

ORACLE CORP DE

*Filing Date: 06/30/01*

ORACLE CORPORATION
CONSOLIDATED BALANCE SHEETS
As of May 31, 2001 and 2000

| (in thousands, except share data) | May 31, 2001 | May 31, 2000 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents........................... | $ 4,449,166 | $ 7,429,206 |
| Short-term cash investments......................... | 1,438,495 | 332,792 |
| Trade receivables, net of allowance for doubtful accounts of $403,305 in 2001 and $272,203 in 2000.. | 2,432,131 | 2,533,964 |
| Other receivables................................... | 281,782 | 256,203 |
| Prepaid and refundable income taxes................. | 272,742 | 212,829 |
| Prepaid expenses and other current assets........... | 88,834 | 118,340 |
| Total current assets............................ | 8,963,150 | 10,883,334 |
| Long-term cash investments........................... | -- | 110,000 |
| Property, net........................................ | 974,751 | 934,455 |
| Long-term prepaid income taxes....................... | 376,030 | 322,379 |
| Intangible and other assets.......................... | 716,229 | 826,611 |
| Total assets.................................... | $11,030,160 | $13,076,779 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Notes payable and current maturities of long-term debt............................................... | $    2,849 | $    2,691 |
| Accounts payable.................................... | 270,112 | 287,495 |
| Income taxes payable................................ | 767,087 | 2,821,776 |
| Accrued compensation and related benefits........... | 734,705 | 725,860 |
| Customer advances and unearned revenues............. | 1,213,529 | 1,133,482 |
| Value added tax and sales tax payable............... | 165,210 | 165,304 |
| Other accrued liabilities........................... | 763,127 | 725,630 |
| Total current liabilities....................... | 3,916,619 | 5,862,238 |
| Long-term debt....................................... | 300,847 | 300,770 |
| Deferred income taxes................................ | 327,788 | 266,130 |
| Other long-term liabilities.......................... | 207,135 | 186,178 |
| Commitments (Note 5)................................. | -- | -- |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value--authorized, 1,500,000 shares; outstanding: none................ | -- | -- |
| Common stock, $0.01 par value and additional paid in capital--authorized, 11,000,000,000 shares; outstanding: 5,592,360,823 shares in 2001 and 5,614,671,898 shares in 2000...................... | 4,820,869 | 3,112,126 |
| Retained earnings................................... | 1,610,480 | 3,343,857 |
| Accumulated other comprehensive income (loss)....... | (153,578) | 5,480 |
| Total stockholders' equity...................... | 6,277,771 | 6,461,463 |
| Total liabilities and stockholders' equity........ | $11,030,160 | $13,076,779 |

See notes to consolidated financial statements.

25

     *Filing Date: 06/30/01*

EXHIBIT 23.01

## CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation of our report included in this Form 10-K into the Company's previously filed Registration Statement on Form S-8 (File No.'s 33-16749, 33-33564, 33-44702, 33-51754, 33-53349, 33-53351, 33-53355, 333-18997, 333-19001, 333-41935, 333-63315, 333-74973, 333-74977, 333-75607, 333-75679, 333-83299, 333-83305, 333-96035, 333-34022 and 333-43836).

/s/ ARTHUR ANDERSEN LLP

San Jose, California
August 10, 2001

Exhibit 25

 **NEWS.COM**    http://www.news.com/

# After Andersen, accounting worries stick

By Larry Dignan
http://news.com.com/After+Andersen%
2C+accounting+worries+stick/2100-1017_3-936813.html

Story last modified Mon Jun 17 12:55:00 PDT 2002

**While Arthur Andersen and Enron are on their way to becoming footnotes of American business, the bookkeeping questions they raised threaten to drag down tech companies.**

On Saturday, a federal jury in Houston convicted the auditing firm of one felony count of obstructing the Securities and Exchange Commission's investigation into Enron. Immediately after the verdict, which Arthur Andersen said it will appeal, the company informed the SEC that it intends to discontinue auditing public companies by the end of August.

In the aftermath of the debacle, tech clients including Qwest Communications International, WorldCom and Peregrine Systems are dealing with accounting issues ranging from SEC inquiries to earnings restatements. All three were former Arthur Andersen clients, according to regulatory filings.

Qwest and WorldCom are facing questions about how they recognized revenue and booked sales, respectively.

Peregrine shares collapsed after the company's new auditor, KPMG, found accounting issues. Peregrine, which dropped Arthur Andersen in April, said in May that it would restate its earnings for fiscal 2000 and 2001, and for the first three quarters of 2003. An SEC investigation followed.

The company has since dropped KPMG because some of the transactions under review were with KPMG Consulting. Peregrine hired PricewaterhouseCoopers to replace KPMG.

