# Exhibit 1

In Re Oracle Securities Litigation

### SHEET 1 PAGE 1

```
                                              Pages 1 - 161
                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
           BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

IN RE:                          )
                                ) Case No. C01-0988 MJJ
ORACLE SECURITIES LITIGATION    )
                                ) Tuesday
                                ) March 1, 2005
_____ ) 11:00 a.m.

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:     LERACH, COUGHLIN, STOIA, GELLER
                       Rudman & Robbins LLP
                   100 Pine Street
                   Suite 2600
                   San Francisco, California 94111
              BY:  MARK SOLOMON, ESQ.
                   SHAWN A. WILLIAMS, ESQ.
                   MONIQUE WINKLER, ESQ.
                   WILLOW RADCLIFFE, ESQ.


           (APPEARANCES CONTINUED ON FOLLOWING PAGE)




Reported By: Debra L. Pas, CSR 11916, CRR, RMR, RPR
             Official Reporter - US District Court
             Computerized Transcription By Eclipse
```

### PAGE 2

```
APPEARANCES: (CONTINUED)

For Defendant:    MAYER, BROWN, ROWE & MAW
                  190 South LaSalle Street
                  Chicago, Illinois 60603-3441
             BY:  ALAN N. SALPETER, ESQ.
                  JAVIER H. RUBINSTEIN, ESQ.
                  LEE N. RUBIN, ESQ.
                  ELI GREENSTEIN, ESQ.
                  SHIRISH GUPTA, ESQ.


Also Present:     James C. Maroulis, Esq.
                  Senior Corporate Counsel
                  Oracle Corporation


                  Andy Rudolph
                  Forensic Accountant
                  Lerach, Coughlin, Stoia, Geller,
                      Rudman & Robbins, LLP
```

### PAGE 3

```
                         PROCEEDINGS
MARCH 1, 2005                                    11:00 a.m.

         THE CLERK: Calling Case C01-0988, In Re Oracle
Securities Litigation. Counsel --
         THE COURT: Do you have the sheet? Do you have a
sheet with these people's names on it, the cards?
         THE CLERK: Yes. I will print it out.
         THE COURT: All right. Why don't you all state your
appearances, please?
         MR. SOLOMON: Mark Solomon, your Honor, appearing on
behalf of plaintiffs.
         MR. WILLIAMS: Shawn Williams on behalf of plaintiff.
Good morning, your Honor.
         THE COURT: Good morning.
         MR. GREENSTEIN: Good morning, your Honor. Eli
Greenstein on behalf of the plaintiffs.
         MS. WINKLER: Monique Winkler on behalf of the
plaintiffs.
         MS. RADCLIFFE: And Willow Radcliffe on behalf of the
plaintiffs.
         THE COURT: Welcome.
         MR. SALPETER: Good morning, your Honor. I'm Alan
Salpeter from Mayer, Brown in Chicago for Oracle.
         THE COURT: Welcome.
```

### PAGE 4

```
         MR. RUBINSTEIN: Good morning, your Honor. Javier
Rubinstein on behalf of Oracle also from Mayer, Brown.
         THE COURT: Welcome.
         MR. RUBINSTEIN: Thank you.
         MR. MAROULIS: Good morning, your Honor. James
Maroulis from Oracle Corporation for Oracle.
         MR. RUBIN: And Lee Rubin also from Mayer, Brown.
         THE COURT: All right.
         MR. SOLOMON: Can we also just add we also have Andy
Rudolph with us, who is our in-house forensic accountant.
         THE COURT: Welcome. Good. All right. We are here
pursuant to Judge Jenkins' order of February 7th referring us
in the matter of preparation of a discovery plan.
         I have reviewed in detail the parties' submissions.
I take as my text for the preparation of the plan the outline
presented in your February 23rd joint letter as supplemented by
the Mayer, Brown letter clarifying certain aspects of their
position.
         And what I want to do is I want to go through in the
order you have presented them the issues and come up with an
order that I will ask you all to draft reflecting whatever
agreements or rulings we come to today.
         We don't have endless amounts of time today so we are
going to try to move pretty quickly, but let's start on Page 1
with the -- or Page 1, 2, and 3, which is the whose files
```

