PAGE 85

```
1  documents.
2         And correct me if that's not your understanding.
3         MR. RUBIN: We had indicated to plaintiffs that we
4  thought that our document protection policies and other written
5  material would provide the information they were looking for.
6  But if they choose, we are certainly prepared to offer an
7  organizational representative if they want to inquire --
8         THE COURT: On document preservation, that's fine.
9         On the accounting issues. Is there an issue on the
10 accounting issues?
11        MR. RUBIN: I just was making the point to
12 Mr. Williams in a side bar moment that the scope that the Court
13 has already ruled upon related to the accounting will control
14 the 30(b)6 depositions.
15        THE COURT: Of course. Of course. The subject
16 matter is for discovery, right not just for documents. That's
17 right.
18        Okay. And then there is forecasting. No issue on
19 that, right? There will be a 30(b)6 on forecasting. I mean, I
20 guess that's a reasonably broad subject, but it will be how you
21 do your forecasting and how you came up with the numbers that
22 are the forecasts in this case.
23        Is there any issue on forecasting?
24        MR. WILLIAMS: I don't think we ever had an issue on
25 that.
```

PAGE 86

```
1         THE COURT: Okay. Now, 11i. 11i interoperability.
2         MR. WILLIAMS: And if I may interrupt, your Honor?
3         THE COURT: Please.
4         MR. WILLIAMS: I think that the interoperability
5  there is -- you know, it's accurate, but probably too narrow.
6         THE COURT: I thought you might say that.
7         MR. WILLIAMS: If I may, your Honor. I don't want to
8  kind of go down a road that we have already been around, but as
9  we were talking over the lunch hour or lunch 20 minutes, we
10 were kind of talking about what your order was earlier on that
11 issue, and I don't know if anyone recalled it specifically
12 enough to have a definitive conclusion.
13        But I understood your Honor to have a long discussion
14 about the integration and interoperability and how even if
15 there are bugs that don't necessarily relate directly to
16 integration and interoperability, that those bugs at some point
17 do -- do rise to a level that the product does not work.
18        And, indeed, we have statements, false statements in
19 the complaint where, I think it was either Sandy Sanderson or
20 George Roberts who said that both the supply chain management,
21 SCM, and the CRM are working, and I think your Honor picked
22 occupy that as well.
23        But as you went further down into your, quote,
24 unquote, order on the subject, your order sounded much narrower
25 than your earlier commentary on it and I don't want the parties
```

PAGE 87

```
1  later to fight about what you meant.
2         THE COURT: Okay. Let's go back to what I said and
3  what I should have said.
4         The documents that are being produced on the
5  functionality are as follows, and it should guide the scope of
6  the 30(b)6 depositions.
7         Obviously, you are going to produce the three
8  versions of 11i in the code so that plaintiff can contest it
9  anyway they want.
10        They are going to -- you are going to produce the
11 design documents and technical memos.
12        Okay. You are going to produce bug reports that in
13 any way reference integration and interoperability, right?
14 That's included in your things. So that certainly is within
15 the scope.
16        In addition, you are going to produce documents
17 regarding any lost, deferred sales or sales with respects to
18 which there was a material expense with respect to any product
19 before the relevant time period. Materiality being defined as
20 we stated.
21        In addition, I guess the piece that is missing is you
22 did say that we could come up with a high level, some kind of
23 high level documents which are relevant to the scope of
24 problems with the program and I'm not -- you know, without
25 characterizing them, problems with the program on a more global
```

PAGE 88

```
1  basis that got to the folks in, for example, what you say is
2  the original speakers group, but some way of capturing the bug
3  problem other than integration issues.
4         I guess I had never -- I have neglected to get
5  closure on what that is.
6         MR. RUBINSTEIN: Well, I think what I would like to
7  do, and with the Court's permission, is to basically try to
8  craft an order that reflects what your Honor just said because
9  I don't -- I can't identify what the actual document would be,
10 but I think I understand what the Court's order is and I don't
11 know whether the Court is comfortable proceeding with an order
12 in which the category is described that way.
13        THE COURT: That's not a bad idea. What you are
14 talking about is an order that says, you are going to produce
15 documents that describe the scope and dimension of the bug
16 problems with the program other than, sufficient to, that kind
17 of language.
18        MR. RUBINSTEIN: Okay.
19        THE COURT: Sufficient to describe the scope and
20 dimension of the bug problems with the program other than
21 integration and interoperability.
22        And, obviously, with respect to each of these things,
23 you have the opportunity to have an examination of someone on
24 them.
25        MR. WILLIAMS: Maybe what we will have to do is see
```

**SHEET 12   PAGE 89**

89

1  if we can hammer out an agreement on what that should be and if
2  we can't agree, we will just submit something separate and have
3  the Court iron it out.
4           I do want to address one more issue, your Honor --
5           THE COURT: Yes.
6           MR. WILLIAMS: -- with regard to the materiality.
7           We talked about materiality and I guess a materiality
8  cut-off of $500,000 and I really think that that might narrow
9  things too much.
10          The $500,000 deals -- I can't stand here and say that
11 I know which ones they are, but one of the arguments that they
12 have made is that Oracle has thousands and thousands of
13 customers and that's probably true. It is true.
14          How many of those are above 500,000 we don't know.
15 They did have, quote, unquote, big deal reports, but they were
16 a small number and those don't encompass all the customers who
17 were buying the product whose businesses were impacted by the
18 fact that the product didn't work.
19          And I think if we just use that $500,000 number,
20 which is a big number, it's a big sale, we are not going to get
21 what we are looking for.
22          And, finally --
23          THE COURT: Of course, you won't get what you are
24 looking for, but, okay, but let's talk about what you need.
25          I mean, you are trying to get enough information

**PAGE 90**

90

1  about, frankly, issues with customers other than integration,
2  right?
3           MR. WILLIAMS: Sure.
4           THE COURT: And trying to prove that those problems
5  with the customers are so large that notwithstanding the fact
6  that there isn't an actionable representation that there are no
7  bugs in this, or that there are insignificant bugs in it, or
8  trivial bugs or anything like that, that by virtue of the fact
9  that the program has so many flaws, that that means that when
10 you say this is a program that you can buy off the shelf and
11 you don't have to have any integration programming involved,
12 you are really violating that. You are really making that a
13 false statement.
14          MR. WILLIAMS: I think you are, right.
15          THE COURT: That's a pretty high level of problem and
16 I'm wondering how we get into that.
17          One of the ways I'm thinking about getting into it is
18 you say, well, what are the problems that the big players are
19 having with this program? I mean, aren't you going to capture
20 -- you aren't going to get -- you are right. You are not going
21 to get every customer, but aren't you going to capture in the
22 machinations between Oracle and one of its bigger customers or
23 50 of its bigger customers are whatever they are, maybe it's
24 not a thousand, but aren't you going to capture in that the
25 dimensions of the bug problem?

**PAGE 91**

91

1           Those are the people who are going to be all over the
2  program, right? They are the people -- the big consumers of
3  the product are the ones who are going to have giant in-house
4  technical staff all over the product and all over Oracle. They
5  are the people who are going to be the ones for whom Oracle is
6  going to have to spend money and time and who are going to
7  have, frankly, their own records and we will get to that.
8           But isn't -- aren't you going to capture the most
9  important problems that way?
10          MR. WILLIAMS: The answer is maybe. The answer is
11 maybe. And that's because some of those big customers were
12 buying, say, the entire 11i Suite. Some of the smaller
13 customers were buying only certain modules. And let's say, for
14 example, CRM.
15          Now, a $500,000 threshold might be interesting for
16 the forecast, but with regard to customers, some of these
17 customers were buying just the CRM. And I don't know how much
18 it costs. I don't think it was a half million dollars, but we
19 know that just the implementation of this -- of the attempted
20 implementation of the CRM shut down entire businesses.
21          And I don't know -- so the impact to that business
22 might be greater than $500,000 even though they didn't pay
23 $500,000 for the software.
24          So to begin, it's difficult to say let's have this
25 $500,000 cut-off because a lot of the problems -- I mean, this

**PAGE 92**

92

1  was a brand new software. They were trying to sell it to
2  anybody, not just the big companies. And what we allege in the
3  complaint is that the big companies were afraid to buy it
4  because they may have heard of some of the smaller companies
5  that had big problems with it.
6           So when we get to that $500,000 cut-off, we may only
7  get a small sliver of what is important for the case. And
8  maybe we should just come with -- agree on a number that's
9  lower than $500,000. I'm not saying I want everything --
10          THE COURT: Why don't I do this? Let's leave it the
11 way it is. If it turns out you are right, well, then you are
12 going to be back here. If you are right that you are not
13 getting a good sense of the dimensions of this problem by what
14 we have ordered, well, then, it was the wrong order and we will
15 fix it.
16          MR. WILLIAMS: Okay.
17          THE COURT: We will fix it. I think that's right.
18          Okay. So substantive witness depositions, meaning
19 other depositions other than 30(b)6, will start in May I guess.
20          With respect to the files that Oracle has regarding
21 any current or former Oracle employees, that's going to be on
22 the list of 65. That's the issue you were raising, I think,
23 and those you want to have before you begin the depositions,
24 and they may or may not be within the scope of the files we
25 have ordered reviewed.

PAGE 93

```
1           What do you think about that?
2           MR. RUBINSTEIN: I think what we would have to do is
3  take it on a -- as the depositions are noticed and as
4  plaintiffs give us the list of documents that they want, we
5  would, obviously --
6           THE COURT: The list of documents they want is here.
7  All right. This is the scope of what they get. They will
8  flesh it out in demands, but it will be within the scope.
9           MR. RUBINSTEIN: If it's within the scope and they
10 want the documents in advance, I think -- I don't think we have
11 a problem with that.
12          THE COURT: You may ask for something else and they
13 may agree or disagree. You will come to somebody, me or Judge
14 Jenkins, if there is a problem.
15          But the question is timing. You know, will you --
16 leaving aside the scope, okay. Leaving aside the scope because
17 the Court approved scope is in this order. There may be other
18 things that may work. May be other things that don't work, but
19 the timing is that you will agree to search those files and
20 produce them on 30 days' notice as long as they are on the
21 witness list that's going to be deposed. They are going to
22 have a list of 65 people.
23          MR. RUBINSTEIN: I just want to make sure I
24 understand. So once the plaintiffs identify who they want to
25 depose --
```

PAGE 94

```
1           THE COURT: It's going to be in the order.
2           MR. RUBINSTEIN: It will be in the order. Then we
3  will be required to produce the documents in the files of those
4  people.
5           THE COURT: Yes, yes.
6           MR. RUBINSTEIN: Within 30 days, although I don't
7  know --
8           THE COURT: Within 30 days of a request for them.
9  There may be some period of time in advance of their
10 depositions.
11          MR. RUBINSTEIN: That's actually what I was thinking.
12 What if we agreed to produce them at least seven days in
13 advance of the deposition itself.
14          MR. WILLIAMS: Well, sure, that's fine. I mean, if
15 it turns out to be 20 boxes of documents, we might have an
16 issue. But I think seven days is fair.
17          THE COURT: It won't be. It won't be seven boxes of
18 documents.
19          MR. WILLIAMS: I think that's fair, if we had seven
20 days.
21          On the same issue, defendants have indicated that
22 they want to depose some of -- well, maybe all of the
23 confidential witnesses and, obviously, that's fine, but we
24 should get -- any of those confidential witnesses who are
25 former employees of the company, we should get all of the
```

