# Attachment 1

LEXSEE 2006 U.S. DIST. LEXIS 1718

## IN RE BEARINGPOINT, INC. SECURITIES LITIGATION

### Civil Action No. 1:05cv454

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

*2006 U.S. Dist. LEXIS 1718*

**January 17, 2006, Decided**

**COUNSEL:** [*1] For Karen Gautreau, Individually and On Behalf of All Other Similarly Situated, Matrix Capital Management Fund LP, Matrix Capital Management Fund II, LP, Matrix Capital Management Fund Ltd., Plaintiffs: Steven Jeffrey Toll, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC.

For Louisiana School Employees Retirement System, Consolidated Plaintiff: Ford C. Ladd, Alexandria, VA.

For Richard Beasley, TDH Partners, LLP, Daniel Sutton, Detectives Endowment Association Annuity Fund, On Behalf of Itself and On Behalf of All Others Similarly Situated, Consolidated Plaintiffs: Benjamin Joseph Weir, Finkelstein Thompson & Loughran, Washington, DC.

For BDM, LLC, Individually and On Behalf of All Others Similarly Situated, Consolidated Plaintiff: Steven Jeffrey Toll, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC.

For BearingPoint, Inc., Roderick C. McGeary, Randolph C. Blazer, Robert S. Falcone, Defendants: Charles William McIntyre, Jr., McGuireWoods LLP, Washington, DC.

For General Retirement System of the City of Detroit, Movant: Mark Campbell Shuford, Kaufman & Canoles, Richmond, VA.

For Pension Trust Fund for Operating Engineers, Movant: Craig Crandall Reilly, [*2] Richard McGettigan Reilly & West PC, Alexandria, VA.

For Massachusetts Pension Fund Group, Movant: Timothy D. Battin, Straus & Boies LLP, Fairfax, VA.

For Public Employees' Retirment System of Mississippi, Secure Trading Group, Inc., Movants: Benjamin Joseph Weir, Finkelstein Thompson & Loughran, Washington, DC.

For Matrix Capital Management LP, Movant: Steven Jeffrey Toll, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC.

**JUDGES:** T. S. Ellis, III, United States District Judge.

**OPINIONBY:** T. S. Ellis, III

**OPINION:**

### MEMORANDUM OPINION

An important issue, appropriately addressed early in this securities fraud action, is whether the alleged class of plaintiffs merits certification pursuant to *Rule 23, Fed.R.Civ.P.* For the reasons that follow, class certification is warranted.

#### I.

On April 20, 2005, BearingPoint, a global provider of strategic consulting and systems integration services that was formerly part of KPMG, announced to the investing public that it expected to take a goodwill impairment charge of between $250 million to $400 million, and that its prior financial statements for 2003 and 2004 were not reliable because [*3] of errors. More specifically, BearingPoint warned that errors in its Form 10-Q filings for the first three quarters of fiscal year 2004, as well as earlier periods, and in its form 10-K filings for the fiscal year ended June 30, 2003 and for the six month transition period ending December 31, 2003 n1 would require restatement of its earnings for those periods. n2 This announcement also disclosed that BearingPoint was the target of an informal SEC investigation into its accounting and financial reporting, n3 and that nine of BearingPoint's top twenty executives had left BearingPoint's employment or were in the process of leaving. As a result of these

disclosures, the price for BearingPoint's publicly traded shares n4 dropped 32% from a closing price of $7.77 per share on April 20, 2005 to a closing price of $5.28 per share on April 21, 2005. Significantly, this drop in share price occurred on a trading volume of 67,749,504 shares, over forty-six times the stock's average daily trading volume for the year preceding the announcement.

n1 During 2003, BearingPoint decided to shift from a fiscal year ending June 30 to a more conventional fiscal year ending December 31. Accordingly, it filed a 10-k for the year ending June 30, 2003 and for the six month transition period ending December 31, 2003.

[*4]

n2 BearingPoint has not yet provided these restated financial statements, nor has it provided any financial statements for the year ended December 31, 2004 or for any period during 2005. In July 2005, BearingPoint announced that it expected to complete the restatement of its financials by the end of September. On September 7, 2005 BearingPoint announced that it would not meet this deadline, but that it expected to announce its restated financials by the end of October 2005. This deadline, too, has come and gone, but BearingPoint has not yet provided restated financials.

n3 Also on September 7, 2005, BearingPoint announced that the SEC had launched a formal investigation into its accounting and financial reporting.

n4 BearingPoint's shares are traded on the New York Stock Exchange (NYSE) under the symbol BE.

