Attachment 2

1 of 1 DOCUMENT

PARKER FREELAND, et al., individually and on behalf of all others similarly situated, Plaintiffs, v. IRIDIUM WORLD COMMUNICATIONS, LTD., et al., Defendants.

Civil Action Nos. 99-1002, 99-1017, 99-1036, 99-1053, 99-1058, 99-1096, 99-1117, 99-1128, 99-1159, 99-1259, 99-1333, 99-1373, 99-1374, 99-1375, 99-1411, 99-1424, 99-1492, 99-1506, 99-1561, and 99-1647 (consolidated)(TPJ)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2006 U.S. Dist. LEXIS 744

January 9, 2006, Decided

**COUNSEL:** [*1] For PARKER FREELAND, Individually And On Behalf Of All Others Similarly Situated, Plaintiff: Douglas Graham Thompson, Jr., FINKELSTEIN, THOMPSON & LOUGHRAN, Washington, DC; Fred T. Isquith, Gregory M. Nespole, Scott J. Farrell, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, NY; William W. Wickersham, ENTWISTLE & WICKERSHAM, New York, NY.

For PLAINTIFFS' GROUP, Plaintiff: Douglas Graham Thompson, Jr., Donald J. Enright, FINKELSTEIN, THOMPSON & LOUGHRAN, Washington, DC; Benjamin Y. Kaufman, January L. Kerr, Robert A. Wallner, Susan M. Greenwood, MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, NY; Fred T. Isquith, Gregory M. Nespole, Scott J. Farrell, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, NY; Marvin L. Frank, MURRAY, FRANK & SAILER LLP, New York, NY; William W. Wickersham, ENTWISTLE & WICKERSHAM, New York, NY.

For JIM HOYT, individually and on behalf of all others similarly situated, Plaintiff: Eric J. Belfi, MURRAY, FRANK & SAILER LLP, New York, NY; Fred T. Isquith, Gregory M. Nespole, Scott J. Farrell, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, NY; William W. Wickersham, ENTWISTLE & WICKERSHAM, New York, NY.

For MOTOROLA INC, Defendant: [*2] Jeffrey L. Willian, John E. Tangren, Kellye L. Fabian, W. Allen Woolley, KIRKLAND & ELLIS, LLP, Chicago, IL; Paul Lamont McDonald, KIRKLAND & ELLIS, LLP, Washington, DC; David Patrick Sullivan, WILEY REIN & FIELDING, LLP, Washington, DC.

For EDWARD STAIANO, ROY GRANT, Defendants: Gandolfo V. DiBlasi, SULLIVAN & CROMWELL LLP, New York, NY; Thomas Russell Leuba, Jordan Toumey Razza, SULLIVAN & CROMWELL LLP, Washington, DC.

For UNDERWRITER, Defendant: James F. Moyle, Christopher R. Chase, Jeff E. Butler, CLIFFORD CHANCE US LLP, New York, NY; Jon R. Roellke, CLIFFORD CHANCE US LLP, Washington, DC.

**JUDGES:** NANETTE K. LAUGHREY, United States District Judge.

**OPINIONBY:** NANETTE K. LAUGHREY

**OPINION:**

ORDER

Pending before the Court is Plaintiffs' Renewed Motion for Class Certification [Doc. # 120]. Plaintiffs n1 seek to certify a class of all persons or entities who suffered damages following the purchase of Iridium securities, Iridium call options, and/or Iridium put options. The proposed class period is from September 8, 1998, to May 13, 1999, inclusive. Plaintiff Richard Mandelbaum ("Mandelbaum") further seeks certification of a sub-class of all persons or entities who were damaged after [*3] purchasing Iridium Class A common stock pursuant to, or traceable to, a Registered Statement filed by Iridium on or about October 13, 1998, and amended November 13, 1998. Both the putative class and sub-class exclude the officers and directors of Iridium and Motorola, Inc., their immediate families, and their legal representatives, heirs, successors and assigns, and any entity in which any defendant has or had a controlling interest. For the reasons set forth below, class certification is granted for both

classes.

