

**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS** LLP

**REDACTED**

SAN DIEGO • SAN FRANCISCO
LOS ANGELES • NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
PHILADELPHIA • SEATTLE

April 4, 2006

<u>VIA ELECTRONIC FILING AND HAND DELIVERY</u>

The Honorable Joseph C. Spero
Magistrate Judge
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

   Re: *In re Oracle Corp. Sec. Litig.*
     Master File No. C-01-0988-MJJ (N.D. Cal.)

Dear Judge Spero:

  In accordance with this Court's March 30, 2006 Order, plaintiffs hereby address the outstanding discovery disputes.

  On March 30, 2006, the parties met in this Court to discuss the March 15, 2006 letter submissions detailing the outstanding discovery disputes currently affecting and largely inhibiting the discovery process. The parties reached agreement on some issues (P6, P7, D3 and D5), and agreed to further meet and confer on P3. However, the parties were unable to resolve issues P1, P2, P4, P5, P9, P10, D1, D2, D4, and D6. On the most fundamental of issues - the destruction of documents consequent to Oracle Corp.'s ("Oracle" or the "Company") failure to preserve documents in accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b)(3)(C), the parties exchanged proposals. Plaintiffs proposed and hereby propose the following to resolve four of the disputed issues (P1, P2, P4, and P5) that primarily reflect Oracle's failure to preserve and destruction of documents and Oracle's false assurances during the March 1, 2005 discovery conference. Plaintiffs believe that additional briefing is required to resolve issues P9 and P10.

  Incredibly, defendants have revealed that on March 13, 2001, shortly after the first of these actions was filed and served, Oracle sought to preserve potentially relevant documents from the files of only 29 Oracle employees. To that paltry list were added 13 more, three months later. The files preserved failed to include Oracle's management level. It did not even include Oracle's Area Vice Presidents ("AVP"). Oracle's failure to communicate the duty to *preserve* to *all* employees was the beginning of a series of failures that have resulted in the sparse and incomplete production to date. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432-33 (S.D.N.Y. 2004) (requiring suspension of document destruction policies and confirmation that *all* sources of potentially relevant information are preserved). Instead of targeting such a tiny group (29, then 42 from over 40,000 employees), Oracle was obligated under the PSLRA to instruct "all employees to produce electronic copies of their relevant active files." *Id.* at 434.

  Nevertheless, four years after the inception of this case, during this Court's March 1, 2005 discovery conference in which the Court first defined the parameters of discovery, Oracle represented falsely that a search of all of Oracle's AVP files would capture the vast majority of the relevant documents in the case. *See* Plaintiffs' Appendix in Support of Plaintiffs' Positions Regarding Discovery Issues ("Plaintiffs' Appendix"), Ex. 4 ("Your Honor, the area vice-presidents – to the extent that the area vice-presidents would have communicated to the direct reports . . . of the speakers which are within, encompassed within, the group that we are talking about, the plaintiffs *would get those documents to the extent they are otherwise responsive.*") (emphasis added). What defendants knew and failed to tell the Court at the March 1, 2005 discovery conference, however, was that most of the AVP files *never were preserved.* Indeed, 26 of the 33 AVP files this Court ordered produced never were preserved. As a result, though Oracle claims that in 2005, after this Court's Order, that it searched the files of the AVPs, Oracle has not produced a single relevant document from 20 of the 33 individual files. An untold number of relevant documents have either been destroyed or exist only on backup tapes. Separately, the evidence suggests that even those stark few individuals who were sent preservation emails by Oracle's counsel failed to heed the preservation instructions, as responsive emails that were sent to the top executives at the Company (including defendants Ellison and Sanderson and Executive Vice President George Roberts) were not



The Honorable Joseph C. Spero
April 4, 2006
Page 2

produced from the sender's and/or recipient's supposedly preserved files. Instead, several of the documents were produced fortuitously from the files of Gayle Fitzpatrick, who plaintiffs only guessed might have responsive information and thus called as a deposition witness. *See* Plaintiffs' Appendix, Exs. 5 and 6.

