# EXHIBIT 1

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
415-774-2611
415-982-5287 (fax)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| In re ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-09888-MJJ (JCS) |
| --- | --- |
| | **ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE THE SPECIAL MASTER'S JULY 17, 2006 ORDER AND TO COMPEL ADDITIONAL ACCOUNTING DOCUMENTS BASED ON RECENT TESTIMONY AND NEW EVIDENCE** |

On October 30, 2006, Plaintiffs submitted a motion to compel Defendants' production of accounting documents. Defendants' opposition to the motion was submitted on November 13, 2006. Plaintiffs' reply was submitted on November 20, 2006. The Special Master has considered the papers and the arguments of counsel and rules as follows:

## Background

*The Revised Second Amended Complaint for Violation of the Federal Securities Laws*

On March 9, 2001, Plaintiff Local 144 Nursing Home Pension Fund, on behalf of itself and all persons who publicly traded securities of Oracle Corporation between December 15, 2000 and March 1, 2001 ("the Class period"), filed a complaint for violation of the federal securities laws (Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder) against Defendants Oracle Corporation ("Oracle" or "the Company") and Lawrence J. Ellison ("Ellison") arising out of Defendants' dissemination of false and misleading statements concerning Oracle's operations and prospects for Q3 2001.

On October 11, 2002, Plaintiffs filed a second amended complaint. The complaint included, for the first time, allegations concerning Oracle's accounting during the second quarter

1

of fiscal year 2001. Plaintiffs' Second Amended Complaint at ¶¶ 8, 35-44. On December 9, 2002, Plaintiffs filed a Revised Second Amended Complaint ("RSAC"), which added additional facts and witnesses relating to the accounting allegations. Plaintiffs allege that in order to mask the fact that sales of Suite 11i were not growing as expected in the second quarter of 2001 and to give investors the impression that sales were accelerating, Defendants created phony sales invoices and improperly recognized revenue from past customer credits and overpayments that Oracle had held in reserve (its "unapplied account") without informing its customers between 1991 and 2000. *Id.*, ¶¶ 8, 36(c). Plaintiffs allege that on November 17, 2000, Oracle executed more than 46,000 sham invoice transactions (debit memos) in order to "clean up" the account, converting the reserved overpayments to revenue totaling approximately \$228 million.[1] *Id.*, ¶¶ 8, 37. As a result of Oracle's improper conversion of customer credits to revenue, on December 14, 2000, Oracle falsely reported 2Q01 revenues, causing the Company's stock price to increase.[2] *Id.*, ¶¶ 8, 43. Plaintiffs allege that Oracle's recognition of \$228 million as revenue was a violation of Generally Accepted Accounting Principles ("GAAP"), because Oracle had not earned the revenue it was reporting and was not entitled to retain the overpayments it had previously received from its customers. *Id.*, ¶ 42. "Oracle owed its customers refunds for that amount." *Id.*

*Plaintiffs' Requests for Production of Accounting Documents*

On December 9, 2004, after the stay on discovery was lifted, Plaintiffs propounded upon Defendants their first set of requests for production of documents. The requests sought, *inter alia*, all documents relating to: credit or debit memos created in November 2000 (request 32); the disposition of unassigned cash receipts assigned to any Oracle reserve account, including but not limited to account 12601 and/or customer overpayments (request 36); any effort or actions reconcile Oracle's "On Account" or "unapplied cash," including unapplied cash account 25005 (request 39); any measures taken from October 2002 to the present relating to refunding customers, adjusting or reconciling invoices, or adjusting credit analyst notes for all customers

---

[1] "Debit memos" are essentially fake invoices that were created by Oracle to make it look like the customer overpayments were actually payments for legitimate invoices. RSAC, ¶ 37(c). "Each of the debit memos lists a 'credit' in the amount of the overpayment and clearly states 'Revenue' at the start of the line item." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004). "Each of the credit line items offsets a debit of the same amount that is identified as a 'Receivable,' which reveals that the funds apparently moved from the receivable to the revenue account ... [i]n other words, the amounts were improperly recognized as revenue." *Id.*
[2] Plaintiffs allege that a witness, Confidential Witness ("CW") 46, reported that Oracle's 2Q01 reported revenues and earnings were false when made and were the result of the improper conversion of more than \$228 million of customer cash "On Account" to revenue in 2Q01. RSAC, ¶¶ 36-38. Additional corroboration of is provided by CW 49. *Id.*, ¶ 41

(request 40); the November 17, 2001 debit memos and/or unapplied cash (request 42); transactions in Oracle's 25005 account occurring between November 1, 2000 and November 30, 2000 and between October 11, 2002 and March 31, 2003 (request 43); and any "On Account" clean up or reconciliation of Oracle's "On Account" during the relevant time period and/or between October 2001 and March 31, 2003 (request 44).

On January 18, 2005, Defendants provided Plaintiffs with responses to the requests. Subject to and without waiving numerous objections, Defendants agreed to produce "responsive, non-privileged documents for the period June 1, 2000 to March 1, 2001 that relate to debit memoranda identified in the [RSAC] as occurring November 17, 2000." *Id.* On February 17, 2005, Oracle produced a number of documents in response to Plaintiffs' requests.[3]

### *The March 10, 2005 Discovery Plan*

On March 1, 2005, Judge Spero held a day-long discovery conference with the parties regarding the Discovery Plan. During the discovery conference, Judge Spero limited production of accounting documents in two ways. First, the Discovery Plan limited production of accounting documents to only those pertaining to the November 17, 2000 account clean up, the 46,000 debit memoranda created at that time, and all documents related to the accounting treatment of those debit memoranda. Second, Judge Spero denied Plaintiffs' request for discovery into the 2002 clean up project. Judge Spero balanced both these limitations on Plaintiffs' discovery, however, by recognizing Plaintiffs' entitlement to: (1) an audit trail and complete history of account transactions for all of the debit memoranda, and (2) the opportunity to reassert a request for discovery relating to the 2002 clean up project if the documents produced in response to the Discovery Plan demonstrated a connection between the debit memos and the 2002 clean up. Specifically, Judge Spero stated to Plaintiffs' counsel:

> You are going to look at every piece of paper that has to do with these debit memos up and down and if it goes through the accounts that you suspect it is going through, well, then, that will be one thing. If it isn't, then it isn't... if it turns out that none of this money passes through the 12601 account, then why isn't that the answer? ... Okay. We will find out.

