# EXHIBIT 4



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

SAN DIEGO • SAN FRANCISCO
LOS ANGELES • NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
PHILADELPHIA • SEATTLE

Shawn A. Williams
ShawnW@lerachlaw.com

February 23, 2005

<u>VIA E-FILE & HAND DELIVERY</u>

The Honorable Joseph C. Spero
Magistrate Judge of the United States
District Court
450 Golden Gate Avenue
San Francisco, CA  94102

   Re: *In re Oracle Corp. Sec. Litig.*
     Master File No. C-01-0988-MJJ (JCS)

### THE PARTIES' JOINT DISCOVERY PLAN

Dear Judge Spero:

   Pursuant to the Court's February 4, 2005 direction, the parties have exchanged detailed discovery plans, and on February 18, 2005, the parties, including lead trial counsel for plaintiffs (Mark Solomon) and defendants (Alan Salpeter), met and conferred in person regarding the scope of discovery in this action.  The parties had previously resolved through the meet and confer process many of their disputes concerning document requests served by plaintiffs on defendants.  Open issues include the scope of persons and files from which plaintiffs should get discovery; scope of discovery on accounting issues; the relevant time period; scope of discovery from non-parties; the nature or form of production; and the relevance of documents pertaining to 11i.  As of the date of this submission, the parties are continuing discussions and will provide the Court an update on March 1, 2005.

### RELEVANT SCOPE OF DISCOVERY FROM ORACLE

   The parties have a substantial disagreement on the scope of discovery and particularly whose files should be searched for relevant and responsive documents. Plaintiffs believe that individual files should be searched (within reason) in order to capture information regarding the allegations that false statements were made that, *inter alia*, (i) the economy was not affecting Oracle Corporation ("Oracle" or the



The Honorable Joseph C. Spero
February 23, 2005
Page 2

"Company"); (ii) 11i and its individual modules were preintegrated, interoperable and performing well; (iii) that the Company would report substantial revenue earnings, database sales and applications sales growth; and (iv) the Company financial reporting for 2Q01.

Plaintiffs' Position:

Subject to the production and review of proper organizational charts and information obtained during future Rule 30b(6) depositions, plaintiffs seek documents from the files of Oracle and individuals such as sales representatives, executive vice presidents, area vice presidents, regional vice presidents, managers, practice directors, finance personnel, accounting managers, controllers, technical support representatives, and the adm inistrative and executive assistants to each, as well as other Oracle employees not currently known to plaintiffs who are likely to have information relevant to the claims and defenses of the parties.

Plaintiffs are also entitled to communications exchanged between Oracle's sales and consulting representatives and Oracle's product support teams and customers discussing integration, implementation and performance problems of Suite 11i, and its individual modules including, but not limited to, CRM, the timing of releases, functionality of patches, etc. The information is relevant to prove the falsity of defendants' statements that, *inter alia*, Suite 11i was "pre-integrated and fully interoperable out of the box" (¶58);[1] that "no systems integration is required" (¶¶50-51, 63, 68); that "CRM, and SCM are also performing well, *etc.* (¶58); that "[y]ou get the savings in months.... It costs you less, and it takes less time to install" (¶50); and that "Oracle's CRM suite is both complete and integrated.... No systems integration is required to install the Oracle CRM suite" (¶63). Documents related to functionality of 11i are also relevant to defedant Ellison's false statement that:

Now the nice thing is it's like Lego blocks. Once you have one piece in, ***the other pieces just snap together. There's no systems integration required. The key thing is, you can install just one piece and then again install another piece. No systems integration. You just basically turn it on or snap it together....***

---

[1]     All paragraph references are to plaintiffs' Revised Second Amended Complaint ("RSAC"), filed on 12/9/02.



The Honorable Joseph C. Spero
February 23, 2005
Page 3

### *Plug and play. It is absolutely, all the pieces within the suite are literally plug and play.*

¶68.

Because Oracle has not yet produced meaningful organizational charts, plaintiffs are not in a position to make a comprehensive and informed proposal on whose files should be searched for responsive documents. However, with regard to the sales staff, Oracle should search for and produce responsive documents from the files of *at least* the so-called "Speaker's Group" and the area vice presidents and regional managers in each of the sales and consulting divisions – Oracle Product Industries ("OPI"), Oracle Servicing Industries ("OSI"), and North American Sales ("NAS"). For example, plaintiffs have recently learned that regional sales managers participated in weekly forecast conference calls and were sent weekly forecast packages. These individuals were from just one sales division at the Company, OPI. Plaintiffs are at least entitled to the responsive documents (including in electronic form) from the files of these individuals. These do not include members NAS or OSI who also would have relevant information.

Defendants complain that plaintiffs unreasonably seek documents from every corner of Oracle. However, Oracle's Form 10-K for 2001 stated that as of May 31, 2001, the Company employed *42,927* full-time employees, including *29,422* in sales and services, 1,230 in marketing, 7,926 in research and development and 4,349 in general and administrative positions. Plaintiffs have only sought documents from a small fragment of Oracle's employees.

#### Defendants' Position:

Plaintiffs have sought broad discovery from every corner of Oracle–without limitation as to the people more likely than others to have discoverable information. (*see e.g.,* Doc. Req. Nos. 20, 22, 23-26; December 15, 2004, Dep. Notice at 3). In response, Defendants have agreed to produce information from the files of the Oracle employees with responsibility for sales, product development, and forecasting. Defendants selected this group of employees beginning with those who the RSAC alleges have made false statements about either Suite 11i or Oracle's revenue and income forecasts: Lawrence Ellison ("Ellison"), Jeffrey Henley ("Henley"), Edward Sanderson, Jennifer Glass, and Stephanie Aas. Defendants have agreed to produce information from these employees' files and from those of their direct reports. To this group, Defendants have added the department responsible for preparing Oracle's


LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 4

corporate forecast, which gathers and distills all information regarding company-wide
sales.[2]  Given the seniority of these individuals– particularly Messrs. Ellison and Henley
– their documents, and those of the employees that directly reported to them, will
necessarily represent Oracle management's understanding of the issues alleged in this
case.  In short, absent a specific showing of need or relevance (and Defendants have
agreed to produce documents from additional Oracle employees based on such a
showing), affording Plaintiffs discovery beyond this group (at least in the first
instance) would turn discovery into an exercise of second guessing management
rather than a search for information that is truly relevant to this case and would be
improper.[3]

## DISCOVERY TO BE TAKEN FROM DEFENDANTS RE: ECONOMY AND IMPACT ON SALES REVENUE AND EARNINGS

Plaintiffs   seek   documents   and   communications   (including   e-mail
correspondence) concerning the United States economy and its impact or potential
impact on Oracle's revenues, earnings and expenses; its impact or potential impact on
customer purchasing decisions of IT products and services in general; and specifically
the purchase of products or services from Oracle.  With respect to the latter, for
example, if customers communicated to Oracle (or Oracle's independent research
showed) that a customer may or may not be investing in Oracle products or IT
products in general due to tightened budgets and or the slowing economy, plaintiffs
seek those documents and communications.

---

[2]      Defendants have included the list of individuals from whom they have agreed
to produce documents as Attachment B to their separate submission.

[3]      See Chen v. Navarre Corp. (In re Navarre Corp. Secs. Litig.), 299 F.3d 735, 743 (8th
Cir. 2002) ("'Corporate officials need not be clairvoyant; they are only responsible for
revealing those material facts reasonabl[y] available to them.'") (quoting Novak v.
Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)); In re Cross Media Marketing Corp. Secs. Litig,
314 F. Supp. 2d 256, 263 (S.D.N.Y. 2004) (pleadings insufficient where plaintiffs failed
to specify that speaker "failed to check information that he had a duty to monitor,
ignored obvious signs, or made public statements inconsistent with reasonably
available data.").



The Honorable Joseph C. Spero
February 23, 2005
Page 5

Agreement:  The parties have agreed that the above-category of documents are discoverable subject to limitations on the issues of which persons files should be searched for responsive documents and time frame.

