EXHIBIT A

# United Kingdom

## EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

An Act to make new provision for enabling the High Court, the Court of Session and the High Court of Justice in Northern Ireland to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions; to extend the powers of those courts to issue process effective throughout the United Kingdom for securing the attendance of witnesses; and for purposes connected with those matters.

---

Evidence for civil proceedings
Evidence for criminal proceedings
Evidence for international proceedings
Supplementary

---

**Evidence for civil proceedings**

**1**. Where an application is made to the High Court, the Court of Session or the High Court of Justice in Northern Ireland for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction and the court is satisfied--

> (a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ("the requesting court") exercising jurisdiction in any other part of the United Kingdom or in a country or territory outside the United Kingdom; and

> (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated,

the High Court, Court of session or High Court of Justice in Northern Ireland, as the case may be, shall have the powers conferred on it by the following provisions of this Act.

**2**.--(l) Subject to the provisions of this section, the High Court, the Court of Session and the High Court of Justice in Northern Ireland shall each have power, on any such application as is mentioned in section 1 above, by order to make such provision for obtaining evidence in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made; and any such order may require a person specified therein to take such steps as the court may consider appropriate for that purpose.

(2) Without prejudice to the generality of subsection (1) above but subject to the provisions of this section, an order under this section may, in particular, make provision--

> (a) for the examination of witnesses, either orally or in writing;

> (b) for the production of documents;

(c) for the inspection, photographing, preservation, custody or detention of any property;

(d) for the taking of samples of any property and the carrying out of any experiments on or with any property;

(e) for the medical examination of any person;

(f) without prejudice to paragraph (e) above, for the taking and testing of samples of blood from any person.

(3) An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order (whether or not proceedings of the same description as those to which the application for the order relates); but this subsection shall not preclude the making of an order requiring a person to give testimony (either orally or in writing) otherwise than on oath where this is asked for by the requesting court.

(4) An order under this section shall not require a person--

(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or

(b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession custody or power.

(5) A person who, by virtue of an order under this section, is required to attend at any place shall be entitled to the like conduct money and payment for expenses and loss of time as on attendance as a witness in civil proceedings before the court making the order.

**3**.--(1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give--

(a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or

(b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction.

(2) Subsection (l)(b) above shall not apply unless the claim of the person in question to be exempt from giving the evidence is either--

(a) supported by a statement contained in the request (whether it is so supported unconditionally or subject to conditions that are fulfilled; or

(b) conceded by the applicant for the order;

and where such a claim made by any person is not supported or conceded as aforesaid he may (subject to the other provisions of this section) be required to give the evidence to which the claim relates but that evidence shall not be transmitted to the requesting court if that court, on the matter being referred to

it, upholds the claim.

(3) Without prejudice to subsection (1) above, a person shall not be compelled by virtue of an order under section 2 above to give any evidence if his doing so would be prejudicial to the security of the United Kingdom; and a certificate signed by or on behalf of the Secretary of State to the effect that it would be so prejudicial for that person to do so shall be conclusive evidence of that fact.

(4) In this section references to giving evidence include references to answering any question and to producing any document and the reference in subsection (2) above to the transmission of evidence given by a person shall be construed accordingly.

**4**. Section 49 of the Supreme Court of Judicature (Consolidation) Act 1925 (which enables the High Court to order the issue of a subpoena in special form, enforceable throughout the United Kingdom. for the attendance of a witness at a trial) and the Attendance of Witnesses Act 1854 (corresponding provisions for Court of Session [and High Court of Justice in Northern Ireland]) shall have effect as if references to attendance at a trial included references to attendance before an examiner or commissioner appointed by the court or a judge thereof in any cause or matter in that court, including an examiner or commissioner appointed to take evidence outside the jurisdiction of the court.

**Evidence for criminal proceedings**

**5**.--(1) The provisions of sections 1 to 3 above shall have effect in relation to the obtaining of evidence for the purposes of criminal proceedings as they have effect in relation to the obtaining of evidence for the purposes of civil proceedings except that--

> (a) paragraph (a) of section 1 above shall apply only to a court or tribunal exercising jurisdiction in a country or territory outside the United Kingdom;

> (b) paragraph (b) of that section shall apply only to proceedings which have been instituted; and

> (c) no order under section 2 above shall make provision otherwise than for the examination of witnesses, either orally or in writing, or for the production of documents.

(2) In its application by virtue of subsection (1) above, section 3(1)(a) and (b) above shall have effect as if for the words "civil proceedings" there were substituted the words "criminal proceedings".

(3) Nothing in this section applies in the case of criminal proceedings of a political character.

**Evidence for international proceedings**

**6**.--(1) Her Majesty may by Order in Council direct that, subject to such exceptions, adaptations or modifications as may be specified in the Order, the provisions of sections 1 to 3 above shall have effect in relation to international proceedings of any description specified in the order.

(2) An Order in Council under this section may direct that section 1(4) of the Perjury Act 1911 or section 1(4) of the Perjury Act (Northern Ireland) 1946 shall have effect in relation to international proceedings to which the Order applies as it has effect in relation to a judicial proceeding in a tribunal of a foreign state.

(3) In this section "international proceedings" means proceedings before the International Court of

Justice or any other court, tribunal, commission, body or authority (whether consisting of one or more persons) which, in pursuance of any international agreement or any resolution of the General Assembly of the United Nations, exercises any jurisdiction or performs any functions of a judicial nature or by way of arbitration, conciliation or inquiry or is appointed (whether permanently or temporarily) for the purpose of exercising any jurisdiction or performing any such functions.

## Supplementary

**7**. The power to make rules of court under section 99 of the Supreme Court of Judicature (Consolidation) Act 1925 or section 7 of the Northern Ireland Act 1962 shall include power to make rules of court--

(a) as to the manner in which any such application as is mentioned in section 1 above is to be made;

(b) subject to the provisions of this Act, as to the circumstances in which an order can be made under section 2 above; and

(c) as to the manner in which any such reference as is mentioned in section 3(2) above is to be made;

and any such rules may include such incidental, supplementary and consequential provision as the authority making the rules may consider necessary or expedient.

**8**.--(l). (2)

(3) Nothing in this section shall affect--

(a) any application to any court or judge which is pending at the commencement of this Act;

(b) any certificate given for the purposes of any such application;

(c) any power to make an order on such an application; or

(d) the operation or enforcement of any order made on such an application.

(4) Subsection (3) above is without prejudice to section 38(2) of the Interpretation Act 1889 (effect of repeals).

**9**.--(l) In this Act--

"civil proceedings", in relation to the requesting court, means proceedings in any civil or commercial matter;

"requesting court" has the meaning given in section 1 above;

"property" includes any land, chattel or other corporeal property of any description;

"request" includes any commission, order or other process issued by or on behalf of the requesting court.

(2) In relation to any application made in pursuance of a request issued by the High Court under section 85 of the County Courts Act 1959 or the High Court of Justice in Northern Ireland under section 58 of the County Courts Act (Northern Ireland) 1959, the reference in section 1(b) above to proceedings instituted before the requesting court shall be construed as a reference to the relevant proceedings in the county court.

(3) Any power conferred by this Act to make an Order in Council includes power to revoke or vary any such Order by a subsequent Order in Council.

(4) Nothing in this Act shall be construed as enabling any court to make an order that is binding on the Crown or on any person in his capacity as an officer or servant of the Crown.

---

*Last Update: 08/17/98*
*Copyright ©1998 by David D. Caron - ALL RIGHTS RESERVED*

 Site Technologies, Inc.

EXHIBIT B

# Rio Tinto Zinc Corporation and others v Westinghouse Electric Corporation et e contra

## RTZ Services Ltd and others v Westinghouse Electric Corporation et e contra

### HOUSE OF LORDS

LORD WILBERFORCE, VISCOUNT DILHORNE, LORD DIPLOCK, LORD FRASER OF TULLYBELTON AND LORD KEITH OF KINKEL

17th, 18th, 19th, 20th, 24th, 25th, 26th, 27th, 31st OCTOBER, 1st DECEMBER 1977

Evidence – Foreign tribunal – Examination of witness in relation to matters pending before foreign tribunal – Evidence . . . for purpose of civil proceedings – Production of documents – Extent of court's jurisdiction to make order for production of documents – Discovery against persons not parties to foreign action – Discovery in nature of a fishing operation not permissible – Whether jurisdiction to specify documents with sufficient particularity – Evidence (Proceedings in Other Jurisdictions) Act 1975, s 1 (1)(b), 2(4)(b).

Evidence – Privilege – Incrimination of witness or spouse – Belief that evidence would expose witness to proceedings for offence or recovery of penalty – Reasonable ground for belief – Sufficient to show real and appreciable risk that proceedings would be taken or increase of an existing risk of proceedings – Discovery of documents – Production of documents by company sought by party to American proceedings for use as evidence in those proceedings – Documents disclosing that company was a member of an international cartel – Cartels prohibited under EEC law – European Commission having power to impose fine for breach of prohibition – Commission aware for five years of existence of cartel but no action taken by commission – Whether production of documents would tend to expose company to greater risk of proceedings for recovery of a fine – Whether company having reasonable ground for belief in risk of proceedings – Whether company entitled to claim privilege from production of documents – Civil Evidence Act 1968, s 14(1) – Evidence (Proceedings in Other Jurisdictions) Act 1975, s 3(1)(b) – EEC Treaty, art 85 – EEC Council Regulation 17/62, art 15(2).

Evidence – Foreign tribunal – Examination of witness in relation to matters pending before foreign tribunal – Privilege of witness from giving evidence he would not be compelled to give before foreign tribunal – Privilege against self-incrimination – Letters rogatory issued by United States court to High Court – Claim to privilege under Fifth Amendment to United States Constitution – United States judge ruling that claim to privilege well taken – Subsequently United States Department of Justice requesting evidence for purpose of investigation into possible criminal offences against United States anti-trust laws – United States judge at instance of Department of Justice making orders compelling giving of evidence – Policy of United Kingdom Government not to comply with extra-territorial requests for evidence for purpose of foreign criminal investigations – Whether witnesses could claim privilege – Evidence (Proceedings in Other Jurisdictions) Act 1975, s 3(1)(b).

Several utility companies commenced civil proceedings in Richmond, USA, against W, an American corporation, alleging breaches by W of contracts for the supply of uranium. The contracts were fixed price contracts subject only to escalation with increases in the cost of living. In its defence to the proceedings W pleaded that performance of the contracts had been rendered commercially impracticable because of the existence of an international cartel of uranium producers whose activities, W alleged, had caused a lack of supply of uranium and artificially high prices. In September 1976 W received from a private environmental organisation proceedings relating to the existence and activities of the cartel indicating that two English companies ('the RTZ companies') were members of the cartel. In October 1976 W started civil proceedings in Illinois against the RTZ companies and others for breach of United States anti-trust laws, in order to prove the existence of the cartel in the Richmond

proceedings, W applied to the Richmond court, in the course of the pre-trial proceedings, for the issue of letters rogatory addressed to the High Court in England. The Richmond court issued two letters rogatory requesting the High Court to summon certain former or present directors or employees of the RTZ companies named in the letters ('the individual witnesses') to attend before an examiner in London to give oral evidence as witnesses in the Richmond actions. The letters also requested that the RTZ companies should produce before the examiner the documents specified in a long schedule to the letters. They included a number of particular documents which, on the face of the descriptions of them, might be in the possession of the RTZ companies or of companies over which they had power, and which appeared to be relevant to the existence of the alleged cartel. However in many instances the description of the particular documents was followed by the wide and vague request for 'any memoranda, correspondence or other documents relevant to' the particular documents described. The letters recited that it had been shown to the Richmond court that the justice could not be done among the parties to the Richmond proceedings without the testimony of the individual witnesses, that it is intended to be given in respect of the named individuals or without production of the scheduled documents, that the testimony and documents related to the existence and terms of various agreements, arrangements or practices between the RTZ companies and others and that the evidence requested was relevant to the matters in issue in the Richmond proceedings. No order grounds were given in the letters to support the assertion that the evidence of the individual witnesses would be evidence relevant to the proceedings or to enable the English court to form a view whether the scheduled documents were in the possession, control or power of the RTZ companies. From the scheduled documents it appeared that some of the individual witnesses had attended or had knowledge of meetings at which matters relevant to the existence of the cartel might have been discussed but in respect of other individual witnesses no such connection with the cartel was shown. On 28th October 1976 a High Court master made an order pursuant to s 2[a] of the Evidence (Proceedings in Other Jurisdictions) Act 1975, giving effect to the letters rogatory. The RTZ companies and seven of the individual witnesses ('the appellants') applied to have the order set aside but the order was upheld by the senior master and on appeal by the judge. The appellants appealed to the Court of Appeal. The court dismissed the appeals and ordered execution of the letters rogatory on the ground that both the oral evidence and the documents requested were required for use as evidence in the Richmond proceedings, and the letters were not an attempt to obtain impermissible pre-trial discovery, but the court modified the specification of the documents by striking out the words 'any memoranda, correspondence or other documents relevant' wherever they appeared in the schedule and substituting a different phrase to narrow the range of documents to be produced. The court declared, however, that the RTZ companies might be entitled to claim the privilege from production conferred by s 14[b] of the Civil Evidence Act 1968, since art 15(2) of EEC Council Regulation 17/62 empowered the

[a] Section 2, so far as material, provides:
'(1) Subject to the provisions of this section, the High Court . . . shall . . . have power on any such application as is mentioned in section 1 above, by order to make such provision for obtaining evidence in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made; and any such order may require a person specified therein to take such steps as the court may consider appropriate for that purpose.

'(2) Without prejudice to the generality of subsection (1) above but subject to the provisions of this section, an order under this section may, in particular, make provision—
(a) for the examination of witnesses, either orally or in writing; . . .'

[b] Section 14(1), so far as material, is set out at p 464 a b, post

European Commission ('the Commission') to impose large fines for breach of the prohibition against cartels contained in art 85 of the EEC Treaty, that those fines constituted a 'penalty' within s 14(c), and that the privilege under s 14(c) was preserved by s 3(c)(a)^d of the 1968 Act. Furthermore, the court declared that the individual witnesses would be entitled to claim the privilege from self-incrimination given by the Fifth Amendment to the United States Constitution, by virtue of s 3(c)(b) of the 1975 Act, and not as requests for pre-trial discovery in the nature of 'fishing' operations which, before the examiner in London and, respectively, claimed privilege under s 14(c) of the 1968 Act, and privilege under the Fifth Amendment. The examiner referred the individual witnesses' claim to privilege under the Fifth Amendment to the judge, who upheld the Richmond court, in accordance with the 1975 Act. On 15th June the judge ruled that witnesses were not required to give any evidence pursuant to the letters rogatory other than their statement of Justice which stated that the evidence of a witness requested were not required to give any evidence pursuant to the 1975 Act. On 14th June the judge received a letter from the United States Department of Justice which stated that the evidence of the witness requested in the letters rogatory was required by the department for the purpose of a grand jury investigation up by it into alleged offences against United States anti-trust laws and the possible assurance that the witness's testimony would not be used for criminal proceedings. The statement gave an assurance that the witness's testimony would be indispensable to the grand jury's investigation and was necessary in the public interest and that, as the witness were British subjects, it was unlikely that the evidence might be obtained otherwise than under the letters rogatory. The judge declined to rule that the witnesses were no longer entitled to the Fifth Amendment privilege. On 18th July the Department of Justice applied to the judge under United States legislation for orders compelling the witnesses to give evidence under the letters rogatory and the judge granted the orders taking the view that he had no discretion in the matter, but he intimated that the matter should be tested in the English courts. On 25th July one of the individual witnesses declined to answer questions put to him by the examiner pursuant to the letters rogatory and indicated that he would appeal to the English court for a ruling whether the individual witnesses were entitled to claim the Fifth Amendment privilege. The RTZ companies and the individual witnesses appealed to the House of Lords against the Court of Appeal's order that the letters should be executed. W, while conceding that the fines imposable under art 15(2) of EEC Council Regulation 17/62^e were penalties within s 14(c) of the 1968 Act, cross-appealed against the court's decision upholding the RTZ companies' claim to privilege under s 14(c) on the ground that as no action had been taken by the commission despite knowledge of the existence of the cartel, the risk to the RTZ companies of proceedings being taken against them by the commission was far so remote a risk if a fine would not be increased by production of the documents. The individual witnesses appealed on the ground that despite the documents, events which had happened they were entitled to the Fifth Amendment privilege in respect of evidence requested under the letters rogatory. In respect of that appeal, the English Attorney-General intervened to state that it was the policy of Her Majesty's Government that requests by the United States Government for evidence to be given by companies or individuals who were outside the jurisdiction of the United States for the purpose of investigations in the United States into alleged breaches of United States anti-trust law would constitute infringement of the United Kingdom's sovereignty.

---

**Held** – (i) (Viscount Dilhorne dissenting) Having regard to the substance and terms of the letters rogatory, and to the spirit of the 1975 Act which was to enable judicial assistance to be given to foreign courts, the requests made in the letters should be treated as requests for 'evidence' for the purposes of 'civil proceedings' instituted by the requesting court, i e the Richmond court, within s 1(b)^f of the 1975 Act, and not as requests for pre-trial discovery in the nature of 'fishing' operations which, as it was possible to do so, the letters should be given effect both in respect of the documents requested (Lord Fraser of Tullybelton dissenting) and the oral evidence of the individual witnesses, and under s 2^g of the 1975 Act it was possible to give effect to the letters by severally reducing the documents which were to be produced and disallowing the evidence of some of the named individuals. The fact that evidence obtained under the letters might be used in other proceedings, i e in the anti-trust proceedings in Illinois, was not (Viscount Dilhorne concurring) a reason for refusing to grant the requests under the letters since the Illinois proceedings were civil proceedings within s 1(b) of the 1975 Act, and in any event once evidence had been given it was within the public domain. It followed that in accordance with the order of 28th October 1976 W was entitled to proceed with discovery of documents and the examination of the individual witnesses under the letters rogatory subject to any claim to privilege made by the RTZ companies and the witnesses (see p 442 f-j, p 444 f to j, p 449 j to p 451 a, h, p 454 d e and g to h, p 455 b e, p 462 h, p 463 c, p 476 c, h and p 478 c d e to f, h and j, and p 480 b, p 481 b c and p 483 j to p 486 a and h j, p 489 j to p 491 a, p 493 g h to p 495 g h, p 496 g, post); Radio Corpn of America v Rauland Corpn [1956] 1 All ER 549 applied.

(ii) The RTZ companies were entitled to claim the privilege from production of documents given by s 14(c) of the 1968 Act notwithstanding that the commission had knowledge of the cartel and had not taken any action in respect of it, for if the documents were produced under the letters rogatory the RTZ companies would be exposed to a greater risk of proceedings being brought against them by the commission for recovery of a fine than they were exposed to at present, since production of the documents might authenticate and support the existing information in the hands of the commission and afford conclusive proof of a breach by the RTZ companies of the prohibition against cartels, and might cause the commission to take action against the RTZ companies. Accordingly the Court of Appeal's decision in upholding the claim to privilege under s 14(c) of the 1968 Act had been right (see p 445 b to d, p 456 b to f, p 457 a and c to f, p 466 j, p 465 b c, p 474 g to p 475 a and p 476 b, post); dictum of du Parcq LJ in Triplex Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd [1939] 2 All ER 617 applied.

(iii) Furthermore, the individual witnesses were entitled to claim the privilege against self-incrimination given by the Fifth Amendment in respect of the evidence requested under the letters rogatory, since the purpose for which the evidence was sought by the United States Department of Justice was not a purpose for which it could have been obtained by the department under the 1975 Act since it was not required by, nor was the department for the purpose of the department, within s 1(b) of the 1975 Act, and, a grand jury proceeding had not yet been instituted by the department. Accordingly, to enforce the letters would be a misuse of the procedure of the 1975 Act. Furthermore, having regard to the declared policy of Her Majesty's Government, the request, being a request by the United States of British companies and individuals who were not subject to United States jurisdiction, in respect of alleged infringement of United States anti-trust laws, constituted an abuse of the sovereignty of the United

Kingdom (see p 447 f to j, p 448 d to j, p 460 a to c and j to p 461 a, p 466 d and j to p 467 d, p 475 h j and p 476 b to e and h, post).

