# SWANSON McNAMARA & HALLER LLP

300 MONTGOMERY STREET / SUITE 1100 / SAN FRANCISCO, CA 94104
TELEPHONE 415.477.3800   FAX 415.477.9010
WWW.SMHLEGAL.COM

May 11, 2007

The Honorable Martin J. Jenkins
United States District Judge
450 Golden Gate Avenue
San Francisco, California 94102

**RE:** *In re Oracle Corporation Securities Litig.*, **Master File No. C-01-0988-MJJ**

Your Honor:

Attached please find the English authority, *In re Westinghouse Electric Corp. Uranium Contract Litig.*, 3 W.L.R. 430 (1977), cited by undersigned counsel during the hearing earlier today. The portion to which counsel referred at the hearing is marked on page 441.

Respectfully submitted,

Edward W. Swanson
Alexis Haller
Swanson, McNamara & Haller LLP

**Bridge L.J.**    Saif Ali v. Sydney Mitchell & Co. (C.A.)    [1977]

I am content to adopt that rule for the present purposes. I am not of course saying that the boundary of the immunity in our courts may not extend further, but I am perfectly satisfied that on any reasonable interpretation of *Rondel v. Worsley* [1969] 1 A.C. 191 the immunity extends at least as far, and that is sufficient for the barrister in this case, because it is clear that all the acts of negligence pleaded against the barrister were acts or omissions so intimately connected with the conduct of the cause in court that they can fairly be said to be preliminary decisions affecting the way that cause was to be conducted when it came to trial.

I too would allow the appeal.

*Appeal allowed with costs in Court of Appeal and below. Registrar's order restored. Third party proceedings struck out.*

*Leave to appeal refused.*

Solicitors: *Hewitt, Woollacott & Chown; Sydney Mitchell & Co.*

A. H. B.

July 27, 1977. The Appeal Committee of the House of Lords (Lord Wilberforce, Lord Edmund-Davies and Lord Fraser of Tullybelton) allowed a petition by the solicitors for leave to appeal.

---

[COURT OF APPEAL]

In re WESTINGHOUSE ELECTRIC CORPORATION URANIUM CONTRACT LITIGATION M.D.L. DOCKET No. 235

1977 May 25, 26    Lord Denning M.R., Roskill and Shaw L.JJ.

*Evidence—Foreign tribunal, for—Jurisdiction of English court—Letters rogatory—Privilege against self-incrimination—Liability to fines under E.E.C. Treaty and American anti-trust legislation—Whether "penalties"—Procedure to be followed if privilege claimed at examination—Testimony and documents—Whether required for use at trial—Civil Evidence Act 1968 (c. 64), s. 14—Evidence (Proceedings in Other Jurisdictions) Act 1975 (c. 34), ss. 1, 2 (1) (2) (4), 3 (1)—E.E.C. Treaty (Cmnd. 5179–II), arts. 85, 189, 192—E.E.C. Regulation No. 17/62, art. 15*

W, an American corporation, were sued in two states of the United States by power companies with whom they had entered into contracts to build nuclear power stations with supply them with uranium. W had been unable to fulfil their contractual obligations owing to the steep rise in price, and shortage, of uranium. In 1976 W learned of the existence of an international cartel which big producers of uranium, including two English Rio Tinto-Zinc companies ("RTZ"), had formed to regulate the price and output of uranium and limit competition. In their defences to the actions against them W had pleaded that performance of the contracts was "commercially impracticable" and alleged anti-competitive actions by uranium producers. On the application of W, who wanted to prove the existence of the cartel, the

United States District Court for the Eastern Division of Virginia, on October 21, 1976, issued two letters rogatory to the High Court in London asking the court to issue process requiring named persons to appear before a United States consular officer in London to be examined orally as witnesses in action in Virginia and requiring RTZ (with whom the named persons were connected as officers or directors) to appear at the examinations to produce documents listed in schedules to the letters. The letters stated that justice could not be done without the required testimony which was intended to be given at the trial of the actions. On October 28 Master Creightmore in London made orders under section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 [1] giving effect to the letters. Master Jacob dismissed applications by RTZ to set aside the orders and MacKenna J. affirmed his decision.

On appeals by RTZ and the witnesses served with the orders, who contended, inter alia, that infringement of the prohibition on cartels in articles 85, 189 and 192 of the European Economic Community Treaty [2] involved liability to fines under articles 15, paragraph 2, of E.E.C. Regulation No. 17/62 and relied upon the privilege against self-incrimination under section 14 (1) of the Civil Evidence Act 1968 [3] and the United States Fifth Amendment:—

*Held*, dismissing the appeals subject to variations in the documents listed in the schedules to the letters rogatory, that in accordance with the Evidence (Proceedings in Other Jurisdictions) Act 1975 it was the duty and pleasure of the court to do all that it could do to assist the United States Federal Court and, since the evidence and the documents were relevant to, and required for use in, the actions in Virginia, and they were not required for pre-trial discovery, the orders giving effect to the letters should (with the modifications) stand (post, pp. 436B–F, 437A, C–D, 441G–H, 442H–443A, C–D, H—444A).

*Radio Corporation of America v. Rauland Corporation* [1956] 1 Q.B. 618, D.C. considered.

*Per curiam.* Documents to be produced under letters rogatory should be specified with such distinctiveness as would be sufficient for a subpoena duces tecum; but they need not be ancillary to the oral evidence of witnesses (post, pp. 438B, 443E–F).

The privilege against self-incrimination in respect of

---

[1] Evidence (Proceedings in Other Jurisdictions) Act 1975, s. 1: "Where an application is made to the High Court . . . for an order for evidence to be obtained in the part of the United Kingdom in which it exercises jurisdiction, and the court is satisfied—(a) that the application is made in pursuance of a request issued by or on behalf of a court . . . (" the requesting court") exercising jurisdiction . . . in a country or territory outside the United Kingdom; and (b) that the evidence to which the application relates is to be obtained for the purposes of civil proceedings which either have been instituted before the requesting court . . . the High Court . . . shall have the powers conferred on it by . . . this Act."

