LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
     michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
  Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
     matt.rawlinson@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Phone: (212) 906-1200
Fax: (212) 751-4864
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DEFENDANTS' [CORRECTED] NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>**Date:   September 26, 2007**<br>**Time:  2:30 p.m.**<br>**Judge: Martin J. Jenkins** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................1

II.   FACTS ...............................................................................................................4

    A.    Oracle's Business ...................................................................................4

    B.    Oracle's Public Financial Projections In 3Q01 .....................................5

        1.    The December 14, 2000 Conference Call ...................................5

        2.    Oracle's Forecasting Process......................................................6

        3.    Oracle's Internal Forecast Data Fully Supported the
            Projections Announced on December 14, 2000 ..........................8

        4.    After the December 14 Call, Oracle's Internal Forecast
            Data Continued To Support Its 3Q01 Projections .....................9

    C.    Oracle's Sales Force and Management Are Surprised by the Miss ....11

    D.    Oracle Pre-Announces on March 1, 2001 ...........................................14

    E.    Suite 11i ...............................................................................................15

        1.    The Enterprise Applications Market.........................................15

        2.    The Development of Suite 11i ...................................................16

        3.    Oracle's Marketing Message for Suite 11i ...............................17

        4.    Suite 11i's Release and Early Success in the Market...............18

        5.    Market Expectations for Suite 11i ............................................18

        6.    Early Implementation Experiences............................................20

        7.    Oracle's Own Upgrade to Suite 11i..........................................21

III.  ARGUMENT....................................................................................................22

    A.    Oracle's 3Q01 Financial Projections...................................................22

        1.    Plaintiffs Cannot Prove Oracle's 3Q01 Projections Were
            False .........................................................................................23

        2.    Oracle's 3Q01 Projections Are Protected by the Safe
            Harbor ......................................................................................26

            a.    Plaintiffs Cannot Show "Actual Knowledge" Of
                Falsity ...........................................................................26

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

**b.** Oracle's 3Q01 Projections Were Accompanied By Meaningful Cautionary Language ............................................26

**B.** Statements About the Economy ........................................................28

    1. Plaintiffs Cannot Show the Statements Were False or Misleading ........................................................................28

    2. There Is No Evidence That Any Defendant Acted "Recklessly" .....................................................................32

        **a.** Plaintiffs Have Failed to Provide Evidence to Support the Central Allegations That the Ninth Circuit Relied Upon .............................................32

        **b.** Defendants' Stock Sales Do Not Show Scienter .........................33

**C.** Statements About Suite 11i ..............................................................35

    1. Suite 11i Was Not a Failed Product ............................................35

    2. Plaintiffs Cannot Prove Any of Defendants' Statements About Suite 11i Were False Or Misleading .............................37

    3. Plaintiffs Cannot Prove Loss Causation ......................................39

**D.** Alleged Improper Accounting In 2Q01 ..............................................43

    1. Plaintiffs' Debit Memo Claim Is Baseless ..................................43

    2. Plaintiffs' Unpled Accounting Claims Also Fail ..........................45

        **a.** Plaintiffs Cannot Show Loss Causation ......................45

        **b.** Plaintiffs Cannot Demonstrate Materiality ..................46

        **c.** Plaintiffs Cannot Prove Scienter ................................47

        **d.** Plaintiffs' Unpled Accounting "Fraud" Claims Are Wrong ..................................................................48

**IV.** CONCLUSION ...............................................................................49

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF AUTHORITIES

Page

## CASES

*Acito v. IMCERA Group., Inc.,*
47 F.3d 47 (2nd Cir. 1995) .................................................................................. 33

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................ 22

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ......................................................................... 22, 39, 40, 45

*Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. The Clorox Co.,*
353 F.3d 1125 (9th Cir. 2004) ....................................................................... 25, 28

*Howard v. Everex Sys., Inc.,*
228 F.3d 1057 (9th Cir. 2000) .............................................................................. 32

*In re Adobe Systems, Inc. Sec. Litig.,*
787 F. Supp. 912 (N.D. Cal. 1992) ................................................................. 22, 23

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir. 1999) .................................................................................. 33

*In re Anchor Gaming Litigation,*
33 F. Supp. 2d 889 (D. Nev. 1999) ....................................................................... 46

*In re Apple Computer Sec. Litig.,*
886 F.2d 1109 (9th Cir. 1989) ................................................................... 34, 36, 40

*In re Broadcom Co. Sec. Litig.,*
No. SA CV 01-275-GLT MLGX, 2004 WL 3390052 (C.D. Cal. Nov. 23,
2004) ............................................................................................................... 26, 28

*In re Broadcom Corp. Sec. Litig.,*
No. SA CV 01-275-GLT, 2004 U.S. Dist. LEXIS 28088 (C.D. Cal. Nov. 24,
2004) ...................................................................................................................... 46

*In re Convergent Tech. Sec. Litig.,*
948 F.2d 507 (9th Cir. 1991) ..................................................................... 28, 29, 37

*In re Convergent Techs. Second Half 1984 Sec. Litig.,*
No. C-85-20130-SW, 1990 WL 606271 (N.D. Cal. Jan. 10, 1990) ...................... 46

*In re Gilead Sciences Securities Litigation,*
Slip Copy, 2006 WL 1320466 (N.D. Cal. 2006) ............................................. 40, 45

*In re Impax Labs., Inc., Sec. Litig.,*
No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 723 (N.D. Cal. Jan. 3, 2007).... 41, 45

*In re Intershop Communs. AG Sec. Litig.,*
No. C 01-20333 JW, 2003 U.S. Dist. LEXIS 26923 (N.D. Cal. Jul. 23, 2003) .... 46

*In re Network Assocs., Inc. II Sec. Litig.,*
No. C 00-4849 MJJ, 2003 U.S. Dist. LEXIS 14442 (N.D. Cal. Mar. 25,
2003) ...................................................................................................................... 46

*In re Oracle Corp. Derivative Litigation,*
867 A.2d 904 (Del. Ch. 2004),
*aff'd* No. 561, 2004 (Del. Apr. 14, 2005) .................................................... passim

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*In re Oracle Corp. Sec. Litig.*,
  No. C-01-0988-MJJ, 2003 U.S. Dist. LEXIS 9980, at *4-8 (N.D. Cal. Mar.
  24, 2003) ........................................................................................................... 22

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ............................................................................ 23

*In re Stratosphere Corp. Sec. Litig.*,
  66 F. Supp. 2d 1182 (D. Nev. 1999) ........................................................... 45, 47

*In re Sybase Inc. Secs. Litig.*,
  48 F. Supp. 2d 958 (N.D. Cal. 1999) ................................................................ 41

*In re The Clorox Co. Sec. Litig.*,
  238 F. Supp. 2d 1139 (N.D. Cal. 2002) ............................................................ 27

*In re Tibco Software, Inc. Sec. Litig.*,
  No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) .................. 27

*In re VeriFone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993) .............................................................................. 22

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) ................................................................. 23

*Kowal v. MCI Communications Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ......................................................................... 23

*Mathews v. Centex Telemanagement, Inc.*,
  No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. Jun. 9, 1994) ..... 46

*Morgan v. AXT, Inc.*,
  No. C 04-4362 MJJ, 2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) .................. 26

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
  Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................ 26

*Nursing Home Pension Fund v. Oracle Corp.*,
  242 F. Supp. 2d 671 (N.D. Cal. 2002) ........................................................... 2, 27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ......................................................... 3, 30, 32, 33

*Paracor Fin. Corp. v. General Electric Cap. Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ............................................................................ 22

*Pickern v. Pier 1 Imports, Inc*,
  457 F.3d 963 (9th Cir. 2006) ............................................................................ 44

*Recreational Developments of Phoenix, Inc. v. City of Phoenix*,
  220 F.Supp.2d 1054 (D. Ariz. 2002) ................................................................ 39

*SEC v. Todd*,
  No. 03CV2230 BEN, 2007 U.S. Dist. LEXIS 38985 (S.D. Cal. May 30,
  2007) ................................................................................................................ 46

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ............................................................................ 23

*Shuster v. Symmetricon, Inc.*,
  No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ................. 36

*Siegel v. Lyons*,
  No. C-95-3588 DLJ, 1996 WL 438793 (C.D. Cal. Apr. 26, 1996) ..................... 29

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*Sparling v. Daou (In re Daou Sys.),*
    411 F.3d 1006 (9th Cir. 2005) .................................................. 40

*Tuchman v. DSC Communications Corp.,*
    818 F. Supp. 971 (N.D. Tex. 1993) ............................................ 40

## STATUTES

15 U.S.C. § 78u-5(c)(1)(A) ........................................................ 26
15 U.S.C. § 78u-5(c)(1)(B) ..................................................... 23, 26
15 U.S.C. § 78u-5(i)(1)(A) ........................................................ 26

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ............................................................... 1
Fed. R. Civ. P. 56(d) ............................................................... 1

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

## MOTION FOR SUMMARY JUDGMENT

Defendants hereby move this Court for summary judgment under Federal Rule of Civil Procedure 56(c) or, in the alternative, for summary adjudication under Federal Rule of Civil Procedure 56(d), that certain facts are not in dispute.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On March 1, 2001, Oracle announced it had missed its guidance for the third quarter of its 2001 fiscal year ("3Q01"), which ended on February 28, 2001.  Oracle's stock price dropped, and the inevitable lawsuits (including this one) ensued.  Since the case was remanded by the Ninth Circuit, Plaintiffs have obtained massive amounts of discovery, and their theories have shifted considerably.  But regardless of what theory Plaintiffs pursue, the undisputed facts entitle Defendants to judgment as a matter of law on all of Plaintiffs' claims.

Plaintiffs' ever-changing theories now rest on four categories of alleged false or misleading statements.  First, Plaintiffs claim Oracle's financial projections for 3Q01 were false or misleading.  Second, Plaintiffs claim Defendants falsely assured the market that the U.S. economy would not negatively impact Oracle's business.  Third, Plaintiffs claim Defendants made a number of false statements about Oracle's newest release of applications software, Suite 11i.  Fourth, although the case arises out of Oracle's failure to meet guidance for 3Q01, Plaintiffs claim Oracle improperly recognized certain revenue during the *second* quarter of that fiscal year ("2Q01").  For each category, Plaintiffs have failed to develop evidence to support one or more elements of their claim, and thus Defendants are entitled to judgment as a matter of law.

Plaintiffs' claim that Oracle's 3Q01 financial projections were false mirror those asserted in a derivative case filed in Delaware three days after this case was filed.  *In re Oracle Corp. Derivative Litigation*, 867 A.2d 904 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005).  In that case, the Chancery Court granted summary judgment for the defendants, concluding that "no rational trier of fact" could find that Oracle's CEO Larry Ellison or its then-CFO, Jeff Henley, possessed any material, nonpublic financial information indicating that Oracle would miss its guidance. *Oracle Corp. Deriv. Litig.*, 867 A.2d at 906.  Despite the enormous volume of

1    discovery taken in this case (including over two million pages of documents produced by Oracle

2    and over 100 depositions, all in addition to the "massive" record compiled in Delaware), the

3    record on Oracle's 3Q01 guidance has not changed.  There is no evidence from which a rational

4    trier of fact could conclude that Oracle's 3Q01 guidance was false or misleading, let alone that

5    the Defendants acted with the "fraudulent state of mind" necessary to prove securities fraud.

6         Indeed, because Oracle's projections were forward-looking statements under the Safe

7    Harbor provisions of the PSLRA, Plaintiffs must prove Defendants had "actual knowledge" that

8    the projections were false.  Plaintiffs have unearthed absolutely no evidence of "actual

9    knowledge."  There is not a single email or internal memo, and not a shred of deposition

10   testimony suggesting that anyone ever voiced concern to Larry Ellison, Jeff Henley, or Edward J.

11   ("Sandy") Sanderson—before the very end of the quarter—that Oracle would miss its guidance

12   or that the guidance was unreasonable.  Quite the contrary, the undisputed evidence shows that

13   Oracle's internal forecasting data supported Oracle's 3Q01 guidance up to the end of the quarter.

14        With regard to Defendants' statements about the economy, Plaintiffs mischaracterize

15   what Defendants said.  Defendants did not tell investors that Oracle's business "would not" be

16   affected by the economy.  Defendants repeatedly noted—in their public statements and in

17   Oracle's SEC filings—that a sudden economic downturn could negatively affect Oracle's

18   business.  During the first several weeks of the quarter, though, based on the information known

19   to them at the time, Defendants truthfully noted that Oracle was not seeing any negative impact

20   from the economy at that time.  Plaintiffs cannot show these statements were false, and they

21   cannot show that any Defendant acted with the recklessness necessary to establish scienter.

22        Plaintiffs' claims about Suite 11i likewise fail.  Plaintiffs initially challenged several

23   statements during the Class Period that the modules of Suite 11i were "integrated" or "pre-

24   integrated" with one another, thereby eliminating the need for "systems integration" to enable the

25   modules to work together.  *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671,

26   674, 680 (N.D. Cal. 2002).  Plaintiffs now claim that virtually everything Defendants ever said

27   about Suite 11i, including the very fact that it was "available" for sale, was false because Suite

28   11i was so riddled with defects that selling Suite 11i was like selling "a car without wheels."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    Plaintiffs cannot establish falsity or loss causation with respect to the Suite 11i

2  statements.  To prove Defendants' statements were "false," Plaintiffs rely on anecdotal evidence

3  of complaints from a relatively small number of customers implementing Suite 11i during the

4  Class Period.  At most, Plaintiffs have gathered evidence that Suite 11i had bugs (as all software

5  does), and some relatively small number of Oracle's existing customers—those that had already

6  purchased the product—complained about various issues.  This evidence does not support a

7  reasonable inference that Defendants' statements about Suite 11i were false.  As for loss

8  causation, Plaintiffs claim that "problems" with Suite 11i caused potential customers to delay or

9  cancel purchases, which caused Oracle to miss its 3Q01 guidance.  Plaintiffs' claim finds no

10  support in the record—they have not identified a single potential customer that delayed or

11  canceled a deal due to undisclosed problems with Suite 11i, much less shown that such delayed

12  or canceled deals caused Oracle's 3Q01 miss.  Plaintiffs face a daunting task because unlike in a

13  typical "defective product" case, Plaintiffs do not claim that problems with Suite 11i were known

14  only to Oracle insiders.  To the contrary, Plaintiffs' loss causation theory requires them to prove

15  that potential customers learned the "truth" about Suite 11i *before* the end of 3Q01 (and delayed

16  or canceled deals for that reason), but the market remained ignorant of that "truth" until *after* the

17  quarter, when Oracle disclosed its 3Q01 results on March 1, 2001.  To prove loss causation,

18  Plaintiffs must identify a specific fact that Defendants withheld from the market, and prove that

19  the undisclosed fact caused Oracle's 3Q01 earnings miss.  Plaintiffs can prove no such thing

20  here.

21    Plaintiffs have likewise produced no evidence to support a securities fraud claim based

22  on purported improper accounting during 2Q01.  Despite the fact that the Ninth Circuit described

23  it as "important" in overruling this Court's dismissal of the Revised Second Amended Complaint

24  ("RSAC"), Plaintiffs have now abandoned their initial claim that Oracle fraudulently recognized

25  approximately $228 million in revenue on a single day in 2Q01 by creating 46,000-plus "debit

26  memos."  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th

27  Cir. 2004).  Plaintiffs abandoned the only accounting claim asserted in the RSAC because, after

28  two years of discovery, it is now clear that the claim was false.  Indeed, Confidential Witness 49,

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   cited in the RSAC and the Ninth Circuit's opinion for the "facts" allegedly supporting this claim,

2   refused to appear for a deposition because he is facing felony criminal charges for embezzling

3   more than $1 million from Oracle.

