1                IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3

4

5     In re ORACLE CORPORATION

6     SECURITIES LITIGATION.

7                         Master File No. C-01-0988-MJJ

8     This Document Relates To:

9

10         ALL ACTIONS.

11     _____  _____/

12

13                    ---oOo---

14                   CONFIDENTIAL

15     VIDEOTAPED DEPOSITION OF LAWRENCE ELLISON

16                    Volume II

17         Thursday, September 21, 2006

18                    ---oOo---

19         SHEILA CHASE & ASSOCIATES

               REPORTING FOR:

20         LiveNote World Service

           221 Main Street, Suite 1250

21     San Francisco, California 94105

           Phone: (415) 321-2300

22         Fax: (415) 321-2301

23

24     Reported by:

       RACHEL FERRIER, CSR

25     CSR No. 6948

9/21/2006  Ellison, Lawrence Vol. II

```
 1                  I N D E X
 2             INDEX OF EXAMINATION
 3                                          PAGE
 4   EXAMINATION BY MR. SOLOMON         241, 334
 5
 6                  ---oOo---
 7             INDEX OF EXHIBITS
 8   DESCRIPTION                             PAGE
 9   Exhibit 52    E-mail from Elizabeth
                   Baker to Larry Ellison
10                 dated 1/2/01                243
11   Exhibit 53    E-mail from Lawrence
                   Ellison to George
12                 Roberts, et al., dated
                   1/5/01                      248
13
     Exhibit 54    E-mail from Safra Catz to
14                 Lawrence Ellison dated
                   1/9/01                      252
15
     Exhibit 55    E-mail from Safra Catz to
16                 Mark Barrenechea dated
                   1/11/01                     253
17
     Exhibit 56    E-mail from Safra Catz to
18                 Lawrence Ellison dated
                   1/3/01                      257
19
     Exhibit 57    Cover page titled "Exhibit
20                 N" with attached e-mail
                   from Sohaib Abbasi to
21                 Lawrence Ellison dated
                   2/1/01                      258
22
     Exhibit 58    Document entitled "CEO
23                 Roundtable-San Francisco
                   Briefing Document 2/6/2001"  259
24
25
```

```
 1    Exhibit 59      E-mail from Lawrence
                      Ellison to Jennifer
 2                    Minton dated 2/22/01          266
 3    Exhibit 60      E-mail from Lawrence
                      Ellison to Gary Reiner,
 4                    et al., dated 2/26/01         268
 5    Exhibit 61      E-mail from Gary Reiner
                      to Larry Ellison dated
 6                    3/20/01                       270
 7    Exhibit 62      E-mail from Gayle
                      Fitzpatrick to George
 8                    Roberts dated 3/20/01         273
 9    Exhibit 63      E-mail from Sergio
                      Giacoletto to Mark
10                    Jarvis dated 3/23/01          274
11    Exhibit 64      E-mail from Kirsten
                      Shaw to Ronal Wohl
12                    dated 3/26/01                 275
13    Exhibit 65      E-mail from Mark Jarvis
                      to George Roberts dated
14                    3/29/01                       284
15    Exhibit 66      E-mail from Mark Jarvis
                      to Safra Catz dated
16                    3/26/01                       287
17    Exhibit 67      E-mail from Mark
                      Barrenechea to Lawrence
18                    Ellison, et al., dated
                      4/9/01                        293
19
      Exhibit 68      E-mail from Stephen Smith
20                    to Lawrence Ellison dated
                      4/13/01                       294
21
      Exhibit 69      E-mail from George Roberts
22                    to Ken Hamel dated 4/19/01    295
23    Exhibit 70      E-mail from Mark
                      Barrenechea to Lawrence
24                    Ellison dated 4/24/01         296
25
```

9/21/2006  Ellison, Lawrence Vol. II

| | | | |
|---|---|---|---|
| 1 | Exhibit 71 | E-mail from Mark | |
| | | Barrenechea to Tom Victory | |
| 2 | | dated 4/26/01 | 297 |
| 3 | Exhibit 72 | E-mail from Madhu Gowda | |
| | | to Kirsten Shaw dated | |
| 4 | | 5/9/01 | 298 |
| 5 | Exhibit 73 | E-mail from Mike Runda | |
| | | to Larry Ellison, et al., | |
| 6 | | dated 5/21/01 | 300 |
| 7 | Exhibit 74 | Part of an e-mail | |
| | | beginning "Safra A. Catz | |
| 8 | | Wrote" | 301 |
| 9 | Exhibit 75 | E-mail from Lawrence | |
| | | Ellison to Safra Catz, | |
| 10 | | et al., dated 6/3/01 | 303 |
| 11 | Exhibit 76 | E-mail from Nadeem Syed | |
| | | to Stephanie Aas dated | |
| 12 | | 6/6/01 | 305 |
| 13 | Exhibit 77 | E-mail from Sergio | |
| | | Giacoletto to Mark | |
| 14 | | Barrenechea dated 6/7/01 | 306 |
| 15 | Exhibit 78 | E-mail from Mike Runda | |
| | | to Lawrence Ellison, et al., | |
| 16 | | dated 6/11/01 | 308 |
| 17 | Exhibit 79 | E-mail from Mike Rund | |
| | | to Larry Ellison, et al., | |
| 18 | | dated 6/18/01 | 308 |
| 19 | Exhibit 80 | E-mail from Mark Jarvis | |
| | | to Benny Souder dated | |
| 20 | | 8/30/01 | 315 |
| 21 | Exhibit 81 | Document entitled "Summary | |
| | | Analysis of Oracle CRM | |
| 22 | | Customers FY 1Q02 Earnings | |
| | | Call Announcement" | 316 |
| 23 | | | |
| | Exhibit 82 | E-mail from Mark Jarvis | |
| 24 | | to Julie Gibbs dated | |
| | | 10/23/01 | 321 |
| 25 | | | |

9/21/2006  Ellison, Lawrence Vol. II

| | | | |
|---|---|---|---|
| 1 | Exhibit 83 | E-mail from Jennifer Minton to William Plant, | |
| 2 | | et al., dated 3/22/02 | 326 |
| 3 | Exhibit 84 | E-mail from Susan Marks to Lawrence Ellison dated | |
| 4 | | 3/29/02 | 329 |
| 5 | Exhibit 85 | Cover page titled "Exhibit Y" with attached e-mail | |
| 6 | | from Eric Louttit to Lisa Pope dated 4/11/02 | 330 |
| 7 | | | |
| | Exhibit 86 | E-mail from Mark Jarvis | |
| 8 | | to Lisa Arthur dated 5/21/02 | 331 |
| 9 | | | |
| | Exhibit 87 | Pages 182-183 from the | |
| 10 | | Softwar book | 334 |
| 11 | Exhibit 88 | Page 191 from the Softwar book | 341 |
| 12 | | | |
| | Exhibit 89 | Page 192 from the Softwar | |
| 13 | | book | 342 |
| 14 | Exhibit 90 | Page 196 from the Softwar book | 345 |
| 15 | | | |
| | Exhibit 91 | Pages 193-195 from the | |
| 16 | | Softwar book | 351 |
| 17 | Exhibit 92 | Pages 199-201 from the Softwar book | 358 |
| 18 | | | |
| | Exhibit 93 | Page 202 from the Softwar | |
| 19 | | book | 372 |
| 20 | Exhibit 94 | Page 210 from the Softwar book | 373 |
| 21 | | | |
| | Exhibit 95 | Page 213 from the Softwar | |
| 22 | | book | 376 |
| 23 | Exhibit 96 | Page 221 from the Softwar book | 377 |
| 24 | | | |
| | Exhibit 97 | Page 226 from the Softwar | |
| 25 | | book | 381 |

| | | | |
|---|---|---|---|
| 1 | Exhibit 98 | Page of Chapter 12 from the Softwar book | 385 |
| 2 | | | |
| 3 | Exhibit 99 | Page 229 from the Softwar book | 385 |
| 4 | Exhibit 100 | Page 141 from the Softwar book | 388 |
| 5 | | | |
| 6 | Exhibit 101 | Pages 143-144 from the Softwar book | 395 |
| 7 | Exhibit 102 | Page 147 from the Softwar book | 397 |
| 8 | | | |
| 9 | Exhibit 103 | Page 180 from the Softwar book | 402 |
| 10 | Exhibit 104 | Page 177 from the Softwar book | 403 |
| 11 | | | |
| 12 | Exhibit 105 | Page 189 from the Softwar book | 409 |
| 13 | Exhibit 106 | Pages 156-157 from the Softwar book | 413 |
| 14 | | | |
| 15 | Exhibit 107 | E-mail from mhagan to Larry Ellison, et al., dated 1/11/00 | 414 |
| 16 | | | |
| 17 | Exhibit 108 | E-mail from Jeff Henley to Jennifer Minton dated 9/11/00 | 417 |
| 18 | | | |
| 19 | Exhibit 109 | E-mail from Lia Burke to Lawrence Ellison, et al., dated 9/22/00 | 421 |
| 20 | | | |
| 21 | Exhibit 110 | E-mail from Patricia McManus to James English dated 10/6/00 | 423 |
| 22 | | | |
| 23 | Exhibit 111 | E-mail from David Winton to George Roberts dated 12/7/00 | 426 |
| 24 | | | |
| 25 | | | |

9/21/2006  Ellison, Lawrence Vol. II

| | | | |
|---|---|---|---|
| 1 | Exhibit 112 | E-mail from David Winton to Jennifer Minton dated | |
| 2 | | 1/11/01 | 429 |
| 3 | Exhibit 113 | Cover page titled "Exhibit M" with attached e-mail | |
| 4 | | from Jim English to Jennifer Minton dated | |
| 5 | | 4/11/02 | 433 |
| 6 | Exhibit 114 | E-mail from Jennifer Minton to Ivgen Guner | |
| 7 | | dated 1/18/01 | 437 |
| 8 | Exhibit 115 | E-mail from Larry Garnick to Jennifer Minton, | |
| 9 | | et al., dated 1/17/01 | 440 |
| 10 | Exhibit 116 | Document entitled "Defendants' Response to | |
| 11 | | Plaintiffs' First Set of Requests for Admissions" | 455 |
| 12 | | | |
| | Exhibit 117 | E-mail from Jay Nussbaum | |
| 13 | | to Terrence Ford, et al., dated 10/16/00 | 457 |
| 14 | | | |
| | Exhibit 118 | Pages 286-287 from the | |
| 15 | | Softwar book | 460 |
| 16 | Exhibit 119 | E-mail from George Roberts to nagvp, et al., | |
| 17 | | dated 12/4/00 | 464 |
| 18 | Exhibit 120 | E-mail from Mike Rosser to Stephanie Aas dated | |
| 19 | | 12/4/00 | 466 |
| 20 | Exhibit 121 | E-mail from Jennifer Minton to Ron Police, | |
| 21 | | et al., dated 12/6/00 | 469 |
| 22 | Exhibit 122 | E-mail from Ron Wohl to Jennifer Minton dated | |
| 23 | | 12/9/00 | 470 |
| 24 | Exhibit 123 | Document entitled "Custom Calendar Report" | 488 |
| 25 | | | |

9/21/2006  Ellison, Lawrence Vol. II

| | | | |
|---|---|---|---|
| 1 | Exhibit 124 | E-mail from Deborah Lange to Jeff Henley dated | |
| 2 | | 1/10/01 | 494 |
| 3 | Exhibit 125 | E-mail from Safra Catz to Dan Cooperman dated | |
| 4 | | 1/19/01 | 496 |
| 5 | Exhibit 126 | E-mail from Safra Catz to Jonathan White dated | |
| 6 | | 1/22/01 | 498 |
| 7 | Exhibit 127 | E-mail from Safra Catz to Larry Ellison dated | |
| 8 | | 1/24/01 | 500 |
| 9 | Exhibit 128 | Memorandum from Daniel Cooperman | 503 |
| 10 | | | |
| 11 | Exhibit 129 | E-mail from Lawrence Ellison to Michael Rocha dated 10/12/00 | 505 |
| 12 | | | |
| 13 | Exhibit 130 | Letter from Larry Ellison to Cary Fiorina dated 11/30/00 | 509 |
| 14 | | | |
| 15 | Exhibit 131 | Board of Directors January 8, 2001 Meeting Minutes | 511 |
| 16 | | | |
| 17 | Exhibit 132 | E-mail from Lawrence Ellison to Jay Nussbaum dated 4/21/00 | 518 |
| 18 | | | |
| 19 | Exhibit 133 | E-mail from Safra Catz to Scott Little dated 1/29/01 | 521 |
| 20 | | | |
| 21 | Exhibit 134 | Bloomberg News report dated 1/24/01 | 523 |
| 22 | Exhibit 135 | E-mail from Jeff Henley to Thomas Williams dated 11/30/00 | 525 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

**9/21/2006  Ellison, Lawrence Vol. II**

```
1      Exhibit 136      Letter from Larry
                        Ellison to Cary Fiorina
2                       dated 11/30/00, with
                        handwritten notes              526
3
       Exhibit 137      Document entitled
4                       "E-Business Suite
                        High Level Requirements
5                       Document"                      530
6      Exhibit 138      E-mail from Jennifer
                        Glass to Larry Ellison
7                       dated 10/30/00                 540
8      Exhibit 139      Pages 205-206 from the
                        The Difference Between
9                       God and Larry Ellison
                        book                           547
10
       Exhibit 140      Letter from Mark
11                      Solomon to Peter Wald
                        dated 8/29/06                  556
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              BE IT REMEMBERED that on Thursday,
2    September 21, 2006, commencing at the hour of
3    9:49 a.m., thereof, at the Law Offices of LERACH,
4    COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS, LLP,
5    100 Pine Street, Suite 2600, San Francisco,
6    California, before me, RACHEL FERRIER, a Certified
7    Shorthand Reporter in and for the State of
8    California, personally appeared
9                     LAWRENCE ELLISON,
10   called as a witness by the Plaintiffs herein, who,
11   being by me first duly resworn/affirmed, was
12   thereupon examined and testified further as
13   hereinafter set forth.
14                     ---oOo---
15   Appearing as counsel on behalf of Plaintiffs:
16        MARK SOLOMON, Esquire
          STACY KAPLAN, Esquire
17        LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
          ROBBINS, LLP
18        655 West Broadway, Suite 1900
          San Diego, California 92101-3301
19        (619) 231-1058
          marks@lerachlaw.com
20        skaplan@lerachlaw.com
21
          JENNIE LEE ANDERSON, Esquire
22        LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
          ROBBINS, LLP
23        100 Pine Street, Suite 2600
          San Francisco, California 94111
24        (415) 288-4545
          jenniea@lerachlaw.com
25
```

```
 1      Appearing as counsel on behalf of the Defendants:
 2           GREGORY P. LINDSTROM, Esquire
             LATHAM & WATKINS, LLP
 3           505 Montgomery Street, Suite 1900
             San Francisco, California 94111-2562
 4           (415) 391-0600
             gregory.lindstrom@lw.com
 5
 6           PATRICK E. GIBBS, Esquire
             LATHAM & WATKINS, LLP
 7           140 Scott Drive
             Menlo Park, California 94025-1008
 8           (650) 328-4600
             patrick.gibbs@lw.com
 9
10           JAMES C. MAROULIS, Esquire
             ORACLE CORPORATION
11           500 Oracle Parkway, MS 5OP7
             Redwood Shores, California 94065
12           (650) 506-5200
             jim.maroulis@oracle.com
13
14
15      Present via Internet:  Shawn Williams, Esq.
                                Monique Winkler, Esq.
16
17      Also present:    James Terrell, Videographer
18
19
20
21
22
23
24
25
```

1                 THE VIDEOGRAPHER:  This begins Tape 1,

2        Volume 2, in the videotaped deposition of Larry

3        Ellison in the matter In Re Oracle Corporation

4        Securities Litigation filed in the United States

5        District Court, Northern District of California,

6        number C-01-0988-MJJ.

7                 Today's date is September 21, 2006.  The

8        time on the video monitor is 9:49.

9                 The Video Operator today is James Terrell,

10       representing LiveNote World Service.  The Court

11       Reporter is Rachel Ferrier with Sheila Chase &

12       Associates reporting on behalf of LiveNote World

13       Service.

14                Today's deposition is taking place at 100

15       Pine Street, San Francisco, California, for

16       plaintiffs' counsel.

17                You may continue.

18                MR. SOLOMON:  And just for the record, here

19       for plaintiffs today for the second day of

20       Mr. Ellison's deposition is myself, Mark Solomon;

21       Stacy Kaplan, and Jennie Anderson.

22                I don't know if you want to make an

23       introduction, Mr. Lindstrom.

24                MR. LINDSTROM:  Thank you, Mark.

25                I'm Greg Lindstrom, on behalf of the

1    witness and Oracle.

2              MR. GIBBS:  Patrick Gibbs, also on behalf

3    of the witness and defendants.

4              MR. MAROULIS:  James Maroulis from Oracle

5    Corporation for Oracle Corporation.

6                        LAWRENCE ELLISON,

7    having been duly resworn, testified further as

8    follows:

9                        EXAMINATION

10   BY MR. SOLOMON:

11       Q    Since you gave testimony in this matter in

12   July, have you had a chance to review the transcript

13   of that testimony?

14       A    I have.

15       Q    Okay.  And have you made any corrections?

16       A    I think a few.

17       Q    And do you have those corrections with you?

18       A    I -- counsel has the corrections.

19       Q    Okay.  And have you signed those

20   corrections?

21       A    I believe so.

22              MR. SOLOMON:  Okay.  Could I have those

23   corrections, Counsel?

24              MR. GIBBS:  The signed version is on its

25   way over.

**9/21/2006  Ellison, Lawrence Vol. II**

1            MR. SOLOMON:  Okay.  Thank you.

2       Q    And since your testimony in July, have you

3    now reviewed the complaint in this matter?

4       A    I have not.

5       Q    Okay.  Have you prepared in any way for

6    this session?

7       A    I met with counsel yesterday afternoon.

8       Q    Okay.  How long did you meet for?

9       A    Three hours.

10      Q    And did you review documents?

11      A    A few.

12      Q    Did they refresh your recollection as to

13   events in the past?

14      A    They did.

15      Q    What events did they refresh your

16   recollection regarding?  Go ahead.

17      A    Sorry.

18           The period around my stock sales between --

19   in late January.

20      Q    Okay.  Anything else?

21           MR. LINDSTROM:  As to which his

22   recollection was refreshed?

23           MR. SOLOMON:  Correct.

24           THE WITNESS:  Our results at the end of the

25   quarter, the quarter that ended in February.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    BY MR. SOLOMON:

2         Q    Okay.  Did any of the documents refresh

3    your recollection as to issues concerning the 11i

4    suite?

5         A    No.

6         Q    Okay.  We are going to start -- we are

7    going to continue where we left off, pretty much, and

8    that was talking about 11i and showing you some

9    documents.

10             I want to have marked as the next exhibit a

11   document produced by the defendants in this

12   litigation with the control numbers 019153 through

13   155.

14             (Exhibit No. 52 was marked for

15              identification.)

16   BY MR. SOLOMON:

17        Q    And if you recall, Mr. Ellison, the drill

18   is to take a look at it, and then once you have had a

19   chance to review it, I'm going to ask you if you

20   recognize it.

21        A    I don't recognize the document

22   specifically, but I recognize the issue that the

23   document refers to.

24        Q    Okay.  And you will see on the first page

25   it's addressed to you.  It's dated 2nd of January
```

1    2001 from Elizabeth Baker with a number of people

2    copied.

3              Do you see that?

4        A    I do.

5        Q    And it says, at the beginning, "Larry,

6    Happy New Year," and it goes on to say, "The

7    Oracle -- Sun R11i - JDK client certification process

8    is going very, very slow.  This is hindering our

9    ability to secure Oracle Compensation," then in

10   parens, "($4 million in license).  Our Competition is

11   Siebel and Siebel is making this a big issue."

12             Do you see that?

13       A    I do.

14       Q    Do you recall being aware at around the

15   date of this document that there was this issue with

16   the potential loss of $4 million in license?

17       A    Yes, I do.

18       Q    And do you know -- tell me what you

19   remember about it.

20       A    Well, Sun was an unusual customer.  They

21   wanted virtually every other customer that we have

22   for our applications, run those applications on

23   desktop personal computers, or they run the user

24   interface on desktop personal computers.  Sun had its

25   own device called the Sun Ray, and the Sun Ray was

**9/21/2006  Ellison, Lawrence Vol. II**

1    again -- it's also called the Java Station.  It ran a

2    computer program called Java as opposed to Windows.

3            And what Sun asked, because Sun was a big

4    application customer of ours and a big customer of

5    ours, was that we make our applications work on the

6    Sun Ray desktop machine rather than Windows, because

7    they didn't want to use the Microsoft -- Sun and

8    Microsoft don't get along, so they didn't want to use

9    a Microsoft desktop computer; they wanted to use the

10   Sun computer.

11           And in order for us to do that, Sun had to

12   certify what's called the JDK.  Certify their Java,

13   the Java that they had implemented on the work -- on

14   their workstation to work with our applications.

15   And, in fact, it took years before Sun actually

16   completed that certification process.

17           So what we are waiting for here is not

18   really an Oracle -- Oracle engineering to be

19   completed; we are waiting for Sun certification of

20   their JDK to be completed.

21       Q    Okay.  And do you know what happened with

22   respect to the compensation referred to, the

23   $4 million in license?

24       A    Sun is completely standardized on -- I

25   mean, I can't tell you exactly --

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Okay.

2      A      -- you know, what happened on this

3   particular transaction, but Sun is now completely

4   standardized on all Oracle applications, but I

5   don't -- I know it took a very, very long time for

6   Sun to finish their engineering, and it was a point

7   of frustration for everybody.

8      Q      Okay.  And this document would have been in

9   your files as of January 2, 2001; is that correct?

10      A      I think so, yeah.

11      Q      And it -- I can represent to you that it

12   was not produced from your files.

13            Can you explain why?

14      A      I cannot.

15      Q      Did there come a time in the

16   December-2000-to-March-2001 time frame when you

17   adopted a practice of offering to pay customers or

18   allow them concessions if they would act as a

19   reference for 11i?

20      A      I don't recall.

21      Q      Do you understand what I mean --

22      A      Yes.

23      Q      -- when I say that?

24      A      Yes.

25      Q      Is it a practice at Oracle generally to pay

1    customers to be references for Oracle's products?

2         A      Well, characterize "pay."  If we have a

3    particularly important reference customer -- let's

4    say it's a brand-new banking customer, and we just

5    implemented a new version of our software at that

6    bank, and we pepper that customer with lots and lots

7    of references -- they are taking a lot of their time

8    and they are doing demonstrations for prospective

9    clients of ours -- we will often give them free

10   consulting or discounts on software or something to

11   compensate them for their efforts of being a

12   reference.

13        Q    Isn't it true that between December 2000

14   and March 2001 that you were so desperate for

15   references for the 11i that you engaged in the

16   practice of offering concessions or payments to

17   customers to be references?

18        A    I think -- I think we have done that

19   historically, yeah.  It depends on how much a

20   reference is used.

21        Q    Isn't it true that in 2000 -- between

22   December 2000 and March 2001 that you were desperate

23   for references for the Suite 11i custom -- Suite 11i

24   suite?  Excuse me.

25        A    No, I wouldn't characterize us as

```
1    desperate.

2            MR. SOLOMON:  So mark as the next exhibit

3    document produced by the defendants in this

4    litigation with the control numbers 017475 and 76.

5            (Exhibit No. 53 was marked for

6            identification.)

7    BY MR. SOLOMON:

8        Q     Take a look at the document, Mr. Ellison,

9    and let me know if you recognize it.

10       A     I do.

11       Q     All right.  And you will see that it's

12   dated January 5th, 2001, and on the first page, it's

13   from you to George Roberts and Carolyn Balkenhol.

14            Do you see that?

15       A     Yes, I do.

16       Q     And attached is a letter that has been

17   drafted for your signature.

18            You see that?

19       A     I do.

20       Q     Do you know who Mr. Murray Weiss is --

21   excuse me, Morry Weiss?

22       A     I've never met him, but he was, at the

23   time, chairman and CEO of American Greetings.

24       Q     And do you remember at around the time of

25   this communication learning that American Greetings
```

```
1    was having problems implementing your products?

2         A      Well, again, I'm not sure it was -- depends

3    how you define "problems," but they were certainly

4    having issues with the rate of order management, and

5    I can explain, if you like.

6         Q      Well, let's just -- before you explain,

7    let's just go into the body of the document a little

8    bit.

9         A      Okay.

10        Q      The second paragraph you write:  "So, let

11   me restate my offer to American Greetings related to

12   completing a successful benchmark of our 11i Order

13   Management Solution.  Oracle guarantees that our

14   Order Management solution will process four million

15   order lines within a" 24 hour "window by December of

16   2001."

17        A      "20 hour window," yes.

18        Q      Excuse me, "20 hour window by December of

19   2001.  By March 31, our team will be in a position to

20   demonstrate 2.5, 3.5 million order lines with current

21   releases of our software on a hardware configuration

22   that will be specified in writing shortly after the

23   completion of the benchmark."  And it goes on to say,

24   "In the unlikely event that this specified hardware

25   configuration proves not to be sufficient, then
```

**9/21/2006  Ellison, Lawrence Vol. II**

1    Oracle will provide American Greetings with up to $10

2    million for additional hardware to reach the four

3    million order line throughput when you go production

4    on 11i."

5              You see all that?

6        A    I do.

7        Q    Do you have any idea how the transaction

8    that's discussed here was accounted for at Oracle?

9        A    What -- you mean did we make the sale to

10   American Greetings and --

11       Q    Do you know what the financial accounting

12   treatment was of any transaction with American

13   Greetings referred to here?

14       A    I'm not sure any transaction even occurred.

15       Q    Okay.  You go on to say, in the next

16   paragraphs -- next paragraph, "If the performance of

17   these servers does not increase by at least 200% and"

18   AGM -- excuse me, "AG.COM elects to keep the software

19   the only charge will be the first year support fees.

20   If the performance does increase by 200% or more,

21   Oracle will provide the software to AG.COM at a

22   50% discount in return for" AG's "agreement to become

23   an Oracle reference."

24             Do you see that?

25       A    I do.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        Q      And do you remember at the time making a
2    financial offer to this customer that if they would
3    be a reference, you would allow them a 50 percent
4    discount?
5        A      Does it say there -- yes.  It says it right
6    here.
7        Q      Yes?
8        A      Yeah.
9        Q      And does that not reflect a effort on your
10   part to increase the number of Oracle customers who
11   would be a reference for the 11i suite?
12              MR. LINDSTROM:  For 11i?
13              MR. SOLOMON:  Excuse me?
14              MR. LINDSTROM:  For 11i?
15              MR. SOLOMON:  Yes.
16              THE WITNESS:  Yes, of course.
17   BY MR. SOLOMON:
18       Q      And this document would have been in your
19   files in January of 2001; is that right?
20       A      I believe so.
21       Q      And it wasn't produced from your files and
22   you don't know why; is that right?
23       A      That's correct.
24       Q      There's a reference at the end of the
25   document to a CEO roundtable.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1           Do you see that?

2     A     Yes.

3     Q     Do you recall whether the CEO roundtable

4  referred to here took place?

5     A     I believe it did.

6     Q     And do you recall who was present?

7     A     I do not.

8           MR. SOLOMON:  Have marked as the next

9  exhibit a document with the control numbers 610546 to

10  548.

11          (Exhibit No. 54 was marked for

12          identification.)

13          THE WITNESS:  Okay.

14  BY MR. SOLOMON:

15    Q     Do you recognize this?

16    A     I don't recognize it.  I certainly know

17  what issues it refers to.

18    Q     Okay.  And it's dated January 9th, 2001,

19  and it's an exchange involving yourself, Jeff Henley,

20  Larry Garnick, Jennifer Minton, and Safra Catz.

21          Do you see that?

22    A     Yes.

23    Q     And there is a copy of an e-mail that Larry

24  Garnick wrote which is -- says it's a summary of a

25  call.

**9/21/2006  Ellison, Lawrence Vol. II**

1               Do you see that?

2      A    Yes.

3      Q    And then above that, it says, "This is very

4    helpful.  Please do this daily."

5               Do you see that?

6      A    Yes.

7      Q    And do you recall seeing this in January of

8    2001?

9      A    I don't recall seeing it.

10     Q    It wasn't produced from your files, but it

11   would have been in your files in January of 2001; is

12   that right?

13     A    That's correct.

14     Q    And you can't tell me why it wasn't

15   produced in from your files?

16     A    That's correct.

17     Q    And there's a reference -- it mentions,

18   "This is very helpful.  Please do this daily."

19               Do you know if this was done daily?

20     A    I do not.

21               MR. SOLOMON:  I've marked as the next

22   exhibit a document produced by the defendants in this

23   litigation with the control numbers 035280 through

24   282.

25               (Exhibit No. 55 was marked for

1                 identification.)

2     BY MR. SOLOMON:

3         Q      Take a look, and when you have had a chance

4     to view it, let me know, please.

5         A      Okay.

6         Q      Okay.  Have you seen this before,

7     Mr. Ellison?

8         A      Not that I recall.

9         Q      Okay.  You will see that it reflects

10    communications among Safra Catz, Ron Wohl, Mark

11    Barrenechea and yourself?

12               And I'm focusing in just on the first page.

13        A      I'm sorry.  I don't see where I was copied

14    on this.  Maybe I was.

15        Q      You see -- halfway down, you see Mark

16    Barrenechea, and to the right it says your name?

17        A      It says, "Larry, if it's okay with you."

18    Yeah, but I'm not on the distribution list on the

19    top.

20        Q      Got it.

21               MR. LINDSTROM:  I think counsel is

22    referring to the embedded e-mail below.

23               MR. SOLOMON:  That is what I'm referring

24    to.  Thank you.

25               MR. LINDSTROM:  So about halfway down the

1     first page, Larry.

2              THE WITNESS:  Oh, I'm sorry.  Okay.  Okay.

3     BY MR. SOLOMON:

4        Q     But you have no recollection of this?

5        A     No, I don't.

6        Q     Okay.  And you will see that Mark

7     Barrenechea writes, in part:  "Larry if it's okay

8     with you, I would like to defer this topic a week.  I

9     need to keep focused on the 11i internal install and

10    would prefer to you skip the meeting tomorrow.  It

11    also need" -- I'm not sure what that says, actually,

12    but something -- "also need key members of my

13    management team to stay similarly focused" --

14       A     I think that's Ron -- I think that's Ron --

15       Q     I must apologize.  It's Ron Wohl.

16       A     Yeah.

17       Q     Do you recall Ron Wohl expressing that

18    sentiment to you in January 2001?

19       A     I don't.

20       Q     And do you recall Mark Barrenechea making a

21    reference to Ron Wohl still coding?

22              MR. LINDSTROM:  Vague and ambiguous.

23              THE WITNESS:  Yeah, I don't remember -- I

24    don't remember this note.

25    BY MR. SOLOMON:

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1      Q      Okay.  Where it says, "Mark Barrenechea

 2    wrote:  Can you say," and in quotes, "I am still

 3    coding."

 4             Do you have an understanding what that

 5    means?

 6      A      That he's still working -- you know,

 7    working on things.

 8      Q      Okay.  And then there's a reference, and it

 9    seems to be from Safra Catz which says, "I am so

10    pissed."

11             Do you see that?

12      A      I do.

13      Q      Do you recall being made aware by Safra

14    Catz that she was pissed, as she says here, with

15    respect to this?

16      A      No.

17      Q      You never had a conversation with her about

18    it?

19      A      No.

20      Q      Now, this would have been in your files in

21    January of 2001?

22      A      That's right.

23      Q      And you can't explain why it wasn't

24    produced from your files?

25      A      That's correct.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1              MR. LINDSTROM:  Mark, we may have done this

2    last time, but can we have an understanding that in

3    each of these questions, you are representing to the

4    witness that it has not been produced in the

5    litigation?

6              MR. SOLOMON:  From his files?

7              MR. LINDSTROM:  Correct.

8              MR. SOLOMON:  Correct.

9              And as I said last time, if I'm wrong and

10   you can demonstrate I'm wrong, I apologize.

11             MR. LINDSTROM:  I understand.  I'm just

12   concerned the question, as opposed, assumes a fact

13   about which there's no foundation that he has no

14   knowledge, so I just want to make sure the record

15   reflects that you are representing to him that that's

16   the case.

17             MR. SOLOMON:  Correct.  That's fine.

18             And I've marked as the next exhibit a

19   document with the control numbers 031405 through 407.

20             (Exhibit No. 56 was marked for

21             identification.)

22             THE WITNESS:  Okay.

23   BY MR. SOLOMON:

24      Q    Do you recognize this?

25      A    I don't recognize it.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        Q      You do or don't?

2        A      I do not recognize this specific document.

3        Q      You don't dispute that it would have been

4    in your files in January of 2001?

5        A      I do not.

6        Q      And I'm going to represent to you it wasn't

7    produced from your files and you can't tell me why;

8    correct?

9        A      That's correct.

10              MR. SOLOMON:  Marked as the next exhibit a

11   document produced in this litigation with the control

12   numbers 297774 to 777.

13              (Exhibit No. 57 was marked for

14              identification.)

15              THE WITNESS:  Okay.

16   BY MR. SOLOMON:

17       Q      Okay.  Do you recognize this?

18       A      I do.

19       Q      And you remember seeing it around January

20   30th of 2000 -- excuse me, February 1st of 2001?

21       A      Again, not specifically, but I'm very

22   familiar with the issues involved.

23       Q      Okay.  And one of the issues is the

24   downward revision of the Q3 forecast revision; is

25   that right?
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1       A      Yeah.  We had put in a custom system called
2   OTA.
3       Q      I just want to know if that was one of the
4   issues that you remember, downward revision?
5              MR. LINDSTROM:  Could we have the question
6   reread, please.
7              (Record read by the Reporter as follows:
8              "QUESTION:  Okay.  And one of the issues is
9              the downward revision of the Q3 forecast;
10             is that right?")
11             THE WITNESS:  Thank you.
12             MR. SOLOMON:  Thank you.
13      Q      And this would have been in your files on
14  February 1, 2001?
15      A      Yes.
16      Q      And you can't explain why it wasn't
17  produced from your files; is that right?
18      A      That's correct.
19             MR. SOLOMON:  So I've marked as the next
20  exhibit a document produced by the defendants in this
21  litigation with the control numbers 175224 and 245.
22             (Exhibit No. 58 was marked for
23              identification.)
24             THE WITNESS:  Okay.
25  BY MR. SOLOMON:
```

1      Q      Okay.  Do you recognize this?

2      A      I do.

3      Q      Okay.  And this represents a list

4    identifying the people who were to attend your CEO

5    roundtable dinner in February of 2001?

6      A      I'm not sure it was a dinner, but, yes.

7      Q      And do you remember whether the people

8    reflected on the first two pages attended the event?

9      A      I don't recall if all of them attended.

10     Q      Okay.  Do you -- if you go down the list,

11   could you tell me, just 1 through 13, who you

12   remember attending?

13     A      I really can't.  I would be guessing.

14     Q      Okay.  You will see that then after those

15   two pages for each company, there is a page of

16   information.

17            Do you see that?

18     A      I do.

19     Q      And the last question for each of them is,

20   "What results do we want to achieve from LJE?"  And

21   then there's a variety of answers to that.

22            Do you see that?

23     A      Yes.

24     Q      And did you review all of these pages in

25   order to address the topic of what these customers

```
1   wanted to achieve?

2        A     I read all the pages, yes.

3        Q     Now, you will see that there's a couple of

4   luminaries or poster boys for securities fraud

5   referenced here.

6        A     I sure do.

7        Q     And do you remember whether -- well, I

8   guess we will name two, shall we?  No. 8 and No. 12

9   are pretty notorious.

10       A     Yeah.

11       Q     Did they attend?

12       A     I think Richard Scrushy did.  I don't

13  remember Jeffrey Skilling attending.

14       Q     Okay.  And, in fact, you discuss with

15  Mr. Scrushy a deal with Health South; is that right?

16             MR. LINDSTROM:  On that occasion?

17             MR. SOLOMON:  On that occasion.

18             THE WITNESS:  Actually, I decided that

19  under no circumstances do we do business with Health

20  South after meeting Richard Scrushy.

21  BY MR. SOLOMON:

22       Q     It was that obvious?

23       A     It was pretty obvious, yes.  Not so with

24  Mr. Skilling, but with Scrushy it was.

25       Q     Okay.  He hadn't perfected his act.
```

1        A      It's extraordinary.

2        Q      And kind of interested.  You say

3    "extraordinary."

4               What was extraordinary about it?

5        A      Oh, I don't -- I think -- I visited Health

6    South, and they had more airplanes than United

7    Airlines, and they had airplanes and helicopters, and

8    it's just not that big a company, so they had an

9    incredible fleet of airplanes.  And then -- I mean,

10   this all sounds funny, but you arrive -- I don't know

11   how to describe it, but they had all of these women

12   dressed in white leather.  It was just a very strange

13   operation.  I've never seen an operation like this in

14   my life.

15              And Scrushy himself was a very smarmy guy.

16   He had committed to creating a digital hospital in

17   Alabama, and, in fact, you got to get per -- if you

18   are closing down a State-run hospital, you have to

19   get permission from the State to close that State-run

20   hospital down, and to get that permission, he

21   committed to get this digital hospital running in a

22   very, very short period of time, and he was now

23   trying to get Oracle to take responsibility for

24   building this digital hospital and all of its

25   liabilities, and in a year, which was technically

**9/21/2006  Ellison, Lawrence Vol. II**

1      just impossible.  So became very, very clear that

2      this was not -- and it's rare to find someone we just

3      won't entertain getting into contract with at all.

4          Q     Okay.  Is it black leather at Oracle?

5          A     Not a lot of leather at Oracle in general.

6          Q     And Jeff Skilling, have you met Jeff

7      Skilling?

8          A     I don't -- I don't think so.

9          Q     Looking at the Control No. 175247, it says,

10     at the bottom, "What results do we want to achieve

11     from LJE?"  And then it says, "The results that I

12     would like to achieve from LJE is 1) leave Saied with

13     the message that if Oracle can save a billion

14     dollars, that he too can save costs during the

15     initial startup of his business.  2) have Saied's

16     support that purchasing the Oracle," and then there's

17     nothing else.

18         A     Yeah.

19         Q     By the way, who wrote this, do you know?

20         A     I think they are written by the sales

21     executives assigned to those accounts.

22         Q     Okay.  Do you recall having a conversation

23     with Saied, whoever this refers to, along those

24     lines?

25         A     Not specifically.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Do you recall Saied Nadjafi being there?

2      A      I don't.

3      Q      And you will see, for Health South, "What

4   results do we want to achieve from LJE?"  And it

5   says, "Want Richard Scrushy to look at Oracle as a

6   partner for e-business transformation."

7             I assume after this, that wasn't a

8   possibility?

9      A      That wasn't a possibility, no.

10     Q      Go to Enron, which is the last page --

11     A      Second-to-last page.

12     Q      I apologize.  It is, yes.

13             And it says, "Again, what results do we

14   want to achieve from LJE?"  And it says "Closure to

15   an agenda that both Enron and Oracle's executives

16   support regarding efforts and process."

17             Do you see that?

18     A      I do.

19     Q      Do you know what -- first of all, do you

20   recall any conversation with anyone from Enron

21   Corporation along those lines?

22     A      I don't.  I think -- I think Enron was a

23   database customer, a large database customer, but --

24     Q      The last page, which is GE Power --

25     A      Yeah.

**9/21/2006  Ellison, Lawrence Vol. II**

1       Q       -- "What results do we want to achieve from

2    LJE?"  And it says, "We would like Larry to reinforce

3    Oracle commitment to both the Hungary project and

4    their overall digitalization effort and help close

5    our deal for $18 million."

6             Do you see that?

7       A    I do.

8       Q    And did you have conversation with John

9    Rice along those lines?

10      A    Yeah.  I was the corporate sponsor at GE,

11   and I spoke to John all the time.

12      Q    And did you engage in negotiating any

13   transactions with any of the representatives of these

14   customers?

15           MR. LINDSTROM:  Vague and ambiguous.

16   BY MR. SOLOMON:

17      Q    Go ahead.

18      A    I don't negotiate deals, business deals.  I

19   don't like doing it.

20      Q    Okay.  I guess -- and then the last

21   question is:  This would have been in your files in

22   February of 2001; is that correct?

23           MR. LINDSTROM:  No foundation.

24           THE WITNESS:  I think they hand me these

25   documents.  They usually give me a folder with these

**9/21/2006  Ellison, Lawrence Vol. II**

1    documents.  Doesn't look like it was sent in e-mail,

2    so they usually give me a folder with these documents

3    in it --

4              MR. SOLOMON:  Okay.

5              THE WITNESS:  -- prior to me going into the

6    meeting.

7    BY MR. SOLOMON:

8       Q    Okay.  So this is slightly different, then.

9    This wasn't produced from your files.

10             Can you explain why this document would not

11   have been produced from your files?

12      A    I normally review these in preparation for

13   the meeting and then dispose of them.

14      Q    That's what you expected to do with this

15   one?

16      A    I really -- I just don't -- I don't know.

17   Yeah, I wouldn't have kept this document unless I

18   thought it would have been useful, of some use later

19   on.

20             MR. SOLOMON:  Gotcha.

21             Marked as the next exhibit document

22   produced by the defendants with control numbers

23   101468 through 470.

24             (Exhibit No. 59 was marked for

25              identification.)

1              THE WITNESS:  Okay.

2   BY MR. SOLOMON:

3       Q     Do you recognize this?

4       A     Again, I don't recognize the specific

5   document, but I'm familiar with the issues to which

6   it refers.

7       Q     Okay.  And one of the issues is the upgrade

8   to OKS; is that correct?

9       A     That's right.

10      Q     You write, on the first page -- and, for

11  the record, it's dated 22nd of February 2001 from you

12  to Jennifer Minton, copying a number of people.  You

13  say, "I do not understand why we did not hear about

14  all these systems problems until 10 days before

15  quarter close.  The system has to be fixed to be sure

16  but we should have" -- I think you meant to say

17  "had"?

18      A     Right.

19      Q     -- "more notice of the problems earlier in

20  the quarter.  Larry."

21            Do you see that?

22      A     I do.

23      Q     And do you recall expressing that concern

24  in February of 2001?

25      A     That's correct.

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q     And you say you should have heard about the

2     problems, but you didn't.

3              Why is it you would have expected to have

4     heard about the problems earlier?

5        A     Jennifer Minton, in charge of -- our

6     running our back office, was having -- had a list of

7     systems problems, and she was escalating those

8     problems, and I just wish when people are having

9     problems, they let us know early -- you know, not

10    wait -- you know, two weeks before the end of the

11    quarter is better than ten days, and a month is

12    better than two weeks, and the more notice we have to

13    fix the problems, the better off we all are.

14       Q     This would have been in your files at

15    around the date of this e-mail; right, February 22nd,

16    2001?

17       A     That's right.

18       Q     And it wasn't produced from your files and

19    you cannot explain why; is that right?

20       A     That's right.

21             MR. SOLOMON:  Marked as the next exhibit a

22    document with control number 052637.

23             (Exhibit No. 60 was marked for

24             identification.)

25             THE WITNESS:  Okay.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    BY MR. SOLOMON:

2         Q      And let me know if you recognize this,

3    please.

4         A      I do.

5         Q      Okay.  It's dated the 26th of February

6    2001, and it's from you to Gary Reiner?

7         A      Yes.

8         Q      Who is Gary Reiner?

9         A      Gary Reiner is the executive vice president

10   and chief information officer of General Electric.

11        Q      Okay.  And it reflects, first of all, a

12   message to you from Gary.

13               Do you see that?

14        A      Yes.

15        Q      And it says -- first of all, it says,

16   "Thanks for what appears to be a great success so far

17   in the Hungary implementation.  On a different and

18   more difficult note, the Indirect Procurement

19   solution we are rolling out company-wide, where we

20   are upgrading to 11i, has had a number of P1 Tar's,

21   some of which are still outstanding.  It's causing

22   great frustration."

23               Do you see that?

24        A      I do.

25        Q      Okay.  And do you recall being made aware
```

1    of that around the date of this e-mail?

2       A     Again, I'm -- I can't pinpoint the date,

3    but I certainly remember the issues.

4       Q     Okay.  And, again, this would have been in

5    your file around the 26th of February 2001?

6       A     That's correct.

7       Q     And it was not produced from your file and

8    you cannot explain why; is that right?

9       A     That's right.

10              MR. SOLOMON:  Let's have marked as the next

11   exhibit a document produced by the defendants with a

12   control number 278006 to 009.

13              (Exhibit No. 61 was marked for

14              identification.)

15              THE WITNESS:  Okay.

16   BY MR. SOLOMON:

17      Q     Okay.  Do you recognize this?

18      A     I do not.

19      Q     Okay.  You will see that it's dated

20   March 20th, 2001 from Gary Reiner to you and Naren

21   Gursahaney.

22              Do you know who Naren Gursahaney is?

23      A     I do not.

24      Q     And you have no recollection of receiving

25   this around March 20th, 2001?

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        A      I don't.

2        Q      And there's a message to you from Gary

3   Reiner followed by a communication between Gary

4   Reiner and Naren Gursahaney, and there's, attached,

5   an article entitled "Oracle Simple Products Making

6   Life Tough."

7               Do you see that?

8        A      I do.

9        Q      Did you ever read the article?

10       A      I read part of it now.

11       Q      Before now?

12       A      No.

13       Q      Now, you recall that in -- at the beginning

14  of March 2000, Oracle announced to the market that it

15  wasn't going to meet its forecast?

16       A      Say that one more time.

17       Q      Do you recall that at the beginning of

18  March 2001, Oracle announced to the market that it

19  was not going to meet its three key forecasts?

20       A      That's correct.

21       Q      And when Oracle made that announcement, did

22  a securities fraud suit spring to mind?

23               MR. LINDSTROM:   Objection; vague and

24  ambiguous.

25  BY MR. SOLOMON:
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Did the potential for a securities fraud

2    suit spring to mind?

3      A      I don't recall.

4             MR. LINDSTROM:   Same objection.

5    BY MR. SOLOMON:

6      Q      All right.   Are you familiar that when

7    there are unexpected significant drops in the stock

8    price of publicly traded companies in America, there

9    often is a securities fraud lawsuit filed?

10     A      Yes.

11     Q      And you were familiar with that in 2001?

12     A      Yes.

13     Q      And do you recall, shortly after making

14   that announcement, getting an instruction from your

15   in-house lawyers not to destroy any documents?

16     A      Yes.

17     Q      And to preserve documents?

18     A      Yes.

19     Q      And this would have been in your file on

20   March 20th, 2001; is that right?

21     A      Yes.

22     Q      And it wasn't produced from your file and

23   you can't explain why; is that right?

24     A      That's right.

25             MR. SOLOMON:   Mark as the next exhibit a

1    document produced in the litigation with a control

2    number 618418 to 421.

3                 (Exhibit No. 62 was marked for

4                 identification.)

5                 THE WITNESS:  Okay.

6    BY MR. SOLOMON:

7        Q     Okay.  Have you ever seen this document

8    before?

9        A     Not that I recall.

10       Q     Okay.

11       A     But I am very familiar with the issues to

12   which it refers.

13       Q     Okay.  And you would have been familiar

14   with them around this date in March of 2001?

15       A     I believe so.

16       Q     And on the first page at the bottom, it

17   says, "This is excellent.  You should continue to

18   publish these every week until they get fixed.  When

19   you see all the names of prospects, it's really

20   sickening -- hopefully Larry will get sick as well

21   and put more pressure on getting this fixed."

22             Do you see that?

23       A     Yes.

24       Q     Have you ever seen that message before?

25       A     Not that I recall.

1      Q      Okay.  Do you recall having a conversation

2      with Jeff Henley discussing this list?

3             MR. LINDSTROM:  The list?

4             MR. SOLOMON:  Excuse me.

5      Q      Discussing getting this document published

6      every week?

7      A      No, I do not.

8      Q      Do you know if it was?

9      A      No.

10            MR. SOLOMON:  Okay.  Let's have marked as

11     the next exhibit a document produced by the

12     defendants with the control number 111294.

13            (Exhibit No. 63 was marked for

14            identification.)

15     BY MR. SOLOMON:

16     Q      Let me know if you recognize it.

17     A      I don't.

18     Q      Okay.  You see that it's dated Friday,

19     March 23rd, 2001, and it's an e-mail communication

20     among Sergio Giacoletto, Mark Jarvis, yourself, Safra

21     Catz, Mark Barrenechea?

22     A      Yes.

23     Q      And there's a reference -- I'll just start

24     reading through the document.

25            "Mark," and then in parentheses, "(Jarvis),

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    we need your help to counter an increasing number of
2    negative comments on the quality of our applications
3    products.  The latest is the attached PUBLIC,"
4    capitals, "note from Forrester of March 19th."  But
5    "if this continues it will slow down our sales and
6    the migration of existing customers until 11.5.4 or
7    11.5.5."  This is just -- "This has just costed us
8    one loss at a client," exclamation mark,
9    "unfortunately many new prospects listen and believe
10   to" our "analysts."
11             Do you see that language?
12       A    I do.
13       Q    And do you have any idea what client is
14   being referred to as the one that's been lost?
15       A    I do not.
16       Q    And this would have been in your file as of
17   March 23rd, 2001?
18       A    Yes.
19       Q    And it wasn't produced from your files and
20   you cannot explain why; is that right?
21       A    That's right.
22             MR. SOLOMON:  I've marked as the next
23   exhibit a document produced by the defendants with
24   the control numbers 054074 through 80.
25             (Exhibit No. 64 was marked for
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1                  identification.)

2                  THE WITNESS:  Okay.

3       BY MR. SOLOMON:

4           Q      Do you recognize these exchanges?

5           A      I don't recognize them.  Again, I'm

6       familiar with the issues.

7           Q      Starting on the first page, there's a

8       number of titles with different addressees with the

9       same title "Urgent Action Required."  And then at

10      bottom on the first page, it says, "Folks - Larry

11      seems to be getting very upset with all the

12      escalation's.  Please make sure we are focussed on

13      all our escalated customers."

14                 Do you see that?

15          A      Yes.

16          Q      And do you recall in late March of 2001

17      being very upset with all the escalations?

18          A      Well, I certainly recall us having

19      escalations and wanted to make sure those customers

20      were getting proper attention, and I asked -- you

21      know, I asked to get daily reports on -- you know,

22      for some of the customers until the problems were

23      fixed.

24          Q      Did you get daily reports?

25          A      I don't think so.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1       Q      Why not?

2       A      Well, I think sometimes the status can

3    change from day to day, and I think that's -- some

4    time -- I usually got a report when any -- when there

5    was any progress made or any status change.

6       Q      Let me put it another way.

7              Did you get many escalation reports after

8    this e-mail was sent?

9              MR. LINDSTROM:  And are you referring to

10   which e-mail in this chain?

11             MR. SOLOMON:  The one that I just read.

12             MR. LINDSTROM:  March 26?

13             MR. SOLOMON:  Correct.

14             THE WITNESS:  It depends what you mean by

15   report.  I had regular meetings, regular telephone

16   conversations, e-mail exchanges, so the combination

17   of the above, yes, I got regular reports.

18   BY MR. SOLOMON:

19      Q      Okay.  You don't know if they have been

20   produced in this litigation; is that fair?

21      A      I do not know.

22      Q      Do you recall how many escalated customers

23   you were concerned about around this time?

24      A      A handful.  You know, less than ten.

25      Q      Now, that doesn't mean there are less than

1    ten escalated customers; it's just the ones you were

2    personally concerned about; is that right?

3        A    The ones I was personally -- yeah, there

4    was less than ten that I was personally tracking.

5        Q    And were those particularly big customers?

6        A    No.  For example, Papa John's, which is

7    referred to here, is a rather small customer.

8        Q    Don't you reserve your best treatment for

9    your largest customers?

10       A    We certainly pay more attention to

11   customers who give us a lot of money than smaller

12   customers.  But in the case of Papa John's, we were

13   delivering a brand-new product, so they were

14   getting -- they were one of the first users of a

15   brand-new product and behooves us to pay a lot of

16   attention to the status of that product.

17       Q    What formal documents, if you know, would

18   be created to deal with an escalation?

19            MR. LINDSTROM:  Objection; vague.

20   BY MR. SOLOMON:

21       Q    At this time, in March of 2001?

22            MR. LINDSTROM:  Vague and ambiguous as to

23   formal document.

24            THE WITNESS:  Again, we have a service

25   request system, you know, where people ask for

 1    service using an Internet-based system that's -- so

 2    everyone will ask for service, and we have lots and

 3    lots of requests coming in for service, so we

 4    maintain a database on that.  If the problem gets

 5    very serious, customers are not shy about picking up

 6    the telephone and calling.

 7    BY MR. SOLOMON:

 8        Q     Okay.  What's the database called?

 9        A     The database is called Metal Link.

10        Q     And do you know whether the Metal Link

11    database was -- the information on the -- on that

12    database was preserved when this litigation

13    commenced?

14        A     I don't -- Metal Link was preserved.  I

15    don't know.

16        Q     You just don't remember.

17              If you look at the second page, at the very

18    bottom, there's a reference to "Support's ITS

19    system" -- second page of the document at the very

20    bottom just above where it says "6 TARS."

21        A     Right.

22        Q     What is Support's ITS system?

23        A     I think it stands for Incident Tracking

24    System, which is part -- it's also part of Metal

25    Link.

1      Q      Okay.  And that would track escalated

2   customers?

3      A      It would.

4      Q      And do you know if the information on --

5   contained within that system was preserved?

6      A      I do not.

7      Q      If you go to the page with the control

8   number 054077, do you recognize this exchange?  When

9   I say "this exchange," I'm talking to the -- talking

10  about the March 23rd, 2001 e-mail from you to George

11  Roberts, copying Mark Barrenechea?

12     A      I think I do.

13     Q      And with respect to Papa John, did you get

14  the daily reports that you requested?

15     A      I don't -- I really don't remember.

16     Q      Okay.  When you say, "I need a list of the

17  other escalated customers and I need it now," do you

18  see that?

19     A      Yes.

20     Q      Hard to believe you didn't get that list.

21            Did you get that list?

22            MR. LINDSTROM:  Objection; argumentative.

23            THE WITNESS:  I don't recall.  I assume I

24  did.  I don't recall.

25  BY MR. SOLOMON:

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q      When you say you want something and you

2    want it now, you typically get it?

3        A      Not always.  Not always.

4        Q      It goes on to say, "And I need support to

5    resurrect the reports grading whether products are

6    within the agreed quality parameters" --

7        A      Right.

8        Q      -- Mark -- sorry.  "Mike R. is responsible

9    for delivering the reports."

10              Was that instruction carried out?

11       A      Yeah.  Again, I believe so.  We routinely

12    grade our products for -- on quality, counting the

13    number of defects that are in the products.

14       Q      You then go on to say, "We will meet on

15    this on Wednesday to review every escalated customers

16    and every product quality rating."

17              Do you see that?

18       A      Yes.

19       Q      Do you know if that meeting took place?

20       A      Yeah.  There is a regularly scheduled

21    applications meeting every Wednesday which I chair.

22       Q      "Until further notice every Thursday

23    applications meeting will begin with a review of all

24    escalated customers and application product quality."

25              Do you see that?

**9/21/2006  Ellison, Lawrence Vol. II**

1      A      Yes.  I think at that time --

2             MR. LINDSTROM:  The question is, "Do you

3      see that?"

4             Right?

5             MR. SOLOMON:  Yes, it is.

6      Q      And then you can go on to tell me why it's

7      Thursday and not Wednesday.

8      A      These meetings -- I do see it, and the

9      meetings moved around.  I think, at one point, we had

10     ERP applications on Wednesday and CRM applications on

11     Thursday before the two groups were merged.

12     Q      Okay.  You go on to say, "The only allowed

13     topics will be demo status and internal

14     implementation requirements."

15            Do you see that?

16     A      Yes.

17     Q      And were -- did -- is that what occurred?

18     A      I don't recall.  I believe so.

19     Q      Now, if I wanted to go into the ITS system

20     today to look back at what happened in March of 2001

21     or what was there in 2001, could I do that?

22     A      I don't know.

23     Q      Okay.  The same with Metal Link, generally?

24     A      I think ITS is a part of Metal Link.

25     Q      Okay.

**9/21/2006  Ellison, Lawrence Vol. II**

1        A      And so I don't know.

2        Q      Okay.  And these exchanges would have been

3    in your file as of March 26, 2001 --

4               MR. LINDSTROM:  Objection; compound.

5    BY MR. SOLOMON:

6        Q      -- is that right?

7               Let's take them one by one, then.

8               The exchanges on the first page where --

9               MR. LINDSTROM:  Where he's not copied?

10              MR. SOLOMON:  Where you are not copied, I

11   guess they wouldn't have been in your file; right?

12              Let's go to the third page of the

13   document -- sorry, the fourth page of the document,

14   which is the control number 054077.

15       A      Yes.

16       Q      That e-mail exchange and that -- by "that"

17   I mean the one dated February -- March 23rd, 2001

18   would have been in your files as of that date?

19       A      Yes.

20       Q      And you can't explain why it wasn't

21   produced in your file?

22       A      That's correct.

23              MR. SOLOMON:  I've marked as the next

24   exhibit a document produced by the defendants in this

25   litigation with the control numbers 061815 to 818.

**9/21/2006  Ellison, Lawrence Vol. II**

1              (Exhibit No. 65 was marked for

2              identification.)

3              THE WITNESS:  Okay.

4    BY MR. SOLOMON:

5       Q     And do you recognize these exchanges?

6       A     I do not.

7       Q     Okay.  You will see that at the top of the

8    first page you are copied.

9              Do you see that?

10      A     Yes, I do.

11      Q     The date is March 29, 2001 on that e-mail

12   exchange.

13             And it's fair to say this would have been

14   in your file as of March 29th, 2001?

15      A     Yes.

16      Q     And you can't explain why that particular

17   communication wasn't produced from your file?

18      A     That's correct.

19      Q     And then below, you will see that there's a

20   reference to a -- what's referred to as a "solid apps

21   opportunity."

22             Do you see that?

23      A     Yes.

24      Q     Okay.  If you go over to the second page,

25   you will see that there's an e-mail to Ron and Leslie

1    from Bill Bagshaw.

2              Do you see that?

3        A    I do.

4        Q    Do you know who Bill Bagshaw is?

5        A    I do not.

6        Q    And do you know who Ron and Leslie are?

7        A    I do not.

8        Q    Then in the middle of that paragraph, it

9    says, "I just want to make you aware that these

10   reports are starting to have a tangible negative

11   affect" (sic) "on our pipelines.  The customer who

12   wrote this note just got budget approval for ERP &

13   CRM.  They are focused 99% on Oracle.  This report

14   now has them second guessing."

15             Do you see that?

16       A    I do.

17       Q    Were you aware of that in late March 2001?

18             MR. LINDSTROM:  Aware of what?  Vague and

19   ambiguous.

20   BY MR. SOLOMON:

21       Q    Aware of the concern that the reports were

22   causing a potential customer to second-guess?

23       A    Not that I recall.

24       Q    Were you aware of a concern that it was

25   having a negative effect on your pipelines?

**9/21/2006  Ellison, Lawrence Vol. II**

1       A     Not that I recall.

2       Q     And if you go to the bottom of that page,

3   there's an e-mail from Stephen DeFronzo to Philip

4   Carty.

5             Do you see that?

6       A     I do.

7       Q     Do you know either of those people?

8       A     I do not.

9       Q     Okay.  And if you go over the page, part of

10  the message that reads I don't -- "I also don't want

11  to be the first company to install major components

12  of the full CRM/ERP suite.  I want evidence the

13  components we will implement from 11i are rock

14  solid."

15            Do you see that?

16      A     I do.

17      Q     And, in fact, as of this time, you couldn't

18  cite one happy referenceable 11i suite customer; is

19  that right?

20      A     I don't believe so, no.  I don't think

21  that's right.

22      Q     You don't think that's right?

23      A     I don't think --

24      Q     You think I'm wrong?

25      A     I think you are wrong.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      What about the 5,000 patches; were you

2  aware at that time of the 5,000 patches?

3      A      Yeah.  Patches are often enhancements.

4      Q      Just talking about the number.

5             Were you aware that around 5,000 --

6      A      Not 5,000 specifically, no.

7      Q      This -- okay.  Thank you.

8             Do you know when you first found a happy

9  referenceable customer for the 11i suite?

10             MR. LINDSTROM:  Objection; argumentative,

11  vague and ambiguous as to "found."

12             THE WITNESS:  I don't know what the

13  first -- when the first referenceable customer was

14  live.

15             MR. SOLOMON:  Okay.  Marked as the next

16  exhibit a document with the control numbers --

17  produced by the defendants with the control numbers

18  063478 through 480.

19             (Exhibit No. 66 was marked for

20             identification.)

21             THE WITNESS:  Okay.

22  BY MR. SOLOMON:

23      Q      Have you seen this before?

24      A      Not that I recall.

25      Q      You will see that it's dated 26th of March

1      2001, and there are communications involving, among

2      others, Mark Jarvis, Safra Catz, Mark Barrenechea,

3      Ron Wohl, and Charles Phillips.

4          A      Yes.

5          Q      If we look at the first page, it begins:

6      "We are being hit on all sides by the press on 11i

7      quality - the bugs in the software (generally quoted

8      as more than 5000 bugs) have started a flurry of

9      press articles about how IBM's approach of

10     integration is better than our approach of soup to

11     nuts."

12             "I think there are several ways to deal

13     with this:

14             "1.  We get customers implemented faster.

15     This one's out of my hands.

16             "2.  We get the unhappy customers help

17     asap.  Larry's focus on this should help us along.

18             "3.  We find some happy, referenceable

19     customers.  I need considerable assistance from sales

20     account management for this.  We'll then use these

21     customers in ads, a la BellSouth."

22             Do you see that?

23         A      I do.

24         Q      Were you aware at the end of March 2001

25     that Mark Jarvis was making these recommendations?

1              MR. LINDSTROM:  The three you just read or

2     the four detailed in Exhibit 66?

3              MR. SOLOMON:  The three that I just read.

4              THE WITNESS:  Not specifically, no.

5     BY MR. SOLOMON:

6        Q     And wasn't it a fact that as of this date,

7     you had been unable to find any happy, referenceable

8     11i suite customers?

9        A     Absolutely untrue.

10       Q     Okay.  And isn't it a fact that as of this

11    date, there were fundamental integration problems

12    between ERP and CRM?

13       A     There were certainly integration problems,

14    but I wouldn't call them fundamental.  They were

15    fixed.  If they were fundamental, they couldn't be

16    fixed.

17       Q     And although I note your objection to the

18    language, isn't it also true that there were

19    fundamental integration problems not just between ERP

20    and CRM, but within each?

21       A     I would say there were problems.  I mean,

22    connecting all these pieces together there definitely

23    were bugs; there were lots of new code.  But none of

24    the problems were fundamental; all the problems were

25    fixed.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1       Q      And when were all the problems fixed?

2       A      Let me be careful.  All the problems are

3   never fixed in software, so let me be cautious about

4   my language.

5              I think -- I think the software just gets

6   progressively more reliable and functionally richer,

7   so we still have integration issues today.  The -- we

8   are never -- yeah, we are never as good as we could

9   be, but we -- the software is working well for -- you

10  know, for a number of customers, and we were able to

11  locate -- have plenty of, you know, happy customers.

12      Q      Okay.  Let me ask -- sorry, go on.

13      A      No, go ahead.

14      Q      I was going to say, When did the

15  fundamental problems go away?

16      A      There were no fundamental problems.

17      Q      Okay.  At the bottom, it says Safra Catz

18  wrote, and I don't see anything that Safra Catz

19  wrote.

20             Do you know -- can you shed any light on

21  that?

22      A      She could -- she could just forward a

23  document with no comments on the forwarding.

24      Q      Below that, it's a -- there's an e-mail

25  from Charles Phillips, and Charles Phillips is now
```

**9/21/2006  Ellison, Lawrence Vol. II**

1    employed by you, your company; correct?

2        A    Yes, he is.

3        Q    And is he the No. 2 at the company; is that

4    how you would describe him?

5        A    He and Safra are co-presidents, so they are

6    the co-No. 2 people in the company.

7        Q    And he used to work for Morgan Stanley?

8        A    Yes.

9        Q    And he covered Oracle during this period?

10       A    He was the No. 1 technology analyst, I

11   think, for ten years.

12       Q    And did you have regular conversations with

13   him while he was the analyst?

14            MR. LINDSTROM:  And by "you," you mean

15   Mr. Ellison?

16            MR. SOLOMON:  Mr. Ellison, yeah.

17            THE WITNESS:  Regular.  I probably talked

18   to Charles couple times a year.

19   BY MR. SOLOMON:

20       Q    Okay.  Was there someone who was the

21   regular interface?

22       A    I think Charles made a point of talking to

23   lots of different people, so he got a broad

24   perspective.

25       Q    Okay.  Including Jeff Henley?

**9/21/2006  Ellison, Lawrence Vol. II**

1        A      I'm sure including Jeff Henley.

2        Q      Charles Phillips writes, in part -- I'm on

3    the second page of the exhibit, and around halfway

4    through his message, he says:  But I'm hearing from

5    multiple sources including the user group members and

6    Oracle employees about the stability of the product.

7    I think it's improved since much of this was written

8    but not many people know that -- know that and all

9    the early adopters have plenty of horror stories they

10   are willing to share with whomever may call.

11          Did you know that around -- at the end of

12   March 2001 that it was Mr. Phillips' view that there

13   were plenty of horror stories being shared by the

14   early adopters?

15       A      What he said was the early adopters had

16   more problems and that the problems are largely

17   behind us, at least that's what he's saying.  But

18   people remember -- people remember the problems and

19   are talking about them.  That's what he said.

20       Q      But he does refer to horror stories,

21   doesn't he?

22       A      I think -- I think that's a metaphorical

23   reference to problems that they had.

24          MR. LINDSTROM:  The question was whether

25   you were aware that he was expressing this viewpoint

```
1       at the time.

2               Right?

3               MR. SOLOMON:  That's right.

4               THE WITNESS:  I don't recall.

5    BY MR. SOLOMON:

6       Q     Okay.  It goes on to say:  It's worth

7    deploying corporate level consulting resources to get

8    them happy ASAP to turn them into proponents instead

9    of critics.  A few of the reps I spoke with don't

10   have the condense to push CRM because of the quality

11   issues in the past.

12              Do you see that?

13      A     I do.

14      Q     And were you aware at the time that

15   Mr. Phillips was of the view that there were reps who

16   didn't have confidence in CRM and, therefore, weren't

17   purchasing?

18      A     I don't recall.

19              MR. SOLOMON:  Marked as the next exhibit a

20   document produced by Oracle with the control number

21   094109.

22              (Exhibit No. 67 was marked for

23              identification.)

24   BY MR. SOLOMON:

25      Q     Do you recognize this?
```

```
 1        A      I don't.

 2        Q      You see it's dated Monday, the 9th of April

 3   2001, and it's to you and some others from Mark

 4   Barrenechea?

 5        A      Yes.

 6        Q      And it would have been in your file as of

 7   that date?

 8        A      Yes.

 9        Q      And it wasn't produced from your file and

10   you can't explain why?

11        A      That's correct.

12        Q      It refers to a very escalated situation

13   with Value Vision.

14               Do you see that?

15        A      I do.

16        Q      Are you familiar with that?

17        A      Not really.

18               MR. SOLOMON:  I've marked as the next

19   exhibit another document produced by defendants with

20   the control numbers 094110 to 111.

21               (Exhibit No. 68 was marked for

22               identification.)

23               THE WITNESS:  Okay.

24   BY MR. SOLOMON:

25        Q      Do you recognize this?
```

**9/21/2006  Ellison, Lawrence Vol. II**

1        A       Again, I don't recognize it.  I remember

2    the issues that it refers to.

3        Q       And this would have been in your file

4    around April 13, 2001?

5        A       That's right.

6        Q       And it wasn't produced from your file and

7    you cannot explain why; is that right?

8        A       That's right.

9        Q       Did Mr. Rawlings make the call that's

10   referred to at the top of this message?

11       A       I don't recall.

12               MR. SOLOMON:  Okay.  I've marked as the

13   next exhibit a document produced by the defendants

14   with the control numbers 061370 to 372.

15               (Exhibit No. 69 was marked for

16               identification.)

17               THE WITNESS:  Okay.

18   BY MR. SOLOMON:

19       Q       Okay.  Do you recognize this?

20       A       I don't, but I'm very familiar with the

21   issues to which it refers.

22       Q       Okay.  And it would have been in your files

23   around April 19, 2001?

24       A       Yes.

25       Q       And it wasn't produced from your file and

```
 1    you cannot explain why?

 2         A     That's right.

 3               MR. SOLOMON:  Okay.  Marked as the next

 4    exhibit a document produced by the defendants with

 5    the control number 062005.

 6               (Exhibit No. 70 was marked for

 7                identification.)

 8               THE WITNESS:  Okay.

 9    BY MR. SOLOMON:

10         Q     And do you recognize this?

11         A     I do not.

12         Q     Okay.  It would have been in your file

13    around April 24, 2001?

14         A     Yes.

15         Q     And it wasn't produced from your file and

16    you cannot explain why?

17         A     That's right.

18         Q     And you will see, it says, "We now have,"

19    and then it lists some customers, "Live with 11i -

20    Mark."

21               Do you see that?

22         A     I do.

23         Q     So, first of all, was HP live on 11i as of

24    this date?

25         A     I don't know.
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1       Q       Was BellSouth?

2       A       I don't know.

3       Q       Was Toshiba?

4       A       I don't know.

5       Q       Cut this short.

6               Do you know if any of them were?

7       A       No.

8               MR. SOLOMON:  Thank you.

9               Have marked as the next exhibit a document

10      produced by the defendants with a control number

11      619342.

12              (Exhibit No. 71 was marked for

13              identification.)

14              THE WITNESS:  Okay.

15      BY MR. SOLOMON:

16      Q       Do you recognize this?

17      A       I do not.

18      Q       Okay.  It would have been in your file as

19      of April 26, 2001?

20      A       Yes.

21      Q       And it wasn't produced from your file and

22      you cannot explain why?

23      A       That's right.

24      Q       Did you issue any instruction in the spring

25      of 2001 to the effect that exceptional discounting to
```

1    clients would only be approved if the client agreed

2    to be a reference?

3         A    I don't recall.

4         Q    Are you aware of anyone issuing that

5    instruction?

6         A    Don't recall.

7              MR. LINDSTROM:  In the same time frame?

8              MR. SOLOMON:  In the same time frame.

9              THE WITNESS:  Don't recall.

10   BY MR. SOLOMON:

11        Q    Did -- were you aware in the spring of 2001

12   that problems with 11i had prevented GE from closing

13   its April books?

14             MR. LINDSTROM:  Objection; assumes a fact.

15             THE WITNESS:  I don't believe that

16   happened.

17             MR. SOLOMON:  Let's have marked as the next

18   exhibit a document produced by the defendants with a

19   the control number 971508.

20             (Exhibit No. 72 was marked for

21              identification.)

22             THE WITNESS:  Okay.

23   BY MR. SOLOMON:

24        Q    Okay.  Do you recognize this?

25        A    I do not.

**9/21/2006  Ellison, Lawrence Vol. II**

1     Q     Okay.  And do you see that there's a

2  reference at the bottom and a exchange between

3  Kirsten Shaw and Madhu and Anne that GE has not

4  closed the April books?  Do you see that?

5     A     I do.

6     Q     Am I mistaken in reading from this that

7  there was a problem with your product that caused

8  that?

9     A     GE closed their books in April.  There's no

10 way GE didn't close their books in April.

11    Q     Okay.  How is it you know that?

12    A     I think everyone would have known if GE

13 hadn't closed their books.

14    Q     Okay.

15    A     They are a public company.

16    Q     Okay.

17    A     I'm sure Gary Reiner would have called me

18 on the phone.

19    Q     So as far as you know, this is simply a

20 mistake?

21    A     Yeah.  I'm sure there were -- I believe

22 there were problems as described here, but I'm sure

23 General Electric found a way to close the books in

24 spite of the problems.

25           MR. SOLOMON:  Okay.  So marked as the next

9/21/2006  Ellison, Lawrence Vol. II

1     exhibit a document produced by the defendants with

2     the control numbers 121542 through 580.

3                  (Exhibit No. 73 was marked for

4                  identification.)

5           MR. SOLOMON:  This is a rather lengthy

6     exhibit.  I don't intend going into detail, so what I

7     would like to know, when you get a chance to look at

8     it, is whether you recognize it before without

9     necessarily going into all the detail.

10        A     Okay.

11               MR. LINDSTROM:  And, Mark, the question is,

12    Does he recognize this particular exhibit that's been

13    marked as 73, or is he familiar with the form of the

14    report that's attached, or --

15               MR. SOLOMON:  Does he recognize having seen

16    this before.

17               MR. LINDSTROM:  The precise document that's

18    before him.

19               MR. SOLOMON:  Correct.

20               MR. LINDSTROM:  Thank you.

21               THE WITNESS:  I've seen reports like this

22    before, but I don't recall seeing this specific

23    report.

24    BY MR. SOLOMON:

25        Q     Okay.  It would have been in your files as

1    of May 21, 2001; is that right?

2         A    Yes.

3         Q    Okay.  And it wasn't produced from your

4    files and you cannot explain why?

5         A    That's correct.

6              MR. SOLOMON:  Okay.  Let's go off the

7    record for two minutes while we change tapes.

8              THE VIDEOGRAPHER:  This marks the end of

9    Tape 1 in Volume 2 of the deposition of Larry

10   Ellison.

11             At 11:35, going off the record.

12             (Recess taken.)

13             THE VIDEOGRAPHER:  On record at 11:37.

14             This marks the beginning of Tape 2,

15   Volume 2, in the deposition of Larry Ellison.

16             MR. SOLOMON:  We have marked as the next

17   exhibit a document produced by the defendants with

18   the control numbers 184342 through 360.

19             (Exhibit No. 74 was marked for

20             identification.)

21   BY MR. SOLOMON:

22        Q    And I'm not going to go into much detail,

23   Mr. Ellison.  I just want you to take a look at it

24   and tell me if you recognize this document?

25        A    Okay.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Okay.  Do you recognize this?

2      A      I do.

3      Q      Okay.  And it's a document that would have

4    been in your files?  "Yes" or "no"?

5      A      I don't see an e-mail associated with this,

6    so I can't -- okay.  There's one -- if there's not an

7    e-mail header on it --

8      Q      Okay.

9      A      -- so I can't really tell.  I mean, it

10   looks like it was sent to me and looks like I

11   responded, but looks like the header is missing.

12     Q      Okay.  And at the top, that's you saying,

13   "I don't want to do this unless GE agrees to us

14   publicly referencing them as a customer and

15   indicating how long the implementation took and how

16   much they saved.  Larry."

17            Do you see that?

18     A      That's what I said.

19     Q      And what happened?

20     A      GE wouldn't agree, and we approved the deal

21   anyway.  GE just never let's -- virtually never let's

22   themselves be used as references for any of their

23   vendors.

24     Q      This wasn't produced from your file.  You

25   don't know why; is that true?

1       A     I don't -- again, there's no e-mail header,

2    but, yeah, I don't know.

3              MR. SOLOMON:  I've marked as the next

4    exhibit a document produced by the defendants with

5    the control numbers 121355 through 359.

6              (Exhibit No. 75 was marked for

7              identification.)

8              THE WITNESS:  Okay.

9    BY MR. SOLOMON:

10      Q     Do you recognize this?

11      A     Again, I don't recognize the specific

12   document, but I'm very familiar with the issues it

13   discusses.

14      Q     Okay.  And this would have been in your

15   file on the 3rd of June 2001?

16              I guess I should be more precise.

17              The first exchange on the first page, at

18   the top of the page, would have been in your file as

19   of the 3rd of June of 2001?

20      A     I think I authored this, and I don't know

21   if I sent a copy to myself.

22      Q     Okay.

23      A     So perhaps not.

24      Q     Okay.  And it says that you want a detail

25   postmortem concerning Tropicana.

**9/21/2006  Ellison, Lawrence Vol. II**

1               Do you see that?

2        A     Yes.

3        Q     And did that detailed postmortem take

4   place?

5        A     Yes, it did.

6        Q     And were any documents created concerning

7   that postmortem?

8        A     I don't recall.

9        Q     And in any event, you can't explain why

10  this particular exchange wasn't produced from your

11  files; is that right?

12              MR. LINDSTROM:  Objection --

13              THE WITNESS:  Well, again, as I --

14              MR. LINDSTROM:  -- mischaracterizes his

15  testimony.

16              THE WITNESS:  -- said earlier, the

17  header -- the header -- it's from me.  Clearly I'm

18  including other stuff.

19  BY MR. SOLOMON:

20       Q     Did you understand as of the 3rd of June

21  2001 that you were under an obligation to preserve

22  exchanges such as this one concerning Tropicana?

23              MR. LINDSTROM:  No foundation, assumes

24  facts.

25              THE WITNESS:  I don't know what date the

**9/21/2006  Ellison, Lawrence Vol. II**

1       document preservation order came out.

2       BY MR. SOLOMON:

3           Q      Okay.

4           A      And I'm just looking for my name --

5           Q      Okay.

6           A      -- on any of these other than as an author.

7           Q      I don't think -- I think you were only on

8       that first page as the author, as far as I can see.

9           A      And if I didn't send a copy to myself, then

10      it wouldn't be in my file.

11              MR. SOLOMON:  Okay.  Have marked as the

12      next exhibit a document produced by the defendants

13      with a control number 376443.

14              (Exhibit No. 76 was marked for

15              identification.)

16              THE WITNESS:  Okay.

17      BY MR. SOLOMON:

18          Q      Okay.  Do you recognize this?

19          A      I do not.

20          Q      Okay.  And you will see that, at the top,

21      it says, "Stephanie, GE, Honeywell, and Agere are not

22      live yet."

23              Do you see that?

24          A      Yes.

25          Q      Were you aware, as of beginning of June

**9/21/2006  Ellison, Lawrence Vol. II**

1   2001, that those three customers were not live?

2       A     GE has lots and lots of systems.  I'm not

3   sure what their -- what they mean when they say GE

4   isn't live yet.

5       Q     And Honeywell?

6       A     I'm not familiar with Honeywell or Agere.

7       Q     Okay.

8       A     In fact, down below, it says GE Aircraft --

9       Q     Okay.

10      A     -- as opposed to GE Power or GE Medical.

11      Q     Okay.  Did you know at that time -- I'm

12  talking about June 2001 -- where Alcoa was with their

13  implementation?

14      A     I don't recall.

15      Q     Okay.  And did you know that UPS was live

16  but was experiencing issues and, hence, was not

17  referenceable?

18          MR. LINDSTROM:  Objection; assumes facts.

19          THE WITNESS:  I don't -- no, I did not.

20          MR. SOLOMON:  Okay.  So we have marked as

21  the next exhibit document produced by the defendants

22  with the control numbers 162213 through 16.

23          (Exhibit No. 77 was marked for

24              identification.)

25          THE WITNESS:  Okay.

1    BY MR. SOLOMON:

2        Q       Okay.  So this is dated 7th of June 2001

3    from Sergio Giacoletto to Mark Barrenechea, copied a

4    number of people, including yourself?

5        A       Yes.

6        Q       And subject is "CRM Business Update - my

7    feedback."

8                You see that on the first page?

9        A       Yes.

10       Q       And then skipping the second page onto the

11   third page, it begins, at the top, "Mark, I also

12   disappointed by the results," ellipsis, "but,"

13   ellipsis, "as you know, we had six to nine months of

14   product issues which caused loss of confidence by

15   sales, partners, analysts and customers.  Even as of

16   today, R11.5.4, which is the first stable release

17   is," and then in capitals, "NOT AVAILABLE in local

18   language and we will only get it between July and

19   October 2001.  This continued delay between the

20   American English release and the local language is

21   hurting us."

22               Do you see that?

23       A       I do.

24       Q       And were you aware, as of June 2001, that

25   local languages, other than the American English

**9/21/2006  Ellison, Lawrence Vol. II**

1    release, still were not available?

2        A     Local languages were available; they just

3    weren't available for -- there's a delay -- they

4    weren't available for the latest release.

5        Q     Okay.  But it's your testimony that they

6    were -- they were available for all the prior

7    releases as of that date?

8        A     I don't know offhand about all the prior

9    releases, but there was a delay -- whenever a new

10   release comes out, like 11.5.4, it comes out first in

11   American English which then goes into translation.

12       Q     Okay.  And this would have been in your

13   files as of June 7, 2001?

14       A     Yes.

15       Q     And you cannot -- and it wasn't produced

16   from your file and you cannot explain why; is that

17   right?

18       A     That's correct.

19             MR. SOLOMON:  Have marked as the next two

20   exhibits, the first exhibit document produced by the

21   defendants with the control numbers 121067 through

22   095, and the second exhibit produced by the

23   defendants with the control numbers 121145 through

24   175.

25             (Exhibit Nos. 78 and 79 were marked for

**9/21/2006  Ellison, Lawrence Vol. II**

```
1               identification.)

2      BY MR. SOLOMON:

3         Q      Again, Mr. Ellison, these are lengthy

4      exhibits, and I don't intend to examine you in detail

5      about them, but I would like to ask you first if you

6      recognize them.

7         A      Okay.

8         Q      And looking at the first exhibit, it's

9      dated Monday, the 11th of June 2001?

10        A      Yes.

11        Q      Do you see that?

12               And you will see that you are involved in

13     an exchange from you -- excuse me, from Mike Runda to

14     you and to others.

15               You see that?

16        A      I do.

17        Q      Do you know who Mike Runda is?

18        A      I don't.

19        Q      And do you recognize the document?

20        A      I do -- well, I recognize that the -- not

21     the specific instance of the document, but it's a

22     list of escalated customers.

23        Q      And you don't dispute this would have been

24     in your file in mid-June 2001?

25        A      I do not.
```

1        Q     Okay.  And it wasn't produced from your

2   file and you cannot explain why; is that right?

3        A     That's right.

4        Q     And with respect to the second similar

5   exhibit dated Monday, the 18th of June 2001, this

6   would have been in your file as of that date;

7   correct?

8        A     Yes.

9        Q     And it wasn't produced from your file and

10  you cannot explain why; is that correct?

11       A     That's correct.

12       Q     Going to the June 11th --

13             MR. LINDSTROM:  Is that Exhibit 78?

14  BY MR. SOLOMON:

15       Q     Is that June 11th?  Sorry, Mr. Ellison.

16       A     Yes, it is.

17       Q     Thank you very much.

18             You will see, at the bottom of the page,

19  121078.

20       A     Okay.

21       Q     Another reference to a customer not being

22  able to close its books.

23             Do you see that?

24       A     I do.  This time it's AT&T that can't close

25  its books.

**9/21/2006  Ellison, Lawrence Vol. II**

1       Q       And were you aware of an issue as reflected

2    here concerning AT&T and their inability to close

3    several books?

4       A       I believe -- again, I'm sure -- I'm sure

5    there's a problem that's being logged here.  I'm also

6    quite certain that AT&T was able to close its books.

7       Q       At some stage?

8       A       Certainly in time for public reporting

9    and -- yes.

10      Q       It also says, if you look over the page,

11   that you are negotiating.  It says, "Mr. Larry

12   Ellison will be negotiating with AT&T over the next

13   few days on this matter."

14              Do you see that?

15      A       I do.

16      Q       Did you negotiate with AT&T?

17      A       Oracle is in the process of a $60 to 70

18   million CRM deal with AT&T.  I mean, that's -- we

19   never had a deal remotely like that with AT&T.

20      Q       So is it --

21      A       And I don't remember us ever negotiating a

22   deal remotely like that with AT&T, or anybody else

23   for that matter.

24      Q       Do you remember ever negotiating a deal

25   with AT&T?

1       A       I do, actually, but it was probably 30

2    years ago when Oracle was very small.

3       Q       Okay.  Is that what put you off

4    negotiating?

5       A       Not very good at it.

6       Q       Have you ever accessed the ECMS database?

7       A       I'm not even sure what -- what is the ECMS

8    database?

9       Q       It's for escalated customers.

10              MR. LINDSTROM:  Has he ever accessed it

11   himself?

12              THE WITNESS:  Directly, no.  No, I'm not

13   familiar with that term.

14   BY MR. SOLOMON:

15      Q       Okay.  If you look at the middle of the

16   first page on both exhibits, I believe --

17      A       Right.

18      Q       -- there's a reference to -- actually, I

19   apologize.  I'm looking at the one dated June 11th.

20              There's a reference to "Customer Care ECMS

21   System."

22              Do you see that in the middle of the page?

23   It starts:  "The URL for this report"?

24      A       Yes.

25      Q       And you are not familiar with Customer Care

1    ECMS System?

2       A    I'm not familiar with that term.  Again, I

3    think it's all part of a database that's -- I think

4    they are all reports on a database called Metal Link.

5       Q    Okay.

6       A    I believe, but I'm --

7       Q    Okay.  Is it true that as of the end of

8    August 2001, Oracle was going through a rough patch

9    because the 11i had not been working?

10           MR. LINDSTROM:  Objection; vague and

11   ambiguous.

12           THE WITNESS:  No.  11i worked.  I mean, 11i

13   was a relatively new and very large, complicated

14   product, and we had a number of customers that were

15   experiencing issues.  It had lots of new features.

16           MR. SOLOMON:  Okay.

17           THE WITNESS:  And not lots of new

18   components.

19   BY MR. SOLOMON:

20      Q    Okay.  Would you agree with the following:

21   "We are going through a rough patch because 11i did

22   not work (but it does now), we missed two quarters

23   and we pissed off a lot of customers with the apps

24   upgrade to 11i"?

25      A    I mean, saying 11i does not work certainly

**9/21/2006  Ellison, Lawrence Vol. II**

1    is not the case.  It certainly had bugs, but --

2         Q     Okay.  Who was Mark Jarvis?

3         A     Mark Jarvis was our head of marketing at

4    the time.

5         Q     Was he familiar with your products, with

6    Oracle's products?

7         A     I mean, he wasn't an engineer; he was --

8    again, he was a marketing guy.

9         Q     Okay.

10        A     So he didn't have the kind of detailed

11   knowledge an engineer might have, but he was familiar

12   in a marketing sense.

13        Q     Did he know if your products worked or not?

14        A     It's just -- I mean, I guess you -- I don't

15   want to go into this.  It's a complicated system --

16   it's a very large, complicated system.  The airplane

17   flew just fine.  Maybe the seat backs got stuck up,

18   but -- I'm sorry to use the metaphor, but the system

19   worked.  We had plenty of happy customers, plenty of

20   live customers.  That's not to say that we didn't

21   have bugs and unhappy customers.  We did happen to

22   have those too.

23             MR. SOLOMON:  Okay.  So marked as the next

24   exhibit a document produced by the defendants with

25   the control numbers 062223 and 24.

**9/21/2006  Ellison, Lawrence Vol. II**

1           THE WITNESS:  Are we finished with these

2   two exhibits?

3           MR. SOLOMON:  Yes, we are.  Thank you.

4           (Exhibit No. 80 was marked for

5           identification.)

6           THE WITNESS:  Okay.

7   BY MR. SOLOMON:

8       Q     Do you recognize this?

9       A     I don't.

10      Q     And you will see that it's from Mark Jarvis

11  to Benny Souder, copying Andrew Mendelsohn, dated

12  August 30th, 2001?

13      A     Yes.

14      Q     Do you know who Andrew Mendelsohn is?

15      A     I do.

16      Q     Who is he?

17      A     He's head of our database department.

18      Q     And Benny Souder?

19      A     I believe he was an engineer in

20  applications, but I'm not -- he's moved into several

21  different -- I know who he is.  He's moved into

22  several different groups.  I'm not sure what job he

23  had at this time.

24      Q     Okay.  I'm looking at the second paragraph

25  of that e-mail.  It says, "We are going through a

**9/21/2006  Ellison, Lawrence Vol. II**

1    rough patch because 11i did not work (but it does

2    now), we missed two quarters and we pissed off a lot

3    of customers with the apps upgrade to 11i.  That is

4    what the press like to cover."

5              Do you see that?

6       A     I do.

7       Q     Do you agree with those sentiments?

8       A     Well, no.  I think -- 11i did not work.

9    11i -- if he rewrote it and said, "11I had problems.

10   It has a lot fewer problems now," then I would agree

11   with it.

12             MR. SOLOMON:  Okay.  I'm going to have

13   marked as the next exhibit a document produced by the

14   defendants with the control numbers 397378 through

15   380.

16             (Exhibit No. 81 was marked for

17             identification.)

18             THE WITNESS:  Okay.

19   BY MR. SOLOMON:

20      Q     Have you ever seen this before?

21      A     Never.

22      Q     Do you recognize any of the handwriting?

23      A     No.  No.

24      Q     Okay.  And you have no idea who authored

25   this; is that true?

```
 1            MR. LINDSTROM:  I'm sorry.  Could we have

 2     the question reread.

 3     BY MR. SOLOMON:

 4        Q     Who authored it?  Do you have any idea who

 5     authored it?

 6        A     Yeah, I do.

 7            MR. LINDSTROM:  Let me just clarify the

 8     question.

 9            When you say "authored," you are talking

10     about the typewritten text that appears in

11     Exhibit 81?

12            MR. SOLOMON:  I'm going to ask both

13     questions.

14            MR. LINDSTROM:  All right.

15     BY MR. SOLOMON:

16        Q     The typewritten text, first of all.

17        A     Yeah, I think so.

18        Q     You know who authored it?

19        A     I don't know, but I can make a pretty good

20     guess.

21        Q     Okay.  Who?

22        A     Siebel Systems.

23        Q     And you don't know who authored the

24     handwritten notes?

25        A     No.
```

```
1       Q       Okay.  And it says --

2       A       Siebel Systems before we bought them.

3       Q       They wouldn't say that now.

4       A       They would not.

5       Q       So it says, at the top, "Oracle announced a

6   total of 12 new and/or live CRM customers following

7   its fiscal year '02 first quarter earnings call."

8       A       Right.

9       Q       "Upon further investigation, Oracle's CRM

10  customer claims fall into four categories," and the

11  first is "Complete Fabrication."

12      A       Right.

13      Q       The second is "Creative Reclassification of

14  Revenue."  The third is "Irrelevant," and the fourth

15  is "Verified."

16              Do you see that?

17      A       Yes.

18      Q       So the first one says, "Oracle CRM Claim:

19  Unisys."

20              Did Oracle claim that Unisys was a 11i

21  customer?

22      A       I don't -- I don't recall.

23      Q       Okay.  Do you recall selling any CRM

24  software to Unisys?

25      A       I do not.  I cannot recall the specifics of
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    what systems we sold Unisys.

 2         Q      Okay.  How about the next one; "Oracle CRM

 3    Claim:  British Telecom"?

 4         A      We sell a lot of stuff to Unisys and a lot

 5    of stuff to British Telecom.

 6         Q      Okay.

 7         A      But I can't remember specifically what was

 8    sold on what date.

 9         Q      Okay.  And just for that reference to

10    British Telecom there, you don't know whether there

11    was a representation by Oracle prior to this document

12    being created that it had sold British Telecom CRM?

13         A      I don't know.

14         Q      Okay.  What about POSCO; it says "Oracle

15    CRM Claim:  POSCO."  Did POSCO purchase Oracle CRM?

16         A      I believe they have, but I just -- I can't

17    tell you what date they purchased CRM --

18         Q      Okay.  So you can't say that they --

19         A      No --

20         Q      -- purchased it as of the date of this

21    document?

22         A      No, I can't.

23         Q      What about the reclassification of revenue;

24    do you have any knowledge of any reclassification of

25    revenue with respect to Pitney Bowes?
```

1      A      Siebel has accused SAP and Oracle of

2   reclassifying revenue to make our CRM sales look

3   larger than they really are, and Oracle certainly

4   doesn't do that.

5      Q      And never did?

6      A      Not to my knowledge.

7      Q      Do you know anything about the "Oracle CRM

8   Claim:  Kyocera"?

9      A      It's a Japanese copier company.  I don't --

10   again, we sell them a lot of things, but I can't tell

11   you what we sold them and when we sold them.

12      Q      Okay.  The Oracle CRM claim relating to

13   Dell, do you know anything about that?

14      A      The same answer.  I just can't tell you.

15   Dell uses some of our CRM, and all of our -- yeah, a

16   lot of our ERP and a lot of our supply chain, but I

17   can't -- and the standardized in our database, but I

18   just can't tell you the dates they bought the stuff.

19      Q      Did you engage in swap transactions with

20   Dell?

21          MR. LINDSTROM:  Objection; calls for a

22   conclusion, vague and ambiguous.

23          THE WITNESS:  Not that I know of.

24   BY MR. SOLOMON:

25      Q      What about Oracle CRM claim with Toshiba

1    Medical; do you know anything about that?

2        A     It will be the same answer.  You know,

3    Toshiba is a big customer of ours.  They buy a lot of

4    applications in technology.

5        Q     Okay.

6        A     But I can't tell you the dates that they

7    bought it.

8        Q     Okay.  And would you say -- would it be the

9    same answer with respect to the next customer,

10   Cochlear Limited?

11       A     I'm unfamiliar with Cochlear.

12       Q     Unfamiliar?

13       A     I just don't know that company.

14       Q     And you will see, on the following page,

15   there is a "Verified" deal.

16             Do you know anything about that?

17       A     I'm not familiar -- I'm not familiar with

18   that company.

19             MR. SOLOMON:  Okay.  Thank you.

20             Have marked as next exhibit a document

21   produced by the defendants with the control numbers

22   062376 through 393.

23             (Exhibit No. 82 was marked for

24             identification.)

25             THE WITNESS:  Kind of hard to read.

1          MR. SOLOMON:  Okay.

2          THE WITNESS:  I'll stop.

3          MR. SOLOMON:  Okay.  I'll probably be able

4    to get to that bit --

5          THE WITNESS:  Yeah.

6          MR. SOLOMON:  -- but it's narrow.

7      Q    First of all, do you recognize this

8    document?

9      A    I do not.

10     Q    Okay.  It's dated October 23, 2001 on

11   the -- at the top of the first page, and there's an

12   exchange among Mark Jarvis, Julie Gibbs, and some

13   individuals who were copied.

14          And at the bottom, there's an e-mail dated

15   the 18th of September 2001, and it's an exchange from

16   Mark Jarvis to Paul Burrin.

17          Then over the page, there's another

18   exchange -- there are more exchanges, excuse me,

19   dated September 18, 2001.

20          Do you see those exchanges?

21     A    What page are you on?

22     Q    I'm just -- I'm looking at the first page,

23   the second page, and the first half of the third

24   page, pretty much.

25     A    Yes.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Okay.  I'm on the third page of the

2    exhibit, looking halfway down where it says

3    "Val/Csaba."

4             Do you see that?

5      A      Third page of the exhibit?

6      Q      Third page, yeah.

7      A      Yeah.

8      Q      And it says, "Can you please let me know

9    who you are working with on the Press Releases at GE

10   Power?  I need to know the specific person in case GE

11   in the US brings this up.  There have been concerns

12   in the past that we have used their name without

13   proper approval.  We are in negotiations for a

14   significant deal and we need to be aware of the

15   account activity."

16            Do you see that?

17     A      I do.

18     Q      It said, "Thanks for your help, Keith."

19            Do you know who the Keith is?

20            MR. LINDSTROM:  Keith Garver?

21            THE WITNESS:  Looks like Keith Garver, but

22   I don't know who Keith Garver is.

23   BY MR. SOLOMON:

24     Q      And then further up the page, Val Russell

25   writes:  "Keith, we are cognizant of the restrictions

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    in using the GE name and Christine Englund and Corp

2    Pr are in the loop.  Please see my next note."

3              Do you see that?

4       A    I do.

5       Q    Do you know who Val Russell is?

6       A    I do not.

7       Q    And just, again, up to the top of the page,

8    it says, "Thank you for the response.  GE Power has

9    asked that we not use their name as a reference even

10   if we are using previously approved information, so

11   we need to be very careful.  I know you are aware of

12   this, but we cannot send" out -- "send our" -- I

13   think it means out -- "any press release without

14   their approval.  They have been very clear on this

15   issue."

16             Do you see that?

17      A    Yes.

18      Q    Okay.  And then on the second page, in the

19   middle, there's another reference to the reference

20   issue.  It says, "Paul, I continue to receive

21   messages from the GEPS Account Team with request to

22   remove GEPS as a reference from Oracle.com.  Mark

23   Jarvis requested that we retain the reference until

24   we receive a direct request from GEPS."

25             Do you see that?
```

**9/21/2006  Ellison, Lawrence Vol. II**

1        A      I do.

2        Q      Now I'm looking at the bottom of the first

3    page and the top of the second, and it says, "Larry's

4    directive was that we would not remove GE as a

5    reference until they stopped using our software."

6              Do you see that?

7        A      Yes.

8        Q      Is that accurate?  Did you issue a

9    directive not to remove GE as a reference until they

10   stopped using Oracle software?

11       A      I did.

12       Q      And was that directive adhered to?

13       A      I think so.

14       Q      Okay.  And why did you issue that

15   directive?

16       A      The -- again, I was the corporate sponsor

17   at GE.  They are a very important customer.  They are

18   arguably the most respected corporation in the United

19   States.

20       Q      Other than Microsoft; right?

21       A      Other than Microsoft.  Even more respected

22   than Microsoft, and Microsoft is not a very big

23   customer of ours.  And it was important -- it was

24   very important -- we made a huge effort in a variety

25   of GE divisions to help them be successful, and we

**9/21/2006  Ellison, Lawrence Vol. II**

```
1      thought it was legitimate for us to disclose the fact
2      that we were, you know, the standard -- application
3      standard at GE.  So GE always -- you know, GE didn't
4      like being used as a reference.  Or more precisely,
5      GE would like some quid pro quo in exchange for being
6      used as a reference.
7              So they would say -- so I decided just to
8      put them on Oracle.com and leave them there even if
9      they weren't entirely happy with it.  And I told them
10     that.
11             MR. SOLOMON:  Thank you.
12             Have the next document marked as --
13             What exhibit number are we on, please?
14             THE REPORTER:  We are on Exhibit 83.
15             MR. SOLOMON:  Exhibit 83, and that was
16     produced by the defendants with the control numbers
17     059745 to 47.
18             (Exhibit No. 83 was marked for
19              identification.)
20             THE WITNESS:  Okay.
21     BY MR. SOLOMON:
22        Q    Okay.  Do you recognize this?
23        A    I do.
24        Q    And the second half of the first page
25     reflects an e-mail from you to Jeff Henley, Mark
```

1    Barrenechea, and copying Jeff Henley, Jennifer

2    Minton, and Safra Catz?

3        A    That's correct.

4        Q    And the subject is "RE: IT CRM"?

5        A    Yes.

6        Q    And then you wrote the message at the top

7    of the second page; is that right?

8        A    I did.

9        Q    Okay.  And you say, halfway down, "We

10   cannot remain in denial if we talk with our users

11   every day."

12            Had you been in denial?

13       A    Had I been in denial?  I don't think I had

14   been in denial.

15       Q    Had other people at Oracle been in denial?

16       A    I think some of the engineers were in a

17   competition with Siebel, and Siebel had features we

18   didn't have.  They had been in the business much

19   longer, and sometimes, you know, you love your baby,

20   and they -- you know, they were very proud of what

21   they had done, but they were still missing certain

22   features that our competitors had.

23       Q    And you say, at the top, "Our top priority

24   is to get Oracle users are 'delighted,'" in quotes,

25   "with the quality and functionality our CRM

1    products."

2              Do you see that?

3    A    Yes.

4    Q    And then you go on to say, "Until that

5    happens I doubt we will achieve success in the

6    market."

7              Do you see that?

8    A    Yes.

9    Q    And those were your -- that was your view

10   as of March 22nd, 2002; correct?

11   A    Yes.

12   Q    And this would have been in your file, or

13   not, as of March 2002?

14   A    Well, since I -- since I authored it and if

15   I didn't send myself a copy, it wouldn't be.

16   Q    Okay.  And at the time you wrote this, were

17   you aware of any obligation to preserve this document

18   for this litigation?

19             MR. LINDSTROM:  Objection; assumes facts.

20             THE WITNESS:  Yeah.  Again, I certainly --

21   you know, again, I don't know the where -- the date

22   of the document retention order, but I was aware at

23   some point in time that we had to preserve all

24   documents.

25   BY MR. SOLOMON:

1       Q       Including a document such as this?

2               MR. LINDSTROM:  Objection; no foundation,

3       calls for speculation.

4               THE WITNESS:  Yes.

5       BY MR. SOLOMON:

6       Q       Okay.  And this was not produced from your

7       files; you don't even know if it was in your files;

8       is that right?

9       A       Yeah.  Again, I think because I authored it

10      and didn't send myself a copy, it was never in my

11      file.

12              MR. SOLOMON:  Marked as the next exhibit a

13      document produced by the defendants with the control

14      number 100146.

15              (Exhibit No. 84 was marked for

16              identification.)

17              THE WITNESS:  Okay.

18      BY MR. SOLOMON:

19      Q       And this is -- first of all, do you

20      recognize it?

21      A       I don't.

22      Q       Okay.  It's from Susan Marks to you,

23      copying Joyce Higashi, dated the 29th of March 2002.

24              Do you see that?

25      A       I do.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        Q       And are you familiar with the customer NCR?

2        A       Very.

3        Q       And were they implementing any 11i modules

4    in 2000 to 2001, do you know?

5                MR. LINDSTROM:   In 2000-2001?

6                MR. SOLOMON:   That's my question.

7                THE WITNESS:   I don't know.

8                MR. SOLOMON:   You don't know.   Okay.

9        Q       And this would have been in your files in

10   March of 2002; is that right?

11       A       Yes.

12       Q       And it wasn't produced from your files and

13   you don't know why?

14       A       That's correct.

15               MR. SOLOMON:   I've have marked as the next

16   document -- next exhibit, excuse me, the document

17   with the control numbers 297895 to 896.

18               (Exhibit No. 85 was marked for

19               identification.)

20               THE WITNESS:   Okay.

21   BY MR. SOLOMON:

22       Q       Do you recognize this?

23       A       I don't.

24       Q       Okay.   On the second page of the

25   Exhibit (sic) 297895, and it reflects, at the top,
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    two e-mail exchanges.  The second one I'm looking at
2    is dated March 5th, 2002 from Peter Piascik, I'm
3    going to guess, to Larry Ellison and others.
4              Do you see that?
5        A     I do.
6        Q     Do you know who the sender is?
7        A     I don't.
8        Q     Do you recognize the name of the company,
9    ADT?
10       A     I don't.  No, actually, I remember seeing
11   their advertising on television.
12       Q     Okay.  Were you aware around the date of
13   this e-mail that ADT was holding up payments to
14   Oracle because of concerns with the 11i
15   implementation?
16       A     That's what it says in the e-mail, but I
17   don't recall it.
18       Q     Okay.  And this would have been in your
19   file on March 5th, 2002?
20       A     That's right.
21       Q     And it wasn't produced from your files and
22   you can't explain why; correct?
23       A     That's right.
24             MR. SOLOMON:  We will have marked as the
25   next exhibit a document produced by the defendants
```

```
 1    with the control numbers 062679 and 680.
 2              (Exhibit No. 86 was marked for
 3              identification.)
 4              THE WITNESS:  Okay.
 5    BY MR. SOLOMON:
 6         Q    Okay.  Do you recognize this?
 7         A    Again, not specifically.  I recall the
 8    discussion.
 9         Q    Okay.  And you will see, at the bottom of
10    the page, you are an addressee, a copy on an e-mail
11    from Safra Catz.
12              Do you see that?
13         A    Yes.
14         Q    And it says, "Let's kill the No. 1 in CRM
15    adv.  Let's discuss."
16              Do you see that?
17         A    I do.
18         Q    What does "adv" mean?
19         A    Advertisement.
20         Q    And over the -- under the second page, it
21    says, "Larry, I know you wanted to skip it.  Let's
22    skip it."
23              Do you see that?
24         A    I do.
25         Q    Do you know what she's referring to?
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        A     Yeah.  I want to kill the ad.  I don't want
2   to advertise something.
3        Q     Okay.
4        A     That we are No. 1 in CRM.  Just not true.
5        Q     Okay.  And this would have been in your
6   file -- and I'm looking at that exchange, certainly
7   at the bottom.  This would have been in your file as
8   of Monday, May 20th, 2002, that exchange?
9        A     That's correct.
10       Q     And it wasn't produced from your files and
11  you cannot explain why?
12       A     That's correct.
13             MR. SOLOMON:  Okay.  Let's go off the
14  record.
15             THE VIDEOGRAPHER:  Off record at 12:30 p.m.
16             (Lunch recess taken.)
17
18
19
20
21
22
23
24
25
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    AFTERNOON SESSION                          1:10 P.M.

 2

 3              THE VIDEOGRAPHER:  On record at 1:10.

 4    BY MR. SOLOMON:

 5        Q    Okay.  You recall making a claim in the

 6    2000-2001 time frame, Mr. Ellison, that by utilizing

 7    Suite 11i, Oracle had saved a billion dollars?

 8        A    No.  I think I said by using our own

 9    applications, we had saved over a billion dollars.

10        Q    And is that the distinction you were

11    saying, just using applications and you weren't

12    limiting it to the 11i suite; is that right?

13        A    Yeah.  Yes.

14              MR. SOLOMON:  Okay.  We will have marked as

15    the next exhibit an excerpt from a book entitled

16    "Softwar."

17              (Exhibit No. 87 was marked for

18              identification.)

19    BY MR. SOLOMON:

20        Q    Mr. Ellison, I'm going to be asking you a

21    number of questions about the contents of that book,

22    and so before I start doing that, of course, you are

23    familiar with the book Softwar?

24        A    I am.

25        Q    And can you describe your involvement in
```

**9/21/2006  Ellison, Lawrence Vol. II**

1     the publication of that book?

2          A      I -- yes.  I was interviewed for the book,

3     extensively interviewed for the book, and I also

4     wrote footnotes where I -- if I disagreed or wanted

5     to clarify something the book said.

6          Q      Okay.  I'm looking at what is page 182 of

7     the book, and I'm looking at the bottom paragraph,

8     and it says, in part, "The final qualification about

9     Oracle's story of transforming its efficiency by

10    using its own E-Business Suite is that the claim is

11    only partly true, because the first billion dollars

12    of" saving "was pretty much in the bag before 11i was

13    finished."

14             Do you see that?

15         A      I do.

16         Q      Is that true?

17         A      Yeah.  Yeah.  Well, let me be clear.  The

18    second part is certainly true that we were well on

19    our way -- well on our way to saving a billion

20    dollars before 11i was finished.  That's true.  So

21    the qualification that -- you know, Oracle

22    transforming itself by using its only business suite,

23    I'm not sure I ever said that.  I mean, I don't know

24    how I use the term E-Business.  E-Business -- I

25    sometimes use the term "E-Business Suite" to mean all

```
 1    of our applications, not our applications beginning

 2    at 11i.

 3              So I think sometimes I'm not terribly

 4    clear, you know.  To me, when I say E-Business Suite,

 5    I mean our applications.

 6        Q    Okay.  So you are in agreement with that

 7    first sentence; is that fair or not?

 8              MR. LINDSTROM:  Objection; mischaracterizes

 9    his testimony.

10              THE WITNESS:  Yeah.  I'm in agreement with

11    the second half of the sentence starting "because."

12    BY MR. SOLOMON:

13        Q    Okay.  And tell me where you disagree.

14        A    I don't believe I ever made the claim that

15    we transformed ourself with the 11i versions of our

16    applications only.

17        Q    Okay.

18        A    I believe I made the claim we had

19    transformed ourself with our applications and

20    sometimes -- and I sometimes described those

21    applications as E-Business Suite.

22        Q    Okay.

23        A    But that includes Version 11 as well as

24    11i.

25        Q    Okay.  You haven't clarified this, have
```

**9/21/2006  Ellison, Lawrence Vol. II**

1    you?

2        A      No.

3        Q      And why not?

4        A      Well, one, I didn't notice it until you

5    just pointed it out.  But I didn't try to -- I didn't

6    try to rewrite the book.  You know, I thought I had a

7    limited number of footnotes that I could put in, and,

8    you know, I wanted to pick my spots, and I didn't

9    think it was a major issue.

10       Q      Was there an agreement there would be a

11   limited number of footnotes?

12       A      Was there an agreement.  I don't expect --

13   I don't believe you need the footnotes to be larger

14   than the book itself.  Plus it takes a long time to

15   write the footnotes, so I just didn't correct every

16   single thing.  I didn't parse every single paragraph

17   very carefully and write -- write down something I

18   thought, you know, was slightly off or, you know,

19   needed clarification.  I didn't do that every single

20   time.  That would have been --

21       Q      Okay.

22       A      -- that would have required a lot of

23   footnotes.

24       Q      Okay.  It goes on to say, "The software

25   that Oracle used to turn itself into an e-business

```
 1     was, in fact, a combination of modules from Release
 2     11.0, which shipped in late" 1988 -- "1998," excuse
 3     me, "and a number of customized prototype
 4     applications that were global, Internet-based
 5     systems."
 6              Do you agree with that sentence?
 7     A    Yeah.
 8     Q    Okay.  It goes on to say, "A key element of
 9     the E-Business Suite, however, was missing: the
10     underlying information architecture, including the
11     vital shared data schema that were the basis for
12     Oracle's claims about the tight integration of all
13     the applications."
14              Is that true?
15              MR. LINDSTROM:  Objection; compound.
16              THE WITNESS:  Now, this is referring to in
17     the past, so they are saying the key element was
18     missing prior -- prior to the E-Business Suite.
19              MR. SOLOMON:  Okay.
20              THE WITNESS:  Just as I'm reading this,
21     prior to the E-Business Suite, the data-sharing
22     schema did not exist.  If that's what it's -- I
23     believe that's what I'm agreeing to.  Before the --
24     what the E-Business Suite brought -- excuse me.  Let
25     me stop using the term "E-Business Suite."
```

```
 1           What Version 11i brought was a much more
 2     tightly integrated data schema, and before 11i, we
 3     didn't have that tightly integrated data schema.
 4     BY MR. SOLOMON:
 5        Q    Okay.  And that what is called "vital
 6     schema" -- it says here that schema was the basis or
 7     were the basis for your claims about the tight
 8     integration of all the applications; right?
 9        A    Yeah, and it existed in 11i, but did not
10     exist in 11o.
11        Q    Okay.  And then it goes on to say, "Ellison
12     says, 'That's absolutely right.  The software that
13     saved Oracle a billion dollars in the first year was
14     a combination of our standard applications product
15     plus prototype applications that had not yet been
16     integrated into the E-Business Suite. . . rewritten
17     and integrated into what would become the E-Business
18     Suite."
19           Do I read that right?
20        A    Yes.
21        Q    And do you agree with that?
22        A    Yes.
23        Q    Okay.  Now, if you go to the bottom of 183,
24     it reads as follows, in part:  "But in one sense, the
25     marketing claims were misleading.  The reassuring
```

1    message to prospective customers was that Oracle had

2    been successfully running the same E-Business Suite

3    that they would buy for at least a year."

4              Do you agree with that?

5        A    No.

6        Q    But you didn't clarify it, did you?

7        A    No.

8        Q    And you didn't correct it?

9        A    That's correct.

10       Q    That was -- reading on:  "That was very far

11   from the case.  Not for the first time in Oracle's

12   history, early guinea-pig customers would pay a price

13   for taking too much on trust."

14             Do you agree with that?

15       A    The price they paid was more than offset by

16   the benefits, so early adopters of any software

17   product discovered more bugs and had more problems

18   than people who wait.  The advantage of being an

19   early adopter -- and the reason there are early

20   adopters of software products -- is they get the

21   benefit sooner, so it's more costly, but you get the

22   benefits earlier.

23       Q    Okay.  But the question was --

24       A    And the net is you save.

25       Q    The question was:  Do you agree with that

```
 1    sentence?

 2       A       Which sentence?

 3       Q       Starting with, "Not for the first time,"

 4    ending in "trust"?

 5       A       No.

 6       Q       Okay.  But you didn't clarify or correct

 7    it, did you?

 8       A       No.

 9               MR. SOLOMON:  Have marked as the next

10    exhibit another excerpt from the book Softwar.

11               (Exhibit No. 88 was marked for

12               identification.)

13    BY MR. SOLOMON:

14       Q       And I'm going to draw your attention to --

15    toward the bottom of the page.

16               MR. LINDSTROM:  Which page?

17               THE WITNESS:  191?

18               MR. SOLOMON:  That's correct, 191.

19       Q       And I'm going to read the following

20    language:  "'I had already delayed the 11i release

21    date, and that forced our customers to revise their

22    implementation plans.  There was tremendous pressure

23    not to delay again.  Our customers had their

24    resources all lined up and were ready to install our

25    software as soon as we released it.  It was a bit
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1     like the beginning of World War I:  once the troop

 2     mobilizations began, there was no turning back.'"

 3              Do you see that?

 4      A      I do.

 5      Q      Is that your language?

 6      A      Yes.

 7      Q      Okay.  Would you agree now that it's -- the

 8     more appropriate analogy would be with Don Kirk

 9     (phonetic) in World War II?

10      A      No.

11              MR. SOLOMON:  Mark as the next exhibit

12     another excerpt from Softwar.

13              (Exhibit No. 89 was marked for

14              identification.)

15     BY MR. SOLOMON:

16      Q      And just while we are having the exhibit

17     marked, Mr. Ellison, the chapter is -- that we are

18     looking at is headed "Ready or Not."

19              Do you have an understanding what "Ready Or

20     Not" refers to?

21      A      I do.

22      Q      And is it 11i?

23      A      Yes.

24      Q      Okay.  I'm looking at page 192, and I'm

25     looking at the language quarter of the way down the
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    page where it says, "Ellison says, 'We had just

 2    finished a complete rewrite of our order management

 3    system.  It was a huge job.'"

 4             Do you see -- do you see that?

 5      A      I do.

 6      Q      And then without going through it all, you

 7    talk about five stages.

 8             Do you see the reference to five stages?

 9             Halfway in, you say, "There were five

10    stages to the order management decision.  Stage one:

11    We have time to put the new order system into the

12    suite; let's do it.  Stage two:  No, too risky; we

13    have to go with the old order system.  Stage three:

14    Let's put them both in; absolutely fantastic idea.

15    Stage four:  Fantastic idea, but we can't make it

16    work.  Stage five:  Well, then, let's put in the new

17    one.'"

18             You see all that?

19      A      I do.

20      Q      Okay.  And is that all accurate?

21      A      I think so.

22      Q      Then you go on to say, "'It was my

23    decision.  It's in my nature to go for the

24    highest-risk/highest-reward option.  That's my cross

25    to bear.'"
```

1              Did you say that?

2        A      I did.

3        Q      It goes on to say, "'We went from having an

4   average order management product to having the

5   premier order management program on the planet.  The

6   only problem was it was brand new and we hadn't done

7   enough testing.'"

8              Do you see that?

9        A      Yes, I do.

10       Q      Was it accurate?

11       A      Yes.

12       Q      And then further down the page, it says,

13  "Ellison had no illusions about how critical the

14  order management system was," and then he quotes you:

15  "'The order management system is the heart of the

16  sell side of our e-business suite.  Order management

17  is the funnel that captures the information about the

18  sale.  The better your order management system, the

19  more information it captures.  Our new system

20  captures. . . the details about the products sold,

21  contractual obligations, payment terms, everything.

22  It manages marketing, promotions, vendor rebates, and

23  tracks what salespeople should be compensated on the

24  deal.  The flexible pricing engine handles complex

25  and arbitrary rules -- like buy two and get the third

**9/21/2006  Ellison, Lawrence Vol. II**

```
1     one free.  And the automatic configurator keeps

2     people from buying the wrong combination of

3     products -- like computer components that won't work

4     together.  It's a great system.  But when it first

5     came out, it had a lot of bugs.'"

6              Did I read that accurately?

7     A     Yes.

8     Q     And did you say all that?

9     A     I did.

10             MR. SOLOMON:  Marked as the next exhibit

11    another excerpt from the Softwar book.

12             (Exhibit No. 90 was marked for

13              identification.)

14    BY MR. SOLOMON:

15    Q     Okay.  Looking at -- looking at page 193 --

16    A     196?

17    Q     I'm sorry.  Hold on one second.  We are

18    having a bit of document trouble.

19             Okay.  196.  Third of the way down the

20    page, you are quoted as saying, in part, "'We should

21    have done two things:  installed it in-house first

22    and engaged with the early implementations at an

23    executive development level.  I think if either of

24    those things had happened, we would have rapidly

25    found out that it wasn't done.  As it was, it took us
```

1    until November to realize we had issues here and to

2    start to mobilize.'"

3             Do you see that?

4    A    I do.

5    Q    And is that accurate?

6    A    I didn't say it.

7    Q    Sorry?

8    A    I think -- I think they are quoting George

9    Roberts.

10   Q    Thank you very much.

11            Is the content accurate?  Do you agree, in

12   other words, with George Roberts?

13            MR. LINDSTROM:  Objection; compound.

14   BY MR. SOLOMON:

15   Q    Okay.  Let's start -- or break it down,

16   since the objection's been interposed.

17            Do you agree with the first sentence where

18   it says, "'We should have done two things'"?  Then

19   the first thing that he mentions is the installing it

20   in-house and engaging with early implementations at

21   an executive development level.

22            Do you agree with that?

23   A    We did install it in-house.

24   Q    Okay.  And did you engage with early

25   implementations at an executive development level?

1        A      I think we engaged in early implementations

2     with the teams of people that -- that our customers

3     responsible for that implementation, I think we

4     worked with the right people.

5        Q      Okay.  What about the last sentence -- "'As

6     it was, it took us until November to realize we had

7     issues here and to start to mobilize" -- do you know

8     what that refers to?

9        A      I'm not sure what -- no.

10       Q      Okay.  Now, looking further down the page,

11    two-thirds of the way down, it reads:  "'The next

12    really big push was to get in contracting and order

13    management over New Year's.'"

14              Do you see that?

15       A      I do.

16       Q      And this is referencing Oracle's internal

17    implementation; is that right?

18       A      I don't know.  I would have to --

19       Q      Okay.

20       A      -- I can't really tell.  Give me a second.

21       Q      Okay.

22       A      Okay.

23       Q      Okay?

24       A      Yeah.

25       Q      So this reflects Mark Barrenechea

1    referencing the big push; correct?

2        A       Yes.

3        Q       Okay.  And then he goes on to say, "'What

4    happened was one of the most dramatic moments I'd

5    seen during my five years at Oracle.  Everyone except

6    Ron knew that we could not place an order with the

7    new system.'"

8               And then there's an asterisk, and that's

9    because you entered a clarification; correct?

10       A       Yes.

11       Q       In fact, correction.  You say, "'Nonsense.

12   Of course Ron knew about the problems with our

13   internal order management implementation.  He was

14   personally running the project to put it in and make

15   it work.  We planned to be down for a while, and we

16   were."

17              Is it accurate?

18              MR. LINDSTROM:  Have you read it

19   accurately, or are the statements in there accurate?

20              MR. SOLOMON:  Both.

21       Q       Have I read it accurately?

22       A       I was reading along as you read.

23       Q       Okay.

24       A       But the statements as written here is

25   accurate.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Okay.  Then it goes on in the text:  "And

2     Larry, knowing we can't place an order, not knowing

3     when we would be able to place an order, and knowing

4     that once we turned off the old bespoke system that

5     there was no going back. . . 'We are going live

6     anyway.  I need a forcing function, so off we go.'

7     So we upgraded, and Oracle went down.  We were down

8     for fourteen days.  For fourteen days that January,

9     Oracle could not place a single order."

10            Is it true that for the 14 days he refers

11    to that Oracle could not place a single order?

12     A      I think I said "Nonsense," you know.  No.

13     Q      So your -- your clarification or your

14    asterisk and your "Nonsense" doesn't just refer to

15    the sentence where the asterisk is; it continues,

16    does it?

17     A      Well, I don't think -- I don't think we

18    were down for 14 -- I'm not sure.  I don't recall

19    exactly how many days we were down.  But even when we

20    were down, we had ways to work around the system and

21    place orders.

22            So the -- the sys -- there's no question

23    the system -- you know, when we put the new system

24    in, we were out, and that happens with almost every

25    release:  When you put in a new system, you are out

1      some number of days, and there were some number of

2      days we were definitely out of service, putting the

3      new system in.

4              But we solved the problems, got the system

5      up and running, and we were fine.

6          Q     Okay.  And when you were -- when you were

7      down, do you know if that was before you sold your

8      stock at the end of January?

9          A     I have no recollection.

10         Q     Okay.  It goes on to say, "It was

11     frightening.  But we got it to work.  Larry was

12     right.  It was a great forcing function.  At that

13     point I became acutely aware of the customer

14     dissatisfaction and immediately started drilling down

15     into the implementations we were doing."

16             Do you see that?

17         A     I do.

18         Q     Now, were you aware at that time that Mark

19     had become -- Mark Barrenechea had become acutely

20     aware of customer dissatisfaction?

21         A     I would have hoped he would have been aware

22     before then.  I mean, we were having -- you know, I

23     asked that we go over all of the dissatisfied

24     customers and keep -- you know, keep track of them.

25         Q     Were you acutely aware of customer

**9/21/2006  Ellison, Lawrence Vol. II**

1    dissatisfaction at that time?

2        A    I think I've said before that we have -- we

3    had several customers that were having problems, and

4    we monitored them closely and made them successful.

5            MR. SOLOMON:  Okay.  We will have marked as

6    the next exhibit further excerpts from the book

7    Softwar.

8            (Exhibit No. 91 was marked for

9            identification.)

10   BY MR. SOLOMON:

11       Q    Okay.  On page 193, at the top, Ron Wohl,

12   referring, I believe, to the order management system,

13   is quoted as saying, "'Technically, we really had to

14   include it to fulfill the objective of the E-Business

15   Suite.  If it had the flexibility to meet modern

16   e-business practices, you're in great shape; if it

17   doesn't, you don't really have an E-Business Suite.'"

18           Do you see that?

19       A    I do.

20       Q    Is that factually accurate?

21       A    No.

22       Q    And you didn't clarify or dispute it,

23   though, did you?

24       A    Well, I mean, initially, if you recall our

25   five steps, we were going to include the old version

**9/21/2006  Ellison, Lawrence Vol. II**

1  of the order management system, so I think you had --

2  you know, certainly you are more competitive if you

3  have the most modern -- you know, even better version

4  of order management, you are more competitive than if

5  you have an older version -- you know, not as capable

6  version as order management.

7        But as long as all the pieces are

8  integrated together -- all E-Business Suite means,

9  you got all the major functions covered, and they are

10  all integrated out of the box by engineering.

11    Q    Okay.  Down at the bottom of the page, it

12  says, "Even with Oracle's vaunted rapid

13  implementation procedures for installing 11i, it

14  would be at least three or four months before any

15  significant 'go-lives' -- the moment when a business

16  switches its operations to new software."

17        Do you see that?

18    A    I do.

19    Q    And is that factually accurate?

20    A    I believe what it's saying is, from the

21  time someone buys the software, it will take us --

22  even though we have a rapid implementation technique,

23  rapid means we can't get them running in less than

24  three or four months, and that's how I read that, and

25  that's reason -- yeah, that's correct.  Four months

**9/21/2006  Ellison, Lawrence Vol. II**

```
1       is very fast.  Three months is very fast.

2           Q     And if you look at the bottom of the -- of

3       page 193 where you enter a footnote, you write:  "Not

4       true.  Ron explained the risks, and I understood the

5       uncertainty surrounding release of the new order

6       management system.  And I made the decision to

7       release it."

8           A     That's referring to the quote in the middle

9       of the page.

10          Q     Okay.

11          A     You can see the asterisk.

12          Q     Correct.

13          A     That's referring to Mark Barrenechea.  If

14      you read that section, it's about Mark Barrenechea

15      saying that Ron would just tell me what I wanted to

16      hear and I would just -- going to take it at face

17      value.  So that footnote applies to that.  I guess it

18      would be the end of the first paragraph on that page.

19          Q     And this is Ron and Mark's feud almost;

20      right?

21          A     Feud's a good term.

22          Q     And you are taking responsibility; correct?

23          A     Yeah.  I don't think Ron deceived me, and I

24      don't think Ron was able to deceive me.  I think I

25      gathered all the facts and I made the call.
```

1      Q      Okay.  And then -- I'm on page 194, and

2    there's a reference -- about a third of the way down

3    the page, there's a sentence I want to read:  "Just

4    as in 1990, he seemed to think that any economic

5    slowdown might pass Oracle by."

6      A      Yeah.

7      Q      That refers to you; right?

8      A      Yes.

9      Q      And is that true?  Is that how you felt?

10     A      Well, it's -- no, and it's also hindsight.

11   But, no, I didn't think an economic slowdown, yeah,

12   would pass us by.  It was certainly impossible to

13   tell when an economic slowdown would hit us and what

14   the impact might be, but I -- you know, I don't think

15   I believed that we were immune to macroeconomic

16   changes.

17     Q      Okay.  But, again, you didn't clarify or

18   dispute that sentence, did you?

19     A      No.  Again, I would like to say -- I mean,

20   if I thought it was important, I would clarify it.

21   If not, I would move on.

22     Q      I'm now on page 194 at the bottom.  It

23   says, "If Ellison had known what was coming, he might

24   have restrained himself a little more.  In October,

25   the first reports from the field described early 11i

1    implementations afflicted with more than usual

2    bugginess."

3              Do you agree with that sentence?

4       A    Well, "more than usual bugginess," I mean,

5    it was -- we didn't -- we certainly didn't think so

6    at the time.  It was a huge product, and I don't know

7    what his basis for saying that is.  It's a huge

8    product.  It's a huge amount of code.  We expected a

9    good deal of bugginess.

10      Q    But, again, you didn't clarify or dispute

11   that sentence; correct?

12      A    Yeah.  I can't -- I would have written a

13   book as long as the book if I tried to --

14      Q    Okay.

15      A     -- you know, say how I would have said it

16   or everything I disagreed with.

17      Q    Okay.

18      A    This is his opinion.

19      Q    Okay.  And then it goes on to say, "At the

20   Oracle Applications User Group conference in Honolulu

21   at the end of October, the complaints were legion.

22   Attendees griped about a lack of reliable information

23   concerning the status of applications, malfunctioning

24   modules -- especially CRM and order management. . ."

25              Do you see that?

**9/21/2006  Ellison, Lawrence Vol. II**

1      A     I do.

2      Q     And do you agree that, first of all -- or

3   are you aware that the Oracle Applications Users

4   Group conference, the complaints were legion?

5      A     Well, Matthew is a very colorful journalist

6   and "legion" is an interesting word, but we certainly

7   had problems.  The CRM products were new.  The order

8   management module was new.  We expected bugs.  We had

9   bugs.  I wouldn't describe them as legion.

10     Q     Okay.  And the sentence, "Attendees griped

11  about a lack of reliable information," etc., do you

12  have any knowledge of that?

13     A     I don't recall.  I don't recall them

14  asking, you know -- complaining about no reliable

15  information.  I certainly, you know -- you know,

16  remember some of them saying that they were having

17  problems during implementation with CRM and order

18  management.

19     Q     Okay.  And I'm now on page 195, halfway

20  down the page, and it says, "Over the next couple of

21  months," customers -- "customer complaints poured in.

22  Instead of working on the planned features and

23  functions to flush out the suite's capabilities as

24  planned, development was increasingly engaged in a

25  feverish attempt to produce patches that would fix

**9/21/2006  Ellison, Lawrence Vol. II**

1    the bugs that seemed to be flying at them from all

2    sides."

3              Do you agree with that?

4              MR. LINDSTROM:  Objection; compound.

5              MR. SOLOMON:  Okay.  Let's break it down.

6              THE WITNESS:  Well, no --

7              MR. SOLOMON:  Well, we have to, because,

8    otherwise, your lawyer is, perhaps, going to press

9    his objection so --

10             MR. LINDSTROM:  The reason why it's a good

11   objection is we won't understand a "yes" or "no"

12   answer.

13             MR. SOLOMON:  Hey, I've conceded.  I'm

14   going to rephrase it.  Don't worry.

15        Q    "Over the next couple months, customer

16   complaints poured in."

17             Do you agree with that?

18        A    No, I don't think they poured in.  We had

19   some of our customers -- some of our customers had

20   problems.

21        Q    Okay.  And you didn't correct or clarify

22   that sentence; correct?

23        A    That's correct.

24        Q    And then it goes on to say, "Instead of

25   working on the planned features and functions to

1    plush out the suite's capabilities as planned,

2    development was increasingly engaged in a feverish

3    attempt to produce patches that would fix the bugs

4    that seemed to be flying at them from all sides."

5            Do you agree with that?

6        A    No.  We certainly spent more time fixing

7    bugs, but we continued to develop new features and

8    functions simultaneously, and we would release a bug

9    fix and a new feature as a patch.  So patches

10   sometimes are bug fixes, and sometimes patches are

11   new features, but we did both simultaneously.

12       Q    Okay.  And then further down in that

13   paragraph, you are quoted as saying:  "'I was way too

14   optimistic.  It just kind of got away from us, and

15   that became a very big problem.'"

16           Is that an accurate quote?

17       A    It certainly took -- and what I mean by

18   that, it took longer, you know, to fix the all -- the

19   bugs than I thought.

20       Q    And did you say, "'It just kind of got away

21   from us, and that became a very big problem'"?

22       A    I said it, yeah.

23           MR. SOLOMON:  Okay.  Have marked as the

24   next exhibit another excerpt from the Softwar book.

25           (Exhibit No. 92 was marked for

1              identification.)

2    BY MR. SOLOMON:

3        Q      I'm looking at page 199 to start with.  I'm

4    looking at -- towards the bottom of the page, it's --

5    says, "As shareholders chewed over the

6    possibility. . ."

7              Do you see that --

8        A      I do.

9        Q      -- on the bottom?

10             It says, "As shareholders chewed over the

11   possibility that Ellison might have exaggerated the

12   extent of Oracle's immunity to the forces that were

13   blighting other tech companies, Oracle's stock price

14   plunged by 13 percent, to $23.56.  In response,

15   Oracle reiterated that it was standing by its bullish

16   forecast."

17             Do you see that?

18       A      Yes.

19       Q      Did you exaggerate the extent of Oracle's

20   immunity to the forces that were blighting other tech

21   companies?

22       A      I don't think so.

23       Q      Do you remember Oracle's stock price

24   plunging by 13 percent in February of 2001?

25       A      I mean, this refreshes my memory, yeah.

1        Q       And did that concern you when that

2    happened?

3        A       Sure.

4        Q       How did you respond?  Strike that.

5                Did you respond by issuing a statement that

6    the bullish forecast was -- was -- that you were

7    standing by your bullish forecast?

8        A       I don't think so.  Not that I recall.

9        Q       Did anybody respond that way?

10       A       Not that I recall.

11       Q       Okay.  Do you remember Chuck Phillips

12   issuing a report in February of 2001 in which doubt

13   was cast on the ability of Oracle to make its 3Q

14   numbers?

15       A       Again, not that I recall.

16       Q       Okay.  Looking at page 199 -- sorry, the

17   bottom of 199, the beginning of 200, and it says, in

18   part, "A few days later in Paris, Ellison seemed

19   unusually nervous and flustered."

20               Were you unusually nervous and flustered in

21   Paris?

22       A       Not that I recall.

23       Q       You remember going to Paris?

24       A       I might have been jet-lagged, but -- say

25   again?

**9/21/2006  Ellison, Lawrence Vol. II**

1       Q       You remember going to Paris in February of

2    2001?

3       A       Not specifically.

4       Q       It goes on to say, "The main theme of his

5    speech was on the folly of customizing Oracle's

6    software and why it was better to buy a complete

7    suite from Oracle -- in Ellison's analogy, a finished

8    car that you knew would work -- rather than a bundle

9    of kit glued together by mechanics from IBM."

10              Do you see that?

11      A       I do.

12      Q       Is it accurate?

13              MR. LINDSTROM:  Is it accurate that he gave

14   that analysis?

15              MR. SOLOMON:  Correct.  Thank you.

16              THE WITNESS:  Yes, it is.

17   BY MR. SOLOMON:

18      Q       And did you also talk about the folly of

19   customizing Oracle's software?

20      A       I don't think I ever used the word "folly."

21      Q       Okay.  But did you talk about the mistake

22   customers would be making?

23      A       Well, I think I talked about customization

24   is expensive and it's risky, because we are in the

25   business of building software, and we make mistake --

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    plenty of mistakes when we are building software.

 2    When customers write their own software, they are

 3    even more likely to make mistakes when they write

 4    their own custom software, so it's expensive, it's

 5    time-consuming, and it negatively affects overall

 6    quality of your systems.

 7        Q    Okay.  Have you since talking in Paris

 8    commented that you were imprecise and perhaps not

 9    clear in your statements there?

10             MR. LINDSTROM:  Objection; vague and

11    ambiguous.

12             THE WITNESS:  I think I know what you are

13    referring to.

14             Yeah, in terms -- I tried to distinguish

15    customization, meaning changing the code, from

16    customization, if you will, extending the code,

17    adding your own -- you know, so don't -- there's a

18    difference between a module you write, a component

19    you write, and then you connect to Oracle versus

20    actually going into the Oracle written code and

21    changing it.

22             So I tried to clarify myself.  I didn't

23    mean that you shouldn't write -- if you have clever

24    ideas and you want to, you know, implement your own

25    systems and write those systems, that's all well and
```

1    good.  The mistake is usually going into our code,

2    the Oracle written code, and making changes to that.

3    BY MR. SOLOMON:

4        Q    Okay.  And then if you go a little bit

5    further down the page, it says, in your footnote,

6    "Worse than being overzealous in this presentation, I

7    was ambiguous, imprecise, and easily misunderstood.

8    The problem was that I failed to be clear as to what

9    I meant by 'customize.'  Of course customers can

10   tailor our applications to their business processes,

11   but they should never modify our software."

12           And you wrote that; right?

13       A    Yes.

14       Q    And then on page 201 -- let's see if I can

15   find it -- sorry, the bottom of 200 and beginning of

16   201, it says, "The other big," in quotes, "'take-out'

17   from the Paris speech was Ellison's frank recognition

18   that the E-Business Suite didn't yet do everything

19   its customers wanted and maybe never would but that

20   an '80 to 85 percent solution' that could be

21   implemented in five months was better than the

22   100 percent" still "promised by some vendors that"

23   will "take three years to put in and still wouldn't

24   work."

25           Do you see that?

1       A      I do.

2       Q      Okay.  Did you recognize at that conference

3    that Oracle was only offering an 80 to 85 percent

4    solution at that time?

5       A      No.  I think -- I think I knew all along

6    that the E-Business Suite would never do everything

7    every company wanted to do, but it would -- should do

8    all of your general ledger, all of your accounts

9    receivable, all of your accounts payable.  So it

10   would be a complete solution in the areas where we

11   had developed product.

12            We didn't, at the time, have product for --

13   if you are a bank, managing savings accounts, your

14   customer savings accounts; manage your customer's

15   checking account or Internet banking, so there were a

16   lot of pieces we didn't have that were industry

17   specific, but where we had pieces, it was a pretty

18   complete solution.

19      Q      Okay.  And it finishes -- the passage

20   finishes with, "Immediately, the chorus went up that

21   Ellison had claimed that the suite was complete and

22   now he was saying that it wasn't."

23            Do you remember that chorus going up?

24      A      No.

25      Q      Okay.  On page 201, I'm looking at the

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    language that reads:  "Although applications had

 2    continued to grow strongly thanks to the buzz that

 3    had been generated around 11i, database revenue

 4    growth was flat to negative.  Ellison explained," and

 5    now you are being quoted, "'It's very disappointing.

 6    A bunch of deals were approved at the senior vice

 7    president level, but once they got to the CFO and CEO

 8    level, they were pushed off.  We have a lot of

 9    nervous executives looking at this economy and being

10    very cautious.  They want to wait thirty to sixty

11    days so they can get a better read on this economy.'"

12              Do you see that?

13         A    I do.

14         Q    Is that an accurate quote?

15         A    Yes.  I think it might be hindsight, but

16    it's an accurate quote.  I said it.

17         Q    Okay.  Do you know what deals you are

18    referring to when you are saying they are approved at

19    the senior vice president level?

20         A    We had -- we had a variety of large deals,

21    mainly database deals, that were going through --

22    that had been qualified.  And what I mean by

23    "qualified," the customers had said they are going to

24    buy the database.  They said they wanted price --

25    they had gone through a price negotiation.  We
```

```
 1   completed the price negotiation.  We had delivered to

 2   them a contract.  So it was really awaiting final

 3   approval.  And in the last couple of days of the

 4   quarter, we were having a hard time getting those --

 5   you know, the final sign off from the CFO or the CEO

 6   or whoever had that approval authority for those

 7   larger deals.

 8        Q     And can you name the customers involved in

 9   those deals?

10        A     I cannot.

11              You mean from memory?

12        Q     Yes.

13        A     No, I cannot.

14        Q     And how would that information be

15   retrieved?  Who has that information?

16        A     We had a system for tracking prospects in

17   pipeline, and I believe they are -- I believe it's

18   someplace around.

19        Q     And what's that system called?

20        A     We have a sales -- you know, we have a

21   sales automation -- I'm not sure what we had --

22   again, this was talking about 2001.

23        Q     Correct.

24        A     You know, I'm not sure what system was

25   available in -- you know, was available in 2001, but
```

1    we certainly kept track of our large deals, the

2    contracts we'd, you know -- most of those -- I would

3    think a lot of those deals would be in the form of

4    contracts and proposals at that point.

5         Q     Okay.  But back to the system that was

6    available to track these deals, are you talking about

7    Oracle Sales Online?

8         A     Yeah.  And I just don't remember its status

9    in early 2001.

10        Q     Do you know anything about Oracle Sales

11   Online being purged in July of 2001?

12        A     No.

13        Q     You never heard that?

14        A     No.

15        Q     Not aware that -- do you know who

16   Mr. Kirkby is?

17        A     No.

18        Q     He's a VP of IT at your company now.

19              Never heard of him?

20        A     Never heard of him.

21        Q     Have you ever read the Special Litigation

22   Committee Report?

23        A     It's very thick.  No.

24        Q     Mr. Kirkby, represent to you, indicates

25   that in July of 2001 that OSO was purged.

1           MR. LINDSTROM:  So you are making this

2    representation that that's true?

3           MR. SOLOMON:  I'm making the representation

4    that Mr. Kirkby made the representation in SLC -- to

5    the SLC.

6           MR. LINDSTROM:  And so what's the question?

7    BY MR. SOLOMON:

8        Q     Have you ever heard of that?

9        A     No.

10       Q     Would you be concerned that after this

11   litigation was commenced, Oracle sales had been

12   purged?

13          MR. LINDSTROM:  Objection; calls for

14   speculation, hypothetical.

15          THE WITNESS:  Sure.

16   BY MR. SOLOMON:

17       Q     And are you going to take any action to

18   follow up on that concern?

19          MR. LINDSTROM:  Objection; assumes facts.

20          THE WITNESS:  I assume that we have had a

21   Special Litigation Committee look into it, and I

22   guess our legal department already knows about it, so

23   I assume that action's already been taken.

24   BY MR. SOLOMON:

25       Q     You know that Delaware Court found

1      Professor Grundfest to be nonindependent?

2          A      Yes.

3          Q      So without having OSO available to me, how

4      can I find out what deals you are referring to here?

5                  MR. LINDSTROM:  Objection; assumes facts.

6                  THE WITNESS:  I think Safra Catz approved a

7      lot of the deals.  I don't -- you know -- the

8      people -- the deals went through -- for final

9      approval went through Safra Catz and Keith Block and

10     George Roberts, and those were the executives that

11     handled them.  I think other people in the back

12     office, you know --

13                 MR. SOLOMON:  Okay.

14                 THE WITNESS:  -- were -- prepared

15     contracts.

16     BY MR. SOLOMON:

17         Q      And assuming they can't remember and

18     without OSO, is there any way I can get an answer to

19     this?

20                 MR. LINDSTROM:  Doubly assumes facts.

21                 THE WITNESS:  I can't think of any.

22     BY MR. SOLOMON:

23         Q      And why would you be concerned if it turns

24     out to be true that OSO was purged after this

25     litigation commenced?

**9/21/2006  Ellison, Lawrence Vol. II**

1            MR. LINDSTROM:  Calls for speculation.

2            THE WITNESS:  Well, we tried -- you know,

3    we try to archive all of our information.  We try to

4    keep track of it so we can analyze it.  So it's -- I

5    believe it's our practice to keep -- to keep our

6    records for, you know, fairly long periods of time.

7    BY MR. SOLOMON:

8        Q     Does your concern -- aside from Oracle's

9    own desire to keep track of historical information,

10   is your concern related to the fact that it -- it's

11   not available in this litigation?

12           MR. LINDSTROM:  No foundation.

13           THE WITNESS:  Again, I rely on our counsel

14   to deal with that.  I'm not an expert.

15   BY MR. SOLOMON:

16       Q     You let them tell you whether you should be

17   concerned or not?

18       A     Yes, I do.  In this area, I do.

19       Q     Still on page 2001 (sic), looking at the

20   language that reads:  "The real figure had turned out

21   to be only 25 percent.  It didn't take a genius to

22   see that not everything that was going on could be

23   explained by the weakening economy and edgy CEOs

24   waiting for 'visibility' to return.  For anyone who

25   wanted to see, there was mounting evidence that it

1    wasn't only the economy that prospective Oracle

2    applications customers wanted to see stabilize."

3            Do you see that?

4        A    I do.

5        Q    Do you have an understanding what is meant

6    in that last sentence by it wasn't the only -- "it

7    wasn't only the economy that prospective Oracle

8    applications customers wanted to see stabilized"?

9        A    I do.

10       Q    And what's your understanding?

11       A    What does Matthew mean when he says that?

12       Q    Yes.

13       A    I think --

14           MR. LINDSTROM:  Objection; calls for

15   speculation.

16   BY MR. SOLOMON:

17       Q    What's your understanding?

18       A    That people -- you know, people are

19   concerned.  There have been articles written, and

20   people are concerned about the stability of 11i.

21       Q    And isn't it true that 11i had been sent

22   out to customers in an unfit state?

23       A    No.

24           MR. SOLOMON:  So have marked as the next

25   exhibit another excerpt from the book Softwar.

1             (Exhibit No. 93 was marked for

2             identification.)

3    BY MR. SOLOMON:

4        Q    If you look at page 202, up at the top,

5    there's a reference to a lawsuit, and it says, "The

6    suit, on behalf of a mall pension fund, accused

7    Ellison of concealing information about the cost of

8    the 'massive technical problems,'" in quotes, "of

9    11i."

10            Do you see that?

11       A    I do.

12       Q    Do you know what suit is being referred to?

13       A    I think this one.

14       Q    Okay.  And you are aware that this is a

15   class action?

16       A    I am.

17       Q    And it's not just on behalf of a small

18   pension fund; you are aware of that?

19       A    Yes, I am.

20       Q    And it goes on to say, Oracle says the suit

21   was entirely without merit and would defend it -- and

22   would be defended vigorously.

23            Do you see that?

24       A    I do.

25       Q    I can -- I know it's being defended

1    vigorously.

2              Do you still believe it's without merit?

3         A    I do.

4         Q    At the bottom of the page, it says, "The

5    mood at Oracle was bloody but unbowed.  There was an

6    embarrassed realization that it had fallen down badly

7    on execution in sending a hugely important new

8    product out to customers in an unfit state."

9              Do you see that?

10        A    Yes.

11        Q    Do you agree with that?

12        A    I do not.

13        Q    But you didn't qualify or correct it, did

14   you?

15        A    No.  That's Matthew's opinion.

16             MR. SOLOMON:  I have marked as another

17   exhibit another excerpt from the Softwar book.

18             (Exhibit No. 94 was marked for

19             identification.)

20             THE WITNESS:  Okay.

21   BY MR. SOLOMON:

22        Q    Okay.  On page 210, halfway down, looking

23   at the language that reads:  "What really happened

24   during the last few days in February at the end of

25   the quarter?  Was it a question of two or three big

```
 1    deals falling through at the last moment, as Ellison

 2    had earlier appeared to suggest, or was something

 3    more fundamental going on?"

 4              Do you see that?

 5       A    I don't, actually.  Where are you?

 6       Q    Let me get it for you.  It is halfway

 7    down --

 8       A    Page 210?

 9       Q    -- page 210, and it starts halfway down on

10    the right-hand side of the page, "What really

11    happened."

12       A    Is it in the last paragraph?

13       Q    No.  It's in the --

14       A    I got it.  I got it.  "What really

15    happened."

16       Q    "What really happened," do you see that?

17       A    I do.

18       Q    Then it goes on.  It would appear to quote

19    you as follows:  "'No.  It was a lot of deals --

20    dozens, I'd say.  Sometimes a deal was delayed.

21    Sometimes the size of the deal dropped from

22    $6 million to $2 million.  All of a sudden people

23    stopped buying in anticipation of their needs for the

24    next couple of years."

25              Do you see that?
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      A      I do.

2      Q      And is that an accurate quote of you?

3      A      I believe so.

4      Q      Okay.  And, again, you cannot identify

5  those deals, can you?

6      A      I think if you keep going, there's even

7  cases where companies that were already using our

8  software were trying to find ways not to pay for it.

9  I'm not going to mention any names, Sprint, but a

10  very large wireless company.  Oh, that's Sprint.

11  That one I remembered because that was particularly

12  annoying.

13      Q      Any others?

14      A      I wouldn't have remembered that either, but

15  this 15, 20 and -- this refreshed my memory.  That's

16  the only one I can think of.  They actually owed us

17  the money by calculation.  They had an annual payment

18  and they just refused to pay.

19      Q      Do you remember why?

20      A      You have to ask Safra.  Basically they

21  didn't like -- they didn't think they would sell that

22  much.  We had so much per wireless subscriber, we

23  were paid by number of wireless subscribers, and they

24  just didn't like the bill.

25      Q      When did you first learn that Sprint was

1    taking that position?

2        A       I think about -- I think we were still

3    fighting for the deal I think the last hour of the

4    quarter.  Safra thought we'd get the deal in the last

5    hour of the quarter.

6        Q       Okay.

7                MR. LINDSTROM:  So we are done with

8    Exhibit 94?

9                MR. SOLOMON:  We are.  Thank you.

10               Okay.  Let's have marked as the next

11   exhibit another excerpt from the Softwar book.

12               (Exhibit No. 95 was marked for

13               identification.)

14   BY MR. SOLOMON:

15       Q       Looking at page 213, I'm looking at the

16   language that reads:  "A big part of Ellison's 11i

17   campaign has been centered on the idea that systems

18   integration was to be avoided at all cost.  Yet the

19   assumption behind being able to install the software

20   was to manage a particular flow was that it was being

21   integrated at some point with legacy systems.  Didn't

22   that mean he was backtracking on something pretty

23   fundamental?"  And then you are quoted:  "'Yeah, the

24   'Just say no to systems integration' slogan was

25   poorly thought out on my part.  It wasn't systems

1    integration that had to be avoided; it was code

2    modifying that had to be avoided.  Of course, some

3    systems integration may be necessary.  So wake up!

4    Try a little harder!'"

5              Is that an accurate quote?

6        A    Yes.

7              MR. SOLOMON:  Okay.  Let's go off the

8    record to change tapes.

9              THE VIDEOGRAPHER:  All right.  This marks

10   the end of Tape 2, Volume 2, in the deposition of

11   Larry Ellison.

12             At 2:12, going off the record.

13             (Recess taken.)

14             THE VIDEOGRAPHER:  On record at 2:19.

15             This marks the beginning of Tape 3,

16   Volume 2, in the deposition of Larry Ellison.

17             MR. SOLOMON:  Okay.  I've marked as the

18   next exhibit another excerpt from the book Softwar.

19             (Exhibit No. 96 was marked for

20             identification.)

21             MR. LINDSTROM:  Is this 96?

22             THE REPORTER:  Yes.

23   BY MR. SOLOMON:

24       Q    Okay.  You will see there's reference to

25   George Buckley of Brunswick Corporation --

**9/21/2006  Ellison, Lawrence Vol. II**

1        A      Yes --

2        Q      -- do you know him?

3        A      -- say again?

4        Q      Do you know him?

5        A      I met him at that one afternoon,

6    roundtable.

7        Q      The meeting that's being referred to here?

8        A      Yes.

9        Q      And then he's quoted as saying, "'Larry,

10    we've spent $250 million on systems in the last few

11    years, and" we got -- "and we've got jack shit.  I

12    feel like we were led down the primrose path by the

13    IT guys.  It was always jam tomorrow.  We have all

14    the best stuff in the candy store -- PeopleSoft, i2,

15    Oracle -- it's a real hodgepodge of systems.'"

16            Do you see that?

17        A      I do.

18        Q      And then your response is reported to be,

19    "'There you are!'" with a kind of smirk on your face.

20    "'That's the absolute archetype of what not to do.'"

21            Is that an accurate quote?

22            MR. LINDSTROM:  Which quote?

23            MR. SOLOMON:  The second quote attributed

24    to Mr. Ellison.

25            MR. LINDSTROM:  The one that says, "'That's

1      the absolute archetype of what not to do'"?

2              MR. SOLOMON:  If you -- yes, if that's how

3      you want to pronounce it.

4              THE WITNESS:  "Archetype."

5              MR. LINDSTROM:  I would like a clear

6      record.

7              MR. SOLOMON:  On the pronunciation?

8              MR. LINDSTROM:  On the question.

9      BY MR. SOLOMON:

10         Q      So go ahead.

11         A      So is that quote accurate?

12         Q      Yeah.

13         A      I don't recall.

14         Q      Buckley -- it goes on, "Buckley looks

15     furiously across the table at him:  'Well, I've got

16     to tell you that it was Oracle consultants who, when

17     pressed by my IT people on a perceived deficiency in

18     your software, would say that maybe PeopleSoft or i2

19     might be better.  Well, I'm not going to throw in

20     another $200 million to fix it now.'"

21             Do you recall Mr. Buckley saying that?

22         A      I remember the gist of his commitments.  I

23     don't remember these specific words.

24         Q      And then it says, "IDT's Jim Courter chips

25     in, saying, 'We were fed all kinds of promises that

1     it will all work, and it doesn't.'"

2              Do you remember Mr. Courter saying that?

3       A     But keep in mind, they are not -- I don't

4     believe they are complaining about Oracle software.

5       Q     Okay.

6       A     I believe they are complaining kind of

7     about IT in general --

8       Q     Okay.

9       A     -- and I don't remember the specific

10    comments.

11      Q     Okay.  And, "Buckley adds, 'We're in so

12    deep now that spending money is not the way.  We're

13    spending $100 million a year. . . so how do we get

14    out of this mess?'"

15             Do you recall Mr. Buckley saying that?

16      A     Again, not specifically, but the general --

17    the general sense of what -- of their frustration

18    I've heard before.

19      Q     Okay.  And then your footnote, because you

20    do clarify with the footnote here, and you basically

21    say that CEO is getting incredibly pissed off about

22    how much they spend on the systems; right?

23      A     Right.

24             MR. SOLOMON:  Okay.  I've marked as the

25    next exhibit another excerpt from Softwar book.

1            (Exhibit No. 97 was marked for

2            identification.)

3    BY MR. SOLOMON:

4        Q     And I'm looking at page 226.

5        A     Okay.

6        Q     And I'm looking at, first of all, the

7    language reading:  "Jim Courter helpfully adds that

8    he's trying to do something like that now and 'it's a

9    complete nightmare.'"  And then you are quote:

10   "'Absolutely.  It might work a little bit some of the

11   time, just enough to tempt you to keep trying.  You

12   can put wings on a car, drive very fast, and it will

13   take off...  landing safely is another matter.'"

14            Is that an accurate quote?

15       A     It's an accurate quote.

16            MR. LINDSTROM:  Well, it has ellipses in

17   it.

18            MR. SOLOMON:  Fair enough.

19            MR. LINDSTROM:  Which you left out of the

20   description.

21            MR. SOLOMON:  Fair enough.

22       Q     Do you know what these ellipses are

23   concealing?

24       A     I don't, and, again, let me emphasize, this

25   is not talking about Oracle software; it's talking

1    about big systems integration projects.

2         Q      Continuing from the previous page, the same

3    thing; right?

4         A      Right.

5         Q      Then it says, "The next question turns out

6    to be trickier.  The air force's Ron Orr wants to

7    know, reasonably enough, where Oracle has an example

8    of 11i up and running that has stood the test of

9    time.  Ellison points out that the suite has been out

10   for only a year but that a few customers had adopted

11   the 'no-modifications' model early on out of poverty.

12   One such is Techtronics in Oregon -- five years ago

13   its business," in quotes, "'fell off a cliff,' so it

14   put in global systems because that was the cheapest

15   way to go.  It's an odd example to give.  Sensing it,

16   Oracle's Mark Jarvis adds that Cisco is a well-known

17   example using Oracle financials to achieve a daily,"

18   in quotes, "'virtual close.'  Somebody points out

19   that it didn't help Cisco from making a hash of its

20   forecasting."

21              Do you see that?

22        A      Yes.

23        Q      First of all, do you know who -- do you

24   remember meeting Ron Orr?

25        A      Vaguely.

**9/21/2006  Ellison, Lawrence Vol. II**

1     Q    Okay.  Do you remember him asking for an

2  example of an 11i implementation that had stood the

3  test of time?

4     A    I -- I don't.

5     Q    Do you -- did you point out the suite had

6  been only out a year but that a few customers had

7  adopted the no-modifications model out of poverty?

8     A    I certainly -- yes.  Yeah.  Techtronics

9  specifically, yeah.

10    Q    You don't recall Techtronics; is that

11  what --

12    A    No, I said I do vividly recall Techtronics.

13    Q    So is it accurate, then, that as of the

14  date of this -- of the meeting that's being referred

15  to here, the only examples offered by Oracle

16  personnel at the meeting of 11i up and running that

17  had stood the test of time was or were Techtronics

18  and Cisco?

19    A    No.

20    Q    Okay.  And what you are saying, then, is --

21    A    They were just specific examples.

22    Q    Right.

23       As Matthew Symonds -- in other words, has

24  Matthew Symonds omitted other examples that were

25  given at that meeting?

1        A       I believe so.

2        Q       That's very misleading if he has, isn't it?

3                MR. LINDSTROM:  Objection; argumentative.

4                THE WITNESS:  No, I don't think so, but --

5    BY MR. SOLOMON:

6        Q       Okay.  And then you enter a footnote or

7    clarification which reads:  "As I've said before, our

8    forecasting system is not clairvoyant.  Our

9    forecasting does statistical extrapolations based on

10   historical trends.  If something that's outside our

11   mathematical model of the business changes, like a

12   war in the Middle East, our forecasting becomes

13   inaccurate."

14               Do you see that?

15       A       Yes, I do.

16       Q       Okay.  And you stand by that?

17       A       Absolutely.

18       Q       Now, it wouldn't -- a war in the Middle

19   East is just one example.  There could be who knows

20   how many examples; right?

21       A       Price of oil goes over a hundred dollars a

22   barrel, lots of things.

23       Q       And the point you are making is that while

24   your forecasting system does extrapolations based on

25   historic trends, if something is happening that would

1    suggest that the historical trend is not necessarily

2    reliable, then your forecasting will not be reliable;

3    is that right?

4        A      Right.  Major macroeconomic change;

5    sudden -- sudden growth in the economy or sudden

6    shrinkage in the economy would cause -- you can't

7    extrapolate anymore.

8            MR. SOLOMON:  Okay.  Have marked as the

9    next exhibit another excerpt from the Softwar book.

10           (Exhibit No. 98 was marked for

11           identification.)

12   BY MR. SOLOMON:

13       Q    And you will see that this chapter is

14   called "Hungarian Lessons," and in chapter -- it says

15   Chapter 12, "Hungarian Lessons."  I'm looking at the

16   language, "But the bit of GE he's" -- and it's

17   referring to you -- "improbably declared a model 11i

18   customer is in a far-flung outpost of Jack Welch's

19   sprawling imperium."

20           Do you see that?

21       A    I do.

22           MR. SOLOMON:  Then I'm going to have marked

23   as the next exhibit another excerpt from the Softwar

24   book.

25           (Exhibit No. 99 was marked for

1              identification.)

2    BY MR. SOLOMON:

3        Q      When you referenced GE Power's

4    implementation of 11i, were you careful to say that

5    it was the Hungarian operation that was implemented?

6        A      Sometimes I mentioned Hungary specifically

7    as a green field; sometimes not.  It was more than

8    just Hungary, but the very first one we did was in

9    Hungary.

10       Q      And I'm looking at the paragraph on

11   page 229 at the bottom that begins with, "The

12   contract."

13              Do you see that?

14       A      Okay.

15       Q      It says, "The contract was signed in late

16   October with a clear understanding that if Oracle

17   delivered at" -- and I'm not going to try and

18   pronounce the name.

19              Can you pronounce the name of that place?

20       A      I can't.

21       Q      It's V-e-r-e-s-e-g-y-h-a-z with an accent

22   z.

23              I'll continue:  "GE would start rolling out

24   11i across its thirty or so other turbine plants.

25   Within a month, the project was in trouble."

1              Just stopping there, is it true that the

2    contract was signed in late October?

3         A    I don't recall.

4         Q    Was the -- was the project in trouble by

5    the end of November 2000?

6         A    I think -- I think the issue was there

7    weren't -- there weren't a lot of experienced

8    computer consultants available in rural Hungary.

9         Q    And then it actually goes on down the page,

10   "'Within a week we had thirty to forty Oracle

11   consultants.  It was like a MASH unit arriving.'"

12             Do you see that?

13        A    Right.

14        Q    And that was in response --

15        A    Response to lack of experience of technical

16   people in that part of the world.

17        Q    Did you visit that site?

18        A    I have not.

19        Q    Do you know -- I'm sorry.  We are back on

20   that exhibit, Mr. Ellison.

21             Do you know who that local -- do you know

22   anything about that local consulting firm, Ejiva?

23        A    No.

24        Q    Do you know who paid for the consulting?

25   Was it GE or was it Oracle?

1       A       I assume it was GE.

2               MR. SOLOMON:  Okay.  I've marked as the

3       next exhibit another excerpt from the Softwar book.

4               (Exhibit No. 100 was marked for

5               identification.)

6       BY MR. SOLOMON:

7       Q       I'm looking halfway down the page, almost,

8       and at the language that reads:  "Even though Ellison

9       used the threat of Lane's departure to get another

10      1.5 million options for himself and 1 million for

11      Jeff Henley, he felt increasingly sick about what

12      he'd done," and then there's an ellipses, and I just

13      want to stop there.

14              Did you use the threat of Ray Lane's

15      departure to get another 1.5 million options for

16      yourself?

17      A       No.  We --

18              MR. LINDSTROM:  You have answered the

19      question.

20      BY MR. SOLOMON:

21      Q       And the answer's no, you did not,

22      apparently?

23      A       No.

24      Q       Do you have any idea why Symonds would have

25      said this?

**9/21/2006  Ellison, Lawrence Vol. II**

1       A       Mr. Symonds?  His name is Matthew Symonds.

2       Q       I'm sorry.

3       A       For the record, most people pronounce it

4    "Simmons"; it's written "Symonds."  He's a Brit.

5               What happened -- what happened was, Ray had

6    an offer from Novell, and that offered him more

7    compensation than he thought he would get at Oracle,

8    so as part of the deal for him to stay with Oracle,

9    he got more stock.  And then the board of directors

10   felt that if they were going to give more stock to

11   one senior executive, that the entire management team

12   should get additional stock.

13      Q       Okay.

14      A       For purposes of equity.  So they gave Jeff

15   Henley more stock, and they gave me more stock.

16      Q       Okay.  And the two point -- which, in

17   aggregate, amounted to 2.5 million; right?

18      A       Yes.

19      Q       And it was 2.5 million that Mr. Lane was

20   awarded; is that right?

21      A       I don't recall.

22      Q       In fact, do you recall that Mr. Lane had

23   agreed that 2 million would be sufficient to induce

24   him to stay?

25      A       You have refreshed my memory, right.  Yeah,

1    I think that's right.  He asked for 2 million, and I

2    think I went to the board and asked for two and a

3    half.

4        Q      Okay.  Did you tell the board that he would

5    be happy with 2 million?

6        A      I don't recall.

7        Q      Would you expect you would have told the

8    board that?

9        A      I -- probably, but I don't -- but I just

10   don't remember.

11       Q      Okay.  And what's the equity involved in

12   you and Jeff Henley getting two and a half million

13   more options because Ray Lane did?

14       A      I think the board felt if Ray was going to

15   get a bump in compensation not at the usual time, you

16   know, in the middle of the year, that it wouldn't be

17   fair, you know, not to also review the other members

18   of the senior management team and see if an

19   adjustment there was also required for purposes of

20   equity.

21       Q      Have you ever fired anyone and timed the

22   firing to deprive them of being able to exercise

23   options?

24       A      No.  The -- we grant our options at the end

25   of the year.  We also fire people at the end of the

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    year as a rule.  We review their performance at the
 2    end of the year.  So since -- since we give people
 3    stock options and raises, performance -- performance
 4    reviews and promotions around the end of the year,
 5    there are promotions that are given around the end of
 6    the year.  Options, raises and terminations all
 7    happen about the same time of the year -- around the
 8    same time of the year.
 9         Q    Okay.
10         A    And that could mean that someone is let go
11    before options vest, but it's all done -- virtually
12    all of our stuff is done right or about May 31st.
13         Q    You fired Mr. Falotti?
14         A    Pier Carlo Falotti, yes.
15         Q    And you fired Randy Baker?
16         A    Yes.
17         Q    And is -- in those instances --
18         A    I was trying to remember if I fired Randy
19    Baker.
20         Q    Okay.
21         A    I really don't remember if I fired Randy
22    Baker or if he left.
23         Q    Okay.  Do you remember any issue with
24    respect to those two individuals, any issue
25    concerning their options and their ability to
```

1  exercise it?

2     A    I think there were lawsuits involved in

3  both cases.  I think both of them sued to get the

4  right to vest their options.

5     Q    And do you know what the outcome of those

6  lawsuits was?

7     A    I believe we settled the Baker case, and we

8  won the Falotti case.

9     Q    And Falotti is the Swiss -- he was in

10  Switzerland at the time?

11     A    Complicated, yeah.  He lived in

12  Switzerland.  He paid taxes in Italy, and he was paid

13  in the United States.

14     Q    Do you know what the terms of the Baker

15  settlement were?

16     A    I don't --

17         MR. LINDSTROM:  Objection.  Before I

18  consider whether or not to allow him to respond to

19  that question, can you tell me what the relevance

20  would be to the Baker settlement to this litigation?

21         MR. SOLOMON:  It doesn't matter because

22  Mr. Ellison doesn't know anyway, so I'll move on.

23         MR. LINDSTROM:  Yeah, and let me make a

24  statement for the record, if I could.  We have passed

25  100 exhibits now in this witness's deposition, which

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    is a milestone.  As you know, it's the second day of

 2    his deposition.  It's now 2:30 of the second day of

 3    his deposition, and as I've told you off the record,

 4    we don't plan to make this witness available for

 5    additional days of testimony, so I want to make sure

 6    that you use the remaining time that you have to

 7    cover the topics that you think you need to cover.

 8              MR. SOLOMON:  Okay.

 9        Q    You exercised stock options in the end of

10    January 2001; correct?

11        A    Yes.

12        Q    Were all of those options awarded in the

13    regular course of business?

14        A    Again, I'm recalling, but I believe they

15    were going to expire.  I believe I received them nine

16    and a half years ago, so the timing would be they

17    were going to expire something like June or July,

18    August of that year.  So, you know, I think all of

19    those options were in the normal course of business.

20        Q    Okay.

21        A    And about to expire.

22        Q    Okay.  And with respect to Mr. Baker and

23    Mr. Falotti, did you in any way irrigate to yourself

24    their options?

25              MR. LINDSTROM:  Objection; irrelevant.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1              THE WITNESS:  Again, there's no notion of

2      an option pool, a finite, you know -- that's not

3      quite accurate.  We submit -- every year, we submit

4      option recommendations to the board of directors, and

5      they create a pool based on our recommendations, but

6      there's no matter of -- until that pool is created --

7      that pool is then created and then divided,

8      completely divided and granted.  If someone leaves

9      for any reason, those options are then not -- are not

10     reapportioned to anybody else.

11             MR. SOLOMON:  Okay.  Thank you.

12     Q      Were there any similarities between the

13     roll-out of 11i and the 10 -- 10.7 database?

14     A      I think what you are -- 10.7 was an

15     application release.  I think what you are referring

16     to is Database Version 6.

17     Q      Could be.

18     A      The version -- there was --

19             MR. LINDSTROM:  The question is 10.7.

20     BY MR. SOLOMON:

21     Q      Go ahead.  Just tell me what your answer

22     is.

23     A      We've never had a 10.7 on the database.

24     There's no such thing as 10.7 --

25     Q      Okay.

1       A       -- for database.

2       Q       So let me rephrase it, then.

3               What about an application 10.7?

4       A       No.

5       Q       No?

6       A       No.

7               MR. SOLOMON:  Okay.  Let's have marked as

8       the next exhibit another excerpt from the Softwar

9       book.

10              (Exhibit No. 101 was marked for

11              identification.)

12              THE WITNESS:  Okay.

13      BY MR. SOLOMON:

14      Q       Okay.  And I'm looking at the language that

15      reads:  "The idea that there was a trade-off between

16      getting 10.7."

17              Do you see that language?

18      A       Are you looking at the bottom of the last

19      paragraph, bottom of the page, page 143?

20      Q       I'm on 144.  Sorry.

21      A       Okay.

22      Q       And I'm at the -- almost at the top of the

23      page where it says, on the right-hand side, "The idea

24      that there was a trade-off."

25      A       Top paragraph in 144, the last sentence or

**9/21/2006  Ellison, Lawrence Vol. II**

1    the first full paragraph on 144?

2        Q    If you look at the first full paragraph --

3        A    Okay.

4        Q    -- just under halfway in?

5        A    Yeah.

6        Q    And then the sentence on the right-hand

7    side, "The idea that there was"?

8        A    Okay.

9        Q    That seems to be suggesting that Mr. Lane

10   is saying that this product had been rolled out and

11   represented no improvement on the prior product; is

12   that right?

13       A    I'm not -- can I just have a second --

14       Q    Sure.

15       A    -- I need a second to look at this

16   document.

17       Q    Absolutely.

18       A    Okay.

19       Q    Mr. Lane seems to be saying that the claims

20   with respect to the 10.7 NCA were misleading; is that

21   fair?

22            MR. LINDSTROM:  Objection; mischaracterizes

23   the document.

24            THE WITNESS:  Where do you have --

25   BY MR. SOLOMON:

1        Q        Okay.  Let me just read it into the record.

2        A        Okay.

3        Q        "The idea that there was a trade-off

4     between getting 10.7 Smart Client right and Oracle

5     being first to the Internet is not one that Lane has

6     much time for.  He claims that when the Internet

7     version of 10.7, known as 10.7 NCA," and in parens,

8     "(network computing architecture), came out in early

9     1998, it wasn't any better than the client/server

10    release that had been rolled out five months earlier.

11    He says, 'NCA wasn't what it was sold as.  We said it

12    was browser-based, but you had to have Java code

13    running on the client or it wouldn't work.'"

14             Do you see that?

15       A        I do.

16       Q        Okay.  Do you agree with what Mr. Lane is

17    saying there?

18             MR. LINDSTROM:  The quote?

19             MR. SOLOMON:  Yes.

20             THE WITNESS:  Complete nonsense.

21             MR. SOLOMON:  Okay.  Okay.  That's fine.

22             Mark another excerpt from the book marked

23    as an exhibit.

24             (Exhibit No. 102 was marked for

25             identification.)

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    BY MR. SOLOMON:

 2         Q      And I'm looking halfway down the page, the

 3    language that reads:  "Lane's version of the episode

 4    is at odds with Ellison's.  He says that the issue of

 5    moving away from client/server had not been that

 6    important.  'It was the same old story that the

 7    applications didn't work and they weren't competitive

 8    and how Ron Wohl was a joke.'"

 9              Do you see that?

10         A      I do.

11         Q      I assume that you are going to disagree,

12    but tell me if you will:  Do you agree or disagree

13    with the quotation it was the same old story that the

14    applications didn't work and they weren't

15    competitive?

16         A      It's just astonishing to me that people say

17    the applications don't work.  I mean, it's very glib

18    and easy to say -- we are the second-largest

19    applications company in the world.  We were at the

20    time, the second-largest applications company in the

21    world.  It didn't mean our applications were

22    flawless.  They certainly had a lot of bugs.  It's a

23    tough business.  They are complicated -- they are

24    very complicated pieces of engineering, but they did

25    work.  We had lots of happy customers.  The happy
```

**9/21/2006  Ellison, Lawrence Vol. II**

1    customers outnumbered the unhappy customers by a huge

2    margin.  Ron Wohl had built those applications.  He

3    was not a joke.  He wasn't perfect.  You know, I

4    mean, but.

5         Q     You took exception to him being called a

6    joke; right?  You entered a footnote here?

7         A     Oh, I did.  There's a whole -- I should

8    just refer to my footnote.

9              MR. LINDSTROM:  You are remarkably

10   consistent.

11   BY MR. SOLOMON:

12        Q     And let me read you footnote --

13        A     But people do use language like that.  They

14   do use, you know, this doesn't work; that doesn't

15   work.  I mean, that kind of hyperbole, you know, is

16   just --

17        Q     And some people say it works; it's

18   integrated; just snap it together?

19        A     It is --

20              MR. LINDSTROM:  Argumentative.

21              THE WITNESS:  The -- that is a

22   simplification, certainly.

23   BY MR. SOLOMON:

24        Q     You say, "calling Ron Wohl a 'joke' is as

25   unprofessional and unfair as it is factually

1     inaccurate."

2         A     Yeah.

3         Q     "The applications that Ron Wohl built run

4    nearly fifteen thousand companies around the world,

5    second in success only to SAP."

6              Are you still second in success to SAP?

7         A     Unfortunately, yep.  Yep, after all these

8    years, still second.  But we are a lot closer to them

9    and -- and business is good.

10        Q     Okay.  The book describes -- I'll

11   paraphrase, but it seems to describe that you

12   orchestrated secretly, for quite some time, the

13   firing of Ray Lane; is that fair?

14        A     Well, it's not clear I had the authority to

15   fire Ray Lane, so when someone that senior in the

16   company is being fired -- one of my direct reports

17   is -- leaves -- I really have to go get support of

18   the board of directors or I can't do it.

19        Q     Okay.  But you talked about putting in

20   shadow management team sort of while he was still

21   there, but you had already decided he had to leave,

22   did you not?

23        A     I'm not sure shadow management team.  I

24   certainly started thinking about what it would mean

25   if -- what it would mean if Ray left, and how we

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    would organize the company after Ray left.  And I
 2    started acquainting myself with some of the things
 3    that he was doing.
 4         Q    Okay.
 5         A    And thought about replacing -- you know,
 6    new jobs for other people if he were to leave,
 7    because I was certainly lobbying the board for him
 8    being dismissed, that's right.
 9         Q    Okay.  And in the context of orchestrating
10    his departure, you described yourself as not
11    confron -- not confrontational but calculating; is
12    that fair, carefully calculating?
13         A    Yeah.  I certainly plan -- I certainly
14    think it's my responsibility to plan for what happens
15    after he leaves.
16         Q    Okay.
17              MR. LINDSTROM:  Counsel, are you going to
18    be on this topic much longer?  Because, again, I
19    don't see the relevance of this to the litigation.
20              MR. SOLOMON:  That's fine.  It will emerge.
21         Q    Would you describe yourself as carefully
22    calculating generally about business?
23         A    I think I plan in advance.
24         Q    Okay.  Would you describe yourself as a
25    hyperquant?
```

1        A     I think I'm rational.  I think I'm

2   quantitative.  I think I weigh risks and rewards.

3                We are done with this exhibit?

4                MR. SOLOMON:  Yes.

5                I've marked as an exhibit another excerpt

6   from Softwar.

7                (Exhibit No. 103 was marked for

8                identification.)

9   BY MR. SOLOMON:

10       Q     Okay.  I'm looking at page 180, the first

11   full paragraph, which reads:  "Despite his enjoyment

12   of controversy, Ellison doesn't have a great appetite

13   for argument, at least not in a professional context.

14   While he's always prepared to listen to the views of

15   developers when they differ from his and is willing

16   to be persuaded if he's wrong, he doesn't enjoy

17   debates about business issues that depend on hunch

18   and feel."

19                Is that accurate?

20       A     Completely.

21       Q     "Ellison is a self-confessed 'hyperquant'

22   who feels fully in control only when he's processing

23   data."

24                Is that true?

25       A     I think -- I think it's a bit of an

1    exaggeration, but I -- yes.

2        Q    Okay.  And then it goes on to say, Even

3    when flying a plane or racing "Sayonara," he prefers

4    to be guided by the numbers coming out of the

5    computer systems, etc.

6             Is that accurate?

7        A    Well, no.  Again, it's -- it's a bit of an

8    exaggeration and simplification, but, you know,

9    clearly, I look at the computer system when I'm

10   racing the sailboat, but I also pay attention to, you

11   know, puffs on the water and clouds in the sky, so

12   I'm looking around at a lot of things, not just

13   numbers --

14       Q    Okay.

15       A    -- but I know what he's saying.

16            MR. SOLOMON:  Okay.  All right.  I'll have

17   this additional excerpt of Softwar marked as an

18   exhibit, please.

19            (Exhibit No. 104 was marked for

20            identification.)

21   BY MR. SOLOMON:

22       Q    Okay.  First, I'm looking at page 177 and

23   the language:  "Remarkably, within not much more than

24   a year of Ellison's beginning his campaign to cut

25   costs by turning Oracle into an exemplary e-business,

```
 1    the targeted first billion dollars of savings -- a
 2    number pretty much plucked from the air to help
 3    dramatize the project -- had been secured and
 4    Oracle's profit margin had moved from a little under
 5    20 percent to more than 30 percent."
 6           Do you see that?
 7       A    I do.
 8       Q    Was the number pretty much plucked from the
 9    air?
10       A    It wasn't calculated.  That's what's meant
11    by "plucked from the air."  It was seen as a -- it
12    was seen as a target.  We thought there was a -- we
13    thought there was a lot of efficiency that could be
14    gained, so we picked as a target a billion dollars.
15    It's a round number.  We are a big company, so we set
16    a goal of a billion dollars as something everyone
17    could remember.
18       Q    Okay.  And then further down the page --
19       A    We didn't -- what I meant by that, we
20    didn't know where it was all going to come from by
21    the time we started the project.
22       Q    Okay.  And then if you just go a few lines
23    down, it says, "Ellison decided that Oracle's own
24    Internet-derived efficiencies would be the first
25    reference.  Soon, Oracle's $300 million marketing
```

**9/21/2006  Ellison, Lawrence Vol. II**

1    budget was pumping out the insistent message," and

2    then, in quotes, "'By using our own E-Business Suite,

3    Oracle saved $1 billion in one year.'"

4           Do you see that?

5    A     I do.

6    Q     And is that the representation that you and

7    Oracle were making, in quotes, By using our

8    E-Business Suite, Oracle saved $1 billion in one

9    year?

10   A     Again, I think I answered this earlier.  By

11   using our own applications, by more automation, by

12   using the Internet, by using, you know, modern -- you

13   know, modern systems, modern technologies, we can

14   become much more efficient, and so can other

15   companies.

16   Q     Okay.  And then a few lines down, it says,

17   "Partly because of Ellison's reputation for

18   stretching the truth when it suited him, critics were

19   keen to find explanations for the cost savings that

20   didn't depend on the performance of Oracle's

21   software."

22          Do you see that?

23   A     I do.

24   Q     Do you believe you have a reputation for

25   stretching the truth when it suits you?

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        A      I don't -- I don't know.

2        Q      Do you stretch the truth when it suits you?

3        A      No.  I think I'm sometimes guilty of

4    simplification, you know, in a marketing slogan, but,

5    no, I try to be very, very accurate.  In fact, even

6    our marketing campaigns are -- are

7    quantitative-based; try to be based on hard, hard

8    facts.  We have a hard marketing campaign against SAP

9    right now, and it's based on numbers, so we think

10   fact-based, hard, quantitative ads are more

11   effective.

12       Q      And just so the record's clear, do you

13   believe that you have a reputation for stretching the

14   truth when it suits you?

15       A      I don't -- you know, I don't know.

16       Q      Okay.  And then on page -- at the bottom of

17   page 177 -- then it goes on to page 178 -- it says,

18   "An article in the magazine 'InternetWeek' by Mitch

19   Wagner published in March 2001 and entitled 'Oracle

20   Savings Don't Add Up' was fairly representative."

21              Do you see that?

22       A      Yes.

23       Q      Did you ever read that article?

24       A      I didn't.

25       Q      And you will see that it says, in the
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    middle, "Much of the savings actually have come from
 2    cost-cutting measures that could have been achieved
 3    without the Internet, according to experts and an
 4    analysis of Oracle's financial statements."
 5            Do you agree with that?
 6      A     I'm sure there are some -- you know, some
 7    of the savings had to do with sometimes you just hire
 8    better people or -- but, no, I think the bulk of the
 9    savings -- and we saved a lot more than a billion
10    dollars in the end, but the bulk of the savings went
11    from moving to modern automated systems.
12      Q     Okay.  And then it goes on to say, "One
13    such expert, John Puricelli, an analyst with A.G.
14    Edwards & Sons, opined that most of these savings had
15    come from old-fashioned belt-tightening."
16            Do you agree with that?
17      A     What is -- what is old-fashioned
18    belt-tightening?  It's an interesting metaphor.  If
19    everyone can save -- I mean, how is it that we were
20    able to save a billion dollars in such a short period
21    of time and raise our margin so much.  We were able
22    to do more with fewer people.  The only way you can
23    do that is have better automation and better tools.
24    It's really dramatic productive improvement based on
25    computers.
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1            I mean, old-fashioned -- I mean,
2    old-fashioned belt-tightening, can your -- can your
3    firms save, you know, a lot of money by old-fashioned
4    belt-tightening?  I'm not sure anyone can save -- I
5    don't even know what old-fashioned belt-tightening
6    is.
7        Q    What about the quote that's attributed to
8    Mr. Puricelli:  "'A lot of the cost savings that came
9    were changes in employee behavior, and software
10   doesn't do that'"?
11       A    That's ridiculous.  That's ridiculous.  Of
12   course software changes behavior.  You think the word
13   processor or Microsoft, you know, desktop computers
14   changed human behavior?  It's just idiocy.
15       Q    Let's go to page 178.  And I'm now looking
16   at the language:  "A review of both investigations by
17   the Economist Intelligence Unit concluded, 'These
18   studies provide impressive evidence of a company in
19   the midst of dramatic changes inspired by the
20   Internet -- although as Oracle's senior executives
21   freely concede, many of the efforts of transformation
22   derive as much from old-fashioned sound business
23   practices as they do from Internet-driven
24   innovation.'"
25            Do you agree with that?
```

1      A      Well, not really.  I really think old -- I

2    don't think you want to have old-fashioned business

3    practices if you have -- if you have modern software.

4    I mean, everyone's business should change to take

5    advantage of technology.

6            So, I mean, it sounds interesting, but the

7    fact of the matter is modern tools has made -- you

8    know -- you know, changes our behavior and changes

9    our business practices.

10           MR. SOLOMON:  Okay.  So I've marked as the

11   next exhibit another excerpt from the Softwar book.

12           (Exhibit No. 105 was marked for

13             identification.)

14   BY MR. SOLOMON:

15     Q      Okay.  I'm looking at page 189, and I'm at

16   the bottom of the page.  I'm looking at the language

17   that reads:  "Their caveat was that Ellison's," in

18   quotes, "'change the game' strategy required

19   near-flawless execution."

20           Just stopping there, was it your view in

21   2000 that Oracle's strategy required near-flawless

22   execution?

23     A      If our strategy requires flawless

24   execution, we have no chance at all because we never

25   flawlessly execute.  Nobody ever flawlessly executes.

```
 1                  I think, you know, the strategy was a good
 2        one.  It's paid off for us.  It's paid off for our
 3        customers, and it's paid off for our shareholders,
 4        but our execution wasn't flawless, but the good news
 5        is nobody is -- nobody's is.
 6             Q     Now, you say it's paid off for your
 7        shareholders --
 8             A     Yeah.
 9             Q     -- but isn't it true that when you sold
10        your stock at the end of January 2001, the stock
11        price was $30 or more, and now it's under 20?
12             A     Absolutely, but I don't think that was to
13        do -- but our company has more than doubled in sales,
14        more than doubled in profits, more than doubled the
15        number of customers it has, and the fact is that --
16        you know, that we were in the midst now, in
17        hindsight -- we can all look back on those years and
18        say we were in the midst of a stock market bubble.
19        But were other companies in the face of that decline
20        in the bubble are not worth very much.  You know,
21        Oracle has come back very, very strong.
22             Q     It goes on to say, "Oracle was on a roll,
23        but if it became apparent that it had bitten off more
24        than it could chew, the company could expect little
25        mercy."
```

**9/21/2006  Ellison, Lawrence Vol. II**

1          Was that an expectation that you had in

2     calendar 2000?

3          A     No.  Again, I think we had -- we had made

4     the right strategic decision, and I think history has

5     borne that out by building E-Business Suite; by going

6     to the Internet and building the E-Business Suite,

7     and it's been a bumpy road, but it's paid off for

8     everybody.

9          Q     But it's true you should have delayed

10    rolling out 11i; isn't that true?

11         A     The -- we did delay.  You know, we

12    delayed -- we probably delayed a couple times before

13    rolling it out.

14         Q     Then you should have delayed even longer?

15         A     Reasonable people can, you know, disagree

16    on that.

17         Q     What's your position?

18         A     I would have rolled it out at the same time

19    that I rolled it out.  I probably would have had our

20    existing customer base move -- migrate to the new

21    software more slowly so we could manage that process

22    a little bit better with -- within the support

23    organization.

24          So for new customers, it worked -- you

25    know, it worked pretty well.  We got it -- we got the

1    product out, but I would have -- would have kind of

2    narrowed the funnel so we could manage the process

3    better than we did.

4        Q     Don't you think you should have delayed the

5    release longer than you did?

6        A     No.

7              MR. LINDSTROM:  Objection; asked and

8    answered.

9              THE WITNESS:  No.  No.

10   BY MR. SOLOMON:

11       Q     Okay.  Looking at your footnote, it reads:

12   We are getting a lot of -- excuse me.  "We were

13   getting a lot of pressure from our customers to

14   deliver the 11i applications.  I made a lot of them

15   mad by delaying the release for several months.  I

16   should have delayed it even longer."

17             Is that your footnote?

18       A     Yeah.  Again, in more detail, let me repeat

19   what I said.  I would have released it exactly the

20   same time, but in terms of our existing customer

21   base, who were planning to migrate, I should have

22   slowed that process down.  It's just a little -- a

23   little more meat on the bones here.  Just slowed that

24   process down so we could have done a better job of

25   managing them through the early -- the early versions

**9/21/2006  Ellison, Lawrence Vol. II**

1    of 11i.

2           MR. SOLOMON:  I've marked as the next

3    exhibit another excerpt from the Softwar book.

4           (Exhibit No. 106 was marked for

5           identification.)

6    BY MR. SOLOMON:

7       Q    And I'm looking at page 157, and I'm

8    looking, actually, at your footnote, and it reads:

9    "He takes personal credit for our stock price run-up?

10   Amazing.  Oracle rode the Internet wave because our

11   database powered virtually every major Web site on

12   the Net.  If you plot the stock price of Cisco,

13   Oracle, and Sun, you will see that all three

14   companies rose and fell together in perfect

15   synchronization as sentiment about the Internet rose

16   and fell."

17          Did you write that footnote?

18      A    I did.

19      Q    Do you recall that in January of 2001,

20   Cisco preannounced that it wasn't going to make its

21   numbers?

22      A    I don't recall.

23      Q    You don't recall that event?

24      A    Well, you are refreshing my memory, so kind

25   of.

1       Q       Okay.  At the time that Cisco preannounced,

2    do you recall being concerned that Oracle might not

3    make its numbers?

4       A       No, because we -- you know, we had signed

5    the largest -- you know, we had signed the largest

6    deal in our history, and we had a strong pipeline.

7    We were in good shape in the quarter.

8       Q       Okay.

9       A       This was written in hindsight, of course,

10   just looking at the graphs.

11              MR. SOLOMON:  Okay.  Let's go off the

12   record for a couple seconds to organize some

13   documents.

14              THE VIDEOGRAPHER:  Off the record at 3:16.

15              (Recess taken.)

16              THE VIDEOGRAPHER:  On record at 3:30.

17              MR. SOLOMON:  Have marked as the next

18   exhibit a document produced by the defendants in this

19   litigation with the control numbers 034669 and 670.

20              (Exhibit No. 107 was marked for

21              identification.)

22   BY MR. SOLOMON:

23      Q       When you have had a chance to view it, let

24   me know if you recognize it, please.

25      A       Okay.  I've read the whole thing.

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q      Okay.

2        A      But still not quite sure what it's about.

3    Go ahead.

4        Q      Okay.  You will see that it's dated the

5    11th of January 2000 and that you are an addressee?

6        A      Yes.

7        Q      Okay.  And it's Larry -- to Larry, Jeff,

8    Ray and Safra.  "I wanted to let you know where we

9    are in analyzing the effect of the changes we made

10   yesterday to the conversion ratios and in analyzing

11   the effect of the pricing changes on the Q3

12   pipeline."

13           Do you see that?

14       A      I do.

15       Q      Do you have any idea what the reference is

16   to the changes being made to the conversion ratios?

17       A      A conversion ratio means the number of

18   the -- percentage of the deals in the pipeline that

19   will become sales.  That's conversion ratio.  And the

20   pricing changes are referring to changing in price in

21   our products.  So there are two things.

22       Q      Right.

23       A      -- that will change the forecast.  One is

24   if the -- the product -- if we decrease the price of

25   the product, and the other would be if we increased

**9/21/2006  Ellison, Lawrence Vol. II**

1    or decreased the conversion ratio.

2        Q    Okay.

3        A    But I don't know what it's specifically

4    about.

5        Q    Okay.

6        A    I don't know what price changes they are

7    talking.

8        Q    And you don't know what prompted the

9    changes reflected here in the conversion ratios?

10       A    I would be guessing, but, no, I don't know.

11       Q    Okay.  And what is your guess?

12            MR. LINDSTROM:  Objection; calls for

13   speculation, no foundation.

14            THE WITNESS:  My guess is we were looking

15   at lowering prices.  We virtually never raise prices.

16   We were looking at lowering prices and how that would

17   affect -- we tend to test a price change against an

18   existing forecast, and we will take it out several

19   quarters.  And then sometimes there's an elasticity

20   change, so if the price goes down, people buy more.

21   So they buy more frequently, so the conversion ratio

22   might go up.  But, again, I don't know specifically

23   what this experiment was.

24            MR. SOLOMON:  Okay.  Have marked as the

25   next exhibit another document produced in the

```
 1     litigation with the control number 020724 and 725.
 2                 (Exhibit No. 108 was marked for
 3                 identification.)
 4                 THE WITNESS:  Okay.
 5     BY MR. SOLOMON:
 6        Q      Okay.  Do you recognize this?
 7        A      I don't specifically recognize it.
 8        Q      Okay.  It's dated the 11th of September
 9     2000?
10        A      Right.
11        Q      And it's from Jeff Henley to Jennifer
12     Minton, and you are copied; is that right?
13        A      Yes.  Yes.
14        Q      And this would have been in your files in
15     or around September of 2000?
16        A      Yes.
17        Q      And it wasn't produced from your files and
18     you can't explain why; is that right?
19        A      That's correct.
20        Q      The first sentence reads:  "Thank god there
21     was a disproportionate amount that went to ERP.  Only
22     CRM now looks bad and total apps is at least
23     respectable."
24                 Do you see that?
25        A      Yes.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Do you recall being aware in September of

2    2000 that CRM was looking bad?

3      A      You mean the growth rate --

4      Q      Right.

5      A      -- the growth rate in that quarter --

6      Q      Correct.

7      A      -- most-recently-reported quarter?

8             Yeah, our CRM applications were new.  We

9    had a very formidable competitor that we were behind,

10   Siebel Corporation, and CRM was a new business for

11   us.

12     Q      In fact, it reflects a negative growth

13   rate; is that right?

14     A      Yes, it does.

15     Q      If you turn the page, it says, at the top,

16   "Jeff Henley wrote," and down the page a little bit,

17   it says, "The only apps groups that should" -- "that

18   should" -- I speculate that is meant to say "shows"

19   or "show" -- "showed," but anyway, "the only apps

20   group should strong growth rate were iProcurement,"

21   in parens, "(76%) and HR," in parens, "(110%).  In

22   CRM the huge HP deal ago was just a killer coupled

23   with slow closings on a number of deals or losses."

24            Do you see that?

25     A      I do.

**9/21/2006  Ellison, Lawrence Vol. II**

1       Q       Do you know what the reference is to the HP

2    deal?

3       A       Yeah.  I think in the same quarter -- at

4    least this is refreshing my memory, so.  In the same

5    quarter last year, we concluded a very large purchase

6    of CRM by Hewlett-Packard.  They bought it.  So

7    growth rate is a comparison between what you did this

8    quarter and the quarter a year ago.  If you had a

9    really big deal, an out-of-the-ordinary big deal a

10   year ago, it makes your comparisons difficult, and

11   it's much harder to show growth if you had a really

12   great quarter a year ago, and that's what this is

13   referring to.

14      Q       Okay.  And is the reference here to an HP

15   deal that was contemplated to close in Q1 but didn't?

16      A       No.  I believe this is referring to an HP

17   deal that actually closed a year before.

18      Q       Got it.  Okay.

19      A       In '99.

20      Q       Okay.

21      A       So this is 2000; right?

22      Q       Yeah.

23      A       Yeah.  So HP deal closed in '99.  So

24   comparing the 2000 -- the results in 2000.  That's

25   what I think this is -- again, I don't know these

**9/21/2006  Ellison, Lawrence Vol. II**

1    dates offhand.

2         Q    Okay.

3         A    So comparing these had made it hard to show

4    growth this year because the big deal --

5         Q    Okay.

6         A    -- last year.

7         Q    The slow closings on a number of deals or

8    losses, that would refer to the current quarter --

9         A    Current quarter in 2000, right, for CRM.

10        Q    Okay.

11        A    And tools is also down a lot.

12        Q    Okay.  Then it goes on to say, "We'll have

13   our work cut out to explain apps.  We rebounded

14   strongly on database as we promised but apps on the

15   surface looks terrible.  This will be the area of

16   focus on the call."

17             Do you recall Mr. Henley sharing with you

18   around this time that the apps numbers on the surface

19   looked terrible?

20        A    Again, I'd have to go back and look at what

21   growth rate we were expecting for applications,

22   because I think the 45 percent is -- well, actually,

23   he says -- it's kind of funny.  In one part of it, it

24   says "on the surface" -- people aren't always

25   consistent.  "On the surface looks terrible."  Then

**9/21/2006  Ellison, Lawrence Vol. II**

1    back here, in the same note, he says the "total apps

2    is at least respectable."

3        Q     Right.

4        A     So the note itself is not consistent.

5        Q     Doesn't that reflect, though, that his

6    concern is with CRM more than with ERP?

7        A     No.  I think he was talking --

8              MR. LINDSTROM:  Calls for speculation.

9              THE WITNESS:  This will be -- let's see.  I

10   mean, just looking at the two paragraphs, it says,

11   "We'll have our work cut out to explain apps."  So I

12   think he's referring to all of applications.  It's --

13             MR. SOLOMON:  Okay.

14             THE WITNESS:  -- just not consistent.

15             MR. SOLOMON:  Okay.  I've marked as the

16   next exhibit a document produced in the litigation

17   with the control number 036423.

18             (Exhibit No. 109 was marked for

19             identification.)

20             THE WITNESS:  Okay.

21   BY MR. SOLOMON:

22       Q     Okay.  Do you recognize this?

23       A     I don't recall it specifically.

24       Q     Okay.  You see it's dated the 22nd of

25   September 2000, and it's from Lia Burke to you and

1    others?

2         A      Yes.

3         Q      Do you know who Lia Burke is?

4         A      I do not.

5         Q      And it says, "Larry, Jeff asked that we

6    provide you with a status on the use of OSO to

7    capture pipeline and forecast data.

8                "The pipeline data in OSO is in very good

9    shape, as the data in OSO is very dynamic, at the

10   time of the forecast submissions earlier this week

11   the pipeline data was in agreement with what is being

12   presented to the EC on Monday.  The forecast module

13   is newer and while most of the data is good we

14   continue to work with a few groups to ensure OSO is

15   being kept up to date."

16               Do you see that?

17        A      I do.

18        Q      Is that an issue that you were involved

19   in at that time --

20        A      Yeah.

21        Q      -- what was going into OSO?

22        A      Yeah.  Specifically, I wanted to not get

23   forecasts that weren't -- that didn't come out of the

24   system, so our old practice where people -- the sales

25   executives would come into the room and they would

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1      have their forecasts on spreadsheets or in their

 2      heads and you go around the room and get everyone's

 3      forecast, and I thought -- and then we would go back

 4      and look at OSO and the two might not necessarily

 5      agree, so we were trying -- you know, I was trying to

 6      get the system to be used at all times.

 7          Q    Okay.  At around this time, did you want

 8      more risk to be put into the forecasts?

 9               MR. LINDSTROM:  Vague and ambiguous.

10               THE WITNESS:  No.  I've always wanted the

11      forecast to be accurate.  You know, I would say

12      slightly conservative but accurate.

13               MR. SOLOMON:  Okay.

14               THE WITNESS:  So sometimes -- sometimes

15      people would get so conservative, you get a culture

16      where everyone wants to beat their forecast every

17      time, and then you can get very -- you know,

18      misleadingly low forecasts.  So I've always -- I'll

19      stop there.

20               MR. SOLOMON:  Okay.  So we are having

21      marked as the next exhibit another document produced

22      by the defendants with the control numbers 203681

23      through 683.

24               (Exhibit No. 110 was marked for

25                identification.)
```

1              THE WITNESS:  Okay.

2    BY MR. SOLOMON:

3        Q      Do you recognize this?

4        A      I don't.

5        Q      You will see, on the third page of the

6    exhibit -- well, first, on the first page, the

7    subject is "Draft New terminology on Forecasting"?

8        A      Yeah.

9        Q      It's dated October the 6th, 2000; right?

10       A      Right.

11       Q      And then the third page has some text, and

12   it starts, "Hi, Jim, we can talk through the

13   recommendation, let me know your thoughts...

14              "Recently Larry has changed the way that he

15   is interpreting our forecast.  He would like us to

16   reflect our numbers as follows," and then there's a

17   "Worst," "Forecast," and a "Best" category.

18              Do you see that?

19       A      I do.

20       Q      Does this reflect the -- a change in

21   forecasting that you directed?

22       A      Yeah.  I was trying to accomplish two

23   things.  I wanted to -- you know, yeah.  Rather than

24   a single number -- rather than getting a single

25   number, I wanted to get three numbers:  Worst case,

1    most likely case, and best case --

2              THE REPORTER:  Say it one more time.

3              THE WITNESS:  Rather than getting a single

4    forecast number from each of the sales executives, I

5    wanted to get three separate numbers reflecting a

6    worst case, guaranteed we will at least do that well;

7    a most likely case, what you thought you were

8    actually going to do; and a best case, if everything

9    goes really well, how high could it go.

10             And I was also trying to get -- in putting

11   in the new methodology, I was also trying to

12   synchronize the way Europe forecasts with the way

13   Latin America forecasts and Asia Pacific and

14   different groups would have different ways of doing

15   their forecast.  And I was trying to get as much of

16   that variability out of the system as possible.

17             Now, you can't get the personalities out of

18   the system.  I mean, if you have a conservative sales

19   executive, they are going to forecast conservatively.

20   If you have an optimistic sales executive, they are

21   going to forecast less conservatively.

22   BY MR. SOLOMON:

23        Q    What drove you to make this change?

24        A    The -- we were going to put the three

25   numbers in the computer system.  What I wanted to

```
 1      see -- I've done -- to get more information, just
 2      getting more -- you know, getting more data rather
 3      than one number, which usually was someplace between
 4      the best case and the most likely -- what they used
 5      to call a commit forecast; one we could count on.  I
 6      was trying to, you know, get a better idea of what,
 7      you know -- get more data -- more data to work with.
 8           Q     Okay.  And, at that stage -- and we are
 9      talking about October 2000 -- how long had Oracle
10      internally been using OSO?
11           A     I don't recall.
12           Q     Years or months, could you tell me that?
13           A     I think a few years.
14                MR. SOLOMON:  Okay.  Mark as the next
15      exhibit a document produced by the defendants with
16      the control number 6123 -- 612306 and 307.
17                (Exhibit No. 111 was marked for
18                identification.)
19                THE WITNESS:  Okay.
20      BY MR. SOLOMON:
21           Q     Do you recognize having seen this before?
22           A     No, I don't.
23           Q     The e-mail exchange in the bottom half of
24      the page is from David Winton to David Winton, and it
25      appears that went up the chain to George Roberts.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1          Do you see that?

2      A     Yes.

3      Q     And it says that David Winton wrote, and

4   then there are a few paragraphs and some numbered

5   paragraphs starting with, "1.  Slow start in FY'00."

6          Just for the record, this is dated 7th of

7   December -- this is dated the 6th of December 2000.

8          "Slow start in FY'00 -- The growth

9   comparisons to last year have been relatively easy in

10  the first two quarters as we did not perform that

11  well a year ago.  The disruption over account moves

12  in Majors last year was the main factor."

13         Were you aware that, as stated here, the

14  growth comparisons for last year had been -- the last

15  year had been relatively easy in the first two

16  quarters because they -- Oracle did not perform well

17  in those quarters in the previous year?

18     A     Don't recall.

19     Q     You don't recall.  Okay.

20         And then No. 2, "More Big Deals this

21  Q1&2 -- As the schedule shows, our results this year

22  have been boosted by big deals in both quarters.

23  Combined, these greater than $5 million deals

24  contributed over $55 million year to date.  Note that

25  we only have one deal over $5 million currently in

1    the Q3 Pipe.  Last year we had four deals that netted

2    $28 million."

3              Do you see that?

4        A    I do.

5        Q    Did you know that in December of 2000?

6              MR. LINDSTROM:  Compound.

7              THE WITNESS:  This is -- this is in George

8    Roberts' sales unit.

9              MR. SOLOMON:  Correct.

10             THE WITNESS:  Because we have lots and lots

11   of sales units.

12             MR. SOLOMON:  Correct.

13             THE WITNESS:  But, no, I did not know

14   specifically know the details in his unit.

15   BY MR. SOLOMON:

16       Q    And "3.  Growth comparisons tougher in

17   Q3&4."  It says, "NAS results took off last year in

18   Q3 and continued into Q4.  Growth rates will slow in

19   the second half but we still feel that the annual 31%

20   target is achievable with some potential upside of 2

21   to 3 points if Q3 is strong."

22             Do you see that?

23       A    I do.

24       Q    Were you aware of those facts in December

25   of 2000?

1        A       Not specifically that I recall.

2        Q       And then 4 says, "Q3 Pipe not where it

3     needs to be."

4                Were you aware of that in December of 2000?

5        A       Again, I tend not to look at each

6     individual sales unit; I tend to look at the company

7     as a whole.  But, no.  No, I don't recall.

8                MR. SOLOMON:  All right.  I've marked as

9     the next exhibit another document produced by the

10    defendants in this litigation with a control number

11    040617.

12               (Exhibit No. 112 was marked for

13                identification.)

14    BY MR. SOLOMON:

15       Q       And when you have had a chance to review

16    it, let me know if you recognize this.

17       A       I don't recognize it, no.

18       Q       Okay.  And, again, it references a sales

19    unit in the company, sales division?

20       A       I believe this is all of North America,

21    but, again, I'm not -- so this is not a unit, but

22    this is --

23       Q       Okay.

24       A       -- all of North America.

25       Q       Okay.  And that's in contrast to the last

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    exhibit which was --

 2         A      Which was just George -- yes, exactly

 3    right.

 4         Q      Is it right that NAS contributes about

 5    25 -- at that time, contributed about 25 percent of

 6    the company's revenues?

 7         A      Over the previous 12 months?  I'm not --

 8    that's close.

 9         Q      Okay.

10         A      Close.

11         Q      Okay.  Back to this exhibit, it's dated

12    January 11th, 2001.  It's from David Winton to

13    Jennifer Minton, and it starts off saying, "We

14    finished the Ops Reviews this afternoon and I wanted

15    to give you a quick update on the current quarter and

16    full year look," and it says, "Our Q3 forecast of

17    $346 million has not changed but the upside or Best

18    is revised down by $16.8 million to $360 million."

19         A      Right.

20         Q      It says, "Main factors," and it says, "1.

21    The Pipe has not grown as we had anticipated.  We're

22    actually slightly down from December and reporting."

23               Do you see that?

24         A      I do.

25         Q      So you were aware as of December -- excuse
```

1    me, January 11, 2001 the pipe had not grown as

2    anticipated?

3        A     I don't recall.

4        Q     No. 2 says, "Lack of big deals" -- excuse

5    me.  "Lack of big deals.  Unlike Q1 & Q2, we have" a

6    "few big deals in Best case that could drive us past

7    the $360 million" -- "we have few," not "we have a

8    few."  "We have few big deals," excuse me.

9             Were you aware that unlike Q1 and Q2, there

10   were few big deals in Q3 that could drive you past

11   360?

12       A     No, I was not aware.

13       Q     "3," Drops in -- "Drop in Technology.  As

14   reflected in the softening Pipe, both GB and Majors

15   see a slow down in both Q3 and Q4.  GB's dot com

16   bubble has burst," and in parens, "(they expect the

17   West to end the year 30 to $40 million behind their

18   original Budget for Technology).  Majors sees a slow

19   down in spend along with smaller deal" size --

20   "sizes.  Also, the change in the ASP model for

21   Generic Tech hosting" 11i's -- lic's coupled with the

22   dot com crash is impacting projected Tech results in

23   that segment."

24             Do you see that?

25       A     I do.

```
 1       Q     Were you aware of the issues raised in
 2   Point No. 3 in January of 2000 -- January of 2001,
 3   excuse me?
 4       A     Yes, and I certainly don't agree with all
 5   of them.  The ASP model for Generic Tech hosting
 6   never happened.
 7       Q     Okay.  Do you know why that reference is
 8   made there, though?
 9       A     At the time, people were talking about no
10   longer buying their own computers, no longer buying
11   their own software but rather renting time from --
12   from hosters, you know, kind of a whole new -- I'm
13   trying to remember the -- some of the names of some
14   of the businesses that were started at the time to do
15   this generic hosting, but they are all gone.
16       Q     Do you think in January 2001 a regular
17   Oracle investor would be interested in knowing that
18   the pipe hadn't grown as anticipated?
19             MR. LINDSTROM:  Objection; calls for
20   speculation, hypothetical, no foundation.
21             THE WITNESS:  I don't know.
22             MR. SOLOMON:  Have marked as the next
23   exhibit a document produced by the defendants in this
24   litigation with the control number 297773.  Actually,
25   it will be 297772 and 3.
```

```
1                (Exhibit No. 113 was marked for

2                identification.)

3    BY MR. SOLOMON:

4        Q       And let me know if you recognize this?

5        A       I don't.

6        Q       You see it's dated the 17th of January

7    2001, and it's from Jim English to Jennifer Minton.

8                Do you see that?

9        A       I do.

10       Q       It says, "When you asked for a forecast

11   summary I should have asked what you were looking

12   for.  I hope this helps.

13               "We are holding at $150 million but I'll be

14   a bit more aggressive and say a likely of 150 million

15   to $170 million.  If you pull Covisant" -- or

16   "Covisant" -- "from pipe, apply our week 7 FY00

17   coverage rate and then add Covisant back in you get

18   $170 million.  We have a lot of pipe at challenging

19   clients."

20               Do you see that?

21       A       I do.

22       Q       Were you aware as of the 17th of January

23   2001 that you had a lot of pipe at challenging

24   clients?

25       A       I was aware we had a lot of pipe.
```

1      Q      And what about the end bit of that?

2      A      I'm not -- I wouldn't know what he means by

3    "challenging clients."  If they are in the pipeline,

4    presumably there's -- you know, they have been

5    qualified.

6      Q      And what's the minimum to get into the

7    pipe?

8      A      The minimum likelihood of close?

9      Q      Correct.

10     A      At this time, I'm not sure.

11     Q      Then there's some bullet points.  The first

12   bullet point says, "nearly $30 million at GE.

13   Although they announce pending layoffs our biggest

14   deals are in Capital, Aircraft, Engines and Power

15   which were reported to be doing very well.  We will

16   see in coming weeks."

17            Do you see that?

18     A      I do.

19     Q      And it says, "GM with poor earnings and

20   announced poor 1st quarter.  They are reviewing all

21   budgets."

22            Do you see that?

23     A      Yes.

24     Q      And, "Gateway.  Again poor earnings but we

25   presented very strong ROI analysis."

1                Do you see that?

2        A     Yes.

3        Q     And then the next sentence says, "Our best

4    is at $220 million which is a real stretch as several

5    of these deals will be Q4.  One" ADP -- "AVP talked

6    of starting to see indications of client delays on

7    decisions."

8                Do you see that?

9        A     I do.

10       Q     Were you aware on or around January 17,

11   2001 of Oracle -- an Oracle AVP reporting indications

12   of client delays on decisions?

13       A     We have a lot of AVPs, and I was unaware of

14   it.

15       Q     Now, you will see, if you go all the way

16   down to the bottom of the page, it says, "Q3 Forecast

17   coverage is 246%."  340 -- "342% without Covisant,"

18   or "Covisant."

19                Do you see that, the very, very last entry

20   on the page?

21       A     Yes.

22       Q     Yeah.

23                Do you have an understanding what is meant

24   by 246 percent coverage for Q3, 342 percent without

25   Covisant?

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1       A      I'm not sure how that -- I'm not sure how
 2    they are calculating the pipeline --
 3       Q      Okay.
 4       A      -- with this.  What I think it means -- if
 5    you want me to guess, then I'll tell you.
 6              MR. LINDSTROM:  Objection; calls for
 7    speculation.
 8              THE WITNESS:  It means the size of the
 9    weighted pipeline.  The pipeline times the
10    probability is roughly two and a half times the
11    forecast.
12    BY MR. SOLOMON:
13       Q      Okay.  Do you have an understanding why the
14    calculation was with Covisant and without Covisant?
15       A      "Covisant."
16       Q      "Covisant."
17       A      It doesn't exist anymore --
18       Q      Can just say "Covisant."
19       A      -- it doesn't matter.  It doesn't exist.
20              The -- it was such -- it was such a large
21    deal, it kind of throws the numbers off, and there's
22    a statistical technique called "exponential
23    smoothing" that takes it out.
24       Q      And why would you -- why is that being
25    employed?
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      A      Again, it was -- it was a -- it's a very

2      large -- it's a very, very large deal.  It's a

3      standard statistical technique.

4      Q      The standard statistical technique being

5      take out something that is anomalous?

6      A      Just anything that's large.

7             MR. SOLOMON:  Okay.  Have marked as next

8      exhibit another document produced by the defendants

9      in this litigation with the control number 220022 to

10     24.

11            (Exhibit No. 114 was marked for

12            identification.)

13     BY MR. SOLOMON:

14     Q      And tell me if you recognize this, please?

15     A      I do not.

16     Q      Okay.  You see it's dated Thursday,

17     January 18, 2001, and it reflects e-mail exchanges

18     among Jennifer Minton, "Ivgen" or "Ivgen" --

19     A      Ivgen Guner.

20     Q      And copies a number of people.  And I'll

21     skip the middle page, and then the third page has

22     some text.

23            Do you see that?

24     A      I do.

25     Q      And a third of the way down, under

```
 1     "Budget," it says, "To follow-up on my voice mail
 2     from last night -- The field is getting concerned
 3     about the targets."
 4             Do you know what that refers to?
 5     A     Where are you?
 6     Q     Okay.  Under "Budget."
 7     A     Under "Budget."  Yeah.  We were talking
 8     about planning for next year, and I had, according to
 9     this note, set a target of 30 percent growth for next
10     year; you know, pretty aggressive growth -- you know,
11     reasonably aggressive growth targets, and that means
12     we have to start hiring people, and I guess this
13     means that they thought perhaps that my 30 percent
14     growth for, you know, this year and next was too
15     aggressive.
16     Q     Okay.  Now, isn't it true, though, that if
17     you look at the context of this, what's being
18     expressed here, is concern about targets for the
19     current fiscal period?
20             MR. LINDSTROM:  Objection; argumentative.
21             THE WITNESS:  It's not how I read it.  I
22     mean, I read -- I read the top -- you know, the top
23     line --
24             MR. SOLOMON:  Okay.
25             THE WITNESS:  -- that Larry Ellison has
```

```
 1    made it clear that this year and next year's targets
 2    are 30 percent.  So we want to keep the same growth
 3    rate not only for this year but for next year --
 4               MR. SOLOMON:  Okay.
 5               THE WITNESS:  -- and they were concerned
 6    about that being too aggressive a growth target.
 7    BY MR. SOLOMON:
 8        Q     Okay.  It's fair to say -- right? -- that
 9    this is half way through Q3, fiscal Q3 of '01; right?
10        A     Yes.
11        Q     And, at that point, this seems to reflect
12    that at a meeting around this time, you had made it
13    clear that the license revenue growth target for
14    fiscal '01 remained at 30 percent; right?
15        A     Again, I don't remember -- I'm just using
16    this -- you know, this document to refresh my memory.
17    I don't remember this document at all.
18        Q     Okay.
19        A     But -- I don't think I've ever seen this
20    document before, but it is our practice to plan; you
21    know, takes a long time to hire people, and when you
22    are growing that rapidly, and so we talk about our
23    targets for this -- the coming year.
24        Q     Okay.
25        A     So I was quite optimistic and thought we
```

1    would keep the growth rate up.

2              MR. SOLOMON:  Mark as the next exhibit a

3    document produced by the defendants in this

4    litigation with the control numbers 00540 to 543.

5              (Exhibit No. 115 was marked for

6              identification.)

7              THE WITNESS:  Okay.

8    BY MR. SOLOMON:

9         Q    Okay.  Do you recognize this document?

10        A    I don't recognize it, but I'm on the

11   distribution list.

12        Q    Okay.  Do you -- and when you say that, you

13   don't remember ever seeing this before?

14        A    I don't recall it.  Looks like -- I'm sure

15   it was sent to me, but I don't recall seeing it.

16        Q    Okay.  And it's dated Wednesday, January

17   17, 2001, and it is sent from Larry Garnick to you

18   and others?

19        A    Right.

20        Q    And this would have been in your file on or

21   around January 17, 2001?

22        A    That's right.

23        Q    And I'll represent to you it wasn't

24   produced from your file and you cannot explain why;

25   is that right?

**9/21/2006  Ellison, Lawrence Vol. II**

1        A      That's right.

2        Q      Looking at the first bullet point on the

3   first page, it says, in part, "The license revenues

4   growth rate was 35% in USD, 25 points better than the

5   10% growth we experienced in December FY00 over

6   December FY99.  However, excluding the $60 million

7   Covisant" -- "Covisant" -- "license deal, the USD

8   growth rate would have been only 6%."

9            Do you see that?

10       A      I do.

11       Q      And it goes on to say, "Excluding Covisant,

12   OPI license revenue growth would have been" a

13   negative "(85%)."

14           Do you see that?

15       A      I do.

16           MR. LINDSTROM:  I think that

17   mischaracterizes the document, or at least maybe I'm

18   misreading it.  I don't see "a negative 85%."  Maybe

19   you misread it.

20           THE WITNESS:  I think that's what the

21   parentheses mean.

22   BY MR. SOLOMON:

23       Q      The parentheses mean negative, don't they?

24       A      Right.

25       Q      Thank you, Mr. Ellison.

**9/21/2006  Ellison, Lawrence Vol. II**

1           Do you remember being aware of that at the

2    time?

3         A     Yes.

4         Q     I'm skipping a bullet point to the next --

5    to third bullet point.  "December license results

6    represents 19% of the total forecasts for Q3 FY01.

7    In FY00 and FY99, December represented 16% and 19%,

8    respectively, of the quarter total."

9           Do you see that?

10        A     I do.

11        Q     Were you aware of that at the time?

12        A     Yes.

13        Q     And then the next bullet point reads:

14   "Applications product growth was 216%," and then in

15   brackets, it says "[ERP equals 365%, CRM equals," in

16   parens, "(58%)]."

17          Do you understand that 58 percent to be a

18   negative?

19        A     I do.

20        Q     Yeah.

21          "While database product growth was 17%,

22   and, again, in parens, "[Server equals 21%" -- sorry,

23   in brackets, "[Server equals 21%, Tools equals," in

24   parens, so a negative 26 percent; is that correct?

25        A     That's correct.

1      Q      And then it says, "Excluding Covisant,

2   Applications product growth would have been" negative

3   "(46%) and database product growth would have been

4   13%."

5             Do you see that?

6      A      I do.

7      Q      And did you know that at the time?

8      A      Yes.

9      Q      Okay.  And then if you look at the

10  spreadsheet on the second page, you will see that

11  there's a heading "License Organization," and looking

12  at the line for "Nussbaum OSI"?

13     A      Yes.

14     Q      There's a reference to a negative 81

15  percent growth under U.S. dollars.

16            Do you see that?

17     A      I do.

18     Q      And a negative 81 percent growth under

19  constant dollars.

20            Do you see that?

21     A      I do.

22     Q      And did you know that at the time?

23     A      I did.

24     Q      And against NAS for Roberts, in constant --

25  excuse me, in U.S. dollars, it reflects a negative

**9/21/2006  Ellison, Lawrence Vol. II**

```
1      growth rate of 24 percent.

2              Do you see that?

3      A      Yes.

4      Q      And in constant dollars, a negative growth

5      rate of 23 percent.

6              Do you see that?

7      A      I do.

8      Q      And you knew that at the time?

9      A      Yes.

10     Q      And have you ever experienced, halfway into

11     the fiscal quarter, negative growth rates in all U.S.

12     divisions?

13             MR. LINDSTROM:  Mischaracterizes the

14     document.

15             THE WITNESS:  We didn't have negative

16     growth rates in all U.S. divisions.

17     BY MR. SOLOMON:

18     Q      That's not what I said.  I said, "Have you

19     ever experienced?"

20     A      All three negative --

21     Q      Yes.

22     A      Well, this was not halfway through.  This

23     was one-third of the way through.

24     Q      Okay.  But --

25     A      So in -- we have no measures for halfway
```

1    through a quarter.  I'm not trying to be cute here.

2         Q     Okay.

3         A     We have -- you know, we have -- after Month

4    1, one-third; after Month 2, two-thirds, and a final,

5    so there's no halfway.

6         Q     Okay.

7         A     So have I seen negative growth in all

8    three -- we had three U.S. divisions here that are

9    listed:  OSI, NAS, and OPI.

10        Q     Correct.

11        A     Okay.  Two are negative; one is positive.

12              After the first month of the quarter, which

13   is what this is, you know, often, you know -- as I

14   say, the range is 15 to 20 percent of how much

15   business we do in a quarter is done in the first

16   month.  Sometimes even lower, you know, 14 percent,

17   13 percent.  So I have seen, after the first month,

18   the entire U.S. is negative.

19        Q     And what about in the third fiscal quarter?

20              MR. LINDSTROM:  After a --

21              THE WITNESS:  So going back historically,

22   you are asking --

23              MR. SOLOMON:  Yes.

24              THE WITNESS:  -- me, historically, have I

25   ever seen --

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q       Correct.

2        A       Yeah.

3                Keep in mind that December is a funny

4        month.  You know, December, there's a lot of

5        holidays.  It's the first month of our quarter.

6        People often are gone during -- during Chri- -- the

7        Christmas and New Year holiday.  And, again, we just

8        started the quarter, so that's -- that's maybe -- you

9        know, one of our weakest months of the year.  So it

10       wouldn't be uncommon for us not to do much business

11       in December.

12       Q       Isn't it true that it's actually -- you got

13       it completely wrong and it's the best first month of

14       the year, typically?

15               MR. LINDSTROM:  Best first month of the

16       year?

17       BY MR. SOLOMON:

18       Q       Best first month in the quarter.

19       A       Is it the best first month of the year?

20       That's interesting, because it's the end of other

21       people's -- because it's the end of other people's

22       fiscal years?

23       Q       That could be the reason.  I'm just

24       asking --

25       A       Other fiscal years --

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q        -- objectively.

2        A        The truth of the matter is I'm not sure

3    which -- you know, which of our first months is worse

4    again.  Typically, our first month of any quarter is

5    not very strong for us.

6        Q        And if I tell you that the average

7    contribution of December to the third fiscal quarter

8    at Oracle has been 21 percent, would you have a

9    problem with that?

10       A        No.  I think -- I think I said 15 to 20, so

11   21 is not so far off.

12       Q        Now -- and, again, you note that, in this

13   document, there's Covisant in -- or Covisant in,

14   Covisant out.  Why?

15       A        Because it was a very -- because it was a

16   very, very large transaction.

17       Q        Did Oracle's public investors have any

18   information concerning what the growth rates were for

19   Oracle with and without the Covisant deal?

20       A        We don't announce our growth rates at the

21   end of every month, ever.

22       Q        And have you ever heard of a rule in

23   connection with stock transactions called "abstain or

24   disclose"?

25       A        No.

1       Q       Have you ever heard of a requirement that

2       if you are in possession of material inside

3       information when you trade stock, you must disclose

4       that information prior to your trade to make it fair

5       to all shareholders?

6       A       Well, I thought you couldn't trade.

7       Q       Okay.

8       A       If you have material insider information.

9       I didn't think you had the choice --

10      Q       You didn't know that it was --

11      A       I didn't know you had the choice to

12      disclose.

13      Q       You did not abstain, did you?

14      A       No.

15      Q       And you did not disclose, did you?

16      A       Disclose what?

17      Q       Disclose the Covisant-in and the

18      Covisant-out information in terms of the growth rates

19      with the company?

20      A       We had -- we had never -- we didn't

21      disclose our first -- are you asking me did we

22      disclose where we were after one month --

23      Q       In connection --

24      A       -- in the quarter?

25      Q       Before you traded.

1       A       We have never disclosed our first month's

2    results.

3       Q       So the answer is you didn't abstain and you

4    didn't disclose?

5            MR. LINDSTROM:  Covisant?

6            THE WITNESS:  Well, any -- well, any -- I

7    think he's saying did we report our -- you know, our

8    first month's results.  People trade a lot, you know,

9    in the middle of quarters.  We have never reported

10   our first month's results.

11   BY MR. SOLOMON:

12      Q       Okay.  What I'm trying to get at is --

13   partly, at least, is:  Do you think that the

14   investing public would have wanted to know what the

15   trends were at Oracle, both accounting for the

16   Covisant deal and without the Covisant deal?

17           MR. LINDSTROM:  Calls for speculation, no

18   foundation.

19           THE WITNESS:  Yeah, I don't -- I don't

20   know.  We don't disclose our first month's results.

21           MR. SOLOMON:  Okay.  Let's go off the

22   record and change the tape.

23           THE VIDEOGRAPHER:  This marks the end of

24   Tape 3, Volume 2, in the deposition of Larry Ellison.

25           At 4:22, going off the record.

**9/21/2006  Ellison, Lawrence Vol. II**

1              (Recess taken.)

2              THE VIDEOGRAPHER:  On record at 4:32.

3              This marks the beginning of Tape 4,

4      Volume 2, in the deposition of Larry Ellison.

5      BY MR. SOLOMON:

6          Q      Was the Covisant deal an outlier?

7          A      It was the largest deal we have ever done

8      in our history.  It still is.

9          Q      Isn't it true that taking -- leaving

10     Covisant, or "Covisant," in the calculation in the

11     third quarter of '01 would be misleading in terms of

12     trends?

13             MR. LINDSTROM:  Vague and ambiguous.

14             THE WITNESS:  I'm not sure what you mean by

15     "trends."

16             MR. SOLOMON:  Okay.

17             THE WITNESS:  It certainly got us off to a

18     great head start in the quarter.

19     BY MR. SOLOMON:

20         Q      Okay.  But does an outlier deal like

21     Covisant give a good indication of what the trends

22     are generally in the business, or did it?

23         A      We are a fairly -- even though it's a very

24     large deal, we are a pretty large company, so it's

25     not going to -- it's not going to affect our results

```
 1    wildly.  But I'm not sure what you mean by "trend."
 2    It's a -- it will -- you know, it contributes
 3    significantly to the current -- you know, to the
 4    current quarter.
 5            Do you mean can someone say -- you know,
 6    does it mean -- again, I'm not sure what you mean by
 7    "trend."
 8        Q    Well, back to why Covisant was taken out of
 9    the calculation and it was shown both ways.  You say
10    that's a statistical technique.
11        A    Yeah.
12        Q    Right?
13        A    Yeah.
14        Q    But you don't really explain why it's
15    utilized.
16            What's the purpose?
17        A    You mean why do people -- why do people do
18    that?
19        Q    Why was Covisant taken out and why were you
20    privy to information --
21        A    For the same reason -- for the same reason
22    you saw -- you had an earlier document and you saw
23    where HP -- we had an HP deal the previous year in
24    1999, and that made the comparison in the year 2000
25    difficult.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1          Remember?  You pointed out that our CRM

2    sales had dropped 2 to 3 percent.

3          Q     Yeah.

4          A     And it was useful to know a year before we

5    had a very large -- and I'm guessing.  I think about

6    $25 million CRM deal with Hewlett-Packard, so it was

7    useful to know that we had a particularly good

8    quarter because of the large HP deal in the previous

9    quarter, and that made the CRM growth rate a year

10   from then look different, look lower than it would

11   have been.

12         Q     Yeah.

13         A     Okay.  So it's useful to know -- you know,

14   to, you know, look at the quarter to know that

15   Covisant happened that quarter so that the next

16   quarter, let's say, or the previous -- or the

17   previous quarter, for that matter, that that large

18   deal contributed -- you know, contributed

19   substantially to the results in Q3; that Covisant

20   helped -- you know, when one deal contributes very

21   substantially to a quarter, helps a quarter, it makes

22   the next year's comparison more difficult.

23         Q     But the information that you received in

24   the January 17, 2001 Flash report that we just saw

25   tells you what the trend is in the current quarter

**9/21/2006  Ellison, Lawrence Vol. II**

1    without Covisant; is that true?

2           MR. LINDSTROM:  Mischaracterizes the

3    document.

4           THE WITNESS:  That's not true.  It's not a

5    trend.  It's not a trend.  It's the data -- sorry.

6    Just the way -- it's really telling us what our

7    growth rate is with Covisant and what it is without

8    Covisant.

9    BY MR. SOLOMON:

10     Q     And why in the quarter do you not want to

11   know what your growth rate is for that quarter

12   without Covisant?

13     A     Why -- you know, why did they show it?

14     Q     Yes.

15     A     As I said -- as I said before, it -- it

16   shows the -- it's going to make a big difference --

17   it's going to make a big difference to the quarter.

18           I'm not sure I understand your question.

19     Q     I think that's okay for the moment.

20           Did you disclose to the investing public

21   when you engaged in your securities transactions at

22   the end of January 2001 that Oracle's pipeline had

23   been reduced by around 20 percent?

24           MR. LINDSTROM:  Assumes facts.

25           THE WITNESS:  I don't know that fact to be

1    true.

2              MR. SOLOMON:  Okay.

3              THE WITNESS:  And we don't disclose

4    fluctuations.  When a deal closes, we don't tell them

5    the deal closes.  When a pipeline changes, we

6    don't -- when a forecast changes, we don't -- you

7    know, we don't --

8    BY MR. SOLOMON:

9        Q     But you would have -- okay.

10             In the third quarter of -- third fiscal

11   quarter of 2001, you had realtime daily information

12   on what the state of the pipeline was; is that true

13   or false?

14       A     No.  I didn't look at the -- I didn't look

15   at the pipeline very much.  I tended to look at the

16   forecast.

17       Q     Okay.

18       A     So I reviewed the forecast once a week.

19       Q     Okay.  Now, when you say you didn't tend to

20   look at the pipeline very much, that means you looked

21   at it sometimes; you looked at it a little bit?

22       A     We would talk about coverage ratios in the

23   pipeline.  When people would give their forecasts, I

24   would sometimes ask questions, you know, what the

25   coverage was, but not always.

1        Q      Okay.  You told the investing public at the

2   beginning of fiscal Q301 that the pipeline was

3   astounding; is that true?

4        A      I think I told them it was very strong.  I

5   don't know what word I used, but I believe at the

6   beginning of the quarter it was a very strong

7   pipeline.

8        Q      Isn't it true that between December 11,

9   2000 and December 25, 2000, Oracle's best estimate of

10  its pipeline growth for 3Q as -- '01 as opposed to

11  3Q00 decreased from 52 percent to 34 percent?

12       A      34 percent still very, very strong growth.

13       Q      I understand, but I'm talking about the

14  decrease.

15       A      But I don't -- I don't recall those --

16  those numbers.

17       Q      Okay.

18       A      So you are -- go ahead.

19              MR. SOLOMON:  So we will have marked as the

20  next exhibit Defendants' Response To Plaintiffs'

21  First Set of Requests for Admissions in this

22  litigation.

23              (Exhibit No. 116 was marked for

24              identification.)

25              MR. LINDSTROM:  Is there a certain portion

**9/21/2006  Ellison, Lawrence Vol. II**

1    of the document that you would like to direct the

2    witness's attention to?

3            MR. SOLOMON:  Yes.  Thank you.

4        Q      If you look at Request for Admission No. 1,

5    Mr. Ellison, you will see that we request that

6    defendants admit that between December 11, 2000 and

7    December 25, 2000 --

8        A      I'm sorry.  What page are you on?

9        Q      I'm on page 2 of the document.

10       A      Second page.

11       Q      Which is the third page in.

12       A      Oh, third page in --

13       Q      Numbered 2.

14       A      -- all right.

15       Q      Admit between December 11, 2000 and

16   December 25th, 2000, Oracle's best estimate of its

17   sales pipeline growth for 3Q01 as compared to 3Q00,

18   in parens, decreased from 52 percent to 34 percent.

19           Do you see that?

20       A      I do.

21       Q      And then there are a bunch of objections,

22   and then after the objections, it says, "Subject to

23   and without waiving these objections, Defendants

24   admit that on December 11, 2000, Oracle sales

25   pipeline growth for 3Q01 was 52% in constant dollars;

```
 1    and on December 25th, 2000, Oracle sales pipeline

 2    growth at 3Q01 was 34% in constant dollars."

 3              Do you see that?

 4       A    I do.

 5       Q    And you don't dispute that that admission

 6    is accurate?

 7       A    I do.

 8       Q    And do you dispute that you had that

 9    information in January of 2001?

10              MR. LINDSTROM:  No foundation.

11              THE WITNESS:  I don't recall.

12    BY MR. SOLOMON:

13       Q    Do you dispute that you had access to that

14    information?

15       A    I do not.

16       Q    In the third quarter of 2001?

17       A    I do not.

18              MR. SOLOMON:  You don't.  Okay.

19              Have marked as the next exhibit a document

20    produced by the defendants in the litigation with the

21    control numbers 040638 to 640.

22              (Exhibit No. 117 was marked for

23              identification.)

24              THE WITNESS:  Okay.

25    BY MR. SOLOMON:
```

1       Q       Okay.  Do you recognize this?

2       A       I don't.

3       Q       You see, on the first page, it's dated

4    October 13, 2000, and it is an e-mail, in the middle

5    of the page, from Mark Barrenechea, and you are one

6    of the recipients.  In fact, you are the recipient.

7            Do you see that?

8       A       Yes.

9       Q       And over the page, there's a message from

10   you.

11           Do you see that in the top third?

12      A       I do.

13      Q       And it says "'Lawrence J. Ellison' wrote:

14   We will not upgrade unless we are at the 90%

15   confidence level that the new OSO will work better

16   than the current one.  We do not want to discourage

17   the field the last month of the quarter.  Nor do we

18   want to lose a mission critical system.  Larry."

19           Do you see that?

20      A       I do.

21      Q       And do you remember writing that?

22      A       I don't remember writing it, but I'm sure I

23   read it.

24      Q       Okay.  And the mission critical system is

25   OSO?

1        A       That's right.

2        Q       And did you reach the 90 percent confidence

3    level that you referred to here?

4        A       I don't remember.

5        Q       And what is it about the OSO upgrade that

6    could lead to discourage the field in the last month

7    of the quarter?  Could you explain that to me?

8        A       Oh, the users of OSO are the sales people,

9    the field salespeople, and if we put in a system

10   that's problematic, that's causing a lot of problems,

11   they will spend more time just kind of getting -- you

12   know, figuring out how to get their forecast into the

13   system than selling.

14       Q       Okay.  Are you a user of OSO?

15       A       I am not.

16              Well, let me clarify that a little.  I

17   certainly hold meetings where we look at the output

18   of OSO, so, in that sense, I get information from

19   OSO, but I'm not a user in the sense I don't enter

20   any data into OSO; I just look at the forecast

21   results.

22              MR. SOLOMON:  Can you read that answer back

23   to me, please.

24              (Record read by the Reporter as follows;

25              "QUESTION:  Okay.  Are you a user of OSO?

```
 1              ANSWER:  I am not.

 2              Well, let me clarify that a little.  I

 3              certainly hold meetings where we look at

 4              the output of OSO, so, in that sense, I get

 5              information from OSO, but I'm not a user in

 6              the sense I don't enter any data into OSO;

 7              I just look at the forecast results.")

 8              MR. SOLOMON:  Thank you.

 9              Marked as the next exhibit another excerpt

10    from the book Softwar.

11              (Exhibit No. 118 was marked for

12              identification.)

13    BY MR. SOLOMON:

14         Q    I'm looking at page 286, and at the bottom,

15    and it goes on to 287.  It reads:  "A typical day for

16    Ellison starts when he gets up at about seven o'clock

17    and checks his overnight e-mails.  Unlike many CEOs,

18    Ellison has only one e-mail address.  He gets more

19    than a hundred e-mails a day, most of which he

20    answers himself or forwards to the appropriate

21    person."

22              Just stopping there, is that accurate?

23              MR. LINDSTROM:  Objection; compound.

24              MR. SOLOMON:  Okay.  Let's break it down.

25         Q    Does a typical day start for you when you
```

1    get up at 7:00 o'clock and you check your overnight

2    e-mails?

3         A    Close enough.  Sometimes I'm up earlier;

4    sometimes I'm up later.

5         Q    Unlike -- on average.

6         A    Close enough.

7         Q    "Unlike many CEOs, Ellison has only one

8    e-mail address."

9              Is that true?

10        A    That's true.

11        Q    "He gets more than a hundred e-mails a day,

12   most of which he answers himself or forwards to the

13   appropriate person."

14             Is that true?

15             MR. LINDSTROM:  That's compound.

16   BY MR. SOLOMON:

17        Q    Do you get more than a hundred e-mails a

18   day?

19        A    I throw a lot of it away without answering

20   it.  A lot of it is spam --

21        Q    Okay.

22        A    -- and silly stuff.

23        Q    All right.  And then we will skip over the

24   scrambled eggs and bacon, and the paragraph

25   beginning:  "At about nine" -- go down a few lines.

1    It says, "Also part of the routine is a visit to

2    Oracle Sales Online, which might prompt him to leave

3    a message questioning the status of a particular

4    sales opportunity."

5              Is that true?

6    A    Not true.

7    Q    Okay.  Now, although you do enter a

8    footnote on this page, you do not clarify or correct

9    that statement, do you?

10   A    No, I don't.

11             We can prove it's not true.

12   Q    How can you prove it?

13   A    We have logs of everyone who's accessed OSO

14   and when they have accessed it.

15   Q    That's excellent.

16             So I can -- you can prove that you didn't

17   log on to OSO in Q301; right?

18   A    I don't know if we have them going back to

19   Q301.

20   Q    Because you destroyed the logons, logon

21   records, didn't you, or someone did at your company?

22             MR. LINDSTROM:  Assumes facts,

23   argumentative.

24   BY MR. SOLOMON:

25   Q    Do you know the SLC references the fact

**9/21/2006  Ellison, Lawrence Vol. II**

1    that the login records have been destroyed?

2        A     No.

3        Q     So I can't tell whether you have logged

4    into OSO in Q301 or not, can you?

5              MR. LINDSTROM:  Argumentative.

6              THE WITNESS:  Would it be useful for you to

7    find out if I've logged on to OSO anytime in the last

8    three years?

9              MR. SOLOMON:  I'm interested.

10             THE WITNESS:  No, I know, but my practice

11   was never to log in to OSO, and you can show that --

12   I'm getting myself in trouble.  My lawyer is going to

13   smack me.  But -- but, yeah, I think it's fairly easy

14   to demonstrate our practice is just not to look at

15   OSO.

16   BY MR. SOLOMON:

17       Q     Okay.  Why did Mr. Symonds say that that

18   was part of your routine?

19             MR. LINDSTROM:  No foundation, calls for

20   speculation.

21   BY MR. SOLOMON:

22       Q     Do you have any idea?

23       A     I don't know.

24       Q     You did have a login, didn't you, in Q3 for

25   OSO?

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        A      I don't know.

2        Q      And you don't know if it's possible for me

3   to verify Q301 and whether or not you logged on;

4   right?

5        A      I do not know.

6        Q      Okay.  How often did you get reports from

7   the OSO system?

8               MR. LINDSTROM:  Objection; vague as to

9   time.

10  BY MR. SOLOMON:

11       Q      In Q301.

12       A      Typically, we would hold forecast meetings

13  on Mondays, so we would look at -- look at --

14  sometimes we put OSO results up on the screen and

15  talk about what was in OSO.

16       Q      So I'm sorry if that wasn't good.

17              What was the frequency?  Was it daily?

18  Once a week?

19       A      I'm sorry, on Mondays.

20              MR. SOLOMON:  Okay.  Marked as the next

21  exhibit another document produced by the defendants

22  in this litigation with the control numbers 028582

23  and 83.

24              (Exhibit No. 119 was marked for

25              identification.)
```

```
 1    BY MR. SOLOMON:

 2        Q      Take a look at it and let me know if you

 3    have seen it before, please.

 4        A      I don't specifically recall it.

 5        Q      Okay.

 6        A      But I'm on the distribution list.

 7        Q      So you don't dispute receiving it?

 8        A      No.

 9        Q      And receiving the information here?

10        A      I do not.

11               MR. LINDSTROM:  Just so the record's clear,

12    Mark, I think both you and the witness were talking

13    about the embedded e-mail that talks -- that starts

14    halfway --

15               MR. SOLOMON:  Thank you.

16               MR. LINDSTROM:  -- down the page of

17    Exhibit 120.

18               MR. SOLOMON:  Thank you.

19        Q      And that's dated Friday, December the 1st,

20    2000, and it is from Mark Barrenechea to a number of

21    people, and you are copied; is that right?

22        A      That's right.

23        Q      And this would have been in your files in

24    December of 2000?

25        A      Yes.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q      And it wasn't produced from your files and

2    you cannot explain why; is that correct?

3        A      That's correct.

4               MR. SOLOMON:  Have marked as the next

5    exhibit a document produced in this litigation with

6    the control numbers 021388 through 390.

7               (Exhibit No. 120 was marked for

8               identification.)

9               (Discussion off the stenographic record.)

10   BY MR. SOLOMON:

11       Q      And let me know if you recognize it when

12   you have had a chance to review it, please.

13       A      I don't recall it.

14       Q      Okay.

15       A      I'm on the list.

16       Q      And, yes, on the first page, the bottom

17   half of that page --

18       A      Right.

19       Q      -- reflects that this was addressed to you?

20       A      Yes.

21       Q      And some others from Mark Barrenechea?

22       A      Yes.

23       Q      And on the second page, there are --

24   there's a reference to "Top 10 Wins" and "Top

25   Apologies."

**9/21/2006  Ellison, Lawrence Vol. II**

1              Do you see that?

2        A     Yes.

3        Q     And the "Top Apologies," it says "(pushed

4    to Q3)."

5              Do you see that?

6        A     Yes.

7        Q     Do you know what that means, "Top Apologies

8    (pushed to Q3)"?

9        A     I would be guessing.

10       Q     Okay.  Take a guess.

11             MR. LINDSTROM:  Objection; calls for

12   speculation.

13             THE WITNESS:  That he's forecasting that

14   these deals will close in Q3, but I don't know what

15   it means.

16             MR. SOLOMON:  I'm talking about the

17   apologize.

18       Q     What are the apologies and who are they to?

19       A     I don't know.

20       Q     Don't know?  Okay.

21             And it says "Special Highlights" at the

22   bottom.

23             Do you see that?

24       A     Yes.

25       Q     And against "OPI," it says "Without HP, it

1    would have been different.  The East did not bring in

2    any business.  Steve M has large Q3 pipeline."

3                Do you see that?

4        A    Yes.

5        Q    What's the reference to "without HP"?  Do

6    you know?

7        A    I think that's what we just talked about.

8    I think -- again, this is right after our Q2 results.

9        Q    Okay.

10       A    It's right after our Q2 results.  And I

11   think what he's referring to is the negative -- you

12   showed me a document earlier of a negative 2 to 3

13   percent --

14       Q    Yeah.

15       A    -- CRM growth.  And I think he's referring

16   to the difficult comparison based on HP, but, again,

17   I don't have the documents in front of me, so I'm

18   speculating just a bit.

19       Q    Okay.  And this would have been in your

20   files around December 4th, 2000?

21       A    Yes.

22       Q    And it wasn't produced from your files and

23   you cannot explain why?

24       A    That's right.

25                MR. SOLOMON:  Have marked as the next

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    exhibit a document produced by the defendants with
2    the control numbers 086728 and 729.
3                 (Exhibit No. 121 was marked for
4                 identification.)
5    BY MR. SOLOMON:
6        Q     If you look at it and let me know if you
7    recognize it, please.
8        A     I don't recognize it.
9        Q     Okay.  You will see that you are a
10   recipient and it's from Jennifer Minton, at the top,
11   and then --
12       A     Yes.
13       Q     -- at the bottom -- I'm on the first
14   page -- the exchanges are among Ron Police or
15   "Police" and Mark Barrenechea and others.
16             Do you see that?
17       A     Yes.
18       Q     And it refers, among other things, to the
19   "go-live" date for OSO; is that right?
20       A     Yes.
21       Q     And this would have been in your files
22   around December 6, 2000; is that right?
23       A     Yes.
24       Q     And it wasn't produced from your files and
25   you cannot explain why?
```

```
 1      A      That's right.

 2             MR. SOLOMON:  And then we will have another

 3   document produced by the defendants marked as next

 4   exhibit with the control number 012384.

 5             (Exhibit No. 122 was marked for

 6             identification.)

 7             MR. SOLOMON:  And I guess -- let me give

 8   you a different control number.  It's actually 012385

 9   we're looking at.

10             THE WITNESS:  Okay.

11             (Exhibit No. 122 was remarked for

12             identification.)

13   BY MR. SOLOMON:

14      Q      Okay.  Let me know -- do you recognize

15   this?

16      A      I think I remember it.

17      Q      Okay.  And it reflects you saying they can

18   delay the internal implementation of OSO by two weeks

19   but only two weeks; is that right?

20      A      That's right.

21      Q      And it's from you and it's to Ron Wohl and

22   it also copies you?

23      A      Yes.

24      Q      And this would have been in your files as

25   of December 9, 2000?
```

1        A       Yes.

2        Q       And it wasn't produced from your files and

3    you can't explain why; is that right?

4        A       That's right.

5        Q       And just on that question -- because on

6    this occasion, it's from you, but you have copied

7    yourself, but even if you hadn't copied yourself,

8    wouldn't the document be in your outbox unless you

9    deleted it?

10       A       No.  It depends how your e-mail client is

11   set up.

12       Q       Okay.

13       A       Sometimes you can either keep all copies of

14   your e-mail or not.  It's just -- it's a setting on

15   your e-mail system.

16       Q       And do you know what your setting was in

17   2000 and early 2001.

18       A       I don't know what my setting was.

19       Q       And what -- and that would dictate whether

20   or not your outbox was containing outgoing messages

21   or not?

22       A       That's right.

23       Q       Is there any way of finding out?

24               MR. LINDSTROM:  What it was in that time

25   frame?

**9/21/2006  Ellison, Lawrence Vol. II**

1                MR. SOLOMON:  Yeah.

2                THE WITNESS:  I think -- I don't know.

3                MR. SOLOMON:  Okay.

4                THE WITNESS:  I mean, I don't know if we

5        have retained -- I assume we have retained that

6        computer someplace, but I don't know where it is.

7        BY MR. SOLOMON:

8            Q     And which computer are you talking about?

9            A     My desktop.  Of course, I have several

10       computers.

11           Q     Right.

12                 But you assume you have retained them all;

13       right?

14           A     I think we have retained them all.

15           Q     And they exist somewhere?

16           A     Someplace, yeah.  Some lawyer's office.

17           Q     Very hard to get into lawyers' offices.

18                 Now, OSO is mission critical; right?

19           A     Yeah.

20           Q     Okay.

21           A     Yeah.

22           Q     You were upgrading OSO; this was an

23       important event?

24           A     Yes.

25           Q     You were given a login -- or you don't know

1    that?

2        A     No, I don't know that.

3        Q     But it's your testimony that after it was

4    implemented, you didn't access it in that first

5    quarter and take a look and see if it was working

6    properly?

7        A     Well, I was in meetings where we brought it

8    up.  And, again, keep in mind, remember I said, every

9    Monday it was my intention that they would bring up

10   the forecasts and make the forecasts using OSO

11   screens.  You know, we have a big display screen, so

12   rather than people telling us what the forecast was,

13   they would actually bring their personal computer to

14   the -- you know, to the conference room like this,

15   and they would log on and show the OSO forecast on

16   our display screen.

17       Q     Okay.  And that was the extent to which you

18   accessed the actual OSO database in that fiscal

19   quarter?

20       A     I believe so.

21       Q     And is that the extent to which you have

22   ever used -- utilized OSO?

23       A     I believe so.  I mean, I might have -- very

24   early on where they are designing the screens, I

25   might have looked at a user-interface design or

1    something like that, but that's right.

2        Q      Was it a major point of OSO that it was

3    realtime?

4        A      Well, it was -- it was realtime if everyone

5    put in the information.

6        Q      Okay.  But didn't you promote OSO to your

7    customer base as being realtime in enabling you to

8    know what the financial picture of Oracle was at any

9    one moment in time?

10       A      It was realtime in the sense that every

11   time someone put in a change, you saw it.  Anyplace

12   in the world, you know, that -- the change would get

13   registered.  So if someone at headquarters, Jennifer

14   Minton, someone who's monitoring all this, would be

15   able to see -- you know, be able to see the changes.

16   So, in that sense, it was realtime, if you will.

17           The flaw of the system is sometimes the

18   sales guys didn't want to put -- you know, wouldn't

19   even -- wouldn't themselves use OSO.  They would

20   delegate it to a sales assistant or something like

21   that, and only update it once a week rather than keep

22   it current.

23           But the computer system was realtime.  It

24   was global and realtime, but it only works well if

25   the human beings, you know, keep their forecast

1   current.

2        Q     Okay.  Did someone make a presentation of

3   OSO to you in the -- in December -- November or

4   December of 2000?

5            MR. LINDSTROM:  Objection; vague and

6   ambiguous.

7            THE WITNESS:  I had lots of presentations

8   on OSO and demonstrations of OSO, but I don't know.

9   BY MR. SOLOMON:

10       Q     Who was responsible -- who was in charge of

11  the upgrade, the OSO upgrade?

12       A     Combination of Mark Barrenechea and Ron --

13  it was distributed.  I mean, it would be -- the

14  people who own the system would be Mark Barrenechea

15  and Ron Wohl, and then all of the field executives

16  who were the users of the system, so Sergio

17  Giacoletto in Europe, and all the guys whose names

18  you have seen.

19       Q     Okay.  And would they -- would

20  Mr. Barrenechea and Mr. Police update you on the

21  progress at your Monday morning meetings?

22            MR. LINDSTROM:  Progress of what?

23  BY MR. SOLOMON:

24       Q     Of the OSO upgrade?

25       A     No.  No.  That would happen in the

**9/21/2006  Ellison, Lawrence Vol. II**

1    applications meetings on Wednesday or Thursday.

2        Q      Okay.

3        A      Well, actually, we had Monday afternoon

4    meetings called PDMC meetings where all the product

5    division heads were -- so it's possible -- yeah, it's

6    possible it happened on Monday afternoon.

7        Q      Okay.  And would that -- would there be

8    forecasting presentations based on OSO in those

9    Monday afternoon meetings?

10       A      No.

11              MR. LINDSTROM:  PDMC meetings?

12              THE WITNESS:  No.  The forecasting -- the

13   forecasting meetings occurred with the sales

14   executives, the meetings starting at 11:00 a.m. --

15              MR. SOLOMON:  Okay.

16              THE WITNESS:  -- and technical meetings

17   started at 2:00 p.m.

18              MR. SOLOMON:  Thank you.  So --

19              THE WITNESS:  And we would not do

20   forecasting in the afternoon meeting.  The engineers

21   in the afternoon, salespeople in the morning.

22   BY MR. SOLOMON:

23       Q      And would the forecasting presentations on

24   the Monday mornings be based on OSO?

25       A      If OSO was working.

1        Q      And was that a big if?

2        A      Well, no.  I mean, if we are in a

3    transition with a system -- I'm not sure when we

4    started our presentations.  I said -- I think there

5    was an earlier memo where I wanted OSO used for --

6    you know, for the presentation.  I wanted the --

7    someplace in this stack there's someplace me asking

8    that the forecast come out of the system rather than

9    come from people in the spreadsheets.  I'm not sure

10   of the exact date when we started having the Monday

11   forecast meetings using OSO.

12       Q      Okay.  Were you showing slides at the

13   forecast meetings on Monday mornings?

14              MR. LINDSTROM:  Vague as to time.

15              THE WITNESS:  Slides?

16   BY MR. SOLOMON:

17       Q      Mm-hmm.  Screen shots or physical slides.

18   I mean, I'm interested in what the OSO presentation

19   was.

20              Did they print out from OSO?

21       A      What did it look like when you made an OSO

22   present -- when you presented your forecast on OSO?

23       Q      Yeah.

24       A      Yeah, they were screen shots.  So,

25   literally, you would see the same thing that was on

```
1    your laptop would be projected on the screen.

2        Q     Were they preserved?

3        A     They were on a computer, the screen.  You

4    know, all it is is a dumb television screen.

5        Q     Okay.  So wherever it is, it would be

6    within OSO?

7        A     It would be within OSO --

8        Q     In the database?

9        A     In the database.

10             MR. LINDSTROM:  Hey, now.  I recognize it's

11   getting late, but you guys are starting to talk --

12             MR. SOLOMON:  Thank you.

13             MR. LINDSTROM:  -- over the top of each

14   other, and you both need to make sure you don't do

15   that, or we won't have a clean record, and you will

16   drive our Reporter crazy.

17             THE WITNESS:  Okay.

18             MR. SOLOMON:  Thank you.

19             Okay.  Let's go off the record for a couple

20   minutes while I organize.

21             THE VIDEOGRAPHER:  Off record at 5:10.

22             (Recess taken.)

23             THE VIDEOGRAPHER:  On the record at 5:17.

24   BY MR. SOLOMON:

25       Q     Do you know who Joe Lockhart is?
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      A      I do.

2      Q      And who is Joe Lockhart?

3      A      He was Bill Clinton's press secretary when

4  Bill Clinton was president, and he worked for Oracle

5  for a short period of time.

6      Q      And --

7      A      And head of PR.

8      Q      Okay.  And how did he -- how did it come

9  about that he was employed at Oracle?

10     A      I hired him.

11     Q      Okay.  Did you know him before you hired

12  him?

13     A      A little bit.

14     Q      You knew him in a business sense or

15  socially?

16     A      Professionally, I thought he had done a

17  good job for the president.

18     Q      And because he had done a good job for the

19  president, you thought he would be a good employee

20  for you?

21     A      If he would do it.  I was always a little

22  bit skeptical that Joe could leave the excitement of

23  Washington for the boredom of Silicon Valley --

24  relative boredom of Silicon Valley.

25     Q      And so did you call him up and ask him?

**9/21/2006  Ellison, Lawrence Vol. II**

1    How did it come about?

2        A    I don't recall how I first made contact

3    with Joe.

4        Q    Okay.  But at some stage you made contact,

5    and did you have a meeting with him?

6        A    Yes.

7        Q    And did you tell him that you were

8    interested in hiring him?

9        A    Yes.

10       Q    And did he express interest in being hired?

11       A    Yes.

12       Q    And by the end of that meeting, had you

13   hired him?

14       A    I don't think so.  I think it took a couple

15   of meetings.  He had to talk to his family.  He had

16   to think about it.  It was a big decision for him.

17       Q    Okay.  And what did you -- what did you

18   hire -- I know you said head of PR.

19            Was he head of PR for all of Oracle?

20       A    I believe so.

21       Q    Okay.  Did he have any special

22   responsibilities or duties owed to you?

23       A    None other than, you know, as head of PR.

24   I mean, at Oracle, I'm part of Oracle, so.

25       Q    And did you have any disputes with him

**9/21/2006  Ellison, Lawrence Vol. II**

1      while he was employed at Oracle?

2          A       Not that I recall.

3          Q       Did you -- when he left Oracle, do you know

4      why he left?

5          A       I think he left to go back to Washington to

6      form his own -- his own firm, his own consulting

7      firm.

8          Q       And is it true that he was only at Oracle

9      for a few months?

10         A       I believe so.

11         Q       And were you disappointed when he left?

12         A       Well, yes and no.  I mean, I thought it was

13     a bit of a stretch from being the president's press

14     secretary to be -- and being so familiar with what --

15     you know, the business of Washington, D.C.  I think

16     it's a major career change and change in direction to

17     come out to -- to come out to California and work for

18     a company.  So I'm not surprised -- I'm not surprised

19     that that happened.  In fact, I think we decided that

20     he wouldn't relocate until he had worked at Oracle

21     for a bit and fully understood what the job was and

22     then decided whether to commit for a long period of

23     time or not.

24         Q       Okay.  Did you ever discuss your securities

25     transactions with Mr. Lockhart?

```
1              MR. LINDSTROM:  Objection; vague and

2     ambiguous.

3              THE WITNESS:  I don't recall.

4     BY MR. SOLOMON:

5        Q    Okay.  I'm now focusing on the January 2001

6     securities transactions.

7              Did he have any kind of role in providing

8     PR?

9        A    I don't recall.

10       Q    All right.  There came a time in January of

11    2001 when you decided to exercise stock options that

12    were due to expire in August of '01; correct?

13       A    Yes.

14       Q    When did you make that decision?

15       A    I think after we closed the Covisant deal

16    and we were off to a strong -- off to a strong

17    quarter, I decided that would be the safest time for

18    me to sell my stock, when it looked like we had an

19    assured good quarter.

20       Q    And the Covisant deal was closed in the

21    first couple weeks of December 2000; is that right?

22       A    Yes.

23       Q    Okay.  So it was around the middle of

24    December that you made that decision?

25       A    Again, I'm not sure if that's what
```

**9/21/2006  Ellison, Lawrence Vol. II**

1   influenced my decision.  I don't know what -- you

2   know, exactly what day.

3        Q     Okay.

4        A     I think I might have also been on holiday

5   in the middle of December, so.

6        Q     Okay.  When you made the decision, who did

7   you communicate that you made the decision to?

8        A     Philip Simon.

9        Q     And what do you remember of that

10   communication?

11       A     That we would sell the options.  I'm

12   trying -- I think it was 22 million shares.  I'm

13   not -- I think that's the right number, 22 million

14   shares of stock.  It turns out the transaction was in

15   the last week of January, and so the transaction, I

16   think, was restricted to the stock had to be above

17   $30 a share.  The stock -- we had to have not more

18   than a certain volume per day and no trading after

19   January -- after the end of January.

20       Q     Okay.

21       A     Were the restrictions.

22       Q     Okay.  And was -- strike.

23             You made a decision after Covisant closed

24   in mid-December?

25       A     Sometime afterwards, yeah.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1        Q      You then communicated it to Mr. Simon?

2        A      Yes.

3        Q      And what time elapsed between you telling

4   Mr. Simon and then engaging in the stock sales?

5        A      I don't recall.

6        Q      If it was middle -- if it was the middle of

7   December, would you say it was four or five weeks?

8        A      I really -- I don't know if I told him in

9   the middle of December.

10       Q      So you don't know when you told him?

11       A      I don't know when I told him.

12       Q      Clueless?

13       A      Wouldn't say "clueless."  I said I don't

14   remember.

15              MR. LINDSTROM:  Objection; argumentative.

16   BY MR. SOLOMON:

17       Q      Who else did you communicate that decision

18   to?

19       A      I don't think anybody else.

20       Q      Okay.  And was there a reason why you

21   didn't communicate it to anybody else?

22       A      Philip's responsibilities was to clear it

23   with Dan Cooperman, our general counsel, and Jeff

24   Henley, our chief financial officer, and those were

25   the people that were told.
```

1        Q     Okay.  Did you delay -- after you made your

2     decision, do you remember delaying communicating that

3     decision to Mr. Simon?

4        A     I don't recall.

5        Q     Would it make any sense to delay informing

6     Mr. Simon?

7              MR. LINDSTROM:  Calls for speculation.

8              THE WITNESS:  I don't remember.

9     BY MR. SOLOMON:

10       Q     Do you remember the day that you started

11    exercising options and selling?

12       A     Again, I think it was the last week of

13    January.

14       Q     Okay.  And where were you, do you know,

15    when you started exercising and selling?

16       A     I think by then I was back in California,

17    but I don't know for certain.

18       Q     And were you in California for all of the

19    exercises in sales?

20       A     I think so, but I don't recall.

21       Q     Okay.  And if you were in California, were

22    you working?  Were you at the office?

23       A     I believe so.

24       Q     Okay.  And so is it your recollection that

25    while you were engaged in these stock transactions,

1    that, typically, you were in the office?

2         A     I really don't recall.

3         Q     Do you recall considering whether to

4    exercise and sell your stock in January or April or

5    thereafter?

6              MR. LINDSTROM:  Objection; vague and

7    ambiguous.

8              THE WITNESS:  Did I think about selling at

9    some other time?

10             MR. SOLOMON:  Correct.

11             THE WITNESS:  I knew I had to sell it

12    before August.

13             MR. SOLOMON:  Okay.

14             THE WITNESS:  Because they were -- the

15    options were expiring.

16             MR. SOLOMON:  Okay.

17             THE WITNESS:  We had a very strong, you

18    know, start to the quarter, so I thought that would

19    be the safest time to sell.

20    BY MR. SOLOMON:

21        Q     And were you very concerned about your debt

22    at that stage?

23        A     Very concerned.  I certainly wanted to pay

24    down my debt.

25        Q     And Mr. Simon had been calling you to do

```
1    that for some time?

2        A      Yes.

3        Q      Did you tell anybody within Oracle that you

4    had decided to exercise and sell your options in

5    April of 2001?

6        A      Not that I recall.

7        Q      Do you know who Deb Lange is, or "Lange"?

8        A      Yes, I do.

9        Q      Who is she?

10       A      She was our then head of tax, corporate

11   tax.

12       Q      Okay.  Did you tell her that it was your

13   intention of -- selling and exercising your stock in

14   April of 2001?

15       A      No.

16       Q      Did you discuss your exercise -- your

17   exercise of options and sale of stock with Ms. Lange

18   at any time?

19       A      I don't think I've ever had a private

20   conversation with Deb Lange in my life.

21       Q      What does Deb Lange do?

22       A      She was then head of tax for Oracle.

23       Q      Okay.

24       A      She worked for Jeff Henley.

25              MR. SOLOMON:  I've marked as next exhibit a
```

```
 1     document produced by Oracle with a Bates range --

 2     sorry, Control No. 042760 to 766.

 3                 (Exhibit No. 123 was marked for

 4                 identification.)

 5     BY MR. SOLOMON:

 6         Q     And just let me know if you have seen this

 7     before, please.

 8         A     I have not.

 9         Q     You see that your name's at the top on the

10     first page, and it says "Custom Calendar Report"?

11         A     Yes.

12         Q     Do you recognize the handwriting in this

13     document?

14         A     I don't.

15         Q     If you look at the page with the control

16     number 042762, there's a series of references to

17     Mexico --

18         A     Okay.

19         Q     -- beginning on December 20th.

20               Do you see that?

21         A     I do.

22         Q     And it seems to reflect that you were in

23     Mexico on those days?

24         A     Okay.

25         Q     Do you know where you were in Mexico?
```

1       A       I would be guessing, but I was probably in

2    Ixtapa or Zihuatanejo.

3       Q       Okay.  Would you be -- were you in a house

4    or on your boat?

5       A       On my boat.

6       Q       And if you then skip through to Control

7    No. 042764, you see that for Monday, January the

8    25th, it seems to reflect you are in the office;

9    correct?

10              MR. LINDSTROM:  I'm having difficulty

11   reading this.

12              Is that entry on control page 764?

13              MR. SOLOMON:  764, if you look --

14              MR. LINDSTROM:  You said January 25?

15              MR. SOLOMON:  Does it say the 15th?  I

16   can't see it very clearly either.

17              THE WITNESS:  Yeah, I think that's 15th.

18   BY MR. SOLOMON:

19      Q       Okay.  Seems to reflect you are in the

20   office; is that right?

21      A       I think so.

22      Q       Okay.  And then going to the next page,

23   which is 65, Friday, January 19th, reflecting that

24   you are in California; correct, the top of the page?

25      A       Yes.

**9/21/2006  Ellison, Lawrence Vol. II**

1        Q        And then Saturday, again, reflecting that

2     you are in the country but in Chicago; is that right?

3        A        Yes.

4        Q        And then from Sunday, the 21st, it reflects

5     you are in Mexico again?

6        A        That's what it says.

7        Q        Is that accurate?

8        A        I guess so.

9        Q        Okay.

10       A        I don't recall.

11       Q        And then it was just for three days?

12       A        No.  I think I did the GE Power call

13    from -- I would be surprised if I would go to Mexico

14    for three days.  So, again, I'm guessing a little

15    bit, but I think -- I certainly do GE Power calls --

16    I do a lot of calls on the boat, so I could have done

17    that.

18       Q        Okay.  And then it says GE Power call for

19    what looks to be the 24th; right, Wednesday?

20       A        Wednesday, yes.

21       Q        And then Thursday, it says "personal

22    meeting," but you don't know where you were then;

23    right?

24       A        Yeah.  My guess is I was in Mexico all that

25    week.

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1        Q      Okay.  And notwithstanding the fact that
 2    you were in Mexico, you were on your boat attending
 3    to Oracle business; is that right?
 4        A      Well, I certainly -- looks like I made the
 5    GE Power call.
 6        Q      There's no reference to the Friday of that
 7    week.
 8               Do you know why?
 9        A      No.
10        Q      Okay.
11        A      Or Saturday is gone also.
12        Q      You don't know why?
13        A      No.
14        Q      Do you know what those personal meetings
15    were?
16        A      Again, I -- I don't remember ever going
17    down to Mexico for three days.  I would -- looks like
18    I went to Chicago to pick up my family.
19        Q      Okay.
20        A      And then the family -- then we flew to
21    Mexico for the week.  That's my suspicion.
22        Q      And did you have business meetings with
23    anybody on your boat; do you recall?
24        A      In Mexico, no.
25        Q      Okay.  And you don't know what the personal
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    meetings there -- that are referred to there?

2        A    I assume that's just an extension of the

3    Mexico trip.

4        Q    Gotcha.

5             Then Monday you are back in -- does that

6    seem to reflect you are back in California?

7        A    Yes.

8        Q    Okay.  Now, you had to request clearance to

9    engage in your stock sales; correct?

10       A    Correct.

11       Q    And who did you request clearance from?

12            MR. LINDSTROM:  Well, when -- we need to be

13   a little bit careful, because I think he testified

14   that he had -- when you say "you," I want to make

15   sure there's no ambiguity as to whether it's him

16   personally or somebody acting on his behalf, because

17   I think -- I think he already told you that he had

18   that done by Philip Simon, but it was on his behalf,

19   so we just need to be careful in this part of the

20   transcript that we distinguish between what he's

21   doing and what's being done for him.

22   BY MR. SOLOMON:

23       Q    Did you request clearance to trade?

24            MR. LINDSTROM:  Vague and ambiguous.

25            THE WITNESS:  I told Philip to go ahead and
```

```
1    sell the options.

2            MR. SOLOMON:   Okay.

3            THE WITNESS:   And I -- and it's his

4    practice -- it's required -- he has to talk to both

5    our general counsel and our chief financial officer

6    to get clearance before I can trade.

7    BY MR. SOLOMON:

8        Q     Okay.  And did Mr. Simon ask you if you

9    were in possession of any material information?

10       A     No.

11       Q     And did you tell Mr. Simon that you weren't

12   in possession of any material information?

13       A     No.

14       Q     Do you know whether you were in possession

15   of material information?

16       A     I don't believe I was.

17       Q     Okay.  You had no conversations with

18   Mr. Simon, Mr. Coopman -- Mr. Cooperman or, in fact,

19   anybody else as to whether or not you were in

20   possession of inside information when you traded; is

21   that right?

22       A     Not that I recall.

23       Q     Do you recall when the issue of trading, of

24   exercising your options and selling stock with

25   respect to the 2001 expiring options, when that was
```

1    first raised?

2              MR. LINDSTROM:  Vague and ambiguous.

3              THE WITNESS:  Rephrase the question.

4              MR. SOLOMON:  Let me rephrase it.

5       Q    In January of 2001, you exercise sale of

6    stock options that were due to expire in August of

7    2001?

8       A    That's right.

9       Q    Do you recall when the issue -- when the

10   fact they were due to expire in August 2001 was first

11   brought to your attention?

12      A    18 months before.

13      Q    Okay.  And had you constantly been

14   considering, during that time, when to sell, when to

15   exercise and sell?

16      A    Not constantly.  No, not constantly, but

17   certainly from time to time, I thought about it.

18             MR. SOLOMON:  Okay.  Have marked as the

19   next exhibit a document produced by the defendants

20   with a control number 060974.

21             (Exhibit No. 124 was marked for

22             identification.)

23             THE WITNESS:  Okay.

24   BY MR. SOLOMON:

25      Q    Do you recognize this?

**9/21/2006  Ellison, Lawrence Vol. II**

 1        A       No.

 2        Q       You will see that it's an e-mail dated

 3    January 10, 2001 from Deb Lange to Jeff Henley.

 4                Do you see that?

 5        A       Yes.

 6        Q       The subject is Re:  LGA option -- LJE

 7    option exercise?

 8        A       Right.

 9        Q       And Deborah Lange writes:  Jeff, we are

10    working with Larry's accountants re the timing of him

11    exercising his options which expire August of this

12    year.  Larry may be willing to exercise in April if

13    it is beneficial to the company."

14                Do you see that?

15        A       I do.

16        Q       Is it true that you were willing to

17    exercise in April if it were beneficial to the

18    company?

19        A       No one ever asked me.

20        Q       Do you know why she said that, though?

21        A       She must have been talking to Philip or

22    someone, you know, about -- yeah, that -- sounds like

23    she wanted me to exercise my options in the current

24    fiscal year rather than waiting until August.

25        Q       Okay.

1    A      June, July, or August in the next fiscal

2    year.

3    Q      Okay.  And then the second paragraph reads:

4    "The unknown factor is the relative stock price"

5    between "April versus August -- a lower stock price

6    means lower income to Larry but a lesser deduction

7    for the company."

8           Do you see that?

9    A      Yes.

10   Q      Go on to say, "My general recommendation is

11   to ask Larry to do as much as possible in April, but

12   to have the right to modify that advice in April when

13   we have more visibility to FY01 results and the stock

14   market."

15          Do you see that?

16   A      Yeah.

17   Q      And you don't recall hearing a

18   recommendation that you do as much as possible in

19   April of 2001?

20   A      No one ever asked me.

21          MR. SOLOMON:  Okay.  Let's have marked as

22   the next exhibit another document produced by the

23   defendants with control number 039432.

24          (Exhibit No. 125 was marked for

25           identification.)

**9/21/2006  Ellison, Lawrence Vol. II**

```
1              THE WITNESS:  Okay.

2    BY MR. SOLOMON:

3        Q     Do you recognize this?

4        A     No.

5        Q     And you will see that it's an e-mail dated

6    Friday, January 19, 2001 from Safra Catz to Dan

7    Cooperman.

8              Do you see that?

9        A     Yes.

10       Q     And there's a message from Dan Cooperman to

11   Safra Catz concerning her intention to engage in a

12   same-day exercise and sale.

13             Do you see that?

14       A     I do.

15       Q     And then you will see that there's a

16   message at the top:  "I just found out something so I

17   don't think I should trade."

18             Do you see that?

19       A     I do.  I do.

20       Q     Do you have an understanding what Safra

21   Catz is referring to?

22       A     I think she's referring to she found out

23   that I was trading.

24       Q     Okay.  Why would Ms. Catz not want to trade

25   if you were trading?
```

1              MR. LINDSTROM:  Objection; calls for

2     speculation, no foundation.

3              THE WITNESS:  I don't know.

4     BY MR. SOLOMON:

5         Q    Okay.  And why do you suspect that that's

6     what she found out?

7         A    I think that's what my lawyers told me.

8         Q    They are going to punch you now.

9              Now, Ms. Catz would have been a recipient

10    of the January 17 Flash report as well, wouldn't she?

11        A    Yes.

12        Q    Okay.  And she would have learned things in

13    that document, wouldn't she?

14             MR. LINDSTROM:  Objection; no foundation,

15    calls for speculation.

16    BY MR. SOLOMON:

17        Q    She would have learned the information --

18        A    She would have certainly looked at the

19    document, I guess, yeah.

20             MR. SOLOMON:  Marked as the next exhibit --

21    mark as the next exhibit another document produced by

22    the defendants with the control number 035359 and

23    360.

24             (Exhibit No. 126 was marked for

25             identification.)

**9/21/2006  Ellison, Lawrence Vol. II**

1    BY MR. SOLOMON:

2        Q      Let me know if you recognize this.

3        A      No, I have not.

4        Q      Okay.  Now, this appears to reflect that

5    Safra Catz is saying that she has the forms for

6    exercising, selling her options and she will mail

7    them back.

8                Do you see that at the top?

9        A      Yes.

10               MR. LINDSTROM:  Objection; calls for

11   speculation.

12               THE WITNESS:  Yeah, but I'm not sure what

13   it means, "got them."  I don't know what "them" is.

14   BY MR. SOLOMON:

15       Q      You don't know why Ms. Catz was sending

16   these documents back, having said earlier that she

17   had learned something and she wouldn't trade?

18               MR. LINDSTROM:  Objection; calls for

19   speculation, no foundation.

20               THE WITNESS:  I don't know.

21               (Reporter clarification.)

22   BY MR. SOLOMON:

23       Q      Did you have a conversation with Ms. Catz

24   in which you informed her that you were trading?

25       A      I don't recall.

1              MR. SOLOMON:  Marked as the next exhibit a

2    document produced by the defendants with the control

3    number 035365.

4              (Exhibit No. 127 was marked for

5              identification.)

6              THE WITNESS:  Okay.

7    BY MR. SOLOMON:

8         Q    Okay.  Do you recognize this?

9         A    Vaguely.

10        Q    Okay.  And was it you that initiated a

11   request to Mr. Lockhart that he draft a press

12   release?

13        A    I don't recall.

14        Q    Do you recall reviewing the draft press

15   release?

16        A    I believe I did.

17        Q    Okay.  And were you -- did you approve the

18   press release as written by Mr. Lockhart, do you

19   know?

20        A    I don't think we issued the release.

21        Q    Okay.  And was that because in -- some of

22   the news leaked into the market?

23        A    I don't -- I just don't remember.

24        Q    Do you know why the release was being

25   contemplated?

1      A      To reassure people, again, that I was

2    selling -- what was a large dollar amount, it was a

3    very, very small percentage of my holdings.  I was

4    still -- whenever I sell stock, I worry that people

5    think I'm losing confidence in the company.  I think

6    it was important that they knew that I was, you

7    know -- 98.5 percent of my stock I was continuing to

8    hold.

9      Q      Okay.  It was your desire, I assume, to get

10   the highest price you could for your stock?

11     A      Sure.

12     Q      And whose idea was it to set a floor of $30

13   per share?

14     A      Mine.

15     Q      And who did you communicate that to?

16     A      Philip Simon.

17     Q      Anybody else?

18     A      Well, I think he talked to -- obviously the

19   people on the trading desk had to know.  So

20   indirectly -- indirectly, the people who were selling

21   the stock had to know what the floor price was.

22     Q      Okay.  Did you discuss it with Jeff Henley?

23     A      I didn't.  I didn't discuss it with Jeff

24   Henley or Dan Cooperman.  I don't know if Philip

25   Simon did.

1    Q      Were you aware at the time of your stock

2    sales that earlier that same month Mr. Henley had

3    exercised and sold Oracle securities?

4    A      No, did not know.

5    Q      Are you aware that he also set a floor of

6    $30 per share?

7    A      No.

8    Q      And that would be just a coincidence, as

9    far as you know, if that's true?

10   A      Yes.

11   Q      And after you had exercised the expiring

12   options and sold, isn't it true that you continued to

13   sell?

14   A      Yes.

15   Q      What prompted the decision to continue to

16   sell?

17   A      I don't want to go into the market very

18   often.  Again, whenever I go into the market and sell

19   stock, people begin to speculate that I'm losing

20   confidence in the company.  I own a very large

21   portion of the company.  So I only like to do it once

22   and then not sell again for a very, very long time.

23   I wanted to pay down more of my debt.  I thought, I

24   was in the market that week, I would keep selling

25   that week, you know, given -- you know, within the

1    limits of the volume restrictions and the price

2    restrictions, and at the end of that week, I would

3    then stay out of the market for as long as I could.

4        Q    Okay.  And, in total, you realized

5    proceeds -- aggregate proceeds of around $894

6    million; is that right?

7        A    I believe so.

8        Q    And what were the proceeds used for?

9        A    Some of it was used to pay down debt; some

10   of it was retained in cash, largely for investments;

11   other was retaining cash for -- to pay taxes.

12       Q    And is it true that you had a significant

13   multimillion-dollar payment due on the "Rising Sun"

14   in that fiscal quarter?

15       A    I don't recall, but it certainly could be

16   true.

17       Q    Do you know if you paid it?

18       A    If it was due, I paid it.

19       Q    Do you always pay on time?

20       A    Pretty much.

21            MR. SOLOMON:  Have marked as the next

22   exhibit another document produced by the defendants,

23   Control Nos. 005595 to 601.

24            (Exhibit No. 128 was marked for

25            identification.)

1               THE WITNESS:  Okay.

2     BY MR. SOLOMON:

3         Q     Okay.  Have you seen this before?

4         A     Yes.

5         Q     And it's Oracle's insider trading policy?

6         A     It's our stock trading policy, yes.

7         Q     And are you familiar with its contents?

8         A     Generally.

9         Q     Okay.  I'm looking at the second page, the

10    second full paragraph, beginning:  "Trading on inside

11    information."

12              Do you see that?

13        A     Second paragraph -- second full paragraph?

14        Q     Yes.

15              Says, "Trading on inside information can

16    include making a single purchase or sale, or engaging

17    in or facilitating a pattern of transactions, which

18    might appear to take advantage of inside information

19    possessed by others at Oracle.  You need not actually

20    use or rely on inside information, but simply possess

21    it at the time of the trade, to be considered trading

22    on inside information."

23              Were you aware of that?

24        A     Yes.

25              MR. SOLOMON:  Have marked as the next

```
 1    exhibit a document produced by the defendants in this

 2    litigation with the control numbers 028735 and 736.

 3              (Exhibit No. 129 was marked for

 4              identification.)

 5              THE WITNESS:  Okay.

 6    BY MR. SOLOMON:

 7        Q    And do you recognize this?

 8        A    Yes.

 9        Q    Okay.  It's dated the 12th of October 2000,

10    and it's from you -- at least part of the document's

11    from you -- to Michael Rocha.

12              Do you see that?

13        A    Yes.

14        Q    And you say, "Thanks for the update.  I

15    will let you know how it goes.  Larry."  Correct?

16        A    That's right.

17        Q    And that refers to a meeting you were

18    scheduled to have with Carly Fiorina the following

19    day?

20        A    Yes.

21        Q    Now, do you have a recollection of a deal

22    transacted with HP in the second fiscal quarter of

23    2001?

24        A    Second fiscal quarter in 2001.  I don't.

25        Q    Okay.  You weren't involved?
```

1          MR. LINDSTROM:  Objection; vague and

2    ambiguous as to "involved."

3          THE WITNESS:  Yeah.  Again, I don't -- I'm

4    not sure what you mean by "involved."  I'm certainly

5    part -- I certainly helped maintain our relationship

6    with Hewlett-Packard.

7          MR. SOLOMON:  Okay.

8          THE WITNESS:  But I'm not sure that we had

9    a -- I mean, I'm taking your word for it that we had

10   a transaction in the second fiscal quarter.

11   BY MR. SOLOMON:

12       Q    But you don't remember it?

13       A    I don't remember it.  In 1999 -- in other

14   words, in 1999.  Second fiscal quarter would be -- of

15   2000 will be in 1999.

16       Q    I'm sorry if I said 2000.  I meant second

17   fiscal quarter of 2001.

18       A    2001.

19       Q    Yes.

20       A    So in 2000?

21       Q    Correct.

22       A    I don't know.  I don't know when the big --

23   what quarter the big HP deal was in.

24       Q    Okay.  Do you recall what the deal was?

25       A    We sold them a lot of CRM software.  They

1    were going to standardize on our CRM products, or at

2    least make broad use of our CRM products, and we were

3    going to use HP hardware in our engineering

4    organization and our production -- and for our

5    production database servers for -- and in a number of

6    areas.

7         Q    Okay.  Was it a swap transaction?

8              MR. LINDSTROM:  Objection; asked and

9    answered, calls for a conclusion.

10             THE WITNESS:  "Swap transactions" is an

11   accounting term, and I don't know what's -- I don't

12   know -- we looked at -- you know, our accountants

13   looked at this transaction very, very carefully.

14   They were aware that they were -- you know, we were

15   buying hardware; HP was buying software, and we

16   believe we have accounted for it properly.

17             MR. SOLOMON:  I've marked as the next

18   exhibit a document produced by the defendants --

19   excuse me, produced by Hewlett-Packard with the

20   control numbers 00061263.

21             We will mark this a little later.

22        Q    Okay.  So you don't have any recollection

23   right now of the last day of being involved in an HP

24   transaction on the last day of the second fiscal

25   quarter of 2001?

```
 1        A      I said I don't remember what day -- what

 2   day the HP transaction was.

 3        Q      Okay.

 4        A      I didn't say I didn't have any recollection

 5   of it; I just don't know what the date was.

 6        Q      Okay.  Regardless of the date, were you

 7   involved in closing that deal?

 8        A      What do you mean by close?  Again, I'm not

 9   trying to be cute here, but I certainly had

10   discussions with Hewlett-Packard.  You know, I'm the

11   one -- I'm the only one who can commit our company to

12   use Hewlett-Packard gear on the engineering side of

13   our business.  I run engineering directly at Oracle,

14   have from the beginning.

15            So in the sense that I said, yes, we would

16   use Hewlett-Packard gear underneath our -- our

17   main -- what's called global single systems, our main

18   production systems, and use it in our development

19   organization, I made those decisions, so certainly

20   involved in making those decisions, but actually, you

21   know, shaking hands, signing the contract, you know,

22   hammering out the terms and conditions, negotiating

23   the terms and conditions, I don't do.

24        Q      Okay.  Do you recall whether you felt

25   confident or not on the last day of the fiscal
```

```
1     quarter of 2000 -- second fiscal quarter of 2001,

2     confident whether or not Oracle would make its

3     numbers?

4               MR. LINDSTROM:  For that quarter?

5               MR. SOLOMON:  For that quarter.

6               THE WITNESS:  I don't recall.

7               MR. SOLOMON:  So mark as the next exhibit a

8     document produced by the defendants with the control

9     number 021378 to 381.

10              (Exhibit No. 130 was marked for

11               identification.)

12              THE WITNESS:  Okay.

13    BY MR. SOLOMON:

14        Q     Okay.  Do you recognize this?

15        A     I do.

16        Q     And is that your signature on the last

17    page?

18        A     It is.

19        Q     And it's dated November 30, 2000?

20        A     Yes.

21        Q     And it's a letter from you to Carly

22    Fiorina?

23        A     Yes.

24        Q     And if you turn the document upside down,

25    you will see it says, "Sent By:  Atherton."
```

**9/21/2006  Ellison, Lawrence Vol. II**

1          Do you see that?

2     A     Oh, yes.  Right.

3     Q     Does that reflect the fact that this was

4  sent from your house?

5     A     I guess so.

6     Q     Okay.  And if you turn it the right way up

7  again, then there's a fax line that says:  December

8  '01 00 10:43 Bardwick.

9          Do you see that?

10    A     I do.

11    Q     Do you know what that refers to?

12    A     I do not.

13    Q     And it says -- the letter starts, saying,

14  "Dear Carly:  As we discussed, it is my intention

15  that various Oracle computing environments will be

16  moved to HP as discussed in more detail below," and

17  then there's the detail.

18          Do you see that?

19    A     I do.

20    Q     And had you discussed that intention with

21  Carly as you say here?

22    A     I think we spoke in general terms of -- of

23  using Hewlett-Packard hardware more broadly

24  throughout Oracle.  We had never gone into this level

25  of detail between the two of us.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q    Okay.  Now, was the HP deal referred to

2    here the subject of any meetings of the board of

3    directors of Oracle?

4      A    I have no idea.

5          MR. SOLOMON:  So mark as the next exhibit a

6    document produced by the defendants with the control

7    numbers 044428 through 505.

8          (Exhibit No. 131 was marked for

9          identification.)

10          THE WITNESS:  Could you read back his

11    previous question for me, please.

12          (Record read by the Reporter as follows:

13          "QUESTION:  Okay.  Now, was the HP deal

14          referred to here the subject of any

15          meetings of the board of directors of

16          Oracle?")

17          THE WITNESS:  The subject of any meetings.

18          Okay.  Was it ever -- by that do you mean

19    was it ever discussed in any board meetings, or was

20    there a special board meeting about the HP deal?

21    BY MR. SOLOMON:

22      Q    Was there a special board meeting.

23      A    About the HP deal?

24      Q    Yes.

25      A    Not that I know of.

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1        Q      If you go to the control-numbered page

 2     044434 -- and, just for the record, while you are

 3     going to that page, this is a document, as I say,

 4     produced by the defendants, and it appears to be a

 5     collection of board meeting minutes and associated

 6     documentation.

 7               And looking at that page, Mr. Ellison, you

 8     will see that there's a special meeting, at the top

 9     of the page, on November 30th, 2000, but that there's

10     a redaction stamp.

11               Do you see that?

12        A      Yes.

13        Q      Do you know what the special meeting on

14     November 30th was about?

15        A      I don't, but it was not a board meeting; it

16     was what's called an Executive Committee meeting.

17        Q      And is that a committee of the board?

18        A      It's a committee of the board, yes.

19        Q      And does your answer change, then, if I ask

20     you was there a special meeting of the Executive

21     Committee with respect to the HP transaction?

22        A      The answer goes to I don't know.

23        Q      Okay.  And you don't know what's redacted;

24     is that right?

25        A      No.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q     Okay.  What is the Independent Committee?

2      A     Independent Committee certifies potentially

3  conflicted -- conflicting transactions.  I own a

4  company -- I own a disk drive company called Pillar

5  Data.  If Pillar -- Pillar Data bought Oracle

6  software, so the Independent Committee had to approve

7  the pricing and terms and conditions when we are

8  selling because I own that.

9      Q     Do you know why information with respect to

10  the Independent Committees has been redacted?

11      A     I have no idea.

12      Q     Okay.  Now, if you go into the document

13  further to 044458, you will see there's a reference

14  to a November 30th, 2000 meeting -- special meeting

15  of the Executive Committee.

16            Do you see that?

17      A     Yes.

18      Q     Okay.  And it reflects the fact that you

19  and Mr. Henley were present and a quorum established

20  and Mr. Lucas, the third member of the committee, was

21  not in attendance; right?

22      A     Yes.

23      Q     And also there was Safra Catz and Daniel

24  Cooperman.

25            Do you see that?

1      A    I do.

2      Q    Okay.  And it says the meeting was called

3    to order, etc., and then under 2, it says, "Approval

4    of purchase of hardware and services from the," and

5    then we get no more information.

6          Do you see that?

7      A    I do.

8      Q    Do you have any idea what's there or what

9    should have been there, what would be there but for

10   the redaction?

11     A    Want me -- I could guess.

12     Q    If that's all you can do.

13         MR. LINDSTROM:  Objection; calls for

14   speculation.

15   BY MR. SOLOMON:

16     Q    I'll take the guess.

17     A    It's possible that the actual purchase of

18   HP hardware exceeded my purchasing authority, so it

19   was more money, more money than I was authorized to

20   spend, but, again, I'm just --

21     Q    Okay.

22     A    -- making a guess.

23     Q    Okay.  But you don't understand, if that

24   were the case, why the information would be redacted?

25         MR. LINDSTROM:  That calls for speculation,

1    no foundation.

2              THE WITNESS:  I have no idea what it's

3    about.  I'm guessing.

4    BY MR. SOLOMON:

5        Q    Do you have any understanding whether this

6    meeting addressed HP?

7        A    No idea.

8              MR. SOLOMON:  I would ask counsel to

9    produce unredacted copies of --

10             THE WITNESS:  Oh, let me -- let me refine

11   that.  Since it is hardware and services, there just

12   aren't that many companies we buy hardware and

13   services from.  It's a very small list.

14             MR. SOLOMON:  So it's probably HP.

15       Q    You think it's HP?

16             MR. LINDSTROM:  Objection; calls for

17   speculation.

18             THE WITNESS:  If you forced me to bet, yes,

19   I would bet it would be HP.

20   BY MR. SOLOMON:

21       Q    Fair to say you believe it's HP?

22       A    No.  I'm still -- I believe I'm making a

23   decent guess.

24       Q    Okay.  That's fair enough.

25             Again, Counsel, we want full production of

```
 1    that document, please.

 2                MR. LINDSTROM:  We will take your request

 3    under advisement.

 4                MR. SOLOMON:  Reserve the right to continue

 5    questioning Mr. Oracle about the transaction --

 6    Mr. Ellison about the transaction.

 7                Did I say "Mr. Oracle"?

 8                THE WITNESS:  You did.

 9                MR. LINDSTROM:  I think that was a

10    compliment.

11    BY MR. SOLOMON:

12        Q    Do you recall receiving any legal advice

13    concerning the transaction with HP at the end of

14    2Q01?

15                MR. LINDSTROM:  You may answer that "yes"

16    or "no."

17                THE WITNESS:  No.

18                THE VIDEOGRAPHER:  20 minutes, Counsel.

19    BY MR. SOLOMON:

20        Q    Do you recall whether HP implemented the

21    software being sold to it by or licensed to it by

22    Oracle?

23        A    I believe they went through the process of

24    implementation.  I believe they had a project and

25    started to -- and started to implement.
```

1       Q      And was it successful, do you know?

2       A      I don't believe so.

3              MR. SOLOMON:  Okay.  Let's go off the

4       record for a couple minutes.

5              THE VIDEOGRAPHER:  Off record at 6:15.

6              (Discussion off the record.)

7              THE VIDEOGRAPHER:  On record at 6:16.

8              This marks the end of Tape 4, Volume 2, in

9       the deposition of Larry Ellison.

10             At 6:16, going off the record.

11             (Recess taken.)

12             (Record read by the Reporter as follows:

13             "QUESTION:  Do you recall whether HP

14             implemented the software being sold to it

15             by or licensed to it by Oracle?

16             ANSWER:  I believe they went through the

17             process of implementation.  I believe they

18             had a project and started to -- and started

19             to implement.

20             QUESTION:  And was it successful, do you

21             know?

22             ANSWER:  I don't believe so.")

23             THE VIDEOGRAPHER:  And on record at 6:31.

24             This marks the beginning of Tape 5,

25       Volume 2, in the deposition of Larry Ellison.

1            MR. SOLOMON:  I've marked as the next

2    exhibit a document produced by the defendants with

3    the control number 034883.

4            (Exhibit No. 132 was marked for

5            identification.)

6    BY MR. SOLOMON:

7        Q    Now, the question is:  Do you recognize it?

8        A    I do.

9        Q    And this is an e-mail from you dated 21st

10   of April 2000 and it goes to Jay Nussbaum and copies

11   Safra Catz?

12       A    Yes.

13       Q    And it's concerning BellSouth, and at the

14   bottom, it says, "Jay Nussbaum wrote:  Safra/Larry, I

15   surrender.  I thought you verbally approved this.

16   Why is this becoming" so "painful.  This is a great

17   customer and we're quickly losing ground.  Please

18   help."

19            Do you see that?

20       A    I do.

21       Q    And do you know what the approval is that

22   Mr. Nussbaum is referring to?

23       A    Well, the one I -- the one I specifically

24   refer to and the one I found unacceptable is -- from

25   reading this note, which refreshes my memory, is

**9/21/2006  Ellison, Lawrence Vol. II**

```
1    provision where they -- they want us to develop
2    modifications.  Specifically -- they want us to
3    basically enhance the software or change the software
4    so it works perfectly at BellSouth, put in whatever
5    they want us to put in, and then when we are done, we
6    will just make it -- turn it into a standard product.
7              So what's fine for a telephone company,
8    very specific stuff for telephone company, everyone
9    will receive:  hospitals, just -- it's just very --
10   it's crazy.
11       Q     And is the technical term for that
12   "wackfuck"?
13       A     That is the technical term.
14       Q     Did you make that one up yourself?  I
15   haven't heard of it.
16       A     I think it's British.  I think it's
17   British.
18       Q     I should know that.  I've been away too
19   long.
20             I'm interested in the e-mail address.  It
21   says lellison-vaio-katana.us.oracle.com.
22             Do you see that?
23       A     I'm looking for it.
24             MR. LINDSTROM:  At the top.
25             THE WITNESS:  See it from -- okay.  I don't
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      think that's an e-mail address.  I'm not sure what

2      that is.  That could be a router address.

3      BY MR. SOLOMON:

4          Q      Okay.  Would this --

5          A      That doesn't like an e-mail -- that is

6      not -- I'm pretty certain that's not an e-mail

7      address.

8          Q      Okay.  Does it indicate that you were on

9      the boat at the time you wrote the e-mail?

10         A      I think so.

11         Q      Okay.  And was -- were you on this same

12     boat on your Mexican trips in late 2000, early 2001?

13         A      No.

14         Q      What boat were you on then?

15         A      "Ronin," a boat called "Ronin."

16         Q      Okay.  And that would have -- would that

17     have -- well, you are saying it's not an e-mail

18     address.

19             Would it have a similar address, whatever

20     it is, or router address?

21         A      Router address?  Yeah.  It goes from my

22     e-mail address into a router and a switch, and it

23     passes across several different things before it

24     final gets to the e-mail server.

25         Q      Gotcha.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1              So -- okay.  So to the extent you e-mailed
2       in late December 2000 and January 2001 from that
3       boat, those e-mails would disclose the name of the
4       boat as the name of the boat is disclosed here?
5              MR. LINDSTROM:  No foundation, calls for
6       speculation.
7              THE WITNESS:  I don't know.
8              MR. SOLOMON:  Okay.
9              THE WITNESS:  But it is -- from the -- you
10      can see the account, the account is
11      lellison@us.oracle.com, which is our old-fashioned
12      e-mail addresses.
13      BY MR. SOLOMON:
14         Q    Okay.  And, again, somewhere, the computer
15      that was both on the "Katana" and on "Ronin"?
16         A    "Ronin," yes.
17         Q    They still exist, but you don't know where?
18         A    They do still exist, yes.
19         Q    In lawyers' offices?
20         A    Yes.
21             MR. SOLOMON:  Have marked as the next
22      exhibit a document produced by defendants with the
23      control numbers 035682 to 685.
24             (Exhibit No. 133 was marked for
25             identification.)
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    BY MR. SOLOMON:

 2        Q      When you have had a chance to review it,

 3    let me know if you recognize it.

 4        A      I don't recognize it.

 5        Q      Okay.  You will see that it's dated Monday,

 6    January 29, 2001, and it -- on the front page, it's

 7    an e-mail exchange from Safra Catz to Scott Little?

 8        A      Yes.

 9        Q      Do you know who Scott little is?

10        A      I do not.

11        Q      The title is "Forwarded:  Update for LJE's

12    meeting on BMC Software."

13               Do you see that?

14        A      I do.

15        Q      Do you remember having a meeting as

16    reflected here?

17        A      Say again.

18        Q      Did you have that meeting as reflected

19    here?

20        A      I don't recall.

21        Q      And then it says, "Larry ended up out sick

22    all last week."

23               Do you see that?

24        A      Yes.

25        Q      So were you out sick all of the week of
```

1       January 22?

2           A       I think this got -- the -- my calendar said

3       I was in Mexico.

4           Q       Correct.

5           A       Yeah.

6           Q       And so were you sick in Mexico or --

7           A       I don't think so.

8           Q       So you were vacationing in Mexico?

9           A       I think so.

10                  MR. SOLOMON:  And we will have marked as

11      the next exhibit a Bloomberg News article dated

12      January 24th, 2001.

13                  (Exhibit No. 134 was marked for

14                  identification.)

15                  THE WITNESS:  Maybe I was sick in Mexico.

16      I don't know.  I don't remember being in Mexico.  I

17      don't remember being sick.  I just don't recall.

18      BY MR. SOLOMON:

19          Q       So you will see that the headline is

20      "Oracle CEO Ellison Loses Voice, Misses 2 Public

21      Talks In A Week."

22                  You see that?

23          A       Yeah.

24          Q       And you will see that Ms. Glass is quoted

25      as saying, "He does not have a voice, but he's

1      actively working by e-mail."

2              Do you see that?

3      A      Yes.

4      Q      Is it possible that this was a white lie

5      and you were vacationing and it was an excuse?

6      A      What's wrong with saying I'm on holiday --

7      Q      That's what --

8      A      -- on vacation?  So I have no -- maybe I

9      was sick.  I really don't remember.

10     Q      Okay.  And do you have any recollection of

11     the public appearances that you missed that you were

12     scheduled to appear at?

13     A      No.

14     Q      And was it a deliberate -- did you

15     deliberately go on vacation in order to be away from

16     work when you exercised your stock options?

17     A      No.

18              MR. LINDSTROM:  Objection.

19     BY MR. SOLOMON:

20     Q      No connection.

21     A      I'm not even sure I went away.  My calendar

22     said I was in Mexico, but, you know, I don't

23     remember.

24     Q      Okay.

25     A      I assume I was.  According to all this,

1      this is saying I'm sick, you know.

2           Q      Okay.

3           A      I don't know.

4                  MR. SOLOMON:  Okay.  Let's have marked as

5      the next exhibit a document produced by Oracle with

6      control numbers 025020 and 021.

7                  (Exhibit No. 135 was marked for

8                  identification.)

9                  THE WITNESS:  Okay.

10     BY MR. SOLOMON:

11          Q      Okay.  Do you recognize this?

12          A      Yes.

13          Q      And it's dated Thursday, November 30th,

14     2000, and it's from Gary Roberts to you, and it

15     copies others.

16                 Do you see that?

17          A      That's correct.

18          Q      And it starts off saying, "Larry, I

19     believe" -- "Larry, I believe you'll be discussing

20     discounts with HP today.  Please keep these figures

21     in mind," and then there's a lot of detail.

22                 Do you see that?

23          A      I do.

24          Q      Now, does this not reflect -- does this not

25     reflect your engaging in negotiating with HP

1    concerning the deal?

2        A      It reflects that Gary Roberts thinks I

3    engage in price negotiations with Carly Fiorina and

4    we're -- argue about how much we can get -- discount

5    we can get on each server.  I guess -- that's what he

6    does, and it's his job.  He was the then head of the

7    data center, and he would -- he and Maria Maskiewicz

8    would negotiate the best possible prices for our

9    hardware, and it's a very important job, but I don't

10   give him much help.

11           MR. SOLOMON:  Okay.  I've marked as the

12   next exhibit a document with the control numbers

13   020835 through 838.  It was produced by the

14   defendants.

15           (Exhibit No. 136 was marked for

16            identification.)

17   BY MR. SOLOMON:

18       Q      And I'm sorry, Mr. Ellison, just with that

19   last exhibit, this would have been in your files as

20   of November 30th, 2000; correct?

21       A      Yes.

22       Q      And it wasn't produced from your files and

23   you can't explain why; is that correct?

24       A      That's correct.

25       Q      I'm going to show you a document that has a

1    little bit -- just give that back to me.  That's

2    fine.  That has a little bit of highlight on it, but

3    it's going to ease -- it's going to save some time if

4    I do that.

5              So I just marked as the next exhibit --

6    thank you.

7              (Discussion off the stenographic record.)

8    BY MR. SOLOMON:

9        Q    And, Mr. Ellison, my question is going to

10   be:  Do you recognize the handwriting?

11             MR. LINDSTROM:  While he's looking at the

12   document, just for sake of the record, Mark, can you

13   identify the highlighting and any other marks that

14   are on here that came from your office?

15             MR. SOLOMON:  Sure.

16       Q    The highlight, I believe, Mr. Ellison, on

17   the document you are looking at is where it says,

18   "Dear Carly" on the front page and that first

19   sentence and the signature, "Best regards, Larry

20   Ellison."  I don't believe there's any other

21   highlighting.

22             Correct me if I'm wrong.

23             MR. LINDSTROM:  And then on the copy that

24   has been distributed to counsel, in the upper

25   right-hand corner, it says "Source to Sanderson" and

1    somebody else's handwriting.  Looks like a Post-it

2    that's been copied or something like that.

3              MR. SOLOMON:  You -- that is -- with that

4    waiver, I think that's ours.

5              MR. LINDSTROM:  Okay.

6              MR. SOLOMON:  In that corner.  Okay?

7              MR. LINDSTROM:  That's fine.  And it does

8    not appear, for the record, on the version that's

9    been marked as Exhibit 136.

10             MR. SOLOMON:  Correct.  Thank you.  Yeah.

11             MR. LINDSTROM:  Oh, Counsel points out --

12             MR. SOLOMON:  I should have just copied it,

13   shouldn't I?

14             MR. LINDSTROM:  No.  Counsel -- counsel

15   points out that the Post-it covered up a little bit

16   of the handwriting that appears on the -- beneath it,

17   starting from -- looks like "Where" -- that -- can

18   you read that first bullet point to us, if you are

19   able to?

20             MR. SOLOMON:  Yes.  Mr. Ellison has it.

21             MR. LINDSTROM:  So you are working with the

22   same copy I am?

23             MR. SOLOMON:  I'm afraid I am.

24             "Where is this the same as committed in

25   the" -- I don't know.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Can you read that writing?

2      A      I'll try.

3      Q      I guess, is it your writing, is what --

4      A      No, it's not my writing.  I'd have a better

5      chance with my writing.

6      Q      You know, we don't need to dwell on it.  If

7      it's not your writing --

8      A      I think it's "Where in this is the same" --

9      "Where in this is the same as committed" -- sounds

10     like a lawyer, doesn't it?

11     Q      A bit.

12     A      Yeah, a little bit.

13     Q      It looks a little bit like your writing;

14     that's why I was asking --

15     A      No.

16     Q      -- if it's not, we can move on.

17     A      No, it's not my writing.

18     Q      Do you recall a dispute arising with HP

19     concerning the applications sale or lease that Oracle

20     engaged in with them?

21     A      Not offhand.  I know that they were -- they

22     had problems with the software.  They had problems

23     with the software, but -- is that what you were

24     referring to?

25     Q      Yes.

1        A       Yeah.

2        Q       And did the outcome cost Oracle money?

3        A       Did we pay HP some -- I think we probably

4    provided HP with some --

5               MR. LINDSTROM:  He doesn't -- don't

6    speculate.

7    BY MR. SOLOMON:

8        Q       You know I'm going to ask anyway, so you

9    may as well.

10              MR. LINDSTROM:  Or at least let's make it

11   be clear that you are speculating.

12              THE WITNESS:  Okay.  I recall we did some

13   pro bono consulting to help them with the

14   implementation.  But in the end, they decided to go

15   with Siebel.

16              MR. SOLOMON:  Gotcha.  Thanks.

17              Have marked as the next document a document

18   produced by the defendants in this litigation with

19   the control numbers 069907 to 939.

20              (Exhibit No. 137 was marked for

21              identification.)

22   BY MR. SOLOMON:

23       Q       And when you have had a chance to review

24   it, let me know if you recognize it.

25       A       I don't recognize seeing the document

9/21/2006  Ellison, Lawrence Vol. II

1    before, but, again, I'm very familiar with the issues

2    that are discussed in the document.

3        Q    Okay.  And you will see that on the third

4    page of the document, you are on the distribution

5    list.

6             Do you see that in the distribution list

7    box, your name is the first name?

8        A    Yes.  Yes.

9        Q    And do you understand -- do you believe you

10   did receive this?

11       A    No, I believe I received it.

12       Q    And it's called, for the record,

13   "E-Business Suite High Level Requirements Document"?

14       A    Right.

15       Q    It's dated April 4th of 2002, is the

16   creation date.  It was last updated on June 6th,

17   2002.  It's Version 1.4, and it has the designation

18   "Oracle Internal & Confidential."

19       A    Yes.

20       Q    And then on the page that has the

21   distribution list, it says, in the middle, "Due to

22   the sensitive nature of the contents outlined, this

23   document is strictly confidential and strictly for

24   Oracle internal use only.  If you are not an Oracle

25   employee, please delete this document immediately."

1          Do you see that?

2     A     Yes.

3     Q     Do you have an understanding who created

4  this document?

5     A     Our field engineers -- the people who are

6  responsible for implementing our applications around

7  the world, and we are familiar with their strengths

8  and their weaknesses -- prepared the document.

9     Q     Okay.  If you go to page 7, which has the

10  control number 069913 --

11     A     Okay.

12     Q     -- you will see that there are -- there's

13  an introduction, and then almost halfway down the

14  page, there's a paragraph that says, "These

15  recommendations are not considered enhancements.  We

16  consider them fundamental gaps, inconsistencies or

17  duplication of effort within the E-Business Suite

18  architecture."

19          Do you see that?

20     A     I do.

21     Q     Then it goes on to say, "The competition

22  has been extremely aggressive in pointing out these

23  weaknesses within the R11i architecture.  Some of

24  these issues are so fundamental, that it exposes our

25  development environment as 'best of breed' rather

**9/21/2006  Ellison, Lawrence Vol. II**

1    than one unified software vendor."

2           See that?

3       A    I do.

4       Q    Do you agree with that?

5       A    No.  No.  I mean, certainly all the pieces

6    did not fit together, you know, as perfectly as they

7    could, but they were engineered to fit together.

8    They were certainly -- you know, there's certainly

9    problems, but it's still a lot better fitting them

10   together than fitting products from several different

11   vendors, the best-of-breed approach.

12      Q    Go down to the next paragraph.  It says,

13   "We believe these 'fundamental gaps' are serious

14   enough and should be prioritized & addressed by

15   development accordingly."

16           Do you see that?

17      A    I do.

18      Q    And did you agree that they were as serious

19   as suggested here?

20      A    Well, I don't -- again, the first sentence

21   of the document said that Oracle embarked on probably

22   one of the greatest achievements in the history of

23   the software industry.  I mean, there's a lot of

24   strong language --

25      Q    Sure.

1       A       -- in this, so greatest achievement,

2    fundamental gaps, I'm not sure they go together.

3              It was a new product -- I've said this

4    before.  It was a new product.  There were -- not all

5    the pieces worked together as well as they could

6    have, and we had to constantly make improvements, and

7    we were constantly making improvements, and this

8    document helped us pinpoint some of the things we had

9    to work on.

10      Q      Then I'm now looking at what is control

11   number 069920.

12      A      Almost there.  Okay.

13      Q      And, at the top, it says, "Integration

14   Requirements," and, in quotes, "'Best of Breed vs.

15   Suite."

16             Do you see that?

17      A      I do.

18      Q      And it starts off saying, "This section

19   contains all those requirements that are deemed

20   critical to overcome the lack of integration between

21   the E-Business Suite modules (ERP/CRM) as well as the

22   lack of integration within the individual groups of

23   modules."

24             Do you agree that there was the lack of

25   integration that's referred to here?

1      A      Well, the pieces were integrated.  I'm

2      not -- let me see if I can explain this.  The pieces

3      fit together, but there might be a function that was

4      present.  Some of the modules were more mature than

5      other modules.  Some of the modules we had been

6      working on for ten years.  Some of the modules we had

7      been working on for two years.  And the modules with

8      more capability, the more mature modules, did things

9      that were yet to be put into some of the other

10     modules.  I don't know if -- I hope I'm making some

11     sense.

12             So, if you will, you would have liked all

13     the modules to be the same level of maturity.  And

14     one of the reasons that -- one of the things they are

15     pointing out is an integration failing.  It's really

16     not an integration failing at all.  It's a -- the

17     fact that a feature is just missing.  Therefore,

18     using that plug analogy, you know, there would be the

19     receptacle but no prong in one of the plugs, just --

20     it was a pretty new product.  You know, the plug

21     wasn't complete.

22             I don't know if I'm making any sense.  It's

23     difficult to speak metaphorically about this.  I can

24     give you specific examples at some point.

25     Q      Let's just see if we can work through some

**9/21/2006  Ellison, Lawrence Vol. II**

1   more of the document and we will see what comes up.

2            There are -- I'm now looking at Control

3   No. 069921.  There are a number of headings, "Back

4   to" -- the title, "Back to Integration Requirements."

5        A    Yeah.

6        Q    And those headings continue through Control

7   No. 069925.

8        A    Yeah.

9        Q    And I just want to take some examples

10  rather than necessarily going through every single

11  one.

12           For example, on page 069922, at the top,

13  under one of the "Back to Integration Requirements"

14  is a heading, "Cost Rollup For Contracts," and it

15  says, "This is a real business issue for prospects,

16  and damaging for Oracle Sales campaigns to

17  prospects," in parens, "(Unlike Oracle Manufacturing,

18  we cannot identify accrued costs against a Contract

19  over time.  Customers using Oracle Contracts cannot

20  answer simple questions such as:  Are we profitable?

21  unprofitable? should we try to renegotiate?"

22       A    Those are some of the least simple

23  questions there are on the planet.  Understanding

24  whether the profitability of a large consulting

25  engagement is one of the hardest -- is very -- can be

1    very, very difficult.

2        Q      Okay.

3        A      Trying to figure out the overhead costs

4    are -- those are not simple questions.

5        Q      Okay.  And then down the page, "Back to

6    Integration Requirements," and there's a reference to

7    "Demand Planner and CRM Integration," and there it

8    says, "The capabilities to perform an integrated

9    planning in the E-Business Suite is broken."

10           Do you agree with that?

11       A      I don't know what they mean by "integrated

12   plan."  We have been -- we certainly can do planning.

13   You know, demand planning is basically a little bit

14   like a sales forecast.  Tells you what people want to

15   buy and how much of it and when they want to buy it.

16   Then that gets sent off into scheduling the factory,

17   if you have to manufacture something.  Did it -- how

18   gracefully the demand -- the demand from the CRM

19   system, you know, flowed into the -- into the demand

20   planning module was the subject of a lot of debate.

21   I mean, it wasn't -- you know, the automation wasn't

22   as complete as it could be.

23       Q      Okay.

24       A      These guys are out there selling and they

25   would like to make it perfect and were trying to make

1    it perfect.

2         Q      Okay.  That paragraph goes on to say, in

3    part, "For example, salespeople develop their

4    forecasts in sales online."

5         A      Yeah.

6         Q      "These are aggregated regionally and

7    nationally, yet these are not able to be transmitted

8    to the forecasts used in demand planning, supply

9    chain planning, or manufacturing planning."

10        A      Enormously complex job.

11        Q      Okay.  And then it goes on to say, "This

12   implies that we cannot plan/produce according to

13   forecasts or that customers have to manually" relay

14   "the information entered in CRM into the Forecasting

15   modules of Oracle ERP."

16             MR. LINDSTROM:  I think it says "re-key."

17             (Reporter clarification.)

18   BY MR. SOLOMON:

19        Q      And do you agree with that?

20        A      I agree it's an enormously complicated

21   problem.  You have demand coming from all over the

22   world.  You are trying to figure out where to

23   manufacture based on that demand.  Where you

24   manufacture has to do with your labor costs in that

25   country, your shipping costs, available inventory in

1    that plant.

2          So let's say we know we have to produce a

3    million -- simple case:  All we make are widgets.  We

4    have to produce a million of them and then ship them

5    to all these different places.

6          Well, maybe you want to ship the -- if you

7    like to build the widget in Russia -- in Poland and

8    then ship it to Russia, could you save -- you save

9    transportation costs, but your inventory -- your

10   inventory happens to be in Italy, and you can't

11   really move the inventory, so it's actually cheaper

12   to make it in Italy because of inventory rather

13   than -- you know, rather than the labor costs.  These

14   are -- it's an -- ungodly difficult.  Sounds simple.

15         Well, we know what the demand is.  We know

16   where our plants are.  Why can't we simply

17   automatically press a button and figure out where to

18   make all the stuff and ship it and do it in optimal

19   fashion.  It's a really hard problem.

20       Q    Okay.  On Document No. 0699923, towards the

21   top, "Back to Integration Requirements," and then

22   halfway down that page -- or almost halfway down that

23   page, it says, "As there is no integration on the

24   Purchasing Side between a Procurement Contract in

25   Purchasing and a Procurement Contract in the

```
1      'Contracts for Procurement' module, negotiations are

2      only done for the transactionally relevant

3      information of a Procurement Contract and not the

4      extended terms and conditions in a Procurement

5      contract."

6              Do you agree with that?

7              MR. LINDSTROM:  Vague and ambiguous.

8              THE WITNESS:  I don't understand it.  I

9      don't understand what they are saying.

10     BY MR. SOLOMON:

11        Q    Okay.  Now, overall, this document appears

12     to reflect a documented lack of integration within

13     the E-Business Suite.

14              Do you agree with that?

15        A    No.  I think they certainly point out where

16     the integration is imperfect.

17        Q    Okay.

18        A    But they also point out where features are

19     missing.

20              MR. SOLOMON:  Okay.  Have marked as the

21     next exhibit a document produced by Oracle with the

22     control number 014110 to 122.

23              (Exhibit No. 138 was marked for

24              identification.)

25     BY MR. SOLOMON:
```

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Do you recognize this, Mr. Ellison?

2      A      I sure do.

3      Q      And this is an article that is focused on

4    you?

5      A      Really nasty article that Mark Lebovich

6    wrote, right.

7      Q      And if you go to the second page under the

8    heading, "The Fog of Deceit," there's a lot of -- a

9    lot of information here, but I want to look at the

10   paragraph two-thirds of the way down, beginning:

11   "Deceit is a complicated notion."

12           Do you see that?

13     A      Yes.

14     Q      It says, "Deceit is a complicated notion

15   with Ellison.  He's being accused of practicing it in

16   many forms -- exaggerating the capabilities of Oracle

17   products, embellishing the meanness of his boyhood

18   neighborhood and misleading people about which

19   academic degrees he has earned."

20           Do you see that?

21     A      I do.

22     Q      Now, it's true, isn't it, that you have

23   admitted in the past that you lied about having a

24   degree; is that true?

25     A      In order to get a job in Silicon Valley, I

1    did, yeah.

2        Q     Okay.  And it's not true, though, is it,

3    that you have admitted exaggerating the capabilities

4    of Oracle's products?

5              Have you ever admitted that?

6        A     I don't think I have.

7        Q     Either exaggerated or admitted?

8        A     Well, maybe in the very early day -- you

9    know, in the early days, when there were, you know,

10   five or six people in the company, and we had just

11   come out with a product, maybe I exaggerated the

12   capabilities of our database early on, but I don't

13   think I've, you know, made a habit of it over the

14   years.

15       Q     And let's go further into the document.

16   I'm looking at page 00115 -- excuse me, I'm sorry,

17   116.  And there's a reference to one of your former

18   spouses, at the bottom.  And apparently she describes

19   you as being a serial liar.

20             Do you see that?

21             MR. LINDSTROM:  Can you be more specific

22   with the reference.

23             MR. SOLOMON:  Sure.

24       Q     Looking at towards the bottom of the page,

25   reads, in part:  "'I cared deeply about Larry,'" says

```
1      Karen Rutzky Back, now of Los Angeles, but he lied to
2      her serially, she says.  'I got tired of being a
3      detective about everything he said.'"
4           A      Speaking about Karen Rutzky?  I see that,
5      yes.
6           Q      Yes.
7           A      That's a girl I went out with in high
8      school.
9           Q      No.  I understand.  I understand.
10          A      I think you said my -- did you say my
11     ex-wife or something?
12               MR. LINDSTROM:  Yes, he did.
13               MR. SOLOMON:  I apologize.  I apologize.  I
14     apologize if she's your ex-wife.
15               THE WITNESS:  Okay.  I think -- she's
16     not -- she's not an ex-wife; she's someone I went out
17     with in high school.
18               MR. SOLOMON:  Okay.  That's fine.
19          Q      And, anyway, you say the notion that you
20     lied to her is really breathtaking.  In other words,
21     you deny that accusation; correct?
22               MR. LINDSTROM:  On the next page?
23               MR. SOLOMON:  Yes.
24               THE WITNESS:  I don't know what she's
25     talking about.
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1    BY MR. SOLOMON:

 2         Q      Okay.  Further down the page, there's a

 3    reference to you supposedly lying about getting into

 4    medical school.

 5               Did you lie about getting into medical

 6    school?

 7         A      I did.

 8         Q      Okay.  And then further at the bottom of

 9    that page, there's a reference to you saying that you

10    graduated from an obscure college in Sheffield,

11    England.

12               Did you ever say that?

13         A      No.

14         Q      And then it goes on to say, "He told me

15    these big, whopping lies, and he stuck to them.  He

16    can follow these lies for years."

17               Is that accurate?

18         A      This is Karen Rutzky?

19         Q      Right.

20         A      No.

21               I didn't even -- I didn't even know her

22    after I left -- you know, very well after I left --

23    after my first year, second year college.

24         Q      What about Quinn; who is Quinn?

25         A      Adda Quinn, that's my first wife.
```

1       Q       Actually, I think that this is referring to

2   Ms. Quinn, and I think she's saying, "He told me that

3   he graduated from an obscure college in Sheffield,

4   England."

5               You see that?  "Quinn says"?

6       A       I do -- well, actually, I don't.

7               MR. LINDSTROM:  It's the very last two

8   lines of the page.

9   BY MR. SOLOMON:

10      Q       And there's -- now that I've told you it

11  was Ms. Quinn who said that, is that true?

12              MR. LINDSTROM:  Is what true?

13  BY MR. SOLOMON:

14      Q       Did you tell her that you graduated from a

15  college in Sheffield?

16      A       Not that I recall.

17      Q       And Ms. Quinn says, "He told me these big,

18  whopping lies, and he stuck to them.  He can follow

19  these lies for years."

20              Is she right?

21      A       Not that I recall.

22      Q       Okay.  And at the bottom of the page with

23  the control number 0141420, says, at bottom -- and it

24  quotes you -- "I used to practice what I jokingly

25  referred to as 'management by ridicule.'"

```
 1                   Do you see that?

 2          A       I do.

 3          Q       "People would be terrified to come into

 4     meetings."

 5                   Do you see that?  Did you say that?

 6          A       I don't.  Where are you?

 7          Q       Okay.  It says, "I used to practice what I

 8     jokingly refer to as 'management by ridicule,' he

 9     says."

10          A       Right at the bottom of the page.

11          Q       Yeah.

12                   "People would be terrified to come into

13     meetings."

14                   Did you say that?

15          A       Yes.

16          Q       And as of the time of this article, you

17     changed that practice, had you?

18          A       Long before this article came out.  In the

19     first couple years of Oracle.

20          Q       Okay.

21                   MR. SOLOMON:  Let's go off the record for

22     two minutes, please.

23                   THE VIDEOGRAPHER:  Off record at 7:16.

24                   (Recess taken.)

25                   THE VIDEOGRAPHER:  On record at 7:20.
```

```
 1              MR. SOLOMON:  Okay.  I'll have marked as
 2     the next exhibit an excerpt from a book called "The
 3     Difference between God and Larry Ellison."
 4              (Exhibit No. 139 was marked for
 5              identification.)
 6     BY MR. SOLOMON:
 7        Q    Do you know what the difference is,
 8     Mr. Ellison?
 9        A    It's an old joke.  Started out as a golf
10     joke.
11        Q    Really.
12        A    God doesn't think he's Arnold Palmer.
13             You don't want to hear the joke.
14        Q    Go on.
15        A    Jack Nicklaus, Arnold Palmer.  It's an old
16     joke.  Old-time golfer and daughter are playing golf,
17     and God is playing about 170 -- I don't play golf, so
18     I probably got it wrong.  God's about 170 yards from
19     the green, and God turns to Jack and says, "What do
20     you think -- what do you think Arnold would --
21     would -- you know, would hit here?"
22             "Oh, you know, Arnold would probably hit a
23     seven iron from here."
24             And then God, you know, picks up -- anyway,
25     without going into it, the punch line, is:  God
```

```
 1    doesn't think he's Arnold Palmer.

 2         Q      Got it.

 3                So a bit of plagiarism going on here.

 4         A      Afraid so.

 5         Q      All right.  So I want to draw your

 6    attention to pages 2005 and 2006.

 7         A      Okay.

 8         Q      Now, first of all, I want to read the

 9    language on page 2005 that says, "Oracle's meeting

10    for analysts yesterday was a very positive briefing

11    and it appears that the company's business has shown

12    no evidence of deterioration due to economic or

13    competitive issues.

14                "The company continues to feel that 60 to

15    70 percent growth in revenues and earnings is

16    achievable for the current fiscal year and" --

17                Do you see that?

18         A      I do.

19         Q      "And that longer term, 50 to 60 percent

20    growth is attainable."

21                Do you see that?

22         A      I do.

23         Q      And that's -- that reflects statements made

24    at January 1990 analyst meeting; correct?

25         A      I believe so.
```

1       Q       Okay.  And then --

2       A       I don't fully trust this book, but, yes.

3       Q       Because unlike the other book, you didn't

4   comment and clarify, did you --

5       A       The other book is written by -- by one of

6   the -- an author -- someone who worked for the

7   "Economist."  This guy worked for a religious

8   newspaper in Florida.

9       Q       Okay.  So let's --

10      A       Big difference.

11      Q       You have a view as to which one is more

12  reliable, I take it?

13      A       I would go with the "Economist."

14      Q       Halfway down the page then says, "When

15  Oracle's predictions turned out to be" flat -- excuse

16  me, "turned out to be wrong, the stock did a half

17  gainer.  According to the lawsuit, the defendants

18  'knew or were reckless in not knowing' that the

19  projections were overly optimistic."

20              Do you see that?

21      A       I do.

22      Q       It goes on to say, "Then came the salacious

23  part."

24              Do you see that?

25      A       I do.

**9/21/2006  Ellison, Lawrence Vol. II**

1      Q      Then it references some stock sales.

2             Do you see that?

3      A      I do.

4      Q      And then it says, "In other words, they

5    tried to jack up the stock price artificially so

6    their shares would be worth more."

7             Do you see that?

8      A      I do.

9      Q      Then it goes on, "Years later, in an

10   interview, Walker denied doing any such thing.  His

11   personal financial strategy at the time was to

12   diversify his holdings to 'make sure my family was

13   financially secure.'  He wanted to invest in

14   tax-exempt bonds but needed cash to do it.  He said

15   he sold stock only when Oracle's legal department

16   said he could and only when he would not have to pay

17   a huge capital gains tax for doing so.  According to

18   Walker, the fact was that 'I sold at every

19   opportunity.'"

20            Do you see that?

21     A      Yes.

22     Q      And then it goes on to say, "Still, it was

23   also true that Walker sold the stock soon after

24   Imbler started worrying about" -- "about Oracle's

25   finances.  Ellison believed that Walker dumped stock

1    at least partly," and then you are quoted, "'because

2    he was concerned.  He expressed himself pretty

3    clearly with his financial decision.'"

4              Did you say that?

5        A    Not that I recall.

6        Q    So let's be clear about this.

7              You are not saying that you didn't; you

8    just don't recall one way or the other?

9        A    That's correct.

10       Q    Now, if -- if it were true that Mr. Walker

11   expressed himself clearly with his financial

12   decision, isn't it equally true or more true that you

13   expressed yourself clearly with your financial

14   decision in January of 2001?

15       A    No.  My options were expiring.

16       Q    Okay.

17       A    Quite different than Jeff Walker who was --

18   and most people, actually, who sell their options as

19   soon as they vest.  They sell them as soon as

20   possible.  I hold them for as long as possible.

21       Q    I'm glad you -- glad you mentioned that.

22             When did the expire -- August 2001 expiring

23   options initially vest?

24       A    They would have -- they would vest 25

25   percent annually after -- so 2001, it would be 1991,

1    you know, 1992 -- I guess 1992 for 25 percent; 1993,

2    1994, 1995.

3         Q    Okay.  And is it a dangerous strategy to

4    hold on to expiring options up to close to the date

5    of the expiration?

6         A    You know, I think most people -- my

7    financial advisors don't recommend that I do, you

8    know, that I hold my options for so long, but I

9    believe in the company and I just hold the options.

10        Q    One potential consequence would be that you

11   may be forced or feel forced into entering into a

12   transaction where you exercise and sell stock while

13   you are in possession of material adverse

14   information; isn't that true?

15        A    No.  No.  I wouldn't do that.

16             MR. SOLOMON:  Okay.  Let's have a time

17   check, if we may.

18             THE VIDEOGRAPHER:  We are -- from one hour,

19   we are about eight and a half minutes away.

20             MR. LINDSTROM:  For what it's worth, I show

21   four.

22             THE VIDEOGRAPHER:  Pardon?

23             MR. LINDSTROM:  I show four, but --

24             THE VIDEOGRAPHER:  Well, that's the tape

25   time.  Yeah, that's the tape time.

```
 1                MR. LINDSTROM:  What's our run time today?
 2                THE VIDEOGRAPHER:  Well, we're past seven
 3      hours.  And I thought we were into the extra hour.
 4      With that extra hour, we're, by my clock, about eight
 5      minutes away now.
 6                MR. SOLOMON:  And then if you total them
 7      all up, how many hours?
 8                THE VIDEOGRAPHER:  It would -- I have seven
 9      hours, 50 minutes now.
10                MR. SOLOMON:  Okay.  In that case, I'm
11      going to take a one-minute break while I organize the
12      last couple of documents that I'll be able to use in
13      this session.
14                THE VIDEOGRAPHER:  Off record at 7:27.
15                (Recess taken.)
16                THE VIDEOGRAPHER:  On record at 7:29.
17      BY MR. SOLOMON:
18        Q    It's true, isn't it, Mr. Ellison that by
19      January 22, 2001, you were aware that the 11i
20      business suite was plagued with implementation
21      problems?
22                MR. LINDSTROM:  Objection; argumentative,
23      vague and ambiguous as to "plagued."
24                THE WITNESS:  I certainly knew that some of
25      our customers were successful and some of our
```

1    customers were less successful in implementing the

2    product, and there were bugs.

3    BY MR. SOLOMON:

4        Q     Okay.  And you knew as of January 22nd,

5    2001, that the pipeline growth for fiscal Q301 was

6    dropping?

7        A     I think it had dropped, showing 34 percent

8    growth, which was still robust growth and certainly

9    enough growth to make our -- make our numbers for the

10   quarter.

11       Q     You had information available to you as of

12   January 22nd, 2001 that demonstrated that using

13   converse -- historical conversion rates you couldn't

14   meet your quarter?

15       A     That is not true.

16       Q     No?

17       A     That is not true.

18       Q     You knew as of January 22, 2001, that the

19   historical use of the historical conversion rates was

20   unrealistic?

21       A     I'm not sure what you are saying.

22       Q     You knew as of January 22nd, 2001, that

23   using historical conversion ratios would yield an

24   inaccurate outcome?

25       A     That's not correct.

**9/21/2006  Ellison, Lawrence Vol. II**

```
1      Q      You knew that as of January 22nd, 2001,
2   that NAS was experiencing a decline in its business
3   prospects?
4      A      I think we agreed that the pipeline -- the
5   pipeline had gone down from over 50 percent to 34
6   percent.
7      Q      You knew as of January 22, 2001, that
8   Oracle's internal implementation of the E-Business
9   Suite was resulting in lost revenue?
10     A      That's not correct.  We had a problem with
11  the customs system for education and that caused some
12  education bookings to be lost.  That's the only thing
13  I can recall.
14     Q      You knew as of January 22nd, 2001, that you
15  had engaged in an improper swap transaction with
16  Hewlett-Packard at the end of Q2?
17     A      Absolutely not.
18     Q      Who's paying for your defense costs in this
19  litigation, Mr. Ellison?
20     A      I believe the company is.
21     Q      Do you have insurance?
22     A      Yes, we do.
23     Q      And the insurer's not paying?
24     A      I believe the insurance is paying, paying
25  up to the limit on the policy.
```

**9/21/2006  Ellison, Lawrence Vol. II**

1           MR. LINDSTROM:  But -- there's no

2     foundation, speculation.

3           THE WITNESS:  Right.

4     BY MR. SOLOMON:

5       Q    And do you understand that there is a claim

6     in this litigation for insider trading?

7       A    Yes.

8       Q    And do you understand that you are

9     personally liable for that, or do you believe the

10    company is accountable for that?

11          MR. LINDSTROM:  Objection; calls for a

12    legal conclusion, no foundation, speculation.

13          You may answer if you understand.

14          THE WITNESS:  My understanding is that I'm

15    personally liable.

16          MR. SOLOMON:  Okay.  Have marked as the

17    next exhibit a letter dated August 29, 2006 from

18    myself to Mr. Wald.

19          (Exhibit No. 140 was marked for

20           identification.)

21          MR. LINDSTROM:  So we are now down under

22    two minutes.  I assume you don't intend to ask him a

23    lot of questions about correspondence between counsel

24    and pending litigation.

25    BY MR. SOLOMON:

1      Q      Have you seen this letter before,

2   Mr. Ellison?

3      A      I have not.

4      Q      Are you aware that we demanded at the end

5   of August of this year, in addition to discussions

6   concerning corporate governance enhancements, the sum

7   of $1,975,000,000 to resolve this litigation?

8      A      There was an e-mail, I think, that went out

9   to all -- certainly went out to me, you know,

10   summarizing this.

11      Q      Okay.  And you are aware that according to

12   the terms of this letter, the offer remains open

13   until November the 28th, unless it's either withdrawn

14   in writing prior to exception -- acceptance or unless

15   Judge Jenkins rules in our favor?

16             You understand that?

17      A      I do now.

18             MR. SOLOMON:  I guess you don't want to

19   write a check.

20             MR. LINDSTROM:  Argumentative.

21             We are done, aren't we?

22             MR. SOLOMON:  We are except for the

23   reservation that, first, I've had to speed through

24   many, many documents to finish, and there are many

25   documents that I would like the opportunity to

**9/21/2006  Ellison, Lawrence Vol. II**

1    question you about that I haven't been able to, and I

2    reserve the right to ask the Court for more time.

3            In addition, there may be more documents

4    produced in the litigation.  To the extent they

5    implicate you, I'm going to ask for more time for

6    that as well, but thank you in the meantime for your

7    testimony.

8            MR. LINDSTROM:  Off the record.

9            THE VIDEOGRAPHER:  This is the end of

10   Videotape No. 5, Volume 2, in the deposition of Larry

11   Ellison.

12           The original videotapes will be retained by

13   LiveNote World Service.

14           We are going off the record; the time on

15   the monitor is 7:36.

16           (Deposition concluded at 7:36 p.m.)

17   //

18   //

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF WITNESS

 2

 3            I, the undersigned, declare under penalty of

 4       perjury that I have read the foregoing transcript,

 5       and I have made any corrections, additions, or

 6       deletions that I was desirous of making; that the

 7       foregoing is a true and correct transcript of my

 8       testimony contained therein.

 9

10       EXECUTED this _____ day of _____,

11       20___, at _____, _____.
                    (City)                    (State)

12

13

14

              _____
15                     LAWRENCE ELLISON

16

17

18

19

20

21

22

23

24

25
```

**9/21/2006  Ellison, Lawrence Vol. II**

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2         I, RACHEL FERRIER, CSR, CSR No. 6948, duly

 3    authorized to administer oaths pursuant to Section

 4    8211 of the California Code of Civil Procedure,

 5    hereby certify that the witness in the foregoing

 6    deposition was by me sworn to testify to the truth,

 7    the whole truth and nothing but the truth in the

 8    within-entitled cause; that said deposition was taken

 9    at the time and place therein stated; that the

10    testimony of said witness was reported by me and was

11    thereafter transcribed by me or under my direction by

12    means of computer-aided transcription; that the

13    foregoing is a full, complete and true record of said

14    testimony; and that the witness was given an

15    opportunity to read and correct said deposition and

16    to subscribe same.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties in the

19    foregoing deposition and caption named, nor in any

20    way interested in the outcome of the cause named in

21    said caption.

22         IN WITNESS WHEREOF, I have hereunto subscribed

23    by my hand this 28th day of September, 2006.

24

25              RACHEL FERRIER, CSR No. 6948
```