```
1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                       -oOo-

4    IN RE
                                    CERTIFIED COPY
     ORACLE CORPORATION

5    SECURITIES LITIGATION

                                MASTER FILE NO.

6                               C-01-0988-MJJ

     This Document Relates To:

7

         ALL ACTIONS

8    _____/

9

10

11                     -oOo-

12

13                  CONFIDENTIAL

14      VIDEOTAPED DEPOSITION OF SARAH KOPP

15              June 14, 2006

16

17                     -oOo-

18         SHEILA CHASE & ASSOCIATES

              REPORTING FOR:

19          LiveNote World Service

          221 Main Street, Suite 1259

20          San Francisco, CA 94105

           Telephone: (415) 321-2300

21            Fax: (415) 321-2301

22                     -oOo-

23   Reported by:

     KELLIE A. ZOLLARS, CSR, RPR, CRR

24   CSR License No. 5735

25
```

1      Q.   Okay.   So these forecast reports, were they

2  generated for a purpose?

3      MS. KYROUZ:   Objection.   Vague.

4      THE WITNESS:   Yes.

5      BY MS. McLAUGHLIN:

6      Q.   Would they have been generated for a meeting?

7  For preparation of a meeting?

8      MS. KYROUZ:   Same objection.

9      THE WITNESS:   Not generally.

10     BY MS. McLAUGHLIN:

11     Q.   Not generally.   Okay.

12          What was the purpose of preparing the report?

13     A.   Was to -- it was just required that we submit

14  a forecast every two weeks so...

15     Q.   Okay.

16     A.   So it was detail supporting the forecast.   Or

17  supporting Jay's forecast.

18     Q.   When you say supporting Jay's forecast, did

19  Jay have a separate forecast of his own?

20     MS. KYROUZ:   Objection.   Vague.

21     THE WITNESS:   Other than the package I prepared

22  for him?

23          No.   Not that I'm aware of.

24     BY MS. McLAUGHLIN:

25     Q.   Okay.   So can we talk about the process of

1   this forecasting report.

2       A.   Uh-huh.

3       Q.   Could you explain to me the process that you

4   went through -- or you or your group went through to

5   prepare those reports?

6       MS. KYROUZ:  Objection.  Vague.

7       THE WITNESS:  In broad strokes.  It's been a long

8   time.  Many different forecast packs since then.

9           In general we looked at the business with

10  Jay, talked to him about where he believed the

11  businesses would wind up.  We put in those forecasts

12  based on his input and based on the input of his

13  directs, and we pulled pipeline data from our systems

14  and provided him some data points to help support his

15  forecast.

16      BY MS. McLAUGHLIN:

17      Q.   In a particular quarter when do you start this

18  sort of process of the forecast?  Does it occur prior

19  to the commencement of the quarter or is it started

20  right at the beginning of the quarter?

21          It's compound, I know, but...

22      MS. KYROUZ:  Objection.  Vague.

23      THE WITNESS:  So we're talking about that quarter.

24      MS. McLAUGHLIN:  Yes.  Yes.

25      THE WITNESS:  Not do you, but -- yeah.

1      MS. McLAUGHLIN:  Let's talk about that quarter.

2  That's what I'm really interested in.

3      THE WITNESS:  At that time it was probably a

4  process that started right at the beginning of the

5  quarter as opposed to ahead of time.

6      BY MS. McLAUGHLIN:

7      Q.  And would you have a meeting with Jay and

8  others, I guess the directs you said, to discuss the

9  forecast?  At the beginning of the quarter?

10      MS. KYROUZ:  Objection.  Vague.

11      THE WITNESS:  Not on any kind of set schedule, no.

12      BY MS. McLAUGHLIN:

13      Q.  Okay.  So you -- so when you said that you

14  would produce this forecast report every two weeks for

15  the first part of the quarter, let's start, like, at

16  the beginning of the quarter.  So the first week would

17  you -- you said you would compile data from the

18  pipeline and from the people who are, I guess, the

19  sales reps in the field?  Was that correct?

