IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

    Master File No. C-01-0988-MJJ

This Document Relates To:

    ALL ACTIONS.

_____/

---oOo---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JENNIFER MINTON

Volume 2

Monday, September 25, 2006

---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone: (415) 321-2300
Fax: (415) 321-2301

Reported by:
RACHEL FERRIER, CSR
CSR No. 6948

1   somebody, Sarah and/or Jay, after printing out this
2   e-mail note, because I printed it out and I made
3   notations on it.
4       Q    Okay.
5       A    So it was likely based on input that I got
6   from either Sarah or the field -- or, I should say,
7   Sarah or Jay.
8       Q    Okay.  And did this impact your upside
9   adjustment for OSI?
10      A    I don't recall.  Did it impact it; was it
11  taken into consideration?  Yes, as was our America's
12  Forecast calls and any other conversations that I
13  had.  Again, I can testify over and over that there
14  are multiple data points that came into consideration
15  when determining my upside amounts.
16      Q    And, now, your upside adjustments were used
17  to give your view of what would happen in that
18  division for the quarter as of that period of time;
19  is that right?
20      A    My upside adjustments were to come to the
21  forecasts that we thought that the company would more
22  than likely meet.
23      Q    Right.
24           And when you were talking about a specific
25  organization, your upside adjustments would be used

1  for the same purpose for that organization; is that
2  right?
3      A    I would try my best, but it wasn't
4  necessarily -- you know, I might make it off on one
5  organization and maybe cancelled out by getting it
6  off on another organization, going in the opposite
7  direction.
8           But, in general, if you look at the
9  forecasts that I would come up with over the prior
10 history, my forecasts were more on line with our
11 actual results than were the field forecasts.
12     Q    All right.  Move to strike as
13 nonresponsive.
14          The 75 percent confidence level -- so as of
15 January 18, 2001, you were presented with
16 Mr. Nussbaum's forecast of 225 with the 75 percent
17 confidence level; is that fair?
18          MR. WALD:  Object to the form.
19          THE WITNESS:  No.  I've told you that I was
20 presented with this and that I wrote down 75 percent
21 confidence level.
22 BY MR. BRITTON:
23     Q    Is that -- well, I guess I should have
24 asked you:  What does 75 percent confidence level
25 mean?

```
 1       A      That somebody was 75 percent confident in
 2   achieving that forecast.
 3       Q      Okay.  Most likely Jay Nussbaum?
 4       A      Most likely Jay Nussbaum.
 5       Q      So if Mr. Nussbaum presented with you 225
 6   and said 75 percent confidence level, it would be
 7   reasonable to assume that you would give a negative
 8   upside adjustment to come in somewhere less than what
 9   he thought he would do; is that fair?
10              MR. WALD:  Object to the form.
11              THE WITNESS:  No.
12   BY MR. BRITTON:
13       Q      Why not?
14       A      Because Jay's history of forecasting was
15   not accurate or always in line with his actual
16   results.
17       Q      Okay.  Now, your finance --
18       A      If I may?
19       Q      Sure.
20       A      There was clearly an awful lot of deals in
21   play, so he had to close just a couple of these large
22   deals, and he would have easily exceeded his
23   forecast.
24       Q      Okay.  Now, if you believed that, that
25   would have been reflected in your upside adjustments;
```

