IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re ORACLE CORPORATION
SECURITIES LITIGATION,

vs.                              Master File No.: C-01-0988-MJJ

This Document Relates To:,

    ALL ACTIONS.

_____/

Certified Copy

---o0o---

CONFIDENTIAL

DEPOSITION OF JEFFREY HENLEY

Thursday, November 16, 2006

VOLUME II, Pages 228 - 494

---o0o---

SHEILA CHASE & ASSOCIATES
REPORTING FOR
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:  (415) 321-2301

Reported by
APRIL DAWN HEVEROH, CSR
CSR No. 8759

1    and Larry and others, I guess, somehow knew that we were

2    going to miss our quarter and we were trading stock and

3    knowing what the market did.  So I think that's the

4    central issue.

5        Q.   And your understanding of the issues, then,

6    hasn't changed at all since we first began speaking the

7    first session; is that right?

8        A.   That's right.

9             MR. SOLOMON:  Let's have in front of you the

10   transcript of the first session.  I guess we may as well

11   mark it as Exhibit 48.

12             (Whereupon, Plaintiff's Exhibit 48 was marked

13             for identification.)

14             MR. SOLOMON:  Q.  And just to be clear, you

15   didn't, after the first session, have any conversations

16   with Mr. Ellison about --

17       A.   No, I've never had any conversations with him

18   about this.

19       Q.   Or, in fact, with anybody other than your

20   lawyers; is that your testimony?

21       A.   That's correct.

22       Q.   And have you reviewed your deposition

23   transcript since the first session?

24       A.   Yes.

25       Q.   And were there any errors in there that you

```
 1    noticed?
 2         A.   I think we noted a few minor things and that
 3    sort of thing, but for the most part, I think it was
 4    reflective of what we said.
 5         Q.   Turn to page 143 of the transcript.  You'll
 6    see that, if you look at line 10 onwards, you say,
 7    "'Well, gee, this is what I had,' but I've always been,
 8    as I testified earlier, very careful not to talk about
 9    the quarter when people come in to see me.  I have no
10    interest in getting into the details of the quarter."
11              Do you see that?
12         A.   Yes.
13         Q.   And you stick by that testimony today, do you?
14         A.   That's correct.
15         Q.   And it's your testimony still that you didn't
16    reaffirm guidance intra-quarter; is that your testimony?
17         A.   Yes.  My policy was always to not get into
18    reiterating guidance because I had no more information
19    than what I did on the earnings call at any quarter.
20              MR. SOLOMON:  Okay.  I'll have marked as the
21    next exhibit a news article dated October 4, 2000.
22              (Whereupon, Plaintiff's Exhibit 49 was marked
23              for identification.)
24              MR. SOLOMON:  Q.  Do you recognize this?
25         A.   I don't, but I'm sure I must have said it.
```

1   I'm sure it must have been published, apparently, by

2   Oracle.

3       Q.   And what is this if it's not you reiterating

4   guidance intra-quarter?

5       A.   I don't -- I don't view this as reiterating

6   guidance.  I think this is a -- this was done,

7   apparently, at one of our conventions.  This is our

8   annual trade show Open World, and our PR people were --

9   I don't know if I said this at the conference or whether

10  they put this out, but, you know, I don't consider this

11  reiterating guidance.  My position was always that I --

12  we gave everybody everything we do at our quarterly

13  earnings call, and unless there was a material change

14  that I could be sure of that there was no benefit to me

15  to, you know, reiterate guidance, there was nothing more

16  for me to tell people.  My obligation was to tell people

17  if something changed.

18      Q.   Here's what it says in the second paragraph in

19  part in quotes.  "'There has been no change in the

20  outlook for Oracle's financial results in the current

21  fiscal quarter and its full fiscal year,' said Oracle

22  Chief Financial Officer Jeff Henley."

23           What is that if it's not reiterating guidance?

24      A.   I don't know.  All I know is this was --

25           Again, what was the date?  October 4th?

1        Q.    That's what it says at the top, October 4,

2    2000.

3        A.    So this would have been a couple of weeks

4    after we had our earnings call, I think, 'cause

5    typically, we would have -- we would end our quarter.

