LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
  505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
        michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
  Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
        matt.rawlinson@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Phone: (213) 485-1234
Fax: (213) 891-7863
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, CA 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF BROOKS HILLIARD; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF**<br><br>**Honorable Judge Martin J. Jenkins** |

LATHAM•WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1   TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

2           PLEASE TAKE NOTICE THAT Defendants Oracle Corporation, Lawrence J.

3   Ellison, Jeffrey O. Henley and Edward J. Sanderson (collectively, "Defendants") hereby move

4   the Court for an order precluding Plaintiffs from offering the expert declarations or testimony of

5   Brooks Hilliard at trial of this matter on grounds that Mr. Hilliard's declarations and testimony

6   are unreliable, irrelevant, and therefore inadmissible pursuant to Federal Rules of Evidence 403,

7   702, and 703 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  This Motion

8   is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the

9   files and records of this action, and such arguments and evidence as may be presented to the

10  Court at or prior to hearing.

11  Dated: July 26, 2007                    LATHAM & WATKINS LLP
                                            Peter A. Wald
12                                          Michele F. Kyrouz
                                            Patrick E. Gibbs
13                                          Jamie L. Wine
                                            Matthew Rawlinson
14

15

16                                          By: _____
                                        FoR  Matthew Rawlinson
17                                          Attorneys for Defendants ORACLE
                                            CORPORATION, LAWRENCE J. ELLISON,
18                                          JEFFREY O. HENLEY, and EDWARD J.
                                            SANDERSON
19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

# **TABLE OF CONTENTS**

**Pages**

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 3

III.  LEGAL STANDARDS ............................................................................................ 4

IV.   ARGUMENT ........................................................................................................... 6

    A.    Mr. Hilliard's Methodology Is Not Reliable ................................................. 6

        1.    Mr. Hilliard's Basic Methodology Is Fundamentally
            Flawed And Will Not Support His Conclusions ...................................... 6

            a.    *Mr. Hilliard Did Not Perform A Technical Analysis
                of Suite 11i* ............................................................................. 6

            b.    *Mr. Hilliard Did Not Perform An Systematic Or
                Comparative Analysis Of Suite 11i's Quality.* ...................... 7

            c.    *Dr. Jensen Confirms That Mr. Hilliard's Analysis
                Cannot Support Any Conclusion Regarding Suite
                11i's Quality Or Stability.* .................................................... 11

        2.    Mr. Hilliard's Methodology Suffers From A Variety of
            Other Problems. ................................................................................... 12

            a.    *Mr. Hilliard's Analysis Is Not Based On  Any
                Objective Standard.* .............................................................. 12

            b.    *Mr. Hilliard's Analysis Cannot Be Recreated Or
                Reproduced.* ......................................................................... 13

            c.    *Mr. Hilliard Knowingly Used A Biased,
                Unrepresentative Sample.* ..................................................... 14

            d.    *Mr. Hilliard Further Biased His Analysis By
                Discounting Any Information That Was Inconsistent
                With His Thesis.* ................................................................... 14

            e.    *Mr. Hilliard Employs Standards of Commercial
                Quality that are Impossible to Determine, Let Alone
                Meet* ..................................................................................... 15

            f.    *Mr. Hilliard Does Not Even Purport To Analyze
                The Evidence From The Perspective Of An Expert.* ................... 16

            g.    *The "Reliability" of Mr. Hilliard's Unspecified
                Methodology Is Further Undermined By Assertions
                That Are Plainly Incorrect.* .................................................. 17

    B.    Mr. Hilliard's Opinions Are Based On Insufficient And Unreliable
        Data ............................................................................................................. 17

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

C.   Many Of Mr. Hilliard's Primary Assertions Are Unsupported Or Contradicted By The Record ............................................................. 19

V.   CONCLUSION.............................................................................................. 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF AUTHORITIES

Pages

## CASES

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993) ............................................................................................. 18, 22

Cavallo v. Star Enter.,
892 F. Supp. 756 (E.D. Va. 1995), aff'd in pertinent part, 100 F.3d 1150 (4th
Cir. 1996) ........................................................................................................... 5, 8

Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir.), on
remand, cert. denied, 516 U.S. 869 (1995) .......................................................... 6, 14

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ............................................................................................ passim

Democratic Party of Wash. State v. Reed,
2002 WL 32925223 (W.D. Wash. 2002) ........................................................... 5, 13

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) ............................................................................................ 5

Goebel v. Denver & Rio Grande Western R.R.,
346 F.3d 987 (10th Cir. 2003) ........................................................................... 5

Guillory v. Domtar Industries, Inc.,
95 F.3d 1320 (5th Cir. 1996) ............................................................................. 23

In re Paoli R.R. Yard PCB Litig.,
35 F.3d 717 (3d Cir. 1994) ................................................................................. 6

In re Silicone Gel Breasts Implants,
318 F. Supp. 2d 879 (C.D. Cal. 2004) ............................................................... 13

Israel v. Springs Indus.,
2006 WL 3196956 (E.D.N.Y. 2006) .................................................................. 14

Jones v. United States,
933 F.Supp. 894 (N.D. Cal. 1996) ..................................................................... 5

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) ............................................................................................ 6, 21

Recreational Dev. of Phoenix, Inc. v. City of Phoenix,
220 F.Supp.2d 1054 (D. Ariz. 2002) ................................................................. 5, 7, 12

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

*Redfoot v. B.F. Ascher & Co.,*
    2007 WL 1593239 (N.D. Cal. 2007) ........................................................................ 6

*Redman v. John D. Brush & Co.,*
    111 F.3d 1174 (4th Cir. 1997) .......................................................................... 6, 19

*United States v. Finley,*
    301 F.3d 1000 (9th Cir. 2002) ........................................................................ 16, 18

*United States v. Webb,*
    115 F.3d (9th Cir. 1997) ...................................................................................... 4

*Weisgram v. Marley Company,*
    528 U.S. 440 (2000) .............................................................................................. 7

## OTHER AUTHORITIES

*4 Weinstein's Federal Evidence* § 702.03 .................................................... 15, 16

## RULES

Fed. R. Civ. Proc. 26 ................................................................................................ 13

Fed. R. Evid. 104 ....................................................................................................... 5

Fed. R. Evid. 702 .................................................................................................. 4, 15

Fed. R. Evid. 703 ............................................................................................ 5, 18, 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

The opinions of Brooks Hilliard, one of Plaintiffs' designated witnesses on Suite 11i, are based on such a deficient evidentiary basis and unreliable methodology that they belie his role as an "expert" here and risk misleading the jury as to the matters relevant to Plaintiffs' securities fraud claim.  Accordingly, Defendants move for an order excluding his declarations and testimony for failure to meet the requirements for expert opinions under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Mr. Hilliard's opinions are Plaintiffs' primary support for the proposition that various "product"-related statements made by Defendants were false – primarily statements comparing the pre-existing integration of Suite 11i with the integration needed to implement "best-of-breed" alternatives but also including statements that Suite 11i was "available" and "support[ed] global operations."  Mr. Hilliard does not dispute that Suite 11i was built to "work together" in a way that the "best-of-breed" products were not.  Nor does he dispute that the architecture of Suite 11i was engineered to be integrated around a single data model for the full suite of applications.  Mr. Hilliard freely admits that he ignored these issues and did not study the Suite 11i software or its technical documentation.  Instead, he limits himself to an indirect method of proof – arguing that the quality of Suite 11i was so poor that it necessarily rendered the statements false.

