UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Master File No. C-01-0988-MJJ |
| This Document Relates To: ALL ACTIONS | | |

**REBUTTAL REPORT OF BJORN I. STEINHOLT, CFA**

**June 22, 2007**

## I.      INTRODUCTION

1.      I have been retained by plaintiffs' counsel to analyze and provide expert testimony regarding the economic issues related to market efficiency, materiality, loss causation, and the calculation of Section 10(b) damages suffered by purchasers of Oracle Corporation ("Oracle" or the "Company") common stock from December 14, 2000 through March 1, 2001 (the "Class Period"). In addition, I have been asked to analyze defendants' insider sales during the Class Period and calculate the related damages pursuant to Section 20A of the Securities Exchange Act of 1934.  On May 25, 2007, I submitted an expert report in this matter in which I provided my analyses of the above issues, including the quantification of damages resulting from the March 2, 2001 decline in Oracle's stock price ("May 2007 Report").

2.      I have now been asked to review and discuss an expert report by Mr. Christopher James ("James Report") submitted on behalf of defendant Oracle and the individual defendants Lawrence J. Ellison, Jeffrey O. Henley and Edward J. Sanderson.  Below I discuss Mr. James' analysis of (a) materiality, and (b) Oracle's March 2, 2001 stock price decline.

## II.     MATERIALITY

3.      In my May 2007 Report, I analyzed whether the alleged misrepresentations and omissions would have been important to reasonable investors, *i.e.*, whether the information misrepresented or omitted would be information that reasonable investors would have wanted to consider prior to making an investment decision.  This is different than Mr. James' materiality analysis which focuses on whether the misrepresentations or omissions "significantly change[d] the total mix of information," and then claims that in the absence of a statistically significant upward price movement "the market [would] not consider these statements to be material."  (James Report, ¶43.)  It is important to fully understand Mr. James' alternative approach to assess materiality, and specifically the limitations of his approach.  Consequently, below, I will first discuss the limitation

of using Mr. James' approach to assess materiality.  Second, I will compare Mr. James' event analysis with my own and explain why my event analysis is superior to Mr. James' analysis when assessing statistical significance, specifically with respect to Oracle's December 15, 2000 price increase.

<u>Limitation of Mr. James' Approach to Assess Materiality</u>

4.      The difference between Mr. James' materiality analysis and my own can be demonstrated through a simplified hypothetical.  Let's assume that a company falsely reports earnings of $1 per share when it, in fact, should have reported 50 cents per share, and that investors used these earnings to forecast the company's future earnings.  In this simplified hypothetical, the company's stock price would trade at a higher level after falsely reporting earnings of $1 per share than where it would have traded if the company had truthfully reported earnings of only 50 cents per share.  Consequently, the misrepresentation was material.

5.      Mr. James' approach to assessing materiality, however, would not focus on the difference between reporting false earnings of $1 per share versus reporting truthful earnings of 50 cents per share.  Instead, Mr. James' approach would focus on whether the false earnings of $1 per share were significantly different than investors' expectations.  (James Report, ¶15.)  In other words, the prior day's stock price (reflecting investors' expectations) would be compared with the stock price following the earnings announcement (reflecting the false $1 earnings per share).  At no time would the magnitude of the overstated earnings be analyzed.  This means that if investors expected the company to report earnings of $1 per share, and the company reported false earnings of $1 per share, the stock price would not increase, leading Mr. James to concluded that "the market did not consider [the reported $1 earnings per share] to be material."  (James Report, ¶43.)  This type of analysis will only demonstrate materiality if the misrepresentation changed investors' assessment of

future cash flows **relative to prior expectations**.  The limitation of Mr. James' approach is explained as follows in one paper:

> For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents.  If the company falsely announced earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings.  Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.[1]

6.     Clearly, in the above examples, a reasonable investor would have wanted to consider the company's true earnings, as opposed to the artificially inflated earnings, prior to making an investment decision.  Furthermore, it would be incorrect to conclude that simply because there was no increase in the stock price, investors would have viewed the overstated earnings as immaterial.  Sometimes false and misleading statements simply maintain inflation in the stock price, they do not necessarily cause an increase in inflation.  Mr. James' analysis of materiality, therefore, is of limited benefit.

Mr. James' Event Analysis

7.     As discussed above, materiality can be demonstrated using an event analysis when the misrepresentations caused investors to change their assessment of future cash flows relative to prior expectations, resulting in an increase in price.  Specifically, an event analysis can be used to assess statistical significance of the price increase.  In statistics, a result is considered significant if it is unlikely to have occurred by chance only.  While Mr. James' event analysis is similar to my own, I disagree with his conclusion regarding the statistical significance of Oracle's stock price reaction on December 15, 2000, following the Company's announcement of its Second Quarter 2000 results.

---

[1]     David Tabak, "Loss Causation and Damages in Shareholder Class Actions: When It Takes Two Steps to Tango," NERA Working Paper, May 2004, attached hereto as Exhibit A.

Mr. James calculates that Oracle's price increase on December 15, 2000, net of market and industry factors, was 6.8%, which translates into an increase in Oracle's market value of more than $10 billion.[2]  (James Report, Exhibit 5.)  However, presumably based on his event analysis, Mr. James claims that this price increase was not statistically significant.  (James Report, Exhibit 7, ¶8.)  This is inconsistent with my event analysis that demonstrates that the December 15 price increase, indeed, was statistically significant at the 95% confidence level (t-statistic equal to 2.06).  Below, I first discuss the fact that even Mr. James' event analysis demonstrates that the December 15, 2000 price increase was statistically significant at the 95% level using a one-tailed test.[3]  Second, I discuss why Mr. James' event study is inferior to my own event analysis, based on objective statistical measures such as the adjusted r-squared, standard error or t-statistic.

8.      In order to assess statistical significance, the t-statistic is first calculated.  If one is testing for a statistically significant price increase using a one-tailed test, consistent with plaintiffs' allegations, a t-statistic of 1.65 or greater would be characterized as statistically significant at the 95% level.  In layman's terms, this means that a market adjusted price increase of this magnitude or greater would only be expected to occur 5% of the time in a random sample.  Mr. James' does not provide the t-statistic for December 15, 2000, which is the relevant statistic used to assess statistical significance.  Rather, Mr. James simply claims that the price decline was not statistically significant.  (James Report, Exhibit 7, ¶8.)  As a result, I duplicated Mr. James' event analysis and determined that, using his regression model, the t-statistic for December 15, 2000, was 1.76, or greater than the 1.65 benchmark discussed above, *i.e.*, the December 15, 2000 price increase, using Mr. James' own

---

[2]      (5.5 billion shares) x (6.8% residual return) x ($27.50 per share) = $10.4 billion.

[3]      A one-tailed test is used to test for large price increases only (or large decreases only), while a two-tailed test is used to test for large price movements in either direction.  Mr. James' analysis tests for large price increases, consequently, a one-tailed test is appropriate.  (James Report, ¶3.b.)

analysis, was statistically significant at the 95% level using a one-tailed test.  In other words, a price increase of this magnitude would be expected to occur less than 5% of the time randomly, *i.e.*, the December 15 price increase was a price increase unlikely to have occurred simply by chance.

9.      It should also be noted that the confidence level used to determine statistical significance varies depending upon the context.  The benchmark used to determine whether an event study is suitable for academic publication – generally the 95% level – nonetheless may not be the appropriate level for civil or criminal litigation.  A court certainly would not convict a defendant in a criminal case solely based on an observed result that had a 5% probability of occurring simply by chance.  Similarly, a sufficient confidence level in civil litigation, where plaintiffs only have to prove their case by a preponderance of the evidence, may be much lower than the 95% level.  For example, the 90% level of confidence would also be of interest when assessing the level of materiality, as there is, to my knowledge, no absolute benchmark in civil proceedings, as discussed in a commonly used reference text below:

> It is not clear what level of statistical significance corresponds to a legal definition of materiality.  As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options.  There is no definite case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation.  With an event study, however, courts can quantify the level of materiality, compare it across cases, and assess it using professional standards from the economic literature. [4]

10.      Mr. James calculated the t-statistic for the December 15, 2000 price increase to be 1.76, which is less than the t-statistic of 2.06 in my May 2007 Report.  This difference is a result of different regression models.  To determine which regression model is superior, it is common to compare the adjusted r-squared of the regression models, or the proportion of variability in a data set

---

[4]      David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (3d ed. 2001), attached hereto as Exhibit B.

that is accounted for by the statistical model.  In this case, the adjusted r-squared of my regression model is 52%, much greater than the adjusted r-squared of Mr. James' regression model of only 43%.  This suggests that my regression model is superior to that of Mr. James.  The higher adjusted r-squared in my regression model also corresponds to a lower standard error in my model of 3.49%, versus a much higher standard error in Mr. James regression model of 3.8%.  Furthermore, the t-statistic associated with the independent variable in my regression model (the NASDAQ 100 index) is greater than 16, versus only 5.5 and 3.1 in James' regression model for the CRSP Value-Weighted NYSE/AMEX/NASDAQ index returns and Mr. James' industry index, respectively.  Again, this also suggests that my regression model is superior to that of Mr. James.  Based on the above, it is my opinion that my regression model is superior to that of Mr. James.  As noted in one commonly used reference text:

> When the estimation regression is run, one of the statistics generated is the adjusted R-squared.  This statistic measures the strength of the fraction of the variability of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining.  The higher this statistic, the larger the portion of the variability explained.  Another relevant statistic is the t-statistic associated with each independent variable; this statistic measures the strength of the individual independent variable's correlation with the company's stock price.  The farther the t-statistic is from zero, the stronger the relation.  While one should not use either the adjusted R-squared or t-statistics as a blind measure for the comparison of the explanatory power of different indices, an expert should be prepared to provide these statistics.  Moreover, if the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.[5]

11.    Based on the above, it is my opinion that Oracle's announcement of its Second Quarter Fiscal 2001 results, including defendants' commentary, caused a statistically significant price increase, at the 95% level, in the Company's common stock on December 15, 2000.

---

[5]    Ibid.

**III.    Oracle's March 2, 2001 Price Decline**

12.    Mr. James concedes that the price decline in Oracle's common stock on March 2, 2001, following the Company's pre-announcement of its Third Quarter Fiscal 2001 results, was statistically significant.  (James Report, ¶49.)  In other words, this price decline was not explained by Mr. James' market and industry indices.  In fact, the residual return calculated by Mr. James of -16.76% for March 2, 2001 is slightly smaller than the residual return calculated by me of -16.68%, and would therefore result in greater damages than those calculated in my May 2007 Report.

13.    Mr. James also opines that, on March 2, 2001, "Oracle's stock price fell in reaction to its earnings and revenue miss for the quarter which had current and future cash flow implications." (James Report, ¶3.c.)  I agree.  It therefore logically follows that, had investors been informed earlier about Oracle's inability to meet the revenue and earnings expectations for the Third Quarter Fiscal 2001, the Company's stock price would also have declined earlier, rather than on March 2, 2001. The critical issue in this case is whether Oracle, internally, was aware of the issues that ultimately caused it to miss investors' revenue and earnings expectations, and whether the Company had a duty to disclose this to investors earlier than it did.  According to plaintiffs' allegations, the Company, rather than disclosing the problems that ultimately caused it to miss revenue and earnings expectations, concealed these problems by: (a) reporting inflated revenues and earnings for the Second Quarter Fiscal 2001, (b) misrepresenting the quality and capabilities of, and customer demand for Oracle's 11i Application Suite ("Suite 11i"), (c) providing false financial projections for the Third Quarter Fiscal 2001, including forecasting earnings per share ("EPS") of 12 cents, database sales growth of 25% and applications sales growth of 75%, and (d) representing that the Company would not be negatively impacted by the economic slowdown and reduced IT spending.  For my purposes, I assumed that plaintiffs' allegations are true, and, consequently, I concluded that the price decline on March 2, 2001 relates directly to plaintiffs' allegations.

14.     Mr. James, on the other hand, reviews each of the allegations individually and effectively argues that none of them account for the decline in Oracle's stock price on March 2, 2001.  (James Report, ¶3.)  It should be noted that it does not appear that any of Mr. James' opinions are based on an actual review of any internal documents.  Therefore, Mr. James is incapable of opining on what the defendants knew about the problems that ultimately caused the Company to miss investors' revenue and earnings expectations for the Third Quarter Fiscal 2001.  Regardless, below I will review and discuss each of Mr. James' arguments.

False Second Quarter Fiscal 2001 Results

15.     According to plaintiffs' allegations, Oracle reported inflated Second Quarter Fiscal 2001 results.  More specifically, plaintiffs allege that Oracle artificially inflated its revenue and EPS results for the Second Quarter Fiscal 2001.  Defendants manipulated Oracle's unapplied cash and customer overpayments accounts in connection with the creation of 46,000 fictitious "debit memo" invoices in November 2000, thereby artificially materially inflating Oracle's revenue and earnings for the Second Quarter Fiscal 2001.  I understand that plaintiffs also intend to prove that Oracle further artificially materially inflated its revenue and earnings by improperly recognizing revenue on a transaction with Hewlett Packard on the last day of the quarter, November 30, 2000.  As a result of the allegedly false financials, Oracle reported EPS of $0.11 for the Second Quarter Fiscal 2001 that were inflated by, at least, 1 cent per share, thereby exceeding analysts' consensus expectations of $0.10 cents per share by 1 cent per share.

16.     Mr. James argues that "Oracle's stock price decline on March 2, 2001 was not caused by the disclosure of information related to alleged accounting errors in 2QFY01."  (James Report, ¶3.h.)  The relevant issue, however, is whether the allegedly false and misleading earnings reported misled investors as to Oracle's true financial performance during Second Quarter Fiscal 2001, and, thereby, concealed the issues that later caused the Company to miss investors' revenue and earnings

expectations for the Third Quarter Fiscal 2001.  If so, plaintiffs' allegations would relate to the Company failing to meet the inflated revenue and earnings expectations.  For my purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle's publicly reported Second Quarter Fiscal 2001 results were false and misleading as discussed above.

