UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

———————————————————————)
IN RE ORACLE CORPORATION            )        MASTER FILE NO:
SECURITIES LITIGATION               )        C001-0988-MJJ
———————————————————————)


**REBUTTAL EXPERT REPORT OF CHRISTOPHER M. JAMES**

**Rebuttal Expert Report of Christopher M. James**

I.      Qualifications ................................................................................................ 1

II.     Assignment .................................................................................................... 1

III.    Summary of Opinions .................................................................................... 1

IV.     Steinholt's Liability Assumptions.................................................................. 4

V.      Steinholt's Opinions Regarding Materiality Are Flawed .............................. 5

VI.     Steinholt Does Not Prove Loss Causation .................................................. 15

VII.    Steinholt's Quantification of Damages Per Share Is Flawed........................ 22

## I.        Qualifications

1.        I am the William H. Dial / SunBank Eminent Scholar in Finance and Economics and Professor of Finance at the University of Florida.  My qualifications and compensation are described in my previous report in this matter dated May 25, 2007 (the "James Report").

## II.       Assignment

2.        I have been asked by counsel for Oracle Corporation to review the reports of Plaintiffs' experts (Alan G. Goedde, Brooks Hilliard, D. Paul Regan, and Bjorn Steinholt) filed May 25, 2007 ("Goedde Report," "Hilliard Report," "Regan Report," and "Steinholt Report") and to address the Steinholt Report as it relates to materiality, loss causation, and damages issues.  Additional documents reviewed are cited in this report and exhibits.  A list of documents I have relied upon in forming my opinions is attached hereto as Exhibit 1.  My work in this matter is ongoing.

## III.      Summary of Opinions

3.        Below is a summary of my opinions expressed in this report.  The bases for each opinion are detailed in the sections that follow.

> i.       Steinholt's liability assumptions are not consistent with the alleged false and misleading statements identified in the Revised Second Amended Complaint dated December 9, 2002 ("Complaint") and certain Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs ("Plaintiffs' Contention Responses")[1] and are too vague to form

---

[1] Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 is the exemplar response I use.  I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter.  In addressing these unpled issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to make these allegations in the Complaint.

the basis of any scientific test to demonstrate materiality, establish loss causation, or calculate damages.

ii.    Steinholt's assertion that certain alleged false and misleading statements were material is subjective and not based on any objective analysis. Because Steinholt does not specify what allegedly could and should have been said and does not consider this information in the context of the total mix of information, he cannot provide an objective, scientific, and reliable test of whether the alleged false and misleading information significantly altered the total mix of information.

iii.    In my opinion, the alleged false and misleading statements related to Suite 11i identified by Plaintiffs in the Complaint and Plaintiffs' Contention Responses and the new statements identified in the Hilliard Report did not significantly change the total mix of information. Thus, the market did not consider these statements to be material as alleged by Plaintiffs.

iv.    Steinholt's assertion that the March 1, 2001 pre-announcement of its 3QFY01 financial results ("March 1 pre-announcement") "reduced and/or eliminated the inflation in Oracle's common stock resulting from the alleged false and misleading statements and omissions"[2] is subjective and unscientific. Steinholt fails to identify the specific "truths" that were allegedly revealed through the March 1, 2001 pre-announcement, and he fails to identify a causal link between those purported "truths" and the statements Plaintiffs claim to have been false. Put another way, Steinholt makes no effort to demonstrate that the March 1, 2001 pre-announcement revealed any "facts" that Plaintiffs claim Oracle hid from the market. Instead, Steinholt simply asserts "the relevant truth alleged by plaintiffs was revealed when the Company, after the market closed on March 1, 2001, admitted that it would not meet its previously stated Third Quarter 2001 guidance."[3] This assertion is too broad and includes losses that would have been suffered regardless of whether or not Plaintiffs' allegations are true.

v.    Steinholt does not specify what allegedly could and should have been said (or when). Therefore, he cannot demonstrate which piece of alleged misinformation is being corrected by the March 1, 2001 pre-announcement. He has no way to distinguish the information that allegedly corrects the alleged prior misrepresentations from other new information related to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other [non-litigation related] events…."[4] He cannot provide

---

[2] Steinholt Report ¶46.
[3] Steinholt Report ¶41.
[4] *Dura Pharmaceuticals v. Broudo*, 125 S. Ct., 1627 (2005) ("*Dura*").

an objective and scientific test of how much of the alleged inflation resulting from a given allegation is eliminated by the March 1, 2001 pre-announcement, as I understand is required by *Dura*.

vi.    In my opinion, the market was aware of the following facts: (1) Oracle was not immune to an economic downturn, (2) Oracle's ability to make its guidance depended on its performance at the end of the quarter, and (3) customers of Suite 11i experienced implementation-related difficulties and complained about "bugs" in Suite 11i and the number of patches needed to fix bugs or enhance functionality. The evidence I reviewed also indicates that the market attributed Oracle's earnings miss to the impact of the economy-wide slowdown on the enterprise software sector.

vii.    Steinholt does not establish loss causation with respect to the alleged false and misleading statements identified by Plaintiffs. In my opinion, Oracle's earnings miss was a result of the sudden and sharp impact of the economic slowdown on the enterprise software industry. The evidence does not indicate that the market considered Oracle's 3QFY01 earnings miss to have revealed any previously undisclosed problems with Suite 11i. In my opinion, Oracle's stock price decline on March 2, 2001 was also not caused by the disclosure of information related to Oracle's savings from its use of the E-Business Suite or the disclosure of information related to alleged accounting errors in 2QFY01. I find no evidence in the Steinholt Report that links the March 1, 2001 pre-announcement to the alleged false and misleading statements that Suite 11i was "integrated" or "interoperable," previously undisclosed product quality problems with Suite 11i, the alleged 2QFY01 overstatement of earnings and revenues, or the alleged false and misleading statements regarding Oracle's savings from its use of the E-Business Suite as asserted by Plaintiffs.

viii.    Steinholt's quantification of damages per share is flawed and unscientific. Steinholt's use of the constant percentage method for calculating damages per share and his assumption that 100 percent of the residual stock price decline on March 2, 2001 was caused by litigation related factors makes his damages analysis subjective and unscientific because it is based on losses resulting from "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, and other [non-litigation related] events…."[5]

ix.    The alleged per share inflation calculated by Steinholt assumes without support that Oracle could have simply pre-announced on December 14, 2000 the very same information contained in the March 1, 2001 press release and earnings conference call.

