UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

**Certified Copy**

IN RE
ORACLE CORPORATION
SECURITIES LITIGATION

MASTER FILE NO.
C-01-0988-MJJ

This Document Relates To:

    ALL ACTIONS

_____/

-oOo-

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PHILIP B. SIMON

September 6, 2006

-oOo-

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, CA 94105
Telephone: (415) 321-2300
Fax: (415) 321-2301

-oOo-

Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
CSR License No. 5735

```
 1        MR. SOLOMON:  Okay.  Mark as the next exhibit a
 2   document produced by defendants with control numbers 294238
 3   and 239.
 4        (Exhibit 31 was marked for identification.)
 5        BY MR. SOLOMON:
 6        Q.   Let me know, when you've had a chance to look at
 7   it, if you recognize this.
 8        A.   This appears to be an e-mail from me to Carolyn
 9   Balkenhol dated January 26, 2001.
10        Q.   Did you have a practice of reporting to
11   Ms. Balkenhol the transactions that you were engaged in
12   with Mr. Ellison?
13        A.   That would appear to be the case, yes.
14        Q.   Were you speaking with Ms. Balkenhol on a daily
15   basis during this time?
16        A.   I don't recall, but I may have.
17        Q.   Do you -- strike.
18             I've marked as the next exhibit a document
19   produced by the defendants with the control number 357858.
20        (Exhibit 32 was marked for identification.)
21        MR. SOLOMON:  Tell me if you recognize this after
22   you've had a chance to look at it.
23        THE WITNESS:  This appears to be an e-mail from Dan
24   Cooperman to me dated January 26, 2001.
25        BY MR. SOLOMON:
```

1    Q.   Okay.  And it starts saying, "Philip, at your
2  request the trading clearance below is extended -- is
3  extended an additional 7 days, now expiring at the close of
4  the market on Friday, February 2, 2001."  Do you see that?
5    A.   Yes, I do.
6    Q.   You requested of Mr. Cooperman seven days
7  additional trading clearance; is that right?
8    A.   That appears to be the case.
9    Q.   And do you know what prompted that request?
10    A.   Yes.  We were in the midsts of a trading program,
11  and I believe my first authorization was -- each time I was
12  authorized for 7 days.  I was told to check back after 7
13  days, so I checked back and got a further clearance to
14  ensure that there was further clearance.
15    Q.   Now you'll see it says that the expiration now is
16  Friday, February 2nd, 2001.  Do you see that?
17    A.   Yes, I do see that.
18    Q.   Did you ask for any extensions after this
19  particular request was granted?
20    A.   I don't recall.
21    Q.   Okay.
22    A.   Though I would note that I believe trading
23  stopped, the final day of trading was January 31st.
24  Because I was cleared through February 2nd.  Since we
25  stopped trading, logically, I would not have asked.  But I

```
 1   may have, I don't recall.
 2       Q.   Okay.
 3            And you were familiar with at least the practice
 4   at that time at Oracle, and that was not to trade at all in
 5   the last month of the quarter?
 6       MS. KYROUZ:  Objection.  Misstates prior testimony.
 7       THE WITNESS:  I was told you were allowed to trade
 8   Oracle up until the last two weeks of the third month of
 9   the quarter.  And that was the rule I was given.
10   BY MR. SOLOMON:
11       Q.   There was never a but?  You never heard "but the
12   practice here is not to trade at all in the last month"?
13   You never heard that?
14       A.   I remember being told it would be better if you
15   did not, but you're free to because optically it might look
16   worse.  Or something like -- I want to -- I don't know what
17   they said.
18            I knew that you could trade until -- up until the
19   last two weeks of the quarter, but it's better if you only
20   trade up until the end of the second month of the quarter.
21       Q.   I've marked as the next exhibit a document
22   produced by defendants with the control numbers 294216 and
23   217.
24       (Exhibit 33 was marked for identification.)
25   BY MR. SOLOMON:
```

