IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

                         Master File No. C-01-0988-MJJ

This Document Relates To:


     ALL ACTIONS.

_____/


                    ---o0o---


     VIDEOTAPED DEPOSITION OF EDWARD YOURDON

               TUESDAY, JULY 3, 2007

                    ---o0o---




               SHEILA CHASE & ASSOCIATES
                    REPORTING FOR:
                 LiveNote World Service
              221 Main Street, Suite 1250
             San Francisco, California 94105
                  Phone:  (415) 321-2311
                   Fax:  (415) 321-2301

Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

1    electronic form.

2        Q.   Okay.

3        A.   It was more likely to be the opposite, that I

4    would have received electronic versions, which if I

5    found convenient I could print out on my own.

6        Q.   Sure.  With respect to the deposition

7    transcripts that you received in electronic form on CDs,

8    were those among the CDs that we just talked about, 12,

9    or were these additional CDs?

10       A.   No.  They were among the CDs that I mentioned.

11       Q.   Among those; okay.  Do you know how many

12   depositions were taken in this case?

13       A.   I don't.

14       Q.   Do you think or do you believe that you have

15   reviewed them all?

16       A.   No.  I did not ask to nor was I asked to

17   review depositions associated with aspects of this case

18   that are beyond my assignment.  Some of the accounting

19   matters and forecasting matters, as I understand, had

20   depositions involving appropriate witnesses.  So, those

21   I definitely did not review.

22       Q.   All right.  Let me -- well, you did provide

23   some generalized opinion regarding forecasting matters

24   though; didn't you?

25            MR. RAWLINSON:  Objection; mischaracterizes

 1    the witness's report.

 2              THE WITNESS:  I offered opinions in a couple

 3    of parts of my reports that had to do with such matters,

 4    yes.

 5              MR. WILLIAMS:  Q.  Right.  So do you know

 6    whether you reviewed all of the depositions concerning

 7    or which touched upon forecasting issues in this case?

 8              MR. RAWLINSON:  Objection; vague and

 9    ambiguous.

10              THE WITNESS:  I don't know.  The ones that I

11    reviewed in that particular area have been itemized and

12    cited in my report.

13              MR. WILLIAMS:  Q.  Okay.  And just going back

14    to my earlier question as to whether or not you reviewed

15    all of the depositions, I think your testimony generally

16    was that you did not review or you don't believe you

17    reviewed depositions relating to other portions of the

18    case that may not be related to your expert testimony;

19    is that fair?

20         A.   Not quite.  As I tried to qualify it, I did

21    not make any attempt to review the brood range of all

22    such depositions in other financial and forecasting and

23    accounting matters.  I was asked to review a limited

24    number of such depositions, which I did, and which are

25    cited in my report.

Yourdon, Edward                                                          7/3/2007

1        Q.    So any deposition that is not cited in your

2    report relating to issues other than computer

3    programming type issues you did not review?

4        A.    I believe that's too narrow.  Because some of

5    the depositions that were relevant to my report involve

6    things beyond just computer programming, per se.  I was

7    trying to characterize the depositions associated with

8    accounting and financial and forecasting things as

9    opposed to anything associated with the product or the

10   implementation of the product or the success of the

11   product in customer implementation.  Those are the ones

12   I concentrated on.

13       Q.    Did you select the depositions you were going

14   to review or did someone else select them for you?

15            MR. RAWLINSON:  Objection; ambiguous.

16            THE WITNESS:  It was a combination.  In some

17   cases counsel suggested to me that they felt certain

18   depositions would be useful.  In other cases either I

19   saw reference to other depositions or references to

20   individuals that I thought were probably important

21   enough that they might have been deposed, so I asked if

22   such depositions had been taken and if I could review

23   them.

24            MR. WILLIAMS:  Q.  With respect to the

25   documents you received, who selected the documents that

1          MR. WILLIAMS:  Q.  And someone who writes as

2    much as you do is very likely to also be criticized for

3    some of their views; is that fair?  Or people disagree

4    with some of your views?

5          A.   I imagine there are people somewhere who

6    disagree with some of the views I've expressed.

7          Q.   If you look at paragraph 5 of your report,

8    you -- I'll give you a chance to get there?

9          A.   I've gotten there.

10         Q.   You list several books from 19 -- I would say

11   1994 through 2004.  Are those the only books that you've

12   written in that space of time?

13         A.   No.

14         Q.   Are there any books that you did not include

15   in that paragraph?

16         A.   There are one, perhaps two books about the

17   so-called Y2K phenomenon in that list.  There may be

18   others as well.  Those are the two that I've noticed

19   looking at this list.

20         Q.   What are the titles of those books?

21         A.   One of them is called Time Bomb 2000, and the

22   other one for which I was -- actually, I was a co-author

23   on that one as well, but the other one I believe it was

24   "A Financial Guide to the Y2K Problem," or entitled

25   roughly along those lines, also co-authored.

1       Q.    Why did you leave those two off of that list?

2       A.    Because they were of a less technical nature,

3    unlike these books that were aimed at a technical

4    audience, those books were aimed more at the general

5    public.

6       Q.    And were they or were they not relating to

7    anticipated problems that could occur as a result of,

8    you know, speculative Y2K computer glitches?

9       A.    I would disagree with the characterization of

10   speculative.

11      Q.    How would you characterize it?

12      A.    I would characterize it as problems for which

13   the American economy spent roughly 100 billion dollars

14   for real technical problems associated with computer

15   difficulties that would occur both before and after

16   January 1st, 2000.

17      Q.    And what were some of those technical

18   problems?

19      A.    The problems all revolved around the central

20   issue of whether the millions and millions of computer

21   systems around the world would properly recognize the

22   so-called rollover or transition from December 31st,

23   1999 to January 1st, 2000 without either stopping

24   completely or possibly misunderstanding the date to be

25   January 1st of 1900 or various other erroneous decisions

1   or actions.

2       Q.   Now, you say, however, that those books were

3   less technical in nature than the others that you

4   included here?

5       A.   That's correct.

6       Q.   And can you describe in what fashion they were

7   less technical?

8       A.   Because they were aimed at an audience of

9   non-technical people to try to explain these computer

10  issues that I've just summarized in language that I

11  hoped non-technical people would understand, along with

12  a discussion of some of the possible consequences that

13  they might see in their day-to-day lives.

14      Q.   And the books that you've cited here were for

15  an audience of primarily technical people, the ones you

16  cited in paragraph number 5?

17      A.   Yes, that's correct.

18      Q.   And so you would not expect generally for --

19  well, let me withdraw that.

20           How would you define or describe technical or

21  non-technical people?

22      A.   In the context of this discussion that we've

23  been having, I would define technical people as being

24  people who had a background and education in the field

25  of computer hardware or software, and most likely people

1      A.    Yes, that's correct.

2      Q.    And no doubt they have the source code; right?

3      A.    I would assume they have the source code.

4  Someone should have the source code, and I believe they

5  do, yes.

6      Q.    You understand also that there are issues

7  pertaining to the demonstration systems or demonstration

8  environments for 11i software during the period that

9  this lawsuit pertains to; right?

10      A.    Yes, I am aware of that.

11      Q.    Did you at any point between, I guess, January

12  of 2007 to today have access to any of the demonstration

13  systems that were -- are at issue in this case?

