CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--

In re:  ORACLE CORPORATION      Master File No.
SECURITIES LITIGATION      C-01-0988-MJJ (JCS)
_____/   CLASS ACTION



-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --

Videotaped Deposition of

RANDALL W. JENSEN, PH.D.

_____

Friday, July 13, 2007

Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 75321

CONFIDENTIAL

1    "implementation" to mean in the context of the

2    implementation of enterprise application software?

3          A.   Most of the enterprise application systems

4    I've dealt with involve taking a baseline product, like

5    11i would be an example, and customizing it to work

6    with -- I'll call it peculiar, not specifically Oracle

7    databases, applications that are not specifically Oracle.

8          So the software has to be customized to do it

9    at another job, basically.  The data formats are not the

10   same.  The needs are not exactly the same.  So that's

11   typically what implementation is to me.

12         Q.   Okay.  I think that's fair enough.

13         So having in mind your understanding of the

14   term, you've just described one project you worked on

15   last week involving a military project of implementing

16   some enterprise application software.  And my question

17   is:  Do you have any other work experience in

18   implementing enterprise application software?

19         A.   Other than projecting the work involved, how

20   much it will cost, how long it will take, that's pretty

21   much what we do.

22         Q.   Okay.

23         A.   Conversion, customization, interfaces.

24         Q.   And that's based on your -- your research

25   over many years in the estimating field?

15

CONFIDENTIAL

1          A.   And experience, yeah.

2          Q.   Okay.  So in terms of the actual on-site work

3     doing the implementation, data conversion, working with

4     the interfaces, things like that, you haven't actually

5     done that kind of implementation work?

6          A.   No.

7          Q.   Okay.  You mentioned your estimating work.  I

8     want to mark and place in front of you a third exhibit

9     here.  It's actually something I think you're familiar

10    with.  It's Capers Jones' book, Estimating Software

11    Costs?

12         A.   Oh, yes.  Yes.

13         MR. GIBBS:  We're going to mark the whole

14    book as Exhibit 3.

15         (Exhibit 3 marked.)

16         Q.   BY MR. GIBBS:  First question, actually, is

17    about the very first page.  I promise we won't go through

18    page-by-page, but the about the author section starts

19    with a sentence that says, quote:  Capers Jones is a

20    leading authority in the world of software estimating,

21    measurement, metrics, productivity and quality," end

22    quote.

23         Do you have that language in front of you?

24         A.   Right there (indicating).

25         Q.   Do you agree with that?

CONFIDENTIAL

1          A.   Yes, he is.

2          Q.   And you've read his book, Estimating Software

3    Costs?

4          A.   Yes.

5          Q.   I see.  Okay.  How about Watts Humphrey; do

6    you know who he is?

7          A.   Yes, I do.  He's the -- well, I'll call it

8    the CMMI expert for the world.  He came from IBM, works

9    at Carnegie Mellon.

10         Q.   What's CMMI?

11         A.   Capability maturity model improved.

12         Q.   Have you ever heard Mr. Humphrey referred to

13   as the father of software quality?

14         A.   Do I need to answer that?

15              MR. WILLIAMS:  Yes.

16              THE WITNESS:  Yes, okay.  The reason I --

17   yes, I've heard him called that.

18         Q.   BY MR. GIBBS:  You agree or disagree with

19   that?

20         A.   From my estimating background, I disagree

21   with that.

22         Q.   Why is that?

23         A.   Claims for productivity improvement using

24   CMMI, I think, are exaggerated, my opinion.

25         Q.   CMMI is a methodology that he's developed,

CONFIDENTIAL

1  and you believe that claims made about the productivity

2  increases that can be achieved using that method are

3  overstated?

4       A.  If you get your process down, people are

5  interchangeable.  I don't believe that.

6       Q.  Does he have expertise in software

7  development?

8            MR. WILLIAMS:  Objection.  Form.

9            THE WITNESS:  I don't know.  That's

10 outside --

11      Q.  BY MR. GIBBS:  Fair enough.  We've had your

12 report in this matter marked as Exhibit 1.  It's now

13 underneath the bound copy of Mr. Jones' book.

14      A.  Okay.

15      Q.  First question is:  How did you go about

16 determining what your assignment would be in this case?

