LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
VALERIE L. McLAUGHLIN (191916)
GAVIN M. BOWIE (235532)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@lerachlaw.com
dougb@lerachlaw.com
valeriem@lerachlaw.com
gbowie@lerachlaw.com
        – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
MONIQUE C. WINKLER (213031)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@lerachlaw.com
willowr@lerachlaw.com
elig@lerachlaw.com
moniquew@lerachlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | 1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS |
| ALL ACTIONS. | |

Pursuant to Fed. R. Civ. P. 26 and 33 as well as Civil L.R. 33-1, plaintiff 1199 SEIU Greater New York Pension Fund[1] hereby supplements its responses to Defendants' Second Set of Interrogatories to Plaintiffs (the "Interrogatories").  All responses contained herein are based only upon such information and documents presently available and specifically known to 1199 SEIU Greater New York Pension Fund.  Further independent discovery, independent investigation, legal research and analysis may supply additional facts and/or add meaning to the known facts.  Moreover, the responses below are given without prejudice to 1199 SEIU Greater New York Pension Fund's right at trial or other proceedings to produce evidence of any subsequently-discovered fact or facts that may later develop.

## I.      GENERAL OBJECTIONS

1199 SEIU Greater New York Pension Fund generally objects to the Interrogatories on the following grounds, each of which is incorporated by reference in the responses to the individual interrogatories below.  All responses set forth herein are subject to and without waiver of any of these General Objections:

1.      1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the extent they seek to impose obligations on 1199 SEIU Greater New York Pension Fund beyond those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules.

2.      1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the extent that they call for the disclosure of information protected by the attorney-client privilege, the attorney work-product doctrine and/or any other applicable privilege or protection.  This includes interrogatories that seek disclosure of "all facts" or "all reasons" which would necessarily call for attorney work product.  Such responses that may occur pursuant to the Interrogatories shall not include any information protected by such privileges or doctrines.  Inadvertent production of any such information is not intended to be, and shall not operate as, a waiver of any applicable privilege, protection or immunity, in whole or in part.

---

[1]      Local 144 Nursing Home Pension Fund has changed its name to 1199 SEIU Greater New York Pension Fund.

1    3.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

2 extent that they impose a duty to seek out information and documents which are not in 1199 SEIU

3 Greater New York Pension Fund's possession, custody or control.

4    4.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories on the

5 ground of undue burden to the extent the Interrogatories seek information that is equally available to

6 the Oracle defendants or information that originated in the Oracle defendants' possession, custody or

7 control.

8    5.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

9 extent they seek information that can be found in the pleadings in this action.

10    6.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

11 extent they are overly broad and unduly burdensome.

12    7.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

13 extent that they are vague, ambiguous, complex or confusing as to make a meaningful or complete

14 response impossible.

15    8.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

16 extent they prematurely seek information related to expert(s), expert testimony or opinion at a time

17 when no experts have been designated.

18    9.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

19 extent they fail to state with sufficient particularity the information to be provided.

20    10.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

21 extent that they call for a legal conclusion, a legal argument or constitute a contention discovery

22 request that is premature at this stage of the litigation and is invasive of the attorney work product

23 doctrine.

24    11.    1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the

25 extent they seek information that may be protected by the right to privacy recognized under the

26 United States Constitution, or any other federal or state law.

27

28

12.     1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the extent they seek information neither relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

13.     1199 SEIU Greater New York Pension Fund objects to the Interrogatories to the extent they seek proprietary or trade-secret information.

14.     1199 SEIU Greater New York Pension Fund objects to the Interrogatories as overbroad and unduly burdensome to the extent they provide no limitation as to time.

15.     1199 SEIU Greater New York Pension Fund objects to the Definitions to the extent that they are overbroad, vague, ambiguous, compound and render each interrogatory unintelligible.

16.     1199 SEIU Greater New York Pension Fund objects to the definition of "Lead Plaintiffs" to the extent that it includes any and all of their advisors, accountants, consultants, agents, representatives, attorneys and all other persons acting on their behalf in this matter.

17.     1199 SEIU Greater New York Pension Fund further objects to the definition of "Lead Plaintiffs" to the extent it includes UFCW Local 56 Retail Meat Pension Fund, Drifton Finance Corporation and Robert D. Sawyer, whom 1199 SEIU Greater New York Pension Fund does not have custody, possession or control of.

18.     1199 SEIU Greater New York Pension Fund objects to the definition of "You" or "Your" to the extent that it includes any and all of its advisors, accountants, consultants, agents, representatives, attorneys and all other persons acting on its behalf in this matter.

19.     1199 SEIU Greater New York Pension Fund further objects to the definition of "You" or "Your" to the extent it includes UFCW Local 56 Retail Meat Pension Fund, Drifton Finance Corporation and Robert D. Sawyer, whom 1199 SEIU Greater New York Pension Fund does not have custody, possession, or control of.

20.     1199 SEIU Greater New York Pension Fund objects to the definition of "Defendants" as vague, ambiguous, overbroad and imposing an undue burden on 1199 SEIU Greater New York Pension Fund in responding to the Interrogatories.

21.     1199 SEIU Greater New York Pension Fund objects to the definition of "Oracle Securities" as vague and ambiguous.

1       22.    1199 SEIU Greater New York Pension Fund objects to the definition of "Purported Class Period" as vague, ambiguous and a mischaracterization of the complaint.  The Class Period in this action is between December 14, 2000 and March 1, 2001 as set forth in Plaintiffs' Revised Second Amended Complaint for Violations of the Federal Securities Laws ("RSAC").

23.    1199 SEIU Greater New York Pension Fund generally objects to the Instructions to the extent they seek to impose obligations on 1199 SEIU Greater New York Pension Fund beyond those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules.

24.    1199 SEIU Greater New York Pension Fund objects to Instruction No. 1 to the extent that it calls for the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine and is unduly burdensome.

25.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 1 to the extent it renders the Interrogatories vague, ambiguous, overly broad and unduly burdensome.

26.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 1 to the extent that it makes each interrogatory in which it applies compound.

27.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 1 to the extent that it imposes a duty to seek out information which is not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

28.    1199 SEIU Greater New York Pension Fund objects to Instruction No. 2 to the extent that it calls for the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine and is unduly burdensome.

29.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 2 to the extent it renders the Interrogatories vague, ambiguous, overly broad and unduly burdensome.

30.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 2 to the extent that it makes each interrogatory in which it applies compound.

31.    1199 SEIU Greater New York Pension Fund further objects to Instruction No. 2 to the extent that it imposes a duty to seek out information which is not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

32.     1199 SEIU Greater New York Pension Fund objects to Instruction No. 3 to the extent that it calls for the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine and is unduly burdensome.

33.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 3 to the extent it renders the Interrogatories vague, ambiguous, overly broad and unduly burdensome.

34.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 3 to the extent that it makes each interrogatory in which it applies compound.

35.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 3 to the extent that it imposes a duty to seek out information which is not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

36.     1199 SEIU Greater New York Pension Fund objects to Instruction No. 4 to the extent that it calls for the disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine and is unduly burdensome.

37.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 4 to the extent it renders the Interrogatories vague, ambiguous, overly broad and unduly burdensome.

38.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 4 to the extent that it makes each interrogatory in which it applies compound.

39.     1199 SEIU Greater New York Pension Fund further objects to Instruction No. 4 to the extent that it imposes a duty to seek out information which is not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

40.     1199 SEIU Greater New York Pension Fund objects to Instruction No. 5 as vague and ambiguous.

41.     1199 SEIU Greater New York Pension Fund generally objects to the Instructions to the extent that they impose a duty to seek out information which is not in 1199 SEIU Greater New York Pension Fund's possession, custody or control and because they are unduly burdensome.

42.     1199 SEIU Greater New York Pension Fund's decision to provide information, notwithstanding the objectionable nature of any of the interrogatories themselves, should not be construed as: (a) an admission that the material is relevant; (b) a waiver of the General Objections or

1  the objections asserted in response to a specific interrogatory; or (c) an agreement that an

2  interrogatory for similar information in this or any other related proceedings will be treated in a

3  similar manner.

4       43.     In responding to the Interrogatories, 1199 SEIU Greater New York Pension Fund

5  does not in any way waive or intend to waive any privilege or objection, but rather intends to

6  preserve and is preserving the following:

7       (a)     all objections as to the competency, relevancy, materiality and admissibility of

8  any interrogatory, 1199 SEIU Greater New York Pension Fund's response or the subject matter;

9       (b)     all objections as to vagueness, ambiguity or other infirmity in the form of the

10 Interrogatories and any objections based on the undue burden imposed by the Interrogatories;

11      (c)     all rights to object on any ground to the use of any of the responses, or their

12 subject matter, in any subsequent proceedings, including the trial of this or any other action;

13      (d)     all rights to object on any ground to any further document requests or

14 interrogatories or other discovery requests involving or related to the subject matter of the

15 Interrogatories;

16      (e)     the right to supplement responses to the Interrogatories prior to trial; and

17      (f)     any and all privileges and/or rights under the applicable rule under the Federal

18 Rules of Civil Procedure or other statutes, guidelines or common law.

19      44.     The failure to object on a particular ground or grounds shall not be construed as a

20 waiver of 1199 SEIU Greater New York Pension Fund's right to object on any additional grounds.

21      45.     1199 SEIU Greater New York Pension Fund reserves the right to supplement and/or

22 amend the specific objections and responses set forth herein.

23 **II.     SPECIFIC OBJECTIONS AND RESPONSES**

24 <u>INTERROGATORY NO. 5</u>:

25      Identify any Communication made by any Defendant during the purported Class Period that

26 You claim to be materially false or materially misleading.

27

28

1    RESPONSE TO INTERROGATORY NO. 5:

2         1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

3    above as if set forth herein.

4         1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

5    grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome,

6    without reasonable limitation in its scope, and seeks information that is neither relevant nor

7    reasonably calculated to lead to the discovery of admissible evidence.

8         1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

9    grounds that the term "claim" is vague and ambiguous.

10        1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

11   it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-

12   product doctrine.

13        1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

14   that it seeks to impose upon 1199 SEIU Greater New York Pension Fund a duty to seek out

15   information and documents which are not in 1199 SEIU Greater New York Pension Fund's

16   possession, custody or control.

17        1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

18   to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

19   including information to be obtained during the depositions of and document production by the

20   Oracle defendants and various third parties – or expert opinion.

21        1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

22   grounds that it constitutes a contention discovery request that is premature at this stage of the

23   litigation.

24        Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

25   Greater New York Pension Fund directs defendants to the RSAC for statements made by defendants

26   that are materially false and/or misleading.

27

28

1   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

2         The defendants disseminated the following false and misleading communications that

3   defendants made during the class period:

4         1.      Oracle's December 5, 2000 press release:

5                 (a)      "Using its own suite of e-business applications, Oracle beat the goal set by co-

6   founder and CEO Lawrence J. Ellison – cut one billion in costs in one year – passing the billion

7   dollar savings mark before the year was up."

8         2.      Oracle's December 14, 2000 press release:

9                 (a)      Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up

10  66%, Database Sales Up 19% . . . .  Today, Oracle Corporation announced that second quarter net

11  income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion.

12        3.      Oracle's December 14, 2000 2Q01 earnings conference call:

13                (a)      And then lastly . . . [about] the economy . . . [a]t this point, we see no impact

14  or slowing in our business.  We have seen no slowing of our business.

15                (b)      [S]o the numbers I'm going to give you here, for database . . . we're thinking,

16  you know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar growth, or

17  20-to-25.  Applications, we're thinking 75, or potentially better.  You'd have to add five points to

18  that.

19                (c)      So I would assume, 12 cents would be a reasonable number at this point.  I

20  don't think history is going to be a lot different, here.

21                (d)      The good news about applications, this quarter, is that every part of the little

22  sub-markets that we're in, we're strong.  And every geography, (we're) strong, Europe, Asia, U.S.

23  So there's nothing that we – no weakness in our applications business and the pipelines at every one

24  of these geographies looks astounding for this next quarter.

25                (e)      [Y]ou can buy our complete E-Business Suite, where all the pieces are

26  designed and engineered to fit together, and no systems integration is required.  It's up and running

27  in months.  You get the savings in months.  It costs you less, and it takes less time to install.

28        4.      December 14, 2000 statement by Jeff Henley reported by Bloomberg:

1        (a)      "The economy is slowing . . . . It's just not having a negative impact on our

2    business."

3        5.      December 15, 2006 Jeff Henley interview with Radio Wall Street:

4        (a)      [T]he economy right now even though it's slowing doesn't seem to be

5    affecting us.  We see no difference in demand for our upcoming third fiscal quarter.

6        (b)      [S]o far we look pretty hard at indicators.  We're seeing no softening in our

7    business.

8        (c)      "If they [Oracle's customers] have to slow down on discretionary spending,

9    it's not going to be on e-business," Henley said.

10        (d)      The margins were continuing to expand nicely and the application business

11    was really picking up steam.  He saw no difference in demand for the upcoming fiscal Q3.

12        (e)      The application[s] business was going to be solid and steady.  But the real

13    momentum in the much higher growth was going to be in the applications business. . . .

14        6.      December 15, 2000 Ellison statement reported by Bloomberg:

15        (a)      The economic slowdown isn't hurting Oracle, said Oracle Chief Executive

16    Larry Ellison, because the company has spent the past three years updating its product line to focus

17    on software that helps companies use the Internet to cut costs and boost efficiency.

18    "The whole (idea behind Oracle 11i) is to start saving money fast."

19        7.      January 9, 2001 Sanderson statement reported by Salomon Smith Barney:

20        (a)      The suite is pre-integrated and fully interoperable out of the box, helping to

21    lower consulting costs and time-to-value.

22        (b)      Oracle sees robust demand for both its database and applications business.

23    Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

24    scheduling, CRM, and SCM products are also performing well.  Oracle says it is also seeing

25    sustained demand for its database product, despite industry-wide concern over contracting IT

26    budgets.  3,500 copies of applications shipped – pipeline looks strong.  Sanderson noted two trends

27    driving demand for databases is demand for the 11i applications that are typically bundled with the

28    database as well as applications of other vendors that rely on the functionality of the Oracle database.

8.    January 20, 2001 Sanderson statement reported by RealMoney.com:

(a)    "You know, it's a big hill to climb.  Every year we climb that hill.  I expect we'll do it again.  Our pipelines are strong, and we're well-positioned from a products perspective, so it's all about execution."

9.    January 11, 2001 statement of Stephanie Aas reported by *Bloomberg*:

(a)    Company spokeswoman Stephanie Aas today said Oracle has yet to see any signs that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets. . . .  "Obviously the economy is a wild card.  So if we went into a recession or there is a sharp downturn [in the economy], we could be impacted . . . .  But we're not seeing it now."

10.    January 24, 2001 statement by Jennifer Glass as reported by Bloomberg:

(a)    "Oracle Corp. Chief Executive Larry Ellison canceled plans to appear on a PBS television program that was to be taped today, because he is suffering from severe laryngitis."

11.    February 6, 2001 Technical Whitepaper:

(a)    Oracle's CRM suite is both complete and integrated . . . .  No systems integration is required to install the Oracle CRM suite.

(b)    In fact, systems integration labor usually runs many times the cost of the software or the hardware needed to run the system – and the customer gets to pay for it.  To install the Oracle CRM suite, no systems integration is required.  And because the CRM suite consists of true Internet applications, every application works in every country, every major language, and every major currency.

(c)    Oracle employs more than 7,000 direct sales representatives in 60 countries and in seven global business units.  All Oracle sales reps are using Oracle Sales Online for customer management, pipeline management, forecasting, and external financial reporting. . . .

(d)    Oracle's financial organization also uses this application to prepare reports for management and for analyst calls.  The company does business in 25 local currencies, with one reporting currency (U.S. dollars).  After e-mail, Sales Online is the most-used application at Oracle.

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 10 -

1       (e)     Global Sales Forecast:  Can you state your exact global sales forecast, up to

2 the minute? . . . covering all geographies, all lines of business, all products, all services, all

3 customers, all partners – and including all licenses, product renewals, support contracts, Web-based

4 sales, call center telebusiness, direct business, mail catalogs, and business through partners and other

5 channels? Can the forecast reflect management judgments as well as the estimates of the sales reps?

6 Can you review opportunity data and identify which opportunities your sales organizations are

7 committed to?  Can you see multiple views of that information – one by manager and one by

8 salesperson?

9       12.     February 7, 2001 statement of Jeff Henley reported by First Union Securities, Inc.:

10       (a)     On February 7th, we met with management of Oracle, including CFO Jeff

11 Henley at Oracle Headquarters.  We note the following points regarding our meeting:

12       &bull;     Oracle is not seeing the effects of a slowing economy at this point, but next

13            several weeks will be critical.

14       &bull;     Management reiterates guidance of 15-20% y/y database revenue growth and

15            75% y/y applications revenue growth for FQ301.

16

17       13.     February 7, 2001 Company statement/Jeff Henley statements reported by Deutsche

18 Bank Alex Brown:

19       (a)     Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff

20 Henley and VPs in the server and applications development organizations.

21       (b)     According to management, it has yet to see macro-related weakness in its

22 business. . . .

23       (c)     . . . Barring a severe economic downturn, management sees continued growth

24 driven by strong demand in key segments such as supply chain, customer relationship management

25 and collaboration.

26       (d)     Mr. Henley reiterated that the Company's outlook and guidance were

27 unchanged for F3Q01 (Feb).

28       14.     February 9, 2001 statement by Oracle's Jennifer Glass reported on Bloomberg:

1    (a)    "Oracle is still upbeat about its prospects for earnings growth, which will be

2 fueled by a new suite of Internet-friendly business software dubbed Oracle 11i," spokeswoman

3 Jennifer Glass said.

4    (b)    "We haven't changed our projections at all," Glass said.  "This slowdown is

5 going to provide new opportunities for Oracle as companies need to streamline and be more strategic

6 about the technology they buy."

7    15.    February 13, 2001 statement by Sanderson reported by Street.com:

8    (a)    As an example, [Sanderson] said one recent deal he's involved in wasn't

9 scheduled to close until Oracle's fourth quarter, which ends in May.  Instead, that deal should now

10 close shortly.

11    (b)    "I met with the COO and he decided he wanted to do it in February [instead of

12 May]," Sanderson said.

13    (c)    Sanderson said its database and application software business are strong.

14    (d)    "Actually, our pipelines around applications and database have never been

15 stronger," Sanderson said.

16    16.    February 13, 2001 Sanderson statements at Goldman Sachs Investor Conference:

17    (a)    "For example, in the sales area, in the sales automation area, I can now –

18 Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the

19 minute at any level of detail that you want to see. . . .  And if we go back in five minutes later and

20 look at what our forecast is, it's different.  Because some rep around he world has changed the

21 forecast.  Now I can see every deal out there that my reps around the world are working."

22    17.    February 13, 2001 statement by defendant Sanderson at Goldman Sachs conference

23 question and answer session:

24    Q.    Sandy, I'm curious about this new sales forecasting you have, how
        that's working.

25

26    A.    It's working great.

27    Q.    As you get together every week and sort of roll up your numbers, the
        economy – what's the sense, what are you hearing from the field in
        terms of how – the economy and sales cycles, anything changing
28      there?

1     A.    We're actually – I guess I'd start out by saying that our pipelines are – at application and database have never been stronger.  And that continues to be the case.

2

3     18.    February 21, 2001 statement of Jeff Henley reported by Deutsch Bank:

4     (a)    CFO Jeff Henley gave a brief presentation to the financial community, but

5 offered no commentary on the current quarter (Company is in its quiet period) and no change to

6 guidance.  Management still expects growth in applications license revenue to accelerate in the

7 second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters.

8     19.    February 21, 2001 statement by the Company reported by First Union Securities:

9     (a)    Our conversations with management continue to indicate that the pipeline is

10 strong both domestically and internationally for applications and database.  Management continues

11 to reiterate their guidance and belief that absent a material downturn in the economy their guidance

12 will hold up.

13     20.    February 21, 2001 statement by Jeff Henley reported by Robertson Stephens:

14     (a)    At an analyst briefing on Tuesday evening, CFO Jeff Henley maintained his

15 positive outlook and guidance of 75% year/year growth in applications and 15-20% year/year growth

16 in database servers for both the February and May quarters.  Consistent with recent statements,

17 Henley does not expect the slowing economy – barring a serious recession – to significantly impact

18 results over the near-term. . . .

19     21.    February 22, 2001 statement by Jeff Henley reported by William Blair & Co.:

20     (a)    Oracle management was positive during the formal analyst sessions (which

21 were Web-simulcast due to regulation FD).  Specifically, CFO Jeff Henley commented that since

22 Oracle participates in high ROI software, it is not clear that it will see much impact (negative) on its

23 business due to the weakening economy.  He also said that the economy is a wildcard, but he

24 suspects that Oracle will not be negatively affected unless there is a serious recession.  It also is

25 important to note that if Oracle management were concerned about the quarter, we believe it would

26 have used the analyst session as an opportunity to lower estimates.  According to Mr. Henley,

27 business looks good,  He was very bullish in the sessions.  We want to quote a few things he said.  In

28 regard to applications growth, he said that, "The second half growth will be as good, or better, than

the 69% growth posted in the first half."  As for the economy, he commented that, "ORCL is not seeing an impact."

22.    Oracles Sales Online Datasheet:

(a)    Oracle Sales Online provides sales professionals with complete customer overviews at each stage of the sales process.

- Global Forecast Reporting: Oracle Sales Online consolidates divisional forecasts within multiple currencies to provide sales executives with a global view of their company revenue forecast.  Senior executives can view global roll-ups of sales forecasts across geographic regions, currencies, sales organizations, and product lines. . . .

- Integration with Oracle Business Intelligence System: Oracle Sales Intelligence provides sales teams with a real-time, enterprise view of sales to help them meet quotas, assess current performance, and make continuous improvements.

23.    February 13, 2001 Sanderson statement at Goldman Sachs conference:

"So not only do  we have, you know, for example, an E- business Suite, Which I'll tell you more about.  But its basically ERP and CRM all integrated together.  But its written in 23 different languages , including Spanish and Latin American Spanish, Portugal, Portuguese and Brazilian Portuguese as being four different languages but we have also taken care of the localization requirements around the world as well."

24.    February 21, 2001 statement by defendant Ellison at AppsWorld:

(a)    We were the first Company to use this eBusiness suite and in the very first year we put it in, we saved $1 billion.

(b)    In fact, we recommend that you start with, you try a component of the suite and then you add it in.  Now the nice thing is it's like Lego blocks.  Once you have one piece in, the other pieces just snap together.  There's no systems integration required.  The key thing is, you can install just one piece and then again install another piece.  No systems integration.  You just basically

1 | turn it on or snap it together. . . .  Plug and play.  It is absolutely, all the pieces within the suite are

2 | literally plug and play.

3 |       25.    March 1, 2001 Statements by defendant Oracle to BlueStone Capital analyst:

4 |       (a)    "[M]anagement indicated last week that Oracle had not experienced any

5 | slowdown in business this quarter" and "Oracle's business continues to grow; the current pipeline is

6 | as strong as it has ever been, according to management."

7 | <u>INTERROGATORY NO. 6</u>:

8 |       Identify any material information that You contend was not disclosed by any Defendant

9 | during the purported Class Period and Identify the Communication or Communications made by any

10 | Defendant that You contend imposed a duty to disclose the omitted information.

11 | <u>RESPONSE TO INTERROGATORY NO. 6</u>:

12 |       1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

13 | above as if set forth herein.

14 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

15 | grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome,

16 | without reasonable limitation in its scope, and seeks information that is neither relevant nor

17 | reasonably calculated to lead to the discovery of admissible evidence.

18 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

19 | grounds that the phrase "any material information" is vague and ambiguous.

20 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

21 | grounds that it is overly broad in that it seeks information not related to Oracle.

22 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

23 | it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-

24 | product doctrine.

25 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

26 | it calls for a legal conclusion.

27 |       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

28 | that it seeks to impose upon 1199 SEIU Greater New York Pension Fund a duty to seek out

1   information and documents which are not in 1199 SEIU Greater New York Pension Fund's

2   possession, custody or control.

3        1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

4   to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

5   including information to be obtained during the depositions of and document production by the

6   Oracle defendants and various third parties – or expert opinion.

7        1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

8   grounds that it constitutes a contention discovery request that is premature at this stage of the

9   litigation.

10       Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

11  Greater New York Pension Fund directs defendants to the RSAC for examples of material

12  information that was not disclosed by defendants.

13  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6</u>:

14       Defendants failed to disclose the following material information:

15       •   Oracle customers had rejected/declined to purchase 11i or reduced purchases and

16  implementation commitments modules because the product did not work as represented.

17       •   Oracle customers had demanded and Oracle had paid millions in cash or service

18
    concessions due to problematic and failed implementations of 11i and its individual modules.
19

20       •   Oracle, though publicly stating that customers were "live" on 11i, repeatedly failed to

21  disclose that few, if any, customers were "live" on the full 11i suite software with the ERP and CRM

22  modules working together as represented.

23       •   Oracle could not consistently demonstrate a working full integrated suite of software

24  to prospective customers, which cost them millions in lost sales in each U.S. license division.

25  Sanderson moved deals out of his forecast if the demonstration went bad.

26

27

28

- Defendants' issued guidance to investors based on a forecasting process that failed to take into consideration the macroeconomic environment that Oracle faced entering Q301 and the change to Oracle's forecasting process that Ellison mandated in Q201.

- The failure to account for these changes rendered Oracle's forecast inaccurate.

- Oracle's internal sales pipeline was knowingly inflated to include deals that were stale or had very low likelihood of materializing in the quarter.

- Defendants did not believe the pipeline growth rates at the beginning of the quarter because they were too good to be true.

- Oracle sales growth rates during the Class Period were in fact declining for both its database and applications products.

- Oracle's sales pipeline growth was declining during the Class Period. The drop in Oracle's pipeline was unusual as compared to prior quarters both in terms of the timing and size of the drop.

- The pipeline coverage ratio dropped consistently and dramatically throughout the quarter while the conversion ratio climbed to as high as 64% of the pipeline for the finance department.

- The "Comfort/Growth Gap" was unusually narrow in Q301, showing that the pipeline growth was decelerating in comparison to the forecasted revenue growth when compared to prior quarters.

- Oracle's product based forecasts were inaccurate.

- The field forecasted earnings per share and database growth results below guidance in every week of the Class Period. The field's forecast for applications growth dropped precipitously throughout the Class Period and were below guidance at the beginning of February.

- • The 2Q01 Covisint transaction, while the largest in the Company's history, was not indicative of an ongoing increase in growth trends relevant to the future sales of the Company's future sales growth trends.

- • Oracle's sales staff prior to and during the Class Period had communicated to senior Oracle executives that sales were declining during the Class Period.

- • 11i was released well before testing had been completed (or in some instances started) on several of its modules including, but not limited to, its CRM module and its Order Management modules.

- • Oracle's 2Q01 financial statements were false and misleading, materially overstating revenue and EPS.

- • But for a November 30, 2000 last day of the quarter swap transaction with Hewlett Packard Oracle ("HP"), according to its own methods for reporting EPS, the Company would have reported only $0.10 per share for 2Q01.

- • The 2Q01 HP transaction had little economic value in that Oracle was only able to secure the deal with a promise to purchase a substantially equal amount of products from HP with millions in penalties for failure to abide by the agreement.

- • The Company had improperly kept money that customers had overpaid or double paid and had not informed customers of the fact nor returned said money.  Instead, Oracle used customer overpayments and duplicate payments to improperly adjust the Company's bad debt reserves, for example, and artificially inflate reported earnings.

- • During the Class Period, the Company's internal periodic financial results (flash reports, upside reports, pipeline reports) showed material sales growth declines during the Class Period.

- Oracle's own internal attempts to implement the 11i Suite of software in December 2000 and January 2001 had caused substantial delays due to product defects, contributed to reported revenue declines during the Class Period and shut down the Company for weeks.

- 11i, and in particular the CRM module, was not fully developed and riddled with bugs and functionality gaps which made it costly to implement.

- The Company had misrepresented 11i's functional capabilities to customers to convince them to purchase 11i, including conducting sales demonstrations with fake data.

- The downturn in the United States economy had affected the Company's ability to increase sales growth of its products in part due to customers spending less on information technology and dot.com customers were going out of business.

- During the Class Period, Oracle's internal periodic reports showed that the financial forecast, including earnings forecast for Q301, were declining and reflected that the Company would report earnings below publicly forecasted results.

- The financial forecast was declining because of reports of bad performance and adverse information in the U.S. license divisions.

- Applications customers during the Class Period threatened to cancel, canceled or reduced their purchases or installations of 11i software applications because the Company could not demonstrate that it worked, failing implementations, and or the cost associated with installing the software had skyrocketed.

- Oracle's implementations partners had experienced substantial difficulty in their attempts to install or implement the software at customer sites and had complained directly to Oracle that the 11i software did not work and communicate demands for refunds to Oracle executives.

- Oracle's own consulting organization had before, during and after the Class Period, worked for free at customer sites trying to make 11i software work.

• Oracle's utilization rates for its consulting organization were below what defendants considered good and had dropped from 74% in Q201 to a forecasted 57% in Q301. Numerous consultants were on the bench in Q301.

• The problems with CRM made Oracle's sales representatives reluctant to sell the product, which cost Oracle millions in applications opportunities.

• Even though the Company claimed that 11i suite was designed to be pre-integrated and interoperable and, the development organizations did not develop and design the ERP and CRM software together designed the modules and platforms, but separately which contributed to the failure of the modules to communicate and function in a integrated and interoperable manner as defendants had represented.

• 11i, particularly CRM, the patches that were supposed to correct defects were often not properly tested and they often created more bugs in the software.

• The Company's largest sales organization NAS, during the Class Period showed significant signs of sales growth declines as a result of the slowing economy and the dot.com bust, among other things.

• The dot.com fall out was having a progressively negative impact on Oracle than in prior quarters and internal reports showed that Oracle could not fill the dot.com void with traditional brick and mortar sales.

• NAS reported on January 9, 2000 that the dot.com bubble had burst in the division.

• The Company's OPI sales division sales had reported declining-sales growth in periodic reports notwithstanding the 2Q01 Covisint transaction. Oracle analyzed OPI's results without Covisint, which showed negative growth rates throughout Q301 for OPI.

• The Company's OSI sales division sales had reported declining sales growth in periodic reports during the Class Period.

- Actual results for the first and second month of Q301 were far below prior year results and behind where Oracle needed at the end of each month to meet guidance.

- Month end analysis for December and January showed that Oracle was on track to meet the field forecast and not the financial department forecast.

- The EVP in the OSI division was advocating special incentives to try to boost Q3 sales.

- Defendant Sanderson created special programs to build OPI pipeline in Q3 and Q4.

- During January 2001, defendants Ellison and Henley were in possession of material nonpublic information at the same time that both individuals exercised options and sold Oracle stock to the public.

- Oracle had not and was not using Suite 11i to run its business internally.

- Key evidence in Oracle's accounting systems concerning debit memo transactions and their accounting history and documents in the files of members of its accounting staff have been admittedly destroyed or altered.

- Margins on applications and database sales were deteriorating due to competition from IBM and Microsoft providers and because Oracle's expenses were rising throughout the quarter.

- Oracle publicly cited customers as 11i references even though those customers were not using 11i.

- Oracle had millions in customer overpayments that it kept without the customers' knowledge.

- 11i application did not work in every language as Oracle had represented.

- During 2Q01, Oracle used customer overpayments and unapplied cash by, inter alia, improperly transferring the funds to a bad debt reserve account (which inflated revenue, net income

and EPS) and various other revenue and expense accounts (which also inflated revenue, net income and EPS).

- Oracle booked hundreds of millions of dollars in adjustments that improperly reduced the account balance of both Accounts receivable and Customer advances and unearned revenue. These adjustments caused Oracle's Days Sales Outstanding ("DSOs") to be understated by at least 20%.

- It had repeatedly violated state escheat laws on hundreds of payments for millions of dollars in funds that Oracle could not or would not return to customers.

- Plaintiff incorporates by reference the information outlined in response to Interrogatory No. 7.

Plaintiff further supplement its responses to Part 2 of Interrogatory No. 6 as follows:

26. Oracle's December 14, 2000 press release:

(a) Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19% . . . . Today, Oracle Corporation announced that second quarter net income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion.

27. Oracle's December 14, 2000 2Q01 earnings conference call:

(a) And then lastly . . . [about] the economy . . . [a]t this point, we see no impact or slowing in our business. We have seen no slowing of our business.

(b) [S]o the numbers I'm going to give you here, for database . . . we're thinking, you know, 15-to-20. You have to add five points to that, in terms of real (constant) dollar growth, or 20-to-25. Applications, we're thinking 75, or potentially better. You'd have to add five points to that.

(c) So I would assume, 12 cents would be a reasonable number at this point. I don't think history is going to be a lot different, here.

(d) The good news about applications, this quarter, is that every part of the little sub-markets that we're in, we're strong. And every geography, (we're) strong, Europe, Asia, U.S.

1  So there's nothing that we – no weakness in our applications business and the pipelines at every one

2  of these geographies looks astounding for this next quarter.

3          (e)     [Y]ou can buy our complete E-Business Suite, where all the pieces are

4  designed and engineered to fit together, and no systems integration is required.  It's up and running

5  in months.  You get the savings in months.  It costs you less, and it takes less time to install.

