IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

Master File No. C-01-0988-MJJ

This Document Relates To:


    ALL ACTIONS.

_____/



---o0o---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN

THURSDAY, JULY 12, 2007


---o0o---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:  (415) 321-2301


Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

 1   engagement with me.

 2        Q.   What are their names?

 3        A.   Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our

 4   office in Los Angeles.

 5        Q.   That's Alix Partners?

 6        A.   A-l-i-x, P-a-r-t-n-e-r-s.  Next individual is

 7   Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles

 8   office.  And lastly Shannon Zavoda, Z-v-o-d-a --

 9   Z-a-v-o-d-a, excuse me, who is also a CPA in our Los

10   Angeles office.

11        Q.   You currently work for Alix Partners in Los

12   Angeles; correct?

13        A.   I do, yes.

14        Q.   Besides those three individuals, did you work

15   with anyone outside your company on drafting the report,

16   besides Oracle's lawyers?

17        A.   No.

18        Q.   Did you talk to anybody outside your company

19   besides Oracle's lawyers and Deloitte and Touche about

20   your report?

21        A.   No.

22        Q.   When is the last time you looked at your

23   report?

24        A.   This morning.

25        Q.   Before that, when was the last time?

1    anything substantively in the report today?

2        A.   No, I do not.

3        Q.   Have you ever changed, substantively changed

4    your expert report the day of a deposition?

5        A.   Have I ever changed it?

6        Q.   Yes, in the deposition?

7        A.   No.

8        Q.   You never have?

9        A.   No.

10       Q.   I just want to talk a little bit about your

11   work history.  Is it fair to say you joined Price --

12   Coopers and Lybrand in 1985?

13       A.   That's correct.

14       Q.   Then, when did you -- and that became PWC?

15       A.   Correct.  On July 1st, 1998.

16       Q.   And from 1995 through 1999, you were the

17   partner in charge of the New York Metro region FAS

18   practice?

19       A.   No.  I was the partner in charge of the FAS

20   practice for Coopers and Lybrand for the western region.

21       Q.   And what does FAS stand for?

22       A.   Financial advisory services.

23       Q.   And what does that mean to be partner in

24   charge?

25       A.   I was the senior partner of that practice for

1   the entire western region, meaning I had not only client

2   responsibilities, but also administrative

3   responsibilities in administering the practice.

4        Q.   And financial advisory you said?

5        A.   Correct.

6        Q.   Does that have anything to do with auditing,

7   or is that more consulting side?

8        A.   Both.  There were -- during my tenure as the

9   partner in charge, I continued to do audits of

10  companies, all the way up to 2000, 2001.  Also in my

11  client responsibilities, I continued to work on the

12  auditing side as well as advising clients in auditing

13  and/or accounting issues.

14       Q.   So you actually conducted audits of clients

15  during that time?

16       A.   I did, yes.

17       Q.   Did you sign any audit opinions during that

18  time?

19       A.   I did, yes, several.

20       Q.   More than five?

21       A.   Yes.

22       Q.   Okay.  During that time did you ever work for

23  Oracle?

24       A.   I did not, no.

25       Q.   Have you ever had an engagement with Oracle

1    prior to this retention?

2         A.   I have not.

3         Q.   Ever worked for any of the individual

4    defendants prior to being retained?

5         A.   I have not.

6         Q.   And so when did you -- when was your next

7    promotion after you were, let's say, 2000?

8         A.   I don't know if you would call it promotion,

9    but I was asked to go run the FAS practice as partner in

10   charge for the New York Metro practice.  I might

11   consider that a demotion, but.  Anyway, July 1st, 1998 I

12   left California and went to New York and ran that

13   practice for two-and-a-half years.

14        Q.   What is the time frame of that?

15        A.   1998 through about mid 2000, July 1st, 1998,

16   through about mid 2000 I was the partner in charge of

17   the financial advisory service practices for New York.

18        Q.   Okay.  And what was your next position after

19   that?

20        A.   Then was a promotion, I came back to

21   California and was the financial advisory services

22   partner in charge for the western region again from 2000

23   until my departure from PWC, which was January 31st,

24   2003.

25        Q.   So you left PWC January 31st, 2003?

1      A.    Correct.

2      Q.    And you joined Alix Partners at that time?

3      A.    On February 1st, 2003.

4      Q.    Okay.  And you were partner in charge of the

5  FAS practice for the LA office during that time; right?

6      A.    That time being July 1st?

7      Q.    2000 through 2003.

8      A.    That's correct.  I came back mid -- beginning

9  to mid of 2000 and left in January of 2003.  And I was

10  the FAS partner in charge as well as the partner in

11  charge of the dispute analysis and investigation

12  practice for the western region.

