CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--

In re:  ORACLE CORPORATION                Master File No.
SECURITIES LITIGATION                     C-01-0988-MJJ (JCS)
_____/         CLASS ACTION


-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --


Videotaped Deposition of

D. PAUL REGAN, CPA, CFE

_____

Monday, July 9, 2007


Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 75266

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

1    share by one penny or would it have increased earnings

2    per share of .22 of a cent?

3              MR. GREENSTEIN:  Objection.  Form.

4              THE WITNESS:  It increased earnings per share

5    by portion of a cent, which has the effect of increasing

6    earnings per share from 10 cents to 11 cents.

7         Q.  BY MR. GLENNON:  Once EPS crosses 10.5, isn't

8    Oracle required under GAAP to round that cent up?

9              MR. GREENSTEIN:  Objection.  Form.

10             THE WITNESS:  That's certainly the custom and

11   practice in the issuance of financial statements.

12        Q.  BY MR. GLENNON:  What percentage of the net

13   income did the impact of the bad debt -- let me start

14   that question over again.

15             The $12.9 million increase in the net income

16   that you just referenced, what percentage of Oracle's

17   overall net income for the quarter did that represent?

18        A.  It's a little over 2 percent.

19        Q.  Of the $20 million that was released into

20   revenue, what percentage of Oracle's quarterly revenues

21   did that $20 million represent?

22             MR. GREENSTEIN:  Objection.  Form.

23             THE WITNESS:  Rounds to -- it's less than

24   1 percent.

25        Q.  BY MR. GLENNON:  Mr. Regan, would you agree

CONFIDENTIAL

1    Q.   BY MR. GLENNON:  Did you look at -- oh,

2    sorry.

3    A.   And I also concur with Tom Williams, who

4    indicated that this adjustment for $20 million was made

5    because it had a significant effect on the financial

6    performance of Oracle in the second quarter.  It seemed

7    like a reasonable judgment to me.

8    Q.   Did you consider how Oracle's stock

9    performed -- let me strike that question and start over.

10       Do you know how Oracle's stock performed the

11   day after the third quarter of fiscal year 1999 earnings

12   release when Oracle announced that it had beaten

13   consensus EPS by 1 cent?

14       MR. GREENSTEIN:  Objection.  Form.

15       THE WITNESS:  What was the quarter?

16   Q.   BY MR. GLENNON:  Third quarter of fiscal year

17   1999.

18   A.   Yeah, I've looked at some of the analyst

19   reports, and the analysts were very disappointed in the

20   revenue growth.

21   Q.   You would agree with me that the day after

22   the third quarter fiscal year 1999 earnings release,

23   Oracle's stock dropped 22.6 percent?

24       MR. GREENSTEIN:  Objection.  Form.

25       THE WITNESS:  Yes, and the investment

CONFIDENTIAL

1  community was disappointed in the revenue growth of

2  Oracle.

3       Q.   BY MR. GLENNON:  Do you know --

4       A.   The investment community looks at a lot of

5  numbers.  Earnings per share is one.  Revenue is another.

6  Composition of revenue is another.  There's a variety of

7  indicators that are important and might be material.

8       Q.   Do you know how Oracle stock performed the

9  day after the Q1 fiscal year 2001 earnings release when

10 Oracle announced that it had beaten consensus EPS by

11 4 cents?

12           MR. GREENSTEIN:  Objection.  Form.

13           THE WITNESS:  Q1 oh what?

14      Q.   BY MR. GLENNON:  '01.

15      A.   A similar occurrence.  It went down because

16 of disappointment in the database software products and

17 the revenues associated with them.

18      Q.   Would you agree with me that the day after

19 the first quarter of fiscal year 2001 earnings release,

20 Oracle's stock dropped by 8 percent?

21           MR. GREENSTEIN:  Objection.  Form.

22           THE WITNESS:  Yes.

23      Q.   BY MR. GLENNON:  And given the substantial

24 variation in how the market reacts when Oracle actually

25 beats consensus expectations, can you conclude that the

CONFIDENTIAL

1          MR. GREENSTEIN:  I'm not.  I'm making my

2    objection.

3          Q.  BY MR. GLENNON:  Okay.  Mr. Regan, do you

4    need me to repeat the question?

5          A.  Yeah, you may as well.

6          Q.  So is it a fair statement that you reached

7    your opinion that Oracle improperly recognized

8    $19.9 million on a transaction with Hewlett Packard on

9    November 30th before you even looked at the revenue

10   recognition checklist?

