11-14-02

MAYER, BROWN, ROWE & MAW
Donald M. Falk (SBN 150256)
555 College Avenue
Palo Alto, California 94306
Telephone:   (650) 331-2030
Facsimile:    (650) 331-2060

MAYER, BROWN, ROWE & MAW
Steven O. Kramer (SBN 79626)
Christopher P. Murphy (SBN 120048)
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071-1503
Telephone:   (213) 229-9500
Facsimile:    (213) 625-0248

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
Dorian Daley (SBN 129049)
Lauren G. Segal (SBN 150826)
500 Oracle Parkway
Mailstop 5OP7
Redwood City, California 94065
Telephone:   (650) 506-5200
Facsimile:    (650) 506-7114

Attorneys for Defendant ORACLE CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-0988-MJJ (Consolidated) |
| | **DECLARATION OF MICHAEL QUINN** |
| This Document Relates To:<br>ALL ACTIONS. | Date:    N/A<br>Time:   N/A<br>Place:   Ctrm. 11<br>Honorable Martin J. Jenkins, United States District Judge |

I, Michael Quinn, declare as follows:

**Introduction**

1. I am Vice President of Americas Revenue Accounting at Oracle Corporation. I have worked at Oracle since June 29, 1998.

2. I make this Declaration in opposition to the Plaintiffs' Ex Parte Application for an Order Directing Oracle to Preserve Evidence and Granting Particularized Discovery.

3. I have personal knowledge of the matters set forth below.

4. In 2000, my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications. As part of that conversion, it was determined that the previous functionality of assigning "on account" notations to unassigned cash receipts, once they were to be applied, was no longer necessary, and it was thus required that all existing "on account" flags that had accumulated in our Unapplied Cash Account (25005) be reversed through a series of offsetting debit/credit transactions within Account 25005, and thus would have no impact on Oracle's financial statements. I assigned Greg Myers, who reported to me, to serve as Project Manager for this project.

5. Earlier this year, I also was personally assigned by Thomas Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collection staff had, over time, assigned to an accounts receivable reserve account known as Account 12601. That project is still ongoing.

6. I immediately want to address the allegation in plaintiffs' Ex Parte Application that accuses Oracle of "destroy[ing] evidence critical to plaintiffs' claims" in connection with our recent investigation to determine the proper source and disposition of cash receipts previously allocated by the collections staff into Oracle's accounts receivable reserve account. These accusations are completely *false*. I have never directed anyone, nor have I ever been directed, to alter or destroy any Oracle records or evidence whatsoever. I personally offended by plaintiffs' accusation.

7. As described more fully below, our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account

1  (Account 12601) has nothing to do with the approximately 46,000 debit memo transactions that occurred on November 17, 2000, and that plaintiffs refer to in their Application. Nor will our ongoing work in any way "alter" transactions that took place in the past. *New* accounting entries likely will be made in some cases in order to move cash receipts out of 12601 and to the account where they properly belong, but such new entries will leave a clear and traceable audit trail that will preserve the accounting history relating to these transactions.

8. In order to explain why plaintiffs' accusations of evidence destruction are so clearly false, first I must explain the circumstances involving the November 17, 2000 debit memo transactions, and why those transactions, contrary to plaintiffs' allegations, had absolutely no revenue effect whatsoever in 2Q01 or in any other quarter. This is important because plaintiffs suggest that the recent project involving Account 12601 was somehow designed to "cover up" or alter the November 17, 2000 debit memo transactions, when in fact there was never anything to "cover up" in the first place. I will then describe the recent and separate investigation that we have undertaken in the transfer of unapplied cash receipts into Account 12601.

### The November 17, 2000 Debit Memo Transactions

9. Plaintiffs state in their Ex Parte Application (as well as their Second Amended Complaint) that "on November 17, 2000, in a series of approximately 46,000 transactions, Oracle converted $228 million of ... customer overpayments held in its unapplied cash account to revenue by creating phony sales invoices called 'debit memos' and clearing the debit memos with money held in the unapplied cash account." Ex Parte, at 2. I can confirm from personal knowledge that these allegations are *categorically false*, and that Oracle recognized *no revenue whatsoever* from these debit memo transactions; nor did these transactions have a financial impact on Oracle's unapplied cash account. The true facts are as follows.

10. In late 2000, as Oracle prepared to globalize its accounts receivable processes and upgrade to the latest version of the Oracle Accounts Receivable software application, Oracle decided to change some internal practices. Among these was the "on account" designation that segregated certain unidentified cash receipts in a subledger within the "Customer Over-

payments and Advances" account (known as "Account 25005") once the proper application of the receipts was determined.

