CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--


In re:  ORACLE CORPORATION          Master File No.
SECURITIES LITIGATION               C-01-0988-MJJ (JCS)
_____/    CLASS ACTION




-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --


Videotaped Deposition of

D. PAUL REGAN, CPA, CFE

_____

Monday, July 9, 2007




Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 75266

CONFIDENTIAL

1    Regan, CPA, CFE.

2              (Exhibit 2 marked.)

3         Q.  BY MR. GLENNON:  Mr. Regan, have you seen

4    this document before?

5         A.  Yes.

6         Q.  And is this the expert report that you

7    authored in connection with this case?

8         A.  It is.

9              MR. GLENNON:  I'd like to mark as Exhibit 3

10   what purports to be the rebuttal report of D. Paul Regan,

11   CPA, CFE.

12             (Exhibit 3 marked.)

13        Q.  BY MR. GLENNON:  Mr. Regan, have you seen

14   this document before?

15        A.  I have, yes.

16        Q.  Is this the rebuttal report that you prepared

17   in connection with this case?

18        A.  Yes, it is.

19        Q.  Thank you.  Mr. Regan, as you may know,

20   defendants produced a number of documents in support of

21   Mr. O'Bryan's rebuttal report pertaining to the propriety

22   of Oracle's decision to recognize revenue on a CRM

23   license sale to HP on November 30th, 2000.

24             Have you had a chance to review those

25   documents?

8

CONFIDENTIAL

1       A.  I have reviewed -- I don't know that I've

2    reviewed all of them, but I have reviewed at least some

3    of them.

4       Q.  And have you had an opportunity to review

5    Mr. O'Bryan's rebuttal report?

6       A.  Yes.

7       Q.  As a result of your review of those documents

8    and Mr. O'Bryan's rebuttal report, have any of your

9    opinions regarding the propriety of Oracle's decision to

10   recognize revenue on the November 30th CRM license sale

11   to HP changed?

12      A.  No.

13      Q.  So you still contend that the sale of

14   licenses was part of an improper swap transaction?

15          MR. GREENSTEIN:  Objection.  Form.

16          THE WITNESS:  Well, I contend a number of

17   things, including that it wasn't a sale, and that there

18   are a number of other things which I've commented on in

19   my -- what's been marked as Exhibit 2.  But certainly the

20   revenue that was recognized on November 30 by Oracle

21   should not have been recognized.

22      Q.  BY MR. GLENNON:  And is it your contention

23   that the sale of CRM licenses on November 30th, 2000 by

24   Oracle to HP was part of an improper swap transaction?

25          MR. GREENSTEIN:  Objection.  Form.

CONFIDENTIAL

1          THE WITNESS:  Well, I think first my opinion

2     is that it wasn't a sale on November 30th for a number of

3     reasons, and those reasons are described both in Exhibit

4     2 and in Exhibit 3.

5          Q.  BY MR. GLENNON:  And when you say it wasn't a

6     sale, is that because you believe it was part of a

7     non-monetary swap transaction?

8          MR. GREENSTEIN:  Objection.  Form.

9          THE WITNESS:  There are a number of reasons

10     that are spelled out in both Exhibit 2 and Exhibit 3 with

11     respect to the criteria that need to be in place in order

12     for it to be recognized as revenue, and it fails those

13     criteria in a number of ways, including the ways that

14     you've described in your question.

15          Q.  BY MR. GLENNON:  Is it still your contention

16     that the transaction fails to satisfy all four

17     requirements under SOP 97-2?

18          MR. GREENSTEIN:  Objection.  Form.

19          THE WITNESS:  My recollection is that my

20     opinion was and continues to be there is significant

21     doubt as to whether or not it satisfies any of the four

22     criteria.  And with respect to some of the criteria, it

23     certainly does not satisfy the criteria.

24          Q.  BY MR. GLENNON:  Have any of the documents

25     that defendants produced in connection with their

10

CONFIDENTIAL

1    rebuttal report or Mr. O'Bryan's rebuttal report itself

2    changed any of the reasonings that underlie your

3    conclusion with respect to Oracle's determination to

4    recognize revenue on the November 30th CRM license sale

5    to HP?

6                    MR. GREENSTEIN:  Objection.  Form.

7                    THE WITNESS:  No.

8            Q.   BY MR. GLENNON:  All right.  Thank you.

9                    Mr. Regan, turning to your expert report,

10   what has been marked as Exhibit 2, at paragraph 4, you

11   state --

12           A.   Is this paragraph 4 on page 2?

13           Q.   It's paragraph 4 on page 5.

14           A.   Okay.  Because as you know, there are many

15   paragraph 4s.  So it's helpful if you say the page.

16           Q.   Fair point.  I'll do my best.

17                    In this particular paragraph you state,

18   quote:  "At the beginning of 2Q FY '01 Oracle had

19   accumulated at least $144 million of cash receipts from

20   customers that it was unable to apply to an invoice."

21                    Do you see where I'm referring?

22           A.   I do.

23           Q.   And then in your report, you refer to a table

24   at page 9; correct?

25           A.   Yes.

CONFIDENTIAL

1    items which improperly added to Oracle's bad debt reserve

2    and Oracle's improper use of that excess to inflate its

3    reported earnings in the second quarter '01.

4         Q.  BY MR. GLENNON:  You would agree with me,

5    though, that the majority of the transactions encompassed

6    in the script output don't involve any transfers into the

7    bad debt reserve; correct?

8              MR. GREENSTEIN:  Objection.  Form.

9              THE WITNESS:  Well, certainly when you --

10   when you look at a script relating to a particular

11   customer and a particular debit memo, there's many

12   transactions that don't have anything to do with

13   account 12601, at least if you look at it in isolation.

14   So if you just -- if you just built a little spreadsheet

15   and you added up the transactions where the entry was to

16   12601 and the entries were not to 12601, you'd get a -- a

17   numerator that was small in comparison to the

18   denominator.

19        Q.  BY MR. GLENNON:  How many of the on-account

20   flags that are reflected in the script output relate to a

21   transfer into the bad debt reserve --

22             MR. GREENSTEIN:  Objection.

23        Q.  BY MR. GLENNON:  -- of the 926 total?

24             MR. GREENSTEIN:  Objection.  Form.  And only

25   answer if you can answer without looking at the script

94

CONFIDENTIAL

1   output.

2                  THE WITNESS:  Yeah.  I -- that's something

3   that you would need to run a computer inquiry of and make

4   that determination.  I don't have that in mind.

5          Q.  BY MR. GLENNON:  Did you ever run that

6   computer inquiry or make that determination?

7          A.  I may have, but I don't recall at this time.

8          Q.  You've reviewed Mr. Duross's rebuttal report;

9   correct?

10         A.  Yes.

11         Q.  And you remember earlier we were talking

12  about refunds that Oracle issued that are reflected in

13  the script output, refunds that were issued prior to

14  November 17th, 2000?

15         A.  Yes.

16         Q.  Mr. Regan, as you probably saw in

17  Mr. O'Bryan's rebuttal report, he identified 277 refunds

18  totaling $103 million which occurred prior to

19  November 17th, 2000.

20                 Do you disagree with those numbers?

21                 MR. GREENSTEIN:  Objection.  Form.

22                 THE WITNESS:  I don't agree or disagree.

23  It's not what we're talking about -- or what I'm talking

24  about in my report.  And it's not what we're talking

25  about in terms of the items which impacted the

95

CONFIDENTIAL

1    overstatement of the bad debt reserve.  Those are

2    different transactions.

3         Q.  BY MR. GLENNON:  And did you focus or were

4    you -- let me start that question over again.

