IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

Master File No. C-01-0988-MJJ

This Document Relates To:


    ALL ACTIONS.

_____/



---oOo---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN

THURSDAY, JULY 12, 2007


---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:  (415) 321-2301


Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

```
 1    and/or Arbitration for Period January 1st, '94 through

 2    September 20th, 2004"?

 3         A.   I'm sorry, you're on Exhibit 3 now, page --

 4         Q.   I know this is confusing.  Appendix B of

 5    Exhibit 3.

 6         A.   I'm there, yeah.

 7         Q.   And you see how it says, "and/or Arbitration"

 8    at the top?

 9         A.   I do, yes.

10         Q.   Is there a reason that that Stroock case is

11    not listed on there?

12         A.   I don't know.  Unless we realized I didn't

13    testify on that and there was a mistake made in the

14    original report.  Because I don't remember testifying on

15    a case for Stroock.  I know I was named on a case for

16    Stroock.  As I recall it was a Houston case.  But as I

17    recall, that case settled before I testified.

18         Q.   So, were you deposed?

19         A.   I don't recall being deposed.  It says I was

20    in May of '04, but I don't recall that.

21         Q.   Okay.  You said you reviewed the second

22    amended complaint in this case; correct?

23         A.   I believe that's true, yes.

24         Q.   Now, you may not know the distinction, but do

25    you know if it is the second amended complaint or the
```

```
1    revised proposed second amended complaint?

2         A.   If you let me get to my documents.

3         Q.   Sure, no problem.

4         A.   It says here, "Revised Second Amended

5    Complaint."  I'm referring to tab 2 within my binder.

6         Q.   Tab 2, is that a footnote to your opening

7    report?

8         A.   It is footnote 1 to my opening report.

9         Q.   Okay.  Great.

10        A.   There is an annotated version of this report

11   that has references, read references, that tie to the

12   documents in the three binders I have for the rebuttal,

13   two binders for the original report.  So the sections

14   may not exactly match up with the footnotes because they

15   are just different.

16        Q.   But if I were -- the report I have if I were

17   to look at the footnotes that refer to documents, would

18   those be accurate references?

19        A.   Absolutely.  They may just have a different

20   section within my support binder.

21        Q.   Got it; okay.  So after reading the complaint,

22   what is -- strike that.

23             What is your understanding of which quarters'

24   financial reports are alleged to be false and misleading

25   in this case?
```

1        A.    The second quarter of fiscal '01.

2        Q.    You're not here to testify or you don't intend

3   to testify on the falsity of Oracle's third quarter 2001

4   results; right?

5        A.    I am not testifying on the accuracy of the

6   third quarter of 2001.  I am testifying, however, that I

7   don't believe that any either alleged or potential

8   misstatements affected the second quarter, and they did

9   not affect the third quarter.

10       Q.    So you are not -- in this case you do not

11  intend to provide any testimony as to the accuracy of

12  Oracle's third quarter financial results; right?

13       A.    Only to the extent that my opinion is that any

14  accounting alleged errors or alleged misclassifications

15  affected the second quarter, and not the third quarter.

16  But I'm not going to opine about what those numbers were

17  in the third quarter or what they should have been.

18       Q.    So is it fair to say that to the extent

19  that -- strike that.

20             Are you saying that to the extent that the

21  second quarter results are inaccurate, you're not

22  opining on whether or not the third quarter was

23  inaccurate by nature of the second quarter being

24  accurate?  Is that fair to say?  Is that what you mean?

25             MR. GLENNON:  I object on vagueness grounds.

1          MR. GREENSTEIN:  Q.  I don't understand what

2     you mean in your last statement.

3          A.    Maybe I can simplify it.  All I'm suggesting

4     is that the second quarter alleged misstatements affect

5     the second quarter only, they do not affect any other

6     quarter of Oracle.  So they don't affect the third, they

7     don't affect the fourth.  They affect the second quarter

8     only.  They are isolated to the second quarter.

9          Q.    Okay.  Well, to the extent revenue was

10    improperly recognized in the second quarter and should

11    never have been recognized, wouldn't that have an impact

12    on the third quarter results?

13         A.    No.  It would be a second quarter issue.

14         Q.    Right.  But if a transaction was booked, for

15    example, $20 million improperly in the second quarter,

16    and it should never have been booked in any quarter?

17         A.    That would affect the second quarter only.

18         Q.    Wouldn't that revenue be part of Oracle's

19    financial statements in the third quarter?

20         A.    No.  Because it was booked in the second

21    quarter.

