UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

In re ORACLE CORPORATION,          No. C-01-0988-MJJ
SECURITIES LITIGATION.

_____/

# CERTIFIED
# COPY

Videotaped Deposition of

M. LAURENTIUS MARAIS, PH.D.

_____

Tuesday, September 12, 2006

Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 70685

Page 1

1    or are you --

2         Q.  Let's start with trial testimony.

3         A.  I don't know as I sit here.  I would -- to

4    try to give you a precise answer, one thing that I could

5    do, if you want me to do that, is to turn to the list of

6    testimony attached to Exhibit 3 and to go run my finger

7    down those and remind myself, if I can, what they were

8    about.

9         Q.  Sure.

10        A.  I just don't know one way or the other.

11        Q.  If you can do that quickly and let me know if

12   anything --

13        A.  These are limited to the date range January

14   2001, December 2005.  As I -- and I -- looking at that, I

15   am immediately reminded of an occasion before January

16   2001 when I did, in fact, testify on a managerial

17   accounting topic in a trial-like proceeding, but it was

18   before an administrative law judge, not in a -- in that

19   kind of court.

20        Q.  Uh-huh.

21        A.  Yes, item 3 on this list would be such an

22   example.  Item 6 would be another.  Item 10 would be

23   another.  Item 13 would be another.  14 would be --

24   unclear whether 14 is just managerial or involves aspects

25   of financial accounting, depends on how one interprets

```
 1    those terms.  16.

 2                 So those are the ones that I recognize on

 3    this list.  So the answer is evidently yes.

 4         Q.  And these are areas where you recall

 5    providing testimony on managerial accounting issues?

 6         A.  Where my testimony included in its scope

 7    managerial accounting issues.  It may not have been

 8    limited to -- certainly where my background in that field

 9    played a central role.

10         Q.  Have you -- just to close the loop on that,

11    judging on the number of instances you've identified

12    vis-a-vis trial testimony, I take it that there have been

13    a number of other instances where you've given deposition

14    testimony in the area of managerial accounting?

15         A.  I should clarify that this is a list, as its

16    heading indicates, of deposition and trial testimony.

17         Q.  Yes, I see.

18         A.  And I would have to go through the list again

19    to be sure that these were all trial occasions.  I'm not

20    sure they were.

21         Q.  Have you ever given testimony in the area of

22    financial accounting?

23         A.  That would depend on exactly what you mean by

24    financial accounting.  And I'll clarify in the following

25    way:  I have never testified about the proper application
```

1    of GAAP -- G-A-A-P -- to any set of transactions, or

2    whether it had been applied or interpreted properly.  As

3    I've testified previously, I'm not a CPA, I'm not a

4    Certified Public Accountant, and that's -- I'm

5    knowledgeable about many such issues, but I do not

6    describe myself as an expert in that area.

7                On the other hand, financial accounting as

8    defined in university programs and in university

9    departments involves and encompasses the full range of

10   disclosure of corporate information, public disclosure of

11   information about corporate performance and operations

12   and the processing of such information by securities

13   markets.

14       Q.  Uh-huh.

15       A.  There is, for example, a subject of the

16   so-called -- of so-called event studies in securities

17   litigation in which I do happen to have expertise and

18   have written and published in that area.

19       Q.  Uh-huh.

20       A.  So I would say in certain areas that some

21   would classify as falling under the umbrella of financial

22   accounting, yes, and I have testified on such matters.

23       Q.  Uh-huh.

24       A.  But I -- but with the clear distinction that

25   I have made that I am not a CPA, and there are areas

1   central to financial accounting in which I would not

2   offer myself as an expert and I certainly have not

3   testified.

4        Q.  So is it fair to assume that you have not

5   ever provided testimony in an area of financial

6   accounting that would involve, for example, revenue

7   recognition?

8              MS. WINKLER:  Objection.  Form.

9              THE WITNESS:  I have not ever testified as to

10   whether revenue should or should not have been recognized

11   subject to GAAP.  There are matters in which I have

12   testified where proper or improper recognition of revenue

13   was at issue.  But my testimony -- and so certainly I may

14   have spoken the words in the course of my testimony of

15   revenue recognition and that that was central to what I

16   was talking about, but not because I was there to opine

17   on whether the -- out of my own expertise, whether the

18   recognition had been proper or not.

19        Q.  BY MS. WINE:  Item No. 14 on this listing on

20   Bates No. 2774 is a case involving Broadcom securities

21   litigation.  Can you tell me what you recall about the

22   nature of your work on that matter?

23        A.  Yes.  I was retained to advise counsel and

24   ultimately to provide opinions on the degree of validity

25   of design choices that had been made for an event study

1   supporting a calculation of damages in that case, and I

2   provided such advice and eventually wrote it down and

3   signed it and was deposed about it.

