1  LATHAM & WATKINS LLP
   Peter A. Wald (SBN 85705)
2     Michele F. Kyrouz (SBN 168004)
   505 Montgomery Street, Suite 2000
3  San Francisco, CA  94111-2562
   Telephone: (415) 391-0600
4  Facsimile: (415) 395-8095
   E-mail: peter.wald@lw.com
5          michele.kyrouz@lw.com

LATHAM & WATKINS LLP
   Patrick E. Gibbs  (SBN 183174)
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

6  LATHAM & WATKINS LLP
   Jamie L. Wine  (SBN 181373)
7  633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
8  Telephone: (213) 485-1234
Facsimile: (213) 891-8763
9  E-mail: jamie.wine@lw.com

10  Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
11

ORACLE CORPORATION
12     Dorian E. Daley (SBN 129049)
   James C. Maroulis (SBN 208316)
13  500 Oracle Parkway
Mailstop 5OP7
14  Redwood Shores, California 94065
Telephone: (650) 506-5200
15  Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com
16
Attorneys for Defendant ORACLE CORPORATION
17

18                 **UNITED STATES DISTRICT COURT**

19  **NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

20

21  In re ORACLE CORPORATION
SECURITIES LITIGATION

22

23  ————————————————————

24  This Document Relates To:

25  ALL ACTIONS.

26

27

28

Master File No. C-01-0988-MJJ (JCS)
(Consolidated)

CLASS ACTION

**DECLARATION OF KIRSTEN F. SHAW
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Date:   N/A
Time:   N/A
Judge:  Hon. Martin J. Jenkins

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF KIRSTEN F. SHAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1       I, Kirsten F. Shaw, declare as follows:

2           1.    I submit this declaration in support of Defendants' Motion for Summary

3   Judgment, or in the Alternative, Summary Adjudication. I have personal knowledge of the facts

4   set forth below and, if called upon, I could and would competently testify thereto.

5   **Background**

6           2.    I have been employed by Oracle Corporation for over ten years. My

7   current position at Oracle is Vice President of Customer and System Integrator Programs, which

8   is a subset of Oracle's Product Development group. During 2000 and 2001, I held the positions

9   of Director and Senior Director of the Triage Group, a division of the Product Development

10   organization for Oracle's Enterprise Resource Management ("ERP") software applications. I

11   believe several people served a similar role with respect to Oracle's Customer Relationship

12   Management ("CRM") products during this time. In my role as a Director (and then Senior

13   Director) of Triage, I managed the accounts of two subsets of Oracle ERP applications

14   customers.

15           3.    The first subset of accounts I managed in 2000 and 2001 consisted of

16   customer implementations that Oracle, for business reasons, deemed important to track. My

17   group tracked these customers regardless of whether they had difficult implementations of Suite

18   11i. These were many of Oracle's important strategic accounts. For instance, my group was

19   responsible for tracking the implementations of early adopters of Suite 11i.

20           4.    The second group of accounts I managed during 2000 and 2001 consisted

21   of the small subset of Oracle customers who, for whatever reason, experienced difficulties

22   implementing Suite 11i. My responsibility was to escalate these customers internally and

23   marshal various resources to make them happy and get them up and running on Oracle's

24   software. With a degree in computer science and a strong software development background, I

25   was able to understand and assist the customers in determining what technical problems, if any,

26   they encountered with Oracle's software, and escalate these problems to the appropriate groups

27   for resolution. This subset of accounts I managed during 2000 and 2001 consisted of only those

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF KIRSTEN F. SHAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  that either experienced very difficult implementations or required resolution of important issues

2  – such as relatively small issue that might affect a future sale.

3        5.     During 2000 and 2001, I worked with no more than one or two percent of

4  Oracle's customer base, which I would track on a white board in my office.  The customers that

5  my group managed were typically referred to us either by Critical Accounts (a subset of Oracle's

6  Support group), or by the Enterprise Service Delivery Manager ("ESDM") (another subset of

7  Support that usually worked with large customers).

8             **Bugs and Implementation Problems in Early Software Releases**

9        6.     In my over ten years at Oracle, it has been my experience that bugs and

10  implementation difficulties accompany the first several point releases of new business enterprise

11  software of the magnitude sold by Oracle.  In this respect, Suite 11i was no different than any of

12  the other software releases I worked with since 1996 when I started at the company.  Early

13  customers (often called "early adopters") elect to implement early release software for various

14  reasons, knowing that there will be more bugs and gaps in functionality to work out than if they

15  were to buy the software later, after several point releases.  This is a fact of life in the software

16  business, and does not mean that the software does not work.  It is a lifecycle that every new

17  release of substantial magnitude experiences.

