LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
        michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jamie.wine@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  N/A<br>Time:  N/A<br>Judge: Hon. Martin J. Jenkins |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

I, Jeffrey O. Henley, declare as follows:

1. I submit this declaration in support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication. I have personal knowledge of the facts set forth below and, if called upon, I could and would competently testify thereto.

2. I am currently the Chairman of the Board of Directors for Oracle Corporation. I have served as a director since June 1995 and as Chairman since January 2004. I served as Executive Vice President and Chief Financial Officer of Oracle from March 1991 to July 2004.

### My Role as Oracle's CFO

3. In my capacity as CFO of Oracle, it was my responsibility to manage Oracle's finances and to monitor its financial condition on an ongoing basis. In carrying out these duties, I relied heavily upon the staff of Oracle's Financial Planning and Analysis ("FP&A") department, which was managed by Jennifer Minton.

4. During Oracle's 2001 fiscal year, I received and relied upon information from a variety of sources in monitoring Oracle's financial condition and generating internal financial forecasts. These sources included internal "Upside Reports" prepared by Jennifer Minton and her group; forecasting data for all of Oracle's divisions (internationally and in the U.S.); internal reports reflecting information about Oracle's sales pipeline ("Pipeline Reports"); and, near the end of the quarter, reports on the status of large transactions that were expected to close. I also received periodic "Flash Reports" reflecting preliminary actual results for the first and second months of a given quarter.

5. During Oracle's 2001 fiscal year, I regularly communicated with Oracle's CEO Larry Ellison, Ms. Minton, Executive Vice President Safra Catz and other senior Oracle executives responsible for Oracle's business units. I generally also received publicly available information concerning Oracle's competitors and customers, as well as media reports on general economic trends.

6. At the start of every quarter during this time frame, I utilized all of this information, and worked with the FP&A staff both to develop internal financial forecasts for the

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  quarter and to prepare for the quarterly earnings forecast call. I continued to monitor this
2  information regularly during the quarter.

### Oracle's Q3 2001 Forecast and Actual Results

4  7.  Entering the third quarter of Oracle's 2001 fiscal year ("Q3 2001"), I was
optimistic about Oracle's business. We had great success in both of the two previous quarters
(Q1 2001 and Q2 2001) and our sales pipelines going into Q3 2001 were robust. Although our
new applications products, Suite 11i, encountered the kinds of issues that would be expected of
any new software system of its complexity, nothing I knew regarding issues with early releases
of Suite 11i led me to believe it would hamper Oracle's ability to meet its Q3 2001 guidance.
Based on all of the information I knew at the time, I believed Oracle would achieve the earnings
guidance we announced to the market on December 14, 2000. In fact, as of the December 14,
2000, conference call with analysts (during which we announced our results for Q2 2001 and our
guidance for Q3 2001), I believed the guidance we gave the market was conservative.

8.  At the time of the December 14, 2000, call, I was particularly confident
about Oracle's ability to meet or exceed its forecasts for the quarter because, in early December,
the Oracle Products Industries ("OPI") sales division closed a $60 million deal with Covisint –
the largest software license transaction in Oracle's history. When I issued public guidance on
December 14, 2000, the Covisint deal (which was already in our Q3 2001 forecast) had already
closed. This deal provided me with an additional reason to be confident that Oracle would meet
or exceed its earnings projections for Q3 2001.

9.  As the quarter progressed, I remained optimistic that Oracle would meet or
exceed its earnings forecast. While I had some general concerns about the economy, I was
satisfied that Oracle's projections were reasonable, and I had confidence that Oracle's business
was not softening. I reassured myself throughout the quarter by speaking at length with Oracle's
senior sales executives, who confirmed their confidence in their forecasts for Q3 2001. I also
required sales representatives to poll customers and confirm that potential deals were on track,
and the reports I received were positive. As with every quarter, I also monitored the sales and
economic data available to me.

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

10. I did not believe there was a reasonable possibility that Oracle would miss its Q3 2001 guidance until the last few days of February 2001. At that time, I was informed that Oracle's North American Sales ("NAS") division would reduce its forecast by $20 million because economic uncertainty and financial concerns caused deals to slip at the end of the quarter. On February 27, 2001, the second-to-last day of the quarter, I learned also that Oracle's potential revenue projection dipped below 11 cents for this first time during the quarter. It was not until this moment that I began to doubt that Oracle would meet its 12-cents EPS guidance. During the final hours of the quarter, I learned that significant numbers of large transactions in other regions that were expected to close were also deferred for economic and financial reasons. The dramatic drop of Oracle's historical conversion rate during the last few days of the quarter was unprecedented and came as a complete surprise to me.

