LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
        michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian E. Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  N/A<br>Time:  N/A<br>Judge: Hon. Martin J. Jenkins |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

I, Alan J. Fletcher, declare as follows:

1. I submit this declaration in support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication. I have personal knowledge of the facts set forth below and, if called upon, I could and would competently testify thereto.

2. I have been employed by Oracle Corporation for over 18 years. I currently am Oracle's Vice President of E-Business Suite Development. During the time period relevant to this litigation, I was the Vice President of Operations for Customer Relationship Management ("CRM") Development. In this position, I was responsible for the development methodology for Oracle's Suite 11i CRM software applications, which included the fundamental design and coding of these products. I was also responsible for designing a methodology for testing Suite 11i's CRM applications. In carrying out these responsibilities, my team and I interacted on a regular basis with software developers in the ERP group.

### Suite 11i Unit Testing, Generally

3. Before Oracle released Suite 11i, the Company did more testing on that product than it had done on any other product in Oracle's history. The development-level testing methodology – *i.e.*, testing that took place within and between the individual ERP and CRM development groups – which I created for the CRM product families, included unit testing, systems level testing, integration testing and performance testing. These were only a handful of the many other steps Oracle took to ensure Suite 11i was ready for commercial use at its May 2000 release, and for each of its subsequent point releases.

### Suite 11i Unit Testing

4. Suite 11i's unit testing consisted of the initial set of tests that the development engineers of each product wrote and executed for the individual components of the Suite 11i modules. These initial tests checked for bugs and gaps in functionality of the individual pieces of code in the modules that made up the application product families for both ERP and CRM. Unit testing ran for several rounds, and had to be completed before systems level testing could start. The development groups performed unit testing prior to the initial release of Suite 11i, as well as for each of its subsequent point releases.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

### Suite 11i Systems Level Testing

5. Following unit testing, quality assurance ("QA") teams within each of the two development groups wrote and executed systems level tests for their Suite 11i product families. Each product family – *e.g.*, Order Management, Human Resources and Financials in ERP, and Sales, Marketing and Business Intelligence in CRM – had its own QA director and QA managers who were responsible for systems testing and integration testing at the development level.

6. System level testing was designed to verify that all of the functions within the specific applications were working together properly. For instance, the Call Center CRM applications family contains a number of modules, including Call Center, Collections, Interaction Blending, Scripting, Telephony, and Universal Work Queue. Systems level testing would validate that the functions within the Call Center application were all operating correctly across these various modules.

7. So, in contrast to unit testing, which validated the readiness of the code for each individual component, systems testing encompassed how well entire product families worked together. Like unit testing, the QA teams performed several rounds of systems level testing before the product was ready for integration testing. This validation was done prior to the initial release of Suite 11i, as well as for each of its subsequent point releases.

### Suite 11i Integration Testing

8. The third major category of testing performed at the development level for Suite 11i was integration testing. Upon the completion of systems level testing, the QA teams within the CRM and ERP product divisions worked together to execute integration tests, which crossed both the application families within each major product group and the CRM and ERP product groups themselves.

9. As an initial matter, it is important to understand that, while Oracle had two separate product development groups in 2000 and 2001, the thousands of developers in the CRM and ERP groups worked together on a continuous basis for many months to design the CRM and ERP products so that they would share data. Indeed, CRM and ERP applications,

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

which were written on a single data schema, shared thousands of interdependencies that required the teams to work together to integrate Suite 11i fundamental design. Integration testing was a way of identifying any potential shortcomings in the flow of information over this design as it crossed product boundaries.

10. To identify gaps between the applications' ability to share data, QA teams identified hundreds of integration points between various modules that initiated and received data in the integration scenario in a typical business process. Each integration point supported a business process between different applications within the Suite where data is being passed as between different departments in a company. The teams would run data through each integration point (both applications within CRM and ERP, and across CRM and ERP applications) to ensure that the flows were functioning as designed.

11. This process can be illustrated by a typical order of a company's product over the telephone. For that business flow, the QA teams in CRM would identify and test the integration points between Telesales (CRM) and Order Capture (CRM) to log a telephone sale, and then Order Capture and Sales Compensation (CRM) to provide the sales person with commission. Then, the QA teams in CRM would work with the QA teams in ERP to test the integration points between Telesales and Order Management (ERP) to fulfill the customer's order, and Order Capture to Inventory (ERP) to account for the product sold. While it is impossible to test every permutation of the products in every scenario, pushing data through thousands of these touch points was designed to verify that data passing between applications was generally flowing correctly.

12. Like the other forms of testing, the various QA teams in the product group would run multiple rounds of integration testing prior to the initial release of Suite 11i, as well as for each of its subsequent point releases and for any new modules added to Suite 11i.

