1    LATHAM & WATKINS LLP
      Peter A. Wald (SBN 85705)
2      Michele F. Kyrouz (SBN 168004)
   505 Montgomery Street, Suite 2000
3    San Francisco, CA 94111-2562
   Telephone: (415) 391-0600
4    Facsimile: (415) 395-8095
   E-mail: peter.wald@lw.com
5          michele.kyrouz@lw.com

6    LATHAM & WATKINS LLP
      Jamie L. Wine (SBN 181373)
7    633 West Fifth Street, Suite 4000
   Los Angeles, CA 90071-2007
8    Telephone: (213) 485-1234
   Facsimile: (213) 891-8763
9    E-mail: jamie.wine@lw.com

10    Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
   J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
11

12    ORACLE CORPORATION
      Dorian Daley (SBN 129049)
      James C. Maroulis (SBN 208316)
13    500 Oracle Parkway
   Mailstop 5OP7
14    Redwood Shores, California 94065
   Telephone: (650) 506-5200
15    Facsimile: (650) 506-7114
   E-mail: jim.maroulis@oracle.com
16
   Attorneys for Defendant ORACLE CORPORATION
17

Latham & Watkins LLP

Patrick E. Gibbs (SBN 183174)
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

18             **UNITED STATES DISTRICT COURT**

19    **NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

20

| | |
|---|---|
| 21   In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ (JCS) (Consolidated) |
| 22 | |
| 23 ———————————————— | <u>CLASS ACTION</u> |
| 24   This Document Relates To: | **DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 25   ALL ACTIONS. | |
| 26 | Date:    N/A |
| 27 | Time:    N/A<br>Judge:   Hon. Martin J. Jenkins |

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    I, Lawrence J. Ellison, declare as follows:

2       1.      I submit this declaration in support of Defendants' Motion for Summary

3    Judgment, or in the Alternative, Summary Adjudication.

4       2.      I am the Chief Executive Officer of Oracle Corporation ("Oracle"). I have been

5    the CEO since I co-founded the company in 1977. I have personal knowledge of the facts set

6    forth below, or where I do not have personal knowledge, I am informed and believe the stated

7    facts to be true and correct.

8                    ## Oracle's Q3 2001 Forecasting and Actual Results

9       3.      Going into the third quarter of Oracle's 2001 fiscal year ("Q3 2001"), I was very

10   optimistic about Oracle's business. We had just finished our best quarter ever; Oracle's profit

11   margins were rising; and our pipeline showed significant growth. I also believed that Oracle's

12   products were still a high purchasing priority for our customers because they offered customers

13   the ability to enhance efficiency and lower operating costs. This was confirmed by our very

14   strong showings in Q1 2001 and Q2 2001. In addition, at the very beginning of Q3 2001, Oracle

15   closed a $60 million applications deal with Covisint, Oracle's largest software license deal ever.

16   Based on all of the information known to me at the time, I strongly believed Oracle would meet

17   or exceed the guidance we gave the market on December 14, 2000.

18      4.      During Q3 2001, like any quarter, I received an array of information about

19   Oracle's performance during the quarter, as well as internal projections of Oracle's final results

20   for the quarter. In any given quarter, information about Oracle's performance and projections for

21   Oracle's final results vary over time, and Q3 2001 was no different. Until the very end of the

22   quarter, based on all of the information known to me at the time, I continued to believe Oracle

23   would meet or exceed its quarterly guidance. None of the information I received before the very

24   end of the quarter led me to think that Oracle would miss its guidance.

25                    ## My Oracle Stock Sales in Q3 2001

26      5.      Because I was optimistic about Oracle's business during Q3 2001, I was

27   comfortable selling Oracle stock during January 2001, the second month of the quarter.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

6.       As a general matter, I do not regularly sell Oracle stock, and I am always concerned about the effect my trades could have on Oracle's share price. I am also reluctant to sell any of my Oracle holdings because I have tremendous faith in the company. I do exercise my Oracle options, however, when they are about to expire. As of Q3 2001, I had 22 million Oracle options that I had held for over nine years and were scheduled to expire in August 2001. If I did not exercise those shares before they expired, I would have lost well over a half a billion dollars.

