LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
        michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
135 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>**DECLARATION OF EDWARD J. SANDERSON, JR. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  N/A<br>Time:  N/A<br>Judge: Hon. Martin J. Jenkins |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF EDWARD J. SANDERSON, JR. IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

I, Edward J. Sanderson, Jr., declare as follows:

1. I submit this declaration in support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication. I have personal knowledge of the facts set forth below and, if called upon, I could and would competently testify thereto.

2. I was actively employed by Oracle Corporation from July 1995 until September 2001. I remained employed by Oracle, but on leave of absence, until April 2002. During Oracle's 2001 fiscal year (and for some time prior to that), I was the Executive Vice President responsible for the Oracle Product Industries ("OPI") and Latin America software licensing sales divisions, and I was responsible for Oracle's Americas Consulting division (Canada, U.S. and Latin America and OPI).

### My Forecasting Process for OPI

3. While I was the Executive Vice President responsible for OPI, I was responsible for providing internal estimates or forecasts of software license revenues for the OPI division. As part of the sales forecasting process for OPI, I conducted regular calls with my Area Vice Presidents ("AVPs"), and occasionally regional managers, to discuss their forecasts and specific deals in the pipeline. I conducted these calls on a bi-weekly basis at the beginning of each quarter, and then held them once a week towards the end of the quarter. For years, I relied on the same method to compile sales information for my meetings and report OPI's weekly sales forecasts to Finance.

4. My AVPs first would conduct individual forecasting calls with their account managers and regional managers. The AVPs then compiled their forecasts with the help of their finance representatives. James English, the designated finance director for OPI, would then compile this information into a weekly Excel spreadsheet for my review. After the forecasts were consolidated, and after receiving input from my AVPs on the calls, I would impose any appropriate judgment, and then provide it to Mr. English to transmit to Jennifer Minton.

5. To provide the forecast for OPI, I used my knowledge of specific deals throughout each quarter based on conversations with the AVPs, the regional managers, and other sales representatives. During my tenure at Oracle, it was not unusual for deals to move in and

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF EDWARD J. SANDERSON, JR. IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

out of the forecast until the last day of every quarter as the conditions surrounding each deal changed. It was not unusual for the sales pipeline to decrease during the quarter and for the forecast to reduce over time as we gained more clarity on the question of whether specific deals would close. It also was not uncommon for deals to slip into the next quarter altogether or be delayed for some period of time.

## Oracle's Q3 2001 Forecasting and Actual Results

6. Going into Oracle's Q3 2001, I was optimistic about Oracle's business. We were selling a new product with robust amounts of new functionality. While Suite 11i encountered problems that would be expected of any new software product of its complexity, Oracle was coming off a record quarter in Q2 2001 and showing strong year-over-year growth. Adding to this optimism was the fact that, in early December 2000, OPI closed a $60 million software license deal with Covisint – the largest applications deal in Oracle's history. This strong early start gave me additional confidence that OPI would meet or exceed its quarterly guidance for Q3 2001.

7. As the quarter progressed, I did not receive any information that caused me to doubt that Oracle would meet its quarterly guidance. As with any quarter, I monitored specific deals in my forecast, conducted regular calls with my AVPs, and spoke with sales representatives. I was satisfied also that the utilization rate of the consultants in Americas was typical for the third quarter of Oracle's fiscal year.

8. Notwithstanding the typical decline in the pipeline during the quarter, as the end of the quarter approached, the pipeline remained strong by historical standards. Up until the last day of the quarter, I believed that the major deals in my forecast would close, and that OPI would meet or exceed its forecasted revenues. I had no reason to believe that Oracle's other major licensing divisions, NAS and OSI, would not achieve their forecasted revenues. I did not become aware that Oracle failed to meet its Q3 2001 earnings projections until the morning of March 1, 2001, when I arrived at work.

### Oracle's Q2 2001 Earnings Results

9. I understand the Plaintiffs in this litigation have alleged that Oracle improperly recognized certain revenue for Q2 2001. I believed the results we reported for Q2 2001 were correct when we reported them (and I still do). I was not aware then (and I am not aware now) of any information indicating that Oracle's Q2 2001 results were incorrect.

10. I understand the Plaintiffs have alleged that Oracle artificially inflated its revenue and reported earnings per share by converting approximately $228 million in customer overpayments to revenue through the creation of and accounting for 46,000-plus "debit memos." At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial results, I had no knowledge of any such "debit memos" or their accounting treatment. I only became aware of these alleged accounting issues in connection with this litigation.

11. I also understand the Plaintiffs now claim that Oracle inflated its revenue during Q2 2001 by transferring payments from its unapplied cash account to its bad debt reserve account. At the time Oracle reported its Q2 2001 financial results and its Q3 2001 financial results, I had no knowledge of any transfer of payments from an unapplied cash account to a bad debt reserve account. I only became aware of these alleged accounting issues in connection with this litigation.

12. I understand the Plaintiffs have claimed that Oracle improperly recognized approximately $20 million in revenue in connection with a software license transaction with Hewlett-Packard at the end of Q2 2001. At the time of the transaction and when Oracle reported its Q2 2001 results, I was not aware of any reason why Oracle should not recognize any revenue relating to the license transaction with H-P.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 19th day of July, 2007, at San Diego, California.

_____
Edward J. Sanderson, Jr.