LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
          michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
  Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
          matt.rawlinson@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Phone: (212) 906-1200
Fax: (212) 751-4864
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ (Consolidated) |
| | CLASS ACTION |
| This Document Relates To: | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| ALL ACTIONS. | |
| | **Date:** **September 26, 2007** **Time:** **2:30 p.m.** **Judge:** **Martin J. Jenkins** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.     LEGAL STANDARD.............................................................................................. 4

III.     ARGUMENT ......................................................................................................... 4

     A.     Plaintiffs Cannot Prove Loss Causation ................................................... 4

         1.     Plaintiffs Cannot Establish That Defendants' Statements Regarding Its 2Q01 Results Caused Plaintiffs' Alleged Damages....................................................................................... 7

         2.     Plaintiffs Cannot Prove Loss Causation With Respect To Defendants' Product-Related Statements .................................... 8

     B.     Plaintiffs Have Failed To Prove The Remaining Elements Of A Section 10(b) Claim Based Upon Any Accounting Theory .............................. 10

         1.     Plaintiffs Have Failed To Demonstrate With Competent Evidence That Defendants Made Any False Or Misleading Statement ............................................................................... 10

         2.     Plaintiffs Have Not Proven That Any Alleged Misstatement In Defendants' 2Q01 Financial Statements Was Material...................... 12

         3.     Plaintiffs Have Not Proven That Defendants Acted With Scienter With Regard To Oracle's 2Q01 Financial Statements ............................................................................... 13

     C.     Plaintiffs Have Failed To Prove The Remaining Elements Of A Section 10(b) Claim Based Upon Statements About Suite 11i........................... 15

         1.     Defendants' Statements About "Pre-Integration" Were True ............................................................................................ 15

             a.     Plaintiffs Have Conceded The Underlying Facts........................ 16

             b.     Plaintiffs' Attacks On Suite 11i's Overall Quality Do Not Undercut Defendants' Statements................................... 18

                 (1)     Oracle's Implementation And Customer Complaints ........................................................................ 19

                 (2)     Purported Lack Of Integration And OM Testing.................................................................. 21

                 (3)     Oracle's Demonstration System ................................... 22

         2.     Defendants' Statements About Language Capabilities Were True ...................................................................................... 23

a.     Plaintiffs Cannot Prove That The February 6, 2001 "Statement" Was Public..................................................23

b.     Defendants' Statements Regarding Suite 11i's Language Capabilities Were True ................................24

D.     Plaintiffs Have Not Proven That Defendants Acted With Scienter In Making Any Alleged Misstatement Regarding Suite 11i................................24

IV.    CONCLUSION..........................................................................................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

## CASES

4
*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)...........................................................................................5, 12

5

6
*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)......................................................................................4, 5, 12

7
*Dura Pharmaceutical, Inc. v. Broudo*,
 544 U.S. 336 (2005)...............................................................................................passim
8

9
*Freeman v. Alta Bates Summit Medical Center Campus*,
 No. C 04-2019 SBA, 2004 WL 2326369 (N.D. Cal. 2004)....................................4

10

11
*Higginbotham v. Baxter Int'l Inc.*,
 No. 06-1312, 2007 WL 2142298 (7th Cir. Jul. 27, 2007).................................. 10

12
*Houghton v. South*,
 965 F.2d 1532 (9th Cir. 1992) ...........................................................................4, 6
13

14
*Howard v. Everex Sys., Inc.*,
 228 F.3d 1057 (9th Cir. 2000) .......................................................................13, 24

15
*In re Cirrus Logic Secs. Litig.*,
 946 F. Supp. 1446 (N.D. Cal. 1996) ................................................................... 23
16

17
*In re Daou Systems, Inc. Sec. Litig.*,
 411 F.3d 1006 (9th Cir. 2005) ....................................................................5, 6, 7, 8
18

19
*In re Gilead Sciences Sec. Litig.*,
 No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893 (N.D. Cal. May 12, 2006)......................7

20

21
*In re Intershop Communs. AG Sec. Litig.*,
 No. C 01-20333 JW, 2003 U.S. Dist. LEXIS 26923 (N.D. Cal. July 23, 2003).................. 13

22
*In re Invision Techs., Inc. Sec. Litig.*,
 No. C 04-03181 MJJ, 2006 U.S. Dist. LEXIS 12166 (N.D. Cal. Jan. 24, 2006)................. 14
23

24
*In re Oracle Corp. Deriv. Litig.*,
 867 A.2d 904 (Del. Ch. 2004).............................................................................. 1

25
*In re Oracle Corp. Deriv. Litig.*,
 872 A.2d 960, No. 18751, 2005 WL 877903 (Del. 2005) ..................................... 1
26

27
*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) .............................................................................. 14
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*In re TECO Energy, Inc. Secs. Litig.*,
   No. 8:04-CV-1948-T-27EAJ, 2006 WL 845161 (M.D. Fla. Mar. 30, 2006) .........................7

*In re Verisign Corp. Secs. Litig.*,
   No. C 02-02270 JW, 2005 WL 2893783 (N.D. Cal. Nov. 2, 2005) .......................................6

*Kassbaum v. Steppenwolf Productions, Inc.*,
   236 F.3d 487 (9th Cir. 2000) .................................................................................4, 5, 12

*Mathews v. Centex Telemanagement, Inc.*,
   No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. June 9, 1994) ....................13

*McCabe v. Ernst & Young LLP*,
   No. 06-1318, 2007 WL 2301916 (3d Cir. Jul. 26, 2007)......................................................6

*Northwest Adm'rs, Inc. v. San Bruno Garbage Co., Inc.*,
   No. C-06-4961 MMC, 2007 WL 1703657 (N.D. Cal. Jun. 12, 2007)..............................4, 6

*Nursing Home Pension Fund v. Oracle Corp.*,
   No. C-01-0988-MJJ, 2006 U.S. Dist. Lexis 94470 (N.D. Cal. Dec. 20, 2006) .....................6

*SEC v. Todd*,
   No. 03CV2230 BEN, 2007 U.S. Dist. LEXIS 38985 (S.D. Cal. May 30, 2007) ................13

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers LLP*,
   475 F.3d 824 (7th Cir. 2007) .................................................................................................7

**STATUTES**

Securities Exchange Act of 1934 § 10(b) ..............................................................passim

**RULES**

Fed R. Civ. P. 56(c) .............................................................................................................4

Fed. R. Civ. P. 8 ...................................................................................................................6

N.D. Cal. Local Civil Rule 7-4(a)(5) ...................................................................................4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case arises out of a drop in the price of Oracle's stock following an announcement that Oracle had missed its public guidance for the third quarter of its 2001 fiscal year ("3Q01"). Oracle's forecasting process and the events leading up to the miss were litigated to judgment in a derivative lawsuit filed in the Delaware Court of Chancery just days after this case was filed.  *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904 (Del. Ch. 2004).  In that case, the Chancery Court held that Oracle's two most senior executives (CEO Larry Ellison and then-CFO Jeff Henley) did not possess any material, nonpublic facts suggesting that Oracle would miss its forecast when they sold Oracle stock during 3Q01.  *Id.* at 906, 941-53.  The Chancery Court found that Oracle's internal data fully supported its public guidance, and Oracle's senior management was completely surprised by the miss.  *Id.* at 910-25, 941-52.  Notwithstanding the Chancery Court's thorough and well-reasoned opinion (later affirmed by the Delaware Supreme Court, *In re Oracle Corp. Deriv. Litig.*, 872 A.2d 960 (Table), No. 18751, 2005 WL 877903 (Del. 2005)), Plaintiffs here continue to press the claim that Oracle and its senior executives knew (or were reckless in not knowing) that Oracle would miss its 3Q01 guidance.  Mot. at 4-5, 23-25.  On that basis, Plaintiffs claim that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") when they issued that guidance and affirmed it during the quarter.  *Id.*

Hoping to avoid the result reached in Delaware, Plaintiffs have spent the better part of two and a half years pursuing two additional theories, as to which Plaintiffs now seek "partial summary judgment."  First, Plaintiffs claim Defendants violated Section 10(b) by reporting Oracle's financial results for the *second* quarter of its 2001 fiscal year ("2Q01").  Second, Plaintiffs claim Defendants violated Section 10(b) when they echoed Oracle's basic marketing message for its then-recent release of enterprise applications software, Suite 11i, including principally that the modules of Suite 11i were "pre-integrated" and thus required no "systems integration" to work together.  *See* Plaintiffs' Am. Mot. for Partial Summ. J. ("Mot.") at *passim*. Far from supporting their claims of securities fraud based on these two theories, Plaintiffs' Motion exposes several key failures of proof on Plaintiffs' part, mandating judgment as a matter

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  of law for Defendants, not Plaintiffs. *See* Defs.' Mot. for Summ. J. ("Defs.' MSJ") at 35-48.

