IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Certified Copy

In re ORACLE CORPORATION
SECURITIES LITIGATION,

vs.                         Master File No.: C-01-0988-MJJ

This Document Relates To:,

    ALL ACTIONS.

_____/

---oOo---

CONFIDENTIAL

DEPOSITION OF JEFFREY HENLEY

Thursday, November 16, 2006

VOLUME II, Pages 228 - 494

---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:    (415) 321-2301

Reported by
APRIL DAWN HEVEROH, CSR
CSR No. 8759

```
 1   that people would still keep spending on high ROI
 2   projects.  And so at this point, there was no clear
 3   indication that customers were telling us they were
 4   cutting off spending.  They were still saying all of our
 5   sales force and all of the checking was still -- things
 6   are a little soft, but the customers are committed to
 7   buying the software.  So that was kind of what -- but we
 8   kept reading about statements of other people about
 9   their business was getting worse, the economy was
10   getting worse, so I said it's a wild card.  And it all
11   depends on how bad the economy does, ultimately.
12        Q.   When did you start reading statements of other
13   people or hearing statements of other people about their
14   business getting worse?
15        A.   I think we were asked the question in our
16   earnings call in the second quarter.  So in that
17   December 2000 call, we were -- we commented on why did
18   certain companies seem to be softer and we had such a
19   good quarter, which we did.  And our answer was, well,
20   our theory was that we had higher ROI kind of stuff, and
21   so people were maybe starting to ration their budgets a
22   bit, but they were still using our stuff because it had
23   a higher ROI.
24        Q.   Did you take any steps to look at the
25   performance of Oracle any closer than you normally would
```

```
 1   in light of the fact that you were hearing that other
 2   companies were being adversely affected?
 3            MR. LINDSTROM:  Vague and ambiguous.
 4            THE WITNESS:  I sat through all of the weekly
 5   sales calls, and I recall definitely pushing a little
 6   harder on the sales force to sort of say, "Look, I'm
 7   hearing that some of the other companies out there and
 8   other certain segments are softening.  What are you guys
 9   seeing?  Are you seeing your customers starting to back
10   off?"  Whatever.  And I really kind of pressed hard to
11   be sure that there wasn't something that I was missing
12   for the numbers.
13            And the guys were pretty aggressive and
14   standing up and saying, "No, we have gone back to our
15   sales guys.  We're pretty convinced we'll get a normal
16   conversion rate of the business we've got here, and we
17   think things are okay."  For all the reasons I just told
18   you.  I mean, I didn't make up this high ROI thing.
19   This is what I was hearing from customers and from our
20   sales force.
21        Q.  Now, as of the start of the third fiscal
22   quarter, fiscal quarter of '01, was more risk put into
23   the forecast than had been in the forecasts in prior
24   quarters?
25            MR. LINDSTROM:  Vague and ambiguous.
```

```
 1        THE WITNESS:  I don't know.  I mean, Jennifer
 2   Minton did the forecast.  And so it -- I don't recall
 3   whether we tried to factor in additional risks or
 4   whatever.  I think we had a long history of making our
 5   quarters, we had a pretty good sense of how things
 6   converted, and as I testified earlier, I kept pressing
 7   the sales guys to be confident that they thought we
 8   would have sort of normal success rates and so forth.
 9   So that's how we developed the forecast.  And Jennifer
10   Minton regularly made these calls, she regularly tried
11   to assess what everybody was saying and all the numbers
12   and did regular updates to reflect her best thinking of
13   where she thought things stood.
14        MR. SOLOMON:  Q.  So you don't know if more
15   risk was in the forecast in fiscal 3 '01 than earlier,
16   correct?
17        A.   I don't recall her methodology or her thought
18   processes or how she was assigning these things, no.
19        Q.   And what about interactions with Mr. Ellison
20   concerning this; did you talk at all with Mr. Ellison
21   about how much should be -- excuse me.
22             Did you talk with Mr. Ellison about whether or
23   not more risk ought to be placed into the forecast for
24   fiscal 3 '01 than previously?
25        A.   Well, the weekly sales calls that our
```

```
 1   executive committee, Mr. Ellison, was typically there.
 2   So when I was pressing the salespeople, he was
 3   interested in hearing what their response; always, any
 4   quarter, as with Safra Catz and other people. So I
 5   think everyone's job is to listen and try to understand
 6   what's going on with the business and, you know, try to
 7   figure out whether the forecast is right or wrong, or
 8   whatever.
 9       Q.  But again, as to whether or not there was more
10   risk in the fiscal 3 '01 forecast and whether you were
11   aware of it at the time, you don't recall --
12       A.  I don't recall. Again --
13           MR. LINDSTROM: You've answered, twice. You
14   don't recall.
15           THE WITNESS: Okay.
16           (Recess taken from 10:23 to 10:36 A.M.)
17           MR. SOLOMON: I'll have marked as the next
18   exhibit a document produced by the defendants with the
19   control numbers 109482 through 484.
20               (Whereupon, Plaintiff's Exhibit 53 was marked
21               for identification.)
22           MR. SOLOMON:  Q.  You can take as long as you
23   need to take, Mr. Henley, and tell me whether you
24   recognize this.
25       A.  I remember doing a road show.
```

```
 1        Q.   Okay.
 2        A.   With Jim Moore, so this perhaps is a writeup
 3   from that road show.  I'm not sure I remember this
 4   specific document, but I definitely remember meeting
 5   with a number of investors in New York with him.
 6        Q.   Okay.  And you'll see this is dated
 7   October 25th, 2001.
 8        A.   Yes.
 9        Q.   And it talks on the highlights of them hosting
10   Oracle CFO Jeff Henley.  Do you see that?
