IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

                Master File No. C-01-0988-MJJ

This Document Relates To:


   ALL ACTIONS.

_____/


---oOo---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN

THURSDAY, JULY 12, 2007


---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:    (415) 321-2301


Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

1  Q. Okay, so let me see if I understand this
2  correctly.
3       So you're saying that in November 2002 or
4  after November 2002 when that sales report was run,
5  there may have been adjustments to Oracle's second
6  quarter results that were issued two years before?
7       MR. GLENNON: Objection; mischaracterizes the
8  testimony, lack of foundation.
9       THE WITNESS: No, I'm not saying that at all.
10      MR. GREENSTEIN: Q. I'm just trying to
11 understand the inconsistency between page 31 of
12 Exhibit 6 and the total on Exhibit 5.
13  A. I don't, as I said, I don't know what the
14 difference is made up of. I don't know the source of
15 971491. I don't know where that information came from,
16 nor do I know what document was used, if it was even the
17 same run that was used in Exhibit 6.
18      I can understand why there might be
19 differences, was my point. But I don't know what they
20 are, and I don't know what the reconciliation of that
21 $800,000 is.
22  Q. But Oracle's second quarter '01 ended on
23 November 30th; correct?
24  A. Correct.
25  Q. So as an auditor, when would -- when would

```
 1   somebody make an adjustment two years later to its
 2   revenue numbers, such that this would occur?
 3           MR. GLENNON:  Objection; lack of foundation,
 4   vague and ambiguous, incomplete hypothetical.
 5           THE WITNESS:  Well, this could have been a
 6   report that was run at the time for 11/17, and there
 7   could have been what are called topside adjustments,
 8   meaning that someone decided that there was an $800,000
 9   reduction in revenue that was appropriate for that day
10   because of subsequent information.
11           So topside adjustments could have very easily
12   been made off of that GL run to that summarized run.
13   There is a lot of reasons it could happen.  I don't know
14   what they are, but there is a lot of accounting reasons
15   that could occur.
16           MR. GREENSTEIN:  Q.  In your opinion, what was
17   the amount of revenue booked at Oracle on November 17th,
18   2000?
19       A.  The document I relied to, I chose the larger
20   of the two just to be conservative.  This shows 10.1.
21   This is actually a lower amount.  I chose to be
22   conservative in my report, and used 10.1.
23       Q.  Do you know what Oracle's total revenue for 2Q
24   '01 was?
25       A.  It was $2.6 billion.
```

| | |
|---|---|
| 1 | Q. Do you know what amount it was for the U.S.? |
| 2 | A. For the U.S.? No, I didn't break out that |
| 3 | component. |
| 4 | MR. GREENSTEIN: Mark this as No. 8. |
| 5 | (Exhibit 8 marked for |
| 6 | identification.) |
| 7 | MR. GREENSTEIN: For the record, NDCA-ORCL |
| 8 | 1895918 through 1895922, it is an August 26th, 2004 |
| 9 | e-mail from Molly Littlefield to Greg Myers and Lilly |
| 10 | Hao, H-a-o. |
| 11 | Q. Let me know when you're finished reviewing it. |
| 12 | A. I'm there, thank you. |
| 13 | Q. Have you seen this document before? |
| 14 | A. I have, yes. |
| 15 | Q. Did you rely on this document in either your |
| 16 | report or your rebuttal report? |
| 17 | A. No. Considered it; didn't rely on. |
| 18 | Q. Page 2, 1895919. In the middle of the page it |
| 19 | is an e-mail from Molly Littlefield to a number of |
| 20 | individuals dated August 4th, 2004. Do you see that? |
| 21 | A. I do. |
| 22 | Q. And it says in the first sentence, "Debit |
| 23 | memos can be very tricky, especially all the ones |
| 24 | created on November 18th, 2000." Do you see that? |
| 25 | A. I do. |

