11-14-02

MAYER, BROWN, ROWE & MAW
Donald M. Falk (SBN 150256)
555 College Avenue
Palo Alto, California 94306
Telephone: (650) 331-2030
Facsimile: (650) 331-2060

MAYER, BROWN, ROWE & MAW
Steven O. Kramer (SBN 79626)
Christopher P. Murphy (SBN 120048)
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
Dorian Daley (SBN 129049)
Lauren G. Segal (SBN 150826)
500 Oracle Parkway
Mailstop 5OP7
Redwood City, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114

Attorneys for Defendant ORACLE CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

IN RE ORACLE CORPORATION SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS.

Case No. C-01-0988-MJJ
(Consolidated)

**DECLARATION OF MICHAEL QUINN**

Date: N/A
Time: N/A
Place: Ctrm. 11
Honorable Martin J. Jenkins, United States District Judge

I, Michael Quinn, declare as follows:

**Introduction**

1. I am Vice President of Americas Revenue Accounting at Oracle Corporation. I have worked at Oracle since June 29, 1998.

2. I make this Declaration in opposition to the Plaintiffs' Ex Parte Application for an Order Directing Oracle to Preserve Evidence and Granting Particularized Discovery.

3. I have personal knowledge of the matters set forth below.

4. In 2000, my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications. As part of that conversion, it was determined that the previous functionality of assigning "on account" notations to unassigned cash receipts, once they were to be applied, was no longer necessary, and it was thus required that all existing "on account" flags that had accumulated in our Unapplied Cash Account (25005) be reversed through a series of offsetting debit/credit transactions within Account 25005, and thus would have no impact on Oracle's financial statements. I assigned Greg Myers, who reported to me, to serve as Project Manager for this project.

5. Earlier this year, I also was personally assigned by Thomas Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collection staff had, over time, assigned to an accounts receivable reserve account known as Account 12601. That project is still ongoing.

6. I immediately want to address the allegation in plaintiffs' Ex Parte Application that accuses Oracle of "destroy[ing] evidence critical to plaintiffs' claims" in connection with our recent investigation to determine the proper source and disposition of cash receipts previously allocated by the collections staff into Oracle's accounts receivable reserve account. These accusations are completely *false*. I have never directed anyone, nor have I ever been directed, to alter or destroy any Oracle records or evidence whatsoever. I personally offended by plaintiffs' accusation.

7. As described more fully below, our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account

(Account 12601) has nothing to do with the approximately 46,000 debit memo transactions that occurred on November 17, 2000, and that plaintiffs refer to in their Application. Nor will our ongoing work in any way "alter" transactions that took place in the past. *New* accounting entries likely will be made in some cases in order to move cash receipts out of 12601 and to the account where they properly belong, but such new entries will leave a clear and traceable audit trail that will preserve the accounting history relating to these transactions.

8. In order to explain why plaintiffs' accusations of evidence destruction are so clearly false, first I must explain the circumstances involving the November 17, 2000 debit memo transactions, and why those transactions, contrary to plaintiffs' allegations, had absolutely no revenue effect whatsoever in 2Q01 or in any other quarter. This is important because plaintiffs suggest that the recent project involving Account 12601 was somehow designed to "cover up" or alter the November 17, 2000 debit memo transactions, when in fact there was never anything to "cover up" in the first place. I will then describe the recent and separate investigation that we have undertaken in the transfer of unapplied cash receipts into Account 12601.

**<u>The November 17, 2000 Debit Memo Transactions</u>**

9. Plaintiffs state in their Ex Parte Application (as well as their Second Amended Complaint) that "on November 17, 2000, in a series of approximately 46,000 transactions, Oracle converted $228 million of … customer overpayments held in its unapplied cash account to revenue by creating phony sales invoices called 'debit memos' and clearing the debit memos with money held in the unapplied cash account." Ex Parte, at 2. I can confirm from personal knowledge that these allegations are *categorically false*, and that Oracle recognized *no revenue whatsoever* from these debit memo transactions; nor did these transactions have a financial impact on Oracle's unapplied cash account. The true facts are as follows.

10. In late 2000, as Oracle prepared to globalize its accounts receivable processes and upgrade to the latest version of the Oracle Accounts Receivable software application, Oracle decided to change some internal practices. Among these was the "on account" designation that segregated certain unidentified cash receipts in a subledger within the "Customer Over-



19. Mr. Keatly also asserts that CW49 claims to have expressed to me his concern about recognizing revenue on the basis of unapplied cash, and that I allegedly told CW49 that it was none of his concern. ¶ 8. That is simply untrue. I never had such a conversation witih anyone, and I could not have, as no such revenue was recognized.

**My Supervision Of Oracle's Recent Investigation Of Accounts Receivable Reserves**

20. In October 2002, my staff discovered that, on occasion, Oracle's Collections staff had been moving unapplied cash receipts into an accounts receivable reserve account (12601) in cases where they had difficulty matching up cash receipts with invoices or other receivables. Although the amounts of the receipts involved were small, it was determined that these receipts should not be allowed to remain in the reserve account unless they properly belonged there. The project that plaintiffs refer to as the "action plan" was (and is) intended to move the receipts out of the reserve account and into their proper location. I also want to reemphasize that this project has absolutely nothing to do with the November 17, 2000 debit memo transactions described above.

21. Plaintiffs mischaracterize the nature and the scope of this action plan by selectively referring to the last few sentences of an email that I sent to my team describing the purpose of this investigation. See Ex. D to Keatly Decl. A complete copy of the email is attached hereto as Ex. __. I articulated the specific objectives of the investigation in the first page of the email. These stated objectives confirm that I never instructed anyone at Oracle to alter or destroy any historical records or evidence. To the contrary, I explained to my team that the purpose of this investigation was to gather and analyze historical data, *not* to destroy it. My oral instructions also were in accord with the written instructions, and similarly did not include any instruction to alter or destroy any historical records or evidence.

22. I specifically informed my team that the objective of the investigation was to produce three deliverables. The first was to provide an update to the Audit Committee of the Oracle Board of Directors into the "Revenue Impact this process of taking unapplied cash receipts to the reserve will have on our financial statements," including an analysis of the "impact this process has had on revenue in each of the last 8 quarters." Second, I instructed my team