```
 1              IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN FRANCISCO DIVISION                Certified Copy
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION
 7                                 Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9        ALL ACTIONS.
     _____/
10
11                          ---oOo---
12                        CONFIDENTIAL
13                  DEPOSITION OF JOEL SUMMERS
14                  TUESDAY, MARCH 21, 2006
15                          ---oOo---
16
                       SHEILA CHASE & ASSOCIATES
17
                          REPORTING FOR:
18
                       LiveNote World Service
19
                    221 Main Street, Suite 1250
20
                   San Francisco, California 94105
21
                       Phone:  (415) 321-2311
22
                        Fax:   (415) 321-2301
23   Reported by:
24   DIANA NOBRIGA, CSR, CRR
25   LICENSE NO. 7071
```

1   A.   Not that I recall.
2   Q.   Did the documents you reviewed refresh your
3   recollection as to the functionality of suite 11i?
4   A.   No.
5   Q.   Did the documents you reviewed refresh your
6   recollection as to problem with functionality of suite
7   11i?
8           MR. GIBBS:  Objection; vague.
9           Answer if you can.
10          THE WITNESS:  No.
11          MS. ANDERSON:  Q.  Did the documents reviewed
12  refresh your recollection with respect to Oracle's
13  products?
14          MR. GIBBS:  Objection; vague.
15          Answer if you can.
16          THE WITNESS:  On a very -- I mean, refresh
17  my -- Jennie, can I just ask for a little bit of help
18  here?
19          MS. ANDERSON:  Q.  Sure.
20  A.   When you say refresh my recollection about
21  Oracle's products, that's -- refresh my recollection?
22  No, I don't think they did.
23  Q.   Okay.  With respect to the customer complaints
24  that you said the documents did refresh your memory
25  about, what were the nature of those complaints?

```
 1         MR. GIBBS:  Objection; misstates the
 2   testimony.
 3         Answer if you can.
 4         THE WITNESS:  Vis-a-vis Liberty Mutual
 5   insurance, it refreshed my recollection on what the
 6   nature of their concerns were.
 7         MS. ANDERSON:  Q.  And what was the nature of
 8   their concerns?
 9         A.  They cited several things.  They cited support
10   capabilities, they cited product quality, they cited
11   their third party consultancy.  Those were the natures.
12         Q.  And by reviewing these documents, was your
13   memory refreshed with respect to these issues you just
14   mentioned?
15         A.  Yes.  It was refreshed that they had mentioned
16   those issues.
17         Q.  Okay.  And did you also recall these instances
18   independently from the documents?
19         A.  Had somebody asked me about Liberty Mutual, I
20   would have recalled it independently, yes.
21         Q.  But the details that you described, the
22   document refreshed your recollection as to those?
23         A.  It reminded me of the specifics.  As I
24   mentioned, there were three -- three issues in there,
25   and it reminded me of all three of those.
```

```
 1      Q.   And what were those documents that refreshed
 2  your memory?
 3           MR. GIBBS:  That question you can answer, if
 4  you recall.
 5           THE WITNESS:  There was a letter to
 6  Mr. Ellison from Liberty Mutual insurance that cited
 7  those issues.
 8           MS. ANDERSON:  Q.  Okay.  And do you recall
 9  who was the author of that letter?
10      A.   I believe it was Helen Sayles, VP of HR for
11  Liberty Mutual, and I believe their head of -- their CIO
12  also.
13      Q.   And do you recall the date of that letter?
14      A.   I do not recall the date precisely.
15      Q.   Was it in the 2000/2001 time period?
16      A.   Yes, it was.
17      Q.   Okay.  And was anybody else other than
18  Mr. Ellison a recipient to that letter?
19      A.   I'm not aware.  I don't know.
20      Q.   And did you bring that letter with you today?
21      A.   I did not.
22           MS. ANDERSON:  Okay.  Plaintiffs request the
23  defendants produce the letter.
24           MR. GIBBS:  It's been produced.
25           MS. ANDERSON:  Then we ask that you identify
```

