```
                UNTIED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION        Certified Copy

IN RE:   ORACLE CORPORATION
         SECURITIES LITIGATION,

                                        Case No.
This Document Relates To:               C-01-0988-MJJ
                                        (Consolidated)
ALL ACTIONS

_____/

                       CONFIDENTIAL

VIDEOTAPED
DEPOSITION OF:       RICHARD SELLERS

DATE:                February 28, 2006

TIME:                10:41 a.m. to 6:47 p.m.

PLACE:               17260 Harbour Pointe Dr.
                     Ft. Myers, Florida

PURSUANT TO:         Notice by counsel for Plaintiffs
                     for purposes of discovery, use at
                     trial or such other purposes as
                     are permitted under the Federal
                     Rules of Civil Procedure

REPORTED BY:         Aaron T. Perkins, RPR
                     Notary Public, State of
                     Florida at Large
                     Pages 1 to 279
```

```
 1   nonperformance of 11i" -- "of 11i product."
 2       Q.  Do you know why the e-mail is directed to
 3   HQAPP, but the text is written -- it looks like directly
 4   to you, right?
 5           MR. HARRISON:  Objection.  Calls for
 6       speculation.
 7           THE WITNESS:  No.
 8           MR. HARRISON:  Lacks foundation.
 9           THE WITNESS:  Well, let me just say it's not
10       written to me.
11   BY MR. WILLIAMS:
12       Q.  Oh, okay.
13       A.  I've never been called Rich.
14       Q.  Oh, okay.
15       A.  Everybody at Oracle knows me as Dick.
16       Q.  Okay.
17       A.  And you will notice all other e-mails were
18   addressed to Dick.
19       Q.  Okay.
20       A.  So, no, Rich is not me.  Rich is a person in
21   that HQAPP --
22       Q.  Okay.
23       A.  -- group.
24       Q.  Do you know what his last name is?
25       A.  I don't.
```

```
 1       Q.   No?
 2       A.   You know, I had to sit here and think for a
 3   while to remember HQAPP.
 4       Q.   Okay.  All right.  As of May 24th, 2001, was
 5   it your understanding that -- I'm sorry.  Was it your
 6   understanding that your organization had a subset of
 7   customers that were extremely upset about the
 8   nonperformance of 11i?
 9            MR. HARRISON:  Objection.  Calls for
10       speculation.
11            THE WITNESS:  We always had a subset of
12       customers that were upset by whatever the latest
13       implementations were.
14   BY MR. WILLIAMS:
15       Q.   I understand.
16       A.   So it was not uncommon for me to have that.
17   The purpose of this memo all comes back to the Q3 miss
18   in keeping Rocha informed of any variation or anything
19   that's going on to the revenue stream.  So I give him --
20   make sure he knows about all concessions.  Madsen is
21   making sure that he knows that we're saying -- telling
22   these customers that we're not going to support them
23   unless they renew.  So that means they may -- they may
24   get mad and not renew.
25       Q.   Okay.
```

1   A.   They're going to HP -- HQAPP operations. He's
2   asking for their advice, because we're in the early
3   stages of this product. We don't want to develop angry
4   customers. So we have been, as evidenced by my other
5   memo, giving concessions, and we want to make sure that
6   Safra's group understands that and approves it.
7   Q.   Okay.
8   A.   We don't want to be out there all by
9   ourselves.
10  Q.   Okay. So why don't you just read for me
11  beginning -- a few lines down where it says "some
12  customers."
13  A.   "Some customers are going ahead and paying the
14  support renewal and others are getting more upset. One
15  customer has mentioned legal action and has brought in
16  Seibel for a demonstration. Do we want to continue on
17  this course with these customers and shut off support?
18  Current customer in question are Emulex -- LJE has
19  already declined this one -- Symantec, Master
20  Protection. Your advice is appreciated."
21  Q.   Okay. Do you recall some of these issues?
22  A.   I remember Emulex went to LJE, and he talked
23  to them, and then -- no. You know, I do not remember.
24  Q.   Okay. LJE is Larry Ellison, right?
25  A.   Right.

```
 1    if you can solve that.  Typically, when we get that, we
 2    solve them in a matter of days.  So I assume he solved
 3    that in a matter of days.
 4         Q.   Now, you indicated the -- well, withdrawn.
 5              You said that this type of comment was typical
 6    of Mr. Kendig.
 7         A.   Yes.
 8         Q.   Was it, in your opinion, typical of the entire
 9    organization or just Mr. Kendig?
10              MR. HARRISON:  Objection.  Calls --
11    BY MR. WILLIAMS:
12         Q.   His -- I'm sorry.  Of his organization, the
13    state and local or government organization.
