```
 1              IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN FRANCISCO DIVISION
 4                                                    CERTIFIED COPY
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7                              Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10        ALL ACTIONS.
11   _____/
12
13                          ---oOo---
14                        CONFIDENTIAL
15              DEPOSITION OF MICHAEL ROCHA
16                  FRIDAY, APRIL 7, 2006
17                          ---oOo---
18
19               SHEILA CHASE & ASSOCIATES
                      REPORTING FOR:
20                LiveNote World Service
              221 Main Street, Suite 1250
21           San Francisco, California 94105
                  Phone:  (415) 321-2311
22                Fax:    (415) 321-2301
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25
```

Rocha, Michael
CONFIDENTIAL

4/7/2006

1    A.    Yes, yes.

2    Q.    So to the best of your knowledge, the
3    documents I have shown you, you either sent or received
4    the e-mails?

5    A.    Yes.  It is just a strange question, every
6    time you ask it.  Well, yeah, I'm sure I received it,
7    but --

8    Q.    What does it mean when a support invoice is
9    credit memoed?

10   A.    There could be a lot of reasons for it.  It
11   essentially means that, you know, they cancelled the
12   previous contract and generated another one, and then
13   had to issue a credit.  So it could be a result of, you
14   know, a billing problem.  You know, it could be
15   something as simple as the name on the contract was
16   incorrect or whatever.  It could be associated with a
17   cancel -- what we call, refer to the merging of
18   contracts, so you're cancelling one and you're replacing
19   it with another contract.  So there is a lot of reasons
20   why, excuse me, that a credit rebill could happen.  And
21   they do happen when there's a very large volume of
22   those.

23   Q.    What is your understanding of why the
24   $10 million in support invoices were credit memoed that
25   Ms. Minton refers to in her e-mail here?

1  MR. HARRISON: Objection; lacks foundation. I
2  don't think he said he did understand that, or even
3  knows about it.
4  THE WITNESS: I don't -- I mean, in the end of
5  the day, she is just basically talking about the
6  accounting for the revenue, you know. I'm not sure
7  specifically why, you know, why these were credit memoed
8  or not.
9  MS. WINKLER: Q. Do you recall the forecast
10  shortfall estimate being as high as $30 million?
11  A. I do not recall that specific number. There
12  were a lot of numbers floating around. And I think I
13  mentioned in a previous note that we talked about,
14  Jennifer's numbers were larger than what my organization
15  was coming up with. So the numbers had a pretty wide
16  range, and we were trying to get to what they should be.
17  Obviously, they were closer to our group's number
18  according to this memo.
19  Q. Mr. Rocha, do you recall receiving requests
20  for concessions on support contracts that were related
21  to issues that customers were having with Suite 11i?
22  A. Yes.
23  Q. When did you recall that first happening?
24  A. I don't have any specific recollection. I
25  mean, you know, we, throughout my tenure in running that

```
1   organization, we would get requests from customers for
2   various reasons, either, you know, their perceived
3   quality -- their perceived issues with the quality of
4   the product, failed implementations, not -- you know,
5   the inability to -- their deployment schedules being
6   behind.  So I -- we would see a relatively small number,
7   but we would see -- you know, we would see requests for
8   concessions all the time.
9              MS. WINKLER:  I'm going to ask the court
10  reporter to mark NDCA-ORCL 121687 through 689 as Rocha
11  Exhibit 11.
12                  (Exhibit 11 marked for
13                      identification.)
14             THE WITNESS:  Okay.
15             MS. WINKLER:  Q.  Do you recognize this
16  document, Mr. Rocha?
17      A.   Yes.
18      Q.   Had Mr. Garnick transitioned into his role
19  working with the support organization as of this time,
20  April 2001?
21      A.   I don't recall.  I'm assuming so.
22      Q.   Who is Kathleen Lindsey?
23      A.   Kathleen Lindsey ran a renewals organization
24  for Chris Madsen in North America.
25      Q.   Do you recall customers, Oracle customers
```

1  specifically having problems implementing the CRM
2  portion of Suite 11i?
3      A.  Customers, yes, I do recall customers
4  having -- having issues with implementing that for
5  various reasons.
6      Q.  What were those various reasons?
7      A.  It could have been -- it could have been
8  related to the product and the functional match to the
9  product.  It could have been related to their
10 implementation schedules and whether they were able to
11 sort of get the software in and managing implementation
12 of that scale and magnitude.  It could have been just a
13 change in the economy where, you know, all of a sudden
14 they are committed to this software roll-out, and that's
15 not where they wanted to put their resources, and we
16 didn't see the shift in the economy.  So what we would
17 tend to see -- you can kind of see it in this note, is
18 there is 12,000 customers of applications at this time
19 at Oracle, and, you know, the reasons for concessions
20 and cancellations or not renewing are sort of varied.
21     Q.  What did you generally do when you got a
22 request for a concession in the support organization?
23     A.  What did I generally do?  We tried to -- we
24 tried to do a couple things.  We tried to understand
25 what the situation was of the customer's environment.

