CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--

In re: ORACLE CORPORATION SECURITIES LITIGATION
_____/

Master File No. C-01-0988-MJJ (JCS)
CLASS ACTION



-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --

Videotaped Deposition of

RANDALL W. JENSEN, PH.D.

Friday, July 13, 2007

Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 75321

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

1  released with?
2         MR. WILLIAMS:  Objection.  Form.
3         THE WITNESS:  Not necessarily.  It depends on
4  the process.  A well-run process like a CMMI level five
5  process, for example, would generate less errors than
6  a -- the old-fashioned code and test process.
7         Q.  BY MR. GIBBS:  Okay.
8         A.  So it's variable.
9         Q.  Let's assume you hold all factors constant
10  except for the size of the software.
11        A.  Okay.
12        Q.  In that instance, the size, I take it, would
13  affect the number of errors you would expect to see?
14        A.  That's true.
15        Q.  And so holding everything else constant, if
16  the software gets bigger, you would expect to see more
17  errors even after release; correct?
18        A.  That's true.
19        Q.  What about complexity?  I know there are a
20  number of different ways to measure software complexity,
21  but just generally speaking, again, if you hold
22  everything else about the project constant, would you
23  agree that the more complex the software is, the more
24  errors you would expect to see it released with?
25        MR. WILLIAMS:  Objection.  Form.

29

CONFIDENTIAL

1         THE WITNESS:  Yes and no.  Now, that's a
2  terrible answer, I realize, but it is yes and no.  A very
3  complex piece of software developed by a team that's
4  developing non-complex software, same development method,
5  same development process would probably produce more
6  errors.  But people who develop very complex software
7  usually use smaller teams and take longer, and they don't
8  produce more errors.
9         Q.  BY MR. GIBBS:  Okay.  But I think your answer
10 has changed one of the variables.  But if you really
11 stick to my hypothetical, which I understand you may not
12 agree with, but if you hold everything constant, the more
13 complex it is, the more errors you would expect to see;
14 is that fair?
15        MR. WILLIAMS:  Objection.  Form, asked and
16 answered.
17        THE WITNESS:  You're asking me to make a
18 decision about the competence of the developer.  A
19 competent developer would have done it the way I
20 suggested.  So it didn't -- it didn't solve the problem.
21 If we've got a given developer who has a given set of
22 skills, complex software would take longer and use fewer
23 people and would have no more bugs than when it was not
24 complex.
25        Q.  BY MR. GIBBS:  Okay.  Let me ask you a

CONFIDENTIAL

1  slightly different question:  In your Conclusion
2  Number 2, you say, "Based on the source of Mr. Yourdon --
3  Y-o-u-r-d-o-n -- relied upon to determine the prevalence
4  of defects in ERP-type software, Mr. Yourdon had no
5  factual basis to state whether Oracle 11i defect levels
6  with high, low, or normal."
7          Now, first of all, before we get into the
8  actual conclusion, I want to ask you about the concept of
9  high, low, or normal as it's applied to defect levels in
10 software.  Again, I take it that implies there is some
11 level of defects that would be normal and expected for
12 various kinds of software.  Correct?
13     A.  Always.
14     Q.  And the level you would expect depends in
15 part on the type of software; correct?
16         MR. WILLIAMS:  Objection.  Form.
17         THE WITNESS:  That's true.
18     Q.  BY MR. GIBBS:  ERP being one category of
19 software?
20     A.  Not -- that doesn't necessarily lead you to
21 more or less errors.
22     Q.  Okay --
23     A.  ERP is a product type.
24     Q.  Would you -- just as a category, would you
25 expect a different normal level of defects, for example,

1  in military software compared to commercial software?
2      A.  I would expect less.
3      Q.  Okay.  I would hope for less.
4      A.  Nuclear weapons.
5      Q.  Agreed.  Is it possible to know what would be
6  the normal and expected defect level without knowing the
7  size of a particular software program?
8          MR. WILLIAMS:  Objection.  Form.  Size.
9          THE WITNESS:  Read that again.
10     Q.  BY MR. GIBBS:  Sure.
11     A.  Try it one more time.
12     Q.  I will.
13         Is it possible to know what would be the
14 normal and expected defect level without knowing the size
15 of a particular software program?
16         MR. WILLIAMS:  Same objection.
17         THE WITNESS:  Size is definitely a factor.
18 But you're coming down to process now.  If I'm building
19 nuclear weapons, I have no errors, or very few.  There
20 are errors, but there are very few.
21         If I'm doing something in a commercial world,
22 I probably will have more because they're more
23 acceptable.
24     Q.  BY MR. GIBBS:  Okay.  Well, I take your point
25 that size is not --

