LATHAM & WATKINS·LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
         michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Phone: (212) 906-1200
Fax: (212) 751-4864
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSO

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
  Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
         matt.rawlinson@lw.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (Consolidated)<br><br><u>CLASS ACTION</u><br><br>**DEFENDANT ELLISON'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON FOR TRADING ON THE BASIS OF NONPUBLIC INFORMATION**<br><br>**Date:** September 26, 2007<br>**Time:** 2:30 p.m.<br>**Judge:** Martin J. Jenkins |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................................... 1

II.     LEGAL STANDARD............................................................................................... 2

III.    ARGUMENT ............................................................................................................ 3

        A.      Plaintiffs Have Not Shown The Alleged Information Was Material.................... 3

                1.      The Chancery Court Correctly Concluded That Neither The
                        January 17, 2001 Flash Report Nor Oracle's Intraquarter
                        Pipeline Data Was Material ...................................................................... 4

                        a.      The January 17, 2001 Flash Report ............................................. 4

                        b.      Oracle's Pipeline Data ................................................................. 6

                2.      Plaintiffs' New Theory That Oracle's Forecast Was
                        "Unreliable" Does Not Show Materiality .................................................. 9

                        a.      Minton Did Not Create The Potential Projection By
                                Applying A Historical Conversion Rate ...................................... 9

                        b.      The Purported "Major Macroeconomic Change"
                                Did Not Make Oracle's Forecasts "Unreliable" ......................... 10

                        c.      The Mix Of Products In The Pipeline Did Not
                                Render The Forecasts Unreliable................................................. 12

                        d.      The Alleged "Directive" By Ellison Did Not Render
                                The Forecast Unreliable............................................................... 13

                        e.      Ellison Did Not Believe Oracle's Guidance Was
                                "Unreliable" Due to "Problems With Suite 11i" ......................... 15

        B.      Plaintiffs Have Not Shown Ellison Acted With The Requisite
                Intent ................................................................................................................. 20

                1.      Plaintiffs Have Not Shown Ellison Was "Aware" Of Facts
                        Showing The Data Was Material ............................................................. 20

                2.      The Undisputed Facts Reflect A "Credible and Wholly
                        Innocent" Reason for Ellison's Trades .................................................... 20

                3.      Ellison Did Not "Suddenly Deviate" From A Plan To Sell.................... 23

                4.      Plaintiffs' References To An "Excessive Lifestyle" Are
                        Irrelevant ................................................................................................. 23

                5.      Plaintiffs' "Spoliation" Claims Do Not Prove Scienter......................... 24

IV.     CONCLUSION....................................................................................................... 25

1

## **TABLE OF AUTHORITIES**

2
Page

3
## **CASES**

4
*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................... 4

5
*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ....................................................................... 2

6
*Calexico Warehouse, Inc. v. Neufeld*,
    259 F. Supp. 2d 1067 (S.D. Cal. 2002) ....................................................... 3

7
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................... 3

8

9
*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................ 2, 20

10
*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996).......................................................................4, 6

11
*Houghton v. South*,
    965 F.2d 1532 (9th Cir. 1992) ..................................................................... 3

12

13
*In re Adobe Systems, Inc. Sec. Litig.*,
    787 F. Supp. 912 (N. D. Cal. 1992) ............................................................. 4

14
*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ................................................................2, 21

15
*In re Oracle Corp. Derivative Litigation*,
    867 A.2d 904 (Del. Ch. 2004),

16
    *aff'd* No. 561, 2004 (Del. Apr. 14, 2005) ......................................... passim

17
*In re SeeBeyond Techs. Corp. Secs. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ....................................................... 4

18
*In re Skechers U.S.A., Inc. Sec. Litig.*,
    No. CV 03-02094 PA, 2004 WL 1080174 (C.D. Cal. May 7, 2004) ................ 22

19
*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ....................................................................4, 6

20

21
*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ..................................................................3, 20

22
*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ................................................................21, 22

23
*Kassbaum v. Steppenwolf Productions, Inc.*,
    236 F.3d 487 (9th Cir. 2000) ....................................................................... 3

24
*Northwest Adm'rs, Inc. v. San Bruno Garbage Co., Inc.*,
    No. C-06-4961 MMC, 2007 WL 1703657 (N.D. Cal. Jun. 12, 2007).................. 3

25

26
*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ................................................................... 22

27
*Shaw v. Digital Equipment Co.*,
    82 F.3d 1194 (1st Cir. 1996)...........................................................1, 4, 6, 8

28
*Shurkin v. Golden State Vintners, Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006) ......................................................... 3

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir 1989) ................................................................................................. 4

**STATUTES**

15 U.S.C. §78t-1 (1988) ............................................................................................................ 2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 2, 21

Fed. R. Civ. P. 37 ...................................................................................................................... 25

Fed. R. Evid. 802 ...................................................................................................................... 17

## I.    INTRODUCTION

Although Plaintiffs assert that "[n]o reasonable trier of fact could conclude, on these facts, that Ellison did not possess material non-public information at the time he sold" Oracle stock in January of 2001 (Plaintiffs' Motion at 20), Plaintiffs fail to mention that the Delaware Court of Chancery came to exactly that conclusion.  *In re Oracle Corp. Derivative Litigation*, 867 A.2d 904 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005).  Indeed, in granting summary judgment for the ***defendants***, the Chancery Court concluded that "no rational trier of fact could find that . . .Ellison . . . possessed material, nonpublic financial information as of the time of [his] trades. . . ."  *Oracle Corp. Deriv. Litig.*, 867 A.2d at 906.  In so holding, the court looked at the same trades during the third quarter of Oracle's 2001 fiscal year ("3Q01") at issue here, applied the federal standard for "material nonpublic information," examined the same forecasting documents Plaintiffs cite here, and rejected many of the arguments Plaintiffs make here—for example, about the alleged "collapse" in the pipeline and the significance of Oracle's December 2000 results.  Plaintiffs' failure to discuss, or even *cite*, this contrary authority is breathtaking.  The Chancery Court's opinion (affirmed by the Delaware Supreme Court) was well-reasoned and demonstrably correct, and the same conclusion should be reached here.

First, Plaintiffs have not shown the intra-quarter information they claim Ellison knew was "material nonpublic information."  For intra-quarter data to be "material," that information must indicate "some *substantial likelihood* that the quarter would turn out to be an *extreme departure* from publicly known trends" or projections.  *Shaw v. Digital Equipment Co.*, 82 F.3d 1194, 1210 (1st Cir. 1996).[1]  None of the intra-quarter data in 3Q01 indicated a "substantial likelihood" of an "extreme departure" from Oracle's public projections.  To the contrary, all of Oracle's internal forecast reports supported Oracle's public guidance throughout the quarter.  Faced with this undisputed evidence, Plaintiffs claim Oracle's entire forecast process should have been disregarded because it became "unreliable" in 3Q01 (after seven quarters of success) due to internal or external changes.  Mot. at 2-9, 18-19.  As discussed below, these allegations fare no better; Plaintiffs fail to show that the alleged changes rendered Oracle's forecasting process so

---

[1]  Unless otherwise noted, all emphasis is added and all internal quotes and citations are omitted.

deficient that it lacked a reasonable basis—much less that the allegedly defective forecast created a "substantial likelihood" of "an extreme departure" from guidance.

Second, Plaintiffs have not shown that Ellison *knew* any of the alleged information was material when he traded—*i.e.,* that he *knew* any of the intra-quarter data indicated a "substantial likelihood" of an "extreme departure" from Oracle's public forecast, or that the forecast lacked a reasonable basis. Plaintiffs therefore fail to establish Ellison acted with the requisite intent for an insider trading violation. Instead, Plaintiffs contend they have met the scienter requirement by showing Ellison's trades were "suspicious in timing and amount." Mot. at 20-22. The mere fact of these trades is insufficient to show the required "intent to deceive." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Moreover, the undisputed facts— not set forth in the complaint and therefore not considered by the Fed. R. Civ. P. 12(b)(6) Ninth Circuit under Rule 12(b)(6)—show Ellison's wholly innocent reasons for selling Oracle stock in 3Q01: to exercise several hundred million dollars' worth of stock options before they expired and to pay down debt. The Ninth Circuit has made clear that where, as here, there is unrebutted evidence of an innocent reason for selling stock, those sales do not create a genuine issue of material fact regarding scienter. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).

