IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

                        Master File No. C-01-0988-MJJ

This Document Relates To:


     ALL ACTIONS.

_____   _____/



               ---oOo---

            CONFIDENTIAL

   VIDEOTAPED DEPOSITION OF LAWRENCE ELLISON

              Volume II

       Thursday, September 21, 2006

               ---oOo---

       SHEILA CHASE & ASSOCIATES
            REPORTING FOR:
        LiveNote World Service
      221 Main Street, Suite 1250
     San Francisco, California 94105
          Phone: (415) 321-2300
            Fax: (415) 321-2301



Reported by:
RACHEL FERRIER, CSR
CSR No. 6948

1       Q       Okay.

2       A       -- you know, what happened on this

3    particular transaction, but Sun is now completely

4    standardized on all Oracle applications, but I

5    don't -- I know it took a very, very long time for

6    Sun to finish their engineering, and it was a point

7    of frustration for everybody.

8       Q       Okay.  And this document would have been in

9    your files as of January 2, 2001; is that correct?

10      A       I think so, yeah.

11      Q       And it -- I can represent to you that it

12   was not produced from your files.

13              Can you explain why?

14      A       I cannot.

15      Q       Did there come a time in the

16   December-2000-to-March-2001 time frame when you

17   adopted a practice of offering to pay customers or

18   allow them concessions if they would act as a

19   reference for 11i?

20      A       I don't recall.

21      Q       Do you understand what I mean --

22      A       Yes.

23      Q       -- when I say that?

24      A       Yes.

25      Q       Is it a practice at Oracle generally to pay

1  customers to be references for Oracle's products?

2       A     Well, characterize "pay."  If we have a

3  particularly important reference customer -- let's

4  say it's a brand-new banking customer, and we just

5  implemented a new version of our software at that

6  bank, and we pepper that customer with lots and lots

7  of references -- they are taking a lot of their time

8  and they are doing demonstrations for prospective

9  clients of ours -- we will often give them free

10  consulting or discounts on software or something to

11  compensate them for their efforts of being a

12  reference.

13       Q     Isn't it true that between December 2000

14  and March 2001 that you were so desperate for

15  references for the 11i that you engaged in the

16  practice of offering concessions or payments to

17  customers to be references?

18       A     I think -- I think we have done that

19  historically, yeah.  It depends on how much a

20  reference is used.

21       Q     Isn't it true that in 2000 -- between

22  December 2000 and March 2001 that you were desperate

23  for references for the Suite 11i custom -- Suite 11i

24  suite?  Excuse me.

25       A     No, I wouldn't characterize us as

```
 1    desperate.

 2              MR. SOLOMON:  So mark as the next exhibit

 3    document produced by the defendants in this

 4    litigation with the control numbers 017475 and 76.

 5              (Exhibit No. 53 was marked for

 6              identification.)

 7    BY MR. SOLOMON:

 8        Q    Take a look at the document, Mr. Ellison,

 9    and let me know if you recognize it.

10        A    I do.

11        Q    All right.  And you will see that it's

12    dated January 5th, 2001, and on the first page, it's

13    from you to George Roberts and Carolyn Balkenhol.

14              Do you see that?

15        A    Yes, I do.

16        Q    And attached is a letter that has been

17    drafted for your signature.

18              You see that?

19        A    I do.

20        Q    Do you know who Mr. Murray Weiss is --

21    excuse me, Morry Weiss?

22        A    I've never met him, but he was, at the

23    time, chairman and CEO of American Greetings.

24        Q    And do you remember at around the time of

25    this communication learning that American Greetings
```

1    was having problems implementing your products?

2        A    Well, again, I'm not sure it was -- depends

3    how you define "problems," but they were certainly

4    having issues with the rate of order management, and

5    I can explain, if you like.

6        Q    Well, let's just -- before you explain,

7    let's just go into the body of the document a little

8    bit.

9        A    Okay.

10       Q    The second paragraph you write:  "So, let

11   me restate my offer to American Greetings related to

12   completing a successful benchmark of our 11i Order

13   Management Solution.  Oracle guarantees that our

14   Order Management solution will process four million

15   order lines within a" 24 hour "window by December of

16   2001."

17       A    "20 hour window," yes.

18       Q    Excuse me, "20 hour window by December of

19   2001.  By March 31, our team will be in a position to

20   demonstrate 2.5, 3.5 million order lines with current

21   releases of our software on a hardware configuration

22   that will be specified in writing shortly after the

23   completion of the benchmark."  And it goes on to say,

24   "In the unlikely event that this specified hardware

25   configuration proves not to be sufficient, then

1    employed by you, your company; correct?

2        A     Yes, he is.

3        Q     And is he the No. 2 at the company; is that

4    how you would describe him?

5        A     He and Safra are co-presidents, so they are

6    the co-No. 2 people in the company.

