UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

*Certified Copy*

IN RE
ORACLE CORPORATION
SECURITIES LITIGATION

                              MASTER FILE NO.
                              C-01-0988-MJJ

This Document Relates To:

    ALL ACTIONS

_____/

-oOo-

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PHILIP B. SIMON

September 6, 2006

-oOo-

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, CA 94105
Telephone: (415) 321-2300
Fax: (415) 321-2301

-oOo-

Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
CSR License No. 5735

```
 1        A.   I don't know.
 2             Probably lowered interest rates.
 3             Or made a nice speech.
 4        MR. SOLOMON:  I have marked as the next exhibit a
 5   document produced by the defendants with a control number
 6   060974.
 7        (Exhibit 19 was marked for identification.)
 8        BY MR. SOLOMON:
 9        Q.   Have you seen this before?
10        A.   I don't believe so.
11        Q.   It's dated January 10, 2001, and it's from Deborah
12   Lange to Jeff Henley.  Do you know who Jeff Henley was?
13        A.   Jeff was the CFO of Oracle Corporation.
14        Q.   You didn't handle any of his transactions, did
15   you?
16        A.   You mean -- I don't know what you --
17        Q.   You didn't work for Jeff Henley at all?
18        A.   I don't think I ever met him.  I don't think I'd
19   recognize him.
20        Q.   It starts at the top Jeff -- no, it doesn't start.
21   Deborah Lange wrote, "Jeff, we are working with Larry's
22   accountants as to the timing of him exercising his options
23   which expire August of this year.  Larry may be willing to
24   exercise in April if it is beneficial to the company."  Do
25   you see that?
```

1      A.   Correct.

2      Q.   So as of January 10, were you aware that

3  Mr. Ellison had indicated that he might be willing to

4  exercise the expiring options in April of 2001?

5      MS. KYROUZ:   Objection.  Lacks foundation.

6      THE WITNESS:   The answer is I never saw this e-mail so

7  I have no knowledge about this.

8      MR. SOLOMON:   Right.  That wasn't the question,

9  though.

10      A.   Okay.

11      Q.   The question was as of around the date of this

12  e-mail, were you aware that Mr. Ellison had indicated a

13  willingness to exercise his expiring options in April of

14  2001?

15      A.   Okay.  I think your premise is possibly and

16  probably mistaken because I think Deb Lange is referring to

17  Catherine Ong's e-mail that you showed me earlier saying

18  that Catherine would be willing to do so.  So Deb Lange was

19  referring to Catherine Ong, not Larry.

20      Q.   Oh, I see.  Okay.

21           So when it says Larry may be willing to exercise

22  in April, you're speculating that really had nothing to do

23  with whether Larry was willing to or not?

24      A.   Correct.  Larry is like when you say "Oracle is

25  willing to do it," you're referring to certain people at

| | |
|---|---|
| 1 | Oracle. Deb Lange is making recommendation for Oracle; |
| 2 | Catherine Ong, the tax technician, a good tax professional, |
| 3 | was making a comment to Deb Lange. So I read this, though |
| 4 | I'm not saying I'm necessarily right; but I think the |
| 5 | better reading is given the prior e-mail exchange between |
| 6 | Deb Lange and Catherine; but I don't know, I've never seen |
| 7 | this before. This is an internal Oracle e-mail. |
| 8 |     Q.    Okay. |
| 9 |     So you went to New Zealand for two weeks, was it? |
| 10 | Do you recall? |
| 11 |     A.    I think ten days. |
| 12 |     Q.    Ten days. And that was in January? |
| 13 |     A.    Approximately. I don't recall. |
| 14 |     Q.    In January of 2001? |
| 15 |     A.    Apparently. |
| 16 |     Q.    And when you returned from New Zealand to the |
| 17 | U.S., did you have any immediate communication with |
| 18 | Mr. Ellison? |
| 19 |     A.    I believe on the Friday I returned home I got a |
| 20 | phone call from Carolyn Balkenhol. |
| 21 |     Q.    And tell me what you remember about that call, |
| 22 | please. |
| 23 |     A.    That's my recollection; but this is based on |
| 24 | reviewing documents yesterday and that you have. So we |
| 25 | might take a look at the documents for specifics. My |

