LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
  Matthew D. Harrison (SBN 210981)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
         michele.kyrouz@lw.com
         matt.harrison@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, California 90071
Phone: (213) 485-1234
Fax: (213) 891-8763
E-mail: jamie.wine@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
  Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
         matt.rawlinson@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: dorian.daley@oracle.com
         jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ (Consolidated) |
| | **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates To: | |
| ALL ACTIONS. | |

LATHAM•WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENT ....................................................................................................... 3

    A.  Legal Standards.......................................................................................... 3

    B.  There Is No Genuine Issue Of Material Fact As To Falsity Or
        Scienter Regarding Oracle's 3Q01 Guidance ....................................... 4

        1.  Plaintiffs Cannot Prove The Statements Were False ............................... 4

            a.  Minton Did Not Mechanically Apply The
                Conversion Rate............................................................ 5

            b.  Plaintiffs' Purported "Major Economic Change"
                Did Not Render The 3Q01 Forecast False................................... 6

            c.  There Was No Directive To Increase The Risk in
                Oracle's Forecasts .......................................................... 7

            d.  The Success Of Suite 11i Did Not Render The
                Forecast False................................................................ 7

        2.  Plaintiffs Cannot Prove Defendants' Scienter ........................................ 8

            a.  The Safe Harbor Applies .................................................. 8

            b.  Plaintiffs Cannot Demonstrate "Actual Knowledge" ................... 9

                 (1)  The "Division Level "Indicators" Do Not
                    Show Defendants' "Actual Knowledge"
                    That The Forecast Was False.............................. 9

                 (2)  4Q01 Forecasts Made During 3Q01 Are
                    Irrelevant And Do Not Show Defendants'
                    "Actual Knowledge" That The Forecast Was
                    False ........................................................... 10

    C.  There Is No Genuine Issue Of Material Fact As To Falsity Or
        Scienter Regarding Defendants' Statements About the Economy ..................... 11

        1.  Plaintiffs Cannot Prove The Statements Were False ............................... 11

        2.  Plaintiffs Cannot Prove Defendants' Scienter ........................................ 11

    D.  There Is No Genuine Issue Of Material Fact As To Falsity Or
        Scienter Regarding Defendants' Statements About Suite 11i ........................ 13

        1.  Plaintiffs Cannot Prove The Statements Were False ............................... 13

            a.  Plaintiffs Cannot Prove A False Or Misleading

Statement About "Integration" ...................................................... 13

     b.    Plaintiffs Cannot Prove The Statements About Suite 11i's Foreign Language Capabilities Were False ....................... 17

    2.    Plaintiffs Cannot Prove Defendants' Scienter ......................................... 17

E.    There Is No Genuine Issue of Material Fact As To Falsity, Materiality Or Scienter Regarding Plaintiffs' 2Q01 Accounting Claim.......................................................................................................... 18

    1.    Plaintiffs Cannot Prove The Statements Were False ............................. 18

    2.    Plaintiffs Cannot Prove Materiality ........................................................ 19

    3.    Plaintiffs Cannot Prove Defendants' Scienter ....................................... 21

F.    Plaintiffs Cannot Prove Loss Causation As To Defendants' Statements Regarding Oracle's 2Q01 Results And Suite 11i............................ 22

III.    CONCLUSION......................................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) .................................................................................. 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1996).......................................................................................... 3

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................... 18

*Commodity Futures Trading Com'n v. Wilshire Inv. Management Corp.*
    407 F. Supp. 2d 1304 (S.D. Fla. 2005) ............................................................. 15

*Dura Pharm., Inc. v. Broudo*
    544 U.S. 336 (2005)...................................................................................... 23, 24

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................................... 12

*In re Adobe Systems, Inc. Sec. Litig.*,
    787 F. Supp. 912 (N.D. Cal. 1992) .................................................................... 9

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999).............................................................................. 12

*In re Apple Computer Sec. Litig.*
    886 F.2d 1109 (9th Cir. 1989) ....................................................................... 9, 12

*In re Broadcom Co. Sec. Litig.*,
    No. SA CV 01-275-GLT MLGX, 2004 WL 3390052, (C.D. Cal. Nov. 23,
    2004) ............................................................................................................... 8

*In re Convergent Tech. Sec. Litig.*
    948 F.2d 507 (9th Cir. 1991) ............................................................................ 11

*In re Daou Systems, Inc.*
    411 F.3d 1006 (9th Cir. 2005) ........................................................................... 24

*In re Gilead Sciences Sec. Litig.*
    Case No. C-03-4999-MJJ, 2006 WL 1320466 at *7 (N.D. Cal. Feb. 6, 2006) .................. 25

*In re Ikon Office Solutions, Inc. Sec. Litig.*
    131 F. Supp. 2d 680 (E.D. Pa. 2001) ................................................................. 24

*In re Oracle Corp. Deriv. Litig.*
    867 A.2d 904 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005) ............. 1, 5, 9

*In re Skechers U.S.A., Inc. Sec. Litig.*,
   No. CV 03-02094 PA, 2004 WL 1080174  (C.D. Cal. May 7, 2004) ................................. 12

*In re The Clorox Co. Sec. Litig.*,
   238 F. Supp. 2d 1139 (N.D. Cal. 2002) ......................................................................... 8

*Keenan v. Allan*,
   91 F.3d 1275, 1279 (9th Cir. 1996) .............................................................................. 4

*Marketel Intern., Inc. v. Priceline.com*,
   138 F. Supp. 2d 1210 (N.D. Cal. 2001) ......................................................................... 4

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920  (9th Cir. 2003) ..................................................................................... 12

*Nursing Home Pension Fund v. Oracle Corp.*
   242 F. Supp. 2d 671 (N.D. Cal. 2002) ......................................................................... 14

*Nursing Home Pension Fund v. Oracle Corp.*
   No. C-01-0988-MJJ, 2006 U.S. Dist. Lexis 94470, at *35 (N.D. Cal. Dec. 20, 2006) ..................................................................................................................... 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*
   380 F.3d 1226 (9th Cir. 2004) ............................................................................... 1, 18

*Olson v. Ford Motor Co.*,
   410 F. Supp. 2d 855 (D.N.D. 2006) ............................................................................ 15

*Orr v. Bank of America*,
   285 F.3d 764, 775 (9th Cir. 2002) ............................................................................... 4

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ..................................................................................... 4

*Robbins v. Kroger Props.*
    116 F.3d 1441 (11th Cir. 1997) ................................................................................ 23

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ...................................................................................... 9

*Shuster v. Symmetricon, Inc.*,
   No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ........................... 4, 18

**STATUTES AND RULES**

15 U.S.C. § 78u-5(c)(1)(B) ................................................................................................ 8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

REPLY IN SUPPORT OF  DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  **OTHER AUTHORITIES**

2  Fed. R. Civ. P. 12(b)(6) ................................................................................................ 1

3  Fed. R. Civ. P. 56(c) ..................................................................................................... 1

4  Fed. R. Civ. P. 8 .......................................................................................................... 24

5  Fed. R. Evid. 801(c) ................................................................................................... 15

6  Fed. R. Evid. 805 ........................................................................................................ 15

7  SEC Rule 144 .............................................................................................................. 12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

## I.      INTRODUCTION

Three years ago, accepting Plaintiffs' allegations as true under Fed. R. Civ. P. 12(b)(6), the Ninth Circuit reversed this Court's dismissal of the Revised Second Amended Complaint ("RSAC").  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004).  Since then, the parties have amassed an enormous factual record—which establishes beyond doubt that Plaintiffs' allegations were and always have been unfounded.  Plaintiffs have failed to muster evidence sufficient to avoid summary judgment under Fed. R. Civ. P. 56(c).

The Ninth Circuit assumed, for example, that Plaintiffs would prove Defendants knew, early in the third quarter of Oracle's 2001 fiscal year ("3Q01"), that Oracle could not meet its quarterly guidance.  *Id.* at 1231-33.  However, two months later, based on a "massive" evidentiary record, the Delaware Court of Chancery held in a related derivative case that no reasonable trier of fact could find that Oracle's CEO Larry Ellison or its then-CFO, Jeff Henley, possessed material non-public facts during 3Q01 that Oracle would not meet guidance.  *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 906 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005).  The material facts have not changed.  Oracle's internal forecast fully supported its public guidance until the very end of the quarter, when customers—fearful of a sustained business downturn—declined to close deals.

Faced with undisputed evidence that Oracle's executives expected Oracle to meet guidance and were surprised by the miss, Plaintiffs ask the Court to second-guess Oracle's forecasting process—claiming in hindsight that the process was flawed and rendered "unreliable" by certain economic "changes."  But to show that Oracle's guidance was "false," Plaintiffs must do more than criticize Oracle's process or point to ambiguous facts suggesting, at most, some metaphysical doubt as to whether Oracle would meet guidance.  Instead, Plaintiffs must prove Oracle's projections had "no reasonable basis," or that the speakers were aware of facts "tending to *seriously* undermine" those projections.  Plaintiffs come nowhere near to meeting this burden.  In addition, to establish Defendants' "scienter" with respect to these forward-looking statements, Plaintiffs must show that Defendants had "actual knowledge" of their falsity (*i.e.*, actual knowledge that the forecasts were without reasonable basis or that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   undisclosed facts "seriously undermined" Oracle's guidance).  Again, Plaintiffs come nowhere

2   near to meeting this burden.  Nor have Plaintiffs adduced facts to show that Defendants'

3   statements about the economy were false, or that Defendants acted recklessly in making them.

