LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
  Sean P.J. Coyle (SBN 233039)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
         michele.kyrouz@lw.com
         sean.coyle@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Phone: (213) 485-1234
Fax: (213) 891-8763
E-mail: jamie.wine@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
135 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: dorian.daley@oracle.com
         jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ (Consolidated) |
| This Document Relates To: | **DECLARATION OF SEAN P.J. COYLE IN SUPPORT OF DEFENDANTS' MEMORANDUM REGARDING PLAINTIFFS' MOTION TO COMPEL TESTIMONY AND DETERMINE THE APPLICABILITY OF THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION** |
| ALL ACTIONS. | Judge:  Martin J. Jenkins<br>Date:   May 1, 2007<br>Time:   9:30 a.m. |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VOLUME   1

COYLE DECL ISO DEFS' MEMO RE PLTFS' MTC TESTIMONY
AND DETERMINE THE APPLICABILITY OF 5TH AMEN
Master File No. C-01-0988-MJJ

1      I, Sean P.J. Coyle, declare as follows:

2          1.      I am an attorney duly licensed to practice before the courts of the State of

3   California.  I am an associate with the law firm of Latham & Watkins LLP, counsel of record for

4   Defendants in the above-entitled action.  I have personal knowledge of the matters stated herein

5   and, if called upon, I could and would competently testify thereto.

6          2.      I submit this declaration in support of Defendants' Memorandum

7   Regarding Plaintiffs' Motion to Compel Testimony and Determine the Applicability of the Fifth

8   Amendment Right Against Self-Incrimination.

9          3.      Attached hereto as Exhibit 1 is a true and correct copy of Defendants'

10  Opposition to Plaintiffs' [Renewed] Motion to Compel Additional Time for the Depositions of

11  Larry Ellison and Safra Catz, dated March 2, 2007.

12         4.      Attached hereto as Exhibit 2 is a true and correct copy of a February 22,

13  2007 letter from P. Gibbs (on behalf of Defendants) to M. Solomon (on behalf of Plaintiffs).

14         5.      Attached hetero as Exhibit 3 is a true and correct copy of  the transcript of

15  the March 30, 2007 Deposition of Lawrence Ellison.

16         6.      Attached hereto as Exhibit 4 is a true and correct copy of a January 14,

17  2007 letter from third party M. Symonds to P. Gibbs.

18         7.      Attached hereto as Exhibit 5 is a true and correct copy of a Plaintiffs'

19  Reply in Support of Motion to Compel Additional Time for the Depositions of Larry Ellison and

20  Safra Catz, dated March 7, 2007.

21         8.      Attached hereto as Exhibit 6 is a true and correct copy of a January 10,

22  2007  e-mail from P. Gibbs to M. Symonds.

23         9.      Attached hereto as Exhibit 7 is a true and correct copy of a January 10,

24  2007 letter from L. Ellison to M. Symonds.

25         10.     Attached hereto as Exhibit 8 is a true and correct copy of a March 16,

26  2007 letter from S. Kaplan (on behalf of Plaintiffs) to M. Harrison (on behalf of Defendants).

27  ///

28  ///

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

COYLE DECL ISO DEFS' MEMO RE PLTFS' MTC TESTIMONY
AND DETERMINE THE APPLICABILITY OF 5TH AMEN
Master File No. C-01-0988-MJJ

11.     I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on April 25, 2007 in San Francisco, California.

Sean P.J. Coyle

ATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COYLE DECL ISO DEFS' MEMO RE PLTFS' MTC TESTIMONY
AND DETERMINE THE APPLICABILITY OF 5TH AMEN
Master File No. C-01-0988-MJJ

## PROOF OF SERVICE

I am employed in the County of San Francisco, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, Ca 94111.

**On April 25, 2007**, I served the following document described as:

**DEFENDANTS' MEMORANDUM REGARDING PLAINTIFFS' MOTION TO COMPEL TESTIMONY AND DETERMINE THE APPLICABILITY OF THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION**

**DECLARATION OF SEAN P.J. COYLE IN SUPPORT OF DEFENDANTS' MEMORANDUM REGARDING PLAINTIFFS' MOTION TO COMPEL TESTIMONY AND DETERMINE THE APPLICABILITY OF THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION**

by serving a true copy of the above-described document in the following manner:

### BY HAND DELIVERY

I am familiar with the office practice of Latham & Watkins for collecting and processing documents for hand delivery by a messenger courier service or a registered process server. Under that practice, documents are deposited to the Latham & Watkins personnel responsible for dispatching a messenger courier service or registered process server for the delivery of documents by hand in accordance with the instructions provided to the messenger courier service or registered process server; such documents are delivered to a messenger courier service or registered process server on that same day in the ordinary course of business. I caused a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins for collecting and processing documents for hand delivery by a messenger courier service or a registered process server

Shawn A. Williams
Willow E. Radcliffe
Lerach, Couglin, Stoia, Geller, Rudman
& Robbins LLP
100 Pine Street, Suite 2600
San Francisco, California 94111-5238

### BY US MAIL

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service. Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents with the United States Postal Service; such documents are delivered to the United States Postal Service on that same day in the ordinary course of business, with postage thereon fully prepaid. I deposited in Latham & Watkins LLP' interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service:

Mark Solomon
Lerach, Coughlin, Stoia, Geller,
Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

## BY FACSIMILE

I am familiar with the office practice of Latham & Watkins LLP for collecting, processing, and transmitting facsimiles. Under that practice, when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted that same day in the ordinary course of business. I deposited the above-described document for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for collecting and processing facsimiles. The facsimile of the above-described document was transmitted to the following parties from San Francisco, California on April 25, 2007, at the times noted on the attached confirmation sheet:

Mark Solomon
Lerach, Coughlin, Stoia, Geller, Rudman &
Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
Fax No.: (619) 231-7423

Shawn A. Williams
Willow E. Radcliffe
Lerach, Couglin, Stoia, Geller, Rudman
  & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, California 94111-5238
Fax No.: (415) 288-4534

The facsimile number of the sending machine is (415) 395-8095. Said transmission was complete and without error. All parties on whom this facsimile transmission has been served have agreed in writing to such form of service pursuant to agreement.

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **April 25, 2007**, at San Francisco, California.

_____
Katarzyna Schmidt

# EXHIBIT 1

LATHAM & WATKINS LLP
  Peter A. Wald (SBN 85705)
  Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
        michele.kyrouz@lw.com

LATHAM & WATKINS LLP
  Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jamie.wine@lw.com

LATHAM & WATKINS LLP
  Patrick E. Gibbs (SBN 183174)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
  Dorian E. Daley (SBN 129049)
  James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br>CLASS ACTION<br><br>DEFENDANTS' OPPOSITION TO PLAINTIFFS' [RENEWED] MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ |

## CONFIDENTIAL

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ......................................... 2

III.  ARGUMENT ..................................................................................................... 5

    A.    Applicable Legal Standard ...................................................................... 5

    B.    The *Softwar* Related Discovery Cited by Plaintiffs Does not
        Provide a Basis for Plaintiffs' Request for Additional Time................... 6

        1.    The *Softwar* Interview Transcripts Formed the Basis of
            Plaintiffs' Prior Motion for Additional Time, Which Was
            Granted in Part. ............................................................................. 6

        2.    Plaintiffs' Request for Additional Time to Question Ellison
            about Materials they Might Obtain from Third Parties is
            Purely Speculative. ....................................................................... 9

        3.    Plaintiffs Already Have Sufficient Time to Question Mr.
            Ellison About His Knowledge of the Unavailability of
            *Softwar* Materials. ...................................................................... 9

    C.    Defendants' Supplemental Accounting Productions Do Not
        Warrant Additional Deposition Time for Mr. Ellison or Ms. Catz ...... 10

IV.   CONCLUSION ................................................................................................ 13

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bhatnagar by Bhatnagar v. Surrendra Overseas*
  52 F.3d 1220 (3d Cir. 1995) .................................................................. 6

*Harris v. Computer Assocs. Int'l, Inc.*
  204 F.R.D. 44 (E.D.N.Y. 2001) ........................................................ 5, 8

*Mulvey v. Chrysler Corp.*
  106 F.R.D. 364 (D.R.I. 1985) ............................................................... 5

## STATUTES AND RULES

Fed. R. Civ. P. 30.................................................................................. 1, 5

Fed. R. Civ. P. 30(d)(2) ........................................................................ 5, 8

N.D. Cal. L.R. 7-9(a)-(b) .......................................................................... 6

LATHAM&WATKINS℠
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     INTRODUCTION**

For the *third* time, Plaintiffs are seeking additional time to depose Oracle's two most senior executives: Larry Ellison and Safra Catz. Between this case and the previous derivative proceedings relating largely to the same underlying facts, Larry Ellison already has been deposed for more than twenty-four hours. The Court already has granted Plaintiffs the right to another three and a half hours – or half day – of testimony which is scheduled to occur later this month. When this half day is completed, Ellison will have provided **28 hours, four full days,** of testimony on these issues, *four times* the default established by the Federal Rules. Likewise, Ms. Catz, who is hardly a central figure to the events at issue, already has sat for nearly ten hours of deposition, including approximately four hours in the prior derivative proceedings. She already is scheduled for an additional 2.5 hours of deposition later this month.

Plaintiffs proffer two bases for their current request to extend further the extensions they already have received, but neither comes close to meeting the "good cause" standard applied under Federal Rule of Civil Procedure 30. First, Plaintiffs claim that certain *Softwar*-related discovery entitles them to additional deposition time with Mr. Ellison and Ms. Catz. Based on their expectation of receiving precisely the same documents, Plaintiffs advanced exactly the same arguments in their prior motion seeking additional deposition time with Mr. Ellison and Ms. Catz. Thus, Plaintiffs are merely recycling for this motion the same arguments that were the basis for their previous motion. The Court already has considered Plaintiffs' arguments, and granted them the appropriate relief under the circumstances. Plaintiffs also fail to explain how this additional *Softwar* discovery even is even relevant to Ms. Catz.

Plaintiffs' second argument, relating to Defendants' supplemental accounting productions in January and February 2007, fares even worse. These documents pertain to certain accounting activities in which neither Mr. Ellison nor Ms. Catz was involved. Neither Mr. Ellison nor Ms. Catz appears as the author, custodian, sender or recipient of any document that Defendants produced as part of the supplemental accounting production. Indeed, Plaintiffs have not identified a single document, nor have they articulated any line of questioning pertaining to

LATHAM&WATKINS⊔⁰
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1    the supplemental accounting production, that would justify further additional deposition time

2    with Mr. Ellison and Ms. Catz.  In the end, this request, like many that came before it, seeks

3    additional discovery for the sake of seeking additional discovery.  As set forth in greater detail

4    below, the Motion should be denied.

5    **II.    FACTUAL AND PROCEDURAL BACKGROUND**

6              On December 17, 2004, Judge Jenkins entered an Amended Pretrial Order that

7    limited each party to 65 depositions.  *See* Ex. 1 (Dec. 17, 2004 Amended Pretrial Order).[1]  In

8    June 2006, Plaintiffs first moved for an additional seven hours of deposition time for, among

9    others, Larry Ellison and Safra Catz.  *See* Ex. 2 (Plaintiffs' June 2, 2006 Motion to Compel Two

10   Day Deposition).  The Court granted Plaintiffs' request for an additional day with Mr. Ellison,

11   but denied the request as it pertained to Ms. Catz, finding Plaintiffs had failed to established

12   good cause.  *See* Ex. 3 (June 20, 2006 Hearing Tr.) at 14.  In accordance with that ruling and

13   Rule 30, Mr. Ellison now has sat for over 14 hours of deposition testimony in this case, over the

14   course of two days.  *See* Ex. 4 (July 13, 2006 Ellison Depo. Tr.); Ex. 5 (Sept. 21, 2006 Ellison

15   Depo. Tr.).[2]  For her part, Ms. Catz has sat for nearly a full day of testimony (Plaintiffs ended her

16   deposition before a full seven hours had expired because they had nothing else to ask her).  *See*

17   Ex. 8 (July 20, 2006 Catz Depo. Tr.).

18             On October 30, 2006, after the close of fact discovery, Plaintiffs moved (for the

19   second time) for an additional day of testimony from both Mr. Ellison and Ms. Catz.  *See* Ex. 9

20   (Plaintiffs' Oct. 30, 2006 Motion to Compel the Depositions of Christopher Balkenhol and

21   Dorian Daley and Additional Time for the Depositions of Larry Ellison and Safra Catz

22   ["Plaintiffs' Oct. 30, 2006 Motion for Additional Time"]).  In support of their second motion for

23   additional deposition time with these witnesses, Plaintiffs argued that the additional time was

24

25   [1]  All Exhibit references are to the Declaration of Sean P.J. Coyle in Support of Defendants'
         Opposition to Plaintiffs' Motion, filed concurrently herewith.

26   [2]  This time is in addition to the more than ten hours of testimony given by Mr. Ellison in the
27        derivative suits.  *See* Ex. 6; Ex. 7 (Ellison Derivative Depo. Transcripts).  Plaintiffs
          demanded and received the transcripts of Mr. Ellison's and Ms. Catz's depositions in the
28        derivative suits on the grounds that the subject matter in the derivative proceedings largely
          overlapped with the subject matter of this case.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1 | warranted by their then-pending motion to compel, *inter alia*, transcripts of interviews of Mr.

2 | Ellison conducted by Matthew Symonds, the author of *Softwar: An Intimate Portrait of Larry*

3 | *Ellison and Oracle*. *See* Motion at 8-9; Ex. 10 (Plaintiffs' Oct. 30, 2006 *Softwar* Motion).

4 | Plaintiffs asserted in this concurrently-filed motion that the *Softwar* discovery they sought at that

5 | time, including the interview transcripts, would bear on a number of topics that they claimed

6 | were relevant to their claims in this case, including Oracle's Suite 11i, its billion dollar savings

7 | claim and stock sales by Larry Ellison. *See id.* at 10. Tellingly, in their October 30 motion for

8 | additional deposition time, Plaintiffs did *not* claim that they needed to question Mr. Ellison or

9 | Ms. Catz about any accounting issues, although by the time of the Ellison and Catz depositions

10 | Defendants had already made voluminous productions of documents pertaining to much of the

11 | same accounting issues addressed in the recent supplemental accounting productions. The Court

12 | granted Plaintiffs' October 30 motion for additional time, in part, allowing 3.5 additional hours

13 | of deposition time with Mr. Ellison and 2.5 hours with Ms. Catz. In refusing Plaintiffs' request

14 | for even more time, the Court noted that Plaintiffs "already have deposed Ellison for 14 hours,

15 | and are not entitled to question Ellison regarding every Oracle document that references Ellison."

16 | Ex. 11 (Dec. 14, 2006 Order).

17 | On December 29, 2006, the Court ruled on Plaintiffs' concurrently-filed motion to

18 | compel *Softwar* discovery. *See* Ex. 12 (Dec. 29, 2006 *Softwar* Order). In its Order, the Court

19 | found, over Defendants' objection, that Mr. Ellison had legal control over the *Softwar* materials,

20 | and ordered that Mr. Ellison produce them. Defendants contacted Mr. Symonds (who at all

21 | times had sole physical possession of the transcripts and related materials) and requested that he

22 | turn them over to Defendants. Mr. Symonds produced to Defendants approximately 200 pages

23 | of transcripts of interviews he conducted of Mr. Ellison in researching and writing the book,

24 | which Defendants, in turn, produced to Plaintiffs on January 16, 2007. *See* Ex. 13 (Jan. 16, 2007

25 | Letter from R. Morgan to S. Williams).[3]

---

26 |

27 | [3] When contacted by Defendants' counsel in November of 2006, Mr. Symonds claimed that he possessed both audio tapes and transcripts of interviews he conducted with Mr. Ellison. However, he has since informed Defendants' counsel (who have informed Plaintiffs) that he

28 | no longer possesses any of the audio tapes and many of the transcripts of these interviews because he disposed of the laptop computer on which they were stored (in spite of

1   The Court also ruled that Defendants needed to reproduce unredacted copies of

2   certain accounting documents that Oracle previously had produced in redacted form.  In addition,

3   the Court ordered Defendants to produce documents relating to transfers of unapplied cash into

4   the bad debt reserve in the second quarter of fiscal year 2001, and the 2002 "unapplied cash"

5   project.  Both of these projects were performed by entry-level employees working at one of

6   Oracle's satellite offices and, as a result, none of the documents produced as part of the

7   supplemental accounting productions in January and February 2007 identifies Mr. Ellison or Ms.

8   Catz – Oracle's most senior executives – as the author, custodian, sender or recipient of the

9   document.  Indeed, presumably because of their lack of involvement in these low-level

10  accounting projects, Plaintiffs chose not to ask Mr. Ellison or Ms. Catz a single question about

11  the bad debt transfers or the unapplied cash project during any of their prior depositions.

12  Plaintiffs' behavior to date has made clear that their request for additional time

13  with Mr. Ellison and Ms. Catz has nothing to do with any recently-produced documents;

14  Plaintiffs have intended to seek more time with both witnesses all along.  Indeed, before even

15  receiving any of the recently-produced documents, Plaintiffs requested a stipulation allowing

16  them to bring a single motion to compel additional time with these witnesses after several

17  separate document productions had been completed.  *See* Ex. 16 (Jan. 30, 2007 Stipulation).

18  Thus, Plaintiffs did not even wait to review the documents before deciding they would move for

19  additional time.[4]

20  On February 20, 2007, Plaintiffs brought this motion, their third request for

21  additional deposition time with Mr. Ellison and Ms. Catz, citing as their only bases the *Softwar*

22  Defendants' counsel's request that he preserve them).  *See* Ex. 14 (Feb. 22, 2007 Letter from
P. Gibbs to M. Solomon).  Mr. Symonds claims to have provided Defendants' counsel with
23  all the interview transcripts in his possession.  Defendants' counsel and Mr. Ellison have no
way to verify whether Mr. Symonds possesses any audio tapes or transcripts beyond what he
24  has provided to date.  *See* Ex. 14 (Feb. 22, 2007 Letter From P. Gibbs to M. Solomon); Ex.
15 (Feb. 23, 2007 Letter to from S. Coyle to S.M. Infante).
25

[4]  In fact, as early as January 16, 2007 (just over a month after the Court's order granting in part
26  Plaintiffs' second motion for additional time with Mr. Ellison and Ms. Catz), Plaintiffs
indicated to the Court that they wanted to bring another motion for additional time with these
27  witnesses at a telephonic hearing to discuss their currently-scheduled deposition dates.  The
Court recognized at that time that Plaintiffs "would have to make a ***strong showing*** of good
28  cause" in order to prevail on such a motion.  *See* Ex. 17 (Jan. 16, 2007 Tr.) at 5:17-18
(emphasis added).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1   discovery that was the basis for their previous motion, and recently-produced accounting

2   documents that are not directly related to either Mr. Ellison or Ms. Catz.

3   **III.   ARGUMENT**

4       **A.   Applicable Legal Standard**

5           Plaintiffs' request for additional deposition time with Mr. Ellison and Ms. Catz is

6   governed by Federal Rule of Civil Procedure 30(d)(2), which provides that "a deposition is

7   limited to one day of seven hours" unless otherwise authorized by the court or stipulated by the

8   parties. *See* Fed. R. Civ. P. 30(d)(2).  To justify additional time, the moving party must

9   demonstrate that such time is "needed for a fair examination of the deponent or if the deponent

10   or another person, or other circumstance, impedes or delays the examination." Fed. R. Civ. P.

11   30(d)(2).  And, in any event, "[t]he party seeking a court order to extend the examination, or

12   otherwise alter the limitations, is expected to show good cause to justify such an order." Fed. R.

13   Civ. P. 30, Advisory Committee Notes to 2000 Amendment.

14           Courts have long recognized that depositions of senior corporate executives create

15   a serious risk of undue burden or oppression. *See, e.g., Mulvey v. Chrysler Corp.*, 106 F.R.D.

16   364, 366 (D.R.I. 1985) (noting that Lee Iacocca's position as head of Chrysler Corporation

17   rendered him "easily subjected to unwarranted harassment and abuse" through the discovery

18   process).  This risk is particularly significant when the witness has knowledge that is only

19   indirectly related to the facts at issue. *Harris v. Computer Assocs. Int'l, Inc.*, 204 F.R.D. 44, 46

20   (E.D.N.Y. 2001) ("Depositions of high level corporate executives may be duplicative,

21   cumulative and burdensome where the person sought to be deposed has no personal knowledge

22   of the events in dispute.").  As this Court has noted, production of a large volume of documents

23   relating to a witness after the witnesses' deposition may provide a basis for granting more time

24   with the witness; however, Plaintiffs are not entitled to question a witness about every document

25   that references them. *See* Ex. 11 (Dec. 14, 2006 Order) at 4.

26   ///

27   ///

28   ///

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

**B.**  **The *Softwar* Related Discovery Cited by Plaintiffs Does not Provide a Basis for Plaintiffs' Request for Additional Time.**

    1.  The *Softwar* Interview Transcripts Formed the Basis of Plaintiffs' Prior Motion for Additional Time, Which Was Granted in Part.

In their October 2006 motion for additional deposition time with Mr. Ellison and Ms. Catz, Plaintiffs cited as a basis for their request for more time their then-pending motion to compel discovery pertaining to the book *Softwar*, a motion in which they requested audio tapes and transcripts of "hundreds of hours" of interviews with Mr. Ellison. *See* Ex. 9 (Plaintiffs' Oct. 30, 2006 Motion for Additional Time) at 9; Ex. 10 (Plaintiffs' Oct. 30, 2006 *Softwar* Motion) at 10. At that time, Plaintiffs told the Court "[i]f plaintiffs are successful in their pursuit of these documents [including *Softwar*-related interview transcripts], plaintiffs expect that they will want to examine Mr. Ellison regarding their contents."[5] Now, with their prior motion for additional deposition time having been granted only in part, Plaintiffs request that these witnesses be ordered to sit for ***still more time*** based upon Defendants' production of the very discovery Plaintiffs cited in their last motion.[6] This is simply a motion to reconsider under another name, and Plaintiffs have made no effort to meet the standard applicable to such a motion.[7]

---

[5]  Although at the time of their October 30 motion Plaintiffs did not apparently foresee questioning Ms. Catz about the interview transcripts they were seeking, they now wish to do so, even though they cannot point to anything in the transcripts that pertains uniquely to her. *See* Motion at 5; *see also infra*. Plaintiffs, however, did request additional time in their October 30 motion in order to question Ms. Catz about *Softwar*-related documents that Defendants' already had produced at the time. Ex. 9 (Plaintiffs' Oct. 30, 2006 Motion for Additional Time) at 10.

