COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
         – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS. | ) ) |
| | ) |

Master File No. C-01-0988-MJJ

CLASS ACTION

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF R. GLENN HUBBARD

DATE:          November 16, 2007
TIME:          1:30 p.m.
COURTROOM:  The Honorable
                    Martin J. Jenkins

**PREVIOUSLY FILED ON JULY 26, 2007 (DOCKET NO. 852)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND ..................................................................................................2

III.  LEGAL STANDARD...........................................................................................3

IV.  ARGUMENT ........................................................................................................5

    A.  Hubbard's Bias Precludes Him from Offering Reliable Opinions .........................5

    B.  Hubbard's Opinions About Oracle's Forecasting Process and Internal Forecast Data Should Be Excluded.........................................6

    C.  Hubbard's Opinions that Oracle's Sales Forecasts Were Informed by Economic Data Is Speculative and Should Be Excluded.....................................10

    D.  Hubbard's Opinions Are Duplicative of Foster's Opinions and Should Be Excluded Under Rule 403 ....................................12

    E.  Hubbard's Opinions About Whether the Economy Was in a Recession Should Be Excluded..........................................13

    F.  Hubbard's Opinions that Rely on the Financial Results of Oracle's Competitors and the Statements of Analysts About Those results Are Unreliable..........................................17

    G.  Hubbard's Opinions Based on Unspecified Channel Checks Are Unreliable..........................................19

    H.  Hubbard's Opinion that the Diversity of Oracle's Customer Base Protected Its Revenues Should Be Excluded as Unreliable and Irrelevant ...........20

    I.  Hubbard's Opinions Invade the Province of the Jury...........................................21

V.  CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bourjaily v. United States,*
    483 U.S. 171 (1987)...................................................................................4, 11

*City of Tuscaloosa v. Harcros Chems.,*
    158 F.3d 548 (11th Cir. 1998) ...........................................................................21

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993) ................................................................................. *passim*

*Daubert v. Merrell Dow Pharms.,*
    43 F.3d 1311 (9th Cir. 1995) ....................................................................8, 11, 17

*DSU Med. Corp. v. JMS Co., Ltd.,*
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...............................................................4

*Folden v. Wash. State Dep't of Social and Health Servs.,*
    744 F. Supp. 1507 (W.D. Wash. 1990), *aff'd,*
    981 F.2d 1054 (9th Cir. 1992) ...........................................................................6

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997).............................................................................5, 10, 11, 21

*GST Telecommunications, Inc. v. Irwin,*
    192 F.R.D. 109 (S.D.N.Y. 2000) ......................................................................22

*Hester v. BIC Corp.,*
    225 F.3d 178 (2d Cir. 2000)...............................................................................18

*Hines v. Consol. Rail Corp.,*
    926 F.2d 262 (3d Cir. 1991).................................................................................7

*Jinro Am., Inc. v. Secure Invs., Inc.,*
    266 F.3d 993 (9th Cir. 2001) .............................................................................5

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)...................................................................................3, 4, 5

*Lust v. Merrell Dow Pharms.,*
    89 F.3d 594 (9th Cir. 1996) ...............................................................................4

*Mitroff v. Xomox Corp.,*
    797 F.2d 271 (6th Cir. 1986) .............................................................................18

*Mukhtar v. Cal. State Univ.,*
    299 F.3d 1053 (9th Cir. 2002) ...........................................................................3

*Polsby v. Shalala,*
    925 F. Supp. 379 (D. Md. 1996), *aff'd sub nom.,*
    *Polsby v. Chase,* 165 F.3d 19 (4th Cir. 1998)...................................................6

1

2                                                                                        **Page**

3   *Ralston v. Smith & Nephew Richards, Inc.*,
        275 F.3d 965 (10th Cir. 2001) ..................................................................................6
4
    *SEC v. Lipson*,
5       46 F. Supp. 2d 758 (N.D. Ill. 1999) .......................................................................21

6   *Thompson v. State Farm Fire & Cas. Co.*,
        34 F.3d 932 (10th Cir. 1994) ..................................................................................21
7
    *United States v. Downing*,
8       753 F.2d 1224 (3d Cir. 1985)..........................................................................4, 14, 15

9   *United States v. Frazier*,
        387 F.3d 1244 (11th Cir. 2004),
10      *cert. denied*, 544 U.S. 1063 (2005)..........................................................................6

11  *United States v. Scholl*,
        166 F.3d 964 (9th Cir. 1999) ....................................................................................4
12
    *Watkins v. Telsmith, Inc.*,
13      121 F.3d 984 (5th Cir. 1997) ..................................................................................10

14  *Weisgram v. Marley Co.*,
        528 U.S. 440 (2000)..................................................................................................4
15

16
    **STATUTES, RULES AND REGULATIONS**
17
    15 U.S.C.
18      §78j(b)........................................................................................................................1

19  Federal Rules of Evidence
        Rule 401 ....................................................................................................................1
20      Rule 402 ................................................................................................................1, 4
        Rule 403 ........................................................................................................... *passim*
21      Rule 702 ........................................................................................................... *passim*
        Rule 704 ..............................................................................................................16, 18
22

23

24

25

26

27

28

TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that on November 16, 2007, at 1:30 p.m., in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs will and hereby do move this Court to preclude the testimony of R. Glenn Hubbard ("Hubbard").  This motion is made pursuant to Federal Rules of Evidence 401, 402, 403 and 702 on the grounds that Hubbard's opinions are unreliable, would serve to mislead and confuse the jury, waste the Court's time, will not assist the trier of fact to understand the evidence or determine a fact at issue, and invades the province of the jury.  This motion is based upon this notice, the following memorandum of points and authorities, the pleadings and records on file herein, and such further evidence and argument as may be presented to the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

This case arises out of defendants' use of fraud and deception to portray Oracle's business as healthy through numerous false and misleading statements concerning financial data, earnings guidance, and the performance of Oracle's product Suite 11i.  Accordingly, a central issue in this case is whether defendants made false and misleading public statements in violation of §10(b) of the Securities Exchange Act of 1934.  In support of their defense, defendants offer the opinions of R. Glenn Hubbard (a business school dean and Chair of the Paulson Committee whose principle endeavor is the elimination of securities suits like this one) to opine upon the "reasonableness" of the statements alleged in the case to be false and misleading.  In particular, Hubbard seeks to offer opinions on the "reasonableness" of defendants' statements based upon his view of the economy in Oracle's fiscal year 2001 and his view of Oracle's forecast process.

