COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
       – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Master File No. C-01-0988-MJJ

CLASS ACTION

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GEORGE FOSTER

DATE:          November 16, 2007
TIME:          1:30 p.m.
COURTROOM:  The Honorable
                    Martin J. Jenkins

**PREVIOUSLY FILED ON JULY 26, 2007 (DOCKET NO. 853)**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................2

III. LEGAL STANDARD.............................................................................................3

IV.  ARGUMENT .........................................................................................................5

    A.   Foster's Opinions Are Biased from His Numerous Personal and
Professional Connections to Oracle .............................................................5

    B.   Foster's Opinions Should Be Excluded as He Lacks Fundamental
Knowledge of the Facts Underlying His Opinions .......................................8

    C.   Foster Failed to Consider Critical Facts that Undermine the Reliability of
His Methods and Opinions...........................................................................13

    D.   Foster Admits to Developing Several Opinions Specifically for Purposes
of Testifying in this Litigation ....................................................................16

    E.   Foster's Opinions that Rely on Securities Analysts Should Be Excluded............18

    F.   Foster's Opinions on the Predictive Quality of Oracle's Intra-Quarter
Pipeline Growth Should Be Excluded as Unreliable ..................................20

    G.   Foster's Opinions Improperly Rely Upon Data Inputs from Oracle's Field
Sales Force ..................................................................................................21

    H.   Foster's Opinions Should Be Excluded Under Rule 403......................................23

V.   CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bourjaily v. United States*,
  483 U.S. 171 (1987)............................................................................4, 8

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ........................................................ *passim*

*Daubert v. Merrell Dow Pharms.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................16

*DSU Med. Corp. v. JMS Co., Ltd.*,
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) ........................................4

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)........................................................5, 15

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
  No. 5:96:MD:1122, 1999 U.S. Dist. LEXIS 17153
  (W.D. Mich. Sept. 29, 1999)................................................9

*In re Oracle Corp. Derivative Litig.*,
  824 A.2d 917 (Del. Ch. 2003)................................1, 5, 6, 7

*Jinro Am., Inc. v. Secure Invs., Inc.*,
  266 F.3d 993 (9th Cir. 2001) ................................................5

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................3, 4, 19

*Lust v. Merrell Dow Pharms.*,
  89 F.3d 594 (9th Cir. 1996) ................................................4, 8

*Mukhtar v. Cal. State Univ.*,
  299 F.3d 1053 (9th Cir. 2002) ................................................3

*Sheehan v. Daily Racing Form*,
  104 F.3d 940 (7th Cir. 1997) ................................................19

*Trigon Ins. Co. v. United States*,
  204 F.R.D. 277 (E.D. Va. 2001) ................................8, 9, 10

*United States v. Fuentes-Cariaga*,
  209 F.3d 1140 (9th Cir. 2000) ................................................21

*United States v. Scholl*,
  166 F.3d 964 (9th Cir. 1999) ................................................3

*Watkins v. Telsmith, Inc.*,
  121 F.3d 984 (5th Cir. 1997) ................................................22

Page

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000)...........................................................................................................4


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)............................................................................................................................2

Federal Rules of Evidence
    Rule 26(a)(2).............................................................................................................9, 10
    Rule 104(a)......................................................................................................................4
    Rule 401......................................................................................................................1, 2
    Rule 402 ..................................................................................................................1, 2, 3
    Rule 403 ............................................................................................................... *passim*
    Rule 702.............................................................................................................. *passim*
    Rule 704.................................................................................................................13, 15

TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that on November 16, 2007, at 1:30 p.m., in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs will and hereby do move this Court to preclude the testimony of George Foster ("Foster").  This motion is made pursuant to Federal Rules of Evidence 401, 402, 403 and 702 on the grounds that Foster's opinions are unreliable, would serve to mislead and confuse the jury, waste the Court's time, and will not assist the trier of fact to understand the evidence or determine a fact at issue.  This motion is based upon this notice, the following memorandum of points and authorities, the pleadings and records on file herein, and such further evidence and argument as may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiffs move to exclude the opinions of Foster as expressed in his expert rebuttal report, dated June 22, 2007.  The opinions offered by Foster do not rest on a reliable foundation and therefore should be excluded pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  Expert testimony is admissible only if it is relevant and reliable.  *Id.*  Speculative opinions or those that simply characterize the evidence should be excluded as they will not assist the trier of fact and opinions based on unreliable or non-existent methodologies must themselves be excluded as unreliable and unhelpful.  *Id.*  Foster's opinions violate each of these principles.

By this motion, plaintiffs seek to exclude the opinions of Foster, whom defendants have retained despite (and perhaps because of) his connections to Oracle and Oracle's executives (including the defendants in this case and executives who faced similar allegations in the related *In re Oracle Corp. Derivative Litig.*) through his position as a Stanford University professor.  The Delaware Court of Chancery under similar facts already determined that Oracle's Special Litigation Committee (the "SLC") was "fraught" with "bias-creating relationships" because of its connection to Stanford and through it Oracle.  Foster has a similar bias-creating relationship that destroys his credibility and should serve to exclude his opinions from this litigation.

1    Apart from his conflicted relationship, Foster's opinions should also be excluded as

2  unreliable as he lacks fundamental knowledge of the facts underlying his opinions (the opinions do

3  not appear to be his own) and employed an unreliable methodology by failing to consider critical

4  facts that directly undermine his opinion.  In fact, despite opining about the reasonableness of

5  Oracle's forecasting process and its historical accuracy, Foster simply disregards the fact that

6  Oracle's forecasting process had changed prior to the period at issue in this case.  He also failed to

7  consider the reliability of the metric that his report says was a "reasonableness check" on Oracle's

8  forecast, and failed to consider the economic change between Oracle's Q3'00 and Q3'01 despite

9  testifying that the economic environment is a data point in the forecasting process and that Oracle

10  utilized its Q3'00 financial results as a baseline for its Q3'01 public guidance.  These fundamental

11  flaws in Foster's methodologies render his opinions about Oracle's forecast process unreliable and

12  undermine Rule 702's requirement that an expert apply methods reliably to the facts of the case.  His

13  opinions about Oracle's forecasting process should be excluded.

14    Foster's opinions should also be excluded as they were specifically created for purposes of

15  testifying in this litigation, have not been subject to or appeared in any peer-reviewed publications,

16  and have not been generally accepted in his field.  In fact, Foster employed methodologies that do

17  nothing but characterize the evidence, result in rank speculation, and result in opinions that are

18  largely duplicative of the opinions offered by defendants' other forecasting "expert" R. Glenn

19  Hubbard ("Hubbard"), who is Chair of the Paulson Committee dedicated to eliminating shareholder

20  actions.  Plaintiffs have moved separately to exclude Hubbard's opinions.  As discussed herein,

21  Foster's opinions should be excluded under *Daubert* and under Fed. R. Evid. 702 and 401-403.

22  **II.    BACKGROUND**

23    This case arises out of defendants' use of fraud and deception to portray Oracle's business as

24  healthy through numerous false and misleading statements concerning financial data, earnings

25  guidance, and the performance of Oracle's product Suite 11i.  Accordingly, a central issue in this

26  case is whether defendants made false and misleading public statements in violation of §10(b) of the

27  Securities Exchange Act of 1934.  In support of their defense, defendants offer Foster's opinions to

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-MJJ                                                                    - 2 -

rebut the opinions of plaintiffs' expert, Dr. Alan Goedde ("Goedde"), as set forth in Dr. Goedde's May 25, 2007 report.  Foster only submitted a rebuttal report, dated June 22, 2007.

