COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
VALERIE L. McLAUGHLIN (191916)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
valeriem@csgrr.com
skaplan@csgrr.com
    – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
danp@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) ) ) ) ) ) ) |

Master File No. C-01-0988-MJJ

CLASS ACTION

PLAINTIFFS' AMENDED NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION

DATE:         November 16, 2007
TIME:         1:30 p.m.
COURTROOM:    The Honorable
              Martin J. Jenkins

**REDACTED VERSION OF DOCUMENT PREVIOUSLY FILED ON AUGUST 7, 2007
(DOCKET 959)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF FACTS .............................................................................................. 2

    A.  Ellison Knew that Oracle's Forecast and Guidance in 3Q01 Were
        Unreliable and Inaccurate .................................................................................. 2

        1.  The Major Macroeconomic Change Facing Oracle Rendered Its
            3Q01 Forecast Inaccurate ................................................................... 4

        2.  The Change in Oracle's Product Mix and Problems with 11i
            Rendered Oracle's 3Q01 Forecast Inaccurate ..................................... 6

        3.  Ellison's Directive Just Before 3Q01 to Increase the Risk in
            Oracle's Forecast Rendered It Unreliable and Inaccurate ................... 8

        4.  Oracle's Guidance Was Unreliable Because Minton Applied Her
            Inaccurate Conversion Analysis to an Inaccurate Pipeline.................. 9

    B.  When Ellison Suddenly Deviated from Plan and Decided to Sell Stock in
        January 2001, the Internal Indicators that He Preferred to Rely on Painted
        a Bleak Picture for Oracle's Financial Prospects............................................. 9

        1.  Less than 36 Hours Before He Decided to Unload Early, Ellison
            Received Oracle's Dismal Actual Results for December ......................10

        2.  When He Sold, Ellison Was Aware that Oracle's "Astounding"
            Pipeline Had Taken an Unprecedented Nosedive.................................11

    C.  After Receiving Adverse Material Non-Public Information, Ellison
        Suddenly Decided to Unload 40 Million Shares of Oracle Stock to Fund
        His "Absolutely Excessive" Lifestyle..............................................................12

III. ARGUMENT ..................................................................................................................14

    A.  Standard of Review for Summary Judgment .....................................................14

    B.  Insider Trading Qualifies as a Deceptive Device in Violation of §10(b)
        and Is Prohibited by §20A of the Exchange Act................................................15

    C.  Ellison Traded on the Basis of Material Non-Public Information .......................16

        1.  Ellison Knew that Oracle's U.S. License Divisions Had
            Experienced Severe Negative Growth Rates .......................................17

        2.  Ellison Knew that Oracle's Pipeline Had Collapsed .................................17

        3.  Ellison Knew that Oracle's Public Guidance Was Unreliable
            Because of Significant Internal and External Changes...........................18

Page

4.  Ellison Knew that Oracle Would Not Meet Its Applications
    Growth Guidance Because of the Problems with Oracle's 11i Suite ........19

D.  Ellison's Trades Were Suspicious in Timing and Amount .....................................20

1.  Ellison's Sales Were Dramatically Out of Line with His Prior
    Trading Practices and Were Timed to Maximize His Personal
    Benefit...........................................................................................................20

2.  The Amount and Percentage of Shares Sold by Ellison Was
    Unusually Large............................................................................................21

3.  Ellison's Use of Proceeds Establish that He Acted with Scienter .............22

E.  The Wholesale Destruction of Documents Evidencing Ellison's
    Knowledge and Mental State Is Further Evidence of Scienter ...............................22

IV.  CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)....................................................................................15

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................16, 19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................14

*Chiarella v. United States*,
  445 U.S. 222 (1980)....................................................................................16

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ......................................................................18

*In re Silicon Graphics Sec. Litig.*,
  970 F. Supp. 746 (N.D. Cal. 1997) .............................................................15

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*,
  11 F.3d 865 (9th Cir. 1993) .........................................................................15

*Johnson v. Aljian*,
  394 F. Supp. 2d 1184 (C.D. Cal. 2004), *aff'd*,
  No. 04-56997, 2007 U.S. App. LEXIS 14466
  (9th Cir. June 20, 2007) ..........................................................................16, 21

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) .......................................................................22

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................................15

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .................................................................20, 21

*SEC v. Clark*,
  915 F.2d 439 (9th Cir. 1990) ...................................................................15, 16

*SEC v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968)........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  __ U.S. __, 127 S. Ct. 2499 (2007) ..............................................................18

*TSC Indus. v. Northway, Inc.*,
  426 U.S. 438 (1976)..........................................................................16, 19, 21

**Page**

*United States v. Atul Bhagat,*
    436 F.3d 1140 (9th Cir. 2006) ............................................................21

*United States v. Causey,*
    No. H-04-025-SS. 2005 U.S. Dist. LEXIS 39619
    (S.D. Tex. Dec. 29, 2005) ...............................................................16

*United States v. O'Hagan,*
    521 U.S. 642 (1997)........................................................................15


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78i(b) ...............................................................................15, 25
    §78t-1 ...............................................................................15, 25
    §78t-1(a)...................................................................................15

Federal Rules of Civil Procedure
    Rule 56(c)............................................................................1, 14

17 C.F.R.
    §230.144...................................................................................21
    §230.144(e)...............................................................................21
    §230.144(e)(1)...........................................................................21
    §240.10b-5..........................................................................15, 16
    §240.10b-5(a)............................................................................15
    §240.10b-5-1.................................................................15, 16, 19, 21
    §240.10b-5-1(b)....................................................................16, 21
    §240.10b-5-1(c)........................................................................16

Civil Local Rules
    Rule 56..................................................................................1

TO:  ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on November 16, 2007, at 1:30 p.m. in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs will and do hereby move this Court for an order granting their Motion for Summary Judgment Against Lawrence Ellison for Trading on the Basis of Material Non-Public Information pursuant to Fed. R. Civ. P. 56(c) and Civ. L.R. 56.  The motion is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the Appendix of Exhibits in Support thereof ("Appendix"),[1] and all exhibits thereto, the pleadings and evidence submitted herewith, and any other information submitted before or during the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On January 19, 2001, Larry Ellison first instructed Philip Simon, his financial advisor, to immediately unload 40 million shares of Oracle Corporation ("Oracle") stock. Ex. 1. at 69:1-70:3; Ex. 2 at 59:15-60:6; Ex. 3 at 300606.  Prior to January 19, Ellison had not informed anyone of an intent to sell in January 2001.  *Id.*  To the contrary, before January 19, every indication from Ellison, Simon, and Oracle was that Ellison planned to exercise options and sell stock in April 2001 as part of Oracle's corporate tax plan.  Exs. 4 & 5.

Despite this plan, which had been discussed for months, on January 19, after receiving dismal news regarding Oracle's revenues and products, including an e-mailed Flash Report on January 17 (less than 36 hours earlier) disclosing that all three of Oracle's U.S. divisions (50% of Oracle's license revenues) had experienced severe negative growth trends in December 2000, Ellison decided to unload early. Ex. 6; Ex. 3 at 300606.  Between January 22 and January 31, Ellison engaged in one of the largest insider trading binges in history, unloading over $895 million worth of Oracle stock. Ex. 7 at 300656.  Ellison's timing was impeccable.  Just a short month later, Oracle announced what Ellison had known for months – that Oracle's financial condition had been severely and negatively affected by the declining economy and problems with its applications Suite 11i.  Exs. 8 & 9.

---

[1]      All "Ex." or "Exs." references are to exhibits attached to the Appendix.

Oracle's stock plummeted.  Seven days later, Ellison wrote, "[i]t's good to be a bit more liquid in light of the economic downturn."  Ex. 7 at 300656.

More than six years later, Oracle's stock price has yet to return to its 3Q01 levels.  To this day, Ellison is one of the last persons to sell Oracle stock above $30.

