COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
      – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION |

DATE:               November 16, 2007
TIME:               1:30 p.m.
COURTROOM:   The Honorable
                        Martin J. Jenkins

**REDACTED VERSION OF DOCUMENT
PREVIOUSLY FILED ON JULY 26, 2007 (DOCKET NO. 854)**

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................................1

II.    Statement of Facts .......................................................................................................2

~~A.    Ellison Knew that Oracle's Forecast and Guidance in 3Q01 Were~~
Unreliable and Inaccurate ...............................................................................2

        1.    The Major Macroeconomic Change Facing Oracle Rendered Its
3Q01 Forecast Inaccurate ..................................................................4

        2.    The Change in Oracle's Product Mix and Problems with 11i
Rendered Oracle's 3Q01 Forecast Inaccurate.....................................7

        3.    Ellison's Directive Just Before 3Q01 to Increase the Risk in
Oracle's Forecast Rendered It Unreliable and Inaccurate ......................12

        4.    Oracle's Public Guidance Was Unreliable Because Minton
Applied Her Inaccurate Conversion Ratio to a "Too Good to Be
True" Pipeline .................................................................................13

B.    When Ellison Suddenly Deviated from Plan and Decided to Sell Stock in
January 2001, the Internal Indicators that He Preferred to Rely on Painted
a Bleak Picture for Oracle's Financial Prospects..........................................14

        1.    Less than 36 Hours Before He Decided to Unload Early, Ellison
Received Oracle's Dismal Actual Results for December 2000 ................14

        2.    When He Sold, Ellison Was Aware that Oracle's "Astounding"
Pipeline Had Taken an Unprecedented Nosedive.....................................16

C.    After Receiving Adverse Material Non-Public Information, Ellison
Suddenly Decided to Unload 40 Million Shares of Oracle Stock to Fund
His "Absolutely Excessive" Lifestyle.........................................................18

III.    Argument ...................................................................................................................21

A.    Standard of Review for Summary Judgment................................................21

B.    Insider Trading Qualifies as a Deceptive Device in Violation of §10(b)
and Is Prohibited by §20A of the Exchange Act...........................................22

C.    Ellison Traded While in Possession of Material Non-Public Information ..........24

        1.    When Ellison Traded, He Knew that Oracle's U.S. License
Divisions Had Experienced Severe Negative Growth Rates ....................25

        2.    When Ellison Traded, He Knew that Oracle's Pipeline Had
Collapsed.........................................................................................27

Page

3. When Ellison Traded, He Knew that Oracle's Public Guidance Was Unreliable Because of Significant Internal and External Changes.................................................................28

4. When Ellison Traded, He Knew that Oracle Would Not Meet Its Applications Growth Guidance Because of the Problems with Oracle's 11i Suite..............................................30

D. Ellison's Trades Were Suspicious in Timing and Amount....................................32

1. Ellison's Sales Were Dramatically Out of Line with His Prior Trading Practices and Were Timed to Maximize His Personal Benefit..............................................................33

2. The Amount and Percentage of Shares Sold by Ellison Was Unusually Large..............................................................34

3. Ellison's Use of Proceeds Establish that Ellison Acted with Scienter ..............................................................35

E. The Wholesale Destruction of Documents Evidencing Ellison's Knowledge and Mental State Is Further Evidence of Scienter.............................36

IV. Conclusion ..............................................................41

PLTFS' NOT OF MOT &  MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ

- ii -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................21, 22

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).............................................................25, 30

*Brinson v. Linda Rose Joint Venture*,
   53 F.3d 1044 (9th Cir. 1995) .....................................................22

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
   818 F.2d 1466 (9th Cir. 1987) ...................................................22

*Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*,
   769 F.2d 561 (9th Cir. 1985) .....................................................24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................21, 22

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .....................................................28

*In re Omnivision Techs.*,
   No. C-04-2297, 2005 U.S. Dist. LEXIS 16009
   (N.D. Cal. July 29, 2005)..........................................................33

*In re Secure Computing Corp.*,
   184 F. Supp. 2d 980 (N.D. Cal. 2001) .........................................33

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...............................................32, 35

*In re Silicon Graphics Sec. Litig.*,
   970 F. Supp. 746 (N.D. Cal. 1997) .............................................24

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ....................................................34

*In re Verifone Sec. Litig.*,
   784 F. Supp. 1471 (N.D. Cal. 1992),
   *aff'd*, 11 F.3d 865 (9th Cir. 1993)..............................................24

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) ...................................24, 34

*Johnson v. Aljian*,
   No. 04-56997, 2007 U.S. App. LEXIS 14466
   (9th Cir. June 20, 2007) .....................................................24, 34

**Page**

Kaplan v. Rose,
  49 F.3d 1363 (9th Cir. 1994) ...............................................................35, 36

No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
Am. West Holding Corp.,
  320 F.3d 920 (9th Cir. 2003) ...............................................................23

Nursing Home Pension Fund, Local 144 v. Oracle Corp.,
  380 F.3d 1226 (9th Cir. 2004) ............................................32, 33, 34, 35

Ronconi v. Larkin,
  253 F.3d 423 (9th Cir. 2001) ...............................................................35

SEC v. Adler,
  137 F.3d 1325 (11th Cir. 1998) ...........................................................25

SEC v. Clark,
  915 F.2d 439 (9th Cir. 1990) ...........................................................23, 25

SEC v. Hahn Truong,
  98 F. Supp. 2d 1086 (N.D. Cal. 2000) ...............................................22

SEC v. Sargent,
  229 F.3d 68 (1st Cir. 2000) ..................................................................22

SEC v. Texas Gulf Sulphur Co.,
  401 F.2d 833 (2d Cir. 1968) ................................................................25

SEC v. Warde,
  151 F.3d 42 (2d Cir. 1998) ..................................................................22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  _U.S._, 168 L. Ed. 2d 179 (2007) ..........................................22, 23, 28

TSC Indus. v. Northway, Inc.,
  426 U.S. 438 (1976) ..................................................................25, 30, 34

United States v. Atul Bhagat,
  436 F.3d 1140 (2006) ...........................................................................33

United States v. Causey,
  No. H-04-025-SS, 2005 U.S. Dist. LEXIS 39619
  (S.D. Tex. Dec. 29, 2005) ....................................................................25

United States v. O'Hagan,
  521 U.S. 642 (1997) .............................................................................23

United States v. Smith,
  155 F.3d 1051 (9th Cir. 1998) .............................................................22

**Page**

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   865 F.2d 1539 (9th Cir. 1989) ....................................................................22

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78i(b)........................................................................................ *passim*
   §78t-1(a)..........................................................................................23
   §78t-l(b)(1).......................................................................................23

Federal Rules of Civil Procedure
   Rule 56(c)....................................................................................1, 21
   Rule 56(e).........................................................................................22

Civ. L.R. 56............................................................................................1

17 C.F.R.
   §230.144(e)........................................................................................35
   §240.10b-5.......................................................................22, 23, 24, 25
   §240.10b-5-1................................................................................ *passim*
   §240.10b-5-1(b) .............................................................................25, 33
   §240.10b-5-1(c) ................................................................................25

1    TO:  ALL PARTIES AND THEIR COUNSEL OF RECORD

2         PLEASE TAKE NOTICE that on November 16, 2007, at 1:30 p.m.. in the Courtroom of the

3    Honorable Martin J. Jenkins, plaintiffs will and do hereby move this Court for an order granting their

4    Motion for Summary Judgment Against Lawrence Ellison for Trading on the Basis of Material Non-

5    Public Information pursuant to Fed. R. Civ. P. 56(c) and Civ. L.R. 56.  The motion is based upon

6    this Notice of Motion, the following Memorandum of Points and Authorities, the Appendix of

7    Exhibits in Support of Plaintiffs' Motion for Summary Judgment Against Lawrence Ellison for

8    Trading on the Basis of Material Non-Public Information ("Appendix"),[1] and all exhibits thereto, the

9    pleadings and evidence submitted herewith, and any other information submitted before or during

10   the hearing on this matter.

11                   **MEMORANDUM OF POINTS AND AUTHORITIES**

12   **I.      Introduction**

13        On January 19, 2001, Larry Ellison first informed Philip Simon, his financial advisor, of his

14   desire to immediately unload 40 million shares of Oracle Corporation ("Oracle") stock. Ex. 1. at

15   69:1-70:3; Ex. 2 at 59:15-60:6; Ex. 3 at NDCA-ORCL 300606. Prior to January 19, Ellison had not

16   informed anyone of an intent to sell Oracle shares in January 2001.  *Id.*  To the contrary, before

17   January 19, every indication from Ellison, Simon, and Oracle was that Ellison planned to exercise

18   options and sell stock in April 2001 as part of Oracle's corporate tax plan.  Exs. 4 & 5.

19        Despite this plan, which had been discussed for months, on January 19, 2001, after receiving

20   dismal news regarding Oracle's financial condition and applications products, including an e-mailed

21   Flash Report on January 17 (less than 36 hours earlier) disclosing that all three of Oracle's U.S.

22   license divisions (which represented 50% of Oracle's license revenues) had experienced severe

23   negative growth trends in December 2000, Ellison decided to unload early. Ex. 6 ; Ex. 3 at NDCA-

24   ORCL 300606.  Between January 22, 2001 and January 31, 2001, Ellison engaged in one of the

25   largest insider trading binges in history, unloading over $895 million worth of Oracle stock. Ex. 7 at

26   _____

27   [1]      All "Ex." or "Exs." are to exhibits attached to the Appendix.

28

1   NDCA-ORCL 300656.  Ellison's timing was impeccable.  Just a short month later, despite constant

2   reassurances to the contrary, Oracle announced what Ellison had known for months – that Oracle's

3   financial condition had been severely and negatively affected by the declining economy and

4   problems with its applications Suite 11i.  Exs. 8 & 9.  Oracle's stock plummeted 13% in a single day

5   ~~of trading.  Seven days later, Ellison wrote "It's good to be a bit more liquid in light of the economic~~

6   downturn."  Ex. 7 at NDCA-ORCL 300656.

7       More than six years later, Oracle's stock price has yet to return to its 3Q01 levels.  To this

8   day, Ellison is one of the last persons to sell Oracle stock above $30.

9   **II.    Statement of Facts**

10      **A.    Ellison Knew that Oracle's Forecast and Guidance in 3Q01 Were
              Unreliable and Inaccurate**

11

12      On December 14, 2000, Oracle issued guidance for 3Q01.[2]  Ex. 10.  Oracle projected license

13  revenue growth of 25%, database revenue growth of 15%-20%, applications revenue growth of 75%,

14  and 12 cents earnings per share.  *Id.* at NDCA-ORCL 003221-22.  This was an aggressive forecast;

15  growth rates were defined year-over-year, and in 3Q00 Oracle had achieved stellar results.  *See*

16  Ex. 11.  Oracle also informed analysts and investors that it was seeing "no impact or slowing in [its]

17  business" as a result of the economic downturn that was being discussed widely in the press and

18  within Oracle.  Ex. 10 at NDCA-ORCL 0031702.  *See also* Ex. 12 at Ex. B ("***The economic***

19  ***slowdown isn't hurting Oracle, said [Ellison], because the company has spent the past three years***

20  ***updating its product line to focus on software that helps companies use the Internet to cut costs***").

21  Oracle reiterated its guidance throughout 3Q01, while continuing to emphasize the strengths of its

22  pipelines and products.  Ex. 13 at NDCA-ORCL 091536; Ex. 14 at NDCA-ORCL 091532.  *See also*

23  Ex. 15 at NDCA-ORCL 141677 ("Our pipelines are strong, and we're well-positioned from a

24  products perspective, so it's all about execution.").  *See also* Ex. 16; Ex. 17, Ex. 12 at Exs. C & D.

25

---

26  [2]     Oracle's fiscal year begins on June 1 and ends on May 31.  Its third fiscal quarter in 2001
    began on December 1, 2000 and ended on February 28, 2001.  The Class Period in this case begins
27  on December 14, 2000 (when Oracle announced results for 2Q01 and issued guidance for 3Q01) and
    ends on March 1, 2001 (when Oracle pre-announced its results for 3Q01).

28

PLTFS' NOT OF MOT & MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ          - 2 -

1    Oracle's guidance figures were based on its finance department forecast.   Oracle's

2  forecasting process consisted of two major parts. First, sales opportunities were placed into Oracle's

3  pipeline (which contained every possible sales opportunity) and were forecasted by Oracle's field

4  sales units (the "Field") based on the likelihood of those opportunities closing in the quarter. Ex. 18

5  at 110:22-111:10. Those forecasts were rolled up into an overall "Field Forecast." Ex. 19 at 104:15-

6  105:11.  According to Jennifer Minton, the head of Oracle's Corporate Finance Department, the

7  Field had historically "sandbagged," or underestimated, actual revenue for the quarter and this was a

8  source of contention with Ellison. Ex. 20 at 101:8-18. Minton described "sandbagging" as the Field

9  "commit[ting] to numbers that were significantly less than what they would actually deliver." *Id.*

10  As a result, Minton added "upside," or management judgment, to the Field Forecast to account for

11  the effect of "sandbagging." Ex. 21 at 123:14-125:4. The resulting corporate finance forecast (the

12  "Potential Forecast") formed the basis for Oracle's guidance. Ex. 22 at 126:7-15. Ellison testified,

13  however, that he did not rely on the Potential Forecast, which he referred to as a "mood ring," and

14  instead preferred to look to actual intra-quarter results and pipeline data. Ex. 23 at 279:1-11; Ex. 24

15  at 286:15-18.

