COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
       – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates To: | |
| ALL ACTIONS. | |

Master File No.  C-01-0988-MJJ

<u>CLASS ACTION</u>

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

DATE:          November 16, 2007
TIME:          1:30 p.m.
COURTROOM: The Honorable Martin J. Jenkins

**PREVIOUSLY FILED ON JULY 26, 2007 (DOCKET NO. 867)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND FACTUAL OVERVIEW ...........................................................1

    A.  Undisputed Facts Support Entry of Partial Summary Judgment on Misrepresentations Concerning the Functionality of Oracle's E-Business Suite 11i. ......................................................................................................1

    B.  Undisputed Facts Support Entry of Partial Summary Judgment on Oracle's Misrepresentation of Its 2Q01 Revenue and Earnings Results..............................5

II.  STANDARD ON SUMMARY JUDGMENT ..............................................................7

III.  ARGUMENT ...........................................................................................................8

    A.  There Is No Genuine Dispute of Material Fact About Whether Oracle's Revenues and Earnings in 2Q01 Were Overstated by at Least $0.01 Per Share ...............................................................................................................10

    B.  Undisputed Facts Demonstrate that Defendants Were Aware of Oracle's Misuse of Debit Memos and Customer Overpayments to Inflate Oracle's 2Q01 Financial Results ...................................................................................13

        1.  Undisputed Facts Demonstrate that Oracle Used a Systematic Process to Intentionally "Sweep" Debit Memo Overpayments to Oracle's Bad Debt Reserve and Revenue Accounts in 2Q01 to Inflate Oracle's Financial Results..................................................16

        2.  Undisputed Facts Demonstrate that Oracle Knew About the Fraudulent $20 Million in Transfers to Oracle's Revenue and Income Prior to Oracle's Earnings Announcement on December 14, 2000 and Knew Oracle Needed Those Transfers to Beat Wall Street Expectations...................................................................19

        3.  Undisputed Facts Demonstrate that the November 2000 Debit Memo Clean Up Was Part of Oracle's Attempt to Conceal Its Accounting Manipulations and Its Huge Cache of Customer Overpayments to Inflate Earnings ............................................21

    C.  Undisputed Facts Surrounding Oracle's 2002 Unapplied Cash Clean Up Demonstrate Defendants' Fraudulent Intent........................................................22

        1.  Oracle's Clean Up Meetings in October 2002.........................................22

        2.  Conflicting and False Testimony from Oracle's Current CFO, Jennifer Minton, Demonstrates Oracle's Knowledge of Its Improper Conduct ..............................................................................27

        3.  Oracle's Process of Adjusting Up Invoices Demonstrates Fraudulent Intent..............................................................................29

1

2                                                                                                    **Page**

3       D.      Undisputed Facts Demonstrate that Suite 11i Was Not Fully Integrated
                and Interoperable Out-of-the-Box, Nor Was 11i Easy to Install and Did
4               Not Help Save Money Fast ...................................................................................31

5               1.      Defendants Knew that Suite 11i Did Not Work in a Fully
                        Integrated Fashion Because Oracle Could Not Even Demonstrate a
6                       Fully Integrated Functioning Suite to Potential Customers and Lost
                        Sales ..........................................................................................................31
7
                8.      Undisputed Facts Demonstrate that Defendants Knew that Suite
8                       11i Did Not Work and Suite 11i Customers Demanded Cash
                        Concessions ...............................................................................................33
9
        E.      Suite 11i Did Not Work in Every Language Undisputed Facts
10              Demonstrate and Defendants Knew It ...................................................................37

11      F.      Undisputed Facts Demonstrate that Oracle Knew that Its Internal Upgrade
                to Suite 11i Had Shut Down the Company for Two Weeks and Cost
12              Oracle Millions in 3Q01 Revenue .........................................................................40

13      G.      Oracle Knew that It Had Not Fully Tested Whether Suite 11i Worked in
                an Integrated Fashion and Never Tested the Order Management Module –
14              at All – Which Was Crucial to Performing Integrated Business Flows ...............42

15      H.      Internal Software Development Documents Demonstrate that Two Years
                After Release Suite 11i Was Still Not Fully Integrated .........................................46
16
        I.      Disclosure of Oracle's True Financial Condition Proximately Caused
17              Plaintiffs' Economic Loss ......................................................................................48

18  IV.     CONCLUSION ..................................................................................................................51

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

[Insert Table of Authorities **here**]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO:  ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on November 16, 2007, plaintiffs will and do hereby move this Court for an order granting their Motion for Partial Summary Judgment ("Motion") pursuant to Fed. R. Civ. P. 56(c) and Civ. L.R. 56.  The motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, the Appendix of Exhibits, pleadings and evidence submitted herewith and any other information submitted before or during the hearing on this matter.

I.      INTRODUCTION AND FACTUAL OVERVIEW

A.      Undisputed Facts Support Entry of Partial Summary Judgment on Misrepresentations Concerning the Functionality of Oracle's E-Business Suite 11i.

On May 24, 2000 Oracle Corporation ("Oracle" or the "Company") released its "revolutionary" E-Business Suite 11i ("Suite 11i"), which combined back office enterprise resource planning ("ERP") with front office customer-facing Customer Resource Planning ("CRM") software.  Prior to and during the Class Period (December 14, 2000 - March 1, 2001). Oracle sought to convince investors that sales of Oracle's Suite 11i would drive the Company's future revenue and earnings growth and more directly drive FY01 and 3Q01 revenue forecasts (including applications growth of 75% year over year).  To advance that theme, defendants repeatedly and falsely claimed that Suite 11i was a fully integrated[1] and interoperable suite of software applications that was fully functional "out-of-the-box" combining back office ERP software with front office CRM software.  On May 24, 2000, Oracle released Suite 11i, trumpeting its supposed capabilities that Suite 11i would  "eliminate... largest  cost  and  risk  factor  associated  with  enterprise  application implementations" because all of its components were fully integrated and interoperable out of the box, as opposed to the best of breed, stitched together solutions requiring systems integration and

---

[1]      Integration refers to the relationship between modules within a single product or suite of products.  Expert witnesses for both parties agree that "Integration" includes: 1) "data integration," 2) workflow integration, 3) functional integration, and 4) user interface integration.  Exhibit 130 at 35-41; Ex. 133 at 7-8.  (All exhibits are attached to the Appendix of Exhibits, filed concurrently herewith.)

huge resources to work.  Ex. 10.  Oracle claimed it was the **only** vendor to provide a suite that "combined tightly integrated ERP and CRM":

> Oracle Corp. today announced immediate availability of the Oracle(R) E-Business Suite 11i, the industry's first **fully-integrated** e-Business applications suite.[2] **The entire E-Business Suite is available today**, adding Customer Relationship Management (CRM) and Order Management components to the already available 11i financials, human resources, manufacturing, procurement, projects and supply chain offerings. **Oracle E-Business Suite 11i provides out-of-the-box integration of e-Business applications throughout the extended enterprise from customers and partners to suppliers**.

Ex. 10.

The Company further described the "out-of-the-box" availability of the Suite 11i Order Management module as

> **the critical component that enables orders to seamlessly flow from customer-facing operations through the supply chain**.

> \*          \*          \*

> **Oracle Order Management 11i is available immediately as a fully integrated component of the Oracle E-Business Suite**.[3]

Ex. 11.

Much of the representations in the initial release messages were plainly false.  As detailed below, Oracle's material misrepresentations concerning the functionality including the completeness, functionality and more specifically, the integration and interoperability of Suite 11i were repeated throughout the Class Period.  Indeed, the stated success of Suite 11i and Oracle's "integration" value proposition was material to investors and described as **the** feature that separated Oracle from other software vendors and high tech industry vendors, and which would insulate Oracle from any potential economic downturn.  According to Oracle, "earnings growth . . . will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i." Ex. 47.  The investment community had seized on whether the Company could deliver a fully integrated suite of applications and

---

[2]     The Company repeatedly represented that Suite 11i was a "**fully integrated**" suite of business applications comprised of CRM and ERP applications.  Exs. 12-13.

[3]     Mark Barrenechea testified that "available" means that "it's **tested, that it's functionally complete, documented**." Ex. 123 at 233:23-24.

1   defendant Larry Ellison specifically assured investors that the Company had delivered the finished

2   Suite 11i to customers.  For example, during the December 14, 2000 earnings conference call,

3   Ellison told investors that "It's getting clearer and clearer . . . that not only, we can deliver the suite,

4   **but we have delivered the suite**.").  Ex. 29 at NDCA-ORCL 234429.  Indeed, the future growth of

5   the Company's earnings and revenue and more importantly, investment value of Oracle's stock,

6   depended on the success of 11i.[4]  Further, for 2Q01, the Company reported 66% applications growth,

7   which according to some financial analysts "validat[ed] the notion that many corporate IT decision

8   makers really do prefer an integrated, comprehensive solution," and allayed early concerns about

9   early reports of bugs in the software.[5]  Ex. 31.

10         During the Class Period, defendants made the following key false and misleading statements

11   at issue in this motion:

12         (a)     December 14, 2000 Conference Call

13         [Y]ou can buy our complete E-Business Suite, where all the pieces are designed and
14         engineered to fit together, and no systems integration is required.  ***It's up and
            running in months.  You get the savings in months.[6]  It costs you less, and it takes
15         less time to install***.

16   Ex. 29 at NDCA-ORCL 234430.

17         (b)     January 9, 2001 Edward Sanderson statement reported by Salomon Smith
18         Barney:

---

19   [4]     Ex. 138 (October 10, 2000 First Union Securities Inc. report: "Oracle's premium multiple is
20   driven in parge part by the potential growth in its e-business applications"); Ex. 138 (November 6,
     2000 Solomon Smith Barney report "BZ-3 Enterprise" statement: "Oracle's valuation reflects the
21   realization of the projected revenues associated with its new e-business suite.").

22   [5]     *See* Ex. 32 (December 15, 2000 Deutsche Bank, Alex.Brown report: "Applications license
     growth of 66% solidly outpaced Street expectations in the 50-60% range.  The ***out performance
23   should also allay concerns about the viability of Oracle's, applications business and the relative
     immaturity of release*** 11i, following last quarter's decent, but slightly disappointing growth."); *see
24   also* Ex. 33 (December 15, 2000 Solomon Smith Barney report: "We anticipate the ***applications
     division will continue to accelerate*** given the Company has exhibited significant traction since
25   release of Version 2 of its E-business Suite in October.  We are under the impression that the first
     version had considerable bugs and the most recent version is really gaining traction.").

26   [6]     Ellison had reiterated the savings to be had by implementing Suite 11i at the November 29,
27   2000 Credit Suisse First Boston conference.  "So why would they go ahead and install the e-business
     suite?  I think if you want to save . . . ."  Ex. 25 at 26.

28

The suite is *pre-integrated and fully interoperable out of the box*, *helping to lower consulting costs and time-to-value*.

Ex. 40.

(d)     February 6, 2001

And because the CRM suite consists of true Internet applications, *every application works in every country, every major language, and every major currency*.

Ex. 46 at NDCA-ORCL 106691.

(e)     February 13, 2001

So not only do we have, you know, for example, an E- business Suite . . . *[b]ut it's basically ERP and CRM all integrated together.  But it's written in 23 different languages, including Spanish Spanish and Latin American Spanish, Portugal Portuguese and Brazilian Portuguese as being four different languages.  But we also have taken care of the localization requirements of all these countries around the world as well*. . . .

Ex. 49 at NDCA-ORCL 03285.

(c)     February 21, 2001

*Now the nice thing is it's like Lego blocks.  Once you have one piece in, the other pieces just snap together*.  There's no systems integration required.  *The key thing is, you can install just one piece and then again install another piece*.  No systems integration.  *You just basically turn it on or snap it together*.

                          *        *        *

It is absolutely, all the pieces within the suite are literally *plug and play*. . . .

Ex. 139 at 13-14.

For each of the Suite 11i statements set forth above, defendants knew but failed to disclose material facts wholly undermining the truth of accuracy of the statements.  For example, defendants knew that Suite 11i did not work[7] as represented, and (a) was not designed and engineered to fit together and work out-of-the-box – in fact, Suite 11i had never been fully tested to determine whether its ERP and CRM modules worked together and Oracle did not test the Order Management module at all; (b) customers were losing, not saving, money with Suite 11i, and disastrous

---

[7]     Edward Yourdon, Oracle's designated "expert" on the issues pertaining to functionality of Suite 11i, defined integration "for the end-user . . . as well as for IT professionals . . . simply means that the pieces or (components or modules) of the system 'work together.'"  Ex. 130 at 35.

1    implementations were costing customers and Oracle millions; (c) neither Suite 11i, nor its individual

2    CRM modules worked in every language and its failure to work in European, Middle Eastern, and

3    Asian languages actually hurt sales; and (d) the Company's own implementation of Suite 11i in

4    January 2001 was disastrous and contributed to the revenue shortfall reported on March 1, 2001.

5    These facts are not and cannot be disputed.

6         **B.    Undisputed Facts Support Entry of Partial Summary Judgment on
               Oracle's Misrepresentation of Its 2Q01 Revenue and Earnings Results**

7              Undisputed facts demonstrate that Oracle knowingly and materially misstated 2Q01 financial

8    results (for the three months ended November 30, 2000).  Through the unlawful conversion of

9    customer overpayment to revenue and earnings, the manipulation of the customer cash resulted in

10   the artificial inflation of 2Q01 earnings of $0.01 per share.  ¶35.  Specifically, plaintiffs allege that

11   Oracle accumulated over $100 million of unapplied cash from customer overpayments and duplicate

12   payments that it should have refunded to customers.   ¶41(b).  Plaintiffs also allege that Oracle

13   engaged in an "On Account Clean Up" in November 2000 (the "November 2000 Clean Up") and

14   created 46,000 fictitious "debit memo" invoices to improperly "apply" the millions in customer

15   overpayments to the debit memos and conceal Oracle's use of customer money to inflate revenue

16   and earnings in 2Q01.  ¶¶36-43.

