COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
      – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | PLAINTIFFS' [CORRECTED] AMENDED NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |

DATE:          November 16, 2007
TIME:           1:30 p.m.
COURTROOM:  THE HONORABLE
                        MARTIN J. JENKINS

**PREVIOUSLY FILED ON SEPTEMBER 6, 2007**
**(DOCKET NO. 1053)**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND FACTUAL OVERVIEW ..........................................................1

    A.    Undisputed Facts Support Entry of Partial Summary Judgment on
    Misrepresentations Concerning E-Business Suite 11i .............................................1

    B.    Undisputed Facts Support Entry of Partial Summary Judgment on Oracle's
    Misrepresentation of Its 2Q01 Revenue and Earnings Results................................3

II.   STANDARD ON SUMMARY JUDGMENT ......................................................................4

III.  ARGUMENT ........................................................................................................................5

    A.    There Is No Genuine Dispute of Material Fact that Oracle's Revenues and
    Earnings in 2Q01 Were Overstated by at Least $0.01 Per Share ...........................5

    B.    Defendants Were Aware of Oracle's Misuse of Debit Memos and
    Customer Overpayments to Inflate Oracle's 2Q01 Financial Results ....................7

        1.    Oracle Knew About the Fraudulent $20 Million in Transfers Prior
        to Its Earnings Announcement on December 14, 2000 .............................8

        2.    Undisputed Facts Demonstrate that the November 2000 Debit
        Memo Clean Up Was Part of Oracle's Attempt to Conceal Its
        Accounting Manipulations in 2Q01........................................................10

        3.    Undisputed Facts Surrounding Oracle's 2002 Clean Up
        Demonstrate Defendants' Fraudulent Intent.............................................11

    C.    Suite 11i Was Not Fully Integrated and Interoperable Out-of-the-Box, Nor
    Was Suite 11i Easy to Install and Did Not Help Save Money Fast.......................14

    D.    Undisputed Facts Demonstrate that Suite 11i Did Not Work in Every
    Language................................................................................................................17

    E.    Undisputed Facts Demonstrate that Oracle's Internal Upgrade to Suite 11i
    Cost Oracle Millions ............................................................................................19

    F.    Oracle Knew that It Had Not Fully Tested Whether Suite 11i Worked in
    an Integrated Fashion ...........................................................................................20

    G.    Internal Software Development Documents Demonstrate that Two Years
    After Release Suite 11i Was Still Not Fully Integrated.........................................22

    H.    Oracle's Misrepresentations and Disclosure of Oracle's True Financial
    Condition Proximately Caused Plaintiffs' Economic Loss ...................................23

IV.   CONCLUSION...................................................................................................................25

PLTFS' [CORRECTED] AMENDED NOT OF MOTION AND MOTION FOR PARTIAL SUMMARY
JUDGMENT; & MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - C-01-0988-MJJ

- i -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................................4

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) ......................................................................................5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................4

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    387 F.3d 468 (6th Cir. 2004),
    *cert. denied*, 546 U.S. 936 (2005) ...............................................................................5

*Dura Pharms., Inc.  v. Broudo*,
    544 U.S. 336 (2005)......................................................................................................23

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ......................................................................................5

*In re Daou Sys. Inc.*,
    411 F.3d 1006 (9th Cir. 2005),
    *cert. denied*, 546 U.S. 1172 (2006).............................................................................23

*Nursing Home Pension Fund v. Oracle Corp.*,
    No. C-01-0988-MJJ, 2006 U.S. Dist. LEXIS 94470
    (N.D. Cal. Dec. 20, 2006) ............................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. ___, 168 L. Ed. 2d 179 (2007) .......................................................................5

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j ..................................................................................................................................4
    §78u-4(b)(4).....................................................................................................................23

17 C.F.R.
    §240.10b-5 .......................................................................................................................4

Federal Rules of Civil Procedure
    Rule 56(c)......................................................................................................................1, 4
    Rule 56(e).........................................................................................................................4

TO:  ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on November 16, 2007, at 1:30 p.m., plaintiffs will move this Court for an order granting their Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56(c) and Civ. L. R. 56.  The motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, the Appendix of Exhibits, pleadings and evidence previously submitted and any other information submitted before or during the hearing on this matter.

# I.   INTRODUCTION AND FACTUAL OVERVIEW

## A.   Undisputed Facts Support Entry of Partial Summary Judgment on Misrepresentations Concerning E-Business Suite 11i

On May 24, 2000, Oracle Corporation ("Oracle" or the "Company") released its "revolutionary" E-Business Suite 11i ("Suite 11i"), which combined back office enterprise resource planning ("ERP") with front office customer relationship management ("CRM") software.  Prior to and during the Class Period (December 14, 2000-March 1, 2001), Oracle sought to convince investors that sales of Oracle's Suite 11i would drive the Company's future revenue and earnings growth and more directly drive FY01 and 3Q01 revenue forecasts (including applications growth of 75% year over year).  To advance that theme, defendants repeatedly and falsely claimed that Suite 11i was a fully integrated[1] and interoperable suite of software applications that was fully functional "out-of-the-box," "combin[ing] tightly integrated ERP and CRM." Exs. 10, 12-13. Suite 11i "eliminate[d]. . . the largest cost and risk factor associated with enterprise application implementations." Ex. 10.  The Order Management ("OM") module was "***the critical component that enables orders to seamlessly flow from customer-facing operations through the supply chain***." Ex. 11.[2]

---

[1]      Integration refers to the relationship between modules within a single product or suite of products.  Expert witnesses for both parties agree that "Integration" includes:  1) "data integration," 2) workflow integration, 3) functional integration, and 4) user interface integration.  Exhibit 130 at 35-41; Ex. 133 at 7-8.  (All exhibits are attached to the Appendix of Exhibits, filed on July 26, 2007.)

[2]      All citations and internal quotations are omitted and all emphasis is added.

Suite 11i and Oracle's "integration" value proposition was material to investors and described as ***the*** feature that separated Oracle from other software vendors and would insulate Oracle from any potential economic downturn. Ex. 47. Larry Ellison assured investors that the Company had delivered the finished Suite 11i to customers ("It's getting clearer and clearer . . . that not only, we can deliver the suite, ***but we have delivered the suite***."). Ex. 29 at 234429. Indeed, Oracle's future financial growth, investment value of Oracle's stock, depended on the success of Suite 11i.[3] Further, for 2Q01, the Company reported 66% applications growth, which according to some financial analysts "validat[ed] the . . . integrated, comprehensive solution," and allayed early concerns about early reports of bugs in the software.[4] Ex. 31. During the Class Period, defendants made the following key false and misleading statements at issue in this motion:

(a)   December 14, 2000: [Y]ou can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required. ***It's up and running in months. You get the savings in months.[5] It costs you less, and it takes less time to install***. Ex. 29 at 234430.

(b)   January 9, 2001: The suite is ***pre-integrated and fully interoperable out of the box***, ***helping to lower consulting costs and time-to-value***. Ex. 40.

(d)   February 6, 2001: And because the CRM suite consists of true Internet applications, ***every application works in every country, every major language, and every major currency***. Ex. 46 at 106691.

(e)   February 13, 2001: So not only do we have, you know, for example, an E-business Suite . . . *[b]ut it's basically ERP and CRM all integrated together. But it's written in 23 different languages, including Spanish Spanish and Latin American Spanish, Portugal Portuguese and Brazilian Portuguese as being four different languages. But we also have taken care of the localization requirements of all these countries around the world as well*. . . . Ex. 49 at 03285.

---

[3]   Ex. 138 ("Oracle's premium multiple is driven in large part by the potential growth in its e-business applications . . . ."); Ex. 143 ("Oracle's current valuation reflects the realization of the projected revenues associated with its new eBusiness Suite.").

[4]   *See* Ex. 32 ("Applications license growth of 66% solidly outpaced Street expectations in the 50-60% range. The ***outperformance should also allay concerns about the viability of Oracle's, applications business and the relative immaturity of release*** . . . ."); *see also* Ex. 33 ("We anticipate the ***applications division will continue to accelerate*** . . . . We are under the impression that the first version had considerable bugs . . . .").

