1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  MARK SOLOMON (151949)
   DOUGLAS R. BRITTON (188769)
3  STACEY M. KAPLAN (241989)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   marks@csgrr.com
6  dougb@csgrr.com
   skaplan@csgrr.com
7       – and –
   SHAWN A. WILLIAMS (213113)
8  WILLOW E. RADCLIFFE (200087)
   MONIQUE C. WINKLER (213031)
9  ELI R. GREENSTEIN (217945)
   DANIEL J. PFEFFERBAUM (248631)
10 100 Pine Street, Suite 2600
   San Francisco, CA  94111
11 Telephone:  415/288-4545
   415/288-4534 (fax)
12 shawnw@csgrr.com
   willowr@csgrr.com
13 moniquew@csgrr.com
   elig@csgrr.com
14
   Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION |
| ALL ACTIONS. | |
| | DATE: November 16, 2007<br>TIME: 1:30 p.m.<br>COURTROOM: The Honorable Martin J. Jenkins |

**PREVIOUSLY FILED ON SEPTEMBER 10, 2007
(DOCKET NO. 1086)**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................1

II. ARGUMENT..............................................................................................................1

    A.  Ellison Traded on the Basis of Material Non-Public Information...........................1

        1.  Oracle's Forecast Was Inaccurate Due to Economic Change .....................2

        2.  Oracle's Forecast Was Inaccurate Due to the Change in Its Product Mix and Problems with 11i........................................................................4

        3.  Ellison's Directive Rendered Oracle's Forecast Inaccurate .......................6

        4.  Less than 36 Hours Before He Decided to Unload Early, Ellison Received Oracle's Dismal Actual Results for December ...........................7

        5.  Ellison Knew that Oracle's Pipeline Had Collapsed .................................8

    B.  Plaintiffs Have Established Ellison's Scienter......................................................10

III. CONCLUSION.........................................................................................................12

# TABLE OF AUTHORITIES

Page

**CASES**

*Glassman v. Computervision*,
    90 F.3d 617 (1st Cir. 1996)...........................................................................................2

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .....................................................................................11

*In re Oracle Corp. Derivative Litig.*,
    867 A.2d 904 (Del. Ch. 2004), *aff'd*,
    2005 U.S. Dist. LEXIS 177 (Del. Apr. 14, 2005)..........................................................8

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ........................................................................................2

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ......................................................................................11

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).............................................................................1, 2, 10

*United States v. Smith*,
    155 F.3d 1051 (9th Cir. 1998) ......................................................................................1


**STATUTES, RULES AND REGULATIONS**

17 C.F.R.
    §240.10b5-1 ................................................................................................................10
    §240.10b5-1(b)............................................................................................................10

**I.     INTRODUCTION**

On January 19, 2001, less than 36 hours after receiving Oracle's dismal December 2000 results, Ellison suddenly decided to dump 40 million Oracle shares. Mot. at 13; Ex. 6.[1] Until then, every indication was that Ellison planned to trade in April or August 2001. Mot. at 13. When Ellison traded, he was in possession of material non-public information, including that Oracle had falsified its 2Q01 earnings, that its forecast (and guidance) was inaccurate, that 11i was performing miserably and that there were fundamental weaknesses in the U.S. divisions. Nowhere does Ellison argue that a reasonable investor would not have considered these facts important. Instead, his opposition is rife with assertions unsupportable in either evidence or law. No reasonable jury could find that Ellison did not trade on the basis of material non-public information.

**II.     ARGUMENT**

    **A.     Ellison Traded on the Basis of Material Non-Public Information**

The standard for materiality is a constant – "'whether a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" *United States v. Smith*, 155 F.3d 1051, 1064-65 (9th Cir. 1998).[2] Ellison argues that a reasonable investor would not have considered important the information that he undisputedly possessed when he traded.[3] Instead, Ellison relies on mischaracterized language from the First Circuit opinion in *Shaw*, which rejected a similar "Hail Mary" argument:

> Defendants posit, in essence, that there can never be a duty to disclose internally known, pre-end-of-quarter financial information, because any inferences about the quarter that might be drawn from such information could be rendered unreliable by later developments in the same quarter, such as a sudden surge of profitable sales. This position does not withstand scrutiny. Present, known information that strongly implies an important future outcome is not immune from mandatory disclosure merely because it does not foreordain any particular outcome. The question whether such present information must be disclosed (assuming the

---

[1] "Mot." or "Motion" refer to plaintiffs' opening brief herein. All "Ex." references are to plaintiffs' opening and reply appendices to the instant motion.

