# EXHIBIT G

ORIGINAL   169

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE ORACLE CORP. DERIVATIVE LITIGATION | ) CONSOLIDATED<br>) CIVIL ACTION NO. 18751<br>)<br>) FILED UNDER SEAL PURSUANT<br>) TO COURT ORDERS DATED<br>) 11/20/2002 AND 11/25/2002 |

### AFFIDAVIT OF RAYMOND J. LANE

NCC RJC
originally filed
4/14/03
4:11 pm

unsealed 6/7/07
2:07 pm

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

------------------------------------------------x
:
IN RE ORACLE CORP. DERIVATIVE       :   CONSOLIDATED
LITIGATION                          :   CIVIL ACTION NO. 18751
:
------------------------------------------------x

### AFFIDAVIT OF RAYMOND J. LANE

STATE OF CALIFORNIA    )
                       )  ss.:
COUNTY OF SAN MATEO    )

I, Raymond J. Lane, now come before the Court and testify as follows:

1. From 1992 through July 2000, I served in various executive capacities at the Oracle Corporation. I joined the Company in 1992 as President of Oracle USA and held this position until October 1993. From October 1993 to July 1996, I served as Executive Vice President of World Wide Operations. From July 1996 until July 2000, I served as President and Chief Operating Officer of the Company and as a member of Oracle's Board of Directors.

2. As a member of the Executive Committee and the Board of Directors and prior to that as the head of World Wide Operations, I was knowledgeable about all aspects of the company's operations, management and financial condition.

3. Both as Executive Vice President and Chief Operating Officer, I was also directly involved in the executive management process, overseeing each division of the Company (other than Development and Finance which reported to Larry Ellison and Jeff Henley respectively) on a daily basis. This process included constant discussions with division heads and senior sales personnel and participation in weekly Executive Management Committee (EMC) meetings. I also interacted with industry and securities analysts. I participated in quarterly conference calls with analysts. I attended periodic meetings of analysts to report on the progress of the business and I met regularly with individual analysts while I was at the Company.

4. Before joining Oracle, I was a senior partner with Booz-Allen & Hamilton, where I led the Information Systems Group and served on the firm's Executive Committee and Board of Directors. Prior to joining Booz-Allen, I served as division vice-president at Electronic Data Systems. I previously spent eight years with IBM serving in various product management, sales and marketing positions. I left Oracle in July 2000 to become a General Partner at Kleiner Perkins Caufield & Byers, a venture capital firm, where I continue to work today.

5. I was contacted by plaintiffs' counsel and provided with internal Oracle documents and information regarding the company's operations and financial condition for Q2/Q3 FY '01, including Flash Reports, EMC Reports, pipeline reports, internal emails, Upside Reports, interview summaries of certain Oracle personnel and segments of the Report of the Special Litigation Committee, which counsel advised me had been formed by the Oracle Board in response to the litigation. I focused my review on information regarding interim company performance during Q3 FY 2001.

6. Based on my review of the information contained in these documents, it is my opinion that there were a number of indications of softening in Oracle's License business in December 2000 and January 2001, including the fact the December License revenue growth rate over Q3 '00 was flat (absent a one-time deal the Company booked in the first few days of Q3 '01), License upside was declining, and the spread between pipeline growth and license revenue growth had narrowed.

7. In response to plaintiffs' counsel's inquiry, it is my opinion that this information would have been of interest to the investment community and would have raised concern such that I would not have sold Oracle stock if this information had not been public.

8. Actual December FY 01 Revenue results contained in a January 17, 2001 email from Larry Garnick, attached as Exhibit 1, showed no USD License revenue growth for the month of December 2000 over December 1999 absent the Covisint deal.

