COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
    – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. C-01-0988-MJJ<br><br>CLASS ACTION<br><br>[CORRECTED] REPLY IN SUPPORT OF PLAINTIFFS' [CORRECTED] AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>DATE:     November 16, 2007<br>TIME:     1:30 p.m.<br>COURTROOM:  The Honorable Martin J. Jenkins |

**PREVIOUSLY FILED ON SEPTEMBER 19, 2007**
**Docket No. 1162**

# TABLE OF CONTENTS

**Page**

I.     DEFENDANTS CANNOT DEFEAT SUMMARY JUDGMENT ON THE
       ACCOUNTING CLAIMS .................................................................................1

       A.     Defendants Cannot Dispute the Falsity of Oracle's 2Q01 Results ........................1

       B.     Defendants Cannot Defeat Summary Judgment on Materiality ...........................2

       C.     Defendants Fail to Dispute the Evidence Establishing Scienter ...........................3

       D.     The Evidence Surrounding the 2002 Clean Up Reinforces Scienter ......................6

II.    DEFENDANTS FAIL TO RAISE A GENUINE ISSUE OF MATERIAL FACT
       WITH RESPECT TO 11I .................................................................................7

       A.     Defendants Fail to Adduce Evidence to Dispute that Suite 11i Was Not
              Fully Integrated and Interoperable Out of the Box ......................................7

       B.     Defendants Do Not Dispute Evidence that Failure to Demonstrate an
              Integrated Suite 11i Hurt Sales and or that Defendants Knew It ..........................10

       C.     Defendants Do Not Raise a Genuine Issue of Fact Concerning Knowledge
              that Suite 11i Did Not Work in Every Language ....................................10

       D.     Oracle Does Not Dispute Knowledge that the January Internal
              Implementation of 11i Contributed to the 3Q01 Miss ...........................11

       E.     Defendants Have Failed to Raise Any Genuine Issue of Material Fact in
              Dispute of Plaintiffs' Evidence of Loss Causation .................................12

III.   CONCLUSION ..........................................................................................13

1

# TABLE OF AUTHORITIES

2
Page

3 **CASES**

4 *Adams v. Kinder-Morgan, Inc.,*
  340 F.3d 1083 (10th Cir. 2003) ...................................................................4
5
6 *Aldridge v. A.T. Cross Corp.,*
  284 F.3d 72 (1st Cir. 2002) .........................................................................6

7 *Dura Pharms., Inc. v. Bruodo,*
  544 U.S. 336 (2005)...............................................................................7, 13
8
9 *Howard v. Everex Sys.,*
  228 F.3d 1057 (9th Cir. 2000) ....................................................................4

10 *In re Convergent Techs. Sec. Litig.,*
   948 F.2d 507 (9th Cir. 1991) ......................................................................9
11
12 *In re Daou Sys., Inc.,*
   411 F.3d 1006 (9th Cir. 2005),
   *cert. denied,* 546 U.S. 1172 (2006)...........................................................7
13

14 *In re Gilead Scis. Sec. Litig.,*
   No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893
   (N.D. Cal. May 12, 2006) .........................................................................13
15

16 *In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001).........................................................................6

17 *In re Stellent, Inc. Sec. Litig.,*
   326 F. Supp. 2d 970 (D. Minn. 2004) .........................................................6
18

19 *In re Verisign Corp. Sec. Litig.,*
   No. C02-2270 JW, 2005 WL 2893783
   (N.D. Cal. Nov. 2, 2005)...........................................................................13
20

21 *Nathenson v. Zonagen, Inc.,*
   267 F.3d 400 (5th Cir. 2001) ......................................................................6

22 *Nordstrom, Inc. v. Chubb & Son, Inc.,*
   54 F.3d 1424 (9th Cir. 1995) ......................................................................4
23

24 *Plotkin Inc. v. IP Axess Inc.,*
   407 F.3d 690 (5th Cir. 2005) ......................................................................6

25 *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
   No. 94 Civ. 5587 (PKL), 2002 U.S. Dist. LEXIS 23829
26 (S.D.N.Y. Dec. 11, 2002) ...........................................................................6

27 *Rothman v. Gregor,*
   220 F.3d 81 (2d Cir. 2000).........................................................................6

28

1

2                                                                                                           **Page**

3 *SEC v. Phan*,
        No. 05-55269, 2007 U.S. App. LEXIS 20624
4        (9th Cir. Aug. 29, 2007).....................................................................................................3

5 **STATUTE, RULES AND REGULATIONS**

6 Federal Rules of Civil Procedure
        Rule 30(b)(6)................................................................................................................5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   DEFENDANTS CANNOT DEFEAT SUMMARY JUDGMENT ON THE ACCOUNTING CLAIMS

