Ellison, Lawrence 3/30/2007 12:00:00 AM

561

```
1         IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4
5    IN RE ORACLE CORPORATION
     SECURITIES LITIGATION.
6              CASE NO.  C-01-0988-MJJ
7    THIS DOCUMENT RELATES TO:
8    ALL ACTIONS.
9    ------------------------/
10
11              ---oOo---
12             CONFIDENTIAL
13     DEPOSITION OF LAWRENCE ELLISON
14              VOLUME III
15          Friday, March 30, 2007
16            (Pages 561 - 744)
17              ---oOo---
18
        SHEILA CHASE & ASSOCIATES
19          REPORTING FOR:
          LiveNote World Service
20    221 Main Street, Suite 1250
      San Francisco, California  94105
21       Phone: (415) 321-2311
          Fax: (415) 321-2301
22
23
24   Reported by:
     KATHLEEN A. WILKINS, CSR, RPR, CRR
25   CSR No. 10068
```

563

```
1              INDEX OF EXHIBITS (Continued)
2    Ellison      Description      Page
3    Exhibit 145  Document entitled, "Transcript    604
4                 from LJE keynote at Oracle Apps
5                 World, New Orleans, February
6                 20, 2001," Bates stamped 099883
7                 through 099928 - 46 pages
8    Exhibit 146  Forbes magazine article dated     615
9                 August 14, 2006 - 8 pages
10   Exhibit 147  Web page from the Oracle          618
11                Education Foundation - 2 pages
12   Exhibit 148  Web pages from High Tech Mag -    620
13                5 pages
14   Exhibit 149  Web page article from             621
15                Forbes.com - 4 pages
16   Exhibit 150  Article entitled, "Oracle's       622
17                Catz, Ellison Heir, Gets Credit
18                for Growth Strategy" - 4 pages
19   Exhibit 151  Document entitled, "Matthew       636
20                Symonds Interviews, Oracle,
21                Interview with Larry Ellison on
22                January 18th, 2002," Bates
23                stamped 1529157 to 1529180 - 24
24                pages
25
```

562

```
1                  INDEX
2           INDEX OF EXAMINATIONS
3                  PAGE
4    RESUMED EXAMINATION BY MR. SOLOMON     570
5           INDEX OF EXHIBITS
6    Ellison      Description      Page
7    Exhibit 141  Letter to Matthew Symonds from    582
8                 Larry Ellison, dated January
9                 10, 2007 - 1 page
10   Exhibit 142  Document entitled, "Matthew       587
11                Symonds Interview with Larry
12                Ellison: Oracle," Bates
13                stamped 1529283 through 1529322
14                - 40 pages
15   Exhibit 143  Document entitled, "#21           600
16                Interview Memorandum of
17                Lawrence Ellison (Interview 2)
18                09/20/02," Bates stamped 297543
19                through 297559 - 17 pages
20   Exhibit 144  E-mail from Martha Cavanna to     602
21                Stacey Torman, dated March 16,
22                2001, Bates stamped 178069
23                through 178073 - 5 pages
24
25
```

564

```
1              INDEX OF EXHIBITS (Continued)
2    Ellison      Description      Page
3    Exhibit 152  Excerpts from Softwar - 18        671
4                 pages
5    Exhibit 153  Excerpt from Softwar - 4 pages    675
6    Exhibit 154  Document entitled, "InterLogix    677
7                 Inc. - Customer Satisfaction
8                 Issue," Bates stamped 1056850
9                 and 1056851 - 2 pages
10   Exhibit 155  Document entitled, "Softwar,      691
11                The Rewards of Recklessness: A
12                Portrait of Larry Ellison and
13                Oracle Corporation at War, By
14                Matthew Symonds," Bates stamped
15                1053564 to 1053577 - 14 pages
16   Exhibit 156  Fortune Magazine article dated    698
17                November 13th, 2000, Bates
18                stamped - 8 pages
19   Exhibit 157  E-mail from Dan Cooperman to      703
20                Dorian Daley; Lauren Segal,
21                dated March 29, 2001, Bates
22                stamped 1914926 through 1914934
23                - 9 pages
24   Exhibit 158  Excerpt from Softwar - 4 pages    709
25
```

Ellison, Lawrence 3/30/2007 12:00:00 AM

565

| 1 | INDEX OF EXHIBITS (Continued) | | |
|---|---|---|---|
| 2 | Ellison | Description | Page |
| 3 | Exhibit 159 | Document entitled, "Matthew | 712 |
| 4 | | Symonds Interviews, Oracle, | |
| 5 | | Interview with Larry Ellison," | |
| 6 | | Bates stamped 1529262 through | |
| 7 | | 1529282 - 21 pages | |
| 8 | Exhibit 160 | Document entitled, "Oracle | 718 |
| 9 | | Update," Bates stamped 1529215 | |
| 10 | | through 15299233 - 19 pages | |
| 11 | Exhibit 161 | Copy of a Wall Street Journal | 721 |
| 12 | | article dated August 6th, 2001 | |
| 13 | | - 4 pages | |
| 14 | Exhibit 162 | E-mail from Kirsten Shaw dated | 728 |
| 15 | | December 1, 2000, Bates stamped | |
| 16 | | 1027516 through 1027521 - 6 | |
| 17 | | pages | |
| 18 | Exhibit 163 | E-mail Bates stamped 1026720 | 733 |
| 19 | | through 1026721 - 2 pages | |
| 20 | Exhibit 164 | String of e-mails beginning | 734 |
| 21 | | with an e-mail from Salma | |
| 22 | | Carel to Joyce Boland, dated | |
| 23 | | March 23, 2001, Bates stamped | |
| 24 | | 061785 through 061790 - 6 pages | |
| 25 | | | |

567

| 1 | BE IT REMEMBERED that on Friday, March 30, |
|---|---|
| 2 | 2007, commencing at the hour of 1:01 p.m. thereof, |
| 3 | at 100 Pine Street, Suite 2600, San Francisco, |
| 4 | California, before me, KATHLEEN A. WILKINS, RPR, |
| 5 | CRR, a Certified Shorthand Reporter in and for the |
| 6 | State of California, personally appeared |
| 7 | LAWRENCE ELLISON, |
| 8 | called as a witness by the Plaintiffs herein, who, |
| 9 | being by me first duly sworn, was thereupon examined |
| 10 | and testified as hereinafter set forth. |
| 11 | ---oOo--- |
| 12 | Appearing as counsel on behalf of Plaintiffs: |
| 13 | MARK SOLOMON, Esquire |
| | STACEY M. KAPLAN, Esquire |
| 14 | RYAN GUIBOA, Esquire |
| | MONIQUE WINKLER, Esquire |
| 15 | LERACH, COUGHLIN, STOIA, GELLER, |
| | RUDMAN & ROBBINS, LLP |
| 16 | 655 West Broadway, Suite 1900 |
| | San Diego, California 92101-3301 |
| 17 | marks@lerachlaw.com |
| 18 | Appearing as counsel on behalf of Defendants: |
| 19 | GREGORY P. LINDSTROM, Esquire |
| | LATHAM & WATKINS, LLP |
| 20 | 505 Montgomery Street, Suite 1900 |
| | San Francisco, California 94111-2562 |
| 21 | gregory.lindstrom@lw.com |
| 22 | PATRICK E. GIBBS, Esquire |
| | LATHAM & WATKINS, LLP |
| 23 | 140 Scott Drive |
| | Menlo Park, California 94025-1008 |
| 24 | patrick.gibbs@lw.com |
| 25 | |

566

| 1 | INDEX OF EXHIBITS (Continued) | | |
|---|---|---|---|
| 2 | Ellison | Description | Page |
| 3 | Exhibit 165 | Article from Vanity Fair called | 736 |
| 4 | | "Absolutely Excessive" - 7 | |
| 5 | | pages | |
| 6 | | EXHIBITS PREVIOUSLY MARKED | |
| 7 | | AND REFERRED TO IN THIS DEPOSITION | |
| 8 | EXHIBIT | | PAGE |
| 9 | Exhibit 10 | | 619 |
| 10 | Exhibit 57 | | 668 |
| 11 | QUESTION WITNESS INSTRUCTED NOT TO ANSWER | | |
| 12 | PAGE LINE | | |
| 13 | 574 10 | | |
| 14 | 634 11 | | |
| 15 | 635 8 | | |
| 16 | ---oOo--- | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

568

| 1 | DORIAN DALEY, Esquire |
|---|---|
| | ORACLE CORPORATION |
| 2 | VICE PRESIDENT, LEGAL; ASSOCIATE GENERAL |
| | COUNSEL |
| 3 | LITIGATION, TRADEMARK & COPYRIGHT GROUP |
| | 500 Oracle Parkway, M/S 5op762 |
| 4 | Redwood Shores, California 94065 |
| | Dorian.daley@oracle.com |
| 5 | |
| | Present via Internet: Keith Meutner, Esq., Doug |
| 6 | Lerach, Esq.; John Mayer |
| 7 | Also Present: Gary Brewer, videographer |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Ellison, Lawrence  3/30/2007  12:00:00 AM

569

```
1         P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Good afternoon.  We are
3    going on the record.  Here marks the beginning of
4    Videotape No. 1, Volume 3, in the deposition of
5    Lawrence Ellison, in the matter In Re Oracle
6    Corporation Securities Litigation, in the United
7    States District Court, Northern District of
8    California, San Francisco Division, Case Number
9    C-01-0988-MJJ.
10             The video operator today is Gary Brewer,
11   representing LiveNote World Service, located at 221
12   Main Street, Suite 1250, San Francisco, California,
13   94105.  Telephone number (415) 321-2300.
14             The court reporter is Kathleen Wilkins,
15   reporting on behalf of LiveNote World Service.
16             Today's deposition is being taken on
17   behalf of the Plaintiff and is taking place at 100
18   Pine Street, San Francisco, California.
19             Counsel, will you please introduce
20   yourselves and state whom you represent.
21             MR. SOLOMON:  Mark Solomon representing
22   plaintiffs.
23             MS. KAPLAN:  Stacey Kaplan representing
24   plaintiffs.
25             MS. WINKLER:  Monique Winkler representing
```

570

```
1    plaintiffs.
2              MR. GUIBOA:  Ryan Guiboa representing
3    plaintiffs.
4              MR. LINDSTROM:  Greg Lindstrom for
5    defendants.
6              MR. GIBBS:  Patrick Gibbs for defendants.
7              MS. DALEY:  Dorian Daley for defendants.
8              THE VIDEOGRAPHER:  Would the court
9    reporter please swear in the witness.
10             LAWRENCE ELLISON,
11        having been duly sworn,
12        was examined and testified as follows:
13             --oOo--
14             THE VIDEOGRAPHER:  Please begin.
15        RESUMED EXAMINATION BY MR. SOLOMON
16             MR. SOLOMON:  Q.  Good afternoon,
17   Mr. Ellison.
18        A.  Good afternoon.
19        Q.  Have you reviewed the transcript of your
20   second day of testimony in this litigation?
21        A.  I have not.
22        Q.  And have you reviewed the complaint in
23   this matter yet?
24        A.  I have not.
25        Q.  You know Mr. Matthew Symonds?
```

571



572

Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM

585

587

1   session?

2       A.  I did not.

3       Q.  Do you remember what you told Mr. Symonds

4   about your option exercises and sales in January of

5   2001?

6       MR. LINDSTROM:  So let me -- let me

7   understand.  So you're talking about during the

8   course of the interviews for the book?

9       MR. SOLOMON:  Correct.

10      THE WITNESS:  No.

11      MR. SOLOMON:  Let's have marked as the

12  next exhibit an interview transcript produced in

13  this litigation with the control numbers 1529283

14  through -322.

15      (Whereupon, Deposition Exhibit 142

16  was marked for identification.)

17      THE WITNESS:  I assume you don't want me

18  to read this whole thing?

19      MR. SOLOMON:  O.  No, I don't.

20      First of all, this is dated, at least

21  there's a handwritten notation on the first page, of

22  June 2002.

23      You don't recognize that handwriting, do

24  you?

25      A.  I do not.

586

588

1       Q.  So it starts off saying, "This is Matthew

2   Symonds talking to Larry Ellison.  It's June 24th."

3       Do you see that?

4       A.  Yes.

5       Q.  Can you just describe how Mr. Symonds

6   recorded the conversations?

7       A.  He had a digital -- a digital recorder.  I

8   think it was a Sony digital recorder.  It's kind of

9   small.  It's not a tape.  I think it had solid state

10  memory.  So there was a table microphone about this

11  size.  The recorder was about this size but thinner.

12      And he put -- you know, put the recorder

13  down and the microphone down and he'd start -- he'd

14  have some notes, I guess, with pre-prepared

15  questions, and he'd start asking me questions.

16      Q.  Could you estimate how many hours of

17  recordings he made of interviews with you?

18      A.  I mean, I could.  It would be a pretty

19  gross estimate, but ... 30 to 100.  Probably 30

20  hours -- I don't -- again, I'm just trying to --

21      Q.  Thirty hours to 100 hours --

22      A.  Yeah.

23      Q.  -- is your range?

24      A.  I think.  One hundred hours is a lot,

25  but ...

Ellison, Lawrence  3/30/2007  12:00:00 AM

589

1   Q.  And is it fair to say that this --
2   A.  30 to -- let me refine.  30 to 60.  100
3   hours sounds crazy to me.
4   Q.  Was it over a couple of years, the
5   interview process?
6   A.  It was over nearly two years.  And then
7   there -- yeah.  Yeah.  I think it was more than 18
8   months, less than two years, I think.
9   Q.  Okay.  So if you go to the third page of
10  this document, and it has the control number
11  1529285 --
12  A.  Okay.
13  Q.  -- you'll see that it starts at the top
14  with the word "Right."  And then it goes on to say,
15  "Of course, when Oracle stock started to slide last
16  year and around that sort of time you also cashed in
17  those options invested, you were kind of hit ..."
18       Did you see that?
19  A.  Yes.
20  Q.  All right.  And then this apparently is
21  your language.  And you say, "Well, actually, the
22  options were invested long, long ago.  I got those
23  options ten years ago.  They were expiring.  They
24  were months from expiring."
25       Do you see that?

590

1   A.  Yeah.  There's a transcription error in
2   it, but yes.
3   Q.  What's the error?
4   A.  I think the options were not "invested"
5   but "vested," the word "vested."
6   Q.  Got it.
7        And then it goes on to say, "So it was
8   actually the last moment that you could sell them."
9        And then you say, "right."
10       Do you see that?
11  A.  Yes.
12  Q.  Is that an accurate transcription, in your
13  recollection?
14  A.  You mean the word "moment"?
15  Q.  The word "right."
16       MR. LINDSTROM:  The question is whether
17  that's an accurate transcription?
18       MR. SOLOMON:  Mh-hmm.
19       THE WITNESS:  Probably.
20       MR SOLOMON:  Q.  Okay.  And what about,
21  "So it was actually the last moment you could sell
22  them"?  Do you think that's --
23  A.  Well, it's not precise.
24  Q.  What do you mean, it's not precise?
25  A.  Well, I suppose the last moment would be

591

1   the last minute of the last trading day before the
2   options expired, or even the last moment would be
3   the last fraction of a second in the last trading
4   day.  I don't know how -- how big a moment is.
5   Q.  Okay.  Well, do you think that the moment
6   was basically January 22nd through January 31?
7   A.  No.  I think the options expired -- I
8   don't remember -- August?  Were the options expired
9   in August?
10  Q.  (Nods head.)
11  A.  So I suppose I had up until August to sell
12  them.  So in a ten-year period, I was in my last six
13  months.
14  Q.  All right.  And, in fact, you weren't even
15  in the last trading window, were you?
16  A.  No.
17  Q.  Because there were two more trading
18  windows, weren't there?
19  A.  Well, again, I was in the last six
20  months -- yes.
21  Q.  And so to the extent he says, "So it was
22  actually the last moment you could sell them," let's
23  say he said "window" and you said "right," that
24  would be inaccurate, wouldn't it?
25  A.  I would say it's imprecise.  It should

592

1   have been -- it was nearly -- you were almost -- the
2   question is I was almost out of time.  But I wasn't
3   out of time.
4   Q.  And you know that in his writings he's
5   actually explained your stock sale as saying that it
6   was -- you had to, you had no choice, the options
7   would have expired otherwise?
8        Are you aware that that's what Mr. Symonds
9   had written?
10       MR. LINDSTROM:  Assumes facts.
11  Mischaracterizes his writings.
12       THE WITNESS:  Can I read -- is it here?
13       MR. SOLOMON:  Q.  I'll try to find it a
14  little bit later on.  I just want to know if you
15  recall that that's what he's written.
16  A.  No.
17  Q.  And, in fact, at the moment, because all
18  of this is sealed and confidential, no one knows --
19  the public certainly doesn't know that, in fact, you
20  had additional trading windows, do they?
21       MR. LINDSTROM:  Assumes facts.  No
22  foundation.  Calls for speculation.
23       THE WITNESS:  I don't know how much -- in
24  terms of my options, I think everyone knows my
25  option dates.  So I think whenever I receive an

