LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
VALERIE L. McLAUGHLIN (191916)
GAVIN M. BOWIE (235532)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@lerachlaw.com
dougb@lerachlaw.com
valeriem@lerachlaw.com
gbowie@lerachlaw.com
skaplan@lerachlaw.com
– and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@lerachlaw.com
willowr@lerachlaw.com
moniquew@lerachlaw.com
elig@lerachlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | <u>CLASS ACTION</u> |
| This Document Relates To: ALL ACTIONS. | PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ |

DATE: March 9, 2007
TIME: 8:45 a.m.
JUDGE: The Honorable Edward A. Infante (Ret.)

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. PLAINTIFFS HAVE NOT HAD A FAIR OPPORTUNITY TO EXAMINE ELLISON OR CATZ REGARDING 800,000 PAGES OF RECENTLY PRODUCED DOCUMENTS ..... 1

A. Plaintiffs Will Be Prejudiced Unless Granted Additional Time to Examine Ellison and Catz Regarding Softwar Transcripts Containing a "Number of Central Facts and Circumstances at Issue in This Case" ..... 3

B. Given Evidence of the Involvement of Ellison and His Counsel in the Destruction of the Softwar Materials, Plaintiffs Should Be Granted Additional Time to Examine Ellison ..... 7

C. Plaintiffs Are Entitled to Additional Time to Depose Ellison and Catz Regarding Newly Produced Documents Relating to Oracle's 2002 Clean Up ..... 10

1. Plaintiffs Are Entitled to Ask Ellison and Catz About the New Production Concerning the 2002 Clean Up and Bad Debt Transfers ..... 10

2. Defendants' Second Attempt to Alter the Testimony of Jennifer Minton Regarding Her Involvement in the 2002 Clean Up Confirms the Need to Question Ellison and Catz About the New Documents ..... 12

III. CONCLUSION ..... 13

## TABLE OF AUTHORITIES

Page

**CASES**

*U.S. v. Lundwall*,
1 F. Supp. 2d 249 (S.D.N.Y. 1998) ..... 7

**STATUTES, RULES AND REGULATIONS**

18 U.S.C.
§1503 ..... 8

Federal Rules of Civil Procedure
Rule 26 ..... 12

## I. INTRODUCTION

Defendants recently produced, for the first time, over 800,000 pages of documents to plaintiffs. These documents concern central accounting allegations as well as, by defendants' own admission, a "number of central facts and circumstances at issue in this case." As these documents have never been previously produced either in this litigation or the derivative litigation, plaintiffs have never had an opportunity to examine either Larry Ellison or Safra Catz, key witnesses in this litigation, regarding them. Plaintiffs are entitled to additional time to examine both Ellison and Catz regarding these documents.

Additionally, defendants have recently admitted that the Softwar materials ordered produced by Your Honor were intentionally destroyed after the filing of plaintiffs' motion to compel their production. Defendants have also admitted that the initial story regarding the destruction of Softwar evidence was completely fabricated. There is substantial evidence of Ellison's involvement in the destruction of the Softwar materials. And, notably, Matthew Symonds had absolutely no incentive to destroy (in fact, had every incentive to retain) the Softwar materials other than a desire to protect Ellison from their obviously incriminating contents. Plaintiffs will soon receive discovery from Symonds and PC World regarding the destruction of the Softwar materials. Plaintiffs will be prejudiced if they are not granted additional time to examine Ellison regarding the evidence destruction.