Meanwhile, many other tech companies had already dumped Arthur Andersen to avoid any perceived problems. Oracle, Liberate Technologies, Iomega and BMC Software were just a few of the tech companies that dismissed Arthur Andersen after its indictment in March.

In an April statement, Oracle CFO Jeff Henley said Arthur Andersen delivered "professional work" for 15 years, but the company had to switch auditors after the auditing firm began selling some of its branch offices to rivals.

Oracle decided to go with Ernst & Young as an auditor because it "has no commercial relationship with the company that would impair its independence."

Other companies issued similar statements.

Analysts said tech companies dismissed Arthur Andersen because they didn't want to have a stigma attached to their financial results.

"I don't believe Arthur Andersen's quality was worse, but there was a stigma," said Lawrence D. Brown, an accounting professor at Georgia State University. "There was also a notion that the firm couldn't continue."

Brown said former Andersen clients aren't likely to have any more accounting problems than other technology companies. "No, I don't think they'll have more bad audits" than non-Andersen companies, he said.

Nevertheless, the Arthur Andersen-Enron mess has opened the door for a host of accounting concerns that will affect technology companies.

Bill Schaff, fund manager for the Berger Information Technology Fund, said the Arthur Andersen scandal has opened the door to accounting

reforms.

"Arthur Andersen has more implications for accounting changes," he said. "More specifically, footnotes are being closely watched, and there's a lot of talk of expensing stock options, which will hurt a lot of tech companies."

Schaff said investors are scrutinizing the technology sector because it has been one of the most aggressive when it comes to accounting.

Although companies such as Amazon.com and Cisco Systems have been scrutinized for their accounting, analysts say the worries are often a case of witch hunting. "There's a big difference between being aggressive and being fraudulent," Schaff said.

Even though aggressive accounting may not be a crime, Wall Street isn't noting many distinctions.

"The accounting problems add another layer of complexity to the companies," said Sujatha R. Avutu, co-manager of the Evergreen Growth & Income Fund. "The accounting issues are a moving target. What was acceptable six months ago isn't now."

She said companies that focus on consumer staples and retailing have outshined technology in 2002.

That fact isn't lost on Schaff, who focuses solely on technology. "There's a lot of nuances in technology," he said. "Investors are getting back to basics. It's easy to understand Wal-Mart and McDonalds."


Copyright ©1995-2005 CNET Networks, Inc. All rights reserved.

Exhibit 26

RECEIVED

MAY 3 1 2001

MAY 3 1 2001

BARRACK, RODOS & BACINE
SAN DIEGO, CALIFORNIA

FILED

MAY 2 5 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re HI/FN, INC. SECURITIES LITIGATION _____/ | No. C 99-4531 SI **ORDER RE: DISCOVERY** |
| This Document Relates to: | |
| ALL ACTIONS. _____/ | |

By letter briefs, the parties seek the Court's assistance in resolving several disputes concerning discovery. See Plaintiff's Ltr. Brief to Compel Discovery ("Motion to Compel") (dated Mar. 6, 2001); Defendant's Ltr. Brief for Protective Order ("Motion for Prot. Ord.") (dated April 2, 2001).

This lawsuit involves a securities class action brought on behalf of all purchasers of common stock of Hi/fn, Inc. ("Hi/fn") between July 26, 1999 and October 7, 1999 ("the class period") against Hi/fn and its Chief Executive Officer and Chairman of the Board Raymond J. Farnham ("Farnham"). Hi/fn designs and markets semiconductor chips used to provide secure, high-bandwidth connections to the Internet and increased data storage. During all times relevant to this action, Hi/fn was dependent on two companies for 85% of its revenues: Quantum Corporation ("Quantum") and Lucent Technologies, Inc./Ascend Communications ("Lucent"). Beginning in June 1999, defendants allegedly learned that Quantum and Lucent planned to significantly decrease purchase orders for Hi/fn products, due to an overstock in inventory with Quantum and a shift in product line with Lucent. Defendant Farnham is alleged to have traded on this insider knowledge. Furthermore, plaintiffs assert that, defendants made public statements assuring an optimistic outlook for Hi/fn to stock analysts and the financial news media, despite knowledge of the impending shortfall in business. Plaintiffs claim that defendants leaked the information concerning Quantum and Lucent to select stock analysts on October 6, 1999, and the next day, held a conference call with analysts, money and portfolio managers, Hi/fn

1    shareholders, brokers, and stock traders to convey that the information was only recently learned. The

2    information caused Hi/fn stock to decline from $104-3/4 at the close of trading on October 6, 1999 to

3    $74 on October 7, 1999, and, after a temporary halt in trading, to a low of $37-3/4 at the close of trading

4    on October 8, 1999.

5        At issue before the Court are a motion by plaintiffs to compel production of documents and a

6    motion by defendants on behalf of third party PriceWaterhouseCoopers LLP for a protective order.