SHEET 6  PAGE 41

41

1 relevant period of time. And we will get to the relevant
2 period of time later.
3         Revenue earnings and forecastings is agreed to,
4 right?
5         MR. RUBINSTEIN: Generally.
6         MR. WILLIAMS: Generally, yes.
7         THE COURT: Agreed to as to the subject matter, the
8 issue is to be the search.
9         MR. WILLIAMS: That was the open issue.
10        THE COURT: Right.
11        MR. RUBINSTEIN: Your Honor, with respect to the
12 previous ruling, with respect to the materiality threshold?
13        THE COURT: It's $500,000. 500k materiality. My
14 mistake. I meant to insert that.
15        MR. SOLOMON: Your Honor, I guess all I would say to
16 that is, you know, with what -- potentially revisit that as we
17 go along, but based on the information now I understand.
18        THE COURT: Sure. It takes a showing to revisit it
19 obviously, but I don't -- you know, this is a learning process
20 for me, too.
21        So revenue and earnings forecasting is an agreed to
22 subject matter, and I have made a ruling as to the search and
23 that will have whatever indications it has.
24        The accounting allegations. I guess I don't
25 understand why the plaintiffs think they need all of these

PAGE 42

42

1 accounting documents. The accounting allegations -- this is
2 only in one very small respect, and not an unimportant respect,
3 but in one very small respect an accounting allegation in the
4 case.
5         This isn't, you know, broad based revenue recognition
6 problems in a variety of areas. This is, on November 17th you
7 executed 46,000 false invoices from the -- you know, to convert
8 revenue from unapplied to revenue, convert money from unapplied
9 to revenue in the amount of $228 million.
10        I don't understand why you need all of their
11 accounting documents.
12        MR. WILLIAMS: Well, I think that we had reached an
13 agreement at least or close to an agreement -- and correct me
14 if I'm wrong, defendants -- with regard to the work papers for
15 the entire year of fiscal 2001.
16        And that's really an integration issue not with the
17 product, but with the work papers themselves and being able to
18 understand the work papers.
19        THE COURT: Is that right?
20        MR. RUBINSTEIN: No.
21        MR. WILLIAMS: I thought that we had come very close
22 to an agreement on that at least. If your position is
23 different, maybe it is. . .
24        MR. RUBINSTEIN: We agreed to produce work papers as
25 they relate to this debit memo issue.

PAGE 43

43

1         MR. WILLIAMS: I don't think that that's correct and
2 I don't think that the law supports that.
3         I think it's just generally being able to understand
4 the work papers for the year, you need the full set of work
5 papers. I understood that we were close to an agreement on
6 that.
7         THE COURT: I guess not. So you are going to have to
8 justify yourself.
9         MR. WILLIAMS: With regard to the integration of the
10 work papers?
11        THE COURT: Yeah. Well, we are not -- the work
12 papers, we haven't even gotten to the accountants yet, but I
13 was talking about the accounting allegations in general. You
14 have asked for all their policies, documents, system documents,
15 general ledger, monthly credit memos, miscellaneous reports,
16 accounting reserves, not to mention the 2002 internal.
17        MR. WILLIAMS: I will begin with the general ledger,
18 your Honor.
19        We need the general ledger because it's clearly -- as
20 we allege, these debit memos were created and money was taken
21 from this unapplied cash account and taken down to revenue.
22        The general ledger is, that's the beginning of
23 understanding these transactions. And where they -- I guess
24 all the T's of the transaction; where the money -- where the
25 money came from, where it went, and the accounts in which it

PAGE 44

44

1 spread through. Now --
2         THE COURT: Well, if you get every piece of paper or
3 every record that is on these 46,000 debit memos or any piece
4 of paper that is related to those 46,000 debit memos, why isn't
5 that enough?
6         MR. WILLIAMS: I didn't understand that to be the
7 position.
8         MR. RUBINSTEIN: That is our position. That's
9 exactly what we are offering.
10        MR. RUBIN: There has never been a dispute about
11 that.
12        MR. WILLIAMS: So that includes the general ledger?
13        THE COURT: It includes pieces of the general ledger.
14 Can you imagine what Oracle's general ledger looks like?
15        MR. WILLIAMS: I'm sure that --
16        THE COURT: You are not going to read it. You are
17 going to want 46,000 out of two trillion entries, something
18 like that. I mean, it's a tiny little bit.
19        MR. SOLOMON: Your Honor, obviously, we have to trace
20 this up to the financial statements. If they can meaningfully
21 or usefully segregate out revenue items, A/R out items and
22 reserves, that would be meaningful and that has to include the
23 unapplied cash accounts.
24        If they can meaningfully do that, that wouldn't be
25 easy for them I don't think.