PAGE 95

```
1  responsive documents from those people's files as well. We
2  shouldn't have to wait until they notice the deposition.
3           THE COURT: Well, what about seven days in advance of
4  the deposition? Okay? Why not? Okay.
5           So with respect to any witnesses, either side, that
6  are current or former Oracle employees, seven days in advance
7  of their deposition Oracle will produce documents from their
8  files.
9           Now, the scope of the production will be what you
10 have requested that's within the scope the Court permits or
11 whatever else you can agree to or whatever else you can
12 convince some good natured judge of.
13          Okay. The open issues on this, I'm not sure I
14 understand. You don't get to -- can't you work out how long
15 the depositions are going to be?
16          MR. WILLIAMS: I think we can work that out, your
17 Honor. Just with the basic understanding that some of them,
18 obviously, are going to require more than seven hours.
19          MR. RUBINSTEIN: What we would suggest is that,
20 obviously, the presumptive limit of the federal rules would
21 apply and if on a witness-by-witness basis if the plaintiffs
22 believe they need more than that or if we feel we need more
23 than that as to any witness, we will meet-and-confer.
24          THE COURT: Don't mess around on this issue. This is
25 one that's particularly irritating to the Court. Both sides,
```

PAGE 96

```
1  asking too much or offering too little. It is a no win
2  situation.
3           MR. WILLIAMS: Your Honor, there is an issue that
4  might fit in here that isn't in our letter that I want to
5  address.
6           THE COURT: Okay.
7           MR. WILLIAMS: I know that we have had a dispute
8  recently about 30(b)6 witnesses being deposed in their
9  individual capacity and we don't have a problem with -- with,
10 say, for instance we are going to depose one person and it
11 turns out to be a person that they designate as a 30(b)6
12 witness.
13          We don't have to accept that as the substantive
14 deposition of that witness, but if, you know, they don't want
15 to produce the witness twice, we are happy with that. We can
16 deal with that, but we need the documents from their files at
17 the time of the 30(b)(6) deposition.
18          MR. RUBIN: That's what we said, your Honor.
19          THE COURT: Fine.
20          MR. RUBIN: It came up with one of the 30(b)6
21 witnesses. We said as long as you have this particular
22 deponent's documents, there is no reason that we would need to
23 bring them back twice.
24          THE COURT: Fine. Good. Customer discovery. I'm
25 still . . . I'm not sure --
```

SHEET 13   PAGE 97

**97**

1   MR. RUBINSTEIN: Your Honor, we were going to propose
2   maybe one way to cut through this is, we are certainly willing
3   to abide by the Court's scope ruling with respect to
4   third-party discovery as well.
5       I mean, we think that the scope ought to be what the
6   Court has ruled and, really, the only issue that I think then
7   the parties are still at odds about is the number.
8       THE COURT: Let me see if that works. Just thinking
9   out loud. Maybe I won't. Just let me look.
10      That means with regard to the economy, they go to the
11  customers and you define the scope, which is documents related
12  to cancelled sales from Oracle, et cetera, et cetera, that are
13  a result of the down turn in the economy. That's the scope
14  from the economy perspective. That's in here.
15      MR. WILLIAMS: It might be slightly broader than
16  that, your Honor.
17      THE COURT: It says documents concerning the United
18  States economy and its impact or potential impact on Oracle's
19  revenues, earnings and expenses on its potential impact and
20  customer purchasing decisions and services in general,
21  purchasing of products, specifically purchasing of products and
22  services from Oracle.
23      For example, if customers communicated to Oracle that
24  the products in general were -- I guess the products in general
25  weren't being ordered due to tight end budgets or slowing

PAGE 98

**98**

1   economy. I mean, I'm not sure that that's very narrow when it
2   come to going to a customer.
3       You have got to go to a customer -- I guess with
4   respect to Oracle, it's -- I don't know how you interpret that.
5   What does that mean? They get to ask from Oracle any documents
6   that refer to the impact of the economy on customer purchasing
7   decisions.
8       MR. RUBINSTEIN: Well, if the request is coming to
9   Oracle itself or from Oracle, then, clearly, it would only be
10  documents in which a customer is communicating that to Oracle.
11      THE COURT: Right. Or internal memos about that
12  subject or that kind of stuff.
13      MR. RUBINSTEIN: Right.
14      THE COURT: And we have cabined it by having it just
15  these files are being searched.
16      MR. RUBINSTEIN: Sure.
17      THE COURT: So you go out to a customer and you ask
18  that same question, aren't you asking for the world? Every
19  piece of paper on how they made their decisions?
20      MR. RUBINSTEIN: We would suggest that it should be
21  the same type of documents being communications to Oracle about
22  -- as opposed, I think we have seen from some of the objections
23  that the customers are going to have some problems with purely
24  internal documents that were never communicated.
25      THE COURT: Let me just make sure I understand what

PAGE 99

**99**

1   you are saying.
2       What you are saying is that the scope ought to be
3   with respect to the economy, the subject matter insofar as its
4   contained in the communication to or from Oracle?
5       MR. RUBINSTEIN: Yes.
6       THE COURT: Yes?
7       MR. WILLIAMS: I think that that's too narrow, but I
8   honestly am going to say I'm not sure I quite understand
9   defendant's proposal that it be the same as the request from
10  the company.
11      But we do think that we have substantially narrowed
12  the area that we are seeking discovery from non-parties based
13  on your Honor's comments back on February 4th.
14      Now, with regard to the economy, I would say that we
15  are interested in the -- say, for instance, we take a customer.
16  We want to know whether or not their IT budgets were shrinking
17  during that period for application software products. Not
18  for -- you know, because is that, indeed, was what Oracle said
19  was not going to effect their company.
20      Now, certainly, we want communications as well with
21  Oracle.
22      THE COURT: Why does it matter if it wasn't
23  communicated to Oracle?
24      MR. WILLIAMS: I'm sorry, your Honor?
25      THE COURT: Why does it matter if it wasn't

PAGE 100

**100**

1   communicated to Oracle?
2       MR. WILLIAMS: Because Oracle represented that these
3   -- that their customers were not --
4       THE COURT: But you have to prove that that was made
5   recklessly.
6       MR. WILLIAMS: Exactly.
7       THE COURT: And how are you going to do that if there
8   is no communications from the customers to Oracle suggesting
9   that their IT budgets are shrinking?
10      MR. WILLIAMS: Well, for example, now if internally
11  at a customer members of the, I guess, procurement or IT
12  department are discussing the separate proposals that were
13  given to them, say, either by SAP, IT or Oracle and they are
14  discussing amongst themselves that this is -- we cannot afford
15  what Oracle is selling right now because our budgets are
16  shrinking.
17      Therefore, when Oracle shows up on Tuesday for this
18  presentation, you know, either we have to communicate that to
19  them in one way or another or let's just cancel it all together
20  because we can't afford what they are buying.
21      Now, it's hard for me to anticipate what the
22  documents are going to say and, certainly, the communications
23  to Oracle are important, but I do think that it's important for
24  us to get probably a narrower area of communications within
25  these customers that discuss the limited budgets for IT

**PAGE 101**

101

1 purchases, especially because that's exactly what was -- the
2 questions that were raised to Oracle, the Oracle defendants,
3 and their response was, "That will not affect us." The IT --
4 IT budgets shrinking is not going to affect Oracle because this
5 is a product that's going to help those people save money.
6     THE COURT: My issue is not that it's entirely
7 irrelevant. I think it is -- certainly has some peripheral
8 relevance to the question of whether or not the economy was
9 affecting Oracle's sales.
10     But it's a question of degree, right? It's the Rule
11 26 proportionality question.
12     What you are asking for is if there are -- is
13 internal documents at the customers which make specific
14 reference to their purchasing last Oracle software because of
15 the financial fortunes of the particular company, you know,
16 that might be reasonably narrow.
17     I mean, those will be memoranda which say, "We are
18 not going to purchase as much software from Oracle this year
19 because the company is experiencing a down turn in sales or
20 revenues or whatever it is."
21     I mean, that might be fairly narrow. And it is --
22 the other thing I was going to say to you is the fewer
23 customers you bother with this stuff, the more likely I am to
24 give it to you, too.
25     But what's wrong with that? Having a certain number

**PAGE 102**

102

1 of customers that produce documents which specifically refer to
2 reducing or eliminating purchases from Oracle on the basis of
3 the fortunes of that particular company -- the declining
4 fortunes of the particular company, as well as communications
5 to Oracle on that subject?
6     MR. RUBINSTEIN: Well, I think, first of all, if we
7 are assuming -- if it's communicated to Oracle, we don't have a
8 problem with that.
9     If it was something that was never communicated to
10 Oracle, then what plaintiffs are really going to be doing is
11 conducting an inquiry into the purchasing decisions and the
12 internal deliberative process of the customer, which I am doing
13 to predict that if it is something that was not issued outside
14 of the company, that there may well be objections which we have
15 seen, in fact, from customers.
16     And, again, I think that the relevance is, I think,
17 very limited in that, again, it's not something that Oracle
18 would have known. Unless, of course, if it was something that
19 was communicated orally, plaintiffs are going to get that.
20     THE COURT: Well, or not. See, the problem here is
21 cart and horse, and to a certain extent it is they want these
22 documents so that they can start investigating communications
23 you are talking about.
24     They want to ask the people at the customer and they
25 want to ask your people, "Weren't you told at some point that

**PAGE 103**

103

1 company X was reducing its purchases this quarter because the
2 economy was hurting it?"
3     And they want to look at the documents to see that
4 and then they want to ask you the question about it.
5     There may be an oral statement that's not reflected
6 in the documents. I'm not sure -- I'm not willing to cut it
7 off so completely. It's just communications, because I think
8 this is discovery and discovery goes more broadly than that.
9 It's an investigation.
10     I am willing to leave -- have it a fairly narrow
11 category of internal documents and I am willing to -- we are
12 not having 200 customers produce that amount of information.
13     But it seems to me there is some relevance and, you
14 know, maybe the plaintiffs have made their bed they are going
15 to lie in it. They have got 95 subpoenas out. Maybe that's
16 it. Maybe they don't get to do any other customer subpoenas.
17     But I think I have to give them some measure of what
18 was the customer thinking.
19     MR. RUBINSTEIN: Well, again, not to belabor the
20 point, we think that the Court would be doing that by including
21 within the scope communications to and from Oracle addressing
22 those exact issues, and which doesn't strike me as something
23 that would be unreasonable in that presumably at some point if
24 a customer was going to inform Oracle that it was not going to
25 purchase something, that would be something that would be