The April 20th announcement was not the first time BearingPoint had warned of potential problems with its financial accounting. In the six months prior to this announcement, BearingPoint had acknowledged problems or potential problems with its financial controls on three separate [*5] occasions: (i) an amended Form 10-Q filing for the period ending September 30, 2004 filed on November 17, 2004, (ii) a Form 8-K filing of December 16, 2004 concerning the offering of convertible debentures, and (iii) a Form 8-K filing of March 18, 2005 announcing BearingPoint's entry into a new credit agreement. Each of these merits a brief description.

The amended 10-Q disclosed that subsequent to its original 10-Q filing for the period ending September 30, 2004, BearingPoint discovered that $92.9 million had

been erroneously recorded in the original 10-Q as accounts receivable when that amount should have been recorded as unbilled revenue. This amendment did not affect BearingPoint's income statement for that period or its net cash flow for the period. Further, the Form 10Q/A disclosed that:

> The Company's disclosure controls and procedures as of September 30, 2004 were not effective to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

This statement [*6] was made in the context of the overstatement of accounts receivable, and along with the restatement itself was largely ignored by the market for BearingPoint's shares, which reacted by reducing the stock price only 42 cents, from $9.42 per share to $9.00 per share on trading volume of 3,256,700 shares.

Similarly, BearingPoint's Form 8-K of December 16, 2004, which was filed in connection with an issuance of convertible debentures, repeated that management had discovered material weaknesses in its internal control components and noted that failure to address the internal control problems promptly could "materially and adversely impact our business, our financial condition and the market value of our securities and expose us to litigation and scrutiny from private litigants and the Securities and Exchange Commission." The market's reaction was again quite modest: BearingPoint's share price dropped on December 16, 2004 from $8.48 to $7.75 per share on a trading volume of 13,329,500 shares, and again the next day, on December 17, 2004 from $7.75 to $7.59 per share on a trading volume of 19,197,300 shares.

Finally, in its Form 8-K filing of March 18, 2005, in which BearingPoint [*7] announced the terms of its amended credit agreement with certain lenders, BearingPoint also revealed information pertaining to its financial controls, namely: (i) that BearingPoint expected to take a material goodwill impairment charge of potentially more than $230 million; (ii) that BearingPoint had informed the SEC that it would not timely file its Form 10-K for the year ended December 31, 2004 or its Form 10-Q for the quarter ended March 31, 2005; (iii) that BearingPoint's internal financial controls remained ineffective; (iv) that BearingPoint expected its independent auditors to issue an adverse opinion on the effectiveness of its internal controls over financial reporting; (v) that BearingPoint had identified that there were items in pre-

vious period financial statements for the fiscal year ending December 31, 2004 that would probably require adjustments; and (vi) that Moody's Investor's Services, Inc. and Standard and Poor's Rating Services downgraded BearingPoint's credit rating in December 2004 to "below investment grade." Paradoxically, the market reacted positively to this filing: The day following the filing, BearingPoint's share price actually rose 13% from $7.55 per [*8] share to $8.53 per share on a trading volume of 8,067,900 shares.

Corporate announcements that financial statements must be restated typically and quickly spawn a spate of securities fraud lawsuits. BearingPoint's April 20th announcement was no exception. Within weeks several such lawsuits were filed in this district against BearingPoint and its officers. n5 Thereafter, and pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA), *15 U.S.C. § 78u-4*, and *Rule 42, Fed.R.Civ.P.*, the various lawsuits were consolidated. *See In re BearingPoint Sec. Litig.*, Civil Action No. 1:05cv454 (June 27, 2005). After consolidation, pursuant to *15 U.S.C. § 78u-4(a)(3)(B)*, Matrix was selected as lead plaintiff owing, in part, to Matrix's sophistication as an investor and its substantial financial interest at stake in the litigation. *See In re BearingPoint Sec. Litig.*, Civil Action No. 1:05cv454 (July 26, 2005). This Order also approved the appointment of Gold Bennett Cera & Sidener LLP (GBCS) as lead plaintiff's counsel. *Id.* These decisions were confirmed in an Order denying a motion [*9] for reconsideration of the appointment. *See In re BearingPoint Sec. Litig.*, Civil Action No. 1:05cv454 (August 15, 2005).