> n1 Richard Ackerman, Richard Mandelbaum, Antonio Planos, Robert Predaina, Remy's Ltd., John Sekas, and Wade Developers, Inc., were appointed "lead plaintiffs" by the Court's March 15, 2001, Order under *Section 21D* of the Securities Exchange Act of 1934 and *Section 27* of the Securities Act of 1933

## I. Class Certification

Certification of a class requires the putative class representatives to prove (1) that the class is so numerous as to make joinder of all members impracticable, (2) that [*4] there are common questions of fact or law, (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) that the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. If those urging class certification meet the first four prerequisites, they must then satisfy one of the subdivisions of *Fed. R. Civ. P. 23(b)*. The subdivision relied on by the Plaintiffs for class certification is *Rule 23(b)(3)*, which requires that the questions of fact or law common to the whole class predominate over any questions affecting only individual members, and that the class action is a superior method for adjudicating the controversy.

As to all Plaintiff Representatives except Mandelbaum, Defendants appear to concede the prerequisites of numerosity, commonality, typicality, and adequacy, as well as the requirements that common questions predominate and that a class action is a superior format to resolve the dispute. Nevertheless, they argue that the class period should end on March 31, 1999, instead of May 13 and [*5] the sub-class should not be certified because it includes aftermarket purchasers. In addition, they object to Mandelbaum as a class or sub-class representative on the grounds that (A) his claims are not typical of either class because he cannot show loss causation and (B) he is not an adequate representative of either class because, as an "in an out" purchaser, he has a conflict of interest with the class.

### A. The Class Period

Defendants argue that any fraud inflating the market price of Iridium securities was disclosed on March 29, 1999, and after that date it was unreasonable for class members to rely on prior Iridium representations when they purchased Iridium securities. Among the March 29 disclosures cited by Defendants were the resignation of Iridium's CFO, Defendant Roy Grant; a sixty day extension by Iridium's lenders of its deadlines to achieve minimum subscriber and revenue covenants; and a notice to Iridium's lenders that Iridium was revising its customer and revenue estimates and intended to seek a modification of the covenants once it finished its revisions. Also on that day came several reports about Iridium's financial condition, including a Bloomberg News article [*6] noting a 27 percent drop in Iridium stock since February 18, 1999, following growing concern about the company's ability to meet its covenants; a Reuter's article reporting a 73 percent drop in Iridium's stock price since its 52-week high the previous May; and a statement by stock analyst Tim O'Neill saying that he expected a drastic reduction in subscriber and revenue targets. As evidence of the market correction precipitated by these disclosures, Defendants point out that Iridium's stock price dropped 30 percent from March 26 to March 31; that the Plaintiffs filed this lawsuit on April 22; and that in their original complaint, the Plaintiffs ended the class period on March 29 because that was the date on which, according to an early press release by Plaintiffs' counsel, the Company's fraudulent practices were disclosed.

Plaintiffs argue that they pushed back the close of the class period since filing their original April 1999 complaint because they now believe that the March 29 press release—on which they based the original closing date—was itself fraudulent. n2 Consequently, they claim that Iridium's fraud was not revealed to the market until Iridium announced on May 13 that [*7] it would not be able to satisfy its covenants. Defendants argue that the March 29 press release was not misleading because it put investors on notice that Iridium had notified its bank lenders that it was revising its revenue and customer estimates and that it would seek modification of its covenants.

> n2 Plaintiffs maintain that Iridium knew on March 29 that they would not be able to satisfy its covenants even with the extension to May 31.

When precisely any alleged fraud on the market was cured remains in dispute. The price of Iridium stock did fall following the March 29 press release which announced that the company was revising its customer and revenue estimates, n3 but it also fell further following the May 13 revelation that it would not satisfy its covenants. n4 Indeed, the price of Iridium stock had begun to fall months earlier: as reported in the Bloomberg News article, it suffered a 27 percent drop from February 18 to March 29. Based only on the change in stock price, the Court is not persuaded that [*8] the alleged fraud was cured by March 31 rather than May 13. There is simply not enough information before the Court at this stage in

the litigation to say conclusively that Iridium's March 29 press release cured any fraud on the market. Moreover, Courts must not venture too deeply into the merits of a case in deciding whether to certify a class. *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)* ("We find nothing in either the language or history of *Rule 23* that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Bynum v. District of Columbia, 214 F.R.D. 27, 40 (D.D.C. 2003)* ("The Court will not make a preliminary inquiry into the merits in determining whether to certify the class."). Thus, it would be inappropriate to limit the class period to March 31 as Defendants request.