In order to resolve issue P1, plaintiffs propose that Oracle restore email backup tapes to recover all relevant documents and email existing when this lawsuit was filed in March 2001. Oracle has admitted that its backup tapes "contain the email files of all U.S. and Latin American employees as of the third quarter of fiscal year 2001." *See* April 22, 2005 letter from Lee H. Rubin to Douglas R. Britton, attached hereto as Ex. A. The restoration should also cover the period extending to the end of the current relevant period, June 30, 2001. From those tapes plaintiffs propose that Oracle produce all of the relevant documents from the files of all of: a) the AVPs this Court ordered produced pursuant to the March 10, 2005 Amended Order and Discovery Plan ("Discovery Plan"), b) all individuals listed in the Discovery Plan at page 6; c) all CWs; and d) all prior deponents and those who will be deposed. Finally, Oracle must produce relevant documents from the files of the individuals identified in plaintiffs' January 19, 2006 letter and their January 17, 2006 letter, attached as Exs. 15 and 18 to Plaintiffs' Appendix, in accordance with §I.B.5. of the Discovery Plan.

With respect to the backup tape restoration and production, plaintiffs propose that Oracle first specifically identify the location, number of tapes and the time period and documents residing on the tapes, and whether the tapes are restorable and the information on the tapes is retrievable. Oracle must then produce the relevant documents for plaintiffs' review for scope, prior to plaintiffs' agreement that issue P1 is resolved.

The scope of the above proposal and restoration of backup tapes is conservative and already framed by the current Discovery Plan. It does not expand the scope of relevance, nor does it increase the number of custodian files the Court has already ordered searched to retrieve relevant and responsive documents other than those identified in Plaintiffs' Appendix, Exs. 15 and 18. If restoration and retrieval is not accomplished, plaintiffs will seek an order of default judgment or an adverse inference and sanctions at summary judgment and trial owing to defendants' failure to preserve and destruction of documents.

Notwithstanding the above proposal, in the meantime, plaintiffs propose that the Court order Oracle to immediately produce all relevant documents from the files of all individuals whose files Oracle claims to have preserved in 2001 and 2002 pursuant to directives from the Company. A list of such people was provided by Oracle as Ex. B to the March 15, 2006 letter brief ("Defs' Ex. B"). The preservation instruction identifies the topics of information most clearly relevant to this lawsuit notwithstanding the fact that Oracle currently disputes the relevance of certain information: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. B attached hereto. Clearly all of these emails are easily searchable for terms and individual names to retrieve responsive documents. Such production should not be burdensome as many of those individuals' files have already been ordered searched pursuant to the Court's March 10, 2005 Discovery Plan. Plaintiffs also propose that the Court order Oracle to immediately produce documents preserved pursuant to Oracle's May 31, 2001 directive stating: "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. B attached hereto.[1]

---

[1] On March 30, 2006, plaintiffs notified defendants of their recent discovery of the May 31, 2001 email referenced above. Plaintiffs also provided defendants the Bates number of the document and described its contents. As prior defense counsel is well aware, the initial document retention communication contained within the May 31, 2001 email was previously produced to plaintiffs in response to this Court's Order to produce the SLC report and all documents submitted in support of it. *See* Ex. C attached hereto (March 13, 2001 email from Lauren Segal re "New Securities Suits - Document Retention"). Oracle submitted the March 13, 2001



The Honorable Joseph C. Spero
April 4, 2006
Page 3

Plaintiffs also request an immediate order from the Court on basic principles of relevance (P2). For example, plaintiffs noticed the deposition of witness Ian Hatada. On February 10, 2006, defendants informed plaintiffs that after "an extensive search," defendants were unable to locate *any* responsive documents from Mr. Hatada's files. Plaintiffs' Appendix, Ex. 7. In response, plaintiffs identified several documents from Mr. Hatada's Oracle email uncovered in plaintiffs' independent investigation that explicitly discuss, among other relevant topics, multiple 550 debit memoranda created on November 17, 2000 and the accounting treatment thereof. *See, e.g.*, Plaintiffs' Appendix, Exs. 8 and 9. Though Oracle claims to have preserved Mr. Hatada's files, *see* Defs' Ex. B, remarkably, defendants insist no relevant documents exist, and the clearly relevant documents independently uncovered by plaintiffs fall outside the permissible scope of discovery under the Discovery Plan. Plaintiffs' Appendix, Ex. 10. In fact, the Discovery Plan explicitly calls for the production of documents relating to the 46,000 debit memoranda and the accounting treatment thereof, and all such documents found in these files should be produced. Plaintiffs' Appendix, Ex. 1 at 2; *see* P2.