---

[3] As part of its production, Oracle produced accounting documents, including: (1) internal and external e-mail communications regarding the creation of the computer program that effected the debit memo project, refunds to customers, and the "on account" clean up generally; (2) screenshots from Oracle's accounts receivable program showing the offsetting debits, credits, refunds and payments for a variety of customers; (3) a variety of reports, including Billing Histories, Summary Trial Balance sheets, Segment Values Listing, Sales Journals, Receipt Histories and the Invoice Register; (4) copies of refund checks; (5) accounts payable check request forms; and (6) a copy of Oracle's presentation to the SEC.

1  *Id.* Judge Spero concluded by stating that:

2
3          So with respect to the accounting allegations, the subject matter is all of the documents
           regarding the on account clean up in 2000 – in the relevant time period, all the documents
4          regarding or related to the 46,000 debit memos and all documents related to the
           accounting treatment of those memos.

5  *Id.*, Ex. 3 at 44:20-25. On March 10, 2005, Judge Spero issued an Amended Order Setting a

6  Discovery Plan ("the Discovery Plan"). The Court ordered Defendants to produce by May 1,

7  2005:

8          all documents relating to (i) the alleged 'On Account Cleanup' occurring in November
           2000; (ii) the 46,000 debit memoranda; and (iii) the accounting treatment of those debit
9          memoranda, including any audit trail, and all related accounting policies.

10 *Id.*, §§ I.C.4 and II.A.

11         On May 10, 2005, Defendants produced additional documents in response to the

12 Discovery Plan. Defendants' production included a spreadsheet containing information for each

13 of the 46,000 debit memos, including the debit memo amount and the corresponding credit

14 amount. Myers Decl., ¶ 11.

15                                    *The October 19, 2005 Order*

16         On August 5, 2005, Plaintiffs sent a letter to Judge Spero requesting an order compelling

17 Defendants to produce all documents relating to the 46,000 debit memos. Plaintiffs took issue

18 with the spreadsheet produced by Oracle and asserted that Defendants had failed to produce

19 underlying or supporting documents relating to the debit memos, including, invoices, all journal

20 entries and correspondence with customers regarding overpayments. In response, Defendants

21 asserted that they had produced all of the documents contemplated by the Discovery Plan. On

22 August 12, 2005, the parties participated in another conference with Judge Spero. Further meet

23 and confer efforts failed to resolve the parties' dispute. On October 7, 2005, the parties submitted

24 a joint letter to the Court regarding Defendants' production of accounting documents in response

   to the Discovery Plan.

25         A hearing regarding the dispute was held before Judge Spero on October 18, 2005. Judge

26 Spero began the hearing by stating:

27         I'm concerned that during the course of setting up the very detailed discovery plan
           in this case, the defendants argued and obtain[ed] a narrower scope of discovery in
28         exchange for a commitment that all of the documents regarding all of these debit memos,

29

                                                                                                    4

including all the underlying documents would be committed. And that, to my mind, is clear as day in the transcript that that [sic] was the position taken at that time. And you are changing your position.

Now, there may be good reasons to change your position, maybe I'll buy that, but one of the things that occurs to me is … why shouldn't I just hold you to your position?

Judge Spero further stated that:

I'm never going to believe that every canceled check, that every canceled check on 10,000 debit memos are relevant to this case . . . You are never going to be able to convince me of that. So doesn't that mean that that we need some dramatic compromise? You both have to answer those questions.

Prior to hearing oral argument, Judge Spero proposed the following order, which accorded the Plaintiffs the right to seek additional production of documents upon an adequate showing of good cause:

That the defendants would produce all information stored in electronic form regarding all [46,000] debit memos in all underlying transactions …; that the defendants produce all documents [not in electronic form] regarding the … debit memos in the underlying transactions only for debit memos over $ 1 million …; and that lastly, if after reviewing all this evidence the plaintiffs can convince me that there is a good reason why they should get more of the hard documentation regarding … the underlying transactions … then we'll take that up at that time.

Addressing the possibility of a further request for accounting documents by Plaintiffs, Judge Spero observed that:

Well, it depends on your showing. You are welcome if you make a good showing, you are unwelcome if you make a bad showing. Seriously, at some point it becomes such minutia. And I'm not reluctant to have them spend a thousand hours preparing what the Court has suggested in terms of the electronic data, I am reluctant to have them spend 45,000 hours or 25,000 hours preparing. It would take some more significant showing to do that.

After hearing further argument by the parties, Judge Spero ordered that Oracle must produce within 30 days:

1.     All electronic information, including electronic images of documents, relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $100,000 or greater.
2.     All paper documents relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $1,000,000 or greater.

5

There are 776 debit memos in excess of $100,000; these debit memos account for $528 million of the $692 million total of the debit memos created on November 17, 2000. July 17, 2006 Order, citing Myers Decl., ¶ 8. The October 19, 2005 Order was made "without prejudice to Plaintiffs' right to come to this Court and seek additional production of documents and electronic information related to the debit memos, upon a showing of good cause." With respect to the remaining debit memos, Judge Spero stated that "if you guys can work out a sampling on them, that would be great," and that "I think you proposed a sampling at some point."

In November 2005, Defendants produced more than 100 boxes of hard copy documents relating to the transactions underlying the debit memos worth $1 million or more. Defendants also produced an Excel spreadsheet, in native format, containing electronic-stored data regarding the 776 debit memos (that have a dollar amount in excess of $100,000). The spreadsheet or "script output" provided a complete accounting history for the debit memos, organized according to debit memo and their underlying transactions, contemplated by the October 19, 2005 Order. On February 13, 2006 and February 16, 2006, Defendants produced additional accounting documents. On April 27, 2006, Defendants produced thousands of pages of additional spreadsheets, including "call notes" related to customer overpayments and unapplied cash items.

*The July 17, 2006 Order*

On May 25, 2006, Plaintiffs submitted a motion to compel Defendants' production of accounting documents. Specifically, Plaintiffs asked the Special Master to: (1) enforce the Court's March 10, 2005, and October 19, 2005 Orders by compelling Defendants to produce all documents relating to the 46,000 debit memos and the underlying transactions as previously agreed upon by Defendants on March 1, 2005, including eight specific categories of documents; (2) issue an order permitting discovery into Oracle's improper transfers of tens of millions of dollars in customer overpayments and unapplied cash to its bad debt reserve and other accounts (including $20 million in transfers in 2Q01) to inflate Oracle's earnings; and (3) compel defendants to produce documents related to Oracle's 2002 Clean Up and investigation regarding customer overpayments and unapplied cash.