## DISCOVERY TO BE TAKEN FROM DEFENDANTS RE: PRODUCT FUNCTIONALITY PROBLEMS

The parties have not reached agreement on the scope of discovery from Oracle concerning functionality of 11i and individual modules including CRM.

### Plaintiffs' Position:

Plaintiffs seek the documents and communications (including e-mail) relating to the functionality of 11i *and its individual modules* including, but not limited to, the CRM module (including Oracle's internal implementation of 11i).  The document requests reprinted below are an attempt to directly capture the responsive information. The remainder of plaintiffs' requests regarding 11i are attached. Ex. G:

(a)     Documents discussing customers' implementation of the 11i Suite, CRM or any of its individual modules where a customer or Oracle representative discussed integration or implementation issues like defects, integration problems, gaps or bugs in Oracle software.  ¶¶52(d), (e), (f), (j), (l), 53, 54(h), (l), (m);

(b)     Documents discussing defects, integration problems, bugs and gaps in 11i software, including documents from Oracle sales or consulting staff including, but not limited to, software engineering, project managers and sales personnel responsible for doing product demonstrations.  ¶¶52(r), 54(i);

(c)     Documents from the Company's technical staff regarding the timing or release of different modules and iterations of modules, and/or patches to fix or correct problems, gaps and bugs.  ¶¶54(b), 55(a), (b), (e);

(d)     Documents and communications discussing costs of implementation initially at Oracle and at customer sites and timing of the release of patches.  ¶¶52(m), (n), (o), (p); and

(e)     Documents and communications regarding discounts or service concessions provided to customers as a result of implementation problems or product defects related to 11i and/or its individual modules.



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 6

Defendants have not proposed a workable plan. Instead they have chosen to brief **again** relevance.

Defendants' Position:

The Revised Second Amended Complaint ("RSAC") raises two categories of allegations about Suite 11i. First, it sets forth allegedly false statements about the integration of Suite 11i. (See RSAC at ¶¶ 50, 51, 58, 63 & 68.) Next, the RSAC alleges that Suite 11i was encumbered with significant "bugs," or defects – including in the CRM modules that were part of Suite 11i. (See, e.g., RSAC ¶¶ 52 & 53) According to the RSAC, these "bugs" resulted in lost sales, postponed sales, and vast expenditures in order to remediate problems with the Suite 11i software. (See, e.g., RSAC ¶¶ 54) As we understand Plaintiffs' claims, both from our reading of the RSAC and through the meet and confer process, Oracle knew or willfully blinded itself to the fact that, at the time it announced its earnings and revenue forecasts in the third quarter of FY2001, it could not possibly achieve those forecasted results because of the integration problems and because of the slowdown in sales and increase in expenses associated with the "bugs" facing Suite 11i. (See, e.g., RSAC ¶¶ 82)

Plaintiffs have sought broad discovery, claiming that relevant information concerning sales activity and Suite 11i defects may reside all the way down to the lowest levels of the sales force or technical support staff. (see e.g., Doc. Req. Nos. 20, 22, 23-26; December 15, 2004, Dep. Notice at 3). Recently, after being urged by Defendants to offer some reasonable limitation on the scope of the document search that reflects the allegations in the case and does not impose an unreasonable burden on Defendants, Plaintiffs have proposed some finite categories of files that should be searched for responsive documents. While discussions are ongoing, Defendants believe that even Plaintiffs' current proposals are far too broad and do not properly reflect either the allegations in the RSAC or take into account the unreasonable burden that would be placed on Oracle from such a far-reaching discovery expedition.

In response, Defendants have proposed producing two categories of information. In the first category, Defendants will produce: all three release versions of Oracle's Suite 11i software so that Plaintiffs may examine the software itself; high level design documents for the 11i Suite; and bug reports that specifically refer to integration or interoperability. In the second category, Defendants will produce documents within the files of the group of current and former employees whose files are most likely to contain discoverable information, as outlined above, that refer to lost or deferred sales of any Oracle product, including Suite 11i, during 3Q01, as well



The Honorable Joseph C. Spero
February 23, 2005
Page 7

### Defendants' Position Continued:

as any material expenditures involving Suite 11i or other Oracle products—such as refunds, rebates or remediation. Given the nature of Plaintiffs' allegations concerning the general presence of bugs in Suite 11i – all of which appear to be tied to alleged knowing misstatements to the public about the forecast itself – the categories of discoverable documents proposed by Defendants will provide Plaintiffs with the information that genuinely bears on their case. Also, as we explain more fully below, the wide range of Suite 11i bugs that Oracle was required to address in Suite 11i –information that was well known the public – is a vastly over-inclusive category of discovery that has no meaningful connection to the RSAC. Moreover, any marginal relevance of documents related to Suite 11i "bugs" generally is far outweighed by the enormous burden that would be imposed on Oracle by gathering and producing literally hundreds of thousands of documents related to all manner of technical support for its software during this period.

***Defendants' Proposed Document Categories Relate Directly To Plaintiffs' Claims***  -- The RSAC alleges a handful of purportedly "false" statements about Oracle's 11i Suite of software that deal with the "integration" or "interoperability" of Oracle's software. In order for the Court to resolve any disputes related to the proper scope of Suite 11i related to discovery, Defendants believe it is necessary for the parties and the Court to have a common understanding of these terms. To this end, Defendants explain below what the 11i Suite is and the market into which it was introduced.

Oracle introduced a suite of business software in May 2000 known as Suite 11i. The software consisted of over 50 separate application modules. Customers had the option of purchasing one or more of the modules. Each module fell under one of two broad categories: either Enterprise Resource Planning ("ERP") or Customer Relationship Management ("CRM"). ERP modules addressed the "back office" functions of a company, e.g., procuring and paying for supplies and manufacturing goods or developing services – activities that generally are not visible to the customer.

CRM modules addressed the "front office" functions of a company, e.g., marketing, sales and servicing.

What was unique about Oracle's 11i software was that it was designed to be an integrated suite of modules. "Integrated," when used in the context of describing Suite 11i, meant that every application in the suite was engineered around a unified

LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 8

### Defendants' Position Continued:

global customer and product database. See Oracle Corporation Technical White Paper, "Customer Relationship Management" (cited in paragraph 63 of the RSAC). In other words, there was only one database, and each item of information concerning customers and products was stored in only one place in the database. Each module in the Suite was designed to be able to find and read that data because there was a single data schema identifying the location of each item of information in the database and all the data was written in the same computer language. Furthermore, if one module updated an item of information in the database, the update would be instantly available to every other module since they were all working off the same database and using the same language.

Oracle's integrated modular approach was in sharp contrast to the prevailing industry practice which was commonly referred to as "best of breed." In such an installation, the customer chooses software from different vendors for different business functions based upon its assessment of which vendor's software performs each function the best. Since the software has been developed by different vendors who generally use different computer programming technology, databases and database schemas, it is necessary for the customer to hire consultants to "integrate" the software from the different vendors. This integration process can be very time-consuming and expensive. Generally, the integrator has to write extensive customized computer code to cause data from one database to transfer to other databases and be readable by the other applications. In addition, it usually is necessary to devise new computer programs to update the information in each database when an item in one databases is changed by one of the applications. It was in this context that Oracle executives made statements regarding "integration" and "interoperability" – setting Suite 11i apart from the existing "best of breed" approach.

Oracle never represented to the public that Suite 11i would have no defects. It is common knowledge that complex business software, particularly new releases installed in new business environments, will have a substantial number of defects or "bugs" that will have to be corrected before a customer can go live. If the software is not performing according to specifications, the fix will be paid for by Oracle. If the customer requests changes in the software to accommodate its business practices, the customer generally pays extra for the customization.