(iv) It followed that the appeals of the RTZ companies and the individual witnesses would be allowed, the order of 26th October 1976 giving effect to the letters rogatory would be discharged, and the cross-appeal of W would be dismissed (see p 449 b, p 454 j, p 457 f, p 467 c f, p 476 g h and p 478 j, post).

Per Lord Wilberforce and Viscount Dilhorne. The word 'evidence' in the 1975 Act does not have a wider meaning than the word 'testimony' in the Foreign Tribunals Evidence Act 1856, and under the 1975 Act the court before acceding to the request of the foreign court must be satisfied that the evidence required is direct evidence for use in the trial in the requesting court as contrasted with information which may lead to the discovery of evidence (see p 442 c and p 459 f to h, post).

Per Lord Diplock. (i) The words 'civil proceedings' in the phrase 'civil evidence ... to be obtained for the purposes of civil proceedings' in s 1(b) of the 1975 Act includes all of the procedural steps taken in the course of the proceedings from their institution up to and including their completion and if the procedural system of the requesting court provides for the examination or the production of documents for the purposes of enabling a party to ascertain whether there exists admissible evidence to support his own case or to contradict that of his opponent the High Court has jurisdiction to make an order of the kind (see p 461 h j to p 462 b, post).

(ii) Where the High Court has (see s 2(3) of the 1975 Act) the jurisdiction to make an order, the court should not hesitate long before exercising its discretion in favour of refusal to make an order unless it is satisfied that the application would be regarded as falling within the specification of 'particular documents' which means individual documents (see p 462 d, post).

Per Viscount Dilhorne and Lord Diplock. The requirements of s 2(4)(b) of the 1975 Act are not satisfied by the specification of classes of documents. What is called for is the specification of 'particular documents' which means individual documents separately described (see p 455 c to g and p 465 e, post).

Decision of the Court of Appeal [1977] 3 All ER 717 affirmed.

**Notes**

For evidence for proceedings in other jurisdictions, see 17 Halsbury's Laws (4th Edn) paras 326-400, and for cases on the subject, see 22 Digest (Reissue) 665-668, 7111-7143.

For privilege from giving evidence on the ground of incrimination of witness, see 17 Halsbury's Laws (4th Edn) para 240; for privilege from production of documents exposing a party to penalties, see 13 Halsbury's Laws (4th Edn) para 92; and for cases on the subject, see 22 Digest (Reissue) 433-437, 4310-4344 and 18 Digest (Reissue) 19, 149-151, 97-102, 1197-1231.

For the Evidence Act 1968, s 14, see 12 Halsbury's Statutes (3rd Edn) 926.

For the Civil Evidence Act 1968, s 14, see 12 Halsbury's Statutes (3rd Edn) 910, 936.

For the Evidence (Proceedings in Other Jurisdictions) Act 1975, ss 1, 2 and 3, see 45 Halsbury's Statutes (3rd Edn) 483, 484, 486.

For the EEC Treaty, art 85, and for EEC Council Regulation 17/62, art 15, see 42A Halsbury's Statutes (3rd Edn) 1178, 1197.

**Cases referred to in opinions**

British Nylon Spinners Ltd v Imperial Chemical Industries Ltd [1952] 2 All ER 780, [1955] Ch 19, CA, 1 Digest (Reissue) 589, 3385.

Burchard v Macfarlane, ex parte Tindall [1891] 2 QB 241, [1891-4] All ER Rep 137, 60 LJQB 587, 65 LT 282, 7 Asp MLC 93, CA, 18 Digest (Reissue) 24, 144.

Fagernes, The [1927] P 311, 96 LJP 183, 138 LT 30, 17 Asp MLC 326, CA, 11 Digest (Reissue) 678, 134.

R v Boyes (1861) 1 B & S 311, [1861-73] All ER Rep 172, 30 LJQB 301, 5 LT 147, 25 JP 789, 7 Jur NS 1158, 9 Cox CC 32, 121 ER 730, 11 Digest (Reissue) 685, 203.

Radio Corpn of America v Rauland [1956] 1 All ER 260, [1956] 1 QB 618, rvsd in part [1956], 1 All ER 549, [1956] 1 QB 618, [1956] 2 WLR 612, DC, 45 JP 533.

Reynolds, Re, ex parte Reynolds (1882) 20 Ch D 294, 51 LJCh 756, 46 LT 508, 46 JP 533, 15 Cox CC 108, CA, 22 Digest (Reissue) 434, 4311.

Triplex Safety Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd [1939] 2 All ER 613, [1939] 2 KB 395, 108 LJKB 762, 160 LT 595, CA, 18 Digest (Reissue) 245, 1933.

**Interlocutory appeals**

On 28th October 1976 Master Creighmore, pursuant to the Evidence (Proceedings in Other Jurisdictions) Act 1975, and RSC Ord 70, made orders giving effect to two letters rogatory issued by the District Court for the Eastern District of Virginia, Richmond, United States of America (the Richmond court) on the application of the respondents, Westinghouse Electric Corpn ('Westinghouse'), an American corporation which was the defendant in civil proceedings in the Richmond court brought by utility companies for breach of contract for the supply of uranium, and which were addressed to the High Court in England requiring it to require two British companies ('the RTZ companies') to produce before an examiner in London the documents specified in a schedule to the letters rogatory and to require certain named individuals ('the individual witnesses') who were former or present directors or employees of the RTZ companies, to give oral evidence before the examiner. The evidence sought in the letters rogatory was requested by Westinghouse for the purpose of its defence in the Richmond court proceedings that it had been unable to fulfil the contracts for the supply of uranium because of the activities of an international cartel of uranium producers which included the RTZ companies. On appeal by the RTZ companies and the individual witnesses the orders of 28th October 1976 were upheld by Master Jacob, on 2nd February 1977 and by MacKenna J on 10th May. The RTZ companies and individual witnesses appealed to the Court of Appeal which, on 26th May, affirmed the orders of 28th October 1976 with variations. At the request of the parties the court declared that, before the examiner, the RTZ companies might be able to claim privilege from production of the documents, under s 14(1) of the Civil Evidence Act 1968 by virtue of s 3(1)(a) of the 1975 Act, on the ground that production would tend to expose them to a penalty within s 14(1), ie to fines imposable by the European Commission for breach of the prohibition against cartels contained in art 85 of the EEC Treaty. The court also declared that, before the examiner, the individual witnesses would be entitled to claim the privilege from self-incrimination given by the Fifth Amendment to the United States Constitution, by virtue of s 3(1)(b) of the 1975 Act. The Court of Appeal granted both sides leave to appeal to the House of Lords but refused to grant a stay of the order giving effect to the letters rogatory pending the appeal.

In June 1977 the RTZ companies and the individual witnesses attended before the examiner in London and, respectively, claimed privilege from production of the documents specified in the schedule, under s 14(1) of the 1968 Act, and the privilege given by the Fifth Amendment. Westinghouse appealed to the Court of Appeal for an order compelling the RTZ companies to produce the documents and on 11th July 1977 the court upheld the RTZ companies' claim to privilege and refused Westinghouse leave to appeal against that decision. The examiner referred the claim to the Fifth Amendment privilege of the individual witnesses to the judge of the Richmond court, as the examiner was entitled to do under the 1975 Act, and on 14th June the judge ruled that the individual witnesses were entitled to the Fifth Amendment privilege. On 18th July, at the instance of the United States Department of Justice, the judge made orders compelling the individual witnesses to give evidence

1 [1977] 3 All ER 703
2 [1977] 3 All ER 717

under the letters rogatory for the purposes of an investigation into possible offences against United States anti-trust laws. On 27th July the Appeal Committee of the House of Lords granted the individual witnesses a stay of the order of 26th May of the Court of Appeal, giving effect to the letters rogatory, pending the hearing of the appeals of the RTZ companies and the witnesses against that order. Westinghouse cross-appealed against the decision of 26th May insofar as it is declared that exposure of the RTZ companies to proceedings for a fine by the European Commission would entitle them to claim the privilege under s 14(1) of the 1968 Act, upholding the RTZ companies' claim to privilege. All the appeals were heard together. The facts are set out in the opinion of Lord Wilberforce.

*K S Rokison QC and Michael Burton for the RTZ companies and the individual witnesses.*
*John Vinelott QC and Timothy Walker for Westinghouse.*
*The Attorney-General (Samuel Silkin QC), Harry Woolf and N Bratza for the Crown.*

Their lordships took time for consideration.

*1st December 1977.* The following opinions were delivered.

**LORD WILBERFORCE.** My Lords, on 28th October 1976 an ex parte order was made in the High Court, Queen's Bench Division, under s 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, giving effect to letters rogatory issued out of the United States District Court for the Eastern District of Virginia, Richmond Division, at the instance of Westinghouse Electric Corpn ('Westinghouse'). In the Richmond court Westinghouse are defendants in a number of actions (civil proceedings) consolidated in that court, by utility companies producing electricity, alleging breaches of contract by Westinghouse for the supply of uranium and claiming very large sums in damages. Westinghouse put forward (inter alia) a defence of commercial impracticability arising from an alleged international (producers') cartel.

The letters rogatory, issued on 21st October 1976 and returnable 11 January 1977, seeks the examination of nine named persons described as present or former officers or employees of two British companies, the Rio Tinto Zinc Corpn Ltd ('RTZ') and RTZ Services Ltd ('RTZ Services'), which collectively I shall refer to as 'the RTZ companies', or of 'such other director or other person who has "knowledge of the facts as to which evidence is desired"'. The letters also seek the production of documents according to a lengthy schedule alleged to be in the possession of the RTZ companies. The present appeals are brought by the RTZ companies and seven of the nine named persons, the other two being out of the jurisdiction. In effect they seek to have the order giving effect to the letters rogatory set aside or discharged.

Since the order of 28th October 1976 there have been a number of applications to the English courts and appeals arising therefrom. The appellants sought to have the order set aside but their application to that effect was rejected by the High Court. On 26th May 1977 the Court of Appeal[1] dismissed an appeal against that rejection but ordered that the schedule of documents attached to the letters rogatory should be amended by the deletion of certain categories of documents. The court also ruled, in favour of the RTZ companies, that (a) penalties provided for by art 15 of EEC Council Regulation 17/62 for breach of arts 85 and 86 of the EEC Treaty (which deals with restrictive or concerted practices) constituted a 'penalty' within the meaning of s 14 of the Civil Evidence Act 1968 so as to provide the foundation for a

---

1  [1977] 3 All ER 703, [1977] 1 WLR 430

---

claim for privilege against the production of documents. The RTZ companies now appeal against the first part of this order and Westinghouse against the second.

Since that decision of the Court of Appeal there have been two further developments. The first of these concerns a claim by the individual witnesses to privilege under the law of the United States, viz the fifth article of amendment to the Constitution (self-incrimination).[1] I shall state the facts relevant to this claim later when I come to consider it. The second concerns the production, on 10th June 1977, in proceedings under the letters rogatory at the United States Embassy in London, by the RTZ companies, pursuant to an order of the Court of Appeal of 26th May 1977, claimed privilege against production of all (save six) of the scheduled documents on the ground that production would tend to expose the RTZ companies to proceedings for the recovery of a penalty (s 14 of the Civil Evidence Act 1968). This claim was challenged by Westinghouse but the Court of Appeal[2] upheld it. By leave of this House Westinghouse now appeals against that judgment.

There are thus three main issues before the House. 1, Ought the order of 28th October 1976 giving effect to the letters rogatory to have been set aside? 2, Can the RTZ companies claim privilege against production of the scheduled documents? 3, Can the individual witnesses claim privilege against self-incrimination under the law of the United States?

The law in England which provides for giving effect to letters rogatory is the Evidence (Proceedings in Other Jurisdictions) Act 1975 ('the 1975 Act'), before 1975 this matter was regulated by the Foreign Tribunals Evidence Act 1856. The 1975 Act was passed in order to enable the United Kingdom to ratify and give effect to the principles of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970[3] which the United Kingdom ratified in 1976. The 1975 Act is, as I think, clear in its terms so that reference to and interpretation of previous statutes is not required. But one background matter requires mention in order that the 1975 Act, particularly s 2, may be understood. This arises from the United States pre-trial procedure, as laid down in the Federal Rules of Civil Procedure and particularly rr 26 and 30. These rules give wide powers, wider than exist in England, of pre-trial discovery against persons not parties to a suit. (The powers was well summarised by Devlin J in Radio Corpn of America v Rauland Corpn[4] as follows:

'It is plain that the principle [of discovery] has been carried very much further in the United States of America than it has been carried in this country. It is not restricted merely to obtaining disclosure of documents from the other party to the suit. It is plain that there is a procedure ... which allows interrogation not merely of the parties to the suit but also of persons who may be witnesses in the suit or whom it may be thought may be witnesses in the suit to require them to answer questions and produce documents. It seems to me on the plain enough that those questions would not necessarily be restricted to matters which were

---

1  Article V provides: 'No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation.'
2  [1977] 3 All ER 703, [1977] 3 WLR 430
3  [1977] 3 All ER 717, [1977] 3 WLR 492
4  Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991
5  [1956] All ER 549 at 551, [1956] 1 QB 618 at 643, 644

relevant in the suit or to produce necessarily what was admissible evidence, but might be used to lead to a train of inquiry which might itself lead to relevant material.'

That case, not dissimilar on its facts from the present, arose under the 1856 Act, s 1 of which referred to the obtaining of 'testimony'. The decision was that there was a distinction between 'direct' material immediately relevant to the issue in dispute, as to which testimony could be obtained, and 'indirect' material by way of discovery, as to which testimony for which could not be obtained. There is no doubt that this distinction was in the mind of the draftsman of the 1975 Act.

In the first place, the 1970 convention by art 23 enabled a contracting state to declare that it would not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents. The United Kingdom in fact made a declaration to this effect coinciding with s 2(4). In the 1975 Act itself, s 1 refers to 'evidence' in place of 'testimony' but if there is any difference between the two words it must be in the sense of 'directness' rather than the reverse. The distinction drawn in the Radio Corpn case is preserved in s 2(3) and (4) of the 1975 Act. Subsection (3) states than an order (sc of the English High Court) given effect to the request—

'shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order ...'

and sub-s (4) that an order under s 2 shall not require a person—

'(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power'.

These provisions, and especially the words 'particular documents specified in the order' (replacing 'documents to be mentioned in the order' in the 1856 Act) together with the expressed duty of the English court to decide that the documents are or are likely to be in the possession, custody or power of the person called on to produce, show in my opinion that a strict attitude is to be taken by English courts in giving effect to foreign requests for the production of documents by non-party witnesses. They are, in the words of Lord Goddard CJ, not to countenance 'fishing expeditions'.

Radio Corpn of America v Rauland Corpn[1].

My Lords, I have referred to some background matters because misinformation as to some of them appears to have influenced the Court of Appeal. Lord Denning MR referred to a submission for RTZ that the case was similar to the Radio Corpn case[2], and that the letters rogatory ought to be rejected. He referred to the Hague Convention and said that the United Kingdom when it ratified the convention did not make any declaration under art 23. (Unfortunately the print of Command Paper 3991 does not contain the reservation.) So he could not accept counsel's general submissions. Roskill LJ seems to have been under the same impression for he too put the Radio Corpn case[2] on one side. I think that the Court of Appeal, while correctly stating that the 1975 Act was a new Act, may have been led to treat it as dealing more liberally than its predecessor with pre-trial discovery. I do not so regard the Act; on the contrary, it appears to me that it takes a stricter line.

The other argument accepted by the Court of Appeal against total rejection of the letters rogatory was based on the terms of the letters rogatory and some observations by the learned United States district judge at Richmond (Judge Merhige). The letter in relation to RTZ recites that—

'it has been suggested to us that justice cannot be done among the said parties without the testimony, which is intended to be given at the trial of the actions, of the following persons ... nor without the production of certain documents in the possession of the Rio Tinto Zinc Corporation Limited such testimony and such documents being related to the existence and terms of various agreements, arrangements or concerned practices between Rio Tinto Zinc Corporation Limited and [numerous other named companies] ... And whereas the existence and terms of such agreements, arrangements or concerned practices are relevant to the matters in issue in the actions at present in this Court ...'

(My emphasis).

The letter in relation to RTZ Services is in similar form except that for the words 'it has been suggested to us there are substituted 'it has been shown to us'—the difference suggesting that neither phrase is significant. Both letters rogatory were drafted by lawyers for Westinghouse and, as they frankly claimed, were drafted after consultation with eminent counsel from England. The phrasing of the letters rogatory themselves ... are the product of those gentlemen's experience and knowledge. It does not take much perspicuous to see that the words italicised are directed to the distinction drawn by Devlin J in the Radio Corpn of America case between 'a process by way of discovery and testimony for that purpose' and 'testimony for the trial itself'. But which it is in fact is not to be determined by the drafting of Westinghouse's lawyers, however objectively it is intended to be put in at the trial is quite consistent with the any evidence obtained is intended to be put in at the trial is quite consistent with the enquiry extending (impermissibly) to trains of inquiry which might produce such evidence.

My Lords, I have much doubt whether the letters rogatory ought not to be rejected altogether. They range exceedingly widely and undoubtedly extend into areas, access to which is forbidden by English law. As regards some at least of the individual witnesses no grounds are given for supposing that they could have any relevant evidence to give (I have already commented on the words 'it has been shown to us'). As regards the schedule of documents, this extends far beyond 'particular documents specified in the order', includes categories and classes of documents which, though obtainable under an English order for discovery, cannot be called for under the 1975 Act and provides little or no material as to many of the scheduled documents, apart from the statement in the letters rogatory themselves, which would enable the English court to form a view whether or not they are or are likely to be in the possession, custody or power of the RTZ companies.

On the other hand, the schedule does list a number of particular and specified documents. These documents (many of which appear to be copies of originals not listed) came into the possession of Westinghouse from an environmentalists group in September 1976 and are claimed to amount to hard evidence of a uranium producers' cartel. Some of these, on the face of the descriptions, or copies or originals of them, might be in the possession of one of the RTZ companies or of a subsidiary over which they have power, and many of them appear on the face of the description to be relevant to the existence or terms of a uranium cartel. It is possible that the existence and terms of use uranium cartel may be relevant to Westinghouse's defence of commercial impracticability. I applied a 'blue pencil', i e if deleted (as under s 2 of the 1975 Act it is entitled to do) a number of items, and (more doubtfully) substituted for the words 'relating thereto' the words referred to therein. For my part I would have applied the blue pencil still more vigorously so as to leave in the schedule only particular documents specified 'together with replies to letters where replies must have been sent. But this leaves the question whether any 'blue-pencil' approach is

---

1 [1956] 1 All ER 549, [1956] 1 QB 618
2 [1956] 1 All ER 549 at 554, [1956] 1 QB 618 at 649

1 [1956] 1 All ER 549 at 551, [1956] 1 QB 618 at 645

appropriate in relation to this request or whether the whole request is so far reaching and so far of the nature of 'fishing' that, even though a portion of it can be salved, it ought to be rejected out of hand, or should the court, which under the 1975 Act has powers to limit its action to what it considers appropriate, make an order confined to what can be supported under the Act. Before I give my answer on this issue, I must deal with the position as regards the individual witnesses and with a separate argument.

As regards the named individual witnesses, the position can be broadly stated. There are some individuals employed by one or other of the RTZ companies who appear from the scheduled documents to have attended or to have knowledge of meetings of uranium producers at which matters relevant to the existence of a cartel may have been discussed. In the case of others (a minority) no connection is shown between them and any such meeting or with the existence of a cartel. So the question again is whether there is sufficient in the assertion that there is testimony of some identified individuals who are expected for the trial or whether the generality of the request invalidates the whole application.