S. 2: "(1) . . . the High Court, the Court of Session and the High Court in Northern Ireland shall each have power, on any such application as is mentioned in section 1 above, by order to make such provision for obtaining evidence in the part of the United Kingdom in which it exercises jurisdiction as may appear to the court to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made; . . . (2) . . . an order under this section may, in particular, make provision—(a) for the examination of witnesses, either orally or in writing; . . . (b) for the production of documents; (3) An order under this section shall not require any particular steps to be taken unless they are steps of civil proceedings in the court making the order."

S. 2 (4): see post, p. 437E–F, G.

S. 3 (1): see post, p. 441A, C–D.

[2] E.E.C. Treaty, art. 85: see post, p. 440A–B.

[3] Civil Evidence Act 1968, s. 14: see post, p. 420c

## In re Westinghouse Litigation (C.A.)   [1977]

"penalties" in section 14 (1) of the Civil Evidence Act 1968 is not confined to penalties in revenue cases, but includes a "penalty" to which a person is subject under any part of English law (post, pp. 439G, 445B–C); if W's allegations were right, RTZ were in breach of article 85 of the E.E.C. Treaty, which prohibits any cartel to keep up prices or to limit competition, and (by virtue of articles 189 and 192 of the Treaty and Regulation No. 17 of February 6, 1962, article 15, paragraph (2)) could be exposed to very large fines which, being recoverable by English procedure, would be "penalties" within section 14 (1) of the Civil Evidence Act 1968 (post, pp. 440C, F–H, 444G–H); and, at the request of the parties, the court made a declaration accordingly.

Directions as to the position and the procedure to be followed if on the examinations RTZ claimed privilege, which was preserved by section 3 (1) of the Act of 1975, under English law or under the Fifth Amendment (post, pp. 441D–G, 445E–G).

Decision of MacKenna J. affirmed with modifications.

The following cases are referred to in the judgments:

*American Express Warehousing Ltd. v. Doe* [1967] 1 Lloyd's Rep. 222, C.A.
*Colne Valley Water Co. v. Watford and St. Albans Gas Co.* [1948] 1 K.B. 500; [1948] 1 All E.R. 104, C.A.
*Comet Products U.K. Ltd. v. Hawkex Plastics Ltd.* [1971] 2 Q.B. 67; [1971] 2 W.L.R. 361; [1971] 1 All E.R. 1141, C.A.
*Mexborough (Earl of) v. Whitwood Urban District Council* [1897] 2 Q.B. 111, C.A.
*Radio Corporation of America v. Rauland Corporation* [1956] 1 Q.B. 618; [1956] 2 W.L.R. 281, 612; [1956] 1 All E.R. 260, D.C.
*Redfern v. Redfern* [1891] P. 139, C.A.
*Reg. v. Boyes* (1861) 1 B. & S. 311.

The following additional cases were cited in argument:

*Blunt v. Park Lane Hotel Ltd.* [1942] 2 K.B. 253; [1942] 2 All E.R. 187, C.A.
*Burchard v. MacFarlane, Ex parte Tindall* [1891] 2 Q.B. 241, C.A.
*Debtor, In re A* [1910] 2 K.B. 59, C.A.
*Elder v. Carter, Ex parte Slide & Spur Gold Mining Co.* (1890) 25 Q.B. 194, C.A.
*Hunnings v. Williamson* (1883) 10 Q.B.D. 459.
*Martin v. Treacher* (1886) 16 Q.B.D. 507.
*National Association of Operative Plasterers v. Smithies* [1906] A.C. 434, H.L.(E.).
*Panthalu v. Ramnord Research Laboratories Ltd.* [1966] 2 Q.B. 173; [1965] 3 W.L.R. 682; [1965] 2 All E.R. 921, C.A.
*Penn-Texas Corporation v. Murat Anstalt (No. 2)* [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.
*Reg. v. Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057; H.L.(E.).
*Seyfang v. G.D. Searle & Co.* [1973] Q.B. 148; [1973] 2 W.L.R. 17; [1973] 1 All E.R. 290.
*Soul v. Inland Revenue Commissioners* [1963] 1 W.L.R. 112; [1963] 1 All E.R. 68, C.A.

INTERLOCUTORY APPEALS from MacKenna J.

On October 21, 1976, Judge Merhige in the United States District Court for the Eastern District of Virginia, Richmond Division granted

the applications of Westinghouse Electric Corporation ("Westinghouse") to issue two letters rogatory to the High Court asking that court to issue process causing named persons to appear before a consular officer of the United States in London, to be examined orally, as witnesses in actions in Virginia and causing two English companies, Rio-Tinto Corporation Ltd. and RTZ Services Ltd. ("RTZ"), with which the named persons were connected as officers or directors, to appear at the oral examination of the witnesses to produce itemised documents. Pursuant to the letters rogatory and to the Evidence (Proceedings in Other Jurisdictions) Act 1975 and R.S.C., Ord. 70, Master Creightmore on October 28, 1976, made two orders (1) that Peter Daniel, Jean Loup Dherse, the Rt. Hon. Lord Shackleton of Burley, Sir Ronald Mark Cunliffe Turner and Roy William Wright to attend before the consul, vice-consul or consular officer of the United States Embassy on a named date to be examined on oath or affirmation touching evidence required for civil proceedings in Virginia, and that RTZ by its director and proper officer Andrew Edward Buxton produce at the oral examination the documents enumerated in Schedule B to the letter rogatory, (2) a similar order naming Andrew Edward Buxton and Kenneth E. Bayliss as witnesses and RTZ Services Ltd. by its director and proper officer Andrew Edward Buxton as the company to produce the documents enumerated in Schedule B to the other letter rogatory.

On February 22, 1977, Master Jacob upheld the order of Master Creightmore and on May 10, 1977, MacKenna J. dismissed appeals from Master Jacob.