4          In place of the only accounting claim asserted in the operative complaint, Plaintiffs

5   purport to assert two new accounting claims:  (a) Plaintiffs claim that Oracle improperly

6   transferred $20 million in customer overpayments to a bad-debt reserve, thereby inflating its

7   2Q01 revenue by $20 million; and (b) Plaintiffs claim that Oracle improperly recognized about

8   $20 million in revenue on a single license transaction with Hewlett-Packard Corporation ("HP")

9   at the end of 2Q01.  Neither claim was asserted in the RSAC, and so neither claim was ever

10  tested under the PSLRA's strict pleading standards.  But in any event, both of Plaintiffs' new

11  accounting claims fail.  First, Plaintiffs admit that Oracle never restated its 2Q01 financial

12  statements, and the 3Q01 results that Oracle announced on March 1, 2001, did not reflect a

13  change to any revenue Plaintiffs claim should not have been recognized.  Thus, there is no

14  evidence that any alleged misstatement of Oracle's 2Q01 results caused the loss triggered by the

15  March 1 announcement.  Second, the amounts at issue—at most $40 million (in contrast to the

16  $228 million fraud alleged in the complaint)—are not material in the context of Oracle's nearly

17  $2.7 billion in revenue for that quarter.  Third, there is no evidence that any of the Defendants

18  knew or were reckless in not knowing that Oracle's 2Q01 results were overstated, nor is there

19  any evidence that they were aware of the bad debt transfers or any concerns regarding the HP

20  transaction.  Finally, Plaintiffs cannot prove the underlying merits of their two unpled accounting

21  fraud claims.

22  **II.     FACTS**[1]

23      **A.     Oracle's Business**

24          Oracle is the world's second largest software company.  Its principal business is the

25  creation, sale and maintenance of "systems" and "applications" software to businesses and other

26  organizations (or "enterprise" customers).  Oracle also earns revenue from support fees paid by

27  ───────────────

28  [1]  All Exhibits cited herein are true and correct copies of the consecutively numbered exhibits
attached to the Declarations of Ivgen Guner (Exs. 1-28), Jenn Bicho (Exs. 29-40), Bruce Deal
(Exs. 42-43), Mary Ann Anthony (Exs. 44-53), and Matthew D. Harrison (Exs. 41, 51, 54-245).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   existing licensees and fees earned by Oracle's consulting division. *E.g.*, Ex. 54 at 143915-18,

2   24. Database software (a type of systems software) was Oracle's first major software business

3   and, historically, has been its largest source of software revenue. During Oracle's 2001 fiscal

4   year (June 1, 2000 through May 31, 2001), Oracle recognized $3.562 billion in database license

5   revenues and $1.022 billion in applications revenues. *Id.* at 143967. Database software remains

6   Oracle's largest source of software license revenues. *Id.* at 143967; Ex. 55 at 36.

7       **B.**    **Oracle's Public Financial Projections In 3Q01**

8           Because Plaintiffs' claims arise out of Oracle's March 1, 2001 announcement that it

9   would miss its previously disclosed guidance for 3Q01, it is essential to understand Oracle's

10  public guidance for 3Q01; its forecasting process; and the internal forecasting data available to

11  Oracle's senior executives throughout the quarter, each of which is discussed below.

12          **1.**    **The December 14, 2000 Conference Call**

13          Plaintiffs' Class Period begins on December 14, 2000. On that day, on a conference call

14  with analysts and in a press release, Oracle announced its financial results for the 2Q01 (which

15  ended November 30, 2000) and offered guidance for 3Q01. Ex. 56. For 2Q01, Oracle reported

16  earnings per share ("EPS") of $0.11, nearly double the prior year, and $2.7 billion in revenue,

17  which included software license revenue of $1.1 billion (up 25% from 2Q00). Database sales

18  grew 19% (to $775 million), and applications sales grew 66% (to $279 million). Ex. 29 at

19  296295. For 3Q01, Oracle projected EPS of $.12 per share, and software license growth of 25%,

20  including 15-20% growth in database revenues and 75% growth in applications revenues. RSAC

21  ¶ 46; Ex. 56 at 003221-22. During the conference call, CFO Jeff Henley noted that the United

22  States economy was "slowing down" but said: "At this point, we see no impact or slowing in

23  our business." Ex. 56 at 003218. Henley made clear that a deterioration of economic conditions

24  in the future could impact Oracle's business. *Id.* Days before the December 14 call, however,

25  Oracle had closed the largest software license deal in its history—a $60 million sale of Suite 11i

26  applications to Covisint. Ex. 57 at 74:17-25; Ex. 58 at 025791.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

## 2.     Oracle's Forecasting Process

The guidance Oracle announced during the December 14 call was based on a bottoms-up forecasting process Oracle had been using for some time.  The process began with sales representatives entering opportunities into a system known as Oracle Sales Online ("OSO").  Ex. 59 at 75:9-23.  The sum of all sales opportunities with the potential to close in a quarter was referred to as the "pipeline."  Ex. 60 at 93:4-94:6; Ex. 61 at 127:15-128:4; Ex. 62 at 46:11-17.  Based on an evaluation of specific opportunities in the pipeline, and a determination of which sales were likely to close within the quarter (and for how much), each sales representative submitted a forecast to his or her manager.  Ex. 63 at 351:21-352:12, 565:20-567:7.  Managers, in turn, would submit a forecast to their own supervisors, aggregating the forecasts of their sales representatives and adjusting the sum of those forecasts based on the manager's judgment— informed by the managers' knowledge of each sales representative's forecasting tendencies (as well as frequent and pointed discussions with them), and often through direct contact with potential customers.  *Id.*; Ex. 60 at 120:25-121:13.  Sales representatives and managers viewed forecasts as commitments to their supervisors and the company.  Ex. 61 at 80:5-14, 89:12-19.

This process was repeated up through the heads of the various business units.  Ex. 64 at 96:4-12; Ex. 65 at 102:6-103:9; Ex. 60 at 80:3-18; Ex. 66 at 250:24-251:22, 255:15-257:8; Ex. 62 at 28:9-31:7.  For software licensing in North America, those business units were North American Sales ("NAS"), Oracle Product Industries ("OPI") and Oracle Services Industries ("OSI").  *E.g.*, Ex. 1 at 213091.  The Executive Vice President in charge of each business unit (Edward "Sandy" Sanderson for OPI; Jay Nussbaum for OSI; and George Roberts for NAS) would determine the forecast for that unit after consulting with finance personnel and considering the feedback received through the consolidation process from lower levels of the sales hierarchy.  Ex. 67 at 251:21-253:16, 256:12-257:21.  Forecasts for the various business units were then consolidated by Oracle's finance department.  Ex. 65 at 102:6-103:9.  Jennifer Minton, Oracle's Senior Vice President of Global Finance and Operations, then applied an additional layer of judgment onto the forecasts of the business units.  Ex. 65 at 122:24-125:18, 137:4-138:2, 156:4-15.  Among other things, Minton had to account for the fact that salespeople,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    including the business unit heads, habitually "sandbagged," or submitted forecasts lower than

2    they expected to achieve so they could be sure they would meet or exceed their forecasts. Ex. 64

3    at 101:8-18. Minton's judgment, also known as the "Upside," was then added (or subtracted, if

4    the forecasts were too high) to the various forecasts to reflect Minton's best estimate of the

5    results Oracle would achieve. Ex. 65 at 122:24-125:18. Minton's best estimates were referred to

6    as the "Potential" or "Potential Forecast." *Id.* at 122:24-125:18, 137:4-138:2, 156:4-15.

7    Historically, the "Potential" was the best predictor of Oracle's quarterly performance, albeit a

8    conservative one. *Oracle Corp. Deriv. Litig.*, 867 A.2d at 906, 949. In the seven quarters

9    preceding 3Q01, Oracle met or exceeded Minton's initial "Potential" EPS estimate by an average

10    of 22%. Ex. 42 .

11        The consolidated forecast, with Minton's Upside and Potential, were presented in the

12    "Upside Report," which was discussed at Executive Management Committee meetings attended

13    by Ellison, Henley, Sanderson, and other top executives. Ex. 65 at 105:22-108:12. Other reports

14    discussed at these meetings included "Pipeline Reports" and "Flash Reports." Pipeline Reports

15    reflected (among other things) the size of Oracle's software license pipeline—that is, the dollar

16    amount of deals with the potential to close during the quarter. *E.g.*, Ex. 11. The Pipeline

17    Reports also included historical and comparative information, such as a comparison of the

18    pipeline data to the same quarter of the prior fiscal year, and information about the "conversion

19    ratio"—that is, the percentage of the pipeline (expressed in dollar amounts) that Oracle ended up

20    closing within the same quarter of the prior fiscal year. Minton considered Oracle's historical

21    conversion ratio (among other things) as a check on the forecast numbers. Ex. 65 at 169:3-25;

22    Ex. 68 307:3-11, 318:24-319:3. Flash Reports reflected preliminary actual results for various

23    intervals (such as the first month) of the quarter. *E.g.*, Ex. 9.

24        Although Minton's Potential EPS estimate had been a reliable (but conservative)

25    predictor of Oracle's results, the market understood that Oracle's results were extremely difficult

26    to predict with precision. This was in large part because the vast majority of Oracle's quarterly

27    revenue comes in during the very last days and weeks of the quarter. Indeed, during the 2001

28    fiscal year, more than two-thirds of Oracle's licensing revenue in the United States was earned in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

the third month of each quarter, with roughly 50% of total revenue coming in the last week.  Ex. 69.  This phenomenon, referred to as the "hockey-stick effect" (which means that a line graph of revenue across a quarter resembles a hockey stick), made it literally impossible for Oracle to know for sure what its quarterly results would be until the very last days of the quarter.  *Oracle Corp.*, 867 A.2d at 910-11, 941.  The hockey-stick phenomenon was well known to the market and common in the enterprise software industry.  *Id.* at 910; Ex. 70 at 26:13-27:2.

### 3.    Oracle's Internal Forecast Data Fully Supported the Projections Announced on December 14, 2000

Oracle's internal forecast data supported Oracle's projections for 3Q01.  On December 11, 2000, the first Pipeline Report of the quarter showed that Oracle's total software license pipeline was 52% higher than the year before, and the pipeline for applications was particularly strong, with growth of 75% or more in each major geographic division (including 144% in the U.S.).  Ex. 11 at 033552.  Indeed, given the pipeline reflected in the December 11 Pipeline Report, the projections Oracle announced on December 14, 2000 were extremely conservative, for they assumed a conversion rate of only 42%—which would have been the lowest conversion rate since Q499 (March 1999-May 1999).  Ex. 1 at 213092; Ex. 11 at 033557.[2]  If Oracle had converted its pipeline at a level consistent with the preceding third quarter (3Q00), which was the established baseline for comparison due to the seasonal nature of Oracle's software business, Oracle was in a position to post license revenues far higher than the guidance announced on December 14.  Ex. 11 at 033550.

The December 11, 2000 Upside Report—the last such report available in advance of the December 14, 2000 earnings conference call—projected strong growth across the board.  Indeed, the December 11 Upside Report reflected a Potential EPS of 12.82 cents, but Henley took an even more conservative approach and projected only 12 cents EPS to the market.  (Oracle had a disclosed policy of rounding up its EPS to the nearest penny.  Ex. 68 at 329:1-4.  Thus, the 12.82

---

[2]  Henley testified that he believed the pipeline growth at the beginning of the quarter was "just too good to be true," and that as a result, they discounted those figures and "decided to be more conservative."  Ex. 71 at 354:3-355:3; *see also* Ex. 63 at 334:14-24.  Henley testified that when the pipeline diminished in December, it was "not a big surprise," (Ex. 71 at 354:7-14), and still represented a "very healthy growth rate."  Ex. 71 at 356:17-21.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

cents EPS projection would have been rounded to 13 cents.)  The December 11 Upside Report projected overall license revenue growth in actual dollars of 33%, including 14% growth in database and 129% growth in applications. Ex. 1 at 213092, 213095.  By comparison, the guidance Oracle announced to the market on December 14 (overall license growth of 25%; database growth of 15-20%; and applications growth of 75%) was conservative compared with the projections in the December 11 Upside Report.  This is particularly true given the already conservative bias in Minton's Potential projections generally.  Ex. 42.  There is absolutely no evidence in the record that anyone ever told Henley or Ellison before the December 14, 2000 conference call that Oracle could not achieve this guidance or that it was unreasonable.

### 4.   After the December 14 Call, Oracle's Internal Forecast Data Continued To Support Its 3Q01 Projections

Oracle's internal forecast data continued to support Oracle's 3Q01 projections throughout the quarter.  The first Upside Report following the December 14 call (December 25) changed little from the December 11 Upside Report discussed above.  It reflected Potential EPS of 12.70 cents, based on the same license revenue projected in the December 11 Report and a slight reduction of the Upside ($3 million or 0.3%) related to support revenue. Ex. 2 at 1913696.  The January 15, 2001 Pipeline Report showed pipeline growth of 34% compared to 3Q00, well above the 25% license growth Oracle projected on December 14, 2000. Ex. 12 at 008549.  It also indicated that if Oracle could convert 51% of the existing pipeline—the same percentage it converted as of this point in 3Q00—Oracle would achieve license revenues of nearly $1.6 billion in 3Q01 – far more than publicly projected.[3]  *Id.*  Thus, based on the data at this time, Oracle's December 14 projections remained conservative.

The January 15, 2001 Upside Report included a Potential EPS of 12.11 cents, which was conservative in light of the large pipeline and well above the 11.50 cents needed for Oracle to

---

[3]  As it turned out, Oracle's actual License revenues for 3Q01 reflected a conversion rate of just 41% based on the January 15 pipeline.  Ex. 23 at 975976.  This was *thirteen percentage points lower than the average conversion rate for the preceding seven quarters and seven percentage points lower than any conversion rate in the preceding two years*.  Ex. 11 at 033557.  Had Oracle repeated *any* of these historic conversion rates from that point in 3Q01, Oracle would have met its quarterly performance forecasts.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

report EPS of $0.12.  Ex. 3 at 1913735.  Although Minton reduced her Upside adjustment for license revenue by 0.4% from the December 25 Report, there was no change to the field forecasts of NAS, OSI or OPI—the sales organizations continued to stand by their forecasts. *Compare id.* at 1913738 *with* Ex. 2 at 1913699.  On January 17, 2001, the first Flash Report of the quarter was available.  The January 17 Flash Report showed that as compared to the same period a year earlier, Oracle's license revenue in December had grown by 35%.  Ex. 9 at 306579. The Report also showed that December license revenue equaled 19% of the forecast, compared to 16% and 19% of total quarterly revenue in 3Q00 and 3Q99.  *Id.*[4] at 306577.

The Upside Report dated January 29, 2001, projected EPS of 11.58 cents, which would have been rounded to 12 cents per share.  Ex. 4; Ex. 68 at 329:1-9.  While Minton again reduced her Upside adjustment for license revenue, the field forecasts for NAS, OSI and OPI still remained unchanged from December 11, 2000.  *Compare* Ex. 4 *with* Ex. 1.  On February 5, 2001, the Pipeline Report showed 32% pipeline growth over the prior year, well above the 25% license growth Oracle projected on December 14, 2000.  Ex. 13.  The Report also indicated that if Oracle converted its pipeline at the same rate as it had the same quarter one year earlier (3Q00), Oracle would have easily met its quarterly earnings targets.  *Id.* at 306677.

The February 5, 2001 Upside Report dipped below a rounded 12 cents per share EPS for the first time in the quarter, projecting EPS of 11.29 cents.  Ex. 5 at 1911893.  Given the hockey-stick effect, which meant that Oracle earned as much as 50% of its quarterly license revenue during the last week of a given quarter, this slight dip in the internal EPS projection did not suggest, by any means, that achieving guidance was out of reach.  Ex. 69.  As Minton testified, being barely three-tenths of a penny short of a rounded 12 cents per share was "not indicative that we aren't going to make our quarter."  Ex. 68 at 331:2-6.  It was not uncommon for Oracle to finish much stronger than implied by Minton's Potential Forecast at this stage in the quarter. For example, in 4Q00, Oracle's potential projection was 12.35 cents at the beginning of the last month of the quarter, but Oracle ultimately achieved 15.5 cents EPS; similarly, in 1Q01, the potential projection at the beginning of the last month of the quarter was 7.7 cents, and Oracle

---

[4]  This initial Flash Report reflected the $60 million Covisint deal discussed above.  *See id.*

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

ultimately achieved 8.5 cents (all figures split-adjusted). Ex. 42. Thus, the fact that the Potential from the February 5 Upside Report was just barely below Oracle's guidance for the quarter did not suggest that Oracle was likely to miss its guidance. To the contrary, Oracle was well within striking distance of achieving its guidance. Ex. 5 at 1911893. Indeed, based on the Potential Forecast in the February 5 Upside report, Oracle would have needed to increase license revenue by less than 1% of the existing Potential Forecast to meet guidance. Ex. 5 at 1911893. Oracle's pipeline still included a number of large deals that could have closed before the end of the quarter and closed the gap necessary to reach EPS of 12 cents. Ex. 14; Ex. 15; Ex. 16.