20      MS. KYROUZ:  Objection.  Misstates testimony.

21      THE WITNESS:  Not exactly.  No.

22          So we would pull pipeline data out of the

23  system and we would get input from -- well, my staff

24  would provide me input from their business leads.  So,

25  for instance, on the consulting side, they had a whole

1   different process.  So they had a more detailed

2   forecast and they would just feed me the forecast that

3   was coming out from the VPs in consulting.  And then

4   on the license side the same thing, they would provide

5   me with that input.  I would sit down with Jay and go

6   through that input, and then we would set his

7   forecast.

8        BY MS. McLAUGHLIN:

9        Q.  Okay.  And when you -- when you say input,

10   could you describe to me what the input would be.

11        A.  Well, the pipeline is pulled directly from the

12   system.

13        Q.  Okay.

14        A.  And then there was an area in the system where

15   the VPs could go in and put in high-level projections

16   for where their numbers would come in so...

17        Q.  Okay.  And the pipeline you said you pulled

18   from the system, is that from the Oracle -- the OSO,

19   the Oracle services Online?

20        A.  Sales.

21        Q.  Sales Online.  Oracle Sales Online?

22        A.  That's what it was then, yes.

23        Q.  And that's where you would pull the pipeline

24   information from?

25        A.  That's where I pulled the current year

1    pipeline information from.

2        Q.   Okay.   And when you would pull this

3    information, would you -- what would that -- what sort

4    of information would be in the pipeline?

5        MS. KYROUZ:   Objection.   Vague.

6        THE WITNESS:   Well, the pipeline is just a

7    summation of deals that are in the system.

8        BY MS. McLAUGHLIN:

9        Q.   Okay.   And are the deals input by the sales

10   rep into OSO?

11       A.   That's the intent, yes.

12       Q.   The intent.   Okay.

13           When the sales reps would input the deals,

14   were they required to put any specific information

15   about the deals into the OSO?

16       MS. KYROUZ:   Objection.   Lacks foundation.   Vague.

17       THE WITNESS:   There are fields.   So I don't know

18   that they were forced to.   I don't enter deals in

19   there so I don't know exactly what the fields were,

20   but there are fields.

21       BY MS. McLAUGHLIN:

22       Q.   And do you recall the fields?

23       A.   Some of them.   Customer, deal, opportunity,

24   value.   And then at some point there was a worst,

25   likely, and best value.

Kopp, Sarah
**CONFIDENTIAL**                                                6/14/2006

1      Q.   Do you recall whether there was a win

2   probability?

3      A.   There was also a win probability.

4      Q.   Okay.  And a product specification field?

5      A.   I don't know that one very well so I'm not

6   sure.

7      Q.   Do you -- do you know if there were any

8   requirements for the sales reps to enter all of the

9   information in each of the fields?

10     A.   I don't know.

11     Q.   Do you recall if there was a practice in doing

12   so at that time?

13     MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

14     THE WITNESS:  No, I don't know.

15     BY MS. McLAUGHLIN:

16     Q.   Okay.  Do you recall there ever being any

17   problems with the sales reps not properly entering the

18   information into the OSO?

19     MS. KYROUZ:  Same objections.

20     THE WITNESS:  They weren't as diligent about

21   getting everything in there, I think, as, you know,

22   the corporate people would have liked to have seen.

23     MS. McLAUGHLIN:  Okay.  I'm going to show you a

24   document, and I think I'll start it at Kopp 1.

25        Where would you like these placed on here?

1     A.  We did for some time.  I don't remember how

2   many of them were produced, though.

3     Q.  And what would be the difference between a big

4   deal report or a big deal scenario?

5     MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

6     MS. McLAUGHLIN:  If there was a difference.

7     THE WITNESS:  The big deal scenario was just a

8   different way of looking at the big deals report.

9   That was something Jennifer wanted to see.  So it was

10  similar data in a different format.

11    BY MS. McLAUGHLIN:

12    Q.  Would it have any additional data?

13    A.  I don't remember exactly.

14    Q.  Do you remember when those were created?

15  Those big deal scenarios?

16    A.  Not specifically.

17    Q.  Do you remember who would have created them?

18    A.  I know it was under Jennifer's direction.  I

19  don't know who created them.