| | |
|---|---|
| 1 | Q   Okay.  So on Exhibit 43, the first page, |
| 2 | the third bullet point where it references "December |
| 3 | license results represents 19% of the total forecast |
| 4 | for Q3 FY01," the total forecast referenced there is |
| 5 | the field forecast; is that right? |
| 6 | A   As I calculate it based off of this |
| 7 | forecast, which is January 15th, Exhibit 25A, it |
| 8 | would be 19 percent of the field forecast and |
| 9 | 18 percent of the total license forecast. |
| 10 | Q   Then the next sentence says, "In FY00 and |
| 11 | FY99, December represented 16% and 19%, respectively, |
| 12 | of the quarter total." |
| 13 | Do you see that? |
| 14 | A   I do. |
| 15 | Q   Is it fair to read this document to mean |
| 16 | that December license results for Q301 were on track, |
| 17 | historically, to meet the field forecasts for the |
| 18 | quarter? |
| 19 | MR. WALD:  Can I have the question back? |
| 20 | Hold on. |
| 21 | To meet the field -- object to the form. |
| 22 | THE WITNESS:  I'm sorry.  Can I have the |
| 23 | question read back. |
| 24 | (Record read by the Reporter as follows: |
| 25 | "QUESTION:  Is it fair to read this |

```
 1              document to mean that December license
 2              results for Q301 were on track,
 3              historically, to meet the field forecasts
 4              for the quarter?")
 5              THE WITNESS:  It would be fair to say that
 6   we were on track; that the reality is the Covisant
 7   transaction gave us a healthy start despite the fact
 8   that we got off on a slow start, excluding Covisant.
 9   So Q3's tend to be very back-end loaded.
10   BY MR. BRITTON:
11       Q      If you go down to the next bullet point, it
12   said, "Applications product growth was 216% and,"
13   brackets, "{ERP 365%}" and then CRM has a negative
14   58%.
15              Does that mean that year over year CRM
16   product growth was down 58 percent?
17       A      Yes.
18       Q      Okay.  Did this impact your --
19       A      For the month of December.
20       Q      Did this impact your upside adjustment at
21   all?
22       A      This particular point here?
23       Q      Mm-hmm.
24       A      Again, I don't recall.  It would have been
25   another data point that I tended not to focus on the
```

```
 1   product revenue forecasts.  They weren't as
 2   meaningful in deducing a upside number.  I tended to
 3   look at license revenues in totality, not by product.
 4        Q    Put that document aside.
 5             All right.  If you turn to the
 6   January 22nd, 2001 upside report, which is Exhibit
 7   26A, starts at Bates 440127 and ends at 143; if you
 8   look at the second page of Exhibit 26A, the upside
 9   adjustment for license revenues is not changed; is
10   that right?
11        A    That is correct.
12        Q    Okay.  And the earnings per share that you
13   are projecting is 12.06 cents per share?
14        A    That is correct.
15        Q    And the field is forecasting 10.7 cents per
16   share; is that right?
17        A    That is correct.
18        Q    If you go to the page ending with 131, no
19   adjustments to the -- withdrawn.
20             No upside adjustments for the
21   organizations, no change?
22        A    That is correct.
23             (Exhibit No. 44 was marked for
24             identification.)
25   BY MR. BRITTON:
```

```
 1        Q     Placed in front of you what's been marked
 2   as Plaintiffs' Exhibit 44.
 3              Will you take a moment to look at this
 4   exhibit.
 5        A     This is for the week of January 22nd?
 6        Q     That's one of my questions:  Do you
 7   recognize it, and what is it?
 8        A     This is an America's Forecast report that
 9   was sent out to Jay Nussbaum, Sandy Sanderson, and
10   George Roberts as well as other EC members and
11   finance team.  And this document is a printout of
12   that report for the week of January 22nd.
13        Q     And January 22nd is a Monday; I checked.
14        A     Right.
15        Q     So would this have been produced after --
16        A     It's for that week.
17        Q     It would have been produced after the
18   executive management committee meeting or before?
19        A     This would have been produced in
20   preparation for the Thursday calls, not for the EC
21   meetings, so for the Thursday America's Forecast
22   calls.
23        Q     So any effect that information in this
24   document would have would show up on the following
25   week's upside report; is that right?
```

```
 1          All right.  If you look down at the bottom
 2   on Exhibit 27A, the earnings per share, this is the
 3   first time that your upside adjustment and your
 4   forecast for earnings per share for the quarter fell
 5   below market guidance; is that right?
 6       A     Are you on 27A?
 7       Q     Yes.
 8       A     I see that the --
 9            MR. WALD:  Object to form.
10            THE WITNESS:  -- EPS is 11.58 cents.
11            MR. BRITTON:  Right.
12       Q     And this was distributed at the executive
13   management committee meeting?
14       A     27A?
15       Q     Yes.
16       A     You are saying that the -- that it fell
17   below EPS?
18       Q     Correct.
19            That's the first time it fell below market
20   expectation --
21            MR. WALD:  Object to the form.
22   BY MR. BRITTON:
23       Q     -- is that right?
24       A     11.58 cents in rounded terms is 12
25   percent -- is 12 cents.  Sorry.
```