6    That quarter would have been August.  We would have done

7    an earnings call two or three weeks into September.  So

8    this would have been, I guess, a couple of weeks after

9    the September call.  So it's -- you know, I don't

10   remember it, but maybe I did say it.  But it was

11   basically just reiterating what I basically told the

12   analysts a couple weeks before.

13       Q.    This is an Oracle document.  Do you know that?

14       A.    It -- apparently, it says it's coming from PR

15   Newswire, which is put out by Oracle, yes.

16       Q.    And you know you never produced this in

17   litigation to us.  We had to get this ourselves.  Did

18   you know that?

19       A.    I did not know that.

20       Q.    And isn't it remarkable that you lied about

21   not reaffirming guidance and we find it in a document

22   you didn't produce?

23            MR. LINDSTROM:  Objection, argumentative.

24   Assumes facts.

25            THE WITNESS:  I didn't lie about anything.

1    I'm telling you what my position has been when I was CFO

2    for Oracle for 13 years.  It was always to basically

3    tell people, "Look, I've given you the quarter in the

4    earnings call.  I've told you everything I know, and

5    unless something changes, there's nothing more I can

6    tell you."  And I really spent most of my time

7    historically, whenever I talked to analysts, talking

8    about the big picture of where things were going.  So I

9    don't find this inconsistent.

10              MR. SOLOMON:  Q.  I want you to look at page

11    144.

12              MR. LINDSTROM:  Of his deposition, Exhibit 48?

13              THE WITNESS:  The next page here?

14              MR. SOLOMON:  Q.  Start at line 17.  And it

15    reads, "And it says, 'Mr. Henley reiterated that the

16    company's outlook and guidance were unchanged for F3Q

17    '01.'"

18              And your testimony is that that is not true,

19    and your answer was, "My stock line is always that I'm

20    not going to get into the quarter.  If we have something

21    to report to you, we'll do it publicly.  I'm not going

22    to get into the quarter.  So a lot of these guys

23    interpret that, I guess, to mean that there's no change.

24    I don't use those words; never have, never will.  I just

25    don't get into talking about the quarter."

```
 1        A.    That's correct.  And again --

 2              MR. LINDSTROM:  There's no pending question.

 3    He's just reading from your prior transcript.  If he

 4    wishes to ask you a question, he'll do so.

 5              MR. SOLOMON:  Q.  The pending question now is:

 6    What did you want to add?

 7        A.    I don't think I have any more to add than what

 8    I said in the deposition last time.  I think that

 9    summarized the positions I always had.

10        Q.    And your position is you would only give

11    guidance at the beginning of the quarter, and you would

12    never reiterate guidance within the quarter; is that

13    right?

14              MR. LINDSTROM:  Objection.  Mischaracterizes

15    his testimony.

16              MR. SOLOMON:  Q.  Is that your testimony?

17        A.    My testimony, again, is that we gave a lot of

18    thought into what happened in the previous quarter at

19    our earnings call and what the outlook was for the

20    current quarter, and that I -- my stock answer, whenever

21    I went to conferences during that quarter, was, "Look,

22    I've told you all I know about the quarter.  There's no

23    sense getting into the quarter at this point.  That's

24    not why I'm here to talk to you."

25        Q.    Okay.  And you did not use these words, then;
```

1   is that right?

2        A.   I never used -- to the best of my

3   recollection, I have never used the words "I reiterate

4   guidance.  I reiterate that our guidance is the same."

5   I don't believe I've ever used those words.

6        Q.   But you may have used the word that there has

7   been no change in the outlook for Oracle's financial

8   results in the current fiscal quarter.  Is that your

9   testimony?

10            MR. LINDSTROM:  Objection.  Argumentative,

11   mischaracterizes his testimony.

12            THE WITNESS:  You've showed me a document

13   where, apparently, I was quoted saying something, so

14   it's quite conceivable this is what I said.  And it may

15   have -- I may have occasionally done something in a

16   public format like this a couple weeks after, but I

17   don't consider that reiteration guidance when something

18   comes out of our PR department at Open World two weeks

19   after I just made all the statements to the public.