But Mr. Hilliard fails entirely to provide a reliable basis to support any conclusion about Suite 11i's quality.  He performed no systematic or comparative analysis of Suite 11i against any meaningful benchmark or standard.  Nor did he compare the quality of Suite 11i with the quality of competing products or other similarly complex software.  Instead, Mr. Hilliard's conclusion that Suite 11i was not of "commercial quality" (and his derivative conclusion that Defendants' statements were false) relies solely on anecdotal evidence from a small number of Oracle employees and customers regarding problems they encountered with Suite 11i.  He assumes these complaints, which are nearly all untested hearsay, accurately reflected the facts (an assumption that contradicts the process Mr. Hilliard follows in his own non-litigation work), then

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1   further assumes without basis that the problems described in the complaints were experienced by

2   Oracle's other customers (even those that did not complain).  All the while, Mr. Hilliard

3   inexplicably ignores both the context of the evidence he relies on as well as significant contrary

4   evidence demonstrating that many customers (including many he cites as examples of alleged

5   problems) used Suite 11i with great success.

6         The reasons that Mr. Hilliard's analysis cannot support the sweeping conclusions he

7   offers were confirmed by Dr. Randall Jensen, a second software expert proffered by Plaintiffs.

8   Dr. Jensen conceded each of the following points during his deposition:

9   •  Mr. Hilliard's report presents no basis or analysis sufficient to support any conclusion
       about the size of Suite 11i (other than that is was "very large"), and without knowing
10     the size of the software, one cannot determine the *expected* or normal number of bugs
       present upon release;
11

12   •  Mr. Hilliard's report presents no basis or analysis sufficient to support any conclusion
       regarding whether Suite 11i had a high, average, or low number of defects compared
       to similarly sized software or other ERP systems;
13

14   •  Mr. Hilliard's report presents no basis or analysis sufficient to determine the *actual*
       number of bugs present in Suite 11i, much less how many high severity errors were
15     present in the software;

16   •  The type of evidence relied upon by Mr. Hilliard (anecdotal evidence from customers
       and "error" reports) is inherently unreliable and is not relied upon by professionals in
17     the field to determine whether an error exists in software, much less to make overall
       judgments about the software's quality; and

18   •  In order to determine the level of Suite 11i's quality and "stability," one would need
       to perform a much broader, more even-handed analysis than the one Mr. Hilliard
19     performed, investigate complaints to determine if they were credible or meaningful,
20     and consider a larger set of information, including the type of positive information
       discounted by Mr. Hilliard from his analysis.
21

22         These failings are of particular concern here in light of the jury's unfamiliarity with

23   commercial software of Suite 11i's scale and complexity and the disconnect between Mr.

24   Hilliard's testimony and the statements Plaintiffs' claim were false and misleading, none of

25   which specifically addressed quality.  As a result, Mr. Hilliard's opinions run a serious risk of

26   creating the misleading impression that that Suite 11i's quality was poor compared to other large

27   software releases (and particularly typical of ERP systems) – even though his analysis cannot

28   support this proposition.  Defendants thus respectfully request an order excluding Mr. Hilliard's

   declarations from evidence and precluding Mr. Hilliard from testifying at trial.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

## II.     BACKGROUND

Mr. Hilliard offers Plaintiffs' main expert report in support of their claims that various "product"-related statements made by Defendants were false.  Although Mr. Hilliard articulates three separate opinions (with six categories of challenged statements), his analysis reveals that all of these opinions boil down to a claim about quality:  Mr. Hilliard believes that all of Defendants' statements about Suite 11i – from whether it was "integrated"[1] to whether it was even "available"[2] for sale – must have been false because customers were experiencing too many bugs.  *See generally* Declaration of Rees Morgan[3] at Exh. 1, Declaration of Brooks L. Hilliard ("Hilliard Report") at §§ 5.1.6, 5.2.3, 5.3.4, "Summing Up" (Suite 11i "never achieved minimally acceptable standards for commercial business software.").

Although only Mr. Hilliard's "Opinion #3" expressly purports to address "the quality of the Oracle 11i E-Business Suite," Mr. Hilliard's focus on quality runs through his other opinions as well, as he relies almost exclusively on anecdotal accounts of quality problems in the software to support all his opinions.  For example, to support his "Opinion #1" – that Defendants made false statements "about the functionality of the Oracle 11i E-Business Suite" – Mr. Hilliard includes a laundry list of "functional defects," based principally on customer complaints.  *See, e.g.*, *id.* at 46-48.  Mr. Hilliard does not contest that Suite 11i was designed to include all the "functionality" that Defendants represented; he merely contends that, for various reasons, the software "did not work."  *See id.* at 62.  Likewise, his "Opinion #2" – that Defendants made false statements "about the pre-integration of the components of the Oracle 11i E-Business Suite" – focuses on "integration defects" but does not contest that Suite 11i's architecture was integrated.

---

[1] Notably, however, Mr. Hilliard does not dispute that Suite 11i was substantially more integrated than "best-of-breed" software packages (*See* Exh. 2, Excerpts from Deposition of Brooks Hilliard ("Hilliard Tr.") at 144:1-11).  Mr. Hilliard's failure to contest this issue is significant because the context of *every one* of the Suite 11i-related statements Plaintiffs identified in discovery reveals Defendants were comparing Suite 11i's level of pre-integration and necessary systems integration to best-of-breed alternatives.  *See, e.g.*,Exh. 9, Responses to Contention Interrogatories at 8-15.

[2] In his report, Mr. Hilliard identified for the first time several statements that had never been included in any of Plaintiffs' complaints or in their responses to contention interrogatories, including the statement that Suite 11i was "available."  *Compare* Exh. 1, Hilliard Report at § 4 *with* Exhs. 8-9, Revised Second Amended Complaint, Responses to Contention Interrogatories at 8-15.

[3] All exhibits referenced herein are attached to the Declaration of Rees Morgan in support of this motion, filed concurrently herewith.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    *Compare* Exh. 1, Hilliard Report at 63 *with* Exh. 2, Hilliard Tr. at 157:9-22.

2         Plaintiffs have designated two software experts, however, and when it comes to assessing

3    the quality of software such as Suite 11i, Plaintiffs' second expert, Dr. Randall Jensen, has

4    superior qualifications:  Dr. Jensen has over 48 years of experience in the design, analysis,

5    application, and testing of sophisticated software systems. *See* Exh. 6, Rebuttal Declaration of

6    Randall Jensen ("Jensen Rebuttal") at Resume.  Dr. Jensen's extensive programming experience

7    provides him with significantly more insight than Mr. Hilliard into overall quality issues

8    associated with the release of major software like Suite 11i, and how to evaluate them .  Mr.

9    Hilliard, in contrast, is a management consultant who "does not do software development [or]

10   implement computer software or systems" (Exh. 1, Hilliard Report at Exh. 3) and who has never

11   opined on the overall quality or integration of a product like Suite 11i (*see* Exh. 2, Hilliard Tr. at

12   21:19-24, 24:13-17).  Accordingly, Dr. Jensen's Report and deposition testimony are of

13   significant value in understanding why Mr. Hilliard's methodology is fundamentally flawed.

14   **III.    LEGAL STANDARDS**

15        The touchstones of the admissibility of expert opinions are reliability and specific,

16   technical relevance to the issues in dispute.  As a result, Rule 702, permits the use of such

17   testimony *only* if it "will assist the trier of fact to understand the evidence or to determine a fact

18   in issue" *and* if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the

19   product of reliable principles and methods, and (3) the witness has applied the principles and

20   methods reliably to the facts of the case."  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 594.