Suite 11i Product Issues

17.     Plaintiffs allege that defendants misrepresented the quality and capabilities of, and customer demand for, Oracle's Suite 11i.  Among other things, plaintiffs allege that defendants falsely and repeatedly stated that Oracle's Suite 11i, first introduced in May of 2000, worked well and was pre-integrated and interoperable out-of-the-box.  Defendants also falsely stated that no systems integration was required, that the components of Suite 11i were literally plug-and-play, and that Suite 11i would manage all aspects of a customer's business and help reduce costs in a declining economy.  Plaintiffs also allege that defendants misrepresented that Suite 11i would drive sales growth at Oracle and that customer acceptance of Suite 11i was high. Defendants falsely projected 75% applications sales growth and 25% database sales growth for the Third Quarter Fiscal 2001. In reality, Suite 11i was beset with severe technical problems and defects, including integration problems, and required costly implementations to work.  These problems caused customers to suffer from implementation delay and/or to forego or delay planned purchases from Oracle.  Plaintiffs further allege that the misapplication of customer cash and improper revenue recognition in the Second Quarter Fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the problems with Suite 11i.

18.     Mr. James argues that financial analysts "did not attribute the earnings miss announced on March 1, 2001 to any integration or interoperability problems with Suite 11i or to any new information regarding product quality issues about Suite 11i."  (James Report, ¶3.f.)  First, the real issue is whether, as plaintiffs allege, lack of customer acceptance of Suite 11i, and thus strong

applications sales growth, was one reason why Oracle failed to meet investors' revenue and earnings expectations on March 1, 2001, and whether these problems were known by the Company and should have been disclosed prior to the end of the Class Period.  If so, the March 2, 2001 price decline directly relates to plaintiffs' allegations.  Second, analysts were, in fact, concerned that a portion of the revenue and earnings miss was due to lack of acceptance of the Company's e-business applications.[6]  Third, while analysts were aware of anecdotal accounts of problems with Suite 11i, they would not have a full understanding of its impact on Oracle's results.[7]  Oracle, on the other hand, claimed to have up to the minute information regarding its sales and forecasts.  Thus, the evidence simply does not support the assertion that analysts and investors fully understood the impact of the product problems on the demand for Oracle's 11i Suite prior to the March 1, 2001 disclosure.  For my purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle knew, but concealed, that customer acceptance of Suite 11i was lacking due, at least in part, to the problems discussed above.

---

[6]    The March 16, 2001 CIBC World Markets analyst report stated: "Management's lack of explanation and our conversations with customers and salespeople lead us to believe that the economy is not the only reason for the shortfall.  From our conversations, customers still desire best of breed solutions designed with the customer in mind versus a suite that may not be customizable or offering specific industry centric features."  The March 16, 2001 Banc of America Securities analyst report stated: "Are Oracle's problems entirely the economy?  We do not think so. . . .  On the application side, especially in light of Oracle's weaker than expected 3Q application growth, we believe the economy may only explain 20-30% of the weakness.  The rest, in our view, is a result of the product set not yet reaching a competitive level of functionality, relative to best-of-breed vendors." (James Report, Ex. 3.)

[7]    *See*, for example, the February 23, 2001 US Bancorp Piper Jaffray analyst report that stated "discussions with customers and partners also highlighted the fact that product bugs and execution challenges remain," but still concluded that "[d]emand for Oracle's 11i e-Business Suite is growing, and is beginning to drive additional momentum within its application business."  (James Report, Ex. 3.)

Economic Downturn and Reduced Corporate IT Spending

19.     Plaintiffs also allege that defendants falsely represented that the Company's sales would not be negatively impacted by the general economic slowdown during the Class Period. Defendants' false representations were made despite a known decline in the United States economy that began in early summer 2000 and impacted Oracle's customers. The economic downturn caused Oracle's customers to cut information technology budgets, which in turn impacted sales at Oracle and caused Oracle to discount its products. Plaintiffs also allege that defendants knew of the impact of the economy on Oracle's business based upon defendants' use of an application to manage worldwide sales which gave defendants up to the minute information on the Company's global forecast and sales. After the Class Period, defendants admitted that the economy had a negative impact on the Third Quarter applications and database sales.

20.     Mr. James claims that the impact of the economic downturn on Oracle was "sudden and sharp."  (James Report, ¶3.f.)  Mr. James does not appear to have reviewed any internal documents to determine whether or not his claim is true and plaintiffs' allegations wrong.  He appears to ignore that several other large technology companies reduced their financial guidance due to economic factors much earlier than Oracle.  Despite the reduced financial guidance of other large technology firms, Oracle represented that "the economic slump isn't affecting Oracle and is unlikely to do so in the future because most customers buy the software to help them use the Internet to cut costs and boost efficiency."[8]  Apparently as a result of the Company's representations regarding cost

---

[8]     *Bloomberg*, "Oracle 2nd-Qtr Net Rises 62%; Applications Sales Jump (Update2)," December 14, 2000 (May 2007 Report, App. 5.)

savings, some analysts were surprised about the sales delays regarding applications.[9]   For my

purposes, I have assumed that plaintiffs will be able to prove their allegations that Oracle concealed

and misrepresented the impact of the slowing economy and reduced IT spending on the Company's

performance prior to the March 1, 2001 disclosure.

Defendants' Specific Financial Projections

21.     Plaintiffs also allege that defendants falsely made and maintained financial guidance

for the Third Quarter Fiscal 2001 – including that Oracle would continue to have sequential EPS

growth and would report revenue of $2.9 billion based upon projected 75% applications sales growth

and 25% database sales growth.   During the Class Period, Oracle made numerous statements

maintaining its guidance and asserting that the general economic slowdown was not negatively

impacting its business, as demonstrated by the examples below.   According to a January 11, 2001

*Bloomberg* article, Company spokeswoman Stephanie Aas claimed that "Oracle has yet to see any

signs that its business is being hurt by the economic slowdown or reported cuts to information-

technology budgets." (May 2007 Report, App. 9 at 1.)  On February 7, 2001, First Union Securities

reported in an analyst report that, according to CFO Jeff Henley, "Oracle is not seeing the effects of

a slowing economy at this point," and that "[m]anagement reiterates guidance of 15-20% y/y

database revenue growth and 75% y/y applications revenue growth for FQ301." (May 2007 Report,

App. 10 at 1.)  On February 13, 2001, MarketWatch reported that an Oracle executive vice president,

Sandy Sanderson, stated that Oracle's "pipeline around the database and applications business have

never been stronger . . . [v]ery few customers are canceling contracts," and that "[i]n some ways . . .

the tougher environment in technology may even be increasing sales at Oracle." (May 2007 Report,

---

[9]     The March 2, 2001 Needham & Co. analyst report stated:  "We find these delays remarkable given the fact that the deployments were likely to produce rapid paybacks (particularly for e-business applications, in our view)."  (James report, Ex. 3.)

App. 11.)  On February 21, 2001, Deutsche Bank Alex. Brown issued an analyst report stating that Oracle's "management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters." (May 2007 Report, App. 12 at 2.)  Even as late as March 1, 2001, the last day of the Class Period, BlueStone Capital issued an analyst report that stated that "management indicated last week that Oracle had not experienced any slowdown in business this quarter," and that "Oracle's business continues to grow; the current pipeline is as strong as it has ever been, according to management." (May 2007 Report, App. 13 at 1.)  In particular, on February 21, 2001, following a presentation by defendant Jeff Henley at the AppsWorld Conference, William Blair & Company issued an analyst report.  It stated:

> According to Mr. Henley, business looks good.  He was very bullish in the sessions. We want to quote a few of the things he said.  In regard to applications growth, he said that, "The second half growth will be as good, or better, than the 69% growth posted in the first half."  As for the economy, he commented that, "ORCL is not seeing an impact."  He also stated that, "We are in spaces that are high ROI and it's not clear if we'll see much of an impact in our business due to the economy."  In a related statement, he said, "The economy is a wild card, but unless there is a serious recession, we are not sure we'll see much of an impact."  Clearly, his statements are bullish in regard to ORCL's current business.

(May 2007 Report, App. 14.)

22.     Mr. James does not specifically address the allegations relating to Oracle's specific financial guidance regarding its Third Quarter 2001, nor that the financial guidance was reaffirmed throughout the Class Period, thereby maintaining its inflationary impact on Oracle's stock price. However, as discussed above, it was the Company's failure to meet these specific financial projections that caused Oracle's stock price to decline on March 2, 2001.  Consequently, these allegations are directly related to investors' losses resulting from the March 2, 2001 price decline.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 22nd day of June, 2007, at San Diego, California.


Respectfully submitted,


BJORN I. STEINHOLT, CFA

# Exhibit A

May 2004

**LOSS CAUSATION AND DAMAGES IN SHAREHOLDER CLASS
ACTIONS:  WHEN IT TAKES TWO STEPS TO TANGO**

*by David Tabak*



NERA
Economic Consulting

Marsh & McLennan Companies

# Loss Causation and Damages in Shareholder Class Actions: When It Takes Two Steps to Tango

David Tabak[*]

There is currently a split among the circuits on the requirements to plead loss causation in shareholder class actions. Some circuits require plaintiffs to plead that there was a price decline associated with the fraud or its disclosure, while others require plaintiffs to plead only that the stock price was inflated at the time of purchase. We argue that the resolution of the issue affects not only how loss causation must be pled, but also the measurement of damages. Moreover, consideration of the analyses in damage calculations may inform the question of the requirements for pleading loss causation.

## I.  INTRODUCTION

In a simple case where proximate cause is a consideration, the time when a plaintiff is harmed is clear. For example, if D drops a bowling ball on P's foot, the harm to P occurs when the bowling ball hits her foot. On the other hand, a debate about the time of the harm exists in securities law because the harm to a purchaser of a security whose price is inflated above its true value arguably occurs in two steps. Suppose that XYZ is a company that issues a falsely positive statement about its profitability. The market believes this false news and the price of XYZ's stock rises. P then purchases the stock at an inflated price, say paying $50 a share for a stock that is really worth only $10 a share. Later, the falsity of XYZ's statement is revealed and XYZ's stock price falls to $10. The question then is when is P harmed.

One school of thought is that P is harmed when she pays $50 for a share worth $10. This school argues that loss causation depends on whether the price of the stock P purchased was higher than its true value due to false statements or omissions of information required to be disclosed by defendants. The other school argues that the loss is caused when the truth is revealed and the stock price falls, so that the value of what P holds and could sell drops from $50 to $10.

[*] Vice President, NERA Economic Consulting.  I thank Tsvetan Beloreshki, Darren Klein, Ben Rosenberg, and members of NERA's securities and finance practice for comments on earlier drafts of this paper.

- 2 -

The prior example may seem academic, as there is a $40 loss in each case.  But, now, consider the following.  P purchases 100 shares of stock in an ocean liner for $50 apiece.  On its maiden voyage, the ship, which was known to be uninsured, hits an iceberg and sinks.  The company goes bankrupt and P's stock has no value.  Later, it is revealed that the company had been inflating its projected customer base, so that the stock was not really worth $50 when P made her purchase.  The question is then whether P has a claim for a loss due to the fraud.  The first school would argue that 100 shares would have cost P less than $5,000, and thus she has suffered a loss due to her overpayment.  The second would maintain that P would have lost her entire $5,000 investment in the company anyway, and thus has suffered no additional loss due to the fraud.[1,2]

In this paper, we argue that both steps – overpayment on purchase and a price decline due to the fraud or its disclosure[3] – are generally needed for a plaintiff to have a damage claim.  If a plaintiff fails to purchase the stock in question while its price is inflated, she has no standing to bring a suit.  In addition, if the plaintiff purchases and resells a share, she has no damage claim if the effect of the misrepresentation on the stock price was unchanged between the time of purchase and the time of sale: if the plaintiff overpaid by $40 on purchase and then sold her share and received $40 in excess proceeds (proceeds above the true value of the stock), on net she has not been harmed by the fraud.  Thus, for a plaintiff to have a damage claim, she will ultimately have to prove both that she purchased the stock at an inflated price and that the effect of the fraud declined between the times of her purchase and her sale.

In Part II, we discuss how the loss causation concept has been applied in cases of securities fraud.  Because the relevant cases deal with pleading loss causation, our discussion will generally center on this issue, leaving aside questions about whether plaintiffs will be able to prove their allegations.  Assuming that plaintiffs must plead all necessary elements of their

---

[1] One way to view the dispute, though this does not appear in case decisions, is whether P was attempting to buy 100 shares or $5,000 worth of stock.

[2] If one replaces iceberg with Internet crash, this is essentially the reasoning given in *Merrill Lynch & Co. Research Reports Securities. Litig.* (SDNY, June 30, 2003).

[3] For simplicity, we sometimes simply refer to a price decline.  It should be understood that for purposes of showing a loss or calculating damages, the only relevant price movements are those caused by a change in the level of inflation in the stock.

- 3 -

case and need not make any allegations that must not ultimately proven, we can focus on the role of loss causation without worrying about the level of proof for plaintiffs' allegations.  In Part III, we argue that for a loss causation pleading requirement to be meaningful for most cases, plaintiffs would have to explicitly argue that the price of the stock they purchased declined as a result of the fraud and at least implicitly allege that there was an inflation at the time of purchase.  We further argue, in Part IV, that these requirements have an impact on the measurement of damages.  Part V concludes.