---

[5] *Dura.*

x.      Steinholt does not apportion the stock price decline observed on March 2, 2001 between the litigation and non-litigation related factors.  As such, his calculation of alleged damages per share is incorrect in that it is not equivalent to the recoverable damages as I understand are permitted under *Dura*.  Moreover, Steinholt does not apportion the loss among the various allegations.  Thus, if a court or jury were to reject any of the Plaintiffs' allegations, Steinholt would also be unable to provide an objective opinion regarding recoverable damages resulting from any remaining allegations, given his current analysis.

xi.      It is my understanding that Section 20A provides that the total amount of damages shall not exceed the insider's profit gained or loss avoided in the transaction.  Using this definition, alleged damages should be calculated as the minimum of the alleged inflation at the time of sale and the actual price decline resulting from the revelation of the alleged false and misleading information on the date of the alleged corrective disclosure. Steinholt's calculation of alleged inflation is subjective and unscientific and thus cannot be used in this calculation.

## IV.     Steinholt's Liability Assumptions

4.      Steinholt's liability assumptions are not consistent with the Complaint or Plaintiffs' Contention Responses.  Moreover, as I discuss below, they are too vague to be scientifically assessed, thereby rendering impossible any scientific analysis of materiality, loss causation, or damages.[6]

5.      For example, Steinholt assumes Oracle made alleged false and misleading statements that Suite 11i "worked well" and that "Suite 11i would manage all aspects of a customer's business."[7]  In my review of the Complaint and Plaintiffs' Contention Responses, I could not find Steinholt's assumed misstatements among those alleged by Plaintiffs to be false and misleading.  Specifically, I saw no statements alleged to be false and misleading to the effect

---

[6] Steinholt lists assumptions that form the basis of his opinions on materiality, loss causation, and damages in his report.  See Steinholt Report ¶¶7 and 9.

[7] Steinholt Report ¶8.

that Oracle stated that Suite 11i "worked well" or commented on Suite 11i's ability to "manage all aspects of a customer's business."[8]

6.      Steinholt also assumes that Oracle allegedly "misrepresented the quality and capabilities of, and customer demand for Oracle's 11i Application Suite…."[9]  Steinholt further assumes that Oracle "misrepresented that Suite 11i would drive sales growth at Oracle and that customer acceptance of Suite 11i was high."[10]  In my opinion, the vagueness of these assumptions prevents them from being proved or disproved.  For example, the word "high" as a modifier of "customer acceptance" has no specific meaning.  As a consequence, one cannot determine whether customer acceptance of Suite 11i was "high" or not.  Thus, Steinholt's assumptions are too vague to form the basis of any scientific test to demonstrate alleged materiality, establish alleged loss causation, or calculate alleged damages.

## V.      Steinholt's Opinions Regarding Materiality Are Flawed

7.      Steinholt's opinions on materiality have a number of flaws.  Steinholt's assertion that certain alleged false and misleading statements were material is subjective and not based on any objective analysis.  Steinholt does not identify the underlying "truth" for any of those statements, and therefore does not specify what allegedly could and should have been said (and when), and he does not consider this information in the context of the total mix of information.  As a result, he cannot provide an objective and scientific test of whether the alleged false and misleading information, and only this information, significantly altered the total mix of information.  Rather, Steinholt relies on a definition of materiality that is subjective.  Steinholt

---

[8] Steinholt Report ¶8.
[9] Steinholt Report ¶8.
[10] Steinholt Report ¶8.

simply assumes Plaintiffs' allegations are true and asserts Oracle's stock price would not have been inflated but for the alleged false and misleading (though unspecified) information contained in these statements.  Steinholt does not demonstrate that the alleged false and misleading information on its own resulted in a significant increase in Oracle's stock price.  Furthermore, Steinholt does not attempt to apportion any alleged price increase across the different allegations.  Thus, Steinholt has no basis on which to provide an objective opinion as to what specific alleged false and misleading information resulted in which, if any, alleged price increase.  Steinholt does not even *mention*, let alone analyze, a number of Complaint Days (days on which Plaintiffs allege Oracle made false and misleading statements).  Each of these problems is discussed in more detail below.

8.      My understanding is that materiality requires a test that "focuses on the substantial likelihood that the fact would have altered the 'total mix' of information" in the market.[11]  In an efficient market, the price of a security reflects its fundamental value and prices react quickly to new information that investors view as having a material impact on value.  Thus, for information to be material, it must have an impact on the value of the security, which occurs if the information leads to a significant revision in investors' expectations about future cash flows or risks associated with future cash flows.

9.      Steinholt does not use a consistent definition of materiality.  Steinholt acknowledges the definition of materiality I describe in the previous paragraph in asserting that the market for Oracle's stock price is efficient.  He states:

---

[11] Bagley, Constance E., *Managers and the Legal Environment: Strategies for the 21st Century*, West Publishing Company, 1991, p. 592.

The ultimate test of market efficiency is a stock's actual price reaction to unexpected new material information. This test can be conducted by identifying a day when there was new material information disclosed about a company that investors would view as significantly negative or positive about the company's future prospects, and then examining the price movement following the announcement to determine whether or not the new information quickly became reflected in the company's common stock price.[12]

10.     When he opines on the potential materiality of the alleged false and misleading statements in this case (in the section of his report entitled "Materiality"), however, Steinholt redefines material information as "information that a reasonable investor would want to consider prior to making an investment decision."[13]  According to this definition, materiality exists whenever a reasonable investor would consider this information important prior to making an investment decision.  Thus, Steinholt considers information material even if the information does not significantly alter the total mix of information.  Apparently, under the definition, the litmus test of whether an investor "would want to consider" is simply Steinholt's *assertion* that an investor would want to consider.

11.     Under Steinholt's definition of materiality, the materiality of a statement is not verifiable or testable.  In order to objectively and scientifically assess materiality, Plaintiffs must first identify and subsequently value any new, *allegation-related* information contained in the alleged false and misleading statements.[14]  In doing so, Plaintiffs must be careful to separate out any alleged false information from other new information in each statement.  Moreover, Plaintiffs must be careful to apportion any alleged valuation impact of the alleged false information to the different allegations in the Complaint.

---

[12] Steinholt Report ¶24.

[13] Steinholt Report ¶28.

[14] The procedure I describe is the same procedure used in peer reviewed studies to identify and isolate the valuation or announcement effects of news announcements.  See, for example, Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, Chapter 4.