1    MR. SOLOMON: Have marked as the next exhibit a
2    document produced by the defendants with control numbers
3    300652 to 654.
4        (Exhibit 41 was marked for identification.)
5    BY MR. SOLOMON:
6        Q.  Let me know if you recognize it when you've had a
7    chance to review it.
8        A.  I have no recollection of this document, but it
9    appears to be an e-mail from me to Larry Ellison dated
10   Wednesday, January 31, 2001, sent at 12:38 p.m. Pacific
11   Standard Time.
12       Q.  Okay.  And, again, you're reporting on this
13   occasion to Mr. Ellison the results of sales transactions,
14   correct?
15       A.  That's what it appears to be, yes.
16       Q.  And does this appear to be the final tally?
17       A.  I believe that's the case; but, uhm, I will find
18   out as we get to the next e-mail.  I think we stopped on
19   the 31st, but I don't recall.
20       Q.  And you'll see under point 2, and I think you
21   referred to this number earlier on, you see cumulative
22   gross sale proceeds of 894 million --
23       A.  Correct.
24       Q.  -- and some hundreds of thousands of dollars.  Do
25   you see that?

```
 1      A.   Uh-huh.
 2      Q.   And then at the bottom you say "PS, the U.S.
 3   capital markets are pretty amazing, raising almost
 4   $1 billion in eight days."  Were you surprised -- sounds
 5   like you were pretty surprised that you were able to
 6   accomplish that.
 7      A.   No.  It's just more comment about we live in a
 8   wonderful country with wonderful capital markets, and
 9   commenting about it.
10      Q.   There was a floor price of $30 per share; is that
11   right?
12      A.   At one point in time during the period I believe
13   there was.  I do not recall if it was maintained throughout
14   the period.
15      Q.   Okay.  Do you know how that $30 minimum came
16   about?
17      A.   No, I don't recall.
18      Q.   Do you believe -- do you have any belief as to
19   whether or not it was Mr. Ellison's idea or not?
20      A.   Since I follow instructions, it was most likely a
21   result of discussion between Larry and me.  Or I should
22   say -- "discussion."  Communication because it could have
23   been e-mail or -- if that floor price did exist throughout
24   the trade period.
25           MR. SOLOMON:  I'll have marked as the next exhibit a
```

```
 1   document produced by defendants with the control numbers
 2   294252 to 254.
 3        (Exhibit 42 was marked for identification.)
 4   BY MR. SOLOMON:
 5        Q.   And, again, when you've reviewed it, let me know
 6   if you recognize it, please.
 7        A.   I do not recall this document, but it appears to
 8   be an e-mail from me to Kim Clarke at Merrill Lynch dated
 9   Tuesday, January 30th, 2001, with cc's to Carolyn Balkenhol
10   and Catherine Ong.
11        Q.   Okay.  And, then, what's the relationship between
12   Mr. Ellison and Integral Capital Partners?  Or what was it?
13        A.   Integral Capital Partners is an investment
14   partnership; and Larry had been an investor in Capital
15   Partners and the partnership liquidated, sold most of its
16   assets, and issued some shares in kind to its investors.
17        Q.   Okay.  And these refer to Oracle shares?
18        A.   Correct.
19        Q.   And was Integral Capital Partners liquidated in
20   order to sell the shares?
21        A.   No.  These came out from the Integral Capital
22   Partners years before.
23        Q.   Okay.
24        A.   And I was tracking them because they had a high
25   tax basis, as opposed to the founders stock.
```

```
 1   294269 and 270.
 2        (Exhibit 45 was marked for identification.)
 3        THE WITNESS:  I've reviewed the document.
 4        BY MR. SOLOMON:
 5        Q.   Do you recognize this?
 6        A.   I don't recall the document, but it appears to be
 7   an e-mail exchange from -- with me and Carolyn Balkenhol
 8   dated February 27, 2001.
 9        Q.   Okay.
10             Looking at the e-mail from you to Carolyn
11   Balkenhol, you, first of all, in the first paragraph talk
12   about a trip that you're making to New York; and you say
13   you're going to meet the head of NASDAQ trading for Merrill
14   Lynch, correct?
15        A.   That's what it says, yes.
16        Q.   What was the purpose of meeting with him?  Or her?
17        A.   I wasn't happy with the execution we received on
18   the trades from Merrill Lynch.
19        Q.   Now, which is reflected where you say "I was not
20   fully satisfied"?
21        A.   Correct.
22        Q.   And what was it that you were unhappy about or not
23   satisfied with?
24        A.   I don't believe we got the best price, and I
25   thought -- I was suspicious they had marked up the price.
```

```
 1    I had asked for transparency in the commission they were
 2    quoting to me I was promised that, but I was suspicious
 3    that they clipped us.
 4         Q.   When you say -- that's interesting.
 5              When you say "they," who are you referring to?
 6         A.   Merrill Lynch.  Institutionally.  Not individuals
 7    at Merrill Lynch, Merrill Lynch institutionally.
 8         Q.   You say, "I was not fully satisfied," then you say
 9    in parens, "(maybe wrongfully so but I'll learn more in
10    New York) with the way the trading went when we sold the
11    29 million shares.  Big picture, we did wonderfully,
12    29 million shares sold at a good price, very discreet, the
13    market really didn't pick up on the sales until we were
14    almost done.  In many ways I'd rate the outcome as an A,
15    but I was hoping it would match or get close to the daily
16    volume weighted average price each day.  We did on a few
17    days, but generally only when Oracle traded below our 30
18    limit."  That's the $30 limit, correct?
19         A.   Correct.
20         Q.   "Otherwise we tended to be 12 to 13 cents off."
21              Is it your belief that Merrill Lynch was somehow
22    ripping you off to the tune of 12 to 13 cents?
23         A.   Are you asking me about the time I sent this
24    e-mail or after I came back from New York?
25         Q.   Take them one at a time.  When you wrote the
```

```
 1   e-mail?
 2      A.    At the time I sent the e-mail I was suspicious.
 3      Q.    You say here you would learn more in New York,
 4   right?
 5      A.    Correct.
 6      Q.    Did you learn more in New York?
 7      A.    Yes.
 8      Q.    Did your opinion change?
 9      A.    What?
10      Q.    Did you change your opinion or your view?
11      A.    I went from suspicious to absolute certainty.
12      Q.    That you had been ripped off?
13      A.    Let me put it this way:  They promised me complete
14   transparency and a certain stated commission, and that's
15   what the people thought they were getting, and I believed
16   them.  But they were not sophisticated enough to control
17   their NASDAQ desk, and the NASDAQ desk was lying or
18   omitting to tell the people I was working with in Newport
19   Beach.  And I spent a day in meetings in New York and they
20   obfuscated, never said anything, until I met with the head
21   trader.  And I said, "Okay, bygones are bygones."  I said,
22   "We just want to learn from the experience.  How can I do
23   it better in the" past?  "In the future."
24            And the measure of performance is volume weighted
25   average price or what's called VWAP.  VWAP is the standard
```