14      A.    No, I did not.

15      Q.    And so you didn't attempt to do a

16  demonstration of any version or release of 11i software

17  on any of the demonstration systems that were in use

18  during the time relevant to this case?

19      A.    No, I did not do that.

20      Q.    Did you inspect any of the software code,

21  source code, that was used to create or maintain the

22  demonstration systems that were in use during the time

23  frame pertaining to this case?

24           MR. RAWLINSON:  By time frame, you mean the

25  last period or something else?

1          MR. WILLIAMS:   No.

2      Q.   Do you have an understanding of the time frame

3   that pertains to this case?

4      A.   Well, I've seen different descriptions of the

5   time frame, and I'm not sure which one you're referring

6   to.

7      Q.   Why don't we just say from June 2000 to June

8   2001, that's what I mean by pertaining to this case,

9   unless I say otherwise.

10      A.   Okay.

11      Q.   Did you view -- I forgot my question.  Can you

12   read the last question back, please.

13          (Record read as follows:  QUESTION:  Did you

14          inspect any of the software code, source code,

15          that was used to create or maintain the

16          demonstration systems that were in use during

17          the time frame pertaining to this case?)

18          THE WITNESS:  No, I did not.

19          MR. WILLIAMS:   Q.  And source code actually

20   becomes software at some point; is that fair?

21      A.   That's not how most technical people would

22   describe it.  Source code through one mechanism or

23   another becomes executable software or executable code

24   or binary code.

25      Q.   And just so, I'm not a technical person, just

1    so I'm not missing anything, I haven't missed some

2    category of source code, software or any other related

3    information that you may have tested but I simply have

4    not asked the question?

5        A.    I don't know what else you may have had in

6    mind.

7        Q.    Okay, that's fine.  All right.  One of the

8    issues pertaining to the allegations in the case relate

9    to representations that 11i software was, you know,

10   preintegrated and interoperable generally; is that fair

11   to say?  You understand that?

12       A.    Yes, yes, I do.

13       Q.    And you provide in paragraph 100 a definition

14   of what you believe an end-user would understand

15   integration to mean?

16       A.    Yes, I do.

17       Q.    Is that fair?

18       A.    Yes.

19       Q.    And in your view an end-user is someone who is

20   using the software doing day-to-day activities, someone

21   actually making use of the software; is that fair?  Or

22   would you describe that differently?

23       A.    Well, in paragraph 100, I also refer to

24   business professionals.  But -- let's see whether that's

25   the paragraph where the phrase end-user appears.  In

1    program did not work together in parts of 11i, would 11i

2    still be integrated?

3         A.    I'm still confused, because the word

4    processing program is not part of 11i or anything like

5    11i, so I --

6         Q.    Does that matter, if there are programs within

7    11i that did not work together, would you still find

8    that 11i was integrated?

9         A.    If there were programs within 11i that did not

10   work together in the broad sense of the term work

11   together, and if I understood in detail what we meant by

12   that, then I might draw such a conclusion.

13        Q.    What do you mean by the broad sense of the

14   word?

15        A.    Well, I did not provide all of the details of

16   the manner in which I would expect the word processing

17   document to be -- sorry, the manner in which spreadsheet

18   tables could be incorporated into the word processing

19   document.  I was referring to that in a fairly broad

20   sense.  There might be 1,000 detailed elements of such

21   incorporation, and I did not mean that necessarily to

22   intend that, you know, that all 1,000 necessarily had to

23   be incorporated, but that in the broad sense that if

24   end-users or IT professionals looked at it they would

25   say it appears that spreadsheets and word processing

1    documents can be incorporated into one another.

2         Q.   Have you ever used 11i?

3         A.   No, I have not used it.  I've used other ERP

4    systems, but not 11i.

5         Q.   Same paragraph, few lines down, you say that,

6    "The same is true for ERP products.  The marketplace

7    expects that an integrated ERP product will have

8    financial modules, human resources modules,

9    manufacturing modules, and other modules that work

10   together so that day-to-day business activities can flow

11   back and forth as needed between different software

12   components."  Right?

13        A.   Yes.

14        Q.   So that's generally your definition of what

15   integrated means with respect to ERP software?

16        A.   In general terms, yes.

17        Q.   And so if someone in the marketplace found

18   that the financial modules and human resource modules

19   did not quote, unquote, work together, allowing them to

20   do day-to-day business activities, would it be correct

21   that 11i was not integrated, or at least an ERP product

22   was not integrated?

23        A.   Not necessarily.  Because as you can see in

24   the very next sentence, there is the statement that how

25   well components work together is often in the eye of the

1    beholder.

2            So, in your example, there may be one person

3    or one business user within the marketplace that feels

4    that the components of the ERP product do not work

5    together as they need, that does not necessarily mean

6    that the product as a whole would not be considered

7    integrated.

8        Q.   Okay.  So in your view it's -- it depends on

9    the numbers of people or end-users who may not be able

10   to conduct the business -- day-to-day business

11   activities that would allow one to determine whether or

12   not the product was, indeed, integrated?

13           MR. RAWLINSON:  Objection to form.

14           THE WITNESS:  I think it would depend on the

15   number of users individually, but more importantly the

16   number of end-user organizations, since an ERP product

17   is typically not used by one individual in the manner

18   that you and I use word processing programs.  And it

19   would depend on the degree and extent and pervasiveness

20   of whatever issues such organizations or individuals

21   might have.  It is not, in my opinion, a binary all or

22   nothing, either/or situation.

23           MR. RAWLINSON:  Should we take a break for

24   about ten minutes?  We've been going over an hour.

25           MR. WILLIAMS:  We can take one.  It is 10:19.

 1    Why don't we take five minutes now.

 2             THE WITNESS:  Okay.

 3             VIDEOGRAPHER:  Off record at 10:19.

 4                  (Recess, 10:19 a.m. - 10:32 a.m.)

 5             VIDEOGRAPHER:  On record at 10:32.

 6             MR. WILLIAMS:  Q.  Just going back to

 7    paragraph 100, beginning where -- the sentence starting,

 8    "The same is true for ERP products," and then you

 9    reference generally financial modules, human resource

10    modules -- manufacturing modules.  Any of those three

11    modules, would they be included in CRM application or an

12    ERP application?

13        A.   In most products today, based on my

14    understanding, those three particular examples would be

15    in -- within the ERP side as opposed to the CRM side.

16             By the way, if I might interject, since you

17    have brought my attention back to this paragraph, I had

18    earlier commented how well components work together is

19    in the eye of the beholder, and one aspect of that that

20    I probably should have mentioned as well is that the eye

21    of the beholder includes, or is focused on not just what

22    this particular set of financial modules and so forth

23    does, but is also a relative term based on what other

24    comparable products or competitive products might be

25    doing in the marketplace, as would be the case with

1    Office suites.

2           My perception of the extent or degree with

3    which Microsoft Office is integrated is informed at

4    least partly by what alternatives may or may not be out

5    there and also how well I've managed to install them on

6    my computer.  If I neglected to install Excel, it's

7    going to be pretty hard to make Word talk to it.

8           I didn't mean to interrupt your train of

9    thought; since we saw this sentence again.