17           MR. WILLIAMS:  Let me just object to the form

18 of the question.  And if your answer requires you to

19 testify as to conversations that you've had with any of

20 the lawyers in the case, I'd instruct you not to answer

21 the question.  But if you can answer it without doing so,

22 go ahead.

23           THE WITNESS:  I was asked to look at the Ed

24 Yourdon report and the rebuttal to that report and give

25 my opinion on some particular issues about the report in

18

CONFIDENTIAL

1    point count; correct?

2         A.   That's true.   That's true.

3         Q.   If it does not, then it wouldn't be a useful

4    metric?

5              MR. WILLIAMS:   Objection.   Form.

6              THE WITNESS:   That's true.

7         Q.   BY MR. GIBBS:   Okay.   And you don't know

8    whether it does?

9         A.   Well, we're assuming in this, in the

10   analysis, that all of those functions were performed on

11   11i.

12        Q.   Understood.   But you don't know whether the

13   hours expended on all four of those hours of activities

14   are included in that 6 million staff hour count; is that

15   correct?

16        A.   That's true.

17        Q.   Let me ask you some questions generally about

18   software, and we'll particularize them if it's necessary

19   to answer the questions.

20             First of all, would you agree with me that

21   all commercial software has defects when it's released?

22        A.   Yes.

23        Q.   All right.   And would you agree with me that

24   the larger the software is, measured by some meaningful

25   metric, the more errors you would expect it to be

28

CONFIDENTIAL

1    released with?

2            MR. WILLIAMS:  Objection.  Form.

3            THE WITNESS:  Not necessarily.  It depends on

4    the process.  A well-run process like a CMMI level five

5    process, for example, would generate less errors than

6    a -- the old-fashioned code and test process.

7            Q.  BY MR. GIBBS:  Okay.

8            A.  So it's variable.

9            Q.  Let's assume you hold all factors constant

10   except for the size of the software.

11           A.  Okay.

12           Q.  In that instance, the size, I take it, would

13   affect the number of errors you would expect to see?

14           A.  That's true.

15           Q.  And so holding everything else constant, if

16   the software gets bigger, you would expect to see more

17   errors even after release; correct?

18           A.  That's true.

19           Q.  What about complexity?  I know there are a

20   number of different ways to measure software complexity,

21   but just generally speaking, again, if you hold

22   everything else about the project constant, would you

23   agree that the more complex the software is, the more

24   errors you would expect to see it released with?

25           MR. WILLIAMS:  Objection.  Form.

29

CONFIDENTIAL

1          THE WITNESS:  Yes and no.  Now, that's a

2    terrible answer, I realize, but it is yes and no.  A very

3    complex piece of software developed by a team that's

4    developing non-complex software, same development method,

5    same development process would probably produce more

6    errors.  But people who develop very complex software

7    usually use smaller teams and take longer, and they don't

8    produce more errors.

9          Q.  BY MR. GIBBS:  Okay.  But I think your answer

10   has changed one of the variables.  But if you really

11   stick to my hypothetical, which I understand you may not

12   agree with, but if you hold everything constant, the more

13   complex it is, the more errors you would expect to see;

14   is that fair?

15          MR. WILLIAMS:  Objection.  Form, asked and

16   answered.

17          THE WITNESS:  You're asking me to make a

18   decision about the competence of the developer.  A

19   competent developer would have done it the way I

20   suggested.  So it didn't -- it didn't solve the problem.

21   If we've got a given developer who has a given set of

22   skills, complex software would take longer and use fewer

23   people and would have no more bugs than when it was not

24   complex.

25          Q.  BY MR. GIBBS:  Okay.  Let me ask you a

CONFIDENTIAL

1    in military software compared to commercial software?

2         A.   I would expect less.

3         Q.   Okay.  I would hope for less.

4         A.   Nuclear weapons.

5         Q.   Agreed.  Is it possible to know what would be

6    the normal and expected defect level without knowing the

7    size of a particular software program?

8              MR. WILLIAMS:  Objection.  Form.  Size.

9              THE WITNESS:  Read that again.

10        Q.  BY MR. GIBBS:  Sure.

11        A.   Try it one more time.

12        Q.   I will.

13             Is it possible to know what would be the

14   normal and expected defect level without knowing the size

15   of a particular software program?