6      28.     December 14, 2000 statement by Jeff Henley reported by Bloomberg:

7          (a)     "The economy is slowing . . . .  It's just not having a negative impact on our

8  business."

9      29.     December 15, 2006 Jeff Henley interview with Radio Wall Street:

10          (a)     [T]he economy right now even though it's slowing doesn't seem to be

11  affecting us.  We see no difference in demand for our upcoming third fiscal quarter.

12          (b)     [S]o far we look pretty hard at indicators.  We're seeing no softening in our

13  business.

14          (c)     "If they [Oracle's customers] have to slow down on discretionary spending,

15  it's not going to be on e-business," Henley said.

16          (d)     The margins were continuing to expand nicely and the application business

17  was really picking up steam.  He saw no difference in demand for the upcoming fiscal Q3.

18          (e)     The application[s] business was going to be solid and steady.  But the real

19  momentum in the much higher growth was going to be in the applications business. . . .

20      30.     December 15, 2000 Ellison statement reported by Bloomberg:

21          (a)     The economic slowdown isn't hurting Oracle, said Oracle Chief Executive

22  Larry Ellison, because the company has spent the past three years updating its product line to focus

23  on software that helps companies use the Internet to cut costs and boost efficiency.

24  "The whole (idea behind Oracle 11i) is to start saving money fast."

25      31.     January 9, 2001 Sanderson statement reported by Salomon Smith Barney:

26          (a)     The suite is pre-integrated and fully interoperable out of the box, helping to

27  lower consulting costs and time-to-value.

28

1      (b)     Oracle sees robust demand for both its database and applications business.

2 Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

3 scheduling, CRM, and SCM products are also performing well.  Oracle says it is also seeing

4 sustained demand for its database product, despite industry-wide concern over contracting IT

5 budgets.  3,500 copies of applications shipped – pipeline looks strong.  Sanderson noted two trends

6 driving demand for databases is demand for the 11i applications that are typically bundled with the

7 database as well as applications of other vendors that rely on the functionality of the Oracle database.

8      32.     January 20, 2001 Sanderson statement reported by RealMoney.com:

9      (a)     "You know, it's a big hill to climb.  Every year we climb that hill.  I expect

10 we'll do it again.  Our pipelines are strong, and we're well-positioned from a products perspective,

11 so it's all about execution."

12      33.     January 11, 2001 Statement of Stephanie Aas reported by Bloomberg:

13      (a)     Company spokeswoman Stephanie Aas today said Oracle has yet to see any

14 signs that its business is being hurt by the economic slowdown or reported cuts to information-

15 technology budgets. . . .  "Obviously the economy is a wild card.  So if we went into a recession or

16 there is a sharp downturn [in the economy], we could be impacted . . . .  But we're not seeing it

17 now."

18      34.     February 6, 2001 Technical Whitepaper:

19      (a)     Oracle's CRM suite is both complete and integrated . . . .  No systems

20 integration is required to install the Oracle CRM suite.

21      (b)     In fact, systems integration labor usually runs many times the cost of the

22 software or the hardware needed to run the system – and the customer gets to pay for it.  To install

23 the Oracle CRM suite, no systems integration is required.  And because the CRM suite consists of

24 true Internet applications, every application works in every country, every major language, and every

25 major currency.

26      (c)     Oracle employs more than 7,000 direct sales representatives in 60 countries

27 and in seven global business units.  All Oracle sales reps are using Oracle Sales Online for customer

28 management, pipeline management, forecasting, and external financial reporting. . . .

(d)     Oracle's financial organization also uses this application to prepare reports for management and for analyst calls.  The company does business in 25 local currencies, with one reporting currency (U.S. dollars).  After e-mail, Sales Online is the most-used application at Oracle.

(e)     Global Sales Forecast:  Can you state your exact global sales forecast, up to the minute? . . . covering all geographies, all lines of business, all products, all services, all customers, all partners – and including all licenses, product renewals, support contracts, Web-based sales, call center telebusiness, direct business, mail catalogs, and business through partners and other channels? Can the forecast reflect management judgments as well as the estimates of the sales reps? Can you review opportunity data and identify which opportunities your sales organizations are committed to?  Can you see multiple views of that information – one by manager and one by salesperson?

35.     February 7, 2001 statement of Jeff Henley reported by First Union Securities, Inc.:

(a)     On February 7th, we met with management of Oracle, including CFO Jeff Henley at Oracle Headquarters.  We note the following points regarding our meeting:

- Oracle is not seeing the effects of a slowing economy at this point, but next several weeks will be critical.

- Management reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301.

36.     February 7, 2001 Company statement/Jeff Henley statements reported by Deutsche Bank Alex Brown:

(a)     Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff Henley and VPs in the server and applications development organizations.

(b)     According to management, it has yet to see macro-related weakness in its business. . . .

(c)     . . . Barring a severe economic downturn, management sees continued growth driven by strong demand in key segments such as supply chain, customer relationship management and collaboration.

1    (d)    Mr. Henley reiterated that the Company's outlook and guidance were
2  unchanged for F3Q01 (Feb).

3    37.    February 9, 2001 Statement by Oracle's Jennifer Glass reported on Bloomberg:

4    (a)    "Oracle is still upbeat about its prospects for earnings growth, which will be
5  fueled by a new suite of Internet-friendly business software dubbed Oracle 11i," spokeswoman
6  Jennifer Glass said.

7    (b)    "We haven't changed our projections at all," Glass said.  "This slowdown is
8  going to provide new opportunities for Oracle as companies need to streamline and be more strategic
9  about the technology they buy."

10    38.    February 13, 2001 statement by Sanderson reported by Street.com:

11    (a)    As an example, [Sanderson] said one recent deal he's involved in wasn't
12  scheduled to close until Oracle's fourth quarter, which ends in May.  Instead, that deal should now
13  close shortly.

14    (b)    "I met with the COO and he decided he wanted to do it in February [instead of
15  May]," Sanderson said.

16    (c)    Sanderson said its database and application software business are strong.

17    (d)    "Actually, our pipelines around applications and database have never been
18  stronger," Sanderson said.

19    39.    February 13, 2001 Sanderson statements at Goldman Sachs Investor Conference:

20    (a)    "For example, in the sales area, in the sales automation area, I can now –
21  Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the
22  minute at any level of detail that you want to see. . . .  And if we go back in five minutes later and
23  look at what our forecast is, it's different.  Because some rep around he world has changed the
24  forecast.  Now I can see every deal out there that my reps around the world are working."

25    40.    February 13, 2001 Statement by Defendant Sanderson at Goldman Sachs conference
26  question and answer session:

27    Q.    Sandy, I'm curious about this new sales forecasting you have, how
         that's working.
28

A.   It's working great.

Q.   As you get together every week and sort of roll up your numbers, the economy – what's the sense, what are you hearing from the field in terms of how – the economy and sales cycles, anything changing there?

A.   We're actually – I guess I'd start out by saying that our pipelines are – at application and database have never been stronger.  And that continues to be the case.

41.   February 21, 2001 statement of Jeff Henley reported by Deutsch Bank:

(a)   CFO Jeff Henley gave a brief presentation to the financial community, but offered no commentary on the current quarter (Company is in its quiet period) and no change to guidance.  Management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters.

42.   February 21, 2001 statement by the Company reported by First Union Securities:

(a)   Our conversations with management continue to indicate that the pipeline is strong both domestically and internationally for applications and database.  Management continues to reiterate their guidance and belief that absent a material downturn in the economy their guidance will hold up.

43.   February 21, 2001 statement by Jeff Henley reported by Robertson Stephens:

At an analyst briefing on Tuesday evening, CFO Jeff Henley maintained his positive outlook and guidance of 75% year/year growth in applications and 15-20% year/year growth in database servers for both the February and May quarters.  Consistent with recent statements, Henley does not expect the slowing economy – barring a serious recession – to significantly impact results over the near-term. . . .

44.   February 22, 2001 statement by Jeff Henley reported by William Blair & Co.:

(a)   Oracle management was positive during the formal analyst sessions (which were Web-simulcast due to regulation FD).  Specifically, CFO Jeff Henley commented that since Oracle participates in high ROI software, it is not clear that it will see much impact (negative) on its business due to the weakening economy.  He also said that the economy is a wildcard, but he suspects that Oracle will not be negatively affected unless there is a serious recession.  It also is

1   important to note that if Oracle management were concerned about the quarter, we believe it would

2   have used the analyst session as an opportunity to lower estimates.  According to Mr. Henley,

3   business looks good,  He was very bullish in the sessions.  We want to quote a few things he said.  In

4   regard to applications growth, he said that, "The second half growth will be as good, or better, than

5   the 69% growth posted in the first half."  As for the economy, he commented that, "ORCL is not

6   seeing an impact."

7       45.     Oracles Sales Online Datasheet:

8               (a)     Oracle Sales Online provides sales professionals with complete customer

9   overviews at each stage of the sales process.

10              •       Global Forecast Reporting: Oracle Sales Online consolidates divisional

11                      forecasts within multiple currencies to provide sales executives with a global

12                      view of their company revenue forecast.  Senior executives can view global

13                      roll-ups of sales forecasts across geographic regions, currencies, sales

14                      organizations, and product lines. . . .

15

16              •       Integration with Oracle Business Intelligence System: Oracle Sales

17                      Intelligence provides sales teams with a real-time, enterprise view of sales to

18                      help them meet quotas, assess current performance, and make continuous

19                      improvements.

20

21      46.     February 13, 2001 Sanderson statement at Goldman Sachs conference:

22              "So not only do  we have, you know, for example, an E- business Suite,
                Which I'll tell you more about.  But its basically ERP and CRM all integrated
23              together.  But its written in 23 different languages , including Spanish and
                Latin American Spanish, Portugal, Portuguese and Brazilian Portuguese as
24              being four different languages but we have also taken care of the localization
                requirements around the world as well."

25      47.     February 21, 2001 statement by defendant Ellison at AppsWorld:

26              (a)     We were the first Company to use this eBusiness suite and in the very first

27   year we put it in, we saved $1 billion.

28

1          (b)     In fact, we recommend that you start with, you try a component of the suite

2    and then you add it in.  Now the nice thing is it's like Lego blocks.  Once you have one piece in, the

3    other pieces just snap together.  There's no systems integration required.  The key thing is, you can

4    install just one piece and then again install another piece.  No systems integration.  You just basically

5    turn it on or snap it together. . . .  Plug and play.  It is absolutely, all the pieces within the suite are

6    literally plug and play.

7    INTERROGATORY NO. 7:

8          Identify all facts that support Your contention in paragraph 16 of the Complaint that

9    "Defendants ... knew that 3Q01 sales would not meet public revenue and earnings projections,"

10   including the date in 3Q01 on which You allege Defendants knew this fact, and each fact that You

11   allege formed the basis of their knowledge.

12   RESPONSE TO INTERROGATORY NO. 7:

13         1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

14   above as if set forth herein.

15         1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

16   grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and

17   without reasonable limitation in its scope.

18         1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

19   of the attorney work-product doctrine and/or attorney-client privilege.

20         1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

21   it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

22   control.

23         1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

24   it mischaracterizes the allegations in the RSAC.

25         1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

26   grounds that the phrases "the date in 3Q01 on which You allege Defendants knew this fact" and

27   "each fact that You allege formed the basis of their knowledge" are vague and ambiguous.

28

1    1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

2    to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

3    including information to be obtained during the depositions of and document production by the

4    Oracle defendants and various third parties – or expert opinion.

5    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

6    grounds that it constitutes a contention discovery request that is premature at this stage of the

7    litigation.

8    Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

9    Greater New York Pension Fund directs defendants to the RSAC.

10   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

11   •      The facts that support the contention in this Interrogatory are listed, in part, in

12   paragraph 16 of the Complaint.  Defendants Ellison, Henley, and Sanderson had regular access to

13   critical information about Oracle's business and its ability to meet guidance.  Ellison is a hands-on

14   manager who loved getting involved in every detail of the business.  Ellison maintained tight control

15   over every aspect of Oracle's operations, including forecasting.  Ellison agreed that he was "close to

16   the business, well informed, and very persistent in terms of assembling the facts as to the matters in

17   front of him in which he needs to make decision."  Ellison admitted he was a very hands-on CEO

18   who took the initiative to make calls or obtain the necessary information from a variety of sources to

19   be able to make approvals or decide on policies.  Oracle promoted 11i and its Oracle Sales Online

20   application as giving senior executives, including each defendant, a global view of sales and revenue

21   forecasts, including the ability to assess current sales performance against targets.   Ellison

22   specifically kept track of Oracle sales on a single internal database that covered not only the United

23   States, but the entire world:  All of Oracle's information was in one database.  Defendants knew

24   exactly how much Oracle had sold in the last hour around the world.  OSO was realtime in the sense

25   that every time someone put in a change, you saw it.  OSO gave Ellison, Henley, Sanderson and

26

27

28

other Oracle executives information about prospective opportunities, dollar amount, probability percentage, the dollar split between applications and technology, and the type of applications that were being projected, among other things.  The benefit of OSO was global visibility.  As Oracle rolled out OSO, defendants could sit down, go online right at their desks or when they were traveling and go online.  Ellison had been using OSO for years and was demanding full compliance as early as September 2000.  Part of Ellison's daily routine is a visit to OSO.  Oracle purged OSO after the filing of this lawsuit and also destroyed all OSO log-in records for the Class Period.  Ellison facilitated the destruction of recorded conversations between himself and Matthew Symonds, the author of the Ellison biography.  The defendants would hold forecast meetings on Mondays, where they would look at OSO results up on the screen and talk about what was in OSO.

- Defendants' forecasting process and their reliance on that process to provide guidance to investors in Q301 failed to take into consideration that Ellison had mandated a change to Oracle's forecasting process in Q201 (by increasing the risk that Ellison mandated the field include in its forecast) and it ignored the dramatic change in the macroeconomic environment that Oracle faced entering Q301.  In October 2000, Ellison intentionally changed the forecasting process to include more risk than in the past.  Defendants failed to take this change into consideration when increasing the forecast received from the field in Q301.  The forecasting change increased the risk (and therefore the aggressiveness) of the forecast coming from the field.  In December 2000 NAS followed Ellison's directive by adding $28 million of Judgment at the line of business level and another $39 million at the division level.  The other U.S. license divisions also followed Ellison's mandate.  The forecasting change caused riskier deals to be included in the pipeline and therefore necessarily increased the size of the pipeline.

- Defendants failed to take into consideration the forecasting change and the severe economic conditions that were then impacting Oracle's business.  Q300, the quarter from which

1  Oracle used to forecast growth, was the height of the market and the height of an economy that had

2  been described as irrationally exuberant.  Ellison himself acknowledged that the strong economy in

3  Q300 and Oracle's performance in that economy set the bar very high (a bar that Ellison demanded

4  to be raised by 30%).  The finance director from the NAS division (Oracle's largest sales division)

5  noted at the outset of the quarter that growth comparisons would be tougher in Q301 and Q401

6  because "NAS results took off last year in Q3 and continued into Q4."  At the outset of Q301, NAS

7  was seeing a slowdown in large deals and its pipeline was not where it needed to be to meet its

8  $359,977 million quarterly budget.  Defendants knew that NAS sales would slow in Q301 and that

9  fact was discussed at the EMC meetings.  As of December 8, 2000, NAS had no big deals in the

10  pipeline.  As of December 5, 2000, OSO reflected negative 10% per year-over-year growth in the

11  pipeline for OSI while OSI's forecast reflected 50% year-over-year growth.  Henley had concerns

12  about each license division before he issued guidance.  He knew that NAS had no big deals in the

13  pipeline, that the tech pipeline for OSI was down "a lot," and that the upside for OSI had questions.

14  •    At the outset of Q301, defendants' forecasts effectively double-counted the deals that

15  formed the basis of the field.  Sudden growth or shrinkage in the economy would necessarily render

16  Oracle's forecasts unreliable unless accounted for.  Defendants deliberately ignored changes in the

17  macro-economic environment to permit the dissemination of inaccurate forecasts.  Ellison did not

18  believe Oracle's product forecasts to be accurate.  Defendants therefore knew, or recklessly

19  disregarded, as of the date issued, that sales would not meet revenue and earnings protections in

20  Q301.

21  •    Defendants also knew from the beginning of the Class Period that 3Q01 sales would

22  not meet public revenue and earnings projections through Oracle's internal forecasting process and

23  through weekly executive management committee meetings, which all defendants attended every

24  Monday with the EVPs of the U.S. Divisions, Safra Catz and Jennifer Minton for the purpose of

discussing their forecasts and how they were performing.  Ellison examined any week-to-week changes in the total company and/or division level forecasts and discussed the basis for any such changes.  Defendants gave consideration to the historical differences between Q2 and Q3. Defendants were in possession of facts at the beginning of each week in the quarter, informing them that Q3 sales would not meet revenue and earnings protections and that Oracle's business was being adversely affected by the economy.  Those dates include, at a minimum, 12/11/00, 12/25/00, 1/15/01, 1/22/01, 1/29/01, 2/5/01, 2/12/01, 2/19/01, 2/26/01, 2/27/01 and 2/28/01.  Facts also show that defendants received, and were in possession of, information showing defendants that Oracle would miss guidance and was being adversely affected by the economy at other points in the quarter, as discussed herein.

•       Ellison believed that the key intra-quarter forecasting indicators were year-over-year pipeline growth, field sales forecasts, financial department forecasts, actual results for the first and second months of the quarter, and the number and size of the big deals that are potentially going to close in the quarter.  Ellison and Henley claim to have looked at all the performance factors collectively to evaluate the forecasts and to gauge Oracle's intra-quarter performance on an ongoing basis throughout the quarter.  Each of these indicators showed that Oracle's business was being negatively impacted by the downturn in the economy.  Each defendant received reports outlining results for each of these indicators throughout the Class Period, including "Upside Reports," the "Pipeline Reporting Package," and "Americas Forecast Package."[2]

_____

[2]       Plaintiffs' allegation that defendants knew that they were going to miss guidance is further supported by Oracle's destruction of numerous documents, including reports that would reveal trends and information about Oracle's forecast throughout the quarter.  In fact, Henley reluctantly admitted that Oracle "probably would have" documents that defendants have failed to produce in this litigation.

- Year-over-year pipeline growth, while as high as 52% in week 1 of the quarter, dropped precipitously in the next few weeks and continued to fall throughout the quarter. Total Company pipeline growth was 52% on December 11, 2000 and dropped to 34% by December 25, 2000. This represented a $342 million drop in the pipeline in a two week period. The dramatic decline in the pipeline and pipeline growth so early in the quarter was unusual as compared to the prior quarters, both in terms of the size and the timing of the drop. Henley did not believe the reported pipeline growth at the beginning of Q301. Henley did not believe that the growth rate was accurate because he felt he was unable to get a good read from people. Between December 11, 2000 and January 22, 2001, Oracle's license pipeline declined $311,900,000 and its pipeline growth rate declined from 52% to 31%, both of which represent the largest declines occurring at comparable times in any of the previous four quarters. Between December 11, 2000 and January 22, 2001: (a) Oracle's license pipelines for the US Divisions, NAS, OPI, and OSI all declined, individually and collectively, more than they had at comparable times in Q300 and Q201; (b) Oracle's license pipeline growth for the U.S. Divisions combined declined more than it had at comparable times in Q300 and Q201; and (c) Oracle's license pipeline growth for NAS declined more than it had at comparable times in Q300 and Q201. The pipeline growth rates dropped to as low as 29% in February with pipeline itself collapsing nearly $500 million in the month. It dropped $232 million from January 22, 2001 to February 5, 2001, another $121 million by the second week of February, and another $109 million by February 19, 2001. The total pipeline only fell $31 million in the last week of the month. Of the total $800+ million collapse in the pipeline, more than $600 million of it came out of the applications pipeline. In January 2001, the NAS division had only one deal above $5 million in the Q3 pipe. The previous year, NAS had four deals that netted $28 million. There were no other "Covisint" type deals in the pipeline. And the deal cycle was lengthening. The deal cycle (the time it took to close a transaction from beginning to end) for application deals is several

months and the cycle for database deals is shorter.  When there is an economic downturn Oracle's deal cycle gets longer because deals will take longer to close when companies require more approvals, resulting in slowdowns or cancelled deals.  The pipeline is therefore harder to convert in an economic downturn.  Oracle was facing an economic downturn in Q301.  Defendants knew this at the beginning of the quarter.

•     Ellison reviewed pipeline numbers for the total Company and by geographic divisions.  Ellison examined any week-to-week changes in the pipeline figures and discussed the reasons for any such changes at the EMC meetings.  Ellison followed the pipeline progress and examined the pipeline closely throughout the quarter and compared changes in pipeline to the prior year.  Ellison is aware that the dynamics of the pipeline are very important.  Defendants had access to the information showing that the pipeline had, in fact, fallen rapidly during the first two months of Q301.  Defendants knew by December 25, 2000 that Oracle was being adversely impacted by the economy and that the basis for its guidance had changed considerably.

•     The decline in Oracle business and in the pipeline had an impact on the conversion and coverage ratios that Oracle utilized to forecast its sales.  The Forecast coverage ratio is calculated by dividing the pipeline by the forecast.  The Potential coverage ratio is calculating by dividing the pipeline by the Potential.  Ellison and others examined the Forecast coverage ratio/Potential coverage ratio to see whether they were reasonable as compared to prior period coverage ratios.  If the pipeline coverage ratio was higher than in a prior quarter, defendants would inquire about the quality of the pipeline and have the sales force examine the probability of specific deals closing.  Coverage ratios were declining rapidly throughout Q301.  The pipeline coverage ratio dropped consistently and dramatically throughout Q301.  The behavior of this metric showed each defendant that Oracle was, in fact, feeling the impact of the economic downturn and undermined any belief in Oracle's ability to meet guidance.

1    • Defendants estimated license revenues by applying the historical pipeline conversion

2    ratio from prior periods to the current pipeline. The historical pipeline conversion ratio is calculated

3    by dividing the pipeline number for a particular point in a prior quarter into the end of quarter actual

4    results for that same quarter. The historical pipeline conversion ratio from prior quarters was applied

5    to the pipeline in the current quarter to project revenues for the current quarter. Ellison and others

6    applied the historical pipeline conversion ratios from previous points in prior quarters and years to

7    determine what a reasonable conversion ratio was based on history. Defendants applied the

8    historical actual conversion rate from the previous two quarters. Although many of the historical

9    comparisons were done year-over-year, defendants applied the historical pipeline conversion ratio

10   from prior quarters, not just the historical pipeline conversion ratio from Q300, to the Q301 pipeline

11   to estimate Q301 license revenue figures.

12   • Ellison applied the historical conversion ratio from multiple quarters, including Q201.

13   The historical actual conversion rates are hard numbers, according to Ellison, a ratio, not a forecast.

14   Defendants claim that they made this assessment at various points in the quarter. Ellison testified in

15   one case that he personally relied on this calculation intra-quarter in Q301. Ellison claims to have

16   performed the calculation at least twice: (i) once at the end of January 2001; and (ii) in December to

17   conclude that Oracle would achieve $0.16 EPS. Ellison changed his story, however, during his

18   September 21, 2006 deposition. When presented with the 20% drop in the pipeline from the

19   beginning of the quarter to the date of his sales, Ellison denied looking much at the pipeline growth

20   and reverted to claiming he relied upon the forecast. Defendants had the tools to analyze conversion

21   rates and trends within particular quarters. The conversion ratio climbed to as high as 64% of the

22   pipeline in Q301. The conversion ratios applied by the finance department were only slightly below

23   those that Oracle achieved in Q300 (one of the strongest quarters in Oracle's history). Given the

24   adverse news from the field, the conversion ratios applied by the finance department were unrealistic

and unachievable.  The behavior of this metrics showed each defendant that Oracle was, in fact, feeling the impact of the economic downturn and undermined any belief in Oracle's ability to meet guidance.

- Historical ratios and analyses were discussed at the EMC meetings.  The forecast conversion ratios for total Company license revenue were higher than they were in Q201 or Q300, indicating that a higher percentage of deals would need to be realized out of the pipeline to make the forecasts than was necessary in Q301 or Q300.  The forecast conversion ratios for the division-level license forecasts were higher for Q301 than at comparable times in Q201 and Q300, indicating that a higher percentage of deals would need to be realized out of the pipeline to make the forecasts than was necessary in Q201 or Q300.  In fiscal 2000, using the year over year historical pipeline conversion ratio yielded a more accurate forecast.  In fiscal 2001, the use of the prior quarter historical conversion rate yielded a more accurate forecast than year-over-year.

- The "Comfort/Growth Gap" was a metric that Oracle used to measure its forecast for the quarter.  Oracle Senior executives, including defendants Ellison and Henley, tracked the spread between forecasted license revenue growth rates and the pipeline revenue growth rates, as another tool to assess the achievability of the forecast and the strength of the license business.  Ellison compared the difference between the pipeline growth rate and the revenue growth rate as well as "at what rate is the pipeline growing" as compared to "at what rate is the forecast growing."  Ellison admitted that he customarily examined the relationship between pipeline growth rates and forecast growth rates.  In evaluating Oracle's intra-quarter revenue figures, Ellison analyzed the difference between the forecasted growth and potential growth figures on the one hand and the pipeline growth figures on the other hand.  When confronted with a Pipeline Reporting Package with the Comfort/Growth Gap figures penned in his own handwriting, Henley conceded that he analyzed the difference in the Comfort/Growth Gap and requested that it be included in report format.  Since both

forecasted license revenue growth rates and the pipeline growth rates appear on the face of the Upside Reports used in Q3FY01, the Comfort/Growth Gap was easily discerned.

- The Comfort/Growth Gap showed defendants that Oracle would miss guidance for the quarter. The difference between the rate of the forecasted revenue growth and the rate of pipeline growth, or "Comfort/Growth Gap," was unusually narrow in Q3FY2001, showing that the pipeline growth was decelerating in comparison to the forecasted revenue growth when compared to prior quarters. In the preceding four quarters, the average Comfort/Growth Gap had ranged from 12% to 43%. At the beginning of Q3FY01, there was an average Comfort/Growth Gap of 22%. On December 25, 2000, the average Comfort/Growth Gap narrowed to 4%, which was uncharacteristic of first month behavior. The average Comfort/Growth Gap remained between 4% and 7% throughout January 2001 and continued to be 7% for most of February. The Potential Comfort/Growth Gap was even more telling. The Comfort/Growth gap between pipeline growth and the Potential growth rate was negative at times in December and in January and dropped as low as 5% in February. The gap between December 25, 2000 and January 29, 2001 never reached higher than 4% and was negative half the time. The financial department forecast, which formed the basis of Oracle's guidance to investors, was therefore forecasting license revenues to grow at a more rapid rate than the pipeline was growing. It had not done this in any of the first two months of a quarter in the prior year. Ellison was concerned that the pipeline was growing only slightly faster than the forecast. Ellison knew that it would be inappropriate to forecast sales growth in the absence of pipeline growth.

- Field sales forecasts put defendants on notice from the beginning of the Class Period that public guidance was unreachable. Ellison testified falsely in the derivative case that the field was forecasting "a great quarter." The field forecasted EPS and database growth substantially below guidance throughout the entire Class Period, and rapidly declining applications growth. The field's

forecast also decreased throughout the quarter, which was contrary to the normal behavior of the field forecast.  In December 2000 and January 2001, none of the U.S. Divisions increased their forecasts.  The U.S. Divisions forecasted EPS of $0.107 on December 11, 2000 (three days before Oracle issued guidance), $0.106 on December 25, 2000, $0.106 on January 15, 2001, $0.107 on January 22, 2001, $0.107 on January 29, 2001, $0.105 on February 5, 2001, $0.109 on February 12, 2001, $0.11 on February 19, 2001, $0.11 on February 26, 2001, $0.11 on February 27, 2001, and $0.107 on February 28, 2001.  The field forecast was far below guidance for Oracle database products.  They forecasted database growth of 3% on December 11, 2000 (three days before Oracle issued guidance), 3% on December 25, 2000, 5% on January 15, 2001, 8% on January 22, 2001, 8% on January 29, 2001, 9% on February 5, 2001, 11% on February 12, 2001, 12% on February 19, 2001, 10% on February 26, 2001, 10% on February 27, 2001, and 5% on February 28, 2001.  And while the field forecast actually exceeded guidance for applications growth, it only did so in January and February but fell precipitously throughout the Class Period.  Defendants forecasted applications growth of 107% on December 11, 2000, 107% on December 25, 2000, 95% on January 15, 2001, 86% on January 22, 2001, 86% on January 29, 2001, 73% on February 5, 2001, 68% on February 12, 2001, 56% on February 19, 2001, 66% on February 26, 2001, 66% on February 27, 2001, and 59% on February 28, 2001.  These product-based numbers were provided using budget rates.  Given Ellison's mandate to the field to increase the risk in its forecast, defendants knew before December 14, 2000 that guidance was unreachable.

• At the weekly EMC meeting, the Finance Department reported its "Upside" numbers based on each division's forecasts.  Ellison examined how the Potential forecasts grew compared to prior year forecasts.  The Upside Reports relied heavily upon past trends, and did not take into account current macroeconomic conditions – such as the dot.com implosion.  The Upside Reports failed to account for discounts granted to customers at the end of the quarter, even though Oracle

historically granted large discounts to those customers comprising its so-called "hockeystick effect." Minton double counted deals when she added $159.5 million in upside to the license forecast at the beginning of the quarter, as the field had already included additional risk/upside in its forecast pursuant to Ellison's instructions.  The upside adjustments fell precipitously throughout Q301 with no offsetting increase in the division level forecast.  The Upside adjustments fell by $62 million in the first two months of the quarter and dropped below guidance on January 29, 2001.  In the January 15, 2001 Upside Report distributed at the EMC meeting of the same date, the Finance Department lowered its total Company License Upside by $64.6 million (from $159.5 million to $94.91 million) and reduced the Potential EPS to $0.1211 (down from the December 25, 2000 Potential EPS of $0.127).  The Finance Department also lowered its Upside for NAS by $36 million and eliminated all upside for OSI.  By January 22, 2001, the Finance Department's Upside declines reduced the spread between Potential and guidance to $24 million or 1.5%.  In the January 29, 2001 Upside Report distributed at the EMC meeting of the same date, the Finance Department lowered its total Company License Upside by $51.5 million (from $94.91 million to $43.41 million) and reduced the Potential EPS to $0.1158 compared to the January 15, 2001 Upside Report.  By January 29, 2001, the Finance Department had not only lowered its total Company License Upside revenue by an additional $51.5 million, it had eliminated the Upside for NAS entirely and applied a negative $35 million Upside to OSI.  Q301 was the first time in the four quarters prior to Q301 that Oracle had ever applied a negative Upside judgment to a U.S. Division in the first two months of the quarter.  By January 29, 2001, the Finance Department's Potential Figures for Total License Revenue, Total License Revenue Growth, Database License Revenue, Database License Revenue Growth, and EPS were all below the guidance.  The upside adjustments fell another $22 million in the first two weeks of February.

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 40 -

1       • Usually, Oracle decreased upside as a result of deals closing or becoming more likely

2   to close – this would cause these deals to be included in the forecast and would remove the necessity

3   of including them in upside.  For the upside to decrease without a corresponding increase in the

4   forecast meant that upside deals were dropping out completely.  This was the first time there was a

5   decrease in upside without a corresponding increase in forecast.  Henley admits that at least by

6   January 29, 2001, he thought that making Oracle's guidance for the quarter was going to be a "horse

7   race."  Minton specifically identified a series of e-mails she had received from the Senior Finance

8   Directors of the U.S. Divisions and the December Flash Report as a source for her lowered Upsides.

9   These included information based on e-mails received from David Winton on January 11, 2001,

10  James English on January 17, 2001, Larry Garnick on January 17, 2001 and Sarah Kopp on January

11  18, 2001.  This information was discussed with defendants at the weekly executive committee

12  meetings.  Even if defendants were to have relied solely on Minton's upside forecast, they knew by

13  January 29, 2001 that Oracle would not meet guidance and that Oracle was being adversely impacted

14  by the economy much earlier.  Ellison did not rely on Minton's projections, but conducted his own

15  analysis to gauge Oracle's performance including quarter-to-date sales information.  Ellison

16  conducted analyses using the data contained in OSO, the Upside Reports and Pipeline Reporting

17  Packages (which contained historical pipeline data), actual revenue data contained in Flash Reports

18  and updates provided by the EVPs regarding specific deals and the status of the quarter.

19      • Actual results for the first and second months of a quarter as well as quarterly

20  contributions to the fiscal year are important indicators to defendants of future performance.  Ellison

21  and the other EMC members compared the actual results to the forecasts to see how much revenue

22  they needed to generate in order to make guidance.  Henley reviewed analyses based on historical

23  data, including comparing quarter-to-date results to historical performance of prior first months.

24  Defendants compared first month results to historical first month results to forecast and analyze

historical contributions of each month to quarterly results to assess performance.  Sanderson put a particular emphasis on monthly actuals.

- Each month of a year contributes a generally consistent percentage of revenues for each specific quarter, with December contributing the highest average percentage of first months, and February contributing the lowest average percentage of third months.  Oracle's third quarter has, on average, the least pronounced "hockey-stick effect" of any of its quarters.  December accounts for, on average, 21 percent of quarterly revenue as compared to June (14 percent), September (13 percent), and March (11 percent).  On average, January accounts for 19 percent of total third quarter revenues.  On average, the first two months of Oracle's third quarter account for 40 percent of total third quarter revenues.  Ellison and Henley received monthly and QTD results through e-mails from Larry Garnick (the "Garnick Flash Report") summarizing the actual results for the month just ended, which Ellison studied.