13      Q.    So what does dispute analysis investigations

14  unit do or department?

15      A.    It is a subset of the financial advisory

16  services practice.  And it deals principally with

17  forensic accounting issues, any other types of disputes

18  or potential disputes involving either litigants or

19  potential litigants.  It can involve expert testimony.

20  It can involve fraud investigation.  It can involve

21  internal corporate investigations.  A number of

22  different things that they have basically those three

23  items in the title, dispute, analysis, and/or

24  investigation.

25      Q.    And when you said fraud investigations, are

O'Bryan , John Duross
CONFIDENTIAL                                    7/12/2007

1    A.   No.  I mean, I saw -- as you well know in my

2    original report, my rebuttal report, we talk about $2

3    million, where we've gone and looked at source

4    documents.

5          And I've also looked at, as you saw in my

6    report, a sample of 60, where we actually got source

7    documents and tied them back.

8          So I have seen support for those, yes.  But I

9    didn't go back and audit all 926.

10   Q.   Right.  So of the 926, you've looked at source

11   documentation for 60 of them; right?

12   A.   Just with respect to the three transactions,

13   the 11/17 debit memos.

14   Q.   There are 46,000 plus 11/17 debit memos;

15   correct?

16   A.   That's correct.

17   Q.   And out of that -- well, how many of those

18   debit memos did you look at in connection with your

19   reports?

20        MR. GLENNON:  Objection; vague and ambiguous.

21        THE WITNESS:  I looked at each and every one

22   of the 926.  And then I took a subset of the 926, 60, to

23   go back and see the individual debit memos to see that

24   they tied.

25        MR. GREENSTEIN:  Q.  So you looked at -- so in

1          MR. GLENNON:  Objection; vague and ambiguous.

2          THE WITNESS:  I relied on the script output,

3     plus I took 60 of those and tied them back to source

4     documents.

5          MR. GREENSTEIN:  Q.  So of the 46,000 debit

6     memos, you looked at source documents for 60 of them;

7     correct?

8          MR. GLENNON:  Objection; vague and ambiguous,

9     lack of foundation.

10         THE WITNESS:  As it relates to the debit

11    memos, that's correct.

12         MR. GREENSTEIN:  Q.  So back to the script

13    output.  So, you didn't verify or test the script output

14    to determine whether it was accurately reflecting those

15    926 debit memos; did you?

16         MR. GLENNON:  Objection; vague and ambiguous.

17         THE WITNESS:  No.  I did.  I looked at each

18    one of the three entries on the 926 script outputs, and

19    I saw there were three corresponding entries into 25005,

20    in and out.

21         MR. GREENSTEIN:  Q.  What I'm saying, did you

22    do any sort of testing or verification that the data in

23    the script output was accurate?

24         MR. GLENNON:  Same objection; asked and

25    answered.

1          THE WITNESS:  Yeah, as I said, I took a

2    subset -- first of all, I'm going to move into an audit

3    perspective here, inquiry and observation is evidence

4    from an auditor's perspective.  So I put on an auditor's

5    hat in looking at that.  And observing there were three

6    offsetting entries into the 926 script outputs helped me

7    understand that those were three offsetting transactions

8    that occurred.  I then decided, using professional

9    skepticism, to then test 60 individually and see the

10   individual source documents.

11          MR. GREENSTEIN:  Q.  I understand.

12      A.    The actual debit memos.

13      Q.    Well, the script output has additional entries

14   other than the three offsetting entries to 25005;

15   correct?

16      A.    Absolutely.

17      Q.    So what I'm asking is, did you perform any

18   independent testing to verify the accuracy of all the

19   data that was contained in the script output?

20          MR. GLENNON:  Objection; asked and answered.

21          THE WITNESS:  No.

22          MR. GREENSTEIN:  Q.  Okay.  So to the extent

23   you rely upon the script output in your reports, you're

24   assuming that the data within that is accurate; right?

25          MR. GLENNON:  Objection; vague and ambiguous.

1    12601.

2       Q.    You're talking about -- you found that $2

3    million was appropriate?

4       A.    Approximately $2 million.  What I did was I

5    then matched that.  I found about $2 million, which I

6    could find some support for in script output, any kind

7    of notes that were taken from the collectors during that

8    time frame on the miscellaneous receipts section of

9    their report.