11          MR. GREENSTEIN:  Same objections.

12          THE WITNESS:  Yes.

13          MR. GLENNON:  I'd like to have this marked as

14   Exhibit 10.

15          MR. WILLIAMS:  This is another document that

16   wasn't produced in the litigation.

17          MR. GLENNON:  We produced it.

18          MR. WILLIAMS:  This is one of the documents

19   that was produced last week or something like that?

20          MR. GLENNON:  Yes.

21          MR. WILLIAMS:  Well, it wasn't available to

22   this witness prior to his opening or rebuttal report.

23          MR. GLENNON:  It wasn't responsive to any

24   discovery order.

25          MR. WILLIAMS:  It wasn't available to him.

172

CONFIDENTIAL

1    conclusions in your opening report?

2              MR. GREENSTEIN:  Same objection.  He didn't

3    have the document.

4              MR. GLENNON:  He said he had the document and

5    that he reviewed it before.

6              MR. GREENSTEIN:  Okay.  Well, this was

7    produced on June 22nd.

8              MR. GLENNON:  You can just have you're

9    standing objection for anything we introduce.

10             MR. GREENSTEIN:  Okay.

11             MR. GLENNON:  And when we mark exhibits, I'll

12   flag stuff that we produced for rebuttal.

13             MR. GREENSTEIN:  That works.

14             THE WITNESS:  My recollection is that I got

15   this document a few days ago.

16        Q.   BY MR. GLENNON:  Okay.

17        A.   And the document indicates to me that Arthur

18   Andersen did something of a review of this contract.

19   There are a lot of issues that are raised, certain

20   representations were made to Arthur Andersen, and certain

21   assumptions were made by Arthur Andersen, which I don't

22   think are warranted, given the other facts and

23   circumstances that we're aware of.

24             And I think I've discussed those as I've

25   talked about the document.

CONFIDENTIAL

1      Q.  Correct.  And so at the time you wrote your

2  opening report, you didn't have that particular document;

3  is that correct?

4          MR. GREENSTEIN:  Objection.  Asked and

5  answered, argumentative.

6          THE WITNESS:  That's my recollection.

7      Q.  BY MR. GLENNON:  Can I direct your attention

8  to what we've marked as Exhibit 11, please.

9          MR. GREENSTEIN:  I'm going to enter a

10  standing objection.  Same objections to this document.

11  This was produced late.  Also note for the record that an

12  objection to foundation.  A lot of these emails on here

13  don't have dates on them.  So foundation.

14          THE WITNESS:  Okay.  I've got Exhibit 11.

15      Q.  BY MR. GLENNON:  Did you have that document

16  at the time you issued your opening report?

17          MR. GREENSTEIN:  Same objections.

18          THE WITNESS:  Do you know what exhibit this

19  was made to Mr. O'Bryan's rebuttal report?

20          MR. GLENNON:  I can find out for you at a

21  break.

22          MR. GREENSTEIN:  Brian, do you want to

23  represent whether this was or was not produced.

24          MR. GLENNON:  Yeah, I'm happy to.  We

25  produced this with our rebuttal.

185

CONFIDENTIAL

1      Q.  So you would agree with me that Oracle's

2   audit committee also reviewed the determination as to

3   Oracle's recognition of revenue on the Hewlett Packard

4   transaction on November 30th, 2000?

5          MR. GREENSTEIN:  Objection.  Foundation.  It

6   looks like this is an Arthur Andersen presentation to the

7   audit committee on January 5th, 2001.

8          THE WITNESS:  It looks as if the audit

9   committee received a presentation of Arthur Andersen and

10  its audit committee dated January 5th, 2001, and within

11  one of the approximately -- one of the many pages

12  included in the presentation is three lines about the HP

13  transaction.

14     Q.  BY MR. GLENNON:  Mr. Regan, is this another

15  document that you didn't have at the time you reached

16  your conclusions in your opening report?

17         MR. GREENSTEIN:  Objection.  Form.

18         THE WITNESS:  That's my recollection.

19     Q.  BY MR. GLENNON:  Mr. Regan, turning your

20  attention to paragraph 83 of your opening report, you

21  reference a 15-day acceptance period?

22     A.  Yes.

23     Q.  In that same paragraph, you reference the

24  fact that several amendments were executed to the SLSA

25  subsequent to its original execution date.  Correct?

190

CONFIDENTIAL

1    practice, but somebody can say, well, that's not forensic

2    accounting, it's not involved in litigation, and

3    hopefully, there won't be any.