11. Through calendar year 2000, all cash received by Oracle was debited from the cash account and credited to Account 25005 when the cash receipt was imported from the bank "lockbox" data. An item explicitly referencing an open receivable immediately resulted in a debit (decrease) to Account 25005 and a credit (decrease) to a receivable account. That is, where a cash receipt was clearly identified as relating to a particular receivable (such as an invoice), the cash receipt was flagged "applied" and transferred from Account 25005 to decrease the receivable. Any unmatched receipts, though, initially were flagged as "unapplied."

12. A receipt was flagged as being "on account" where a previously "unapplied" receipt (or part of it) had been allocated, and was not available to be applied to another receivable. Within Oracle's computerized accounting system, moving a receipt from "unapplied" status to the "on account" subledger required a debit entry and a credit entry to the same account, *i.e.*, Account 25005, and accordingly had no effect on Oracle's financial statements. The actual refund or application to another account would be recorded through an offsetting journal entry, or an offsetting negative miscellaneous receipt entry, to zero out the accounting within Account 25005, as reflected in the general ledger. Because of the way our computerized accounting system was structured at the time, though, the "on account" flag remained on the receipt which, although offset within Account 25005, would remain in the "on account" subledger.

13. As a result, even after a miscellaneous receipt in Account 25005 was applied against another general ledger account, or refunded to the customer, subsequent customer account statements nonetheless might reflect a balance as "on account." This was not ideal because it could lead to confusion on the part both of customers, who might think they had a credit balance, and Oracle staffers, who might try to "refund" the "on account" balance or apply it to an open receivable.

14. Because the "on account" flags had created a subledger through offsetting debit/credit transactions within Account 25005, the only way to "clean up" the flags (to use

1  plaintiffs' jargon) was to generate another set of offsetting debit/credit transactions to zero out
2  the subledger, also entirely within Account 25005. To clear the "on account" subledger re-
3  quired three steps, each involving an offsetting Debit 25005/Credit 25005 transaction, and leav-
4  ing the general ledger balance completely unchanged.

5      15.    To distinguish these "clean up" transactions from transactions with financial
6  substance, Oracle began a new document sequence beginning with "550" to set these transac-
7  tions apart from transactions in the normal course of Oracle's business. As a consequence, the
8  document numbers for the November 17, 2000 debit memos all began with "550."

9      16.    Each transaction was reflected in Account 25005 as equal and offsetting debit
10 and credit transactions in Account 25005 (reflected as 001.0000.25005.0000.959.070.999.999).
11 See, e.g., Ex. __ to Oracle' Motion to Dismiss the Second Amended Complaint. Although the
12 debit memos used the "credit revenue" notation because of the way that the Oracle Receivables
13 software application was designed at the time, the debit memos make clear that the debits and
14 credits were entered to the *same account* — 25005. Thus, *these transactions had absolutely no*
15 *revenue effect whatsoever.* Nothing was allocated to a revenue account of any kind, and noth-
16 ing was moved or "converted" from one account to another. Any actual funds that were in Ac-
17 count 25005 were just as available for refund or application on customers' behalf as they were
18 before. Plaintiffs' allegations to the contrary are simply false.

19     17.    Thus, plaintiffs' statement at p. 3 of their Ex Parte Application that I "applied
20 the money from the unapplied account to revenue" is simply and utterly false.

21     18.    Leaving aside the fact that the November 17, 2000 debit memo transactions had
22 no revenue effect whatsoever, I am particularly puzzled by plaintiffs' suggestion that these
23 transactions resulted in the recognition of $230 million in revenue because that figure has no
24 relation to those transactions. If plaintiffs are suggesting that the November 17, 2000 debit
25 memos had an aggregate value of $230, they are far off. In fact, those transactions totaled more
26 than $692 million. See Ex. __ to Oracle's Motion to Dismiss (containing summary of all such
27 transactions).
28

19. Mr. Keatly also asserts that CW49 claims to have expressed to me his concern about recognizing revenue on the basis of unapplied cash, and that I allegedly told CW49 that it was none of his concern. ¶ 8. That is simply untrue. I never had such a conversation witih anyone, and I could not have, as no such revenue was recognized.

**My Supervision Of Oracle's Recent Investigation Of Accounts Receivable Reserves**

20. In October 2002, my staff discovered that, on occasion, Oracle's Collections staff had been moving unapplied cash receipts into an accounts receivable reserve account (12601) in cases where they had difficulty matching up cash receipts with invoices or other receivables. Although the amounts of the receipts involved were small, it was determined that these receipts should not be allowed to remain in the reserve account unless they properly belonged there. The project that plaintiffs refer to as the "action plan" was (and is) intended to move the receipts out of the reserve account and into their proper location. I also want to re-emphasize that this project has absolutely nothing to do with the November 17, 2000 debit memo transactions described above.