5              Did you form any opinions on those particular

6    transactions?

7              MR. GREENSTEIN:  Objection.  Form.  And I'll

8    make a substantial objection that those 277 transactions

9    are not listed out, and we don't know what those are, and

10   it doesn't say in the rebuttal report.

11             MR. GLENNON:  I'm going to object that you're

12   coaching the witness, which is very clearly what's taking

13   place.  That's not an objection to the form of the

14   question, not by a long shot.

15             MR. GREENSTEIN:  Objection.  Form.

16             THE WITNESS:  Well, when I read that, it

17   struck me that this was an analysis on transactions which

18   are not relevant to my -- my opinions.  Certainly they're

19   not relevant to my opinions with respect to the

20   20 million -- the $20 million overstatement of the bad

21   debt reserve; they don't relate to that.  So I don't view

22   that comment as relevant to my analysis indicating that

23   the bad debt reserve was overstated by 20 million --

24   approximately $20 million.

25             I also noted that -- the footnote reference,

CONFIDENTIAL

1    which is footnote 44, refers to the script output, so in

2    order for me to identify those items and to understand

3    what was included, I would need to run an inquiry into

4    the script output.  And that's something I haven't done

5    because I don't think it's relevant to what's at issue in

6    this case.

7          Q.  BY MR. GLENNON:  And why don't you think it's

8    relevant to the issues in this case?

9          A.  It doesn't relate to the $20 million

10   overstatement in the allowance for bad debts.

11         Q.  And how did you determine that that was

12   relevant to the issues in this case?

13              MR. GREENSTEIN:  Objection.  Form.

14              THE WITNESS:  The overstatement of the

15   $20 million?

16         Q.  BY MR. GLENNON:  Correct.

17         A.  It's the overstatement of the allowance for

18   bad debts that was in the balance at November 30, 2000,

19   which enabled Oracle management to record the $20 million

20   decrease to the accounts receivable reserve sometime in

21   early December and make that entry as of November 30th.

22              It's the assessment that there was a

23   significant overstatement of the reserve.  The

24   overstatement of the reserve of $20 million caused by the

25   transfer of unapplied customer payments being included in

CONFIDENTIAL

1   12601, that's the -- that's the principle issue of -- in

2   this dispute.

3       Q.  And how did you come to that conclusion, that

4   that was the principal issue in this dispute?

5       MR. GREENSTEIN:  Objection.  Form.

6       THE WITNESS:  On page 1 of my expert report,

7   which is marked as Exhibit 2, I have a summary of

8   opinions.  And the first opinion is that "Oracle

9   improperly utilized a series of debit memos to apply

10  unapplied cash.  These debit memos helped conceal

11  Oracle's use of customer overpayments to overstate its

12  bad debt reserve by at least $20 million.  The

13  overstatement of the bad debt reserve was eliminated by

14  improperly increasing revenue and pre-tax earnings in the

15  same amount in 2Q FY '01."

16      That's -- I have four opinions; that's the

17  first one.

18      Q.  BY MR. GLENNON:  My question was:  How did

19  you come to the conclusion that that was the issue that's

20  in dispute?

21      MR. GREENSTEIN:  Objection.  Form.

22      THE WITNESS:  Maybe that's a -- not the best

23  way to describe it.  But when I wrote the four opinions,

24  this is the first opinion which I have reached in this

25  case.  And when I look to Mr. O'Bryan's comment on

98

CONFIDENTIAL

1   page 13 of his rebuttal report, that there are refunds

2   which predated September 17th, 2000, of $103 million, I

3   know that that refunding of $103 million on those items

4   are not at issue and don't relate to item -- my Opinion

5   Number 1.  If the -- these items were refunded, which

6   accumulate to the $20 million excess, they wouldn't be in

7   the $20 million excess.

8           Q.  BY MR. GLENNON:  Did you attempt to reach a

9   conclusion and form an opinion, as plaintiffs' accounting

10  expert, on the financial statement impact of those debit

11  memos that do not contain bad debt transfers in their

12  accounting histories?

13               MR. GREENSTEIN:  Objection.  Form.

14               THE WITNESS:  Can I hear the question?

15               (The record was read by the reporter as

16               follows:

17               "QUESTION:  Did you attempt to reach a

18               conclusion and form an opinion, as

19               plaintiffs' accounting expert, on the

20               financial statement impact of those debit

21               memos that do not contain bad debt transfers

22               in their accounting histories?")

23               THE WITNESS:  Yes.  However, it became

24  apparent that -- that we don't have a -- a complete

25  understanding of the trends -- the other elements of

99

CONFIDENTIAL

1          MR. GREENSTEIN:  Objection.  Form.

2          THE WITNESS:  Well, with respect to these

3    questions, it doesn't have, as I recall, the specificity

4    that you describe.

5          Q.  BY MR. GLENNON:  Would you --

6          A.  It alleges improprieties, it allege -- and it

7    discusses these issues generally.  But it doesn't have

8    the kind of specificity that, in my opinion, it is

9    addressing.

10         Q.  It discusses bad debt transfers generally?

11         A.  Well, it addresses misstatements of Oracle's

12   financial statements in -- in this time frame.  And it

13   identifies the use of debit memos as facilitating that --

14   those misstatements.  And Opinion Number 1 is captured

15   within that broader discussion that's in the Complaint.

16         Q.  Even though the Complaint makes absolutely no

17   mention of account 12601, bad debt reserves, or a

18   $20 million reserve adjustment at the end of the second

19   quarter?

20         MR. GREENSTEIN:  Objection.  Foundation,

21   argumentative.

22         THE WITNESS:  Well, I think that's probably a

23   legal question.  But certainly when I see the Complaint

24   and it's broad discussion of misstatements of the

25   financial statements, Opinion Number 1 is underneath that

CONFIDENTIAL

1    umbrella.

2        Q.  BY MR. GLENNON:  The Complaint alleges that

3    the financial statements in the second quarter were

4    overstated by at least $228 million because of the way

5    the debit memos were accounted for.

6            Do you agree with that allegation?

7            MR. GREENSTEIN:  Objection.  Form.

8            THE WITNESS:  It's consistent with my

9    recollection.

10       Q.  BY MR. GLENNON:  So your statement now is

11   that -- no.  I'm sorry.  That wasn't my question.

12           My question is:  Do you agree with that

13   allegation, not whether or not that allegation is there?

14           MR. GREENSTEIN:  Objection.  Form.

15           THE WITNESS:  You mean did I misspeak and --

16   and not write Opinions 1, 2, 3 and 4 so that one of them

17   said that the financial statements were misstated by

18   200 -- more than $200 million?

19           MR. GLENNON:  No.  It probably wasn't a good

20   question.  I'll try it again.

21       Q.  BY MR. GLENNON:  The Complaint alleges that

22   Oracle created and accounted for 46,000 debit memos in a

23   manner that allowed them, allowed Oracle, to recognize at

24   least $228 million on November 17th, 2000.

25           Do you agree with that allegation?

                                                        109

CONFIDENTIAL

1           MR. GREENSTEIN:  Objection.  Form,

2   mischaracterizes the Complaint.

3           THE WITNESS:  I'm not here today to give that

4   opinion.  That's not what I've given an opinion on with

5   respect to my expert report.

6           Q.  BY MR. GLENNON:  Were you asked to give that

7   opinion?

8           MR. GREENSTEIN:  Objection.  Form.  And also

9   caution you not to disclose any conversations you had

10  between counsel and yourself.