22         Q.    But -- so, your testimony in this case is only

23    on the accuracy or -- the accuracy of the second quarter

24    results; is that correct?

25         A.    Yes.  And just to clarify, only that it

1    involves the second quarter.  It doesn't affect any

2    other quarter.

3           So, in other words, my opinion is that whether

4    it is $$20 million that affected the second quarter or

5    $40 million, $20 million with the bad debt reserve

6    transfers allegedly done improperly, $20 million for the

7    HP transaction allegedly done improperly, those affect

8    the second quarter.  There is no rollover effect into

9    the third quarter because of those issues.

10   Q.   Why is that?  Why do you believe that to be

11   the case?

12   A.   Because they were booked in the second

13   quarter.  And if they are found to be not second quarter

14   transactions, they come out of the second quarter.

15   Q.   Okay.  So in the case of a misstatement of a

16   particular quarter in general, is it always the case

17   that that misstatement can't impact the next quarter's

18   results?

19   A.   No.  There could be issuances -- there can be

20   instances where you may move from one quarter to the

21   next.

22   Q.   To the extent something was improperly put --

23   improperly reflected in Oracle's balance sheet in the

24   second quarter and remained -- and that was improper,

25   wouldn't it remain on the balance sheet in the third

O'Bryan , John Duross
CONFIDENTIAL                                          7/12/2007

1    quarter?

2        A.    No.   Because the third quarter would be

3    trued-up for actual results.

4        Q.    What if they didn't reverse whatever was

5    improper in the second quarter in the third quarter?

6        A.    Well, you wouldn't reverse.   What we're

7    talking about here, I think you're talking about is the

8    reserve itself.

9        Q.    No.   I'm talking about in general, whether a

10   misstatement in one particular quarter can impact the

11   next quarter.

12       A.    It can if it should have been moved to that

13   next quarter.   But in this case, the issues we're

14   talking about just affect the second quarter, not the

15   third quarter.

16       Q.    If you could turn to page 21 in your opening

17   report, which is Exhibit 1, please.

18       A.    I'm there.

19       Q.    See how it says, "Reviewed various accounting

20   reports and documents"?

21       A.    I'm there.

22       Q.    And the first paragraph is, "Review of Summary

23   Reports."

24       A.    I'm there.

25       Q.    On this paragraph it appears that you say in

```
 1    the second sentence, "The first report I reviewed was a

 2    transaction register"; correct?

 3         A.   Correct.

 4         Q.   "Which listed all debit memos generated for

 5    that day."  Do you see that?

 6         A.   I do.

 7         Q.   Okay.  And then the next sentence says, "I

 8    inspected the account analysis report."  Do you see

 9    that?

10         A.   Two sentences down you mean?

11         Q.   The one after the transaction -- yes, yes.

12         A.   "I inspected the account"; I'm there, yeah.

13         Q.   You looked at the transaction register and the

14    account analysis report; correct?

15         A.   I did look at those two reports, yes.

16         Q.   Okay.  And then in the next full paragraph it

17    says, "I also reviewed a sales journal by GL account

18    report."  Do you see that?

19         A.   I do, yes.

20         Q.   So, the next section says, "Review of Sample

21    On-Account Transactions."  You see that?

22         A.   I do, yes.

23         Q.   In those two paragraphs it appears that you

24    say you reviewed three reports, the transaction

25    register, the account analysis report and sales journal
```

1      Q.    Okay, so let me see if I understand this

2   correctly.

3           So you're saying that in November 2002 or

4   after November 2002 when that sales report was run,

5   there may have been adjustments to Oracle's second

6   quarter results that were issued two years before?

7           MR. GLENNON:   Objection; mischaracterizes the

8   testimony, lack of foundation.

9           THE WITNESS:   No, I'm not saying that at all.

10          MR. GREENSTEIN:   Q.   I'm just trying to

11  understand the inconsistency between page 31 of

12  Exhibit 6 and the total on Exhibit 5.

13     A.    I don't, as I said, I don't know what the

14  difference is made up of.   I don't know the source of

15  971491.   I don't know where that information came from,

16  nor do I know what document was used, if it was even the

17  same run that was used in Exhibit 6.

18          I can understand why there might be

19  differences, was my point.   But I don't know what they

20  are, and I don't know what the reconciliation of that

21  $800,000 is.