4           Q.   So your work on that matter was limited to

5   the analysis of damages as opposed to any underlying

6   liability issues?

7           A.   That's fair, yes.

8                MS. WINE:  Are you guys all ready for another

9   break?

10               MS. WINKLER:  Sure.

11               THE VIDEOGRAPHER:  We are now going off the

12  record.  The time is 11:30 a.m.

13               (Recess.)

14               THE VIDEOGRAPHER:  We are now back on the

15  video record.  The time is 11:44 a.m.

16          Q.   BY MS. WINE:  Dr. Marais, when you were first

17  contacted to work on this matter, do you recall who

18  contacted you?

19          A.   Yes.

20          Q.   And who was that?

21          A.   It was Ron Hoffman.

22          Q.   And who is Ron Hoffman?

23          A.   He is, as far as I know, an attorney who was

24  working with, I gather, but not for, the -- Ms. Winkler's

25  firm in this matter.

ESQUIRE DEPOSITION SERVICES
(800)640-2461

1   Mr. Hoffman to the confidential informant.

2        Q.  And by the way, if you had all 46,000 amounts

3   for each of these accounts, would that have made your job

4   easier because at that point you could have just tallied

5   them up and come up with a total for the population?

6        A.  Well, it would have changed my job.  And that

7   would be an easy job.  My job, if -- it depends on

8   what -- I assume I would not have received Mr. Hoffman's

9   phone call in that case.  And -- but in that

10  hypothetical, if he had called, whether it would be an

11  easier assignment would depend on exactly what the

12  assignment was.

13        But taking your hypothetical, if the

14  assignment was I have here a list of 46,000 numbers, can

15  you add them up, that would be easier.

16        Q.  And apart from being easier, is that a

17  better, more reliable way of coming to an understanding

18  of what the total population is, if you have each of the

19  46,000 debit memos and their amounts?

20        MS. WINKLER:  Objection.  Form.

21        THE WITNESS:  It's -- it would be misleading

22  to simply agree that that would be better and more

23  reliable because the premise of your question conveys

24  that the question that the statistical thinking is aimed

25  at does not arise.  So since the same -- since the

Page 98

1    question of drawing an inference about a population from

2    a sample does not arise in that hypothetical, it's hard

3    to compare the effectiveness of the statistical method to

4    a situation where the statistical method does not even --

5    is not even relevant.

6         Q.  BY MS. WINE:  And perhaps I'm putting this

7    too much in layman's terms.  But are you saying if you

8    had a sample of your entire population, there's almost no

9    need in that instance to apply statistical methodology in

10   order to arrive at what the total of your population is?

11             MS. WINKLER:  Objection.  Form.

12             THE WITNESS:  I think it was ambiguous as you

13   formulated it.  If you -- you said if you had a sample of

14   your entire population.  I think -- I understand you to

15   mean by that if the sample consisted of the entire

16   population, then there would be no need for a statistical

17   inference about the total account balance of the entire

18   population.  It would be a matter of arithmetic.

19        Q.  BY MS. WINE:  If we are trying to assess the

20   total population of A universe of accounts and we do have

21   the ability to tally up each of the members in that

22   universe, is it fair to say that the actual total that

23   you would arrive at is more accurate than any statistical

24   inference that can be drawn about the population?

25             MS. WINKLER:  Objection.  Form.

ESQUIRE DEPOSITION SERVICES
(800)640-2461

1          THE WITNESS:  It is fair to say that the

2     total would be perfectly accurate, assuming that the

3     numbers were known with precision, and so it would

4     achieve perfect accuracy.  Statistical inferences based

5     on partial, not complete information, can never achieve

6     perfect accuracy.  And so in that sense, the arithmetic

7     of simply adding up the actual known account balances is

8     more accurate and precise than is a statistical

9     inference.

10          That -- that's not a statement about

11     superiority of one method over another because those two

12     methods are incomparable.  They are dealing with

13     completely different sets of input information, and

14     really the accuracy of the precision we're talking about

15     here does not go to the method.  It's not that arithmetic

16     is better than statistics; it's that the available

17     information for getting to an answer is quite different

18     in those two situations.

19          But someone who had available to them a

20     complete list of the actual accounts in question without

21     ambiguity about the universe, without ambiguity about the

22     numbers of the elements, the numbers in the elements of

23     that universe, could perform the arithmetic to arrive at

24     a perfectly accurate total for that list of numbers.