18        7.     In my experience, customers experience implementation difficulties, and

19  are sometimes escalated into Critical Accounts and to the Triage Group (and to other levels at

20  Oracle) for a number of reasons.  Suite 11i was no different than any other release in this respect.

21  Sometimes implementation problems occurred because of code defects or the instability of the

22  current release.  In other cases, implementation problems have nothing to do with code defects.

23  For instance, some customers or even the on-site consultants implementing the product lack an

24  understanding of the product sufficient to make it work.  Sometimes problems occur because of

25  improper configurations, corrupted data or inadequate hardware.  Often customers lack the

26  appropriate resources or management buy-in, or do not understand the commitment required to

27  install such massive, enterprise-wide systems.  Sometimes customers merely become unhappy

28  with Oracle Support's responsiveness to problems, or with the performance of Oracle or third-

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF KIRSTEN F. SHAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1 | party consultants.  In other cases, problems occur because the customer uses these complex

2 | products incorrectly or in a manner for which it was not intended, or customizes and configures

3 | them in a way that causes implementation difficulties.  The latter often occurs when customers

4 | create large amounts of customized extensions to prior versions or releases of Oracle software,

5 | and then either have to eliminate or recreate them during the current implementation.  In short,

6 | implementation problems occur all the time, and customers complain all the time.  These

7 | phenomena are not, in and of themselves, reflective of a sub-par product.

8 |      8.     Customers and on-site consultants communicate with Oracle by sending

9 | Technical Assistance Requests (or TARs).  Often TARs consist of nothing more than questions

10 | about the product.  In early stages of software releases, for example, education may not be

11 | readily available, so Support often receives calls or emails simply asking how various aspects of

12 | the product work.  Thus, TARs often do not represent problems or perceived problems at all.

13 | When customers or consultants believe they have encountered a bug and communicate it to

14 | Oracle, more often than not, these perceived problems are not the result an actual code defect.

15 | Based on my role in Oracle's Development organization over the past ten years and my

16 | interaction with the Support group, well more than half of what customers perceive as a bug

17 | turns out not to require any code fix.  Even TARs that Support analysts characterize as a possible

18 | bug and refer to the Development organization for further resolution often do not turn out to be

19 | an actual problem software.  Indeed, many times these perceived code defects relate to

20 | configuration issues, customization problems, enhancement requests, and other issues that do not

21 | require programmers to issue a patch.

22 |      9.     Bugs exist in all software, and especially in the software's early stages –

23 | such as the first several point releases of Release 10.7, Release 11 or Suite 11i.  Likewise,

24 | escalated customers are a fact of life for any release, and occur with greater frequency for early

25 | adopters of the first several point releases.  However, these problematic escalations always

26 | comprise a small percentage of Oracle's overall installation base, and Suite 11i was no different.

27 | Oracle's escalated customers in 2000 and 2001 represented only a small handful of those

28 |

LATHAM&WATKINS⊔ₚ
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECLARATION OF KIRSTEN F. SHAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  implementing the product at the time, and many installations went smoothly, despite inevitable

2  issues that always occur in an implementation of Suite 11i's magnitude.

3  **Customer Concessions and Reimbursements**

4      10.    During my ten years at Oracle, it has been my experience that customers

5  sometimes request concessions or reimbursements in connection with implementation problems.

6  Such requests are not limited to Suite 11i, and happen for all sorts of reasons. For instance,

7  customers sometimes ask for concessions because they feel their sales representative oversold

8  what the product could do, or because they want the product to do something that it is not

9  intended to do. On occasion, they also ask to be reimbursed because they feel support was not

10  fast enough in resolving a problem or that the consulting work was inadequate. Of course,

11  customers also request concessions at times because they feel they experienced too many bugs,

12  but again, this is not out of the ordinary or unique to Suite 11i. Much like the practice of waiting

13  until the end of the quarter to secure better discounts, customers sometimes complain about

14  product quality, whether justified or not, as a negotiating tool when purchasing new licenses or

15  renewing annual support contracts.

16      11.    In the end, the success of Oracle's products lies in repeat business and

17  strong references for new customers. Thus, even if Oracle ultimately disagrees with a customer

18  about the source of an implementation problem, Oracle may agree to provide concessions to

19  customers for many reasons, including to maintain long-term relationships. It is in Oracle's

20  interest to get customers up and running on the software, whatever the problem, so Oracle

21  typically does what it can to identify the source of any implementation difficulties and ensure

22  that customers are satisfied. This is simply good business, and not a reflection that a certain

23  product is not commercially viable or problematic.

24      I declare under penalty of perjury under the laws of the State of California that the

25  foregoing is true and correct. Executed this 25th day of July, 2007, at Redwood City, California.

26

27  Kirsten F. Shaw

28

SF\617477.3

LATHAM•WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF KIRSTEN F. SHAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)