### My Oracle Stock Sales in 3Q01

11. Because of my strong confidence in Oracle's business during the first three quarters of fiscal year 2001, I sold 2,500,000 shares of Oracle stock during this time frame. These sales, which constituted 16.5% of my shares, were spread out through the first three quarters of the fiscal year: 1 million shares in both Q1 2001 and Q3 2001 and 500,000 shares in Q2 2001.

12. As of Q3 2001, I had followed a fairly regular pattern of selling shares of my stock in Oracle. By that time, I had sold a portion of my Oracle shares every year since 1993, largely in order to diversify my portfolio. My sales typically occurred within a specific window – beginning a few days after earnings are released in the first month of the new quarter until early in the second month of the quarter.

13. During my time at Oracle, I have followed the same guidelines as other Oracle personnel and clear my sales with Oracle's General Counsel, Daniel Cooperman. In fact, during the time relevant to this litigation, Mr. Cooperman and I were responsible for enforcing Oracle's insider trading policy. In order to aid Mr. Cooperman in determining whether to grant clearance in general, I would advise him whenever I had learned of any material non-public information. Occasionally, if either of us believed a "red flag" – like a large, impending

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

acquisition or suspicion that Oracle would not meet its earnings projections for the quarter – existed, we issued a blanket order for insiders to stop trading.

14. I sold less than 7% of my Oracle shares on January 4, 2001. While I decided to sell shares in December 2000, and sought clearance to do so that same month, I opted to wait until the new calendar year for tax purposes. I did not sell any other Oracle shares in 3Q01.

15. As noted above, at the time I sold my Oracle shares on January 4, 2001, I believed the outlook for Oracle's Q3 2001 was very strong, and I believed that Oracle would meet or exceed the earnings guidance announced in December 2000. At no time before January 4, 2001 – or even until the last 72 hours of the quarter – did I believe or suspect that Oracle would fall short of its guidance for Q3 2001. To the contrary, I felt confident that Oracle would meet its forecasted earnings and revenue estimates, and thus I believed it would be appropriate for me to sell Oracle shares when I did.

16. At no time, either in Q3 2001 or at any other time, have I ever sold shares of Oracle stock due to my knowledge of non-public information. I have always taken great care to ensure that I did not sell any Oracle shares when there was any doubt that I might possess knowledge of material, non-public information, or when I believed that there was reasonable chance that Oracle would fail to meet its earnings guidance.

### Oracle's Q2 2001 Earnings Results

17. I understand the Plaintiffs in this litigation have alleged that Oracle improperly recognized certain revenue for Q2 2001. I believed the results we reported for Q2 2001 were correct when we reported them (and I still do). I was not aware then (and I am not aware now) of any information indicating that Oracle's Q2 2001 results were incorrect. Nor have Oracle's auditors suggested that the company's Q2 2001 results might need to be restated.

18. I understand the Plaintiffs have alleged that Oracle artificially inflated its revenue and reported earnings per share by converting approximately $228 million in customer overpayments to revenue through the creation of and accounting for 46,000-plus "debit memos." At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial results, I had

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

no knowledge of any such "debit memos" or their accounting treatment. I only became aware of these alleged accounting issues in connection with this litigation.

19. I also understand the Plaintiffs now claim that Oracle inflated its revenue during Q2 2001 by transferring payments from its unapplied cash account to its bad debt reserve account. At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial results, I had no knowledge of any transfer of payments from an unapplied cash account to a bad debt reserve account. I only became aware of these alleged accounting issues in connection with this litigation.

I understand the Plaintiffs have claimed that Oracle improperly recognized approximately $20 million in revenue in connection with a software license transaction with Hewlett-Packard at the end of Q2 2001. At the time of the transaction and when Oracle reported its Q2 2001 results, I was not aware of any reason why Oracle should not recognize any revenue relating to the license transaction with H-P. On the contrary, I understood that this transaction had been reviewed by Oracle's internal Revenue Recognition group and its outside, independent auditors, each of whom signed off on the recognition of the revenue.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this ___ day of July, 2007, at Santa Barbara, California.

_____
Jeffrey O. Henley

SF\618936.6

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECLARATION OF JEFFREY O. HENLEY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)