### Suite 11i Performance Testing

13. Another form of testing performed at the development level for Suite 11i was performance or "load" testing. Performance testing was the responsibility of a specific group within each development organization. That group tested Suite 11i's performance

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

capabilities (*i.e.*, response times, painting of various screens, refresh rates, etc.) by determining how the entire system worked based on various levels of users or transaction volumes at any one time. This was also a key component of post-implementation testing of Suite 11i at customer sites. Once a customer installed the software, the implementation team would test how well it worked on the specific customer configuration.

### High-Level Business Flow Audits of Suite 11i

14.     After the various testing methodologies were completed at the development level – *i.e.*, by and between the CRM and ERP groups – and approved by the development heads, then a group led by Greg Seiden would perform a high-level audit of integrated business flows before each release was shipped. This testing consisted of identifying numerous key business flows that had a high probability of touching the highest amount of individual function points in the Suite, and running data through them to identify any problems. Oracle would install the software and ensure that data starting at one module would end up at other modules included in that business flow. If this group detected any high-level problems, it would inform development that a fix was necessary.

15.     This testing did not serve as a substitute for the extensive integration testing already done at the development levels among the various product groups within and across CRM and ERP. Instead, it served a high-level audit function to verify the integration testing that had already been done by the development organizations. It was merely a "sanity check" on development's certification that the modules shared data across product families.

### Suite 11i Regression Testing

16.     Oracle also performed numerous rounds of "regression" testing on Suite 11i and its subsequent point releases. Regression testing is the selective retesting of modified software to verify that previously working functions have not failed, and to ensure that newly-added features have not created problems with previous versions of the software. In other words, regression testing compared new versions to old versions to make sure everything is working the same as it was designed. Regression testing is used to test software that has not been drastically modified. Thus, it is more useful for iterative releases of software, instead of new releases that

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

contain large new amounts of functionality and are constantly changing in the pre-release development stage.

17. Oracle conducted regression testing to compare the functionality in each of Suite 11i's subsequent point releases (11i.2, 11i.3, etc.) to earlier versions. For the Suite 11i's first several point releases, Oracle used proprietary software and programmers to test whether existing functionality still worked as designed, as compared to prior versions. This was a time-consuming and expensive task. As a result, Oracle later replaced this process with an automated, third-party program from Mercury Interactive. While the automated program was certainly more efficient than having humans perform regression testing for existing functionality, its adoption at Oracle did not signify that Oracle's previous methodology was inadequate, or that the development and testing of these early versions was incomplete.

## Suite 11i Alpha and Beta Testing

18. In addition to the rigorous internal testing methodology for Suite 11i, Oracle subjected the product to an "acceptance" testing phase. While Oracle generally referred to this stage as "beta" testing for Suite 11i, the methodology included elements of what is typically known in the industry as both alpha and beta testing.

19. Oracle's pre-release acceptance testing was initiated by the development groups for Release 11.0 and began for Suite 11i approximately a year before its release. The first stage of acceptance testing, alpha testing, typically consists of simulated use of the software internally. For Suite 11i's alpha testing, the development teams installed the software and made it available in a conference room with numerous PCs. They also developed numerous alpha testing scripts that they wanted the internal subjects to run through the software. Then, a large number of Oracle consultants and support analysts arrived at Redwood Shores and spent several weeks running the scripts on the software. The consultants and support analysts were also able to test any custom scripts they saw fit. This also served as a way to train Oracle's consulting and support personnel on the product. At the end of each day, the testers met with product managers to discuss any bugs or issues they found, which was then logged in the bug database.

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

20. The second phase of acceptance testing, beta testing, typically consists of providing the software to a limited audience outside the company. Sometimes beta software is made available to the general public. Other times, beta software is limited to specific groups of customers and performed internally. For Suite 11i, beta testing involved a setup similar to the alpha testing phase, but instead of internal employees, Oracle enlisted several dozen customers to participate in numerous rounds of trying out the software. Some customers provided their own data to Oracle Development, which was then loaded into a database to test the Suite 11i software at Redwood Shores. Others did not provide their actual databases, but still came to Oracle's offices and participated in two to three weeks of testing of various Suite 11i features. Like the alpha testing phase, customers either tried the software on their own scripts or scripts that were provided by development. These customers were, in most instances, existing customers of Release 10.7 or 11.0 that would eventually upgrade to Suite 11i. Thus, it was a good way to get feedback from the end-user perspective before the initial product launch.