7.       It is my understanding that, under Oracle's insider trading policy at the time, certain senior officers and directors (myself included) were prohibited from trading in Oracle securities during the period from two weeks before the end of each quarter through two full trading days after Oracle released its earnings report for that quarter. Oracle's General Counsel, Daniel Cooperman, established an additional, prophylactic measure discouraging trades by some Oracle insiders within one month of the end of each quarter without a compelling reason.

8.       Given these policies, as of Q3 2001, there were only three "open windows" in which I could have exercised these options before they expired: December 17, 2000 - January 31, 2001, March 16, 2001 - April 30, 2001 and June 16, 2001 - July 31, 2001. If I had come into the possession of material nonpublic information during any of those windows, I would not have been able to trade during that window. As of January 2001, I had no way of knowing whether I would, in fact, come into the possession of such information during the remaining two open windows – in the spring and summer of 2001. By way of example, Oracle has recently acquired several public companies (including Hyperion on March 1, 2007, Siebel on September 12, 2005, and PeopleSoft on December 13, 2004). If, in 2001, Oracle had decided to make a similar sizable acquisition, but not yet announced the transaction, I might have been unable to trade during the remaining windows before August 2001 and could have lost the ability to exercise options worth over $550 million dollars.

9.       Moreover, before Q3 2001, my financial advisor, Philip Simon, had repeatedly recommended that I exercise my Oracle options and sell my shares to diversify my

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  portfolio and to retire some of my debt. Thus, in January 2001, I decided to exercise the options

2  I had received more than nine years earlier because: (a) the options were going to expire in the

3  next eight months, and I was uncertain that I would have another opportunity to exercise them;

4  and (b) exercising the options was consistent with the advice I had been receiving from Mr.

5  Simon. I do not like to sell Oracle stock any more frequently than needed because I am

6  concerned that shareholders might mistakenly interpret my sales of stock as a suggestion that I

7  had lost confidence in Oracle's business prospects. Accordingly, when I decided to exercise

8  options in January 2001, I also decided to sell some of my Oracle stock, so that I could pay down

9  a revolving line of credit, thereby reducing my debt as Mr. Simon had recommended.

10        10.    After consulting with Mr. Simon, I decided to sell a total of 40 million

11  shares, more than the number of options that were due to expire in August 2001. Our target was

12  to raise $822 million in proceeds, after taxes. Mr. Simon estimated that we would need to sell 40

13  million shares to reach our goal. If I had sold only the shares I would receive from exercising

14  my options, I would not have met the $822 million target; hence, I decided to sell additional

15  shares.

16        11.    I imposed strict conditions, however, on my Oracle trades. To avoid

17  affecting Oracle's stock price, I instructed Mr. Simon that the trades must not exceed 10-15% of

18  any day's trading volume. Additionally, I instructed Mr. Simon not to sell any shares if the share

19  price fell below $30 because I believed that any price below $30 would not fairly value Oracle's

20  shares. Lastly, I directed that the shares be sold over a one-week period and that no trades take

21  place in February.

22        12.    I also instructed Mr. Simon to obtain the necessary insider trading

23  clearance from Mr. Cooperman and to coordinate the transaction with my broker. Mr. Simon

24  contacted Mr. Cooperman and obtained the necessary clearance. Mr. Cooperman granted me

25  clearance to trade through the first two days of February; regardless, I instructed Mr. Simon not

26  to conduct any trades in February. Although I could have sold these shares in Q2 2001 or in mid

27  to late December 2000, I waited until January 2001 because I wanted to take advantage of the

28  new tax year.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

13.     My sales of Oracle stock were carried out from January 22 through January 31, 2001.  Because of the conditions I placed on the sales (minimum sales price, no trading in February, and the maximum sales volume), I was only able to sell 29 million of the 40 million shares I contemplated selling.  In all, I sold 2.09% of my Oracle holdings.

14.     At no time during the period my stock trades were executed did I believe or suspect that Oracle would miss its projections for Q3 2001.  To the contrary, I felt that it was safe for me to sell Oracle shares when I did, especially in light of the Covisint transaction and Oracle's projected strong financial performance to date.