2  First, Plaintiffs' motion fails to identify any facts that could support a finding of loss

3  causation under either theory. Instead, Plaintiffs misconstrue Ninth Circuit precedent to require

4  only a showing that Oracle's stock dropped when Oracle revealed its "true financial condition,"

5  without regard to any causal link between that "condition" and the allegedly false or misleading

6  statements about Oracle's 2Q01 results or Suite 11i. Plaintiffs have failed to show any link

7  (much less a proximate causal link) between Oracle's 3Q01 miss and either its 2Q01 results (no

8  portion of which has ever been restated) or Defendants' statements about Suite 11i. Plaintiffs

9  cannot prove that Oracle's stock dropped when the market learned a "truth" that Defendants

10 allegedly concealed through any false statements about Oracle's 2Q01 results or Suite 11i.

11 Each theory also fails because Plaintiffs cannot prove other essential elements of their

12 Section 10(b) claim. With regard to Oracle's 2Q01 results, Plaintiffs essentially have abandoned

13 the "debit memo" claim they first asserted in the Fall of 2002 (and on which the Ninth Circuit

14 relied in reversing this Court's dismissal of the operative complaint). Plaintiffs had claimed that

15 Oracle falsely recognized over $228 million in revenue—in a single day—through the creation

16 of about 46,000 debit memos. However, Plaintiffs' own expert concedes (as Defendants always

17 have maintained) that these debit memos effected offsetting debits and credits, and therefore had

18 no impact on Oracle's reported revenue for 2Q01. Their initial accounting fraud theory proven

19 wrong, Plaintiffs have asserted two entirely new (and unpled) accounting fraud claims, only one

20 of which is the subject of the instant Motion: Plaintiffs now contend that Oracle improperly

21 recognized $20 million of revenue during 2Q01 by improperly transferring certain unapplied

22 customer payments to a bad debt reserve. But like their other theories, Plaintiffs have failed to

23 establish loss causation with respect to the bad debt reserve "claim," and it otherwise fails to

24 meet the material falsity and scienter requirements of a Section 10(b) claim. Plaintiffs have

25 failed completely to prove that Oracle's reported 2Q01 EPS of $0.11 was materially false when

26 made; in fact, the only evidence in the record is that at least some of the $20 million in question

27 was transferred properly or should have been recognized as revenue, and thus did not improperly

28 inflate Oracle's revenues. Moreover, even assuming the entire $20 million improperly inflated

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Oracle's 2Q01 revenue, that amount is immaterial as a matter of law when compared to the

2   $2.66 billion in revenue recognized by Oracle during 2Q01.  Finally, Plaintiffs have adduced no

3   evidence that any of the individual Defendants even was aware of the bad debt transfers when

4   they occurred, much less that those transfers improperly inflated Oracle's 2Q01 revenues.

5          Plaintiffs' Suite 11i theory likewise fails for lack of evidence to prove material falsity or

6   scienter.  Plaintiffs' own experts have conceded the key facts supporting Defendants' statements

7   about Suite 11i—*i.e.*, when compared with separate "best-of-breed" products from different

8   vendors, the modules of Suite 11i were "pre-integrated" and require no post-purchase "systems

9   integration" to work together.  Plaintiffs therefore try to undermine Defendants' statements

10  indirectly by attacking Suite 11i's overall quality, but Plaintiffs' own expert concedes that the

11  factual record does not support any meaningful conclusion about the overall quality of the Suite.

12  At best, Plaintiffs have put forth evidence that Suite 11i had bugs (as all commercial software

13  does), and some small number of customers implementing Suite 11i during 3Q01 complained

14  about various, apparently unrelated issues.  These facts have nothing to do with whether the

15  different modules of the Suite were "pre-integrated" when compared with separate best-of-breed

16  products, or whether the modules of Suite 11i could work together without post-purchase

17  "systems integration."  But even taken at face value, Plaintiffs' "product quality" case fails

18  because they cannot prove that Suite 11i failed to meet any meaningful measure of quality—they

19  cannot show, for example, that Suite 11i's quality was lower than average in the industry, or that

20  Suite 11i's quality was any worse than a comparable best-of-breed system.  Indeed, based on the

21  facts before the Court, it is entirely possible that Suite 11i actually was better than any of the

22  alternatives available to the market.  As such, even if it were possible to show that statements

23  about "pre-integration" were false on the basis of overall product quality, Plaintiffs have not

24  developed the evidence to make such a showing here.  Finally, Plaintiffs have not cited any

25  evidence that the Defendants knew (or were reckless in not knowing) that their statements about

26  Suite 11i were false.  There is simply no evidence that any of the Defendants believed that Suite

27  11i was not "integrated" as compared to best-of-breed products from different vendors.

28         Plaintiffs' Motion clarifies Plaintiffs' claims and their view of the best supporting

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  evidence.  Plaintiffs' best evidence, however, warrants summary adjudication *against* them.

2  **II.    LEGAL STANDARD**

3          As the moving party, Plaintiffs "must come forward with evidence which would entitle

4  [them] to a directed verdict if the evidence went uncontroverted at trial."  *Houghton v. South*,

5  965 F.2d 1532, 1536 (9th Cir. 1992) (internal citation and quotation omitted); *Northwest Adm'rs,*

6  *Inc. v. San Bruno Garbage Co., Inc.*, No. C-06-4961 MMC, 2007 WL 1703657, at *3 (N.D. Cal.

7  Jun. 12, 2007) (a plaintiff moving for summary judgment "must establish beyond peradventure

8  all of the essential elements of [its] claim . . . to warrant judgment in [its] favor.") (internal

9  citation and quotation omitted).  Plaintiffs also must identify the legal authorities that support

10 their entitlement to judgment as a matter of law.  *See* F. R. Civ. P. 56(c); N.D. Cal. Local Civil

11 Rule 7-4(a)(5); *Freeman v. Alta Bates Summit Medical Center Campus*, No. C 04-2019 SBA,

12 2004 WL 2326369, at *6-*7 (N.D. Cal. 2004).  Plaintiffs do not meet these burdens.  They fail to

13 cite any legal authority in support of the falsity, materiality or scienter arguments, and they fail to

14 identify facts to support their claims.  To the contrary, by attempting to put their best case

15 forward, Plaintiffs' Motion has exposed the complete absence of any facts or law that support

16 their fraud claims relating to Oracle's 2Q01 results and product-related statements.  Under such

17 circumstances, a court has the authority to grant summary judgment *against* Plaintiffs unless they

18 identify evidence from which a rational trier of fact could find in their favor on each element of

19 their claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Kassbaum v. Steppenwolf*

20 *Productions, Inc.*, 236 F.3d 487, 494-95 (9th Cir. 2000).

21 **III.    ARGUMENT**

22       **A.    Plaintiffs Cannot Prove Loss Causation**

23          The theories on which Plaintiffs seek partial summary judgment—based on statements

24 about Oracle's 2Q01 results and Suite 11i—reflect a flawed theory of loss causation that ignores

25 the central teaching of *Dura Pharmaceutical, Inc. v. Broudo*, 544 U.S. 336 (2005).  In *Dura*, the

26 Supreme Court held that the element of "loss causation" is met only if a plaintiff proves that a

27 loss arises "as a result" of depreciation caused by the revelation of the fraud.  *Id.* at 344.  It is not

28 enough to show that the stock price was inflated by a prior misstatement or that the loss in some

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   sense "touch[es] upon" the misstatement. *Id.* at 343.  A plaintiff must prove that the revelation

2   of a specific "truth" concealed by the alleged false statements was the "proximate cause" of their

3   loss. *Id.* at 344-46.

4   Here, Plaintiffs claim the market learned "the relevant truth" through Oracle's March 1,

5   2001 announcement that it would miss its 3Q01 guidance.  Plaintiffs thus must prove that some

6   underlying "truth"—a truth concealed by Defendants through their statements about Oracle's

7   2Q01 results and Suite 11i—***caused*** Oracle to miss its 3Q01 guidance.  However, the March 1

8   announcement did not say anything about Oracle's 2Q01 results or Defendants' statements about

9   Suite 11i.  Moreover, Plaintiffs have not presented any other evidence linking Oracle's 3Q01

10  miss to the revelation of some "truth" that Defendants concealed through their statements about

11  Oracle's 2Q01 results or Suite 11i's integration, inter-operability, or quality.  This failure of

12  proof not only requires that Plaintiffs' Motion be denied; it mandates judgment in favor of

13  Defendants. *Celotex*, 477 U.S. at 326; *Kassbaum*, 236 F.3d at 494-95.

14  Perhaps recognizing this absence of proof, Plaintiffs incorrectly cite *In re Daou Systems,*

15  *Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005), for the notion that they need only identify a stock

16  drop following an announcement revealing Oracle's "true financial condition."  *See* Mot. at 23.