11        A.   Yes.
12        Q.   And the next bullet point below that says,
13   "Henley reiterated visibility is very weak and that
14   business is likely to worsen in the U.S. and Europe over
15   the near term.  However, the company expects to see a
16   pickup in the domestic economy by spring 2002 and does
17   not believe that Europe will contract as sharply as the
18   U.S."
19             Do you see that?
20        A.   I do see that.
21        Q.   And then if you go over the page to page --
22   with the control No. 109483, page 2 of 3 at the top, and
23   you'll see under "Near term remains cautious," there's
24   an attribution to you.  Halfway down, "Henley stated."
25   Do you see that?  And there's a discussion about
```

```
 1   Do you see that?
 2         A.   Yes.
 3         Q.   Okay.  And were you aware, at or around the
 4   date of this report, of OSI reporting a negative growth
 5   rate in U.S. dollars of 81 percent?
 6         A.   I don't recall.  But as I've previously
 7   testified, the first month of any quarter is not
 8   particularly meaningful.  It tends to be very small.
 9         Q.   But regardless of that comment, you don't
10   recall --
11         A.   I don't recall whether I saw plus 81 or plus
12   or minus 81, or plus 82 later in the column.  I don't
13   recall any of this.
14         Q.   Okay.  Now, it's fair to say, isn't it, that
15   the investing public, as of January 17, 2001, would not
16   know of this negative 81 percent trend reflected here?
17         A.   That's correct.
18         Q.   And the same for Roberts and NAS.  You see
19   there's a negative 24 percent there.  Do you see that?
20         A.   Yes.
21         Q.   And do you see that -- sorry.  You agree that
22   the investing public wouldn't have that information as
23   of the middle of January 2001?
24         A.   That's correct.
25         Q.   And do you remember whether you had that
```

```
 1  information?
 2      A.   Again, I don't recall whether I went through
 3  every line of detail on this report.
 4      Q.   Okay.
 5      A.   So I just don't recall.
 6      Q.   And then under Sanderson and OPI, you see a
 7  positive there of 243 percent.  Do you see that?
 8      A.   Uh-huh.
 9      Q.   And were you aware of that in the middle of
10  January of 2001?
11      A.   I was aware of the Covisint transaction having
12  been concluded.  So I was aware that that created, you
13  know, a big effect for him in that month.
14      Q.   Okay.
15      A.   I don't remember the precise number.
16      Q.   Okay.  Do you know what the -- what that
17  figure would have been if you backed Covisint out?
18      A.   No.  I would have to go look at the document.
19  Offhand, I don't know.
20      Q.   Would it surprise you to learn that it would
21  be in the negative 80 percent or more?
22      A.   It's positive, it's possible, just like
23  252 percent positive in Smith.  I mean, there's all
24  sorts of things in first months of quarters.  You
25  just -- it's not particularly indicative of how your
```

```
 1   quarter will do, as I testified earlier.
 2       Q.   Okay.  It gets more indicative as the quarter
 3   goes, is your testimony; is that right?
 4       A.   I said it's somewhat more indicative after
 5   two quarters, but I said at the end of the day, the real
 6   numbers happen in the third month, and particularly in
 7   the last week of the quarter.  That's what I said
 8   earlier.
 9       Q.   Okay.  Now, if you'll go to the first page,
10   you'll see that there's a reference to, in the first
11   bullet point, to license revenue growth.  Do you see
12   that?
13       A.   Yes.  The first bullet?  Yes.
14       Q.   Yes.  And you'll see the last sentence says,
15   "Excluding Covisint, OPI license revenue growth would
16   have been negative 85 percent."  Do you see that?
17       A.   Yes, I do.
18       Q.   Okay.  Now, did you have anything to do with
19   the creation of this document?
20       A.   No.
21       Q.   Did you discuss this document with anybody
22   around the time you received it?
23       A.   I don't recall.
24       Q.   And did you discuss with anybody, either
25   before the creation of this document or afterwards, the
```

```
 1   exclusion of Covisint to show what rates would have been
 2   applicable without the Covisint deal?
 3           MR. LINDSTROM:  Vague and ambiguous.
 4           THE WITNESS:  Ask the question again.
 5           MR. SOLOMON:  Q.  I guess what I'm trying to
 6   get at is:  Did you talk about why Mr. Garnick backed
 7   out of Covisint to show you that negative 85 percent?
 8       A.  I don't recall, but --
 9           MR. LINDSTROM:  You've answered the question.
10           THE WITNESS:  I don't recall.
11           MR. SOLOMON:  Q.  And do you have an idea as
12   to why he would have done that?
13       A.  I can speculate.
14       Q.  Go ahead.
15       A.  Standard financial analysis at Oracle was to
16   do all kinds of supplemental analysis to try to look at
17   different trends.  So we all knew Covisint was very
18   large, and so I think it's not the only time in our
19   history where we've kind of taken things out and said,
20   "Well, it would have been with and without," and that
21   sort of thing.  So that was the purpose of it.  I think
22   he did it on his own.  It's not something I instructed
23   him to do, but it was a typical analytic technique that
24   we use from time to time.
25       Q.  And you said, just to quote your language, you
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3          I hereby certify that the foregoing is a true
 4     record of the testimony as reported to the best of my
 5     ability by me, a Certified Shorthand Reporter and a
 6     disinterested person, and was thereafter transcribed
 7     under my direction into typewriting by computer.
 8
 9          I FURTHER CERTIFY that I am not interested in
10     the outcome of the said action and not connected with
11     nor related to any of the parties in said action or
12     their respective counsel.
13     Dated: 11-21-06       _____
14                            APRIL DAWN HEVEROH, CSR
                                   CSR NO. 8759
```