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | A.  I don't recall.  It wasn't material enough.                      |
| 2  | Q.  You don't know what customer it was for?                         |
| 3  | A.  No.                                                              |
| 4  | Q.  How did you find it?                                             |
| 5  | MR. GLENNON:  Objection; asked and answered.                         |
| 6  | THE WITNESS:  I think one of my team members                         |
| 7  | told me about that, Mr. Sheppard.                                    |
| 8  | MR. GREENSTEIN:  Q.  Did he tell you anything                        |
| 9  | else --                                                              |
| 10 | A.  No.                                                              |
| 11 | Q.  -- about how he found it?                                        |
| 12 | A.  No.  It doesn't surprise me.  Out of 46,000 --                   |
| 13 | MR. GLENNON:  Just put an objection to the                           |
| 14 | extent that the communications between Mr. Duross and                |
| 15 | his team are protected under the stip.                               |
| 16 | MR. GREENSTEIN:  Okay.                                               |
| 17 | THE WITNESS:  Sorry.                                                 |
| 18 | MR. GLENNON:  That's all right.                                      |
| 19 | MR. GREENSTEIN:  Q.  What is your                                    |
| 20 | understanding of what a debit memo is?                               |
| 21 | A.  Debit memo is something that would increase an                   |
| 22 | amount owed to a company because of a transaction.  It               |
| 23 | could be a new invoice, could be an adjustment to an                 |
| 24 | invoice.  But it is an increase to an account                        |
| 25 | receivable, basically.                                               |

```
 1        Q.   So were the 46,000 debit memos an increase to
 2   the accounts receivable?
 3             MR. GLENNON:  Objection; vague and ambiguous.
 4             THE WITNESS:  No.  They were an increase and a
 5   decrease to an account.
 6             MR. GREENSTEIN:  Q.  So is that -- that's
 7   inconsistent with what you believe to be the purpose of
 8   a debit memo; correct?
 9             MR. GLENNON:  Objection; vague and ambiguous.
10   Mischaracterizes the testimony.
11             THE WITNESS:  The debit memo was just a
12   process to clear a flag, that's it.  And because of
13   Oracle's accounting system, they had to create a debit
14   to relieve the on-account.  But there was no impact to
15   an individual account or to the overall financial
16   statements.  They were debits in and credits out.
17             MR. GREENSTEIN:  Q.  But the use of debit
18   memos on November 17th was different from the definition
19   that you described; correct?
20        A.   There can be a number -- I mean, I gave you
21   one definition.
22             Another definition would be to use it to clear
23   an on-account flag.
24             MR. GREENSTEIN:  Okay, let's mark this next,
25   9.
```

| | |
|---|---|
| 1 | (Exhibit 9 marked for |
| 2 | identification.) |
| 3 | MR. GREENSTEIN: For the record, this is |
| 4 | NDCA-ORCL 047279 through 048683. It says, "Oracle |
| 5 | Receivables User's Guide." This was previously marked |
| 6 | at Tom Williams' deposition as Exhibit 4. |
| 7 | Q.    Mr. O'Bryan, if you could turn your attention |
| 8 | to page 048665. |
| 9 | A.    I'm there. |
| 10 | Q.    You see it has a definition of debit memos? |
| 11 | A.    I see that. |
| 12 | Q.    Have you seen this document before? |
| 13 | A.    I have, yes. |
| 14 | Q.    And what is it? |
| 15 | A.    This is Oracle Receivables User's Guide, dated |
| 16 | March 1997, Volume I, Release 10SC. |
| 17 | Q.    Okay. Did you rely on this document in |
| 18 | issuing your report? |
| 19 | A.    I certainly considered it. I don't know that |
| 20 | I relied on it. |
| 21 | Q.    And the definition of debit memo there, it |
| 22 | says, "Debit that you assign to your customer for |
| 23 | additional charges that you want to collect." Do you |
| 24 | see that? |
| 25 | A.    I do. |

1  analysis of the remaining $9.5 million in transfers to
2  the bad debt reserve in 2Q '01?
3          MR. GLENNON:  Objection; vague and ambiguous,
4  compound.
5          THE WITNESS:  No.
6          MR. GREENSTEIN:  Q.  With respect to the $10.6
7  million you looked at, the 121 transfers, can you just
8  describe the methodology you used in determining whether
9  those transfers were appropriate?
10     A.   The $10.6 million?
11     Q.   Right.
12     A.   There is a binder I brought with me today that
13  basically summarizes -- what we did was we ran a
14  database that pulled out of the 926 scripts all of those
15  that went from 25005 to 12601.
16          As I said, there was 121, totalling $6.10
17  million.
18          We then printed out script reports, script
19  output reports on each one of those and went through
20  each one of those in detail, and summarized this binder,
21  and as best summarized in a two-page document in front
22  of that binder is really the findings I've laid out with
23  respect to what I believe were appropriately, at least
24  some indication it was appropriate to include those in
25  the second Q '01 as being transferred from 25005 to

```
 1   12601.
 2       Q.   You're talking about -- you found that $2
 3   million was appropriate?
 4       A.   Approximately $2 million.  What I did was I
 5   then matched that.  I found about $2 million, which I
 6   could find some support for in script output, any kind
 7   of notes that were taken from the collectors during that
 8   time frame on the miscellaneous receipts section of
 9   their report.
10            And I then matched that to the document we
11   just talked about, which summarizes the cash transfer
12   project.  And, you know, ours was $2 million.  When I
13   look at the report, it looks like it is at least $5.5
14   million that Oracle had decided was appropriately
15   recognized based into revenue based on that project.  I
16   felt like my number was conservative.
17       Q.   What was the total amount of bad debt
18   transfers that occurred, that Oracle tried to resolve
19   during the 2002 cleanup for all periods?
20            MR. GLENNON:  Objection; vague and ambiguous.
21            THE WITNESS:  I think it was approximately $50
22   million.
23            MR. GREENSTEIN:  Q.  $50 million?
24       A.   Something to that effect.
25       Q.   Could you calculate of that $50 million how
```