| | |
|---|---|
| 1 | the best of your recollection? |
| 2 | A.   It was. |
| 3 | Q.   And was this the situation that was escalated |
| 4 | to Larry Ellison that you referred to before? |
| 5 | A.   Yes. |
| 6 | Q.   And was that when you were brought on as the |
| 7 | executive sponsor? |
| 8 | A.   Yes, it was. |
| 9 | MS. ANDERSON:  Okay.  And again, we would ask |
| 10 | for the Bates number of the document that refreshed his |
| 11 | memory as to that transaction. |
| 12 | MR. GIBBS:  I expect you're reading from it. |
| 13 | It is NDCA-ORCL 018733 through 018736. |
| 14 | Did I sink the battleship? |
| 15 | MS. ANDERSON:  Q.  Okay.  And is it your |
| 16 | recollection that Larry Ellison remained pretty involved |
| 17 | in that account? |
| 18 | A.   That's -- I don't know how involved Larry was. |
| 19 | Q.   Okay.  And do you recall whether you were -- |
| 20 | whether Liberty Mutual was going to make its go-live |
| 21 | date? |
| 22 | A.   When Liberty Mutual addressed that letter to |
| 23 | Larry, they were -- they were pretty certain that they |
| 24 | were not going to make it.  I think that's what raised |
| 25 | the flag. |

```
 1      Q.   Okay.  And since this had been something that
 2   had been elevated to Larry Ellison, were you reporting
 3   to Mr. Ellison on the status of this account regularly?
 4      A.   I believe I did -- yeah, again, regularly, I
 5   did provide, I believe, some updates to Larry on what
 6   was happening.
 7      Q.   Okay.  Do you recall when Liberty Mutual went
 8   live?
 9      A.   They went live on time.
10      Q.   And what did you have to do to see that they
11   were live on time?
12      A.   If -- if we -- if you look at the letter --
13   and I believe that earlier this morning I talked about
14   several items that they had talked about in that letter.
15   They had talked about they weren't sure that their
16   issues were being addressed by support.  They were not
17   sure they had defined product issues.  They had defined
18   a problem with their implementation partner.  They had
19   provided -- and I think they also identified that there
20   was some training issues within their own staff.  I
21   believe those were the four items identified in that
22   letter.
23      Q.   Okay.  Do you recall when they went live?
24      A.   When they went live?  I believe it was
25   January 1 of 2001.
```

1    Q.   Okay.  And do you know what modules they went
2    live on?
3    A.   They went live on HR, payroll and manager
4    self-service.
5    Q.   Did they go -- were they operating on any
6    other suite 11i modules other than HRMS?
7    A.   Not that I'm aware of, no.
8    Q.   Okay.  And did you become aware that they
9    continued to have problems even after they went live?
10   A.   I was aware that they stated they had problems
11   after 11i.
12   Q.   And did you become aware that even after they
13   were live, that there were considerable performance
14   problems, and that Liberty Mutual wanted those resolved
15   because they were causing a negative impact on their
16   business?
17   A.   That was certainly one of their communications
18   to us.
19   Q.   Okay.  And do you recall that Cliff Godwin
20   requested on-site help to make corrections to prevent
21   this impact on their business?
22   A.   No.  I would have to delve into that.  On-site
23   help from whom?
24   Q.   What was Oracle's assessment of their problems
25   after going live, if you recall?

1    A.   The nature of the problems to which you just
2 referred, Jennie, I believe, were online performance in
3 the manager self-service arena.
4    Q.   Okay.
5    A.   Performance is -- is how a system performs.
6 And again performance -- we're going to be talking about
7 very specifically in this case -- performance means
8 throughput.  In other words, what is the reaction or
9 transaction time.  Okay.
10        Performance issues can have to do with how
11 much hardware do I have?  How much -- how big is my
12 middle tier?  Is it modern or is it not modern?  Do I
13 have a connection pool of satisfactory size?  These are
14 on-site issues.  These are not software issues, per se.
15 This is configuration, this is how I set things up on my
16 site to get the best performance possible.  Okay.  So
17 there can be network issues, hardware issues, connection
18 pool issues.  There could be some bottleneck in the
19 software.
20    Q.   And do you have an understanding of what the
21 problems that they were experiencing at Liberty Mutual
22 were?
23    A.   I believe that it was a compendium of the
24 above.
25    Q.   Were these problems that were exclusive to

1    that mean there is a defect in the software?
2        A.   Not necessarily.
3        Q.   If a TAR is ranked as P1, does that mean there
4    is a bug in the software?
5        A.   Not necessarily.
6        Q.   Could there be a P1 TAR logged even if the
7    software is performing exactly as it was designed to
8    perform?
9            MS. ANDERSON:  Objection to form and
10   mischaracterizes testimony.
11           THE WITNESS:  Yes.
12           MR. GIBBS:  Q.  Within Oracle is it possible
13   for an item to be logged as a bug, even if it is not a
14   bug?
15       A.   Yes.
16       Q.   Can you explain how that might happen?
17       A.   As I mentioned, the support analysts that are
18   on the phone with the customer taking the issue would
19   hear the customer issue, would try to deduce either from
20   their own knowledge or from a knowledge base of issues
21   whether it was something that the customer had
22   experienced before.  They would try to say, I wonder if
23   it's a configuration issue.  They would do some analysis
24   on that.
25           If they couldn't figure it out, the way to get