14              MR. HARRISON:  Objection.  Calls for
15         speculation and lacks foundation.
16              THE WITNESS:  I only worked directly with him.
17    BY MR. WILLIAMS:
18         Q.   Okay.  So you don't -- you indicated you don't
19    know who David Natelson is, right?
20         A.   No.
21         Q.   Did you have much correspondence directly with
22    Jay Nussbaum?
23         A.   No.
24         Q.   Okay.
25         A.   I presented for his group one time.
```

```
 1        Q.   Okay.  How about other people in that
 2   organization?
 3        A.   Yes.  The government organization was very
 4   vocal, in fact, so vocal about support that I put an
 5   entire support center staffed with about 16 people in
 6   Virginia just to take care of their problems, to try to
 7   handle some of their issues.
 8        Q.   Their issues went directly to support?
 9             MR. HARRISON:  Objection.  Vague.  Ambiguous.
10             THE WITNESS:  Their issues with support went
11        directly to support.
12   BY MR. WILLIAMS:
13        Q.   Okay.  Do you know -- withdrawn.
14             What is CSC?
15        A.   That's the consulting group.
16        Q.   Internally?
17        A.   No.
18        Q.   Oh.
19        A.   It's -- it's like Deloitte & Touche.
20        Q.   Okay.  So it's an outside --
21        A.   It's an outside -- yeah, it's an outside
22   consulting group.
23        Q.   Okay.
24        A.   And these conditions -- you know, I dealt with
25   them.  I don't want to seem cavalier, but I deal with a
```

```
 1   hundred of these a quarter or more.  The customer hires
 2   an outside consulting group.  They come in and they do
 3   whatever work they do.  They always blame the vendor who
 4   sold the software.  The -- then they complain about this
 5   long list of TARs, which we've solved half of them, but
 6   they haven't got the answer yet because they weren't
 7   there to get the answer.
 8              So we consistently solved these issues as soon
 9   as we put a person just assigned to that account.  Okay.
10   Go look and see what's going on there; figure out what
11   they're doing; which TARs do we need to -- that are
12   really important to them, which ones -- you know, there
13   is a hundred requests for information.  Which ones
14   really are holding them up and which ones are just
15   somebody was reading a manual and wanted to know how
16   does this work?
17        Q.   Okay.
18        A.   See through that, solve the problem.
19   Engineering was very responsive any time I would call
20   and say, Hey, we need these two things solved.  Get them
21   solved, done, we walk away.
22              And the organization -- this organization, you
23   know, it's -- it's like the squeaking wheel gets the
24   grease.  Everybody knows.  Complain, get it to the top,
25   and everything gets fixed faster.
```

```
 1        Q.   Do you know Mary Ann Anthony?
 2        A.   I do not.
 3        Q.   Okay.  Do you know Mary Aragon-Arachila?
 4        A.   I do not.
 5        Q.   I'll ask the reporter to mark this document as
 6   Sellers Exhibit No. 8.
 7             (Exhibit No. 8 was marked for identification.)
 8   BY MR. WILLIAMS:
 9        Q.   Sellers No. 8 is Bates numbered NDCA-ORCL
10   202671 through 674.  And if you could just take a look
11   at that document and let me know when you're done, I
12   would appreciate it.
13        A.   Okay.
14        Q.   Is Sellers No. 8 a document or report created
15   by your organization?
16        A.   It is not, no.
17        Q.   Okay.  Do you recognize it?  Do you know what
18   it is?
19        A.   I don't recall ever seeing anything that looks
20   like this.
21        Q.   Okay.
22        A.   I'm going to guess -- well, I'm not going to
23   guess.
24        Q.   Okay.  All right.  I'll ask the reporter to
25   mark this document as Sellers No. 9.
```

```
 1                    REPORTER'S CERTIFICATE

 2
        STATE OF FLORIDA
 3      COUNTY OF HILLSBOROUGH

 4
              I, Aaron T. Perkins, Registered Professional
 5      Reporter, certify that I was authorized to and did
        stenographically report the deposition of
 6      RICHARD SELLERS; that a review of the transcript was
        requested; and that the transcript is a true and
 7      complete record of my stenographic notes.

 8

 9            I further certify that I am not a relative,
        employee, attorney, or counsel of any of the parties,
10      nor am I a relative or employee of any of the parties'
        attorney or counsel connected with the action, nor am I
11      financially interested in the action.

12

13            Dated this 5th day of March, 2006.

14

15

16

17

18

19
                         _____
20                            Aaron T. Perkins, RPR

21

22

23

24

25
```