Rocha, Michael
CONFIDENTIAL
4/7/2006

```
 1        Q.   Do you recall that customer?
 2        A.   No, I do not.
 3        Q.   Do you recall issues that San Diego County was
 4   having implementing Suite 11i?
 5        A.   I was not in charge of the implementation, and
 6   I don't remember.  In most cases, particularly during
 7   implementation, if there was Oracle consulting involved,
 8   the Oracle consulting side would tend to manage the
 9   account until the go-live, and then --
10        Q.   Do you have any -- I'm sorry.
11        A.   And then Oracle support would take over.  So
12   pretty much the domain of consulting would be managing
13   through these implementations, and we would support
14   them.
15        Q.   Do you recall any problems San Diego County
16   had after implementation?
17        A.   I do not.
18             MS. WINKLER:  Q.  I'm going to ask the court
19   reporter to mark NDCA-ORCL 121288 through 294 as Rocha
20   Exhibit 38.
21                       (Exhibit 38 marked for
22                        identification.)
23             THE WITNESS:  Okay.
24             MS. WINKLER:  Q.  Do you recognize this
25   document?
```

```
 1       A.   Yes.
 2       Q.   Does this document refresh your recollection
 3  as to the problems that San Diego County was having with
 4  Suite 11i?
 5       A.   I really do not remember the specific
 6  escalation at all.
 7       Q.   Okay.
 8       A.   Just so that, you know, this bears to stating.
 9  We had -- we had a lot -- we have a lot of -- we had a
10  lot of customers all of which were going to be upgraded
11  on a lot of software.  We're sort of picking, you know,
12  a couple customers here inside of a big customer base.
13  So it's hard to sort of take one situation and draw
14  conclusions from it in the general case.  You know, I
15  wouldn't -- these are a handful of cases.
16       Q.   Did you receive e-mails like this on a regular
17  basis in 2001?
18       A.   I received e-mails like this on a regular
19  basis until I left.  You know, the bottom line is, there
20  is -- the software has a lot -- this -- there is a lot
21  of software that's going in.  These are big, long
22  implementation projects.  There is a lot of moving parts
23  to them.  And there is a lot of things that can go
24  wrong.  Some of it is in the software; some of it is in
25  the implementation; some of it is in just the business
```

1  practices that the customer implements. It's -- you
2  know, when you receive e-mails like this, it's
3  impossible to look at the account and go, you know,
4  "It's that bug." And it's -- I mean, that's just not
5  practical and certainly not what we do in the industry.
6        And so what we tried to do in all of these
7  cases is put the best people we could on the account to
8  make sure that the customer -- you know, that the
9  customer -- we were managing the customer through the
10 escalation and we were doing everything we could to get
11 the implementation back on track.
12        But you can't tell whether CSC -- you know, I
13 had a customer one time who implemented fixed assets on
14 a train system. You know, I mean, you're sitting there
15 going, "Well, what part of fixed assets did you not
16 understand?" That's just the way the industry works.
17 We had -- we had -- we were rolling out a lot of
18 software; there were a lot of implementations; the
19 implementations are a lot of times very ambitious. And
20 it was our job to sort of see the customer through them
21 the best we could.
22     Q.   If somebody wanted to find out today using
23 San Diego County as an example, what problems San Diego
24 County really was having with the software, where would
25 they look?