32

1    and probably more; correct?
2         A.   To determine if -- yeah, if the errors -- the
3    defect rate was lower than expected.  Not necessarily
4    low, most likely, or high.  It's what was expected.
5         Q.   Okay.  And let's assume for present purposes
6    that there were 5,000 software patches in the first six
7    months.  And let's further assume, as you have, that all
8    of those 5,000 software patches were to correct some kind
9    of defect.  Without knowing how big or how complex the
10   software is and without knowing what defect removal
11   procedures were undertaken, how can you possibly have an
12   opinion as to whether 5,000 defects is higher than what
13   you would expect?
14        MR. WILLIAMS:  Objection.  Form.
15        THE WITNESS:  That does -- that requires
16   something that's beyond the material I had.
17        Q.   BY MR. GIBBS:  So you can't reach that
18   conclusion?
19        A.   No.
20        Q.   Now, I can't tell from the report, but you
21   seem to be comparing the 5,000 software patches to the
22   1,000 high severity defects referenced in Mr. Yourdon's
23   report; is that correct?
24        A.   No.  In his report, he talked about a
25   thousand of the defects would be high severity defects,

1  quoting -- not anything other than quoting Capers Jones.
2  That's where he got his information.
3         Is 5,000 high?  Well, Capers Jones says a
4  thousand should be expected.  I don't think the software
5  patches that were put in those first six months were
6  cosmetic.
7      Q.  Do you have any basis for concluding that
8  every one of the 5,000 was a high severity defect?
9         MR. WILLIAMS:  Objection.  Form.
10        THE WITNESS:  That requires something that
11 nobody really knows.
12     Q.  BY MR. GIBBS:  Well, you don't know it.
13     A.  I don't know.  I don't think anyone else
14 does, either.
15     Q.  So would that be impossible to determine?
16        MR. WILLIAMS:  Objection.  Form.
17        THE WITNESS:  That's -- first there has to be
18 a definition of a high severity defect.  The trail that
19 the TARs went through, there was no apparent formal
20 process that said this is a bug and this isn't a bug.
21 It's what they felt like calling it at the time.  It's
22 not unusual and it's not non-standard practice to do
23 that.
24     Q.  BY MR. GIBBS:  Let me -- let's talk about the
25 TARs.  Do you understand TAR to mean a technical

CONFIDENTIAL

```
 1   assistance request?
 2          A.   Uh-huh.
 3          Q.   And that's a term used at Oracle?
 4          A.   That's what Oracle calls them.
 5          Q.   And do you understand that that's a request
 6   from a software user for some kind of assistance?
 7               MR. WILLIAMS:  Objection.  Form.
 8               THE WITNESS:  That's right.
 9          Q.   BY MR. GIBBS:  It might include a report of
10   an error in the software?
11          A.   It might.
12          Q.   In your work in the software development
13   field, were you ever called upon to diagnose defects in
14   the software that you were either developing yourself or
15   overseeing the development of?
16          A.   Yes.
17          Q.   And I take it diagnosing a defect in the
18   software typically starts with a user reporting some kind
19   of error; correct?
20          A.   That's right.
21          Q.   Is the user's error report by itself
22   typically enough to know whether there is in fact a
23   defect in the software?
24          A.   Not initially, no.
25          Q.   Okay.  What else do you need to do after
```

84

CONFIDENTIAL

1   receiving an error report to determine whether there is
2   in fact a defect in the software?
3            MR. WILLIAMS:  Objection.  Form.
4            Go ahead.
5            THE WITNESS:  Go ahead.
6            MR. WILLIAMS:  Yeah.
7            THE WITNESS:  The -- typically a committee
8   gets together and says -- analyzes the problem and says
9   this is a problem with the software or it's a problem
10  with the user interface or it was an incorrect action by
11  the user or it's something that would be nice to have,
12  and they're categorized.
13           And in a typical sense -- I don't say this
14  facetiously -- the ones that are called true errors are
15  minimized because you don't want a high error rate in
16  your software.  That's typical.  And I think this was
17  handled, from what I read, fairly typically.
18       Q.  BY MR. GIBBS:  But in your life as a software
19  developer and a manager of software development projects,
20  once you have a user reporting an error, before you can
21  conclude whether or not there is in fact a defect in the
22  software, you'd need to exclude other potential causes of
23  the error other than a defect in the software itself;
24  correct?
25       A.  Or -- or what you could do is say, yes, there