Plaintiffs' Motion exposes several key failures of proof on critical elements of their Section 20A claim. As such, not only should their Motion be denied, but summary adjudication should be entered *in Ellison's favor* on this claim. *See* Defs' Motion for Summary Judgment ("Defs' MSJ") at 22-35.

## II.    LEGAL STANDARD

In seeking to recover under Section 20A of the Securities Exchange Act of 1934 ("Exchange Act"), Plaintiffs must prove that Ellison sold a security while in possession of material nonpublic information. 15 U.S.C. §78t-1 (1988). Plaintiffs also must prove that they traded contemporaneously with Ellison. *Id.*; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002). In addition, underpinning the maintenance of a 20A claim is the requirement that Plaintiffs must prove all elements of an independent violation of the Exchange Act or the rules and regulations promulgated thereunder. *Johnson v. Aljian*, 490 F.3d 778, 781

1  (9th Cir. 2007); *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1026 (N.D. Cal.

2  2006).

3  As the moving party seeking summary judgment, Plaintiffs "must come forward with

4  evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at

5  trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *Northwest Adm'rs, Inc. v. San

6  *Bruno Garbage Co., Inc*., No. C-06-4961 MMC, 2007 WL 1703657, at *3 (N.D. Cal. Jun. 12,

7  2007) (a plaintiff moving for summary judgment "must establish beyond peradventure *all* of the

8  essential elements of [their] claim...to warrant judgment in [their] favor") (emphasis in original).

9  In other words, Plaintiffs must show that the undisputed facts entitle them to judgment as a

10  matter of law. *See Calexico Warehouse, Inc. v. Neufeld*, 259 F. Supp. 2d 1067, 1075 (S.D. Cal.

11  2002). Plaintiffs have utterly failed to meet this burden. Moreover, by attempting to put their

12  best case forward, Plaintiffs have exposed the complete absence of any facts or law that support

13  their insider trading claim. Under such circumstances, a court has the authority to grant

14  summary judgment against Plaintiffs unless they identify evidence from which a rational trier of

15  fact could find in their favor on each element of their claim—which they have not done here.

16  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Kassbaum v. Steppenwolf Productions, Inc.*,

17  236 F.3d 487, 494-95 (9th Cir. 2000).

18  **III.   ARGUMENT**

19  Plaintiffs have failed to show that the undisputed facts entitle them to judgment as a

20  matter of law on their Section 20A claim. Plaintiffs claim Ellison was aware of "material,

21  nonpublic information" when he sold Oracle stock in January of 2001. Mot. at 16-20. However,

22  Plaintiffs fail to prove as a matter of law that any of the information was "material," or that

23  Ellison knew it was material at the time he traded. Thus, Plaintiffs fail to prove a predicate

24  violation of the Exchange Act and their claim under Section 20A fails.

25  **A.   Plaintiffs Have Not Shown The Alleged Information Was Material**

26  Plaintiffs argue, either expressly or by implication, that all of the information they point

27  to was "material" because it suggested that Oracle would not meet its guidance for 3Q01. *See*

28  Mot. at 17-20. However, Plaintiffs bear a heavy burden: federal courts have held that for intra-

quarter data to be "material," that information must indicate "some *substantial likelihood* that the quarter would turn out to be an *extreme departure* from publicly known trends" or projections. *Shaw*, 82 F.3d at 1210; *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 632 (1st Cir. 1996) (intra-quarter data not material unless it predicts "a material departure in the end-of-quarter results"); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (nonpublic information regarding "first quarter sales" was immaterial because the quarter "was not yet complete"); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir 1989) ("[F]irms need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading."); *Oracle Corp. Deriv. Litig.*, 867 A.2d at 939-40 ("To find information material simply because it cast some doubt on the company's ability to meet its projections more or less exactly would unduly chill trading by issuers and insiders (not to mention issuers' willingness to provide guidance at all).")[2]; *cf. In re Adobe Systems, Inc. Sec. Litig.*, 787 F. Supp. 912, 919 (N. D. Cal. 1992) (nonpublic information is material only if it tends to seriously undermine the accuracy of the company's projection).  Whether as to facts already considered by the Chancery Court or facts presented for the first time here, Plaintiffs do not come close to meeting this burden.

> 1. **The Chancery Court Correctly Concluded That Neither The January 17, 2001 Flash Report Nor Oracle's Intraquarter Pipeline Data Was Material**
>
>    a. **The January 17, 2001 Flash Report**

Plaintiffs claim that the January 17, 2001 Flash Report (reflecting preliminary actual results for the first month of the quarter, December 2000) reflected material nonpublic

---

[2] As the Supreme Court has warned, setting the materiality threshold too low might cause management "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988).  Congress enacted the Safe Harbor of the PSLRA for the express purpose of encouraging companies to provide forward-looking guidance to the market.  *See In re SeeBeyond Techs. Corp. Secs. Litig.*, 266 F. Supp. 2d 1150, 1166 (C.D. Cal. 2003) ("Congress intended 'the statutory safe harbor protection to make more information about a company's future plans available to investors and the public.'" (citing H.R. Conf. Rep. No. 104-369 (1995))).

1   information because it showed "negative growth rates" in the U.S. License divisions.  Mot. at 17.

2   As the Chancery Court concluded, however, "the December 2000 results are precisely the sort of

3   intraquarter data that courts have considered immaterial, as they did not create any substantial

4   likelihood that Oracle would fall short of the Market Estimates."  867 A.2d at 948.

5           The Chancery Court's conclusion was clearly correct.  As a result of the "hockey-stick

6   effect" (which meant that Oracle earned the vast majority of its quarterly revenue in the final

7   weeks of a given quarter), Ellison and other insiders thought the first month's revenues were "by

8   no means an accurate predictor" of results for the quarter.  Ex. 323 at 292:17-294:6; *see also* Ex.

9   324 at 365:23-366:8 (testifying that actual results from the first two months are "not particularly

10  indicative of how [Oracle's] quarter will do" because "the real numbers happen in the third

11  month, particularly the last week of the quarter").  And in any event, Oracle's December 2000

12  results were in line with prior quarters in which Oracle had met its revenue targets.  The January

13  17 Flash Report showed that as compared to the same period a year earlier, Oracle's license

14  revenue in December had grown by 35%, far better than the 25% growth publicly projected for

15  the full quarter.  Ex. 9 at 306579.  The Report also showed that December license revenue

16  equaled 19% of the quarterly forecast, compared to 16% and 19% of total quarterly revenue in

17  3Q00 and 3Q99.  *Id.* at 306577.[3]  Perhaps for that reason, Plaintiffs have not pointed to any

18  evidence that *anyone* at Oracle thought these results suggested a shortfall in overall results for

19  the quarter.  *See* 867 A.2d at 948.

20          Plaintiffs' argument does not benefit from their specious attempt to equate the January

21  17, 2001 Flash Report with the type of information Ellison testified he would consider material

22  (Motion at 17, referring to "zero sales in Europe").  What Plaintiffs refer to as "negative growth

23  rates" in Oracle's U.S. licensing divisions is a far cry from having "zero" sales in one of Oracle's

24

---

25  [3]  The January 17, 2001 Flash Report reflected the $60 million Covisint deal.  Ex. 9 at 306577-
    78.  It is illogical for Plaintiffs to suggest that in assessing Oracle's prospects for the quarter,
26  Ellison and others should have ignored the Covisint deal.  *See* Mot. at 17.  Under Plaintiffs'
    view, Ellison should have concluded that it was *bad* news that Oracle had just closed the largest
27  software license transaction in its history.  "As much as they would like to imagine otherwise,
    [Plaintiffs] need to accept that the Covisint transaction occurred and that it generated real
28  revenue that counted towards Oracle's achievement of the Market Estimates."  *Oracle Corp.
    Deriv. Litig.*, 867 A.2d at 946; *see also* Ex. 323 at 316:15-25.

major divisions.  The January 17, 2001 Flash Report showed that Oracle had recognized $96,036,000 of license revenue in its U.S. divisions during December, not zero, and that number reflected a percentage of the total quarterly forecast that was in line with prior first month results as a percentage of final quarterly results.  The information contained in this Flash Report is precisely the kind of intra-quarter data that courts have held to be immaterial as a matter of law.  *See Shaw*, 82 F.3d at 1210; *Glassman*, 90 F.3d at 632; *Worlds of Wonder*, 35 F.3d at 1419; *Oracle Corp. Deriv. Litig.*, 867 A.2d at 948.