7        Q     And he used to work for Morgan Stanley?

8        A     Yes.

9        Q     And he covered Oracle during this period?

10       A     He was the No. 1 technology analyst, I

11   think, for ten years.

12       Q     And did you have regular conversations with

13   him while he was the analyst?

14            MR. LINDSTROM:  And by "you," you mean

15   Mr. Ellison?

16            MR. SOLOMON:  Mr. Ellison, yeah.

17            THE WITNESS:  Regular.  I probably talked

18   to Charles couple times a year.

19   BY MR. SOLOMON:

20       Q     Okay.  Was there someone who was the

21   regular interface?

22       A     I think Charles made a point of talking to

23   lots of different people, so he got a broad

24   perspective.

25       Q     Okay.  Including Jeff Henley?

1        A       I'm sure including Jeff Henley.

2        Q       Charles Phillips writes, in part -- I'm on

3    the second page of the exhibit, and around halfway

4    through his message, he says:  But I'm hearing from

5    multiple sources including the user group members and

6    Oracle employees about the stability of the product.

7    I think it's improved since much of this was written

8    but not many people know that -- know that and all

9    the early adopters have plenty of horror stories they

10   are willing to share with whomever may call.

11              Did you know that around -- at the end of

12   March 2001 that it was Mr. Phillips' view that there

13   were plenty of horror stories being shared by the

14   early adopters?

15       A       What he said was the early adopters had

16   more problems and that the problems are largely

17   behind us, at least that's what he's saying.  But

18   people remember -- people remember the problems and

19   are talking about them.  That's what he said.

20       Q       But he does refer to horror stories,

21   doesn't he?

22       A       I think -- I think that's a metaphorical

23   reference to problems that they had.

24              MR. LINDSTROM:  The question was whether

25   you were aware that he was expressing this viewpoint

```
 1    at the time.

 2              Right?

 3              MR. SOLOMON:  That's right.

 4              THE WITNESS:  I don't recall.

 5    BY MR. SOLOMON:

 6         Q    Okay.  It goes on to say:  It's worth

 7    deploying corporate level consulting resources to get

 8    them happy ASAP to turn them into proponents instead

 9    of critics.  A few of the reps I spoke with don't

10    have the condense to push CRM because of the quality

11    issues in the past.

12              Do you see that?

13         A    I do.

14         Q    And were you aware at the time that

15    Mr. Phillips was of the view that there were reps who

16    didn't have confidence in CRM and, therefore, weren't

17    purchasing?

18         A    I don't recall.

19              MR. SOLOMON:  Marked as the next exhibit a

20    document produced by Oracle with the control number

21    094109.

22              (Exhibit No. 67 was marked for

23              identification.)

24    BY MR. SOLOMON:

25         Q    Do you recognize this?
```

1        A     I don't.

2        Q     You see it's dated Monday, the 9th of April

3   2001, and it's to you and some others from Mark

4   Barrenechea?

5        A     Yes.

6        Q     And it would have been in your file as of

7   that date?

8        A     Yes.

9        Q     And it wasn't produced from your file and

10  you can't explain why?

11       A     That's correct.

12       Q     It refers to a very escalated situation

13  with Value Vision.

14             Do you see that?

15       A     I do.

16       Q     Are you familiar with that?

17       A     Not really.

18             MR. SOLOMON:   I've marked as the next

19  exhibit another document produced by defendants with

20  the control numbers 094110 to 111.

21             (Exhibit No. 68 was marked for

22             identification.)

23             THE WITNESS:   Okay.

24  BY MR. SOLOMON:

25       Q     Do you recognize this?

1      A      Again, I don't recognize it.  I remember

2   the issues that it refers to.

3      Q      And this would have been in your file

4   around April 13, 2001?

5      A      That's right.

6      Q      And it wasn't produced from your file and

7   you cannot explain why; is that right?

8      A      That's right.

9      Q      Did Mr. Rawlings make the call that's

10  referred to at the top of this message?

11     A      I don't recall.

12            MR. SOLOMON:  Okay.  I've marked as the

13  next exhibit a document produced by the defendants

14  with the control numbers 061370 to 372.

15            (Exhibit No. 69 was marked for

16            identification.)

17            THE WITNESS:  Okay.

18  BY MR. SOLOMON:

19     Q      Okay.  Do you recognize this?

20     A      I don't, but I'm very familiar with the

21  issues to which it refers.

22     Q      Okay.  And it would have been in your files

23  around April 19, 2001?