1  understanding is that decisions were made to exercise and
2  start selling the stock options.
3      Q.   And how did you react?
4      A.   My reaction was to implement and take care of
5  that.  So my phone call was to Oracle Legal Department to
6  confirm that we had clear -- trading clearance to do so.
7  And then I made a phone call to a brokerage firm, Merrill
8  Lynch, to handle the exercise and sale.  And get them set
9  up from a legal perspective so they could coordinate with
10 Oracle Legal.  So if we were going to start executing the
11 trades on Monday, we'd have the legal clearance from both
12 Oracle internally and from Merrill Lynch Finance
13 Department.
14     Q.   Before that call did you have any knowledge that
15 Mr. Ellison was planning to exercise and sell in January of
16 2001?
17     A.   I have no recollection.
18     Q.   Were you surprised when you received the call?
19     MS. KYROUZ:  Objection.  Vague.
20     THE WITNESS:  I have no recollection what my reaction
21 was, but I knew we had to start exercising and selling the
22 options because they were going to be expiring.
23     BY MR. SOLOMON:
24     Q.   Were you delighted?
25     A.   I was pleased, yes.

```
 1   newswire reports this to explain Oracle's down day."  Do
 2   you see that?
 3        A.   Yes, I do see that.
 4        Q.   Now, is it possible that Oracle's down day was in
 5   reality the result of Mr. Ellison selling?
 6        MS. KYROUZ:  Objection.  Lacks foundation.
 7        THE WITNESS:  Unlikely.  It could be.
 8        MR. SOLOMON:  Okay.
 9        THE WITNESS:  I -- as I said earlier, stocks go up and
10   down based on supply and demand.
11        BY MR. SOLOMON:
12        Q.   And he was selling?
13        A.   But there are other people selling as well.
14        Q.   Do you know if Oracle ended up actually purchasing
15   some of the very stock that Mr. Ellison was selling in
16   January?
17        A.   The answer is no.  We sold into the market via
18   Merrill Lynch.
19        Q.   Right.
20             And was Oracle not purchasing in the open market
21   at the same time?
22        A.   I don't --
23        MS. KYROUZ:  Objection.  Lacks foundation.
24        THE WITNESS:  I don't know.
25        BY MR. SOLOMON:
```

```
 1      Q.   Are you aware Oracle had a stock repurchase
 2  program?
 3      MS. KYROUZ:  Objection.  Misstates testimony.
 4      THE WITNESS:  I do not know, but I had heard they had
 5  one.
 6      MR. SOLOMON:  Okay.
 7          So, we've marked as the next exhibit a document
 8  produced by defendants with the control number 024193.
 9      (Exhibit 22 was marked for identification.)
10      THE WITNESS:  Okay.  I've finished my review.
11  BY MR. SOLOMON:
12      Q.   Do you recognize this exchange?
13      A.   It appears to be an e-mail exchange from Deb Lange
14  to me and her reply.
15      Q.   And Deb sends to you the following message dated
16  1/10/01.  And it says, "Our general philosophy is" in
17  quotes "'earlier the better.'  It is obviously Larry's
18  call, but there is a possible benefit to the company of
19  exercising in FY '01 (April rather than FY '02)," and it
20  goes on to talk about the tax consequences.  Do you see
21  that?
22      A.   Uh-huh.
23      Q.   "Many thanks, Deb."  And then you reply on Monday
24  the 22nd, "Got it.  Thanks Deb."  Do you see that?
25      A.   I do see it.
```