4          With regard to Suite 11i, the Ninth Circuit assumed Plaintiffs would prove that

5   Defendants' statements about "integration" were false.  Plaintiffs' own software expert, however,

6   has conceded the truth of Defendants' actual statements—namely, that unlike "best of breed"

7   products from different vendors, which are incapable of working together without "systems

8   integration," the modules of Suite 11i were "designed and engineered" to work together and thus

9   needed no "systems integration."  Although Plaintiffs have argued that Defendants' statements

10  were nevertheless false because of problems with the Suite 11i software, the existence of such

11  problems (even if they had been worse than the problems attendant to software releases of

12  similar size and complexity, which Plaintiffs do not even attempt to show) does not render false

13  or misleading the statements that Defendants actually made.

14         Plaintiffs' claim of accounting fraud in the second quarter of Oracle's 2001 fiscal year

15  ("2Q01") fails at every level.  Plaintiffs now concede that the allegations the Ninth Circuit found

16  "important" in holding that the RSAC adequately pled scienter—namely, that Oracle improperly

17  recognized over $228 million in revenue in a single day by creating 46,000 debit memos—are

18  and always have been baseless.  Plaintiffs' own expert agrees the debit memos had zero impact

19  on Oracle's revenues—just as Defendants have claimed throughout this litigation.  Although

20  Plaintiffs have raised an entirely new (and unpled) claim—that Oracle improperly recognized

21  $20 million in revenue during 2Q01 by transferring alleged customer overpayments to a bad debt

22  reserve—this claim is completely unfounded.  First, Plaintiffs' own accounting expert concedes

23  that he did not perform *any* analysis to determine whether the transfers improperly inflated

24  Oracle's revenue.  Second, the only record evidence on this point shows that at least some

25  portion of the $20 million either was properly transferred or otherwise did not improperly inflate

26  Oracle's revenue (while the evidence is simply insufficient to draw any conclusions about the

27  remaining transfers).  Third, even assuming that the entire $20 million caused improper revenue

28  recognition (it did not), Plaintiffs have failed to establish that $20 million in overstated revenue

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

was material given the $2.66 *billion* in revenue that Oracle recognized in 2Q01.  Fourth, Plaintiffs have cited no evidence that any member of Oracle's senior management was even aware of the transfers when they occurred—much less, had any reason to believe that those transfers materially inflated Oracle's 2Q01 revenues (they did not).

Finally, Plaintiffs' Suite 11i and 2Q01 accounting fraud theories also fail because Plaintiffs cannot show loss causation.  Plaintiffs' damages claim is based entirely on the March 1, 2001 announcement that Oracle missed its guidance for 3Q01.  That announcement did not say anything about alleged problems with Suite 11i or Oracle's 2Q01 results.  Although Plaintiffs claim that the March 1 announcement revealed Oracle's "true financial condition," Plaintiffs do not purport to show that this "true financial condition" reflected the falsity of Defendants' challenged statements.  Instead, Plaintiffs argue that loss causation exists whenever a stock drop follows the revelation of a company's "true financial condition"—regardless of whether that condition is *linked* to the challenged statements.  Plfs.' Opp. to Defs.' Mot. Summ. J. ("Opp.") at 46.  This argument flatly violates *Dura Pharmaceuticals v. Broudo*, which requires Plaintiffs to prove that Oracle's stock dropped when the market learned "the ***relevant*** truth"— *i.e.*, a truth that Defendants concealed through false statements.  Plaintiffs have not even attempted to meet this burden—and certainly have not done so.

## II.     ARGUMENT

### A.     Legal Standards

To avoid summary judgment, Plaintiffs must put forth admissible evidence establishing a "***genuine*** issue of ***material*** fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 249 (1996) (emphasis in original).  A dispute is "genuine" only if there is "evidence on which the jury could reasonably find for [Plaintiffs]."  *Anderson*, 477 U.S. at 252.  A fact is "material" only if it will "affect the outcome of the suit . . . ."  *Id.* at 248.

As an initial matter, many of Plaintiffs' factual assertions are unsupported by any evidence whatsoever.  Plaintiffs repeatedly cite their complaint for various factual propositions (*e.g.*, Opp. at 7:21-22 n.9, 15:5, 21:15, 22:10), or assert "facts" with no evidentiary support in the record (*e.g.*, Opp. at 6:12-14, 9:2-6, 23:10, 48:12-15).  In other instances, Plaintiffs cite evidence

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   that does not support the proposition for which it is cited,[1] or voluminous exhibits without

2   pinpoint cites.[2]  In one particularly egregious instance, Plaintiffs combine all three flaws at

3   once—citing, as "evidence" of spoliation, Plaintiffs' own ninety-one page brief in support of a

4   motion for sanctions that the Court has declined to schedule for a hearing.  Opp. at 13 n.20.[3]

5   This Court is not required "to scour the record in search of a genuine issue of triable fact."

6   Rather, Plaintiffs must "identify with reasonable particularity the evidence that precludes

7   summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Marketel*

8   *Intern., Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1216 (N.D. Cal. 2001).  This Court should

9   ignore evidence not identified with reasonable particularity, as it has the discretion to do.  *Orr v.*

10  *Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002).[4]

11      **B.      There Is No Genuine Issue Of Material Fact As To Falsity Or Scienter**
                 **Regarding Oracle's 3Q01 Guidance**

12          **1.      Plaintiffs Cannot Prove The Statements Were False**

13          Plaintiffs concede that in order to demonstrate falsity, they must prove that Oracle's

14  3Q01 projections had "no reasonable basis" or that "the speaker [was] aware of undisclosed facts

15  tending seriously to undermine" their accuracy.  Opp. at 27.  One of Plaintiffs' own authorities,

16  *Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996), illustrates just how far short of meeting this

17  burden Plaintiffs fall.  In *Provenz*, the company predicted a quarterly profit of $624,000, even

18  though the company's "best, most accurate" internal forecast predicted a loss of $4,000,000.  102

19  F.3d at 1487-88.  In this case, it is undisputed that the internal forecast used by Oracle's

20  executives to assess the company's prospects throughout 3Q01—Jennifer Minton's Potential

---

[1] *Compare, e.g.*, Opp. at 8 n.11 *with* Pls.' Exs. 21-24; Opp. at 17:13-17 *with* Pls.' Ex. 91 at ¶4; Opp. at 18:12-13 *with* Pls.' Exs. 74, 101, 148, 185; Opp. at 18:8-9 *with* Pls.' Exs. 148-49.

[2] *See, e.g.*, Opp. at 16 (Pls.' Exs. 68 and 73), 18 (Pls.' Exs. 149, 185, and 94), 20 (Pls.' Exs. 113 and 114), 21 (Pls.' Ex. 12), 23 (Pls.' Exs. Y, 145, and 201), 48 (Pls.' Ex. 203).

[3] Furthermore, on September 10, 2007, the due date for this Reply brief as set by the Court, Plaintiffs filed, under seal, "corrected" copies of several exhibits to their Opposition (Pls.' Exs. 63, 256, 333 and 370), effectively ensuring Defendants would not have an opportunity to review and respond to these exhibits.  *See* Docket Nos. 1070, 1073.  This came on the heels of Plaintiffs filing on September 8, 2007, a corrected copy of their Opposition (the business day before Defendants' Reply was due), and corrected copies of their partial motions for summary judgment (ten days ***after*** Defendants filed their Oppositions to them).

[4] Plaintiffs' counsel has been admonished for precisely this type of behavior.  *Shuster v. Symmetricon, Inc.*, No. C9420024RMW, 2000 WL 33115909, at *2 n.2 (N.D. Cal. Aug. 1, 2000).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

projection—supported Oracle's guidance throughout the quarter.  Certainly, that projection did not "seriously undermine" Oracle's guidance.[5]  *See* Defs.' MSJ at 22-25.  Faced with this undisputed evidence, Plaintiffs are left to argue that Defendants should have disregarded the company's internal forecasts because of alleged "internal and external changes" rendering those forecasts "unreliable."  Opp. at 28, 32.  But Plaintiffs' manufactured theories do not support a reasonable inference that Oracle's forecasts lacked any "reasonable basis," or that the speakers were aware of facts tending to "seriously undermine" them.