[6]  In fact, Plaintiffs referred to "*Softwar*" no less than seven times in their October 30 motion for additional time. *See* Ex. 9 (Plaintiffs' Oct. 30, 2006 Motion for Additional Time).

[7]  Under Local Rule 7-9, Plaintiffs were required to request leave to even file a motion to reconsider, and in order to obtain such leave, Plaintiffs were required to establish one or more of the following circumstances: (i) they failed to present to the Court materially different facts or law that were previously unknown to them, acting diligently; (ii) new material facts or a change in law emerged since the Court's entry of the order; or (iii) the Court manifestly failed to consider material facts or dispositive legal arguments. *See* N.D. Cal. L.R. 7-9(a)-(b); *see also Bhatnagar by Bhatnagar v. Surrendra Overseas*, 52 F.3d 1220, 1232 (3d Cir. 1995) (noting that "reconsideration should not be granted where it would merely allow wasteful repetition of arguments already briefed, considered and decided") (internal quotations and citations omitted).

1    Not only did Plaintiffs anticipate receiving these interview transcripts when they

2    previously moved for more time with Mr. Ellison and Ms. Catz, they also anticipated the

3    substance of the transcripts.  Then, as now, Plaintiffs claimed that the transcripts contain

4    information pertaining to Oracle's Suite 11i, Oracle's billion dollar savings claim, the effect of

5    the economy on Oracle and Larry Ellison's stock sales.  *See* Ex. 9 (Plaintiffs' Oct. 30, 2006

6    Motion for Additional Time) at 9; Ex. 10 (Plaintiffs' Oct. 30, 2006 *Softwar* motion) at 10;

7    Motion at 4.  In fact, a comparison of Plaintiffs' description of the relevance of these transcripts

8    in their motion to compel *Softwar* discovery (which, again, was filed concurrently with and

9    referenced in their prior motion for more deposition time), with their description of the relevance

10   of the materials in the current Motion, demonstrates conclusively that Plaintiffs received in

11   substance exactly what they anticipated they would:

12

| Plaintiffs' description of the transcripts' relevance at the time of their second motion for additional deposition time | Plaintiffs' description of the transcripts' relevance in their third motion for additional deposition time |
|---|---|
| • "the release of 11i" | • "the release of Suite 11i" |
| • "problems with 11i and the effect of those problems on customers" | • "problems with 11i and the effect of those problems on both Oracle and its customers" |
| • "Oracle's billion dollar savings claim" | • "Oracle's billion dollar savings claim" |
| • "trades by insiders including Ellison's January 2001 sales" | • "stock sales by Oracle executives" and "Ellison's use of his insider proceeds" |
| • "the effect of the economy on [Oracle's] business"[8] | • "the effect of the economy on Oracle's business"[9] |

25   Thus, at the time they filed their prior motion for additional time with these

26

27   [8]  *See* Ex. 10 (*Softwar* motion) at 10; Ex. 9 (Plaintiffs' Oct. 30, 2006 Motion for Additional
     Time) at 8-9.

28   [9]  *See* Motion at 4.

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1   witnesses, Plaintiffs already had anticipated asking the witnesses about precisely the same

2   documents and precisely the same issues cited in support of their current motion. Because the

3   Court granted in part Plaintiffs' prior motion and allowed them additional time with Mr. Ellison

4   and Ms. Catz, Plaintiffs have already been afforded time to question these witnesses on those

5   materials, to the extent the Court considered it appropriate.

6           In any event, nothing about the transcripts themselves introduces any new facts or

7   information to the case. At Mr. Ellison's September 21, 2006 deposition, Plaintiffs spent several

8   hours asking Mr. Ellison about passages from the book itself dealing with precisely the same

9   subjects set forth in Plaintiffs' Motion, including the release of Suite 11i, problems with Suite

10   11i, Oracle's Billion dollar savings claim, and the effect of the economy on Oracle's business.

11   *See, e.g.*, Ex. 10 (Plaintiffs' Oct. 30, 2006 *Softwar* Motion) at 5-8; Ex. 5 (Sept. 21, 2006 Ellison

12   Depo. Tr.) at 334:14-414:13. The information in the transcripts, in other words, is already

13   reflected in the book, and Plaintiffs already have had more than enough time to question Mr.

14   Ellison about the book. *See id.*[10] That time, plus the additional 3.5 hours already granted under

15   the Court's December 14, 2006 Order, is more than enough time for a "fair" examination of Mr.

16   Ellison. *See* Fed. R. Civ. P. 30(d)(2).

17           Finally, Plaintiffs' have pointed to nothing in the transcripts that would provide a

18   basis for additional deposition time with Ms. Catz. Plaintiffs claim that Ms. Catz should be

19   subjected to additional deposition time (on top of that already ordered pursuant to their October

20   30 motion) because she was a high-ranking executive at Oracle during the relevant time period,

21   shared a business suite with Mr. Ellison and attended upper-level meetings with him. *See*

22   Motion at 5. None of these bases pertains uniquely to interview transcripts of Mr. Ellison

23   created in preparation of *Softwar*. Nothing about *Softwar* applies uniquely to Ms. Catz. These

24   materials are interviews of Mr. Ellison, not of Ms. Catz. *See, e.g.*, *Harris v. Computer Assocs.*

25   *Int'l, Inc.*, 204 F.R.D. 44, 46 (E.D.N.Y. 2001) ("Depositions of high level corporate executives

26

27   [10]   Indeed, the book, which was published well before discovery in the case commenced, contains interview quotes from Mr. Ellison pertaining to the very the topics cited by Plaintiffs in their Motion. *See, e.g.*, Ex. 18 (*Softwar* Excerpts) at 169 (integration of Suite

28   11i), 183 (Oracle's billion dollar savings claim), 191-92 (the timing and release of Suite 11i and specifically the Order Management Module), 234 (specific customer implementations).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1   may be duplicative, cumulative and burdensome where the person sought to be deposed has no

2   personal knowledge of the events in dispute."). They certainly do not provide a basis for more

3   deposition time with her any more than they would Oracle's entire roster of senior executives.

4               2.      Plaintiffs' Request for Additional Time to Question Ellison about

5                       Materials they Might Obtain from Third Parties is Purely Speculative.

6               Plaintiffs have requested additional time to question Mr. Ellison "regarding any

7   information discovered pursuant to" their third party *Softwar* discovery. *See* Motion at 8.

8   Plaintiffs cite no such information. Plaintiffs ask the Court to grant them additional time to

9   question Mr. Ellison about materials or information from third parties pertaining to *Softwar in*

10  *the event* they receive any. The basis for this request is purely speculative, and it fits a pattern of

11  Plaintiffs insisting on more time with Oracle's top executives regardless of the actual state of

12  discovery in the case. Plaintiffs telegraphed their desire to bring this motion before they had

13  seen many of the documents that now form its purported basis. *See* Ex. 17 (Jan. 16, 2007 Tr.) at

14  4:23-5:3; Ex. 16 (Jan. 30, 2007 Stipulation). Now, in bringing the motion, they cite as

15  justification documents they might someday receive from third parties to the litigation. Plaintiffs

16  clearly have had their minds made up that they will bring this motion whether the record

17  supports it or not. Plaintiffs' speculation that they might receive materials or information does

18  not properly form the basis of a request for additional deposition time.

19              3.      Plaintiffs Already Have Sufficient Time to Question Mr. Ellison About

20                      His Knowledge of the Unavailability of *Softwar* Materials.

21              Plaintiffs claim that they need additional deposition time with Mr. Ellison to ask

22  him about "his efforts to preserve" materials that are the subject of the Court's December 29,

23  2006 Order regarding the production of *Softwar* materials. *See* Motion at 8. These materials,

24  however, never have been in the physical possession, custody or control of Mr. Ellison. As

25  Plaintiffs are aware, these materials always resided in the physical possession, custody and

26  control of Matthew Symonds, the author of *Softwar*. *See* Ex. 19 (Jan. 15, 2007 Letter from P.

27  Wald to S.M. Infante) at 2; Ex. 14 (February 22, 2007 Letter from P. Gibbs to M. Solomon). As

28  such, Mr. Ellison's efforts to preserve them consist of a request, though Mr. Ellison's counsel,

LATHAM=WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1   that Mr. Symonds preserve them.  Ex. 19 (Jan. 15, 2007 Letter from P. Wald to S.M. Infante);

2   Ex. 14 (February 22, 2007 Letter from P. Gibbs to M. Solomon).[11]  Plaintiffs already know this.

3   *See id.*  And, as plainly can be seen from the record with respect to these materials, Mr. Ellison

4   was not involved personally in the circumstances surrounding their unavailability.  *Id.*  Plaintiffs'

5   questioning on this topic will be short and fruitless, and in any event can be exhausted in a

6   fraction of the time already permitted by the Court's Order granting in part Plaintiffs' previous

7   request for additional time.

8          **C.**      **Defendants' Supplemental Accounting Productions Do Not Warrant**

9                  **Additional Deposition Time for Mr. Ellison or Ms. Catz**

10           With respect to the recent accounting productions,  Plaintiffs have failed to

11   identify a *single* document that would justify their request for additional deposition time with

12   Mr. Ellison and Ms. Catz.  Indeed, neither Mr. Ellison nor Ms. Catz appears as a custodian,

13   sender or recipient of any of the roughly 782,000 pages that comprise Defendants' supplemental

14   accounting productions from January and February 2007.  Mr. Ellison and Ms. Catz are not even

15   copied on these documents.

16           This cannot come as a surprise to Plaintiffs.  Plaintiffs have conceded that the

17   supplemental accounting documents relate to Oracle's bad debt transfers in the second quarter of

18   fiscal year 2001, and the 2002 "unapplied cash" project.  *See* Motion at 6.  As Plaintiffs are

19   aware, both activities were performed by entry-level collections staff working at Oracle's

20   Rocklin, California facility.  Mr. Ellison and Ms. Catz – whom Plaintiffs accurately describe as

21   Oracle's "most senior executives" – were not involved in either undertaking.  As a result,

22   Plaintiffs are forced to acknowledge that they cannot identify any relevant documents, nor can

23   they articulate a line of questioning based upon the supplemental accounting documents, that

24   would justify an extension of time to depose Mr. Ellison and Ms. Catz.  *See* Motion at 6

25   ("Plaintiffs . . . are unable to offer detailed descriptions of the documents and lines of

26   questioning which they wish to examine Ellison and Catz regarding.").

27

28   [11]  Plaintiffs, of course, will have the opportunity to depose Mr. Symonds himself about these
     issues very soon.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

1          The only tangible "support" Plaintiffs proffer in furtherance of their request

2  relates to Mr. Ellison's relationship with General Electric ("GE"). Plaintiffs apparently believe

3  that Mr. Ellison's role as GE's Executive Sponsor – coupled with the fact that there are debit

4  memos associated with certain GE transactions – necessarily means that Mr. Ellison was

5  involved in the bad debt transfers or the unapplied cash project. Plaintiffs, however, do not and

6  cannot provide any support for this speculative leap, nor do they explain how Mr. Ellison's

7  Executive Sponsor relationship with GE, standing alone, supports their request for additional

8  deposition time. Indeed, Plaintiffs were aware of these facts before Mr. Ellison's depositions,

9  and they already questioned Mr. Ellison about his role as GE's Executive Sponsor. *See* Ex. 4

10  (July 13, 2006 Ellison Depo. Tr.) at 48:26-27. Moreover, Plaintiffs had the Script Output, which

11  contains the complete accounting histories for 33 different GE-related transactions that contain

12  debit memos in their accounting histories, prior to deposing Mr. Ellison. *See* Ex. 20 (Oct. 25,

13  2006 letter from B. Glennon to E. Greenstein). Thus, Plaintiffs had every opportunity to

14  question Mr. Ellison regarding his relationship with GE, the debit memos that appear in the

15  accounting histories of certain GE transactions or any refunds issued to GE.[12] Plaintiffs chose

16  not to pursue this line of questioning with Mr. Ellison or Ms. Catz as a matter of strategy, and

17  not, as the Motion suggests, for lack of evidence.[13]

18

---

19  [12] Plaintiffs' justification for seeking additional deposition time with Ms. Catz is even more

20  attenuated. Ellison's relationship with GE obviously has nothing to do with Ms. Catz, and Plaintiffs have not identified a single document from the supplemental accounting production

21  that justifies additional deposition time with Ms. Catz. Instead, Plaintiffs claim that Ms. Catz is the current CFO of Oracle, that she attended Finance and Audit Committee meetings and

22  that she is "heavily involved" in quarterly closing activities. *See* Motion at 7. This information, however, is not "new," nor does it have anything to do with Defendants'

23  supplemental accounting productions.

    [13] Plaintiffs' allegations regarding Jennifer Minton, although completely unfounded, ultimately

24  are irrelevant. As an initial matter, contrary to Plaintiffs' accusations, Ms. Minton did not make any "demonstratively . . . false representations" about the 2002 unapplied cash project.

25  *See* Motion at 7. Ms. Minton originally testified that while she was not involved and did not recall the results, she "thought it was appropriate for legal to keep [her] involved." *See* Ex.

26  21 (July 7, 2006 Minton Depo. Tr.) at 162:13-14 and 175:18-19. After reflecting on her testimony, Ms. Minton later clarified that she did, in fact, recall "becom[ing] aware of the

27  results of the investigation" outside of a privileged context and that "there was not a material impact on [Oracle's 2001] financial statements." Ex. 22 (September 25, 2006 Depo. Tr.) at

28  278:15-279:20. Thus, Ms. Minton never made any "false representations" about the 2002 unapplied cash project. Perhaps more importantly, Plaintiffs deposed Ms. Minton for two

1    Finally, Plaintiffs' contention that the "370,000 page" supplemental accounting

2    production represents Defendants' first production relating to the bad debt transfers or the

3    unapplied cash project simply is incorrect and misleading. *See* Ex. 23 (Oct. 20, 2006 Letter from

4    B. Glennon to E. Greenstein); Ex. 24 (Declaration of Judy Hui in support of Defendants'

5    Opposition to Plaintiffs' Motion to Enforce the Court's July 17, 2006 Order and to Compel

6    Additional Accounting Documents Based on Recent Testimony and Evidence) at ¶ 13.

7    Defendants previously produced electronic information and documents pertaining to bad debt

8    transfers and the unapplied cash project to the extent such data or documents appeared in the

9    accounting history of a transaction that also included one of the 926 debit memos. Thereafter,

10   Plaintiffs deposed numerous accounting witnesses at length regarding both the bad debt transfers

11   and the unapplied cash project (and Defendants permitted these lines of questioning). Among

12   others, Plaintiffs questioned extensively Molly Littlefield (Venkataramana), Michael Quinn,

13   Thomas Williams, Ian Hatada, Raul Campos and Jeffrey Henley regarding both issues. Plaintiffs

14   could have questioned, but chose not to question, Mr. Ellison and Ms. Catz on these issues.

15   Given their lack of involvement in these events, Plaintiffs certainly have more than enough time

16   remaining with Mr. Ellison and Ms. Catz to cover any outstanding accounting issues, and probe

17   any document from Defendants' supplemental accounting productions. There is no legitimate

18   basis, however, for Plaintiffs to contend that they need additional deposition time with Mr.

19   Ellison and Ms. Catz based upon the supplemental accounting productions.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25

26   days *before* they deposed Mr. Ellison and Ms. Catz. In addition, the "Upside Reports"
     (NDCA-ORCL 000246-000263) cited in the Motion were not produced as part of the

27   supplemental accounting productions, but instead, were produced *over two years ago*, in
     January 2005. *See* Motion at 7. Thus, neither Ms. Minton's testimony nor the "Upside

28   Reports" provides any basis for affording Plaintiffs additional time to depose Mr. Ellison and
     Ms. Catz.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS.
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

IV.    **CONCLUSION**

Based on the foregoing, Defendants respectfully request that Plaintiffs' [Renewed] Motion to Compel Additional Deposition Time For The Depositions of Larry Ellison and Safra Catz be denied in its entirety.

Dated:  March 2, 2007

Respectfully submitted,

LATHAM & WATKINS LLP
   Peter A. Wald
   Michele F. Kyrouz
   Patrick E. Gibbs
   Jamie L. Wine

By: _Patrick E. Gibbs/SPJC_

Patrick E. Gibbs
Attorneys for Defendants
ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY and
EDWARD J. SANDERSON

LATHAM•WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFS' OPP. TO PLFS' MOT. TO COMPEL ADDITIONAL DEPOS
TIME WITH ELLISON AND CATZ
Master File No. C-01-0988-MJJ (JCS)

## PROOF OF SERVICE

I am employed in the County of San Francisco, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, CA 94111-2562.

On **March 2, 2007,** I served the following document described as:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' [RENEWED] MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ**

**DECLARATION OF SEAN P.J. COYLE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' [RENEWED] MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ**

**[PROPOSED] ORDER DENYING PLAINTIFFS' MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ**

by serving a true copy of the above-described document in the following manner:

## BY HAND DELIVERY

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server. Under that practice, documents are deposited to the Latham & Watkins LLP personnel responsible for dispatching a messenger courier service or registered process server for the delivery of documents by hand in accordance with the instructions provided to the messenger courier service or registered process server; such documents are delivered to a messenger courier service or registered process server on that same day in the ordinary course of business. I caused a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server.

The Honorable Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

Shawn A. Williams, Esq.
Willow E. Radcliffe, Esq.
Lerach, Couglin, Stoia, Geller, Rudman &
    Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238

## BY FACSIMILE

I am familiar with the office practice of Latham & Watkins LLP for collecting, processing, and transmitting facsimiles. Under that practice, when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted that same day in the ordinary course of business. I deposited the above-described document for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for collecting and processing facsimiles. The facsimile of the above-described document was transmitted to the following party from San Francisco, California on March 2, 2007, at the time noted on the attached confirmation sheet:

Mark Solomon, Esq.
Douglas Britton, Esq.
Lerach, Coughlin, Stoia, Geller, Rudman &
    Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Fax No.: (619) 231-7423

Shawn A. Williams, Esq.
Willow E. Radcliffe, Esq.
Lerach, Coughlin, Stoia, Geller, Rudman &
    Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
Fax No.: (415) 288-4534

The facsimile number of the sending machine is (415) 395-8095. Said transmission was complete and without error. The party on whom this facsimile transmission has been served has agreed in writing to such form of service pursuant to agreement.

## BY OVERNIGHT MAIL DELIVERY

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for overnight mail delivery by Federal Express. Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents in a post office, mailbox, subpost office, substation, mail chute, or other like facility regularly maintained for receipt of overnight mail by Federal Express; such documents are delivered for overnight mail delivery by Federal Express on that same day in the ordinary course of business, with delivery fees thereon fully prepaid and/or provided for. I deposited in Latham & Watkins LLP' interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for overnight mail delivery by Federal Express:

Mark Solomon, Esq.
Douglas Britton, Esq.
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **March 2, 2007**, at San Francisco, California.

_____
Doreen Griffin

# EXHIBIT 2

Patrick E. Gibbs
(650) 463-4696
patrick.gibbs@lw.com

140 Sc... _...ve
Menlo Park, California 94025
Tel: (650) 328-4600  Fax: (650) 463-2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

February 22, 2007

## BY FACSIMILE AND E-MAIL

Mark Solomon, Esq.
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Re:   In re Oracle Corporation Securities Litigation

Dear Mark:

I write to inform you that Matthew Symonds told us today, for the first time, that much of the information he previously provided to us (and that we, in turn, relayed to Plaintiffs) regarding the laptop computer on which he had stored interview recordings and transcripts was false. Specifically, Mr. Symonds informed us today that, contrary to what he previously told us, he did not try to have the laptop computer repaired; he was never told the laptop had a computer virus; he was never told that the data files on the computer were inaccessible; and he did not instruct a repair shop to dispose of the laptop. Mr. Symonds now claims that, some time after becoming aware of Plaintiffs' motion to compel production of materials related to *Softwar*, he attempted to use the laptop on which the recordings and transcripts were stored, and, because it was not performing properly, he disposed of the computer himself by dropping it off at a facility for the "ecological" disposal of computers and similar items. (He did not identify the facility.) Mr. Symonds claims that the rest of the information he provided to Defendants' counsel (and that we in turn relayed to Plaintiffs) was correct. In particular, Mr. Symonds continues to maintain that, other than the typing service he previously identified, Mr. Symonds did not provide copies of any recordings or transcripts of his interviews with Mr. Ellison to anyone.

As we have previously noted, Defendants have no personal knowledge about the events described by Mr. Symonds (either today or previously), and we have no way to independently verify Mr. Symonds' claims. We do, however, intend to inform Judge Jenkins and Judge Infante of today's developments.