Hubbard's opinions must be excluded under Rule 702 and under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  Hubbard utilizes unreliable methodologies, offers opinions on the economic environment that are inconsistent with opinions that he held while an economic advisor to President George W. Bush during the relevant period, and fails to explain how his opinion that the U.S. economy was not in a recession in Oracle's Q3FY01 relate to or fit with the issues to be tried in the case.  His opinions concerning the economic environment must therefore be excluded as unreliable and irrelevant.  Hubbard's opinions about Oracle's forecast process should also be

1   excluded as he is not qualified to opine upon forecasting processes in a business environment and

2   employs unreliable methodology in reaching his opinions.  In fact, he fails to consider multiple

3   metrics that Oracle actually used in its forecasting process (instead focusing largely on one metric)

4   and failed to consider or analyze important facts that he, himself, testified were inputs into a

5   reasonable forecast process.  His opinions on Oracle's forecasting process should be excluded as

6   unreliable.  They should also be excluded under Rule 403 as they duplicate the opinions of

7   defendants' other forecasting expert George Foster ("Foster").

8   **II.    BACKGROUND**

9        Hubbard offers the following summary of the opinions that defendants intend to offer in the

10  case:

11  - The earnings per share ("EPS") and other financial performance guidance Oracle
        issued on December 14, 2000 was reasonable and consistent with the business
12      conditions Oracle faced at the time, including what was known about relevant sector-
        specific data and macroeconomic data.  It was also reasonable in light of Oracle's
13      internal forecasting process and data at the time.

14  - Defendants' subsequent statements regarding Oracle's financial performance during
        3Q FY2001 were reasonable in light of the relevant sector-specific and
15      macroeconomic data available during the course of Oracle's 3Q FY2001 and the
        contemporaneous information available through Oracle's internal forecasting
16      process.

17  Declaration of Douglas R. Britton in Support of Motion to Exclude the Expert Testimony of R.

18  Glenn Hubbard ("Britton Decl."), Ex. 1 at 5, ¶¶10-11.[1]

19       From this general summary flows numerous opinions regarding the state of the general U.S.

20  economy and the broad economic indicators that Hubbard selects to gauge that economy (for periods

21  dating as far back as 14 years prior to the relevant period), and the state of the economy in the

22  software industry, including an analysis of sector-specific metrics for periods dating as far back as

23  40 years prior to the relevant period.  Hubbard also provides numerous opinions regarding Oracle's

24  forecasting process, including the historical accuracy of the process, the manner in which that

25

26  ———————————————

27  [1]    All "Ex." or "Exs." references are to the Britton Decl.

28  PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE EXPERT TESTIMONY OF R. GLENN
    HUBBARD - C-01-0988-MJJ                                                    - 2 -

1  process incorporated economic conditions, the knowledge that Oracle's executives gained from that

2  process, and the reasonableness of defendants' public statements in light of that process.

3       Following the parties' exchange of opening expert reports, Hubbard submitted a rebuttal

4  report that addressed the economic analysis provided in the report of plaintiffs' forecasting and

5  economic expert Dr. Alan Goedde.  Missing from the Hubbard Rebuttal Report was any meaningful

6  discussion of Oracle's forecasting process.  Instead, Hubbard limited his analysis largely to

7  economic issues and to the extent that he discussed Oracle's forecast process, he did so largely to

8  opine that Oracle used economic information in that process.  Hubbard has therefore deferred to

9  defendants' new rebuttal expert Foster for a discussion of Oracle's forecasting process and the

10  information that defendants received from that process.

11       Plaintiffs have moved separately to exclude portions of Foster's rebuttal report.  But as

12  discussed below, Hubbard's opinions concerning Oracle's forecast process should be excluded as he

13  lacks the necessary qualifications to opine on a forecast process in the business environment and

14  largely duplicates the opinions of Foster.

15  **III.    LEGAL STANDARD**

16       The trial courts act as gatekeepers in determining whether to admit expert testimony.  *Kumho*

17  *Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 589.  This is a critical

18  function of the court because "[m]aintaining *Daubert's* standards is particularly important

19  considering the aura of authority experts often exude, which can lead juries to give more weight to

20  their testimony."  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).

21       Expert testimony may be admitted as evidence only when the testimony (1) "will assist the

22  trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based

23  upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods,"

24  and (4) "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R.

25  Evid. 702; *Daubert*, 509 U.S. at 589.  A witness may be qualified as an expert by knowledge, skill,

26

27

28

PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE EXPERT TESTIMONY OF R. GLENN
HUBBARD - C-01-0988-MJJ                                                                           - 3 -

1    experience, training, or education.  *Id.*[2]  Expert testimony is also subject to the limitations of Federal

2    Rules of Evidence 402 and 403.  *See, e.g.*, Fed. R. Evid. 402, 403; *United States v. Scholl*, 166 F.3d

3    964, 971 (9th Cir. 1999) (finding that admissibility of expert testimony should be evaluated under

4    Fed. R. Evid. 402 and 403).  Relevance, in this context, requires that the expert's proposed opinion

5    would assist the trier of fact to understand or determine a fact in issue.  *Daubert*, 509 U.S. at 591

6    (holding that the requirement that the expert testimony "'assist the trier of fact' . . . goes primarily to

7    relevance").  "'An additional consideration under Rule 702 – and another aspect of relevancy – is

8    whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will

9    aid the jury in resolving a factual dispute.'"  *Id*. (quoting *United States v. Downing*, 753 F.2d 1224,

10   1242 (3d Cir. 1985)).  This consideration is known as "fit."  *Daubert*, 509 U.S. at 591.

11          Moreover, to be admissible under Rule 702, an expert's opinion must be "'not only relevant,

12   but reliable.'"  *See Kumho Tire*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589; Fed. R. Evid. 104(a),

13   702.  A proponent of expert testimony bears the burden of establishing by a preponderance of the

14   evidence that the proposed testimony meets both Daubert's reliability and relevancy requirements.

15   *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *Lust v. Merrell Dow Pharms.*, 89

16   F.3d 594, 598 (9th Cir. 1996); *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1146 (N.D.

17   Cal. 2003) (granting in part motion to exclude expert testimony as unreliable).  The Supreme Court

18   has characterized the reliability inquiry as an "exacting" one.  *Weisgram v. Marley Co.*, 528 U.S.

19   440, 451 (2000).  In performing its gatekeeping role, the court does not focus on the correctness of

20   the conclusions of the expert's testimony.  *See, e.g.*, *DSU Med.*, 296 F. Supp. 2d at 1146-47.  Rather,

21   the court focuses on whether the methodology used by the expert to reach his conclusions is

22   sufficiently reliable for submission of that testimony into evidence.  *Id.*

23          In determining reliability, the Supreme Court in *Daubert* held that a trial court may (1) assess

24   whether the expert's technique or theory has been tested, (2) assess whether the technique or theory

25   has been subject to peer review and publication, (3) evaluate the known or potential rate of error of

26   _____

27   [2]          Citations are omitted and emphasis is added, unless otherwise noted.