Foster now offers the following central opinions in his rebuttal report:

- "Contrary to Dr. Goedde's conclusions, Oracle's financial forecasting process met relevant quality criteria and incorporated relevant economic and business information in a timely and appropriate manner."

- "Dr. Goedde's conclusion that Oracle's internal measures indicated that Oracle would miss its public guidance is not supported by the data."

Declaration of Douglas R. Britton in Support of Plaintiffs' Motion to Exclude the Expert Testimony of George Foster ("Britton Decl."), Ex. 1 at 4-5.[1]  Foster's opinions are patently unreliable under the *Daubert* framework as he fails to consider relevant data, his methodology is unreliable or non-existent, and he is biased in favor of defendants.

## III.   LEGAL STANDARD

The trial courts act as gatekeepers in determining whether to admit expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 589.  This is a critical function of the court because "[m]aintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony."  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).

Expert testimony may be admitted as evidence only when the testimony (1) "will assist the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 588-89.  A witness may be qualified as an expert by "knowledge, skill, experience, training," or education.  *Id*.  Expert testimony is also subject to the limitations of Fed. R. Evid. 402 and 403.  *See, e.g*., Fed. R. Evid. 402, 403; *United States v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999) (finding that admissibility of expert testimony should be evaluated under Fed. R. Evid. 402 and 403).  Relevance, in this context, requires that the expert's proposed opinion would

---

[1]     All "Ex." or "Exs." references are to the Britton Decl.

1   assist the trier of fact to understand or determine a fact in issue.  *Daubert*, 509 U.S. at 591 (holding

2   that the requirement that the expert testimony "'assist the trier of fact' . . . goes primarily to

3   relevance").

4        Moreover, to be admissible under Rule 702, an expert's opinion must be "'not only relevant,

5   but reliable.'"  *See Kumho Tire*, 526 U.S. at 147;[2] *Daubert*, 509 U.S. at 589; Fed. R. Evid. 104(a)

6   and 702.  A proponent of expert testimony bears the burden of establishing by a preponderance of

7   the evidence that the proposed testimony meets both *Daubert*'s reliability and relevancy

8   requirements.  *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *Lust v. Merrell*

9   *Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996); *DSU Med. Corp. v. JMS Co.*, *Ltd.*, 296 F. Supp. 2d

10  1140, 1146 (N.D. Cal. 2003) (granting in-part motion to exclude expert testimony as unreliable).

11  The Supreme Court has characterized the reliability inquiry as an "exacting" one.  *Weisgram v.*

12  *Marley Co.*, 528 U.S. 440, 451 (2000).  In performing its gatekeeping role, the court does not focus

13  on the correctness of the conclusions of the expert's testimony.  *See, e.g.*, *DSU Med.*, 296 F. Supp.

14  2d at 1146-47.  Rather, the court focuses on whether the methodology used by the expert to reach his

15  conclusions is sufficiently reliable for submission of that testimony into evidence.  *Id.*

16       In determining reliability, *Daubert* held that a trial court may (1) assess whether the expert's

17  technique or theory has been tested; (2) assess whether the technique or theory has been subject to

18  peer review and publication; (3) evaluate the known or potential rate of error of the technique or

19  theory when applied; (4) ascertain the existence and maintenance of standards and controls; and (5)

20  determine whether the technique or theory has been generally accepted in the scientific community.

21  *Daubert*, 509 U.S. at 590-94.  As the Supreme Court emphasized, however, "[t]he inquiry

22  envisioned by Rule 702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and must be "'tied to the

23  facts' of a particular 'case.'"  *Kumho Tire*, 526 U.S. at 150.  Other factors may also be relevant in

24  determining whether expert testimony is sufficiently reliable to be considered by the jury, such as

25  (1) whether the expert proposes to testify about matters growing naturally and directly out of his

26  ─────────────────────

27  [2]     Here, as elsewhere, all citations are omitted and emphasis is added.

28

1   research, independent of the litigation, or whether he has developed his opinion expressly for the

2   purpose of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise

3   to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative

4   explanations; (4) whether the expert is being as careful as he would be in his regular professional

5   work outside his paid litigation consulting; and (5) whether the field of expertise claimed by the

6   expert is known to reach reliable results for the type of opinion the expert would give.  *See* Fed. R.

7   Evid. 702, advisory committee's notes.

8          "When [expert] opinions are excluded, it is because they are unhelpful and therefore

9   superfluous and a waste of time."  *Id.*; *see, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

10  (the evidence must be excluded if the court finds "that there is simply too great an analytical gap

11  between the data and the opinion proffered"); *Jinro Am., Inc. v. Secure Invs., Inc*., 266 F.3d 993,

12  1006 (9th Cir. 2001) ("impressionistic generalizations" are inadmissible).  Opinions based on mere

13  speculation or lacking the requisite methodological rigor should be excluded at trial.

14  **IV.    ARGUMENT**

15         **A.    Foster's Opinions Are Biased from His Numerous Personal and**
             **Professional Connections to Oracle**

16

17         As a business professor at Stanford University actively involved in the Silicon Valley

18  business community, Foster has numerous connections to Oracle that serve to undermine his

     impartiality – and therefore his reliability as an expert witness in this case.[3]  Indeed, the substantial

19
     ties between Stanford and Oracle are well-documented and have already served as the basis for the

20
     Delaware Court of Chancery to find Oracle's SLC conflicted.  *In re Oracle Corp. Derivative Litig*.,

21
     824 A.2d 917 (Del. Ch. 2003).  There, professors at Stanford were charged with investigating Oracle

22
     for the same conduct that partially gave rise to the instant case and, unsurprisingly, found no

23
     wrongdoing.  In reaching its decision, the Court stated:

24
             [B]y requiring SLC members to consider accusing a fellow professor and two large

25           benefactors of their university of conduct that is rightly considered a violation of

26
     _____

27  [3]       Foster testified that he has been affiliated with Stanford University since 1978.  Ex. 2 at
     53:15-17.

28

1  criminal law was unnecessary and inconsistent with the concept of independence
2  recognized by our law.  The possibility that these extraneous considerations biased
   the inquiry of the SLC is too substantial for this court to ignore.

3  *Id*. at 921.  The same rationale that served to reject the SLC's independence is readily applicable to

4  Foster's opinions here because, much like the SLC, under no plausible scenario would Foster render

5  opinions adverse to fellow Stanford professors and significant donors to Stanford.  Absent the ability

6  to independently judge Oracle's conduct, Foster's opinions should be excluded as unreliable.  Fed.

7  R. Evid. 702; *Daubert*, 509 U.S. at 589; *Oracle Derivative*, 824 A.2d 917.

8       Currently, two Stanford professors serve on Oracle's Board of Directors, Michael Boskin

9  ("Boskin") and Hector Garcia-Molina ("Garcia-Molina").    A third, Joseph A. Grundfest

10 ("Grundfest"), recently resigned.  Grundfest and Garcia-Molina led the SLC's investigation.  Boskin

11 is a professor of economics – a job that has natural overlap with Foster's position within Stanford's

12 business school.  Ex. 2 at 28.  When asked whether he knew Boskin, Foster testified: "I have met

13 him several times" because "[a]s a Stanford professor, whose area – he's in business,

14 economics . . . ."  *Id*. at 28:6-12.  Grundfest is a business law professor and, like Boskin, Foster has

15 met him several times because their positions at Stanford overlap.