## II.    STATEMENT OF FACTS

### A.    Ellison Knew that Oracle's Forecast and Guidance in 3Q01 Were Unreliable and Inaccurate

On December 14, 2000, Oracle issued guidance for 3Q01.[2]  Ex. 10.  Oracle projected license revenue growth of 25%, database revenue growth of 15%-20%, applications revenue growth of 75%, and 12 cents earnings per share ("EPS").  *Id.* at 03221-22.  This was an aggressive forecast; growth rates were defined year-over-year, and in 3Q00 Oracle had achieved stellar results.  *See* Ex. 11.  Oracle also informed analysts and investors that it was seeing "no impact or slowing in [its] business" from the economic downturn that was being discussed widely in the press and within Oracle.  Ex. 10 at 03218.  *See also* Ex. 12 at Ex. B (***The economic slowdown isn't hurting Oracle, said [Ellison], because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs . . . .***").[3]  Oracle reiterated its guidance throughout 3Q01, while continuing to emphasize the strengths of its pipelines and products.  Ex. 12 at Exs. C & D; Ex. 13 at 091536; Ex. 14 at 091532; Ex. 15 at 141677; Exs. 16 & 17.

Oracle's guidance was based on its corporate finance forecast.  Oracle's forecasting process consisted of two main parts.  First, all possible sales opportunities were placed into Oracle's pipeline and were forecasted by Oracle's field sales units (the "Field") based on the likelihood of closing in the quarter.  Ex. 18 at 110:22-111:10.  The forecasts were rolled up into an overall "Field Forecast."  Ex. 19 at 104:15-105:11.  According to Jennifer Minton, head of Corporate Finance, the Field had

---

[2]    Oracle's fiscal year begins on June 1 and ends on May 31.  Its third fiscal quarter in 2001 began on December 1, 2000 and ended on February 28, 2001.

[3]    All emphasis is added and citations are omitted, unless otherwise noted.

1   historically "sandbagged," or underestimated, actual revenue for the quarter and this was a source of

2   contention with Ellison. Ex. 20 at 101:8-18. As a result, Minton added "upside," or management

3   judgment, to the Field Forecast to account for "sandbagging." Ex. 21 at 123:14-125:4. The resulting

4   corporate finance forecast ("Potential Forecast") was the basis for Oracle's guidance. Ex. 22 at

5   126:7-15. Ellison testified, however, that he did not rely on the Potential Forecast and instead

6   preferred to look to actual intra-quarter results and pipeline data. Ex. 23 at 279:1-11; Ex. 24 at

7   286:15-18.

8        Ellison explained why he was reluctant to rely on Oracle's Potential Forecast – in times of

9   changing conditions, Oracle's forecasting becomes inaccurate. He wrote, "[a]s I've said before, our

10  forecasting system is not clairvoyant. Our forecasting does statistical extrapolations based on

11  historic trends. If something that's outside our mathematical model of business changes, . . . our

12  forecasting becomes inaccurate." Ex. 25 at 226; Ex. 26 at 384:6-385:7. More specifically, Ellison

13  testified that a major economic change would cause Oracle's forecasting to become inaccurate

14  because "you can't extrapolate anymore." Ex. 26 at 384:23-385:7. The reason for this inaccuracy

15  was that Minton's "upside" was largely a year-over-year extrapolation – she applied the prior year's

16  historical conversion ratio (the percentage of the pipeline that had closed in the same quarter of the

17  prior fiscal year) to the current year's quarterly pipeline to estimate Oracle's license revenues for the

18  quarter. Ex. 27 at 122:1-24; Ex. 28 at 211. In times of change, this calculation inaccurately assumed

19  that Oracle would close deals at the same rate that it had in the prior year.

20       In 3Q01, Minton applied the historical conversion rate from 3Q00 to Oracle's pipeline to

21  reach Oracle's Potential Forecast. Ex. 27 at 122:1-24; Ex. 29 at 78-79 & Ex. 4. Ellison knew that

22  this led to an inaccurate forecast in 3Q01 for several reasons, including: (1) a major economic

23  change had occurred between 3Q00 and 3Q01 that was affecting Oracle's business; (2) Oracle's

24  pipeline contained a higher mix of applications deals (with lower conversion rates and product

25  problems) than it had in the past; and (3) in 2Q01, Ellison changed the forecast process by directing

26  the Field to add more risk to its forecasts, thereby eliminating the need for any upside adjustment.

27  Ex. 26 at 384:6-385:7; Ex. 12 at Ex. B; Ex. 29 at 2-65 & Exs. 6 & 7; Ex. 30 at 4-8; Ex. 31. As a

28

result, Ellison knew that Oracle's Potential Forecast (and resulting public guidance) was unreliable and unreachable.

### 1. The Major Macroeconomic Change Facing Oracle Rendered Its 3Q01 Forecast Inaccurate

In Oracle's 3Q00, the economy was extraordinary. The NASDAQ was at its highest level in history and Minton characterized the period as "a very high growth period." Ex. 32 at 85:16-17; Ex. 30 at 4-8. Oracle took advantage of the frenzied technology spending and increased its sales to unprecedented levels. *See* Ex. 33 at 185 ("Fueled by the prevailing Internet fever, never before in history had there been such an appetite by businesses to buy the latest in computing technology, and Oracle was one of the leading beneficiaries."). One benefit to Oracle was new dot.com companies to which it could sell its saturated database product. In 3Q00, sales to dot.coms represented nearly 11% of Oracle's license revenues compared to just 3.1% in 3Q99 and just 0.7% in 1Q99. Ex. 30 at Ex. 5. The technology spending boom was so beneficial to Oracle that it exceeded its 3Q00 forecast substantially. Ex. 34; Ex. 35 at 0122080; Ex. 36 at 1914019. This strong quarter led to difficult comparisons, making revenue growth the following year very difficult. Ex. 37.

A year later, by Oracle's 3Q01, however, the NASDAQ had collapsed and the dot.com bubble had burst. Ex. 30 at Ex. 6. By November 2000, technology spending was down considerably and companies had problems acquiring financing. *Id.* at 4-8. The deteriorating economy is well-documented in "The Rewards of Recklessness," an article for use in January 2001 by Ellison and his co-author, Matthew Symonds, to promote their book *Softwar*. Ex. 38 at 1053564. In fact, the economy facing Oracle in 3Q01 had slowed so dramatically that in January 2001 the Federal Reserve reduced the Federal Funds rate twice in one month (which it had not done in ten years) and noted a "sizable decline in business spending on equipment and software." Ex. 39 at 2-3; Ex. 29 at 9-20; Ex. 40 at 13. Minton testified she knew in early January 2001 that "the general macroeconomic environment was suffering." Ex. 43 at 223:14-18. And defendant Henley told Oracle's audit committee on January 4, 2001 (the day he sold shares for proceeds of $32.3 million) that "all data since the [December 14 earnings] call point to more economic softening so there is risk of slippage in deals." Exs. 44 & 45.

Ellison, a daily reader of financial publications (Ex. 46 at 287), was aware that Oracle was facing a major economic change between 3Q00 and 3Q01 and that it could not expect to convert as large a percentage of its pipeline in 3Q01 as it had in the boom economy of 3Q00. Yet Minton's forecast predicted just that. This economic downturn was the exact sort of change that Ellison testified he knew would cause Oracle's forecast to become inaccurate. Ex. 26 at 384:6-385:7.[4]

Ellison was aware of hard evidence that Oracle's ability to convert its sales opportunities was being directly impacted: Oracle's conversion ratio had been lower in FY01 than it was in FY00. Ex. 48. The conversion rates in 1Q00, 2Q00, 3Q00 and 4Q00 were 56%, 57%, 53% and 56%, respectively. *Id.* The conversion rates in 1Q01 and 2Q01 were 45% and 49%, respectively. *Id.* Oracle was converting significantly fewer opportunities into sales in FY01 than in FY00, a decline amplified in 3Q01 by the application of these ratios to a pipeline near $3 billion. Ex. 30 at Ex. 10.

Ellison also knew that Oracle's dot.com business was declining. After reaching $172 million in 4Q00, dot.com sales fell to just $66 million in 2Q01. *Id.* at Ex. 5. By the end of December 2000, North American Sales ("NAS"), the division that sold primarily to dot.coms, reported that its dot.com bubble had burst. Ex. 49. NAS also reported that Oracle had already sold to larger dot.coms a year earlier and any new sales would have to be to lower tier dot.coms, which were quickly disappearing. Ex. 50 at 78:7-18. By January 29, 2001, Oracle was forecasting only $41 million in sales to dot.coms (3% of total revenues), compared to $111.5 million (11%) one year earlier. *See* Ex. 30 at Ex. 5.