16    Ellison explained why he was reluctant to rely on Oracle's Potential Forecast – in times of

17  changing conditions, according to Ellison, Oracle's forecasting process becomes inaccurate.   He

18  wrote, "[a]s I've said before, our forecasting system is not clairvoyant.  Our forecasting does

19  statistical extrapolations based on historic trends.  If something that's outside our mathematical

20  model of business changes, like a war in the middle east, our forecasting becomes inaccurate." 

21  Ex. 25 at 226; Ex. 26 at 384:6-385:7.    More specifically, Ellison testified that a major

22  macroeconomic change would cause Oracle's forecasting to become inaccurate:

23    "Q.   And the point you are making is that while your forecasting system does
            extrapolations based on historic trends, if something is happening that would
24          suggest that the historical trend is not necessarily reliable, then your
            forecasting will not be reliable; is that right:

25
      A.    Right.  Major economic change; sudden growth in the economy or sudden
26          shrinkage in the economy would cause – you can't extrapolate anymore."

27  *Id.* at 384:23-385:7. The reason for the resulting inaccuracy was that Minton's "upside adjustment"

28  was largely a year-over-year extrapolation – she applied the prior year's historical conversion ratio

PLTFS' NOT OF MOT &  MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ        - 3 -

1  (the percentage of the pipeline that had closed in the same quarter of the prior fiscal year) to the

2  current year's quarterly pipeline to estimate Oracle's license revenues for the quarter. Ex. 27 at

3  122:1-24; *see also* Ex. 28 at 211 (According to Ellison, "Our sales forecasting system tells us how

4  many deals are in the pipeline and multiplies their value by a historic close rate."). This calculation

5  ~~assumed that Oracle would close deals at the same rate that it had in the prior year. In times of~~

6  change, however, as Ellison himself pointed out, this assumption led to inaccurate forecasts. Ex. 26

7  at 384:6-385:7.

8      In 3Q01, Minton applied the historical conversion rate from 3Q00 to Oracle's pipeline to

9  reach Oracle's Potential Forecast. Ex. 27 at 122:1-24; Ex. 29 at 78-79. *Id.* at Ex. 4. Ellison knew

10  that this was how Minton estimated Oracle's revenues and that it led to an inaccurate forecast in

11  3Q01 for several reasons, including: (1) a major macroeconomic change had occurred between 3Q00

12  and 3Q01 that was affecting Oracle's business; (2) Oracle's pipeline (the foundation of Oracle's

13  extrapolation) contained a higher mix of applications deals (which have a lower conversion rate and

14  which Oracle was having problems selling as a result of product problems) than it had in the past;

15  and (3) in 2Q01, Ellison changed the forecast process by directing the Field to add more risk to its

16  forecasts, thereby eliminating the need for any upside adjustment. Ex. 26 at 384:6-385:7; Ex. 12 at

17  Ex. B; Ex. 30 at 4-8; Ex. 29 at 2-65; *id.* at Ex. 6; *id.* at Ex. 7; Ex. 31. As a result of these changes,

18  Ellison knew that Oracle's Potential Forecast (and resulting public guidance) were unreliable and

19  unreachable.

20          **1.    The Major Macroeconomic Change Facing Oracle Rendered
              Its 3Q01 Forecast Inaccurate**

21      In Oracle's 3Q00, the economy was extraordinary. The NASDAQ was at its highest level in

22  history and Minton characterized the period as "a very high growth period." Ex. 32 at 85:16-17;

23  Ex. 30 at 4-8. Oracle took advantage of the frenzied technology spending in the economy as a whole

24  and increased its sales to unprecedented levels. *See* Ex. 33 at 185 ("Fueled by the prevailing Internet

25  fever, never before in history had there been such an appetite by businesses to buy the latest in

26  computing technology, and Oracle was one of the leading beneficiaries."). One benefit to Oracle of

27  that particular economic boom was an entirely new group of companies to whom it could sell its

28

1 | highly saturated database product. In 3Q00, sales to dot.com companies represented nearly 11% of

2 | Oracle's license revenues compared to just 3.1% in 3Q99 and just 0.7% in 1Q99. Ex. 30 at Ex. 5.

3 | The technology spending boom was so beneficial to Oracle that it exceeded its 3Q00 forecast

4 | substantially. Ex. 34; Ex. 35 at ORCL 0122080; Ex. 36 at NDCA-ORCL 1914019. This strong

5 | ~~outlier quarter led to difficult comparisons and made revenue growth in the following year extremely~~

6 | difficult. Ex. 37.

7 | A year later, by Oracle's 3Q01, however, the NASDAQ had collapsed and the dot.com

8 | bubble had burst. Ex. 30 at Ex. 6. By November 2000, technology spending was down considerably

9 | and companies had problems acquiring financing. Ex. 30 at 4-8. The deteriorating economic

10 | conditions are well-documented in an article titled "The Rewards of Recklessness," which was used

11 | in January 2001 by Ellison and his co-author, Matthew Symonds, to promote their book, *Softwar*:

12 | "The Nasdaq index, one-time proud symbol of America's high-tech boom, has more
than halved since March [2000]. All around, the dot.coms lie dead and dying.

13 | Amazon and Yahoo, the names that launched a thousand business magazine covers
in the late 1990s survive, but now exist in some sad Internet twilight zone, their

14 | shares worth little more than a tenth of their value a year ago. Even the mighty Lords
of Wintel – Microsoft and Intel – have lost two-thirds of their value in the last 12

15 | months as PC growth has slumped. Shares in WorldCom, so recently the very model
of next-generation telecoms, are down to $14 compared with $55 at the beginning of

16 | 2000. Wherever you look, whether at once-fashionable Internet business software
firms such as Arabia, Commerce One and i2 or those paragons of New Economy

17 | management cool, Cisco and Dell, the rule is the same: lowered expectations, and
investors stampeding for the exit."

18 | 

19 | Ex. 38.

20 | The economic environment that faced Oracle in 3Q01 had changed so dramatically over the

21 | prior year that the Federal Reserve reduced the Federal Funds rate twice in one month (which it had

22 | not done in ten years) and noted a "sizable decline in business spending on equipment and software."

23 | Ex. 39 at 2-3; Ex. 29 at 9-20; Ex. 40 at 13.[3] Minton testified that she knew in early January 2001

24 | 

25 | [3] This contrasted with the economic environment that Oracle faced in its 3Q00. The Federal
Reserve explained in 3Q00 that "opportunities to enhance profits by using new technology were
likely to lead to robust further growth in business fixed investment, based mainly on spending for

26 | equipment and software over the year ahead." Ex. 41 at 14. It then proceeded to raise interest rates
three times between February 2000 and May 2000 to cool down an overheated economy where

27 | purchases of equipment and software "registered extraordinary gains in the first half of the year."
Ex. 42 at 2; Ex. 39 at 2.

28 | 

PLTFS' NOT OF MOT & MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ      - 5 -

1    that "the general macroeconomic environment was suffering." Ex. 43 at 223:14-18. Defendant

2    Henley told Oracle's audit committee on January 4, 2001 (the same day he sold one million Oracle

3    shares for proceeds of $32.3 million) that "all data since the [December 14, 2000 earnings] call point

4    to more economic softening so there is risk of slippage in deals." Ex. 44; Ex. 45.

5    ~~Ellison, a daily reader of financial publications (Ex. 46 at 287), was well aware that Oracle~~

6    was facing a major macroeconomic change between 3Q00 and 3Q01 and that Oracle could not

7    expect to convert as large a percentage of its pipeline in 3Q01 as it had in the boom economy of

8    3Q00. Yet Minton's forecast predicted just that. This economic downturn was the exact sort of

9    change that Ellison testified would cause Oracle's forecasting process to become inaccurate. Ex. 26

10   at 384:6-385:7.[4] He therefore knew that Oracle's forecasting process, and its guidance, were

11   unreliable and unreachable. Investors did not.

12   Ellison was aware of hard evidence that the economic change was directly impacting

13   Oracle's ability to convert its sales opportunities. Ellison was in possession of information showing

14   that Oracle's conversion ratio had been lower throughout FY01 than it was throughout FY00.

15   Ex. 48. The conversion rates in 1Q00, 2Q00, 3Q00 and Q400 were 56%, 57%, 53% and 56%,

16   respectively. *Id.* In contrast, the conversion rates in 1Q01 and 2Q01 were 45% and 49%,

17   respectively. *Id.* Oracle was therefore converting significantly fewer opportunities into sales in

18   FY01 than it was in FY00, a decline that was amplified in 3Q01 by the application of these ratios to

19   a pipeline near $3 billion. Ex. 30 at Ex. 10.

20   In addition, Ellison knew that Oracle's dot.com business had been declining leading up to

21   3Q01. After reaching $172 million in 4Q00, dot.com sales fell to 6.01%, or just $66 million, in

22   2Q01. Ex. 30 at Ex. 5. By the end of December 2000, North American Sales ("NAS"), the division

23   that sold primarily to Oracle's dot.com customers, reported that its dot.com bubble had burst. Ex.

24   49. NAS also reported that Oracle had already sold to the larger dot.com companies a year earlier

25

---

26   [4]    Ellison also testified that when there is an economic downturn, Oracle's deal cycle gets
27   longer because companies require more approvals, resulting in slowdowns or cancelled deals.
     Ex. 47 at 245:18-247:4. The pipeline is therefore harder to convert in times of economic slowdown.

28

1   and that any new sales would have to be to second and third tier dot.com companies, which were

2   quickly disappearing.  Ex. 50 at 78:7-18.  By January 29, 2001, Oracle was forecasting only $41

3   million in sales to dot.com customers (3.17% of total sales), compared to $111.5 million (11% of

4   total revenues) one year earlier.  *See* Ex. 30 at Ex. 5.

5   ~~Ellison was aware of this negative effect on Oracle's business.  He testified, "I'm sure we~~

6   had [seen an effect of the downturn in the economy in Oracle's dot-com sales by 3Q01]" and that

7   "you're absolutely right that our dot-com business was certainly off by that point in time."  Ex. 51 at

8   178:9-179:1.  Ellison testified that this collapse put a "lot of pressure on [Oracle's] database" for

9   3Q01.  Ex. 52 at 255:21-256:21.  And he said that Oracle had a "very, very high hurdle.  So for the

10  business to grow, it meant we had to overcome the fact that a lot of our dot-com companies –

11  customers, our ex-customers, were gone."  Ex. 53 at 385:10-22.  Ellison was aware of this negative

12  effect on Oracle's business at the time he traded.  He was aware that Oracle's forecast was based on

13  the assumption that Oracle would convert as many deals in the slowing economy of 3Q01 as it had

14  in the extraordinary economy the year before.  He was aware that this made Oracle's forecast

15  inaccurate.  Investors were not.

16  **2.      The Change in Oracle's Product Mix and Problems with 11i**
        **Rendered Oracle's 3Q01 Forecast Inaccurate**

17

18          Minton's application of the historical conversion rate from 3Q00 to the 3Q01 pipeline also

19  produced inaccurate results because, as Ellison was well aware, the mix of products that Oracle was

20  selling had changed dramatically.  Ex. 29 at 85-87.  Prior to May 2000, Oracle's applications sales

21  had consisted almost exclusively of Enterprise Resource Planning ("ERP") products.  Ex. 54 at

22  101:1-7.  ERP applications are the applications that run a company's back office (accounting, order

23  entry, accounts receivable and payable, etc.).  In May 2000, Oracle released its new applications

24  suite 11i, which included not only a new and untested rewrite of its ERP software, but also an

25  entirely new and untested Customer Relationship Management ("CRM") component.  *Id.*  CRM

26  applications are intended to run a company's front office (*i.e.*, customer recordkeeping and support,

27  including call centers, marketing, technical support, etc.).  In 3Q00, applications products comprised

28  18.6% of Oracle's license sales.  Ex. 30 at 85.  *Id.* at Ex. 7  When Oracle issued guidance in 3Q01,

however, Minton forecasted that applications sales would comprise 31.5% of total license sales. *Id.*

The change in Oracle's product mix rendered Minton's historical conversion analysis inaccurate for

several reasons.

At the time guidance was issued in 3Q01, Oracle's pipeline contained a much higher

~~percentage of applications deals than it had in 3Q00. Ex. 29 at Ex. 6. *Id.* at 85.~~ In 3Q01, Oracle's

pipeline contained 42% applications deals and 58% technology deals. *Id.* at Ex. 6. *Id.* at 86. In

contrast, in 3Q00, the pipeline had consisted of 29% applications deals and 71% technology deals.