17             On November 11, 2002, plaintiffs filed an Ex Parte Application providing additional

18   accounting allegations concerning the debit memos based on internal Oracle documents and

19   witnesses (the "November 2002 Allegations").  The November 2002 Allegations contend that Oracle

20   had a "long-standing practice of inappropriate use of customer's overpayments and unapplied cash

21   by doing so-called 'auto adjustments' of customer overpayments in its Unapplied Cash account and

22   ***applying the money to its bad debt accounts***."  Ex. 88, ¶6; *see also, e.g.*, Ex. 89 at 3-7.  The

23   November 2002 Allegations also claim that during 2Q01, Oracle personnel were under pressure to

24   "clean up" the unapplied cash accounts and devised the debit memo scheme to facilitate and conceal

25   the use of customer overpayments to revenue and earnings.  Ex. 88, ¶3.  Plaintiffs allege that "at the

26   end of a month, Oracle would run an 'auto adjustment' that would ***take money out of the Unapplied***

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ        - 5 -

1  *Cash account and would transfer it to the Reserve for Bad Debt account*," thereby "*inflat[ing] net*

2  *income*."  Ex. 88, ¶12.

3        The November 2002 Allegations also include internal Oracle e-mails and information

4  demonstrating that immediately after plaintiffs filed their debit memo accounting allegations on

5  October 11, 2002, Oracle held a flurry of special meetings and devised a plan internally dubbed the

6  "Unapplied Cash Clean Up" (the "2002 Clean Up") to alter and reverse the debit memo transactions

7  and the accounting manipulations that occurred in 2Q01 (and other quarters).  Ex. 89 at 4-7.  Indeed,

8  according to a former Oracle collections manager, Ian Hatada, who was directly involved in and

9  supervised aspects of the 2002 Clean Up, the entire project was initiated to "help Oracle" clean up

10  the debit memo and unapplied cash issues raised by plaintiffs in this lawsuit:

11      A.    From – from what I know from meetings that we had from – with Ryan
                  Roberts, *that there was a lawsuit and it was our job to clean up the*
12                 *unapplied plus what had been now moved in to the unapplied account from*
                  *other accounts because of the lawsuit, so in an effort to – to clean that up,*
13                 *to – to help Oracle with this lawsuit*.  That was what – my understanding.

14  Ex. 128 at 264:12-265:6.  Hatada also testified that one of the purposes of the 2002 Clean Up was to

15  address the "revenue impact" of Oracle's misuse of customer debit memo overpayments and

16  unapplied cash:

17      Q.    Now, correct me if I'm wrong, but I think you testified that this unapplied
                  cash project that you undertook in 2002 had a major revenue impact, is that
18                 correct?  Is that your understanding?

19      A.    *There was a possibility that it could have, and that's what I took out of our*
                  *meetings, especially the first meetings, that, you know, it could cause a big*
20                 *problem with revenue if we end up refunding all of this cash.*

21  *Id*. at 472:13-473:2; *see also id.* at 153:16-154:6.  Hatada also testified that Oracle intentionally

22  withheld refunds from customers if their overpayments were "revenue impacting."  *See id.* at 64:23-

23  68:20; *see also id*. at 139:6-11 ("It happened when Quinn had – *advised us not to refund anything*

24  *that was revenue impacting*, and it happened when we got farther in to the project and found that

25  there were a lot of items that truly needed to be refunded, and Tom Williams shut off the – the whole

26  refunding of the project.").

27        The November 2002 Allegations also allege that Oracle used the 2002 Clean Up to alter the

28  historical audit trail and accounting history of the debit memos and the transfers of customer

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ    - 6 -

1    overpayments to the bad debt reserve in 2Q01.  Ex. 89 at 4-7.  These allegations have now been

2    independently corroborated by undisputed facts and judgment should be entered.

3         As evidenced by the undisputed facts in Oracle internal documents,[8] the deposition testimony

4    of Oracle's most senior executives controlling the Company, including Larry Ellison, George

5    Roberts, Ron Wohl, Edward Sanderson and Mark Barrenechea and others, each of the above

6    described representations was false and misleading and in direct violation of §10(b) of the Securities

7    Exchange Act of 1934 ("Exchange Act") and Rule 10b-5.

8         The disclosures at the end of the Class Period concerning the true financial condition of the

9    Company, including the impact of the economy, its failure to meet earnings expectations and Suite

10   11i application growth forecasts and future growth associated with its business together undisputedly

11   caused the stock price decline and thus plaintiffs' economic loss.  Accordingly, plaintiffs respectfully

12   submit that there are no genuine issues of material fact with respect to certain of plaintiffs' claims of

13   liability detailed herein and respectfully request that this Court enter an order granting plaintiffs'

14   motion for partial summary judgment pursuant to Fed. R. Civ. P. 56(c).

15   **II.    STANDARD ON SUMMARY JUDGMENT**

16        Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to

17   interrogatories and admissions on file together with affidavits show that there is no genuine issue as

18   to any material fact and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56

19   (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is a genuine issue of material fact if,

20   and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of

21   the party opposing the motion in accordance with the applicable standard of proof.  *Anderson v.*

22   *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A scintilla of evidence, however, that is merely

23   colorable or not significantly probative does not present a genuine issue of material fact.  *United*

24   *Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).  In addition, where

25

26   [8]    Defendants admit that all of the documents produced by Oracle in this litigation are true and
27   correct copies of documents are in the Company's files.  Ex. 64 (Defendants' Responses and
     Objection to Plaintiffs' Second Set of Requests for Admissions No. 20).

28

1  a non-moving party's claims are factually implausible that party must produce more persuasive

2  evidence than would otherwise be required.  *California Architectural Bldg. Prods., Inc. v.*

3  *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987).

4       The moving party's burden is one of persuasion (rather than proof) to show the absence of a

5  genuine issue of material fact.  *See Anderson*, 477 U.S. at 249.  Once a party has met that burden, the

6  burden shifts to the non-moving party to show that a genuine issue of one or more material facts

7  exists as to each element of that claim for relief.  *See id.*  Defendants here may not rest on allegations

8  or denials.  *Celotex*, 477 U.S. at 324; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th

9  Cir. 1995).  Instead, Oracle must present admissible evidence showing that there is indeed a genuine

10  issue of material fact.  Fed. R. Civ. P. 56(e).

11       Here, there is simply no genuine issue of material fact with respect to certain of the

12  statements forming the basis of plaintiffs' claims alleged in Plaintiffs' Revised Second Amended

13  Complaint for Violations of the Federal Securities Laws ("RSAC").[9]  Specifically, there is no

14  genuine issue of material fact concerning defendants' violations of §10(b) of the Exchange Act and

15  Rule 10b-5 promulgated hereunder with respect to alleged false and misleading statements during

16  the Class Period.  As discussed in detail below, undisputed facts demonstrate that (a) Oracle's

17  financial results for its 2Q01 were false and misleading; and (b) certain of the statements concerning

18  the functionality and quality of Suite 11i were false and misleading.  Judgment should be entered in

19  favor of plaintiffs.

20  **III.   ARGUMENT**

21       Section 10(b) of the Exchange Act makes it unlawful for any person to:

22       [D]irectly or indirectly, by the use of any means or instrumentality of interstate
     commerce or of the mails, or of any facility of any national securities exchange –

23  

24               *   *   *

25       (b)     [U]se or employ, in connection with the purchase or sale of any security
     registered on a national securities exchange or any security not so registered, or any

26  

27  [9]   All paragraph ("¶") references are to the RSAC unless otherwise noted.

28

securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j.[10]

In order to prove a claim under §10 of the Exchange Act and Rule 10b-5, a plaintiff must prove (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). The misstatement or omission complained of must be misleading; in the case of an omission, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "Whether an omission is material . . . requires a delicate assessment of inferences, a reasonable shareholder would draw from a given set of facts . . . and those inferences to him . . . ." *Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995).[11] Only if materiality is so obvious that reasonable minds could not differ is summary judgment appropriate. *Id*. at 1081.

Scienter is established upon proof that the defendant acted knowingly or recklessly. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ___, 168 L. Ed. 2d 179, 196 (2007) (plaintiffs must prove falsity and scienter by a preponderance of the evidence) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)). Recklessness, and thus scienter, exists where the danger of misleading buyers or sellers is so obvious that the defendant must have been aware of it. *Id.* Further, liability also attaches if a person omits to state a material fact necessary to make statements made not misleading. 15 U.S.C. §78j(b). Thus, even if under no duty to speak, if one undertakes to do so, either voluntarily or in response to inquiries, the speaker is bound not only to speak truthfully, but also to

---

[10]    Defendants have not disputed whether defendants Ellison, Jeff Henley and Sanderson controlled Oracle consistent with §20(a) of the Exchange Act.

[11]    All citations and internal quotations are omitted and all emphasis is added unless otherwise noted.

1   not suppress or conceal any facts which materially qualify those stated.  *City of Monroe Employees*

2   *Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468 (6th Cir. 2004), *cert. denied*, 546 U.S. 936 (2005) (a

3   speaker cannot speak about material details without revealing certain additional known facts

4   necessary to make his statements not misleading).

5       **A.    There Is No Genuine Dispute of Material Fact About Whether
               Oracle's Revenues and Earnings in 2Q01 Were Overstated by at
6              Least $0.01 Per Share**

7       It is undisputed that at the beginning of 2Q01, Oracle had accumulated over $100 million of

8   cash receipts from its customers that had not been applied to an invoice.  *See* Ex. 27 at NDCA-

9   ORCL 1610987; Ex. 26.  It is also undisputed that at least $70 million of that amount was sitting in a

10  liability account called "Account 25005-Customer Overpayments."  Ex. 26 at AA 000040.  Oracle's

11  former Director of Revenue Accounting, Michael Quinn, confirmed that the amounts of unapplied

12  cash sitting in Account 25005 were generally items that needed to be refunded to customers:

13      Q.    What's the difference between unapplied cash that would be in the liability
              account and unapplied cash that would be in an accounts receivable account?
14
        A.    Generally speaking, it would be – the items in 25005 would be – actually,
15            I'm sorry.  Let me answer the question.  The amounts that would be in a
              liability account would be ***generally something that are flagged to be***
16            ***refunded to a customer, payable to a customer***.

17  Ex. 117 at 97:9-19.

18      It is also undisputed that during 2Q01, Oracle improperly transferred at least $20 million in

19  customer unapplied cash from its Customer Overpayments account (Account 25005) to its "Bad

20  Debt Write-Offs" account (Account 12601) during 2Q01.  *See* Ex. 3 ("12601 Reserve Activity").

21      Defendants' accounting expert J. Duross O'Bryan confirmed the $20 million in transfers in

22  both his expert report and deposition.  *See* Ex. 131 at 20 (***"[Oracle] learned that $20.1 million of***

23  ***unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal***

24  ***year 2001."***); Ex. 136 at 70:10-14 ("Q.  What was the total amount transferred from 25005 to 12601

25

26

27

28

1   during the second quarter? A. *I think approximately $20 million*.").  Both parties' experts,

2   therefore, agree on this point. *See* Ex. 132, ¶¶30-38. [12]

3          It is also undisputed that the entire $20 million in transfers in 2Q01 was applied to debit

4   memos as part of the November 2000 Clean Up, and that Oracle later reversed those debit memos

5   (and the corresponding transfers to Account 12601), as part of the 2002 Clean Up.  Ex. 5.  Oracle's

6   accounting expert O'Bryan confirmed this fact in both his report and deposition. Ex. 131 at 20 ("As

7   a precautionary initial step, *Oracle reversed these transfers from the bad debt reserve account back*

8   *to the unapplied cash account*."); *id*. at 34-35 ("On November 8, 2002, Oracle *reversed the*

9   *processing of the November 17, 2000 debit memo*, thus switching the receipt status from 'Applied'

10  back to 'Unapplied.'"); Ex. 136 at 154:7-11 ("So, if in the second Q they were applying the 25005 to

11  the 12601, that's recording income.  If – then remember during October/November [2002] time

12  frame *they reversed all of that.  It all went out of reserve.  It reduced revenue, basically, by that*

13  *$20 million.*").  Plaintiffs' expert agrees.  *See* Ex. 132, ¶¶42-45.

14         It is also undisputed that the $20 million in customer overpayment transfers from Account

15  25005 to Account 12601 in 2Q01 went directly to Oracle's revenue and earnings. Ex. 136 at 146:19-

16  147:1 ("[O]racle individuals made decisions to *transfer from 25005 to 12601*.  *That went right into*

17  *income, actually went into reserve that went into income."*); *see also* Ex. 27 at NDCA-ORCL

18  1610987 (Bad Debt Reserve Reconciliation showing the $20 million "adjustment" to Account 12601

19  in 2Q01). [13]  Oracle's revenue manager during the Class Period, Michael Quinn, also admitted that

20  Oracle's debit memo transfers impacted revenue and earnings. Ex. 117 at 227:25-228:15 ("Q. Did

21

22  [12]      *See also* Ex. 117 at 227:25-228:15 ("Q. And 12601, that was the number for an accounts
23  receivable reserve?  A. Yes. . . . Q. And prior to November of 2002, money was being transferred
    between 25005 and 12601, right?  A. That's my understanding, yes.  Q. And those transfers
24  impacted Oracle's balance sheet, right?  A. Yes.  Q. And in what way?  A. It increased the reserve
    balance that was in the – that GL account, 12601."); *id*. at 197:12-24.

25  [13]      Defendants' expert agrees that any improper transfers from Account 25005 to Account 12601
26  violate Generally Accepted Accounting Principles.  Ex. 131 at 6 ("Plaintiffs claim that Oracle
    improperly used customer overpayments to increase its bad debt reserve, thereby materially inflating
27  reported results of operations in its second quarter of fiscal year 2001 financial statements. *These*
    *claims, if true, would violate GAAP.*") (footnote omitted).

28

1   the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior

2   to October 2002?  A. Yes.").  During his interview with the Special Litigation Committee of the

3   Board of Directors ("SLC"), Tom Williams, Oracle's Director of Global Finance admitted that from

4   August 2000 to August 2002, approximately $48 million was transferred from Account 25005

5   Customer Overpayments to Oracle's bad debt reserve Account 12601.  Ex. 90 at NDCA-ORCL

6   313783; *see also* Ex. 120 at 125:16-18 (admitting that bad debt reserve transfers would increase

7   income), 177:7-15 (admitting that 2Q01 transfer relating to debit memo from customer K-force was

8   not proper).  This testimony is consistent with plaintiffs' expert's opinion.  *See* Ex. 132, ¶¶43-44.

9        Most importantly, it is undisputed that Oracle's $20.1 million in bad debt transfers caused

10   Oracle to overstate 2Q01 revenues and earnings by $0.01 per share.  *See* Ex. 131 at 38 (chart

11   showing $0.01 earnings per share ("EPS") impact of 2Q01 debit memo bad debt transfers); *see* Ex.