[5]   Ellison had reiterated the savings to be had by implementing Suite 11i at the November 29, 2000 Credit Suisse First Boston conference. "So why would they go ahead and install the e-business suite? I think if you want to save . . . ." Ex. 25 at 26.

(c)    <u>February 21, 2001</u>: ***Now the nice thing is it's like Lego blocks.  Once you have one piece in, the other pieces just snap together***.  There's no systems integration required.  ***The key thing is, you can install just one piece and then again install another piece***.  No systems integration.  ***You just basically turn it on or snap it together***.

*      *      *

It is absolutely, all the pieces within the suite are literally ***plug and play***.  Ex. 139 at 13-14.

Defendants knew but failed to disclose material facts wholly undermining the accuracy of the statements.  For example, defendants knew that: (a) Suite 11i did not work as represented,[6] and had never been fully tested to determine whether its ERP and CRM modules worked together as represented; (b) Oracle customers were losing, not saving, money with Suite 11i implementations; (c) Suite 11i did not work in every language and its failure to do so hurt sales; and (d) the Company's own implementation of Suite 11i in January contributed to the 3Q01 revenue shortfall.

## B.    Undisputed Facts Support Entry of Partial Summary Judgment on Oracle's Misrepresentation of Its 2Q01 Revenue and Earnings Results

Undisputed facts demonstrate that Oracle's 2Q01 financial results were materially false.  Specifically, undisputed facts show that in 2Q01, Oracle had improperly accumulated and concealed over $100 million in overpayments and "unapplied cash" from customers, and improperly used those funds to artificially inflate its earnings per share ("EPS") by $0.01 in 2Q01, allowing Oracle to beat Wall Street's consensus expectations by a penny.  Exs. 3, 27, 131 at 38, 132, ¶39.

Defendants cannot dispute that Oracle converted customer overpayments to revenue and income in 2Q01 by transferring customer money from its "Customer Overpayments" account (Account 25005) to its bad debt reserve (Account 12601), and then applying them to "debit memo" invoices as part of a "On Account Clean Up" in November 2000 (the "November 2000 Clean Up").  Defendants' own accounting expert, J. Duross O'Bryan agrees that at least $20 million in customer overpayments was transferred to revenue and income in 2Q01, and without those transfers, Oracle

---

[6]    Edward Yourdon, Oracle's designated "expert" on the issues pertaining to functionality of Suite 11i, defined integration "for the end-user . . . as well as for IT professionals . . . simply means that the pieces or (components or modules) of the system 'work together.'"  Ex. 130 at 35.

1    would have reported only $0.10 per share in 2Q01, a full penny less than they reported to the market.

2    Ex. 131 at 38.[7]  This overstatement was material because it allowed Oracle to "beat the street" by a

3    full penny during a huge economic downturn in the overall market.  Oracle's $0.01 overstatement in

4    2Q01 was also material because it allowed Oracle to inflate its 3Q01 earnings forecasts to $0.12 per

5    share, knowing that forecast was premised on false 2Q01 results.

6          The misrepresentations and disclosures at the end of the Class Period concerning the true

7    financial condition of the Company, including the impact of the economy, the failure to meet

8    earnings expectations, Suite 11i application growth forecasts and overall future business growth,

9    taken together, undisputedly caused the stock price decline and thus plaintiffs' economic loss.

10   Accordingly, plaintiffs respectfully submit that there are no genuine issues of material fact with

11   respect to certain claims of liability detailed herein and respectfully request that this Court enter an

12   order granting plaintiffs' motion for partial summary judgment pursuant to Fed. R. Civ. P. 56(c).

13   **II.      STANDARD ON SUMMARY JUDGMENT**

14         Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to

15   interrogatories and admissions on file together with affidavits show that there is no genuine issue as

16   to any material fact and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

17   56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is a genuine issue of material fact

18   if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor

19   of the party opposing the motion in accordance with the applicable standard of proof.  *Anderson v.*

20   *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Once a party has met its burden, the burden shifts to

21   the non-moving party to show with admissible evidence that a genuine issue of one or more material

22   facts exists as to each element of that claim for relief.  *See id.*; Fed. R. Civ. P. 56(e).

23

24

25

26   [7]      Defendants admit that all of the documents produced by Oracle in this litigation are true and
     correct copies of documents in the Company's files.  Ex. 64 (Defendants' Responses and Objection

27   to Plaintiffs' Second Set of Requests for Admissions No. 20).

28

III.     ARGUMENT

In order to prove a claim under §10 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, a plaintiff must prove (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss.  *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).[8]  Scienter is established upon proof that the defendant acted knowingly or recklessly.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ___, 168 L. Ed. 2d 179, 196 (2007) (plaintiffs must prove falsity and scienter by a preponderance of the evidence).  Recklessness, and thus scienter, exists where the danger of misleading buyers or sellers is so obvious that the defendant must have been aware of it.  *Id.*  Even if under no duty to speak, if one undertakes to do so, either voluntarily or in response to inquiries, the speaker is bound not only to speak truthfully, but also to not suppress or conceal any facts which materially qualify those stated.  *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468 (6th Cir. 2004), *cert. denied*, 546 U.S. 936 (2005).

   A.     **There Is No Genuine Dispute of Material Fact that Oracle's Revenues and Earnings in 2Q01 Were Overstated by at Least $0.01 Per Share**

It is undisputed that at the beginning of 2Q01, Oracle had accumulated over $100 million of cash receipts from its customers that had not been applied to an invoice.  *See* Ex. 27 at 1610987; Ex. 26.  It is also undisputed that at least $70 million of that amount was sitting in a liability account called "Account 25005-Customer Overpayments."  Ex. 26 at AA 000040.  Oracle's former Director of Revenue Accounting, Michael Quinn, confirmed that the amounts of unapplied cash sitting in Account 25005 were generally "something that are flagged to be refunded to a customer, payable to a customer."  Ex. 117 at 97:9-19.

It is also undisputed that during 2Q01, Oracle improperly transferred at least $20 million from its Customer Overpayments account to its "Bad Debt Write-Offs" account (Account 12601).

---

[8]     Defendants have not disputed whether defendants Ellison, Jeff Henley and Edward Sanderson controlled Oracle consistent with §20(a) of the Exchange Act.

1   *See* Ex. 3 ("12601 Reserve Activity"); Ex. 27 at 1610987 ($20 million adjustment).  Defendants'

2   accounting expert O'Bryan conceded this fact.  *See* Ex. 131 at 20 ("***[Oracle] learned that $20.1***

3   ***million of unapplied cash had been transferred to the bad debt reserve during the second quarter***

4   ***of fiscal year 2001***."); *see also* Ex. 136 at 70:10-14.  O'Bryan's $20 million calculation agrees with

5   plaintiffs' accounting expert, D. Paul Regan.  *See* Ex. 132, ¶¶30-38.

6        It is also undisputed that the $20 million in customer overpayment transfers from Account

7   25005 to Account 12601 went directly to Oracle's revenue and earnings in 2Q01.  O'Bryan admitted

8   this fact.  Ex. 136 at 146:19-147:1 ("[O]racle individuals made decisions to ***transfer from 25005 to***

9   ***12601***. ***That went right into income, actually went into reserve that went into income***.").  Quinn

10  also confirmed it.  Ex. 117 at 197:12-24; 227:25-228:15 ("Q. Did the process of taking unapplied

11  cash to the reserve impact revenue in any of the eight quarters prior to October 2002?  A. Yes.").  So

12  did Tom Williams, Oracle's Director of Global Finance during the Class Period.  Ex. 90 at 313783

13  (admitting that $48 million was transferred from Account 25005 to Account 12601); *see also* Ex.

14  120 at 125:16-18 (admitting that bad debt reserve transfers would increase income), 177:7-15

15  (admitting that 2Q01 transfer relating to debit memo from customer K-force was improper).