[2] Here, as elsewhere, all citations are omitted and emphasis is added unless otherwise noted.

[3] Plaintiffs have not put their "best case" forward but, rather, have offered undisputed evidence that entitles them to judgment. Opp. at 3. It is by no means plaintiffs' only evidence.

existence of a duty), poses a classic materiality issue: given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996). The language that defendants cite was never adopted by the *Shaw* court. Opp. at 1, 4.[4] The court merely found that plaintiff's ***allegations*** that the information indicated an extreme departure from publicly known trends and uncertainties was sufficient to meet the classic materiality standard. *Shaw*, 82 F.3d at 1211.[5]

### 1. Oracle's Forecast Was Inaccurate Due to Economic Change

Plaintiffs' Motion sets forth undisputable evidence that Ellison knew that the economy facing Oracle in 3Q01 was dramatically different than 3Q00 (the quarter used for comparison). Mot. at 4-5. Ellison testified that Oracle's forecast becomes inaccurate in such times of change because it is based on a historical extrapolation. Ex. 161 at 211, 226; Ex. J at 384:6-385:7.[6] Plaintiffs have shown that Ellison traded knowing that Oracle's guidance was inaccurate. Mot. at 4-5. Ellison resorts to wholesale denial and claims that plaintiffs have manufactured the phrase "macroeconomic change." Opp. at 10-11; Mot. at 4. Not true. Ellison himself offered this undisputed fact – Oracle's forecast is an extrapolation that becomes inaccurate in times of change, particularly during a "major

---

[4] All "Opp." references are to defendants' opposition to the instant motion.

[5] *Shaw* is further distinguishable because there, defendants made no public projection. Instead, the court made its materiality determination in relation to a range of possible results based on publicly known trends and uncertainties. *Id.* at 1210-11. It is not surprising that the court might require a more substantial departure in that situation (with a range of possibilities) than is necessary when defendants make specific projections. Likely realizing this, Ellison repeatedly misrepresents to the Court that *Shaw* was about public projections. *Compare Shaw* 82 F.3d at 1211 *with* Opp. at 1, 4; *see also Glassman v. Computervision*, 90 F.3d 617, 631 (1st Cir. 1996) ("Plaintiffs' nondisclosure claims fail because they base their allegations solely on discrepancies between actual (but undisclosed) intra-quarterly information and Computervision's ***undisclosed internal projections***."); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("the extent to which first quarter sales lagged behind WOW's ***internal projections***" was not material). Regardless, plaintiffs have offered ample evidence which meets even Ellison's mischaracterized *Shaw* "standard."

[6] All lettered exhibits are to the Appendix of Deposition Transcripts in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

macroeconomic change."[7]  Ex. 161 at 211, 226; Ex. J at 384:6-385:7.

Ellison also asserts that "there . . . is no evidence" of an economic change in 3Q01 that rendered Oracle's forecast unreasonable.  Opp. at 11.  Not true.  Defendant Sanderson testified that "*[T]he dot com falloff*" was a "*major macroeconomic event*" that was discussed at EMC meetings.  Ex. KK at 88:5-89:11, 92:23-25.  Minton testified that in early January 2001 *the "general macroeconomic environment was suffering*."  Ex. FFF at 223:14-18.  And Henley wrote on January 4, 2001 that "*all data since the [December 14 earnings] call point to more economic softening* so there is risk of slippage in deals."  Exs. 44, 45; Ex. 162 at 282605-08.  This declining economy caused both Minton and Sanderson to plan to sell shares in January 2001.  Ex. 163 at 611349.  Since Ellison knew of these changes when he traded (and of the effect they were having on Oracle's ability to convert its pipeline), he traded on the basis of material non-public information.  Mot. at 4-5; Ex. GG at 170:8-177:25.[8]  Ellison also cannot credibly dispute that the economic change affected Oracle's forecast.  Minton admitted that she did not take "*any economic factors whatsoever*" into account in the conversion analysis (Ex. EEE at 135:7-136:3) and that the economic change in 3Q01 rendered her extrapolated forecast inaccurate.  Ex. 164 at 609541; Ex. FF at 123:18-126:19.[9]

Since Ellison's statements have come to light, defendants have beat a hasty retreat from the conversion analysis, denying that it was anything more than a reasonableness "check."  Ex. G at

---

[7]  Ellison argues that plaintiffs have "grossly mischaracterized" his testimony because he was speaking of a "world event."  Opp. at 4, 10.  Besides being untrue, Ellison utterly fails to explain how a change not caused by a specific event would somehow be taken into account through Oracle's extrapolated forecast, whereas changes caused by events were not.