9. To accurately assess the license revenue, and the direction of the license revenue business, Covisint's results should have been backed out of the December revenue actuals. Except for the technical timing of the booking of the revenues, the Covisint deal was not a Q3 deal, and was not indicative of the business at that time or relevant in assessing its prospects going forward. The deal was originally structured as a long-term license and service partnership providing revenues to Oracle over an extended contract period. The contract structure was based on the percentage of revenues earned by Covisint. It was anticipated this structure, if Covisint's business model were successful, would generate as much as $200 million in revenues to Oracle over the life of the contract. The negotiation of the Covisint deal was substantially complete by July 2000. Larry Ellison decided to change the structure of the transaction, eliminating the long-term partnership structure and providing for a one-time, lump sum payment to Oracle of $60 million. Q2 of FY '01 was spent renegotiating the structure of the deal. These negotiations were completed in Q2 and the deal was executed in the first few days of Q3, resulting in revenue technically being earned in Q3.

10. In addition, because of the size of the transaction, $60 million, I believe the largest deal in the Company's history to that point, the revenue should not have been included in assessing the trend in the underlying License business going forward. Covisint, by its size, was a unique transaction and gave no indication of the expected flow of the License business generated in routine transactions. The timing of the execution of the transaction also weighed firmly against its

2

use in assessing trends in Q3. Closing, as it did, in the first few days of the quarter was further indication it was not reflective of trends in Q3 deal flow.

11. The most important gauges of the Company's business and its prospects were actual performance data, including license revenue and pipeline data, combined with real time interface with the Division Heads regarding their sales. These were the gauges Larry Ellison and I routinely relied on in assessing the Company, both on an intra-quarter basis and going forward. The fact that, absent Covisint, the USD License revenue growth rate for December 2000 over December 1999 was flat, as reflected in the Garnick email, was a red flag indicating softening in the License business.

12. In assessing the trend for the quarter and thereafter, analysts would have been interested in the fact the license revenue growth absent Covisint was flat on a year-over-year (YOY) comparative basis.

13. An additional red flag was Jennifer Minton's reduction of her upside number for License revenue twice in January 2001. She lowered her upside number for License revenue by $64.6 million on January 12, 2001. She lowered it again by $51.5 million on January 29, 2001. These reductions reflected continued weakening in the License business in January. Although the upside number is only one factor in assessing trends in the business, based on my experience at the Company, upside reports were reviewed at the weekly EMC meetings. Declines in an upside of these amounts and the basis for them would have been discussed in detail. Copies of Upside Reports dated December 25, 2000, January 12, 2001, January 22, 2001, and January 29, 2001, are attached as Exhibits 2 through 5.

### Q3 FY 2001 UPSIDE DECLINES

| | | | | |
|---|---|---|---|---|
| 12/8/2000 | $159,500,000 | $25,000,000 | $50,000,000 | $35,000,000 |
| 12/11/2000 | $159,500,000 | $25,000,000 | $50,000,000 | $35,000,000 |
| 12/25/2000 | $159,500,000 | $25,000,000 | $50,000,000 | $35,000,000 |
| 1/12/2001 | $94,910,000 | | $14,000,000 | $35,000,000 |
| 1/15/2001 | $94,910,000 | | $14,000,000 | $35,000,000 |
| 1/22/2001 | $94,910,000 | | $14,000,000 | $35,000,000 |
| 1/29/2001 | $43,410,000 | -$35,000,000 | | $35,000,000 |
| 2/5/2001 | $32,796,000 | | | |
| 2/12/2001 | $22,000,000 | | | |
| 2/19/2001 | $31,392,000 | | | |
| 2/26/2001 | $40,275,000 | $20,000,000 | -$20,000,000 | $30,000,000 |
| 2/27/2001 | $3,514,000 | $15,000,000 | -$50,000,000 | $33,000,000 |
| 2/28/2001 | -$47,158,000 | -$44,000,000 | -$26,000,000 | $5,500,000 |

3

14. Pipeline data included in Q3 '01 Upside Reports provided another indication of weakening in the License business. In evaluating Oracle's intra-quarter revenue figures, it was understood by Oracle's senior management that the closer the relationship between the average of the forecasted growth and potential growth figures ("average forecasted growth") on the one hand and the pipeline growth figures on the other hand, the less comfort there would be that the forecasted growth figures would actually be met. The following chart is derived from the Upside Reports for Q3 '00 through Q3 '01 and details the "comfort gap" from Q3 '00 through Q3 '01. The chart shows a strong contrast between Q3 '01 and the preceding four quarters. For example, in the first two months of Q3 '00, there was a comfort gap between the average forecasted growth and the pipeline growth ranging from 19% to 11%.