### A.   Defendants Cannot Dispute the Falsity of Oracle's 2Q01 Results

Plaintiffs' motion demonstrated that Oracle's 2Q01 financial results were overstated by at least $0.01 per share in fictitious earnings from Oracle's improper conversion of customer overpayments to revenue via Oracle's bad debt reserve.  Plaintiffs' [Corrected] Amended Notice of Motion and Motion for Partial Summary Judgment ("Mot.") at 5-7.  Oracle's own expert J. Duross O'Bryan did not challenge more than 90% of the improper transfers and therefore could not dispute that Oracle violated GAAP and inflated its EPS by $0.01.  *Id.* at 6-7.  Instead, defendants' only challenge is the false assertion that plaintiffs' allegations are "entirely new."  Defendants' Opposition to Plaintiffs' Amended Motion for Partial Summary Judgment ("Defs' Opp.") at 2.  In fact, the bad debt transfer allegations relating to the debit memos were: (a) alleged in multiple pleadings and court filings beginning in 2002; (b) set forth in detail in plaintiffs' interrogatory responses; (c) expressly held to be relevant by the Special Master who ordered the production of hundreds of thousands of pages of documents related to the issue; (d) analyzed and opined upon by both parties' experts; and (e) the subject of countless briefs, hearings, and discovery motions.  Plaintiffs' [Corrected] Opposition to Defendants' Motion for Summary Judgment ("Opp.") at 4-5.  It is utterly absurd to suggest that plaintiffs' allegations are "entirely new" when plaintiffs have been alleging the same accounting fraud involving the improper conversion of customer overpayments to revenue and earnings for over four years of litigation.

It is equally absurd for defendants to suggest that there is no "logical or evidentiary [accounting] connection" between the debit memos, the bad debt transfers, Oracle's unapplied cash accounts and the unapplied cash "clean up" project initiated in October 2002 (the "2002 Clean Up").  Defs' Opp. at 11 n.4, 14.  Plaintiffs' motion proved otherwise (Mot. at 10-13) and Special Master Infante already rejected defendants' assertion:

> ***In the July 17, 2006 Order, the Special Master concluded that documents relating to transfers of customer overpayments to Oracle's bad debt reserve, which could also be linked to the November 17, 2000 debit memos were relevant to***

> ***Plaintiffs' allegations. The new or different evidence cited by Plaintiffs . . . , reveal a further connection between the debit memos and Oracle's bad debt reserve account during the relevant period. . . .*** Reply Ex. P at 22.[1]

The Special Master also found that defendants' attempt to narrow and separate the bad debt transfer issue from the debit memo issues was "ridiculous" (Opp. at 4 n.5) and found that defendants improperly "shifted" their position on the issue:

> ***Judge Spero has already voiced concern that Defendants have made statements to the Court regarding discovery of accounting documents and then later changed their position. Here, again, Defendants have stated one position (that there is no link between the debit memos and the 2002 Clean Up project) and later shifted that position (by claiming all linked documents have been produced and that the link is not substantial.).*** Reply Ex. P at 19.[2]

Defendants cannot defeat summary judgment on falsity by repeating this "no connection" argument and avoiding the actual evidence.

## B.    Defendants Cannot Defeat Summary Judgment on Materiality

Oracle claims that the $20 million in false earnings from the debit memo transactions and the bad debt transfers was not material because it was "less than 1% of Oracle's reported revenue for the quarter." Defs' Opp. at 12. That 1% of revenue, however, equated to a 10% overstatement of Oracle's EPS, and was the sole difference between meeting or beating Wall Street's consensus earnings' expectations. Mot. at 7. The SEC rule on materiality states that intentional violations of accounting rules to manage earnings is presumptively material. Reply Ex. B at 5. Larry Ellison

---

[1]     All emphasis is added unless otherwise noted.

[2]     If there was any question whether the debit memos and the bad debt transfer allegations were "connected," that question was answered when Judge Infante ordered defendants to produce hundreds of thousands of pages of documents related to the bad debt transfers and the 2002 Clean Up, and those documents expressly referred to and discussed the November 2000 debit memos. Reply Ex. R at 14-15. ("Ex." refers to the exhibits attached to the Appendix in Support of Plaintiffs' [Corrected] Amended Motion for Partial Summary Judgment and "Reply Ex." refers to exhibits attached to the Appendix in Support of Reply.) Defendants still do not and cannot dispute that over $20 million in customer overpayments was transferred from Account 25005 to revenue and income through Account 12601 and that every transfer to the bad debt reserve in 2Q01 was ***applied to a debit memo on or around November 17, 2000***. Mot. at 6-7. Nor can defendants dispute that the entire $20 million in transfers and their respective debit memos were reversed, removed from the reserve, credited, refunded and/or escheated during the 2002 Clean Up project – the same project that defendants falsely told the Court had "no connection whatsoever" to the debit memos and "nothing to do" and "no relation" to the November 2000 events. *Id*. at 11-13.