Ellison, Lawrence  3/30/2007  12:00:00 AM

597

| | |
|---|---|
| 1 | MR. LINDSTROM: Can we have the question |
| 2 | reread? |
| 3 | (Record read by the reporter as follows: |
| 4 | QUESTION: And can you explain why, |
| 5 | after March of 2001, you didn't preserve |
| 6 | e-mails that you sent that concerned the |
| 7 | facts in this lawsuit?) |
| 8 | THE WITNESS: The answer is, I don't know |
| 9 | if I did or didn't preserve e-mails in March 2001 |
| 10 | MR. SOLOMON: Q. And how is it that you |
| 11 | don't know that? |
| 12 | MR. LINDSTROM: Argumentative |
| 13 | THE WITNESS: It was a long time ago. I |
| 14 | just don't remember what -- March 2001. |
| 15 | MR SOLOMON: Q. Do you know why the |
| 16 | letter that you sent to Mr. Symonds on January the |
| 17 | 10th of this year wasn't produced until now to the |
| 18 | plaintiffs? |
| 19 | A. I do not. |
| 20 | Q. What's the status of Larryellison.com? |
| 21 | A. I -- sorry. I think it's -- I haven't |
| 22 | looked at it for years. |
| 23 | Q. When was the last time you looked at it? |
| 24 | A. Five years ago. More. I don't know. |
| 25 | Q. And why -- why do you not use it anymore? |

598

| | |
|---|---|
| 1 | A. I don't think I ever used it. |
| 2 | Q. Okay. What was it for? |
| 3 | A. You mean what were my various ideas? Why |
| 4 | did I get Larryellison.com? |
| 5 | Q. Yes. |
| 6 | A. I wanted to reserve the Internet -- I |
| 7 | wanted to reserve the Internet name. People were -- |
| 8 | those were the days everyone was grabbing Internet |
| 9 | names. I wanted to make sure I had it. I don't |
| 10 | think I've ever used it for anything. |
| 11 | Q. So it was just a bare name? Nothing |
| 12 | there? |
| 13 | A. I don't know. I haven't been to it for |
| 14 | years. I don't know what's there. |
| 15 | Q. Did you use it for e-mail? |
| 16 | A. No. |
| 17 | Q. So when you told the audience at Apps |
| 18 | World in February 2001 that they could e-mail you at |
| 19 | Larryellison.com, that wasn't true? |
| 20 | A. I don't believe I ever said that. |
| 21 | Q. Okay. And when the special litigation |
| 22 | committee says that you used Larryellison.com to |
| 23 | store transcripts of your speeches and public |
| 24 | statements, that's inaccurate, is it? |
| 25 | MR. LINDSTROM: Assumes facts. |

599

| | |
|---|---|
| 1 | Argumentative, |
| 2 | THE WITNESS: I believe so. |
| 3 | MR. SOLOMON: Q. The special litigation |
| 4 | committee lawyers just made that up? |
| 5 | MR. LINDSTROM: Argumentative. Assumes |
| 6 | facts. |
| 7 | THE WITNESS: No. I think -- I'm happy to |
| 8 | discuss this if you want to discuss it. |
| 9 | At one point I thought it would be an |
| 10 | interesting idea, because with the advent of the |
| 11 | Internet -- and I'm quoted a lot in the press, and |
| 12 | the quotes aren't always accurate. So I thought it |
| 13 | would be very interesting, with the advent of the |
| 14 | Internet, that I could take my actual speeches that |
| 15 | I gave and exactly what I said, and recordings of my |
| 16 | speeches that I gave, and put them up on the |
| 17 | Internet. |
| 18 | And then if the press quoted me out of |
| 19 | context or misquoted me, I would have an actual |
| 20 | record of all of my speeches. It was kind of when I |
| 21 | thought it was an interesting idea to do that, but I |
| 22 | never did it. |
| 23 | MR SOLOMON: Okay. Okay. Marked as the |
| 24 | next exhibit -- |
| 25 | THE WITNESS: I'm sorry, we're done with |

600

| | |
|---|---|
| 1 | this one? |
| 2 | MR. SOLOMON: For the moment. We'll be |
| 3 | looking at it again in a minute, so you might as |
| 4 | well keep it close. |
| 5 | THE WITNESS: Okay, I'll just keep it out. |
| 6 | MR. SOLOMON: Marked as the next exhibit, |
| 7 | an interview memorandum dated 9/20/02. |
| 8 | (Whereupon, Deposition Exhibit 143 was |
| 9 | marked for identification.) |
| 10 | THE REPORTER: 143. |
| 11 | MR. LINDSTROM: Thank you. |
| 12 | MR. SOLOMON: The control range is |
| 13 | 297559 -- excuse me, 297543 through -559. |
| 14 | Q. I'm looking at the last page, Mr. Ellison, |
| 15 | A. Okay. -5597 |
| 16 | Q. Yeah. If you could just read that |
| 17 | paragraph. |
| 18 | A. Okay. |
| 19 | Okay. |
| 20 | Q. Is that not accurate? |
| 21 | Let me focus on the last sentence. |
| 22 | "According to Ellison, Q3 FY01, the web site would |
| 23 | have consisted of transcripts of his interviews." |
| 24 | Is that not true? |
| 25 | A. Well, I think this says it became -- it |

Ellison, Lawrence  3/30/2007  12:00:00 AM

601

1  says I had the idea, exactly as I described before,
2  if you read the whole paragraph.  The idea behind
3  the web site was to post transcripts of my
4  interviews.
5      And -- and it says, "became too time
6  consuming to maintain the site," which is not quite
7  accurate.  It was too time consuming to do at all,
8  and I never did it at all.  So this is not
9  completely accurate.
10     Q.  Okay.  And that last sentence again, is
11 that accurate?
12     A.  I'm not even sure what it means.  "Q3 FY01
13 the web site would have consisted of transcripts of
14 his interviews."
15         I'm -- I'm having a hard time
16 understanding what that's saying.
17     Q.  Okay.
18     A.  The web site would have consisted of
19 transcripts of ...
20     Q.  You don't think -- you don't even
21 understand it, so you can't say --
22     A.  Well, I don't understand it.  But I can
23 tell you what is true.  What is true is I had the
24 idea to put my interviews up on that web site, on
25 Larryellison.com, for the very reasons stated here.

602

1  And I just never did.  I don't think there's a
2  single interview that's ever gone onto that web
3  site.
4      Q.  So it's kind of odd, though, isn't it,
5  that the four people who apparently were present
6  interviewing appear to have signed off on the
7  sentence, "According to Ellison, Q3 FY01, the web
8  site would have consisted of transcripts of his
9  interviews"?
10         MR. LINDSTROM:  Argumentative.  Vague and
11 ambiguous as to "odd."
12         THE WITNESS:  I think I was clear about --
13 I think they must have misunderstood that I
14 didn't -- you know, I never put any interviews on
15 there, at least I don't think I did.
16         MR. SOLOMON:  Okay.  Let's have marked as
17 the next exhibit a document produced by the
18 defendants with the control numbers 178069
19 through -073.
20         (Whereupon, Deposition Exhibit 144
21         was marked for identification.)
22         MR. SOLOMON:  Q.  And if you just look at
23 that first -- the first two paragraphs under
24 "Jennifer and Stacey."
25     A.  Okay.

603

1      Q.  Okay.  So now it certainly appears that
2  Martha Cavanna believes that your Larryellison.com
3  web site had content, doesn't it?
4      A.  I think -- I think at some point, the
5  people in the marketing department at Oracle --
6  people in the marketing department at Oracle were
7  involved with this site.  I think Oracle obtained
8  the Larryellison.com web address, and I think the
9  marketing people had ideas of what to do with it.
10 But I don't -- frankly, I don't remember what they
11 did.
12     Q.  You don't dispute the accuracy of this
13 note though, do you, this message?
14     A.  I don't even know who Jennifer and Stacey
15 are, or Martha Cavanna.  But let me just read --
16 give me another second to read it.
17         Yeah.  Okay.
18     Q.  You don't dispute the accuracy of that
19 message, do you?
20     A.  No.
21     Q.  You know who Jennifer Glass is, don't you?
22     A.  Oh, Jennifer.  I'm sorry.  Yes, I do.
23     Q.  Do you know who Stacey Torman is?  You
24 don't know?
25     A.  I don't.

604

1      MR. SOLOMON:  Marked as the next exhibit,
2  a document produced by the defendants in this
3  litigation with the control numbers 099883 through
4  099928.
5      (Whereupon, Deposition Exhibit 145
6      was marked for identification.)
7      MR. SOLOMON:  Q.  Without looking at the
8  whole document, you'll see that this purports to be
9  a transcript from LJE keynote to Oracle Apps World,
10 New Orleans, February 20th, 2001.
11     A.  Yes.
12     Q.  Have you seen this before?
13     A.  No.
14     Q.  This transcript?
15     A.  No.
16         MR. LINDSTROM:  Why don't you take a
17 moment to familiarize yourself with the document
18 before counsel asks you questions --
19         THE WITNESS:  Okay.
20         MR. LINDSTROM:  -- since you haven't seen
21 it before.
22         MR. SOLOMON:  Q.  I'm only going to be
23 asking you about one page, so when you think you are
24 sufficiently familiar, I'll direct you to the page.
25         MR. LINDSTROM:  If you want to give him

Ellison, Lawrence  3/30/2007  12:00:00 AM

605

1  the page, maybe he can read that page and what's
2  just before it or behind it. But I leave that to
3  you.
4        MR. SOLOMON: That's fine.
5     Q. Go to page 42 of the document.
6  Mr. Ellison, which has the control number 099924
7     A. -9924?
8     Q. Yeah.
9     A. Okay.
10    Q. I'm looking at the second box which
11  begins, "In order." I'm looking at the last two
12  sentences in that second box.
13       MR. LINDSTROM: So why don't you read
14  what's in the box and then as much before it or
15  after as you feel is necessary to get the context.
16       THE WITNESS: I've read it. I've read it.
17  It's wrong. My -- my --
18       MR. LINDSTROM: There's no question
19  pending.
20       THE WITNESS: Oh.
21       MR. SOLOMON: Q. So you weren't telling
22  the truth?
23    A. No. The transcription is wrong.
24    Q. Ah. Wow, that's sort of quite a big
25  error, isn't it?

606

1        MR. LINDSTROM: Argumentative.
2        THE WITNESS: My e-mail address is
3  Larry.ellison@oracle.com. I think "e-mail me at
4  Larryellison.com," is -- I don't think that's a huge
5  transcription error.
6        MR. SOLOMON: Q. It says, "I will look
7  into it, and if you e-mail me at Larryellison.com, I
8  will actually have an answer for you by tomorrow."
9     A. I never said that.
10    Q. Do you have a copy of the audio of this
11  anywhere?
12    A. My guess is we have a copy of the video of
13  this.
14    Q. Can you explain why that hasn't been
15  produced to us in this litigation?
16    A. Was it asked for?
17    Q. Sure it was.
18    A. Okay. No, I don't.
19       MR. LINDSTROM: Assumes facts.
20       THE WITNESS: Again --
21       MR. LINDSTROM: No foundation.
22       THE WITNESS: I'm guessing we have a copy
23  of the audio. I'd like to think they keep all of my
24  speeches.
25       MR. SOLOMON: Q. Will you produce it?

607

1     A. If we have it, you can have it. But I
2  frequently say -- I frequently give my e-mail
3  address during speeches. And my e-mail address is
4  Larry.ellison@oracle.com.
5     Q. Right. And if you -- if we got the audio,
6  we'd know, wouldn't we, what you actually said?
7        MR. LINDSTROM: The witness has told
8  you --
9        THE WITNESS: And I -- and I said
10  Larry.ellison@oracle.com. I didn't say
11  Larryellison.com
12       MR. SOLOMON: Q. Okay. Okay. I'm now
13  going back to the transcript of Mr. Symonds'
14  interview of you.
15       MR. LINDSTROM: So this is Exhibit 142?
16       MR. SOLOMON: Correct.
17       MR. LINDSTROM: From June 2002?
18       MR. SOLOMON: Correct.
19    Q. If you go to control number 1529287. And
20  at the bottom of that page it reads, "And you were
21  telling me about that, about the reasons for that
22  yesterday, that the technical problems with the
23  glass but that turns out to be quite fortuitous in a
24  way from what you were saying about your move and
25  how the world might react to this kind of thing

608

1  being launched . . ."
2        Then the following page says "Laughing."
3  And then, "Yes?"
4        And then it says, "Oh, what's this coming
5  down here? I'll just have to hide it! Is this a
6  recession boat?"
7        Just focusing on that sentence, "Oh,
8  what's this coming down here," and the rest of that
9  line, who said that?
10       MR. LINDSTROM: Well, again, if you need
11  to look at more of the document in order to answer
12  counsel's questions or to familiarize yourself with
13  the context, feel free to do that.
14       THE WITNESS: Can I have a couple seconds
15  to look at the document?
16       MR. SOLOMON: Sure.
17       THE WITNESS: Okay.
18       MR. SOLOMON: Q. Okay. So do you know
19  who said that?
20    A. Well, I don't know -- it doesn't --
21       MR. LINDSTROM: Again, for the record,
22  this is, "Oh, what's this coming down here?"
23       THE WITNESS: "... down here? I'll just
24  have to hide it. Is this a recession boat?"
25       MR. SOLOMON: Q. Right.

Ellison, Lawrence   3/30/2007  12:00:00 AM

609

1   A. I think it's supposed to be Matthew

2 Symonds, but I don't know if it's an accurate

3 transcription.

4   Q. Then skipping a few lines, I'll read the

5 language into the record. "Are there any feelings

6 you have as a consequence of the kind of pain that

7 Oracle stockholders or kind of Oracle employees with

8 options leading as well ..."

9   Now, aside from whether or not that's an

10 accurate transcription, that appears to be

11 Mr. Symonds talking?

12   A. That's correct.

13   Q. All right. And then the seven or eight

14 lines below, that's your response; is that right?

15   A. Well, I mean, I think Mr. Symonds is in

16 the boldface.

17   Q. Yeah, okay.

18   A. Then I'm in the normal type, is the

19 convention.

20   Q. Okay. And does -- do those lines, those

21 seven lines accurately reflect your answer?

22   A. You're referring to?

23   Q. Beginning "Oh, yes."

24   A. Beginning "Oh, yes." Let me just read the

25 question.

611

1 cash, and I'm not exactly sure how it was disbursed.

2   Q. So, in fact, it could be that some of it

3 went to pay for the boat; is that right?

4   A. It's -- yes

5   Q. Have you spoken with Safra Catz about this

6 litigation?

7   A. About the existence of the litigation,

8 or ...

9   Q. About the litigation at all.

10   MR. LINDSTROM. Vague as to time.

11   THE WITNESS: I mean. I knew she was out

12 last week being deposed So ...

13   MR. SOLOMON: Q. Have you spoken with her

14 about her deposition?

15   A. Other than the fact that she had one?

16   Q. Yes.

17   A. You mean the context of the deposition?

18   Q. Yes.

19   A. No.

20   Q. And have you discussed the contents of

21 your deposition testimony thus far with Ms. Catz?

22   A. No.

23   Q. And have you discussed the litigation

24 generally with Ms. Catz?

25   MR. LINDSTROM. Vague and ambiguous.

610

1   Q. Sure.

2   A. So this was discussing the feelings of

3 people after the stock market crash.

4   Q. Right.

5   A. And so I'm responding to the -- how people

6 at Oracle felt after the stock market crash. And --

7   Q. Okay.

8   A. Yeah, I think it's pretty accurate. Yeah.

9   Q. All right. Did anybody at the company

10 make any remarks to you about your ability to

11 sell -- exercise and sell the options in January of

12 2001 prior to the stock declining in March?

13   A. No. Not that I recall.

14   Q. And is it true that you used some of the

15 proceeds of your sales in January 2001 to buy a

16 large yacht?

17   A. No.

18   Q. No? Small yacht? Any yacht?

19   A. No. I believe I used the proceeds to pay

20 down my loan.

21   Q. Which loan?

22   A. I had a stock margin loan.

23   Well, let me -- let me -- let me correct

24 that. I think some of the proceeds were used to pay

25 down the loan, and some of the proceeds went into

612

1   THE WITNESS. Yeah, at a high level.

2   MR. SOLOMON: Q. And when have you --

3 tell me when you've had those conversations.

4   A. I told her today that I was -- couldn't go

5 to a meeting because I was on my way to -- I was

6 going to be deposed today.

7   Q. Okay. Apart from -- apart from telling

8 her that you were going to be deposed today, have

9 you spoken with her about the substance of the

10 litigation ever?

11   MR. LINDSTROM: When he says "ever," that

12 means ever. So all the way back to the point in

13 time when it was first filed.

14   THE WITNESS: Yes.

15   MR. SOLOMON: Q. Okay. And how many

16 conversations have you had with her about the

17 substance of this litigation?

18   A. I don't know.

19   Q. Okay. What -- describe the conversations

20 you've had with her about the substance of this

21 litigation.