## II. PLAINTIFFS HAVE NOT HAD A FAIR OPPORTUNITY TO EXAMINE ELLISON OR CATZ REGARDING 800,000 PAGES OF RECENTLY PRODUCED DOCUMENTS

Defendants first argue that plaintiffs are not entitled to additional deposition time with Ellison and Catz because they are already in possession of deposition transcripts from the Delaware litigation and because they have already deposed both witnesses. This argument lacks merit. Not only are plaintiffs not required to rely on the work of other lawyers in a case containing different allegations than the current litigation, but the 800,000 pages of documents which form the basis for plaintiffs' motion were never produced in either litigation. Neither the plaintiffs in Delaware nor the plaintiffs in this case have ever been given the opportunity to examine Ellison or Catz regarding these new issues or documents. As such, the Delaware depositions and, indeed, the depositions

already taken in this case, bear little relevance to the question of whether plaintiffs are entitled to examine Mr. Ellison and Ms. Catz on this new discovery.

Defendants also argue that plaintiffs' request for a stipulation is somehow evidence that plaintiffs had decided to bring this motion to compel prior to reviewing the documents. The true facts completely undercut this argument. First, plaintiffs' initial contact with defendants regarding the stipulation was on January 24, 2007. The first draft of the stipulation was sent to counsel for defendants on January 25, 2007. The stipulation was not filed until January 30, 2007. All of these events took place over a week after defendants' production of the 2002 Softwar transcripts and their production of over 400,000 pages of accounting documents.[1] Before contacting defendants regarding the stipulation, plaintiffs had already reviewed the Softwar transcripts and knew that they wished to bring a motion to compel based on them alone. Plaintiffs were also aware that the deadline for any motion to compel on the basis of those documents was fast-approaching. To promote efficiency, plaintiffs contacted defendants to request that they be allowed to bring one motion on the basis of all of the new productions, instead of having separate deadlines for each production. That defendants now feel the need to use plaintiffs' efforts at efficiency as a reason for denying their motion speaks to the weakness of the support for their opposition.

Defendants' arguments are red herrings. To the extent possible, given the size of the recent productions, plaintiffs have commenced review of them and made the determination that, based on the relevance of the documents to their claims, they require the opportunity to examine Ellison and Catz. Defendants themselves were well aware, surely based on their own review of the recent documents, that plaintiffs would desire further time to examine Ellison and Catz. In their letter to

---

[1] Defendants' contentions regarding Mr. Solomon's representations at the January 16, 2007 telephonic hearing with Your Honor are, likewise, irrelevant. Mr. Solomon merely informed Your Honor that plaintiffs might bring a motion to compel additional time based on the various new productions. *See* Declaration of Stacey M. Kaplan in Support of Plaintiffs' Reply in Support of Motion to Compel Additional Time for the Depositions of Larry Ellison and Safra Catz ("Kaplan Decl."), Ex. A at 5 ("We may want to come to the court on a good cause showing, based on the documents that we receive, and request additional time on those one-day sittings with each of these witnesses.").

All "Ex. __" references are to the Kaplan Declaration.

Your Honor of January 15, 2005, defendants admitted that plaintiffs might want to utilize documents from the productions ordered for January 17 and 30 during the depositions of Ellison and Catz. *See* Ex. B at 2.[2]

In sum, plaintiffs will be severely prejudiced if they are not granted additional time to examine these key witnesses regarding the recently produced documents.[3]

### A. Plaintiffs Will Be Prejudiced Unless Granted Additional Time to Examine Ellison and Catz Regarding Softwar Transcripts Containing a "Number of Central Facts and Circumstances at Issue in This Case"

Defendants do not seriously dispute that plaintiffs are entitled to additional deposition time to depose Ellison and Catz regarding the recently produced transcripts. Indeed, having proclaimed their relevance to a "number of central facts and circumstances at issue in this case," defendants instead argue that plaintiffs are not entitled to additional deposition time because they mentioned the possible production of these documents in their previous motion for additional deposition time. The record, however, does not support defendants' argument.