7

8    **A.    Production of Documents**

9        The disputes regarding production of documents arise from plaintiffs' First Request for

10    Production of Documents. The parties disagree over the relevant time period for discovery, the scope

11    of the requests, the extent to which defendants must search for documents, and whether certain

12    notebooks maintained by Hi/fn's Director of Sales need to be produced.

13

14        **1.    Relevant Time Period for Discovery**

15        Plaintiffs demand production of documents for the period December 17, 1998 through

16    September 30, 2000, but defendants are only willing to produce documents for the calendar year 1999.

17    According to plaintiffs, December 17, 1998 is the date when Hi/fn was "spun-off from Stac

18    Electronics," and it is important "that plaintiffs can ensure that they capture documents discussing the

19    status of Hi/fn's products as they entered into the next year." Motion to Compel 4. Furthermore,

20    plaintiffs demand documents through September 30, 2000 (the end of Hi/fn's fiscal year 2000) because

21    the complaint "contains numerous allegations that defendants made false statements and omissions

22    about Hi/fn's results for its first quarter of 2000 (which ended on December 31, 1999), as well as its

23    fiscal year 2000 result." Motion to Compel 5.

24        Plaintiffs' causes of action are based on alleged misrepresentations made in July 1999 relating

25    to information learned by defendants no earlier than June 1999. The misrepresentations involve

26    forecasts concerning Hi/fn's future sales and the development of the market for Hi/fn's products. The

27    key issue is defendants' knowledge during the time they made the alleged misrepresentations, not

28    whether the forecasts were later confirmed or proven to be inaccurate. See id. ("Plaintiffs have pled that

2

1  these forecasts were contradicted by the information that Hi/fn and Farnham had about the status of its

2  sales and products."). Stating only in a conclusory fashion that the broader discovery period is required

3  to prove these claims, plaintiffs have not demonstrated with particularity that information about the

4  "status of Hi/fn's products as they entered into [1999]" is relevant to any asserted claim or defense.

5  Furthermore, actual figures about fiscal year 2000 growth and revenues are not relevant to defendants'

6  knowledge in Summer 1999. The relevance of such information, if any, would only be tenuous and

7  could not justify the substantial burden of production imposed on defendants.

8       The relevant time period for discovery is calendar year 1999 and, as defendants proposed, any

9  other documents "created in 2000 that substantively discuss the relevant events during the Class Period."

10  Deft.'s Ltr. Brief in Oppo. to Mtn. to Compel (dated Mar. 13, 2001) at 2.

11

12       **2.    Use of "Refer or Relate to"**

13       Many of plaintiffs' discovery requests seek documents which refer or relate to the topic of the

14  request, defined to mean:

15       all documents which explicitly or implicitly, in whole or in part, were received in conjunction
      with, or were generated as a result of, the subject matter of the request, including, but not limited
16  .    to, all documents which reflect, record, memorialize, discuss, describe, compare, consider,
      concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinging upon,
17       or impact the subject matter of the request.

18  Motion to Compel, Ex. 1 (First Req. for Prod. of Docs.) at 2. Defendants contend that such language

19  makes the request overbroad, vague and burdensome, and instead assert that they will produce

20  documents which constitute or discuss the topic of the requests.

21       Federal Rule of Civil Procedure 26(b)(1) allows discovery of any material which is "relevant

22  to the claims or defense of any . . . party." This suggests a broad range for discoverable material.

23  However, Rule 34 requires that requests for production identify sought documents with reasonable

24  precision. General phrases like "refer" or "relate to" have been stricken as overly broad or vague if they

25  are used in conjunction with other general or non-specific language. See Cotracom Commodity Trading

26  Co. v. Seaboard Corp., 189 F.R.D. 655, 666 (D. Kan. 1999) ("The term 'reflecting' does not necessarily

27  make a request overly broad on its face. Its use in conjunction with other non-specific language . . .

28  makes the request overly broad."). For instance, a request for documents relating to a company's staff

United States District Court

For the Northern District of California

3

1  meetings may be overbroad, but not a request for documents relating to a company's monthly sales

2  department meetings. See, e.g., Bregman v. District of Columbia, 182 F.R.D. 352, 358 (D.D.C. 1998)

3  (striking request for "all other documents . . . relating to any of the [previously stated document

4  requests]."); Roto-Finish Co. v. Ultramatic Equipment Co., 60 F.R.D. 571 (N.D. Ill. 1973) (upholding

5  request for "all documents and sales records relating to sales and use of [defendant's] vibratory finishing

6  machines").