PAGE 45

```
 1        THE COURT: I'm not saying that it's easy. But it
 2  may be easier -- preferable, I don't know that it's easier than
 3  just loading up a truck with them. It may be preferable.
 4        But what they have to do -- and I use different
 5  language than the one you did, and I do it on purpose. With
 6  respect to the 46,000 debit memos that are alleged in the
 7  complaint, I would want them to produce every piece of paper or
 8  every computer record that relates to that. And that means if
 9  they -- all the changes that occurred for them, the
10  transactions that they arise from, if they go up a level or
11  down a level, they have to trace those transactions so you have
12  a complete history of those transactions.
13        That's what you are talking about, right?
14        MR. WILLIAMS: That is what I'm talking about and,
15  again, we understand that --
16        THE COURT: Okay.
17        MR. WILLIAMS: -- it touches other accounts. So the
18  debit memos, it's just not one transaction that hit -- that
19  touched the debit memo and was created. There were other
20  accounts which were implicated by the creation of the debit
21  memos and the application or the movement of that money to
22  revenues, and I would expect that we are going to --
23        THE COURT: Well, I don't know. You will see what it
24  is. You will get all the documents about it. It will touch
25  other accounts. It won't. But whatever has to do with --
```

PAGE 46

```
 1  okay. So the other things other than that, you are going to
 2  produce all documents of the so-called on account clean up, all
 3  right?
 4        MR. RUBINSTEIN: That is what these debit memos are.
 5  It's going to be all the audit trail and which is, obviously,
 6  related to these 46,000.
 7        THE COURT: And, obviously, any documents regarding
 8  the accounting treatment by any of the memos including all
 9  policy documents on such -- on those accounting treatments.
10  You know, there may be internal systems on the kind of
11  accounting treatment they were given. There may be internal
12  policies, et cetera, et cetera.
13        Anything that touches on the accounting treatment of
14  those debit memos, is that what you are intending?
15        MR. RUBINSTEIN: Yes, yes.
16        THE COURT: Let's talk a little bit about the 2002
17  internal investigation. I guess my concern is this, and this
18  is again for you.
19        At the end of the day the motion was denied. It
20  seems to me that the reason the motion was denied was because
21  of the things that are contained in the declarations with
22  respect to that investigation which basically said, it doesn't
23  have anything to do with the 46,000 debit memos.
24        And as I understand your response, it's limited to,
25  well, it had to do with stuff during the class period.
```

PAGE 47

```
 1  I'm not sure why I care what happened during the
 2  class period if it's not actually on the 46,000 debit memos.
 3        MR. WILLIAMS: I'm not sure if you mean not actually
 4  on the 46,000 debit memos, but I understand their position to
 5  be that whatever happened in late 2002 had absolutely nothing
 6  to do with the creation and whatever happened to those debit
 7  memos, and I think that that's just wrong. And on the face of
 8  the declarations that they submitted in support of their
 9  opposition it shows that it's wrong.
10        If you just look at that one e-mail from Michael
11  Quinn --
12        THE COURT: Let's see it. Tell me where it is.
13  Point me to an exhibit tab.
14        MR. WILLIAMS: Exhibit number or letter C.
15        THE COURT: Okay.
16        MR. WILLIAMS: That's the declaration itself. And
17  then the document that I'm referring to now is directly behind
18  it.
19        THE COURT: Got it.
20        MR. WILLIAMS: Well, if you just begin with the
21  declaration, if you look at Paragraph 4 of the declaration, he
22  says: "In 2000 my staff participated in the conversion of" --
23        THE COURT: Paragraph 4, there are numbers?
24        MR. WILLIAMS: Yes. Paragraph 4 of the declaration
25  of Michael Quinn.
```

PAGE 48

```
 1        THE COURT: I see.
 2        MR. WILLIAMS: I don't need to read it out loud if
 3  your Honor wants to just take a look at it.
 4        (Brief pause.)
 5        THE COURT: Okay. Yes.
 6        MR. WILLIAMS: That's directly related to the 25005
 7  on account. That is the -- those are the -- that's the account
 8  from which we allege the unapplied cash which was applied to
 9  the debit memos during our class period came from.
10        The next paragraph he explains this, I guess, other
11  project which related directly again to the same unassigned
12  cash receipts.
13        THE COURT: Yeah, and they are still doing it.
14        MR. WILLIAMS: Right, and it goes to this account,
15  12601.
16        THE COURT: Well, but he says that that
17  investigation, the 2000 and whatever this is, 2, 3, 4, 5
18  investigation has nothing to do with the debit memos, the
19  transactions that occurred on the 17th of November in 2000.
20        MR. WILLIAMS: That's right. He says that, but then
21  if you look at the e-mail that is attached to it --
22        THE COURT: Okay. Now, look at the e-mail, which is
23  an e-mail dated in 2002. Got it.
24        MR. WILLIAMS: It's right behind it. And now Michael
25  Quinn is the same person, your Honor, we allege in the
```