**PAGE 104**

104

1 communicated.
2     And so I think at a minimum it would be reasonable to
3 start there and only if it turns out that there just aren't any
4 documents like that, that then we would turn and expand that
5 scope.
6     We also, obviously, are very much concerned about the
7 scope as it relates to the number of customers that the
8 plaintiffs are intending to issue these subpoenas to. We think
9 that even 95 is just far too broad, and that we think that --
10 now, I don't know if the Court wants to address that second?
11     THE COURT: Not yet. Not yet.
12     MR. RUBINSTEIN: Okay.
13     THE COURT: Let's get the -- I have got it in mind,
14 but I want to talk about subject matter.
15     MR. SALPETER: Your Honor, can I say one thing about
16 that since I haven't spoken yet today?
17     THE COURT: I was going to say. . .
18     MR. SALPETER: Alan Salpeter.
19     THE COURT: What's your name?
20     MR. SALPETER: Alan Salpeter.
21     THE COURT: Just kidding.
22     MR. SALPETER: All of this discovery that we are
23 talking about today ultimately is going to evolve into a trial
24 of this case or disposition before trial. And I wonder
25 ultimately whether what a customer says but doesn't communicate

SHEET 14   PAGE 105

**Page 105**

1 to Oracle is going to have any even marginal relevance at an
2 ultimate trial in this case.
3          THE COURT: Ultimately? You are probably correct.
4 You are undoubtedly right.
5          I mean, it seems very unlikely that Judge Jenkins
6 will allow in the trial untethered information about customer
7 experience. I think that that's right.
8          But the question now is in investigating the customer
9 experience, that may or may not have been communicated to
10 Oracle but was communicated -- but wasn't communicated, whether
11 or not they are not permitted, to some extent, to start at the
12 back end and say, "There was this problem, was it
13 communicated?"
14          MR. SALPETER: It just seemed to me so marginal and
15 so on the edge here of what is potentially relevant and
16 ultimately usable at the trial, because ultimately this case is
17 going to come down to what Jeff Henley and Larry Ellison were
18 thinking about when they were speaking publicly.
19          And if you parse through the statements they made, it
20 was that the economy isn't affecting us yet. Everybody knows
21 what was going on in the economy. Everybody knew about the
22 bubble bursting and the internet company problems.
23          What they were saying, and they were very careful
24 about what they said, was that we are not seeing it hitting our
25 business yet.

**Page 106**

1          So the fact that the customer might be saying, you
2 know, we are starting to feel the pain of what's going on in
3 the economy, if that's not communicated to Oracle --
4          THE COURT: No, no. We are agreeing. We are
5 agreeing as a matter of ultimate relevance.
6          I think we are agreeing as a matter of ultimate
7 relevance, but in terms of investigation I need to give them a
8 little more leeway than I would if it was my case for one thing
9 and that I would if it was a trial.
10         You know, I know everybody is going to try security
11 class actions now because defendants are now winning, right?
12 And you won't settle it and we will all go to trial, and Judge
13 Jenkins needs another securities trial. He hasn't done enough
14 of them, but when you get there, it will be a very focused
15 trial.
16         It's really interesting. I don't know how much of
17 the Clarent trial you caught, but it's extremely focused
18 inquiry once you get there when they really try the case, and
19 this isn't that.
20         MR. SALPETER: Is there anything you can do to narrow
21 it beyond simply the customer, you know, discussing the pain of
22 the economy? I mean, can we put some --
23         THE COURT: I was going to say, decisions -- here is
24 what I wrote down for discussion purposes.
25         With respect to the economy. Obviously,

**Page 107**

1 communications with Oracle regarding increases or decreases in
2 purchases from Oracle due to the economy. That's the
3 communications.
4          With respect to other documents. Other documents
5 referring specifically to decisions to purchase or not purchase
6 from Oracle because of the economy. It's got to specifically
7 refer to a decision that is based on -- to purchase or not
8 purchase from Oracle because of the economy.
9          And you get that in that that may lead places. It
10 may not lead places, but it gets you some measure and then the
11 only question -- and my guess is that that is something that a
12 customer could more readily search for than every piece of
13 paper on their purchasing decisions and that kind of stuff.
14 That will be a smaller group of folks at least. Okay. That's
15 my thought on the economy.
16         In terms of product problems. I don't want you to go
17 into bugs with the customers. I don't want you to go into
18 anything bugs other than interoperability and integration,
19 okay?
20         I think that you are going to get these high level in
21 the first instance issues about the dimensions of the problems
22 other than the integrations problems. If you can convince me
23 that that's such a level that you need customer inquiries, we
24 will get to that.
25         But to start with, I don't want any investigation of

**Page 108**

1 just sort of everybody's problems with the Oracle software.
2          On the other hand, with respect to integration
3 problems with the software, I don't know, that might be all
4 right as a subject matter. Documents from customers regarding
5 integration problems with the Oracle software.
6          Yes, sir?
7          MR. WILLIAMS: I think that that's fine, your Honor,
8 with a couple of caveats.
9          THE COURT: Yes.
10         MR. WILLIAMS: For our document requests, I think
11 that we can -- and based on what your Honor is saying, we can
12 eliminate the word "bugs."
13         However, when your Honor uses the term "integration,"
14 I know that that term is going to be one that people latch onto
15 and it's too narrow, especially with the customers because the
16 customers -- what the customers are experiencing is
17 implementation, and the implementation is directly related to
18 the integration and interoperability and problems associated
19 with gaps or bugs. So I can imagine --
20         THE COURT: Yes, gaps or bugs, meaning integration,
21 interoperability, gaps and bugs.
22         MR. WILLIAMS: I can imagine if I ask the customer
23 about its implementation experience, what they are going to
24 respond with is, well, this -- the product had an enormous
25 amount of bugs. There was no way I could implement it because

PAGE 109

1 of the bugs that were associated with it. And it was certainly
2 not integrated and interoperable because the software code was
3 not written yet to make those modules speak to one another.
4     Now, maybe we can fashion a request that is
5 satisfactory to everyone, but I think as soon as you ask these
6 customers about their experience with the implementation of 11i
7 or any of its individual modules, the response is going to be
8 without us asking for it, there were a huge amount of bugs in
9 the software and we couldn't do what Oracle said we could do
10 with it once we bought it.
11     THE COURT: Yeah. And, therefore?
12     MR. WILLIAMS: You are saying you don't want us to
13 ask about bugs, and I'm trying to understand how --
14     THE COURT: What I want you to ask about is a
15 specific category of failings in the software. That is to say,
16 the failings that, in fact, there were -- I mean, the
17 representations in the complaint are that the -- it requires no
18 integration, right? You can ask about problems they had with
19 respect to 11i, with respect to integration.
20     MR. RUBINSTEIN: And, your Honor, with respect to
21 what the meaning of integration, the complaint itself refers to
22 a white paper in -- it's at Paragraph 63 of the Revised Second
23 Amended Complaint.
24     "And the white paper defines what Oracle means by
25 integration in the context of Suite 11i."

PAGE 110

1     So I agree with the Court that the way to solve the
2 problem is to be precise so that the customer knows what it is
3 being asked to produce.
4     THE COURT: Okay. Why doesn't that work?
5 Yes, go ahead.
6     MR. WILLIAMS: If I may approach, we have actually
7 broken out for you the statements regarding 11i and what can be
8 done with it.
9     THE COURT: I read it. I read it.
10     MR. WILLIAMS: I just want to point out --
11     THE COURT: I have already decided on the scope. I
12 have already decided on the scope of the 11i problems that we
13 are investigating. The question is applying it to the
14 customers.
15     MR. WILLIAMS: I think that's right. But what your
16 Honor just said was that what Ellison and Henley said, well,
17 it's preintegrated and interoperable, but they said much more
18 than that.
19     They said that, you know, you can implement it in a
20 certain amount of time. It's up and running fast and it works.
21 And those are things that if you ask the customer, "Well, did
22 you try to implement it?" "Yes." "What happened?" "Well,
23 there were so many bugs," they might say, "that we couldn't
24 implement it."
25     THE COURT: And I agree with that. I know that's

PAGE 111

1 part of the statement and I'm giving you some level of
2 investigation into that. It's coming from Oracle. It's not
3 coming from the customers.
4     I'm not going to bother the third parties with stuff
5 unless you show me that you have -- that this is an important
6 area of investigation where you are really likely to get
7 admissible evidence from the customers and you haven't yet.
8     You may once you get the documents from Oracle, but
9 we are going to start with Oracle and because it's going to
10 have to be a lot more than just "there were lots of bugs."
11 It's going to have to be a lot more than lots of bugs, because
12 there is no -- the thing that rings true to me is that this
13 case was not about that this was a buggy software or there were
14 lots of bugs. There are lots -- you know, that doesn't make a
15 securities fraud case. Or that, "This is a good software. Buy
16 it and it will work."
17     You know, if it was so buggy that it couldn't
18 possibly work, then that would be a false statement to the
19 market. But just the fact that there are a bunch of bugs or a
20 lot of customers had problems with it, I'm not sure that that
21 proves it.
22     However, however, I'm going to let you investigate
23 the dimensions of it. I'm going to start with Oracle's
24 documents. If you come up with evidence that it is of a
25 sufficient level that you can reasonably when you go to the

PAGE 112

1 customers, we are going to find the kinds of things that are
2 going to help us in an admissible fashion prove our case, then
3 you are going to get it.
4     MR. RUBINSTEIN: But -- sorry.
5     THE COURT: Let him finish.
6     MR. WILLIAMS: Now, two things.
7     One, how would you propose doing that? And if your
8 Honor would allow me today to make a representation to you
9 based on the documents that we have seen thus far to satisfy
10 you that we may find what I think we are going to find when we
11 go to these customers about this, I would be happy to do that
12 today.
13     We have brought just a couple of the documents we
14 have seen from Oracle. Obviously, we don't want to violate any
15 protective order that's in place, but I think that we can make
16 that representation right now.
17     THE COURT: You cannot. I guarantee you cannot. You
18 had your chance. That's what this is. You wrote me a letter.
19 You gave it in detail. You gave your positions. You told me
20 why. You don't have it.
21     Whatever you have got, it is insufficient. I suggest
22 you go to Oracle first and only on the level that I have talked
23 about, because I'm very skeptical as to whether or not you can
24 make a securities case out of this.
25     Maybe you can. I'm going to give you an opportunity

**SHEET 15   PAGE 113**

**113**

1 to try, but right now you are not going to get those documents.
2          Okay, let's keep going. Documents that refer to
3 integration problems with 11i can be sought from the customers.
4          On the accounting issues I guess this is separate and
5 apart from the documents that are going to be produced by the
6 accountants, which is a separate question from the customers.
7 Any documents relating to those 49,000 debit memos, period.
8          MR. WILLIAMS: I think that's fair.
9          THE COURT: Whatever the transactions are that those
10 involve.
11         MR. WILLIAMS: That's fair.
12         MR. SOLOMON: That's fair, your Honor.
13         THE COURT: Okay. That seems to me the scope of what
14 you are going to get from the customers.
15         The next question is how many. You know, my sort of
16 -- I want to get you enough customer information so that you
17 will be able to have -- you can't prove this case through
18 customer information, right, because it's not a scientific. It
19 won't show materiality, right? It's not an amount that is
20 going to be significant except for the giant people, which you
21 are going to get anyways.
22         But the customer information going out 200, 400
23 customers is not how you are going to prove ultimately that
24 this was of a sufficient quantity that it was reckless to
25 represent otherwise. You know, 10, 20, 200, 400. You are

**PAGE 114**

**114**

1 going to get anecdotal information. I'm not saying it's
2 irrelevant, but it's anecdotal.
3         How many customers does Oracle have?
4         MR. RUBINSTEIN: Thousands.
5         THE COURT: Thousands.. You know, thousands and
6 thousands and thousands. Pick a number, 10,000 customers. If
7 you put 200 of them in, 200 out of a 10,000 is relatively a
8 small percentage and by itself is going to be a difficult time
9 proving the dimensions of the problem through the customers.
10        What you get to is investigation the customers to
11 find the kinds of problems that you think are there, and then
12 communications to Oracle that would put -- have some level of
13 notice of the kinds of problems and then the internal documents
14 to Oracle are going to be the key.
15        So this is important, but not as important as the
16 internal documents to Oracle.
17        So it seems to me is that it matters -- that whether
18 it's 50 or 100 or 200 or 300, you know, that extra delta
19 doesn't buy you very much. Because whatever it is, it's not
20 going to be a scientifically sample of all their customers
21 because it's so small. Don't you think that?
22        MR. WILLIAMS: Well, statistically you may be right,
23 your Honor.
24        THE COURT: That's what we are talking about.
25        MR. WILLIAMS: They have got thousands of customers.