> n5 The defendants in the present case include: (i) BearingPoint; (ii) Randolph C. Blazer, who served as BearingPoint's President, Chief Executive Officer, and Chairman of the Board until November 10, 2004, and (iii) Robert S. Falcone, who served as BearingPoint's Executive Vice President and Chief Financial Officer from April 2003 until November 30, 2004.

Matrix filed its Consolidated Complaint on October 7, 2005 alleging various violations of the securities laws. Specifically, Matrix alleges that defendants knowingly or recklessly misrepresented BearingPoint's financial condition by overstating its earnings and assets by hundreds of millions of dollars, although the precise size of the overstatement awaits BearingPoint's restated financials. *See supra* note 2. Accordingly, Matrix seeks certification of the following class:

> All persons or entities who purchased or otherwise [*10] acquired the securities of

> BearingPoint between August 14, 2003 and April 20, 2005 and who were damaged thereby.

Matrix's motion for class certification has been fully briefed and argued and is now ripe for disposition.

## II.

The principles governing the certification of plaintiff classes pursuant to *Rule 23* are well-established. First, the party moving for class certification bears the burden of demonstrating that its proposed class meets the requirements found in *Rule 23 Fed.R.Civ.P. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. Next, the statute instructs courts to determine whether or not to certify a class at "an early practicable time" and provides a two-step procedure for analyzing the certification issue. *See Fed.R.Civ.P. 23; Lutz v. Int'l Assoc. of Machinists and Aerospace Workers, 196 F.R.D. 447, 450 (E.D.Va. 2000)*. In the first step, the movant must satisfy the threshold requirements contained in *Fed.R.Civ.P. 23(a)*, which include the following: (1) that the class is so numerous that joinder [*11] of all members would be impracticable; (2) that questions of law or fact are common to the class; (3) that the claims or defenses of the representative party are typical of those of the class; and (4) that the representative party fairly and adequately protect the interests of the class. *See Fed.R.Civ.P. 23(a)*. Should the party seeking certification satisfy these requirements, it must then demonstrate that the proposed class fits one of the three categories of actions identified in *Fed.R.Civ.P. 23(b). See Lutz, 196 F.R.D. at 450*. Here, typical of securities fraud cases, the contention is that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed.R.Civ.P. 23(b)(3)*.

In addition to these principles, it is important to bear in mind that "in light of the importance of the class action device in securities fraud suits," the requirements of *Rule 23* "are [*12] to be construed liberally." *Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179 (2d Cir. 1990)*. Thus, any doubts about the propriety of certification should be resolved in favor of certification. *See Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)* (in securities cases, "any error, if there is to be one, should be committed in favor of allowing the class action.").

### A.

*1. Numerosity*

The numerosity requirement, which is seldom disputed in securities fraud cases, is also undisputed here: BearingPoint does not dispute that the members of the proposed class are "so numerous that joinder of all members is impracticable." *Fed.R.Civ.P. 23(a)*. The absence of a dispute stems from the fact that during the class period, BearingPoint had more than 194 million shares of common stock outstanding, and, while the precise number of shareholders is unknown, it is reasonable to infer from this fact that there are hundreds, if not thousands, of potential class members dispersed throughout the country. *See, e.g., Ganesh, LLC v. Computer Learning Centers, Inc., 183 F.R.D. 487, 489 (E.D.Va. 1998)* [*13] (5.1 million shares actively traded on NASDAQ Exchange satisfies numerosity requirement); *Garfinkel v. Memory Metals, Inc., 695 F.Supp. 1397, 1401 (D.Conn. 1988)*. As it would be impracticable to join such a large and geographically diverse group, the numerosity requirement is easily satisfied.