> n3 Iridium's stock closed at $19.938 (just before the disclosure) on March 29, and at $15.125 on March 31, a two day drop of 25 percent. Closing stock prices taken from http://bigcharts.marketwatch.com. The Court may take judicial notice of closing stock prices. *See Fed. R. Evid. 201*; *SEC v. Bilzerian, 814 F. Supp. 116, 123 n. 19 (D.D.C. 1993)*; *In re Delmarva Sec. Litig., 794 F. Supp. 1293, 1300 n. 5 (D. Del. 1992)*; *FMC Corp. v. Boesky, 727 F. Supp. 1182, 1196 n. 17 (N.D. Ill. 1989)*; *Jacobsen Mfg. Co. v. Sterling Precision Corp., 282 F. Supp. 598, 602 (E.D. Wis. 1968)*.

[*9]

> n4 It closed at $14.50 on May 13 and at $9.375 on May 17, a three day drop of 35 percent. Closing stock prices taken from http://bigcharts.marketwatch.com.

### B. Sub-Class Certification with Aftermarket Purchasers

Defendant Underwriters urge the Court to reject the proposed Sub-Class because it includes not only those who bought shares in the Secondary Offering but also those whose aftermarket purchases are traceable to the Registration Statement. They correctly point out that aftermarket purchasers have no standing under *Section 12* of the Securities Act of 1933 because *Section 12* is limited to direct purchasers. *DeMaria v. Andersen, 318 F.3d 170, 177-78 (2nd Cir. 2003)*; *Lee v. Ernst & Young, LLP, 294 F.3d 969, 976 (8th Cir. 2002)*; *Hertzberg v. Dignity Partners, Inc. 191 F.3d 1076, 1080-81 (9th Cir. 1999)*. Because Mandelbaum bought his own shares during the Secondary Offering, there is no question as to his standing under *Section 12*. However, while he concedes that no aftermarket purchasers in the sub-class may recover under *Section 12*, [*10] Mandelbaum contends that the aftermarket purchasers may recover under *Section 11*.

Thus, the question for the Court to decide is whether the inability of aftermarket purchasers to recover under *Section 12* defeats certification of a sub-class which pursues both *Section 11* and *12* claims. The Court concludes that the answer is no because common questions of fact still predominate even though some members of the sub-class cannot recover under both *Section 11* and *12*.

If Mandelbaum's claim is successful on the merits, those who bought directly during the Secondary Offering will be able to recover under both *Section 11* and *Section 12*; those who can only trace their shares to the Registration Statement will only be able to recover under *Section 11*. The difference is essentially one of damages for the individual members of the sub-class. The common question of whether the registration statement contained any material misrepresentations predominates over the secondary issue of which class members can recover under both *Sections 11* and *12* and which can only recover under *Section 11*. See, e.g., *Schwartz v. Celestial Seasonings, Inc., 178 F.R.D. 545, 554 n. 4 (D. Colo. 1998)* (holding [*11] that the common question of whether the registration statement was misleading predominated over any secondary tracing issues as to whether plaintiffs could trace to one of the two offerings alleged in the complaint). Thus, the inclusion of aftermarket purchasers who lack standing under *Section 12* does not automatically defeat certification of the sub-class. n5

> n5 Even if the common issues didn't predominate, Plaintiffs could easily seek to certify two sub-classes, one with Section 11 claims and one with Section 12 claims. Forcing the Plaintiffs to do so unnecessarily, however, would add yet another delay to what is already a long-lived case, especially since it would be much more efficient to consider these differences at the damages stage, if and when it is reached. This makes more sense than having repeated trials to decide the common questions of fact. Separate trials might also produce inconsistent findings.

Defendants, however, also contend that class certification is impractical because the tracing problem [*12] associated with aftermarket purchasers is insurmountable. This is because the aftermarket purchasers can recover under *Section 11* only if they can actually trace their shares to the Registration Statement.

Iridium's initial public offering of 12 million shares of Class A common stock came in June 1997. Pl. Am.