Plaintiffs further propose that the parties agree to the taking of 25 additional depositions by plaintiffs to investigate and address known deficiencies in the document production to date, and specifically the fact that plaintiffs have been reviewing a vast array of documents from the files of witnesses who did not preserve responsive documents. In addition, Oracle has refused to authenticate all documents that were plainly stored in its electronic files and databases. Thus, for summary judgment and trial, plaintiffs will depose some individuals simply to further authenticate documents.

With respect to scheduling depositions (P11), plaintiffs propose that for all depositions previously noticed by plaintiffs, by April 15, 2006, Oracle provide at least three proposed available dates for the depositions of those individuals represented by Oracle's lawyers, with each deposition occurring prior to May 15, 2006. With respect to those deponents who have yet to be noticed and whom Oracle represents, plaintiffs propose that within seven days of the notice, Oracle provide three available dates for each witness' deposition, each date to fall within two weeks of the originally-noticed date.

With respect to P8, at the outset of this litigation defendants took the position that Oracle missed its 3Q01 forecast because it unexpectedly lost deals that it expected to close. In an interrogatory response (Response to Interrogatory No. 4) Oracle identified 182 deals lost but refuses to amend the Discovery Plan to permit plaintiffs to subpoena the customers. Unless Oracle wishes to retract its attribution of its missed forecast to the unexpected lost deals and admits the truth, plaintiffs seek a modification of the Discovery Plan to accommodate the necessary discovery. Defendants have refused to compromise at all on this issue.

With respect to P9 and P10, Oracle has failed at the most basic levels to comply with the Court's March 10, 2005 and October 19, 2005 Orders regarding the documents to be produced concerning the alleged improper revenue recognition. Plaintiffs intend to fully brief this issue.

Respectfully submitted,
/s/
MARK SOLOMON

---

email to the Chancery Court in Delaware as exhibit 131 in support of its motion to dismiss. By doing so, Oracle waived any privilege that might have been applicable to the documents. During the March 30, 2006 meeting of the parties, Oracle first disclaimed any knowledge of any separate secured server repository for email relevant to the litigation but later they admitted that they knew of the May 31, 2001 email but accused plaintiffs of misinterpreting its contents. Oracle did not claim the document was privileged. Instead, on the eve of this filing, in order to keep the documents from this Court's view, Oracle belatedly and incorrectly attempted to assert a privilege that does not exist here and if it ever did, was waived long ago and, for good measure, accused plaintiffs' counsel of being unethical.

# Exhibit A

MAYER
BROWN
ROWE
& MAW

April 22, 2005

Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112

Main Tel (650) 331-2000
Main Fax (650) 331-2060
www.mayerbrownrowe.com

VIA FACSIMILE (619) 231-7423

Douglas R. Britton
Lerach Coughlin Stoia Geller
 Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101

Lee H. Rubin
Direct Tel (650) 331-2037
Direct Fax (650) 331-4537
lrubin@mayerbrownrowe.com

Re: In Re Oracle Securities Litigation

Dear Doug:

As you know, Defendants are in the process of gathering and reviewing hundreds of thousands of documents to respond to Plaintiffs' discovery requests in this litigation. In connection with this effort, we thought it appropriate to bring to your attention the existence of certain email disaster-recovery backup tapes ("disaster-recovery tapes") that Oracle collected shortly after this lawsuit was filed. As explained below, while it is unknown whether these tapes contain any unique, pertinent data, it is quite clear that, because of the unique configuration of Oracle's data storage system, it will be enormously expensive for a third-party vendor to determine in the first instance whether the data are retrievable at all. In light of the substantial cost of any diagnostic work and the fact that Oracle has gone to great lengths to preserve and produce responsive data from its employees' files, Defendants do not believe that any disaster-recovery tape restoration effort is warranted. That being said, if Plaintiffs have an interest in determining whether the tapes contain retrievable data, Oracle is prepared to split the costs of a preliminary diagnostic analysis by a third party vendor to make that threshold determination.