On July 17, 2006, the Special Master issued an order granting in part and denying in part Plaintiffs' motion. *See* July 17, 2006 Order. Plaintiffs' motion to compel production of all documents relating to the 46,000 debit memo transactions was denied. The Special Master, however, found that Defendants' production of a spreadsheet was insufficient to comply with the

6

October 19, 2005 Order and ordered Defendants to produce *all* electronic information relating to the 776 debit memo transactions that exceed $100,000 and *all* paper documents relating to the debit memo transactions that exceed $1 million. With respect to Plaintiffs' request that Defendants be compelled to produce documents related to a sample of debit memos valued at under $100,000, the motion was granted in part. Defendants were ordered to produce a sampling documents valued at less than $100,000 (up to 150 debit memos to be selected by Plaintiffs), and to all transactions that underlie those debit memos. Defendants were also ordered to produce all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, which could also be linked to the November 17, 2000 debit memos valued at more than $100,000. Finally, Plaintiffs' request for production of documents related to Oracle's 2002 Clean Up was denied, on the grounds that:

> Plaintiffs' accounting allegations are focused upon the November 17, 2000 debit memos, not Oracle's 2002 Clean Up. As previously stated, documents related to credit memos and refunds that were issued to customers in connection with debit memos are relevant to Plaintiffs' accounting claims and must be produced. Documents related to bad transfers that can be connected to debit memos in excess of $100,000 also must be produced. Plaintiffs' request for production of all documents related to Oracle's 2002 Clean Up, however, is overbroad.

*See* July 17, 2006 at 16. Defendants were ordered to produce the above information and documents no later than August 31, 2006.

### Oracle's Response to the July 17, 2006 Order

On August 31, 2006 and September 8, 2006, Defendants produced approximately 350,000 pages of new accounting documents pursuant to the Court's July 17, 2006 Order. Most of the documents are accounting reports, spreadsheets and emails purporting to reflect information relating to 776 debit memos greater than $100,000, and the 150 smaller debit memos selected by Plaintiffs (the "926 debit memos").[4] These documents, however, were heavily redacted by

---

[4] Defendants have produced the following eight types of documents or information pursuant to the Special Master's July 17, 2006 Order: (1) all accounting-related correspondence, with redactions of information unrelated to one of the 926 debit memos, (2) several accounting reports, including a Billing and Receipt History Report, which "provides a comprehensive list of all billings and payment transactions...for each of the customers related to the 926 debit memos...[beginning] on the earliest date on which there is any accounting transaction...with that particular customer, and ends on the last date...", a Receipt Register Report with similar parameters, a Seven Bucket Aging By Customer Report for each of the thirteen months of the relevant time period, and an Unapplied, Unidentified , On Account Payment Report, with parameters similar to those used in the Aging Report, (3) all electronic "notes" and "comments" fields regarding cash receipts and unapplied receipts, related to accounts payable invoices, and related

7

Defendants. Plaintiffs assert that: "Some of the reports have been redacted in their entirety, leaving hundreds of pages and thousands of lines of blank spreadsheets. These redactions completely distort the relevant information contained in the reports and obscure the relevant information contained in the documents." Plaintiffs Motion at 3; *see* Greenstein Decl., Exs. 2-8 (examples of Defendants' redactions).

### *New Evidence Concerning the 2002 Clean Up Project*

Plaintiffs assert that since the entry of the July 17, 2006 Order, they have discovered new evidence which they believe confirms that the events beginning in October 2002 were directly related to, and used as a cover up for, the November 2000 Clean Up and Defendants' fraudulent use of debit memos and customer overpayments. Plaintiffs offer the following new evidence to support this claim.

### 1. Testimony of Ian Hatada

On October 5 and 10, 2006, Plaintiffs deposed Ian Hatada, a former Oracle Collections Manager who was involved in the 2002 clean up project and attended meetings held to discuss and implement the project. Mr. Hatada's testimony addressed the relationship between the 2002 clean up project, the debit memos created during the November 17, 2000 account clean up and the present lawsuit. Specifically, Mr. Hatada testified about a series of meetings in late October 2002 to discuss an "on account problem" and a significant amount of customer overpayments and unapplied cash that was several years old and that had previously been moved to different accounts by Oracle's creation of debit memos in November 2000 as follows:

> A.    Well, the first—the first meeting that we had to actually give us a—kind of a short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, there was a lot more in the reserve that we were going to have to try to resolve because of a specific lawsuit that, you know, that we had money that we shouldn't have had, and whether it was in the reserve or the unapplied, but the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve.

to credit memos and debit memos, as well as Special Instruction and Notes Relating to Invoices, Credit Memos, and Debit Memos and Dispute Notes Relating to Invoices, (4) electronic data and documents relating to refunds, (5) electronic data, documents, and communications showing any transfers of money from unapplied cash into Oracle's bad debt reserve accounts that could be linked to one of the 926 debit memos, (6) two separate reports related to all accounts receivable "write offs" linked to the 926 debit memos, (7) miscellaneous documents such as a complete copy of the presentation Oracle made to the SEC, and (8) a supplemental Script Output that contains the complete accounting trail for the 926 debit memos. *See* Opposition at 4-10.

8

Q: And were those the items, as far as you know, that resulted from creation of debit memos previously?

A: I believe that was one of the reasons that Mike Quinn and Greg Myers had given us. Greenstein Decl., Ex. 1 (Hatada Tr. at 128:8-129:2; 257:24-263).

Q: ... [w]hat do you recall was the explanation of the on account problem?

A. Well, I—I mean, like this first item, you know, we were called together to explain exactly what it says, that you know, there's an unapplied account issue, there's—there's a lawsuit that's about to happen, and—and we need to resolve— you know, we're going to have to resolve these unapplied amounts, and, you know, there will be a meeting in the near future to explain how we're going to do it. And you know, the bottom line was that they need to figure out if it was—if we had recognized revenue on it or we had not, so if it was revenue impacting or not revenue impacting. *Id.* (Hatada Tr. at 113:19-114:7).