An Oracle customer can experience several different types of problems when installing the software. First, a module may not perform the function assigned to it



The Honorable Joseph C. Spero
February 23, 2005
Page 9

Defendants' Position Continued:

according to its specifications. For example, a module responsible for adding customer charges might add one and one and incorrectly show three, or a button on a computer screen might not work. The problem is in the programming that constitutes the module.

Second, a module might not function in a manner that is consistent with the way the owner does business. Here, the module performs according to its specifications, but does not properly process the owner's transactions. In this case, either the owner must change its business practices to conform to the business logic underlying the software or the software has to be changed to perform according to the owner's business process. If the software is changed, the changes may affect other functions of the software and its integration with other software.

Third, there can be a defect in the integration programming that is intended to enable Oracle and non-Oracle software to exchange information. Finally, there can be a defect in the programming that Oracle used to store information in the common database and/or enable modules to find and read data in the database.

Only problems of this latter type actually relate to the integration and interoperability statements in the RSAC. Thus, Defendants have agreed to allow Plaintiffs to **actually read and test the code for the Suite 11i software** and review the technical manuals that describe how the software is supposed to function in order to determine whether it was integrated and interoperable. Defendants will also provide high level design documents demonstrating that the 11i Suite was designed to be integrated and interoperable. And, rather than producing all bugs for Oracle's software – a massive undertaking that is unlikely to lead the discovery of evidence that has any meaningful connection to this case – Defendants will produce the bug reports that specifically refer to integration or interoperability.

**General Discovery Into "Bugs" Is Not Relevant** – The release of Suite 11i – like any such massive effort – was publicly recognized to be far from flawless, well before 3Q01. For example, in October 2000 there was a meeting of Oracle users that several Oracle senior executives attended. At that meeting, customers complained about the number of bugs and patches that were required to fix the bugs in Oracle's first version of 11i, which was released in May 2000. Ron Wohl, Oracle's Executive Vice President, Applications Development, acknowledged that there were a significant number of bugs in the initial release, stated that version 2 which was released in



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 10

#### Defendants' Position Continued:

October 2000 would substantially reduce the number of bugs in the ERP modules and that version 3, which was scheduled for release in January 2001, would substantially reduce the number of bugs in the CRM modules.

Notwithstanding public knowledge of bugs in Oracle's 11i software, many customers purchased the software during the first three quarters of Oracle's fiscal year 2001 (June 2000 to March 1, 2001). Oracle had record profits in the first, second and third quarters of fiscal year 2001, driven in significant part by sales of modules of Suite 11i. By the beginning of 3Q01, 43 customers had gone live with one or more modules of Suite 11i, indicating that the software "worked" in the configurations that they had set. In addition, Oracle Latin America went live with many of the 11i modules in November 2000. By January 2001, the number of go lives had increased to 120. By that time, Oracle had gone live worldwide with substantially the entire 11i Suite.

Given that Plaintiffs do not claim – nor could they – that Defendants falsely represented that Suite 11i was "bug-free" or problem -free, and that the RSAC seeks to link the bug-related problems in Suite 11i to lost sales or additional expenses, there is no basis for broad discovery into all bugs and alleged defects in Suite 11i encountered during this period. Indeed, since many customers were purchasing Suite 11i prior to and during 3Q01 despite public information about bugs in Suite 11i, that those Oracle employees who are alleged to have made false statements could have known to which the existence of bugs might affect Oracle's sales is if they received some indication from existing or potential customers that the bugs might affect their purchasing decisions. The enormous amount of communications concerning customer problems that were part of Oracle's day-to-day business as a software manufacturer/installer and that were not linked to potential lost sales opportunities are completely irrelevant to the forecasting case. To the extent these documents have any marginal relevance to this case, it is far outweighed by the enormous burden that would be placed on Oracle to collect and produce these documents. Accordingly, Oracle proposes to produce documents that refer to bugs in Suite 11i (not limited to integration) to the extent that the documents directly refer to a lost or deferred sale (or material expenditure) or directly speaks to the bugs' impact on Oracle sales forecasts.

LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 11

## DISCOVERY RE: REVENUE – EARNINGS – PRODUCT – CONSULTING FORECASTING TO BE TAKEN FROM DEFENDANTS:

As set forth in plaintiffs' document requests, plaintiffs seek documents, as well as e-mail, discussing the Company's forecasts, including any mention of the economy as it relates to Oracle's ability to make its forecasts or sales and as it related to the Company's pipeline and its growth or decline. Additionally, documents relating to Oracle's sales pipeline and pipeline conversion rates/ratios. Plaintiffs also seek documents and communications discussing or comparing Oracle's 3Q01 sales pipeline to past conversion ratios.

Agreement: The parties have agreed on plaintiffs' specific document requests which cover the general subjects above. Those documents are discoverable subject to limitations to be determined on the issues of whose files should be searched for responsive documents and time limitations.

## DISCOVERY TO BE TAKEN FROM DEFENDANTS RE: ACCOUNTING ALLEGATIONS:

The parties have not reached an agreement on the scope of discovery for accounting documents to be discovered from the Company.

### Plaintiffs' Position:

As set forth in plaintiffs' document requests, plaintiffs seek documents related to defendants' improper accounting for customer overpayments, including, but not limited to, Oracle's accounting policies, internal accounting systems, general ledger, monthly credit memo registers, unassigned cash receipts, miscellaneous offset reports, accounts receivable reserves, and efforts to reconcile Oracle's "on account" or "unapplied cash" and corresponding journal entries.

These documents are relevant to the allegations of improper revenue recognition through the creation of phony invoices, and the improper satisfaction of such invoices using customer overpayments held in the Company's "on accounts." Plaintiffs also seek to discover e-mail communications and memoranda discussing the same and debit memo transactions and "on account clean up" occurring on or around November 17, 2000. This information includes documents relating to overpayments from sales transactions occurring as early as 1997 as alleged in the RSAC. *See, e.g.*, ¶38(a).



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 12

Plaintiff also seek discovery of facts concerning 2002 Oracle internal investigations (occurring only days after plaintiffs filed their Second Amended Complaint ("SAC")) resulting in the alteration of documents relevant to the claims in the SAC. Shortly after plaintiffs filed the SAC on October 11, 2002, plaintiffs learned from several former Oracle employees witnesses that Oracle immediately began altering documents related to accounting issues raised in the SAC (*i.e.*, improper accounting for customer overpayments). Specifically, those witnesses explained that Mike Quinn (named in the complaint as being responsible for Oracle's improper revenue recognition, *see, e.g.,* ¶41(a)-(d)), assembled an "on account team" and devised an "action plan" to investigate, alter and clean up documents relating to the same accounting issues and specific accounts raised in plaintiffs' SAC and later augmented in the RSAC. Plaintiffs provided these witness statements and documents to the court in support of Plaintiffs' Ex Parte Application for an Order Enjoining Defendants to Cease Altering Evidence, Directing Defendants to Preserve Evidence and Granting Plaintiffs Particularized Discovery to Preserve Documents ("*Ex Parte* Application"), which is attached hereto as Ex. A. The following are some of the notes taken by Oracle employees during the 2002 clean up which were submitted in plaintiffs' *Ex Parte* Application:

> October 21 Monday: Mgr meeting– explanation of on account problem and company's suit to pay back money. ***Saying not rev[enue] recognized and everything will be okay***. Lawsuit holds no water because this is a recent issue.

> October 22 Tuesday: Quinn sends ss [spreadsheet] to mgrs be cut up [amongst] mgmt team to resolve items that had been reserved. Create a plan to resolve and get out of reserve by Friday. ***Collections meets with AR to agree how to adjust up invoices and how to send over details***.

> October 23 Wednesday: Collections mgrs breakup workload amongst staff and tell them to finish by cob [close of business]. SS [spreadsheet] sent to Quinn who sends back with his notes and says this isn't good enough. These explanations will not due [sic]. Quinn meets with mgrs and lights into them.