The separate argument arises in this way. On 15th October 1976, soon after the 'environmental' documents reached them, Westinghouse commenced in the United States District Court for the Northern District of Illinois Eastern anti-trust proceedings against the RTZ companies and 27 other alleged members of a uranium cartel. Westinghouse claimed, in accordance with United States anti-trust legislation, treble damages against all defendants. The RTZ companies have not accepted jurisdiction in these proceedings and have taken no part in them. The letters rogatory give rise to a contention by the RTZ companies that the real, or predominant, purpose of the letters rogatory is to further the anti-trust proceedings, and that as those proceedings are of a penal character, because of the treble damages claim, the letters rogatory should not be acceded to. I need not express any opinion whether if the letters rogatory had been issued in the Illinois proceedings they could be implemented in England, for I am of opinion that the appellants' argument fails at an earlier stage. Unless a case of bad faith is made against Westinghouse (which is expressly disclaimed) it is impossible to deny that the letters rogatory were issued for the purposes of obtaining evidence in the Richmond proceedings. The fact, if it be so, that evidence so obtained may be used in the other proceedings and indeed may be central in those proceedings is no reason for refusing to allow it to be requested: all evidence, once brought out in court, is in the public domain. I must accept the argument, once brought out in court, is in the public domain. I must accept the argument that following the letters rogatory procedure, and that as those proceedings are of a penal character, because of the treble damages claim, the letters rogatory should not be acceded to. I need not express any opinion whether if the letters rogatory had been issued in the Illinois proceeding they could be implemented in England, for I am of opinion that following the spirit of the 1975 Act which is to on the whole, I am of opinion that following the spirit of the 1975 Act which is to enable judicial assistance to be given to foreign courts, the letters rogatory ought to be given effect to so far as possible and that it would be possible to give effect to them subject to certain limitations. The documents to be produced and the witnesses to be examined at the earlier stage, I am of opinion that on the whole of the witnesses. Exactly what these should be I need not specify in view of my conclusions on other aspects of the case. It is enough to say that agreeing in principle, if not totally in detail, with the decisions of the Court of Appeal, I would not set aside the order of 26th October 1976 on the ground that it provided for illegitimate discovery.

2. I now deal with the question whether the RTZ companies can claim privilege against production of the documents requested under s 14 of the Civil Evidence Act 1968. This, as s 3(1)(b) of the 1975 Act makes clear, is a matter of English law. I shall deal with it briefly because I agree with the decisions of the Court of Appeal of 26th May 1977[1] and 11th July 1977[2] and I am satisfied with their reasoning. These judgments establish: (a) that fines imposable by the Commission of the European

1 [1977] 3 All ER 703, [1977] 3 WLR 430
2 [1977] 3 All ER 717, [1977] 3 WLR 492

Communities under arts 85 and 86 of the EEC Treaty and art 15 of EEC Council Regulation 17/62 are penalties; this was not disputed in this House; (b) that s 14 of the 1968 Act is not limited to such penalties as are imposed as the result of proceedings; but covers penalties imposed by administrative action and recoverable by proceedings; (c) that since these penalties are recoverable under English law by virtue of the European Communities Act 1972 they are 'penalties provided for by such law' (Civil Evidence Act 1968, s 14(1)(a)); (d) that production of the documents would tend to expose the RTZ companies to proceedings for the recovery of a penalty, nonetheless though the Commission: (i) has knowledge of the 'environmentals' documents; (ii) has extensive powers of investigation; (iii) has a duty to enforce arts 85 and 86 of the EEC Treaty: see art 89.

I base that conclusion in part on evidence which was before and considered by the High Court and the Court of Appeal and in part on the proposition that the tendency to expose to a penalty would be increased if the documents in question were to be validated and connected with the RTZ companies by sworn evidence, as opposed to being, as they are now, pieces of paper found in a file. The test of this proposition, which was in effect and correctly applied by the Court of Appeal, was that laid down in Triplex Safety Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd[1].

In my opinion the RTZ companies make good their claim to privilege against production of the scheduled documents except those conceded and quod those documents that can be implemented.

3. The individual witnesses cannot claim privilege against giving any oral evidence on the ground that to do so might incriminate them. This claim attracts the protection of the fifth article of amendment to the United States Constitution. Since it is a claim for privilege under United States law, its validity has to be determined as if it had been made in civil proceedings in the United States of America (s 3(1)(b) of the 1975 Act).

It is necessary to state the facts in detail since this is a matter which has arisen since the judgment of the Court of Appeal.

On 8th June 1977 one of the individual witnesses, Kenneth Bayliss, attended at the United States Embassy in London before a consular officer designated to take evidence under the letters rogatory. He claimed privilege under the Fifth Amendment. After argument, the officer did not direct the witness to answer as she had power to do under s 3(c) of the Act of 1975. Instead she permitted guidance to be sought from Judge Merhige, the judge in charge of the Richmond proceedings, by telephone. Judge Merhige came to London in order to rule on this question and sat at the United States Embassy from 13th-16th June. All the seven witnesses claimed the Fifth Amendment privilege and on 14th June 1977 Judge Merhige ruled that the privilege was well taken and that the witnesses need answer no questions except to give their names and addresses. There can be no doubt that this ruling has the status of a decision of the competent United States district court.

On 15th June 1977 Judge Merhige received a letter from the United States Department of Justice stating that the department required the evidence of the witnesses for the purposes of a grand jury investigation. This investigation had been started early in 1976 to pursue this investigation and to initiate criminal proceedings if thought fit. It was represented to the judge that depositions taken pursuant to the letters rogatory might well be the sole opportunity for the grand jury to obtain information vital to its investigation. Further it was represented that the Department of Justice would not utilise the testimony of any of the named witnesses as the basis for a criminal prosecution in the United States. On 16th June 1977 a representative of the United States Attorney General appeared before Judge Merhige and stated that it was the firm policy of the Department of Justice not to make any

1 [1939] 2 All ER 613, [1939] 2 KB 395

application in a civil case to which the United States Government was not a party for an order under 18 United States Code §§6002 and 6003 (see below) and that accordingly such an order had not been sought and was not intended to be sought. However, Judge Merhige was invited to rule that, in the light of the representation contained in the letter, the Fifth Amendment privilege was no longer available. Judge Merhige declined to accede to this invitation and ruled that the privilege was still effective. This ruling also has the status of a decision of the competent United States district court.

However, notwithstanding its 'firm policy', the United States Department of Justice on 18th July 1977 made application to Judge Merhige in Richmond for an order to compel testimony under 18 United States Code §§6002 and 6003. These provisions are, so far as relevant, as follows:

'6002. Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—(1) a court or grand jury of the United States ... and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order ... may be used against the witness in any criminal case ...

'6003. (a) In the case of an individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

'(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgement—(1) the testimony or other information from such individual may be necessary to the public interest; and (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.'

The request was accompanied by two letters.

(i) A letter dated 11th July 1977 signed by the Deputy Assistant Attorney General, Anti-Trust Division, to the United States Attorney, Eastern District of Virginia. It was headed 'Grand Jury Investigation of the Uranium Industry'. It authorised the United States Attorney, pursuant to §§6002 and 6003 requiring a named witness 'to give testimony or provide other information in the above matter and in any further proceedings ancillary thereto'. (My emphasis.)

(ii) A letter dated 12th July 1977 signed by the Attorney General of the United States also addressed to the United States Attorney, Eastern District of Virginia, stating that the writer concurred in the request. This letter contained the following:

'These immunity requests are for the purpose of permitting testimony to be compelled in a civil litigation to which the United States is not a party. As you know, the Department of Justice has a firm policy against seeking such an order in private litigation except in the most extraordinary circumstances. In my judgment, however, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) [The witnesses have refused to testify on the basis of privilege against self-incrimination and are outside the jurisdiction of the

the United States courts) ... (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement cooperation between the United States and the United Kingdom ... (5) The testimony these persons give may well be indispensable to the grand jury; and (6) The subject matter of this grand jury is of particular importance.'

On 18th July 1977 Judge Merhige, as he was obliged to do under §6003(a), made an order in respect of each of the witnesses named compelling his testimony in the terms provided for by §§6002 and 6003. He expressed the opinion that the matter of sanctions might be tested in the English court and said that he encouraged that course. On 25th July the witness Bayliss attended at the United States Embassy in London and declined to answer questions put to him on the ground that he wished to seek the assistance of the English court. It is now for this House, on these appeals, to decide whether, in the light of this situation, the letters rogatory should be given effect to so far as regards these witnesses.

My Lords, it is my clear opinion that effect should now be given. The position is that so far as the civil proceedings in Richmond, Virginia, are concerned, a ruling was given by the learned district judge that the witnesses were entitled to the Fifth Amendment privilege. Though the procedure followed was, in certain respects which I need not particularise, short-circuited in the interest of time saving, there is no doubt that the course taken, with agreement of the parties, was in accordance with the 1975 Act. The ruling was given by the competent judicial authority that the evidence sought was evidence which the witnesses could not be compelled to give in civil proceedings in the country in which the requesting court exercises jurisdiction (s 3(1)(b) of the 1975 Act). I am not prepared to go so far as to say (as the appellants submitted) that thereafter the requesting court was functus officio, or the letters rogatory exhausted; the procedure allows of sensible flexibility. But when a considered ruling in law has been given and not displaced by appeal, it is necessary to look very carefully at an action which is said to negative that ruling.

The action relied on is the order made by the district judge under the provisions of 18 United States Code §§6002 and 6003. Looking at this order and the application for it, there is no doubt as to its character and purpose. This is shown beyond doubt by the letters of 11th June and 11th and 12th July, documents of complete frankness and totally without subterfuge or disingenuousness. The evidence to obtain which the orders was made and the immunity granted was on the face of these documents evidence required for a grand jury investigation set up by the United States Department of Justice, Anti-Trust Division. This is the first objection: the request for it does not comply with s 1(b) of the 1975 Act, in order to obtain the evidence is a misuse of that procedure. Secondly, the evidence, as the letters explicitly state, is sought for the purpose of a grand jury investigation which may lead to criminal proceedings (see above). Now s 5 of the 1975 Act provides for the obtaining of evidence for criminal proceedings but expressly the section only applies to proceedings which have been instituted (none have been instituted) and, impliedly, to a request by the court in which the proceedings have been instituted. The case is therefore not within s 5, and the procedure is an attempt to get the evidence in spite of that fact. Thirdly, the evidence is sought for the purpose of an anti-trust investigation into the activities of companies not subject to the jurisdiction of the United States. I think that in such circumstances the courts would properly, in accordance with accepted principle, refuse to give effect to the request on the grounds that the procedure of the 1975 Act was being used for a purpose for which it was never intended and that the attempt to extend the grand jury investigation extra-territorially to the activities of the RTZ companies was an infringement of United Kingdom sovereignty: see British Nylon Spinners Ltd v Imperial Chemical Industries Ltd[1].

1  [1955] 2 All ER 780, [1955] Ch 19

448    All England Law Reports    [1978] 1 All ER

But in the present case, there has been an intervention by Her Majesty's Attorney-General on behalf of the Government of the United Kingdom. In this intervention the Attorney-General brought to the notice of your Lordships the following matters.

(a) Her Majesty's Government considers that the wide investigatory procedures under the United States anti-trust legislation against persons outside the United States who are not United States citizens constitute an infringement of the proper jurisdiction and sovereignty of the United Kingdom.

(b) That the grand jury have issued a subpoena to Westinghouse requiring that company to produce to the grand jury documents and testimony obtained in discovery in the Virginia proceedings. Therefore evidence given in pursuance of the letters rogatory will be available to the United States Government for use against a United Kingdom company and United Kingdom nationals in relation to activities occurring outside United States territory in anti-trust proceedings of a penal character.

(c) That the intervention of the United States Government followed by the grant of the orders and immunity of 18th July 1977 shows that the execution of the letters rogatory is being sought for the purpose of the exercise by the United States Government's extra-territorial jurisdiction in penal matters which in the view of Her Majesty's Government is prejudicial to the jurisdiction and sovereignty of the United Kingdom.

My Lords, I think that there is no doubt that, in deciding whether to give effect to letters rogatory, the courts are entitled to have regard to any possible prejudices to the sovereignty of the United Kingdom; that is expressly provided for in art 12(b) of the Hague Convention. Equally, that in a matter affecting the sovereignty of the United Kingdom the courts are entitled to take account of the declared policy of Her Majesty's Government. Her Majesty's Government's intervention is in my opinion beyond doubt. Indeed, this follows as the order of 18th July 1977 and the letter of 12th July 1977 make plain, the order is the counterpart of the action which the United States Government has taken. For, as the order of 18th July 1977 and the letter of 12th July 1977 make plain, the order is to be treated as government policy, and granting immunity to the witnesses were entitled to privilege under the Fifth Amendment.

For these reasons, I am of opinion that recognition should not be given to the order of 18th July 1977 granting immunity to the individual witnesses, that the matter in question, if 12th June 1977 that the witnesses were entitled to privilege under the Fifth Amendment.

The intervention of Her Majesty's Attorney-General establishes that quite apart from the present case, over a number of years and in a number of cases, the policy of Her Majesty's Government has been against recognition of United States investigatory jurisdiction extra-territorially against United Kingdom companies. The courts should in such matters speak with the same voice as the executive (see The Fagernes); they have, as I have stated, no difficulty in doing so.

It is a question of implementing the order here. It is axiomatic that in anti-trust matters this is the policy of one state may be to defend what it is the policy of another state to attack.

June 12th July 1977, that there is a firm policy against seeking orders under §§6004 and 6005 in private litigation. It appears that the present is the only case in which such an order has been made. (One other instance cited is not comparable.) But if public interest enters into this matter on one side, so it must be taken account of on the other; and as the views of the executive in the United States of America impel the making of the order, so must the views of the executive in the United Kingdom be considered when it is a question of implementing the order here. It is axiomatic that in anti-trust matters this is the policy of one state may be to defend what it is the policy of another state to attack.

It is, I think, clear that there is no doubt that, in regard to giving effect to letters rogatory, the courts are entitled to take account of the declared policy of the United Kingdom Government and granting testimony and granting immunity in extraordinary circumstances relating to the public interest of the United States. That the making of the order is a matter of government policy, and not related to the civil proceedings in Richmond, is confirmed beyond doubt by the statement made before Judge Merhige on 16th

1.  Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970 (Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991)
2.  [1932] P 311

---

HL    Rio Tinto Zinc v Westinghouse (Lord Wilberforce)    449

A further point was taken by the appellants that the individual witnesses should not be compelled to give evidence which would, in effect, remove the corporate privilege of their company against production of documents, an argument, in effect, that evidence that cannot be obtained directly from the companies should not be obtainable indirectly through their employees. This raised some novel and interesting contentions which may merit consideration in another case, or by the Law Commission. It is unnecessary, and therefore inappropriate, to decide on it now.

I would allow the appeals of the RTZ companies and of the individual appellants and order that the order giving effect to the letters rogatory be discharged. I would dismiss the appeals of Westinghouse. I would order Westinghouse to pay the appellants' costs of the appeals and cross-appeals in this House.

VISCOUNT DILHORNE. My Lords, on 18th March 1970 the United Kingdom signed at The Hague a convention[1] on the Taking of Evidence Abroad in Civil or Commercial Matters designed to improve mutual judicial co-operation in civil and commercial matters. It was ratified on 16th July 1976. Among the other states which signed and ratified the convention was the United States. Article 1 of the convention stated that a letter of request should not be used to obtain evidence not intended for use in judicial proceedings commenced or contemplated. Article 12 stated that the execution of a letter of request might be refused only to the extent that the execution of the letter did not fall within the functions of the judiciary of the state to which the request was directed, or that that state considered that its sovereignty or security would be prejudiced thereby. Article 23 stated that a contracting state might at the time of signature, ratification or accession declare that it would not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries.

Pursuant to that article, Her Majesty's Government on ratifying the convention declared that the United Kingdom would not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents and understood that the purpose of obtaining pre-trial discovery of documents required a person—

'(a) to state what documents relevant to the proceedings to which the letters of request relate are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the letter of request, as being documents appearing to the requested court to be or to be likely to be in his possession, custody or power to be letters of request issued for the purpose of obtaining pre-trial discovery of documents.'

To enable the United Kingdom's obligations under the convention to be implemented, the Evidence (Proceedings in Other Jurisdictions) Act 1975 (hereafter referred to as 'the 1975 Act') was passed. That Act went further than was necessary for the purposes of the convention for it made provision for the taking of evidence not only for civil or commercial proceedings but also for criminal proceedings.

In the interests of comity, it is, and I trust will continue to be, as Lord Denning MR said in this case in the Court of Appeal[2], our duty and our pleasure to do all we can to assist 'the requesting court.

The powers possessed by United Kingdom courts in this regard are now contained and defined in the 1975 Act which, its long title states, was 'to make new provision for enabling the High Court ... to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions.' Section 1 of that Act provides that

1.  Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991
2.  [1977] 3 All ER 703 at 708, [1977] 3 WLR 430 at 436

## 450    All England Law Reports    [1978] 1 All ER

Kingdom—

'and the court is satisfied—(a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ("the requesting court") exercising jurisdiction ... in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated.'

then, and I stress only then, has the court the powers conferred by the following provisions of the Act and is it able to give effect to the request.

So the first question that a court must consider when such an application is made is whether it is satisfied that each of these conditions is fulfilled.

In *Radio Corpn of America v Rauland Corpn*[1] the letters rogatory, which emanated from the President of the United States, stated that the testimony of the following witnesses (and then followed a long list of members of boards of directors of English companies) was 'necessary in the trial of the issues in the said cause and without the testimony of whom justice cannot be completely done between the parties'. The production of documents was also asked for. Despite the statement in the letters rogatory that such testimony was necessary at the trial, the Divisional Court held that what was being sought was material relating to pre-trial discovery, material which might lead to a line of enquiry which itself would disclose relevant material, and that it had not been shown that the United States court wished to obtain 'evidence' (that word in the Foreign Tribunals Evidence Act 1856, s 1, now replaced by 'evidence' in the 1975 Act) which is in the nature of proof for the purpose of the trial, and that consequently the application to make the order should be refused. In the course of the argument Lord Goddard CJ[2] said that the court had to look at the substance of the matter and regard was had to what was said in the court in Illinois when the letters rogatory were issued. In his judgment, he said[3] that it was an endeavour to get in evidence by examining people who may be put to the parties in the way of getting evidence. 'That' he said 'is mainly what we should call a fishing proceeding which is never allowed in the English courts.'

I do not think that 'evidence' in the 1975 Act has a different meaning from 'testimony' in the 1856 Act. The distinction drawn in that case and in the cases cited therein between the obtaining of evidence for use in a trial and the obtaining of information which might lead to the procurement of evidence is equally relevant in construing the 1975 Act. In that Act and in the convention the emphasis is on the obtaining of evidence. If the court is not satisfied that evidence is required, direct evidence for use at a trial as contrasted with information which may lead to the obtaining of evidence, however much the court may be disposed to accede to the request, it has no power to do so. As I see it it has no discretion in the matter.

In this case no difficulty arises with regard to s 1(a). They say that the letters rogatory are directed to obtaining information from and discovery by persons not parties to the litigation in Richmond, Virginia, which might lead to the procurement of evidence; that it is sought primarily for the purpose of civil proceedings brought by the respondents against the appellant companies and others in Illinois and now also for a grand jury empanelled in Washington DC.

The material put before us does not suffice to enable me to decide that use in the Illinois proceedings is the respondents' predominant purpose. If it is, and it may well be, that would not in my opinion prevent s 1(b) being satisfied for it is not disputed

1 [1956] 1 All ER 549, [1956] 1 QB 618
2 [1956] 1 QB 618 at 641
3 [1956] 1 All ER at 554, [1956] 1 QB 618 at 649

## [1978] 1 All ER    Rio Tinto Zinc v Westinghouse (Viscount Dilhorne)    451

HL

that what is being sought is for the purpose of the civil proceedings in Richmond, and the proceedings in Illinois are civil proceedings.

Between 1966 and 1972 the respondents entered into a number of contracts under which they undertook to supply 79 million lbs of uranium in the period up to and including 1994. They were fixed price contracts subject to escalation with increases in the cost of living. By 1976 the price of uranium had risen from about $6 a lb in 1973 to about $41 a lb. The respondents had not covered themselves against this liability and by September 1975 were short of approximately 75 million lbs of uranium. In that month they gave notice to the other parties to these contracts that they would be unable to carry them out with the consequence that 16 utility companies started actions against them in which a sum in the region of $2,000 million was claimed. On the respondents' application 12 of these actions were consolidated in the United States District Court at Richmond for the purpose of the pre-trial procedures.