RTZ and the persons named appealed on the grounds that the judge erred: (1) in holding that the order sought for the production of documents was within section 2 (4) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, for the following reasons; (a) the order would require RTZ to state what relevant documents were or had been in its possession, custody or power, contrary to section 2 (4) (a); (b) the documents sought were not "particular documents" within the meaning of section 2 (4) (b); (2) in holding that the onus on an applicant for the production of documents under the Act was only to show that the documents appeared to be likely to exist, and that the applicant need not show that they did in fact exist; (3) in finding that all the documents sought appeared to be likely to exist, and appeared to be likely to be in the possession custody or power of RTZ; (4) in holding that the Act did not require that the documents sought be ancillary to the oral testimony of a witness at the trial; and erred in fact in finding that the documents sought were so ancillary; (5) in that he considered de novo the question of what directly relevant oral testimony the persons named in the letters rogatory would have to give; and ignored the fact that the judge who issued the letters rogatory had not considered the question whether the named persons did have such evidence to give, and that there was no evidence before that judge on which he could have answered that question in the affirmative: (6) in deciding for himself whether the named persons had directly relevant evidence to give, he erred in law in holding that the onus on an applicant under the Act was only to show that the named persons were likely to have such evidence to give, and that the applicant need not show that they did in fact have such evidence to give; and erred in fact in finding that all the persons named in the letters rogatory were likely to have relevant

**In re Westinghouse Litigation (C.A.)** [1977]

evidence to give; (7) in holding and/or in finding that the request, both for oral and documentary material, was not an application for discovery against persons not parties to the United States proceedings in respect of which the letters were issued. In particular, the judge failed to take any or any sufficient account of the breadth of the description of the documents sought; or of the fact that the judge who issued the letters had not decided that the material sought would be directly relevant at the trial of the action, and indeed stated that he did not know how relevant the material would be. The judge further attached undue importance to statements made on behalf of Westinghouse that they intended to use all the material sought at the trial of the action; (8) in holding that the request, both for oral and documentary material, was not objectionable by reason of the fact that it was made by the United States court as part of its pre-trial discovery procedure; (9) in the exercise of his discretion in ordering production of the documents sought in that he failed to take any or any proper account of the fact that the material, insofar as it tended to prove the issues to which Westinghouse alleged it related, would also be relevant in certain anti-trust proceedings pending in the United States District Court for the Northern District of Illinois, Eastern Division, in which proceedings RTZ were defendants and in which they had elected to take no part on the ground that the Illinois court had no jurisdiction, and (10) in the exercise of his discretion in ordering that the named persons do attend to give oral testimony in that he failed to direct himself correctly in the application of the Fifth Amendment of the United States Constitution, or to consider adequately the implications thereof.

By a respondent's notice, Westinghouse contended that MacKenna J.'s judgment should be affirmed on the additional grounds that (1) under the provisions of the Act of 1975 there was no requirement that documents ordered to be produced must be ancillary to the oral evidence of witnesses; and (2) the privilege against exposure to proceedings for the recovery of a penalty under section 14 of the Civil Evidence Act 1968 did not confer any right to refuse to answer any question or produce any document on the grounds that to do so would tend to expose the person claiming the privilege to the imposition of a fine under article 85 or 86 of the Treaty of Rome and articles 14 or 15 of E.E.C. Regulation No. 17/62.

The facts are stated in the judgment of Lord Denning M.R.

*Raymond Kidwell Q.C.* and *Richard Wood* for RTZ and the persons named in the orders.
*T. H. Bingham Q.C.* and *Timothy Walker* for Westinghouse.

LORD DENNING M.R. As this is an urgent matter we will give judgment straight away. It arises out of a dispute now going on in the United States of America. In the 1960s the Westinghouse Electric Corporation made contracts with power companies under which Westinghouse were to build nuclear power stations and to supply them with uranium as a fuel. The prices were stated in the contracts. There was an escalation clause to meet increases in the general cost of living, but not to meet changes in the market price of uranium.

At the time when Westinghouse agreed to supply this uranium, the price was comparatively low, but in the middle 1970s, especially after

**3 W.L.R.** **In re Westinghouse Litigation (C.A.)** **Lord Denning M.R.**

A  the raising of the oil prices, the price of uranium rose very sharply. In February 1973 it was only $6 a pound, but three years later it had risen to $41 a pound. The result was that Westinghouse found themselves in great difficulty, both in getting uranium and in supplying it to the power stations. So much so that they were unable to fulfill their contracts. They sought to excuse themselves on the ground that the performance of them was "commercially impracticable", a line of
B  defence with which we are familiar in England, and known as "frustration owing to supervening circumstances."

Then the power companies brought proceedings against Westinghouse in the States of Virginia and Pennsylvania. In addition there is an anti-trust suit in the State of Illinois. The amount in dispute is extremely large, $2,000 million or £1,000 million sterling.

C  At first sight this dispute seems to have nothing to do with England at all or any of us. But it appears that in Australia about a year ago someone surreptitiously got access to the files of an Australian uranium producer and Westinghouse got hold of those files. They disclosed the existence of an international cartel in uranium. This cartel was an association by which the big producers of uranium combined to regulate the output of uranium and the price of it. We are told that
D  Australia, Canada, South Africa, France and the English company of Rio Tinto were parties to this cartel. Its object is said to have been to manipulate the market in uranium, to limit competition and to force prices up to excessively high levels. The files showed that in about 1972 there was formed a policy committee, an operating committee and a secretariat.

E  To aid their defence in America, Westinghouse want to prove the existence of this cartel and its dealings. They want to see all the documents which have been passing between the members and the notes of all the meetings. They desire to show the existence of this "conspiracy," as they would call it, to keep up prices. They have tried and failed in Australia, Canada, France and South Africa. We were
F  told that in those countries regulations have been passed so as to forbid the documents of the cartel being disclosed. Now Westinghouse seek to get them from Rio Tinto in England.