On February 8, 2001, the second Flash Report for the quarter came out. Ex. 10. It showed that through the first two months of the quarter, Oracle's license revenues were 36% of the total quarterly forecast. At the same point in 3Q00 and 3Q99, respectively, Oracle had been at 33% and 38% of its final results. *Id.* So the percent of forecast Oracle had achieved in the first two months of 3Q01 was in line with the percentage of final results Oracle had achieved in the first two months of the two most recent third quarters.

A few days later, the February 12, 2001, Upside Report showed a rebound in Potential EPS to 11.58 cents per share, which would have been rounded to 12 cents. Ex. 6 at 1532827. One week later, entering the final week of the quarter, the February 19 Upside Report projected a slightly reduced EPS projection of 11.23 cents per share. Ex. 7 at 1532875. As with the February 5 Upside Report, though, this slight dip in Minton's conservative Potential EPS number did not mean that achieving guidance was out of reach. As of February 19, Oracle's Potential was at 94% of guidance, and Oracle had closed much larger gaps in recent years. *Id.*; Ex. 42. At the same point a year earlier (February 20, 2000), Oracle's potential was just 90% of consensus estimates, and yet Oracle closed the gap in the final weeks of the quarter and actually exceeded estimates. Ex. 42. As in prior quarters, Oracle still had plenty of deals in the pipeline that could have made up the deficit if they closed. Ex. 17; Ex. 18; Ex. 19.

## C.  Oracle's Sales Force and Management Are Surprised by the Miss

The first sign of unusual deal slippage came late in the evening on February 25, 2001, in the form of an email to Ellison and Henley from the Executive Vice President of the NAS

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

division, George Roberts.  In it, Roberts indicated that the General Business West area had lost 70 transactions, worth about $10 million of forecasted business, over the course of a few days. Ex. 73.  According to Roberts, "[t]he top reason given by the companies was capital preservation."  *Id.*  Roberts decided to reduce the NAS forecast by $20 million (*id.*), and he forwarded more detail from Nick Classick, the Area Vice President in General Business West:

> The past 6 business days our forecast has dropped to the point that I know our organization will have put John [Nugent, Senior Vice President of General Business], Oracle and yourself in a bad spot. … I am aware of the impact this [$10 million reduction in the General Business West forecast] news has to Oracle and I am sorry that we have created such a problem.  This is my organization and I am responsible for a forecast to you—I failed.  From the 2-16 forecast to the 2-23 forecast we had 78 field deals, by 47 different reps totaling $14.9m move out of the quarter.  The last month of the quarter I go over deal [sic], line by line item with the managers weekly.  This has been successful in the past as it gives me the oppt [sic] to get accurate info to provide upper management and build a reliable forecast.  George, you have been a great supporter for my team and myself.  In my 6 years with Oracle this is the most difficult news I have had to deliver as a forecast, especially this late in the quarter, is a personal commitment and I have let you and Oracle down.  I am sorry.

Ex. 73.  Although it was bad news, the $20 million reduction in the NAS forecast was a small fraction of Oracle's total revenue projection, hardly enough to indicate that Oracle's guidance was unattainable.  Indeed, Roberts testified that the reason he asked Classick for additional information about his miss is that he was even then still "trying to understand what the issue is."  Ex. 67 at 255:4-256:11.

Ellison responded on the 26th by asking Roberts whether the deals slipped into 4Q01 or disappeared altogether.  Ex. 74 at 308454.  Roberts asked Classick, and Classick replied:

> NET – lost to competition 5%, firm q4 projects 25%, delayed until economic or business conditions are cleared 70%.  We had 5 POs cut that Presidents pulled until April as they wanted to see what their q1 would look like.  The uncertainty of their business and outlooks for the year has [sic] caused many clients to delay until they better understand what directions 2001 will take.  We can't commit this 70% as April results and the business climate will have to determine.

Reflecting the information conveyed by Roberts, Minton reduced the Upside in the NAS forecast portion of the February 26 Upside Report by $20 million.  Ex. 8 at 1532945, 1532948. With that adjustment, the Upside Report projected EPS of 11.19 cents, down just .04 cents from the week earlier.  *Id.*  Even with this reduction in the Upside Report's projected EPS, Oracle was

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

well within striking distance of meeting its quarterly projections.  As of February 26, 2001 (two days before the end of the quarter), Oracle's earnings projection was 97% of the earnings needed to report 12 cents EPS.  *Id.*  At the very same point in 3Q00, Oracle was projecting just 88% of the consensus estimate (*id.*), but in the last two business days of the quarter Oracle closed enough deals to exceed the consensus estimates.  *Id.*  Thus, as in 3Q00, meeting guidance was still within reach, even in the last 48 hours of the quarter.

Other forecasting data continued to suggest that Oracle could meet its guidance.  One such piece of data was the "Big Deal Update," a report Oracle created only in the last few business days of each quarter tracking the status of deals over $500,000.  Ex. 65 at 181:5-185:17, 200:8-201:2.  These reports were emailed to Ellison, Henley, Catz and a few key finance personnel, including Minton.  Ex. 20.  The Big Deal Update for Monday, February 26, 2001 demonstrated that Oracle was performing quite well on big deals.  As compared to the same time a year prior, Oracle had closed almost three times as much revenue from big deals ($213 million versus $73 million), and had a pipeline of deals with draft contracts that was $100 million larger than the prior year ($621 million versus $521 million, for an increase of nearly 20%).  Ex. 20 at 306787.  The hockey-stick effect was particularly acute with respect to big deals, which typically closed in the last two days of each quarter, because large, sophisticated customers believed they could obtain larger discounts at that time.  Ex. 62 at 196:8-198:1.

Moreover, in another February 26 email, Henley expressed his belief that Oracle still had a chance to meet its EPS guidance because of expense reductions:

> My guess is that we have some upside in expenses based on this unless there was something unusual a year ago that causes the growth rate to be distorted in month 3.  If the expenses grow say 5% rather than 10%, the difference would be $80 million lower.

Ex. 75.  The next day, however, Minton informed Henley that in a single day (February 26 to 27), Oracle's "Big Deals" estimate (total deals over $500,000 closed and in the pipeline) had dropped from 40% to 25% growth over the prior year.  A series of emails on February 27 and 28 revealed a rapid deterioration in OSI's conversion of significant deals during the last 48 hours of the quarter.  Ex. 76.  All told, between 9 a.m. on February 27 and 4 p.m. on February 28, the OSI

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  division reduced its revenue estimates from $243 million to $175 million. *Id.* at 308491,

2  308504. The NAS division saw a similarly sudden and dramatic drop in business over the last

3  three days of the quarter. From February 26 to February 28, the NAS field forecast dropped

4  from $320 million (to which Minton applied Upside judgment of minus $20 million) to $271

5  million (to which Minton applied Upside judgment of minus $26 million). Ex. 8 at 1532948; Ex.

6  77 at 1533010.

7        The massive and sudden slippage of deals during the last business days of the quarter was

8  a surprise to Oracle and its senior management. During his deposition, Henley testified that he

9  did not know Oracle would miss the quarter until the late afternoon of the last day of the quarter,

10 and that he did not begin to suspect that Oracle would miss until the "last several days." Ex. 78

11 at 127:10-13, 129:21-130:7. This testimony is confirmed by contemporaneous documents in

12 which Henley wrote that "right to the last day we still thought we could get there [to $0.12]."

13 Ex. 79 at 289923. Each of the individual defendants confirms his belief that Oracle was in a

14 position to be able to achieve its public guidance until the very end of the quarter. Ellison Decl.

15 ¶ 4, Henley Decl. ¶ 10, Sanderson Decl. ¶ 8. Indeed, as reflected above, it was not until the very

16 last days of the quarter that Oracle's executives saw evidence indicating that Oracle might miss

17 its guidance. Until the very last days of the quarter: (i) there was no significant drop in the

18 forecasts from the major sales organizations; (ii) there was no news of unusual deal slippage; (iii)

19 there was no sharp drop in Minton's historically conservative Potential Forecast; and (iv) no one

20 was telling senior management that Oracle's guidance was out of reach.

21     **D.**    **Oracle Pre-Announces on March 1, 2001**

22       On March 1, 2001, Oracle announced an EPS estimate of 10 cents, with an estimate of

23 6% total license growth, including flat or slightly negative database growth and applications

24 growth of 50%. Ex. 30. The next day, Oracle's stock dropped from $21.38 to $16.88.

25       On March 15, 2001, Oracle confirmed its preliminary EPS estimate of 10 cents, but

26 announced that database sales had increased by 6%, while applications sales had increased by

27 25%, as opposed to the 50% increase Oracle had estimated on March 1, 2001. Ex. 31. Despite

28 the additional information about applications revenue, Oracle's stock did not decline by a

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

meaningful amount the next day.  Ex. 80 at ¶ 73.  Indeed, the market perceived Oracle's miss as a sign of a downturn in the enterprise software sector, and therefore market participants expected other enterprise software companies—most of which were due to report their most recent quarterly results one month later than Oracle—to see disappointing results.  Ex. 40 at 435256-57.  And in the wake of Oracle's March 1 and March 15 announcements, a wave of other software companies either lowered or missed their guidance for the quarter, as the industry as a whole felt the impact of a sudden and sharp downturn.  Ex. 80 at ¶ 69 and Ex. 8.

### E.   Suite 11i

Plaintiffs claim that Oracle's guidance miss for 3Q01 was caused, in part, by "problems" with Suite 11i.  Ex. 81 at 85.  To understand this claim, it is important to understand the enterprise applications market; Oracle's development and marketing of Suite 11i; market expectations for the Suite and the early press and analyst reports following the Suite's release; as well as Oracle's own successful implementation of Suite 11i during the Class Period.

### 1.   The Enterprise Applications Market

Applications software automates business functions.  Ex. 54 at 143915.  By the late 1990s, enterprise applications generally were divided into two categories:  (1) ERP or "enterprise resource planning" applications to automate "back-office" functions such as financials, human resources, manufacturing, procurement, and supply chain management; and (2) CRM or "customer relationship management" applications to automate "front-office" functions, such as call centers, customer service, and other customer-facing activities.  *E.g.*, Ex. 82 at 167136-37; Ex. 83 at 035471; Ellison Decl., ¶ 15.  Oracle first entered the applications market in 1987 with the release of certain ERP software.  *E.g.*, Ex. 84 at 315386.  By 2000, Oracle was the second largest vendor of ERP software in the world (*e.g.*, Ex. 85 at 398:16-399:4; Ex. 86 at 1051343), and earned new applications license revenue in excess of $900 million (Ex. 54 at 143967).

By that time, Oracle and a few other vendors such as SAP, PeopleSoft, and J.D. Edwards offered "suites" of several different applications designed to automate a variety of different business functions.  *E.g.*, Ex. 87; Ex. 88.  Although these vendors touted the benefits of an "integrated" suite of applications from one vendor, many customers preferred to buy what they

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   perceived to be the best product in each category from different vendors, a strategy referred to as

2   "best of breed." Ellison Decl., ¶ 16; Ex. 89 at 023879; Ex. 90 at 014915. The "best of breed"

3   strategy offered depth of functionality in each category. *E.g.*, Ex. 91 at 006528; Ex. 92 at

4   008976; Ex. 93 at 009003; Ex. 90 at 014920. But one downside of the strategy was the need to

5   write (or pay someone else to write) custom code to "stitch together" programs that had been

6   designed and engineered separately. Ellison Decl., ¶ 16; Ex. 94 at 3; Ex. 95 at 110538; Ex. 96 at

7   023899-900; Ex. 97 at 132:23-133:7. This process, called "systems integration," often costs

8   much more than the software itself. Ex. 83 at 035471; Ex. 56 at 003225; Ex. 98 at 420078; Ex.

9   99 at 64:17-20. Even following extensive "systems integration," the separate pieces of software

10  still relied on different sets of data and often did not work together well, if at all. Ex. 100 at

11  141844; Ex. 101 at 306996-97, 307000-01; *id.* at 306999-7002; Ellison Decl., ¶ 16; Ex. 102 at ¶¶

12  71-72, 102. Vendors, customers, and analysts debated the relative merits of the "best of breed"

13  and "suite" strategies. *E.g.*, Ex. 95 at 110538; Ex. 103 at 167711.

14         **2.**     **The Development of Suite 11i**

15       By the late 1990s, Oracle identified a gap in the applications market: No vendor offered

16  a single suite of products that included both ERP and CRM functionality. Ellison Decl., ¶ 15;

17  Ex. 94 at 3; Ex. 104 at 442971; Ex. 105; Ex. 106 at 091478. Thus, companies wishing to

18  automate both "front-office" and "back-office" functions would have no choice but to buy

19  applications from different vendors and pay for systems integration work to stitch different

20  vendors' products together. Ellison Decl., ¶ 16; Ex. 94; Ex. 96 at 023899-900; Ex. 63 at 413:9-

21  18; Ex. 97 at 132:23-133:7; Ex. 102 at ¶¶ 70-72, 118-19. In 1998, Oracle began developing a

22  single suite of products—later released as Suite 11i—that included both ERP and CRM. Ex. 107

23  at 027782-83; Ex. 108 at 117404; Ex. 92 at 008975. Oracle's goal was to market a single "suite"

24  of products, designed and engineered by a single vendor, to automate major back-office and

25  front-office functions, without requiring post-purchase "systems integration" work to make the

26  programs work together. Ellison Decl., ¶¶ 15-16; Ex. 101 at 306995-97, 306999-7003; Ex. 109

27  at 003411. Developing Suite 11i was a massive project, and the resulting software was

28  enormous and complex by any measure. Ex. 99 at 122:8-18; Ex. 104 at 442972. When it was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

released in May 2000, Suite 11i spanned many major categories of functions and included numerous separate products (or "modules"). Ex. 110. The suite contained "massive" amounts of "significant new functionality" compared to its predecessor. Ex. 99 at 122:8-18; Ex. 111 at 105:4-106:3. In describing the CRM portion of the release, one analyst described it as "one of the largest single application releases ever." Ex. 112 at 019758. Another noted that "Oracle basically introduced an application that covers the functionality of at least five (ERP, CRM, SCM, HRMS, Service) enterprise class applications." Ex. 104 at 442972.

### 3.    Oracle's Marketing Message for Suite 11i

Oracle differentiated Suite 11i from two sources of competition. First, in contrast with the "best of breed" approach, Oracle stressed that Suite 11i did not require extensive post-purchase software programming to make the various pieces of software work together. Ex. 41 at 141274; Ex. 107 at 027782; Ex. 98 at 420079; Ex. 97 at 69:7-70:4; Ex. 113 at 106690; Ex. 56 at 003224-25; Ex. 97 at 132:23-133:7; Ex. 114 at 40:12-41:13; 43:3-43:20; Ex. 115 at 055807-13.

Second, in contrast with other suites on the market, Suite 11i included both back-office (ERP) and front-office (CRM) functionality:

> Oracle Applications Release 11i also encompasses both Oracle's leading enterprise resource planning (ERP) and customer relationship management (CRM) applications. Unlike competing offerings, only Oracle Applications provides out-of-the-box integration between these applications families.

Ex. 116 at 306807; Ellison Decl., ¶ 15. Ellison and Henley reiterated Oracle's basic marketing message during the December 14, 2000 conference call. Henley pointed out, of course, that customers would still need to do the "implementation" work necessary to install any enterprise applications system. Ex. 56 at 003237-8. And although both Henley and Ellison stressed the benefits of customers using the entire Suite, Henley made clear that customers were not necessarily buying or implementing the entire Suite at once. *Id.* at 003223.

The market understood Oracle's message, as observers consistently contrasted Suite 11i with the "best of breed" alternative and noted that Suite 11i was the first "suite" to automate a broad array of both ERP and CRM functions. Ex. 92 at 008975; Ex. 117 at 009736; Ex. 118 at 006339; Ex. 83 at 035471; Ex. 119 at 1051217; Ex. 120 at 009364-65; Ex. 108 at 117404; Ex.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

117 at 009736; Ex. 121 at 2; Ex. 122 at 308701; Ex. 123 at 308696; Ex. 124 at 308715; Ex. 125 at 00015. Analysts also noted that Oracle's approach would eliminate the systems integration typically required when customers purchased separate applications from different vendors.[5] Ex. 124 at 308716; Ex. 121 at 2; Ex. 126 at 006140; Ex. 127 at 307329; Ex. 83 at 035471.