20    Q.  So it would have been someone in her

21  department, not in OSI?

22    A.  Well, we would fill in the deal information;

23  but the actual format that came out, it came from

24  corporate finance.

25    Q.  Okay.  And would it be your -- your directs

```
 1    that would give her the information --

 2        A.  Yes.

 3        Q.  -- on the deals?

 4        A.  Yes.

 5        Q.  Okay.

 6            Okay.  I want to talk a minute about the

 7    pipeline.  Could you define for me what you think the

 8    pipeline is.  Or was at that time.

 9        MS. KYROUZ:  Referring to Q3 of '01?

10        MS. McLAUGHLIN:  Yes.  At that time.

11        THE WITNESS:  The pipeline is just a list of --

12    it's not a list of deals, it's the sum total of the

13    opportunity values that were in OSO.

14        BY MS. McLAUGHLIN:

15        Q.  Okay.  And was there a criteria for a

16    particular deal to make it into the pipeline?

17        A.  No.

18        MS. KYROUZ:  Objection.  Vague.

19        BY MS. McLAUGHLIN:

20        Q.  So there was no, like, standard criteria that

21    was given to sales reps for what a deal in the

22    pipeline would be?

23        MS. KYROUZ:  Objection.  Vague.

24        BY MS. McLAUGHLIN:

25        Q.  Is that correct?
```

1        MS. KYROUZ:  Lacks foundation.

2        THE WITNESS:  That's correct.

3        BY MS. McLAUGHLIN:

4        Q.  So would it be fair to say that the reps --

5    well, I suppose -- the pipeline came from what you

6    would describe as the OSO system; is that correct?

7        A.  Yes.

8        Q.  Okay.  And it was your directs and the reps

9    entering the information into the OSO system?

10       MS. KYROUZ:  Objection.  Misstates testimony.

11       BY MS. McLAUGHLIN:

12       Q.  Is that correct?

13       A.  My directs don't enter anything into the OSO.

14       Q.  Okay.  Just the sales reps would enter --

15       A.  I don't know who enters it.  You know, whether

16   it's sales reps, sales managers, whoever.  The sales

17   organization.

18       Q.  Sales organization.

19       A.  Yes.

20       Q.  That's fair.

21          So would it be fair to say that it was a

22   subjective sort of decision on, I guess, any different

23   salesperson whether to input the information into the

24   pipeline?

25       MS. KYROUZ:  Objection.  Lacks foundation.  Vague.

1   Nussbaum was personally working that deal along with

2   the VP for Teleco.  So that deal was -- it's not a

3   little entry level rep in there telling Jay Lucent's

4   not going to close.  Jay was with Lucent the day

5   before the last day of the quarter.

6        Q.  Do you recall if Larry Ellison was with

7   Lucent?

8        A.  I have no idea.  No idea.

9        Q.  Do you recall if Larry Ellison had any direct

10  involvement in the large deals that didn't close at

11  the end?

12       A.  No.

13           And I don't know what extent Jay was involved

14  in the other ones, but I do recall him actually going

15  to Lucent.

16       Q.  To Lucent.

17           All right.  Put that one aside.

18           At some point in the quarter were you

19  concerned that the deals that were in OSO were not

20  closing and that you became more heavily dependent on

21  these large swing deals that didn't close in the end

22  of the quarter?

23       MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

24       BY MS. McLAUGHLIN:

25       Q.  Do you recall that?

1     A.  Uhm, no.  And it seems like two or three

2   different questions all wrapped into one question.  I

3   mean, was I concerned that -- that deals weren't

4   closing?  No.  Maybe as of midnight on the 28th I was

5   concerned that deals weren't closing.  I don't know

6   when you're talking about when you say at some point

7   in the quarter.

8     Q.  At some point in the quarter when the deals

9   that were listed in these big deal reports -- because

10   many of them didn't close in addition to the large

11   ones.  When those didn't close during the quarter, did

12   that cause you concern?