1   Q   11.58 cents is less than 12 cents; is that
2  right?
3   A   But we have a practice of rounding, so this
4  is still hitting market expectations of 12 cents.
5   Q   Okay. So with your rounding, you are right
6  at market expectation as of January 29th, 2001; is
7  that right?
8   A   We are still at market expectations of
9  12 cents.
10   Q   And the field is still forecasting
11  10.7 cents per share; is that right?
12   A   That is a combination of revenue and
13  expense, but, yes, it's still 10.7. With upside
14  adjustments and other adjustments that were made, we
15  arrive at the 11.58, which is 12 cents.
16   Q   Now, if you go to the page ending with 148,
17  which is the organizational adjustments --
18   A   Yes.
19   Q   -- you are now down a negative $35 million
20  adjustment for OSI.
21      Do you see that?
22   A   Yes.
23   Q   Do you know why?
24   A   Again, I don't recall the specifics as to,
25  you know, how any of the upside numbers were derived.

```
 1   We, unfortunately, never documented how we arrived at
 2   those numbers.
 3        Q     All right.  And you are still -- at zero
 4   upside adjustments for NAS?
 5        A     That is correct.
 6        Q     And OPI, $35 million upside adjustment?
 7        A     That is correct.
 8        Q     Now, if you move to the February 5th, 2001
 9   upside report, turn to the second page of that
10   report, your upside adjustments come down?
11        A     That is correct.
12        Q     From 43.4 million to 32.796 million?
13        A     That is correct, but the forecast also
14   changed; the forecast also came down.
15        Q     And that's the first time that the field
16   forecast came down; is that right?
17        A     I don't know.  I would have to go back and
18   validate if that's a true or not statement -- a true
19   statement or not.  Sorry.
20        Q     I'll represent that it is.
21              The earnings per share, now, this is the
22   first time without rounding that you are falling
23   below market expectation; is that right?
24              MR. WALD:  Object to the form.
25              THE WITNESS:  Yes.
```

1  BY MR. BRITTON:
2     Q    So even with rounding, you are not going to
3  achieve market guidance?
4     A    At this point in the quarter.  But, again,
5  our quarters are so back-end loaded that this is not
6  indicative that we aren't going to make our quarter.
7     Q    Well, this is your best estimate of where
8  the quarter was going --
9     A    At that point in time.
10    Q    Okay.  And if you knew of anything that
11 would change in the last few days of the quarter,
12 they would have been reflected here; right?
13         MR. WALD:  As of February 5th?
14         MR. BRITTON:  Correct.
15         THE WITNESS:  If the information that came
16 to me in the last few days of the quarter had been
17 brought to my attention earlier in the corner -- in
18 the quarter, as of February 5th, they would have been
19 reflected here.
20         MR. BRITTON:  Right.
21    Q    And the field forecast, it's down to
22 10.5 cents per share; right?
23    A    That is correct.
24    Q    And this February 5th, 2001 upside report
25 was passed out at the executive committee meetings;

```
 1   is that right?
 2        A    If we had an executive committee meeting on
 3   that date, it would have been passed out to certain
 4   members of the executive committee.
 5        Q    Okay.  And that would include Larry
 6   Ellison, Jeff Henley, Sandy Sanderson, among others?
 7        A    Sandy Sanderson -- no, it would not.  The
 8   entire upside package was only distributed to Larry,
 9   Jeff Henley, and Safra Catz, as well as myself.  The
10   field guys, meaning the folks such as Sandy
11   Sanderson, Jay Nussbaum, and whatnot, only received a
12   couple of pages from the forecast which showed the
13   license revenue forecast only.  We did not have a
14   wide distribution of the total company-wide forecast.
15        Q    All right.  If you turn to Exhibit 28A with
16   the Bates ending at 250?
17        A    Yes.
18        Q    Now, you have no upside adjustments for any
19   of the field organizations; is that right --
20   withdrawn.
21             You have no upside adjustments for OSI,
22   NAS, or OPI; is that right?
23        A    That is correct.
24        Q    Okay.  Why not?
25        A    Again, I do not have the -- I do not recall
```

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2         I, RACHEL FERRIER, CSR, CSR No. 6948, duly
 3    authorized to administer oaths pursuant to Section
 4    8211 of the California Code of Civil Procedure,
 5    hereby certify that the witness in the foregoing
 6    deposition was by me sworn to testify to the truth,
 7    the whole truth and nothing but the truth in the
 8    within-entitled cause; that said deposition was taken
 9    at the time and place therein stated; that the
10    testimony of said witness was reported by me and was
11    thereafter transcribed by me or under my direction by
12    means of computer-aided transcription; that the
13    foregoing is a full, complete and true record of said
14    testimony; and that the witness was given an
15    opportunity to read and correct said deposition and
16    to subscribe same.
17         I further certify that I am not of counsel or
18    attorney for either or any of the parties in the
19    foregoing deposition and caption named, nor in any
20    way interested in the outcome of the cause named in
21    said caption.
22         IN WITNESS WHEREOF, I have hereunto subscribed
23    by my hand this 5th day of October, 2006.
24
25    _____
                RACHEL FERRIER, CSR No. 6948
```