20            MR. SOLOMON:  Q.  Okay.  And was this an

21   unusual event, by the way, for you to do this?

22            MR. LINDSTROM:  To do what?

23            MR. SOLOMON:  Q.  Sorry.  For Oracle to issue

24   a statement in the middle of the quarter, almost in the

25   middle of the quarter saying there's been no change in

```
 1              MR. SOLOMON:  Q.  If anyone.  You don't know?
 2         A.   No.
 3         Q.   In fact, you know nothing about Larry Ellison
 4    at HP; is that fair?
 5         A.   Well, no.  Are you talking about in general,
 6    or on this particular --
 7         Q.   Larry Ellison's relationship with HP.
 8         A.   Oh, sure.  I think Larry's met a number of
 9    people over the years that have been -- senior people at
10    HP over the years.  From time to time, he's met people.
11    I know that.  Just like he's met people from Sun and
12    some of our large hardware partners.
13         Q.   And has he met them socially or in the context
14    of business?
15         A.   Certainly, I'm speaking of business.  I have
16    no idea what he does socially.
17         Q.   And when he did business with Hewlett Packard,
18    what was his role in doing business with Hewlett
19    Packard?
20              MR. LINDSTROM:  Compound, assumes facts, no
21    foundation.
22              THE WITNESS:  Again, over the years, they --
23    Sun, IBM, others -- had been important partners.  They
24    sell our database on their hardware.  So he's had
25    relational meetings with them, talked about working
```

Henley, Jeffrey  - Volume II
CONFIDENTIAL

11/16/2006

1  together, you know, going to market together, things

2  like that.  But beyond that, I really have typically not

3  been in the meetings.  I have no idea the kinds of

4  things he's gotten into with them.

5       MR. SOLOMON:  Q.  Okay.  Gary Roberts, do you

6  know him to be an honest man?

7       A.  Yes.

8       Q.  And if he says, "Larry, I believe you'll be

9  discussing discounts with Hewlett Packard today," you've

10  got no reason to believe that that's not true?

11       A.  I believe he said what he said.  He said, "I

12  believe you'll be discussing."  He's speculating, I

13  guess.  I don't know.

14       Q.  All right.  Now, why did you forward this on

15  to Tom Williams?

16       A.  Because they -- we were trying to sell them

17  software, and based on what Gary said, we have a process

18  that if we ever have a situation where we're both trying

19  to sell each other something, I want to make sure the

20  revenue recognition people are right front and center.

21  So Tom Williams ran revenue recognition for us for many

22  years and is a very able guy, so I immediately forwarded

23  it to him, so he was aware of it and could weigh it in

24  with Gary or anybody else to be confident that this was

25  separate transactions, arms length, et cetera.

1      Q.    Okay.  Did you get involved with assessing the

2   propriety of this deal?

3      A.    I don't believe so.  Again, that's why I said

4   before, I wasn't involved.  I was aware of this and

5   other things over time.  But my approach was to send it

6   to the experts in this case.  If it's a rev rec issue,

7   let Tom Williams get involved and make those calls.

8      Q.    Okay.  So when you testified -- excuse me.

9   Let me just go back to it.

10          When you testified that you weren't involved,

11  you meant to say you weren't involved beyond forwarding

12  this --

13     A.    Yes.  That's informational stuff, but my

14  involvement is if I'm good at making calls on revenue

15  recognition, or I'm involved in negotiating, that, to

16  me, is involvement.  I think I did testify I was aware

17  of it, heard about it and so forth.

18     Q.    How did you hear about it?

19     A.    Again, I knew we were talking to them, and at

20  the end of the quarter we published quarters of all of

21  the larger transactions.  So I'm always made aware of

22  all of our larger transactions at the end of the

23  quarter.  Again, informational, typically never -- many

24  of them I have never heard of.  This one I had heard of

25  because of this information that I got that I forwarded

1    to Tom Williams.

2              MR. SOLOMON:  I'll have marked as the next

3    exhibit a document produced by the defendants in this

4    litigation with the control numbers 044428 through 505.

5              (Whereupon, Plaintiff's Exhibit 58 was marked

6              for identification.)