21        Before expert testimony may be admitted, *Daubert* "demands a searching inquiry as to

22   method." *United States v. Webb*, 115 F.3d 711, 716 (9th Cir. 1997).  "[A]ny step that renders the

23   analysis unreliable . . . renders the expert's testimony inadmissible."  *Goebel v. Denver & Rio*

24   *Grande Western R.R.*, 346 F.3d 987, 992 (10th Cir. 2003) (citations and internal quotations

25   omitted).  Testimony that requires "too great an analytical gap between the data and the opinion

26   offered" is also impermissible.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

27        These same concerns limit the types of evidence considered sufficient to support reliable

28   conclusions.  Experts generally may not rely upon anecdotal reports because they are not derived

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

through the scientific method and "fall short of the proven, cause and effect relationship that is necessary to satisfy the *Daubert* standard." *Jones v. United States*, 933 F.Supp. 894, 898-900 (N.D. Cal. 1996), *aff'd* 127 F.3d 1154 (9th Cir. 1997), *cert. denied* 524 U.S. 946 (1998).  As one court noted:

> The danger here is that rather than the factual underpinnings consisting of empirical data, the witnesses' conclusions are supported by their experience (an amorphous matter in most cases), isolated anecdotal evidence, or belief.  This kind of evidence going to critical aspects of this case does not make for proper opinion testimony – lay or expert – and it must be excluded.

*Democratic Party of Wash. State v. Reed*, 2002 WL 32925223 at *15 (W.D. Wash. 2002). Anecdotal evidence is "by definition, non-systematic and non-generalizable." *Recreational Dev. of Phoenix, Inc. v. City of Phoenix*, 220 F.Supp.2d 1054, 1061 (D. Ariz. 2002); *see also Cavallo v. Star Enter.*, 892 F.Supp. 756, 765 (E.D. Va. 1995), *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir. 1996) (finding anecdotal reports unreliable "because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group.").

Rule 703 also forbids reliance on hearsay or other inadmissible evidence if experts would not normally rely on such materials to reach similar conclusions outside litigation. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In light of this restriction, opinions based on such evidence must be excluded unless Plaintiffs can show by a preponderance of the evidence that the inadmissible evidence is of a type normally relied on by experts in the field. *See* Fed. R. Evid. 104(a); *see also Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997).

Finally, because of its disproportionate impact on and potential to mislead the jury, expert testimony must satisfy a significantly higher standard of relevance than does typical fact testimony.  It must "logically advance[] a material aspect of the proposing party's case" and "speak[] clearly and directly to an issue in dispute in the case" in a manner that will "not mislead the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 & n.17 (9th Cir.), *on remand, cert. denied,* 516 U.S. 869 (1995); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[T]he standard for fit is higher than bare relevance."); *Redfoot v. B.F.*

1   *Ascher & Co.* 2007 WL 1593239, *4 (N.D. Cal. 2007); *Amaral*, 488 F.2d at 1152.

2   **IV.    ARGUMENT**

3       **A.    Mr. Hilliard's Methodology Is Not Reliable**

4           Mr. Hilliard's methods fall far short of the "exacting standards of reliability" required by

5   the Supreme Court. *Weisgram v. Marley Company*, 528 U.S. 440, 455 (2000). Mr. Hilliard's

6   approach suffers from many serious shortcomings, including his failure to conduct any technical,

7   systematic, or comparative analysis of the quality of Suite 11i, instead relying on anecdotal

8   evidence that courts routinely find unreliable. *See, e.g., City of Phoenix*, 220 F.Supp.2d at 1061.

9             1.    <u>Mr. Hilliard's Basic Methodology Is Fundamentally Flawed And Will Not</u>

10                 <u>Support His Conclusions</u>

11            a.    *Mr. Hilliard Did Not Perform A Technical Analysis of Suite 11i*

12          Mr. Hilliard freely admits that he did not perform any technical analysis whatsoever of

13  Suite 11i: he never used or observed the software and performed only a cursory review of the

14  technical reference manuals before dismissing them as irrelevant. *See* Exh. 1, Hilliard Report at

15  § 3.1 (installing and testing the software "would have no significant value in reaching my

16  opinions"); *see also* Exh. 2, Hilliard Tr. at 149:17-20 (technical resource manuals "weren't

17  relevant to the specific issues on – that my opinions where directed toward"). Consistent with

18  his failure to analyze this material, Mr. Hilliard does not dispute that Suite 11i's architecture was

19  integrated. *See* Exh. 2, Hilliard Tr. at 157:9-22. He also does not contest that Suite 11i was

20  substantially more integrated than the "best-of-breed" software packages to which Defendants

21  compared Suite 11i in the allegedly false statements. *See id.* at 144:1-11.[4]

22          Rather, having skirted any technical analysis, Mr. Hilliard launches a collateral attack on

23  various statements made by Defendants based primarily on anecdotal evidence about the quality

24  of Suite 11i. He then uses these anecdotes to draw broad conclusions that Suite 11i was

25  generally of such poor quality that the representations could not have been true. *See, e.g.*, Exh.

26  1, Hilliard Report at 74 (citing a single customer complaint for the claim that "many" 11i

27

28

---

[4] Nor does he contest that it was actually "available" for sale, in light of the hundreds of customers who purchased Suite 11i during the class period. *See* Exh. 7, Rebuttal Expert Report of Edward Yourdon ("Yourdon Rebuttal") at ¶ 205.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1   customers thought Suite 11i was not integrated).  As discussed below, without some more

2   systematic analysis, Mr. Hilliard's anecdotal evidence does not support such sweeping

3   conclusions.  *See Cavallo*, 892 F. Supp. at 765 (finding that anecdotal reports are not reliable

4   "because they simply describe reported phenomena without comparison to the rate at which the

5   phenomena occur in the general population or in a defined control group").

6                       b.      *Mr. Hilliard Did Not Perform An Systematic Or Comparative*
7                               *Analysis Of Suite 11i's Quality.*

8                               (1)      Background Regarding ERP Software.

9           In the absence of any technical analysis, "quality" becomes the linchpin of Mr. Hilliard's

10   opinions.  As Dr. Jensen noted, however, "[q]uality is a strange word.  It means a lot of different

11   things to different people."  Exh. 3, Excerpts from Deposition of Randall Jensen ("Jensen Tr.") at

12   8:6-17.  It is thus critical that any opinions offered regarding (or based on an assessment of) Suite

13   11i's quality put bug levels in appropriate context so that jurors can render meaningful

14   conclusions – particularly since large, complex business software is an unusual product whose

15   essential characteristics are outside of most lay person's experiences. For instance, an article

16   discussing business software in *Computerworld* explained:

17                   There are very few markets where ***buyers are willing to accept***
18                   ***products that they know are going to malfunction***," said Gregory
                     Tassey, the [National Institute of Standards and Technology]
19                   senior economist who headed the study. "But software is at the
                     extreme end in terms of errors or bugs that are in the typical
20                   product when it is sold."