## II.   LOSS CAUSATION IN SECURITIES FRAUD

To understand proximate cause in securities fraud, it is helpful to review the pleading requirements for a class action complaint.  The case is premised on a misrepresentation by defendants, meaning a false statement or a failure to disclose information required to be disclosed.  The most common allegation is an overpricing due to falsely positive information or the omission of negative information.  Plaintiffs have typically been required to plead some version of the following: "(1) defendants made a false statement or omission with regard to a material fact; (2) in connection with the purchase or the sale of a security; (3) with scienter; (4) upon which plaintiffs reasonably relied; and (5) that proximately caused the alleged loss."[4]

Shareholder class actions grew significantly after the Supreme Court's *Basic v. Levinson*[5] decision, which provided plaintiffs with a rebuttable presumption of reliance if the stock traded in an efficient market.  The reasoning was that if the market is efficient, informed traders are aware of public information and set prices accordingly.  Consequently, individual investors do not need to scrutinize all public information in making their investment decisions; instead they can reasonably presume that the stock price already reflected that information.  Plaintiffs were no longer required to show that they had read a document with the misstatement or that should have contained the omitted information.

---

[4] *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933 (9th Cir. 2003), citing *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).

[5] 485 U.S. 224 (1988).

- 4 -

The 1995 Private Securities Litigation Reform Act ("PSLRA") explicitly added in a requirement that plaintiffs prove loss causation.  Specifically, it required that "In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."

In the last few years, a split has developed among the circuits as to what plaintiffs must do to plead loss causation.  As noted above, one argument is that the loss occurs when the plaintiff pays too much for her shares, while the alternative view is that the loss occurs when the stock price declines.  Currently two circuits hold that plaintiffs *do not* have to argue that the fraud or its disclosure caused a price decline but have to plead only that there was a difference between the market price and the stock's true value (a "purchase price disparity").  The Eighth Circuit made such a ruling in *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003) ("Our finding of materiality allows the plaintiffs to invoke the fraud-on-the-market theory and assume that the misrepresentations inflated the stock's price. Paying more for something than it is worth is damaging. Thus, the plaintiffs adequately pleaded their case for damages.") Similarly, in *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933 (9th Cir. 2003), the Ninth Circuit held that "loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise. It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause."

On the other side, in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), the Second Circuit held that "Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of NETV securities."  It explicitly rejected the purchase-only pleading requirement, noting that "Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement."  Two other circuits earlier held that plaintiffs must show that the fraud or its disclosure caused a price decline.  The Third Circuit, in *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), stated, "Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an

- 5 -

economic loss attributable to that misrepresentation."  Similarly, the Eleventh Circuit in *Robbins v. Koger Props, Inc*., 116 F.3d 1441 (11th Cir. 1997) held,  "Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."

## III.   PLEADING LOSS CAUSATION

To analyze the varying interpretations of loss causation, we consider the implications of different scenarios regarding what plaintiffs must plead to satisfy the loss causation requirement of the PSLRA.  Here we focus on fraud-on-the-market class actions, which account for the bulk of securities fraud cases, and in particular the interaction between the economic measurement of price inflation or movements and proof of loss causation.[6]

### A. Purchase Price Disparity

One concern with pleading loss causation by only showing an inflated price on purchase is that many plaintiffs can make such a pleading even though they actually suffered no loss as a result of the fraud.  Consider an "in-and-out" plaintiff, or an investor who both purchased and sold a stock at an inflated price.  For simplicity, suppose the amount of the inflation is constant, with the stock trading at $50 when it should be trading at $10.  This hypothetical plaintiff bought a share of stock for $50 and sold it for $50, breaking even in the process.  Had there been no fraud, the plaintiff would have purchased the stock for $10 and sold it for $10, again breaking even.[7]  If loss causation requires only inflation on purchase, there is no reason that this in-and-out plaintiff who suffered no loss could not satisfy this pleading standard by claiming, and perhaps even proving, that the stock was overpriced at the time of purchase.[8]

---

[6] One area we do not consider is whether the use of a purchase price-inflation standard results in a conflating of transaction causation and loss causation, as argued by David M. Brodsky and Jeff G. Hammel, "The Fraud on the Market Theory and Securities Fraud Claims," *New York Law Journal*, Vol. 230 - No. 82, October 24, 2003.

[7] One could also argue that with $50 the plaintiff could have bought 5 shares of stock at $10, but still would have sold those shares for an aggregate amount of $50.

[8] The *Semerenko* court noted this, stating, "In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price."

- 6 -

A second concern with pleading only a purchase price disparity is that the pleading may be superfluous. For a fraud-on-the-market case, plaintiffs have already pled that defendants made a misrepresentation with regard to a material fact and that the stock traded in an efficient market. Plaintiffs may now claim that "this statement (omission) caused the stock to trade at an artificially high price." In most cases, this phrase, or something like it, would be sufficient to plead loss causation under the requirement that plaintiffs plead an inflated price at purchase.[9]

To support an allegation of a purchase price disparity by more than claiming that the misrepresentation was material, plaintiffs typically must present evidence of the effect of the misrepresentation on the stock price. Because one would not expect the stock price to move when defendants did not make a statement, so there is no reason to examine the stock price at the time of an alleged omission. An alternative way of showing the effect of the omission is by examining the stock price when the information was finally disclosed, but this simply brings back the price-decline interpretation of loss causation.

If the case involves a misstatement, plaintiffs may be able to show that the stock price moved up in response to the false information. Unfortunately, this is not always even possible. For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents. If the company falsely announces earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings. Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.

The foregoing analysis argues that if one accepts that it is necessary to plead a purchase price disparity without reference to a price decline at disclosure, in most fraud-on-the-market cases the pleading need not go beyond alleging the materiality of the false or omitted

---

[9] For example, for its Section 10(b) claims, the Amended Complaint in *Clive T. Miller v. Apropos Technology, Inc., et al.* (USDC NDIL Eastern Division, Civil Action No. 01 C8406) alleges that the "omission from the Registration Statement of the material facts identified in … this Complaint caused the offering price of Apropos common stock on the offering to be higher than the offering price would have been had the true facts … been disclosed to the investing public," (¶114) and "The Registration Statement remained on file with the SEC after the offering … [and] thereby caused the market price of Apropos common stock on the NASDAQ market after the Offering to be artificially inflated" (¶115). The Amended Complaint made no reference to a price decline.

- 7 -

information.[10]  In a limited number of cases, one could require plaintiffs to show that a release of false information raised a stock price.[11]  Because this cannot be a universal or near-universal requirement, it seems more reasonable that in those cases where one would expect a stock price rise, defendants could rebut the pleading of loss causation by showing that the misstated information did not affect the stock price.[12]

One way to address these concerns is to require plaintiffs to also plead that the stock price was not as inflated at the time of sale.  As discussed in the following subsection, this would make the loss causation pleading meaningful and prevent in-and-out plaintiffs from alleging a loss if there was no price decline due to the fraud or its disclosure.

### B.  Fraud-Induced Price Decline

Suppose that, following the Second, Third, and Eleventh Circuits, to properly plead loss causation, a plaintiff has to plead that there was a price decline as a result of the fraud or its revelation.  Does this avoid the problems with the other pleading standard?

The first problem with the purchase inflation pleading standard was that in-and-out purchasers could plead loss causation even though they actually suffered no loss.  We must therefore ask whether a similar problem exists under the disclosure pleading standard.  Because retention plaintiffs necessarily hold through the price decline, if their allegations hold true, they will have a valid damage claim.  In-and-out plaintiffs, however, cannot plead a loss based on that decline.  There are then two possibilities.

First, in-and-out plaintiffs can provisionally be allowed to be in the class because part of the class has made a showing that there could be a loss associated with defendants' actions.  Including in-and-out plaintiffs presents minimal additional costs at this stage and preserves

---

[10] Though this would not wholly vitiate the loss causation requirement of the PSLRA, it would severely diminish its impact due to the limited number of cases where it would require anything beyond the previous pleading requirements.  To the extent that this would render the loss causation section insignificant, it arguably goes against established precedent.  See, e.g., *Duncan v. Walker*, 533 U.S. 167, 174 (2001) at 174.

[11] One study estimated that 51% of post-PSLRA cases are accounting cases, in which one might not expect a price increase at the time of the misstatement.  (Todd S. Foster, Frederick C. Dunbar, Denise N. Martin, Vinita M. Juneja, and Lucy P. Allen, "Recent Trends VII: PSLRA Six Years Later," *NERA Economic Consulting* (2002).)

[12] See, for example, *Zonagen Inc. Securities Litigation*, USDC for the Southern District of Texas (Civil Action No. H-98-0693) opinion dated June 13, 2003.

- 8 -

their ability to receive compensation if they are later able to prove that they suffered a loss. While one could argue that by similar reasoning in-and-out plaintiffs should initially be part of the class under a purchase inflation pleading standard, the arguments are not truly parallel. Under the price-decline standard, an in-and-out plaintiff *has not yet* satisfied the loss causation pleading standard herself and still must make that showing before she can claim a damage. Thus, some plaintiffs would be allowed in the class but could later be dropped if they fail to prove a loss.  This is actually common practice today, as most shareholder class actions start with claims for all purchasers, even though many in-and-outs ultimately have no damage claim. Under the purchase price disparity standard, there is the false conclusion that an in-and-out plaintiff *has affirmatively* satisfied the loss causation requirement, when she may have no damages even if the allegations are proven true.  In addition, if the in-and-out plaintiff has (falsely) satisfied the standard, how can she later be required to prove that she actually suffered a loss except under a different test?  If so, one should ask what would that test is, and why it should not be pled at the start of the case.

This brings us to the second possibility for dealing with in-and-out plaintiffs under the price-decline standard.  They could be required to argue that there was a price decline related to the fraud or its disclosure at one or more points over which they held their shares (i.e., between the time they were "in" on purchase and "out" on sale).  There is something appealing to this because it puts the in-and-out plaintiffs on the same footing as the retention plaintiffs, being required to show a price decline that caused them a loss.  The drawback is that over the course of discovery plaintiffs may conclude that a price decline in the middle of the class period that they did not originally believe was related to the fraud in fact was a product of the fraud. Under those circumstances, in-and-out plaintiffs who were previously unable to satisfy the loss causation pleading standard should be able to reenter the class.  While this could be a reasonable outcome, it may lead to concerns about whether in-and-outs initially excluded from the class should file their own suits before the statute of limitations runs out or save that expense and hope that they will ultimately be a part of the class.

In either case, under the price-decline standard, the question concerns the timing of when in-and-out plaintiffs must prove that they suffered a loss, rather than the possibility of

- 9 -

following a false or unworkable presumption.  For that reason, while there may be some issues in following a disclosure pleading standard, they pale in comparison with the problems that arise under a purchase inflation pleading standard.

The second problem with the purchase price disparity standard was that the pleading requirement was often gratuitous once a plaintiff pled that the misstated or omitted information was material.  This is not a problem under the price decline pleading standard.  No matter what has been pled about the materiality of the information at the time of purchase, pleading a price decline involves a different set of facts: plaintiffs generally have to state what the price was before disclosure and what it was afterward.  This would make the loss causation pleading meaningful because if there was no price decline, plaintiffs would be unable to satisfy this requirement.  In some cases, the requirement would be easily satisfied, such as when there is a large decline after a disclosure.  In others, the requirement would be difficult, though not necessarily impossible, to satisfy, such as if the price decline is small, so that it may be just a chance movement, or occurs at a time other than immediately following a known disclosure.[13]

Finally, we ask whether plaintiffs can plead a loss based on a price decline even if they have not overpaid on purchase.  Obviously if the stock price was not inflated until after a plaintiff made her purchase, she may hold through a price decline associated with a disclosure but not have a valid damage claim because she never overpaid for her stock.  However, because plaintiffs must allege that their purchase was based on a prior material misrepresentation, they will necessarily plead a purchase price disparity.  Because the disclosure must relate to the misstated or omitted information, if the disclosure caused a price decline it will generally be the case that the stock price was inflated at the time of the misstatement or omission.  Barring a counter-argument by defendants, in most cases one could reasonably assume that if a the correction of a misrepresentation caused a price decline, the stock price was inflated from the time of that misrepresentation.  Thus, pleading a price decline based on a fraud or its disclosure essentially entails pleading a prior purchase price disparity or inflation.

---

[13] In particular, plaintiffs may argue that the information leaked to the market or that the fraud caused the company to underperform during the class period.  We do not consider the level of proof that should be required to support such an allegation.

## IV.   IMPLICATIONS FOR DAMAGES

We now ask whether the different loss causation pleading requirements have implications for the calculation of damages.  As the Fourth Circuit noted, "We, along with other courts, use the terms 'injury' and 'damages,' as well as 'loss' and 'harm,' interchangeably to refer to the actual pecuniary loss that a private plaintiff must establish to prove liability in a Rule 10b-5 case."[14] (Internal citations omitted.)   Thus, to the extent that decisions affect the definition of loss causation, they should also affect the measure of damages.   Were that not true, one could find the strange scenarios where a plaintiff had proven a loss due to defendants' actions but had no damages, or had proven damages but not suffered a loss.

### A.  Damage Calculations Under Different Loss Causation Standards

Damages in securities fraud cases are typically calculated under the out-of-pocket measure, meaning the inflation at purchase less the amount of inflation at sale.[15]  For retention plaintiffs, it is generally assumed that there was no inflation after the end of the class period, so there is no offset to the purchase inflation.

To examine how the different loss causation requirements affect the calculation of damages, we start with a simple example where those requirements do not affect the damage calculation and then proceed to examples where there should be an interaction between the requirements for showing loss causation and the damage calculation.