12.     To accomplish this task, Plaintiffs must undertake several steps.  First, Plaintiffs must specify what they claim could and should have been said (and when) as opposed to simply asserting that an alleged statement was false and misleading.  Whenever statements on a given day relate to multiple allegations, Plaintiffs must specify, separately, what they claim could and should have been said regarding each of the Plaintiffs' allegations.  Second, Plaintiffs must then investigate the impact this incremental (allegedly false and misleading) information had on the total mix of information, separating out the impact of any other new information unrelated to Plaintiffs' claims.  This incremental allegedly false and misleading information is considered material if this information (on its own) results in a significant change in the total mix of information.

13.     Steinholt does not identify what Oracle allegedly could and should have said, nor does he compare this alleged truth to the total mix of information then available to the market.  For example, Steinholt assumes that Oracle falsely stated that "Suite 11i, first introduced in May of 2000, worked well and was pre-integrated and interoperable out-of-the-box" [15] and that "no systems integration was required, that the components of Suite 11i were literally plug and play, and that Suite 11i would manage all aspects of a customer's business." [16]  Steinholt never specifies what allegedly could and should have been said regarding Suite 11i.  Moreover, he does not provide any analysis of the total mix of information available to investors related to the product quality of Suite 11i throughout the Class Period.  In my prior report, I found that the market was aware that customers of Suite 11i experienced implementation-related difficulties and complained about "bugs" in Suite 11i and the number of patches needed to fix bugs or

---

[15] Steinholt Report ¶8.
[16] Steinholt Report ¶8.

enhance functionality during the Class Period.  Without comparing the alleged "truth" with information already in the total mix of information available to the market at the time, Steinholt cannot reach any objective or scientific conclusions as to whether the challenged statements were material.

14.     Steinholt also assumes that Oracle "falsely represented that the Company's sales would not be negatively impacted by the general economic slowdown during the Class Period".[17] and claims that the alleged representation was material.  Similar to the allegations related to Suite 11i, he does not provide any analysis of the total mix of information related to the potential impact of an economic downturn on Oracle's performance.  In fact, Oracle commented on the economy's potential impact on company performance.  For example, Oracle stated in its December 14, 2000 press release that "[a] weakening of the economy may affect the overall demand for computer software and services which could result in decreased revenues or lower revenue growth rates."[18]  Oracle also stated:

> In particular, **a slowdown in the economy may cause purchasing decisions to be delayed, reduced in amount or cancelled which will therefore reduce the overall license pipeline conversion rates in a particular period of time.**[19]

15.     Market participants commented on the fact that Oracle would not be immune to an economic downturn during the Class Period.  For example, the First Union Securities analyst report cited by Steinholt states:

> While the sales pipeline apparently shows no signs of weakness at this point, **we note the next several weeks will be critical for the company** as many potential

---

[17] Steinholt Report ¶9.

[18] "Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19%," Oracle Press Release, December 14, 2000.

[19] Oracle's SEC Filing for the quarter ending November 30, 2000, filed on January 16, 2001(emphasis added).

customers will likely make decisions to buy or defer purchase during the activity-intensive final weeks of FQ3.  Henley also indicated **Oracle would not be immune to any prolonged economic downturn**, but felt that current forecasts for F2002 were conservative and had room for some general economic weakness.[20]

16.     The above quote indicates that this analyst was aware (contrary to Plaintiffs'

allegations) that Oracle would not be immune to an economic downturn.  Moreover, throughout

the alleged Class Period, other analysts also commented that Oracle was not immune to the

effects of an economic downturn:

> **Robertson Stephens:**  Although our channel checks indicate that databases and applications remain high priorities for corporations, Oracle is not immune to the effects of a more conservative spending environment, in our opinion.[21]

> **Banc of America:**  Against the backdrop of further economic slowing, we believe an extra ounce of caution may be warranted.  Though management seems confident in the progress Oracle has made thus far in the quarter, we remind investors that a good amount of the quarter's business remains to be done.  The next 3 weeks will tell the tale....[22]

> **SG Cowen:**  Still, it is unlikely that the company will remain completely insulated from the slowdown.  Along these lines, in its most recent 10Q filing (FQ2), Oracle added the following two statements that had never before been included:

> "...future operating results may also be adversely impacted by external factors, such as a slowing in demand for hardware used in conjunction with its software."

> and

> "In particular, a slowdown in the economy may cause purchasing decisions to be delayed, reduced in amount or canceled which will therefore reduce the overall license pipeline conversion rates in a particular period of time."[23]

> **Goldman Sachs:**  Oracle is not immune to weakness in IT spending and the macro environment.[24]

---

[20] First Union Securities, February 8, 2001, 9:36 AM (emphasis added).  Unless specifically noted otherwise, all time stamps mentioned in this report are EST.
[21] Robertson Stephens, January 18, 2001, 12:28 AM.
[22] Banc of America Securities, February 7, 2001.
[23] SG Cowen Securities Inc., February 7, 2001.

**William Blair & Co:**  That said, how the stock performs over the near term depends on two factors:  the economy and Oracle's third-quarter results.  Oracle said that it has not seen a slowing due to the current economic environment, but if the U.S. economy suffers a protracted recession, Oracle will not be immune….[25]

**CIBC World Markets:**  Management indicated that they see no impact on Oracle's results do to the slowdown in the US economy.  However, should the US economy fall into a recession, management stated that growth could be impaired.[26]

17.     Instead of specifying what allegedly could and should have been said and investigating the impact that this incremental, allegedly false and misleading information (and only this information) had on the total mix of information, Steinholt uses a subjective definition of materiality and simply asserts that the alleged false and misleading information was material.

18.     Because Steinholt does not specify what allegedly could and should have been said regarding each of the Plaintiffs' allegations, he has no basis on which to provide an objective opinion on the materiality of the alleged false and misleading information contained in the statements identified by Plaintiffs.  For the same reason, he cannot allocate any alleged inflation across the various allegations.  Thus, if a court or jury were to reject any of the Plaintiffs' allegations, Steinholt would be unable to provide an objective opinion regarding the materiality of the remaining allegations given his current analysis.

19.     For example, Steinholt asserts that "absent the allegedly inflated earnings reported and false Third Quarter 2001 guidance, Oracle's stock price would not have increased as it did on December 15, 2001 [*sic*], following the Second Quarter earnings announcement."[27]  Put differently, Steinholt claims that Oracle's 2QFY01 earnings report and 3QFY01 guidance caused

---

[24] Goldman Sachs, February 9, 2001.
[25] William Blair & Co., February 22, 2001, 8:01 AM.
[26] CIBC World Markets, Corp., February 23, 2001, 7:36 AM.
[27] Steinholt Report ¶35.