1  calls a year.  And during certain periods, you know, more
2  regular as you saw here; but I've had no -- I've been
3  treated very -- I'm very amicable but --
4      BY MR. SOLOMON:
5      Q.   He hasn't yelled at you?
6      A.   -- brief.
7           I've never been yelled at.  And I have a brief,
8  short relationship with Larry.  When we talk on the phone
9  it's a minute or two minutes dealing with specific business
10 transactions.  In contrast with Carolyn, after we do the
11 business I'll say, "how are your children doing?"  And
12 we'll talk about her children.  So I have a different
13 relationship with Carolyn than I would with Larry.
14      Q.   What was the issue that she felt you hadn't
15 protected her concerning?
16      MS. KYROUZ:  Objection.  Vague.
17      THE WITNESS:  This happened in 2005 or 2006.
18      MS. KYROUZ:  Also, objection.  Relevance.
19      THE WITNESS:  I'm trying to figure out exactly what --
20 I don't totally understand, but I probably was -- I don't
21 really understand the issue, but we're beyond it.  It's one
22 of personal hurt feelings.
23          This has nothing to do with the -- with the
24 Oracle securities sales, it has nothing to do with Larry's
25 financial business.  It has to do with personal

1  relationships, and I hurt her feelings.
2      MR. SOLOMON: Okay.
3      All right. Well, let's take a break; and then,
4  hopefully, we'll get done very quickly after the break.
5      THE VIDEOGRAPHER: Off the record at 4:08.
6      (Recess taken.)
7      THE VIDEOGRAPHER: On record at 4:15.
8      MR. SOLOMON: I've marked as the next exhibit a
9  printout of a San Francisco Chronicle article.
10     (Exhibit 50 was marked for identification.)
11     THE WITNESS: Okay. I've read this exhibit.
12     BY MR. SOLOMON:
13     Q.  Do you recognize this as the article we discussed
14  earlier?
15     A.  It appears to be.
16     Q.  Looking at page 4, at the top where it says
17  "page 4 of 6."
18     A.  Uh-huh. Yes.
19     Q.  First of all, the floor price of $30 -- I know we
20  mentioned this earlier, I just want to be absolutely sure.
21  You don't recollect who insisted on the floor price of $30
22  per share? Is that fair?
23     A.  I said I have no current recollection, but I
24  suspect Larry insisted on it.
25     Q.  Okay.