10      Q.   So, anyway, you cite there the financial

11   modules, human resource modules, manufacturing modules

12   and other modules.  You didn't include any CRM modules

13   in that specific example.  Any reason why, or just

14   didn't come to mind when you were writing this

15   paragraph?

16      A.   No particular reason.  I was simply trying to

17   provide an introductory framework for the whole

18   discussion.  So it was not for some specific purpose

19   that it was omitted.

20      Q.   Just want to direct your attention to page 53.

21   Referring directly to paragraphs 138 and 139, can you

22   just review them for a moment, if you need to.  Maybe

23   you reviewed them this morning or last night.

24           Is it fair to say your opinion with respect to

25   Suite 11i was integrated and interoperable appears at

Yourdon, Edward                                                    7/3/2007

1    138 and 139 -- actually, 138 through say 141?  You can

2    take some time to look at those two pages, if you like.

3         A.   My opinion in terms of my own independent

4    technical assessment is based on paragraphs 138 through

5    141.  But it was also based upon my observation and

6    review of the actual experiences of customers in the

7    field and, you know, all the other testimony and

8    evidence that we talked about earlier.

9         Q.   I was just asking about your opinion about it.

10   Is it fair to say that your opinion on this one issue is

11   captured for the most part in paragraphs 138 through

12   141, and the other stuff you referred to in terms of

13   experience of people in the field supports the opinion?

14        A.   I think that's a fair characterization.  I

15   felt that it was important to reach my own independent

16   opinion based on the technical materials that were

17   available, and then see whether it was supported by or

18   confirmed by or illustrated by, reinforced by various

19   other sources of information.

20             This particular -- I don't know if you've

21   referred to figure 9 at the top of this page, that was

22   simply one illustrative example of the kind of technical

23   evaluation that I did as described in paragraphs 138

24   through 141.

25        Q.   You agree, however, that even in your opinion,

1   that it's almost certain that Oracle developers made

2   some errors implementing the logical data model in 11i?

3        A.   Yes, that is the language that I've used in

4   paragraph 140.  It's possible, in fact, almost certain

5   given the studies that some errors probably would have

6   been made.

7        Q.   Right.  And you also agree that it's almost

8   certain that the developers made errors in creating the

9   database tables in 11i?

10        A.   In the same context, possible, indeed almost

11   certain, yes.

12        Q.   Right.  And you agree that Oracle developers

13   almost certainly made errors in creating the indices in

14   11i?

15        A.   Yes.  I think the significant question is how

16   many such errors, and particularly as compared to the

17   number of errors that one would expect to see in

18   software systems of this size or other comparable

19   software, as opposed to any kind of absolute measure.

20        Q.   And you agree that the software -- withdrawn.

21             You agree that Oracle developers almost

22   certainly made errors when coding the triggers and

23   navigation paths in 11i?

24        A.   Yes, with the same caveats, you know, as

25   indicated in paragraph 140.

Yourdon, Edward                                                    7/3/2007

1       Q.    Okay.  And you agree that -- well, withdrawn.

2             And ultimately you find that 11i, the

3    integration was less than perfect?

4       A.    Not based on my own independent review of the,

5    you know, the technical documents.  I did not personally

6    see errors or defects or imperfections.  But based on my

7    general experience and also based on the other evidence,

8    I would agree that there were imperfections.  I believe

9    that's the term you used.  I'm not sure.

10      Q.    I did.

11      A.    Okay.

12      Q.    And now when a developer makes some of the --

13   or withdrawn.

14            When developers make some of the errors that

15   you described in paragraph 140, for example, is that or

16   is that not part of the engineering process?

17            MR. RAWLINSON:  Objection to form.

18            THE WITNESS:  I don't know what you mean by

19   engineering process.

20            MR. WILLIAMS:  Q.  Okay.  Well, is coding part

21   of the software engineering process?

22      A.    Coding would normally be considered part of

23   the software engineering process, yes.

24      Q.    And is creating the database tables part of

25   the software engineering process?

Yourdon, Edward                                    7/3/2007

1    could be tested.

2         Q.   But you don't remember who that individual

3    was?

4         A.   Not sitting here right now.  If my memory gets

5    refreshed during the day, I'll certainly try to bring it

6    to your attention.

7         Q.   All right.  And was it a male or female?

8         A.   It was a male.

9         Q.   And was it a lawyer or was it an Oracle

10   employee?

11        A.   It was an Oracle employee.

12        Q.   A current Oracle employee?

13        A.   To the best of my recollection, yes.

14        Q.   And the only one that you've been able to

15   identify for me today that you recall speaking to, I

16   think, was either Don Klaiss or Mr. Seiden; is that

17   right?

18             MR. RAWLINSON:  Objection; to the extent it

19   mischaracterizes the previous testimony.

20             THE WITNESS:  I think I may have identified

21   Mr. Fletcher as well.

22             MR. WILLIAMS:  Q.  And Mr. Fletcher, that's

23   right.

24        A.   I think it was probably one of those three

25   individuals.  But, as I say, if my memory is refreshed

1    during the course of the day, I will let you know.

2        Q.   Now, some of the things that you discuss,

3    again, in paragraph 140 about some of the errors that

4    may be made in the software engineering process, do any

5    of those errors, or would any of those errors impact the

6    quality of software?

7        A.   As you might appreciate, I'd love to have you

8    tell me what you mean by quality.

9        Q.   Well, why don't we do that.  Haven't you

10   defined the term quality as a lack of bugs in your

11   report?

12       A.   I may well have done so.  I don't recall the

13   language I used and whether I describe that as one

14   aspect of quality.  Normally that would be considered

15   just one aspect of quality.  And I must apologize, I

16   can't remember where I would have put that into my

17   report.

18       Q.   I'm going to find it for you.

19       A.   Thank you.  If I had my laptop computer I

20   could help you, but I don't.

21       Q.   Paragraph 41.

22       A.   Yes, I did do so.

23       Q.   Well, why don't we find it and talk about --

24   can you just read that section for me.

25       A.   Yes, I can read that section.  And having done

Yourdon, Edward                                    7/3/2007

1    so, I would like to change one Latin abbreviation for

2    another.  But let me read it for the record now.

3            Paragraph 41 says, "Most segments of the

4    computer software industry are highly competitive, and

5    vendors compete on a number of factors - including

6    price, functionality, interoperability, quality, (i.e.

7    absence of software defects)."

8        Q.    That's not what you wrote.

9        A.    I apologize.  Thank you for correcting me.

10   "(absence of software bugs) ease of use, and time to

11   market."

12       Q.    Okay.

13       A.    And looking at this now, I believe I should

14   have used the Latin abbreviation e.g., such as, absence

15   of software bugs.

16       Q.    So what you're saying is that you're not --

17   your definition of quality here is not "i.e., absence of

18   software bugs," but, "e.g., absence of software bugs"?

19       A.    That's correct.

20       Q.    Would you -- that's a considerable

21   definitional change; wouldn't you say?

22       A.    That depends on the circumstances.  In many

23   cases the absence of software bugs is the most important

24   parameter or aspect of quality.

25            But to give you an example, there may be other

1    circumstances in which such things as response time or

2    performance are almost as important.  All the more so

3    because software bugs, as I have itemized them here, are

4    not all the same.  There may well be systems in which I

5    can tolerate a number of relatively minor bugs, but I'm

6    less able to tolerate other aspects of quality, such as

7    performance and response time.