16             MR. WILLIAMS:  Same objection.

17             THE WITNESS:  Size is definitely a factor.

18   But you're coming down to process now.  If I'm building

19   nuclear weapons, I have no errors, or very few.  There

20   are errors, but there are very few.

21             If I'm doing something in a commercial world,

22   I probably will have more because they're more

23   acceptable.

24        Q.  BY MR. GIBBS:  Okay.  Well, I take your point

25   that size is not --

32

CONFIDENTIAL

1        A.   And size is not really the issue.

2        Q.   It's not the only issue.

3        A.   Yeah.

4        Q.   But it's one factor that would affect what

5   you would expect to see.

6        A.   Oh, yeah.  Errors go up with size.

7        Q.   Okay.  Let me put it another way, then.

8   There are a variety of different factors that affect the

9   number of defects you would expect to see from a software

10  program.

11       A.   Yes, that's true.

12       Q.   And without knowing all of those different

13  things that affect expected defect levels, you can't say

14  what level of defects you would expect from a particular

15  program, can you?

16       A.   Not in general, but yes, you can, looking at

17  the industry or the product type as an average -- and

18  that's what Capers does -- you can project the range that

19  you would expect to see errors within.  You can't say

20  it's this number.  You can say it's probably between here

21  and here (indicating).

22       Q.   Okay.  So to understand what level of defects

23  you would expect to see for a particular software

24  product, you would want to look at other products in the

25  same category?

CONFIDENTIAL

1          A.   That's true.

2          Q.   And you would look for a range, not some

3     specific benchmark number?

4          A.   That's true.

5          Q.   There would be a range within which the

6     defect level would be reasonable; is that a fair way of

7     putting it?

8               MR. WILLIAMS:  Objection.  Form.

9               THE WITNESS:  Collecting sufficient data,

10    that's probably true.

11         Q.   BY MR. GIBBS:  Okay.  And outside those

12    ranges, the defect level would be unreasonable?

13              MR. WILLIAMS:  Objection.  Form.

14              THE WITNESS:  Depends.  Again, the range may

15    be this wide, but one contractor may have an error rate

16    that's down here or up here (indicating).  Another one

17    may be down here, but we're looking at collected data

18    from a lot of places.

19         Q.   BY MR. GIBBS:  Okay.  But if you had

20    sufficient data, a large data set, and you had data from

21    the relevant comparable products, if a particular product

22    had a defect rate that was well within the range of that

23    industry, that would be reasonable, wouldn't it?

24              MR. WILLIAMS:  Objection.  Form.

25              THE WITNESS:  It would be expected, you mean?

34

CONFIDENTIAL

1    It would be an expected range.

2            Q.  BY MR. GIBBS:  Fair enough.

3            A.  Okay.

4            Q.  Now, you don't know how many defects

5    Suite 11i had when it was released; correct?

6            A.  No, I do not.

7            Q.  Do you know how many defects it had at any

8    particular point in time?

9            A.  The only information I have is what I read in

10   the reports.

11           Q.  Okay.  Did you see anything in the reports

12   that told you how many defects Suite 11i had at any

13   particular point in time?

14           A.  One report suggested 5,000 the first six

15   months, another 5,000 the next year.  I don't know what

16   that means.  In fact, you have to qualify what a defect

17   is.

18           Q.  In this context I'm talking about defect in

19   the same way you used it in your Conclusion Number 2.  So

20   that's a fair point.

21               You refer in your conclusion to Oracle 11i

22   defect levels.  What did you mean by "defect" in that

23   context?

24           A.  What I read in the material, I reviewed to

25   form this conclusion.  A defect was essentially

CONFIDENTIAL

1  defined -- well, with the technical assistance report,

2  that's where it starts.  And technical assistance reports

3  go up the ladder a ways, quite a ways, and at some point

4  somebody at Oracle says this is a defect -- this is a bug

5  or this is not a bug.  And I did not sense any formal

6  demarcation of this is bad or this is bad.  It's whatever

7  they felt like at that time.

8       Q.  Okay.

9       A.  And it was essentially meaningless.

10      Q.  What was meaningless?

11      A.  The -- the defect count.  I'm not sure what a

12  defect was.  I'm not sure what their definition of a

13  defect was.