- Actual results for the first and second month of Q3-01, including results in Oracle's license divisions, were dramatically below prior year results and far behind where Oracle needed at the end of each month to meet guidance.  Ellison received December's results, at the latest, on January 17 or 18, 2001 in an e-mail from Larry Garnick (the January Garnick Flash Report).  The very next day he instructed his accountant, for the first time, begin trading on the next trading day.  The January Flash Report was sent to all members of the executive committee, including defendants Ellison, Henley and Sanderson.  According the January Garnick Flash Report, each of Oracle's U.S. divisions was exhibiting negative trends in their businesses by the end of December 2000.  NAS had forecasted division level growth of 12 percent for December 2000 and forecasted potential growth of 28 percent for December 2000.  In December 2000, NAS had actual growth of negative 84 percent.  OSI division level forecasted growth for December 2000 was 19 percent and forecasted potential growth was 38 percent.  OSI's actual growth in December 2000 was negative 84 percent.  Excluding

Covisint, which Ellison admitted was an outlier that Oracle itself was backing out of its forecast in order to understand current trends in its business, OPI's growth in December was negative 85 percent.  These negative trends made it extremely unlikely that Oracle would outperform historical trends in the last two months of the third quarter 2001, as was necessary to meet its guidance. Without Covisint, Oracle's total license revenue growth in December 2000 was 1 percent.  Oracle had provided guidance for license revenue growth of 25 percent.  Without Covisint, December 2000 contributed only 14 percent of the revenue necessary to meet Oracle's guidance (again, less Covisint) for 3Q01.  Even with the Covisint transaction, Oracle was behind where it needed to be to meet guidance.  The month end analysis shows that given historical contributions, Oracle was on track to meet the field's forecast of $0.107 cents earnings per share, far below the $0.12 earnings per share guidance given on December 14, 2000.   Applications and database were also down significantly for December 2000 without the one-time Covisint transaction.  Applications product growth was 216% (ERP was at 365% and CRM was at negative 58%) while database product growth was 17% (Server was at 21% and Tools was at negative 26%).  Excluding Covisint, Applications product growth would have been negative 46% and database product growth would have been 13%.

- Because Covisint was an unrepresentative "outlier," defendants analyzed their business without the transaction and knew that Oracle's business was down significantly from prior year results.  Ellison had been informed early in the quarter that large deals had slipped in NAS. Ellison was aware that big deals are the first to go in a down economy, which is exactly what was happening during the Class Period.  Defendants were aware that the January Garnick Flash Report showed that Oracle was off to a "slow start" excluding Covisint.  The revenue Oracle generated in December 2000, even with Covisint, trailed the percentage contribution December historically made to the quarter.  With Covisint, Oracle's total license revenue was $237,787,000 in December 2000.

This equals: (a) 18% of the $1,310,556,000 Guidance given on December 15, 2000; (b) 19% of the $1,257,864,000 division-level forecast for January 15, 2001; and (c) 18% of the $1,352,774,000 Potential forecast for January 15, 2001.  These figures are all below the average 21% contribution of December to the quarter.  Thus, Oracle needed to outperform its historical average in January and February to reach its guidance for license revenue.  Adjusting for Covisint shows that Oracle's performance in December 2000 measured against the historical average contribution of Q3 to the quarter was below the historical range.  Without Covisint, Oracle's total license revenue was $177,787,000 in December 2000.  This equals: (a) 14% of the $1,250,556,000 (the $1,310,556,000 Guidance given on December 14, 2000, less Covisint); (b) 15% of $1,197,864,000 (the $1,257,864,000 division-level forecast for January 15, 2001, less Covisint); (c) 14% of $1,292,343,000 (the $1,352,774,000 Potential forecast for January 15, 2001, less Covisint).  These figures are well below the average 21% contribution of December to the third quarter.  Ellison attempted to minimize the importance of December's results to Oracle's third fiscal quarter but could not dispute that December was the best first month in terms of revenue of any quarter in the year.  Dividing Oracle's non-Covisint revenue by 0.21 results in estimated quarterly non-Covisint License revenue of $859,638,095, an amount well short of the projected quarterly non-Covisint revenue of $1,244,000,000.  At the end of December 2000, Oracle was not on pace to equal or exceed guidance.

• January's results were even worse than December.  The first two months of Oracle's third quarter accounted for, on average, 40 percent of its revenue for the quarter.  Ellison received January results, at the latest, on February 8 or 9, 2001 in an e-mail from Garnick (the "February Garnick Flash Report").  The February Garnick Flash Report was sent to all members of the Executive Committee, including each defendant.

• The February Garnick Flash Report showed that Oracle's QTD actual results through January were dismal.  OSI showed negative 17% growth, NAS showed negative 33% growth, and

without Covisint OPI showed negative 63% growth.  Results through January showed that Oracle was at best only on track to meet the field's forecast of  $0.109 per share – January QTD license results represented 36% of the total forecast for Q3FY01.  The QTD analysis that Ellison, Henley, and Sanderson each received noted that Oracle was not on track to reach the guidance that Oracle gave to investors on December 14, 2000 and then reiterated throughout the class period.  Defendants were aware that the analyst community was expecting 23% license revenue growth and 18% overall revenue growth for Q3FY01.  To deliver 23% USD license revenue growth Oracle needed $1,341 million in CD license revenue for the quarter, $95 million (8%) more than the current forecast.  As of January 15, 2001, NAS had reported only $1.4 million in sales for the month to date, for a total of $31.4 million quarter-to-date.  In the last two weeks of January, NAS only booked $24.6 million in revenue.  In December and January 2001, NAS only had total license revenue of $56 million, which was far short of the $80.4 million that NAS had internally forecasted on January 15, 2001, for the first two months of Q3FY01.  NAS experienced a combined growth rate for December and January of negative 35%, worse than its December negative 24% growth rate.  As of January 9, 2001, OSI forecasted $73,600,000 in license revenue for December 2000 and January 2001.  OSI only had sales of $22,747,000 in December 2000 and January 2001.  OSI license revenue growth rate for December and January was negative 17%.  As of January 26, 2001, OPI had booked no license revenue in January 2001.  Thus, at the time that Ellison decided to trade, OPI had not generated a single dollar of license revenue in the month of January 2001.  OPI only generated $2.6 million and $4.8 million in license revenue in addition to Covisint in December and January 2001, respectively.  The combined license revenue for both December 2000 and January 2001 in addition to the Covisint deal was $7.4 million.  The January Flash Report shows that Oracle's total license revenue growth for the combined months of December 2000 and January 2001 was 25% with the benefit of the Covisint transaction.  Excluding the Covisint deal, total license revenue grew 8%.  The February Garnick

Flash Report showed license revenue in the U.S. divisions grew negative 4% in January and 15% in December/January combined even with the Covisint deal.  The February Garnick Flash Report showed license revenue in the U.S. Divisions grew negative 32% in December and January 2001 combined adjusted for the Covisint deal.  The quarter-to-date figures at the end of January 2001 showed that Oracle needed to beat its average and equal its best February (final month) in the previous five years, which was at the apex of the economy and the stock market in FY00, to make its Q301 guidance of $1,310,556,000 for USD license revenues.  The revenue Oracle generated in December 2000 and January 2001, even with Covisint, trailed substantially the percentage contribution December and January historically made to the quarter.  With Covisint, Oracle's total license revenue was $434,408,000 for December 2000 and January 2001.  This equals: (a) 35% of the $1,253,433,000 division-level forecast for January 29, 2001; (b) 33% of the $1,296,843,000 Potential forecast for January 29, 2001; and (c) 33% of the $1,310,556,000 Guidance given on December 14, 2000.  These figures are all below the average 40% contribution of December and January actual results to the quarter.  Thus, Oracle needed to outperform its historical average January and February to reach its guidance for license revenue.  Without Covisint, Oracle's total license revenues was $374,408,000 in December 2000 and January 2001.  This equals: (a) 31% of $1,193,433,000 (the $1,253,433,000 division-level forecast for January 29, 2001, less Covisint); (b) 30% of $1,236,843,000 (the $1,296,843,000 Potential forecast for January 29, 2001, less Covisint); and (c) 30% of the $1,250,556,000 (the $1,310,556,000 guidance given on December 14, 2000, less Covisint).  These figures are far below the average 40% contribution of December and January to the third quarter.  At the end of each month, and at the latest 1/17/01 and 2/8/01, Ellison, Henley, and Sanderson each were in possession of material adverse information showing that Oracle would miss guidance and that Oracle's business was being adversely affected by the economy.

- • Defendants also knew that Oracle would miss guidance for Q301 because they took illegal steps in Q2 to report revenues to meet guidance for that quarter. Defendants therefore knew at the end of Q2 that Oracle's business was slowing. Specifically, Oracle had to enter into an illegal barter transaction with HP to meet its public guidance for Q201. Ellison negotiated the transaction with Carly Fiorina and delivered from his house a letter that he signed during the last minutes of the last day of Q2-01 memorializing Oracle's transaction with HP. Oracle agreed to buy $30 million in product from HP in exchange for HP committing to purchase $30 million in products and support from Oracle. Oracle sold its product to HP at "very high" discount rates to get the deal done and included product that HP did not need or did not intend to use for long periods of time. Safra Catz signed a non-cancellable letter agreement on Oracle's behalf on November 30, 2000 obligating Oracle to purchase $30 million in product from HP in two separate installments of $15 million each ($15 million by December 28, 2000 and $15 million by September 30, 2001). In the agreement, Oracle committed to move 100 percent of Oracle's production data to HP Unix servers by May 31, 2001 and 100% of Oracle's CRM development servers to HP UNIX servers by November 1, 2001. Oracle also agreed to operate all CRM online services, the Oracle store, the Oracle web-based customer interaction database, and the Oracle defect database on HP Unix servers by November 1, 2001 and to operate Oracle platinum systems CRM training, education, and consulting implementation pilots on HP Unix servers by November 1, 2001. Defendants delivered the agreement to HP at approximately 11:45 p.m. on the last day of the quarter. Oracle did not receive the signed agreement from HP until the next day. In return, HP placed a $29.8 million order with Oracle at around midnight on November 30, 2001. The order included $21.3 million in license fees that Oracle recognized as revenue in Q2 and support service fees of $8.5 million. Henley was involved in the HP transactions and approved it on the last day of the quarter despite concerns over the barter nature of the transaction. The HP purchase was the subject of a special meeting of the

executive committee on the last day of the quarter.  The transaction was a swap transaction that was improperly accounted for.

- Defendants took other measures to offset the decline in its business and meet guidance for Q201.  Oracle engaged in accounting manipulations to bring in tens of millions of dollars in revenues for the quarter.  Plaintiff incorporates herein by reference the discussion of Q201 accounting manipulations in response to Interrogatory No. 7.  The HP deal and the accounting manipulations reveal that defendants knew as early as Q2 that its business was slowing and feeling the impact of the economy.  According to Henley, Oracle's 3Q01 forecast seemed reasonable in part because it was forecasting EPS just one penny higher than it had earned in 2Q01.  Thus, to the extent that Oracle's 2Q01 results were the product of improper revenue recognition, the reasonable nature of Oracle's 3Q01 forecast comes into question.  They were therefore in possession of adverse information undermining their forecast and showing that Oracle's business was showing even before issuing guidance on December 14, 2000.

- When they discussed what guidance to give the market, Henley told Ellison that he was concerned with the economy.  Minton "was a bit nervous going entering Q301 because Q201, which was very successful, had been even more back-end loaded than usual."  Ellison knew that, by Q3FY01, Oracle's dot.com business had largely disappeared.  Ellison acknowledged that, since Oracle had a very strong database quarter a year earlier that was driven by the dot.com there was a "lot of pressure on [Oracle's] database" for Q3FY01.  In Q100, dot.coms made up 73.3% of total GB license revenue field sales; 58.9% in Q200; 74.6% in Q300; 68.4% in Q400; and 65% in Q101.  However, by Q201, dot.coms made up only 51% of GB's field sales revenue.  GB dot.com field revenues totaled $4 million in Q199; $5.5 million in Q299; $24.5 million in Q399; $35.8 million in Q499; $42 million in Q100; $56.5 million in Q200; $111.5 million in Q300; $172.6 million in Q400; and $51.9 million in Q101.  As early as April 2000 Oracle's management was being warned that the

dot.com business was softening.  Defendants also knew by September 2000, that Oracle was experiencing "terrible," in fact, negative applications growth.  Ellison understood that Oracle was setting a high bar for year-over-year growth since the dot.com boom had resulted in an exceptionally strong Q300 and the bust had started to impact the Company's database business.  Ellison was aware that in times of major recessions, "businesses get very reluctant to spend a lot of money on large new capital projects.  And a lot of our software sales were part of an even larger IT development project. So these were large capital items, which are often deferred in times of recession."  Ellison knew that "large deals fall out more quickly" in a declining economy.  Ellison knew that "when the telecom's bubble got burst or the dot.com bubble burst, I would expect that sales to those industries would decline."

- •      Oracle started the quarter with news that its license divisions were being negatively impacted by the economy.  The finance director from the NAS division (Oracle's largest sales division) noted at the outset of the quarter that growth comparisons would be tougher in Q301 and Q401 because "NAS results took off last year in Q3 and continued into Q4."  At the outset of Q301, NAS was seeing a slowdown in large deals and its pipeline was not where it needed to be to meet its $359.977 million quarterly budget.  Defendants knew that NAS sales would slow in Q301 and that fact was discussed at the EMC meetings.  As of December 8, 2000, NAS had no big deals in the pipeline.  As of December 5, 2000, OSO reflected negative 10% per year-over-year growth in the pipeline for OSI while Nussbaum's OSI forecast reflect 50% year-over-year growth.   NAS generates, on average, approximately 25 percent of Oracle's annual license revenues.  OSI generates, on average, approximately 15 percent of Oracle's annual license revenues.  OPI generates, on average, approximately 10 percent of Oracle's annual license revenues.

- •      As of January 4, 2001, all data since December 14, 2001 pointed to more economic softening and the risk of the deals.  From January 9 to 11, 2001, NAS held a meeting for the entire

NAS division to evaluate and discuss how its business units were performing and how its forecast looked ("Ops Review"). At this Ops Review, members of NAS discussed the "Sluggish Economic Outlook" where the "Focus in on Profits" and "Reduc[ing] Costs." At this Ops Review, members of NAS discussed numerous problems plaguing NAS including the fact that GB noted that the larger dot.coms had already acquired the Oracle database so Oracle was looking to sell to second and third tier dot.coms, which meant sales would be more difficult. At this Ops Review, members of NAS discussed the fact that they were envisioning a "Mid Teen Technology Growth Rate" for the second half of fiscal 2001 and 2002 because there were no or few million dollar Dot.Com deals and average transactions were going to be smaller than before. At this Ops Review, members of NAS discussed the fact that there was a "Dramatic Decline in DotCom Business," which led to a $40 million database shortfall in the West division of GB and required a quota reduction for dot.com and trimming of the sales force. At this Ops Review, members of the NAS discussed the fact that the West division of GB was noticing CIOs were on a "shorter leash," that CEOs were more involved in the purchasing decisions," "CEO's meeting with CIO's More Frequently" and that CEOs wanted more return on profit. The problems affecting the dot.com/EC Sector through Q301, included 61,000 Layoffs, 50% of named dot.com list out of business, Trillions lost in market valuation, Pink Slip parties, dot.com's . . . dot.gone, and 100's of VCs turn off Funding Spicket. These were the very facts that Classick alerted George Roberts to in Q2-01. Over 70% of GB's sales were in technology. Technology comprised the bulk of sales to dot.coms, which in turn became a substantial part of GB's business, particularly in the West. Dot.com sales were projected as more than half of GB's technology business for FY01, and comprised almost 2/3 of GB-West's technology business. In Q101, dot.coms generated 75% of GB's technology field sales revenue. NAS' dot.com business in 3Q01 fell 66% from 3Q00, dropping from $111.4 million to only $37.5 million. In 3Q00, dot.com business made

up 40% of NAS' total revenues; however, in 3Q01, dot.coms were responsible for only 17.5% of NAS' total revenues.

- As of January 11, 2001, defendants were aware that NAS was reporting a slowdown for Q3 and Q4 and a slowdown in January 2001 from December 2000. NAS was the best indicator of how the economy was doing in the U.S. NAS West had started to see a slowdown in the technology area in Spring 2000 when customers started to indicate that they were not going to spend money until their businesses were profitable and deals started to take longer to close.

- During the first two months of Q3FY01, NAS internal forecasting documents, to which defendants had access, consistently showed negative growth in technology sales of Majors, General Business, and the division as a whole. Defendants had no expectation that the "bricks & mortar" customer base of NAS could fill the increasingly large void created by the dot.com bust. In Q100, dot.coms made up 73.3% of total GB license revenue field sales; 58.9% in Q200; 74.6% in Q300; 68.4% in Q400; and 65% in Q101. However, by Q201, dot.coms made up only 51% of GB's field sales revenue. GB dot.com field revenues totaled $4 million in Q199; $5.5 million in Q299; $24.5 million in Q399; $35.8 million in Q499; $42 million in Q100; $56.5 million in Q200; $111.5 million in Q300; $172.6 million in Q400; and $51.9 million in Q101. By January 29, 2001, technology sales to NAS' dot.com customers and "brick and mortar" (the non-dot.com) customers showed overall negative growth for Q3FY01 in NAS' technology sales. As of January 29, 2001, Oracle was facing: (a) negative 8% year over year growth in NAS' dot.com and ASP technology revenue in the first half of FY01 and anticipated growth of negative 54% and negative 41% in these lines of business in Q301 and Q401, respectively; (b) while there had been 65% growth in NAS' Brick and Mortar technology license revenue, the growth rate was anticipated to fall to 41% and 29% for this line of business in Q301 and Q401, respectively; (c) in total, while NAS had experienced 38% growth in technology in the first half of fiscal 2001, Oracle projected negative 6%

growth in NAS technology in Q301 and only 2% growth in Q4FY01.  As of January 29, 2001, defendants were aware that the dot.com fallout was having a progressively more negative impact on Oracle than in prior quarters.  The decline in the dot.com revenue stream was a topic of conversation at the EMC meetings during Q2FY01 and Q3FY01.

- Given Oracle's reliance upon historical revenue trends, a year over year comparison of NAS's GB unit put them on notice that Oracle would miss guidance.  Notably, GB's pipeline increased during January 2000, but fell from $487 million to $419 million in January 2001.  In several quarters prior to 3Q01, GB had experienced a pipeline that grew between the beginning of the quarter and the first week of the last month of the quarter.  In the first month of 3Q00, GB closed $24.5 million, but only $13 million in the same period of 3Q01.  During the first two months of 3Q00, GB closed $56.4 million, but in the same period of 3Q01 had only closed $17.7 million out of a forecast of $168 million – leaving 90% of the quarter's revenue to be pursued in February.

- OSI was experiencing signs of a slowdown in earnings, apart from the negative 8% growth rate in December.  As of January 18, 2001, defendants were aware that: (a) OSI was only standing by its $225 million forecast number so long as none of the very large opportunities dropped out, many of which were in the deeply troubled telecom industry; (b) OSI was only committing to $134 million, so there was $91 million in judgment to reach the $225 million forecast; (c) conversion rates across the board (except state and local) were north of 50% and its pipeline was only $422 million.  As of January 18, 2001, conversion rates for OSI and each of its verticals (except local) were over 50 percent.  The forecasted conversion rate for Federal was 62 percent.  The forecasted conversion ratio for State and Local was 43 percent.  The forecasted conversion ratio for Higher Education was 54 percent.  The forecasted conversion ratio for Healthcare was 54 percent.  The forecasted conversion ratio for Financial Services was 56 percent.  The forecasted conversion ratio for Communications and Utilities was 53 percent.  The forecasted conversion ratio for OSI

license was 53 percent.  Nussbaum testified that he was only comfortable with a forecasted conversion ratio of 40 percent or less.

• Defendants knew throughout Q301 that OSI was having trouble collecting from WorldCom and that both WorldCom and Health South were long-shots.  There were so many problems with the CRM product (the 11i Suite) during Q3FY01 that the sales force was reluctant to sell it until it was more stable.  Internally at Oracle it was known that buying the 11i Suite was akin to purchasing a BMW but receiving one without a steering wheel, an engine or tires and then being told that it would take more time and money to receive these items.  The CRM product problems led to OSI having to spend $21 to $22 million in labor to address Bell South problems.  Oracle had to reverse $6.7 million license revenue in 3Q01 for Bell South.  The revenue had been recognized in December 2000 but was reversed one week after the close of the quarter.  OSI experienced a decrease in its margins (as of February 14, 2001, a 4 percent decrease for the year) due to costs associated with the Bell South deal.  The OSI Federal vertical was expected to close $50 million in revenue but the field had committed to only $20 million and it had booked only $8.6 million.  The OSI State and Local vertical was expected to close $35 million in revenue but the field had committed to only $28 million and it had booked only $5.4 million.  The OSI Higher Education vertical was expected to close $10 million in revenue but the field had committed to only $8 million and it had booked only $0.3 million.  The OSI Healthcare vertical was expected to close $5 million in revenue but the field had booked only $1.6 million.  The OSI Communications and Utilities vertical was expected to close $80 million in revenue but the field had committed to only $48 million and it had booked only $15 million; and the OSI Financial Services vertical was expected to close $30 million in revenue but the field had committed to only $10 million and it had booked only $2.8 million.

- Oracle was also feeling a slowdown in OPI. As of January 17, 2001, defendants were aware that OPI had a "lot of pipe at challenging clients." As of January 17, 2001, defendants were aware that: (a) the best case number for OPI is "a real stretch as several of these deals will be Q4"; (b) one [Area Vice President] talked of starting to see indications of client delays on decisions." In the first two months of Q3FY01, OPI internal forecasting documents showed deals sliding from December 2000 and January 2001 to February 2001. As of January 17, 2001, defendants knew that: (a) OPI was reporting a coverage ratio of 240%; (b) OPI was projecting – 16% growth for Q4FY01, only 65% of target.

- The defendants were alerted to these facts in various documents, including flash reports and by discussions, at the EMC meetings. Ellison and Henley claimed that they grilled the EVPs on all forecasting data, including upside and downside of the forecasts, the EVPs' perspectives and sense of how things were going, and any impact the economy was having on their business. Ellison and Henley discussed the reasons for the decreases in the forecasts or potential figures and Minton relied on the negative information in lowering her Upside figures. Defendants also received information from forecasting calls on Thursdays. Henley, Minton and Catz would ask questions at the Thursday forecasting calls they attended and there would be discussions about the numbers in the Americas Forecasting Package including revenue, forecast, pipeline, margin and conversion rate figures and their accuracy and how they compared to prior week, prior quarter, or prior year, budget figures, particular deals and of any problems that might exist. During two January 2001 Thursday Forecasting Calls there were discussions about "concern in the East" division of OPI and the fact that Sanderson was "reluctant" with a "best" forecast of $185 million instead of the listed $225 million at that meeting.

- Defendants were also seeing the adverse impact the economy was having on Oracle in other ways. Oracle's expenses were rising throughout the quarter. Oracle's projections for expenses

and expense growth rates were rising in Q3FY01, in contrast to the declines in prior quarters. Oracle's total operating expenses actually increased in Q3FY01 over Q3FY00 and Q2FY01. Defendants also knew from initial consulting assignments that Oracle was feeling the impact of the economy.  Oracle's utilization rate of consultants was down considerably entering Q301.  A utilization rate at Oracle meant the amount of time that Oracle consultant were engaged in billable projects.  The remaining non-billable time was attributable to "vacations, holidays, training, proposals, things of that nature."  An optimal utilization rate is anything above 60%.  Oracle's utilizations rates for its consultants started the quarter at 57%, which was below the optimal range and dramatically below the 74% utilization rate that Oracle maintained in Q201.  The minimum of 60% included non-billable time attributable to the holidays and vacations.  Numerous were "on the bench" in Q3 and the 57% utilization rate was Oracle's internal forecasted number.  EVPs were either advocating "special incentives" to drive Q3 numbers or were creating special programs to build pipeline.  By December 18, 2000, Jay Nussbaum requested that defendant Ellison approve a "special incentive" for Q3.  Sanderson created his own "special program" in early February to try to build his pipeline for the last month of Q3 and for Q4, which he recognized was short in Q4 by $150 million and "a big hill to climb."

- Defendants knew that Oracle's 11i product was costing Oracle millions of dollars, which undermined Oracle's ability to meet guidance.  The 11i pipeline was "light" in Oracle's terminology in Q301 because Oracle did not have enough references and because the field was "afraid to sell it."  Throughout Q301, worldwide, sales people were reluctant to promote the 11i due to the product problems, lack of references, and local language problems.  One EVP stated that he had a simple, internal only, explanation.  Given the 11i problems in Q101 and Q201, many of Oracle's salespeople decided to focus on technology to make their quota and were waiting for the product to stabilize.  Throughout FY01 and beyond, Oracle 11i was plagued with severe product

problems which caused loss of confidence by sales, partners, analysts and customers.  Morgan Stanley advised Oracle secretly in Q3, 2001 that "a few of the reps I spoke with don't have the confidence to push crm because of the quality issues in the past."  Ellison sought Morgan Stanley's help to counter the increasing number of negative comments on the quality of Oracle's applications products.

- The problems with 11i, in particular Oracle's inability to demonstrate a product, limited Oracle's sales ability for 11i.  The inability to demonstrate the product caused a bottleneck preventing Oracle from effectively selling the product.  Oracle's inability to demonstrate the 11i negatively impacted Oracle's conversion rate.  The list of prospects that were being affected by Oracle's demo problems was described by defendant Henley as "really sickening."  The demo issue plagued 11i from its release in May 2000. In July 2000, Oracle was having major problems with the 11i demo system and the problems were known by defendants to cost Oracle Q1 business.  According to an e-mail received by defendant Sanderson and others, the real complaint was the fact that Oracle released the 11i product in May 2000 and two months later SCs were still unable to show a full suite of CRM live.  In January 2001, defendants knew that the 11i Suite remained unstable and demo problems continued to plague the Company.  Sanderson admits that a consistent theme throughout FY01 was the 11i's poor performance, Oracle's inability to prove their E-Business Suite integration story and product stability and quality issues.  Throughout FY01, Oracle was unable to show a complete integrated CRM demo let alone a complete E-Business Suite, ERM/ERP integrated demo.  The demo problems were causing Oracle's SC's to spend half of their time "resolving or working around demo/environment issues" instead of "spending 100 percent of their time around sales" and "zero time around resolving or working around demo environment issues."  Throughout Q301, the top three issues for demos remained performance, product quality/stability and the ability to show a complete integrated e-Business suite solution.  As of the beginning of February 2001,

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 56 -

more than 50 percent of an SC's time was spent resolving or working around demo/environment issues versus sales-related activities.

• Defendants also knew that as of January 2001, heavy patching due to product instability was impacting Oracle's ability to engage existing clients who were implementing 11i into additional sales cycles. Defendant Sanderson was notified throughout calendar year 2000 that problems with 11i were causing Oracle to lose opportunities for license and consulting sales. As early at October 2000, he heard that Oracle was about to lose another CRM opportunity and a lot of additional ERP business because of severe product problems. Oracle could not even train customers properly. Sanderson learned on October 12, 2000 that Yamaha, one of Oracle's largest clients in the west, had said that they were going to wait until 2002 to upgrade to 11i due to lack of training and product quality. In Q1 alone, Sanderson was told that 1730 days of Oracle consulting had been provided free to 11i customers, a North America hit of approximately $3 million. Sanderson was informed that due to the bugs and the number of patches required in some cases, field consulting teams had recommended to clients to wait until the new year until the product shakes out. Hudson's Bay also indicated that they would not be too interested in Oracle's CRM and Customer Loyalty solutions and that the decision could potentially cost Oracle $4 million in future business plus anything that it felt it could recover from Oracle. A November 4, 2000 e-mail request for live 11i sites for PR purposes by Roberts was rejected in his own organization because "we need to have a plan to fix the problems before we can address the issue of PR." Sanderson's consulting organization, OCS, had "1700 hours of nonbillable bugs" for one implementation of which Sanderson was certainly aware. Sanderson received a report of non-billable hours. In January 2001, Consulting and Support were being taxed by crises arising in the final stages of many 11i and CRM implementation projects. Sanderson's organizations swallowed $21 million of free consulting

1   services in fiscal 2000 because of the problems with 11i.  11i also cost Oracle significant support

2   revenues.

3   •   Oracle began implementing 11i internally in early December 2000 and negatively

4   impacted all Oracle divisions.  Kopp experienced problems with 11i during the internal upgrade.  On

5   January 19, 2001, the day after she wrote an e-mail explaining to various colleagues that she had

6   received assurances from Bret Fuller that the system had been fixed, she wrote to Terry Ford saying

7   "fyi . . . of course, for the fourth day in a row, it didn't stay up regardless of the assurances."  On

8   January 29, 2001, Kopp sent another e-mail detailing the "most significant issues" with the 11i

9   upgrade, including "The applications (Self Service Time & Self Service Expense) have been down

10  since 10 am today.  Operational Impact – not able to enter time in order to calculate labor revenue or

11  to rebill expenses.  We risk falling behind like we have the past two weeks."  The implementation

12  not only shut Oracle down for two weeks during Q301, but it also caused lost sales and orders in

13  specific divisions and company-wide.  It caused the Latin America division to lose millions in

14  telesales revenue and also caused Oracle to fall short on its support revenue, which both Henley and

15  Ellison knew at the latest by February 19, 2001 when told that lack of management reporting for the

16  new system, OKS, had crippled management's ability to detect an underlying problem in the renewal

17  rate in a timely fashion and that it seemed like a disaster based on the large drop in support revenue

18  growth for Q3.  Ellison and Henley were reminded that for the past several quarters Oracle had been

19  falling behind and for Q3 it seemed like things were worsening.  Minton would escalate systems

20  problems to Ellison routinely.  He and the other defendants were therefore acutely aware of all of the

21  problems that Oracle was experiencing with 11i and, consequently, the impact that those problems

22  were having on Oracle's Q3 results and its ability to meet guidance.

23  •   Defendants also knew that Oracle's implementation of 11i was adversely impacting

24  other parts of Oracle's operations.  On February 1, 2001, defendant Ellison was told that the

education forecast for Q301 was reduced by $7.2 million because of the internal implementation and performance issues with 11i.  The $7.2 million reduction represented nearly 15% of the education forecast for the quarter.  Defendant Ellison admits he was very familiar with these issues.  The reason for these and other problems were spelled out in SOFTWAR:

> "The next really big push was to get in contracting and order management over New Year's.  What happened was one of the most dramatic moments I'd seen during my five years at Oracle.  Everyone except Ron knew that we could not place an order with the new system."[]  And Larry, knowing we can't place an order, not knowing when we would be able to place an order, and knowing that once we turned off the old bespoke system that there was no going back, said, 'We're going live anyway.  I need a forcing function, so off we go.'  So we upgraded, and Oracle went down.  We were down for fourteen days.  For fourteen days that January, Oracle could not place a single order.

The following facts also support plaintiff's allegation that defendants knew and recklessly disregarded that Q3 sales would not meet revenue and earnings projections:

- Ellison uses the prices of Cisco and Sun stock as proxies for Oracle's performance.  He wrote, "If you plot the stock price of Cisco, Oracle, and Sun, you will see that all three companies rose and fell together in perfect synchronization as sentiment about the Internet rose and fell."  In the period leading up to Ellison's stock sales, both Cisco and Sun lowered earnings expectations as a result of the economy's effect on their business.  Sun pre-announced on January 19, 2001, the very same day that Ellison decided to trade.  Cisco pre-announced even earlier, along with other major industry players.

- At his deposition, Ellison admitted under oath that he has lied on several occasions about getting into medical school and about having a degree.  He also admitted to exaggerating the capabilities of Oracle's products.

- Ellison lied under oath in this litigation regarding a deal between Oracle and HealthSouth.

- Defendants recently settled a derivative case with similar but fewer claims for over $120 million.

- Ellison is famous for his lies. A Washington Post article titled "The Fog of Deceit" and dedicated entirely to Ellison's lies contains the following examples: "Deceit is a complicated notion with Ellison. He's been accused of practicing it in many forms – exaggerating the capabilities of Oracle's products, embellishing the meanness of his boyhood neighborhood and misleading people about which academic degrees he has earned," "'I care deeply about Larry,' says Karen Rutzky Back, now of Los Angeles. But he lied to her serially, she says. 'I got tired of being a detective about everything he said,'" "'He told me he graduated from an obscure college in Sheffield, England,' Quinn says. 'He told these big, whopping lies, and he stuck to them. He can follow these lies for years.'" The article goes on to discuss, at length, Ellison's lies to relatives, girlfriends, and wives.

- During the period in question, Ellison had only one e-mail address and received more than a hundred e-mails a day, most of which he answered himself or forwarded to the appropriate person. He also visited Oracle Sales Online on a daily basis and left messages questioning the status of particular sales opportunities as a result.

- According to Chris Kirkby, responsible for Oracle's Global IT System, Oracle's CRM forecasting tool, Oracle Sales Online (OSO), which Ellison bragged allowed him to view sales up to the minute, was "backed up daily." However, "[a]ny back-up tapes that had been maintained were 'purged' in connection with a system change by the IT Group that took place in July 2001."

- Oracle keeps logs of everyone who has accessed OSO and when they have accessed it. However, Oracle destroyed its log of OSO log-ins for the period in question.