10           And I then matched that to the document we

11   just talked about, which summarizes the cash transfer

12   project.  And, you know, ours was $2 million.  When I

13   look at the report, it looks like it is at least $5.5

14   million that Oracle had decided was appropriately

15   recognized based into revenue based on that project.  I

16   felt like my number was conservative.

17      Q.    What was the total amount of bad debt

18   transfers that occurred, that Oracle tried to resolve

19   during the 2002 cleanup for all periods?

20           MR. GLENNON:  Objection; vague and ambiguous.

21           THE WITNESS:  I think it was approximately $50

22   million.

23           MR. GREENSTEIN:  Q.  $50 million?

24      A.    Something to that effect.

25      Q.    Could you calculate of that $50 million how

1            MR. GLENNON:   Objection; mischaracterizes the

2    testimony.

3            MR. GREENSTEIN:   Q.  Did you rely on that

4    binder in front of you?

5            MR. GLENNON:  Same objection.

6            THE WITNESS:  I did rely on this binder in

7    front of me.

8            MR. GREENSTEIN:   Q.  And that binder contains

9    summaries of data that was pulled from the script

10   output; correct?

11           MR. GLENNON:  Same objection.

12           THE WITNESS:  As I said, the script outputs

13   were reviewed by us, and the information comes off of

14   that.  You can get all of the numbers that you see in my

15   report as to the $2 million right off of the script

16   outputs or the notes, the miscellaneous receipts.

17           All we did, for ease of summarization, was

18   prepare just that, a summary, which then ties to these

19   numbers.

20           So I certainly looked at it.  But the data

21   that I relied on was the source data, i.e., the script

22   outputs or the underlying source data.

23           MR. GREENSTEIN:   Q.  Turning to page 32 of

24   your report, of your opening report.  See the bullet at

25   the bottom, and it discusses, "Of the $10.6 million,

1    subject to my review, almost $700,000 of unapplied cash

2    transferred to the bad debt reserve during the second

3    quarter of fiscal year 2001 related to certain royalties

4    paid to Oracle."  Do you see that?

5           A.    Yes, I do.

6           Q.    How did you come up with that 700,000 number?

7                 MR. GLENNON:  Objection; vague and ambiguous.

8                 THE WITNESS:  By going through the script

9    outputs and the notes of the collectors as they went

10   through their cash project in October/November of 2002.

11                MR. GREENSTEIN:  Q.  So that $700,000, was

12   that related to one debit memo or multiple debit memos?

13          A.    Multiple.

14          Q.    Multiple.  How many, do you any?

15                MR. GLENNON:  Objection; vague and ambiguous.

16                MR. GREENSTEIN:  For the record the witness is

17   looking in the binder that is in front of him that he

18   said he didn't rely upon.

19                MR. GLENNON:  It is a videotaped deposition.

20                THE WITNESS:  Well, I want to clarify.  When I

21   said I didn't rely on -- when I said I did rely, I

22   relied on the script outputs and the notes.  The

23   summaries I don't need to rely on.  If you want to take

24   those out, that's fine.

25                MR. GREENSTEIN:  Q.  Can you tell me --

1   a check to Oracle from Open Market.

2        Q.   And is there a reason you didn't cite that in

3   your report, that document?

4            MR. GLENNON:  Objection; vague and ambiguous.

5            THE WITNESS:  You mean cite on page 20 --

6            MR. GREENSTEIN:  Q.  32.

7        A.   32?

8        Q.   Yeah.

9        A.   No.

10       Q.   Why not?

11       A.   I didn't see a reason.

12           MR. GLENNON:  Objection; vague and ambiguous.

13           MR. GREENSTEIN:  Q.  I'm sorry?

14       A.   I didn't cite every single document in the

15   report.  I may have relied on it, which would be back in

16   Appendix C, but I didn't cite each and every document we

17   saw in the report.

18       Q.   I understand.  So that document is cited in

19   Appendix C; correct?

20       A.   I believe so.

21       Q.   So what other -- did you look at source

22   documents for the $700,000 royalty payments?

23       A.   To the extent that we had them.  For example,

24   on -- well, some of the Dell information we had some

25   invoices.  On Open Market we talked about, we actually

 1    have a royalty report that demonstrates to one of the

 2    researchers that this was a royalty relationship.  And

 3    I'm referring there to NDCA-ORCL 515892, which appears

 4    to be attached to remittance advice.  So to the extent

 5    we had source documents, we attached those.

 6         Q.   So you didn't have some source documents for

 7    some of those five debit memos?