4              And actually, right now, for the last couple

5    of years, maybe 20 to 30 percent of my work is working

6    with audit committees of large public firms which are

7    concerned about audit and accounting, GAAP and GAAS

8    issues.

9         Q.   Outside of your capacity as a forensic

10   accountant, have you ever had to apply SOP 97-2 in the

11   first instance to a software license agreement?

12             MR. GREENSTEIN:  Objection.  Form.

13             THE WITNESS:  I don't think so.

14        Q.   BY MR. GLENNON:  So you personally have never

15   had to be the person in the first instance to determine

16   whether or not it was proper to recognize revenue on a

17   software license transaction?

18             MR. GREENSTEIN:  Objection.  Form.

19             THE WITNESS:  Not on a 97-2.  I mean, when we

20   sold software as a firm, we would record revenue on our

21   software sales, but it wasn't under 97-2.

22        Q.   BY MR. GLENNON:  Mr. Regan, what would be the

23   net accounting impact be if you simultaneously debited

24   and credited the same account in the same amount?

25             MR. GREENSTEIN:  Objection.  Form.

208

CONFIDENTIAL

1          THE WITNESS:  Well, if that was the only

2   thing you did and there was no other impacts on the

3   underlying computer database, from an accounting

4   perspective, the balance would be unchanged after the

5   debit and the credit, assuming that the debit and the

6   credit were recorded at the same time.

7          Q.  BY MR. GLENNON:  The net accounting impact of

8   that particular transaction would be zero?

9          MR. GREENSTEIN:  Objection.  Form.

10          THE WITNESS:  Assuming they were recorded at

11   the same time and that there were no other factors that

12   impacted the account.

13          MR. GLENNON:  I'd like to have marked as

14   Exhibit 14 a one-page screen shot dated November 17th,

15   2000.

16          MR. WILLIAMS:  The screen shot is dated

17   November 17th, 2000.

18          MR. GLENNON:  Sure.

19          (Exhibit 14 marked.)

20          Q.  BY MR. GLENNON:  Mr. Regan, have you seen

21   this document before?

22          A.  I don't know have a recollection of seeing

23   this document.  It's a screen shot.  I've seen other

24   screen shots.

25          Q.  On the bottom half of the page, under the

209

CONFIDENTIAL

1    like to talk about the three sets of journal entries that

2    Oracle recorded on November 17th, 2000.

3              Do you understand?

4              MR. GREENSTEIN:  Objection.  Foundation,

5    vague and ambiguous, calls for speculation, incomplete

6    hypothetical.

7              THE WITNESS:  I understand you want to talk

8    about the three entries?

9         Q.  BY MR. GLENNON:  As of November 17th, 2000.

10        A.  Yes.

11        Q.  Mr. Regan, do you understand that the three

12   sets of journal entries that were recorded to account

13   25005 on November 17th, 2000, as of November 17th, 2000,

14   netted to zero?

15             MR. GREENSTEIN:  Objection.  Form.

16             THE WITNESS:  It's my understanding that if

17   you were to just look at those six debits and credits and

18   you ignored all of the other things that we've discussed

19   that's in my report here today, those six debits and

20   credits result in a zero impact on account 25005.

21        Q.  BY MR. GLENNON:  So the creation of an

22   accounting for the 46,881 debit memos standing alone nets

23   to zero as of November 17th, 2000; is that correct?

24             MR. GREENSTEIN:  Objection.  Misstates

25   testimony, foundation, vague and ambiguous, incomplete

213

CONFIDENTIAL

1   hypothetical.

2   　　　　THE WITNESS:  Well, I don't think we're here

3   to look at just what happened on November 17 and just

4   within account 25005.  We're here to talk about movement

5   of unapplied cash from customers out of a liability

6   account and into a reserve for bad debt and have -- and

7   certain impacts which the debit memo process had on the

8   visibility and the transparency and the behavior of

9   the -- of Oracle and its collectors.  We're looking at

10   that entire -- at that entire process and journey, not

11   just with respect to these six debits and credits.

12   　　　　Q.  BY MR. GLENNON:  My question just relates to

13   these six debits and credits, and you can answer a

14   hypothetical question as plaintiffs' accounting expert.

15   　　　　So my question is, the creation of an

16   accounting for the 46,881 standing alone nets to zero as

17   of November 17th, 2000; correct?

18   　　　　MR. GREENSTEIN:  Objection.  Incomplete

19   hypothetical, lacks foundation, vague and ambiguous,

20   asked and answered.

21   　　　　THE WITNESS:  They weren't made for the

22   purpose of standing alone and for the fact that they

23   added to zero.