21. Plaintiffs mischaracterize the nature and the scope of this action plan by selectively referring to the last few sentences of an email that I sent to my team describing the purpose of this investigation. See Ex. D to Keatly Decl. A complete copy of the email is attached hereto as Ex. __. I articulated the specific objectives of the investigation in the first page of the email. These stated objectives confirm that I never instructed anyone at Oracle to alter or destroy any historical records or evidence. To the contrary, I explained to my team that the purpose of this investigation was to gather and analyze historical data, *not* to destroy it. My oral instructions also were in accord with the written instructions, and similarly did not include any instruction to alter or destroy any historical records or evidence.

22. I specifically informed my team that the objective of the investigation was to produce three deliverables. The first was to provide an update to the Audit Committee of the Oracle Board of Directors into the "Revenue Impact this process of taking unapplied cash receipts to the reserve will have on our financial statements," including an analysis of the "impact this process has had on revenue in each of the last 8 quarters." Second, I instructed my team

that we needed to "clean up" the 12601 account "by moving cash receipts to the proper buckets (unapplied, customer overpayments, or on account), as appropriate." And third, I stated that "[w]e need to establish new policies and procedures to ensure this never happens again." I also made clear in these instructions that in order to carry this project out, "what needs to be done" is simply "to determine 1) what should have happened to the cash receipt and 2) make the correction to put it in the right place."

23.  *None* of these instructions was (or is) intended by me, either directly or indirectly, to "alter" or "delete" any historical transactions or records. Instead, the process is solely intended to make sure that cash receipts are properly moved to the account where they belong. Any such movements will clearly be reflected by an audit trail that will preserve the history of these and earlier transactions. Indeed, as stated above, one of the goals of this process was to analyze the historical data to determine why any errors occurred, and "to accumulate the error by quarter." This could only be accomplished by *preserving* historical information, not by altering or deleting it.

24.  If and when it is determined that a receipt was improperly moved by Collections into the 12601 account (because there was an open invoice or receivable to which the receipt should have been applied), a series of accounting transactions would take place, leaving a traceable audit trail: The first step would be to reverse the positive Miscellaneous receipt that placed the money into Account 12601 (debit 12601/credit cash). The next step is to reverse the negative Miscellaneous receipt that originally removed the amount from cash and put it into 25005 (debit cash/credit 25005). Finally, the debit memo is unapplied from the original Cash receipt (debit 25005/credit 25005), and the debit memo is finally offset by a credit memo (debit 25005/credit 25005). The net effect of these accounting entries is a debit to 12601 and a credit to 25005. This entire process will be recorded both from an accounting perspective as well as an application perspective. Thus, a person could still review all the transactions involved in this project, including the two Miscellaneous receipts, the Cash receipt, the debit memo, and the credit memo. The accounting is stored on each transaction record and can be easily displayed.

DECLARATION OF MICHAEL QUINN
CASE NO. C-01-0988-MJJ

These actions cannot take place in the AR application without a history of the transaction being stored.

25. Plaintiffs also falsely state in their Ex Parte Application that "the purpose of the plan was to direct cash collections personnel and accounts receivable personnel to clean up the debit memos that were created in November 2000, plus any debit memo's created between 1998 to the present which were above $15000." (Pg. 4 ll. 16-17) This is entirely untrue. As stated above, the goal of this project is simply to remove those Miscellaneous receipts that were incorrectly applied to the 12601 reserve account, and to move those receipts to the proper account where they belong.

26. Plaintiffs also allege that I was interested in determining whether any of the reserve transactions had any revenue impact. This is true, and entirely proper. For instance, if an original invoice is booked (debit AR/credit Revenue) for some delivered service, and 30 days later the customer sends Oracle a check for this transaction, but does not provide any remittance information, the invoice would sit open and the cash would remain unapplied. Due to the inability to match the cash receipt and the invoice, Oracle would have written the invoice off (debit Revenue/credit AR). Since the receipt would have been sitting in unapplied cash for an extended amount of time, Collections moved the receipt to Account 12601. Our project is designed to review the receipts in greater detail. If, after this investigation, Collections is able to pinpoint the location where the invoice should have been originally applied, and that invoice had been written off (to revenue), Oracle has a right under GAAP to recognize the previously written off revenue. The processes to re-recognize this revenue is an adjustment up against the original transaction and to apply the cash. This keeps the cash payment with the invoice the customer intended to pay, and thus the customer statement would accurately reflect the complete transaction.