11          THE WITNESS:  I don't think counsel asked --

12          MR. GREENSTEIN:  Well, let me -- let me stop

13  you there.  The stipulation in this case -- the expert

14  stipulation says that communications between attorneys

15  and experts is not discoverable.  So to the extent you

16  can answer the question without divulging conversations

17  you've had with attorneys, then you can go ahead and do

18  so.

19          THE WITNESS:  How is that possible?

20          MR. GREENSTEIN:  If it's not, then --

21          (Discussion off the record.)

22          THE WITNESS:  I -- I think what I'm hearing

23  is that you're asking me a question that I'm not able to

24  answer because of the stipulations of the parties.

25          Q.  BY MR. GLENNON:  Let me ask you this, then.

110

CONFIDENTIAL

1              Did you undertake an effort to analyze

2    whether or not Oracle recognized at least $228 million to

3    the account -- to the accounting of the debit memos on

4    November 17th, 2000, did you undertake that exercise?

5              MR. GREENSTEIN:  Objection.  Form.

6              THE WITNESS:  I think some of our efforts

7    would be -- could be characterized as attempting to do

8    that.

9         Q.  BY MR. GLENNON:  So attempting to look to see

10   whether or not --

11             MR. GREENSTEIN:  Hold on.  Were you finished?

12             THE WITNESS:  With -- with the documents that

13   we had, I would characterize what we did as an effort to

14   undertake that effort.

15        Q.  BY MR. GLENNON:  So your testimony is that

16   you did attempt to determine whether or not the

17   accounting for the 46,000-plus debit memos resulted in

18   the improper revenue recognition of -- the improper

19   recognition of $228 million on November 17th, 2000?

20             MR. GREENSTEIN:  Objection.  Form.

21             THE WITNESS:  I think some of our effort

22   would be -- could be characterized in -- in that way.

23        Q.  BY MR. GLENNON:  Well, you don't set forth in

24   the nature of your assignment that you ever attempted to

25   form an opinion on the financial statement impact of the

CONFIDENTIAL

1    consistent with his not learning about it until later.

2            And I don't recall any document that

3    indicates that he knew about it prior to that time,

4    although, again, one would think that if your transfers

5    in the bad debt reserve are so substantial as to

6    overwhelm the real bad debt writeoffs and cause the debit

7    balance to become a credit balance, that that's something

8    that, particularly in the fall of 2000, when the economic

9    circumstances were such that there were a lot of bad

10   debts in the software industry, for there to be more

11   recoveries than bad debts, I would find that that would

12   be a surprise to people of Mr. Henley's circumstance.

13   But I don't have a specific document that identifies him

14   as knowing.

15       Q.  BY MR. GLENNON:  Is it your testimony that

16   you haven't seen evidence that he knew about these

17   particular bad debt transfers in the second quarter of

18   fiscal year 2001?

19           MR. GREENSTEIN:  Objection.  Misstates

20   testimony.

21           THE WITNESS:  Can I hear that again.

22           (The record was read by the reporter as

23           follows:

24           "QUESTION:  Is it your testimony that you

25           haven't seen evidence that he knew about

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

```
 1              these particular bad debt transfers in the
 2              second quarter of fiscal year 2001?")
 3         THE WITNESS:  I don't recall seeing a
 4    document that indicates that he knew of these transfers.
 5    But I see the surrounding facts and circumstances and
 6    wonder why he didn't -- why he wasn't aware of this.
 7         Q.  BY MR. GLENNON:  Have you seen evidence to
 8    suggest that Mr. Sanderson was aware of the transfers
 9    into the bad debt reserve during the second quarter of
10    fiscal year 2001 prior to November 30th, 2000?
11         A.  I think that the same answer would be
12    applicable, that I don't -- I don't recall as I sit here
13    today seeing evidence that he was aware of unapplied
14    cash, miscellaneous unapplied cash being moved into
15    12601.
16         Q.  Mr. Regan, you testified that as a result of
17    the transfers into the bad debt reserve, both before and
18    during the second quarter of fiscal year 2001, there was
19    a subsequent $20 million adjustment which effectively
20    increased revenues by that same amount.  Is that correct?
21         A.  Correct.
22         MR. WILLIAMS:  Objection.  Form.
23         Q.  BY MR. GLENNON:  Which financial reporting
24    period did that impact?
25         MR. GREENSTEIN:  Objection.  Form.
```

119

CONFIDENTIAL

1          THE WITNESS:  Well, in Q2 '01, it resulted in

2     additional revenues of $20 million and income before

3     taxes of $20 million and income after tax effect.  So it

4     enhanced the bottom line.  It's Q2 '01.

5          Q.  BY MR. GLENNON:  Did the transfers into the

6     bad debt reserve, both before and during the second

7     quarter of fiscal year 2001, have any impact on the

8     financial statements for the third quarter of fiscal year

9     2001?

10          MR. GREENSTEIN:  Objection.  Form.

11          THE WITNESS:  To the extent that there were

12     transfers into the bad debt reserve that continued and

13     had not been considered in assessing the adequacy of the

14     bad debt reserve for Q2 '01, to the extent that they

15     continued to occur, they would have either reduced the

16     adjustment to the bad debt reserve that was eventually

17     made or led to a reduced judgment or would have -- would

18     have been a part of the decision that the impact was

19     insignificant, and therefore, no adjustment was made.

20          Or if the allowance for bad debts was

21     decreased, but my understanding is it wasn't decreased,

22     it was increased substantially, but -- so it would have

23     led to a reduced increase to the allowance for bad debts.

24          Q.  BY MR. GLENNON:  Now, you said to the extent

25     that there were already transfers into the bad debt

120

CONFIDENTIAL

1   reserve that continued after the second quarter into the

2   third quarter.  Are you aware of any transfers that were

3   made in the second quarter of fiscal year 2001 that

4   continued and weren't released as part of the judgment

5   that took place and impacted the second quarter financial

6   statements?

7           MR. GREENSTEIN:  Objection.  Form.

8           THE WITNESS:  My recollection is that there

9   are transfers during November which were not incorporated

10  into the bad debt reserve calculation.  They're braced

11  within the formulaic impact, but not within the

12  assessment of whether to increase or decrease the reserve

13  for bad debts.  So they would have been deferred to a

14  later time.

15          Q.  BY MR. GLENNON:  How much -- let me start

16  that over.

17          What was the total amount of these transfers

18  into the bad debt reserve in November of 2000 that you

19  claim weren't adjusted out of the reserve as part of the

20  reserve adjustment?

21          MR. GREENSTEIN:  Objection.  Form.

22          THE WITNESS:  My recollection is it's in the

23  neighborhood of $5 million.

24          Q.  BY MR. GLENNON:  And can you describe for me

25  how that $5 million impacted the third quarter of fiscal

121

CONFIDENTIAL

1   expert, when you say that some financial statements were

2   materially misstated, you don't have to say whether

3   they're quantitatively misstated or qualitatively

4   misstated.  It's not a determination that one needs to

5   make.  But I think I did make a quantitative as well as

6   qualitative determination.  And for at least those

7   paragraphs and sections that I cited.  So I think it's

8   a -- it's a misstatement of my expert report.

9          Q.   BY MR. GLENNON:  What was the impact of the

10   $20 million bad debt adjustment at the end of the second

11   quarter on Oracle's net income after taxes?

12          A.   You're talking about the debit memo?

13          Q.   No, I'm talking about the bad debt

14   adjustment.

15               MR. GREENSTEIN:  Objection.  Form.

16               THE WITNESS:  The debit memo bad debt

17   adjustments.  I mean there's two $20 million adjustments.