22     Q.    But Oracle's second quarter '01 ended on

23  November 30th; correct?

24     A.    Correct.

25     Q.    So as an auditor, when would -- when would

```
 1    somebody make an adjustment two years later to its

 2    revenue numbers, such that this would occur?

 3            MR. GLENNON:  Objection; lack of foundation,

 4    vague and ambiguous, incomplete hypothetical.

 5            THE WITNESS:  Well, this could have been a

 6    report that was run at the time for 11/17, and there

 7    could have been what are called topside adjustments,

 8    meaning that someone decided that there was an $800,000

 9    reduction in revenue that was appropriate for that day

10    because of subsequent information.

11            So topside adjustments could have very easily

12    been made off of that GL run to that summarized run.

13    There is a lot of reasons it could happen.  I don't know

14    what they are, but there is a lot of accounting reasons

15    that could occur.

16            MR. GREENSTEIN:  Q.  In your opinion, what was

17    the amount of revenue booked at Oracle on November 17th,

18    2000?

19        A.   The document I relied to, I chose the larger

20    of the two just to be conservative.  This shows 10.1.

21    This is actually a lower amount.  I chose to be

22    conservative in my report, and used 10.1.

23        Q.   Do you know what Oracle's total revenue for 2Q

24    '01 was?

25        A.   It was $2.6 billion.
```

1          Q.    Do you know what amount it was for the U.S.?

2          A.    For the U.S.?  No, I didn't break out that

3    component.

4               MR. GREENSTEIN:  Mark this as No. 8.

5                    (Exhibit 8 marked for

6                    identification.)

7               MR. GREENSTEIN:  For the record, NDCA-ORCL

8    1895918 through 1895922, it is an August 26th, 2004

9    e-mail from Molly Littlefield to Greg Myers and Lilly

10   Hao, H-a-o.

11         Q.    Let me know when you're finished reviewing it.

12         A.    I'm there, thank you.

13         Q.    Have you seen this document before?

14         A.    I have, yes.

15         Q.    Did you rely on this document in either your

16   report or your rebuttal report?

17         A.    No.  Considered it; didn't rely on.

18         Q.    Page 2, 1895919.  In the middle of the page it

19   is an e-mail from Molly Littlefield to a number of

20   individuals dated August 4th, 2004.  Do you see that?

21         A.    I do.

22         Q.    And it says in the first sentence, "Debit

23   memos can be very tricky, especially all the ones

24   created on November 18th, 2000."  Do you see that?

25         A.    I do.

```
 1        A.    I don't recall.  It wasn't material enough.

 2        Q.    You don't know what customer it was for?

 3        A.    No.

 4        Q.    How did you find it?

 5              MR. GLENNON:  Objection; asked and answered.

 6              THE WITNESS:  I think one of my team members

 7    told me about that, Mr. Sheppard.

 8              MR. GREENSTEIN:  Q.  Did he tell you anything

 9    else --

10        A.    No.

11        Q.    -- about how he found it?

12        A.    No.  It doesn't surprise me.  Out of 46,000 --

13              MR. GLENNON:  Just put an objection to the

14    extent that the communications between Mr. Duross and

15    his team are protected under the stip.

16              MR. GREENSTEIN:  Okay.

17              THE WITNESS:  Sorry.

18              MR. GLENNON:  That's all right.

19              MR. GREENSTEIN:  Q.  What is your

20    understanding of what a debit memo is?

21        A.    Debit memo is something that would increase an

22    amount owed to a company because of a transaction.  It

23    could be a new invoice, could be an adjustment to an

24    invoice.  But it is an increase to an account

25    receivable, basically.
```

1          Q.    So were the 46,000 debit memos an increase to

2     the accounts receivable?

3               MR. GLENNON:   Objection; vague and ambiguous.

4               THE WITNESS:   No.   They were an increase and a

5     decrease to an account.

6               MR. GREENSTEIN:   Q.   So is that -- that's

7     inconsistent with what you believe to be the purpose of

8     a debit memo; correct?

9               MR. GLENNON:   Objection; vague and ambiguous.

10    Mischaracterizes the testimony.

11              THE WITNESS:   The debit memo was just a

12    process to clear a flag, that's it.   And because of

13    Oracle's accounting system, they had to create a debit

14    to relieve the on-account.   But there was no impact to

15    an individual account or to the overall financial

16    statements.   They were debits in and credits out.

17              MR. GREENSTEIN:   Q.   But the use of debit

18    memos on November 17th was different from the definition

19    that you described; correct?

20         A.    There can be a number -- I mean, I gave you

21    one definition.

22              Another definition would be to use it to clear

23    an on-account flag.