25          Q.  BY MS. WINE:  Have you ever been given in

Page 100

1    this case a complete listing of each of the 46,000-plus
2    debit memos at issue and their corresponding amounts?
3        A.   No.
4        Q.   Do you know if one exists?
5        A.   I don't know that based on any document or
6    evidence in this case, but as a logical matter in this
7    case, in some sense, such a list exists.  I don't mean
8    that there's a single piece of paper.  But we are not --
9    as I understand it, my work was not about quantifying
10   some nonexistent thing.
11            So I know -- I've never seen such a list.
12   I've not received it.  As a hypothetical object, yes, I
13   believe it has some existence.
14       Q.   What did you understand -- strike that.
15            Did you understand for what purpose your work
16   was going to be used?
17       A.   Not with any specificity.  And let me explain
18   that.  I was not completely clear in my own mind until a
19   few days ago that this was a securities litigation matter
20   as opposed to something else, for instance.  So I
21   notice -- I mention that because I notice on the billing
22   record we were looking at in Exhibit 2, that it lists
23   cases identified as Oracle Corporation securities
24   litigation, and I'm not sure whether that's just a label
25   that got applied to it because some employee saw Milberg

1   to me that in my review of the narrative document from

2   the confidential informant, there is a reference to such

3   a reduction.  And I -- I noted that particularly because

4   I had recently read the Complaint in this matter.  And I

5   bring this up now because the confidential informant

6   document was available to me at the time back in 2002.

7              But I don't -- I can't say that I was ever --

8   that it was ever a specific subject of my -- or that I

9   even noticed at the time that that piece of the story was

10  in there.

11             I was reading the story, in other words,

12  the -- I already knew the narrative before I saw the

13  narrative document, and when I saw the narrative

14  document, it seemed to confirm what I knew about 760

15  versus 46,000.  And I do not, to be quite frank, recall

16  recognizing the point about the reduction in the balance.

17       Q.  And just to be clear, apart from what you

18  were given in the narrative from the confidential

19  informant, did you otherwise learn anything about

20  Oracle's customer advances and unearned revenue account

21  during the course of your work on this matter?

22             MS. WINKLER:  Objection.  Asked and answered.

23             THE WITNESS:  To the extent that you refer to

24  what I learned from the narrative, and as I have already

25  testified, I had heard the same story told to me before I

ESQUIRE DEPOSITION SERVICES
(800)640-2461

1    even saw the narrative.  In that sense, yes, I learned it

2    from a different source from Mr. Hoffman.  But to be

3    clear, the account whose name you have spoken precisely

4    several times now is not even -- that's not a name or a

5    term that I knew at the time.

6         So I did not have specific knowledge of that

7    account or how it articulated with other accounts or any

8    other aspect of it beyond the oral version that I heard

9    from Mr. Hoffman and then the confirmation of the aspects

10   of the story that I -- that actually were pertinent as

11   direct inputs into the work that I was doing.

12        Q.  BY MS. WINE:  Did you view any of the

13   information in the narrative from the confidential

14   witness concerning the creation of these debit memos and

15   what may have or may not have been done in terms of

16   recognizing revenue as a result of these debit memos?

17   Was that relevant to the work that you were doing in any

18   way?

19             MS. WINKLER:  Objection.  Form.

20             THE WITNESS:  No.  It provided a context in

21   which I understood why anyone would care about the answer

22   to the question that I was being asked.  But the question

23   that I was asked and that I answered in this case could

24   be stated as an entirely abstract question without

25   mentioning accounts or accounting.

1          Q.  BY MS. WINE:  And I take it that you didn't

2     do anything independently to verify the information that

3     was in the narrative from the confidential informant

4     about Oracle's accounts or what was done with the debit

5     memos or revenue recognition?

6          A.  That's correct.

7          Q.  I don't think I asked this earlier.  Have you

8     reviewed any transcripts of testimony from any witnesses

9     in this case?

10          A.  No.

11          Q.  Have you been told what any of the witnesses

12     in this case have testified about?

13          MS. WINKLER:  Object to that question to the

14     extent it calls for -- object on the basis of the

15     attorney-client privilege.  To the extent that it calls

16     for any communications from your counsel, I'd advise you

17     not to answer.

18          THE WITNESS:  I have no specific knowledge of

19     testimony offered by anyone, and I say it that way to

20     clarify because I don't know that I ever knew or that I

21     know until this day whether Mr. Hoffman's information

22     from the confidential informant came in the form -- in

23     part, of some transcript of some proceeding like a

24     deposition or not.  I just did not know that.

25          Q.  BY MS. WINE:  Sure.  And so other than that,

1     the information that Mr. Hoffman gave you back in 2002,

2     are you informed in any way of what a witness in this

3     case may have testified about?

4            A.   Unless there happens to be some reference to

5     that -- to such information in the Complaint, not every

6     page of which I read from top to bottom, I don't believe

7     so.

8            Q.   Okay.  Did you ever discuss the information

9     in the narrative report from the confidential witness

10    with anyone other than Mr. Hoffman?  In understanding

11    that you may recall some other conversation that involved

12    a third party, apart from that, did you have any

13    conversations with anyone else about the information that

14    was in that narrative?