### Suite 11i's Early Adopter Program

21. Following Suite 11i's release, Oracle also established a program for a number of early customers that had purchased the product and were actually implementing it. This program was not part of the general testing methodology of Suite 11i. Instead, it was a way to take care of customers who opted to purchase and install early versions of the code. As with any new release, early customers experience some bugs, gaps in functionality and implementation difficulties. Thus, Oracle tracked these customers even before their implementations and provided special attention to help them address any problems they experienced. Oracle also hosted some of these implementations on its own server to reduce the level of problems they early adopters experienced. Like acceptance testing, monitoring the early adopters allowed Oracle to track persistent issues with the product and provide solutions in future point releases.

### Suite 11i's TAR Resolution Process

22. Oracle's support organization fields customer requests for assistance through the use of Technical Assistance Requests (or TARs). Oracle's TAR system was in place

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

- 6 -

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

long before Suite 11i, and continues to be in use today. TARs span a wide variety of issues at implementation sites, as relayed to Oracle by customers or on-site consultants. A TAR may represent the customer's view that the product is not performing as represented by the product's documentation, or that the product documentation itself is erroneous. A TAR can also be a customer's request that Oracle add additional features in future releases. Or a TAR can simply be a question about the product or another aspect of the customer's relationship with Oracle.

23. In short, a TAR represents any communication by the customer to Oracle. Customers and consultants issue TARs for many reasons, many of which have nothing to do with bugs in the software. If a customer logs a TAR to report a suspected bug, it represents the customer's belief that the software is not working properly. Often this turns out to be a problem unrelated to Oracle's software, such as a configuration issue, migration of bad data, problematic customization, or a misunderstanding or misuse of the product. In fact, the vast majority of TARs received by Oracle do not ultimately require a code fix by development.

24. Once a member of the Oracle support organization assesses a TAR and determines that it may be a product defect, he or she logs it in the bug database. In my experience at Oracle, only a small fraction of all TARs sent to support are ultimately deemed by support to require development follow up (often called a "bugged" TAR). When a TAR is bugged, it means only that the support organization has determined that development should research it further and determine if the problem requires a fix.

25. After a TAR is logged in Oracle's bug database as a possible code defect, programmers in the development group research the nature of the issue and assign a tracking number to identify its status. Thus, the bug database serves as a work queue for development. Even when support analysts log TARs in the bug database as suspected software bugs, these often do not require any code fixes. This is illustrated by the various status numbers that are assigned to bugs in the database. For example, Status 13 generally represents that it is a documentation problem; Status 15 means that the bug is a customer enhancement request; Status 11 means that the issue is open for work by development with the presumption that it is a bug (but ultimately may turn out to be a configuration issue or other problem); Status 31 means that

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

7

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

the development group cannot reproduce the bug; Status 96 represents a duplicate; and Status 32 means that the bug is part of the custom code used by a specific customer (and not a problem with Oracle's software). So, what the customer may report to Oracle's support group as a bug quite often turns out not to require any code fix by development.

26. If a TAR actually involves a bug, Oracle programmers fix the code and issue a patch so that the software will work as designed. Patches may also include enhanced functionality to the software, either that Oracle decided to include after each release, or that customers requested and Oracle then created. Enhancement requests are a normal part of the product life cycle, as Oracle cannot anticipate every feature its diverse customer base might want. Indeed, Oracle often enters into strategic development agreements with technology companies like Hewlett-Packard and Sun Microsystems, in which the partners participate in the development of the product by providing input into functionality of future releases.

27. In any event, like bugs, patches are a normal part of software development both for bug fixes and to add new features the product. They can be delivered to customers in many ways, including one-off patches, and in "mini-packs" or "family packs," which contain several patches. Oracle and other vendors compile and deliver all patches and additional functionality in a given period in the form of regularly-issued point releases of software. (Suite 11i is currently on its eleventh point release – 11i.10, or 11.5.10.) These point releases are intended, among other things, to capture new functionality, implement necessary localization changes, and roll up any code fixes for defects discovered after the software was released. Given the size of 11i, there was nothing problematic or out of the ordinary that Oracle issued three, regularly scheduled point releases of 11i in its first year of general release.

28. Sometimes, patches that are issued to address code defects will cause an unforeseen problem for a given customer. While Oracle tests these patches before they issue them to ensure they are compatible with the software they are designed to augment, it is impossible to test every possible software usage or configuration permutation, just as is the case with the initial release of the application itself. As a result, complications caused by patch implementation are inevitable and not out of the ordinary.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DECLARATION OF ALAN J. FLETCHER IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct. Executed this 25th day of July, 2007, at Redwood City, California.

*[signature]*

Alan J. Fletcher

7  SF\617478.4

ATTORNEYS AT LAW

                                                            DECLARATION OF ALAN J. FLETCHER IN SUPPORT
                                                 9          MOTION FOR SUMMARY JUDG...