### Oracle's Suite 11i

15.     When it was released in 2000, Oracle's Suite 11i was the only "suite" of enterprise applications products that could automate a full range of "front-office" and "back-office" functions.  Obviously, it is impossible for any off-the-shelf software product to automate every conceivable business process, but Oracle's Suite 11i was designed to (and did) cover the broadest footprint of any enterprise applications suite then on the market.  As the only enterprise application suite at the time to include broad ERP and CRM functionality, Suite 11i included features for automating most of the business processes common to most kinds of businesses.

16.     When Oracle released Suite 11i, many enterprise applications customers followed what was called a "best of breed" strategy:  they would buy several applications designed and engineered separately by different vendors and then pay consultants to write custom code to enable those products to work together.  This work, which is referred to as "systems integration," was (and still is) an extremely difficult, expensive, and time-consuming process, at the end of which the different applications still store information in separate databases.  Moreover, when a customer wants to upgrade to a new version of one application, some of the initial systems integration work needs to be redone.  With the release of Suite 11i, Oracle offered customers a different approach:  a complete suite of enterprise applications designed and engineered to work together without complex and expensive systems integration.

17.     Suite 11i had bugs when it was released.  All software does.  In the 30 years that I have been running Oracle, every new release of software has had bugs.  This is part

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   of what I have previously referred to as the painful birthing process that is common to all

2   software (not just Oracle's), particularly large and complex software systems like Suite 11i. Like

3   any new release, Suite 11i got less buggy and more stable as time passed, which is also a normal

4   part of the software product cycle.

5           18.     During the first few quarters after Suite 11i's release, I was aware that

6   some customers implementing or upgrading to Suite 11i experienced difficulties. As I testified

7   during my deposition in this case, these are complex engineering projects, and they often involve

8   changes to many of the customer's business processes. Even under the best of circumstances,

9   large-scale implementations take months, and difficulties inevitably arise. This is true with

10   newly-released products like Suite 11i during its first few quarters on the market, and it is true

11   with much more mature products.

12           19.     Moreover, problems can arise from a wide range of potential sources,

13   many of which have nothing to do with the applications themselves. The fact that a given

14   customer is experiencing difficulties in implementing a particular application does not, by itself,

15   mean there is a defect in the product. As of Q3 2001, the customer difficulties of which I was

16   aware did not suggest any particularly severe or unexpected problems with Suite 11i, especially

17   for such an enormous and complex set of products so soon after their release. They certainly did

18   not suggest that the software did not work. Indeed, by the beginning of that quarter, it is my

19   understanding that over 80 customers were live on some part of the Suite; over a thousand

20   customers were in the process of implementing or upgrading to Suite 11i (or parts of it); and

21   many more customers had licensed and were about to begin their own implementations or

22   upgrades to Suite 11i. At no time during Q3 2001 did I believe any product quality issues with

23   Suite 11i would hinder Oracle's ability to meet or exceed its financial guidance for the quarter.

24                               **Oracle's $1 Billion Savings**

25           20.     In May 1999, I announced that Oracle would become an "E-business." By

26   that, I meant Oracle would use its own business applications software to put every aspect of

27   Oracle's business on the Internet. I also stated in May 1999 that, by becoming an E-business,

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Oracle would save $1 billion. In March 2000, we announced that we had accomplished this goal

2   more quickly than we had anticipated.

3        21.    Since at least 2000, Oracle has referred to its enterprise applications

4   products, collectively, as the E-Business Suite. This brand name, which I have used to refer to

5   various releases of Oracle's enterprise applications, reflected Oracle's move from a client/server

6   architecture to an Internet-based architecture for its applications. Oracle had begun offering

7   internet-based applications some time before 2000, but adopted the "E-Business Suite" brand

8   name at around the time Oracle began selling release 11i of its applications products, which we

9   called Suite 11i. When referring to Oracle saving $1 billion, I have referred to Oracle's use of

10   the "E-Business Suite," meaning Oracle's internet-based applications.

11        22.    As I said in my letter to Oracle's shareholders in the 2000 Annual Report

12   (Ex. 41), the $1 billion savings announced in March 2000 represented a 10-point improvement in

13   operating margin compared to Oracle's prior fiscal year. By the end of fiscal year 2000, when I

14   issued the letter, Oracle's operating margin had improved even more, a 14-points improvement

15   over the previous year (from 27% in Q4 1999 to over 41% in Q4 2000).