17  But nothing in *Daou* supports Plaintiffs' implied argument that they need not prove any

18  connection between the alleged "true financial condition" that was revealed on March 1, 2001,

19  and Defendants' statements about Oracle's 2Q01 results and Suite 11i (nor could it, consistent

20  with *Dura*).[1]  On the contrary, *Daou* requires Plaintiffs to show a causal connection between

21  Defendants' statements and the "true financial condition" revealed on March 1, 2001.  The

22  plaintiffs in *Daou* claimed that Daou issued false financial statements by recognizing revenue

23  prematurely, and that the market learned the truth when the company reported poor financial

24  results that were caused, in part, by the company having prematurely recognized revenue in the

---

[1]  Indeed, because the price of a security reflects all information available to the market about
that security, a stock price decline necessarily reflects *some* information about the company's
"true financial condition."  *See Basic Inc. v. Levinson*, 485 U.S. 224, 248-50 (1988).  Under
*Dura*, however, the question is whether that "true financial condition" reflects the disclosure of
some "truth" that the defendants had concealed from the market through their allegedly false or
misleading statements.  *See Dura*, 544 U.S. at 343-47.  If not, the required causal relationship is
missing.  *Id.*  Plaintiffs' reading of *Daou* would eviscerate this central holding of *Dura*.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

past.  *See Daou,* 411 F.3d at 1026 ("Notably, the TAC alleges that 'Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables—*the direct result of prematurely recognizing revenue.*'").  Because the revelation of Daou's deteriorating financial results, in turn, caused the company's stock price to drop, the Ninth Circuit held that the plaintiffs had adequately pled a causal link between the alleged false statements (prematurely recognized revenue) and the stock price drop.  *Id.*   In so doing, the Ninth Circuit applied the liberal notice pleading standard of Fed. R. Civ. P. 8, and therefore asked only whether the allegations were "sufficient to provide Daou with *some indication* that the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." *Id.* at 1026, 1027-28 (emphasis added).  On a motion for summary judgment, of course, Plaintiffs must do more than give "some indication" of a causal relationship; they must submit evidence conclusively establishing that Defendants' statements about Oracle's 2Q01 results and Suite 11i were materially false, and that Oracle's stock price decline resulted from the disclosure of the underlying "truth."  *See Houghton*, 965 F.2d at 1536; *Northwest Adm'rs*, 2007 WL 1703657, at *3; *McCabe v. Ernst & Young LLP*, No. 06-1318, 2007 WL 2301916, at *14 (3d Cir. Jul. 26, 2007).  Plaintiffs have utterly failed to meet that burden.

Plaintiffs similarly misread this Court's December 20, 2006 Order granting class certification as relieving them of their burden to "connect specific misrepresentations with specific disclosures." Mot. at 24.  In that Order, however, this Court held only that the market may learn the "relevant truth" through some means other than a disclosure explicitly revealing that a prior statement was false.  *Nursing Home Pension Fund v. Oracle Corp.*, No. C-01-0988-MJJ, 2006 U.S. Dist. Lexis 94470, at *35 (N.D. Cal. Dec. 20, 2006).  Nothing in the decision suggests that Plaintiffs need not "connect specific misrepresentations with specific disclosures." Mot. at 24.  To the contrary, absent such a connection, no reasonable trier of fact could conclude, as *Dura* requires, that the stock price declined because the market learned the "relevant truth" about Oracle's 2Q01 results and Suite 11i.  *See, e.g., In re Verisign Corp. Secs. Litig.*, No. C 02-02270 JW, 2005 WL 2893783, at *2, *6 (N.D. Cal. Nov. 2, 2005); *McCabe*, 2007 WL 2301916

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

at *9, *14; *In re TECO Energy, Inc. Secs. Litig.*, No. 8:04-CV-1948-T-27EAJ, 2006 WL 845161, at *1, *3 n.5, *4-5 (M.D. Fla. Mar. 30, 2006).  Plaintiffs cannot prove the required causal link between their loss and Defendants' statements about Oracle's 2Q01 results or Suite 11i.

### 1.    Plaintiffs Cannot Establish That Defendants' Statements Regarding Its 2Q01 Results Caused Plaintiffs' Alleged Damages

There is no evidence that the purported falsity of Defendants' 2Q01 results, based either on the accounting for the debit memos or the bad debt transfers, caused Plaintiffs' alleged loss. As noted above, Plaintiffs must establish that the revelation of Defendants' alleged (but previously undisclosed) fraud caused their economic loss.  *Dura*, 544 U.S. at 338; *see also Daou*, 411 F.3d at 1025; *In re Gilead Sciences Sec. Litig.*, No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893, at *28 (N.D. Cal. May 12, 2006) ("Merely alleging that a misrepresentation caused an inflated purchase price does not, without more, demonstrate loss causation.").

In the March 1, 2001 press release, Defendants announced that Oracle would post sequential EPS declines for the first time in eight years, database growth would be flat or negative, and applications growth would be only two-thirds of what was projected previously. RSAC ¶¶ 17, 74.  In stark contrast to the *Daou* corrective disclosure that causally linked the stock drop to the alleged prior misstatements, Oracle's March 1 disclosure did not say anything about or reveal, either directly or indirectly, that Oracle's 2Q01 financial statements were false or misleading.  *See Gilead*, 2006 U.S. Dist. LEXIS 32894, at *23 (rejecting plaintiffs' argument because it required the court to make an "unreasonable inference" regarding causal link between alleged misstatement and decline in stock price).  Indeed, Oracle *never* has issued a corrective disclosure about the debit memos or the bad debt transfers, nor restated its 2Q01 financial statements.  *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers LLP*, 475 F.3d 824, 843-44 (7th Cir. 2007) (dismissing loss causation argument for failure to allege that truth about the accounting fraud on which plaintiff purportedly relied ever was disclosed).

Although Plaintiffs make a weak attempt to suggest some link between Oracle's 2Q01 financial results and its EPS forecast for 3Q01 (Mot. at 24-25), there is no factual basis for the alleged link—much less evidence compelling the conclusion that Plaintiffs' purported loss was caused by disclosure of the "truth" about Oracle's 2Q01 results.  Indeed, the market knew that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

Oracle did not base its 3Q01 guidance upon its 2Q01 results, but rather, upon a rigorous forecasting process involving a "pipeline" of potential deals.  Ex. 251 at 143487-88;[2] Ex. 252 at 103:6-22;  s*ee also In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 912-14 (Del. Ch. 2004).  Moreover, Mr. Henley testified that his comment regarding Oracle's EPS in the second and third quarters was nothing more than a historical observation and confirmation that Oracle's 3Q01 forecast was reasonable based on prior experience.  Ex. 253 at 343:15-344:2.  Oracle's 3Q01 forecasted EPS could not possibly have been based upon Oracle's reported EPS in 2Q01, since analysts already had projected $0.12 EPS for 3Q01 before Oracle even had announced its 2Q01 financial results. Ex. 254 at Ex. 2.

Plaintiffs have failed to establish any link between the alleged accounting fraud in 2Q01 and the March 1 disclosure.  Plaintiffs have no evidence to demonstrate that the March 1 disclosure dissipated any purported inflation caused by any alleged misstatement in Oracle's 2Q01 financial statements.  At most, Plaintiffs' Motion argues (but clearly does not prove) that Oracle's stock price increased artificially as a result of Oracle's 2Q01 financial results.  Mot. at 25 ("In response to the December 14 results, Oracle's stock price increased from $27.50 on December 14, 2000 to $29.63 on December 15, 2000.").  This is insufficient as a matter of law to establish loss causation.  *See Dura*, 544 U.S. at 347 ("[T]he 'artificially inflated purchase price' is not itself a relevant economic loss."); *Daou*, 411 F.3d at 1026 ("[I]f the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages.").

### 2. Plaintiffs Cannot Prove Loss Causation With Respect To Defendants' Product-Related Statements

Plaintiffs claim that potential customers learned the "truth" about purported Suite 11i problems, and for that reason canceled and delayed purchases of Oracle products, thereby causing Oracle to miss its 3Q01 guidance.  RSAC ¶¶ 6, 11, 54; Ex. 255 at 85.  But Plaintiffs have not identified a single potential customer that canceled or delayed a deal due to alleged

---

[2] Unless otherwise noted, all Exhibits cited herein are true and correct copies of the Exhibits attached to the Declarations filed in support of Defendants' July 26, 2007 Motion for Summary Judgment, the Supplemental Declarations of Mary Ann Anthony (Ex. 248) and Alan J. Fletcher (Exs. 249-50), and the Declaration of Sean P.J. Coyle (Exs. 251-322, 362).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

"problems" with Suite 11i, much less shown that such delays or cancellations actually caused Oracle to miss its 3Q01 guidance.  *See* Mot. at 23-25; Ex. 255 at 85.  Plaintiffs were allowed to serve subpoenas on over 100 Oracle customers—but the information only undercut Plaintiffs' claim.  Ex. 256 at § V.C.; Ex. 257; *see also* Ex. 258 at TIM 000006-7.  It is remarkable that having subpoenaed documents from over 100 Oracle customers, Plaintiffs do not cite a single customer document in support of their claim that Suite 11i problems caused Oracle's 3Q01 miss.