Case: In re Oracle Securities Litigation, Master File No. C-01-0988MJJ
Witness: Jeffrey O. Henley
Date: November 16, 2006
Reporter: April Dawn Heveroh, CSR No. 8759

I HAVE READ THE EXAMINATION AS REQUESTED. PLEASE NOTE THE FOLLOWING:

____ No changes need to be made to the transcript.
_X_ Changes listed below.

WITNESS SIGNATURE: Jeffrey C. Henley
DATE SIGNED: 1-5-07

Note: Please check the appropriate column for add (+) or delete (-). If you wish to **add** anything to the deposition, use the **exact** words you want to add. If you wish to **delete** anything from the deposition, please use the **exact** words you want to delete. Thank you.

| Page/Line | + - | | Reason |
|---|---|---|---|
| 238:3 | | Change "knowing what the market did" to "knowing things before the market knew it" | Incomplete |
| 244:17 | | Change "reiteration" to "reiterating" | Grammatical error |
| 253:16 | | Change the period to a comma | Typographical error |
| Passim | | Change "sale site" to "sell side" | Typographical error |
| Passim | | Change "APSWorld" to "Apps World" | Typographical error |
| 273:16 | | Delete "an" | Grammatical error |
| Passim | | Change "Lang" to "Lange" | Typographical error |
| 293:10 | | Change "what the audit committee." to "what the audit committee intended," | Incomplete sentence |
| 299:4 | | Change "whether that detail," to "whether that detail was listed," | Incomplete sentence |
| 300:25 | | Change "we occasionally have" to "we occasionally have them" | Incomplete |
| 302:16 | | Change "time, at the time was Bruce Lang" to "time, Bruce Lange" | Grammatical error |

| Location | Change | Reason |
|---|---|---|
| 316:19 | Change "and" to "at" | Typographical error |
| 329:8 | Change "wouldn't" to "would" | Grammatical error |
| 345:14 | Change "'cause" to "because" | Grammatical error |
| 348:25 | Change "asking about Larry Ellison" to "being asked about Larry Ellison" | Incomplete |
| 359:21 | Change "accounts in" to "accounts division in" | Incomplete |
| 390:3 | Delete "from the previous" | Incorrect preposition |
| 407:2 | Change "Zone" to "Zhone" | Typographical error |
| 407:3 | Change "representative for Baker" to "representative, Baker" | Typographical error |
| 409:16 | Change "management" to "Order management" | Incomplete |
| 409:19 | Change "Oracle management" to "Order management" | Typographical error |
| Passim | Change "1103" to "11.0.3" | Typographical error |
| 415:25 | Change "technology, database" to "technology (database)" | Typographical error |
| 417:23 | Change "So" to "But" | Grammatical error |
| 419:13 | Change "reporting to him" to "reporting to me" | Incorrect |
| 420:20 | Delete "or" | Typographical error |
| 420:23 | Change "anything" to "nothing" | Grammatical error |
| 430:10 | Change "hit his" to "his" | Grammatical error |
| 453:5 | Change "Anderson" to "Andersen" | Typographical error |
| 467:1 | Change "nettting" to "netting" | Typographical error |
| 490:5 | Capitalize Economist | Typographical error |