|    |    |
|----|----|
| 1  | many items were refunded during the 2002 cleanup? |
| 2  | MR. GLENNON:  Same objection. |
| 3  | THE WITNESS:  No.  Because -- I did with |
| 4  | respect to the second Q.  But, again, the results are a |
| 5  | little bit skewed, because you're about a month off on |
| 6  | one side, maybe a couple months off on the other. |
| 7  | MR. GREENSTEIN:  Q.  So you didn't do any |
| 8  | calculations with respect to -- putting 2Q aside, the |
| 9  | rest of the, what did you say, $50 million? |
| 10 | A.   Might have been $49 million. |
| 11 | Q.   So you didn't do any independent analysis of |
| 12 | those other transfers, did you? |
| 13 | MR. GLENNON:  Objection; vague and ambiguous. |
| 14 | THE WITNESS:  What other transfers? |
| 15 | MR. GREENSTEIN:  Q.  The transfers in other |
| 16 | quarters besides 2Q '01 that were resolved in the 2000 |
| 17 | cleanup. |
| 18 | MR. GLENNON:  Same objection. |
| 19 | THE WITNESS:  I didn't look at other Qs other |
| 20 | than the second Q. |
| 21 | MR. GREENSTEIN:  Q.  Okay.  So going back to |
| 22 | that binder, that is something obviously you relied upon |
| 23 | in doing your calculations in your opening report; |
| 24 | correct? |
| 25 | A.   I did, yes. |

```
 1  this deposition is five.  This is the end of videotape
 2  number five in Volume I in the deposition of J. Duross
 3  O'Bryan.  The original videotapes will be retained by
 4  LiveNote World Service.  We're going off the record.
 5  The time on the monitor is 7:37.
 6                  (Discussion off the record.)
 7          MR. GREENSTEIN:  We just had a discussion off
 8  the record.  Both parties agree that the deposition and
 9  the exhibits should be designated as confidential.
10          MR. GLENNON:  And it is going to get shipped
11  to us for our review in 30 days to review and sign?
12          MR. GREENSTEIN:  Right.
13          (Whereupon, at 7:38 p.m. the deposition of
14  JOHN DUROSS O'BRYAN was adjourned.)
15
16          I declare under penalty of perjury that the
17  foregoing is true and correct.
18
19  Dated: _____   _____
20                                  JOHN DUROSS O'BRYAN
```

```
 1  STATE OF CALIFORNIA      )
 2                           )
 3  COUNTY OF ALAMEDA        )
 4          I, DIANA NOBRIGA, hereby certify that the
 5  witness in the foregoing deposition was by me duly sworn
 6  to testify to the truth, the whole truth, and nothing
 7  but the truth in the within-entitled cause; that said
 8  deposition was taken at the time and place therein
 9  stated; that the testimony of said witness was reported
10  by me, a Certified Shorthand Reporter and disinterested
11  person, and was thereafter transcribed into typewriting,
12  and that the pertinent provisions of the applicable code
13  or rules of civil procedure relating to the notification
14  of the witness and counsel for the parties hereto of the
15  availability of the original transcript of the
16  deposition for reading, correcting and signing have been
17  met.
18          And I further certify that I am not of counsel
19  or attorney for either or any of the parties to said
20  deposition, nor in any way interested in the outcome of
21  the cause named in said action.
22          DATED: 7/16/07
23
24                                    _____
25                                    DIANA NOBRIGA, CSR NO. 7071
```