Summers, Joel
CONFIDENTIAL
3/21/2006

```
 1  it to development is to put a bug number on it.
 2       Q.   And then once a bug number is assigned to it,
 3  development looks at the issue?
 4       A.   That's correct.
 5       Q.   And are some of the issues looked at by
 6  development determined to not involve bugs in the
 7  software?
 8       A.   Quite often.
 9       Q.   Let me ask you about Liberty Mutual.
10       A.   Yes.
11       Q.   You talked a little bit about the process you
12  would usually undertake to investigate issues raised by
13  customers.
14       A.   Yes.
15       Q.   Did you investigate the implementation issues
16  that were raised by Liberty Mutual?
17       A.   I investigated a number of them, yes.
18            When I say "I," I mean my team in general,
19  yes.
20       Q.   Do you recall what kinds of things were
21  causing the implementation issues that Liberty Mutual
22  experienced?
23            MS. ANDERSON:  Objection; form.
24            THE WITNESS:  There was, again, a spectrum.
25  Some of it they identified they had a consultancy firm,
```

1  not very knowledgeable in Oracle HR payroll.  That
2  consultancy firm made some mistakes.  They had some
3  training issues.  The configuration of the system for
4  optimal performance, and then some defects, it was the
5  spectrum.
6              MR. GIBBS:  Q.  Let me turn briefly to another
7  customer, GE.
8       A.    Yes.
9       Q.    Did anyone ever tell you that GE decided not
10 to license Oracle's payroll and benefits software
11 because of any perceived quality problems with suite
12 11i?
13      A.    Not that I recall, no.
14      Q.    Were the modules within suite 11i designed to
15 operate on a single database?
16      A.    Yes, they were.
17      Q.    Were they capable of operating on a single
18 database?
19      A.    Yes, they were.
20      Q.    Were the modules within 11i designed to use a
21 single data scheme?
22             MS. ANDERSON:  Objection; form.
23             THE WITNESS:  Yes, they were.
24             MR. GIBBS:  Q.  Would the use of a single data
25 scheme affect the need for systems integration?

```
 1            MS. ANDERSON:  Objection; form, lack of
 2   foundation.
 3            THE WITNESS:  Yes, they would.
 4            MR. GIBBS:  Q.  Were the modules within suite
 5   11i designed to share information across different
 6   modules?
 7            MS. ANDERSON:  Objection; form.
 8            THE WITNESS:  Yes, they were.
 9            MR. GIBBS:  Q.  To your knowledge, did the
10   modules within 11i actually share information across
11   different modules?
12       A.   They were certainly sharing.
13            MR. GIBBS:  That's all I have.  Thank you.
14            MS. RADCLIFFE:  I think we need five minutes.
15            VIDEOGRAPHER:  Going off record, time is 5:34.
16                 (Recess, 5:34 p.m. - 5:46 p.m.)
17            VIDEOGRAPHER:  Going back on record.  Time is
18   5:46.
19            FURTHER EXAMINATION BY MS. ANDERSON
20            MS. ANDERSON:  Q.  Okay, Mr. Summers, I really
21   just have one follow-up question for you.
22            Are you aware that customers complained in the
23   2000 and 2001 time period that Oracle software did not
24   perform as promised?
25       A.   Um, yes.
```

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, DIANA NOBRIGA, hereby certify that the
 3   witness in the foregoing deposition was by me duly sworn
 4   to testify to the truth, the whole truth, and nothing
 5   but the truth in the within-entitled cause; that said
 6   deposition was taken at the time and place therein
 7   stated; that the testimony of said witness was reported
 8   by me, a Certified Shorthand Reporter and disinterested
 9   person, and was thereafter transcribed into typewriting,
10   and that the pertinent provisions of the applicable code
11   or rules of civil procedure relating to the notification
12   of the witness and counsel for the parties hereto of the
13   availability of the original transcript of the
14   deposition for reading, correcting and signing have been
15   met.
16              I further certify that I am not of counsel or
17   attorney for either or any of the parties to said
18   deposition, nor in any way interested in the outcome of
19   the cause named in said action.
20              In WITNESS WHEREOF, I have hereunto
21   subscribed by my hand this 31st day of March 2006.
22
23
24                        _____
25                        DIANA NOBRIGA, CSR NO. 7071
```