1  MR. HARRISON: Objection; calls for
2  speculation and lacks foundation.
3  THE WITNESS: You would have -- I mean, you
4  would have to put a very senior team on the account to
5  look at implementation, implementation methodology,
6  business practices, training of the group that was --
7  you know, that installed the software and was going to
8  use the software. It is not something that you can just
9  sort of say, let's drop somebody in when they missed the
10 go-live, and in two weeks let's determine what the
11 situation is.
12 MS. WINKLER: Q. I guess what I'm searching
13 for is a record of what happened at that customer.
14 A. And as I said, I just don't think those
15 records exist.
16 Q. Okay.
17 A. I think that there are a lot of -- there are a
18 lot of moving parts in these accounts. The programs are
19 very ambitious. There are a lot of -- you know, there
20 are a lot of things that can go wrong.
21 Q. Would the people who worked directly with each
22 account know better the specific circumstances?
23 MR. HARRISON: Objection; calls for
24 speculation.
25 THE WITNESS: The people that worked -- worked

```
 1   on the account would know their specific circumstances
 2   very well.  That doesn't mean that, you know, that they
 3   can attribute a missed go-live to a bug.
 4           That is -- you are talking about a software
 5   suite that is just massive, and to just sit there and
 6   go, "It's that one bug was the whole reason why we
 7   missed an implementation," it just doesn't work that
 8   way.
 9           MS. WINKLER:  Q.  The questions I'm asking,
10   I'm not trying to get you to tell me that it was bug A
11   or bug B.  I'm just trying to get you to -- to see if
12   you have a general recollection of the problem that the
13   customers were having.
14           A.  I have a general recollection, and the general
15   recollection was there was bugs just like every software
16   that's ever gone out of a software lab.  There were
17   problems with implementation, just like most large
18   implementations I ever saw.  There were problems with
19   support, you know, people not being responsive or maybe
20   not having technical background to do their jobs.
21           I mean, in each case, there was something
22   different, and it's just -- you know, we did the best we
23   could to sort of marshal the customer through that.  And
24   I don't think -- I don't think you could sort of sit
25   back and go, "It was this problem in general."
```

```
 1      Q.   Okay.
 2      A.   That's my -- that's my analysis of 11i.
 3           And by the way, I do believe that if you
 4   looked at closed data on TARs and things like that,
 5   you'd come to the same conclusion.  The software was
 6   heavily -- the implementation -- customers are
 7   customizing their own software, putting it inside of
 8   Oracle.  They got their own data inside of Oracle.  You
 9   know, they've got configuration setup issues, which can
10   be contributed to consulting.  I mean, there is -- you
11   know, if you kind of looked at the amount of issues we
12   saw versus the amount of defects we saw, you know, there
13   was a wide range by account, and in almost every account
14   the ratio of issues to bugs was -- issues were much
15   higher, like 10 to 1.
16      Q.   Do you recall there being any issues with
17   customers being concerned about when Oracle was going to
18   stop supporting 10.7?
19      A.   Yes.
20      Q.   What were those issues?
21      A.   You just said -- I mean, in many --
22   customers -- 10.7 was going to be de-supported, and
23   there were a lot of reasons for that.  And customers,
24   you know, ultimately had to set their implementation
25   schedule, right, so they could be concerned about the
```

```
 1   resources they have to spend on the implementation, the
 2   time frame by which they had to do it; the support for
 3   sort of things like payroll and taxes implications.  So
 4   I think by and large, customers were both concerned
 5   about being forced to go to an upgrade, as well as the
 6   time frame in which we were sort of forcing them to do
 7   this.
 8       Q.   Did you have an opinion about whether the
 9   de-support date was too early?
10       A.   I had an opinion.
11       Q.   What was your opinion?
12       A.   I've always believed that, you know, forward
13   migration is a good thing, because I think it is very
14   hard to support multiple code lines.  You know, I've --
15   you know, I wasn't responsible for the products, so I
16   was not in the best position to assess, you know,
17   whether that -- you know, whether there was time for
18   customers to upgrade or not.  But the people -- I had
19   great confidence in the people that were.  So they are
20   in the best position.  I think it was probably the right
21   decision.
22            I do not think -- and let me state for the
23   record, I don't think that it was -- I don't think it
24   was support's job, nor should it be.  They are not the
25   experts in how the software was put together, to decide
```

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, DIANA NOBRIGA, hereby certify that the
 3   witness in the foregoing deposition was by me duly sworn
 4   to testify to the truth, the whole truth, and nothing
 5   but the truth in the within-entitled cause; that said
 6   deposition was taken at the time and place therein
 7   stated; that the testimony of said witness was reported
 8   by me, a Certified Shorthand Reporter and disinterested
 9   person, and was thereafter transcribed into typewriting,
10   and that the pertinent provisions of the applicable code
11   or rules of civil procedure relating to the notification
12   of the witness and counsel for the parties hereto of the
13   availability of the original transcript of the
14   deposition for reading, correcting and signing have been
15   met.
16              I further certify that I am not of counsel or
17   attorney for either or any of the parties to said
18   deposition, nor in any way interested in the outcome of
19   the cause named in said action.
20              In WITNESS WHEREOF, I have hereunto
21   subscribed by my hand this 14th day of April 2006.
22
23
24
25                            DIANA NOBRIGA, CSR NO. 7071
```

LIVENOTE | **World Service**℠

Worldwide Deposition Reporting & Legal Videography

# ERRATA Sheet

Deposition of: Michael Rocha

I wish to make the following changes for the following reasons:

| Page | Line | Change | Reason |
|---|---|---|---|
| 69 | 16 | Support fees are 22% of Net License, discounting couldhappen | Clarification |
| 184 | 20 | Tony tong managed Asia Pacific. Nagayama managed Japan | Clarification |
| 187 | 5 | Development should read Server technologies. | |
| 203 | 7 | Don Haig is a customer advocate. | |
| 213 | 6 | -- Should read dependent | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Witness Signature/Date _____

Thank you for using LiveNote World Service for your reporting needs.
For assistance, please call 800-LIVENOTE (548-3668)

221 Main Street, Suite 1250, San Francisco, CA 94105
www.livenoteworldservice.com

CERTIFICATE OF WITNESS

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _MAY_ day of _B_,

2006, at _Hillsborough_, _CA_.
          (City)               (State)

_____
MICHAEL ROCHA