1    Q.  Fair enough.
2    A.  You've got to have the best processes, the best tools, the best management structure, the best teaming. I mean, there's a lot of things that go into a productive organization and one that does its job real well.
7    Q.  Okay. In terms of commercial software, as you understand that term, is it your opinion that if a software vendor does not live up to that best-in-class standard, across all those things you've just mentioned, that its products are defective?
12   A.  Its products are less desirable. That's not defective.
14   Q.  Okay. And if something falls short of best in class in terms of defect removal efficiency, does that preclude a suite of products from being integrated?
17       MR. WILLIAMS:  Objection.  Form.
18   Q.  BY MR. GIBBS:  Necessarily?
19   A.  Read me the first part of that again. I want to make sure I get this.
21   Q.  Let's assume you have a vendor that falls short of best-in-class processes for defect removal.
23   A.  Okay.
24   Q.  Does that necessarily mean the products can't be integrated?

CONFIDENTIAL

```
 1         MR. WILLIAMS:  Objection.  Form.
 2         THE WITNESS:  No.
 3      Q.  BY MR. GIBBS:  And falling short of best in
 4  class defect removal standards doesn't mean that the
 5  software doesn't work; correct?
 6      A.  It has more errors, more defects.  So it
 7  doesn't work as well.  And in some cases, it doesn't work
 8  at all.  It depends on the high severity errors that
 9  you're getting to.
10      Q.  But even best-in-class software in terms of
11  defect removal efficiency might have unknown show
12  stoppers in it when it's released; correct?
13         MR. WILLIAMS:  Objects.
14         THE WITNESS:  All software has show stoppers.
15      Q.  BY MR. GIBBS:  When it's released?
16      A.  When it gets old and dies, there are probably
17  still things nobody has managed to trip over.
18      Q.  So the difference between -- in terms of how
19  many show stoppers are embedded in there, the difference
20  between best in class and just average is one of degree;
21  correct?
22         MR. WILLIAMS:  I'm just going to object --
23         THE WITNESS:  It's one of perception.  I
24  could have some software that had tons of bugs in it, had
25  a really great user interface, and did my job pretty
```

1  efficiently, still had a lot of bugs, and I may prefer
2  that to something that has no bugs, but has a crummy
3  interface.  I mean, it comes to the quality issue.
4          When you look at -- I'll simplify this.  If
5  you put a Ferrari and a Toyota and a Rolls Royce side by
6  side, which one is the highest quality?  The Toyota has
7  less bugs.  The Ferrari has the most, and if it happens
8  to be a Mercedes, you have to carry a mechanic in the
9  back seat.  But they each have different views of
10 quality, and software is the same way.  It may be buggy.
11 It has cool interface.  It may play music while you're
12 working, I don't know.  But whatever it is, is what
13 people buy.
14         MR. WILLIAMS:  I'm sorry, I need to inject an
15 objection to the prior question just in the usage of the
16 phrase "best in class."  I think you had established
17 earlier that you were -- when you were referring to "best
18 in class," you were referring to a process, and then you
19 described software itself as being best-in-class
20 software.
21         So I'm just interposing an objection as to
22 form, vague.
23         Q.  BY MR. GIBBS:  Okay.  Let me follow up on
24 something you've alluded to just to clarify.
25         You mentioned that you might have a product

CONFIDENTIAL

```
 1        Q.  And who would you want to talk to if you were
 2   asked to reach a conclusion about whether it was stable?
 3            MR. WILLIAMS:  Objection.  Form, beyond the
 4   scope.
 5            THE WITNESS:  Yeah, that's kind of -- that's
 6   way outside of what I was doing.
 7        Q.  BY MR. GIBBS:  Well, you said in Conclusion 4
 8   that evidence of 5,000 patches strongly indicates that
 9   the software was neither stable nor mature.  So I'm
10   really just trying to explore that --
11        A.  Yeah.
12            MR. WILLIAMS:  Hold on a second.  Objection.
13   Form.  He didn't say -- he didn't simply say that
14   evidence of 5,000 patches strongly indicates whether that
15   the software was stable, nor -- I think your question
16   ended there.
17            He said, in fact, I believe that the
18   existence of 5,000 patches and the continuing bugs during
19   the following months are evidence strongly indicating
20   that the 11i software was neither stable nor mature.
21            MR. GIBBS:  The point stands.  He's offering
22   an opinion about stability, and I'm exploring it.  I
23   think we're well within the scope of the report.
24        Q.  So let me ask you again --
25            MR. WILLIAMS:  I didn't instruct him not to
```