### b.    Oracle's Pipeline Data

As in the Delaware derivative case, Plaintiffs here claim that Ellison possessed "material, nonpublic information" because he knew that Oracle's pipeline growth had declined from 52% at the beginning of December to 34% at the end of December.  *See* Mot. at 17-18.  Plaintiffs characterize this as a "collapse" in Oracle's pipeline.  *See id.*  In rejecting this precise claim, the Chancery Court characterized it as coming "very close to failing the straight face test" and "nowhere near avoiding summary judgment" for defendants.  867 A.2d at 944.

Again, the Chancery Court's conclusion was clearly correct.  Plaintiffs' repeated claim that Oracle's pipeline "collapsed" during 3Q01 is simply contrary to the undisputed evidence and rests on the absurd premise that Ellison should have been concerned about a 34% growth in the pipeline—a strong rate of growth by any reasonable measure, and far more than the 25% overall license growth Oracle had projected for the quarter.  *See* Mot. at 17-18.

Indeed, it was not a "collapse" in the pipeline that resulted in the miss; it was an unprecedented drop in Oracle's conversion rates at the end of the quarter.  The January 15, 2001 Pipeline Report (the last such report issued before Ellison began trading) showed that if Oracle could convert 51% of the existing pipeline—the same percentage Oracle had converted from the same point a year earlier—Oracle would achieve license revenues of nearly $1.6 billion in 3Q01, far more than the 25% license growth (approximately $1.3 billion) that Oracle publicly projected.  Ex. 325 at 008549.  As it turned out, Oracle's actual License revenues for 3Q01 reflected a conversion rate of just 41% based on the January 15 pipeline.  Ex. 326 at 975976.  This was thirteen percentage points lower than the average conversion rate *for the preceding*

*seven quarters* and seven percentage points lower than any conversion rate *in the preceding two years.* Ex. 325 at 008556.  Had Oracle matched any of the historic conversion rates from that point in the quarter, Oracle would have met its quarterly performance forecasts.  Plaintiffs have cited absolutely no evidence suggesting that Ellison or anyone else predicted this dramatic drop in Oracle's conversion rate at any time before the very end of the quarter, long after Ellison finished trading.

Contrary to Plaintiffs' suggestion that the pipeline decline portended disaster for the quarter, Oracle's executives *expected* the pipeline to decline from the 52% growth rate reflected in the December 11, 2000 Pipeline Report.  Decreases in pipeline growth over the course of a given quarter were a normal part of Oracle's business.  Ex. 327 at 48, Table 9 (showing Oracle's pipeline growth rates dropped in the first two months of 1Q01 and 2Q01, but Oracle met its forecast in each of those quarters).  For that reason, Mr. Henley announced guidance that was "more conservative" than the December 11 pipeline figures might have implied.  Ex. 71 at 354:3-355:3.  Because the forecast was based on an assumption that the 52% pipeline growth rate would decline over the course of the quarter, it is little wonder that Plaintiffs have found not one shred of evidence that anyone at Oracle was concerned that the decrease from 52% to 34% pipeline growth would prevent Oracle from meeting guidance.[4]

In fact, Oracle executives testified that changes in the pipeline growth during the quarter were not used as a forecasting measure.  *See* Ex. 324 at 384:6-15; Ex. 329 at 334:14-24; *see also Oracle Corp. Deriv. Litig.*, 867 A.2d at 952.[5]  As Henley explained "[e]verything is relative to where you are in the course of a quarter, historically how much . . . the absolute size of the

---

[4] As late as early February 2001, after Ellison's trading was completed, Oracle's Pipeline Report showed 32% pipeline growth over the prior year, well above the 25% license growth Oracle projected on December 14, 2000. Ex. 328 at 306669.  Oracle's February 5, 2001 Pipeline Report indicated that Oracle's pipeline for Technology was up 20% from the same date in Q3 of FY 2000 and Oracle's pipeline for Applications was still showing 66% growth. *Id*.  The Report also indicated that if Oracle converted its pipeline at the same rate as it had the same quarter one year earlier (3Q00), Oracle easily would have met its quarterly earnings targets. *Id*. at 306670.

[5] Even if they had, the decline in pipeline growth during 3Q01 would have implied precisely the opposite of what Plaintiffs claim.  The undisputed evidence shows that greater year-over-year revenue growth is actually correlated with more rapidly declining pipeline growth. Ex. 327 at ¶¶ 108-10.

1    pipeline at that point in time," and "the pipelines typically come down over the course of a

2    quarter because deals slip and so forth … [s]o you wouldn't expect the pipeline to be as large at

3    the end of January as it is . . . starting out in December, for instance."  Ex. 324 at 384:6-15.  Even

4    when, as expected, the pipeline diminished in December, it still represented a "very healthy

5    growth rate."  Ex. 71 at 354:7-14, 356:17-21 ("it was not a big surprise").  As the Chancery

6    Court concluded, at the time of Ellison's trades (and up to the end of the quarter), Oracle's

7    pipeline data did not suggest that Oracle would depart from its guidance in *any way*, much less

8    indicate "some *substantial likelihood* that the quarter would turn out to be an *extreme departure*

9    from publicly known trends" or projections.  *Shaw,* 82 F.3d at 1210; *Oracle Corp. Deriv. Litig.*,

10   867 A.2d at 944.

11        Plaintiffs' contention that the so-called "growth gap" was "smaller than usual" and "had

12   been negative for weeks" also gets them nowhere.  Mot. at 17-18.  Henley testified that he had

13   previously calculated the growth gap (*i.e.*, the difference between pipeline growth and license

14   revenue growth) and found that it bore no relation to Oracle's results or Oracle's ability to

15   achieve guidance.  Ex. 330 at 100:17-103:11 (testifying that the growth gap in prior quarters had

16   ranged from -17% to +13%); *see also* Ex. 42 (demonstrating that Oracle achieved the consensus

17   estimates before 3Q01).

18        Furthermore, Plaintiffs have adduced no evidence that anyone at Oracle considered the

19   "growth gap" as part of the forecasting process in 3Q01.  *See Oracle Corp. Deriv. Litig.*, 867

20   A.2d at 944.  Contrary to Plaintiffs' assertion, Ellison did not rely on an analysis of the "comfort

21   gap."  He testified only to looking at the forecast growth compared with the pipeline growth to

22   check that the "underlying pipeline growth" covered forecasted sales growth (Pls.' Ex. 100 at

23   86:9-87:9; Ex. 331 at 201:10-202:13) to see that there was "[s]till more than enough to make the

24   forecast".  Ex. 323 at 420:23.  In any event, pipeline growth throughout 3Q01 exceeded the

25   projected license growth of 25%.  *See* Exs. 1-8.  Thus, even if considered with the pipeline

26   growth decline, this "fact" was not material because it did not suggest *any* departure from

27   Oracle's guidance, let alone a "substantial likelihood" of an "extreme departure."  *See Oracle*

28   *Corp. Deriv. Litig.*, 867 A.2d at 944.

### 2. Plaintiffs' New Theory That Oracle's Forecast Was "Unreliable" Does Not Show Materiality

All of the undisputed evidence shows that Oracle's internal forecasts supported its public projections throughout 3Q01.  *See* Defs' MSJ at 5-14.  Faced with this overwhelming evidence, Plaintiffs claim that Ellison should have disregarded the internal forecasts in 3Q01 because Oracle's forecasting process—which had conservatively projected Oracle's results for the preceding seven quarters—had become so "unreliable" or "inaccurate" that Oracle could not have (and therefore should not have) provided *any* guidance to the market.  Ex. 332 at 94:11-95:15.  This position is absurd.  None of these alleged "facts" or "theories" show that Oracle lacked a reasonable basis for its forecast.  That alone ends the inquiry.  Certainly the evidence cited does not establish a forecasting process so deficient that a "substantial likelihood" of an "extreme departure" from the forecast was being masked—much less that Ellison knew of such a likelihood at the time he traded.