24     A      Yes.

25     Q      And it wasn't produced from your file and

Ellison, Lawrence
CONFIDENTIAL                                              9/21/2006

```
 1    AFTERNOON SESSION                            1:10 P.M.

 2

 3              THE VIDEOGRAPHER:  On record at 1:10.

 4    BY MR. SOLOMON:

 5       Q    Okay.  You recall making a claim in the

 6    2000-2001 time frame, Mr. Ellison, that by utilizing

 7    Suite 11i, Oracle had saved a billion dollars?

 8       A    No.  I think I said by using our own

 9    applications, we had saved over a billion dollars.

10       Q    And is that the distinction you were

11    saying, just using applications and you weren't

12    limiting it to the 11i suite; is that right?

13       A    Yeah.  Yes.

14              MR. SOLOMON:  Okay.  We will have marked as

15    the next exhibit an excerpt from a book entitled

16    "Softwar."

17              (Exhibit No. 87 was marked for

18              identification.)

19    BY MR. SOLOMON:

20       Q    Mr. Ellison, I'm going to be asking you a

21    number of questions about the contents of that book,

22    and so before I start doing that, of course, you are

23    familiar with the book Softwar?

24       A    I am.

25       Q    And can you describe your involvement in
```

```
 1    the publication of that book?
 2        A    I -- yes.  I was interviewed for the book,
 3    extensively interviewed for the book, and I also
 4    wrote footnotes where I -- if I disagreed or wanted
 5    to clarify something the book said.
 6        Q    Okay.  I'm looking at what is page 182 of
 7    the book, and I'm looking at the bottom paragraph,
 8    and it says, in part, "The final qualification about
 9    Oracle's story of transforming its efficiency by
10    using its own E-Business Suite is that the claim is
11    only partly true, because the first billion dollars
12    of" saving "was pretty much in the bag before 11i was
13    finished."
14            Do you see that?
15        A    I do.
16        Q    Is that true?
17        A    Yeah.  Yeah.  Well, let me be clear.  The
18    second part is certainly true that we were well on
19    our way -- well on our way to saving a billion
20    dollars before 11i was finished.  That's true.  So
21    the qualification that -- you know, Oracle
22    transforming itself by using its only business suite,
23    I'm not sure I ever said that.  I mean, I don't know
24    how I use the term E-Business.  E-Business -- I
25    sometimes use the term "E-Business Suite" to mean all
```

1    of our applications, not our applications beginning

2    at 11i.

3            So I think sometimes I'm not terribly

4    clear, you know.  To me, when I say E-Business Suite,

5    I mean our applications.

6        Q    Okay.  So you are in agreement with that

7    first sentence; is that fair or not?

8            MR. LINDSTROM:  Objection; mischaracterizes

9    his testimony.

10            THE WITNESS:  Yeah.  I'm in agreement with

11    the second half of the sentence starting "because."

12    BY MR. SOLOMON:

13        Q    Okay.  And tell me where you disagree.

14        A    I don't believe I ever made the claim that

15    we transformed ourself with the 11i versions of our

16    applications only.

17        Q    Okay.

18        A    I believe I made the claim we had

19    transformed ourself with our applications and

20    sometimes -- and I sometimes described those

21    applications as E-Business Suite.

22        Q    Okay.

23        A    But that includes Version 11 as well as

24    11i.

25        Q    Okay.  You haven't clarified this, have

1    you?

2        A     No.

3        Q     And why not?

4        A     Well, one, I didn't notice it until you

5    just pointed it out.  But I didn't try to -- I didn't

6    try to rewrite the book.  You know, I thought I had a

7    limited number of footnotes that I could put in, and,

8    you know, I wanted to pick my spots, and I didn't

9    think it was a major issue.

10       Q     Was there an agreement there would be a

11   limited number of footnotes?

12       A     Was there an agreement.  I don't expect --

13   I don't believe you need the footnotes to be larger

14   than the book itself.  Plus it takes a long time to

15   write the footnotes, so I just didn't correct every

16   single thing.  I didn't parse every single paragraph

17   very carefully and write -- write down something I

18   thought, you know, was slightly off or, you know,

19   needed clarification.  I didn't do that every single

20   time.  That would have been --

21       Q     Okay.

22       A     -- that would have required a lot of

23   footnotes.

24       Q     Okay.  It goes on to say, "The software

25   that Oracle used to turn itself into an e-business

```
 1   was, in fact, a combination of modules from Release

 2   11.0, which shipped in late" 1988 -- "1998," excuse

 3   me, "and a number of customized prototype

 4   applications that were global, Internet-based

 5   systems."

 6           Do you agree with that sentence?

 7      A    Yeah.

 8      Q    Okay.  It goes on to say, "A key element of

 9   the E-Business Suite, however, was missing: the

10   underlying information architecture, including the

11   vital shared data schema that were the basis for

12   Oracle's claims about the tight integration of all

13   the applications."

14           Is that true?

15           MR. LINDSTROM:  Objection; compound.

16           THE WITNESS:  Now, this is referring to in

17   the past, so they are saying the key element was

18   missing prior -- prior to the E-Business Suite.

19           MR. SOLOMON:  Okay.

20           THE WITNESS:  Just as I'm reading this,

21   prior to the E-Business Suite, the data-sharing

22   schema did not exist.  If that's what it's -- I

23   believe that's what I'm agreeing to.  Before the --

24   what the E-Business Suite brought -- excuse me.  Let

25   me stop using the term "E-Business Suite."
```

1    budget was pumping out the insistent message," and

2    then, in quotes, "'By using our own E-Business Suite,

3    Oracle saved $1 billion in one year.'"

4            Do you see that?

5        A    I do.

6        Q    And is that the representation that you and

7    Oracle were making, in quotes, By using our

8    E-Business Suite, Oracle saved $1 billion in one

9    year?