Simon, Philip B.
CONFIDENTIAL

9/6/2006

| | |
|---|---|
| 1 | Q. First of all, do you know why Deb Lange was |
| 2 | forwarding that January 10th e-mail to you on the 22nd of |
| 3 | January? |
| 4 | A. I don't believe she's forwarding to me. I think |
| 5 | she sent it to me on January 10th. I was in New Zealand, |
| 6 | and the 22nd appears to be the first day back and I was |
| 7 | just clearing e-mail. |
| 8 | Q. Got you. |
| 9 | Now, this is timed 1741 in the afternoon? |
| 10 | A. Minus 11 hours. So it looks like -- I'm not sure |
| 11 | if the 1741 is Eastern Standard Time or Greenwich Mean |
| 12 | Time; but it's minus 800s, which means -- I think that's -- |
| 13 | we're eight hours time difference from London. So I think |
| 14 | it's 1741 Greenwich Mean Time, which means it's 11:41 a.m. |
| 15 | Pacific Standard Time. |
| 16 | Q. Okay. You received this e-mail from Deb Lange and |
| 17 | opened it presumably, then, on the Monday the 22nd. And |
| 18 | you see that she's referring to the exercise of the |
| 19 | expiring options in April of '01. Do you see that? |
| 20 | A. Yes. |
| 21 | Q. And then your response doesn't tell Ms. Lange, in |
| 22 | fact, Mr. Ellison has already started trading. Did you |
| 23 | deliberately not want to tell her that? |
| 24 | MS. KYROUZ: Objection. Lacks foundation. |
| 25 | THE WITNESS: I actually think you're misinterpreting |