### a. Minton Did Not Mechanically Apply The Conversion Rate

Plaintiffs first argue that Minton's Potential projection was "unreliable" because she mechanically applied the 3Q00 conversion rate to the 3Q01 pipeline, even though the economy had changed.  Opp. at 28.  Of course, the undisputed evidence shows exactly the opposite: Minton did ***not*** apply the 3Q00 conversion rate mechanically.  Ex. 333 at 122:17-127:24; Defs.' Opp. to Pls.' Mot. Summ. J. Against L. Ellison ("20A Opp.") at 9-10.[6]  In their Opposition, Plaintiffs submit a new declaration from their expert Dr. Goedde, seeking to salvage his opinion by suggesting a statistically strong correlation exists between Minton's Potential projection and the application of a conversion rate.  Not only is this submission improper under Rule 26 and irretrievably flawed as a method of statistical analysis (*see* Goedde Reply)—it is demonstrably wrong as a matter of basic mathematics.[7]  It is undisputed that the Potential projection from the

---

[5]  Plaintiffs note that the February 5 Upside Report showed a slight dip in the Potential projection (Opp. at 33, n.52), but this did not "seriously undermine" Oracle's guidance.  The Potential projection rebounded just one week later, and Oracle routinely exceeded this historically-conservative estimate.  Defs.' Mot. Summ. J. ("Defs.' MSJ") at 10-11; *Oracle Corp. Deriv. Litig.*, 867 A.2d at 950-52.

[6]  Unless otherwise noted, all Exhibits cited herein are true and correct copies of the consecutively numbered Exhibits attached to the Declarations filed in support of Defendants' July 26, 2007 Motion for Summary Judgment and August 27, 2007 Opposition to Plaintiffs' Partial Motion for Summary Judgment, and the Declaration of Holly J. Tate (Exs. 363-393).

[7]  As discussed in Defendants' Reply In Support of Motion to Exclude Expert Reports and Testimony of Alan G. Goedde ("Goedde Reply"), Dr. Goedde purports to find a "correlation" between Minton's Potential projection and the prior year's conversion ratio based on an unreliable and misleading analysis that violates basic econometric principles.  *See* Goedde Reply at 9-12.  More fundamentally, the fact that the Potential projection was, on average, within some percentage points of what it would have been based on a mechanical application of the prior year's conversion ratio does *not* prove that Minton "mechanically" applied the prior year's ratio.  Obviously, it proves *just the opposite*.  If Minton *had* "mechanically" applied the prior year's conversion ratio, her Potential projection would have been *exactly* the same as the projection Dr.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

December 11 Upside Report (just before the December 14, 2000 call) assumed a conversion ratio of only 48%—five percentage points *lower* than the 53% conversion ratio achieved in 3Q00. *See* Ex. 1 at 213095; Ex. 334 033550. Thus, by definition, Minton did *not* "mechanically" apply the prior year's ratio. Moreover, it is undisputed that the guidance Oracle announced to the market on December 14, 2000 assumed a conversion ratio of 42%—*eleven* percentage points lower than 3Q00's 53% conversion ratio. *See* Ex. 1 at 213095 Ex. 334 at 033550, 033557; Ex. 363 at 003221. Any suggestion that Oracle's **guidance** was false because it was based on a "mechanical" application of the 3Q00 conversion ratio is just wrong.

### b. Plaintiffs' Purported "Major Economic Change" Did Not Render The 3Q01 Forecast False

Plaintiffs next argue that Defendants knew the 3Q01 forecast was "unreliable" because of a "major economic change," citing the NASDAQ decline and the bursting of the dot-com bubble in early 2000. Opp. at 29. As discussed in Ellison's opposition to Plaintiffs' motion for summary judgment on their Section 20A claim, Plaintiffs fail to show how any alleged changes in the economy "seriously undermine[d]" Oracle's forecast. Indeed, Oracle had achieved stellar performances in 1Q01 and 2Q01—*after* the supposed change. 20A Opp. at 10-11. Even at the end of 2Q01, with NASDAQ off 49% from its highs and Oracle's dot-com revenues declining, Oracle *still* had a record second quarter. Pls.' Opp. Ex. 230 at 13 & Ex. 4; Ex. 364 at 975697. There is simply no correlation between a NASDAQ decline and Oracle's forecast. Ex. 365 at ¶¶ 62-65. Moreover, there is no support for Plaintiffs' bald assertion that Oracle's 3Q01 guidance was "aggressive."[8] Opp. at 27. Oracle's 3Q01 guidance was **lower than** its internal forecast in the most recent Upside Report (Defs.' MSJ at 8-9), and it assumed conversion ratios lower than those achieved in 3Q00. None of Plaintiffs' claims regarding a "major economic change" render Oracle's 3Q01 forecasts "false."

---

Goedde calculated by "mechanically" applying the prior year's ratio. In fact, the two are never the same, and the difference between the two ranges from $5 million to $278 million.

[8] Plaintiffs contend that Oracle should have realized it would miss its earnings targets by looking to Cisco and Sun. Opp. at 30 n.45. But neither Cisco nor Sun is identified as a competitor in Oracle's SEC filings (Ex. 54 at 143917) and the *ex-post* May 2001 emails by Henley (Pls.' Opp. Exs. 244, 245) were written with knowledge of the numerous earnings misses in the software sector **after** March 1, 2001 and the subsequent decline in the telecom market. Those emails have no relevance to what Henley or Ellison knew about the effect of the economy on Oracle in 3Q01.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**c.    There Was No Directive To Increase The Risk in Oracle's Forecasts**

Plaintiffs claim that Ellison issued a "directive" that caused sales representatives to stop "sandbagging" and put more risk into the forecast, and therefore that Minton's Upside adjustments were unnecessary and rendered the forecasts "unreliable."  Opp. at 32-33.  As set forth in the 20A Opposition, this theory fails at every level.  20A Opp. at 13-15.  Though Plaintiffs cite additional material here, most of it reflects Oracle's effort to migrate its forecasting process to a new version of Oracle Sales Online (OSO) as part of the company's worldwide upgrade to Suite 11i.  *See* Pls.' Opp. Exs. 231, 265.  None of that evidence suggests (as Plaintiffs argue) that Oracle was putting in place a "new forecasting methodology" (Opp. at 32) that rendered Minton's Upside adjustments "obsolete."  *See* 20A Opp. at 13-15.

Plaintiffs also argue that an email from Minton, forwarded by Sanderson and Nussbaum, shows that "numerous executives … discussed methods for implementing Ellison's directive." Opp. at 32, Ex. 271-72.  These emails support no such claim. Even read in the light most favorable to Plaintiffs, they reflect nothing more than what Ellison and Minton testified to—an ongoing effort to make the field forecasts as accurate as possible.  *See* Ex. 342 at 423:7-12; Ex. 341 at 103:11-106:11.  There is no evidence that these efforts eliminated "sandbagging" or rendered Minton's Upside adjustments "obsolete"—much less, that they rendered Oracle's guidance "false."

**d.    The Success Of Suite 11i Did Not Render The Forecast False**

Finally, Plaintiffs contend that because the percentage of Oracle's pipeline attributable to applications had increased to 42% at the beginning of 3Q01, Defendants "knew" the pipeline would convert at a lower rate than in prior years because historically, applications deals tended to close at a lower rate than technology deals.  Opp. at 31.  This argument fails for at least three reasons.  First, it assumes that the 3Q01 forecasts were based on historical conversion rates rather than a "bottoms up," deal-by-deal assessment of 3Q01 sales opportunities.  As shown above and in Ellison's 20A Opposition, this is simply not true.  *See* Section II.B.1.a, *supra*; 20A Opp. at 12-13.  Second, even if Minton had "mechanically applied" prior year conversion rates, and had separately calculated projected sales for applications and technology products based on

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

their different historical conversion rates (she did not), the sum of those figures *still* would have

supported Oracle's 3Q01 guidance.  *Id.* at 12 & n.8.  Third, the whole premise of Plaintiffs'

argument fails; an increase in the percentage of 3Q01's pipeline attributable to applications sales

opportunities would *not* have alerted defendants that Oracle's 3Q01 forecasts were inaccurate,

because Oracle exceeded its 2Q01 forecasts with an almost identical percentage of applications

deals in the pipeline.  Pls.' Opp. Ex. 229 at Ex. 6.  Clearly, the fact that Oracle's applications

business was growing faster than its technology business did not mean that Oracle's 3Q01

forecasts lacked a "reasonable basis," nor did it "seriously undermine" those forecasts.[9]

### 2. Plaintiffs Cannot Prove Defendants' Scienter
#### a. The Safe Harbor Applies

Plaintiffs deny that the Safe Harbor applies to Defendants' statements about Oracle's

3Q01 guidance (Opp. at 41-42), and assert that the Safe Harbor should not apply at the summary

judgment stage (Opp. at 41 n.59).  However, the Court unquestionably can decide this issue on

summary judgment where, as here, there is no genuine issue of material fact as to its application.

*See In re Broadcom Co. Sec. Litig.*, No. SA CV 01-275-GLT MLGX, 2004 WL 3390052, at *1

(C.D. Cal. Nov. 23, 2004); *In re The Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1142 (N.D.

Cal. 2002).  Plaintiffs also complain that many of Oracle's cautionary statements were

incorporated by reference to Oracle's SEC filings (Opp. at 41-42), but courts have routinely

applied the Safe Harbor based on such statements.  Defs.' MSJ at 27.