Very truly yours,

Patrick E. Gibbs
of LATHAM & WATKINS LLP

cc:   Shawn A. Williams, Esq. (*by facsimile*)

# EXHIBIT 3

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5  IN RE ORACLE CORPORATION
    SECURITIES LITIGATION.
 6                          CASE NO.  C-01-0988-MJJ
 7  THIS DOCUMENT RELATES TO:
 8       ALL ACTIONS.
 9  ------------------------------/
10
11                 ---oOo---
12                CONFIDENTIAL
13          DEPOSITION OF LAWRENCE ELLISON
14                  VOLUME III
15            Friday, March 30, 2007
16             (Pages 561 - 744)
17                ---oOo---
18
            SHEILA CHASE & ASSOCIATES
19               REPORTING FOR:
            LiveNote World Service
20        221 Main Street, Suite 1250
         San Francisco, California  94105
21          Phone: (415) 321-2311
            Fax: (415) 321-2301
22
23
24  Reported by:
    KATHLEEN A. WILKINS, CSR, RPR, CRR
25  CSR No. 10068
```

## INDEX

### INDEX OF EXAMINATIONS

| | PAGE |
|---|---|
| RESUMED EXAMINATION BY MR. SOLOMON | 570 |

### INDEX OF EXHIBITS

| Ellison | Description | Page |
|---|---|---|
| Exhibit 141 | Letter to Matthew Symonds from Larry Ellison, dated January 10, 2007 - 1 page | 582 |
| Exhibit 142 | Document entitled, "Matthew Symonds Interview with Larry Ellison:  Oracle," Bates stamped 1529283 through 1529322 - 40 pages | 587 |
| Exhibit 143 | Document entitled, "#21 Interview Memorandum of Lawrence Ellison (Interview 2) 09/20/02," Bates stamped 297543 through 297559 - 17 pages | 600 |
| Exhibit 144 | E-mail from Martha Cavanna to Stacey Torman, dated March 16, 2001, Bates stamped 178069 through 178073 - 5 pages | 602 |

| INL. | EXHIBITS (Continued) | |
|---|---|---|
| Ellison | Description | Page |
| Exhibit 145 | Document entitled, "Transcript from LJE keynote at Oracle Apps World, New Orleans, February 20, 2001," Bates stamped 099883 through 099928 - 46 pages | 604 |
| Exhibit 146 | Forbes magazine article dated August 14, 2006 - 8 pages | 615 |
| Exhibit 147 | Web page from the Oracle Education Foundation - 2 pages | 618 |
| Exhibit 148 | Web pages from High Tech Mag - 5 pages | 620 |
| Exhibit 149 | Web page article from Forbes.com - 4 pages | 621 |
| Exhibit 150 | Article entitled, "Oracle's Catz, Ellison Heir, Gets Credit for Growth Strategy" - 4 pages | 622 |
| Exhibit 151 | Document entitled, "Matthew Symonds Interviews, Oracle, Interview with Larry Ellison on January 18th, 2002," Bates stamped 1529157 to 1529180 - 24 pages | 636 |

### INDEX OF EXHIBITS (Continued)

| Ellison | Description | Page |
|---|---|---|
| Exhibit 152 | Excerpts from Softwar - 18 pages | 671 |
| Exhibit 153 | Excerpt from Softwar - 4 pages | 675 |
| Exhibit 154 | Document entitled, "InterLogix Inc. - Customer Satisfaction Issue," Bates stamped 1056850 and 1056851 - 2 pages | 677 |
| Exhibit 155 | Document entitled, "Softwar, The Rewards of Recklessness: A Portrait of Larry Ellison and Oracle Corporation at War, By Matthew Symonds," Bates stamped 1053564 to 1053577 - 14 pages | 691 |
| Exhibit 156 | Fortune Magazine article dated November 13th, 2000, Bates stamped - 8 pages | 698 |
| Exhibit 157 | E-mail from Dan Cooperman to Dorian Daley; Lauren Segal, dated March 29, 2001, Bates stamped 1914926 through 1914934 - 9 pages | 703 |
| Exhibit 158 | Excerpt from Softwar - 4 pages | 709 |

INDEX OF EXHIBITS (Continued)

| Ellison | Description | Page |
|---|---|---|
| Exhibit 159 | Document entitled, "Matthew Symonds Interviews, Oracle, Interview with Larry Ellison," Bates stamped 1529262 through 1529282 - 21 pages | 712 |
| Exhibit 160 | Document entitled, "Oracle Update," Bates stamped 15299215 through 15299233 - 19 pages | 718 |
| Exhibit 161 | Copy of a Wall Street Journal article dated August 6th, 2001 - 4 pages | 721 |
| Exhibit 162 | E-mail from Kirsten Shaw dated December 1, 2000, Bates stamped 1027516 through 1027521 - 6 pages | 728 |
| Exhibit 163 | E-mail Bates stamped 1026720 through 1026721 - 2 pages | 733 |
| Exhibit 164 | String of e-mails beginning with an e-mail from Salima Ceret to Joyce Boland, dated March 23, 2001, Bates stamped 061785 through 061790 - 6 pages | 734 |

---

INDEX OF EXHIBITS (Continued)

| Ellison | Description | Page |
|---|---|---|
| Exhibit 165 | Article from Vanity Fair called "Absolutely Excessive" - 7 pages | 736 |

EXHIBITS PREVIOUSLY MARKED
AND REFERRED TO IN THIS DEPOSITION

| EXHIBIT | PAGE |
|---|---|
| Exhibit 10 | 619 |
| Exhibit 57 | 668 |

QUESTION WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 574 | 10 |
| 634 | 11 |
| 635 | 8 |

---o0o---

---

1     BE IT RE...ED that on Friday, March 30,
2  2007, commencing at the hour of 1:01 p.m. thereof,
3  at 100 Pine Street, Suite 2600, San Francisco,
4  California, before me, KATHLEEN A. WILKINS, RPR,
5  CRR, a Certified Shorthand Reporter in and for the
6  State of California, personally appeared
7          LAWRENCE ELLISON,
8  called as a witness by the Plaintiffs herein, who,
9  being by me first duly sworn, was thereupon examined
10 and testified as hereinafter set forth.
11          ---o0o---
12 Appearing as counsel on behalf of Plaintiffs:
13     MARK SOLOMON, Esquire
       STACEY M. KAPLAN, Esquire
14     RYAN GUIBOA, Esquire
       MONIQUE WINKLER, Esquire
15     LERACH, COUGHLIN, STOIA, GELLER,
       RUDMAN & ROBBINS, LLP
16     655 West Broadway, Suite 1900
       San Diego, California  92101-3301
17     marks@lerachlaw.com
18 Appearing as counsel on behalf of Defendants:
19     GREGORY P. LINDSTROM, Esquire
       LATHAM & WATKINS, LLP
20     505 Montgomery Street, Suite 1900
       San Francisco, California  94111-2562
21     gregory.lindstrom@lw.com
22     PATRICK E. GIBBS, Esquire
       LATHAM & WATKINS, LLP
23     140 Scott Drive
       Menlo Park, California  94025-1008
24     patrick.gibbs@lw.com
25

---

1     DORIAN DALEY, Esquire
      ORACLE CORPORATION
2     VICE PRESIDENT, LEGAL; ASSOCIATE GENERAL
      COUNSEL
3     LITIGATION, TRADEMARK & COPYRIGHT GROUP
      500 Oracle Parkway, M/S 5op762
4     Redwood Shores, California  94065
      Dorian.daley@oracle.com
5
   Present via Internet:  Keith Mautner, Esq.; Doug
6  Lerach, Esq.; John Mayer
7  Also Present:  Gary Brewer, videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Good afternoon.  We are
3    going on the record.  Here marks the beginning of
4    Videotape No. 1, Volume 3, in the deposition of
5    Lawrence Ellison, in the matter In Re Oracle
6    Corporation Securities Litigation, in the United
7    States District Court, Northern District of
8    California, San Francisco Division, Case Number
9    C-01-0988-MJJ.
10             The video operator today is Gary Brewer,
11   representing LiveNote World Service, located at 221
12   Main Street, Suite 1250, San Francisco, California,
13   94105.  Telephone number (415) 321-2300.
14             The court reporter is Kathleen Wilkins,
15   reporting on behalf of LiveNote World Service.
16             Today's deposition is being taken on
17   behalf of the Plaintiff and is taking place at 100
18   Pine Street, San Francisco, California.
19             Counsel, will you please introduce
20   yourselves and state whom you represent.
21             MR. SOLOMON:  Mark Solomon representing
22   plaintiffs.
23             MS. KAPLAN:  Stacey Kaplan representing
24   plaintiffs.
25             MS. WINKLER:  Monique Winkler representing
```

```
1    plaintiffs.
2              MR. GUIBOA:  Ryan Guiboa representing
3    plaintiffs.
4              MR. LINDSTROM:  Greg Lindstrom for
5    defendants.
6              MR. GIBBS:  Patrick Gibbs for defendants.
7              MS. DALEY:  Dorian Daley for defendants.
8              THE VIDEOGRAPHER:  Would the court
9    reporter please swear in the witness.
10             LAWRENCE ELLISON,
11             having been duly sworn,
12   was examined and testified as follows:
13             --oOo--
14             THE VIDEOGRAPHER:  Please begin.
15             RESUMED EXAMINATION BY MR. SOLOMON
16             MR. SOLOMON:  Q.  Good afternoon.
17   Mr. Ellison.
18        A.   Good afternoon.
19        Q.   Have you reviewed the transcript of your
20   second day of testimony in this litigation?
21        A.   I have not.
22        Q.   And have you reviewed the complaint in
23   this matter yet?
24        A.   I have not.
25        Q.   You know Mr. Matthew Symonds?
```

Exhibit 3, pages 571-586 to the Coyle Declaration in Support of Defendants' Memorandum Regarding Plaintiffs' Motion to Compel Testimony and Determine the Applicability of the Fifth Amendment Right Against Self-Incrimination

**Remains Sealed** at this Time Per the Request of Counsel for Matthew Symonds

1    session?

2    A.   I did not.

3    Q.   Do you remember what you told Mr. Symonds

4    about your option exercises and sales in January of

5    2001?

6    MR. LINDSTROM:  So let me -- let me

7    understand.  So you're talking about during the

8    course of the interviews for the book?

9    MR. SOLOMON:  Correct.

10   THE WITNESS:  No.

11   MR. SOLOMON:  Let's have marked as the

12   next exhibit an interview transcript produced in

13   this litigation with the control numbers 1529283

14   through -322.

15   (Whereupon, Deposition Exhibit 142

16   was marked for identification.)

17   THE WITNESS:  I assume you don't want me

18   to read this whole thing?

19   MR. SOLOMON:  Q.  No, I don't.

20   First of all, this is dated, at least

21   there's a handwritten notation on the first page, of

22   June 2002.

23   You don't recognize that handwriting, do

24   you?

25   A.   I do not.

3/30/2007  Ellison, Lawrence Vol. III

1    Q.   So it starts off saying, "This is Matthew

2    Symonds talking to Larry Ellison.  It's June 24th."

3    Do you see that?

4    A.   Yes.

5    Q.   Can you just describe how Mr. Symonds

6    recorded the conversations?

7    A.   He had a digital -- a digital recorder.  I

8    think it was a Sony digital recorder.  It's kind of

9    small.  It's not a tape.  I think it had solid state

10   memory.  So there was a table microphone about this

11   size.  The recorder was about this size but thinner.

12   And he put -- you know, put the recorder

13   down and the microphone down and he'd start -- he'd

14   have some notes, I guess, with pre-prepared

15   questions, and he'd start asking me questions.

16   Q.   Could you estimate how many hours of

17   recordings he made of interviews with you?

18   A.   I mean, I could.  It would be a pretty

19   gross estimate, but ... 30 to 100.  Probably 30

20   hours -- I don't -- again, I'm just trying to --

21   Q.   Thirty hours to 100 hours --

22   A.   Yeah.

23   Q.   -- is your range?

24   A.   I think.  One hundred hours is a lot,

25   but ...

1   Q.   And is it fair to say that this

2   A.   30 to -- let me refine.  30 to 60.  100

3   hours sounds crazy to me.

4   Q.   Was it over a couple of years, the

5   interview process?

6   A.   It was over nearly two years.  And then

7   there -- yeah.  Yeah.  I think it was more than 18

8   months, less than two years, I think.

9   Q.   Okay.  So if you go to the third page of

10  this document, and it has the control number

11  1529285 --

12  A.   Okay.

13  Q.   -- you'll see that it starts at the top

14  with the word "Right."  And then it goes on to say,

15  "Of course, when Oracle stock started to slide last

16  year and around that sort of time you also cashed in

17  those options invested, you were kind of hit ..."

18       Did you see that?

19  A.   Yes.

20  Q.   All right.  And then this apparently is

21  your language.  And you say, "Well, actually, the

22  options were invested long, long ago.  I got those

23  options ten years ago.  They were expiring.  They

24  were months from expiring."

25       Do you see that?

589

1   A.   Yeah.  There's a transcription error in

2   it, but yes.

3   Q.   What's the error?

4   A.   I think the options were not "invested"

5   but "vested," the word "vested."

6   Q.   Got it.

7        And then it goes on to say, "So it was

8   actually the last moment that you could sell them."

9        And then you say, "right."

10       Do you see that?

11  A.   Yes.

12  Q.   Is that an accurate transcription, in your

13  recollection?

14  A.   You mean the word "moment"?

15  Q.   The word "right."

16       MR. LINDSTROM:  The question is whether

17  that's an accurate transcription?

18       MR. SOLOMON:  Mh-hmm.

19       THE WITNESS:  Probably.

20       MR. SOLOMON:  Q.  Okay.  And what about,

21  "So it was actually the last moment you could sell

22  them"?  Do you think that's --

23  A.   Well, it's not precise.

24  Q.   What do you mean, it's not precise?

25  A.   Well, I suppose the last moment would be

590

the last minute, the last trading day before the

2   options expired, or even the last moment would be

3   the last fraction of a second in the last trading

4   day.  I don't know how -- how big a moment is.

5   Q.   Okay.  Well, do you think that the moment

6   was basically January 22nd through January 31?

7   A.   No.  I think the options expired -- I

8   don't remember -- August?  Were the options expired

9   in August?

10  Q.   (Nods head.)

11  A.   So I suppose I had up until August to sell

12  them.  So in a ten-year period, I was in my last six

13  months.

14  Q.   All right.  And, in fact, you weren't even

15  in the last trading window, were you?

16  A.   No.

17  Q.   Because there were two more trading

18  windows, weren't there?

19  A.   Well, again, I was in the last six

20  months -- yes.

21  Q.   And so to the extent he says, "So it was

22  actually the last moment you could sell them," let's

23  say he said "window," and you said "right," that

24  would be inaccurate, wouldn't it?

25  A.   I would say it's imprecise.  It should

591

have been -- it was nearly -- you were almost -- the

2   question is I was almost out of time.  But I wasn't

3   out of time.

4   Q.   And you know that in his writings he's

5   actually explained your stock sale as saying that it

6   was -- you had to, you had no choice, the options

7   would have expired otherwise?

8        Are you aware that that's what Mr. Symonds

9   had written?

10       MR. LINDSTROM:  Assumes facts.

11  Mischaracterizes his writings.

12       THE WITNESS:  Can I read -- is it here?

13       MR. SOLOMON:  Q.  I'll try to find it a

14  little bit later on.  I just want to know if you

15  recall that that's what he's written.

16  A.   No.

17  Q.   And, in fact, at the moment, because all

18  of this is sealed and confidential, no one knows --

19  the public certainly doesn't know that, in fact, you

20  had additional trading windows, do they?

21       MR. LINDSTROM:  Assumes facts.  No

22  foundation.  Calls for speculation.

23       THE WITNESS:  I don't know how much -- in

24  terms of my options, I think everyone knows my

25  option dates.  So I think whenever I receive an

592

1   option, we're obliged to disclose it in the    or
2   the 10K.  So everyone knows that it is a ten-year
3   option period, because that's -- that's publicly
4   available.
5           Everyone knows what my option date is
6   because that was publicly disclosed also.  You just
7   add ten years to that date.  So anyone who cares to
8   look at the documents would know exactly how much
9   time I had.
10          So when you say the public doesn't know,
11  they could -- anyone could know by looking at the
12  publicly available documents.
13          MR. SOLOMON:  Q.  Okay.  And if they
14  simply took you at your word, or Mr. Symonds at his
15  word, they would have thought that your stock
16  options needed to be exercised in January of 2001;
17  otherwise you'd lose them.
18          Do you think that's fair?
19          MR. LINDSTROM:  No foundation.
20  Argumentative.
21          THE WITNESS:  Again, I don't think that's
22  a fair characterization.  I agree with you, this is
23  imprecise, saying it was the last moment, but it
24  was -- I was nearly out of time is more accurate.
25          MR. SOLOMON:  Q.  And then it goes on to

1   document.  Co
2           THE WITNESS:  Do I remember it
3   specifically?
4           MR. SOLOMON:  Q.  Yes.  Do you remember
5   the gist of this answer that you gave Mr. Symonds?
6       A.   Ignoring that this is refreshing my
7   memory?  So do I remember --
8       Q.   I'll allow your memory to be refreshed.
9       A.   Well, I mean, I believe these transcripts
10  are accurate --
11      Q.   Okay.
12      A.   -- so I -- again, insofar as the
13  transcripts are accurate, I believe this is what I
14  said.
15          MR. LINDSTROM:  Well, this is a little bit
16  different.  His question is whether you remember
17  this.
18          THE WITNESS:  Well, I said -- I said I
19  didn't remember this.  I said I specifically -- I'm
20  sorry.  Sorry.  I didn't -- I don't specifically
21  remember this --
22          MR. SOLOMON:  Q.  Okay.
23      A.   -- if that's the question.  But -- okay.
24  I'll stop there.
25      Q.   And do you have any concern that there was

1   say -- I'm going to skip a couple of lines -- "Sure,
2   but there were quite a lot of shareholder actions to
3   do with that.  Are any of those ongoing still?"
4           And your answer as transcribed here is,
5   "Yes, I think the judges ruled against them,
6   dismissed them a couple of times and they filed
7   amended complaints.  And they've been dismissed and
8   complaints have come in.  We've won one set of
9   complaints and we're" -- there seems to be a gap --
10  "and we're the last set."
11          Do you see that?
12          MR. LINDSTROM:  I think the record should
13  reflect, Mark, that there's some brackets there that
14  suggests whoever transcribed this couldn't -- at
15  least they suggest to me that they couldn't
16  accurately hear what was being said in that portion
17  of the sentence.
18          MR. SOLOMON:  Okay.
19          MR. LINDSTROM:  Your question?
20          MR. SOLOMON:  Q.  And just in terms of the
21  gist, do you remember saying to Mr. Symonds around
22  the date of this interview that some of the
23  complaints had been dismissed, but you were on the
24  last set of complaints?
25          MR. LINDSTROM:  That mischaracterizes the

1   a document preservation or instruction in place
2   while you were collaborating with him concerning
3   this book?
4           MR. LINDSTROM:  That's vague as to time.
5   I assume you're asking him did he have a concern at
6   the time --
7           MR. SOLOMON:  Correct.
8           MR. LINDSTROM:  -- that the tape was
9   made --
10          MR. SOLOMON:  Correct.
11          MR. LINDSTROM:  -- by Symonds.
12          MR. SOLOMON:  Correct.
13          THE WITNESS:  Didn't even think about it.
14          MR. SOLOMON:  Q.  Even while you were
15  talking about the lawsuits?
16          MR. LINDSTROM:  It's argumentative.
17          THE WITNESS:  Didn't -- didn't occur to
18  me.
19          MR. SOLOMON:  Q.  And can you explain why,
20  after March of 2001, you didn't preserve e-mails
21  that you sent that concerned the facts in this
22  lawsuit?
23          MR. LINDSTROM:  Assumes facts.
24          THE WITNESS:  Say that again.  In
25  March 2001, I didn't preserve e-mails.

```
 1          MR. LINDSTROM:  Can we have the      ion
 2   reread?
 3          (Record read by the reporter as follows:
 4          QUESTION:  And can you explain why,
 5      after March of 2001, you didn't preserve
 6      e-mails that you sent that concerned the
 7      facts in this lawsuit?)
 8          THE WITNESS:  The answer is, I don't know
 9   if I did or didn't preserve e-mails in March 2001.
10          MR. SOLOMON:  Q.  And how is it that you
11   don't know that?
12          MR. LINDSTROM:  Argumentative.
13          THE WITNESS:  It was a long time ago.  I
14   just don't remember what -- March 2001.
15          MR. SOLOMON:  Q.  Do you know why the
16   letter that you sent to Mr. Symonds on January the
17   10th of this year wasn't produced until now to the
18   plaintiffs?
19      A.  I do not.
20      Q.  What's the status of Larryellison.com?
21      A.  I -- sorry.  I think it's -- I haven't
22   looked at it for years.
23      Q.  When was the last time you looked at it?
24      A.  Five years ago.  More.  I don't know.
25      Q.  And why -- why do you not use it anymore?
```

```
 1      A.  I don't think I ever used it.
 2      Q.  Okay.  What was it for?
 3      A.  You mean what were my various ideas?  Why
 4   did I get Larryellison.com?
 5      Q.  Yes.
 6      A.  I wanted to reserve the Internet -- I
 7   wanted to reserve the Internet name.  People were --
 8   those were the days everyone was grabbing Internet
 9   names.  I wanted to make sure I had it.  I don't
10   think I've ever used it for anything.
11      Q.  So it was just a bare name?  Nothing
12   there?
13      A.  I don't know.  I haven't been to it for
14   years.  I don't know what's there.
15      Q.  Did you use it for e-mail?
16      A.  No.
17      Q.  So when you told the audience at Apps
18   World in February 2001 that they could e-mail you at
19   Larryellison.com, that wasn't true?
20      A.  I don't believe I ever said that.
21      Q.  Okay.  And when the special litigation
22   committee says that you used Larryellison.com to
23   store transcripts of your speeches and public
24   statements, that's inaccurate, is it?
25          MR. LINDSTROM:  Assumes facts.
```

```
 1   Argumentative.
 2          THE WITNESS:  I believe so.
 3          MR. SOLOMON:  Q.  The special litigation
 4   committee lawyers just made that up?
 5          MR. LINDSTROM:  Argumentative.  Assumes
 6   facts.
 7          THE WITNESS:  No.  I think -- I'm happy to
 8   discuss this if you want to discuss it.
 9          At one point I thought it would be an
10   interesting idea, because with the advent of the
11   Internet -- and I'm quoted a lot in the press, and
12   the quotes aren't always accurate.  So I thought it
13   would be very interesting, with the advent of the
14   Internet, that I could take my actual speeches that
15   I gave and exactly what I said, and recordings of my
16   speeches that I gave, and put them up on the
17   Internet.
18          And then if the press quoted me out of
19   context or misquoted me, I would have an actual
20   record of all of my speeches.  It was kind of when I
21   thought it was an interesting idea to do that, but I
22   never did it.
23          MR. SOLOMON:  Okay.  Okay.  Marked as the
24   next exhibit --
25          THE WITNESS:  I'm sorry, we're done with
```

```
 1   this one?
 2          MR. SOLOMON:  For the moment.  We'll be
 3   looking at it again in a minute, so you might as
 4   well keep it close.
 5          THE WITNESS:  Okay, I'll just keep it out.
 6          MR. SOLOMON:  Marked as the next exhibit,
 7   an interview memorandum dated 9/20/02.
 8          (Whereupon, Deposition Exhibit 143 was
 9          marked for identification.)
10          THE REPORTER:  143.
11          MR. LINDSTROM:  Thank you.
12          MR. SOLOMON:  The control range is
13   297559 -- excuse me.  297543 through -559.
14      Q.  I'm looking at the last page, Mr. Ellison.
15      A.  Okay.  -559?
16      Q.  Yeah.  If you could just read that
17   paragraph.
18      A.  Okay.
19          Okay.
20      Q.  Is that not accurate?
21          Let me focus on the last sentence.
22   "According to Ellison, Q3 FY01, the web site would
23   have consisted of transcripts of his interviews."
24          Is that not true?
25      A.  Well, I think this says it became -- it
```

1  says I had the idea, exactly as I described here,
2  if you read the whole paragraph.  The idea behind
3  the web site was to post transcripts of my
4  interviews.
5          And -- and it says, "became too time
6  consuming to maintain the site," which is not quite
7  accurate.  It was too time consuming to do at all,
8  and I never did it at all.  So this is not
9  completely accurate.
10      Q.  Okay.  And that last sentence again, is
11  that accurate?
12      A.  I'm not even sure what it means.  "Q3 FY01
13  the web site would have consisted of transcripts of
14  his interviews."
15          I'm -- I'm having a hard time
16  understanding what that's saying.
17      Q.  Okay.
18      A.  The web site would have consisted of
19  transcripts of ...
20      Q.  You don't think -- you don't even
21  understand it, so you can't say --
22      A.  Well, I don't understand it.  But I can
23  tell you what is true.  What is true is I had the
24  idea to put my interviews up on that web site, on
25  Larryellison.com, for the very reasons stated here.