28   PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE EXPERT TESTIMONY OF R. GLENN
     HUBBARD - C-01-0988-MJJ                                                              - 4 -

the technique or theory when applied, (4) ascertain the existence and maintenance of standards and controls, and (5) determine whether the technique or theory has been generally accepted in the scientific community. 509 U.S. at 590-94. These factors may be applied to assess the reliability of "all 'scientific,' 'technical,' or 'other specialized' matters." *Kumho Tire*, 526 U.S. at 147. As the Supreme Court emphasized, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and must be "'tied to the facts' of a particular 'case.'" *Kumho Tire*, 526 U.S. at 150.

Other factors may also be relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury, such as (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* Fed. R. Evid. 702 advisory committee's note.

"When [expert] opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." *Id.*; *see, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (the evidence must be excluded if the court finds "that there is simply too great an analytical gap between the data and the opinion proffered"); *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) ("impressionistic generalizations" are inadmissible). Opinions based on mere speculation or lacking the requisite methodological rigor should be excluded at trial.

## IV.    ARGUMENT

### A.    Hubbard's Bias Precludes Him from Offering Reliable Opinions

Hubbard's opinions are unreliable because of his affiliation with the Committee on Capital Markets Regulation ( the "Paulson Committee"). The Paulson Committee was formed in 2005 and issues interim reports with recommendations concerning the U.S. capital markets. One of the Committee's principle endeavors is to curb shareholder litigation. Ex. 12 at xii. Hubbard is co-

chairman of the Committee.  In a November 30, 2006 report, the Committee concluded that "the private litigation system needs modification," promoted caps on corporate liability, argued that securities class action litigation is to blame for decreased competitiveness in the US public equity capital market, stated "the penalties [of securities enforcement] have grown disproportionately large relative to their deterrent benefit," and advocates the dissolution of the current securities class action process.  *Id*. at xii, 5, 11.  Hubbard's signature appears on the preface to the report, and Hubbard is one of three members endorsing the report.  *Id*. at vii.  Hubbard also testified that "I've certainly offered the opinion in the context of the national commission that I recently co-chaired . . . that securities class action litigation has some problematic elements."  Ex. 2 at 25:12-15.  It follows that Hubbard's bias against securities class actions would not permit him to give an independent, objective opinion in this case and is cause for his exclusion, especially considering that the opinions he offers are at odds with the opinions that he held during the relevant period.  *See* §IV.A.5, *infra*.

Several courts have recognized that a biased expert witness, or an expert witness lacking in independence, is not reliable.  *See, e.g.*, *Polsby v. Shalala*, 925 F. Supp. 379, 393 (D. Md. 1996) (finding that a "lack of independence as an expert witness destroys his credibility"), *aff'd sub nom.*, *Polsby v. Chase*, 165 F.3d 19 (4th Cir. 1998); *Folden v. Wash. State Dep't of Social and Health Servs.*, 744 F. Supp. 1507, 1522 (W.D. Wash. 1990) (same), *aff'd*, 981 F.2d 1054 (9th Cir. 1992).  Given Hubbard's service with the Paulson Committee and his strong opposition to securities litigation, the Court should consider Hubbard's bias as a significant factor weighing on his credibility and, when combined with the factors outlined below, exclude his testimony.

### B.    Hubbard's Opinions About Oracle's Forecasting Process and Internal Forecast Data Should Be Excluded

Rule 702 permits opinion testimony only by a witness qualified as an expert by knowledge, skill, experience, training or education.  Fed. R. Evid. 702.  The burden is on the party offering the expert testimony to demonstrate that the expert is sufficiently qualified to provide the opinions proffered.  *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 971 n.4 (10th Cir. 2001) (explaining that proponent of expert testimony bears burden of demonstrating expert's qualifications); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of

1  establishing qualification, reliability, and helpfulness rests on the proponent of the expert

2  opinion . . . ."), *cert. denied*, 544 U.S. 1063 (2005).

3      In his report, Hubbard repeatedly asserts that Oracle's statements were reasonable "in light of

4  Oracle's internal forecasting process and data at the time" and because of "contemporaneous

5  information available through Oracle's internal forecasting process." Ex. 1 at 5, ¶¶10-11.  Hubbard

6  then expresses more detailed opinions about Oracle's forecasting process, including the

7  reasonableness of that process and the historical accuracy of that process. *Id.* at 78-94.  After his

8  review of defendants' version of the facts, Hubbard gives the opinion that Oracle's forecasting

9  process "is exactly what one would expect in Oracle's type of business, in which software sales are

10  the result of individual business purchasing decisions rather than a direct function of economic

11  conditions." *Id.* at 78, ¶159.

12      Hubbard's opinions about Oracle's forecasting process should be excluded as he does not

13  possess the requisite knowledge, skill, experience, training or education, to opine on the

14  reasonableness or adequacy of a forecast process in a business environment.  *See* Fed. R. Evid. 702

15  ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

16  thereto in the form of an opinion"); *Daubert*, 509 U.S. 579 (instructing trial judges to exclude

17  unqualified witnesses); *see also Hines v. Consol. Rail Corp*., 926 F.2d 262, 272-73 (3d Cir. 1991)

18  (noting two general reasons to exclude evidence under Rule 702:  unqualified witness and unreliable

19  scientific technique).  While Hubbard's CV spans a total of 16 pages, it is virtually silent on any

20  qualifications that would enable Hubbard to assist the trier of fact in understanding Oracle's

21  forecasting process or to determine a critical fact at issue relating to Oracle's forecast process.  In

22  fact, the only reference in Hubbard's report that even suggests that he possesses forecasting

23  experience states that Hubbard was "responsible for economic analysis of tax policy, the

24  administration's revenue estimates, and health care policy issues" for two years at the U.S.

25  Department of Treasury. Ex. 1 at 4, ¶6.  And when asked in deposition concerning his experience in

26  business forecasting, he referenced his government service and his service as a member of the board

27  of directors for several different companies or firms.  Ex. 2 at 34:21-35:6.  This experience hardly

28  qualifies Hubbard to offer expert opinions on Oracle's forecasting process.

1    As the Ninth Circuit has noted, "[o]ne very significant fact to be considered is whether the

2  experts are proposing to testify about matters growing naturally and directly out of research they

3  have conducted independent of the litigation, or whether they have developed their opinions

4  expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th

5  Cir. 1995). Given Hubbard's lack of experience in the business forecasting environment, by study or

6  otherwise, Hubbard has developed his opinions concerning Oracle's forecast process expressly for

7  purposes of testifying. *Id.* In fact, defendants' own recognition of Hubbard's lack of forecasting

8  qualifications apparently led them to find a different forecasting expert to rebut the opinions of

9  plaintiffs' forecasting expert, Dr. Alan Goedde. Tellingly, Hubbard largely fails to address most of

10  Dr. Goedde's critique of that process in his rebuttal report. Instead, he largely limits his opinion on

11  Oracle's forecast process to opining that Oracle used economic information in its forecasting

12  process, which as discussed below must be excluded as speculative, unreliable, and duplicative of

13  the opinions offered by Foster. *See* §IV.A.4; *see also* Ex. 1 at 3, ¶4.