16      Q:    Do you ever work with Mr. Grundfest?

17      A:    I have met him several times . . . .

18      Q:    And in what context have you met Professor Grundfest?

19      A:    He's a law professor, our areas overlap somewhat, and I have heard him talk.

20 *Id*. at 26:3-9.  Foster also has colleagues that work extensively with Grundfest.  Foster has "been

21 research colleagues and just colleagues for over 20 years" with a Professor Maureen McNichols

22 ("McNichols") at Stanford and has a "close working relationship" with her.  *Id*. at 27:6-7, 26:19-21.

23 McNichols teaches at both Stanford's business school and law school, and has taught a joint course

24 with Grundfest.  McNichols had defendant Jeff Henley ("Henley") speak to one of her classes.  *Id*. at

25 21:14-18.  Grundfest is also co-director of Stanford's Rock Center for Corporate Governance with

26 Professor David Larcker ("Larcker") – who is also a professor at the business school with Foster and

27 whose office is across the hall from Foster's.  *Id*. at 29.

28

1    Beyond the immediate academic connections Foster and Stanford have to Oracle, they also –
2  perhaps more importantly – have strong financial connections.  Donald J. Lucas ("Lucas") currently
3  serves on Oracle's Board, and is a large contributor to Stanford as well as a loyal alumnus.  Exs. 3-6;
4  *Oracle Derivative*, 824 A.2d at 931-32.  As chair of the Richard M. Lucas foundation, Lucas has
5  personally directed over $5 million to Stanford through the foundation between 2003 and 2005
6  alone, including millions to the Stanford Institute for Economic Policy Research ("SIEPR").  Exs. 4-
7  6.  Boskin serves as a faculty member of SIEPR and Grundfest is formerly a senior fellow at SIEPR.
8  Ex. 7; *Oracle Derivative*, 824 A.2d at 931.  SIEPR has a conference center named after Lucas.
9  *Oracle Derivative*, 824 A.2d. at 932.  Defendant Lawrence Ellison ("Ellison") also has given over
10  $20 million between 2002 and 2005 to Stanford through his foundation, The Ellison Medical
11  Foundation. Exs. 8-11.  Foster testified that his research is funded by alumni donations and that such
12  donations "are important to the university."  Ex. 2 at 22-23.  Indeed, such donations are the lifeblood
13  of academic institutions.

14    Under similar facts, the Delaware Chancery Court found the SLC to be "fraught with . . .
15  bias-creating relationships," and stated "I find this to be the case because the ties among the SLC, the
16  . . . Defendants, and Stanford are so substantial that they cause reasonable doubt about the SLC's
17  ability to impartially consider whether the . . . Defendants should face suit."  *Oracle Derivative*, 824
18  A.2d at 942, 947-48.  The Court recognized that "[e]ven though Boskin was in a different academic
19  department from either SLC member, it is reasonable to assume that the fact that Boskin was also on
20  faculty would – to persons possessing typical sensibilities and institutional loyalty – be a matter of
21  more than trivial concern." *Id.* at 942.  And "[a]lthough they were not responsible for fundraising, as
22  sophisticated professors they undoubtedly are aware of how important large contributors are to
23  Stanford, and they share in the benefits that come from serving at a university with a rich
24  endowment." *Id.* at 943.  By virtue of Foster's connections to Stanford, Grundfest, Boskin, Garcia-
25  Molina, Lucas, Ellison and Oracle, a similar conclusion should be reached here as to that found in
26  the derivative case – namely that Foster's opinions are biased and unreliable.  Fed. R. Evid. 702;
27  *Daubert*, 509 U.S. at 589; *Oracle Derivative*, 824 A.2d 917.

28

Rendering anything other than an opinion directly in line with defendants' version of the facts would result in Foster (1) directly conflicting the findings of his Stanford colleagues Grundfest and Garcia-Molina in the derivative case; (2) adversely opining on conduct by large donors to Stanford; (3) adversely opining on conduct by Oracle's Board – including colleagues; (4) jeopardizing personal and professional relationships with Professors McNichols and Larcker; and (5) jeopardizing donations to Stanford.  With the weight of these considerations, Foster is not independent and his opinions should accordingly be excluded as unreliable.  Defendants bear the burden of establishing by a preponderance of the evidence that Foster's opinions are reliable and relevant, a burden they cannot meet here.  *See, e.g.*, *Bourjaily*, 483 U.S. at 175-76 ; *Lust*, 89 F.3d at 598.

**B.    Foster's Opinions Should Be Excluded as He Lacks Fundamental Knowledge of the Facts Underlying His Opinions**

Foster testified at his deposition that he did not write most of his report or create the exhibits attached thereto. Ex. 2 at 19-20; 37:2-3.  In fact, Foster testified that he never even met with defense counsel throughout the entire time his report was being drafted for him.  *Id*. at 20:15-17.  Rather, employees of a professional legal services group, Analysis Group ("AGE"), met with defense counsel and drafted Foster's report for him to sign.  *Id*. at 18-20.  Foster testified that he spent only 40-50 hours working on his report between May 25, 2007 and June 22, 2007 – a truly amazing feat given his claim of reliance upon hundreds of documents and 17 deposition transcripts.  *Id*. at 6:2-4; Ex. 1 at Appx. C.  A careful reading of the 17 deposition transcripts alone should have taken most, if not all, of the 40-50 hours – added to which Foster testified he did "several" very detailed reads of Dr. Goedde's May 25, 2007 report.  Ex. 2 at 19:13-14.  Yet Foster also was purportedly actively involved in his 55-page report, complete with numerous detailed charts and tables.  However, Foster's claim of 40-50 hours of work cannot be reconciled with the sheer volume of his report and supposed preparation efforts absent the conclusion that AGE did almost all the work for him – a conclusion that undermines the reliability of his report.

This is not the first case in which AGE has prepared a report for its experts.  In *Trigon Insurance Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001), AGE and its owner Bruce Deal

1   (who attended the depositions of Hubbard, Foster, and Dr. Goedde in this case) were found to have

2   intentionally destroyed documents to cover up the fact that "AGE had participated extensively in the

3   drafting (both preparation and editing) of the testifying expert's reports." *Id.* at 281.  The Court

4   explained that documents had been destroyed as a result of AGE's document retention policy for

5   purposes of denying meaningful cross-examination into the preparation of the reports:

6           And, the United States and AGE certainly were aware of the value of the
        documents which were spoiled.  In fact, the rather obvious effect, and perhaps even
7       the purpose, of AGE's document retention policy was to eliminate the source of
        undeniably meaningful cross-examination resource about the substance of the expert
8       opinions and about the ghost writing of the opinions.

9   *Id.* at 290.  While the Court held that Trigon had not met its burden of proof that AGE provided the

10  substance of the opinions of the testifying experts, it noted that it would consider the issue at trial.