Ellison was aware of this negative effect: "you're absolutely right that our dot-com business was certainly off by [3Q01]." Ex. 51 at 178:9-179:1. Ellison also testified that this put a "lot of pressure on [Oracle's] database" for 3Q01 (Ex. 52 at 255:21-256:21) and that Oracle had a "very, very high hurdle. So for the business to grow, it meant we had to overcome the fact that a lot of our dot-com companies – customers, our ex-customers, were gone." Ex. 53 at 385:10-22. Ellison was

---

[4] Ellison also testified that in an economic downturn, Oracle's deal cycle gets longer because companies require more approvals, resulting in slowdowns or cancelled deals. Ex. 47 at 245:18-247:4. The pipeline is therefore harder to convert.

aware that Oracle's forecast assumed that Oracle would convert as many deals in 3Q01 as it had in the extraordinary economy the year before.  He was aware that this made Oracle's forecast (and guidance) inaccurate.  Investors were not.

**2.    The Change in Oracle's Product Mix and Problems with 11i Rendered Oracle's 3Q01 Forecast Inaccurate**

Minton's application of the historical conversion rate from 3Q00 to the 3Q01 pipeline also produced an inaccurate forecast in 3Q01 because Oracle's product mix had changed dramatically.  Ex. 29 at 85-87.  Prior to May 2000, Oracle's applications were almost exclusively Enterprise Resource Planning ("ERP") products.  Ex. 54 at 101:1-7.  In May 2000, Oracle released its new applications Suite 11i, which included not only an untested rewrite of its ERP product, but also an entirely new and untested Customer Relationship Management ("CRM") product.  *Id.*  In 3Q00, applications comprised 18.6% of Oracle's license sales.  Ex. 30 at 85 & Ex. 7.  When Oracle issued guidance in 3Q01, however, Minton forecasted that applications would comprise 31.5% of license sales.  *Id.*  The change in Oracle's product mix rendered its forecast inaccurate for several reasons.

When guidance was issued in 3Q01, Oracle's pipeline contained a much higher percentage of applications deals than it had in 3Q00.  Ex. 29 at 85 & Ex. 6.  In 3Q01, Oracle's pipeline contained 42% applications and 58% technology.  *Id.* at 86 & Ex. 6.  In 3Q00, the pipeline had consisted of 29% applications and 71% technology.  *Id.*  Historically, on average, applications deals had a much lower conversion ratio (approximately 38.7%) than technology deals (approximately 63.3%).  *Id.* at 86 & Ex. 7.  Ellison knew that applying the 3Q00 historical conversion ratio to the heavily applications-weighted 3Q01 pipeline rendered the forecast inaccurate.  *Id.*

Ellison was also aware that Oracle's sales force "was not very good at selling applications."  Ex. 55 at 114; Ex. 56 at 173.  And the Field was further handicapped because, in 3Q01, the 11i applications did not work.  Multiple sources within Oracle, including Ellison, agree that 11i was released too early and caused what Mark Jarvis, head of Oracle marketing, called "eighteen months of Hell."  Ex. 57 at 424; Ex. 61 at 189 ("[Ellison] writes: We were getting a lot of pressure from our customers to deliver the 11i applications.  I made a lot of them mad by delaying the release for

1   several months.  I should have delayed it even longer.").  *See also* Ex. 58 at 196 (George Roberts);

2   Ex. 59 at 202-03 (Ron Wohl and Mark Barrenechea); Ex. 60 at 68:7-74:13 (Jay Nussbaum).

3        Ellison was aware of the problems with 11i.  He himself had made the decision to risk the

4   early release of unfinished and untested products.  For example, Ellison decided to release a "too

5   risky" version of Order Management, the most critical part of Oracle's ERP product. Ex. 62 at 192.

6   Ellison admitted that Order Management "hadn't been tested yet, so we thought it was much too

7   risky to put it into the suite," but that he decided to put it in anyway.  *Id.* ("It was my decision. . . .

8   The only problem was that it was brand new and we hadn't done enough testing.").  *See also* Ex. 63

9   at 640:12-21.

10       The early release of 11i caused huge problems for Oracle and its customers.  *See* Ex. 64 at

11  039325 ("As you know some of our earliest 11i clients (especially CRM and Order Management) are

12  exhausted from the effort of implementing the products.").  According to *Softwar*:

13           "[In November and December 2000] ***customer complaints poured in***.  Instead of
             working on the planned features and functions to flesh out the suite's capabilities as
14           planned, development was increasingly engaged in a feverish attempt to produce
             patches that would fix the bugs that seemed to be flying at them from all sides."
15
    Ex. 65 at 194-95.  Ellison admits that the problems with 11i "***just kind of got away from us, and***
16
    ***that became a very big problem***."  *Id.*
17
         The problems severely affected Oracle's ability to sell 11i.  *See* Ex. 66 ("CRM: we are
18
    loosing [sic] a bit of momentum; sales people are reluctant to engage to the product problems, lack
19
    of references and local language issues."); Exs. 67 & 68.  Oracle had virtually no 11i customer
20
    references by November 2000 and only nine 11i CRM references by June 2001.  Ex. 69 at 153367;
21
    Ex. 70.  This severely affected Oracle's ability to convert its applications pipeline because, as Ellison
22
    put it, "*[t]he first year of selling the [11i] suite was the hardest year.  It's difficult to sell without*
23
    *customer references*."  Ex. 71 at 249.  *See also* Ex. 72 at 239.  Ellison admits that between
24
    December 2000 and March 2001, Oracle was so desperate for references that it engaged in the
25
    practice of offering concessions or payments to customers to be references.  *See* Ex. 78 at 251:1-16.
26
    Ellison was also aware of Oracle's inability to demonstrate 11i and reluctance by Oracle's sales
27
    representatives to sell CRM.  *See, e.g.*, Ex. 73; Ex. 74 at 273:3-12.  *See also* Ex. 75 at 105:7-8.
28

Despite its failure to test 11i in-house prior to its release, in an attempt to manufacture an 11i reference, Oracle reassured customers and the market that Oracle itself had already saved a billion dollars in one year using its E-Business Suite. Ex. 76. Ellison later admitted that this was untrue and that "the first billion dollars of savings was pretty much in the bag before 11i was finished. . . . *Ellison says, 'That's absolutely right*.'" Ex. 77 at 182-83.

Investors were not aware that Oracle's claims regarding its in-house use of 11i were false. Investors were not aware that the product problems combined with the lack of references were making 11i difficult to sell. They were not aware that these problems rendered Oracle's (and Ellison's) statements that 11i would allow Oracle to escape the effects of the economic slowdown false and misleading. Investors were also not aware that the higher mix of applications deals in the pipeline rendered Oracle's forecast inaccurate. Ellison was.

### 3. Ellison's Directive Just Before 3Q01 to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate

When Oracle issued 3Q01 guidance, Ellison was aware that Minton's $160 million 3Q01 upside adjustment was no longer necessary because he had instructed the Field in late 2Q01 to add more risk (and amount) to its forecast. Ex. 30 at Ex. 11; Ex. 31. Ellison's directive, designed to eliminate sandbagging, rendered Minton's upside (historically applied to eliminate the same problem) obsolete.

According to Minton's e-mail regarding Ellison's directive, which was sent to executives and finance personnel in the field units, "Larry [Ellison] made it clear that he wants everyone to submit realistic forecasts – he is not interested in 'commit' numbers." Ex. 79 at 151961-62; Ex. 80 at 105:10-21. Numerous executives forwarded Minton's e-mail, and executives and finance personnel in the field divisions discussed methods for implementing Ellison's directive:

> Recently Larry has changed the way he is interpreting our forecast. . . . This is a change from our current thinking in that our forecast has not usually had a significant amount of judgment. It was the amount that you believed you could deliver at a minimum. That emphasis has shifted . . . *and now our forecast is a number that includes more risk than in the past*.

Ex. 31. Ellison confirmed that the "Larry" in the e-mail was him and Minton testified that she did not take the directive into account when adding upside to the Field Forecast in 3Q01. Ex. 81 at

423:24-425:1; Ex. 82 at 19:17-19.  Oracle documents show that this directive was in effect before 3Q01 – "[w]e will incorporate this [change] in our OSO 11i training that is tentatively scheduled the week of 10/23."  Ex. 31.  Despite the added risk, the Field Forecast still informed Ellison throughout 3Q01 that Oracle was projecting to miss guidance.  Ex. 30 at Ex. 12.