*Id.* Historically, on average, applications deals had a much lower conversion ratio (approximately

38.7%) than technology deals (approximately 63.3%). *Id.* at Ex. 7. *Id.* at 86. For these reason, the

application of the historical conversion ratio from 3Q00 to the more heavily applications-weighted

3Q01 pipeline rendered Minton's analysis inaccurate. *Id.* at 7, 86. Ellison was well aware of this

change.

Ellison was also aware that Oracle's sales force was much better at selling database products

than it was at selling applications products. *See* Ex. 9 at 114 (Ellison states, "Ray and I both agreed

that our database sales force was not very good at selling applications."); Ex. 56 at 173 ("Ellison

recognizes that applications can't be sold the same way as database."). And the already sales-

challenged Field was further handicapped by the fact that, in 3Q01, the 11i applications products that

it was selling did not work. Multiple sources within Oracle, including Ellison, agree that 11i was

released too early and caused what Mark Jarvis, head of Oracle marketing, called "eighteen months

of Hell" (Ex. 57 at 424):

- According to George Roberts, Executive Vice President ("EVP") of NAS: "We should have done two things: installed it in-house first and engaged with the early implementations at an executive development level. I think if either of those things had happened, we would have rapidly found out that it wasn't done. As it was, it took us until November to realize we had issues here and to start to mobilize." Ex. 58 at 196.

- "The mood at Oracle was bloody but unbowed. There was an embarrassing realization that it had fallen down badly on execution in sending a hugely important new product out to customers in an unfit state." Ex. 59 at 202.

- According to Ron Wohl, EVP in charge of ERP Applications Development: "We would have been better off as a company if we had deferred the release by three or four months. . . . Customers who started on one of the early versions [released prior

1    to February 2001] weren't happy, and they had a right to be upset with us." *Id.* at
2    203.

3    • "Mark Barrenechea [SVP in charge of CRM Applications Development] thanks God
     for the recession: 'We actually got a little lucky that the economy turned down. It
     gave us more time to deal with the [11i product] problems.'" *Id.* at 203.

4
5    • Jay Nussbaum, EVP of Oracle Service Industries ("OSI"), testified that there were so
     ~~many problems with the CRM product during 3Q01 that the sales force was reluctant~~
6    to sell it until it was more stable. Ex. 60 at 68:7-74:13. Nussbaum compared buying
     the CRM product to purchasing a BMW, but receiving one without a steering wheel,
     an engine or tires and being told it would take more time and money to receive these
7    items. *Id.*

8    • "LE [Larry Ellison] writes: We were getting a lot of pressure from our customers to
     deliver the 11i applications. I made a lot of them mad by delaying the release for
9    several months. I should have delayed it even longer." Ex. 61 at 189.

10       Ellison was well aware of the problems with 11i. He himself had made the decision to risk

11   the early release of unfinished and untested products. For example, Ellison decided to release a "too

12   risky" version of Oracle's Order Management product, the most critical part of Oracle's ERP

13   product and which Ellison referred to as "the heart of the sell side of our e-business suite." Ex. 62 at

14   192. Ellison admitted in *Softwar* that "the new order management system was dramatically better

15   than the old one, but it hadn't been tested yet, so we thought it was much too risky to put it into the

16   suite." *Id.* He also admitted that the ultimate decision to put in that new and untested order

17   management module into the suite was his:

18       "It was my decision [to put in the 'much too risky' new order management module].
         It's in my nature to go for the highest-risk/highest-reward option. That's my cross to
19       bear. We went from having an average order management product to having the
         premier order management product on the planet. The only problem was that it was
20       brand new and we hadn't done enough testing."

21   *Id. See also* Ex. 63 at 640:12-21 ("And we had – I had made the decision – it was run the cusp,

22   whether we should put in a brand-new order management system or upgrade our existing system.

23   And I decided to completely replace the order management system knowing it was an enormously

24   complicated piece of new code, the most complicated piece of the whole system.").

25       The risky early release of the untested 11i product caused huge problems for Oracle and its

26   customers. *See* Ex. 64 at NDCA-ORCL 037143 ("As you know some of our earliest 11i clients

27   (especially CRM and Order Management) are exhausted from the effort of implementing the

28   products."). According to *Softwar*:

"In October, the first reports from the field described early 11i implementations afflicted with more than usual bugginess. At the Oracle Applications Users Group conference in Hawaii at the end of October, the ***complaints were legion***. Attendees griped about a lack of reliable information concerning the status of applications, ***malfunctioning modules – especially CRM and order management*** – a constant stream of bug-fix patches, and poor support from the customer service organization, which, according to some, hadn't been properly trained on the workings of 11i. . . . Over the next couple of months, ***customer complaints poured in. Instead of working on the planned features and functions to flesh out the suite's capabilities*** ***as planned, development was increasingly engaged in a feverish attempt to produce patches that would fix the bugs that seemed to be flying at them from all sides***. . . . Ellison says, '11i was a huge new product, so I knew there would be a lot of bugs, but there was no way to know how many there were or how long it would take us to fix them. I thought we could fix most of the bugs pretty quickly, during the controlled release phase. I was way too optimistic. ***It just kind of got away from us, and that became a very big problem***.'"

Ex. 65 at 194-95. The problems with 11i severely affected the ability of the Oracle sales force to sell the 11i products. *See* Ex. 66 ("CRM: we are loosing [sic] a bit of momentum; sales people are reluctant to engage to the product problems, lack of references and local language issues."); Ex. 67 ("I have a simple, internal only, explanation. Give the R11i problems in Q1/Q2, many of our sales people decided to focus on technology to make their quota and wait for the product to be stable."); Ex. 68 ("as you know, we had six-nine months of product issues which caused loss of confidence by sales, partners, analysts and customers.").

Because of these quality issues, Oracle had virtually no 11i customer references by November 2000 (the month before the Class Period) and only nine 11i CRM customer references by June 2001 (three months after the end of the Class Period). Ex. 69 at NDCA-ORCL 153367; Ex. 70. These startling facts severely affected Oracle's ability to convert its applications pipeline because, as Ellison put it, "***The first year of selling the 11i suite was the hardest year. It's difficult to sell*** ***without customer references***." Ex. 71 at 249. In fact, Ellison admits that customer references, which were virtually non-existent in Oracle's 3Q01, "are the key to selling software." According to Ellison (in 2002):

"I don't think it makes a difference whether our stock is flat or down a bit; in the long run what really determines our success and our stock price is how good our products are. And our products are really, really good right now. ***All we need are*** ***more references. References are the key to selling software***. That's what gives people the courage to buy a complex, almost incomprehensible piece of technology. Selling the architecture only works with a few early adopters. In most cases, even when they agree that our applications architecture is much better, they'll still go with the market leader. People buy Siebel because 'everyone buys Siebel.' People have

1  an innate belief that there is safety in numbers. It's deep inside everyone's biology.
2  ***So until we have a significant number of references, including people who threw
   Siebel out, it will be slow going. So for now we're just going to take it hill by hill,
   deal by deal, until we have a strong enough foothold for our sales force to do what
3  it does best, reference selling.***"

4  Ex. 72 at 239 (emphasis added). Ellison was also aware of Oracle's inability to demonstrate 11i and

5  reluctance by Oracle's sales representatives to sell the CRM component of the suite. *See, e.g.*,

6  Ex. 73 (noting that if Oracle's inability to demonstrate 11i did not improve, "it will continue to

7  impact our conversion rate" and that "when you see all of the names of prospects [being affected by

8  Oracle's inability to demonstrate 11i] it's really sickening. Hopefully Larry will get sick as well and

9  put more pressure on getting this fixed."). Ellison testified that he did not recall seeing that

10 document but that he was "very familiar with the issues to which it refers." Ex. 74 at 273:3-12. *See*

11 *also* Ex. 75 at 105:7-8 ("I was certainly aware that we had problems with our demonstration

12 system.").

13     Despite its failure to test 11i in-house prior to its release, in an attempt to manufacture an 11i

14 reference, Oracle represented to customers and the market that Oracle itself had already saved a

15 billion dollars in one year using its E-Business Suite. Ex. 76. Ellison later admitted that Oracle did

16 not save a billion dollars using its own E-Business Suite. According to *Softwar*:

17     "***The final qualification about Oracle's story of transforming its efficiency by
       using its own E-Business Suite is that the claim is only partly true, because the first
18     billion dollars of savings was pretty much in the bag before 11i was finished. . . .
       Ellison says, 'That's absolutely right.*** The software that saved Oracle a billion
19     dollars in the first year was a combination of our standard applications products plus
       prototype applications that had not yet been integrated into the E-Business Suite. . . .
20     in one sense, the marketing claims were misleading.' ***The reassuring message to
       prospective customers was that Oracle had been successfully running the same E-
21     Business Suite that they would buy for at least a year. That was very far from the
       case***. Not for the first time in Oracle's history, early guinea-pig customers would pay
22     a price for taking too much on trust. Not, however, as great as Oracle and Ellison
       would pay."
23
   Ex. 77 at 182-83.
24
25     Investors were not aware that Oracle's claims regarding its in-house use of 11i were false and

26 misleading. They were not aware that between December 2000 and March 2001, Oracle was so

27 desperate for references for 11i that it engaged in the practice of offering concessions or payments to

28 customers to be references. *See* Ex. 78 at 251:1-16. Investors were also not aware that the product

1 problems and lack of references, combined with an inexperienced sales force, were making 11i

2 difficult to sell.  They were not aware that these problems rendered Oracle's (and Ellison's)

3 statements that 11i would allow Oracle to escape the effects of the economic slowdown false and

4 misleading.  Investors were also not aware that the higher mix of applications deals in the pipeline

5 rendered Oracle's forecast inaccurate.  Ellison was.

### 3.   Ellison's Directive Just Before 3Q01 to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate

When Oracle issued guidance on December 14, 2000, Ellison was aware that the $160

million upside adjustment that Minton had applied to the 3Q01 forecast was no longer necessary. In

late 2Q01 (just before the start of the Class Period), Ellison issued a directive to the Field to add

more risk (and amount) to their forecasts.  Ex. 31.  Ellison's directive, designed to eliminate

sandbagging, rendered Minton's upside adjustment (historically applied to eliminate the same

problem) obsolete.

According to Minton's e-mail regarding Ellison's directive, which was sent to executives and

finance personnel in the field units, "Larry [Ellison] made it clear that he wants everyone to submit

realistic forecasts – he is not interested in 'commit' numbers."  Ex. 79 at NDCA-ORCL 151961.

Minton testified that she was "asking my finance team to work closer with the field to make sure that

the . . . field sales organizations were submitting more realistic numbers."  Ex. 80 at 105:10-21.

Numerous executives forwarded Minton's e-mail, and executives and finance personnel in the field

divisions discussed methods for implementing Ellison's directive:

> "Recently Larry has changed the way he is interpreting our forecast. . . . This is a change from our current thinking in that our forecast has not usually had a significant amount of judgment.  It was the amount that you believed you could deliver at a minimum.  That emphasis has shifted . . . *and now our forecast is a number that includes more risk than in the past*."

Ex. 31 (emphasis added).  Ellison confirmed that the reference to "Larry" in this e-mail was to him.

Ex. 81 at 423:24-425:1.  And internal Oracle documents show that this directive went into effect

before Oracle's 3Q01 – "[W]e will incorporate this [change] in our OSO 11i training that is

tentatively scheduled the week of 10/23."  Ex. 31.  Despite the addition of this risk, the Field

1   Forecast still informed Ellison throughout 3Q01 that Oracle was projecting it would miss guidance.

2   Ex. 30 at Ex. 12.

3        Ellison was aware that Minton's upside was no longer necessary as the mechanism to adjust

4   for "sandbagging."  He was also aware that, despite the directive, Minton added $159.5 million in

5   ~~upside to the field forecast in 3Q01 to estimate Oracle's guidance.  Ex. 30 at Ex. 11.  Minton~~

6   testified that she did not take the directive into account when adding this upside to the Field Forecast

7   in 3Q01. Ex. 82 at 19:17-19.  Ellison was aware that Minton's unnecessary and duplicative upside

8   adjustment served as the basis for guidance.  Investors were not.

9              **4.      Oracle's Public Guidance Was Unreliable Because Minton**
             **Applied Her Inaccurate Conversion Ratio to a "Too Good to**
10            **Be True" Pipeline**

11       As discussed above, Ellison was aware that the major macroeconomic change between 3Q01

12  and 3Q00, the change in the product mix of Oracle's pipeline, and the myriad problems with Suite

13  11i rendered Oracle's conversion analysis, and thus its forecast, inaccurate.  Ellison was also aware

14  that Minton was applying this inaccurate conversion analysis to a pipeline that Henley testified was

15  "too good to be true." Ex. 83 at 354:15-355:3.  This "too good to be true" pipeline, which Oracle

16  touted to analysts in December 2000 as a reason for its belief in the strength of its financial

17  prospects, was in reality caused by Oracle's move in early December 2000 to 11i Oracle Sales

18  Online ("OSO").  Ex. 84; Ex. 85 at 270:2-14 ("The – one thing that we all wanted, Larry – I

19  remember Larry asking for it, and I was after it as well, is sometimes there is a reluctance of a sales

20  person to put a deal into OSO or into the sales pipeline because, as soon as they did that, somebody

21  is going to start asking questions about it.  And they may conclude in their mind somewhere that the

22  deal hadn't matured enough in the process to do that.  So, I – I actually made it a point as well that I

23  wanted our sales reps to make sure they were putting all deals into the – into OSO.  It wasn't – if

24  they were working on it, it went in.").