12   134 at 21 n.82 ("As I stated in my Opening Report, to the extent that any money that was transferred

13   to the bad debt reserve could not be matched to a previously written off invoice, ***such a transfer***

14   ***represented an erroneous reclassification*.").[14]  The following chart was submitted by O'Bryan in

15   his opening report to reflect Oracle's EPS results for 2Q01 if the $20 million in transfers of customer

16   overpayments did not occur:

|  | In $000s |
|---|---|
| Net Income | $609,812 |
| Shares Outstanding – Diluted | 5,874,9087 |

[14]   Of the approximately $20 million total transfers of customer overpayments from Account 25005 to Account 12601 (and then to revenues and income) during 2Q01, O'Bryan could only dispute $1.5 million. Ex. 131 at 32. Even assuming O'Bryan is correct, however, and the $1.5 million is subtracted from the $20.1 million total, Oracle still would have reported $0.10 per share in 2Q01 without the transfers (Net Income [$611.3 million] ÷ Shares Outstanding [5,874,908] = ***10.4 cents per share***). In any event, O'Bryan could not support his findings with any specific source documents, and his opinion was based entirely upon the "Script Output," which was created by defendants' lawyers, and undated electronic "notes" that were deleted and written over during the 2002 Clean Up. Further, counsel for O'Bryan expressly refused to provide plaintiffs with the evidence upon which O'Bryan relied in analyzing the $1.5 million items. *See* Plaintiffs' Motion to Exclude the Testimony of Defendants' Accounting Expert J. Durross O'Bryan at, filed concurrently herewith.

| Earnings Per Share | $  0.1038 |
|---|---|
| Reported As (Rounded) | $      0.10 |

Ex. 131 at 38.

O'Bryan's conclusion agrees with the calculations of plaintiffs' expert:

| Impact of Bad Debt Reserve Adjustment on Q2FY01 | Net Income ($M's) | EPS |
|---|---|---|
| As reported by Oracle | $622.8 | $0.11 |
| Reverse Bad Debt Reserve Adjustment (after-tax) | (12.9) | (0.01) |
| GAAP | $609.9 | **$0.10** |

*See* Ex. 132, ¶39.

Accordingly, there is no genuine dispute that Oracle's improper transfers of customer overpayments to revenue and earnings, via the bad debt reserve, inflated its 2Q01 EPS by $0.01. There is also no dispute that the $20 million in overpayment transfers were connected to November 2000 debit memos.

**B.** **Undisputed Facts Demonstrate that Defendants Were Aware of Oracle's Misuse of Debit Memos and Customer Overpayments to Inflate Oracle's 2Q01 Financial Results**

It is undisputed that Oracle's top executives were well aware of the Company's customer unapplied cash problem in 2Q01. Defendant CFO Jeff Henley admitted that he was aware of the problem when he first joined Oracle and that the misconduct during 2Q01 was "repeating sins of the past":

> Q.   And what was the cause of those problems?
>
> A.   Again, my recollection, as best I can tell, I think, was that the group over there that was in that department started falling behind and was not – were not staying up on top of the work, and it had – there was a similar problem when I joined the company many years ago, which we cleaned up.  And so I was disappointed when I found out about it because ***here we were repeating sins of the past many years later***.

Ex. 126 at 465:7-21.

Former Oracle Collections Manager Ian Hatada testified that Oracle's "large" balance of unapplied cash was a "***very, very large problem, the biggest problem that anybody in collections or accounts receivable had.***" Ex. 128 at 78:20-25-79:9. Oracle's former "Unapplied Cash Specialist"

1  Raul Campos, confirmed that Oracle did not refund overpayments until a customer somehow

2  discovered the money and requested a refund:

3    Q.    Once you did some research and found that there was nothing – in
          circumstances where you found there was nothing to apply it to did you
4         refund the customers?

5    A.    If the customer would request a refund.

6    Q.    What about if a customer didn't request a refund?

7    A.    **It would remain unapplied.**

8    Q.    **Did you call customers to tell them, "Hey, you have money unapplied.  Do
          you want it back?"**

9
   A.    **No.**
10
   Ex. 115 at 126:15-25.
11
     Q.    And did you or anyone at Oracle send letters to the customers saying, "Hey,
12        there are these items associated with you that are in our Unapplied Account?"

13   A.    I did not personally send any letters out and to my knowledge nobody else
          did either.
14
     Q.    **Did you call customers and tell them that they had money in On Account
15        that is available for refund or anything like that?**

16   A.    **No.**

17   Q.    **Do you know if anyone else did at Oracle?**

18   A.    **Not to my knowledge.**

19  *Id*. at 128:17-129:12.[15]

20       Evidence also shows that Oracle affirmatively attempted ***not*** to refund money that it  knew

21  belonged to customers:

22  _____

23  [15]     Oracle also accumulated large amounts of customer overpayments because of its practice of
   not sending credit memos that were applied to their accounts as a result of overcharges and
24  concessions granted by Oracle to the customers.  This resulted in thousands of customer
   overpayments that were never refunded to customers and were swept into Oracle's fund of unapplied
25  cash. *See* Ex. 81 at PLF-ORC 000133 ("***Our practice of not sending Credit Memos makes account
   reconciliation extremely difficult***.  We send the invoice and often send a rebill, but ***we never send
26  the Credit Memo*** that clears the original invoice and validates the rebill.").  Indeed, according to an
   October 25, 2002 internal Oracle memo sent to Jennifer Minton and Tom Williams two weeks after
27  plaintiffs filed their complaint, Oracle admitted that its internal processes for issuing credit memos
   "***does not provide for an audit trail***." *See* Ex. 84 at NDCA-ORCL 1727985.

28

1    A.      At times we – we had to put together a request to the Accounts Receivable Department to refund, and at times those requests would be put on hold for long periods of time, and **the money would not go back to the client**.

2

3    Q.      Okay.  So was it determined that an item of unapplied cash needed to be refunded but the process was never implemented so the money never got refunded?  Is that correct?

4

5    A.      True.

6  Ex. 128 at 66:7-24.

7       Michael Quinn, Oracle's former Director of Revenue Accounting during the Class Period,

8  also confirmed knowledge of the unapplied cash problem as alleged by plaintiffs in the RSAC:

9    Q.      On line 8 [of page 21 of the RSAC], do you see where it says, "Specifically, CW49 disclosed that before, during and after the class period Oracle had a longstanding problem of accumulating cash from customer overpayments and maintaining that cash in its unapplied cash account"?  Do you see that?

10

11

12    A.      I see it.

13    Q.      And that's what you were testifying to earlier today, right, that there was a challenge due to accumulating cash partly from customer overpayments in Oracle's unapplied cash account, right?

14

15    A.      **The problem was an accumulation of items in unapplied cash.**

16    Q.      Including customer overpayments.

17    A.      **Which may include customer overpayments.**

18  Ex. 117 at 158:3-21; Ex. 132, ¶¶5-7.

19       Former Collections Manager Hatada testified that the unapplied cash fund was so large that

20  Oracle was never able to resolve it.  Ex. 128 at 141:24-142:10 ("I just know that it was – when we

21  originally looked at it, it was – it **was looked at as being impossible – just because it was so big**. . . .

22  It was such a large amount that we – just didn't think that it – we could put a dent in it, obviously,

23  but we would never be able to resolve the whole thing."); *id*. at 133:11-18 ("There was just way too

24  many to try to resolve, you know.  We – we put a dent in it, but **I don't believe we fully resolved it**.

25  Like I said before, I don't think it would ever be fully resolved.").

26       Other Oracle managers and employees testified to knowing about Oracle's unapplied cash

27  problem during the Class Period.  *See* Ex. 110 at 198:10-14   ("A.  The unapplied cash account.  **I**

28  **was aware of it being a big problem.**  I did not know exactly how that account arose.  And that I was

1   somewhat surprised when I was at Oracle, that an information company would have this big of a

2   problem with something like that.").   Former Oracle Collections Manager Molly [Littlefield]

3   Venkataramana testified that she personally issued "hundreds" of refunds of overpayments and

4   unapplied cash to customers during the 2002 Clean Up.  *See* Ex. 116 at 249:23-250:11.  The 2002

5   Clean Up lasted many years.  Even in FY06, Oracle was still reversing revenue and writing off

6   receivables related to customer overpayments that Oracle had improperly applied to debit memos

7   during the November 2000 Clean Up.  *See* NDCA-ORCL 1058909 (script output database); Ex. 85

8   at NDCA-ORCL 1534024, 1534049, 1534169 (journal entries reversing receipts from 12601).

9        Oracle's acknowledgment that it accumulated customer overpayments and used those monies

10  for improper purposes on its balance sheet and income statement appears to be in direct violation of

11  the Securities and Exchange Commission ("SEC") Consent Decree issued in 1993.  Ex. 9.

12  According to §III of the Consent Decree, Oracle and its agents and employees

13      are permanently restrained and enjoined from, directly or indirectly, failing or
14  causing Oracle to fail to devise and maintain a system of internal accounting controls
    sufficient to provide reasonable assurances that:

15      (A)  transactions are executed in accordance with management's
    general or specific authorization;
16

17      (B)  transactions are recorded as necessary (i) to permit preparation
    of financial statements in conformity with generally accepted
    accounting principles or any other criteria applicable to such
18      statements, and (ii) to maintain accountability for assets;

19      (C)  access to assets is permitted only in accordance with
    management's general or specific authorization; and
20

21      (D)  the recorded accountability for assets is compared with the
    existing assets at reasonable intervals and appropriate action is
    taken with respect to any differences
22

23      in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

  *Id*. at 3-4.
24

25      **1.    Undisputed Facts Demonstrate that Oracle Used a Systematic
    Process to Intentionally "Sweep" Debit Memo Overpayments
    to Oracle's Bad Debt Reserve and Revenue Accounts in 2Q01
26      to Inflate Oracle's Financial Results**

27      Evidence belatedly produced by defendants months after the discovery period closed

28  confirms Oracle's intentional misuse of customer unapplied cash during the Class Period.

1    According to an e-mail sent two years into the 2002 Clean Up project, Oracle held end-of-the-

2    quarter "clean up drills" in order to conceal unapplied customer overpayments and make the cash

3    appear as if it had been properly applied to invoices:

> 4    The application that I made to invoice 6057195 is definitely a misapplication.  I'm
>      not big on intentionally misapplying funds. ***However, being a Feb. 2001 application,***
> 5    ***I'm pretty sure I was involved in one of our routine "Q-end unapplied clean up"***
>      ***drills, as we used to do on the final months of each Q back then.***  Please do unapply
> 6    this payment, as I'm 99% sure it doesn't belong to invoice 6057195.

7    *See* Ex. 100.

8         For overpayments that were not improperly applied to invoices in this manner, Oracle had a

9    different process for creating income from customers' money; moving the cash to Oracle's bad debt

10   reserve  and concealing the cash.  *See* Ex. 3132, ¶¶26-29, *see also* Ex. 134 at 7-8.  For example, on

11   November 6, 2000, the final month of 2Q01, Neil Menon, Oracle's "Unapplied Cash Specialist" at

12   the time specifically directed Oracle employees to "resolve as many unapplied items before the end

13   of the quarter."  Ex. 22 at NDCA-ORCL 3042910.  The e-mail explained that "***resolving the [Oracle***

14   ***Credit and Collections] items would help us in achieving our quarter goal***":

> 15   Since we are approaching the end of the quarter, we would like to resolve these items
>      as quickly as possible.  If there is no response by November 20, 2000, we will review
> 16   the items and ***place them in our reserve account***.

17   *Id.*[16]

18        Undisputed facts also confirm that Oracle intentionally executed an "auto-adjustment"

19   process to sweep small items of unapplied cash and customer overpayments into its bad debt reserve

20   Account 12601:

> 21   Q.    So these auto adjustments that we were talking about in Quinn No. 5 would
>            increase the bad debt reserve?
> 22
>      A.    Correct.
> 23

---

24   [16]    Importantly, defendants did not produce this highly relevant and incriminating e-mail until
25   April 17, 2007, nearly two full years after the deadline to produce all relevant documents under the
     Discovery Plan and months after the last discovery deadline imposed by the Special Master.
26   Defendants' explanation for withholding the document was simply hard to believe – they claimed
     that "***these documents mistakenly never were loaded on to our database at the time the documents***
27   ***originally were gathered***."  Ex. 129 at 1.  Thus, plaintiffs were severely prejudiced and precluded
     from using this admittedly relevant document during the entire discovery period.

28

Q.      Is that the only account that the auto adjustments would impact?

A.      Other than the unapplied account because *it would be taken out of the unapplied account and put into the bad debt reserve account*.

Q.      Bad debt reserve account.

A.      *The 12601.*

Ex. 117 at 205:16-206:11; *see also id*. at 212:11-23. ("Q.  Some of the money that was in unapplied cash was less than 30 days old, which was part of the auto adjustments, right?  A.  Yes.  Q.  *Was Oracle doing these auto adjustments prior to May of 2001?  A.  Yes.*  Q.  Okay.  And how long prior?  A.  I don't know.  Q.  And it was always coming out of the unapplied cash?  A.  That's my understanding.").

Tom Williams, Oracle's Vice President of Finance Operations during the Class Period, corroborated and confirmed that Oracle used an "auto-adjustment" process to transfer small items of unapplied cash to Oracle's bad debt reserve, Account 12601:

Q.      Were there instances at Oracle where unapplied cash would be moved to 12601 for reasons that you have just articulated – either they are small dollar amounts, the difficulty in actually determining the proper placement or proper reconciliation would be too difficult?  Were there instances where those monies would be transferred to 12601?

A.      *I believe the answer to that is, yes.*

Ex. 120 at 178:19-179:2.

Notably, after plaintiffs filed their accounting allegations on October 11, 2002, Oracle attempted to shut off the auto-adjustment process of sweeping customer overpayments to the bad debt reserve.  Ex. 82 ("Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc receipt write off *has been turned off*.").  Oracle's intentional use of the "auto-adjustment" process for sweeping customer overpayments to Account 12601, which inflated earnings,  confirms that defendants were well aware of Oracle's misuse of unapplied cash to increase its earnings and revenue in 2Q01.