16  Defendants' testimony is consistent with Regan's opinion that Oracle's debit memo transfers to the

17  bad debt reserve inflated revenue and income.  *See* Ex. 132, ¶¶43-44.[9]

18       It is also undisputed that the entire $20 million in bad debt transfers was applied to

19  November 2000 debit memos and was ***reversed*** as part of the "Unapplied Cash Clean Up" (the

20  "2002 Clean Up").  Ex. 5.  Oracle's accounting expert conceded this fact.  Ex. 131 at 20 ("***Oracle***

21  ***reversed these transfers from the bad debt reserve account back to the unapplied cash account***.");

22  *id*. at 34-35 ("On November 8, 2002, Oracle ***reversed the processing of the November 17, 2000***

---

24  [9]      Defendants' expert agreed that any improper transfers from Account 25005 to Account
25  12601 violate Generally Accepted Accounting Principles ("GAAP").  Ex. 131 at 6 ("Plaintiffs claim
    that Oracle improperly used customer overpayments to increase its bad debt reserve, thereby
26  materially inflating reported results of operations in its second quarter of fiscal year 2001 financial
    statements.  ***These claims, if true, would violate GAAP.***") (footnote omitted); *see also* Ex. 134 at 21
    n.82 ("[T]o the extent that any money that was transferred to the bad debt reserve could not be
27  matched to a previously written off invoice, ***such a transfer represented an erroneous***
    ***reclassification***.").

28

1    *debit memo*, thus switching the receipt status from 'Applied' back to 'Unapplied.'"); Ex. 136 at

2    154:7-11 ("So, if in the second Q they were applying the 25005 to the 12601, that's recording

3    income. If – then remember during October/November [2002] time frame *they reversed all of that.*

4    *It all went out of reserve.  It reduced revenue, basically, by that $20 million*.").

5         Finally, it is undisputed that Oracle's $20 million in bad debt transfers applied to debit

6    memos caused Oracle to overstate revenues and earnings by $0.01 per share in 2Q01. Defendants'

7    expert O'Bryan agreed that if the $20 million in transfers of customer overpayments did not occur in

8    2Q01, Oracle would have only reported $0.10 per share. Ex. 131 at 38. O'Bryan's calculations of a

9    $0.01 impact of the debit memo bad debt transfers are consistent with the findings of plaintiffs'

10   expert.  *See* Ex. 132, ¶39.[10]  Accordingly, there is no genuine dispute that Oracle's improper

11   transfers of $20 million in debit memo customer overpayments to revenue and earnings, via the bad

12   debt reserve, inflated its 2Q01 EPS by $0.01.

13        **B.**     **Defendants Were Aware of Oracle's Misuse of Debit Memos and**
                   **Customer Overpayments to Inflate Oracle's 2Q01 Financial Results**

14

15         Undisputed facts confirm that Oracle's top executives were aware of the Company's

16   customer unapplied cash problem in 2Q01. Defendant CFO Jeff Henley admitted that he was aware

17   of the "problem" when he first joined Oracle and that the misconduct during 2Q01 was "repeating

18   sins of the past." Ex. 126 at 465:7-21. Former Oracle Collections Manager Ian Hatada testified that

19   Oracle's "large" balance of unapplied cash was a "*very, very large problem, the biggest problem*

20   *that anybody in collections or accounts receivable had*." Ex. 128 at 78:20-25-79:9, 141:24-142:10

21   ("I just know that it was – when we originally looked at it, it was – it *was looked at as being*

22   *impossible – just because it was so big* . . .  we could put a dent in it, obviously, but we would never

23

           ————————————————

24  [10]      Of the approximately $20 million total transfers of customer overpayments from Account
    25005 to revenue and income via Account 12601 during 2Q01, O'Bryan only disputed $1.5 million.

25   Ex. 131 at 32-33.  Even assuming O'Bryan is correct, however, and the $1.5 million is subtracted
    from the $20.1 million total ($20.1m - $1.5m = $18.6m), Oracle still would have only reported $0.10

26   per share in 2Q01 (Net Income [$611.3 million] ÷ Shares Outstanding [5,874,908] = *10.4 cents per*

27   *share*).  In other words, defendants and their expert cannot dispute that Oracle's $20 million in debit
    memo bad debt transfers inflated its 2Q01 earnings and revenues by $0.01 per share.

28

be able to resolve the whole thing."). Other Oracle managers concurred. *See* Ex. 110 at 198:10-14

("A. The unapplied cash account. *I was aware of it being a big problem*.").

Oracle accumulated large amounts of customer overpayments because of its policy of not

informing customers about their unapplied cash unless the customer discovered it and affirmatively

requested the money back. Ex. 115 at 126:15-25 ("***Q. What about if a customer didn't request a***

***refund? A. It would remain unapplied. Q. Did you call customers to tell them, 'Hey, you have***

***money unapplied. Do you want it back?' A. No***."); *id.* at 128:17-129:12. Oracle also affirmatively

tried to keep money that belonged to customers even ***after*** a refund was requested. Ex. 128 at 66:7-

24 ("[A]t times those [refund] requests would be put on hold for long periods of time, and ***the money***

***would not go back to the client*."). Oracle's accumulation and concealment of customer

overpayments was deliberate and allowed defendants to use customer money as needed to inflate its

bad debt reserve, revenues and earnings.

### 1. Oracle Knew About the Fraudulent $20 Million in Transfers Prior to Its Earnings Announcement on December 14, 2000

Undisputed evidence demonstrates that Oracle was aware of deliberate end-of-the-quarter

"clean up drills" to conceal unapplied customer overpayments by applying them to unrelated

invoices which made it appear as if the customer money belonged to Oracle:

> ***The application that I made to invoice 6057195 is definitely a misapplication. I'm***
> ***not big on intentionally misapplying funds***. However, being a Feb. 2001
> application, I'm pretty sure I was involved in one of our routine "Q-end unapplied
> clean up" drills, as we used to do on the final months of each Q back then. ***Please do***
> ***unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195***.

*See* Ex. 100. In addition to the "clean up drills," Oracle also deliberately employed an "auto-

adjustment" process to sweep small amounts of customer overpayments into its bad debt reserve

Account 12601 each quarter to generate revenue and income.[11] On November 6, 2000, three weeks

---

[11]   Quinn admitted that the auto-adjustments transferred amounts from unapplied cash (Account 25005) to the bad debt reserve (Account 12601). Ex. 117 at 205:16-206:11, 212:11-23. Tom Williams also confirmed that Oracle used the auto-adjustment process. Ex. 120 at 178:19-179:2. So did Hatada. Ex. 128 at 232:10-240:6, 348:10-349:20. Notably, after plaintiffs filed their accounting allegations on October 11, 2002, Oracle attempted to shut off the auto-adjustment process. Ex. 82 ("Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc receipt write off *has been turned off*.").

1    before the end of 2Q01, Neil Menon, Oracle's "Unapplied Cash Specialist," directed Oracle

2    employees to transfer customer overpayments to Oracle's bad debt reserve before the end of the

3    quarter.  Ex. 22 at 3042910 ("Since we are approaching the end of the quarter, we would like to

4    resolve these items as quickly as possible.  If there is no response by November 20, 2000, we will

5    review the items and *place them in our reserve account*.") ("resolving the [Oracle Credit and

6    Collections] items would help us in achieving our quarter goal").[12]

7         On Monday, November 27, 2000, Oracle's controller Jennifer Minton created and distributed

8    Oracle's Week 13 "Upside Report" for the last week of 2Q01.  Ex. 24 at 1532779.  The Upside

9    Report shows that Oracle's "Potential" or best possible EPS result for 2Q01 was only 10.34 cents.  It

10   is undisputed that Minton's Upside Reports were reviewed by defendants and the Executive

11   Committee on Mondays during each quarter.  *See* Ex. 126 at 116:25-117:18; Ex. 108, ¶31; Ex. 124 at

12   143:17-145:11; Ex. 109, ¶3; Ex. 107 at 105:22-25; Ex. 125 at 25:23-26:24, 38:1-40:20.   On

13   December 1, 2000, the day *after* 2Q01 officially closed, Oracle's management printed out the

14   Upside Report for 2Q01 which reported a final EPS "Forecast" result of 9.1 cents per share and an

15   "Upside" forecast of only 1.2 cents per share.  Ex. 80 at 440830 (metadata confirming the "print"

16   date of December 1, 2000).  The "Potential" column of the Upside Report again confirmed the final

17   EPS result of *10.34 cents*.  *Id*.  Thus, as of December 1, 2000, Oracle knew that it did not and could

18   not beat Wall Street's expectations of $0.10 per share in 2Q01 without inflating earnings by $20

19   million or more to push its EPS result to 10.5 cents.