[8]  Ellison's attempt to prove that the economy was not softening fails.  Opp. at 11 n.7.  In fact, Ellison admits that technology spending was expected to increase "at a slower rate than a year earlier."  *Id.*  And he cannot deny that investment in software had slowed dramatically in 4QFY01.  Declaration of Alan G. Goedde filed 8/27/07 ("Goedde Decl."), ¶¶11-12 & Ex. 7.  Even the FOMC noted a "sizable decline in business spending on equipment and software."  Ex. 40 at 13.

[9]  Ellison's claim that Oracle "made" its guidance in 1Q01 and 2Q01 is unavailing.  Opp. at 11.  It is undisputed that Oracle improperly recognized revenue to report 11¢ EPS in 2Q01, which Ellison knew would negatively impact 3Q01.  Plaintiffs' [Corrected] Amended Motion for Partial Summary Judgment ("MPSJ") at 4-11; Ex. 10 at 03222; Ex. 161 at 216.  Further, Ellison was aware that Oracle did not have the same difficult comparisons in 1Q01 and 2Q01 that it did in 3Q01 (especially dot.com sales, which peaked in 3Q00).  Mot. at 4-5; Ex. 37; Ex. SS at 176:10-179:10.

77:20-79:19, 121:6-125:9, 126:5-128:7; Ex. 166 at 81; Ex. PP at 76:23-77:25, 78:1-85:7, 85:20-86:1, 110:14-114:15; Ex. 193 at §IV.D.1.d.; Opp at 9.  Undisputed evidence, however, shows that that analysis was the basis for Potential and that Ellison knew it.  Ex. 161 at 211, 226; Ex. 167; Ex. J at 384:6-385:7; Goedde Decl., ¶¶3-5 & Exs. 1-3.[10]  Ellison's sole evidence to dispute this fact is that, on December 11, 2000, the forecasted conversion rate was slightly lower than the 3Q00 rate.  Opp. at 9-10.  Slight variation in the quarter does not change the fact that Oracle's forecast was based almost entirely on Minton's extrapolation.  There is a 97% correlation between the Potential and a straight conversion analysis with 94% of any variation in the Potential explained by similar variations in that conversion analysis.  Goedde Decl., ¶¶3-5 & Exs. 1-3.

### 2.  Oracle's Forecast Was Inaccurate Due to the Change in Its Product Mix and Problems with 11i

Ellison does not dispute that, in 3Q01, Oracle's pipeline contained a higher concentration of lower-converting applications than in 3Q00.  Mot. at 6-8.[11]  Ellison admits that he was aware of this change and that Oracle did not adjust for it.  Opp. at 12.  Far from constituting "fraud by hindsight," Ellison's admission proves plaintiffs' point.  *Id*.  Ellison knew that Oracle's failure to adjust for the product mix change rendered its forecast inaccurate.  Mot. at 6-8.

Ellison argues that had the product pipelines been analyzed separately when Oracle issued 3Q01 guidance, it would have forecasted revenue growth of 26%.  Opp. at 12-13 & n.8.  Again, Ellison's calculations underscore the importance of plaintiffs' point.  When Oracle issued 3Q01 guidance, its Potential forecasted revenue growth of 38%, however, Henley issued guidance of 25% (13% lower) because Oracle's pipeline was "just too good to be true."  Ex. H at 354:15-355:3; Ex. 94 at 440076.  As Ellison explains, simply adjusting for the 3Q01 product mix change would

---

[10]  Ellison points to the "irony" in plaintiffs' use of the 2Q01 Potential for claims of improper revenue recognition.  Opp. at n.6.  Plaintiffs' use of the 2Q01 Potential is not inconsistent.  Plaintiffs highlight the 2Q01 Potential only during the last days of 2Q01 and after 2Q01 had closed, by which time the Potential was no longer based on Minton's historical extrapolation, but instead reflected actual revenues booked.  MPSJ at 9.

[11]  Although Ellison contends that applications pipeline growth was seen as a sign of healthy 11i demand, he does not explain how the $297 million drop in that pipeline before he traded supports his argument that he did not possess material information.  Opp. at 12; Mot. at 19-20.