**COMFORT GAP**

|  | Q3 '00 | Q4 '00 | Q1 '01 | Q2 '01 | Q3 '01 |
|---|---|---|---|---|---|
| 1 |  |  |  |  |  |
| 2 | 19% | 16% |  | 38% | 22% |
| 3 |  |  | 42% | 38% |  |
| 4 |  | 20% |  | 20% | 4% |
| 5 |  |  |  |  |  |
| 6 | 13% | 24% | 43% | 19% |  |
| 7 |  |  | 40% | 15% | 6% |
| 8 | 11% | 23% |  |  | 3% |
| 9 |  |  | 37% |  | 6% |
| 10 | 13% | 26% | 22% | 10% | 9% |
| 11 | 5% | 22% | 20% | 10% | 6% |
| 12 | 2% | 23% | 20% | 5% | 12% |
| 13 | 5% | 19% | 20% | 5% | 13% |

In contrast, at the beginning of Q3 '01 there was a "comfort gap" of 22%, but that gap narrowed on December 25, 2000, to 4% and remained between 3% and 6% in January 2001. On December 25, 2000, and January 22, 2001, the projected "potential growth" percentage was actually higher than the pipeline growth percentage, an event that should only happen, if at all, during the last two or three weeks of a quarter when the "potential growth" figures can be more accurately predicted. The narrow gap starting on December 25, 2000, and throughout January 2001 indicated an increased difficulty in meeting Oracle's forecasted revenue.

15. Emails from division personnel raised additional red flags regarding the continuing softening in January 2001 in the License business. In an email from David Winton to Jennifer Minton dated January 11, 2001, attached as Exhibit 6, Winton reports the pipeline had not grown as anticipated, a lack of big deals, a drop in Technology with both General Business and Majors seeing a slowdown both in Q3 and Q4, and a burst in GB's dot.com bubble, with the West division expected to end $30 to $40 million behind budget. Although Winton was keeping to the

4

NAS Q3 forecast, the information contained in the email is a red flag indicating softening in the NAS business continuing into January 2001.

16. An email from Kent Kelly to Sandy Sanderson and James English dated January 17, 2001, attached as Exhibit 7, provides a detailed forecast review for OPI License Q301, citing a base revenue forecast of $150 million for the quarter, and an 80% YOY growth rate. The Covisint deal was substantially attributed to OPI. Adjusted for Covisint, the forecasted OPI growth rate of 8.4% reflected a weakening in the business. Kelly reported a Q3 forecast coverage ratio of 240%, well below the accepted benchmark of 300%, another indication of weakness. Kelly also forecast negative growth for Q4 of 16%, 65% of target.

17. A January 18, 2001 email from Sarah Kopp to Jennifer Minton, attached as Exhibit 8, details the basis for the OSI Q3 forecast. Jay Nussbaum, the OSI division head, applied $91 million in "judgment" to the SVP Commit levels to arrive at a forecast of $225 million. Nussbaum was consistently aggressive in his forecasts, and was viewed as such by Henley and me. This level of judgment, combined with the forecasts' reliance on large deals, in particular a prospective Bell South deal, and the historical aggressiveness of this Division head's forecasts, calls into question the reliability of the $225 million forecast. Based on the data provided and my past experience with the Company a reasonable forecast for OSI would have been substantially lower.

18. Adjusted appropriately, and in combination with the OPI assessment absent Covisint, these emails raise concern regarding the continuing deterioration in the license business and revenue in January 2001.

19. Based on my knowledge of Oracle's operations and the information I reviewed, it is my opinion the internal information described above was indicative of a weakening in Oracle's business; this information would have been relevant to analysts in assessing Oracle's business prospects; this information likely would have had a negative impact on the price of Oracle stock if made public at the time; and I would not have traded in the face of it.

RAYMOND J. LANE

Sworn to before me this
10 day of April 2003

NOTARY PUBLIC

KIMBERLY K. SMITH
Commission # 1244893
Notary Public - California
San Francisco County
My Comm Expires Dec 17, 2003

5