1    himself stated that the "one thing" that "would make a difference" to the market was a "quarter that

2    beat expectations." Ex. 17 at 431.  Plaintiffs' expert concluded that the $0.01 EPS misstatement was

3    both quantitatively and qualitatively material.  Reply Ex. Q at 3-9.[3]

4        Defendants claim that analysts (not Oracle investors) were "well aware" that Oracle rounded

5    its EPS to the nearest penny and thus, were "fully capable of determining" Oracle's true EPS number

6    if they did the math. Defs' Opp. at 12.  That is simply not true.  Even if analysts and investors

7    calculated the precise EPS number from Oracle's reported results, that number was false.  Neither

8    analysts nor investors could have "determined" that Oracle really earned only $0.10 but inflated that

9    number by illegally converting $20 million in customer money to income, and booking an improper

10   $20 million swap deal with Hewlett-Packard Company ("HP"), *after* 2Q01 closed.  Mot. at 8-10.

11   Further, Oracle investors and analysts also had no way of knowing that Oracle's *3Q01* guidance of

12   $0.12 per share was based on 2Q01 results of $0.11 that were intentionally inflated by defendants'

13   accounting manipulations.  Opp. at 8 n.12.  In fact, Jeff Henley told the market that the $0.12

14   forecast was "reasonable" *because* Oracle reported $0.11 in 2Q01, which was knowingly false.[4]  *Id.*

15   Oracle investors were not "well aware" of Oracle's accounting manipulations.

16       **C.**      **Defendants Fail to Dispute the Evidence Establishing Scienter**

17        Defendants do not even attempt to dispute that Oracle created and circulated internal "Upside

18   Reports" to the Executive Committee, including defendants Ellison and Henley, on November 27,

19   2000, December 1, 2000, December 4, 2000 and December 5, 2000, all of which show irrefutably

20

---

21    [3]      The Ninth Circuit recently affirmed the general principle that materiality is an issue best left

22   to the jury.  *SEC v. Phan*, No. 05-55269, 2007 U.S. App. LEXIS 20624, at *33-*34 (9th Cir. Aug.

23   29, 2007).  Plaintiffs submit, however, that because Oracle's accounting misstatement was
intentionally engineered in order to beat Wall Street earnings expectations by $0.01, no rational trier

24   of fact could find that Oracle's misstatement was not material.  Oracle would not have made the
improper $20 million adjustment if it was not material to its financial statements.  Mot. at 10 n.13.

25    [4]      Defendants' assertion that the improper accounting was only "two-tenths of a cent" ignores

26   that the "two-tenths" allowed Oracle to round up to $0.11 per share.  Mot. at 9-10.  If "two-tenths of
a cent" was not material as Oracle now claims, Oracle would not have made the $20 million

27   adjustment (and would not have prematurely booked the HP deal after 2Q01 closed).  Indeed, Tom
Williams has admitted that Oracle would not make bad debt adjustments during a quarter unless they
were "significant."  Ex. 120 at 124:23-125:2.

28

1    that Oracle did not earn $0.11 per share as of the close of 2Q01.  Mot. at 9-10; Opp. at 9; Reply Exs.

2    C at 440761, E at 1532779, F at 1532805, T at 440830.  Each Upside Report had a "Corporate

3    Adjustments" page with a line item conspicuously labeled "US Bad Debt Adjustment."  Reply Exs.

4    C at 440763, E at 1532781, T at 440832.  Defendants do not dispute that an Executive Committee

5    meeting was held on December 4, 2000 *after* the reports were communicated to defendants showing

6    that Oracle did not earn $0.11 in 2Q01.  Reply Ex. D at 208835.  Nor do defendants dispute that on

7    December 8, 2000, Oracle's Controller, Jennifer Minton, and V.P. of Finance, Tom Williams (both

8    of whom reported to Henley and attended Oracle's Executive Committee meetings every Monday),

9    received Oracle's final "Bad Debt Reconciliation" for 2Q01 showing the $20 million "adjustment"

10   to the bad debt reserve.  Ex. 27 at 1610987.

11       Defendants try to refute the evidence above by submitting self-serving declarations of

12   Ellison, Henley and Sanderson, which state that they had "no contemporaneous knowledge" of the

13   2Q01 conversion of customer money to earnings.  Defs' Opp. at 14.  Notably, the declarations do not

14   deny that Ellison and Henley received and reviewed the Upside Reports on November 27, 2000 and

15   December 1, 4, and 5, 2000.  *Id.*  The declarations do not refute that Ellison and Henley attended the

16   Executive Committee meeting held on December 4, 2000 the same day that Oracle's Upside Report

17   confirmed that Oracle had not earned $0.11.  Reply Ex. D at 208835.  Nor do Ellison and Henley

18   dispute that they were aware of Oracle's December 8, 2000 "Bad Debt Reconciliation" showing that