22   MR. LINDSTROM. All right. Let me again

23 interpose an objection based on the attorney-client

24 privilege.

25   To the extent that you had conversations

Ellison, Lawrence 3/30/2007 12:00:00 AM

613

1  with Ms. Catz in the presence of your lawyers, I
2  don't want you to divulge that. If you had
3  independent conversations, for example, you and
4  Ms. Catz talking alone, he's entitled to know about
5  that.
6      THE WITNESS: Could you repeat the
7  question?
8      MR. SOLOMON: Yeah.
9  Q. Please describe the conversations you've
10 had with her about the substance of this litigation.
11     MR. LINDSTROM: Excluding any in the
12 presence of counsel.
13     THE WITNESS: That -- again, I can give
14 you a high -- I can't tell you the content. I can't
15 give you the word for word or, you know, the
16 contents. But I can tell kind of the gist. And I
17 can't tell you how many conversations there were,
18 but I can tell you the gist.
19     MR. SOLOMON: Okay.
20     THE WITNESS: That the litigation is
21 about -- is about a -- is about an earnings miss in
22 a quarter, and that the plaintiffs allege that
23 problems with the 11i suite caused the earnings
24 miss. And as far as we can tell, that's just not
25 the case.

614

1      MR. SOLOMON: Q. And that's something
2  that you've said to Ms. Catz or something Ms. Catz
3  said to you?
4      A. Going -- going back and forth.
5      Q. Okay. And your insider sales haven't
6  cropped up in your conversations?
7      A. I'm not sure. I mean, she -- I mean,
8  she's -- I'm not sure if we discussed that
9  specifically.
10     Q. In your estimation, does Ms. Catz have a
11 good memory?
12     A. Yes.
13     Q. You didn't discuss your sales of stock in
14 January 2001 with Ms. Catz prior to engaging in the
15 sales, did you?
16     MR. LINDSTROM: So we're now -- we're not
17 talking about conversations at that time? Not since
18 the litigation?
19     THE WITNESS: In 2001, I don't recall.
20     MR. SOLOMON: Okay. I'll have marked as
21 the next exhibit a Forbes magazine article dated
22 August 14, 2006.
23     THE WITNESS: Mr. Solomon, are we going to
24 use this transcription document again?
25     MR. SOLOMON: Yes, we are.

615

1      THE WITNESS: The others?
2      MR. SOLOMON: Probably not.
3      THE WITNESS: Okay.
4      (Whereupon, Deposition Exhibit 146
5      was marked for identification.)
6      MR. SOLOMON: Q. Did you read this
7  article, Mr. Ellison, around the time it was
8  published?
9      A. I think I did.
10     Q. And looking at what is page 87 -- excuse
11 me. I'm mistaken. I may be wrong about that.
12     A. Page 86, an unnumbered page, then page 91.
13     Q. Right. So if you go past 86 to the next
14 page which has, "Interesting Conflicts" in a box, do
15 you see that?
16     A. Yes. It's difficult to read, but yes.
17     Q. I'm looking at the paragraph -- the last
18 paragraph in the body of that.
19     MR. LINDSTROM: In the body of the box or
20 the article?
21     MR. SOLOMON: In the body of the article.
22     Q. And it says, "By the time Lane and Bloom
23 had quit in 2000 Safra Catz had taken control. A
24 dealmaker at the brokerage Donaldson, Lufkin &
25 Jenrette, she had covered the software industry

616

1  since 1986 and was a close friend of Ellison. He
2  was enchanted by her intellect," and then in
3  parentheses, "[Larry likes to say she graduated in
4  the top of her class at Harvard Law,]" close parens,
5  "and 13 years later he brought her to Oracle."
6      Do you see that?
7      A. I do.
8      Q. Now, did you used to -- did you like to
9  say that Ms. Catz graduated top of her class at
10 Harvard Law?
11     A. I don't recall ever saying that.
12     Q. So do you have any idea why that's said
13 here?
14     MR. LINDSTROM: No foundation. Calls for
15 speculation.
16     THE WITNESS: I think she went to Harvard,
17 but -- Harvard Law, but I don't think I ever said
18 she graduated top of her class.
19     MR. SOLOMON: Q. And why do you think she
20 went to Harvard?
21     A. I think she said she went to Harvard.
22     Q. Do you know she never graduated from
23 Harvard? Do you know that?
24     A. No.
25     Q. Is this the first time you've heard that?

Ellison, Lawrence  3/30/2007  12:00:00 AM

617

1    A.  No.  I think -- I think I knew that.  She
2    graduated from Penn?
3         Q.  She did.
4         A.  Yeah.
5         MR. LINDSTROM:  That's what she testified
6    to.
7         THE WITNESS:  Yeah.
8         MR. LINDSTROM:  Also --
9         MR. SOLOMON:  Q.  Are you aware that all
10   over the web it appears that she graduated from
11   Harvard?
12        MR. LINDSTROM:  Assumes facts.  Calls for
13   a conclusion.  Argumentative.
14        THE WITNESS:  No.
15        MR. SOLOMON:  Q.  Are you aware that alone
16   among the board of directors of Oracle, Safra Catz
17   doesn't list her education?
18        MR. LINDSTROM:  Assumes facts.
19        THE WITNESS:  Do I list mine?  I
20   don't know --
21        MR. SOLOMON:  Q.  You're smiling.  I'm
22   smiling --
23        A.  No, I don't know if I -- I don't know if I
24   list mine.  I don't think I list my education, and
25   I'm on the board.

618

1         Q.  I'm talking about Safra Catz.
2         MR. LINDSTROM:  But I think you said
3    "alone on the board." --
4         THE WITNESS:  You said "alone" --
5         MR. SOLOMON:  Oh, I'm sorry.
6         THE WITNESS:  You said alone amongst the
7    members of the board of directors, she doesn't list
8    her education.  And I just said I don't think I list
9    my education.
10        MR. LINDSTROM:  So, Mark, could you repose
11   the question?
12        MR. SOLOMON:  Q.  So other than you, then,
13   alone among the board of directors.  Let's get this
14   as an exhibit.  Let's mark this, and then we'll have
15   some context.
16        Actually, let me be more accurate.  Alone
17   among the directors of Oracle Education Foundation.
18        THE WITNESS:  Okay.
19        MR. SOLOMON:  Q.  Okay?
20        A.  Okay.
21        MR. SOLOMON:  Let's mark these pages
22   describing the board of directors of Oracle
23   Education Foundation as the next exhibit.
24        (Whereupon, Deposition Exhibit 147
25        was marked for identification.)

619

1         MR. SOLOMON:  Q.  We don't have to dwell
2    on this very long, Mr. Ellison.  I just want to
3    know, do you know why she doesn't list her
4    education?
5         A.  No.
6         MR. SOLOMON:  I'll have marked as the --
7    actually, this is already Exhibit 10 to the
8    deposition of Ms. Catz, so I'll just pass it
9    straight over to you, Mr. Ellison.
10        THE WITNESS:  Okay.  Thank you.
11        MR. LINDSTROM:  Is this 148?
12        THE REPORTER:  Previously marked.
13        MR. SOLOMON:  Exhibit 10.
14        MR. LINDSTROM:  Thank you, Counsel.
15        MR. SOLOMON:  Q.  I just wanted you to
16   look at the second page into the document.
17        A.  Including the cover page?
18        Q.  So the cover page, I want you to look at
19   the next page which just says, "Catz's Background."
20   I just want to point out to you that there,
21   apparently, the special litigation committee was led
22   to believe somehow that she graduated from Harvard
23   Law School with a JD.
24        Do you see that?
25        MR. LINDSTROM:  Is there a question -- I'm

620

1    going to object to the preface of the question as
2    being argumentative, lacking foundation.
3         Do you see that?  You may respond.
4         THE WITNESS:  Do I see it?
5         MR. SOLOMON:  Q.  Yeah.
6         A.  I see it.
7         Q.  And you don't know what would have led the
8    special litigation committee to believe she went to
9    Harvard Law School, do you?
10        A.  I think she did go to Harvard Law School.
11        Q.  Sorry, that she graduated from Harvard Law
12   School.
13        A.  No.
14        MR. SOLOMON:  Let's go off the record for
15   a couple minutes.
16        THE VIDEOGRAPHER:  Off the record.  The
17   time is 2:07 p.m.
18        (Whereupon, a recess was taken.)
19        THE VIDEOGRAPHER:  We are back on the
20   record.  The time is 2:08 p.m.
21        MR. SOLOMON:  I've marked as the next
22   exhibit -- sorry -- a document describing Ms. Catz
23   and her education.
24        (Whereupon, Deposition Exhibit 148
25        was marked for identification.)

621

1     MR. SOLOMON. Q. If you look at the third
2     page of the exhibit, Mr. Ellison, you'll see that
3     there's a reference to Ms. Catz having a BS from
4     Wharton School and a JD from Harvard Law School.
5         Do you see that?
6     A. I do.
7     Q. You don't know how that got there?
8     A. No.
9     MR. LINDSTROM: No foundation.
10    THE WITNESS: Are we done with --
11    MR. SOLOMON: Yes. Thank you.
12    We'll have marked as the next exhibit a
13    document that contains a correction concerning
14    Ms. Catz.
15        (Whereupon, Deposition Exhibit 149
16        was marked for identification.)
17    MR. SOLOMON: Q. If you go to the second
18    page, Mr. Ellison, you'll see halfway down that page
19    it says, "Our cover story on Oracle," and then it
20    references the article, "Chief Executive Larry
21    Ellison," in quotes, "'Irreplaceable',' in parens,
22    "(August 14), repeated an Ellison claim that Oracle
23    co-president Safra Catz graduated from the Harvard
24    Law School; her law degree is from the University of
25    Pennsylvania."

622

1         Do you see that?
2     A. I do.
3     Q. But, again, it's your testimony you've
4     never claimed that she went to Harvard Law School,
5     is that right?
6     THE WITNESS: No --
7     MR. LINDSTROM: Assumes facts.
8     Mischaracterizes his testimony.
9     MR. SOLOMON: Q. Sorry. Start again.
10    It's your testimony that you've never
11    claimed that Ms. Catz graduated top in her class at
12    Harvard Law School?
13    A. I've never -- I've never said that.
14    Q. And have you, in the past, said that she
15    graduated from Harvard Law School?
16    A. I think at one point I thought she had
17    graduated from Harvard Law School.
18    MR. SOLOMON: Okay. And we'll have marked
19    as the next exhibit an article entitled, "Oracle's
20    Catz, Ellison Heir, Gets Credit for Growth
21    Strategy."
22        (Whereupon, Deposition Exhibit 150
23        was marked for identification.)
24    MR. SOLOMON: Q. I'm looking at the third
25    page of this document. You'll see halfway down on

623

1     that third page it says, "Catz received her
2     bachelor's degree in business from the Wharton
3     School of the University of Pennsylvania in 1983,
4     earning her law degree from Harvard Law School in
5     1986."
6         Do you see that?
7     A. I do.
8     Q. You didn't provide that information for
9     this article, did you?
10    A. No. I'm not sure -- what is this article?
11    I can't even tell where it came from.
12    Q. If you go to the last page, you'll see
13    that there's a reference to the reporter being
14    Rochelle Garner in San Francisco.
15        Do you know who Rochelle Garner is?
16    A. I don't. Do you know --
17    Q. Have you ever heard of the San Jose
18    Mercury News?
19    A. Of course. Is this a San Jose Mercury
20    News article?
21    Q. I believe it is.
22    A. I don't see where it ...
23    Q. We'll double-check later on, Mr. Ellison,
24    but I believe this is an article that was published
25    in December of last year in the San Jose Mercury

624

1     News. And I'll let you know if I'm -- when I find
2     another version of this, whether that's right or
3     wrong.
4         But in any event, have you ever had a
5     discussion with Ms. Catz about her being reported to
6     have earned her law degree from Harvard Law School?
7     A. No. I don't think she ever told me --
8     MR. LINDSTROM: The answer is yes or no.
9     THE WITNESS: Sorry.
10    MR. LINDSTROM: And you've answered.
11    MR. SOLOMON: Q. Do you know why there's
12    no correction -- there's been no correction of this
13    information?
14    MR. LINDSTROM: No foundation.
15    THE WITNESS: No.
16    MR. SOLOMON: Q. Are you aware that every
17    document that discusses your exercise of your
18    options in January 2001, to the extent -- prior to
19    your exercising those options, to the extent there
20    was -- there were ever any dates projected for when
21    you would be exercising, they were April 2001 or
22    thereafter? Are you aware of that?
23    MR. LINDSTROM: Assumes facts.
24    Mischaracterizes the documents.
25    THE WITNESS: I'm not -- I'm not sure i

Ellison, Lawrence 3/30/2007 12:00:00 AM

625

1  understood what you just said.
2      MR. SOLOMON: Q. Okay. Prior to your
3  exercising your options in January 2001, there are
4  some e-mails that I'll share with you in a few
5  minutes involving Deborah Lange.
6      Do you know who Deborah Lange is?
7  A. Yes.
8  Q. And some of those discuss when you would
9  be exercising your options. Are you aware of that?
10      MR. LINDSTROM: Assumes facts.
11      THE WITNESS: No.
12      MR. SOLOMON: Q. And there's never any
13  mention of you exercising in January of 2001; only
14  of exercising in April or thereafter. Are you aware
15  of that?
16      MR. LINDSTROM: Assumes facts.
17  Mischaracterizes the document. Documents.
18      THE WITNESS: No.
19      MR. LINDSTROM: Q. After we filed our
20  lawsuit in March of 2001, did you ever have any
21  discussion with anybody at Oracle concerning
22  Ms. Lange --
23  A. Now I know what you're talking about --
24  Q. -- stating that --
25  Okay. What am I talking about?

626

1      MR. LINDSTROM: Why don't you let him
2  finish the question.
3      MR. SOLOMON: Q. I did. What am I
4  talking about?
5      MR. LINDSTROM: Calls for speculation.
6  We'll see how good you can read what's in his head.
7      THE WITNESS: I think -- I think I've
8  heard somewhere that Deborah Lange wrote something
9  about the tax treatment of my options and the ideal
10  time for me to exercise as far as Oracle was
11  concerned.
12      MR. SOLOMON: Okay.
13      MR. LINDSTROM: So, Mark, was he right?
14  Was that what you were thinking?
15      MR. SOLOMON: Somewhat. Absolutely.
16  Q. I was also thinking that when we discussed
17  this with your financial adviser, Mr. Simon, he got
18  very upset when I showed him documents that suggest
19  that you were planning on exercising in April.
20      Are you aware of that?
21      MR. LINDSTROM: Assumes facts.
22  Mischaracterizes his testimony
23      THE WITNESS: That he got very upset? No.
24  I don't know anything about that.
25      MR. SOLOMON: Q. Have you spoken to

627

1  Mr. Symonds about his testimony?
2  A. I didn't even know he had been deposed
3  until now -- no.
4  Q. Have you referred in the past to "software
5  swaps," transactions described as "software swaps"?
6      MR. LINDSTROM: In those exact words?
7      MR. SOLOMON: (Nods head.)
8      THE WITNESS: I don't think I've ever said
9  "software swaps." I know what a swap is, a swap
10  transaction. I don't think I've ever said "software
11  swaps."
12      MR. SOLOMON: Q. Okay. And what is a
13  software swap?
14      MR. LINDSTROM: What is a software --
15      MR. SOLOMON: Sorry. You're right.
16  Q. What is a swap transaction?
17  A. It would be where -- in case of a software
18  swap, it would be where -- hypothetically, where we
19  supplied our database technology to Microsoft in
20  exchange for Microsoft Office, and we -- kind of
21  simultaneously, the transactions have passed in the
22  air.
23  Q. Okay. Does that raise any concern in your
24  mind as to the propriety of that sort of
25  transaction?

628

1      MR. LINDSTROM: The hypothetical he
2  described?
3      MR. SOLOMON: Yeah.
4      THE WITNESS: It depends -- it's all
5  contextual. So if Microsoft had a real need for the
6  database, a legitimate need for the database, and
7  they were going to buy it anyway, and we had a
8  legitimate need for Microsoft Office and we were
9  going to buy it anyway, and those needs had been
10  well established, then the fact that we were
11  buying -- you know, kind of simultaneously buying
12  something of theirs and they were simultaneously
13  buying something of ours is okay in terms of you can
14  actually record the revenue. It was a legitimate
15  sale of technology from us to Microsoft and from
16  Microsoft to us.
17      So as long as it is, if you will,
18  coincidental with their occurring at the same time,
19  then it's legitimate and both companies can record
20  the transaction as revenue, as legitimate sales and
21  legitimate revenue.
22      If they were contrived and there's no
23  legitimate need, then the transaction should not be
24  recorded as revenue.
25      MR. SOLOMON: Q. Okay. And does that --

Ellison, Lawrence  3/30/2007  12:00:00 AM

629

1   where you're talking about contrived, does that
2   accurately describe the deal that you entered into
3   with HP at the end of 2001?
4       MR. LINDSTROM:  Was it contrived?
5       THE WITNESS:  No.  It was absolutely not
6   contrived.  It was a legitimate need of HP's and a
7   legitimate need of ours.
8       MR. SOLOMON:  Q.  And do you recall
9   signing a document late on November 30th, 2000 with
10  respect to the HP deal?
11      A.  Not specifically.
12      Q.  Do you recall that it was unclear until
13  the last minute whether or not Oracle would meet
14  guidance for the second fiscal quarter of 2001?
15      MR. LINDSTROM:  Assumes facts.
16      THE WITNESS:  Q2 2001?
17      MR. SOLOMON:  Q.  Q2 -- which is --
18      A.  Fiscal -- yes.  November of 2000.  I don't
19  specifically recall.
20      Q.  Did you discuss the second fiscal quarter
21  of 2001 with Mr. Symonds at all when he was
22  interviewing you for the book?
23      A.  I don't recall.
24      Q.  Back to 142.
25      I'm looking at page 1529302.