First, plaintiffs' only reference to the possible production of the Softwar transcripts in their October 30, 2006 motion to compel was two sentences which read as follows: "Finally, plaintiffs are moving to compel the production of several categories of documents which are likely to implicate Mr. Ellison, including documents concerning and created in preparation for SOFTWAR . . . . If

---

[2] "Defendants do not know whether Plaintiffs intend to use these accounting-related documents with Ms. Catz or Mr. Ellison, but Plaintiffs have refused to rule out that possibility. . . . Defendants can see no reason why these two depositions should proceed now if there is any possibility that Plaintiffs will wish to question these witnesses about documents to be produced over the next two weeks"; "Plaintiffs have made clear that they intend to question both Mr. Ellison and Ms. Catz about the customer issues involved in these documents"; "To the extent that Plaintiffs may wish to question Mr. Ellison or Ms. Catz about any of [the SOFTWAR discovery related] issues, Defendants can see no reason why Mr. Ellison's or Ms. Catz's depositions should proceed now given the risk that later-received materials may generate yet another request for more deposition time." *Id.* at 2-3.

[3] Further, in addition to the Softwar transcripts and the hundreds of boxes of new accounting docs, after the filing of plaintiffs' current motion defendants produced additional documents pursuant to the Special Master's January 3, 2007 Order which specifically referenced Ellison and Catz. *See, e.g.*, Ex. C at NDCA-ORCL 1914916-18 (e-mail string regarding Catz's request that Ellison approve a transaction and stating "Approved – Larry"); Exs. D-F (e-mails to and from Catz). Plaintiffs are entitled to ask Ellison and Catz about these documents that were previously withheld as privileged.

plaintiffs are successful in their pursuit of these documents, plaintiffs expect that they will want to examine Mr. Ellison regarding their contents." Ex. G at 9. These two sentences are part of six pages that plaintiffs devoted to the basis for their request for additional time for Ellison. Those six pages concluded with the following: "Because plaintiffs have received thousands of pages of new documents implicating Mr. Ellison and proving that he lied under oath, and because plaintiffs have not yet had the opportunity to examine Mr. Ellison about previously produced and incriminating documents or the baffling recent production from his files, plaintiffs respectfully request that this Court compel Mr. Ellison to appear for an additional seven hours of deposition time." *Id.* at 10. The possible production of Softwar tapes and transcripts was not mentioned at all in the section of that motion requesting additional time with Catz.

On November 20, 2006, plaintiffs filed their reply. In the reply, plaintiffs decreased the amount of time requested with both Ellison and Catz and, for each, specifically reserved their rights with respect to all future productions of documents. *See* Ex. H at 8-9 ("[N]oting that defendants have recently informed plaintiffs that the hundreds of documents that they had 'sourced' to Ellison were not actually from his files, ***plaintiffs are willing, subject to this Court's rulings on its other pending motions to compel, to decrease the amount of time necessary to fairly examine Mr. Ellison. Without waiving rights with regard to any documents produced in the future***, plaintiffs respectfully request an additional 5 hours to examine Mr. Ellison.") (emphasis added); *Id.* at 10 ("[O]n the basis of documents which have been produced to date, plaintiffs request an additional hour of deposition time with Ms. Catz . . . ***subject to resolution of the plaintiffs' currently pending motions to compel. Should defendants be ordered to produce any additional documents, and should those additional documents implicate Ms. Catz in any way, plaintiffs reserve the right to revisit the amount of additional time requested***.").

On December 14, 2006 Your Honor issued an Order requiring Ellison to appear for an additional 3.5 hours of deposition time and Catz to appear for an additional 2.5 hours of deposition time. As to Ellison, Your Honor summarized plaintiffs' arguments regarding their request to compel additional time as follows: "Plaintiffs contend that they should be granted additional time to examine Ellison regarding: (1) Defendants' post-close of discovery production of documents from Ellison's

Finally, Catz was involved in the negotiation process for Softwar itself. Both the draft contract between Ellison and Symonds and the promotional article, "The Rewards of Recklessness," were produced from her files. Plaintiffs are clearly entitled to additional time to examine both Ellison and Catz regarding the Softwar transcripts.