7       Defendants' categorical objection to any use of the phrase "refer or relate to" fails to take

8  account of the distinct context in which the terms are used.  Defendants' substitute proposal of

9  producing documents which "constitute or discuss" the topics of the request is too narrow.  Having

10  reviewed all of the document requests which use "refer" or "relate to," the Court finds the following

11  document requests valid:

| Req. No. | Refer or Relate to . . . |
|---|---|
| 2 | "methods in which Hi/fn determined and forecasted demand for all Hi/fn products" |
| 5 | "Lucent's Ascend TNT product" |
| 6 | "the migration of Lucent's Ascend TNT product from a 48 port modem card to a 96 port card and eventually to a 256 port card" |
| 7 | "any meeting held by Hi/fn in or about June 1999 concerning Lucent and/or Lucent's Ascend TNT Box" |
| 12 | "planned or forecasted shipments of Hi/fn products to Jabil" |
| 13 | "planned or forecasted shipments of Hi/fn products to Solectron" |
| 14 | "inventory levels of Hi/fn products at (a) Quantum and/or Jabil or (b) Lucent and/or Solectron" |
| 15 | "a July 26, 1999 memo sent via e-mail to Stephen Farnow or William Walker stating that Quantum had an excess of Hi/fn parts" |
| 16 | "a memo dated August 25, 1999 to Farnham, Farnow, or Robert Harrah concerning the buildup of Hi/fn parts at Quantum" |
| 24 | "forecasted revenues from sales by Hi/fn to (a) Lucent or (b) Quantum" |
| 26 | "any comparison of or variance from Hi/fn's actual business or financial performance and its expected, planned, budgeted, or forecasted performance" |
| 27 | "any sales meeting by Hi/fn held at the Pruneyard Hotel in Campbell, California in August 1999" |

4

Case 3:01-cv-00988-SI   Document 400-7   Filed 12/08/05   Page 17 of 34

05-31-2001   03:00pm   From-BARRACK RODOS BACINE   619-230-1776   T-401   P.006/012   F-161
Case 4:00-cv-02036-WDB   Document 123   Filed 05/17/2005   Page 6 of 12

29    "forecasts made by Hi/fn's sales staff relating to revenues or potential revenues or sales or potential sales"

30    "inventory levels, including, but not limited to, any analysis of changes in inventory levels and the items making up the inventory"

36    "interviews (a) by CNBC Squawkbox of Farnham on or about September 8, 1999 or (b) by the Wall Street Transcript of Farnham and Walker on or about July 29, 1999"

38    "Farnham's predictions of 20% growth made during the Class Period"

39    "the following reports . . . . [within the relevant discovery time period]"

40    "the following meetings . . . . [within the relevant discovery time period]"

42    "termination of employment of Saroop Mathur"

43    "all April 1999 presentations which involved Waltz and Mike Scruggs"

48    "Company's policy concerning transactions in the Company's stock by insiders . . . ."

The remainder of document requests which use the terms refer or relate are overbroad and vague. These requests include nos. 1, 3, 4, 8, 10, 11, 17, 22, 28, 44, 45, 51, 56, 59, 61, and 76. The Court has modified and narrowed plaintiffs' definition of "refer or relate to" for use with respect to these document requests: Documents must be produced if they record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate, analyze, review, report on, or comment on the subject matter of the request.

3.    **Scope of Search for Documents**

As a result of the meet and confer process, plaintiffs agreed that defendants can limit their search for requested documents to the offices and files of 20-30 employees so long as defendants provide the names and job descriptions of the individuals whose officers and files are searched. Plaintiffs claim they need this information in order to "verify that the list includes everyone necessary for proper litigation of the case." Motion to Compel 6. Having received no such list from defendants, plaintiff now moves to compel disclosure or, in the alternative, to compel defendants to search the files and offices of all Hi/fn employees.

Defendants contend that disclosure of individuals whose office and files were searched, along with their job descriptions, would constitute disclosure of protected attorney opinion work product. The

5

1    Supreme Court first articulated the work product doctrine in Hickman v. Taylor, 329 U.S. 495, 67 S.

2    Ct. 385 (1947): materials prepared by an attorney in anticipation of litigation are protected from

3    disclosure. The protection afforded by the work product doctrine extends to "opinion work product,"

4    defined as "the mental impressions, conclusions, opinions or legal theories of an attorney or other

5    representative of a party concerning the litigation at hand." Dion v. Nationwide Mut. Ins. Co., 185

6    F.R.D. 288, 292 (D. Mont. 1998). A list of employees searched, along with their job description, could

7    reveal information concerning who defendants' counsel thinks is important to the litigation. For

8    instance, such information may reveal defense counsel's mental impressions and opinions about who

9    may be a witness and other litigation strategies. See U.S. v. District Counsel of New York City, 1992

10   WL 208284, *11 (S.D.N.Y. Aug. 18, 1992) ("[A] party may not secure disclosure of an adversary's

11   counsel's view of the case or trial preparation by seeking disclosure of those facts or sources of facts

12   which counsel considers more significant than others and has devoted time to pursuing.").