PAGE 125

125

1 integration of the various parts of the 11i Suite with each
2 other. You know, with the data base part of the suite, you
3 know, with each other, et cetera, et cetera.
4       If that's what you believe the false statement is,
5 that's what you get discovery into.
6       MR. RUBINSTEIN: Again, I think that --
7       THE COURT: Okay. Okay. We have got it. That's
8 done.
9       MR. RUBINSTEIN: Okay.
10      THE COURT: Okay. And then in terms of the timing of
11 the production, you just cooperate with the third parties and
12 work with them. I'm going to be very sensitive to their
13 concerns in terms of that, and so I expect you to cooperate.
14      How about the time period is June 1, 2000 to June 1,
15 2001?
16      MR. WILLIAMS: For non-parties?
17      THE COURT: Everybody. Everything.
18      MR. WILLIAMS: You know, we originally had asked for
19 a much broader period than that and in the meet-and-confers
20 what we said is, look, we are perfectly willing to come down to
21 say when the Form 10K was filed for fiscal year 01, and that
22 was in August, and it makes sense because the fiscal year ended
23 on June 30.
24      So if we stopped production of responsive documents
25 at June 1st, your Honor, we cannot capture even the entire next

PAGE 126

126

1 quarter. It would just stop right in the middle.
2       And the defense is going to be -- and we have seen it
3 in the derivative action, in Judge Strine's opinion that there
4 is a hockey stick effect which Oracle relies on on a
5 quarter-to-quarter basis and that happens in the last month of
6 the quarter.
7       So if we are restricting discovery to end before that
8 last month of the quarter --
9       THE COURT: Well, except the quarter that ends
10 June 30, 01 itself isn't at issue in this case. It's the prior
11 quarters.
12      So the only reason I go out is to capture documents
13 that may have additional relevance to what happened before.
14      MR. WILLIAMS: I agree with that, your Honor, but,
15 again, one of the things that Larry Ellison said when the miss
16 in our quarter is that a lot of these deals were pushed out to
17 the next quarter. Not lost, but pushed out to the next
18 quarter. And they also said that a lot of the deals ended up
19 closing in the final month of the quarter.
20      So one could -- one would imagine that, say, for
21 instance --
22      THE COURT: So the miss in the third quarter of 01,
23 which is -- ends in what, March?
24      MR. RUBINSTEIN: The Q3 ended on February 28.
25      THE COURT: So?

PAGE 127

127

1       MR. RUBINSTEIN: But the statements that Mr. Ellison
2 made were right at the end of the third quarter. And so what
3 happens later --
4       MR. WILLIAMS: To the end of the fourth quarter it
5 should be.
6       MR. RUBINSTEIN: Doesn't matter. Again, the
7 relevance of any -- of any later created documents would be
8 only with respect to matters that refer back to Q3 itself. I
9 think the Court is right that Q4 is not an issue in this case.
10      THE COURT: What do you think about my time period?
11      MR. RUBINSTEIN: We could accept that.
12      THE COURT: Okay. That's the time period. June 1,
13 2000 to June 1, 2001 and documents that refer to events during
14 that period which may have been generated at a later time.
15      15, analysts and media organization. You have
16 already got that, right?
17      MR. WILLIAMS: Think so, your Honor.
18      THE COURT: On all these ones where I say you have
19 got agreement, make sure you put that scope in the order.
20 Auditors and accountants.
21      MR. RUBINSTEIN: Your Honor, we would suggest that
22 the scope be the same as the scope we have already worked out.
23      THE COURT: Right. Why shouldn't it be that?
24      MR. SOLOMON: Are you talking about the conference,
25 your Honor?

PAGE 128

128

1       THE COURT: Yes, sir.
2       MR. SOLOMON: The reason is, your Honor, that -- and
3 I think we have cited a case or there is abundant law to this
4 effect; that is, where you have accounting allegations in a
5 securities fraud case, typically I think this doesn't take us
6 outside of the typical arena, you would need all of the work
7 papers to get an overall understanding and comprehension of
8 just what went on with the financial statements at issue.
9       For example, we have the accounting allegations
10 concerning the end of November 2000 adjustments. They claim
11 that there was no impact on the financial statements. We
12 obviously need to look at what the auditors examined with
13 respect to that issue apart from anything else.
14      Also, there was forecasting allegations in our case.
15 What accountants -- what auditors do when they are auditing
16 companies, as I'm sure you are familiar, is they look at
17 internal controls. They look at management integrity. We need
18 all that stuff. That is clearly relevant to this case. In
19 order to --
20      THE COURT: Indulge me a little bit. Why is that
21 relevant to this case?
22      MR. SOLOMON: Well, there is going to be a defense --
23 there's a number of defenses we know about. One is they don't
24 even hit the financial statements.
25      If it did hit the financial statements, the defense