**PAGE 115**

**115**

1 We know that their own representations in December of 2000,
2 they said they had 83 customers live on 11i.
3         In January of 2000 they said -- January 2001, I'm
4 sorry, they said they had 160 customers live on 11i.
5         And based on what we have seen thus far, I'm not sure
6 what live means, but even if we -- we don't want 400 customers.
7 We don't want 300. We probably don't even want 200, but we
8 think that there is something between what we have done already
9 and a few more that we do need. And that is within what they
10 have said were live on 11i.
11        For example, in February or -- the January and
12 February of 2001 they said they had 2500 companies implementing
13 11i currently. We obviously don't want that. Nobody wants
14 that.
15        And so what we -- and I really believe that we have
16 been extremely, extremely reasonable with the cut that we have
17 made as to the documents or non-parties' customers that we
18 ought to get discovery from. They said 160 live on 11i in
19 January of 2001.
20        THE COURT: Your 93 you think would capture most of
21 those?
22        MR. WILLIAMS: I think it would capture most of
23 those. We were talking about it over the last couple weeks
24 and, in fact, just yesterday.
25        You know, probably 15 more that we haven't subpoenaed

**PAGE 116**

**116**

1 yet. And it's not because we thought they were less important.
2 It was because, you know, we just hadn't gotten to do those
3 before, you know, defendants had an opposition in. We didn't
4 think it was proper to continue sending them out while they had
5 this opposition in front of the Court. But there are at least,
6 you know, 15 to 20 more that we think that we need to send out.
7         Then if your Honor or -- we can -- we are prepared to
8 say, look, if we want any more that, we will tell you who we
9 want to subpoena. You let us know what you think, whether or
10 not you think it's relevant. If we have a dispute, we will go
11 to the Court and you can get a protective order before we send
12 out anything.
13        So I think that we have been very reasonable on that
14 issue.
15        THE COURT: Okay. Why not -- let me just put this in
16 your lap, because you won't like it. No, no. I do it on
17 purpose so I can figure out whether I'm messing up.
18        Why don't I tell them that they can do these four
19 categories, they can seek documents within these four
20 categories: From the 93 customers and 7 more and then they are
21 done. Without some extraordinary showing to the Court, they
22 are done.
23        MR. RUBINSTEIN: Well, the reason that I guess I have
24 a problem with it is because it ultimately involves a process
25 where customers are being subpoenaed without much inquiry into

PAGE 117

1 whether or not they really are reasonably likely to lead to
2 discovery of admissible evidence. And I will give the Court an
3 example of what I mean.
4     The Court is already requiring us to produce
5 information regarding communications with customers that fall
6 into the category that the Court has defined to be at least
7 sufficiently relevant to be likely or reasonably likely to lead
8 to the discovery of admissible evidence.
9     It seems to us that if you are going to get that
10 information, that would give them the ability -- it would give
11 plaintiffs the ability to be able to make a good cut at which
12 customers are reasonably likely without at the same time -- and
13 we --
14     THE COURT: I agree with that. I agree with that
15 completely, but when they do that, they are going to come up
16 with 200 people, 200 customers.
17     MR. RUBINSTEIN: Well, I honestly don't know why 30
18 of their choosing is not --
19     THE COURT: What's the difference between 30 and 90?
20     MR. RUBINSTEIN: It makes a big difference to Oracle
21 in terms of the impact that it has on Oracle's relationship
22 with its customers.
23     THE COURT: Because it's 90 instead of 30, right?
24 But there is no -- you haven't given me a principal reason why
25 90 is not a -- why 90 is the right number or 30 is not the

PAGE 118

1 right number other than, "We like it better. It hurts us
2 less."
3     MR. RUBINSTEIN: Well, it hurts us less and I think
4 that it adopts a view that I think is consistent with the
5 approach the Court has taken in other situations, where after
6 they have subpoenaed 30 customers, which I think is quite a
7 large number, then at that point they ought to be able to -- if
8 they think that's not enough, then at least they will be able
9 to make a showing at that point as to why not.
10     As opposed to now where I think we are in a situation
11 where we are pulling numbers out, I mean, of necessity, and I
12 think that especially after the plaintiffs are going to get
13 whatever documents they are going to get, I think it's going to
14 make the process much more likely to be -- to really to satisfy
15 the objective of discovery here.
16     THE COURT: You know, I disagree. I think it's going
17 to lead to more litigation and delay. I want to get this done
18 now, and I think --
19     MR. RUBINSTEIN: Well, the problem we have is if
20 there is a finite cut-off, I'm almost confident -- I'm rather
21 confident that plaintiffs are going to come back and say, "Your
22 Honor, we need more now."
23     THE COURT: They have to ask and then I can say no.
24 But you have suggested the same thing anyways. You have the
25 exact same proposal, except your number is 30 instead of 90.

PAGE 119

1 Yours is as every bit as arbitrary as theirs, and their number
2 is nearly 200.
3     So I don't -- you know, I don't know. How did you
4 come up with the particular companies that you have subpoenaed
5 thus far?
6     MR. WILLIAMS: We came up with them through Oracle's
7 representations about who was using live or implementing 11i.
8     Our confidential witnesses who were at Oracle at the
9 time who told us that they were either trying to sell, sold or
10 been rejected by certain customers about 11i. Most of them
11 came from there.
12     We also have some documents that were provided to us
13 that show that during that period Oracle had either tried to
14 through a proposal or a bid to searching customers for, you
15 know, significant amounts of money that were still pending
16 during that quarter or around that quarter. That's how we came
17 up with our group of customers who may have responsive
18 information regarding either implementation or whether or not
19 they were actually going to buy Oracle products in the quarter
20 because of, you know, financial reasons in the economy.
21     We didn't -- it wasn't arbitrary. I should mention
22 that we asked -- in the last couple of weeks we have asked
23 Oracle to tell us which customers were the 160 that you say
24 were live on 11i. We haven't gotten a response. We want to
25 know which ones they were.

PAGE 120

1     THE COURT: But where does that leave you?
2     MR. WILLIAMS: I'm not saying --
3     THE COURT: Therefore what?
4     MR. WILLIAMS: The reason I'm saying that is because
5 you are asking me whether -- I think you are trying to figure
6 out whether or not it's an arbitrary number and why we
7 subpoenaed these people.
8     THE COURT: It is an arbitrary number. I'm trying to
9 figure out how arbitrary. It _is_ how much information went into
10 the choice.
11     Or whether or not we should just -- because part of
12 my concern is that we are going to end up with another
13 arbitrary number. It will -- I expect it will be three months
14 from now, and it will be -- you know, they will still want more
15 than you will want to give.
16     Why not just narrow the categories of documents as I
17 have, which is very narrow, set a number, say that you have
18 already subpoenaed them and we will be done. That absent some
19 special showing that there is admissible evidence in the hands
20 of these -- of other customers and that I believe that it's
21 fair to require it to be produced, which is unlikely -- and I
22 guess I have said that for the record, and that's what I
23 mean -- that they are done.
24     I mean, it seems to me that we are going to end up
25 with some kind of fairly arbitrary cut-off one way or the other

SHEET 16   PAGE 121

**121**

1 and the question of whether we should do it now or three months
2 from now just means that it will delay the discovery that much
3 longer and there will be somebody -- I want to get it underway.
4 I want to get it all done with. That's part of my goal here,
5 is to get this lined up so everybody knows what the marching
6 orders are for the next 18 months and we will get it all done.
7         I hear you. I understand the question. I think if I
8 was Oracle I would be very wary of the fact that my customers
9 are being subpoenaed into a securities action over a stock fall
10 of $3 or something, or whatever it was during that -- after the
11 announcement was made. I would be wary of that.
12        On the other hand, I can't say that the customer
13 information isn't relevant and I can't say that they can't get
14 -- that they have to wait. I don't want -- because I don't
15 think it really adds to the problem in any material way or to
16 the exclusion of the problem by waiting.
17        I think that we will end up with another set of
18 arbitrary numbers. Everybody is proposing arbitrary numbers
19 now and we will have arbitrary numbers with extra reasons
20 attached in three months and it will be three months later.
21        I don't want to wait so long. That discovery was
22 served last year. I want to get it underway.
23        MR. SALPETER: Can I suggest another arbitrary
24 number?
25        THE COURT: Yes.

PAGE 122

**122**

1        MR. SALPETER: Fifty. Because I think the
2 disruption, the ultimate disruption to these customers and to
3 the relationship between Oracle and the customer is something
4 that the Court ought to take into account.
5        THE COURT: I do, I do.
6        MR. SALPETER: Particularly given how marginal this
7 is. It has potentially some relevance. We think it's
8 borderline. They are making a case that it's stronger.
9        We would like to see 30. They would like to see 93
10 plus seven. Whatever number we pick is going to be arbitrary,
11 but I would like to try to limit the amount of disruption to
12 the relationships.
13        These are customers who got a product that they said
14 was a buggy, lousy product, maybe defective in design, and now
15 we are going to add insult to injury by dragging them into this
16 securities litigation, having their deposition taken, their
17 documents sought.
18        THE COURT: These are the documents. We are not
19 talking about their depositions yet.
20        MR. SALPETER: Okay. Documents. I stand corrected.
21        THE COURT: But I want to make sure that's right.
22 They are not on the list of witnesses. You are going to have
23 to ask if you want those extra.
24        MR. SOLOMON: We want to see the documents and make a
25 reasonable choice before we go around talking to people live.

PAGE 123

**123**

1 Absolutely. We have met and conferred, your Honor, with 73 of
2 these potential witnesses already.
3        MR. SALPETER: Well, they should be able to pick the
4 best 30 or best 50, the ones they think will make their case --
5        THE COURT: Or the best 93.
6        MR. SALPETER: -- out of because --
7        THE COURT: They all seem. I mean, it's hard for me
8 to distinguish. You know, if they had gotten out 200 numbers,
9 you would be out -- 200 subpoenas, you would be out asking for
10 93 or 100.
11       MR. SALPETER: Well, because I -- you know there is
12 an inspector to discovery that is pure infliction of pain and
13 that ought to be limited frankly.
14       THE COURT: I know and I'm trying to limit it.
15       MR. SALPETER: I made my pitch for a different
16 number.
17       THE COURT: Okay. 93 plus seven more. That's it.
18 You better have a very good reason if you want to go beyond
19 that.
20       And the 93 are the ones you have already got out, so
21 and narrow to these subject matters.
22       MR. RUBINSTEIN: Your Honor, I did want to go back to
23 one question.
24       The Court talked about limiting the scope, it was for
25 third parties regarding bugs to integration.