### 2. Commonality and Typicality

The next two *Rule 23(a)* requirements, (i) that "there are questions of law or fact common to the class," and (ii) that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," are complimentary and therefore often considered together. *See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*. As the Supreme Court has explained:

> The commonality and typicality requirements of *Rule 23(a)* tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Id. See also Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998)*; [*14] *Lutz, 196 F.R.D. at 451*. In other words, "'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001)* (quoting *General Tel. Co., 457 U.S. at 156*). But it is also true that the commonality and typicality requirements do not "require that members of the class have identical factual and legal claims in all respects." *Broussard, 155 F.3d 331, 344*. Thus, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *Gary Plastic, 903 F.2d at*

*180*. In sum, the premise of class certification is that due process requires the interests of the party representing a class to be substantially similar to those of the unrepresented parties. *Broussard, 155 F.3d at 338*. This determination, in turn, necessarily requires some discussion of the substantive legal issues likely to arise in the litigation of the merits. *See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004)* [*15] ("While an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in *Rule 23* must be addressed through findings, even if they overlap with issues on the merits."). n6

> n6 While this factual inquiry may overlap with issues that go to the merits of Matrix's claims, it is important to note that "the findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of *Rule 23* have been demonstrated." *See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004)* (emphasis in original). Thus, the ultimate fact finder is free to reach a conclusion contrary to the factual conclusions reached at the Rule 23 stage. *Id.*

To prevail under *§ 10(b)* of the Securities Exchange Act and Rule 10b-5, "'a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) [*16] with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Gariety, 368 F.3d at 362* (quoting *Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999)*). Members of a proposed class in a securities case are especially likely to share common claims and defenses. n7 This case is no exception. Because various of defendants' acts and omissions are at the center of this case, it follows that there are a number of questions of both law and fact common to all members of the proposed class, including: (i) whether statements made by the defendants to the investing public during the proposed class period omitted or misrepresented material facts about the business, operations, financial condition and income of BearingPoint; (ii) whether defendants acted with knowledge or recklessness in omitting to state and/or misrepresenting material facts; (iii) whether the market price of BearingPoint's stock was artificially inflated during the class period due to any material omissions or misrepresentations; (iv) whether the defendants participated in and pursued the common course of conduct described in the complaint; [*17] and (v) whether the individual defendants were "control persons" within the meaning of *Section 20(a)* of the Securities Exchange Act. Given

this, it is clear that Matrix's claims represent the essential claims of the proposed plaintiff class, and therefore satisfy the commonality and typicality requirements of *Rule 23(a)*.

> n7 *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of [stock] purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may be profitably tried in one suit."); *In re Resource America Secs. Litig.*, 202 F.R.D. 177, 181–82 (E.D.Pa. 2001) ("The commonality requirement is permissively applied in the context of securities fraud litigation.").

[*18]

Defendants resists this conclusion, contending that Matrix is subject to a unique defense, namely that Matrix's reliance on BearingPoint's past filings was unreasonable given the disclosures made in BearingPoint's Form 10-Q/A for the period ending September 30, 2004, and its Form 8-K filing of December 16, 2004. Defendants argue that these filings disclosed the problems associated with its internal controls, and therefore that Matrix cannot plead justifiable reliance on BearingPoint's alleged misstatements when it purchased 882,100 shares of BearingPoint stock in January of 2005. Because this defense applies only to those members of the proposed plaintiff class who purchased BearingPoint stock after these partial disclosures, and because many members of the proposed class purchased their BearingPoint shares before these alleged disclosures, it follows, according to defendants, that claims applicable to Matrix are not typical of the class as a whole.

This argument fails because it is clear that BearingPoint's November and December 2004 disclosures did not render Matrix's reliance on BearingPoint's past financial filings unreasonable, and therefore that Matrix is not in fact subject [*19] to a unique defense that will render its claims uncommon or atypical. This is so because Matrix is entitled to a "presumption of reliance, based on the proposition that 'an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of the market price.'" *Gariety, 368 F.3d at 367* (quoting *Basic v. Levinson, 485 U.S. 224, 247, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*). This presumption is derived from what is generally known as the "fraud-on-the-market theory." This theory and the

presumption derived from it are premised on the notion that in an efficient market, the "'prices of actively traded securities reflect publicly available information.'" *Id.* (quoting Daniel R. Fischel, *Efficient Capital Markets, the Crash and the Fraud on the Market Theory, 74 Conrell L. Rev. 907, 911 (1989)*). Because the share price of an actively traded security in an efficient market is presumed to reflect all publicly available information, Matrix need not demonstrate that its reliance on the market price of BearingPoint's shares in January was reasonable, but must simply demonstrate that BearingPoint's shares trade in an efficient market. *See Id. at 367–68.* If [*20] the market for BearingPoint's shares is shown to qualify in this respect, then not only is reliance presumed, but the reasonableness of that reliance is also presumed. To hold otherwise, and to require each member of the proposed class to demonstrate the reasonableness of his or her reliance on the price set by the market, would effectively foreclose the possibility of the class action, thereby eviscerating the Supreme Court's teaching in *Basic. See Basic v. Levinson, 485 U.S. 224, 242, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