Compl. P32. Consequently, the Secondary Offering in early 1999 occurred when there were already millions of shares on the open market. In order to recover under *Section 11*, any putative sub-class members who bought their shares aftermarket "must demonstrate *all* stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement." *Krim v. PcOrder.com, Inc.*, 210 F.R.D. 581, 586 (D. Tex. 2002) (emphasis in original). Defendants point out that "this requirement has been strictly applied, even where its application draws arbitrary distinctions between plaintiffs based on the remote genesis of their shares." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 117 (S.D.N.Y. 2004).

Several courts have found that [*13] tracing of aftermarket shares is often virtually impossible where there are other identical shares available on the market at the time of the Offering. n6 Indeed, some of the other lead Plaintiffs who bought aftermarket shares following the Secondary Offering have conceded during discovery that they cannot trace their shares to the Registration Statement. From this limited concession, however, Defendants urge the Court to deny certification of the entire sub-class. They cite *Simer v. Rios*, in which the Seventh Circuit denied certification in a non-securities class action because the court believed it would be a "Sisyphean task" to identify which class members (1) qualified for the government program at issue, (2) knew of a particular regulation, and (3) were discouraged from applying for assistance by the regulation's notice requirement. 661 F.2d 655, 669 (7th Cir. 1981). Defendants also cite a handful of other cases n7 denying certification because the class was not adequately defined, though none of them deals with the tracing difficulty alleged in the present case.

> n6 See, e.g., *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 (D.N.Y. 2004); *Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 873 (N.D. Cal. 1986); *Klein v. Computer Devices, Inc.*, 591 F. Supp. 270, 273 n. 7 (S.D.N.Y. 1984); *Lorber v. Beebe*, 407 F. Supp. 279, 287 (S.D.N.Y. 1975)

[*14]

> n7 See *Williams v. Glickman*, 1997 U.S. Dist. LEXIS 1683 (D.D.C. 1997); See also *Burley v. City of New York*, 2005 U.S. Dist. LEXIS 4439 (S.D.N.Y. 2005); *Adair v. Johnston*, 221 F.R.D. 573 (M.D. Ala. 2004); *In re Copper Antitrust Litig.*, 196 F.R.D. 348 (W.D. Wis. 2000).

Mandelbaum concedes that those sub-class members who purchased their shares aftermarket may have difficulty tracing their stock to the Registration Statement. He argues, however, that potential difficulty proving damages by some of the sub-class members is an inappropriate basis for denying class certification. The Court agrees with Mandelbaum, and with other courts who have reached the same conclusion in similar circumstances. In *Charal v. Pierce*, 1981 U.S. Dist. LEXIS 17497 (E.D.N.Y. Nov. 3, 1981), the U.S. District Court for the Eastern District of New York certified a class of shareholders who could trace their purchase of stock to a Registration Statement that was misleading under *Section 11*. Rejecting defendants' argument that tracing the [*15] individual class members' shares would be too difficult, that court held,

> When, after establishment of liability, the time comes for each member of the class to prove his or her right to recover, it may be difficult, if not ... impossible for each person who did not purchase directly from LILCO itself to prove that he purchased securities issued under the 1978 prospectus and registration statement. Such potential difficulty down the line does not, however, warrant elimination at this stage of all those persons who purchased the 2,390,593 shares of LILCO stock from the underwriter defendants from the class since to do so would not result in protection of the claims of the class, but rather their summary elimination from the lawsuit without an opportunity to explore the factual and legal issues on which a resolution of the question may ultimately turn.

*Id.* at *22. See also, *In re Seebeyond Techs. Corp. Secs. Litig.*, 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003) ("The Court acknowledges the defendants' argument that it may be difficult or impossible to trace the stock purchased [in a secondary offering] by the plaintiff, but the plaintiff should [*16] be provided the opportunity to prove its allegation in this respect."); *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 671 (E.D.N.Y. 1986) (holding that "with respect to the manageability issue, however, it is apparent that tracing will not pose insurmountable obstacles warranting denial of class status" and noting that tracing is a question of fact reserved for trial).

In the present case, any difficulty by individual class members in tracing their particular aftermarket-purchased shares to the Registration Statement is a secondary issue to be resolved after the predominant issue of Defendant Underwriters' liability has been decided. It

Case 3:01-cv-00988-SI  Document 444-2  Filed 02/13/06  Page 6 of 9

Page 5
2006 U.S. Dist. LEXIS 744, *16

would be inappropriate to foreclose such Plaintiffs' resort to the class action format simply because some of their cases may be difficult to prove. *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)* ("We find nothing in either the language or history of *Rule 23* that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Bynum v. District of Columbia, 214 F.R.D. 27, 40 (D.D.C. 2003)* [*17] ("The Court will not make a preliminary inquiry into the merits in determining whether to certify the class.").