Oracle has undertaken significant efforts to preserve and collect documents that may be relevant to this litigation. You already have received hundreds of thousands of pages of responsive material and, over the course of the next several weeks, you will be receiving thousands of additional documents pursuant to the court-ordered discovery plan. Based upon Oracle's substantial document preservation and collection effort, which includes the collection of approximately 200,000 pages of documents gathered by the Special Litigation Committee in connection with the parallel derivative action, we believe that Oracle has amply satisfied its obligations to preserve and collect potentially relevant material.

In addition to the hundreds of the thousands of pages of hard copy and electronic data that Oracle preserved after this action was filed, Oracle also removed over 190 DLT Type IV disaster-recovery tapes from its ordinary disaster-recovery backup rotation in mid-March 2001. These disaster-recovery tapes represent multiple backups of Oracle's single-instance e-mail database from February and March 2001, made using VERITAS NetBackup software. The tapes contain the email files of all of Oracle's U.S. and Latin America employees as of the third

Berlin Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete y Nader S.C.

Mayer, Brown, Rowe & Maw LLP

Doug R. Britton
April 22, 2005
Page 2

quarter of fiscal year 2001. Currently, Oracle does not know whether data contained on the disaster-recovery tapes are retrievable or readable.

Based on our discussions with an outside vendor, we understand that, given the manner in which data are stored in an email database, it is not possible to recreate the data without piecing together entire sets of disaster-recovery tapes, which would include the email files of Oracle's tens of thousands of U.S. and Latin America employees as of 2001. Unlike many other companies that have multiple e-mail databases, Oracle has a single instance email database for *all U.S. and Latin America operations*. In cases involving companies that utilize multiple email databases, retrieval of data from backup tapes often may be accomplished by restoring only a selected portion of backup tapes that contain email files that are relevant to the litigation. Here, however, because Oracle uses a single database for email, the process of restoring Oracle's disaster-recovery backup tapes is substantially more involved because each of the tapes may contain a portion of the email files of tens of thousands of employees. As a result, an outside vendor initially would be required to prepare an inventory and catalogue *all* of the disaster-recovery tapes. From this process, the vendor could determine whether or not the data on the tapes are retrievable. If the data are retrievable in some fashion, we have been advised that, based upon the condition of the data and other unique features of the backup tapes, the vendor would then be in a position to provide a reliable cost estimate for building an appropriate platform from which the data might be searched. According to information provided by the vendor, that process could cost in the hundreds of thousands of dollars.

Based on the information that we presently possess about these tapes, we understand that it will cost approximately $70,000 for a vendor to determine whether the data on the tapes are retrievable at all. Given that Oracle has made reasonable efforts to preserve relevant documents, we do not believe that it is necessary to spend any time or money exploring whether the tapes could be restored.

Nonetheless, Oracle recognizes that Plaintiffs might wish to determine whether the data contained on the tapes can be retrieved and read and, if so, whether the tapes contain any material amount of responsive data not otherwise captured in Oracle's document collection effort. While Oracle believes that it has no obligation to share in any of this expense, in order to avoid a protracted dispute and to advance the litigation, Oracle is prepared to share equally in the costs of the initial process of assessing the retrievability of the data. This approach will provide critical information for evaluating whether further efforts are warranted.

May-02-05  04:12pm  From-LERACH ET AL          6192394197         T-648  P.004/005  F-303

Mayer, Brown, Rowe & Maw LLP

Doug R. Britton
April 22, 2005
Page 3

  If you would like to discuss this matter further, please feel free to call either me (at the number listed above) or my colleague, Trace Schmeltz, at (312) 701-8531.

          Very truly yours,

          *Lee H. Rubin /s/*

          Lee H. Rubin

cc: James C. Maroulis, Esq.
   Trace Schmeltz, Esq.

# Exhibit B
# FILED UNDER SEAL

# Exhibit C
# FILED UNDER SEAL