A. From—from what I know from meetings that we had from—with Ryan Roberts, that there was a lawsuit and it was our job to clean up the unapplied plus what had been now moved in to the unapplied account from other accounts because the lawsuit, so in an effort to—to clean that up, to—to help Oracle with this lawsuit. That was what—my understanding. *Id.* (Hatada Tr. at 264:12-265:6)

Additionally, Hatada testified that he was instructed to research and determine the "revenue impact" of Oracles' misuse of customer overpayments, told by Mike Quinn that the results of the investigation were to go to Jeff Henley, and that the revenue impact was "major." *Id.* (Hatada Tr. at 307:5-9, 266:10-21 and 153:16-154:6) Handwritten notes taken by Mr. Hatada contemporaneously with the meetings discussing the events in 2002 also contain multiple references to "debit memos," "on account" and "revenue impact" of the items pertaining to the project. The notes also refer to a "56m" amount for "2 years" which Mr. Hatada testified was the amount of unapplied cash that was transferred to Oracle's reserve during a two year period. *Id.* (Hatada Tr. 305:13-306:21).

## 2. Testimony of Terry Elam

On September 28, 2006, Plaintiffs deposed Terry Elam, a current Oracle manager and former Accounts Receivable Manager involved in the unapplied cash project in 2002. Mr. Elam was one of the few individuals that Greg Myers named as having helped him prepare Oracle's presentation to the SEC on the debit memo issue. Greenstein Decl., Ex. 14 (Myers Tr. at 322:20-323:10). Mr. Elam gave the following testimony:

9

Q. Was there more than one discussion about that, about on-account debit memos being credit memoed two years after November 17th, 2000?

A. I don't recall any—how many there were.

Q. Okay. Well, what do you—just what do you recall about those discussions at all?

A. Um, specifically in the—from Greg Myers about the process related to pulling out some of the entries into the 12601 account in the October-November of 2002 time frame.

Q. Okay. So pulling out some of the entries in 12601; is that what you said?

A. Yeah. The associated entries with the debit memos. Greenstein Decl., Ex. 15 (Elam Tr. at 185:23-186:11).

. . .

A: There—it's a—there's a specific process of—associated with a debit memo that you have to follow to, um, pull—there's two—there's a miscellaneous receipt that you need to—to take out or reverse out of this system, plus unapply a debit memo to actually process the credit memo on it.

Q. Right. But why were you—why were you processing credit memos—or why were you reversing entries into 12601 during 2002?

A: Well, that's part of the spreadsheet that was given to myself, was there was a number of steps needed to credit memo the debit memo. And part of that is to reverse out the miscellaneous receipt into 12601. *Id.* (Elam Tr. at 187: 10-188:2).

### 3. Testimony of Jennifer Minton

Plaintiffs also cite as significant, the contradictory testimony by Oracle's current CFO and former Vice President of Global Finance during the Class Period, Jennifer Minton. On July 7, 2006, during the first day of her deposition, Ms. Minton testified that she had not been involved in the 2002 investigation into Oracle's unapplied cash problem, and had been told by Oracle's legal department to keep herself uninvolved from the 2002 investigation and that she did not know the results of the investigation. On September 25, 2006, the second day of her deposition, Ms. Minton clarified her testimony, stating that she was aware that there was an investigation going on, and she became aware of the results of the investigation and did discuss the financial results of the investigation with Tom Williams. Greenstein Decl., Ex. 17 (Minton Tr. at 278:15-279:20).

### 4. New Documents

Plaintiffs additionally cite several documents produced in response to the Special Master's July 17, 2006 Order as new evidence of a connection between the 2002 clean up project and the debit memos created on November 17, 2000. A key document is a 318 page spreadsheet dated April 23, 2003 with 2 tabs that includes the column headings "Total amounts to adjust up & apply," "Explanation," "Debit Memo Number if app.," "Reason for Credit Memo," "Ok to refund per Telam [Terry Elam]," "PA Reason for Credit Memo" and "Refund/Adjust." (NDCA-ORCL 274340-793547). All but 34 of over 4,500 rows of this spreadsheet, however, have been redacted by Defendants. Greenstein Decl., Ex. 20. NDCA-ORCL 835639-835763 is a 125 page spreadsheet dated May 28, 2003 with two tabs, including the column headings "Revenue Reversed?," "Amount CM'd," "Amount Paid," "Amount Adj[uste]d," "Amount in Dispute," "Scrubbed Amount," "In Dispute" and "Reason Code." All but seven of over 3,000 rows of data have been redacted. *Id.*, Ex. 21.

Finally, Plaintiffs state that after analyzing the information produced regarding the 926 debit memos, 180 of the 926 debit memos (almost 20%) were reversed and at least 68 were refunded as part of the 2002 unapplied cash project. *Id.*, Ex. 16. "Of the 150 smaller debit memos selected by Plaintiffs pursuant to the Court's July 17, 2006 Order, approximately 27% of those debit memos were reversed and/or refunded as part of the unapplied cash project in 2002. Reply at 7 (citing ex. 16).

*New Evidence Concerning Transfers to Account 12601*

Plaintiffs also offer new evidence relating to Oracle's transfers of unapplied cash to Oracle's bad debt reserve in 2Q01. Plaintiffs assert that analysis of the documents Defendants have produced in response to the July 17, 2006 Order reveal that "some of the more than $20 million in customer overpayments from Account 25005 that were transferred to Account 12601, thereby inflating Oracle's 2Q01 results, were made in connection with smaller debit memos that Oracle refuses to produce." Motion at 17. Plaintiffs assert that "evidence reveals that Oracle frequently performed an 'auto-adjustment' or 'sweep' of unapplied cash to Oracle's bad debt reserve that transferred extremely small dollar amounts, in some cases as little as $0.01. Greenstein Decl., Ex. 24." *Id.* Oracle representative Tom Williams had testified that the auto-adjustment only occurred once in January 2002. Mr. Hatada testified during his deposition that from his understanding "this is something that was ran either—you know, I don't know how

often, but I know it wasn't something that wasn't ran once." Greenstein Decl., Ex. 1 (Hatada Tr. at 348:18-349:20).

### Legal Standard

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "Whether material is relevant is ... a function of the relationship of the data to the central accusations of [the] lawsuit." *U.S. ex rel. Fisher v. Network Software Associates,* 217 F.R.D. 240, 245 (D.D.C. 2003) (citation omitted).