> ***Quinn*** wants to figure out why the items were reserved and ***can't tell if the item was a revenue impact or not. Will not refund any***



The Honorable Joseph C. Spero
February 23, 2005
Page 13

> **item that impacts revenue, adjust up invoice for revenue impacting items**.

In response, defendants submitted declarations of Mike Quinn and Greg Myers (also named in the RSAC as being integral to the accounting manipulations, *e.g.*, ¶41(c)). Exs. C-D. Defendants also submitted a declaration of Kimberly Henderson. Ex. E. Their declarations asserted several factual defenses to plaintiffs' document destruction allegations, including that the internal investigation into "account 12601" (Oracle's Accounts Receivable Reserve Account) were unrelated to the 46,000 debit memo transactions occurring on November 17, 2000. *See* Exs. C-E. However, the declarations of Myers and Quinn, and emails attached thereto, confirm that the alteration of documents included accounting transactions and specific Oracle financial accounts related to the conduct which occurred **during the Class Period**. For example, one of the emails from Quinn to his on account team directing the "action plan" states:

- We need to provide an update to Audit Committee in regards to **what revenue impact this process of taking unapplied cash to reserve will have on our financial statements**. In addition, we need to provide what impact this process has had **on revenue** each of the **last eight quarters**.

- We need to clean up the **entire problem prior to the end of October by moving cash receipt to the proper buckets** (unapplied, customer overpayments, or on account.

- We need to establish **new policies and procedures so that this never happens again**.

- For items in the **Miscellaneous Offset Report, August-00 through September-02**, we need to review each item $10,000 to determine 1) what should have happened to the cash receipt and 2) make the correction to put in the right place....

In addition to Oracle's declarations, documents obtained from Oracle employees during plaintiffs' internal investigations **confirm** that the improper clean up alterations in 2002 was directly related to the very same accounts and types of customer overpayment issues, and may have been used to cover up the accounting improprieties alleged in the RSAC. Exs. B-E, H. The documents contain dates of



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 14

numerous transactions occurring **during the Class Period** which appear to have
been altered during the 2002 "action plan." Ex. F. These facts strongly suggest that
documents related to plaintiffs' accounting allegations may no longer exist in the
form they were during the Class Period. As such, these documents are reasonably
calculated to lead to discovery of admissible evidence concerning, *inter alia*, alteration
of documents related to plaintiffs' claims, defendants' knowledge and intent during
the Class Period, defendants' defenses to plaintiffs' accounting allegations and any
attempt to cover up the improper accounting occurring during the Class Period.
Defendants refuse to produce any documents related to the admitted 2002
investigation, "action plan" and account clean up which relate to the same Oracle
accounts and transactions as alleged in the RSAC.

### Defendants' Position:

The RSAC alleges that "defendants created phony sales invoices and
improperly recognized revenue from past customer credits and overpayments it
had held in reserve without informing its customers.... On November 17, 2000,
Oracle executed more than 46,000 sham invoice transactions converting ... reserved
overpayments to revenue totaling approximately \$228 million." In 2002, Plaintiffs
made an *Ex Parte* Application for an Order Enjoining Defendants to Cease Altering
Evidence, Directing Defendants to Preserve Evidence and Granting Plaintiffs'
Particularized Discovery to Preserve Evidence based on unsubstantiated and
unpleaded allegations of an alleged fraudulent cover-up of the purportedly "sham
invoice transactions." The Court denied Plaintiffs' application.

Plaintiffs now seek broad discovery into Oracle's accounting processes,
including "all documents and communications" relating to debit and credit
memos, the reconciliation of Oracle's accounts receivable to its general ledger
account, and other similarly broad information. *See* Req. Nos. 28, 29, 37, 38, 39
and 40 ("all documents and communications relating to:" Oracle's monthly
reconciliation of its accounts receivable to its general ledger; "Oracle's credit
memos and monthly credit memo registers;" "**any** miscellaneous offset report;"
"**any** miscellaneous receipt write-off;" "any measures taken from October, 2002 to



**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS** LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 15

the present related to refunding customers, adjusting or reconciling customer
invoices, or adjusting credit analyst notes for all customers").[4]

Plaintiffs attempt to justify these requests by stating they need to
understand Oracle's accounting, generally, in order to make their case that the
46,000 debit memos were improper. Plaintiff cannot invoke some generalized
need to understand Oracle's accounting processes as a basis to seek broad
discovery on the narrow accounting misconduct alleged in this case. Plaintiffs have
a right to take discovery into the alleged "On Account Cleanup," the 46,000 debit
memos generated as part of that "cleanup," and the accounting treatment for
each memo. To the extent that miscellaneous offset reports were generated or
accounts were posted to the general ledger as part of the "cleanup," Plaintiffs are
entitled to receive those documents. To this end, Defendants will not bear the
unreasonable burden imposed by Plaintiffs' requests for "all documents and
communications relating to" broad categories of documents with no nexus to the
issues pleaded in the RSAC. ***Plaintiffs refuse to narrow any of these requests.***

Furthermore, Plaintiffs seek discovery into the events alleged in their *Ex
Parte* Application or Defendants' Opposition to that motion. *See, e.g.* Req. No. 34
("*pro forma* website used to generate *pro forma* invoices for clients"). And, finally,
Plaintiffs seek discovery of information up to the present day on a wide variety of
issues – again, based on the *Ex Parte* Application. *See, e.g.,* Req. Nos. 37 (2002); 38
(2003); 40 (present); 41 (2003). Defendants are prepared to allow discovery into
the events pleaded in the RSAC; they will not agree to allow Plaintiffs to explore
speculative theories that have not met the pleading requirements of Fed. R. Civ. P.
9(b).

Defendants contend that Plaintiffs' proposed discovery into Oracle's
accounting processes bears no rational connection to the accounting allegations in
the RSAC and thus exceeds the bounds of permissible discovery. Oracle proposes
producing documents, reports and communications, including:

- Those generated as a result of the alleged "On Account Cleanup" in
  November 2000;

---

[4]     Plaintiffs make requests of similar breadth to Oracle's outside auditors—Ernst &
Young and Arthur Andersen.



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 16

- The 46,000 allegedly false debit memos, including historical records of those debit memos and all 46,000 allegedly false debit memos as they exist today;

- The accounting treatment for these 46,000 debit memos, including any instances in which a debit memo was posted to the general ledger;

- Those relating to the decision to perform the "On Account Cleanup," including any analysis of why the cleanup was necessary in light of Oracle's internal conversion to Suite 11i.

To the extent that much, if not all, of this information is in Oracle's Global Single Instance Production, Oracle will consider running specific queries to compile additional information that directly bears on the accounting allegations in the RSAC.

**DISCOVERY TO BE TAKEN FROM DEFENDANTS RE: INSIDER TRADING:**

Plaintiffs seek documents related to defendants Jeff Henley and Larry Ellison's actual or contemplated sales of Oracle securities, including documents from defendants' investment and financial advisors or consultants. This would include option agreements, their net worth, the reasons and timing of their sales, company policies and procedures regarding trading and options, and knowledge of the allegations in the RSAC regarding accounting, downturn in the economy, forecasts, earnings, product problems, etc.

Agreement: The parties agreed that defendants will produce documents and communications regarding defendants' sales or contemplated sales of Oracle securities during the Class Period of Oracle stock during January 2001 and the reasons for the sales.

**DOCUMENTS RELATING TO THE SPECIAL LITIGATION COMMITTEE (SLC):**

Plaintiffs' Position

Plaintiffs seek documents related to SLC investigations of insider trading, malfeasance and/or accounting allegations raised in plaintiffs' RSAC. The SLC specifically investigated claims related to this securities fraud class action.



The Honorable Joseph C. Spero
February 23, 2005
Page 17

### Defendants' Position:

Defendants have not agreed to produce documents from the SLC claiming that the report is covered by a privilege.