In their defence to these actions the respondents relied on the defence of 'commercial impracticability' under §2-615 of the United States Uniform Commercial Code and asserted the existence of an international cartel of uranium producers which they alleged had had a serious impact on the uranium market and had caused artificially high prices. They admit that at that time they had not any had evidence of the existence and activities of the cartel.

In March 1976 the United States Department of Justice started an investigation into possible violations of the United States anti-trust laws by members of the cartel and in June 1976 a grand jury was empanelled to pursue this investigation and to initiate criminal proceedings for the warranted.

The convention made no provision for obtaining evidence for the purpose of criminal proceedings and under s 9 of the 1975 Act an order can only be made for the purpose of obtaining evidence for criminal proceedings where proceedings have been instituted. So no order could be made for the obtaining of evidence to go before the grand jury.

In September 1976 the respondents received through an organisation called 'The Friends of the Earth' documents relating to the existence and activities of such a cartel of which the RTZ companies with uranium producers (including government) from France, Canada, Australia and South Africa were members.

On 15th October 1976 the respondents started civil proceedings for breach of anti-trust laws in Illinois against the RTZ companies and many others. In that action they claimed treble damages, a sum in the region of US $6,000 million.

On the same day, in the course of the pre-trial proceedings in Richmond, they filed applications for the issuance of letters rogatory seeking the taking of depositions and the production of documents in Canada, Australia and the United Kingdom. The plaintiffs in the actions in Virginia lodged a memorandum in opposition in which they alleged (i) that the court had a discretion whether to issue the letters; (2) that the information sought was irrelevant, one ground for that assertion being that the cartel deliberately excluded the United States market and its existence had been known to the respondents for more than four years; (3) that the issuance of the letters would cause substantial delay in the preparation of the cases for trial; (4) that the depositions and documents sought were 'really in aid of Westinghouse's claim ... in its anti-trust suit' and (5) that the granting of the letters rogatory would be a futile act as, if the letters rogatory were issued in the form sought, they would not be honoured by the courts of England.

The application was heard by Judge Merhige at Richmond on 21st October. It was contended for the respondents that the issuance of the letters was a matter of routine and that the court had no discretion as to it. In the course of the argument their counsel said: 'As far as exploring areas of possible evidence is concerned, it would be done with despatch, and 'We are here seeking to discover critical evidence to the defence in this case from several of the international giants in the mining and milling business.'

## 452      All England Law Reports      [1978] 1 All ER

It appears that American pre-trial discovery operates over a far wider field than discovery in this country. Parties may obtain discovery regarding any matter not privileged—

'including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.'

And such discovery may be obtained from persons not parties to the action.

The applications were made in the course of pre-trial proceedings and the shorthand notes of the hearing do not reveal that there was any consideration of the law in England with regard to the difference between the obtaining of evidence in the strict sense and obtaining of information which might lead to the obtaining of evidence. Counsel for the respondents told the judge that the phrasing of the letters was in accordance with the advice of eminent counsel and that their form was 'acceptable in these foreign jurisdictions'. Most of the letters appears to have been on the effect the issuing of the letters would have in causing discovery of the material sought and the judge who did not see the relevance of the material sought and who did not say whether or not he had any discretion in the matter, issued the letters in the circumstances it seems to me not probable that the issuing of the letters was regarded as a step in the normal process of discovery in American courts which included the obtaining of material which might lead to the obtaining of evidence; in other words, what we would call a 'fishing' operation. Support for this view is to be found in the observations of the respondents' counsel cited above.

The two letters rogatory were similar in all material respects. It will suffice to consider one of them and I must do so in some detail in view of their importance. Each contained recitals, one saying—

'it has been suggested to us that justice cannot be done among the said parties without the testimony, which is intended to be given in evidence at the trial of the actions of the following persons . . . being directors and/or employees and/or former directors and/or former employees of the Rio Tinto Zinc Corporation . . .'

Then five persons are named and the recital goes on—

'or such other director or other person who has knowledge of the facts as to which evidence is desired as hereinafter stated, nor without the production of certain documents in the possession of [RTZ] such testimony and such documents being related to the existence and terms of various agreements, arrangements or concerted practices between [RTZ] and the following entities as well as others whose identities are presently unknown . . .'

Then follow the names of 20 companies of which 26 were Canadian, Australian, South African, French and English.

The letter goes on:

'Said terms, arrangements or concerted practices identities [sic] relate to past, present and future uranium prices, uranium supply, uranium demand, allocation of uranium markets, relationships of uranium producers with "middle-men" including their willingness or lack of same to make sales to "middlemen" and the terms and conditions under which such sales should be made, if at all, the terms of contracts for the sale of uranium to uranium consumers and the United States embargo on the importation of enriched uranium. And whereas the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this Court.'

These recitals were followed by the request that the persons named 'or other person having knowledge of the facts should be caused to appear before any consul or other consular officer of the United States 'to be examined orally as a witness in the above entitled actions as to 'the existence and terms of the above-mentioned agreements, arrangements or concerted practices.'

This was followed by the request that the proper officer of RTZ should be ordered to produce the documents enumerated in Schedule B hereto, being documents which appear to be or to be likely to be in the possession, custody or power of that company.

Schedule B contains 73 paragraphs of which no less than 57 ended with the words 'and any memoranda, correspondence or other documents relating thereto'. I do not propose to refer in any detail to the contents of each paragraph. The pattern followed appears to relate to the contents of each paragraph to a letter or meeting or agenda etc of which the respondents had received information from the Friends of the Earth organisation, and then to request the production of anything that might be connected therewith. I will only cite para 16 which asked for the production of—

'Copies of all contracts, letters of intent, enquiries and quotations together with invoices of actual deliveries of uranium, thorium and their ores and compounds provided by members of the organization or organizations known variously as "the 'Uranium Marketing Research Organization', the 'Uranium Producers Club', "The Secretariat" and Société D'etudes et de Recherches D'uranium ('SERU')".

The wide ranging and at the same time vague description of the documents sought makes it to my mind even clearer than it was in the Radio Corps of America case[1] that this was a fishing operation.

In that case as in this oral testimony was sought as well as the production of documents. The letters rogatory asked that Sir George Nelson and Mr Nelson should be examined on 'such of the above-mentioned agreements and documents, and the conversations, transactions, activities and negotiations referred to therein, as may be within the knowledge of them or either of them'. In this case the letters rogatory asked that the persons named or other person having knowledge of the facts . . . be examined as to the existence and terms of the above-mentioned agreements, arrangements or concerted practices'.

In that case Barry J had affirmed the order giving effect to the letters rogatory to the extent that Sir George Nelson and Mr Nelson were to be required to give oral testimony but disallowed the appeal against the order insofar as it related to the production of documents. On appeal Devlin J, with whose judgment Lord Goddard CJ and Hilbery J agreed, expressed the view that Barry J ought logically to have gone on and disallowed the order for the examination of Sir George Nelson and Mr Nelson too[2]—

'because exactly the same principle applies to both. If he had not power to do one, he had not power to do the other. He had not power because it was not made clear to him that the foreign court was desirous of obtaining . . . evidence which may be used at the trial and not in proceedings for inspection and discovery before the trial'.

In my view Devlin J's observations apply to this case.

In the Court of Appeal it was held that the words which so often appear in Sch B 'any memoranda, correspondence or other documents relating thereto' were too wide and the words 'relating thereto' were struck out. In their place the words 'referred to therein' were inserted.

That court then recognised that a part of the letters was of a fishing character. Letters of request may take a variety of forms. Some, it may clearly appear, are

1   [1956] 1 All ER 549, [1956] 1 QB 618
2   [1956] 1 All ER 260, [1956] 1 QB 618 at 635
3   [1956] 1 All ER 549 at 553, [1956] 1 QB 618 at 648

wholly directed to the obtaining of evidence: some, it may equally clearly appear are not; one part of a request may be for evidence and the remainder not. The language of others may be such that it is not possible with any degree of certainty to decide into which category they fall.

If it is clear that part of the request is for the obtaining of evidence and that part is severable from the rest, it might be right to hold that that part satisfies of the 1975 Act. If it is clear that the request is substantially for the obtaining of evidence although a minor part is not, again it might be right to hold that the part imposed by that section was passed. The order made by the court could ignore the fishing part.

In this case, as in the Radio Corpn of America case[1], the request for the examination of named persons is linked with the request for the production of documents. One is supplementary to the other. The witnesses would be examined on the very matters to which the documents of which production is sought, relate. In the Radio Corpn case[2] Barry J, as I have said, sought to sever the examination of witnesses from the production of documents and it was held that he was wrong to do so. It would, I think, be equally wrong to do so in this case.

Nor can it be said that the amendments made by the Court of Appeal were of a minor character. With those amendments made and para 16 of Sch B deleted, it appears that the court thought that the letters were restricted to the obtaining of evidence and that the 'fishing' elements were eliminated. I do not think they were but that is by the way. The amendment of no less than 57 paragraphs of the schedule and the deletion of para 16 was a substantial alteration. It is not, in my opinion, open to the courts of this country to convert letters rogatory into letters which comply with s 1 by the use of a 'blue pencil' or to insert words in place of those struck out, though, as I have said, where it is clear that the letters are substantially for the obtaining of evidence, a minor part which is not might be ignored.

In relation to s 1 of the 1975 Act the letters have to be considered in the form in which they are received.

In this case, as in the Radio Corpn of America case[1], the letters stated that without the evidence of the named persons justice could not be done between the parties. I do not ignore the fact that in this case, unlike that, it is said that it is intended that the 'evidence' should be given at the trial. Whether or not that was inserted on the advice of eminent counsel I do not know, but as Lord Goddard CJ said in that case one must look, 'at the substance of the matter'.

I have naturally carefully considered the judgments of Lord Denning MR, of Roskill LJ and of MacKenna J and I regret that I cannot come to the conclusion to which they came. That the ultimate object was to obtain evidence for use at the trial I do not doubt, but the substance of the letters in my opinion shows that the discovery and examination of the named persons sought was of a fishing character. It might produce some direct evidence and it might result in getting information which would lead to the securing of evidence.

Looking at the letters alone, I cannot say that I am satisfied that they were directed to the obtaining of evidence either only or mainly. What occurred in the court at Richmond when they were issued, in my opinion strongly supports the conclusion that they were not. Even if they were not issued as a matter of routine, there are a number of indications that their issue was part of the normal American pre-trial discovery, which, as I have said, includes discovery of matters which may lead to the securing of evidence.

Not being so satisfied, as s 1 requires the court to be, I do not think the court had power to make orders giving effect to the requests and in my opinion it was wrong to do so.

On this ground I would allow the appeals.

1    [1956] 1 All ER 549, [1956] 1 QB 618
2    [1956] 1 All ER 260, [1956] 1 QB 618 at 635

It was also contended on behalf of the appellants that if s 1 of the 1975 Act was satisfied and the court was entitled to exercise the powers contained in its later provisions, nevertheless in the exercise of its discretion, it should have refused to make the order. The following provisions of the 1975 Act give the court powers, subject to certain restrictions, and impose no duty. The court is clearly entitled to exercise its discretion whether or not to make an order.

Before I consider the exercise of discretion it is necessary to refer to other provisions of the 1975 Act. Section 2(1) gives the court power by order to make such provision for obtaining evidence ... as may appear to the court to be appropriate for the purpose of giving effect to the request ...'. Section 2(3) and (4) contains restrictions on the exercise of that power, sub-s (3) providing that:

'An order under this section shall not require any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order ...'

Subsection (4) reads as follows:

'An order under this section shall not require a person—(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power.'

This subsection states in statutory form the reservation made by Her Majesty's Government on the signing of the convention.

It was argued that if documents were sufficiently specified for the purposes of the subpoena duces tecum, they were specified in a letter of request for the order court to be able to make an order for their production. This is not so. The only documents which a person can be ordered to produce under s 2 of the 1975 Act are particular documents.

It follows that, if it were the case that the court was satisfied that the application for the purpose of obtaining evidence for civil proceedings, the court could only order the production of particular documents which it specified. It could not order the production of 'any memoranda, correspondence or other documents relating thereto' or, in my opinion, of 'any' memoranda correspondence or other documents referred to therein', for those formulae do not specify particular documents. Section 2 of the 1975 Act is of general application. As Lord Goddard CJ said in the Radio Corpn of America case[1] 'fishing proceedings are never allowed in the English courts; and, if one concludes, as I do, that this was a fishing operation, then the consequence is that no order should, even if s 1 of the 1975 Act is satisfied, have been made for the examination of any witness or for the production of any documents.

On 28th October 1976 Master Creighmore ordered the examination of the persons named in the letters rogatory and the production of the documents asked for in Sch B, and on 2nd February 1977 Master Jacob refused to set aside his order and MacKenna J dismissed the appeal from his decision. On 26th May 1977 the Court of Appeal, as I dismissed the appeal and varied the order and, subject thereto, allowed the order to stand. On 8th June, consequently, three of the persons named attended before a consular officer at the United States Embassy and on 11th June the RTZ companies appeared by their proper officer. Those persons and the RTZ companies claimed privilege. Section 3(1) of the 1975 Act provides:

'A person shall not be compelled by virtue of an order under section 2 above'

1    [1956] 1 All ER 549 at 554, [1956] 1 QB 618 at 649

Section 3(a) reads as follows:

'Subsection (1(b)) above shall not apply unless the claim of the person in question to be exempt from giving the evidence is either—(a) supported by a statement contained in the request . . . or (b) conceded by the applicant for the order; and where such a claim made by any person is not supported or conceded as aforesaid he may (subject to the other provisions in this section) be required to give the evidence to which the claim relates but that evidence shall not be transmitted to the requesting court if that court, on the matter being referred to it, upholds the claim.

The three named persons claimed that under the fifth article of amendment to the United States Constitution they could not be compelled to give evidence and the RTZ companies claimed privilege under s 14 of the Civil Evidence Act 1968 on the ground that to produce the documents 'would tend to expose' them to 'proceedings for the recovery of a penalty' being a penalty provided for by the law of England. It will be convenient to consider this latter claim first. Article 85 of the EEC Treaty prohibits as—

'incompatible with the common market: all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the common market . . .'

For infringement of this article the commission may impose a fine of 'from 1 000 to 1 000 000 units of account, or a sum in excess thereof but not exceeding 10 per cent of the turnover in the preceding business year of the infringing undertaking'[1].

In this House it was not contended that a fine imposed for breach of art 85 was not a penalty within the meaning of s 14 of the Civil Evidence Act 1968. But two points were taken on behalf of the respondents. First, it was contended that the privilege recognised by that section did not extend to cases where the penalty could be imposed without an action or proceeding and that it could only be claimed where there were proceedings to establish liability to the penalty and for its recovery. This argument, when advanced in the Court of Appeal was rejected and in my view rightly. A person may be exposed to proceedings for the recovery of a penalty consequent on the imposition of a penalty by a body such as the commission.

Secondly, it was argued that the discovery of the document would not in the circumstances tend to expose the RTZ companies to such proceedings. It was said that as the commission had knowledge from the 'Friends of the Earth' documents for a considerable time of the existence of the cartel and had taken no action, there was no real risk of such proceedings if the documents in the possession of the RTZ companies were disclosed.

In Triplex Safety Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd[2] the judgment of the Court of Appeal, of which Greene MR was a member, was delivered by du Parcq LJ. He said that it was not in doubt that the power of the court to insist on an answer to interrogatories extended to any case in which it was not made to appear to the court that there is reasonable ground to apprehend danger to the witness from his

1  EEC Council Regulation 17/62, art 15(2)
2  [1939] 2 All ER 613, [1939] 4 KB 395

being compelled to answer (R v Boyes[1]). That was the test applied in the Triplex case[2] and the same test is to be applied in relation to the discovery of documents. In the present case, Lord Denning MR said[3] that he doubted whether that case would be decided in the same way today. It may be that would now be held that answering interrogatories as to libel would not be a reasonable ground for apprehending a prosecution for criminal libel. I do not read Lord Denning MR as criticising the reasoning in the Triplex case[4] but only its application.

Lord Denning MR went on to say that if it appears that a witness's answer could be used against him in criminal proceedings, his objections should be upheld; and that if it appears that a witness is at risk 'great latitude should be allowed to him in judging for himself the effect of any particular question'[5]. He went on to say:

'It may be improbable that they [proceedings] will be taken but nevertheless, if there is some risk of their being taken, a real and appreciable risk as distinct from a remote or insubstantial risk, then he should not be made to answer or to disclose the documents.'

With these observations I respectfully agree. It was suggested that the reasoning in the Triplex case[6] had reduced the burden which formerly lay on a person claiming privilege but I do not think that that is the case. In this judgment du Parcq LJ reviewed the earlier cases and based his conclusions on them. Lord Denning MR contrasted a real and appreciable risk with a remote or insubstantial one, and once it appears that the risk is not fanciful, then it follows that it is real. If it is real, then there must be a reasonable ground to apprehend danger, and, if there is, great latitude is to be allowed to the witness and to a person required to produce documents.

If the RTZ companies are compelled to produce the documents which they were asked to produce, I cannot reach the conclusion that it would be fanciful to suppose that that would expose them to no greater risk than at present of proceedings for the recovery of a penalty being brought against them. The documents might well authenticate and support the information now in the hands of the commission. They might afford conclusive proof of a breach of art 85 and, when in possession of such evidence, the commission might decide to take action.

In my opinion the decision of the Court of Appeal was right on this and it follows that the respondents' cross-appeal should be dismissed.

I now turn to the claims of privilege under the fifth article of amendment. Instead of the procedure laid down by RSC Ord 70, r 6, being followed Judge Merhige came to London on the United States Embassy and there, on 14th June 1977, ruled that the claims to privilege were well taken. In so doing he must have acted as judge of the Richmond court. He appears to have been under the impression that the witnesses who had appeared at the United States Embassy in obedience to the order of the High Court had become subject to his jurisdiction. I do not think that that was so but it matters not.

On 15th June 1977, Judge Merhige received a letter from the Deputy Assistant Attorney-General, Anti-Trust Division, of the United States in the following terms:

'Dear Judge Merhige,
'The United States Department of Justice ("Department") has been informed by counsel for Westinghouse Electric Corporation that to date the depositions of certain employees of the Rio Tinto Zinc Corporation, which are being taken

1  (1861) 1 B & S 311, [1861–73] All ER Rep 172
2  [1939] 2 All ER 613, [1939] 2 KB 395
3  [1977] 3 All ER 717 at 721, [1977] 1 WLR 492 at 495
4  R v Boyes (1861) 1 B & S 311 at 330, [1861–73] All ER Rep 172 at 174
5  [1977] 3 All ER 717 at 722, [1977] 3 WLR 492 at 496

in England pursuant to letters rogatory issued by your Court ... have been totally unproductive due to assertions of the United States Fifth Amendment privilege by the witnesses. We have also been informed that counsel for the letters rogatory deponents have indicated that all future witnesses will likewise assert their privilege against self-incrimination and refuse to testify.

'As you undoubtedly know, the Department is currently conducting a Grand Jury investigation into certain aspects of the domestic and international uranium industry, including the possibility that non-U.S. uranium producers, one of which is Rio Tinto Zinc Corporation Ltd, have engaged in conduct violative of United States anti-trust laws. In the course of this investigation the Department has attempted, with little or no success, to obtain information directly from foreign uranium producers and their officers and employees. We therefore believe that depositions taken pursuant to the letters rogatory issued by this Court might well be a singular opportunity for our Grand Jury to obtain information vital to its investigation. It is necessary to its orderly functioning that full discovery pursuant to the letters rogatory be had.

'Accordingly to eliminate what may be a major obstacle to discovery in the letters rogatory proceedings, the Government represents to this Court and to the letters rogatory deponents listed below that it will not utilise, either directly or indirectly, the deposition testimony of a witness which is given pursuant to letters rogatory issued by this Court as a basis for a criminal prosecution of that witness for a violation of any United States law. This representation applies to the following individuals ...'