There are no regulations in England forbidding access to these documents. The disclosure of them depends on our ordinary rules of law. We have before us a courteous request from the United States District
G  Court for the Eastern District of Virginia, Richmond Division. It has asked us to order the Rio Tinto Zinc Corporation Ltd. and its principal directors, Sir Ronald Mark Cunliffe Turner, Lord Shackleton of Burley and others, to produce the documents relating to this cartel, and also to give evidence here in England. The federal judge, Judge Robert R. Merhige Jr., has issued two letters rogatory (which we call letters of request) addressed to us on October 21, 1976. The actual words are
H  worth noting:

"The People of the United States of America to the High Court of Justice in England. Greetings:

"Whereas, certain actions are pending in our District Court for the Eastern District of Virginia, Richmond Division, in which the corporations listed in Schedule A attached hereto are plaintiffs and Westinghouse Electric Corporation is defendant, and it has been shown to us that justice cannot be done among the said parties

**Lord Denning M.R.**    In re Westinghouse Litigation (C.A.)    [1977]

without the testimony, which is intended to be given in evidence at the trial of the actions, of the following persons residing in your jurisdiction, being directors . . . of the RTZ Services Ltd. . . . nor without the production of certain documents in the possession of the RTZ Services Ltd. . . . related to the existence and terms of various agreements, arrangements or concerted practices between RTZ Services Ltd. and the following entities . . . Rio Tinto Zinc Corporation Ltd. (England) . . . And whereas the existence and terms of such agreements, arrangements or concerted practices are relevant to the matters in issue in the actions at present in this court.

"We, therefore, request that in the interest of justice, you cause by your proper and usual process [Sir Ronald Mark Cunliffe Turner and others] . . . to appear before any consul or vice-consul or other consular officer of the United States at London . . . to be examined orally as witnesses . . . and . . . cause the said RTZ Services Ltd. . . . to produce the documents enumerated in Schedule B hereto, being documents which appear to be or to be likely to be in the possession, custody or power of the RTZ Services Ltd. . . ."

The letter rogatory finished with the assurance: " and we shall be ready and willing to do the same for you in a similar case when required."

A few days ago on May 20, Federal Judge Merhige made a supplement to these letters in which he makes it clear that the letters rogatory are concerned with material that is required not merely for pre-trial procedure (as it is called in the United States of America) but for evidence and documents for actual use at the trial. He tells us that he has ordered that the trial of the proceedings in Virginia shall commence on August 22, 1977. He desires that all proceedings here be completed at the earliest possible date, so that the plaintiff shall have an adequate opportunity to consider such testimony and documents in connection with the presentation of their case.

Such is the request made by the United States Federal Court. It is our duty and our pleasure to do all we can to assist that court, just as we would expect the United States court to help us in like circumstances. "Do unto others as you would be done by."

In answering this request, we have to go by our English statutes. Until 1975 the law on this subject was governed by the Foreign Tribunals Evidence Act 1856. There have been many decisions on that Act. Notably, in our present context, is the *Radio Corporation of America v. Rauland Corporation* [1956] 1 Q.B. 618. The Divisional Court there made it quite plain that we should not accede to anything in the nature of a roving inquiry in which a party sought to "fish out" something. (It was thought that pre-trial discovery was of this nature.) But that case should not be read as putting any difficulty in the way of relevant evidence and ancillary documents. That was made clear by the latest case before the new Act. It was *American Express Warehousing Ltd. v. Doe* [1967] 1 Lloyd's Rep. 222.

The Act of 1856 has now been replaced by the Evidence (Proceedings in Other Jurisdictions) Act 1975. It was passed so as to give effect to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters 1968 (Cmd. 3991 of 1969). It makes new provision for enabling the High Court to assist foreign courts in obtaining evidence here. Section 2 is expressed in much wider language than

3 W.L.R.    In re Westinghouse Litigation (C.A.)    **Lord Denning M.R.**

the Act of 1856. The High Court is empowered to make provision for the examination of witnesses, for the production of documents, for the inspection of property and many other things which were not within the Act of 1856 at all. So long as the evidence is required for use in civil proceedings, the request of the foreign court should usually be granted; provided that the evidence is relevant to the issues in dispute in the foreign court. (The only limitations are those contained in section 2 (4) and section 3. They require separate consideration.)

Mr. Kidwell made, however, a general submission. He asked us to throw out these letters rogatory altogether. He submitted that this case is just like the *Radio Corporation* case [1956] 1 Q.B. 618. The United States court, he said, want the documents for "pre-trial discovery,"—in the sense in which that phrase was there used (see p. 620)—that is to discover documents which are not necessarily relevant in the trial, but they "might lead to a line of inquiry which would itself disclose relevant material": *per* Devlin J. at p. 643.

The first answer to this is given by Federal Judge Merhige himself. In his latest supplement to the letters rogatory he made it clear that that court requires the documents, not for pre-trial discovery, but for use at the actual trial itself which has been listed for August 22, 1977. The second answer is to be found in the Convention. It deals with pre-trial discovery in article 23 which said:

"A contracting state may at the time of signature, ratification or accession, declare that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."

The United Kingdom, when it ratified this, did not make any such declaration. So I cannot accept Mr. Kidwell's general submission.

Turning now to the statutory limitations. Section 2 (4) (*a*) says:

"An order under this section shall not require a person—(*a*) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power."

That seems to me to exclude what we would call a "fishing inquiry." A witness cannot be required to make a general affidavit of documents. To that extent it excludes pre-trial discovery.  Section 2 (4) (*b*) says that the order shall not require a person:

"to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

So the only documents which can properly be the subject of an order are

"particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

This also, in a way, excludes pre-trial discovery too.

We have had some discussion as to whether the documents in those letters rogatory are sufficiently specified. They are in Schedule B with sub-headings from 1 to 81. It contains many documents which are specified as being or likely to be in the possession of Rio Tinto. Most

A   of them are particular documents which are specified sufficiently. For instance, all underlined in green and those underlined in pencil seem to me to be sufficiently specified. But some of the words in the sub-headings seem to me to be rather too wide. They have these words, "and also all memoranda, letters and other documents in its files relating to" the foregoing. Those words were used in the *American Express* case [1967] 1 Lloyd's Rep. 222. They may have to be narrowed a bit. I

B   think the words "relating thereto" cast the net too widely. It would be better to limit them more specifically, such as "referred to therein" or some such words. The point is that the documents should be specified with such distinctiveness as would be sufficient for a subpoena duces tecum. The description should be sufficiently specific to enable the person to put his hand on the documents or the file without himself having to make a

C   random search—in short, to know specifically what to look for.

Going through the documents, no. 16 seems to me to be cast too widely. The person ought not to be required to chase through masses of documents to see whether this or that may or may not relate to the dispute. There may be other items too. On the whole the list seems to be valid, but it may need some modification so as to be sure

D   the documents are sufficiently specified so as to satisfy the section of the statute.