### 4.    Suite 11i's Release and Early Success in the Market

Oracle released Suite 11i in May 2000 and, in short order, achieved significant success. The dollar value and number of Suite 11i licenses sold in the first few quarters after its release was enormous. In 1Q01 and 2Q01 (the first two quarters in which Suite 11i was on the market), Oracle's new applications license revenue exceeded $435 million, and Oracle sold another $249 million worth of Suite 11i licenses in 3Q01. Ex. 25 at 973930; Ex. 26 at 976820; Ex. 27 at 977030. In the first three quarters that Suite 11i was on the market, Oracle achieved year-over-year applications revenue growth of 42%, 66%, and 25%, for an average quarterly growth of 44%. *Id.* These growth numbers were particularly notable because they compared sales of a brand new product (Suite 11i) with the much more mature products that Oracle had been selling the year before. Ex. 85 at 337:24-338:7; Ex. 128 at 061434. During roughly the same calendar period, Oracle's main competitor, SAP, reported average quarterly new license growth of only 33%. Ex. 129; Ex. 130 at 307611; Ex. 131 at 307748.

### 5.    Market Expectations for Suite 11i

Enterprise applications are notoriously complex. They are designed to automate an incredibly wide range of functions, from accounting and human resources to manufacturing and supply chain management, for all different kinds of enterprises, from manufacturers to service providers to government agencies. The sheer size and complexity of these software programs

---

[5] A key part of Oracle's "integration" message was that the modules of Suite 11i were designed to share a single data model and to run on a single database. Ex. 113 at 106690; Ex. 97 at 69:7-70:4; Ex. 99 at 139:17-140:17; Ex. 83 at 035471-72; Ex. 244 at 009891. This feature, referred to as "data integration," meant that elements of data (such as a customer's name) are all defined the same way across different components of the Suite, and the different applications can all store data in the same place. This approach leads to increased consistency and efficiency, especially compared to a "best of breed" approach, where different software programs might define the same piece of data (such as a customer's name) differently, and the different products would store data in separate databases. *See* Ex. 114 at 40:12-41:10; Ex. 63 at 465:12-466:15; Ex. 97 at 132:23-133:7; Ex. 102 at ¶¶ 60-61, 126.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   have several implications for the enterprise applications market, all of which were well known to

2   the industry and the financial markets by the time Oracle released Suite 11i.

3          As an initial matter, all software programs have bugs.  Ex. 102 at ¶¶ 43-48; Ex. 132 at

4   28:20-22; Ex. 133 at 212:14-18; Ellison Decl., ¶ 17.  It is impossible to eliminate all bugs

5   through testing.  Fletcher Decl., ¶ 28; Ex. 102 at ¶¶ 43-48, 195; Ex. 132 at 93:10-17; Ex. 111 at

6   134:1-12.  Given their size and complexity, enterprise applications packages are expected to

7   have larger numbers of bugs than other programs, and unavoidably, some number of bugs will

8   not be identified or remedied until after customers begin using them in the field.  Ellison Decl., ¶

9   17; Shaw Decl., ¶ 6.  In fact, according to one recent study, a typical enterprise applications

10  package can be expected to have 1.5 million defects after completion, only 90% of which would

11  likely be removed before initial release, leaving as many as 150,000 defects at the time of

12  release.  Ex. 102 at ¶ 87 (*citing* Ex. 134 at 151); Ex. 132 at 16:16-17:1.  Of these, one would

13  expect about 1,000 to be "high-severity" defects (which can prevent the system from functioning

14  at all) and 20,000 to be medium-severity defects.  Ex. 102 at ¶ 87.  After deployment, defects

15  will be found, reported by customers and fixed at a rate of about 40% per year overall, with high-

16  severity defects getting found and fixed at a rate of about 70% in the initial year of deployment

17  and about 60% per year after that.  *Id.* at ¶ 88.  But the "bad-fix injection rate" on such systems is

18  about 7%, which means that patches designed to cure defects will actually create new defects for

19  several years after the systems are released.  *Id.*  Although this error rate seems quite high, the

20  same study noted that the error rate for enterprise applications software is about the same as the

21  error rate for the large operating systems widely used by individual consumers.  Ex. 134 at 152.

22  As a result of all this, modern enterprise applications can be expected to achieve "reasonable

23  levels of stability" only "after several years of deployment and usage."  Ex. 102 at ¶ 88 (*citing*

24  Ex. 134 at 151) .

25         Enterprise customers understand these issues, and they choose different strategies based

26  upon their appetite for risk and their desire for new technology.  So-called "early adopters" will

27  accept the risks associated with early release software in order to benefit earlier from improved

28  functionality.  Shaw Decl., ¶ 6; Ex. 102 at ¶¶ 34-36, Figure 2; Ex. 85 at 340:16-22; Ex. 135 at

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

161:8-162:1; Ex. 132 at 113:10-115:7; Ex. 136 at 057423; Ex. 67 at 141:18-143:1.  Others, however, will forego new features or functionality for some time in order to wait for a more mature and stable release.  Shaw Decl., ¶ 6; Ex. 102 at ¶¶ 34-36, Figure 2; Ex. 137 at 92:17-23.  The financial markets, too, are well aware of these dynamics within the enterprise applications industry.  Market observers therefore expect new products to exhibit bugs and stability issues, and they understand that different customers have different levels of tolerance for the risks associated with early release software.  *E.g.*, Ex. 138 at 111279; Ex. 139 at 005916.

Given the realities of the enterprise applications market, and the massive size and scope of Suite 11i, the market knew that its initial release was likely to have bugs, and that early adopters of this massive new system would likely have difficult implementations.  Ex. 117 at 009737; *also* Ex. 112 at 019759; Ex. 127 at 307330; Ex. 140 at 009467.  These concerns applied with particular force to the CRM portions of Suite 11i, which were much newer than the ERP portions of the Suite.  Ex. 99 at 122:8-18.  Because this software was particularly new, the market was especially aware of the likely difficulties that would likely be involved with early adopters of CRM.  Ex. 112 at 019759.; Ex. 120.

## 6. Early Implementation Experiences

Aware of these challenges posed by early release software, Oracle customers nevertheless pressed Oracle to release Suite 11i as soon as possible because they wanted its new features and functionality.  Ex. 85 at 340:15-22; Ex. 141.  These customers were willing to accept risks in order to obtain new features and functionality.  Ex. 102 at ¶¶ 34-36, Figure 2; Ex. 85 at 340:10-24; Ex. 137 at 93:17-95:5; Shaw Decl., ¶¶ 6, 9.  Suite 11i attracted a number of these "early adopter" customers.  Ex. 135 at 157:22-159:16, 160:25-162:1; Ex. 142 at 259:19-260:25; Ex. 35 at 027705; Ex. 143 at 009520; Ex. 136 at 057423; Ex. 144 at 034913.

After these "early adopters" began to implement Suite 11i, public reports described precisely the kinds of issues one would expect from a major new release of complex enterprise software—bugs, instability in the initial releases, and difficult implementations.  Ex. 119 at 1051216; *also id.* at 1051217; Ex. 112 at 019758; Ex. 104 at 442972.  Market observers expressed no surprise or particular concern over these issues, however, because they are a normal

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   part of the software development process.[6]  Indeed, despite early growing pains for Suite 11i,

2   Oracle saw steady growth in new license sales, customer implementations and "go-lives" during

3   the first few quarters after Suite 11i was released.  Ellison Decl., ¶¶ 18-19.  During 3Q01, the

4   number of customers implementing 11i applications steadily increased, from approximately

5   1,000 customers in the process of implementing 11i applications at the start of the quarter

6   (Ellison Decl., ¶ 19; *also* Ex. 145 at 154523), to approximately 1,300 customers by mid-January

7   2001 (Ex. 63 at 408:5-22; *also* Ex. 83 at 035472), to 2,500 customers by the end of the quarter

8   (Ex. 78 at 122:24-123:21; Ex. 146 at 092887; *also* Ex. 138 at 111279; Ex. 51 at 417086).

9   Customers "live" on Suite 11i applications increased steadily throughout the quarter, from 85 to

10  nearly 200 by quarter's end.[7]  Ex. 44 at 418888-91; Ex. 45 at 418744-47; Ex. 46 at 418726-31;

11  Ex. 47 at 418629-34; Ex. 48 at 418419-25; Ellison Decl., ¶ 19.  By the end of FY 2001, nearly

12  400 customers were live on Suite 11i software.  Ex. 49 at 417620-33.  Throughout, Suite 11i was

13  winning key big license deals.  *E.g.*, Ex. 149 at 419950; Ex. 150 at 420561; Ex. 151 at 01072.

### 7.   Oracle's Own Upgrade to Suite 11i

15          During the Class Period, Oracle itself upgraded its U.S. operations to Suite 11i as part of

16  a worldwide upgrade that begun in the summer of 2000.  Oracle's upgrade was a massive

17  project, as one would expect given Oracle's size and complexity.  Ellison Decl., ¶ 23; Ex. 111 at

18  238:1-22.  In connection with the upgrade, Oracle consolidated dozens[8] of separate application

19  instances into at first just a few and ultimately a single instance for all of Oracle's applications.

20  Ex. 111 at 237:22-238:22; Ex. 97 at 232:11-22; Ex. 152 at 60:2:2-61:8.  For example, before the

21  consolidation, Oracle had approximately 100 separate email databases around the world.  Ellison

22  Decl., ¶ 24.  After the upgrade and consolidation, Oracle's entire business ran on a single email

23  database, which decreased the number and geographic spread of Oracle's servers.  Ellison Decl.,

---

[6] Notably, despite the widespread awareness of Suite 11i's early challenges, market observers did not suggest that those challenges rendered false or misleading Oracle's basic marketing message that the components of the suite were "pre-integrated" and therefore did not need "systems integration" to work together.  *E.g.*, Ex. 147 at 101612.

[7] A customer is considered "live" on Suite 11i if the customer "is performing some business process as part of their day-to-day business operations" using one or more applications that are part of Suite 11i.  *E.g.*, Ex. 148 at 230:12-21; Ex. 114 at 194:12-18; Ex. 106 at 091478.

[8] Ellison Decl., ¶ 23; Ex. 111 at 238:1-22.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

¶¶ 25-26.  As with any upgrade of this magnitude, Oracle encountered bugs and downtime for certain applications, but those issues were neither unusual nor unexpected for an implementation project on this scale.  Ex. 85 at 349:17-350:5.

## III.   ARGUMENT

Under Section 10(b) of the Securities Exchange Act of 1934, Plaintiffs must show:  (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with a purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).[9]  To avoid summary judgment, Plaintiffs must adduce evidence from which a rational trier of fact could find in their favor on each element of their claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325-28 (1986).  "The Supreme Court has made clear that strained or inconclusive inferences alone should not defeat a motion for summary judgment.  The rigorous scrutiny of evidence offered in opposition to a motion for summary judgment is no less appropriate in complex, fact-specific securities fraud cases."  *In re Adobe Systems, Inc. Sec. Litig.*, 787 F. Supp. 912, 918 (N.D. Cal. 1992).  For each category of statements Plaintiffs claim were false and misleading here—*i.e.*, statements about Oracle's guidance for 3Q01; statements about the effect of the economy on Oracle's business; statements about Suite 11i; and statements about Oracle's financial statements for 2Q01—there is no genuine issue of material fact as to one or more of these elements.[10]  *Celotex*, 477 U.S. at 325-28.

### A.   Oracle's 3Q01 Financial Projections

This case arises out of Oracle's failure to meet its financial guidance for 3Q01.  *In re Oracle Corp. Sec. Litig.*, No. C-01-0988-MJJ, 2003 U.S. Dist. LEXIS 9980, at *4-8 (N.D. Cal. Mar. 24, 2003).  Plaintiffs' claim is that Oracle's guidance for 3Q01 was false when it was announced on December 14, 2000, and the Defendants falsely repeated that guidance over the course of the quarter.  RSAC ¶¶ 1-19.

---

[9]  Unless noted, all citations and quotations are omitted, and all emphasis is in the original.

[10]  Because liability under Section 10(b) is a prerequisite for controlling person liability under Section 20(a) (RSAC ¶¶ 94-98) and insider trading liability under Section 20A (RSAC ¶¶ 99-104), these claims necessarily fail as well.  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *Paracor Fin. Corp. v. General Electric Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

As courts in this district have recognized, claims alleging "fraud" based on a failure to meet earnings projections require special care at the summary judgment stage:

> Common sense tells us—and case law supports the proposition—that courts must be especially wary of permitting a trial regarding (allegedly) fraudulent forward-looking statements to proceed on the strength of confusing and speculative inferences, because forward-looking statements—and earnings projections in particular—are uncertain by their very nature. If the mere existence of differing implications (for future corporate performance) reasonably drawable from information available at the time a projection is made can create a triable issue of fact in a lawsuit alleging that the projection was *fraudulent*, then virtually every lawsuit alleging such a projection would, it seems, go to trial—for, indeed, every projection of corporate earnings is uncertain and subject to different predictive interpretations. That is why 10b-5 liability for a projection requires that there be either *no* reasonable basis for believing that the projection was accurate or the awareness of undisclosed facts tending *seriously* to undermine the accuracy of that projection.

*Adobe*, 787 F. Supp. at 919; *also In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1487 (N.D. Cal. 1992); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276-77 (D.C. Cir. 1994).[11]

Indeed, to prevent liability based on hindsight (as opposed to fraud), Congress created a statutory "Safe Harbor" for forward-looking statements such as financial projections. *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). Under the Safe Harbor, Plaintiffs must prove Defendants had "actual knowledge" that the statements were false. 15 U.S.C. § 78u-5(c)(1)(B). Together, these rules (appropriately) set a very high bar for claims based on a failure to meet earnings projections: A projection is not "false" unless it is made without any reasonable basis to believe it is true or there are undisclosed facts that "seriously undermine" it. *Adobe*, 787 F. Supp. at 919; *Verifone*, 784 F. Supp. at 1487. To prove scienter, a plaintiff must prove the projections were made with "actual knowledge" that they were false. 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs here cannot show either falsity or scienter.

### 1.    Plaintiffs Cannot Prove Oracle's 3Q01 Projections Were False

Plaintiffs cannot come close to showing that Oracle's 3Q01 projections were false. When Oracle announced its 3Q01 guidance, Oracle's internal forecasting data strongly supported that

---

[11]  These concerns are particularly important in a case, such as this one, involving claims based on a failure to disclose intra-quarter information. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210-11 (1st Cir. 1996) (holding that intra-quarter information is not material, and need not be disclosed, unless it creates a "substantial likelihood" of an "extreme departure" from the range of results that could reasonably be anticipated based on currently available information).

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   guidance. Indeed, if anything, the information available at the time supported an even higher

2   EPS projection. Jennifer Minton's Potential EPS number—historically the most accurate, albeit

3   conservative, predictor of Oracle's quarterly results—projected 12.82 cents per share, which

4   would have been rounded up to 13 cents. Ex. 1 at 213092. Jeff Henley nevertheless used an

5   even more conservative EPS projection of 12 cents. Ex. 72 at 025769. Although Plaintiffs have

6   claimed that a major macroeconomic change rendered Oracle's forecasting process unreliable

7   (Ex. 153 at 93:4-24), Oracle met or exceeded expectations in the first two quarters of its 2001

8   fiscal year, after the alleged economic change. Ex. 42. Plaintiffs have cited no reason why

9   Defendants could not reasonably rely on a forecasting process whose projections Oracle had

10   consistently met or exceeded.