13     A.  At what point?

14     Q.  When they weren't closing.  These --

15     A.  In January?  I mean -- so, typically, the

16   larger transactions in a quarter all go until the last

17   two days.  Typically.  They still do.  Because they're

18   in intense negotiations, they're trying -- the

19   customers are trying to get higher discounts.  And in

20   reality our customers are trained not to deal with us

21   until the end of the quarter because they think they

22   can get a better deal.  Whether or not they can.  So

23   the larger transactions very rarely close earlier in

24   the quarter.  Very rarely.

25     Q.  And -- or -- it is the large transactions

```
 1     that -- the big deals that are above 500,000 in your

 2     sheet, there are several of those --

 3        A.   Uh-huh.

 4        Q.   -- that didn't close as well.  I understand

 5     that these large ones, ones that would be in the last

 6     two weeks -- Lucent was at some point forecasted

 7     36 million as you said; but all of those deals that

 8     were, you know, just above 500,000 or 2 million or

 9     3 million.  When those deals started not closing in

10     January, did that concern you?

11        A.   No.

12        Q.   And is this because you believed Jay, that

13     these larger deals would close at the end of the

14     quarter?

15        A.   It's because -- not just the larger deals, but

16     we typically see, I don't know, 65 percent or more of

17     the revenue come in in the last couple of weeks.  The

18     only stuff you see come in in December or January,

19     really, are very -- you know, the telesales kind of

20     transactions that are phone sales that start to build

21     up.  But we don't -- we rarely get concerned with

22     close rates at that point in the quarter.

23            Truly, most of it comes in later.  That's why

24     we don't -- you know, these days we don't even do

25     status update calls until two about three or four days
```

1    out.  We just don't.

2       Q.  Okay.  This is Exhibit 42.

3       MS. KYROUZ:  And how many pages?

4       MS. McLAUGHLIN:  It's just one page.  I threw them

5    all at you by accident.  I apologize.

6       Q.  Can you identify this document for me?

7       A.  It is a page that I used to do for him.  And I

8    don't know when I started doing it because I remember

9    trying to create something that would be helpful to

10   him.

11          But this one's not dated, so I don't know if

12   it's -- what quarter it's for or anything.

13      Q.  Uhm --

14      A.  But it's a sheet that lists the deals that

15   according to OSO are in the "likely" case.  Or in the

16   likely bucket.  And then a list of other deals that

17   are out there, that are in the upside bucket.

18      Q.  Okay.  And would this report ordinarily have a

19   date on it?  If you -- when you prepared it?

20      A.  Maybe not initially.  Like I say, I think I

21   created this for Jay, and I don't even know what

22   quarter I created it in.

23          You know, were I to create something like this

24   now, I'd probably put what forecast week underneath;

25   but this might have been an early genesis of this

1    thing.

2        Q.   Okay.

3            Let me give you -- but you do believe you

4    prepared this or someone in your group prepared this?

5        A.   Yes.

6        Q.   And does it look like it's a genuine and

7    authentic copy of the original?

8        A.   Yeah.

9        Q.   Sorry.

10       A.   I see now I have a title on top of it.  Like I

11   say, I was playing around with the format.

12       Q.   That's what was my question.  Is this a

13   similar report to what --

14       A.   Yeah.  It looks like sort of the same report,

15   only I'm trying to change it around.  Maybe to make

16   him like it or whatever.

17       Q.   Is there a way you can discern the date on

18   this report?

19       A.   No.  Other than I think the 320 was his

20   forecast in Q4.

21       Q.   In Q4?

22       A.   I think all this was after Q3.

23            Yeah.  320 was his Q4 forecast so...

24       Q.   Okay.

25            I have a series of reports that are all the

1    STATE OF CALIFORNIA      )

2    COUNTY OF SAN MATEO      )

3              I hereby certify that the witness in the

4    foregoing videotaped deposition, SARAH KOPP, was by me

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth, in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true

9    record of the witness' testimony as reported by me, a

10   duly certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into

12   typewriting by computer.

13             I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand this 27th day of June, 2006.

19

20

21              *Luisa Chase*

22        for  KELLIE A. ZOLLARS, CSR

23             STATE OF CALIFORNIA

24

25