7              THE WITNESS:  Again, you don't want me to read

8    all of this?

9              MR. SOLOMON:  Q.  No, I want to know if you

10   recognize it, though.

11        A.   Again, this looks like a typical quarterly

12   package that's sent to our directors in advance of our

13   quarterly board meeting.

14        Q.   Okay.  I'm looking at the second page of the

15   document.  It lists you as being a recipient.

16             Do you see that?

17        A.   Yes, on the -- it says, "The notice of the

18   regular meeting."

19        Q.   Yeah.

20        A.   Yes.

21        Q.   And as far as you know, you did receive this,

22   right?

23        A.   Yes.  Sure.  I always get the quarterly

24   package.

25        Q.   And on the next page, control No. 044430,

1    And that was really the whole spirit, I think, when you

2    first started your line of questioning the last time.

3        Q.   It says Don Lucas wasn't present.  How was he

4    involved in the approval?

5        A.   Just like me.  There's three of us that have

6    to go -- if something goes beyond Larry Ellison's

7    spending authority, then it goes to the executive

8    committee.  And then if it goes beyond the spending

9    authority of the executive committee, the full board has

10   to approve it.

11       Q.   Who approved this deal, this HP deal?  Who

12   approved it?

13            MR. LINDSTROM:  Objection.  No foundation,

14   calls for speculation.  It's also ambiguous as to what

15   deal you're talking about, whether it's the purchase of

16   hardware from HP or the purchase by HP of product from

17   Oracle.  You just referred to "deal".

18            THE WITNESS:  I agree.  So if you could --

19            MR. SOLOMON:   Q.   Who approved the purchase

20   from HP?

21       A.   Well, it started with Gary Roberts negotiating

22   it, probably, who ran IT and some of his guys.  Then

23   clearly, the chain of command is Larry Ellison had to

24   then approve it because Gary didn't have the spending

25   authority, and Larry himself had to send it up to Don

1   and me because it was beyond his -- so technically, the

2   final approval was the three of us.  But all the work

3   was done way below my level.

4        Q.    How did Don Lucas indicate his approval?

5        A.    I don't know.

6        Q.    What has been redacted?

7             MR. LINDSTROM:  He's already answered you.

8             THE WITNESS:  I told you earlier, I have no

9   idea what's been redacted.

10             MR. SOLOMON:  Q.  Do you know the purpose of

11   the redaction?

12        A.    I told you earlier, I have no idea.

13        Q.    What do you mean when you say that you wanted

14   to be sure the HP deal was offset separately?

15             MR. LINDSTROM:  Mischaracterizes his

16   testimony.

17             THE WITNESS:  We've had a rule for a long time

18   that we don't do what is referred to in the industry and

19   what I've read about in some companies doing called

20   barter transactions, all right?  So we will only buy

21   things from vendors when we need them and at arms length

22   prices.  And a way to make sure that -- and our auditors

23   are very concerned about this, as well.  So we've had a

24   process that any time something like this came up --

25   there have been several situations like this over the

1    years, that Tom Williams got involved, our auditors

2    looked at it, 'cause we wanted to be absolutely certain

3    that this was a legitimate, independent transaction from

4    what was being sold to the customer.

5            MR. SOLOMON:  Q.  And how did you satisfy

6    yourself when giving approval that you were looking at

7    independent transactions?

8            MR. LINDSTROM:  Assumes facts.

9    Mischaracterizes his testimony.

10           THE WITNESS:  I -- certainly there was a

11   presentation made to us to give us the assurance that it

12   was a -- each side stood on its own and so forth, and

13   Tom Williams had looked at it.  So I have great

14   confidence that if he would buy off on it, it met all

15   the tests from an accounting standpoint.  And certainly

16   from a business standpoint, Larry, as well as Gary

17   Roberts, were well aware of the concern that we had that

18   we had to make sure that these things were, you know,

19   legitimate business purposes and not done just to sort

20   of generate revenue.