21   Exh. 10, "Study: Buggy software costs users, vendors nearly $60B annually," *Computerworld*,

22   June 25, 2002 (emphasis added).

23          In light of this reality, there is no dispute here that all commercial software has defects or

24   bugs when it is released.  *See* Exh. 3, Jensen Tr. at 30:25-31:13 ("Q: [T]here is some level of

25   defects that would be normal and expected for various kinds of software; correct?  A:

26   Always."); Exh. 2, Hilliard Tr. at 129:1-2 ("As we said, all software has bugs.").  These errors

27   would necessarily include some amount of "high severity" or "show stopper" bugs.  Exh. 3,

28

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1   Jensen Tr. at 93:10-14 ("All software has show stoppers.").[5]   There is also no dispute that

2   generally, the bigger software is, the more bugs it will have. *See id.* at 29:20-29:18 ("Q: And so

3   holding everything else constant, if the software gets bigger you could expect to see more errors

4   even after release; correct?  A: That's true."); *see also* Exh. 2, Hilliard Tr. at 84:23-25.  Thus, in

5   order to determine the expected number of errors in a piece of released software, one would want

6   to know its size, as well as industry norms for pre-release defect removal rates. *See generally*

7   Exh. 3, Jensen Tr. at 32:13-35:1.

8         ERP systems are among the largest and most complex type of software ever sold. *See*

9   Exh. 4, Expert Report of Edward Yourdon ("Yourdon Report") at ¶ 121; *see also* Exh. 3, Jensen

10  Tr. at 70:2-3.  Both Mr. Hilliard and Dr. Jensen admit they do not know how large Suite 11i is

11  but concede "it is very large." *See* Jensen Rebuttal at Conclusion #1 (estimating the size of Suite

12  11i as between 76,000 and 556,000 function points); *see also* Exh. 2, Hilliard Tr. at 85:20-22.

13  Given their size and complexity, ERP systems historically have experienced many defects and

14  troubled implementations. *See* Exh. 11, *Supply Chain: Hershey's Bittersweet Lesson*, CIO

15  Magazine, Nov. 15, 2002 (discussing failed SAP and Seibel implementation at Hershey's);[6] *see*

16  *also* Exh. 26, *Making The World Safe For Software*, Business 2.0, June 1, 2003 (noting that "the

17  underlying problem – big software's inconceivable complexity – isn't going away").

18        Even with extensive pre-release testing, the expected number of errors in such a system

19  ***upon release*** is significant, as explained in a textbook by Capers Jones, who Plaintiffs' expert

20  admits is "is a leading authority in the world of software estimating, measurement, metrics,

---

21  [5] These features of ERP systems were no secret to customers or the market. *See* Exh. 3, Jensen Tr. at

22  115:3-7 ("Q.  Is it fair to say, then, that the customers buying a newly released ERP system would expect at least some level of instability? ... THE WITNESS:  It is software, yep.").

23  [6] As discussed in Mr. Yourdon's Report, ERP software is known for troubled implementations– even

24  those involving SAP, the leading ERP vendor at the time. *See, e.g.,* Exh. 21, L. Mearian, *Retailers Hit Installation Bumps With SAP Software*, Computerworld, Feb. 19, 2001 ("SAP AG's applications for retailers continue to be stung by a series of high-profile installation problems that many say illustrate the

25  complexity of trying to fit an integrated suite of enterprise resource planning software into a retail operation ... 'I can't point to a single happy SAP Retail account in North America,' said [Greg Girard, an

26  analyst at AMR Research Inc.].''); Exh. 22, J. Bailey, *Trash Haulers Are Taking Fancy Software to the Dump – Allied Waste, Following Waste Management, to Shed SAP's Costly R/3*, The Wall Street Journal,

27  June 9, 1999 ("Allied Waste Industries Inc.... plans to pull the plug on a brand-new $130 million computer system that uses the complex software known as SAP R/3. The planned move, previously

28  undisclosed, follows a similar cancellation of a major SAP R/3 installation, one that would have cost about $250 million, at Waste Management Inc."); *see also* Exh. 4, Yourdon Report at ¶ 98.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    productivity and quality" (Exh. 3, Jensen Tr. at 16:19-17:1):

2            ERP packages, like all other large software applications, contain
             defects or bugs. Typically, ERP packages start with defect potentials
3            of about 6.0 per function point due to their large sizes. Defect-
             removal efficiency before their initial release is about 90 percent.
4            Thus, for an ERP package of 250,000 function points the total defect
             volume would be 1,500,000 defects. At first deployment, as many as
5            150,000 defects would still be present. About 1000 would be high-
             severity defects, 20,000 would be medium-severity defects, and
6            129,000 would be low-severity defects.

7
8    Exh. 13, Excerpt from Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating*

9    (Second Edition, McGraw-Hill, 2007) at 151.  The available data suggest roughly 40 percent of

10   these bugs are normally found and addressed per year.  *See id.*  ERP systems typically take a year

11   or two to stabilize following their release.  *See id.*  ("[A]fter several years of deployment and

12   usage, the ERP packages achieve reasonable levels of stability.").

13           This data is consistent with the wide-ranging press at the time Suite 11i was released,

14   warning potential users that, as a huge new ERP system (perhaps the largest ever), users should

15   expect that it would take time for the software to stabilize.  *See, e.g.*, Exh. 14, Steve Hamm,

16   *Oracle: Why It's Cool Again*, Business Week, April 28, 2000 (NDCA-ORCL 307328-35).  It is

17   also consistent with the enormous body of literature describing the commonplace problems of

18   large software projects and systems, and ERP in particular. *See generally* Exh. 4, Yourdon

19   Report at §§ V.3 ("Things That Go Wrong In Software Development Efforts And Other Large-

20   Scale Software Projects"), VI.5 ("Historical Difficulties With ERP Implementations").   It is also

21   consistent with Dr. Jensen's observation that purchasers of an ERP system like Suite 11i would

22   expect instability early in its lifecycle.  *See* Exh. 3, Jensen Tr. at 115:3-7.

23           (2)      Mr. Hilliard Fails To Consider The ERP Context.

24           As a result, if Mr. Hilliard hopes to opine that Oracle's statements about Suite 11i were

25   "false" because it had an inappropriate number of errors during the Class Period, Mr. Hilliard's

26   analysis must provide a reasonable basis to establish that Suite 11i's defects were abnormal for a

27   massive new release of ERP software.  As described at length by Defendants' Suite 11i expert,

28   Edward Yourdon, in order to analyze software quality in a reliable and principled way, it is

1    necessary to understand several factors, including (1) the size of the software, (2) the actual

2    quantity and type of errors experienced by the users of the software as a class (3) the

3    performance (including actual quantity and type of errors) of software of a similar class and size.

4    *See* Exh. 4, Yourdon Report at § VI.5, *see also* Exh. 3, Jensen Tr. at 32:13-23, 33:12-25.

5           Plaintiffs offer no basis to contest the analytical framework put forward in Mr. Jones'

6    books and described by Mr. Yourdon.  Dr. Jensen in fact indicates that the potential counts for

7    ERP errors at release compiled by Mr. Jones and quoted above may be ***too low***.  *See* Exh. 3,

8    Jensen Tr. at 49:13-50:2 ("I could go through the calculations to show that we're talking like

9    much – ***almost an order of magnitude larger***.");  93:14-17 ("All software has show stoppers….

10   When it gets old and dies, there are probably still things nobody has managed to trip over.").

11          Yet Mr. Hilliard fails entirely to take these issues into account, or to systematically

12   evaluate Suite 11i's quality against any objective benchmark.  He frankly admits that he has no

13   real understanding of Suite 11i's size.  *See* Exh. 2, Hilliard Tr. at 85:12-15 ("Q.  Do you know

14   how large Suite 11i is measured by any metric? A.  No.").  He did not review any statistical data

15   regarding bug expectancies, either by size or product class.  *See* Exh. 1, Hilliard Report at § 3.2.