First, consider a plaintiff who purchases a share of XYZ Corporation for $50.  Suppose that XYZ's stock price remains at $50 until a disclosure of a prior misrepresentation is made, causing the stock price to fall to $10.  Also assume that the magnitude of the fraud did not change or interact with other information, so that the stock had a true value of $10 throughout the class period.  The inflation at purchase was then $40, exactly the same as the price decline

---

[14] *Miller v. Asensio & Company.*  (Appeal from USDC for South Carolina, at Charleston, CA-99-1861-2-18)

[15] In footnote 5 of *Robbins v. Koger*, the Eleventh Circuit argues that the "proper measure of damages uses the out-of-pocket rule."  Interestingly, while noting that damages calculations require the removal of causes for the price movement unrelated to the fraud, as distinguished from loss causation, for which "a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value," the court notes, "Proof of damages under the out-of-pocket rule is not proof of loss causation." (Internal citations omitted.)  The court does not make clear how the fraud could have caused a price decline, and hence damages, yet not have caused a loss.

- 11 -

at the disclosure.  A retention plaintiff then has a claim of $40, representing either how much she overpaid on purchase or how much she lost at the disclosure.

Next, consider an example where the stock price declines from $50 to $0 (e.g., the ocean liner's company goes bankrupt when the ship hits an iceberg) before there is a disclosure of the fraud.  Again, assume that at the time of purchase, the true value of the stock was $10.  Under the purchase-inflation requirement, the damage claim is $40.  Under the price-decline requirement, plaintiffs will not be able to show a loss, because the stock price has already fallen to zero before there was any disclosure of the fraud, and for this requirement, the proper damage claim is zero; if not, we would have the strange situation where plaintiffs have a damage without having suffered a loss.  In this case, the definition of loss causation clearly affects the measure of damages.

Now consider a more complicated example.  Suppose the investor again pays $50 for a share of stock of XYZ Corporation, a furniture maker.  Over the next year, the furniture industry's fortunes decline so that XYZ's stock falls from $50 to $30.  Later, it is revealed that XYZ had overstated its previous financials and its stock was worth only 20% as much as believed, meaning that it was worth $10 at the time of the investor's purchase and $6 after the industry decline.  The investor sues, arguing that she overpaid by $40, based on the inflation at the time of purchase.  The company responds that even if that is true, the fraudulent financials were not the proximate cause of all of the investor's loss because the stock price fell from $50 to $30 due to events unrelated to the fraud.  The company argues that the investor's damage claim should equal the $24 price decline at the time of disclosure.

This example shows that the measure of damages is intimately tied in with the standard for loss causation.  If loss causation means that the price was inflated at the time of purchase, damages equal the amount by which the price exceeds the true value at purchase (purchase inflation) less any inflation at the time of sale.  In the above example, this would correspond to a claim of $40 for retention purchasers.

NERA
Economic Consulting

- 12 -

If loss causation means that there was a price decline on disclosure, damages equal the portion of the price decline caused by the misstated or omitted information at the time of purchase.[16]  In the above example, this would correspond to a claim of $24.

Finally, if loss causation means both a purchase inflation and a price decline on disclosure, damages should equal the *minimum* of the inflation at the time of purchase and the portion of the price decline attributable to the misstatements and omissions at the time of purchase.  In the example we have been using, this would correspond to the $24 price decline.  A different example, however, shows not only that the alternative result is possible, but that failing to limit damages to the inflation at purchase can result in plaintiffs receiving a damage claim that is larger than the total amount that they paid for the stock.

Suppose that at the time of purchase, a stock trades at $16 even through the true value is only $10, again due to some misstatement by defendants.  Suppose that the industry does well after the misstatement, such that the stock's price triples to $48 while the true value triples to $30.  After this, there is a disclosure of the misstated information, causing the stock price to decline by $18 from $48 to the true value of $30.  The overpayment at purchase is $6 and the price decline at the time of disclosure is $18.

If the damage is the $18 price decline, plaintiffs would have a claim larger than the amount of their purchase.  Such a result would require a different theory than the out-of-pocket measure used in securities fraud cases.  In fact, if a sufficient number of retention shares are purchased early in the class period (when the price was $16), the sum of the $18 damage claims from those purchases can exceed the company's inflated market capitalization at that time.  Beyond departing from the out-of-pocket standard, this conclusion may violate the actual damages provision of the 1934 Securities Exchange Act[17], which is often interpreted to limit damages to the difference between what the plaintiff paid for her shares and what she sold them for, since the claim is even larger than the purchase price.

---

[16] For example, if defendants made two equal-sized misstatements, a retention plaintiff who purchased after both misstatements would get a claim equal to the full price decline, while a retention plaintiff who purchased after the first misstatement would only have a claim for half of the price decline.

## B.  Arguments For and Against a "Minimum Damage" Calculation

As discussed above, to satisfy both requirements – limiting damages to the amount of overpayment (to prevent pre-class period purchasers from having a claim) and limiting damages to the price decline caused by the fraud (to prevent a plaintiff who buys and sells at the same inflation from having a claim) – the damage claim should equal to the *lower* of the purchase inflation and the price decline due to the misrepresentations at the time of purchase. Using the minimum of these two measures results in lower average damages than using either measure alone.  While this may be unfair to plaintiffs, laws are not always designed to be fair. In particular, the PSLRA itself explicitly limits the damages for plaintiffs who hold more than 90 days after a disclosure to the difference between their purchase price and the average price over that 90-day period.[18]  If the plaintiff in the above example purchased the stock at $16 and held it for 90 days after the disclosure while the price remained at $18, this provision would eliminate her claim.  There is no adjustment, however, if the stock price falls over the 90-day period, so that if that average price is $1, a plaintiff who paid $16 may not argue for a $15 claim.  The history of the PSLRA shows that this provision was designed to limit plaintiffs' damage claims.[19]  Thus, it would not be inconsistent with the intent of the PSLRA for one of its provisions, in this case the loss causation requirement, to limit plaintiffs' damage claims.[20]

Finally, there is another reason not to use purchase inflation as the sole measure of damages, but to limit the claims to the price decline at disclosure caused by the fraud existing at the time of purchase.  Suppose the stock price declined over the course of the class period.

---

[17] Section 28 (a) ("… no person permitted to maintain a suit for damages under the provisions of this title shall recover … a total amount in excess of his actual damages on account of the act complained of.")

[18] "… the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."  A similar limitation applies to plaintiffs who sell during the 90-day period.

[19] While there is history on the justification for this limitation, the actual limitation does not accord with either the standard damage calculations or even the effects of the bounce-back in prices that the Congress discussed.  On theoretical grounds, the limitation is not structured logically.

[20] For an intriguing argument on why corporate law has developed to include more pro-business provisions, see Ronald Chen and Jon Hanson, *The Illusion of Law: The Legitimating Schemas of Modern Policymaking and Corporate Law*, 103 MICH. L. REV. 1 (forthcoming 2004).

- 14 -

Unless this price decline was caused by disclosures, the plaintiff would have lost part of her investment even if there had been no fraud.  In particular, let us return to the example where XYZ's stock fell from $50 to $30 before any disclosure and then fell to $6 after the disclosure because in truth the stock was worth only 20% of the market price.  Suppose further that the stocks of the other companies in the industry also declined by 40%.  Providing the plaintiff with a $40 recovery (80% of the $50 purchase price) for investing in XYZ would limit her post-litigation loss to $4, since the $50 investment would ultimately yield $6 in stock and a $40 recovery.   The plaintiff's net loss would then be only 8% of her investment, meaning that she would have done better by investing in a fraudulent company than by investing in an otherwise identical non-fraudulent company in which she would have suffered a 40% loss.  Such an outcome makes the securities fraud laws a form of insurance: if an investor is "lucky" enough to buy a fraud-affected stock before a market decline, she may be able to recover some or all of her market-related losses, while she would not have such a recovery if there was no fraud.  Various cases argue that having the securities laws provide such insurance is inappropriate.  (E.g., *Carlton v. Franklin* 1990 U.S. App. LEXIS 12946 (4th Cir. Aug. 2, 1990)).  This also seems to violate at least the spirit of the loss causation requirement that the damages sought be due to losses caused by the fraud, instead of losses caused by broader market forces.

**C.      Conclusion**

This section does not attempt to conclude how the debate on loss causation should be resolved.  In particular, it makes no analysis of how the law on loss causation should be written, or how considerations such as deterrence of wrongdoing and compensation of victims should be balanced.  Instead, we argue that if a plaintiff has a damage claim if and only if she has suffered a loss, then there are certain logical relationships between whatever definition of loss causation is accepted and the corresponding measure of damages.

Of course, courts have not always insisted on logic in the settlement of shareholder class actions.  For example, in *In re Cendant Corp. Litig.*, 264 F.3d 201, 250 (3rd Cir. 2001), the Court threw out the damage claims of those who bought and sold before a disclosure, but allowed varying claims for retention plaintiffs based on when they purchased.  Thus, a price decline before a disclosure was not considered sufficient to be the basis for a damage claim by

**NERA**
Economic Consulting

itself, but that decline was considered part of the damage claim of retention plaintiffs.  The inconsistency can be seen by noting how a completely offsetting pair of transactions can affect a damage claim.  Suppose the inflation fell from $40 to $24 before a disclosure reduced the inflation to zero.  Under the reasoning of the *Cendant* court, an investor who purchased at the $40 inflation and sold when the inflation was $24 has no damage claim, presumably because she would still have suffered the same loss had there been no fraud.  A retention plaintiff who purchased at the $24 inflation has a claim of $24 and a retention plaintiff who purchased at the $40 inflation has a claim of $40.  Now suppose that this last investor sold the share she bought at the $40 inflation when the inflation was $24 and immediately purchased another share at the same price and the same $24 inflation.  Those last two transactions completely offset each other: the investor sold and purchased a share at the same price and inflation.  However, if we match the investor's transactions chronologically, she now has two different claims for two different shares, one for the in-and-out share purchased at the $40 inflation and sold at the $24 inflation, and the second for the retention share bought at the $24 inflation.  Under the reasoning of the *Cendant* court, there is no claim for the first share and a $24 claim for the second.  Thus, the perfectly offsetting transactions reduce the damage claim from $40 to $24.

This contradiction would be avoided if damages were limited to the disclosure-related price decline.  With no disclosures in the middle of the class period, damages would equal the $24 price effect of the disclosure, whether a share was purchased at a $40 inflation or a $24 inflation.[21]  The pair of offsetting transactions would not affect damages, as the in-and-out share created would have no damage claim and there would still be just one retention share.[22]

---

[21] In fact, because the plan of allocation approved by the *Cendant* court had a build-up feature based on the extent of the accounting fraud, the share purchased earlier could have a smaller claim.  While not relevant to the instant discussion, the build-up is an example a court's recognition of the reasoning behind the earlier discussion about limiting damages to the *portion* of the price decline related to the fraudulent information at the time of purchase.

[22] To maintain consistency, if there was an increase in inflation between the first purchase and the sale, the in-and-out share should be accorded a negative damage that would offset the damage claim from the other purchase.

- 16 -

# V.    CONCLUSION

The 1995 Private Securities Litigation Reform Act made explicit the loss causation element of shareholder class actions but did not state what plaintiffs must plead to satisfy that requirement.  Recently, a split has developed among the circuits about whether plaintiffs must plead a price decline related to the fraud, or whether they must plead only a purchase inflation. Because the latter pleading is often trivial, one can argue that plaintiffs should have to plead a price decline related to the fraud.  Moreover, if plaintiffs have to plead either only a purchase inflation or only a later price decline, some investors will "successfully" plead loss causation without having suffered a loss.  Thus, there is a logical argument for plaintiffs to plead both a purchase inflation and a later price decline, though pleading a purchase inflation may be implicit in pleading an efficient market and a material misrepresentation prior to purchase.

Whatever loss causation standard is accepted should have implications for the measurement of damages.  A purchase-inflation-only standard leads to a result inconsistent with current out-of-pocket method of calculating damages, potentially allowing an investor to claim more than what she spent on the stock.  It would also be contrary to the intent of a requirement meant to increase the burden on plaintiffs if it increased damages.  If plaintiffs also have to plead a price decline, damages should equal the lower of purchase inflation and the price decline resulting from that inflation.  While this may not have been an explicit intent of the PSLRA, it would be consistent with a portion fn that law that limits damage claims. Finally, that damage measure would be logically consistent with the two necessary parts of the loss causation pleading requirement.

# Exhibit B

# LITIGATION SERVICES HANDBOOK

## The Role of the Financial Expert

Third Edition

**Edited by**

**ROMAN L. WEIL**

**MICHAEL J. WAGNER**

**PETER B. FRANK**



## JOHN WILEY & SONS, INC.

**New York   •   Chichester   •   Weinheim   •   Brisbane   •   Singapore   •   Toronto**

CHAPTER **19**

# MATERIALITY AND MAGNITUDE: EVENT STUDIES IN THE COURTROOM

**David I. Tabak, PhD**
**Frederick C. Dunbar, PhD**

## CONTENTS

19.1  Introduction and Background   19.1
   (a) Overview of the Event Study Technique   19.2
   (b) Materiality   19.3
   (c) Magnitude   19.3
19.2  Performing the Basic Event Study   19.4
   (a) Identifying the Event   19.4
   (b) The Event Window   19.4
   (c) Controlling for Market and Industry Effects   19.5
   (d) Estimating the Effects of the Event   19.6
19.3  Are Event Studies Really Science under *Daubert*?   19.6
   (a) The *Daubert* Decision   19.6
   (b) Are Event Studies Objective?   19.7
   (c) Applying the *Daubert* Factors   19.8
19.4  Deciding on Materiality   19.9
   (a) Standard for Materiality   19.9
   (b) Other Price Reaction Methodologies   19.9
   (c) Changing Levels of Materiality   19.10

19.5  Measuring Lost Profits   19.11
   (a) Lost Profits Calculations Based on Projections   19.11
   (b) Lost Profits Calculations Based on Future Events   19.12
19.6  Recent Literature and Case Law   19.12
19.7  Do Event Studies Accurately Measure Loss to the Corporation?   19.13
   (a) Stock Market Anomalies   19.13
   (b) Bias from Litigation Expectations   19.14
   (c) Whose Loss Does an Event Study Measure?   19.15
   (d) Do Event Studies Capture All Components of a Loss?   19.15
   (e) Tax Effects   19.16
19.8  Conclusion   19.16

NOTES   **19.17**

LIST OF CASES   **19.22**

**19.1  INTRODUCTION AND BACKGROUND.**   The Supreme Court's *Daubert* ruling[1] has led to increased scrutiny of expert testimony in the courtroom. This scrutiny has generated a need for analyses that, to the extent possible, are testable, supported by published literature, have a "known or potential rate of error," and

The authors would like to thank Denise Martin for research on the *Daubert* decision, Lucy Allen for research on the use of event studies in damages studies, and Louis Guth and Christoph Muelbert for many helpful comments on earlier drafts of this chapter.

follow procedures derived from objective standards, rather than from an expert's own potentially subjective opinions or beliefs.