Oracle's stock price to increase on December 15, 2000. Steinholt does nothing to establish this claims is true.

20.     Steinholt ignores other information entering the market at the time of the 2QFY01 announcement. The stock price reaction on December 15, 2001 is the joint effect of all new information entering the market, including all new information in the December 14-15 announcements. In my opinion, the fact that operating expenses are down is consistent with the stock price increase on December 15, 2000.[28] Steinholt has done no analysis to determine whether the price increase on December 15, 2000 was attributable to information related or unrelated to Plaintiffs allegations, such as the reduction in operating expenses. Nor has Steinholt done analysis to link the price increase on December 15, 2000 to either of the two items he specifies (the alleged false and misleading 2QFY01 earnings and 3QFY01 guidance) or to quantify the relative importance (if any) of the alleged false and misleading 2QFY01 results versus the alleged false and misleading 3QFY01 guidance.

21.     In particular, Steinholt provides no evidence to demonstrate that Oracle's guidance as stated on December 14, 2000 significantly altered the total mix of information regarding Oracle's expected performance in 3QFY01. I find that Oracle's 3QFY01 guidance issued on December 14, 2000 did not change financial analysts' consensus estimates of 3QFY01 earnings per share ("EPS") as reported by First Call. As reflected in Exhibit 2, analysts' consensus EPS estimate for 3QFY01 were $0.12 per share before the December 14, 2000

---

[28] See for example, "Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19%," Oracle Press Release, December 14, 2000 and Oracle's 2QFY01 Conference Call Transcript, December 14, 2000.

announcement, and that consensus estimate remained unchanged after the December 14, 2000 announcement.

22.     Steinholt also states, "Following the December 14, 2000 earnings announcement, Oracle made numerous statements maintaining its guidance and asserting that the general economic slowdown was not negatively impacting its business…."[29]  Steinholt asserts that these statements are the "types of representations made by the Company reaffirming its previous guidance regarding the Third Quarter 2001" that in his opinion maintained the inflation in Oracle's stock price.[30]  Once again, Steinholt does not specify the incremental allegedly false and misleading information contained in these statements.  Thus, he has no basis on which to provide an objective opinion regarding the materiality of this alleged (though unspecified) false and misleading information.

23.     In the section of his report entitled "Materiality", Steinholt does not discuss or even mention in his report a number of the statements alleged to be false and misleading in the Complaint and Plaintiffs' Contention Responses.  The unmentioned statements are those that were alleged to be false and misleading on (for example) January 9, 2001, January 20, 2001, February 6, 2001, February 9, 2001, and February 21, 2001.  For example, Steinholt does not even mention statements to the effect that Suite 11i was "integrated" or "interoperable" that Plaintiffs claim were made on January 9, 2001, February 6, 2001, and February 21, 2001.[31]  He also does not mention the alleged false and misleading statements regarding guidance or the effect of the economy on Oracle's business identified by Plaintiffs on January 9, January 20, and

---

[29] Steinholt Report ¶36.
[30] Steinholt Report ¶38.
[31] See Complaint ¶¶58, 63, and 68.

February 9, 2001.[32]  Steinholt also does not mention the alleged false and misleading statements related to cost savings of Oracle's use of its E-Business Suite.[33]  I analyzed Oracle's stock returns (as well as the stock prices of Oracle's industry peers) on those dates in my prior report and found no statistically significant positive stock returns associated with the alleged false and misleading statements identified by Plaintiffs.  It is my opinion that the alleged misstatements did not significantly change the total mix of information and thus the market did not consider these statements to be material as alleged by Plaintiffs.

24.    Steinholt also does not mention many of the alleged false and misleading statements regarding Suite 11i identified by Plaintiffs' expert, Brooks Hilliard.  Specifically, the Hilliard Report alleges that on two separate dates prior to the Class Period, Oracle made false and misleading statements related to Suite 11i.[34]  Based on my review, I find no evidence that these additional statements resulted in significant stock price increases.  Having analyzed Oracle's stock returns (as well as the stock prices of Oracle's industry peers) on these dates and found no statistically significant positive stock returns associated with these alleged false and misleading statements identified in the Hilliard Report, it is also my opinion that the alleged misstatements did not significantly change the total mix of information and thus the market did not consider these statements to be material.

---

[32] See Complaint ¶¶58 and 65.  Plaintiffs' Contention Responses, p. 9, ¶8.
[33] See Plaintiffs' Contention Responses, p. 7, ¶1.
[34] I also note that these statements did not result in statistically significant returns, whether I use Steinholt's market model or my own.

## VI.      Steinholt Does Not Prove Loss Causation

25.      Steinholt does not prove loss causation.  Rather, his opinions on loss causation are subjective and unscientific.  Steinholt's assertion that the March 1, 2001 pre-announcement "reduced and/or eliminated the inflation in Oracle's common stock resulting from the alleged false and misleading statements and omissions"[35] is subjective and unscientific.  Steinholt simply asserts loss causation by assuming the March 1, 2001 pre-announcement "substantially revealed the relevant [though unspecified] truth"[36] as alleged in the Complaint.  This assertion is too broad and includes losses that would have been suffered regardless of whether or not Plaintiffs' allegations are true.  Because Steinholt does not specify what allegedly could and should have been said (or when), he cannot demonstrate which piece of alleged misinformation was corrected by the March 1, 2001 pre-announcement and thus he cannot provide an objective and scientific test of how much of the alleged inflation resulting from a given allegation was eliminated by the March 1, 2001 pre-announcement as required based on my understanding of *Dura*.  I elaborate on these problems in more detail below.

26.      Steinholt begins the section entitled "Loss Causation" in his report by stating, "Loss causation relates to the question of whether an alleged fraud caused plaintiffs to suffer economic losses."[37]  He goes on to quote an article by Thorsen, Kaplan, and Hakala:

> Loss causation exists whenever fraud leads the stock price to be higher than it should be, the buyer pays "too much" for the stock, and the buyer is unable to recover that overpayment in the marketplace.[38]

---

[35] Steinholt Report ¶46.
[36] Steinholt Report ¶44.
[37] Steinholt Report ¶40.
[38] Steinholt Report ¶40, citing Thorsen, Madge S., Richard A. Kaplan, and Scott Hakala, "Rediscovering the Economics of Loss Causation," 6 *J. Bus. & Sec. L.* 93, 2006, pg. 93.