1           And you see that there was the floor of $30 a
2    share and this report says, "Oracle's shares fell to $16.88
3    in March of that year, after Oracle warned that its third
4    quarter profit would not meet market expectations." Do you
5    see that?
6       A.   I see that.
7       Q.   And do you remember we started off today with me
8    asking whether you recalled in March Oracle announcing that
9    it missed its numbers and the stock price collapsing. And
10   I think your testimony this morning was you didn't have a
11   recollection?
12      A.   That is correct.
13      Q.   Does this refresh your recollection?
14   MS. KYROUZ: Objection. Lacks foundation.
15   BY MR. SOLOMON:
16      Q.   Go ahead.
17      A.   The answer is no because I don't know if this is
18   an accurate -- this is just an article in the newspaper.
19   I'm not trying to be facetious here, but this is an article
20   in the newspaper. And I think it was published recently,
21   I'm not sure when. In January 2006. So I don't know if
22   this is accurate or not. It probably is, but I don't know.
23   But it doesn't refresh any recollection because I was
24   not --
25      Q.   Okay.

```
1  STATE OF CALIFORNIA     )
2  COUNTY OF SAN MATEO     )
3          I hereby certify that the witness in the
4  foregoing deposition,
5  was by me duly sworn to testify to the truth, the
6  whole truth, and nothing but the truth in the
7  within-entitled cause; that said deposition was taken
8  at the time and place herein named; that the
9  deposition is a true record of the witness's testimony
10 as reported by me, a duly certified shorthand reporter
11 and a disinterested person, and was thereafter
12 transcribed into typewriting by computer.
13         I further certify that I am not interested in
14 the outcome of the said action, nor connected with,
15 nor related to any of the parties in said action, nor
16 to their respective counsel.
17         IN WITNESS WHEREOF, I have hereunto set my
18 hand this  20   of  September , 2006.
19
20
21         _____
22              KELLIE A. ZOLLARS, CSR
23              STATE OF CALIFORNIA
24
25
```

**LIVENOTE | World Service**℠
Worldwide Deposition Reporting & Legal Videography

# ERRATA Sheet

Deposition of: PHILIP B. SIMON

I wish to make the following changes for the following reasons:

| Page | Line | Change | Reason |
|---|---|---|---|
| 12 | 16 | delete "not" | clarify explanation |
| 21 | 23 | delete entire line; replace with "a small firm that had just broken away from a" | clarify language |
| 31 | 3 | after "him", add words: "about that" | clarify answer |
| 32 | 2 | "code terminus" - should be "co-terminus" | Correct typo |
| 33 | 4 | Should be: "I have no recollection about 1994" | clarify - 1st part of question answering |
| 39 | 22 | delete "uncovered" & insert "not covered by the document request" | Correct typo & clarify answer |
| 46 | 15 | change line to: "of conversations at this point in time." | to clarify answer is to question about conversations |
| 63 | 11 | change "rarely speak on the phone" to "infrequently speak on the phone" | to be more precise |
| 63 | 12 | insert word "primarily" before "via email" | to be more precise and to clarify answer |
| 77 | 20 | "selling" should be "saving" | Correct typo or use of wrong word in error |
| 105 | 16, 17, 18 | Mary Joe is spelled Mary Jo | Correct spelling |

Witness Signature/Date _[signature]_  9/26/06

Thank you for using LiveNote World Service for your reporting needs.
For assistance, please call 800-LIVENOTE (548-3668)

221 Main Street, Suite 1250, San Francisco, CA 94105
www.livenoteworldservice.com

**ERRATA Sheet**
Deposition of: PHILIP B. SIMON

**LIVENOTE/World Service**
Worldwide Deposition Reporting Legal Videography

| | | I wish to make the following changes for the following reasons: | |
|---|---|---|---|
| Page | Line | Change | Reason |
| 182 | 9 | "Thed" to "When" | Correct typo or sloppy speaking |
| 188 | 19/21 | "Larsos" to "Luerssen" | Correct spelling |
| 216 | 22 | "filler" to "filter" | Correct typo |