8        Q.   Well, let's go back to what we were talking

9    about prior to finding your definition of quality.  And

10   that is back to paragraph 140, and my question was

11   whether or not the errors that you agree almost

12   certainly occurred in the development or the engineering

13   process in 11i would impact the quality of the software?

14       A.   I will agree they may impact the quality in

15   one or more dimensions for some customers under some

16   circumstances.  I would not agree they always would, nor

17   would I agree they always would in the same way for all

18   people or organizations in the marketplace.

19       Q.   All right.  But the answer that you just

20   provided me is not consistent with the definition, prior

21   to your change, of quality?

22           MR. RAWLINSON:  Objection to form.  And

23   objection, mischaracterizes prior testimony.

24           THE WITNESS:  No, I don't believe the two are

25   consistent.  Certainly I did provide a broader

1    definition of quality.  But even if we were to restrict

2    it to a definition of quality being equal to bugs, the

3    rest of my statement still stands.

4           The presence of some errors of the sort that

5    we've been discussing in paragraph 140 might affect the

6    quality, bugginess, presence of or visibility of bugs

7    for some customers, but not other customers, might

8    affect them under some circumstances but not other

9    circumstances, might affect them in minor ways or major

10   ways.

11          Now, as I said a moment ago, not all bugs are

12   the same in terms of their severity.

13          MR. WILLIAMS:  Q.  So it may impact quality?

14       A.   Yes.

15       Q.   All right.  Now, you concluded that, you know,

16   11i was integrated.  How many errors that you described

17   in paragraph 140 would it take for you to conclude that

18   an ERP system or software suite was not integrated?

19          MR. RAWLINSON:  Objection; vague and

20   ambiguous.

21          MR. WILLIAMS:  Q.  If you can quantify it.

22          MR. RAWLINSON:  Same objection.

23          THE WITNESS:  Well, first of all, that would

24   only be part of the evaluation of whether 11i or any

25   other system was integrated.  The other part would be

1    based on this evaluation that I discussed in paragraphs

2    138 to 140.

3              MR. WILLIAMS:   Q.   Sure, I understand that.

4         A.   But if I concluded that the architecture was

5    integrated by virtue of the database -- the data model

6    being integrated, et cetera, then to go to your question

7    about how many bugs would it take to conclude that the

8    integration essentially was not there, that would be

9    based on, in my opinion, a comparative figure of the

10   number of bugs or errors that are normally seen in

11   products of this sort.

12             And I think I did provide some figures for

13   that in the report.  It would be further quantified, if

14   I may continue, by the other aspect that I mentioned a

15   little bit earlier, it would be a function of whether

16   the bugs were visible to, or noticeable to a significant

17   number of customers.  And it would also be based on

18   whether the bugs were actually in the software as

19   opposed to being blamed on the software, but ultimately

20   demonstrated to be caused by something other than the

21   software.

22        Q.   Isn't it true that even if the architecture or

23   design appears to be such that the intent was to have

24   the product be integrated, that the software engineering

25   process, if the errors in that process are numerous or

1          THE WITNESS:  I believe that I did do so to

2    the extent of demonstrating what is ordinary based on

3    available statistics.  And also based on the published

4    reports of the 5,000 patches as one published indicator

5    of perceived quality problems.

6          MR. WILLIAMS:  Q.  You did not compare

7    Oracle's software to any other software available in the

8    industry in the time frame relevant to this action, June

9    2000 to June 2001; isn't that true?

10         MR. RAWLINSON:  Objection; vague and

11   ambiguous.

12         THE WITNESS:  That is correct, yeah, I did not

13   compare them --

14         MR. WILLIAMS:  Q.  Sure.

15   A.    -- as of that time frame.

16   Q.    Not as of that time frame?

17         MR. RAWLINSON:  You have to let him finish.

18         MR. WILLIAMS:  Q.  Were you finished?  I

19   didn't mean to cut you off.

20   A.    I may have misunderstood your question.  I did

21   not compare them as they were at that time frame between

22   June of 2000 and June 2001.

23   Q.    Sure.  And you didn't have access, did you,

24   for purposes of analysis that you provide here, to the

25   number of bugs, say, in the PeopleSoft application suite

1    available say between June of 2000 and June of 2001, did

2    you?

3          A.    No, I did not.

4          Q.    And you didn't have access to, say, a SAP, SAP

5    application suite that was available in June 2000

6    through June 2001, did you, for purposes of doing your

7    analysis here?

8          A.    No, I did not.

9          Q.    All right.  Nor did you have access to any

10   Siebel application suite available in the period from

11   June 2000 to June 2001 for your analysis as it applies

12   to your report here?

13         A.    No, I did not.

14         Q.    So you don't know what those software vendors

15   were experiencing -- withdrawn.

16               You don't know from any internal company

17   material what those software companies were experiencing

18   in terms of functionality or bugs as it relates to their

19   software suites during that period of time?

20         A.    No, I don't.

21         Q.    So you didn't use any of that information to

22   do any comparison for purposes of your report in this

23   case?

24         A.    No, I did not.

25         Q.    And isn't it true that Oracle represented that

Yourdon, Edward                                                    7/3/2007

```
 1    there was no software available that was comparable in
 2    terms of scope to 11i in the marketplace in June 2000
 3    through June of 2001?
 4              MR. RAWLINSON:  Objection; vague.
 5              THE WITNESS:  I believe that may be the case.
 6    But I would have to see some of the representations with
 7    regard to scope, which you have now begun talking about,
 8    as distinct from the bugs that we were talking about a
 9    moment ago.
10              MR. WILLIAMS:  Q.  That's fine.  Are you aware
11    of any software vendor that was selling a software suite
12    that included ERP and CRM together in the period between
13    June of 2000 and June of 2001?
14         A.   My recollection from that period is that some
15    of the other vendors included a few CRM pieces in their
16    ERP offering, but I'm not aware of any that offered or
17    provided, marketed the extent of CRM and ERP products
18    integrated together into one product during that period
19    of time.
20         Q.   So when you discuss in your report the
21    necessity of doing a comparison to other software to
22    make a determination as to what would be ordinary for an
23    ERP suite comparable to 11i, that was not something you
24    did; right?
25              MR. RAWLINSON:  Objection; vague and
```

1      A.    That's correct, it did not include the

2    depositions of accounting people and forecasting people,

3    et cetera, as we discussed earlier today.

4      Q.    Well, I just wanted to clarify that.  Is it

5    your -- is it your testimony that you read every

6    deposition that is related to the product or 11i issues

7    in this case, and that they were provided to you?

8      A.    I believe that to be the case to the best of

9    my knowledge sitting here, yes.

10      Q.    The factual record that was provided to you

11    did not include all of the documents that were produced

12    in the case; right?

13      A.    No, it did not.

14      Q.    And in this sentence you qualify the word true

15    with fundamentally.  What does that mean?

16            MR. RAWLINSON:  Objection to form.

17            THE WITNESS:  That means that there may have

18    been minor inaccuracies or minor errors in the

19    statements that Oracle made, but that in my opinion did

20    not detract from the fundamental truth, the basic truth

21    as would be perceived by, as I went on to say at the end

22    of this sentence, the audience for which they were

23    intended.