14      Q.  Okay.  Did you -- so let me ask you this:

15  Did you read anything other than Mr. Yourdon's opening

16  report and Mr. Yourdon's rebuttal report in forming your

17  opinion in this case?

18      A.  And Mr. Hilliard's report.

19      Q.  His opening report, his rebuttal, or both?

20      A.  All of -- all three.

21      Q.  Okay.  I think --

22      A.  Yourdon had two reports and Hilliard had one.

23  I read all three of those reports.

24      Q.  Okay.  Did you know that Mr. Hilliard did a

25  rebuttal report as well?

36

CONFIDENTIAL

1          A.   I haven't seen it.   I haven't used it.

2          Q.   Okay.   Okay.   Have you read any other

3   documents from this case in order to form your opinion?

4          A.   Just the -- the specific quotations, if you

5   will, out of the reports is how I formed the definition

6   of what a defect was.

7          Q.   And from those materials, you were unable to

8   determine how Oracle defines defect in that context?

9          A.   Yes.

10          Q.   Okay.   And I take it you were also not able

11   to come up with any definitive numbers showing how many

12   defects Suite 11i had?

13          A.   Well, using the information in the reports,

14   there are a couple of reports -- a couple of attempts

15   made at projecting defects.   I looked at both of them and

16   said they're not founded on anything solid.

17          Q.   Okay.   I'm not trying to get at what people

18   projected would be the likely or expected number of

19   defects.   I'm trying to get at whether you saw anything

20   that established for you the number of defects that were

21   actually observed in Suite 11i --

22          A.   No.

23          Q.   -- at any particular point in time.

24          A.   No, I did not, as a matter of fact.   And what

25   I read were projections of what the defect rate should

CONFIDENTIAL

1  be.  And the methods that I looked at to determine what

2  that rate should be were conflicting.

3       Q.  Okay.  So I take it from all of that, that

4  you don't have an opinion as to whether Oracle 11i defect

5  levels were high, low, or normal; correct?

6       A.  I don't.

7       Q.  You can't tell from the information you've

8  seen?

9       A.  No, I can't.

10       Q.  You can't tell from Mr. Hilliard's report?

11       A.  I don't think from any of the reports anyone

12  can form a definition of what a defect is or how many

13  there were.

14       Q.  And whether the defect rate was high, low, or

15  normal?

16       A.  Yeah.  Yes.  That's true.

17       Q.  Okay.  In this Conclusion Number 2, in your

18  first bullet point there, you refer to Mr. Yourdon's

19  paragraph 48.  Referring to normal defect level of one to

20  two defects per thousand lines of code, and you say,

21  "Mr. Yourdon does not know or state how many lines of

22  code Oracle 11i has."

23       I gather you don't know, either, how many

24  lines of code Oracle 11i had; correct?

25       A.  That's true.  And calculating the defects

CONFIDENTIAL

1  from that bullet, compared to the defects in the next

2  bullet were totally different.  They're off by better of

3  an order of magnitude.

4       Q.  What do you mean by that?

5       A.  Well, the first one, one to two defects per

6  thousand lines of code, we're having a hard time defining

7  how many function points there were in the system, and I

8  would have to convert function points to lines of code in

9  order to get to this number.

10      Q.  Which number?

11      A.  Well, one or two defects per thousand lines

12 of code, it's not one or two defects per function point;

13 right?  We're trying to count this system in size in

14 function points, not lines of code, and this metric is

15 for lines of code, which doesn't work.

16      Q.  Let me try to understand you.

17          I understood Mr. Yourdon to be saying

18 generally --

19      A.  Okay.

20      Q.  -- in software one would expect one to two

21 defects per thousand lines of code.  First of all, set

22 aside how many defects there were in Suite 11i.

23      A.  Okay.

24      Q.  As a general matter, would you agree that for

25 software generally, one could expect one to two defects

39

CONFIDENTIAL

1    and probably more; correct?

2          A.   To determine if -- yeah, if the errors -- the

3    defect rate was lower than expected.  Not necessarily

4    low, most likely, or high.  It's what was expected.