- In the days that immediately followed the October 11, 2002 filing of the Complaint alleging that Oracle was using customer overpayments and unapplied cash in its 25005 account to inflate 2Q01 financial results, Oracle instituted an "action plan" to clean up customer "unapplied cash" and overpayments that were currently "On Account."

1   •   No documents were produced from the files of Julie Chan, the Senior Accounts

2   Receivable Manager responsible for providing detailed information to Arthur Andersen LLP

3   concerning 2Q01 material declines in the Company's "customer advances and unearned revenues."

4   Chan never received a document retention notice.

5   •   Oracle failed to preserve and produce documents concerning the SEC's investigation

6   into the allegations of the Complaint (including the refund check to Household Finance Corporation

7

8   ("Household") demonstrating that Oracle's representations to the SEC were false)

9   •   Oracle deleted the hard drives of key individuals in this litigation.

10   •   Oracle intentionally altered documents by adjusting up invoices associated with credit

11   memos in order to make it appear as though a customer had actually made a payment to an invoice.

12   This had the effect of creating the appearance that the customer overpayments plaintiffs alleged were

13   used to increase revenue and income would appear as though they were accurately applied.

14

15   •   Oracle intentionally destroyed relevant documents.  For example, defendants were

16   unable to produce any relevant documents from the files of Molly Littlefield, whose handwritten

17   notes made clear Oracle's scheme to alter documents relevant to this litigation, because she never

18   received a preservation e-mail and her computer was re-imaged and deleted in 2003.

19

20   •   Oracle has been and is currently under a Final Judgment of Permanent Injunction and

21   Consent Decree requiring broad and strict adherence to the Securities Exchange Act of 1934 and a

22   multitude of associated statutes.  The Company is specifically and permanently enjoined from failing

23   "to make and keep books, records and accounts which, in reasonable detail, accurately and fairly

24   reflect transactions and disposition of assets. . . ."

25   •   Oracle's records retention schedule provides that certain accounting documents must

26   be retained for several years after their creation.  For example, accounting backup Credit Memo

27   Adjustments must be kept for four years.  Call Notes from the collections department regarding

28

customer collections must be kept for a minimum of four years.  Account Reconciliation  to the General Ledger and supporting detail must be kept for four years.  Revenue Accounting account reconciliation must be kept for four years.  Some documents must be retained indefinitely.  Forecasting reports must be kept for three years.  Oracle had failed to preserve documents in accordance with the PSLRA, the Federal Rules of Civil Procedure, and even its own document retention policies.

- •      Defendants have produced just 20 generic, mass-distributed e-mails from Ellison's files, many of which are just duplicates.  Just one of these e-mails was sent after the Class Period.  The total production of documents from Ellison's files amounts to 123 documents totaling 623 pages (of which hundreds of pages are simply similar drafts of the same document).  Plaintiffs have received multiple e-mails from the files of other custodians which were sent to Ellison, both before and even after the filing of this action, which were not produced from Ellison's files.  Ellison only cleaned out his e-mail box once a year.  Daniel Cooperman testified that Ellison got information from a variety of different sources, including salesmen in the field.  Because Defendants falsely represented to the Court that Ellison only received information from his direct reports, they were only required to search the files of direct reports and at the AVP level and above for responsive documents.  Based on these facts, it is extremely likely that many relevant communications between Ellison and sale representatives below the AVP level (for example, regional Vice President who participated in forecasting calls with Ellison and others), other Oracle employees below the AVP level, customers, analysts, or other sources outside of Oracle were not produced in this litigation.  Even relevant communications between Ellison and Oracle employees at the AVP level or above are likely to have been lost because of the dearth of materials produced from Ellison's files combined with the fact that only 26 AVPs received preservation notices and some employees above the AVP level did not receive a timely preservation notice.  To the extent that Ellison communicated with

either an employee within the scope of the discovery plan who did not receive a timely preservation notice or an employee below the AVP level who was not within the scope of the discovery plan (as a result of defendants' false representations) through a method other than e-mail, it is impossible to understand what those persons were experiencing at Oracle at the time (and likely communicating to Ellison) because their files have not been properly preserved.

- The default setting at Oracle during the Class Period was to automatically delete sent e-mails (they had no outboxes). This was Ellison's setting during the relevant period. Oracle did not instruct either its employees generally or Ellison specifically to change this instruction once it became likely that this litigation would be filed. Thus, all e-mails sent by Ellison and others retaining this default setting, even after Defendants had a duty to preserve them, were not preserved.

- Defendants produced 181 documents from Safra Catz's files weeks after the close of discovery.

- Two weeks after the close of discovery, defendants produced an additional 50,000 pages of documents sourced to 73 different individuals.

- Ellison, Cooperman, and Segal all testified that they expected a lawsuit at least as soon as March 1, 2001. Cooperman testified that his concerns were raised when Ellison sold stock in January 2001.

- Oracle represents that Ellison, Mary Ann Anthony, Valerie Borthwick, Daniel Cooperman, Terry Ford, Mary Ann Gillespie, Jay Nussbaum, Roberta Ronnse, William Roselli, Frank Varasano, Barbara Wallace, and David Winton all either had: (1) no hard drive; (2) no responsive documents on their hard drives; and/or (3) their hard drive was deleted when the employee left Oracle before the filing of the Delaware Derivative action. Only Frank Varasano left before the filing of the Delaware Action and Segal has testified that she has never heard of an Oracle employee not having a hard drive.

- Defendants destroyed documents in violation of Oracle's document retention policies.

- The Special Litigation Committee tasked by Oracle's Board to investigate the allegations in the Delaware Derivative Litigation (with similar, although less, claims than this litigation) was held not to be disinterested.

- Defendants did not produce to plaintiffs all relevant documents from the derivative litigation.

- On December 9, 2004, plaintiffs served their First Set of Requests for Production of Documents to Defendants demanding documents (including electronic documents) from Defendants and all sources within their control.

- Despite evidence that such charts exist or existed at the time of that defendants were on notice that litigation was likely, defendants have never produced organizational charts to plaintiffs

- Defendants have consistently produced documents directly prior to the depositions of witnesses despite duties on their part to produce such documents pursuant to document requests much earlier in the litigation.

- After the first complaint was filed, on March 13, 2001, Oracle sent a document preservation e-mail to only 29 of 40,000 employees.   A few days later, Oracle sent such notice to 14 more employees.  Despite the fact that plaintiffs sought discovery of a broader range of employees, the Court, based on defendants misrepresentations about what information was communicated to Defendants, ordered production of documents from just the speakers, their direct reports, and 33 area vice presidents.   However, defendants had not even sent preservation notices to this group of individuals although they failed to alert the Court or plaintiffs to this fact.   The files of a large portion of the individuals whose files were ordered produced by the Court were not preserved.  Of the 33 AVPs, only 26 received preservation notices.

- Evidence suggests that in some instances, Oracle intentionally altered or destroyed relevant evidence.

- Oracle has repeatedly and falsely stated that its production of accounting documents was complete and that plaintiffs were entitled to nothing more. Only upon taking depositions (without key documents) have plaintiffs discovered the breadth of Oracle's discovery violations and its failure to preserve and secure evidence at the outset of this litigation.

- Oracle did not adequately monitor the preservation efforts of those few individuals who did receive preservation notices, instead merely instructing them to forward on the notice as they saw fit.

- Defendants have been unable to adequately answer plaintiffs' interrogatories regarding, among other things, lost deals, as a result of their destruction of the relevant documents. For example, defendants have been unable, in most cases to provide plaintiffs with the names of the sales and purchasing representatives involved in the deals and the reason why the deal did not close, among other things. Defendants have provided plaintiffs with the reasons that eight of the 182 deals lost in February 2001 did not close. From these sparse responses it is clear that defendants are trying to conceal the fact that deals did not close for the reasons alleged by plaintiffs, including the pervasive problems with 11i.

- Defendants have still not produced in this litigation a copy of SOFTWAR: An Intimate Portrait of Larry Ellison and Oracle, which the Court has found to be clearly relevant and responsive to many of Plaintiffs' document requests.

- OSO was purged after this lawsuit was filed. Defendants made little or no effort to ensure that the information on OSO and its backup tapes was preserved for this litigation.

- The information saved on other databases, for example Metalink, ECMS, or PRP, was not preserved by Oracle.

- Of the two attorneys for Oracle who have testified in this case (including the attorney responsible for Oracle's preservation effort), neither has been able to provide detail regarding Oracle's efforts to preserve Ellison's files.

- Defendants made no effort to preserve the information contained on Larry Ellison.com.

- Oracle did not preserve its preservation notices.

- Plaintiffs have received a few relevant documents from third parties which were not produced by defendants in this litigation as a result of their lack of preservation effort. It is unclear how much additional relevant material has been lost as a result of defendants' spoliation.

- Cooperman testified that Oracle did constant extensive surveys of its customers' opinions and experiences on every topic under the sun. Although Oracle has represented that they have produced all such relevant document required under the discovery plan, plaintiffs have received no such surveys of customer experiences from the relevant time period.

- Oracle indicated for the first time that some individuals' files may not have been preserved in mid-May 2005 (over four years after the lawsuit was filed and after the Court's deadline for document production had passed).

- Even the direct reports of defendants and executives alleged to have made false and misleading public statements in this lawsuit did not receive preservation notices. For example, of Sanderson's 12 direct reports, eight never received a document retention notice. The remaining 4 received such notices eight months after the case was filed. Because Oracle's backup tapes are recycled every 30 days, unless specifically saved or archived by a witness, documents from the files of those who received late document retention notices are likely gone forever. Not one of Stephanie Aas's direct reports received a document retention notice.

1   • Oracle never preserved the files of confidential witnesses and even people specifically

2   named in the Complaint, for example Adam Hahn and Brad Scott.

3   • Many witnesses who never received preservation notices have testified that relevant

4   documents would have been in their files.

5

6   • Oracle has produced documents from the files of witnesses or which involve these

7   witnesses well after their depositions

8   • Upon an employee's departure from Oracle, that employee's e-mail is purged and

9   deleted.

10  • Upon the filing of this lawsuit, Oracle failed to put into place a litigation hold and its

11  backup tapes continued to be recycled every day.

12

13  • Oracle executives, including Ellison, Henley, and Sanderson, served as executive

14  sponsors for sales accounts and owned particular escalated 11i accounts. As such, had direct contact

15  with all levels of Oracle employees working to assist the relevant customer, not just those employees

16  at the AVP level and above.

17  • Given that there were 54 AVPs and 262 weekdays during the relevant period, Oracle

18  preserved on average less than two e-mails per week day per AVP. One AVP testified that he likely

19  sent between 75 and 125 e-mails per day. An SVP who did not receive a timely preservation notice

20  testified that she received hundreds of e-mails per day. Another testified that he would be copied on

21  100 e-mails per day. Many others gave similar testimony.

22

23  • The senior executives for General Business, to which Oracle attributed much of its

24  miss in 3Q01, received no preservation notices.

25  • Documents created after the filing of this lawsuit have not been preserved. A

26  March 19, 2001 e-mail sent from George Roberts to, among others, Ellison, Barrenechea, Sanderson,

27  Nussbaum, Jarvis, and Henley regarding Suite 11i problems at Papa John's, and stating "[t]his

28

situation can no longer wait.  I have 3-4 clients where we are about to lose control" was not preserved in the files of any of the recipients.

- Although Henley testified that he never reaffirmed guidance during a quarter, plaintiffs have identified and defendants have produced multiple documents, both from analysts and from Oracle public and investor relations in which Henley is quoted as reaffirming guidance during a quarter.

- Defendants Ellison and Henley, while in possession of adverse material insider information, sold over 32 million shares of Oracle for proceeds of over $900 million during the Class Period.

- On December 27, 2000, Ellison exercised 815,000 options, which witnesses have testified were exercised for year end tax planning purchases.

- Between January 22, 2001 and January 31, 2001, Ellison sold 29,084,576 shares of Oracle stock for proceeds of $894,786,135.  Prior to these sales, Ellison had not sold Oracle stock since 1996.

- Until he received the barrage of negative insider information regarding Oracle's business prospects in December 2000 and January 2001, Ellison's original plan was to exercise and sell in either 1Q02 or 4Q01.  Employees within Oracle, especially in Oracle's corporate tax department, sought to persuade Ellison to trade during the final trading window of fiscal 2001 (April 2001) instead of 1Q02 for Oracle's own tax planning purposes.  As a result, it is clear that Ellison planned to exercise and sell in April 2001.  Ellison did not communicate a decision to trade in January 2001 to anyone until January 19, 2001 when he informed Carolyn Balkenhol and Philip Simon.

- Between January 22, 2001 and January 29, 2001, Ellison exercised 22,232,000 options.

- • On January 4, 2001, Henley sold 1 million shares of Oracle stock for proceeds of $32,312,500. On January 4, 2001, Henley exercised 1 million options.

- • In 1Q00, Oracle repurchased approximately 78,052,000 shares of its own stock for approximately $579,895,000. In 2Q00, Oracle repurchased approximately 76,702,000 shares of its own stock for approximately $791,906,000. In 3Q00, Oracle repurchased approximately 31,098,000 shares of its own stock for approximately $672,732,000. In 4Q00, Oracle repurchased approximately 104,889,854 shares of its own stock for approximately $3,262,238,000. In FY2000, Oracle repurchased approximately 290,741,854 shares of its own stock for approximately $5,306,771,000. In 1Q01 Oracle repurchased approximately 51,807,656 shares of its own stock for approximately $1,995,423,000. In 2Q01 Oracle repurchased approximately 43,600,000 shares of its own stock for approximately $1,425,400,000. In 3Q01, Oracle repurchased approximately 12,600,000 shares of its own stock for approximately $350,900,000. In 4Q01, Oracle repurchased approximately 33,556,604 shares of its own stock for approximately $528,277,000. In FY2001 Oracle repurchased approximately 141,564,260 shares of its own stock for approximately $4,300,000,000. In 1Q02, Oracle repurchased approximately 42,100,000 shares of its own stock for approximately $753,800,000. In 2Q02, Oracle repurchased approximately 82,500,000 shares of its own stock for approximately $1,100,000,000.

- • At the end of 2000, Henley stated: "It's a whole new opportunity. Now, whether we'll do it or not, I have no idea, but it's the thrill of doing something really big with 11i. So I have strong financial incentives to want to stay, and certainly the stock has imploded. I'd like to see it regain, do a double or a triple, and get some of my capital. I want my money back, that sort of thing. I've got a lot of vested options, so a lot of reasons, a lots of reasons that I've stayed."

- • After delaying the release of 11i once, Ellison felt tremendous pressure from customers and analysts not to delay again.

1

•       Order management was critical to Suite 11i. According to Ellison, "The order

2

management system is the heart of the sell side of our e-business suite. Order management is the

3

funnel that captures the information about the sale. The better your order management system, the

4

more information it captures."

5

6

•       According to Ellison, when order management came out it had a lot of bugs.

7

•       The release of a new order management system in Suite 11i was originally deemed

8

"too risky" but Ellison decided to include it in the Suite anyhow. As a result, order management was

9

released without enough testing.

10

•       Oracle was acutely aware of customer dissatisfaction with Suite 11i.

11

12

•       According to Ellison, the myriad problems with 11i "just kind of got away from us,

13

and that became a very big problem."

14

•       It took longer to fix all of the problems with 11i than Ellison anticipated.

15

•       According to Ellison, he should have delayed the release of 11i for longer than he did.

16

•       Ellison has a habit of making false representations about the functionality of Oracle

17

products.

18

•       Oracle has had problems with releasing its software too early and without enough

19

20

testing in the past.

21

•       Ellison on the release of 11i: "We should have done two things: installed it in-house

22

first and engaged with the early implementations at an executive development level. I think if either

23

of those things had happened, we would have rapidly found out that it wasn't done. As it was, it

24

took us until November [2000] to realize we had issues and start to mobilize."

25

•       Ellison discussing Oracle's internal implementation of 11i in December 2000 and

26

January 2001: "But I wanted to get all our latest application software installed, up, and running at

27

28

1  Oracle, and I wanted to do it fast.  We should have done it before we released 11i to customers, but
2  we didn't.  Okay, that was my mistake.  Now I wanted to remedy that mistake as soon as possible."

3  • On GE Medical's 11i implementation: "The contract was signed in late October
4  [2000] with a clear understanding that if Oracle delivered at Veresegyhaz, GE would start rolling out
5  11i across its thirty or so other turbine plants.  Within a month, the project was in trouble."

6  • On the release of 11i "If Ellison had known what was coming, he might have
7  restrained himself a little more.  In October [2000], the first reports from the field described early 11i
8  implementations afflicted with more than usual bugginess. . . .  Over the next couple of months,
9  customer complaints poured in.  Instead of working on the planned features and functions to flesh
10 out the suite's capabilities as planned, development was increasingly engaged in a feverish attempt
11 to produce patches that would fix the bugs that seemed to be flying at them from all sides. . . .
12 Ellison says, '11i was a huge new product, so I knew there would be a lot of bugs, but there was no
13 way to know how many there were or how long it would take us to fix them.  I thought we could fix
14 most of the bugs pretty quickly, during the controlled release phase.  I was way too optimistic.  It
15 just kind of got away from us, and that became a very big problem."

16 • SOFTWAR promotional materials on the release of 11i: "Then last spring, Ellison
17 rolled the dice for the second time: Oracle shipped Release 11i. . . .  If the first bet was daring, this
18 second bet is even reckless.

19 • SOFTWAR promotional materials on Ellison: "Ellison says he's only happy when
20 everyone else thinks he's wrong, when he's 'walking way out to the end of the limb, then jumping
21 up and down.'. . .  For Ellison, it will always be a matter of 'win or die.'  He says, 'Without
22 recklessness, you can't innovate.  The rewards of recklessness are enormous.'"

- • SOFTWAR promotional materials on Ellison's penchant for lying: (quoting Ellison) "'But I was lying:  I had no intention of doing that.  I lied because I wanted to appear balanced and reasonable and because I needed time.  I never had a problem lying.  I knew I was right.'"

- • Sergio Giacoletto was concerned that Oracle was losing its credibility as a result of problems with 11i implementations.

- • GE felt that 11i had not been properly tested and were upset that specifically had to identify problems to Oracle's development team before that team would begin working on the problem.

- • 11i was still not stable long after the Class Period ended.

- • Escalated Account Reports received by top Oracle executives detail hundreds of unhappy Oracle 11i customers, many of whom had problems which were not resolved for months or at all.

- • There were significant customer escalations as a result of the code quality of 11i releases.

- • Hewlett Packard was concerned about the quality of the support that they received from Oracle on 11i.

- • As of the end of August 2000, there were 15 customers live on 11i.  None of these customers were live on CRM.

- • 11i CRM and ERP did not integrate.  In late August 2000, Oracle executives expressed disbelief that a customer could be live on both CRM and ERP, stating "We have a hard time to believe that they have ERP and CRM running together."  The were right.  At this time, there were no Oracle customers live on CRM.

- • In January 2001 Christopher Balkenhol, who had recently taken over CRM customer escalations, was overwhelmed with the number of escalations.

1         •      11i was so dysfunctional that Jay Nussbaum refused to forecast it.

2         •      Oracle's own User's Group was extremely negative about the quality of 11i.

3
4         •      Oracle employees informed Oracle executives that the myriad of problems with 11i and the resulting failed implementations were putting OSI's State & Local vertical out of business.

5
6         •      Oracle employees felt that troubled implementations were creating a "big quality

7 black eye" for Oracle.

8         •      Mary Ann Anthony reported that many customers preferred 10.7 or previous versions

9 of Oracle's application suite as a result of "the lengthy and painful patching exercise" of upgrading

10 to Suite 11i.

11
12         •      Mark Barrenechea did not think that CRM was ready to release at the end of May

13 2000.

14         •      Oracle would have lost credibility in the market if it further delayed the release of 11i.

15         •      Oracle was concerned about a possible loss of credibility connected with any failure

16 to timely release a performance fix for the use of 11i on Apple computers.

17         •      Oracle had a difficult time competing with Siebel's CRM products.

18
19         •      Before, during, and after the Class Period, Oracle had extreme difficulties with

20 running 11i in different languages.  This was despite Ellison's statements to the contrary in October

21 2000.

22         •      Oracle's own difficulties in implementing 11i internally included problems in its

23 Education business which resulted in its inability to recognize revenues.

24         •      Oracle delayed its internal implementation of 11i many times because of concerns

25 with the product.

26         •      Customers experienced extreme difficulties with Oracle's NT product during the

27
28 Class Period.

- Oracle had trouble finding references for 11i before, during, and after the class period. E-mails detail their desperate searches for customers to act as references. Ellison was reduced to using companies as references when in fact only a small portion of the company was using 11i and in some cases, was not even live yet. Ellison also refused to remove GE as a reference even after it demanded that it not be used. Oracle went out of its way to ensure that contact information for GE was not released so that potential customers and analysts could not contact GE to ascertain its experience with 11i. Oracle offered discounts to customers to persuade them to act as references.

- Oracle internal documents discuss the lack of integration between 11i modules as late as 2002. For example, such documents state that weaknesses in 11i architecture made it more akin to Best of Breed, problems were damaging Oracle's sales campaigns, and the capabilities to integrate were non-existent or broken.

- Oracle gave concessions to unhappy customers to induce them to act as references for 11i. For example, Select Medical Corporation had previously been a reference for Oracle but asked that potential customers not contact them because of major problems with their implementation of 11i HR and Financials, including almost coming within 15 minutes of missing a direct deposit pay run as a result of poor system performance and the causation of months of instability in their underlying database. Even a weekly conference call with Oracle development could not quickly solve the problems. An upgrade to 11.5.3 caused even more problems. Oracle offered the customer a renewal of non e-business licenses at 100 percent discount of support cap, approved by Larry Ellison, in order to induce Select Medical to act as a reference for Oracle. Approval for a $450,000 concession to Interlogix, Inc. was requested from Ellison because their implementation of 11i was a disaster. The CEO had lost confidence in the product and the problems cost Interlogix $2.4 million in overruns. Problems with 11i were affecting both Interlogix's financial health and its employees'

morale.  Oracle recommended approving the $450,000 concession on the condition that Interlogix signed a release and agreed to be a reference.

- Oracle was forced to give concessions to unhappy 11i customers to avoid litigation and bad publicity, among other reasons.

- In October 2000, there were huge problems with the 11i implementation at Xerox.  Oracle was putting in hundreds of patches a week and still could not get Contracts to function.  According to Todd Allen, "We still can't get contracts to work.  We have no idea what awaits us as we implement the rest of CRM!  The products do not integrate to the back office, they don't work period."  The product was not stable.  At that time, Xerox was threatening to write a letter to Ellison to ask for its money back and told Oracle representatives that "your company is two steps away from fraudulent."  Ellison testified that "Xerox was implementing fairly standard software" and that ultimately, "Xerox was implemented successfully, very close to on schedule."  In actuality, Oracle was forced to pay a large concession to Xerox as a result of problems with 11i.  Ellison approved a $2.7 million concession to Xerox due to significant issues with its implementation resulting from problems with code stability and lack of integration between CRM and Order Management.

- Concessions to unhappy 11i customers impacted Oracle's financial prospects.  For example, the negative revenue impact on just NAS and OPI in Q301 was at least $14.6 million.

- According to Ellison, if Oracle upset too many customers in a particular time frame, it could affect Oracle's financial results.

- Paxar experienced extreme hardship while upgrading to 11i.  In December 2000, top Oracle executives including Ellison, Henley, Roberts, and Cochran were alerted to these hardships.  Paxar claimed that Oracle had guaranteed that 11i Order Management was stable and ready for implementation.  Paxar was dissatisfied with Oracle's products and Oracle consulting was forced to give away over 1,700 hours of non-billable time as a result of Paxar's issues.  Paxar was threatening

to take its negative experience with 11i public and Oracle decided to act quickly to fix the problems so that the problems would not be publicized.

- As of April 13, 2001, 11i product issues had caused a two percent deterioration in fiscal year 2001 margin percentage for Oracle consulting.  Oracle made a $2 million concession to Paxar, a $2 million concession to Ingersoll Rand, at least a $1 million concession to Xerox, a $1 million concession to Greenway Medical, a $1 million concession to Honeywell, and a $1 million concession to Franklin Covey, to name a few, as a result of problems with 11i.

- Oracle made a huge concession to BellSouth as a result of its problems implementing 11i.

- The problems with 11i harmed the Oracle customers who attempted to install it. Zapmedia's CFO sent e-mails to Mark Barrenechea and Larry Ellison regarding the company's problems with its implementation of the CRM module.  He explained that even after 50 hours of patching by Oracle's consultants the product did not work and that as a result, the company could not roll out its new product and was losing huge amounts of money.  Zapmedia's CFO claimed that Oracle Support could not solve their problems and had limited knowledge of 11i and that the CRM package was extremely unstable.  Later, Oracle was forced to grant Zapmedia a concession but by that time that company was on the verge of going out of business and declaring bankruptcy.

- Liberty Mutual met its go live date with 11i in early January 2001 but then experienced "atrocious" performance issues with 11i HR/Payroll.  Ellison knew about the problems at Liberty Mutual.  As of January 9, 2001, LM felt that the implementation was not complete as a result of performance problems.  These problems were having a negative impact on LM's business.

- In August 2000, National Pen claimed that Oracle showed them software features not actually available in 11i, that the software did not have the correct functionality for its business, that software performance caused extreme difficulty processing orders and that the implementation was

flawed.  NP claimed to be in worse shape after implementing 11i and was extremely upset with the gap between its expectations and the actual business results of the software implemented by Oracle. NP was in extreme financial difficulty, had lost their financial backing, and claimed that the implementation of 11i was a major factor in their business decline.  Ellison and Catz were aware of the situation in August 2000.

- In mid-December 2000, the implementation of 11i at Pepsi Cola's Ireland plant was an "unmitigated disaster for [the plant] from both a cost, employee, and relationship perspective." The plant claimed to have spent a fortune trying to get 11i to work but claimed that the software simply didn't work and was defective.  The employees at the plant were demoralized as a result and the plant was forced to announce a delay to its customers, thus tarnishing its reputation.  The customer was using "vanilla" 11i software and avoiding modifications, yet could still not get the product to work.  Ellison was aware of this problem in December 2000.

- By January 2001, Oracle's earliest 11i customers (especially CRM and Order Management) were exhausted from the effort of implementing 11i.

- The problems with 11i affected Oracle's ability to sell to potential customers both directly and indirectly.  Oracle customers were refusing to act as references for 11i due to their terrible experiences with the product.  Without references, Oracle had a difficult time convincing customers to buy their expensive new product. Chipotle removed themselves as an Oracle reference in March 2001 until the "reality meets the hype."  Chipotle's problems with 11i negatively affected Oracle's ability to sell to McDonald's Chipotle's parent company.

- Customers were refusing to buy additional products from Oracle as a result of their terrible experience with 11i.  TMP Worldwide, a multibillion dollar company implementing Suite 11i could not get it working and was threatening to cancel both the 11i project and an additional $3 million deal as a result.  In October 2000 Ingersoll Rand ("IR") had a critical situation with its

upgrade to 11i.  According to IR, it could not get the software to function and had no confidence in Oracle's ability to provide it with a stable working environment.  Its onsite consultants were debugging the software instead of working on the project itself.  IR believed that CRM and OM were not ready for deployment in October 2000.  IR had already been delayed, expected to be further delayed, and felt that Oracle as an organization had let it down.  The Oracle executive sponsors felt that Oracle was failing at attempts to install 11i CRM and ORM at IR and, as a result, were missing related revenue opportunities valued at between $10 and $20 million.  They referred to the implementation as a "crisis situation."  According to the Oracle executive, IR had originally been quite eager to be a reference but later refused to do so as a result of the problems.  IR was considering replacing Oracle with Siebel.  According to the Oracle consultants on the IR project, there was little 11i documentation, little training, and various other shortcomings and failures which were apparent to their customers.  IR was also refusing to buy Oracle database products because of its issues with Oracle's applications even though the sales representative noted that IR had always been a big Oracle supporter and it should have been an easy database sale.  In November 2000, IR was no happier with 11i.  Although Ellison testified that IR was eventually a happy 11i customer, in actuality Oracle was forced to make a $2 million concession to IR as a result of these issues.

- In January 2001, and the period leading up to it, there was an upward trend in "critical accounts" implementing Suite 11i.  Critical accounts are described as "[w]here a situation deteriorates to the point where the relationship with the customer is threatened and/or future business at risk. . . ."  The upward trend was attributed to ERP and CRM issues.

- Oracle never delivered MRO, as promised to General Electric Aircraft Engines. GEAE felt that Oracle had missed every date and commitment for delivery of the product.  This failure on Oracle's part affected its ability to negotiate later transactions with GE involving 11i and prompted GE to request extra assurances that Oracle could deliver on its products and contract for

large penalties in the event that it did not.  Oracle felt that it would be difficult to bring in 11i revenues (between $8 to $10 million worth) without delivering on MRO, which it never did.  Ellison was convinced that there would be lost revenue as a result.

- According to Keith Block, Oracle consultants were recommending that potential clients wait to update to 11i based on their negative experiences with the product.  Clients were also making that decision on their own.  Block felt that 11i training and product quality were to blame and Sanderson wrote that "Product quality in Q1 alone impacted profitability by $3 million." According to Ellison, such problems were discussed constantly by the entire management team, including himself.

- At the beginning of January 2001, Barclays was threatening to revisit alternative software providers as a result of problems with 11i – in particular, their "get well plan" had "slipped significantly."  According to a letter from Ellison to Barclays, Oracle was "aware that our UK support and technical operations are inadequate."

- As of January 2001, Oracle's sales representatives felt that "in existing clients who are currently implementing 11i, heavy patching due to product instability is impacting our ability to engage them in additional sales cycles."

- According to Sergio Giacoletto, as of December 2000, his salespeople were reluctant to try to sell 11i due to product problems, lack of references, and local language issues.

- Oracle had few, if any, happy 11i customers during and leading up to the Class Period.  The few customers who did act as references for Oracle were often customers who had been bribed to do so through the use of concessions and settlements that required the customer to act as a reference in exchange for the concession or through the use of discounts as an inducement.  As a result of this lack of references, Oracle had a difficult time selling 11i during the Class Period and beyond.

- Oracle experienced extreme difficulty trying to demo 11i to potential customers. These difficulties made it difficult for Oracle to sell 11i. The issues which caused the problems were similar to issues customers were experiencing in trying to install the product. Oracle has admitted that at least one large deal did not close in February 2001 as a result of the inability of Oracle to demo 11i. Evidence shows that many additional customers were negatively influenced by their demo experiences.

- Catz, Sanderson, Wohl, Barrenenechea, and Roberts were aware that problems with the 11i demo system were costing Oracle 1Q01 business. The demo system was seen as crucial to the "e-business story" and, as a result of these problems, weekly conference calls were set up to address such problems.

- Order Management, CRM and a lack of integration between the two were problems cited as causing demo issues in July 2000.

- According to Ellison, without a working product demo including example or demonstration data, it harder to sell the product. Oracle did not have such a working demo during the Class Period nor long after.

- In October 2000, Oracle's demo problems were affecting its ability to sell 11i. The problems included product integration and stability. Oracle still did not have an integrated demo. Ellison was aware of this in October 2000.

- In January 2001, Oracle was still having major problems with its product demos. Ellison was aware that Oracle was getting its "clocks cleaned by Siebel" as a result. In January 2001, the CRM and ERP product demos did not integrate and still required separate demonstrations and interfaces. Ellison was aware of this issue. According to Oracle employees, a functional live integrated demo was "key to our success in Majors. We can't keep going back to the customers to

1   ask for a "do-over" when it comes to demos.  This has been the norm rather than the exception of

2   late."

3           •       Ellison testified that many of the demo problems Oracle was experiencing in January

4   2001 were the same sorts of demo issues it was confronting throughout 2000.

5           •       Ellison and Wohl were executive sponsors for POSCO.  In August 2000, POSCO's

6   CIO communicated to Ellison that issues with 11i were putting its go-live date at risk, despite the

7

8   huge amount of resources POSCO was putting into the project.  Oracle's POSCO representative felt

9   that there were substantial issues to which Oracle was not providing a satisfactory reply.

10          •       Ellison had monthly calls with GE regarding their implementations.  In December

11  2000, GE Power was having problems with its 11i upgrade prompting an Oracle engineering

12  manager to comment that the December 15, 2000 call would be a "rough call."

13

14          •       As of December 2000, all of Oracle's partners were facing huge issues in their

15  implementations of 11i as a result of poor product quality.  They were not able to implement the

16  product in a reasonable time nor to stabilize the environments.

17          •       In October 2000, Hewlett Packard was not happy with the quality of Oracle's CRM

18  products.  HP believed that it received an uninstallable product and was asked to pay consulting fees

19  to make it work.  As a result, it had withheld payment of such consulting fees.

20

21          •       In December 2000 and January 2001, despite four weeks of trying, GE was unable to

22  upgrade a single instance during its 11i implementation.  GE was concerned about the quality of the

23  product and its ability to meet its scheduled go-live date.  Ellison was having biweekly calls with the

24  CIO of GE during this time frame.

25          •       As of the July 2000, testing of 11i at BellSouth was not going well, causing

26  disappointment to the customer.

27

28

- • Ellison was aware that BellSouth's 11i implementation "did not go well" from "lots of meetings" that he attended about BellSouth.  He was personally involved in the implementation. Ellison felt that the BellSouth implementation was an enormously risky project.