 8              MR. GLENNON:  Objection; vague and ambiguous.

 9              THE WITNESS:  I would have to go through each

10    and every one -- we did have source documents.  I don't

11    know if they were absolutely complete.  But what made it

12    complete was the reviewing of the notes and seeing that

13    there was a royalty relationship based on the notes.

14              MR. GREENSTEIN:  Q.  When you say the notes,

15    you mean collector notes?

16         A.   That's right

17              MR. GLENNON:  Same objection.

18              MR. GREENSTEIN:  Q.  You're referring to the

19    ones in the script output; correct?

20         A.   That's correct.

21         Q.   Okay.  And was there one note for each

22    transaction?

23              MR. GLENNON:  Same objection.

24              MR. GREENSTEIN:  Q.  Strike that.

25              Was there one note for each of the five debit

```
 1    him that question, you can.

 2           MR. GREENSTEIN:   Q.   This 121 transfers, can

 3    you tell me right now what the names of those -- what

 4    customers and debit memos they are?

 5           A.   Yes.

 6           Q.   And is there a document that I could -- a

 7    Bates numbered document I could look at just to find out

 8    what debit memo numbers they are?

 9           A.   Well, it is in the script.

10           Q.   Right.   But I don't know which ones they are.

11    There is 926 in the script output; correct?

12           A.   Correct.

13           Q.   You found 121 of them that you're relying upon

14    in drawing conclusions about the appropriateness of

15    them; correct?

16           MR. GLENNON:   I object to the extent it

17    mischaracterizes the testimony and to the extent you're

18    trying to get our expert to do work that you guys can

19    easily do on your own with the materials you have.

20           MR. GREENSTEIN:   How can we find out what the

21    121 debit memos are, Brian?

22           MR. GLENNON:   Are you asking me a question?

23           MR. GREENSTEIN:   Q.   I'm asking you.

24    Mr. O'Bryan, is there any way sitting here if I go back

25    to the script output I could determine the debit memo
```

```
 1   numbers for these 121 transfers?

 2       A.    Yes.

 3       Q.    Okay.  How would I do that?

 4       A.    You just go into the script and run a sort in

 5   the database that has the credit amount 12601, then it

 6   prints all the information about that.  That's all we

 7   did.

 8       Q.    So if I did that, and then whatever came up as

 9   crediting 12601, there would 121 transfer items?

10           MR. GLENNON:  Objection; vague and ambiguous.

11           THE WITNESS:  It would be 121 debit memos or

12   transfers from 25005 into 12601, totaling

13   $10,586,182.02.

14           MR. GREENSTEIN:  Q.  What document are you

15   looking at when you just made that calculation?

16           MR. GLENNON:  Objection; vague and ambiguous,

17   mischaracterizes the testimony.

18           THE WITNESS:  This is a summary of that query

19   that we ran off the script.

20           MR. GREENSTEIN:  Q.  And you're relying on

21   that document as we sit here right now to tell me the

22   total number; correct?

23           MR. GLENNON:  Objection; mischaracterizes the

24   testimony.

25           THE WITNESS:  Again, the basis of this is just
```

1   because the royalties don't have invoices.

2        Q.   So in 2004 you just said that they applied

3   that to an invoice; right?

4        A.   They would have created an invoice and credit

5   memoed it up, because -- or adjusted it up, because

6   there was no invoice that existed, so you would have to

7   create the invoice, which was done in May of '04.

8        Q.   So they created an invoice for a payment that

9   was made prior to November 2000; correct?

10            MR. GLENNON:   Objection; vague and ambiguous.

11            THE WITNESS:   Correct.  You would have to,

12   because you have to apply that somewhere.

13            MR. GREENSTEIN:   Q.  Do you know the date they

14   created the invoice?

15            MR. GLENNON:   Same objection.

16            THE WITNESS:   May 2004.

17            MR. GREENSTEIN:   Q.  A specific date?

18        A.   May 11th, 2004.

19        Q.   Page 33, the bullet, "In addition, over

20   $800,000 of over transfers to the bad debt reserve

21   during this period were appropriate."  Do you see that?

22        A.   Where are you?

23        Q.   Page 33.

24        A.   Yes.

25        Q.   The bullet at the top of the page, the

1    $800,000?

2         A.    Yes.

3         Q.    It says, "In addition, over $800,000 other

4    transfers to the bad debt reserve during this period

5    were appropriate."  Do you see that?

6         A.    I do.

7         Q.    You mean 2Q '01?

8         A.    Correct.

9         Q.    Then you say, "It's appropriate in that Oracle

10   had already reduced its revenues for certain open and

11   unpaid invoices either all or in part through the use of

12   credit memos and/or inclusion in Oracle's general bad

13   debt reserve as of the second quarter of fiscal year

14   2001."  Do you see that?