24   　　　　Q.  BY MR. GLENNON:  I'm going to ask my question

25   again.  The creation of an accounting for the 46,881

214

CONFIDENTIAL

```
1    debit memos standing alone nets to zero as of
2    November 17, 2000; correct?
3              MR. GREENSTEIN:  Asked and answered several
4    times.
5              THE WITNESS:  Yeah, as I answered when you
6    had me look at what's been marked as Exhibit 14, there is
7    a debit of $212,850 to account 25005, and there is a
8    credit to account 25005.  And a debit decreases the
9    account by that number, and a credit increases the
10   account by that number, and the net effect after you
11   consider both of those entries is zero.
12        Q.  BY MR. GLENNON:  And is it your understanding
13   that all 46,881 debit memos that were created on
14   November 17, 2000 were created with the same journal
15   entries?
16             MR. GREENSTEIN:  Objection.  Foundation,
17   speculation.
18             THE WITNESS:  The amounts differed, but the
19   form of the entries were the same.
20        Q.  BY MR. GLENNON:  So your testimony is that
21   the creation of an accounting for the 46,881 debit memos
22   standing alone nets to zero as of November 17, 2000;
23   right?
24             MR. GREENSTEIN:  Objection.  Asked and
25   answered several times, incomplete hypothetical, lacks
```

215

CONFIDENTIAL

1          THE WITNESS:  Yes, because when you say

2     "creation of," it seems to me that I need to consider the

3     whole journey that we're talking about here that's in my

4     report for, you know, 30 or 40 pages.

5          Q.  BY MR. GLENNON:  Fair enough.

6          A.  In that journey, we've discussed it for many

7     hours today, and you know my opinion with respect to that

8     journey is a lot different than the question you're

9     asking.

10          Q.  Sure.

11          A.  So "creation of," in my mind, takes me

12     through the journey.  And we've talked about that for

13     probably four hours today.

14          Q.  Did the accounting for the 46,000 debit memos

15     as of November 17th, 2000 net to zero?

16          MR. GREENSTEIN:  Same objections.  Asked and

17     answered.

18          THE WITNESS:  Again, assuming you're asking

19     me about the debits and credits on November 17, my

20     understanding is that the debits total a number and the

21     credits totalled the same number, and the debits are to

22     the same account as the credits so that at the end of

23     November 17, 2000, the account is not changed.

24          Q.  BY MR. GLENNON:  Are you aware of any of the

25     46,881 debit memos that were accounted for any

CONFIDENTIAL

1   differently than what you just described?

2              MR. GREENSTEIN:  Objection.  Form.

3              THE WITNESS:  I see some uncertainty as to

4   whether or not the numbers 46,000 or something in the

5   48,000 range.  The ones that I've seen are similar to --

6   are essentially the same as what you see on Exhibit 14.

7         Q.  BY MR. GLENNON:  Have you identified any

8   debit memo that had accounting that's different than

9   what's reflected on Exhibit 14?

10             MR. GREENSTEIN:  Objection.  Form.

11             THE WITNESS:  I haven't seen any -- any that

12  differ.

13        Q.  BY MR. GLENNON:  I want to go back to an

14  issue we were discussing a little bit earlier today, but

15  I'm going to do a little better job with my hypothetical.

16  Let's assume all other circumstances are unchanged,

17  whatever transfers have gone into 12601 during the second

18  quarter have gone into 12601, whatever money had been

19  refunded had been refunded.  What is the financial

20  statement impact as of the second quarter fiscal year

21  2001 if the debit memos aren't created?

22             MR. GREENSTEIN:  Objection.  Calls for

23  speculation, incomplete hypothetical, lacks foundation,

24  vague.

25             THE WITNESS:  Well, I really don't know

220

# CONFIDENTIAL

1               REPORTER'S CERTIFICATE

2        I certify that the witness in the forgoing

3  deposition,

4

5  was by me duly sworn to tell the truth, the whole truth

6  and nothing but the truth in the within-entitled cause;

7  that said deposition was taken at the time and place

8  herein named; that the testimony of said witness was

9  reported by me, a duly certified shorthand reporter and

10  a disinterested person, and was thereafter transcribed

11  under my direction into typewriting.

12        I further certify that I am not of counsel or

13  attorney for either or any of the parties to said

14  deposition, nor in any way interested in the outcome of

15  the cause named in said caption.

16        Dated

17

18

19             *Leslie Rockwood*

20             Leslie Rockwood
                 Certified Shorthand Reporter
21             State of California
                 Certificate No. 3462

22

23

24

25