27. Plaintiffs' witnesses also are wrong when they claim that either I or anyone else at Oracle instructed personnel to alter or delete historical transaction notes on Oracle's AR system. To begin with, no such instruction has been given to any employee involved in the project

or otherwise. That is not to say, though, that comment entries might not be changed to ensure that the comments accurately reflected the current status of the transaction in question.

28.  Second, and more importantly, however, *all* of the 12601 transactions from August 2000 up through the period immediately preceding the recent 12601 project have been electronically *preserved*, including *all* of the most recent comments associated with those transactions. When the 12601 account irregularities were first discovered, Greg Myers ran a report of all 12601 transactions from August 2000 through October 2002. These transactions, including all comments associated with those transactions, have been fully and independently preserved to this day. Accordingly, plaintiffs' assertion that any electronic "evidence" has been destroyed in connection with our ongoing project is categorically *false*.

29.  It is also important to point out that the "comments" that plaintiffs' witnesses refer to have absolutely no accounting significance whatsoever. As explained above, if any 12601 transactions are to be modified as a result of our ongoing project, complete accounting entries will be created that preserve a full audit trail, and will not affect any historical transactions whatsoever.

30.  Plaintiffs also claim that one of the "methods" that Oracle currently is using to address the cash receipt reserve issue is to "erase the debit memo's all together." (Keatly Decl. ¶ 18) That is also false. To begin with, it is impossible for any user of the Accounts Receivable System to alter or erase source documentation or accounting entries that have already posted to the general ledger. Even if a transaction is reversed, there will always be a clear audit trail in the accounting and in the Application. As stated above, if it is determined that cash receipts were incorrectly applied to the reserve account (12601), the debit memo (and related receipts) would be reversed and the cash applied as appropriately determined, always accompanied by the corresponding audit trail. Thus, the suggestion of Mr. Keatly's anonymous source (at ¶ 13 of his Declaration) that Oracle has directed personnel in the collections department to alter electronic records so that it will appear as though the unapplied cash had not been booked as revenue in November 2000, is utterly absurd.

31. According to the Declaration of Mr. Keatly, CW49 reportedly states that "Oracle had a long standing practice of inappropriate use of customer's overpayments and unapplied cash by doing so-called "auto-adjustments" of customer overpayments in its Unapplied Cash account and applying the money to its bad debt accounts, thereby lowering the Company's reported bad debt." Keatly ¶ 6. This statement is both misleading and incorrect. Oracle Applications has the ability to write off small dollar invoices, or small (under $1,000) remaining amounts on invoices, using the auto-adjustment functionality. However, this process writes off invoices, not receipts. The accounting entry will debit bad debt reserve (12601) and credit the trade A/R account. This process has been in use since 1990. Oracle released new standard functionality to write off small remaining amounts of unapplied cash (such as customer overpayments of $0.05, etc.), but this functionality was introduced in January 2002 and was used only once in the US. Moreover, the software is still under development and has not been used or in place for any significant amount of time.

32. Plaintiffs also refer to an old database that was used to generate proforma invoices. However, no alterations have been made to that database; it was strictly used as a research tool to assist in our investigation. In particular, the database is an old web-based application that was used to generate proforma invoices. Occasionally, customers (especially government) would require an invoice prior to any contract being signed, the securing of payment, and the delivery of service. Due to the fact that Oracle does not book an order/invoice without the above items, no invoice can be generated via the system. Therefore, as a stop-gap, a website was created to generate a proforma invoice in the interim. The proforma generated no accounting entries and was used solely as a mechanism so that the customer could provide a purchase order. During the research recently completed by Collections, comments apparently were found that alluded to the payment of one of these proforma invoices. Because such invoices would not be found in Oracle's A/R system, Collections requested that this legacy system be temporarily re-enabled to complete the research and resolve such receipts. No changes were made to this legacy system, though, and it still is preserved in the same condition as it existed immediately prior to the commencement of this project.

33. Finally, I would like to point out a number of factual errors in the statements contained in Mr. Keatly's Declaration. First of all, I do not, and have never, reported directly to Jennifer Minton. See App. p. 1, ¶ 1, p. 3, ¶ 1. During the past few years I have reported to Tom Williams, Oracle's Vice President of North America Finance (and who is certainly *not* a consultant (see App. p. 1 ¶ 7)). Mr. Williams in turns reports directly to Jennifer Minton and has done so for the last four years.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that this Declaration was executed on November 14, 2002 in Sao Paulo, Brazil.

_____
MICHAEL QUINN