18   HP is a $20 million adjustment.  So if you asked me a

19   question --

20          Q.   BY MR. GLENNON:  Well, I'm talking about the

21   bad debt reserve adjustment.

22          A.   It's calculated on page 21.  And it's

23   12.9 million.  And it increased earnings per share by one

24   penny.

25          Q.   Well, would it have increased earnings per

CONFIDENTIAL

1    share by one penny or would it have increased earnings

2    per share of .22 of a cent?

3                MR. GREENSTEIN:  Objection.  Form.

4                THE WITNESS:  It increased earnings per share

5    by portion of a cent, which has the effect of increasing

6    earnings per share from 10 cents to 11 cents.

7        Q.  BY MR. GLENNON:  Once EPS crosses 10.5, isn't

8    Oracle required under GAAP to round that cent up?

9                MR. GREENSTEIN:  Objection.  Form.

10                THE WITNESS:  That's certainly the custom and

11    practice in the issuance of financial statements.

12        Q.  BY MR. GLENNON:  What percentage of the net

13    income did the impact of the bad debt -- let me start

14    that question over again.

15            The $12.9 million increase in the net income

16    that you just referenced, what percentage of Oracle's

17    overall net income for the quarter did that represent?

18        A.  It's a little over 2 percent.

19        Q.  Of the $20 million that was released into

20    revenue, what percentage of Oracle's quarterly revenues

21    did that $20 million represent?

22                MR. GREENSTEIN:  Objection.  Form.

23                THE WITNESS:  Rounds to -- it's less than

24    1 percent.

25        Q.  BY MR. GLENNON:  Mr. Regan, would you agree

CONFIDENTIAL

1  with me that had the bad debt transfers never occurred

2  and had the subsequent adjustment never occurred in the

3  second quarter of fiscal year 2001, Oracle still would

4  have reported EPS of 10 cents?

5         MR. GREENSTEIN:  Objection.  Form.

6         THE WITNESS:  Well, I don't know what they

7  would have done.  But assuming they wouldn't have

8  utilized some other element in the absence of any other

9  element of -- to be used, they would have reported EPS of

10 10 cents.

11     Q.  BY MR. GLENNON:  Well, let's take it a

12 slightly different way.  If you were to reverse the

13 adjustment out of revenue, would Oracle still have

14 reported EPS of 10 cents in the second quarter of fiscal

15 year 2001?

16        MR. GREENSTEIN:  Objection.  Form.

17        THE WITNESS:  Well, I think it's complicated

18 by the fact that the HP transaction, because the HP

19 transaction also brings it over 10.5, which rounds to 11.

20 So you have to -- in getting to your answer, you have to

21 eliminate both HP and the bad debt writeoff.

22     Q.  BY MR. GLENNON:  Let's put HP aside for a

23 second.  Let's just focus on the bad debt adjustment.  If

24 you were to reverse the $20 million release at the end of

25 the second quarter, would that bring Oracle down to below

128

CONFIDENTIAL

1   10 cents of EPS?

2           MR. GREENSTEIN:  Objection.  Form.

3           THE WITNESS:  No, because the HP transaction

4   would have brought it over.

5           Q.  BY MR. GLENNON:  If you would have reversed

6   both.

7           A.  Yes, it would have -- absent any other

8   transaction, it would have reflected EPS of 10 cents.

9           Q.  In other words, if you reverse both the bad

10  debt reserve and the HP transaction, Oracle still would

11  have posted EPS or reported EPS of 10 cents in the second

12  quarter of fiscal year 2001; is that correct?

13          A.  Yes.

14          Q.  And you agree with me that in the second

15  quarter of fiscal year 2001, consensus estimates of EPS

16  for Oracle was 10 cents?

17          MR. GREENSTEIN:  Objection.  Form.

18          THE WITNESS:  That's my understanding.

19          Q.  BY MR. GLENNON:  So you're not arguing that

20  the bad debt transfers concealed a earnings miss,

21  consensus earnings miss?

22          MR. GREENSTEIN:  Sorry, Objection.  Form.

23          THE WITNESS:  I don't argue that.  But it

24  presents a consensus earnings, a beat of consensus

25  earnings which, for Oracle, appears to have been a

CONFIDENTIAL

1    significant presentation to the investment community.

2         Q.  BY MR. GLENNON:  In paragraph --

3         A.  In other words, when you're assessing the

4    significance of a particular item, you assess it in the

5    context of what's important to users of financial

6    statements, and you look at the historical facts and

7    factors that are important to users of financial

8    statements for the particular company.  And for a company

9    like Oracle, beating consensus estimates and meeting

10   consensus estimates can be significantly different, and

11   it happens that it is significantly different for Oracle

12   in that time frame.

13        Q.  And you've undertaken that analysis to

14   determine that there is a statistically significant

15   difference between meeting and beating earnings

16   expectations as of the second quarter of fiscal year

17   2001?

18             MR. GREENSTEIN:  Objection.  Form.

19             THE WITNESS:  I didn't look at it from a

20   statistical perspective, but what I looked at was for the

21   prior I think nine or ten quarters, when Oracle announced

22   that it met consensus estimates, the reception in the

23   investment community was not enthusiastic.  But when it

24   exceeded the consensus estimates, the reception tended to

25   be very favorable.  So that it -- that becomes

130

CONFIDENTIAL

1    Mr. O'Bryan attached that to his report, to support the

2    statement that it appears that HP received a 60 percent

3    discount on the new license fees.  That's what it refers

4    to.  To me, that's a so what.  So I didn't look at this

5    particular document.

6          Q.  BY MR. GLENNON:  Okay.  So is it a fair

7    statement that you reached your opinion that Oracle

8    improperly recognized $19.9 million in the HP transaction

9    on November 30th before you even looked at the revenue

10   recognition checklist?

11         MR. GREENSTEIN:  Objection.  Form.  While

12   this wasn't produced until after rebuttal reports were

13   already exchanged so it's impossible for him to look at

14   this.

15         MR. GLENNON:  You've already made your

16   objection on that point.  No speaking objections.  And

17   stop coaching the witness.  I'm trying to get an answer

18   on these questions.

19         MR. GREENSTEIN:  The objection is clear.

20         MR. GLENNON:  It is --

21         MR. GREENSTEIN:  And we'll try to exclude any

22   questioning and testimony that relates to documents

23   produced after the reports were exchanged.

24         MR. GLENNON:  Are you instructing him not to

25   answer?

171

CONFIDENTIAL

1          MR. GREENSTEIN:  I'm not.  I'm making my

2    objection.

3          Q.  BY MR. GLENNON:  Okay.  Mr. Regan, do you

4    need me to repeat the question?

5          A.  Yeah, you may as well.

6          Q.  So is it a fair statement that you reached

7    your opinion that Oracle improperly recognized

8    $19.9 million on a transaction with Hewlett Packard on

9    November 30th before you even looked at the revenue

10   recognition checklist?

11         MR. GREENSTEIN:  Same objections.

12         THE WITNESS:  Yes.

13         MR. GLENNON:  I'd like to have this marked as

14   Exhibit 10.

15         MR. WILLIAMS:  This is another document that

16   wasn't produced in the litigation.

17         MR. GLENNON:  We produced it.

18         MR. WILLIAMS:  This is one of the documents

19   that was produced last week or something like that?

20         MR. GLENNON:  Yes.

21         MR. WILLIAMS:  Well, it wasn't available to

22   this witness prior to his opening or rebuttal report.

23         MR. GLENNON:  It wasn't responsive to any

24   discovery order.