24              MR. GREENSTEIN:   Okay, let's mark this next,

25    9.

```
 1              (Exhibit 9 marked for

 2               identification.)

 3        MR. GREENSTEIN:  For the record, this is

 4   NDCA-ORCL 047279 through 048683.  It says, "Oracle

 5   Receivables User's Guide."  This was previously marked

 6   at Tom Williams' deposition as Exhibit 4.

 7        Q.   Mr. O'Bryan, if you could turn your attention

 8   to page 048665.

 9        A.   I'm there.

10        Q.   You see it has a definition of debit memos?

11        A.   I see that.

12        Q.   Have you seen this document before?

13        A.   I have, yes.

14        Q.   And what is it?

15        A.   This is Oracle Receivables User's Guide, dated

16   March 1997, Volume I, Release 10SC.

17        Q.   Okay.  Did you rely on this document in

18   issuing your report?

19        A.   I certainly considered it.  I don't know that

20   I relied on it.

21        Q.   And the definition of debit memo there, it

22   says, "Debit that you assign to your customer for

23   additional charges that you want to collect."  Do you

24   see that?

25        A.   I do.
```

1    analysis of the remaining $9.5 million in transfers to

2    the bad debt reserve in 2Q '01?

3              MR. GLENNON:   Objection; vague and ambiguous,

4    compound.

5              THE WITNESS:   No.

6              MR. GREENSTEIN:   Q.   With respect to the $10.6

7    million you looked at, the 121 transfers, can you just

8    describe the methodology you used in determining whether

9    those transfers were appropriate?

10        A.    The $10.6 million?

11        Q.    Right.

12        A.    There is a binder I brought with me today that

13   basically summarizes -- what we did was we ran a

14   database that pulled out of the 926 scripts all of those

15   that went from 25005 to 12601.

16             As I said, there was 121, totalling $6.10

17   million.

18             We then printed out script reports, script

19   output reports on each one of those and went through

20   each one of those in detail, and summarized this binder,

21   and as best summarized in a two-page document in front

22   of that binder is really the findings I've laid out with

23   respect to what I believe were appropriately, at least

24   some indication it was appropriate to include those in

25   the second Q '01 as being transferred from 25005 to

```
 1    12601.
 2         Q.   You're talking about -- you found that $2
 3    million was appropriate?
 4         A.   Approximately $2 million.  What I did was I
 5    then matched that.  I found about $2 million, which I
 6    could find some support for in script output, any kind
 7    of notes that were taken from the collectors during that
 8    time frame on the miscellaneous receipts section of
 9    their report.
10              And I then matched that to the document we
11    just talked about, which summarizes the cash transfer
12    project.  And, you know, ours was $2 million.  When I
13    look at the report, it looks like it is at least $5.5
14    million that Oracle had decided was appropriately
15    recognized based into revenue based on that project.  I
16    felt like my number was conservative.
17         Q.   What was the total amount of bad debt
18    transfers that occurred, that Oracle tried to resolve
19    during the 2002 cleanup for all periods?
20              MR. GLENNON:   Objection; vague and ambiguous.
21              THE WITNESS:   I think it was approximately $50
22    million.
23              MR. GREENSTEIN:  Q.  $50 million?
24         A.   Something to that effect.
25         Q.   Could you calculate of that $50 million how
```

1    many items were refunded during the 2002 cleanup?

2              MR. GLENNON:  Same objection.

3              THE WITNESS:  No.  Because -- I did with

4    respect to the second Q.  But, again, the results are a

5    little bit skewed, because you're about a month off on

6    one side, maybe a couple months off on the other.

7              MR. GREENSTEIN:  Q.  So you didn't do any

8    calculations with respect to -- putting 2Q aside, the

9    rest of the, what did you say, $50 million?

10         A.    Might have been $49 million.

11         Q.    So you didn't do any independent analysis of

12   those other transfers, did you?

13             MR. GLENNON:  Objection; vague and ambiguous.

14             THE WITNESS:  What other transfers?

15             MR. GREENSTEIN:  Q.  The transfers in other

16   quarters besides 2Q '01 that were resolved in the 2000

17   cleanup.

18             MR. GLENNON:  Same objection.

19             THE WITNESS:  I didn't look at other Qs other

20   than the second Q.

21             MR. GREENSTEIN:  Q.  Okay.  So going back to

22   that binder, that is something obviously you relied upon

23   in doing your calculations in your opening report;

24   correct?

25         A.    I did, yes.

1   transaction."  Do you see that?

2        A.    Correct.

3        Q.    Is it required for an auditor to make an

4   adjustment in order for a revenue recognition deal to be

5   material?

6              MR. GLENNON:  Objection; vague and ambiguous,

7   incomplete hypothetical.