15           MS. WINKLER:  Objection.  Form.

16           THE WITNESS:  I may well have discussed it

17    with my analyst, Justin Smith.  And I may have discussed

18    it with others inside the firm from the perspective of

19    forming the opinion that I arrived at.  Beyond that,

20    I'm -- I don't recall talking to Mr. Smith, but it seems

21    unlikely that I wouldn't have.  Beyond that, I don't

22    believe so.  Within the scope of 2002 and thereabouts.

23           Q.   BY MS. WINE:  And can you just --

24           A.   And excuse me, barring the possibility that I

25    testified to earlier today that there was a conversation

1    I'm not making any assumption about representativeness or

2    not of the particular sample.  My observation is simply

3    that it would not be fair to -- it would not be

4    appropriate to treat it and interpret it and to draw

5    inferences purely as if it were randomly selected because

6    it was not.

7              THE VIDEOGRAPHER:  Counsel, you have one

8    minute.

9              MS. WINE:  Okay, let's change the tape.

10             THE VIDEOGRAPHER:  This is the end of

11   Videotape No. 2.  We are now going off the video record.

12   The time is 2:17 p.m.

13             (Recess.)

14             THE VIDEOGRAPHER:  This is the beginning of

15   Videotape No. 3.  We are now back on the video record.

16   The time is 2:33 p.m.

17        Q.  BY MS. WINE:  Mr. Marais, before the break

18   you gave me an example of an extreme case where all of

19   the accounts would equal zero where I believe it might

20   suggest to you that it would not be appropriate to

21   project from the sample of the 760 to the overall

22   population; is that correct?

23             MS. WINKLER:  Objection.  Form.

24             THE WITNESS:  It would be -- in that

25   hypothetical, it would be unnecessary to project, and for

Page 132

1    someone unaware of the configuration of the data, their

2    projection would be incorrect.  It would miss by some

3    margin, substantial margin, what they were trying to

4    project.  The -- it does not affect the logic of the

5    projection, but the logic of the projection, as I've

6    described it, recognizes the possibility that the

7    projection could be in error.  It simply quantifies that

8    possibility.

9          The hypothetical that I gave to you would

10   fall into the 1 percent of cases in my specific example,

11   for instance, where the available sample happened to be

12   highly unrepresentative.  And it's not impossible for

13   that to happen.  It's just that that happens for only a

14   very small fraction of possible samples.

15         Q.  BY MS. WINE:  And did you undertake any

16   effort to confirm that in fact the 760 didn't fall into

17   one of those extreme scenarios?

18         A.  I undertook no such effort, and in fact,

19   within the scope of the information available to me and

20   the question being asked of me, there's no information

21   that allows that.  As I testified here earlier today, if

22   someone in possession of the 46,000 balances were simply

23   to provide them, then, of course, the whole question of

24   an extrapolation would become irrelevant.  And if someone

25   in possession of information that even points to or

Page 133

1    quantifies some aspect of nonrepresentativeness, or could

2    provide that information, then that might be something

3    that one might want to take into account.

4                But in any event, I did not -- let me put it

5    this way:  The best way to confirm whether a particular

6    sample is or is not representative, the best conceivable

7    way would be to have available the 46,000 account

8    balances and then to see whether the sample projection of

9    account balance resembled the population total.

10                But in that case, of course, one would not

11    need to be making the projection at all.  I did not have

12    that best conceivable way or even a half step towards it

13    available to me.

14          Q.  Apart from the information that you were

15    provided by the confidential informant, did you make any

16    inquiries about the 760 debit memos that would help you

17    assess the representativeness, or lack thereof, of that

18    sample?

19          A.  I have a recollection, although hardly a

20    fresh recollection, that this was a subject of my

21    conversations with Mr. Hoffman, my pointing out that this

22    was -- that the selection mechanism of a sample -- the

23    selection process can, under certain circumstances and in

24    a certain sense, guarantee representativeness through the

25    nature of the selection process, random probability

Page 134

1                    REPORTER'S CERTIFICATE

2        I certify that the witness in the forgoing

3    deposition,

4              M. LAURENTIUS MARAIS, PH.D.

5    was by me duly sworn to tell the truth, the whole truth

6    and nothing but the truth in the within-entitled cause;

7    that said deposition was taken at the time and place

8    herein named; that the testimony of said witness was

9    reported by me, a duly certified shorthand reporter and

10   a disinterested person, and was thereafter transcribed

11   under my direction into typewriting.

12       I further certify that I am not of counsel or

13   attorney for either or any of the parties to said

14   deposition, nor in any way interested in the outcome of

15   the cause named in said caption.

16       Dated September 13, 2006.

17

18

19                    _Leslie Rockwood_

20                    Leslie Rockwood
                      Certified Shorthand Reporter
                      State of California
21                    Certificate No. 3462

22

23

24

25

Page 236