16        23.    These increased margins resulted from a dramatic change in the way

17   Oracle did business, a change made possible by using our own applications to move key business

18   processes to the internet. As part of this process, we upgraded our internal applications to Suite

19   11i, and we consolidated our IT systems from dozens of different instances down to a single,

20   global instance.

21        24.    In the past, Oracle ran its business on dozens of separate computer

22   systems, each using their own separate databases. This meant that all of Oracle's information

23   was fragmented across hundreds of separate databases. Each of Oracle's organizations—

24   marketing, sales, service, etc.—had its own computer system, which in turn, had its own

25   database. Virtually every country in which Oracle operated had multiple databases. Oracle's

26   U.S. operations alone had six separate customer databases (marketing, Web store, telesales, field

27   sales, accounting and service). Oracle's information was spread across 140 separate product and

28   pricing databases, 70 separate human resources databases and nearly 100 e-mail databases

LATHAM&WATKINS‹‹‹
ATTORNEYS AT LAW
SAN FRANCISCO

6

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    worldwide. In addition to the cost and complexity of maintaining all these separate systems, the

2    fragmentation of data made it extremely difficult to gather information about the company as a

3    whole.

4          25.      To fix this problem, Oracle began a worldwide IT consolidation into what

5    we called the "Global Single Instance" (or "GSI"), a single system with a single database

6    containing all of Oracle's key business information. Oracle converted its enterprise applications

7    to its E-Business Suite applications and then consolidated each server into progressively fewer

8    instances, with the eventual goal of running the entire business on a single instance.

9          26.      The move to the GSI allowed Oracle to consolidate its technology

10    operations and centralize its worldwide data centers. This, in turn, allowed Oracle to restructure

11    the way it did business, including revamping marketing, sales, and service organizations into

12    global lines of business. It also changed Oracle's culture by transforming it into a self-service

13    model and encouraging employees to move business processes to the Internet. Accompanying

14    this global IT consolidation was the net effect of lowered costs and increased efficiency.

### Oracle's Q2 2001 Earnings Results

16          27.      I understand the Plaintiffs in this litigation have alleged that Oracle

17    improperly recognized certain revenue for Q2 2001. I believed the results we reported for Q2

18    2001 were correct when we reported them (and I still do). I was not aware then (and I am not

19    aware now) of any information indicating that Oracle's Q2 2001 results were incorrect. Nor

20    have Oracle's auditors suggested that the company's Q2 2001 results might need to be restated.

21          28.      I understand the Plaintiffs have alleged that Oracle artificially inflated its

22    revenue and reported earnings per share by converting approximately $228 million in customer

23    overpayments to revenue through the creation of and accounting for 46,000-plus "debit memos."

24    At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial results, I had

25    no knowledge of any such "debit memos" or their accounting treatment. I only became aware of

26    these alleged accounting issues in connection with this litigation.

27          29.      I also understand the Plaintiffs now claim that Oracle inflated its revenue

28    during Q2 2001 by transferring payments from its unapplied cash account to its bad debt reserve

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   account.  At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial

2   results, I had no knowledge of any transfer of payments from an unapplied cash account to a bad

3   debt reserve account.  I only became aware of these alleged accounting issues in connection with

4   this litigation.

5           30.     I understand the Plaintiffs have claimed that Oracle improperly recognized

6   approximately $20 million in revenue in connection with a software license transaction with

7   Hewlett-Packard at the end of Q2 2001.  At the time of the transaction and when Oracle reported

8   its Q2 2001 results, I was not aware of any reason why Oracle should not recognize any revenue

9   relating to the license transaction with H-P.  On the contrary, I understood that this transaction

10  had been reviewed by Oracle's internal Revenue Recognition group and its outside, independent

11  auditors, each of whom signed off on the recognition of the revenue.

12          I declare under penalty of perjury under the laws of the State of California that the

13  foregoing is true and correct.  Executed this 19th day of July, 2007, at Redwood City, California.

14

15                               Lawrence J. Ellison

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF LAWRENCE J. ELLISON IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)