The undisputed facts establish that Oracle's stock drop on March 1, 2001 had nothing to do with Suite 11i, let alone some "truth" about Suite 11i that Defendants had concealed from the market.  *See* Defs.' MSJ at 11-15; 39-43.  In the weeks following Oracle's March 1 announcement, several of Oracle's competitors in the enterprise software business, and dozens of software companies generally, lowered or missed their guidance.  *See* Ex. 259 at ¶ 69 & Ex. 8.  As contemporaneous analyst reports noted, this avalanche of subsequent negative results demonstrated that Oracle's miss was caused by an industry-wide downturn.  *Id.*; *see also* Ex. 214 at 179623; Ex. 40  at 435256-7.  Moreover, in the three months following the revelation of the "truth" (according to Plaintiffs, the three months immediately ***after*** the market learned that Suite 11i was like a "car without wheels"), Oracle sold over $338 million worth of new Suite 11i applications licenses, nearly $100 million more than the quarter before the "truth" allegedly was revealed.  *See* Ex. 260 at 977287; Ex. 27 at 977030.

This evidence is not surprising.  At its core, Plaintiffs' loss causation theory as to Suite 11i is inherently inconsistent with a securities fraud claim.  Plaintiffs claim the "truth" about Suite 11i—some variation of the allegation that Suite 11i suffered from unusually severe quality problems—became so widely known to the public that Oracle's prospective customers decided *en masse* to delay or cancel deals well before the end of 3Q01.  Yet, under Plaintiffs' logic, that very same "truth" remained hidden from the market until March 1, 2001, when Oracle announced its results for the quarter.  The notion that large numbers of customers learned the "truth" about Suite 11i and canceled or delayed deals early in the quarter for that reason, but the market remained ignorant of that very same "truth" until after the end of the quarter, is flatly inconsistent with the efficient market theory underlying Plaintiffs' reliance claim.  *Cf.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*Higginbotham v. Baxter Int'l Inc.*, No. 06-1312, 2007 WL 2142298, at *4 (7th Cir. Jul. 27, 2007) ("If it were enough to demonstrate fraud, then plaintiffs and other investors could have drawn the inference themselves, and the price of Baxter's stock would have declined immediately."). Plaintiffs' own Motion thus makes clear that Plaintiffs cannot establish loss causation with regard to Defendants' statements about Suite 11i.

### B. Plaintiffs Have Failed To Prove The Remaining Elements Of A Section 10(b) Claim Based Upon Any Accounting Theory

Even though Plaintiffs conceded at the class certification hearing in March 2006 that their 2Q01 accounting allegations do not form the basis of an independent Section 10(b) claim, and were asserted only as an attempt to show scienter in connection with the earnings miss in 3Q01 (Ex. 261 at 31:22-33:17), Plaintiffs nonetheless have moved for summary adjudication relating to Oracle's 2Q01 financial results. In addition to their failure to prove loss causation, Plaintiffs have proffered no evidence to support the other requisite elements of a Section 10(b) accounting claim including a false statement, materiality or scienter.

### 1. Plaintiffs Have Failed To Demonstrate With Competent Evidence That Defendants Made Any False Or Misleading Statement

Having abandoned the claim that Oracle falsely recognized $228 million in revenue through the creation of debit memos—the only accounting claim pled in the RSAC—Plaintiffs now argue that Oracle falsely recognized $20 million of revenue during 2Q01 by improperly transferring unapplied customer payments to a bad debt reserve. Plaintiffs contend that Oracle's 2Q01 financial results were misstated and that Oracle's 2Q01 reported EPS of $0.11 was false or misleading. Mot. at 7. But there is a complete failure of proof on Plaintiffs' part regarding this contention. The only evidence in the record is that EPS was $0.11, and Plaintiffs cannot point to any competent evidence to the contrary.

Defendants' accounting expert, J. Duross O'Bryan, is the only witness in this case who has analyzed the bad debt transfers. Mr. O'Bryan explained that of the $10.6 million in transfers upon which discovery focused,[3] at least $2 million was proper when transferred, or previously

---

[3] The discovery orders required Defendants to produce detailed accounting data for transactions that comprised $10.6 million (of the approximately $20 million) in bad debt transfers in 2Q01.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  should have been recorded as revenue.  *See* Ex. 262 at 4, 32-36, 38; Ex. 263 at 136:2-16.  While

2  Plaintiffs theorize that EPS would have been $0.10 if Oracle had not transferred $20 million to

3  bad debt in 2Q01 (Mot. at 7), there is no record evidence to support that theory.  In fact,

4  Plaintiffs' accounting expert admitted that he performed *no* analysis to determine which of the

5  bad debt transfers properly could be recognized as revenue in 2Q01 or, said conversely, which of

6  these transfers indeed were improper and should not have been recognized as revenue.  *See* Ex.

7  264 at 233:21-234:7.  This admission is critical; to the extent that a sufficient number of transfers

8  were appropriate such that Oracle could report EPS of $0.11, the 2Q01 financial statements were

9  not false or misleading.  Thus, there is no evidence whatsoever that the reported EPS of $0.11

10  was wrong.  Indeed, Oracle never has had to restate its 2Q01 financial statements (which were

11  reviewed by two independent auditing firms before and after the allegations made in this case).[4]

12          Accordingly, not only are Plaintiffs not entitled to summary judgment on their accounting

13  claims, but because of their utter failure of proof, Defendants are entitled to summary judgment.

14

---

15  [4] Plaintiffs devote pages of their Motion trying to disguise their new, unpled bad debt transfer "claim" as part of their original debit memo claim pled in the RSAC.  Plaintiffs use nonsensical

16  and misleading language—not used by any current or former Oracle employee—to conflate the bad debt transfers with the debit memos, presumably in an attempt to get around the fact that

17  they never pled the bad debt "claim."  *See*, *e.g.*, Mot. at 6, 9 (referring to "debit memo transfers").  The Court should not be distracted by this.  First, even if Plaintiffs properly had

18  alleged the bad debt transfer "claim," it fails on each essential element of a Section 10(b) claim, as detailed above in Section III.B.

19  Second, Plaintiffs have failed to establish any accounting connection between the debit memos

20  and the bad debt transfers (or the subsequent 2002 "unapplied cash project") that would bear upon whether the bad debt transfers resulted in a false statement in 2Q01.  The debit memos did

21  not effect transfers of unapplied cash into Oracle's bad debt reserve, and Plaintiffs themselves acknowledge that the debit memos did not have any accounting impact.  *See* Ex. 265 at ¶ 5; Ex.

22  266 at 144:3-23; Ex. 263 at 117:6-16; Ex. 264 at 208:22-209:12, 213:11-20, 214:24-215:19, 219:24-220:12.  Moreover, the uncontroverted evidence shows that the 2002 unapplied cash

23  project involved analyzing transfers into Oracle's bad debt reserve that occurred both long before, and long after, 2Q01 and the creation of the 46,000-plus debit memos in November 2000.

24  *See* Ex. 265 at ¶ 27; Ex. 267 at ¶¶ 5, 7, 20; Ex. 262 at 32.  While some of the transactions that were the subject of the 2002 unapplied cash project also include in their respective histories a

25  November 2000 debit memo, this historical lineage does not change the facts that:  (1) the November 2000 debit memos had no financial statement impact; (2) the debit memos did not

26  effect bad debt transfers; (3) the 2002 unapplied cash project did not alter the accounting for the debit memos in any way; and (4) the 2002 unapplied cash project did not bear upon whether the

27  2Q01 bad debt transfers were proper when made.  *See* Ex. 265 at ¶ 28; Ex. 268 at 346:15-22. Plaintiffs' misleading reliance on Ian Hatada (Mot. at 12-13) does not change the analysis, since

28  Mr. Hatada had no personal knowledge of the relevant facts.  *See* Ex. 269 at 384:25-385:4, 382:8-383:15, 383:17-384:13, 435:12-436:1, 437:21-438:17.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*Celotex*, 477 U.S. at 326; *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487, 494-95 (9th Cir. 2000); Defs.' MSJ at 45, 48.

### 2. Plaintiffs Have Not Proven That Any Alleged Misstatement In Defendants' 2Q01 Financial Statements Was Material

Plaintiffs also acknowledge that they must prove that any alleged misstatement was "material." Mot. at 4. The Motion, however, is bereft of competent evidence or any legal authority establishing that the purported overstatement was material; Plaintiffs certainly make no argument suggesting that the $20 million in bad debt transfers in 2Q01 were material to any 3Q01 event. This failure is fatal to Plaintiffs' entire accounting fraud theory. *See Basic*, 485 U.S. at 231-32.