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

1   answer.
2           MR. GIBBS:  But he objected and didn't answer
3   the question.
4           THE WITNESS:  No, I didn't, really.  This is
5   basically what I meant.  If you're putting out 5,000
6   patches in the first six months, that's not stable, in my
7   opinion.
8       Q.  BY MR. GIBBS:  Okay.  And my question is:
9   Well, you mentioned that you hadn't talked to anybody.
10  Who would you want to talk to if you wanted to reach a
11  broader conclusion as to whether Suite 11i was stable?
12          MR. WILLIAMS:  Objection.  Form.
13          THE WITNESS:  Oh, boy.  That's a whole new --
14  wow, what a task that would be, literally to do that, to
15  go through and talk to all the friends and foes of 11i to
16  determine if it was stable or not.
17      Q.  BY MR. GIBBS:  You'd have to talk to a large
18  cross section of users?
19      A.  I'd have to.
20      Q.  Okay.  And you'd have to factor in the degree
21  to which different customers customize the software?
22      A.  That's true.
23      Q.  Because without knowing that, you can't tell
24  whether the instability has been introduced by the
25  customization or was there to begin with; correct?

111

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

1    MR. WILLIAMS:  Objection.  Form.
2    THE WITNESS:  That's true.
3    Q.  BY MR. GIBBS:  Now, you also mentioned that
4    you hadn't used Suite 11i.  If you were asked to opine in
5    absolute terms whether Suite 11i was acceptably stable,
6    would you want to use the software?
7    MR. WILLIAMS:  Objection.  Form.
8    THE WITNESS:  Yeah, 11i is not something I
9    would ever use.
10   Q.  BY MR. GIBBS:  Do you think you could reach a
11   fair conclusion about the relative stability of the
12   software without using it?
13   MR. WILLIAMS:  Objection.  Form.
14   Q.  BY MR. GIBBS:  Or watching someone else use
15   it?
16   MR. WILLIAMS:  Objection.  Form.  I'm not
17   sure what you're asking.
18   If you can understand what he's asking, you
19   can answer.
20   THE WITNESS:  It would take a good-sized
21   sample, a good cross section of the users pro and con.
22   It would be more interesting, and I can't do this because
23   I'm not -- I'm -- I don't want to say that.
24   What would be interesting to see was what
25   some out-of-the-box 11i users had to say about that.  But

```
 1   I'm -- that's for someone else to do.  Please don't sign
 2   me up to interview all these people.
 3           Q.  BY MR. GIBBS:  And you don't know what's
 4   typical in terms of stability for ERP release in its
 5   first six months of general availability; correct?
 6           A.  No.
 7           Q.  Would you agree, though, that some level of
 8   instability would be reasonable to expect?
 9           MR. WILLIAMS:  Objection.  Form.
10           THE WITNESS:  There's always some instability
11   in the beginning.  This product was put right out on the
12   street, and I would expect there to be quite a bit of
13   instability in the beginning.  I would expect it.  I
14   don't know if there was, but I would expect it.
15           Q.  BY MR. GIBBS:  And do you think customers
16   would expect it?
17           MR. WILLIAMS:  Objection.  Form.
18           THE WITNESS:  That's an opinion.  I don't
19   know if they would.  I would expect it.  I don't know if
20   they would.
21           Q.  BY MR. GIBBS:  Do you think people with
22   knowledge of the enterprise application industry would
23   expect it?
24           A.  Apparently some of them did.  Some people
25   bought it.  A lot of people bought it.
```

113

```
 1                    REPORTER'S CERTIFICATE
 2        I certify that the witness in the forgoing
 3   deposition,
 4
 5   was by me duly sworn to tell the truth, the whole truth
 6   and nothing but the truth in the within-entitled cause;
 7   that said deposition was taken at the time and place
 8   herein named; that the testimony of said witness was
 9   reported by me, a duly certified shorthand reporter and
10   a disinterested person, and was thereafter transcribed
11   under my direction into typewriting.
12        I further certify that I am not of counsel or
13   attorney for either or any of the parties to said
14   deposition, nor in any way interested in the outcome of
15   the cause named in said caption.
16        Dated         JUL 1 6 2007
17
18
19              Leslie Rockwood
                ─────────────────
20              Leslie Rockwood
                Certified Shorthand Reporter
21              State of California
                Certificate No. 3462
22
23
24
25
```