### a. Minton Did Not Create The Potential Projection By Applying A Historical Conversion Rate

In an attempt to undermine Minton's Upside Reports, which clearly show a reasonable basis for the 3Q01 forecast, Plaintiffs claim that the forecast prepared by Jennifer Minton was "unreliable" and "inaccurate" because it was generated by mechanically applying the 3Q00 conversion rate to the 3Q01 pipeline, and failed to account for changing economic conditions.[6]  Mot. at 3, 5-6, 9.  This simply isn't true.  The undisputed facts demonstrate conclusively that Minton did ***not*** derive the Potential Projection by applying a historical conversion rate to the existing pipeline.  *See* Ex. 333 at 122:17-127:24.  Indeed, based on the December 11, 2000 Pipeline report, to achieve Minton's Potential Projection, Oracle would have had to convert deals

---

[6] Ironically, while Plaintiffs claim that Minton's forecasts were entirely unreliable in late 2000, Plaintiffs argue in their motion for partial summary judgment that Oracle's forecasts were phenomenally accurate.  Specifically, Plaintiffs claim that if Oracle had not engaged in various alleged accounting improprieties, Oracle would have reported "final EPS results of *10.34 cents*" in 2Q01.  Motion for Partial Summary Judgment ("PSJ") at 9.  Plaintiffs point out that on November 27, 2000, Jennifer Minton's Upside Report projected EPS of "10.34 cents."  *Id.*  Thus, Plaintiffs claimed that with three days left in the quarter and with hundreds of millions of dollars in potential deals yet to close, Minton issued a forecast that was accurate to the *hundredth of a penny*.  Plaintiffs further asserted that if Oracle had done its accounting differently, the Company would have reported 10 cents earnings per share—exactly in line with the guidance that Oracle provided to the market in September 2000 based on Minton's forecasts.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

in the pipeline at a rate of only 48%, which is 5% less than the 53% conversion rate observed in 3Q00.  *See* Ex. 1 at 213095; Mot. at 5.  The guidance Oracle gave the market on December 14, 2000 was ***even lower*** than Minton's Potential Projection.  Thus, to achieve the public guidance, Oracle only needed to convert 42% of the pipeline reflected in the December 11, 2000 Pipeline Report—a conversion rate ***11 percentage points lower*** than the 3Q00 rate, and lower than any conversion rate since Oracle's 4Q99.  Ex. 334 at 033550, 033557.  These facts put to rest any argument that Oracle's forecast was based on the 3Q00 conversion rate.  Thus, Plaintiffs cannot show that the use of a particular conversion rate undermined the forecast's reasonable basis, and certainly cannot show that it created a substantial likelihood of an extreme departure from guidance.

### b.   The Purported "Major Macroeconomic Change" Did Not Make Oracle's Forecasts "Unreliable"

Plaintiffs also claim that a "major macroeconomic change" between 3Q00 and 3Q01 rendered Oracle's forecasting process "inaccurate" or unreliable.  Mot. at 4.  Plaintiffs do not explain how Oracle met or exceeded expectations in the first two quarters of fiscal year 2001, in spite of the alleged "major macroeconomic change," or why Defendants should have expected a different result in 3Q01.  Ex. 42.

In any event, the entire concept of a "major macroeconomic change" as conjured up by Plaintiffs for this litigation is bogus.  This phrase is not a term of art and has no generally accepted meaning in the finance community—or anywhere other than in Dr. Goedde's report in this litigation.  *See* Ex. 332 at 79:6-84:23, 84:24-85:4.  Presumably, Plaintiffs manufactured this concept based upon a passage from Ellison's deposition, which Plaintiffs have grossly mischaracterized.  Ellison testified that in the event of a:  "Major macroeconomic change; sudden—sudden growth in the economy or sudden shrinkage in the economy would cause—you can't extrapolate anymore," and Ellison provided as examples a war in the Middle East or oil rising over $100 per barrel.  Pls.' Ex. 26 at 384:6-385:7.  There is nothing remarkable about the proposition that a major world event (such as the examples provided by Ellison) might result in a sudden and unexpected economic shrinkage that could affect Oracle's sales.  Plaintiffs have

1    twisted this simple proposition, however, to contend that *any* slowing in the economy constitutes

2    a "major macroeconomic change" rendering Oracle's entire forecasting process "unreliable."

3    Ellison never said this (or anything remotely close), and more importantly, it is not true—as

4    demonstrated by Oracle's accurate and conservative forecasts in 1Q01 and 2Q01.  *Id.*; Ex. 42.

5           Setting aside Plaintiffs' manufactured concept, there is also no evidence that the factors

6    Plaintiffs characterize as a "major macroeconomic change" rendered Oracle's forecast

7    unreasonable or indicated a substantial likelihood of an extreme departure from the forecast.  For

8    instance, Plaintiffs contend that the decline in the NASDAQ and the "bursting of the dot com

9    bubble" made clear to Defendants that Oracle would not make its 3Q01 forecast.[7]  Mot at 4.  Yet,

10   as noted above, the dot-com decline began several quarters before 3Q01—quarters in which

11   Oracle *exceeded* its forecasts—and any impact or fallout from the decline in the dot-com sector

12   was already "baked in" to the 3Q01 forecast.  Ex. 338 at 170:21-171:1 (testifying that his

13   forecast for database sales was significantly below budget in 3Q01 and 4Q01); *see also* Ex. 339

14   (stating that the reduced expectations for database sales in the General Business division were

15   built into the NAS forecast); Pls.' Ex. 30 at 13 (noting a decline in Oracle's dot-com revenues

16   from 4Q00 to 1Q01 and 2Q01); Ex. 42 (demonstrating that Oracle achieved the consensus

17   estimate or its guidance in 1Q01 and 2Q01 despite the lower dot-com revenues).  Moreover,

18   there was no correlation between NASDAQ's performance and Oracle's sales.  Ex. 335 at ¶¶ 62-

19   64.  Thus, the decline in NASDAQ (which, incidentally, hardly constitutes "nonpublic

20   information") and the other economic factors Plaintiffs point to do not show Oracle lacked a

21   reasonable basis for its forecast and certainly do not indicate a substantial likelihood of an

22   extreme departure from the forecast.

23

24

---

25   [7] In addition to the decline in the NASDAQ index, Plaintiffs also mention a purported reduction
     in technology spending, lack of financing and actions by the Federal Reserve in support of their
26   argument that there was a major macroeconomic change.  These arguments grossly
     mischaracterize the record.  *See* Defendants' Motion to Exclude Expert Reports and Testimony
27   of Alan G. Goedde.  In fact, technology spending was expected to *increase* in calendar year
     2001, albeit at a slower rate than a year earlier, Ex. 336 at 1, and the data published by the
28   Bureau of Economic Analysis and relied upon by the Federal Reserve indicated an *increase* in
     software sales throughout calendar year 2000.  Ex. 337 at 8.

c.      **The Mix Of Products In The Pipeline Did Not Render The Forecasts Unreliable**

Plaintiffs also argue that "Minton's application of the historical conversion rate from 3Q00 to the 3Q01 pipeline also produced an inaccurate forecast in 3Q01 because Oracle's product mix had changed dramatically."  Mot. at 6.  Oracle's pipeline for both kinds of products was increasing, so the increased percentage of applications meant that the applications pipeline was growing faster than technology—something Ellison and other Oracle executives would have seen, properly, as a sign of healthy demand for Suite 11i.

In any event, this argument fails because, as discussed above, Minton did not apply the 3Q00 conversion rate in order to generate her Potential forecast, and the guidance given to the market was even lower than the Potential forecast, suggesting a lower conversion rate.  Mot. at 6.  Moreover, there is absolutely no evidence that anyone at Oracle analyzed Oracle's quarterly prospects based on applying separate applications and technology conversion rates to the applications and technology pipelines, whether in 3Q01 or at any other time.  Plaintiffs' attempt to prove that Ellison traded on material, nonpublic information based on metrics such as this one, that were never presented to or considered by Ellison, is precisely the kind of "fraud by hindsight" that courts have repeatedly rejected in this context.  As the Chancery Court held:  "At best, the plaintiffs have pointed to the existence of financial information that might have led a rational insider at Oracle at various points in January 2001 to believe that Oracle might not meet the Market Estimates, if they had thought about the information in the manner that the plaintiffs now do (which there is no evidence that Ellison or Henley did) and had the benefit of hindsight (which Ellison and Henley did not)." *Oracle Corp. Deriv. Litig.*, 867 A.2d at 907.