10       A    Again, I think I answered this earlier.  By

11   using our own applications, by more automation, by

12   using the Internet, by using, you know, modern -- you

13   know, modern systems, modern technologies, we can

14   become much more efficient, and so can other

15   companies.

16       Q    Okay.  And then a few lines down, it says,

17   "Partly because of Ellison's reputation for

18   stretching the truth when it suited him, critics were

19   keen to find explanations for the cost savings that

20   didn't depend on the performance of Oracle's

21   software."

22           Do you see that?

23       A    I do.

24       Q    Do you believe you have a reputation for

25   stretching the truth when it suits you?

1      A      I don't -- I don't know.

2      Q      Do you stretch the truth when it suits you?

3      A      No.  I think I'm sometimes guilty of

4  simplification, you know, in a marketing slogan, but,

5  no, I try to be very, very accurate.  In fact, even

6  our marketing campaigns are -- are

7  quantitative-based; try to be based on hard, hard

8  facts.  We have a hard marketing campaign against SAP

9  right now, and it's based on numbers, so we think

10  fact-based, hard, quantitative ads are more

11  effective.

12      Q      And just so the record's clear, do you

13  believe that you have a reputation for stretching the

14  truth when it suits you?

15      A      I don't -- you know, I don't know.

16      Q      Okay.  And then on page -- at the bottom of

17  page 177 -- then it goes on to page 178 -- it says,

18  "An article in the magazine 'InternetWeek' by Mitch

19  Wagner published in March 2001 and entitled 'Oracle

20  Savings Don't Add Up' was fairly representative."

21          Do you see that?

22      A      Yes.

23      Q      Did you ever read that article?

24      A      I didn't.

25      Q      And you will see that it says, in the

```
 1    middle, "Much of the savings actually have come from

 2    cost-cutting measures that could have been achieved

 3    without the Internet, according to experts and an

 4    analysis of Oracle's financial statements."

 5              Do you agree with that?

 6        A     I'm sure there are some -- you know, some

 7    of the savings had to do with sometimes you just hire

 8    better people or -- but, no, I think the bulk of the

 9    savings -- and we saved a lot more than a billion

10    dollars in the end, but the bulk of the savings went

11    from moving to modern automated systems.

12        Q     Okay.  And then it goes on to say, "One

13    such expert, John Puricelli, an analyst with A.G.

14    Edwards & Sons, opined that most of these savings had

15    come from old-fashioned belt-tightening."

16              Do you agree with that?

17        A     What is -- what is old-fashioned

18    belt-tightening?  It's an interesting metaphor.  If

19    everyone can save -- I mean, how is it that we were

20    able to save a billion dollars in such a short period

21    of time and raise our margin so much.  We were able

22    to do more with fewer people.  The only way you can

23    do that is have better automation and better tools.

24    It's really dramatic productive improvement based on

25    computers.
```

1   product out, but I would have -- would have kind of

2   narrowed the funnel so we could manage the process

3   better than we did.

4        Q    Don't you think you should have delayed the

5   release longer than you did?

6        A    No.

7             MR. LINDSTROM:  Objection; asked and

8   answered.

9             THE WITNESS:  No.  No.

10  BY MR. SOLOMON:

11       Q    Okay.  Looking at your footnote, it reads:

12  We are getting a lot of -- excuse me.  "We were

13  getting a lot of pressure from our customers to

14  deliver the 11i applications.  I made a lot of them

15  mad by delaying the release for several months.  I

16  should have delayed it even longer."

17            Is that your footnote?

18       A    Yeah.  Again, in more detail, let me repeat

19  what I said.  I would have released it exactly the

20  same time, but in terms of our existing customer

21  base, who were planning to migrate, I should have

22  slowed that process down.  It's just a little -- a

23  little more meat on the bones here.  Just slowed that

24  process down so we could have done a better job of

25  managing them through the early -- the early versions

```
 1    of 11i.
 2              MR. SOLOMON:  I've marked as the next
 3    exhibit another excerpt from the Softwar book.
 4              (Exhibit No. 106 was marked for
 5              identification.)
 6    BY MR. SOLOMON:
 7         Q    And I'm looking at page 157, and I'm
 8    looking, actually, at your footnote, and it reads:
 9    "He takes personal credit for our stock price run-up?
10    Amazing.  Oracle rode the Internet wave because our
11    database powered virtually every major Web site on
12    the Net.  If you plot the stock price of Cisco,
13    Oracle, and Sun, you will see that all three
14    companies rose and fell together in perfect
15    synchronization as sentiment about the Internet rose
16    and fell."
17              Did you write that footnote?
18         A    I did.
19         Q    Do you recall that in January of 2001,
20    Cisco preannounced that it wasn't going to make its
21    numbers?
22         A    I don't recall.
23         Q    You don't recall that event?
24         A    Well, you are refreshing my memory, so kind
25    of.
```

1    Q    Okay.  At the time that Cisco preannounced,

2  do you recall being concerned that Oracle might not

3  make its numbers?