Simon, Philip B.
CONFIDENTIAL

9/6/2006

1   her e-mail.
2       MR. SOLOMON:  I may be.
3       THE WITNESS:  What she's saying is Oracle wants the
4   income tax deduction, the compensation deduction, in their
5   fiscal year ending May 31st.  She's using April as a
6   shorthand for the fiscal year.  So I'm replying "yes, got
7   it" because we're actually doing what she requested.
8   Because it was to Oracle's benefit to trigger the gain.
9   The option gain in the current fiscal year.
10      MR. SOLOMON:  I'm not sure if I follow you, but let's
11  see if we can get that.
12          She's talked of the possible benefit of the
13  company of exercising in FY '01, and then she puts
14  "(April)."  What is it you're telling me that you think is
15  the reason?
16      A.  Fiscal year '01 is the fiscal year ending
17  May 31st, 2001.
18      Q.  Uh-huh.
19      A.  And from her prior e-mails that you showed me
20  Oracle wanted the corporate tax deduction for the built-in
21  gain triggered in their fiscal year ending May 31st.  They
22  did not want Larry to exercise the shares in June, July, or
23  August of 2001.
24      Q.  Right.
25      A.  They wanted the deduction in the 2001 fiscal year

```
 1   so they could utilize their foreign tax credits; and if
 2   there's a large enough gain, to take the loss as a
 3   carryback to their 1999 fiscal year return and get a tax
 4   refund.
 5           So what Deb was suggesting was encouraging us to
 6   exercise in the fiscal year ending May 31st, and we
 7   responded.  And so I was saying yes, got it, we're doing
 8   it.  So what I'm saying is our actions were consistent with
 9   what she recommended.  You are misinterpreting the "April."
10   She's referring to the fiscal year.  And that goes back to
11   the interpretation of the tax concepts that I was looking
12   at with the foreign tax credit utilization and with foreign
13   source -- and foreign source income.
14       BY MR. SOLOMON:
15       Q.  Now, she's saying fiscal year, which ends May 31,
16   and she's put in April because that is an open window
17   period for Mr. Ellison.  That's the reality, isn't it?
18       MS. KYROUZ:  Objection.  Misstates the document.
19       THE WITNESS:  No.  You're misinterpreting it.  January
20   is an open window as well.
21       BY MR. SOLOMON:
22       Q.  Well, it is; but the expectation that Ms. Lange is
23   communicating is that he was -- he might be willing -- as
24   you know from a prior exhibit, he might be willing to do it
25   in April.
```

```
 1        A.   No.  You're --
 2        MS. KYROUZ:  Objection.
 3        THE WITNESS:  I'm sorry.  I understand what you're
 4   trying to conclude, but I believe that you are
 5   misinterpreting hers -- her reference because you don't
 6   understand the tax consequences well.  If you understood
 7   the tax consequences, it's absolutely clear to me, as a tax
 8   professional, that she's referring to triggering gain in
 9   fiscal year May 31.
10             And, in fact, from a tax perspective, the
11   corporation is better triggering the tax deduction earlier
12   because it reduces their -- it minimizes their estimated
13   tax payments.  So January, actually, is better than April,
14   and it triggers the loss in the correct fiscal year to
15   optimize the tax deduction for Oracle, and actually works
16   to Oracle's benefit.
17             So, I'm sorry, but I just reiterate -- and you
18   can bring in a tax consultant.  You are just
19   misinterpreting her e-mail.  You can try again, and you can
20   read it again; but you're wrong.
21        Q.   I've got a feeling you never want to agree with me
22   on this one because it doesn't really help your client,
23   does it?
24        A.   No.  I'm disagreeing with you because you are
25   misinterpreting the tax concept.  It has nothing to do with
```

```
 1   what helps my client or not.  I'm giving you the correct
 2   interpretation.  And you may want to argue; but if you want
 3   to misinterpret the data, you're welcome to misinterpret
 4   it.  But I'm going to tell you how I interpret it and what
 5   it means.
 6       Q.  Okay.  Tell me, please, precisely why April is
 7   chosen to somehow deal with this tax issue?  Why April?
 8       A.  To me it's a shorthand way of saying the last
 9   window in the fiscal year.  It's saying we want the tax
10   deduction in this fiscal year.
11       Q.  And the last window for Mr. Ellison in the fiscal
12   year was --
13       A.  April.
14       Q.  -- April.
15           Correct?
16       A.  But I'm not going to let you get away with
17   misinterpretation.  Nobody waits until the last window
18   because if there was a special transaction going on that
19   would close the window in April, you're taking the risk of
20   moving the deduction to the next year.  Common tax planning
21   and sense would be to trigger it earlier.  So your
22   interpretation -- I know you're trying to make a case.
23   This is just -- you're just plain wrong.  It just -- I
24   would move on to another issue.  You're wrong.
25       Q.  I kind of like this issue, believe it or not.
```

```
 1      A.   You could like it, but you're wrong.
 2      Q.   So you've heard of abstain or disclose?
 3      A.   No.
 4      MS. KYROUZ:  Objection.  Calls for a legal conclusion.
 5      BY MR. SOLOMON:
 6      Q.   No?
 7           You never heard of that in the context of
 8   securities transactions?
 9      A.   No.
10      Q.   So you can't help me any more than you've already
11   tried to help me.  The reason she's put in April as opposed
12   to January, you don't know?
13      A.   I've told you she's giving the end of the fiscal
14   year in which you can make the option sale.  If your fiscal
15   year -- what she's telling me is please exercise by the end
16   of the fiscal year; and because of windows please exercise
17   by the end of April.  That's how I interpret it.
18      Q.   Okay.  And do you remember seeing a previous
19   exhibit in which the statement was that -- to the effect
20   that Mr. Ellison may be willing to exercise in April?
21      A.   I believe you're referring to Deb Lange's
22   referring to Catherine Ong in my office.  Because Catherine
23   Ong -- people at Oracle refer to our office as Larry's
24   office; and so I do recall we had this discussion that Deb
25   Lange was paraphrasing Catherine Ong's comment to Deb Lange
```

```
 1   and we had the e-mail there.  Yes, I do recall that.
 2       Q.  And, of course, had Mr. Ellison exercised in
 3   April, as Deb Lange seems to be anticipating in this
 4   e-mail, the truth about Oracle's condition would have
 5   already been disseminated to the investors and he would
 6   have realized substantially less on his sales; isn't that
 7   true?
 8       MS. KYROUZ:  Objection.  Lacks foundation.
 9   Argumentative.  Misstates the evidence and the testimony.
10       THE WITNESS:  I don't know.  I don't know what Oracle
11   share price was then.
12           Oh.  And if I may add?
13       MR. SOLOMON:  Sure.
14       THE WITNESS:  Oracle Corporation actually benefitted
15   if -- assuming your assumption is correct, that the share
16   price declined to April -- I don't know if it did -- Oracle
17   actually benefited from a higher share price because it got
18   a larger income tax deduction.  Because its income tax
19   deduction is measured by the gain so it's actually in
20   Oracle Corporation's interest to have the higher share
21   price.  And Deb Lange referred to that in her tax memo.
22       MR. SOLOMON:  No, it's in the shareholder's interest
23   to have a higher share price.  No one is disputing that.
24       A.  No, no, no.  I'm talking about Oracle Corporation
25   benefited from a higher share price.  It had to pay less
```

```
 1  STATE OF CALIFORNIA    )
 2  COUNTY OF SAN MATEO    )
 3          I hereby certify that the witness in the
 4  foregoing deposition,
 5  was by me duly sworn to testify to the truth, the
 6  whole truth, and nothing but the truth in the
 7  within-entitled cause; that said deposition was taken
 8  at the time and place herein named; that the
 9  deposition is a true record of the witness's testimony
10  as reported by me, a duly certified shorthand reporter
11  and a disinterested person, and was thereafter
12  transcribed into typewriting by computer.
13          I further certify that I am not interested in
14  the outcome of the said action, nor connected with,
15  nor related to any of the parties in said action, nor
16  to their respective counsel.
17          IN WITNESS WHEREOF, I have hereunto set my
18  hand this 20 of September, 2006.
19
20
21          _____
22                  KELLIE A. ZOLLARS, CSR
23                  STATE OF CALIFORNIA
24
25
```