Finally, Plaintiffs argue that the risks Oracle warned about had already materialized, and

therefore that the Safe Harbor does not apply.  Opp. at 41-42.  But Plaintiffs cite no evidence for

this assertion, and they make no attempt to articulate *which* risks had materialized, or how.  *Id.* at

42.  In any event, whether seeking to avoid the Safe Harbor altogether, or establish liability

despite the Safe Harbor, Plaintiffs must prove Defendants' "actual knowledge" that Oracle's

guidance was "false"—*i.e.*, "actual knowledge" that Oracle's forecasting process lacked a

"reasonable basis," or that facts of which Defendants were aware "seriously undermine[d]"

Oracle's guidance.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *In re Adobe Systems, Inc. Sec. Litig.*, 787 F.

---

[9] Plaintiffs' arguments about Oracle's sales force, the demonstration environment, Suite 11i, and reference customers were addressed in the 20A Opp. at 15-19 & nn.13-14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

Supp. 912, 919 (N.D. Cal. 1992); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

### b.      Plaintiffs Cannot Demonstrate "Actual Knowledge"

Plaintiffs argue that four "indicators" at Oracle "told" Defendants that Oracle's guidance was "inaccurate." Opp. at 34. In fact, these "indicators" are simply fragments of data, wrenched out of context, which are not sufficient to create a triable issue as to forecast "falsity"—let alone Defendants' "actual knowledge" of "falsity." Defs.' MSJ at 8-14, 22-25.[10] Two of these "indicators"—Oracle's Flash Reports with actual results and Oracle's pipeline growth—were discussed in opposition to Plaintiffs' Section 20A motion (20A Opp. at 4-8), and the Delaware Chancery Court rejected precisely the same arguments. *Oracle Corp. Deriv. Litig.*, 867 A.2d at 944, 948-52. Plaintiffs raise two additional alleged "indicators," which are addressed below.

#### (1)      The "Division Level "Indicators" Do Not Show Defendants' "Actual Knowledge" That The Forecast Was False

Because Oracle's company-wide forecasts clearly supported its 3Q01 projections, Plaintiffs are left to argue that various "division level" forecast data "seriously undermined" Oracle's guidance and establishes Defendants' "actual knowledge" that such guidance was "false." Opp. at 35-39. This assertion is baseless. The undisputed evidence proves that the heads of NAS, OSI and OPI and their finance directors—the individuals charged with analyzing the "division level" data and formulating the division-level forecasts on which Oracle's company-wide forecasts were based—all believed until the very end of the quarter that Oracle would meet guidance, and *did not significantly reduce their division-level forecasts until the very end of the quarter*. *See, e.g.*, Sanderson Decl. ¶¶ 6-8; Ex. 366 at 356:1-10, 379:2-11; Ex. 367 at 159:9-21; Pls.' Ex. 305; Pls.' Ex. 327; Ex. 368 at 132:15-133:24; Ex. 76.

Indeed, in the very documents Plaintiffs cite as evidence that the Defendants knew Oracle would not meet its guidance, the division heads and finance directors repeatedly assured Minton

---

[10]   This is particularly true of the undisclosed intra-quarter data Plaintiffs cite. Opp. at 34-40. Absent a showing that this intraquarter data indicated a "substantial likelihood" of an "extreme departure" from Oracle's guidance, it is immaterial as a matter of law, and therefore does not render Oracle's guidance false or misleading. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

and others that they would meet their forecasts, and might even exceed those forecasts by tens of millions of dollars.  Thus, for example, NAS's finance director, David Winton, noted that "[o]ur Q3 forecast of $346M has not changed" and revised NAS's "upside" to $360 million.  Pls.' Opp. Ex. 240; *see also* Pls.' Opp. Ex. 236 (Winton explaining the reasoning behind NAS's initial $346 million forecast).  Sarah Kopp, OSI's finance director, told Minton that Jay Nussbaum, the Executive Vice President in charge of the OSI division, was "confident" in his $225 million forecast.  Pls.' Ex. 305.  Kopp herself told Minton that she believed OSI would finish the quarter "between 210 and 220" million, with potential upside of $240 million or even $288 million. Pls.' Ex. 327; Ex. 368 at 132:15-133:24 (commenting on Pls.' Ex. 327).  Jim English, OPI's finance director, told Minton that OPI "was holding at $150M but I'll be a bit more aggressive and say a likely $150-170."  Pls.' Ex. 329.[11]  To suggest that these documents gave Defendants "actual knowledge" that Oracle's guidance was "false," even as the documents themselves reaffirm the division-level forecasts on which that guidance was based, is absurd.

> **(2)      4Q01 Forecasts Made During 3Q01 Are Irrelevant And Do Not Show Defendants' "Actual Knowledge" That The Forecast Was False**

Plaintiffs claim that Defendants somehow knew the hockey stick effect would not occur in 3Q01 because the forecasts *for 4Q01* made during 3Q01 were low compared with Oracle's *actual results* for 4Q00.  Opp. at 39.  This argument is just plain silly.  Plaintiffs do not explain how this preliminary forecast for an entirely different quarter establishes Defendants' "actual knowledge" that Oracle's 3Q01 forecast was "false."  Indeed, the very same forecasting process that generated the 4Q01 projections—a process that Plaintiffs simultaneously characterize as irretrievably flawed and "unreliable"—was consistently confirming that Oracle was on track to meet its 3Q01 guidance.  *See* Defs.' MSJ at 6-14.  Nor do Plaintiffs explain why it makes sense to compare a *forecast* for 4Q01 prepared during 3Q01 with the *actual results* from 4Q00—or

---

[11]  *See also* Pls. Opp. Ex. 241 (John Nugent's Ops Review PowerPoint); Ex. 369 at 230:16-234:23 (explaining that the "market observations" listed in the Ops Review were observations picked up from pundits, not comments about his General Business unit's ability to make its forecast) and 257:17-258:9, 270:2-20, 271:19-275:13 (testifying that at the end of January Nugent was "still feeling good about the forecast" given that "nobody said [the news in the marketplace] is going to affect my forecast.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   why such a comparison would have given Defendants "actual knowledge" that the 3Q01 forecast

2   was "false."[12]  Clearly, it did not.

3       **C.      There Is No Genuine Issue Of Material Fact As To Falsity Or Scienter
              Regarding Defendants' Statements About the Economy**

4           **1.      Plaintiffs Cannot Prove The Statements Were False**

5           With respect to Defendants' statements about the economy, the undisputed facts show

6   that Defendants' statements were true when made, and were supported by Oracle's results for

7   1Q01 and 2Q01, as well as its internal forecast data for 3Q01.[13]  *See* Defs.' MSJ at 5-14, 28-32.

8   Ignoring the content of the statements, which referred to the impact of the economy on Oracle's

9   business as a whole, Plaintiffs claim the statements were false because certain portions of

10  Oracle's business had declined in 2000.  Opp. at 43 (citing lower dot-com revenue and fewer big

11  deals in NAS).  Given the strength of Oracle's overall results during the first two quarters of

12  FY01 and the strength of its pipeline during 3Q01, Plaintiffs' assertion that Defendants'

13  statements were false because certain sectors within Oracle's business had declined deserves

14  little response.  At a minimum, to demonstrate that these statements were "false," Plaintiffs

15  would have to show that the decrease in dot-com revenue and big deals in the NAS division was

16  having a material negative impact on Oracle's business as a whole.  *See In re Convergent Tech.*

17  *Sec. Litig.,* 948 F.2d 507, 512-13 (9th Cir. 1991).  Plaintiffs make no such showing here—as

18  demonstrated throughout the briefing on summary judgment.

19          **2.      Plaintiffs Cannot Prove Defendants' Scienter**

20          Plaintiffs cite no evidence that Defendants knew their statements about the economy were

21  false, or ignored a danger of misleading investors "so obvious" that Defendants "must have been

---

22  12  There is no reason to believe that Oracle's executives would have been concerned about the

23  size of the 4Q01 forecasts prepared during 3Q01.  During any given quarter, Oracle would
    expect to close roughly half of the business in its pipeline. *See, e.g.,* Ex. 11 at 033557.  At that

24  point, many of those opportunities would become part of the pipeline and/or forecast for the
    following quarter.  Thus, Defendants would have had every reason to expect that, by the

25  beginning of 4Q01, a large number of deals in the 3Q01 pipeline would become 4Q01
    opportunities, increasing the 4Q01 pipeline and forecast.  What happened in 3Q01, of course, is

26  that Oracle failed to close the proportion of deals that it had historically closed at the end of the
    quarter.

27  [13] Plaintiffs complain that Defendants rely on the forecast documents to support their statements
    about the economy (Opp. at 43, n.63)—but Plaintiffs do not explain why Defendants were not

28  entitled to rely on those documents if the documents showed that Oracle was on track to make its
    3Q01 projections.  Opp. at 43.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   aware of it." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000).  Citing the Ninth

2   Circuit's reversal of this Court's dismissal of the RSAC, Plaintiffs rely largely on stock sales by

3   Ellison and Henley.  Opp. at 44-45.  But the *facts* currently before the Court were not before the

4   Ninth Circuit (20A Opp. at 22), and those facts completely negate any inference of scienter.  *In*

5   *re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  Plaintiffs' contrary

6   arguments fail because they misstate both the law and the facts.  First, Plaintiffs misstate the

7   holding of *America West* (Opp. at 44), which held only that "a lack of stock sales by a defendant

8   *is not dispositive as to scienter*"—but did not reject the holdings of *Acito* and *Advanta* that the

9   lack of stock sales undercuts an inference of scienter.  *Compare No. 84 Employer-Teamster Joint*

10  *Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) *with*

11  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) *and In re Advanta Corp. Sec. Litig.*,

12  180 F.3d 525, 540 (3d Cir. 1999).