1      Q.  Okay        now it certainly appears that
2  Martha Cavanna believes that your Larryellison.com
3  web site had content, doesn't it?
4      A.  I think -- I think at some point, the
5  people in the marketing department at Oracle --
6  people in the marketing department at Oracle were
7  involved with this site.  I think Oracle obtained
8  the Larryellison.com web address, and I think the
9  marketing people had ideas of what to do with it.
10  But I don't -- frankly, I don't remember what they
11  did.
12      Q.  You don't dispute the accuracy of this
13  note though, do you, this message?
14      A.  I don't even know who Jennifer and Stacey
15  are, or Martha Cavanna.  But let me just read --
16  give me another second to read it.
17          Yeah.  Okay.
18      Q.  You don't dispute the accuracy of that
19  message, do you?
20      A.  No.
21      Q.  You know who Jennifer Glass is, don't you?
22      A.  Oh, Jennifer.  I'm sorry.  Yes, I do.
23      Q.  Do you know who Stacey Torman is?  You
24  don't know?
25      A.  I don't.

1  And I just never did.  I don't think there's a
2  single interview that's ever gone onto that web
3  site.
4      Q.  So it's kind of odd, though, isn't it,
5  that the four people who apparently were present
6  interviewing appear to have signed off on the
7  sentence, "According to Ellison, Q3 FY01, the web
8  site would have consisted of transcripts of his
9  interviews"?
10          MR. LINDSTROM:  Argumentative.  Vague and
11  ambiguous as to "odd."
12          THE WITNESS:  I think I was clear about --
13  I think they must have misunderstood that I
14  didn't -- you know, I never put any interviews on
15  there, at least I don't think I did.
16          MR. SOLOMON:  Okay.  Let's have marked as
17  the next exhibit a document produced by the
18  defendants with the control numbers 178069
19  through -073.
20          (Whereupon, Deposition Exhibit 144
21          was marked for identification.)
22          MR. SOLOMON:  Q.  And if you just look at
23  that first -- the first two paragraphs under
24  "Jennifer and Stacey."
25      A.  Okay.

1          MR. SOLOMON:  Marked as the next exhibit,
2  a document produced by the defendants in this
3  litigation with the control numbers 099883 through
4  099928.
5          (Whereupon, Deposition Exhibit 145
6          was marked for identification.)
7          MR. SOLOMON:  Q.  Without looking at the
8  whole document, you'll see that this purports to be
9  a transcript from LJE keynote to Oracle Apps World,
10  New Orleans, February 20th, 2001.
11      A.  Yes.
12      Q.  Have you seen this before?
13      A.  No.
14      Q.  This transcript?
15      A.  No.
16          MR. LINDSTROM:  Why don't you take a
17  moment to familiarize yourself with the document
18  before counsel asks you questions --
19          THE WITNESS:  Okay.
20          MR. LINDSTROM:  -- since you haven't seen
21  it before.
22          MR. SOLOMON:  Q.  I'm only going to be
23  asking you about one page, so when you think you are
24  sufficiently familiar, I'll direct you to the page.
25          MR. LINDSTROM:  If you want to give him

**[Page 605]**

```
 1   the page, maybe he can read that page and        s
 2   just before it or behind it. But I leave that to
 3   you.
 4        MR. SOLOMON: That's fine.
 5     Q.  Go to page 42 of the document,
 6   Mr. Ellison, which has the control number 099924.
 7     A.  -9924?
 8     Q.  Yeah.
 9     A.  Okay.
10     Q.  I'm looking at the second box which
11   begins, "In order." I'm looking at the last two
12   sentences in that second box.
13        MR. LINDSTROM: So why don't you read
14   what's in the box and then as much before it or
15   after as you feel is necessary to get the context.
16        THE WITNESS: I've read it. I've read it.
17   It's wrong. My -- my --
18        MR. LINDSTROM: There's no question
19   pending.
20        THE WITNESS: Oh.
21        MR. SOLOMON: Q. So you weren't telling
22   the truth?
23     A.  No. The transcription is wrong.
24     Q.  Ah. Wow, that's sort of quite a big
25   error, isn't it?
```

**[Page 607]**

```
 1        A.  If .   e it, you can have it. But I
 2   frequently say -- I frequently give my e-mail
 3   address during speeches. And my e-mail address is
 4   Larry.ellison@oracle.com.
 5     Q.  Right. And if you -- if we got the audio,
 6   we'd know, wouldn't we, what you actually said?
 7        MR. LINDSTROM: The witness has told
 8   you --
 9        THE WITNESS: And I -- and I said
10   Larry.ellison@oracle.com. I didn't say
11   Larryellison.com.
12        MR. SOLOMON: Q. Okay. Okay. I'm now
13   going back to the transcript of Mr. Symonds'
14   interview of you.
15        MR. LINDSTROM: So this is Exhibit 142?
16        MR. SOLOMON: Correct.
17        MR. LINDSTROM: From June 2002?
18        MR. SOLOMON: Correct.
19     Q.  If you go to control number 1529287. And
20   at the bottom of that page it reads, "And you were
21   telling me about that, about the reasons for that
22   yesterday, that the technical problems with the
23   glass but that turns out to be quite fortuitous in a
24   way from what you were saying about your move and
25   how the world might react to this kind of thing
```

**[Page 606]**

```
 1        MR. LINDSTROM: Argumentative.
 2        THE WITNESS: My e-mail address is
 3   Larry.ellison@oracle.com. I think "e-mail me at
 4   Larryellison.com," is -- I don't think that's a huge
 5   transcription error.
 6        MR. SOLOMON: Q. It says, "I will look
 7   into it, and if you e-mail me at Larryellison.com, I
 8   will actually have an answer for you by tomorrow."
 9     A.  I never said that.
10     Q.  Do you have a copy of the audio of this
11   anywhere?
12     A.  My guess is we have a copy of the video of
13   this.
14     Q.  Can you explain why that hasn't been
15   produced to us in this litigation?
16     A.  Was it asked for?
17     Q.  Sure it was.
18     A.  Okay. No, I don't.
19        MR. LINDSTROM: Assumes facts.
20        THE WITNESS: Again --
21        MR. LINDSTROM: No foundation.
22        THE WITNESS: I'm guessing we have a copy
23   of the audio. I'd like to think they keep all of my
24   speeches.
25        MR. SOLOMON: Q. Will you produce it?
```

**[Page 608]**

```
 1   being launched ..."
 2        Then the following page says "Laughing.".
 3   And then, "Yes!"
 4        And then it says, "Oh, what's this coming
 5   down here? I'll just have to hide it! Is this a
 6   recession boat?"
 7        Just focusing on that sentence, "Oh,
 8   what's this coming down here," and the rest of that
 9   line, who said that?
10        MR. LINDSTROM: Well, again, if you need
11   to look at more of the document in order to answer
12   counsel's questions or to familiarize yourself with
13   the context, feel free to do that.
14        THE WITNESS: Can I have a couple seconds
15   to look at the document?
16        MR. SOLOMON: Sure.
17        THE WITNESS: Okay.
18        MR. SOLOMON: Q. Okay. So do you know
19   who said that?
20     A.  Well, I don't know -- it doesn't --
21        MR. LINDSTROM: Again, for the record,
22   this is, "Oh, what's this coming down here?"
23        THE WITNESS: "... down here? I'll just
24   have to hide it. Is this a recession boat?"
25        MR. SOLOMON: Q. Right.
```

1     A.   I think it's supposed to be Mat.

2  Symonds, but I don't know if it's an accurate

3  transcription.

4     Q.   Then skipping a few lines, I'll read the

5  language into the record.  "Are there any feelings

6  you have as a consequence of the kind of pain that

7  Oracle stockholders or kind of Oracle employees with

8  options feeding as well ..."

9         Now, aside from whether or not that's an

10  accurate transcription, that appears to be

11  Mr. Symonds talking?

12     A.   That's correct.

13     Q.   All right.  And then the seven or eight

14  lines below, that's your response; is that right?

15     A.   Well, I mean, I think Mr. Symonds is in

16  the boldface.

17     Q.   Yeah, okay.

18     A.   Then I'm in the normal type, is the

19  convention.

20     Q.   Okay.  And does -- do those lines, those

21  seven lines accurately reflect your answer?

22     A.   You're referring to?

23     Q.   Beginning "Oh, yes."

24     A.   Beginning "Oh, yes."  Let me just read the

25  question.

1  cash, and I'm    exactly sure how it was disbursed.

2     Q.   So, in fact, it could be that some of it

3  went to pay for the boat; is that right?

4     A.   It's -- yes.

5     Q.   Have you spoken with Safra Catz about this

6  litigation?

7     A.   About the existence of the litigation,

8  or ...

9     Q.   About the litigation at all.

10        MR. LINDSTROM:  Vague as to time.

11        THE WITNESS:  I mean, I knew she was out

12  last week being deposed.  So ...

13        MR. SOLOMON:  Q.  Have you spoken with her

14  about her deposition?

15     A.   Other than the fact that she had one?

16     Q.   Yes.

17     A.   You mean the context of the deposition?

18     Q.   Yes.

19     A.   No.

20     Q.   And have you discussed the contents of

21  your deposition testimony thus far with Ms. Catz?

22     A.   No.

23     Q.   And have you discussed the litigation

24  generally with Ms. Catz?

25        MR. LINDSTROM:  Vague and ambiguous.

1     Q.   Sure.

2     A.   So this was discussing the feelings of

3  people after the stock market crash.

4     Q.   Right.

5     A.   And so I'm responding to the -- how people

6  at Oracle felt after the stock market crash.  And --

7     Q.   Okay.

8     A.   Yeah, I think it's pretty accurate.  Yeah.

9     Q.   All right.  Did anybody at the company

10  make any remarks to you about your ability to

11  sell -- exercise and sell the options in January of

12  2001 prior to the stock declining in March?

13     A.   No.  Not that I recall.

14     Q.   And is it true that you used some of the

15  proceeds of your sales in January 2001 to buy a

16  large yacht?

17     A.   No.

18     Q.   No?  Small yacht?  Any yacht?

19     A.   No.  I believe I used the proceeds to pay

20  down my loan.

21     Q.   Which loan?

22     A.   I had a stock margin loan.

23        Well, let me -- let me -- let me correct

24  that.  I think some of the proceeds were used to pay

25  down the loan, and some of the proceeds went into

1        THE WITNESS:  Yeah, at a high level.

2        MR. SOLOMON:  Q.  And when have you --

3  tell me when you've had those conversations.

4     A.   I told her today that I was -- couldn't go

5  to a meeting because I was on my way to -- I was

6  going to be deposed today.

7     Q.   Okay.  Apart from -- apart from telling

8  her that you were going to be deposed today, have

9  you spoken with her about the substance of the

10  litigation ever?

11        MR. LINDSTROM:  When he says "ever," that

12  means ever.  So all the way back to the point in

13  time when it was first filed.

14        THE WITNESS:  Yes.

15        MR. SOLOMON:  Q.  Okay.  And how many

16  conversations have you had with her about the

17  substance of this litigation?

18     A.   I don't know.

19     Q.   Okay.  What -- describe the conversations

20  you've had with her about the substance of this

21  litigation.

22        MR. LINDSTROM:  All right.  Let me again

23  interpose an objection based on the attorney-client

24  privilege.

25        To the extent that you had conversations

1  with Ms. Catz in the presence of your law.      I
2  don't want you to divulge that.  If you had
3  independent conversations, for example, you and
4  Ms. Catz talking alone, he's entitled to know about
5  that.
6          THE WITNESS:  Could you repeat the
7  question?
8          MR. SOLOMON:  Yeah.
9      Q.  Please describe the conversations you've
10  had with her about the substance of this litigation.
11          MR. LINDSTROM:  Excluding any in the
12  presence of counsel.
13          THE WITNESS:  That -- again, I can give
14  you a high -- I can't tell you the content.  I can't
15  give you the word for word or you, know, the
16  contents.  But I can tell kind of the gist.  And I
17  can't tell you how many conversations there were,
18  but I can tell you the gist.
19          MR. SOLOMON:  Okay.
20          THE WITNESS:  That the litigation is
21  about -- is about a -- is about an earnings miss in
22  a quarter, and that the plaintiffs allege that
23  problems with the 11i suite caused the earnings
24  miss.  And as far as we can tell, that's just not
25  the case.

1          MR. SOLOMON:  Q.  And that's something
2  that you've said to Ms. Catz or something Ms. Catz
3  said to you?
4      A.  Going -- going back and forth.
5      Q.  Okay.  And your insider sales haven't
6  cropped up in your conversations?
7      A.  I'm not sure.  I mean, she -- I mean,
8  she's -- I'm not sure if we discussed that
9  specifically.
10      Q.  In your estimation, does Ms. Catz have a
11  good memory?
12      A.  Yes.
13      Q.  You didn't discuss your sales of stock in
14  January 2001 with Ms. Catz prior to engaging in the
15  sales, did you?
16          MR. LINDSTROM:  So we're now -- we're not
17  talking about conversations at that time?  Not since
18  the litigation?
19          THE WITNESS:  In 2001, I don't recall.
20          MR. SOLOMON:  Okay.  I'll have marked as
21  the next exhibit a Forbes magazine article dated
22  August 14, 2006.
23          THE WITNESS:  Mr. Solomon, are we going to
24  use this transcription document again?
25          MR. SOLOMON:  Yes, we are.

1          THE WITNESS:  The others?
2          MR. SOLOMON:  Probably not.
3          THE WITNESS:  Okay.
4          (Whereupon, Deposition Exhibit 146
5          was marked for identification.)
6          MR. SOLOMON:  Q.  Did you read this
7  article, Mr. Ellison, around the time it was
8  published?
9      A.  I think I did.
10      Q.  And looking at what is page 87 -- excuse
11  me.  I'm mistaken.  I may be wrong about that.
12      A.  Page 86, an unnumbered page, then page 91.
13      Q.  Right.  So if you go past 86 to the next
14  page which has, "Interesting Conflicts" in a box, do
15  you see that?
16      A.  Yes.  It's difficult to read, but yes.
17      Q.  I'm looking at the paragraph -- the last
18  paragraph in the body of that.
19          MR. LINDSTROM:  In the body of the box or
20  the article?
21          MR. SOLOMON:  In the body of the article.
22      Q.  And it says, "By the time Lane and Bloom
23  had quit in 2000 Safra Catz had taken control.  A
24  dealmaker at the brokerage Donaldson, Lufkin &
25  Jenrette, she had covered the software industry

1  since 1986 and was a close friend of Ellison.  He
2  was enchanted by her intellect," and then in
3  parentheses, "(Larry likes to say she graduated in
4  the top of her class at Harvard Law)," close parens,
5  "and 13 years later he brought her to Oracle."
6          Do you see that?
7      A.  I do.
8      Q.  Now, did you used to -- did you like to
9  say that Ms. Catz graduated top of her class at
10  Harvard Law?
11      A.  I don't recall ever saying that.
12      Q.  So do you have any idea why that's said
13  here?
14          MR. LINDSTROM:  No foundation.  Calls for
15  speculation.
16          THE WITNESS:  I think she went to Harvard,
17  but -- Harvard Law, but I don't think I ever said
18  she graduated top of her class.
19          MR. SOLOMON:  Q.  And why do you think she
20  went to Harvard?
21      A.  I think she said she went to Harvard.
22      Q.  Do you know she never graduated from
23  Harvard?  Do you know that?
24      A.  No.
25      Q.  Is this the first time you've heard that?

1  A.   No.  I think -- I think I knew       She
2  graduated from Penn?
3  Q.   She did.
4  A.   Yeah.
5  MR. LINDSTROM:  That's what she testified
6  to.
7  THE WITNESS:  Yeah.
8  MR. LINDSTROM:  Also --
9  MR. SOLOMON:  Q.  Are you aware that all
10  over the web it appears that she graduated from
11  Harvard?
12  MR. LINDSTROM:  Assumes facts.  Calls for
13  a conclusion.  Argumentative.
14  THE WITNESS:  No.
15  MR. SOLOMON:  Q.  Are you aware that alone
16  among the board of directors of Oracle, Safra Catz
17  doesn't list her education?
18  MR. LINDSTROM:  Assumes facts.
19  THE WITNESS:  Do I list mine?  I
20  don't know --
21  MR. SOLOMON:  Q.  You're smiling.  I'm
22  smiling --
23  A.   No, I don't know if I -- I don't know if I
24  list mine.  I don't think I list my education, and
25  I'm on the board.

1  Q.   I'm talking about Safra Catz.
2  MR. LINDSTROM:  But I think you said
3  "alone on the board" --
4  THE WITNESS:  You said "alone" --
5  MR. SOLOMON:  Oh, I'm sorry.
6  THE WITNESS:  You said alone amongst the
7  members of the board of directors, she doesn't list
8  her education.  And I just said I don't think I list
9  my education.
10  MR. LINDSTROM:  So, Mark, could you repose
11  the question?
12  MR. SOLOMON:  Q.  So other than you, then,
13  alone among the board of directors.  Let's get this
14  as an exhibit.  Let's mark this, and then we'll have
15  some context.
16  Actually, let me be more accurate.  Alone
17  among the directors of Oracle Education Foundation.
18  THE WITNESS:  Okay.
19  MR. SOLOMON:  Q.  Okay?
20  A.   Okay.
21  MR. SOLOMON:  Let's mark these pages
22  describing the board of directors of Oracle
23  Education Foundation as the next exhibit.
24  (Whereupon, Deposition Exhibit 147
25  was marked for identification.)

1  MR.    JN:  Q.  We don't have to dwell
2  on this very long, Mr. Ellison.  I just want to
3  know, do you know why she doesn't list her
4  education?
5  A.   No.
6  MR. SOLOMON:  I'll have marked as the --
7  actually, this is already Exhibit 10 to the
8  deposition of Ms. Catz, so I'll just pass it
9  straight over to you, Mr. Ellison.
10  THE WITNESS:  Okay.  Thank you.
11  MR. LINDSTROM:  Is this 148?
12  THE REPORTER:  Previously marked.
13  MR. SOLOMON:  Exhibit 10.
14  MR. LINDSTROM:  Thank you, Counsel.
15  MR. SOLOMON:  Q.  I just wanted you to
16  look at the second page into the document.
17  A.   Including the cover page?
18  Q.   So the cover page, I want you to look at
19  the next page which just says, "Catz's Background."
20  I just want to point out to you that there,
21  apparently, the special litigation committee was led
22  to believe somehow that she graduated from Harvard
23  Law School with a JD.
24  Do you see that?
25  MR. LINDSTROM:  Is there a question -- I'm

1  going to object to the preface of the question as
2  being argumentative, lacking foundation.
3  Do you see that?  You may respond.
4  THE WITNESS:  Do I see it?
5  MR. SOLOMON:  Q.  Yeah.
6  A.   I see it.
7  Q.   And you don't know what would have led the
8  special litigation committee to believe she went to
9  Harvard Law School, do you?
10  A.   I think she did go to Harvard Law School.
11  Q.   Sorry, that she graduated from Harvard Law
12  School.
13  A.   No.
14  MR. SOLOMON:  Let's go off the record for
15  a couple minutes.
16  THE VIDEOGRAPHER:  Off the record.  The
17  time is 2:07 p.m.
18  (Whereupon, a recess was taken.)
19  THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 2:08 p.m.
21  MR. SOLOMON:  I've marked as the next
22  exhibit -- sorry -- a document describing Ms. Catz
23  and her education.
24  (Whereupon, Deposition Exhibit 148
25  was marked for identification.)