14    Even if Hubbard was qualified to give opinions on forecasting processes in the business

15  environment, however, his opinions about Oracle's forecast process should be excluded here because

16  he employed unreliable methodologies in reaching those opinions by failing to consider facts that

17  undermined Oracle's forecast process. For example, Hubbard did not know the impact of defendant

18  Ellison's directive to increase the risk (and amount) in the forecast and did not bother to even study

19  it before rendering his opinions. Ex. 2 at 87; *see* Ex. 3 at 22-23; Ex. 14 at 78, 81-84. He did not

20  know when the directive occurred and did not consider it "material" even though he acknowledged

21  that Ellison gave the directive to address sandbagging by its sales representatives – facts that would

22  and did significantly impact the forecast process. *Id.* at 42:8-16; 62:8-21. In fact, he declined to

23  address the change resulting from the directive both before and after plaintiffs' expert, Dr. Goedde,

24  pointed it out in his report. Ex. 3 at 22-26. Hubbard also did not test the reliability of Oracle's

25  conversion ratio (both before and after Dr. Goedde revealed that the historical conversion ratio that

26  Minton used as the basis for her Potential Forecast and public guidance was growing increasing

27  unreliable) and did not credit the fact that Oracle's product mix had changed, which adversely

28  affected the conversion ratio. Ex. 14 at 85-87. Indeed, he did not analyze the effect of the changing

1    product mix on Oracle's forecast process and even failed to analyze the problems that Oracle was

2    encountering with its 11i suite even though he acknowledged that "how poorly any product is doing

3    is an input into a reasonable forecast process." Ex. 2 at 15:5-18. Instead, Hubbard chose to assume

4    that the sales representatives credited the change and accounted for the product issues. *Id*. at 67:9-

5    68:2, 15:19-16:7, 18:15-19. And he did so without analyzing or considering evidence on how the

6    sales representatives did so. He therefore did not apply his principles and methods reliably to the

7    facts of the case. Fed. R. Evid. 702. The foregoing changes affected the very foundation of Oracle's

8    forecasting process. Failing to consider them renders his methodology unreliable.

9         Hubbard also failed to analyze or even consider the very "forecasting indicators" that Ellison

10   testified were "key" to gauging Oracle's forecast. Ex. 13 at 179. He did not analyze Oracle's actual

11   results or the January 17, 2001 or February 8, 2001 Garnick Flash Reports. In fact, he did not know

12   that the flash reports, which revealed Oracle's actual results through the quarter, showed that

13   Oracle's U.S. license divisions had reported severe ***negative*** growth rates throughout the quarter.

14   Ex. 2 at 71:23-72:7; *see also* Ex. 3 at 28-35; Ex. 14 at 67-69. In fact, he also did not analyze the

15   pipeline growth even though the pipeline had dropped significantly through the quarter and did not

16   know that Henley testified that the pipeline was "too good to be true." Ex. 2 at 73:21-24. He did not

17   analyze the "growth gap" even though it was unusually narrow throughout December and January

18   and did not even know what it was. *Id*. at 135:18-22, 137:17-20; Ex. 3 at 35; Ex. 14 at 70-71. And

19   he did not analyze the field forecast or the behavior of that forecast even though it was affected by

20   the directive and behaved unusually throughout the quarter. *See* Ex. 3 at 37-39; Ex. 14 at 71-74.

21   Instead, he analyzed nothing more than what defendants believe supports their case and left the rest

22   up to Foster. Ex. 4 at 3, ¶4.

23        Hubbard also revealed his bias at deposition. When presented at deposition with a

24   declaration from Oracle's former President Ray Lane, who declared under oath that Ellison

25   considered these metrics important and declared that many were "red flags," he cast it aside as the

26   rantings of a "disgruntled former employee of Oracle." Ex. 2 at 116:8-118:10. He therefore failed

27   to account for obvious alternative explanations and did not apply principles and methods reliably to

28   the facts of the case. Fed. R. Evid. 702 advisory committee's notes. Given his failure to consider

1   most everything that defendants actually considered, "there is simply too great an analytical gap

2   between the data and opinion proferred."  *Joiner*, 522 U.S. at 146.  His opinions about Oracle's

3   forecasting process must therefore be excluded as unreliable.  Ex. 3 at 10-22.  Without testing the

4   basis of his opinions, Hubbard cannot render reliable opinions.

5        Defendants have failed to carry their burden of demonstrating that Hubbard is qualified to

6   give any opinions on Oracle's forecasting process or that he applied reliable methodologies.  He

7   should therefore be precluded from providing any such testimony.

8   **C.**     **Hubbard's Opinions that Oracle's Sales Forecasts Were Informed by Economic Data Is Speculative and Should Be Excluded**

9

10        Rule 702 does not permit even a qualified expert witness to offer speculation in the guise of

11   expert testimony.  "[T]he word 'knowledge' [in Rule 702] connotes more than subjective belief or

12   unsupported speculation."  *Daubert*, 509 U.S. at 590; *accord Watkins v. Telsmith, Inc.*, 121 F.3d

13   984, 990 (5th Cir. 1997).  Despite this clear language, Hubbard offers just that to support his opinion

14   that the sales forecasts at Oracle were the product of economic information.  Ex. 1 at 8, 78, ¶¶27,

15   159; Ex. 4 at 18-22, ¶¶47-60.  Hubbard states that "economic information is considered a part of the

16   forecasting process, even if it is not always explicitly identified as such" and explains that Oracle's

17   "sales are the product of thousands of salespeople calling on thousands of customers around the

18   globe across all sorts of industries each and every month."  Ex. 4 at 21, ¶54.  Hubbard even gives an

19   example of the manner in which economic information purportedly informed the sales forecasts:

20          For example, when an individual salesperson is talking to a Chief Information Officer (CIO) of a large company, the CIO may talk to them about new Information Technology (IT) initiatives, when the project will likely be budgeted, and whether

21   there is likely to be any delays or accelerations to the process.  All of that information, which relates to the economic circumstances of the client, even if not

22   expressly communicated to or understood by the salesperson in macroeconomic terms, is then factored into the salesperson's assessment of whether Oracle is likely

23   to make a sale this quarter to that client and how much the sale will be.  It is precisely this type of close-to-the-customer process that uses the most timely and relevant

24   economic data to inform the forecasting process.

25   *Id*. at 21, ¶55.  Hubbard's example, which forms the basis of his opinion, is rank speculation and

26   inherently unreliable.  Hubbard utilizes no methodology, let alone a reliable and accepted one, to

27   inform his opinions.  *Daubert*, 509 U.S. at 589.  He does not cite to customer testimony, customer

28   documents, sales documents, or any other internal information to inform or test his opinion.  *Id.*  He

1   says nothing about whether his opinions have been subject to peer-review or accepted in his field

2   (other than from defendants' other testifying expert Foster).  Indeed, Hubbard's opinions appear to

3   have been developed solely for this litigation.  Ninth Circuit precedent considers this to be a "very

4   significant" fact in assessing reliability.  *Daubert*, 43 F.3d at 1317.