11  *Id.* at 295.  For the destruction of evidence, however, the Court held that it was appropriate to "draw

12  adverse inferences respecting the substantive testimony and credibility of the experts," which it

13  would do at trial.  *Id.* at 291.  Notably, AGE was foreclosed from "further participation in any aspect

14  of the development and presentation of the expert testimony to be offered by the United States."  *Id.*

15          While the parties have entered a stipulation in this case limiting the scope of permissible

16  expert discovery, Foster's anemic involvement in the preparation of his report (40-50 hours) and his

17  lack of knowledge about even basic foundational facts reveal that AGE "participated extensively in

18  the drafting (both preparation and editing) of the testifying expert's reports."  *Id.* at 281.  In fact, the

19  reports of Hubbard and Foster cover the same issues and give the same opinions and some of the

20  charts that each "expert" cite as support are identical.  *Compare* Ex. 1 at 23-25, ¶¶57, 61 *with* Ex. 13

21  at 78, ¶159 and Ex. 14 at 21-22, ¶¶56, 58; *compare* Ex. 1 at Figures 1-3, 13 *with* Ex. 13 at Figures

22  44, 50; *see also* §IV.A.8, *supra*.  The substantial overlap between these reports combined with

23  Foster's lack of basic knowledge of the case (discussed below) reveals that he did not prepare the

24  report within the meaning of Fed. R. Evid. 26(a)(2).  Courts have excluded expert testimony under

25  similar circumstances.  In *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, No. 5:96:MD:1122, 1999

26  U.S. Dist. LEXIS 17153 (W.D. Mich. Sept. 29, 1999), the court excluded an expert report on the

27  grounds that the report had not been prepared by the expert within the meaning of Rule 26(a)(2)

28  where "the substantial similarity among the three expert witness reports derived from the authorship

1  of their common language by plaintiffs' counsel." *Id.* at *3.  The similarity between the Hubbard

2  and Foster reports, the duplicative Figures, and Foster's lack of knowledge require the exclusion of

3  his report.

4        Foster's lack of knowledge also reveals that the opinions that he offers are those of AGE and

5  not his own.  *Trigon*, 204 F.R.D. at 294 ("if opinions expressed in an expert report are not the

6  opinions of the expert, the expert will not be able to satisfy the requirements of [Fed. R. Evid.] 702

7  and *Daubert* that the report be based on the expert's own valid reasoning and methodology").

8  Foster's deposition testimony revealed that he has only a limited knowledge of Oracle's forecasting

9  process – the very process for which defendants have offered him as an expert.  Foster testified that

10  he was supplied information by AGE, such as highlighted deposition transcript excerpts that were

11  selected by the AGE.  Ex. 2 at 31:19-32:2, 33:5-9.  Foster testified that he managed to only "skim"

12  through the deposition transcripts of Jennifer Minton ("Minton"), the Oracle executive in charge of

13  forecasting during the relevant time.  *Id*. at 32:23-25, 33:1.  Absent from the depositions that Foster

14  listed as having "reviewed" were George Roberts' ("Roberts") March 17, 2004, June 22, 2006, and

15  August 8, 2006 depositions (Roberts served as the Executive Vice President of Oracle's NAS

16  division), defendant Ellison's July 13, 2006 deposition, defendant Henley's July 27, 2006

17  deposition, Executive Vice President of OSI Jay Nussbaum's ("Nussbaum") June 22, 2006

18  deposition, and scores of other relevant depositions.  Ex. 1 at Appx. C.[4]  And despite supposedly

19  reviewing several depositions from the derivative case, Foster had no idea what the derivative case

20  was and which depositions he relied upon were given in the derivative case.  Ex. 2 at 32:13-16.

21  Similarly, Foster had no knowledge of how many times defendant Ellison had been deposed in the

22  Oracle litigation.  Ex. 2 at 32:17-22.

23        Foster's knowledge of Oracle's forecasting process is inadequate for his opinions to be

24  considered reliable.  At his deposition, Foster was unfamiliar with numerous simple facts that

25  _____

26  [4]      While the parties' expert stipulation limited the scope of documents to be disclosed to those
27  that the expert actually relied upon in reaching his opinions, Foster testified that he did not review
   anything other than what was listed in his Appendix of Documents Relied On.

28

undermine the reliability of his opinions.  For example, Foster's report concludes that pipeline growth was not used as a forecasting measure and when asked where Oracle's pipeline growth data could be found, Foster did not know.  Ex. 1 at 49, ¶108; Ex. 2 at 178:16-19.  Foster was surprised to learn that pipeline growth data appears on the first page of Oracle's central forecasting tool, the Upside Report.  Ex. 2 at 178-79.  Foster had no knowledge of what percentage Oracle's U.S. license sales composed of total company license sales.  *Id*. at 199-200.  And he did not know that Oracle's NAS and OSI license divisions had negative growth rates in December 2000 and January 2001.  *Id*. at 200.  And the list goes on:

- Foster did not know what two divisions composed Oracle's NAS line of business.  *Id*. at 223:14-20.

- Foster did not know what sales divisions were responsible for Oracle's Q3'01 earnings miss.  *Id*. at 224:11-12.

- Foster did not know whether Minton had ever applied a negative upside adjustment prior to Q3'01.  *Id*. at 224:13-18.

- Foster did not know the dollar amount of Oracle's dot.com revenues in Q3'00 even though in Q3'01 Oracle expected its dot.com revenues to decline year-over-year.  *Id*. at 225:4-10; Ex. 12.

- Foster did not know what internal forecasting calls defendant Ellison participated in.  Ex. 2 at 229:2-4.

Foster also testified he did not know who John Nugent ("Nugent") is, even though Nugent oversaw the Oracle sales division most affected by the collapse of dot.com spending that significantly contributed to Oracle's Q3'01 earnings miss.  *Id*. at 202.

> Q:   Now, you saw the evidence from John Nugent, didn't you, about what the AVPs were saying in the field? . . .
>
> A:   I can't remember the specific thing you are referring to.
>
> Q:   Do you know who John Nugent is?
>
> A:   No, I don't.
>
> Q:   You have no idea who John Nugent is?
>
> A:   I can't recollect.

*Id*. at 202:1-11.  Foster also had no knowledge of Oracle's products, despite admitting that the products were "factors that you would consider in terms of the forecasting."  *Id*. at 46:2-3.  In fact,

1  absent from his report is any mention of Oracle's products, including the troubled Suite 11i, or the

2  impact that the problems with Suite 11i had on Oracle's attempts to sell the product.

3        Finally, Foster's deposition made clear that he did not have an independent recollection of

4  the facts giving rise to his opinions, and that he was confused about the content of his report.  Foster

5  even gave testimony conflicting with his report, at one point admitting that pipeline growth was a

6  forecasting factor.  *Id*. at 176.  However, his report states that no executive at Oracle used pipeline

7  growth as a forecasting measure.  Ex. 1 at 49, ¶108.  When confronted with his conflicting opinions,

8  Foster testified, "Well, I misstated then."  Ex. 2 at 177:17.  Foster also testified that the difference

9  between pipeline growth and projected revenue growth (the "growth gap") was used in Oracle's

10 forecasting process, but his report states that the growth gap was not used.  *Id*. at 158:18-25; Ex. 1 at

11 44, ¶101.  The record is replete with evidence that Foster has almost no independent recollection of

12 basic relevant information that relate to his opinions:

13 •      Foster does not remember critical statements that Oracle made to investors
          concerning the pipeline during Q3'01 even though he utilizes analysts and the
14        purported information that analysts utilize in support of his opinions. Ex. 2 at 188:1-
          12, 190:8-11; Ex. 1 at 25-27, ¶¶62, 64.
15
16 •      Foster does not remember testimony by Minton concerning why she reduced her
          upside adjustment in Q3'01 even though his report specifically analyzes Minton's
          upside adjustments as a percentage of the field forecast to explain that they usually
17        decline.  Ex. 2 at 206:22-207:1; Ex. 1 at 50-53, ¶¶113-116.