Ellison was aware that Minton's upside was no longer necessary but that, despite the directive, Minton added $160 million in upside in 3Q01.  Investors were not.

### 4.   Oracle's Guidance Was Unreliable Because Minton Applied Her Inaccurate Conversion Analysis to an Inaccurate Pipeline

Ellison was aware that the major economic change, the change in Oracle's product mix, and the myriad problems with Suite 11i rendered Minton's conversion analysis inaccurate.  Ellison was also aware that in 3Q01, Minton was applying this inaccurate conversion analysis to a pipeline that Henley testified was "too good to be true."  Ex. 83 at 354:15-355:3.  This overstated pipeline, which Oracle touted to analysts in December 2000 as a reason for its belief in the strength of its financial prospects, was in reality caused by Oracle's move in early December 2000 to 11i Oracle Sales Online ("OSO").  Ex. 84; Ex. 85 at 270:2-14.  The move to OSO increased Oracle's pipeline in 3Q01 by adding deals that the Field would previously not have felt comfortable enough to include.  Ex. 85 at 270:2-14.  Henley testified that this overstated pipeline was the reason that Oracle issued public guidance of 12 cents EPS instead of the 12.8 cents that Minton was forecasting at the time.  *See* Ex. 86 at 354:5-14 ("[W]e were skeptical of the strength of the pipeline to start [the quarter, so we did not make all that into our forecast for the third quarter.").  In issuing guidance, however, Oracle completely failed to take into account the variety of other changes, including the macroeconomic change, the change in Oracle's product mix and Ellison's directive, that made Oracle's forecast inaccurate.

### B.   When Ellison Suddenly Deviated from Plan and Decided to Sell Stock in January 2001, the Internal Indicators that He Preferred to Rely on Painted a Bleak Picture for Oracle's Financial Prospects

In addition to knowing that Oracle's guidance was inaccurate, Ellison was also informed by internal forecasting indicators that Oracle was not on track to meet that guidance.  Ellison testified that he relies primarily on actual sales and pipeline data, rather than the Potential Forecast.  Ex. 23 at

279:1-11. Both the actual sales data and pipeline data available to Ellison when he traded indicated that Oracle was being adversely affected by the economy and product problems and was not on track to meet its guidance. Ellison knew all of this information. Ex. 87 at 77:13-16 ("*So you're saying before trading commenced on the 22nd, was I pretty much up-to-date with all of the information available, then available?  And the answer's yes.*").

**1.    Less than 36 Hours Before He Decided to Unload Early, Ellison Received Oracle's Dismal Actual Results for December**

Actual results for December 2000 informed Ellison that Oracle was being adversely affected by the economy and product problems, and was tracking to miss guidance.  On January 17, 2001, Ellison received and read the Flash Report containing Oracle's actual results for December 2000. Ex. 6.  The Flash Report disclosed that the NAS and Oracle Services Industries ("OSI") lines of business (the divisions responsible for Oracle's 3Q01 miss) had revenue growth of *negative* 24% and *negative* 81%, respectively, and that Oracle Product Industries had growth of *negative* 85% after adjusting for Covisint.[5]  *Id.*  Accordingly, as of January 17, Ellison was aware that all three U.S. divisions (50% of Oracle's license revenues) had negative growth trends.[6]

The Flash Report also informed Ellison that Oracle's U.S. divisions had sold virtually no applications, excluding Covisint. Ex. 6.  Although its U.S. divisions were *forecasting $323 million* (excluding Covisint) in applications sales for 3Q01, in December 2000, Oracle's U.S. divisions *sold*

---

[5]    Covisint was a $60 million applications deal that was the largest transaction in Oracle's history.  Larry Garnick removed Covisint from his Flash Report analysis because the size and one-time nature of the transaction skewed Oracle's trends.  Ex. 88 at 312:2-313:4; Ex. 89 at 216:25-218:23.  According to Ray Lane, former President and Chief Operating Officer of Oracle, Covisint was, in actuality, a 2Q01 deal that was not indicative of 3Q01 trends.  Ex. 90 at 2 ¶9.  Additionally, Ellison himself testified that removing Covisint was proper in analyzing December 2000 results.  Ex. 91 at 436:13-437:6.

[6]    Ellison was aware of the problems in NAS and OSI even earlier.  For example, on his copy of the December 8, 2000 Upside Report, Henley noted that (i) NAS had no big deals in the pipeline; and (ii) the technology pipeline for OSI was down a lot since the last report.  *See* Ex. 92 at 610124; Ex. 93 at 214:2-19.  Over the next few weeks (by 12/25/00), OSI's applications pipeline would also plummet by almost $200 million.  Exs. 34, 94, 95.  *See also* Ex. 49 (Jan. 11, 2001 e-mail from David Winton (head of NAS finance) to Jennifer Minton, stating: "Drop in Technology.  As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4.  GB's dot com bubble has burst. . . .  Majors sees a slow down in spend along with smaller deal sizes.").  Ellison testified that he was aware of these issues in January 2001.  Ex. 96 at 429:12-432:6.

*less than $1.3 million* in applications ($805,000 of CRM and $458,000 of ERP, excluding Covisint). *Id.* **This represented year-over-year applications license growth of negative 92%.** *Id.* The U.S. divisions did not fare much better in database. In December 2000, Oracle's U.S. divisions had **negative** 33% growth in database, even including Covisint. *Id.* Excluding Covisint, U.S. database sales had **negative** 44% growth. *Id.* Thus, by January 17, Ellison was aware of the negative trends in the U.S. divisions that accounted for Oracle's shortfall. *Id.*

The Flash Report disclosed further adverse information. Excluding Covisint, total company license growth was just 1% (compared to 25% guidance) and total company applications growth was negative 46% compared to guidance of 75%. *Id.* Henley testified that the Flash Report disclosed that Oracle was "off to a slow start irrespect [sic] – you know, excluding Covisint." Ex. 97 at 226:6-7. And given the negative trends in every U.S. division, Oracle was unlikely to make up for that slow start. Ellison received this information just before midnight on January 17. Ex. 6. On January 19 (less than 36 hours later), without any prior indication of an intention to trade in January 2001, Ellison instructed Simon to dump 40 million shares of Oracle stock. Ex. 1 at 69:1-70:3; Ex. 2 at 59:15-60:6; Ex. 3 at 300606.

### 2.    When He Sold, Ellison Was Aware that Oracle's "Astounding" Pipeline Had Taken an Unprecedented Nosedive

Oracle's pipeline also informed Ellison that Oracle was being adversely impacted by the economy and product problems. At Oracle, "pipeline" referred to "all the deals that were being worked on or had an opportunity to close during the quarter" and included deals that had already closed. Ex. 98 at 110:22-111:1; Ex. 99 at 128. Year-over-year pipeline growth, while as high as 52% in Week 1 of 3Q01, dropped precipitously in the next few weeks and continued to fall throughout the quarter. Exs. 94 & 95; Ex. 30 at Ex. 20. Total company pipeline growth dropped to 34% (by $328 million) by December 25, 2000. Exs. 94 & 95. As this was an indicator Ellison relied on, the pipeline informed him no later than December 25 that Oracle's business had been negatively impacted.

The pipeline collapse continued throughout 3Q01. In addition to the $328 million drop in December, Oracle's pipeline collapsed $544 million by February 5. Ex. 30 at Ex. 20. In contrast,

1 the pipeline for the same months in the prior year *increased* by $69 million. *Id.* Historically,

2 Oracle's pipeline tended to increase in the quarter before declining at the end. *Id.* at Ex. 21. The

3 size of the pipeline declines in the previous quarters were also nowhere near the size of the declines

4 in 3Q01. *Id.* The rapid and uncharacteristic decline in 3Q01 indicated that more deals were being

5 lost. Ellison was aware of this when he traded. Investors were not.