25       The move to OSO necessarily increased the size of Oracle's pipeline in 3Q01 by adding deals

26  that the Field would previously not have felt comfortable enough to include.  This overstated

27  pipeline is yet another reason that Minton's application of the 3Q00 historical conversion ratio, and

28  thus Oracle's 3Q01 forecast, were unreliable and inaccurate.  Henley testified that this overstated

PLTFS' NOT OF MOT & MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ      - 13 -

1   pipeline was the reason that Oracle issued public guidance of 12 cents EPS instead of the 12.8 cents

2   that Minton was forecasting at the time.  *See* Ex. 86 at 354:5-14 ("[W]e were skeptical of the

3   strength of the pipeline to start the quarter, so we did not make all that into our forecast for the third

4   quarter.").  In issuing guidance, however, Oracle completely failed to take into account the variety of

5   ~~other changes, including the macroeconomic change, the change in Oracle's product mix, and~~

6   Ellison's directive, that made Minton's conversion analysis, and thus, Oracle's forecast, inaccurate.

7   Ellison himself testified that these sorts of changes rendered Oracle's forecast inaccurate.

8   Ellison therefore knew that Oracle's public guidance was unreliable and unreachable.  Investors did

9   not.

10   **B.     When Ellison Suddenly Deviated from Plan and Decided to Sell Stock
           in January 2001, the Internal Indicators that He Preferred to Rely on**

11   **Painted a Bleak Picture for Oracle's Financial Prospects**

12   In addition to knowing that Oracle's guidance was unreliable given the major changes

13   between 3Q01 and 3Q00, Ellison was also informed by internal forecasting indicators that Oracle

14   was being adversely affected by the economic downturn and the quality of its products.  In his

15   February 27, 2004 deposition, Ellison stated that he relies primarily on actual sales and pipeline data,

16   rather than focusing on the mood ring potential forecast.  Ex. 23 at 279:1-11.  Both the actual sales

17   data and the pipeline data available to Ellison at the time that he traded indicated that Oracle was

18   being adversely affected by the economy and problems with its products and was not on track to

19   meet its guidance.  Ellison admitted to knowing all of this information.  Ex. 87 at 77:13-16 ("***So***

20   ***you're saying before trading commenced on the 22nd, was I pretty much up-to-date with all of the***

21   ***information available, then available?  And the answer's yes***.").

22   **1.     Less than 36 Hours Before He Decided to Unload Early,
           Ellison Received Oracle's Dismal Actual Results for December**

23   **2000**

24   Actual results for December 2000 informed Ellison that Oracle was being adversely affected

25   by the economic downturn and quality of its products, and that it was tracking to miss guidance.  On

26   January 17, 2001, Ellison received and read the Larry Garnick Flash Report ("January 17 Flash

27   Report") containing Oracle's actual results for December 2000.  Ex. 6.  The January 17 Flash Report

28   disclosed that the NAS and OSI lines of business (the divisions that were ultimately responsible for

Oracle's 3Q01 miss) had growth of *negative* 24% and *negative* 81%, respectively, and that the Oracle Product Industries ("OPI") division had growth of *negative* 85% after adjusting for Covisint.[5] *Id.* Accordingly, as of January 17, 2001, Ellison was aware that all three of Oracle's U.S. divisions (representing approximately 50% of its license revenues) had negative growth trends.[6]

The January 17 Flash Report also disclosed to Ellison that Oracle's U.S. license divisions had sold virtually no applications (11i) software, excluding Covisint. Ex. 6. Although its U.S. divisions were *forecasting $323 million* (excluding Covisint) in applications license sales for 3Q01, in December 2000, Oracle's U.S. license divisions *sold less than $1.3 million* in applications ($805,000 of CRM and $458,000 ERP, excluding Covisint). *Id.* *This represented year-over-year applications license growth of negative 92%.* *Id.*

The U.S. divisions did not fare much better in database. By January 17, 2001, Ellison was aware that Oracle's U.S. divisions had *negative* 33% growth in database license sales, even including Covisint. *Id.* Excluding Covisint, U.S. database license sales had *negative* 44% growth. *Id.* Thus, by at least January 17, 2001, just 36 hours prior to unloading, Ellison was aware of the negative trends in the U.S. license divisions (50% of Oracle's license revenue) that accounted for the earnings shortfall that Oracle would not disclose for a month. *Id.*

---

[5]     Covisint was a $60 million applications deal that was the largest transaction in Oracle's history at the time.  Garnick removed Covisint from his analysis because the size and one-time nature of the transaction skewed Oracle's trends. Ex. 88 at 312:2-313:4; Ex. 89 at 216:25-218:23. According to Ray Lane, Covisint was, in actuality, a 2Q01 deal that was not indicative of 3Q01 trends. Ex. 90 at ¶9. Additionally, Ellison himself testified that removing Covisint was proper in analyzing December 2000 results. Ex. 91 at 436:13-437:6.

[6]     Ellison was aware of the problems in NAS and OSI even earlier.  For example, on his copy of the December 8, 2000 Upside Report, Henley noted that (i) NAS had no big deals in the pipeline; and (ii) the tech pipeline for OSI was down a lot since the fact report. *See* Ex. 92 at NDCA-ORCL 610124.  Henley testified that he must have been concerned about the fact that the tech pipeline for OSI was down "a lot." Ex. 93 at 214:2-19.  Over the next few weeks (by 12/25/00), OSI's applications pipeline would also plummet by almost $200 million. Ex. 34; Ex. 94; Ex. 95. *See also* Ex. 49 (Jan. 11, 2001 e-mail from David Winton (head of NAS finance) to Jennifer Minton, stating: "Drop in Technology.  As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4.  GB's dot.com bubble has burst (they expect the West to end the year $30 to $40 million behind their original Budget for Technology.  Majors sees a slow down in spend along with smaller deal sizes.").  Ellison testified that he was aware of these issues in January 2001. Ex. 96 at 429:12-432:6.

The January 17 Flash Report disclosed further adverse information.  Excluding Covisint, total company license revenue growth was just 1% (compared to 25% guidance) and total company applications product growth would have been negative 46% compared to guidance of 75% growth.  *Id.*  Henley testified that the Garnick Flash Report showed that the Company "was off to a slow start irrespect [sic] – you know, excluding Covisint."  Ex. 97 at 226:6-7.  And given the negative trends in every U.S. division, it was unlikely that the remainder of the quarter would make up for the slow start.  Ellison received this information just before midnight on January 17, 2001.  Ex. 6.  On January 19, 2001 (less than 36 hours later), without any prior indication of an intention to trade in January 2001, Ellison instructed Simon to dump 40 million shares of Oracle stock.  Ex. 1 at 69:1-70:3; Ex. 2 at 59:15-60:6; Ex. 3 at NDCA-ORCL 300606.

### 2.   When He Sold, Ellison Was Aware that Oracle's "Astounding" Pipeline Had Taken an Unprecedented Nosedive

The behavior of Oracle's pipeline also informed Ellison that Oracle was being adversely impacted by the downturn in the economy and problems with its products.  The term "pipeline" as used in the Upside Reports and other senior level reports referred to "all the deals that were being worked on or had an opportunity to close during the quarter" and includes deals that have already closed.  Ex. 98 at 110:22-111:1; Ex. 99 at 128.  Year-over-year pipeline growth, while as high as 52% in Week 1 of the quarter, dropped precipitously in the next few weeks and continued to fall throughout the quarter.  Exs. 94 & 95; Ex. 30 at Ex. 20.  Total company pipeline growth was 52% on December 11, 2000, and dropped by $328 million to 34% by December 25, 2000.  Exs. 94 & 95.  As Ellison considered this a key forecasting indicator, the behavior of the pipeline therefore informed him no later than December 25, 2000 that Oracle's business had been negatively impacted.

The pipeline collapse continued throughout the quarter.  In addition to the $328 million drop in December, Oracle's pipeline collapsed by $544 million by February 5.  Ex. 30 at Ex. 20.  By contrast, the pipeline for the same period in the prior year *increased* by $69 million in December 1999 and January 2000.  *Id.*  The historical data produced by Oracle for other quarters before 3Q01 also reflect that the pipeline tended to increase in the quarter before declining at the end.  Ex. 30 at Ex. 21.  That data also reflects that the size of the pipeline declines in the previous quarters were

1    nowhere near the size of the declines in 3Q01 (for the company as a whole as well as for Oracle's

2    U.S. license divisions).  *Id.*  The rapid and uncharacteristic decline in the pipeline indicated more

3    deals were being lost than in prior years.  Ellison was aware of this information regarding the

4    plummeting pipeline when he traded.  Investors were not.

5              Ellison testified that another indicator that he relied on was the "comfort gap," the difference

6    between forecasted license revenue growth rates and the pipeline revenue growth rates.  Ex. 100 at

7    86:3-87:5; Ex. 101 at 420:12-14.  Ellison stated, "as long as the pipeline growth is greater than –

8    than the revenue growth, you should be able to meet your numbers." *Id.* at 420:12-14.  With revenue

9    growth higher than pipeline growth during significant parts of December and January, Ellison's own

10   measure indicated that Oracle's business was faltering.  Ex. 30 at Ex. 13.  Since both metrics

11   appeared on the first page of the Upside Report that he received every Monday, Ellison was

12   informed of this fact when he traded.  Ex. 34; Ex. 94; Ex. 95; Ex. 102; Ex. 103; Ex. 104.

13             Unlike the four quarters prior to the Class Period, the gap between these measures was

14   extremely narrow in 3Q01.  In fact, between December 25, 2000 and January 29, 2001, the gap

15   never reached higher than 4% and was negative half the time.  Ex. 30 at Ex. 13.  Thus, Ellison was

16   informed that the financial department was forecasting license revenues to grow at a more rapid rate

17   than the pipeline was growing for most of December and January.  *Id.*  This was out of line with

18   Oracle's historical experience, which showed a negative gap only once prior to 3Q01, and an

19   average spread of 13.4%.  *Id.*  A negative gap is important because it indicates that the forecast target

20   is less likely to be met.  As Ellison noted, it would be "incautious to . . . forecast sales growth

21   without underlying pipeline growth."  Ex. 100 at 86:21-87:5.  When Ellison began trading, the

22   growth gap was ***negative*** 1%.  Ex. 30 at Ex. 13.  Ellison was aware of this adverse information.

23   Investors were not.

24

25

26

27

28

1    In isolation, many of these facts indicate that Oracle's license revenues were being impacted

2  by the economic downturn.  When viewed collectively, they paint a dismal picture.  Ellison was

3  aware of these facts when he traded.  Investors were not.[7]

4  **C.    After Receiving Adverse Material Non-Public Information, Ellison**
   **Suddenly Decided to Unload 40 Million Shares of Oracle Stock to**
5  **Fund His "Absolutely Excessive" Lifestyle**

6    Within 36 hours of receiving and reviewing the January 17 Flash Report, which informed

7  him that all three of Oracle's U.S. divisions had negative revenue growth trends and that Oracle was

8  not on track to meet its guidance, on January 19, 2001, Ellison ordered Simon to unload 40 million

9  shares of Oracle stock.  Ex. 1 at 69:1-70:3; Ex. 2 at 59:15-60:6; Ex. 3 at NDCA-ORCL 300606.

10  Prior to January 19, Ellison had not informed Simon or anyone else of any intent to sell stock in

11  January 2001.  To the contrary, prior to January 19, every indication from Ellison, Simon and Oracle

12  was that Ellison would exercise his options and sell shares in April 2001.  Exs. 4 & 5.

13    Ellison had a track record of holding on to his Oracle options until the last possible moment,

14  despite the constant advice of Simon that Ellison needed to diversify and pay down his debt.  In the

15  late spring of 2000, Ellison was under the mistaken impression that his Oracle options were expiring

16  in August 2000.  Ex. 3 at NDCA-ORCL 300606; Ex. 106.  Having held his options until what he

17  believed were the final two trading windows, Ellison, Simon and Oracle discussed the tax

18  consequences for Oracle of his selling in April 2000.  Ex. 107.  When Simon correctly informed

19  Ellison that his options were actually expiring in August 2001, Ellison decided again to delay his

20  trading until the last minute.  Ex. 3 at NDCA-ORCL 300606; Ex. 106.

21    That fall (in October 2000), Oracle's tax department personnel discussed again with Ellison's

22  tax advisors whether it would be most beneficial to the company to have Ellison exercise his options

23

24  [7]    Ellison also watched the performance of other companies as a gauge of Oracle's business.
    *See* Ex. 105 at 157 ("LE writes [regarding Ray Lane]: He takes personal credit for our stock price
25  run-up?  Amazing.  Oracle rode the Internet wave because our database powered virtually every
    major Web site on the Net.  If you plot the stock price of Cisco, Oracle, and Sun, you will see that all
26  three companies rose and fell together in perfect synchronization as sentiment about the Internet rose
    and fell.").  On January 19, 2001, the very day that Ellison decided to trade, Sun pre-announced.
27  Cisco had pre-announced even earlier.  Ellison, whose daily routine includes checking the websites
    of rivals, was aware of these facts.  *Id.* at 287.