2.    **Undisputed Facts Demonstrate that Oracle Knew About the Fraudulent $20 Million in Transfers to Oracle's Revenue and Income Prior to Oracle's Earnings Announcement on December 14, 2000 and Knew Oracle Needed Those Transfers to Beat Wall Street Expectations**

The $20 million transfers of debit memo overpayments from Account 25005 to Account 12601 allowed Oracle to artificially inflate its final EPS results to a level above 10.5 cents so that it could improperly round up and report $0.11 per share on December 14, 2000. Without the $20 million adjustment, Oracle would have only reported $0.10 per share on December 14, 2000, and would not have exceeded consensus EPS expectations by a penny for 2Q01.

Indeed, on Monday, November 27, 2000, Oracle's controller Jennifer Minton created and distributed Oracle's Week 13 "Upside Report" for the last week of 2Q01. Ex. 24 at NDCA-ORCL 1532779. The November 27, 2000 Upside Report shows that Oracle's "Potential" EPS result for 2Q01 was only 10.34 cents.[17] It is undisputed that Minton's Upside Reports were given to the individual defendants and members of Oracle's Executive Committee each Monday during the quarter. *See* Ex. 126 at 116:25-117:18; Ex. 108 at 31; Ex. 124 at 143:17-145:11; Ex. 109 at 3; Ex. 107 at 105:22-25; Ex. 125 at 25:23-26:24, 38:1-40:20.

On December 1, 2000, the day after 2Q01 officially closed, Oracle's management printed out the Upside Report for 2Q01 which reported a final EPS "Forecast" result of 9.1 cents per share and an "Upside" forecast of only 1.2 cents per share. Ex. 80 at NDCA-ORCL 440830 (metadata confirming the "print" date of December 1, 2000). The "Potential" column of the Upside Report again confirmed the final EPS result of ***10.34 cents***. *Id.* Thus, as of December 1, 2000, Oracle knew that it did not and could not beat Wall Street's expectations of $0.10 per share in 2Q01 unless it somehow inflated earnings by approximately $20 million to push its EPS result to 10.5 cents or more.

---

[17] According to Minton, Oracle's purportedly "most knowledgeable" forecasting witness designee under Fed. R. Civ. P. 30(b)(6), the "Potential" column in Oracle's Upside Reports was the purported basis for Oracle's forecast for each quarter. Ex. 107 at 124:16-18 ("[T]hat's the forecast that we always relied upon for setting expectations. That would be the ***potential column*** . . . .").

1    On December 8, 2000 – eight days after 2Q01 closed and six days before Oracle announced

2  its 2Q01 results – Oracle employee Tammy Pinnick e-mailed the Company's "final version of the

3  Bad Debt Analysis"  to Minton and Tom Williams.  Ex. 27.  In the section entitled "Bad Debt

4  Reserve Reconciliation 2QFY01," Oracle's improper $20 million adjustment to Account 12601 from

5  the unapplied cash debit memo transfers clearly appears in the "November-00" column.  *Id.* at

6  NDCA-ORCL 1610987.  Notably, the $20 million adjustment was done after 2Q01 closed.  Further,

7  the $20 million adjustment was the only bad debt adjustment in the quarter and allowed Oracle to

8  increase revenue by reducing its then-inflated "Total Reserve" balance to approximately $163

9  million from the $183 million it had been prior to the improper adjustment.  *See id.*; Ex. 75 at

10  NDCA-ORCL 140463, 140468-69; Ex. 132, ¶¶33-38.[18]

11    Minton confirmed that Oracle's process of adjusting the bad debt reserve impacted Oracle's

12  revenue account.  Ex. 107 at 143:7-12, 143:25-144:10, 216:19-25; *see also id.* at 184:17-21.  Tom

13  Williams testified that Oracle would only adjust the bad debt reserve if the difference between the

14  required and actual reserve levels was "significant."  Ex. 120 at 124:23-125:1-2 ("If there was a

15  significant difference between the requirements and the reserve then an adjustment would be

16  booked.  If it was not a significant difference then no adjustment would be booked.").

17    In other words, subsequent to quarter-end and prior to Oracle's earnings announcement on

18  December 14, 2000, defendants knew that without the $20 million "adjustment" from the improper

19  transfers of debit memo customer overpayments to Oracle's bad debt reserve, Oracle would not beat

20  consensus EPS estimates of $0.10.  Only by intentionally adjusting its revenue and earnings by the

21  $20 million in debit memo transactions was Oracle able to report $0.11 per share and beat Wall

22  Street expectations.

23

24

25  [18]    Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy states: "We
    charge both credit memos and write-offs directly against the current periods revenue . . . .  Although
26  we also reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double
    counting . . .  by *adjusting the bad debt and credit reserve balance quarterly to its required*
27  *balance, with a corresponding adjustment, upwards or downwards, to the current quarter's*
    *revenues*."  Ex. 70 at NDCA-ORCL 140468-69; *see also id.* at NDCA-ORCL 140474.

28

**3.    Undisputed Facts Demonstrate that the November 2000 Debit Memo Clean Up Was Part of Oracle's Attempt to Conceal Its Accounting Manipulations and Its Huge Cache of Customer Overpayments to Inflate Earnings**

On or around November 17-18, 2000, Oracle engaged in the debit memo "On Account Clean Up" to conceal the massive slush fund of unapplied cash and customer overpayments that the Company had used to manipulate revenues and earnings in 2Q01 and other quarters.  Ex. 73 (**"All invoices that start with '550' are actually debit memo #'s.  These were created to clean up our unapplied account at the time.  They were more that likely overpayments."**); *see also* Ex. 72 (**"All 10 of the invoices that start with '550' are on 'account clean up.'  These funds are available for refund or to apply to future or past due invoices."**).

The November 2000 Clean Up of customer overpayments and unapplied cash consisted of creating 46,000+ fictitious debit memo invoices and "applying" the 46,000+ unapplied cash items to the fake invoices, thereby making it appear in Oracle's books as if the items were legitimately applied to real invoices.  *Compare* Ex. 93 at NDCA-ORCL 313985-86 *to id.* at NDCA-ORCL 313987-89; Ex. 132, ¶27.  Each of the 46,000+ unapplied cash receipts that were designated "On Account" as of November 17-18, 2000 were applied to one of the 46,000 debit memos.  *See* Ex. 131 at 12; Ex. 132, ¶¶24-25.  Applying the On Account items to a debit memo converted each "unapplied" cash receipt in the "On Account" to "applied."  Ex. 132, ¶26.

According to Oracle's Director of Revenue Accounting, Quinn, the unapplied cash items that had been transferred to the bad debt reserve Account 12601 were transferred to "On Account":

Q.  You see where you write "We need to establish new policies and procedures to ensure that this never happens again"?

A.  Yes.

Q.  And what were you referring to that should never happen again?

A.  The movement of unapplied cash items to on account and, therefore, that hitting the 12601 account, the bad debt reserve account.

Q.  So are you saying that the movements that you described in bullet point 1, taking unapplied cash receipts to the reserve account first goes to the on account?

A.  First goes to the on account.  That's how they got there.  ***That's how they got to the reserve account***.

Ex. 117 at 231:24-232:16.  Quinn's testimony regarding "On Account" was corroborated by former

Oracle Collections Manager Hatada:

> Q.    Now, do you know what the term "on account" means?
>
> A.    Somewhat. I mean, it's – from what I know, putting on an amount on account – you know, from a collections analyst or collections manager standpoint it would *erase it from the unapplied account and move it to the reserve or another account*.
>
> Q.    Okay.  And when you say "move it to the reserve," what do you mean by that?
>
> A.    Move it to an account that wasn't visible or that wasn't in the actual unapplied account that was visible to all collections analysts as well as managers."

Ex. 128 at 103: 24-104:11.

Thus, the undisputed evidence shows that Oracle created the 46,000+ debit memos on or around November 17-18, 2000 in order to apply millions in unapplied cash and customer overpayments to the debit memo invoices, making it look like the money was applied, rather than unapplied.  Then, during the 2002 Clean Up, Oracle reversed the debit memos to unapply the overpayments so the items could be resolved and refunded to customers.  Hundreds of the refunds during the 2002 Clean Up included overpayments that Oracle had been withholding from customers for up to ten years.  Further, as late as FY05, millions in overpayments and unapplied cash that Oracle had improperly withheld for many years had to be escheated to the state as part of the 2002 Clean Up's "*escheatment of unapplied cash*" project.  Ex. 103 ("We are doing an escheatment program for unapplied cash. . . . based on a random sampling we will escheat and/or create revenue for the whole population."); *see also* Ex. 104 ("We have Jennifer's [Minton] approval to expand the scope of the PWC project up to $20K.").

C.    **Undisputed Facts Surrounding Oracle's 2002 Unapplied Cash Clean Up Demonstrate Defendants' Fraudulent Intent**

1.    **Oracle's Clean Up Meetings in October 2002**

Following the filing of plaintiffs' October 11, 2002 accounting allegations, Oracle held a flurry of special meetings in late October 2002 to devise a plan to "clean up" the "on account problem," to determine the "revenue impact" of the problem, and to make sure the improper transactions "never happened again."  Exs. 82, 4.  Oracle personnel involved in the 2002 Clean Up testified that during the meetings they were told about an "on account problem" and a huge amount

of customer overpayments and unapplied cash that were up to five to ten years old and had previously been applied to debit memos in November 2000:

> A.   Well, the first – the first meeting that we had to actually give us a – kind of a short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, **there was a lot more in the reserve that we were going to have to try to resolve because of a specific lawsuit that, you know, that we had money that we shouldn't have had, and whether it was in the reserve or the unapplied, but the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve.**

> Q.   **And were those the items, as far as you know, that resulted from creation of debit memos previously?**

> A.   **I believe that was one of the reasons that Mike Quinn and Greg Myers had given us.**

Ex. 128 at 128:8-129:2; 257:24-263.

Further, contrary to defendants' previous representations to the Court that there was "**no connection whatsoever**" between the events in 2002 and the November 2000 debit memos, Hatada testified that the entire project was part of Oracle's attempt to "**help Oracle**" clean up the debit memos and the issues raised in plaintiffs' lawsuit. *Id.* at 264:12-265:6. Indeed, Oracle's collections staff were specifically told about plaintiffs' lawsuit regarding the debit memos and were told to address the "revenue impact" of Oracle's misuse of customer overpayments and to try to clean up the customer unapplied cash that suddenly needed to be reversed, resolved, and refunded as part of the 2002 Clean Up:

> Q.   [W]hat do you recall was the explanation of the on account problem?

> A.   Well, I – I mean, like this first item, you know, we were called together to explain exactly what it says, that, you know, there's an unapplied account issue, there's – there's a lawsuit that's about to happen, and – and we need to resolve – you know, **we're going to have to resolve these unapplied amounts, and, you know, there will be a meeting in the near future to explain how we're going to do it.**

> **And, you know, the bottom line was that they needed to figure out if it was – if we had recognized revenue on it or we had not, so if it was revenue impacting or not revenue impacting.**

*Id.* at 113:19-114:7:

> [T]he biggest thing that I was ever responsible for when it came to unapplied cash was the point of Michael Quinn and Greg Myers getting all of us collections

1    managers together and letting us know that ***there was a problem with the unapplied***
2    ***cash, and we had a large amount of unapplied cash that was a lot larger than us***
     ***collections managers had ever seen before, and it was our responsibility as quick***
3    ***as possible to clear this unapplied cash and find a home for this unapplied – the***
     ***unapplied amounts***.

4    *See also id.* at 38:24-39:10.

5    Hatada also testified that defendant Henley was involved in the 2002 Clean Up:

6    A.    I know Jeff Henley was – you know, we were supposed to get this
           information to Jeff Henley, and the – in the end.  I mean, that's where it was
7          supposed to end up.

8    Q.    Okay.  And how do you know that?

9    A.    From our meetings with Mike Quinn.

10   Q.    ***So did Mike Quinn ever say, "We need to get these results to Jeff Henley"?***

11   A.    ***Yes, he did.***

12   *Id.* at 266:10-21; *id.* at 105:1-106:3 ("I'd say once we had that first meeting there was a meeting

13   every couple days to discuss what Mike Quinn or what Jeff Henley wanted us to do moving forward

14   with our action plans."); *id.* at 307:5-9 ("[R]eally you know, at a bottom line, this is really what they

15   wanted to know – from Mike's [Quinn] point of view, was he wanted to know after it's all said and

16   done what's going to be revenue impacting and what's not going to be revenue impacting.").[19]

17   Additionally, Terry Elam, a current Oracle manager and former Accounts Receivable

18   Manager who was involved in the 2002 Clean Up and was named by Greg Myers as having helped

19   prepare Oracle's presentation to the SEC in October 2003 (Ex. 127 at 322:20-323:10), testified that

20   in October 2002, he was specifically asked by Myers to research debit memo items contained on a

21   "spreadsheet."  *Id.* at 66:25-67:20.  Elam testified that part of the project was to issue credit memos

22   for debit memo items and "***pull[] out some of the entries into the 12601 account in October-***

23   ***November of 2002***."  *Id.* at 186:8-9.  Elam confessed that the "entries" that had to be reversed were

24   those associated with the ***November 2000 debit memos***:

25   _____

26   [19]    Oracle's former Director of Revenue Accounting, Quinn, testified that Oracle learned during
     2002 that there was indeed a "revenue impact" of the bad debt transfers that were connected to debit
27   memos.  Ex. 117 at 229:2-8.  Hatada testified that the revenue impact was "major."  Ex. 128 at
     153:16-154:6.

28

Q.     Was there more than one discussion about that, about on-account debit memos being credit memoed two years after November 17th, 2000?

A.     I don't recall any – how many there were.

Q.     Okay. Well, what do you – just what do you recall about those discussions at all?

A.     Um, specifically in the – *from Greg Myers about the process related to pulling out some of the entries into the 12601 account in the October-November of 2002 time frame*.

Q.     Okay. So pulling out some of the entries in 12601; is that what you said?

A.     Yeah. *The associated entries with the debit memos.*

*Id*. at 185:23-186:11.

Elam also explained that during the 2002 Clean Up, Oracle implemented a specific process for reversing debit memo receipts that had been moved into Account 12601:

THE WITNESS:     There – it's a – there's a specific process of – *associated with a debit memo* that you have to follow to, um, pull – there's two – there's a miscellaneous receipt that you need to – to take out or *reverse out of this system, plus unapply a debit memo to actually process the credit memo on it*.

Q.     Right. But why were you – why were you processing credit memos – or why were you reversing entries into 12601 during 2002?