20        On December 8, 2000 – eight days after 2Q01 closed and six days before Oracle announced

21   its 2Q01 results – Oracle employee Tammy Pinnick e-mailed the Company's "final version of the

22   Bad Debt Analysis" to Minton and Tom Williams.  Ex. 27.  In the section entitled "Bad Debt

23   Reserve Reconciliation 2QFY01," Oracle's improper $20 million adjustment to Account 12601 from

24   the unapplied cash debit memo transfers clearly appears in the "November-00" column.  *Id*. at

---

25

26   [12]    Importantly, defendants did not produce this highly relevant and incriminating e-mail until
     April 17, 2007, long after the close of discovery.  Defendants explained this violation of the Court's
27   orders as follows: "*these documents mistakenly never were loaded on to our database at the time
     the documents originally were gathered*."  Ex. 129 at 1.

28

1  1610987.  Thus, the $20 million adjustment was done *after* 2Q01 closed for the specific purpose of

2  increasing revenue.  *Id.*; *see also* Ex. 80.[13]

3       In sum, prior to Oracle's earnings announcement on December 14, 2000, defendants knew

4  that without the "significant" $20 million adjustment from the improper transfers of debit memo

5  customer overpayments to Oracle's bad debt reserve, Oracle would not beat consensus EPS

6  estimates of $0.10.[14]

7              **2.**    **Undisputed Facts Demonstrate that the November 2000 Debit**
                     **Memo Clean Up Was Part of Oracle's Attempt to Conceal Its**
8                    **Accounting Manipulations in 2Q01**

9       On or around November 17-18, 2000, Oracle engaged in the debit memo "On Account Clean

10  Up" to conceal the massive slush fund of unapplied cash and customer overpayments that the

11  Company had used to manipulate revenues and earnings in 2Q01 and other quarters.  The November

12  2000 Clean Up consisted of creating 46,000+ fictitious debit memo invoices and "applying" the

13  46,000+ unapplied cash items to the fake invoices, thereby making it appear in Oracle's books as if

14  the items were legitimately applied to real invoices.  *Compare* Ex. 93 at 313985-86 to *id.* at 313987-

15  89; Ex. 131 at 12; Ex. 132, ¶¶24-27.

16       It is undisputed that the November 2000 debit memo invoices were designated with a "550"

17  prefix and consisted of customer overpayments and unapplied cash.  Ex. 73 ("***All invoices that start***

18  ***with '550' are actually debit memo #'s.  These were created to clean up our unapplied account at***

19  ***the time.  They were more than likely overpayments***."); *see also* Ex.  72 ("***All 10 of the invoices***

20

21  [13]    Both Minton and Oracle's internal documents confirm that Oracle's process of adjusting the
22  bad debt reserve impacted Oracle's revenue account.  Ex. 107 at 143:7-12, 143:25-144:10, 184:17-
    21, 216:19-25; Ex. 70 at 140468-69, 140474.  Tom Williams testified that Oracle would only adjust
23  the bad debt reserve if the change needed was "significant."  Ex. 120 at 124:23-125:1-2 ("If there
    was a significant difference between the requirements and the reserve then an adjustment would be
24  booked.  If it was not a significant difference then no adjustment would be booked.").

25  [14]    Defendants were required to know about the improper misuse of customer overpayments to
26  inflate revenues and earnings because they were subject to a 1993 Consent Decree issued by the
    Securities and Exchange Commission which enjoins Oracle and its agents and employees from
27  "directly or indirectly, failing or causing Oracle to fail to devise and maintain a system of internal
    accounting controls" sufficient to provide reasonable assurances that transactions are properly
    recorded in compliance with GAAP.  Ex. 9 at 3-4.

28

1   *that start with '550' are on 'account clean up.'  These funds are available for refund or to apply to*

2   *future or past due invoices*.").   According to Quinn, the unapplied cash items that had been

3   transferred from Account 25005 to the bad debt reserve (Account 12601) were transferred through

4   "On Account."  Ex. 117 at 231:24-232:16 ("Q.  So are you saying that the movements that you

5   described in bullet point 1, taking unapplied cash receipts to the reserve account first goes to the on

6   account?  A.  First goes to the on account.  That's how they got there.  ***That's how they got to the***

7   ***reserve account***.").   Quinn's testimony was corroborated by former Oracle Collections Manager

8   Hatada.  Ex. 128 at 103: 24-104:11 ("[F]rom what I know, putting an amount on account – you

9   know, from a collections analyst or collections manager standpoint it would ***erase it from the***

10  ***unapplied account and move it to the reserve or another account***.").

11      Thus, the undisputed evidence shows that Oracle created the 46,000+ debit memos on or

12  around November 17-18, 2000 in order to apply millions in unapplied cash and customer

13  overpayments to the debit memo invoices, making it look like the money was applied, rather than

14  unapplied.  Then, as set forth below, Oracle attempted to unwind its fraud during the 2002 Clean Up

15  by reversing the debit memos and the $20 million in improper bad debt transfers and refunding or

16  escheating millions in customer overpayments.[15]

17          **3.      Undisputed Facts Surrounding Oracle's 2002 Clean Up
                       Demonstrate Defendants' Fraudulent Intent**

18

19      Following the filing of plaintiffs' October 11, 2002 accounting allegations, Oracle held a

20  flurry of special meetings in late October 2002 to devise a plan to "clean up" the "on account

21  problem," to determine the "revenue impact" of the problem, and to make sure the improper

22  transactions "never happened again."  Exs. 4, 82.  Oracle personnel involved in the 2002 Clean Up

23  testified that during the meetings they were told about the "on account problem" and a huge amount

24  of old customer overpayments that had previously been applied to debit memos in November 2000:

25  [15]      Plaintiffs also intend to prove at trial, if necessary, that defendants improperly recorded an

26  illegal eleventh hour $20 million "swap" transaction with Hewlett-Packard Company ("HP"), which
    had no economic basis but was designed to inflate earnings of both Oracle and HP.  Without the $20

27  million HP swap transaction, Oracle would have reported only 54% applications growth (versus the
    66% actually reported) in 2Q01.

28

A.     Well, the first – the first meeting that we had to actually give us a – kind of a short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, there was a lot more in the reserve that we were going to have to try to resolve because of a specific lawsuit that, you know, that we had money that we shouldn't have had, and whether it was in the reserve or the unapplied, but the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve.

Q.     And were those the items, as far as you know, that resulted from creation of debit memos previously?

A.     I believe that was one of the reasons that Mike Quinn and Greg Myers had given us.

Ex. 128 at 128:8-129:2; 257:24-263; *id*. at 307:5-9 ("[R]eally you know, at a bottom line, this is really what they wanted to know – from Mike's [Quinn] point of view, was he wanted to know after it's all said and done what's going to be revenue impacting and what's not going to be revenue impacting.").[16] Further, contrary to defendants' numerous representations to the Court that there was "***no connection whatsoever***" between the 2002 Clean Up and the November 2000 debit memos, Hatada testified that the entire project was part of Oracle's attempt to "***help Oracle***" clean up the debit memos and the issues raised in plaintiffs' lawsuit. Ex. 128 at 264:12-265:6. Hatada explained:

[T]here was a problem with the unapplied cash, and we had a large amount of unapplied cash that was a lot larger than us collections managers had ever seen before, and it was our responsibility as quick as possible to clear this unapplied cash and find a home for this unapplied – the unapplied amounts.

*Id*. at 38:24-39:10; *see also id*. at 113:19-114:7.

During the 2002 Clean Up, Oracle implemented a specific process to "reverse" the November 2000 debit memos and the improper transfers of debit memo overpayments to the bad debt reserve. Ex. 127 at 66:25-67:20, 185:23-186:11, 186:8-9, 187:10-188:2; *see also* Exs. 86-87. Internal Oracle documents confirm that Oracle reversed and removed over $50 million in improper debit memo customer overpayments that were transferred to the bad debt reserve. Ex. 5; *see also*

---

[16]     Quinn testified that there was indeed a "revenue impact" of the bad debt transfers that were connected to debit memos. Ex. 117 at 229:2-8. Hatada testified that the revenue impact was "major." Ex. 128 at 153:16-154:6. Both parties' experts agree that the impact was approximately $20 million in 2Q01. Exs. 131 at 20, 132, ¶¶30-38.