1  have brought Oracle's forecasted revenue growth down by 12% (from 38% to 26%). Opp. at 12-13
2  & n.8. If Oracle had properly adjusted for both the change in its product mix and the "too good to be
3  true" pipeline, it would have issued 13% guidance (13% lower than 26%). This is without adjusting
4  for the impact of the economic change or the myriad 11i problems that made it highly unlikely that
5  Oracle would achieve its historical applications conversion rate. Mot. at 4-5; MPSJ at 14-23.[12]

6  Plaintiffs' Motion established that 11i problems were adversely affecting Oracle's ability to
7  sell 11i and convert its applications pipeline.[13] Mot. at 6-8. Ellison argues that plaintiffs have
8  mischaracterized the evidence by saying that Oracle had "virtually no 11i customer references" in
9  November 2000. Opp. at 17 n.13; Mot. at 7; Ex. 69 at 153367. But Ellison's characterization of that
10 same evidence as stating that Oracle had "few" or "thin" references simply underscores plaintiffs'
11 argument (and the document does state that Oracle did not have *any* references). The same is true
12 for defendants' contention that a June 2001 document referred to just a subset of "references": those
13 who were "live" and those who had "specifically approved" the use of their names. Opp. at 17 n.13.
14 Plaintiffs are at a loss to understand who defendants' other "references" were.[14]

15 Ellison disputes that Oracle misrepresented that it saved $1 billion in one year using 11i.

---

[12] Plaintiffs will fully respond to defendants' admissibility objections when appropriate. It is worth noting, however, that many statements in *Softwar* were made by senior Oracle executives and are admissions by a party opponent. In addition, Ellison is a co-author of *Softwar* and had the opportunity to comment on anything that he disagreed with or wanted to clarify. Finally, plaintiffs have been severely prejudiced by defendants' spoliation of the underlying tapes and transcripts and by Symonds' invocation of the Fifth Amendment.

[13] Ellison's attempt to explain away his statements that Oracle's sales force was "not very good at selling applications" is unavailing. Opp. at 16. Although he was discussing the sales force's difficulties in selling applications in 1993, he admits that the problems were not remedied until after the Class Period. Ex. 161 at 114-16, 173, 485; Ex. 168 at 609246.

[14] Ellison has not cited a single internal document to support his contention that Oracle had references. Opp. at 18. The only evidence that Ellison is able to point to is analyst reports relaying statements that Oracle was making to the public at the time about live customers. Opp. at 18; Opp. Exs. 354-355 (all "Opp. Ex." references are to exhibits attached to the 8/27/07 Declaration of Kyra G. Busby in support of defendants' opposition to the instant motion). And, in reality, many of the customers listed in the December 2000 analyst report were either not live at the time Oracle represented such to analysts or were experiencing major problems with 11i. Opp. Ex. 355 at 023376; Exs. 169-179. Oracle even had to bribe one of the customers to remain a "reference." Exs. 170, 180.

1 Opp. at 18.  He claims that "nothing Plaintiffs cite" supports their accusation.  *Id*.  Untrue.  Ellison

2 specifically admitted in *Softwar* that "the first billion dollars of savings was pretty much in the bag

3 before 11i was finished" – "'[t]hat's absolutely right.'"  Ex. 161 at 182-83.  And defendants'

4 marketing message made clear that the savings came from Oracle's E-Business Suite, which was

5 Oracle's title for 11i.  Ex. 76 at 015757; Exs. 181-184; Opp. Ex. 358.  Yet, Ellison testified falsely

6 that he never attributed the savings to the "E-Business Suite."  Ex. J at 713:7-714:17.  He did,

7 repeatedly.  Opp. Ex. 358; Ex. 76; Exs. 183-184.  Ellison offers no internal evidence to substantiate

8 Oracle's claim that it saved a billion dollars using the E-Business Suite.  In fact, internal documents

9 suggest that Oracle could not substantiate this claim.  Ex. 185.

### 3. Ellison's Directive Rendered Oracle's Forecast Inaccurate

11 Plaintiffs cite undisputed evidence that Oracle's guidance was inaccurate because Ellison

12 directed executives and finance personnel in the U.S. divisions to add risk to their field forecasts (to

13 account for "sandbagging"), which Minton failed to adjust for, adding $160 million in upside despite

14 it.  Mot. at 8-9.  In response, Ellison attempts to recharacterize his directive, but regardless of how

15 Ellison characterizes his instructions, the result is the same – Ellison instructed the Field to add more

16 risk to the forecast.  Opp. at 13-15.  Ellison argues that he did not want to increase the risk, but

17 merely wanted to make the forecasts more accurate.  Opp. at 13-14.  But the Field had just been

18 informed (by Henley's study) that they were consistently underestimating revenues by 11%-16%.