19   Oracle improperly transferred $20 million in customer overpayments to earnings.  In fact, although

20   Oracle submitted declarations of countless employees, Oracle failed to provide any affidavits from

21   Minton and Williams, who were undisputedly aware of the improper $20 million accounting

22   adjustment.  *Id.*[5]  Defendants' utter failure to dispute the evidence of Minton's and William's

23   scienter is further support of summary judgment in plaintiffs' favor.[6]

24

25   [5]     Defendants' failure to address the scienter of Minton is particularly dispositive because she
26   was a controlling officer who ***signed Oracle's Form 10-Q and certified Oracle's false 2Q01
     financial statements***.  The scienter of an executive officer such as Minton who signs false financial
27   statements is imputed to the company itself.  *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424,
     1435-36 (9th Cir. 1995) (scienter of top officers is imputed to corporation) *Adams v. Kinder-
28   Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (same); *Howard v. Everex Sys.*, 228 F.3d

1        Oracle also tries to avoid the direct evidence of scienter by claiming that its 2Q01 results

2    were "reviewed by two independent auditing firms before and after the allegations made in this

3    case." Defs' Opp. at 11.  The evidence shows, however, that Oracle's auditor, the now-defunct

4    Arthur Andersen LLP ("AA"), did not review the debit memos or the corresponding bad debt

5    transfers in 2Q01.  The only two AA witnesses in the case (Senior Audit Partner Gary Matuszak and

6    "person most knowledgeable" Jason Sevier) had no knowledge of either issue.  Opp. at 14; Reply

7    Ex. N at 251:24-252.  Oracle's reliance on a purported "review" by E&Y LLP ("E&Y") years after

8    the improprieties occurred is also misplaced.  Evidence shows that E&Y never reviewed the bad debt

9    transfers or Account 12601 in 2Q01.  Opp. at 11 n.17.  E&Y's designated witness under Fed. R. Civ.

10    P. 30(b)(6) admitted this fact:

11            ***Q.  Do you know if Ernst & Young in the course of its review or
engagement related to the debit memo transactions ever looked at the transfers to
Account 12601? A: No, I don't recall that specifically.  No.  Q: Do you recall if
they looked at the transfers to the bad-debt reserve? A: For which period? Q: All.***
13            ***A: I don't recall, no.***  Reply Ex. O at 179:18-180:2.

14        Simply put, E&Y failed to do any review of the bad debt transfers in 2Q01.  This is

15    confirmed by the report of Oracle's SLC, which cites to E&Y's review and finds that over $5 million

16    in improper transfers occurred in *3Q01*, but failed to review the transfers in *2Q01*.  Reply Ex. L.  The

---

19    1057, 1061-62 (9th Cir. 2000) ("[W]hen a corporate officer signs a document on behalf of the
20    corporation, that signature will be rendered meaningless unless the officer believes that the
statements in the document are true.").

21    [6]      Instead of disputing the direct evidence of scienter above, Oracle suggests that the process of
22    "truing up" the bad debt reserve ***after*** the quarter is normal and "like other large companies, Oracle
typically takes several weeks to finalize its financial results from a reporting period before releasing
23    them to the market." Defs' Opp. at 15.  As an initial matter, there is not one shred of evidence,
admissible or otherwise, to suggest that Oracle "trued up" or "finalized" its numbers lawfully after
24    2Q01 closed.  In fact, defendants' expert O'Bryan never discusses such a concept.  He admits that
the $20 million transferred from Account 25005 to Account 12601 "***went right into income, actually***
25    ***went into reserve that went into income***." Ex. 136 at 146:19-147:1.  O'Bryan also admitted that
transferring customer overpayments to income by adjusting the bad debt reserve violated GAAP, and
26    he did not challenge 90% of the transfers.  Mot. at 6-7.  The amount he attempted to challenge ($2
million) is not based on admissible evidence, or any facts or supporting evidence in the record.  *See*
27    Reply Ex. S at 10-12.  In any event, even if $2 million in transfers were proper, that does not change
the $0.01 per share impact of the improper transfers.  Mot. at 7, n.10; Opp. at 3.

28

1    SLC's interview memo of E&Y's senior audit partner, John Banker, confirms that E&Y did not

2    review the transfers in 2Q01.  Reply Ex. M.

3        **D.    The Evidence Surrounding the 2002 Clean Up Reinforces Scienter**

4            As set forth in plaintiffs' motion and their spoliation briefing, evidence shows that

5    immediately after plaintiffs filed their accounting allegations, Oracle held a series of meetings and

6    improper "clean up" initiatives to reverse, credit, and refund the accounting for over $50 million in

7    debit memo overpayments, including the $20 million in transfers in 2Q01, and to alter the historical

8    audit trail of the underlying transactions.  Mot. at 11-14.  Defendants summarily ignore the entire

9    evidentiary record surrounding the 2002 Clean Up, and simply contend that the evidence occurred

10   "years after the alleged false statements were made."  Defs' Opp. at 14.  It is well-established law,