631

1       MR. SOLOMON:  Yes.
2       THE WITNESS:  Sorry.  Accumulating too
3   many of these things.
4       Okay.  -302.
5       MR. LINDSTROM:  Why don't you find that
6   page and then take a moment to familiarize yourself
7   with the passage that counsel's directed your
8   attention to.
9       THE WITNESS:  Okay.  There are a lot of
10  transcription errors in this.  It's hard to read
11      MR. SOLOMON:  Too bad we don't have the
12  audio.
13      MR. LINDSTROM:  Is that a question?
14      MR. SOLOMON:  Q.  Don't you agree,
15  Mr. Ellison?
16      A.  I do.
17      Q.  Halfway -- well, the last sentence of the
18  paragraph that I'm focusing on says, "There was no
19  reason I should have believed we could do that in
20  the timeframe but I thought we could other than
21  denial."
22      Do you see that?
23      A.  Okay, the last sentence?
24      Q.  Yeah.
25      A.  I do.  But give me a second to read the

630

1       A.  Last three numbers again?
2       Q.  -302?
3       A.  -302.
4       Q.  And then I'm looking at the paragraph
5   beginning exactly halfway down the page.  And I'm
6   looking at, in that paragraph, where it says, "This
7   is hard stuff."
8       If you just read that, I'll ask you a
9   couple of questions about it.
10      A.  -302?  Page -302?
11      Q.  Yes.
12      While you're reading it, I'll read to you.
13      "This is hard stuff, you know, a lot of
14  smart people" --
15      A.  Slow down.  I can't find, "This is hard
16  stuff."
17      MR. LINDSTROM:  I can't either.
18      MR. SOLOMON:  -302 at the bottom.
19      THE WITNESS:  -302.  I can't find it.
20      MR. SOLOMON:  There's handwriting on the
21  left-hand side.
22      MR. LINDSTROM:  Why don't you --
23      MR. SOLOMON:  Wrong document.
24      THE WITNESS:  Oh, 142.  Sorry.  Are we
25  done with this one?

632

1   whole thing.
2       Okay.
3       Q.  Okay.  So that last sentence, did you say
4   that?
5       A.  I think so.
6       Q.  Okay.  And you were in denial in terms of
7   the E-Business Suite and how long it would take; is
8   that right?
9       A.  No.  If you read the entire paragraph, I
10  was more optimistic about us getting it done in a
11  certain timeframe than I should have been.
12  Experience -- experience tells us in the software
13  business that big projects are enormously complex
14  and they often slip.  I mean, we've had big projects
15  slip in the past.  Microsoft has huge projects that
16  slip.  Still, we put together dates that are
17  aggressive and goals that are aggressive.  It's not
18  uncommon to miss those dates.
19      Q.  Do you stand by that sentence where you
20  say, "There was no reason I should have believed we
21  could do that in the timeframe"?
22      MR. LINDSTROM:  The entire sentence,
23  right?
24      THE WITNESS:  The -- I still manage
25  engineering today at Oracle, and we still have

Ellison, Lawrence  3/30/2007  12:00:00 AM

633

1  aggressive delivery dates.  And I still think it's a
2  good management technique to have aggressive
3  delivery dates.
4       MR. SOLOMON:  Okay.  Let's take a -- let's
5  take a ten-minute break, if that's okay.
6       THE VIDEOGRAPHER:  We are going off the
7  record.  Here marks the end of Videotape No. 1,
8  Volume 3, in the deposition of Lawrence Ellison.  We
9  are going off the record.  The time is 2:28 p.m.
10      (Whereupon, a recess was taken.)
11      THE VIDEOGRAPHER:  Good afternoon.  We are
12  back on the record.  Here marks the beginning of
13  Videotape No. 2, Volume 3, in the deposition of
14  Larry Ellison.  The time is 2:42 p.m.
15      MR. SOLOMON:  Q.  Mr. Ellison, have you
16  heard -- I remarked that you have a problem with
17  tenses?
18      A.  Verb tenses?
19      Q.  Tenses.
20      MR. LINDSTROM:  Verb tenses.
21      THE WITNESS:  Have I heard that remark?  I
22  think I made that remark.
23      MR. SOLOMON:  Q.  Okay.  And who did you
24  make that remark to?
25      A.  I'm not sure exactly.

634

1       Q.  Okay.  And why did you say that?
2       A.  I think there was some point in my career
3  where I did not make it plain whether a product was
4  finished or about to be finished.
5       Q.  Okay.  Do you still have a problem with
6  tenses?
7       A.  No.
8       Q.  When did you stop having a problem with
9  tenses?
10      A.  Long time ago.
11      Q.  Would you be willing to submit to a lie
12  detector test for the purposes of this litigation?
13      MR. LINDSTROM:  I'm going to object to
14  that question as being argumentative and beyond the
15  requirements of the Federal Rules of Civil
16  Procedure, and I'm going to instruct him not to
17  respond to that question, unless you can give me
18  some justification for why you have authority to
19  pose that kind of question.
20      MR. SOLOMON:  I think --
21      Q.  Did you respond already by nodding your
22  head yes?
23      A.  Yes.
24      Q.  And --
25      MR. LINDSTROM:  Well, he may be willing to

635

1  do it, but I don't think you can ask that question.
2  You have limited time with this witness.  And, you
3  know, I suggest you move on to things that are
4  properly the subject of discovery.
5       MR. SOLOMON:  So just -- I will withdraw
6  the question for the second, but let's just finish
7  this off.
8       Q.  So after this deposition, you would be
9  willing to enter into an agreement whereby if
10  questions were agreed, you would submit to a lie
11  detector test, is that right?
12      MR. LINDSTROM:  Asked and answered.  It's
13  argumentative.  It's irrelevant.  Improper
14  discovery.  He's told you what he would do, and I'm
15  going to instruct him not to answer any further.
16      MR. SOLOMON:  Q.  And you're going to
17  accept the instruction, I take it?
18      A.  (Nods head.)
19      Q.  Yes.
20      MR. LINDSTROM:  Thank you.
21      MR. SOLOMON:  Q.  That's yes, you --
22      A.  Yes, I accept the instruction.
23      Q.  Got you.
24      Let's have marked as the next exhibit
25  another interview transcript with the Bates range

636

1  1529157 to 1529180.
2       (Whereupon, Deposition Exhibit 151
3  was marked for identification.)
4       THE WITNESS:  Are we finished with this
5  transcript?
6       MR. SOLOMON:  Yes, we are.  We're finished
7  with it, yes.
8       Q.  And this is an interview transcript.  It's
9  dated January 18, 2002, and the control range is
10  1529157 -- I may have said this already --
11  through -180.
12      You'll see on the first page in the second
13  paragraph a reference to the phrase "brand damage."
14      Do you see that?
15      A.  I do.
16      Q.  And that's a phrase you say you invented;
17  is that right?
18      A.  Can I have a second just to read the
19  context?
20      MR. LINDSTROM:  While Mr. Ellison is
21  reviewing the document, is this 151 for
22  identification?
23      THE REPORTER:  (Nods head.)
24      MR. LINDSTROM:  Thank you.
25      THE WITNESS:  Are we talking about the

637

1  very first page?
2        MR. SOLOMON: Yes.
3        THE WITNESS: Because this is reverse --
4  this is Mr. Symonds in regular type and me in
5  boldface?
6        MR. SOLOMON: Q. Appears to be.
7  A  Just reverse of the other one.
8        Okay. Go ahead.
9  Q  Okay. You coined the phrase "brand
10  damage"?
11  A  I don't think I coined the phrase "brand
12  damage." I used the phrase "brand damage" in
13  regards to some of the problems some customers were
14  having with release 11i. I don't think it had ever
15  been used in Oracle before.
16  Q  Then if you go to the third page of the
17  document, 1529159, just looking in the middle there
18  at what appears to be your language, "So you have
19  delivered a product that doesn't work very well and
20  you can't support very well, so all I care about is
21  service requests and that's all I measure so that
22  that was a key point in saying by the way service
23  requests must go down 5 percent a month."
24        Do you see that?
25  A  I do

638

1  Q  Are you talking about 11i there?
2  A  Can I just have a second to look at this?
3  Q  Sure.
4  A  No. I think if you look at the previous
5  paragraph, I think what I'm talking about is the
6  general notion of what you should measure when
7  you're trying to ascertain product quality.
8        And the engine and -- what I had become
9  convinced of was that measuring bugs was a mistake.
10  The programmer says here's a bug. Instead what you
11  want to measure is customer -- customers reporting
12  problems. And there's a fundamental -- a
13  fundamental difference.
14        One bug might produce zero or very few
15  customer-reported problems. There might be a
16  legitimate bug in their product, but either no one
17  cares or it doesn't occur. One bug might cause very
18  serious problems that hundreds of customers might
19  then come up with service requests.
20        So the impact of that bug is much greater
21  if you measure service requests. So counting bugs
22  simply was not a very good way of measuring product
23  quality. The right way to measure product quality
24  was service requests. And then I had set a goal --
25  and that was true of all of our products, not just

639

1  11i -- the way to measure product quality was
2  measure service requests. And then the said
3  targets, to reduce -- constantly reduce those number
4  of service requests coming in.
5        It used to be -- it used to be that
6  engineering would measure bugs as their measure of
7  quality, and reducing bugs was showing improved
8  quality. The support organization would measure
9  service requests. And they weren't synchronized.
10  They didn't agree what the right measures were.
11        So I was pushing the notion of let's all
12  agree it's just service requests and just get them
13  down.
14  Q  Was this after March 2001 that you
15  developed this view, or was it something you already
16  held, a view you already held as of March 2001?
17  A  I'm not sure exactly when I decided we
18  should have a single measure of the quality.
19  Q  Okay. If you go to pages 1529167
20  and -168 -- in fact, I'm looking at -168.
21  A  You're on -168?
22  Q  Yeah. Sorry.
23        And I'm just looking at a couple of the
24  lines on that page. A third of the way down, "So
25  when did you first realize that it wasn't really

640

1  working very well?"
2        And your response appears to be, "Oh, I
3  knew there was a huge risk up front, so I kind of
4  walked into this. I can't plead ignorance on this,
5  but it took much longer."
6        Do you see that?
7  A  I do. Can I have a moment to read around
8  it? Because I'm not sure what this is about.
9  Q  Yeah.
10  A  Okay. Now I know what it's about.
11  Q  Okay. And what is it about?
12  A  It's about the most complicated component
13  of an ERP system or the application system, which is
14  the order management system. And we had -- I had
15  made the decision -- it was run on the cusp, whether
16  we should put in a brand-new order management system
17  or kind of upgrade our existing system,
18        And I decided to completely replace the
19  order management system knowing it was an enormously
20  complicated piece of new code, the most complicated
21  piece of the whole system.
22  Q  Just keep that in front of you for a
23  second. I just want to touch on some other areas
24  and then come back to this. I want to go back for a
25  second to Mr. Symonds and the issue of Softwar.

Ellison, Lawrence  3/30/2007  12:00:00 AM

641

1      Do you know what spoliation means?

2   A   Yes.

3   Q   What's your understanding of spoliation?

4   A   It's documents that should have been

5   preserved that weren't

6   Q   Are you aware that spoliation has become

7   an issue in this case?

8   A   I understand you've raised it as an issue,

9   yes.

10   Q   Okay.  And you're aware that the special

11   master magistrate in charge of discovery had

12   indicated this is an issue in this case?

13      MR. LINDSTROM:  I'm going to instruct you

14   not to divulge any communications you may have had

15   with your counsel.  In other words, as before, you

16   need to be answering these questions independent of

17   communications for your counsel.  So, for example,

18   if you've read an order or a transcript or something

19   where the special master made a statement of the

20   type that Mr. Solomon just mentioned, then fine.

21   But I don't want you telling him information that

22   may or may not have been given to you through your

23   lawyers.

24      THE WITNESS:  No.  Excuse me.  No.

25      MR. SOLOMON:  Q.  Okay.  I asked you last

643



642



644



Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM

657



659



658



660

1   damages are in this litigation, the claimed damages?
2       MR. LINDSTROM:  No foundation.  Calls for
3   speculation.  Oh, claimed damages.  I'm sorry.  I'll
4   withdraw that.
5       Again, other than from counsel, do you
6   know what the claimed damages are?
7       THE WITNESS:  I think so.
8       MR. SOLOMON:  Q.  What do you think they
9   are?
10      A.  The only number I remember is $2 billion.
11      Q.  Right.
12      And that's from the demand letter that
13  plaintiffs sent; is that right?
14      MR. LINDSTROM:  I think you showed it to
15  him in a prior version of --
16      MR. SOLOMON:  Yes.  Yes.  Right.
17      Q.  Do you know that demand has been
18  withdrawn?  We've withdrawn that demand.  Are you
19  aware of that?
20      A.  No.
21      Q.  Do you know that your lawyers represented
22  to a court in Denmark in a deposition that was taken
23  there that the damages may reach $10 billion?
24  $10 billion?
25      MR. LINDSTROM:  No foundation.  Same

Ellison, Lawrence  3/30/2007  12:00:00 AM



Ellison, Lawrence  3/30/2007  12:00:00 AM



665



667



666

1   industry, the pace of development means that events
2   just relatively recently may actually be irrelevant;
3   is that -- is that fair?
4       MR. LINDSTROM: Vague and ambiguous.
5       THE WITNESS:  Recent events can be
6   irrelevant?
7       MR. SOLOMON:  Q.  Let me give you some
8   context, because I'm not doing very well there.
9   I'll find a document.
10    A.  Okay.
11    Q.  We'll come back to it.  I'm not going to
12   waste time.  Excuse me a second.
13      Okay.  I'll show you what was previously
14   marked Exhibit 57 in your deposition, Mr. Ellison.
15   And I noticed we haven't actually got an answer to a
16   question that I asked about that document.  So if
17   you could please take a look at it.
18       MR. LINDSTROM:  So are you saying,
19   Counsel, that when you posed the question last time,
20   the transcript doesn't reflect an answer?
21       MR. SOLOMON:  Yeah.  Nothing improper.  I
22   just want to get a -- an answer to a question that I
23   posed but somehow got lost.
24       MR. LINDSTROM:  That's fine.  I just
25   wanted to understand the context.