**B. Given Evidence of the Involvement of Ellison and His Counsel in the Destruction of the Softwar Materials, Plaintiffs Should Be Granted Additional Time to Examine Ellison**

Defendants claim that plaintiffs are not entitled to additional time to depose Ellison regarding the destruction of the Softwar materials ordered produced because he "was not personally involved in the circumstances surrounding their unavailability. Contrary to defendants' contentions, despite the fact that plaintiffs have not yet received discovery from either Symonds or PC World on this issue, there is still substantial evidence implicating Mr. Ellison.

[redacted] ordered by Your Honor was intentionally destroyed after plaintiffs filed a motion to compel the evidence on October 30, 2006. Defendants have also admitted that the initial story told to plaintiffs and the Court about how and when the Softwar evidence was destroyed, was intentionally fabricated. Plaintiffs are entitled to examine Ellison regarding his communications with Symonds both during this period and before. Plaintiffs also have no personal knowledge as to whether Ellison ever possessed the transcripts in question. Plaintiffs are entitled to examine Ellison, under oath, regarding these issues.

In addition, Ellison and Symonds were close friends. Besides his friendship with Ellison, Symonds had every incentive not to destroy the Softwar materials. Symonds served for three years as the Technology and Communications Editor for *The Economist* prior to taking a leave of absence to research and write Softwar. He currently serves as the Political Editor of *The Economist*. Symonds is clearly a public figure with much to lose. As a political journalist, his public credibility is extremely important. Yet, Symonds has chosen to engage in the intentional destruction of relevant evidence for which he now faces possible criminal penalties. *See U.S. v. Lundwall*, 1 F. Supp. 2d

249, 255 (S.D.N.Y. 1998) (holding that non-parties who destroyed evidence relevant to civil litigation had obstructed justice in violation of 18 U.S.C. §1503 after finding that "[d]efendants here are not charged with concealing and destroying documents they incorrectly concluded were not sought, or erroneously thought to be irrelevant or burdensome. Rather, they are charged with seeking to impair a pending court proceeding through the intentional destruction of documents sought in, and highly relevant to, that proceeding"). The reasons for Mr. Symonds's actions scream out from between the lines. The contents of the destroyed materials must have been explosive and highly damaging, as Ellison and Symonds obviously knew.

In addition to a desire to avoid possible criminal penalties for the destruction of evidence, Symonds had plenty of other incentive to retain the tapes and transcripts of interviews with Ellison. Symonds continues to write magazine articles about Ellison. Also, under the final Softwar agreement, he shares motion picture rights with Ellison, has the first of first and last refusal for any treatment of a motion picture based on the book, may draw from the "transcripts of conversations conducted in preparation on the Work" for a second, short book, and has the right of first refusal to write any future editions or revisions of the book. The materials destroyed by Symonds would clearly be useful for any such future endeavors. As such, Symonds must have had very good incentive to destroy them. Such incentive no doubt came from Larry Ellison. Plaintiffs are entitled to examine Ellison regarding the destruction.

In addition, there is ample evidence that defendants knew of the destruction of Softwar materials prior to informing either plaintiffs or the Court. On January 2, 2007, Your Honor issued an order requiring defendants to produce, by January 16, 2007, tapes and transcripts of interviews with Ellison created in preparation of Softwar. Plaintiffs immediately requested information regarding the anticipated size of defendants' production. *See* Ex. M.

During a January 4, 2007 conversation among plaintiffs' and defendants' counsel, Mr. Solomon asked Mr. Gibbs about the status of the Softwar materials. Mr. Gibbs responded that he did not yet know whether defendants would take the position that Symonds was refusing to turn over the materials or that they no longer existed. Plaintiffs' counsel was so stunned by that statement that he quickly memorialized it. *See* Ex. N ("Gibbs stated today that he is dealing with the

Softwar issues for defendants and does not know – even today – whether their position will be that the tapes ad [sic] transcripts no longer exist, or that Symonds refuses to turn them over.").[5] On January 5, 2007, plaintiffs followed up via letter, confirming Gibbs's statements and expressing disbelief at this position. *See* Ex. O. Defendants did not respond to the January 5, 2007 letter. Later, during a meet and confer regarding the parties' Joint Status Statement (and in the Statement itself) in advance of the CMC with Judge Jenkins on January 9, 2007, Mr. Gibbs denied having made the statement. *See* Ex. P at 7.