13       Plaintiffs note that the names of employees searched are not confidential because they will

14   eventually be produced in a source log. However, the source log keeps track of documents that are

15   actually produced. Not everyone whose office and files were searched may turn up responsive

16   documents and thus end up in the source log. Plaintiffs are not entitled to a list of all employees whose

17   offices and files were searched, along with their job descriptions.

18       The alternative argument to compel search of all Hi/fn employees is unpersuasive. A reasonable

19   search does not require defendants to search all the offices and all the files of every employee. It only

20   requires defendants to conduct a search that is "reasonably calculated to uncover all relevant

21   documents." Ethyl Corp. v. EPA, 25 F.3d 1241, 1246 (4th Cir. 1994). Plaintiffs offer no reason a

22   search of 20-30 Hi/fn employees would not lead to all relevant documents. Absent such a showing, it

23   is not necessary for defendants to expand their search.

24

25       **4.    Notebooks of Robert Harrah and Sarah Ferguson**

26       Plaintiffs request production of notebooks kept by Robert Harrah, Vice President of Sales, and

27   binders maintained by Sarah Ferguson, who worked directly under Harrah. Defendants produced

28   segments of the documents with redactions of privileged or non-relevant information. Plaintiffs argue

6

1  that only privileged information may be redacted.

2      It is clear that privileged information may be redacted. Information that is not relevant to any

3  claim or defense by any party is not discoverable and thus may also be redacted. See, e.g., Hall v.

4  Harleysville Ins. Co., 164 F .R.D. 172, 173 (E.D. Pa. 1995) (although contents of consumer credit

5  reports were relevant to action, names and other identifying information were not and were subject to

6  redaction). Defendants are reminded, however, that the test for relevancy remains broad; information

7  is relevant if "it relates to the claim or defense of the party seeking discovery or to the claim or defense

8  of any other party." Fed. R. Civ. P. 26(b)(1). Furthermore, as agreed, defendants must provide a log

9  of redactions similar to a privilege log so that plaintiffs can determine the general subject matter of the

10  redacted information and make any necessary challenges.

11      Subject to the foregoing discussion, defendants are ORDERED to comply with plaintiffs' First

12  Request for Production of Documents no later than June 22, 2001.

13

14  **B.**    **Protective Order Against Third Party Subpoena**

15      Plaintiffs have issued a subpoena to PriceWaterhouseCoopers, LLP ("PwC") for production of

16  accounting work papers, documents, and communications generally arising from PwC's professional

17  service of Hi/fn. See Motion for Prot. Ord, Ex.1 (subpoena). Joined by counsel for PwC, defendants

18  move for a protective order limiting the scope of the subpoena to cover only materials that "discuss

19  Hi/fn's public statements or forecasts during the class period." Id. at 3. Defendants and PwC argue that

20  the subpoena seeks documents that are not relevant to a claim or defense asserted by any party. They

21  contend that "the only issue in this action [] is whether Farnham's forecasts were false when made

22  because Farnham knew that Quantum and Lucent would reduce orders." Id. at 1. There are no claims

23  of improper or fraudulent accounting, nor are there claims that Hi/fn misrepresented its financial results.

24  Defendants and PwC argue that "[a]ccounting and audit information thus has no bearing on the

25  allegations of this case." Id. at 2.

26      As a preliminary matter, plaintiffs challenge defendants' standing to assert the instant motion

27  and argue, to the extent that PwC is seeking a protective order on its own behalf, the relevance objection

28  is not timely. "A party may not ask for an order to protect the rights of another party or a witness . . .

United States District Court
For the Northern District of California

Case 3:01-cv-00988-SI   Document 400-7   Filed 12/08/05   Page 20 of 34

05-31-2001   03:10pm   From BARRACK RODOS BACINE         Document 123   619-230-1871   Filed 05/17/2005   T-408   P.009/012   F-161
Case 1:00-CV-02830-WBH

1   but a party may seek an order if it believes its own interest is jeopardized by the discovery sought from

2   a third person." 8 Wright, Miller & Marcus, Federal Practice & Procedure: Civil § 2035, at 475.

3   Defendants assert that the requested documents contain confidential information that is within the scope

4   of Hi/fn's privacy rights. See Olympic Chartering, S.A. v. Ministry of Industry and Trade of Jordan,

5   134 F. Supp. 2d 528, 535 (S.D.N.Y. 2001) ("While the general rule is that a party lacks standing to

6   quash a third-party subpoena, a party whose records have been subpoenaed has a sufficient privacy

7   interest in the confidentiality of [the] records so as to assert standing to challenge the subpoena.")

8   (citations and internal quotations omitted). Defendants' privacy rights are already protected under a

9   separate protective order applicable to all material that would be turned over by PwC. See Stipulated

10  Protective Order (Dec. 6, 2000). Defendants make no argument why an additional protective order is

11  needed to protect their privacy.