SHEET 17   PAGE 129

### 129

1 would be the defendants didn't know about it for whatever
2 reasons.
3         And one of the reasons they will say the defendants
4 didn't know about it was because the auditors passed on it.
5         Why did the auditors pass on it? Again, there will
6 be examinations in the audit work papers of what management
7 representations were as to -- in other words, to get a picture
8 of whether or not management knew, whether they should have
9 known, what the accountants thought about the accounting
10 treatment or if they knew about it, how it affected the
11 financial statements ultimately all needs to be examined in the
12 context of Oracle's overall financial statements.
13         And our experts and auditors and courts have
14 concluded time and again the only way to do that is to get all
15 of the papers. Is that difficult? No. They are always
16 organized by the auditors.
17         Very simply, they are ready to be produced right now,
18 I would anticipate --
19         THE COURT: I'm sure they are on a disk.
20         MR. SOLOMON: -- or they could be very quickly.
21         MR. RUBINSTEIN: Your Honor, going back to a comment
22 I believe you made earlier today.
23         This is not an accounting case in which there is some
24 allegation about overarching policies. It's about a particular
25 event that occurred on a particular date involving a finite

PAGE 130

### 130

1 series of transactions.
2         We have agreed to have the outside auditors produce
3 documents that relate to the accounting treatment of those
4 debit memos. I don't think there is any disagreement there.
5         THE COURT: Right.
6         MR. RUBINSTEIN: The rest of it I, frankly, just
7 don't understand.
8         And there is no allegation in this complaint about a
9 lack of internal controls as it relates to the forecasting
10 process.
11         I mean, I just think that this -- this is just way
12 far afield. And to the extent that there are work papers that
13 relate specifically to this debit memo, I don't have a problem
14 with that. But I think anything else is just a fishing
15 expedition and this is not like every other accounting case.
16 It's a very narrow issue. Either it hit revenue or it didn't.
17         And the audit trail we have agreed to produce that
18 and what the accounting treatment was, that's fine. But I
19 think it ought to be restricted to that issue because that's
20 what's went pled.
21         MR. SOLOMON: And, your Honor, ultimately the
22 auditors had to sign off on the fiscal year, not just the
23 quarter in question, and how material the events were that we
24 alleged, to what extent they were known and to what extent the
25 auditors signed off on them with knowledge is all relevant to

PAGE 131

### 131

1 our case.
2         THE COURT: Well, you get all of that by getting
3 every scrap of paper in that audit that has anything to do with
4 the 49,000 debit memos, isn't it?
5         MR. SALPETER: 46.
6         THE COURT: Whatever. 2000 debit memos between us
7 friends . . .
8         MR. SOLOMON: One element to the case, your Honor.
9 Another elements to the case is the forecasting. Expenses,
10 expenses in relation to 11i are all embraced within those
11 allegations.
12         THE COURT: Yes. They didn't audit the forecasts.
13         MR. SOLOMON: No, but certainly the auditors would
14 have looked at the quality of their forecasting function.
15 That's a function of the auditors, and they will have done
16 that. They will do that in every case in which they audit.
17         THE COURT: Why don't I add that? Okay. Why don't I
18 do that? We will say that the auditors have to produce
19 everything in their files related to the 49,000 -- to the
20 accounting treatment of the 49,000 -- related to the 49,000
21 debit memos and any audit of the forecasting function at
22 Oracle.
23         MR. SOLOMON: All right. And what about the
24 expenses?
25         THE COURT: Does that work? Does that work? I mean,

PAGE 132

### 132

1 if it did, audit the forecasting function, it's probably
2 relevant.
3         MR. SOLOMON: The expenses, your Honor, and their
4 financial function.
5         THE COURT: Well, if you -- if the auditors raise
6 that the forecasting function was flawed in the following six
7 ways and you continued to rely on the false forecasting in
8 making these projections, maybe it's relevant. I don't know.
9         MR. RUBINSTEIN: Your Honor, the problem I have with
10 that, it's not been pled. There is no theory in this case that
11 there was a failure of control and that there was some
12 fundamental flaw in the forecasting process.
13         THE COURT: Well, it's an underlying. The allegation
14 is that you forecast -- well, maybe you are right.
15         The allegation is that you forecast -- well, the
16 allegation is that you forecast wrongly, right, is that you
17 made forecasts when, in fact, you knew the forecasts were
18 inaccurate.
19         They were inaccurate, you knew, because the economy
20 was, as you knew, was having a greater impact on sales and, in
21 addition, you knew that the 11i wasn't going as well as you
22 were representing in your forecasts it would go.
23         If the forecasting function was audited, why wouldn't
24 that audit have something do with -- why wouldn't it -- an
25 auditor looking at that, maybe they came up with it and maybe