PAGE 124

**124**

1        THE COURT: Yes.
2        MR. RUBINSTEIN: And I think it's important to be
3 clear and for the parties to be clear about what that means.
4        And in particular there is in the plaintiff's letter
5 a suggestion that integration might mean the ability of Oracle
6 products to be integrated with non-Oracle products, which it
7 seemed -- maybe we have reached agreement. I was not there.
8        But with regard to the meet-and-confer that occurred
9 last week, it's my understanding that that is not what is meant
10 and that that is not what the plaintiffs will define
11 integration to mean. I just want to make sure that that is
12 clear.
13       THE COURT: Is it clear?
14       MR. WILLIAMS: Your Honor, until we actually -- I
15 mean, this is the point I was raising earlier about using the
16 words "integration" and "implementation."
17       THE COURT: I understand that, but there is a false
18 representation alleged in this case. It is that these products
19 require no integration.
20       That means a particular thing, does it not? It means
21 that these different modules can be integrated with each other.
22       MR. WILLIAMS: I believe that that is what the
23 representation is.
24       THE COURT: Fine. And that is the scope of the
25 order. That is what we mean by "integration." It is the

**PAGE 125**

```
 1  integration of the various parts of the 11i Suite with each
 2  other. You know, with the data base part of the suite, you
 3  know, with each other, et cetera, et cetera.
 4       If that's what you believe the false statement is,
 5  that's what you get discovery into.
 6       MR. RUBINSTEIN: Again, I think that --
 7       THE COURT: Okay. Okay. We have got it. That's
 8  done.
 9       MR. RUBINSTEIN: Okay.
10       THE COURT: Okay. And then in terms of the timing of
11  the production, you just cooperate with the third parties and
12  work with them. I'm going to be very sensitive to their
13  concerns in terms of that, and so I expect you to cooperate.
14       How about the time period is June 1, 2000 to June 1,
15  2001?
16       MR. WILLIAMS: For non-parties?
17       THE COURT: Everybody. Everything.
18       MR. WILLIAMS: You know, we originally had asked for
19  a much broader period than that and in the meet-and-confers
20  what we said is, look, we are perfectly willing to come down to
21  say when the Form 10K was filed for fiscal year 01, and that
22  was in August, and it makes sense because the fiscal year ended
23  on June 30.
24       So if we stopped production of responsive documents
25  at June 1st, your Honor, we cannot capture even the entire next
```

**PAGE 126**

```
 1  quarter. It would just stop right in the middle.
 2       And the defense is going to be -- and we have seen it
 3  in the derivative action, in Judge Strine's opinion that there
 4  is a hockey stick effect which Oracle relies on on a
 5  quarter-to-quarter basis and that happens in the last month of
 6  the quarter.
 7       So if we are restricting discovery to end before that
 8  last month of the quarter --
 9       THE COURT: Well, except the quarter that ends
10  June 30, 01 itself isn't at issue in this case. It's the prior
11  quarters.
12       So the only reason I go out is to capture documents
13  that may have additional relevance to what happened before.
14       MR. WILLIAMS: I agree with that, your Honor, but,
15  again, one of the things that Larry Ellison said when the miss
16  in our quarter is that a lot of these deals were pushed out to
17  the next quarter. Not lost, but pushed out to the next
18  quarter. And they also said that a lot of the deals ended up
19  closing in the final month of the quarter.
20       So one could -- one would imagine that, say, for
21  instance --
22       THE COURT: So the miss in the third quarter of 01,
23  which is -- ends in what, March?
24       MR. RUBINSTEIN: The Q3 ended on February 28.
25       THE COURT: So?
```

**PAGE 127**

```
 1       MR. RUBINSTEIN: But the statements that Mr. Ellison
 2  made were right at the end of the third quarter. And so what
 3  happens later --
 4       MR. WILLIAMS: To the end of the fourth quarter it
 5  should be.
 6       MR. RUBINSTEIN: Doesn't matter. Again, the
 7  relevance of any -- of any later created documents would be
 8  only with respect to matters that refer back to Q3 itself. I
 9  think the Court is right that Q4 is not an issue in this case.
10       THE COURT: What do you think about my time period?
11       MR. RUBINSTEIN: We could accept that.
12       THE COURT: Okay. That's the time period. June 1,
13  2000 to June 1, 2001 and documents that refer to events during
14  that period which may have been generated at a later time.
15       15, analysts and media organization. You have
16  already got that, right?
17       MR. WILLIAMS: Think so, your Honor.
18       THE COURT: On all these ones where I say you have
19  got agreement, make sure you put that scope in the order.
20  Auditors and accountants.
21       MR. RUBINSTEIN: Your Honor, we would suggest that
22  the scope be the same as the scope we have already worked out.
23       THE COURT: Right. Why shouldn't it be that?
24       MR. SOLOMON: Are you talking about the conference,
25  your Honor?
```

**PAGE 128**

```
 1       THE COURT: Yes, sir.
 2       MR. SOLOMON: The reason is, your Honor, that -- and
 3  I think we have cited a case or there is abundant law to this
 4  effect; that is, where you have accounting allegations in a
 5  securities fraud case, typically I think this doesn't take us
 6  outside of the typical arena, you would need all of the work
 7  papers to get an overall understanding and comprehension of
 8  just what went on with the financial statements at issue.
 9       For example, we have the accounting allegations
10  concerning the end of November 2000 adjustments. They claim
11  that there was no impact on the financial statements. We
12  obviously need to look at what the auditors examined with
13  respect to that issue apart from anything else.
14       Also, there was forecasting allegations in our case.
15  What accountants -- what auditors do when they are auditing
16  companies, as I'm sure you are familiar, is they look at
17  internal controls. They look at management integrity. We need
18  all that stuff. That is clearly relevant to this case. In
19  order to --
20       THE COURT: Indulge me a little bit. Why is that
21  relevant to this case?
22       MR. SOLOMON: Well, there is going to be a defense --
23  there's a number of defenses we know about. One is they don't
24  even hit the financial statements.
25       If it did hit the financial statements, the defense
```

SHEET 17   PAGE 129

**129**

1 would be the defendants didn't know about it for whatever
2 reasons.
3          And one of the reasons they will say the defendants
4 didn't know about it was because the auditors passed on it.
5          Why did the auditors pass on it? Again, there will
6 be examinations in the audit work papers of what management
7 representations were as to -- in other words, to get a picture
8 of whether or not management knew, whether they should have
9 known, what the accountants thought about the accounting
10 treatment or if they knew about it, how it affected the
11 financial statements ultimately all needs to be examined in the
12 context of Oracle's overall financial statements.
13          And our experts and auditors and courts have
14 concluded time and again the only way to do that is to get all
15 of the papers. Is that difficult? No. They are always
16 organized by the auditors.
17          Very simply, they are ready to be produced right now,
18 I would anticipate --
19          THE COURT: I'm sure they are on a disk.
20          MR. SOLOMON: -- or they could be very quickly.
21          MR. RUBINSTEIN: Your Honor, going back to a comment
22 I believe you made earlier today.
23          This is not an accounting case in which there is some
24 allegation about overarching policies. It's about a particular
25 event that occurred on a particular date involving a finite

PAGE 130

**130**

1 series of transactions.
2          We have agreed to have the outside auditors produce
3 documents that relate to the accounting treatment of those
4 debit memos. I don't think there is any disagreement there.
5          THE COURT: Right.
6          MR. RUBINSTEIN: The rest of it I, frankly, just
7 don't understand.
8          And there is no allegation in this complaint about a
9 lack of internal controls as it relates to the forecasting
10 process.
11          I mean, I just think that this -- this is just way
12 far afield. And to the extent that there are work papers that
13 relate specifically to this debit memo, I don't have a problem
14 with that. But I think anything else is just a fishing
15 expedition and this is not like every other accounting case.
16 It's a very narrow issue. Either it hit revenue or it didn't.
17          And the audit trail we have agreed to produce that
18 and what the accounting treatment was, that's fine. But I
19 think it ought to be restricted to that issue because that's
20 what's been pled.
21          MR. SOLOMON: And, your Honor, ultimately the
22 auditors had to sign off on the fiscal year, not just the
23 quarter in question, and how material the events were that we
24 alleged, to what extent they were known and to what extent the
25 auditors signed off on them with knowledge is all relevant to

PAGE 131

**131**

1 our case.
2          THE COURT: Well, you get all of that by getting
3 every scrap of paper in that audit that has anything to do with
4 the 49,000 debit memos, isn't it?
5          MR. SALPETER: 46.
6          THE COURT: Whatever. 2000 debit memos between us
7 friends . . .
8          MR. SOLOMON: One element to the case, your Honor.
9 Another elements to the case is the forecasting. Expenses,
10 expenses in relation to 11i are all embraced within those
11 allegations.
12          THE COURT: Yes. They didn't audit the forecasts.
13          MR. SOLOMON: No, but certainly the auditors would
14 have looked at the quality of their forecasting function.
15 That's a function of the auditors, and they will have done
16 that. They will do that in every case in which they audit.
17          THE COURT: Why don't I add that? Okay. Why don't I
18 do that? We will say that the auditors have to produce
19 everything in their files related to the 49,000 -- to the
20 accounting treatment of the 49,000 -- related to the 49,000
21 debit memos and any audit of the forecasting function at
22 Oracle.
23          MR. SOLOMON: All right. And what about the
24 expenses?
25          THE COURT: Does that work? Does that work? I mean,

PAGE 132

**132**

1 if it did, audit the forecasting function, it's probably
2 relevant.
3          MR. SOLOMON: The expenses, your Honor, and their
4 financial function.
5          THE COURT: Well, if you -- if the auditors raise
6 that the forecasting function was flawed in the following six
7 ways and you continued to rely on the false forecasting in
8 making these projections, maybe it's relevant. I don't know.
9          MR. RUBINSTEIN: Your Honor, the problem I have with
10 that, it's not been pled. There is no theory in this case that
11 there was a failure of control and that there was some
12 fundamental flaw in the forecasting process.
13          THE COURT: Well, it's an underlying. The allegation
14 is that you forecast -- well, maybe you are right.
15          The allegation is that you forecast -- well, the
16 allegation is that you forecast wrongly, right, is that you
17 made forecasts when, in fact, you knew the forecasts were
18 inaccurate.
19          They were inaccurate, you knew, because the economy
20 was, as you knew, was having a greater impact on sales and, in
21 addition, you knew that the 11i wasn't going as well as you
22 were representing in your forecasts it would go.
23          If the forecasting function was audited, why wouldn't
24 that audit have something do with -- why wouldn't it -- an
25 auditor looking at that, maybe they came up with it and maybe