To prove that the market for BearingPoint's shares was efficient, Matrix must demonstrate (i) that the security was actively traded in sufficiently large volumes and (ii) that the share price is followed by market professionals. *Gariety, 368 F.3d. at 368.* Because BearingPoint's shares are traded on the New York Stock Exchange, these requirements are easily met. n8 Trading volumes during the relevant periods of disclosure [*21] were well north of 1 million shares per day; in fact, more than ten million shares were traded on the two days following the December 2004 disclosure. And the day following the April 2005 disclosure, an eye-opening 67,749,504 shares changed hands. In addition, BearingPoint is followed by investment analysts at more than fifteen investment banks. n9 Thus, because the market for BearingPoint's shares, by these criteria, is efficient, Matrix is entitled to a presumption that it relied on the integrity of the share price and that such reliance was reasonable.

> n8 *See, e.g., Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) ("it appears that securities traded in national secondary markets such as the New York Stock Exchange . . . are well suited for application of the fraud on the market theory."); *In re Laidlaw Sec. Litig.*, 1992 U.S. Dist. LEXIS 4977, 1992 WL 68341 at *10 n.8 (E.D.Pa. Mar. 31, 1992)("the fraud on the market

theory is particularly applicable to a large national market such as the NYSE.").

n9 *See* BearingPoint's analyst coverage, *available at* www.corporate-ir.net/ireye/ir_site.zhtml?ticker=be&script=500, listing such organizations as Bear Stearns, Bernstein, Goldman, Sachs & Co., JP Morgan, Merrill Lynch, Morgan Stanley Dean Witter, Smith Barney Citigroup, and UBS. Judicial notice of this information is appropriate pursuant to *Fed.R.Evid. 201. See, e.g., Wang v. Pataki, 396 F. Supp. 2d 446, 2005 WL 276562, *10 n.2 (S.D.N.Y. 2005)* (taking judicial notice of the contents of a website) (citing *Hotel Employees & Rest. Employees Union, Local 100 v. New York Dep't of Parks & Recreation, 311 F.3d 534, 549 (2d Cir.2002)).* It is worth noting, however, that judicial notice of websites may not always be appropriate given their relatively ephemeral nature. *See The Great Disappearing Act, 9 Green Bag 2d 3, 3-7 (2005).*

[*22]

Nor do the defendants persuasively rebut this presumption by pointing to the November and December 2004 disclosures. The market reacted quite modestly to these disclosures. By contrast, the sharp drop in BearingPoint's share price after the April 2005 disclosure confirms the conclusion that the prior disclosures had not cured any of BearingPoint's early misrepresentations, and further that not only Matrix, but the entire market had continued to rely on the erroneous financial statements until the April 2005 disclosure. Because Matrix's reliance on the integrity of BearingPoint's share price during the period between the 2004 disclosures and the April 20, 2005 disclosure was reasonable, Matrix is not subject to a unique defense. To the contrary, Matrix's claims and defenses are typical of those of the proposed class members, from which it follows that *Rule 23(a)*'s requirements of commonality and typicality are met here.

### 3. Adequacy

The final *Rule 23(a)* requirement is that "the representative parties will fairly and adequately protect the interests of the class." *Fed.R.Civ.P. 23(a).* To satisfy this requirement the class representative [*23] and his counsel must: (1) possess the qualifications and ability to litigate the case; and (2) be free of any interests antagonistic to those of the class. *Lutz, 196 F.R.D. at 452.*

There is no dispute that both the class representative and, more importantly, class counsel have the ability and the resources to represent the class. Defendants contend, however, that class counsel should be disqual-

ified because of a purported conflict that arises from its representation of a class of shareholders in another securities fraud suit in which BearingPoint was, until recently, a defendant. That case, *In re Peregrine Systems, Inc. Sec. Litig.,* Case No. 02-870, is pending in the United States District Court for the Southern District of California, and involves claims that BearingPoint's predecessor-in-interest, KPMG Consulting, was involved in certain revenue generating transactions recorded by Peregrine Systems, Inc. that were ultimately shown to be fictitious. Although originally named as a defendant, BearingPoint was subsequently dismissed as a party in January 2005 on the ground that the only claim against BearingPoint was for aiding and abetting a securities fraud, which [*24] is not actionable under the securities laws. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1993)* ("[A] private plaintiff may not maintain an aiding and abetting suit under § 10(b).")*. Although plaintiffs in that case have moved for an order of final judgment pursuant to *Rule 54(b), Fed.R.Civ.P.,* in order to appeal this decision, they have thus far been unsuccessful.