## II. Plaintiff Mandelbaum

Defendants object to Mandelbaum as a class and sub-class representative on the grounds that (A) his claims are not typical of the class or subclass because he cannot show loss causation, (B) common questions of law or fact do not predominate between his claims and the subclass's because he is subject to a unique loss causation defense, and (C) he does not adequately represent the class because, as an "in and out" purchaser, he has a conflict of interest with the rest of the class.

### A. Mandelbaum's Ability to Prove Loss Causation

Defendants argue that Mandelbaum is an inappropriate class representative because, unlike other putative class members, he did not own any Iridium securities on May 13, 1999. Mandelbaum bought 1,000 shares of Iridium stock on January 21, 1999, at the Secondary Offering price of $33.50 per share, and sold them on March 10 at $21 per share for a loss of $12,500. Since he sold his Iridium stock on March 10, believing the company was going to collapse even before the alleged fraud was fully revealed, Defendants [*18] argue that he cannot prove loss causation and, therefore, should not represent the class.

Defendants base their challenge on *Dura Pharmaceuticals, Inc. v. Broudo, 161 L. Ed. 2d 577, 125 S. Ct. 1627 (2005)*, in which the Supreme Court dismissed a securities fraud claim because the plaintiff was unable to prove loss causation even though the plaintiff could prove an inflation of the stock price due to the defendants' misrepresentations. *Id. at 1629-31.* Following the logic of *Dura*, Defendants argue that: "It is not enough for Mandelbaum to show that he purchased Iridium shares at a price inflated by the alleged misrepresentations." Motorola's Resp. to Pl.'s Renewed Mot. For Class Certification at 7. Therefore, Defendants claim that "any failure to show 'loss causation' is fatal to Mandelbaum's claims." *Id.*

*Dura* involved *Section 10b* of the Securities Exchange Act of 1934 and Rule 10b-5 fraud. n8 By contrast, the putative sub-class for which Mandelbaum is the sole representative pursues causes of action under *Sections 11, 12,* and *15* of the Securities Act of 1933. The absence of loss causation is an affirmative defense under both *Section 11* and *12* of the [*19] Securities Act rather than an element of Plaintiff's prima facie case. *See Herman & Maclean v. Huddleston, 459 U.S. 375, 382, 103 S. Ct. 683, 74 L. Ed. 2d 548 (U.S. 1983)* ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements."); *See also Section 11, 15 U.S.C. § 77k(e)* ("Provided: That if the defendant proves . . . such damages represent[] other than the depreciation . . . resulting from such part of the registration statement . . . not being true or omitting to state a material fact . . . such portion of or all such damages shall not be recoverable."); *Section 12, 15 U.S.C. § 77l(b)*(same). Thus, contrary to Defendants assertions, Mandelbaum's own failure to show loss causation is not fatal to *Section 11* and *12* claims because he does not bear the burden of proof on loss causation vis-a-vis those claims. Whether the Defendant Underwriters will be able to prove the absence of loss causation as an affirmative defense [*20] has been raised in their pending Motion for Summary Judgment. The Court will wait to consider the presence or absence of loss causation in the context of the pending Summary Judgment Motion. *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)* ("We find nothing in either the language or history of *Rule 23* that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Bynum v. District of Columbia, 214 F.R.D. 27, 40 (D.D.C. 2003)* ("the Court will not make a preliminary inquiry into the merits in determining whether to certify the class").

> n8 Plaintiffs in Rule 10b-5 cases must prove six elements: (1) a material misrepresentation, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura, 125 S. Ct. at 1631.*

The larger class, of which Mandelbaum is one of [*21] six potential class representatives, does pursue a Rule 10b-5 fraud claim in Count IV of their Consolidated Amended Complaint. Mandelbaum contends, however, that he will be able to demonstrate loss causation in Count IV. Conceding that *Dura* held mere proof of price inflation due to misrepresentation insufficient to sustain a Rule 10b-5 claim, Mandelbaum argues that the Supreme Court

stopped short of requiring plaintiffs to prove that they sold after a complete, corrective disclosure resulting in a large price decline. Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures. Several District Courts have, therefore, read *Dura* narrowly, n9 and this Court finds their reasoning persuasive.