"All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." Fed. R. Civ. Proc. 26(b)(1). "Rule 26(b)(2)(iii) expressly limits discovery where the burden or expense of the proposed discovery outweighs its likely benefit." *Jackson v. Montgomery Ward & Co., Inc.*, 173 F.R.D. 524, 528 (D.Nev. 1997). "The party claiming that a discovery request is unduly burdensome must allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence. *Id.* at 528-529 (citations omitted). "Just because complying with a discovery request will involve expense or may be time consuming, does not make it unduly burdensome." *Id.* at 529 (citations omitted).

In *Seafirst Corp. v. Jenkins*, 644 F.Supp. 1160 (W.D.Wash. 1986), the Comptroller of the Currency asserted that the subpoenas seeking copies of specific reports were overbroad in that much of the information contained in the reports was irrelevant to the litigation. The court stated that:

> The court believes that disclosure of some possibly irrelevant material will cause no harm. In contrast, partial disclosure may tend to distort the tenor of the reports. *See Franklin Nat'l Bank*, 478 F.Supp. at 585. The court observes that the redacted versions of [the] reports the Comptroller supplied to class plaintiffs two years ago are incoherent and virtually useless.
>
> The court concludes that the best course of action is to require production of whole reports. This approach eliminates any burden on OCC to separate relevant and irrelevant portions of the reports. It also protects the litigants from possible nondisclosure of information they might consider significant.

*Id.* at 1165.

In *In re Atlantic Financial Federal Securities Litigation,* 1991 WL 153075 (E.D.Pa. August 6, 1991), a class action securities fraud case, the plaintiffs filed a motion to compel production of *inter alia* minutes of and reports to the board of directors and unredacted copies of documents previously produced. The plaintiffs asserted that the defendants had deleted and withheld highly relevant pages from the documents it produced, and that the defendants had redacted other documents to such an extent that they had been rendered meaningless. Defendants responded "that the vast majority of the documentation would be provided in unredacted form," but noted that "only those documents containing irrelevant information ... were ... redacted." After noting the plaintiffs' reliance upon *Seafirst*, the court stated that:

> In the present case, no privileges are asserted by [the defendants] and the only objection made is that the redacted information is irrelevant. Given that relevancy is broadly construed for discovery purposes ... and that plaintiffs have indicated the possibility of additional relevant information within the redacted documents, it is within this Court's discretion to order the documents produced in unredacted form. Moreover, defendants are already well-protected from improper disclosure by the confidentiality order. Therefore, in the event that there are documents yet unproduced or produced in redacted form, defendants are ordered to produce those to plaintiffs.

*Id.* at *4.

*In re Medeva Securities Litigation,* 1995 WL 943468 (C.D.Cal. May 30, 1995), the plaintiff filed a motion for an order compelling further production of documents. The plaintiff complained that the defendants had redacted at least some material from "thousands" of documents, and that in some cases, the documents have been redacted so severely that they are unusable or devoid of context. Defendants responded that they have redacted the documents based upon a number of principles, including: (i) privilege; (ii) descriptions of pending litigation; and (iii) outside the relevant time period. The court stated that:

> The problem is less the principles than the procedure. The Court does not welcome unilateral editing of documents by the producing party. Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured. It also tends to make documents confusing or difficult to use. All too often, the practice results in litigation of collateral issues and *in camera* review of documents by the Court, with the result that the time of both counsel and the Court is wasted. These drawbacks ordinarily outweigh the minimal harm that may result from disclosure of some irrelevant material. Infrequently, where a document contains a paragraph of privileged or very sensitive material, redaction is a sensible solution. Under those circumstances, however, the party requesting production should be given a document-by-document indication, such as plaintiffs

13

received with respect to allegedly privileged documents in this case, as to the nature of the material redacted and the basis for the redaction.

*Id.* at *3. The court found that with respect to documents redacted for reasons other than privilege, corrective measures were warranted, and granted the plaintiffs' motion to compel the defendants to produce unredacted copies of documents redacted on a basis other than privilege. *Id.*

Discussion

*Oracle's Redactions of Documents Produced Pursuant to the July 17, 2006 Order*

Plaintiffs contend that Defendants improperly redacted hundreds of thousands of pages of documents related to the 926 debit memos. Plaintiffs assert that Defendants "have redacted all information that cannot be specifically traced to one of the 926 debit memos, even if that information contains information on other debit memos and account-level reconciliations that consolidate other smaller debit memo items. Plaintiffs object that these redactions "completely distort the relevant information contained in the reports and obscure the relevant information contained in the documents, and that Defendants' unilateral redaction for relevance or 'non-responsiveness' is improper. Plaintiffs assert that Defendants are not redacting the information based upon the attorney-client privilege, work product doctrine, trade secret or right to privacy grounds. Plaintiffs assert that "the July 17, 2006 order was premised on defendants' argument that producing information on the other 45,000+ debit memos was unduly burdensome and would cost 'millions' of dollars to produce." Plaintiffs contend that: (1) Defendants' burden argument does not apply to documents and reports already produced and (2) "the burden of searching, analyzing and redacting thousands of lines of data from reports, spreadsheets and emails...is far greater than the minimal burden of merely producing the documents in unredacted form."

Defendants contend that the redacted information has "nothing to do with the 926 debit memos" and does not relate to the 926 debit memos. Defendants assert that given the nature of the documents and the parameters of the reports produced as part of the supplemental accounting production, Defendants believe that much of the redacted information has nothing to do with any of the 46,000 debit memos." Opposition at 12. Defendants assert that given the information they have produced, the argument that the redactions distort the accounting history of the 926 debit memos is demonstrably incorrect. Defendants assert that their produced documents were guided by the prior orders of the Court and the Special Master, which "clearly set forth that Plaintiffs are

entitled only to information that relates to the 926 debit memos. Defendants assert that multiple courts have upheld a responding party's redactions of non-responsive information in discovery productions, and assert that they have redacted non-responsive, confidential, and proprietary information pertaining to transactions and customers having nothing whatsoever to do with the 926 debit memos.