## PARAMETERS OF DOCUMENT PRODUCTION FROM DEFENDANTS

### Format of Production

#### Plaintiffs' Position:

Plaintiffs seek documents that were created in electronic format in the usual course of business (*i.e.*, in native format). Native format production is necessary to allow plaintiffs to efficiently access and review all relevant information including, but not limited to: (a) formulas, comments and other hidden information included in spreadsheets; (b) metadata for all electronic documents; and (c) the identities of recipients of e-mail blind copies and access to documents embedded in and/or attached to e-mail. *See, e.g., In re Verisign Corporation Sec. Litig.*, No. C 02-2270 (N.D. Cal.), March 4, 2004 Order (ordering defendants in securities class action alleging violations of the Securities Exchange Act of 1934 to produce all electronic evidence in original native format); *In re Pemstar, Inc. Sec. Litig.*, No. 02-1821 (D. Minn.) (finding the production of electronic discovery in native format to be appropriate, feasible and important in a securities fraud class action and recognizing that electronic evidence produced in native format may be particularly valuable to plaintiffs in proving their claims under the Securities Exchange Act of 1934, in particular scienter); *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-MIV, 2003 U.S. Dist. LEXIS 14447, at **15-16, 30 (W.D. Tenn. May 13, 2003) (recognizing that "electronic data files reasonably could lead to the discovery of admissible evidence that is not available from hard copy" and establishing a discovery protocol for electronic data which allowed the requesting party to review documents in native electronic format); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1277 (D.C. Cir. 1993) (recognizing that "hard-copy print-outs ... may omit fundamental pieces of information which are an integral part of the original electronic records").

Further, the Private Securities Litigation Reform Act (PSLRA) requires defendants to have kept all electronically recorded or stored data relevant to a plaintiff's allegations as if it were the subject of a continuing request for the production of documents. See 15 U.S.C. §78u-4(b)(3)(c)(i). Thus, the electronic documents that plaintiffs seek should be readily available.


LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 18

Moreover, to date, documents produced by Oracle are largely illegible further requiring production in the native format.

Defendants' Position:

Plaintiffs have insisted that Defendants produce documents that were originally created electronically in their native format. Plaintiffs contend that they need electronic documents in their original format in order to review the "metadata" accompanying those documents. Plaintiffs also have claimed that it will be less burdensome for them to review electronic documents – particularly spreadsheets – in their native formats than to examine those same materials in hard copy.

In response, Defendants have explained that because Oracle has preserved and collected documents relating to the claims in the litigation ***in paper format*** since the initial securities complaints were filed and the Special Litigation Committee was convened over three years ago, it would be an immense burden on Oracle to gather those same documents electronically. Moreover, consistent with Fed. R. Civ. P. 34, Defendants intend to identify documents that are responsive to specific requests, rather than produce them as they are kept in the ordinary course of business. This approach will dramatically reduce any burden Plaintiffs might otherwise face as a result of production in paper format.

That being said, Defendants will produce spreadsheets in electronic format, provided the parties can reach an agreement on locking and protecting spreadsheets to prevent alteration or manipulation of formulas. Furthermore, Defendants will produce e-mails on an on-going basis in a searchable, electronic format that captures typical "metadata," such as sender, recipient, blind and carbon copies, date sent, e-mail box from whom the document is produced, and information regarding whether the e-mail was forwarded or responded to. Outside of this commonly understood realm of metadata for emails, Oracle will not produce metadata to Plaintiffs. As Judge Shira Ann Scheindlin, a U.S. District Judge for the Southern District of New York and the author of the *Zubulake* decisions (*see, e.g., Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003)), has stated:

[I]n many cases the metadata is not relevant. When you say metadata, I think that you want to have it searchable.

LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 19

> You want to get an e-mail that even if it is produced in .tiff, you have a
> concomitant list of searchable data that allows you to organize it by
> sender, by recipient, by date. That is important. But when I think of
> metadata, I think about pages and pages of code about how the e-mail
> got from Tallahassee to Gainesville via some server out in the western
> part of the country. I don't think anybody wants that and it's very rare
> that it is needed.

Judicial Conference Advisory Committee on the Federal Rules of Civil Procedure,
*Panel Two: Rules 33, 34: Defining E-Documents and the Form of Production,* 73
Fordham L. Rev. 33, 43 (Oct. 2004) ("Advisory Committee (Panel Two)"). Despite
Defendants' repeated requests of Plaintiffs to prepare a letter outlining what
metadata they seek and the reasons they believe such metadata is relevant to their
case, they have failed to provide Defendants with such information.

### Timing of Production

### Document Production

Plaintiffs' Position:

Defendants should endeavor to produce all responsive documents to plaintiffs'
document request by March 21, 2005. The production of documents from individuals'
files not specifically designated should be reasonably timed so that production occurs
before the deposition of an individual and/or the subject matters for which a
Company representative is designated. Plaintiffs propose that production occur at a
minimum seven days prior to any said deposition. Plaintiffs will produce responsive
non-class certification documents by March 21, 2005 for which there are no
outstanding objections.

Defendants' Position:

Defendants already have produced more than 45,000 pages of documents.
Defendants will make a rolling production of documents and will complete their initial
production of responsive documents by March 21, 2005. Although Defendants will
likely produce additional documents after March 21, based on further review and
investigation in the case, this initial production will likely constitute the vast majority
of responsive documents. Plaintiffs will produce responsive non-class certification
documents by March 21, 2005.



The Honorable Joseph C. Spero
February 23, 2005
Page 20

## Expert Discovery

<u>Plaintiffs' Position:</u>

Plaintiffs believe it is premature to propose expert discovery deadlines at this juncture. A case management conference is scheduled before Judge Jenkins regarding this matter.

<u>Defendants' Position:</u>

The parties will exchange any affirmative expert reports on March 3 2006 and any rebuttal reports on April 3, 2006. The parties will complete expert discovery by May 22, 2006.

## Production Source Log

<u>Plaintiffs' Position:</u>

Plaintiffs' propose that a production log be produced on a rolling basis no later than ten days after the production of any set of documents. This log should identify (by Bates number) where and from whose files each responsive document was produced. Moreover, if a large volume of documents will be produced, it only makes sense for the documents to be organized by file. This should not be difficult if the parties are able to agree on individuals whose files will be searched for responsive documents. There is not reason to limit this requirement to future productions. There is no reason to limit this production requirement to future productions.

<u>Defendants' Position:</u>

For all document productions made from February 22, 2005, forward, Defendants will identify the source of the documents (*i.e.*, the person from whom they were obtained) they produce to Plaintiffs.

## Timing of Production of a Privilege Log

<u>Plaintiffs' Position:</u>

Plaintiffs propose that a privilege log be produced no later than 30 days after documents are produced.



The Honorable Joseph C. Spero
February 23, 2005
Page 21

### Defendants' Position:

Defendants propose producing privilege logs within a reasonable amount of time, not to exceed 45 days, after documents are produced from which privileged documents are withheld.

## **Authentication of Documents**

Agreement: The parties agreed to work toward a stipulation for the authenticity of documents produced by defendants in this action. Such a stipulation could help avoid additional deposition testimony for the sole purpose of authenticating documents produced by the defendants.

## **DEPOSITIONS**

The Court has already approved 65 depositions per party. The parties set forth their anticipated deponents below.