Then the individuals are named and the letter concludes with the sentence: 'If you have any questions, please feel free to contact C. Forrest Bannan ...'

On 16th June 1977, Mr Bannan appeared on behalf of the United States Department of Justice at a resumed hearing before Judge Merhige at the United States Embassy. In the course of his observations, Mr Bannan stated that it was the firm policy of the Department of Justice not to grant immunity to a witness in a private litigation—in any litigation to which it is not a party' and that 'only government witnesses would be granted immunity'. He went on to say that the investigation by the department was considered to be of paramount importance and to stress the importance of the evidence of those it was wished to examine, pointing out that efforts to obtain such evidence in Canada, Australia, South Africa and France had not been successful. At the conclusion of the hearing, Judge Merhige ruled that the witnesses should not be required to answer any questions which they deemed might incriminate them.

During the course of the argument it is to be noted that Judge Merhige stated that, when he issued the letters rogatory, he gave no thought as to the use of the evidence for any purpose except civil litigation and that he doubted, if the Department of Justice had asked him to issue letters rogatory, whether he would have done so as there was no case before his court of a criminal nature.

An aide memoire dated 27th June was delivered to the State Department expressing Her Majesty's Government's concern at this attempt by the Department of Justice to obtain evidence for a criminal anti-trust investigation by intervening in a civil case, stressing the great importance to be attached to the strict observance of agreed procedures as a protection for the rights of individuals and expressing the 'strong hope' that the Department of Justice will desist from its attempts to undermine these procedures and discontinue its intervention.

In spite of this aide memoire, on 11th July 1977, the United States Deputy Assistant Attorney General, Anti-Trust Division, authorised an application to Judge Merhige at Richmond for an order under 18 United States Code §§6002 and 6003 that Lord Shackleton should give evidence.

18 United States Code §6002 provides that a United States district court shall, on the request of the United States attorney for the district, issue an order requiring a

witness to testify despite his refusal to do so on the ground that it might incriminate him; and 18 United States Code §6002 provides that on such an order being communicated to the witness, he may not refuse to comply with it on the ground that to do so might incriminate him, but that evidence so given cannot be used against the witness in any criminal case except a prosecution for perjury or for a similar offence.

On 12th July the Attorney General for the United States wrote to the United States attorney for the district a letter which, so far as material, reads as follows:

'These immunity requests are for the purpose of permitting testimony to be compelled in a civil litigation to which the United States is not a party. As you know, the Department of Justice has a firm policy against seeking such orders in private litigation except in the most extraordinary circumstances. In my judgment, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) Those persons whose testimony is sought have refused to testify on the basis of their privilege against self-incrimination, and they are outside the personal jurisdiction of the United States courts; (2) These persons are not likely to come within the personal jurisdiction of United States courts so long as the Department of Justice continues a sitting grand jury investigation of the international uranium industry; (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement cooperation between the United States and the United Kingdom; (4) The Department of Justice has been largely unable to obtain information from these foreign persons about the subject matter of this investigation; (5) The testimony these persons give may well be indispensable to the work of the grand jury; and (6) The subject matter of this grand jury is of particular importance. It is on this basis that I approve of the requests for orders requiring these individuals to give testimony.'

On 28th July Judge Merhige made the order sought by the United States attorney. Whether or not he had a discretion in the matter I do not know, but I observe that in the course of the proceedings at the United States Embassy on 16th June he said that he had no discretion.

This action by the United States Attorney General led to the intervention of the Attorney-General before the House, an intervention which, if I may say so, it was, in my opinion, not only his right but also his duty to make on the ground that despite the representations made by Her Majesty's Government, the sovereignty of this country had been prejudiced and that there had been 'an excess of sovereignty or an excess of jurisdiction on the part of the United States'.

But for the intervention of the United States Attorney-General, it is clear that the claims to privilege under the fifth article of amendment would have been upheld. That intervention materially altered the character of the proceedings under the letters rogatory. Whether or not such letters would have been issued in the first place by Judge Merhige on the application of the United States attorney, it is clear that the High Court could not, if they had been issued on his application, have made an order under s 2 of the 1975 Act to give effect to them for it had no power to do so.

The convention to which the United States was a party only relates to evidence for civil or commercial proceedings. It cannot be right for a state to seek to avail itself, for the purpose of securing evidence for criminal proceedings, of the obligations accepted by another state in respect of the furnishing of evidence for civil or commercial proceedings. While, as I have said, the 1975 Act goes beyond the convention in providing for the supplying of evidence when criminal proceedings have been instituted, no such proceedings have been instituted.

In this case if the proceedings had ended on 16th June it is clear that the persons named could not have been compelled to testify. The question now is, should they

now be required to do so consequent on the intervention of the United States Attorney General who wants to compel the giving of evidence by persons who, his letter of 14th July 1977 recognises, are British subjects and outside the jurisdiction of the United States courts.

I have no hesitation in expressing the opinion that in these circumstances it would be wrong for the High Court, even if it had power under s 2 of the 1975 Act to make an order compelling them to give evidence, to make such an order in the exercise of its discretion, even if in consequence of the United States Attorney General's intervention they would no longer be in peril of prosecution on account of such evidence and so not entitled under American law to rely on the fifth article of amendment.

In this case it is now clear beyond all doubt that the evidence is required for the grand jury. Indeed it may have been throughout for, as I have said, the grand jury was empanelled in June 1976 and in March 1977 the respondents were served with a subpoena duces tecum to produce to the grand jury documents obtained by them as part of the discovery in the 1974 actions then pending in the United States and issued in that year.

In other cases it may not be so clear that one of the main purposes which the issue of letters rogatory seeks to achieve, and whatever may have been the purpose when they were issued it is now one of the main purposes of the letters in this case, is the securing of evidence for a grand jury in an anti-trust investigation from British nationals and British companies not subject to United States jurisdiction. But I hope that the courts of this country will not make an order requiring evidence to be given by such persons unless it is clearly established that, even if it is required for civil proceedings, it is not also sought for for criminal proceedings.

For many years now the United States has sought to exercise jurisdiction over foreigners in respect of acts done outside the jurisdiction of that country. This is not in accordance with international law and has led to legislation on the part of other states, including the United Kingdom, designed to protect their nationals from criminal proceedings in foreign courts where the claims to jurisdiction by those courts are excessive and constitute an invasion of sovereignty.

Having reached these conclusions I do not find it necessary to consider whether the intended use by the respondents in the Illinois proceedings of the evidence, if secured, should have led the High Court to refuse to make orders under s 2 of the 1975 Act, or whether the fact that those proceedings are penal and against, among others, the RTZ companies not subject to United States jurisdiction, justifies the conclusion that they constitute an invasion of sovereignty of the United Kingdom insofar as they relate to those companies.

Counsel for the appellants advanced the interesting argument that the privilege to which the RTZ companies were entitled and which was claimed by their proper officers, could not be invaded by seeking the evidence, which the companies could be compelled to give from officers or servants of the companies through, as he said, 'the back door.' He was unable to cite any authority for that proposition and I express no opinion on it, save to say that it renders a company's privilege of little value if it can be got round in that way. This appears to me to be a proper matter for consideration when a revision of company law is being considered.

My conclusions can be summarised as follows: 1. The orders should not have been made requiring the giving of evidence and the production of documents. 2. If the view of the majority of the House is that those orders were properly made, then the RTZ companies could not be compelled to produce the documents requested as to do so would tend to expose them to proceedings for the recovery of a penalty. 3. If the orders were properly made, the individual witnesses' claims to privilege upheld by Judge Merhige on 16th June meant that, in consequence of s 3(1)(b) of the 1975 Act, they could not then be compelled to give evidence. 4. If the order made by Judge Merhige at the instance of the United States Attorney General destroyed their

privilege by granting them immunity from prosecution, that order materially changed the character of the letters rogatory from requests for the obtaining of evidence for civil proceedings into requests for the obtaining of evidence for criminal and civil proceedings, and the High Court should consequently, in the exercise of its discretion, rescind the order.

**LORD DIPLOCK.** My Lords, the jurisdiction and powers of the High Court to make the orders that are the subject of this appeal are to be found in ss 1 and 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, and nowhere else. The 1975 Act was passed, in part (which includes ss 1, 2 and 3), to enable the United Kingdom to ratify the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[1] done at The Hague on 18th March 1970. Ratification by the United Kingdom took place on 16th July 1976, with certain reservations and declarations. The convention had previously been ratified by the United States of America.

Your Lordships have been invited to construe the 1975 Act in conformity with previous decisions of English courts as to the meaning of different words used in previous statutes, the Foreign Tribunals Evidence Act 1856, which was repealed by the 1975 Act. For my part I think that any assistance is to be gained from those decisions. The jurisdiction of English courts to order the attendance of witnesses to provide oral or documentary evidence in aid of proceedings conducted before a court of justice in a foreign country has always been exclusively statutory. There is no presumption that Parliament in repealing one statute and substituting another in different terms, intended to make the minimum changes in the previous law that it is possible to reconcile with the actual wording of the new statute, particularly where, as in the instant case, the new statute is passed to give effect to a new international convention.

So disregarding any previous authorities, I turn to the actual terms of the 1975 Act. Section 1 is the section which confers on the High Court jurisdiction to make an order under the Act; s 2 defines what provisions that court has power to include in such an order; while s 3 deals with the right of witnesses to refuse to give oral or documentary evidence under the order.

Under s 1, three conditions precedent must be fulfilled before the court has jurisdiction to make any order under the Act. First, there must be an application for an order for evidence to be obtained in England and Wales, and secondly, the application must be made pursuant to the request of a court exercising jurisdiction outside England and Wales. The third condition precedent as to which the court must be satisfied is in the following terms:

'(b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated.'

My Lords, I would not be inclined to place any narrow interpretation on the phrase 'evidence . . . to be obtained for the purposes of civil proceedings'. The 1975 Act applies to civil proceedings pending or contemplated in courts and tribunals of all countries in the world. It is not confined to countries that are parties to the Hague Convention of 18th March 1970; nor is it limited to courts of law. It extends to tribunals. These courts and tribunals make use of a wide variety of different systems of procedure and rules of evidence in civil matters. In many of these systems it is not possible to draw a distinction between what would be regarded in England as the actual trial of a civil action and what precedes the trial. I do not think that in relation to those countries the expression 'civil proceedings' in s 1(b) can have the restricted meaning of the actual trial or hearing of a civil action; and, if this be so, it cannot bear a more restricted meaning in relation to those countries such as the United States of America where, as in England, it is possible to draw a distinction between the trial and what precedes the trial. In my view, 'civil proceeding' includes all the procedural

1   Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991

steps taken in the course of the proceedings from their institution up to and including their completion and, if the procedural system of the requesting court provides for the examination of witnesses or the production of documents for the purpose of enabling a party to ascertain whether there exists admissible evidence to support his own case or to contradict that of his opponent, the High Court has jurisdiction to make an order under the 1975 Act. Any limitation on the use of this procedure for the purpose of 'fishing' discovery is, in my view, to be found in s 2.

The English court cannot be expected to know the systems of civil procedure of all countries from which request for an order under the 1975 Act may come. It has to be satisfied that the evidence is required for the purpose of civil proceedings in the requesting court but, in the ordinary way in the absence of evidence to the contrary, it is entitled to accept the statement by the requesting court that such is the purpose for which the evidence is required.

The letters of the United States District Court for the Eastern District of Virginia ('the letters rogatory') contained in the preamble what on a fair reading is, in my view, an adequate statement to this effect; so the High Court had jurisdiction to make an order. It was not bound to do so, but I think that the court should hesitate long before exercising its discretion in favour of refusing to make an order unless it was satisfied that the application would be regarded as falling within the description of frivolous, vexatious or an abuse of the process of the court.

The letters rogatory requested the oral examination of directors and employees of the two RTZ companies and the production of documents by these companies. The relevant limitations on the power of the court to grant these requests are contained in sub-ss (3) and (4) of s 2 of the 1975 Act. They read as follows:

'(3) An order under this section shall not require any particular steps to be taken unless they are steps which may be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the court making the order (whether or not proceedings of the same description as those to which the application for the order relates); but this subsection shall not preclude the making of an order requiring a person to give testimony (either orally or in writing) otherwise than on oath where this is asked for by the requesting court.

(4) An order under this section shall not require a person—(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power.'

Subsection (3) applies to both oral and documentary evidence. It is this provision which prohibits the making of an order for the examination of a witness not a party to the action for the purpose of seeking information which, though inadmissible at the trial, appears to be reasonably calculated to lead to the discovery of admissible evidence. This is permitted by r 26 of the United States Federal Rules of Civil Procedure. Under the procedure of the High Court of England depositions of witnesses, either at home or abroad, may be taken before examiners for use at the trial, but the subject-matter of such depositions is restricted to the evidence admissible at the trial. So the evidence requested in the letters rogatory can only be ordered to the extent that it is confined to evidence which will be admissible at the trial of the action in Virginia.

The difficulty involved in the application of sub-s (3) to proceedings in the United States courts lies in the fact that the examination for discovery of witnesses who are not parties to the action serves a dual purpose: the ordinary purpose of obtaining evidence for the wide line of enquiry which that permits and also the purpose of obtaining in the form of a deposition evidence from the witness which will be admissible at the trial in the event of the witness not being called in person.

Westinghouse and the United States district court judge (Judge Merhige) appear to have done their best to limit the request to evidence admissible at the trial; and, as respects the oral examination of the named directors and employees of the two RTZ companies, I think that, in the main, they have succeeded. To ask for oral evidence from 'such other person who has knowledge of the facts' is obviously excessive, but this has never been part of the order as originally made by Master Creightmore. As regards the named persons, however, Westinghouse were in possession of photostatic copies of documents of considerable probative weight, even if technically inadmissible at the trial in the Virginia proceedings, which linked the two RTZ companies and the named persons with operations of an international cartel of uranium producers and gave strong prima facie grounds for believing that those persons could give admissible evidence about the operations; a belief which has been confirmed by the subsequent claim to privilege against self-incrimination.

The requests for the production of documents by the two RTZ companies must satisfy not only the requirements of sub-s (3) which exclude fishing discovery, but also the stricter requirements of sub-s (4). Under the procedure of the High Court of England there is no power to order discovery of documents by a person not a party to the action, but such a person can be required by subpoena duces tecum to produce documents to the court or, where the evidence is taken before an examiner prior to the trial, at such examination. There is a good deal of authority dicted by Lord Denning MR in his judgment as to how specific the reference to documents must be in subpoena duces tecum. Classes of documents, provided the description of the class is sufficiently clear, may be required to be produced on subpoena duces tecum.

The requirements of s 2(4)(b), however, are not in my view satisfied by the specification of classes of documents. What is called for is the specification of particular documents' which I would construe as meaning individual documents separately described.

In the letters rogatory most of the many requests for particular documents are followed by a request for 'any memoranda, correspondence or other documents relevant thereto.' This is far too wide and these words were struck out wherever they appeared in my view bound by s 2(4)(b) to strike from the master's order the words referred to. However, they did not limit themselves to using a blue pencil. In a number of cases they substituted the phrase 'any memoranda, correspondence or other documents referred to therein' (sc in the particular document specified). Quite apart from the fact that although it may be sufficient for a subpoena duces tecum I do not think that this is sufficiently specific to satisfy the requirements of s 2(4)(b), I do not consider that the court had any power to substitute a different category of documents for the category which had been requested by the United States court.

Subject, however, to this minor amendment which in the events that have happened has ceased to be of any significance, I think that the order of the Court of Appeal of 26th May 1977 was right. Accordingly, Westinghouse were entitled to proceed with the examination of witnesses and production of documents under Master Creightmore's order subject to any claim to privilege on which the RTZ companies claimed privilege under para (4), the individual witnesses under para (b). Section 3(1) reads as follows:

'A person shall not be compelled by virtue of an order under section 2 to give any evidence which he could not be compelled to give—(a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or (b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction.'

When the examination was held, the RTZ companies claimed privilege under para (4), the individual witnesses under para (b).

The privilege claimed by the RTZ companies under para (a) is a privilege under English law. It arises under s 14 of the Civil Evidence Act 1968, which provides as follows:

'(1) The right of a person in any legal proceedings other than criminal pro-ceedings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty—(a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law ...'

So far as it relates to offences and penalties provided for by the law of the United Kingdom this provision is declaratory of the common law. Its purpose is to remove the doubt as to whether the privilege against self-incrimination extends to offences and penalties under foreign law, a question on which the previous authorities were not wholly consistent. (See the Sixteenth Report of the Law Reform Committee[1] (1967).)

The privilege to which the companies claim discovery of documents would tend to expose them is a fine imposed by the Commission of the European Communities under art 15 of EEC Council Regulation 17/62, for intentionally or negligently acting in breach of art 85 of the EEC Treaty. This article of the treaty prohibits cartels which have as their object or effect the prevention, restriction or distortion of competition within the common market. It is directly applicable in the member states; it forms part of the law of England; so does EEC Council Regulation 17/62. For the reasons given by the Court of Appeal in their judgments of 26th May 1977, I agree that a fine imposed by the commission under the regulation is a 'penalty' for the purposes of s 14 of the Civil Evidence Act 1968, and that it is enforced by proceedings for recovery of a penalty under the European Communities (Enforcement of Community Judgments) Order 1972[2].

The RTZ companies took their claim to privilege under s 3(1)(b) of the 1975 Act before the examiner. It was upheld by MacKenna J and on appeal by the Court of Appeal[3] in their judgment of 11th July 1977. The argument for Westinghouse, rejected by the Court of Appeal, that has been pressed in this House was that whatever risk the RTZ companies ran of having a fine imposed on them by the commission it would be in no wise enhanced by the production in the United States proceedings of documents that constituted evidence of their participation in a cartel prohibited by art 85[1] of the EEC Treaty. The argument does not involve the proposition that the companies are not infringing art 85[1] of the treaty. On the contrary Westinghouse not only assert that they are but also deny that the cartel could be brought within art 85[3] which empowers the commission to declare art 85[1] to be inapplicable to cartels which satisfy certain conditions.

My Lords, art 89 of the treaty imposes on the commission the duty of seeing to the application of art 85, of investigating infringements and of taking steps to remedy the situation. If contrary to their duty the commission fail to act they may be called on to do so under art 175 by any other institution of the community including the European Parliament, or by any member state, and on continued failure may be proceeded against before the European Court of Justice. It is not for your Lordships to speculate why the commission have hitherto remained quiescent in the matter, nor what may stir them into activity. Under EEC Council Regulation 17/62 they have

1　Privilege in Civil Proceedings (Cmnd 3472)
2　[1973] 3 All ER 795, [1973] 3 WLR 480
3　SI 1972 No 1590
4　[1973] 3 All ER 717, [1973] 3 WLR 492

wide powers of investigation under which they could, if they thought fit, themselves compel the RTZ companies to produce the very documents of which Westinghouse seek to obtain production in the instant proceedings. This may be so, but there is a proverb 'let sleeping dogs lie' which may have some application in the international politics of uranium production and enrichment which it would be disingenuous to pretend are not lurking in the background of this case.

I do not think that your Lordships are entitled to dismiss as fanciful the risk that if the documents relating to the cartel were produced at the trial in the Virginia pro-ceedings and came, as they then would, into the public domain, the resulting publicity in this sensitive political field might result in an increase in pressure on the commission to take against the RTZ companies speedier and severer action than they might otherwise have done and that such action might well include the imposition of penalties under art 15 of EEC Council Regulation 17/62. The Court of Appeal in my opinion were right in upholding the refusal of the two RTZ companies to produce the documents registered in the letter rogatory.

It was submitted that since the RTZ companies were entitled to withhold the documents from production, they had a privilege, in English law to require their officers and servants to refuse to answer questions that might tend to expose the contents of the documents or provide evidence that would tend to expose the companies to a penalty. At common law, as declared in s 14(1) of the Civil Evidence Act 1968, the privilege against self-incrimination was restricted to the incrimination of the person claiming it and no one else. There is no trace in the decided cases that it is of wider application; no textbook old or modern suggests the contrary. This is not for your Lordships to manufacture for the purposes of the instant case a new privilege hitherto unknown to the law.