There is no similar provision in regard to oral testimony. The limitation in section 2 (4) only applies to documents. So far as evidence is to be given, by word of mouth, the witnesses can, I think, be required to answer any questions which fairly relate to the matters in dispute in the foreign action. Mr. Kidwell asked us to disallow questions of a

E   roving nature, but I do not think the order can or should be so limited. The only practical test of any question is: "Is it relevant? Does it relate to the matters in question?" No one would wish the witnesses to be asked about irrelevant matters or to go into other things with which the dispute is not concerned. But it is said there is a difficulty. The witnesses are not conversant with the issues in the case. They do not know what is relevant, and what is not. Any difficulty on that score

F   is readily overcome. By agreement (and I think even without agreement) these witnesses, when they are asked to give evidence, can and should have legal advisers at their elbow. There are very reputable and responsible advisers on each side. If a question is irrelevant the witness will be told and advised not to answer. So the point can and should be resolved by the responsible lawyers on each side without difficulty.

G   Now I come to the really troublesome question, that is, the question of privilege. We have a rule here against self-incrimination. The common law has for centuries held that a person is not bound to answer a question which may render him liable to punishment, penalty or forfeiture. In the United States under the Fifth Amendment an individual (not a company) is entitled to a privilege by which he is not bound to answer questions by

H   which he may incriminate himself.

Take first our English position. We discussed it in the recent case of *Comet Products U.K. Ltd.* v. *Hawkex Plastics Ltd.* [1971] 2 Q.B. 67. I quoted at p. 73 Bowen L.J. as saying in *Redfern* v. *Redfern* [1891] P. 139, 147:

"It is one of the inveterate principles of English law that a party cannot be compelled to discover that which, if answered, would

The Weekly Law Reports, October 7, 1977   439

3 W.L.R.   In re Westinghouse Litigation (C.A.)   Lord Denning M.R.

A   tend to subject him to any punishment, penalty, forfeiture, . . . 'no one is bound to criminate himself'."

That privilege prevailed in England until an inquiry by the Law Reform Committee, 16th Report in 1967 (Cmnd. 3472). They recommended that the privilege in regard to forfeiture should be abolished. It had been upheld in *Earl of Mexborough* v. *Whitwood Urban District Council*

B   [1897] 2 Q.B. 111. It was expressly abolished by the Civil Evidence Act 1968, section 16 (1) (*a*).

But the privilege in respect of penalties was not abolished. It was retained by section 14. It says:

"(1) The right of a person in any legal proceedings (other than criminal proceedings) to refuse to answer any question or produce

C   any document or thing if to do so would tend to expose that person to proceedings for an offence or for the recovery of a penalty—(*a*) shall apply only as regards criminal offences under the law of any part of the United Kingdom and penalties provided for by such law; . . ."

D   Mr. Bingham submitted that the word "penalties" should be confined to penalties in revenue cases. He referred us to the report of the Law Reform Committee which said in paragraph 13: "Actions for penalties are now obsolete except in revenue cases." He referred us also to a case about penalties in the Water Works Clauses Acts of *Colne Valley Water Co.* v. *Watford and St. Albans Gas Co.* [1948] 1 K.B. 500: he said that they, too, had become obsolete. He pointed out, quite rightly,

E   that in the old days common informers used to sue for penalties under various Acts but these had all been replaced by summary proceedings before the magistrates. I appreciate the force of these submissions, but I am afraid I do not feel able to give effect to them. The statute retains the privilege in respect of penalties provided for by "the" law of any part of the United Kingdom and I do not see that we can escape from it. There is, after all, good reason for retaining it—the same reason as

F   lay behind its introduction centuries ago. No person should be compelled to expose himself to pains or penalties out of his mouth. If he is to be penalised for wrong-doing, it should be proved against him by those who accuse him.

Mr. Bingham did raise another argument of a semantic nature. He stressed the words proceedings "for the recovery of a penalty." He

G   said that the privilege was allowed when a person was in danger of an action to recover a penalty; but not to a case in which a person might be liable to have a penalty imposed on him without an action. That is too fine a distinction for me. If he is liable to a penalty, it matters not whether it is recoverable by action or otherwise.

So in my view the word "penalty" includes a penalty to which a person may be subject under the law of any part of the United Kingdom.

H   Now I come to the community law. None of the witnesses in this case would be liable to a penalty under the old law of England. But since 1972 everything is different. We are now in the European Economic Community. The Treaty of Rome ("E.E.C." Treaty signed at Rome, March 25, 1957) and all its provisions are now part of the law of England. That is clear from section 2 of the European Communities Act 1972. We have to give force to the Treaty as being incorporated—lock, stock and barrel—into our own law here.

**Lord Denning M.R.**    **In re Westinghouse Litigation (C.A.)**    [1977]

One of the most important of the provisions of the Treaty is article 85. It is wide enough to prohibit any cartel or association of producers by which they agree to keep up prices or to limit competition in a way which affects the common market. It says:

"... all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between member states and which have as their object or effect the prevention, restriction or distortion of competition within the common market, and in particular those which: (*a*) directly or indirectly fix purchase or selling prices or any other trading conditions; (*b*) limit or control production, markets, technical developments, or investment,"

and so on, are prohibited. It goes on to say that all those that are so prohibited are automatically void.

If the allegations made by Westinghouse are well-founded, it does look as if the Rio Tinto company and the French companies were parties to an agreement which had, as its object, the restriction of competition and the fixing of selling price; and that this would affect the trade between member states—as interpreted by the European Court. So there would be a breach of article 85 by Rio Tinto.

But what are the consequences? For these we have to turn to the regulations which are binding as part of English law. Article 189 says: "A regulation shall have general application. It shall be binding in its entirety and directly applicable in all member states." The material regulations are the General Regulations No. 17 of February 6, 1962. Article 15, paragraph 2 says that the Commission may impose fines on undertakings (not on individuals) who intentionally or negligently break article 85. The fines may be as much as 1,000 million units of account, or not exceeding 10 per cent. of the turnover in the preceding business year. In fixing the amount of the fine, regard shall be had both to the gravity and the duration of the infringement.