11        Although Plaintiffs claim certain Defendants "affirmed" Oracle's guidance over the

12   course of the Class Period, Oracle's internal data continued to support Oracle's guidance into

13   January and February. *Supra* Section II.B.4. Plaintiffs allege, for example, that Defendants

14   reaffirmed Oracle's 3Q01 forecast on February 7 and February 9, 2001. RSAC ¶ 65. By that

15   time, Minton's Potential EPS projection had dipped below 11.50 cents (the amount necessary to

16   report 12 cents EPS), but only by $0.0021. This slight decrease—which was erased just one

17   week later, when Minton's Potential EPS projection increased to 11.58 cents—did not "seriously

18   undermine" Oracle's guidance. For Minton's Potential EPS projection—a projection Oracle

19   exceeded in six out of seven prior quarters—to tip just $0.0021 below guidance was no reason

20   for Defendants to doubt that Oracle would meet guidance. Ex. 42. Indeed, in two of the

21   preceding four quarters, Minton's Potential fell below the amount necessary to meet consensus

22   estimates or guidance, but Oracle met or exceeded expectations both times. *Id.*

23        Plaintiffs also claim that Henley repeated certain of Oracle's 3Q01 projections in late

24   February, both at an AppsWorld Conference in New Orleans and in a presentation to analysts on

25   February 20, 2001. RSAC ¶¶ 70-71; Ex. 154; *also* Ex. 155; Ex. 156. By that date, Minton's

26   Potential EPS number had hovered around the 11.50 cents needed for Oracle to report 12 cents

27   EPS, and although the Potential was at 11.23 EPS, the Potential Forecast was 94% of guidance,

28   and Oracle had actually made up (with room to spare) a larger gap in the previous third quarter.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  Ex. 7 at 1532875.  Thus, even if Henley affirmed guidance at that time, Oracle's internal

2  forecasting data continued to support the forecast.[12]

3       It should be noted that neither Plaintiffs nor their experts have been able to articulate

4  precisely what Defendants should have told the market about its projections over the course of

5  3Q01.  Although they challenge Oracle's December 14 guidance, they do not explain what

6  Oracle should have said instead.  Likewise, Plaintiffs do not explain what Defendants should

7  have disclosed to the market about intra-quarter developments.  They seem to suggest that Oracle

8  should have alerted the market every time there was a slight change in its internal forecasting

9  data, such that Oracle should have told the market it was a little less confident when Minton's

10 Potential EPS number dropped a shade below 12 cents on February 5, though under that theory,

11 Oracle also should have told the market it was feeling a bit better the next week, when the

12 Potential EPS number rebounded above the amount needed to report 12 cents EPS.  Quite

13 sensibly, the Supreme Court has rejected this kind of approach.  *See Basic, Inc. v. Levinson*, 485

14 U.S. 224, 231 (1988) (noting that setting materiality standard too low might cause management

15 "simply to bury the shareholders in an avalanche of trivial information – a result that is hardly

16 conducive to informed decisionmaking"); *see also Oracle Corp. Deriv. Litig.*, 867 A.2d at 939-

17 40 ("To find information material simply because it cast some doubt on the company's ability to

18 meet its projections more or less exactly would unduly chill trading by issuers and insiders (not

19 to mention issuers' willingness to provide guidance at all.").

20

21

_____

22 [12]  By February 20, Oracle was in its quiet period, and thus Oracle policy prohibited any public discussion of quarterly results.  *See* Ex. 157.  Henley has testified that he did not reiterate

23 guidance or otherwise comment on the quarter at AppsWorld in February 2001.  Ex. 78 at 121:21-122:23; Ex. 71 at 238:15-19, 239:22-242:9, 243:17-24; *also* Ex. 158 at 180:2-18.  A

24 videotape of the analysts' meeting that day proves that Henley did not reiterate guidance.  *See* Ex. 37.  One of the very reports Plaintiffs cite makes clear that Henley "offered no commentary

25 on the current quarter."  Ex. 154 at 091463.  Plaintiffs have adduced no evidence to the contrary, and therefore there is no genuine issue of fact on the question of whether Henley reiterated

26 guidance on February 20.  *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir. 2004) (analyst report was insufficient to create a

27 triable issue as to whether statement was made when defendants submitted the script and slides from the presentation and a declaration that the challenged statement was not made).  Even if

28 Henley had reaffirmed guidance, Oracle gave a Safe Harbor statement at AppsWorld (Ex. 159 at 399566), and any such reaffirmation would be protected by the Safe Harbor as discussed below.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

### 2.   Oracle's 3Q01 Projections Are Protected by the Safe Harbor

Oracle's 3Q01 projections were, by their very nature, forward-looking statements under the Safe Harbor. 15 U.S.C. § 78u-5(i)(1)(A).   The plain language of the Safe Harbor makes clear that a forward-looking statement is immune if it is accompanied by meaningful cautionary language, 15 U.S.C. § 78u-5(c)(1)(A), "or" the plaintiff fails to prove the statement was made with "actual knowledge" that it was false, 15 U.S.C. § 78u-5(c)(1)(B).[13]   As discussed below, Plaintiffs cannot show a genuine issue of fact as to either question, and thus Oracle's 3Q01 projections are immune under any construction of the statute.

### a.   Plaintiffs Cannot Show "Actual Knowledge" Of Falsity

Plaintiffs must prove Defendants had *actual knowledge* that those statements were false or misleading when made. *America West*, 320 F.3d at 936.   There is zero evidence that any Defendant had "actual knowledge" that Oracle would miss its 3Q01 guidance.   The individual Defendants have testified that they had no reason to believe, until the very end of the quarter, that Oracle would miss.   Ellison Decl., ¶¶ 3-4; Henley Decl., ¶¶ 7-10; Sanderson Decl., ¶¶ 6-8. This testimony is unrebutted:  No witness has testified that he or she told Defendants that Oracle could not meet its guidance, and no internal document suggested, before the very end of the quarter, that Oracle would miss.   No rational trier of fact could conclude that any of the Defendants had "actual knowledge" that Oracle would miss until the final days of the quarter.[14]

### b.   Oracle's 3Q01 Projections Were Accompanied By Meaningful Cautionary Language

Cautionary language is "meaningful" under the Safe Harbor if it mentions "important factors of similar significance to those actually realized." *In re Broadcom Co. Sec. Litig.*, No.

---

[13]  As this Court has noted, there are conflicting authorities on the question of whether a forward-looking statement must be accompanied by cautionary language to be within the Safe Harbor at all, or instead is immune under the Safe Harbor if it is accompanied by cautionary language *or* the plaintiff fails to prove it was made with "actual knowledge" that it was false or misleading. *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005 WL 2347125 at *6 (N.D. Cal. Sept. 23, 2005). The Ninth Circuit's opinion in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) does not resolve this issue.

[14]  Corporate "scienter" requires a showing of scienter on the part of a named individual defendant. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424 (9th Cir. 1995).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   SA CV 01-275-GLT MLGX, 2004 WL 3390052, at *1 (C.D. Cal. Nov. 23, 2004); *In re Tibco*

2   *Software, Inc. Sec. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654 at *26 (N.D. Cal. May 25,

3   2006). At the pleading stage, this Court recognized that Oracle's projections for 3Q01 were

4   accompanied by cautionary language referring to the very issues Plaintiffs claim to have caused

5   the miss. *Oracle Corp.*, 242 F. Supp. 2d at 679. The Court declined to dismiss on this ground,

6   however, because the Court believed it was not ripe for a decision at that stage. *Id.* After more

7   than two years of discovery, the factual record is more than sufficient to address this issue.

8   Oracle's 3Q01 projections were accompanied by language that easily meets this standard.[15]

9           The December 14, 2000 call began with a statement advising that the call might include

10  forward-looking statements and warning that actual results could differ from projections. Ex. 56

11  at 003216. During the call, Henley specifically noted the risk that a downturn could negatively

12  impact Oracle's actual results. *Id.* at 003218. Moreover, Oracle directed listeners to its most

13  recent SEC filings for further information on specific risk factors that could impact actual results

14  (*id.* at 003216), as permitted by the Safe Harbor. *In re The Clorox Co. Sec. Litig.*, 238 F. Supp.

15  2d 1139, 1142 (N.D. Cal. 2002). Those public filings provided cautionary language about a

16  variety of risks, including the very things Plaintiffs claim ultimately caused the miss.

17          In its October 16, 2000 10-Q, for example, Oracle warned that a "softening of demand for

18  computer software caused by a weakening of the economy may result in decreased revenues or

19  lower revenue growth rates." Ex. 160 at 024182. Oracle explained the "'pipeline' system" and

20  warned that "pipeline estimates are necessarily speculative and may not correlate to revenues in a

21  particular quarter," and thus a "variation in the conversion of the pipeline into contracts or in the

22  pipeline itself could cause the Company to improperly plan or budget." *Id.* at 024185. Oracle

23  reminded investors that the forecast was influenced by unpredictable contracting patterns, which

24  could cause revenues to vary for many reasons, including "changes in customer budgets," and

25  "general economic conditions." *Id.* at 024184-85. Oracle also explained the "hockey-stick"

26  effect. *Id.* The 10-Q says: "Accordingly, the Company's quarterly results are difficult to predict

27

28  [15] This cautionary language would also mandate summary judgment under the "bespeaks
    caution" doctrine. *Clorox*, 353 F.3d at 1132.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

until the end of the quarter, and delays in product delivery or closing of sales near the end of a quarter have historically caused and could cause quarterly revenues and net income to fall significantly short of anticipated levels." *Id.* Oracle also advised investors of the inherent uncertainty around new products such as Suite 11i (and especially the newer CRM products within the Suite), including the risk of "[s]ignificant undetected errors or delays in new products or new versions of a product." *Id.* at 024183. Oracle cautioned that "if customers were to experience significant problems with the implementation and installation of products, or if customers were dissatisfied with product functionality or performance," actual results could differ from projections. *Id.* Oracle thus had "no assurance that the Company's new products will achieve significant market acceptance or will generate significant revenue." *Id.*[16]

Taken as a whole, this cautionary language identified the very factors that resulted in the 3Q01 guidance miss, whether one accepts Defendants' view of what caused the miss (*i.e.*, a large number of deals slipped in the last few days of the quarter due to customers' concerns about the economy) or Plaintiffs' view (*i.e.*, defects in Suite 11i negatively impacted customer acceptance of Suite 11i). *Clorox*, 353 F.3d at 1132; *Broadcom*, 2004 WL 3390052, at *4-5.

**B.      Statements About the Economy**

Plaintiffs also claim Defendants made a series of false statements about the effect of the economy on Oracle's business. RSAC ¶¶ 45(a), 60, 65; Ex. 56 at 003218; Ex. 81 at 8-14.[17] This claim, too, fails because Plaintiffs cannot prove falsity or scienter.

**1.      Plaintiffs Cannot Show the Statements Were False or Misleading**

Plaintiffs "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed

---

[16] Oracle repeated substantially the same cautionary language in the 10-Q it filed on January 16, 2001. *See* Ex. 161 at 143484-89.

[17] RSAC ¶ 45(a); Ex. 162 at 141652 ("The economy is slowing …. It's just not having a negative impact on our business."); RSAC ¶ 45(a); Ex. 163 at 141660-61 ("the economy right now even though it's slowing doesn't seem to be affecting us. We see no difference in demand for our upcoming third fiscal quarter….[S]o far we look pretty hard at indicators. We're seeing no softening in our business."); RSAC ¶ 45(a); Ex. 164 at 141658 ("The economic slowdown isn't hurting Oracle, said Oracle Chief Executive Larry Ellison, because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs and boost efficiency.").

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

28

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   a false or misleading impression." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th

2   Cir. 1991). In that regard, statements must be read in context. *Siegel v. Lyons*, No. C-95-3588

3   DLJ, 1996 WL 438793, at *7 (C.D. Cal. Apr. 26, 1996).

4        As an initial matter, Plaintiffs have repeatedly mischaracterized Defendants' statements,

5   frequently by omitting crucial context. In so doing, Plaintiffs have attempted to suggest that

6   Defendants said, without qualification, that the economy was not hurting—or even "would not"

7   hurt—Oracle's business. RSAC ¶ 45. In fact, Defendants repeatedly warned that although

8   Oracle did not see any impact on its business ***at that time***, a deterioration in economic conditions

9   could negatively impact Oracle's business. RSAC ¶ 60; Ex. 56 at 003218-19; Ex. 163 at

10  141661; Ex. 165 at 309120-21; Ex. 166 at 091443. Taking into account the full context of what

11  Defendants said, and the other information then available to the market, the undisputed facts

12  make clear that these statements were true.

13       The market obviously was aware of the general macroeconomic climate. Henley

14  discussed the general economic climate during the December 14 call (Ex. 56 at 003218-19), and

15  warned that a severe downturn could harm Oracle's business. *Id.* The subject of the

16  macroeconomic climate was widely discussed in analyst reports at the time, and Oracle had

17  warned about the potential impact of the economy in its 10-Q. Ex. 167; Ex. 168 at 308967-68;

18  Ex. 169 at 005852; Ex. 170 at 005880; Ex. 171 at 005867; Ex. 172 at 435065; Ex. 173 at

19  023377; Ex. 174 at 016875; Ex. 175 at 005808. The market also was aware of the "hockey-

20  stick" effect and its impact on Oracle's business, which Oracle discussed in the risk-factor

21  sections of its SEC filings. *E.g.*, Ex. 160 at 024184-85. Indeed, in reaction to some of the very

22  statements Plaintiffs complain about, analysts noted that Oracle's ability to meet guidance would

23  not become clear until the end of the quarter. Ex. 176 at 419979; Ex. 177 at 091536; Ex. 178 at

24  091443; Ex. 179 at 069398. With all of this in the "total mix of information" available to

25  investors, Plaintiffs must prove that facts not known to the market (Oracle's internal forecast

26  data) rendered Defendants' statements about the economy false or misleading when they were

27  made. *Convergent*, 948 F.2d at 512. On that question, Plaintiffs cannot establish a genuine issue

28  of fact.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

On December 14, Bloomberg quoted Henley as saying that the economy was "not having a negative impact on our business," on December 15, Bloomberg attributed to Ellison the statement that the "economic slowdown isn't hurting Oracle" because Oracle's products "help[] companies use the Internet to cut costs and boost efficiency, and on December 15, Henley interviewed with Radio Wall Street and stated that the economy "doesn't seem to be affecting us." Ex. 81 at 8-9. There is absolutely no evidence that the economy was negatively impacting Oracle's business at the time, and therefore no evidence the statements were false. Oracle's impressive results for the first two quarters of its 2001 fiscal year, combined with the 33% license growth projected by Oracle's December 11, 2000 Upside Report, demonstrate the truth of Ellison's and Henley's statements. Indeed, as of December 14 and 15, Oracle's software license pipeline showed enormous growth over the same period a year earlier (before the dot-com bubble burst). Ex. 1 at 213095. That Oracle's pipeline had grown tremendously despite the economic uncertainty clearly supported Ellison's and Henley's statements. Simply put, as of mid-December 2000, Oracle was not seeing a slowdown in its business.[18]

Plaintiffs also claim that on January 9, 2001, Sanderson spoke at a Salomon Smith Barney conference, after which an analyst report attributed the following to him: "Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets." RSAC ¶ 58; Ex. 180 at 078422.[19] Plaintiffs also claim Oracle's Senior Director of Investor Relations said the following

---

[18] Indeed, one of Plaintiffs' Confidential Witnesses testified that as of the end of 2Q01, Oracle was doing great and "seemed to be immune from the circumstances affecting other companies. And there were lots of good reasons," including that Oracle was a "[l]ong-established company, product that's required by everybody, information needs gather – you know, continuing to grow. You know, this was why we were protected." Ex. 70 at 63:11-64:11. In 3Q01, "[b]usiness was good and there was a positive buzz around how we were responding to the economy. So my assumption was things were going to continue that way." Ex. 70 at 68:7-17. This was one of the very Confidential Witnesses Plaintiffs claimed to have had knowledge that Oracle was going to miss the quarter. The Ninth Circuit cited this witness in reversing this Court's dismissal of the operative complaint (380 F.3d at 1231), although it now appears this witness said no such thing.

[19] RSAC alleges that this statement was made on January 8, 2001. RSAC ¶ 58. In their responses to Defendants' contention interrogatories (Ex. 81) at page 9, Plaintiffs recognize that

LATHAM&WATKINS⊔⊔ᴘ
ATTORNEYS AT LAW
SAN FRANCISCO

30

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    on January 11, 2001: "Oracle has yet to see any signs that its business is being hurt by the

2    economic slowdown or reported cuts to information-technology budgets.  Obviously the

3    economy is a wild card.  So if we went into a recession or there is a sharp downturn, we could be

4    impacted…. But we're not seeing it now."  RSAC ¶ 60; Ex. 181 at 419674.