21           Q.   And who made the presentation?

22           A.   I don't remember.

23           Q.   Do you know whether, under GAAP, the

24   transaction with HP on November 30th, 2000 would be

25   characterized as a barter deal?

```
 1            MR. LINDSTROM:  Objection.  No foundation,

 2    calls for expert conclusion beyond his expertise.

 3            THE WITNESS:  Yeah, ask me the question again.

 4            MR. SOLOMON:  Q.  Do you know whether, under

 5    GAAP, the transaction with HP on November 30th, 2000

 6    would be characterized as a barter deal?

 7            MR. LINDSTROM:  Same objections.

 8            THE WITNESS:  I don't know the answer to that.

 9    I know that Tom Williams looked at it very carefully,

10    and however we recognized revenue, booked the cost into

11    our fixed assets records, I'm confident was done

12    properly according to GAAP.  Whether the barter -- I'm

13    not sure what that means.

14            MR. SOLOMON:  Q.  Now, you were the Chief

15    Financial Officer at the time, correct?

16        A.   That's correct.

17        Q.   And Tom Williams reported to you; is that

18    right?

19        A.   He did for a number of years.  He was our

20    Chief Accounting Officer, and then he moved to Rocklin

21    and took on a role as the head of shared services and

22    revenue recognition.  So I honestly don't remember

23    whether Tom was in his former role or his latter role,

24    but in either role, he always got involved with revenue

25    recognition issues of large transactions.  So he may not
```

1   have reported to me when -- he didn't when he was in

2   Rocklin, but he still had the same functional

3   responsibility for revenue recognition.

4        Q.   Now, if you look at the minutes under

5   attendants and quorum, it doesn't appear that

6   Mr. Williams was invited to attend that meeting.

7             Is that fair?

8        A.   Where is this, again?

9             MR. LINDSTROM:  Objection.  The document

10  speaks for itself.

11            MR. SOLOMON:  Q.  044458.

12       A.   He's not listed.

13       Q.   Okay.  Now, why would he not be there if this

14  meeting was to assess whether or not to approve the

15  deal?

16            MR. LINDSTROM:  Which deal?

17            MR. SOLOMON:  Q.  The Hewlett Packard deal or

18  deals.

19       A.   Well, we don't know.  I mean, it was

20  something, apparently, but I don't think we always have

21  every expert at every meeting.  Safra and Dan, myself,

22  all know what Tom does, and if Tom looked at something

23  and told us, "Okay.  It doesn't necessarily need to be

24  there."  Certainly if anybody had a question, they could

25  phone him.  I don't recollect whether we did that or

1        Q.    Okay.

2        A.    I wasn't shown as a copy, but --

3        Q.    So in -- is it fair to say, in granting your

4    approval for Mr. Nussbaum, you are unaware of what's

5    detailed against No. 1 here?

6        A.    I think that's right.  But even if I saw this,

7    it wouldn't have changed my position.

8        Q.    I'm sure that's going to be your position.

9              Under 2, it says, "Lack of big deals.  Unlike

10   Q1 and 2, we have a few big deals in best case" --

11   sorry.  "We have few big deals in best case that could

12   drive us past the 360 line."

13             Do you see that?  The $360 line.

14       A.    Uh-huh.

15       Q.    Now, were you aware of that at the time you

16   granted approval to Mr. Nussbaum?

17       A.    Again, I don't recall this note, and I don't

18   recall all the details of comments that George Roberts

19   or other people made.  I really don't.

20       Q.    Okay.  Under 3 it says, "Drop in technology."

21   It says, "As reflected in the softening pipe, both GB

22   and Majors see a slowdown in both Q3 and Q4.  GB's dot

23   bubble have burst," and parens, "(They expect the west

24   to end the year 30 to $40 million behind their original

25   budget for technology.)"

1          Do you see that?

2     A.    Yes.

3     Q.    Does that part of 3, were you aware of those

4  facts at the time you allowed Mr. Nussbaum to trade?

5     A.    I don't recall, other than I did, as I

6  testified earlier, get occasional pipeline reports which

7  had their numbers as part of the global numbers.  As I

8  testified earlier, we were skeptical of the strength of

9  the pipeline to start the quarter, so we did not make

10  all that into our forecast for the third quarter.  So

11  the fact that some of that pipeline growth slowed down

12  was not a big surprise.  We didn't expect it.  We would

13  have never forecasted 52 percent growth in license

14  revenue even if the pipeline said it.