16   Nor did he address the total number of bugs actually present in Suite 11i.  *See* Exh. 2, Hilliard

17   Tr. at 88:1-3.  He did not attempt to compare any data relating to Suite 11i to any data (either

18   general or specific) regarding other large software, including other ERP suites.  *See id.* at 87:6-7

19   ("I didn't look at it on a relative basis.").  Mr. Hilliard did not even know how many customers

20   were implementing Suite 11i during the relevant period, and makes no effort to apply any

21   systematic analysis.  *See id.* at 77:7-8 ("I don't know what number were in the process of

22   implementing, no.").

23          Given that he does not identify anything close to the number of errors that Mr. Jones'

24   published data suggests would be expected (much less high severity "P1" bugs), and his claim

25   that he has no idea of the number of actual users implementing the software, it is not at all clear

26   how Mr. Hilliard reaches his conclusion that Suite 11i's quality was poor.  This is precisely the

27   problem with Mr. Hilliard's anecdotal approach:  expert witnesses are not permitted to generalize

28   from evidence that is, "by definition, non-systematic and non-generalizable."  *See City of*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1   *Phoenix*, 220 F.Supp.2d at 1061. As a result, Mr. Hilliard has no reliable basis to say whether

2   Suite 11i is better or worse than other software of its size and class.

3           c.     *Dr. Jensen Confirms That Mr. Hilliard's Analysis Cannot Support*
    *Any Conclusion Regarding Suite 11i's Quality Or Stability.*

4         Dr. Jensen, Plaintiffs' second software expert, confirms the inadequacy of Mr. Hilliard's

5   anecdotal methodology. He admits it would be important to know software's size to opine on its

6   quality. *See* Exh. 3, Jensen Tr. at 29:12-14. He also admits one would need to evaluate the error

7   rates typical for the relevant class of software and the performance of other similar products. *See*

8   *id.* at 33:22-34:1 ("[T]o understand what level of defects you would expect to see for a particular

9   software product you would want to look at other products in the same category."). Dr. Jensen

10  further admits that the error removal rate identified by Mr. Jones for ERP software (and thus the

11  number of errors at release) is, if anything, conservative. *See id.* at 47:9-14 ("That would be very

12  good. It would be a very good number, 90 percent. Most commercial software goes out about

13  99 percent when it's finally released. I would think 85 percent wouldn't be bad for some of

14  these systems."). Finally, Dr. Jensen admits that it would not be surprising to find complex

15  software that did not "work" even a year after release. *See id.* at 114:21-24.

16        As a result, even Dr. Jensen – ***Plaintiffs' expert*** – concluded that Mr. Hilliard did not

17  have a sufficient basis from which to estimate the number of defects in Suite 11i or whether that

18  number was out of the ordinary:

19          Q. You can't tell from Mr. Hilliard's report?

20          A. I don't think from any of the reports anyone can form a
    definition of what a defect is or how many there were.

21          Q. And whether the defect rate was high, low or normal?
            A. Yeah. Yes. That's true.

22  Exh. 3, Jensen Tr. at 38:10-16. [7] Dr. Jensen indicated a far more wide-ranging and even-handed

23

24  [7] In their rebuttals, both Mr. Hilliard and Dr. Jensen initially claimed Suite 11i had 5,000 high-severity
    bugs (also known as "priority one" or "P1" bugs). *See* Exh. 5, Hilliard Rebuttal at 2; Exh. 6, Jensen

25  Rebuttal at Conclusion #4. However, both admitted in deposition that they did not have any basis for that
    conclusion. *See* Exh. 3, Jensen Tr. at 83:7-14 ("Q. Do you have any basis for concluding that every one

26  of the 5,000 was a high severity defect?...[A.] That requires something that nobody really knows. Q.
    Well, you don't know it. A. I don't know. I don't think anyone else does, either."); *see also* Exh. 2,

27  Hilliard Tr. at 91:17-21 ("Q. Do you know how many P1 bugs Suite 11i users experienced during the
    class period? . . . [A.] I don't have any numbers specifically for the class period."). Both of Plaintiffs'

28  experts claimed to derive their figures from a sentence in Mr. Yourdon's report that does not support such
    a conclusion on its face (*see* Exh. 4, Yourdon Report at 14) and that Mr. Yourdon testified they

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    investigation than Mr. Hilliard's would be required to determine if Suite 11i was "stable":

2            Q.  BY MR. GIBBS:   Okay.   And my question is: Well, you
             mentioned that you hadn't talked to anybody.  Who would you
3            want to talk to if you wanted to reach a broader conclusion as to
             whether Suite 11i was stable?
4            ....

5            THE WITNESS:  Oh, boy.  *That's a whole new – wow, what a
             task that would be, literally to do that,* to go through and talk to all
6            the friends and foes of 11i to determine if it was stable or not.

7            Q.  BY MR. GIBBS:  You'd have to talk to a large cross section of
             users?
8            A.  I'd have to.

9            Q.   Okay.   And you'd have to factor in the degree to which
             different customers customize the software?
10           A.  That's true.

11           Q.   Because without knowing that, you can't tell whether the
             instability has been introduced by the  customization or was there
12           to begin with; correct?
             ....
13           THE WITNESS:  That's true.

14   Jensen Tr. at 111:8-112:2 (emphasis added).  In sum, Mr. Hilliard impermissibly asks this court

15   to "simply tak[e] [his] word for it" when even Plaintiffs' other expert will not.  *In re Silicone Gel*

16   *Breasts Implants*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004).  His broad conclusions cannot be

17   supported merely by anecdotal evidence filtered through his (not terribly relevant) experience:

18           The danger here is that rather than the factual underpinnings
             consisting of empirical data, the witnesses' conclusion are
19           supported by their experience (an amorphous matter in most
             cases), isolated anecdotal evidence, or belief.    This kind of
20           evidence going to critical aspects of this case does not make for
             proper opinion testimony – lay or expert – and it must be excluded.
21

22   *Democratic Party of Washington*, 2002 WL 32925223 at *15.

23           2.     Mr. Hilliard's Methodology Suffers From A Variety of Other Problems.

24       Mr. Hilliard's methodology also suffers from a host of other disqualifying shortcomings.

25               a.      *Mr. Hilliard's Analysis Is Not Based On  Any Objective Standard.*

26       Mr. Hilliard's initial report asserted that he engaged in a "rigorous and standardized

27   methodology," that "follow[ed] all industry-accepted guidelines," (Exh. 1, Hilliard Report at 9),

28

misinterpreted.  *See* Exh. 12, Excerpts from Deposition of Edward Yourdon at 240:2-15.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

but his deposition testimony flatly contradicts these characterizations:

- Mr. Hilliard admits that he cannot identify his so-called "industry-accepted guidelines." Exh. 2, Hilliard Tr. at 43:10-44:20 ("There isn't an industry of expert analysis of software.... I don't know that there is a reference source that you could go to. There may well be.").[8]

- Mr. Hilliard admits that he cannot point to *any standard for software quality. See* Exh. 2, Hilliard Tr. at 192:7-12 ("Because each submarket, each vertical market is so different from one another that the standards vary for each one, and that's why there is no common standard that's published for all, and each one is so individualized I don't know of specific published standards for any one of them....") .