Courts can screen an event study of a security's price, typically the measurement of a stock price's movement in response to a specific event or announcement, for admissibility with straightforward application of the *Daubert* factors. Courts have admitted testimony based on correctly done event studies but excluded testimony based on an infirm event study.[2] Although commonly used in securities litigation, their use in other commercial litigation is less common, but increasing.[3]

Here, we argue that a properly conducted event study can help in litigation outside the field of securities law, and that event studies are often applied in a crude or unscientific manner within securities litigation.[4] This chapter discusses how experts can use event studies to measure the impact of two different types of events. First, we look at revelations of securities fraud, where event studies are already common, though often nonrigorous. Second, we examine the measurement of the effect of offending actions on a plaintiff's future profits, an area in which the use of event studies is less common.

We also compare the event study to other methodologies for measuring the importance and size of an outside event on a company, and examine the conditions under which properly conducted event studies provide more objective and accurate measurements of the effects of these events on the company. We describe the event study technique and the two items that stock price changes let us measure, materiality and magnitude, as well as their relevance to the determinations of liability and damages in a litigation context.

**(a) Overview of the Event Study Technique.**   Event studies of the type used in litigation rely on two well-accepted principles: first, the semi-strong version of the Efficient Market Hypothesis, which states that stock prices in an actively traded security reflect all publicly available information and respond quickly to new information;[5] second, the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow.[6] Consequently, the stock price impacts of an event can reveal the effects of the event on future cash flows if the following four conditions are present:

1. The event is a well-defined news item or series of items.
2. The times that the news reaches the market are known.
3. There is no reason to believe that the market anticipated the news.
4. It is possible to isolate the effect of the news from market, industry, and other firm-specific factors simultaneously affecting the firm's stock price.

The procedure for performing an event study has several well-defined steps.

First, one estimates a predicted stock price return, or percentage change, from the day before the news reaches the market to the day the stock price assimilates the news. In doing this estimation, one uses a model that takes into account market and industry effects on stock price returns. One can do this for several dates, not necessarily consecutive.

Next, the analyst subtracts the predicted return from the actual return to compute the so-called *abnormal return.* If the abnormal return is calculated as the sum of individual abnormal returns over a number of periods (usually individual trad-

ing days), the difference between the actual and predicted returns summed over all these periods is called the *cumulative abnormal return* (or *CAR*).

Typically, the predicted return does not exactly equal the actual return even when no event has occurred. To decide whether the difference between the actual and the predicted return (the CAR) results merely from chance, one tests the CAR for statistical significance, as described in section 19.4 (a).

The final step, if necessary, involves computing the relevant magnitude of the event. To do this, one calculates the change in stock price or capitalized value of the firm implied by the estimated CAR and thus attributable to the event in question.

Because of its wide acceptance, the existence of standards governing its operation, the known rate of error and the ability to test hypotheses, the event study technique provides a good example of scientific evidence. Furthermore, these same factors mean that a court can screen any particular event study under the *Daubert* guidelines to determine its admissibility as the basis for expert testimony.

**(b) Materiality.**   An event study can help measure the materiality of the event under consideration. While all can agree that an event is material if it is important, this begs the question of how to measure importance. We can consider several measures suggested by Mitchell and Netter in their examination of the role of financial economics in litigation. They note three such measures: reasonable investor, probability/magnitude, and market impact.[7] Unfortunately, these imprecise standards require subjective determinations that vary from case to case. For example, how should a trier of fact determine what a reasonable investor would consider material? One could ask a long-time investor to serve as an expert on materiality, and while this does provide useful insight, the results are necessarily subjective and could vary from case to case.[8] Standardization over different cases could come only from a careful reading of the case law and would be followed by disputes about the similarity or difference between the case at bar and cited precedents. Instead, using the tools of financial economics, one can measure materiality as the probability that a stock price movement resulted from chance and not from the news about a particular event.[9] One can quantify materiality with an event study in a manner comparable across cases and events.

**(c) Magnitude.**   Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences.[10] This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed. As a result, an event study is a common method that serves as the basis for quantifying damages in securities fraud cases.[11]

Consider a different litigation setting where the plaintiff is a firm suing for lost profits due the company.[12] According to economic theory, there are circumstances in which damages can be measured by the change in the stock price caused by the defendant's conduct multiplied by the number of shares outstanding.[13] This is true

because stock prices are the market's estimate of the present value of future cash flows.[14] Equivalently, stock prices are the market's estimate of a company's net liquid assets plus the present value of future profits from the operating assets.[15] Consequently, when there is an unexpected change in assets, liabilities, or expected future profits, this will show up as a change in the stock price. To the extent that the defendant's actions giving rise to liability negatively impact the company's financial well-being, the stock price will decline by the market's estimation of the present value of the harm that the company has suffered.

Though not common in litigation, case law supports this proposition. For example, consider a situation where a business files a suit claiming that another party's illegal actions have damaged it and reduced the company's value or worth. Courts have supported the use of market value to determine the value of a company.[16] Thus, it naturally follows that the portion of the change in the enterprise's market value that can be attributed to the defendant, as measured by a careful event study, is a proper measure of the change in corporate value, that is, damages, in this case.

## 19.2  PERFORMING THE BASIC EVENT STUDY

**(a) Identifying the Event.**  Many texts discuss how to perform an event study.[17] While there are some differences in exposition, authors agree on the necessary steps and general procedures. First, one must identify the event or events to be studied. In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud, the dates of the fraudulent statements, or both. When one is measuring lost profits, the relevant dates would be those dates on which the public received information about the alleged wrongful act.

**(b) The Event Window.**  Next, we establish the event windows. *Event windows* are the periods over which stock price movements are calculated. Generally, these windows begin immediately before an announcement and conclude shortly thereafter. When it is unlikely that the news of an announcement was leaked beforehand, one typically would start the event window at the end of the trading day before the announcement was made. When there is a reasonable possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage.[18] The end of the event window is somewhat more arbitrary. In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement. The most recent academic pronouncement expresses support for the shorter one-day or two-day window, though it recognizes that in practice, analysts often use longer windows.[19] Occasionally, there is another news announcement, or confounding event, within the event window. When this occurs, the event window is often cut short so that it does not include the effects of the confounding event.

The longer the event window, the more likely it incorporates all of the prior leakage and the market's ongoing adjustment to the news, but also the more likely it picks up other effects unrelated to the event under consideration. Deciding on the length of the event window is thus one of the most important considerations in performing an event study.[20]

**(c) Controlling for Market and Industry Effects.**   Once the event windows have been established, the analyst next calculates the relations between the company's stock and an index or indices that proxy for outside forces such as market and industry effects. These relations will later be used to remove those market and industry effects from the price movement observed in the event window.[21] One finds these relations by running a regression of the company's stock price on a market or industry index, or both, over a period of time labeled an estimation window.[22] Here, the analyst must make two additional decisions. First, over what period should the regression be run? This period is called the *estimation window.* And, second, which market or industry indices should be used to control for outside influences on the company's stock price?

In regard to the first question, one would typically like to use an estimation window close to the event because the relation between the company's stock and an index changes over time. Therefore, the closer the estimation window is to the event, the more relevant the estimated relation will be. Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window. The most common choice places the estimation window before the event.[23] Analysts sometimes place the estimation window after the event window or split the estimation window to cover periods before and after the event window. When the analysis studies multiple events, the estimation window may cover the periods around the event windows, including the period(s) between event windows. The estimation window is often placed at one of these locations rather than before the event window because of a lack of relevant prior trading history (for example, because the event window comes shortly after an IPO or change in regulatory environment).[24]

In addition to determining the placement of the estimation window, the analyst must also determine the length of that window. Again a tradeoff applies: the longer the estimation window is, the more data there will be, implying a more accurate regression. On the other hand, the farther the estimation window stretches from the event window, the less the estimated relation between the stock price and the market index is likely to represent the underlying relation during the event window.

A second decision the analyst must make is which market and/or industry indices to use to control for outside influences on the company's stock price. When deciding which indices to use, the analyst should consider both the source of the index and the relation between movements of the company's stock price and the index during the estimation window.

A good index can be

- a standard index (say one developed by Standard & Poor's), or
- one that was constructed based on comparable companies listed in analyst reports or public filings, or
- one based on selecting all companies that meet certain objective criteria (e.g., market capitalization within 10 percent of the pre-event market capitalization of the company being studied).

On the other hand, an index is suspect when the expert chooses the companies in the index without objective criteria.

The second consideration in selecting an index relates to how the company's stock price movements relate to those of the index during the estimation window.

When the estimation regression is run, one of the statistics generated is the adjusted R-squared.[25] This statistic measures the strength of the fraction of the variability of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining. The higher this statistic, the larger the portion of the variability explained. Another relevant statistic is the t-statistic associated with each independent variable; this statistic measures the strength of the individual independent variable's correlation with the company's stock price. The farther the t-statistic is from zero, the stronger the relation. While one should not use either the adjusted R-squared or t-statistics as a blind measure for the comparison of the explanatory power of different indices, an expert should be prepared to provide these statistics.[26] Moreover, if the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.[27]

**(d) Estimating the Effects of the Event.**   The choice of the event window and indices used to predict the stock price over the estimation window provide the basic ingredients for the analytical steps of the event study. The estimated relations from the regression during the estimation window are applied to control for market and industry movements in the event window. The predicted return is then compared to the actual return in the event window, with the difference representing the abnormal or excess return. This return, multiplied by the company stock price, provides an estimate of the per-share dollar effect of the event being studied.[28]

Finally, note that the abnormal return would include the effects of the event being studied as well as any other company-specific news or events (if any) that occur in the event window. Whenever possible, the analysis should disentangle the effects of these events. The procedure for doing so depends on the available data and the nature of the other event(s) in the window. For example, if the event coincided with an earnings announcement, the effects of the latter could be removed by estimating the stock price's response to earnings surprises and applying the measured relation to the announcement within the event window. Though this would not perfectly remove the effects of the earnings announcement, the remaining abnormal return would be a much better estimate of the effect of the event for which the window was constructed. After removing the effects of these other events, materiality tests have to be adjusted to account for both the magnitudes of these events and the uncertainty surrounding the estimates of those magnitudes.[29]

## 19.3   ARE EVENT STUDIES REALLY SCIENCE UNDER *DAUBERT*?

**(a) The *Daubert* Decision.**   In 1993, the Supreme Court reviewed a standard on the admissibility of expert testimony stated in *Frye v. United States* (1923). *Frye* set a standard that an expert's methodology must be "generally accepted" in the scientific community to be admissible. In its 1993 ruling in *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court expanded the admissibility standard set forth in *Frye* to allow potentially new though reliable techniques that had not yet achieved peer review. In its 1999 ruling in *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that the *Daubert* criteria apply to "all expert testimony."

The plaintiffs in the *Daubert* case, a products-liability action, sought to establish a causal link between the ingestion of a prescription drug during pregnancy and

the subsequent delivery of children with birth defects. Consequently, the Court's decision focused on scientific rather than economic testimony.

The Court found that the basic rule is that "all relevant evidence is admissible."[30] According to the Court, relevant evidence must "assist the trier of fact to understand the evidence or determine a fact in issue."[31]

The Supreme Court also limited the *Daubert* analysis to "scientific" knowledge, which it defined as based on the scientific method. The evidence must meet the same standards of all evidence by being "not only relevant, but reliable." In the scientific context, reliable evidence is "based upon scientific validity."[32] A federal district court in the Sixth Circuit has expanded the *Daubert* framework beyond scientific testimony, to include technical and other specialized knowledge.[33]

The *Daubert* Court admonished against proffering testimony that was based on "unsupported assertion" or "subjective belief" and provided guidance by noting four factors that should be considered to assist in this inquiry:

1. whether the theory or technique can be (and has been) tested;
2. whether the technique or theory has been subjected to peer review and publication;
3. the known or potential rate of error and standards controlling the technique's operations; and
4. whether the theory or technique has been generally accepted by the scientific community.[34]

After the Supreme Court sent the case back to the Court of Appeals for the Ninth Circuit, that court suggested a fifth factor: whether the methodology was created solely for purposes of litigation.[35] The Sixth Circuit apparently also considers this factor important.[36]

**(b) Are Event Studies Objective?**   We now take a moment to consider the effects of the choices discussed in the previous section to see if they would withstand being called "subjective belief" or "unsupported assertion" under *Daubert*. If the calculation is to take into consideration the specifics of a particular case, some common sense must be added to the science because several considerations determine the proper methodology for running an event study.[37]

The foregoing does not imply that one cannot use a standard procedure. In fact, it is often useful to do so when one is running a number of event studies for different firms (for example, if one wanted to look at how the average firm responded to a certain type of announcement). In that situation, it is common to establish a standard price reaction methodology both for ease of analysis and to prevent the possibility that choosing different methodologies for different events biased, or even determined, the overall result. When combining multiple event studies to determine how stock prices respond to events, it is not necessary to find a procedure that provides the best estimate for each firm or event individually; instead, with a large number of events being combined, errors in one event will, at least to some degree, cancel those in another.