27. The Thorsen et al. interpretation of loss causation is far broader than what I understand in *Dura*, because under the Thorsen interpretation an investor might be able to recover "damages" due to reasons unrelated to the alleged fraud, such as a decline in the share price for other reasons.  Based on my understanding, *Dura* limits recoverable damages to those losses caused by the fraud, which means a decrease in the stock price when the "truth" was revealed, as opposed to a decrease caused by some other factor:

> [I]f…the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  **When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price**…  Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.
>
> Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.  It may prove to be a necessary condition of any such loss, and in that sense one might say that **the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss…  But, even if that is so, it is insufficient.  To "touch upon" a loss is not to** *cause* **a loss, and it is the latter that the law requires**.[39]

28. Given this language, it is my understanding that the maximum recoverable damages in this matter are the share price declines actually *caused* by the alleged false and misleading statements and *suffered* when the truth allegedly entered the market via some corrective event(s).  To demonstrate that the share price declines resulted from the alleged false and misleading statements and were suffered when the truth allegedly entered the market, Plaintiffs must specify what they alleged could and should have been said (and when) and match

---

[39] *Dura* (emphasis in italics in original) (emphasis in bold added).

these alleged truths to actual statements and/or outcomes at the time of the alleged corrective event(s). By failing to match the alleged curative disclosures to actual statements and/or outcomes, Steinholt has failed to exclude share price declines resulting from factors other than the disclosure of the "truth," such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other non-litigation related events.

29. Instead of specifying the allegedly curative disclosures and then matching these allegedly curative disclosures to actual corrective statements or corrective events that are causally linked to the alleged fraud, Steinholt simply asserts "the relevant truth alleged by plaintiffs was revealed when the Company, after the market closed on March 1, 2001, admitted that it would not meet its previously stated Third Quarter 2001 guidance."[40] He bases this assertion on his *assumption* that loss causation results whenever:

> The inflated expectations (as well as the price inflation) are then, generally, reduced, either by: (a) the company failing to meet the inflated expectations, or (b) a specific disclosure of the falsehood or misleading nature of the information at issue.[41]

30. This approach is flawed because it simply assumes that a company's failure to meet allegedly "inflated" expectations must have been caused by the "truth" that had been withheld from the market, thereby ignoring the possibility that the company could have missed expectations for reasons having nothing to do with the alleged misstatements. To show loss causation based on a failure to meet "inflated expectations" (as opposed to a specific disclosure contradicting a prior alleged misstatement), Plaintiffs must show that the failure to meet

---

[40] Steinholt Report ¶41.
[41] Steinholt Report ¶41.

expectations was caused by the specific "truth" that Plaintiffs claim was withheld from the market.

31.     For example, assume a hypothetical company announces revenue guidance of $100 million resulting from equal revenues of two customers, customer A and customer B.  At the time of this announcement, the company is in possession of information that indicates customer A is not likely to purchase product during this quarter.  Next, assume at the end of the quarter, the company reports total revenues of $50 million (all from customer A, who purchased after all) and that the stock price falls by 25 percent.  The revenue shortfall is the result of customer *B* not purchasing the product due to economy wide factors.

32.     Following the Company's guidance miss, Plaintiffs allege that guidance was inflated as a result of the omission that customer A was not likely to purchase product.  Plaintiffs assert damages resulting from this misrepresentation.  This mere assertion does not prove loss causation.  As this example demonstrates, the fact that the earnings miss resulted from customer B's decision not to purchase, as opposed to customer A's decision not to purchase, dictates that the losses suffered by shareholders did not result from the alleged misrepresentation and instead resulted from firm-specific facts, conditions, or other non-litigation related events.

33.     From the example above, it is clear that any objective and reliable analysis of loss causation must begin with a specification of what allegedly could and should have been said (and when) and a subsequent matching of this alleged "truth" to actual statements and/or outcomes at the time of the alleged corrective event(s).  Because Steinholt does not require either a direct disclosure correcting a prior misstatement or an indirect corrective event that is caused by some "truth" that the prior misstatement or omission hid from the market, he cannot reliably opine that

the "March 1, 2001 event substantially revealed the relevant truth"[42] or that "this disclosure reduced and/or eliminated the inflation in Oracle's common stock resulting from the alleged false and misleading statements and omissions."[43]  Moreover, because Steinholt does not specify what allegedly could and should have been said (and when), he cannot demonstrate the necessary causal link between alleged misstatements or omissions during the Class Period and their alleged curative disclosure in the March 1, 2001 pre-announcement.  Steinholt admits in part this inability insofar as he states that he is unable to determine whether the March 1, 2001 pre-announcement "reduced and/or eliminated"[44] the alleged inflation in Oracle's stock price.

34.     Moreover, because Steinholt does not specify what allegedly could and should have been said (and when) and then match these alleged truths to actual statements and/or outcomes, he also has no way to distinguish the information that allegedly corrects the alleged prior misrepresentation from other new information related to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other [non-litigation related] events."[45]  Nor can Steinholt apportion the alleged loss caused across the various allegations, a crucial step in demonstrating loss causation with respect to each of Plaintiffs' false and misleading statements.

35.     In its March 1, 2001 pre-announcement press release, Oracle reported preliminary EPS of $0.10 for 3QFY01.[46]  Oracle also reported that license revenue grew at approximately 6 percent with applications revenue growth estimated at approximately 50 percent and database

---

[42] Steinholt Report ¶44.
[43] Steinholt Report ¶46.
[44] Steinholt Report ¶46.
[45] *Dura.*
[46] "Oracle Announces Preliminary Third Quarter Earnings Results," Oracle Press Release, March 1, 2001, 4:55 PM.

revenue growth estimated to be flat to slightly negative. Steinholt provides no evidence supporting his assertion that the March 1, 2001 pre-announcement revealed any truths regarding (a) Oracle's alleged false and misleading 2QFY01 earnings, (b) the alleged false and misleading 3QFY01 guidance when stated, (c) the alleged false and misleading statements that Suite 11i worked well, was pre-integrated and interoperable out-of-the-box, required no systems integration, was literally plug and play, and would manage all aspects of a customer's business, or (d) the alleged false and misleading statements regarding the effect of an economic downturn on Oracle's performance in 3QFY01.[47]

36.     Steinholt's assertion that the March 1, 2001 pre-announcement revealed the alleged truth regarding prior alleged false and misleading statements that Suite 11i "would drive sales growth at Oracle and that customer acceptance of Suite 11i was high"[48] is simply unfounded. The March 1, 2001 pre-announcement reported a year-over-year growth rate in application revenues of 50 percent, hardly a number that suggests Suite 11i would not contribute to sales growth at Oracle.