Witness Signature/Date [signature]   9/26/06

## Page 225

1  my possession -- and what date was it in 2000?
2  MR. SOLOMON: In the third fiscal quarter of 2001.
3  THE WITNESS: -- (continuing) in the third fiscal
4  quarter of 2001 are still in my possession or in storage.
5  MR. SOLOMON: Okay.
6  THE WITNESS: There has been no -- to the best of my
7  knowledge, there's been no destruction of any documents,
8  physical documents.
9  BY MR. SOLOMON:
10  Q. Okay. And then once your staff has time to devote
11  to the project and you have time to devote to the project
12  in November sometime of this year, how long do you estimate
13  it would take to be able to recover the physical documents?
14  MS. KYROUZ: Objection. Lacks foundation.
15  THE WITNESS: I would have to review -- I would have
16  to know which documents you want and how many files we'd
17  have. I would say a reasonable time -- we're also busy in
18  December. If we start in November, maybe we could get done
19  by the end of November, we have Thanksgiving. Maybe we
20  need into February. But, basically, within three months of
21  when we start we should be able to search the files and
22  find documents.
23  MR. SOLOMON: Okay. All right.
24  Okay. Well, subject to resolving any dispute
25  concerning those documents, I'm finished with my

## Page 226

1  questioning. But should the Court order that those
2  documents be produced, then I'll reserve the right to
3  question you further once I've seen those documents. And
4  in the meantime, thank you for your testimony.
5  THE WITNESS: You're very welcome.
6  MS. KYROUZ: We obviously disagree with the position.
7  Please mark the deposition confidential.
8  THE VIDEOGRAPHER: This marks the end of Videotape 4,
9  Volume I in the deposition of Philip B. Simon. The
10  original videotapes will be retained by LiveNote World
11  Service. We're going off the record. The time on the
12  video monitor is 4:45.
13  (At 4:45 p.m. the deposition proceedings
14  concluded.)
15  -oOo-
16
17
18
19  PHILIP B. SIMON
20
21  *[signature]*
22
23
24
25  10/9/06

## Page 227

1  STATE OF CALIFORNIA )
2  COUNTY OF SAN MATEO )
3  I hereby certify that the witness in the foregoing
4  deposition, PHILIP B. SIMON, was by me duly sworn to
5  testify to the truth, the whole truth, and nothing but the
6  truth, in the within-entitled cause; that said deposition
7  was taken at the time and place herein named; that the
8  deposition is a true record of the witness's testimony as
9  reported by me, a duly certified shorthand reporter and a
10  disinterested person, and was thereafter transcribed into
11  typewriting by computer.
12  I further certify that I am not interested in the
13  outcome of the said action, nor connected with, nor related
14  to any of the parties in said action, nor to their
15  respective counsel.
16  IN WITNESS WHEREOF, I have hereunto set my hand
17  this 20th day of September, 2006.
18
19
20  _____
21  KELLIE A. ZOLLARS, CSR
22  STATE OF CALIFORNIA
23
24
25

Case: In re Oracle Securities Litigation, Master File No. C-01-0988MJJ

Witness: Philip B. Simon

Date: September 6, 2006

Reporter: Kellie A. Zollars, CSR No. 5735

I HAVE READ THE EXAMINATION AS REQUESTED. PLEASE NOTE THE FOLLOWING:

_____   No changes need to be made to the transcript.

\_\_X\_\_   Changes listed below.

_____   10/16/06
WITNESS SIGNATURE                              DATE SIGNED

Note: Please check the appropriate column for add (+) or delete (-). If you wish to add anything to the deposition, use the <u>exact</u> words you want to add. If you wish to <u>delete</u> anything from the deposition, please use the <u>exact</u> words you want to delete. Thank you.

| Page | Line | + | - |
|---|---|---|---|
| 12:17 | Add "saved" after "those" | | |
| 31:3 | Add "about that" after "him" | | |
| 32:2 | Change "code terminus" to "co-terminus" | | |
| 33:4 | Add "about 1994" after "recollection" | | |
| 77:20 | Change "selling" to "paying" | | |
| 105:16-18 | Change spelling of "Mary Joe" to "Mary Jo" | | |
| 188:19,21 | Change spelling of "Larson" to "Luerssen" | | |
| 216:22 | Change "filler" to "filter" | | |

SV\527218.1