24            MR. WILLIAMS:  Q.  So you used the word

25    fundamentally there to convey that there may have been

1    some errors in the statements that were made by Oracle?

2        A.   It was meant to say that there might possibly

3    have been, in my opinion, minor errors.  But, yes,

4    possibly.

5        Q.   But you didn't include the fundamentally in

6    your conclusions or in the summary of your conclusions

7    that we looked at just a moment ago; right?

8        A.   That's correct.

9        Q.   Should you have used fundamentally in the

10   summary of conclusions or in the conclusions, meaning

11   that there may, indeed, have been some errors in what

12   Oracle said?

13       A.   No.  The only caveat or qualifier that I would

14   have added to that, which I have done in this

15   discussion, is the qualifier in the context that they

16   were made and for the audience for whom they were

17   intended, as I put at the end of paragraph 156.

18       Q.   Can you just turn to page 168, please.

19       A.   Paragraph 168?

20       Q.   I'm sorry, paragraph 168.

21       A.   I didn't think my report was quite that long.

22       Q.   Just really quickly, the last sentence of that

23   paragraph says, "Your review compels only one

24   conclusion, that plaintiffs' allegations that Suite 11i

25   was not integrated and, therefore, that Oracle's

1   statements regarding Suite 11i were false are

2   fundamentally misguided."

3        A.   I see that.

4        Q.   What does fundamentally misguided mean?

5        A.   I believe it means that they were inaccurate

6   or incomplete or misleading in very basic ways, as

7   opposed to possible specific minor ways.

8        Q.   So how does the word fundamentally qualify the

9   word misguided as compared to the way in which you used

10  it to qualify the word true in paragraph 156?

11       A.   In both cases I believe that a synonym for

12  "fundamentally" would be "basically."

13            So Oracle's statements were basically true,

14  except possibly for minor details.  And plaintiffs'

15  allegations were basically misguided, except possibly

16  for minor details.

17       Q.   But if the allegations, plaintiffs'

18  allegations relate to the very statements that you admit

19  that included some errors, how could it be -- how could

20  the allegations be fundamentally misguided, or how do

21  you determine that?  What was your process?

22            MR. RAWLINSON:  Objection; mischaracterizes

23  the prior testimony.

24            THE WITNESS:  My process was to look at the

25  extent of integration that was available on a technical

1    question here and my statement simultaneously.

2            It was my intention writing this sentence that

3    industry expert meant somebody like myself, that is, a

4    technical expert.  It is also my understanding that the

5    statements, many of which I've cited here, made by some

6    of the defendants, were made to people that were

7    industry experts, though not necessarily of the same

8    type as me, that is, they were stock market analysts or

9    technical analysts or other forms of experts.

10           But that was not the intent of my statement.

11   I was trying to say that my expertise gives me, I

12   believe, the ability to understand the context in which

13   these statements were made to various audiences,

14   including Wall Street analysts and attendees at Oracle

15   user conferences and so forth.

16       Q.   Is this another one of those sentences that

17   you would rewrite if you had the opportunity?

18           MR. RAWLINSON:  Objection to form.

19           THE WITNESS:  No, I don't think so.  I suppose

20   if I thought you were having difficulty understanding it

21   or that you might interpret it in a manner different

22   than what I intended I would be happy to rewrite it, but

23   I believe the meaning is clear as I wrote it, so I'm

24   happy to leave it as it is.

25           MR. WILLIAMS:  Q.  So is it your opinion or

1    your view that the statements that plaintiffs allege to

2    be false and misleading were intended for industry

3    experts and not the public at large?

4             MR. RAWLINSON:  Objection to form, vague.

5             THE WITNESS:  No, that's not my -- that is not

6    my intention as we sit here today, and that was not my

7    intention when I wrote this sentence.

8             MR. WILLIAMS:  Q.  Well, just go back to page

9    52 -- I'm sorry, paragraph 152 and just take a look at

10   paragraph 152 for me, please.

11        A.   Okay.

12        Q.   And if you can look at paragraph 153 as well.

13        A.   Okay.

14        Q.   Now, the block quoted section there is from

15   Oracle's CRM white paper; is that fair?

16        A.   That's correct.

17        Q.   And on the next page you say that "No one in

18   the industry would have adopted any of the

19   interpretations suggested by the plaintiff."  Do you see

20   that?

21        A.   Yes, I see that.

22        Q.   So are you limiting your opinion there as to

23   people in the IT industry, IT professionals?

24        A.   I'm limiting it to people who are involved in,

25   work in or are associated with the IT industry which, in

1    my opinion, would include some of these analysts that

2    I've mentioned who, in my opinion, have some degree of

3    expertise with regard to evaluating and assessing

4    products.

5        Q.   So what about institutional investors, for

6    example?  If some of the statements that you evaluated

7    were made to institutional investors, would you still

8    say that the statements were fundamentally accurate or

9    fundamentally true even if the statements were made to

10   people other than those in the IT industry?

11       A.   I believe that to be the case.  If there are

12   specifics you have in mind, I would be happy to look at

13   it.  The comment that you asked me to look at here in

14   paragraph 153 was part of a white paper, and I don't

15   know the audience to whom that was distributed.

16            I focused and I made my sentence statement

17   here based on my understanding of what industry people

18   would have done or how they would have interpreted it.

19       Q.   So if it is later found that the statements

20   were not made to industry people, would you have an

21   opinion as to whether or not the statements could be

22   false or misleading?

23       A.   To people other than people in the IT

24   industry?

25       Q.   Exactly.

1      A.    Such as institutional investors?

2      Q.    Or anyone.

3      A.    Or the general public?

4      Q.    General public.

5      A.    I don't think that they would be rendered

6   false by such a thing.  Whether they would be misleading

7   I think would depend on the context of the sentence, for

8   example, the understanding of the word engineering that

9   we had a moment ago.  I am not offering an opinion on

10  that as we sit here today.  I was focusing on the

11  industry people here.

12     Q.    So if it is found, I just want to be clear, if

13  it is found that the IT professional industry is only a

14  small part of the audience to which these statements

15  were made, you would not be offering an opinion as to

16  the -- as to whether or not any of the statements were

17  misleading to any of that broader audience?

18          MR. RAWLINSON:  Objection to form.  Objection

19  to the extent it mischaracterizes prior testimony.

20          THE WITNESS:  Based on the information I've

21  reviewed thus far in this report, I would not be

22  offering an opinion.

23          MR. WILLIAMS:  Q.  Okay.

24     A.    I don't know if I'm going to be exposed to new

25  information between now and trial that might make it

1   the introduction or launch of the product.  But I

2   believe there were.

3       Q.   And that's somewhere in your report or your

4   rebuttal report you think?

5       A.   I think so.  I can't recall exactly from

6   memory.  But I'm fairly certain that I've seen several

7   such companies in my review of the various

8   implementation efforts.

9       Q.   Okay.  And --

10      A.   If I may pause for a moment, I'm fairly

11  certain that in my report there's a list, at least a

12  partial list of companies that were up and running, you

13  know, within months.  As to which of those met your

14  criterion of being both ERP and CRM, I don't recall

15  whether I identified that subset or that additional

16  qualification.  But I do know from looking at some of

17  the data involved that indeed some of them were both.