5          Q.   Okay.  And let's assume for present purposes

6    that there were 5,000 software patches in the first six

7    months.  And let's further assume, as you have, that all

8    of those 5,000 software patches were to correct some kind

9    of defect.  Without knowing how big or how complex the

10   software is and without knowing what defect removal

11   procedures were undertaken, how can you possibly have an

12   opinion as to whether 5,000 defects is higher than what

13   you would expect?

14              MR. WILLIAMS:  Objection.  Form.

15              THE WITNESS:  That does -- that requires

16   something that's beyond the material I had.

17         Q.   BY MR. GIBBS:  So you can't reach that

18   conclusion?

19         A.   No.

20         Q.   Now, I can't tell from the report, but you

21   seem to be comparing the 5,000 software patches to the

22   1,000 high severity defects referenced in Mr. Yourdon's

23   report; is that correct?

24         A.   No.  In his report, he talked about a

25   thousand of the defects would be high severity defects,

82

CONFIDENTIAL

1   quoting -- not anything other than quoting Capers Jones.

2   That's where he got his information.

3           Is 5,000 high?  Well, Capers Jones says a

4   thousand should be expected.  I don't think the software

5   patches that were put in those first six months were

6   cosmetic.

7       Q.   Do you have any basis for concluding that

8   every one of the 5,000 was a high severity defect?

9           MR. WILLIAMS:   Objection.  Form.

10          THE WITNESS:   That requires something that

11  nobody really knows.

12      Q.   BY MR. GIBBS:  Well, you don't know it.

13      A.   I don't know.  I don't think anyone else

14  does, either.

15      Q.   So would that be impossible to determine?

16          MR. WILLIAMS:   Objection.  Form.

17          THE WITNESS:   That's -- first there has to be

18  a definition of a high severity defect.  The trail that

19  the TARs went through, there was no apparent formal

20  process that said this is a bug and this isn't a bug.

21  It's what they felt like calling it at the time.  It's

22  not unusual and it's not non-standard practice to do

23  that.

24      Q.   BY MR. GIBBS:  Let me -- let's talk about the

25  TARs.  Do you understand TAR to mean a technical

CONFIDENTIAL

1     assistance request?

2          A.   Uh-huh.

3          Q.   And that's a term used at Oracle?

4          A.   That's what Oracle calls them.

5          Q.   And do you understand that that's a request

6     from a software user for some kind of assistance?

7               MR. WILLIAMS:   Objection.   Form.

8               THE WITNESS:   That's right.

9          Q.   BY MR. GIBBS:   It might include a report of

10    an error in the software?

11         A.   It might.

12         Q.   In your work in the software development

13    field, were you ever called upon to diagnose defects in

14    the software that you were either developing yourself or

15    overseeing the development of?

16         A.   Yes.

17         Q.   And I take it diagnosing a defect in the

18    software typically starts with a user reporting some kind

19    of error; correct?

20         A.   That's right.

21         Q.   Is the user's error report by itself

22    typically enough to know whether there is in fact a

23    defect in the software?

24         A.   Not initially, no.

25         Q.   Okay.   What else do you need to do after

CONFIDENTIAL

1        Q.  And who would you want to talk to if you were

2    asked to reach a conclusion about whether it was stable?

3              MR. WILLIAMS:  Objection.  Form, beyond the

4    scope.

5              THE WITNESS:  Yeah, that's kind of -- that's

6    way outside of what I was doing.

7        Q.  BY MR. GIBBS:  Well, you said in Conclusion 4

8    that evidence of 5,000 patches strongly indicates that

9    the software was neither stable nor mature.  So I'm

10   really just trying to explore that --

11       A.  Yeah.

12             MR. WILLIAMS:  Hold on a second.  Objection.

13   Form.  He didn't say -- he didn't simply say that

14   evidence of 5,000 patches strongly indicates whether that

15   the software was stable, nor -- I think your question

16   ended there.

17             He said, in fact, I believe that the

18   existence of 5,000 patches and the continuing bugs during

19   the following months are evidence strongly indicating

20   that the 11i software was neither stable nor mature.

21             MR. GIBBS:  The point stands.  He's offering

22   an opinion about stability, and I'm exploring it.  I

23   think we're well within the scope of the report.

24       Q.  So let me ask you again --

25             MR. WILLIAMS:  I didn't instruct him not to

110

CONFIDENTIAL

1   answer.

2          MR. GIBBS:  But he objected and didn't answer

3   the question.