- • Numerous other customers, including Papa John's, ValueVision, American Greetings, and Tropicana, to name a few, had negative experiences as a result of problems with 11i.

INTERROGATORY NO. 9:

Identify all facts that support Your contention in paragraph 14 of the Complaint that Suite 11i was "supposed to drive both 25% database and 75% applications sales growth in 3Q01" and, for each such fact, Identify the source of the fact.

RESPONSE TO INTERROGATORY NO. 9:

1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections above as if set forth herein.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the grounds that it is compound, vague, ambiguous, overly broad and unduly burdensome.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the grounds that the term "source" is vague and ambiguous.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis of the attorney work-product doctrine.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or control.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature to the extent it seeks facts and/or information that are subject to ongoing or future discovery – including information to be obtained during the depositions of and document production by the Oracle defendants and various third parties – or expert opinion.

1   1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

2   grounds that it constitutes a contention discovery request that is premature at this stage of the

3   litigation.

4   1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

5   it mischaracterizes the allegations in the RSAC.

6   Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

7   Greater New York Pension Fund directs defendants to the RSAC.

8   <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9</u>:

9   Plaintiff supplements its responses as follows:

10   48.   In an interview with Bloomberg News published on December 14, 2000, defendant

11   "Henley said he expects sales growth of Oracle 11i to accelerate in the third quarter, enabling the

12   company to meet its full-year applications sales growth target of 50 percent to 100 percent."

13   49.   During a December 14, 2000 conference call, defendant Henley stated "[S]o the

14   numbers I'm going to give you here, . . . in terms of real (constant) dollar growth . . . [a]pplications,

15   we're thinking 75, or potentially better."

16   50.   On January 8, 2001, defendant Sanderson visited the offices of Salomon Smith

17   Barney and made the following statements to securities analysts, which were repeated in a report

18   issued by Salomon Smith Barney:

19   (a)   The suite is pre-integrated and fully interoperable out of the box, helping to

20   lower consulting costs and time-to-value.

21   (b)   Oracle sees robust demand for both its database and applications business.

22   Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

23   scheduling, CRM, and SCM products are also performing well.  Oracle says it is also seeing

24   sustained demand for its database product, despite industry-wide concern over contracting IT

25   budgets.  Sanderson noted two trends driving demand for databases is demand for the 11i

26   applications that are typically bundled with the database as well as applications of other vendors that

27   rely on the functionality of the Oracle database.

28

1      51.    At the time these statements were made, the "applications" products sold by Oracle

2  were primarily Suite 11i and/or it the modules of Suite 11i.

3  <u>INTERROGATORY NO. 10</u>:

4      Explain how any of the alleged problems with Suite 11i that You identify in the Complaint

5  caused Oracle to fail to meet its 3Q01 revenue and sales forecast.

6  <u>RESPONSE TO INTERROGATORY NO. 10</u>:

7      1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

8  above as if set forth herein.

9      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

10  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and

11  without reasonable limitation in its scope.

12      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

13  that the terms "explain" and "caused" are vague and ambiguous.

14      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

15  of the attorney work product-doctrine and/or the attorney-client privilege.

16      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

17  it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

18  control.

19      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

20  it mischaracterizes the allegations in the RSAC.

21      1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

22  to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

23  including information to be obtained during the depositions of and document production by the

24  Oracle defendants and various third parties – or expert opinion.

25      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

26  grounds that it constitutes a contention discovery request that is premature at this stage of the

27  litigation.

28

1   1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

2   it seeks a legal conclusion.

3   Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

4   Greater New York Pension Fund directs defendants to the RSAC and the Ninth Circuit's Opinion in

5   Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).

6   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

7   Plaintiff supplements its responses as follows:

8   Problems with Suite 11i identified in the Complaint caused Oracle to fail to meet its 3Q01

9   revenue and sales forecast for the following reasons:

10   •   Customers and potential customers of defendants declined or deferred purchasing

11   Suite 11i due to the problems with Suite 11i;

12   •   Customers and potential customers of defendants declined or deferred purchasing

13   products and services sold by defendants in conjunction with sales of Suite 11i due to the problems

14   with Suite 11i;

15

16   •   Customers and potential customers of defendants declined or deferred purchasing

17   database products due to the problems with Suite 11i;

18   •   Customers and potential customers of defendants declined or deferred purchasing

19   products and services sold by defendants in conjunction with sales of database products due to the

20   problems with Suite 11i; and

21

22   •   Problems with Suite 11i forced Oracle to defer revenue and to incur contra-revenue

23   and expenses associated with concessions, unbillable costs, product returns, "free consulting" and

24   settlements.

25   INTERROGATORY NO. 11:

26   Identify the "Witnesses" who You allege in paragraph 7 of the Complaint "confirmed" that

27   Oracle was extending "deep discounts in order to fend off emerging database competitor IBM."

28   When Identifying such witnesses, if any were Oracle employees, please include each such witness'

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 85 -

1  title or titles with Oracle and the precise location of that witness' office(s) while employed with

2  Oracle.

3  <u>RESPONSE TO INTERROGATORY NO. 11</u>:

4      1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

5  above as if set forth herein.

6      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

7  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and

8  without reasonable limitation in its scope.

9      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

10  of the attorney work-product doctrine and/or the attorney-client privilege.

11      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

12  it seeks information not in 1199 SEIU Greater New York Pension Fund's custody, possession or

13  control.

14      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

15  that it seeks information equally or more readily available to defendants.

16      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

17  it mischaracterizes the allegations in the RSAC.

18      1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

19  to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

20  including information to be obtained during the depositions of and document production by the

21  Oracle defendants and various third parties.

22      Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

23  Greater New York Pension Fund responds as follows:

24      Jo Ann Chard

25      Brian Woollacott

26

27

28

1   <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11</u>:

2       Plaintiff supplements its responses as follows:  Jo Ann Chard was an Account Manager with

3   Oracle.  Her office was located in Redwood Shores, California.  Brian Woollacott was a Corporate

4   Account Manager with Oracle.  His office was located in Boston, Massachusetts.

5   <u>INTERROGATORY NO. 12</u>:

6       Identify all facts that support Your contention in paragraph 8 of the Complaint that Oracle

7   withheld overpayments and credits from its customers and improperly recognized revenue from

8   them by creating "phony sales invoices."

9   <u>RESPONSE TO INTERROGATORY NO. 12</u>:

10      1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

11  above as if set forth herein.

12      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

13  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome,

14  without reasonable limitation in its scope, and seeks information that is neither relevant nor

15  reasonably calculated to lead to the discovery of admissible evidence.

16      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

17  it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-

18  product doctrine.

19      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

20  it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

21  control.

22      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

23  it mischaracterizes the allegations in the RSAC.

24      1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

25  to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

26  including information to be obtained during the depositions of and document production by the

27  Oracle defendants and various third parties – or expert opinion.

28

1    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

2    grounds that it constitutes a contention discovery request that is premature at this stage of the

3    litigation.

4    Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

5    Greater New York Pension Fund directs defendants to the RSAC.

6    SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

7    Plaintiff's supplemental response is subject to the following facts.  Oracle has still not

8    produced all documents pertaining to plaintiffs' accounting allegations which may contain facts

9    responsive to this Interrogatory.  Oracle produced hundreds of thousands of pages of accounting

10   documents on January 17, 2007, and at least 200,000 pages of new accounting documents yesterday,

11   January 30, 2007.  Oracle has also indicated that it will produce additional documents after the

12   Court-ordered production deadline of January 31, 2007.  Facts responsive to this Interrogatory may

13   arise from those documents directly, or from the analysis of those documents in conjunction with

14   documents and facts already produced.  Further, defendants only produced documents relating to 926

15   or less than 1% of the 46,880 debit memos.  Much of the information produced by defendants in

16   connection with the 926 debit memos was contained on a "Script Output" which is riddled with

17   errors and inconsistencies.  Subject to the foregoing, plaintiff supplements its responses as follows:

18   •    Over the period of many years dating back to at least 1990, thousands of customers

19   inadvertently overpaid invoices or made duplicate payments to Oracle.  Overpayments occurred for a

20   variety of reasons.  In some instances, Oracle overcharged customers by issuing duplicate invoices

21   and customers paid twice.  This happened, for example, when Oracle personnel created "Pro Forma

22   Invoices" or "POEFs" which were essentially sales documents that were created before the actual

23   sale occurred.  Sometimes, Oracle sent these Pro Forma Invoices to customers, and also sent a

24   legitimate invoice for the same sale, causing the customer to unknowingly pay twice for the same

25   invoice.

26

27

28

1    •    On other occasions, overpayments were the result of a customer paying the full

2  amount for an open invoice that was reduced or adjusted downward by use of a "credit memo,"

3  sometimes before, and sometimes after, the payment was made.  This happened, for example, when

4  Oracle issued discounts or concessions to customers because of product problems, returns, or

5  complaints by the customer.  Sometimes, customer deposits were simply not returned, or refunds

6  would be agreed to, but Oracle failed to execute the refund.  Credit memos were also issued when

7  Oracle executed a "credit memo/rebill," to reallocate revenue between license and support.  Oracle's

8  policy was to not send copies of credit memos to its customers.  Thus, customers unwittingly

9  overpaid millions of dollars on invoices that had been double-billed or reduced due to a credit memo.

10    •    In many instances, Oracle's customers did not realize they overpaid or paid twice for

11  the same invoice.  Oracle simply kept the money in Account 25005 on the General Ledger entitled

12  "Customer Overpayments."  The overpayments were designated by Oracle as "unapplied cash."

13  Oracle also held customer overpayments in Account 12018.

14    •    Prior to, during, and after the Class Period, Oracle's unapplied cash and customer

15  overpayments accumulated to more than $100 million dollars.  Oracle had a policy of not refunding

16  customers for overpayments or duplicate payments unless the customer specifically requested a

17  refund in writing.  Because the customers were typically not aware of the overpayment, they rarely

18  requested refunds or credits from Oracle and Oracle kept the money.

19    •    Some customers hired third party audit and recovery firms such as PRG Schultz, Inc.

20  ("PRG") to research and recover overpayments from Oracle.  PRG discovered millions of dollars in

21  customer overpayments and duplicate payments that were never refunded to Oracle's customers.

22  Some of the customers that learned of the overpayments from PRG eventually demanded and

23  received cash refunds from Oracle for their overpayments.  Many customer overpayments, however,

went undetected by customers.  In 2Q01 and other fiscal periods, Oracle used the overpayments for improper purposes to boost its own financial results.

- On or around November 17-19, 2000, Oracle conducted an "On Account Clean Up for U.S.A. Data."  Oracle created over 46,000 debit memo invoices for thousands of customers. Oracle created additional debit memos in December 2000.  According to Oracle's user guide a "debit memo" is defined as:  "Debits that you assign to your customer for additional charges that you want to collect.  You may want to charge your customers for unearned discounts taken, additional freight charges, taxes and finance charges."

- For each debit memo created in November 2000, Oracle created a sales invoice with a "550" prefix.  For each debit memo, there was a "debit" to Oracle's Accounts Receivable account and a "credit" to Oracle's Revenue account.  An Accounting "credit" to the revenue account means an increase in the amount of revenue in that account.  The sales invoices created for each debit memo made it look like the debit memos resulted from legitimate sales.

- On November 18, 2000, Oracle created a cash receipt for each debit memo to make it look like a legitimate cash receipt came in on that day.  In reality, the cash receipts associated with the debit memos came in prior to November 17, 2000.  The creation of the debit memos caused the 46,000+ items of unapplied cash and customer overpayments to be hidden from Oracle's collections department so that Oracle's own staff could not see overpayments.  Thus, thousands of customers were never made aware of their overpayments.

- Prior to and during the Class Period, Oracle unlawfully transferred customer overpayments and unapplied cash from Oracle's "Customer Overpayment Account," Account 25005 to Oracle's Bad Debt Reserve account, known as "Account 12601."  These improper transfers allowed Oracle to increase their bad debt reserve on Oracle's financial statements.  Because Oracle accounted for changes in the bad debt reserve by adjusting revenue, the transfers artificially inflated

Oracle's revenues and earnings.  Oracle's Upside Reports for 2Q01 confirm that a "bad debt adjustment" was taken which impacted revenue.  Many facts related to these bad debt transfers are likely contained in hundreds of thousands of documents that Oracle is producing on January 30-31, 2007, pursuant to the Special Master's December 19, 2006 Order Granting Plaintiffs' Motion to Enforce the Special Master's July 17, 2006 Order.

•       Of the 926 debit memos produced by defendants, at least 180 or approximately 20% involved transfers to Oracle's bad debt reserve or other income-generating accounts.  Those improper transfers were later reversed by Oracle after November 17, 2000, mostly during the 2002 Clean Up.

•       Oracle also had a practice of automatically transferring customer overpayments and unapplied cash to the bad debt reserve through an "auto-adjustment" process.  The auto-adjustments consisted of smaller amounts of unapplied cash, sometimes as little as $0.01.  These smaller items were systematically "swept" from Account 25005 to the bad debt reserve periodically to artificially increase Oracle's earnings.  Because the items of unapplied cash were so small, Oracle's customers rarely found out about the overpayments and they were easier to hide.

•       Beginning in October 2002, immediately following the filing of plaintiffs' complaint on October 11, 2002, Oracle held a series of meetings to discuss how to "clean up" the unapplied cash "problem" to determine the "revenue impact" of the debit memos and the unapplied cash transfers, to put the unapplied cash back into the "proper" buckets, and to ensure that the problem "never happened again" (the "2002 Clean Up").  The clean up was referred to as an "On Account Clean Up for U.S.A. Data" which was the same terms used for the November 2000 Clean Up.  During the meetings, Oracle's collections staff was told about plaintiffs' lawsuit and the debit memo allegations and that it was their job to help Oracle fix the problem and figure out how to resolve the thousands of customer overpayments and unapplied cash items.  During the meetings it was

discussed that what happened in November 2000 with respect to the debit memos caused the problem that was the focus of the 2002 Clean Up. Oracle's collectors were told that they should focus all of their time and attention to fixing the unapplied cash problem on a full time basis.

- During the 2002 Clean Up, Oracle engaged in a systematic process to reverse the November 2000 debit memos and make it look like the debit memo transactions never resulted in fictitious revenue and earnings and never were transferred to Oracle's bad debt reserve. Oracle did this by issuing at least one thousand credit memos to reverse corresponding debit memos and transfers of customer overpayments to Oracle's bad debt reserve. The creation and issuance of a credit memo has the effect of reducing revenue (as does reducing the bad debt reserve). The rate of credit memos issued during 2002 Clean Up was more than 100 times higher than the normal rate of credit memos issued by Oracle. Oracle also tried to disable the ability to move unapplied cash to the bad debt reserve via "on account."

- Further, to "clean up" the debit memos and the massive unapplied cash problem, Oracle issued hundreds of cash refunds to customers for tens of millions of dollars that had been sitting on Oracle's books for years. Oracle tried to hide the impact of some of the improper transfers of unapplied cash to the bad debt reserve by "adjusting up" invoices and applying the unapplied cash to the invoice. Oracle also applied unapplied cash from debit memos to new invoices. This made it look like the unapplied cash receipt (payment) was applied to a legitimate invoice for a legitimate sale. This also allowed Oracle to hide overpayments from its customers and avoid refunding the money. Oracle is still holding millions in customer overpayments from debit memo transactions that are more than six years old.

- The number of unapplied cash items was so large and the amount so great, that Oracle did not have the resources to resolve all of the items, especially the smaller debit memo and unapplied items. As part of the process, Oracle was forced to open and reactivate an old pro forma

database to attempt to determine which customer overpayments resulted from customers double paying due to the issuance of two invoices, one pro forma, and one legitimate invoice.  In 2003, Oracle announced that it was moving its collections department to India.  The unresolved items of unapplied cash and customer overpayments were ultimately transferred to India as well, ensuring that many customer overpayments were never discovered, resolved or refunded.

- • On October 23, 2003, Oracle made a presentation to the SEC regarding plaintiffs' debit memo allegations.  The presentation primarily focused on a few specific debit memos involving customers Eli Lilly & Co. and Household International.  Oracle claimed that the unapplied cash and overpayments made by Eli Lilly and Household could not have been improperly recognized as revenue during the Class Period because those overpayments were refunded to Eli Lilly and Household years earlier.  This was the basis upon which the SLC found that plaintiffs' accounting allegations had no merit.  Oracle failed to disclose to the SEC that Eli Lilly and Household were both refunded for their debit memos years after Oracle said they were refunded.  Oracle also failed to tell the SEC that it had improperly transferred millions in unapplied cash to its bad debt reserve to inflate revenue and earnings during the Relevant Time Period.  Oracle also failed to tell the SEC that it reversed, credited and refunded hundreds of debit memos for tens of millions of dollars after plaintiffs filed their Complaint in October 2002.

- • Oracle has admitted that Account 25005 entitled "Customer Overpayments" was publicly reported on Oracle's balance sheet as part of the line item "Customer Advances and Unearned Revenue."  The money that Oracle kept in its customer overpayments account, however, was not unearned revenue; it was money that belonged to customers due to overpayments and duplicate payments that Oracle never returned and used for improper purposes.

- • Oracle's auditor during the Class Period, Arthur Andersen, did not conduct proper audits or reviews of Oracle's financial statements and was not told that Oracle created the debit

memos.  As a result, Andersen could not do any substantive analysis of the impact of the debit memos on Oracle's financial statements.  Andersen's consulting fees were more than nine times its audit fees.  After Andersen was replaced as auditor, Ernst & Young ("E&Y") took over and the audit fees surged from $700,000 to $2.45 million, a 250% spike.

- E&Y did not conduct a reasonable or complete investigation of the debit memos and the on account clean up.  E&Y relied upon documentation provided by Oracle and only reviewed 195 debit memos, less than 1% of the total debit memos.  E&Y's investigation did not look at debit memo audit trails or transactions underlying the debit memos.  Oracle directed E&Y to confine its procedures to a single day, November 17, 2000, even though the debit memo script may have been run after that date, and the transfers and purported funds occurred prior to that date.  E&Y never tried to determine whether Oracle's unapplied cash funds belonged to Oracle's customers, or whether the 2Q01 financial statements were materially misstated as a result of Oracle's improper use of customer funds.  E&Y claimed it did not know about Oracle's illegal transfers from Customer Overpayments to the bad debt reserve and its documentation confirms this.  E&Y did not determine whether the bad debt transfers were legitimate or whether the transfers impacted  revenue on days other than November 17, 2000, and whether the transfers impacted Oracle's financial statements.

- E&Y, AA and Oracle's Special Litigation Committee never analyzed the impact of Oracle's bad debt transfers on Oracle's 2Q01 financial results.  The Special Litigation Committee only analyzed the impact on Oracle's 3Q01 financial statements.  Oracle's Accounting Management only analyzed the impact on Oracle's full-year (fiscal 2001) financial statements.

- The financial impact of Oracle's debit memo scheme has been altered, distorted and possibly lost forever by Oracle's improper destruction of key data and evidence during Oracle's 2002 Clean Up.  As part of Oracle's attempts to resolve the huge amount of unapplied cash related to debit memos, Oracle collectors were told to delete, change and overwrite certain customer notes that

had been previously entered into the system to document the history of customer overpayments and/or debit memo transactions.  During the 2002 Clean Up, lawyers for Oracle told Jennifer Minton, Oracle's controller and the primary author of Oracle's Upside Reports upon which Oracle's 3Q01 forecasts were based, that she should intentionally keep herself uninvolved in the 2002 Clean Up and investigation.

- Further, plaintiffs believe that information responsive to this interrogatory, including highly relevant e-mails, spreadsheets and other documents were contained on the computer of Oracle collections manager Molly [Littlefield] Venkataramana.  That computer was deleted and reimaged in approximately May 2003 after Oracle employees were told to preserve documents, and all information on the computer appears to have been destroyed in violation of the PSLRA.  The "script output" produced by Oracle is riddled with inconsistent data.

- Plaintiffs incorporate by reference all facts discussed in Response to Interrogatory No. 7 relating to defendants' spoliation of evidence.

INTERROGATORY NO. 13:

Identify the amounts of customer credits or overpayments Oracle allegedly withheld from the 16 customers identified in paragraph 36(b) of the Complaint.

RESPONSE TO INTERROGATORY NO. 13:

1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections above as if set forth herein.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable limitation in its scope.

1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the grounds that it is overly broad because there is no limitation as to time provided.

1    1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

2  it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-

3  product doctrine.

4    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

5  of attorney work-product and/or attorney-client privilege.

6    1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

7  it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

8  control.

9    1199 SEIU Greater New York Pension Fund further objects to this interrogatory as seeking

10  information that is equally or more readily available to the defendants in this action.

11    1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

12  to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

13  including information to be obtained during the depositions of and document production by the

14  Oracle defendants and various third parties – or expert opinion.

15    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

16  grounds that it constitutes a contention discovery request that is premature at this stage of the

17  litigation.

18  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

19    Plaintiff's supplemental response is subject to the following facts.  Oracle has still not

20  produced all documents pertaining to plaintiffs' accounting allegations which may contain facts

21  responsive to this Interrogatory.  Oracle produced hundreds of thousands of pages of accounting

22  documents on January 17, 2007, and at least 200,000 pages of new accounting documents yesterday,

23  January 30, 2007.  Oracle has also indicated that it will produce additional documents after the

24  Court-ordered production deadline of January 31, 2007.  Facts responsive to this Interrogatory may

25  arise from those documents directly, or from the analysis of those documents in conjunction with

26  documents and facts already produced.  Further, defendants only produced documents relating to 926

27  or less than 1% of the 46,880 debit memos.  Much of the information produced by defendants in

28

connection with the 926 debit memos was contained on a "Script Output" which is riddled with errors and inconsistencies.  Subject to the foregoing, plaintiff supplements its response as follows:

For Hewlett Packard, Oracle withheld at least $6,000 and as much as $1,985,000 in customer credits or overpayments.

For General Motors, Oracle withheld at least $10,000 and as much as $56,000 in customer credits or overpayments.

For Cargill, Oracle withheld as much as $69,000 in customer credits or overpayments.

For Pharmacia, Oracle withheld as much as $17,000 in customer credits or overpayments.

For Household, Oracle withheld at least $178,000 and as much as $179,000 in customer credits or overpayments.

For Motorola, Oracle withheld at least $220,000 and as much as $1,407,000 in customer credits or overpayments.

For SBC Southwestern Bell & Affiliates, Oracle withheld at least $590,000 and as much as $1,171,000 in customer credits or overpayments.

For Dupont, Oracle withheld at least $100,000 and as much as $100,000 in customer credits or overpayments.

For Eli Lilly, Oracle withheld at least $15,000 and as much as $61,000 in customer credits or overpayments.

For First Hawaiian Bank, Oracle withheld as much as $17,000 in customer credits or overpayments.

For Texas Instruments, Oracle withheld as much as $5,385,000 in customer credits or overpayments.

For Sprint, Oracle withheld at least $3,000 and as much as $2,801,000 in customer credits or overpayments.

For Phillips, Oracle withheld at least $268,000 and as much as $320,000 in customer credits or overpayments.

For PacifiCare, Oracle withheld as much as $915,000 in customer credits or overpayments.

1    For Cummings [sic], Oracle withheld as much as $282,000 in customer credits or

2    overpayments.

3    For Kemet Electronics, Oracle withheld at least $85,000 and as much as $85,000 in customer

4    credits or overpayments.

5    Plaintiffs incorporate by reference all facts discussed in Response to Interrogatory No. 7

6    relating to defendants' spoliation of evidence.

7    <u>INTERROGATORY NO. 14</u>:

8    Identify all facts that support the contention that Defendants Ellison, Henley and Sanderson

9    were aware of, or authorized, the improper revenue recognition alleged in paragraph 8 of the

10    Complaint.

11    <u>RESPONSE TO INTERROGATORY NO. 14</u>:

12    1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

13    above as if set forth herein.

14    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

15    grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and

16    without reasonable limitation in its scope.

17    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

18    grounds that the phrase "the contention" is vague and ambiguous.

19    1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

20    grounds that the term "authorized" is vague and ambiguous.

21    1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

22    it calls for a legal conclusion.

23    1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

24    it seeks disclosure of information protected by the attorney-client privilege and/or the attorney work-

25    product doctrine.

26    1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

27    to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

28

1  including information to be obtained during the depositions of and document production by the

2  Oracle defendants and various third parties – or expert opinion.

3       1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

4  grounds that it constitutes a contention discovery request that is premature at this stage of the

5  litigation.

6       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

7  it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

8  control.

9       1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

10  it mischaracterizes the allegations in the RSAC.

11      Subject to and without waiving the foregoing specific and general objections, 1199 SEIU

12  Greater New York Pension Fund directs defendants to the RSAC.

13  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14</u>:

14      Plaintiff's supplemental response is subject to the following facts.  Oracle has still not

15  produced all documents pertaining to plaintiffs' accounting allegations which may contain facts

16  responsive to this Interrogatory.  Oracle produced hundreds of thousands of pages of accounting

17  documents on January 17, 2007, and at least 200,000 pages of new accounting documents yesterday,

18  January 30, 2007.  Oracle has also indicated that it will produce additional documents after the

19  Court-ordered production deadline of January 31, 2007.  Facts responsive to this Interrogatory may

20  arise from those documents directly, or from the analysis of those documents in conjunction with

21  documents and facts already produced.  Further, defendants only produced documents relating to 926

22  or less than 1% of the 46,880 debit memos.  Much of the information produced by defendants in

23  connection with the 926 debit memos was contained on a "Script Output" which is riddled with

24  errors and inconsistencies.  Subject to the foregoing, plaintiff supplements its responses as follows:

25      •   Over the period of many years dating back to at least 1990, thousands of customers

26  inadvertently overpaid invoices or made duplicate payments to Oracle.  Overpayments occurred for a

27  variety of reasons.  In some instances, Oracle overcharged customers by issuing duplicate invoices

28

and customers paid twice.  This happened, for example, when Oracle personnel created "Pro Forma Invoices" or "POEFs" which were essentially sales documents that were created before the actual sale occurred.  Sometimes, Oracle sent these Pro Forma Invoices to customers, and also sent a legitimate invoice for the same sale, causing the customer to unknowingly pay twice for the same invoice.

• On other occasions, overpayments were the result of a customer paying the full amount for an open invoice that was reduced or adjusted downward by use of a "credit memo," sometimes before, and sometimes after, the payment was made.  This happened, for example, when Oracle issued discounts or concessions to customers because of product problems, returns, or complaints by the customer.  Sometimes, customer deposits were simply not returned, or refunds would be agreed to, but Oracle failed to execute the refund.  Credit memos were also issued when Oracle executed a "credit memo/rebill," to reallocate revenue between license and support.  Oracle's policy was to not send copies of credit memos to its customers.  Thus, customers unwittingly overpaid millions of dollars on invoices that had been double-billed or reduced due to a credit memo.

• In many instances, Oracle's customers did not realize they overpaid or paid twice for the same invoice.  Oracle simply kept the money in Account 25005 on the General Ledger entitled "Customer Overpayments."  The overpayments were designated by Oracle as "unapplied cash."  Oracle also held customer overpayments in Account 12018.

• Prior to, during, and after the Class Period, Oracle's unapplied cash and customer overpayments accumulated to more than $100 million dollars.  Oracle had a policy of not refunding customers for overpayments or duplicate payments unless the customer specifically requested a refund in writing.  Because the customers were typically not aware of the overpayment, they rarely requested refunds or credits from Oracle and Oracle kept the money.

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 100 -

- Some customers hired third party audit and recovery firms such as PRG Schultz, Inc. ("PRG") to research and recover overpayments from Oracle.  PRG discovered millions of dollars in customer overpayments and duplicate payments that were never refunded to Oracle's customers.  Some of the customers that learned of the overpayments from PRG eventually demanded and received cash refunds from Oracle for their overpayments.  Many customer overpayments, however, went undetected by customers.  In 2Q01 and other fiscal periods, Oracle used the overpayments for improper purposes to boost its own financial results.

- On or around November 17-19, 2000, Oracle conducted an "On Account Clean Up for U.S.A. Data."  Oracle created over 46,000 debit memo invoices for thousands of customers.  Oracle created additional debit memos in December 2000.  According to Oracle's user guide a "debit memo" is defined as:  "Debits that you assign to your customer for additional charges that you want to collect.  You may want to charge your customers for unearned discounts taken, additional freight charges, taxes and finance charges."

- For each debit memo created in November 2000, Oracle created a sales invoice with a "550" prefix.  For each debit memo, there was a "debit" to Oracle's Accounts Receivable account and a "credit" to Oracle's Revenue account.  An Accounting "credit" to the revenue account means an increase in the amount of revenue in that account.  The sales invoices created for each debit memo made it look like the debit memos resulted from legitimate sales.

- On November 18, 2000, Oracle created a cash receipt for each debit memo to make it look like a legitimate cash receipt came in on that day.  In reality, the cash receipts associated with the debit memos came in prior to November 17, 2000.  The creation of the debit memos caused the 46,000+ items of unapplied cash and customer overpayments to be hidden from Oracle's collections department so that Oracle's own staff could not see overpayments.  Thus, thousands of customers were never made aware of their overpayments.

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 101 -

1  •      Prior to and during the Class Period, Oracle unlawfully transferred customer

2  overpayments and unapplied cash from Oracle's "Customer Overpayment Account," Account 25005

3  to Oracle's Bad Debt Reserve account, known as "Account 12601."  These improper transfers

4  allowed Oracle to increase their bad debt reserve on Oracle's financial statements.  Because Oracle

5  accounted for changes in the bad debt reserve by adjusting revenue, the transfers artificially inflated

6  Oracle's revenues and earnings.  Oracle's Upside Reports for 2Q01 confirm that a "bad debt

7  adjustment" was taken which impacted revenue.  Many facts related to these bad debt transfers are

8  likely contained in hundreds of thousands of documents that Oracle is producing on January 30-31,

9

10  2007, pursuant to the Special Master's December 19, 2006 Order Granting Plaintiffs' Motion to

11  Enforce the Special Master's July 17, 2006 Order.

12  •      Of the 926 debit memos produced by defendants, at least 180 or approximately 20%

13  involved transfers to Oracle's bad debt reserve or other income-generating accounts.  Those

14  improper transfers were later reversed by Oracle after November 17, 2000, mostly during the 2002

15  Clean Up.

16

17  •      Oracle also had a practice of automatically transferring customer overpayments and

18  unapplied cash to the bad debt reserve through an "auto-adjustment" process.  The auto-adjustments

19  consisted of smaller amounts of unapplied cash, sometimes as little as $0.01.  These smaller items

20  were systematically "swept" from Account 25005 to the bad debt reserve periodically to artificially

21  increase Oracle's earnings.  Because the items of unapplied cash were so small, Oracle's customers

22  rarely found out about the overpayments and they were easier to hide.

23

24  •      Beginning in October 2002, immediately following the filing of plaintiffs' complaint

25  on October 11, 2002, Oracle held a series of meetings to discuss how to "clean up" the unapplied

26  cash "problem" to determine the "revenue impact" of the debit memos and the unapplied cash

27  transfers, to put the unapplied cash back into the "proper" buckets, and to ensure that the problem

28

1    "never happened again" (the "2002 Clean Up").  The clean up was referred to as an "On Account

2    Clean Up for U.S.A. Data" which was the same terms used for the November 2000 Clean Up.

3    During the meetings, Oracle's collections staff was told about plaintiffs' lawsuit and the debit memo

4    allegations and that it was their job to help Oracle fix the problem and figure out how to resolve the

5    thousands of customer overpayments and unapplied cash items.  During the meetings it was

6    discussed that what happened in November 2000 with respect to the debit memos caused the

7    problem that was the focus of the 2002 Clean Up.  Oracle's collectors were told that they should

8    focus all of their time and attention to fixing the unapplied cash problem on a full time basis.

9

10           •      During the 2002 Clean Up, Oracle engaged in a systematic process to reverse the

11   November 2000 debit memos and make it look like the debit memo transactions never resulted in

12   fictitious revenue and earnings and never were transferred to Oracle's bad debt reserve.  Oracle did

13   this by issuing at least one thousand credit memos to reverse corresponding debit memos and

14   transfers of customer overpayments to Oracle's bad debt reserve.  The creation and issuance of a

15   credit memo has the effect of reducing revenue (as does reducing the bad debt reserve).  The rate of

16   credit memos issued during 2002 Clean Up was more than 100 times higher than the normal rate of

17   credit memos issued by Oracle.  Oracle also tried to disable the ability to move unapplied cash to the

18   bad debt reserve via "on account."

19

20           •      Further, to "clean up" the debit memos and the massive unapplied cash problem,

21   Oracle issued hundreds of cash refunds to customers for tens of millions of dollars that had been

22   sitting on Oracle's books for years.  Oracle tried to hide the impact of some of the improper transfers

23   of unapplied cash to the bad debt reserve by "adjusting up" invoices and applying the unapplied cash

24   to the invoice.  Oracle also applied unapplied cash from debit memos to new invoices.  This made it

25   look like the unapplied cash receipt (payment) was applied to a legitimate invoice for a legitimate

26   sale.  This also allowed Oracle to hide overpayments from its customers and avoid refunding the

money. Oracle is still holding millions in customer overpayments from debit memo transactions that are more than six years old.

- The number of unapplied cash items was so large and the amount so great, that Oracle did not have the resources to resolve all of the items, especially the smaller debit memo and unapplied items.  As part of the process, Oracle was forced to open and reactivate an old pro forma database to attempt to determine which customer overpayments resulted from customers double paying due to the issuance of two invoices, one pro forma, and one legitimate invoice.  In 2003, Oracle announced that it was moving its collections department to India.  The unresolved items of unapplied cash and customer overpayments were ultimately transferred to India as well, ensuring that many customer overpayments were never discovered, resolved or refunded.