15        A.    That's correct.

16        Q.    So can you explain what you mean there?

17        A.    That when the collections department was

18   researching the applied cash project, during the applied

19   cash project in October/November of '02 time frame, they

20   researched individually all these that came -- all these

21   debit memos that got reversed.

22              And in certain instances, we have one, two,

23   three, four, five, six, seven -- twelve instances where

24   the evidence is that they are effectively adjusting up

25   an invoice because they had inappropriately issued a

```
 1   credit memo back in the 2000 time frame.

 2        Q.   You said 12 items.  Is that 12 debit memos?

 3        A.   That's correct.

 4        Q.   So 12 debit memos made up the $800,000;

 5   correct?

 6        A.   That's correct.

 7        Q.   Can you tell me -- can you just tell me the

 8   debit memo numbers --

 9        A.   Certainly.

10        Q.   -- of those?

11        A.   10200, 29695, 33442, 41212 -- actually, let me

12   go back.

13             These are the numbers that relate to a credit

14   memo that are in the $800,000 or that are in part of

15   that component.  And that would be, again --

16        Q.   Let me stop you there.  So are there debit

17   memos associated with those 12 items?

18        A.   You mean credit memos?

19        Q.   I mean debit memos.

20        A.   Oh, yes.

21        Q.   So can you tell me the debit memos -- the

22   debit memo numbers?

23        A.   I am sorry.  10200, 29695, 33442, 41212, 54 --

24   excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,

25   45948, and 46151.  Those total up about $727,000.
```

1    Plastics, they actually realized that there had been

2    credit memos that were inappropriately issued, and they

3    then booked the receivables and booked the sales.  And

4    then unbooked the 25005 account.

5        Q.   Okay.

6        A.   So, and that information was obtained through

7    looking at the notes, the collectors' notes, for this

8    account in the '03 time frame.

9        Q.   So when you say that was reflected in the

10   note, what was reflected in the notes?

11       A.   The credit memo discussion.

12       Q.   So, for these 12 transactions, how do you know

13   that those items were -- had erroneous credit memos?

14           MR. GLENNON:  Objection; vague and ambiguous.

15           THE WITNESS:  From the notes of the --

16           MR. GREENSTEIN:  Q.  Other than the notes, is

17   there any evidence that those 12 debit memos had

18   erroneous credit memos?

19           MR. GLENNON:  Same objection.

20           THE WITNESS:  In some cases you can actually

21   see credit memos.  But for the most part it was the

22   notes the collectors had done contemporaneous.

23           MR. GREENSTEIN:  Q.  Right.  You could see the

24   credit memos, but that doesn't tell you that they are

25   proper or improper; correct?

1        A.   Well, no.   The notes say, "Receipt notes were

2    incorrect; wrong PA; do not show sufficient credit

3    memos; erroneous notes; and credit memo 722616."

4              So you can see, you can trace that back and

5    see there was an inappropriate credit memo on -- at some

6    point in time in the history.

7        Q.   Okay, so other than the notes, is there any

8    evidence that those 12 transactions had erroneous credit

9    memos?

10       A.   That's the summary of what we considered.   As

11   I said, we have a number of different documents here,

12   which is actual invoices, and appears to be documents

13   which were put together by collectors, et cetera, to

14   support that.   I haven't gone through and reconciled

15   those specifically.

16       Q.   So what source documents would tell you that

17   the credit memo is issued erroneously?

18       A.   Well, as I said, for the most part for me I'm

19   using the notes.   Those are the contemporaneous

20   documents I'm using.

21       Q.   I just want to make sure.   You said for the

22   most part.

23              So is there any other document that you're

24   relying upon in making the determination that those 12

25   transactions had erroneous credit memos?

1    day we're going to write off this much automatically,

2    because there is a presumption it can't be collected.

3        Q.   But don't they presume the other portion can

4    be collected?

5        A.   At a later point in time, if they haven't

6    collected it, the remainder of it will be written off.

7    I have seen a number of companies do that.  They say,

8    180 days, automatically 50 percent gets written off no

9    matter what.

10       Q.   Turning to page 33 again, underneath the

11   $800,000 discussion, there is a discussion of at least

12   another $500,000.

13            And you state that, "These transfers were

14   appropriate, although the evidence relating to these

15   transfers is not as complete as the evidence I reviewed

16   in connection with the $1.5 million in transfers noted

17   above."  Do you see that?