25         MR. WILLIAMS:  It wasn't available to him.

172

CONFIDENTIAL

1          MR. GLENNON:  Because it wasn't responsive to

2    discovery order, and if you want to cite me your

3    discovery order --

4          MR. WILLIAMS:  You're asking him a question

5    you know the answer to.  You're asking him whether or not

6    he reached his opinion before having this document that

7    you know he didn't have at his disposal prior to the time

8    he formed his opinion or his rebuttal report -- or wrote

9    his rebuttal report.  Maybe you should have a good-faith

10   basis for asking certain questions before you ask them.

11          (Exhibit 10 marked.)

12          THE WITNESS:  Okay.  Is there a question?

13     Q.  BY MR. GLENNON:  Mr. Regan, have you reviewed

14   this document before?

15          MR. GREENSTEIN:  Same objections.

16          THE WITNESS:  I did.  I've seen it a couple

17   of days ago.

18     Q.  BY MR. GLENNON:  So you're aware that Arthur

19   Andersen specifically analyzed the propriety of Oracle's

20   decision to recognize revenue on the Hewlett Packard

21   transactions on the last day of the second quarter of

22   fiscal year 2001?

23          MR. GREENSTEIN:  Objection.  Form.

24          THE WITNESS:  May I hear the question,

25   please.

173

1   migrated licenses within the next of years.  Company does

2   not believe this to be a concession as this option

3   existed in the previous HP agreement.

4            Whether or not that's a concession or not is

5   something that one would need to study.  In note A, which

6   is a note which is to the right of the discussion of it

7   not really being a short-term license but a perpetual

8   license, I think it says the financing was, quote,

9   papered, end quote, as a lease at the customer's request

10  with the term of 11 months.  However, more than

11  90 percent of the payment is made in the 11 months, and

12  the remaining amount is deferred.  In substance, the

13  license is -- is a -- I'm not sure what the next word

14  is -- as the customer would not forfeit the right to

15  utilize and convert, it looks like.

16           Also, PCS is period -- is priced as a

17  perpetual lease.

18           I think that basically is speculation about

19  exercise, and again, SOP 97-2 doesn't call for the

20  lessee, the lessor to review this transaction in this

21  fashion.

22           It's real hard to read -- hard for me to read

23  what's to the left of the first bullet.

24      Q.  BY MR. GLENNON:  Mr. Regan, was this a

25  document that you relied upon in reaching your

183

CONFIDENTIAL

1    conclusions in your opening report?

2             MR. GREENSTEIN:  Same objection.  He didn't

3    have the document.

4             MR. GLENNON:  He said he had the document and

5    that he reviewed it before.

6             MR. GREENSTEIN:  Okay.  Well, this was

7    produced on June 22nd.

8             MR. GLENNON:  You can just have you're

9    standing objection for anything we introduce.

10            MR. GREENSTEIN:  Okay.

11            MR. GLENNON:  And when we mark exhibits, I'll

12   flag stuff that we produced for rebuttal.

13            MR. GREENSTEIN:  That works.

14            THE WITNESS:  My recollection is that I got

15   this document a few days ago.

16        Q.  BY MR. GLENNON:  Okay.

17        A.  And the document indicates to me that Arthur

18   Andersen did something of a review of this contract.

19   There are a lot of issues that are raised, certain

20   representations were made to Arthur Andersen, and certain

21   assumptions were made by Arthur Andersen, which I don't

22   think are warranted, given the other facts and

23   circumstances that we're aware of.

24            And I think I've discussed those as I've

25   talked about the document.

CONFIDENTIAL

```
 1          Q.  Correct.  And so at the time you wrote your
 2   opening report, you didn't have that particular document;
 3   is that correct?
 4          MR. GREENSTEIN:  Objection.  Asked and
 5   answered, argumentative.
 6          THE WITNESS:  That's my recollection.
 7          Q.  BY MR. GLENNON:  Can I direct your attention
 8   to what we've marked as Exhibit 11, please.
 9          MR. GREENSTEIN:  I'm going to enter a
10   standing objection.  Same objections to this document.
11   This was produced late.  Also note for the record that an
12   objection to foundation.  A lot of these emails on here
13   don't have dates on them.  So foundation.
14          THE WITNESS:  Okay.  I've got Exhibit 11.
15          Q.  BY MR. GLENNON:  Did you have that document
16   at the time you issued your opening report?
17          MR. GREENSTEIN:  Same objections.
18          THE WITNESS:  Do you know what exhibit this
19   was made to Mr. O'Bryan's rebuttal report?
20          MR. GLENNON:  I can find out for you at a
21   break.
22          MR. GREENSTEIN:  Brian, do you want to
23   represent whether this was or was not produced.
24          MR. GLENNON:  Yeah, I'm happy to.  We
25   produced this with our rebuttal.
```

185

CONFIDENTIAL

1      THE WITNESS:  Right, that's my recollection.

2      MR. GLENNON:  I didn't understand that's what

3  he was asking.

4      THE WITNESS:  So I have seen it -- I believe

5  I've seen it a couple of days ago.  Let me find it.  I've

6  printed that out.  I didn't bring it with me, if I did.

7      Q.  BY MR. GLENNON:  Did you have an opportunity

8  to review this document before your deposition?

9      MR. GREENSTEIN:  Same objections.

10     THE WITNESS:  I don't -- I don't recall

11  seeing the document before today.  Just now.  I believe

12  that Matt Lombardi in my office saw the document because

13  he described this email to me.

14     Q.  BY MR. GLENNON:  Mr. Regan, you would agree

15  with me that the bottom portion of the first page,

16  Shelley Curtis attests to the timing of the execution of

17  the agreement with HP?  Do you see where I'm referring?

18     MR. GREENSTEIN:  Objection.  Form,

19  foundation, speculation.

20     THE WITNESS:  It's about halfway up where

21  Shelley Curtis wrote?

22     MR. GLENNON:  Correct.

23     THE WITNESS:  And what part of it that she's

24  saying, my husband can attest?

25     Q.  BY MR. GLENNON:  The whole -- the whole

CONFIDENTIAL

1    With respect to those things which Arthur Andersen

2    addressed in their limited review, it appears as if they

3    may have been relying on information which wasn't

4    relevant, and there was a GAAP problem with respect to

5    the paragraph and bullet that I identified on document --

6    or Bates -- second page of Exhibit 10.

7         Q.  BY MR. GLENNON:  Are you aware that the audit

8    committee of Oracle also reviewed the determination to

9    recognize revenue on the sale of CRM licenses to HP on

10   November 30th, 2000?

11             MR. GREENSTEIN:  Objection.  Form.

12             THE WITNESS:  I have a recollection that

13   there was some kind of presentation to the audit

14   committee.

15        Q.  BY MR. GLENNON:  Have you reviewed the audit

16   committee's presentations?

17        A.  I may have.

18             MR. GLENNON:  This is another document that

19   was produced with our rebuttal report.  I'm going to have

20   it marked as Exhibit 12.

21             (Exhibit 12 marked.)

22        Q.  BY MR. GLENNON:  Mr. Regan, have you reviewed

23   this document before?

24        A.  I believe I have seen it within the last

25   couple of days.

CONFIDENTIAL

1       Q.  So you would agree with me that Oracle's

2   audit committee also reviewed the determination as to

3   Oracle's recognition of revenue on the Hewlett Packard

4   transaction on November 30th, 2000?

5           MR. GREENSTEIN:  Objection.  Foundation.  It

6   looks like this is an Arthur Andersen presentation to the

7   audit committee on January 5th, 2001.