8              THE WITNESS:  I don't understand your

9   question.

10             MR. GREENSTEIN:  Q.  If you turn to Appendix C

11  of your opening report.

12       A.    I'm there.  I'm there.

13       Q.    And you see the depositions that you relied

14  upon there?

15       A.    I do, yes.

16       Q.    You will see that Tom Rathjens' isn't in

17  there?

18       A.    That's correct.

19       Q.    Is it fair to say you didn't rely on the

20  deposition of Tom Rathjens in issuing this May 25th

21  opinion on the HP transaction?

22             MR. GLENNON:  Objection; vague and ambiguous,

23  lacks foundation.

24             THE WITNESS:  Yeah, I don't think I looked at

25  Mr. Rathjens' deposition prior to the issuance of this

```
1    initial report.
2                MR. GREENSTEIN:  Q.  And why not?
3                MR. GLENNON:  Objection; vague and ambiguous.
4                THE WITNESS:  Because, as I state in my
5    report, I don't see any evidence, in considering what
6    went on with this transaction, that this was improperly
7    booked at this point in time when I wrote this report.
8                With all due respect to Mr. Regan, he's the
9    only individual, at least accounting professional that
10   I've seen that seven years later suggests the HP deal
11   was not booked properly.
12               This deal was looked at by the company, by the
13   audit committee, by the revenue recognition group of the
14   company and by the auditors.  Every single one of them
15   have looked at this transaction and suggested it was
16   properly stated.
17               Seven years later Mr. Regan comes along and
18   says that that was inappropriate, which I find
19   troubling.
20               So, that was the information I was considering
21   at the time.  And there was no reason for me to look at
22   Mr. Rathjens, who was HP's individual PMK or whatever he
23   was designated as, because this thing had been fully
24   vetted.
25               What HP thought about and thinks about Oracle
```

1    booking their deal is completely irrelevant.  It is how

2    Oracle decides to book this deal.  And it was

3    appropriate to book, and it was appropriate to book

4    given all of the professionals that have looked at this.

5    And I think it is silly, quite frankly, that Mr. Regan

6    suggests otherwise.

7              MR. GREENSTEIN:  Q.  So, is it fair to say

8    that what you just said in that long answer is what you

9    considered before submitting your May 25th report?

10             MR. GLENNON:  Objection; mischaracterizes the

11   testimony, lack of foundation.

12             THE WITNESS:  Well, it is any of the footnotes

13   that I have here or references to documents or

14   depositions.  Mr. Matuszak's deposition, Arthur

15   Andersen's consideration, the audit committee.

16             MR. GREENSTEIN:  Q.  Okay.  So you didn't

17   consider Tom Rathjens' deposition in forming your expert

18   opinion on the propriety of the HP transaction on

19   May 25th?

20             MR. GLENNON:  Objection; asked and answered.

21             THE WITNESS:  In my opinion there would be no

22   need to, given the date of the original report.

23             MR. GREENSTEIN:  Okay, I'm done.

24             MR. GLENNON:  I don't have any redirect.

25             VIDEOGRAPHER:  The number of tapes used for

1    this deposition is five.  This is the end of videotape

2    number five in Volume I in the deposition of J. Duross

3    O'Bryan.  The original videotapes will be retained by

4    LiveNote World Service.  We're going off the record.

5    The time on the monitor is 7:37.

6                    (Discussion off the record.)

7          MR. GREENSTEIN:  We just had a discussion off

8    the record.  Both parties agree that the deposition and

9    the exhibits should be designated as confidential.

10         MR. GLENNON:  And it is going to get shipped

11   to us for our review in 30 days to review and sign?

12         MR. GREENSTEIN:  Right.

13         (Whereupon, at 7:38 p.m. the deposition of

14   JOHN DUROSS O'BRYAN was adjourned.)

15

16         I declare under penalty of perjury that the

17   foregoing is true and correct.

18

19   Dated:_____   _____

20                                  JOHN DUROSS O'BRYAN

21

22

23

24

25

```
 1   STATE OF CALIFORNIA        )

 2                              )

 3   COUNTY OF ALAMEDA          )

 4            I, DIANA NOBRIGA, hereby certify that the

 5   witness in the foregoing deposition was by me duly sworn

 6   to testify to the truth, the whole truth, and nothing

 7   but the truth in the within-entitled cause; that said

 8   deposition was taken at the time and place therein

 9   stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18            And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22        DATED: _____7/16/07_____

23

24               _____

25               DIANA  NOBRIGA, CSR NO. 7071
```