In 2Q01, Oracle reported revenue of $2.66 billion and net income of $622.8 million. *See* Ex. 251 at 143471; Ex. 263 at 98:23-25. Even assuming the entire $20.1 million improperly was transferred to the bad debt reserve during 2Q01, any resulting revenue would constitute less than 1% of Oracle's reported revenue for the quarter. *See* Ex. 262 at 38-39. Plaintiffs assert— without factual or legal support—that the purported overstatement of EPS by $0.01 was material because "Oracle…'beat the street' by a full penny [and]…it allowed Oracle to inflate its 3Q01 earnings forecasts to $0.12 per share[.]" Mot. at 4. This argument is both wrong and irrelevant.

As an initial matter, it is disingenuous for Plaintiffs to suggest that the bad debt transfers helped Oracle "'beat the street' by a full penny." *Id.* The undisputed evidence shows that analysts were well aware of the fact that Oracle rounded its EPS to the nearest penny, and were fully capable of determining Oracle's EPS to the tenth (or even the hundredth) of a cent because Oracle publicly disclosed its total net income and the total number of outstanding shares. *See* Ex. 259 at 52 n.174.[5] Thus, when Oracle announced its EPS of $0.11 for 2Q01, analysts easily could have determined whether this figure represented EPS of $0.114 that had been rounded down, or EPS of $0.105 that had been rounded up. Accordingly, even if Plaintiffs could show that the full $20 million was transferred improperly—which they cannot—the impact of the bad debt transfers on EPS was only two-tenths of a cent. *See* Ex. 262 at 37-38.

---

[5] Plaintiffs' expert conceded that under generally accepted accounting principles ("GAAP"), large companies commonly round up EPS to the nearest cent. *See* Ex. 264 at 127:7-11.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    Moreover, Plaintiffs cannot dispute that the two-tenths of a cent change in EPS was

2    immaterial under GAAP.  Staff Accounting Bulletin 99, the relevant accounting guidance

3    regarding materiality, discusses (among other things) materiality in the context of a company

4    *meeting*, not *beating*, earning expectations.  Here, even Plaintiffs' accounting expert

5    acknowledged that Oracle would have met consensus expectations in 2Q01 even if the bad debt

6    transfers never had occurred.  *See* Ex. 264 at 129:9-18.

7    In any event, courts in the Ninth Circuit routinely have held that alleged misstatements of

8    reported revenue and EPS of a similar magnitude are immaterial as a matter of law.  *See, e.g.,*

9    *SEC v. Todd*, No. 03CV2230 BEN, 2007 U.S. Dist. LEXIS 38985, at *13-14 (S.D. Cal. May 30,

10   2007) ("The idea that a transaction becomes qualitatively material because it boosts EPS by a

11   penny…opens a materiality minefield."); *In re Intershop Communs. AG Sec. Litig.*, No. C 01-

12   20333 JW, 2003 U.S. Dist. LEXIS 26923, at *16 (N.D. Cal. July 23, 2003) (finding immaterial a

13   claimed overstatement of revenues of "less than two percent"); *Mathews v. Centex*

14   *Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895, at *18 (N.D. Cal.

15   June 9, 1994) (noting that transactions "under one or two percent of net operating revenues" and

16   a variation in EPS from $0.15 to $0.14 were immaterial).  Plaintiffs' discussion of materiality is

17   cursory and unsupported, and Plaintiffs have failed to meet their heavy burden of proving that

18   any alleged misstatement in Oracle's 2Q01 financial statements was material.  For this additional

19   reason, the Motion should be denied.

### 3.    Plaintiffs Have Not Proven That Defendants Acted With Scienter With Regard To Oracle's 2Q01 Financial Statements

21   It is not sufficient for Plaintiffs merely to suggest that Defendants made a material false

22   statement; Plaintiffs also must demonstrate affirmatively that any material false statement was

23   made with the requisite scienter.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir.

24   2000).  In order to establish scienter, Plaintiffs must prove knowledge of falsity or recklessness.

25   *See id.* (defining recklessness as "not merely simple, or even inexcusable negligence, but an

26   extreme departure from the standards of ordinary care, and which presents a danger of

27   misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

28   must have been aware of it.") (internal quotations and citations omitted).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   In this case, each of the individually-named Defendants has submitted an affidavit

2   affirming that he had no contemporaneous knowledge of the 2Q01 transfers into Oracle's bad

3   debt reserve. *See* Ellison Decl. at ¶¶ 27, 29; Henley Decl. at ¶¶ 17, 19; Sanderson Decl. at ¶¶ 9,

4   11. Each Defendant has affirmed that he had no reason to believe that Oracle's 2Q01 financial

5   statements were false or misleading when they were reported, and that he did not believe they

6   should be restated. *Id.* Plaintiffs cannot overcome this evidence. They failed to ask Messrs.

7   Ellison or Sanderson a single question about the bad debt transfers during their multi-day

8   depositions. The one individual Defendant Plaintiffs questioned on these issues, Mr. Henley,

9   testified unequivocally that he did not know about the bad debt reserve transfers until Fall 2002.

10  *See* Ex. 253 at 451:1-452:5.

11   The other evidence Plaintiffs cite cannot establish scienter because it relates to the 2002

12  unapplied cash project, which occurred years after the alleged false statements were made. *See*

13  *In re Invision Techs., Inc. Sec. Litig.*, No. C 04-03181 MJJ, 2006 U.S. Dist. LEXIS 12166, at

14  *14-15 (N.D. Cal. Jan. 24, 2006) (a plaintiff must prove that the defendants knew the alleged

15  misstatements were "untrue or misleading at the time they were made."). Such "fraud by

16  hindsight" arguments cannot establish Section 10(b) liability. *See In re Silicon Graphics, Inc.*

17  *Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). For instance, referencing his deposition

18  testimony, Plaintiffs assert in their Motion that Mr. Henley was aware "the [unapplied cash]

19  problem" when he first joined Oracle and that Oracle's alleged "misconduct during 2Q01 was

20  'repeating sins of the past.'" Mot. at 7. This evidence does not establish scienter. Mr. Henley

21  merely was describing his reaction when he first learned about the 2Q01 accounting issues *in*

22  *Fall 2002*, two years after the bad debt transfers were made and Oracle issued its 2Q01 financial

23  statements. *See* Ex. 253 at 463:6-466:3. Moreover, as Plaintiffs acknowledge in their Motion

24  (Mot. at 7), the "problem" to which Mr. Henley referred was the increasing balance of unapplied

25  cash, *not* the bad debt transfers. *Id.* There is no logical or evidentiary connection between the

26  balance of unapplied cash and any purported accounting error or financial misstatement. Thus,

27  Mr. Henley's testimony does not demonstrate any recklessness or knowledge by Mr. Henley

28  regarding improper accounting by Oracle in 2Q01.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   Plaintiffs' contention that Jennifer Minton's statements about her role in the 2002 Clean

2   Up were "false" similarly does not demonstrate scienter.  *See* Mot. at 13-14.  Nothing about her

3   testimony suggests that she (or anyone else) knew that the 2Q01 financial statements were false

4   or misleading when made.  Although Plaintiffs do not like Ms. Minton's clarifying testimony

5   that she did recall "becom[ing] aware of the results of the investigation" in 2002 and that "there

6   was not a material impact on [Oracle's 2001] financial statements" (Ex. 270 at 278:15-279:20), it

7   proves nothing about scienter or Ms. Minton's knowledge of events in Fall 2000.

8   Plaintiffs' other attempts to demonstrate scienter miss the mark.  For example, Plaintiffs

9   contend that "Oracle knew about the fraudulent $20 million in transfers prior to its earnings

10  announcement on December 14, 2000."  Mot. at 8.  In support of this contention, however,

11  Plaintiffs cite documents dated in 2004 that have nothing to do with the 2Q01 transfers or

12  Oracle's financial statements, and testimony from collections personnel regarding unrelated

13  quarter-end adjustments.  *Id.* at 8-9.  Plaintiffs fail to explain how any of this evidence

14  establishes scienter with respect to the 2Q01 financial statements.  Plaintiffs also claim that the

15  timing of certain "Upside Reports" demonstrates that "Oracle knew that it did not and could not

16  beat Wall Street's expectations of $0.10 in 2Q01 without inflating earnings by $20 million or

17  more[.]"  *Id.* at 9.  But like other large public companies, Oracle typically takes several weeks to

18  finalize its financial results from a reporting period before releasing them to the market.  *See* Ex.

19  252 at 28:23-30:4.  Nothing in the cited testimony of Ms. Minton or Thomas Williams—both of

20  whom described the process of "truing up" the bad debt reserve at the end of a reporting

21  period—suggests that any senior officer knew or was reckless in not knowing the alleged falsity

22  of Oracle's 2Q01 financial statements.  Because none of Plaintiffs' evidence is relevant to

23  Defendants' state of mind *as of 2Q01*, Plaintiffs have failed to meet their burden of proving that

24  Defendants acted with scienter with respect to 2Q01 results.

25  **C.    Plaintiffs Have Failed To Prove The Remaining Elements Of A Section 10(b) Claim Based Upon Statements About Suite 11i**

26  **1.    Defendants' Statements About "Pre-Integration" Were True**

27  Plaintiffs challenge three allegedly false statements to the effect that, as compared with

28  separate best-of-breed applications from different vendors, the components of Suite 11i were

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

"pre-integrated," and therefore needed no post-purchase "systems integration" to work together.