Ironically, if Ellison had analyzed the pipeline data as Plaintiffs now suggest, the result would have supported Oracle's public guidance, not undermined it.  Applying the 3Q00 applications and technology conversion ratios to the 3Q01 applications and technology pipelines leading up to Ellison's trades would have projected total license growth of 26%—above the 25% overall license growth that Oracle projected to the market.[8]  Thus, even if Ellison had been

---

[8] According to Plaintiffs' expert, as of January 15, 2001 (the last Pipeline Report before Ellison began trading), Oracle had an applications pipeline of $975,298,000 and a technology pipeline of

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

ELLISON'S OPP. TO PLFS' MSJ AGAINST ELLISON
Master File No. C-01-0988-MJJ (JCS)

presented with and considered the different product mix in the pipeline, it did not show that Oracle's forecast lacked a reasonable basis or that Oracle was substantially likely to have an "extreme departure" from its guidance for the quarter.

### d. The Alleged "Directive" By Ellison Did Not Render The Forecast Unreliable

Plaintiffs claim that Ellison introduced more "risk" into the forecast by issuing a "directive" that caused the sales force to stop "sandbagging" (*i.e.*, forecasting lower results than sales personnel actually anticipate) thereby eliminating the need for any Upside adjustments and making Minton's Potential forecast (which continued to include Upside adjustments) "unreliable." Mot. at 8-9. This argument fails at every level. There is no evidence that Ellison ever gave such a "directive;" there is no evidence that Oracle's sales force actually stopped sandbagging; and there is no evidence that Minton was unaware of—and failed to account for—any purported change in the sales forces' approach to forecasting.

First, the so-called "directive" was not a directive at all, and certainly was not intended to "increase the risk" in the forecasting process. The evidence reflects an ongoing dialogue through which senior executives were trying to make the forecasts as accurate as possible. The finance personnel conducted some analysis and concluded that Oracle's forecasts in FY00 were only 84-89% of the Company's actual results—showing that results were significantly exceeding forecasts. Pls.' Ex. 79 at 151959, 61; Ex. 340 at 151966-67. This highlights why Minton's Upside judgment was needed. Minton told her finance personnel that they should work closer with the sales units to improve accuracy of the forecasts. *See e.g.,* Pls.' Ex. 79; Ex. 341 at 103:11-106:11. As Ellison testified: "Q. Okay. At around this time, did you want more risk to be put into the forecasts? … THE WITNESS: No. I've always wanted the forecast to be accurate. You know, I would say slightly conservative but accurate." Ex. 342 at 423:7-12. Plaintiffs rely on an email from one finance employee to another discussing her understanding of

---

$1,715,878,000, and that pipeline converted at a rate of 33% for applications and 60% for technology. Pls.' Ex. 29 at Ex. 7. Multiplying those rates by the applications and technology pipelines in 3Q01 would yield applications revenues of $321,848,340 and technology revenues of $1,029,526,800, or total license revenue of $1,351,375,140 and growth of 26%—above Oracle's guidance of 25% total license growth. Far from undercutting Oracle's forecast, Plaintiffs' hindsight analysis lends further support to it.

"new terminology" regarding the three categories of forecast numbers (best, forecast and worst) in the computer system (Pls.' Ex. 31) and claim this indicates a "directive" to increase risk. However, as Minton testified, this email reflects the fact that Oracle was "rolling out a new application" and "we wanted to have consistent definitions…in part, due to the fact that we had three different sales organizations in North America." Ex. 341 at 111:13-19.   There is no evidence that the attempt to make forecasts more accurate, or using consistent definitions in the computer system, if that ever occurred, would reduce sandbagging or eliminate the need for Minton to apply her Upside judgment.

Nor is there any evidence any steps taken actually resulted in less "sandbagging" by the sales personnel, or that Ellison or anyone else expected it to have such a result. Ex. 341 at 111:8-19. Ellison testified that he:

> wanted to get three separate numbers reflecting a worst case, guaranteed we will at least do that well, a most likely case, what you thought you were actually going to do, and a best case, if everything goes really well, how high could it go.  And I was also trying to get—in putting in the new methodology, I was also trying to synchronize the way Europe forecasts with the way Latin America forecasts and Asia Pacific and different groups would have different ways of doing their forecast.  And I was trying to get as much of that variability out of the system as possible.  Now you can't get the personalities out of the system.  I mean, if you have a conservative sales executive, they are going to forecast conservatively.  If you have an optimistic sales executive, they are going to forecast less conservatively.
>
> Q:  What drove you to make this change?
>
> A:  The—we were going to put the three numbers in the computer system.  What I wanted to see—I've done—to get more information, just getting more—you know, getting more data rather than one number, which usually was someplace between the best case and the most likely—what they used to call a commit forecast; one we could count on.  I was trying to, you know, get a better idea of what, you know—get more data—get more data to work with."

Ex. 342 at 425: 5-21.  Ellison's testimony demonstrates that he did not believe that getting three separate numbers from the sales divisions, showing a range of possibilities, was going to eliminate the "personalities" in the forecast process, much less eliminate sandbagging altogether. Clearly, he did not think this approach would "increase risk" or eliminate the need for Minton to add or subtract Upside judgment (as Plaintiffs contend).  Instead, by having access to all three

numbers, they would have greater information to inform the judgments being made. This evidence simply does not support the notion that Ellison knew the 3Q01 forecast was inflated because there was no need for Minton's Upside judgment, as Plaintiffs contend.

Finally, even if Ellison had given the directive Plaintiffs suggest (he didn't), and even if the sales personnel in the field stopped sandbagging altogether (they didn't), there is no evidence that Minton would have failed to adjust her Potential forecast appropriately.  Minton and others have testified that they discussed the status of deals during weekly and biweekly forecast calls. Ex. 333 at 178:7-180:5; Ex. 343 at 39:21-42:11.  Thus, Minton was aware of the likelihood of any particular deal closing based upon these calls, and adjusted her Upside accordingly.  If a deal was in the "forecast" column that might previously have been in the "best case" column, Minton would have learned the status of that deal and could determine whether any Upside should be applied, either positive or negative.[9]  Thus, the very premise that a "directive" by Ellison would have resulted in overstated Upside amounts finds no support in the record, and Plaintiffs have failed to prove that Oracle lacked a reasonable basis for its forecast based on this issue.

### e. Ellison Did Not Believe Oracle's Guidance Was "Unreliable" Due to "Problems With Suite 11i"

Finally, Plaintiffs assert that Ellison possessed material non-public information concerning Suite 11i that could, theoretically, impact Oracle's applications sales forecast. Specifically,  Plaintiffs claim that (1) Oracle's sales force was incapable of selling applications software, (2) that Suite 11i was released too early, causing too many problems for its early customers, (3) that Suite 11i lacked reference customers, and (4) that Oracle's $1 billion dollar savings advertising campaign was false.  Mot. at 6-8, 19-20.[10]  Plaintiffs, however, fail to present

---

[9] In addition, Minton relied on finance personnel in the field to perform a cross-check on the forecast of the sales managers.  Ex. 343 at 37:4-7 ("Q.  So in your forecasting duties for OSI one of them was to verify whether you thought [Mr. Nussbaum's] forecast was reasonable to Jennifer Minton?  A.  That's right.").  For Plaintiffs' argument to make sense, Plaintiffs would have to prove that Ellison and the sales force increased the risk in the forecast without Minton or any of her people becoming aware of it.  However, the very email upon which Plaintiffs rely in advancing this theory was a communication between field finance personnel.

[10] Other Suite 11i allegations put forward in these sections—including Plaintiffs' claims that Suite 11i was not sufficiently tested prior to release, that Suite 11i's Order Management module was particularly problematic, and that Oracle could not adequately demonstrate the Suite 11i software—also are advanced in Plaintiffs' PSJ, and Defendants thus address those arguments in

1   any evidence of information in Ellison's possession that is actually "material" or "non-public"

2   with respect to any of these issues.