4    A    No, because we -- you know, we had signed

5  the largest -- you know, we had signed the largest

6  deal in our history, and we had a strong pipeline.

7  We were in good shape in the quarter.

8    Q    Okay.

9    A    This was written in hindsight, of course,

10  just looking at the graphs.

11        MR. SOLOMON:  Okay.  Let's go off the

12  record for a couple seconds to organize some

13  documents.

14        THE VIDEOGRAPHER:  Off the record at 3:16.

15        (Recess taken.)

16        THE VIDEOGRAPHER:  On record at 3:30.

17        MR. SOLOMON:  Have marked as the next

18  exhibit a document produced by the defendants in this

19  litigation with the control numbers 034669 and 670.

20        (Exhibit No. 107 was marked for

21        identification.)

22  BY MR. SOLOMON:

23    Q    When you have had a chance to view it, let

24  me know if you recognize it, please.

25    A    Okay.  I've read the whole thing.

1   others?

2        A      Yes.

3        Q      Do you know who Lia Burke is?

4        A      I do not.

5        Q      And it says, "Larry, Jeff asked that we

6   provide you with a status on the use of OSO to

7   capture pipeline and forecast data.

8              "The pipeline data in OSO is in very good

9   shape, as the data in OSO is very dynamic, at the

10  time of the forecast submissions earlier this week

11  the pipeline data was in agreement with what is being

12  presented to the EC on Monday.  The forecast module

13  is newer and while most of the data is good we

14  continue to work with a few groups to ensure OSO is

15  being kept up to date."

16             Do you see that?

17       A      I do.

18       Q      Is that an issue that you were involved

19  in at that time --

20       A      Yeah.

21       Q      -- what was going into OSO?

22       A      Yeah.  Specifically, I wanted to not get

23  forecasts that weren't -- that didn't come out of the

24  system, so our old practice where people -- the sales

25  executives would come into the room and they would

```
 1   have their forecasts on spreadsheets or in their

 2   heads and you go around the room and get everyone's

 3   forecast, and I thought -- and then we would go back

 4   and look at OSO and the two might not necessarily

 5   agree, so we were trying -- you know, I was trying to

 6   get the system to be used at all times.

 7        Q    Okay.  At around this time, did you want

 8   more risk to be put into the forecasts?

 9             MR. LINDSTROM:  Vague and ambiguous.

10             THE WITNESS:  No.  I've always wanted the

11   forecast to be accurate.  You know, I would say

12   slightly conservative but accurate.

13             MR. SOLOMON:  Okay.

14             THE WITNESS:  So sometimes -- sometimes

15   people would get so conservative, you get a culture

16   where everyone wants to beat their forecast every

17   time, and then you can get very -- you know,

18   misleadingly low forecasts.  So I've always -- I'll

19   stop there.

20             MR. SOLOMON:  Okay.  So we are having

21   marked as the next exhibit another document produced

22   by the defendants with the control numbers 203681

23   through 683.

24             (Exhibit No. 110 was marked for

25             identification.)
```

1              THE WITNESS:   Okay.

2    BY MR. SOLOMON:

3        Q     Do you recognize this?

4        A     I don't.

5        Q     You will see, on the third page of the

6    exhibit -- well, first, on the first page, the

7    subject is "Draft New terminology on Forecasting"?

8        A     Yeah.

9        Q     It's dated October the 6th, 2000; right?

10       A     Right.

11       Q     And then the third page has some text, and

12   it starts, "Hi, Jim, we can talk through the

13   recommendation, let me know your thoughts...

14             "Recently Larry has changed the way that he

15   is interpreting our forecast.  He would like us to

16   reflect our numbers as follows," and then there's a

17   "Worst," "Forecast," and a "Best" category.

18             Do you see that?

19       A     I do.

20       Q     Does this reflect the -- a change in

21   forecasting that you directed?