**LIVENOTE | World Service**℠
Worldwide Deposition Reporting & Legal Videography

# ERRATA Sheet

Deposition of: PHILIP B. SIMON

I wish to make the following changes for the following reasons:

| Page | Line | Change | Reason |
|---|---|---|---|
| 12 | 16 | delete "not" | clarify explanation |
| 21 | 23 | delete entire line; replace with "a small firm that had just broken away from a" | clarify language |
| 31 | 3 | after "him", add words: "about that" | clarify answer |
| 32 | 2 | "code terminus" - should be "co-terminus" | correct typo |
| 33 | 4 | Should be: "I have no recollection about 1994" | clarify - part of answering 1st question |
| 39 | 22 | delete "uncovered" & insert "not covered by the document request" | correct typo & clarify answer |
| 46 | 15 | change line to: "of conversations at this point in time." | to clarify answer is to question about conversations |
| 63 | 11 | change "rarely speak on the phone" to "infrequently speak on the phone" | to be more precise |
| 63 | 12 | insert word "primarily" before "via email" | to be more precise and to clarify answer |
| 77 | 20 | "Selling" should be "saving" | correct typo or use of wrong word in error |
| 105 | 16, 17, 18 | Mary Joe is spelled Mary Jo | correct spelling |

Witness Signature/Date _____ 9/26/06

Thank you for using LiveNote World Service for your reporting needs.
For assistance, please call 800-LIVENOTE (548-3668).

221 Main Street, Suite 1250, San Francisco, CA 94105
www.livenoteworldservice.com

**ERRATA Sheet**
Deposition of: PHILIP B. SIMON

LIVENOTE/World Service
Worldwide Deposition Reporting Legal Videography

I wish to make the following changes for the following reasons:

| Page | Line | Change | Reason |
|---|---|---|---|
| 182 | 9 | "That" to "What" | Correct typo or sloppy speaking |
| 188 | 19/21 | "Larsos" to "Luersced" | Correct spelling |
| 216 | 22 | "filles" to "filter" | Correct typo |