13          Second, Plaintiffs cite SEC rule 144 (Opp. at 44), but ignore *In re Skechers U.S.A., Inc.*

14  *Sec. Litig.*, which held that sales by an insider of 95% of the stock permitted to be sold under that

15  rule did ***not*** support a strong inference of scienter.  No. CV 03-02094 PA, 2004 WL 1080174, at

16  *10 (C.D. Cal. May 7, 2004).  Thus, while Plaintiffs note that Ellison sold 16.34% of the stock

17  he could have sold under Rule 144 (Opp. at 44 n.64), this fact actually ***undercuts*** any inference

18  of scienter under *Skechers*.  Ellison Decl. ¶ 11.

19          Third, Plaintiffs' factual arguments find no support in the record.  Ellison did not "unload

20  early" (Opp. at 44), but rather exercised his options in one of the three exercise windows

21  remaining prior to expiration.  Ellison Decl. ¶¶ 6, 8.  This was not "dramatically out of line with

22  his trading history," Opp. at 44, but rather, as Plaintiffs concede, consistent with his "track record

23  of holding on to his Oracle options until the last possible moment."  Pls.' MSJ at 12.

24  Furthermore, the overwhelming majority of the proceeds from Ellison's sales went to pay taxes

25  and reduce debt.  Pls.' Opp. Ex. 344.  Plaintiffs argue that Sanderson "had plans to sell [stock] in

26  January 2001," but provide no evidence to support this assertion, and Plaintiffs' argument as to

27  Minton is based entirely on hearsay.  Opp. at 45.  The fact that Catz and Cooperman did not trade

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

12

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    in late January, even if it was "because they found out that Ellison was selling" (Opp. at 45),

2    certainly is not evidence that either of Ellison or Henley acted with scienter.

3          In addition to Ellison's and Henley's trades, Plaintiffs cite Oracle's own purchases of

4    Oracle stock during 3Q01 (a subject as to which the Special Master denied discovery).  But

5    Plaintiffs' chart reflecting Oracle's stock repurchases for 3Q01 shows nothing more than that

6    Oracle, like any other buyer, tended to buy more shares when the price of the stock declined.

7    Pls.' Opp. Ex. 376.  Plaintiffs have not even attempted to show that Ellison or Henley engaged in

8    day-to-day supervision of the stock repurchase program—much less controlled  the program in a

9    manner allowing either of them to "unload their shares at higher prices."  Indeed, the undisputed

10   testimony is that neither Henley nor Ellison was in such position.  Pls.' Opp. Ex. H at 289:11-

11   290:7; Pls.' Opp. Ex. J at 700:15-701:10.  In any event, this entire theory ignores the fact that

12   Oracle had been continuously buying back shares for years preceding 3Q01 and continued to do

13   so for years after 3Q01.  *See* Pls.' Opp. Ex. H at 288:8-15.  There is simply no evidence of any

14   connection between the buyback program and either Ellison's or Henley's trades.

15        **D.    There Is No Genuine Issue Of Material Fact As To Falsity Or Scienter
              Regarding Defendants' Statements About Suite 11i**

16        Plaintiffs' Opposition fails to identify a genuine issue of ***material*** fact regarding the truth

17   of Defendants' statements concerning Suite 11i.  Thus, in addition to Plaintiffs' failure to show

18   loss causation (*see* Section II.F, *infra*), Plaintiffs have failed to produce evidence that would

19   support a rational jury finding that any of the challenged statements about Suite 11i were

20   materially false.  Plaintiffs also fail to cite any evidence that any of the Defendants knew, or was

21   reckless in not knowing, that their statements about Suite 11i were false.

22        **1.    Plaintiffs Cannot Prove The Statements Were False**

23              **a.    Plaintiffs Cannot Prove A False Or Misleading Statement
                      About "Integration"**

24        Each of Defendants' Class Period statements about the "integration" of Suite 11i—which

25   comprise most of the challenged Suite 11i statements—closely tracked Oracle's basic marketing

26   message for Suite 11i.  *See* Ex. 370 at 003224-25; Ex. 283 at 035471; Ex. 285 at 306999-7001;

27   Ex. 272 at 2-8, 14.  This marketing message reflected Oracle's effort, which began long before

28   the Class Period, to position Suite 11i as an alternative to separate "best of breed" products from

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

REPLY IN SUPPORT OF  DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

different vendors.  Unlike best of breed products, Suite 11i was "designed and engineered to work together," and thus did not require expensive and time-consuming "systems integration" to work together.[14]  *See* Ex. 374 at 141274; Ex. 372 at 027782; Ex. 98 at 420079; Ex. 56 at 003224-25; Ex. 116 at 306807; Ellison Decl., ¶ 16; Ex. 271 at 003224-25, 003237; Ex. 272 at 2-8, 14; Ex 273 at 132:23-133:17; Ex. 274 at 64:4-13; Ex. 275 at 191:13-192:1; Ex. 276 at 230:18-232:15; Ex. 271 at 003224; Ex. 277 at 106690; Ex 273 at 69:7-70:4; Ex. 278 at 33:21-34:7, 48:2-49:5; Ex. 279 at 139:17-140:17; Ex. 280 at 40:12-41:10; Ex. 281 at 465:12-466:15; Ex. 282 at ¶¶ 60-61, 126; Ex. 283 at 035471; Ex. 284 at 009891.

Plaintiffs do not deny the comparison between Suite 11i and "best of breed" alternatives that Defendants drew with their challenged statements—including that Suite 11i was, as Ellison said, "designed and engineered" to work together in a way that best of breed products are not. Ex. 286 at 156:11-157:22; Defs.' MSJ at 17-18, 37-39.  Instead, Plaintiffs have claimed that the statements were false because, whatever Suite 11i was "designed and engineered" to do, its quality was so poor—it was so riddled with defects—that it did not work. *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 684 (N.D. Cal. 2002) ("Plaintiffs contend that the 11i Suite did not work, was virtually unsellable from its introduction and that the product defects led to Oracle's third quarter shortfall."); RSAC ¶¶ 6, 55-56, 66, 82; Ex. 375 at 16, 19-20, 85.  But Plaintiffs now concede they cannot prove anything about Suite 11i's quality—much less, that it had so many defects it "did not work."  *See* Opp. at 15 n.24, 24 n.38.  In fact, in opposition to Defendants' motion to exclude testimony from Plaintiffs' software expert (Hilliard), Plaintiffs state:  "It is undisputed that neither party knows with any degree of accuracy either the size of Suite 11i or the number of defects the software contained."  Opp. at 18.[15]

---

[14]  Plaintiffs also cite a statement that Suite 11i was "plug and play" (Opp. at 14), but they misrepresent its meaning.  Read in context, this statement referred to the fact that customers could implement one or more modules initially, and then later implement additional modules without "systems integration."  *See* Ex. 371 at 306974-75; *see also* Ex. 372 at 027783.  A variation on the basic "pre-integration" message, this statement does not mean (as Plaintiffs suggest) that Suite 11i was "easy" to implement.   In fact, Defendants repeatedly noted that even though Suite 11i eliminated the need for "systems integration," other implementation work was required, as with any comparably complex application system.  *See* Ex. 363 at 003237-8; Ex. 373 at 37-38.

[15]  Plaintiffs had little choice but to concede this failure of proof because their own rebuttal software expert, Dr. Randall Jensen, confirmed that the record in this case (and, specifically, the

1    Forced to abandon their claim that the statements were false because the software "did not

2    work," Plaintiffs now deny that they ever made such a claim.  *Compare* RSAC ¶ 52(s) (alleging

3    that statements about Suite 11i were false because selling Suite 11i was "not just selling a car

4    without tires, they sold it without wheels!") *with* Opp. at 15 ("Plaintiffs never alleged that 11i

5    was 'defective' like a 'car without wheels.'").

6            But having discarded the longstanding foundation for their claim that Defendants' Suite

7    11i statements were false, Plaintiffs have failed to identify any other material "truth" that

8    Defendants' Suite 11i statements concealed.  Instead, Plaintiffs submit a collage of sound bites

9    without context, and without explaining how any of that "evidence" demonstrates that

10   Defendants' statements were false.  Plaintiffs' parade of "evidence" shows, at most, that Suite

11   11i encountered the same kinds of problems that any new software release encounters—

12   problems that in no way undercut Defendants' statements concerning Suite 11i's "integration"

13   relative to "best of breed" alternatives.  In particular, Plaintiffs' evidence shows that: (i) the early

14   releases of Suite 11i had bugs, as all software does (Opp. at 15-21); (ii) some number of early

15   Suite 11i customers, a fraction of those using or implementing the software during the Class

16   Period, complained about its quality[16] (Opp. at 15-20, 24-25; Defs.' Opp. to Pls.' Mot. Partial

17   Summ. J. Re: 10(b) Claims ("Defs.' Opp. to MPSJ") at 20; Defs.' MSJ. at 35-36, 38-39); (iii) in

18   order to maintain relationships, and often pursuant to the sale of additional products, Oracle

19   sometimes granted concessions to customers (Opp. at 16-17, 19-20; Defs.' Opp. to MPSJ at 20);

20   
21   facts relied upon by Plaintiffs' principal software expert, Hilliard) do not support any meaningful
     conclusion about Suite 11i's quality.  *See* Ex. 132 at 38:3-16; *see also* Defs.' MSJ at 38-39.