1        MR. SOLOMON:  Q.  If you look at    .hird

2  page of the exhibit, Mr. Ellison, you'll see that

3  there's a reference to Ms. Catz having a BS from

4  Wharton School and a JD from Harvard Law School.

5        Do you see that?

6      A.  I do.

7      Q.  You don't know how that got there?

8      A.  No.

9        MR. LINDSTROM:  No foundation.

10        THE WITNESS:  Are we done with --

11        MR. SOLOMON:  Yes.  Thank you.

12        We'll have marked as the next exhibit a

13  document that contains a correction concerning

14  Ms. Catz.

15        (Whereupon, Deposition Exhibit 149

16        was marked for identification.)

17        MR. SOLOMON:  Q.  If you go to the second

18  page, Mr. Ellison, you'll see halfway down that page

19  it says, "Our cover story on Oracle," and then it

20  references the article, "Chief Executive Larry

21  Ellison," in quotes, "'Irreplaceable',", in parens,

22  "(August 14), repeated an Ellison claim that Oracle

23  co-president Safra Catz graduated from the Harvard

24  Law School; her law degree is from the University of

25  Pennsylvania."

---

1        Do you see that?

2      A.  I do.

3      Q.  But, again, it's your testimony you've

4  never claimed that she went to Harvard Law School;

5  is that right?

6        THE WITNESS:  No --

7        MR. LINDSTROM:  Assumes facts.

8  Mischaracterizes his testimony.

9        MR. SOLOMON:  Q.  Sorry.  Start again.

10        It's your testimony that you've never

11  claimed that Ms. Catz graduated top in her class at

12  Harvard Law School?

13      A.  I've never -- I've never said that.

14      Q.  And have you, in the past, said that she

15  graduated from Harvard Law School?

16      A.  I think at one point I thought she had

17  graduated from Harvard Law School.

18        MR. SOLOMON:  Okay.  And we'll have marked

19  as the next exhibit an article entitled, "Oracle's

20  Catz, Ellison Heir, Gets Credit for Growth

21  Strategy."

22        (Whereupon, Deposition Exhibit 150

23        was marked for identification.)

24        MR. SOLOMON:  Q.  I'm looking at the third

25  page of this document.  You'll see halfway down on

---

1  that third pag_   .ys, "Catz received her

2  bachelor's degree in business from the Wharton

3  School of the University of Pennsylvania in 1983,

4  earning her law degree from Harvard Law School in

5  1986."

6        Do you see that?

7      A.  I do.

8      Q.  You didn't provide that information for

9  this article, did you?

10      A.  No.  I'm not sure -- what is this article?

11  I can't even tell where it came from.

12      Q.  If you go to the last page, you'll see

13  that there's a reference to the reporter being

14  Rochelle Garner in San Francisco.

15        Do you know who Rochelle Garner is?

16      A.  I don't.  Do you know --

17      Q.  Have you ever heard of the San Jose

18  Mercury News?

19      A.  Of course.  Is this a San Jose Mercury

20  News article?

21      Q.  I believe it is.

22      A.  I don't see where it ...

23      Q.  We'll double-check later on, Mr. Ellison,

24  but I believe this is an article that was published

25  in December of last year in the San Jose Mercury

---

1  News.  And I'll let you know if I'm -- when I find

2  another version of this, whether that's right or

3  wrong.

4        But in any event, have you ever had a

5  discussion with Ms. Catz about her being reported to

6  have earned her law degree from Harvard Law School?

7      A.  No.  I don't think she ever told me --

8        MR. LINDSTROM:  The answer is yes or no.

9        THE WITNESS:  Sorry.

10        MR. LINDSTROM:  And you've answered.

11        MR. SOLOMON:  Q.  Do you know why there's

12  no correction -- there's been no correction of this

13  information?

14        MR. LINDSTROM:  No foundation.

15        THE WITNESS:  No.

16        MR. SOLOMON:  Q.  Are you aware that every

17  document that discusses your exercise of your

18  options in January 2001, to the extent -- prior to

19  your exercising those options, to the extent there

20  was -- there were ever any dates projected for when

21  you would be exercising, they were April 2001 or

22  thereafter?  Are you aware of that?

23        MR. LINDSTROM:  Assumes facts.

24  Mischaracterizes the documents.

25        THE WITNESS:  I'm not -- I'm not sure I

1    understood what you just said.

2        MR. SOLOMON:  Q.  Okay.  Prior to your

3    exercising your options in January 2001, there are

4    some e-mails that I'll share with you in a few

5    minutes involving Deborah Lange.

6        Do you know who Deborah Lange is?

7    A.  Yes.

8        Q.  And some of those discuss when you would

9    be exercising your options.  Are you aware of that?

10       MR. LINDSTROM:  Assumes facts.

11       THE WITNESS:  No.

12       MR. SOLOMON:  Q.  And there's never any

13   mention of you exercising in January of 2001; only

14   of exercising in April or thereafter.  Are you aware

15   of that?

16       MR. LINDSTROM:  Assumes facts.

17   Mischaracterizes the document.  Documents.

18       THE WITNESS:  No.

19       MR. SOLOMON:  Q.  After we filed our

20   lawsuit in March of 2001, did you ever have any

21   discussion with anybody at Oracle concerning

22   Ms. Lange --

23   A.  Now I know what you're talking about --

24       Q.  -- stating that --

25       Okay.  What am I talking about?

1    Mr. Symonds at.    .is testimony?

2    A.  I didn't even know he had been deposed

3    until now -- no.

4        Q.  Have you referred in the past to "software

5    swaps," transactions described as "software swaps"?

6        MR. LINDSTROM:  In those exact words?

7        MR. SOLOMON:  (Nods head.)

8        THE WITNESS:  I don't think I've ever said

9    "software swaps."  I know what a swap is, a swap

10   transaction.  I don't think I've ever said "software

11   swaps."

12       MR. SOLOMON:  Q.  Okay.  And what is a

13   software swap?

14       MR. LINDSTROM:  What is a software --

15       MR. SOLOMON:  Sorry.  You're right.

16       Q.  What is a swap transaction?

17       A.  It would be where -- in case of a software

18   swap, it would be where -- hypothetically, where we

19   supplied our database technology to Microsoft in

20   exchange for Microsoft Office, and we -- kind of

21   simultaneously, the transactions have passed in the

22   air.

23       Q.  Okay.  Does that raise any concern in your

24   mind as to the propriety of that sort of

25   transaction?.

1        MR. LINDSTROM:  Why don't you let him

2    finish the question.

3        MR. SOLOMON:  Q.  I did.  What am I

4    talking about?

5        MR. LINDSTROM:  Calls for speculation.

6    We'll see how good you can read what's in his head.

7        THE WITNESS:  I think -- I think I've

8    heard somewhere that Deborah Lange wrote something

9    about the tax treatment of my options and the ideal

10   time for me to exercise as far as Oracle was

11   concerned.

12       MR. SOLOMON:  Okay.

13       MR. LINDSTROM:  So, Mark, was he right?

14   Was that what you were thinking?

15       MR. SOLOMON:  Somewhat.  Absolutely.

16       Q.  I was also thinking that when we discussed

17   this with your financial adviser, Mr. Simon, he got

18   very upset when I showed him documents that suggest

19   that you were planning on exercising in April.

20       Are you aware of that?

21       MR. LINDSTROM:  Assumes facts.

22   Mischaracterizes his testimony.

23       THE WITNESS:  That he got very upset?  No,

24   I don't know anything about that.

25       MR. SOLOMON:  Q.  Have you spoken to

1        MR. LINDSTROM:  The hypothetical he

2    described?

3        MR. SOLOMON:  Yeah.

4        THE WITNESS:  It depends -- it's all

5    contextual.  So if Microsoft had a real need for the

6    database, a legitimate need for the database, and

7    they were going to buy it anyway, and we had a

8    legitimate need for Microsoft Office and we were

9    going to buy it anyway, and those needs had been

10   well established, then the fact that we were

11   buying -- you know, kind of simultaneously buying

12   something of theirs and they were simultaneously

13   buying something of ours is okay in terms of you can

14   actually record the revenue.  It was a legitimate

15   sale of technology from us to Microsoft and from

16   Microsoft to us.

17       So as long as it is, if you will,

18   coincidental with their occurring at the same time,

19   then it's legitimate and both companies can record

20   the transaction as revenue, as legitimate sales and

21   legitimate revenue.

22       If they were contrived and there's no

23   legitimate need, then the transaction should not be

24   recorded as revenue.

25       MR. SOLOMON:  Q.  Okay.  And does that --

1   where you're talking about contrived, dou    .c
2   accurately describe the deal that you entered into
3   with HP at the end of 2001?
4           MR. LINDSTROM:  Was it contrived?
5           THE WITNESS:  No.  It was absolutely not
6   contrived.  It was a legitimate need of HP's and a
7   legitimate need of ours.
8           MR. SOLOMON:  Q.  And do you recall
9   signing a document late on November 30th, 2000 with
10  respect to the HP deal?
11      A.  Not specifically.
12      Q.  Do you recall that it was unclear until
13  the last minute whether or not Oracle would meet
14  guidance for the second fiscal quarter of 2001?
15          MR. LINDSTROM:  Assumes facts.
16          THE WITNESS:  Q2 2001?
17          MR. SOLOMON:  Q.  Q2 -- which is --
18      A.  Fiscal -- yes.  November of 2000.  I don't
19  specifically recall.
20      Q.  Did you discuss the second fiscal quarter
21  of 2001 with Mr. Symonds at all when he was
22  interviewing you for the book?
23      A.  I don't recall.
24      Q.  Back to 142.
25          I'm looking at page 1529302.

1       A.  Last three numbers again?
2       Q.  -302?
3       A.  -302.
4       Q.  And then I'm looking at the paragraph
5   beginning exactly halfway down the page.  And I'm
6   looking at, in that paragraph, where it says, "This
7   is hard stuff."
8           If you just read that, I'll ask you a
9   couple of questions about it.
10      A.  -302?  Page -302?
11     .Q.  Yes.
12          While you're reading it, I'll read to you.
13          "This is hard stuff, you know, a lot of
14  smart people" --
15      A.  Slow down.  I can't find, "This is hard
16  stuff."
17          MR. LINDSTROM:  I can't either.
18          MR. SOLOMON:  -302 at the bottom.
19          THE WITNESS:  -302.  I can't find it.
20          MR. SOLOMON:  There's handwriting on the
21  left-hand side.
22          MR. LINDSTROM:  Why don't you --
23          MR. SOLOMON:  Wrong document.
24          THE WITNESS:  Oh, 142.  Sorry.  Are we
25  done with this one?

1           MR.  .ON:  Yes.
2           THE WITNESS:  Sorry.  Accumulating too
3   many of these things.
4           Okay.  -302.
5           MR. LINDSTROM:  Why don't you find that
6   page and then take a moment to familiarize yourself
7   with the passage that counsel's directed your
8   attention to.
9           THE WITNESS:  Okay.  There are a lot of
10  transcription errors in this.  It's hard to read.
11          MR. SOLOMON:  Too bad we don't have the
12  audio.
13          MR. LINDSTROM:  Is that a question?
14          MR. SOLOMON:  Q.  Don't you agree,
15  Mr. Ellison?
16      A.  I do.
17      Q.  Halfway -- well, the last sentence of the
18  paragraph that I'm focusing on says, "There was no
19  reason I should have believed we could do that in
20  the timeframe but I thought we could other than
21  denial."
22          Do you see that?
23      A.  Okay, the last sentence?
24      Q.  Yeah.
25      A.  I do.  But give me a second to read the

1   whole thing.
2           Okay.
3       Q.  Okay.  So that last sentence, did you say
4   that?
5       A.  I think so.
6       Q.  Okay.  And you were in denial in terms of
7   the E-Business Suite and how long it would take; is
8   that right?
9       A.  No.  If you read the entire paragraph, I
10  was more optimistic about us getting it done in a
11  certain timeframe than I should have been.
12  Experience -- experience tells us in the software
13  business that big projects are enormously complex
14  and they often slip.  I mean, we've had big projects
15  slip in the past.  Microsoft has huge projects that
16  slip.  Still, we put together dates that are
17  aggressive and goals that are aggressive.  It's not
18  uncommon to miss those dates.
19      Q.  Do you stand by that sentence where you
20  say, "there was no reason I should have believed we
21  could do that in the timeframe"?
22          MR. LINDSTROM:  The entire sentence,
23  right?
24          THE WITNESS:  The -- I still manage
25  engineering today at Oracle, and we still have

1  aggressive delivery dates. And I still th.    s a
2  good management technique to have aggressive
3  delivery dates.
4          MR. SOLOMON:  Okay.  Let's take a -- let's
5  take a ten-minute break, if that's okay.
6          THE VIDEOGRAPHER:  We are going off the
7  record.  Here marks the end of Videotape No. 1,
8  Volume 3, in the deposition of Lawrence Ellison.  We
9  are going off the record.  The time is 2:28 p.m.
10         (Whereupon, a recess was taken.)
11         THE VIDEOGRAPHER:  Good afternoon.  We are
12  back on the record.  Here marks the beginning of
13  Videotape No. 2, Volume 3, in the deposition of
14  Larry Ellison.  The time is 2:42 p.m.
15         MR. SOLOMON:  Q.  Mr. Ellison, have you
16  heard it remarked that you have a problem with
17  tenses?
18     A.   Verb tenses?
19     Q.   Tenses.
20         MR. LINDSTROM:  Verb tenses.
21         THE WITNESS:  Have I heard that remark?  I
22  think I made that remark.
23         MR. SOLOMON:  Q.  Okay.  And who did you
24  make that remark to?
25     A.   I'm not sure exactly.

1  do it, but I c       .ink you can ask that question.
2  You have limited time with this witness.  And, you
3  know, I suggest you move on to things that are
4  properly the subject of discovery.
5          MR. SOLOMON:  So just -- I will withdraw
6  the question for the second, but let's just finish
7  this off.
8      Q.   So after this deposition, you would be
9  willing to enter into an agreement whereby if
10  questions were agreed, you would submit to a lie
11  detector test; is that right?
12         MR. LINDSTROM:  Asked and answered.  It's
13  argumentative.  It's irrelevant.  Improper
14  discovery.  He's told you what he would do, and I'm
15  going to instruct him not to answer any further.
16         MR. SOLOMON:  Q.  And you're going to
17  accept the instruction, I take it?
18     A.   (Nods head.)
19         Yes.
20         MR. LINDSTROM:  Thank you.
21         MR. SOLOMON:  Q.  That's yes, you --
22     A.   Yes, I accept the instruction.
23     Q.   Got you.
24         Let's have marked as the next exhibit
25  another interview transcript with the Bates range

1      Q.   Okay.  And why did you say that?
2      A.   I think there was some point in my career
3  where I did not make it plain whether a product was
4  finished or about to be finished.
5      Q.   Okay.  Do you still have a problem with
6  tenses?
7      A.   No.
8      Q.   When did you stop having a problem with
9  tenses?
10     A.   Long time ago.
11     Q.   Would you be willing to submit to a lie
12  detector test for the purposes of this litigation?
13         MR. LINDSTROM:  I'm going to object to
14  that question as being argumentative and beyond the
15  requirements of the Federal Rules of Civil
16  Procedure, and I'm going to instruct him not to
17  respond to that question, unless you can give me
18  some justification for why you have authority to
19  pose that kind of question.
20         MR. SOLOMON:  I think --
21     Q.   Did you respond already by nodding your
22  head yes?
23     A.   Yes.
24     Q.   And --
25         MR. LINDSTROM:  Well, he may be willing to

1  1529157 to 1529180.
2          (Whereupon, Deposition Exhibit 151
3          was marked for identification.)
4          THE WITNESS:  Are we finished with this
5  transcript?
6          MR. SOLOMON:  Yes, we are.  We're finished
7  with it, yes.
8      Q.   And this is an interview transcript.  It's
9  dated January 18, 2002, and the control range is
10  1529157 -- I may have said this already --
11  through -180.
12         You'll see on the first page in the second
13  paragraph a reference to the phrase "brand damage."
14         Do you see that?
15     A.   I do.
16     Q.   And that's a phrase you say you invented;
17  is that right?
18     A.   Can I have a second just to read the
19  context?
20         MR. LINDSTROM:  While Mr. Ellison is
21  reviewing the document, is this 151 for
22  identification?
23         THE REPORTER:  (Nods head.)
24         MR. LINDSTROM:  Thank you.
25         THE WITNESS:  Are we talking about the

1  very first page?

2       MR. SOLOMON:  Yes.

3       THE WITNESS:  Because this is reverse --

4  this is Mr. Symonds in regular type and me in

5  boldface?

6       MR. SOLOMON:  Q.  Appears to be.

7       A.  Just reverse of the other one.

8       Okay.  Go ahead.

9       Q.  Okay.  You coined the phrase "brand

10  damage"?

11      A.  I don't think I coined the phrase "brand

12  damage."  I used the phrase "brand damage" in

13  regards to some of the problems some customers were

14  having with release 11i.  I don't think it had ever

15  been used in Oracle before.

16      Q.  Then if you go to the third page of the

17  document, 1529159, just looking in the middle there

18  at what appears to be your language, "So you have

19  delivered a product that doesn't work very well and

20  you can't support very well, so all I care about is

21  service requests and that's all I measure so that

22  that was a key point in saying by the way service

23  requests must go down 5 percent a month."

24      Do you see that?

25      A.  I do.

1      11i -- the wa,    easure product quality was

2  measure service requests.  And then the said

3  targets, to reduce -- constantly reduce those number

4  of service requests coming in.

5      It used to be -- it used to be that

6  engineering would measure bugs as their measure of

7  quality, and reducing bugs was showing improved

8  quality.  The support organization would measure

9  service requests.  And they weren't synchronized.

10  They didn't agree what the right measures were.

11      So I was pushing the notion of let's all

12  agree it's just service requests and just get them

13  down.

14      Q.  Was this after March 2001 that you

15  developed this view, or was it something you already

16  held, a view you already held as of March 2001?

17      A.  I'm not sure exactly when I decided we

18  should have a single measure of the quality.

19      Q.  Okay.  If you go to pages 1529167

20  and -168 -- in fact, I'm looking at -168.

21      A.  You're on -168?

22      Q.  Yeah.  Sorry.

23      And I'm just looking at a couple of the

24  lines on that page.  A third of the way down, "So

25  when did you first realize that it wasn't really

1      Q.  Are you talking about 11i there?

2      A.  Can I just have a second to look at this?

3      Q.  Sure.

4      A.  No.  I think if you look at the previous

5  paragraph, I think what I'm talking about is the

6  general notion of what you should measure when

7  you're trying to ascertain product quality.

8      And the engine and -- what I had become

9  convinced of was that measuring bugs was a mistake.

10  The programmer says here's a bug.  Instead what you

11  want to measure is customer -- customers reporting

12  problems.  And there's a fundamental -- a

13  fundamental difference.

14      One bug might produce zero or very few

15  customer-reported problems.  There might be a

16  legitimate bug in their product, but either no one

17  cares or it doesn't occur.  One bug might cause very

18  serious problems that hundreds of customers might

19  then come up with service requests.

20      So the impact of that bug is much greater

21  if you measure service requests.  So counting bugs

22  simply was not a very good way of measuring product

23  quality.  The right way to measure product quality

24  was service requests.  And then I had set a goal --

25  and that was true of all of our products, not just

1  working very well?"

2      And your response appears to be, "Oh, I

3  knew there was a huge risk up front, so I kind of

4  walked into this.  I can't plead ignorance on this,

5  but it took much longer."

6      Do you see that?

7      A.  I do.  Can I have a moment to read around

8  it?  Because I'm not sure what this is about.

9      Q.  Yeah.

10      A.  Okay.  Now I know what it's about.

11      Q.  Okay.  And what is it about?

12      A.  It's about the most complicated component

13  of an ERP system or the application system, which is

14  the order management system.  And we had -- I had

15  made the decision -- it was run on the cusp, whether

16  we should put in a brand-new order management system

17  or kind of upgrade our existing system.

18      And I decided to completely replace the

19  order management system knowing it was an enormously

20  complicated piece of new code, the most complicated

21  piece of the whole system.

22      Q.  Just keep that in front of you for a

23  second.  I just want to touch on some other areas

24  and then come back to this.  I want to go back for a

25  second to Mr. Symonds and the issue of Softwar.

```
 1        Do you know what spoliation mean.
 2     A.   Yes.
 3     Q.   What's your understanding of spoliation?
 4     A.   It's documents that should have been
 5   preserved that weren't.
 6     Q.   Are you aware that spoliation has become
 7   an issue in this case?
 8     A.   I understand you've raised it as an issue,
 9   yes.
10     Q.   Okay.  And you're aware that the special
11   master magistrate in charge of discovery had
12   indicated this is an issue in this case?
13        MR. LINDSTROM:  I'm going to instruct you
14   not to divulge any communications you may have had
15   with your counsel.  In other words, as before, you
16   need to be answering these questions independent of
17   communications for your counsel.  So, for example,
18   if you've read an order or a transcript or something
19   where the special master made a statement of the
20   type that Mr. Solomon just mentioned, then fine.
21   But I don't want you telling him information that
22   may or may not have been given to you through your
23   lawyers.
24        THE WITNESS:  No.  Excuse me.  No.
25        MR. SOLOMON:  Q.  Okay.  I asked you last
```

Exhibit 3, pages 642-659, to the Coyle Declaration in Support of Defendants' Memorandum Regarding Plaintiffs' Motion to Compel Testimony and Determine the Applicability of the Fifth Amendment Right Against Self-Incrimination

**Remains Sealed** at this Time Per the Request of Counsel for Matthew Symonds

659

damages are in this litigation, the claimed damages?

      MR. LINDSTROM:  No foundation.  Calls for
speculation.  Oh, claimed damages.  I'm sorry.  I'll
withdraw that.

      Again, other than from counsel, do you
know what the claimed damages are?

      THE WITNESS:  I think so.

      MR. SOLOMON:  Q.  What do you think they
are?

      A.  The only number I remember is $2 billion.

      Q.  Right.

      And that's from the demand letter that
plaintiffs sent; is that right?

      MR. LINDSTROM:  I think you showed it to
him in a prior version of --

      MR. SOLOMON:  Yes.  Yes.  Right.