5          It is up to Hubbard to establish that economic information, in fact, informed Oracle's sales

6   forecasts.  *See, e.g.*, *Bourjaily*, 483 U.S. at 175-76 (a proponent of expert testimony bears the burden

7   of establishing by a preponderance of the evidence that the proposed testimony meets both

8   *Daubert's* reliability and relevancy requirements).  Hubbard attempts to do so by citing general

9   statements by three Oracle executives that they spoke to Oracle's customers (or the sales

10  representative that called on the customers) and to each other during the quarter.  Ex. 4 at 21-22.  But

11  absent from any of this testimony is specifics on what information the executives learned, whether

12  Oracle's customers were forthcoming with information, or whether and how that information formed

13  the bases of the field-level forecasts.  Without any specifics, Hubbard's opinions are unreliable, are

14  based on nothing more than speculation, and must be excluded.  *Gen. Elec.*, 522 U.S. at 146 (the

15  evidence must be excluded if the court finds "that there is simply too great an analytical gap between

16  the data and the opinion proffered").  Speculative opinions will not assist the trier of fact to

17  understand the evidence or determine a fact in issue.  Fed. R. Evid. 702.

18         Hubbard, as well as defendants, should also be foreclosed from referencing sales-level

19  information given the discovery limitations in this case and defendants' failure to preserve evidence

20  from sales-level employees.  As the Court is aware, plaintiffs were specifically precluded from

21  discovering evidence from the files of the regional sales managers who specifically participated in

22  the weekly forecast calls with Oracle's Area Vice Presidents – and whose files were never preserved.

23         So my . . . first ruling will be that the files to be searched are the . . . 53 individuals
       that the defendants have identified, plus the area-vice presidents' files in the three
24     sales and consulting divisions listed in the letter.

25                            *        *        *

26         I'm not giving you . . . the regional managers.

27  Ex. 5 at 16:16-22; 26:15-16.  Because of the discovery limitations that defendants demanded (and

28  their failure to preserve relevant evidence), plaintiffs were unable to adequately discover evidence to

rebut these arguments.[3]  Hubbard's opinions based on sales-level information should therefore be excluded.

### D.   Hubbard's Opinions Are Duplicative of Foster's Opinions and Should Be Excluded Under Rule 403

Hubbard's opinions concerning Oracle's forecast process must also be excluded under Federal Rule of Evidence 403 as they are duplicative of the opinions that defendants offer through Foster.  In his report, Foster gives identical opinions about the forecasting process and the manner in which economic information informed that process:

| *Foster Rebuttal Report* | *Hubbard Opening Report* |
|---|---|
| It is my view that Oracle's forecasting process incorporated macroeconomic, customer, and product market information in two ways – through sales representatives' direct interactions with customers and the application of management judgment.<br><br>By virtue of relying on sales representatives' estimates of likely purchases by potential customers, Oracle's forecasting process incorporated relevant macroeconomic, product, and customer information. | Macroeconomic conditions were incorporated in the forecast through both sales representatives' estimates of likely purchasing behavior of their prospective customers and the informed judgment of more senior executives based on their critical review of forecasting information received from their direct reports. |

*See* Ex. 6 at 23-24, ¶¶57, 61; Ex. 1 at 78, ¶159; *compare* Ex. 6 at 23, ¶57 (quoting testimony of Jay Nussbaum and Edward Sanderson regarding general conversations with customers and sales representatives) *with* Ex. 4 at 21-22, ¶¶56, 58 (quoting same testimony of Jay Nussbaum and Edward Sanderson regarding general conversations with customers and sales representatives).  Hubbard offered the same opinions in deposition. Ex. 2 at 15:19-16:7; 17:23-18:19, 66:16-68-2.

The reports of Foster and Hubbard are duplicative in several additional respects.  Both purport to outline the forecasting process at Oracle in determining that the forecast process was

[3]      Plaintiffs have filed, contemporaneous with this motion, their motion for sanctions, which describes defendants' evidence destruction in this case.  Plaintiffs hereby incorporate by reference the discussion on the sales-level documents and evidence that defendants failed to preserve.  *See* Plaintiffs' Motion and Supplemental Submission Regarding Defendants' Destruction of Evidence and Request for Sanctions at §§V.B.1. and V.B.2.a.(1).

1    reasonable, including overlapping opinions on historical validation of the process, Minton's upside

2    adjustments, and "appropriate" checks and balances.  Ex. 6 at 11-20, ¶¶31-48; Ex. 1 at 78-93, ¶¶157-

3    196.  These duplicative opinions are improper under Rule 403.  Fed. R. Evid. 403 ("evidence may be

4    excluded if its probative value is substantially outweighed by . . . considerations of . . . needless

5    presentation of cumulative evidence").  Foster and Hubbard also use similar charts to convey similar

6    opinions – which is unsurprising given that the same legal services group was retained by defendants

7    to create the charts for both reports.  Ex. 2 at 113-114; Ex. 7 at 37. For example, Foster's Figure 3

8    addresses Oracle's EPS guidance, forecasts, and actual results – the exact same topic as that

9    addressed by Hubbard's Figures 44.  Ex. 6 at Appendix D, Figure 3; Ex. 1 at Appendix D, Figure 44.

10   Hubbard's Figures 43 and 45 also address the topics of Oracle's EPS and analyst forecasts, which

11   are covered by Foster's Figure 3.  Ex. 1 at Appendix D, Figures 43 & 45; Ex. 6 at Appendix D,

12   Figure 3.  Foster's Figure 1 gauges, in part, Oracle's potential forecast – which Hubbard addresses at

13   his Figure 46.  Ex. 6 at Appendix D, Figure 1; Ex. 1 at Appendix D, Figure 46.  Foster's Figure 13

14   measures conversion ratios in the same manner as Hubbard's Figure 50 measures conversion ratios.

15   Ex. 6 at Appendix D, Figure 13; Ex. 1 at Appendix D, Figure 50.  Foster's Figure 12 analyzes

16   Oracle's upside adjustment as a percentage of license forecast, the exact same metric also considered

17   in Hubbard's Figure 42.  Ex. 6 at Appendix D, Figure 12; Ex. 1 at Appendix D, Figure 42.

18        The reports of Hubbard and Foster are replete with duplicative opinions and charts, and

19   should accordingly be excluded.  Fed. R. Evid. 403 ("evidence may be excluded if its probative

20   value is substantially outweighed by . . . considerations of . . . needless presentation of cumulative

21   evidence").