18 •      Foster does not remember testimony by defendant Henley concerning Minton's
          January 29, 2001 upside adjustment to reach 11.58 EPS even though he offered an
19        opinion that the Potential Forecast falling below guidance was not a source of
          concern (Henley testified that that it did cause him concern and made him believe
20        that the quarter was going to be "more of a horse race.")  Ex. 2 at 209:9-18; Ex. 1 at
          51, ¶114; Ex. 15 at 267:11.
21
22 •      Foster does not remember whether the hockey stick effect impacted Minton's
          forecasting process even though he opines extensively that it did (Minton testified
23        that it did not).  Ex. 2 at 213:11-17; Ex. 1 at 27-34, ¶¶65-76; Ex. 16 at 139:10-
          140:15.
24 •      Foster does not remember what defendant Ellison used as key forecasting indicators
          even though that testimony contradicts many of Foster's opinions about what Ellison
25        considered important in measuring the quarter.  Ex. 2 at 221:20-23; Ex. 1 at 38-39,
          44, 49, ¶¶88, 89, 101, 102, 108; Ex. 17 at 179:6-19.
26
27        Without sufficient knowledge of Oracle's forecasting process, a jury should not be subjected

28 to Foster's "expert" opinions. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-MJJ                                                          - 12 -

### C.   Foster Failed to Consider Critical Facts that Undermine the Reliability of His Methods and Opinions

One of the *Daubert* factors readily applicable to Foster's opinions is whether the expert has adequately accounted for obvious alternative explanations.  *See* Fed. R. Evid. 702, advisory committee's notes.  Here, Foster improperly failed to consider critical facts that not only offer obvious alternative explanations but also undermine his opinions.  At its most egregious level, Foster's opinions are unreliable because he fails to consider or account for the fact that Oracle's forecast process had changed prior to Q3'01.  Instead of analyzing how that change could have affected the forecasting process and the reliability of public guidance, Foster elected to dispute the evidence – and nothing more.  He employed no methodology, let alone a reliable one, in his reaching his opinions and instead plays the role of oath helper. Fed. R. Evid. 704, advisory committee's notes (stating the trial court must protect "against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day").

As set forth in the reports of Dr. Goedde, in the quarter prior to the class period, Ellison directed Oracle's sales representatives to add additional risk (*i.e.*, amount) to the field-level forecast. Ex. 18 at 22-23; Ex. 19 at 81-84.  According to an email between OPI Finance personnel, Ellison's directive required the inclusion in the forecast of certain deals having a lower probability of winning than were included in previous forecasts.  *Id*.  Numerous documents and testimony from Oracle's executives reveal that this directive was intended to adjust for the practice of salespeople and executives to underestimate their quarterly sales in order to consistently meet or exceed their forecasts, a practice called "sandbagging."  *Id*.  Prior to the directive, Oracle compensated for this practice through "upside" adjustments by Oracle's controller Minton.  *Id.*  Minton added the "upside" adjustment to the field-level forecast to generate what she termed the "Potential Forecast." Ex. 18 at 10.  The directive was therefore intended to increase the amount of the field-level forecast. It also rendered Ms. Minton's upside adjustments and her "Potential Forecast" unnecessary and unreliable.  Ex. 19 at 81-84.

Despite this fundamental change and its affect on the forecast process, Foster focuses his rebuttal report largely on the accuracy of Ms. Minton's "Potential" forecast.  In fact, he dismisses all

1   of the metrics that Oracle's executives actually utilized to gauge Oracle's performance throughout

2   the quarter as either inferior predictors or not predictive at all and instead focuses on the predictive

3   nature of Ms. Minton's Potential Forecast. Ex. 1 at 39-43, ¶100 ("monthly actual results were a less

4   accurate predictor of Oracle's quarterly results than was the Potential Forecast"); *id.* at 50, ¶111

5   ("the Potential-based EPS Forecast was historically more accurate than EPS estimates based on the

6   Field Forecast"). According to Foster, the metrics that Oracle's executives actually utilized to gauge

7   performance are meaningless because the Potential Forecast was in line with historical practice. *Id.*

8   at 17-20, ¶¶44-48.

9       But in reaching these opinions, Foster simply dismisses the significant change to the

10  forecasting process directed by Mr. Ellison, which rendered irrelevant the historical accuracy of the

11  Potential Forecast, because he "disagree[s] with Dr. Goedde that any such increase in risk occurred."

12  *Id.* at 34-35, ¶78. That is the extent of Foster's analysis and methodology – reviewing evidence to

13  conclude that the directive did not occur. *Id.* at 34-37. He cites Ellison's statement that he did not

14  want more risk in the forecast because he "always wanted the forecast to be accurate" but ignores the

15  explanation in the e-mail showing that the directive changed the field-level forecast. *Id.* at 36, ¶81.

16  He says that "Jeff Henley did not recall any such change occurring." *Id.* He says that Minton "did

17  not recall the field including additional judgment in its forecasts beginning in Q2 FY2001." *Id.* And

18  he disagrees with the very language in the e-mail describing the change – "The e-mail requested

19  ***additional*** information to be provided to Ms. Minton, not a ***substitution*** of one kind of forecast for

20  another." *Id.* (emphasis in original). This is the sum total of Foster's analysis. He did not test to see

21  whether any additional risk was, in fact, included in the field forecast and simply disbelieved the

22  evidence because it was not the type that he wanted to see:

23      Q:    But your testimony was is that if it is a directive from Ellison and he wanted
              to do it company-wide, there would have been a directive from him. But

24            you've seen testimony from him where he admits, "Yeah, that was me."

25      THE WITNESS: He states he wanted more information in the process.

26      Q:    Right. So the directive came from him?

27      THE WITNESS: It wasn't a company-wide statement.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-MJJ                                              - 14 -

> Q:   So you would want to see a company-wide e-mail before you would believe that, in fact, the directive had been made?
>
> A:   I would want to see – I would look for that. That would be one piece of evidence.