6       Ellison also relied upon the "comfort gap," the difference between forecasted revenue growth

7 rates and pipeline growth rates. Ex. 100 at 86:3-87:5; Ex. 101 at 420:12-14. Ellison stated, "as long

8 as the pipeline growth is greater than – than the revenue growth, you should be able to meet your

9 numbers." *Id.* at 420:12-14. With the opposite true during significant parts of December and

10 January, Ellison's own measure indicated that Oracle's business was faltering. Ex. 30 at Ex. 13.

11       Unlike the prior four quarters, the comfort gap was extremely narrow in 3Q01. Between

12 December 25 and January 29, the gap was never higher than 4% and was negative half the time.

13 Ex. 30 at Ex. 13. This was out of line with Oracle's experience, which showed a negative gap only

14 once prior to 3Q01, and an average gap of 13.4%. *Id.* A negative gap is important because it

15 indicates that the forecast is less likely to be met. As Ellison noted, it would be "incautious to

16 . . . forecast sales growth without underlying pipeline growth." Ex. 100 at 86:21-87:5. Yet, when

17 Ellison began trading, the growth gap was *negative* 1%. Ex. 30 at Ex. 13. Ellison was aware of this

18 adverse information. Exs. 34, 94, 95, 102-104. Investors were not.

19     **C.**    **After Receiving Adverse Material Non-Public Information, Ellison**

20           **Suddenly Decided to Unload 40 Million Shares of Oracle Stock to Fund His "Absolutely Excessive" Lifestyle**

21       Ellison had a track record of holding on to his Oracle options until the last possible moment,

22 despite Simon's constant advice to diversify and pay down debt. In the spring of 2000, Ellison was

23 under the mistaken impression that his options were expiring in August 2000. Ex. 3 at 300606; Ex.

24 106. Having held his options until what he believed were the final two windows, Ellison, Simon and

25 Oracle discussed the tax consequences for Oracle of his selling in April 2000. Ex. 107. When

26 Simon correctly informed Ellison that his options were expiring in August 2001, Ellison decided

27 again to delay his trading until the last minute. Ex. 3 at 300606; Ex. 106.

28

1    In October 2000, Oracle's tax department again discussed with Ellison's advisors whether it

2    would be beneficial to Oracle to have Ellison sell in FY01 or FY02 (after May 2001).  Ex. 108.

3    After stating that Ellison's decision would "of course depend on Oracle's stock price and Larry's

4    mood," Ellison's advisor concluded that Ellison would be willing to exercise in either FY01 ("before

5    the May 2001 quiet period") or FY02 (August 2001) so long as it would be tax neutral for him. *Id.*

6    On January 10, 2001, Deborah Lange, a SVP in Oracle's Tax Department, e-mailed Henley

7    that Oracle would prefer that Ellison sell in April 2001 instead of August 2001.  Ex. 4.  She wrote:

8       Larry may be willing to exercise in April if it is beneficial to the company. . . .  The
        unknown factor is the relative stock price [in] April versus August . . . .  My general
9       recommendation is to ask Larry to do as much as possible in April, but to have the
        right to modify that advice in April when we have more visibility to FY01 results and
10      the stock market.

11   *Id.*  No mention was made of any possibility that Ellison might sell in January 2001.  On January 22,

12   2001, still under the impression that Ellison was going to exercise options and sell Oracle stock

13   either in April 2001 or August 2001 (despite the fact that Ellison had already began his selling

14   spree), Lange wrote to Simon: "It is obviously Larry's call but there is a possible benefit to the

15   company of exercising in FY01 (April) rather than FY02 . . . ."  Ex. 5.

16   As of January 19, no one had heard of any plan by Ellison to sell in January 2001.  Ex. 3 at

17   300606.  That day, however, less than 36 hours after receiving Oracle's December actual results,

18   Ellison suddenly decided to unload.  Ex. 6; Ex. 3 at 300606.  In addition to the 22 million expiring

19   options that he had planned to sell later in the year, Ellison instructed Simon to sell an additional 18

20   million shares.  Ex. 3 at 300609.  *See* Ex. 109 at 33:2-5.  With the exception of gifts and small trades

21   conducted for tax planning purposes, Ellison had not sold any Oracle shares since 1996.  Ex. 110 at

22   28:2-4.

23   Between January 22 and January 31, Ellison unloaded an unprecedented $895 million worth

24   of Oracle stock.  Ex. 7 at 300656.  The trades were carefully executed by Merrill Lynch and Simon

25   to ensure that the shares could be sold without driving down the price.  Because of this limitation,

26   Ellison was only able to sell 29 million shares.  Ex. 7; Ex. 111 at 65:4-67:19; Ex. 112 at 50:5-52:20;

27   Ex. 113 at 185:18-186:7.  Ellison also traded his shares in violation of Oracle's trading policy, which

28   required him to first obtain clearance from both the legal and finance department heads.  Ex. 114 at

1    005595.   Although Ellison obtained clearance from the legal department (which did not do an

2    independent investigation into whether Ellison held material non-public information), Ellison made

3    no attempt to obtain clearance from Henley, head of finance.  Ex. 115 at 66:7-9; Ex. 116 at 134:10-

4    12; Ex. 117 at 37:11-13.

5         Ellison's "story" regarding his sales has "evolved" throughout both the derivative litigation

6    and this litigation.  Ellison has verified that he spoke to no one regarding the reason for his sales.

7    Ex. 118 at 609922.  Ellison also testified that he discussed these reasons with Simon.  Ex. 119 at

8    378:1-14.  Ellison has testified that he took Simon's advice to pay down debt and diversify when he

9    sold.  Ex. 120.   Yet, Ellison used a large portion of the proceeds not on any debt payment or

10   diversification strategy, but instead to fund his "absolutely excessive" lifestyle.  Ex. 121 at 323.

11        According to *Softwar*, Ellison "derives straightforward pleasure from owning hugely

12   expensive material status symbols."  Ex. 122 at 485-86.  It is not surprising, then, that much of the

13   cash from Ellison's insider trading was used to pay for hugely expensive material status symbols,

14   including: (1) his new yacht, Rising Sun, the longest privately-owned boat in the world (Ex. 121 at

15   318) – $250 million; and (2) his Japanese village "home" in Woodside, "at well over $100 million,

16   probably the costliest American home built for a private individual since William Randolph Hearst's

17   grandiloquent San Simeon."  Ex. 123 at 369-70; Ex. 121 at 323; Ex. 124 at 353:24-354:8.

18        While Ellison was able to reap the benefits of his conveniently timed trades, all over $30 per

19   share, most investors were not so fortunate.  Just a short month later, on March 1, 2001, Oracle pre-

20   announced its revenue and earnings shortfall.  Ex. 8.  On March 15, 2001, Oracle fully disclosed

21   major shortfalls in its U.S. divisions and conceded that the "'U.S. economic downturn over the past

22   several months clearly affected our revenue and profit growth.'"  Ex. 125 at 038232.  Oracle stock

23   plummeted to nearly half the price Ellison cashed in at.  It has never recovered.

24   **III.    ARGUMENT**

25        **A.    Standard of Review for Summary Judgment**

26        Summary judgment must be granted if there is no genuine issue as to any material fact and

27   the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*,

28   477 U.S. 317, 324 (1986).  There is a genuine issue of material fact only if the evidence would allow

PLTFS' NOT OF MOT & MOT FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-MJJ      - 14 -

1  a reasonable trier of fact to find the underlying fact in favor of the opposing party. *Anderson v.*

2  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party's burden is one of persuasion

3  (rather than proof) to show the absence of a genuine issue of material fact. *See id.* Once a party has

4  met that burden, the burden shifts to the non-moving party to show that a genuine issue of one or

5  more material facts exist as to each element of that claim for relief. *See id.*

**B.    Insider Trading Qualifies as a Deceptive Device in Violation of §10(b)
        and Is Prohibited by §20A of the Exchange Act**

6
7
        Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to

8  "use or employ, in connection with the purchase or sale of any security . . . any manipulative or

9  deceptive device or contrivance." 15 U.S.C. §78j(b). Rule 10b-5 prohibits the employment of any

10  "device, scheme, or artifice to defraud." 17 C.F.R. §240.10b-5(a). Trading on material non-public

11  information qualifies as a deceptive device under §10(b) and Rule 10b-5. *No. 84 Employer-*

12  *Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 927 (9th Cir.