28

1    and sell Oracle shares in FY01 or FY02 (after May 2001). Ex. 108. After stating that Ellison's

2    decision on when to exercise would "of course depend on Oracle's stock price and Larry's mood,"

3    Ellison's tax advisor concluded that Ellison would be willing to exercise in either FY01 ("before the

4    May 2001 quiet period") or FY02 (August 2001) so long as it would be tax neutral for Ellison. *Id.*

5    ~~By January 10, 2001, Deborah Lange, a Senior Vice President in Oracle's Tax Department,~~

6    e-mailed Jeff Henley that Oracle's tax department would prefer that Ellison sell in April 2001

7    instead of August 2001. Ex. 4. She wrote:

8         "Larry may be willing to exercise in April if it is beneficial to the
         company. . . .   The unknown factor is the relative stock price April versus
9         August. . . . My general recommendation is to ask Larry to do as much as possible in
         April, but to modify that advice in April when we have more visibility to FY01
10        results and the stock market."

11   *Id.*

12   No mention was made of any possibility that Ellison might sell in January 2001. On

13   January 22, 2001, still under the impression that Ellison was going to exercise options and sell

14   Oracle stock either in April 2001 or August 2001 (despite the fact that Ellison had already began his

15   selling spree), Lange wrote to Simon: "It is obviously Larry's call but there is a possible benefit to

16   the company of exercising in FY1 (April) rather than FY02." Ex. 5.

17   As of January 19, 2001, neither Simon nor anyone else had heard of any plan by Ellison to

18   exercise his options and sell in January 2001. Ex. 3 at NDCA-ORCL 300606. That day, however,

19   less than 36 hours after receiving Oracle's December 2000 actual results, Ellison suddenly decided

20   to unload. Ex. 6; Ex. 3 at NDCA-ORCL 300606. In addition to the 22 million expiring options that

21   he had been planning to sell later in the year, Ellison instructed Simon to sell an additional 18

22   million shares of Oracle stock. Ex. 3 at NDCA-ORCL 300609. *See* Ex. 109 at 33:2-5 ("Q. Okay. . .

23   . Did you consider exercising your option – this block of expiring options and then just selling

24   enough to cover taxes? A. No. No, I wanted to raise some cash."). With the exception of gifts and

25   some small trades conducted for tax planning purposes, Ellison had not sold any Oracle shares since

26   1996. Ex. 110 at 28:2-4.

27   Between January 22, 2001 (the next available trading day) and January 31, 2001, Ellison

28   unloaded an unprecedented $895 million worth of Oracle stock. Ex. 7 at NDCA-ORCL 300656.

1   The trades were carefully executed by Merrill Lynch and Simon to ensure that the desired number of

2   shares could be sold without moving the market and driving the price of the stock down.  Because of

3   this limitation, Ellison was only able to sell 29 million shares in January 2001 (as opposed to the 40

4   million that he had instructed Simon to sell).  Ex. 7; Ex. 111 at 65:4-67:19; Ex. 112 at 50:5-52:20;

5   Ex. 113 at 185:18-186:7.  Ellison also traded his shares in violation of Oracle's insider trading

6   policy, which required him to first obtain clearance from both the legal department and the finance

7   department heads.  Ex. 114 at NDCA-ORCL 005595.  Although Ellison obtained clearance from the

8   legal department (which did not do its own independent investigation into whether Ellison held

9   material non-public information),[8] Ellison made absolutely no attempt to obtain clearance from

10  Henley, the head of Oracle finance.  Ex. 115 at 134:10-12; Ex. 117 at 37:11-13.

11      Ellison's "story" regarding his sales has "evolved" throughout both the derivative litigation

12  and this litigation.  Ellison has verified that he spoke to no one regarding the reason for his sales.

13  Ex. 118 at NDCA-ORCL 609922.  Ellison has also testified that he spoke to Simon regarding his

14  reasons for the sales.  Ex. 119 at 378:1-14.  Ellison has testified that he took Simon's advice to pay

15  down debt and diversify when he sold.  Ex. 120.  Yet Ellison has used a large portion of the cash that

16  he raised in selling his shares, not on any debt payment or diversification strategy, but instead to

17  fund his "excessive" lifestyle.  Ex. 121 at 323.

18      According to *Softwar*, Ellison "derives straightforward pleasure from owning hugely

19  expensive material status symbols."  Ex. 122 at 485-86.  It is not surprising, then, that much of the

20  cash from Ellison's insider trading was used to pay for hugely expensive material status symbols,

21  including: (1) his "absolutely excessive" new yacht, Rising Sun, the longest privately-owned boat in

22  the world (Ex. 121 at 318) – at a cost of $250 million; and (2) his Japanese village "home" in

23  Woodside which is, according to *Softwar* "at well over $100 million, probably the costliest

24  American home built for a private individual since William Randolph Hearst's grandiloquent San

25  Simeon."  Ex. 123 at 369-70.  *See* Ex. 121 at 323 ("Pressure because Ellison had come under

26

27  [8]    "Q. In January 2001, did you know any facts about Oracle's finances that Mr. Cooperman
    did not know?  A.  Probably."  Ex. 115 at 66:7-9.

28

1   personal attack after vesting more than $700 million worth of Oracle stock shortly before its price

2   tanked following a profits warning – ***money that had been put to use funding the construction both***

3   ***at Woodside and of Rising Sun***."); *see also* Ex. 124 at 353:24-354:8.

4         Whatever Ellison's final "story" turns out to be, one thing is clear – until January 19, 2001,

5   every indication from Simon, Ellison and Oracle was that Ellison would exercise options and sell

6   stock in April 2001. It was only upon the receipt of a plethora of negative information regarding

7   Oracle's products and financial prospects that Ellison suddenly decided to unload early. Ex. 6.

8   While Ellison was able to reap the benefits of his conveniently timed trades, all of which were over

9   $30, most of Oracle's investors were not so fortunate. Just a short month after Ellison's insider

10   trading spree, on March 1, 2001, Oracle pre-announced its revenue and earnings shortfall. Ex. 8. On

11   March 15, 2001, Oracle fully disclosed major shortfalls in its U.S. divisions and conceded that the

12   "U.S. economic downturn over the past several months clearly affected our revenue and profit

13   growth." Ex. 125 at NDCA-ORCL 038232. Oracle stock plummeted to nearly half the price that

14   Ellison was able to cash in at and has never recovered since.

15   **III.**     **Argument**

16         **A.**     **Standard of Review for Summary Judgment**

17         Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to

18   interrogatories and admissions on file together with affidavits show that there is no genuine issue as

19   to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56

20   (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). There is a genuine issue of material fact if,

21   and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of

22   the party opposing the motion in accordance with the applicable standard of proof. *Anderson v.*

23   *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A scintilla of evidence, however, that is merely

24

25

26

27

28

1  colorable or not significantly probative does not present a genuine issue of material fact. *United*

2  *Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).[9]

3      The moving party's burden is one of persuasion (rather than proof) to show the absence of a

4  genuine issue of material fact. *See Anderson*, 477 U.S. at 249.  Once a party has met that burden, the

5  burden shifts to the non-moving party to show that a genuine issue of one or more material facts

6  exist as to each element of that claim for relief. *See id.*  The non-moving party – here Ellison – may

7  not rest on allegations or denials. *Celotex*, 477 U.S. at 324; *Brinson v. Linda Rose Joint Venture*, 53

8  F.3d 1044, 1049 (9th Cir. 1995).  Instead, he must present admissible evidence showing that there is

9  indeed a genuine issue of material fact. Fed. R. Civ. P. 56(e).[10]

10  **B.**    **Insider Trading Qualifies as a Deceptive Device in Violation of §10(b)**
       **and Is Prohibited by §20A of the Exchange Act**

11

12      Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") makes it unlawful

13  for any person to "use or employ, in connection with the purchase or sale of any security . . . any

14  manipulative or deceptive device or contrivance" in violation of SEC rules and regulations.  15

15  U.S.C. §78j(b).  Rule 10b-5 prohibits the employment of any "device, scheme, or artifice to

16  defraud." 17 C.F.R. §240.10b-5. "To establish liability under §10(b) and Rule 10b-5, a private

17  plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to

18  deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, _U.S._, 168 L. Ed.

---

19  [9]    Where a non-moving party's claims are factually implausible, that party must produce more
20  persuasive evidence than would otherwise be required. *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987).

21  [10]    The moving party can satisfy its burden without introducing direct evidence.  *See SEC v.
22  Hahn Truong*, 98 F. Supp. 2d 1086, 1095 (N.D. Cal. 2000) ("*Smith* recognized that causation or use may be inferred from circumstantial evidence. 'Any number of types of circumstantial evidence
23  might be relevant to the causation issue.'") (citing *United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998)); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) (direct evidence not required where
24  circumstantial evidence is "just as appropriate").  In fact, most insider trading cases rely upon circumstantial evidence because few individuals admit to liability. *SEC v. Warde*, 151 F.3d 42, 49
25  (2d Cir. 1998) (SEC presented sufficient evidence, though circumstantial, to support jury finding that defendant traded on inside information).  And courts have routinely looked to circumstantial
26  evidence in determining whether a defendant possessed inside information at the time of the trade. *SEC v. Downe*, 969 F. Supp. 149, 153-56 (S.D.N.Y. 1997) (finding that circumstantial evidence was
27  sufficient to support jury finding defendant guilty of insider trading through knowledge of major merger developments), *aff'd sub nom.*, *SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998).

28

PLTFS' NOT OF MOT &  MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ    - 22 -

1   2d 179, 190 (2007).  The Court must view the evidence "holistically" instead of analyzing each piece

2   in isolation to determine whether a defendant acted with scienter.  *Id.* at 195.  Insider trading is a

3   classic example of evidence proving a defendants' scienter.  *United States v. O'Hagan*, 521 U.S.

4   642, 651-52 (1997).  In fact, the Supreme Court noted in *Tellabs* that "personal financial gain may

5   weigh heavily in favor of a scienter inference" even at the pleadings stage.  *Tellabs*, 168 L. Ed. 2d at

6   194.

7          Trading on material non-public information qualifies as a deceptive device under §10(b) and

8   Rule 10b-5.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding*

9   *Corp.*, 320 F.3d 920, 927 (9th Cir. 2003); 17 C.F.R. §240.10b-5-1.  "[A] person violates Rule 10b-5

10  by buying or selling securities on the basis of material nonpublic information if: (1) he owes a

11  fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation in

12  whose shares he trades, and thus owes a fiduciary duty to the corporation's shareholders; or (3) he is

13  a tippee who received his information from an insider of the corporation and knows, or should know,

14  that the insider breached a fiduciary duty in disclosing the information to him."  *SEC v. Clark*, 915

15  F.2d 439, 443 (9th Cir. 1990).  Insider trading constitutes a "deceptive device" under §10(b) because

16  "a relationship of trust and confidence [exists] between the shareholders of a corporation and those

17  insiders who have obtained confidential information by reason of their position with that

18  corporation."  *O'Hagan*, 521 U.S. at 652 (internal citations omitted).  The relationship between

19  corporate insiders and shareholders "gives rise to a duty to disclose [or to abstain from trading]

20  because of the necessity of preventing a corporate insider from . . . taking unfair advantage of . . .

21  uninformed . . . stockholders."  *Id.*

22         Section 20A also imposes liability on insiders for damages suffered by persons who trade

23  contemporaneously with the insider.  According to the statute, "[a]ny person who violates any

24  provision of this title or the rules and regulations thereunder by purchasing or selling a security while

25  in possession of material, nonpublic information shall be liable . . . to any person who,

26  contemporaneously with the purchase or sale of securities that is the subject of such violation, has

27  purchased . . . or sold . . . securities of the same class."  15 U.S.C. §78t-1(a).  Section 20A requires

28  the insiders to disgorge all illegal profit gained from the sales.  15 U.S.C. §78t-l(b)(1).  To

PLTFS' NOT OF MOT &  MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ          - 23 -

1 demonstrate contemporaneous trades, courts within the Ninth Circuit have held that a plaintiff must

2 show that it purchased within six to fourteen days of the illegal trade. *See In re Silicon Graphics*

3 *Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) ("only purchases within six days of insider sales

4 are truly contemporaneous"); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1489 (N.D. Cal. 1992)

5 (plaintiffs must show trades within fourteen days of each other to establish contemporaneousness),

6 *aff'd*, 11 F.3d 865 (9th Cir. 1993).[11] Section 20A also requires a showing of a predicate violation of

7 the Exchange Act or the rules promulgated thereunder. *Johnson v. Aljian*, No. 04-56997, 2007 U.S.

8 App. LEXIS 14466, at *9 (9th Cir. June 20, 2007).[12]

9   To establish insider liability, the Ninth Circuit has held that plaintiffs must show that

10 defendants "(1) intentionally . . . (2) misrepresented or failed to disclose . . . (3) a material fact . . .