THE WITNESS:     Well, that's part of the spreadsheet that was given to myself, was *there was a number of steps needed to credit memo the debit memo. And part of that is to reverse out the miscellaneous receipt into 12601*.

*Id*. at 187:10-188:2; *see also* Exs. 86-87.

Internal Oracle documents also confirm that as part of the 2002 Clean Up, Oracle removed more than $50 million of cash receipts that had been inappropriately transferred into the bad debt reserve from its Customer Overpayments account, including the transfers made in 2Q01. Ex. 5. *See also* Ex. 131 at 19-20; *see also* Ex. 132, ¶¶43-44. It is undisputed that Oracle reversed the November 2000 debit memos that had been applied to the customer overpayments transferred to the bad debt reserve account during 2Q01. *See* NDCA-ORCL 1058909 (script output database); Ex. 85 at NDCA-ORCL 1534024, 1534049, 1534169 (journal entries reversing receipts from 12601.

The 2002 Clean Up resulted in a modification of Oracle's historical accounting for all of the $45 million in customer unapplied cash that Oracle reviewed. *See, e.g.*, Ex. 5. After the unapplied

1    cash receipts over $10,000, which were removed from the Bad Debt Reserve, their status was

2    restored to "unapplied," which allowed Oracle to use the cash for (a) customer refunds;

3    (b) escheatment to state governments; (c) application to improperly "adjusted up" invoices; or

4    (d) keeping the cash but no longer reporting it as a component of the bad debt reserve.

5         It is also undisputed that the 2002 Clean Up was still ongoing in 2005 because of the sheer

6    number and amount of Oracle's fund of customer overpayments and unapplied cash that

7    accumulated over many years.  *See* Exs. 99, 97; Ex. 128 at 266:23-267:24; Ex. 116 at 304:9-17; Ex.

8    ¶43.   In fact, the number and amount of items sitting in Oracle's slush fund of customer

9    overpayments was so large that Oracle decided not to address or refund the customer overpayments

10   under a certain dollar amount.  Exs. 5, 82.  Oracle intentionally ignored and kept millions in smaller

11   dollar value customer overpayments that were sitting in its unapplied cash accounts.  *Id.*

12        Further, during the 2002 Clean Up, Oracle affirmatively attempted to conceal overpayments

13   from customers even though it knew the money should be refunded.  Ex. 132, ¶44 n.92.  For

14   example, in 2004, two years into the 2002 Clean Up, Oracle's managers admitted that one customer,

15   I2 Technologies, had paid on an order that was never booked in 1999; yet Oracle attempted to keep

16   the money five years later.  Ex. 101 at NDCA-ORCL 1895745 (***"We actually have the unapplied***

17   ***cash.  We never booked the order but the customer paid.  We want to book it or try to get upper***

18   ***management to agree that we should keep this money."***).  When one Oracle employee asked

19   "Who's [sic] upper management?," the collections manager replied, "***It will go to Jennifer Minton***."

20   *Id.*  Shockingly, in the same e-mail, one employee suggested fraud: "If this isn't enough to close out

21   the [purchase order], ***could it end up in a fire under mysterious circumstances?***"  *Id.*

22        Other e-mails written during the 2002 Clean Up demonstrate Oracle's attempt to keep

23   customer money even though they knew it should be refunded.  *See* Ex. 98 at NDCA-ORCL

24   1886317 ("All, I agree we should not rush into the refund at this point, but I wanted to just add a

25   couple of points.  ***I believe the research that is provided on the refund is correct and we owe the***

26   ***customer this money***.");  *see also* Ex. 106 ("***We probably should not have given them the list of***

27   ***unapplied but since we did we need to make them prove to us that the money is theirs*** . . . .";  "They

28   should be providing us the reasons for refunding.  We should not be researching for them.  ***If they***

1  *want a refund then make them prove to us why?*  Maybe I am missing something here but if they

2  want the money shouldn't they tell us why?").

3        2.      **Conflicting and False Testimony from Oracle's Current CFO,
                Jennifer Minton, Demonstrates Oracle's Knowledge of Its
4                Improper Conduct**

5        On July 7, 2006, plaintiffs deposed Oracle's current CFO Jennifer Minton regarding the 2002

6  Clean Up and Oracle's misuse of customer overpayments and its transfer of unapplied cash to

7  Oracle's bad debt reserve.  Minton was Oracle's Vice President of Global Finance during the Class

8  Period and was directly in charge of Oracle's collections department during the 2002 Clean Up.

9  Many of the principal participants in the project, including Myers, Quinn and Williams, reported to

10  Minton during that time.

11        Minton initially testified during her July 7, 2006 deposition that she was "not involved" in

12  the 2002 project or its corresponding investigations.  *Id*. at 162:23-163:4 ("***I was not involved in the***

13  ***investigation. . . . I do not know of any details of the investigation.***").  Minton also made a startling

14  admission – she was specifically told by counsel to deliberately keep herself in the dark regarding

15  the 2002 Clean Up:

16    Q.    If you had responsibility for the global finance organization of which
            collections was underneath, did anybody give you the results of this
17          investigation?

18    A.    No.

19    Q.    Why not?

20    A.    I don't know.

21    Q.    Didn't you care?

22    A.    ***I don't recall receiving the results of the investigation.***

23    Q.    And my question was, were you interested in the investigation?

24    A.    Yes.

25    Q.    If this stuff had happened, weren't you interested in finding out the results?

26    A.    Yes.

27    Q.    But you didn't look for the results or ask about the results?

28

A. ***I was told – I think it was appropriate for legal to keep me uninvolved in the investigation.***

*Id*. at 174:25-175:19.

On September 25, 2006, plaintiffs deposed Minton for a second day in her individual capacity. *Id*. At the urging of her counsel, and in stark contrast to her testimony on July 7, 2006, Minton suddenly remembered that she was in fact told about the results of Oracle's 2002 Clean Up investigation and recalled specific conversations with individuals about the investigation. Minton still falsely maintained, however, that she was "***not involved*** in the actual underlying investigation itself":

> Oracle Counsel:     Doug, as I mentioned to you right at the beginning, the witness would like to clarify two points that she testified about previously.

> Plaintiffs' Counsel:     Certainly. Why don't you do that.

> Ms. Minton:     Well, while I was thinking about my testimony in recent days, I recalled that there was a question that was asked of me about whether or not I knew about the investigation that the company undertook once we had some complaints filed about accounting allegations. I just want to clarify what I did know. ***I knew that there was an investigation going on.*** I knew that – ***but I was not involved in the actual underlying investigation itself***. In addition, I believe – not believe, but I know that after – thinking about it, that ***I did become aware of the results of the investigation outside of attorney-client privileged communications***.

> And to further that point, I did, in fact, have conversations with both – with Tom Williams; that I can't recall specifically anyone else that evaluated the – that ***discussed the financial results of that investigation***, and we did an evaluation of those results to determine if there was a material impact on our fiscal 2001 financial statements.

> And we had concluded that we had not – that there was not a material impact on those financial statements, so I needed to clarify that aspect of my testimony.

*Id*. at 278:15-279:20.

Undisputed facts demonstrate that Minton was indeed involved in the 2002 Clean Up investigation, and personally supervised it. Numerous e-mails to and from Minton herself confirm that she was directing parts of the investigation and actually approving customer refunds relating to the 2002 Clean Up. *See, e.g.*, Ex. 84 at NDCA-ORCL 1727980 ("I have also tried to summarize the open questions ***Jennifer had from our meeting earlier this week***. . . . Jennifer has initiated a project to cover our work in this area. . . . ***Jennifer would like to meet next week on our progress***.");

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ          - 28 -

Ex. 101 at NDCA-ORCL 1895745 ("We actually have the unapplied cash. We never booked the order but the customer paid.  We want to book it or try to get [Minton] to agree that we should keep this money."); Ex. 91 at NDCA-ORCL 1733105 (Tom Williams e-mail to Minton: "[D]uring our discussion at last Friday's audit committee meeting, I told you that I would supply an update on our review of the unapplied cash items that had been moved to the reserve account by today."); Ex. 91 at NDCA-ORCL 1733103 (November 17, 2002 Annica Magnusson e-mail to Minton with subject "Status Update on AR Project and Proposed con call on Wed Nov 20"); Ex. 99 at NDCA-ORCL 1886329 (Minton June 3, 2004 e-mail: "I am absolutely thrilled with the success that the cash apps team has had in driving down the unapplied cash balance."); Ex. 105 at NDCA-ORCL 1892686-87 (e-mail from Minton approving Department of Treasury refund request where overpayment was "misapplied to various other government invoices that [Oracle] had no authorization to apply the payment to"); Ex. 104 at NDCA-ORCL 1885840-41 (Minton's approval regarding scope of 2002 Clean Up).

Minton's involvement in the 2002 Clean Up is also corroborated by testimony of defendant Henley who claimed that he directed Minton and Tom Williams to supervise the 2002 Clean Up. Ex. 126 at 437:1-6 ("I think the people that, first of all, got into more of the detail and reviewed it were our corporate controller, Jennifer Minton, and the previous corporate controller Tom Williams. So those two people are CPAs, they're quite knowledgeable and way more into details than I was."); Ex. 92 at NDCA-ORCL 313792 ("Henley additionally said that **he expected Minton and Williams** to get to the bottom of the issue and take any necessary action to resolve it.").  Henley also testified that Minton was responsible for reviewing the bad debt adjustments in 2001.  Ex. 126 at 451:10-17 ("Q.  Who at Oracle, in fiscal 2001, would have been responsible for making adjustments to Oracle's bad debt reserve?  A.  **Certainly the review was done by Jennifer Minton** . . . .").

### 3.   Oracle's Process of Adjusting Up Invoices Demonstrates Fraudulent Intent

One of the ways Oracle concealed overpayments from customers during the 2002 Clean Up was to reverse credit memos that had been previously authorized and approved by management applied to old customer invoices, and then apply customer overpayments to the newly "adjusted up"

invoices.  The "adjusted-up" invoices were not sent to customers and were used, unbeknownst to customers, to apply old customer overpayments:

> Typically we only adjusted up invoices if there was a credit memo on them.

*      *      *

> When – you know, as long as there was a credit memo done on the invoice, you could adjust up the invoice and take away the credit memo to apply.

*See* Ex. 128 at 93:20-94:17; *see lso* Ex. 132, ¶45; *see also* Ex. 131.  Another former Oracle Collections Manager, Molly Venkataramana, confirmed that she was told to "adjust up" invoices during the 2002 Clean Up, but did not have any basis to reverse customer credits and keep the customer overpayments.  Ex. 116 at 216:14-261:20 ("[P]reviously, . . . collections would credit memo invoices erroneously.  And the credit memos were not valid.  Q. And did you guys discuss why those credit memos were not valid?  A. *I don't believe so*, no.").  This is corroborated by notes that were  taken during the 2002 Clean Up meetings.  Ex. 4.  Notably, Quinn, Oracle's Director of Revenue Accounting, denied telling anyone to adjust up invoices.  Ex. 117 at 281:16-19 ("Q. [D]id you, at any time, tell of your collection staff to adjust up invoice? A. No, not that I recall.").  Quinn's testimony is directly at odds with the testimony of Collections Manager Molly [Littlefield] Venkataramana.  Ex. 116 at 26:14-18 ("You had previously asked me if Mike Quinn had asked us to adjust up invoices associated with credit memos, and I said no.  I want to change that answer to yes. I believe he did.").

E-mails exchanged during the 2002 Clean Up confirm that Oracle's process of "adjusting up" invoices to apply customer overpayments was not proper and that Oracle misled customers about their overpayments in order to keep the money.  According to one e-mail during the 2002 Clean Up relating to customer Pioneer Electronics – a customer specifically cited by plaintiffs in ¶38(e) of the RSAC – Oracle knew that it was withholding overpayments that should have been credited or refunded, but Oracle attempted to keep the money by telling Pioneer Electronics that its previous credits (which resulted in the overpayments) were not valid:

> "I think all the highlighted invoices for Pioneer should be adjusted up.  We have plenty of unapplied cash to pay for this money. *Once they are adjusted I can easily apply money.  However, in some cases the customers have taken credits for these items and I think if we adjust them up to their normal dollar amount and I can*

1    *apply the cash and then go back to them and tell them that the credits they took*
2    *were not valid.* Otherwise the outstanding money that we have for them will be used
     as credits again."

3    Ex. 96.

4        In this manner, Oracle improperly retained more than $11 million by improperly adjusting up

5    invoices, including $5.3 million of customer overpayments that had been transferred to the Bad Debt

6    Reserve as of November 30, 2000. Ex. 132 at 24 n.103.

7        **D.**       **Undisputed Facts Demonstrate that Suite 11i Was Not Fully**
     **Integrated and Interoperable Out-of-the-Box, Nor Was 11i Easy to**
8    **Install and Did Not Help Save Money Fast[20]**

9            **1.**      **Defendants Knew that Suite 11i Did Not Work in a Fully**
     **Integrated Fashion Because Oracle Could Not Even**
10   **Demonstrate a Fully Integrated Functioning Suite to Potential**
     **Customers and Lost Sales**

11       During the same period that Oracle told the market that it had "*delivered*" Suite 11i,

12   trumpeting it as a "complete," integrated and interoperable "out of the box," Oracle knew – and it is

13   undisputed – that the Company could not even demonstrate a working and fully integrated Suite 11i

14   application for sales demonstrations, much less "deliver" a fully integrated suite.  Undisputed facts

15   show that the Company's inability to demonstrate a working version of Suite 11i cost the Company

16   applications sales before, during and after the Class Period.

17       For example, prior to the Class Period on October 6, 2000, Vice President Ken Hamel

18   explained to George Roberts, Executive Vice President of North American Sales, how the

19   Company's failure to demonstrate an integrated suite of 11i applications had undermined its key

20   marketing story and already resulted in lost deals to large customers:

21       *Simply put, all of our demo issues have to do with our key marketed strength,*
22   *INTEGRATION.  We still have a great deal of difficulty showing Oracle's*
     *integrated suite of applications; from CRM through to ERP.*[21]
23

24   _____

25   [20]    Plaintiffs allege and will prove that notwithstanding the outright falsity and/or failure to
     disclose material facts that would make statements at issue in this Motion not misleading, the
26   breadth and severity and impact of defects in Suite 11i not detailed herein materially undermined the
     accuracy of defendants' statements regarding the functionality of Suite 11i, the Company's 3Q01
27   earnings and growth forecasts.  Further, facts supporting each of these issues will be presented in
     opposition to defendants' expected motion for summary judgment and trial.