Ex. 131 at 19-20; *see also* Ex. 132, ¶¶43-44; 1058909 (script output database); Ex. 85 at 1534024, 1534049, 1534169 (journal entries reversing receipts from 12601).[17]

Other documents show that during the 2002 Clean Up, Oracle continued to conceal overpayments from customers.  Ex. 132, ¶44 n.92; Ex. 101 at 1895745 ("***We actually have the unapplied cash.  We never booked the order but the customer paid.  We want to book it or try to get upper management to agree that we should keep this money***.").  Shockingly, in one instance, an Oracle employee suggested that if upper management could not figure out a way to keep the money, it should cover up the fraud by destroying the evidence.  Ex. 101 ("If this isn't enough to close out the [purchase order], ***could it end up in a fire under mysterious circumstances***?"); *see also* Ex. 98 at 1886317; Ex. 106.  During the 2002 Clean Up, millions in customer money had to be escheated to the state.  Ex. 103 ("We are doing an escheatment program for unapplied cash. . . .  [B]ased on a random sampling we will escheat and/or create revenue for the whole population.").[18]

Evidence confirms that Oracle's top officers were involved in the 2002 Clean Up.  Hatada testified that defendant Henley was involved.  Ex. 128 at 266:10-21; *id*. at 105:1-106:3.  Jennifer Minton, Oracle's Director of Global Finance, affirmatively tried to cover up her role in the 2002 Clean Up.  First she said she was "not involved in the investigation" and "[did] not know of any details of the investigation" because Oracle's counsel specifically told her to stay out of it.  Ex. 107 at 162:23-163:4; *id*. at 174:25-175:19 ("Q. If this stuff had happened, weren't you interested in finding out the results?  A. Yes.  Q. But you didn't look for the results or ask about the results?  A. ***I was told – I think it was appropriate for legal to keep me uninvolved in the investigation***.").

---

[17]    The 2002 Clean Up was still ongoing in 2005 because of the massive number and amount of Oracle's fund of customer overpayments and unapplied cash.  *See* Exs. 97, 99; Ex. 116 at 304:9-17; Ex. 128 at 266:23-267:24.  Even in FY06, Oracle was still reversing revenue and writing off receivables related to customer debit memo overpayments.  *See* 1058909; Ex. 85 at 1534024, 1534049, 1534169 (journal entries reversing receipts from 12601); Exs. 5, 82.

[18]    Evidence also shows that one of Oracle's tactics to keep customer overpayments was to "adjust up" invoices that had a credit in their history to make it look like the credit was never given. *See* Ex. 4; Ex. 128 at 93:20-94:17; Ex. 132, ¶45; Ex. 116 at 216:14-261:20; Ex. 96 ("I think all the highlighted invoices for Pioneer should be adjusted up.  We have plenty of unapplied cash to pay for this money.  ***Once they are adjusted I can easily apply money***.").

Minton later changed her story and claimed that she was aware of the "results" of the 2002 Clean Up, but was "not involved in the actual underlying investigation itself." *Id.* at 278:15-279:20. Minton's testimony has been proven false; Henley and Williams both testified that Minton was involved.[19]   Numerous e-mails prove that she was involved.[20]   The 2002 Clean Up is further circumstantial evidence that defendants were aware of their false accounting in 2Q01 and attempted to cover it up in 2002 after plaintiffs filed their accounting allegations.

### C.   Suite 11i Was Not Fully Integrated and Interoperable Out-of-the-Box, Nor Was Suite 11i Easy to Install and Did Not Help Save Money Fast

Undisputed facts show that during the same period that Oracle told the market that it had "***delivered***" Suite 11i, trumpeting it as a "complete," integrated and interoperable "out of the box," Oracle knew that the Company could not even demonstrate a working and fully integrated Suite 11i application for sales demonstrations.  Oracle consultants used fake data in demonstrations in order to sell the Suite 11i software.  *See* Ex. 20 at 617118.  On October 6, 2000, VP Ken Hamel explained the difficulties and lost sales to EVP George Roberts:

> ***Simply put, all of our demo issues have to do with our key marketed strength, INTEGRATION.   We still have a great deal of difficulty showing Oracle's integrated suite of applications; from CRM through to ERP***.  Ex. 16; *see also* Exs. 17-19; Ex. 1 at 0616860.

According to Hamel, the Company was "***essentially doing integration work in the field***." Ex. 119 at 81:1-6.  On February 5, 2001, Julie Cullivan, former VP of Sales Consulting, wrote to

---

[19]   Ex. 126 at 437:1-6 ("I think the people that, first of all, got into more of the detail and reviewed it were our ***corporate controller, Jennifer Minton,*** and the previous corporate controller Tom Williams."); Ex. 92 at 313792 ("Henley additionally said that ***he expected Minton and Williams*** to get to the bottom of the issue and take any necessary action to resolve it."); Ex. 126 at 451:10-17 ("Q.  Who at Oracle, in fiscal 2001, would have been responsible for making adjustments to Oracle's bad debt reserve?  A.  ***Certainly the review was done by Jennifer Minton*** . . . .").

[20]   E-mails to and from Minton herself demonstrate that she was not only "involved" in the 2002 Clean Up investigation but was supervising and directing it. *See, e.g.*, Ex. 84 at 1727980 ("I have also tried to summarize the open questions ***Jennifer had from our meeting earlier this week*** . . . . ***Jennifer has initiated a project to cover our work in this area. . . .  Jennifer would like to meet next week on our progress***."); Ex. 104 (***"We have Jennifer's [Minton] approval to expand the scope of the [escheatment] project up to $20K."***); *see also* Ex. 101 at 1895745; Ex. 91 at 1733103-105 (e-mail to Minton); Ex. 99 at 1886329 (e-mail from Minton); Ex. 105 at 1892686-87 (e-mail from Minton); Ex. 104 at 1885840-41 (Minton's approval regarding scope of 2002 Clean Up).

1  Sanderson about the Company's "[i]nability to [p]rove our EBusiness Suite Integration Story" in

2  demonstrations. Ex. 45 at 617970-74 ("***Cannot show a complete integrated CRM demo let alone a***

3  ***complete EBiz Suite (CRM/ERP) integrated demo.***");[21] *see also* Ex. 66. Also, in February 2001,

4  Ron Wohl knew that sales were continuing to be lost due to failing Suite 11i demonstrations. *See*

5  Ex. 53 ("[a]nother deal lost primarily to demo system performance"). On February 13, 2001,

6  Roberts confirmed that Oracle "believe[d] that applications are the key to [Oracle's] future." Ex. 48

7  at 7. On March 20, 2001, Roberts explained to Jeff Henley via e-mail, if the Suite 11i application

8  demonstrations "[did] not improve, it will ***continue to impact our [sales] conversion rate***." Ex. 61.

9  The negative impact on sales was confirmed by Henley. Ex. 126 at 400:1-3 ("I was certainly

10  concerned that not having optimum demos . . . would suboptimize our revenue opportunity.").

11  Roberts confirmed that when the Company could not show a working demo it could not win sales:

12  "***if you can't give a good demo, then you are not going to win as much business***." Ex. 121 at

13  301:17-23, 176:1-5. On April 19, 2001, Roberts again explained to Henley that Suite 11i

14  demonstrations were still "not heading in the right direction." Ex. 65 at 061370. A "frustrated"

15  Henley summed up the situation: "Absolutely incredible. We're blowing the opportunity of a

16  lifetime with 11i." Exs. 65-66; Ex. 126 at 400-02.[22]

17       Defendants actually knew that Oracle had ***not*** "delivered" the suite they had trumpeted as

18  being "complete," and "fully integrated" allowing customers to ***save*** money in a slowing economy.

19  Some customers demanded millions of dollars of concessions from Oracle citing defects and lack of

20  functionality in Suite 11i. On November 7, 2000, Liberty Mutual Group, wrote directly to Ellison

21  detailing "basic functionality" flaws with Suite 11i. Ex. 23 ("***To put it bluntly, we have***

22  ***encountered multiple software quality problems . . . . [T]he bottom line is that we have a product***

23  ────────────────────

24  [21]    Securities analysts had reported on December 15, 2000 after 2Q01 financial results, that

25  "functional product demos . . . on the eBusiness Suite should propel growth in the applications division going forward." Ex. 33 at 308932; *see also* Ex. 29 at 234436 ("Demonstrations we're still

26  tweaking those, ***we got those all ready now***.").