19 Mot. at 8-9; Ex. 79 at 151959-61; Exs. 186, 187.  A directive by Ellison to "be more accurate" would

20 necessarily have entailed including revenue that they would normally not have included (and, as a

21 result, more risk).  Ellison also argues that he was simply trying to get "more information" by

22 breaking the forecast into three categories (best, most likely, and worst).  Opp. at 14-15.  But

23 forecasting reports in the U.S. divisions included those categories long before Ellison's directive.

24 *See, e.g.*, Ex. 188.  Ellison suggests that he was merely attempting to have the U.S. divisions use

25 "consistent definitions" across those categories after the implementation of OSO.  Opp. at 14.

26 However, the "consistent definitions" that Ellison instructed the U.S. divisions to implement in OSO

27 training necessarily included more risk (because they moved deals with lower win probabilities into

28 the forecast).  Ex. 31.  In fact, the field personnel working with Ellison to create new definitions for

the U.S. divisions described this effect and specifically noted that it caused the field forecast to have more risk. Ex. 31 at 203683; Ex. 189.

Contrary to defendants' contention, there is much evidence that the Field stopped sandbagging. In the weeks following the directive, the field level management judgment in all three U.S. divisions suddenly skyrocketed and remained uncharacteristically high through 3Q01 and 4Q01. Goedde Decl., ¶¶6-10 & Exs. 4-6. Because Ellison cannot dispute these facts, he resorts to arguing that, had the directive occurred, Minton would have taken it into account. But Minton testified the exact opposite. Ex. FFF at 19:17-19; Ex. EEE at 135:7-136:3.[15]

### 4. Less than 36 Hours Before He Decided to Unload Early, Ellison Received Oracle's Dismal Actual Results for December

It is undisputed that Ellison suddenly decided to trade within 36 hours of receiving December's results. Mot. at 13; Ex. 6. Defendants attempt to escape this devastating fact by misrepresenting to the Court that Ellison did not rely on actual results. Opp. at 5. But he testified to the exact opposite ("when I analyze the data personally, I look at the actual size of the pipe, the size of the pipeline and how much has actually – has actually been sold") and explained that first month actual results were a useful, reasonable predictor of quarterly results. Ex. YY at 286:15-18, 293:1-16.[16] In fact, Ellison testified first month actual results was precisely the sort of material information that would prevent him from trading. Ex. GG at 43:12-44:6 ("a massive drop in our . . . sales in Europe" or "sales in Europe were zero" "after the end of the first month" "would have required me to not trade"). Importantly, Oracle's 3Q01 miss came from two of its U.S. divisions (OSI and NAS)

---

[15] Under Ellison's theory, Minton would have had to be aware of every deal in each U.S. division (there were thousands) and the mindset of the individual field representatives in selecting the category in which to place the deal. Opp. at 15. Minton, who spent just three to four hours each week on forecasting, was surely not privy to this level of detail. Ex. MM at 181:4-182:8; Ex. 163 at 611341. Minton's purported conversations with field finance managers also would not have allowed her to accurately account for the directive. Opp. at 15. 3Q01 was the first quarter that these managers reported to Minton. Ex. FF at 139:20-141:24; Ex. 189. Ellison's argument assumes that these new direct reports were able to decipher changes in the forecasting styles of their EVPs and report those changes to Minton. This was very unlikely. Ex. FF at 80:12-81:11, 143:3-18.

[16] According to Ellison, he could never be liable for trading because the information that he actually relied on (pipeline and actual results) was *per se* immaterial. Opp. at 5, 7-8.