11   however, that evidence created outside of the Class Period is admissible to show liability, intent, and

12   scienter during the Class Period.[7]  Indeed, Judge Infante held that documents related to the 2002

13   Clean Up were relevant to both liability and scienter.  Reply Ex. P at 19.  Further, the documents

14   related to the 2002 Clean Up expressly refer and relate to the November 2000 debit memos.  The

15   documents include a "step-by-step" guide to **reverse the debit memos** and the corresponding

16   transfers to the bad debt reserve.  Ex. 87.  E-mails show that Henley, Williams and Minton were

17   supervising the 2002 Clean Up project (Mot. at 13-14), which consisted of altering documents and

18   concealing customer refunds.  *See, e.g.*, Ex. 101 at 1895745 ("We never booked the order but the

19   customer paid.  We want to book it or try to get upper management to agree that we should keep this

20   money . . . *if this is not enough to close the [purchase order] could it end up in the fire under*

21   *mysterious circumstances?*").  This evidence does not show "fraud by hindsight" as defendants

22

23   [7]    *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre- and post-class period
24   information may "confirm" defendants' scienter during class period); *Rothman v. Gregor*, 220 F.3d
     81, 92 (2d Cir. 2000) (evidence from 13 months after the class period, "[t]aken together" with other
25   allegations, supports a strong inference of defendants' knowledge); *RMED Int'l, Inc. v. Sloan's
     Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2002 U.S. Dist. LEXIS 23829, at *6-*7 (S.D.N.Y. Dec.
26   11, 2002); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 81 (1st Cir. 2002) (same); *Nathenson v.
     Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (same); *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp.
27   2d 970 (D. Minn. 2004) (same); *Plotkin Inc. v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005)
     (same).

28

1    contend.  Defs' Opp. at 14.  It exposes a cover up of prior accounting manipulations after defendants

2    learned of plaintiffs' lawsuit.  Mot. at 11-12.

3    **II.**      **DEFENDANTS FAIL TO RAISE A GENUINE ISSUE OF MATERIAL**
                **FACT WITH RESPECT TO 11I**

4

5        Defendants have not set forth specific facts contradicting plaintiffs' evidence to withstand

   summary judgment.  Even where they have attempted to do so, their efforts fail.  For example,

6

7    plaintiffs have detailed specific facts proving defendants' knowledge (mostly through documents and

   e-mails received or drafted by the defendants and/or the most senior executives at the Company)

8

9    during the Class Period that: (a) Suite 11i did not work in a fully integrated fashion – and certainly

   not out of the box; (b) Suite 11i was not fully tested to determine whether it would work in an

10

11    integrated fashion – an admitted engineering flaw; (c) Suite 11i's failure to work in every language

   or even every major language as represented hurt sales; (d) the Company's inability to demonstrate

12

13    to customers a working integrated 11i Suite hurt sales; (e) Suite 11i did not help save money but

   instead cost Oracle millions in unearned revenue, refunds to customers and concessions; and (f)

14

15    Oracle's own implementation of Suite 11i contributed to the 3Q01 revenue and earnings miss due to

   technical defects – it was not "plug and play."  Defendants do not identify any genuine material facts

16

17    to contradict plaintiffs' evidence.  Plaintiffs have also proved the causal connection between

   defendants' misrepresentations and plaintiffs' economic loss consistent with *Dura Pharms., Inc. v.*

18

19    *Bruodo*, 544 U.S. 336 (2005) and *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005), *cert. denied*,

   546 U.S. 1172 (2006).  Again, defendants offer no facts to controvert the evidence and ignore the

20

21    testimony of their own damages expert whose testimony confirms plaintiffs' proof.

22      **A.**      **Defendants Fail to Adduce Evidence to Dispute that Suite 11i Was Not**
                **Fully Integrated and Interoperable Out of the Box**

23        Defendants state that their statements about "pre-integration" were true and suggest that the

24    proof presented by plaintiffs relate only to the "***degree of integration*** between [the] modules."  Defs'

25    Opp. at 16, 25.  Defendants conveniently omit from their submission any factual dispute or reference

26    to the false representation that not only was Suite 11i pre-integrated, but also that it was "***fully***

27    ***integrated***," "***fully interoperable out of the box***," simply "***plug and play***," "***the pieces just snap***

28    ***together***."  *See* Exs. 10-11, 14, 139.  Defendants also ignore their own advocacy that Suite 11i was in

1   fact unlike any software available in the marketplace.  Exs. 10-11; 25 at 15:7-8 ("[A]ll the pieces fit

2   together.   And **no one else has it**.").   They insist, however, on a self described impossible

3   comparison between 11i and "best-of-breed" offerings.  Defs' Opp. at 17-18.  Defendants adduce no

4   evidence disputing knowledge of facts underlying the accuracy of statements that Suite 11i was

5   "designed and engineered" to work in a fully integrated fashion out of the box.  In fact, the testing

6   and QA process admittedly did not work resulting in huge gaps and thousands of defects.  Ex. 95 at

7   203.  Testing is part of engineering and the QA process.  Exs. 123 at 119:5-6; 135 at 212:18-24.