668



669

```
1        MR. SOLOMON:  Sure.
2        Q.  Okay.  As I say, it was marked as
3    Exhibit 57 in your last session.  And I asked you,
4    at page --
5        A.  Okay.
6        Q.  I asked you if you recognized it, and your
7    answer was -- well, I'll read the question and
8    answer.  Question,
9        "And do you remember seeing it around
10    - January 30th of 2000 -- excuse me --
11    February 1st of 2001?"
12    Your answer was,
13        "Again, not specifically, but I'm very
14    familiar with the issues involved."
15    Then I ask,
16    "Okay.  And one of the issues is a
17    downward revision of the Q3 forecast
18    revision, is that right?"
19    And you answer,
20    "Yeah.  We had put in a custom system,
21    OTA "
22    And then I say, question,
23    "I just want to know if that was one
24    of the issues that you remembered, downward
25    revision."
```

570

```
1        And somehow we didn't get that answered
2    So my question is, is that one of the issues you
3    remember, downward revision?
4        A.  Do I remember because of the order -- that
5    the education entry -- this is about our
6    education business.
7        Q.  Sure.
8        A.  And we had put a new order entry system
9    for people -- basically, a registration system for
10    taking classes.  And that was a custom -- a
11    custom-made system called OTA, and because it was a
12    new system, they were having -- they were having
13    difficulties registering for classes, and,
14    therefore, in North America they were -- they had
15    lowered the forecast
16        Q.  Okay.  And, again, my question was, and
17    that's -- all I want to know is yes or no.  Do you
18    remember that downward revision?
19        A.  Do I remember it specifically at the time
20    as opposed to refreshed by this --
21        MR. SOLOMON:  Yes.  Correct.
22        THE WITNESS:  I don't remember it
23    specifically.
24        MR. SOLOMON:  Q.  Okay.  But you were
25    aware of it around the time of this document; is
```

671

```
1    that right?
2        MR. LINDSTROM:  No foundation.
3    Mischaracterizes his testimony.
4        THE WITNESS:  I think in the overall
5    scheme of Oracle, the North American sales education
6    is a relatively small number.
7        MR. SOLOMON:  Q.  I'm not arguing about --
8        A.  No.  I understand that.  I understand
9    that.  All I'm saying is I'm not sure around this
10    time I was paying a lot of attention to this.
11        Q.  Okay.
12        A.  That's the only --
13        MR. SOLOMON:  Okay.  Let's go off the
14    record for a couple of minutes.
15        THE VIDEOGRAPHER:  Off the record.  The
16    time is 3 33 p.m.
17        (Whereupon, a recess was taken.)
18        THE VIDEOGRAPHER:  We are back on the
19    record.  The time is the 2:36 p.m. -- I'm sorry,
20    make that 3:36 p.m.
21        MR. SOLOMON:  We'll have marked as the
22    next exhibit excerpts from the book Softwar.
23        (Whereupon, Deposition Exhibit 152
24    was marked for identification.)
25        MR. SOLOMON:  Q.  If you go to page 226,
```

672

```
1    I'm looking at the paragraph that starts the next
2    question.  And I'll just read it into the record.
3        It reads, "The next question turns out to
4    be trickier.  The air force's Ron Orr wants to know,
5    reasonably enough, where Oracle has an example of
6    11i up and running that has stood the test of time.
7    Ellison points out that the suite has been out for
8    only a year but there are a few customers had
9    adopted the 'no-modifications' model early on out of
10    poverty.  One such is Techtronics in Oregon - five
11    years ago its business 'fell off a cliff,' so it
12    puts in global systems because that was the cheapest
13    way to go.  It's an odd example to give.  Sensing
14    it, Oracle's Mark Jarvis adds that Cisco is a
15    well-known example using Oracle financials to
16    achieve a daily 'virtual close.'  Somebody points
17    out that we didn't help Cisco from making a hash of
18    its forecasting."
19        Do you see that?
20        A.  Yes.
21        Q.  Is it true that after we filed the lawsuit
22    in March 2001, that you were unable to identify any
23    companies, other than Techtronics and Cisco here, as
24    being customers that have had 11i up and running
25    that stood the test of time?
```

Ellison, Lawrence  3/30/2007  12:00:00 AM

673

```
1       MR. LINDSTROM:  Through what point in
2    time?  So after the filing of the lawsuit through to
3    today?
4       MR. SOLOMON:  Q.  When -- when you had the
5    conversation with Mr. Symonds.
6       A.  Again, it takes a good deal of time to
7    implement an ERP system.
8       Q.  Yeah.  But I'm just asking, is it true
9    that you could only identify, or there was only an
10   attempt to identify those two companies?
11      MR. LINDSTROM:  It's vague and ambiguous
12   as to the timeframe at which you're asking him,
13   whether it's the time of the quote to Ron -- the
14   purported quote to Ron Orr or whether it was the
15   time of the statement.
16      MR. SOLOMON:  Okay.  The time of the
17   purported quote to Ron Orr.
18      THE WITNESS:  I don't recall.  You're
19   asking me at the time Ron Orr asked me the question,
20   was I able, don't I have in my memory a number of
21   companies that were running 11i that have stood the
22   test of time.
23      MR. SOLOMON:  Q.  Right.
24      A.  And I think it was very -- since the
25   product had only been out for a short period of
```

674

```
1    time, it takes awhile to implement the product.  How
2    long could it have been running to have stood the
3    test of time.
4       So the question, it was -- there weren't a
5    lot of customers -- am I interpreting that
6    correctly -- correctly, Mr. Solomon?
7       Q.  Yeah.
8       A.  Okay.  So -- but, again, I don't know how
9    many companies at that point were running -- were
10   live on 11i.
11      Q.  All right.  The reason I'm asking is, of
12   course, we don't have all the tapes and transcripts
13   of the audio.  So I'm sort of trying to dig in to
14   see whether you agree with some more of the
15   statements that are made in Softwar.
16      Now, you make a footnote, and I want to
17   ask you about your footnotes.  How did you write --
18   what was the process by which you wrote these
19   footnotes?
20      MR. LINDSTROM:  Asked and answered.
21      MR. SOLOMON:  Q.  Did you type them into a
22   computer?
23      A.  Yes.  Yes.
24      Q.  Which computer?
25      A.  My computer.
```

675

```
1       Q.  Okay.  And where is that computer now?
2       A.  2001, I have no idea.
3       Q.  So it's gone?
4       A.  I --
5       MR. LINDSTROM:  Assumes facts.  No
6    foundation.  He's told you he has no idea.
7       THE WITNESS:  I have no idea.
8       MR. LINDSTROM:  Doesn't mean it's gone.
9       MR. SOLOMON:  Q.  Have you a copy of your
10   footnotes, other than the printed version in the-
11   book?
12      A.  Not that I know of.
13      Q.  And it didn't occur to you as you were
14   writing that you ought to preserve your writings
15   because of this litigation?
16      MR. LINDSTROM:  Assumes facts.
17      THE WITNESS:  Did not occur to me.
18      MR. SOLOMON:  Marked as the next exhibit,
19   another excerpt from the book Softwar.
20      (Whereupon, Deposition Exhibit 153
21       was marked for identification.)
22      THE WITNESS:  Are we done with this one?
23      MR. SOLOMON:  Yes.  Thank you.
24      THE WITNESS:  Okay.
25      MR. SOLOMON:  Q.  If you go to page 248 --
```

676

```
1    sorry.  249.  I'm looking in the -- at the fifth or
2    sixth line where it says, "It's difficult to sell
3    without customer references."
4       Do you see that?
5       A.  Yes.
6       Q.  Okay.  So do you recall that as of
7    March 2001, Oracle had great difficulty getting
8    customers to act as references for 11i?
9       MR. LINDSTROM:  As of March 2001?
10      MR. SOLOMON:  Correct.
11      THE WITNESS:  Can I have -- can I have a
12   second to look at this?
13      MR. SOLOMON:  Sure.
14      Q.  Again, without -- I don't need an
15   explanation.  I just want to know if you recall
16   whether or not, as of March 2001, Oracle had great
17   difficulty getting customers to act as references
18   for 11i.
19      A.  I don't recall.
20      Q.  We talked a little bit last time I think
21   about the practice of not servicing clients'
22   software unless they would agree to act as
23   references.
24      Do you recall --
25      A.  No --
```

Ellison, Lawrence  3/30/2007  12:00:00 AM

677

1    MR. LINDSTROM: Assumes facts
2    Mischaracterizes his testimony.
3        MR. SOLOMON: Q  Do you recall that
4    testimony?
5    A.  It's just not true.  We have never refused
6    to service clients unless they acted as references.
7    Q.  Okay  And you've never seen any documents
8    then that suggested that was your practice?
9    A.  That we would refuse service unless they'd
10   act as a reference?
11   Q.  Yes
12   A.  No
13       MR. SOLOMON: Okay  Let's go off the
14   record for a while.
15       THE VIDEOGRAPHER: Off the record.  The
16   time is 3:46 p.m.
17       (Whereupon, a recess was taken.)
18       THE VIDEOGRAPHER: We are back on the
19   record.  The time is 4:01 p.m.
20       MR. SOLOMON: Q.  Yes.  I've marked as the
21   next exhibit a document produced by the defendants
22   with the control numbers 1056850 and -51.
23       (Whereupon, Deposition Exhibit 154
24       was marked for identification.)
25       MR. SOLOMON: Q.  Let me know, when you've

678

1    had a chance to familiarize yourself with this, if
2    you recognize this document.
3    A.  I don't.  If you'd just give me a moment.
4       Excuse me.
5    Q.  Sure.
6    A.  Okay.
7    Q.  Okay?
8    A.  Yes.
9    Q.  Do you recognize this?
10   A.  I do not.
11   Q.  Do you recognize the name InterLogix,
12   Inc.?
13   A.  I do not.
14   Q.  It says, "Approved by LJE."
15       That would be you, correct?
16   A.  Yes.
17   Q.  And I'm looking at the bottom of the page.
18   Well, first of all, excuse me.  Let's go to halfway
19   down the page where the sentence begins, "The
20   project."
21       It says, "The project has lost the
22   confidence of the InterLogix Steering Committee and
23   their CEO, Brian McCarthy."
24       Do you know Brian McCarthy?
25   A.  I don't.

679

1    Q.  "Mr. McCarthy told me his company lost 2.4
2    million in cost overruns associated with excessive
3    bug fixes, poorly documented upgrade scripts and
4    scripts that didn't take into consideration
5    integration with other modules.  Mr. McCarthy also
6    mentioned his firm has had to implement costly
7    interim solutions while his business waits for the
8    upgrades to be fully tested and implemented."
9       Do you see that?
10   A.  I do.
11   Q.  And then skipping a few lines, it says,
12   "Note that InterLogix has acquired $2.3 million in
13   Oracle product. $1.3 [sic] million in Oracle
14   services in FY01."
15   A.  "1.1 million in Oracle services."
16   Q.  Yes.
17       "They are a great Oracle customer that is
18   living through an extremely burdensome upgrade that
19   is affecting employee moral [sic] and the firm's
20   financial health."
21       Do you see that?
22   A.  I do.
23   Q.  Then the recommendation says, "Approve
24   with George's requirement that they sign an [sic]
25   release and agree to be a reference.  Dorian is

680

1    involved."
2       Do you see that?
3    A.  Yes.
4    Q.  Do you see that?
5    A.  I do.
6    Q.  Dorian is Dorian Daley, who is here today?
7    A.  I believe so, yes.
8    Q.  Doesn't this represent Oracle bribing a
9    customer to be a reference?
10      MR. LINDSTROM: Let me object to the
11   question as argumentative.  Calls for a conclusion.
12      You may respond.
13      THE WITNESS: Bribing, no.
14      MR. LINDSTROM: You've answered the
15   question.
16      MR. SOLOMON: Q.  Do you think that this
17   is an appropriate business practice of only
18   approving if they agree to be a reference?
19      MR. LINDSTROM: Mischaracterizes the
20   document.
21      THE WITNESS: The document is -- we have
22   decided to give them a lot of free consulting.  So
23   we said -- I'm not sure -- I think it was $350,000
24   worth of free consulting.
25      MR. SOLOMON: Q.  So --

Ellison, Lawrence  3/30/2007  12:00:00 AM

681

1   A.  And, I mean, there are a number of quid
2   pro quos.  They'd had -- they've had problems
3   implementing the 11i suite, bugs, that's at least
4   partially our responsibility.  And they're had some
5   cost overruns on their project.  And I think they
6   owed us, what, $1.1 million in consulting fees.
7        And I think we decided to lower their
8   consulting -- their consulting fees by $350,000,
9   which is kind of acknowledging that, yeah, that some
10  of the problems that they had during the
11  implementation of 11i were caused by us, and we're
12  taking that into account.
13       But we will get these problems fixed.
14  We're going to get everything fixed.  We're going to
15  make you a happy customer.  And we're going to pay
16  for the consulting.  Some of the consulting is going
17  to be on our nickel.  We're going to pay for it.
18  But we'd like you -- once you have a successful
19  implementation, we'd like you to be a reference.  I
20  think that's a legitimate quid pro quo, not a -- not
21  a bribe.
22       Q.  So -- but isn't it true you're installing
23  that a customer that's had an unhappy experience
24  with your product acts as a reference for that
25  product if it wants the concessions?

682

1        MR. LINDSTROM:  Mischaracterizes the
2   document.  Argumentative.
3        MR. SOLOMON:  Q.  Isn't that what this is
4   all about?
5        MR. LINDSTROM:  Same objections.
6        THE WITNESS:  No.  The customer -- it is,
7   again -- it's a quid pro quo.  We are making -- we
8   are making concessions.  I mean, we are
9   definitely -- I just -- I just don't agree with your
10  use of the word "bribe."  So we -- but we are -- you
11  know, we're making concessions.
12       We have a longstanding and good
13  relationship with this customer.  They're
14  implementing one of our products.  The product had
15  bugs in it, no question.  They had problem -- you
16  know, the project took longer than they had
17  intended.  You know, they had some budget overruns.
18  We're taking responsibility for that.
19       You know, we're going to give them -- you
20  know, we're going to reduce their consulting bill.
21  And presumably, if -- you know, they're doing
22  better, if you read the entire document.  They had
23  problems with 11.5.1.  They're now on 11.5.3 and
24  things are going better.  So it's on -- we think
25  we're on our way to a success.

683

1   So that's what it says right here.  The
2   current -- the current attempt to go directly --
3   they said, "Attempt to upgrade to 11.5.1 was a
4   disaster."  And a great word.  "But things are going
5   better with 11.5.3."  Again, I'll take that as we're
6   on our way to success with 11.5.3.
7        But the fact is there were real costs.
8   They incurred real costs with the 11.5.1 upgrade,
9   and it was partially our responsibility.  So we'll
10  pay for part of that.  We'll reduce your consulting
11  bill.
12       But if things are going well in 11.5.3 --
13  and that's what I take this to mean, things are
14  going well with 11.5.3 -- we'd like you to be a
15  reference.  So I think it's a perfectly legitimate
16  exchange.
17       Q.  Okay.  Let me read this into the record.
18       "The current attempt to go directly from
19  10.7 to 11.5.3 is going better," and this is what
20  you didn't read into the record, "but is slow and is
21  met with extreme difficulties as well.  They have
22  missed several different go-live dates, forcing them
23  to entrench and spend significantly more money each
24  time our consulting services add internal costs."
25  And it goes on to say, "The project has lost the

684

1   confidence."
2        How can you -- how can you spin that as
3   good news?
4        MR. LINDSTROM:  Argumentative.  Vague and
5   ambiguous.
6        THE WITNESS:  It is a significant
7   improvement from 11.5.1, and they say it's going
8   better.  The implementation is going slowly, and
9   they're having difficulties.
10       MR. SOLOMON:  Q.  Extreme difficulties.
11       MR. LINDSTROM:  Argumentative.
12       THE WITNESS:  Again, my take is that
13  things are going better.  And if they're agreeable
14  to be -- and I don't think they would agree to be a
15  reference if they weren't on their way to a success.
16  How can you be a reference?  What can you say as a
17  reference if you can't say you had a good -- you
18  know, that it's up and running.
19       MR. SOLOMON:  Q.  Well, it looks like
20  there's some mutual back scratching being suggested
21  which doesn't lead to any accurate portrayal of the
22  product.
23       MR. LINDSTROM:  Argumentative.
24  Mischaracterizes the document.  Assumes facts.
25  Vague and ambiguous.

Ellison, Lawrence  3/30/2007  12:00:00 AM



Oracle



Ellison, Lawrence  3/30/2007  12:00:00 AM

689



691



690



692

1    The Rewards of Recklessness, A Portrait of Larry
2    Ellison and Oracle Corporation at War."
3        A.  I've never seen it before.
4        Q.  No.
5        Have you ever spoken to Mr. Symonds about
6    it?
7        A.  No --
8        MR. LINDSTROM:  About Exhibit 155?
9        MR. SOLOMON:  Correct.
10       THE WITNESS:  No.
11       MR. SOLOMON:  Okay.  Going to page 12.
12       MR. LINDSTROM:  What's the Bates stamp
13   number?
14       MR. SOLOMON:  1053575.  The heading is,
15   "The Collaboration."
16       Q.  And I just want to ask you a few questions
17   about some of the contents.  To start with, it says
18   at the beginning, "I have known Ellison for over
19   three years, since becoming Technology and
20   Communications editor of The Economist."
21       Is that true, that he's known you three
22   years, as of the beginning of 2001?
23       A.  I believe so.
24       Q.  And then the next paragraph starts off
25   saying, "During the writing of the book, I will

Ellison, Lawrence  3/30/2007  12:00:00 AM

693

1  spend at least ten days each month with Ellison and
2  record up to 200 hours of one-to-one interviews."
3      Do you know whether Mr. Symonds spent
4  around ten days each month with you?
5  A  I don't think so.
6  Q  It was less?
7  A  Yes.  Much less.
8  Q  Says, "I will have office space at Oracle
9  on the same floor as Ellison and will sit in on
10  every kind of business meeting."
11      Did that happen?
12      MR. LINDSTROM:  Compound.
13      MR. SOLOMON:  Q.  Did he share an office
14  on your floor?
15      MR. LINDSTROM:  Mischaracterizes the --
16      THE WITNESS:  Share an office?  He
17  certainly didn't share an office.
18      MR. SOLOMON:  Q.  I didn't mean share with
19  you.  Did he have office space on your floor?
20  A  I don't know.  I don't think so.
21  Q  Did he attend business meetings with you?
22  A  Some -- some meetings, yes.
23  Q  And he traveled with you?
24  A  A few times.
25  Q  It goes on a few lines down, "Wherever