It would be an amazing coincidence if plaintiffs were both so dishonest and so clairvoyant as to pretend that defendants made the statements regarding the destruction of the Softwar materials to counsel for defendants one week before defendants first confirmed to plaintiffs that the Softwar materials had, in fact, been destroyed. From Symonds's declaration, plaintiffs clearly knew that the Softwar materials existed as of November 2006. They had no possible way of knowing that the materials would be destroyed after the filing of their motion to compel the production of such materials. The plausible explanation (indeed, the only explanation that makes sense) is that Mr. Gibbs made the representation attributed to him. By January 4, 2007, counsel for defendants either knew that the Softwar materials had been destroyed or that they were about to be destroyed.

During a telephone conversation on the afternoon (PST) of January 10, 2007, Mr. Solomon and Mr. Williams again asked Mr. Gibbs about the status of the Softwar materials. As of that date, just three business days before the materials were to be produced, Mr. Gibbs claimed that he had not yet spoken to Mr. Symonds and, thus, still did not know the status of the Softwar materials. That same day, eight days after the Special Master's Order, Mr. Gibbs sent Symonds a letter purporting to inform Symonds, for the first time, that the Softwar materials finally had been ordered produced and demanding that Symonds produce such materials.

Defendants' failure to seek the Softwar materials from Symonds prior to January 10, 2007 is further evidence that they were fully aware that the materials had been or were about to be

---

[5] Plaintiffs produce this e-mail, without waiver, solely to demonstrate the immediate memorialization of defense counsels' shocking statement.

destroyed. Had the materials been produced, they would have contained over a 100 hours of tapes and transcripts of interviews with Ellison. Defendants were obligated to produce these materials to plaintiffs by January 16, 2007. To produce the materials, defendants would have had to procure them in the United Kingdom, review them, and format them prior to producing them to plaintiffs. It seems highly unlikely that defendants, who have been quick to request extensions for such large scale reviews in the past, would wait until January 10, 2007 (again, just three business days prior to the date of their production obligation) to even inform Symonds that they had been ordered. The more logical explanation, once again, is that defendants were not concerned with ensuring time to adequately review the materials prior to production because they were fully aware (at least by January 4, 2007) that the materials either had been or were about to be destroyed.

Finally, plaintiffs will soon be receiving discovery from both PC World and Symonds. The High Court of Justice in England recently ordered both testimonial and documentary evidence from both Symond and PC World. Plaintiffs are entitled to examine Ellison, using this evidence, about his involvement in the destruction of the Softwar materials.

### C. Plaintiffs Are Entitled to Additional Time to Depose Ellison and Catz Regarding Newly Produced Documents Relating to Oracle's 2002 Clean Up

#### 1. Plaintiffs Are Entitled to Ask Ellison and Catz About the New Production Concerning the 2002 Clean Up and Bad Debt Transfers

On January 30 and February 5, 2007, defendants produced, for the first time, over 381,000 pages of documents relating to Oracle's bad debt transfers and Oracle's 2002 Clean Up, an event that was suspiciously initiated days after plaintiffs filed their [Proposed] Revised Second Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint"), including new accounting allegations, on December 9, 2002. Many of these documents refer and relate specifically to "debit memos" and the November 2000 Clean Up, two of the most fundamentally relevant categories of accounting documents that were ordered by Judge Spero in the March 10, 2005 Discovery Plan.