12        The true essence of defendants' challenge to the PwC subpoena is the scope of the request.

13  Although defendants do not appear to have standing to raise a relevancy objection against this third

14  party subpoena, PwC may seek a protective order under Rule 26(c). The argument that PwC's objection

15  is untimely is misplaced. Plaintiffs correctly note that a person served with a subpoena must object

16  within fourteen days in order to modify or quash the subpoena. Fed. R. Civ. P. 45(c)(2)(B). However,

17  this motion is brought under Rule 26(c), which does not contain a 14-day time limit for seeking a

18  protective order.

19        The subpoena casts a very wide net, seeking, for example, all workpapers and documents

20  concerning all professional services performed by PwC for Hi/fn and all documents constituting or

21  concerning any communication between PwC and Hi/fn. Plaintiffs contend that the requested

22  documents are relevant because this action is centered on Hi/fn's financial condition when its directors

23  and officers made certain statements about the company in the summer of 1999. They argue that the

24  requested documents should only be limited by the relevant time period, not by the type of documents

25  sought.

26        The alleged misrepresentations that are at the heart of this lawsuit concern not only forecasts

27  about Hi/fn sales and the relevant market for its products, but also Hi/fn's general financial condition

28  as it neared the end of fiscal year 1999. See Consolidated Amended Compl. ¶¶ 52-59. It is alleged that

United States District Court

For the Northern District of California

1   Hi/fn was greatly dependent on the Lucent and Quantum accounts, and would not survive if there was

2   a dramatic decline in orders from these clients. The Court agrees with plaintiffs that PwC's accounting

3   documents would help illustrate these allegations and are relevant to plaintiffs' claims.

4       The remaining issue is to determine the relevant time period for the PwC subpoena. The Court

5   has determined that the relevant time period for plaintiffs' other document requests is calendar year

6   1999. To be consistent, this time period shall apply to the PwC subpoena as well.

7

8   **CONCLUSION**

9       For the foregoing reasons, the Court GRANTS plaintiffs' motion to compel to the extent set out

10   in this order [Docket No. 61] and DENIES defendant and PwC's request for a protective order to the

11   extent set out in this order [Docket No. 67].

12

13   **IT IS SO ORDERED.**

14

15   Dated: May 24, 2001

16

                    SUSAN ILLSTON
                    United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*For the Northern District of California*

9

United States District Court
for the
Northern District of California
May 25, 2001

*  *  CERTIFICATE OF SERVICE  *  *


Case Number:3:99-cv-04531


Anthony F. Tucci

  vs

Hi/Fn Inc.


I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on  May 25, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

        William S. Lerach, Esq.
        Patrick J. Coughlin, Esq.
        Milberg Weiss Bershad Hynes & Lerach LLP
        100 Pine Street
        Ste 2600
        San Francisco, CA  94111

        Helen J. Hodges, Esq.
        Kirk B. Hulett, Esq.
        Darren J. Robbins, Esq.
        Milberg Weiss Bershad Hynes & Lerach LLP
        600 W Broadway Ste 1800
        One America Plaza
        San Diego, CA  92101

        Stephen R. Basser, Esq.
        Barrack Rodos & Bacine
        402 West Broadway
        Ste 850
        San Diego, CA  92101

        James A. Caputo, Esq.
        Spector Roseman & Kodroff, P.C.
        600 West Broadway
        Ste 1600

Jerome F. Birn Jr., Esq.
Aileen L. Arrieta, Esq.
Hanley N. Chew, Esq.
Jennifer L. Cahill, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050

SI;TS

Richard W. Wieking, Clerk

                    Lorena Parada
BY: _____
        Deputy Clerk

# Exhibit 27

# FILED UNDER SEAL

# Exhibit 28

Case 3:04-cv-00988-SI    Document 400-7    Filed 12/08/05    Page 27 of 34

# MCI Can Keep KPMG, Judge Rules
## 14 States Had Sought to Have Auditor Fired, Fees Returned

*By Tom Becker and Dana Cimilluca*
*Bloomberg News*
Thursday, July 1, 2004; Page E05

KPMG LLP can remain MCI Inc.'s auditor and does not have to return $146 million in fees, a federal bankruptcy judge ruled yesterday.

Fourteen states, led by Massachusetts, wanted KPMG fired for designing a strategy that helped the company, then known as WorldCom Inc., avoid hundreds of millions of dollars in taxes between 1998 and 2001. The states said MCI, the second-biggest U.S. long-distance phone company behind AT&T Corp., should also consider suing KPMG.

The states said an outside firm should replace KPMG to review the accountant's tax strategy. Former U.S. attorney general Richard Thornburgh, appointed to review WorldCom matters, said in a January report that KPMG's strategy for minimizing WorldCom's state taxes was flawed.