PAGE 133

```
 1 they didn't, that there were these failings in your forecasting
 2 function. Maybe they brought it to management's attention and
 3 said, "You are not properly accounting for this. You are not
 4 properly accounting for that," and so -- or you didn't. And
 5 you say, "We had it audited. We have got a validated
 6 forecasting function and we followed it, and the auditor signed
 7 off on it."
 8           I don't know. Are we talking about anything? Is
 9 there anything --
10           MR. RUBINSTEIN: No, no, no.
11           MR. SOLOMON: Your Honor --
12           THE COURT: Do the auditors do this?
13           MR. SALPETER: No, because this --
14           MR. SOLOMON: Your Honor, the --
15           THE COURT: Stop. One at a time.
16           MR. SALPETER: This is way beyond the scope of the
17 audit here. The audit is --
18           THE COURT: Okay.
19           MR. SALPETER: -- addressed to the financial
20 statements.
21           THE COURT: That's fine. Did the auditors and
22 accountants here not audit the forecasting functions? You tell
23 me that and you don't get discovery into it.
24           MR. RUBINSTEIN: I'm not aware of any.
25           THE COURT: That's a little different.
```

PAGE 134

```
 1           MR. SOLOMON: The fact that we are having this
 2 discussion, I think, reinforces my point that I think we need
 3 all of the work papers.
 4           THE COURT: No, it doesn't. That is truly the cart
 5 before the horse.
 6           MR. SALPETER: Your Honor --
 7           MR. SOLOMON: Thanks for putting it that way.
 8           THE COURT: In any event --
 9           MR. SALPETER: Your Honor, can I make one other
10 point?
11           Their allegation isn't that the forecasting process
12 was flawed. It's that Ellison and Henley knew that the
13 12-cent per share forecast wouldn't be met because of these
14 negative things; the economy, 11i, et cetera, right? That's
15 the core of their case.
16           THE COURT: Let me ask you this: What if they can
17 prove the first half and not the second? What if they prove
18 that Ellison knew that the forecast wasn't being met. Okay,
19 just bear with me. I don't expect you to agree with that.
20           And the reason is not because of what they have
21 alleged in the complaint. The reason is because the auditors
22 advised him that his forecasting method was flawed.
23           Can they put on this case?
24           MR. SALPETER: Not on this complaint.
25           THE COURT: You can't put that on this complaint.
```

PAGE 135

```
 1 There is a knowing misrepresentation of a forecast. He makes a
 2 forecast knowing it's false and the reason he knows it's false
 3 is not the reason that they give. He can't do that?
 4           MR. SALPETER: That's not their case.
 5           THE COURT: Stop there.
 6           MR. SALPETER: It's a hypothetical that is so far
 7 afield from really what we are talking about here.
 8           I mean, their case and all these derivative cases
 9 have all alleged essentially the same thing. Not that the
10 forecasting process was bad or flawed, but that once the
11 forecast was made of 12 cents a share Henley and Ellison knew
12 they weren't going to meet it.
13           THE COURT: Okay.
14           MR. SALPETER: I mean, your hypothetical is
15 interesting, but it's not --
16           THE COURT: It is.
17           MR. SALPETER: It's interesting, and I would like to
18 think about it some more before I answer it, but it is not our
19 case. In fact, it's not even a fifth cousin once removed to
20 this case.
21           THE COURT: So you are giving discovery of the --
22 your forecasting methods and what went into the forecastings
23 that were made public and they are going to look at those.
24           MR. SALPETER: Right. And then they are going to
25 come back if they find some major flaw that they think should
```

PAGE 136

```
 1 be caught by auditors or outsiders, they are going to come back
 2 and they will be waving their arms and making an impassioned
 3 argument to you about why they should go further.
 4           But on the base of this complaint, they really
 5 shouldn't be getting into what the auditors have done beyond
 6 the narrow scope that has been --
 7           THE COURT: I have got to tell you, my predilection
 8 with respect to is unlike with the customers, where I'm
 9 sensitive to the relationship concerns.
10           My general work in the past has been, you know, what
11 do I care about the work papers? Have them.
12           My concern about the work papers is I don't want it
13 to be a fishing expedition. I don't want this to be an excuse
14 to look for 75 other flaws and amend the complaint for 75 other
15 flaws that they haven't yet discovered in the financial records
16 in the company.
17           So I don't want to get into all of the audit. It's
18 not pled and we are not going to get into it.
19           On the other hand, with respect to the auditing of
20 the forecast model, is that a big deal?
21           MR. SALPETER: I don't think it was done. I don't
22 think it was ever done.
23           THE COURT: Fine.
24           MR. RUBINSTEIN: It's a bit academic.
25           THE COURT: Here is what you do. Here is what you
```