PAGE 133

```
133
 1  they didn't, that there were these failings in your forecasting
 2  function. Maybe they brought it to management's attention and
 3  said, "You are not properly accounting for this. You are not
 4  properly accounting for that," and so -- or you didn't. And
 5  you say, "We had it audited. We have got a validated
 6  forecasting function and we followed it, and the auditor signed
 7  off on it."
 8         I don't know. Are we talking about anything? Is
 9  there anything --
10         MR. RUBINSTEIN: No, no, no.
11         MR. SOLOMON: Your Honor --
12         THE COURT: Do the auditors do this?
13         MR. SALPETER: No, because this --
14         MR. SOLOMON: Your Honor, the --
15         THE COURT: Stop. One at a time.
16         MR. SALPETER: This is way beyond the scope of the
17  audit here. The audit is --
18         THE COURT: Okay.
19         MR. SALPETER: -- addressed to the financial
20  statements.
21         THE COURT: That's fine. Did the auditors and
22  accountants here not audit the forecasting functions? You tell
23  me that and you don't get discovery into it.
24         MR. RUBINSTEIN: I'm not aware of any.
25         THE COURT: That's a little different.
```

PAGE 134

```
134
 1         MR. SOLOMON: The fact that we are having this
 2  discussion, I think, reinforces my point that I think we need
 3  all of the work papers.
 4         THE COURT: No, it doesn't. That is truly the cart
 5  before the horse.
 6         MR. SALPETER: Your Honor --
 7         MR. SOLOMON: Thanks for putting it that way.
 8         THE COURT: In any event --
 9         MR. SALPETER: Your Honor, can I make one other
10  point?
11         Their allegation isn't that the forecasting process
12  was flawed. It's that Ellison and Henley knew that the
13  12 cent per share forecast wouldn't be met because of these
14  negative things; the economy, 11i, et cetera, right? That's
15  the core of their case.
16         THE COURT: Let me ask you this: What if they can
17  prove the first half and not the second? What if they prove
18  that Ellison knew that the forecast wasn't being met. Okay,
19  just bear with me. I don't expect you to agree with that.
20         And the reason is not because of what they have
21  alleged in the complaint. The reason is because the auditors
22  advised him that his forecasting method was flawed.
23         Can they put on this case?
24         MR. SALPETER: Not on this complaint.
25         THE COURT: You can't put that on this complaint.
```

PAGE 135

```
135
 1  There is a knowing misrepresentation of a forecast. He makes a
 2  forecast knowing it's false and the reason he knows it's false
 3  is not the reason that they give. He can't do that?
 4         MR. SALPETER: That's not their case.
 5         THE COURT: Stop there.
 6         MR. SALPETER: It's a hypothetical that is so far
 7  afield from really what we are talking about here.
 8         I mean, their case and all these derivative cases
 9  have all alleged essentially the same thing. Not that the
10  forecasting process was bad or flawed, but that once the
11  forecast was made of 12 cents a share Henley and Ellison knew
12  they weren't going to meet it.
13         THE COURT: Okay.
14         MR. SALPETER: I mean, your hypothetical is
15  interesting, but it's not --
16         THE COURT: It is.
17         MR. SALPETER: It's interesting, and I would like to
18  think about it some more before I answer it, but it is not our
19  case. In fact, it's not even a fifth cousin once removed to
20  this case.
21         THE COURT: So you are giving discovery of the --
22  your forecasting methods and what went into the forecastings
23  that were made public and they are going to look at those.
24         MR. SALPETER: Right. And then they are going to
25  come back if they find some major flaw that they think should
```

PAGE 136

```
136
 1  be caught by auditors or outsiders, they are going to come back
 2  and they will be waving their arms and making an impassioned
 3  argument to you about why they should go further.
 4         But on the base of this complaint, they really
 5  shouldn't be getting into what the auditors have done beyond
 6  the narrow scope that has been --
 7         THE COURT: I have got to tell you, my predilection
 8  with respect to is unlike with the customers, where I'm
 9  sensitive to the relationship concerns.
10         My general work in the past has been, you know, what
11  do I care about the work papers? Have them.
12         My concern about the work papers is I don't want it
13  to be a fishing expedition. I don't want this to be an excuse
14  to look for 75 other flaws and amend the complaint for 75 other
15  flaws that they haven't yet discovered in the financial records
16  in the company.
17         So I don't want to get into all of the audit. It's
18  not pled and we are not going to get into it.
19         On the other hand, with respect to the auditing of
20  the forecast model, is that a big deal?
21         MR. SALPETER: I don't think it was done. I don't
22  think it was ever done.
23         THE COURT: Fine.
24         MR. RUBINSTEIN: It's a bit academic.
25         THE COURT: Here is what you do. Here is what you
```

SHEET 18  PAGE 137

**Page 137**

```
 1  do. Okay.
 2       MR. WILLIAMS: Can I say one thing, your Honor,
 3  before you rule?
 4       THE COURT: Yes.
 5       MR. WILLIAMS: One of the issues is Andersen.
 6  Andersen was the auditors at the time and we have begun the
 7  meet-and-confer process with them before we ended up in the
 8  position that we are today.
 9       Now, I don't know if anyone knows how long those
10  documents will be available, and I think -- what was it? Just
11  ask if we have got them all, then they could produce them
12  quickly or if they have to go through them, they wouldn't be
13  able to produce them quickly; is that correct?
14       MS. RADCLIFFE: My understanding is that Andersen
15  themselves have not looked at the work papers. They are in a
16  warehouse in Redwood City along with all of their other work
17  papers.
18       That they have taken the client -- used to have desk
19  files for the engagement team, but that is now consolidated
20  into a single client file which would be labeled in this case
21  "Oracle" pursuant to numerous preservation orders across the
22  land regarding --
23       THE COURT: Good.
24       MS. RADCLIFFE: But how long those particular
25  documents, you know, would be there, I don't know.
```

**Page 138**

```
 1       THE COURT: Would be there? We can take care of the
 2  "would be there."
 3       MS. RADCLIFFE: What's in them and what's there is
 4  questionable.
 5       THE COURT: But they are not about to get rid of
 6  them.
 7       MS. RADCLIFFE: Well, no. I believe that they
 8  indicated that Ernst & Young, for example, the subsequent
 9  auditor, probably looked at them.
10       THE COURT: My point is you are not saying there is a
11  preservation issue there.
12       MR. WILLIAMS: I thought there may have been one.
13       THE COURT: Aren't there court orders in place for
14  the auditors to preserve --
15       MS. RADCLIFFE: As to this case?
16       THE COURT: Any case. As long as they have to
17  preserve them.
18       MS. RADCLIFFE: I don't know that there is an order
19  that apply to those documents.
20       THE COURT: Is there anybody that would object during
21  the pendency of this case requiring that the work papers be
22  preserved?
23       MR. RUBINSTEIN: No, your Honor.
24       THE COURT: Okay, put that in. Of course, they are
25  not before me, but put it in anyway. You can ask them and then
```

**Page 139**

```
 1  they have to do it.
 2       MS. RADCLIFFE: One of the issues that's going take
 3  arise with the auditors is in addition to the hard copy work
 4  papers, will be the work papers in electronic format.
 5       THE COURT: Well, you are going to take that up with
 6  them. I'm not going to get into the details. I'm going to do
 7  scope.
 8       MS. RADCLIFFE: There is also, in addition to the
 9  work papers, the desk files or client files that relate to at
10  least the allegations in the complaint.
11       THE COURT: Well, you are saying it's all in one
12  file?
13       MS. RADCLIFFE: That's my understanding with respect
14  only as to Arthur Andersen.
15       THE COURT: Well, we will just say documents -- I
16  want them to preserve all of their work papers with respect to
17  the Oracle engagement -- engagements, probably have more than
18  one, certainly for the relevant period of time.
19       So put it that way. Preserve all the work papers for
20  the relevant period of time.
21       If there are other documents that they are required
22  to preserve by someone else's order, that's fine, but I
23  don't -- I don't have a good sense that anything beyond that is
24  obviously relevant here, or even marginally relevant.
25       I mean, I guess I could say preserve everything
```

**Page 140**

```
 1  relevant to Oracle, but this may go on for quite some time and
 2  I don't know, maybe they keep it anyways.
 3       Does any of this matter how I say this from your
 4  perspective. Can I just say "preserve documents"?
 5       MR. RUBINSTEIN: We have no problem with the
 6  preservation.
 7       THE COURT: All right. Preserve all documents
 8  regarding Oracle for the relevant period. Fine.
 9       What you can get from the auditors is documents
10  regarding or relating to the 46,000 debit memos. And I guess
11  there was an agreement on documents relating to tax advisory
12  services to the defendants.
13       Okay. Plaintiffs witnesses and documents --
14       MR. RUBINSTEIN: Your Honor, with respect to the tax
15  advisory services, it's my understanding what that meant was
16  tax advisory services as to Mr. Ellison or Mr. Henley to the
17  extent that that occurred.
18       THE COURT: All right.
19       MR. SOLOMON: Your Honor, are you saying then with
20  respect to expenses associated with 111 problem, costs
21  associated --
22       THE COURT: No, no.
23       MR. SOLOMON: And are you saying with respect to
24  forecasting, that we get nothing from the accountants?
25       THE COURT: Right. Yes.
```

**PAGE 141**

1   Okay. Confidential witnesses. You know, why don't
2   we -- can you duplicate Judge Alsup's order, the stipulation in
3   that case?
4   MR. WILLIAMS: We can go very close, your Honor. I
5   think that we made an initial proposal and in their letter we
6   saw their kind of cross-proposal for the first time.
7   I think the only real issue there is to agree on the
8   fact that if they have to do some investigation internally at
9   Oracle about someone they know to be a confidential witness,
10  that they don't represent to people at Oracle that the person
11  is a confidential witness.
12  They can say that, you know, Joe Blow for example,
13  did you know anything about him? Is he a credible guy? Is he
14  somebody that would lie? That's fine.
15  But I don't think they should be able to say, well,
16  this guy is a person who has made -- you know, has made some
17  sort of factual allegation against Oracle and, therefore, was
18  he a credible guy? You know, is he somebody that could be -- I
19  don't think that should be problematic.
20  MR. RUBINSTEIN: Your Honor, we do have a problem
21  with that.
22  Obviously, when -- as we would for any witness, we
23  would want to be able to conduct factual investigation about
24  this person, whoever they are, so that we can actually prepare
25  to take their deposition.