So it appears, therefore, that defendants' attack on the adequacy of class counsel rests on a string of suppositions. First, defendants suppose that plaintiffs in *In re Peregrine,* although unsuccessful to date, will ultimately succeed in winning a reversal of that district court's ruling dismissing BearingPoint as a defendant and further, that those plaintiffs will ultimately win a sizeable judgment against BearingPoint in that case. Next, defendants suppose that they will win a sizeable judgment against BearingPoint in this case. And finally, defendants suppose that the possibility of these two supposed judgments presents class counsel with a conflict because, it is further supposed, BearingPoint's assets would [*25] not be sufficient to satisfy the judgment in both cases. This string of suppositions or contingencies is plainly speculative. And courts sensibly hold that speculative conflicts of interest do not preclude a finding that class counsel is adequate. *See, e.g., Williams v. Empire Funding Corp., 183 F.R.D. 428, 440 (E.D.Pa 1998)* (holding that "merely speculative and hypothetical" conflicts of class counsel will not bar class certification); *In re Olsten Corp. Sec. Litig., 3 F.Supp.2d 286, 296 (E.D.N.Y. 1998)* (same). This is especially so, given the procedural protections afforded by Rule 23's mandated judicial supervision of the class litigation and any proposed settlement. *See Rule 23(d) & (e),* Fed.R.Civ.P.; *see also Sheftelman v. Jones, 667 F.Supp. 859, 865 (N.D.Ga. 1987)* (holding that any conflicts presented by class counsel representing two classes against the same defendant are speculative and can be cured by procedural safeguards); *Anderson v. Bank of the South,*

*N.A., 118 F.R.D. 136, 149 (M.D.Fla. 1987)* (same). Thus, Matrix and its counsel satisfy the adequacy requirements of *Rule 23(a)*.

**B.**

The final [*26] step in the class certification inquiry is to determine whether: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed.R.Civ.P. 23(b)(3).* This inquiry appropriately ensures that certification occurs in "cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)* (quoting Adv. Comm. Notes, 28 U.S.C.App., p.697).

The inquiry with respect to the predominance standard focuses on the issue of liability, and "if the liability issue is common to the class, common questions are held to predominate over individual ones." *In re Kirschner Medical Corp. Sec. Litig., 139 F.R.D. 74, 80 (D.Md. 1991).* Damages are less central to the predominance inquiry; [*27] courts generally hold that "differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *Morris v. Wachovia Sec., Inc., 223 F.R.D. 284, 299 (E.D.Va. 2004).* Securities fraud cases are particularly appropriate candidates for treatment under *Rule 23(b)(3)* since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases. *See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)* ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

Defendants contend that the predominance standard is not met here because the following individual issues will predominate: (1) whether reliance was reasonable after the partial disclosures contained in the November 10-QA, and the December and March 8-Ks, and (2) whether "in-and-out" purchasers of BearingPoint stock, namely those who bought and sold their shares within the class period, can prove loss causation. Both of these arguments fail: The first [*28] argument fails because of the fraud-on-the-market theory and the evidence that the entire market had relied on BearingPoint's financials despite its partial disclosures. The second argument fails because the question whether in-and-out traders can prove loss

causation does not present individual issues that alter the clear conclusion that the common issues stemming from defendants' alleged acts or omissions in violation of the securities laws that will predominate in the litigation.