> n9 *See e.g., In re GeoPharma, Inc. Sec. Litig, 399 F. Supp. 2d 432, No. 04 Civ. 9463 (SAS), 2005 WL 2431518, at *7 (S.D.N.Y. Sept. 30, 2005)* (holding that where an alleged misstatement conceals a condition or event which then occurs and causes plaintiff's loss, it is the materialization of the undisclosed condition or event which causes the loss, without need for a corrective disclosure); *see also Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.), No. 04 MD 1653 (LAK), 2005 U.S. Dist. LEXIS 12554 (S.D.N.Y. June 28, 2005)* ("corrective disclosure" not necessary where subject of the misrepresentation and omissions caused loss); *In re Loewen Group Inc. Sec. Litig., 395 F. Supp. 2d 211, 2005 U.S. Dist. LEXIS 23841, at *18-19 (E.D. Pa. 2005)* (post-*Dura* decision, denying defendants' motion for partial summary judgment: "Plaintiffs have pleaded loss causation adequately by alleging that they purchased TLGI stock at an inflated price and lost money when the price fell. . . . Because the existence and significance of any losses is unclear, loss causation is an inappropriate ground for summary judgment."); *Stumpf v. Garvey, No. 02-MDL-1335-PB, 2005 DNH 125, 2005 U.S. Dist. LEXIS 19154, at *42 (D.N.H. Sept. 2, 2005)* (plaintiffs satisfied Dura "by alleging that defendants' fraudulent misrepresentations and omissions caused the price of TyCom stock to be artificially inflated, so that when, over time, the true facts came out regarding TyCom's prospects and the state of demand for bandwidth generally, facts that were at odds with defendants' prior representations, the stock lost value and investors suffered a loss.") (internal citation omitted); *In re OmniVision Techs., Inc., C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *18-19 (N.D. Cal. July 29, 2005)* (plaintiffs satisfied Dura by alleging: "Plaintiffs purchased OmniVision securities at artificially inflated prices and suffered damages when revelation of the true facts caused a decline in the value of their investments.") (internal citation omitted)..

[*22]

The question before the Court, then, is whether Mandelbaum will not be able to prove in his Rule 10b-5 claim that the decline in the price of his stock was proximately caused by Defendants alleged misrepresentations. As mentioned above, resolution of this issue would require the Court to venture into the merits of Mandelbaum's claim and would be more appropriately considered in the context the Underwriters' pending Motion for Summary Judgment. n10

> n10 *See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974); Bynum v. District of Columbia, 214 F.R.D. 27, 40 (D.D.C. 2003)*. See also, *supra*, note 9 and accompanying text.

### B. Commonality and Unique Defenses

Conceding that the absence of loss causation is an affirmative defense to Mandelbaum's *Section 11* and *12* claims against them, the Underwriter Defendants argue that his susceptibility to such a defense makes his case atypical of the sub-class and renders him an inadequate representative. Their argument [*23] is not without support. In *Kas v. Financial General Bankshares, Inc.*, the putative shareholder class representatives had voted against a merger for reasons unrelated to the alleged misrepresentations in the proxy statement that formed the basis of their fraud claim. *105 F.R.D. 453, 461-62 (D.D.C. 1985)*. Unlike the majority of the class they sought to represent, they did not rely on the allegedly misleading proxy statement and were uniquely vulnerable to a lack of reliance defense. *Id.* The court held:

> Where the representative parties are subject to unique defenses, their claim is not typical of the class. Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative. It is not necessary that the defense asserted against the putative class representative ultimately succeed. Rather, the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class, as well as bring into question the named plaintiff's representation.

[*24]

*Id.* at 462.