Finally Defendants assert that there is a substantial burden associated with producing information unrelated to the debit memos. Defendants argue that granting Plaintiffs' request for unredacted documents would impose a substantial burden on Defendants because "Plaintiffs undoubtedly would seek (as they have in the past) documents underlying these extraneous transactions on the theory that the limited information set forth in the unredacted documents does not provide enough context for Plaintiffs to understand the transactions." Opposition at 15. Defendants claim they have already spent a massive amount of time and money complying with the accounting discovery orders and that Plaintiffs will attempt to use any additional discovery to manufacture new claims that have nothing to do with the accounting allegations in their complaint. *Id.*

In reply, Plaintiffs assert *inter alia* that: (1) speculation about the possibility of future discovery battles arising from the production of documents does not constitute an unreasonable burden under Fed. R. Civ. P. 26, because such a rule would render virtually any document request unduly burdensome; (2) Defendants' claims that they have redacted "confidential and proprietary information" are entirely conclusory, and Defendants have failed "to identify a single piece of data that is confidential or 'proprietary' under Fed. R. Civ. P. 26(c) such as trade secrets, social security numbers, private banking account numbers or other private information;" and (3) the stipulated protective order ensures that there is no risk that any proprietary information will be disclosed by production of unredacted documents.

The July 17, 2006 Order requires Defendants to produce documents and information related to the 926 debit memos. The order did not permit Defendants to redact information from the documents that Defendants believe to be non-responsive. The documents at issue were produced by Defendants in response the July 17, 2006 Order, and thus clearly contain relevant information. Any and all redactions from responsive documents must be logged and explained. Consistent with the cases cited above, while a party may redact privileged material from a responsive document, it is inappropriate for a party to redact information on the basis that

15

information is "non-responsive." Defendants' unilateral redaction of information from the supplemental accounting documents on the grounds it is not relevant or is "non-responsive" is improper. Defendants have failed to support their brief assertion that they have redacted "confidential" and "proprietary information" from the documents responsive to the July 17, 2006 Order. Defendants' burden argument with respect to producing unredacted copies of the documents already produced is unpersuasive.[5]

Accordingly, Plaintiffs' motion to compel production of unredacted copies of all documents (including reports, spreadsheets and e-mails) produced by Defendants pursuant to July 17, 2006 Order is GRANTED.

*All Documents Relating to Oracle's October 2002 Unapplied Cash Project*

Plaintiffs' May 25, 2006 motion to compel sought production of documents related to Oracle's 2002 "Clean Up" of customer overpayments and unapplied cash. Plaintiffs asserted that the 2002 Clean Up, commenced shortly after Plaintiffs filed their Second Amended Complaint adding accounting allegations, was an attempt to conceal the previous November 2000 Clean Up, the fraudulent impact of the debit memo transactions, the improper bad debt reserves transfers and the overall unapplied cash scheme to hide customer overpayments. Plaintiffs sought an order compelling Defendants to produce "all documents and communications relating to any investigation, clean up, project or reconciliation relating to Oracle's unapplied cash, bad debt reserve, or customer overpayment accounts after November 17, 2000, including but not limited to any investigation relating to Account 25005, Account 12601, or Account 12018 and any debit memos, credit memos or refunds associated with those investigations. The motion to compel production of such documents was denied on the basis that while documents related to credit memos and refunds that were issued to customers in connection with debit memos were relevant to Plaintiffs' accounting claims, Plaintiffs' request for production of all documents related to Oracle's 2002 Clean Up was overbroad.

Plaintiffs contend that new evidence has confirmed that Oracle's unapplied cash project in 2002 was a direct result of Plaintiffs' lawsuit and the debit memo allegations, and as such, all documents relating to Oracle's unapplied cash clean up project commenced in October 2002 are relevant to Plaintiffs' accounting allegations and thus discoverable. Plaintiffs assert that: (1)

---

[5]  It is usually more burdensome and costly to redact documents than to produce documents without redaction.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

contrary to Defendants' previous representations that there was "no connection whatsoever" between the events in 2002 and Plaintiffs' accounting allegations, new testimony from former Oracle collections manager, Ian Hatada, confirms that the events in 2002 were related to the November 2000 Clean Up and the debit memos; (2) new testimony by former Oracle accounts receivable manager Terry Elam and Oracle's current CFO, Jennifer Minton, confirms that the 2002 project was related to Plaintiffs' accounting allegations; (3) new documents produced since the entry of the July 17, 2006 Order confirm that the unapplied cash project beginning in 2002 is related to Plaintiffs' accounting allegations; and (4) new evidence confirms that thousands of credit memos were issued and millions of dollars were refunded for debit memo items in 2002 and 2003.  Plaintiffs assert that the cited testimony and documents, not available at the time of the entry of the July 17, 2006 Order, confirms that the investigations and events beginning in October 2002 were not "separate" events unrelated to Plaintiffs' lawsuits and the debit memo transactions as defendants have repeatedly represented, and that the project in 2002 resulted in the reversal of debit memo transactions and countless refunds of millions of dollars that were directly related to debit memos and the November 2000 Clean Up.

15
16
17
18
19
20
21
22
23
24
25
26

Defendants contend that Plaintiffs have not provided any basis for additional discovery into the October 2002 unapplied cash project. Defendants assert that: (1) Mr. Hatada's testimony "amounts to little more than speculation and hearsay from a former Oracle employee who readily admitted that he did not understand what he was being told to do " and that Mr. Hatada had "no accounting background, training, or knowledge, no familiarity with Oracle's revenue recognition policies, and no involvement at any time with Oracle's revenue recognition process" (Hatada Tr. at 350-363; 473:4-11; 376:16-19; 379:7-20); (2) numerous witnesses have confirmed the lack of connection between the unapplied cash project (2002 Clean Up project) and the debit memos, citing the testimony of Molly Littlefield-Venkataramana (another Collections Manager involved in the October 2002 activities), and Michael Quinn and Thomas Williams, both former high-level Oracle executives; (3) neither Elam nor Minton "suggested even remotely that there was a connection between the creation or accounting of the debit memos and the unapplied cash project;"[6] and (4) the documents produced in response to the July 17, 2006 Order do not justify a

27

---

6  When asked, "do you believe that any of the steps you took in that time period, October-November of 2002, changed the original accounting of the on-account debit memos that were created in November of 2000?" Mr. Elam answered, "No, I do not." Collins-Burgard Decl., Ex. 33, (Elam Tr. at 330:5-13). Mr. Elam further testified that he did not recall any conversations in October 2002 regarding refunds of debit memos and that he did not know even if

17

reconsideration of the scope of discovery, stating that "if there truly were a connection between the debit memos and the unapplied cash project, one would expect that a larger percentage of the debit memo transactions would have been refunded as part of the 2002 unapplied cash project, instead of the 68 debit memos identified by Plaintiffs."