## **Deponents**

### Plaintiffs' Position:

Based on plaintiffs' cursory review of a limited number of documents produced by defendants thus far, the following is a non-exclusive list of the depositions of former/current Oracle employees that plaintiffs believe at this juncture will likely be taken: Jennifer Minton; Sergio Giacolletto; George Roberts; Edward J. Sanderson; Jay Nussbaum; Mark Barrenechea; Charles Rozwat; Sohaib Abbasi; Safra Catz; Mark Jarvis; Stephanie Aas; Bruce M. Lange; Deborah A. Lange; Mathew Mayerson; Kate L. McGee; Jennifer L. Minton; Sharon Montoya Bretz; Anil Vora; Keith G. Block; Richard P. Blotner; Valerie A. Borthwick; Jay Carter; Drew Costakis; Michael P. DeCesare; John P. Fikany; Sebastian J. Gunningham; Margaret Marks; Steve McLaughlin; Mark A. Salser; David Cooperman; Joyce E. Westerdahl; Shari A. Simon; Mark T. Tombridge; Jenn Bicho; Joelle Teresa Fitzgerald; Mary Ann Riles; Jim English; Christian Facey; Larry Garnick; Sarah J. Kopp; Annica Magnusson; Cheryl Jean McDowell; Estele Oloresisimo; Daniel N. Sharpley; Thomas A. Williams; David Winton; John Nugent; Frank Varasano; Mary Ann Gillespie; Allen Snyder; Ian Thacker; Joel Summers; Phillip Tate; Ian Sterling; Michael DeCesare; Mike Murphy; Michael Rocha; Conway Snyder; Raymond Barman; Chabra Deepjot; Ray Lane; Carolyn Barkenhoff; Gary Roberts; Terrence Ford; Derek Williams; Gary Bloom; Ira Entis; R. Police; Cayle Fitzpatrick; Kenneth Hammoz; Mike



The Honorable Joseph C. Spero
February 23, 2005
Page 22

Metcalf; Don Warren; Cliff Godwin; Andrew Huda; Mike Quinn; Greg Myers; Kimberly Henderson; Raul Campos; Bret Fuller; Kimberly Kane and Graham Mair.

        In addition to the above, plaintiffs believe they will need to depose members of the SLC and their counsel, analysts, Oracle's two auditors, and customers.

        Defendants' Position:

        Defendants presently intend to depose the 49 Confidential Witnesses referenced in the RSAC, as well as the class representatives identified in Plaintiffs' Motion for Class Certification.

        **Timing**

        (a)        30(b)(6) depositions: Plaintiffs propose that 30(b)(6) depositions be completed before March 30, 2005 (preservation, accounting, forecasting, and Suite 11i interoperability). Defendants propose that 30(b)(6) depositions on electronic systems be completed by March 30, 2005.

        (b)        The parties agree that substantive witness depositions will begin in April 2005 subject to timely production of documents.

        (c)        The parties agree that depositions of non-Oracle employees will be staggered, beginning after plaintiffs have obtained documents pursuant to the third party subpoenas they issued in December 2004/January 2005. The files of any third party current or former Oracle employee shall be produced by Oracle upon 30 days notice.

        Open Issues:

        (a)  .     Plaintiffs propose that for 30(b)(6) depositions, that the 7-hour limit be extended if defendants intend to profer the witness in both their individual capacity and as a 30(b)(6) representative.

        (b)        Between April 22, 2005 and February 24, 2006, the parties will engage in additional fact discovery, including written discovery and depositions.



The Honorable Joseph C. Spero
February 23, 2005
Page 23

## THIRD PARTY CUSTOMER (FORMER/POTENTIAL CUSTOMER) DISCOVERY

Plaintiffs' Position:  While plaintiffs do not believe the court to have ruled that the substance of plaintiffs' requests were improper or that they should be narrowed more than what they have in meet and confers.  The following topics are the general topics plaintiffs believe they are entitled to support their claims.  These subject categories are substantially narrower than those previously sent to the non-parties.

    1.    General Subject Matters

        (a)    Oracle's Product Problems

Plaintiffs seek documents from third parties regarding implementation and integration problems with Oracle's products, including customer complaints, cancellations or delays that relate to functionality of application products.

        (b)    Downturn in the Economy

Plaintiffs seek documents relating to the impact of the declining United States economy on third parties' decisions to order, purchase, defer, cancel or modify deals for Oracle products and services.  Plaintiffs also seek documents related to third parties' purchase of IT products in general.  Many of these documents will not be found in Oracle's files because they were exchanged internally at the third party companies and may not have been communicated to Oracle.

        (c)    Accounting

Plaintiffs seek documents from third parties regarding the accounting allegations in the RSAC (specifically customer overpayments and improper revenue recognition) and any pre- and post-Class Period information related to same (*i.e.*, documents from transactions occurring prior to the Class Period and documents in 2002 related to Oracle's "investigation" and clean up described in §V, supra).

Accordingly plaintiffs have agreed to refine their requests without prejudice to the following:

- Documents and communications concerning your actual or attempted installation integration or implementation of Oracle applications and database, products, licenses or services including, but not limited to Oracle 11i, or any of its individual modules including CRM.  ¶¶52-55.

LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 24

- Documents and communications concerning the functionality of Oracle's products and services and compatibility with hardware, software and information technology systems used by or considered for use by your company. ¶¶52-55.

- Documents and communications concerning technical defects, problems, bugs, patches or technical difficulties related to Oracle's applications, product and licenses including complaints you had or raised with Oracle. ¶¶52-55.

- Documents and communications concerning your efforts to audit, collect, or recover payments or monies paid to Oracle or owed to you by Oracle, relating to Oracle's products, licenses or services. ¶¶36-38.

- Documents and communications concerning the loss of business or costs incurred by you in connection with your purchase or use of Oracle's applications and database products, licenses or services including 11i and CRM. ¶54(j).

- Documents and communications concerning your information technology budget for Oracle products, licenses or services, including, but not limited to any decline or change due to the slowing of the United States economy. ¶¶47-49.

- Documents and communications concerning sales presentations, promotions or product demonstrations made to you by Oracle for Oracle products, licenses or services including, but not limited to any discussions, promises or guarantees made to you regarding the functionality or performance of Oracle products. ¶52(k).

- Documents and communications concerning any discussions or meetings between you and Oracle or any individual defendant relating to Oracle contracts, agreements or Oracle's products, licenses or services. ¶¶36-43.

- Documents constituting or concerning invoices, purchase orders, receipts, checks, refunds, credits in connection with the purchase or sale of Oracle's products or services relating to 2Q01 (Sept. 2000 - Nov. 2000) regardless of when created. ¶¶36-43.


LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 25

### Defendants' Position:

Plaintiffs are to propound five requests, with Defendants' agreement, to third-party customers. Defendants have agreed to allow subpoenas to 30 third-party customers. Subject to these agreements and to the other limitations on discovery that Defendants have proposed, Defendants will produce documents relating to the same third-party customers.

Plaintiff seek the Court's permission to obtain discovery from the 93 customers that are the subject to the current stay and propose that the discovery plan expressly authorize the issuance of up to 200 subpoenas to Oracle's customers.

2.    Timing of Production

### Plaintiffs' Position:

(a)    Immediately for those non-parties that have already been subpoenaed.

(b)    Plaintiffs are prepared to subpoena an additional 50 or more non-parties whom plaintiffs have a good faith basis to believe are likely to have information relevant to this action. Plaintiffs are prepared to set an initial limit of 200 non-party document subpoenas and agree to notify defendants of additional non-parties in excess of 200, allowing defendants ten days to seek an order from the Court stating (for good cause shown) why plaintiffs should not issue the additional non-party subpoenas for documents.

(c)    Plaintiffs believe this proposal is extremely reasonable in light of Oracle's position as the second largest software manufacturer in the world, statements that as of December 15, 2000, the Company had "several hundred live" and "several thousand that are in the process of upgrading right now," as well as Ernst & Young LLP's review of 195 accounts alone in connection with the SEC's investigation of accounting allegations in the RSAC.

3.    Relevant Time Period

### Plaintiffs' Position:

Plaintiffs' position is that the Relevant Time Period is June 1, 2000 through and including December 31, 2001 (exclusive of plaintiffs' allegations concerning accounting



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 26

irregularities), including documents created outside this time frame which relate to
*inter alia*, statements, events, circumstances and knowledge during the Relevant Time
Period. Plaintiffs have proposed to accept a shortened relevant time period ending on
August 10, 2001, the date of the filing of the Company's Form 10-K for the fiscal year
ending 2001. For example, because Oracle internally does its financial analysis on a
quarter-to-quarter and year-over-year basis, it is important to have the entire next
quarter and arguably through the third quarter fiscal 2002 to indeed determine
whether the economy was impacting the Company and whether 11i applications
would indeed help save money in difficult times. Secondly, customers that plaintiffs
alleged were buying or attempting to implement 11i applications were still
experiencing significant technological and functionality defects. Defendant Ellison
stated that many of the 3Q01 deals simply slipped from 3Q01 to 4Q01 and therefore
would or should show up in the 4Q01 revenue stream.