There remains to be considered what effect the recent events that have occurred in relation to the named persons' claim to privilege under s 3(1)(b) of the 1975 Act ought to have on the order of Master Creightmore requiring them to give oral evid-ence. Their right to claim this 'Fifth Amendment' privilege depends on United States federal law, and the 1975 Act, it was for Judge Merhige to rule on the validity of the claim.

In order to obtain a speedy ruling from him the parties, by mutual consent, de-parted from the procedure laid down in RSC Ord 70, r 6. In view of the imminence of the trial in Virginia they took short cuts. This has led to some degree of procedural confusion as to the capacity in which Judge Merhige was doing the various things he did. This has led to technical disputes about such matters as to whether and if so at what point the letters rogatory were exhausted and as to the legal nature and effect in England of the orders made by Judge Merhige in Virginia on 18th July 1977 pur-portedly under the Organized Crime Control Act 1970, 18 United States Code §6002. I would not wish to decide this part of the case on mere technical errors of procedure that could be cured by the issue of fresh letters rogatory. In my view the events that happened enable me to base my decision on principles which transcend any irregularities in procedure.

The essential facts are: (1) On 14th June 1977 Judge Merhige upheld the claim of the named persons to Fifth Amendment privilege and ruled that they need not answer any questions save as to their names and addresses. (2) On 15th June 1977 a letter was received by Judge Merhige from the United States Department of Justice stating that the oral evidence of the named persons that was requested in the letters rogatory was required by the department for the purpose of a grand jury investigation into alleged offences against the anti-trust laws of the United States. It contained an assurance that the department would not use the testimony of the named persons as the basis for criminal prosecution of them in the United States. (3) On 16th July 1977 a repre-sentative of the Department of Justice appeared before Judge Merhige and asked him, on the strength of the letter, to rule that the named persons were no longer entitled to claim their Fifth Amendment privilege. The judge declined. He confirmed his

previous ruling; but added that if an application were to be made to him under 18 United States Code §§6002 and 6003 for an order requiring the named persons to give evidence on terms that it could not be used against them in any criminal case, he, Judge Merhige, would feel compelled to rule that they were no longer entitled to refuse to answer the questions. (4) On 18th July 1977, applications were made to Judge Merhige, with the written approval of the United States Attorney General, insofar as the evidence was intended to be used for the purposes of criminal proceedings; for orders under §§6002 and 6003 in respect of each of the named persons; and on the same day the judge issued orders which ordered each of them to give testimony or provide other information in response to questions pronounced pursuant to letters rogatory issued by this Court. Whatever their procedural defects I am prepared to treat these orders as a ruling by the United States court under s 3(2) of the 1975 Act, that the Fifth Amendment privilege claimed by the named persons is no longer available to them.

My Lords, it is clear from Judge Merhige's rulings of 14th and 16th June 1977 that so long as the evidence in respect of which Fifth Amendment privilege was claimed was to be used for the purposes of civil proceedings only, it could not in the events that happened be obtained under an order made under ss 1 and 2 of the 1975 Act. Insofar as the evidence was intended to be used for the purposes of criminal proceedings in the United States, which §§6002 and 6003 exclude the jurisdiction of the High Court to make an order requiring the evidence to be given.

The United States is not a party to the civil proceedings in which the letters rogatory have been issued. Those proceedings, in the words of the United States Attorney General, are 'private litigation'. The proceedings in the United States to seek an order under §§6002 and 6003 in private litigation pending in the United States is, we have been told, unprecedented. It is acknowledged by the United States Attorney General in his letter to be contrary to the firm policy of the department 'except in this most extraordinary circumstances'.

The extraordinary circumstances listed, in addition to his expressing belief that the testimony sought may well be indispensable to the work of the grand jury, include the following statement:

'These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement cooperation between the United States and the United Kingdom.'

This is a reference to the long-standing controversy between Her Majesty's Government and the Government of the United States as to the claim of the latter to have jurisdiction to enforce its own anti-trust laws against British companies not carrying on business in the United States in respect of acts done by them outside the territory of the United States. As your Lordships have been informed by Her Majesty's Attorney-General it has long been the policy of Her Majesty's Government actively to deny such claim. Her Majesty's Government regards as an unacceptable invasion of its own sovereignty the activities outside the United States by British companies and individuals which it can investigate in claims infringe the anti-trust laws of the United States. Section 2 of the Shipping Contracts and Commercial Documents Act 1944 was passed in an attempt to thwart this practice. Past attempts by the United States Government to use the United States courts in this investigatory role have been the subject of diplomatic process. One such protest was made in respect of the intervention of the Department of Justice in the proceedings in the instant case before Judge Merhige on 16th June 1977.

My Lords, what follows from the essential facts I have recounted is: first that the evidence sought from the named persons could not be obtained by Westinghouse so long as the only purposes for which it was required were civil proceedings; secondly,

that it was only when that evidence was called for by the United States Department of Justice for the purposes of an investigation by a grand jury in the United States with a view to discovering whether there were grounds for instituting criminal proceedings against someone that under United States law the named persons would become compellable to give it; thirdly, that the purpose for which the Department of Justice was seeking to obtain the evidence was not one for which it could have been obtained by them under the 1975 Act since no criminal proceedings had yet been instituted; fourthly that the evidence was required for the purpose of investigating the activities outside the United States of British companies and individuals for alleged infringements of anti-trust laws of the United States, a procedure which, as the department knew, Her Majesty's Government regards as an unwarrantable invasion of its sovereignty.

My Lords, I have no hesitation in holding that with the intervention of the Department of Justice and its obtaining of the orders under §§6002 and 6003 on 18th July 1977 the continued enforcement of Master Creightmore's order as respects the oral evidence of the named persons would amount to an abuse of the process of the High Court under the 1975 Act. The letters rogatory issued in the civil proceedings in the Virginia court on Westinghouse's application are manifestly being made use of by jury investigation which it is desired from obtaining evidence for a grand jury investigation which it is debarred from obtaining directly by s 1(b) of the 1975 Act. I do not find it necessary to enquire whether this making use of by the department was in connivance with Westinghouse or against its wishes, the fact remains that evidence of the named persons whose claim to Fifth Amendment privilege was upheld by Judge Merhige before 18th July 1977 could not have been obtained by them under that order.

Since the rest of Master Creightmore's order, which relates to the production of documents by the two RTZ companies, is also spent by reason of their claim to privilege being upheld by this House, I would discharge the whole order as from 18th July 1977.

LORD FRASER OF TULLYBELTON. My Lords, on 21st October 1976 the Honourable Judge Merhige, sitting in the United States District Court for the Eastern District of Virginia, Richmond Division, issued two letters rogatory addressed to the High Court of Justice in England seeking the examination on oath of nine named individuals, and of other persons not named, and the production of documents alleged to be in the possession of Rio Tinto Zinc Corp Ltd, in the case of one of the letters, and of RTZ Services Ltd in the case of the other letter. Both these companies ('the RTZ companies') are registered in England and neither of them is a party to the proceedings in Virginia. All the named persons are witnesses as respects subjects resident in England or, at least, outside the United States of America, and none of them is a party to the proceedings in Virginia. Judge Merhige was dealing with 13 actions which had been initiated in different federal courts in the United States of America and had been consolidated in his court; in each of these appeals there was a different plaintiff, but in all of them the defendants were Westinghouse, who are the respondents in two of the instant appeals and the appellants in three appeals. On 28th October 1976 Master Creightmore on the ex parte application of Westinghouse, made orders under s 2 of the Evidence (Procedure in Other Jurisdictions) Act 1975 ('the 1975 Act') giving effect to the letters rogatory. He ordered the nine named individuals (but no others) to attend before an American consular officer in the United States Embassy in London, and ordered each of the RTZ companies to produce the documents described in a schedule to the letter rogatory relating to that company. A fundamental objection to the making of the order of 28th October 1976 has been taken by the RTZ companies and by the individuals on the ground that, as they maintain, the requests made by the letters rogatory do not fall within the terms of the 1975

Act. There is no difference between the objections taken by the two RTZ companies, but somewhat different considerations apply to the companies' objections to producing documents on the one hand, and to the individuals' objections to giving oral evidence on the other hand.

One of the main purposes of the 1975 Act was to make new provision for enabling the High Court in England to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions, and it repealed several earlier Acts including the Foreign Tribunals Evidence Act 1856. It gives legal effect in the United Kingdom to the principles of the Hague Convention of 18th March 1970; though in one respect at least, it goes beyond the convention: see s 5 of the 1975 Act dealing with evidence for the purposes of foreign criminal proceedings. Section 1 of the 1975 Act provides as follows:

'Where an application is made to the High Court ... for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied—(a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ("the requesting court") exercising jurisdiction ... in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated, the High Court ... shall have the powers conferred on it by the following provisions of this Act.'

The first question in the instant appeals is whether the court should be satisfied, as required by para (b) of s 1, that the requests made in the letters rogatory are for 'evidence' in the sense in which that word is used in the paragraph or whether they are truly for a wider discovery. Unless the application passes through this filter no order can be made to give effect to it. The distinction between evidence and discovery in this context was explained in Radio Corpn of America v Rauland Corpn[2]. That was a case under the, now repealed, Foreign Tribunals Evidence Act 1856, where the word used was 'testimony', but I do not consider that there is any difference concerning the instant appeal between that word and 'evidence' in s 1 of the 1975 Act. Devlin J said this[3]:

'In that authority [Burchard v Macfarlane, ex parte Tindall[4]] the distinction is made plain between what I have called discovery or indirect material on the one hand, and proof or direct material on the other hand. That is, I think, the true distinction with which one must approach the word "testimony" in the 1856 Act. Testimony which is in the nature of proof for the purpose of the trial is permissible. Testimony if it can be called "testimony", which is mere answers to questions on the discovery proceeding designed to lead to a train of inquiry, is not permissible. Into which category does the present fall? It might perhaps be enough to say that it is plain enough from what I have said of the nature of proceedings in the court of Illinois that they fall into the category of pre-trial proceedings, proceedings by way of discovery, but if these be any doubt about that I do not think that one has to go further than to look at the reasons why the learned judge in the District Court of Illinois, Juoca Igon, gave when he granted the letters rogatory in this case. One passage is sufficient for my purpose. He said: "I can find no authority; none has been cited for the proposition that a

1    Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991
2    [1956] 1 All ER 549, [1956] 1 QB 618
3    [1956] 1 All ER 549 at 555, [1956] 1 QB 618 at 646
4    [1891] 2 QB 241, [1891-4] All ER Rep 137

party must show what relevant and material evidence proposed witnesses have in their possession as a condition precedent to the taking of depositions of alleged co-conspirators in an anti-trust case. It seems obvious that examination of the officers and agents of alleged co-conspirators may lead to the discovery of relevant evidence, and that is all that is required." That shows, I think, plainly enough what the object of this procedure is.'

The distinction between evidence and discovery is recognised in art 23 of the Hague Convention, and in s 2(4) of the 1975 Act, and was fully accepted by counsel for Westinghouse who did not dispute that, if the letters rogatory were merely seeking discovery, they ought not to receive effect. This issue was decided in favour of Westinghouse by Master Jacob, by MacKenna J and by the Court of Appeal, and counsel for Westinghouse argued that their decisions turned on the evidence and that there was no question of principle that would justify your Lordships' House in coming to a different conclusion. I recognise, of course, that great weight must be given to the judgments in these courts but I have felt entitled and bound to re-examine the issue. In the forefront of the evidence relied on by the Court of Appeal was the statement in the recital at the beginning of the letters rogatory that 'Justice cannot be done among the said parties without the testimony, which is intended to be given in evidence at the trial of the actions, of the following persons' (my emphasis). But in my opinion it would be wrong to place reliance on that recital because it was drafted by the legal advisers of Westinghouse with the object of meeting the requirements of the English courts, and it cannot be regarded as stating the considered opinion of the American court, Judge Merhige's order of 20th May 1977, which was relied on by Lord Denning MR and Roskill LJ was also drafted by Westinghouse's advisers and is open to the same comment. No doubt any testimony elicited in response to the letters, so far as it is relevant and admissible, would be used as evidence at the trial, but I think we have to consider whether the letters are not calculated to elicit also a substantial quantity of material that would not be direct evidence. In judging of that the main weight must be given to the substance of the letters rogatory and to the circumstances in which they were issued. They were issued as part of the discovery process in the United States in the 13 consolidated actions raised by Westinghouse's customers in federal courts. Part of Westinghouse's defence was commercial impracticability based on the allegation that the price of uranium had been forced up by a cartel of producers. It was in support of that defence that they wanted production of the documents and the oral evidence. At the stage of discovery American courts will compel persons within their jurisdiction who are not parties to the proceedings to produce documents and to submit to oral examination if such procedure appears reasonably likely to lead to itself such evidence. Thus they allow a range of enquiry much wider than would be allowed in England. I think that the Court of Appeal may have underestimated the importance of this factor, because Lord Denning MR referred to art 23 of the Hague Convention which provides:

'A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.'

He said that the United Kingdom when it ratified the convention did not make any such declaration. But unfortunately he was misinformed. Roskill LJ also referred to art 23 and was apparently under the same misapprehension. The instrument of

1    [1977] 3 All ER 703, [1977] 3 WLR 430
2    [1977] 3 All ER 703 at 708 and 715, [1977] 3 WLR 430 at 436 and 444
3    [1977] 3 All ER 703 at 709, [1977] 3 WLR 430 at 437
4    [1977] 3 All ER 703 at 714, [1977] 3 WLR 430 at 442

ratification of the United Kingdom contains a declaration that in accordance with art 23 Her Majesty's Government will not execute letters of request 'issued for the purpose of obtaining pre-trial discovery of documents,' and adding that Her Majesty's Government understand that description as including any letter of request which requires a person to make statements or produce documents that would now be struck at by s 2(4) of the 1975 Act. Of course the mere fact that letters rogatory have been issued at the pre-trial discovery stage does not necessarily mean that they are not seeking for evidence in the sense of s 1 of the 1975 Act but it does, so to speak, put one on one's guard. In the present case Judge Merhige, when he issued the letters rogatory is reported to have said that 'it may lead to something'. I am not sure whether he was not entitled to have regard to that statement, just as the court in the Radio Corpn case¹ had regard to the statement by the American judge in that case; and it seems to show that Judge Merhige regarded the letter as what it is, in my opinion, of decisive importance is the operative part of the interrogatory. The requests for production of documents and for taking oral testimony have to be considered separately. The description of the documents sought is in Sch B to each of the letters and it is, I think, conceded on behalf of West-inghouse, and is in any event clear, that the description is at least in part too extensive to pass through the filter of s 1 of the 1975 Act. A typical specimen of the objectionable matter is in para 1 which calls for minutes of certain meetings and then for 'any memoranda, correspondence or other documents relating thereto.' These words would include any letters or telex messages reserving accommodation, hotel bills and many other trivial documents relating to matters for representatives of RTZ to attend the meetings referred to in support of Westinghouse's case.

A separate though related objection to the terms of many of the items in the schedule is that they could not, in my opinion, receive effect under an order of the English court without contravening s 2(4) of the 1975 Act. That subsection provides as follows:

'An order under this section shall not require a person—(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power.'

The reference to 'any' documents in the sweeping-up words in the schedule to the letters rogatory suggests to me that the draftsman did not know whether such docu-ments were in existence or not. Accordingly the words seem to be an attempt to circumvent s 2(4) of the 1975 Act, an attempt which should not be allowed to succeed. Moreover, I think that many of the items in Sch B would be contrary to s 2(4)(b) in respect that they call for production not of 'particular documents specified' but of classes or descriptions of documents.

The Court of Appeal declined to make an order containing these wide words and they amended the order made by Master Creightmore by deleting them, and by substituting words such as 'all other documents referred to therein'. No doubt the intention was to narrow the range of documents to be produced, although one cannot be sure whether that would be the effect of the substitution. In any case the amended form is still not limited to particular documents specified. Several para-graphs of the schedule were also deleted. But in judging the nature of the letters

1 [1996] 1 All ER 549, [1996] 1 QB 618

rogatory as a whole the court must in my opinion look at them in the unamended form in which they were received from the American court. I do not say that, if they were found to include a few relatively minor items which could not qualify under s 1 or under s 2(4) of the 1975 Act, the whole request in the letters would have to be refused. The court has to look at the substance of the matter: see Radio Corpn of America v Rauland Corpn¹, per Lord Goddard CJ. In this case, having regard to the very wide range of documents that would fall within the description in Sch B, I am not satisfied that, so far as the documents are concerned, the letters are substantially limited to obtaining 'evidence' in the sense of s 1 of the 1975 Act. On the contrary I think they call for discovery of information far beyond what is necessary or even relevant to s 2(4). I am therefore of opinion that the order of 26th October, in so far as it orders production of the documents, ought not to have been issued. Further, for the reasons I have given, the documents seems to me so far outside the limits permitted by the 1975 Act, that they ought not to receive effect, even in an amended form. I would therefore set aside the order of 28th October so far as it relates to production of documents.

The position of the witnesses whose oral evidence is sought is different and I regard it as a narrow question whether the part of the order relating to them was rightly made. The letters rogatory clearly go too far in requesting oral evidence from 'other persons having knowledge of the facts'. But that part was omitted from the order of 28th October, and I do not consider that its inclusion in the letters rogatory necessarily shows that their purpose was for discovery. The named witnesses are all former em-ployees and/or former directors whose evidence is sought as 'being directors and/or employees and/or officers of the RTZ companies and it seems fairly clear that some knowledge is sought in one or other of the documents sought to be recovered. It seems reasonable to assume that they will have some knowledge about the existence and terms of the agreements, and I therefore agree with the Court of Appeal that the order, so far as it directs the named witnesses to attend for examination, should stand.

I go on to consider the privilege issues raised in these appeals. The issues concerning the production of documents by the RTZ companies are quite different from those affecting the oral evidence of the named witnesses. So far as the documents are concerned, Mackenna J held that the companies were not bound to produce the documents because they were entitled to rely on privilege against self-incrimination under English law, and the Court of Appeal dismissed an appeal by Westinghouse against his decision. Westinghouse are now appealing to your Lordship's House in what was referred to as the fifth appeal. It turns on s 14(1) of the Civil Evidence Act 1968 which provides as follows:

'The right of a person in any legal proceedings other than criminal proceed-ings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty—(a) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law ...'

The RTZ companies rely on that subsection because they say that production of the documents called for in Sch B would tend to expose them to proceedings for recovery of a penalty, namely a fine under EEC Council Regulation 17/62, which was passed in implementation of arts 85 and 86 of the EEC Treaty. EEC Council Regulation 17/62 now forms part of the law of England by virtue of art 189 of the EEC Treaty, and the

1 [1956] 1 QB 618 at 641
2 [1997] 3 All ER 717, [1997] 3 WLR 492

472    All England Law Reports    [1978] 1 All ER

European Communities Act 1972, s 2, and therefore the penalty would be a penalty provided for by the law of part of the United Kingdom. Accordingly, privilege would exist under English law in civil proceedings in England and the same privilege applies to proceedings under the letters rogatory; see s 3(1)(b) of the 1975 Act. In the Court of Appeal, Westinghouse argued that a fine imposed by the Common Market was not a penalty in the sense of s 14 of the 1968 Act, but the court rejected that argument and it was not repeated in this House.

Two other arguments were advanced on behalf of Westinghouse to show that the decision of the Court of Appeal was wrong. First it was said that the privilege only exists where a person would tend to be exposed to 'proceedings... for the recovery of a penalty' and that no 'proceedings' were required for the imposition of fines by the European Commission under art 15 of EEC Council Regulation 17/62. It was well founded, because the Court of Justice has power under art 17 of EEC Council Regulation 17/62 to review decisions of the commission imposing fines and, whatever the position may be while the commission is considering a 'decision', a review by the court would involve a resort to proceedings of some sort. But even if the argument were right so far as it breaks down at the next stage because a fine imposed by the commission could only be enforced by legal proceedings in the English courts. It was argued that proceedings for recovery of a penalty in terms of s 14 did not include proceedings for its enforcement as distinct from imposition, but I cannot see why that should be. I think that the Court of Appeal rightly rejected this argument.