It is plain, therefore, that Rio Tinto may be exposed to a very large fine by the European Commission. Is it a penalty? I think it is. It is a penalty for entering into an agreement to restrict competition or to fix prices contrary to article 85. It is to be noted that article 15, paragraph 4 of the General Regulations says: "The decisions taken under paragraphs 1 and 2 shall not entail any consequences under criminal law." That is inserted because the Treaty in article 192 provides that enforcement of fines and so forth "shall be governed by the rules of civil procedure in force in the state in the territory of which it is carried out." So the fines are not enforceable by the sanctions of criminal law. Only by the civil procedures of the state. In this case, by the civil procedure of the English courts. Nevertheless they are clearly "penalties" just as much as the penalties under revenue law are penalties enforceable by civil procedures: see sections 93 to 100 of the Taxes Management Act 1970. And they are "provided for by" the "law of ... the United Kingdom," because the Treaty is part of our law. So liability to them is a ground for privilege against self-incrimination.

All I have said about "penalties" is, however, a preliminary view—given because the parties requested it. It is preliminary in case the company claims a privilege, on the ground that it may expose itself to penalties by the European Commission. If the company does claim privilege, the examiner must give effect to it. It is preserved by section

3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, which provides:

"(1) A person shall not be compelled by virtue of an order under section 2 above to give any evidence which he could not be compelled to give (*a*) in civil proceedings in the part of the United Kingdom in which the court that made the order exercises jurisdiction, ..."

Applied to this case, if Rio Tinto Zinc claim privilege saying: "We would be exposed to penalties at the instance of the European Commission" then they have a privilege against self-incrimination and can take the objection before the examiner.

If, however, circumstances arose so as to show that there is no "real or appreciable" danger to the Rio Tinto company of being fined or exposed to a penalty, the privilege would be lost: see *Reg.* v. *Boyes* (1861) 1 B. & S. 311, 330. So if the European Commission said they were not going to take any proceedings, there would not be any risk and the privilege would go.

Turning now to the American position. Section 3 (1) (*b*) of the Act of 1975 says that a person shall not be compelled to give evidence which he could not be compelled to give "in civil proceedings in the country or territory in which the requesting court exercises jurisdiction." So under these letters rogatory when an individual witness was asked to give evidence, he could claim the privilege given by the Fifth Amendment. He could say: "I am giving evidence for the purpose of being used in an American court. So I have a privilege against incriminating myself and making myself liable to proceedings in the United States if I go there." He has a privilege, therefore, which he can call in aid in an examination here under the Fifth Amendment in the United States. It only applies to individuals and not to companies—an interesting contrast to article 85 which only applies to undertakings and not to individuals.

So far as procedure is concerned, if privilege is claimed because of the risk of a fine by the European Commission, the procedure is governed by R.S.C., Ord. 39, r. 5. If the witness refuses to answer the question, an application can be made to the court to see whether he can be required to answer; and then the court will rule upon his claim. If privilege is claimed under the Fifth Amendment, the examiner will have to act under the new R.S.C., Ord. 70, r. 6. The examiner will have to take down the evidence, seal it up and send it across to the United States: and then the United States court will rule whether the claim is good or not.

The result will be that the order will be varied so as to make the variations I have indicated about the specification of the documents. So far as claims of privilege against self-crimination are concerned, they must await the examination of the witnesses to see if privilege is claimed or not: and then be dealt with on the lines I have stated.

ROSKILL L.J. Subject to hearing counsel as to its form, I agree with the order which Lord Denning M.R. has proposed but I venture to add to his judgment for two reasons. First, this appeal is of immense importance to the parties before this court, Westinghouse on the one hand and RTZ and the potential witnesses on the other; secondly, this

is the first time that this court has had to consider the Evidence (Proceedings in Other Jurisdictions) Act 1975, a fact which makes this appeal of importance beyond its importance to the parties immediately concerned.

So far as the statute goes, Mr. Kidwell put in the forefront of his argument that MacKenna J. was wrong in having affirmed the order of Master Jacob because the letters rogatory were in truth designed to obtain discovery in this country against both the corporate witnesses and the individual witnesses. He put his submission thus: if, looking at the matter broadly, this was an exercise in discovery, then the whole request should be rejected. He founded much of his argument upon the line of cases which followed the Foreign Tribunals Evidence Act 1856 which had governed matters of this kind until the Act of 1975 was passed. He invited us to approach our decision upon the construction of the Act of 1975 by reference to those earlier decisions. With all respect to the persuasive skill of that argument, I think it is a wholly erroneous approach to invite the court to consider the true construction of a statute passed in 1975 by reference to a line of judicial decisions, albeit of high authority, under a statute in different terms passed in different circumstances about 125 years ago.

The Act of 1975, as Lord Denning M.R. has already said, enacted the Hague Convention of 1968 as part of the law of this country. Whether or not it is legitimate to construe the Act of 1975 by reference to that Convention (it is only right to say that the Convention itself is not referred to in the statute) none the less, treating that Convention as what Lord Wilberforce recently called [*Reardon Smith Line Ltd.* v. *Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989, 997] part of the "factual matrix," it seems to me plain what the purpose of that Convention was, as indeed it states upon its face. It will be found in Command Paper 3991 and recites that the states signatory to the Convention desire "to facilitate the transmission and execution of letters of request and to further the accommodation of the different methods which they use for this purpose," and also that they desire "to improve mutual judicial co-operation in civil or commercial matters." We move in 1975 in a very different world from that of 1856.

When one sees that this Convention was signed on behalf of some 25 signatories, some of them common law countries and some of them countries with systems of law vastly different from those either of this country or of the United States of America or of any of its states, one realises how broad was its general intention. It is relevant, as Lord Denning M.R. pointed out both in his judgment and during argument, that article 23 of that Convention provides:

"A contracting state may at the time of signature, ratification or accession, declare that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."

There is authority in this country under the Act of 1856, the *Radio Corporation* case [1956] 1 Q.B. 618, that this court will not facilitate what I can, with sufficient accuracy, call the United States pre-trial discovery procedure by allowing letters rogatory to be issued solely for the purpose of obtaining in this country pre-trial discovery in the strict

sense of that phrase. It has been said that the evidence sought must be evidence directed to use at the trial itself.