5         As of January 9 and 11, 2001, these statements were true:  The most recent Upside

6    Report (December 25) projected EPS of 12.70 cents and license revenue growth well in excess of

7    Oracle's projections.  Ex. 2 at 1913696.  The January 15, 2001 pipeline reporting package just a

8    few days later showed pipeline growth of 34% over the prior year, well in excess of the

9    approximately 25% license growth Oracle had projected.  Ex. 12 at 008548.  Moreover, as of

10   January 15, the field forecasts from Oracle's NAS, OSI and OPI units had not changed at all

11   from the December 11 report.  Ex. 3 at 1913734.  Thus, the salespeople closest to the customers

12   had not changed their forecasts at all.

13        Plaintiffs also claim Sanderson made the following statement to RealMoney.com on

14   January 20, 2001: "You know, it's a big hill to climb.  Every year we climb that hill.  I expect

15   we'll do it again.  Our pipelines are strong, and we're well-positioned from a products

16   perspective, so it's all about execution."  Ex. 182 at 419664.  Again, however, Oracle's most

17   recent internal data fully supported Sanderson's statement.  The January 15 Pipeline Report

18   showed pipeline growth of 34%—surely a "strong" pipeline by any measure.  *Oracle Corp.*

19   *Deriv. Litig.*, 867 A.2d at 918; Ex. 12 at 008549.

20        Plaintiffs also claim that on February 7, 2001, Henley met with analysts from Deutsche

21   Banc at Oracle's headquarters.  RSAC ¶ 65(b).  A Deutsche Banc report following that meeting

22   attributes the following to Henley:

23        VISIT WITH MANAGEMENT.  Yesterday, we checked in with Oracle for a mid-quarter
          update with CFO Jeff Henley and VPs in the server and applications development
24        organizations. *** PERSPECTIVE ON THE MACRO ENVIRONMENT.  According to
          management, it has yet to see macro-related weakness in its business…. *** …Barring a
25        severe economic downturn, management sees continued growth driven by strong demand
          in key segments such as supply chain, customer relationship management and
26        collaboration. ***

27

28   the statements occurred on January 9.  Ex. 180 at 078420 (indicating that the conference was
     held on a Tuesday; January 9, 2001 was a Tuesday).

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Ex. 177 at 091536.  On February 13, 2001, according to Plaintiffs, Sanderson told analysts from

2   Goldman Sachs that Oracle's pipelines had "never been stronger."  Ex. 38 at 003309; Ex. 183 at

3   141794; Ex. 63 at 472:10-21.  Again, however, the internal forecast data at the time were fully

4   consistent with these statements.  *Supra* Section II.B.4.

5              **2.      There Is No Evidence That Any Defendant Acted "Recklessly"**

6              Defendants' statements about the observed current effect of the economy were phrased in

7   the present tense.  Unlike Oracle's 3Q01 projections, they were not forward-looking statements,

8   and therefore are not subject to the Safe Harbor's "actual knowledge" standard.  For these

9   statements, Plaintiffs must prove Defendants acted "recklessly."  *Howard v. Everex Sys., Inc.*,

10  228 F.3d 1057, 1063 (9th Cir. 2000).  Here, Plaintiffs can cite absolutely no evidence to support

11  an inference that Defendants either knew these statements were false or ignored a danger of

12  misleading investors that was "so obvious" that Defendants "must have been aware of it."  *Id.*

13             **a.      Plaintiffs Have Failed to Provide Evidence to Support the**

14                      **Central Allegations That the Ninth Circuit Relied Upon**

15             Reversing this Court's dismissal of the RSAC, the Ninth Circuit cited several allegations

16  which, taken together, the Court believed created a "strong inference" of scienter.  *Oracle Corp.*,

17  380 F.3d at 1234.  Most of these allegations turned out to be false.  The Ninth Circuit cited

18  Plaintiffs' "debit memo" allegations as  "important[]" support for this inference.  *Id.* at 1233.

19  Plaintiffs have completely abandoned those allegations.  *Infra* Section III.D.1.  In reversing this

20  Court's dismissal of the RSAC, the Ninth Circuit also relied, at least in part, on statements

21  attributed to several Confidential Witnesses ("CWs").  *Id.* at 1231-2.  As discovery revealed, this

22  reliance was misplaced.  Of the four CWs cited by the Ninth Circuit, one flatly contradicted what

23  was attributed to him in the RSAC, another refused to appear for his deposition because he is

24  facing felony charges for embezzling over one million dollars from Oracle, and the other two

25  admitted that they were low-level employees with no knowledge regarding the status of Oracle's

26  sales and/or business beyond their own limited, personal responsibilities.  Ex. 70 at 88:1-12; Ex

27  184 at 2; Ex. 185 at 12:13-16, 60:4-14, 84:6-14; Ex. 186 at 62:25-63:24, 89:12-17.  In addition,

28  while these CWs claimed there had been a "major slowdown in sales" as far back as the summer

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

32

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  of 2000, Oracle's pipeline and sales data for the two quarters preceding 3Q01, and for 3Q01

2  itself, belie any allegations of such a slowdown.  Ex. 42.

3       The Ninth Circuit also cited the company's ability to determine the amount of products

4  "sold in the last hour around the world."  *Oracle Corp.*, 380 F.3d at 1231.  Not before the Ninth

5  Circuit, however, were undisputed facts about the hockey-stick effect:  Given that the vast

6  majority of Oracle's sales were made in the last month of the quarter, and most of that during the

7  last two weeks, even up-to-the-minute sales data would be of no use in predicting Oracle's

8  results until the very end of the quarter.  The sales data Oracle's senior executives actually

9  reviewed—the Flash Reports—gave absolutely no indication that the Company was likely to

10  miss its guidance.[20]  Exs. 9-10.

11       **b.**     **Defendants' Stock Sales Do Not Show Scienter**

12       The Ninth Circuit also relied on stock sales by Ellison between January 22 and 31, 2001,

13  as support for a "strong inference" of scienter.  *Oracle Corp.*, 380 F.3d at 1232.  Any such

14  inference, however, is conclusively undercut by undisputed facts in the record.

15       First, it is undisputed that one of the individual Defendants, Sanderson, did not sell any

16  stock during the Class Period.  That fact undercuts any inference of scienter, not just as to

17  Sanderson but as to all Defendants.[21]  *E.g.*, *Acito v. IMCERA Group., Inc.*, 47 F.3d 47, 54 (2nd

18  Cir. 1995); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999).

19       Second, as of the Class Period, Henley had sold Oracle stock on a regular basis—every

20  year since 1993.  Henley Decl., ¶ 12.  There was nothing suspicious about the timing of Henley's

21  sale during 3Q01.  He sold on a single day, January 4, 2001, at which point all of Oracle's

22  internal forecasting data indicated that Oracle would meet or exceed its guidance.  *Id.* ¶¶ 15-16;

23  Ex. 2 at 1913696.  Based on the same facts, Vice Chancellor Strine concluded in the related

---

25  [20]  The Ninth Circuit also referred to allegations of large deals lost in December and January.
26  *Oracle Corp.*, 380 F.3d at 1231-32.  Plaintiffs have proved no such thing here, and in any event,
   it is undisputed that Oracle's pipeline during December 2000 and January 2001 remained large
27  enough that Oracle could have met its guidance if its conversion ratio had remained consistent
   with historical trends.  Ex. 12 at 008549.  Clearly, to the extent any deals were lost in December
28  or January, they did not render it impossible for Oracle to meet its guidance, as Plaintiffs claim.
   [21]  Similarly, Catz, Wohl and Minton did not sell during 3Q01.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  derivative case that "[P]laintiffs' claim that Henley possessed material, adverse information

2  comes very close to failing the straight face test and comes nowhere near avoiding summary

3  judgment." *Oracle Corp. Deriv. Litig.*, 867 A.2d at 944.

4        Finally, with regard to Ellison's sales, there are several undisputed facts, not pled in

5  RSAC and therefore not before the Ninth Circuit, that affirmatively undercut any inference of

6  scienter arising from those sales. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th

7  Cir. 1989). Indeed, ruling on the basis of a "massive" evidentiary record in the derivative case,

8  the Chancery Court concluded: "Given this record, it is impossible for a rational mind to infer

9  that Ellison possessed material, adverse information at the time he instructed his broker to sell

10 shares on January 19, or at the time when he actually sold shares from January 22 to January 31,

11 2001." *Oracle Corp. Deriv. Litig.*, 867 A.2d at 950. The record, and the reasonable inferences

12 that may be drawn from it, remain the same here.

13       It is undisputed that as of 3Q01, Ellison held 22 million Oracle options—worth over half

14 a billion dollars—that were due to expire if they were not exercised before August of 2001.

15 Ellison Decl., ¶ 6. Under Oracle's insider trading policy, Ellison had only three trading

16 "windows" left in which to exercise those options. Ellison Decl., ¶ 8. If, during any of those

17 windows, Ellison had come into the possession of material, nonpublic information (such as a

18 decision by Oracle to pursue a sizeable acquisition), Ellison would have been unable to trade

19 during that window. *Id.* Thus, if Ellison had not exercised those options during 3Q01, he would

20 have been at risk of losing the ability to exercise them at all. *Id.* Once he decided to exercise

21 these options, Ellison decided to sell additional shares to pay down debt. *Id.* ¶ 9-10.

22       Setting aside the reasons for his sales, Ellison placed a number of restrictions on the sales

23 that are completely inconsistent with any inference that he sold because he believed Oracle

24 would miss its guidance. *Id.* ¶¶ 11-12. Ellison directed that his sales should not exceed 10% to

25 15% of Oracle's total trading volume for any given day; that no sales should be made at all if the

26 price of Oracle's stock fell below $30; and that no sales would take place after January 31, even

27 though he had obtained clearance to trade into February. *Id.*; Ex. 187 at 174:10-24, 202:19-24;

28 164:1-24. In part due to these restrictions, Ellison ended up selling only 29 million of the 40

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

34

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    million shares that he and his investment advisor had decided to sell.  Ellison Decl., ¶ 13; Ex.

2    187 at 180:8-19; Ex. 188.  These facts are flatly inconsistent with any inference that Ellison was

3    bailing out of his Oracle stock because he believed Oracle would miss its guidance.  In fact,

4    Ellison has testified to the contrary.  Ellison 16:24-17:4; *also* Ellison Decl., ¶¶ 3-4, 14.  Ellison's

5    testimony is confirmed by the data available to him at the time.  Exs. 3-4; *supra* Section II.B.4.

6    **C.      Statements About Suite 11i**

7         Plaintiffs also claim Defendants misled the market about Suite 11i.  Plaintiffs initially

8    challenged several statements during the Class Period echoing Oracle's basic marketing message

9    for Suite 11i—that the modules of the Suite were "pre-integrated" with one another, and

10   therefore needed no expensive "systems integration to work together."  Ex. 189 at 3.  Without

11   moving to amend the RSAC, Plaintiffs have attempted to expand this theory, now claiming that

12   nearly everything Oracle said about Suite 11i—including the very statement that it was available

13   for purchase—was false.  *E.g.*, Ex. 190 at 10-21, 50-58.  Plaintiffs claim that potential customers

14   learned the "truth" about Suite 11i, and canceled or delayed deals for that reason, thereby

15   causing Oracle's guidance miss.  Ex. 81 at 85.  This claim fails because Plaintiffs cannot prove

16   falsity or loss causation.

17   **1.      Suite 11i Was Not a Failed Product**

18        Plaintiffs have scoured the enormous discovery record in this case and cited, as an

19   allegedly undisclosed "fact," every negative thing regarding Suite 11i—every customer

20   complaint, every critical statement by Oracle's own executives and engineers, every challenge

21   Oracle faced with its own implementation of Suite 11i, etc.  *E.g.,* Ex. 190 at 56, 93-95; RSAC at

22   ¶¶ 54(a)-(m); Ex. 81 at 72-74, 77-79.  In so doing, Plaintiffs have ignored facts that reveal a

23   larger truth:  By any reasonable standard, Suite 11i was a financial and a technical success.

24   Although sales of Suite 11i did not meet Oracle's projections for 3Q01, Suite 11i was by no

25   means a failed product.

26        In the first two quarters after Oracle released Suite 11i, a time during which Plaintiffs

27   claim Suite 11i suffered from precisely the same defects as during the Class Period, Oracle

28   licensed Suite 11i to over 3,000 customers, and its new applications revenue exceeded $435

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   million.  Ex. 39 at 025214; Ex. 25 at 973930; Ex. 26 at 976820; *also* Ex. 83 at 035472.  For those

2   same quarters, Oracle achieved year-over-year applications growth of 42% and 66%.  Ex. 25 at

3   973930; Ex. 26 at 976820.  Although sales of Suite 11i did not meet Oracle's projections for

4   3Q01, Oracle licensed Suite 11i to about 2,000 customers, generating new applications license

5   revenue of $249 million, with year-over-year applications license revenue growth of 25%.  Ex.

6   191 at 141686; Ex. 27 at 977030.  During roughly the same calendar period, Oracle's leading

7   competitor, SAP, reported average quarterly new license growth of just 33%, compared with the

8   44% growth that Oracle averaged over the first three quarters after Suite 11i was released.  Ex.

9   129; Ex. 130 at 307611; Ex. 131 at 307748.  Clearly, this is not like a typical securities fraud

10  case alleging "disastrous" problems that "doomed" a new product.  *Shuster v. Symmetricon, Inc.*,

11  No. C9420024RMW, 2000 WL 33115909, at *6 (N.D. Cal. Aug. 1, 2000) (distinguishing cases

12  involving "substantially more disastrous problems with . . . new products, which usually doomed

13  the product"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1111 (9th Cir. 1989) ("Apple

14  replaced Twiggy with another disk-drive system before actual sales . . . began.").

15          Suite 11i also was a technical success.  By the beginning of 3Q01, approximately 85

16  customers were "live" on one or more modules of the Suite.  Ellison Decl. ¶ 19; Ex. 44 at

17  418888-91; *also* Ex. 145 at 154523.  This number increased substantially during and shortly after

18  the Class Period, as nearly 200 customers were "live" on a part of the Suite by the end of 3Q01,

19  while nearly 400 customers were live by the end of 4Q01.  Ex. 48 at 418419-25; Ex. 49 at

20  417620-33; *also* Ex. 51 at 417086; Ex. 192 at 419298.  These success stories included customers

21  using a wide range of modules, including both ERP and CRM products.[22]  Oracle itself upgraded

---

[22] For example, POSCO, the largest steel manufacturer in the world, achieved great success
implementing the full Suite.  *E.g.*, Ex. 190 at 89 .  By September of 2001, POSCO had realized
significant benefits, and POSCO estimated that using Suite 11i would save it $3.6 billion over
ten years.  Ex. 53 at 419006-7.  POSCO was not the only 11i customer to implement numerous
Suite 11i modules from both the ERP and CRM families by the end of the third quarter of
Oracle's fiscal year 2001.  *E.g.*, Ex. 50 at 418301-7 .  Imation, a $1.2 billion global company,
exemplifies the many 11i customers successfully using numerous modules from Suite 11i during
the Class Period.  By February of 2001, Imation was live on 11i in multiple European countries,
providing "[m]ulti-lingual, multi-org and multi-currency" support for its international operations.
Ex. 48 at 418421.  Notably, Imation's Suite 11i implementation in both the United States as well
as Europe included the 11i Order Management module, which Plaintiffs have repeatedly cited as
virtually inoperable.  Ex. 53 at 419001.  Imation was far from the only example of an 11i
customer successfully using Order Management during the Class Period.  Ex. 50 at 418301-7.

LATHAM&WATKINS↳↳↳
ATTORNEYS AT LAW
SAN FRANCISCO

36

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   to significant portions of the Suite during this period. Ex.193 at 136:4-9; Ex. 194 at 1055150.

2   Customers, too, successfully implemented a wide range of Suite 11i modules before, during and

3   after the Class Period. Ex. 44 at 418888-96; Ex. 47 at 418629-40; Ex. 49 at 417620-39.