15     Q.    And just in terms of your skepticism, what

16  drove your skepticism as to the strength of the

17  pipeline?

18     A.    It was just too good to be true.  In other

19  words, the pipeline is somewhat unscientific.  It

20  doesn't have perfect correlation.  We've looked at it

21  over the years, and it just -- it sounded great, but we

22  weren't going to get out there and set an expectation

23  based on a number that just seemed high.  We couldn't

24  get a good read from people, and so we just decided to

25  be more conservative, and sure enough, fairly quickly my

1  recollection was that the pipeline growth was still

2  good, but it slowed down a bit from what the original

3  numbers that you showed me here.

4       Q.   Carrying on in point 3, "Majors sees a

5  slowdown in spend along with smaller deal sizes."

6            Were you aware of that at the time of the

7  Nussbaum trade?

8       A.   I don't recall.  I had thorough conversations

9  at our executive committee with all the executives,

10  so -- I don't recall exactly all the details of what was

11  said.

12       Q.   And then it goes on to say, "Also, the change

13  in the ASP model for generic tech hosting, 11 C's," it

14  looks like, but you can tell me what that means, if you

15  know, "coupled with the dot-com crash is impacting

16  projected tech results in that segment."

17            Do you see that?

18            MR. LINDSTROM:  I don't think it's 11 Cs.

19            MR. SOLOMON:  What does it say, 11 --

20            MS. KYROUZ:  L-I-C.

21            MR. SOLOMON:  Thank you very much.

22       Q.   So I assume that's short for licenses?

23       A.   Licenses, I believe, sure.

24       Q.   So were you aware of those facts at the time

25  you allowed Mr. Nussbaum to trade?

```
 1        A.   I believe that we knew that the dot-com growth
 2   was starting to change, absolutely.  Again, I don't see
 3   this -- but George Roberts is a very honest guy.  I
 4   think he represented a lot of detail about what he did
 5   in his meetings with all of his people.  David, I think,
 6   worked for him.  So I don't remember exactly all the
 7   things that were done, other than we grilled all of our
 8   executives intensively trying to be sure we had a good
 9   sense of how we were going to do for the quarter and
10   whether we were going to make the quarter.
11        Q.   It's fair to say, is it not, that the
12   information here, with respect to the softening of the
13   pipe and the slowdown in GB and Majors, was non-public
14   information at the time; is that true?
15        A.   We did not publish interim pipeline data
16   publicly.  We didn't publish any pipeline data publicly,
17   never have.  And again, you're -- you're talking about a
18   relative change in growth rate.  It was still a very
19   healthy growth rate.  It just wasn't as strong as the
20   initial report, which we had discounted when we made our
21   forecast.
22        Q.   Because that was too good to be true?
23        A.   Yeah, it just didn't make sense, so we
24   decided, "Look, let's -- it's early.  A lot of times
25   there's cleanup that goes on in pipelines, and so let's
```

```
 1    be more conservative based on trends, and we'll see how
 2    it comes out."
 3        Q.    Wouldn't another element of the conservative
 4    approach and prudent approach have been to not allow
 5    people to trade while in possession of this non-public
 6    information?
 7             MR. LINDSTROM:  Can we have that question
 8    reread, please?
 9             THE REPORTER:  I'm struggling with it myself.
10    I was going to ask him to say it again.
11             MR. SOLOMON:  Q.  Wouldn't another element of
12    the conservative approach you're talking about have been
13    to not allow people inside the company to trade while
14    the investing public didn't have this information?
15             MR. LINDSTROM:  Objection.  Argumentative.
16             THE WITNESS:  Well, then we would never trade
17    because we never give out that information.  So I don't
18    understand your point.  We never give out pipeline data.
19    We routinely generate it.  It was factored into our
20    forecast.
21             MR. SOLOMON:  Q.  Well, maybe you should never
22    trade if you're in possession of non-public information
23    that would affect the public's --
24             MR. LINDSTROM:  Objection, argumentative.
25             MR. SOLOMON:  Q.  Well, is that funny?
```

1   were done."