In other words, Hilliard's "methodology" consists of precisely the sort of "unadorned assertions that the methodology...employed comports with standard [specialized] procedures" rejected by the Ninth Circuit. *Daubert*, 43 F.3d at 1319. As that rejection indicates, an "expert's bald assurance of validity is not enough." *Daubert*, 509 U.S. at 594. Rather, reliability requires "the existence of standards controlling the technique's operation." *Israel v. Springs Indus.*, 2006 WL 3196956, at *2 (E.D.N.Y. 2006). These standards are missing from Mr. Hilliard's analysis.

### b. *Mr. Hilliard's Analysis Cannot Be Recreated Or Reproduced.*

A basic requirement of expert testimony is that the analysis forming the basis of the opinion can be recreated. *See Daubert*, 509 U.S. at 593-94. Here, Mr. Hilliard cannot explain the basis for key aspects of his analysis, such as his conclusion that 2,500 customers Oracle identified as implementing Suite 11i during the class period were not doing so and therefore should not be considered in evaluating the quality of the software. *See* Exh. 2, Hilliard Tr. at 23-24. ("I can't tell you where I got that understanding."). Nor can he identify the documents he relied upon or the role they played in his analysis.[9] *See id.* at 53:1-21. He cannot even recreate his analysis with respect to the examples in his Report or meaningfully articulate what role they played in his conclusions. *See id.* at 167:23-169:3.

---

[8] In fact, there are such reference sources, including the books by Capers Jones discussed at length by both Defendants' expert Mr. Yourdon and Plaintiffs' other expert, Dr. Jensen. *See, e.g.,* Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating*; Capers Jones (Second Edition, McGraw-Hill, 2007), *Applied Software Measurement* (McGraw-Hill 1996). Mr. Hilliard simply did not consider them.

[9] Mr. Hilliard's Report indicates that he cited "the majority of" the documents on which he "relied to" reach his conclusions (Exh. 1, Hilliard Report at 6) – but also "took into consideration" various other documents that he could not identify. Hilliard Tr. at 53:1-21. Not only does this violate the requirements of Federal Rule of Civil Procedure 26(a)(2) *and* the Discovery Plan that experts identify *all such* documents, it renders it impossible for Mr. Hilliard's methods to be recreated or tested by Defendants.

1    The significance of these failures is magnified by the subjective and unspecified

2   standards Mr. Hilliard applies.  For instance, when pressed to reveal the specific "quality"

3   standard that he applied,  Mr. Hilliard indicated that it would be impossible, because a separate

4   standard of acceptability applied to each "submarket." *Id.* at 191:8-19.  Mr. Hilliard further

5   explained: "[b]ecause each submarket, each vertical market is so different from one another that

6   the standards vary for each one, and that's why there is no common standard that's published for

7   all, and each one is so individualized I don't know of specific published standards for any one of

8   them." *Id.* at 192:7-12.  In light of this subjectivity, Mr. Hilliard admits he had no basis to

9   believe other experts with similar experience would agree with key aspects of his analysis. *See*

10   *id.* at 75:6-9.

11         c.    *Mr. Hilliard Knowingly Used A Biased, Unrepresentative Sample.*

12    Mr. Hilliard's Report cites approximately 40 customers who purportedly had difficult 11i

13   implementations – a small fraction of the more than 2,500 customers implementing 11i during

14   the Class Period. *See* Exh. 19, February 20, 2001 Oracle Press Release.  This necessarily skews

15   his analysis by limiting it to a biased sample of the most troubled implementations among

16   Oracle's customers.  Mr. Hilliard concedes he made no effort to determine if these problems

17   were experienced consistently by other customers. *See* Exh. 2, Hilliard Tr. at 78:4-79:2 ("I

18   didn't look to see whether there might have been – whether that was represented –

19   representative, because that wasn't relevant.").

20         d.    *Mr. Hilliard Further Biased His Analysis By Discounting Any*
            *Information That Was Inconsistent With His Thesis.*

21

22    Within his already biased sample, Mr. Hilliard admits that he uniformly credited negative

23   assessments of the Suite 11i product (*i.e.*, assessments that support Plaintiffs' theory of the case)

24   while discounting Suite 11i success stories (*i.e.*, assessments that support the defense).[10]  *See*

25   Exh. 2, Hilliard Tr. at 57:7-59:8.[11]  By ignoring positive information, Mr. Hilliard creates a

26   [10] As discussed more fully below (*see* Section III.B) Mr. Hilliard's decision to give such credit to negative
    appraisals is particularly puzzling because every expert involved in this matter, including Mr. Hilliard,

27   agrees that customer trouble reports are not reliable indica of the existence or nature of problems with the
    underlying software.

28   [11] Mr. Hilliard's selective approach also violates the well-established rule that experts are not permitted to
    testify regarding credibility determinations.  "Expert testimony which does nothing but vouch for the

14

1   misleading snapshot of particularly challenging periods of time in a process that takes months to

2   complete.[12]  Just how misleading is reflected by two facts:  first, nearly all of the customers cited

3   by Mr. Hilliard for his claim that Suite 11i fell outside the bounds of "commercial acceptability"

4   successfully implemented Suite 11i, and second, nearly half later agreed to serve as reference

5   customers for Suite 11i. *See* Exh. 7, Yourdon Rebuttal Report at §§ VIII.1.2, VIII.1.3 (*citing,*

6   *e.g.*, Exh. 20, 11i Key Customer References as of October 9, 2001).  When considered in the

7   context of an industry in which ERP implementations often fail altogether, the full picture does

8   not support the inference that there were unusual problems ***even for these specific customers***,

9   much less the broader customer base.

10              e.      *Mr. Hilliard Employs Standards of Commercial Quality that are*
                        *Impossible to Determine, Let Alone Meet*
11

12          Mr. Hilliard's standard for commercial quality relies heavily on the satisfaction of

13   individual "customer expectations."  Exh. 1, Hilliard Report at 77.  But this standard is so

14   subjective that it is impossible to articulate (let alone test), and whether it has been attained is

15   unknowable.  Mr. Hilliard defines pertinent expectations so broadly that he admits it would be

16   necessary to know all representations made by Oracle employees to each customer.  *See* Exh. 2,

17   Hilliard Tr. at 195:25-196:3.  And beyond that, "you may need to know things that wouldn't be

18   part of a representation because they're at such a detailed level that they just wouldn't be

19   included."  *Id.* at 196:25-197:3.  Mr. Hilliard's broad standard is compounded by the transitory

20   and unpredictable nature of customer satisfaction and expectations – and his failure to account

21   for such factors.  For example, customers who have not before experienced implementations of

22   similarly comprehensive and sophisticated software might be more likely to have unrealistic

23   expectations because they have no prior benchmarks to establish a "typical" experience and thus

24   have correspondingly lower satisfaction rates.  Thus, as Mr. Hilliard admits, "[b]ecause of the

25   ─────────────────────────────────────────

26   credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility
     determinations, and therefore does not 'assist the trier of fact' as required by Rule 702."  *United States v.*
     *Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002); *see also* 4 Weinstein's Federal Evidence § 702.03.