When looking at the particular firm and events at issue in a lawsuit, however, it may be preferable to tailor the event study to the special circumstances at hand. As discussed above, in performing an event study there are at least three choices that

feature prominently in the analyst's mind: (1) the time frame for the measurement of the price reaction; (2) the time frame for estimating the relation between the stock and the market, both in terms of length of period and when the period should be relative to the event under consideration; and (3) which index or indices should be used to control for market and/or industry effects.

The effects of the different choices will naturally vary from case to case. Generally, though, the choice of index and estimation window will likely have a relatively minor impact.[38] On the other hand, the choice of the time frame for measuring the price reaction (the event window) would be expected to lead to greater variability.

Even so, once the analyst makes these choices, the analysis is completely objective, in that another expert would be able to replicate it. That is, if one specified an index, an estimation window, and an event window, any two experts would come up with the same measurement for the price reaction.[39] This means that if one expert presents a result based on an event study, an opposing expert can check for errors in the underlying calculations. The opposing expert can also test what would happen if the first expert changed any of the assumptions. This allows the opposing expert to discover which assumptions, if any, are innocuous because changing them has no significant effect on the results. (For example, adjusting for market movements with the S&P 500 and with the Nasdaq Composite Index is likely to produce similar results if the indices moved similarly in the event window.) Conversely, the opposing expert can identify which assumptions, if any, drive the first expert's result and focus the debate on those points. (For example, if the price reaction is large after two days but the price returns to its original level after five days, the debate can focus on how long it took for the market to absorb all of the effects of the relevant event.)

In most cases, objective measures can aid in evaluating the choices. For example, as discussed above, comparing the adjusted *R*-squared from one estimating regression to the next provides information that can help in deciding which better explains the stock price's movements.[40] In deciding the proper price reaction period, one could go with accepted standards in the literature or in litigation. Alternatively, one could use a proxy for materiality, such as trading volume or number of news stories relating to the event, in deciding over what period of time the stock was still responding to an event.

**(c) Applying the *Daubert* Factors.**   The event study technique satisfies the four factors to be used in determining the admissibility of expert testimony as described by the Court.

1. Can the theory or technique be tested? The choices available to the analyst involving the index and estimation window are testable using statistics that are computed when the analyst performs a regression analysis of the firm's stock price return on the return of an index. The choice of event window may be tested using approaches mentioned above, although it may instead be based on convention (that is, the analyst can use a one- or two-day window supported by the literature rather than doing a separate analysis for each event study to determine *de novo* the length of the window most appropriate for the individual event under consideration).

2. Has the technique or theory been subjected to peer review and publication? By now, hundreds of peer-reviewed articles have applied the event study methodology, including many that focus specifically on methodological considerations.

3. Does the technique have a known or potential rate of error and standards for controlling its operations? The error associated with either a test of materiality or the measurement of the size of the event is a statistic that can be estimated with each application; moreover, the academic literature provides guidance on proper application of the technique.

4. Has the scientific community generally accepted the theory or technique? The scale of publications alone shows that the technique has gained general acceptance.

## 19.4   DECIDING ON MATERIALITY

**(a) Standard for Materiality.**   In determining materiality, statistical analysis can provide information on the likelihood that the price movement was due solely to chance. Formally, a materiality test provides a statistical answer to the question: How likely is it that the observed stock price movement in the event window could have occurred if there were no event influencing stock prices in that window? For example, if an event is material at the 5 percent level, this means that there is only a 5 percent likelihood that the abnormal return (or the stock price movement once one controls for market, industry, and other effects) could have been caused by the stock's normal random price fluctuations. Alternatively, we can say that we are 95 percent confident that the abnormal return is greater than what would be expected based on the stock's normal random price fluctuations.

It is not clear what level of statistical significance corresponds to a legal definition of materiality. As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options. There is no definitive case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation. With an event study, however, courts can quantify the level of materiality, compare it across cases, and assess it using professional standards from the economics literature.

**(b) Other Price Reaction Methodologies**

*(i) Simple Price Reaction.*   Occasionally, expert reports will contain a conclusion on materiality based on the observation that the stock price reacted to an event and, relying solely on the expert's background and judgment, this price reaction was material. Absent more, such an opinion would fail the Court's admonishment to avoid "unsupported assertion" and "subjective belief." Besides obviously not satisfying the factors laid down for scientific evidence (including testability, known rate of error, standards for operation of the technique, and general acceptability), the approach fails to consider the other potential influences on the stock price over the time period the price was observed to be falling. This alone would make the proffered opinion run afoul of *Executive Telecard.*

*(ii) Net-of-Market Price Reaction.*   A somewhat more sophisticated, and common, methodology designed to take account of other influences on price reactions is to simply measure so-called net-of-market movements. This is done, for example, by first computing the average price of a security over the five days before an event and the average price over the five days after the event. The percentage change in these two averages is then compared to the percentage change of a market or industry index over the same period of time.

This methodology has at least two flaws. First, this form of price reaction implicitly assumes that the stock moves one-for-one with the market or the chosen industry index. One can, and should, test this assumption with, say, a regression analysis to measure the relation between the security and the index. The regression would supply a beta or a coefficient showing how much the stock moved with the index, and a *t*-statistic on that coefficient, showing the statistical significance of that relation. If the beta is statistically different from one, it would be difficult to see why one would throw out the empirical results in favor of the generic alternative.[41] A second problem with the net-of-market methodology is that it does not allow for the most accurate determination of materiality. Because the assumed one-for-one relation between the stock and the market or industry index is generally not statistically the best estimate, the estimated abnormal returns with this approach may also not be a best estimate statistically, and a materiality test is not as powerful as it otherwise could be.[42]

When used by itself, the net-of-market adjustment would appear to fail some of the *Daubert* criteria. First, a simple net-of-market calculation has no known rate of error (in part because the analyst never computes the standard deviation of the average five-day return). Second, its support in the academic literature is generally limited to studies that focus on many firms, where running multiple market model regressions may be cumbersome. Finally, because a net-of-market model provides no test for the goodness-of-fit of the market or industry index (i.e., an adjusted *R*-squared or any other residual analysis is never computed), the choice of index is more subjective than when such a statistic is used to evaluate the appropriateness of different indices. None of the above is meant to say that net-of-market models are useless or necessarily wrong; rather, they are dominated by regression analysis and should not be used unless other choices add error or are infeasible. For example, if a company goes public and then stops trading all within an extremely short time frame, the lack of trading data may make the regression results unreliable.

**(c) Changing Levels of Materiality.**   A final issue pertaining to materiality arises when the cumulative price reaction moves in and out of materiality as time passes. For example, if a stock drops by a large amount on the day of an announcement, the one-day reaction may be significant. However, a rebound on the next day may cause the two-day price reaction to be not material, while another drop on the third day may cause the three-day price reaction to regain its status as a material event. In general, one needs to look at why the level of materiality changes over the price reaction window. If new information comes into the market that is not relevant to the instant case, then the analysis should remove the effects of this new information in considering the materiality of the event under examination. In addition, one would want to see whether the changes in materiality result from the market's reevaluating the importance of the initial event or information, something that one can often deduce from contemporaneous news stories or analyst reports.

As a general matter, the potential for stock market overreaction is now generally accepted as a factor in stock market behavior.[43] Though there remains some dispute over long-term overreaction, short-term price reversal after unconditional price declines has been detected in large samples of stock prices. This means that if the price initially declines after an event and if, say on the second day, the price returns to a level that makes the event not material with no intervening news event, then there is justification for assuming short-term overreaction. The analyst would be hard pressed to make a finding that the event was material under this fact pattern.

## 19.5  MEASURING LOST PROFITS.

This section examines how an event study compares to other methodologies for measuring lost profits.[44]

**(a) Lost Profits Calculations Based on Projections.**   Experts often calculate lost profits by measuring changes in future profit estimates using data from before and after some specific action by the defendant that harmed the plaintiff. For example, suppose that before an allegedly tortious event occurred, analysts projected that Prospects, Ltd. would have profits of $5 million in each of the next five years. Further suppose that following the event, analysts projected that Prospects' profits would be $1 million for the next three years and $2 million for the following two years. Prospects has therefore been harmed, in the analysts' view, by the present value of $4 million for each of the next three years plus $3 million for each of the two years after that. Prospects' harm would also include effects that would be measured by the changes in projections that could have been made for periods more than five years in the future.

Note that this form of measurement does not depend on the actual realization of profits. Instead, it concerns changes in the expectation of future profits at the time of an event. In that sense, it is quite similar to an event study, in which stock prices before and after the event are the market's projections of future profits or cash flows.

Thus, the principal question that arises here is which set of projections to use, those assumed by the market in setting stock prices, or some other set of projections from a different source. In deciding this issue, one criterion is the degree of objectivity in the two measures. The event study is based primarily on market conditions, or on values set by investors only concerned with obtaining the proper value for their purchases and sales, and not by parties interested in the outcome of the litigation. Investors have incentives to set the price correctly because they invest their own money. If the market believes that a stock is underpriced relative to the company's value, investors will place orders to buy the stock, driving its price up; similarly, if the market consensus is that a company's stock is overpriced, sell orders will drive the stock price down.

In an examination of expected lost profits based on the change in analyst or expert projections surrounding the allegedly tortious act, the results will naturally depend on the projections used. Often, there is a large range of projections for profits from the company and analysts for the short term. If one goes out more than a few years, there are often no projections or only internal company projections. And at some point, there are generally not even company projections. Thus, for events likely to have a long-term impact on profits, the expert must create projections in the litigation. Even if the expert attempts to be completely objective,

this often involves a large degree of subjectivity.[45] Moreover, even when projections are available, the expert must decide which one or ones to use.

If done carefully, the use of analyst projections to calculate lost profits is likely to satisfy the *Daubert* criteria, though perhaps not as well as an event study would. In an event study, one uses stock prices, figures that are accepted by all to be what they represent: the market's current valuation of a company's equity. In looking at projections, the question arises as to which set of projections to use. If one uses projections from the same disinterested analysts both before and after the tortious event, there is likely to be little objection about subjectivity (provided, of course, that one does not select only those analysts who viewed the event as especially large or small). If the expert uses projections from one of the interested parties, such as the plaintiff company, or makes his or her own estimates of what projections should have been before and after the tortious event, then subjectivity becomes a serious concern.

**(b) Lost Profits Calculations Based on Future Events.**   Lost profits are also often calculated by comparing actual results to projections made at or immediately before the alleged business interference. This section compares the calculation of lost profits using this methodology to the calculation of lost profits through the use of an event study.

Let us return to the example of Prospects, Ltd., which was expected to have $5 million in profits in each of the five years immediately following the tortious event. Suppose that its actual profits were $1 million in the first year and $3 million in each of the next four years. Prospects' damages claim would then include $4 million in lost profits from the first year and $2 million in lost profits from each of the subsequent years. These values would then be expressed in present value terms, or adjusted for prejudgment interest. In addition, the company would still have a claim for any lost profits occurring more than five years from the time of the wrong.

The most important difference between the methodologies is that an event study (or a comparison of changes in projections as discussed in the previous section) is an ex ante analysis, while an examination of actual results is an ex post analysis.

**19.6   RECENT LITERATURE AND CASE LAW.**   The question of whether experts can use the stock (and debt) market value of a firm to value the underlying asset has been answered affirmatively by both appraisers and the courts. In the legal context, the so-called stock and debt approach to valuation has been advocated primarily for railroad and utility properties, but applies to firms in other industries.[46] Indeed, a textbook on corporate valuation devotes an entire chapter to the approach without limitation to type of firm or industry.[47]

Adherents to the approach make the claim that "[w]here data to make possible a stock and debt valuation are available, it is best to go no further."[48] With regard to the objectivity of the approach, "[t]he stock and debt method avoids overreliance on the judgment or expectations of a single individual (the appraiser) about the future prospects of the firm, substituting instead the consensus view of many market participants—all of whom, as we have said, have a strong interest in making accurate forecasts."[49]

Case 3:01-cv-00988-SI   Document 1200-2   Filed 10/09/07   Page 48 of 57

The stock and debt approach to appraisal has been accepted by both regulatory bodies and courts.[50] A circuit court decision, *Mills v. Electric Auto-Lite Co.*, used language that virtually mirrored the professional literature.[51] The court held that to determine the worth of a company "when market value is available and reliable, other factors should not be utilized. . . . Although criteria such as earnings and book value are an indication of actual worth, they are only secondary indicia. In a market economy, market value will always be the primary gauge of an enterprise's worth."

Furthermore, another court recognized the distinction between the projections made by analysts and those implicitly made by the market: "self-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges."[52]

It follows from these citations that the change in capitalization of the company accurately measures a change in the worth of a company. Such change in worth, of course, can come from the present discounted value of the future stream of cash flows lost by the actions of a defendant. As such, the appraisal and valuation methods that support determining the value of a company by using the market value of stock and debt would also support determining the value of a company before and after the wrongful act of a defendant. The event study method measures this change in valuation.

## 19.7   DO EVENT STUDIES ACCURATELY MEASURE LOSS TO THE CORPORATION?

We next ask whether the event study is a reliable measure of damages. This includes a discussion of the issue of whether the technique really measures the loss to the corporation instead of, for example, the loss to shareholders.