37.     Steinholt also states that the March 15, 2001 pre-announcement "provided further details about the earnings miss."[49] Steinholt does not specify which additional "truths" were allegedly revealed by this announcement. Instead, he states:

> Specifically, the Company admitted that Suite 11i applications sales were substantially lower and database sales greater than originally reported on March 1, 2001.[50]

---

[47] Steinholt does not mention the alleged false and misleading statements regarding Oracle's savings resulting from its use of the E-Business Suite.
[48] Steinholt Report ¶8.
[49] Steinholt Report ¶44.

38.     Steinholt does not identify precisely what new information the March 15 announcement brought to the market.  Once again, because Steinholt does not specify what allegedly could and should have been said (and when), he has no way of determining which, if any, of the alleged truths were allegedly revealed to the market in the March 15, 2001 announcement.  If the March 15 announcement were material and if Steinholt is claiming that the information revealed on March 15, 2001 related to the alleged false and misleading statements regarding Suite 11i, then I would expect this "truth" to result in a significant stock price decline.[51]  Steinholt's event study reveals no statistically significant decline on March 15, 2001.

39.     The evidence I presented in this report and my prior report, led to my opinion that the market was aware of the following facts:  (1) Oracle was not immune to an economic downturn, (2) Oracle's ability to make its guidance depended on its performance at the end of the quarter, and (3) customers of Suite 11i experienced implementation-related difficulties and complained about "bugs" in Suite 11i and the number of patches needed to fix bugs or enhance functionality.  The evidence I reviewed also indicates that the market attributed Oracle's earnings miss to the impact of the economy-wide slowdown on the enterprise software sector.

40.     The Steinholt Report offers no evidence that would lead me to change any of my opinions.  In fact, the only analyst report cited by Steinholt related to loss causation gives no indication whatsoever that the market learned the alleged falsity of prior statements identified in the Complaint and Plaintiffs Contention Responses related to the integration and interoperable qualities of Suite 11i, or to other previously undisclosed product quality issues.  Rather, the

---

[50] Steinholt Report ¶44.
[51] I remind the reader that according to Steinholt, "[t]he ultimate test of market efficiency is a stock's actual price reaction to unexpected new material information…." (Steinholt Report ¶24).

analyst attributes Oracle's earnings miss to the fact that "customers still desire best of breed solutions designed with the customer in mind verses [sic] a suite that may not be customizable or offering specific industry centric features."[52]

41.     In my opinion, Oracle's earnings miss was a result of the sudden and sharp impact of the economic slowdown on the enterprise software industry.  The evidence does not indicate that the market considered Oracle's 3QFY01 earnings miss to have revealed any previously undisclosed problems with Suite 11i.  In my opinion, Oracle's stock price decline on March 2, 2001 was also not caused by the disclosure of information related to Oracle's savings from its use of the E-Business Suite or the disclosure of information related to alleged accounting errors in 2QFY01.  I find no evidence in the Steinholt Report that links the March 1 pre-announcement to the alleged false and misleading statements to the effect that Suite 11i was "integrated" or "interoperable," previously undisclosed product quality problems with Suite 11i, the alleged 2QFY01 overstatement of earnings and revenues, or the alleged false and misleading statements regarding Oracle's savings from its use of the E-Business Suite as asserted by Plaintiffs.

## VII.    Steinholt's Quantification of Damages Per Share Is Flawed

42.     Steinholt's quantification of damages per share is flawed.  Steinholt's definition of damages per share is inconsistent with my understanding of recoverable damages as defined by *Dura*.  Moreover, Steinholt's use of the constant percentage method for calculating damages per share and his calculation that 100 percent of the residual stock price drop on March 2, 2001 was caused by litigation related factors makes his damages analysis subjective and unscientific.

---

[52] CIBC World Markets, March 16, 2001, 7:36 AM.  As I discussed in my prior report (James Report ¶31), the market commented on the risks resulting from Oracle's strategic decision to compete in the enterprise software market by offering a suite of products during the Class Period.

His calculation of alleged per share inflation is flawed because it includes losses resulting from "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, and other [non-litigation related] events."[53]   In fact, the per share inflation reported by Steinholt assumes that Oracle could have simply pre-announced on December 14, 2000 the very same information contained in the March 1, 2001 press release and earnings conference call.  His per share inflation estimates are also inconsistent with his own assumptions regarding liability and his opinions regarding inflation.  Each of these problems is discussed in more detail below.

43.     Steinholt states, "Damages in securities class actions are usually calculated using the out-of-pocket measure."[54]  According to Steinholt's out-of-pocket methodology, damages are the difference between inflation at purchase and inflation at sale.  While an out-of-pocket calculation may be a step in an assessment of damages in a matter like this, it cannot be the final step.  To calculate *recoverable* damages, one must limit out-of-pocket damages to losses actually caused by the fraud.  I understand that recoverable damages are limited to the appropriate portion of the dollar price decline(s) actually suffered when an alleged misrepresentation or omission is corrected.  Steinholt has not performed this last step.  That is, Steinholt has not determined the portion of the residual dollar decline attributable to the alleged curative disclosures.  In particular, he has not distinguished the price decline caused by the alleged curative disclosures from that caused by other information entering the market.  Moreover, he does not limit recoverable damages to that portion of the actual dollar decline caused by the fraud.  As such, his calculation of alleged damages per share is incorrect in that it is not a measure of the recoverable

---

[53] *Dura*.
[54] Steinholt Report ¶48.

damages as I understand are permitted under *Dura*.  Moreover, Steinholt does not apportion the loss among the various allegations.  Thus, if a court or jury were to reject any of the Plaintiffs' allegations, Steinholt would also be unable to provide an objective opinion regarding recoverable damages resulting from any remaining allegations given his current analysis.

44.     Steinholt states that "the key to calculating out-of-pocket damages is to determine the price at which the security would have traded absent the alleged fraud, also known as the value line."[55]  Under Plaintiffs' theory of inflation, the actual price of Oracle's stock that was observed during the alleged Class Period is alleged to equal the price at which the security would have traded absent the alleged fraud (the true value) plus the alleged inflation.

45.     To calculate inflation, one must determine the price that would have prevailed absent the alleged misstatements or omissions for each day during the alleged Class Period.  To calculate this alleged but-for price, one must specify any alleged change in the information that results from correcting the allegedly false and misleading information, then determine the stock price that would prevail as a result of this change in information holding constant all other information available to the market.  The first step requires Plaintiffs to specify what allegedly could and should have been said (and when) instead of simply identifying the dates on which alleged false and misleading statements were made.  Plaintiffs' specification of what allegedly could and should have been said must be specific enough to allow one to value the alleged incremental information arising from an alleged curative disclosure.  Failure to specify on a daily basis this hypothetical change in the information available to the market as a result of the alleged

---

[55] Steinholt Report ¶50.

fraud precludes one from applying scientific tools to calculate an objective "but-for" price and resulting inflation.