18  Whether I called them out in such a way in the report,

19  I'd have to look and see.

20      Q.   And did you analyze whether any Oracle

21  customers on Suite 11i as of December 14th, 2000 had

22  gotten any savings due to their implementation of Suite

23  11i?

24          MR. RAWLINSON:  Objection to form.  Vague and

25  ambiguous.

1              THE WITNESS:  No, I did not evaluate that or

2      analyze that.  I'm sorry.  No.

3              MR. WILLIAMS:  Q.  Then how is it that you

4      could sit here today and say that you're prepared to

5      provide an expert opinion as to whether or not the

6      statement that it's up and running in months, you get

7      the savings in months, it costs you less and it takes

8      less time to install is true or fundamentally true?

9          A.  I would be prepared to make that statement

10     based on my experience with the cost of implementation

11     as provided by consulting firms such as IBM and Anderson

12     Consulting, which is quoted in the previous paragraph of

13     Mr. Ellison's statement, usually associated with a great

14     deal of integration activity, after-the-fact integration

15     activity, which generally is far more excessive than the

16     cost of the ERP product itself.  Indeed, as someone has

17     indicated here in some material that I've cited, often

18     as much as ten times more expensive.

19              So I would certainly be willing to make such,

20     or offer such an opinion as having been fundamentally

21     true with the understanding that there might be the

22     occasional outlier or anomaly where perhaps the

23     implementation savings was smaller or nonexistent, but

24     it would be an extreme exception, as opposed to the

25     general case.

1        Q.    So you would be prepared to make that -- to

2    provide that expert opinion, notwithstanding the fact

3    that you've been provided substantial documents

4    concerning implementations of Suite 11i in the time

5    frame relevant to this case, but you're unable to cite

6    to any customer that got savings in months due to their

7    implementation of Suite 11i as of December 14th of 2000?

8        MR. RAWLINSON:  Objection to form.  Objection

9    to the extent it mischaracterizes prior testimony.

10       THE WITNESS:  It is unlikely if not impossible

11   that I would have the precise accounting data associated

12   with such savings, because the savings are being

13   realized by customers, not by Oracle.  So while I had

14   access, obviously, to a great deal of Oracle

15   information, I didn't have access to the books of, nor

16   the financial records of all the companies that

17   implemented it.  So there may well have been public

18   statements made by some of these customers as to how

19   much they felt they had saved, but not in any detailed

20   financial form that I could analyze.

21       MR. WILLIAMS:   Q.   So, again, based on what

22   you've seen in the evidence in this case, and not seeing

23   any information provided by an Oracle customer

24   concerning whether they got savings in months from their

25   implementation of 11i as of December 14th, 2000, you

```
 1    would be prepared to provide an expert opinion as to
 2    whether or not that statement is true?
 3              MR. RAWLINSON:  Objection to the form.
 4              THE WITNESS:  I would be prepared to offer
 5    such an opinion with my interpretation and understanding
 6    that I mentioned earlier, namely that the savings
 7    referred to here by Mr. Ellison are savings in
 8    implementation costs as compared to the costs that would
 9    exist using consulting firms like IBM or Anderson.  Not
10    savings necessarily associated with the operational use
11    of Suite 11i once it had been put into production.
12              MR. WILLIAMS:  Q.  So would you also be
13    willing to provide an expert opinion on what Larry
14    Ellison or Oracle meant by the statement?
15              MR. RAWLINSON:  Objection; asked and answered.
16              THE WITNESS:  No, I'm not -- I don't claim
17    mind reading amongst my many skills.  I would be
18    prepared to testify that the understanding or
19    interpretation of such a statement by Mr. Ellison by the
20    audience that I think is involved here would be that the
21    savings that are being referred to are the savings
22    associated with implementation costs.  Mr. Ellison
23    obviously will have to speak for himself as to what he
24    meant by those words.
25              MR. WILLIAMS:  Q.  Can you turn to paragraph
```

1    197 for me, please, on page 75.

2        A.    Okay.

3        Q.    You can read that to yourself, if you want.

4        A.    Okay, yes, I've read it.

5        Q.    You see where you write, "It would be

6    incorrect for me to assert that there were no product

7    problems.  During the first year of its release a number

8    of Oracle customers implementing Suite 11i did

9    experience bugs and defects that caused numerous

10   setbacks; however, problems with these early releases of

11   software are common and expected by the industry"?  Do

12   you see that?

13       A.    Yes, I do.

14       Q.    So it's true that Suite 11i experienced

15   certain bugs and defects?  You concede that; right?  Or

16   you agree with that?

17       A.    I agree with that.  I don't consider that a

18   concession.

19       Q.    You agree with that?

20       A.    Yes.

21       Q.    And they did cause numerous setbacks for

22   customers; is that fair?

23       A.    I think that's fair.  Not necessarily

24   permanent or fatal setbacks, but certainly setbacks,

25   yes.

1      Q.   Sure.   In the sentence above that, you say,

2    "As noted above, even problems that are reported to

3    Oracle as TARs are more often than not unrelated to

4    software defects."

5      A.   Yes, I see that.

6      Q.   Did you evaluate all of the TARs that were

7    logged at Oracle?

8      A.   No, I did not.

9            MR. RAWLINSON:   During the relevant time

10   period?

11           MR. WILLIAMS:   Sure.

12     Q.   During the relevant time period.

13     A.   No, I did not.

14     Q.   And you didn't do an independent evaluation of

15   whether or not problems reported to Oracle as TARs are

16   more often than not unrelated to software defects?

17     A.   I did from the testimony of several witnesses,

18   several Oracle witnesses that are reported in this

19   report, and I believe also the other report, indicating

20   that approximately two-thirds roughly speaking of the

21   TARs, as they are often called, turned out not to be

22   software defects.

23     Q.   But did you not do an independent analysis of

24   that?

25           MR. RAWLINSON:   Objection to form.

 1      A.    Unknown or undisclosed.  Not that I recall.

 2 Again, I remember addressing that fairly specifically in

 3 a later section in my report.  However, I think

 4 Mr. Bonadio is saying as a general proposition you might

 5 want to consider delaying, without even looking to see

 6 if there are specific problems, because newer

 7 applications need to be treated cautiously, et cetera,

 8 et cetera.

 9      Q.    You did find certain customers did delay

10 implementation or purchases of Oracle 11i due to

11 problems with the software; isn't that true?

12           MR. RAWLINSON:  Objection to form.  Objection;

13 mischaracterizes testimony.

14           MR. WILLIAMS:  Q.  If it is not, you can say

15 it is not.

16      A.    Well, again, what I need to do is take a look

17 at the language in my report where I said I -- in

18 section XI, Roman numeral XI, I discussed a number of

19 prospects or companies that were in the sales pipeline

20 that were considering 11i.  And again I would have to

21 look at the language here to see whether there are

22 perhaps one or two -- you know, I have seen no evidence

23 that deals failed to close because of problems that

24 undermined Oracle's statements that the product was

25 integrated and operable.

1          But I don't see that as being at all related

2     to the paragraph you directed me to look at by

3     Mr. Bonadio.  There may have been customers that delayed

4     implementation because of advice from analysts of this

5     sort without having specifically looked at the product.