4          THE WITNESS:  No, I didn't, really.  This is

5   basically what I meant.  If you're putting out 5,000

6   patches in the first six months, that's not stable, in my

7   opinion.

8      Q.  BY MR. GIBBS:  Okay.  And my question is:

9   Well, you mentioned that you hadn't talked to anybody.

10  Who would you want to talk to if you wanted to reach a

11  broader conclusion as to whether Suite 11i was stable?

12         MR. WILLIAMS:  Objection.  Form.

13         THE WITNESS:  Oh, boy.  That's a whole new --

14  wow, what a task that would be, literally to do that, to

15  go through and talk to all the friends and foes of 11i to

16  determine if it was stable or not.

17     Q.  BY MR. GIBBS:  You'd have to talk to a large

18  cross section of users?

19     A.  I'd have to.

20     Q.  Okay.  And you'd have to factor in the degree

21  to which different customers customize the software?

22     A.  That's true.

23     Q.  Because without knowing that, you can't tell

24  whether the instability has been introduced by the

25  customization or was there to begin with; correct?

CONFIDENTIAL

1          MR. WILLIAMS:  Objection.  Form.

2          THE WITNESS:  That's true.

3      Q.   BY MR. GIBBS:  Now, you also mentioned that

4  you hadn't used Suite 11i.  If you were asked to opine in

5  absolute terms whether Suite 11i was acceptably stable,

6  would you want to use the software?

7          MR. WILLIAMS:  Objection.  Form.

8          THE WITNESS:  Yeah, 11i is not something I

9  would ever use.

10     Q.   BY MR. GIBBS:  Do you think you could reach a

11 fair conclusion about the relative stability of the

12 software without using it?

13         MR. WILLIAMS:  Objection.  Form.

14     Q.   BY MR. GIBBS:  Or watching someone else use

15 it?

16         MR. WILLIAMS:  Objection.  Form.  I'm not

17 sure what you're asking.

18         If you can understand what he's asking, you

19 can answer.

20         THE WITNESS:  It would take a good-sized

21 sample, a good cross section of the users pro and con.

22 It would be more interesting, and I can't do this because

23 I'm not -- I'm -- I don't want to say that.

24         What would be interesting to see was what

25 some out-of-the-box 11i users had to say about that.  But

112

CONFIDENTIAL

1    I'm -- that's for someone else to do.  Please don't sign

2    me up to interview all these people.

3           Q.  BY MR. GIBBS:  And you don't know what's

4    typical in terms of stability for ERP release in its

5    first six months of general availability; correct?

6           A.  No.

7           Q.  Would you agree, though, that some level of

8    instability would be reasonable to expect?

9               MR. WILLIAMS:  Objection.  Form.

10              THE WITNESS:  There's always some instability

11   in the beginning.  This product was put right out on the

12   street, and I would expect there to be quite a bit of

13   instability in the beginning.  I would expect it.  I

14   don't know if there was, but I would expect it.

15          Q.  BY MR. GIBBS:  And do you think customers

16   would expect it?

17              MR. WILLIAMS:  Objection.  Form.

18              THE WITNESS:  That's an opinion.  I don't

19   know if they would.  I would expect it.  I don't know if

20   they would.

21          Q.  BY MR. GIBBS:  Do you think people with

22   knowledge of the enterprise application industry would

23   expect it?

24          A.  Apparently some of them did.  Some people

25   bought it.  A lot of people bought it.

113

REPORTER'S CERTIFICATE

1
2       I certify that the witness in the forgoing
3   deposition,
4
5   was by me duly sworn to tell the truth, the whole truth
6   and nothing but the truth in the within-entitled cause;
7   that said deposition was taken at the time and place
8   herein named; that the testimony of said witness was
9   reported by me, a duly certified shorthand reporter and
10  a disinterested person, and was thereafter transcribed
11  under my direction into typewriting.
12      I further certify that I am not of counsel or
13  attorney for either or any of the parties to said
14  deposition, nor in any way interested in the outcome of
15  the cause named in said caption.
16      Dated          JUL 1 6 2007
17
18
19                     Leslie Rockwood
20                     Leslie Rockwood
                       Certified Shorthand Reporter
                       State of California
21                     Certificate No. 3462
22
23
24
25