- On October 23, 2003, Oracle made a presentation to the SEC regarding plaintiffs' debit memo allegations.  The presentation primarily focused on a few specific debit memos involving customers Eli Lilly & Co. and Household International.  Oracle claimed that the unapplied cash and overpayments made by Eli Lilly and Household could not have been improperly recognized as revenue during the Class Period because those overpayments were refunded to Eli Lilly and Household years earlier.  This was the basis upon which the SLC found that plaintiffs' accounting allegations had no merit.  Oracle failed to disclose to the SEC that Eli Lilly and Household were both refunded for their debit memos years after Oracle said they were refunded.  Oracle also failed to tell the SEC that it had improperly transferred millions in unapplied cash to its bad debt reserve to inflate revenue and earnings during the Relevant Time Period.  Oracle also failed to tell the SEC that it reversed, credited and refunded hundreds of debit memos for tens of millions of dollars after plaintiffs filed their Complaint in October 2002.

- Oracle has admitted that Account 25005 entitled "Customer Overpayments" was publicly reported on Oracle's balance sheet as part of the line item "Customer Advances and

Unearned Revenue."  The money that Oracle kept in its customer overpayments account, however, was not unearned revenue; it was money that belonged to customers due to overpayments and duplicate payments that Oracle never returned and used for improper purposes.

- Oracle's auditor during the Class Period, Arthur Andersen, did not conduct proper audits or reviews of Oracle's financial statements and was not told that Oracle created the debit memos.  As a result, Andersen could not do any substantive analysis of the impact of the debit memos on Oracle's financial statements.  Andersen's consulting fees were more than nine times its audit fees.  After Andersen was replaced as auditor, Ernst & Young ("E&Y") took over and the audit fees surged from $700,000 to $2.45 million, a 250% spike.

- E&Y did not conduct a reasonable or complete investigation of the debit memos and the on account clean up.  E&Y relied upon documentation provided by Oracle and only reviewed 195 debit memos, less than 1% of the total debit memos.  E&Y's investigation did not look at debit memo audit trails or transactions underlying the debit memos.  Oracle directed E&Y to confine its procedures to a single day, November 17, 2000, even though the debit memo script may have been run after that date, and the transfers and purported funds occurred prior to that date.  E&Y never tried to determine whether Oracle's unapplied cash funds belonged to Oracle's customers, or whether the 2Q01 financial statements were materially misstated as a result of Oracle's improper use of customer funds.  E&Y claimed it did not know about Oracle's illegal transfers from Customer Overpayments to the bad debt reserve and its documentation confirms this.  E&Y did not determine whether the bad debt transfers were legitimate or whether the transfers impacted  revenue on days other than November 17, 2000, and whether the transfers impacted Oracle's financial statements.

- E&Y, AA and Oracle's Special Litigation Committee never analyzed the impact of Oracle's bad debt transfers on Oracle's 2Q01 financial results.  The Special Litigation Committee

1  only analyzed the impact on Oracle's 3Q01 financial statements.  Oracle's Accounting Management

2  only analyzed the impact on Oracle's full-year (fiscal 2001) financial statements.

3       •       The financial impact of Oracle's debit memo scheme has been altered, distorted and

4  possibly lost forever by Oracle's improper destruction of key data and evidence during Oracle's

5  2002 Clean Up.  As part of Oracle's attempts to resolve the huge amount of unapplied cash related to

6  debit memos, Oracle collectors were told to delete, change and overwrite certain customer notes that

7  had been previously entered into the system to document the history of customer overpayments

8  and/or debit memo transactions.  During the 2002 Clean Up, lawyers for Oracle told Jennifer

9  Minton, Oracle's controller and the primary author of Oracle's Upside Reports upon which Oracle's

10  3Q01 forecasts were based, that she should intentionally keep herself uninvolved in the 2002 Clean

11  Up and investigation.

12

13       •       Further, plaintiffs believe that information responsive to this interrogatory, including

14  highly relevant e-mails, spreadsheets and other documents were contained on the computer of Oracle

15  collections manager Molly [Littlefield] Venkataramana.  That computer was deleted and reimaged in

16  approximately May 2003 after Oracle employees were told to preserve documents, and all

17  information on the computer appears to have been destroyed in violation of the PSLRA.  The "script

18  output" produced by Oracle is riddled with inconsistent data.

19

20       Further, plaintiffs believe that information responsive to this interrogatory, including highly

21  relevant e-mails, spreadsheets and other documents were contained on the computer of Oracle

22  collections manager Molly [Littlefield] Venkataramana.  That computer was deleted and reimaged in

23  May 2003 after Oracle employees were told to preserve documents, and all information on the

24  computer appears to have been destroyed in violation of the PSLRA.  The "script output" produced

25  by Oracle is riddled with inconsistent data.

26       Defendant Henley was Oracle's Chief Financial Officer ("CFO"), Executive Vice President

27  and a Director during the Relevant Time Period.  Henley signed and attested to Oracle's financial

28

1   statements in 2Q01 in filings with the SEC representing that the financial statements were accurate

2   and in conformance with GAAP.   As CFO, Henley was responsible for ensuring that Oracle's

3   accounting was in compliance with GAAP and fairly presented Oracle's financial results and true

4   financial condition.

5          Henley was involved in overseeing the results of the 2002 Clean Up and the impact of the

6   debit memos on Oracle's financial statements.   As set forth above, the 2002 Clean Up was used to

7   reverse, alter and cover up the financial impact of the debit memo transactions.   Tom Williams and

8   Jennifer Minton were designated by Henley to oversee the 2002 Clean Up and investigation.   The

9   problems with Oracle's unapplied cash and customer overpayments had been occurring for many

10  years and Henley testified that he was aware of the problem years before the 2002 Clean Up began.

11         Defendant Edward J. Sanderson was Oracle's Executive Vice President, Consulting and

12  Latin American Division of Oracle.   He described himself as being responsible for all products, the

13  entire 13,000 member consulting organization, and all business-to-business initiatives.

14         Defendant Larry Ellison was Oracle's CEO and Chairman of the Board during the relevant

15  time period.   Ellison signed off on Oracle's Form 10-K for 2001 and corresponding financial results,

16  including results for 2Q01.   In June 2000, Ellison admitted that he is a hands-on manager who

17  "'love[d] getting involved in every detail of the business.'"   Defendants were personally familiar

18  with Oracle's diminished revenue prospects as 3Q01 progressed, as they continually monitored

19  Oracle's sales and revenues via the Company's live global CRM database of pipeline, sales and

20  financial activity called "Oracle Sales Online."   During his February 21, 2001 keynote address at the

21  AppsWorld conference in New Orleans, Louisiana, Ellison bragged about the worldwide capability

22  of the database:

23              We have one customer database. We have one  way of billing a customer.
            We have one set of support processes. We have one way of filling out expense
24          reports. All of our information is on one database. We know exactly how much we
            have sold in the last hour around the world and we're paying less to know more.
25

26         On February 13, 2001, defendant Sanderson gave a presentation at the Goldman conference

27  where he admitted the defendants had a global view of the sales forecasts around the world.

28

1    For example, in the sales area, in the sales automation area, I can now – Larry
     can look at, for example, our forecast on a global basis, our forecast around the world
2    up to the minute at any level of detail that you want to see. . . .

3    And if we go back in five minutes later and look at what our forecast is, it's
     different.  Because some rep around he world has changed the forecast.
4
                                    *        *        *
5
     Now I can see every deal out there that my reps around the world are
6    working.

7    On March 15, 2001, defendants held a transcribed conference call for investors, during which

8    Henley stated:

9    [T]his pipeline system is real-time.  We give constant updates as we did with
     Q3.  But I think given that the conversion rates were much less than normal in Q3,
10   we have to assume that something like that will probably happen again . . . .

11   Insider Trading

12   Ellison sold more than 29 million shares of his Oracle stock for proceeds of almost $900

13   million between January 22-31, 2001, at artificially inflated prices of $30-32 per share, one of the

14   largest insider trading incidents in United States market history.  These stock sales were dramatically

15   out of line with Ellison's prior trading history, as he had not sold any of his shares for five years

16   prior to these sales.  Moreover, as reported by Ellison in his Form 4 filed with the SEC on

17   February 9, 2001, 23 million of the 29 million shares sold by Ellison during the Class Period were

18   options that he acquired for a mere $0.23 per share.

19   On January 4, 2001, Henley sold one million shares of his Oracle stock at the artificially

20   inflated price of $32 per share for proceeds of $32.3 million.  793,772 of these shares were options

21   which Henley acquired at only $1.04 per share.  The other 206,228 shares were also options which

22   Henley exercised at only $1.69 per share.

23   Ellison's insider trading was suspiciously timed shortly after defendants' false statements on

24   January 5 and 8, 2001 that pushed the stock to over $30 per share.  This was also only one month

25   before Oracle missed its financial forecasts on March 1, 2001 when the stock dropped to $16.88.

26   Similarly, Henley sold on January 4, 2001, only two weeks after his false forecasts on December 14-

27   15, 2000, and less than two months before Oracle missed those forecasts on March 1, 2001.

28

1    A summary of defendants Ellison and Henley's Class Period stock sales (adjusted for stock

2    splits) follows:

| Defendant | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| L. Ellison | 01/22/01 | 3,100,000 | $32.010 | $99,231,000 |
| | 01/23/01 | 5,100,000 | $31.640 | $161,364,000 |
| | 01/24/01 | 4,900,000 | $30.730 | $150,577,000 |
| | 01/25/01 | 3,825,000 | $30.140 | $115,285,500 |
| | 01/26/01 | 4,225,000 | $30.090 | $127,130,250 |
| | 01/29/01 | 1,082,000 | $30.030 | $32,492,460 |
| | 01/29/01 | 815,000 | $30.220 | $24,629,300 |
| | 01/29/01 | 1,500,000 | $30.490 | $45,735,000 |
| | 01/30/01 | 352,000 | $30.540 | $10,750,080 |
| | 01/30/01 | 1,560,000 | $30.440 | $47,486,400 |
| | 01/30/01 | 25,576 | $30.250 | $773,674 |
| | 01/30/01 | 1,000,000 | $30.830 | $30,830,000 |
| | 01/30/01 | 300,000 | $30.210 | $9,063,000 |
| | 01/31/01 | 1,300,000 | $30.350 | $39,455,000 |
| | Class Period Totals: | 29,084,576 | | $894,802,664 |
| J. Henley | 01/04/01 | 206,228 | $32.310 | $6,663,227 |
| | 01/04/01 | 793,772 | $32.310 | $25,646,773 |
| | Class Period Totals: | 1,000,000 | | $32,310,000 |

21    Defendants and other senior executives were regularly informed about Oracle's use of

22   customer overpayments to increase revenue through management reports, including Upside Reports.

23   The executive committee, which included Ellison, Henley and Sanderson received management

24   forecast reports, including Upside Reports.  Transfers from customer overpayments and unapplied

25   cash to the bad debt reserve were reflected as increased revenue on management forecast reports,

26   including Upside Reports.

27    Plaintiff incorporates by reference all facts discussed in Response to Interrogatory No. 7

28   relating to defendants' spoliation of evidence.

1  INTERROGATORY NO. 15:

2      For each Person identified in Plaintiffs' Initial Disclosures, Identify all facts that support

3  Your belief that each such Person is "likely to have discoverable information" that support Plaintiffs'

4  "claims."

5  RESPONSE TO INTERROGATORY NO. 15:

6      1199 SEIU Greater New York Pension Fund hereby incorporates the General Objections

7  above as if set forth herein.

8      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the

9  grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome,

10  without reasonable limitation in its scope, and seeks information that is neither relevant nor

11  reasonably calculated to lead to the discovery of admissible evidence.

12      1199 SEIU Greater New York Pension Fund further objects to this interrogatory on the basis

13  of the attorney work-product doctrine and/or the attorney-client privilege.

14      1199 SEIU Greater New York Pension Fund further objects to this interrogatory to the extent

15  it seeks a legal conclusion.

16      1199 SEIU Greater New York Pension Fund further objects to this interrogatory as premature

17  to the extent it seeks facts and/or information that are subject to ongoing or future discovery –

18  including information to be obtained during the depositions of and document production by the

19  Oracle defendants and various third parties.  Initial Disclosures are subject to amendment and

20  supplementation during discovery.

21      1199 SEIU Greater New York Pension Fund further objects to this Interrogatory to the extent

22  it seeks information not in 1199 SEIU Greater New York Pension Fund's possession, custody or

23  control.

24  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:

25  **I.     Lead Plaintiff**

26      1.     Local 144 Nursing Home Pension Fund:  As an investor plaintiff, this person is likely

27  to have discoverable information regarding its purchase and/or sale of Oracle Corporation ("Oracle"

28

1   or the "Company") stock between December 14, 2000 and March 1, 2001 (the "Class Period") that

2   supports plaintiffs' claims.

3       2.    Local 56 Retail Meat Pension Fund:  As an investor plaintiff, this person is likely to

4   have discoverable information regarding its purchase and/or sale of Oracle stock during the Class

5   Period.

6       3.    Drifton Finance Corporation:  As an investor plaintiff, this person is likely to have

7   discoverable information regarding its purchase and/or sale of Oracle stock during the Class Period.

8       4.    Robert D. Sawyer:  As an investor plaintiff, this person is likely to have discoverable

9   information regarding his purchase and/or sale of Oracle stock during the Class Period.

10  **II.     Named Plaintiffs**

11      1.    Oleg "Alex" Trepetin:   As an investor plaintiff, this person is likely to have

12  discoverable information regarding his purchase and/or sale of Oracle stock during the Class Period.

13      2.    Thomas Wright:  As an investor plaintiff, this person is likely to have discoverable

14  information regarding his purchase and/or sale of Oracle stock during the Class Period.

15      3.    Dzung Chu:  As an investor plaintiff, this person is likely to have discoverable

16  information regarding his purchase and/or sale of Oracle stock during the Class Period.

17      4.    Ryan Kuehmichel:  As an investor plaintiff, this person is likely to have discoverable

18  information regarding his purchase and/or sale of Oracle stock during the Class Period.

19      5.    Misop Lessard:  As an investor plaintiff, this person is likely to have discoverable

20  information regarding his purchase and/or sale of Oracle stock during the Class Period.

21      6.    Ke Wan:   As an investor plaintiff, this person is likely to have discoverable

22  information regarding his purchase and/or sale of Oracle stock during the Class Period.

23

24

25

26

27

28

### III.   The Individual Defendants

1.      Larry Ellison:  As defendant and as an Oracle executive, this person is likely to have discoverable information regarding all allegations in the Complaint[3] and about evidence destruction that supports plaintiffs' claims except as to plaintiffs' purchases and sales;

2.      Jeffrey O. Henley:  As defendant and as an Oracle executive, this person is likely to have discoverable information regarding all allegations in the Complaint and about evidence destruction that supports plaintiffs' claims except as to plaintiffs' purchases and sales;

3.      Edward J. Sanderson:  As defendant and as an Oracle executive, this person is likely to have discoverable information regarding all allegations in the Complaint and about evidence destruction that supports plaintiffs' claims except as to plaintiffs' purchases and sales.

### IV.   Current and Former Oracle Employees, Directors and Consultants

As former or current Oracle employees, directors and consultants, the following persons are likely to have discoverable information relating to facts alleged in the Complaint, that supports plaintiffs' claims as described in greater detail below each individuals' name.

1.      Aas, Stephanie
Former Senior Director of Investor Relations
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products. Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

2.      Abbasi, Sohaib
Senior Vice President, Development
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

3.      Adams, Brian
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations

---

[3]      Plaintiffs' Revised Second Amended Complaint for Violations of the Federal Securities Laws.

relating to Suite 11i.

4.   Adams, Doug
     Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

5.   Adao, Ann Maria
     Debit and credit memos, unapplied cash accounts and improper revenue recognition and evidence destruction.

6.   Agneta, Arthur
     Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

7.   Aldrich, Joe
     Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

8.   Alesi, Paul
     Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

9.   Allen, Doug
     Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

10.  Ananthakrishnan, Satish
     Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

11.  Andersen, Jesper
     Product defects and/or problems with implementation and functioning of Oracle products and evidence destruction.

12.  Antonio, Hazel
     Debit and credit memos, unapplied cash accounts and improper revenue recognition.

13.  Ariko, Barry

Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

14.   Assefa, Gera
        Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

15.   Baccure, Mark
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

16.   Backs, Justin
        Debit and credit memos, unapplied cash accounts and improper revenue recognition and evidence destruction.

17.   Bagley, Kelly Ann
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

18.   Baker, Martyn
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

19.   Baker, Randy
        Former Executive Vice President, Operations
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

20.   Balkenhol, Carolyn
        Assistant to the Chairman and Chief Executive Officer
        Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

21.   Balkenhol, Chris
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 114 -

software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i, insider sales and evidence destruction.

22. Barrenechea, Mark J.
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

23. Barta, Rick
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

24. Becker, Gary
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

25. Ben, Tai
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

26. Benati, Paul
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

27. Berg, Jeffrey
Member, Board of Directors
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

28. Berman, Ron
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software and evidence destruction.

29. Bhat, Krithika
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or

1      product cancellations relating to Suite 11i and evidence destruction.

2     30.    Bhola, Arun
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

5     31.    Bingham, Pat
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

32.    Bishop, Sheila
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

33.    Blake, Richard S.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer consultations, cancellations and/or complaints regarding Oracle products and evidence destruction.

34.    Block, Keith
Executive Vice President, North America
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

35.    Bloom, Gary
Former Executive Vice President, Operations
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

36.    Boskin, Michael J.
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

37.    Bretz, Sharon Montoya
Executive Assistant

Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products. Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

38.   Brown, Michelle
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

39.   Buckingham, Stephen
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

40.   Burke, Lia
Debit and credit memos, unapplied cash accounts, improper revenue recognition, and evidence destruction.

41.   Burton, Jeremy
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or false sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

42.   Calmon, Joao
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

43.   Campos, Raul
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

44.   Cannahan, Tom
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

45.   Cappelluci, Steve
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations

1   relating to Suite 11i and evidence destruction.

2   46.   Cappotto, David
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
3         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
          software.  Customer complaints, consultation requests and/or product cancellations
4         relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and
          evidence destruction.
5
6   47.   Carchedi, Frank
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
6         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
7         software.  Customer complaints, consultation requests and/or product cancellations
          relating to Suite 11i and evidence destruction.
8
9   48.   Catz, Safra A.
          Member, Board of Directors
10        Debit and credit memos, unapplied cash accounts and improper revenue
          recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
11        Problems with the implementation and functioning of Suite 11i and/or defects in
          Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
12        earnings.  Customer complaints, consultation requests and/or product cancellations
          relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
13        Information relating to the named defendants' stock sales, self-dealing and
          evidence destruction.

14  49.   Chan, Julie
          Debit and credit memos, unapplied cash accounts and improper revenue
15        recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.
          Problems with the implementation and functioning of Suite 11i and/or defects in
16        Suite 11i applications software.  Customer complaints, consultation requests and/or
          product cancellations relating to Suite 11i and evidence destruction.
17
18  50.   Chard, Jo Ann
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
19        implementation and functioning of Suite 11i and/or defects in Suite 11i applications
          software.  Customer complaints, consultation requests and/or product cancellations
20        relating to Suite 11i and evidence destruction.

21  51.   Chestnut, James
          Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
22        pipeline and/or sales for Oracle products.  Problems with the implementation and
          functioning of Suite 11i and/or defects in Suite 11i applications software.
23        Customer complaints, consultation requests and/or product cancellations relating to
          Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence
24        destruction.

25  52.   Chieffalo, Pasquale (Pat)
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
26        implementation and functioning of Suite 11i and/or defects in Suite 11i applications
          software.  Customer complaints, consultation requests and/or product cancellations
27        relating to Suite 11i and evidence destruction.

28  53.   Chou, David
          Problems with the implementation and functioning of Suite 11i and/or defects in

1    Suite 11i applications software and evidence destruction.

2    54.   Christie, Marisa
           Debit and credit memos, unapplied cash accounts, improper revenue recognition
3          and evidence destruction.

4    55.   Cianelli, Sam
           Debit and credit memos, unapplied cash accounts, improper revenue recognition
5          and evidence destruction.

6    56.   Classik, Nick
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
7          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
8          relating to Suite 11i and evidence destruction.

9    57.   Clements, Sherrill
           Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
10         pipeline and/or sales for Oracle products.  Customer complaints, consultation
           requests and/or product cancellations relating to Suite 11i.  Impact of the slowing
11         economy on Oracle's sales, pipeline and evidence destruction.

12   58.   Cohron, Malcolm
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
13         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
14         relating to Suite 11i and evidence destruction.

15   59.   Connors, Matt
           Problems with the implementation and functioning of Suite 11i and/or defects in
16         Suite 11i applications software and evidence destruction.

17   60.   Cooperman, Daniel
           Senior Vice President, General Counsel and Secretary
18         Debit and credit memos, unapplied cash accounts and improper revenue
           recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
19         Problems with the implementation and functioning of Suite 11i and/or defects in
           Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
20         earnings.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
21         Information relating to the named defendants' stock sales, self-dealing and
           evidence destruction.
22
23   61.   Corsey, Rudy
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
24         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
25         relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and
           evidence destruction.

26   62.   Cosenza, Michael
           Slowdown in demand, pipeline and/or sales for Oracle products.  Product defect
27         and/or problems with implementation and functioning of Oracle products.
           Customer consultations, cancellations and/or complaints regarding Oracle products.
28

63. Costell, Jim
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

64. Crenshaw, Don
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

65. Cuneo, Ronald E.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Impact of the slowing economy on Oracle's sales and pipeline.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

66. Daltrope, Lesa
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

67. Damm, Emily
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

68. Davies, Andy
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

69. Davis, Todd
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

70. De La Cruz, Joan
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

71. De Souza, Jude
Slowdown in demand, pipeline and/or false sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in

Suite 11i applications software and evidence destruction.

72.    DeCesare, Michael P.
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i, fraudulent accounting and evidence destruction.

73.    Derodef, Steve
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

74.    Dolan, Tom
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

75.    Donnelly, Peter
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline.  Defendants' stock sales, self-dealing and evidence destruction.

76.    Durizo, Mike
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer consultations, cancellations and/or complaints relating to Suite 11i and evidence destruction.

77.    Easton, Terrie
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

78.    Eaton, Cindy
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

79.    Elam, Terry
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

80.    Ellert, Roger T. Jr.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

81.    Elloy, Boz

Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software and evidence destruction.

82. Ellsworth, Christie
Oracle's actual and/or forecasted revenue and earnings. Slowdown in demand, pipeline and/or sales for Oracle products. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

83. Evans, Donna
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

84. Evert, Bobbie
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

85. Fahjardo, Robert
Debit and credit memos, unapplied cash accounts and improper revenue recognition. Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Oracle's actual and/or forecasted revenue and earnings. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Slowdown in sales, pipeline and demand for Oracle products. Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

86. Falotti, Pier Carlo
Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

87. Fardanesh, Omid
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

88. Fetters, Dan
Slowdown in demand, pipeline and/or sales for Oracle products. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

89. Fitzgerald, Kevin J.
Senior Vice President, Government, Education of Healthcare
Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Slowdown in sales, pipeline, demand for Oracle products and evidence destruction.

90. Fields, Tyce
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software and evidence destruction.

91. Flanigan, Connie

1  Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation
2  requests and/or product cancellations relating to Suite 11i and evidence destruction.

3  92.  Foster, Kelly
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
4  implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations
5  relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline.

6  93.  Foster, Romen
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
7  implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations
8  relating to Suite 11i and evidence destruction.

9  94.  France, Dave
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
10  implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations
11  relating to Suite 11i and evidence destruction.

12  95.  Frank, Steve
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
13  implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations
14  relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and
15  evidence destruction.

16  96.  Fresnia, Tony
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
16  implementation and functioning of Suite 11i and/or defects in Suite 11i applications
17  software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

18  97.  Gage, Rick
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
19  implementation and functioning of Suite 11i and/or defects in Suite 11i applications
20  software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

21  98.  Gaikwad, Sanjay
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
22  implementation and functioning of Suite 11i and/or defects in Suite 11i applications
23  software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

24  99.  Garcia, Jose
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
25  implementation and functioning of Suite 11i and/or defects in Suite 11i applications
26  software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

27  100.  Garcia-Molina, Hector
28  Member, Board of Directors

Debit and credit memos, unapplied cash accounts and improper revenue recognition. Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Oracle's actual and/or forecasted revenue and earnings. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Slowdown in sales, pipeline and demand for Oracle products. Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

101.    Garnick, Larry
        Oracle's actual and/or forecasted revenue and earnings. Debit and credit memos, unapplied cash accounts and improper revenue recognition. Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

102.    Garoote, Brandon
        Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

103.    Gentry, Thenton
        Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

104.    George, Shaju
        Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

105.    Gerry, Anne
        Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

106.    Giacoletto, Sergio
        Executive Vice President, Europe, Middle East and Africa
        Oracle's actual and/or forecasted revenue and earnings. Slowdown in demand, pipeline and/or sales for Oracle products. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

107.    Glass, Jennifer
        Debit and credit memos, unapplied cash accounts and improper revenue recognition. Impact of the slowing economy on Oracle's sales and pipeline. Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software. Oracle's actual and/or forecasted revenue and

earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

108.   Gozdeck, Karen
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software and evidence destruction.

109.   Grace, Lawrence
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

110.   Grainan, Frances
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline.

111.   Green, Robert
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customers consultations, cancellations and/or complaints regarding Oracle products and evidence destruction.

112.   Greener, Michael
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customers consultations, cancellations and/or complaints regarding Oracle products and evidence destruction.

113.   Grundfest, Joseph
Member, Board of Directors
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

114.   Gunner, Ivgen
Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

115.   Guthrie, Christine
Product defects and/or problems with implementation and functioning of Oracle

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 125 -

1      products and evidence destruction.

2   116.   Guthrie, Jim
3          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
4          relating to Suite 11i and evidence destruction.

5   117.   Gutz, Scott
          Debit and credit memos, unapplied cash accounts and improper revenue
6          recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
           Problems with the implementation and functioning of Suite 11i and/or defects in
7          Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
           earnings.  Customer complaints, consultation requests and/or product cancellations
8          relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
           Information relating to the named defendants' stock sales, self-dealing and
9          evidence destruction.

10  118.   Guy, Carlos
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
11         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
12         relating to Suite 11i and evidence destruction.

13  119.   Hahn, Adam
          Debit and credit memos, unapplied cash accounts and improper revenue
14         recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence
           destruction.
15
16  120.   Hanes, Jerry
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
16         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
17         software.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i.
18
19  121.   Hannon, Luke
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
19         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
20         software.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i and evidence destruction.
21
22  122.   Hatada, Ian
          Debit and credit memos, unapplied cash accounts, improper revenue recognition
22         and evidence destruction.
23
24  123.   Henderson, Frank
          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
24         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
25         software.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i and evidence destruction.
26
27  124.   Henderson, Kim
          Debit and credit memos, unapplied cash accounts, improper revenue recognition
27         and evidence destruction.
28

125. Hill, Dana
Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

126. Hinkey, Cera E.
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

127. Hodack, Brad T.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

128. Hoffman, Cynthia
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

129. Hooper, Charles
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

130. Hoover, Michael
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

131. Humberger, Tom
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

132. Hutchinson, John
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

133. Hylick, Eric
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

134.  Iglesias, Carlos
      Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
      implementation and functioning of Suite 11i and/or defects in Suite 11i applications
      software.  Customer complaints, consultation requests and/or product cancellations
      relating to Suite 11i.

135.  Jarvis, Mark
      Senior Vice President, Chief Marketing Officer
      Debit and credit memos, unapplied cash accounts and improper revenue
      recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
      Problems with the implementation and functioning of Suite 11i and/or defects in
      Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
      earnings.  Customer complaints, consultation requests and/or product cancellations
      relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
      Information relating to the named defendants' stock sales, self-dealing and
      evidence destruction.

136.  Jayamaran, Ramesh
      Product defects and/or problems with implementation, functioning of Oracle
      products and evidence destruction.

137.  Jenkins, Jody
      Debit and credit memos, unapplied cash accounts, improper revenue recognition
      and evidence destruction.

138.  Johannes, Sam
      Debit and credit memos, unapplied cash accounts, improper revenue recognition
      and evidence destruction.

139.  Johnson, Jeffrey
      Debit and credit memos, unapplied cash accounts, improper revenue recognition
      and evidence destruction.

140.  Jones, Vince
      Debit and credit memos, unapplied cash accounts, improper revenue recognition
      and evidence destruction.

141.  Jorgensen, Janel
      Debit and credit memos, unapplied cash accounts, improper revenue recognition
      and evidence destruction.

142.  Kabcenell, Dirk A.
      Customer complaints, consultation requests and/or product cancellations relating to
      Suite 11i.  Problems with the implementation and functioning of Suite 11i and/or
      defects in Suite 11i applications software.  Information relating to the named
      defendants' stock sales, self-dealing and evidence destruction.

143.  Kammer, Trine
      Slowdown in demand, pipeline and/or sales for Oracle products.  Products defects
      and/or problems with implementation and functioning or Oracle products.
      Customer complaints, consultation requests and/or product cancellations relating to
      Suite 11iand evidence destruction.

144.  Kee, Daryl

Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

145.  Keeney, Mark
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

146.  Kefaliotis, Elaine
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

147.  Keller, Dave
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

148.  Keller, Dilek
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

149.  Kemp, Jack F.
Member, Board of Directors
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

150.  Kerwood, Wayne
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

151.  King, Harold
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

152.  Klaiss, Donald

1    Senior Vice President, Applications Development, Manufacturing/Supply Chain
     Products
2    Debit and credit memos, unapplied cash accounts and improper revenue
     recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
3    Problems with the implementation and functioning of Suite 11i and/or defects in
     Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
4    earnings.  Customer complaints, consultation requests and/or product cancellations
     relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
5    Information relating to the named defendants' and evidence destruction.

6    153.    Knowles, Clinton
             Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos,
7            unapplied cash accounts and improper revenue recognition.  Slowdown in demand,
             pipeline and/or sales for Oracle products.  Problems with the implementation and
8            functioning of Suite 11i and/or defects in Suite 11i applications software.
             Customer complaints, consultation requests and/or product cancellations relating to
9            Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence
             destruction.
10
     154.    Kobisher, Michael
11           Debit and credit memos, unapplied cash accounts and improper revenue
             recognition. Oracle's actual and/or forecasted revenue, earnings and evidence
12           destruction.

13   155.    Koplovitz, Kay
             Member, Board of Directors
14           Debit and credit memos, unapplied cash accounts and improper revenue
             recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
15           Problems with the implementation and functioning of Suite 11i and/or defects in
             Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
16           earnings.  Customer complaints, consultation requests and/or product cancellations
             relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
17           Information relating to the named defendants' stock sales, self-dealing and
             evidence destruction.
18
     156.    Kopp, Sarah
19           Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
             pipeline and/or sales for Oracle products.  Problems with the implementation and
20           functioning of Suite 11i and/or defects in Suite 11i applications software.
             Customer complaints, consultation requests and/or product cancellations relating to
21           Suite 11i.  Impact of the slowing economy on Oracle's sales, pipeline and evidence
             destruction.
22
     157.    Kozikowski, Timothy J. "TJ"
23           Debit and credit memos, unapplied cash accounts and improper revenue
             recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
24           Problems with the implementation and functioning of Suite 11i and/or defects in
             Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
25           earnings.  Customer complaints, consultation requests and/or product cancellations
             relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
26           Information relating to the named defendants' stock sales, self-dealing and
             evidence destruction.
27

28

158. Kumar, Sanjay
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

159. Kurian, Thomas
Senior Vice President, Development, Oracle Application Server
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

160. Kwok, Jonathan
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

161. Lachinsky, Dave
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

162. Lacher Hawley, Linda
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

163. Lai, Evonne
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

164. Lane, Raymond
Former President
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

165. Lange, Bruce M.
Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

166. Lange, Deborah A.
Senior Vice President, Corporate Taxation
Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Information relating to

1    the named defendants' stock sales, self-dealing and evidence destruction.

2    167.    Lange, Frederick
             Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
3            implementation and functioning of Suite 11i and/or defects in Suite 11i applications
             software.  Customer complaints, consultation requests and/or product cancellations
4            relating to Suite 11i and evidence destruction.

5    168.    Laughlin, Walter
             Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
6            implementation and functioning of Suite 11i and/or defects in Suite 11i applications
             software.  Customer complaints, consultation requests and/or product cancellations
7            relating to Suite 11i and evidence destruction.

8    169.    Lavey, Tom
             Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
9            implementation and functioning of Suite 11i and/or defects in Suite 11i applications
             software.  Customer complaints, consultation requests and/or product cancellations
10           relating to Suite 11i and evidence destruction.

11   170.    Lawrence, Lindsay
             Problems with the implementation and functioning of Suite 11i and/or defects in
12           Suite 11i applications software and evidence destruction.