18       A.   Yeah.  Yes.

19       Q.   So can you just explain what those

20   transactions are and why you found them appropriate?

21       A.   Well, again, they were originally transferred

22   from 25005 into 12601.  They were reversed in November,

23   November 24th, '02, all these were reversed for the most

24   part.  And when the unapplied cash project was performed

25   at that time, there is some evidence that it looks like

```
 1   it was either an unapplied, or a credit memo that was

 2   bad or a royalty that was appropriate.  The notes were

 3   not necessarily conclusive, or we didn't see any other

 4   type of support for that.

 5            So that appears to be one that should have

 6   been reported, given there is some evidence of a credit

 7   memo or there was some evidence of a royalty or some

 8   other type of revenue that should have been booked.  But

 9   the notes were not conclusive for me, nor did I see any

10   other type of support.  We put that into a bucket of

11   could be.

12       Q.   Could be.  So you can't definitively say that

13   $500,000 of transfers was proper; correct?

14       A.   That's correct.

15       Q.   And how many debit memos made up the $500,000

16   that you're talking about?

17       A.   Twelve.

18       Q.   I hate to do this, but can you just go ahead

19   and list them into the record, please?

20       A.   Certainly.  3503, 3569, 5165, 7992, 10691,

21   40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse

22   me, 45238.

23       Q.   Mr. O'Bryan, in your report you state that of

24   the 926 debit memos there are 277 that were refunded

25   prior to November 17th, 2000 for $103 million; is that
```

```
 1          MR. GLENNON:  You defined Q2 '01, which is why

 2    second quarter caught me off guard.  Sorry.

 3          THE WITNESS:  I don't think the difference

 4    between 11 cents or 10 cents, given the entire mix of

 5    information that was available to the public investor,

 6    that that was a material change.

 7          MR. GREENSTEIN:  Q.  And what standard did you

 8    use to determine what a reasonable investor was?

 9      A.    What standard did I use?

10          MR. GLENNON:  Objection; vague and ambiguous.

11          MR. GREENSTEIN:  Q.  Yeah.

12      A.    I just used the SAB 99, which defines that

13    exact topic.

14      Q.    Okay.  So why don't you take me through your

15    methodology of how you determined that if Oracle had

16    reported 10 cents rather than 11 cents and met investor

17    expectations -- analyst expectations that would not be

18    material?

19          MR. GLENNON:  Objection; mischaracterizes the

20    testimony, lacks foundation.

21          THE WITNESS:  You want me to take you through

22    my report?

23          MR. GREENSTEIN:  Q.  I'm wondering what

24    methodology you used to come to that conclusion.

25      A.    I applied SAB 99.
```

1          Q.    Did you take into account the macroeconomic

2     environment during 2Q '01?

3                MR. GLENNON:   Objection; lack of foundation.

4                THE WITNESS:   Sure.

5                MR. GREENSTEIN:   Q.   What was the

6     macroeconomic environment during that time?

7          A.    It was a tech sector, which was probably a bad

8     time, as I recall it experienced a bit of a downturn.

9          Q.    Do you know what the dot com bust is?

10         A.    I do, yes.

11         Q.    Wasn't that around March 2000?

12         A.    I think I just said experiencing a downturn.

13         Q.    You said a slight downturn.

14         A.    I said a bit of a downturn.   I didn't say

15    slight.

16         Q.    You don't think the dot com bust was more than

17    a bit of a downturn?

18         A.    It was a downturn.

19                MR. GLENNON:   Objection; lack of foundation,

20    mischaracterizes the testimony.

21                THE WITNESS:   That was the macroeconomics that

22    was going on.