8           THE WITNESS:  It looks as if the audit

9   committee received a presentation of Arthur Andersen and

10  its audit committee dated January 5th, 2001, and within

11  one of the approximately -- one of the many pages

12  included in the presentation is three lines about the HP

13  transaction.

14      Q.  BY MR. GLENNON:  Mr. Regan, is this another

15  document that you didn't have at the time you reached

16  your conclusions in your opening report?

17          MR. GREENSTEIN:  Objection.  Form.

18          THE WITNESS:  That's my recollection.

19      Q.  BY MR. GLENNON:  Mr. Regan, turning your

20  attention to paragraph 83 of your opening report, you

21  reference a 15-day acceptance period?

22      A.  Yes.

23      Q.  In that same paragraph, you reference the

24  fact that several amendments were executed to the SLSA

25  subsequent to its original execution date.  Correct?

190

CONFIDENTIAL

1          A.   I need to do a little housekeeping and find

2     that binder.   What page?

3          Q.   Page 43, paragraph 83.

4          A.   I've got it.

5          Q.   How many amendments were executed to the

6     SLSA?

7               MR. GREENSTEIN:   Objection.   Form.   Also like

8     to insert the same objection that this question implies

9     that -- or this question is based upon a document that

10    was also produced after this report was written --

11              MR. GLENNON:   You're coaching the witness.

12              MR. GREENSTEIN:   -- and to the extent it

13    was --

14              MR. GLENNON:   I haven't produced the document

15    yet, and you're coaching the witness.

16              MR. GREENSTEIN:   Well, I don't want him to

17    answer a question that is based upon a document --

18              MR. GLENNON:   You can't coach the witness.

19              MR. GREENSTEIN:   -- that is based upon a

20    document --

21              MR. GLENNON:   I've asked him how many

22    amendments there are to the SLSA.   I may not introduce a

23    document.   You don't know that.

24              MR. GREENSTEIN:   To the extent that that is

25    premised on a document that he did not have at the time

CONFIDENTIAL

1   is currently spent on litigation support?

2           A.   I don't call any of my work litigation

3   support.   I call it forensic accounting.   But I, for

4   about 30 years, ran that practice area for my firm, and

5   now -- and it has been for -- since '95 or '96, all of my

6   time is assisting clients in something which is either in

7   dispute or likely to be in dispute.   So I'd characterize

8   that as forensic work.

9           Q.   And what percentage of your time is spent

10  doing forensic work?

11          MR. GREENSTEIN:   Objection.   Form.

12          THE WITNESS:   Well, it's all of my time that

13  I bill to clients, and that tends to be about 1900 to

14  2200 hours a year.

15          Q.   BY MR. GLENNON:   And has it been -- have you

16  spent all of your billable time doing forensic accounting

17  work since 1995; is that correct?

18          A.   Some of the work may be outside of the scope

19  of what would be called forensic.   For example, we

20  sometimes consult with an audit committee about issues

21  which the audit committee is concerned may -- may be

22  subject to a dispute or may be subject to restatement.

23  And we'll provide consulting and assistance to the audit

24  committee to assist them in their role.

25              I -- I bill that as part of my forensic

CONFIDENTIAL

1    practice, but somebody can say, well, that's not forensic

2    accounting, it's not involved in litigation, and

3    hopefully, there won't be any.

4              And actually, right now, for the last couple

5    of years, maybe 20 to 30 percent of my work is working

6    with audit committees of large public firms which are

7    concerned about audit and accounting, GAAP and GAAS

8    issues.

9              Q.  Outside of your capacity as a forensic

10   accountant, have you ever had to apply SOP 97-2 in the

11   first instance to a software license agreement?

12             MR. GREENSTEIN:  Objection.  Form.

13             THE WITNESS:  I don't think so.

14        Q.  BY MR. GLENNON:  So you personally have never

15   had to be the person in the first instance to determine

16   whether or not it was proper to recognize revenue on a

17   software license transaction?

18             MR. GREENSTEIN:  Objection.  Form.

19             THE WITNESS:  Not on a 97-2.  I mean, when we

20   sold software as a firm, we would record revenue on our

21   software sales, but it wasn't under 97-2.

22        Q.  BY MR. GLENNON:  Mr. Regan, what would be the

23   net accounting impact be if you simultaneously debited

24   and credited the same account in the same amount?

25             MR. GREENSTEIN:  Objection.  Form.

CONFIDENTIAL

1            THE WITNESS:  Well, if that was the only

2     thing you did and there was no other impacts on the

3     underlying computer database, from an accounting

4     perspective, the balance would be unchanged after the

5     debit and the credit, assuming that the debit and the

6     credit were recorded at the same time.

7         Q.  BY MR. GLENNON:  The net accounting impact of

8     that particular transaction would be zero?

9            MR. GREENSTEIN:  Objection.  Form.

10           THE WITNESS:  Assuming they were recorded at

11    the same time and that there were no other factors that

12    impacted the account.

13           MR. GLENNON:  I'd like to have marked as

14    Exhibit 14 a one-page screen shot dated November 17th,

15    2000.

16           MR. WILLIAMS:  The screen shot is dated

17    November 17th, 2000.

18           MR. GLENNON:  Sure.

19           (Exhibit 14 marked.)

20        Q.  BY MR. GLENNON:  Mr. Regan, have you seen

21    this document before?

22        A.  I don't know have a recollection of seeing

23    this document.  It's a screen shot.  I've seen other

24    screen shots.

25        Q.  On the bottom half of the page, under the

209

CONFIDENTIAL

1    column account in the middle there is a number.  Do you

2    see where I'm referring to?

3          A.  I do.

4          Q.  Do you understand that to be account 25005,

5    customer overpayments?

6               MR. GREENSTEIN:  Objection.  Form.

7               THE WITNESS:  Yes.

8          Q.  BY MR. GLENNON:  Is that an account that sits

9    on the liability side of the balance sheet?

10         A.  It does.

11         Q.  Does the same account number appear in both

12   rows?

13               MR. GREENSTEIN:  Objection.  Form.

14               THE WITNESS:  Both rows under the heading

15   account, yes.

16         Q.  BY MR. GLENNON:  Would you agree that the two

17   accounting entries to the same account are offsetting?

18               MR. GREENSTEIN:  Objection.  Form.

19               THE WITNESS:  It appears to be that the debit

20   is $212,850, and the credit is in the same amount.

21         Q.  BY MR. GLENNON:  Do you understand that all

22   46,881 plus debit memos that were created -- let me start

23   that question over again.

24               Do you understand that all 46,000-plus debit

25   memos that were created on November 17th, 2000 were

210

CONFIDENTIAL

1          THE WITNESS:  And in addition, as I've

2    described earlier, this had had an influence on how

3    particular customer balances were presented within

4    various documents.

5          You know, you had another question.

6    Q.  BY MR. GLENNON:  Did all 46,881 debit memos

7    move miscellaneous unapplied payments from accounts

8    receivable into the allowance for bad debts?

9          MR. GREENSTEIN:  Objection.  Form.

10          THE WITNESS:  That's not my understanding.

11    Q.  BY MR. GLENNON:  I'd like to focus on the

12    three sets of journal entries that were recorded on

13    November 17th, 2000.

14          MR. GREENSTEIN:  Objection.

15    Q.  BY MR. GLENNON:  Are you familiar with these

16    accounting entries?

17          MR. GREENSTEIN:  Objection.  That lacks

18    foundation.

19          THE WITNESS:  I think we've talked about them

20    on page 15.