Mot. at 2.  Plaintiffs, however, have conceded the key facts underlying these statements.  Thus, instead of challenging this comparison directly, Plaintiffs argue that Suite 11i suffered from "massive" quality problems, which they claim are indirect evidence that Defendants' statements were false or misleading.  This theory fails both conceptually and as a matter of proof.  None of these alleged quality problems has anything to do with the truth of the Defendants' statements comparing Suite 11i to the alternative best-of-breed approach.  And even if they did, Plaintiffs' evidence of "massive" quality problems is wholly anecdotal.  Plaintiffs have failed to put forth any evidence to support a rational conclusion about the overall quality of Suite 11i.  Plaintiffs' attack on the quality of Suite 11i does not prove any of Defendants' statements to be false.

### a.    Plaintiffs Have Conceded The Underlying Facts

Plaintiffs claim that Defendants made false public statements on December 14, 2000, January 9, 2001 and February 21, 2001.  Mot. at 2.  Read in context (as they must be for purposes of a securities fraud claim), each statement compares Suite 11i to the alternative approach of buying separate best-of-breed products from different vendors.  Mr. Ellison's statement during the December 14, 2000 earnings call clearly reflects this comparison:

> Now, these are astounding timeframes, in terms of delivering a comprehensive application automation of very, very large companies.  You know, how can we do it?  We do it because there's no systems integration required.  This is a huge point and is not well understood.  The conventional way of delivering applications, the so-called best-of-breed (approaches) - customer buys applications from several different suppliers.  And after they accumulate those applications and enough pieces are in the garage, they hire - they got the parts.  Now, they had to hire the labor - either Anderson Consulting or IBM - to assemble these parts into a complete and running system.  And in fact, it's really the responsibility of the consuming company of this technology, to make all the pieces work together.  Typically, the cost of (system) integration is five to 10 times the cost of the software.  And it takes years to get those pieces running.  There are (SAP) implementations that cost billions of dollars and taken years and years, and they're still not complete.

> Our approach is radically different.  If you buy the complete E-Business Suite, there is no systems integration required. . . .

> Most of the risk associated with installing these applications has to do with the labor you hire to glue these pieces together.  IBM shows up with a bunch of guys with glue guns, and they're trying to figure out how to attach (Siebel) to (BroadVision) to (Epiphany) to – you know, to Commerce One, to Ariba, to (SAP).  And it's hard, and it's complex.  In fact, IBM is planning a whole new series of ad, emphasizing how complex this is.  And our whole approach is to agree with IBM.  (That it is) an enormously complex process.  And if you're going to go into a process like that, you need to hire IBM or Anderson [sic] Consulting, and you need to have lots and lots of money and lots and lots of time.  And a stomach for risk.  Or, *you can buy our complete E-Business Suite, where all the pieces are designed and*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

*engineered to fit together, and no systems integration is required.  It's up and running in months.  You get the savings in months.  It costs you less, and it takes less time to install*.

Ex. 271 at 003224-25 (emphasis on language isolated in Plaintiffs' Motion).  Viewed in context, the meaning of this statement is clear:  the components of Suite 11i were pre-integrated in a way that best-of-breed alternatives were not and, as a result, no systems integration was required for the components of the Suite to work together.  *Id.* at 003224-25, 003237; *accord* Ex. 272 at 2-8, 14; *see also* Ex 273 at 132:23-133:17; Ex. 274 at 64:4-13; Ex. 275 at 191:13-192:1; Ex. 276 at 230:18-232:15; Ex. 271 at 003224; Ex. 277 at 106690; Ex 273 at 69:7-70:4; Ex. 278 at 33:21-34:7, 48:2-49:5; Ex. 279 at 139:17-140:17; Ex. 280 at 40:12-41:10; Ex. 281 at 465:12-466:15; Ex. 282 at ¶¶ 60-61, 126; Ex. 283 at 035470; Ex. 284 at 009891.  Each of the other challenged statements is to the same effect.  *See* Ex. 283 at 035471; Ex. 285 at 306999-7001.

Though Plaintiffs contend that the statements are false and misleading, Plaintiffs' expert, Brooks Hilliard, does not deny that Suite 11i was, as Ellison claimed, "designed and engineered" to work together.  Ex 286 at 156:11-157:22.  Rather, Plaintiffs' expert admitted that Suite 11i was architecturally integrated in a manner that best-of-breed products were not.  Ex. 286 at 143:25-144:23, 156:11-20.  He also admitted that without systems integration, best-of-breed products are completely unintegrated and cannot work together in any sense.  *Id.* at 143:25-144:23.  On the contrary, with respect to Suite 11i, Hilliard opined that systems integration was not required to make the various pieces of Suite 11i work together, but was only necessary if a customer decided to integrate Suite 11i with third party or legacy software applications.  *Id.* at 225:16-228:9; *see also* Ex. 287 at 296295.  Plaintiffs also concede the key issue with respect to Oracle's claim that Suite 11i was a "complete" suite of solutions, that is, Suite 11i was the first "suite" to automate a broad array of both back-office (ERP) and front-office (CRM) functions.  *Id.* at 234:5-24; *see also* Ellison Decl. ¶¶ 15-16.

In other words, though Plaintiffs continue to assert that the statements were false, their expert conceded the truth of the comparative claims ***actually contained in the statements.***  *See, e.g., id.* at 99:3-6.   Indeed, he viewed each as so self-evidently true that he did not believe it was necessary to undertake any technical analysis of Suite 11i to confirm them.  *Id.* at 149:9-20; Ex.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

288 at § 3.1, p. 6; *see also* Ex. 286 at 143:25-144:23;156:11-20; 225:16-228:9; 157:24-158:4.

### b. Plaintiffs' Attacks On Suite 11i's Overall Quality Do Not Undercut Defendants' Statements

Having conceded these underlying facts, Plaintiffs try to indirectly undermine the statements by attacking the overall quality of Suite 11i. Mot. at §§ III.C, E-G. To that end, Plaintiffs have gathered every negative statement they can find in the record about Suite 11i, most of them completely unrelated to one another. This effort fails for two reasons. First, as a conceptual matter, the quality of Suite 11i is fundamentally irrelevant to the question of whether, as compared with separate best-of-breed products from different vendors, the modules of Suite 11i were "pre-integrated" (*i.e.*, the challenged statements). Second, even if it were theoretically possible to undermine this comparison by attacking the overall quality of Suite 11i, Plaintiffs have utterly failed to produce any evidence from which one could draw any meaningful conclusion about the overall quality of the Suite, let alone to establish that these problems rendered Defendants' statements false or misleading, or caused Oracle's miss.

Defendants' statements did not claim that Suite 11i met any particular quality standard. They did not speak to quality at all. Instead, they offered Suite 11i as an alternative strategy for customers buying applications from separate vendors and paying consultants to write custom code to "stitch" them together. Regardless of whether Suite 11i's overall quality was above or below average, regardless of whether Suite 11i met some undefined quality standard, the comparison Defendants drew between Suite 11i and the best-of-breed alternative was true, and Plaintiffs have conceded as much—separate best-of-breed products could not work together without expensive "systems integration," whereas the different Suite 11i modules did not require "systems integration" to work together. Plaintiffs' attacks on the overall quality of Suite 11i are simply not relevant.

Moreover, even if the overall quality of Suite 11i were relevant to the question of whether Suite 11i was "pre-integrated" when compared to best-of-breed products, the factual record here does not support any meaningful conclusions about the overall quality of the Suite. Enterprise business software is the most complex commercial software ever created, and it typically ships with hundreds of thousands of "bugs" including about 1,000 "high-severity" defects (which can

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

prevent the system from functioning at all) and 20,000 medium-severity defects (which can prevent the customer from using one or more features, but do not shut down the whole system). Ex. 282 at ¶¶ 81-93; Defs.' MSJ at 31-32; Defs.' Mot. to Excl. Hilliard Decl. and Test. at 8-9; Defs.' Opp. to Mot. to Excl. Yourdon Test. at 4-5; Ellison Decl. ¶ 17; Shaw Decl. ¶¶ 6-7, 9. Implementing  this type of software can result in short term disruption of operations and lost revenue; delayed implementations are common; and even "failed" implementations are hardly unknown.  *See* Hilliard Daubert Mot. at 8:13-17, 8 n.6 & Exs. 11, 21-22; *see also* Ex. 282 at ¶ 98; Ellison Decl. ¶¶ 18-19; Shaw Decl. ¶¶ 6-7, 9.