3           Plaintiffs first assert that Ellison knew Oracle's sales force was "better at selling database

4   products" than application products, which somehow made Oracle's applications sales

5   projections for 3Q01 overly optimistic.  Mot. at 6.  Plaintiffs' evidence for this is two passages

6   from *Softwar*, which not only fail to support Plaintiffs' proposition but undermine it.  *Id.*  In

7   *Softwar*, Ellison wrote about Oracle's database sales force **in 1993**, seven years before the launch

8   of 11i.  Pls.' Ex. 55 at 114.

9           With respect to the timing of Suite 11i's release (Mot. at 6, 19), Plaintiffs again rely on a

10  notation by Ellison in *Softwar* and ignore Ellison's explanation of this same notation at his

11  deposition.  *Id.* at 6-7.[11]  Ellison testified that he "would have released [Suite 11i] at exactly the

12  same time, but in terms of our existing customer base, who were planning to migrate, I should

13  have slowed that process down."  Ex. 342 at 412:11-413:1.  In other words, Ellison explained

14  that **in retrospect,** Oracle should have delayed the migration of *existing* Oracle customers from

15  earlier Oracle applications to Suite 11i until the product was more stable, though he still would

16  have released the software to new customers at the same time.  *Id.*  Plaintiffs fail to explain how

17  this statement rendered Oracle's forecast unreasonable or indicated a substantial likelihood of

18  extreme departure from the forecast.  Furthermore, Ellison's analysis of the issue in hindsight

19

20  Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("PSJ Opposition").

21  *See* PSJ Opposition at 21-23.

[11] Plaintiffs rely on a variety of inadmissible, unreliable and irrelevant evidence relating to Suite
22  11i.  For instance, in addition to the Ellison excerpt from *Softwar* discussed here, Plaintiffs cite a
    number of purported quotes by other Oracle executives in *Softwar*.  Mot. at 7 (citing Pls.' Exs.
23  58 and 59).  These statements have not been authenticated and are double hearsay without any
    applicable exceptions.  Fed. R. Evid. 802.  Tellingly, Plaintiffs had the opportunity to verify the
24  *Softwar* statements of each of these executives at their depositions in this matter, but did not.
    Plaintiffs also repeatedly cite text by Matthew Symonds, *Softwar's* author, to support their
25  arguments.  Mot. at 7 (Ex. 65).  That, too, is hearsay without any exceptions and should be
    excluded.  In addition, Plaintiffs cite the Delaware derivative deposition of Jay Nussbaum, a
26  former Oracle employee.  Mot. at 7 (citing Pls.' Ex. 60).  Like the Softwar excerpts, Nussbaum's
    Delaware deposition is hearsay without any exception.  It is also not particularly meaningful.
27  Anecdotal "horror stories" are par for the course in large ERP implementations.  *See* Defendants'
    Motion for Summary Judgment at 37-39; PSJ Opposition at 18-20.  Plaintiffs have not proven
28  (nor could they) that Suite 11i generated more of these or suffered more problems generally, than
    any other software of similar size and scope.

1  (from a book published in 2003), does not constitute undisclosed material information known to

2  Ellison during the Class Period.[12]

3  　　　　In addition, Plaintiffs contend that Ellison knew Suite 11i lacked reference customers,

4  which "severely affected Oracle's ability to convert its applications pipeline." Mot. at 7.[13]

5  Plaintiffs base this claim on Ellison's statement in *Softwar* that "it's difficult to sell without

6  customer references." Pls.' Ex. 71 at 249.  But Plaintiffs ignore the context of the statement,

7  which merely compares selling Suite 11i's newly released CRM products, which had no

8  references upon release in May of 2000, against Siebel's CRM product—which had been on the

9  market for a decade and had established customers willing to serve as references.  *Id*.  Ellison did

10  not say Oracle was struggling to recruit 11i references, as Plaintiffs suggest.  In fact, though

11  Plaintiffs claim Ellison testified that Oracle was "desperate" for 11i references (Motion at 7),

12  Ellison directly contradicted this in his deposition.  *See* Ex. 342 at 247:18-248:1 ("Q.  Isn't it true

13  that in 2000—between December 2000 and March 2001 that you were desperate for references

14  for…Suite 11i? A.  No, I wouldn't characterize us as desperate.").

15

16  [12] Indeed, the record establishes that Ellison, along with Oracle's top development executives,
17  believed Suite 11i was ready for the market when it was released.  *See, e.g.,* Ex. 344 at 80:17-
   81:2 ("Q:  In May of 2000, just before or right around the release date of 11i, I guess at some
18  point you agreed that it was time to be—for it to be released or it was ready to be released; is that
   fair?  A:  Yes.").  *See also* Ex. 345 at 258:15-259:15; Ex. 346 at 82:21-83:4; Ex. 347 at 68:18-24.
19  Moreover, the market was aware of issues with early versions of the 11i software.  Market
   analysts reported that the earliest versions of Suite 11i may not have been as stable as later
20  versions, a characteristic common to large new software releases.  *See, e.g.,* Ex. 140 at 009467
   ("11i as a complete ERP suite remains suitable primarily for risk-tolerant, early-adopter-oriented
21  enterprises."); Ex. 117 at 009736-38 ("Users must approach the newer applications cautiously,
   because many have not been field tested in real-world scenarios.  For mission critical
22  applications, we recommend users wait at least six months after the release of 11i to
   purchase/implement Oracle's newest applications."); Ex. 112 at 019758-59 (warning early
23  customers about adopting 11i's CRM applications).

24  [13]  Plaintiffs cite a NAS Dialogue for the proposition that 11i had no customer references in
   November 2000, but that document refers to the "few" or "thin" 11i references at the time, not
25  zero and offers no support for the proposition that one would reasonably have expected more
   references this soon after the release of a product like Suite 11i.  *See* Pls.' Ex. 69 at 153364,
26  153368.  Plaintiffs also cite a June 2001 document for the proposition that there were "only nine
   CRM references by June 2001," but that grossly overstates this document, which actually lists
27  only a small subset of 11i CRM references in June 2001:  those that were live and had
   specifically approved Oracle's use of their names on an earnings call.  See Plfs.' Ex. 70 at
28  442698-9.  Nor do Plaintiffs argue (much less prove) how many there "should" have been.
   Oracle may well have wanted "more" references—but that does not mean the number of
   references it did have were reflective of anything other than the youth of the product.

1    Contrary to Plaintiffs' suggestion, there is no support for the conclusion that the number

2 of references obtained by Oracle for Suite 11i by the fall of 2000 was unusually small, or

3 resulted in any lost sales for 3Q01.  Given the extended sales cycle and the fact that even a

4 smooth implementation takes months, during the early stages of a new release software vendors

5 commonly have limited "live" implementations and, consequently, a small reference-account

6 base.  *See* Ex. 348 at ¶¶ 218-228.  *Id; see also* Ex. 349 at 16, 47.  Both Oracle executives and the

7 market understood this dynamic,[14] and Plaintiffs have identified no evidence that Oracle

8 obtained references more slowly than one would expect in these circumstances, or that Oracle's

9 efforts to obtain references amounted to anything other than a well understood aspect of the

10 product cycle.  Far from failing in this regard, Oracle's Suite 11i had obtained a number of

11 reference customers by November of 2000 and added more throughout the Class Period and

12 beyond.  *See, e.g.,* Ex. 354 at 421258 (reporting 27 reference customers in October 2000); Ex.

13 355 at 023373 (reporting 83 reference customers in December 2000); Pls.' Ex. 60 (to PSJ) at

14 129135 (reporting 210 reference customers in March 2001).  This pattern is exactly what one

15 would expect and hope for from a new product.  Again, Plaintiffs fail to prove that a lack of

16 references meant that Oracle had no reasonable basis for its forecast or indicated a substantial

17 likelihood of an extreme departure from the forecast.

18    Plaintiffs also resurrect their accusation that Oracle's $1 billion savings marketing

19 campaign was false, and that Ellison knew it.  Mot. at 8.  However, nothing Plaintiffs cite

20 remotely supports their accusation that Ellison "later admitted that this was untrue."  *Id*.  The

21 evidence they present again comes from *Softwar*, and again, it is largely inadmissible and

22 completely misinterpreted.  Plaintiffs cite text written by Matthew Symonds for the proposition

23 that "the first billion dollars of savings was pretty much in the bag before 11i was finished."  *Id*.