22       A     Yeah.  I was trying to accomplish two

23   things.  I wanted to -- you know, yeah.  Rather than

24   a single number -- rather than getting a single

25   number, I wanted to get three numbers:  Worst case,

```
1    most likely case, and best case --
2            THE REPORTER:  Say it one more time.
3            THE WITNESS:  Rather than getting a single
4    forecast number from each of the sales executives, I
5    wanted to get three separate numbers reflecting a
6    worst case, guaranteed we will at least do that well;
7    a most likely case, what you thought you were
8    actually going to do; and a best case, if everything
9    goes really well, how high could it go.
10           And I was also trying to get -- in putting
11   in the new methodology, I was also trying to
12   synchronize the way Europe forecasts with the way
13   Latin America forecasts and Asia Pacific and
14   different groups would have different ways of doing
15   their forecast.  And I was trying to get as much of
16   that variability out of the system as possible.
17           Now, you can't get the personalities out of
18   the system.  I mean, if you have a conservative sales
19   executive, they are going to forecast conservatively.
20   If you have an optimistic sales executive, they are
21   going to forecast less conservatively.
22   BY MR. SOLOMON:
23       Q     What drove you to make this change?
24       A     The -- we were going to put the three
25   numbers in the computer system.  What I wanted to
```

```
 1    see -- I've done -- to get more information, just

 2    getting more -- you know, getting more data rather

 3    than one number, which usually was someplace between

 4    the best case and the most likely -- what they used

 5    to call a commit forecast; one we could count on.  I

 6    was trying to, you know, get a better idea of what,

 7    you know -- get more data -- more data to work with.

 8        Q     Okay.  And, at that stage -- and we are

 9    talking about October 2000 -- how long had Oracle

10    internally been using OSO?

11        A     I don't recall.

12        Q     Years or months, could you tell me that?

13        A     I think a few years.

14             MR. SOLOMON:  Okay.  Mark as the next

15    exhibit a document produced by the defendants with

16    the control number 6123 -- 612306 and 307.

17             (Exhibit No. 111 was marked for

18             identification.)

19             THE WITNESS:  Okay.

20    BY MR. SOLOMON:

21        Q     Do you recognize having seen this before?

22        A     No, I don't.

23        Q     The e-mail exchange in the bottom half of

24    the page is from David Winton to David Winton, and it

25    appears that went up the chain to George Roberts.
```

```
 1        Q     Okay.  Did you delay -- after you made your

 2   decision, do you remember delaying communicating that

 3   decision to Mr. Simon?

 4        A     I don't recall.

 5        Q     Would it make any sense to delay informing

 6   Mr. Simon?

 7              MR. LINDSTROM:  Calls for speculation.

 8              THE WITNESS:  I don't remember.

 9   BY MR. SOLOMON:

10        Q     Do you remember the day that you started

11   exercising options and selling?

12        A     Again, I think it was the last week of

13   January.

14        Q     Okay.  And where were you, do you know,

15   when you started exercising and selling?

16        A     I think by then I was back in California,

17   but I don't know for certain.

18        Q     And were you in California for all of the

19   exercises in sales?

20        A     I think so, but I don't recall.

21        Q     Okay.  And if you were in California, were

22   you working?  Were you at the office?

23        A     I believe so.

24        Q     Okay.  And so is it your recollection that

25   while you were engaged in these stock transactions,
```

1    that, typically, you were in the office?

2        A    I really don't recall.

3        Q    Do you recall considering whether to

4    exercise and sell your stock in January or April or

5    thereafter?

6            MR. LINDSTROM:  Objection; vague and

7    ambiguous.

8            THE WITNESS:  Did I think about selling at

9    some other time?

10           MR. SOLOMON:  Correct.

11           THE WITNESS:  I knew I had to sell it

12   before August.

13           MR. SOLOMON:  Okay.

14           THE WITNESS:  Because they were -- the

15   options were expiring.

16           MR. SOLOMON:  Okay.

17           THE WITNESS:  We had a very strong, you

18   know, start to the quarter, so I thought that would

19   be the safest time to sell.

20   BY MR. SOLOMON:

21       Q    And were you very concerned about your debt

22   at that stage?

23       A    Very concerned.  I certainly wanted to pay

24   down my debt.

25       Q    And Mr. Simon had been calling you to do

```
 1    that for some time?
 2        A    Yes.
 3        Q    Did you tell anybody within Oracle that you
 4    had decided to exercise and sell your options in
 5    April of 2001?
 6        A    Not that I recall.
 7        Q    Do you know who Deb Lange is, or "Lange"?
 8        A    Yes, I do.
 9        Q    Who is she?
10        A    She was our then head of tax, corporate
11    tax.
12        Q    Okay.  Did you tell her that it was your
13    intention of -- selling and exercising your stock in
14    April of 2001?
15        A    No.
16        Q    Did you discuss your exercise -- your
17    exercise of options and sale of stock with Ms. Lange
18    at any time?
19        A    I don't think I've ever had a private
20    conversation with Deb Lange in my life.
21        Q    What does Deb Lange do?
22        A    She was then head of tax for Oracle.
23        Q    Okay.
24        A    She worked for Jeff Henley.
25             MR. SOLOMON:  I've marked as next exhibit a
```

```
 1    document produced by Oracle with a Bates range --

 2    sorry, Control No. 042760 to 766.

 3             (Exhibit No. 123 was marked for

 4             identification.)

 5    BY MR. SOLOMON:

 6        Q    And just let me know if you have seen this

 7    before, please.

 8        A    I have not.

 9        Q    You see that your name's at the top on the

10    first page, and it says "Custom Calendar Report"?

11        A    Yes.

12        Q    Do you recognize the handwriting in this

13    document?

14        A    I don't.

15        Q    If you look at the page with the control

16    number 042762, there's a series of references to

17    Mexico --

18        A    Okay.

19        Q    -- beginning on December 20th.

20             Do you see that?

21        A    I do.

22        Q    And it seems to reflect that you were in

23    Mexico on those days?

24        A    Okay.

25        Q    Do you know where you were in Mexico?
```