Witness Signature/Date [signature]  9/26/06

Page 225

1  my possession -- and what date was it in 2000?
2  MR. SOLOMON: In the third fiscal quarter of 2001.
3  THE WITNESS: -- (continuing) in the third fiscal
4  quarter of 2001 are still in my possession or in storage.
5  MR. SOLOMON: Okay.
6  THE WITNESS: There has been no -- to the best of my
7  knowledge, there's been no destruction of any documents,
8  physical documents.
9  BY MR. SOLOMON:
10  Q. Okay. And then once your staff has time to devote
11  to the project and you have time to devote to the project
12  in November sometime of this year, how long do you estimate
13  it would take to be able to recover the physical documents?
14  MS. KYROUZ: Objection. Lacks foundation.
15  THE WITNESS: I would have to review -- I would have
16  to know which documents you want and how many files we'd
17  have. I would say a reasonable time -- we're also busy in
18  December. If we start in November, maybe we could get done
19  by the end of November, we have Thanksgiving. Maybe we
20  need into February. But, basically, within three months of
21  when we start we should be able to search the files and
22  find documents.
23  MR. SOLOMON: Okay. All right.
24  Okay. Well, subject to resolving any dispute
25  concerning those documents, I'm finished with my

Page 226

1  questioning. But should the Court order that those
2  documents be produced, then I'll reserve the right to
3  question you further once I've seen those documents. And
4  in the meantime, thank you for your testimony.
5  THE WITNESS: You're very welcome.
6  MS. KYROUZ: We obviously disagree with the position.
7  Please mark the deposition confidential.
8  THE VIDEOGRAPHER: This marks the end of Videotape 4,
9  Volume I in the deposition of Philip B. Simon. The
10  original videotapes will be retained by LiveNote World
11  Service. We're going off the record. The time on the
12  video monitor is 4:45.
13  (At 4:45 p.m. the deposition proceedings
14  concluded.)
15  -oOo-

19  PHILIP B. SIMON

*[signature]* 10/9/06

Page 227

1  STATE OF CALIFORNIA )
2  COUNTY OF SAN MATEO )
3  I hereby certify that the witness in the foregoing
4  deposition, PHILIP B. SIMON, was by me duly sworn to
5  testify to the truth, the whole truth, and nothing but the
6  truth, in the within-entitled cause; that said deposition
7  was taken at the time and place herein named; that the
8  deposition is a true record of the witness's testimony as
9  reported by me, a duly certified shorthand reporter and a
10  disinterested person, and was thereafter transcribed into
11  typewriting by computer.
12  I further certify that I am not interested in the
13  outcome of the said action, nor connected with, nor related
14  to any of the parties in said action, nor to their
15  respective counsel.
16  IN WITNESS WHEREOF, I have hereunto set my hand
17  this 20th day of September, 2006.

21  KELLIE A. ZOLLARS, CSR
22  STATE OF CALIFORNIA

| | |
|---|---|
| Case: | In re Oracle Securities Litigation, Master File No. C-01-0988MJJ |
| Witness: | Philip B. Simon |
| Date: | September 6, 2006 |
| Reporter: | Kellie A. Zollars, CSR No. 5735 |

I HAVE READ THE EXAMINATION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____   No changes need to be made to the transcript.

\_\_X\_\_   Changes listed below.

WITNESS SIGNATURE                                          10/16/06
                                                           DATE SIGNED

Note: Please check the appropriate column for add (+) or delete (-). If you wish to **add** anything to the deposition, use the _exact_ words you want to add. If you wish to **delete** anything from the deposition, please use the _exact_ words you want to delete. Thank you.

| Page  Line | + | - |
|---|---|---|
| 12:17 | Add "saved" after "those" | |
| 31:3 | Add "about that" after "him" | |
| 32:2 | Change "code terminus" to "co-terminus" | |
| 33:4 | Add "about 1994" after "recollection" | |
| 77:20 | Change "selling" to "paying" | |
| 105:16-18 | Change spelling of "Mary Joe" to "Mary Jo" | |
| 188:19,21 | Change spelling of "Larson" to "Luerssen" | |
| 216:22 | Change "filler" to "filter" | |

SV\527218.1