22   [16]  If offered to prove the facts asserted by the customers (*see* Opp. at 18-19, 24), these
     complaints are hearsay, and inadmissible to prove any defects in Suite 11i.  Fed. Rule Evid.
23   801(c); *Olson v. Ford Motor Co.*, 410 F. Supp. 2d 855, 861-62 (D.N.D. 2006) ("[C]ustomer
     complaints, whether contained in Ford's business records or compiled by another party, all
24   constitute hearsay.").  The same is true of internal Oracle emails relaying complaints (*see* Opp. at
     16-17, 19); even if the statements by Oracle's employees were properly treated as admissions,
25   they are simply relaying hearsay statements by the customers.  Fed. R. Evid. 805; *Commodity
     Futures Trading Com'n v. Wilshire Inv. Management Corp.*, 407 F. Supp. 2d 1304, 1315 n.2
26   (S.D. Fla. 2005) (customer complaints memorialized in reports that fall within hearsay exception
     are inadmissible hearsay within hearsay).  At most, these materials are evidence of the fact that
27   customers complained—not evidence of the underlying problems that customers alleged.  As
     experts on both sides agree, the mere fact of a customer complaint is irrelevant to the question of
28   whether the software is defective at all.  *See* Ex. 298 at 83:24-84:24, 86:9-14; Ex. 376 at ¶ 16;
     *see also* Ex. 286 at 88:4-9, 91:25-92:3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1   (iv) with hindsight, some Oracle employees believed Oracle could have done a better job with

2   the pre-release testing and initial roll-out of Suite 11i, or were otherwise critical of the product at

3   various points in time (Opp. at 17, 19-20, 22-26); (v) Oracle had some problems with its

4   demonstration environment for Suite 11i, caused not by any defects in the software itself but by

5   the hardware configuration used for the demonstrations (Opp. at 21-22; Defs.' Opp. to MPSJ at

6   22-23); and (vi) when Oracle itself upgraded to Suite 11i—an upgrade Oracle undertook at a

7   time when Plaintiffs claim that Oracle knew Suite 11i was riddled with "massive defects"—

8   Oracle experienced the same "technical difficulties" experienced by some of its customers (Opp.

9   at 26-27).

10         None of this has anything to do with the alleged falsity of Defendants' statements

11   comparing Suite 11i's degree of integration with separate "best of breed products" purchased

12   from different vendors.  Apparently, Plaintiffs' claim has now devolved into the absurd assertion

13   that the statements were rendered false by the existence of *any* bugs or defects affecting *any* of

14   the hundreds of customers using or implementing Suite 11i during the Class Period, even if (1)

15   the basic comparative claim made in Defendants' statements was true (as Plaintiffs' expert has

16   conceded), and (2) Suite 11i's quality was as good as or better than competing software

17   (something Plaintiffs cannot deny based on the evidence).  In effect, Plaintiffs seek to convert

18   Defendants' statements that Suite 11i was "pre-integrated"  into a guarantee that Suite 11i would

19   be free of the bugs and other issues affecting *all* software of this kind.  *See* Opp. at 15, 16, 17,

20   18, 19, 20, 21, 23, 25, 26.  But to state the proposition is to reject it.  The market unquestionably

21   knew the difficulties faced by new software releases, and knew that Suite 11i was facing its share

22   of those issues.  *See* Defs.' MSJ at 18-21, 41; *see also* Ex. 377 at ¶ 99.  In contrast, not a single

23   piece of evidence suggests that the market (or anyone, for that matter) understood Defendants'

24   statements as a guarantee that Suite 11i would be free of bugs and other problems—something

25   Plaintiffs' own experts agree would have been without precedent in the industry.  *See* Ex. 132 at

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

28:20-22; Ex. 378 at 38 n.73; Ex. 102 at ¶¶ 43-47.  Plaintiffs have failed to meet their burden in opposing summary judgment on this issue.[17]

### b. Plaintiffs Cannot Prove The Statements About Suite 11i's Foreign Language Capabilities Were False

Plaintiffs also cannot contest that long before the Class Period, Suite 11i's user interface screens had been translated into all major languages (including those identified by Plaintiffs' expert as necessary to support this claim, *see* Ex. 379 at 215:8-216:5).  *See* Seiden Decl. ¶¶ 10-15.  Plaintiffs' claim that Suite 11i did not "work" in every language is based on alleged "defects" and "incomplete" language translations (*see* Opp. at 25-26), and the fact that subsequent "minor" releases of Suite 11i (such as 11i.3, 11i.4, etc.) were released first in English, followed by various translations (Opp. at 25).  The only Class Period statement Plaintiffs have identified in this regard—Defendant Sanderson's statement on February 13, 2001, that Suite 11i had been translated into 23 languages (Ex. 375 at 14, 28, ¶ 23; Pls.' Mot. Partial Summ. J. ("Pls.' MPSJ") at 2)—is indisputably true.  *See* Seiden Decl. ¶¶ 10-15; Ex. 322 at 143834.  The fact that there were bugs affecting those translations, or that certain screens may not have been translated, does not render Sanderson's statement materially false.  *See* Ex. 380 at 206:14-208:12; Ex. 381 at 221:17-222:5; Ex. 382 229:16-230:10; *see also* Ex. 383 at 307:24-308:11; Ex. 384 at 190:24-191:7; Ex. 381 at 222:24-223:15.

### 2. Plaintiffs Cannot Prove Defendants' Scienter

Even if Plaintiffs could show that the bugs, customer complaints and other common software problems they cite rendered any of Defendants' statements about Suite 11i false or misleading, Plaintiffs have cited absolutely no evidence, and there is none, that any of the Defendants knew (or was reckless in not knowing) that their statements about Suite 11i were false or misleading.  There is no genuine issue of material fact as to scienter.

---

[17]  Illustrating just how far Plaintiffs' claims have strayed from reality, they simultaneously (i) admit they cannot prove that Suite 11i was worse than any competing products; and yet (ii) argue that Suite 11i's quality was so bad that Oracle should not have recognized *any* applications license revenue during the first three quarters of its 2001 fiscal year (Opp. at 18 n.31)—a period during which Oracle recognized (and no one but Plaintiffs has ever questioned) nearly $700 million worth of application license revenues.  *See* Ex. 25 at 973930; Ex. 26 at 976820; Ex. 27 at 977030.  Under Plaintiffs' logic, every software company in the United States (at least) is fraudulently recognizing license revenues every day.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

**E.    There Is No Genuine Issue of Material Fact As To Falsity, Materiality Or Scienter Regarding Plaintiffs' 2Q01 Accounting Claim**

Plaintiffs have abandoned their original $228 million accounting fraud claim, which the Ninth Circuit specifically identified as an "important" basis for its conclusion that the RSAC sufficiently pled scienter. *See Nursing Home Pension Fund*, 380 F.3d at 1233-34.  Plaintiffs now contend that Oracle committed accounting fraud in 2Q01—the quarter before the earnings miss at issue here—by improperly transferring $20 million in alleged customer overpayments to its bad debt reserve, allegedly resulting in an overstatement of EPS by "at least $0.01."  Opp. at 1, 4-5.[18]  There is a complete failure of proof with respect to every element of Plaintiffs' new (and unpled) claim.  In addition to their failure on loss causation (discussed below), Plaintiffs have failed to produce evidence of falsity, materiality and scienter with respect to this new claim.

**1.    Plaintiffs Cannot Prove The Statements Were False**

Plaintiffs have not met their burden of providing evidence sufficient to show a false statement with respect to the alleged improper $20 million bad debt transfers.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Shuster*, 2000 WL 33115909, at *1.  Although the parties do not dispute that Oracle transferred approximately $20 million from Account 25005 to Account 12601 in 2Q01, Plaintiffs have made no showing that these transfers resulted in the improper inflation of 2Q01 earnings.  Indeed, Plaintiffs' accounting expert, Mr. Regan, conceded that he performed *no* analysis to determine whether and to what extent the bad debt transfers improperly inflated Oracle's 2Q01 financial results.  Ex. 227 at 233:21-234:7.  Defendants' accounting expert—the *only* witness in the case who assessed the propriety of these transfers—analyzed a subset of the 2Q01 bad debt transfers and concluded that at least 20% either were proper when made or should have been recorded as revenue, and thus did not improperly inflate revenue.  Defs.' MSJ at 48.  The remaining 80% were not necessarily improper; rather, the evidence in the

---

[18]  Plaintiffs' argument that the bad debt transfer allegations are not new and unpled distorts the record.  Opp. at 4-5.  While the RSAC alleged a $228 million accounting fraud, it made no mention of the bad debt reserve, $20 million in 2Q01 bad debt transfers, Account 12601 or EPS inflation of $0.01.  RSAC ¶¶ 36-44.  Plaintiffs admit that they first raised these issues in an *ex parte* application in 2002, but Plaintiffs cannot amend their pleadings simply by filing an *ex parte* application.  Opp. at 4 (referring to the "November 2002 Allegations").  Moreover, Plaintiffs amended their Second Amended Complaint *after* they asserted the so-called November 2002 Allegations, but did not include this bad debt transfer claim.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    record was not sufficient to form an opinion.[19]  But it is not Defendants' burden to prove the

2    transfers were proper.  Because Plaintiffs' expert failed to perform *any* analysis of whether the

3    bad debt transfers improperly inflated Oracle's 2Q01 results, Plaintiffs cannot prove Oracle's

4    2Q01 results were false at all.