      Q.  Do you know that demand has been
withdrawn?  We've withdrawn that demand.  Are you
aware of that?

      A.  No.

      Q.  Do you know that your lawyers represented
to a court in Denmark in a deposition that was taken
there that the damages may reach $10 billion?
$10 billion?

      MR. LINDSTROM:  No foundation.  Same

Exhibit 3, pages 661-667, to the Coyle
Declaration in Support of Defendants'
Memorandum Regarding Plaintiffs' Motion to
Compel Testimony and Determine the
Applicability of the Fifth Amendment Right
Against Self-Incrimination

**Remains Sealed** at this Time Per the Request of
Counsel for Matthew Symonds

667

1    industry, the pace of development means that events

2    just relatively recently may actually be irrelevant;

3    is that -- is that fair?

4         MR. LINDSTROM:  Vague and ambiguous.

5         THE WITNESS:  Recent events can be

6    irrelevant?

7         MR. SOLOMON:  Q.  Let me give you some

8    context, because I'm not doing very well there.

9    I'll find a document.

10         A.   Okay.

11         Q.   We'll come back to it.  I'm not going to

12    waste time.  Excuse me a second.

13         Okay.  I'll show you what was previously

14    marked Exhibit 57 in your deposition, Mr. Ellison.

15    And I noticed we haven't actually got an answer to a

16    question that I asked about that document.  So if

17    you could please take a look at it.

18         MR. LINDSTROM:  So are you saying,

19    Counsel, that when you posed the question last time,

20    the transcript doesn't reflect an answer?

21         MR. SOLOMON:  Yeah.  Nothing improper.  I

22    just want to get a -- an answer to a question that I

23    posed but somehow got lost.

24         MR. LINDSTROM:  That's fine.  I just

25    wanted to understand the context.

1      MR. SOLOMON:  Sure.

2      Q.  Okay.  As I say, it was marked as

3  Exhibit 57 in your last session.  And I asked you,

4  at page --

5      A.  Okay.

6      Q.  I asked you if you recognized it, and your

7  answer was -- well, I'll read the question and

8  answer.  Question.

9      "And do you remember seeing it around

10  January 30th of 2000 -- excuse me --

11  February 1st of 2001?"

12      Your answer was,

13      "Again, not specifically, but I'm very

14  familiar with the issues involved."

15      Then I ask,

16      "Okay.  And one of the issues is a

17  downward revision of the Q3 forecast

18  revision; is that right?"

19      And you answer,

20      "Yeah.  We had put in a custom system,

21  OTA."

22      And then I say, question,

23      "I just want to know if that was one

24  of the issues that you remembered, downward

25  revision."

---

1      THE WITNESS:  I think in the overall

2  scheme of Oracle, the North American sales education

3  is a relatively small number.

4      MR. SOLOMON:  Q.  I'm not arguing about --

5      A.  No.  I understand that.  I understand

6  that.  All I'm saying is I'm not sure around this

7  time I was paying a lot of attention to this.

8      Q.  Okay.

9      A.  That's the only --

10      MR. SOLOMON:  Okay.  Let's go off the

11  record for a couple of minutes.

12      THE VIDEOGRAPHER:  Off the record.  The

13  time is 3:33 p.m.

14      (Whereupon, a recess was taken.)

15      THE VIDEOGRAPHER:  We are back on the

16  record.  The time is the 2:36 p.m. -- I'm sorry,

17  make that 3:36 p.m.

18      MR. SOLOMON:  We'll have marked as the

19  next exhibit excerpts from the book Softwar.

20      (Whereupon, Deposition Exhibit 152

21      was marked for identification.)

22      MR. SOLOMON:  Q.  If you go to page 226,

*Line numbers as shown: 1 "that right?"; 2 MR. LINDSTROM: No foundation.; 3 Mischaracterizes his testimony.*

---

1      And somehow we didn't get that answered.

2  So my question is, is that one of the issues you

3  remember, downward revision?

4      A.  Do I remember because of the order -- that

5  the education order entry -- this is about our

6  education business.

7      Q.  Sure.

8      A.  And we had put a new order entry system

9  for people -- basically, a registration system for

10  taking classes.  One such a custom -- a

11  custom-made system called OTA.  And because it was a

12  new system, they were having -- they were having

13  difficulties registering for classes, and,

14  therefore, in North America they were -- they had

15  lowered the forecast.

16      Q.  Okay.  And, again, my question was, and

17  that's -- all I want to know is yes or no:  Do you

18  remember that downward revision?

19      A.  Do I remember it specifically at the time

20  as opposed to refreshed by this --

21      MR. SOLOMON:  Yes.  Correct.

22      THE WITNESS:  I don't remember it

23  specifically.

24      MR. SOLOMON:  Q.  Okay.  But you were

25  aware of it around the time of this document; is

---

1      I'm looking at the paragraph that starts the next

2  question.  And I'll just read it into the record.

3      It reads, "The next question turns out to

4  be trickier.  The air force's Ron Orr wants to know,

5  reasonably enough, where Oracle has an example of

6  11i up and running that has stood the test of time.

7  Ellison points out that the suite has been out for

8  only a year but there are a few customers had

9  adopted the 'no-modifications' model early on out of

10  poverty.  One such is Techtronics in Oregon - five

11  years ago its business 'fell off a cliff,' so it

12  puts in global systems because that was the cheapest

13  way to go.  It's an odd example to give.  Sensing

14  it, Oracle's Mark Jarvis adds that Cisco is a

15  well-known example using Oracle financials to

16  achieve a daily 'virtual close.'  Somebody points

17  out that we didn't help Cisco from making a hash of

18  its forecasting."

19      Do you see that?

20      A.  Yes.

21      Q.  Is it true that after we filed the lawsuit

22  in March 2001, that you were unable to identify any

23  companies, other than Techtronics and Cisco here, as

24  being customers that have had 11i up and running

25  that stood the test of time?

1      MR. LINDSTROM:  Through what po

2  time?  So after the filing of the lawsuit through to

3  today?

4      MR. SOLOMON:  Q.  When -- when you had the

5  conversation with Mr. Symonds.

6    A.  Again, it takes a good deal of time to

7  implement an ERP system.

8    Q.  Yeah.  But I'm just asking, is it true

9  that you could only identify, or there was only an

10  attempt to identify those two companies?

11      MR. LINDSTROM:  It's vague and ambiguous

12  as to the timeframe at which you're asking him,

13  whether it's the time of the quote to Ron -- the

14  purported quote to Ron Orr or whether it was the

15  time of the statement.

16      MR. SOLOMON:  Okay.  The time of the

17  purported quote to Ron Orr.

18      THE WITNESS:  I don't recall.  You're

19  asking me at the time Ron Orr asked me the question,

20  was I able, don't I have in my memory a number of

21  companies that were running 11i that have stood the

22  test of time.

23      MR. SOLOMON:  Q.  Right.

24    A.  And I think it was very -- since the

25  product had only been out for a short period of

673

1  time, it takes awhile to implement the product.  How

2  long could it have been running to have stood the

3  test of time.

4      So the question, it was -- there weren't a

5  lot of customers -- am I interpreting that

6  correctly -- correctly, Mr. Solomon?

7    Q.  Yeah.

8    A.  Okay.  So -- but, again, I don't know how

9  many companies at that point were running -- were

10  live on 11i.

11    Q.  All right.  The reason I'm asking is, of

12  course, we don't have all the tapes and transcripts

13  of the audio.  So I'm sort of trying to dig in to

14  see whether you agree with some more of the

15  statements that are made in Softwar.

16      Now, you make a footnote, and I want to

17  ask you about your footnotes.  How did you write --

18  what was the process by which you wrote these

19  footnotes?

20      MR. LINDSTROM:  Asked and answered.

21      MR. SOLOMON:  Q.  Did you type them into a

22  computer?

23    A.  Yes.  Yes.

24    Q.  Which computer?

25    A.  My computer.

674

1    Q.  Oka,    .d where is that computer now?

2    A.  2001, I have no idea.

3    Q.  So it's gone?

4    A.  I --

5      MR. LINDSTROM:  Assumes facts.  No

6  foundation.  He's told you he has no idea.

7      THE WITNESS:  I have no idea.

8      MR. LINDSTROM:  Doesn't mean it's gone.

9      MR. SOLOMON:  Q.  Have you a copy of your

10  footnotes, other than the printed version in the

11  book?

12    A.  Not that I know of.

13    Q.  And it didn't occur to you as you were

14  writing that you ought to preserve your writings

15  because of this litigation?

16      MR. LINDSTROM:  Assumes facts.

17      THE WITNESS:  Did not occur to me.

18      MR. SOLOMON:  Marked as the next exhibit,

19  another excerpt from the book Softwar.

20      (Whereupon, Deposition Exhibit 153

21      was marked for identification.)

22      THE WITNESS:  Are we done with this one?

23      MR. SOLOMON:  Yes.  Thank you.

24      THE WITNESS:  Okay.

25      MR. SOLOMON:  Q.  If you go to page 248 --

675

1  sorry.  249.  I'm looking in the -- at the fifth or

2  sixth line where it says, "It's difficult to sell

3  without customer references."

4      Do you see that?

5    A.  Yes.

6    Q.  Okay.  So do you recall that as of

7  March 2001, Oracle had great difficulty getting

8  customers to act as references for 11i?

9      MR. LINDSTROM:  As of March 2001?

10      MR. SOLOMON:  Correct.

11      THE WITNESS:  Can I have -- can I have a

12  second to look at this?

13      MR. SOLOMON:  Sure.

14    Q.  Again, without -- I don't need an

15  explanation.  I just want to know if you recall

16  whether or not, as of March 2001, Oracle had great

17  difficulty getting customers to act as references

18  for 11i.

19    A.  I don't recall.

20    Q.  We talked a little bit last time I think

21  about the practice of not servicing clients'

22  software unless they would agree to act as

23  references.

24      Do you recall --

25    A.  No --

676

1    MR. LINDSTROM:  Assumes facts.

2  Mischaracterizes his testimony.

3    MR. SOLOMON:  Q.  Do you recall that

4  testimony?

5    A.  It's just not true.  We have never refused

6  to service clients unless they acted as references.

7    Q.  Okay.  And you've never seen any documents

8  then that suggested that was your practice?

9    A.  That we would refuse service unless they'd

10  act as a reference?

11    Q.  Yes.

12    A.  No.

13    MR. SOLOMON:  Okay.  Let's go off the

14  record for a while.

15    THE VIDEOGRAPHER:  Off the record.  The

16  time is 3:46 p.m.

17    (Whereupon, a recess was taken.)

18    THE VIDEOGRAPHER:  We are back on the

19  record.  The time is 4:01 p.m.

20    MR. SOLOMON:  Q.  Yes.  I've marked as the

21  next exhibit a document produced by the defendants

22  with the control numbers 1056850 and -51.

23    (Whereupon, Deposition Exhibit 154

24    was marked for identification.)

25    MR. SOLOMON:  Q.  Let me know, when you've

677

1  had a chance to familiarize yourself with this, if

2  you recognize this document.

3    A.  I don't.  If you'd just give me a moment.

4  Excuse me.

5    Q.  Sure.

6    A.  Okay.

7    Q.  Okay?

8    A.  Yes.

9    Q.  Do you recognize this?

10    A.  I do not.

11    Q.  Do you recognize the name InterLogix,

12  Inc.?

13    A.  I do not.

14    Q.  It says, "Approved by LJE."

15    That would be you, correct?

16    A.  Yes.

17    Q.  And I'm looking at the bottom of the page.

18  Well, first of all, excuse me.  Let's go to halfway

19  down the page where the sentence begins, "The

20  project."

21    It says, "The project has lost the

22  confidence of the InterLogix Steering Committee and

23  their CEO, Brian McCarthy."

24    Do you know Brian McCarthy?

25    A.  I don't.

678

1    Q.  "Mr     thy told me his company lost 2.4

2  million in cost overruns associated with excessive

3  bug fixes, poorly documented upgrade scripts and

4  scripts that didn't take into consideration

5  integration with other modules.  Mr. McCarthy also

6  mentioned his firm has had to implement costly

7  interim solutions while his business waits for the

8  upgrades to be fully tested and implemented."

9    Do you see that?

10    A.  I do.

11    Q.  And then skipping a few lines, it says,

12  "Note that InterLogix has acquired $2.3 million in

13  Oracle product, $1.3 [sic] million in Oracle

14  services in FY01."

15    A.  "1.1 million in Oracle services."

16    Q.  Yes.

17    "They are a great Oracle customer that is

18  living through an extremely burdensome upgrade that

19  is affecting employee moral [sic] and the firm's

20  financial health."

21    Do you see that?

22    A.  I do.

23    Q.  Then the recommendation says, "Approve

24  with George's requirement that they sign an [sic]

25  release and agree to be a reference.  Dorian is

679

1  involved."

2    Do you see that?

3    A.  Yes.

4    Q.  Do you see that?

5    A.  I do.

6    Q.  Dorian is Dorian Daley, who is here today?

7    A.  I believe so, yes.

8    Q.  Doesn't this represent Oracle bribing a

9  customer to be a reference?

10    MR. LINDSTROM:  Let me object to the

11  question as argumentative.  Calls for a conclusion.

12    You may respond.

13    THE WITNESS:  Bribing, no.

14    MR. LINDSTROM:  You've answered the

15  question.

16    MR. SOLOMON:  Q.  Do you think that this

17  is an appropriate business practice of only

18  approving if they agree to be a reference?

19    MR. LINDSTROM:  Mischaracterizes the

20  document.

21    THE WITNESS:  The document is -- we have

22  decided to give them a lot of free consulting.  So

23  we said -- I'm not sure -- I think it was $350,000

24  worth of free consulting.

25    MR. SOLOMON:  Q.  So --

680

1    A.   And, I mean, there are a number      d
2    pro quos.  They'd had -- they've had problems
3    implementing the 11i suite, bugs, that's at least
4    partially our responsibility.  And they've had some
5    cost overruns on their project.  And I think they
6    owed us, what, $1.1 million in consulting fees.
7        And I think we decided to lower their
8    consulting -- their consulting fees by $350,000,
9    which is kind of acknowledging that, yeah, that some
10   of the problems that they had during the
11   implementation of 11i were caused by us, and we're
12   taking that into account.
13       But we will get these problems fixed.
14   We're going to get everything fixed.  We're going to
15   make you a happy customer.  And we're going to pay
16   for the consulting.  Some of the consulting is going
17   to be on our nickel.  We're going to pay for it.
18   But we'd like you -- once you have a successful
19   implementation, we'd like you to be a reference.  I
20   think that's a legitimate quid pro quo, not a -- not
21   a bribe.
22     Q.   So -- but isn't it true you're insisting
23   that a customer that's had an unhappy experience
24   with your product acts as a reference for that
25   product if it wants the concessions?

1       MR. LINDSTROM:  Mischaracterizes the
2   document.  Argumentative.
3       MR. SOLOMON:  Q.   Isn't that what this is
4   all about?
5       MR. LINDSTROM:  Same objections.
6       THE WITNESS:  No.  The customer -- it is,
7   again -- it's a quid pro quo.  We are making -- we
8   are making concessions.  I mean, we are
9   definitely -- I just -- I just don't agree with your
10   use of the word "bribe."  So we -- but we are -- you
11   know, we're making concessions.
12       We have a longstanding and good
13   relationship with this customer.  They're
14   implementing one of our products.  The product had
15   bugs in it, no question.  They had problem -- you
16   know, the project took longer than they had
17   intended.  You know, they had some budget overruns.
18   We're taking responsibility for that.
19       You know, we're going to give them -- you
20   know, we're going to reduce their consulting bill.
21   And presumably, if -- you know, they're doing
22   better, if you read the entire document.  They had
23   problems with 11.5.1.  They're now on 11.5.3 and
24   things are going better.  So it's on -- we think
25   we're on our way to a success.

1       So,    what it says right here.  The
2   current -- the current attempt to go directly --
3   they said, "Attempt to upgrade to 11.5.1 was a
4   disaster."  Not a great word.  "But things are going
5   better with 11.5.3."  Again, I'll take that as we're
6   on our way to success with 11.5.3.
7       But the fact is there were real costs.
8   They incurred real costs with the 11.5.1 upgrade,
9   and it was partially our responsibility.  So we'll
10   pay for part of that.  We'll reduce your consulting
11   bill.
12       But if things are going well in 11.5.3 --
13   and that's what I take this to mean, things are
14   going well with 11.5.3 -- we'd like you to be a
15   reference.  So I think it's a perfectly legitimate
16   exchange.
17     Q.   Okay.  Let me read this into the record.
18       "The current attempt to go directly from
19   10.7 to 11.5.3 is going better," and this is what
20   you didn't read into the record, "but is slow and is
21   met with extreme difficulties as well.  They have
22   missed several different go-live dates, forcing them
23   to entrench and spend significantly more money each
24   time our consulting services add internal costs."
25   And it goes on to say, "The project has lost the

1   confidence."
2       How can you -- how can you spin that as
3   good news?
4       MR. LINDSTROM:  Argumentative.  Vague and
5   ambiguous.
6       THE WITNESS:  It is a significant
7   improvement from 11.5.1, and they say it's going
8   better.  The implementation is going slowly, and
9   they're having difficulties.
10       MR. SOLOMON:  Q.   Extreme difficulties.
11       MR. LINDSTROM:  Argumentative.
12       THE WITNESS:  Again, my take is that
13   things are going better.  And if they're agreeable
14   to be -- and I don't think they would agree to be a
15   reference if they weren't on their way to a success.
16   How can you be a reference?  What can you say as a
17   reference if you can't say you had a good -- you
18   know, that it's up and running.
19       MR. SOLOMON:  Q.   Well, it looks like
20   there's some mutual back scratching being suggested
21   which doesn't lead to any accurate portrayal of the
22   product.
23       MR. LINDSTROM:  Argumentative.
24   Mischaracterizes the document.  Assumes facts.
25   Vague and ambiguous.

Exhibit 3, pages 685-691, to the Coyle
Declaration in Support of Defendants'
Memorandum Regarding Plaintiffs' Motion to
Compel Testimony and Determine the
Applicability of the Fifth Amendment Right
Against Self-Incrimination

**Remains Sealed** at this Time Per the Request of
Counsel for Matthew Symonds

691

```
1        The Rewards of Recklessness, A Portrait of Larry
2     Ellison and Oracle Corporation at War."
3        A.    I've never seen it before.
4        Q.    No.
5              Have you ever spoken to Mr. Symonds about
6     it?
7        A.    No --
8              MR. LINDSTROM:  About Exhibit 155?
9              MR. SOLOMON:  Correct.
10             THE WITNESS:  No.
11             MR. SOLOMON:  Okay.  Going to page 12.
12             MR. LINDSTROM:  What's the Bates stamp
13    number?
14             MR. SOLOMON:  1053575.  The heading is,
15    "The Collaboration."
16       Q.    And I just want to ask you a few questions
17    about some of the contents.  To start with, it says
18    at the beginning, "I have known Ellison for over
19    three years, since becoming Technology and
20    Communications editor of The Economist."
21             Is that true, that he's known you three
22    years, as of the beginning of 2001?
23       A.    I believe so.
24       Q.    And then the next paragraph starts off
25    saying, "During the writing of the book, I will
```

1  spend at least ten days each month with E.    and
2  record up to 200 hours of one-to-one interviews."
3         Do you know whether Mr. Symonds spent
4  around ten days each month with you?
5     A.   I don't think so.
6     Q.   It was less?
7     A.   Yes.  Much less.
8     Q.   Says, "I will have office space at Oracle
9  on the same floor as Ellison and will sit in on
10 every kind of business meeting."
11        Did that happen?
12        MR. LINDSTROM:  Compound.
13        MR. SOLOMON:  Q.  Did he share an office
14 on your floor?
15        MR. LINDSTROM:  Mischaracterizes the --
16        THE WITNESS:  Share an office?  He
17 certainly didn't share an office.
18        MR. SOLOMON:  Q.  I didn't mean share with
19 you.  Did he have office space on your floor?
20    A.   I don't know.  I don't think so.
21    Q.   Did he attend business meetings with you?
22    A.   Some -- some meetings, yes.
23    Q.   And he traveled with you?
24    A.   A few times.
25    Q.   It goes on a few lines down, "Wherever

1  possible and appropriate, Ellison will help me gain
2  the access I require."
3         Did you help Mr. Symonds gain access, as
4  he states here?
5         MR. LINDSTROM:  In the context he states
6  it?
7         MR. SOLOMON:  Yes.
8         THE WITNESS:  Access to whom?  Or to what?
9  Tell me -- maybe I should just find out.  Where are
10 you reading?
11        MR. SOLOMON:  Q.  It says, "I will
12 seek" -- just over halfway down that second
13 paragraph.  "I will seek meetings with others who
14 may take a different and less positive view, such as
15 business rivals and colleagues whom Ellison fired.
16 Wherever possible and appropriate, Ellison will help
17 me gain the access I require."
18    A.   Okay.
19        MR. LINDSTROM:  What's the question?
20        MR. SOLOMON:  Q.  The question is, did you
21 assist Mr. Symonds with gaining access where he
22 desired it?
23    A.   A few times, yes.
24    Q.   "And Ellison will make available" --
25 excuse me -- "personal documents and photographs as

1  well as previ      onfidential company memoranda
2  and e-mail."
3         Do you see that?
4     A.   I do.
5     Q.   Did you do that?
6     A.   I certainly made available photographs.
7  In terms of personal documents, I can't think of
8  any.
9     Q.   Okay.
10    A.   And company confidential memoranda and
11 e-mail?  Absolutely not.
12    Q.   Okay.  Is there any reason why documents
13 dated 2000/2001 concerning Oracle's business remain
14 confidential today?
15        MR. LINDSTROM:  Objection.  Compound.
16 Calls for speculation.
17        THE WITNESS:  General -- yeah.  I think a
18 lot of -- pertaining to our business?  What aspect
19 of our business?  If one of our businesses would be
20 the health records of one of our employees, that
21 would certainly remain -- that's our business.  That
22 would certainly remain confidential.
23        MR. SOLOMON:  Q.  Sure.
24    A.   That would certainly remain confidential.
25 I mean, it's a very --

1     Q.   What if it's --
2     A.   It's a very broad, hypothetical question.
3     Q.   What if it's an e-mail describing the
4  status of an 11i implementation in 2000?  Why would
5  that be confidential now?
6         MR. LINDSTROM:  Calls for speculation.
7  It's hypothetical.
8         THE WITNESS:  I mean, you'd have to tell
9  me more.  What was in the e-mail?  Who it was from?
10 What it revealed, confidential information about a
11 customer?  There are certain -- certain of our
12 customers, we can't even say who they are.  So, I
13 mean, it's a complicated question.
14        MR. SOLOMON:  Q.  Okay.  Let's think of
15 another category of documents.  What about e-mails
16 concerning your trading and plans to trade in that
17 timeframe; why would they be confidential now?
18        MR. LINDSTROM:  Assumes facts.  Calls for
19 speculation.  Compound.
20        THE WITNESS:  I don't think they would be.
21        MR. SOLOMON:  Q.  Okay.  Do you know why
22 your lawyers have stamped such documents
23 confidential?
24        MR. LINDSTROM:  Assumes facts.  No
25 foundation.