22        **E.     Hubbard's Opinions About Whether the Economy Was in a Recession
                   Should Be Excluded**

23

24        Hubbard's opinions concerning whether the general U.S. economy was in a recession is not

25   sufficiently tied to the facts of this case and should be excluded as irrelevant.  "'An additional

26   consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony

27   proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a

28

1    factual dispute.'"   *Daubert*, 509 U.S. at 591 (quoting *Downing*, 753 F.2d at 1242).   This

2    consideration is known as "fit."   *Daubert*, 509 U.S. at 591.

3            Hubbard opines that Oracle's public statements were reasonable in light of the

4    macroeconomic data available during the course of Oracle's 3Q FY2001.   Ex. 1 at 5, ¶11.   He also

5    explains that "while there were signs of softening in the economy, that softening was consistent with

6    the slow macroeconomic decline that had begun months earlier, and not indicative of a larger,

7    sudden drop-off or recession."   *Id.* at 52, ¶94.   Hubbard then proceeds to analyze numerous broad

8    economic indicators (some spanning a more than 14-year period of time) to conclude that "[n]othing

9    in the mix of contemporaneous economic data available during Oracle 3Q FY2001 undermined the

10   reasonable basis for Oracle's December guidance, and none of the data made Defendants' later

11   statements during the quarter unreasonable."   *Id.* at 76, ¶155.

12           Hubbard's focus was on refuting the idea that the economy had entered a period of recession

13   prior to or during Oracle's 3Q FY01: "These data suggest that at the time, a reasonable observer

14   would not conclude that the U.S. economy appeared to be entering a period of prolonged slow

15   growth or recession . . . ."   *Id.* at 77, ¶155.   In fact, Hubbard's focus on the existence of recession

16   was quite clear in his rebuttal report:

17           While there were signs of economic softening, that softening was consistent with the
             slow macroeconomic decline that had begun months earlier, and economic
18           conditions before and during 3Q FY2001 ***were not sufficiently negative to be
             considered a recession of the sort of major economic downturn that Oracle itself
19           noted could have a negative impact on its financial performance.***

20   Ex. 4 at 6, ¶15.   And Hubbard focused on the existence of a recession even though he did not believe

21   that plaintiffs' expert had done so to support his opinions about the economic environment facing

22   Oracle at the time or the reliability of Oracle's public guidance in light of that environment.   Ex. 2 at

23   94:1-7.

24           Hubbard's opinions about whether the economy was in a recession should be excluded as

25   irrelevant and unreliable.   Ex. 1 at 52-77, ¶¶94-156; Ex. 4 at 6-13, ¶¶14-31.   At the outset, Hubbard

26   fails to support or analyze, in any way, whether a recession was necessary to undermine Oracle's

27   Public Guidance.   He does not cite any peer-reviewed publication that would support his

28   methodology or opinion that an economic recession was a necessary precursor to missed

1    expectations, and he does not identify that his methodology or views have been generally accepted in

2    his field.  In fact, he admitted in his deposition that he would not counsel a business forecaster to

3    wait for a recession before taking note of a deteriorating economy in a forecasting process:

> Q.  Now, you wouldn't tell people in the business of forecasting for their businesses
> that you have to wait for a, quote-unquote, recession before you take any note of a
> deteriorating economy in your forecasting process, would you?
>
> A.  No, of course not.

7    Ex. 2 at 55:5-10.

8         Hubbard also fails to support his opinions about the need for a recession with any factual

9    analysis relating to Oracle.  He does not cite any internal evidence suggesting that Oracle would

10   reach Public Guidance if the economy only stayed on the edge of a recession, as many economists

11   thought at the time, or any external evidence revealing that Oracle's Public Guidance was reachable

12   if the broader economy stayed above the technical definition of a recession.  He therefore fails to

13   provide the "fit" between his opinions and the issues in the case.  *See, e.g.*, *Daubert*, 509 U.S. at 591;

14   *Downing*, 753 F.2d at 1242.  Without this necessary connection, there is no relationship between

15   Hubbard's opinion about the existence of a recession and the issue to be tried – whether the

16   economic environment that affected Oracle in 3QFY01 had changed from the economic environment

17   that affected Oracle in 3QFY00.  Hubbard's opinions about the general macroeconomic outlook

18   must be excluded as they will not assist the trier of fact in understanding the evidence or determining

19   a fact in issue.  Fed. R. Evid. 702.  If anything, Hubbard's opinions are likely to confuse and/or

20   mislead the jury and must therefore be excluded under Rule 403.  Fed. R. Evid. 403 (relevant

21   "evidence may be excluded if its probative value is substantially outweighed by the danger of . . .

22   confusion of the issues, or misleading the jury").

23        Hubbard's opinions about the need for an economic recession are also based on pure

24   speculation and improperly vouch for the credibility of defendants' statements.  In fact, Hubbard

25   does no more than simply conclude that because the broader U.S. economy was not yet in a

26   recession, Oracle's public statements were "reasonable."  Ex. 1 at 76-77, ¶¶153-156; Ex. 4 at 6-13,

27   ¶¶14-31.  He even concludes that "economic conditions before and during 3Q FY2001 were not

28   sufficiently negative to be considered a recession of the sort of major macroeconomic downturn that

1  *Oracle itself noted could have a negative impact on its financial performance.*"  Ex. 4 at 6, ¶15.

2  Hubbard's opinions about the state of the U.S. economy does nothing more than vouch for the

3  credibility of defendants' statements that absent a recession, Oracle was immune to the economic

4  environment.  They must therefore be excluded as mere oath-helping.  Fed. R. Evid. 704 advisory

5  committee's note (stating the trial court must protect "against the admission of opinions which

6  would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an

7  earlier day").

8     Hubbard's opinions about the general economic outlook are also unreliable and appear to

9  have been developed for purposes of this litigation.  Hubbard described himself as an economic

10  advisor to George W. Bush when Mr. Bush was a Presidential candidate and after he was elected

11  President.  Ex. 1 at 4, ¶6; Ex. 2 at 23:18-23, 47:20-48:18.  He was a member of Mr. Bush's

12  Economic Advisory Team in November 2000, a member of his economic transition team following

13  the November 2000 election, and Chairman of President Bush's Council of Economic Advisors

14  beginning in 2001.  Ex. 1 at 52, ¶94; Ex. 2 at 47:20-48:18.  These positions occurred during the very

15  period of time at issue in this lawsuit.  *Id.*

16     Despite these positions and contrary to the advice that Hubbard provided to the

17  administration, Hubbard opines in this case that economic data and commentary available at the time

18  "paint[ed] a consistent picture of economic conditions during Oracle's 3QF2001 – one of continuing

19  positive, but possibly slowing economic growth."  *Id.*  Hubbard's current opinion is inconsistent

20  with the position of the administration during this very period of time – that a recession was

21  imminent.  In fact, a January 12, 2001 article in the *Wall Street Journal* reported that the

22  administration was receiving economic data as early as November 2000 that was at odds with the

23  opinions that Hubbard now reaches studying the same data:

24         As the Bush camp contemplated a Treasury secretary, it was getting constant
        reminders of how the economic outlook was changing. In late November,
25      Mr. Lindsey e-mailed Messrs. Bush and Cheney a six-page single-spaced memo full
        of official economic data and anecdotal evidence from his consulting business about
26      sharp drops in orders and canceled investments. The document included
        Mr. Lindsey's first formal warning to the two men that a recession could be
27      imminent.