Ex. 2 at 126-27.  Foster applied no methodology to support his opinions on defendant Ellison's directive to change the field forecast.  Ex. 1 at 34-37, ¶¶77-85.  By failing to do so, all of his opinions concerning the Potential Forecast are unreliable since he failed to account for (or even consider) a critical fact that bears directly on his opinions.  *See* Fed. R. Evid. 702, advisory committee's notes; *Gen. Elec.*, 522 U.S. at 146 (the evidence must be excluded if the court finds "that there is simply too great an analytical gap between the data and the opinion proffered").  Foster's opinions concerning the directive should be excluded as improper "oath helping" and his opinions about Oracle's forecasting process and his reliance on the Potential Forecast should be excluded as unreliable.  Fed. R. Evid. 704, advisory committee's notes (stating the trial court must protect "against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day"); Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

Foster also failed to analyze another meaningful measure that undermines the reliability of his opinions.  Foster opines that the historical conversion ratio (the percentage by which Oracle converted its pipeline for the same week in the prior year) applied by Ms. Minton to generate her Potential Forecast was merely a "reasonableness check" on Oracle's forecast (he later changed his testimony to "it is one factor that you use").  Ex. 1 at 22, ¶54; Ex. 2 at 85:14-86.  In fact, he opines that "the use of historical Conversion Ratios as a check on the reasonableness of the current forecast was a strength of Oracle's forecasting process."  Ex. 1 at 22, ¶54.  But in reaching this opinion, Foster performed no analysis or study of the reliability of the historical conversion ratio even though Dr. Goedde provided graphs and charts showing that the historical conversion ratio was growing less and less reliable as each quarter passed between Q3FY00 and Q3FY01.  *See* Ex. 19 at 78.  Foster admits that the composition of Oracle's pipeline had changed between Q3'00 and Q3'01 to include a higher percentage of application deals with longer sales cycles, but ignored the impact of this change

1  on the conversion ratio. Ex. 2 at 87:14-21. Hubbard's methodologies are unreliable and his opinions

2  concerning Oracle's forecast process should be excluded.

3      Another important flaw in Foster's methodology was his failure to consider the economic

4  change between Oracle's Q3FY01 and its Q3FY00 – the quarter in which Oracle compared for

5  purposes of its Public Guidance. Despite testifying that "macroeconomic conditions are an input

6  into the forecasting process," Foster failed to perform any analysis of whether Oracle's Q3'00 was

7  an appropriate input for Oracle's Q3'01 forecast even though Oracle experienced extraordinary

8  growth in that quarter. Ex. 2 at 41-42, 93-95. Indeed, Ms. Minton testified that Oracle's fiscal 2000

9  was a "very high growth period" and internal documents and statements by defendants acknowledge

10  that comparisons were difficult because Oracle's sales "took off" in Q3FY00. Ex. 16 at 85:16-17;

11  Ex. 18 at 4-8. Despite the dramatic difference in the economic environment (which would certainly

12  impact Oracle's conversion ratio), Foster testified that "I have not looked into" whether Q3'00 was

13  an outlier quarter. Ex. 2 at 175:16. It is fatal to Foster's analysis that he chose not to "look into it."

14  It establishes that Hubbard has utilized an unreliable methodology to inform his opinions.

15      Foster's refusal to properly test and evaluate his conclusions directly undermines the

16  reliability of his opinions, and they should accordingly be excluded.

17      **D.    Foster Admits to Developing Several Opinions Specifically for
              Purposes of Testifying in this Litigation**

18

19      As the Ninth Circuit has noted, "[o]ne very significant fact to be considered is whether the

20  experts are proposing to testify about matters growing naturally and directly out of research they

21  have conducted independent of the litigation, or whether they have developed their opinions

22  expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th

23  Cir. 1995). Here, Foster admitted that his experience as a testifying expert typically concerns

24  "management systems, [] cost accounting systems, the budgeting systems of companies[] [a]nd . . .

25  valuation." Ex. 2 at 8:20-22. Notably absent from his purported expertise is forecasting processes,

26  with the exception of one prior occasion. *Id*. at 16:14-17. In fact, Foster has never been involved in

27

28

1   business forecasting, other than as an outside observer.[5]  Beyond his limited experience are his

2   flawed methods, which serve to undermine the reliability of his opinions – as set forth below.

3       In evaluating the reasonableness of Oracle's forecasting process, Foster purports to define

4   "what is a reasonable forecast process." Ex. 1 at 11, ¶29.  He offers three criteria in his evaluation:

5       • "Is there a structured, broad-based process for collecting and evaluating
        information?"

6

7       • "Does the process have appropriate checks and balances?"

        • "Is the process historically validated?"

8

9   *Id.*  Foster's reliance upon these criteria here fails under the *Daubert* standard, as this approach has

10  not been subject to peer review or achieved general acceptance in the field. Ex. 2 at 97-98; *Daubert*,

11  509 U.S. at 590-94.  Foster even testified that he has never once checked with another scholar in the

12  field to discuss whether his criteria are reasonable or completely wrong.  Ex. 2 at 98:24-25.  By

13  electing to apply a novel forecasting standard that has not been accepted or even reviewed, Foster's

14  conclusions are inherently unreliable and are exactly the sort that should be excluded under *Daubert*.

15      Foster also utilizes another novel approach to opine that Oracle's actual results, which

16  revealed severe negative growth rates in all U.S. license divisions at the end of December 2000 and

17  the end of January 2001 (compared to 25% projected growth), did not inform defendants that Oracle

18  was being adversely affected by the economic downturn and was tracking to miss guidance.  Ex. 1 at

19  32-34, ¶¶71-75.  Foster manufactures "an appropriate test of intra-quarter growth rate relationships"

20  to "mirror situations in which Oracle might try to predict its total quarter revenue from either its first

21  month's revenue or its first and second month's revenue combined."  *Id.* at 32, ¶¶71, 73 and Tables 6

22  and 6A.  He then proceeds to describe a regression analysis comparing the relationship between the

23  months within a quarter instead of comparing the months to the quarter.  *Id.* at 33, ¶74.

24      Not only is Foster's analysis nonsensical, but it also fails under *Daubert*.  509 U.S. at 590-94.

25  Like his criteria to evaluate a "reasonable forecast process," Foster testified that his approach has not

26

27  ---
    [5]     "I have not been part of a forecasting team.  I've been asked to look at the forecasts of small
    and large companies, but I've not prepared them."  Ex. 2 at 64:20-22.

28

1    been subject to peer review, does not have a known error rate, has not achieved general acceptance

2    in the field, and was prepared solely for the purposes of this litigation.  Ex. 2 at 154-56.  In fact, he

3    testified that this case was the first time he had ever measured the predictive quality of monthly

4    revenues in this manner.  *Id.* at 156:23-25.  These are all factors that contribute to a finding of

5    unreliability under *Daubert* and Rule 702. 509 U.S. at 590-94.  His novel theories must be excluded

6    and his opinions based on those theories must be excluded.

>    **E.    Foster's Opinions that Rely on Securities Analysts Should Be
7    Excluded**

8          Foster also relies upon external anecdotal commentary from securities analysts in formulating

9    his opinions.  Ex. 1 at 25, ¶62.  He opines that if Oracle's forecast process failed to take market

10   information into account in Q3 FY2001, "one would expect to see a clear divergence between what

11   Oracle was forecasting internally and what security analysts were forecasting."  *Id.*  Like the

12   methodology of Hubbard based on the commentary of securities analysts, Foster's methodology is

13   similarly unreliable as he relies on facts and data outside of Oracle to prove what was happening

14   within Oracle at the time.  And he does so without citing any testimony from or interviews with any

15   of the analysts on which he relies.  He does not offer their respective processes, what they considered

16   important, what they did not consider important, or whether they relied on company data.  In fact, as

17   discussed above, Foster did not even remember what Oracle was saying to analysts throughout the

18   quarter about the strength of its pipeline.  Ex. 2 at 187:23-188:10.  He also disregards that Oracle

19   was repeatedly telling analysts that its business what not being impacted by the economic

20   environment at the time because of an "astounding" pipeline.  Ex. 20 at 7-8, 11.