13  2003); 17 C.F.R. §240.10b-5-1. "'[A] person violates Rule 10b-5 by buying or selling securities on

14  the basis of material nonpublic information if . . . he is an insider of the corporation in whose shares

15  he trades, and thus owes a fiduciary duty to the corporation's shareholders.'" *SEC v. Clark*, 915

16  F.2d 439, 443 (9th Cir. 1990); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

17
        Section 20A imposes liability on insiders for damages suffered by persons who trade

18  contemporaneously with the insider. 15 U.S.C. §78t-1(a). To demonstrate contemporaneous trades,

19  a plaintiff must show that it purchased within six to fourteen days of the illegal trade. *See In re*

20  *Silicon Graphics Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997); *In re Verifone Sec. Litig.*, 784

21  F. Supp. 1471, 1489 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).[7] Section 20A also requires

22
23
24
25

---

26  [7]    Plaintiffs Ryan Kuehmichel and Dzung Chu purchased Oracle shares on the same day that
27  Ellison sold (January 23 and 26, respectively) and satisfy §20A's contemporaneous trading
    requirement. Ex. 126 at MORSTAN 0101; Ex. 3 at 300610, 300612; Ex. 127 at BARD0014.
28

1    a showing of a predicate violation of the Exchange Act or the rules promulgated thereunder.

2    *Johnson v. Aljian*, No. 04-56997, 2007 U.S. App. LEXIS 14466, at *9 (9th Cir. June 20, 2007).[8]

3    **C.    Ellison Traded on the Basis of Material Non-Public Information**

4    The "disclose or abstain" rule states that an insider has an affirmative duty to abstain from

5    trading shares of his corporation unless he has first disclosed all material non-public information

6    known to him. *Chiarella v. United States*, 445 U.S. 222, 227 (1980). Information is material if there

7    is "a substantial likelihood that a reasonable shareholder would consider it important." *TSC Indus. v.*

8    *Northway, Inc.*, 426 U.S. 438, 449 (1976). The movant must show that the information would

9    significantly alter the total mix of information available to shareholders. *Basic Inc. v. Levinson*, 485

10   U.S. 224, 231-32 (1988). In an insider trading case, the time at which insiders began to trade is

11   strong circumstantial evidence of materiality. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d

12   Cir. 1968).

13   The Ninth Circuit has recognized that "'a person violates Rule 10b-5 by buying or selling

14   securities *on the basis* of material nonpublic information.'" *Clark*, 915 F.2d at 443. Rule 10b-5-1

15   specifically states that "a purchase or sale of a security of an issuer is 'on the basis of' material

16   nonpublic information about that security or issuer if the person making the purchase or sale *was*

17   *aware of* the material nonpublic information when the person made the purchase or sale." 17 C.F.R.

18   §240.10b-5-1(b). Under Rule 10b-5-1, this is sufficient to make a *prima facie* showing of liability

19   that the defendant may then rebut. *Id.*; *United States v. Causey*, No. H-04-025-SS, 2005 U.S. Dist.

20   LEXIS 39619, at *14 (S.D. Tex. Dec. 29, 2005). The presumption may only be rebutted with

21   specific affirmative defenses, which Ellison cannot satisfy here. 17 C.F.R. §240.10b-5-1(c).

22

23

24

25

---

26   [8]    Plaintiffs establish a predicate violation of §10(b) and Rule 10b-5 by showing that Ellison

27   traded on the basis of material non-public information as discussed in this motion and further violated §10(b) and Rule 10b-5 through false and misleading statements and omissions as discussed in Plaintiffs' Motion for Partial Summary Judgment filed contemporaneously herewith.

28

1. **Ellison Knew that Oracle's U.S. License Divisions Had Experienced Severe Negative Growth Rates**

When Ellison traded, he knew that Oracle's U.S. divisions (50% of Oracle's license revenues) had experienced severe negative growth rates in the first month of 3Q01. Ex. 6. On January 17, 2001, Ellison was informed that through December 2000, license revenue growth was *negative* 24% in NAS and *negative* 81% in OSI (40% of Oracle's license revenues). *Id.* Excluding Covisint, Oracle's U.S. license divisions had sold just $1.3 million of applications products (*negative* 92% applications license growth). *Id.* In addition, its U.S. divisions had *negative* 34% database growth even with Covisint and *negative* 44% without. *Id.* After adjusting for Covisint, Oracle's total company license revenue growth was 1% (compared to guidance of 25%).

Ellison knew that this information was material and precluded him from trading. When asked in deposition "what sort of inside information would prevent you from trading in Oracle stock," Ellison testified directly that adverse results in one of Oracle's major license divisions (his example was Europe) "*after the end of the first month*" would be the type of information that would preclude him from trading. Ex. 129 at 43:12-44:6. Ironically, sales in Europe contributed less to Oracle's license revenues than did its NAS and OSI divisions and after the end of the first month of 3Q01, both of these divisions had severe, negative growth trends and had generated just 5% of their forecasts. Ex. 6. This information was material under Ellison's own definition, and it was also material information that investors would consider important under the securities laws. No reasonable trier of fact could conclude that Ellison did not possess material non-public information when he sold.

2. **Ellison Knew that Oracle's Pipeline Had Collapsed**

On the day that Ellison started to trade, he knew that Oracle's pipeline had collapsed by $311 million and that nearly the entire collapse ($297 million) had come from lost applications deals, which accounted for 31.5% of Oracle's public guidance. Exs. 34, 94, 104; Ex. 30 at Exs. 7 & 20. Oracle's pipeline had collapsed $328 million in the last two weeks of December and $544 million by February 5. Ex. 30 at Ex. 20. This pipeline collapse contrasted with significant increases in the pipeline in 3Q00. *Id.* In addition, the "comfort gap" that Ellison relied on was much smaller than

usual and had been negative for weeks before he started trading. Ex. 30 at Ex. 13. Ellison knew that it was "incautious to . . . forecast sales growth without underlying pipeline growth." Ex. 100 at 86:21-87:5. When Ellison was trading, Oracle was doing just that. Ex. 30 at Ex. 13.

Oracle's pipeline collapse (especially in the troubled 11i product that was supposed to drive growth) was material given defendants' repeated representations that Oracle was not being adversely affected by the economy and would make guidance because of Oracle's "astounding pipeline." Ex. 10 at 03224; Ex. 130 at 005787; Ex. 15 at 141677; Ex. 131 at 03309; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) ("'The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders.'"). This is especially true since Ellison knew at the same time that Oracle's U.S. divisions had reported severe negative growth rates for December 2000. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2511-12 (2007) (court must view the evidence holistically instead of in isolation).

### 3. Ellison Knew that Oracle's Public Guidance Was Unreliable Because of Significant Internal and External Changes

Undisputed facts also show that Ellison knew that Oracle's public guidance was unreliable. He testified that in times of changing conditions, Oracle's forecasting process becomes inaccurate due to its basis in historical trends. Ex. 26 at 384:6-385:7. By 3Q01, Ellison knew that Oracle was facing significant changes that rendered Oracle's forecast and public guidance inaccurate.

Between 3Q00 and 3Q01, Ellison knew that Oracle was facing a major economic change that he testified would render Oracle's forecast inaccurate. Ellison knew that the NASDAQ had collapsed and that Oracle's dot.com business had rapidly evaporated as a result. Ex. 30 at 4-8; Ex. 50 at 78:7-18. This is in direct contrast with 3Q00, when the NASDAQ was at its height, sales to top-tier dot.com companies were booming, and Oracle exceeded its forecast by so much that it made for very difficult comparisons in 3Q01. Ex. 30 at 4-8; Ex. 33 at 185; Ex. 36 at 1914019; Ex. 37. Ellison knew that Oracle's forecast was unreliable because Minton was projecting that Oracle would close as high a percentage of deals as it had in the extraordinary economy of 3Q00.

Ellison also knew that he had undermined Oracle's forecast by changing the process immediately before issuing guidance to investors. Ex. 31; Ex. 79 at 151961. The purpose of

1  Ellison's directive was to eliminate "sandbagging," yet Minton added $160 million in upside in

2  3Q01 for that same purpose. Ex. 20 at 101:8-18; Ex. 31; Ex. 79 at 151961.  And despite the added

3  risk from this change, the Field told Ellison every week before he traded that Oracle would not meet

4  guidance. Ex. 30 at Ex. 12; Ex. 10 at 03222.