11 (4) in connection with the purchase or sale of securities." *Caravan Mobile Home Sales, Inc. v.*

12 *Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 563-64 (9th Cir. 1985).

13   **C.**  **Ellison Traded While in Possession of Material Non-Public Information**

14

15   "The 'disclose or abstain' rule states that a corporate insider has a traditional, affirmative

16 duty to 'abstain from trading in the shares of his corporation unless he has first disclosed all material

17 nonpublic information known to him.'" *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1197 (C.D. Cal.

18 2004) (quoting *Chiarella v. United States*, 445 U.S. 222, 227 (1980), *aff'd*, 2007 U.S. App. LEXIS

19 14466 (9th Cir. June 20, 2007)). As the Supreme Court has noted, information is material under the

20 securities laws if there is "a substantial likelihood that a reasonable shareholder would consider it

---

21 [11] Plaintiffs Dzung Chu and Ryan Kuehmichel purchased Oracle shares on the same day that

22 Ellison sold his and therefore satisfy §20A's contemporaneous trading requirement. Plaintiff Chu purchased 10,000 shares on 1/26/01 when Ellison sold 4.225 million shares. Ex. 126 at MORSTAN

23 0101; Ex. 3 at NDCA-ORCL 300612. Plaintiff Ryan Kuehmichel purchased 2,000 shares on 1/23/01 when Ellison sold 5.1 million shares. Ex. 127 at BARD0014; Ex. 3 at NDCA-ORCL

24 300610.

25 [12] Not only do plaintiffs establish a predicate violation of the Exchange Act and SEC Rule 10b-5 through their showing that Ellison traded on the basis of material non-public information as

26 discussed in this motion, but they have also established a violation of §10(b) and Rule 10b-5 through Ellison's false and misleading statements and omissions as discussed in Plaintiffs' Motion for Partial

27 Summary Adjudication and Plaintiffs' Motion for Partial Summary Judgment filed contemporaneously herewith. They have therefore established predicate violation. *Id.*

28

1    important." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The movant need only show

2    that the information would significantly alter the total mix of information available to shareholders

3    to establish materiality.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  In the context of an

4    insider trading case, the time at which insiders began to trade is strong circumstantial evidence of

5    ~~materiality.  *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).~~

6         The Ninth Circuit has recognized that "'a person violates Rule 10b-5 by buying or selling

7    securities ***on the basis*** of material nonpublic information if . . . he is an insider of the corporation in

8    whose shares he trades.'"  *Clark*, 915 F. 2d at 443 (emphasis added).  Rule 10b-5-1 specifically

9    defines when an insider trades "on the basis of" material non-public information.   17 C.F.R.

10   §240.10b-5-1(b).  It states that "a purchase or sale of a security of an issuer is 'on the basis of'

11   material nonpublic information about that security or issuer if the person making the purchase or sale

12   ***was aware of*** the material nonpublic information when the person made the purchase or sale."  *Id.*

13   Rule 10b-5-1 creates a presumption similar to that found in *SEC v. Adler*, 137 F.3d 1325 (11th Cir.

14   1998).  *United States v. Causey*, No. H-04-025-SS, 2005 U.S. Dist. LEXIS 39619, at *14 (S.D. Tex.

15   Dec. 29, 2005).  In *Adler*, the Eleventh Circuit held that an "insider's 'knowing possession' of

16   material, nonpublic information raises a 'strong inference' that the defendants used that information

17   in trading, sufficient to make a prima facie showing of liability that the defendant could rebut.  *Id.*

18   Under Rule 10b-5-1, the presumption may only be rebutted with specific affirmative defenses, which

19   Ellison cannot satisfy in this case.  17 C.F.R. §240.10b-5-1(c).  Plaintiffs can therefore satisfy their

20   burden by showing that Ellison was "aware of" material non-public information when he sold his

21   stock. 17 C.F.R. §240.10b-5-1(b).  As discussed below, he was aware of exactly that when he sold.

22          **1.    When Ellison Traded, He Knew that Oracle's U.S. License**
             **Divisions Had Experienced Severe Negative Growth Rates**

23

24         Undisputed facts show that when Ellison traded, he knew that Oracle's U.S. license divisions

25   (representing 50% of Oracle's license revenues) had experienced severe negative growth rates and

26   that Oracle's total revenue growth rate was flat year-over-year (compared to 25% license growth that

27   Ellison projected for investors).  Ex. 6.  On January 17, 2001, Larry Garnick e-mailed Ellison,

28   informing him that that through December 2000, license growth was ***negative*** 24% in NAS and

1  *negative* 81% in OSI (the two U.S. divisions responsible for Oracle's 3Q01 miss, and which account

2  for, on average, 40% of Oracle's total license revenues).  *Id.*  OPI's license growth was *negative*

3  85% after adjusting for Covisint.  *Id.*  Through that first month of 3Q01, OPI had sold only

4  $3 million worth of product (after adjusting for Covisint), NAS had sold only $30 million, and OSI

5  had sold only $2.5 million (less than 5% of their combined forecast of $770 million for the quarter,

6  excluding Covisint).  *Id.*  Given the size of the U.S. license divisions (NAS, OSI, and OPI

7  represented 25%, 15% and 10% of total license revenues, respectively), these negative results caused

8  Oracle's total company license revenue growth rate  to be only 1% year-over-year (compared to 25%

9  guidance). *Id.*

10        In addition, Garnick explained that after adjusting for Covisint (because of its size and one-

11  time nature), Oracle's total company applications products growth was a dismal *negative* 46%

12  compared to the 75% license growth that Ellison projected for investors.  *Id.*  Growth trends in both

13  applications and database were even more dismal in Oracle's U.S. divisions (where its miss in 3Q01

14  occurred).  *Id.*  Through December 2000, excluding Covisint, Oracle's U.S. license divisions had

15  sold *less than $1.3 million in applications product* (compared to a forecast of $323 million without

16  Covisint).  *Id.*  This amounted to *negative* 92% applications license growth in the U.S. divisions.  *Id.*

17  The database growth in the U.S. divisions was *negative* 34% even with Covisint and *negative* 44%

18  without.  *Id.*  All of this information was received and read by Ellison within 36 hours of his sudden

19  decision to unload stock.  *Id.*; Ex. 3 at 300606; Ex. 128 at 76:25-77:12.  Ellison was therefore "aware

20  of" this information within the meaning of Rule 10b-5-1 at the time that he decided to trade.  17

21  C.F.R. §240.10b-5-1.

22        Ellison knew that this information was material and precluded him from trading.  When

23  asked in deposition "what sort of inside information would prevent [you] from trading in Oracle

24  stock," Ellison testified directly that adverse results in one of Oracle's major license divisions "*after*

25  *the end of the first month*" would be the type of information that would preclude him from trading:

26        "There were some fundamental – there was a massive drop in our – in our sales in
        Europe suddenly in the middle of a quarter – *or after the end of the first month*.

27        Sales in Europe were zero, you know.  It was – some – some substantial material
        financial event occurred during the quarter.  That would have required me not to

28        trade."

Ex. 129 at 43:25-44:6.  Sales in Europe contributed less to Oracle's license revenues than did its NAS and OSI divisions, which were responsible for Oracle's miss in 3Q01, and which had severe, negative growth trends and generated only $33 million in sales after the end of the first month of the quarter (just 5% of the revenue they were forecasting for the quarter).  Ex. 6.  This information was not only material under Ellison's own definition, but it is also material information that investors would consider important under the securities laws.  No reasonable trier of fact could conclude, on these facts, that Ellison did not possess material non-public information when he sold.

### 2. When Ellison Traded, He Knew that Oracle's Pipeline Had Collapsed

Undisputed facts also establish that on the day that Ellison started to trade, he knew that Oracle's pipeline had collapsed by $311 million and that nearly the entire collapse ($297 million) had come from lost applications deals, which Oracle intended to have drive its database sales and which accounted for 31.5% of Oracle's public guidance.  Exs. 34, 94, 104; Ex. 30 at Exs. 7 & 20.  In fact, Oracle's pipeline had collapsed by $328 million in the last two weeks of December (down from 52% growth to 34% growth) and by $544 million by February 5.  Ex. 30 at Ex. 20.  This pipeline collapse contrasted with significant increases in the pipeline in 3Q00 – the quarter that Oracle used for comparison.  Ex. 30 at Ex. 20.  In addition, the "comfort gap" that Ellison relied on to gauge the health of Oracle's financial prospects (and which was directly affected by movements in the pipeline) was much smaller than usual and had been negative for weeks before he started trading.  Ex. 30 at Ex. 13.  As reflected on the first page of the Upside Report that Ellison received every Monday during the Class Period, Oracle was forecasting revenue growth to grow faster than its pipeline – *i.e.*, its opportunities to sell – for half of December and January.  Ex. 30 at Ex. 13.  Under these circumstances, Ellison knew that it was "incautious to . . . forecast sales growth without underlying pipeline growth."  Ex. 100 at 86:21-87:5.  When Ellison was trading, Oracle was doing just that.  Ex. 30 at Ex. 13.

The status of Oracle's pipeline (especially the collapse in the very troubled product that was supposed to drive Oracle's growth) was material given defendants' repeated representations that Oracle was not being adversely affected by the economic downturn and would make guidance

1  because of Oracle's "astounding pipeline." Ex. 10 at NDCA-ORCL 003224; Ex. 130 at NDCA-

2  ORCL 005787; Ex. 15 at NDCA-ORCL 141677; Ex. 131 at NDCA-ORCL 003309; *see also Hanon*

3  *v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) ("The investing public justifiably places

4  heavy reliance on the statements and opinions of corporate insiders."). Given defendants' repeated

5  reference to the pipeline, there is a substantial likelihood (if not a certainty) that a reasonable

6  investor would consider the pipeline collapse (especially the applications pipeline collapse)

7  important and that it would have significantly altered the total mix of information available. *Id.* No

8  reasonable trier of fact could conclude, on these facts, that Ellison did not possess material non-

9  public information. This is especially true since he knew at the same time that Oracle's U.S. license

10  divisions had reported severe negative growth rates and negative growth rates in both database and

11  applications sales. *Tellabs*, 168 L. Ed. 2d at 195 (court must view the evidence holistically instead

12  of in isolation).

13                    **3.    When Ellison Traded, He Knew that Oracle's Public Guidance**
                             **Was Unreliable Because of Significant Internal and External**
14                           **Changes**

15          Undisputed facts also show that Ellison knew that Oracle's public guidance was unreliable.

16  He testified that in times of changing conditions, Oracle's forecasting process becomes inaccurate

17  due to its basis in historical trends – "Our forecasting does statistical extrapolations based on

18  historical trends. ***If something that's outside our mathematical model of business changes, . . . our***

19  ***forecasting becomes inaccurate.***" Ex. 26 at 384:6-385:7. By the start of 3Q01, Ellison knew that

20  Oracle was facing significant changes (both inside and outside the Company) that rendered Oracle's

21  forecasting process and its public guidance unreliable.

22          As Ellison testified in deposition, he knew that Oracle's forecast would become inaccurate in

23  the face of a major macroeconomic change. *Id.* Between 3Q00 and 3Q01, as Ellison knew, Oracle

24  was facing just that. In fact, he told investors at the beginning of the quarter that there was an

25  "economic slowdown," but added that it wasn't "hurting Oracle." Ex. 12 at Ex. B. But at the very

26  time that he made this statement, Ellison knew that the NASDAQ had collapsed and that Oracle's

27  dot.com business had rapidly evaporated as a result. Ex. 30 at 4-8. In fact, Oracle's dot.com sales

28  were projected to be $70 million less than they were in 3Q00 because many dot.coms had

PLTFS' NOT OF MOT & MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ         - 28 -

1   disappeared and Oracle had already sold its technology to the top-tier dot.coms. Ex. 50 at 78:7-18.

2   Repeated statements by Ellison and Henley acknowledge the economic slowdown in 3Q01, and

3   Ellison admitted in deposition that he knew about the dot.com collapse at the beginning of the

4   quarter: "Q. Hadn't you actually seen an effect of the downturn in the economy in Oracle's dot.com

5   sales by Q3'01? A. Oh, I'm sure we had, I'm sure we had." Ex. 51 at 178:9-179:1. This is in direct

6   contrast with 3Q00, when the NASDAQ was at its height, sales to top-tier dot.com companies were

7   booming, and Oracle exceeded its forecast by so much that it made for very difficult comparisons in

8   3Q01. Ex. 30 at 4-8; Ex. 36 at NDCA-ORCL 1914019; Ex. 37; Ex. 33 at 185. In fact, Ellison also

9   knew that Minton's extrapolated Potential Forecast was unreliable because she was projecting that

10  Oracle would close as high a percentage of deals as it had in the boom economy of 3Q00 (despite the

11  fact that conversion ratios had been lower throughout FY01). These were material adverse facts that

12  a reasonable investor would consider important when deciding to trade. Ex. 48.