28

1                              *     *     *

2      *We cannot show what the customer wants to see when it comes to the  combination
       of CRM and ERP.*

3      *Not only have we lost deals in which we were the new player, many deals have
4      been lost with installed base customers*.

5   Ex. 16; *see also* Exs. 17-19.

6          Hamel   also   referenced   specific   lost   deals   and   the   key   integration   module,   Order

7   Management.[22]   "[A]n Order Management demo which required [us] showing contracts through to

8   accounts receivable . . . took SCs well over a week just to get it to work.  *We're essentially doing*

9   *integration work in the field*."  Ex. 119 at 81:1-6.

10         On February 5, 2001, Julie Cullivan, former Vice President of Sales Consulting, wrote to

11  defendant Sanderson about the Company's "[i]nability to [p]rove our EBusiness Suite Integration

12  Story" in demonstrations.  Ex. 45 at NDCA-ORCL 617970-74; *see also* Ex. 66:

13     *The consistent themes continue to be Poor Performance, Inability to Prove our
       EBusiness [sic] Suite Integration Story, and Product Stability/Quality Issues*.
14                              *     *     *

15     *Cannot show a complete integrated CRM demo let alone a complete EBiz Suite
       (CRM/ERP) integrated demo.*[23]
16
17         Also, in February 2001, Hamel wrote to Executive Vice President Ron Wohl that sales were

    continuing to be lost due to the abysmal performance of Suite 11i in demonstrations.  *See* Ex. 53
18

19

20  _____

21  [21]   *See also* Ex. 1 at NCDA-ORCL 0616860.

22  [22]    Plaintiffs alleged and have now confirmed that Oracle consultants "rigged" demonstrations in
23  order to sell the 11i software.  *See* Ex. 20 at NDCA-ORCL 617118 ("The lack of integration between
    IP and purchasing was inconvenient since we could not show the entire flow without using a *fake
24  data*.").

25  [23]    Securities analysts had reported on December 15, 2000 after 2Q01 financial results, that
    "functional product demos . . . on the eBusiness Suite should propel growth in the applications
26  division going forward." Ex. 33 at NDCA-ORCL 308932; *see also* Ex. 29  at NDCA-ORCL 234436
    ("Demonstrations we're still tweaking those, *we got those all ready now*.").  Ellison also falsely
27  stated "[w]e've got customers live on the whole E-business Suite in 30 to 90 days.").  *Id.*  at NDCA-
    ORCL 234437.

28

1   ("[a]nother deal lost primarily to demo system performance").[24]  Even after March 1, 2001, Oracle

2   still could not demonstrate a working Suite 11i for potential customers.  On March 20, 2001, Roberts

3   explained to Jeff Henley via e-mail, if the 11i application demonstrations "[did] not improve, it will

4   *continue to impact our [sales] conversion rate*,"[25]  Ex. 61.  The negative impact on sales was

5   confirmed by Henley.  *See also* Ex. 126 at 400:1-3 ("I was certainly concerned that not having

6   optimum demos . . . would suboptimize our revenue opportunity.").  Roberts confirmed that when

7   the Company could not show a working demo it could not win sales: "*if you can't give a good*

8   *demo, then you are not going to win as much business*."  Ex. 121 at 301:17-23.[26]  In April 2001,

9   Oracle was still struggling to fix "integration gaps between ERP and CRM."  On April 19, 2001,

10  Roberts again explained to Henley that Suite 11i demonstrations were still "not heading in the right

11  direction."  Ex. 65 at NDCA-ORCL 061370.  A "frustrated" Henley summed up the situation:

12  "Absolutely incredible.  We're blowing the opportunity of a lifetime with 11i."  Exs. 65-66; *see also*

13  Ex. 126 at 400-402.[27]

14                **2.    Undisputed Facts Demonstrate that Defendants Knew that
                          Suite 11i Did Not Work and Suite 11i Customers Demanded**
15                        **Cash Concessions**

16          Defendants, including Ellison, actually knew that throughout the summer of 2000 and the fall

17  of 2001, that Oracle had not delivered the suite they had trumpeted to the market.  In fact, the

18  _____

19  [24]    On February 13, 2001, Roberts made a presentation at the Robertson Stephens Tech
20  conference to discuss Oracle's business and financial prospects to their large institutional investor
        base.  Roberts confirmed to the Robertson Stephens investors that Oracle "believe[d] that
21  applications are the key to [Oracle's] future."  Ex. 48 at 7.

22  [25]    *See also* Ex. 60 at NDCA-ORCL 050624 (Henley: "[G]iven that the conversion rates were
        much less than normal in Q3, we have to assume something like that will happen again this
23  quarter.").

24  [26]    *See also id.* at 176:1-5 ("Well, I – I mean, as I have said, we had some issues with the
        demonstration system.  And if you can't show your product the way you would like, it can impact
25  your sales process.").

26  [27]    The Company's failure to "deliver" an integrated suite was reported by sales consultants as
        affecting the Company's sales consultants ability to sell 11i leading into 3Q01.  (Sales managers
27  prior to 3Q01 who reported that among other things, like few new opportunities available, Suite 11i
        stability, and integration was already impacting sales.)  *See* Ex. 2 at NDCA-ORCL 0616523.

28

1   Company had been fielding a massive number of complaints from Suite 11i customers to whom

2   Oracle had marketed and sold the untested, defect-ridden software, on the false premise that it

3   worked, it was "complete," and "fully integrated" with both ERP and CRM software products out of

4   the box, allowing customers to **save** money in a slowing economy.  Some customers demanded

5   millions of dollars of concessions from Oracle citing defects and lack of functionality in Suite 11i as

6   substantial contributors to their businesses' decline.

7          On November 7, 2000, Liberty Mutual Group, wrote directly to Ellison detailing "basic

8   functionality" flaws with Suite 11i.  Ex. 23:

9          Dear Larry

10                                 *        *        *

11         ***To put it bluntly, we have encountered multiple software quality problems and we
           have struggled to get appropriate support and response to our issues***.

12                                 *        *        *

13         ***[T]he bottom line is that we have a product that does not work . . . .***

14   *Id*. at NDCA-ORCL 018733-35.[28]

15         On December 16, 2000, Pepsi Co. wrote directly to Ellison expressing outrage over the

16   defects in Suite 11i:

17         Mr. Ellison

18         ***Our Oracle [11i] project has been an unmitigated disaster for us from both a cost
           employee and relationship perspective.***

19

20         ***We have spent a fortune (to us) on consultants trying merely to get your product to
           work and months later we still do not have even have [sic] a system to test.  How
           can you release software that does not work is simply beyond my
           comprehension. . . .***

21

22

23   ─────────────────────────

24   [28]     A January 10, 2001 e-mail evidences Liberty Mutual's express dissatisfaction with Suite 11i
           and problems with implementations that were raised to Ellison directly:

25         I need you [sic] help with . . . Liberty Mutual.  ***Even though they are now live, they
           have considerable performance problems and will not be satisfied until they are
           resolved due to the negative impact to their business***.

26

27   Ex. 41.

28

Ex. 36.

On December 20, 2000, and again on January 9, 2001, Rebecca Enonchong of Appstech.com, an Oracle partner, wrote to Ellison explaining that Appstech.com's client (Brock Tool), had already lost nearly $200,000 on a failing implementation of Oracle's Suite 11i. Enonchong further explained that her company, AppsTech, had also purchased 11i financials for internal use and had to scrap it:

> [W]e ordered R11i Financials for our internal use. . . . *We had hoped that using the software internally would serve to reinforce our relationship with Oracle.  We have never been able to implement it and have decided to return it*.
>
> *       *       *
>
> *We have [also] lost close to $200K so far on our implementation of 11i for Brock Tool.*
>
> *       *       *
>
> *Obviously, the Order Management modules were not ready for release to the public in June.  If this product fails, we lose this customer and we could lose our business.*

Ex. 39.

A December 26, 2000 e-mail from Michael Cochoran to Roberts, Henley and Sanderson and forwarded to Ellison, documented more than a thousand lost billing hours and Paxar's refusal to pay Oracle nearly $2 million in license fees and threatened legal action:

> *The situation [at Paxar] has been improving slowly but after hundreds of patches and a significant number of severity 1 bugs . . . OCS has logged over 1,700 hours of non-billable time on such issues. . . .Paxar is refusing to pay the $1.8M license fee that was financed through OCF.*

Ex. 38 at NDCA-ORCL 039327; *see also id.* at NDCA-ORCL 039325.

From January 10, 2001 through January 12, 2001, another purchaser of 11i, TMP Worldwide, communicated via e-mail with Oracle, complaining that it had missed business goals due to the lack of functionality and implementation of Suite 11i.  Cochran characterized the TMP problems as "a familiar story":

> As you know, our corporate goal was to be live on the financials suite January 1, 2001.  We missed that date because Oracle's software is still not ready for production. . . . *TMP spent $1,780,000 on the financials software and another $719,520 for the HR system, which is also unusable at this time.  The delay in our "go live" costs us approximately $75,000 per week in consulting fees alone. . . .*

1    Ex. 42.

2         On January 25, 2001, Chipotle put Oracle on notice that it could lose Chipotle as a reference:

3              Chipotle has finished an upgrade to 11i that was done by OCS. . . . ***They are
     experiencing major performance problems with 11i as well as there still are some
4    feature/function gaps*** . . . .

5         ***The 11i performance issues need to be fixed at Chipotle or BOL will lose one of
     their strongest references*** . . . .[29]
6
     Ex. 44.
7
8         Notably, Oracle had publicly represented in its December 14, 2000 earnings release that

     Chipotle was one of many customers "***live***" on Suite 11i, without disclosing the serious functionality
9
     problems which Chipotle, or any other customers it had reported as "***live***," was experiencing.  Ex. 35
10
     at NDCA-ORCL 014105; Ex. 30 at NDCA-ORCL 019799.
11
          Indeed, customers who had purchased the suite were ***not*** saving money, but instead were
12
     losing the business and the goodwill of their own customers because Suite 11i did not work.  On
13
     August 30, 2001, four months after the end of the Class Period, Oracle had not saved any customer
14
     money.  Mark Jarvis, the Company's head of marketing and public relations in response to request to
15
     issue more positive press releases about the Company to counter negative press, stated:
16
              ***[U]nless we make our revenue numbers in Q1[02], executives stop leaving and we
17    get 11i customers that actually save money . . . , no journalist is going to care.***

18                                  *       *       *

19            ***We are going through a rough patch because 11i did not work (but it does now),
     we missed two quarters and we pissed off a lot of customers with the apps upgrade
20    to 11i.*** . . . .

21   Ex. 69.  Neither defendants nor their software expert have identified a single customer that actually

22   saved money in months using Suite 11i during the Class Period.[30]

23

24   _____

25   [29]     On March 22, 2001, Chipotle removed itself from the reference program: "***We have decided
     to suspend any participation in Oracle PR initiatives . . . .  The hype doesn't meet reality. . . .***"
26   Ex. 62 at NDCA-ORCL 618438.

27   [30]     Yourdon claims that the Company's statements alleged to be false during the Class Period
     were in fact "accurate."  Ex. 130 at ¶¶12, 143.  However, Yourdon remarkably did not and will not
28   offer an opinion on whether any Suite 11i customer actually saved any money months after

1      Defendants knew during the Class Period that Suite 11i was flawed and was costing Oracle

2   millions in free consulting costs alone.  In fact, on September 22, 2000, before the Class Period,

3   Keith Block told Sanderson that the defects with Suite 11i were so pervasive that customers like

4   Yamaha and Veriad were delaying their implementation. Ex. 15.  Block told Sanderson that Suite

5   11i quality problems would "*significantly*" impact sales and consulting revenues, had already cost

6   his support team millions in free consulting, and that even Oracle's own consulting employees have

7   recommended to clients to wait until the new year until the product shakes out."  *Id.*  It is also

8   undisputed that in 1H01, Suite 11i product defects had resulted in a two-point deterioration of FY01

9   margins percentage and had cost Oracle's consulting organization alone *$21 million* in unbilled

10  revenue.  Ex. 63; *see also* Ex. 125 at 187:8-10 ("I think you can see the fact . . . that it impacted us

11  by $21 million . . . .").   In stark contrast, for *all of FY00*, product related issues were only $14

12  million for the consulting organization. Ex. 63 at NDCA-ORCL 159569.  ("R11i Product Issues had

13  a large impact YTD, further negotiations and settlement are ongoing.").

14      **E.    Suite 11i Did Not Work in Every Language Undisputed Facts**
           **Demonstrate and Defendants Knew It**

15

16      Prior to and during the Class Period, the Company sought to convince investors that not only

17  was Suite 11i "pre-integrated and interoperable out of the box," but that it "worked" in "every

18  country and every language."  Ex. 37.  For example, in September 2000, a letter to Oracle

    shareholders falsely claimed that[31]

19

20          *the suite includes every application you need to run your business – marketing,*
            *sales, supply chain, manufacturing, customer service, accounting, human*
            *resources – everything.  It works in every country and in every language.*

21

22  *Id.* at 3-4.  In addition, the Company and the individual defendants repeated similar false statements

23  during the Class Period.

24  _____

25  implementing Suite 11i.  Ex. 135 ("I don't recall offering my own opinion about the savings in
    months.").

26  [31]    In the same letter to shareholders, Ellison stated that "We moved our product demonstrations

27  to the Internet. . . .  Internet product demonstrations and our Web store delivered big productivity
    gains to our sales force."  *Id.* at 8.  As discussed above, they did not work.

28

1       (a)     February 6, 2001

2       And because the CRM suite consists of true Internet applications, ***every application works in every country, every major language, and every major currency***.

3 Ex. 46 at NDCA-ORCL 106691.

4       (b)     February 13, 2001

5

6       So not only do we have, you know, for example, an E- business Suite . . . ***[b]ut it's basically ERP and CRM all integrated together***.  ***But it's written in 23 different languages, including Spanish Spanish and Latin American Spanish, Portugal Portuguese and Brazilian Portuguese as being four different languages.  But we also have taken care of the localization requirements of all these countries around the world as well*** . . . .