27  [22]    Sales managers prior to 3Q01 reported that among other things, few new opportunities available, Suite 11i stability, and integration were already impacting sales. *See* Ex. 2 at 0616523.

28

1   *that does not work. . . .*"); *id.* at 018733-35; *see also* Ex. 41.  On December 16, 2000, Pepsi Co.

2   wrote Ellison:  "***Our Oracle [11i] project has been an unmitigated disaster*** . . . .  We have spent a

3   fortune (to us) on consultants trying merely to get your product to work and months later we still do

4   not have even have [sic] a system to test."  Ex. 36.  On December 20, 2000 and January 9, 2001,

5   Rebecca Enonchong of Appstech.com, an Oracle partner, wrote to Ellison explaining a failing

6   implementation of Oracle's Suite 11i ("[W]e ordered R11i Financials for our internal use. . . .  ***We***

7   ***have never been able to implement it and have decided to return it. . . .  We have [also] lost close to***

8   ***$200K so far on our implementation of 11i for Brock Tool***.").  Ex. 39.  A December 26, 2000 e-

9   mail from Michael Cochoran to Roberts, Henley and Sanderson and forwarded to Ellison,

10  documented more than a thousand lost billing hours and Paxar's refusal to pay nearly $2 million in

11  fees and threatened legal action ("after hundreds of patches and a significant number of severity 1

12  bugs . . .  Paxar is refusing to pay the $1.8M license fee").  Ex. 38 at 039327.

13          From January 10, 2001 through January 12, 2001, another purchaser of Suite 11i, TMP

14  Worldwide, complained that it had missed business goals due to the lack of functionality and

15  implementation of Suite 11i ("Oracle's software is still not ready for production. . . .  ***TMP spent***

16  ***$1,780,000 on the financials software and another $719,520 for the HR system, which is also***

17  ***unusable at this time***.").  Ex. 42.  On January 25, 2001, Chipotle put Oracle on notice that it could

18  lose Chipotle as a reference ("Chipotle has finished an upgrade to 11i that was done by

19  OCS. . . .  They are experiencing major performance problems with 11i as well as there still are some

20  feature/function gaps.").[23]  Ex. 44.  Oracle had represented that Chipotle was one of many customers

21  "***live***" on Suite 11i.  Ex. 35 at 014104; Ex. 30 at 019800.  Customers were ***not*** saving money with

22  11i.  Four months after the Class Period, Mark Jarvis, the Company's head of marketing and public

23  relations in response to requests to issue more positive press releases about the Company to counter

24  negative press, stated: "***[U]nless we make our revenue numbers in Q1[02], executives stop leaving***

25  _____

26  [23]      On March 22, 2001, Chipotle removed itself from the reference program: "***We have decided***
27  ***to suspend any participation in Oracle PR initiatives . . . .  The hype doesn't meet reality . . . .***"
    Ex. 62 at 618438.

28

1   *and we get 11i customers that actually save money . . . , no journalist is going to  care. . . .  We are*

2   *going through a rough patch because 11i did not work (but it does now), we missed two quarters*

3   *and we pissed off a lot of customers with the apps upgrade to 11i*." Ex. 69.  Oracle's software

4   expert has not identified a single customer that saved money in months.[24]

5           Defendants knew during the Class Period that Suite 11i was flawed and had already cost

6   Oracle millions in free consulting costs alone.  Ex. 15.  Block told Sanderson that Suite 11i quality

7   problems would "***significantly***" impact sales and consulting revenues, and had already cost his

8   support team millions in free consulting.  *Id.*  Oracle's own consulting employees recommended to

9   clients to wait until the new year for Suite 11i.  *Id.*  It is also undisputed that Suite 11i product

10  defects' resulted in a two-point deterioration of FY01 margins percentage ***$21 million*** in unbilled

11  consulting revenue.  Ex. 63 at 159568; *see also* Ex. 125 at 187:8-10.

12          **D.    Undisputed Facts Demonstrate that Suite 11i Did Not Work in Every**
               **Language**

13          Prior to and during the Class Period, the Company sought to convince investors that not only

14  was Suite 11i "pre-integrated and interoperable out of the box," (Ex. 40) but that it "worked" in

15  "every country and every language." Ex. 37; *see also* Ex. 10.  For example, in September 2000, a

16  letter to Oracle shareholders falsely claimed that Suite 11i worked in every country and every

17  language.  *Id*. at 4.  In addition, the Company and the individual defendants repeated similar false

18  statements during the Class Period.  *See supra* at 2-3.  Defendants cannot dispute that Suite 11i did

19  ***not work*** in every language, nor every major language.  At the end of 2Q01, sales staff in Europe,

20  Middle East, and Africa were unwilling or unable to sell Suite 11i effectively because of product

21  defects and incomplete language translations ("***[W]e are loosing [sic] a bit of momentum; sales***

22  ***people are reluctant to engage to the product problems, lack of references and local language***

23  ***issues. . . .   Hopefully the situation will turn in January once we get 11.5.3 running in local***

24

25  _____

26  [24]     Yourdon claims that the Company's statements were "accurate."  Ex. 130, ¶¶12, 143.
    However, Yourdon did not offer an opinion on whether any Suite 11i customer actually saved any
27  money months after implementing Suite 11i.  Ex. 135 at 89:2-5 ("I don't recall offering my own
    opinion about the savings in months.").

28

1   *language*.").  Ex. 28.  A January 21, 2001 e-mail from Giacolletto to Ellison stressed the impact of

2   the failure to get the language issues in Suite 11i to work ("NLS will not be fully translated including

3   help until May 2001 for the first languages and August 2001 for the last language").  Ex. 43.

4          Months after the Class Period, Oracle did not have a stable release working in local

5   languages ("***R11.5.4 which is the first stable release is NOT AVAILABLE in local language and***

6   ***we will only get it between July and October 2001***.").  Ex. 67 at 162215-16.  Wohl admitted that the

7   software did not work in every country and in every language.  Instead, Oracle "made decisions in

8   terms of which modules to translate into which languages, and did not choose to translate every

9   module into every language."  Ex. 114 at 220:13-15.[25]  As demonstrated by an Oracle 2002 High

10  Level Technical Requirements Document, drafted by Oracle's field engineers, Suite 11i was not

11  even capable of operating in every language.  Suite 11i was not built with the architectural capability

12  including full multibyte "UTF-8" support which is required to work in ***every*** language or even ***every***

13  "major language."  Exs. 46, 49.  "[L]ack of multibyte support across the various front office systems

14  is going to be a significant impediment to our success in China, Taiwan, Korea and Japan."  Ex. 79

15  at 069921, 069930.  The document further noted, "***[t]he lack of functionality within projects, for***

16  ***example, severely impacts the ability to successfully deploy a global solution involving projects***

17  ***spanning multiple countries with multiple languages***."[26]  Ex. 79 at 069938.  Finally, when

18  confronted in his deposition in 2006, Ellison admitted that Suite 11i did not in fact work in every

19  language: "***I suppose, to make it very precise, it should say every major country. . . . [Y]ou can***

20  ***take exception that it was general rather than – general and imprecise, and it didn't work*** . . . ."

21  Ex. 124 at 131.

22

23

24  [25]      Wohl also testified that like the Company's lack of universal process for integration testing
    of Suite 11i, no person, group, or persons or organization had full responsibility for assuring that all

25  of Suite 11i actually did work in all languages.  *Id.* at 217-19.

26  [26]      SVP Cliff Godwin testified that he believed that Suite 11i was delivered with the UTF8
    architecture; however, conceded that the Company did not deliver translated applications with the

27  release that would have allowed the software to work in multiple or every language.  Ex. 113 at 136-
    38.

28

**E.    Undisputed Facts Demonstrate that Oracle's Internal Upgrade to Suite 11i Cost Oracle Millions**

Even though Oracle said that upgrading to Suite 11i allowed it to save $1 billion and analysts reported during the Class Period that Oracle had further upgraded to Suite 11i in January, 2001, it is undisputed that the Suite 11i upgrade – including 11i OM caused the Company to experience much of the same technical difficulties experienced by its customers.  Mark Barrenechea stated:

> *What happened was one of the most dramatic moments I'd seen during my five years at Oracle.  Everyone except Ron [Wohl] knew that we could not place an order with the new system*. . . .