1  that had virtually no revenue in the first month of 3Q01 (5% of their combined quarterly forecast)
2  and that account for a higher percentage of Oracle's license revenues than does Europe. Exs. 6, 34;
3  Ex. 94 at 440080.[17]  In addition, both NAS and OSI had experienced a "massive drop in sales" –
4  revenue growth of *negative* 24% and *negative* 81%, respectively. Ex. 6 at 00541.[18] In addition, the
5  Flash Report informed Ellison that Oracle was beset with 11i problems. Aside from Covisint,
6  Oracle's U.S. divisions had managed to sell less than $1.3 million dollars in 11i products in
7  December 2000 (*negative* 92% growth). *Id*. Ellison's receipt of this information, just 36 hours
8  before his sudden decision to trade for the first time in six years, is strong evidence that he
9  considered the information material and traded on its basis. *Id*.; Mot. at 13.[19]

### 5.      Ellison Knew that Oracle's Pipeline Had Collapsed

Plaintiffs' Motion cites undisputed evidence showing that Oracles' pipeline had taken an unprecedented nosedive before Ellison sold his stock. Mot. at 11. It also establishes that Oracle's pipeline tended to increase in the quarter before declining at the end, and even those late declines

---

[17]    Defendants argue that Oracle's results were within the range of normal results for the Company. Opp. at 5-6. Defendants cite little evidence for this proposition, likely because it is unsupportable. *Id*. December was, on average, the best first month of any first month of a quarter – accounting for 21% of quarterly revenues. Ex. 30 at Ex. 16. Even including the largest transaction in its history, in December 2000 Oracle recognized just 18% of the revenues necessary to meet its 3Q01 targets. Exs. 6, 34; Ex. 102 at 440111. Excluding Covisint, December 2000 contributed just 13% of Oracle's guidance. Ex. 6; Ex. 30 at Ex. 18. In addition, without Covisint, Oracle's total license growth for December 2000 was just 1% (compared to guidance of 25%). Ex. 6.

[18]    Defendants argue that under plaintiffs' view, "Ellison should have concluded that it was *bad* news that Oracle had just closed the largest software license transaction in its history." Opp. at 5 n.3. Plaintiffs in no way suggest that Covisint should be ignored or that it was bad news. What was bad news was that aside from that one time transaction, Oracle's U.S. divisions were recognizing virtually no revenue. Ex. 6.

[19]    Although Ellison relies heavily on the court's opinion from the Delaware derivative litigation, that case involved extremely different facts and arguments – plaintiffs had no allegations regarding accounting or 11i and made no arguments regarding the reliability of the Potential (and had no testimony from Ellison regarding its inaccuracy). Judge Strine specifically acknowledged, in his opinion, that the actions were extremely different. *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 908 & n.6 (Del. Ch. 2004), *aff'd*, 2005 U.S. Dist. LEXIS 177 (Del. Apr. 14, 2005). In addition, Judge Strine based his materiality determinations strongly on his understanding that the Potential Forecast was Oracle's most accurate internal measure. *Id*. at 941-42. Unlike plaintiffs in Delaware, however, plaintiffs in this litigation have testimony and writings from Ellison proving that he knew that Oracle's forecasting process became inaccurate in times of major change and that such major changes did, in fact, render the 3Q01 forecast (and guidance) unreliable.

1  were nowhere near the size of the declines throughout 3Q01. *Id*. In addition, Oracle's plunging
2  pipeline in December 2000 was unprecedented because most of the drop came from one place –
3  OSI's applications pipeline (which plummeted from 28% growth to *negative* 29% growth in just two
4  weeks). Ex. 94 at 440080; Ex. 95 at 440097. This unprecedented drop informed Ellison that
5  Oracle's U.S. license business (in particular its applications business) was collapsing.

6  According to Ellison, however, Oracle expected its pipeline to plummet (despite having
7  touted its "astounding" growth just weeks before) because it was "just too good to be true" as a
8  result of Oracle's conversion to 11i OSO. Opp. at 7; Ex. 84; Ex. H at 354:15-355:3; Ex. K at 270:2-
9  14. Ellison does not explain, however, why the "inflation" that he expected to fall from the pipeline
10  fell almost exclusively from OSI's applications pipeline. The only viable explanation is that it
11  clearly informed Ellison that Oracle's U.S. license business (particularly in applications) was
12  collapsing and that the inflation from OSO remained in the pipeline even after that drop. Even with
13  the inflated pipeline, however, at several points in 3Q01 Oracle still had to convert ***higher***
14  percentages of its pipeline than it had in the boom economy of 3Q00 in order to make its forecast.
15  Goedde Decl., Ex. 2. And despite defendants' contentions to the contrary, it was not an
16  unprecedented drop in conversion ratios at the end of 3Q01 that caused Oracle to miss its forecast.
17  In fact, as Ellison was informed when he received the Flash Report on January 17, Oracle's U.S.
18  license divisions had not been converting revenue quarter-to-date. Ex. 6. Following Oracle's
19  unprecedented pipeline declines in December 2000, those divisions had even less pipeline to work
20  with. Mot. at 11.