8   Suite 11i was engineered by separate organizations whose heads did not even communicate much

9   less perform integrated engineering to justify its representations.  "The way the applications were

10  built in 11i was no better integrated than the previous releases. . . ."  Ex. 111 at 237:8-13; *see also*

11  Opp. Ex. 85 ("The bug counts are at an 11 week high . . . . No real performance testing. . . ."); *see*

12  *also* Ex. 93 at 295, 346 ("Oracle had not done as good a job as it **could have on integration testing**

13  of patches.").  Ron Wohl conceded, "[T]here should have been **more testing of the boundary points**

14  **between ERP and CRM, and there should have been better – there should have been better**

15  **coordination of processes**."[8]  Ex. 114 at 106:14-21.  The knowing failure was evident in customer

16  experiences.  ValueVision reported the following:

17      [W]e have been struggling with the stability of the CRM and ERP applications, the
        level of integration between CRM and ERP. . . .  [W]e **have applied no fewer than**
18      **2,000 patches** . . . .  **It appears evident that there has been a gross lack of**
        **coordination between the CRM and ERP development organizations.  We have**
19      **identified significant gaps in the integration of the applications** . . . .  We estimate
        the financial impact to ValueVision to be $5 million.[9]
20
21  Reply Ex. J.

22

23  _____

    [8]     Defendants suggest that Suite 11i's failure to work in an integrated fashion "has nothing to
24  do" with quality.  Defs' Opp. at 18.  However, the fact that 11i was riddled with bugs impacting
    integration and overall functionability due to lack of testing was a direct quality metric and failure.
25  Ex. 135 at 57.  It is no wonder that defendants attempt to extricate "quality" of 11i from the relevant
    facts.

26  [9]     Defendants' assertion that plaintiffs never asked any witnesses in depositions about testing is
27  simply false.  *See* Ex. 114 at 106; Ex. 113 at 60, 107, 236, 257, 272; Ex. 123 at 119-123; Ex. 124 at
    23, 58, 122, 153, 175; Ex. 118 at 256-64.

28

1      Even in 2001, Oracle knew it was still shipping Suite 11i and patches without integration

2  testing.  Ex. 68 at 056440-41 ("We are releasing new ERP and CRM Family Packs regularly but do

3  not test them against each other . . ."). OM Module was "the critical component that enables orders

4  to seamlessly flow from customer-facing operations through the supply chain." Ex. 11.  Ellison has

5  admitted that this key module was not fully tested.  **We had just finished a complete rewrite of our**

6  **order management system. . . .  [B]ut it hadn't been tested . . . .**" Ex. 95 at 192; Ex. 71 at 1529167;

7  *see, e.g.*, Ex. 39 ("Brock Tool . . . is ready to ship the software back to you . . . and stop the

8  implementation of the Order Management . . . .").   Oracle engineers reported that Suite 11i

9  integration defects "are so fundamental, that it exposes [Oracle's] development environment as 'best

10  of breed' rather than one of a unified software vendor."  Ex. 79 at 069913; *see also* Ex. 124 at 534-

11  535.  Oracle still needed to "overcome the **lack of integration between the E-Business Suite**

12  **Modules (ERP/CRM)**."  Ex. 79 at 069920, 069925, 069922, 069929 ("**The integration between**

13  **HRMS/Payroll and CRM is not complete**."); ("**The capabilities to perform an integrated planning**

14  **in the E-Business Suite is broken**."); ("Within the different teams (CRM/ERP) the development is

15  drifting in different directions.").  These facts undisputedly prove defendants' knowledge of facts

16  materially undermining the accuracy of their Class Period statements concerning the functionality of

17  Suite 11i.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991).  Ellison admits that

18  "using that plug [and play] analogy, . . . the plug wasn't complete." Ex. 124 at 534:4-9, 535:14-21.

19  Defendants purport to submit evidence that Suite 11i was tested, however none of their submissions

20  show that the Company did (a) full integration testing or that (b) 11i worked or most importantly (c)

21  that they did not **know** their representations were materially false.  Instead, their submissions

22  confirm that Oracle did nothing more than rifle shot testing or audits in individual organizations.  *See*

23  Ex. 118 at 67-68.  No one or organization did or was responsible for testing whether Suite 11i

24  modules actually worked in an integrated fashion – Suite 11i's value proposition as opposed to so-

25  called "best of breed" solutions.  *See* Ex. 114 at 106:14-21; Ex. 118 at 65:13-18; Ex. 113 at 33:9-15.

26  Finally, defendants say their statements "were true," but their expert, Edward Yourdon, could not

27

28

1   opine that Suite 11i was *fully* integrated, nor interoperable out of the box or that it saved money.  Ex.