694

1  possible and appropriate, Ellison will help me gain
2  the access I require."
3      Did you help Mr. Symonds gain access, as
4  he states here?
5      MR. LINDSTROM:  In the context he states
6  it?
7      MR. SOLOMON:  Yes.
8      THE WITNESS:  Access to whom?  Or to what?
9  Tell me -- maybe I should just find out.  Where are
10  you reading?
11      MR. SOLOMON:  Q.  It says, "I will
12  seek" -- just over halfway down that second
13  paragraph.  "I will seek meetings with others who
14  may take a different and less positive view, such as
15  business rivals and colleagues whom Ellison fired.
16  Wherever possible and appropriate, Ellison will help
17  me gain the access I require."
18  A  Okay.
19      MR. LINDSTROM:  What's the question?
20      MR. SOLOMON:  Q.  The question is, did you
21  assist Mr. Symonds with gaining access where he
22  desired it?
23  A  A few times, yes.
24  Q  "And Ellison will make available" --
25  excuse me -- "personal documents and photographs as

695

1  well as previously confidential company memoranda
2  and e-mail."
3      Do you see that?
4  A  I do.
5  Q  Did you do that?
6  A  I certainly made available photographs.
7  In terms of personal documents, I can't think of
8  any.
9      Q  Okay.
10  A  And company confidential memoranda and
11  e-mail?  Absolutely not.
12  Q  Okay.  Is there any reason why documents
13  dated 2000/2001 concerning Oracle's business remain
14  confidential today?
15      MR. LINDSTROM:  Objection.  Compound.
16  Calls for speculation.
17      THE WITNESS:  General -- yeah.  I think a
18  lot of -- pertaining to our business?  What aspect
19  of our business?  If one of our businesses would be
20  the health records of one of our employees, that
21  would certainly remain -- that's our business.  That
22  would certainly remain confidential.
23      MR. SOLOMON:  Q.  Sure.
24  A  That would certainly remain confidential.
25  I mean, it's a very --

696

1  Q  What if it's --
2  A  It's a very broad, hypothetical question.
3  Q  What if it's an e-mail describing the
4  status of an 11i implementation in 2000?  Why would
5  that be confidential now?
6      MR. LINDSTROM:  Calls for speculation.
7  It's hypothetical.
8      THE WITNESS:  I mean, you'd have to tell
9  me more.  What was in the e-mail?  Who it was from?
10  What it revealed, confidential information about a
11  customer?  There are certain -- certain of our
12  customers, we can't even say who they are.  So, I
13  mean, it's a complicated question.
14      MR. SOLOMON:  Q.  Okay.  Let's think of
15  another category of documents.  What about e-mails
16  concerning your trading and plans to trade in that
17  timeframe; why would they be confidential now?
18      MR. LINDSTROM:  Assumes facts.  Calls for
19  speculation.  Compound.
20      THE WITNESS:  I don't think they would be.
21      MR. SOLOMON:  Q.  Okay.  Do you know why
22  your lawyers have stamped such documents
23  confidential?
24      MR. LINDSTROM:  Assumes facts.  No
25  foundation.

Ellison, Lawrence  3/30/2007  12:00:00 AM

697

1    THE WITNESS: No idea.
2    MR. SOLOMON: Q. Your lawyers took the
3    position with respect to the Softwar materials we've
4    been discussing that they are irrelevant to this
5    litigation.
6    Do you have any idea why?
7    MR. LINDSTROM: No foundation.
8    Mischaracterizes the record.
9    And you can answer if you've got an
10   independent basis for knowing what your lawyers did
11   or did not do.
12   THE WITNESS: No independent knowledge.
13   MR. SOLOMON: Q. And is it your testimony
14   that you didn't know until you saw this document
15   today that Mr. Symonds had drafted an article
16   entitled, "The Rewards of Recklessness"?
17   A. I did not know.
18   Q. Did you know that in November of 2000,
19   Jeff Henley was extremely angry about the fact that
20   Oracle's stock price had declined?
21   MR. LINDSTROM: Objection. Assumes facts.
22   Also calls for a conclusion as vague and ambiguous
23   as to "extremely angry."
24   THE WITNESS: That's what I was going to
25   say. I'm not sure what you mean by "extremely

698

1    angry." No one was happy about the stock market
2    collapsing.
3    MR. SOLOMON: Okay. Let's have marked as
4    the next exhibit a magazine --
5    THE WITNESS: I'm sorry, are we done with
6    this one?
7    MR. SOLOMON: Q. Yes, we are for the
8    moment
9    -- a magazine -- Fortune magazine article
10   dated November 13th, 2000.
11   (Whereupon, Deposition Exhibit 156
12   was marked for identification.)
13   MR. SOLOMON: Q. And if you go to -- by
14   the way, have you ever read this article, do you
15   know?
16   MR. LINDSTROM: Why don't you give him a
17   minute to look at it.
18   THE WITNESS: The answer is, I think I
19   have.
20   MR. SOLOMON: Q. Okay. And I'm going to
21   be focusing on some language on page 6.
22   I'll read it into the record. "It's an
23   early October morning at the Emerald City and Jeff
24   Henley is sputtering mad."
25   Do you see that?

699

1    A. Yes.
2    MR. LINDSTROM: The question is "Do you
3    see that?"
4    THE WITNESS: Yes, I do see it.
5    MR. SOLOMON: Q. So when I say "extremely
6    angry," I mean sputtering mad.
7    Did you know he was sputtering mad at the
8    time?
9    MR. LINDSTROM: Assumes facts.
10   THE WITNESS: Can I have a moment to just
11   read this? I don't remember this part of the
12   article, so ...
13   Okay.
14   MR. SOLOMON: Q. Okay. Does that refresh
15   your recollection as to whether or not you remember
16   Jeff Henley being sputtering mad?
17   A. Partially. Again, I don't remember this
18   specific incident. I know, in general, Jeff was not
19   completely convinced that the stock market analysts
20   understood everything he said. So I think it's
21   common frustration CFOs have with stock market
22   analysis.
23   Q. Okay. Did you know that Mr. Henley was
24   planning, at some stage at least before he sold his
25   stock in January, $30 million worth of stock --

700

1    Wait a second.
2    -- did you know that he was planning on
3    selling some stock at the time he was sputtering mad
4    about this stock price decline?
5    MR. LINDSTROM: Assumes facts.
6    Mischaracterizes his testimony.
7    THE WITNESS: No.
8    MR. SOLOMON: Q. And you and he, in
9    January, neither of you knew the other was trading;
10   is that right?
11   MR. LINDSTROM: Objection. No foundation,
12   other than as to this witness.
13   THE WITNESS: I didn't know he was
14   trading.
15   MR. SOLOMON: Q. Okay. Were you aware of
16   the details in January of 2001 of Oracle's stock
17   repurchase program?
18   MR. LINDSTROM: Vague and ambiguous as to
19   "details."
20   THE WITNESS: I mean, I knew we had a
21   stock repurchase program, but you mean the exact
22   timing --
23   MR. SOLOMON: Q. Yes. Correct.
24   A. The timing of it?
25   No. I didn't know what the exact timing

Ellison, Lawrence  3/30/2007  12:00:00 AM

701

1 was. Actually, I don't know if I didn't know  I
2 don't remember.
3     Q.  Okay.  Do you know if any stock
4 repurchases were timed in order to coincide with the
5 dates you were selling stock?
6     A.  They certainly weren't intentionally
7 timed, you know.  I mean, I knew I was selling
8 stocks we were going to buy back at the same time.
9 Kind of a single decision, I'm going to sell?  No,
10 that did not happen.
11     Q.  Okay.  If I told you that the repurchases
12 in January 2001 clustered around your stock sales
13 were statistically unlikely to have happened but for
14 coordination, would you be surprised?
15         MR. LINDSTROM:  No -- no foundation.
16 Assumes facts.  Vague and ambiguous.
17         THE WITNESS:  I have no idea what -- what
18 we were -- what -- if we were --
19         MR. LINDSTROM:  The question is whether
20 you would be surprised.
21         THE WITNESS:  I don't know.
22         MR. SOLOMON:  Q.  For example, if it was
23 like a one in a hundred chance that the sales would
24 be timed around your transactions, would that be --
25 would that surprise you?

702

1         MR. LINDSTROM:  Assumes facts.
2         THE WITNESS:  Without getting cute,
3 it's -- you know, it's very unlikely -- almost --
4 statistics are interesting.
5         MR. SOLOMON:  Q.  I understand that.
6     A.  So it depends how you calculate it.
7     Q.  Okay.  So you can't really answer --
8     A.  No.
9     Q.  -- with just that information?
10     A.  No.
11     Q.  Or one in 500, still couldn't answer?
12         MR. LINDSTROM:  Yeah.
13         THE WITNESS:  Yeah, no.
14         MR. SOLOMON:  Q.  One in a thousand?
15     A.  What were the odds of my son being 6'2"
16 and my daughter being 5.9"?  The odds are very, very
17 unlikely, but they are.
18     Q.  Okay.  So really what you're saying is it
19 really is up to an expert to determine that; is that
20 right?
21         MR. LINDSTROM:  Objection.
22 Mischaracterizes his testimony.
23         THE WITNESS:  No.  I'm just saying there's
24 lots of different ways to calculate likelihoods.
25 Plus, I'd like to add, I had no authority to

703

1 initiate buybacks on my own anyway.  I had to go
2 through a board process to do it.
3         MR. SOLOMON:  Q.  That's a useful -- a
4 useful comment.
5         What was the process and who was involved?
6 First of all, who was involved?
7     A.  Well, a purchase like that is, you know,
8 it requires -- it's a lot of money.  It exceeds my
9 authority.  I don't have the authority to purchase
10 it.  I believe it requires the approval -- I'm not
11 sure.  We're back at a different time.  So I believe
12 it requires at least the approval of the executive
13 committee of the board of directors, the audit
14 committee of the board of directors, or the full
15 board, one of the three, or multiples thereof.
16         MR. SOLOMON:  Let's have marked as the
17 next exhibit a document produced in this litigation
18 with the control numbers 1914926 through -934.
19         (Whereupon, Deposition Exhibit 157
20         was marked for identification.)
21         THE WITNESS:  Thank you.
22         MR. SOLOMON:  And while you're looking for
23 it, for the record, this is dated Thursday,
24 March 29th, 2001.  And there are some e-mail
25 exchanges among Dan Cooperman, Dorian Datey, Lauren

704

1 Segal concerning LGE option exercise.  The first two
2 pages have a redacted stamp.  The third page seems
3 to have information concerning Dan Cooperman, and
4 the fourth page.  The fifth page is an e-mail from a
5 Deb Lange to Jeff Henley.  And the remainder of the
6 exhibit appear to have information concerning --
7 containing information concerning Deborah Lange.
8         Have you seen any of this before?
9         MR. LINDSTROM:  Well, when you say "any of
10 this," are you referring specifically to the Deb
11 Lange, Jeff Henley e-mail or literally any --
12         MR. SOLOMON:  It's okay.  I'll break it
13 down.
14     Q.  First page, have you seen this first page
15 before?
16     A.  I don't know.
17     Q.  Sorry?
18     A.  I'm sorry, I don't know.  I don't know if
19 I've seen it before.  I've heard of the topic that's
20 discussed.
21     Q.  Okay.  Now, on the first page it says
22 "Redacted."
23         Do you know why it says "Redacted"?
24     A.  It means stuff has been removed.
25     Q.  Do you know what's been removed?

Ellison, Lawrence  3/30/2007  12:00:00 AM

705

```
1    A.  I have no idea.
2    Q.  And same with the second page.  If you
3    look at the first page, it says 18:40 in terms of
4    the time.
5        Do you see that?
6    A.  I do.
7    Q.  Then the second page says 17:27, and then
8    it says "redacted" again.
9        Again, you don't know what's been
10   redacted; is that right?
11   A.  I do not.
12   Q.  And then if you go to the Deb Lange
13   e-mail, have you seen that before?
14   A.  I may have.  I'm not sure
15       MR. SOLOMON:  Okay.  Okay.  We're going to
16   change tapes in a minute, so let's go off the record
17   to allow that to happen.
18       THE VIDEOGRAPHER:  I'm sorry.  We are
19   going off the record.  The time is 4:39 p.m.  Here
20   marks the end of Videotape No. 2, Volume 3, in the
21   deposition of Lawrence Ellison.
22       (Whereupon, a recess was taken.)
23       THE VIDEOGRAPHER:  We are back on the
24   record.  The time is 4:48 p.m.  Here marks the
25   beginning of Videotape No. 3, Volume 3, in the
```

706

```
1    deposition of Lawrence Ellison.
2        MR. SOLOMON:  Q.  You testified earlier,
3    Mr. Ellison, that it would make no sense, or you
4    didn't know why you would want as a reference a
5    customer that wasn't happy.
6        Do you recall that?
7        MR. LINDSTROM:  Mischaracterizes his
8    testimony.
9        THE WITNESS:  No.  What I said was if
10   someone called on the phone, a customer that wasn't
11   happy, who said we'll be a reference, that would be
12   a negative reference.
13       MR. SOLOMON:  Q.  Right.
14   A.  So if you call someone on the phone, you
15   want them to be a reasonably happy customer.  So I
16   said, it made no sense for someone who is unhappy
17   to -- you know.
18   Q.  So why did you insist then on citing GE as
19   a reference when they were unhappy and told you not
20   to do that?
21       MR. LINDSTROM:  Assumes facts.
22   Mischaracterizes his prior testimony.
23       THE WITNESS:  I don't think I did that.
24       MR. SOLOMON:  Q.  Okay.
25   A.  And I don't think -- give me -- first of
```

707

```
1    all, GE is a huge company.  There are a lot of
2    people in GE.  I want to know who was unhappy and
3    who told me not to do it.
4    Q.  And is it your testimony that you don't
5    remember being told not to do it but going ahead and
6    doing it anyway?
7        MR. LINDSTROM:  Mischaracterizes -- this
8    is all asked and answered and previously gone over.
9        THE WITNESS:  I think G -- again, I'm
10   doing this from memory.  But I was the GE corporate
11   sponsor.  There certainly were people -- I think GE
12   had a policy -- well, want me to just launch into
13   this?
14       MR. LINDSTROM:  No.  No.  Why don't we go
15   by question and answer.
16       MR. SOLOMON:  Q.  It's okay.  I think we
17   actually did cover that fairly well last time, but I
18   just wanted to see if you were going to give the
19   same testimony you gave last time.
20       What about HostCentric; were they a
21   reference that were unhappy, HostCentric?
22   A.  HostCentric, I don't know who they are.
23   Q.  Now, if you go back to the exhibit in
24   front of you, The Rewards of Recklessness, if you go
25   to page 1053566.
```

708

```
1    A.  -566.  Okay.
2    Q.  Okay.  It says -- it says in part,
3    "Ellison says he's only happy when everyone else
4    thinks he's wrong when he's," in quotes, "walking
5    way out to the end of the limb and then jumping up
6    and down."
7    A.  Yes.
8    Q.  Is that true -- is that an accurate
9    statement of yours -- excuse me.  Is that -- did you
10   say that to Mr. Symonds?
11   A.  I have to explain what I meant -- mean by
12   that.
13   Q.  I don't want an explanation.  I don't have
14   much time.  I want to know, did you say that?
15       MR. LINDSTROM:  The exact words in the
16   sentence that counsel read into the record?
17       THE WITNESS:  I'm not sure.  But something
18   like -- something like that, sure.
19       MR. SOLOMON:  Q.  Okay.  And then the
20   second quote in that paragraph that's attributed to
21   you, "Without reckless" -- "Without recklessness,
22   you can't innovate.  The rewards of recklessness are
23   enormous."
24       Did you say that?
25   A.  I'm not sure I used the word
```

Ellison, Lawrence  3/30/2007 12:00:00 AM

709

1  "recklessness." I think I've said that
2  innovation -- what is innovation? Innovation is
3  when other people say -- when you're the first
4  person to figure something out. So everyone
5  believes the world is flat, and you believe it's
6  round. So everyone thinks you're wrong and you
7  think you're right, and you turn out to be right.
8        And all great discoveries, all great
9  innovation is actually done by people who believe
10  that conventional wisdom is wrong. The world isn't
11  flat, it's round.
12        That's what I mean by all of this. And
13  you have to be -- I'll use the word "reckless,"
14  "brave," whatever you want to use. If everyone is
15  saying, "The world is flat," and you're saying, "No,
16  it's round," you're going to be ridiculed and have
17  to deal with that. You have to have a personality
18  that's willing to deal with that.
19        MR. SOLOMON: Okay. Let's have marked as
20  the next exhibit another excerpt from Softwar.
21        (Whereupon, Deposition Exhibit 158 .
22        was marked for identification.)
23        MR. LINDSTROM: Is this 158?
24        THE REPORTER: Yes.
25        MR. LINDSTROM: Thank you

710

1        MR. SOLOMON: Q. So then I'd like you to
2  just look at the bottom of page 142 and the top of
3  page 143 where it says, "Everything they were
4  reading said that Microsoft and client/server would
5  go on forever. I got the same looks that Galileo
6  got when he told people the earth revolved around
7  the sun. Sure. Whatever you say, boss."
8        Right? See that?
9  A  No, I don't actually.
10  Q  The bottom of 142.
11  A  Can I have a second?
12  Q  Sure.
13  A  Thanks.
14        Okay.
15  Q  Okay.
16  A  Yeah. Got the context.
17  Q  Did you say that? And when I say "that,"
18  did you say, "Everything they were reading said that
19  Microsoft and client/server would go on forever. I
20  got the same looks Galileo got when he told people
21  the earth revolved around the sun. Sure. Whatever
22  you say, boss."
23  A  Did I say this?
24  Q  Yes.
25  A  In this context of me killing a

711

1  client/server project?
2  Q  Right.
3  A  I was in the process of saying we're not
4  going to do any more client/server. We're killing
5  an existing project. And people were very mad at me
6  for killing the project, because they thought that
7  client/server would go on forever, and they were
8  wrong.
9  Q  And you've likened yourself to Galileo on
10  more than one occasion; is that right?
11  A  No. No. In terms of likened myself to
12  Galileo, no. Galileo is one of the great scientists
13  in history. I'm saying that all -- every time you
14  have an innovative idea, even a small one, I
15  innovated -- his idea was planetary, mine was a
16  little tiny piece of software. But every time you
17  challenge conventional wisdom, and you're the
18  first -- and you're in a group of people that
19  believe one thing is true, and you say, "No, I think
20  you're all wrong. I think this is what's" -- "I
21  think this is true," you find yourself in this very
22  funny situation where you're challenging
23  conventional wisdom and it just makes people --
24  sometimes it makes people angry.
25  Q  Okay.