Despite the clear relevance of the circumstances surrounding the 2002 Clean Up, defendants resisted discovery on this issue for over two years and made false representations to the Court about

the lack of "connection" between the 2002 Clean Up and the debit memos. Plaintiffs had to file several motions dating back to 2002 just to obtain the documents relating to the 2002 Clean Up. Thus, any claim by defendants that plaintiffs have had access to the "information" relating to the 2002 Clean Up is disingenuous and false. Plaintiffs did not have these documents until January 30, 2007.

Although plaintiffs have only scratched the surface of defendants' massive new accounting production, discovery has now confirmed that the 2002 Clean Up and Oracle's bad debt transfers were part of a systematic post-Class Period cover up by Oracle to hide their accounting improprieties and the corresponding audit trail. In their Opposition, defendants try to distance Ellison and Catz from the 2002 Clean Up by claiming, for the first time, that the 2002 Clean Up was undertaken completely by "entry-level" collections employees in Oracle's "satellite offices." *See* Defs.' Opp. at 10 ("both activities were performed by entry-level collections staff working at Oracle's Rocklin, California facility").[6] Defendants apparently want the Court to believe that upon the filing of plaintiffs' Amended Complaint on December 9, 2002, including the new accounting allegations concerning millions in fictitious earnings, these rogue lower level employees authorized themselves to investigate plaintiffs' lawsuit, shut down Oracle's collections department to facilitate the clean up, and reverse and refund millions of dollars in debit memo transactions to Oracle's customers all without any knowledge of the CEO, CFO and Chief Operating Officer. Not only is defendants' theory nonsensical, it is belied by the evidence thus far in the case.

Evidence shows that the 2002 Clean Up involved, and indeed was directed by, Oracle executives at the highest levels, including CFO Jeff Henley, and Jennifer Minton, Oracle's Corporate Controller, who rolled up to Ellison and is now Oracle's Chief Accounting Officer. Ex. Q at 9, 12-14. However, Ellison's and Catz's testimony is needed to resolve conflicting testimony among Jeff Henley and his direct reports, Jennifer Minton and Tom Williams. Henley testified that he placed Minton in charge of the 2002 Clean Up and investigation, but Minton denied it. Williams claimed he

---

[6] All "Defs.' Opp. __" references are to Defendants' Opposition to Plaintiffs' [Renewed] Motion to Compel Additional Time for the Depositions of Larry Ellison and Safra Catz.

was in charge, but Henley would not corroborate this. Documents produced for the first time in January and February 2007 may be used to probe Ellison and Catz about the truth of this matter. Ellison and Catz may offer insight why Oracle's most senior accounting executives - including Henley, his direct report - cannot agree on who was in charge. *See, e.g.*, Ex. R at NDCA-ORCL 1733110-6.

Further, Minton reported at weekly executive committee meetings attended by both Ellison and Catz. Surely the Executive Committee would have discussed a massive clean up that resulted in the refund of millions of dollars to Oracle's customers. And certainly, Ellison, as the CEO, and Catz, as the self-professed "co-Chief Operating Officer" during the period at issue, would have become aware of the 2002 Clean Up. Indeed, in January and February 2007, Oracle produced documents showing that Oracle's Audit Committee met during October 2002 and November 2002, after plaintiffs' Amended Complaint was filed, to discuss the 2002 Clean Up. Other newly produced documents suggest that the Audit Committee reviewed the 2002 Clean Up results, including the fact that there were millions in transfers from unapplied cash to Oracle's bad debt reserve, and that tens of millions of dollars were owed to Oracle customers from prior overpayments. Plaintiffs have never had the opportunity to question any witness about these documents because they were previously unaware of their existence. Under any interpretation of Fed. R. Civ. P. 26, plaintiffs are entitled to ask Ellison and Catz about the new 2002 Clean Up documents to determine what they knew.