▼ advertisement



————MCI Inc————
• **(MCIA) Stock Quote and News**
• **Historical Chart**
• **Company Description**

• **Analyst Ratings**

————Post 200 Profile————
• **MCI Inc.**

————MCI Coverage————
• **MCI Lays Off 2,000 More** (The Washington Post, Jun 26, 2004)
• **MCI Layoffs Include 200 in Oklahoma** (The Washington Post, Jun 5, 2004)
• **Qwest Agrees To Let MCI Use Its Lines** (The

"The court finds no appearance of impropriety," U.S. Bankruptcy Judge Arthur J. Gonzalez said in denying the states' request. "KPMG does not have an interest adverse to the interests of MCI, its creditors or equity holders."

The judge noted that MCI has supported keeping KPMG as its auditor. KPMG audited MCI's 2002 and 2003 financial results.

Washington Post, Jun 1, 2004)
• **Story Archive and Company Background**

————MCI————
• **Stock Quote/News**
• **Historical Chart**
• **Company Description**

• **Analyst Ratings**
• **Company Timeline**

✉ **E-Mail This Article**
🖳 **Print This Article**
**Subscribe to The**
🚗 **Post**

"We're obviously disappointed in the judge's decision, and we're still reviewing it to see whether or not we want to appeal," said Joan Grourke, a spokeswoman for the Massachusetts Department of Revenue. "The main issue is whether the commonwealth is owed money. We'll continue to pursue our claims as part of the bankruptcy proceedings."

Massachusetts has said MCI owes it $90 million in taxes.

"We are very pleased that Judge Gonzalez has denied the states' motion for disqualification, which we always believed was without merit," KPMG spokesman Tom Fitzgerald said.

MCI spokesman Peter Lucht declined to comment.

WorldCom subsidiaries paid more than $20 billion in royalties for services to a separate company unit, according to Thornburgh's report, which was commissioned by the bankruptcy court. The subsidiaries deducted the royalty expenses for state-tax purposes and the parent company was lightly taxed on them, the report said.

"KPMG provided the basis for the tax evasion strategy by which

WorldCom generated the invalid deductions" under the royalty plan, the states said in court papers. Both KPMG and MCI have said the strategies were appropriate.

KPMG replaced Arthur Andersen LLP as Ashburn-based WorldCom's auditor in May 2002. Andersen stopped auditing public companies after its conviction for obstructing a government investigation into the collapse of Enron Corp.

WorldCom filed the largest bankruptcy in U.S. history in July 2002 after disclosing financial misstatements that were part of a $10.6 billion accounting fraud. The company exited bankruptcy as MCI in April.

Exhibit 29



April 28, 2003

VIA FACSIMILE

Shirley H. Huang
Milberg Weiss Bershad Hynes & Lerach LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111

**Arthur Andersen LLP**
33 West Monroe Street
Chicago IL 60603-5385

Tel 312 580 0033

www.andersen.com

RE:   In re U.S. Aggregates, Inc. Securities Litigation; Subpoena Served On Arthur
Andersen LLP ("Andersen")

Dear Ms. Huang:

I am writing in regard to the subpoena served on by Arthur Andersen LLP ("Andersen") in the above-referenced matter.

It is my understanding that the subpoena seeks documents related to Andersen's audit engagement(s) for U.S. Aggregates, Inc. and/or its subsidiaries (together, for purposes of this letter only, "U.S. Aggregates") for the time period from August 13, 1999 to December 31, 2001. From a review of Andersen's records, it appears that work related to the engagement (s) was performed in San Francisco and Salt Lake City

As you may be aware, Andersen has closed its operations in San Francisco and Salt Lake City. As part of this process, all files have been sent to storage in an Iron Mountain facility. In addition, it is my understanding that Andersen no longer has any employees sufficiently familiar with the engagement(s) to conduct a meaningful search for documents responsive to the subpoena. In light of these circumstances, Andersen objects to the subpoena on the grounds that it imposes an unwarranted and undue burden on Andersen, a non-party to this litigation. Moreover, the subpoena is oppressive and unreasonable to the extent it seeks information that could be obtained or made available, or that has been obtained or made available, from some other source that is more convenient, less burdensome, or less expensive. In addition, Andersen objects to the requested production of electronic information as duplicative and unduly burdensome on a third party – particularly given Andersen's practice of storing relevant engagement information in hard-copy form, the expense associated with searching for and retrieving any such information, and the lack of personnel available at Andersen to undertake these efforts. Notwithstanding and without waiving the foregoing objections, Andersen will comply with the subpoena through the following process.