SHEET 18   PAGE 137                                                                137

1  do. Okay.
2           MR. WILLIAMS: Can I say one thing, your Honor,
3  before you rule?
4           THE COURT: Yes.
5           MR. WILLIAMS: One of the issues is Andersen.
6  Andersen was the auditors at the time and we have begun the
7  meet-and-confer process with them before we ended up in the
8  position that we are today.
9           Now, I don't know if anyone knows how long those
10 documents will be available, and I think -- what was it? Just
11 ask if we have got them all, then they could produce them
12 quickly or if they have to go through them, they wouldn't be
13 able to produce them quickly; is that correct?
14          MS. RADCLIFFE: My understanding is that Andersen
15 themselves have not looked at the work papers. They are in a
16 warehouse in Redwood City along with all of their other work
17 papers.
18          That they have taken the client -- used to have desk
19 files for the engagement team, but that is now consolidated
20 into a single client file which would be labeled in this case
21 "Oracle" pursuant to numerous preservation orders across the
22 land regarding --
23          THE COURT: Good.
24          MS. RADCLIFFE: But how long those particular
25 documents, you know, would be there, I don't know.

PAGE 138                                                                            138

1           THE COURT: Would be there? We can take care of the
2  "would be there."
3           MS. RADCLIFFE: What's in them and what's there is
4  questionable.
5           THE COURT: But they are not about to get rid of
6  them.
7           MS. RADCLIFFE: Well, no. I believe that they
8  indicated that Ernst & Young, for example, the subsequent
9  auditor, probably looked at them.
10          THE COURT: My point is you are not saying there is a
11 preservation issue there.
12          MR. WILLIAMS: I thought there may have been one.
13          THE COURT: Aren't there court orders in place for
14 the auditors to preserve --
15          MS. RADCLIFFE: As to this case?
16          THE COURT: Any case. As long as they have to
17 preserve them.
18          MS. RADCLIFFE: I don't know that there is an order
19 that apply to those documents.
20          THE COURT: Is there anybody that would object during
21 the pendency of this case requiring that the work papers be
22 preserved?
23          MR. RUBINSTEIN: No, your Honor.
24          THE COURT: Okay, put that in. Of course, they are
25 not before me, but put it in anyway. You can ask them and then

PAGE 139                                                                            139

1  they have to do it.
2           MS. RADCLIFFE: One of the issues that's going take
3  arise with the auditors is in addition to the hard copy work
4  papers, will be the work papers in electronic format.
5           THE COURT: Well, you are going to take that up with
6  them. I'm not going to get into the details. I'm going to do
7  scope.
8           MS. RADCLIFFE: There is also, in addition to the
9  work papers, the desk files or client files that relate to at
10 least the allegations in the complaint.
11          THE COURT: Well, you are saying it's all in one
12 file?
13          MS. RADCLIFFE: That's my understanding with respect
14 only as to Arthur Andersen.
15          THE COURT: Well, we will just say documents -- I
16 want them to preserve all of their work papers with respect to
17 the Oracle engagement -- engagements, probably have more than
18 one, certainly for the relevant period of time.
19          So put it that way. Preserve all the work papers for
20 the relevant period of time.
21          If there are other documents that they are required
22 to preserve by someone else's order, that's fine, but I
23 don't -- I don't have a good sense that anything beyond that is
24 obviously relevant here, or even marginally relevant.
25          I mean, I guess I could say preserve everything

PAGE 140                                                                            140

1  relevant to Oracle, but this may go on for quite some time and
2  I don't know, maybe they keep it anyways.
3           Does any of this matter how I say this from your
4  perspective. Can I just say "preserve documents"?
5           MR. RUBINSTEIN: We have no problem with the
6  preservation.
7           THE COURT: All right. Preserve all documents
8  regarding Oracle for the relevant period. Fine.
9           What you can get from the auditors is documents
10 regarding or relating to the 46,000 debit memos. And I guess
11 there was an agreement on documents relating to tax advisory
12 services to the defendants.
13          Okay. Plaintiffs witnesses and documents --
14          MR. RUBINSTEIN: Your Honor, with respect to the tax
15 advisory services, it's my understanding what that meant was
16 tax advisory services as to Mr. Ellison or Mr. Henley to the
17 extent that that occurred.
18          THE COURT: All right.
19          MR. SOLOMON: Your Honor, are you saying then with
20 respect to expenses associated with 11i problem, costs
21 associated --
22          THE COURT: No, no.
23          MR. SOLOMON: And are you saying with respect to
24 forecasting, that we get nothing from the accountants?
25          THE COURT: Right. Yes.