**PAGE 142**

1   THE COURT: Yes.
2   MR. RUBINSTEIN: And we do have a problem if we are
3   impaired in our ability to conduct a meaningful investigation
4   to be able to depose him.
5   THE COURT: I guess I don't understand the issue.
6   What you are saying is they can do that investigation, right?
7   MR. WILLIAMS: Sure.
8   THE COURT: They can ask about this witness, what
9   they said about particular subject matters, what they didn't
10  say, what they did, what they didn't do, whether they are a
11  good guy, whether they are a bad guy, et cetera, et cetera, but
12  you can't tell anyone that the reason for the investigation is
13  because they are a confidential witness in this case.
14  MR. WILLIAMS: That's our position.
15  THE COURT: What's wrong with that?
16  MR. RUBINSTEIN: My concern is that I'm not sure what
17  the legal predicate is for that.
18  THE COURT: Okay. Give me a break. We are talking
19  practicalities here.
20  MR. RUBINSTEIN: Well, no. The concern we have is
21  that the predicate for this is that we are going to be out
22  there harassing and intimidating witnesses and there is
23  absolutely no showing of that.
24  And the Alsup order, I should point out, it was
25  agreed order. So it's not a judicial determination that that

**PAGE 143**

1   is --
2   THE COURT: Of course. Of course, it's an agreed
3   order.
4   The concern is -- and I'm sure you won't do it. I
5   have no idea whether you will do it, but I'm not presuming that
6   you will do it, is that their witnesses may be concerned about
7   this subject. That is, I'm sure, what generates this. Is that
8   the witness will be concerned.
9   This is some modicum of salve on that so that there
10  won't be any. It doesn't cost you anything. Who cares?
11  MR. SALPETER: Well, let me put a hypothetical
12  together. I understand the restriction that the plaintiffs are
13  putting.
14  We cannot actually show any Oracle employee the
15  complaint and say this is what they say this person said. This
16  is the information. We can't say that.
17  THE COURT: No. But you can say, "John Blow has
18  said," and then quote the complaint.
19  MR. RUBINSTEIN: We just can't refer to --
20  THE COURT: You can't refer to them as a confidential
21  witness or say they are a confidential witness. You just can't
22  talk about the fact that they are giving evidence to the
23  plaintiffs which is being used in a complaint.
24  I mean as a practical matter, why does that matter?
25  MR. RUBINSTEIN: Would we be, for instance, able to

**PAGE 144**

1   have in-house counsel at Oracle know who the confidential
2   witnesses are?
3   THE COURT: Well, I think that's an important issue.
4   MR. RUBINSTEIN: For us to be able to advise our
5   client and, obviously, the legal department.
6   THE COURT: Well, so this is part -- I'm trying to
7   focus on your language so I can figure out where it fits in.
8   It fits in, I guess, Condition 3.
9   "Counsel for defendants will not disclose the
10  confidential witness's roll" -- which is what he's talking
11  about, right, their role as a confidential witness -- "to
12  anyone other than" -- and, obviously, you all get to know it.
13  Consultants get to get it. You have got in-house defendants.
14  By "defendants" I assume you meant -- well --
15  MR. RUBINSTEIN: It's Item 5. We would want to be
16  able to provide this to in-house counsel and we also do think
17  to employees.
18  THE COURT: Well, why?
19  MR. RUBINSTEIN: But if the Court is ruling we can't,
20  I mean, at a minimum we need to be able to provide that
21  information to in-house counsel.
22  MR. WILLIAMS: Your Honor, we accept the fact that
23  their counsel, you know, just as an officer of the court, will
24  not convey that information to the employees and we don't have
25  a major objection to that.

**SHEET 19  PAGE 145**

**145**

1  But you are right, the witnesses, you know, do have
2  some concerns about those things.
3       THE COURT: Then what you should do is -- we will do
4  the defendant's language, except you scratch the word "and
5  Employees" from I.
6       I think that to be clear you are going to have to
7  scratch the word "defendants" -- or "and their." Scratch the
8  word "and their" from I. So you keep talking about defendant's
9  counsel.
10      THE COURT: Defendant's counsel within Mayer, Brown
11 and Platt -- oh, sorry. I am dating myself. I grew up in
12 Chicago, so it's --
13      MR. RUBINSTEIN: That's all right. We do it all the
14 time.
15      Now, your Honor, I have a question. If we are not
16 going to be permitted to communicate the fact of somebody being
17 a confidential witness to another employee, it does seem to me
18 that the undertaking becomes somewhat irrelevant, right,
19 because the person isn't even being told that they are getting
20 information that is protected in the first place.
21      So it seems to me that the undertaking --
22      THE COURT: Who does the undertaking go to?
23      MR. RUBINSTEIN: Well, the concept had been that if
24 Oracle employees outside of the law department were going to
25 know that someone was a confidential witness, then there would

**PAGE 146**

**146**

1  be an undertaking that they would comply with the restrictions
2  of the order.
3       And we can -- we would agree to that if we could
4  convey that information; but if we can't, it seems to me that
5  what -- they go together.
6       THE COURT: Well, I understand that. What do you
7  think about that? Who gets -- the only people that are getting
8  this are outside counsel, in-house counsel, consultants and
9  experts.
10      MR. RUBIN: And we would propose three individual
11 defendants.
12      THE COURT: Well, that's the issue.
13      MR. WILLIAMS: That's just not necessary.
14      MR. RUBIN: Those are our --
15      THE COURT: Oh, come on. They have lawyers. They
16 have in-house counsel.
17      MR. WILLIAMS: With regard to the undertaking, your
18 Honor, I think that we can probably address that stipulation
19 and agree on something, but I think --
20      THE COURT: It seems to me the only person you might
21 think about is for consultants or experts.
22      MR. RUBINSTEIN: All right.
23      THE COURT: All right. So we will limit the
24 undertaking to consultants and experts.
25      MR. RUBINSTEIN: The other concern that we have is

**PAGE 147**

**147**

1  the idea that -- of having the confidential witness identity --
2  or documents, any documents that refer to the confidential
3  witnesses file under seal with the Court.
4       THE COURT: Well, I think the way you put it is
5  correct. They have to seek an order, and then we will take it
6  on a case-by-case basis.
7       At some point it may be totally irrelevant, so --
8  presumably it will be totally irrelevant eventually.
9       So what I'm saying is we will use the defendant's
10 language generally for the stipulation with those modifications
11 we just made as to the undertaking and the scratching out the
12 two bits for the disclosure of the witnesses.
13      MR. RUBINSTEIN: And we just wanted to clarify that
14 we would be getting not only the name of the confidential
15 witnesses, but their corresponding number as referred to in the
16 Revised Second Amended Complaint.
17      THE COURT: They have got to know who is who, right?
18      MR. WILLIAMS: We agreed to that.
19      MR. RUBINSTEIN: Fine. And when -- do we have an
20 agreement as to when we are going to get the names?
21      MR. WILLIAMS: I don't know if we talked about it,
22 but I imagine after we had this discussion today --
23      THE COURT: You know, we are going to do this. What
24 I want to happen -- it is 3:00 o'clock -- is you all go back
25 and get me a proposed form of order that you all agree to based

**PAGE 148**

**148**

1  on my rulings. And that will probably take at least the rest
2  of the day, right? But quickly.
3       I think we need to do this rare rapidly and then, I
4  don't know, 48 hours after I sign an order, give over the
5  numbers, the names.
6       The next issue on here is the class cert discovery.
7  Is there any issue on that?
8       MR. RUBINSTEIN: I think the parties have agreed to a
9  schedule.
10      MR. WILLIAMS: We agreed on a schedule. I think we
11 agreed on everything else. It was very late in the day. There
12 was an issue as to whether or not they wanted to absent class
13 member discovery --
14      THE COURT: They are reserving on it.
15      MR. WILLIAMS: So there is no issue.
16      THE COURT: That's fine. Well, then, put in whatever
17 the agreement is on the class cert discovery.
18      MR. SALPETER: I just want to clarify, also, I think,
19 as the letter confirms, we are going to be getting the
20 documents from the plaintiffs. The letter indicates by the
21 7th. I don't know. Is that -- I wanted to confirm that that's
22 the case.
23      MR. WILLIAMS: I think so.
24      MS. RADCLIFFE: The non-class cert is the 21st.
25      MR. RUBINSTEIN: Non-class will be the 21st, class

PAGE 149

1  will be by the 7th.
2       THE COURT: Class will be by the 7th.
3       MR. RUBINSTEIN: Okay.
4       THE COURT: Contention interrogatories. I don't
5  really like contention interrogatories, though I have
6  propounded many of them.
7       I like them at the end because I think it's a very
8  good trial tool, at least in the trial preparation tool. It
9  confines the case. But I think at the beginning, especially
10 where you are about to produce 2 million pages of documents,
11 it's a little bit dicey.
12      So my proposal, what I would say is that you can't
13 produce -- have contention interrogatories in general until --
14 without further order of the Court. And you can apply later
15 on. But that -- and then eventually, but I wouldn't
16 anticipate, that you would get contention interrogatories for
17 the purpose of defining what you are going to try or move for
18 summary judgment on or whatever the final or penultimate
19 resolution of the case is.
20      Does anyone like to take that up?
21      MR. RUBIN: We would only note, your Honor, that we
22 have already been served with contention interrogatories and
23 have been provided some response. And, perhaps, it was our
24 mistake for not objecting.
25      THE COURT: Well, no, because you wanted answers,

PAGE 150

1  too.
2       MR. RUBIN: But, certainly, we would just want, you
3  know, from here on out reciprocity on that issue. Contention
4  interrogatories from both sides.
5       So to the extent -- let's put it this way: To the
6  extent that they have any objections to our contention
7  interrogatories, I would think that those will await -- those
8  should await the service of contention interrogatories and
9  response by them. We should just be reciprocal. We should
10 move together.
11      THE COURT: I agree with that, but I'm not sure what
12 it means.
13      MR. WILLIAMS: I agree with the contention
14 interrogatory issue, and maybe there are interrogatories that
15 defendants are construing as contention interrogatories and we
16 didn't construe them in the same way.
17      For example, there are statements that, you know --
18 like the one I represented to the Court earlier. They said
19 they had 160 customers live on 11i in January. So we asked;
20 well --
21      THE COURT: That's not what he's talking about.
22      MR. RUBIN: We are talking about, for example,
23 "provide all facts, your factual basis for the statement that,"
24 and then a statement that on March 15th this was -- that our
25 miss was related to, you know, unforeseen facts.

PAGE 151

1       And that was served on us. We have attempted to
2  respond. We don't know if these pages will be sufficient on
3  this. Sit on them --
4       MR. WILLIAMS: We can deal with that, your Honor.
5       THE COURT: You work that out, but nobody gets to get
6  additional answers right now, certainly, to contention
7  interrogatories and I don't want any more served.
8       Now, you know, I have never had to think about the
9  question of exactly what falls within, what doesn't, a
10 contention interrogatory. Usually it's when they ask about
11 pleadings, it's a contention interrogatory, but I can see how
12 there will be things that aren't within strictly focused on the
13 pleadings that are clearly contention interrogatories.
14      But my guess is if you use your common sense, it
15 won't be a problem. But no contention interrogatories and
16 further responses without Court order.
17      Absent class members, we have dealt with. You can
18 come back and seek leave if you think it's appropriate for
19 absent class discovery.
20      Attorney work product. This is taking the easier one
21 first. On the documents from confidential witnesses, you have
22 to produce all the documents you are getting from confidential
23 witnesses and you have to identify who they are from.
24      MR. WILLIAMS: That's fine.
25      THE COURT: Okay. On the work product, there must be

PAGE 152

1  a way through this. This is the issue of -- you have got a
2  laundry list of witnesses listed in your Rule 26 disclosure.
3  They don't know which ones are really important and which ones
4  are not.
5       I don't think that if you say, "Tell me what this
6  person knows about the case," that impinges necessarily on work
7  product, or "Tell me what this witness has to say in general."
8       This must be a way for you to get to them without
9  risking your mental impressions in any material way why the
10 witnesses are on the list.
11      MR. WILLIAMS: That may be true, your Honor, and I
12 think maybe the, quote, unquote, work product kind of objection
13 to it, it doesn't fit as nicely as it ought to.
14      Really what they are asking for is something that is
15 very difficult to do at this point.
16      We have been investigating the case for four years.
17 There are a lot of people that we have talked to. There are a
18 lot of people who have told us there are other people at Oracle
19 who might have this information. Now, we wanted to provide
20 that to defendants.
21      Now, I don't know --
22      THE COURT: Well, you wanted to provide that. You
23 wanted to provide them with the list.
24      MR. WILLIAMS: The list of people who may have
25 discoverable information.