Defendants' first argument that individual issues of reasonable reliance will predominate owing to BearingPoint's partial disclosures in 2004 and March 2005 again fails to appreciate the presumption the Supreme Court recognized in *Basic v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988),* namely that the market price of efficiently traded securities is presumed to reflect all publicly available information, and therefore that reliance on the market price is necessarily reasonable. *See Id. at 244* ("The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.") (quoting *In re LTV Sec. Litig., 88 F.R.D. 134, 143 (N.D.Tex. 1980)).* [*29] In effect, purchasers in a well developed market, as here, may assume that the market price accurately reflects all publicly available information, and that reliance on the market price is, therefore, plainly reasonable. Requiring that each member of a proposed class individually establish the reasonableness of his or her reliance on the market price would be as crippling to efficient class action litigation as requiring members of a proposed class to establish individual reliance on specific misrepresentations. *See Basic, 485 U.S. at 242* ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

While this presumption may be rebutted by showing that the BearingPoint share price was not affected by the misrepresentations, or that the plaintiff knew of the misrepresentations when it purchased the shares, no such evidence has been adduced here. *See Basic, 485 U.S. at 248-49* ("Petitioners may rebut proof of the elements giving rise to the presumption, or show that [*30] the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false."). To the contrary, the dramatic drop in the price of BearingPoint stock after the April 20, 2005 disclosure supports the conclusion that the shares continued to be inflated by BearingPoint's alleged earlier misrepresentations despite any partial disclosures in 2004. Thus, individual issues of reasonable reliance will not predominate over the common issues focusing on defendants' alleged acts in violation of the securities laws.

Nor will issues concerning whether in-and-out class members can show loss causation predominate over the

common issues of law and fact. Specifically, defendants contend that in-and-out trading members of the proposed class who sold before the April 20, 2005 disclosure cannot prove loss causation because any damage that resulted from their purchase of BearingPoint shares at an inflated price during the class period was cancelled out by their sale of the shares at a similarly inflated price later in the class period. In support, defendants cite the Supreme Court's recent holding in *Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 161 L. Ed. 2d 577 (2005),* [*31] that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id. at 1631.* Defendants further note that in *Dura* the Supreme Court quoted with approval the Restatement of Torts for the proposition that:

> A person who "misrepresents the financial condition of a corporation in order to sell its stock" becomes liable to a relying purchaser "for the loss" the purchaser sustains "when the facts . . . become generally known" and "as a result" share value "depreciates." n10

In effect, defendants' claim is that *Dura* requires the dismissal of in-and-out traders, and that including these in-and-out traders in the proposed class will require individual examination of each in-and-out trader to determine whether each such trader has satisfied the loss causation requirement.

> n10 *Dura Pharmaceuticals, 125 S.Ct. at 1633* (quoting *Restatement of Torts, Second,* § *548A, Comment b,* at 107). *See also In re PEC Solutions, Inc. Securities Litigation, 418 F.3d 379, 387, 125 Fed. Appx. 490 (4th Cir. 2005)* ("To show loss causation, a securities-fraud plaintiff must demonstrate that the 'defendant's misrepresentation was a substantial cause of the loss by showing a direct or proximate relationship between the loss and the misrepresentation.'") (quoting *Miller v. Asensio & Co., 364 F.3d 223, 232 (4th Cir.2004)); Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000)* ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.").

[*32]

In opposition, Matrix argues that the in-and-out trader issue need not be reached because the proposed class is already limited to those who have been damaged by defendants' acts or omissions, i.e., those who can demonstrate loss causation. n11 This argument simply begs the question whether in-and-out traders are among those who can demonstrate loss causation. Simply defining a class as those who can demonstrate liability will not avoid the need to address whether in-and-out traders are in the class, nor does it satisfy *Rule 23(c)*'s clear command to "define the class." *Fed.R.Civ.P. 23(c)(B).* Thus, while the merits of the issue need not be definitively resolved at the class certification stage, it is necessary to consider whether in-and-out traders could conceivably satisfy the requirement of loss causation, and are therefore included in the proposed class. Only then can the predominance issue be accurately resolved.

> n11 This class is currently defined as: "All persons or entities who purchased or otherwise acquired the securities of BearingPoint between August 14, 2003 and April 20, 2005 and who were damaged thereby."

[*33]

Whether in-and-out traders, i.e., traders who buy and sell during the class period, can show loss causation is a somewhat novel question. This question was not squarely addressed and decided in *Dura,* nor is there any published Fourth Circuit decision in point. And the several district courts that have considered this issue since *Dura* have not been unanimous on whether an in-and-out trader can prove loss causation. n12 Loss causation is an element of the securities fraud cause of action, n13 but because causation is not at issue, but rather the existence of a loss, the loss causation issue raised by defendants is dependent upon the method for calculating damages. Thus, in order to determine whether in-and-out traders should remain part of the proposed class, it is necessary to demonstrate that they might be able to prove a loss, i.e., damages.