In the instant sub-class litigation, Mandelbaum may be susceptible to a lack of loss causation affirmative de-

fense. In contrast to *Kas*, however, it is not unlikely that the Underwriter Defendants will raise the same affirmative defense against the sub-class as a whole. Because Mandelbaum sold his shares before the end of the class period and before the complete disclosure of Iridium's commercial woes, it is possible that this affirmative defense may be easier to prove against him than it would be against those members of the sub-class who sold after the final disclosure. The Court cannot say, however, that the potential vulnerability to a lack of loss causation defense is unique to Mandelbaum's case. The presence of the loss causation defense does not defeat the typicality of his claims

### C. In and Out Purchasers

Defendants also challenge Mandelbaum on the grounds that his interests as a so-called "in and out" purchaser—one who buys and sells before the end of the class period—conflict with the interests of class members who did not sell until after the class period ended. *See In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341 (N.D. Cal. 1994) [*25] ("*Seagate II*"). Under the *Seagate II* analysis, the "in and out" purchaser has an incentive to minimize the degree of stock inflation on the day he sold his shares—since the more it was inflated when he sold it, the less his own damages would be—while those class members who bought on the same day the "in and out" purchaser sold would want to maximize the stock inflation on that same day. *Id. at 1347-50, 1359-62, 1364-67.*

*Seagate II* has not been well received by other courts, n11 which have almost universally attacked its reasoning as

> overstating the importance of price inflation. The chief role of price inflation remains its function in determining each plaintiff's damages. The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart.

*In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 70 (S.D.N.Y. 1999). Even *Seagate II* itself noted that "This 'seller-purchaser' conflict has been raised by defendants [*26] in numerous courts, usually to no avail." *843 F. Supp. at 1359.* This Court is not persuaded by the analysis in *Seagate II* that Mandelbaum's status as an "in and out" purchaser makes him an inadequate representative of either the class or the sub-class.

n11 *See, e.g., In re Baan Co. Sec. Litig.*, 2002 U.S. Dist. LEXIS 27875 at *25 (D.D.C. 2002) ("*Seagate*, however, is an outlier... and has been uniformly rejected by numerous other courts.") (citations and footnote omitted); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) ("The holding in *Seagate* has been widely discredited."); *In re Lucent Techs. Inc. Sec. Litig.*, 194 F.R.D. 137, 153 n. 20 (D.N.J. 2000) ("Most courts . . . have rejected the analysis of the Retention/Seller Conflict set forth in *Seagate II.*").

Having rejected each of the Defendants' objections, the Court concludes that Mandelbaum is an appropriate class representative.

### III. [*27] Conclusion

Accordingly, it is hereby

ORDERED that this action is certified under *Rule 23(c)(1) of the Federal Rules of Civil Procedure*, on behalf of a class consisting of all persons or entities who purchased Iridium securities, purchased Iridium call options, and/or sold Iridium put options during the period from September 8, 1998, to May 13, 1999, inclusive, (the "Class Period") who suffered damages (the "Class"). A sub-class is certified under *Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure*, consisting of all persons or entities who purchased Iridium Class A common stock pursuant to, or traceable to, a Registration Statement filed by Iridium on or about October 13, 1998, amended November 13, 1998, who suffered damages (the "Sub-Class"). Excluded from the Class and Sub-Class are Defendants, the officers and directors of Iridium and Motorola, members of their immediate families and their legal representatives, heirs, successors and assigns, and any entity in which Defendants have or had a controlling interest. And it is

ORDERED that Plaintiffs Richard Ackerman, Richard Mandelbaum, Antonio [*28] Planos, Robert Predaina, Remy's Ltd., John Sekas, and Weda Developers, Inc., are hereby certified as class representatives on behalf of the Class. Plaintiff Richard Mandelbaum is also hereby certified as class representative on behalf of the Sub-Class. And it is

ORDERED that the law firms of Wolf Haldenstein Adler Freeman & Herz LLP and Milberg Weiss Bershad & Schulman LLP are designated as Plaintiffs' Co-Lead Counsel for the Class, and Finkelstein Thompson & Loughran is appointed Plaintiffs' Liaison Counsel for the Class. The law firms of Entwistle & Cappucci LLP and Beatie and Osborn LLP, along with Finkelstein Thompson

& Loughran, are designated as Executive Committee Members. And it is

ORDERED that the parties shall present to the Court, within thirty days of the date of this Order, a proposed Order directing Class Notice and a form of Notice of the Pendency of this Action to the members of the Class and Sub-Class.

s/ Nanette K. Laughrey

United States District Judge

Dated: January 9, 2006
Jefferson City, Missouri