In reply, Plaintiffs assert that Defendants have repeatedly represented to Judge Jenkins, Judge Spero, and now the Special Master, that the 2002 unapplied cash project and investigation had "no connection whatsoever" to the debit memos and the November 2000 Clean Up. Greenstein Reply Decl., Exs. C (March 1, 2005 Hearing Tr. at 51:19-53:2; *Id. at 52:17-22),* D (July 10, 2006 Hearing Tr. at 79:11-14 -"The creation of the debit memos had no financial impact whatsoever and that it was a discrete separate event from the unapplied cash cleanup that happened in October of 2002…and there is no link…."); *see also id.,* Ex. D at 80:9("There simply is no connection there."). Plaintiffs, after quoting statements from Defendants' opposition brief asserting that Defendants have already "produced any documents or electronic information generated as part of that [unapplied cash] project that could be linked to one of the 926 memos." ask "how can some of the 926 debit memos be 'linked' to the 2002 project if there is 'no connection whatsoever' between the two events?" and "why were senior Oracle accounting officers asking collections personnel to research, reverse, and refund debit memos as part of the 2002 unapplied cash project." Plaintiffs assert that they have established that 20% of the sampled debit memos valued over $100,000 and 27% of those sampled valued at less than $100,000 were reversed and/or refunded during the 2002 unapplied cash project. Plaintiffs note that Mr. Hatada has the same personal knowledge of the events in late 2002 as Ms. Venkataramana and that the conflicting testimony of the two only further justifies the need for discovery into the 2002 Clean Up project. Plaintiffs argue that Defendants' strategy of attacking Mr. Hatada's personal knowledge completely fails to offer evidence refuting his testimony that he and the rest of Oracle's collections staff "was told that the lawsuit and debit memos were part of the same 'problem' that had to be cleaned up immediately to determine the 'revenue impact of the debit memo transactions. Ex. 1 at 128:8-120:2; 257:24-263." Plaintiffs further reassert that Ms.

his work in October 2002 involved any debit memos. *Id.* (Elam Tr. at 188:3-13). Mr. Elam also testified that there was no accounting impact from "credit memo'ing" debit memos in October 2002. *Id.* (Elam Tr. at 332: 7-11).

Ms. Minton's clarification of her testimony on the second day of her deposition was not contradictory, but only an attempt to ensure her testimony was accurate and complete. The information she received concerning the 2002 Clean Up project undercuts Plaintiffs' position because Minton was told "there was not a material impact on [Oracle's 2001] financial statements…." *Id.*, Ex. 14 (Minton Tr. at 278:15-279:20).

Minton's deposition concerning the 2002 unapplied cash project is contradictory and further justification for discovery into the project. Finally, Plaintiffs also contend that Defendants ignore the relevant testimony of Terry Elam, which confirms that the unapplied cash project in 2002 had the effect of "unapplying" debit memos and "reversing" transactions underlying the debit memos.

Judge Spero stated during the March 1, 2005 conference concerning the discovery plan:

> You are going to look at every piece of paper that has to do with these debit memos up and down and if it goes through the accounts that you suspect it is going through, well, then, that will be one thing. If it isn't, then it isn't... if it turns out that none of this money passes through the 12601 account, then why isn't that the answer? ... Okay. We will find out.

*Id.*, Ex. 3 at 44:3-19. There is no dispute between the parties that roughly 20% or more of the debit memos go "through the accounts that [Plaintiffs] suspect [they are] going through." Therefore, Plaintiffs have given the Court reason to reconsider whether discovery should be allowed into the 2002 unapplied cash project.

Mr. Hatada's testimony that he and the rest of Oracle's collections staff was told in 2002 that the unapplied cash clean up project was in response to a law suit and concerned debit memos created in 2000 cannot be negated by attacking Mr. Hatada's personal knowledge of Oracle's accounting practices. Although not conclusive on the issue, Mr. Hatada's testimony, Mr. Elam's testimony, Ms. Minton's testimony, and the documentary evidence offered by Plaintiffs in this motion together raise substantial questions about the relationship between the November 2000 debit memos and the 2002 Clean Up.

Judge Spero has already voiced concern that Defendants have made statements to the Court regarding discovery of accounting documents and then later changed their position. Here, again, Defendants have stated one position (that there is no link between the debit memos and the 2002 Clean Up project) and later shifted that position (by claiming all linked documents have been produced and that the link is not substantial). Given the Defendants' former position and the new evidence offered by Plaintiffs, the Special Master concludes that information relating to events concerning the October 2002 unapplied cash project are reasonably calculated to lead to discovery of admissible evidence regarding Plaintiffs' accounting allegations and Defendants' scienter during the Class Period. Defendants did not offer or suggest any reasonable restrictions regarding the scope of documents requested by Plaintiffs. Defendants similarly failed to offer any burden argument with respect to Plaintiffs' request. Given the new evidence presented, the

burden or expense of the proposed discovery is outweighed by its likely benefit.

Accordingly, Plaintiffs' motion to compel production of documents relating to Oracle's unapplied cash clean up project commenced in October 2002 is GRANTED.

*All Documents Relating to Transfer of Customer Overpayments and Unapplied Cash to Account 12601 in Connection with Oracle's 2Q01*

In Plaintiffs' May 25, 2006 motion to compel production of accounting documents, Plaintiffs asserted that discovery had demonstrated that Oracle overstated its 2Q01 earnings by at least an additional $20 million by improperly transferring customer overpayments (Account 25005) to Oracle's Bad Debt Reserve (Account 12601) between August 2000 and August 2002, directly impacting the Class Period, and that documents relating to Oracle's improper transfers of unapplied cash to the bad debt reserve are relevant to Plaintiffs' allegations that Oracle improperly used customer overpayments and unapplied cash to inflate Oracle's earnings in 2Q01, citing paragraphs 35-41 of the RSAC.[7]  In the July 17, 2006 Order, the Special Master found that documents relating to transfers of customer overpayments and unapplied cash to Oracle's bad debt reserve which can also be linked to the November 17, 2000 debit memos are relevant to Plaintiffs' accounting claims.  Defendants were ordered to produce all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, which can also be linked to the 926 debit memos.