Moreover, defendants made multiple admissions in 4Q01 that go to the veracity
of statements made during the Class Period, for example, the August 2001 *Wall Street
Journal* article attached as Exhibit 1 to the Revised Second Amended Complaint quotes
Ellision and the Company admitting to the 11i product defects and outlines **at least**
four customers – General Electric Co., Ford Motor Co., Alcoa Inc. and Hewlett Packard
– who confirm Ellison's statements that they were "live and running their business on
11i" were not true.

Finally, plaintiffs note that in the narrower California derivative action,
defendants were ordered to produce documents through January 31, 2001.

Defendants' Position:

Despite the fact that Plaintiffs' class period covers a three month period from
December 2000 through February 2001, Plaintiffs seek documents and information for
a period over one-year, from June 1, 2000 to August 31, 2001. In some of their
requests, Plaintiffs seek information from 2002 through the present. *See, e.g.,*
Request for Production Nos. 37 (August 1, 2002 – December 31, 2002); 38 (September
1, 2002 – March 31, 2003); 43 (October 1, 2002 – March 31, 2003); and 44 (October 1,
2002 – present).

Defendants have offered to produce information from June 1, 2000 through
April 2001 ("Relevant Time Period"), as well as documents created after that time that
refer to events or conduct from that time period.



The Honorable Joseph C. Spero
February 23, 2005
Page 27

## ANALYSTS AND MEDIA ORGANIZATIONS COVERING THE COMPANY

Agreement: The parties agree that the scope of discovery sought by plaintiffs from analysts and news services is relevant, including discovery related to:

(a)    The defendants' public statements;

(b)    Customer interviews and complaints/problems with Oracle products, including 11i;

(c)    The downturn in the economy and IT budgets during the Class Period;

(d)    Oracle's forecasts and projections;

(e)    Oracle's revenue and earnings reports and financial statements; and

(f)    One-on-one interviews with Oracle defendants.

## DISCOVERY TO BE TAKEN FROM ACCOUNTANTS/AUDITORS

Plaintiffs' Position:

As set forth in plaintiffs' subpoenas to Arthur Anderson LLP and Ernst & Young LLP, plaintiffs seek the following discovery from the accountants/auditors who performed professional services for the defendants:

(a)    Integrated workpapers in both hard copy and electronic format for Oracle's 2001 and 2002 fiscal quarters and fiscal year-end. See Audit and Accounting Manual §6300.06 ("[w]orking papers should be viewed as an integrated presentation of information.");

(b)    Documentation of professional services performed for Oracle or the individual defendants. This would include, for example, tax consulting work performed by Ernst & Young LLP for Ellison. It would also include Ernst & Young LLP's investigation of allegations in plaintiffs' RSAC;



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 28

      (c)    Desk files, client files and communications (including e-mail) that relate to Oracle's 2001 fiscal year and the quarters therein, whether created during fiscal year 2001 or relating thereto;

      (d)    Documents received or given to the SLC and communications with the SLC;

      (e)    Documents and communications between auditors relating to Oracle or the individual defendants;

      (f)    Communications with the SEC, AICPA and other governmental, law enforcement or regulatory agencies related to Oracle or the individual defendants; and

      (g)    Documents concerning document retention (including any policies) and the alteration, modification or destruction of documents related to plaintiffs' allegations. This would include any documents related to the alteration, modification or destruction of Oracle's audit trail for 2Q01, Account 12601 and/or the debit memoranda or "on account clean up" occurring in November 2000.

    <u>Defendants' Position:</u>

    Plaintiffs are entitled to accounting work papers from Arthur Andersen and Ernst & Young that relate to the debit memo cleanup alleged in the RSAC to have occurred in November 2000. Plaintiffs are also entitled to documents relating to tax advisory services provided to the Defendants by either AA or E&Y, provided that such documents are accorded "Highly Confidential-Attorneys' Eyes Only" treatment.

    Plaintiffs seek all 2001 and 2002 work papers from E&Y and AA, together with the auditors' desk files or client files for those years, and all documents reflecting consulting services provided by E&Y and AA to the Defendants. As the discussion below demonstrates, this request seeks information well beyond the bounds of the narrow accounting issue alleged in the RSAC.

## DISCOVERY TO BE TAKEN FROM PLAINTIFFS:

    1.    Confidential Witnesses



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 29

### Plaintiffs' Position:

Discovery concerning the confidential witnesses should be limited. Plaintiffs are prepared in this case to provide the names of the confidential witnesses along with their correlating witness number so long as an order is in place protecting the confidential witnesses from retaliation and harassment including: that the names of the confidential witnesses only be disclosed to outside counsel for defendants; that the documents that reference the confidential witnesses be filed under seal of the Court; and other additional protections set forth by Judge Alsup in the *In re Northpoint Communications Group, Inc.*, Master File No. C-01-1473-WHA, Order (N.D. Cal. May 13, 2003). Plaintiffs have not had the opportunity to review defendants' proposal regarding a stipulation which was forwarded to plaintiffs at approximately 6:00 p.m. PT time this evening.

### Defendants' Position:

Defendants are entitled to know the identities of the 49 Confidential Witnesses ("CWs"), including by reference to the numbers assigned to them in the RSAC. Plaintiffs have proposed to identify the CWs by name and by the number associated with them in the Revised Second Amended Complaint ("RSAC"), providing the parties can agree to an appropriate stipulation to protect these CWs. Although Defendants do not believe that the Plaintiffs have made any showing of potential harm to these CWs by their disclosure – and have no basis for believing that the CWs may be harassed – Defendants are willing to agree to a confidentiality stipulation in the interest of advancing this litigation. Accordingly, Defendants are willing to enter into a stipulation that imposes the following limitations: (1) Defendants will not make initial contact with a CW without informing Plaintiffs' counsel of its intention to do so no less than forty-eight hours prior to making such initial contact; (2) Counsel for Defendants shall cause anyone obtaining information about a CW in connection with his or her role as a CW, including the fact that such a person was a CW ("CW's Role") to sign an "Undertaking" identical in substance to that ordered by Judge Alsup in *In re Northpoint Communications* (the court's order is attached to Defendants' separate submission as Attachment A); (3) Counsel for Defendants will not disclose a CW's Role to anyone other than (x) Defendants and their counsel within Mayer, Brown, Rowe & Maw LLP ("MBR&M"); (y) any consultant retained by MBR&M for purposes of this litigation; and (z) in-house counsel and employees of Oracle Corporation, without first obtaining written acceptance of such disclosure from the Plaintiffs or the Court in the manner set forth in paragraph 4 of the Alsup Order; (4) The identities of the CWs will



The Honorable Joseph C. Spero
February 23, 2005
Page 30

not be used for any purpose other than this litigation; (5) Defendants will not object to Plaintiffs seeking an order from the Court requiring that any court paper, deposition, hearing or testimony identifying the CWs by anything other than CW number be sealed, in a manner consistent with Paragraph 5.2 of the Revised Stipulated Protective Order Governing Confidentiality entered on January 14, 2005, in this case.