The second argument is more formidable. Counsel for the respondents said that production of the documents would not tend to expose the company to proceedings for recovery of a penalty because they were already fully exposed by reason of the following facts: (1) the European Commission is already aware of the existence and terms of many of the documents, viz those of which copies have been disclosed by the Friends of the Earth; (2) the commission has wide power under art 14 of EEC Council Regulation 17/62 to investigate and to compel the disclosure of documents that might be evidence of infringement of art 85 of the treaty; (3) The commission has a duty under art 89 of the treaty to ensure the application of the principles of art 85 against cartels, to investigate cases of suspected infringement and to propose appropriate means to bring it to an end, (4) there is machinery under art 175 of the treaty for member states and other persons and organisations to bring to the notice of the Court of Justice of the European Communities any failure by the commission to act; (5) no negative and all art 1 of EEC Council Regulation 17/62 has been given, and (6) notwithstanding all these circumstances the commission has made no move to investigate the alleged cartel.

In the light of these facts, the present case is unusual if not unique. The question might, I think, be stated thus: whether the production of the documents would tend to increase the risk, to which the RTZ companies are already exposed, of proceedings for the recovery of penalties.

There is force in counsel for the respondents' contention that the answer should be in the negative, but I have reached the opinion that the Court of Appeal were right in taking the opposite view. We know that the commission has the question of investigating the possible infringement of art 85 constantly under review and, although it has not yet taken action to initiate proceedings, or even to investigate, it is not unreasonable to think that it might decide to act if it saw that there was hard evidence of infringement. Moreover, production of the documents might lead to one of the member states of the community or to some other party taking action under art 175 of the treaty to force the commission to act.

Counsel for the respondents suggested that the Court of Appeal had applied the wrong test in judging whether production would tend too low an onus on the companies to proceedings in that they had imposed too low an onus on them. In my opinion that

[1978] 1 All ER    Rio Tinto Zinc v Westinghouse (Lord Fraser)    473

HL

criticism was not justified. The test was stated in Triplex Safety Glass Co Ltd v Lancegaye Safety Glass (1934) Ltd[4], where du Parcq LJ said this:

'Since the decision of the Court of Appeal in Re Reynolds, Ex p. Reynolds[2], approving the decision of the Court of Queen's Bench in R. v. Boyes[3], it has not been in doubt that the power of the court to insist on an answer is not limited to a case of mala fides. As was said in R. v. Boyes[3] it extends to any case in which it is not made to appear to the court: "... that there is reasonable ground to apprehend danger (of proceedings for a penalty) to the witness from his being compelled to answer."'

The seven individual witnesses claimed privilege under the fifth article of amendment to the United States Constitution and their claim was upheld by Judge Merhige on 14th June 1977. For the purpose of giving this ruling, Judge Merhige came to London and sat in the United States Embassy here. After giving the ruling he heard some further evidence and in the course of the argument in this House a careful analysis was made of the capacity in which the learned judge made various rulings and orders whilst sitting in London, whether as a judge of the United States court or as a commissioner or examiner in an English court. Some of the procedure was criticised. There may be room for doubt whether it was all strictly regular but the short-circuiting of the procedure was with the laudable object of expediting the proceedings in England in order not to delay the beginning of the trial in America which was then imminent and I do not consider that it has resulted in prejudice to any of the parties.

On 16th June 1977, two days after Judge Merhige had ruled that the privilege plea was well taken, he sat again in the United States Embassy in London and stated that on the previous day he had received a letter from the Department of Justice of the United States the effect of which was to offer an informal undertaking that the United States Government would not utilise the deposition testimony of any of the named witnesses as a basis for criminal prosecution of them for the violation of any United States law. The explanation of the letter is that since about March 1976 the Department of Justice had been carrying on an investigation into possible infringements of United States anti-trust laws by members of an alleged cartel of uranium producers, and at some date before 16th June 1977 a federal grand jury had been empanelled to pursue the investigations and to initiate criminal proceedings if they were considered appropriate. The letter is important because it discloses frankly the reasons for the offer of immunity from prosecution. It has already been quoted fully by my noble and learned friend, Viscount Dilhorne, and I do not repeat the quotation. On the same occasion counsel for the Department of Justice appeared and explained to Judge Merhige that the reason why the department had made only an informal offer of immunity instead of requesting the court to make a formal order under the Organized Crime Control Act 1970, 18 United States Code §6002 and 6003, was that, 'there is a firm Department of Justice policy that it will not consider seeking immunity for a witness in a private litigation—in any litigation to which it is not a party.' He also said this:

'We are firmly convinced that we would not have even considered this letter

1    [1939] 2 All ER 613 at 617, [1939] 2 KB 395 at 403, 404
2    (1882) 20 Ch D 294
3    (1861) 1 B & S 311 at 330, [1861-73] All ER Rep 172 at 174
4    [1939] 2 All ER 613, [1939] 2 KB 395

if we had had an opportunity to get further direct information on this alleged cartel, but at present that opportunity seems slim, perhaps not at all.

Later on 16th June, Judge Merhige declined to give effect to the letter or to require the witnesses to answer questions which they considered might incriminate them, but he said that if a formal application under §§6002 and 6003 were made he would have no option but to make an order and grant immunity. The result was that his ruling of 14th June holding the privilege plea well taken remained unaffected. That was how the matter stood when the instant proceeding were last before the Court of Appeal on 11th July 1977.

Since that date an event has occurred which has profoundly altered the situation. On 18th July the Department of Justice departed from its firm policy and made a formal application for an order to compel the testimony of each of the witnesses under §6002. The application was made with the authority of the Attorney General of the United States of America and we have seen copies of two letters relating to it. One was a formal letter dated 11th July 1977 from the Department of Justice bearing the heading 'Re: Grand Jury Investigation of the Uranium Industry.' The other letter was dated 12th July 1977 addressed to the United States District Attorney for the Eastern District of Virginia and signed by the Attorney General of the United States of America in which he explained the reasons for departing from the firm policy of the Department of Justice against seeking such an order in a private litigation, 'except in the most extraordinary circumstances'. His letter includes the following passage:

'In my judgment, the testimony of the individuals for whom orders are to be sought is necessary to the public interest. The extraordinary circumstances which led me to this conclusion include the following: (1) Those persons whose testimony is sought have refused to testify on the basis of their privilege against self-incrimination, and they are outside the personal jurisdiction of the United States courts; (2) These persons are not likely to come within the personal jurisdiction of the United States courts so long as the Department of Justice continues a sitting grand jury investigation of the international uranium industry; (3) These persons are British subjects and we have determined that it is highly unlikely that their testimony could be obtained through existing arrangements for law enforcement cooperation between the United States and the United Kingdom; (4) The Department of Justice has been largely unable to obtain information from these foreign persons about the subject matter of this investigation; (5) The testimony these persons give may well be indispensable to the work of the grand jury; and (6) The subject matter of this grand jury is of particular importance.'

I draw particular attention to para (3) of these reasons.

Judge Merhige on 18th July 1977 made an order that each of the named witnesses should give evidence and granting them immunity. The operative part of each order was in the following terms:

'THEREFORE IT IS HEREBY ORDERED THAT: In accordance with the Organized Crime Control Act of 1970, 18 U.S.C. §6001 et seq., [the named witness] give testimony or provide other information in response to questions propounded pursuant to Letters Rogatory issued by this Court and that any testimony given by [the named witness] pursuant to this order shall be subject to the immunity provisions of that Act as provided in 18 U.S.C. §6002.'

Counsel for the appellants submitted that any evidence given by a witness before the consular officer in London would not be given pursuant to the order of 18th July by Judge Merhige as that order could not have extra-territorial effect in England on a British subject. Any evidence, he said, would be given pursuant to an order of the

---

1 [1973] 3 All ER 717, [1973] 3 WLR 492

English court giving effect to the letter rogatory and therefore the witness would not enjoy immunity from prosecution in the United States in respect of his evidence. ... the matter fell to be decided by English law, that submission might have consider able force. But the question of immunity is a question of American law and Judge Merhige has plainly indicated that in his view the witness would have immunity although I do not understand that he has heard argument on the matter nor that he has given a formal decision on it. It may therefore be that the position in the American law is not free from doubt. But as a practical matter, having regard to the indication of opinion given by Judge Merhige, I think we must proceed on the footing that each witness would have immunity from prosecution in the United States of America in respect of any evidence given by him in response to the letters rogatory.

The question therefore which has to be decided, and which owing to the sequence of events that I have mentioned has unfortunately not been considered by any of the courts below, is whether the witnesses should be ordered to appear again before the American consular officer as examiner and to answer questions propounded under the letter rogatory. On this important matter we have had the assistance of the Attorney-General. He explained that Her Majesty's Government consider that in this case, as in some other cases in recent years, the United States courts have claimed a jurisdiction which is excessive and constitutes an infringement of the proper jurisdiction in the enforcement of anti-trust legislation, and also in requiring the giving of information to facilitate investigatory procedure under that legislation, where the activities complained of have been carried out by British subjects and have taken place exclusively outside the territory of the United States, on the ground that those activities have taken effect within that territory. Her Majesty's Government consider these claims to extra-territorial jurisdiction particularly objectionable in the field of anti-trust legislation because, among other reasons, such legislation reflects national economic policy which may not coincide, and may be indirectly in conflict with, that of other states. The Attorney-General also brought to our attention art 12(b) of the Hague Convention which provides:

'The execution of a Letter of Request may be refused only to the extent that— ...(b) The State addressed considers that its sovereignty or security would be prejudiced thereby. ...'

The exception to security is given statutory effect by s 3(3) of the 1975 Act, but there is no statutory exception for cases where the government of the United Kingdom considers that its sovereignty would be prejudiced as in the present case. Nevertheless I can hardly conceive that if any British court, or your Lordships' House sitting in its judicial capacity, was informed by Her Majesty's Government that they considered the sovereignty of the United Kingdom would be prejudiced by execution of a letter of request in a particular case it would not be its duty to act on the expression of the government's view and to refuse to give effect to the letter. The principle that ought to guide the court in such a case is that a conflict is not to be contemplated between the courts and the executive on such a matter (see The Fagernes[1], per Atkin LJ).

In the present case however I consider that the matter can be disposed of on a narrower ground. The power of the English courts to give effect to the letter rogatory depends on the 1975 Act and s 1(b) of that Act provides that the power exists where the court is satisfied inter alia that the evidence is to be obtained for the purpose of civil proceedings in the requesting court. When the letters rogatory were presented in England the evidence undoubtedly was to be obtained for the purpose of civil proceedings in the Virginia court. In fact it was, and is (if given) likely to be used also in other proceedings for damages for infringement of anti-trust legislation

---

1 [1927] P 311 at 324

in a court in Illinois proceedings include a claim for treble damages; they are in my opinion civil proceedings, and the fact that the evidence may be used for the purpose of those proceedings seems to me irrelevant so long as it is also is bona fide intended to be used in the proceedings in Virginia.

But the use of the evidence for the investigatory procedure before a grand jury is a different matter. The English courts have no power under the 1975 Act, or otherwise, to make orders for giving effect to requests for evidence to be used for such investigatory purposes. They do have power, under s 5 of the 1975 Act, to make orders in relation to obtaining evidence for the purposes of criminal proceedings abroad, but only for 'proceedings which have been instituted'. But the grand jury proceedings are not criminal proceedings and the evidence is not said to be required for any criminal proceedings. The Department have said ... The submission of counsel for the Department was that Judge Merhige and the letters from the department and from the Attorney General of United States of America already mentioned show that the department is seeking the evidence of these witnesses only for the purposes of 12th July proceedings. Moreover para 3 of the Attorney General's letter of 12th July shows that evidence probably could not be obtained for that purpose through the existing machinery. Accordingly what is being attempted is to use the machinery provided by the 1975 Act for obtaining evidence for civil proceedings for the quite different purpose of investigatory proceedings before a grand jury. That is a purpose altogether outside the 1975 Act and is one to which the English courts ought not in my opinion to lend assistance, particularly having regard to the objections stated by Her Majesty's Government. No hardship will be caused to Westinghouse if we refuse to compel the witnesses to answer as that was already the position under Judge Merhige's ruling upholding their privilege. In my opinion therefore the order made by the Court of Appeal on 26th May, before Judge Merhige's ruling and before the application by the Department of Justice, should be reversed.

An interesting submission was made by counsel for the appellants on a question that would have arisen if your Lordships had held that the witnesses have no privilege but that the RTZ companies have privilege. In such an event the privilege of the companies could be rendered useless if their directors and officers could be compelled to give evidence incriminating the companies. Counsel for the appellants submitted that the privilege of a company, which would allow it to refuse to answer written interrogatories by the hand of its proper officer, should apply also to oral evidence given by its directors and officers if such evidence might tend to incriminate the company. The submission is unsupported by any authority but is a logical one and if it had been relevant to do so I would have wished to consider it more carefully.

I would set aside the order of 28th October 1976 made by Master Creighmore so far as it relates to production of documents by the RTZ companies. If that course does not commend itself to your Lordships, I would agree with the order proposed by my noble and learned friend, Lord Wilberforce.

**LORD KEITH OF KINKEL.** My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. I agree with it subject to certain observations which I shall endeavour to express.

I agree that MacKenna J and the Court of Appeal were right in refusing to set aside completely the order of 28th October 1976 giving effect to the letters rogatory. The Court of Appeal was also right, in my view, in holding that the letters should not receive effect in their entirety as regards the documents, production of which was originally sought. The terms of Sch B to the order are such that an unqualified order giving effect to these letters rogatory would necessarily have required both these things to be done.

1    [1977] 3 All ER 703, [1977] 3 WLR 430

(Burchard v Macfarlane; Radio Corpn of America v Rauland Corpn). Thus it was not open to the court, in view of the terms of s 2(3) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, to make an order allowing this to be done. Further, s 2(4) provides that a person shall not be required '(a) to state what documents relevant to the proceedings are or have been in his possession, or (b) to produce any documents other than particular documents specified in the order as being documents appearing to the court ... to be, or to be likely to be, in his possession. The terms of Sch B are such that an unqualified order giving effect to these letters rogatory would necessarily have required both these things to be done. On the other hand there can be no doubt that Sch B does specify a certain number of particular documents which can in the circumstances reasonably be regarded as relevant documents. I refer in particular to the originals of certain documents copies of which are included in the 'Friends of the Earth' collection.

So the question comes to be whether the proper course was to reject completely the letters rogatory, so far at least as they sought the recovery of documents, on the ground that in substance the applicants were seeking a licence for a fishing expedition, or one directed to ascertain as regards the particular documents specified therein which appeared likely to turn out to be in the possession of the RTZ companies.

The answer to this question depends, in my opinion, on the balance of a number of considerations. On the one hand it may be regarded as undesirable that an applicant for letters rogatory should receive any encouragement to think he may properly include therein a wide-ranging schedule of documents in the hope that at least some of request will carry out a pruning operation and allow him so much of it as is properly entitled to demand. On the other hand it is the duty of the court of request to do its best, consistently with the provisions of the statute, to assist the processes of justice in the court from which the request comes, and to do so in such a way as will cause the minimum of delay. If in the present case the letters rogatory were to be entirely rejected, so far as they relate to the recovery of documents, it would presumably be open to applicants to obtain from the Virginia court fresh letters limited to the particular documents specified and come back for an order giving effect to them. This would involve considerable delay, and the end result would be the same as if the court of request had itself cut down the scope of the original letters rogatory. Therefore I am of the opinion that the right course, in circumstances such as the present case, is for the court of request to issue an order limited to those documents the production of which, in its judgment, ought properly to be enforced. I have no doubt that on a proper construction of s 2 of the 1975 Act, having regard in particular to sub-ss (3) and (4), it is within the power of the court, in its discretion, to proceed in that way.

I consider this conclusion to be in accordance with the policy of the 1975 Act. That policy was to improve the arrangements in each of the United Kingdom jurisdictions for obtaining evidence to be used in certain proceedings before the courts of other jurisdictions. The major purpose of the Act was to give effect to the 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[3]. This would involve considerable delay, and come back for an order giving effect to them. The Act, as it is amended, which previously operated in this field. At the same time new provisions in the Evidence Act 1856, which replace with the same new provisions the different jurisdictions of the United Kingdom. The necessity of close collaboration between these jurisdictions is obvious, and exactly the same rules now govern the position as regards jurisdictions abroad. Under the 1859 Act a somewhat narrow view was taken by the English courts in

1    [1893] 2 QB 441, [1890-4] All ER Rep 117
2    [1956] 1 All ER 549, [1956] 1 QB 618
3    Cmnd 6727 (TS 20 (1977)); previously published as part of Miscellaneous No 11 (1969) Cmnd 3991

connection with the enforcement in England of a Scottish commission and diligence for the recovery of documents: see *Burchard v Macfarlane, ex parte Tindall*[1]. It was held that the production of documents by third parties could only be ordered as ancillary to the examination of the parties concerned as witnesses in the case. The decision was generally regarded by the Scottish legal profession as having the effect that no commission and diligence for the recovery of documents could ever be enforced against a third party in England. The essential feature of the commission and diligence procedure is that it enables documents which constitute evidence in the cause to be made available in advance of the trial so that they may receive due consideration and not be sprung on the other party in the course of the trial. It thus offers much convenience and is conducive to the better administration of justice. In the present case the Court of Appeal has taken the view that on a proper construction of the 1975 Act, the production of documents by a third party may be ordered, though not ancillary to the oral examination of that party as a witness. That view is not now challenged and is plainly right. I would further observe that, although commission and diligence to recover documents is part of pre-trial procedure, I can see no justification in the terms of the 1975 Act for refusing effect to it on that ground. Thus there is now greater scope for collaboration among the different jurisdictions of the United Kingdom, and also between these jurisdictions and those of countries abroad. So any letters rogatory should be approached in the spirit that they should receive effect to the fullest extent possible under our law. That was the approach adopted by the Court of Appeal in this case.

The Court of Appeal deleted from Sch B certain categories of documents, and altered the description of certain other categories. In my opinion it was not within the power of the court to take the latter course, and I would, for my part, have carried the blue pencil exercise rather further than did the Court of Appeal, with a view to securing that the provisions of s 2(4) of the 1975 Act were properly satisfied. It is unnecessary in the circumstances to particularise the further deletions which, in my view, would have been appropriate.

As regards the oral evidence sought to be obtained under the letters rogatory, I am of opinion that the Court of Appeal acted rightly in sustaining the order for examination of the persons named therein as witnesses. On the material made available I consider that there were reasonable grounds for the view that these persons might be in a position to give evidence relevant to Westinghouse's defence in the Virginia proceedings. In the face of a statement in letters rogatory that a certain person is a necessary witness for the applicant, I am of opinion that the court of request should not be astute to examine the issues in the action and the circumstances of the case with excessive particularity for the purpose of determining in advance whether the evidence of that person will be relevant and admissible. That is essentially a matter for the requesting court. Should it appear necessary to apply some safeguard against an excessively wide-ranging examination, that can be achieved by making the order for examination subject to a suitably worded limitation.

There is nothing which I can usefully add on the question of privilege against self-incrimination arising under s 3(1) of the 1975 Act, or on the appropriateness, in the light of the intervention by the United States Department of Justice, of executing the letters rogatory.

My Lords, I agree that the appeals of the RTZ companies and the individual witnesses should be allowed, that the order giving effect to the letters rogatory should be discharged, and that the appeals of Westinghouse should be dismissed.

*Appeals of 28th October 1976 giving effect to the letters rogatory discharged; appeals of Westing-house dismissed.*

Solicitors: *Linklaters & Paines* (for the RTZ companies and the individual witnesses); *Freshfields* (for Westinghouse); *Treasury Solicitor.*

Mary Rose Plummer   Barrister.