Looking at the Act of 1975, I draw attention to the preamble. This, as Shaw L.J. pointed out during the argument, is no consolidating Act. It does not re-enact in any shape or form the Act of 1856 or any of the other Victorian statutes which touch upon this question. On the contrary, it is described as

"An Act to make new provision for enabling the High Court . . . to assist in obtaining evidence required for the purposes of proceedings in other jurisdictions . . ."

I need not read the rest of the preamble. It is obviously designed to give effect to the Convention.

This morning, during his reply, Mr. Kidwell said that we should not be astute to assist Westinghouse to obtain the relief which they seek in these proceedings. With respect, that submission is misconceived. We are not concerned with assisting or not assisting Westinghouse. We are concerned with and only concerned with assisting the Federal Court for the District of Richmond in Virginia. It is that court which has enlisted our assistance by letters rogatory and it is that court which, to use Lord Denning M.R.'s phrase, it is both our duty and our pleasure and our power under the Act of 1975 to assist, so far as we properly can. The limitations upon the power and the duty of this court to assist under that statute seem to me to be matters to be found not in decisions under the Act of 1856 at all, but within the language of the statute itself, bearing in mind that it is a statute designed to give effect to a convention to which many different countries with many different systems of law are parties.

Lord Denning M.R. referred in his judgment to a number of the sections of the Act of 1975, and I will not lengthen mine by repeating what he has said. It seems to me that Mr. Kidwell's argument that we should apply the construction placed upon the Act of 1856, and hold that documents to be produced under the present Act have to be ancillary to the oral evidence of witnesses, is wrong. Whatever the true construction of the Act of 1856, as to which there is abundant authority, we are now dealing with a completely different statute: when one looks at section 2 (1) and (2) of the Act of 1975, one finds that section 2 (2), which is described as being "without prejudice to the generality of subsection (1)" empowers the court to make provision for a number of matters (*a*) to (*f*) inclusive, of which (*a*) is "for the examination of witnesses, either orally or in writing" and (*b*) is "for the production of documents." Simply as a matter of construction, it would be quite wrong, with all respect to Mr. Kidwell, to hold that the production of documents should be limited to documents ancillary to the evidence or oral testimony of witnesses whose evidence is to be adduced under the Act. That point, therefore, fails.

I think his other point, what he calls his "root and branch" point, also fails, indeed fails in limine, and for this reason. It was suggested, as I said a moment ago, that this was an attempt to obtain pre-trial discovery. One should ascertain what is the nature of the letters rogatory by looking at the letters rogatory themselves. They are exhibited to an affidavit of Mr. Watson of Freshfields. It seems to me to be

Roskill L.J.              In re Westinghouse Litigation (C.A.)              [1977]

plain—and Lord Denning M.R. has already mentioned this—that those letters rogatory are designed to obtain evidence for use at the trial. If there ever were any doubt about it—and I do not think there was—the matter is put beyond all doubt by an order of May 20 made by Judge Merhige for the benefit of this court. So that it seems to me that the first two grounds which Mr. Kidwell put forward, the "root and branch" argument and the "ancillary" argument, both fail. To that extent, I find myself in complete agreement with the orders made in the courts below.

But the matter does not stop there, because in this court another matter has been fully argued which was not argued before MacKenna J. or Master Jacob. It is said that even if the orders issue in the form ordered below, none the less the corporate witnesses, by which I mean RTZ and RTZ Services, are entitled, as of right, to decline to produce the documents sought on the ground that they are privileged from production under the well known long standing rule in this country by virtue of which witnesses are entitled to protection from self-incrimination.

I do not propose in this judgment to discuss either the historical origin of this rule, or its possible historical links with the Fifth Amendment to which much reference has been made, nor whether it is right that at the present time there should be a continued right to silence in this country or not. We are not concerned with anything other than the privilege against self-incrimination to the extent that that privilege has been preserved by section 14 of the Civil Evidence Act 1968.

The matter arises in this way. We are concerned here with the privilege accorded by the combined effect of section 3 of the Act of 1975, and section 14 of the Act of 1968. It was argued that the reference to penalties in the Act of 1968 should be given a strictly limited meaning and should be construed as limited to penalties such as those imposed by the Income Tax Act 1952 and the Taxes Management Act 1970.

It is true that when the law was altered in 1968 following the report of the Law Revision Committee in 1967 it appears that those penalties— those under the Act of 1952—and those alone were intended to be the subject of preservation, the other protection against self-incrimination having been recommended for abolition. But whatever the original intention may have been, and whatever penalties may have been in mind at that time, we have to consider the position under the Act of 1968 and the Act of 1975 having regard to the entry of this country into the European Economic Community in 1972. As Lord Denning M.R. has pointed out, under the European Communities Act 1972 it is clear that the regulations of the E.E.C. and indeed the Treaty of Rome itself, and in particular article 85, are now a part of the law of this country. We were referred to articles 14 and 15 of Regulation No. 17/62. It is plain that fines or penalties can be inflicted under article 15 for (among other matters) breaches of article 85 of the Treaty. It is also plain from article 15, paragraph 4, that decisions to impose fines taken under paragraphs 1 and 2 of the article shall not be of a criminal law nature.

Those fines or penalties can be enforced by proceedings in this country. After the Act of 1972 was passed, the European Communities (Enforcement of Community Judgments) Order 1972 (S.I. 1972 No. 1590)

3 W.L.R.              In re Westinghouse Litigation (C.A.)              Roskill L.J.

was enacted by Her Majesty in Council and rules of court were thereafter made giving effect to those various pieces of legislation. It is sufficient to refer to the note 71/15–24/2 in *The Supreme Court Practice* (1976), R.S.C., Ord. 71, r. 15, which reads:

"... The most likely Community judgments enforceable under the provisions of the Community Treaties which would require to be registered and enforced in the United Kingdom are decisions of the Commission of the European Communities imposing fines or penalties, either of lump sums expressed in units of account or percentages of the offending firm's turnover, ... under E.E.C. Regulation 17/62, relating to restrictive practices and monopolies."