4           That Suite 11i was not a failed product is perhaps best illustrated by its performance in

5   the months following the Class Period. During 4Q01—the three months immediately *after*

6   Plaintiffs claim the market learned that Suite 11i was so defective it was like "a car without

7   wheels"—Oracle sold over $338 million worth of new applications licenses. Ex. 28 at 977287;

8   Ex.195 at 110953; Ex. 196 at 430558. That performance alone undercuts any claim that the

9   March 1 announcement revealed some undisclosed "truth" that Suite 11i did not work. Indeed,

10  as of the Class Period, Oracle was the world's second largest enterprise applications vendor, and

11  it has remained so ever since. Ex. 85 at 398:16-399:4; Ex. 86 at 1051343. Since their release,

12  Oracle's Suite 11i products have been among the most widely used enterprise applications in the

13  world.

14              **2.    Plaintiffs Cannot Prove Any of Defendants' Statements About Suite**

15                      **11i Were False Or Misleading**

16          Plaintiffs "must demonstrate that a particular statement, when read in light of all the

17  information then available to the market, or a failure to disclose particular information, conveyed

18  a false or misleading impression." *Convergent*, 948 F.2d at 512. The "facts" that Plaintiffs

19  claim Defendants failed to disclose—the facts Plaintiffs cite as proof that Suite 11i did not

20  work—consist almost entirely of anecdotal evidence of user customer complaints. *E.g.,* Ex. 190

21  at 50-59; RSAC at ¶¶ 54(a)-(m); Ex. 81 at 77-79. But Plaintiffs have made no effort to put this

22  anecdotal evidence into context, much less explain how it adds up to a product so defective it

23  was like "a car without wheels." Ex. 197 at 86:21-87:7; Ex. 132 at 32:13-23, 33:12-25. Without

24  such context, Plaintiffs cannot prove their allegation that Suite 11i was so plagued with defects

25  that it was unfit for commercial use. Because that contention (or variations on the theme) forms

26  the basis for all of Plaintiffs' claims concerning Suite 11i (*e.g.,* Ex. 190 at 61-62, 74-76, 107-

27  109), Plaintiffs cannot prove that Defendants misled the market about any material facts.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

37

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Indeed, many of the statements Plaintiffs challenge—including the only statements

2   alleged in the RSAC and identified in Plaintiffs' contention interrogatory responses—speak to

3   the manner in which Suite 11i was "designed" and "engineered," not to its quality.  *E.g.*, RSAC

4   ¶ 50 ("[Y]ou can buy our complete E-Business Suite, where all the pieces are designed and

5   engineered to fit together."); *also id.* ¶¶ 51, 58, 63, 68; Ex. 81 at 8-15 (¶¶ 3(e), 7(a), 11(a)-(b), 23,

6   24(b)).  These statements speak to the very nature of the Suite itself, and they expressly

7   distinguish Oracle's Suite from separate "best of breed" products offered by different vendors.

8   *E.g.,* Ex. 56 at 003224-25; Ex. 198 at 141655; Ex. 83 at 035471; Ex. 113 at 106690-91; Ex. 199

9   at 03286-92; *also* Ex. 200 at ¶ 128.  Plaintiffs do not deny that Suite 11i was "integrated" as

10  compared to "best of breed" products from different vendors (Ex. 197 at 148:22-149:8; 143:25-

11  144:16), nor do they claim that customers needed "systems integration" work for the modules of

12  Suite 11i to work together (Ex. 197 at 227:11-228:9).  Plaintiffs claim, instead, that the quality of

13  Suite 11i was so bad that everything Defendants said about the product, including that it was

14  "available" for customers to purchase, was false.  *E.g.*, Ex. 190 at 10-21, 50-58; Ex. 197 at 8:17-

15  25.  While Defendants do not believe the overall quality of Suite 11i bears on the truth of the

16  challenged statements, nevertheless, Plaintiffs' claim fails even on its own terms.

17      First, without more, customer complaints do not prove that Suite 11i was defective at all.

18  It is undisputed that only a fraction of problems customers reported to Oracle ultimately turned

19  out to be defects in the software, as opposed to problems with the other software or hardware

20  being used with Suite 11i, improper configurations of the software, or other issues.  Ex. 52; Ex.

21  111 at 267:14-268:6; Ex. 201 at 228:1-16; Ex. 202 at 38:3-15; Ex. 97 at 87:3-24; Ex. 203 at

22  240:4-17, 240:18-241:1, 122:4-10; Ex. 133 at 213:2-15; Ellison Decl., ¶ 19; Shaw Decl., ¶ 7-8;

23  Fletcher Decl., ¶ 22-25.  Here, Plaintiffs have simply assumed—without record support—that

24  each customer complaint reflects a defect in Suite 11i.

25      Second, while some number of customer complaints were caused by software bugs,

26  Plaintiffs have made absolutely no effort to show that Suite 11i suffered from a higher defect rate

27  than one would expect for a typical enterprise applications suite, or even that it had more bugs

28  than competing products.  As such, Plaintiffs cannot prove that Suite 11i was somehow

LATHAM&WATKINS℠
ATTORNEYS AT LAW
SAN FRANCISCO

38

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    "defective" because the record is devoid of evidence to show that it had more, fewer, or about

2    the same number of bugs as competing products. Ex. 132 at 38:3-16; Ex. 197 at 87:6-7.

3        Third, not every bug affects every customer. Ex. 111 at 134:1-12; Ex. 67 at 141:18-

4    143:1; Ex. 246 at 72:14-73:12; Ex. 142 at 262:7-18; Ex. 197 at 186:9-14; Ex. 132 at 95:12-96:5.

5    Plaintiffs have cited complaints and difficulties encountered by, at most, a few dozen customers,

6    but Plaintiffs have made no effort to show that those customers are in any way representative of

7    the broader population of customers implementing Suite 11i, a population that grew from about

8    1,000 to 2,500 customers over the course of the Class Period. Ellison Decl., ¶ 19; Shaw Decl., ¶¶

9    5, 9; Ex. 85 at 398:16-399:2; Ex. 204 at 29:3-6; Ex. 67 at 290:1-21; Ex. 133 at 209:8-15; *also*

10    *supra* Section II.E.6. The fact that some small fraction of those customers complained about

11    Suite 11i's quality does not prove anything about the quality or functionality of the Suite overall.

12        Fourth, even for those complaining customers, Plaintiffs frequently present a snapshot or

13    a fragment of information to suggest that the customer was unhappy with Suite 11i. *Compare*,

14    *e.g.*, Ex. 190 at 89 *with* exhibits cited, n. 22, *supra*, and Ex. 200 at 68; *also* Ex. 142 at 259:19-

15    260:25; Ex. 247 at 48:3-51:21; Ex. 67 at 192:21-194:1. But even under the best circumstances,

16    implementing enterprise applications software is a long and complex process. That a particular

17    customer complains at some point in that process does not support any broader inference that the

18    project itself was a failure, let alone that the project failed because of defects in Suite 11i. Ex.

19    197 at 105:12-110:22; *also* Ex. 200 at ¶ 178.

20        Simply put, Plaintiffs' anecdotal evidence simply does not support an inference that Suite

21    11i was so plagued by defects that it was like "a car without wheels," as Plaintiffs claim (Ex. 197

22    at 87:6-7; Ex. 132 at 29:12-14; 33:22-34:1; 38:10-16; 111:8-112:2), and therefore Plaintiffs

23    cannot prove Defendants' statements were false. *E.g.*, Ex. 132 at 38:10-16; *Recreational*

24    *Developments of Phoenix, Inc. v. City of Phoenix*, 220 F.Supp.2d 1054, 1061 (D. Ariz. 2002)

25    (finding that anecdotal evidence is "non-systematic and non-generalizable").

26        **3.**      **Plaintiffs Cannot Prove Loss Causation**

27        Plaintiffs must prove that the price of Oracle's stock dropped when the market learned

28    the "truth" about a prior misstatement or omission. *Dura*, 544 U.S. at 344. Although an express

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

39

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    "corrective" disclosure may not be required (Ex. 205 at 5:23-6:1), there must be a "causal

2    connection" between the alleged misstatement and the stock price drop. *Dura*, 544 U.S. at 347.

3    The March 1, 2001, announcement did not reveal anything about the functionality or quality of

4    Suite 11i, nor did it reveal any of the allegedly undisclosed "facts" that Plaintiffs claim the

5    Defendants had a duty to disclose. Ex. 30. It revealed that Oracle would miss its guidance for

6    the quarter. *Id.* Thus, Plaintiffs must show that Oracle's failure to meet its 3Q01 guidance

7    indirectly revealed the "truth" about Suite 11i—a "truth" that contradicted Defendants'

8    statements or revealed facts about Suite 11i that Defendants were under a duty to disclose. *Dura*,

9    544 U.S. at 344; *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1027 (9th Cir. 2005).

10    Plaintiffs claim potential customers learned the "truth" about Suite 11i, and for that

11    reason they canceled and delayed sales, thereby causing Oracle to miss its 3Q01 guidance.

12    RSAC ¶¶ 6, 11, 54; Ex. 81 at 85. But Plaintiffs have not identified a single potential customer

13    they claim canceled or delayed a deal due to alleged "problems" with Suite 11i, much less shown

14    that such delays or cancellations actually caused Oracle to miss its 3Q01 guidance. Ex. 81 at 85;

15    *cf. Tuchman v. DSC Communications Corp.*, 818 F. Supp. 971, 977 (N.D. Tex. 1993) ("Plaintiffs

16    fail to provide any facts to support [their] assertions [of reduced orders]. How many customers

17    defected? Which customers? Which orders were cancelled? What equipment was returned? What

18    figures demonstrate a fall-off in new orders?"). Thus, Plaintiffs have entirely failed to identify

19    any evidence that any problems with Suite 11i caused Oracle's guidance miss, and Plaintiffs'

20    claim fails. *Dura*, 544 U.S. at 344; *Daou*, 411 F.3d at 1027; *In re Gilead Sciences Securities*

21    *Litigation*; Slip Copy, 2006 WL 1320466 *6-9 (N.D. Cal. 2006).

22    Indeed, Plaintiffs' difficulty here is, to some extent, inherent in their loss causation

23    theory. Unlike a typical "failed product" case, Plaintiffs do not claim that Oracle misled the

24    market about problems known only to Oracle insiders. *Cf. In re Apple Computer Sec. Litig.*, 886

25    F.2d 1109, 1115 (9th Cir. 1989) (alleging that Apple failed to disclose internal product

26    problems). Plaintiffs' theory is that the "truth" about Suite 11i—presumably some variation on

27    the claim that Suite 11i suffered from unusually severe quality problems—became so widely

28    known to the public that Oracle's prospective customers decided *en masse* to delay or cancel

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  deals.  But in order to show that their loss was caused by *fraud*, Plaintiffs must show that the

2  very same "truth" remained hidden from the market until Oracle announced the earnings miss on

3  March 1, 2000.  *Dura*, 544 U.S. at 344.  Any inference to that effect is unsustainable and

4  inconsistent with the efficient market theory underlying Plaintiffs' own reliance claim:  If large

5  numbers of potential customers learned the "truth" about Suite 11i and acted upon it (and

6  Plaintiffs' loss causation theory relies on precisely this assumption), then the efficient market

7  theory underlying Plaintiffs' reliance claim would imply that the same information would have

8  been incorporated into Oracle's stock price.[23]  *Shuster,* No. C9420024RMW, 2000 WL

9  33115909, at *6 ("Once a company has begun to distribute a new product, the market is

10  presumed to possess basic information about customer demand for the product, thereby raising

11  the bar for a securities fraud claim based on predictions of increased demand.").

12           Indeed, both before and during the Class Period, the market was well aware of the very

13  same "facts" Plaintiffs cite as evidence that Suite 11i did not work.  Analysts repeatedly noted

14  that the early releases of Suite 11i had bugs (Ex. 206 at 00162; Ex. 207 at 1; Ex. 140 at 09567;

15  Ex. 208 at 419977; Ex. 209 at 3; Ex. 147 at 101612; Ex. 210 at 309148); that Oracle issued a

16  number of patches (and those patches sometimes caused other programs to "break") (Ex. 211 at

17  307399; Ex. 212 at 1054611; Ex. 154 at 091464); and that various applications within the Suite

18  had "functional gaps" as compared with "best of breed" competitors (Ex. 124 at 308716; Ex. 215

19  at 009598; Ex. 245 at 085851); *cf. In re Sybase Inc. Secs. Litig.*, 48 F. Supp. 2d 958, 961-62

20  (N.D. Cal. 1999) ("[T]he alleged 'bugs' and problems with Sybase's products . . . were amply

21  reported by industry analysts in numerous publications.").  Other reports relayed accusations that

22  Suite 11i had been released "too early" and lacked maturity, described early customers having

23  difficulty implementing the products, and even warned more risk-averse customers to hold off

24  for months until it stabilized.  Ex. 216 at 4 ; Ex. 112 at 019759; Ex. 117 at 009737; Ex. 140 at

25  009467.  This widespread publicity regarding the very same facts Plaintiffs claim the Defendants

26  hid from the market eviscerates Plaintiffs' loss causation theory.  It is undisputed that the market

27

28  [23]  As discussed above, Oracle and its stock were widely covered by analysts and the general
    press.  *See supra* Sections II.B.1, II.D, II.E.3.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

41

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  knew of these issues long before the stock drop that forms the basis of Plaintiffs' damages claim.

2  To establish loss causation, Plaintiffs must identify a specific fact about Suite 11i that (i)

3  Defendants hid from the market, either through an affirmative misstatement or omission; and (ii)

4  caused Oracle to miss its 3Q01 guidance.  *In re Impax Labs., Inc. Sec. Litig.*, No. C 04-04802

5  JW, 2007 U.S. Dist. LEXIS 723, at *9 (N.D. Cal. Jan. 3, 2007) (stating that loss causation rules

6  require that the "misstatement or omission concealed something from the market that, when

7  disclosed, negatively affected the value of the security").  To date, Plaintiffs have failed to

8  adduce evidence that would support either of these two critical facts.

9      Setting aside Plaintiffs' failure to produce evidence in support of their loss causation

10  theory, the undisputed facts affirmatively undercut it.  In the weeks following Oracle's March 1,

11  2001 announcement, several of Oracle's competitors in the enterprise software business, and

12  dozens of software companies generally, either lowered or missed their guidance.  Ex. 80 at ¶ 69

13  and James Exhibit 8.  Indeed, after Oracle's earnings miss, it became clear that the industry had

14  entered a major downturn:

15      They call it Stormy Monday, but Tuesday's just as bad.  At least that's how the
       famous blues song goes but let's hope for a little let up on Tuesday after a Bloody
16      Monday of pre-announcements – a record 8 enterprise software companies in one
       day.  Including five companies that pre-announced last month, a total of 13
17      enterprise software companies have fallen on their swords.  Its [sic] been that kind
       of party.

18      The maiden round of pre-announcements in the enterprise software sector saw a
       median revenue shortfall of 23% . . . Five of the 13 companies announced layoffs
19      while the remainder left the option open as they replan their business.

20      The smallest miss was at i2 Technology (-1.9%) which came in better than
       investors had feared although posting the incremental revenue will make June that
21      much more difficult.  Oracle had the second smallest revenue miss (-7.5%) but the
       smallest earnings miss and was by far the most profitable.  The largest miss was
22      Ariba which missed the top line by 38% compared to our estimates and 49%
       relative to company guidance.  This miss was expected but the magnitude more
23      severe than consensus estimates.

24      Most of the shortfalls were expected in the environment.  Oracle had the
       misfortune of being the first large cap software company to pre-announce given
25      its February quarter end.  Consequently many pointed to product transition issues,
       the absence of Ray Lane, and a host of other problems for the miss.  As the
26      announcements start to mount, the economy seems to be taking over as the
       dominant factor in most cases.

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

42

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Ex. 214 at 179623. This fact provides further evidence that Oracle's earnings miss was caused

2   by an overall decline in the economy and the software sector, not problems with Oracle's

3   products.

4       **D.      Alleged Improper Accounting In 2Q01**

5           Plaintiffs' RSAC claimed that Oracle fraudulently recognized at least $228 million in

6   revenue through the creation of 46,000-plus "phony invoice" debit memos. RSAC ¶¶ 36-43.