2           Do you see that?

3       A.   Yes.

4       Q.   And do you recall reversing -- having revenue

5   reversed out of Q3 '01 because it was recorded

6   incorrectly?

7           MR. LINDSTROM:  You're asking him whether he

8   recalls?

9           MR. SOLOMON:  Yes.

10          THE WITNESS:  Again, I said that I didn't

11  recollect the numbers, anything that happened in the

12  accounting organization.

13          MR. SOLOMON:  Q.  Okay.

14          Okay.  Let's go off the record for a few

15  minutes.

16          (Recess taken from 4:43 to 5:06 P.M.)

17          MR. SOLOMON:  Q.  Were you aware, Mr. Henley,

18  that throughout fiscal 2001, tens of millions of dollars

19  were transferred from Oracle's customer overpayments

20  account to Oracle's bad debt reserve?

21      A.   Customer overpayments to bad debts.  Again,

22  does this relate to this matter we talked about earlier

23  where there were accounting -- things were being debited

24  and credited to wrong accounts, and we had to go clean

25  that up?  Is this what you're referring to?

1       Q.   I'm trying to ask you that question, actually,

2    without necessarily tying it to the cleanup.  I just

3    want to know if you're aware that throughout fiscal

4    2001, tens of millions of dollars was taken out of the

5    customer overpayment account at Oracle and applied to

6    the bad debt reserve.

7       A.   Again, as I said earlier, I was not aware of

8    all the ins and outs of what people were doing in the

9    departments.

10      Q.   Who at Oracle, in fiscal 2001, would have been

11   responsible for making adjustments to Oracle's bad debt

12   reserve?

13      A.   Certainly the review was done by Jennifer

14   Minton, and then there were typically people in the

15   geographic areas, like the Americas in this case.  I

16   think you're speaking to like Tom Williams and his group

17   would go through that review, sure.

18      Q.   So assuming it's true, that tens of millions

19   of dollars in fiscal 2001 were taken from the customer

20   overpayment account and applied to the bad debt reserve,

21   assuming that's true, would you expect Ms. Minton to

22   have been aware of it?

23      A.   I don't know.  I mean, the original

24   assertions, allegations that were made, I remember she

25   was like me.  We didn't -- it was over in Rocklin, and

1    both of us thought it was a fantasy, but it was a

2    concern.  "My goodness, we need to look into this."  So

3    I have no idea what she knew or didn't know.  But I know

4    specifically she did a review with the folks over there,

5    and did this for years, on the bad debt reserve.

6        Q.   And she would do that intra-quarter; is that

7    right?

8        A.   Typically, we would do it before the quarter

9    ended, yes.

10       Q.   Right.

11       A.   Towards the end of the quarter.

12       Q.   Okay.  And you said, earlier on, that with

13   respect to the -- what we're going to call, or what I

14   think Oracle has called the cleanup, with respect to the

15   debit memos in November of 2000, after we made our

16   allegations, you got people involved; is that right?

17       A.   That's correct.

18            MR. LINDSTROM:  Vague and ambiguous.

19            THE WITNESS:  I asked Jennifer and then all

20   the way down, and we got people in the -- the department

21   itself, as well as others, including the internal audit,

22   external auditors, to really get in and understand what

23   did or didn't happen.

24            MR. SOLOMON:  Q.   Okay.  And so you've

25   answered at least the question partially.  You got

1   Ms. Minton involved, you got external auditors involved.

2   Which external auditors?

3        A.   Whoever were our public auditors at the time.

4        Q.   Okay.

5        A.   Either Arthur Anderson or Ernst and Young.

6   And I testified earlier, I can't remember when we

7   switched auditors.

8        Q.   And you got Tom Williams involved?

9        A.   Tom Williams worked for Jennifer Minton, and

10  he clearly was involved because the credit collections

11  department and billing and those things all reported to

12  him, I think.

13       Q.   Are you aware that after allegations had been

14  made with respect to the debit memos, that thereafter,

15  hundreds of refunds were then made to Oracle customers?

16            MR. LINDSTROM:  Assumes facts.

17            THE WITNESS:  I can't remember, but I was

18  aware of the cleanup, and part of the cleanup was kind

19  of getting caught up on duplicate payments or things

20  like that.  So whether it was hundreds or not, I don't

21  know the specifics.