27   [12] For example, Mr. Hilliard adopted the few "negative appraisals" regarding difficulties POSCO had
     implementing the Suite 11i – but ignores the wealth of evidence that POSCO's implementation was a
28   success, that POSCO moved its business to Suite 11i, and that the company was so satisfied with the
     results that it eventually became a reference customer. *See* Exh. 7, Yourdon Rebuttal Report at 68-69.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    differences between the needs of different types of business software customers, there is no

2    formal and universally accepted standard or reference authority that provides metrics to measure

3    such quality." *Id.*

4          In spite of this, Mr. Hilliard has opined that Suite 11i failed to meet customer

5    expectations so pervasively that it did not meet minimal levels of commercial quality – ***without***

6    ***ever talking to a single customer***. *See* Exh. 2, Hilliard Tr. at 198:9-13.  Mr. Hilliard's definition

7    of "commercial quality" is thus inherently unreliable and clearly is not the market's test for

8    commercial acceptability.[13]  *See Daubert*, 509 U.S. at 593-94 (holding that the methodology

9    must be subject to testing and reproduction).  Moreover, Mr. Hilliard's proposed standard would

10   lead to absurd results.  Under his definition, a business application software product might be of

11   the highest quality when measured by all objective standards, but some unknown number of

12   unmet "customer expectations" would render that software not "of commercial quality."

13                        f.      *Mr. Hilliard Does Not Even Purport To Analyze The Evidence*
                                 *From The Perspective Of An Expert.*
14
             Mr. Hilliard's "methodology" is further undermined by his claim that he evaluated the
15
     evidence not as a technical expert, but as *a person with no expertise in the software field*:
16
                    So I was looking at it not from the perspective of someone in the
17                  IT industry or from a customer, but from the perspective to those
                    people to whom that statement was made who are people who
18                  don't have that knowledge, and who I think without that
                    knowledge would have every reason to take that literally.
19
     Exh. 2, Hilliard Tr. at 228:10-231:11.  This is inconsistent with the role of an expert.  It is well-
20
     settled that experts may not opine on matters of general lay knowledge.  *See, e.g., United States*
21
     *v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002); 4 *Weinstein's Federal Evidence* § 702.03.
22
     Further, because he claims that Defendants' statements were false based on Suite 11i's lack of
23
     quality and commercial acceptability, his attempt to apply his lay understanding in one sense (the
24
     meaning of the statements) but his "expert" understanding in another (to claim the statements are
25

26   _____
     [13] As noted in Oracle's motion for summary judgment, Oracle sold roughly $383 million in Suite 11i
27   licenses in the quarter following the revelation, according to Plaintiffs, that Suite 11i was not of
     commercial quality.  Mr. Hilliard offers no reason to believe that this definition provides better evidence
28   of "commercial quality" than his selective review and interpretation of customer complaints and trouble
     reports.

16

1    false based on his expert opinion of the software quality) is worse than unreliable – it is

2    incoherent. Mr. Hilliard does not suggest how to apply such a dual approach, what standards

3    govern it or even how Mr. Hilliard, a software expert, could apply a layperson's perspective.

g.    *The "Reliability" of Mr. Hilliard's Unspecified Methodology Is Further Undermined By Assertions That Are Plainly Incorrect.*

Mr. Hilliard's position is further undercut by his offering opinions that squarely

contradict firmly established principles in the software industry, as evidenced by the record in

this case. For instance, Mr. Hilliard indicates that because some "fixes, while designed to

address specific problems, created new problems themselves," Suite 11i's quality must have

been unusually poor. Exh. 1, Hilliard Report at 27. It is a well-known law of software design,

however, that a certain number of bugs are introduced as a result of fixing other bugs. As with

all types of bugs, a number escape detection, even with extensive testing. *See* Exh. 7, Yourdon

Rebuttal Report at ¶ 86; Exh. 13, Capers Jones, *Estimating Software Costs: Bringing Realism to

Estimating*, at 290. Dr. Jensen acknowledged this "bad fix" phenomenon, and even suggested

that Mr. Jones' estimate for the average rate of bug injection was conservative:

> For every error you fix, there's two other errors. One is
> believing you fixed the error, and the other is the new error you
> injected. I mean, it's kind of a light rule of thumb, but errors get
> put in, and 7 percent seems a little light. . . . I write a lot of
> software, and there's always one more error.

Exh. 3, Jensen Tr. at 100:5-22; *see also id.* at 97:9-21. If Mr. Hilliard is willing to misconstrue

this fundamental principle of software design, it necessarily casts doubt on the other parts of his

methods, particularly given his admission that he cannot articulate the standards he applied.

*            *            *

For the foregoing reasons, Mr. Hilliard's methodology cannot support his conclusions

and are manifestly unreliable. His Report and testimony should be excluded on that basis alone.

**B.    Mr. Hilliard's Opinions Are Based On Insufficient And Unreliable Data**

The vast majority of the data on which Mr. Hilliard relies to conclude that Suite 11i had

excessive software defects are "customer trouble reports" *See, e.g.*, Exh. 1, Hilliard Report at §

5.3.4; Exh. 2, Hilliard Tr. at 87:19-25, 91:25-92:14. This material is clearly hearsay, and much

of it is double hearsay. The Rules of Evidence provide for limited circumstances in which an

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1  expert may rely on otherwise inadmissible information, but this exception is extremely narrow.

2  For instance, because doctors in the field typically rely on tests by nurses and others in making

3  diagnostic decisions, medical experts are permitted to rely on such tests in reaching their own

4  conclusions.  *See* Fed. R. Evid. 703, Advisory Committee Notes. If, however, an expert takes

5  into account inadmissible information that other experts in the field would not normally rely

6  upon, the opinion is subject to exclusion under the Rule. *See, e.g., Redman*, 111 F.3d at 1179.

7          For several reasons, it is clear that his material does not meet this standard:

8          *First,* there is extensive testimony from fact witnesses that customer trouble reports are

9  unreliable.  *See, e.g.*, Exh. 16, Excerpts from Deposition of Ron Wohl at 141:21-23 ("[T]he

10  significant majority of TAR reports did not result in bugs."); *id.* at 142:7-14; Exh. 17, Excerpts

11  from Deposition of Richard Sellers at 38:3-15; Exh. 18, Excerpts from Deposition of Kirsten

12  Shaw at 239:3-7.  Often, something that is initially reported as a bug turns out to be the result of

13  user error, hardware limitations, improper configurations, or other mistakes unrelated to the

14  software code.  *Id.*  Undisputed evidence from Oracle's witnesses indicate that that less than a

15  third of the trouble reports resulted in any change in the software, and documentation regarding

16  the TAR resolution process also confirms this number.  *Id.*

17          *Second,* Mr. Yourdon and Dr. Jensen both confirm that Oracle's experience is typical:

18  customer reports of trouble with the software (many of which originate with users who are not

19  technically proficient) are unreliable.  As Mr. Yourdon explains in his report (*see* Exh. 7,

20  Yourdon Rebuttal at § VIII.1.3), and as Dr. Jensen confirmed during deposition, software

21  professionals do not rely on such reports to diagnose problems or to conclude that that a software

22  error exists.  *See* Exh. 3, Jensen Tr. at 84:21-22 ("Q. Is the user's error report by itself typically

23  enough to know whether there is in fact a defect in the software?  A.   Not initially, no.").  Even

24  *Mr. Hilliard admits that all trouble reports are not necessarily bugs*, but he then fails to apply

25  this professional skepticism when he analyzes and evaluates particular customer complaints.  *See*

26  Exh. 2, Hilliard Tr. at 91:25-92:3.

27          *Third*, though Mr. Hilliard claims that he uses the "same basic methodology" in his

28  technical consulting as he does in litigation (Exh. 1, Hilliard Report at 9), it is clear from his

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    deposition testimony that this is not the case, at least as it applies to the question of crediting

2    customer descriptions of purported bugs.  In his typical consulting projects, he uses "first person"

3    accounts of the alleged software issues, as well as a variety of other cross-checks to determine

4    the real sources of customer problems.  *See* Exh. 2, Hilliard Tr. at 36:4-8.  In this case, however,

5    he based his opinions on unverified documents without using his usual cross-checks to confirm

6    those accounts.  *See id.* at 36:9-22.  In other words, Mr. Hilliard not only improperly assumes

7    that a small number of individual instances represent the experience of all Suite 11i users (but

8    not of users of other ERP systems), he also **assumes the anecdotes** accurately depict the

9    underlying facts even though doing so violates his own practices when consulting outside

10   litigation.