**(a) Stock Market Anomalies.**   A violation of the efficient market hypothesis means that stock prices may not reflect fundamental values at every moment, which, in turn, means that the prices do not always equate to the present discounted value of future dividends. Over the years following the stock market crash of 1987, there developed an academic literature that found a variety of anomalies in stock price behavior and that, when taken as a whole, has probably led economists to have less faith in the efficient market hypothesis than they had in the 1970s.[53]

We do not wish to overturn the presumption accorded the efficient market hypothesis in *Basic v. Levinson*.[54] Rather, we should view the efficient market hypothesis as a presumption that can be disproved for a particular security in a particular time frame. The same literature that has focused on stock market anomalies has also provided analysts with the tools to diagnose the patterns of a stock price to determine whether its behavior is anomalous.

Although it is not the purpose of this chapter to review either the stock market efficiency literature or the adjustments to the event study technique that might be called for if an anomaly exists, we mention a few issues that might arise that could affect the event analysis.[55]

*(i) Volatility.*   Financial economists studied stock market volatility well before the late 1990s.[56] Their principal finding was that the volatility of stock prices likely exceeds

that justified by the variance of dividends. This means that there is no guarantee that stock prices will reflect fundamental value. This being said, these findings by themselves did not lead to professional rejection of the efficient market hypothesis—it was still treated as a presumption for any individual stock or stock market index.

By itself, volatility does not mean that the event study technique is worse than other methods of valuation. The reason for this is that it can be shown that virtually any asset returning a cash flow is likely to be volatile. For example, Paul Samuelson has shown that stock prices following what appears to be a random walk could be based on fundamental values and, in a later article, that the price of land could be a stochastic process much as stock prices appear to be.[57] In both cases, the source of the variation in prices is similar: for stock prices, dividends are a stochastic process because earnings themselves contain a stochastic component; for land prices, rents may also contain a stochastic component. This means, of course, that lost profits (damages) to the underlying asset will themselves be volatile. We should not be surprised, then, that event studies (measuring, as they do, the present discounted value of the lost profits) have some statistical error associated with them though they are generally unbiased. The test statistics typically computed when performing an event study help in assessing the dimensions of this error.

*(ii) Speculative Bubbles.*   In light of the behavior of both the market and individual stocks since 1987, there has grown theoretical literature to show how speculative bubbles can form.[58] These theories show that in speculative markets where there are both informed and uninformed traders, it may be rational for the informed traders to follow the uninformed in a price trend away from fundamental value. If the theory is true, there is no mechanism that, in the short term, causes stock prices to equal the value of their underlying assets. Such an overpriced stock has the unfortunate tendency to crash when the bubble bursts. The bursting of the bubble can occur at the same time as, indeed be precipitated by, the event being analyzed to compute damages. Consequently, the price drop unadjusted for the speculative bubble likely mismeasures damages. The effect of this condition has been noted in the legal literature with reference to shareholder class actions.[59] Fortunately, there are diagnostics that can be used to ascertain whether there appears to be a speculative bubble and, if so, whether other techniques are available to measure the lost profits.[60]

**(b) Bias from Litigation Expectations.**   Event studies are biased toward finding a price drop that is too small because of the market's expectation of a possible recovery through the legal system. To see this, suppose a company lost $1 million in future profits and was expected to sue and recover the million dollars and appropriate interest, but at the expense of $300,000 of legal fees. Then the price reaction observed in the market would reflect only the $300,000 net loss. If this were successfully used as the basis for a damages calculation at trial, the company would receive only the $300,000 of legal fees but not compensation for its actual loss of $1 million in future profits. At the extreme, if the market expected the company to recover lost profits plus punitive damages, or treble damages, its stock price could go up as a result of the malfeasance. Consequently, interpreting the event study re-

sults requires care. Still, because this bias serves to make price reactions show a smaller drop than that due to the defendant's act alone, an event study can still serve to show the minimum damages caused by that act.

**(c) Whose Loss Does an Event Study Measure?**   One of the potential objections one may make to an event study is that it is measuring the wrong damages. Because an event study looks at the value of a corporation's shares, some may argue that one is measuring the loss suffered by shareholders and not by the corporation itself. This leads to the question of whether the event study is measuring the proper damages for use in corporate litigation.

The first answer is that this is a fair criticism of any measure of damages to a corporation. Suppose that Prospects' factory burns down in an apparently accidental fire on February 1, and that Prospects has no insurance to cover the loss. Further suppose that on March 1 it is suddenly revealed that the fire was not an accident but instead was set by agents of a competitor, Ruthless Corp. Last, suppose that on March 1, Prospects sues Ruthless and that everyone believes that Prospects will recover the cost of rebuilding the factory plus any lost profits, however measured, as a result of the arson. We now ask: Who wins and who loses?

In theory, if the damages payment is truly comprehensive, covering all manner of costs and legal fees, loss of competitive position, and so forth, and assuming no punitive damages are awarded, Prospects will be left exactly as well off as if there had been no fire. On March 1, its stock price would therefore recover to where it was on February 1, once one adjusts for market and other forces in the interim. Shareholders on February 1 who held through March 1 have seen a temporary drop in the value of their holdings but are unaffected at the end of the day. February 1 shareholders who sold before March 1 are worse off, because they sold their shares at a time when the price was unduly low. Conversely, investors who purchased between February 1 and March 1 benefit when their shares of Prospects appreciate in value on March 1. But note that this is true no matter how the damages to Prospects are measured, whether it is by the change in its share price or a discounted cash flow model of lost profits. Simply put, under the current legal system, investors who hold shares at the time of a bad act are damaged, while those who hold at the time of an unexpected recovery are benefited.[61] As such, because the change in stock price is simply a *measure* of the damages to Prospects, in the same way that a discounted valuation of lost profits is such a measure, concerns about winners and losers are not specific to the event study methodology.

**(d) Do Event Studies Capture All Components of a Loss?**   Another argument against event studies is that by focusing on a small period of time, an event study does not provide a complete characterization of the effects of a wrongful act. To answer this, let's create an example where the case at bar involves some defamatory statements made by Ruthless against Prospects. Also, suppose that Prospects' stock price falls at the time that the statements are made. One could then ask whether changes in the public's views of the credibility of those statements shouldn't change the damages estimate from the libel. This possibility can be addressed in an event study by looking for changes in the perception of the libelous statements and measuring the effects that those changes in perceptions had on the stock price. For example, if there were a public retraction by Ruthless, one would want to offset the drop in

Prospects' stock price in the event window corresponding to the original libel by the rebound, if any, in an event window corresponding to the retraction.

Again, however, this criticism does not apply solely to event studies. Suppose that an expert was measuring damages by looking at the decline in expected future income. Suppose further that the original libel caused a permanent 30 percent drop in Prospects' sales, perhaps because consumers were misled into believing that Prospects was marketing an unsafe product. If the retraction caused sales to rebound to within 10 percent of their previous level, this information would also have to be incorporated into measures of discounted lost cash flows.[62] Therefore, to the extent that new information affects continuing results, *any* measure of lost profits that does not purport to measure expected lost profits solely at the time of the original bad act must take this new information into account.

**(e) Tax Effects.**   The discounted cash flows measured by stock prices reflect free cash flow available to stockholders that, of course, are after tax. This creates the need for an adjustment to the event study measure of damages. Because damages awards are usually taxable, the convention has arisen that lost profit damages are awarded on a pretax basis. Fortunately, the adjustment to the event study magnitude to remove tax effects is rather simple; in most instances, it can be accomplished by dividing the event study result by one minus the marginal income tax rate of the corporation.

**19.8   CONCLUSION.**   We have seen that event studies can be useful in quantifying damages in cases ranging from securities fraud to other commercial litigation requiring the calculation of lost profits. In some areas, such as securities fraud, stock price reactions are already a standard method for quantifying damages. In such cases, the overarching question is how to perform the most accurate price reaction. This entails developing a model that accounts for market and industry effects. It also entails explicitly testing for the materiality of stock price movements. When this is done, we have a damages calculation that is based on economic literature and that, given the results of the materiality test, has a known rate of error. In this manner, one can perform a damages calculation that meets the *Daubert* criteria for admission as expert testimony. A failure to perform these analyses when possible would mean that the analysis is not in accordance with the literature and has an unknown rate of error.[63]

In comparison to many other methods of calculating lost profits, the measurement of stock price reactions has the benefit of being based on numbers that, being determined by the collective decisions of all investors in the market, are both objective and present a consensus, rather than an idiosyncratic, viewpoint. While the measurement of stock price reactions will inevitably incorporate some degree of choice on the part of the analyst, the degree of subjectivity in these choices is usually low.[64] This contrasts with the situation where an analyst has to choose some set of projections and then decide how to discount those projections back in time, to say nothing of the subjectivity involved in making new projections for the purposes of litigation.

When using stock price movements to measure lost profits, one employs a methodology that is supported by the academic literature, is completely replicable, has a measurable rate of error, and uses a minimal number of variables. By con-

trast, an analyst creating projections of future profits is engaging in a process that may not be replicable by others; while other experts can create their own projections, there is often no reason to believe that they would match those of the original analyst. When several independent sources of profits are available, a study of lost profits using projections requires deciding which projection(s) to use and how to discount the cash flows envisioned in those projections.

None of the foregoing discussion is meant to say that other analyses are not useful, or even necessary at times. When a company is not publicly traded, there would be no stock price data that one can use for an event study, and other methodologies often have to be employed.[65] In addition, other assumptions underlying the appropriateness of the technique, such as the efficient market hypothesis, may not be valid in any individual application requiring either adjustments to the results or abandonment of the method altogether.

Moreover, an event study and another methodology such as a discounted cash flow analysis can be used in conjunction as a test of the robustness of the damages calculation. If the two yield similar results, one can feel more confident in the final figure. If the results differ materially, then the expert should look for errors in both studies by considering the reliability of the data underlying each, the uncertainty surrounding any assumptions made in each analysis, and sources of error such as those discussed in this chapter. If both methodologies still seem reasonable, the expert can use the two results to establish a likely range for alleged damages.

An event study provides an objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused damages. In general, other methodologies for calculating damages do not provide a measure of materiality, other than the simple observation that calculated damages are large, small, or zero. By using the statistical tools that are the basis for event studies, an expert can provide not only a measure of damages based on objective data and calculations but also a statistically accepted means of testing the materiality of this measurement.

## NOTES

1. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

2. *In re Executive Telecard, Ltd. Securities Litigation*, 94 Civ. 7846 (CLB) (S.D.N.Y. 1997). See also *In re Seagate Technology II Securities Litigation*, C-89-2498(A)-VRW (N.D. Cal.), in which the court accepted some of the defendants' event studies and dismissed certain claims on that basis, but ruled that the defendants' other event studies were inadequate and denied their request for summary judgment with regard to those issues. The court also found the plaintiffs' event studies lacking and therefore denied a cross-motion for summary judgment. Also, see *Goldkrantz v. Griffin*, QBS: 02760800 (S.D.N.Y. 1999), in which the court granted summary judgment based on the plaintiffs' failure to contest the defendants' event study analysis.

3. With regard to securities litigation, see, for example, Janet C. Alexander, "The Value of Bad News," *UCLA Law Review*, Vol. 41, No. 6, 1994, pp. 1421–69; Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, November 1982, pp. 1–20; Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of *Basic v. Levinson*," 77 *Virginia Law Review Association* 1017 (1991), pp. 1021–28; A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997, pp. 13–39; and Mark L. Mitchell and Jeffry

M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545–90.

4. The use of an event study to measure the magnitude of an event is certainly not new. See, for example, Mark P. Kritzman, "What Practitioners Need to Know About Event Studies," *Financial Analysts Journal*, November–December 1994. ("Aside from tests of market efficiency, event studies are valuable in gauging the magnitude of an event's impact.") For a recent application, see Jay Dial and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics*, March 1995.

5. Richard A. Brealey and Stewart C. Myers, *Fundamentals of Corporate Finance*, New York: McGraw-Hill, 1995, p. 306.

6. Brealey and Myers, 1995, Chapter 4.

7. Arnold S. Jacobs, "Litigation and Practice Under Rule 10b-5," cited in Mark L. Mitchell and Jeffry M. Netter, *op. cit.*

8. Recognizing this problem, the court in *Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 586 (E.D.N.Y. 1971), confronted with determining the materiality of an omission from a proxy statement, suggested drawing a scientific sample of investors to determine how they might have voted if the truth had been known. To our knowledge, this approach to materiality has never been attempted.

9. Intuitively, if an event is material to investors, it should move stock prices, and if it is not material, it should not affect stock prices. By examining whether the stock price change is different from random movements that occur on days when there is no news, we can determine whether investors felt that the event under consideration was material. As an example, Mitchell and Netter state that "[t]he SEC recently began to use stock price evidence to show materiality in securities fraud cases, especially insider trading cases." Also, from the same paper, "Statistical tests of significance are useful both in establishing materiality and in calculating disgorgement. A finding that a stock return associated with the release of information is large enough that it is unlikely that the return occurred by chance is strong evidence that the information was important." Of course, this is relevant only for potentially large events. An announcement that someone had stolen a $20 bill from a Sears cash register would likely not have any material effect on Sears' stock price.

10. See, for examples, the Alexander and MacKinlay articles cited in note 3 above. Note that in the vocabulary of securities litigation, the inflation in a stock price is the difference between the market price of the stock and the price it would have traded at had there been no misrepresentation or omission of public information. This use of inflation is not to be confused with its traditional economics usage referring to overall price level rate of change.

11. It is, however, not the only way to compute damages. Sometimes a fundamental analysis is appropriate. Also, the expected change in the stock price based on a sample of stock price changes in response to similar events may be used. Which approach is best will depend on circumstances relating to the allegations in the complaint and the reliability of the various types of estimates given the available data.