46.     It is essential that any valuation of the hypothetical change in the information be restricted to the information and circumstances as of the time of the valuation without the benefit of hindsight.  For example, it would be inappropriate to value a company as of a particular date using a discounted cash flow analysis if the projected cash flows were based on information that was not available to the market as of the valuation date but became available later.

47.     In the current matter, to calculate accurately the alleged but-for price on a particular day, all alleged non-fraud-related information on that day must be held constant.  For example, to calculate the alleged inflation on December 14, 2000, Plaintiffs must hold constant the alleged non-fraud-related information available to the market on that day and consider only the incremental, hypothetical information that Plaintiffs claim could and should have been disclosed on that day to determine a "but-for" price.  Steinholt's methodology is unable to provide this calculation.

48.     Steinholt's method is subjective and unscientific.  Instead of relying on this objective and scientific method to calculate alleged inflation per share, Steinholt bases his calculation of alleged per share inflation on his measurement of the residual percentage price decline observed at the end of the Class Period.  Moreover, he assumes an alleged constant percent inflation throughout the Class Period.

49.     For example, Steinholt's event study finds that Oracle had a residual return of –$3.57 per share (or –16.68 percent) on March 2, 2001.[56]  Steinholt asserts that this price impact resulted from the alleged truth being "substantially revealed."[57]  Next, he assumes that 100 percent of this residual return relates to the curing of the alleged misstatements and omissions. As stated previously, Steinholt does not specify what allegedly could and should have been said (and when) and thus has no basis for this assertion that the alleged truth was "substantially revealed."[58]  Moreover, he performs no objective, scientific, and reliable analysis to support his assumption that 100 percent of the residual return equates to the valuation impact resulting from the revelation of the alleged truth regarding Oracle's 2QFY01 earnings, 3QFY01 guidance, or Suite 11i and not from non-litigation related factors.  Indeed, Steinholt provides no economic evidence that *any* of the decline was due to revelation of the alleged truth.

50.     Steinholt calculates that the alleged percent inflation in Oracle's stock price was *17.44 percent*.[59]  He then assumes (without providing any objective and scientific analysis) that this 17.44 percent figure applies *throughout the Class Period*.  This assumption is what I previously referred to as constant percentage inflation.  To calculate alleged per share inflation for each day during the Class Period, Steinholt simply multiplies this alleged constant percentage inflation of 17.44 percent times the stock price of Oracle on each trading day during the Class

---

[56] Oracle's gross return of –21.05 percent less the predicted return (per Steinholt's market model) of –4.37 percent equals a residual return of –16.68 percent.  In dollars per share terms, the gross return of –$4.50 per share less the predicted return of –$0.93 per share equals a residual return of –$3.57 per share.

[57] Steinholt Report ¶44.

[58] Steinholt Report ¶44.

[59] The alert reader may wonder:  if the residual return from March 1 to March 2 was –$3.57 or –16.68 percent, then why or how does Steinholt calculate "inflation or damages per share" of $3.73 or 17.44 percent on March 1?  This can be seen on Steinholt's Exhibit I, p. 3.  Steinholt does this by inferring that the true value of Oracle stock on March 1 was $17.65 per share, and the difference between that figure and the actual price of $21.38 is $3.73 per share.  17.44 percent equals $3.73 divided by $21.38, the actual price on March 1.  Whether the alleged "inflation" per share on March 1 was $3.73 as Steinholt asserts or $10, I understand that *Dura* limits recoverable damages (under Steinholt's 100-percent-of-the-March-2 residual assumption) to $3.57 per share.

Period.  For example, to calculate the alleged per share inflation of $3.31 on February 28, 2001, he multiplies 17.44 percent times $19.00 (the actual stock price on that day).  He calculates that the alleged true value of Oracle's stock was 82.56 percent of its actual price each day during the Class Period (82.56 percent equals 100 percent minus 17.44 percent).

51.     Steinholt's assumption of constant percentage inflation throughout the Class Period is subjective and inconsistent with Plaintiffs' own liability assumptions.  As I stated previously, it is essential that any valuation of the hypothetical change in the information be restricted to the information and circumstances as of the time of the valuation, without the benefit of hindsight.  By using the residual price decline observed on March 2, 2001 as the basis for the alleged inflation in Oracle's stock price for all prior dates, Steinholt is not restricting the valuation impact of the alleged truth to the information and circumstances that are available as of the time of valuation.  Rather, he is assuming that *everything* Oracle disclosed on March 1, 2001 could have and should have been disclosed as early as Oracle's 2QFY01 earnings announcement on December 14, 2000.  Indeed, he states, "Had defendants provided complete and truthful disclosures during the Class Period, this would have been incorporated into Oracle's stock price **from the very beginning of the Class Period**…."[60]

52.     In addition to the evidence presented above that indicates Steinholt's assumption of constant percentage inflation is subjective and unscientific, there are several additional problems with this assumption.  The first problem is that his out-of-pocket theory of damages and his assumption of constant percentage inflation would allow him to calculate damages for shareholders who purchased and sold during the Class Period (so-called "ins-and-outs" traders).

---

[60] Steinholt Report ¶52 (emphasis added).

(He has not stated whether he would do so or not.  If he takes his assumption of out-of-pocket damages to its logical conclusion, that would have him calculating damages for such purchasers.) If the dollar value of inflation varies within the Class Period, as it does for Steinholt,[61] then there would be out-of-pocket losses.  While Steinholt's out-of-pocket damages theory and constant percentage inflation assumption may tilt toward his calculating damages for ins-and-outs, under my understanding of *Dura*, Plaintiffs cannot recover losses if the relevant truth has not been disclosed.