6          Q.   So you're saying that, you know, there is a

7     difference between looking at the product and viewing

8     problems and delaying, or hearing that there may be

9     problems and delaying?

10         A.   Yes, I think that is a significant difference.

11         Q.   Okay.  And did you evaluate whether or not any

12    customers or potential customers heard about problems

13    with Suite 11i and delayed purchases or implementations?

14             MR. RAWLINSON:  Objection; form.

15             THE WITNESS:  The only ones that I would have

16    considered were the ones that heard whatever they heard,

17    whether it was good or bad, but then proceeded farther

18    into the discussions with Oracle to consider such

19    things.  And then the question is whether they would

20    have proceeded or not.

21             I did not analyze the presence or absence of

22    potential customers that heard whatever they heard and

23    then decided to go no further and did not pick up the

24    phone to call Oracle.  That community --

25             MR. WILLIAMS:  Q.  So you have no opinion on

1    whether or not potential customers may have heard about

2    problems with Suite 11i and decided to either delay or

3    just not purchase 11i?

4           MR. RAWLINSON:  Objection to form.

5           THE WITNESS:  In the case where their decision

6    was made without any contact or interaction with Oracle

7    so that Oracle would know that it was even an issue,

8    that's what I'm trying to identify.

9           MR. WILLIAMS:  Q.  I understand that.

10     A.    Okay.

11     Q.    But you're not stating you're aware of every

12   customer that contacted Oracle concerning a possible

13   purchase of 11i during the relevant time period, are

14   you?

15     A.    No, no.  Indeed what I discussed here was the

16   particular subset that I did look at more closely, and

17   that was roughly 100 customers or potential customers, I

18   should say, with particular sales figures above a

19   certain level.  That's what I described in here.

20     Q.    You didn't look at any potential customers

21   beyond the ones that I think you said were -- may

22   purchase applications above $2 million or something like

23   that?

24     A.    That was one or two criteria, yes.  Beyond

25   that category I described in my report --

Yourdon, Edward                                    7/3/2007

1          Q.    Just to be clear, you're relying only upon

2     your experience and Greg Seiden's testimony?  I think

3     that's what you testified to, for that proposition?

4          A.    No.  I also believe I testified that I had

5     seen testimony -- I'm not quite sure of the language I

6     used -- from people below the level of Mr. Seiden --

7     excuse me, below the level of Mr. Wohl and

8     Mr. Barrenechea who were asked if the disagreements or

9     conflicts between Mr. Wohl and Mr. Barrenechea had

10    caused them any difficulty with regard to the

11    development of an integrated and interoperable system or

12    product.

13         Q.    And they said?

14         A.    And they said no.

15         Q.    But you didn't cite that here.  Is there a

16    reason you didn't rely on that in paragraph 211?

17         A.    No, there is not a reason.

18         Q.    You don't recall the names of those

19    individuals, do you, that testified the way that you've

20    just described?

21         A.    I don't.  No, I don't.

22         Q.    Looking at paragraph 212.  You write, "Oracle

23    truthfully represented that Suite 11i was integrated and

24    interoperable; the early problems with CRM that were

25    widely publicized prior to the Class Period do not

1    change of truth of that claim."  Do you see that?

2        A.    Yes, I do.

3        Q.    Do you know when the Class Period is?

4        A.    I believe there is still some dispute as to

5    whether the Class Period is December 14th, 2000 to

6    February 26th, or whether it is, as you had suggested

7    earlier, June 1st to June 1st, or May of 2000 to

8    February 26th of 2001.

9        Q.    And was there -- during any period in the time

10   frame between June of 2000 and June of 2001, would a

11   statement that 11i was integrated and interoperable been

12   misleading in your view?

13       A.    No, I don't believe it would be misleading.

14       Q.    If it was true that Suite 11i was designed to

15   be preintegrated or integrated and interoperable, but it

16   didn't work in the field in that fashion, would the

17   statement also be true, nevertheless, in your view?

18       A.    I think that would depend largely on what you

19   mean by work, which you usually indicated was surrounded

20   by quotation marks.

21       Q.    You raise an interesting point, because I

22   forgot to ask you, and I was going to ask you earlier.

23   There are, I would say, dozens of places in your opening

24   report where you quote or put quotations around words or

25   phrases, but you don't cite to where you're quoting

 1    from.  And I guess generally I wanted to know if there

 2    was any reason for that or anything we should understand

 3    from that.

 4         A.   No, not in general.

 5         Q.   And I think one of the places you did that was

 6    when you described what business people or end-users --

 7    on paragraph 100 you say, "For the end-user of a

 8    software system, as well as for IT professionals

 9    'integration'" -- with no citation -- "simply means that

10    the pieces or components or modules of the system 'work

11    together'" also in quotes.

12              So I'm really -- I'm using the term work in

13    the way that you've used it in your report.

14         A.   Okay.  And as you recall, when we discussed

15    that this morning, we eventually got down to a sentence

16    later in that paragraph where it says, "How well

17    components 'work together' is often in the eye of the

18    beholder," and we had a lengthy discussion about that.

19    And I think that would be the gist of my response to

20    your most recent question.

21         Q.   That's fine.

22         A.   I think your question was if Suite 11i is

23    shown not to work, quote, unquote, would it still be

24    regarded as integrated.  And I think that is in the eye

25    of the beholder.  It is a question of degree, a question

1   deals valued at $500,000.

2       A.   Four hundred out of how many?

3       Q.   Out of 1,000.  Due to 11i quality problems.

4   Would that impact your opinion at all?

5           MR. RAWLINSON:  This is the opinion about lost

6   deals or broader?

7           MR. WILLIAMS:  No.  He said that his --

8       Q.   What you testified to earlier was that you

9   don't think -- you have no opinion concerning whether or

10  not Oracle lost any deals relating to the quality of 11i

11  for deals less than $2 million because you haven't

12  reviewed any of that information?

13          MR. RAWLINSON:  Objection, form.  Objection to

14  the extent it mischaracterizes prior testimony.

15          THE WITNESS:  I don't have any opinion that

16  can be expressed with 100 percent certainty.  What I

17  said was I would express an opinion with a fairly high

18  degree of confidence.

19          And in the hypothetical situation that you

20  just posed, if evidence was presented to me that said 10

21  out of 100 large customers deferred or cancelled

22  potential sales because of quality problems, which I

23  don't believe is, based on my recollection, anywhere

24  near the case, but that 40 percent of the small deals

25  cancelled for similar reasons, would that change my

1    opinion, perhaps so.

2              But based on my experience, I would find that

3    an extremely unlikely scenario that a larger percentage

4    of small customers would be more likely to cancel

5    than -- especially that much larger a percentage.

6         Q.    Why is that?

7         A.    Forty percent?  Because the larger customers

8    are usually more demanding, they've got larger

9    installations, more of a mission-critical business, less

10   of an ability to fall back on manual procedures, et

11   cetera, and also more sophisticated and are able to ask

12   more penetrating questions about quality issues.

13        Q.    They got more money, too, though, don't they?

14        A.    Well, they are presumably prepared to spend

15   more money.  But a smaller customer would normally be

16   asking, and, therefore getting less detailed information

17   about all that, et cetera, et cetera.