13   171.    Lawson, Kurt
             Customer complaints, consultation requests and/or product cancellations relating to
14           Suite 11i.  Problems with the implementation and functioning of Suite 11i and/or
             defects in Suite 11i applications software and evidence destruction.
15
     172.    Lee, Brian
16           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
             implementation and functioning of Suite 11i and/or defects in Suite 11i applications
17           software.  Customer complaints, consultation requests and/or product cancellations
             relating to Suite 11i and evidence destruction.
18
     173.    Lee, Deborah
19           Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos,
             unapplied cash accounts, improper revenue recognition and evidence destruction.
20
     174.    Lee, Marcus
21           Problems with the implementation and functioning of Suite 11i and/or defects in
             Suite 11i applications software.  Customer complaints, consultation requests and/or
22           product cancellations relating to Suite 11i and evidence destruction.

23   175.    Lermo, Cory
             Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
24           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
             software.  Customer complaints, consultation requests and/or product cancellations
25           relating to Suite 11i and evidence destruction.

26   176.    Lindey, David
             Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
27           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
             software.  Customer complaints, consultation requests and/or product cancellations
28           relating to Suite 11i and evidence destruction.

177. Littlefield, Molly
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

178. Lucas, Donald L.
Member, Board of Directors
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

179. Lyon, Richard
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

180. MacInnis, Patty
Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

181. Mackey, Jeanne
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

182. Magarro, Phil
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

183. Mair, Graeme
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

184. Martin, John
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 133 -

185.    Martin, Lynn
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

186.    Mayerson, Matthew
Vice President, Manufacturing and Distribution
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

187.    Mayfield, Mike
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

188.    McCallister, Robert
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

189.    McConnell, Tracy
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

190.    McGee, Kate L.
Vice President of Corporate Affairs
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

191.    McKay, Rick
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

192.    McKenna, Kevin
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

193.    McLaulin, Steve (aka McCaughlin)

Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

194.   Meek, Doug
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

195.   Meister, Luiz
Senior Vice President, Oracle Latin America
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline, demand for Oracle products and evidence destruction.

196.   Mendenhall, Larry
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

197.   Menio, Anthony
Impact of the slowing economy on Oracle's sales and pipeline.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

198.   Menon, Neal
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

199.   Miller, Scott
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

200.   Minton, Jennifer, L.
Senior Vice President, Finance and Operations
Corporate Controller
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

201.  Mitchell, Margaret
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

202.  Moldafsky, Neil
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

203.  Moore, Gary
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

204.  Morris, Colleen
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software and evidence destruction.

205.  Morrow, Andrew
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

206.  Moses, Conrad
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

207.  Munday, Vanessa Jean
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

208.  Munoz, Lucy
Oracle's actual and/or forecasted revenue and earnings.  Impact of the slowing economy on Oracle's sales and pipeline.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

209.  Myers, Greg
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence

1          destruction.

2    210.   Nabeta, Cherie
            Debit and credit memos, unapplied cash accounts, improper revenue recognition
3           and evidence destruction.

4    211.   Naser, Ahmed
            Problems with the implementation and functioning of Suite 11i and/or defects in
5           Suite 11i applications software and evidence destruction.

6    212.   Nasser, George
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
7           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
8           relating to Suite 11i and evidence destruction.

9    213.   Neal, Aaron
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
10          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
11          relating to Suite 11i and evidence destruction.

12   214.   Nguyen, John
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
13          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
14          relating to Suite 11i and evidence destruction.

15   215.   Nugent, John
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
16          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
17          relating to Suite 11i and evidence destruction.

18   216.   Nussbaum, Jay H.
            Former Executive Vice President, Operations
19          Debit and credit memos, unapplied cash accounts and improper revenue
            recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
20          Problems with the implementation and functioning of Suite 11i and/or defects in
            Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
21          earnings.  Customer complaints, consultation requests and/or product cancellations
            relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
22          Information relating to the named defendants' stock sales, self-dealing and
            evidence destruction.
23
     217.   O'Sullivan, Deborah
24          Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
            implementation and functioning of Suite 11i and/or defects in Suite 11i applications
25          software.  Customer complaints, consultation requests and/or product cancellations
            relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings.
26          Impact of the slowing economy on Oracle's sales, pipeline and evidence
            destruction.
27
     218.   Oberg, Erik
28          Debit and credit memos, unapplied cash accounts and improper revenue

recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

219.   Olgin, Jennifer
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

220.   Oliver, Rob
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

221.   Orocchi, Dave
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

222.   Overstreet, Jennifer
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

223.   Parekh, Ami
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

224.   Pavlovich, Antonia "Toni" G.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

225.   Perkins, R.
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

226.   Petrie, Gordon
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

227.   Pickering, Dave
Product defects and/or problems with implementation, functioning of Oracle

1    products and evidence destruction.

2    228.   Pierce, William
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
3          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
4          relating to Suite 11i and evidence destruction.

5    229.   Plant, William
           Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
6          pipeline and/or sales for Oracle products.  Problems with the implementation and
           functioning of Suite 11i and/or defects in Suite 11i applications software.
7          Customer complaints, consultation requests and/or product cancellations relating to
           Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence
8          destruction.

9    230.   Pollock, Beth
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
10         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
11         relating to Suite 11i and evidence destruction.

12   231.   Price, Michael
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
13         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
14         relating to Suite 11i and evidence destruction.

15   232.   Prosser, Sharon
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
16         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
17         relating to Suite 11i and evidence destruction.

18   233.   Quinn, Mike
           Debit and credit memos, unapplied cash accounts and improper revenue
19         recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
           Problems with the implementation and functioning of Suite 11i and/or defects in
20         Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
           earnings.  Customer complaints, consultation requests and/or product cancellations
21         relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
           Information relating to the named defendants' stock sales, self-dealing and
22         evidence destruction.

23   234.   Raffo, Carla
           Debit and credit memos, unapplied cash accounts, improper revenue recognition
24         and evidence destruction.

25   235.   Rafterie, Karen
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
26         implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
27         relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and
           evidence destruction.

28

236.   Rajidid, Poorna
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

237.   Reed, Ellen R.
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

238.   Reed, Jan
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline. Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

239.   Rising, Edward
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

240.   Roberts, Gary
Senior Vice President, Global Technology
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline. Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

241.   Roberts, George J.
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

242.   Roberts, Ryan
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

243.   Roberts, Sherry
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,

pipeline and/or sales for Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

244.    Robins, Elizabeth
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

245.    Robinson, Wren
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

246.    Rocha, Michael S.
Executive Vice President, Global Support Services
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

247.    Roncie, Roberta
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

248.    Ronsse, Robert
Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

249.    Roskovenski, Ryan
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

250.    Rozwat, Charles A.
Executive Vice President of Development, Server Technologies
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

251.    Rudden, Jeff
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

252.    Russ, Kevin
        Debit and credit memos, unapplied cash accounts and improper revenue
        recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence
        destruction.

253.    Sadusky, John
        Debit and credit memos, unapplied cash accounts and improper revenue
        recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence
        destruction.

254.    Salamone, John
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
        implementation and functioning of Suite 11i and/or defects in Suite 11i applications
        software.  Customer complaints, consultation requests and/or product cancellations
        relating to Suite 11i and evidence destruction.

255.    Sanderson, Edward J. ("Sandy")
        Former Executive Vice Presidents, Operations
        Debit and credit memos, unapplied cash accounts and improper revenue
        recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
        Problems with the implementation and functioning of Suite 11i and/or defects in
        Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
        earnings.  Customer complaints, consultation requests and/or product cancellations
        relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
        Information relating to the named defendants' stock sales, self-dealing and
        evidence destruction.

256.    Sandmeier, Hannes
        Product defects and/or problems with  implementation, functioning of Oracle
        products and evidence destruction.

257.    Sayfi, Mark
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
        implementation and functioning of Suite 11i and/or defects in Suite 11i applications
        software.  Customer complaints, consultation requests and/or product cancellations
        relating to Suite 11i and evidence destruction.

258.    Scheidecker, Ron
        Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
        pipeline and/or sales for Oracle products.  Customer complaints, consultation
        requests and/or product cancellations relating to Suite 11i.  Impact of the slowing
        economy on Oracle's sales, pipeline and evidence destruction.

259.    Schlueter, Linda
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
        implementation and functioning of Suite 11i and/or defects in Suite 11i applications
        software.  Customer complaints, consultation requests and/or product cancellations
        relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings.
        Impact of the slowing economy on Oracle's sales, pipeline and evidence
        destruction.

260.    Schreiber, Edward
        Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
        implementation and functioning of Suite 11i and/or defects in Suite 11i applications

software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

261.   Schwermann, Kate
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

262.   Schwoerer, Peter
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

263.   Scott, Brad
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

264.   Screven, Edward L.
Chief Corporate Architect
All allegations in the Complaint except as to plaintiffs' purchases, sales and evidence destruction.

265.   Sedlazek, Walter
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

266.   Seelandt, Bob
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

267.   Sellers, Dick
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

268.   Sengodan, Karthileyan
Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

269.   Settelmeyer, Christopher

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 143 -

Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

270.    Seven, Alex (Robert)
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

271.    Sharron, Will
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

272.    Shaw, Raymond
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

273.    Sheridan, Nicky
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

274.    Shiozawa, Shumpei Ta
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

275.    Shortell, Paul
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

276.    Simmler, Gary
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

277.    Simonetto, Steve
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

278. Simons, John
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

279. Singh, Ena
Product defects and/or problems with  implementation, functioning of Oracle products and evidence destruction.

280. Smith, Jennifer
Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Oracle's actual and/or forecasted revenue and earnings.  Impact of the slowing economy on Oracle's sales and pipeline.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

281. Snyder, Allen
Information regarding Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales and pipeline.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Oracle's actual and/or forecasted revenue and earnings.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.  Information relating to the named defendants' stock sales, self-dealing and evidence destruction.

282. So, Wendy
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

283. Song, Shin
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

284. Souragar, Reza
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

285. Sprague, Chris
Debit and credit memos, unapplied cash accounts, improper revenue recognition and evidence destruction.

286. St. Ledger, Bob
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

287. Stanley, Scott
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and evidence destruction.

288.   Steinmetz, Jeff
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i and evidence destruction.

289.   Stone, Tom
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i. Oracle's actual and/or forecasted revenue and earnings.
       Impact of the slowing economy on Oracle's sales, pipeline and evidence
       destruction.

290.   Strang, Mike
       Debit and credit memos, unapplied cash accounts, improper revenue recognition
       and evidence destruction.

291.   Sullivan, Patty
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i and evidence destruction.

292.   Sultan, Juliette
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and
       evidence destruction.

293.   Sumner, Polly
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and
       evidence destruction.

294.   Syed, Nadeem
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and
       evidence destruction.

295.   Tam, Liza
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i and evidence destruction.

296.   Tandy, Troy
       Debit and credit memos, unapplied cash accounts and improper revenue
       recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence

1    destruction.

2    297.   Thompson, Danita
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
3          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
4          relating to Suite 11i and evidence destruction.

5    298.   Tulgan, Adam
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
6          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
7          relating to Suite 11i and evidence destruction.

8    299.   Tuomi, Jeff
           Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
9          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
           software.  Customer complaints, consultation requests and/or product cancellations
10         relating to Suite 11i and evidence destruction.

11   300.   Van Horn, Paige
           Slowdown in demand, pipeline and/or sales for Oracle products.  Impact of the
12         economy on Oracle's sales, pipeline and evidence destruction.

13   301.   Varasano, Frank
           Former Executive Vice President, Operations
14         Debit and credit memos, unapplied cash accounts and improper revenue
           recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
15         Problems with the implementation and functioning of Suite 11i and/or defects in
           Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
16         earnings.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
17         Information relating to the named defendants' stock sales, self-dealing and
           evidence destruction.
18
     302.   Vasquez, Willie
19         Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
20         software.  Customer complaints, consultation requests and/or product cancellations
           relating to Suite 11i. Debit and credit memos, unapplied cash accounts, improper
21         revenue recognition and evidence destruction.

22   303.   Veidemani, Ieva
           Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
23         pipeline and/or sales for Oracle products.  Customer complaints, consultation
           requests and/or product cancellations relating to Suite 11i and evidence destruction.
24
     304.   Vissapragada, Sudhakar
25         Product defects and/or problems with implementation, functioning of Oracle
           products and evidence destruction.
26
     305.   Voltmer, Fred
27         Product defects and/or problems with  implementation, functioning of Oracle
           products and evidence destruction.
28

306.   Vora, Anil
       Vice President, Oracle Financing Division
       Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos,
       unapplied cash accounts and improper revenue recognition.  Information relating to
       the named defendants' stock sales, self-dealing and evidence destruction.

307.   Wadsworth, John V.
       Corporate Counsel
       Debit and credit memos, unapplied cash accounts and improper revenue
       recognition.  Actual and/or forecasted revenue, earnings and evidence destruction.

308.   Wasson, Amberly
       Debit and credit memos, unapplied cash accounts, improper revenue recognition
       and evidence destruction.

309.   Weaver, Scott
       Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
       implementation and functioning of Suite 11i and/or defects in Suite 11i applications
       software.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i and evidence destruction.

310.   Webleski, Laura
       Debit and credit memos, unapplied cash accounts and improper revenue
       recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
       Problems with the implementation and functioning of Suite 11i and/or defects in
       Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
       earnings.  Customer complaints, consultation requests and/or product cancellations
       relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
       Information relating to the named defendants' stock sales, self-dealing and
       evidence destruction.

311.   Weingarter, Joel
       Slowdown in demand, pipeline and/or sales for Oracle products.  Product defects
       and/or problems with implementation and functioning or Oracle products.
       Customer complaints, consultation requests and/or product cancellations relating to
       Suite 11i and evidence destruction.

312.   Welling, Jana
       Oracle's actual and/or forecasted revenue and earnings.  Debit and credit memos,
       unapplied cash accounts and improper revenue recognition.  Slowdown in demand,
       pipeline and/or sales for Oracle products.  Problems with the implementation and
       functioning of Suite 11i and/or defects in Suite 11i applications software.
       Customer complaints, consultation requests and/or product cancellations relating to
       Suite 11i. and evidence destruction.

313.   Whay, Andrea
       Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
       pipeline and/or sales for Oracle products.  Customer complaints, consultation
       requests and/or product cancellations relating to Suite 11i and evidence destruction.

314.   Wheeler, John
       Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
       pipeline and/or sales for Oracle products.  Problems with the implementation and
       functioning of Suite 11i and/or defects in Suite 11i applications software.
       Customer complaints, consultation requests and/or product cancellations relating to

1          Suite 11i and evidence destruction.

2    315.    White, Paula
            Slowdown in demand, pipeline and/or sales for Oracle products.  Oracle's actual
3           and/or forecasted revenue and earnings. Impact of the slowing economy on
            Oracle's sales, pipeline and evidence destruction.
4

5    316.    Williams, Derek H.
            Executive Vice-President (Asia Pacific Division)
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
6           implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
7           relating to Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline.
            Oracle's actual and/or forecasted revenue, earnings and evidence destruction.
8

9    317.    Williams, Tom (Thomas)
            Debit and credit memos, unapplied cash accounts and improper revenue
            recognition.  Oracle's actual and/or forecasted revenue, earnings and evidence
10          destruction.

11   318.    Wilson, Anthony
            Debit and credit memos, unapplied cash accounts, improper revenue recognition
12          and evidence destruction.

13   319.    Wilson, Billy
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
14          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
15          relating to Suite 11i and evidence destruction.

16   320.    Wilson, Monty.
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
17          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
18          relating to Suite 11i.  Oracle's actual and/or forecasted revenue, earnings and
            evidence destruction.
19

20   321.    Wine, Melanie
            Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
            pipeline and/or sales for Oracle products.  Customer complaints, consultation
21          requests and/or product cancellations relating to Suite 11i and evidence destruction.

22   322.    Winfelder, Scott
            Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
23          implementation and functioning of Suite 11i and/or defects in Suite 11i applications
            software.  Customer complaints, consultation requests and/or product cancellations
24          relating to Suite 11i. Oracle's actual and/or forecasted revenue, earnings and
            evidence destruction.
25

26   323.    Winton, David
            Debit and credit memos, unapplied cash accounts and improper revenue
            recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
27          Problems with the implementation and functioning of Suite 11i and/or defects in
            Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
28          earnings.  Customer complaints, consultation requests and/or product cancellations

relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
Information relating to the named defendants' stock sales, self-dealing and
evidence destruction.

324.  Wion, Kevin A.
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
pipeline and/or sales for Oracle products.  Problems with the implementation and
functioning of Suite 11i and/or defects in Suite 11i applications software.
Customer complaints, consultation requests and/or product cancellations relating to
Suite 11i. Impact of the slowing economy on Oracle's sales and pipeline.  Debit
and credit memos, unapplied cash accounts, improper revenue recognition and
evidence destruction.

325.  Wohl, Ronald A.
Executive Vice President, Applications Development
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand,
pipeline and/or sales for Oracle products.  Problems with the implementation and
functioning of Suite 11i and/or defects in Suite 11i applications software.
Customer complaints, consultation requests and/or product cancellations relating to
Suite 11i.  Impact of the slowing economy on Oracle's sales and pipeline.
Information relating to the named defendants' stock sales, self-dealing and
evidence destruction.

326.  Wood, Kelly
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
implementation and functioning of Suite 11i and/or defects in Suite 11i applications
software.  Customer complaints, consultation requests and/or product cancellations
relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and
evidence destruction.

327.  Woods, Jacqueline
Vice President, Global Pricing and Licensing Strategy
Debit and credit memos, unapplied cash accounts and improper revenue
recognition.  Impact of the slowing economy on Oracle's sales and pipeline.
Problems with the implementation and functioning of Suite 11i and/or defects in
Suite 11i applications software.  Oracle's actual and/or forecasted revenue and
earnings.  Customer complaints, consultation requests and/or product cancellations
relating to Suite 11i.  Slowdown in sales, pipeline and demand for Oracle products.
Information relating to the named defendants' stock sales, self-dealing and
evidence destruction.

328.  Woods, Joe
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
implementation and functioning of Suite 11i and/or defects in Suite 11i applications
software.  Customer complaints, consultation requests and/or product cancellations
relating to Suite 11i.

329.  Woods, Ron
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the
implementation and functioning of Suite 11i and/or defects in Suite 11i applications
software.  Customer complaints, consultation requests and/or product cancellations
relating to Suite 11i and evidence destruction.

330.  Woollacott, David
(deceased)

Slowdown in demand, pipeline and/or sales for Oracle products.  Product defects and/or problems with implementation and functioning or Oracle products.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

331.   Wortley, Lois
Product defects and/or problems with  implementation, functioning of Oracle products and evidence destruction.

332.   Yi, Julian
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

333.   Yohannes, Sam
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

334.   Yoneda, John
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

335.   Zavery, Amit
Product defects and/or problems with implementation, functioning of Oracle products and evidence destruction.

336.   Zefler, Marian
Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i and evidence destruction.

337.   Zettler, John
Oracle's actual and/or forecasted revenue and earnings.  Slowdown in demand, pipeline and/or sales for Oracle products.  Problems with the implementation and functioning of Suite 11i and/or defects in Suite 11i applications software.  Customer complaints, consultation requests and/or product cancellations relating to Suite 11i. Debit and credit memos, unapplied cash accounts and improper revenue recognition.  Impact of the slowing economy on Oracle's sales, pipeline and evidence destruction.

## V.   Analysts and News Services

As analysts and financial journalist that covered or commented upon Oracle, the following entities and individuals are likely to have discoverable information that supports plaintiffs' claims regarding the economic downturn, customer complaints and cancellations, the defendants' false and

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 151 -

1  misleading statements, Oracle's revenue and earnings reports, Oracle's forecasts and projections,

2  and problems with Oracle products, including problems with implementation and functioning of 11i,

3  during the Class Period:

4       1.   A.G. Edwards, Inc.
             Mary O'Rourke
5
6       2.   Banc of America Securities LLC
             Bob Austria
7
        3.   Bloomberg, Inc.
8
        4.   Bluestone Capital Securities, Inc. (or Trade.com Online Securities, Inc.)
9
        5.   Chase Hambrecht & Quist/JP Morgan H & Q
             Jim Pickrel
10
11      6.   CIBC Oppenheimer (or CIBC World Markets)
             Melissa Eisenstat
12
        7.   CNET
             Wylie Wong
13
14      8.   Credit Suisse First Boston Corporation
             Wendall Laidley
15
        9.   Deutsche Banc Alex. Brown, Inc.
             (Deutsche Bank Securities, Inc.)
16           Jim Moore

17      10.  FAC/Equities (First Albany Capital, Inc.)
             Mark Murphy
18
        11.  First Union Securities, Inc.
19           (or Wachovia Securities, Inc.)
             Chip Whitman
20
        12.  Frost Securities, Inc.
21
22      13.  Gartner, Inc.
             Betsy Burton
23
        14.  Josephthal & Co. Inc.
             Bert Hochfeld
24
25      15.  Lehman Brothers, Inc.
             Neil Herman
26
        16.  Merrill Lynch & Co., Inc.
             Charles Shilakes
27

28

17. Morgan Stanley Dean Witter & Co.
    Charles "Chuck" Phillips

18. Needham & Company, Inc.
    Richard Davis

19. PaineWebber (or UBS Financial Services, Inc.)
    Kevin Buttigieg

20. Prudential Securities
    Doug Crook

21. Phil Russom

22. Rob Tholmeier

23. Robertson Stephens
    Eric Upin

24. Salomon Smith Barney, Inc.
    (Citigroup Global Markets Inc.)
    Gretchen Teagarden

25. SG Cowen
    Drew Brosseau

26. The Argus Research Group, Inc.
    Bob Becker

27. The Goldman Sachs Group, Inc.
    Rick Sherlund

28. Thomas Weisel Partners
    Robert Schwartz

29. William Blair & Company
    Laura Lederman

30. Winter Corp.
    Richard Winter

31. Wit Soundview (or Soundview Financial/Technology)
    Jim Mendelson

## VI. Auditors

As auditors that audited Oracle and restored technical accounting and consulting services for trade, the following companies and/or individuals are likely to have discoverable information with respect to the improper accounting practices alleged in the Complaint, including allegations that Oracle falsely reported customer overpayments and credits as 2Q01 revenue that supports plaintiffs' claims. These auditors are also likely to have discoverable information regarding customer

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 153 -

1    advances, recognition of revenue, Oracle's financial statements, earnings, reserves, internal controls,

2    policies and procedures, customer cancellations and information relating to plaintiffs' claims of

3    insider trading that support plaintiffs' claims.

4    **VII.**          1.          Arthur Andersen LLP

5    **VIII.**         2.          Ernst & Young LLP

6    **IX.    Customers, Resellers and Partners**

7              As customers, resellers and/or partners of Oracle, the following individuals and entities

8    (along with their parent companies and/or wholly owned subsidiaries that conducted business with

9    Oracle between January 2000 to December 2001) are likely to have discoverable information

10   plaintiffs that supports plaintiffs' claims may regarding one or more of the following categories:

11   (A) customer advances, withholding of overpayments and credits due, and other accounting

12   irregularities; (B) implementation or integration of Oracle products, including, but not limited to,

13   Suite 11i and its modules; (C) Oracle's pipeline, customer cancellations, and/or delayed or unclosed

14   business deals; (D) the impact of the slowing economy; and (E) slowdown in demand for Oracle

15   products.   Plaintiffs have identified by letter which of the preceding categories apply to each

16   customer, reseller and/or partner.

17        1.          24 Hour Fitness
                          (A)
18
          2.          Abacus Technology
19                        (A)

20        3.          ABT Associates, Inc.
                          (A)
21
          4.          Access Graphics
22                        (A)

23        5.          Acme Electric Corporation
                          (A)
24
          6.          ACS Desktop Solution, Inc.
25                        (A)

26        7.          Adelphia Cable Communication
                          (A)
27

28

| | | |
|---|---|---|
| 1 | 8. | ADT Security Services, Inc. |
| 2 | | (C) |
| 3 | 9. | Advanced Telecom Group, Inc. |
| | | (A) |
| 4 | 10. | Advent Software |
| 5 | | (A), (D) |
| 6 | 11. | Adventist Home Health Care/Housecall |
| | | (C) |
| 7 | 12. | Agile Software Corporation |
| 8 | | (A), (D) |
| 9 | 13. | Agilent Technologies, Inc. |
| | | (A), (B), (C) |
| 10 | 14. | Agilera, Inc. |
| 11 | | (B), (D) |
| 12 | 15. | Airborne Express, Inc. |
| | | (A), (B), (C) |
| 13 | 16. | Airtouch Cellular (Verizon Wireless) |
| 14 | | (C) |
| 15 | 17. | Alcatel |
| | | (A), (C) |
| 16 | 18. | Alcoa, Inc. |
| 17 | | (B) |
| 18 | 19. | Align360 (Appix) |
| | | (A) |
| 19 | 20. | Allen Maxwell & Silver |
| 20 | | (A) |
| 21 | 21. | Allfirst Financial Inc. |
| 22 | | 1209 Orange St. |
| | | Wilmington, DE 19801 |
| | | (C) |
| 23 | 22. | Alliance Coal, LLC |
| 24 | | (B), (C) |
| 25 | 23. | Alliant Techsystems, Inc. |
| | | (A) |
| 26 | 24. | Altera Healthcare Corporation (Alterra Healthcare Corporation) |
| 27 | | (A) |
| 28 | | |

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 155 -

1

25.  Ameren St. Louis (Util.)
     (C)

2

26.  American Axle & Manufacturing
3    (A)

4    27.  American Civil Liberties Union
     (A)

5

28.  American General Corporation
6    American General Insurance
     (A), (B)

7

29.  American Medical Response
8    (A)

9    30.  American Red Cross
     (A)

10

31.  American Trans Air
11   (B)

12   32.  AmeriCredit Corporation of California
     (A), (B), (C)

13

33.  Americredit Financial Services, Inc.
14   (B), (C)

15   34.  Amtrak - National Railroad Passenger Corporation
     (C)

16

35.  Andersen Consulting (Accenture)
17   (A)

18   36.  Anthem Blue Cross and Blue Shield Foundation
     (C)

19

37.  Applied Digital Solutions, Inc.
20   Scott Silverman
     (B), (D)

21

38.  Applied Materials, Inc.
22   (A), (B), (D)

23   39.  Appx Software, Inc.
     (A), (D)

24

40.  Arch Chemicals, Inc.
25   (A)

26   41.  ARINC Research Corporation
     (A)

27

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 156 -

42. Aspect Communications
(A)

43. Astoria Federal Savings
(A)

44. AT&T Broadband (Comcast Corporation)
(B), (C)

45. AT&T Wireless
(A), (C)

46. Aultcare
(A)

47. Automotive Financial
(A)

48. Avaya
(A)

49. AVCOM
(A), (D), (E)

50. Avnet Computer, Inc. (Avnet, Inc.)
(A), (D)

51. BAE Systems
(A)

52. Baltimore County Public Schools Fin.
(B)

53. Bank of America Corporation
(A)

54. Bank of Montreal
(B)

55. Bank One/Bank One Services (now JP Morgan Chase and Co.)
(A)

56. Barclays UK
(B)

57. Bayer USA, Inc.
(A)

58. Bearclaw Systems
(A)

59. Bechtel Corporation
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 157 -

60. Belgacom, Inc.
(B)

61. BellSouth Corporation
Carnella Blount
Joe Coberly
Lori Groves
Judy Hudgens
Gongling Liu
Ed Martinez
Bill Pipkin
Jack Poole
Jim Sticklin
(A), (B), (C)

62. Bidvantage
3600 Via Pescador
Camarillo, CA 93012
(A), (D)

63. Bloomberg, Inc.
(C)

64. Blue 292
(B), (C), (D)

65. Boeing Corporation
(A), (C)

66. Boise State University
(A)

67. Bradford Exchange
(A)

68. Breed Technologies (now Key Safety Systems, Inc.)
(A)

69. Bridgelogix
(A)

70. Bristol Community College
(A)

71. Bristol Meyers Squibb Company
(A)

72. Broadvision, Inc.
(A)

73. Butler County
(A)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

74. Buyandhold.com
(A), (D)

75. California Polytechnic State University
(C)

76. Cambridge Soundworks, Inc.
(A)

77. Canon USA, Inc.
(A)

78. Canopy Group, Inc.
(B), (D), (E)

79. Cap Gemini Ernst & Young U.S. LLC
(or CapGemini U.S. LLC)
(A), (B)

80. CareCentric National LLC
(B)

81. Cargill, Incorporated
(A)

82. Carleton Corporation
(A)

83. CAT Technology
(A), (D), (E)

84. Cellmania.com
(A), (D)

85. Center 7, Inc.
Brad Angus
Robert T. Goates
David Nanney
Kelly Phillips
Chris Skillings
Ryan Tibbits
(B), (D), (E)

86. Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA  30333
(404) 639-3311
(A)

87. Central Carolina Bank (now Suntrust Banks, Inc.)
(A)

88. Chevron U.S.A or ChevronTexaco Corp.
(B), (C)

89. Chipotle Mexican Grill, Inc.
    (A)

90. Ciena Corp.
    (C)

91. Cigna International Corp.
    (A)

92. Cingular
    (A), (C)

93. Cisco Systems, Inc.
    (B), (D)

94. Citibank, N.A.
    (A), (B), (C)

95. Citibank Service Corporation (Subsidiary of Citi FSB)
    (A), (B), (C)

96. CitiGroup, Inc.
    (A), (C)

97. City of Chandler
    (C)

98. City of Chicago
    (A), (B)

99. City of Columbus
    (A)

100. City of Houston
     (C)

101. City of Milwaukee (Public Schools)
     (C)

102. City of New York
     (A), (C)

103. City of New York (Dept. of Transit) (Dept. of Envir. Protec.)
     (C)

104. City of New York Housing Authority
     (A), (C)

105. City of New York Metropolitan Transit Authority
     (A), (C)

106. City of Oakland
     (A), (B)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 160 -

1

107.    City of Palo Alto
        (C)

2

3

108.    City of Phoenix
        (A), (C)

4

109.    City of Portland (Police Dept.)
        (C)

5

6

110.    City of Richmond
        (A)

7

111.    City of San Diego
        (A)

8

9

112.    City of Seattle (Port of Seattle)
        (A), (C)

10

113.    City of St. Louis
        (A), (B)

11

12

114.    City of Tucson
        (C)

13

115.    City of Wichita (Integrated Payroll/Human Resources)
        (C)

14

15

116.    ClearOrbit, Inc.
        (B), (C), (D), (E)

16

117.    Cleveland University Hospital
        (C)

17

18

118.    Client Business Services, Inc.
        (A)

19

119.    Clubcorp Financial
        (A)

20

21

120.    CoBank, ACB
        (C)

22

121.    Coca-Cola Company
        (A)

23

24

122.    Coca-Cola Enterprises
        (A)

25

123.    Cola-Cola Bottling Company
        (A)

26

27

124.    Colorado Department of Corrections
        (C)

28

| 1 | 125. | Columbia University<br>(A) |
| 2 | | |
| 3 | 126. | Columbus State Community College<br>(C) |
| 4 | 127. | Columbus State Community College<br>(C) |
| 5 | | |
| 6 | 128. | Compaq Computer Corporation (Hewlett-Packard)<br>Flint I. Enton<br>Shawn Kearney |
| 7 | | (B), (C), (D) |
| 8 | 129. | Comedy Central<br>(A) |
| 9 | | |
| 10 | 130. | Conagra, Inc.<br>(A) |
| 11 | 131. | Concentra Inc.<br>Frances Morrier |
| 12 | | (B), (C) |
| 13 | 132. | Concurrent Technologies<br>(A) |
| 14 | | |
| 15 | 133. | Connecticut Child Care<br>(C) |
| 16 | 134. | Connecticut Justice Integrated System<br>State of Connecticut Office of Policy and Management |
| 17 | | (B) |
| 18 | 135. | Connexus Energy<br>(A) |
| 19 | | |
| 20 | 136. | Continental<br>(A) |
| 21 | 137. | Continuum<br>(A) |
| 22 | | |
| 23 | 138. | Cornell University<br>(C) |
| 24 | 139. | County of Chesterfield<br>(A), (C) |
| 25 | | |
| 26 | 140. | County of Clark (courts)<br>(A), (C) |
| 27 | 141. | County of Dade, Miami<br>(A) |
| 28 | | |

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 162 -

142.  County of Fresno
      (A), (C)

143.  County of Jefferson
      (A), (C)

144.  County of Johnson
      (C)

145.  County of Los Angeles
      (A), (C)

146.  County of Los Angeles
      IS Advisory Board
      (C)

147.  County of Los Angeles Department of Health Services
      (A)

148.  County of Los Angeles Sheriff's Department
      (C)

149.  County of Los Angeles Superior Court Judiciary
      (C)

150.  County of Marion/Salem
      (C)

151.  County of Milwaukee
      (A)

152.  County of Montgomery
      (C)

153.  County of Orange
      7(A)

154.  County of San Joaquin County (iProcurement)
      (C)

155.  County of San Mateo
      (A)

156.  County of Washoe (Sheriff's Department)
      (C)

157.  County of Waukesha
      (C)

158.  Covisint (Compuware Corporation)
      (B)

159.  Critical Path
      (A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 163 -

160. CSC Consulting, Inc.
(A), (B), (D), (E)

161. Cummings Engine Company
Martha Walden
(A)

162. CyberSource Corporation
Lincoln Hecock
(A)

163. Dallas Public Schools
(A)

164. Danka Office Imaging
(B)

165. DARPA (Healthcare)
Defense Advanced Research Projects Agency
(B), (C)

166. Data Systems Worldwide
Hank Decker
Andrew McDonald
Mike Mogavero
Phil Mogavero
Steve Rockey
(B), (D), (E)

167. Davis County School District
(A)

168. De Lage Landen Operational
(A)

169. Defense Finance & Accouting
(A)

170. Defense Logistics Agency
(A)

171. Dell Computer Corporation
(A), (D)

172. Delta Education, Inc.
(A)

173. Detroit Medical Center
(C)

174. Deutsche Bank AB
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 164 -

1

2

175.   DeVry, Inc.
       (A)

176.   DHL Express USA, Inc.

3      (B)