23                MR. GREENSTEIN:   Q.   So how would you

24    characterize the macroeconomic environment as of the

25    date Oracle reported its earnings for second quarter

```
 1     '01?
 2          A.    Well --
 3               MR. GLENNON:  I'm still going to object on
 4     vague and ambiguous as to time.
 5               THE WITNESS:   The macroeconomic conditions
 6     were that there was a downturn in the tech sector.
 7               MR. GREENSTEIN:  Q.  Okay.  Did you do any
 8     analysis of what was happening to other companies in the
 9     software industry during that time, if they met rather
10     than beat expectations?
11          A.    No.
12          Q.    Did you do any analysis of any companies
13     during that time, what happened when they met rather
14     than beat expectations?
15               MR. GLENNON:  Objection; vague and ambiguous.
16               THE WITNESS:   No.  The issue here is Oracle,
17     not other companies.
18               MR. GREENSTEIN:  Q.  Did you do any analysis
19     of Oracle's previous history of earnings reports to see
20     what happened to Oracle's stock when they met or beat
21     expectations?
22               MR. GLENNON:  Same objection.
23               THE WITNESS:   I did, yes.
24               MR. GREENSTEIN:  Q.  And why don't you take me
25     through what your methodology was in doing that
```

```
 1        A.    Went down 6 percent.

 2        Q.    Okay.  Now, how did you determine -- or strike

 3   that.

 4              How did you decide to use, I think you said

 5   the first -- the stock price on the day following, the

 6   third day and the fifth day; is that right?

 7        A.    That's an analysis typically done by auditors

 8   as it relates to looking at materiality, particularly

 9   about stock movement, looking at those first few days.

10        Q.    Is there any accounting principle or rule that

11   outlines that procedure?

12        A.    No.

13              MR. GLENNON:  Objection; vague and ambiguous.

14              MR. GREENSTEIN:  Q.  When you say it is

15   typically done by auditors, can you cite to any

16   literature that says that that's the analysis that

17   should be conducted?

18              MR. GLENNON:  Same objection.

19              THE WITNESS:  It would be professional

20   standards, due to professional care and auditor's

21   judgment.

22              MR. GREENSTEIN:  Q.  Any article or literature

23   you could point to that suggests using that standard?

24        A.    With respect to one day, three days, five

25   days?
```

```
 1        Q.    Yeah.

 2        A.    No.   That's up to the auditor's judgment.

 3        Q.    You're not a statistician, are you?

 4        A.    I'm actually a computer audit specialist.

 5        Q.    Computer audit specialist, okay.

 6              Did you run a regression analysis of any stock

 7   price movement?

 8        A.    I was not asked to, nor did I.

 9        Q.    Do you know how to run a regression analysis?

10        A.    I do, yes.  Do you want to know about

11   R-squared?

12        Q.    I know a little bit about that.  Do you know

13   what the term vestigial means?

14        A.    Vestigial.  As a I sit rear right now, no.

15        Q.    You don't have a definition of the word

16   vestigial?

17        A.    Not as I sit here now.

18        Q.    You use it in your report?

19        A.    I do.  I don't remember the context I use it

20   in.

21        Q.    The word is not part of your vocabulary as you

22   sit here today?

23        A.    Not right now.

24              MR. GLENNON:  Objection; mischaracterizes the

25   testimony.
```

O'Bryan , John Duross                    7/12/2007
CONFIDENTIAL

```
 1        Q.   Did you -- what surrounding circumstances did

 2   you look at in finding that meeting expectations in the

 3   second quarter would not be material?

 4            MR. GLENNON:   Objection; mischaracterizes the

 5   testimony.

 6            THE WITNESS:   Would you mind restating the

 7   question?

 8            MR. GREENSTEIN:   Q.   Did you do an analysis of

 9   the surrounding circumstances in your materiality

10   analysis?

11        A.   Absolutely.

12        Q.   What were the surrounding circumstances that

13   you looked at?

14        A.   All of the information that was talked about

15   in analyst reports, all of the information looked at

16   with respect to meeting or beating in the stock price,

17   four or five data points after that, the issue with

18   respect to what's being restated, the percentage change

19   in that potential restatement.  There was a multitude of

20   things I looked at in the surrounding circumstances as

21   SAB 99 suggests.

22        Q.   Anything in particular you found important?

23            MR. GLENNON:   Objection; vague and ambiguous.

24            THE WITNESS:   It is all important.

25            MR. GREENSTEIN:   Q.   Anything in particular
```

1    in your mind between an ordinary investor versus what

2    would be reasonable to, say, a hedge fund manager?

3           MR. GLENNON:  Objection; vague and ambiguous,

4    incomplete hypothetical.

5           THE WITNESS:  Well, their sophistication

6    certainly can be different, but they are still users of

7    the financial, which one needs to consider as it relates

8    to materiality.

9           MR. GREENSTEIN:  Q.  Right.  But would you

10   apply the same standard to determining whether something

11   was material to a user any differently depending on what

12   type of investor the person was?

13          MR. GLENNON:  Objection; incomplete

14   hypothetical, lacks foundation.

15          THE WITNESS:  Yeah.  No.  A company and/or

16   auditor don't determine materiality based on whether it

17   is known as a hedge fund or a mom and pop's retirement

18   fund.  It is the total mix and the overall financial

19   statement taken as a whole.

20          MR. GREENSTEIN:  Q.  Do you agree SAB 99 --

21   strike that.

22          What qualitative factor did you look at doing

23   your materiality analysis?