21    Q.  BY MR. GLENNON:  I'd like to talk about the

22    net accounting impact of these three sets of journal

23    entries on November 17th standing alone, putting aside

24    whatever transfers may happen before November 17th and

25    whatever refunds may happen after November 17th.  I'd

212

CONFIDENTIAL

1    like to talk about the three sets of journal entries that

2    Oracle recorded on November 17th, 2000.

3              Do you understand?

4         MR. GREENSTEIN:  Objection.  Foundation,

5    vague and ambiguous, calls for speculation, incomplete

6    hypothetical.

7         THE WITNESS:  I understand you want to talk

8    about the three entries?

9         Q.  BY MR. GLENNON:  As of November 17th, 2000.

10        A.  Yes.

11        Q.  Mr. Regan, do you understand that the three

12   sets of journal entries that were recorded to account

13   25005 on November 17th, 2000, as of November 17th, 2000,

14   netted to zero?

15             MR. GREENSTEIN:  Objection.  Form.

16             THE WITNESS:  It's my understanding that if

17   you were to just look at those six debits and credits and

18   you ignored all of the other things that we've discussed

19   that's in my report here today, those six debits and

20   credits result in a zero impact on account 25005.

21        Q.  BY MR. GLENNON:  So the creation of an

22   accounting for the 46,881 debit memos standing alone nets

23   to zero as of November 17th, 2000; is that correct?

24             MR. GREENSTEIN:  Objection.  Misstates

25   testimony, foundation, vague and ambiguous, incomplete

213

CONFIDENTIAL

1    hypothetical.

2              THE WITNESS:  Well, I don't think we're here

3    to look at just what happened on November 17 and just

4    within account 25005.  We're here to talk about movement

5    of unapplied cash from customers out of a liability

6    account and into a reserve for bad debt and have -- and

7    certain impacts which the debit memo process had on the

8    visibility and the transparency and the behavior of

9    the -- of Oracle and its collectors.  We're looking at

10   that entire -- at that entire process and journey, not

11   just with respect to these six debits and credits.

12             Q.  BY MR. GLENNON:  My question just relates to

13   these six debits and credits, and you can answer a

14   hypothetical question as plaintiffs' accounting expert.

15             So my question is, the creation of an

16   accounting for the 46,881 standing alone nets to zero as

17   of November 17th, 2000; correct?

18             MR. GREENSTEIN:  Objection.  Incomplete

19   hypothetical, lacks foundation, vague and ambiguous,

20   asked and answered.

21             THE WITNESS:  They weren't made for the

22   purpose of standing alone and for the fact that they

23   added to zero.

24             Q.  BY MR. GLENNON:  I'm going to ask my question

25   again.  The creation of an accounting for the 46,881

214

CONFIDENTIAL

1    debit memos standing alone nets to zero as of

2    November 17, 2000; correct?

3            MR. GREENSTEIN:  Asked and answered several

4    times.

5            THE WITNESS:  Yeah, as I answered when you

6    had me look at what's been marked as Exhibit 14, there is

7    a debit of $212,850 to account 25005, and there is a

8    credit to account 25005.  And a debit decreases the

9    account by that number, and a credit increases the

10   account by that number, and the net effect after you

11   consider both of those entries is zero.

12       Q.  BY MR. GLENNON:  And is it your understanding

13   that all 46,881 debit memos that were created on

14   November 17, 2000 were created with the same journal

15   entries?

16           MR. GREENSTEIN:  Objection.  Foundation,

17   speculation.

18           THE WITNESS:  The amounts differed, but the

19   form of the entries were the same.

20       Q.  BY MR. GLENNON:  So your testimony is that

21   the creation of an accounting for the 46,881 debit memos

22   standing alone nets to zero as of November 17, 2000;

23   right?

24           MR. GREENSTEIN:  Objection.  Asked and

25   answered several times, incomplete hypothetical, lacks

215

CONFIDENTIAL

1  foundation, speculation.

2          THE WITNESS:  I think the creation of and

3  accounting for, you need to look at the total journey

4  from, you know, and the total impact on Oracle's

5  financial statements as a result of this process that it

6  went through in the fall of 2000.

7          Q.  BY MR. GLENNON:  I'm going to keep asking

8  this question until I get an answer.  I need to know the

9  net accounting impact as of November 17th, 2000, of the

10  creation of and accounting for the 46,881 debit memos.

11          MR. GREENSTEIN:  Hold on.  Hold on.

12          Objection.  Argumentative.  He's answered

13  that question at least four times.  I'm going to make the

14  same objections.

15          THE WITNESS:  If by your question you're

16  asking in Exhibit 14 is the liability account increased

17  by an amount and decreased by the same amount so that the

18  effect on the account of these two entries at the moment

19  before and the moment after this is recorded, and ignore

20  all other issues that we've discussed today, yes, that's

21  the net effect.

22          Q.  BY MR. GLENNON:  The net effect of the

23  creation of 46,881 debit memos as of November 17th, 2000

24  is zero; correct?

25          MR. GREENSTEIN:  Objection.  Asked and

216

CONFIDENTIAL

1   same question over and over until we get to seven hours,

2   then.

3            MR. GLENNON:  And if he keeps refusing to

4   answer, I'm going to go --

5            MR. WILLIAMS:  He already gave you the

6   answer.  Why don't we call the Court right now and you

7   can read the Court the record right now.

8            MR. GLENNON:  I'd rather get an answer and

9   move on.  I really would rather just get an answer and

10  move on.

11       Q.  Mr. Regan, I'm trying to determine and trying

12  to get an answer from you about the net accounting impact

13  of the creation of and accounting for the debit memos as

14  of November 17th, 2000.

15            My question to you again is:  Did the

16  creation of an accounting for the 46,881 debit memos as

17  of November 17th, 2000, net to zero?

18            MR. GREENSTEIN:  Same objections.  If you

19  want to answer the same.

20            THE WITNESS:  Well, maybe your question by

21  including the word -- the words "creation of," I may not

22  understand what you mean by "creation of" --

23       Q.  BY MR. GLENNON:  Would you like me to ask the

24  question without "creation of"?

25            MR. GREENSTEIN:  Objection.  Form.

218

CONFIDENTIAL

1          THE WITNESS:  Yes, because when you say

2     "creation of," it seems to me that I need to consider the

3     whole journey that we're talking about here that's in my

4     report for, you know, 30 or 40 pages.

5          Q.  BY MR. GLENNON:  Fair enough.

6          A.  In that journey, we've discussed it for many

7     hours today, and you know my opinion with respect to that

8     journey is a lot different than the question you're

9     asking.

10          Q.  Sure.

11          A.  So "creation of," in my mind, takes me

12     through the journey.  And we've talked about that for

13     probably four hours today.

14          Q.  Did the accounting for the 46,000 debit memos

15     as of November 17th, 2000 net to zero?

16          MR. GREENSTEIN:  Same objections.  Asked and

17     answered.

18          THE WITNESS:  Again, assuming you're asking

19     me about the debits and credits on November 17, my

20     understanding is that the debits total a number and the

21     credits totalled the same number, and the debits are to

22     the same account as the credits so that at the end of

23     November 17, 2000, the account is not changed.

24          Q.  BY MR. GLENNON:  Are you aware of any of the

25     46,881 debit memos that were accounted for any

219

CONFIDENTIAL

1  differently than what you just described?

2           MR. GREENSTEIN:  Objection.  Form.

3           THE WITNESS:  I see some uncertainty as to

4  whether or not the numbers 46,000 or something in the

5  48,000 range.  The ones that I've seen are similar to --

6  are essentially the same as what you see on Exhibit 14.

7       Q.  BY MR. GLENNON:  Have you identified any

8  debit memo that had accounting that's different than

9  what's reflected on Exhibit 14?