Plaintiffs' argument that Suite 11i suffered from "massive" quality problems rests entirely on ignoring this context.  Instead, Plaintiffs take facts that are indisputably commonplace in the context of business applications—such as customer complaints (which may or may not reflect the facts on the ground), difficult or delayed implementations, and the existence of software bugs—and attempt to portray them as "massive" quality problems.  Completely absent from Plaintiffs' submission is any evidence that Suite 11i's quality was poor when measured against meaningful benchmarks or comparable products, or that Suite 11i has ***more of these sorts of problems*** than other business enterprise software.  Thus, the "facts" Plaintiffs cite in support of their attack on Suite 11i's overall quality (each of which is discussed below): (i) do not render Defendants' statements about Suite 11i materially false or misleading; (ii) do not prove anything meaningful about the overall quality of Suite 11i; and (iii) as discussed above, are not linked in any way to lost sales during 3Q01, let alone Oracle's 3Q01 earnings miss.

### (1)     Oracle's Implementation And Customer Complaints

Plaintiffs' discussion of Oracle's own Suite 11i implementation illustrates this fundamental failure of proof.  Plaintiffs assert, as if it were meaningful, that Oracle's upgrade to Suite 11i "shut down the company for two weeks" over the Christmas and New Year's holidays. Mot. at 19.  This vague statement appears to be based on a hearsay quote in the book *Softwar* and attributed to Mark Barrenechea.  Implementations of this scale and complexity typically lead to work interruptions, a phenomenon well known in the industry.  Ex. 289 at 349:23-350:5; Ex. 290 at 249:17-250:7; Ex. 291 at ¶ 211; *see also* Ex. 292, at 271764-65, 70 ; Ex. 293; Ex. 294.  Ellison

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   confirmed that Oracle planned for downtime in advance (Ex. 289 at 348:11-25) and that, "even

2   when we were down, we had ways to work around the system and place orders." *Id.* at 349:19-

3   21. Plaintiffs offer no evidence suggesting that Oracle suffered more downtime than one would

4   expect in connection with the implementation of a major software system.

5          Plaintiffs' citation to Liberty Mutual as a customer whose experience demonstrated that

6   Suite 11i was "a product that does not work" is to similar effect. Mot. at 15-16. Plaintiffs make

7   no effort to prove what actually caused the issues raised in this or other implementations, or that

8   they were out of the ordinary for applications software, and certainly have not shown that

9   problems were caused by a lack of integration in the software. Ex. 295 at 85:9-11, 266:9-267:5;

10  *see also* Ex. 296 at 1028759; Ex. 248 at 131164; Ex. 297 at 418745; Ex. 295 at 167:9-168:4.

11  This is not surprising: Plaintiffs' own experts have conceded that issues other than software

12  defects can cause the kinds of problems customers routinely report, and therefore, evidence of

13  problems encountered by individual customers like Liberty Mutual (or even Oracle) simply are

14  not evidence of poor software quality. Ex. 286 at 88:4-9, 91:25-92:3; Ex. 298 at 83:24-84:24,

15  86:9-14; *see also* Shaw Decl. ¶¶ 7-8; Fletcher Decl. ¶¶ 22-28.

16         Plaintiffs' evidence of concessions is likewise irrelevant. In any given quarter, with

17  mature as well as new releases, some customers will claim to be dissatisfied, and some of them,

18  in turn, will demand concessions of some kind. *See* Ex. 299 at 81:13-22; Ex. 300 at 157:4-13,

19  166:24-167:25; Ex. 301 at 120:25-121:5, 161:9-15; Ex. 302 at 120:19-121:8, 209:2-213:15; Ex.

20  276 at 133:10-11, 290:1-21; Ex. 303 at 180:21-181:22; Shaw Decl. ¶¶ 10-11. There is no

21  evidence that concessions granted in connection with the Suite 11i roll-out were greater than

22  those typically offered by Oracle or other software companies during a major rollout. *See, e.g.,*

23  Ex. 299 at 128:8-22, 184:16-185:12.[6]

24

25

26  _____

    [6] Oracle's concessions in fiscal year 2000 (when customers were implementing a mature Release 11) were essentially identical as a proportion of new applications license revenue to concessions

27  in fiscal 2001 (when 11i was released). *See* Mot. at 17; Pls.' Ex. 63 at 159568; Ex. 303 at 143967. Moreover, Oracle's operating margins improved both from 3Q00 to 3Q01 (Ex. 304 at

28  140858) and from FY2000 to FY2001 (Ex. 303 at 143941). Thus, any concessions (which represent increased expenses) granted by Oracle are immaterial.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

### (2)     Purported Lack Of Integration And OM Testing

Citing a dearth of evidence in the record, Plaintiffs also claim that Oracle (i) performed little or no testing of the integration between ERP and CRM modules, and (ii) never tested its Order Management module at all.  Mot. at 20-22.  As an initial matter, the point Plaintiffs attempt to prove (that Suite 11i should have had more integration testing prior to release) is irrelevant to the claims made by Oracle about the advantages of its Suite over the best-of-breed approach.  Given its irrelevance to the asserted claims, it is unsurprising that there is limited evidence of Suite 11i testing in the record, since neither the Discovery Plan nor any other order required production of documents regarding such testing.  *See, e.g.,* Ex. 256 at I.C.2.[7]

Plaintiffs' claim is inaccurate in any event.  Unambiguous—and uncontroverted—evidence demonstrates that Oracle performed substantial integration testing prior to Suite 11i's release.  *See* Fletcher Decl. ¶¶ 8-12; Ex. 306 at 157:20-158:1; *accord* Ex. 307 at 174:21-177:4; Ex. 308 at 25:1-19; Ex. 279 at 67:7-21; Ex. 309 at 125:13-129:14; Ex. 299 at 95:2-23, 103:16-104:13.  None of the evidence identified by Plaintiffs contradicts or undercuts this claim.  Plaintiffs cite testimony from Gregory Seiden, Oracle's former Vice President of Applications Integration, to argue that the validation by Seiden was the only integration testing performed.  Mot. at 20, n.28.  But as Seiden testified, his group served only as an "audit function" of (and not a substitute for) the extensive integration and other testing done by the development groups.  Ex. 273 at 26:7-28:5, 153:12-154:14, 263:19-264:5; *see also* Seiden Decl. ¶¶ 4-9; Fletcher Decl. ¶¶ 14-15; Ex 306 at 157:20-158:1.  Plaintiffs similarly mischaracterize Suite 11i's post-release testing.  The very witness Plaintiffs rely upon for the proposition that no post-release integration testing occurred, however, described at length that such testing did occur.[8]

---

[7] In any event, any purported lack of evidence is the product of Plaintiffs' strategic decision not to ask Oracle witnesses whom Plaintiffs deposed about the testing at issue in the Motion, including a vast majority of the senior employees in Oracle's development group at the time (*e.g.*, Ronald Wohl, Mark Barrenechea, Clifford Godwin, Alan Fletcher and Joel Summers).

[8] Plaintiffs disregard former SVP of Manufacturing, Supply Chain Products Don Klaiss' explanation of the very emails they cite as proof that no pre- or post-release integration testing of 11i occurred.  Mot. at 22; Pls. Ex. 68.  Klaiss testified that: (i) the emails refer solely to *post-release patch testing*, and (ii) while these patches were, indeed, tested for integration, Oracle merely did not have a *centralized testing environment* at that time (which merely would have been more convenient than testing them on separate databases).  Ex. 309 at 167:17-173:17;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    Plaintiffs' specific claim that Suite 11i performed *no testing whatsoever* on its new OM

2    module is similarly unsupported.  Despite two years of discovery, this assertion is based solely

3    on a quote attributed to Ellison in *Softwar*, which is, at best, hearsay and inadmissible.  Mot. at

4    21.  In any event, as is apparent from the context, Ellison merely indicated that OM was untested

5    in the sense that it was brand new and had been completely re-written; it had not been sold to

6    customers before Suite 11i's release.  He did not say, nor suggest, that no pre-release testing was

7    done on the module—even the excerpt quoted by Plaintiffs reflects that testing occurred.  Mot. at

8    21; Pls.' Ex. 95.  Indeed, the record makes clear that the OM module was tested before its

9    release.  Ex. 309 at 47:20-48:1, 61:21-62:4, 82:15-83:4; Ex. 273 at 180:3-12; Ex. 310 at 91:11-

10   92:3.