---

24    [14]  *See* Ex. 350 at 353:17-354:22 ("And, you know, when you have a new release of a new

25 product, you know, it takes a while until you build up a base of 500 plus customers to talk to
people."); Ex. 351 at 108:23-109:8; Ex. 352 at 210:21-211:19; Ex. 149 at 419950 ("Although the

26 company has announced a number of 11i customer wins, none of the bigger names, including
BellSouth, GE, and Lucent, have gone live yet.  We believe it will take several more quarters for

27 the company to implement these customers and to use them as references to win additional
business."); Ex. 353 at 091448 ("[Suite 11i] accounts are becoming referenceable, but we believe

28 the real momentum will begin to build when they are fully implemented and that should take
place over 2001.").

1    Even if this were not pure hearsay, it would not support Plaintiffs' argument.  Oracle's marketing

2    message, as demonstrated by Plaintiffs' own evidence (*see* Pls.' Ex. 76), did not reference

3    savings based upon the use of Suite 11i, but rather on deploying Oracle's e-business suite, a

4    brand name for Oracle's internet-based enterprise applications, of which Suite 11i was merely

5    the latest release during FY 2001.  *See* Ex. 342 at 335:5-13, 336:6-337:2, 406:5-15; Ex. 356 at

6    22:7-18.

7         The market understood that Oracle's $1 billion marketing claim was based on

8    implementing Oracle's internet ready e-business suite and the change in business processes that

9    enabled, and was not specific to Suite 11i.  *See, e.g.,* Ex. 357 at 078421 ("According to

10   Sanderson, this reduction is a key component of the $1 billion Oracle purports to have saved by

11   *transitioning to a fully Web-enabled e-business* and will contribute substantially to the second $1

12   billion the company expects to save."); Ex. 109 at 003409-14.  Ellison told the market exactly

13   that in the months leading up to the Class Period:

14            Oracle saved $1 billion dollars last year, and we'll save a second
             billion this year by—it was not simply a matter of us putting in all
15            this cool software.  It was a matter of us dramatically changing our
             business processes, the way we compensate business sales people,
16            the way we train sales people, the way we sell to our customers,
             the way we support our customers.  All of that has changed
17            because of the internet.

18   *See* Pls.' Ex. 25 (to PSJ) at 46.  References to "last year" in these comments make it clear that

19   the savings were not based on implementation of Suite 11i, which had only been available for a

20   few months.  *See also* July 19, 2007 Ellison Decl. at ¶¶ 20-26.  Finally, the record unequivocally

21   supports Oracle's $1 billion savings marketing message.  *See* Ex. 342 at 335:5-13; 336:6-337:2;

22   406:6-15; Ex. 358 at ST&B 6917.  Plaintiffs' attempt to revive this long-abandoned and

23   unfounded allegation is futile—they have failed to prove this claim was false or that it would

24   have rendered the forecast unreasonable or indicated a substantial likelihood of an extreme

25   departure from the forecast.

26

27

28

**B.** **Plaintiffs Have Not Shown Ellison Acted With The Requisite Intent**

1. **Plaintiffs Have Not Shown Ellison Was "Aware" Of Facts Showing The Data Was Material**

In order to prove an underlying predicate violation of the Exchange Act, Plaintiffs must satisfy Section 10(b)'s scienter requirement—that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst*, 425 U.S. at 193 n.12.

To show an insider trading violation of **Error! Bookmark not defined.**Section 10(b), Plaintiffs must prove that Ellison was "aware" of material nonpublic information at the time he traded. *See* "Selective Disclosure and Insider Trading," SEC Rules and Regulations, 65 FR 51716, 51727 (2000) (Awareness, as required by Rule 10b5-1, "is a commonly used and well-defined English word, meaning 'having knowledge; conscious; cognizant.'"); *see Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1196-97 (C.D. Cal. 2004) (an insider must "have knowledge of material inside information and intentionally trade on [the basis of] that information without disclosing it to the public").

To prove Ellison's "awareness" of material information, Plaintiffs must show not only that Ellison knew the underlying "fact" that Plaintiffs allege—but also, that Ellison *knew* the "fact" *was material at the time he traded* because it indicated a "substantial likelihood" of an "extreme departure" from the forecast. This Plaintiffs have utterly failed to do and make no attempt to do in their Motion. Mot. at 16-19. Plaintiffs' bald assertions that Ellison "knew" the forecast was "unreliable"—which are flatly wrong as a matter of fact—are insufficient as a matter of law to prove scienter. Indeed, as the record amply demonstrates, Ellison believed Oracle would make the forecast until the very end of the quarter. *See* Defs' MSJ at 5-15.

2. **The Undisputed Facts Reflect A "Credible and Wholly Innocent" Reason for Ellison's Trades**

Relying almost exclusively on the Ninth Circuit's opinion reversing this Court's dismissal of the operative complaint under Rule 12(b)(6), Plaintiffs purport to prove scienter by showing that Ellison's trades were "suspicious in timing and amount." *See* Mot. at 20-22. Plaintiffs contend that "the facts have not changed" since the Ninth Circuit's decision. *See id.* at 20. To the contrary, not only have the facts changed, the procedural posture of the case has

changed dramatically.  At summary judgment, Plaintiffs must prove their case, and the Court is not limited to the allegations pled in Plaintiffs' complaint (*i.e.,* the amount and timing of Ellison's trades).  Here, the Court has before it a voluminous record of new and undisputed facts that explain the context for Ellison's trades, and that context completely undercuts any inference of a fraudulent state of mind.  *See Apple*, 886 F.2d at 1117 (no question on scienter from insider trading for jury in light of defendants' "credible and wholly innocent explanations for the stock sales").

Ellison sold Oracle stock in January 2001 because he had over half a billion dollars worth of stock options due to expire in August of that year and only three trading windows still available to exercise them.  *See* July 19, 2007 Ellison Decl. ¶¶ 6, 8.  His decision to sell was a response to months of urging from his financial advisor.  *See id.* ¶ 9.  Once he decided to go into the market to exercise the expiring options, Ellison determined (again at the urging of his advisor) to sell some additional shares as well in order to pay down more debt.  *See id.* ¶¶ 9-10.  Ellison, however, placed restrictions on the sales that are irreconcilable with any suggestion that he was bailing out of Oracle's stock to avoid a price drop.  Specifically, he capped the percentage of daily volume for his trades, imposed a floor on the market price at which he would sell the shares, and declined to sell shares during early February, notwithstanding clearance to do so.  *See id.* ¶ 11.  As a result, Ellison sold only 29 million of the 40 million shares that he and his investment advisor had decided to sell.  July 19, 2007 Ellison Decl. ¶ 13; Ex. 187 at 164:1-24, 174:10-24, 180:8-19, 202:19-24; Ex. 188.  Under *Apple*, Ellison's "credible and wholly innocent explanation" for his sales undercuts any inference of scienter as a matter of law.  886 F.2d at 1117.

The Ninth Circuit's decision in *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), does not undermine this analysis.  In *Kaplan*, the court held that the individual defendants' explanations for their sales were not "wholly innocent," because the two defendants sold two-thirds and 100% of their stock, and one of them sold because he wanted to retire.  *See id.* at 1379-80.  The Ninth Circuit held that, if anything, the fact that one of the defendants sold because he planned to retire supported, an inference of scienter, rather than undermining it.  *See id.* at 1380.  Unlike the

1  defendant in *Kaplan*, Ellison did not trade because he was retiring.  He remains Oracle's CEO.

2  Nor did he sell anywhere near two-thirds (let alone 100%) of his Oracle stock.  He sold

3  approximately 2% of his Oracle holdings.  *See Nursing Home Pension Fund, Local 144 v.*

4  *Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).[15]

5        The Ninth Circuit's conclusion at the pleading stage that the total dollar amount of

6  Ellison's sales was "suspicious" does not change this analysis.  The Ninth Circuit did not have

7  before it the unrebutted evidence explaining the reason both for his sales and for the size of his

8  sales.  *See Oracle Corp.*, 380 F.3d at 1232.  To hold, in the face of these uncontested facts, that

9  Ellison's sales were suspicious merely because of the dollar amount involved would be

10 tantamount to holding that Ellison is required to either exercise options constantly (to avoid large

11 exercises), or forfeit large option grants entirely.