1    first raised?

2              MR. LINDSTROM:  Vague and ambiguous.

3              THE WITNESS:  Rephrase the question.

4              MR. SOLOMON:  Let me rephrase it.

5        Q      In January of 2001, you exercise sale of

6    stock options that were due to expire in August of

7    2001?

8        A      That's right.

9        Q      Do you recall when the issue -- when the

10   fact they were due to expire in August 2001 was first

11   brought to your attention?

12       A      18 months before.

13       Q      Okay.  And had you constantly been

14   considering, during that time, when to sell, when to

15   exercise and sell?

16       A      Not constantly.  No, not constantly, but

17   certainly from time to time, I thought about it.

18             MR. SOLOMON:  Okay.  Have marked as the

19   next exhibit a document produced by the defendants

20   with a control number 060974.

21             (Exhibit No. 124 was marked for

22             identification.)

23             THE WITNESS:  Okay.

24   BY MR. SOLOMON:

25       Q      Do you recognize this?

```
 1         A     No.
 2         Q     You will see that it's an e-mail dated
 3   January 10, 2001 from Deb Lange to Jeff Henley.
 4               Do you see that?
 5         A     Yes.
 6         Q     The subject is Re:  LGA option -- LJE
 7   option exercise?
 8         A     Right.
 9         Q     And Deborah Lange writes:  Jeff, we are
10   working with Larry's accountants re the timing of him
11   exercising his options which expire August of this
12   year.  Larry may be willing to exercise in April if
13   it is beneficial to the company."
14               Do you see that?
15         A     I do.
16         Q     Is it true that you were willing to
17   exercise in April if it were beneficial to the
18   company?
19         A     No one ever asked me.
20         Q     Do you know why she said that, though?
21         A     She must have been talking to Philip or
22   someone, you know, about -- yeah, that -- sounds like
23   she wanted me to exercise my options in the current
24   fiscal year rather than waiting until August.
25         Q     Okay.
```

```
 1        A      June, July, or August in the next fiscal
 2   year.
 3        Q      Okay.  And then the second paragraph reads:
 4   "The unknown factor is the relative stock price"
 5   between "April versus August -- a lower stock price
 6   means lower income to Larry but a lesser deduction
 7   for the company."
 8               Do you see that?
 9        A      Yes.
10        Q      Go on to say, "My general recommendation is
11   to ask Larry to do as much as possible in April, but
12   to have the right to modify that advice in April when
13   we have more visibility to FY01 results and the stock
14   market."
15               Do you see that?
16        A      Yeah.
17        Q      And you don't recall hearing a
18   recommendation that you do as much as possible in
19   April of 2001?
20        A      No one ever asked me.
21               MR. SOLOMON:  Okay.  Let's have marked as
22   the next exhibit another document produced by the
23   defendants with control number 039432.
24               (Exhibit No. 125 was marked for
25               identification.)
```

```
 1              THE WITNESS:   Okay.
 2    BY MR. SOLOMON:
 3         Q      Do you recognize this?
 4         A      No.
 5         Q      And you will see that it's an e-mail dated
 6    Friday, January 19, 2001 from Safra Catz to Dan
 7    Cooperman.
 8              Do you see that?
 9         A      Yes.
10         Q      And there's a message from Dan Cooperman to
11    Safra Catz concerning her intention to engage in a
12    same-day exercise and sale.
13              Do you see that?
14         A      I do.
15         Q      And then you will see that there's a
16    message at the top:   "I just found out something so I
17    don't think I should trade."
18              Do you see that?
19         A      I do.   I do.
20         Q      Do you have an understanding what Safra
21    Catz is referring to?
22         A      I think she's referring to she found out
23    that I was trading.
24         Q      Okay.   Why would Ms. Catz not want to trade
25    if you were trading?
```

1      A      To reassure people, again, that I was

2    selling -- what was a large dollar amount, it was a

3    very, very small percentage of my holdings.  I was

4    still -- whenever I sell stock, I worry that people

5    think I'm losing confidence in the company.  I think

6    it was important that they knew that I was, you

7    know -- 98.5 percent of my stock I was continuing to

8    hold.