5            Further underscoring Plaintiffs' failure of proof on this point, Oracle has never restated

6    its 2Q01 financial statements, which have been reviewed by two independent accounting firms

7    (including after Plaintiffs first raised the bad debt transfer allegations in this litigation).  Ex. 385

8    at 41; Ex. 386 at 122:14-123:21; Ex. 387 at 209:1-210:5.  And contrary to Plaintiffs' claim that

9    the bad debt transfers resulted in an overstatement of EPS of "at least" one cent (*see* Opp. at 1),

10   Plaintiffs' accounting expert acknowledged that the impact of the bad debt transfers on EPS was,

11   at most, a fraction of a cent, and that it is commonplace under GAAP for companies (like Oracle)

12   to round EPS up to the nearest penny.  Ex. 388 at 126:9-127:11.[20]

13                      **2.      Plaintiffs Cannot Prove Materiality**

14           Conceding that the $20 million in alleged improper bad debt transfers represents *less than*

15   *1%* of Oracle's reported 2Q01 revenue of $2.66 billion, and that the total impact on EPS of the

16   transfers and subsequent adjustments would have been only two-tenths of a cent, Plaintiffs also

17   have failed to meet their burden of proving materiality.  Defs.' MSJ at 46; Defs.' Opp. to MPSJ

18   at 12-13; Ex. 388 at 126:9-127:11.  Ignoring a host of cases holding that misstatements of this

19   magnitude are immaterial as a matter of law (Defs.' MSJ at 46-47), Plaintiffs make several

20   arguments not grounded in law or fact.

21

22

---

23   [19]  Discovery in this case included accounting data for transactions that contained $10.6 million

24   of the approximately $20 million in bad debt transfers in 2Q01.  Defs.' MSJ at 48 n.27.

25   [20]  Lacking any facts to support their accounting claims, Plaintiffs attempt to obfuscate by
     conflating their original "debit memo" theory with the new "bad debt transfer" theory, claiming
     that Oracle applied "the $20 million [in 2Q01 bad debt transfers] to fictitious 'debit memo'

26   invoices."  Opp. at 1, 11.  However, not a single fact witness testified that the bad debt transfers
     were applied to the debit memos.  In fact, it is undisputed that the debit memos were created

27   through simultaneous and offsetting debits and credits to a totally different account.  Defs.' MSJ
     at 43-44.   More fundamentally, Plaintiffs' (transparently false) attempt to "link" the "debit

28   memo" and "bad debt transfer" claims adds nothing substantive to their accounting allegations—
     which remain without substance.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    There is, for example, no evidence to support Plaintiffs' bald assertion that the

2    $20 million was material because it involved "intentional earnings manipulation."  Opp. at 6.

3    Plaintiffs do not cite a shred of evidence showing that any of the Defendants orchestrated the

4    2Q01 bad debt transfers to manipulate Oracle's financial results.  On the contrary, the undisputed

5    evidence shows that neither the individual Defendants nor other Oracle executives had

6    contemporaneous knowledge of the bad debt transfers at all—and certainly no reason to believe

7    they were improper.  Defs.' MSJ at 47.  Plaintiffs also mischaracterize SEC Staff Accounting

8    Bulletin No. 99 ("SAB 99") (Opp. at 6-7), which discusses materiality in the context of *meeting*,

9    as opposed to *beating*, earnings expectations.  Nothing in SAB 99 (or other accounting literature)

10   supports Plaintiffs' position that the bad debt transfers were material because they enabled

11   Oracle to *beat* earnings expectations.  Plaintiffs do not dispute (and their own expert conceded)

12   that Oracle would have met analysts' consensus earnings expectations for 2Q01 with or without

13   the transfers.  Defs.' MSJ at 46-47; Ex. 227 at 129:9-18.

14   Plaintiffs' remaining materiality arguments fail.  First, Plaintiffs do not tie either of the

15   general statements by Ellison (Opp. at 6) and Williams (*id*. at 7) to any 2Q01 event, let alone to

16   the bad debt transfers.  Second, Plaintiffs' reference to a 1993 Consent Decree is irrelevant

17   because it has nothing to do with the bad debt transfers or, more generally, Oracle's accounting

18   in 2Q01.  *Id.* at 7.  Third, Plaintiffs' contention that the bad debt transfers were material because

19   "they allowed Oracle to inflate its forecasts for 3Q01" (*id.* at 8 n.12) is simply wrong.  The 3Q01

20   forecast was not based upon Oracle's 2Q01 results.  Ex. 389 at 143487-88; Ex. 252 at 103:6-

21   22.[21]

22

23

24   [21]  Plaintiffs' allegations regarding the HP transaction are also baseless.  Opp. at 7-8.  Those
     allegations are based upon an expert witness who claimed he saw "no evidence" that Oracle
25   complied with the applicable accounting literature in deciding to recognize this 2Q01 revenue.
     Ex. 390 at 43, 52-53, 57.  However, Plaintiffs' expert saw no such evidence because Special
26   Master Infante held that the HP transaction was not a proper subject of fact discovery given
     Plaintiffs' RSAC claims.  Ex. 232 at 14:11-16:5.  After Defendants produced documents relating
27   to the HP transaction in support of their expert's rebuttal report, Plaintiffs all but abandoned their
     HP allegations.  In any event, with respect to materiality, Plaintiffs' accounting expert *admitted*
28   that Oracle would have met earnings expectations for 2Q01 regardless of the bad debt transfers
     and the HP transaction.  Defs.' MSJ at 46-47; Ex. 227 at 129:9-18.

### 3.     Plaintiffs Cannot Prove Defendants' Scienter

Plaintiffs' 2Q01 accounting theory also fails for lack of evidence sufficient to show scienter.  In their Opposition, Plaintiffs ignore completely the most direct evidence regarding scienter—namely, the sworn affidavits submitted by the individually-named Defendants affirming that they had no basis for believing that the 2Q01 financial statements were false or misleading when made, and have no reason to believe that Oracle should restate its 2Q01 financial statements.  Defs.' MSJ at 47.  Plaintiffs' failure even to acknowledge this evidence (much less to controvert these undisputed facts) ends the scienter inquiry with respect to the accounting allegations.  Moreover, despite over 100 depositions having been taken in this case, Plaintiffs do not cite testimony from a single witness who claims to have told Ellison, Henley or Sanderson about the bad debt transfers during 2Q01.

Unable to offer any evidence that Defendants knew or were reckless in not knowing that Oracle's 2Q01 results were incorrect, Plaintiffs refer—inexplicably—to what Plaintiffs characterize as a "problem" with Oracle's unapplied cash account.  Opp. at 8.  Plaintiffs never really articulate what this alleged "problem" was, but it appears to be a reference to testimony that Oracle's collections staff sometimes fell behind in applying incoming cash (Henley), and testimony suggesting that the account balance was "large" (Hatada).  *Id*.  Plaintiffs do not explain what any of this has to do with the bad debt transfers at all, let alone scienter.  Plaintiffs have cited absolutely no evidence that these issues would have suggested to anyone that there was any material misstatement in Oracle's 2Q01 results.  Thus, even assuming any of Oracle's senior executives were aware of these issues, that fact would not support a reasonable inference of scienter.