1          THE WITNESS:  No idea.

2          MR. SOLOMON:  Q.  Your lawyers took the

3  position with respect to the Softwar materials we've

4  been discussing that they are irrelevant to this

5  litigation.

6          Do you have any idea why?

7          MR. LINDSTROM:  No foundation.

8  Mischaracterizes the record.

9          And you can answer if you've got an

10 independent basis for knowing what your lawyers did

11 or did not do.

12         THE WITNESS:  No independent knowledge.

13         MR. SOLOMON:  Q.  And is it your testimony

14 that you didn't know until you saw this document

15 today that Mr. Symonds had drafted an article

16 entitled, "The Rewards of Recklessness"?

17         A.  I did not know.

18         Q.  Did you know that in November of 2000,

19 Jeff Henley was extremely angry about the fact that

20 Oracle's stock price had declined?

21         MR. LINDSTROM:  Objection.  Assumes facts.

22 Also calls for a conclusion as vague and ambiguous

23 as to "extremely angry."

24         THE WITNESS:  That's what I was going to

25 say.  I'm not sure what you mean by "extremely

697

---

1  angry."  No one was happy about the stock market

2  collapsing.

3          MR. SOLOMON:  Okay.  Let's have marked as

4  the next exhibit a magazine --

5          THE WITNESS:  I'm sorry, are we done with

6  this one?

7          MR. SOLOMON:  Q.  Yes, we are for the

8  moment.

9          -- a magazine -- Fortune magazine article

10 dated November 13th, 2000.

11         (Whereupon, Deposition Exhibit 156

12         was marked for identification.)

13         MR. SOLOMON:  Q.  And if you go to -- by

14 the way, have you ever read this article, do you

15 know?

16         MR. LINDSTROM:  Why don't you give him a

17 minute to look at it.

18         THE WITNESS:  The answer is, I think I

19 have.

20         MR. SOLOMON:  Q.  Okay.  And I'm going to

21 be focusing on some language on page 6.

22         I'll read it into the record.  "It's an

23 early October morning at the Emerald City and Jeff

24 Henley is sputtering mad."

25         Do you see that?

698

---

1          A.  Yes.

2          MR. LINDSTROM:  The question is "Do you

3  see that?"

4          THE WITNESS:  Yes, I do see it.

5          MR. SOLOMON:  Q.  So when I say "extremely

6  angry," I mean sputtering mad.

7          Did you know he was sputtering mad at the

8  time?

9          MR. LINDSTROM:  Assumes facts.

10         THE WITNESS:  Can I have a moment to just

11 read this?  I don't remember this part of the

12 article, so ...

13         Okay.

14         MR. SOLOMON:  Q.  Okay.  Does that refresh

15 your recollection as to whether or not you remember

16 Jeff Henley being sputtering mad?

17         A.  Partially.  Again, I don't remember this

18 specific incident.  I know, in general, Jeff was not

19 completely convinced that the stock market analysts

20 understood everything he said.  So I think it's

21 common frustration CFOs have with stock market

22 analysts.

23         Q.  Okay.  Did you know that Mr. Henley was

24 planning, at some stage at least before he sold his

25 stock in January, $30 million worth of stock --

699

---

1          Wait a second.

2          -- did you know that he was planning on

3  selling some stock at the time he was sputtering mad

4  about this stock price decline?

5          MR. LINDSTROM:  Assumes facts.

6  Mischaracterizes his testimony.

7          THE WITNESS:  No.

8          MR. SOLOMON:  Q.  And you and he, in

9  January, neither of you knew the other was trading;

10 is that right?

11         MR. LINDSTROM:  Objection.  No foundation,

12 other than as to this witness.

13         THE WITNESS:  I didn't know he was

14 trading.

15         MR. SOLOMON:  Q.  Okay.  Were you aware of

16 the details in January of 2001 of Oracle's stock

17 repurchase program?

18         MR. LINDSTROM:  Vague and ambiguous as to

19 "details."

20         THE WITNESS:  I mean, I knew we had a

21 stock repurchase program, but you mean the exact

22 timing --

23         MR. SOLOMON:  Q.  Yes.  Correct.

24         A.  The timing of it?

25         No.  I didn't know what the exact timing

700

1  was. Actually, I don't know if I didn't       I
2  don't remember.
3       Q.   Okay.  Do you know if any stock
4  repurchases were timed in order to coincide with the
5  dates you were selling stock?
6       A.   They certainly weren't intentionally
7  timed, you know.  I mean, I knew I was selling
8  stocks we were going to buy back at the same time.
9  Kind of a single decision, I'm going to sell?  No,
10  that did not happen.
11       Q.   Okay.  If I told you that the repurchases
12  in January 2001 clustered around your stock sales
13  were statistically unlikely to have happened but for
14  coordination, would you be surprised?
15       MR. LINDSTROM:  No -- no foundation.
16  Assumes facts.  Vague and ambiguous.
17       THE WITNESS:  I have no idea what -- what
18  we were -- what -- if we were --
19       MR. SOLOMON:  The question is whether
20  you would be surprised.
21       THE WITNESS:  I don't know.
22       MR. SOLOMON:  Q.  For example, if it was
23  like a one in a hundred chance that the sales would
24  be timed around your transactions, would that be --
25  would that surprise you?

1       MR. LINDSTROM:  Assumes facts.
2       THE WITNESS:  Without getting cute,
3  it's -- you know, it's very unlikely -- almost --
4  statistics are interesting.
5       MR. SOLOMON:  Q.  I understand that.
6       A.   So it depends how you calculate it.
7       Q.   Okay.  So you can't really answer --
8       A.   No.
9       Q.   -- with just that information?
10       A.   No.
11       Q.   Or one in 500, still couldn't answer?
12       MR. LINDSTROM:  Yeah.
13       THE WITNESS:  Yeah, no.
14       MR. SOLOMON:  Q.  One in a thousand?
15       A.   What were the odds of my son being 6'2"
16  and my daughter being 5'9"?  The odds are very, very
17  unlikely, but they are.
18       Q.   Okay.  So really what you're saying is it
19  really is up to an expert to determine that; is that
20  right?
21       MR. LINDSTROM:  Objection.
22  Mischaracterizes his testimony.
23       THE WITNESS:  No.  I'm just saying there's
24  lots of different ways to calculate likelihoods.
25  Plus, I'd like to add, I had no authority to

1  initiate buy.       my own anyway.  I had to go
2  through a board process to do it.
3       MR. SOLOMON:  Q.  That's a useful -- a
4  useful comment.
5       What was the process and who was involved?
6  First of all, who was involved?
7       A.   Well, a purchase like that is, you know,
8  it requires -- it's a lot of money.  It exceeds my
9  authority.  I don't have the authority to purchase
10  it.  I believe it requires the approval -- I'm not
11  sure.  We're back at a different time.  So I believe
12  it requires at least the approval of the executive
13  committee of the board of directors, the audit
14  committee of the board of directors, or the full
15  board, one of the three, or multiples thereof.
16       MR. SOLOMON:  Let's have marked as the
17  next exhibit a document produced in this litigation
18  with the control numbers 1914926 through -934.
19       (Whereupon, Deposition Exhibit 157
20       was marked for identification.)
21       THE WITNESS:  Thank you.
22       MR. SOLOMON:  And while you're looking for
23  it, for the record, this is dated Thursday,
24  March 29th, 2001.  And there are some e-mail
25  exchanges among Dan Cooperman, Dorian Daley, Lauren

1  Segal concerning LGE option exercise.  The first two
2  pages have a redacted stamp.  The third page seems
3  to have information concerning Dan Cooperman, and
4  the fourth page.  The fifth page is an e-mail from a
5  Deb Lange to Jeff Henley.  And the remainder of the
6  exhibit appear to have information concerning --
7  containing information concerning Deborah Lange.
8       Have you seen any of this before?
9       MR. LINDSTROM:  Well, when you say "any of
10  this," are you referring specifically to the Deb
11  Lange, Jeff Henley e-mail or literally any --
12       MR. SOLOMON:  It's okay.  I'll break it
13  down.
14       Q.   First page, have you seen this first page
15  before?
16       A.   I don't know.
17       Q.   Sorry?
18       A.   I'm sorry, I don't know.  I don't know if
19  I've seen it before.  I've heard of the topic that's
20  discussed.
21       Q.   Okay.  Now, on the first page it says
22  "Redacted."
23       Do you know why it says "Redacted"?
24       A.   It means stuff has been removed.
25       Q.   Do you know what's been removed?

1    A.    I have no idea.

2    Q.    And same with the second page.  If you

3  look at the first page, it says 18:40 in terms of

4  the time.

5         Do you see that?

6    A.    I do.

7    Q.    Then the second page says 17:27, and then

8  it says "redacted" again.

9         Again, you don't know what's been

10  redacted; is that right?

11    A.    I do not.

12    Q.    And then if you go to the Deb Lange

13  e-mail, have you seen that before?

14    A.    I may have.  I'm not sure.

15         MR. SOLOMON:  Okay.  Okay.  We're going to

16  change tapes in a minute, so let's go off the record

17  to allow that to happen.

18         THE VIDEOGRAPHER:  I'm sorry.  We are

19  going off the record.  The time is 4:39 p.m.  Here

20  marks the end of Videotape No. 2, Volume 3, in the

21  deposition of Lawrence Ellison.

22         (Whereupon, a recess was taken.)

23         THE VIDEOGRAPHER:  We are back on the

24  record.  The time is 4:48 p.m.  Here marks the

25  beginning of Videotape No. 3, Volume 3, in the

1  deposition of Lawrence Ellison.

2         MR. SOLOMON:  Q.  You testified earlier,

3  Mr. Ellison, that it would make no sense, or you

4  didn't know why you would want as a reference a

5  customer that wasn't happy.

6         Do you recall that?

7         MR. LINDSTROM:  Mischaracterizes his

8  testimony.

9         THE WITNESS:  No.  What I said was if

10  someone called on the phone, a customer that wasn't

11  happy, who said we'll be a reference, that would be

12  a negative reference.

13         MR. SOLOMON:  Q.  Right.

14    A.    So if you call someone on the phone, you

15  want them to be a reasonably happy customer.  So I

16  said, it made no sense for someone who is unhappy

17  to -- you know.

18    Q.    So why did you insist then on citing GE as

19  a reference when they were unhappy and told you not

20  to do that?

21         MR. LINDSTROM:  Assumes facts.

22  Mischaracterizes his prior testimony.

23         THE WITNESS:  I don't think I did that.

24         MR. SOLOMON:  Q.  Okay.

25    A.    And I don't think -- give me -- first of

1  all, GE is a    _____  mpany.  There are a lot of

2  people in GE.  I want to know who was unhappy and

3  who told me not to do it.

4    Q.    And is it your testimony that you don't

5  remember being told not to do it but going ahead and

6  doing it anyway?

7         MR. LINDSTROM:  Mischaracterizes -- this

8  is all asked and answered and previously gone over.

9         THE WITNESS:  I think G -- again, I'm

10  doing this from memory.  But I was the GE corporate

11  sponsor.  There certainly were people -- I think GE

12  had a policy -- well, want me to just launch into

13  this?

14         MR. LINDSTROM:  No.  No.  Why don't we go

15  by question and answer.

16         MR. SOLOMON:  Q.  It's okay.  I think we

17  actually did cover that fairly well last time, but I

18  just wanted to see if you were going to give the

19  same testimony you gave last time.

20         What about HostCentric; were they a

21  reference that were unhappy, HostCentric?

22    A.    HostCentric, I don't know who they are.

23    Q.    Now, if you go back to the exhibit in

24  front of you, The Rewards of Recklessness, if you go

25  to page 1053566.

1    A.    -566.  Okay.

2    Q.    Okay.  It says -- it says in part,

3  "Ellison says he's only happy when everyone else

4  thinke he's wrong when he's," in quotes, "'walking

5  way out to the end of the limb and then jumping up

6  and down.'"

7    A.    Yes.

8    Q.    Is that true -- is that an accurate

9  statement of yours -- excuse me.  Is that -- did you

10  say that to Mr. Symonds?

11    A.    I have to explain what I meant -- mean by

12  that.

13    Q.    I don't want an explanation.  I don't have

14  much time.  I want to know, did you say that?

15         MR. LINDSTROM:  The exact words in the

16  sentence that counsel read into the record?

17         THE WITNESS:  I'm not sure.  But something

18  like -- something like that, sure.

19         MR. SOLOMON:  Q.  Okay.  And then the

20  second quote in that paragraph that's attributed to

21  you, "Without reckless" -- "Without recklessness,

22  you can't innovate.  The rewards of recklessness are

23  enormous."

24         Did you say that?

25    A.    I'm not sure I used the word

1   "recklessness." I think I've said that
2   innovation -- what is innovation? Innovation is
3   when other people say -- when you're the first
4   person to figure something out. So everyone
5   believes the world is flat, and you believe it's
6   round. So everyone thinks you're wrong and you
7   think you're right, and you turn out to be right.
8           And all great discoveries, all great
9   innovation is actually done by people who believe
10  that conventional wisdom is wrong. The world isn't
11  flat, it's round.
12          That's what I mean by all of this. And
13  you have to be -- I'll use the word "reckless,"
14  "brave," whatever you want to use. If everyone is
15  saying, "The world is flat," and you're saying, "No,
16  it's round," you're going to be ridiculed and have
17  to deal with that. You have to have a personality
18  that's willing to deal with that.
19          MR. SOLOMON: Okay. Let's have marked as
20  the next exhibit another excerpt from Softwar.
21          (Whereupon, Deposition Exhibit 158
22          was marked for identification.)
23          MR. LINDSTROM: Is this 158?
24          THE REPORTER: Yes.
25          MR. LINDSTROM: Thank you.

709

1           MR. SOLOMON: Q. So then I'd like you to
2   just look at the bottom of page 142 and the top of
3   page 143 where it says, "Everything they were
4   reading said that Microsoft and client/server would
5   go on forever. I got the same looks that Galileo
6   got when he told people the earth revolved around
7   the sun. Sure. Whatever you say, boss."
8           Right? See that?
9   A.      No, I don't actually.
10  Q.      The bottom of 142.
11  A.      Can I have a second?
12  Q.      Sure.
13  A.      Thanks.
14          Okay.
15  Q.      Okay.
16  A.      Yeah. Got the context.
17  Q.      Did you say that? And when I say "that,"
18  did you say, "Everything they were reading said that
19  Microsoft and client/server would go on forever. I
20  got the same looks Galileo got when he told people
21  the earth revolved around the sun. Sure. Whatever
22  you say, boss."
23  A.      Did I say this?
24  Q.      Yes.
25  A.      In this context of me killing a

710

1   client/server       t?
2   Q.      Right.
3   A.      I was in the process of saying we're not
4   going to do any more client/server. We're killing
5   an existing project. And people were very mad at me
6   for killing the project, because they thought that
7   client/server would go on forever, and they were
8   wrong.
9   Q.      And you've likened yourself to Galileo on
10  more than one occasion; is that right?
11  A.      No. No. In terms of likened myself to
12  Galileo, no. Galileo is one of the great scientists
13  in history. I'm saying that all -- every time you
14  have an innovative idea, even a small one, I
15  innovated -- his idea was planetary; mine was a
16  little tiny piece of software. But every time you
17  challenge conventional wisdom, and you're the
18  first -- and you're in a group of people that
19  believe one thing is true, and you say, "No, I think
20  you're all wrong. I think this is what's" -- "I
21  think this is true," you find yourself in this very
22  funny situation where you're challenging
23  conventional wisdom and it just makes people --
24  sometimes it makes people angry.
25  Q.      Okay.

711

1   A.      So I was using Galileo as that on a grand
2   scale and me on a very, very small scale, or anyone
3   who does any kind of innovation, or innovative
4   thinking.
5   Q.      Have you ever heard of Icarus?
6   A.      Of course.
7   Q.      Have you ever likened yourself to Icarus?
8   A.      No.
9   Q.      Don't you think that's more appropriate in
10  the context of this litigation?
11          MR. LINDSTROM: Objection. Argumentative.
12          MR. SOLOMON: I've marked as the next
13  exhibit more transcripts of interviews with --
14  another transcript of an interview with Mr. Symonds.
15  And the control numbers are 1529262 through -282.
16          (Whereupon, Deposition Exhibit 159
17          was marked for identification.)
18          THE WITNESS: Excuse me.
19          MR. SOLOMON: Q. And if you turn to page
20  1529276.
21  A.      Okay.
22  Q.      And looking at the top of the page where
23  it says, "Early this year there were a lot of people
24  coming up with this kind of" --
25  A.      Slow down. -9276?

712

1    you know, in a sense was involved. But, ___ ow --
2    Jeff Henley was our CFO.  I'm not sure when Safra
3    joined the board.
4              MR. SOLOMON:  Q.  Okay.  Did you know that
5    she had planned a stock sale in January 2001 but
6    then changed her mind?
7         A.  No.
8              MR. LINDSTROM:  Vague as to time.  Did he
9    know when?
10             MR. SOLOMON:  Q.  Is the first time you
11   heard that today?
12        A.  Yes.
13        Q.  Did you and Ms. Catz discuss with each
14   other a litigation update you received six weeks to
15   two months ago?
16             MR. LINDSTROM:  Vague and ambiguous.
17             THE WITNESS:  By "litigation update," you
18   mean -- I think the legal department prepares an
19   e-mail -- actually, the answer is I don't think so.
20             MR. SOLOMON:  Q.  Did you have a
21   discussion with Ms. Catz wherein you decided to ask
22   for a litigation update?
23             MR. LINDSTROM:  This is pertaining to this
24   litigation?
25             MR. SOLOMON:  Correct.

1              MR. LINDSTROM:  What timeframe?
2              THE WITNESS:  I don't think so.
3              MR. SOLOMON:  Q.  Within the last two
4    months.
5         A.  Not that I recall.
6              MR. SOLOMON:  Okay.  Let's have marked as
7    the next exhibit another interview transcript.  This
8    bears the date April 18th, 2002.
9              (Whereupon, Deposition Exhibit 160
10             was marked for identification.)
11             MR. SOLOMON:  And the control numbers are
12   1529215 through 1529233.
13        Q.  And if you could turn, Mr. Ellison, to
14   1529225.
15        A.  -225.
16        Q.  Looking at the top of the page on the
17   language, "I think the ERP stuff is in really good
18   shape.  We kind of survey our customers.  We tend to
19   focus on the customers who are having problems.  We
20   find almost wherever Oracle consulting ... one of
21   the reasons we advertise server so much in this last
22   meeting is wherever consulting has been involved, we
23   tended not to have problems.  So we have a terrible
24   irony of some of the most complicated
25   implementations, GE Power or Poscoe, where we are

1    just all swea     llets," in brackets,
2    "[Nagilient] worrying" -- sorry -- "[Nagilient] and
3    worrying, and it is going very smoothly and that's a
4    company we've never heard of is blowing up."
5         Do you see that language?
6         A.  Yes, I do.
7         Q.  Where you reference sweating bullets, why
8    were you sweating bullets?
9         A.  Okay.  I believe what this is saying is
10   that the GE power and the Poscoe implementations
11   were very, very complex, but actually went very
12   well.  By sweating bullets, people were working very
13   hard.  Poscoe is a steel company.  They were, at the
14   time, the largest steel company in the world.
15   They're located in Korea.  And literally, they were
16   doing a big bang switchover to the E-Business Suite.
17             The problem is if you're a steel mill and
18   your system shuts down, the steel cools in the plant
19   and you have to rebuild the plant.  So it was the
20   worst -- it was one of the more stressful moments in
21   terms of putting E-Business Suite in because if it
22   shut the plant down, we were -- it was going to
23   cause a huge number of problems.  So -- so I think
24   that's what it's saying.
25        Q.  What does -- sorry.  I was going to ask

1    you, what do you mean by "terrible irony"?
2         A.  Oh, that the complicated -- that the
3    really complicated, big projects were going well,
4    but then we'd have some small company with a fairly
5    simple implementation.  And it would go badly often
6    because the people who were implementing the
7    product, the service people who were putting it in
8    did something wrong.
9         Q.  And given this is 2002, what business did
10   Jeff Henley have saying in early 2001 that 11i had
11   stabilized?
12        A.  Well, again, this had -- again, I'm not
13   sure what we're talking -- this -- what I'm saying
14   here is, 11i is stable.  The proof is it's working
15   at GE, it's working at Poscoe, but it still has to
16   be implemented properly.
17             And if you read the entire -- I think if
18   you read the entire thing, what it's saying is this
19   has nothing to do with the product; this has to do
20   with if consulting is involved.
21             In other words, if you have good people,
22   what it says, "wherever consulting has been
23   involved, we tend not to have problems."
24             So when we have the right service people
25   putting it in, even in a complicated implementation

1  it is going well.  When we have the wrong
2  it's not going well.  So this was not product
3  related; it was service related.  We didn't have
4  enough trained -- the answer is we didn't have
5  enough trained people doing the implementations.
6        MR. SOLOMON:  Have marked as the next
7  exhibit a copy of a Wall Street Journal article
8  dated August 6th, 2001.
9        (Whereupon, Deposition Exhibit 161
10       was marked for identification.)
11       MR. SOLOMON:  Q.  And have you read this
12  article before?  Do you know --
13       MR. LINDSTROM:  Why don't you give him a
14  moment to look at it.
15       THE WITNESS:  Can I have a second to look
16  at it?
17       Okay.
18       MR. SOLOMON:  Q.  Okay?
19       A.  Okay.
20       Q.  Have you read this before?
21       A.  I believe so, yes.
22       Q.  Okay.  I'm looking at the first page.
23       And starting with, "In this last 12
24  months,' Mr. Ellison said, 'we've gotten over 450
25  customers, big customers, General Electric, Ford,

1  including Gene    .ectric Company's power division,
2  which Mr. Ellison said a point of singling out.  GE
3  Power said it was using the product only at a small
4  plant in Hungary.  'We are not running our business
5  on 11i,' said a spokesman for the GE unit.
6  Likewise, Alcoa said that it was using 11i at just
7  one overseas location."
8       So is the journalist writing this correct
9  in saying that what you had said was not entirely
10  true?
11       A.  I --
12       MR. LINDSTROM:  Compound.  Calls for
13  speculation.  No foundation.
14       THE WITNESS:  I didn't say GE is running
15  its entire business on Oracle.  I said they are
16  running their business on Oracle, meaning part of
17  their business.  GE, four -- these are gigantic
18  corporations.  They use products from lots and lots
19  of people.  Ford will never run their business
20  entirely on Oracle products.
21       So all I was saying is that GE, we got --
22  you know, a part of their business is live and
23  running.  Maybe I can make it clearer by saying "a
24  part."  But I didn't say their entire business or
25  all their business.  The journalist is assuming I

1  Alcoa, Hewlett-Packard, live and running their
2  businesses on 11i.'"
3       Do you see that?
4       A.  Yes.
5       Q.  Did you say that?
6       MR. LINDSTROM:  Well --
7       THE WITNESS:  Yes.
8       MR. LINDSTROM:  Did he say the part in the
9  quotes --
10       THE WITNESS:  I think so.
11       MR. LINDSTROM:  -- or the whole -- the
12  whole thing?
13       MR. SOLOMON:  The part that's in the
14  quotes.
15       MR. LINDSTROM:  Okay.
16       THE WITNESS:  Something -- I don't know if
17  I said exactly that, but something fairly close.
18       MR. SOLOMON:  Q.  Okay.  And it goes on to
19  say, "It was a welcome disclosure.  In the year
20  since its introduction, 11i -- which handles
21  everything from inventory tracking to payroll
22  processing -- has been plagued by reports of slow
23  sales.  There was just one problem:  Mr. Ellison's
24  entirely true.  All four companies Mr. Ellison named
25  told a far more restrained version of the story.

1  mean everything in GE in one year is running on
2  Oracle, which is just -- it's impossible.
3       MR. SOLOMON:  Q.  Okay.
4       A.  Every year more and more of GE runs on
5  Oracle, but even today, many years later, 100
6  percent of GE is not running on Oracle.  Never will.
7       Q.  Do you know Jeff Henley has described you
8  as a person who runs ahead of reality?
9       MR. LINDSTROM:  Mischaracterizes his
10  testimony.  Assumes facts.
11       THE WITNESS:  I don't know what that
12  means.  The answer is no, and I'm not sure what it
13  means.
14       MR. SOLOMON:  Q.  And if you go to the
15  next page of this article, I'm looking almost
16  halfway down, the language that begins, "Still, it's
17  been hard for Oracle to attract big name," in
18  quotes, "'reference accounts' for 11i.  Companies
19  that would testify to the new product's virtues" --
20       A.  I'm sorry, how far down the page?  Same
21  page?
22       Q.  Almost, yes.
23       MR. LINDSTROM:  No, he's on the next page.
24       MR. SOLOMON:  I'm sorry.  On the second
25  page.

1      THE WITNESS:  Next page.  Sorry

2      MR. SOLOMON:  Q.  It's the sentence

3   starting, "Still, it's been hard."

4      A.  Okay.  Got it.

5      Q.  Okay.  Then it goes on to say -- after

6   "product virtues," it goes on to say, "So Oracle

7   decided to provide its own references.  Last year it

8   began buying TV and newspaper ads saying it had

9   saved $1 billion by using the software.  Most

10  analysts scoffed at the claim, attributing any such

11  savings to low-tech methods such as layoffs and site

12  closings."

13     Do you see that?

14     A.  Yes.

15     Q.  Then it goes on to say, "Oracle struck

16  back.  At a company-sponsored conference for users

17  in New Orleans in February, it distributed hundreds

18  of copies of a Harvard Business School case study

19  that Oracle said proved saved money the way it said

20  it had.  In a related news release, the company said

21  the Harvard study, written by Professor Francis

22  Frei," F-R-E-I, "chronicled how Oracle had achieved

23  the savings by using its new software to put," in

24  quotes, "'every aspect of its business,'" end

25  quotes, "on one global network on the Internet,"

1   close quotes.

2      Goes on to say, "But Professor Frei, in an

3   interview, says the study did no such thing.

4   Instead, she says, it simply described how a once

5   fast-growing company was being forced to pay more

6   attention to costs."

7      Do you see all that?

8      A.  I do.

9      Q.  Do you remember in February at New Orleans

10  discussing or mentioning the Harvard study?

11     A.  I've never read it.  Never -- I don't

12  think I've ever mentioned it.

13     Q.  Okay.  Do you recall ever telling Matthew

14  Symonds that Siebel Systems had just finished a

15  quarter in which it engaged in software swaps on a

16  big deal, but that couldn't continue and that they

17  were going to crash because you can't do that two

18  quarters in a row?  Does that ring a bell?

19     MR. LINDSTROM:  Assumes facts.  Compound.

20  The question is did he tell Matthew Symonds all of

21  that?

22     THE WITNESS:  Again, I'm not -- again, I'm

23  not sure, but sounds vaguely close.

24     MR. SOLOMON:  Q.  Okay.  And wouldn't that

25  same comparison be applicable to Oracle in 2Q '01

1   and 3Q '01?

2      A.  No.

3      MR. SOLOMON:  Have marked as the next

4   exhibit a document produced in this litigation with

5   the control numbers 1027517 through -521.

6      (Whereupon, Deposition Exhibit 162

7      was marked for identification.)

8      MR. SOLOMON:  Q.  Once you've had a chance

9   to look at it, the question will be, do you

10  recognize it?

11     A.  Give me -- give me a second.

12     Q.  Okay.

13     A.  So far I do not.  I don't know what this

14  is about.

15     MR. LINDSTROM:  Counsel, is there a first

16  page to this?  This looks to be an e-mail exchange

17  that starts partway through the exchange with the

18  word "Okay."

19     MR. SOLOMON:  Right.

20     MR. LINDSTROM:  It's hard to recognize.

21     MR. SOLOMON:  We'll ask -- let's see if we

22  can get the page, control number before that.

23     Could you do that, Brian, do you think?

24     Let's go off the record for a few minutes

25  then, please.

1      THE VIDEOGRAPHER:  Off the record.  The

2   time is 5:20 p.m.

3      (Whereupon, a recess was taken.)

4      THE VIDEOGRAPHER:  We are back on the

5   record.  The time is 5:38 p.m.

6      MR. SOLOMON:  Q.  Okay.  So we marked the

7   last exhibit -- we did find the first page.  And so

8   what exhibit was it, please?

9      THE REPORTER:  The last exhibit was 162.

10     MR. SOLOMON:  So 162 now is going to be

11  1027516 through -7521.

12     THE WITNESS:  Throw this one away?

13     MR. SOLOMON:  Please.

14     (Whereupon, Deposition Exhibit 162 was

15     remarked for identification.)

16     MR. SOLOMON:  Q.  And do you recognize

17  this document?

18     A.  I don't.

19     Q.  And I notice that you're not -- you're not

20  on the addressee list, but you were the GE corporate

21  sponsor, correct?

22     A.  Still am.

23     Q.  But that wouldn't mean -- would that mean

24  that you would have probably have seen this at the

25  time, or not?

1    A.   Probably not.

2    Q.   I want to go back again to Mr. Symonds.

3         Have you had any e-mail exchanges with

4    Mr. Symonds?

5    A.   As far as I know -- about this litigation,

6    or just a general e-mail?

7    Q.   About this litigation.

8    A.   As far as I know, I haven't had any e-mail

9    about this litigation with Mr. Symonds.

10   Q.   Now, we marked as 141 the letter dated

11   January 10, 2007.

12        How was this transmitted to Mr. -- to

13   Mr. Symonds?

14        MR. LINDSTROM:  No foundation.

15        MR. SOLOMON:  Let me back up.

16   Q.   Was this transmitted to Mr. Symonds?

17   A.   I assume it was.  We're talking about the

18   letter --

19   Q.   Yes.

20   A.   -- my attorneys drafted and I signed?

21   Q.   Yes.

22        MR. LINDSTROM:  And you have it before

23   you?

24        THE WITNESS:  I don't -- I'm sure --

25        MR. SOLOMON:  Q.  It's 141.  It's probably

---

1    at the bottom of your pile somewhere.

2         MR. LINDSTROM:  I think the reporter has

3    the other ones.  You can borrow mine.

4         MR. SOLOMON:  Q.  Well, it says -- first

5    of all, it says it went via e-mail.

6         Do you have e-mail confirmation of that

7    that you can produce?

8    A.   It didn't go via my e-mail.

9    Q.   Okay.  Whose e-mail did it go via?

10   A.   I have no idea.

11   Q.   Okay.  So do you have any objection to

12   finding out and producing the actual e-mail?

13   A.   No.

14   Q.   So you'll do that?

15   A.   Well --

16        MR. LINDSTROM:  We'll take your request

17   under advisement.  I don't see a problem with it.

18        MR. SOLOMON:  Q.  It says "first class

19   mail."

20        You were aware if you send a document to

21   England from the US first class mail, it probably

22   won't get there?

23   A.   No.  No.

24        MR. LINDSTROM:  Assumes facts.

25        MR. SOLOMON:  Q.  No?  You think a first

---

1    class stamp w     t it to --

2    A.   Oh, I have no idea.  I haven't mailed

3    anything in a long time.

4    Q.   Now, you say at the bottom here, "Although

5    I understand that my lawyers will be sending you a

6    more formal letter, I wanted to write to you

7    separately to request that you cooperate with my

8    counsel and forward these materials as quickly as

9    you can."

10        Do you see that?

11   A.   I do.

12   Q.   Have you seen any such formal letters from

13   your lawyers to Mr. Symonds?

14   A.   No.

15   Q.   Then halfway through the second paragraph

16   it says, "We oppose this motion because, quite

17   frankly, we believe those materials were yours, not

18   Oracle's or mine."

19        Do you see that?

20   A.   I do.

21   Q.   Have you looked within -- since October of

22   2006 at the agreement between you and Mr. Symonds?

23   A.   No.

24   Q.   No?

25   A.   No.

---

1    Q.   Do you recall its contents?

2    A.   No, I do not.

3    Q.   And you say, "opposed" -- at least you

4    signed the letter where it says, "We oppose this

5    motion because, quite frankly, we believe those

6    materials were yours."

7         Are you aware that in the brief that was

8    filed, you also contended, or your lawyers

9    contended, that they were simply irrelevant?

10        MR. LINDSTROM:  No foundation.  Asked and

11   answered.

12        THE WITNESS:  No.

13        MR. LINDSTROM:  Calls for speculation.

14        MR. SOLOMON:  Q.  Did you discuss this

15   letter with Daniel Cooperman?

16        MR. LINDSTROM:  I'm going -- I'll permit

17   him.  I think that's generic enough that he can

18   respond to that.

19        THE WITNESS:  No, I did not.

20        MR. SOLOMON:  Q.  Have you discussed it

21   with anyone?

22        MR. LINDSTROM:  When you say "discussed

23   the letter," can you be -- I mean, that's vague.

24        THE WITNESS:  Other than my attorneys.

25        MR. SOLOMON:  Q.  Anyone.  Have you

1  discussed it with your attorneys?

2      A.   No.

3      Q.   How did the language in this letter get

4  into your hands?

5      MR. LINDSTROM:   Vague and ambiguous.

6      THE WITNESS:   The letter was written by

7  one of my lawyers.  I signed it.  I signed the

8  letter.

9      MR. SOLOMON:   Q.   When you say one of your

10  lawyers, do you mean one of your in-house or outside

11  counsel?

12      A.   I'm not sure -- I'm not sure who drafted

13  the letter.

14      Q.   Who gave you the letter to sign it?

15      A.   I don't recall.

16      MR. SOLOMON:   I'll have marked as the next

17  exhibit a document produced in this litigation with

18  the control numbers 1026720, -721.

19      (Whereupon, Deposition Exhibit 163

20      was marked for identification.)

21      THE WITNESS:   Thank you.

22      MR. SOLOMON:   Q.   And let me know if you

23  recognize this.

24      A.   Give me -- give me a second.

25      Vaguely.   I knew about the Barclays

1  exchange, but I'm not sure I ever saw this.  If it

2  was sent to me, I probably saw the note.

3      Q.   Okay.  And this would have been in your

4  files around December 15th, 2000?

5      A.   Yes.

6      Q.   And it wasn't produced from your files in

7  this litigation, and you cannot explain why; is that

8  right?

9      MR. LINDSTROM:   No foundation.  Assumes

10  facts.

11      THE WITNESS:   Yes.

12      MR. SOLOMON:   Q.   You can't explain why,

13  right?

14      A.   Correct.

15      MR. SOLOMON:   I'll have marked as the next

16  exhibit another document produced in this litigation

17  with the control numbers 061785 through -790.

18      (Whereupon, Deposition Exhibit 164

19      was marked for identification.)

20      MR. SOLOMON:   Q.   Let me know when you've

21  had a chance to look at it, if you recognize any of

22  the exchanges.  Just so you know, I'm just going to

23  focus on the first page.

24      A.   Okay.  Just give me one more second.

25  Okay.  But the context -- it's in reverse

1  chronological

2      Q.   Okay.  That's fine.

3      A.   So just give me ...

4      MR. LINDSTROM:   Also, Counsel, maybe you

5  can expedite things.  Do you know, is he anywhere in

6  this chain?  Is there an e-mail to him?

7      MR. SOLOMON:   I do not believe so, no.

8      MR. LINDSTROM:   Okay.

9      THE WITNESS:   Okay.

10      MR. SOLOMON:   Q.   Recognize this at all?

11      A.   I do not.

12      Q.   Okay.  And then on the first page, I'm

13  looking just under halfway down where it says,

14  "Yes."

15      It says, "Yes, we plan to have two

16  customers during the April Gartner executive

17  briefing."  And then in parentheses, "(we are

18  approaching HP and Veritas - not sure.)"

19      Just focusing on the language "approaching

20  HP," were you involved in approaching HP with

21  respect to -- to asking that they'd be a reference

22  around this time?

23      MR. LINDSTROM:   At the April Gartner

24  executive briefing?

25      MR. SOLOMON:   Correct.  Correct.

1      THE WITNESS:   I'm sure I wasn't.

2      MR. SOLOMON:   Q.   Okay.  So you wouldn't

3  have wanted to -- you wouldn't have been exploiting

4  your relationship with Carly Fiorina to try and do

5  that?

6      MR. LINDSTROM:   Assumes facts.

7  Mischaracterizes the testimony.

8      THE WITNESS:   I don't think I'd ask her,

9  at her level, to be a reference.  We'd have to ask

10  someone who was really running the CRM system.

11      MR. SOLOMON:   So you don't know

12  anything about this?

13      A.   No, I don't.

14      MR. SOLOMON:   Okay.  Let's have marked as

15  the next exhibit an article from Vanity Fair called

16  "Absolutely Excessive."

17      (Whereupon, Deposition Exhibit 165

18      was marked for identification.)

19      THE WITNESS:   Okay.

20      MR. SOLOMON:   Q.   Okay.  Have you read

21  this before?

22      A.   I have.

23      Q.   And who wrote this, do you know?

24      A.   Matthew Symonds.

25      Q.   And that's your modest boat on the front

1  page?

2       A.   It's -- I own half of it now.

3       Q.   Okay.  Who owns the other half?

4       A.   David Geffen.

5       Q.   And is it true that this boat was

6  purchased, at least in part, with the proceeds of

7  your sales in January 2001?

8       MR. LINDSTROM:  Asked and answered.

9       THE WITNESS:  Again, the sales went

10  partially to pay down my loans and partially went to

11  cash, and I'm not sure how the cash -- where the

12  cash distributions went.

13       MR. SOLOMON:  Q.  Is there a swimming pool

14  on your boat?

15       A.   No, there's not.  Though there have been

16  numerous newspapers articles talking about swimming

17  pools, chandeliers.  All news to me.  No swimming

18  pool.  No chandeliers.

19       Q.   And there never has been, right?

20       A.   No.

21       Q.   Okay.  That's a lot of money to pay for a

22  boat without a swimming pool, isn't it?

23       A.   Certainly is.

24       Q.   I'm looking at page -- trying to look at,

25  but my eyesight is failing me.  What number is that?

737

1  328, where you're sitting in the cockpit of a

2  fighter jet.

3       A.   Yes.

4       Q.   Okay.  And then on the right-hand side,

5  almost halfway down, there's the following

6  language -- well, excuse me.

7       A.   Don't feel too bad.  It's hard for me to

8  read too, and I've got my glasses on.

9       Q.   In any event, it seems to confirm there,

10  does it not, that some of the proceeds were used --

11       A.   Where are you reading?  Which paragraph?

12       Q.   Hold on one second, Mr. Ellison.  I'm

13  sorry.

14       A.   Okay.  No problem.

15       Q.   It seems to, almost halfway down, say that

16  money that had been put to use funding the

17  construction of the boat.

18       Do you see that reference?

19       A.   I don't.  First, second, third -- give me

20  a paragraph number.

21       Q.   It's in the second full paragraph?

22       A.   Second full paragraph.

23       Q.   Yeah.

24       A.   Okay.  And the sentence begins. "For

25  months he had been under pressure," is this the

738

1  paragraph --          months he had been under pressure

2  because of problems" --

3       Q.   Yes.  Exactly.

4       A.   Okay.

5       Okay.  I read the full paragraph.

6       MR. LINDSTROM:  Is there a pending

7  question?

8       MR. SOLOMON:  Yes.  There will be in a

9  second, as soon as I can focus my eyes a little bit

10  more.

11       Q.   Okay.  Do you see it says, "if he hadn't

12  vested the options then, he would have lost them."

13       Do you see that?

14       A.   Yes.

15       Q.   That's not true, is it?

16       A.   Well, the options had already been vested,

17  so it was -- the sentence makes no sense whatsoever.

18       Q.   Right.

19       And let's assume he meant if you hadn't

20  exercised.

21       A.   Exercised.

22       Q.   That still would be wrong, wouldn't it?

23       A.   No.  If I hadn't exercised -- I had to

24  exercise.  I could have exercised and held or

25  something like that.  But I had to exercise, because

739

1  after ten years, you do lose them.

2       Q.   What I'm saying is you didn't to have

3  exercise in January, did you?

4       MR. LINDSTROM:  But it doesn't say that.

5       THE WITNESS:  It doesn't have a date.

6       MR. SOLOMON:  Right.

7       THE WITNESS:  It says -- if I just reread

8  this, "If he hadn't exercised the options then, he

9  would have lost them."

10       MR. SOLOMON:  Q.  Right.  That's not true,

11  is it?

12       A.   Well, depends what you mean -- I don't

13  mean to be cute, but depends what you mean by

14  "then," "approximately then."

15       Okay.  But no, not that day.  Certainly

16  not that day.  As we said, if I hadn't exercised

17  them at least by August, I would have lost them.

18       Q.   Right.

19       A.   Right.

20       MR. LINDSTROM:  Where are we in time?  We

21  should be -- according to my watch, we're just about

22  done.

23       THE VIDEOGRAPHER:  We have one minute and

24  45 seconds to go.

25       MR. LINDSTROM:  What do you think, Mark?

740

for my last minute and a half and, therefore, I've waived it.

MR. LINDSTROM: I will tell you we will not -- we will not take that position.

MR. SOLOMON: In that case, it's very hot in here and I'm ready to go.

THE WITNESS: By the way, the newspapers also reported that I crashed my fighter jet and died when my fighter jet crashed into the Oracle parking lot. That was also a story that hit the press. You just reminded me. It was the single most bizarre -- there have been a lot of bizarres, but reading about your own death --

MR. LINDSTROM: Are we still on the record?

THE VIDEOGRAPHER: We are.

MR. LINDSTROM: Off the record and you can finish the story.

MR. SOLOMON: Wait a second. Before we go off the record, I just want to make sure. We are reserving our rights. There are issues of

**3/30/2007 Ellison, Lawrence Vol. III**

privilege. There are many more materials to go through. There's the fact that I'm going back, hopefully to take Mr. Symonds' deposition and get some real answers from him. And so I reserve my rights to talk to you again, Mr. Ellison. Thank you for your testimony.

THE VIDEOGRAPHER: This adjourns the deposition of Lawrence Ellison. The number of tapes used today is three. This is the end of Videotape No. 3, Volume 3. The original videotapes will be retained by LiveNote World Service. Going off the record. The time on the monitor is 5:59 p.m.

(Deposition adjourned at 5:59 p.m.)

742

CERTIFICATE OF WITNESS

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____, 20___, at _____, _____.
(CITY)                (STATE)

_____
LAWRENCE ELLISON

743

**3/30/2007 Ellison, Lawrence Vol. III**

CERTIFICATE OF DEPOSITION OFFICER

I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed by me or under my direction by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto subscribed by my hand this 2nd day of April, 2007.

_____

744