28  Ex. 8 at A1.

PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE EXPERT TESTIMONY OF R. GLENN
HUBBARD - C-01-0988-MJJ                                                          - 16 -

The press reports at the time (and even Hubbard's deposition testimony) reveal that based on the advice of their economic advisors, including Hubbard, President Bush and Vice-President Cheney were pessimistic about the economy and were describing the likelihood of a recession. *See* Ex. 9 at 10.  In fact, the administration was promoting a tax cut to "pull the economy back from the 'front edge of a recession.'" and Bush himself stated that he was pessimistic about the economy because the numbers were "beginning to clearly show" that the economy was slowing down.  Ex. 8 at A1.  The economic position of the very administration that Hubbard advised during the Class Period contradicts the opinions that Hubbard seeks to give in this case.

When confronted with the position of the Bush administration at deposition, Hubbard re-characterized the economic period as one of "extreme uncertainty" and one of the most uncertain times in the economy that economists had seen in a generation.  Ex. 2 at 48:24-49:17.  While Hubbard defended this inconsistency by explaining that he disagreed with the economic assessment of the administration, he mentioned nothing of this disagreement in either his opening or rebuttal reports.  *Id.* at 50-51.  Even his opinion about "extreme uncertainty" in the economy stands in stark contrast to the opinion that he gives in his report – that Oracle faced "continuing positive, but possibly slowing economic growth" that was "not indicative of a larger, sudden drop-off or recession."  Ex. 1 at 6-7, 52, ¶¶16-24, 94.  Opinions that are developed for purposes of litigation must be excluded under Ninth Circuit precedent.  *Daubert*, 43 F.3d at 1317.

F.      **Hubbard's Opinions that Rely on the Financial Results of Oracle's Competitors and the Statements of Analysts About Those results Are Unreliable**

Hubbard utilizes the financial results of Oracle's competitors and the statements of analysts about those results to support his opinion that defendants did not know about the effect of the economic downturn on Oracle's business until the last few days of the quarter. Ex. 1 at 34-42, ¶¶70-81.  Hubbard states that the fact that Oracle's competitors exceeded analysts estimates before the end of Oracle's 3Q FY01 and cited an unexpected downturn for their miss after the end of Oracle's 3Q FY01 (in April 2001) "is consistent with Oracle believing that it would achieve its 3Q FY2001 earnings targets as announced to the market on December 14, 2000 until the very end of the quarter, when it experienced a precipitous drop-off in expected deal closings."  *Id.* at 38, ¶80.

1        Hubbard's opinion should be excluded as it results from an unreliable methodology and is

2  based upon facts on which no reasonable expert would rely.  In fact, Hubbard's analysis is flawed as

3  it relies on anecdotal evidence outside of Oracle as evidence to prove what was happening within

4  Oracle at the time.  *Id.* at 34-42, ¶¶70-81.  He does so without testing the reliability of the competitor

5  testimonials on which his analysis relies or verifying when those competitors began to see the cited

6  economic slowdown.  And for Hubbard's opinion that analysts viewed Oracle's miss as a "watershed

7  moment for the sector's overall health," it relies on Oracle's self-serving justifications and hindsight

8  anecdotal evidence to support what Oracle knew or did not know months earlier.  *Id.* at 38, ¶81.  Not

9  only is Hubbard's analysis inherently unreliable, but it is also directly at odds with the internal

10  evidence available to Oracle during the quarter.  Given the evidence available intra-quarter and

11  within Oracle, there is simply no need or justification for analyzing what Oracle knew and did not

12  know based on its own justifications and the comments of industry analysts that repeated those

13  justifications.  Hubbard is again playing the role of oath-helper.  *See, e.g.*, *Hester v. BIC Corp.*, 225

14  F.3d 178, 184-85 (2d Cir. 2000) (finding that where the jury's opinion is as good as the witness's,

15  the witness turns into no more than an improper "oath helper"); *Mitroff v. Xomox Corp.*, 797 F.2d

16  271, 276 (6th Cir. 1986) (same); Fed. R. Evid. 704 advisory committee's note (stating the trial court

17  must protect "against the admission of opinions which would merely tell the jury what result to

18  reach, somewhat in the manner of the oath-helpers of an earlier day").

19        Hubbard's analysis of Oracle's competitors, particularly his reliance on those competitors

20  exceeding guidance, should be excluded for another reason – it does not help answer the question

21  whether Oracle's Public Guidance, on which consensus estimates were based, was reasonable and

22  reliable.  Even assuming that this type of analysis produced meaningful and reliable results, Hubbard

23  has not provided the required fit with the issues to be tried – whether Oracle's public guidance was

24  reliable given the evidence that existed within Oracle at the time.  There could be many reasons why

25  Oracle's competitors made or missed guidance.  Hubbard's opinions that are based upon the

26  statements of Oracle's competitors are speculative and will not assist the trier of fact.

27

28

### G.   Hubbard's Opinions Based on Unspecified Channel Checks Are Unreliable

Hubbard points to analyst expectations and independent channel checks by analysts as evidence that Oracle's public statements were reasonable because analysts were consistently confident in Oracle's ability to make guidance. Ex. 1 at 28, 29, 34, ¶¶63-64, 69; Ex. 4 at 11-13, ¶¶21-31. Hubbard's opinion is based on unreliable methodology as he has not cited to any evidence and has not tested how many customers the analysts checked before issuing the reports cited in his report, whether the systems integrators that the analysts reference were implementing Oracle's applications (or how many), and whether the channel checks were a representative sample of Oracle's customers. His failure to do so undermines his opinion and requires that it be excluded. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

Like Hubbard's opinion about the comments of Oracle's competitors, he attempts to support his opinion with statements outside of Oracle when he had access to evidence within Oracle that would answer the same question. This is not the type of data that reasonable experts would rely upon when they had access to internal information. Hubbard did not analyze the numerous customer complaints that were reflected in internal Oracle documents, or the communications between Oracle's executives suggesting that Oracle had limited its sales opportunities and negatively affected its ability to convert the applications pipeline because severe problems with its applications products interfered with effective demonstrations. Ex. 14 at 57-58. Instead, he focused his opinions on the unchecked and random comments of outside analysts. His opinions must be excluded as unreliable. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

Beyond employing an unreliable methodology, the writing of Oracle's other forecasting expert demonstrates why the jury should not be presented with Hubbard's opinions about the expectations and efforts of securities analysts. In his book entitled *Financial Statement Analysis*, Foster reports on research conducted about securities analyst forecasts. Ex. 10. He explains that "[i]n any one calendar month, only a minority of security analysts will report a revision of their earnings forecasts" because "(1) most analysts follow a large number of securities and do not have the time to do a detailed analysis of each company each month, and (2) only a small set of stocks in

any one month have significant unexpected information releases that prompt analysts to revise their forecasts." *Id.* at 271-74.  In fact, Foster noted that "[a]nalyst[s] may have an incentive not to provide an unbiased forecast (*e.g.*, due to pressure to conform to consensus forecasts)" and that "[a]nalyst[s] may be manipulated by company officials (at least in the short run)." *Id.* at 278.

And if these traits of security analysts forecasts were not enough to call into question the reliability of Hubbard's opinion, Foster directly undermines the opinions that Hubbard offers about security analysts based on "discussions with analysts" (which both "experts" chose not to do in this case):

> Discussions with analysts indicate that forecast revisions made by other analysts are important revision cues.  Individuals in some industries develop reputations as 'lead analysts' and much interest attaches to the direction of their forecast revisions.  ***Analysts also report that high penalties are placed on taking positions that diverge markedly from the consensus when the consensus subsequently turns out to be 'correct.'  The result can be that analysts make forecasts that diverge less from the consensus than what they would report in the absence of these penalties***.

*Id.* at 289.  The foregoing article simply highlights the unreliable methodology that Hubbard applied to reach his opinions that Oracle's public statements were reasonable.  Hubbard did not inquire of a single analyst about the model they used, what influenced their decisions, who they spoke to, why they spoke to those individuals, or why not.  The list of tasks that Hubbard did not do to ensure reliability is lengthy.  His opinions are unreliable and speculative and should be excluded.

## H.    Hubbard's Opinion that the Diversity of Oracle's Customer Base Protected Its Revenues Should Be Excluded as Unreliable and Irrelevant

Hubbard concludes that Oracle's public statements were reasonable because the diversity of Oracle's customer base protected its revenues from being significantly affected by any single customer or sector.  Ex. 1 at 46-47, ¶86.  Hubbard supports this opinion with a statistical analysis showing that Oracle's top 50 customers represented 28% of its revenues between 3Q FY00 and 4Q FY01.  *Id.* at 48-49, ¶88.  Hubbard's methodology is unreliable as he fails to analyze how any one segment of Oracle's customer base could affect Oracle achieving ***public guidance***.  Instead he relies on the general proposition that diversity can protect a company's revenue base in general but he fails to bridge the analytical gap between this general proposition and the issue to be tried in the case –

1  whether Oracle's ability to reach public guidance could be affected by an economic slowdown in the

2  segments of the market that affected Oracle's business.  *See, e.g.*, *Gen-Elec.*, 522 U.S. at 146 (the

3  evidence must be excluded if the court finds "that there is simply too great an analytical gap between

4  the data and the opinion proffered").  His opinion should be excluded as unreliable and irrelevant.

5         Defendants' own statements at the end of the quarter reveal that Oracle's ability to reach

6  public guidance was, in fact, affected by a single sector of the market:

7               ***The dot-coms played some part in this.  But we knew going into the quarter,
          we had a big database comparison issue [with 3Q FY00]*** and we knew that the dot-
8          com segment was slowing down. ***I think in hindsight the dot-com ended up a bit
          worse than we thought***.  But we certainly anticipated – what we didn't realize – the
9          filling factor, you know, obviously was the economy.

10              If you take out – and if you look at our dot-com growth in the third quarter
          year-over-year, it was a negative 66 percent.  So it clearly was a huge decline year-
11         over-year.

12 Ex. 11 at 108-09.

13        The dot.com implosion at Oracle and the comments of defendant Henley cited above directly

14 contradict Hubbard's opinion that Oracle's diverse customer base "underscor[ed] the reasonableness

15 of Defendants' statements."  Ex. 1 at 47, ¶86.  Hubbard's opinions are therefore unreliable and do

16 not "fit" the issues that will be decided by the trier of fact.

17    **I.      Hubbard's Opinions Invade the Province of the Jury**

18        Any opinions offered by Hubbard regarding the "reasonableness" of defendants' statements

19 are "at worst, rank speculation [and] at best, they are credibility choices that are within the province

20 of the jury." *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1999).  Hubbard's attempt to define

21 what is reasonable will not assist the jury "because the trier of fact is entirely capable of determining

22 whether or not to draw such conclusions." *See City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548,

23 565 (11th Cir. 1998); *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 939 (10th Cir. 1994)

24 (jurors are fully "capable of evaluating good and bad faith (just as they regularly determine what

25 constitutes the conduct of a 'reasonable' person) by bringing their own common sense and life

26 experience to bear").

27        The Supreme Court has admonished that, where expert testimony is involved, courts should

28 apply Rule 403 even more carefully: "'Expert evidence can be both powerful and quite misleading

1   because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible

2   prejudice against probative force under Rule 403 . . . exercises more control over experts than over

3   lay witnesses.'"  *Daubert*, 509 U.S. at 595.  Here, Hubbard is effectively opining that defendants'

4   statements did not violate the securities laws.  His attempt to interpret what is "reasonable" carries

5   with it the very real risk that a jury would lend credibility to his opinion rather than to the law to be

6   applied to the facts, as set forth by the Court.  Hubbard offers unreliable and irrelevant opinions on

7   what is ultimately a question of law and fact within the province of judge and jury.  "In short, the

8   Court should not shift to such witnesses the responsibility to give conclusory opinions and

9   characterizations of the business conduct portrayed and to essentially decide the case."  *GST*

10  *Telecommunications, Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000).  The jury can readily

11  decide whether defendants' statements were "reasonable" after evaluating the evidence in the case.

12  Thus, Hubbard's opinions on the "reasonableness" of defendants' statements should be precluded in

13  their entirety.

14  **V.    CONCLUSION**

15          For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs'

16  motion.

17  DATED:  October 9, 2007                    Respectfully submitted,

18                                             COUGHLIN STOIA GELLER
                                                 RUDMAN & ROBBINS LLP
19                                             SHAWN A. WILLIAMS
                                               WILLOW E. RADCLIFFE
20                                             MONIQUE C. WINKLER
                                               ELI R. GREENSTEIN
21                                             DANIEL J. PFEFFERBAUM

22

23                                             _____/s/_____
                                               SHAWN A. WILLIAMS
24
                                               100 Pine Street, Suite 2600
25                                             San Francisco, CA  94111
                                               Telephone:  415/288-4545
26                                             415/288-4534 (fax)

27

28

PLAINTIFFS' NOTICE AND MOTION TO EXCLUDE EXPERT TESTIMONY OF R. GLENN
HUBBARD - C-01-0988-MJJ                                                        - 22 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\BRF00046253_Hubbard.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 9, 2007.

/s/<br>
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: ShawnW@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111