21         As discussed in the reports of both Dr. Goedde and Hubbard, analyst reports often reflect the

22   information provided by management, and do not have the benefit of internal documentation and

23   sales data.  Ex. 19 at 54; Ex. 13 at 35.  As such, analyst reports are inherently unreliable and

24   generally follow the guidance provided by the companies being followed.  As described in plaintiffs'

25   motion to exclude the testimony of Hubbard, Foster's own writing reflects the reality that securities

26   analysts are not a reliable gauge of Oracle's forecasting process or its guidance.  *See* Plaintiffs'

27   Notice of Motion and Motion to Exclude the Expert Testimony of R. Glenn Hubbard at §IV.F.  In

28

his book entitled *Financial Statement Analysis*, Foster explains that "[i]n any one calendar month, only a minority of security analysts will report a revision of their earnings forecasts" because "(1) most analysts follow a large number of securities and do not have the time to do a detailed analysis of each company each month, and (2) only a small set of stocks in any one month have significant unexpected information releases that prompt analysts to revise their forecasts." Ex. 21 at 271-74.  In fact, Foster noted that "[a]nalyst[s] may have an incentive not to provide an unbiased forecast (*e.g.*, due to pressure to conform to consensus forecasts)" and that "[a]nalyst[s] may be manipulated by company officials (at least in the short run)."  *Id.* at 278.

And if these traits of security analysts forecasts were not enough to call into question the reliability of Foster's opinion, his book also directly undermines his opinion in this case based on "discussions with analysts" (which he chose not to do in this case):

> Discussions with analysts indicate that forecast revisions made by other analysts are important revision cues.  Individuals in some industries develop reputations as 'lead analysts' and much interest attaches to the direction of their forecast revisions.  ***Analysts also report that high penalties are placed on taking positions that diverge markedly from the consensus when the consensus subsequently turns out to be 'correct.'  The result can be that analysts make forecasts that diverge less from the consensus than what they would report in the absence of these penalties***.

*Id.* at 289.  The foregoing article simply highlights the unreliable methodology that Foster applied to reach his opinions that Oracle's forecast process incorporated economic data.  The fact that he chose not to confirm his assumptions in this case by reviewing analyst testimony or speaking to analysts (even though he did so to support his opinion in *Financial Statement Analysis* (Ex. 21)) requires the exclusion of his opinions.  *See Kumho Tire*, 526 U.S. at 152 (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Sheehan v. Daily Racing Form*, 104 F.3d 940, 942 (7th Cir. 1997) (finding an expert must be "as careful as he would be in his regular professional work outside his paid litigation consulting").  Foster did not inquire of a single analyst about the model they used, what influenced their decisions, who they spoke to, why they spoke to those individuals, or why not.  Like Hubbard, the list of tasks that Foster did not do to ensure

1    reliability is lengthy.  His opinions are unreliable and speculative and should be excluded.  Fed. R.

2    Evid. 702; *Daubert*, 509 U.S. at 589.

3         **F.**    **Foster's Opinions on the Predictive Quality of Oracle's Intra-Quarter Pipeline Growth Should Be Excluded as Unreliable**

4

5         Despite testimony from several executives (and his own testimony) that pipeline growth was

6    a forecasting indicator for Oracle, Foster offers the opinion in his report that "[t]o my knowledge, no

7    executive at Oracle has testified to using the change in the pipeline or change in the pipeline growth

8    during the quarter as a forecasting measure."  Ex. 1 at 49, ¶108.  He then performs a regression

9    analysis that attempts to refute a positive correlation between pipeline growth and year-over-year

10   actual license revenue growth.  *Id.* at 49, ¶109 and Figure 11.  In fact, Foster goes so far as to suggest

11   that "there is actually a counterintuitive negative relationship between the two, where greater year-

12   over-year revenue growth is correlated with more rapidly declining Pipeline growth."  *Id.*  In other

13   words, Foster would expect revenues to increase as opportunities fall.  *Id.*

14        Foster's opinions must be excluded as the methodology that he utilizes is unreliable.  Apart

15   from the wealth of evidence establishing that Oracle actually used intra-quarter pipeline growth to

16   measure its performance against guidance, Foster utilized an insufficient amount of data to reach his

17   opinions about the positive correlation studied in his Figure 11.[6]  In fact, he admitted that the number

18   of data points used to dispel the positive correlation (six) were insufficient to perform an adequate

19   regression:

20            Q:     The data the other way, if you only have six data points here, your testimony is that it becomes less and less reliable.  The less and less data points you have –

21

22   [6]         Q:     And what does that – what does R-squared with a number of 0.1792 tell you about the data?

23

24            A:     There is, over just these six data points, there is approximately about a .35 negative correlation.

25            Q:     And what does that mean in English?

26            A:     With six observations, that's not a strongly significant result.

27   Ex. 2 at 185:16-186:2.

28        PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GEORGE FOSTER - C-01-0988-MJJ         - 20 -

1    A:    The fewer observations, the less confidence you have of the results; that is
             correct.

2    Q:    Your testimony is, the less data points you have, the less reliable your
3           regression is; right?

4    A:    The fewer the data points; that's correct.

5  Ex. 2 at 194:8-16; *id.* at 192:13-15 (Q:  Now, you testified that in Figure 11 you had six data points;

6  right?  A:  Right.).  The methodology that Foster used to calculate the positive correlation between

7  pipeline growth and revenue growth is unreliable and should be excluded.  Fed. R. Evid. 702;

8  *Daubert*, 509 U.S. at 589.

9          So too should Foster's opinions about the counterintuitive relationship described by the

10  regression in Figure 11.  Ex. 2 at 185-91.  Foster admitted to not testing this part of his regression

11  through an appropriate "F test," which would have enabled Foster to test the reliability of his data:

12    Q:    So this is the data that you produced.  Can you tell me at what confidence
             level you reached the conclusion that there is a counterintuitive negative
13           relationship between pipeline growth and growth in license revenues?

14    A:    I can't with this data.  I have not reported the T statistics.

15    Q:    There is no way for you to tell me that?

16    A:    No, not from this data.

17  Ex. 2 at 185:7-15, 190-91.  If Foster is not aware of the reliability of his calculations, surely a jury

18  should not be subjected to them.  His testimony should therefore be excluded concerning the

19  relationship, either positive or negative, between pipeline growth and revenue growth.  Foster's

20  opinions on whether Oracle actually utilized the data in its forecasting process should also be

21  excluded.  It is well established that an expert must bring to the jury more than the lawyers can offer

22  in argument.  *See United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 n.3 (9th Cir. 2000) (expert

23  testimony not admissible if the testimony is "about an issue within the ken of the jury's

24  knowledge").

25      **G.     Foster's Opinions Improperly Rely Upon Data Inputs from Oracle's
                  Field Sales Force**
26

27          Rule 702 does not permit even a qualified expert witness to offer speculation in the guise of

28  expert testimony.  "[T]he word 'knowledge' [in Rule 702] connotes more than subjective belief or

1   unsupported speculation." *Daubert*, 509 U.S. at 590; *accord Watkins v. Telsmith, Inc.*, 121 F.3d

2   984, 990 (5th Cir. 1997).  Nevertheless, like Hubbard, Foster offers the opinion that "[b]y virtue of

3   relying on sales representatives' estimates of likely purchases by potential customers, Oracle's

4   forecasting process incorporated relevant macroeconomic, product, and customer information."  *See*

5   Ex. 1 at 24, 13, 22-23, ¶¶61, 35, 56-57.  And like Hubbard, Foster relies on the same general

6   references to conversations with customers and sales representatives regarding their interaction with

7   customers.  *Id.* at 23, ¶57.  Absent from any of this testimony is specifics on what information the

8   executives learned, whether Oracle's customers were forthcoming with information, or whether and

9   how that information formed the basis of the field-level forecasts.  Without these specifics, Foster's

10  opinions are equally as speculative as Hubbard's and are unreliable.  Fed. R. Evid. 702; *Daubert*,

11  509 U.S. at 589.  They must therefore be excluded as speculative opinions that will not assist the

12  trier of fact to understand the evidence or determine a fact in issue.  Fed. R. Evid. 702.

13       Foster should also be precluded from testifying about how the field-level forecasts

14  incorporated economic and business information given the discovery limitations that defendants

15  demanded in this case.  As the Court is aware, plaintiffs were specifically precluded during the

16  discovery process from obtaining evidence from the files of the regional sales managers who

17  specifically participated in the weekly forecast calls with Oracle's Area Vice Presidents – and whose

18  files were never preserved:

19       So my . . . first ruling will be that the files to be searched are the . . . 53 individuals
         that the defendants have identified, plus the area-vice presidents' files in the three
20       sales and consulting divisions listed in the letter.

21                              *       *       *

22       I'm not giving you . . . the regional managers.

23  Ex. 22 at 16:16-22, 26:15-16.

24       Foster repeatedly cites the field's contact with customers as the basis for his belief that

25  Oracle took into account the macroeconomic climate:

26  •    "Because the forecasting process involves the salespeople doing that as they
          speak to the customers, that is where that [macroeconomic] information
27        comes into the process."  Ex. 2 at 41:14-16.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-MJJ                                                        - 22 -

- "Because my opinion is that the forecasting process enables that [macroeconomic] information to be put in right from the start in terms of the grass-roots level, so that if there are changes in the economic environment, then that will be reflected into the inputs into the system." *Id*. at 49:18-22.

Absent the ability by plaintiffs to obtain discovery refuting these opinions, it is manifestly unfair to permit defendants to advance opinions concerning topics which were beyond the realm of discovery. Because of the discovery limitations that defendants demanded (and their failure to preserve relevant evidence), plaintiffs were unable to adequately discover evidence to rebut these arguments. Foster's opinions should therefore be excluded. *See* Plaintiffs' Motion and Supplemental Submission Regarding Defendants' Destruction of Evidence and Request for Sanctions at §§V.B.1. and V.B.2.a.(1).

## H. Foster's Opinions Should Be Excluded Under Rule 403

Should the Court decide not to exclude the opinions of Hubbard regarding Oracle's forecast process, it should exclude Foster's opinions about Oracle's forecast process under Fed. R. Evid. 403 as they are duplicative of the opinions that defendants' offer through Hubbard. As discussed in plaintiffs' motion to exclude Hubbard's opinions, Foster gives identical opinions about economic information informing the sales process and even cites to the same evidence to support that opinion:

| *Foster Rebuttal Report* | *Hubbard Opening Report* |
| --- | --- |
| "It is my view that Oracle's forecasting process incorporated macroeconomic, customer, and product market information in two ways – through sales representatives' direct interactions with customers and the application of management judgment."<br><br>"By virtue of relying on sales representatives' estimates of likely purchases by potential customers, Oracle's forecasting process incorporated relevant macroeconomic, product, and customer information." | "Macroeconomic conditions were incorporated in the forecast through both sales representatives' estimates of likely purchasing behavior of their prospective customers and the informed judgment of more senior executives based on their critical review of forecasting information received from their direct reports." |

*See* Ex. 1 at 23-24, ¶¶57, 61; Ex. 13 at 78, ¶159; *compare* Ex. 1 at 23, ¶57 (quoting testimony of Nussbaum and Edward Sanderson ("Sanderson") regarding general conversations with customers

1    and sales representatives) *with* Ex. 14 at 21-22, ¶¶56, 58 (quoting same testimony of Nussbaum and

2    Sanderson regarding general conversations with customers and sales representatives).

3         The reports of Foster and Hubbard are duplicative in several additional respects.  Both

4    purport to outline the forecasting process at Oracle in determining that the forecast process was

5    reasonable, including overlapping opinions on historical validation of the process, Minton's upside

6    adjustments, and "appropriate" checks and balances.  Ex. 1 at 11-20, ¶¶31-48; Ex. 13 at 78-93,

7    ¶¶157-196.  Foster and Hubbard also use similar charts to convey similar opinions – which is

8    unsurprising given that Analysis Group (*i.e.*, AGE) created the charts for both reports.  Ex. 23 at

9    113-14; Ex. 2 at 37.  For example, Foster's Figure 3 addresses Oracle's EPS guidance, forecasts, and

10   actual results – the exact same topic as that addressed by Hubbard's Figure 44.  Ex. 1 at Appx. D,

11   Figure 3; Ex. 13 at Appx. D, Figure 44.  Hubbard's Figures 43 and 45 also address the topics of

12   Oracle's EPS and analyst forecasts, which are covered by Foster's Figure 3.  Ex. 13 at Appx. D,

13   Figures 43 and 45; Ex. 14 at Appx. D, Figure 3.  Foster's Figure 1 gauges, in part, Oracle's potential

14   forecast – which Hubbard addresses at his Figure 46.  Ex. 1 at Appx. D, Figure 1; Ex. 13 at Appx. D,

15   Figure 46.  Foster's Figure 13 measures conversion ratios in the same manner as Hubbard's Figure

16   50 measures conversion ratios.  Ex. 1 at Appx. D, Figure 13; Ex. 13 at Appx. D, Figure 50.  Foster's

17   Figure 12 analyzes Oracle's upside adjustment as a percentage of license forecast, the exact same

18   metric also considered in Hubbard's Figure 42.  Ex. 1 at Appx. D, Figure 12; Ex. 13 at Appx. D,

19   Figure 42.

20        The reports of Hubbard and Foster are replete with duplicative opinions and charts.  Should

21   the court decide to admit the testimony of Hubbard on Oracle's forecast process, it should exclude

22   the opinions of Foster on the same topics under Rule 403.  Fed. R. Evid. 403 ("evidence may be

23   excluded if its probative value is substantially outweighed by . . . considerations of . . . needless

24   presentation of cumulative evidence").

25

26

27

28

# V.      CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs' motion to preclude the opinions of Foster.

DATED:  October 9, 2007                    Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
DANIEL J. PFEFFERBAUM


                                                        /s/
                                              SHAWN A. WILLIAMS

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\BRF00046257_Foster.doc

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List.

5        I certify under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct.  Executed on October 9, 2007.

7

8
_____
                     /s/
            SHAWN A. WILLIAMS

9
COUGHLIN STOIA GELLER
10
     RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
11
San Francisco, CA  94111
Telephone:  415/288-4545
12
415/288-4534 (fax)
E-mail: ShawnW@csgrr.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111