5  Finally, Ellison knew that Oracle's pipeline contained a higher percentage of applications

6  deals than it had in 3Q00, and that applications opportunities converted at a much lower rate (38.7%)

7  than Oracle's technology opportunities (63.3%). Ex. 29 at Exs. 6 & 7.  Despite this change, Ellison

8  knew that Minton extrapolated using practically the same conversion ratio that Oracle achieved in

9  3Q00 and applied it to a pipeline that defendant Henley testified was "too good to be true." Ex. 26 at

10  384:6-385:7; Ex. 28 at 211; Ex. 83 at 354:15-355:3.  Ellison was therefore in possession of material

11  adverse information at the time he sold. *TSC*, 426 U.S. at 449; *Basic*, 485 U.S. at 231-32.

12  Because these changes rendered Oracle's guidance inaccurate, Ellison was "aware of"

13  material non-public information at the time he traded within the meaning of Rule 10b-5-1.

14  ### 4.  Ellison Knew that Oracle Would Not Meet Its Applications Growth Guidance Because of the Problems with Oracle's

15  11i Suite

16  Ellison also knew that problems with 11i adversely affected Oracle's ability to sell

17  applications.  Ellison admitted that he released 11i too early and that he included untested critical

18  modules despite knowing that "'it was much too risky.'" Ex. 62 at 192. Ellison admitted that "'the

19  first year of selling the [11i] suite was the hardest year'" because Oracle did not have customer

20  references and "'[i]t's difficult to sell without customer references.'" Ex. 71 at 249.  Ellison also

21  knew that Oracle's inability to demonstrate 11i cost Oracle business. Ex. 73; Ex. 74 at 273:3-12;

22  Ex. 75 at 105:7-8.  And he knew that through December, Oracle's U.S. divisions had sold just $1.3

23  million in applications (negative 92% growth), excluding Covisint.  Ex. 6.

24  Despite this, at the time Ellison traded, he knew that Oracle was forecasting a much higher

25  percentage of revenues to come from applications than it had in the past, ***even though Oracle's***

26  ***applications pipeline had collapsed by $297 million by that time***.  Ex. 30 at 85 & Exs. 7 & 20.

27  Ellison also knew that conversion ratios for applications (even those that worked) had historically

28  been significantly lower and that Oracle's "sales force was not very good at selling applications."

1    Ex. 29 at Ex. 7; Ex. 132 at 14-16 ¶¶38, 39; Ex. 55 at 114.  Given the adverse effect that 11i was

2    having on Oracle's ability to sell, Ellison knew that its 75% applications growth projection was

3    unreliable and unreachable.  No reasonable trier of fact could conclude that Ellison was not "aware

4    of" material non-public information when he sold his stock.

### D.    Ellison's Trades Were Suspicious in Timing and Amount

6        The Ninth Circuit has already held that Ellison's stock sales were suspicious and support an

7    inference of scienter in this case.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d

8    1226, 1232 (9th Cir. 2004).  The court noted that "[t]o evaluate suspiciousness of stock sales, we

9    consider, *inter alia*, three factors: (1) the amount and percentage of shares sold [by insiders]; (2)

10   timing of the sales; and (3) consistency with [the insider's] prior trading history."  *Id.*  The court

11   specifically analyzed Ellison's sales using these factors.  It explained that "[i]n the past, we have

12   given great weight to the percentage of stock sold."  *Id.* at 1232.  But it added that "where, as here,

13   stock sales result in a truly astronomical figure, less weight should be given to the fact that they may

14   represent a small portion of the defendant's holdings."  *Id.*  The court held that the size of Ellison's

15   trades "present[ed] a novel situation" and also found that the timing was suspicious because "Ellison

16   sold his shares between January 22 and January 31, 2001, approximately one month prior to the

17   March 1 report of lower-than-expected sales."  *Id.*  It also added that "Ellison's January 2001 trades

18   [were] highly inconsistent with his prior trading history" because he "had not sold any of his Oracle

19   stock for five years."  *Id.*  Under these circumstances, the court held that Ellison's sales "support a

20   strong inference of scienter."  *Id.*  The facts have not changed nor have they become disputed.

### 1.    Ellison's Sales Were Dramatically Out of Line with His Prior Trading Practices and Were Timed to Maximize His Personal Benefit

23       Ellison's trades were dramatically out of line with his prior trading practices and were timed

24   to maximize his personal benefit.  Defendants do not (and cannot) dispute that Ellison had not sold

25   stock for five years prior to unloading 29 million shares.  Ex. 110 at 28:2-4.  Ellison's historical

26   trading practices and the dramatic change from that practice in 3Q01 support a finding that Ellison

27   traded on the basis of inside information and acted with scienter.  *Oracle*, 380 F.3d at 1232.

28

1    Ellison's trades were also suspicious in timing and were designed to maximize his personal

2    benefit from material non-public information.  Not only did Ellison sell "one month prior to the

3    March 1 report of lower-than-expected sales," as the Ninth Circuit found compelling, but he also

4    instructed his financial advisor to unload 40 million shares *less than 36 hours* after he was informed

5    that Oracle's U.S. license sales had experienced severe negative growth rates in the first month of

6    3Q01.  *Id.*; Ex. 6.  Doing so put Ellison in the enviable position of having been one of the last

7    investors to sell Oracle stock above $30 per share.  These undisputed facts establish Ellison's

8    scienter and that he traded "on the basis of" material non-public information within the meaning of

9    Rule 10b-5-1.  17 C.F.R. §240.10b-5-1(b); *United States v. Atul Bhagat*, 436 F.3d 1140, 1148 (9th

10   Cir. 2006) (insider traded on the basis of material non-public information where he received adverse

11   information by e-mail and had an opportunity to read the e-mail before making the stock trade); *TSC*,

12   426 U.S. at 449.  No reasonable juror could find for Ellison given these facts.

13          **2.    The Amount and Percentage of Shares Sold by Ellison Was
                    Unusually Large**

14

15          The Ninth Circuit in this case has also held that "where, as here, stock sales result in a truly

16   astronomical figure, less weight should be given to the fact that they may represent a small portion

17   of the defendant's holdings."  *Oracle*, 380 F.3d at 1232; *see also Johnson v. Aljian*, 394 F. Supp. 2d

18   1184, 1199-200 & n.10 (C.D. Cal. 2004), *aff'd*, 2007 U.S. App. LEXIS 14466 (9th Cir. June 20,

19   2007).  Again, the facts have not changed.  Ellison sold 29,084,576 shares at an average price of

20   $30.5697 per share, realizing gross proceeds of $895,087,692.  Ex. 7.  The astronomical figure

21   makes Ellison's stock sales suspicious in amount.  *Oracle*, 380 F.3d at 1232.

22          Ellison's massive trading must also be viewed in light of market limitations and SEC rules.

23   SEC Rule 144 provides that within any three-month period, an "affiliate" may not sell more than the

24   greater of "[o]ne percent of the shares . . . of the class outstanding" or "[t]he average weekly reported

25   volume of trading."  17 C.F.R. §230.144(e)(1).  Ellison sold 16.34% of the maximum allowed by

26   SEC Rule 144 (178 million shares) and authorized up to 22.47% of that maximum.  His sales

27   support a finding of scienter.  Exs. 3 & 7; 17 C.F.R. §230.144(e); Ex. 111 at 65:4-67:19; Ex. 112 at

28   50:5-52:20.

### 3.   Ellison's Use of Proceeds Establish that He Acted with Scienter

Ellison's use of proceeds also compels a finding that he acted with scienter.  In *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), the court recognized that an insiders' reasons for selling – "that they wanted to reap financial benefits for personal reasons" through retirement – supported a finding of scienter.  *Id.* at 1380.  The court noted that the desire to sell stock to fund retirement "would give substance to the contention that the alleged misrepresentations and omissions were deliberate." *Id.*

Ellison's explanations paint an even more compelling picture of scienter – he told inconsistent stories about who he spoke to about his sales and why he sold.  Ex. 118 at 609922; Ex. 119 at 378:1-14; Ex. 3 at 300606.  Contrary to testimony that he took Simon's advice to pay down debt and diversify (Ex. 120 at 609765), Ellison used much of the proceeds from his sales to fund the construction of his $250 million yacht and to pay for his $100 million home.  Ex. 121 at 318, 323; Ex. 123 at 369-70.

If selling stock to fund retirement can give substance to a finding that the alleged misrepresentations and omissions are deliberate, Ellison's changing story and use of the proceeds to purchase expensive status symbols support a finding that Ellison sold when prohibited to maximize his personal benefit.

### E.   The Wholesale Destruction of Documents Evidencing Ellison's Knowledge and Mental State Is Further Evidence of Scienter

Plaintiffs have presented such compelling evidence that Ellison sold Oracle stock on the basis of adverse material non-public information that no reasonable juror could find otherwise.  This is despite the wholesale destruction of evidence regarding Ellison's knowledge and mental state.  Defendants have destroyed Ellison's e-mails and files, the databases that he relied on during the Class Period for information regarding the state of Oracle's business, the website containing his public statements, and the tapes and transcripts of hundreds of hours of interviews, created during and directly following events at issue in this litigation.

Beginning less than two months prior to Ellison's insider trading and continuing for almost two years after, Ellison granted exclusive one-on-one interviews (at least 135 hours) to Symonds for

1   *Softwar*.[9]  Ex. 38; Ex. 133 at 1529371-72.  For almost two years, Ellison consistently discussed with

2   Symonds the events at issue in this litigation, including the dot.com bubble burst, the release of 11i

3   and the subsequent "eighteen months of Hell" that followed, Oracle's forecasting process, Oracle's

4   billion dollar savings claim, and even this litigation itself.  Ex. 133 at 1529371-72; Ex. 38; Ex. 134 at

5   2 & 6; Ex. 57 at 424.  *See, e.g.*, Exs. 25, 28, 33, 46, 55, 58-59, 61-62, 65, 71-72, 77, 122-123.  In

6   addition, Symonds was granted exclusive access to Oracle, its executives and past and present

7   employees.  Exs. 38 & 133.  The Ellison interviews were memorialized both on tapes and in

8   transcripts.  Ex. 133.  Upon completion of *Softwar*, the tapes and transcripts were to be returned to

9   Ellison.  Exs. 133, 135, 136.



23   Ironically, *Softwar* sheds light on additional information that Ellison received during the

24   Class Period and which should have been produced in this litigation:  "A typical day for Ellison

25   starts when he . . . checks his overnight e-mails. . . .  He gets more than a hundred e-mails a day,

---

9   Ellison and Symonds are co-authors and share joint copyright.  Ellison's comments on anything that he disagreed with or wanted to clarify are incorporated as footnotes.  Exs. 38 & 133.

1    most of which he answers himself or forwards to the appropriate person. Ex. 46 at 286-87; Exs. 38

2    & 133. Thus, one would expect a massive production of e-mails and materials from Ellison's files,

3    however, less than 15 generic, mass-distributed e-mails have been produced from Ellison's files,

4    many of which are duplicates.[10] The total production of documents from Ellison's files amounts to

5    663 pages (of which hundreds of pages are similar drafts of one document).[11]  Ex. 148.

6            During 3Q01, Ellison bragged about Oracle's new product, OSO, which allowed him to view

7    up-to-the-minute information regarding Oracle's sales and opportunities.  Specifically, he stated:

8    "All of our information is in one database.  We know exactly how much we have sold in the last

9    hour around the world . . . ." Ex. 152 at 135815.  Symonds reported that Ellison used OSO on a

10   daily basis to keep up-to-date on Oracle's business.  Ex. 46 at 287.  However, defendants have not

11   only failed to preserve OSO, but have gone one step further: weeks after this lawsuit was filed, they

12   purged all OSO back-up tapes.    Ex. 153 at 262:5-263:1.    Despite Symonds' published

13   representations, Ellison has adamantly denied using OSO during the Class Period.  Ex. 154 at

14   472:18-474:1. However, not surprisingly, the only conclusive proof as to whether Ellison used OSO

15   during the Class Period – the OSO log-in records – have also been destroyed.  Ex. 155 at 461:23-

16   463:2.

17           In addition, during the Class Period, Oracle and Ellison maintained larryellison.com, which

18   contained transcripts and audio/video of Ellison's public statements. Ex. 156 at 297559. *See also*

19   Ex. 157 at 178069. Although Ellison informed Oracle's Special Litigation Committee in 2002 that

20

_____

21   [10]    Ellison testified that unless he copied himself, e-mails that he sent would not have been

22   retained because he had no outbox. Ex. 149 at 303:10-305:10. The default setting at Oracle was for
     employees not to have an outbox. Ex. 150 at 278:21-279:9. Defendants did not instruct employees

23   to change this default setting once this lawsuit was filed. Ex. 151 at 320:20-321:6. As a result, e-
     mails sent by Ellison and others, even after the filing of this action, were not preserved.

24   [11]    Plaintiffs have captured some communications by Ellison from the files of other custodians.

25   These documents offer further evidence of the destruction of Ellison's files. Many of these
     documents are e-mails either sent or received by Ellison *after* the filing of this action. By that time,

26   at the very latest, defendants were under an affirmative obligation to preserve all potentially relevant
     communications with Ellison. However, a mere handful of these e-mails were produced from

27   Ellison's files. Had Ellison's files been preserved after the commencement of litigation, these
     documents would necessarily have been in them. They were not.

28

PLTFS' NOT OF MOT & MOT FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-MJJ          - 24 -

1   in 3Q01, "'[larryellison.com] would have consisted of transcripts of his interviews,'" at his

2   deposition in this litigation he denied that the site was ever used. Ex. 156; Ex. 158 at 597:20-602:15.

3   When confronted with a transcript of a speech at Oracle AppsWorld in February 2001 in which

4   Ellison informed his audience that he could even be e-mailed at larryellison.com, Ellison denied

5   having made the statement. Ex. 159 at 606:6-9. A video of that speech (produced only after

6   plaintiffs demanded it at that deposition), however, confirms that Ellison did make the statement.

7   Given Ellison's lies, it is not surprising that since the inception of this lawsuit, larryellison.com has

8   been taken down and the underlying information destroyed. Ex. 160 at 78:12-79:21, 97:6-14.

9       Defendants have failed to preserve and have ultimately destroyed Ellison's e-mails, his files,

10  the files of those that he communicated with, the databases that he used to gather information

11  (records of his access of those databases), records of his public statements, and hundreds of hours of

12  relevant tapes and transcripts of interviews with Ellison, created almost simultaneous with the events

13  at issue in this litigation.[12] Defendants' attempt to cover up Ellison's fraud through the wholesale

14  destruction of evidence is itself further strong evidence of Ellison's scienter.

15  **IV.    CONCLUSION**

16      Because there are no genuine issues of material fact related to plaintiffs' §§10(b) and 20A

17  claims, plaintiffs' Motion for Summary Judgment should be GRANTED.

18  DATED: October 9, 2007                      Respectfully submitted,

19                                              LERACH COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
20                                              MARK SOLOMON
                                                DOUGLAS R. BRITTON
21                                              VALERIE L. McLAUGHLIN
                                                GAVIN M. BOWIE
22                                              STACEY M. KAPLAN

23

24                                                      /s/
                                                DOUGLAS R. BRITTON

25

26  [12]     *See also* Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants'
    Destruction of Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006
27  Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous
    Relief for the Destruction of Evidence.

28

1

2                655 West Broadway, Suite 1900
                San Diego, CA  92101
                Telephone:  619/231-1058

3                619/231-7423 (fax)

4                LERACH COUGHLIN STOIA GELLER
                  RUDMAN & ROBBINS LLP

5                SHAWN A. WILLIAMS
                WILLOW E. RADCLIFFE

6                MONIQUE C. WINKLER
                ELI R. GREENSTEIN

7                DANIEL J. PFEFFERBAUM
                100 Pine Street, Suite 2600

8                San Francisco, CA  94111
                Telephone:  415/288-4545

9                415/288-4534 (fax)

10              Lead Counsel for Plaintiffs

11  T:\CasesSF\Oracle3\BRF00044343_AMD SJ Ellison_REDACTED DKT 959.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

CERTIFICATE OF SERVICE

2   I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List.

5   I certify under penalty of perjury under the laws of the United States of America that the

6 foregoing is true and correct.  Executed on October 9, 2007.

7

8              /s/ Douglas R. Britton
              DOUGLAS R. BRITTON

9

10            COUGHLIN STOIA GELLER
              RUDMAN & ROBBINS LLP

11            655 West Broadway, Suite 1900
            San Diego, CA  92101-3301

12            Telephone:  619/231-1058
            619/231-7423 (fax)

13

14            E-mail:DougB@csgrr.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111