13          Ellison also knew of another significant fact that undermined Oracle's public guidance –

14  Ellison changed the forecast process immediately before issuing guidance to investors. Ex. 31;

15  Ex. 79 at NDCA-ORCL 151961. Internal communications show that Ellison directed the Field to

16  increase the amount of their forecast (necessarily adding more risk) and that the Field followed this

17  directive – "we will incorporate [Ellison's directive] in our OSO 11i training that is tentatively

18  scheduled for the week of 10/23." Ex. 31. The purpose of Ellison's directive was to make the Field

19  Forecast more accurate by eliminating the practice in the Field of "sandbagging" their forecasts.

20  Ex. 20 at 101:8-18; Ex. 31; Ex. 79 at NDCA-ORCL 151961. Despite this change, Oracle's sales

21  divisions told Ellison each and every week before he traded that Oracle would achieve no more than

22  10.7 cents per share for the quarter even though Ellison had projected to investors that Oracle would

23  earn 12 cents per share. Ex. 30 at Ex. 12; Ex. 10 at NDCA-ORCL 003222. Ellison was in

24  possession of this information when he traded and it was material information that investors would

25  consider important.

26          Finally, Ellison knew (based both on the major macroeconomic change and on the change in

27  Oracle's product mix) that the basis for Minton's Potential Forecast, the historical conversion ratio,

28  was no longer a reliable metric with which to extrapolate, and that the Potential Forecast was

1  therefore inaccurate and unreliable.  Undisputed facts show that Oracle's pipeline in 3Q01 contained

2  a higher percentage of applications deals (and thus a lower percentage of technology deals) than it

3  had in 3Q00, and that applications opportunities converted at a much lower rate than Oracle's

4  technology opportunities.  Ex. 29 at Exs. 6 & 7.  The differences were dramatic – applications

5  converted at a historical rate of 38.7% while technology converted at an historical rate of 63.3%.

6  Ex. 29 at Ex. 7.  Despite this change, Ellison knew that Minton extrapolated using the historical

7  conversion ratio achieved in the prior year to add upside to the riskier Field Forecast and that Minton

8  was predicting that Oracle would convert practically the same percentage of the pipeline as it did in

9  3Q00.  Ex. 26 at 384:6-385:7; Ex. 28 at 211.  This was true even though, as defendant Henley

10  testified, the pipeline was "too good to be true." Ex. 83 at 354:15-355:3.  At the time he traded,

11  Ellison knew that the significant change in product mix rendered Minton's Potential Forecast

12  unreliable and unreachable.  Ex. 29 at Ex. 6 and 7.  He was therefore in possession of material

13  adverse information at the time he sold.  *TSC Indus.*, 426 U.S. at 449; *Basic*, 485 U.S. at 231-32.

14       At the time he traded, Ellison knew that Oracle was experiencing significant changes that

15  undermined the reliability of Oracle's forecast process.  There is more than a substantial likelihood

16  that a reasonable investor would consider important the fact that Oracle's forecasting process had

17  become unreliable in the face of these changes.  In fact, there is no doubt that the information would

18  have significantly altered the total mix of information available, especially considering Oracle's

19  aggressive public guidance.  Ellison was therefore "aware of" material non-public information at the

20  time he traded within the meaning of Rule 10b-5-1.

21           **4.    When Ellison Traded, He Knew that Oracle Would Not Meet
                      Its Applications Growth Guidance Because of the Problems
22                   with Oracle's 11i Suite**

23       Undisputed facts also establish that Ellison knew that problems with Oracle's Suite 11i

24  adversely affected Oracle's customers and its ability to convert its applications pipeline.  Ellison

25  admitted in *Softwar* that he was responsible for releasing 11i too early and that he included untested

26  critical modules despite knowing that "it was much too risky to put in the suite." Ex. 62 at 192.

27  Ellison admitted that "the first year of selling the 11i suite [including while he was trading] was the

28  hardest year" because Oracle did not have customer references – "It's difficult to sell without

customer references." Ex. 71 at 249. Oracle had virtually no 11i customer references as of November 2000 (only two months before Ellison traded), and during the Class Period Ellison's executives told him that sales representatives were reluctant to sell the CRM module of the suite because of the quality issues – "we are loosing [sic] a bit of momentum [with CRM]; sales people are reluctant to engage [due] to the product problems, lack of references, and local language issues." Ex. 66. This occurred in Europe and in the U.S. Ex. 60 at 68:7-74:1; Ex. 66; Ex. 67. And, as Ellison knew, Oracle's inability to effectively demonstrate 11i cost Oracle valuable business – if demonstrations "do not improve it will *continue to* impact our conversion rate." Ex. 73. Ellison admitted in deposition that he knew about the problems with 11i demonstrations. Ex. 75 at 105:7-8; Ex. 74 at 273:3-12. And he knew that through December, Oracle's U.S. license divisions had sold less than $1.3 million worth of applications product without Covisint (compared to a forecast of $323 million without Covisint) and that the U.S. division had experienced a negative 92% growth rate in applications without that one-time transaction (compared to forecasted growth of 66%). Ex. 6. He was therefore in possession of material adverse information when he sold his stock.

Despite the effect that 11i's problems were having on Oracle's applications conversion rate, Ellison also knew that Oracle was forecasting a much higher percentage of its revenues to come from applications deals than it had in the past. In contrast to the 18% that applications contributed to Oracle's results in 3Q00, Oracle's Potential Forecast was projecting applications to contribute more than 30% to Oracle's 3Q01 results at the time Ellison was trading, *even though Oracle's applications pipeline had collapsed by $328 million by that time*. Ex. 30 at 85. *Id.* at Ex 7; *Id.* at Ex. 20. Ellison knew from his experience with selling applications products that the conversion ratios for those products (even those that did work) had historically been significantly lower at Oracle – 38% for applications compared to 63% for technology sales. Ex. 29 at Ex. 7. Indeed, defendants' expert George Foster cited evidence showing that the sales cycle for applications products is much longer for applications deals than for database deals and Ellison admitted in *Softwar* that "our database sales force was not very good at selling applications." Ex. 132 at ¶¶38-39; Ex. 55 at 114. Given Oracle's focus on applications in 3Q01 and the adverse affect that 11i was having on Oracle's applications conversion rate, Ellison knew that its 75% projection was unreliable

1   and unreachable.  This was especially true given Ellison's knowledge about the collapsing pipeline

2   and the **negative** growth rates in applications revenue through December 2000 after adjusting for

3   Covisint (**negative** 92% in the U.S. divisions).  Ex. 30 at Ex. 20; Ex. 6.

4        These undisputed facts establish that Ellison was in possession of material adverse

5   information when he sold his stock.  These facts would certainly have been important to investors

6   and would have altered the total mix of information available, especially because Oracle had

7   projected 75% applications growth and hyped 11i as the product that would save Oracle from the

8   slowing economy.  Ex. 10 at NDCA-ORCL 003221-22; Ex. 12 at Ex. B.  No reasonable trier of fact

9   could conclude, on these facts, that Ellison was not "aware of" material non-public information

10  when he sold his stock.

11       **D.     Ellison's Trades Were Suspicious in Timing and Amount**

12       The Ninth Circuit has already held that Ellison's stock sales support an inference of scienter

13  in this case.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir.

14  2004).  The Court acknowledged that "[s]tock trades are only suspicious when 'dramatically out of

15  line with prior trading practices at times calculated to maximize the personal benefit from

16  undisclosed information.'"  *Id.* (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th

17  Cir. 1999)).  And it noted that "[t]o evaluate suspiciousness of stock sales, we consider, *inter alia*,

18  three factors: (1) the amount and percentage of shares sold [by insiders]; (2) the timing of the sales;

19  and (3) consistency with [the insider's] prior trading history."  *Id.*

20       The Court specifically analyzed Ellison's sales using these factors.  It explained that "[i]n the

21  past, we have given great weight to the percentage of stock sold."  *Id.* at 1232.  But it added that

22  "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the

23  fact that they may represent a small portion of the defendant's holdings."  *Id.*  Not only did the Court

24  hold that the size of Ellison's trades "present[ed] a novel situation," but it also found that the timing

25  was suspicious because, as the Court explained, "Ellison sold his shares between January 22 and

26  January 31, 2001, approximately one month prior to the March 1 report of lower-then-expected

27  sales."  *Id.*  It also added that "Ellison's January 2001 trades [were] highly inconsistent with his prior

28

1  trading history" because he "had not sold any of his Oracle stock for five years."  Under these

2  circumstances, the Court held that Ellison's sales "support a strong inference of scienter."  *Id.*

3      The facts have not changed nor have they become disputed.  In fact, as discussed below, the

4  timing of Ellison's trades reveal that he possessed material adverse information and actually used

5  that information to unload 29 million shares of his stock in violation of the federal securities laws.

6      **1.**    **Ellison's Sales Were Dramatically Out of Line with His Prior Trading Practices and Were Timed to Maximize His Personal Benefit**

7

8      Ellison's trades were dramatically out of line with his prior trading practices and were timed

9  to maximize his personal benefit.  Defendants do not (and cannot) dispute that Ellison had not sold

10  stock for five years prior to unloading 29 million shares on investors.  Ex. 110 at 28:2-4.  Those facts

11  have not changed.  Ellison's historical trading practices and the dramatic change from that practice

12  during the Class Period support a finding that Ellison traded on the basis of inside information and

13  acted with scienter.  *Oracle*, 380 F.3d at 1232; *see also In re Secure Computing Corp.*, 184 F. Supp.

14  2d 980 (N.D. Cal. 2001) (sales found suspicious where insider had never previously sold from his

15  company holdings); *In re Omnivision Techs.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at

16  *15 (N.D. Cal. July 29, 2005) (trading found suspicious where traders "more than doubled the

17  relative proportion of their shares they sold during the class period").

18      Ellison's trades were also suspicious in timing and were designed to maximize his personal

19  benefit from material non-public information.  Not only did Ellison sell "one month prior to the

20  March 1 report of lower-than-expected sales" as the Ninth Circuit found compelling, but he also sold

21  ***less than 36 hours*** after Larry Garnick informed him that Oracle's U.S. license sales had

22  experienced severe negative growth rates, that its applications revenues without Covisint were

23  ***negative*** 92%, and that its NAS and OSI license divisions had sold only $33 million (5% of their

24  $645 million forecast) in product through the first month of the quarter and had growth rates of

25  ***negative*** 24% and ***negative*** 81%, respectively.  Ex. 6.  These undisputed facts establish Ellison's

26  scienter and that he traded "on the basis of" material nonpublic information within the meaning of

27  Rule 10b-5-1.  17 C.F.R. §240.10b-5-1(b); *United States v. Atul Bhagat*, 436 F.3d 1140, 1148 (2006)

28  (insider traded on the basis of material non-public information where he received adverse

1  information by e-mail and had an opportunity to read the e-mail before making the suspicious stock

2  trade).

3    Undisputed evidence also establishes that Ellison traded because of this information.  Not

4  only was he "aware" that Oracle's U.S. license divisions had reported adverse results, but his actions

5  ~~after he learned of those results also show that he used that non-public information to maximize his~~

6  personal benefit.  Ex. 6.  Internal correspondence show that prior to January 19, 2001, Ellison had

7  planned to sell stock in April or August of 2001, and had preliminarily decided to trade in April

8  because of the tax benefits to Oracle from doing so.  Exs. 4 and 5.  Prior to Ellison's sudden decision

9  on January 19, there was absolutely no discussion either inside or outside Oracle that Ellison planned

10  to sell in January 2001.  Ex. 3 at NDCA-ORCL 300606.  It was only after Ellison received the

11  dismal results from Garnick that he unexpectedly instructed his financial advisor to start unloading

12  40 million shares immediately.  *Id.* Ex. 6.  Doing so put Ellison in the enviable position of having

13  been one of the last investors to sell Oracle stock above $30 per share.  The timing of his sales,

14  which occurred at the peak of Oracle's stock price, establish Ellison's scienter and that he traded on

15  the basis of material non-public information.  *TSC Industries, Inc.*, 426 U.S. at 449.

16    The foregoing facts, which are indisputable, preclude any finding other than that Ellison

17  traded on the basis of material non-public information in violation of §§10(b) and 20A of the

18  Exchange Act.  No reasonable juror could find for Ellison given these facts.

19      **2.    The Amount and Percentage of Shares Sold by Ellison Was
              Unusually Large**

20

21    The Ninth Circuit in this case has also held that "where, as here, stock sales result in a truly

22  astronomical figure, less weight should be given to the fact that they may represent a small portion

23  of the defendant's holdings."  *Oracle*, 380 F.3d at 1232.  District Courts have since followed this

24  "astronomical figure" analysis.  In *Johnson v. Aljian*, the court distinguished earlier cases on the

25  grounds that "there is no indication that any of the above-cited cases involved amounts – in terms of

26  shares sold or proceeds received – nearing the over 7.5 million shares or over $660 million in

27  proceeds" at issue in that case, and found the huge value of the proceeds of the sale "significant

28  evidence of scienter."  *Johnson*, 394 F. Supp. 2d at 1199-200 & n.10 (distinguishing *In re Vantive*

1   *Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th

2   Cir. 2001); *Silicon Graphics*, 183 F.3d at 987-88, finding that "even to a multi-billion dollar

3   corporation, [$661.6 million in net proceeds] is a significant amount").   The same is true here.

4   Between January 22, 2001 and January 31, 2001, Ellison sold 29,084,576 shares at an average price

5   ~~of $30.5697 per share, realizing gross proceeds of $895,087,692.  Ex. 7.  The astronomical figure~~

6   makes Ellison's stock sales suspicious in amount.  *Oracle*, 380 F.3d at 1232.

7        Ellison's massive trading must also be viewed in light of market limitations and SEC rules.

8   SEC Rule 144 provides that within any three-month period, an "affiliate" may not sell more than the

9   greater of "[o]ne percent of the shares . . . of the class outstanding" or "[t]he average weekly reported

10  volume of trading."  17 C.F.R. §230.144(e).  Pursuant to Rule 144, Ellison could have sold only up

11  to 178,013,050 shares.  *Id.*  He was also limited by the effect his trading had on the market.  He

12  directed his trader to take up no more than 10%-15% of a day's trading; otherwise, he would have

13  affected the share price.  Ex. 111 at 65:4-67:19; Ex. 3; Ex. 112 at 50:5-52:20.  He authorized traders

14  to trade up to 40 million shares of stock if they could sell at or above $30 per share.  *Id.*  Thus,

15  Ellison authorized trading of up to 22.47% of the amount he was allowed to sell by SEC Rule 144

16  during that period.  Ex. 3; 17 C.F.R. §230.144(e).  The fact that he was able to sell 16.34% of the

17  maximum allowed by the SEC rule supports a finding of scienter and that Ellison traded on the basis

18  of inside information.  Ex. 7; 17 C.F.R. §230.144(e).  Ellison sold as much stock as he could

19  possibly sell without adversely affecting the price of Oracle's stock and his overall holdings.

20        **3.     Ellison's Use of Proceeds Establish that Ellison Acted with
                Scienter**

21

22        Ellison's use of proceeds also compels a finding that he sold to maximize his personal benefit

23  and acted with scienter.  In *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), the Ninth Circuit

24  recognized that an insiders' reasons for selling – "that they wanted to reap financial benefits for

25  personal reasons" though retirement – supported a finding of scienter.  *Id.* at 1380.  The court noted

26  that the desire to sell stock to fund retirement "would give substance to the contention that the

27  alleged misrepresentations and omissions were deliberate."  *Id.*  In other words, explanations by

28  insiders for why they sold their stock can serve to support an inference of scienter.  *Id.*

1    In this case, Ellison's explanations paint a more compelling picture of scienter than in *Kaplan*

2  – he told inconsistent stories about who he spoke to about his sales and why he sold. Ellison's initial

3  explanations in response to discovery in the derivative case were that he spoke to no one regarding

4  his sales. Ex. 118 at NDCA-ORCL 609922. Then, he changed his story and testified in deposition

5  that he spoke to Simon. Ex. 119 at 378:1-14. But Simon explained that he did not learn about

6  Ellison's desire to trade until January 19, 2001, when he received Ellison's instruction. Ex. 3 at

7  NDCA-ORCL 300606. Next, Ellison testified that he took Simon's advice to pay down debt and

8  diversify. Ex. 120 at 609765. Then an article titled "Absolutely Excessive" revealed that Ellison

9  used much of the proceeds from his sales to fund the construction of the longest privately-owned

10  yacht in the world ($250 million) and to pay for the "costliest American home built for a private

11  individual since William Randolph Hearst's grandiloquent San Simeon." Ex. 121 at 318 & 323. His

12  Woodside Japanese village home came in at well over $100 million. Ex. 123 at 369-70.

13    If the desire to sell stock to fund retirement can give substance to a finding that the alleged

14  misrepresentations and omissions are deliberate, Ellison's changing story supports a finding at

15  summary judgment that Ellison sold at sensitive times to maximize his personal benefit. This is

16  especially true since he was supposed to use the proceeds to pay down debt and diversify, but instead

17  funded his lavish and "absolutely excessive" lifestyle. No reasonable juror could find that Ellison's

18  sales were motivated by anything other than to maximize his personal benefit. The suspicious

19  timing, amount, and use of proceeds warrants a finding that Oracle violated the federal securities

20  laws by trading on the basis of material non-public information.

21    **E.    The Wholesale Destruction of Documents Evidencing Ellison's**
22    **Knowledge and Mental State Is Further Evidence of Scienter**

23    Plaintiffs have presented such compelling evidence that Ellison sold Oracle stock on the basis

24  of adverse material non-public information that no reasonable juror could find otherwise. This is

25  despite defendants' wholesale destruction of evidence regarding Ellison's knowledge and mental

26  state during the Class Period. Defendants have destroyed Ellison's e-mails and files, the databases

27  that he relied on during the Class Period for information regarding the state of Oracle's business, the

28

1    website containing his public statements, and the tapes and transcripts of hundreds of hours of

2    interviews, created during and directly following events at issue in this litigation.

3         Beginning less than two months prior to Ellison's insider trading and continuing for almost

4    two years after, Ellison granted exclusive one-on-one interviews (at least 135 hours) to journalist

5    Matthew Symonds for the book *Softwar*.[13]  Ex. 133 at NDCA-ORCL 1529371-72; Ex. 38.  For

6    almost two years (the majority of the interviews occurred in the first year), Ellison consistently

7    discussed with Symonds the events at issue in this litigation, including the dot.com bubble burst, the

8    release of 11i and the subsequent "eighteen months of hell" that followed, Oracle's forecasting

9    process, Oracle's billion dollar savings claim, and even this litigation itself.  *Id.*; Ex. 134 at 2 & 6

10   (Special Master's Order finding that *Softwar* "is ***clearly relevant*** to the issues identified in the

11   Discovery Plan.") (emphasis added).  *See, e.g.*, Exs. 25, 28, 33, 46, 55, 58-59, 61-62, 65, 71-72, 77,

12   122-123.  In addition, Symonds was granted exclusive access to Oracle, its executives and past and

13   present employees.  Ex. 38; Ex. 133.  The Ellison interviews were memorialized both on audio tapes

14   and in transcripts.  Ex. 133.  Upon completion of *Softwar*, the tapes and transcripts were to be

15   returned to Ellison under the provisions of the contract between Symonds and Ellison.  Exs. 133,

16   135-136.



13      Ellison and Symonds are co-authors of *Softwar* and share joint copyright.  Ellison had the
right to comment on anything in the book that he disagreed with or wanted to clarify.  These
comments are incorporated as footnotes throughout the text.  Ex. 38; Ex. 133.

1
2
3
4
5
6

7    Ironically, excerpts from *Softwar* shed light on additional information that Ellison received

8    during the Class Period and should have been produced in this litigation.  In *Softwar*, Symonds

9    writes: "A typical day for Ellison starts when he gets up at about seven o'clock and checks his

10   overnight e-mails.  Unlike many CEOs, Ellison has only one e-mail address.  He gets more than a

11   hundred e-mails a day, most of which he answers himself or forwards to the appropriate person. . . .

12   Also part of the routine is a visit to Oracle Sales Online, which might prompt him to leave a message

13   questioning the status of a particular sales opportunity."  Ex. 46 at 286-87.  The basis for these

14   statements was Symonds's observation of Ellison's normal practices during and directly following

15   the Class Period.  Exs. 38, 133.

16   As a hands-on executive who received and responded to hundreds of e-mails a day, one

17   would expect a massive production of such e-mails and materials from Ellison's files.  It is shocking

18   to note, therefore, that less than 15 generic, mass-distributed e-mails have been produced from

19   Ellison's files, many of which are duplicates.  The total production of documents from Ellison's files

20   amounts to 663 pages (of which hundreds of pages are simply similar drafts of the same

21   document).[14]  Ex. 148.

22
23

24   [14]   Plaintiffs have captured some communications by Ellison from the files of other custodians.
25   These documents offer further evidence of the destruction of Ellison's files.  Many of these
     documents are e-mails either sent or received by Ellison *after* the filing of this action.  By that time,
26   at the very latest, defendants were under an affirmative obligation to preserve all potentially relevant
     communications with Ellison.  However, a mere handful of these e-mails were produced from
27   Ellison's files.  Had Ellison's files been preserved after the commencement of litigation, these
     documents would necessarily have been in them.  They were not.
28

1    Ellison testified that, unless he specifically copied himself on an e-mail, e-mails that he sent

2    would not have been retained because he had no outbox.  Ex. 149 at 303:10-305:10.  Indeed, the

3    default setting at Oracle during the relevant time period was for employees not to have an outbox.

4    Ex. 150 at 278:21-279:9.  Defendants did not instruct employees to change this default setting once

5    it became likely that a lawsuit would be filed (nor at any time after it was filed).  Ex. 151 at 320:20-

6    321:6.  As a result, e-mails sent by Ellison and others, even after the filing of this action, were not

7    preserved.

8         In addition, during the Class Period, Ellison bragged to customers and analysts about

9    Oracle's innovative new product, Oracle Sales Online, which allowed him to view up-to-the-minute

10   information regarding Oracle's sales and sales opportunities.  Specifically, he stated, "All of our

11   information is in one database.  We know exactly how much we have sold in the last hour around the

12   world."  Ex. 152 at NDCA-ORCL 135815.  Symonds, who accompanied Ellison throughout his

13   working day over the course of nine months in 2001, reported that Ellison utilized OSO on a daily

14   basis.  Ex. 46 at 287.  Clearly, plaintiffs are entitled to discover information that Ellison was viewing

15   on a daily basis during the Class Period to keep himself informed as to the status of Oracle's

16   business.  However, defendants have not only failed to preserve the OSO database, but have gone

17   one step further: they have purged all OSO back-up tapes.  Ex. 153 at 262:5-263:1.  Despite

18   Symonds' published representations (Ellison, despite his ability to do so, did not comment on the

19   truth of these representations in *Softwar* itself), Ellison has adamantly denied using OSO during the

20   Class Period.  Ex. 154 at 472:18-474:1.  However, not surprisingly, the only conclusive proof as to

21   whether Ellison utilized OSO during the Class Period – the OSO log-in records – have also been

22   destroyed.  Ex. 155 at 461:23-463:2.

23        In addition, during the Class Period, Oracle and Ellison maintained larryellison.com, which

24   contained transcripts and audio/video of Ellison's public statements, including interviews and

25   speeches.  Ex. 156 at NDCA-ORCL 297559; *see also* Ex. 157 at NDCA-ORCL 178069.  Although

26   Ellison informed the SLC in 2002 that in "Q3FY01, [larryellison.com] would have consisted of

27   transcripts of his interviews," at his deposition in this litigation he denied that the site was ever used

28   for any purpose.  Ex. 158 at 597:20-602:15; Ex. 156.  When confronted with a transcript of a speech

PLTFS' NOT OF MOT &  MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON
FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION - C-01-0988-MJJ          - 39 -

1  at Oracle AppsWorld in February 2001 in which Ellison informed his audience that he could even be

2  e-mailed at larryellison.com, Ellison denied having made the statement – "I never said that."

3  Ex. 159 at 606:6-9. A video of that speech (produced by Oracle only after plaintiffs demanded it at

4  that deposition, despite defendants' duty to produce it at the outset of discovery), however, confirms

5  that Ellison did make the statement. Given Ellison's lies regarding the website, it is not surprising

6  that since the inception of this lawsuit, larryellison.com has been taken down and the underlying

7  information has been destroyed. Ex. 160 at 78:12-79:21, 97:6-14.

8      Defendants have failed to preserve and have ultimately destroyed Ellison's emails, his files,

9  the files of those that he communicated with, the databases that he used to gather additional

10  information (and all records of his access of those databases), records of his public statements, and

11  hundreds of hours of clearly relevant tapes and transcripts of interviews with Ellison, created almost

12  simultaneous with the events at issue in this litigation.[15] Defendants' attempt to cover up Ellison's

13  obvious fraud through the wholesale destruction of evidence regarding Ellison's knowledge and

14  mental state, is further strong evidence of Ellison's scienter.

---

[15] *See also* Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants' Destruction of Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006 Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence.

IV.   **Conclusion**

Because there are no genuine issues of material fact related to plaintiffs' §§10(b) and 20A claims that defendant Ellison traded on the basis of material non-public information, plaintiffs' Motion for Summary Judgment should be GRANTED.

DATED: October 9, 2007                    Respectfully submitted,

                                COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP
                                SHAWN A. WILLIAMS
                                WILLOW E. RADCLIFFE
                                MONIQUE C. WINKLER
                                ELI R. GREENSTEIN
                                DANIEL J. PFEFFERBAUM


                                        /s/
                                SHAWN A. WILLIAMS

                                100 Pine Street, Suite 2600
                                San Francisco, CA 94111
                                Telephone: 415/288-4545
                                415/288-4534 (fax)

                                COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP
                                MARK SOLOMON
                                DOUGLAS R. BRITTON
                                STACEY M. KAPLAN
                                655 West Broadway, Suite 1900
                                San Diego, CA 92101
                                Telephone: 619/231-1058
                                619/231-7423 (fax)

                                Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\BRF00046278_MSJ_redacted.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 9, 2007.

/s/ Shawn A. Williams
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:shawnw@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111