7

8

9 Ex. 49 at NDCA-ORCL 03285.

10       Defendants do not and cannot dispute that during and after the Class Period, Suite 11i did ***not***

11 ***work*** in every language, nor every major language, and it negatively impacted sales at the end of

12 2Q01.  Executive Vice President Sergio Giacolleto told Ellison, Henley, and Sanderson that sales

13 staff in Europe, Middle East, and Africa were unwilling or unable to sell Suite 11i effectively

14 because of product defects and incomplete language translations.  Ex. 28:

15

16       ***[W]e are loosing [sic] a bit of momentum; sales people are reluctant to engage to the product problems, lack of references and local language issues*** . . .  ***Hopefully the situation will turn in January once we get 11.5.3 running in local language***.

17

18 *Id*.

19       A January 21, 2001 e-mail from Giacolletto to Ellison stressed the sales and revenue impact

20 of the failure to get the language issues in Suite 11i to work:

21       ***The gap between code freeze and NLS availability is growing again.  For example 11.5.3.  NLS will not be fully translated including help until May 2001 for the first languages and August 2001 for the last language***.

22

                              \*        \*        \*

23

24       ***We just completed the testing of the translation of 11.5.1 NLS and we found almost 5,000 translation issues to be fixed.  This is a problem for our mid market strategy where NLS is critical***.

25 Ex. 43.

26       In fact, even in 4Q01, months after the Class Period, Oracle did not have a stable release

27 transferred into local languages:

28

Mark,

I [sic] also disappointed by the results . . . but . . . as you know, ***we had six-nine months of product issues which caused loss of confidence by sales, partners, analysts and customers***.

Even as of today, ***R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will only get it between July and October 2001***.

Ex. 67 at NDCA-ORCL 162215-16.

Wohl, who was responsible for the overall Suite 11i applications, also admitted that despite statements that the software worked in every country and in every language – it did not.  Instead, Oracle "made decisions in terms of which modules to translate into which languages, and did not choose to translate every module into every language."  Ex. 114 at 220:13-15.[32]

As demonstrated by an Oracle 2002 High Level Technical Requirements Document, drafted by Oracle's field engineers, Suite 11i was not even capable of operating in every language.  Suite 11i was not built with the architectural capability including full multibyte "UTF-8" support which is required to work in ***every*** language or even ***every*** "major language."  Exs. 46, 49.  The High Level Technical Document states that Suite 11i specifically lacked multibyte support, creating a "significant impediment to our success in Asia Pacific."  Discussing the issue, the field engineers stated:

***Key to this is the concept of UTF-8 (for true support of a single global installation with multiple double byte character set languages) and multibyte support for the entire suite, specifically within APAC, lack of multibyte support across the various front office systems is going to be a significant impediment to our success in China, Taiwan, Korea and Japan.***

Ex. 79 at NDCA-ORCL 069921, 069930.

***The lack of functionality within projects, for example, severely impacts the ability to successfully deploy a global solution involving projects spanning multiple countries with multiple languages.***[33]

---

[32]    Wohl also testified that like the Company's lack of universal process for integration testing of Suite 11i, person, group, or persons or organization had full responsibility for assuring that all of Suite 11i actually did work in all languages.  *Id*. at 217-19.

[33]    Cliff Godwin testified that he believed that Suite 11i was delivered with the UTF8 architecture; however, conceded the Company did not deliver translated applications with the release that would have allowed the software to work in multiple or every language.  Ex. 113 at 136-138.

1    *Id.* at NDCA-ORCL 069938.

2         Finally, when confronted in his deposition in 2006, Ellison admitted that Suite 11i did ***not*** in

3    fact work in *every* language:

4         Q.      [I]t says, "***Today the suite includes every application you need to run your***
         ***business***," and it goes through that.  And you say "***everything***," ***and you say, "it***
5    ***works in every country***."

6         A.      *I suppose, to make it very precise, it should say every major*
         *country. . . . [Y]ou can take exception that it was general rather than – general*
7    *and imprecise, and it didn't work . . . .*

8    Ex. 124 at 131:9-21.

9         These facts are undisputed.

10        **F.     Undisputed Facts Demonstrate that Oracle Knew that Its Internal**
              **Upgrade to Suite 11i Had Shut Down the Company for Two Weeks**
11             **and Cost Oracle Millions in 3Q01 Revenue**

12        Even though Oracle said that upgrading to Suite 11i had allowed it to save $1 billion and

13   analysts reported during the Class Period that Oracle had further upgraded to Suite 11i in January,

14   2001, it is undisputed the Suite 11i upgrade – including 11i Order Management caused the Company

15   to experience much of the same technical difficulties experienced by its customers.    Mark

16   Barrenechea stated:

17        *What happened was  one of the most dramatic moments I'd seen during my five*
         *years at Oracle.  Everyone knew that we could not place an order with the new*
18   *system.*

19                             *             *             *

20        *So we upgraded [to 11i], and Oracle went down.  We were down for fourteen days*.
         It was frightening. . . .  *At that point I became acutely aware of the customer*
21   *dissatisfaction) . . . .*

22   Ex. 95 at 196.

23        More importantly, Oracle's January 2001 upgrade to Suite 11i left Oracle's financial staff

24   unable to properly track sales of support renewals in the new software Suite 11i.  The upgrade to

25   Suite 11i and lack of functionality caused the Company to lose approximately $20-$30 million in

26   revenues in 3Q01.  *See, e.g.*, Exs. 51-52, 54-56.  Oracle, through the SLC, admitted that the January

27   2001 11i internal implementation upgrade contributed to the 3Q01 revenue shortfall:

28

> The Committee's investigation revealed . . . [that] **Oracle's business may have been affected by the internal implementation of Suite 11i. . . . First, it is possible that the implementation of the OKS module of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001. . . .**

Ex. 93 at NDCA-ORCL 295356.

The probable 3Q01 revenue shortfall in Oracle's 3Q01 support business as a result of its own Suite 11i implementation was known no later than February 15, 2001 – two weeks before the end of the quarter – by the Company's most senior executives including Safra Catz, Ellison, Henley, Minton and Williams. *See* Ex. 112. Specifically, Suite 11i OKS module could not provide support renewal staff with accurate or complete contract renewal information for 3Q01 forecasted revenues and could not provide information to explain why the support business had already suffered a $20 million revenue shortfall in December 2000 and January 2001. *Id.* On February 15, 2001, Jennifer Minton, in near panic, because Oracle "cannot afford to miss [its] revenue forecast," wrote to Mark Barrenechea, the lead CRM developer concerning the revenue shortfall resulting from the internal upgrade.[34]  Ex. 52.

> Mark–
> **The support organization missed their Dec and Jan revenue forecast by $20 million dollars, and are seriously at risk of missing additional support revenue in the month of February if we do not get immediate visibility to the status of support contracts up for renewal.  We cannot afford to miss our revenue forecast this quarter. . . .**

Ex. 51 at NDCA-ORCL 101417-18.

Notably, only days earlier, the Oracle's CRM Technical Whitepaper touting Suite 11i's CRM completeness and capability challenged customers to examine whether they could manage their global forecast with their existing software:

> Can you state your exact global sales forecast, up to the minute? . . . **covering** all geographies, all lines of business, all products, all services, all customers, all partners–and **including all licenses, product renewals, support contracts, Web-based sales** . . . .

---

[34]     Even with actual knowledge that the Company's internal implementation of Suite 11i had not only had severely impacted revenue forecasts for at least one of its business organizations, on February 20 and 21, 2001, defendants specifically reiterated the Company's revenue and earnings forecast including 75% applications growth failing to disclose that the internal implementation was likely causing a substantial revenue decline.  Ex. 14; Ex. 140.

1  Ex. 46 at NDCA-ORCL 106694.

2      The described "product renewals" and "support contacts" functionality was exactly that

3  which Oracle and their own full team of developers could not get to work at Oracle

4  contemporaneously with the representation.

5      **G.    Oracle Knew that It Had Not Fully Tested Whether Suite 11i Worked
           in an Integrated Fashion and Never Tested the Order Management
6          Module – at All – Which Was Crucial to Performing Integrated
           Business Flows**

7      It is undisputed that the 11i Suite modules were never fully tested to determine whether the

8  suite modules actually functioned in an integrated fashion – and defendants knew it.  Oracle did little

9  if any significant integration testing of the Suite 11i to support claims that ERP and CRM worked in

10  an integrated fashion out of the box.  Oracle essentially admits that Suite 11i was not in fact

11  "designed and engineered" to work in fully integrated fashion and concedes that the development

12  and engineering flaws originated with the Company's software development process where the ERP

13  and CRM applications were engineered by different organizations that did not communicate with

14  one another or test whether the CRM modules worked together with the ERP modules.

15      Ron Wohl, head of all Oracle applications during the Class Period, and specifically

16  responsible for the development of Suite 11i ERP applications, acknowledged the link between the

17  integration defects and the lack of testing, especially the integration points at the boundary between

18  the ERP and CRM modules:

19          In terms of the interaction between the groups, clearly in retrospect as well,
20      ***just as there should have been more testing of the ERP product stand-alone, there
        should have been more testing of the CRM product stand-alone***, there should have
21      been ***more testing of the boundary points between ERP and CRM, and there should
        have been better – there should have been better coordination of processes*.**[35]

22      Oracle's Senior Vice President for Applications Technology Cliff Godwin corroborates

23  failure of the testing process and that no individual or group was responsible for the critical

24  ERP/CRM integration and determining the ability of the ERP and CRM applications could

25  "communicate with one another":

26  _____

27  [35]      *See* Ex. 114 at 106:14-21.

28

1   *There is no single person with that [integration testing] responsibility*.

2                                 *       *       *

3           *[T]here is no individual who is performing that specific task or group that
    is performing that specific task*.[36]

4
5   Even Vice President of Application Integration, Seiden, further corroborates the lack of

6   integration testing and that no application integration group was testing whether "information could

    flow" between ERP and CRM:

7
8           *The bulk of my team was focused on ERP*. . . . [37]  We did some testing of the
    integration between CRM and ERP, but ultimately we were just an audit group.[38]

9   Oracle, through the SLC, also admitted that part of development failures with Suite 11i and

10  integration testing and patches was "the structure of the development effort with Wohl in charge of

11  ERP aspects of the Suite and Barrenechea in charge of the CRM modules sharing integration

12  responsibilities."  Ex. 93 at NDCA-ORCL 295346;[39] Ex. 93 at NDCA-ORCL 295347.  Internal

13  documents and depositions corroborate both the Company and Wohl's admission.  The leaders of the

14  two organizations developing the purportedly "integrated" CRM and ERP suite, rarely

15  communicated.  Wohl, who recommended the May 2000 release date of the "integrated" Suite 11i,

16  concedes now that he "knew little about CRM" at the time Suite 11i was released:

17  _____

18  [36]  *See* Ex. 113 at 33:9-15.  Note: The specific questions were (a) whether Greg Seiden (Oracle's
19  nominal Vice President for Application Integration) was "responsible for developing how the
    various applications [in the E-Business Suite] would communicate with one another," "who was
20  responsible for that?," and "[w]as there a group with that responsibility?"  *Id.* at 32:23-33:5.

21  [37]  *See* Ex. 118 at 65:13-18; *see also* Ex. 93 at NDCA-ORCL 295347 (Wohl: "We should have
    done more testing.").

22  [38]  Ex. 118 at 67:25-68:4.  Seiden explained that the "testing" just consisted of identifying
23  "eighteen to twenty key business flows" and running them.  The results of these limited tests were
    compiled in what was referred to as the "*smiley face bomb report*" where "for each of the eighteen
24  to twenty key business flows, its status would be marked with either a smiley face, meaning that the
    test went through successfully, some squiggly lines, meaning that there was an upstream bug that
25  prevented them from completing the test, or a bomb, meaning that they encountered a bug directly in
    that test"(*see id.* at 79:13-22).

26  [39]  In addition to admissions that the Company did not do enough testing, according to Wohl,
27  "we didn't do a good job up front our QA [quality assurance] *procedures did not work*."  Ex. 95 at
    203.

28
    PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ        - 43 -

Q.     At the time you didn't know whether or not the CRM products, software, had actually passed any tests or functionality tests related to ERP software?

A.     *I had very limited information about the testing completeness of CRM.*

Ex. 114 at 79:24-82:23.

According to Area Vice President Michael Decesare who was responsible for sales in the entire west region, as corroborated by objective evidence, testified that Suite 11i did *not work out of the box* in part because it was not engineered to work together:

> *CRM products were heavily overmarketed. As you saw in Julie's note, there was major pieces of functionality that were advertised that just did not exist*. . . . look **[sic]** at that statement by Mark Barrenechea in there. *It's not factual.  It's not true. It does not operate as integrated out of the box.  That's – that's false*.
>
> *              *              *
>
> *The way the applications were built in 11i was no better integrated than the previous releases.  Ron Wohl still ran ERP.  Mark Barrenechea ran CRM.  They didn't communicate very effectively.  There is noting more – more integrated or coordinated about 11i than there was about the previous releases*.[40]

*Id.* at 234:17-253:3, 236:17-237:13, 239:7-10, 252:12-14.

Indeed, undisputed facts demonstrate one of the critical components (Order Management) necessary for Suite 11i to work in an integrated fashion was not tested.  Ellison described Order Management Module as "the heart of the sell side of our e-business Suite.  Order Management is the funnel that captures all of the information about sales."  Ex. 95 at 192; *see also* Ex. 11.  However, Oracle admittedly never tested the Order Management module, even for basic functionality much less tested it for its actual ability to work  with other applications in the suite, before releasing it in Suite 11i:

> *We had just finished a complete rewrite of our order management system*.  It was a huge job.  The new order management system was dramatically better than the old one, *but it hadn't been tested yet so . . . it was my decision.  It's in my nature to go for the highest-risk/highest-reward option.  That's my cross to bear*.  We went from having an average order management product to having the premier order management product on the planet.  *The only problem was that it was brand new and we hadn't done enough testing*.

---

[40]     Decesare further testified that the CRM product specifically there was things it was advertised to do that just weren't built in the production software."  Ex. 111 at 252:12-14.

1    Ex. 95 at 192.

2         Ellison further admits that as of the release in May 2000, the Order Management had "huge

3    problems. . . .   It hadn't been used anywhere it had just been finished, ***the paint was drying***." Ex. 71

4    at NDCA-ORCL 1529167.[41]

5         Notwithstanding plain admissions of falsity of statements made during the Class Period and

6    knowledge thereof, it is also undisputed that as late as July 2001, again several months after the

7    Class Period, Oracle was ***still*** shipping Suite 11i and patches ***without integration testing*** and had not

8    even developed a complete process for significant testing of the integration of Suite 11i nor the

9    software patches that it was issuing to customers who were experiencing massive technical

10   difficulties as they were attempting to install and implement the software.  For example, on July 9,

11   2001, Don Klaiss, Senior Vice President of Manufacturing and Supply Chain Products (both Suite

12   11i components), in response to an internal complaint that Oracle did not have a system "where

13   complete integrated systems testing for the whole ERP and CRM suite can take place . . . that can

14   prove that all of the integrated flows," wrote about the Company's inability to test integration.  Ex.

15   68 at NDCA-ORCL 056441:

16            ***Today's situation is that we cannot test integrated business flows prior to customer
               shipment.  We are releasing new ERP and CRM Family Packs regularly but do not
17            test them against each other – clearly a bad situation***.

18   Ex. 68 at NDCA-ORCL 056440-41.

19        The fact that Oracle was shipping software to customers without testing in ***July 2001*** was not

20   new information to the Company's senior staff.  Oracle's Senior Vice President Valerie Borthwick,

21   knew for months that was the case.  In October 2000, Borthwick was also informed about the

22   apparent lack of testing from its most valued consultants:

23            ***I think the patches are not well tested especially with other [sic] modules to ensure
               it does not impact the system.  Very often the patches break a heck of a lot of stuff***.
24

25   _____

26   [41]     In a January 18, 2002 interview with Matthew Symonds, author of *Softwar an Intimate
     *Portrait of Larry Ellison and Oracle*, Ellison is quoted as follows regarding Order Management, "Oh
27   I knew there was a huge risk up front . . . .   I can't plead ignorance on this . . . ."  *Id*. at NDCA-
     ORCL 1529168.

28

1                    *     *     *

2   *Patches that are released are not properly tested*. Recommendations to apply
    patches one day are quickly sent with another message to say don't apply them due
3   to further problems. *Patches shipped which did more harm than solve the problems
    are common*.

4   Ex. 21.

5   **H.    Internal Software Development Documents Demonstrate that Two
6          Years After Release Suite 11i Was Still Not Fully Integrated**

7        In June 2002, more than a year after the Class Period, and according to Ellison, the

8   Company's "field engineers, the people who are responsible for implementing our applications

9   around the world" researched and created the confidential E-Business Suite High Level

10  Requirements Document for the Company's senior executives including Ellison, to address

11  deficiencies and integration and technical gaps that were "so fundamental that it exposes [Oracle's]

12  development environment as 'best of breed' rather than one of a unified software vendor." Ex. 79 at

13  NDCA-ORCL 069913; *see also* Ex. 124. The E-Business High Level Requirements Document

14  specifically identified "integration issues" between ERP and CRM and made development

15  recommendations that were critical for Oracle to "overcome the lack of integration between the E-

16  Business Suite Modules (ERP/CRM)." Ex. 79 at NDCA-ORCL 069920.  The document discusses

17  failures in Suite 11i base engineering architecture with respect to integration:

18      *The capabilities to perform an integrated planning in the E-Business Suite is
        broken.*
19
                         *     *     *
20
21      *The concept of Oracle Demand Planning is to pull demand information from a
        number of sources including Marketing, Sales and Manufacturing . . . . Yet these
22      are not able to be transmitted to the Forecasts . . . .*

23                       *     *     *

24      *This implies that we cannot plan/produce according to forecasts or that customers
        have to manually rekey the information entered in CRM into the Forecasting
25      modules of Oracle ERP.*

26  *Id*. at NDCA-ORCL 069922-23.

27

28

1    The E-Business Suite High Level Requirements Document further details failure of

2  integration between Suite 11i Human Resources (ERP) and the CRM module. *See* Ex. 79; *see also*

3  Ex. 10:

4         ***The integration between HRMS / Payroll and CRM is not complete***.  Some specific
         examples can be highlighted:

5

6         • OAB (Advanced Benefits) needs to integrate with Call Center.

7                                    *        *        *

8         • OSO – sales hierarchies are created in Resource Manager and this is separate
           from any hierarchy included in HR, which makes it difficult positioning the
           "one suite" message into existing HR Accounts.

9

10  Ex. 79  at NDCA-ORCL 069925.

11    The E-Business Suite High Level Requirements Document further demonstrates and

12  confirms that even in 2002, the Division of Organization between ERP and CRM was impairing the

13  ability of the software to work in an integrated fashion.  Indeed, CRM and ERP still lacked a

14  common User Interface in design and functionality:

15         ***Within the different teams (CRM/ERP) the development is drifting in different***
         ***directions.  This is the case due to the underlying technology differences*** (as
         described above) but also due to different approaches in the UI design (as can be
16         seen from the different UI Strategies for ERP and CRM).

17  *Id.*

18    Ellison has confessed that all of the pieces of Suite 11i were not "plug and play" or

19  "complete" during the Class Period as he claimed during but rather were incomplete as the

20  E-Business High Level Requirements Document identified:

21         ***[N]ot all the pieces [of Oracle 11i] worked together as well as they could***
         ***have*** . . . .  and we were constantly making improvements . . . ***and this document***
22         ***helped us pinpoint some of the things we had to work on.***

23                                    *        *        *

24         Therefore, ***using that plug [and play] analogy, you know, there would be the***
         ***receptacle but no prong in one of the plugs, just – it was a pretty new product. You***
25         ***know, the plug wasn't complete***.

26  Ex. 124 at 534:4-9, 535:14-21.

27    These facts are not and cannot be disputed.  Even defendants' expert Yourdon cannot opine

28  that Suite 11i was ***fully*** integrated because he admittedly never analyzed whether the suite was

integrated in terms of user "interface integration" or "functional integration," two of the four forms of integration identified as necessary for integration.  *See* Ex. 130 at 36 n.38; *see* Ex. 135 at 236:17-22, 238:5-7 ("Q.  It is fair to say that you are not offering an opinion as to whether or not Suite 11i was integrated with respect to user interface integration for functional integration?  A.  I have not offered such an opinion in this report. . . .  I have not evaluated the functional integration characteristics or capabilities of Suite 11i or the user interface capabilities."); *see also* Ex. 13 at 7-8 (an absence or failure of any one of these four can render software not integrated).

I.      **Disclosure of Oracle's True Financial Condition Proximately Caused Plaintiffs' Economic Loss**

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."  109 Stat 747, 15 USC §78u-4(b)(4)] [15 USC §78u-4(b)(4)]; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-44 (2005).  In order to prove loss causation, a plaintiff must demonstrate a causal connection between the misrepresentation and the loss, *i.e.*, defendants' misrepresentation proximately caused plaintiffs' economic loss.  *Id*.  While a so called "corrective disclosure" specifically linking a disclosure to a specific misrepresentation, may be ***one way*** of proving loss causation, such a corrective disclosure is not required.  *See Nursing Home Pension Fund v. Oracle Corp.*, Master File No. C-01-0988-MJJ, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006).  Rather, loss causation can be proved with evidence of a stock price decline when facts revealing the company's true financial conditions are disclosed.  *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006) (a plaintiff adequately pleads loss causation where a defendant reveals the Company's "true financial condition").

Here, it is undisputed that at the end of the Class Period, new information was disclosed concerning the true financial condition of Oracle's overall business and more details concerning the impact of the slowing economy on Oracle sales results, Suite 11i applications and its failure to meet specific 75% growth in the quarter – or drive database sales to help Oracle meet 3Q01 EPS forecasts of $0.12.  Ex. 58, 142.  On March 1, 2001, the Company reported that it had missed its 0.12 cents per share earnings forecasts by $0.02, which it had, on December 14, 2000, directly pegged to its *false* $0.11 per share reported results in 2Q01.  Ex. 29 at 8.  The new information revealed in the

1  Company's March 1, 2001 press release and conference call of the same day and reports of the

2  financial analyst community undisputedly caused the statistically significant stock price decline on

3  March 2, 2001, and plaintiffs' economic loss. *See* Ex. 141 at 11, 22. Defendants' expert Christopher

4  James unequivocally agrees that the March 1, 2001 disclosure was indeed new information

5  concerning the Company's true financial condition of its overall business, applications growth of

6  Suite 11i and its future prospects which caused the stock price decline:

7       I would view material new information *regarding both the applications business as*
        *well as Oracle's other businesses and how they were faring in the then current*
8       *economic environment*.

9       Q.      And what was the new information regarding how the applications business
        was faring . . . ?
10

11      A.      I think *it is clear to me that the market and market participants were*
        *concerned about the earnings miss and what it conveyed in terms of future*
        *business prospects in the then current economic environment*.
12

13  Ex. 137 at 137:14-138:1.

14       Indeed, the March 1, 2001 disclosures was new and broad reaching in that it disclosed that

15  the U.S. economy has substantially and negatively impacted sales growth.  The Company also

16  reported that applications – Suite 11i – sales had fallen well short of Oracle's stated and reaffirmed

17  forecasts of 75% year over year (*see* Ex. 140), notwithstanding Oracle's claims that Suite 11i's

18  functional efficiency would drive sales forward, even in a slowing economy.

19       This Court has rejected defendants' previous attempts to suggest that plaintiff is required to

20  connect specific misrepresentations with specific disclosures.  *See Oracle Corp.*, No. C01-00988

21  MJJ, 2006 U.S. Dist. LEXIS 94470, at *36 (N.D. Cal 2006) ("as to Defendants' argument that

22  Plaintiffs have failed to identify a corrective disclosure with regard to Plaintiffs' Accounting Claim

23  and Design Claim, the Court finds them without merit").

24       Plaintiffs have, in any event, plainly demonstrated the causal connection between the

25  defendants' misrepresentations (including Suite 11i applications and accounting claims) and

26  plaintiffs' economic loss with undisputed facts.  For example, it is undisputed that on December 14,

27  2000 Oracle, announced 2Q01 revenues and earnings results informing investors of its then current

28  financial condition along with projections of its future revenues and earnings, specifically with

1    respect to 3Q01.  Ex. 30.  The December 14, 2001 press release and conference call with 2Q01

2    financial results specified that Oracle had in fact earned $0.11 per share (which was knowingly and

3    materially false, as detailed herein) for 2Q01 and achieved 66% applications [11i] growth – beating

4    analysts expectations for both earnings and applications sales.  Ex. 30, 29.[42]  Further, the Company,

5    in the same press release and conference call, made the false representations discussed above

6    regarding the functionality of Suite 11i and growth forecasts.  *Id*.  The Company's 2Q01 results,

7    3Q01 forecasts and misstatements concerning the functionality and prowess of Suite 11i were

8    repeated throughout the Class Period.  In response to the December 14 results, Oracle's stock price

9    increased from $27.50 on December 14, 2000 to $29.63 on December 15, 2001.  *See* Ex. 34 ("Oracle

10   Shares Rises After Reporting Higher Quarter Profit").  Oracle's stock price movement after the

11   December 14, 2000 announcements was undisputedly statistically significant.  Ex. 141;

12        Further, the Company and the investment community used the Company's 2Q01 reported

13   sales and $0.11 per share earnings performance as evidence that Oracle could and would weather the

14   economic downturn, and specifically form the basis for 3Q01 forecasted revenue and earnings,

15   which Oracle particularized as 75% applications growth and $0.12 per share in 3Q01.[43]  Ex. 29.

16   Henley specifically connected the $0.11 cents per share reported in 2Q01 to set 3Q01 forecasts for

17   investors.  *Id*.  Discussing 3Q01 earnings forecast of $0.12 EPS, Henley noted "historically, the third

18   quarter is slightly better than the second quarter.  That's the way, sequentially, its worked here. . . .

19   So I would assume, 12 cents would be a reasonable number.").  Ex. 29 at NDCA-ORCL 234427.  It

20   is undisputed that on the March 1, 2001, when Oracle pre-announced 3Q01 financial results with

21   new information concerning its failure to meet forecasted revenue, earnings database growth,

22

---

23   [42]    Plaintiffs intend to also prove at trial, if one is necessary, that the defendants improperly
24   recorded a $20 million illegal midnight, last day of the quarter swap transaction with Hewlett
     Packard ("HP"), which had no economic basis but was instead only designed to inflate earnings of
25   both Oracle and HP.  Without the $20 million HP swap transaction, Oracle would have reported only
     54% applications growth in 2Q01.

26   [43]    During the December 14, 2000 conference call, the Company specifically cited Microsoft,
27   which had pre-announced an earnings miss on the same day,  as being particularly sensitive to the
     economy.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ          - 50 -

1   applications growth and its future growth case uncertain, Oracle's stock price suffered a statistically

2   significant decline.  Ex. 58.

3        Based upon the undisputed facts plaintiffs have demonstrated that the Oracle's

4   misrepresentations during the Class Period proximately caused plaintiffs' economic loss.

5   **IV.**    **CONCLUSION**

6        As detailed herein, undisputed facts demonstrate that there exists no genuine issue of material

7   fact as to whether the Company issued false and misleading statements set forth herein during the

8   Class Period, with the requisite state of mind, in violation of §10b of the Exchange Act and Rule

9   10b-5.  Accordingly, plaintiffs respectfully request that the Court enter an order granting plaintiffs'

10  motion for partial summary judgment.

11  DATED:  October 9, 2007        Respectfully submitted,

12          COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP

13          SHAWN A. WILLIAMS
        WILLOW E. RADCLIFFE

14          MONIQUE C. WINKLER
        ELI R. GREENSTEIN

15          DANIEL J. PFEFFERBAUM

16

17                  /s/
          SHAWN A. WILLIAMS

18

19          100 Pine Street, Suite 2600
        San Francisco, CA  94111
        Telephone:  415/288-4545

20          415/288-4534 (fax)

21          COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP

22          MARK SOLOMON
        DOUGLAS R. BRITTON

23          STACEY M. KAPLAN
        655 West Broadway, Suite 1900

24          San Diego, CA  92101
        Telephone:  619/231-1058

25          619/231-7423 (fax)

26          Lead Counsel for Plaintiffs

27  T:\CasesSF\Oracle3\BRF00046287_MSJ.doc

28

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List.

5        I certify under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct.  Executed on October 9, 2007.

7

8                                                    /s/
                                            SHAWN A. WILLIAMS

9                                   COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
10                                  100 Pine Street, 26th Floor
                                    San Francisco, CA  94111
11                                  Telephone:  415/288-4545
                                    415/288-4534 (fax)
12                                  E-mail: ShawnW@csgrr.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111