*        *        *

> *So we upgraded [to 11i], and Oracle went down.  We were down for fourteen days*. It was frightening. . . .  *At that point I became acutely aware of the customer dissatisfaction* . . . .  Ex. 95 at 196.

Oracle's January 2001 upgrade to Suite 11i left Oracle's financial staff unable to properly track sales of support renewals in the new software Suite 11i.  The upgrade to Suite 11i and lack of functionality caused the Company to lose approximately $20-$30 million in revenues in 3Q01.  *See, e.g.*, Exs. 51-52, 54-56.  Oracle, through the Special Litigation Committee, admitted that the January 2001 Suite 11i internal implementation upgrade likely contributed to the 3Q01 revenue shortfall:

> *The Committee's investigation revealed . . . [that]* Oracle's business may have been affected by the internal implementation of Suite 11i. . . . First, it is possible that the implementation of the OKS module of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001.  Ex. 93 at 295356.

The probable 3Q01 revenue shortfall in Oracle's 3Q01 support business as a result of its own Suite 11i implementation was known no later than February 15, 2001 by the Company's most senior executives, including Safra Catz, Ellison, Henley, Minton and Williams.  *See* Ex. 112.[27]  Ex. 52.

> *Mark – The support organization missed their Dec and Jan revenue forecast by $20 million dollars, and are seriously at risk of missing additional support revenue in the month of February if we do not get immediate visibility to the status of support contracts up for renewal.  We cannot afford to miss our revenue forecast this quarter* . . . .  *Ex. 51 at 101417-18.*

---

[27]    On February 20 and 21, 2001, defendants specifically reiterated the Company's revenue and earnings forecast, including 75% applications growth, failing to disclose that the internal implementation was likely causing a substantial revenue decline.  Ex. 14; Ex. 140.

1   Notably, only days earlier, Oracle's CRM Technical Whitepaper touted Suite 11i's CRM

2   completeness and capability of managing their global forecast "***including all licenses, product***

3   ***renewals, support contracts***."  Ex. 46 at 106694.

4       **F.**    **Oracle Knew that It Had Not Fully Tested Whether Suite 11i Worked**
            **in an Integrated Fashion**

5   It is undisputed that the Suite 11i modules were never fully tested to determine whether the

6   suite modules actually functioned in an integrated fashion – and defendants knew it.  Oracle

7   essentially admits that Suite 11i was not in fact "designed and engineered" to work in fully

8   integrated fashion and development and engineering flaws originated with the Company's software

9   development process where the ERP and CRM applications were engineered by different

10  organizations that did not communicate with one another or test whether the CRM modules worked

11  together with the ERP modules.  Ron Wohl acknowledged the link between the integration defects

12  and the lack of testing at the boundary between the ERP and CRM modules:

13        ***[J]ust as there should have been more testing of the ERP product stand-alone,***
      ***there should have been more testing of the CRM product stand-alone, there should***

14        ***have been more testing of the boundary points between ERP and CRM, and there***
      ***should have been better – there should have been better coordination of processes***.

15        *See* Ex. 114 at 106:14-21.

16  Godwin corroborates failure of the testing process and that no individual or group was

17  responsible for the critical ERP/CRM integration and determining the ability of the ERP and CRM

18  applications could "communicate with one another" ("***[T]here is no individual who is performing***

19  ***that specific task or group that is performing that specific task***.").  *See* Ex. 113 at 33:9-15; *id.* at

20  32:23-33:5.  VP of Application Integration Greg Seiden testified that no application integration

21  group was fully testing whether "information could flow" between ERP and CRM.  *See* Ex. 118 at

22  65:13-18; *see also* Ex. 93 at 295347.[28]  Oracle also admitted that part of development failures with

23  _____

24  [28]    Ex. 118 at 67:25-68:4.  Seiden explained that the "testing" just consisted of identifying

25  "eighteen to twenty key business flows" and running them.  The results of these limited tests were
compiled in what was referred to as the "***smiley face bomb report***" where "for each of the eighteen

26  to twenty key business flows, its status would be marked with either a smiley face, meaning that the
test went through successfully, some squiggly lines, meaning that there was an upstream bug that

27  prevented them from completing the test, or a bomb, meaning that they encountered a bug directly in
that test"(*see id.* at 79:13-22).

28

1   Suite 11i and integration testing and patches was "the structure of the development effort with Wohl

2   in charge of ERP aspects of the Suite and Barrenechea in charge of the CRM modules sharing

3   integration responsibility." Ex. 93 at 295346-47.  According to Wohl, "we didn't do a good job up

4   front – our QA [quality assurance] *procedures didn't work* . . . ." Ex. 95 at 203.  Wohl further

5   concedes that he "knew little about CRM" at the time Suite 11i was released.  Ex. 114 at 79:24-

6   82:23.  According to Area VP Michael Decesare, Suite 11i did *not work out of the box*:

7          *CR[M] products were heavily overmarketed. As you saw in Julie's note, there was*
           *major pieces of functionality that were advertised that just did not exist. . . . It does*
8          *not operate as integrated out of the box.  That's – that's false*.

9                                    *          *          *

10         *The way the applications were built in 11i was no better integrated than the*
           *previous releases.  Ron Wohl still ran ERP.  Mark Barrenechea ran CRM.  They*
11         *didn't communicate very effectively.  There is nothing more – more integrated or*
           *coordinated about 11i than there was about the previous releases*.

12   *Id.* at 234:17-253:3, 236:17-237:13, 239:7-10, 252:12-14.

13         Critical components necessary for Suite 11i to work in an integrated fashion were not tested.

14   Ellison described the OM module as "the heart of the sell side of our e-business Suite.  [OM] is the

15   funnel that captures the information about the sale." Ex. 95 at 192; Ex. 11.  Ellison stated:

16         *We had just finished a complete rewrite of our order management system. . . . [B]ut*
17         *it hadn't been tested yet, so . . . .  It was my decision.  It's in my nature to go for*
           *the highest-risk/highest-reward option.  That's my cross to bear* . . . . *The only*
18         *problem was that it was brand new and we hadn't done enough testing*.  Ex. 95 at
           192; Ex. 71 at 1529167.[29]

19         In October 2000, was also informed about the apparent lack of testing from its most valued

20   consultants ("[I think the patches are not well tested especially with othere [sic] modules to ensure it

21   does not impact the system.  Very often the patches break a heck of a lot of stuff."). Ex. 21.  As late

22   as July 2001, Oracle was still shipping Suite 11i and patches *without integration testing*.  On July 9,

23   2001, SVP Don Klaiss wrote about the Company's inability to test integration. Ex. 68 at 056440-41

24   ("*Today's situation is that we cannot test integrated business flows prior to customer shipment.*

25   _____

26   [29]     In a January 18, 2002 interview with Matthew Symonds, author of *Softwar an Intimate
     Portrait of Larry Ellison and Oracle*, Ellison is quoted as follows regarding OM, "Oh I knew there
27   was a huge risk up front . . .  I can't plead ignorance on this . . . . " Ex. 71 at 1529168.

28

1    *We are releasing new ERP and CRM Family Packs regularly but do not test them against each*

2    *other – clearly a bad situation.*").

3        **G.    Internal Software Development Documents Demonstrate that Two
              Years After Release Suite 11i Was Still Not Fully Integrated**

4

5        In June 2002, the Company's "field engineers" researched and created the confidential E-

6    Business Suite High Level Requirements Document for the Company's senior executives including

7    Ellison, to address deficiencies and integration and technical gaps that were "so fundamental, that it

8    exposes [Oracle's] development environment as 'best of breed' rather than one unified software

9    vendor."  Ex. 79 at 069913; *see also* Ex. 124. The E-Business High Level Requirements Document

10   specifically   identified   "integration   issues"   between   ERP   and   CRM   and   made   development

11   recommendations that were critical for Oracle to "overcome the lack of integration between the E-

12   Business Suite Modules (ERP/CRM)."  Ex. 79 at 069920.  The document discusses failures in Suite

13   11i base engineering architecture with respect to integration:

14       ***The capabilities to perform an integrated planning in the E-Business Suite is
         broken***.

15       ***The concept of Oracle Demand Planning is to pull demand information from a
         number of sources including Marketing, Sales and Manufacturing.  . . .  Yet these
16       are not able to be transmitted to the Forecasts*** . . . .

17                              *           *           *

18       ***This implies that we cannot plan/produce according to forecasts or that customers
         have to manually rekey the information entered in CRM into the Forecasting
19       modules of Oracle ERP***.  *Id*. at 069922-23.

20       The   E-Business   Suite   High   Level   Requirements   Document   further   details   failure   of

21   integration between Suite 11i Human Resources (ERP) and the CRM module. *See* Ex. 79; *id*. at

22   069925 ("***The integration between HRMS / Payroll and CRM is not complete***."); *see also* Ex. 10.

23   The document further confirms that even in 2002, CRM and ERP still lacked a common User

24   Interface in design and functionality ("Within the different teams (CRM/ERP) the development is

25   drifting in different directions.  This is the case due to the underlying technology differences . . . .")

26   *Id*. at 69929.  Ellison has confessed that all of the pieces of Suite 11i were not "plug and play" or

27   "complete":

28

> *[N]ot all the pieces [of Oracle 11i] worked together as well as they could have* . . . *and we were constantly making improvements* . . . *and this document helped us pinpoint some of the things we had to work on.*
>
> \*      \*      \*
>
> *Therefore, using that plug [and play] analogy, you know, there would be the receptacle but no prong in one of the plugs, just – it was a pretty new product. You know, the plug wasn't complete.*

Ex. 124 at 534:4-9, 535:14-21.  These facts are not and cannot be disputed.  Even defendants' expert Yourdon cannot opine that Suite 11i was **fully** integrated because he admittedly never analyzed whether the suite was integrated in terms of user "interface integration" or "functional integration," two of the four forms of integration identified as necessary for integration.  *See* Ex. 130 at 36 n.38; *see* Ex. 135 at 236:17-22, 238:5-7 ("Q.  It is fair to say that you are not offering an opinion as to whether or not Suite 11i was integrated with respect to user interface integration for functional integration?  A.  I have not offered such an opinion in this report. . . .  I have not evaluated the functional integration characteristics or capabilities of Suite 11i or the user interface capabilities.");  Ex. 133 at 7-8 (an absence or failure of any one of these four can render software not integrated).

### H.  Oracle's Misrepresentations and Disclosure of Oracle's True Financial Condition Proximately Caused Plaintiffs' Economic Loss

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."  109 Stat 747, 15 U.S.C. §78u-4(b)(4)] [15 U.S.C. §78u-4(b)(4)]; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-44 (2005).  In order to prove loss causation, a plaintiff must demonstrate a causal connection between the misrepresentation and the loss, *i.e.*, defendants' misrepresentation proximately caused plaintiffs' economic loss.  *Id.*  While a so called "corrective disclosure" specifically linking a disclosure to a specific misrepresentation, may be *one way* of proving loss causation, such a corrective disclosure is not required.  *See Nursing Home Pension Fund v. Oracle Corp.*, No. C-01-0988-MJJ, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006).  Rather, loss causation can be proved with evidence of a stock price decline when facts revealing the company's true financial conditions are disclosed.  *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006) (a plaintiff adequately pleads loss causation where a defendant reveals the Company's "true financial condition"); *see Oracle*, 2006

1   U.S. Dist. LEXIS 94470, at *36 ("as to Defendants' argument that Plaintiffs have failed to identify a

2   corrective disclosure with regard to Plaintiffs' Accounting Claim and Design Claim, the Court finds

3   them without merit").

4          Here, it is undisputed that at the end of the Class Period, new information was disclosed

5   concerning the true financial condition of Oracle's overall business and more details concerning the

6   impact of the slowing economy on Oracle sales results, Suite 11i applications and its failure to meet

7   specific 75% growth in the quarter – or drive database sales to help Oracle meet 3Q01 EPS forecasts

8   of $0.12.  Exs. 58, 142.  On March 1, 2001, the Company reported that it had missed its 0.12 cents

9   per share earnings forecasts by $0.02, which it had, on December 14, 2000, directly pegged to its

10  *false* $0.11 per share reported results in 2Q01.  Ex. 29 at 8.  The Company also reported that

11  applications – Suite 11i – sales had fallen well short of Oracle's stated and reaffirmed forecasts of

12  75% year over year (*see* Exs. 140 ¶130, 58).  The new information revealed in the Company's March

13  1, 2001 press release and conference call of the same day and reports of the financial analyst

14  community undisputedly caused the statistically significant stock price decline on March 2, 2001,

15  and plaintiffs' economic loss.  *See* Ex. 141 at 11, 22.  Defendants' expert Christopher James

16  unequivocally agrees that the March 1, 2001 disclosure was indeed new information concerning the

17  Company's true financial condition of its overall business, applications growth of Suite 11i and its

18  future prospects which caused the stock price decline:

19         [I] would view material new information *regarding both the applications business*
20         *as well as Oracle's other businesses and how they were faring in the then current*
           *economic environment*.

21         Q.     And what was the new information regarding how the applications business
           was faring . . . ?
22
23         A.     . . . I think *it is clear to me that the market and market participants were*
           *concerned about the earnings miss and what it conveyed in terms of future*
           *business prospects in the then current economic environment*.  Ex. 137 at 137:14-
24         138:1.

25         This Court has rejected defendants' previous attempts to suggest that plaintiffs are required to

26  connect specific misrepresentations with specific disclosures.  Plaintiffs have, in any event, plainly

27  demonstrated the causal connection between defendants' misrepresentations (including Suite 11i

28  applications and accounting claims) and plaintiffs' economic loss.  On December 14, 2000, Oracle

1  announced 2Q01 revenues and earnings results informing investors of its then-current financial

2  condition along with projections of its future revenues and earnings, including 3Q01. Exs. 29-30.

3  The December 14, 2000 results specified that Oracle earned $0.11 per share for 2Q01 and achieved

4  66% applications Suite 11i growth – beating analysts' expectations for both earnings and

5  applications sales. Exs. 29-30. The Company also made false representations regarding the

6  functionality of Suite 11i and growth forecasts as discussed above. *Id.* In response to the December

7  14 results, Oracle's stock price increased from $27.50 on December 14, 2000 to $29.63 on

8  December 15, 2000. *See* Ex. 34. Oracle's stock price movement after the December 14, 2000

9  announcements was undisputedly statistically significant. Ex. 141 at 17-18. The Company and the

10 investment community used the 2Q01 earnings results and $0.11 per share earnings performance as

11 evidence that Oracle could and would weather the economic downturn, and to specifically form the

12 basis for 3Q01 forecasted revenue and earnings, which Oracle particularized as 75% applications

13 growth and $0.12 per share in 3Q01. Ex. 29. Henley specifically premised the 3Q01 forecasts on

14 the 2Q01 results of $0.11 cents per share ("[H]istorically, the third quarter is slightly better than the

15 second quarter. That's the way, sequentially, its worked here. . . . So I would assume, 12 cents

16 would be a reasonable number . . . ."). *Id.* at 234427. Plaintiffs have demonstrated that Oracle's

17 misrepresentations during the Class Period proximately caused plaintiffs' economic loss.

18 **IV.    CONCLUSION**

19        Based on the foregoing, plaintiffs' motion should be granted.

20 DATED:  October 9, 2007              Respectfully submitted,

21                                      COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
22                                      SHAWN A. WILLIAMS
                                        WILLOW E. RADCLIFFE
23                                      MONIQUE C. WINKLER
                                        ELI R. GREENSTEIN
24                                      DANIEL J. PFEFFERBAUM

25

26                                      _____/s/_____
                                          SHAWN A. WILLIAMS
27
                                        100 Pine Street, Suite 2600
28                                      San Francisco, CA  94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone:  415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

T:\casesSF\oracle3\BRF00046290.doc

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7    I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9    I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on October 9, 2007.

11

12                                   /s/
                                SHAWN A. WILLIAMS

13                          COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP
14                          100 Pine Street, 26th Floor
                            San Francisco, CA  94111
15                          Telephone:  415/288-4545
                            415/288-4534 (fax)
16                          E-mail: ShawnW@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111