21  Although Ellison argues that pipeline growth and the "comfort gap" in 3Q01 were not
22  indicative of serious problems in Oracle's business, inexplicably Ellison again resorts to
23  misrepresenting that he did not rely on these indicators. Opp. at 7-8. But Ellison specifically
24  testified that pipeline growth was an indicator that he closely tracked to monitor Oracle's business.
25  Mot. at 9-10. Likewise, he testified that he monitored the "comfort gap" because it was "incautious
26  to . . . forecast sales growth without underlying pipeline growth." Ex. GG at 86:21-87:5; Mot. at 12.

27
28

Reasonable investors would have found important that the indicators that Ellison relied on were informing him that Oracle's business growth was sinking.[20]

### B.  Plaintiffs Have Established Ellison's Scienter

As Ellison noted, under SEC Rule 10b5-1, "a purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale *was aware of* the material nonpublic information when the person made the purchase or sale." 17 C.F.R. §240.10b5-1(b); Opp. at 20. Under Rule 10b5-1, this is sufficient to make a *prima facie* showing of liability that defendants may then rebut, however the presumption may only be rebutted with specific affirmative defenses that Ellison cannot satisfy here. 17 C.F.R. §240.10b5-1(b). As discussed above, when Ellison sold, he was aware of a variety of material non-public information regarding Oracle's financial results, prospects and products. Under Rule 10b5-1, this is enough for a *prima facie* showing of liability. Because Ellison cannot meet Rule 10b5-1's specific affirmative defenses, plaintiffs are entitled to summary judgment against Ellison.

Ellison argues that plaintiffs must prove not only that he knew material non-public information, but also that he knew that that information fell within his mischaracterization of *Shaw*. Opp. at 20. Ellison cites absolutely no authority for this proposition, nor could he. At deposition, Ellison was not even aware of the "abstain or disclose" rule. Ex. J at 447:22-25. To reward that professed ignorance is absurd. To require proof that he walked around with specific, mischaracterized language from First Circuit cases in his head is even more so. In any event, to the extent necessary, plaintiffs have shown that Ellison knew that the information in his possession was material. Mot. at 17. In addition to the wealth of information discussed in plaintiffs' Motion,

---

[20] Nowhere do plaintiffs suggest that the only reason that the negative information discussed above was material was that it suggested that Oracle would not meet its guidance for 3Q01. Investors would have wanted to know, as Ellison did, that Oracle's financial prospects, in 3Q01 and beyond, were extremely grim – that the economy was affecting Oracle's business and it was not immune to the current economic slowing (despite constant reassurances to the contrary), that its 11i product was not performing well and was negatively affecting the Company, that Oracle had resorted to fraud in the 2Q01 to reach its reported earnings, and that, as of January 15, even Oracle's most aggressive forecast was predicting virtually no revenue growth in 4Q01 (despite its target of 30% growth). Ex. 190 at 099014.

Ellison testified that the adverse results in the Flash Report falls within his own testimony of what information would have prevented him from trading. Mot. at 17; Ex. 6. The fact that he suddenly deviated from plan and decided to unload just 36 hours after receiving that information is strong evidence both of materiality and that he traded on the basis of that information. Mot. at 13; Ex. 6.

Contrary to Ellison's assertions, plaintiffs do not rely exclusively on a showing that Ellison's trades were "suspicious in timing and amount" to prove scienter. Opp. at 20. Plaintiffs have offered undisputed evidence that Ellison traded on the basis of material non-public information.[21] The suspicious nature of Ellison's "astronomical" sales is additional and strong evidence of scienter. Mot. at 20-22. Ellison cites *Apple* and argues that his sales are not suspicious (though the 9th Circuit in this case already explicitly held that they were) because he has an "explanation" for his sales. Opp. at 21. In *Apple*, and unlike here, the court first found that the defendant's sales were ***not suspicious in timing and amount*** because his sales were completely in line with his trading history. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).[22] Only after doing so did the court accept the "credible and wholly innocent explanation[]" for the sales. *Id*. at 1117. Ellison has

---

[21] In addition, Ellison's destruction of evidence supports a finding of scienter. Mot. at 22-25. In fact, his choice not to respond substantively to many of plaintiffs' claims speaks volumes about their validity. Opp. at 24-25. Ellison's procedural arguments lack merit as does his highly selective response to the damaging evidence that supports plaintiffs' showing. Opp. at 25. Regardless of the discovery orders in this case, Ellison was under an obligation to preserve relevant evidence, including OSO. He was also obligated to produce relevant evidence, including *Softwar*, even though it may have been available "in bookstores throughout the country." *Id*. In fact, Ellison's disregard of his discovery obligations has led to the intentional destruction of the tapes that formed the basis of *Softwar*. And as plaintiffs showed in their Motion, Ellison facilitated the destruction of those tapes. Mot. at 23. Defendants have cited no authority showing that evidence destruction cannot be considered at summary judgment. It supports a finding of scienter in this case.

[22] Ellison's spin on *Kaplan* is likewise unavailing. Opp. at 21-22. In *Kaplan*, the defendant attempted to use his retirement as his wholly innocent reason for selling stock. *Kaplan v. Rose*, 49 F.3d 1363, 1379 (9th Cir. 1994). The court, in holding that *Apple* did not apply, first noted that defendants' sales "were not consistent with earlier patterns; they were in large amounts and at sensitive times." *Id*. It further explained that, far from supporting his argument, defendant's "explanation[] – that [he] wanted to reap financial benefits for personal reasons – merely beg the question of whether [he] acted on the basis of undisclosed inside information in order to reap large returns." *Id*. The court noted that defendant's desire to retire could even support an inference of scienter. *Id*. Likewise, the Ninth Circuit has already held that Ellison's sales support a strong inference of scienter because they were "highly inconsistent" with trading history, "astronomical" in amount, and suspiciously timed. Mot. at 20-22. And as in *Kaplan*, Ellison sold to "reap financial benefits for personal reasons," including funding his "excessive" lifestyle. *Id*.

no such explanations. In fact, Ellison's only explanation for his decision to sell is that his options were expiring in August 2001. Opp. at 21.[23] Overwhelming evidence, however, shows that the timing of Ellison's trades – in January 2001 instead of April or August 2001 as planned, was the result of his receipt of material non-public information. Mot. at 12-13.

To justify his sudden decision to sell in January, Ellison argues that he could not wait to trade in April or August 2001 because he could have come into possession of material non-public information, such as an acquisition. Opp. at 22. Putting aside the fact that Ellison was in possession of material non-public information within 36 hours before he decided to trade in January 2001, Ellison was well aware that Oracle would not engage in a merger or acquisition in April 2001 or August 2001. At the time Ellison traded, Oracle had never made an acquisition greater than $125 million, mainly because Ellison was opposed to them. Ex. 161 at 216-17, 493. In addition, Ellison had not previously been adverse to waiting until those last two windows. Mot. at 12-13. In any event, regardless of Ellison's "explanation," when he sold shares in January 2001 he was in possession of material, non-public information. Ellison had a duty to either disclose that information or to abstain from trading.

### III.   CONCLUSION

For the foregoing reasons, plaintiffs' Motion for should be GRANTED.

DATED: October 9, 2007                                      Respectfully submitted,

                                                                                  /s/
                                                              DOUGLAS R. BRITTON

---

[23] Ellison's assertion that the restrictions he placed on his sales somehow prove his innocence is unavailing. Opp. at 21. The undisputed evidence shows that Ellison placed those restrictions on his stock to avoid driving down the price. Mot. at 13-14. To this end, Ellison even used Oracle's stock repurchase program to stabilize the price. Exs. 191, 192. Far from proving his innocence, Ellison's restrictions are simply further evidence of the heights to which he would climb to sell at a higher price. And Ellison's testimony that he has never had a "private conversation" with Deborah Lange is irrelevant. Opp. at 23. That Ellison has never talked privately with Lange says absolutely nothing about his discussions with her in a business setting or through some other form of communication (such as e-mail or indirectly through others).

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\Efile\10-09-07 various efilings\BRF00046285_RplyEllison(dkt1086).doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 9, 2007.

<u>/s/ Douglas R. Britton</u><br>
DOUGLAS R. BRITTON

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:DouglasB@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

    bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Dorian Daley
500 Oracle Parkway
Redwood City, CA 94065

Corey D. Holzer
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

Raymond Lane
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

PRG-Schultz USA, Inc.
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

Darren Jay Robbins
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
```

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111