2   135 at 236:17-22, 238:5-7.[10]

3       **B.      Defendants Do Not Dispute Evidence that Failure to Demonstrate an
                Integrated Suite 11i Hurt Sales and or that Defendants Knew It**

4

5           Defendants knew but failed to disclose – even though they told investors 11i demos were

6   working – that the Company in fact could not demonstrate a working integrated Suite of ERP and

7   CRM software.  Ex. 29 at 234436 ("we got those all ready now").  Oracle could not "show . . . the

8   combination of CRM and ERP. . . .  Not only have we *lost deals* in which we were the new player,

9   *many deals have been lost* with installed base customers."  Exs. 16-19.  "[We] cannot show a

10  complete integrated CRM demo let alone a complete EBiz Suite (CRM/ERP) integrated demo."

11  Reply Ex. I.  Oracle does not address or dispute the proof of defendants' knowledge that for 11i

12  demos, sales consultants were doing "integration work in the field," Ex. 16, and failed demos

13  resulted in lost sales and low conversion ratios.  Exs. 17-19, 45, 53, 60-61, 66, 119 at 59:5-10, 126 at

14  400:1-3, 177.  Defendants' claim that problems had nothing to do with the integration (Defs' Opp. at

15  23), cannot be reconciled with the objective evidence.  *See*, *e.g.*, Exs. 17-19, 45, 53, 66.  Moreover,

16  even if demos were also impacted by failed "network connections" as defendants claim, that it

17  simply provides an *additional* fact that defendants concealed concerning its failure to even

18  demonstrate Suite 11i which they claimed was pre-integrated and fully interoperable out of the box

19  and could be installed quickly and would help save money in a slowing economy.  Defs' Opp. at 23;

20  *see, e.g*., Reply Exs. A, H.

21      **C.      Defendants Do Not Raise a Genuine Issue of Fact Concerning
                Knowledge that Suite 11i Did Not Work in Every Language**

22          Other than an unsupported assertion that the stated language capabilities "were true" (Defs'

23  Opp. at 23), defendants have adduced zero evidence demonstrating a genuine issue of material fact

24  _____

25  [10]      Defendants offer yet another excuse for their failure to adduce evidence contradicting facts
    that the Company did not do full integration testing and say that it was not called for by the

26  discovery plan.  Defs' Opp. at 21.  Nonsense.  The Complaint itself specifically alleges that "Oracle
    *cut short the technical development and testing of 11i and prematurely released the Software Suite*

27  *even though it was plagued by defects ('bugs') in integrating the various modules of the Suite with
    other systems*."  RSAC ¶¶6, 16, 52(c), (e).

28

[CORRECTED] REPLY IN SUPPORT OF PLAINTIFFS' [CORRECTED] AMENDED MOTION FOR
PARTIAL SUMMARY JUDGMENT - C-01-0988-MJJ                                              - 10 -

1   contradicting evidence that they knew Suite 11i did not work in every country and in "every

2   language" or even every major language during the Class Period. Exs. 37, 46, 49. They admit to

3   bugs in the "interface translations" which would cause the software not to work. Defs' Opp. at 24.

4   Defendants do not address or dispute at all the fact that EVP Giacoletto warned Ellison in December

5   2000 that in Europe, Middle East and Africa ("EMEA"), defects with Suite 11i and lack of "local

6   language" translations presented significant "risk" to the sales forecast. Ex. 28; *see also* Ex. 43

7   ("We just completed the testing of the translation of 11.5 1 NLS and we found almost 5,000

8   translation issues to be fixed. This is a problem for our mid market strategy where NLS is critical.").

9   Indeed, in 3Q01 EMEA ultimately had an extremely disappointing 11i applications sales quarter, no

10  doubt because Suite 11i did not "work in every language." *See* Ex. 29 at 5. In 4Q01 ***after the Class***

11  ***Period***, Giacoletto again reported weak 11i sales in EMEA because more importantly, Giacoletto

12  emphasized that even 11i.4 was still "***not available in local language***" and that it was hurting sales.

13  Ex. 67. *See also* Ex. 79 at 069921, 069930. In desperation, defendants attempt to rewrite history,

14  and totally reconstruct defendant Sanderson's February 13, 2001 statement. Defs' Opp. at 24. But

15  the evidence is plain and undisputed. Defendants actually knew that the Company had ***not*** "also . . .

16  taken care of all of the localization requirements of all these countries" as Sanderson affirmatively

17  stated. Ex. 49 at 0122951. Their claim that Suite 11i had the "fundamental language capability" and

18  reference to a "staged release of language translation patches" again serves as a virtual admission of

19  their knowledge of falsity of Class Period statements. Defs' Opp. at 24. The undisputed fact is 11i

20  simply did ***not work*** in every language.

### D.   Oracle Does Not Dispute Knowledge that the January Internal Implementation of 11i Contributed to the 3Q01 Miss

22      Defendants do not and cannot dispute that Suite 11i technical defects severely impacted the

23  Company's own financial performance in 3Q01 and contributed to the revenue and earnings miss.

24  Exs. 93 at 295356; 52-51. According to the SLC, "***Oracle's business may have been affected by the***

25  ***internal implementation of Suite 11i. . . . First, it is possible that the implementation of the OKS***

26  ***module of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001***." Ex. 93 at

27  295356; *see also* Exs. 51-52. Defendants do not mention at all documents proving that defendants

28

1  *knew* of Suite 11i implementation problems but also that the 3Q01 forecast was at risk because of

2  11i.  *See* Reply Ex. G ("We are starting to feel the impact across all area(s) of our business . . . on the

3  forecast because of the reporting limitations with R11i Order Management."); Ex. 51 at 101417-18

4  ("Mark – [We] are seriously at risk of missing additional support revenue in the month of February .

5  . .  We cannot afford to miss our revenue forecast this quarter . . . .").  At the same time, Oracle

6  reiterated 3Q01 forecasts and false statements regarding Suite 11i (Ex. 48 at 0123066; Ex. 49 at

7  0122962).[11]

8       **E.    Defendants Have Failed to Raise Any Genuine Issue of Material Fact
              in Dispute of Plaintiffs' Evidence of Loss Causation**

9

10          Plaintiffs have set forth undisputed facts proving that plaintiffs' economic loss was

11  proximately caused by defendants' misrepresentations during the Class Period.  Undisputed proof

12  shows the disclosed truth about the Company's financial condition on March 1, 2001, *i.e.*, that the

13  Company would miss its earnings forecasts which were based off of false earnings results of 2Q01,

14  the economy was indeed, hurting sales; Suite 11i would not fuel applications and database sales

15  growth due to its purported integrated and full interoperable out of the box nature resulting in an

16  undisputed significant decline. Exs. 137. Exs. 18, 137, 141-142.[12]  What's remarkable is that even

17  though Oracle's 11i internal implementation contributed directly to the earnings miss, defendants

18  claim that plaintiffs have not demonstrated a causal connection between Suite 11i and plaintiffs'

19  economic loss. Defs' Opp. at 8; *see* Exs. 51-52; 93 at 295356.  Defendants also ignore testimony of

20  their own expert that the March 1, 2001 disclosure provided new facts concerning the Company's

21  true financial condition including Suite 11i applications, and the economy.  Ex. 137 at 137:14-

22

23

24  ───────────────

25  [11]     Defendants' knowledge of 11i failures undisputedly confirm customer complaints and
26  demands for tens of millions in cash refunds and free services before, during and after the Class
    Period, which defendants' opposition completely fails to dispute.  Exs. 38-39, 42, 63, 74.

27  [12]     Defendants do not submit any ***facts*** to dispute the statistically significant stock price increase
    on December 15, 2000.

28

138:1.[13]  Instead, defendants suggest that plaintiffs must identify a virtual mirror image disclosure to

the misrepresentation – a theory already rejected by this Court.  And *Dura* does not require a

"corrective disclosure" at all.  Defs' Opp. at 7.  In any event, with respect to the Company's false

2Q01 reported earnings of $0.11 per share, again defendants' failure to identify a disputed fact must

result in a judgment in plaintiffs' favor.  Henley admits that 3Q01 earnings forecast was specifically

based upon the purported "earnings" of 2Q01.  Indeed, Henley's statements at the December 14,

2000 conference call confirm that the Company's 3Q01 forecast was in large part based upon the

false earnings results of 2Q01 ("[H]istorically, the third quarter is slightly better than the second

quarter. . . .  So we ***did 11 cents in the second quarter.  So I would assume, 12 cents would be a***

***reasonable number at this point.  I don't think history is going to be a lot different, here***.").  Ex. 29

at 8.  Henley's deposition testimony suggests no different.  Neither *In re Verisign Corp. Sec. Litig.*,

No. C02-2270 JW, 2005 WL 2893783 (N.D. Cal. Nov. 2, 2005), nor *In re Gilead Scis. Sec. Litig.*,

No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893 (N.D. Cal. May 12, 2006), require more.

## III.    CONCLUSION

Based on the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment should be

granted.

DATED:  October 10, 2007                             Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
DANIEL J. PFEFFERBAUM


                                                                    /s/
                                          SHAWN A. WILLIAMS

100 Pine Street, Suite 2600

---

[13]     Defendants attempt to define (incorrectly) a theory of plaintiffs' claims that prospective customers learned the truth and delayed deals *en masse* before the end of the Class Period is irrelevant and has nothing to do with proof of loss causation.

1

2

San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

3

4

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

5

6

7

8

Lead Counsel for Plaintiffs

9

T:\CasesSF\Oracle3\BRF00046322_dkt 1162.doc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 10, 2007.

/s/
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail: ShawnW@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111