712

1  A  So I was using Galileo as that on a grand
2  scale and me on a very, very small scale, or anyone
3  who does any kind of innovation, or innovative
4  thinking.
5  Q  Have you ever heard of Icarus?
6  A  Of course.
7  Q  Have you ever likened yourself to Icarus?
8  A  No.
9  Q  Don't you think that's more appropriate in
10  the context of this litigation?
11        MR. LINDSTROM: Objection. Argumentative.
12        MR. SOLOMON: I've marked as the next
13  exhibit more transcripts of interviews with --
14  another transcript of an interview with Mr. Symonds.
15  And the control numbers are 1529262 through -292.
16        (Whereupon, Deposition Exhibit 159
17        was marked for identification.)
18        THE WITNESS: Excuse me.
19        MR. SOLOMON: Q. And if you turn to page
20  1529276.
21  A  Okay.
22  Q  And looking at the top of the page where
23  it says, "Early this year there were a lot of people
24  coming up with this kind of" --
25  A  Slow down, -9276?

Ellison, Lawrence  3/30/2007  12:00:00 AM

713

1    Q  Yes.
2    A.  "Early this year."
3    Q.  Yes.
4    MR. LINDSTROM:  It's at the top of the
5    page.
6    THE WITNESS:  Got it.  Got it.
7    MR. SOLOMON:  Q.  "Early this year there
8    were a lot of people coming up with this kind of
9    accusation if you like that the claim of saving
10   $1 billion through using the E-Business Suite was
11   kind of nonsense, that it was mainly about kind of
12   old fashioned process, re-engineering and old
13   fashioned cost production measures."  I know what
14   the response to that is, but I'd just like to get it
15   on the record from you."
16   Do you see that?
17   A.  Yes.
18   Q.  And isn't it true that in 2001, you cited
19   a Harvard publication saying that that provided
20   support for your claim that the E-Business Suite had
21   saved $1 billion?
22   MR. LINDSTROM:  What point in time?
23   MR. SOLOMON:  In 2001.
24   THE WITNESS:  First of all, I'm not sure I
25   ever claimed the E-Business Suite saved $1 billion.

714

1    I said, using our technology, a combination of the
2    Internet, our applications, a variety of things.
3    But it wasn't just the E-Business Suite.  By using
4    modern Internet technology, including our E-Business
5    Suite, including our applications, we were able to
6    reengineer our business and save a billion dollars.
7    MR. SOLOMON:  Q.  Okay.  And to the extent
8    people thought that you were saying that Oracle had
9    saved $1 billion via the utilization of the
10   E-Business Suite, they were misunderstanding you; is
11   that right?
12   A.  I don't know if they were -- I don't think
13   I ever said that.
14   Q.  I said, to the extent people thought you
15   were saying that.
16   MR. LINDSTROM:  Assumes facts.
17   THE WITNESS:  Yes.
18   MR. SOLOMON:  Q.  And Ray Lane, in fact,
19   has said that your claim was untrue in that respect;
20   is that right?
21   MR. LINDSTROM:  Assumes facts.
22   Mischaracterizes the --
23   THE WITNESS:  Absolutely.  Yes.
24   MR. LINDSTROM:  -- the record.
25   MR. SOLOMON:  Q.  And you presumably think

715

1    that Mr. Lane is lying when he says that?
2    A.  No, not that he's lying.  I just think
3    that his judgement is wrong.  I think he said
4    that -- I think he said a little bit what Matthew
5    framed it, it had -- old fashioned reengineering and
6    cost cutting.
7    And if that were true -- I'll stick with
8    my answer -- why didn't we -- why didn't we save
9    that billion dollars five years ago.  It was as
10   simple as just doing some -- just good management.
11   good management, we should have saved a billion a
12   long time ago.
13   I think it was really was modern -- it was
14   modern technology.  We were able to put our
15   support -- just an example, we were able to put our
16   support center in India.  Prior to the Int- -- prior
17   to the Internet, we couldn't offshore some of our
18   human resources.  We could do programming in India.
19   You need to rethink your entire business in view of
20   modern global technology.
21   Q.  Have you ever heard Safra Catz lie, tell a
22   lie?
23   A.  Not that I know of.
24   Q.  Were you friends with Ms. Catz before she
25   became an employee of Oracle?

716

1    A.  Yes.  Yes.  She was on the --
2    MR. LINDSTROM:  You've answered the
3    question.
4    MR. SOLOMON:  Q.  Tell me the background
5    of the friendship.
6    A.  She was on the team of people from -- on
7    Donaldson, Lufkin & Jenrette that took us public.
8    Q.  Your relationship with him has been purely
9    professional?
10   MR. LINDSTROM:  Him?
11   MR. SOLOMON:  With her.  I'm sorry if I
12   said "him."
13   THE WITNESS:  No.  We were -- we were
14   friends.
15   MR. SOLOMON:  Q.  Platonic?
16   A.  Platonic.
17   Q.  Was she involved in the stock repurchase
18   program in January 2001?
19   MR. LINDSTROM:  No foundation.
20   THE WITNESS:  Trying to say -- was she on
21   the board then?
22   MR. LINDSTROM:  The question is
23   whether she was involved.
24   THE WITNESS:  I'm sorry, I just don't
25   remember it.  I think everyone on the board was --

Ellison, Lawrence  3/30/2007  12:00:00 AM

717

1  you know, in a sense was involved. But, you know --
2  Jeff Henley was our CFO. I'm not sure when Safra
3  joined the board.
4  MR. SOLOMON: Q. Okay. Did you know that
5  she had planned a stock sale in January 2001 but
6  then changed her mind?
7  A  No
8  MR. LINDSTROM: Vague as to time. Did he
9  know when?
10  MR. SOLOMON: Q. Is the first time you
11  heard that today?
12  A  Yes.
13  Q. Did you and Ms. Catz discuss with each
14  other a litigation update you received six weeks to
15  two months ago?
16  MR. LINDSTROM: Vague and ambiguous.
17  THE WITNESS: By "litigation update," you
18  mean -- I think the legal department prepares an
19  e-mail -- actually, the answer is I don't think so.
20  MR. SOLOMON: Q. Did you have a
21  discussion with Ms. Catz wherein you decided to ask
22  for a litigation update?
23  MR. LINDSTROM: This is pertaining to this
24  litigation?
25  MR. SOLOMON: Correct.

718

1  MR. LINDSTROM: What timeframe?
2  THE WITNESS: I don't think so.
3  MR. SOLOMON: Q. Within the last two
4  months.
5  A. Not that I recall.
6  MR. SOLOMON: Okay. Let's have marked as
7  the next exhibit another interview transcript. This
8  bears the date April 18th, 2002.
9  (Whereupon, Deposition Exhibit 160
10  was marked for identification.)
11  MR. SOLOMON: And the control numbers are
12  1529215 through 1529233.
13  Q. And if you could turn, Mr. Ellison, to
14  1529225.
15  A  -225.
16  Q. Looking at the top of the page on the
17  language, "I think the ERP stuff is in really good
18  shape. We kind of survey our customers. We tend to
19  focus on the customers who are having problems. We
20  find almost wherever Oracle consulting ... one of
21  the reasons we advertise server so much in this last
22  meeting is wherever consulting has been involved, we
23  tended not to have problems. So we have a terrible
24  irony of some of the most complicated
25  implementations, GE Power or Poscoe, where we are

719

1  just all sweating bullets," in brackets,
2  "[Napilioni] worrying" -- sorry -- "[Naglieni] and
3  worrying, and it is going very smoothly and that's a
4  company we've never heard of is blowing up "
5  Do you see that language?
6  A  Yes, I do.
7  Q. Where you reference sweating bullets, why
8  were you sweating bullets?
9  A. Okay. I believe what this is saying is
10  that the GE power and the Poscoe implementations
11  were very, very complex, but actually went very
12  well. By sweating bullets, people were working very
13  hard. Poscoe is a steel company. They were, at the
14  time, the largest steel company in the world.
15  They're located in Korea. And literally, they were
16  doing a big bang switchover to the E-Business Suite.
17  The problem is if you're a steel mill and
18  your system shuts down, the steel cools in the plant
19  and you have to rebuild the plant. So it was the
20  worst -- it was one of the more stressful moments in
21  terms of putting E-Business Suite in because if it
22  shut the plant down, we were -- it was going to
23  cause a huge number of problems. So -- so I think
24  that's what it's saying
25  Q. What does -- sorry. I was going to ask

720

1  you, what do you mean by "terrible irony"?
2  A. Oh, that the complicated -- that the
3  really complicated, big projects were going well,
4  but then we'd have some small company with a fairly
5  simple implementation. And it would go badly often
6  because the people who were implementing the
7  product, the service people who were putting it in
8  did something wrong
9  Q. And given this is 2002, what business did
10  Jeff Henley have saying in early 2001 that 11i had
11  stabilized?
12  A. Well, again, this had -- again, I'm not
13  sure what we're talking -- this -- what I'm saying
14  here is, 11i is stable. The proof is it's working
15  at GE, it's working at Poscoe, but it still has to
16  be implemented properly.
17  And if you read the entire -- I think if
18  you read the entire thing, what it's saying is this
19  has nothing to do with the product; this has to do
20  with if consulting is involved.
21  In other words, if you have good people,
22  what it says, "wherever consulting has been
23  involved, we tend not to have problems."
24  So when we have the right service people
25  putting it in, even in a complicated implementation

Ellison, Lawrence  3/30/2007  12:00:00 AM

721

1  it is going well.  When we have the wrong people,
2  it's not going well.  So this was not product
3  related; it was service related.  We didn't have
4  enough trained -- the answer is we didn't have
5  enough trained people doing the implementations.
6         MR. SOLOMON:  Have marked as the next
7  exhibit a copy of a Wall Street Journal article
8  dated August 6th, 2001.
9         (Whereupon, Deposition Exhibit 161
10        was marked for identification.)
11        MR. SOLOMON:  Q.  And have you read this
12  article before?  Do you know --
13        MR. LINDSTROM:  Why don't you give him a
14  moment to look at it.
15        THE WITNESS:  Can I have a second to look
16  at 47
17        Okay.
18        MR. SOLOMON:  Q.  Okey?
19    A  Okay.
20    Q.  Have you read this before?
21    A  I believe so, yes.
22    Q.  Okay.  I'm looking at the first page.
23        And starting with, "In this last 12
24  months," Mr. Ellison said, "we've gotten over 450
25  customers, big customers, General Electric, Ford,

722

1  Alcoa, Hewlett-Packard, live and running their
2  businesses on 11i."
3         Do you see that?
4    A  Yes.
5    Q  Did you say that?
6         MR. LINDSTROM:  Well --
7         THE WITNESS:  Yes.
8         MR. LINDSTROM:  Did he say the part in the
9  quotes --
10        THE WITNESS:  I think so.
11        MR. LINDSTROM:  -- or the whole -- the
12  whole thing?
13        MR. SOLOMON:  The part that's in the
14  quotes
15        MR. LINDSTROM:  Okay.
16        THE WITNESS:  Something -- I don't know if
17  I said exactly that, but something fairly close.
18        MR. SOLOMON:  Q.  Okay.  And it goes on to
19  say, "It was a welcome disclosure, in the year
20  since its introduction, 11i -- which handles
21  everything from inventory tracking to payroll
22  processing -- has been plagued by reports of slow
23  sales.  There was just one problem:  It wasn't
24  entirely true.  All four companies Mr. Ellison named
25  told a far more restrained version of the story.

723

1  including General Electric Company's power division,
2  which Mr. Ellison made a point of singling out  GE
3  Power said it was using the product only at a small
4  plant in Hungary.  'We are not running our business
5  on 11i,' said a spokesman for the GE unit.
6         Likewise, Alcoa said that it was using 11i at just
7  one overseas location."
8         So is the journalist writing this correct
9  in saying that what you had said was not entirely
10  true?
11    A  I --
12        MR. LINDSTROM:  Compound.  Calls for
13  speculation.  No foundation.
14        THE WITNESS:  I didn't say GE is running
15  its entire business on Oracle.  I said they are
16  running their business on Oracle, meaning part of
17  their business.  GE, four -- these are gigantic
18  corporations.  They use products from lots and lots
19  of people.  Ford will never run their business
20  entirely on Oracle products.
21        So all I was saying is that GE, we got --
22  you know, a part of their business is live and
23  running.  Maybe I can make it clearer by saying "a
24  part."  But I didn't say their entire business or
25  all their business.  The journalist is assuming I

724

1  mean everything in GE in one year is running on
2  Oracle, which is just -- it's impossible.
3         MR. SOLOMON:  Q.  Okay.
4    A  Every year more and more of GE runs on
5  Oracle, but even today, many years later, 100
6  percent of GE is not running on Oracle.  Never will.
7    Q.  Do you know Jeff Henley has described you
8  as a person who runs ahead of reality?
9         MR. LINDSTROM:  Mischaracterizes his
10  testimony.  Assumes facts.
11        THE WITNESS:  I don't know what that
12  means.  The answer is no, and I'm not sure what it
13  means.
14        MR. SOLOMON:  Q.  And if you go to the
15  next page of this article, I'm looking almost
16  halfway down, the language that begins, "Still, it's
17  been hard for Oracle to attract big name," in
18  quotes, "reference accounts' for 11i.  Companies
19  that would testify to the new product's virtues" --
20    A  I'm sorry, how far down the page?  Same
21  page?
22    Q.  Almost, yes.
23        MR. LINDSTROM:  No, he's on the next page.
24        MR. SOLOMON:  I'm sorry.  On the second
25  page.

Ellison, Lawrence  3/30/2007  12:00:00 AM

725

1    THE WITNESS: Next page. Sorry.
2        MR. SOLOMON: Q. It's the sentence
3    starting, "Still, it's been hard."
4    A. Okay. Got it.
5        Q. Okay. Then it goes on to say -- after
6    "product virtues," it goes on to say, "So Oracle
7    decided to provide its own references. Last year it
8    began buying TV and newspaper ads saying it had
9    saved $1 billion by using the software. Most
10   analysts scoffed at the claim, attributing any such
11   savings to low-tech methods such as layoffs and site
12   closings."
13       Do you see that?
14   A. Yes
15       Q. Then it goes on to say, "Oracle struck
16   back. At a company-sponsored conference for users
17   in New Orleans in February, it distributed hundreds
18   of copies of a Harvard Business School case study
19   that Oracle said proved saved money the way it said
20   it had. In a related news release, the company said
21   the Harvard study, written by Professor Francis
22   Frei," F-R-E-I, "chronicled how Oracle had achieved
23   the savings by using its new software to put," in
24   quotes, "every aspect of its business," and
25   quotes, "on one global network on the Internet,"

726

1    close quotes.
2        Goes on to say, "But Professor Frei, in an
3    interview, says the study did no such thing.
4    Instead, she says, it simply described how a once
5    fast-growing company was being forced to pay more
6    attention to costs."
7        Do you see all that?
8    A. I do.
9        Q. Do you remember in February at New Orleans
10   discussing or mentioning the Harvard study?
11   A. I've never read it. Never -- I don't
12   think I've ever mentioned it.
13       Q. Okay. Do you recall ever telling Matthew
14   Symonds that Siebel Systems had just finished a
15   quarter in which it engaged in software swaps on a
16   big deal, but that couldn't continue and that they
17   were going to crash because you can't do that two
18   quarters in a row? Does that ring a bell?
19       MR. LINDSTROM: Assumes facts. Compound.
20   The question is did he tell Matthew Symonds all of
21   that?
22       THE WITNESS: Again, I'm not -- again, I'm
23   not sure, but sounds vaguely close.
24       MR. SOLOMON: Q. And wouldn't that
25   same comparison be applicable to Oracle in 2Q '01

727

1    and 3Q '01?
2    A. No.
3        MR. SOLOMON: Have marked as the next
4    exhibit a document produced in this litigation with
5    the control numbers 1027517 through -521.
6        (Whereupon, Deposition Exhibit 162
7        was marked for identification.)
8        MR. SOLOMON: Q. Once you've had a chance
9    to look at it, the question will be, do you
10   recognize it?
11   A. Give me -- give me a second.
12       Q. Okay.
13   A. So far I do not. I don't know what this
14   is about.
15       MR. LINDSTROM: Counsel, is there a first
16   page to this? This looks to be an e-mail exchange
17   that starts partway through the exchange with the
18   word "Okay."
19       MR. SOLOMON: Right.
20       MR. LINDSTROM: It's hard to recognize.
21       MR. SOLOMON: We'll ask -- let's see if we
22   can get the page, control number before that.
23       Could you do that, Brian, do you think?
24       Let's go off the record for a few minutes
25   then, please.

728

1        THE VIDEOGRAPHER: Off the record. The
2    time is 5:20 p.m.
3        (Whereupon, a recess was taken.)
4        THE VIDEOGRAPHER: We are back on the
5    record. The time is 5:38 p.m.
6        MR. SOLOMON: Q. Okay. So we marked the
7    last exhibit -- we did find the first page. And so
8    what exhibit was it, please?
9        THE REPORTER: The last exhibit was 162.
10       MR. SOLOMON: So 162 now is going to be
11   1027516 through -7521.
12       THE WITNESS: Throw this one away?
13       MR. SOLOMON: Please.
14       (Whereupon, Deposition Exhibit 162 was
15       remarked for identification.)
16       MR. SOLOMON: Q. And do you recognize
17   this document?
18   A. I don't.
19       Q. And I notice that you're not -- you're not
20   on the addressee list, but you were the GE corporate
21   sponsor, correct?
22   A. Still am.
23       Q. But that wouldn't mean -- would that mean
24   that you would have probably have seen this at the
25   time, or not?

Ellison, Lawrence  3/30/2007  12:00:00 AM

729

```
1       A.  Probably not.
2       Q.  I want to go back again to Mr. Symonds.
3           Have you had any e-mail exchanges with
4    Mr. Symonds?
5       A.  As far as I know -- about this litigation,
6    or just a general e-mail?
7       Q.  About this litigation.
8       A.  As far as I know, I haven't had any e-mail
9    about this litigation with Mr. Symonds.
10      Q.  Now, we marked as 141 the letter dated
11   January 10, 2007.
12          How was this transmitted to Mr. -- to
13   Mr. Symonds?
14          MR. LINDSTROM:  No foundation.
15          MR. SOLOMON:  Let me back up.
16      Q.  Was this transmitted to Mr. Symonds?
17      A.  I assume it was.  We're talking about the
18   letter --
19      Q.  Yes.
20      A.  -- my attorneys drafted and I signed?
21      Q.  Yes.
22          MR. LINDSTROM:  And you have it before
23   you?
24          THE WITNESS:  I don't -- I'm sure --
25          MR. SOLOMON:  Q.  It's 141.  It's probably
```

730

```
1    at the bottom of your pile somewhere.
2           MR. LINDSTROM:  I think the reporter has
3    the other ones.  You can borrow mine.
4           MR. SOLOMON:  Q.  Well, it says -- first
5    of all, it says it went via e-mail.
6           Do you have e-mail confirmation of that
7    that you can produce?
8       A.  It didn't go via my e-mail.
9       Q.  Okay.  Whose e-mail did it go via?
10      A.  I have no idea.
11      Q.  Okay.  So do you have any objection to
12   finding out and producing the actual e-mail?
13      A.  No.
14      Q.  So you'll do that?
15      A.  Well --
16          MR. LINDSTROM:  We'll take your request
17   under advisement.  I don't see a problem with it.
18          MR. SOLOMON:  Q.  It says "first class
19   mail."
20          You were aware if you send a document to
21   England from the US first class mail, it probably
22   won't get there?
23      A.  No.  No.
24          MR. LINDSTROM:  Assumes facts.
25          MR. SOLOMON:  Q.  No?  You think a first
```

731

```
1    class stamp would get it to --
2       A.  Oh, I have no idea.  I haven't mailed
3    anything in a long time.
4       Q.  Now, you say at the bottom here, "Although
5    I understand that my lawyers will be sending you a
6    more formal letter, I wanted to write to you
7    separately to request that you cooperate with my
8    counsel and forward these materials as quickly as
9    you can."
10          Do you see that?
11      A.  I do.
12      Q.  Have you seen any such formal letters from
13   your lawyers to Mr. Symonds?
14      A.  No.
15      Q.  Then halfway through the second paragraph
16   it says, "We oppose this motion because, quite
17   frankly, we believe those materials were yours, not
18   Oracle's or mine."
19          Do you see that?
20      A.  I do.
21      Q.  Have you looked within -- since October of
22   2006 at the agreement between you and Mr. Symonds?
23      A.  No.
24      Q.  No?
25      A.  No.
```

732

```
1       Q.  Do you recall its contents?
2       A.  No, I do not.
3       Q.  And you say, "We opposed -- at least you
4    signed the letter where it says, "We oppose this
5    motion because, quite frankly, we believe those
6    materials were yours."
7           Are you aware that in the brief that was
8    filed, you also contended, or your lawyers
9    contended, that they were simply irrelevant?
10          MR. LINDSTROM:  No foundation.  Asked and
11   answered.
12          THE WITNESS:  No.
13          MR. LINDSTROM:  Calls for speculation.
14          MR. SOLOMON:  Q.  Did you discuss this
15   letter with Daniel Cooperman?
16          MR. LINDSTROM:  I'm going -- I'll permit
17   him.  I think that's generic enough that he can
18   respond to that.
19          THE WITNESS:  No, I did not.
20          MR. SOLOMON:  Q.  Have you discussed it
21   with anyone?
22          MR. LINDSTROM:  When you say "discussed
23   the letter," can you be -- I mean, that's vague.
24          THE WITNESS:  Other than my attorneys?
25          MR. SOLOMON:  Q.  Anyone.  Have you
```

Ellison, Lawrence  3/30/2007  12:00:00 AM

733

1  discussed it with your attorneys?
2  A. No.
3  Q. How did the language in this letter get
4  into your hands?
5  MR. LINDSTROM: Vague and ambiguous.
6  THE WITNESS: The letter was written by
7  one of my lawyers. I signed it. I signed the
8  letter.
9  MR. SOLOMON: Q. When you say one of your
10  lawyers, do you mean one of your in-house or outside
11  counsel?
12  A. I'm not sure -- I'm not sure who drafted
13  the letter.
14  Q. Who gave you the letter to sign it?
15  A. I don't recall
16  MR. SOLOMON: I'll have marked as the next
17  exhibit a document produced in this litigation with
18  the control numbers 1026720, -721.
19  (Whereupon, Deposition Exhibit 163
20  was marked for identification.)
21  THE WITNESS: Thank you.
22  MR. SOLOMON: Q. And let me know if you
23  recognize this.
24  A. Give me -- give me a second.
25  Vaguely. I knew about the Barclays

734

1  exchange, but I'm not sure I ever saw this. If it
2  was sent to me, I probably saw the note.
3  Q. Okay. And this would have been in your
4  files around December 15th, 2000?
5  A. Yes.
6  Q. And it wasn't produced from your files in
7  this litigation, and you cannot explain why; is that
8  right?
9  MR. LINDSTROM: No foundation. Assumes
10  facts.
11  THE WITNESS: Yes.
12  MR. SOLOMON: Q. You can't explain why,
13  right?
14  A. Correct.
15  MR. SOLOMON: I'll have marked as the next
16  exhibit another document produced in this litigation
17  with the control numbers 061785 through -790.
18  (Whereupon, Deposition Exhibit 164
19  was marked for identification.)
20  MR. SOLOMON: Q. Let me know when you've
21  had a chance to look at it, if you recognize any of
22  the exchanges. Just so you know, I'm just going to
23  focus on the first page.
24  A. Okay. Just give me one more second.
25  Okay. But the context -- it's in reverse

735

1  chronological order.
2  Q. Okay. That's fine.
3  A. So just give me ...
4  MR. LINDSTROM: Also, Counsel, maybe you
5  can expedite things. Do you know, is he anywhere in
6  this chain? Is there an e-mail to him?
7  MR. SOLOMON: I do not believe so, no.
8  MR. LINDSTROM: Okay.
9  THE WITNESS: Okay.
10  MR. SOLOMON: Q. Recognize this at all?
11  A. I do not.
12  Q. Okay. And then on the first page, I'm
13  looking just under halfway down where it says,
14  "Yes."
15  It says, "Yes, we plan to have two
16  customers during the April Gartner executive
17  briefing." And then in parentheses, "(we are
18  approaching HP and Veritas - not sure.)"
19  Just focusing on the language "approaching
20  HP," were you involved in approaching HP with
21  respect to -- to asking that they'd be a reference
22  around this time?
23  MR. LINDSTROM: At the April Gartner
24  executive briefing?
25  MR. SOLOMON: Correct. Correct.

736

1  THE WITNESS: I'm sure I wasn't.
2  MR. SOLOMON: Q. Okay. So you wouldn't
3  have wanted to -- you wouldn't have been exploiting
4  your relationship with Carly Fiorina to try and do
5  that?
6  MR. LINDSTROM: Assumes facts.
7  Mischaracterizes the testimony.
8  THE WITNESS: I don't think I'd ask her,
9  at her level, to be a reference. We'd have to ask
10  someone who was really running the CRM system.
11  MR. SOLOMON: Q. So you don't know
12  anything about this?
13  A. No, I don't.
14  MR. SOLOMON: Okay. Let's have marked as
15  the next exhibit an article from Vanity Fair called
16  "Absolutely Excessive."
17  (Whereupon, Deposition Exhibit 165
18  was marked for identification.)
19  THE WITNESS: Okay.
20  MR. SOLOMON: Q. Okay. Have you read
21  this before?
22  A. I have.
23  Q. And who wrote this, do you know?
24  A. Matthew Symonds.
25  Q. And that's your modest boat on the front

Ellison, Lawrence  3/30/2007  12:00:00 AM

737

1  page?
2  A  It's -- I own half of it now.
3  Q  Okay.  Who owns the other half?
4  A  David Geffen.
5  Q  And is it true that this boat was
6  purchased, at least in part, with the proceeds of
7  your sales in January 2001?
8      MR. LINDSTROM:  Asked and answered.
9      THE WITNESS:  Again, the sales went
10  partially to pay down my loans and partially went to
11  cash, and I'm not sure how the cash -- where the
12  cash distributions went.
13      MR. SOLOMON:  Q.  Is there a swimming pool
14  on your boat?
15  A  No, there's not.  Though there have been
16  numerous newspapers articles talking about swimming
17  pools, chandeliers.  All news to me.  No swimming
18  pool.  No chandeliers.
19  Q  And there never has been, right?
20  A  No.
21  Q  Okay.  That's a lot of money to pay for a
22  boat without a swimming pool, isn't it?
23  A  Certainly is.
24  Q  I'm looking at page -- trying to look at,
25  but my eyesight is failing me.  What number is that?

738

1  328, where you're sitting in the cockpit of a
2  fighter jet.
3  A  Yes.
4  Q  Okay.  And then on the right-hand side,
5  almost halfway down, there's the following
6  language -- well, excuse me.
7  A  Don't feel too bad.  It's hard for me to
8  read too, and I've got my glasses on.
9  Q  In any event, it seems to confirm there,
10  does it not, that some of the proceeds were used --
11  A  Where are you reading?  Which paragraph?
12  Q  Hold on one second, Mr. Ellison.  I'm
13  sorry.
14  A  Okay.  No problem.
15  Q  It seems to, almost halfway down, say that
16  money that had been put to use funding the
17  construction of the boat.
18      Do you see that reference?
19  A  I don't.  First, second, third -- give me
20  a paragraph number.
21  Q  It's in the second full paragraph?
22  A  Second full paragraph.
23  Q  Yeah.
24  A  Okay.  And the sentence begins, "For
25  months he had been under pressure," is this the

739

1  paragraph -- "For months he had been under pressure
2  because of problems" --
3  Q  Yes.  Exactly.
4  A  Okay.
5      Okay.  I read the full paragraph.
6      MR. LINDSTROM:  Is there a pending
7  question?
8      MR. SOLOMON:  Yes.  There will be in a
9  second  as soon as I can focus my eyes a little bit
10  more.
11  Q  Okay  Do you see it says, "if he hadn't
12  vested the options then, he would have lost them."
13      Do you see that?
14  A  Yes.
15  Q  That's not true, is it?
16  A  Well, the options had already been vested,
17  so it was -- the sentence makes no sense whatsoever.
18  Q  Right.
19      And let's assume he meant if you hadn't
20  exercised.
21  A  Exercised.
22  Q  That still would be wrong, wouldn't it?
23  A  No.  If I hadn't exercised -- I had to
24  exercise  I could have exercised and held or
25  something like that.  But I had to exercise, because

740

1  after ten years, you do lose them.
2  Q  What I'm saying is you didn't to have
3  exercise in January, did you?
4      MR. LINDSTROM:  But it doesn't say that.
5      THE WITNESS:  It doesn't have a date.
6      MR. SOLOMON:  Right.
7      THE WITNESS:  It says -- if I just reread
8  this, "if he hadn't exercised the options then, he
9  would have lost them."
10      MR. SOLOMON:  Q.  Right.  That's not true,
11  is it?
12  A  Well, depends what you mean -- I don't
13  mean to be cute, but depends what you mean by
14  "then," "approximately then."
15      Okay.  But no, not that day.  Certainly
16  not that day.  As we said, if I hadn't exercised
17  them at least by August, I would have lost them.
18  Q  Right.
19  A  Right.
20      MR. LINDSTROM:  Where are we in time?  We
21  should be -- according to my watch, we're just about
22  done.
23      THE VIDEOGRAPHER:  We have one minute and
24  45 seconds to go.
25      MR. LINDSTROM:  What do you think, Mark?

Ellison, Lawrence 3/30/2007 12:00:00 AM

741

1   This is probably a fitting place to end, don't you
2   think?
3       MR. SOLOMON: Well, as long as when I ask
4   for more time, you won't say that I didn't use my
5   last minute and a half and, therefore, I've waived
6   it.
7       MR. LINDSTROM: I will tell you we will
8   not -- we will not take that position.
9       MR. SOLOMON: In that case, it's very hot
10  in here and I'm ready to go.
11      THE WITNESS: By the way, the newspapers
12  also reported that I crashed my fighter jet and died
13  when my fighter jet crashed into the Oracle parking
14  lot. That was also a story that hit the press. You
15  just reminded me. It was the single most bizarre --
16  there have been a lot of bizarres, but reading about
17  your own death --
18      MR. LINDSTROM: Are we still on the
19  record?
20      THE VIDEOGRAPHER: We are
21      MR. LINDSTROM: Off the record and you can
22  finish the story.
23      MR. SOLOMON: Wait a second. Before we go
24  off the record, I just want to make sure. We are
25  reserving our rights. There are issues of

742

1   privilege. There are many more materials to go
2   through. There's the fact that I'm going back,
3   hopefully to take Mr. Symonds' deposition and get
4   some real answers from him. And so I reserve my
5   rights to talk to you again, Mr. Ellison. Thank you
6   for your testimony.
7       THE VIDEOGRAPHER: This adjourns the
8   deposition of Lawrence Ellison. The number of tapes
9   used today is three. This is the end of Videotape
10  No. 3, Volume 3. The original videotapes will be
11  retained by LiveNote World Service. Going off the
12  record. The time on the monitor is 5:59 p.m.
13      (Deposition adjourned at 5:59 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

743

1           CERTIFICATE OF WITNESS
2
3       I, the undersigned, declare under penalty of
4   perjury that I have read the foregoing transcript,
5   and I have made any corrections, additions, or
6   deletions that I was desirous of making; that the
7   foregoing is a true and correct transcript of my
8   testimony contained therein.
9
10  EXECUTED this _____ day of _____
11  20___, at _____, _____.
            (CITY)        (STATE)
12
13
14
15
16      _____
        LAWRENCE ELLISON
17
18
19
20
21
22
23
24
25

744

1           CERTIFICATE OF DEPOSITION OFFICER
2       I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068,
3   duly authorized to administer oaths pursuant to
4   Section 8211 of the California Code of Civil
5   Procedure, hereby certify that the witness in the
6   foregoing deposition was by me sworn to testify to
7   the truth, the whole truth and nothing but the truth
8   in the within-entitled cause; that said deposition
9   was taken at the time and place therein stated; that
10  the testimony of said witness was reported by me and
11  was thereafter transcribed by me or under my
12  direction by means of computer-aided
13  transcription; that the foregoing is a full,
14  complete and true record of said testimony; and that
15  the witness was given an opportunity to read and
16  correct said deposition and to subscribe same.
17      I further certify that I am not of counsel or
18  attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said caption.
22      IN WITNESS WHEREOF, I have hereunto subscribed
23  by my hand this 2nd day of April, 2007.
24
25      _____