**2. Defendants' Second Attempt to Alter the Testimony of Jennifer Minton Regarding Her Involvement in the 2002 Clean Up Confirms the Need to Question Ellison and Catz About the New Documents**

The fact that defendants have repeatedly attempted to misrepresent the involvement of Oracle's top management to distance them from what was obviously a cover up underscores and heightens the need to question Ellison and Catz about the new documents. For example, in their opposition to plaintiffs' motion to compel the 2002 Clean Up documents, defendants attempted to alter the deposition testimony of Ms. Minton to make it look like she was aware of what was going on during the 2002 Clean Up. "Minton stated that while she was not involved and did not recall the results, she 'thought it was appropriate for legal to keep [her] ***involved***.'" *See* Ex. S at 21 (emphasis

added). During her first day of deposition, however, Ms. Minton testified, "I was told – I think it was appropriate for legal to keep me ***uninvolved*** in the investigation." *See* Ex. T at 175:18-19. After plaintiffs alerted the Special Master to defendants' blatant alteration of Ms. Minton's testimony, defendants quickly sent a letter to Your Honor acknowledging the inaccurate quotation of Ms. Minton's testimony and claiming it was merely an accidental "***typographical error***." *See* Ex. U (emphasis added) ("Upon reviewing Plaintiffs' reply briefs, we discovered that Defendants' Opposition . . . ***contains a typographical error***. . . . Defendants note that this misquote was accidental.").

Shockingly, in defendants' current brief regarding Ellison and Catz, defendants apparently make the same "typographical error" by once again altering Ms. Minton's testimony to change the word "***uninvolved***" to "***involved***." *See* Defs.' Opp. at 11 n.13 ("Ms. Minton originally testified that while she was not involved and did not recall the results, she 'thought it was appropriate for legal to keep [her] ***involved***."). The fact that defendants have now tried to mislead the Court ***twice*** about Ms. Minton's deposition testimony confirms that their previous claims of a "typo" are simply not credible. It also confirms the need for plaintiffs to take testimony from Ellison and Catz to determine what was really going on during the 2002 Clean Up and who was involved.

## III. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court grant their Motion to Compel Additional Time for the Depositions of Larry Ellison and Safra Catz.

DATED: March 7, 2007

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
VALERIE L. McLAUGHLIN
GAVIN M. BOWIE
STACEY M. KAPLAN

Stacey M. Kaplan
STACEY M. KAPLAN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Oracle3\BRF00039856.doc

**PROOF OF SERVICE BY E-MAIL**

I, KELLY BRENNAN, not a party to the within action, hereby declare that on March 7, 2007, I served the attached **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL ADDITIONAL TIME FOR THE DEPOSITIONS OF LARRY ELLISON AND SAFRA CATZ** on the parties in the within action by e-mail addressed as follows:

**COUNSEL FOR PLAINTIFFS:**

| | | |
|---|---|---|
| Mark Solomon, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SD | marks@lerachlaw.com |
| Douglas Britton, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SD | dougb@lerachlaw.com |
| Valerie McLaughlin, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SD | valeriem@lerachlaw.com |
| Gavin Bowie, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SD | gbowie@lerachlaw.com |
| Shawn Williams, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | shawnw@lerachlaw.com |
| Willow Radcliffe, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | willowr@lerachlaw.com |
| Eli Greenstein, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | elig@lerachlaw.com |
| Monique Winkler, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | moniquew@lerachlaw.com |

**COUNSEL FOR DEFENDANTS:**

| | | |
|---|---|---|
| Peter Wald, Esq.* | Latham & Watkins<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111 | peter.wald@lw.com |
| Michele Kyrouz, Esq. | Latham & Watkins – SF | michele.kyrouz@lw.com |
| Matthew Harrison, Esq. | Latham & Watkins – SF | matthew.harrison@lw.com |
| Patrick Gibbs, Esq. | Latham & Watkins – Menlo Park | patrick.gibbs@lw.com |
| Brian Glennon, Esq. | Latham & Watkins –LA | brian.glennon@lw.com |
| Jamie Wine, Esq. | Latham & Watkins | jamie.wine@lw.com |

* Denotes service via hand delivery and e-mail