The documents, which appear to be related to Andersen's audit, tax and business consulting engagement(s) for U.S. Aggregates for the time period from {August 13, 1999 to December 31, 2001}, will be made available for your review at an Iron Mountain facility. You may review the documents at your convenience and tab the documents you wish to have copied. Copies of all

Shirley Huang
April 28, 2003
Page 2

selected documents will be made by Ikon. The copies will be bates numbered with an AA prefix and will be stamped as "confidential." Ikon will bill you directly for the costs of these copies, and will only release the copies to you upon receipt of full payment. Once the documents have been made available to you, Andersen will consider its obligations under the subpoena to be complete.

Andersen will undertake this process subject to the following conditions:

1. You agree to notify U.S. Aggregates or its counsel and opposing counsel of both the subpoena and Andersen's intended procedure for responding to the subpoena. In particular, U.S. Aggregates or its counsel and opposing counsel should be provided with copies of both the subpoena and this letter, should be informed of the date on which the documents will be made available, and should be instructed to contact me directly should they have any questions or concerns.

2. You agree to bear all costs associated with any production of documents. As indicated above, you will be billed directly for all costs of production, including file retrieval and other access charges and copying costs. Copies of the documents will be released to you only upon full payment of all amounts due.

3. Andersen considers any documents to be produced to be confidential. Thus, Andersen will only produce documents with your agreement that their use will be limited in the following ways: (i) their use will be confined to the above-referenced proceeding; (ii) they will not be further copied or disclosed to persons other than the parties, the court, and experts or consultants retained by the parties in this proceeding; (iii) as a condition precedent to showing or disclosing these documents to your client, experts or consultants, you secure their agreement to be bound by the terms of this letter and/or any applicable protective order; (iv) the documents shall be covered by and subject to the provisions of any protective order issued by the court or agreed upon by the parties to this proceeding; and (v) the documents and all copies thereof will be destroyed after the proceeding has been concluded.

4. Pursuant to Section 7216 of the Internal Revenue Code, Andersen cannot produce any documents or information relating to the provision of tax services without either the express written authorization of the taxpayer or a court order. To the extent you seek the production of documents covered by Section 7216, you agree to obtain from U.S. Aggregates express written authorization permitting Andersen to produce such documents. I have attached hereto a sample letter containing the language you should use in obtaining client authorization to release documents or information relating to the provision of tax services. Unless such written authorization is provided to Andersen or you obtain a court order, documents covered by Section 7216 of the Internal Revenue Code will be excluded from Andersen's production.

Shirley Huang
April 28, 2003
Page 3

5. Access to documents may not be provided to the extent U.S. Aggregates asserts, or has asserted, a privilege-based objection to their production and agrees to provide you with any requisite privilege log. If U.S. Aggregates makes a privilege-based objection to all or part of the requested production and to the extent Andersen withholds documents as a result of that objection, you agree to resolve any production dispute arising from that privilege assertion directly with counsel for U.S. Aggregates.

6. You agree that inadvertent production of documents or information subject to the attorney-client privilege, the work product doctrine or any other applicable evidentiary privilege shall not constitute a waiver of, nor a prejudice to, any claim that such or related material is privileged. If you are notified by Andersen that documents have been inadvertently produced, you agree to immediately return such documents to Andersen and destroy all known copies of such documents. If you dispute the propriety of the privilege asserted by Andersen, you agree to seek resolution with the Court only after the documents have been returned to Andersen. In addition, you will not refer to or rely on the inadvertent production as a basis for seeking the production of the documents at issue.

7. In providing you access as described above, it is possible that you may have access to certain documents that are outside the scope of the subpoena. You agree that such access is inadvertent, and expressly agree to only request copies of documents that are in fact within the scope of the subpoena – i.e., documents related to Andersen's audit, tax, and business consulting engagement(s) for U.S. Aggregates and called for by the document requests. If you are provided access to documents related to any other Andersen engagement(s), or otherwise beyond the express scope of the subpoena, you agree not to copy such documents, and further agree that you will not use such information for any purpose or disseminate such information to any person.

Please be advised that to the extent you undertake a review of documents pursuant to the procedures described above, Andersen will understand that you do so in agreement to each of the conditions detailed above. Please contact Catherine Smith at 312/931-8372 to confirm the logistics for the production of documents.

Very truly yours,

*Caroline Cheng by cjs*

Caroline K. Cheng

Counsel

Attachment

[DATE]

[NAME]
[ADDRESS]

      Re:   *[CASE NAME]*

Dear [NAME]:

On behalf of [TAXPAYER], please accept this letter as the consent of [TAXPAYER] for Arthur Andersen LLP ("Andersen") to produce the documents responsive to the subpoena directed to Andersen in the above-referenced matter. I understand that some of the documents being produced may have previously been protected under IRS Code 7216 and this letter serves as an express authorization to release the documents.

Sincerely Yours,

_____

[TAXPAYER]