PAGE 141

141

1   Okay. Confidential witnesses. You know, why don't
2 we -- can you duplicate Judge Alsup's order, the stipulation in
3 that case?
4   MR. WILLIAMS: We can go very close, your Honor. I
5 think that we made an initial proposal and in their letter we
6 saw their kind of cross proposal for the first time.
7   I think the only real issue there is to agree on the
8 fact that if they have to do some investigation internally at
9 Oracle about someone they know to be a confidential witness,
10 that they don't represent to people at Oracle that the person
11 is a confidential witness.
12   They can say that, you know, Joe Blow for example,
13 did you know anything about him? Is he a credible guy? Is he
14 somebody that would lie? That's fine.
15   But I don't think they should be able to say, well,
16 this guy is a person who has made -- you know, has made some
17 sort of factual allegation against Oracle and, therefore, was
18 he a credible guy? You know, is he somebody that could be -- I
19 don't think that should be problematic.
20   MR. RUBINSTEIN: Your Honor, we do have a problem
21 with that.
22   Obviously, when -- as we would for any witness, we
23 would want to be able to conduct factual investigation about
24 this person, whoever they are, so that we can actually prepare
25 to take their deposition.

PAGE 142

142

1   THE COURT: Yes.
2   MR. RUBINSTEIN: And we do have a problem if we are
3 impaired in our ability to conduct a meaningful investigation
4 to be able to depose him.
5   THE COURT: I guess I don't understand the issue.
6 What you are saying is they can do that investigation, right?
7   MR. WILLIAMS: Sure.
8   THE COURT: They can ask about this witness, what
9 they said about particular subject matters, what they didn't
10 say, what they did, what they didn't do, whether they are a
11 good guy, whether they are a bad guy, et cetera, et cetera, but
12 you can't tell anyone that the reason for the investigation is
13 because they are a confidential witness in this case.
14   MR. WILLIAMS: That's our position.
15   THE COURT: What's wrong with that?
16   MR. RUBINSTEIN: My concern is that I'm not sure what
17 the legal predicate is for that.
18   THE COURT: Okay. Give my a break. We are talking
19 practicalities here.
20   MR. RUBINSTEIN: Well, no. The concern we have is
21 that the predicate for this is that we are going to be out
22 there harassing and intimidating witnesses and there is
23 absolutely no showing of that.
24   And the Alsup order, I should point out, it was
25 agreed order. So it's not a judicial determination that that

PAGE 143

143

1 is --
2   THE COURT: Of course. Of course, it's an agreed
3 order.
4   The concern is -- and I'm sure you won't do it. I
5 have no idea whether you will do it, but I'm not presuming that
6 you will do it, is that their witnesses may be concerned about
7 this subject. That is, I'm sure, what generates this. Is that
8 the witness will be concerned.
9   This is some modicum of salve on that so that there
10 won't be any. It doesn't cost you anything. Who cares?
11   MR. SALPETER: Well, let me put a hypothetical
12 together. I understand the restriction that the plaintiffs are
13 putting.
14   We cannot actually show any Oracle employee the
15 complaint and say this is what they say this person said. This
16 is the information. We can't say that.
17   THE COURT: No. But you can say, "John Blow has
18 said," and then quote the complaint.
19   MR. RUBINSTEIN: We just can't refer to --
20   THE COURT: You can't refer to them as a confidential
21 witness or say they are a confidential witness. You just can't
22 talk about the fact that they are giving evidence to the
23 plaintiffs which is being used in a complaint.
24   I mean as a practical matter, why does that matter?
25   MR. RUBINSTEIN: Would we be, for instance, able to

PAGE 144

144

1 have in-house counsel at Oracle know who the confidential
2 witnesses are?
3   THE COURT: Well, I think that's an important issue.
4   MR. RUBINSTEIN: For us to be able to advise our
5 client and, obviously, the legal department.
6   THE COURT: Well, so this is part -- I'm trying to
7 focus on your language so I can figure out where it fits in.
8 It fits in, I guess, Condition 3.
9   "Counsel for defendants will not disclose the
10 confidential witness's roll" -- which is what he's talking
11 about, right, their role as a confidential witness -- "to
12 anyone other than" -- and, obviously, you all get to know it.
13 Consultants get to get it. You have got in-house defendants.
14   By "defendants" I assume you meant -- well --
15   MR. RUBINSTEIN: It's Item Z. We would want to be
16 able to provide this to in-house counsel and we also do think
17 to employees.
18   THE COURT: Well, why?
19   MR. RUBINSTEIN: But if the Court is ruling we can't,
20 I mean, at a minimum we need to be able to provide that
21 information to in-house counsel.
22   MR. WILLIAMS: Your Honor, we accept the fact that
23 their counsel, you know, just as an officer of the court, will
24 not convey that information to the employees and we don't have
25 a major objection to that.