SHEET 20 PAGE 153

## 153

1 Now, we can say, well, this person -- well, it will
2 be part of our investigation. We will say, you know, Jennifer
3 Whoever was somebody that we were told, you know knew about X.
4           But do we know what the information is going to be
5 once we actually get discovery? We don't know that.
6           THE COURT: No, no. They are not asking for that.
7 They are asking for what you know.
8           MS. RADCLIFFE: Your Honor, we already specified in
9 the initial disclosures what subject matters the person would
10 be.
11          The initial disclosures also break out by category
12 what type of person; for example, the customers, the
13 accountants, the former employees of Oracle.
14          For the former employees of Oracle they have already
15 shown that they could run reports as to what their title is and
16 what department they worked at.
17          And what they want to know is all facts of why we
18 believe these people are likely to have discoverable
19 information and those really go to the mental impressions of
20 counsel.
21          THE COURT: That's nonsense. That's a frivolous
22 objection.
23          MS. RADCLIFFE: I mean, they did --
24          THE COURT: That is a completely frivolous objection
25 and we are not going to go there.

## PAGE 154

## 154

1           You are going to tell me how you are going to get to
2 them. That's what we are doing here.
3           Now are you going to tell them and in what form are
4 you going to tell them what you think these witnesses know.
5           MR. WILLIAMS: Well, like you said, aside from what
6 we have already provided, your Honor, it's just what I have
7 told you today.
8           So if there is a person that was in -- you know, a
9 customer, say XYZ customer. How do you know that -- why do you
10 think that this customer may have documents that are responsive
11 to a discovery request?
12          THE COURT: I have got an answer. Answer the
13 following interrogatory. With respect to all the people on
14 your 26(a) list, I want you to answer the question:
15          What do these witnesses know that is relevant to the
16 case?
17          Now, I will add the following additional conditions:
18          Number one, is the only remedy for the failure to
19 disclose an adequate amount is a motion to compel further
20 disclosure. I don't think I would preclude them or suggest
21 that there is a -- any preclusion here, but I want you to
22 get -- tell them what you think this witness knows about the
23 case and do it -- now, the other thing I would think about is I
24 would want some limitation so that this doesn't become a
25 telephone book.

## PAGE 155

## 155

1           What level -- what kind of detail are you thinking
2 of? I mean, what are you looking for? I mean, do you want two
3 paragraphs on each witness?
4           MR. RUBIN: Your Honor, the rule -- Rule 26, as you
5 know, says likely to have discoverable information.
6           We want what they know today, what kind of
7 information they have that they think would bear upon this
8 case. What is it that they know? What facts do they know that
9 this person has? And so if that is in a paragraph narrative,
10 that makes sense.
11          I mean, we just simply want --
12          THE COURT: Fine. If you are not going to answer my
13 question -- mine is a practical question. What you just asked
14 for is a telephone book. He is going --
15          MR. RUBIN: We just want the facts. If they learned,
16 for example --
17          THE COURT: You want everything they learned from
18 these people, that's what you want?
19          MR. RUBIN: No, no. If Jennifer Smith was -- this is
20 an example -- somebody, and a consultant who now, you know,
21 works at, you know, another company and they are not a
22 confidential witness but on their list, we want to know what
23 fact do they know, the basic facts they know. What she would
24 know that would bear upon the complaint. Does she know
25 that --

## PAGE 156

## 156

1           THE COURT: That's four years of investigation.
2           MR. RUBIN: Well, sales were falling. Did she know--
3 that, you know, the software was not working in the manner for
4 a particular customer.
5           THE COURT: So you want a general description of what
6 they knew?
7           MR. RUBIN: But if, for example, they knew about a
8 particular customer that was having problems and that's why we
9 were on the list, yes, we would want to know that.
10          If Bell South was having problems with the software
11 and she interacted with Bell South, that's enough for us to get
12 a sense of why they were listed in the case.
13          THE COURT: Can you do that?
14          MR. WILLIAMS: I think we can do that, your Honor,
15 but I would like a substantial amount of time to do it.
16          Because I can tell you now that if they are looking
17 for substantive information, they are not going to be terribly
18 excited about what they get here. Because what we did with our
19 initial disclosures based on our investigation and no documents
20 at all, we listed people who are likely to have discoverable
21 information.
22          Why? Because Jennifer Smith told us that, "Hey, Mike
23 McCarthy was in that department and, you know, at that time
24 and, you know, maybe he knew something about the CRM."
25          So I think what they are after here is not really

**PAGE 157**

```
 1  going to be something that is going to be useful to anybody
 2  ultimately.
 3          MR. RUBIN: Your Honor, one other thing. I mentioned
 4  it would be extremely useful to us, there are, I think, about
 5  350, approximately, organizations, businesses listed. And one
 6  issue that we had raised early on was that with businesses the
 7  rule speaks of potential witnesses. It speaks of individuals,
 8  not entities.
 9          So if an entity is listed -- if Alcoa is listed, at a
10  minimum we presume Alcoa is listed because a live human being
11  has some relevant evidence of Alcoa, that we believe there is
12  somebody at Alcoa that has relevant evidence. So who is it?
13          THE COURT: You can presume all you want. I know
14  exactly what they did. They wrote down every name off of every
15  document and every witness list that they ever generated and
16  they put it all together and it's the kitchen sink.
17          MR. RUBIN: We agree, your Honor, and we made an
18  objection these were not Rule 26 disclosures and Judge Jenkins
19  said, okay, well, go back and tell them what categories, but
20  then --
21          MR. WILLIAMS: And we did that.
22          MR. RUBIN: Then defendants have a right, then, to
23  seek discovery underneath the disclosures so they can get an
24  idea of which witnesses are important and which aren't.
25          THE COURT: I don't know that that's actually right.
```

**PAGE 158**

```
 1  You have a right to discovery when the Court tells you you have
 2  the right to discovery.
 3          I never liked that argument, we have a right to get
 4  something, because the Court is going to give you proportionate
 5  discovery. And the important discovery is not coming off the
 6  Rule 26 disclosures.
 7          So here is what you are going to. Done. Enough
 8  discussion. Enough discussion. I'm done. This is not an
 9  important enough subject to spend another 30 seconds on.
10          You will answer the interrogatory which is: Describe
11  generally what each of these witnesses know about the case.
12          Okay. Five-minute break. We are almost done.
13          (Brief recess held in the proceedings.)
14          THE COURT: Okay. Call us back, please.
15          THE CLERK: Resumes session in C01-0988, In Re Oracle
16  Securities Litigation.
17          THE COURT: Okay. Are there any other issues with
18  respect to the discovery order that we need -- other than the
19  preparation of the order that we need to address?
20          The only thing I thought of is the dispute resolution
21  mechanism, but what I think you ought to put in is the Court
22  should comply with Judge Jenkins' standing order on that. I
23  don't know yet who those disputes are going to.
24          I think I have invited one application to me for sure
25  and that is the application regarding sharing of costs. And I
```

**PAGE 159**

```
 1  have certainly invited -- you have got to put in a mechanism
 2  for modifications to the discovery plan, and I think those
 3  should also appropriately come to me since the plan has been
 4  referred.
 5          And I guess disputes regarding the -- and I think
 6  otherwise I would say absent further order of the Court that
 7  you will comply with Judge Jenkins' standing order regarding
 8  discovery or whatever he said in this case regarding discovery,
 9  and then he and I will work out who it actually goes to before
10  you have a dispute. We will figure out who it goes to. Of
11  course, there won't be any, so it's not a problem. So put in
12  those things for the implementation.
13          So you are going to get the transcript, hopefully,
14  tomorrow. How long are -- you better put how soon can you all
15  reasonably get to me an order.
16          MR. RUBINSTEIN: How about Friday?
17          THE COURT: You think you can do it by Friday?
18  That's fine.
19          MR. SALPETER: We thought we would do a draft.
20  Tender it to them and....
21          THE COURT: Go back and forth and get it to me by the
22  end of the day Friday maybe?
23          MR. SOLOMON: We will strive for it. I think that's
24  very optimistic, but we will certainly try for it and explain
25  why not if we don't make it.
```

**PAGE 160**

```
 1          MR. SALPETER: Best efforts.
 2          THE COURT: Best efforts for Friday or some letter
 3  saying what's going to happen, so I will not stay up nights
 4  waiting for it.
 5          Okay. Is there anything pending in front of Judge
 6  Jenkins that we can take care of in light of this order? What
 7  do you have got -- are there any discovery issues in front of
 8  Judge Jenkins that have been sort of stayed?
 9          MR. RUBINSTEIN: I think the only issue that was in
10  front of Judge Jenkins was the CW issue, am I wrong, and Suite
11  111. I think all discovery issues in front of Judge Jenkins --
12          THE COURT: Is there is a Special Master application,
13  or did I deny that?
14          MR. RUBINSTEIN: I think it's been withdrawn, since
15  it's ours. If not, we withdraw it.
16          MR. SOLOMON: Defendants have moved to disqualify us,
17  but we hope you will see us again; but Judge Jenkins is getting
18  that one.
19          THE COURT: I won't comment on that one. If you
20  would communicate to Judge Jenkins with respect to the matters
21  that he actually has got pending, that they were taken care of
22  by the discovery plan.
23          MR. WILLIAMS: Just a quick question, your Honor.
24  With regard to the non-parties, I don't know if it makes sense
25  to send them the order on the entire discovery plan, but I
```

SHEET 21   PAGE 161

161

1 think it would make sense if -- even if we carve out a separate
2 order for the non-parties because it will -- there will be some
3 difficulty getting them to comply without seeing an order from
4 the Court because they were awaiting an order on this issue.
5         THE COURT: I understand that. Why not? I mean, I
6 don't know. There is not going to be anything very secret in
7 this order. I think you should just have one order, one plan
8 and --
9         MR. WILLIAMS: Just send him the entire plan.
10         THE COURT: You are going to have to provide
11 something with respect to them, like the stay is lifted with
12 respect to the ones that are done to the extent of the
13 following subject matters or whatever, however you are going to
14 put it, and then you give them that. And you work out how you
15 deal with that, okay?
16         Okay. Anything else I can help you with?
17         (No response.)
18         THE COURT: You did a very good job. I enjoyed it.
19 I thought I would never say that about a discovery dispute, but
20 thank you all.
21         (Whereupon, further proceedings in the
22         above matter were adjourned.)
23
24                          --oOo--
25

PAGE 162

162

1
2
3                    CERTIFICATE OF REPORTER
4
5         I, DEBRA L. PAS, Official Reporter for the United
6 States Court, Northern District of California, hereby certify
7 that the foregoing proceedings in C01-0988 MJJ, IN RE ORACLE
8 SECURITIES LITIGATION were reported by me, a certified
9 shorthand reporter, and were thereafter transcribed under my
10 direction into typewriting; that the foregoing is a full,
11 complete and true record of said proceedings as bound by me at
12 the time of filing.
13    The validity of the reporter's certification of said
14 transcript may be void upon disassembly and/or removal
15 from the court file.
16
17    _____
18         Debra L. Pas, CSR 11916, CRR, RMR, RPR
19              Wednesday, March 2, 2005
20
21
22
23
24
25

*Debra L. Pas, CSR, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*