> n12 *Compare In re Compuware Sec. Litig., 386 F.Supp.2d 913, 920 (E.D.Mich. 2005)* (granting summary judgment to defendants because plaintiff had sold defendant's shares before disclosure of the misrepresentation); *In re Bally Total Fitness Sec. Litig., 2005 U.S. Dist. LEXIS 6243, 2005 WL 627960, at *6 (N.D.Ill. 2005)* (refusing to appoint an in-and-out trader as lead plaintiff because it would "have to use considerable resources to establish that even though it was an in-and-out trader, its losses nevertheless were caused by the alleged fraudulent statements.") *with Montoya v.*

*Mamma.com, Inc., 2005 U.S. Dist. LEXIS 10224, 2005 WL 1278097, at 2 (S.D.N.Y. 2005)* (appointing in-and-out trader as lead plaintiff because "at least at this stage, 'in and out purchasers' do not appear to be 'unique' and, thus, 'render such plaintiff incapable of adequately representing the class.'").

[*34]

n13 *See Dura, 125 S.Ct. at 1631.*

In securities fraud cases "damages per share are calculated as the artificial inflation when the shares were purchased minus the artificial inflation when the shares were sold." Michael Barclay and Frank C. Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation, 64 Law & Contemp. Prob. 105, 106 (2001).* And although in-and-out traders often have no associated damage because they purchased and sold at prices with the same artificial inflation, this is not always the case. In cases where, as here, there are multiple disclosures, in-and-out traders may well be able to show a loss. *Id.* at n.5. Moreover, it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation. *See In re LTV Sec. Litig., 88 F.R.D. 134, 148 (N.D.Tex. 1980)* ("One who has both bought and sold in the 'tainted market' may nonetheless [*35] have suffered an injury."); *In re Rent-Way Securities Litigation, 218 F.R.D. 101, 119 (W.D.Pa. 2003)* ("The degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period."). In sum, because in-and-out traders may conceivably prove loss causation, they are appropriately counted as members of the proposed class.

Even so, the conclusion that the proposed class includes in-and-out traders, does not, alter the conclusion that common issues of law and fact will predominate over individual issues. The issue of whether in-and-out traders can satisfy loss causation is a single legal issue, not dependent on individual factual determinations, and the proper determination of individual damages can be determined at trial through the use of expert witnesses. *See In re Rent-Way Sec. Litig., 218 F.R.D. 101, 119-20 (W.D.Pa. 2003).* These issues, though not common to all members of the proposed class, are common to many, and in any event, will not make class litigation unwieldy or inefficient. Thus, because common issues will predominate, the first prong of the test in *Rule 23(b)(3)* [*36] is satisfied.

Finally, it is clear that litigation through the class

action mechanism will be "superior to other available methods for the fair and efficient adjudication of the controversy." *Fed.R.Civ.P. 23(b)(3).* The Rule identifies four factors relevant to this inquiry: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *Id.* These factors all point convincingly to the superiority of class litigation. Any interest individual members of the class may have in controlling the litigation is far outweighed by the benefit of distributing the financial burden of the litigation among the class. No other case, not already consolidated with these, has been commenced by members of the class against these defendants alleging these claims. This forum is particularly appropriate [*37] as it is closest to defendant BearingPoint's corporate headquarters and therefore many of the witnesses. Finally, management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members. n14 In sum, because class actions are a particularly appropriate and desirable means to resolve claims based on alleged violations of the securities laws, the plaintiff's proposed class is the superior method for adjudicating this dispute.

n14 *See, e.g., In re Rent-Way Sec. Litig., 218 F.R.D. 101, 121 (W.D.Pa. 2003).*

**III.**

For the foregoing reasons, Matrix is hereby appointed as class representative and the following class is certified pursuant to *Rule 23(c), Fed.R.Civ.P.*:

> All persons or entities who purchased or otherwise acquired the securities of BearingPoint between August 14, 2003 and April 20, 2005 and who were damaged thereby.

Finally, pursuant to *Rule 23(g)*, and because [*38] proposed class counsel is qualified and without any real conflict, BGCS is hereby appointed as class counsel. An appropriate order will issue.

Alexandria, Virginia
January 17, 2006

T. S. Ellis, III

United States District Judge