Plaintiffs contend that Defendants continue to refuse to produce documents relating to Oracle's transfers of unapplied cash to Oracle's bad debt reserve account.  Plaintiffs assert that analysis of documents relating to the 926 debit memos reveals that more than $20 million in customer overpayments from Account 25005 that were transferred to Account 12601, thereby inflating Oracle's 2Q01 results, were made in connection with smaller debit memos that Oracle refused to produce.  Plaintiffs assert that the bad debt transfers were not limited to the 926 debit memos, and that new evidence reveals that Oracle frequently performed an "auto-adjustment" or "sweep" of unapplied cash to Oracle's bad debt reserve that transferred extremely small dollar amounts, in some cases as little as $0.01.  Greenstein Decl, Ex. 24.  During his deposition, Mr.

---

[7] Plaintiffs sought an order compelling Defendants to produce "all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, from the period June 2000 through the present." *See* Plaintiffs' Proposed Order Granting Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents at ¶ 3.

20

Hatada testified, "From my understanding this is something that was ran either—you know, I don't know how often, but I know it wasn't something that wasn't ran once." *Id.*, Ex. 1 (Hatada Tr. at 348:18-349:20). Plaintiffs assert that this evidence calls into question Tom Williams' testimony to the Special Litigation Committee that the auto-adjustment process occurred only once in January 2002.

Plaintiffs contend that they are "entitled to discovery into the bad debt transfers that occurred or impacted Oracle's 2Q01, the specific quarter that plaintiffs allege was false in the SAC." Plaintiffs assert that there is no burden in producing documents relating to Oracle's bad reserve transfers for the single quarter 2Q01 because Defendants have already preserved the documents at issue and already done the research and analysis of which debit memos had a credit balance due to cash in Account 12601 as of November 2001. Specifically, Plaintiffs cite the declaration of Greg Myers, which states, "[A]ll of the 12601 transactions (from the original cash receipt transactions through the final positive miscellaneous receipt transactions) from August 2000 up through the period immediately preceding the recent 12601 project have been electronically preserved, including all of the most recent comments associated with those transactions. *Id.*, Ex. 25. Plaintiffs also cite an email from Terry Elam to Greg Myers which states: "Greg, Attached is the data from the master file for the debit memos that have a Cr. Balance due to cash as of Nov-00 in the 12601 account." *Id.*, Ex. 26.

Defendants contend that they have fully complied with the July 17, 2006 Order which required Defendants to produce only those documents concerning transfers to its bad debt reserve accounts "which can also be linked to the November 17, 2000 debit memos valued at more than $100,000." July 17, 2006 Order at 17-18. Defendants state that they voluntarily produced documents concerning transfers to its bad debt reserve accounts which could be linked to the 150 smaller value debit memos selected by Plaintiffs. Defendants argue that the exhibit relied upon by Plaintiffs, Exhibit 24, in seeking discovery of the purported "auto adjustments" is not new and was produced long ago and was used by Plaintiffs to question numerous witnesses well before the July 17 Order. Defendants argue that Mr. Hatada's testimony on this issue has no substantive value since he "acknowledged that he had no involvement in the creation of the debit memos, did not learn about them until two years later and still does not understand the accounting function of a debit memo." Finally, Defendants state that Plaintiffs' claim that there is no burden associated with producing the requested documents is unfounded and that they would face a substantial

burden in having to produce additional documents beyond the scope of the July 17 Order.

In reply, Plaintiffs state that they seek "documents related to a discreet amount of transfers ($20+ million) related to one specific quarter (2Q01). Plaintiffs reassert that both the email from Mr. Elam to Mr. Myers and the testimony of Mr. Hatada are new evidence establishing the readily availability of a "master file" concerning "debit memo's that have a Cr. Balance due to cash as of Nov-00 in the 12601 account" and that the auto-adjustment process for transferring small amounts of overpayments into the bad debt reserve was regularly used. Plaintiffs argue that while Defendants assert in a conclusory fashion that there is a substantial burden involved in producing what Plaintiffs contend is highly relevant evidence, Defendants make no showing of this burden. Plaintiffs contend that because the July 17, 2006 Order was premised on defendants' assertions of burden, the newly proffered evidence entitles them now to seek a broader scope of discovery since "[t]he relevance of the documents far outweighs any speculative burden that defendants allege." Reply at 14.

In the July 17, 2006 Order, the Special Master concluded that documents relating to transfers of customer overpayments to Oracle's bad debt reserve, which could also be linked to the November 17, 2000 debit memos were relevant to Plaintiffs' allegations. The new or different evidence cited by Plaintiffs, Exs. 11 and 26, reveal a further connection between the debit memos and Oracle's bad debt reserve account during the relevant period. Plaintiffs now seek additional documents related to Oracle's 2Q01. The requested information is relevant to Plaintiffs' allegations. The master file created by Mr. Elam should substantially decrease the burden created by enlarging the scope of production to include all such documents related to 2Q01. Plaintiffs have also produced new testimony suggesting the possibility that the auto-adjustment process was more than a one time event. Defendants have offered no specific rebuttal as to the burden involved in using the master file referred to in Mr. Elam's email to produce the requested documents. Given the new evidence presented, the burden or expense associated with the production of all documents concerning Oracle's transfers of over $20 million in unapplied cash and/or customer overpayments from Account 25004 to Account 12601 in connection with Oracle's second fiscal quarter 2001 is outweighed by its likely benefit. Accordingly, Plaintiffs' motion to compel production of all documents relating to Oracle's transfer of the more than $20 million in transfers of customer overpayments and unapplied cash from Account 25005 to Account 12601 in connection with Oracle's 2Q01 is GRANTED.

1

## Order

2

For the reasons set forth above,

3

1.  Plaintiffs' motion to compel production of unredacted copies of all documents

4

produced pursuant to the Special Master's July 17, 2006 Order re: accounting

5

documents is GRANTED.

6

2.  Plaintiffs' motion to compel production of all documents relating to Oracle's

7

unapplied cash project beginning in October 2002 is GRANTED.

8

3.  Plaintiffs' motion to compel production of all documents relating to Oracle's

9

transfer of the more than $20 million in transfers of customer overpayments and

10

unapplied cash from Account 25005 to Account 12601 in connection with Oracle's

11

2Q01 is GRANTED.

12

4.  Defendants shall provide Plaintiffs with the electronic information and documents

required by this ORDER no later than January 17, 2007.

13

14

15

IT IS SO ORDERED.

16

17

Dated: _12-19-06_

18

Hon. Edward A. Infante (Ret.)
Special Master

19

20

21

22

23

24

25

26

27

28

29