2.    Scope and Timing of Discovery of the Proposed Class Representatives

Plaintiffs' Position:

At this juncture, discovery of plaintiffs should be limited to the adequacy of plaintiffs' proposed class representative: Robert D. Sawyer, Drifton Finance Corporation, Local 144 Nursing Home Pension Fund (now known as 1199 SEIU Greater New York Pension Fund), Ryan Kuehmichel and Dzung Chu. As to Drifton Finance Corporation, 1199 SEIU Greater New York Pension Fund and Robert D. Sawyer, plaintiffs have agreed to endeavor to produce supplemental responses to defendants' second set of interrogatories and documents responsive to defendants' document requests pertaining to class certification subject to their objections by March 7, 2005. Defendants have not propounded discovery on Ryan Kuehmichel or Dzung Chu.

Depositions of the proposed class representatives should take place beginning in the middle of March 2005 and be completed by mid-April 2005. Plaintiffs will not oppose defendants' request to extend the class certification schedule for six weeks as requested by defendants: (a) opposition to the motion for class certification due May 16, 2005; (b) reply due on June 14, 2005; and (c) oral argument in July 2005.

Defendants' Position:

The parties will in good faith attempt to resolve all class certification discovery objections by Monday, March 4, 2005. Plaintiffs will be required to produce responsive documents by Monday, March 7, 2005. Depositions of Lead Plaintiffs will take place between March 21 and April 15, 2005. Defendants' brief in opposition to the motion for class certification will be due on May 16, 2005 and Plaintiffs' reply will be due on June 13, 2005. Oral argument will be held in July 2005 or at the Court's earliest convenience thereafter. Defendants are prepared to stipulate to the proposed modification in the class certification briefing schedule. ***The parties have agreed to all of the dates set forth above, except that with respect to the proposed date for Defendants' to file its opposition to the motion for class certification***



The Honorable Joseph C. Spero
February 23, 2005
Page 31

**(May 16, 2005), Plaintiffs have represented that they do not oppose a modification of the current schedule consistent with this proposed new deadline.**

  3.  Timing and Scope of Contention Interrogatories

  Plaintiffs' Position:

   The contention interrogatories served on plaintiffs by defendants are premature at this juncture of the litigation and should be deferred until after discovery has progressed. "[C]ontention interrogatories are more appropriate after a substantial amount of discovery has been conducted." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 110-111 (D.N.J. 1990); *In re Convergent Technologies Sec. Litig.*, 108 F.R.D. 328, 338 (N.D. Cal. 1985). Plaintiffs agreed to supplement their responses to contention interrogatories previously propounded by defendants on or before August 1, 2005.

  Defendants' Position:

   Defendants are entitled to know the facts that Plaintiffs currently contend support the contentions in the RSAC. At a minimum, this information is necessary to allow Defendants to determine whether Plaintiffs fully complied with their obligations under Fed. R. Civ. P 11(b) in filing the complaint. *See* 15 U.S.C. § 78u-4(c)(1) (court is required "upon final adjudication of the action" to make specific findings "regarding compliance, by each party ... with each requirement of Rule 11(b) ... as to any complaint [.]" ) Defendants respectfully request that Plaintiffs provide responses to Defendants so-called contention interrogatories (Second Set, Interrogatory Nos. 5-7,9-15) by April 15, 2005.

  4.  Discovery of Absent Class Members Not Permitted

  Plaintiffs' Position:

   Defendants should be precluded from seeking discovery from absent class members. "Absent a strong showing of necessity, discovery [of absent class members] generally will be denied." 3 Newberg on Class Actions §16.03 & n.57 (2d ed. 1985).

  Defendants' Position:

   Defendants are not seeking discovery from absent class members.


LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 32

5.    Attorney Work Product

Plaintiffs' Position:

(a)    **Defendants Improperly Seek Work Product**: Defendants' impermissibly seeks attorney work product, including the mental impressions of counsel by insisting on the identification of all facts that support the inclusion of persons identified in their Rule 26(a) Initial Disclosures. Further, the RSAC and the documents attached thereto provide facts indicating that several of the names listed on plaintiffs' Initial Disclosures are likely to have discoverable information. Moreover, certain of the entities listed on plaintiffs' Initial Disclosures obviously have discoverable information including, for example, the analysts who covered Oracle and the auditors who audited or performed engagements for Oracle

(b)    **Documents from Confidential Witnesses**:   Plaintiffs have agreed to produce those documents relevant to the claims or defenses in this litigation received by a confidential witness.  Plaintiffs, however, object on attorney work-product grounds to identifying from which confidential witness lead counsel received which documents, particularly since defendants have refused to produce a source log of those documents it produces.  As a compromise, plaintiffs, without waiving their assertion of attorney work-product agreed to identify the documents received by confidential witness, if defendants also agreed to identify the source from which their documents were obtained.  Defendants continue to refuse.

Defendants' Position

(c)    **Refusal to Respond to Discovery About Witnesses in 26(a) Disclosures.**  Defendants have requested, in an interrogatory, that Plaintiffs identify all facts supporting their belief that each person identified in their Rule 26(a) Initial Disclosures is "likely to have discoverable information" that support Plaintiffs' "claims."  In response to this interrogatory, Plaintiffs have objected on the grounds that the request seeks ***information about too many people and, as a result, is unduly burdensome.***  This objection is directly contrary to the position that Plaintiffs took when the parties met and conferred about Defendants' contention that Plaintiffs had failed to satisfy their obligations under Rule 26(a) by submitting a laundry list of



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 33

individuals and organizations as possible witnesses. At that time, Plaintiffs asserted
(and ultimately represented to the Court) that they needed to list *every* witness that
was included in the initial disclosures, and that Defendants would not be prejudiced
because Defendants were free to seek discovery regarding these witnesses. Now that
Defendants have done so, however, Plaintiffs assert that no such discovery should be
permitted because of the burden to Plaintiffs. ***Defendants cannot make
meaningful decisions about third parties from whom to seek discovery
without this information. Plaintiffs should either be required to narrow their
Rule 26(a) disclosures or to submit detailed information concerning the
individuals and organizations which they have identified as having
discoverable information.***

      (d)   **Documents from Confidential Witnesses.**  In response to a
document request and interrogatory from Defendants, Plaintiffs have agreed to
specifically correlate each document they received from a third party with the identity
(or CW number, if the parties cannot agree on a stipulation) of the third party or CW
from whom they received the document, providing Defendants will agree to identify
the source of each document they produce. Defendants have agreed that, on a going-
forward basis, they will identify the sources of the documents they produce.

## CONCLUSION

      Pursuant to the Court's directive, attached hereto are plaintiffs' and defendants'
separate discovery plans.

                   Respectfully submitted,

                   /s/  Shawn A. Williams

                   Shawn A. Williams



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS LLP

The Honorable Joseph C. Spero
February 23, 2005
Page 34

I, Shawn A. Williams, am the ECF User whose ID and password are being used to
file this Joint Discovery Plan.  In compliance with General Order 45, X.B., I hereby
attest that Lee H. Rubin has concurred in this filing.

Approved: _____/s/_____
Lee H. Rubin
Mayer, Brown Rowe & Maw LLP

SAW:cmb
Enclosures

cc:    All Counsel (see attached)

T:\CasesSF\Oracle3\Corres\Jenkins_Letter_DisPlan.doc

ORACLE III (LEAD)

Service List - 2/22/2005   (201-064-1)

Page 1 of 1

## Counsel For Defendant(s)

Donald M. Falk
Lee H. Rubin
Shirish Gupta
Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
  650/331-2000
  650/331-2060 (Fax)

Dorian Daley
James C. Maroulis
Oracle Corporation
500 Oracle Parkway, Mail Stop 50P7
Redwood City, CA 94065
  650/506-5200
  650/506-7114 (Fax)

Alan N. Salpeter
Javier H. Rubinstein
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street, Suite 3900
Chicago, IL 60603-3441
  312/782-0600
  312/701-7711 (Fax)

## Counsel For Plaintiff(s)

William S. Lerach
Mark Solomon
Douglas R. Britton
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
  619/231-1058
  619/231-7423 (Fax)

Sanford Svetcov
Shawn A. Williams
Willow E. Radcliffe
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
  415/288-4545
  415/288-4534 (Fax)