1   [1891] 2 QB 241, [1891-4] All ER Rep 137

EXHIBIT C

# The International Lawyer



Winter 1979 • Volume 13 • Number 1

## Articles

Obtaining Foreign Discovery and Evidence for
Use in Litigation in the United States
Introduction .............................................. JAMES H. CARTER .... 3
Existing Rules and Procedures ..............................................  5
The Westinghouse Uranium Case:
Problems Encountered in Seeking Foreign
Discovery and Evidence .................... ROBERT R. MERHIGE, JR.  19
Opportunities for and Obstacles to
Obtaining Evidence for Use in Litigation in the United States:
In England .................................. LAWRENCE COLLINS  27
In France .................. JACQUES BOREL and STEPHEN M. BOYD  35

Analogies Between United States and
Common Market Antitrust Law in the
Field of Distribution .............................. ALAN E. SALZMAN  47
Protection of Foreigners' Rights in Mexico ............... FRANK M. LACEY  83
Modern Business Law in the Sultanate of Oman ... LEON G. R. SPOLIANSKY  101
The European Patent Convention and the
Community Patent Convention ................... JEFFREY SINGLETON  119

## Shorter Articles, Comments and Notes

The Patent Cooperation Treaty: Effects on
Domestic and Foreign Patent Practice ......... EUGENE L. FLANAGAN III  141
Legal Aspects of the Space Shuttle ................... STEPHEN CORCOVE  153

## Editorial Comment:
Former Editors in Chief ................................. F. S. RUDDY  163
The International Lawyer ................................. F. S. RUDDY  165

## Current Legal Developments
Pericles: A Review of Significant Recent Judicial,
Legislative, Executive and Administrative Actions in the
United States and Abroad ......................... EDWARD GORDON  167

## Book Reviews ............................................  183

## Books Received ...........................................  203

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. ABA American Bar Association

# The Westinghouse Uranium Case: Problems Encountered in Seeking Foreign Discovery and Evidence

In late October, 1975, the Judicial Panel on Multi-District Litigation transferred thirteen cases to me for consolidated pre-trial discovery.[1] These were suits brought by a number of electrical utility companies against Westinghouse. Each to a large extent involved an alleged contractual obligation on the part of Westinghouse for the present or future delivery of uranium to fuel nuclear power plants operated by the plaintiff utilities or planned for operation by them in the near future. In general terms, Westinghouse contended that its performance has been made commercially impracticable by the occurrence of certain unforeseen events, including the creation of a cartel among foreign and domestic producers of uranium which dramatically forced the price of uranium upward during the critical period.[2] Damages sought by the plaintiffs aggregate amounts in the billions of dollars.

---

Footnotes have been prepared by Margaret K. Pfeiffer, Esq. of the New York and District of Columbia Bars.

*United States District Judge, Eastern District of Virginia.

[1] *In re* Westinghouse Elec. Corp. Uranium Contract Litigation, 405 F. Supp. 316, 319 (J.P.M.D.L. 1975). The cases transferred were: Northeast Utils. Serv. Co. v. Westinghouse Elec. Corp., Civ. No. H-75/373 (D. Conn. 1975); Consolidated Edison Co. of N.Y. v. Westinghouse Elec. Corp., Civ. No. 75CV5503-CHT (S.D.N.Y. 1975); Long Island Lighting Co. v. Westinghouse Elec. Corp., Civ. No. 75C1878 (E.D.N.Y. 1975); South Carolina Elec. & Gas Co. v. Westinghouse Elec. Corp., Civ. No. 75-1863 (D.S.C. 1975); Florida Power & Light Co. v. Westinghouse Elec. Corp., Civ. No. 75-2319 (S.D. Fla. 1975); Alabama Power Co. v. Westinghouse Elec. Corp., Civ. No. 75-P1892S (N.D. Ala. 1975); Virginia Elec. & Power Co. v. Westinghouse Elec. Corp., Civ. No. 75-0514-R (E.D. Va. 1975); Tennessee Valley Auth. v. Westinghouse Elec. Corp., Civ. No. 3-75-298 (E.D. Tenn. 1975); Texas Utils. Servs., Inc. v. Westinghouse Elec. Corp., Civ. No. 3-75-1241C (N.D. Tex. 1975); Houston Lighting & Power Co. v. Westinghouse Elec. Corp., Civ. No. 75-H-1729 (S.D. Tex. 1975); Union Elec. Co. v. Westinghouse Elec. Corp., Civ. No. 75-893C(3) (E.D. Mo. 1975); Kansas Gas & Elec. Co. v. Westinghouse Elec. Corp., Civ. No. 75-250-C6 (D. Kan. 1975); Wisconsin Elec. Power Co. v. Westinghouse Elec. Corp., Civ. No. 75-C-571 (E.D. Wis. 1975).

[2] *See in re* Westinghouse Elec. Corp. Uranium Contract Litigation, 436 F. Supp. 990, 991 (J.P.M.D.L. 1977).

The population of the areas served by the plaintiff utilities approximates 50 million people. In short, the cases are of an incredible magnitude in terms of national interest and monetary potential.

On October 21, 1976, at the request of Westinghouse, letters rogatory were issued for Canadian, Australian and English courts. Westinghouse sought the right to obtain evidence by way of depositions of certain British subjects who were alleged to be employees associated with Rio Tinto Zinc Corporation, a large British uranium producing company. The right of Westinghouse to proceed in this fashion was challenged by certain of the witnesses named in the letters rogatory.[1] Issues involving first-impression interpretation of the British Evidence (Proceedings in Other Jurisdictions) Act, 1975, Ch. 34[2] were addressed to the British courts. After receiving

---

[1]Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp., (1978) 1 All E.R. 434, 440, 451 (H.L. 1977).

[2]This Act implements the principles of the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters of 1968, 23 U.S.T. 2555, T.I.A.S. No. 7444, 658 U.N.T.S. 10, to which the United Kingdom is a signatory.
The Act provides, in pertinent part:
1. Where an application is made to the High Court . . . for an order for evidence to be obtained . . . , and the court is satisfied—
  (a) that the application is made in pursuance of a request issued by or on behalf of a court or tribunal ("the requesting court") exercising jurisdiction in any other part of the United Kingdom or in a country or territory outside the United Kingdom; and
  (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court or whose institution before that court is contemplated,
the High Court, . . . , shall have the power conferred on it by the following provisions of this Act.
2. (1) Subject to the provisions of this section, the High Court . . . shall . . . have power, on any such application as is mentioned in section 1 above to make such provision for obtaining evidence in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made; and any such order may require a person specified therein to take such steps as the Court may consider appropriate for that purpose.
(2) Without prejudice to the generality of subsection (1) above but subject to the provisions of this section, an order under this section may, in particular, make provision—
  (a) for the examination of witnesses, either orally or in writing;
  (b) for the production of documents;
  (c) for the inspection, photographing, preservation, custody or detention of any property;
  . . .
  (3) . . . a person should not be compelled . . . to give any evidence which he could not be compelled to give—
  (a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or
  (b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction.
  (4) An order under this section shall not require a person—
  (a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or
  (b) to produce any documents other than particular documents specified in the order as appearing to the Court making the order to be, or to be likely to be, in his possession, custody, or power.

adverse rulings at three judicial levels,[3] Rio Tinto Zinc witnesses appealed to the Supreme Court of Judicature, the Court of Appeal, Lord Denning, Master of the Rolls, stated as follows:

As this is an urgent matter we will give judgment straight away. It arises out of a dispute now going on in the United States of America. In the 1960s the Westinghouse Electric Corporation made contracts with power companies under which Westinghouse were to build nuclear power stations and to supply them with uranium at a fixed. The prices were stated in the contracts. There was an escalation clause to meet the increases in the general cost of living, but not to meet changes in the market price of uranium.

At the time when Westinghouse agreed to supply this uranium, the price was comparatively low, but in the middle 1970s, especially after the raising of the oil prices, the price of uranium rose very sharply. In February 1973 it was only $6 a pound, but two years later it had risen to $41 a pound. The result was that Westinghouse found themselves in great difficulty, both in getting uranium and in supplying it to the power stations. So much so that they were unable to fulfill their contracts. They sought to excuse themselves on the ground that the performance of them was "commercially impracticable"; a line of defence with which we are familiar in England, and known as "frustration owing to supervening circumstances."

Then the power companies brought proceedings against Westinghouse in the States of Virginia and Pennsylvania. In addition there is an antitrust suit in the State of Illinois. The amount in dispute is extremely large, $2,000 million or £1,000 million sterling.

At first sight this dispute seems to have nothing to do with England at all or any of us. But it appears that in Australia about a year ago someone surreptitiously got access to the files of an Australian uranium producer and Westinghouse got hold of those files. They disclosed the existence of an international cartel in uranium. This cartel was an association by which the big producers of uranium combined to regulate the output of uranium and the price of it. We are told that Australia, Canada, South Africa, France and the English company of Rio Tinto were parties to this cartel. Its object is said to have been to manipulate the prices in uranium, to limit competition and to force prices up to excessively high levels. The files showed that in about 1972 there was formed a policy committee, an operating committee and a secretariat.

---

[3]. (1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give—
  (a) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction; or
  (b) subject to subsection (2) below, in civil proceedings in the country or territory in which the requesting court exercises jurisdiction.
  (2) Subsection (1)(b) above shall not apply unless the claim of the person in question to be exempt from giving the evidence is either—
  (a) supported by a statement contained in the request . . . ; or
  (b) conceded by the applicant for the order and where such a claim made by any person is not so supported or conceded as respects the evidence to which the claim relates, that this section) be required to give the evidence . . .
  being referred to in, upholds the claim.
In re Westinghouse Elec. Corp. Uranium Contracts Litigation, M.D.L. Docket No. 232, [1977] 3 W.L.R. 430, 433 (C.A.).

To aid their defence in America, Westinghouse want to prove the existence of this cartel and its dealings. They want to see all the documents which have been passing between the members and the notes of all the meetings. They desire to show the existence of this "conspiracy," as they would call it, to keep up prices. They have tried and failed in Australia, Canada, France and South Africa. We were told that in those countries regulations have been passed so as to forbid the documents of the cartel being disclosed. Now Westinghouse seek to get them from Rio Tinto in England. . . . We have before us a courteous request from the United States District Court for the Eastern District of Virginia, Richmond Division. It has asked us to order the Rio Tinto Zinc Corporation Ltd. and its principal directors, Sir Mark Cunliffe Turner, Lord Shackleton of Burley and others, to produce the documents relating to this cartel, and also to give evidence here in England. The Federal Judge, Judge Robert R. Merhige, Jr. has issued two letters rogatory (which we call letters of request) addressed to us on October 21, 1976. The actual words are worth noting:—

"The people of the United States of America to the High Court of Justice in England. Greetings:

"Whereas, certain actions are pending in our District Court for the Eastern District of Virginia, Richmond Division, in which the corporations listed in Schedule A attached hereto are plaintiffs and Westinghouse Electric Corporation is defendant, and it has been shown to us that justice cannot be done among the said parties without the testimony, which is intended to be given in evidence at the trial of the actions of the following persons residing in your jurisdiction [the directors of Rio Tinto Zinc] nor without the production of certain documents in the possession of [Rio Tinto Zinc] . . . related to the existence and terms of various agreements, arrangements or concerted practices . . . And whereas the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this court.

"We, therefore, request that in the interest of justice, you cause by your proper and usual process [Sir Mark Cunliffe Turner and others] to appear before any consul . . . of the United States at London . . . to be examined orally as witnesses."[*]

The letter rogatory finished with the assurance: "and we shall be ready and willing to do the same for you in a similar case when required."

A few days ago on May 20, Federal Judge Merhige made a supplement to these letters in which he makes it clear that the letters rogatory are concerned with material that is required not merely for pre-trial procedure (as it is called in the United States of America) but for evidence and actual use at the trial. . . . He desires that all proceedings here be completed at the earliest possible date, so that the plaintiff shall have an adequate opportunity to consider such testimony and documents in connection with the presentation of their case.

Such is the request made by the United States Federal Court. It is our duty and our pleasure to do all we can to assist that court, just as we would expect the United States court to help us in like circumstances. "Do unto others as you would be done by."[*]

At status conferences counsel for the parties attempted to keep me advised of the proceedings in England and it was my understanding that counsel for the witnesses opposed the taking of testimony under the letters

*Id. at 434-36.

---

rogatory on a number of grounds. Among these were the contentions that Westinghouse was not seeking evidence but rather was engaged upon a discovery exercise, an impermissible practice under English law,[*] and that in no event should the witnesses be required to testify because of their rights to privilege under the Fifth Amendment of the United States Constitution and under English law and the rules of the European Economic Community.[*] Lord Denning made these observations in the judgment of the Court of Appeal:

It only applies to individuals and not to companies—an interesting contrast to Article 85 which only applies to undertakings and not to individuals.

So far as procedure is concerned, if privilege is claimed because of the risk of a fine by the European Commission, the procedure is governed by R.S.C., Ord. 39, R. 5. If the witness refuses to answer the question, an application can be made to the court to see whether he can be required to answer, and then the court will rule upon his claim. If privilege is claimed under the Fifth Amendment, the examiner will have to act under the new R.S.C. Ord. 70, R. 6. The examiner will have to take down the whole evidence, seal it up and send it across to the United States; and then the United States court will rule whether the claim is good or not.[*]

The Court continued through Lord Justice Roskill:

We are not concerned with assisting or not assisting Westinghouse. We are concerned with, and only concerned with, assisting the Federal Court for the District of Richmond in Virginia. It is that Court which has enlisted our assistance by letters rogatory and it is that Court which, to use Lord Denning M.R.'s phrase, it is both our duty and our pleasure and our power under the Act of 1975 to assist, so far as we properly can.

Accordingly, for those reasons, I agree with what Lord Denning, M.R. has said about privilege. So far as the Fifth Amendment is concerned, I propose to say very little. Mr. Kidwell has said that we should make it a condition of the issue of the order that a master should act in place of the United States Consul or Vice-Consul for the purpose of taking any evidence that may be given under the letters rogatory and that such a master should be appointed by the Judge in Virginia. The purpose was that a ruling on this privilege on behalf of the Judge might be given instantly so that no problem of delay would arise in connection with any

[*]See, e.g., Radio Corp. of America v. Rauland Corp., [1956] 1 Q.B. 618, 649: "It is an endeavour to get in evidence by examining people who may be able to put the parties in the way of getting evidence. That is what we should call (inaudible) fishing proceedings, which is never allowed in the English courts."

[*]Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp., [1978] 1 All E.R. 434, 444. (H.L. 1977) (E). See in re Westinghouse Elec. Corp. Uranium Contract Litigation M.D.L. Docket No. 235, [1977] 3 W.L.R. 430 (C.A.); In re Westinghouse Elec. Corp. Uranium Contract Litigation M.D.L. Docket No. 235, [1977] 3 W.L.R. 492 (C.A.).

The House of Lords has held that the passage of the 1975 Act has not changed this attitude toward pre-trial discovery. Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp. [1978] 1 All E.R. 434, 441-42, 450 (H.L. 1977) (E).

[*]Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp. Uranium Contract Litigation M.D.L. Docket No. 235, [1977] 3 W.L.R. 441 (C.A.).

*witness who invoked the Fifth Amendment.* All I would say is that I think it would be quite wrong for this court to presume to dictate before whom these proceedings should take place. That, it seems to me, must be a matter for the court in Virginia and not for this court. If the proceedings are to be held in the near future in London, it must be a matter for the Judge in Virginia to say by his *order who is to sit where; possibly either he himself or a master appointed on his behalf,*" on a ... Consul or Vice-Consul as the present order provides. (Emphasis supplied).[16]

Thereafter the taking of evidence commenced at the American Embassy.

Prior to convening for the taking of depositions, counsel had suggested that it would be appropriate and beneficial to the interest of all parties if I would make arrangements to preside over the depositions. It should be remembered that we were rapidly approaching the day that the case was scheduled to commence. Thinking that necessity for rulings could probably be handled by telephone, I at that time declined to go to England for these purposes.

Nevertheless, novel questions of English and American law were developing and in anticipating the need for a more experienced presiding officer than a vice-consul attached to the Embassy, William B. Spong, Jr., Dean of William and Mary Law School, was appointed as Special Master. It was agreed, however, that he would not go to London unless it should develop that his presence there was needed.

Depositions commenced on schedule in London before a vice-consul and the record which I soon received was replete, not with questions and answers from the witnesses, but colloquy between counsel.

Witnesses were represented by both English and American counsel, and it was apparent that they would resist giving testimony by any means properly available to them under English or American law. Ultimately, a conference telephone call was put through to me with both the English and American counsel requesting in most urgent terms that I personally preside over the proceedings. I acquiesced pursuant to our understanding that the Dean accompany me, the thought being that perhaps once I had made certain rulings I could leave the balance of the proceedings to the Dean.

Testimony was first taken from Mr. Price, Secretary of the Uranium Institute, who testified freely and fully without claiming any privilege. Thereafter certain witnesses were called and each, after giving his name, refused upon advice of counsel to answer any further questions, claiming privilege under the Fifth Amendment of the United States Constitution. After extensive argument, I ruled that although these witnesses were British subjects, subpoenaed to testify on British soil, they had the right to avail themselves of the privilege against self-incrimination under our Constitu-

[16] *Id.* at 443, 445.

---

tion.[17] It should be pointed out that at this same time a federal grand jury was sitting in the District of Columbia investigating the possibility of antitrust violations by uranium producers. Immediately after my ruling on the Fifth Amendment, *i.e.,* the following morning, after having flown all night, two members of the Justice Department Antitrust Division appeared and presented to me a letter from the Department stating that it would not prosecute any of the witnesses on the basis of any testimony given in the depositions.[18] It was urged that this letter was sufficient to grant immunity, and thereby remove the previously established rights of the witnesses to claim privilege under the Fifth Amendment. Counsel for Westinghouse and for the United States Department of Justice strenuously argued that this was so. English and American counsel for the witnesses strenuously argued that since the letter did not conform to our immunity statutes, it was not sufficient to waive the Fifth Amendment rights.

While I concluded that the letter would bar the Department of Justice from using any testimony given by these witnesses in any prosecution of them under our antitrust laws, I also concluded that it was not in conformity with the requirements of our immunity statutes and hence the decision to be made was one based upon discretion as distinguished from mandatory requirements of the immunity statutes.[19] My view of the matter was that the overriding consideration was to accord the British witnesses every benefit of the doubt, and every opportunity to protect their legal rights. It was obvious that the English court, should I order the testimony given, would be called upon, in the event that the witnesses continued refusal, to consider sanctions, and I held as follows:

We deal here with a matter involving both the British and American courts. The efficient and expeditious manner in which the British courts have acted in the spirit of total cooperation and the interest of comity and justice should be a source of pride to the citizens of both countries. I, for one, on a personal basis, am very proud of the fact that they and I are part of a profession whose sole desire and function is to do justice under the law. I'm very impressed with the British judges. When an American court, as in the instant case, asks a British court to require its citizens to attend judicial proceedings of an American court to which, indeed, said British are not litigants, in light of Congress' more recent assertion of its power in matters dealing with countries, it is my view that both countries are better served by the utilization of the statutory scheme. Then, our British friends and the British court if called upon to issue sanctions against their own citizens, would know that my such request was not precipitated by the exercising of one Federal Judge's discretionary power. The statutory scheme relieves from this court any discretion, for if it is in proper form, as a judge I

[17] Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp., [1978] 1 All E.R. 434, 445 (H.L. 1977).

[18] *Id.* at 445-46, 458, 465-66.

[19] 18 U.S.C. §§ 6002-6003 (1970).

would have no recourse but to grant the immunity sought, and I remain available to entertain any such motion. Then all would know that the matter had been given consideration by the highest officer of the executive branch or his designee charged with responsibility for criminal investigations and prosecutions. His approval of the United States Attorney seeking any such order would be premised on authority granted by the Congress of the United States. In short, and as Mr. Justice Jackson implied, in the Steel Seizure Cases,[14] the Government is acting with its fullest authority when the Executive acts pursuant to a Legislative delegation. In my view, the British court and its citizens are entitled to no less an authority.[15]

[14]"Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).
[15]"Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp., [1978] 1 All E.R. 434, 445-46 (H.L. 1977) (E).