Notwithstanding Mr. Bingham's ingenious argument this morning, I cannot see any legitimate reason for limiting the construction of the word "penalties" in the Act of 1968 to revenue penalties formerly imposed under the Act of 1952 and presently under the Act of 1970. Like Lord Denning M.R., I have reached this conclusion with a certain regret, because one has an instinctive feeling that there is an element of artificiality about this result, but that being the statutory position in this country, that being the express right of the persons concerned under the Act of 1975 which preserves the relevant privilege, including that preserved by the Act of 1968, I see no answer to the contention that this protection exists in principle. But it is important to remember, as Lord Denning M.R. pointed out, that there may be qualifications upon the right to the protection. Whether there are relevant qualifications in particular instances is something which must be dealt with at the hearing and cannot be determined in advance.

Accordingly, for those reasons, I agree with what Lord Denning M.R. has said about privilege. So far as the Fifth Amendment is concerned, I propose to say very little. Mr. Kidwell has said that we should make it a condition of the issue of the order that a master should act in place of the United States consul or vice-consul for the purpose of taking any evidence that may be given under the letters rogatory and that such a master should be appointed by the judge in Virginia. The purpose was that a ruling on this privilege on behalf of the judge might be given instantly so that no problem of delay would arise in connection with any witness who invoked the Fifth Amendment. All I would say is that I think it would be quite wrong for this court to presume to dictate before whom these proceedings should take place. That, it seems to me, must be a matter for the court in Virginia and not for this court. If the proceedings are to be held in the near future in London, it must be a matter for the judge in Virginia to say by his order who is to sit where; possibly either he himself or a master appointed on his behalf or a consul or vice-consul as the present order provides.

The only remaining point with which I have to deal is the width of the order. Lord Denning M.R. has referred to some matters arising on Schedule B. Like him, I think that some of the descriptions in Schedule B are too wide. If I may take one or two items as an example, I refer first to item 11. That seems to me to be a legitimate use of the phrase "memoranda, correspondence or other documents relating thereto" because those documents are sufficiently specific. On

**Roskill L.J.**    In re Westinghouse Litigation (C.A.)    [1977]

the other hand, like Lord Denning M.R., I think number 16 is much too wide. Again, merely to take an example, I think number 7 is wide; although it only primarily refers to a single document I think the request must identify, for the protection of the person receiving it, with sufficient accuracy, the documents required either individually or generically so that that person concerned may know what it is he has to provide and does not have to search around among his files to make up his own mind whether or not he will be failing in his duty to the court if he does not produce a particular document. His task should be made easy and not difficult; I am sure that with goodwill, having regard to those who have charge of the matter on both sides, the order when issued will be sensibly operated.

For those reasons, as well as those given by Lord Denning M.R., I would in substance dismiss the appeal but with the qualifications on the existing order that Lord Denning M.R. has mentioned.

**Shaw L.J.** I agree with both judgments and there is nothing I wish to add.

*Appeals dismissed with modifications varying order made by MacKenna J.*
*Declaration that fines, if any, which might be imposed under E.E.C Treaty are penalties within section 14 of the Civil Evidence Act 1968.*
*Each party to pay own costs in Court of Appeal. Order for costs below to stand.*
*Leave to both sides to appeal: examination not to be held up.*

Solicitors: *Linklaters & Paines; Freshfields.*

A. H. B.

July 27, 1977. The Appeal Committee of the House of Lords (Lord Wilberforce, Lord Edmund-Davies and Lord Fraser of Tullybelton) allowed petitions by the persons named in the orders for leave to appeal.

---

3 W.L.R.

[PRIVY COUNCIL]

DIRECTOR OF PUBLIC PROSECUTIONS . . . . APPELLANT

AND

DONALD WHITE . . . . . . . . RESPONDENT

[ON APPEAL FROM THE COURT OF APPEAL OF JAMAICA]

1977 March 14, 15;    Lord Diplock, Lord Simon of Glaisdale,
April 28    Lord Salmon, Lord Edmund-Davies and
    Lord Russell of Killowen

*Jamaica—Court of Appeal—Powers—Appeal against conviction—Error of law on face of record—Court holding trial nullity—Conviction quashed—Jurisdiction to order new trial or direct entry of verdict of acquittal—Judicature (Appellate Jurisdiction) Act, s. 14 (1) (2)*

Section 14 of the Judicature (Appellate Jurisdiction) Act provides:

"(1) The court on any such appeal against conviction shall allow the appeal if they think that the verdict of the jury should be set aside on the ground that it is unreasonable or cannot be supported having regard to the evidence or that the judgment of the court before which the appellant was convicted should be set aside on the ground of a wrong decision of any question of law, or that on any ground there was a miscarriage of justice, and in any other case shall dismiss the appeal: . . . (2) Subject to the provisions of this Act the court shall, if they allow an appeal against conviction, quash the conviction, and direct a judgment and verdict of acquittal to be entered, or, if the interests of justice so require, order a new trial at such time and place as the court may think fit."

The defendant was charged on indictment with shooting with intent to do grievous bodily harm and illegal possession of a firearm. The jury gave a majority verdict before the time required by the Jury Act and that irregularity appeared on the face of the record. The Court of Appeal quashed the convictions but, since the trial was a nullity, the court held that it had no power to order a new trial under section 14 of the Judicature (Appellate Jurisdiction) Act. The court, indicating that in the circumstances the proper order would be venire de novo, neither directed a verdict of acquittal nor ordered a new trial under section 14 (2).

On appeal by the Crown to the Judicial Committee:—

*Held*, allowing the appeal, that section 14 (1) and (2) of the Judicature (Appellate Jurisdiction) Act were exhaustive and that, except where an appeal was before the court by virtue of section 33 of that Act, every ground of appeal had to fall within the categories defined by section 14 (1); that where the Court of Appeal allowed an appeal and quashed a conviction on such a ground, section 14 (2) required that the court had either to direct the entry of a verdict of acquittal or order a new trial; and that, since an error on the face of the record was an error of law within section 14 (1) (or it could be considered a miscarriage of justice within the subsection), the case should be remitted to the Court of Appeal for it to consider which of the two orders it should make under section 14 (2) (post, p. 452A–C, D–E).