7   According to Plaintiffs, nearly nine percent of Oracle's total revenue in 2Q01 was simply made

8   up, and Oracle's actual EPS for the quarter was two and a half cents lower than the reported

9   $0.11. *Id.* at ¶ 43. Defendants have maintained, consistently, that this claim is false. After two

10  years of extensive accounting-related discovery—including over 20 depositions and the

11  production of over one million pages of accounting-related documents—Plaintiffs simply

12  abandoned this claim. In its place, Plaintiffs have attempted to assert two new claims, namely,

13  that Oracle overstated revenue and EPS in 2Q01 by (i) improperly transferring $20 million to a

14  bad debt reserve account, and (ii) inappropriately recognizing approximately $20 million in

15  revenue on a sale of software licenses to HP. In other words, what started out as a claim that

16  Oracle fraudulently converted over $228 million in customer overpayments into revenue on a

17  single day, has devolved into claims of two unrelated $20 million accounting errors. These new

18  allegations fare no better than the abandoned debit memo claim.

19      **1.      Plaintiffs' Debit Memo Claim Is Baseless**

20          In anticipation of the internal upgrade to Suite 11i, Oracle decided to eliminate certain

21  remnant "On Account" flags from its accounts receivable subledger. Ex. 217 at ¶ 5; Ex. 218 at

22  110:24-111:10. These flags were used by Oracle's collections staff to notify others that they

23  should not attempt to apply the "flagged" receipt to an open invoice because it already had been

24  resolved. Ex. 217 at ¶¶ 4, 25; Ex. 218 at 52:16-24; Ex. 219 at ¶ 12. However, these flags

25  remained in the accounts receivable subledger long after the underlying payment had been

26  resolved. Ex. 217 at ¶ 24; Ex. 218 at 87:25-88:15; Ex. 219 at ¶¶ 12-13. To eliminate them,

27  Oracle created a computer script that recorded offsetting debits and credits in the same amount to

28  the same account, eliminating the "On Account" flags. Ex. 217 at ¶ 5; Ex. 218 at 144:3-23.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

43

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

The undisputed facts now prove what Defendants have said all along.  Because each of the journal entries involved simultaneous and offsetting debits and credits to the same account in the same amount, the creation of the debit memos did not have (and could not possibly have had) any net accounting impact.  *Id.*; Ex. 220 at 10-14; Ex. 219 at ¶16; Ex. 221 at 165:2-11; Ex. 222 at 149:4-17; Ex. 235 at 117:6-16.  The Confidential Witnesses Plaintiffs cited in support of their claim that these debit memos caused Oracle to recognize over $228 million in revenue, provided no such support in depositions.  Confidential Witness 49 refused to testify because he has been charged with multiple felony counts for embezzling over $1 million from Oracle.  Ex. 223 at 1-7; Ex. 224 at 1-2.  Confidential Witness 46 conceded that she never worked for Oracle, did not participate in the creation of the 46,000-plus debit memos and did not know (nor did she speak with) anyone from Oracle who did participate in the creation of or accounting for the 46,000-plus debit memos.  Ex. 225 at 66:5-9, 66:19-68:5, 156:18-157:16.  Plaintiffs' accounting expert, D. Paul Regan, refused to opine on the financial statement impact of the debit memos and he denied that it was "at issue in this case."  Ex. 226 at 31, 34; Ex. 227 at 95:16-98:2, 109:21-110:5.  Regan admitted, however, that the journal entries through which the debit memos were created and the "On Account" flags were removed had no net accounting impact.  Ex. 227 at 208:22-209:12, 213:11-20, 214:24-215:19, 219:24-220:12.  Dr. Marais, cited in the RSAC for Plaintiffs' claim that the debit memos totaled more than $228 million, gave no opinion on the financial statement impact of the debit memos and, in fact, admitted that his statistical estimation would be "irrelevant" if the actual sum of the debit memos was known.  Ex. 228 at 79:21-80:6, 81:4-18, 99:19-100:9, 114:12-115:6, 133:15-24.  That amount ($692 million) is now known, so Dr. Marais' estimate is, by his own admission, irrelevant.[24]  Ex. 217 at ¶¶ 6-7; Ex. 220 at 21; Ex. 240 at 050060; Ex. 241 at 300914; Ex. 243 at 314324.  Lest there be any doubt, both the SEC and Oracle's independent auditor, Ernst & Young LLP ("EY"), reviewed the accounting for the debit memos.  The SEC took no action, and EY found nothing improper.  Ex. 229; Ex. 230 at EY

---

[24]  The total amount of the debit memos makes clear just how absurd this claim is.  The undisputed facts show that Oracle recognized approximately $10 million in revenue on the day the debit memos were recorded.  Ex. 217 at ¶ 7; Ex. 220 at 21; Ex. 242 at 314324.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

44

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   000143-46; Ex. 231 at 196:19-198:14.  Little wonder Plaintiffs have finally abandoned this

2   claim.

3                    **2.        Plaintiffs' Unpled Accounting Claims Also Fail**

4          Plaintiffs' two new accounting claims—involving bad debt transfers of approximately

5   $20 million and $20 million in revenue on a license transaction with HP (Ex. 81 at 18, 21-22, 47-

6   48, 90-91)—were not alleged in the RSAC.[25]  Plaintiffs cannot defeat summary judgment by

7   abandoning the only accounting claim alleged in the RSAC because it has no merit, and adopting

8   entirely new theories without amending their pleadings.  *Pickern v. Pier 1 Imports, Inc*, 457 F.3d

9   963, 969 (9th Cir. 2006); *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1201 (D.

10  Nev. 1999).  But even setting aside Plaintiffs' failure to amend the RSAC, these two new claims

11  fail for several reasons.  First, there is no evidence of loss causation.  Second, even assuming the

12  bad debt transfers and the HP transaction rendered Oracle's financial statements false or

13  misleading (which they did not), any resulting misstatement would be immaterial as a matter of

14  law.  Third, Plaintiffs have no evidence of either intent or recklessness.  Finally, these two new

15  accounting claims, like the debit memo claim that came before them, are simply wrong.

16                    **a.        Plaintiffs Cannot Show Loss Causation**

17         Plaintiffs have not established, nor can they, that any alleged error in Oracle's 2Q01

18  financial statements caused the stock drop following Oracle's March 1, 2001 announcement of

19  its 3Q01 results.  *Dura*, 544 U.S. at 342; *Gilead Sciences*, 2006 WL 1320466, at *6-9.

20         The March 1 announcement that allegedly triggered Plaintiffs' loss did not reveal, either

21  directly or indirectly, that Oracle's 2Q01 financial statements were false or misleading.  *Impax*

22  *Labs.,* 2007 U.S. Dist. LEXIS 723, at *13-16.  The March 1 announcement did not reveal

23  anything about any bad debt reserve transfers or the revenue recognized by Oracle in connection

24  with the HP transaction.  *E.g.*, RSAC ¶¶ 17, 74.  Moreover, the revenue Oracle reported for

25  3Q01 did not reflect any adjustment to any of the revenue Plaintiffs claim Oracle improperly

26  recognized in 2Q01.  Ex. 235 at 42:23-46:15.  Indeed, Plaintiffs' "loss causation expert" did not

27

28  [25]  Indeed, Special Master Infante specifically ruled that the HP transaction was not within the
    scope of fact discovery because it was not pled in the RSAC.  Ex. 232 at 14:11-16:5.

1   even attempt to tie any alleged misstatement in Oracle's 2Q01 financial statements to the 3Q01

2   earnings miss.  Ex. 233 at 92:23-94:23.  Plaintiffs' accounting expert admitted that the bad debt

3   transfers only impacted 2Q01, and opined that the HP transaction was not a legitimate sale and

4   should *never* have been booked as revenue—not in 2Q01, not in 3Q01 and not in any subsequent

5   reporting period.  Ex. 227 at 119:16-120:4, 9:22-10:14.  Thus, even if the Court were to assume

6   that Oracle's 2Q01 revenue was inflated by these two $20 million items, there is no conceivable

7   theory under which those 2Q01 revenues could have caused the stock drop triggered by the

8   announcement of Oracle's 3Q01 miss.  *Impax Labs*, 2007 U.S. Dist. LEXIS 723, at *13-16.

9                    **b.    Plaintiffs Cannot Demonstrate Materiality**

10          Assuming that all of the transfers into the bad debt reserve *and* Oracle's decision to

11   recognize revenue on the HP transaction in 2Q01 were inappropriate (which they were not),

12   Oracle's revenue would have been overstated (according to Plaintiffs) by about $40 million,

13   approximately 1.5% of Oracle's $2.66 billion in revenue for 2Q01.  Ex. 226 at 2; Ex. 234 at 51;

14   Ex. 235 at 98:23-25; Ex. 227 at 127:19-24; Ex. 161 at 4.  Courts have found that alleged

15   misstatements of reported revenue of this magnitude are immaterial as a matter of law.  *In re*

16   *Intershop Communs. AG Sec. Litig.*, No. C 01-20333 JW, 2003 U.S. Dist. LEXIS 26923, at *16

17   (N.D. Cal. Jul. 23, 2003); *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-4849 MJJ, 2003

18   U.S. Dist. LEXIS 14442, at *45-46 (N.D. Cal. Mar. 25, 2003); *In re Broadcom Corp. Sec. Litig.*,

19   No. SA CV 01-275-GLT, 2004 U.S. Dist. LEXIS 28088, at *16-18 (C.D. Cal. Nov. 24, 2004);

20   *Mathews v. Centex Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895, at

21   *18 (N.D. Cal. Jun. 9, 1994); *In re Convergent Techs. Second Half 1984 Sec. Litig.*, No. C-85-

22   20130-SW, 1990 WL 606271, at *10 (N.D. Cal. Jan. 10, 1990).[26]

23          Plaintiffs also cannot establish a genuine issue of material fact by relying upon any

24   purported change in Oracle's reported EPS for 2Q01.  Even assuming that both the bad debt

25   transfers and the revenue recognition on the HP transaction were improper, Oracle's reported 11

26   cents EPS was overstated by only one cent.  Ex. 234 at 50-51.  Moreover, Plaintiffs' accounting

27   _____

28   [26] Plaintiffs also have failed to establish any competent evidence to suggest  that the transfers into the bad debt reserve and the decision to recognize revenue on the HP transaction are material from a qualitative perspective.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

46

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  expert conceded that Oracle would have met analysts' consensus earnings expectations for 2Q01

2  even if the bad debt transfers and the HP transaction never occurred. Ex. 227 at 129:9-18.

3  Likewise, Oracle would have achieved its own guidance for 2Q01, which also was 10 cents EPS.

4  Under these circumstances, courts have held that similarly insignificant changes in reported EPS

5  were immaterial. *SEC v. Todd*, No. 03CV2230 BEN, 2007 U.S. Dist. LEXIS 38985, at *13-14

6  (S.D. Cal. May 30, 2007); *Mathews*, 1994 U.S. Dist. LEXIS 7895, at *17-20; *In re Anchor*

7  *Gaming Litigation*, 33 F. Supp. 2d 889, 894-895 (D. Nev. 1999).

8  **c.**      **Plaintiffs Cannot Prove Scienter**

9       Plaintiffs' unpled accounting allegations fail for the additional reason that Plaintiffs

10  cannot establish scienter.  There is no evidence that any of the individual Defendants, or any

11  Oracle officer or employee for that matter, knew or was reckless in not knowing the alleged

12  falsity of Oracle's 2Q01 financial statements.  With respect to the bad debt transfers, Ellison,

13  Henley and Sanderson have confirmed that they did not even know the transfers had taken place

14  during 2Q01.  Ellison Decl., ¶ 29; Henley Decl., ¶ 19; Sanderson Decl., ¶ 11; Ex. 71 at 451:1-

15  452:5.  Plaintiffs have produced absolutely no evidence to the contrary, and there is no evidence

16  of recklessness on the part of Ellison, Henley or Sanderson, or any other Oracle executive. *Id.*

17  Because the individual Defendants were unaware of the bad debt transfers in 2Q01 (or their

18  alleged impact on Oracle's financial statements), there is no way Plaintiffs can prove scienter

19  regarding those transfers. *Stratosphere*, 66 F. Supp. 2d at 1190.

20       Plaintiffs' allegations regarding the HP transaction fail for similar reasons.  Ellison,

21  Henley and Sanderson have affirmed that they had no reason to believe there was any problem

22  with the revenue Oracle recognized in connection with the HP transaction.  Ellison Decl., ¶ 30;

23  Henley Decl., ¶ 19; Sanderson Decl., ¶ 12.  Plaintiffs have produced no contrary evidence.

24  Indeed, Oracle's decision to recognize revenue on the HP transaction in 2Q01 was reviewed and

25  approved by Oracle's revenue recognition group, its outside auditor and the Finance and Audit

26  Committee.  Ellison Decl., ¶ 30; Henley Decl., ¶ 19; Ex. 234 at 37-38; Ex. 85 at 507:7-16; Ex.

27  236 at 169:2-21; Ex. 71 at 309:8-310:7, 318:13-319:20, 320:4-13; Ex. 237 at 106:19-107:16; Ex.

28  63 at 499:17-500:13; Ex. 235 at 325:2-326:6.  To this day, moreover, the revenue recognized on

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  the HP transaction has not been reversed.  Ex. 227 at 234:8-14.  Plaintiffs cannot establish

2  scienter with respect to the revenue recognized on the HP transaction.

3          **d.**      **Plaintiffs' Unpled Accounting "Fraud" Claims Are Wrong**

4        Plaintiffs also cannot prove the merits of their two unpled accounting "fraud" claims.

5  First, with respect to the HP transaction, Plaintiffs' accounting expert is the only person who has

6  ever suggested that Oracle should not have recognized revenue on that transaction.  Ex. 235 at

7  325:2-326:6.  Testifying over six years after the fact, Regan admits that he has never personally

8  applied the relevant accounting literature to determine whether revenue should be recognized on

9  a software license agreement in the first instance (Ex. 227 at 208:9-21), and that he formed his

10  opinion on this issue without reviewing critical documents necessary to determine whether

11  revenue recognition was proper.  *Id.* at 172:6-12, 184:14-185:6, 190:1-18.  In contrast, as noted

12  above, at the time of the transaction and with the benefit of the relevant documents, Oracle's

13  revenue recognition group, its outside auditor and the Finance and Audit Committee of its Board

14  all reviewed the transaction and approved the revenue recognition.  Regan's opinion is nowhere

15  near enough to create a genuine issue of fact as to whether the revenue was properly recognized.

16        With respect to the bad debt transfers, Plaintiffs have no evidence to suggest that the

17  entire $20 million was improperly recognized in 2Q01.  Plaintiffs' expert accounting witness

18  admitted that he undertook no independent analysis to determine the amount of the bad debt

19  transfers that could properly be recognized as revenue as of 2Q01.  Ex. 227 at 233:21-234:7.

20  Reviewing $10.6 million of the transfers, Defendants established that at least $2 million of them

21  were proper when made or should have been previously recorded as revenue.[27]  Ex. 220 at 4, 32-

22  33, 38; Ex. 235 at 136:2-16.  But even assuming that some amount of the transfers led to the

23  improper recognition of revenue, Plaintiffs have no evidence to suggest that the transfers

24  amounted to anything other than simple accounting errors by members of Oracle's collections

25  staff.

26   

27  [27]  Discovery in this case included detailed electronic accounting data for transactions that
contained $10.6 million in bad debt transfers in 2Q01 (of the approximately $20 million total bad

28  debt transfers in 2Q01).  Both parties' accounting experts reviewed and relied upon this
electronic accounting data in forming their opinions in this case.  *E.g.*, Ex. 220 at 32.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

48

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   **IV.     CONCLUSION**

2              For the foregoing reasons, Defendants respectfully request summary judgment or,

3   in the alternative, summary adjudication that certain facts are not in dispute.

4   Dated:  August 8, 2007                          LATHAM & WATKINS LLP

5                                                   Peter A. Wald
                                                    Michele F. Kyrouz
6                                                   Jamie L. Wine
                                                    Patrick E. Gibbs
7                                                   Matthew Rawlinson

8

9

10                                          By: _Patrick E. Gibbs/SPJC_
                                                Patrick E. Gibbs
11                                              Attorneys for Defendants ORACLE
                                                CORPORATION, LAWRENCE J.
12                                              ELLISON, JEFFREY O. HENLEY,
                                                and EDWARD J. SANDERSON
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

49

DEFENDANTS' [CORRECTED] MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)