22            MR. SOLOMON:  Q.  Okay.  And have you ever

23  made an effort to ascertain the total dollar amount of

24  refunds that were made after our allegations were filed?

25       A.   These are refunds to customers?  No, I have

REPORTER'S CERTIFICATE

1

2

3           I hereby certify that the foregoing is a true

4   record of the testimony as reported to the best of my

5   ability by me, a Certified Shorthand Reporter and a

6   disinterested person, and was thereafter transcribed

7   under my direction into typewriting by computer.

8

9           I FURTHER CERTIFY that I am not interested in

10  the outcome of the said action and not connected with

11  nor related to any of the parties in said action or

12  their respective counsel.

13  Dated: 11-21-06

14                          for APRIL DAWN HEVEROH, CSR
                                CSR NO. 8759

15

16

17

18

19

20

21

22

23

24

25

Case:       In re Oracle Securities Litigation, Master File No. C-01-0988MJ1

Witness:    Jeffrey O. Henley

Date:       November 16, 2006

Reporter:   April Dawn Heverah, CSR No. 8759

I HAVE READ THE EXAMINATION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____        No changes need to be made to the transcript.

___X___         Changes listed below.


_Jeffrey O. Henley_                              _1-5-07_
WITNESS SIGNATURE                                DATE SIGNED

Note:  Please check the appropriate column for add (+) or delete (-).  If you wish to
add anything to the deposition, use the exact words you want to add.  If you wish to
delete anything from the deposition, please use the exact words you want to delete.
Thank you.

| Page/Line | + | – | | Reason |
|-----------|---|---|---|--------|
| 238:3 | | | Change "knowing what the market did" to "knowing things before the market knew it" | Incomplete |
| 244:17 | | | Change "reiteration" to "reiterating" | Grammatical error |
| 253:16 | | | Change the period to a comma | Typographical error |
| Passim | | | Change "sale site" to "sell side" | Typographical error |
| Passim | | | Change "APSWorld" to "Apps World" | Typographical error |
| 273:16 | | | Delete "an" | Grammatical error |
| Passim | | | Change "Lang" to "Lange" | Typographical error |
| 293:10 | | | Change "what the audit committee." to "what the audit committee intended," | Incomplete sentence |
| 299:4 | | | Change "whether that detail." to "whether that detail was listed," | Incomplete sentence |
| 300:25 | | | Change "we occasionally have" to "we occasionally have them" | Incomplete |
| 302:16 | | | Change "time, at the time was Bruce Lang" to "time, Bruce Lange" | Grammatical error |

| | | |
|---|---|---|
| 316:19 | Change "and" to "at" | Typographical error |
| 329:8 | Change "wouldn't" to "would" | Grammatical error |
| 345:14 | Change "'cause" to "because" | Grammatical error |
| 348:25 | Change "asking about Larry Ellison" to "being asked about Larry Ellison" | Incomplete |
| 359:21 | Change "accounts in" to "accounts division in" | Incomplete |
| 390:3 | Delete "from the previous" | Incorrect preposition |
| 407:2 | Change "Zone" to "Zhone" | Typographical error |
| 407:3 | Change "representative for Baker" to "representative, Baker" | Typographical error |
| 409:16 | Change "management" to "Order management" | Incomplete |
| 409:19 | Change "Oracle management" to "Order management" | Typographical error |
| Passim | Change "1103" to "11.0.3" | Typographical error |
| 415:25 | Change "technology, database" to "technology (database)" | Typographical error |
| 417:23 | Change "So" to "But" | Grammatical error |
| 419:13 | Change "reporting to him" to "reporting to me" | Incorrect |
| 420:20 | Delete "or" | Typographical error |
| 420:23 | Change "anything" to "nothing" | Grammatical error |
| 430:10 | Change "hit his" to "his" | Grammatical error |
| 453:5 | Change "Anderson" to "Andersen" | Typographical error |
| 467:1 | Change "nettting" to "netting" | Typographical error |
| 490:5 | Capitalize Economist | Typographical error |