11          Since software experts – including Mr. Hilliard – do not rely on such data when

12   evaluating the quality or functionality of ERP software in the field, it is not proper to rely on this

13   inadmissible hearsay in litigation. Because of the nature of Mr. Hilliard's analysis, this evidence

14   forms the vast majority of evidence he has considered, and its exclusion necessarily requires

15   preclusion of Mr. Hilliard's testimony and conclusions.  *See* Fed. R. Evid. 703.

16          **C.    Many Of Mr. Hilliard's Primary Assertions Are Unsupported Or**
               **Contradicted By The Record**
17

18          In addition to the foregoing problems, Mr. Hilliard fails to cite any evidence to support a

19   number of significant conclusions.  For instance, Mr. Hilliard offers the blanket assertion that

20   Oracle shipped "Oracle 11i to customers without having done any integration testing," as a

21   primary basis for his opinion that Defendants' statements about integration were false.  Exh. 1,

22   Hilliard Report at 64.   When pressed to identify evidence supporting this position, Mr. Hilliard

23   testified that he had based his opinion on the absence of evidence in the record.  *See* Exh. 2,

24   Hilliard Tr. at 160 ("I saw no evidence at all of any substantive testing that anyone

25   knowledgeable about testing would consider to be a real test regarding integration.").[14]  But

26

27   _____

28   [14] The limited evidence Mr. Hilliard cites in his Reports pertains only to post-release integration testing on
     certain patches or within the demonstration environment.  *See* Exh. 1, Hilliard Report at 65, 68; *see also*
     Exh. 4, Yourdon Report at 50-53.  Some of the evidence cited by Mr. Hilliard actually indicates that

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    Courts have frowned at an expert's reliance on the purported absence of evidence to support the

2    expert's opinion. *See Kumho*, 526 U.S. at 154. This admonition is particularly appropriate here,

3    since neither the Discovery Plan nor any other order required production of documents regarding

4    integration testing. *See, e.g.,* Exh. 15, March 10, 2005 Amended Order Setting a Discovery Plan

5    ("Discovery Plan") at I.C.2 (listing Suite 11i categories within the scope of discovery). As a

6    result, Mr. Hilliard's assumption that such documents do not exist is fundamentally flawed. To

7    the contrary, extensive integration testing was performed on Suite 11i prior to release. *See* Exhs.

8    23-25, Excerpts from Deposition of Alan Fletcher at 66:7-67:24; Excerpts from Deposition of

9    Gregory Seiden at 67:17-69:6; Declaration of Alan Fletcher at ¶¶ 8-12. Thus, a significant

10   premise on which Mr. Hilliard based his opinions is simply wrong.[15]  *See* Exh. 1, Hilliard Report

11   at 45. Expert opinions should be excluded "when indisputable record facts contradict or

12   otherwise render the opinion unreasonable." *Brooke Group Ltd. v. Brown & Williamson*

13   *Tobacco Corp.*, 509 U.S. 209, 242 (1993).

14   Even more tellingly, Mr. Hilliard's Rebuttal Report assumes its conclusion with its claim

15   that it "is known as well that Oracle 11i continued to experience very high defect (*i.e.*, bug)

16   levels from the release of the first version through the end of the Class Period and beyond." Exh.

___

20   Oracle did perform integration testing of Suite 11i prior to release. *See, e.g.,* Exh. 1, Hilliard Report at
21   65-66 ("Objective of this email is...to get an environment to *system test* ERP and CRM...This testing will
     be beyond integration testing which may be a rifle shot through the system.").

22   [15] Mr. Hilliard again relies primarily on the absence of evidence contrary to his opinions, claiming that
     "there is no substantive evidence to show the [rapid implementation] representation to be true." Exh. 1,
23   Hilliard Report at 42-49. Putting aside his misinterpretation of those statements (*see* Exh. 7, Yourdon
     Rebuttal at 35-37), since Plaintiffs did not raise any issues with "rapid implementation" in their
24   complaints or during fact discovery, it is not surprising that there is limited discovery on this issue. *See,
     e.g.,* Exh. 15, Discovery Plan at I.C.2. However, as discussed in Mr. Yourdon's rebuttal report, many
25   Suite 11i customers used Oracle's FastForward program to implement Suite 11i in about 90 days.
     Moreover, 85 customers had completed implementation by December 2000, just months after Suite 11i's
26   initial release. Within a year of release, more than 350 customers had implemented the software – even
     though Mr. Hilliard says that a small implementation project generally would take 295 days (nearly 10
27   months) and large implementations could take 379 days or longer (13 months or longer). The record thus
     indicates that customers were, in fact, implementing Suite 11i more rapidly than other ERP or CRM
28   systems (and presumably far more rapidly than the comparable, best-of-breed offerings). *See* Exh. 7,
     Yourdon Rebuttal at § VI.3.

LATHAM&WATKINS᪴ᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)

1    5, Hilliard Rebuttal at 2.  Mr. Hilliard cites nothing in support of this statement and never

2    attempts to defend it on the merits.  *See id.*  As discussed above, Dr. Jensen confirmed at his

3    deposition that Mr. Hilliard has provided no basis that could support this conclusion.  *See* Exh. 3,

4    Jensen Tr. at 38:10-16.   Similarly, Mr. Hilliard declares – without support – that "two of the

5    most critical functionalities represented by Oracle – Suite-wide integration and Order

6    Management – were among those experiencing the most failures."  *Id.* at 3.  Never in his Reports

7    or testimony does he provide any evidence supporting these assertions – which are foundational

8    to his opinions.   An expert opinion is properly excluded when it is "not based upon the facts in

9    the record but on…speculation designed to bolster" the expert's position.  *Guillory v. Domtar*

10   *Industries, Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).  These statements lack any basis in the

11   record whatsoever, and should be excluded.

12

13

14   **V.       CONCLUSION**

15             For the foregoing reasons, Defendants respectfully request that the Court exclude the

16   Reports and testimony of Brooks Hilliard at trial in this matter.

17   Dated:  July 26, 2007                          Respectfully submitted,
                                                     LATHAM & WATKINS LLP
18                                                        Peter A. Wald
                                                         Patrick E. Gibbs
19                                                       Michele F. Kyrouz
                                                         Jamie L. Wine
20                                                       Matthew Rawlinson

21
                                                     By: _____
22
                                            Fo r  Matthew Rawlinson
23                                                   Attorneys for Defendants ORACLE
                                                     CORPORATION, LAWRENCE J.
24                                                   ELLISON, JEFFREY O. HENLEY,
                                                     and EDWARD J. SANDERSON
25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-MJJ (JCS)