12. The distinction between a firm and its shareholders is a legal artifact and ignores certain economic ambiguities. For example, in economics it is theoretically possible for the current shareholders to be the firm, whereas under the law the firm is a distinct person. Presumably, this legal distinction is necessary to allow the firm to have access to the courts on behalf of the shareholders, thereby reducing the inefficiencies that would occur if the shareholders themselves had to perform the legal duties of the firm.

13. This is strictly true only if common equity is the sole source of financing. When the company has also issued debt and/or other forms of equity, lost profits would be measured by summing the changes in the market value of all of the outstanding financing sources (e.g., number of shares times the share price movement plus the number of bonds times the bond price movement). When the company does not face any serious threat of default on its senior obligations, the change in the market value of its common stock should serve as a good proxy for the change in the total capitalized value of the firm.

14. But note an exception due to the bias from the recovery from future litigation discussed in section 19.7(b).

15. The stock market's assessment would be on an after-tax basis taking account of litigation expenses and contingent claims. The effects of these issues on damages assessment using stock prices are discussed in more detail in section 19.7.

16. See section 19.6.

17. See, for example, MacKinley, *op. cit.* for a description.

18. It is also possible to look at intraday trading to get a tighter event window. This is especially useful if before the news announcement there was a large change in the stock price that one believes was caused by other events. Use of intraday prices, however, entails several difficulties. Among these are calculating movements of the market or industry index over the same time period and adjusting materiality tests to account for the nonstandard event window. A suggested approach for determining the length of an intraday event window is in S. C. Hilmer and P. L. Yu, "The Market Speed of Adjustment to New Information," *Journal of Financial Economics*, Dec. 1979. See also S. J. Chang and Son Nan Chen, "Stock Price Adjustment to Earnings and Dividend Surprises," *Quarterly Review of Economics and Business*, Spring 1989.

19. See MacKinlay, note 3.

20. As with other expert decisions, it is helpful to have some rationale for the length of the event window chosen. For example, one can employ a standard period over different cases, cutting short the window when new information reaches the public. Alternatively, one can look at some other indicator of materiality, such as trading volume or the quantity of news coverage, to decide the period in which the market was reacting to the new information.

21. While some analysts perform crude event studies without adjusting for market effects, the literature nearly uniformly argues that a market adjustment is desirable. Moreover, relevant case law, such as *In re Executive Telecard Ltd. Securities Litigation*, states that in measuring stock price declines, one must eliminate "that portion of the price decline that is the result of forces unrelated to the wrong."

22. A regression is a statistical tool used to estimate the relation between one or more variables (here, the market and/or industry index) and another variable (the stock price of a particular company). An early, but still useful, discussion is provided in Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, May 1980.

23. In securities fraud cases, estimation windows are often placed before the beginning of the alleged class period, even if the only event measured is at the end of the period. This is likely done so that the estimation window would cover a "clean" period that could not have been tainted by any alleged stock price inflation. There is often no theoretical basis for doing so, because the concern about a "clean" period actually relates to the possibility that the estimation of the relation between the stock and the index is contaminated by the effects of the event being studied. That is, one does not want any overlap between the estimation window and the event window. Depending on the nature of the alleged stock price manipulation, there may be no statistical basis for excluding prices during the period of alleged manipulation from the estimation window.

24. Michael Salinger ("Value Event Studies," *Boston University School of Management Working Paper*, 1991) provides a theoretical discussion on whether to place the estimation window before or after the event window. However, see note 38 on his conclusion that such methodological choices are generally irrelevant for short event windows.

25. The adjusted R-squared should not be confused with the [unadjusted] R-squared. The R-squared is a simple measurement of the explanatory power of the independent variables. The adjusted R-squared penalizes the use of additional independent variables to account for the possibility that any additional explanatory power that these variables bring to the overall regression is due solely to chance.

26. Sometimes, the expert will use a multifactor model to predict the stock price. This is a model that has more than one index in it, such as the S&P 500 and an industry index; see MacKinlay, *op. cit.* If the analyst tries a number of multifactor models and ultimately chooses

a model with only one index, then the expert may have to support this decision with the relevant statistical test.

27. There are various reasons for not simply choosing the index with the strongest statistical properties. One would be if it were known that there was a change in the operating characteristics or competitive environment facing members of one index between the estimation and event windows. Also, there are other considerations involved in comparing statistics from different estimation windows, most notably that a good index from an estimation period near the event window may be preferable to an index with more explanatory power in an estimation period further from the event window.

28. There is a question about whether to apply the abnormal return to the stock price at the beginning or end of the event window. This question essentially turns on whether the event occurs first, followed by market effects, or whether market effects come first, followed by the event. As an example, suppose that a stock price drops from $20 to $9 during an event window in which the predicted return was −10%. If we apply the predicted return first, the stock would have been expected to drop to $18, and then it fell by an additional $9 as a result of the event. Alternatively, one could say that the stock fell by $10 as a result of the event, reaching a level of $10, and then fell an additional 10% due to market forces, to reach its final level of $9. The difference is generally not important when market movements are small. In general, one would want to consider when in the event window the effects of the event were more likely to have been felt.

29. See, for example, Katherine Schipper, Rex Thompson, and Roman L. Weil, "Disentangling Interrelated Effects of Regulatory Changes on Shareholder Wealth: The Case of Motor Carrier Deregulation," *Journal of Law and Economics,* Vol. 30, April 1987, pp. 67–100.

30. Fed. R. Evid. 402, as cited in *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,* 925 F. Supp. 1247, 1251 (S.D. Ohio 1996).

31. Fed. R. Evid. 702, as cited in *Ohio ex rel. Montgomery,* 925 F. Supp. at 1251.

32. *Daubert,* 113 S. Ct. at 2795.

33. *Ohio ex rel. Montgomery,* 925 F. Supp. at 1251.

34. *Daubert,* 113 S. Ct. at 2795.

35. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995).

36. *Smelser v. Norfolk Southern Railway Co.,* 105 F.3d 299, 303 (6th Cir. 1997).

37. Still, at least one court has ruled that in examining how events affected stock prices, "available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the opportunity for such manipulation of data." *In re LTV Securities Litigation* (88 F.R.D. 134). Such a statement certainly could not be made about analyses where the analyst has the freedom to essentially make up one or more inputs to the calculation based on nothing more than a claim that those inputs are reasonable.

38. In a seminal article ("Measuring Security Price Performance," *Journal of Financial Economics,* 1980), Stephen J. Brown and Jerold B. Warner state that "a simple methodology based on the market model performs well under a wide variety of conditions." In discussing this and a later paper by the same authors, Michael Salinger, *op. cit.,* states that the previous authors' "results tended to be robust to the methodological alternatives." Salinger further states, "There is a schizophrenia in the event study literature between a very close attention to methodology and the view that for events of any importance, methodology is unlikely to matter a great deal. The latter view is probably quite appropriate when news is revealed over a brief, identifiable interval." "Measuring Security Price Performance," *Journal of Financial Economics* 8 (1980), pp. 205–58.

39. To be entirely correct, one would also have to specify several other minor choices, such as whether to use logarithmic or percentage returns and whether returns are measured daily or over some other period of time.

40. Of course, one must still use common sense in interpreting these results. For instance, if a company moves from an environment characterized by a high degree of government regulation to one of low regulation, there would be reasons to potentially challenge the use of a regression from one period to account for market movements in the other.

41. The net-of-market methodology also assumes that the constant term from the regression, or alpha, equals zero. References to an assumed beta of one should be considered to include this second assumption as well. We do not independently criticize the assumption that alpha is set equal to zero over the event window. Given an accurate estimate of beta, it is possible for reasonable analysts to perform the analysis with different estimates of alpha than what would be produced from a market model regression. One assumption, for example, is to compute an estimate based on the formula given by the Capital Asset Pricing Model; this formula would produce a value of alpha equal to zero whenever beta equals one. In practice, different reasonable estimates of the value of alpha generally do not make a noticeable difference in the expert's findings.

42. If betas are symmetrically distributed around one, the materiality test would be unbiased but not efficient. This means (1) that excessively positive and excessively negative returns would roughly balance over numerous observations but (2) that other tests were more likely to give the correct answer on any one individual case.

43. See Werner F. M. DeBondt, "Stock Price Reversals and Overreaction to New Events: A Survey of Theory and Evidence," 1989; Rui M. C. Guimaraes, Brian G. Kingsman and Stephen J. Taylor, eds., *A Reappraisal of the Efficiency of Financial Markets*, Berlin: Springer-Verlag. Much of the evidence is from the research of Paul Zarowin, including his 1989 article "Short-Run Market Overreaction: Size and Seasonality Effects," *The Journal of Portfolio Management*, Spring, pp. 26–29. See also M. Bremer and Richard Sweeney, "The Information Content of Extreme Daily Rates of Return," *Claremont McKenna College Working Paper*, 1987, later published in the *Journal of Finance.*

44. For more detail on some of the alternative methods, see, for example, Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan, "Losses in Commercial Litigation," *Journal of Forensic Economics* Vol. 6, No. 3, 1993, pp. 179–96. This paper discusses some of the means of measuring lost profits based on projections and accounting statements. Interestingly, while the authors say that the methodology they describe "is conceptually similar to the situation where a plaintiff suffered a loss of a passive investment, such as a securities fraud case," they do not appear to consider whether the event study methodologies of securities fraud cases could be applied to measuring lost profits in a commercial setting.

45. For a series of simple examples on how the same data can lead to extreme variations in lost profits, see Robert L. Dunn, *Recovery of Damages for Lost Profits*, 1992, pp. 459–70. ("The point made is that, depending on the approach taken, great variations in projections will result.")

46. See, for example, Richard R. Simonds, "Public Utility Valuation Methods: Theoretically Equivalent But Not Redundant," *Property Tax Journal*, September 1992, pp. 289–300.

47. Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, Irwin Prof. Publishing, 1993.

48. Steven H. Hanke and Stephen J. K. Walters, "Recent Controversies in the Valuation of Utility Properties," *Public Utilities Fortnightly*, July 21, 1988, p. 24.

49. *Id.* at 23.

50. "Court Declines Review in Five Cases, Including Three Involving Rail Property," *BNA Washington Insider*, June 6, 1995.

51. *Elmer E. Mills and Louis Susman v. The Electric Auto-Lite Co. et al.*, 552 F.2d 1239, 1247 (1997).

52. *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987).

53. Recent financial press commentaries on the volatility, previously high values, and rapid collapse of many Internet stocks represent another event that should lead to investigation of stock market anomalies.

54. *Basic v. Levinson*, 485 U.S. 224, 247 (1988).

55. We omit here mention of stock price overreaction, which was discussed in section 19.4.

56. For a review, see Stephen F. LeRoy, "Efficient Capital Markets and Martingales," *Journal of Economic Literature*, Vol. XXVII, 1989, pp. 1583–621.

57. Paul A. Samuelson, "Proof That Properly Discounted Present Values of Assets Vibrate Randomly," *The Bell Journal of Economics and Management Science*, Vol. 4, No. 2, 1973, pp. 369–74; and "Stochastic Land Valuation: Total Return as Martingale Implying Price Changes a Negatively Correlated Walk," *Paul A. Samuelson's Collected Scientific Papers*, Vol. 5, Cambridge: MIT Press, 1986.

58. See, for example, J. Bradford DeLong, Andrei Shleifer, Lawrence H. Summers, and Robert J. Waldmann, "Positive Feedback Investment Strategies and Destabilizing Rational Speculation," *Journal of Finance*, Vol. 45, No. 2, 1990, pp. 379–95.

59. Baruch Lev and Meiring Devilliers, "Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis," *Stanford Law Review*, November 1994.

60. *Ibid* at p. 35.

61. In some ways this is clearly unfair, as there has been a transfer of wealth from one set of shareholders to another as a result of an illegal act in which neither group knowingly participated. An alternative view is that when investors buy and sell shares, they are trading in the company's fortunes, including expected gains and losses from legal actions and certain illegal acts affecting the company's value.

62. One advantage of event studies here is that if the changes in the perception of the libel occur at discrete times, these effects can be captured by using readily available stock market data. Directly measuring the changes in expected income at various points in time would require a large set of contemporaneous projections.

63. While the actual rate of error is not known without the materiality test, if the stock is simply assumed by the expert to move one-for-one with the market, we can be sure that the rate of error is higher than if the relation between market and stock movements used in the damages calculation is based on statistical analysis.

64. The general attitude toward event studies may be best summed up by Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance* 57(2), June 1990: "The event study is a classic design. Classic designs are simple and elegant, and above all else, functional. The event study has become a classic because it works. It can be used under less than perfect conditions and still produce reliable results."

65. In a case where a private company went through with an initial public offering after suffering some harm, data on the actual offering price can be compared to a previously expected offering price to perform a basic event study. Appropriate market and industry adjustments to the expected offering price can be made based upon the stock's post-offering behavior.

## LIST OF CASES

*Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)

*In re Central Ice Cream Co.*, 836 F. 2d 1068 (7th Cir. 1987)

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993)

*In re Executive Telecard, Ltd. Securities Litigation*, 94 Cir. 7846 (CLB) (S.D.N.Y. 1997)

*Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 586 (E.D.N.Y. 1971)

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)

*Goldkrantz v. Griffin* (S.D.N.Y. 1999)

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999)

*In re LTV Securities Litigation*, 88 F.R.D. 134, 149 (1980)

*Mills v. Electric Auto-Lite Co.*, 552 F. 2d 1239, 1247 (1977)

*Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1251 (S.D. Ohio 1996)

*In re Seagate Technology II Securities Litigation*, C-89-2498(A)-VRW (N.D. Cal.)

*Smelser v. Norfolk Southern Railway Co.*, 105 F. 3d 299, 303 (6th Cir. 1997)