*53.*   Even if Steinholt eschews logical consistency and does not intend to calculate damages for ins-and-outs, his constant percentage inflation assumption violates loss causation standards.  For example, consider two hypothetical investors.  One purchases a share on January 16, 2001 and holds the share past the end of the Class Period.  A second investor purchases a share on January 19, 2001 and holds the share past the end of the Class Period.  Steinholt's "inflation or damages per share" for the two investors are $5.55 per share and $6.03 per share, respectively.[62]  Now, on March 2, 2001, Steinholt calculates that there is a $3.57 per share drop that he attributes fully to the disclosure of the alleged truth.  It should not go unnoticed that Steinholt believes our first shareholder should get $6.03 per share, despite the fact that the disclosure of the alleged truth resulted (according to Steinholt) in a $3.57 per share loss on March 2, 2001.  Setting that aside, though, one wonders why the March 1, 2001 pre-announcement allegedly "caused" more of a loss to the second investor than to the first despite the fact that, between these three days, Plaintiffs do not identify any additional alleged false and misleading statements.  In reality, the alleged corrective disclosure caused the same alleged loss

---

[61] For example, his alleged inflation varies from $3.31 per share (on February 28, 2001) to as high as $6.03 per share (on January 19, 2001).  Steinholt Report, Exhibit I, p. 3.
[62] Steinholt Report, Exhibit I, p. 3.

(if any) to each investor.[63]  This example also illustrates the point that Steinholt's use of constant percentage inflation and his reliance on out-of-pocket damages would result in alleged damages that are not consistent with loss causation and my understanding of *Dura*.

54.     Steinholt also presents alleged damages resulting from Section 20A.  He states:

> Based on my discussion with plaintiffs' counsel, it is my understanding that Section 20A damages are either calculated based on:  a) the inflation/damages per share that existed on the date of the insider sales, or b) the losses avoided by defendants by selling the share during the Class Period, as opposed to selling the shares following the Third Quarter 2001 earnings announcement.[64]

55.     He goes on to calculate Section 20A alleged damages as "the difference between the actual sales price and $15.80 per share (average closing price from March 16, 2001 through April 30, 2001) on the day the shares were sold multiplied with the number of shares sold."[65]  This calculation includes losses that do not result from the alleged fraud.  For example, under this formula for "losses", the price decline in Oracle's stock following the March 1, 2001 pre-announcement contributes to the damages calculation even though the March 1, 2001 ends the Class Period.

56.     Steinholt also provides a calculation of Section 20A damages based upon his calculation of alleged inflation.  This calculation is also flawed because of all of my prior criticisms of Steinholt's calculation of inflation discussed above, including the fact that this calculation includes losses that do not result from the alleged fraud.

---

[63] Put slightly differently, the difference in "inflation" between the two trading days in the example cannot have been caused by the alleged fraud, as there was nothing revealed about the alleged fraud between January 16 and January 19, 2001.

[64] Steinholt Report ¶54.

[65] Steinholt Report ¶54.

Executed on this 22nd day of June in 2007 in Menlo Park, CA.

Christopher M. James

# Exhibit 1
# DOCUMENTS RELIED UPON

| Document Title / Source | Bates Numbers | Document Date |
| --- | --- | --- |

## Legal Documents

Revised Second Amended Complaint | | December 9, 2002

Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs | | January 31, 2007

## Court Decisions

*Dura Pharmaceuticals v. Broudo*, 125 S. Ct. at 1627, 1629 (2005)

## Expert Reports

Expert Report of Alan G. Goedde | | May 25, 2007

Expert Report of D. Paul Regan | | May 25, 2007

Declaration of Brooks L. Hilliard | | May 25, 2007

Expert Report of Bjorn I. Steinholt, with Exhibits | | May 25, 2007

## Academic Literature

Bagley, Constance E., *Managers and the Legal Environment: Strategies for the 21st Century*, West Publishing Company, 1991

Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997

Thorsen, Madge S., Richard A. Kaplan, and Scott Hakala, "Rediscovering the Economics of Loss Causation," 6 J. Bus. & Sec. L. 93, 2006

## Conference Call Transcripts

Oracle's 2QFY01 Conference Call Transcript | | December 14, 2000

Exhibit 1

| Document Title / Source | Bates Numbers | Document Date |
|---|---|---|

### SEC Filings

Oracle's SEC Filing for the quarter ending November 30, 2000, filed on January 16, 2001

### Analyst Reports

| | | |
|---|---|---|
| Robertson Stephens | *NDCA-ORCL 005758-63* | January 18, 2001 |
| Banc of America Securities | *BOA 01071-4* | February 7, 2001 |
| SG Cowen Securities, Inc. | *SG 0170-93* | February 7, 2001 |
| First Union Securities, Inc. | *NDCA-ORCL 091531-3* | February 8, 2001 |
| Goldman Sachs | | February 9, 2001 |
| William Blair & Co. | *NDCA-ORCL 419993-6* | February 22, 2001 |
| CIBC World Markets Corp. | *NDCA-ORCL 309144-50* | February 23, 2001 |
| CIBC World Markets Corp. | *NDCA-ORCL 309244-54* | March 16, 2001 |

### Press Releases

| | |
|---|---|
| "Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19%," Oracle Press Release | December 14, 2000 |
| "Oracle Announces Preliminary Third Quarter Earnings Results," Oracle Press Release | March 1, 2001 |

### Data Sources

*CRSP*, *Bloomberg*, and *First Call* data as used in the Expert Reports of Bjorn I. Steinholt and Chris James dated May 25, 2007

# Exhibit 2
## Oracle Corporation
## Analysts' Consensus EPS Estimate for 3QFY01
## 11/14/00 – 1/1/01
Source:  First Call

| Date | EPS |
|------|-----|
| 11/14/00 | $0.12 |
| 11/15/00 | $0.12 |
| 11/16/00 | $0.12 |
| 11/17/00 | $0.12 |
| 11/20/00 | $0.12 |
| 11/21/00 | $0.12 |
| 11/22/00 | $0.12 |
| 11/23/00 | $0.12 |
| 11/24/00 | $0.12 |
| 11/27/00 | $0.12 |
| 11/28/00 | $0.12 |
| 11/29/00 | $0.12 |
| 11/30/00 | $0.12 |
| 12/1/00 | $0.12 |
| 12/4/00 | $0.12 |
| 12/5/00 | $0.12 |
| 12/6/00 | $0.12 |
| 12/7/00 | $0.12 |
| 12/8/00 | $0.12 |
| 12/11/00 | $0.12 |
| 12/12/00 | $0.12 |
| 12/13/00 | $0.12 |
| 12/14/00 | $0.12 |
| 12/15/00 | $0.12 |
| 12/18/00 | $0.12 |
| 12/19/00 | $0.12 |
| 12/20/00 | $0.12 |
| 12/21/00 | $0.12 |
| 12/22/00 | $0.12 |
| 12/25/00 | $0.12 |
| 12/26/00 | $0.12 |
| 12/27/00 | $0.12 |
| 12/28/00 | $0.12 |
| 12/29/00 | $0.12 |
| 1/1/01 | $0.12 |