18        Q.    All right, looking back at paragraph 258 of

19   your report, bullet point number four, you write, "Many

20   of the problems attributed to Suite 11i by customers,

21   industry analysts, computer trade journals and

22   plaintiffs were not attributable to Oracle's software."

23   Do you see that?

24        A.    Yes, I do.  It is the third bullet point.

25   Yes, I see that.

Yourdon, Edward                                                7/3/2007

 1        Q.    What is the basis of that opinion?

 2        A.    The basis of that opinion was my review of

 3   such computer trade journals, analyst reports, et

 4   cetera, combined with my experience in the field, as

 5   illustrated by some of these exhibits that you've just

 6   shown me a little bit earlier.

 7        Q.    Can you show me where in your report you cite

 8   to any support for that conclusion that many of the

 9   problems attributed to Suite 11i by customers, industry

10   analysts, computer trade journals and the plaintiffs

11   were not attributable to Oracle software?

12        A.    I believe that there is information -- I have

13   not cited specifically here, I agree, with a footnote or

14   anything.  But --

15        Q.    Can you find it in your report if you have

16   time?

17        A.    If we have time this afternoon.  It's possible

18   that it is not in there.  But I certainly have seen

19   testimony, deposition testimony and exhibits of -- in my

20   review of the documents about problems that were

21   attributed by customers, et cetera, that upon further

22   investigation turned out not to be attributable to

23   Oracle software, but rather to setup problems or

24   configuration problems or customization problems, et

25   cetera.

1     Q.    And that, you know, wasn't using the software

2  at all; right?

3     A.    I did not use the software; that's correct.

4     Q.    Not experiencing firsthand any of its

5  functionality; right?

6     A.    That's correct.  It says based on this review

7  that we've been talking about, yes.

8     Q.    Based on that review you said you were

9  confident that the entire Suite 11i suite is integrated.

10 Can you describe for me what it means to be integrated

11 with respect to database and business work flows?

12    A.    Those are two of the four different forms of

13 integration, that I think I mentioned there were two

14 others that I identified but did not discuss in detail.

15          Those are functional integration and user

16 interface integration.  I can't find that right away.

17    Q.    That's okay.  Is it fair to say you are not

18 offering an opinion as to whether or not Suite 11i was

19 integrated with respect to user interface integration

20 for functional integration?

21    A.    I have not offered such an opinion in this

22 report.  I can imagine offering such an opinion if asked

23 to or if instructed to by counsel through additional

24 review or investigation.

25          But since I did not see or at least I was not

1   aware of significant complaints from either plaintiffs

2   or from customers about functional integration or user

3   interface integration, I did not pursue that.

4        Q.   Did you understand statements by the company

5   that Suite 11i was integrated and interoperable to be

6   excluding functional integration or user interface

7   integration?

8        A.   No, I did not.  I did not do so.  But as I

9   explained in footnote 38 at the bottom of page 36, I

10  said that it had very limited relevance to systems

11  integration overall or the market's understanding of

12  whether an ERP was properly described as integrated, et

13  cetera.  And that as I understood the situation at the

14  time, that plaintiffs had not raised issues about those

15  two other aspects or dimensions of integration.

16       Q.   So you cannot -- you cannot provide an opinion

17  that Suite 11i was integrated?

18            MR. RAWLINSON:  Object to the form.

19            THE WITNESS:  I can provide and have provided

20  an opinion with what I understood to be the two most

21  important aspects of integration and the ones about

22  which the complaints were raised.

23            MR. WILLIAMS:  Q.  Isn't it fair to say that

24  you cannot provide an expert opinion as to whether or

25  not Suite 11i was integrated overall?

1            MR. RAWLINSON:  Objection to form.

2            THE WITNESS:  I don't believe so for the

3    reasons I've already stated.

4            MR. WILLIAMS:  Q.  You haven't evaluated it?

5        A.   I have not evaluated the functional

6    integration characteristics or capabilities of Suite 11i

7    or the user interface capabilities.

8            MR. WILLIAMS:  Could I take a short break?

9            VIDEOGRAPHER:  Off record at 5:50.

10                  (Recess, 5:50 p.m. - 6:17 p.m.)

11           VIDEOGRAPHER:  On record at 6:17.

12           MR. WILLIAMS:  Q.  Do you know Randall Jensen?

13       A.   Yes, I do.

14       Q.   Have you met him before?

15       A.   I have several years ago, but I have.

16       Q.   And who is he?

17       A.   He is a software engineer, I believe the

18    author of a book and some papers in the software field.

19       Q.   Did you read his rebuttal report in this case?

20       A.   Yes, I did.

21       Q.   Did you disagree with his report or the

22    contents of it?

23       A.   In some respects I did, yes.

24       Q.   In what respects were those?

25       A.   I felt that his analysis or his criticisms of

1   STATE OF CALIFORNIA     )

2                          )

3   COUNTY OF ALAMEDA      )

4          I, DIANA NOBRIGA, hereby certify that the

5   witness in the foregoing deposition was by me duly sworn

6   to testify to the truth, the whole truth, and nothing

7   but the truth in the within-entitled cause; that said

8   deposition was taken at the time and place therein

9   stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18          And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22          DATED: _July 6, 2007_

23

24

25                  DIANA  NOBRIGA, CSR NO. 7071

# LIVENOTE｜World Service

Worldwide Deposition Reporting & Legal Videography

## **ERRATA Sheet**

Deposition of:
**Edward Yourdon, July 3, 2007**     8/1/2007

I wish to make the following changes for the following reasons:

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 19 | 21 | "brood" should read "broad" | Typographical error |
| 15 | 23 | delete "layer" | Typographical error |
| 21 | 8 | "they" should read "there" | Typographical error |
| 41 | 25 | "defender" should read "defendant" | Typographical error |
| 69 | 25 | "determine" should read "determined" | Typographical error |
| 75 | 23 | delete quotation mark before "Your" | Typographical error |
| 75 | 23 | insert quotation mark before "review" | Typographical error |
| 90 | 17 | "Anderson" should read "Andersen" | Typographical error |
| 90 | 23 | "Anderson" should read "Andersen" | Typographical error |
| 95 | 11 | "Anderson" should read "Andersen" | Typographical error |
| 95 | 15 | "excessive" should read "expensive" | Typographical error |
| 97 | 9 | "Anderson" should read "Andersen" | Typographical error |
| 103 | 25 | "operable" should read "interoperable" | Typographical error |
| 148 | 6 | "release's" should read "releases'" | Typographical error |
| 156 | 23 | "at somewhat" should read "at a somewhat" | Typographical error |

Page 2

| 182 | 4 | "25 to 100" should read "2,500" | Typographical error |
|-----|---|--------------------------------|---------------------|
| 200 | 8 | "META link" should read "Metalink" | Typographical error |
| 209 | 5 | "revenues" should read "revenue" | Typographical error |
| 210 | 24 | "Vaughn" should read "Baan" | Typographical error |

Witness Signature/Date *Edward Yourdon*          *Aug 1, 2007*

Thank you for using LiveNote World Service for your reporting needs.
For assistance, please call 800-LIVENOTE (548-3668)

221 Main Street, Suite 1250, San Francisco, CA 94105
www.livenoteworldservice.com