4      177.   DHL Worldwide Network NV/SA
              Jeremy Young

5             (B)

6      178.   Deisel
              (B)

7

8      179.   Detroit Medical Center
              (C)

9      180.   Digital Island
              (A), (D)

10

11     181.   Diners Club International Ltd.
              (A), (C)

12     182.   Discover Financial Services
              (A)

13

14     183.   District of Columbia
              (A)

15     184.   Diversified Computer Consultants, Inc.
              Paul McCarthy, CEO

16            William L. Varney
              Garth Hernandez

17            (A), (D)

18     185.   DLT Solutions
              (A)

19

20     186.   Doral Financial Corporation
              (B)

21     187.   Dowslake Microsystems
              (A), (D)

22

23     188.   Dream Works SKG
              Diane Waldman
              (B)

24

25     189.   DRS Technologies
              (A)

26     190.   Drug Enforcement Administration
              (A)

27

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 165 -

1

191.    DuPont Photomasks, Inc.
        (A)

2

3       192.    Dynamation (Dynamation Research, Inc.)
                (B)

4       193.    Dynamic Decisions, Inc (DDI)
                (A)

5

6       194.    Eastern Michigan Univ.
                (C)

7       195.    Eaton Corporation
                (B)

8

9       196.    EchoStar Communications
                (A)

10      197.    Efavorites, Inc.
                (A), (D)

11

12      198.    Eli Lilly and Company
                Joseph A. Gore
                (A)

13

14      199.    Emachinery.net, Inc.
                (A), (D)

15      200.    Embry-Riddle Aeronautical University, Inc.
                (C)

16

17      201.    EMC Corporation
                (A)

18      202.    Empirix, Inc.
                (B)

19

20      203.    Entegra Corporation
                (B)

21      204.    EOG Resources
                (A)

22

23      205.    Equator Technologies, Inc.
                (A)

24      206.    Equitrac Corporation
                (A)

25

26      207.    ESS Inc.
                (A)

27      208.    Excite, Inc.
                (A)

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 166 -

209. Exponent, Inc. (which will do business in California as Delaware Exponent, Inc.)
(B)

210. Express Scripts
(A)

211. Exxon Corporation
(A)

212. Exodus (SAVVIS)
(B), (D), (E)

213. Fannie Mae
(A)

214. Federal Aviation Administration
(A), (C)

215. Federal Deposit Insurance Corp.
(C)

216. Federal Express Corporation
(A), (B), (C)

217. First Hawaiian Bank
(A)

218. Flint Ink Corporation
(A)

219. Florida A&M Univ.
(C)

220. Ford Motor Company
(B)

221. Foster's of Australia, Foster's Group Ltd.
(C)

222. Foster's USA, LLC
(C)

223. Foundation Health Company
(A)

224. Franklin Covey
(B), (C)

225. Gab Robins North American, Inc.
(A)

226. GE Access (MRA Systems, Inc.)
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 167 -

227.  GE Aircraft Engines Receivables Corp.
      (A)

228.  GE Capital Financial
      (A)

229.  GE Capital
      Brian Chin
      (B)

230.  GE Capital (GE Power)
      Brian Chin
      David Greiger
      Prassanna Looganthian
      David Merker
      Anthony Alesi
      Debbie Capan
      (A), (B)

231.  GE Financial (General Electric Company)
      (A)

232.  GE Industrial Systems Technology Management, Inc.
      (B)

233.  GE Medical Systems Global Technology Company, LLC
      Ahmed Ali
      (B)

234.  GE New York
      (C)

235.  Gemological Institute of America
      (A)

236.  General American
      (B)

237.  General Binding Corporation
      (A)

238.  General Electric Aircraft Engines
      (A)

239.  General Electric Company
      (B), (C)

240.  General Jewish Hospital
      (C)

241.  General Motors Acceptance Corporation
      (A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 168 -

242.   General Motors Corporation
       (A), (C)

243.   Genesys Telecommunication Laboratories, Inc.
       (C)

244.   Georgia Department of Human Resources
       (A)

245.   Georgia Department of Public
       (A)

246.   Gers Retail Systems
       (A)

247.   Global Directmail Corporation
       (A)

248.   Global FoodExchange (Instill)
       (A)

249.   GMAC Residential Funding
       (A)

250.   Granite Systems Research (Telcordia Technology)
       (A)

251.   Greenbrier & Russel
       (A)

252.   Grumman Aerospace
       (A)

253.   Hallmark Cards, Inc.
       (B)

254.   Hartford Life, Inc.
       (C)

255.   Hartford Technology Services Company, L.L.C.
       (C)

256.   Harvard University
       (A)

257.   Havas Interactive
       (A)

258.   HCFA  (Centers for Medicare and Medicaid Services)
       (C)

259.   Health Net, Inc.
       (A), (B), (C)

260.   HealthSouth Corporation
       (B), (C)

261.   Heartland Information (Heartland ITS, Inc.)
       (A)

262.   Heller Financial, Inc.
       (A)

263.   Hewlett-Packard Company
       William E. Bradley
       Dan Demcak
       Deborah Little
       Mike Overly
       Cindy Terry
       Charlotte Yeh
       (A), (B), (C), (D)

264.   Hitachi Credit (Hitachi Capital UK PLC)
       (A)

265.   Hitachi Data Systems Corporation
       David Robinson
       Chris Worrali
       Michael Howard
       Regis H. Joly
       (B)

266.   HK Systems
       (A)

267.   Homeportfolio, Inc
       (A)

268.   Honeywell Sensing and Control
       Joel Flemming
       (B)

269.   Honeywell, Inc.
       (A), (B)

270.   Hospitality Enterprises, Inc.
       (B)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 170 -

271. Hostcentric
Doug Allen
David Brown
Ernesto Espinoza
Ken Garcia
Rich Jones
Ed Klenity
Greg McKown
Amy Wilson
Mike Wunderlich
(B), (D), (E)

272. Hostcentric
Carl Newton
(B)

273. Houlihan Lokey Howard and Zukin
(A)

274. Household Finance Corporation III
(A)

275. Howard University (Human Resource and Finance)
(B), (C)

276. HSBC USA, Inc.
(A), (C)

277. Humana TMEC
(A), (B), (C)

278. Huntsville Hospital
(A)

279. Hussey Corporation
(A)

280. Hutchinson Telecom (UK)

281. HWT Inc
(A)

282. Hydrochem Industrial
(A)

283. I2 Inc.
(A)

284. IBM Corporation
(A), (D)

285. ICE Automation Group, Inc.
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 171 -

1    286.   IKON Office Solutions, Inc.
            (B)
2
     287.   Infonet Services Corporation
3           James DeMin
            (B)
4
     288.   Informatica Corporation
5           (A)

6    289.   Information Resources, Inc.
            (A)
7
     290.   Ingersoll-Rand
8           Abraham Alemu
            Nirmala Musipala
9           David Preston
            Steven Wright
10          (B)

11   291.   Integon Corporation (GMAC Insurance)
            (A)
12
     292.   Integraph Corporation
13          (A)

14   293.   Intel Corporation
            (A), (D)
15
     294.   International Paper Company
16          (A)

17   295.   Internet Serv. Corp.(Elliance, Inc.)

18   296.   Iproperty.com
            (A), (D)
19
     297.   IRS - Information System Services
20          (A)

21   298.   JDS Uniphase Corporation
            Steven Lybak
22          Scott Paker
            David Sutton
23          (A), (B), (C), (D)

24   299.   JM Huber Corporation
            (A)
25
     300.   John Muir Medical Center
26          (A)

27   301.   JPI Partners, Inc.
            (A)
28

302. Juniper Networks, Inc.
Robert Chappel
Michael Dodd
Scott Kriens
(B)

303. KEMET Electronics Corporation
(A)

304. Kenexa Technology
(A)

305. Keyspan Corp.
(A)

306. Keystone Foods L.L.C.
(A)

307. Kiamichi Technology Center Poteau
(A)

308. Knowles Electric Ltd.
(A)

309. Koch Financial Corporation
(A)

310. KPMG Consulting, Inc. (BearingPoint, Inc.)
(B), (C), (D), (E)

311. Landmark Graphics Corp.
(A)

312. Lavastorm
(A)

313. Leasetec Systems Credit
(A)

314. Ledgent Inc.
(A)

315. Legato Systems, Inc. (EMC Corporation)
Jim Chappel
(B)

316. Legerity, Inc.
Raman Batra
(B)

317. Leo Burnett Limited
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 173 -

318. Level 3 Outsource Management System
(A), (C)

319. LG Electronics U.S.A., Inc.
(B)

320. Limited Brands Inc.
(A)

321. Linuxcare, Inc.
(A)

322. Liz Clairborne, Inc.
(A)

323. Lockheed Martin Aerospace (Lockheed Martin Corporation)
(A)

324. Lockheed Martin Information Systems
(A)

325. Logic Technology
(A)

326. Logicon, Inc.
(A)

327. Lord Corporation
(A)

328. Los Alamos National Laboratory
(A)

329. Los Angeles Department of Water and Power
(C)

330. Lucent Technologies
Larry Kittleberger
(A), (B), (C), (D)

331. Lucent Technolgoies
Martin Klein
(B), (C)

332. Maintenance Warehouse/America Corp.
(A)

333. Maricopa Community Colleges
(B), (C)

334. Mark III Inc.
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 174 -

| | | |
|---|---|---|
| 1 | 335. | Marriott International Inc. |
| 2 | | (A) |
| 3 | 336. | Martin's Famous Pastry Shoppe, Inc. |
| | | (A) |
| 4 | 337. | Massachusetts Department of Water |
| 5 | | (A) |
| 6 | 338. | MBNA America Bank, NA. |
| | | (MBNA Corp.) |
| 7 | | (A), (B) |
| 8 | 339. | McDonald's Corporation |
| | | (A) |
| 9 | 340. | McGhan Medical Corp. |
| 10 | | (B) |
| 11 | 341. | McGraw-Hill Education |
| | | (The McGraw-Hill Companies, Inc.) |
| 12 | | (B), (C) |
| 13 | 342. | McHugh Software |
| | | (A), (D) |
| 14 | 343. | MCI Systemhouse Corporation: |
| 15 | | (A) |
| 16 | 344. | MCI WorldCom Communications, Inc. |
| | | (A) |
| 17 | 345. | McKesson HBOC Inc. |
| 18 | | (A) |
| 19 | 346. | Medscape |
| | | (A) |
| 20 | 347. | Merrill Lynch & Co., Inc. |
| 21 | | Merrill Lynch CICG Technology Global Investment Banking |
| | | (C) |
| 22 | 348. | Metavante Corp. |
| 23 | | (A) |
| 24 | 349. | Micron Electronics |
| | | (Interland Inc.) |
| 25 | | (A) |
| 26 | 350. | Mid-Atlantic Home Healthcare Network Inc. |
| | | (A) |
| 27 | | |
| 28 | | |

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 175 -

351. MidAmerican Energy Company
MidAmerican Energy Holdings Company
(C)

352. Modus Media International Ltd.
(A)

353. Molecular Simulations (Accelrys)
(A)

354. Morgan Stanley Dean Witter & Co.
(C)

355. Motorola, Inc.
(A), (B), (C)

356. Mutual of Omaha Insurance Co. (Mutual of Omaha Marketing Corp.)
(C)

357. Nalco Holding Co.
(A)

358. Nantucket Nectars
(B), (C)

359. NASA
(A), (B), (C)

360. NASA Goddard Space Flight
(A)

361. NASA Jet Propulsion Laboratory
(B)

362. National Institute of Mental Health ("NIMH")
(B), (C)

363. National Oceanic and Atmospheric Administration
(A), (C)

364. Neotix
(B), (D), (E)

365. Network Equipment Technologies Inc.
(A), (D)

366. Newcourt Financial
(A)

367. New York Life
(A)

368. News America Marketing Interactive Inc.
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 176 -

369.   Nextel Communications, Inc.
       Nextel Operations, Inc.
       (A), (C)

370.   Nike
       (B), (C)

371.   North Shore Long Island Jewish Health Sys.
       (C)

372.   Now Foods

       (B)

373.   Nuforia, Inc. (Omnicom Group, Inc.)
       (A)

374.   OAO Corporation (Lockheed Martin Corporation)
       (A)

375.   Odwalla, Inc.
       Gary Hensley
       James Steichen
       (B)

376.   Old Mutual
       (C)

377.   Omnifax (Xerox Omnifax)
       (B), (D)

378.   Onsite Rx (Medvantx)
       (A)

379.   Open Market, Inc.
       (A)

380.   Oracle Applications Users Group (OAUG)
       Current or Former Officers and Board Members include:
       Rocky Bertz
       Karen Gilbert
       Todd Langille
       Mark Linton
       Frances Morrier
       Don Payne
       Donna Rosenstrater
       John Schindler
       Pamela Sheehan
       Jeremy Young
       (B), (C), (D)

381.   Orcom Solutions, Inc.
       (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 177 -

382.    Oregon Public Employees Retirement System
        (C)

383.    PacifiCare Health Systems, Inc.
        (A)

384.    Pac-West Telecomm, Inc.
        (A), (B)

385.    Paine Webber
        (C)

386.    Palm Computing, Inc.
        (A)

387.    Papa John's International, Inc.
        (A)

388.    Paradyne Corporation
        (B)

389.    Parametic Technology (aka PTC)
        (A)

390.    Parts Plus
        (A)

391.    Peer Chain Company
        (A)

392.    Pella Corporation
        (B)

393.    Peoplesoft, Inc.
        Craig Conway
        (B), (D), (E)

394.    Pepco Holdings, Inc.
        (C)

395.    Pepsi-Cola North America
        (A)

396.    Peralta Community College
        (C)

397.    PETCO Animal Supplies, Inc.
        (A)

398.    Pfizer Corporation
        (A)

399.    PG&E Corporation
        (C)

400.    Pharmacia Corporation
        (A)

401.    Phillips Petroleum Company (Conoco Phillips Company)
        (A)

402.    Phone.com, Inc. (Openwave Systems, Inc.)
        (A), (D)

403.    Pioneer Standard Electronics (Agilysys, Inc.)
        (A)

404.    Portal Software, Inc.
        (A), (D)

405.    PPG Industries
        (A)

406.    Premier Design Systems, Inc
        Tim Gotham
        (B), (D), (E)

407.    PRG Schultz Profit Recovery (PRG-Schultz Inc.)
        (A)

408.    Priceline.com Incorporated
        (A), (D)

409.    The Principal Financial Group, Inc.
        (B), (C)

410.    Product Exchange
        (B)

411.    Purdue Pharma, L.P.
        (A)

412.    Qualcomm Incorporated
        (B)

413.    Qwest Communications Corporation
        Quest Internet Solutions
        Quest Consulting
        Quest Communications Corporation
        (B), (C)

414.    Ralston Purina
        (Nestle Purina PetCare Company)
        (A)

415.    Rational Software Corporation
        (A), (D)

416.    Raytheon Company
        (A)

417.    Relera
        (A)

418.    RetailersMarketExchange, Inc.
        (B)

419.    Retek Inc.
        (A)

420.    Reynolds & Reynolds Corporation
        (A)

421.    Rochester Midland Corporation
        (A)

422.    Rotary International
        (A)

423.    Rush Presbyterian Saint Luke's Medical Center
        (A)

424.    Rutgers, The State University of New Jersey
        (B)

425.    Ryland Group, The
        (A)

426.    Saint John's Regional Health Center
        (A)

427.    Saint John's University
        (A)

428.    Saint Luke's Episcopal Health System Corp.
        (C)

429.    SalesLink Corporation
        (A)

430.    Salk Institute for Biological Studies
        (A)

431.    Samsung Telecommunications America LLP
        (C)

432.    San Diego Data Processing Corp.
        (B)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 180 -

433. Sanmina-SCI Corporation
Donna Rosenstrater
(B)

434. Sanwa Bank of California
(A)

435. Sanwa Leasing Corporation
(A)

436. Sapient Corporation
(A)

437. Sara Lee Corporation
(A)

438. SBC Communications, Inc.
(SBC Benchmark; SBC Common Platform Telco Financial; SBC Directories)
(A), (B), (C)

439. SBC Datacomm, Inc.
(A), (C)

440. Schering Plough Company
(A)

441. SCT Education Systems (now Sungard SCT)
(A)

442. Seven Up
(Cadbury Schweppes Americas Beverages)
(A)

443. Shared Medical Systems (Siemens Medical Solutions Health Services Corp. )
(A)

444. Siemens Corporation/Siemens Business Services, Inc.
(A), (B), (D)

445. Silterra Sales & Marketing Sdn. Bhd.
(B)

446. Soltre Technology, Inc.
(B), (C), (D), (E)

447. Solucient, LLC
(A)

448. Sony Corporation of America
(A), (B), (C)

449. Southwest Missouri State University
(A), (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 181 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

450.   Southwestern Bell Communications
       (A)

451.   Southwestern Bell Corporation
       (A)

452.   Southwestern Bell International
       (A)

453.   Southwestern Bell Mobile
       Cingular Wireless
       (A)

454.   Southwestern Bell Technology
       SBC Technology Resources, Inc.
       (A)

455.   Southwestern Bell Telephone
       SBC Southwestern Bell Telephone Company
       (A)

456.   Southwestern Bell Yellow Pages
       (A)

457.   Space Systems Loral Inc.
       (A)

458.   Spectrum
       (A), (D), (E)

459.   Sprint Corporation
       Tadd O'Brian
       William T. Esrey
       George Fucin
       Carol Y. Gast
       Art Krause
       Ron LeMay
       Pat Smith
       (A), (C)

460.   Sprint
       (Sprint International; Sprint PCS Studio; Sprint Spectrum LP)
       (A), (C)

461.   Sprint United Management Company
       Mary Bain
       Pat Moase
       (A)

462.   Stanford University
       (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 182 -

463. Starbucks Corporation
     (B)

464. State of Arizona
     Bureau of IT Consultant Services
     (A), (C)

465. State of California Department of Corrections
     (C)

466. State of California Department of Industrial Relations
     (A), (C)

467. State of Colorado
     Department of Corrections
     (A), (C)

468. State of Connecticut
     (C)

469. State of Florida
     Department of Revenue (HR/payroll)
     (A), (C)

470. State of Georgia
     Governor's Office
     (A), (C)

471. State of Hawaii
     (A)

472. State of Hawaii Department of Transportation
     (C)

473. State of Kentucky
     (C)

474. State of Maine Bureau of Motor Vehicles
     (C)

475. State of Maryland
     (A), (C)

476. State of Massachusetts
     Turkpike Authority, State Transportation Building
     (A), (C)

477. State of Michigan Department of Information Technology (e-Michigan)
     (C)

478. State of Michigan, Human Services Department
     (C)

1

479.    State of Minnesota
        (A)

2

        480.    State of Mississippi
3               Dept. of IT Services
                (A), (C)

4

        481.    State of Nebraska Information System ("NIS")
5               (C)

6       482.    State of New Jersey
                The State House
7               (A), (C)

8       483.    State of New Jersey Department of the Treasury "IFAAS"
                (C)

9

        484.    State of North Dakota Enterprise Resource Planning System
10              (C)

11      485.    State of North Dakota (Procurement)
                Curtis Wolf
12              (C)

13      486.    State of New York
                Metropolitan Transportation Authority
14              (A)

15      487.    State of Ohio
                (A), (C)

16

        488.    State of Ohio State Auditor
17              (C)

18      489.    State of Oklahoma
                (C)

19

        490.    State of Rhode Island
20              (A)

21      491.    State of South Dakota
                (A), (B)

22

        492.    State of Utah
23              (A), (C)

24      493.    State of Wisconsin
                (A)

25

        494.    State Street Bank & Trust (State Street Corporation)
26              (A)

27      495.    Submitorder.com
                (A), (D)

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 184 -

1    496.    Sun Microsystems, Inc.
             Doug Kaewert
2            (A), (C)

3    497.    Tampa Elec. Co. (TECO)
             (A), (C)
4
     498.    Techtronics
5            (C)

6    499.    Telecom New Zealand USA Limited
             (B), (C)
7
     500.    Teledyne Metalworking
8            (A)

9    501.    Telia AB-Sweden (TeliaSonera AB)
             -or-
10           TeliaNet (EMEA)
             TeliaSonera International Carrier, Inc.,
11           (C)

12   502.    Tennessee Valley Authority "TVA" (Integrated Performance Management)
             (A), (C)
13
     503.    Terradyne Systems, Inc.
14           (A), (B)

15   504.    Texas A&M University
             (C)
16
     505.    Texas Christus Healthcare
17           (C)

18   506.    Texas Instruments Incorporated
             (A)
19
     507.    Timex Corporation
20           (A), (B), (C)

21   508.    Toyota Motor Corporation
             (A)
22
     509.    Trinity Health Corporation
23           (C)

24   510.    Tropian, Inc.
             Cindy Pence
25           (B), (C)

26   511.    Tropitone Furniture Co.
             Michael Fancy
27           (B)

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 185 -

512.  Tyson Foods, Inc.
      (A)

513.  U.S. Air Force
      (Flexible Acquisition Sustainment Tool "FAST")
      (A), (C)

514.  U.S. Bureau of Reclamation
      (A)

515.  U.S. Center for Disease Control (CDC)
      (C)

516.  U.S. Department of Agriculture (NCF Pay Engine)
      (A), (C)

517.  U.S. Department of Transportation
      (C)

518.  U.S. Department of Defense
      (B), (C)

519.  U.S. Department of Energy
      (A), (C)

520.  U.S. Department of Interior (U.S. Geological Survey)
      (C)

521.  U.S. Department of State
      (A), (C)

522.  U.S. Department of Treasury
      (A)

523.  U.S. Marine Corps
      (A), (C)

524.  U.S. Naval Facilities Engineering
      (A)

525.  U.S. Naval Sea Systems Command ("NAVSEA")
      (A)

526.  U.S. Navy
      (C)

527.  U.S. Navy Warfare Development Command (Lessons Learned System aks "NLLS")
      (A), (B)

528.  U.S. Postal Service
      (A), (C)

529.  Unilever UK
      (A)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

530.   Unisys Corporation
       (A)

531.   United Asset Coverage, Inc.
       (A)

532.   United Educators
       (A)

533.   United Parcel Service
       UPS eLogistics, Inc.
       (A), (B)

534.   University of Alabama-Birmingham
       (B)

535.   University of Illinois
       (A)

536.   University Hospitals Health System
       (C)

537.   University of Chicago—Central Procurement Services
       (A)

538.   University of Notre Dame, Directory Services
       (B), (C)

539.   University of Pennsylvania
       (C)

540.   University of Pittsburgh
       (A)

541.   University of South Alabama
       (C)

542.   University of Texas
       (A)

543.   USAdata, Inc.
       (A), (D)

544.   USAi
       (B), (D), (E)

545.   ValueVision Media, Inc. (ValueVision International)
       (A), (B)

546.   Vanderlande Industries
       (A)

547.   Vanguard Financial Group
       (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 187 -

548. Vectren Corporation
(A)

549. VERITAS Software Corp.
(A)

550. Verizon Communications
(A), (C)

551. Verizon Global Solutions Inc.
(C)

552. Vingage Corp.
(B)

553. Vodafone Group PLC (Verizon)
(C)

554. VoiceStream Wireless (T-Mobile USA, Inc.)
(C)

555. Volkswagon Credit
(A)

556. Vpacket Communications, Inc.
(A)

557. VWR Scientific Products
(A)

558. Wake Medical Center
(A)

559. Walgreen Company
(A)

560. Wall Street Rarities, Inc.
(B)

561. Warner Bros. Entertainment Inc.
(C)

562. Washburn University
(C)

563. Washington Mutual Bank
(A)

564. Way2bid
(A)

565. Webalg, Inc.
(A)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 188 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

566.    Wells Fargo Bank, N.A.
        (A)

567.    Wells Fargo Services Company
        (A)

568.    Westat, Inc.
        (A)

569.    Westinghouse Savannah River Co. LLC
        (A), (C)

570.    Westpac Associates, Inc.
        (B)

571.    William Beaumont Hospital

572.    The Wills Group, Inc.
        (A)

573.    Wilmington Trust Corporation
        (A)

574.    Woods Equipment Company
        (A)

575.    World Minerals, Inc.
        (A)

576.    WorldCom, Inc. (MCI, Inc.)
        (A)

577.    Worldcrest Group, Inc. (Direct Sourcing Solutions, Inc. "DSSI")
        (A)

578.    Wrigley Company
        (A)

579.    W.W. Grainger, Inc.
        (A)

580.    Xdrive Technologies, Inc.
        (A)

581.    Xerox Corporation
        Malar Elangovan
        Peter W. Karplen
        Gregory Kaufman
        Ann Mulcahy
        Robert M. Neil
        (A), (B), (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 189 -

582.   Xilinx, Inc.
       Sharon Andreson
       (A)

583.   XYZ Corp.
       (A)

584.   Yolo Federal Credit Union
       (A)

585.   Yu, Gene
       (A)

586.   Zen-Noh Unico America Corporation
       (A)

**X.    Actual or Potential Competitors**

As actual or potential competitors, the following entities are likely to have have discoverable information that supports plaintiffs' claims in the Complaint, including, but not limited to, the following categories: (A) problems with Oracle products, including, but not limited to, implementation and integration of Suite 11i and related materials; (B) slowdown in demand for Oracle products; and (C) the impact of the slowing economy.  Plaintiffs have identified which categories of information each competitor or potential competitor is likely to have by letter.

1.    Accenture
      (A), (B), (C)

2.    Actuate
      (A), (B), (C)

3.    Ariba Inc.
      (A), (B), (C)

4.    Autonomy
      (A), (B), (C)

5.    BEA Systems, Inc.
      (A), (B), (C)

6.    BMC Software
      (A), (B), (C)

7.    Borland
      (A), (B), (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 190 -

1

2

8.      Brio Technology
        (A), (B), (C)

3

9.      BroadVision, Inc.
        (A), (B), (C)

4

5

10.     Business Objects
        (A), (B), (C)

6

7

11.     CGEY (Cap Gemini Ernst & Young)
        (A), (B), (C)

8

9

12.     Clarify
        (A), (B), (C)

10

13.     Cognos
        (A), (B), (C)

11

12

14.     Commerce One Operations, Inc.
        (A), (B), (C)

13

14

15.     Crystal Decisions
        (A), (B), (C)

15

16

16.     CSC (Computer Sciences Corporations)
        (A), (B), (C)

17

17.     EDS
        (A), (B), (C)

18

19

18.     Epiphany Solutions, Inc.
        (A), (B), (C)

20

21

19.     Euphony Communications Ltd.
        (A), (B), (C)

22

23

20.     Hyperion
        (A), (B), (C)

24

21.     i2 Technologies, Inc.
        (A), (B), (C)

25

26

22.     Informatica
        (A), (B), (C)

27

28

23. Information Builders
    (A), (B), (C)

24. International Business Machines Corporation
    (including Informix Global Services)
    (A), (B), (C)

25. Intuit
    (A), (B), (C)

26. J.D. Edwards & Company, LLC
    (A), (B), (C)

27. Lawson
    (A), (B), (C)

28. Manugistics
    (A), (B), (C)

29. Microsoft Corporation
    (A), (B), (C)

30. MicroStrategy
    (A), (B), (C)

31. NCR (Teradata)
    (A), (B), (C)

32. Nortel Networks
    (A), (B), (C)

33. PeopleSoft, Inc.
    (A), (B), (C)

34. Plumtree
    (A), (B), (C)

35. Qwest Software
    (A), (B), (C)

36. SAP America, Inc. (SAP AG)
    (A), (B), (C)

37. SAS Institute
    (A), (B), (C)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 192 -

38.   Siebel Systems, Inc.
      (A), (B), (C)

39.   Siemens Business Services
      (A), (B), (C)

40.   SilverStream/Novell
      (A), (B), (C)

41.   Sun Microsystems
      (A), (B), (C)

42.   Sybase
      (A), (B), (C)

43.   Unisys
      (A), (B), (C)

44.   Vignette
      (A), (B), (C)

**XI.   Other Individuals Likely to Have Knowledge of Additional Material Information to Support Plaintiffs' Claims**

The following individuals were identified during plaintiffs investigation as are likely to have information plaintiffs may use in support of their claims, including, but not limited to, information regarding one or more of the following:  (A) customer advances, withholding of overpayments and credits due, and/or other improper accounting practices; (B) implementation or integration of Oracle products, including, but not limited to, Suite 11i and its related modules; (C) Oracle's pipeline, customer cancellations and/or delayed or unclosed business deals; (D) the impact of the slowing economy; and (E) information pertaining to the Special Litigation Committed (SLC) investigations regarding the Delaware derivative action against defendants.  Plaintiffs have identified by letter the type of information each individual is likely to have.

1.   Baily, Rudy
     (A)

2.   Baker, John
     (A)

3.   Barrios, Linda
     (A)

| | | |
|---|---|---|
| 4. | Blanchfield, Tom Merrill Lynch (E) | |
| 5. | Bunting, Ronald (E) | |
| 6. | Chatfield, John (A) | |
| 7. | Clarke, Kimberly Merrill Lynch (E) | |
| 8. | Coll-Very, Alexis (E) | |
| 9. | Davies, Viola (A) | |
| 10. | Ellinger, Aaron (A) | |
| 11. | Emerson, Eric (A) | |
| 12. | Fischer, Sara (A) | |
| 13. | Gillespie, Mary Ann (E) | |
| 14. | Guner, Ivgen (E) | |
| 15. | Hamel, Kenneth (E) | |
| 16. | Hanlon, Mike Merrill Lynch (E) | |
| 17. | Heck, Joe (A) | |
| 18. | Kelly, David (A) | |
| 19. | Klein, Martin (B), (C), (D) | |
| 20. | Kreissman, James (E) | |
| 21. | Mahon, Loren (E) | |
| 22. | McBride, David C. (E) | |
| 23. | Morgan, Nina (A) | |
| 24. | Newcombe, George (E) | |

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

- 194 -

25. Olinger, Thomas
(E)

26. Orr, Cathy
(A)

27. Roselli, William
(E)

28. Saito, Yoji
(A)

29. Sheehan, L.
(A)

30. Shelton, Julie
(A)

31. Simon, Philip
(E)

32. Troxell, Vicki
(A)

33. Van Helm, Henk
(A)

Plaintiff incorporates by reference all facts discussed in Response to Interrogatory No. 7 relating to defendants' spoliation of evidence.

DATED: January 31, 2007

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
VALERIE L. McLAUGHLIN
GAVIN M. BOWIE
STACEY M. KAPLAN


_Stacey M. Kaplan_
STACEY M. KAPLAN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

1

2          LERACH COUGHLIN STOIA GELLER
           RUDMAN & ROBBINS LLP

3          SHAWN A. WILLIAMS
          WILLOW E. RADCLIFFE

4          ELI R. GREENSTEIN
          MONIQUE C. WINKLER

5          100 Pine Street, Suite 2600
          San Francisco, CA  94111

6          Telephone:  415/288-4545
          415/288-4534 (fax)

7          Lead Counsel for Plaintiffs

8 S:\CasesSD\Oracle3\RES00038725_1199_3D SUPP.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1199 SEIU GREATER NEW YORK PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES - C-01-0988-MJJ

1           <u>DECLARATION OF SERVICE BY MAIL AND E-MAIL</u>

2       I, the undersigned, declare:

3       1.     That declarant is and was, at all times herein mentioned, a citizen of the United States

4 and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested

5 party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San

6 Diego, California 92101.

7       2.     That on January 31, 2007, declarant served the 1199 SEIU GREATER NEW YORK

8 PENSION FUND'S THIRD SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET

9 OF INTERROGATORIES TO PLAINTIFFS by depositing a true copy thereof in a United States

10 mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and

11 addressed to the parties listed on the attached Service List. Declarant also served the parties by e-

12 mail.

13       3.     That there is a regular communication by mail between the place of mailing and the

14 places so addressed.

15       I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st

16 day of January, 2007, at San Diego, California.

17

18                             KATHLEEN R. JONES

19

20

21

22

23

24

25

26

27

28

ORACLE III (LEAD)

Service List - 1/16/2007   (201-064-1)

Page 1 of  1

## Counsel For Defendant(s)

Patrick E. Gibbs
Latham & Watkins LLP
140 Scott Drive
Menlo Park, CA  94025
   650/328-4600
   650/463-2600 (Fax)

Peter A. Wald
Michele F. Kyrouz
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
   415/391-0600
   415/395-8095 (Fax)

Jamie L. Wine
Brian T. Glennon
Latham & Watkins LLP
633 West Fifth St., Suite 4000
Los Angeles, CA  90071-2007
   213/485-1234
   213/891-8763 (Fax)

Dorian  Daley
James C. Maroulis
Oracle Corporation
500 Oracle Parkway, Mail Stop 50P7
Redwood City, CA  94065
   650/506-5200
   650/506-7114 (Fax)

## Counsel For Plaintiff(s)

Mark  Solomon
Douglas R. Britton
Valerie L. McLaughlin
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Sanford  Svetcov
Shawn A. Williams
Willow E. Radcliffe
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
   415/288-4545
   415/288-4534 (Fax)