24      A.   Qualitative?

25      Q.   Yeah.

O'Bryan , John Duross
**CONFIDENTIAL**
7/12/2007

1    A.   I looked at the ones we talked about on page

2    39, and anything else that was mentioned in SAB 99.  And

3    you can see those laid out on pages 39 and 40 of my

4    report.

5    Q.   Let's take the first factor, whether a

6    statement arises from an item capable of precise

7    measurement or whether it arises from an estimate, and,

8    if so, the degree of imprecision in that.  Do you see

9    that?

10    A.   I do.

11    Q.   So is it your expert opinion that the

12    transfers from -- the $20.1 million in transfers from

13    25005 to 12601 in the second quarter '01 was an

14    estimate?

15    A.   Yes.

16    MR. GLENNON:  Objection; lack of foundation,

17    vague and ambiguous.

18    THE WITNESS:  It was based on an estimate of a

19    reserve account.

20    MR. GREENSTEIN:  Q.  But the actual transfer

21    from 25005 to 12601 can be accurately calculated, can't

22    it?

23    MR. GLENNON:  Objection; vague and ambiguous,

24    lack of foundation.

25    THE WITNESS:  The amount can be calculated,

1    but the resultant account that is being adjusted is the

2    reserve.  And that is one of the most volatile estimates

3    a company has.

4              MR. GREENSTEIN:  Q.  But actual transfers from

5    25005 to 12601 can be accurately measured; right?

6              MR. GLENNON:  Objection; asked and answered.

7              THE WITNESS:  Yes, it can be.  But that's not

8    the way you measure materiality.  Any adjustment can be

9    accurately measured.  The issue becomes would a reader

10   of a financial statement be interested in whether or not

11   an adjustment took place in cash that can be accounted,

12   or, for example, in a reserve account for bad debt that

13   they would expect to have a significant amount of

14   estimated and a significant amount of judgment placed on

15   it?

16             MR. GREENSTEIN:  Q.  Looking at the second

17   factor, whether the misstatement masks a change in

18   earnings or other trends.  Do you see that?

19        A.   Yes.

20        Q.   You stated you found, quote, "No evidence of

21   this issue"?

22        A.   That's right.

23        Q.   Have you ever found -- in conducting

24   materiality analysis, have you ever found evidence that

25   a misstatement masked a change in earnings?

1          MR. GLENNON:  Objection; vague and ambiguous.

2          THE WITNESS:  Certainly.

3          MR. GREENSTEIN:  Q.  What factors would allow

4     you to draw a conclusion that a misstatement masks a

5     change in earnings or other trends?

6          A.  Well, if it changes from a loss to income.

7          Q.  That's a different factor though; right?

8          A.  It also can be subsumed into that one.  Mask a

9     change in earnings, well, if you're changing the

10    earnings, that's masking a change in earnings.

11         Q.  Okay.

12         A.  So, or other trends.  Have I ever found that?

13    Is that your question?  I'm sorry.

14         Q.  I think you answered my question.

15             Take the next factor, "Whether the

16    misstatement concerns a segment or other portion of the

17    registrant's business that has been identified as

18    playing a significant role in the registrant's

19    operations or profitability."  Do you see that?

20         A.  You skipped down quite a few.

21         Q.  I'm focusing on certain ones.

22         A.  I thought you said the next one.  I'm sorry I

23    do see that one, yes.

24         Q.  And you -- your opinion is that if Oracle had

25    not been able to book the HP transaction second quarter

```
 1   STATE OF CALIFORNIA        )
 2                              )
 3   COUNTY OF ALAMEDA          )
 4           I, DIANA NOBRIGA, hereby certify that the
 5   witness in the foregoing deposition was by me duly sworn
 6   to testify to the truth, the whole truth, and nothing
 7   but the truth in the within-entitled cause; that said
 8   deposition was taken at the time and place therein
 9   stated; that the testimony of said witness was reported
10   by me, a Certified Shorthand Reporter and disinterested
11   person, and was thereafter transcribed into typewriting,
12   and that the pertinent provisions of the applicable code
13   or rules of civil procedure relating to the notification
14   of the witness and counsel for the parties hereto of the
15   availability of the original transcript of the
16   deposition for reading, correcting and signing have been
17   met.
18           And I further certify that I am not of counsel
19   or attorney for either or any of the parties to said
20   deposition, nor in any way interested in the outcome of
21   the cause named in said action.
22   DATED: ___7/16/07___
23
24   _____
25   DIANA  NOBRIGA, CSR NO. 7071
```