10          MR. GREENSTEIN:  Objection.  Form.

11          THE WITNESS:  I haven't seen any -- any that

12  differ.

13      Q.  BY MR. GLENNON:  I want to go back to an

14 issue we were discussing a little bit earlier today, but

15 I'm going to do a little better job with my hypothetical.

16 Let's assume all other circumstances are unchanged,

17 whatever transfers have gone into 12601 during the second

18 quarter have gone into 12601, whatever money had been

19 refunded had been refunded.  What is the financial

20 statement impact as of the second quarter fiscal year

21 2001 if the debit memos aren't created?

22          MR. GREENSTEIN:  Objection.  Calls for

23 speculation, incomplete hypothetical, lacks foundation,

24 vague.

25          THE WITNESS:  Well, I really don't know

220

CONFIDENTIAL

1   because it depends upon what Oracle chooses to do with --

2   with the payments which have been moved in -- at very

3   large amounts, historically high amounts, into the

4   allowance for bad debts.  Or did Oracle choose, instead

5   of moving it to the allowance for bad debts, did it

6   choose to refund those monies to the customers.

7           You really need to know what -- what else

8   happens as a result of the decision not to report debit

9   balance.

10          Q.  BY MR. GLENNON:  So is your testimony --

11          A.  Does this mean the air-conditioning is

12  finally going to come on in this room?

13          MR. RAWLINSON:  I'd like to warn you guy, we

14  tried this yesterday about the same time, too, and it

15  just got hotter.

16          Q.  BY MR. GLENNON:  Is it your testimony that

17  you can't opine on the financial statement impact of the

18  second quarter 2001 if the debit -- let me start that

19  question over again.

20          Is it your testimony that you can't give an

21  opinion on what the financial statement impact would be

22  in the second quarter of fiscal year 2001 had the debit

23  memos not been created?

24          MR. GREENSTEIN:  Objection.  Form.

25          THE WITNESS:  That's correct.  I would need

CONFIDENTIAL

1   think Mr. O'Bryan has analyzed it, and he's come up with

2   what might be approximately a million five, which he

3   thinks may not have been customer overpayments.

4           Q.  BY MR. GLENNON:  Do you have a dollar amount

5   of transfers in the bad debt reserve in the second

6   quarter of fiscal year 2001 that you believe were

7   customer overpayments?

8           MR. GREENSTEIN:  Objection.  Form.  Asked and

9   answered.

10          THE WITNESS:  No, and I don't know that

11  that's a relevant calculation.  I mean, if somebody goes

12  through and in 2007 decides that they figured out that

13  $5,000 really wasn't a customer overpayment, and that

14  that determination was made in 2004, that doesn't tell me

15  that the entry transferring from customer overpayments an

16  amount in the year 2000 into the bad debt reserve was

17  right.

18          I mean, that's a subsequent event which is

19  not relevant to the propriety of the movement of the cash

20  from the customer overpayment account to the bad debt

21  reserve.

22          Q.  BY MR. GLENNON:  Have you made a

23  determination as to how much of the transfers into the

24  bad debt reserve during the second quarter of fiscal year

25  2001 could have been properly recognized as revenue in

232

CONFIDENTIAL

1   the second quarter of fiscal year 2001?

2           MR. GREENSTEIN:  Objection.  Form, calls for

3   speculation, foundation, assumes facts, asked and

4   answered.

5           THE WITNESS:  You mean if Oracle identified

6   in the second quarter of 2001 that this was in fact a

7   royalty payment, could they have moved that from customer

8   overpayments account by debiting that account and

9   crediting royalty income?  I haven't determined how much

10  Oracle could have made such entries for because they

11  didn't do that kind of an analysis in 2000.

12          And doing it in 2003 doesn't make the absence

13  of doing it in 2000 correct.  In other words, the fact

14  that as it turns out they think maybe they had $50,000 as

15  a royalty payment and they shouldn't have transferred

16  customer overpayments into the bad debt reserve doesn't

17  make the transfer in 2000 correct.  It's not relevant to

18  the discussion.

19          Q.  But my question is:  Is did you calculate a

20  number -- let me start that question over again.

21          Did you conduct an independent analysis to

22  determine how much of those transfers could have properly

23  been recognized as revenue in the second quarter of

24  fiscal year 2001?

25          MR. GREENSTEIN:  Same objections.  Asked and

233

CONFIDENTIAL

1    answered.

2              THE WITNESS:  No, I would consider that a

3    useless exercise.  When Oracle makes an entry and moves

4    money out of its customer overpayments accounts and puts

5    it in a bad debt reserve, it has to have a proper basis

6    for doing it then, not three years later.  Or seven years

7    later, if I were to do it now.

8         Q.  BY MR. GLENNON:  Mr. Regan, I only have a

9    couple of areas that I want to close the loop on.

10             Going back to the HP transaction that we were

11   discussing earlier, do you know whether that particular

12   transaction was subsequently reversed in the third

13   quarter of fiscal year 2001?

14        A.  I don't have a recollection of that.

15        Q.  Let me ask this:  Did Oracle's determination

16   to recognize revenue on the CRM license sale to HP on

17   November 30th, 2000 have any impact on Oracle's third

18   quarter of fiscal year 2001 financial statements?

19             MR. GREENSTEIN:  Objection.  Form.

20             THE WITNESS:  Yes.

21        Q.  BY MR. GLENNON:  What was that impact?

22        A.  Well, it -- one, it wasn't a sale.  It was

23   recorded as a sale.  And it doesn't appear that it

24   occurred in the second quarter of 2001, and to the extent

25   that it would have been recorded -- to the extent that it

CONFIDENTIAL

1    could have been recorded ratably in -- over the course of

2    the 11 months of the license agreement, that would be

3    revenue that would be recorded in the third quarter and

4    not in the second quarter.

5            Q.   BY MR. GLENNON:   So it arguably would have

6    increased Oracle's revenues in the third quarter of

7    fiscal year 2001; is that what you're saying?

8                 MR. GREENSTEIN:   Objection.   Form.

9                 THE WITNESS:   What quarter did you say it

10   would increase revenue on?

11           Q.   BY MR. GLENNON:   Under your hypothetical --

12   let me start that question over again.

13                We'll do two hypotheticals here.   The first

14   one, assume the recognition of revenue was proper as of

15   November 30th, 2000.   Oracle's recognition of

16   $19.9 million was proper on November 30th, 2000.   Would

17   that have had any impact on Oracle's financial statements

18   in the third quarter of fiscal year 2001?

19                MR. GREENSTEIN:   Objection.   Form.

20                THE WITNESS:   Yes.

21           Q.   BY MR. GLENNON:   And what would that impact

22   be?

23           A.   If one determined that it was appropriate to

24   recognize revenue over the license period, then in Q3,

25   revenue would have been recorded in Q3 rather than all of

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

```
 1                REPORTER'S CERTIFICATE
 2      I certify that the witness in the forgoing
 3  deposition,
 4
 5  was by me duly sworn to tell the truth, the whole truth
 6  and nothing but the truth in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  herein named; that the testimony of said witness was
 9  reported by me, a duly certified shorthand reporter and
10  a disinterested person, and was thereafter transcribed
11  under my direction into typewriting.
12      I further certify that I am not of counsel or
13  attorney for either or any of the parties to said
14  deposition, nor in any way interested in the outcome of
15  the cause named in said caption.
16      Dated
17
18
19           Leslie Rockwood
20           Leslie Rockwood
             Certified Shorthand Reporter
             State of California
21           Certificate No. 3462
22
23
24
25
```