11                    **(3)    Oracle's Demonstration System**

12   Plaintiffs also cite internal Oracle documents discussing problems with Oracle's

13   demonstration system.  Mot. at 14.  But the undisputed evidence shows that the problems with

14   Oracle's demonstration environment—that is, the new hardware configuration Oracle used to

15   demonstrate Suite 11i to customers remotely over the Internet (Ex. 299 at 221:17-24; Ex. 308 at

16   65:19-25)—had nothing to do with any defects or problems in the software itself.  *See* Ex. 308 at

17   123:13-124:2, 152:13-153:15; Ex. 311 at 206:22-207:14.  When Suite 11i was released, Oracle's

18   CRM products (and even some ERP modules, such as Order Management) were brand new, and

19   could not immediately be loaded onto Oracle's existing ERP demonstration system (the "ADS

20   Master").  Ex. 308 at 66:19-67:4, 68:21-69:8, 70:24-71:13, 93:6-18, 133:16-135:11, 143:21-

21   145:10; Ex. 312 at 117:17-118:6; Ex. 276 at 80:9-81:10, 173:13-175:8, 213:5-215:9; Ex. 273 at

22   197:10-198:7.  Instead, each application had to be loaded on numerous, small servers called a

23   "Mini ADS " (Ex. 311 at 53:3-25, 88:18-89:14, 133:4-134:3; Ex. 308 at 152:13-153:15, 196:15-

24   197:9, 207:23-209:13)*,* and some Oracle salespeople complained that difficulties caused by the

25   separate server environments hampered their efforts to *show* the Suite's integrated nature.  Ex.

26   276 at 78:2-81:10, 219:1-220:13; Ex. 308 at 89:11-25; Ex. 311 at 118:19-119:12, 143:22-144:11;

27

28   *compare also* Mot. at 21; Pls.' Ex. 21 *with* Ex. 313 at 165:23-166:22, Fletcher Decl. ¶¶ 22-28
     *and* Ex. 298 at 97:9-21.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  *see also* Mot. at 14 (and evidence cited).  But these problems had nothing to do with the

2  integration among the different applications of the Suite when installed, as a customer would

3  install them, on a single hardware environment.  Ex. 308 at 123:13-124:2; 152:13-153:15; *see*

4  *also* Ex. 311 at 118:19-119:12; 206:22-207:14; Ex. 276 at 86:23-87:24, 211:24-213:4; Ex. 312 at

5  156:20-157:2, 170:1-15.  Plaintiffs cannot prove that statements about **Suite 11i software** were

6  false (much less comparisons of Suite 11i with best-of-breed software) through reference to

7  evidence of problems caused by the demonstration environment rather than the software.

8      As with the other "evidence" Plaintiffs cite to attack the quality of Suite 11i, issues with

9  Oracle's demonstration environment (i) do not render any of Defendants' statements false;[9] (ii)

10  do not support any reasonable conclusion about the overall quality of the Suite; and (iii) are not

11  linked to any lost sales during 3Q01, much less Oracle's failure to meet its quarterly guidance.[10]

12      **2.**    **Defendants' Statements About Language Capabilities Were True**

13      Plaintiffs also claim two statements regarding Suite 11i's language capabilities were false

14  because "Suite 11i did ***not work*** in every language, nor every major language."  Mot. at 17.  As

15  described below, one statement was not even public, and both were clearly accurate.

16      **a.**    **Plaintiffs Cannot Prove That The February 6, 2001 "Statement" Was Public**

17      In a fraud on the market case, only a public statement can support Section 10(b) liability.

18  *In re Cirrus Logic Secs. Litig.*, 946 F. Supp. 1446, 1468 (N.D. Cal. 1996).  Here, Plaintiffs claim

19  Defendants misrepresented Suite 11i's language capabilities in a February 6, 2001 "white paper,"

20  but cannot prove the statement was made public during the Class Period.  Mot. at 4, 38.  On its

21  face, the document cites an analyst report published on March 5, 2001, making clear that the

22

---

23  [9] Not only do Plaintiffs fail to prove that any of the challenged statements were false, they do not

24  even attempt to show they were *materially* false.  Plaintiffs ignore a host of previously public information that closely tracks the "facts" upon which they base their claim, and make no attempt to distinguish this public  information from the "truth" (*see* Defs.' MSJ at 19-20, 41-42),

25  or to identify specific evidence that any differences between the two were viewed as material by the market.  To the contrary, despite Plaintiffs' claim of a mammoth fraud underlying Oracle's

26  basic marketing message for Suite 11i, Plaintiffs cite no evidence of a market or customer reaction to the revelation of the alleged "truth."

27  [10] Setting aside the fact that problems with Oracle's demonstration environment are irrelevant to

28  the truth of Defendants' statements, Plaintiffs have cited absolutely no evidence that demo issues caused Oracle to lose any sales that otherwise would have closed during 3Q01, let alone that such lost sales were a substantial factor in causing Oracle to miss its guidance for that quarter.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

white paper could not have been published before then.  *See* Pls.' Ex. 46 at 106728.  Ample other evidence confirms that the "statement" was published for the first time, if at all, in 4Q01, and not during the Class Period.  *See, e.g.,* Ex. 316 at 181352; *see also* Ex. 317; Ex. 318; Ex. 319; Ex. 320 at 062031; Coyle Decl. ¶ 69; Ex. 307 at 161:12-24; Ex. 321 at 26.[11]

### b.   Defendants' Statements Regarding Suite 11i's Language Capabilities Were True

The remaining language-related statement challenged by Plaintiffs is a February 13, 2001 assertion by Sandy Sanderson that 11i was "written in 23 different languages" and covered "the localization requirements of all these countries around the world."  Mot. at 2.  Suite 11i was, in fact, written in more than 23 different languages (Seiden Decl. ¶¶ 10-15; Ex. 322 at 143834) and, because Suite 11i was written in Unicode (unlike its predecessor applications), it had the fundamental design capability to work in any number of supported languages.  *See* Ex. 249 at 25-32; Ex. 250 at 617634; Ex. 278.  The existence of bugs in user interface translations, and the staged release of language translation patches (Mot. at 17-18) do not render statements about Suite 11i's language capabilities materially false, much less prove anything about the overall quality of the Suite or the reasons for Oracle's 3Q01 miss.  *See* Section III.C(1)(b), *supra.*

### D.   Plaintiffs Have Not Proven That Defendants Acted With Scienter In Making Any Alleged Misstatement Regarding Suite 11i

Finally, Plaintiffs have failed to offer any evidence of scienter with respect to the Suite 11i-related statements.  *Howard*, 228 F.3d at 1063.  Plaintiffs have not cited any evidence that any of the individual Defendants believed Suite 11i's early challenges were out of the ordinary or unexpected for such a massive new release of software, let alone that these issues undercut Oracle's basic marketing message that, as compared with best-of-breed products from different vendors, Suite 11i was "pre-integrated."  *See* Defs.' MSJ at 18-21, 35-42.  Instead, Plaintiffs cite a memo created in 2002 by a handful of Oracle employees (none of whom Plaintiffs chose to depose).  Mot. at 22-23; Pls.' Ex. 79.  The memo, which calls Suite 11i "one of the greatest

---

[11] In any event, Suite 11i did work "in every country, every major language, and every major currency" (Mot. at 2).  *See* Ex. 248; Ex. 249 at 25-32; Ex. 250 at 617634; *see also* Ex. 362. Unlike prior releases, which allowed users only to run applications in one "base language" with a customized solution to run them in any other language, Suite 11i's use of Unicode removed the limitation on the number of supported languages that could be run in one instance, allowing "all characters in common use in all of the world's modern languages."  Ex. 249 at 25.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

achievements in the history of the software industry" (Pls.' Ex. 79 at 069913), discussed various ways in which these employees believed Suite 11i could be improved, including in the *degree* of integration between modules. *See, e.g., id.* at 069925.  Nothing in the memo suggests that the modules of Suite 11i were not "pre-integrated" as compared with best-of-breed products in 2000 and 2001, and nothing in it suggests that any "systems integration" work was required for the modules of Suite 11i to work together.  *See, e.g.,* Ex 306 at 19:13-20:3, 136:19-137:9, 252:3-253:18, 255:14-256:2; Ex. 276 at 319:7-320:13; Ex. 307 at 80:3-81:13, 82:6-83:12; Ex. 290 at 89:5-23.  The writers simply believed the products could work together better.  That a handful of Oracle employees were identifying ways to continue improving the product in 2002 is hardly evidence that any of the Defendants lied when they said, in 2000 and 2001, that the modules of Suite 11i were "pre-integrated" as compared with best-of-breed products.

## IV.  CONCLUSION

For the foregoing reasons (and for the reasons more fully set forth in Defendants' Motion for Summary Judgment), Defendants respectfully request that the Court deny Plaintiffs' Motion, and enter summary judgment in favor of Defendants based on the undisputed facts in the record.

Dated:  August 27, 2007

LATHAM & WATKINS LLP
Peter A. Wald
Michele F. Kyrouz
Jamie L. Wine
Patrick E. Gibbs
Matthew Rawlinson


By:_____/S/_____
Patrick E. Gibbs
Attorneys for Defendants ORACLE
CORPORATION, LAWRENCE J.
ELLISON, JEFFREY O. HENLEY,
and EDWARD J. SANDERSON

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)