12       Nor were Ellison's sales out of line with his prior trading pattern, as in *Kaplan*.  As

13 Plaintiffs themselves argue, Ellison had a pattern of exercising options as they were about to

14 expire (Motion at 12), and that is precisely what he did here. The fact that Ellison waited more

15 than 9 years until the options were about to expire in order to exercise them is consistent with his

16 prior pattern and in no way suspicious.  Nor is it suspicious (as Plaintiffs claim) that he did not

17 wait until August.  As of January 2001, Ellison had only three trading windows available to him.

18 *See* July 19, 2007 Ellison Decl. ¶¶ 6, 8.  Had he not exercised in January, the remaining windows

19 could have closed if he had come into the possession of any material nonpublic information

20 (such as an unannounced acquisition by Oracle), and therefore would have risked losing options

21 that were worth over half a billion dollars as of January 2001.  *See id.; Oracle Corp. Deriv.*

22 *Litig.*, 867 A.2d at 954-55.

23

24

_____

25 [15]  Plaintiffs wrongly argue that because "Ellison sold 16.34% of the maximum allowed by SEC Rule 144 (178 million shares) … [h]is sales support a finding of scienter."  Mot. at 21.  Plaintiffs cite no authority in support of their position, and indeed, the authority is contrary to plaintiffs'

26 position.  In *In re Skechers U.S.A., Inc. Sec. Litig.*, No. CV 03-02094 PA, 2004 WL 1080174 (C.D. Cal. May 7, 2004), the court held that plaintiffs' arguments that defendants sold "***95% of***

27 ***the shares they were permitted to sell under Securities and Exchange Commission Rule 144***" did not support a strong inference of scienter.  2004 WL 1080174, at *9-10.  If selling 95% of the

28 shares permitted under Rule 144 did not support a strong inference of scienter in *Skechers*, Ellison's sales of just 16.34% here cannot support any inference of scienter.

### 3.      Ellison Did Not "Suddenly Deviate" From A Plan To Sell

Plaintiffs contend that Ellison had a "plan" to sell in April 2001 and that he "suddenly deviated" from that plan to "unload early" in January 2001.  Mot. at 1, 9, 12-14.  This is yet another fiction, unsupported by the evidence.  Both Ellison and his financial advisor, Philip Simon, testified that neither Ellison nor Simon had ever planned to exercise the options in April 2001.  Ex. 342 at 486:3-487:20, 495:16-496:20; Ex. 359 at 122:11-19, 130:7-136:17.  The testimony of Messrs. Ellison and Simon is also consistent with the documentary record, which indicates that Ellison would exercise his options no later than April 2001.  Pls.' Ex. 108. Plaintiffs base the "sell in April" theory on a January 10, 2001 e-mail[16] to Philip Simon from Deborah Lange, an executive in Oracle's tax department as to whom Ellison testified that "I don't think I've ever had a private conversation with Deb Lange in my life."  Ex. 342 at 487:12-20 ("Q.  Did you tell [Lange] that it was your intention of—selling and exercising your stock in April of 2001?  A.  No.");  Simon testified that Lange's email did not reflect any plan on the part of Ellison to sell in April, but rather that Lange would prefer that Ellison exercise his options during Oracle's FY 2001—meaning no later than April 2001 (because the window for insider sales would have been closed in May)—in order to optimize Oracle's tax deductions.  Ex. 359 at 134:3-16.[17]  Ellison did not "suddenly deviate" from a plan to sell in April 2001 as there was no "plan" from which to deviate.  Plaintiffs' arguments are based on no more than unsupported speculation and contradicted by the undisputed facts in the record.

### 4.      Plaintiffs' References To An "Excessive Lifestyle" Are Irrelevant

Plaintiffs' claim that Ellison sold stock to fund his "absolutely excessive lifestyle" is nothing more than an *ad hominem* attack—a suggestion that because Ellison is wealthy, he must have committed fraud.  *See* Mot. at 14, 22.  If anything, Plaintiffs' references to Ellison's lifestyle provide further support for Ellison's unrebutted explanation that he sold his stock, at the

---

[16] Plaintiffs argue that Lange sent the email on January 22, 2001, Mot. at 13, but the document itself clearly indicates that Lange wrote it on January 10.  Pls.' Ex. 5; Ex. 359 at 130:7-131:7.

[17] Although Plaintiffs identified Deborah Lange as a person they planned to depose, they ultimately chose not to depose her and therefore did not question her on this topic.  Ex. 360 at Attachment A.

insistence of his financial advisor, in order to pay down debt on his bank lines and avoid having to obtain a waiver of the debt covenants. Ex. 342 at 486:3-24 ("Q. And you were very concerned about your debt at that stage [January 2001]? A. Very concerned. I certainly wanted to pay down my debt."); *id.* at 502:11-503:11; Pls.' Ex. 3 at 300620, 300624-25. Whether the debt was incurred to buy a boat or any other expense is of absolutely no relevance, for it does not make it any more or less likely that Ellison acted with the requisite scienter; the evidence is undisputed that at least $404 million of the $648 million in net proceeds was used to pay down Ellison's debt. Pls.' Ex. 7.

### 5. Plaintiffs' "Spoliation" Claims Do Not Prove Scienter

Plaintiffs also seek an inference of scienter based on specious allegations of spoliation. *See* Mot. at 22-25. As an initial matter, the conduct of discovery in this case is not evidence, and is not properly considered in support of Plaintiffs' Motion (or, for that matter, in opposition to Defendants' motion for summary judgment). If Plaintiffs wish to obtain an adverse inference based on Defendants' efforts to preserve and produce documents, Plaintiffs must do so through a proper motion under Federal Rule of Civil Procedure 37. Indeed, Plaintiffs have already filed two such motions, and they have threatened to file a third. Unless and until Plaintiffs meet the extremely high burden for obtaining evidentiary sanctions through a proper motion, there is no basis for inferring scienter, or anything else, on the basis of Plaintiffs' claims. In that regard, after reviewing nearly all of the same claims Plaintiffs present here, the Special Master denied Plaintiffs' first motion seeking evidentiary sanctions, finding that Plaintiffs had failed to meet their burden. Plaintiffs have filed an objection seeking to reverse that order, and this Court has directed Defendants not to respond to that objection unless ordered to do so. Separately, Plaintiffs filed a 91-page "supplement" to their prior objection, raising all of the issues raised in support of the instant Motion, and again the Court directed Defendants not to respond until so ordered. Defendants will respond in full to any or all of Plaintiffs' claims as directed by the Court.

In the meantime, setting aside the procedural infirmity of this argument, Plaintiffs' claims of "spoliation" are specious. Plaintiffs complain, for example, about Defendants' alleged

1   "destruction" of OSO material.  Plaintiffs neglect to mention that they previously filed a motion

2   to compel production of the OSO database, and the Special Master ruled that this material was

3   *not discoverable*, and Plaintiffs never appealed that order.[18]  Ex. 361 at 4.  That Plaintiffs are

4   claiming "spoliation" based on alleged destruction of materials the Special Master found were

5   outside the scope of discovery speaks volumes about Plaintiffs' view of "spoliation."  Plaintiffs'

6   complaint to the effect that Defendants never produced to them a copy of the book *Softwar*—a

7   published work that is available for sale in bookstores across the country—is likewise

8   instructive.  And although Plaintiffs suggest that Ellison should be held responsible for Matthew

9   Symonds' apparent destruction of certain transcripts and recordings of his interviews with

10  Ellison, Plaintiffs deposed Ellison at length on this issue, and Ellison's unrebutted testimony

11  confirms that Ellison repeatedly asked Symonds to turn over those transcripts and recordings for

12  production to Plaintiffs here.  There is absolutely no basis for holding Ellison responsible for

13  whatever Symonds may have done with those materials.

14  **IV.     CONCLUSION**

15          For the foregoing reasons, Plaintiffs' Motion should be denied, and the Court should

16  enter judgment as a matter of law in favor of defendant Ellison on Plaintiffs' Section 20A claim.

17

18  Dated: August 27, 2007                          LATHAM & WATKINS LLP

19

20                                                          */S/*

21                                          By:_____

22                                                  Patrick E. Gibbs
                                                    Attorneys for Defendants

23

24

25

26

27  _____

28  [18] In any event, hard-copy evidence of relevant print-outs from the database was preserved in the
    files of the relevant actors and produced to Plaintiffs.  Plaintiffs therefore already have all the
    OSO material that the Court determined they had any right to discover.