9      Q      Okay.  It was your desire, I assume, to get

10   the highest price you could for your stock?

11     A      Sure.

12     Q      And whose idea was it to set a floor of $30

13   per share?

14     A      Mine.

15     Q      And who did you communicate that to?

16     A      Philip Simon.

17     Q      Anybody else?

18     A      Well, I think he talked to -- obviously the

19   people on the trading desk had to know.  So

20   indirectly -- indirectly, the people who were selling

21   the stock had to know what the floor price was.

22     Q      Okay.  Did you discuss it with Jeff Henley?

23     A      I didn't.  I didn't discuss it with Jeff

24   Henley or Dan Cooperman.  I don't know if Philip

25   Simon did.

```
 1        Q    Were you aware at the time of your stock
 2   sales that earlier that same month Mr. Henley had
 3   exercised and sold Oracle securities?
 4        A    No, did not know.
 5        Q    Are you aware that he also set a floor of
 6   $30 per share?
 7        A    No.
 8        Q    And that would be just a coincidence, as
 9   far as you know, if that's true?
10        A    Yes.
11        Q    And after you had exercised the expiring
12   options and sold, isn't it true that you continued to
13   sell?
14        A    Yes.
15        Q    What prompted the decision to continue to
16   sell?
17        A    I don't want to go into the market very
18   often.  Again, whenever I go into the market and sell
19   stock, people begin to speculate that I'm losing
20   confidence in the company.  I own a very large
21   portion of the company.  So I only like to do it once
22   and then not sell again for a very, very long time.
23   I wanted to pay down more of my debt.  I thought, I
24   was in the market that week, I would keep selling
25   that week, you know, given -- you know, within the
```

1    limits of the volume restrictions and the price

2    restrictions, and at the end of that week, I would

3    then stay out of the market for as long as I could.

4        Q    Okay.  And, in total, you realized

5    proceeds -- aggregate proceeds of around $894

6    million; is that right?

7        A    I believe so.

8        Q    And what were the proceeds used for?

9        A    Some of it was used to pay down debt; some

10   of it was retained in cash, largely for investments;

11   other was retaining cash for -- to pay taxes.

12       Q    And is it true that you had a significant

13   multimillion-dollar payment due on the "Rising Sun"

14   in that fiscal quarter?

15       A    I don't recall, but it certainly could be

16   true.

17       Q    Do you know if you paid it?

18       A    If it was due, I paid it.

19       Q    Do you always pay on time?

20       A    Pretty much.

21            MR. SOLOMON:  Have marked as the next

22   exhibit another document produced by the defendants,

23   Control Nos. 005595 to 601.

24            (Exhibit No. 128 was marked for

25            identification.)

1          THE WITNESS:   Okay.

2     BY MR. SOLOMON:

3          Q     Okay.  Have you seen this before?

4          A     Yes.

5          Q     And it's Oracle's insider trading policy?

6          A     It's our stock trading policy, yes.

7          Q     And are you familiar with its contents?

8          A     Generally.

9          Q     Okay.  I'm looking at the second page, the

10    second full paragraph, beginning: "Trading on inside

11    information."

12          Do you see that?

13          A     Second paragraph -- second full paragraph?

14          Q     Yes.

15          Says, "Trading on inside information can

16    include making a single purchase or sale, or engaging

17    in or facilitating a pattern of transactions, which

18    might appear to take advantage of inside information

19    possessed by others at Oracle.  You need not actually

20    use or rely on inside information, but simply possess

21    it at the time of the trade, to be considered trading

22    on inside information."

23          Were you aware of that?

24          A     Yes.

25          MR. SOLOMON:  Have marked as the next

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2          I, RACHEL FERRIER, CSR, CSR No. 6948, duly
 3     authorized to administer oaths pursuant to Section
 4     8211 of the California Code of Civil Procedure,
 5     hereby certify that the witness in the foregoing
 6     deposition was by me sworn to testify to the truth,
 7     the whole truth and nothing but the truth in the
 8     within-entitled cause; that said deposition was taken
 9     at the time and place therein stated; that the
10     testimony of said witness was reported by me and was
11     thereafter transcribed by me or under my direction by
12     means of computer-aided transcription; that the
13     foregoing is a full, complete and true record of said
14     testimony; and that the witness was given an
15     opportunity to read and correct said deposition and
16     to subscribe same.
17          I further certify that I am not of counsel or
18     attorney for either or any of the parties in the
19     foregoing deposition and caption named, nor in any
20     way interested in the outcome of the cause named in
21     said caption.
22          IN WITNESS WHEREOF, I have hereunto subscribed
23     by my hand this 28th day of September, 2006.
24
25     _____
                 RACHEL FERRIER, CSR No. 6948
```