Plaintiffs also cite a routine adjustment to Oracle's bad debt reserve at the end of 2Q01.  Opp. at 9 and n.13.  Plaintiffs cite no evidence that any of the individual Defendants was even aware of this adjustment.  Defs.' MSJ at 47.  And in any event, Plaintiffs do not explain why this routine accounting adjustment would have given any of the individual Defendants (had they known about it) reason to believe Oracle's 2Q01 results were incorrect.  The bad debt reserve is an estimate, and GAAP requires Oracle to review that estimate from time to time and to adjust it

1    appropriately.  Accordingly, Oracle routinely had made this kind of adjustment in prior

2    quarters,[22] and Plaintiffs cite *no* evidence that this particular adjustment was improper, that any

3    of the individual Defendants knew it was improper, or that any of the individual Defendants had

4    reason to believe that the adjustment caused a material misstatement of Oracle's 2Q01 results.[23]

5         F.    **Plaintiffs Cannot Prove Loss Causation As To Defendants' Statements
              Regarding Oracle's 2Q01 Results And Suite 11i**

6              Plaintiffs admit that the March 1 announcement did not directly reveal any alleged

7    "truth" that Defendants concealed through their statements about Oracle's 2Q01 results or Suite

8    11i.[24]  *See* Opp. at 47-48.  Likewise, Plaintiffs admit that they cannot prove Oracle's 3Q01 miss

9    was caused by something the Defendants had concealed with their statements about Oracle's

10   2Q01 results or Suite 11i.[25]  *See* Opp. at 47-49.  Plaintiffs argue, however, that they need not

11   make such a showing because they can prove loss causation "with evidence of a stock price

12   decline when the facts revealing the company's true financial condition are disclosed."  Opp. at

13   46.  Here, Plaintiffs claim the March 1, 2001 announcement revealed Oracle's "true financial

14   condition." *Id.*  Thus, Plaintiffs argue, they have established loss causation regardless of whether

15

16   [22]  Consistent with FAS 5, "Accounting for Contingencies," Oracle routinely adjusted its bad
     debt reserve balance in prior quarters. Ex. 391 at ¶ 14; Ex 392 at 1607472 (illustrating $33
17   million reserve adjustment in 1Q01, $18 million reserve adjustment in 1Q00 and $25 million
     reserve adjustment in 2Q00).
18
     [23]  Plaintiffs also argue that Defendants knew about the "improper" HP transaction.  Opp. at 13.
19   The decision to recognize revenue on that transaction was considered and approved by Oracle's
     revenue recognition group, its outside auditor and the Finance & Audit Committee.  Defs.' MSJ
20   at 47.  The fact that Plaintiffs' accounting expert disagrees with this conclusion (seven years after
     the fact and without having reviewed the most critical deal documents) does not mean that
21   Defendants acted with scienter in issuing the 2Q01 financial statements.

22   [24]  Plaintiffs claim that "[i]nvestors learned that issues concerning the functionality, *i.e.*, bugs and
     lack of stability of Suite 11i which had entered the marketplace during Oracle's 1Q and 2Q, had
23   not in fact been cured as defendants had reported at the end of 2Q."  Opp. at 48.  Plaintiffs cite
     no evidence for this proposition, nor do they explain how investors learned anything about "bugs
24   and lack of stability of Suite 11i" through the March 1 announcement when the announcement
     says no such thing.  Indeed, during the March 1 and March 15 conference calls in which Oracle
25   announced the miss, Defendant Ellison actually repeated, almost *verbatim*, the allegedly false
     statements about Suite 11i.  *See* Ex. 60 to Pls.' MPSJ at 050627-29, 050637-41; Ex. 393 at
26   419811-14.  There is absolutely no basis for Plaintiffs' suggestion that the March 1
     announcement revealed anything about "bugs and lack of stability of Suite 11i."

27   [25]  Indeed, despite there having been over 100 depositions in this case, and despite having
     received millions of pages of documents, Plaintiffs do not identify a *single potential customer*
28   that declined to purchase Suite 11i because of alleged product problems.  *See* Defs.' Opp. to
     MPSJ at 8-9.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    that "true financial condition" revealed a "truth" that Defendants had concealed through

2    statements about Oracle's 2Q01 results and Suite 11i.  *Id.*

3           Plaintiffs' position is flatly inconsistent with the Supreme Court's holding in *Dura*, which

4    requires that a plaintiff seeking to prove loss causation must allege and prove that the company's

5    stock price dropped when the market learned "the relevant truth."  *See Dura Pharm., Inc. v.*

6    *Broudo*, 544 U.S. 336, 342 (2005).  As the Supreme Court held in *Dura*, stock price declines

7    caused by factors such as "changed economic circumstances, changed investor expectations, new

8    industry-specific or firm-specific facts, conditions, or other events," are insufficient to establish

9    loss causation under Section 10(b).  *See id.* at 342-43.  Plaintiffs' version of the standard would

10   obliterate the distinction the Supreme Court drew in *Dura* between stock price drops caused by

11   disclosure of "the relevant truth" and stock price drops caused by market, industry, and

12   company-specific factors not related to the alleged fraud.  Under Plaintiffs' view, loss causation

13   would exist whenever bad news causes a company's stock price to drop, without regard to

14   whether that bad news reveals the falsity of any prior statements.

15          This case well illustrates the flaw in Plaintiffs' theory.  Defendants agree that Oracle's

16   March 1, 2001 announcement revealed Oracle's "true financial condition"—it showed Oracle's

17   financial results for the quarter, from which the market drew conclusions about Oracle's future

18   prospects.[26]  Consistent with *Dura*, however, the March 1, 2001 announcement can only be

19   deemed to have disclosed "the *relevant* truth"—and thus, to have established loss causation

20   under the federal securities laws—if the "true financial condition" reflected in that

21   announcement either was caused by or otherwise revealed to the market some "truth" that the

22   Defendants had concealed through their statements about Oracle's 2Q01 results or Suite 11i.  *See*

23   *Dura*, 544 U.S. at 342-44, 346-47; *see also Robbins v. Kroger Props.*, 116 F.3d 1441, 1447-48

24   (11th Cir. 1997) (plaintiff failed to establish loss causation by not offering evidence of a

25   connection between alleged false statements and subsequent public disclosures that resulted in

26   the decline in stock price); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 689-

27

28   _____

[26]  This is the only sense in which Defendants' expert, Dr. James, agreed that the March 1, 2001
announcement revealed new information about Oracle's business.  *See* Opp. at 49.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

23

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1    91 (E.D. Pa. 2001) (granting summary judgment on loss causation grounds where public

2    disclosures causing stock drop did not relate to alleged misstatements).  Otherwise, there would

3    be no causal link between the alleged corrective disclosure and the alleged fraud—a link that

4    *Dura* requires.  If, for example, Oracle's 3Q01 miss was caused by deals slipping at the very end

5    of the quarter due to customer concerns over the economy (and not by any undisclosed problems

6    with Suite 11i), then the stock drop following the March 1 announcement had nothing to do with

7    the allegedly false statements, and instead was caused by precisely the kind of "changed

8    economic circumstances" and "changed investor expectations" that are insufficient as a matter of

9    law to establish loss causation.  *See id.* at 342-43.

10        The Ninth Circuit's decision in *Daou*, on which Plaintiffs rely for their "true financial

11   condition" test (Opp. at 46), confirms the need to prove a causal relationship between the alleged

12   fraud and the "true financial condition" whose revelation caused the stock to drop.  *See In re*

13   *Daou Systems, Inc.*, 411 F.3d 1006, 1026-28 (9th Cir. 2005) (holding that for purposes of the

14   Rule 8 "notice pleading" standard, plaintiffs had given defendants "some indication" of the

15   claimed causal link by alleging that the company's deteriorating financial condition reflected, in

16   part, the result of having prematurely recognized revenue in prior quarters, which was the basis

17   for plaintiffs' "false statement" claim).

18        This Court's holding, at the class certification stage, that an express "corrective

19   disclosure" is not required to establish loss causation under *Dura* (*see Nursing Home Pension*

20   *Fund v. Oracle Corp.*, No. C-01-0988-MJJ, 2006 U.S. Dist. Lexis 94470, at *35 (N.D. Cal. Dec.

21   20, 2006)) does not change this analysis.  The fact that the market might learn "the relevant

22   truth" through something other than an express "corrective disclosure" does not mean that

23   Plaintiffs can simply dispense with the need to prove a causal connection between the alleged

24   false statements and the March 2 stock price drop.  Indeed, in the case of a disclosure that does

25   not expressly correct a prior statement, it is all the more important for a plaintiff to show

26   evidence of a causal connection between the alleged false statements and the announcement that

27   triggered the stock price drop.  *See, e.g., In re Ikon Office Solutions*, 131 F. Supp. 2d at 689-91

28   (granting summary judgment and rejecting theory that announcement of earnings shortfall and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
Master File No. C-01-0988-MJJ (JCS)

1  other operational problems revealed the "grim reality" of company and thereby "corrected the

2  undue optimism" caused by prior alleged false statements, where plaintiffs failed to show

3  evidence of a causal connection between the announcement and the alleged false statements); *see*

4  *also In re Gilead Sciences Sec. Litig.*, Case No. C-03-4999-MJJ, 2006 WL 1320466 at *7 (N.D.

5  Cal. Feb. 6, 2006) (rejecting, as "too attenuated," plaintiffs' loss causation theory for failure to

6  allege facts sufficient to connect off-label marketing "scheme" with slowdown in sales).

7  **III.    CONCLUSION**

8      For the foregoing reasons, Defendants respectfully request summary judgment or, in the

9  alternative, a finding that certain facts are not in dispute.

10  Dated:  September 10, 2007                    LATHAM & WATKINS LLP

11                                                Peter A. Wald
                                                  Michele F. Kyrouz

12                                                Jamie L. Wine
                                                  Patrick E. Gibbs

13                                                Matthew Rawlinson

14                                                        ***/s/***

15                                                By:_____

16                                                Patrick E. Gibbs
                                                  Attorneys for Defendants ORACLE

17                                                CORPORATION, LAWRENCE J.
                                                  ELLISON, JEFFREY O. HENLEY,

18                                                and EDWARD J. SANDERSON

    SV\577377.8

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO