COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
– and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re ORACLE CORPORATION SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS.

Master File No. C-01-0988-MJJ

CLASS ACTION

PLAINTIFFS' NOTICE OF MOTION AND SUPPLEMENTAL SUBMISSION REGARDING DEFENDANTS' DESTRUCTION OF EVIDENCE AND REQUEST FOR SANCTIONS AND OBJECTIONS TO SPECIAL MASTER'S JULY 17, 2006 ORDER DENYING PLAINTIFFS' MOTION TO COMPEL THE RESTORATION OF BACKUP TAPES AND FOR MISCELLANEOUS RELIEF FOR THE DESTRUCTION OF EVIDENCE

DATE: September 24, 2007
TIME: 9:30 a.m.
COURTROOM: The Honorable Martin J. Jenkins

**PREVIOUSLY FILED ON JULY 26, 2007**
**DOCKET NO. 865**
**REDACTED VERSION**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. RELEVANT PROCEDURAL HISTORY ..... 3

III. LEGAL STANDARD ..... 4

IV. DEFENDANTS ALTERED AND WITHHELD KEY EVIDENCE RELATING TO A "CLEAN UP" OF ACCOUNTING FILES RELEVANT TO PLAINTIFFS' CLAIMS ..... 10

A. Defendants Made False Representations to the Court Concerning the 2002 Clean Up to Shield Highly Relevant Documents from Discovery ..... 11

1. Documents Produced Months After the Discovery Cutoff Reveal Defendants' Attempt to Hide Crucial Documents Under the Guise of the 2002 Clean Up ..... 13

2. The Testimony of Key Oracle Accounting Witnesses Confirms that Defendants Knowingly Misled the Court When They Asserted that There Was No Relationship Between the 2002 Clean Up and the November 2000 Debit Memos ..... 16

3. Oracle Used the 2002 Clean Up to Alter Highly Relevant Accounting Records ..... 20

B. Defendants' Repeated Violations of the Court's Orders Prevented Plaintiffs from Obtaining Relevant Documents Until After the Completion of Discovery and Depositions ..... 22

1. Defendants' Violations of the March 10, 2005 Discovery Plan ..... 22

2. Defendants' Violations of Magistrate Judge Spero's October 19, 2005 Accounting Order ..... 24

3. Defendants' Violations of the Special Master's July 17, 2006 Accounting Order ..... 26

4. Defendants' Violation of the December 19, 2006 Order and Other Sanctionable Discovery Conduct Thereafter ..... 28

a. Defendants' Belated Production of E-mails on April 17, 2007 Regarding Plaintiffs' Accounting Allegations ..... 28

b. Defendants' Belated April 24, 2007 Production of Relevant Board Meeting Memos and E-mails ..... 30

c. Defendants Changed the Source of Documents After the Discovery Cutoff ..... 31

C. Defendants Electronically Altered Many Accounting Documents Before They Were Produced ..... 33

1. Defendants Altered the Electronic Filenames and Metadata Associated with Documents as Kept in the Ordinary Course of Business ....33

2. Defendants Electronically Altered and Failed to Preserve Relevant E-mails ....34

D. Defendants Recently Admitted They Were Aware of Plaintiffs' Accounting Allegations in May 2002 at Least Five Months Before Defendants Sent Preservation Notices to a Select Few Accounting Employees ....36

V. DEFENDANTS FAILED TO PROPERLY PRESERVE EVIDENCE IN BAD FAITH ....37

A. Defendants Expected Litigation Surrounding the March 1, 2001 Disclosures But Did Nothing ....37

B. Even After Service of Broad Based Complaint Allegations Defendants Intentionally Excluded the Vast Majority of Oracle Employees from a Document Preservation Instructions ....38

1. Defendants' Focus on Employees Who Communicated with "Speakers" Was Knowingly Faulty Because Defendants Failed to Determine Who Actually Communicated with the "Speakers" and Employees Admittedly Possessed Relevant Evidence, Regardless of Whether They Communicated Within the "Speakers" ....39

2. Defendants Intentionally Excluded Entire Categories of Employees Who Possessed Relevant Documents from the Preservation Instructions ....44

a. Defendants Did Not Instruct Employees of Certain Divisions to Preserve Evidence ....44

(1) Defendants Failed to Instruct Employees in General Business – the Company's Largest Sales Organization – to Preserve Evidence ....44

(2) Defendants Failed to Instruct Consulting Employees Who Installed Suite 11i to Preserve Evidence ....45

(3) Defendants Failed to Instruct Employees of the Support Division Who Supported Suite 11i Customers to Preserve Evidence ....45

(4) Defendants Failed to Instruct Escalation Managers to Preserve Evidence ....46

b. Defendants Impermissibly Relied Upon Oracle's Non-Attorney Employees to Determine Who Should Receive Preservation Instructions and to Communicate the Instructions ....47

C. The Scope of Defendants' Preservation Instructions Was Knowingly Deficient ....... 47

1. Defendants Failed to Instruct Employees Regarding the Preservation of Evidence Post-Receipt of Preservation Instructions ....... 47

2. Defendants Failed to Instruct Oracle Employees to Preserve Sent Items/Turn off Autodelete Function in Outboxes ....... 51

3. Defendants Failed to Ensure that All Evidence in Ellison's Control and Related to Ellison Was Preserved ....... 52

a. Defendants Failed to Ensure that Ellison Observed the Preservation Instructions ....... 52

b. Defendants Failed to Preserve Ellison's Website larryellison.com ....... 54

D. At a Company Level, Defendants Failed to Preserve Categories of Information Highly Relevant to This Litigation ....... 54

1. Defendants Failed to Preserve the Oracle Sales Online Database that Included Unique and Highly Relevant Material ....... 54

2. Defendants Failed to Preserve Crucial Documents Relating to Oracle's Forecasting Process ....... 56

3. Defendants Failed to Preserve Group E-mail Boxes ....... 63

4. Defendants Failed to Preserve Escalated Customer Reports ....... 64

VI. DEFENDANTS INTENTIONALLY DESTROYED THE HIGHLY RELEVANT *SOFTWAR*-RELATED MATERIALS ....... 64

A. The *SOFTWAR* Materials are Highly Relevant to this Litigation ....... 65

1. Ellison and Symonds Worked Jointly on *SOFTWAR* ....... 65

2. *SOFTWAR* is Replete With Information Relevant to this Litigation ....... 66

3. The Scant *SOFTWAR*-Related Materials Produced Illustrate the Relevance of the Destroyed Materials ....... 68

B. Defendants Had a Duty to Preserve the *SOFTWAR* Materials and Failed to Do So ....... 69

C. Defendants Withheld the *SOFTWAR* Materials from Plaintiffs in Bad Faith ....... 71

1. Defendants Acted in Bad Faith By Failing to Produce Any *SOFTWAR*-Related Material Until the Close of Fact Discovery ....... 71

2. Defendants Acted in Bad Faith in Responding to Plaintiffs' Motion

to Compel the Production of the *SOFTWAR* Materials ....72

D. Defendants Violated the Court's Order to Produce the *SOFTWAR* Materials ....75

1. Defendants Failed to Affirmatively Seek Out the Materials Ordered Produced and Refused to Provide Plaintiffs with Information Necessary for Their Own Efforts to Procure the Materials ....75

a. Defendants Falsely Represented to Plaintiffs that Symonds' Computer Problems Led to the Destruction of the Majority of the *SOFTWAR* Materials Ordered Produced and Continued to Withhold Pertinent Facts in Bad Faith ....76

b. Defendants Represented to Plaintiffs that Their Prior Representations Were False and Provided a Second Account of the Destruction of the *SOFTWAR* Materials Ordered Produced ....78

2. Defendants Misrepresented to this Court and Plaintiffs Ellison's and Defendants' Involvement in the Destruction of the *SOFTWAR* Materials ....79

VII. DEFENDANTS KNOWINGLY MISREPRESENTED THEIR PRESERVATION EFFORTS TO THE COURT ....87

A. Oracle's Representations to the Court in Its Request to Stay Discovery in Parallel State Court Proceedings Were False ....87

B. Oracle's Representations Regarding Its Non-Destruction of Accounting Evidence Made in Response to Plaintiffs *Ex Parte* Application for Relief Were False ....87

C. Statements Made by Defendants to Magistrate Judge Spero at Hearing to Determine the Files to Be Searched Were Patently False and Intentionally Omitted the True Facts of Defendants' Preservation Efforts ....88

VIII. LESSER SANCTIONS ....89

IX. CONCLUSION ....91

## TABLE OF AUTHORITIES

| CASES | Page |
|---|---|
| *A. Farber & Ptnrs., Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006) | 71 |
| *AdvantaCare Health Partners, LP v. Access IV*, Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835 (N.D. Cal. Aug. 17, 2004) | *passim* |
| *Ameripride Servs. Inc. v. Valley Indus. Serv., Inc.*, No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398 (E.D. Cal. Aug. 9, 2006) | 9, 90 |
| *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995) | 5, 6, 8 |
| *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112 (9th Cir. 2004) | *passim* |
| *Halaco Eng'g Co. v. Costle*, 843 F.2d 376 (9th Cir. 1988) | 8 |
| *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005) | 8, 9 |
| *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) | *passim* |
| *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK) | *passim* |
| *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) | 51 |
| *In re Telxon Corp. Secs. Litig.*, Case No. 5:98CV2876, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004) | 7, 8, 13, 16 |
| *In re United States Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063 (N.D. Cal. 2002) | 51 |

| | |
|---|---|
| Juniper Networks, Inc. v. Toshiba America, Inc. et al., Case No. 2:05-CV-0479 (July 11, 2007) | 7 |
| *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) | 9 |
| *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) | *passim* |
| *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280 (E.D. Va. 2004) | 51 |
| *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) | 4, 9, 90 |
| *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992) | 4, 5 |
| *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F. Supp. 1443 (C.D. Cal. 1984) | 69 |
| *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) | 37, 38 |

| **STATUTES, RULES AND REGULATIONS** | **Page** |
|---|---|

| | |
|---|---|
| 15 U.S.C. | |
| §78m(b)(2)(A) | 21 |
| §78u-4(b)(3)(C)(i) | 38 |
| 18 U.S.C. § 1512(c) | 85 |
| Private Securities Litigation Reform Act of 1995 | *passim* |
| Federal Rules of Civil Procedure | |
| Rule 26 | 25 |
| Rule 26(b)(1) | 65 |
| Rule 34 | 33, 71 |
| Rule 30(b)(6) | 29 |
| Rule 37 | *passim* |

TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that on September 24, 2007 or as soon thereafter as the matter may be heard in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs shall and hereby do move this Court, pursuant to the Court's inherent power and Federal Rule of Civil Procedure 37 for an order of default judgment for failure to preserve and maintain the integrity of evidence and violation of discovery orders. In light of the mounting evidence of spoliation, plaintiffs respectively request that this matter be set for hearing.

This motion is based on this Notice and Supplemental Submission; the Declaration of Monique C. Winkler in Support of Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants' Destruction of Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006 Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence ("Winkler Declaration") filed herewith; Plaintiffs' Corrected Notice of Motion and Motion to Compel the Restoration of Back-up Tapes and For Miscellaneous Relief for the Destruction of Evidence ("Motion to Compel") and all supporting documents; Plaintiffs' Reply in Support of Corrected Notice of Motion and Motion to Compel Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence ("Reply") and all supporting documents; Plaintiffs' Notice of Objection and Objection to the Special Master's Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence ("Objection") and all supporting documents; all pleadings and papers filed in this action; the arguments of counsel and any other matter that the Court may consider at a hearing on this motion.

## I. INTRODUCTION

Plaintiffs have discovered many additional facts in addition to those already before the Court that further reveal defendants' wanton destruction or withholding of highly relevant evidence. These facts demonstrate, beyond any doubt, that from the date Oracle Corporation ("Oracle" or the "Company") announced its failure to meet its fiscal third quarter 2001 ("3Q01") forecast, defendants have deliberately engaged in a scheme to destroy and withhold evidence relevant to this litigation, including crucial evidence related to plaintiffs' accounting allegations and virtually all evidence

related to defendant Lawrence J. Ellison ("Ellison"). The spoliation detailed in plaintiffs' Motion to Compel, while egregious, was merely the tip of the iceberg. Indeed, defendants' conduct has been multifarious in nature, beginning with their failure to issue a preservation instruction to Oracle employees at the time that they reasonably anticipated litigation, and including their deliberate destruction of relevant evidence, and knowing misrepresentations to the Court and plaintiffs regarding compliance with preservation requirements.

In addition, defendants withheld hundreds of thousands of pages of accounting evidence until well after the close of discovery by misrepresenting to the Court and plaintiffs the relevance of the evidence and violating multiple Court orders. Moreover, much of the evidence ultimately produced is unreliable because defendants intentionally altered the evidence after plaintiffs filed their accounting allegations and produced evidence in a manner designed to prohibit or obscure plaintiffs' ability to review and analyze the evidence.

And if defendants' failure to properly preserve Ellison's documents was not enough, defendants have now admitted to the ***outright intentional destruction*** of hundreds of hours of tapes and transcripts of interviews with Ellison created in preparation for the book *SOFTWAR*: *An Intimate Portrait of Larry Ellison and Oracle* ("*SOFTWAR*") by Matthew Symonds ("Symonds"). These contemporaneous materials were directly relevant to plaintiffs' allegations of technical problems with Suite 11i and the resulting customer concessions and settlements, Ellison's January 2001 $900 million insider sales, Oracle's forecasting process and the effect of the declining economy on Oracle's business, and Oracle's billion dollar savings claims. Indeed, defendants' actions have resulted in the wholesale destruction of evidence that would demonstrate Ellison's knowledge and mental state at all relevant times.

And if defendants' evidence destruction, alterations and comprehensive failure to preserve Ellison's material were insufficient, defendants' actions with respect to the accounting materials, Ellison-related evidence including the *SOFTWAR* background materials, and the overall failure to preserve, each taken alone, warrant the most severe sanctions. Collectively, defendants' actions here

warrant nothing less than terminating sanctions.[1]

## II. RELEVANT PROCEDURAL HISTORY

On March 15, 2006, the parties submitted joint letter briefs to this Court in order to resolve outstanding discovery disputes including Oracle's failure to preserve evidence in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA").

On April 6, 2006, the Honorable Magistrate Judge Joseph C. Spero referred all discovery matters to Special Master Honorable Edward A. Infante (Ret.). The April 6, 2006 Order directed the parties to submit all reports, findings, and objections and motions in response to the Special Master's ruling, to Magistrate Judge Spero.

On May 16, 2006, plaintiffs filed their Motion to Compel. Ex. 1.[2]

On June 9, 2006, Oracle and the individual defendants filed their Corrected Opposition to Plaintiffs' Motion to Compel the Restoration of Back-up Tapes and For Miscellaneous Relief for the Destruction of Evidence ("Opposition to Motion to Compel").

On June 16, 2006, plaintiffs filed their Reply. Ex. 3.

On July 10, 2006, Special Master Infante heard arguments on plaintiffs' Motion to Compel.

On July 17, 2006, Special Master Infante issued an order denying plaintiffs' Motion to Compel without prejudice, finding that plaintiffs had not presented sufficient facts to support the relief that they were seeking. Ex. 4 at 1.

On August 7, 2006, plaintiffs timely filed their Objection. Ex. 5.[3] Defendants have not responded to plaintiffs' Objection. Plaintiffs' Objection remains pending before this Court.[4]

---

1 In the event this Court does not decide that terminating sanctions are appropriate here, plaintiffs request that the Court impose the most appropriate lesser sanctions, which plaintiffs submit are adverse inference instructions. *See* §VIII, *infra*.

2 All "Ex. __" references are to the Winkler Declaration.

3 Plaintiffs will provide copies of the exhibits to plaintiffs' Motion to Compel, Reply and Objection should the Court require copies of such exhibits.

4 The parties included plaintiffs' Objection in the sections titled "Current Motions Pending Before the Honorable Judge Martin J. Jenkins" in their Joint Status Statements filed on November 2, 2006 and January 5, 2007. *See* Ex. 6 and Ex. 7.

## III. LEGAL STANDARD

This Court possesses the inherent power to sanction defendants for their destruction of evidence. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992). This Court's authority to sanction defendants includes the power to levy terminating sanctions in response to abusive litigation practices. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (imposing dismissal sanction upon a party who destroyed electronic documents). Where a party breaches its duty to preserve evidence as defendants did here, the opposing party may move the court for sanctions. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006). Federal Rule of Civil Procedure 37 ("Rule 37") also provides for sanctions against a party failing to obey an order to provide or permit discovery. *Leon*, 464 F.3d at 958; *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). Rule 37 also permits this Court to enter a default judgment. *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004).

> When choosing among possible sanctions, the Court should consider a sanction designed to: (1) penalize those whose conduct may be deemed to warrant such a sanction; (2) deter parties from engaging in the sanctioned conduct; (3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*AdvantaCare Health Partners, LP v. Access IV*, Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835 at *12-*13 (N.D. Cal. Aug. 17, 2004).

While a variety of sanctions are available to the Court, including the issuance of adverse inference instructions at trial and the exclusion of evidence, default judgment is appropriate here based upon defendants' intentional destruction of evidence, calculated withholding of relevant evidence until well after the close of discovery and ongoing efforts to obscure their misconduct including repeated misrepresentations to the Court and plaintiffs. Defendants' knowing and intentional destruction of relevant evidence, deliberate delay and their failure to comply with the PSLRA document preservation provisions and orders of the Court, including the March 10, 2005 Amended Order Setting a Discovery Plan ("March 10, 2005 Discovery Plan" or "Discovery Plan"), justify the entry of default judgment. *Napster*, 462 F. Supp. 2d at 1066; *Brotby*, 364 F.3d at 1115.

> Dismissal is an available sanction when a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings because courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.

*Leon*, 464 F.3d at 958;[5] *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) ("[C]ourts have inherent power to dismiss an action when a party has willfully deceived the court . . . ."); *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *11 ("[A] Court may enter a default judgment against the party responsible for destroying evidence.").

In order to impose the sanction of default judgment upon defendants here, the Court must make "a finding of willfulness, fault, or bad faith." *Leon*, 464 F.3d at 958; *see also Brotby*, 364 F.3d at 1115 (in order to impose default sanctions under Rule 37, the "party's noncompliance must be due to willfulness, fault, or bad faith"). Bad faith is thus not required. *Napster*, 462 F. Supp. 2d at 1066. Instead, this Court has the power to impose sanctions for the destruction of evidence against a litigant who knew or should have known that the evidence was relevant to litigation or potential litigation. *Unigard*, 982 F.2d at 368. Willfulness is shown if defendants had "some notice that the documents were ***potentially*** relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (emphasis in original). In any event, this Court can impose sanctions against defendants for their document destruction based upon simple negligence or fault. *Id.*

The following factors should be taken into consideration in imposing terminating sanctions where imposed under the Court's inherent power or Rule 37: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."[6] *Id.* at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348); *see also Brotby*, 364 F.3d at 1115. Where a party has violated a court order, the first two factors favor terminating sanctions. *Leon*, 464 F.3d at 958; *see also Brotby*, 364 F.3d at 1115. Further, where

---

5 All emphasis is added and citations are omitted unless otherwise noted.

6 The Court is not required to make explicit findings as to each of the factors. *Id.* at 958.

there is "ample evidence of [] time and resources [having been] spent in investigating and resolving the spoliation issues," the first two factors support terminating sanctions. *Leon*, 464 F.3d at 958 n.5.

With respect to factor number three – the risk of prejudice – the Court should consider "whether the [spoiling party's] actions impaired the [non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Id.* at 959 (alteration in original). Prejudice sufficient to support sanctions has been found where a party's withholding of evidence forced the opposing party to "rely on incomplete and spotty evidence" at trial (*Anheuser-Busch*, 69 F.3d at 354) and where a party produced responsive documents after the opposing party had taken key depositions. *Brotby*, 364 F.3d at 1116-17.

In *Leon*, the Ninth Circuit Court of Appeals affirmed the district court's finding of prejudice and dismissal of plaintiff Leon's claims of violations of the False Claims Act, Title VII, the Americans with Disabilities Act and state law, and imposition of monetary sanctions against Leon based upon Leon's spoliation of evidence. 464 F.3d at 955. Leon had deleted 2,200 files from his laptop computer issued by his employer, defendant IDX Systems Corporation ("IDX"). *Id.* The court found that the failure to preserve and indeed destruction of the files "threatened to distort the resolution of the case, because any number of the 2,200 files could have been relevant to IDX's claims or defenses, although it is impossible to identify which files and how they might have been used." *Id.* at 960.

The Ninth Circuit also affirmed the imposition of terminating sanctions in *Brotby*, 364 F.3d at 1117. There, the plaintiff sought damages for defendants' alleged breach of a non-disclosure/non-solicitation agreement and a variety of business torts. *Id.* at 1114. Defendant Brotby refused to respond to interrogatories and refused to produce key documents. *Id.* After winning several motions to compel and Brotby's intransigent failure to comply with the magistrate judge's orders to respond to discovery, plaintiff moved for terminating sanctions under Rule 37; the magistrate judge recommended that the motion be granted. *Id.* at 1114-15. The district court affirmed, adopting the magistrate judge's recommendation to dismiss Brotby's counterclaims, strike his answer and enter

default against him on plaintiff's claims, finding that defendant's failure to produce documents as ordered by the Court was sufficient prejudice.[7] *Id.* at 1115-16.

Indeed, prejudice can take myriad forms as in *In re Telxon Corp. Secs. Litig.*, Case No. 5:98CV2876, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004), where the court found that the parties seeking sanctions had been prejudiced from third-party defendant auditor PricewaterhouseCoopers LLP's ("PwC") failure to cooperate in discovery in at least three ways:

> (1) PwC's failure to produce certain documents during discovery ***adversely affected Telxon's and plaintiffs' decisions as to whom to depose and which questions to ask deponents***; (2) PwC's failure to produce all versions of relevant documents ***deprived Telxon and plaintiffs of the opportunity to examine how PwC's audit evolved and the timing, nature, extent, and purpose of changes in the audit***; and (3) PwC's failure to produce documents timely and in the order in which they were kept in the regular course of business ***slowed Telxon's and plaintiffs' discovery of relevant information and increased the cost of discovery***.

*Id.* at *114-*115. In *Telxon*, the court entered default judgment pursuant to Rule 37, specifically rejecting lesser sanctions:[8]

> Lesser sanctions would result in "unwinding" over three years of litigation. This would require the re-taking of many depositions and the taking of new depositions, the conduct of additional expert analyses and the production of new reports, and the propounding of new interrogatories.

*Id.* at *119. Among the considerations that the court found militating against imposing lesser sanctions were the fact that "beginning discovery again would mean additional lengthy delay before the case reaches a resolution" unfairly prejudicing Telxon and plaintiffs who already suffered undue

---

7 In a recent decision in *Juniper Networks, Inc. v. Toshiba America, Inc. et al.*, Case No. 2:05-CV-0479 (July 11, 2007), United States District Judge T. John Ward of the Eastern District of Texas also imposed severe sanctions for violation of a court order. Ex. 8. In the patent infringement action, the court found that defendants were in possession of source code ordered produced, but nonetheless misrepresented the existence and availability of the code to the court and failed to produce the code. *Id.* at 5-6. The court found that defendants had willfully and intentionally violated the court's amended discovery order. *Id.* at 1. Among other trial related sanctions and monetary sanctions, the court prohibited the defendants "from proffering ***any*** expert testimony or opinion from ***any*** source during trial regarding non-infringement . . . ." *Id.* at 7-8 (emphasis in original). The court did not make a finding of prejudice.

8 The *Telxon* court gave little weight to the fact that it had not previously warned PwC or its counsel that failure to cooperate could lead to dismissal in light of the "number of discovery disputes and the magistrate judge's ongoing and active involvement in the disputes." *Id.* at *116.

delay because of PwC's bad-faith conduct; that PwC's late numerous delayed productions "undercut[] any belief that PwC [had or ever would] produce all relevant material in its possession;" and that "there [was] strong evidence that documents [had] been destroyed, placing plaintiffs and Telxon in a situation which [could not] be remedied." *Id.* at *119-*120. The court concluded that "[b]ecause PwC's conduct has made it impossible to try this case with any confidence in the justice of the outcome, PwC should bear the burden created by its conduct." *Id.* at *120.

Other Ninth Circuit decisions and decisions from this district have held that prejudice to the wronged party is an optional consideration when determining the appropriateness of default sanctions. *See, e.g.*, *Anheuser-Busch*, 69 F.3d at 353; *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 382 (9th Cir. 1988); *Napster*, 462 F. Supp. 2d at 1066. In any event, as discussed *infra*, plaintiffs proffer an abundance of evidence of prejudice suffered here by plaintiffs as a result of defendants' misconduct.[9]

Defendants' reliance on *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005), in their Opposition to Motion to Compel as requiring plaintiffs to show through extrinsic evidence that the destroyed evidence would have supported plaintiffs' claims in order to establish prejudice is misplaced. Ex. 2 at 28; *see also* Ex. 9 at 22:7-24. Decisions of the Ninth Circuit Court of Appeals and other courts have clearly not required such a showing prior to imposing spoliation sanctions. *See, e.g.*, *Leon,* 464 F.3d at 959 (finding that the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist); *Napster*, 462 F. Supp. 2d at 1066 ("District courts may impose sanctions against a party that merely had notice that the destroyed evidence was potentially relevant to litigation."). Indeed, to require "concrete" evidence as espoused by *Hamilton* (2005 U.S. Dist. LEXIS 40088 at *25) would be contrary to the premise that "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would . . . allow

---

[9] The ***only*** basis Special Master Infante found for denying without prejudice plaintiffs' request for sanctions in the Motion to Compel was that plaintiffs failed to make the required showing of prejudice. Ex. 9 at 39:20-25.

parties who have intentionally destroyed evidence to profit from that destruction." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998); *see also Residential*, 306 F.3d at 109. In fact, the *Hamilton* decision is internally inconsistent as it cites this very principle. *Hamilton*, 2005 U.S. Dist. LEXIS 40088 at *19.[10]

Instead, documents actually preserved and produced by defendants and/or third parties are probative of the relevance of lost documents. *Napster*, 462 F. Supp. 2d at 1076-77. Where a party destroys evidence with knowledge of impending litigation, such behavior suggests "that the evidence would have been threatening to the defense of the case and that it is therefore relevant in an evidentiary sense." *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *22; *Ameripride Servs. Inc. v. Valley Indus. Serv., Inc.*, No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398, at *32 (E.D. Cal. Aug. 9, 2006) ("A party who is on notice that evidence is relevant and then destroys that evidence is 'more likely to have been threatened by that evidence.'").

Moreover, where, as here, bad faith destruction is evident, "that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK)(AJP), 2007 U.S. Dist. LEXIS 6198, at *76 (S.D.N.Y. Jan. 30, 2007) (quoting *Residential*, 306 F.3d at 109). The same holds true for evidence destroyed in a grossly negligent manner or the grossly negligent untimely production of evidence. *NTL*, 2007 U.S. Dist. LEXIS 6198, at *76-*77; *Residential*, 306 F.3d at 109.

---

10 *Hamilton* is also factually inapposite. First, as set forth in plaintiffs' Objection, here, the PSLRA codified defendants' preservation responsibilities, but in *Hamilton*, there was no such statute. Ex. 5 at 16. Moreover, in *Hamilton*, the spoliation claim was based only on the alleged destruction of a portion of a surveillance video that recorded an incident between two individuals and, as noted by the court, the plaintiffs had the statements of two witnesses who claimed to have seen the entire incident and the statements "confirm[ed] that the existing video [was] accurate." *Hamilton*, 2005 U.S. Dist. LEXIS 40088, at *24-*25. This evidence was a factor in the court's finding that the "[p]laintiffs [had] failed to establish through 'concrete' evidence that the missing video would have favored their case and that [defendant] destroyed the [video] because the evidence would have been harmful to it." *Id.* at *25.

## IV. DEFENDANTS ALTERED AND WITHHELD KEY EVIDENCE RELATING TO A "CLEAN UP" OF ACCOUNTING FILES RELEVANT TO PLAINTIFFS' CLAIMS

On October 11, 2002, plaintiffs filed their Second Amended Complaint ("SAC"), which included detailed allegations of accounting fraud committed by Oracle in connection with its second fiscal quarter 2001 ("2Q01"). Generally, the SAC alleged that defendants engaged in accounting manipulations to materially inflate Oracle's financial results for 2Q01. More specifically, plaintiffs allege that Oracle misused a large fund of money from customer duplicate payments and overpayments – money that did not belong to Oracle – to generate false revenues and earnings in 2Q01. To carry out this scheme and cover up the accounting manipulations, Oracle engaged in an "On Account Clean Up" in November 2000 (the "November 2000 Clean Up") and created over 46,000 fictitious "debit memo" invoices in order to hide the customer money that had been improperly converted to revenue and earnings in 2Q01.

After plaintiffs filed the SAC on October 11, 2002, plaintiffs learned from a confidential source ("CW49") that Oracle in response immediately initiated a second "Clean Up" beginning in late October 2002 to cover up and "resolve" its misuse of unapplied cash and debit memos (the "2002 Clean Up"). According to CW49, who reported the events surrounding the 2002 Clean Up while they were happening, Oracle personnel altered evidence by changing historical information in the audit trail of the debit memos and "adjusting up" old invoices to make it look like the November 2000 debit memo receipts (customer overpayments) had been applied to legitimate invoices.[11] Defendants do not and cannot now deny these facts.

On November 11, 2002, plaintiffs filed an *Ex Parte* Application seeking to enjoin defendants from altering or destroying evidence, to order defendants to preserve all documents relating to the accounting allegations and to grant plaintiffs particularized discovery ("*Ex Parte* Application"). *See* Ex. 10. That motion was denied, in part because defendants submitted sworn declarations falsely claiming that the ongoing 2002 Clean Up had "nothing to do" with the November 2000 Clean Up or

---

[11] Information provided by CW49 was ultimately incorporated in the [Proposed] Revised Second Amended Complaint ("RSAC") which was filed on December 9, 2002.

the 46,000 debit memos. Ex. 11. In fact, defendants stated in their opposition: "***Oracle is not deleting, destroying, or altering any documents or evidence relating to the allegations in this case – period.***" Ex. 12. Once the Court ordered discovery into the 2002 Clean Up, the documents ordered produced demonstrate unequivocally that Oracle's representations to the Court regarding the relationship between the 2002 Clean Up and the November 2000 debit memos were false. Moreover, in his December 19, 2006 Order Granting Plaintiffs' Motion to Enforce the Special Master's July 17, 2006 Order and to Compel Additional Accounting Documents Based on Recent Testimony and New Evidence, Special Master Infante specifically found that defendants ***"later shifted that position"*** referring to the sworn declarations submitted by defendants in opposition to plaintiffs' *Ex Parte* Application. Ex. 13 at 19:19-23. The discovery also corroborates the reports of CW49 and plaintiffs' *ex parte* allegations regarding Oracle's alteration and destruction of documents.

**A. Defendants Made False Representations to the Court Concerning the 2002 Clean Up to Shield Highly Relevant Documents from Discovery**

Since the accounting allegations were made, and the beginning of discovery in this case, defendants have deliberately misled the Court about the circumstances surrounding the post-Class Period 2002 Clean Up. Evidence has revealed that immediately after plaintiffs filed the debit memo allegations on October 11, 2002, Oracle engaged in a deliberate and systematic plan to cover up and alter the evidence relating to plaintiffs' accounting allegations by (1) altering key accounting documents and data, (2) reversing thousands of accounting transactions, and (3) refunding and escheating to the government millions in customer overpayments and unapplied cash that Oracle had been illegally withholding from its customers for years – more than 10 years in some cases.

For most of the litigation, defendants successfully resisted discovery concerning the 2002 Clean Up by repeatedly and falsely representing to the Court that there was "***no connection whatsoever***" between the 2002 Clean Up and plaintiffs' debit memo allegations. Ex. 14 at 52:13-16. Defendants falsely claimed that the 2002 Clean Up was "***not related***" to the November 2000 debit memos and had "***nothing to do*** with the approximately 46,000 debit memo transactions that occurred on November 17, 2000." Ex. 11 at 2. The following is a partial chronological list of the

representations made by defendants to resist discovery regarding the 2002 Clean Up:

**November 14, 2002 Sworn Declaration of Greg Myers in Opposition to Plaintiffs' *Ex Parte* Application:**

> "Our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account (known as Account 12601) has ***nothing to do with the approximately 46,000 debit memo transactions that occurred on November 17, 2000 . . . .*** "

Ex. 11 at 2.

**Defendants' Counsel Javier Rubenstein at the March 1, 2005 Discovery Hearing:**

> Now, it turns out that the investigation regarding the bad debt reserve account ***happened to be going on*** when the plaintiffs amended their complaint with respect to the 25005, but there is ***no connection whatsoever between those two events***.

Ex. 14 at 52:13-16.

**June 6, 2006 Sworn Declaration of Greg Myers in Opposition to Plaintiffs' Motion to Compel:**

> "The October 2002 project was ***not related*** to the November 17, 2000 'on account' clean up."

Ex. 15 at 7, ¶28.

**Defendants' Counsel Jamie Wine at the July 10, 2006 Hearing:**

> The creation of the debit memos had no financial impact whatsoever and that ***it was a discrete separate event from the unapplied cash cleanup that happened in October of 2002***.
>
> So they don't have anything new here today. And ***there is no link***, there's no reason for them to, you know – for us to modify the prior orders that have been entered in this case and to now allow them broader discovery into issues ***beyond the debit memos***.
>
> * * *
>
> "***There simply is no connection there.***"

Ex. 9 at 79:11-19, 80:9.

Based upon defendants' unequivocal representations, the Court initially denied plaintiffs discovery into the circumstances surrounding the 2002 Clean Up, but did order defendants to produce "every piece of paper that has to do with these debit memos up and down. . . . " Ex. 14 at 54:1-9. Plaintiffs were forced to take nearly two years of discovery and over 100 depositions

without the benefit of the documents and data relating to the 2002 Clean Up. On December 19, 2006, Special Master Infante issued an Order Granting Plaintiffs' Motion to Enforce the Special Master's July 17, 2006 Order and to Compel Additional Accounting Documents Based on Recent Testimony and New Evidence (the "December 19, 2006 Order"), stating that contrary to defendants' prior representations, the evidence provided by plaintiffs "***raised substantial questions about the relationship between the November 2000 debit memos and the 2002 Clean Up***." Accordingly, Special Master Infante ordered defendants to produce all documents related to the 2002 Clean Up and Oracle's transfers of unapplied cash to its bad debt reserve in 2Q01. Ex. 13.

The amount of new documents produced by defendants in connection with the 2002 Clean Up was staggering – over 800,000 pages (265 boxes) of new spreadsheets, memos and e-mails (discussed below) expressly referring to the November 2000 events and the impact of the "debit memos" themselves. Defendants intentionally withheld these crucial documents under the guise of being part of the purportedly "unrelated" 2002 Clean Up for nearly two years – until after the discovery period was closed. The documents expressly contradict defendants' representations to the Court that there was no relationship between the debit memos and the 2002 Clean Up.

In fact, the documents demonstrate that the 2002 Clean Up was an essential part of Oracle's scheme involving Oracle's debit memo transactions and its perennial misuse of customer overpayments and unapplied cash to boost its financial results. The documents withheld until 2007 reveal not only the truth underlying plaintiffs' allegations (that Oracle used customer overpayments and 46,000 debit memos to inflate its 2Q01 revenue and earnings), but that this fraudulent activity had continued until October 2002, when plaintiffs filed the SAC. Plaintiffs have been severely prejudiced by not having these documents during the entire discovery period to question witnesses and otherwise develop their case in discovery. *See, e.g.*, *Brotby*, 364 F.3d at 1116-117; *Telxon*, 2004 U.S. Dist. LEXIS 272296 at *119-*120.

### 1. Documents Produced Months After the Discovery Cutoff Reveal Defendants' Attempt to Hide Crucial Documents Under the Guise of the 2002 Clean Up

The documents produced pursuant to the December 19, 2006 Order show a direct connection between the 2002 Clean Up and the November 2000 debit memos. Many of the 2002 Clean Up

documents expressly refer to "11/17 debit memos" and specifically discuss plaintiffs' lawsuit and the events on "November 17, 2000." The following are a few examples of the documents that defendants improperly withheld for the entire discovery period claiming (falsely) that the documents had "nothing to do" with the debit memos and plaintiffs' allegations:[12]

| Exhibit | Date; To; From | Subject | References to Debit Memos | Date Produced |
|---|---|---|---|---|
| Ex. 16 | Oct. 22, 2002<br><br>To: Megan Birkler<br>From: Greg Myers | ***"Debit Memo Listing"*** | ***"Attached is the listing of the 47k debit memo's created on November 17, 2000*** (Transactions_Register). I have also a breakdown of the GL side in the 25005 account (25005)." | January 30, 2007 |
| Ex. 17 | Oct. 15, 2002<br><br>To: Thomas Williams<br>From: Greg Myers | ***"DM List"*** | "Tom-***List of 11/17 debit memo's***." | January 30, 2007 |
| Ex. 18 | Date: Oct. 23, 2002<br>To: Thomas Williams<br>From:Greg Myers<br>Cc: Michael Quinn; Lauren Segal | ***"DM for Specific Customers"*** | "Tom-Attached is the modified list of ***debit memos for the customers mentioned in the document***." | January 30, 2007 |
| Ex. 19 | Dec. 20, 2004<br>To: Molly Littlefield<br>From: Colleen Calandra | *"Unapplied cash word doc attached"* | "Matching remaining debit balances to the ***Debit Memo Report for 11/17/00 and the Debit Memo Report for post 11/17/00 activity*** *. . . .Also in some cases on miscellaneous receipt can relate to a combination of debit memos and vice versa."* | February 5, 2007 |

---

[12] Greg Myers ("Myers"), a declarant on motions submitted to the Court by defendants, and Lauren Segal ("Segal"), Oracle's assistant general counsel at relevant times, knew that the debit memos were connected to the 2002 Clean Up and are specifically named on the documents evidencing the connection.

| Ex. 20 | Oct. 22, 2002 From: Greg Myers To: Michael Quinn | *"Misc. Documents"* | "***DM's reviewed***-Terry and I reviewed all items > $1MM and any item > 10K for customers mentioned in the document. This is the detail. Transactions Register – ***A list of all Debit Memo's for November 17***." | January 30, 2007 |
|---|---|---|---|---|

A chart of additional documents relating directly to debit memos and the November 2000 events is attached hereto as Ex. 21. The documents confirm that the 2002 Clean Up was directly related to the November 2000 debit memos. Importantly, some of the documents belatedly produced in 2007 relating to the 2002 Clean Up directly contradict testimony of top Oracle accounting officers. Because of defendants' failure to timely produce all relevant documents, however, plaintiffs did not have the opportunity to confront these witnesses with the documents.

For example, some of the documents produced belatedly in February 2007 demonstrate that Oracle's former controller and current CFO Jennifer Minton ("Minton") was directly involved in the 2002 Clean Up. *See, e.g.*, Ex. 22 at NDCA-ORCL 1727980 ("I have also tried to summarize the open questions Jennifer had from our meeting earlier this week. . . . Jennifer has initiated a project to cover our work in this area. . . . Jennifer would like to meet next week on our progress"); Ex. 23 at NDCA-ORCL 1895745 ("We actually have the unapplied cash. We never booked the order but the customer paid. We want to book it or try to get [Minton] to agree that we should keep the money."); Ex. 24 at 1733105 (Tom Williams e-mail to Minton: "during our discussion at last friday's audit committee meeting, i told you that i would supply an update on our review of the unapplied cash items that had been moved to the reserve account by today."); *Id.* at NDCA-ORCL 1733103 (November 17, 2002 Annica Magnusson e-mail to Minton with subject "Status UPdate on AR Project and Proposed con callon Wed Nov 20"); Ex. 25 at NDCA-ORCL 1886329 (Minton June 3, 2004 e-mail: "I am absolutely thrilled with the success that the cash apps team has had in driving down the unapplied cash balance."); Ex. 26 at NDCA-ORCL 1892686-87 (e-mail from Minton "approv[ing]" Department of Treasury refund request where overpayment was "misapplied to various other government invoices that [Oracle] had no authorization to apply the payment to."); Ex.

27 at NDCA-ORCL 1885840-41 (Minton approval regarding scope of 2002 Clean Up). These documents which corroborate the information provided by defendant Jeffrey O. Henley ("Henley") to the Company's Special Litigation Committee ("SLC") on November 18, 2002 that "he directed Jennifer Minton and Tom Williams to investigate [the allegations in the SAC]" (Ex. 28 at NDCA-ORCL 313790), were essential for Minton's deposition, because she testified unequivocally that she was ***not*** involved in the 2002 Clean Up or its corresponding investigations. Ex. 29 at 162:23-163:4 ("***I was not involved in the investigation. . . . I do not know of any details of the investigation.***"). In fact, Minton testified that she was specifically told by counsel to intentionally keep herself in the dark: "***I was told – I think it was appropriate for legal to keep me uninvolved in the investigation.***" *Id.* at 174:25-175:19.

In a later deposition, Minton attempted to change her story, testifying that she was in fact told about the "results" of Oracle's 2002 investigation, but was not involved in the "underlying investigation itself." Ex. 30 at 279:1-5 ("I just want to clarify what I did know. I knew that there was an investigation going on. I knew that – ***but I was not involved in the actual underlying investigation itself.***" ). This testimony is flatly contradicted by numerous e-mails showing that Minton was personally supervising and directing the investigation. Exs. 22-27. Plaintiffs did not have these documents to confront Minton at the deposition. Moreover, plaintiffs did not have the documents in assessing whether to call and question other witnesses who were specifically named in the Minton e-mails. Simply put, defendants' attempt to withhold critically relevant documents by misleading the Court about the relationship between the 2002 Clean Up and the November 2000 debit memos severely prejudiced plaintiffs' ability to properly develop their case during discovery. *See, e.g.*, *Brotby*, 364 F.3d at 1116-17; *Telxon*, 2004 U.S. Dist. LEXIS 272296 at **119-20.

**2. The Testimony of Key Oracle Accounting Witnesses Confirms that Defendants Knowingly Misled the Court When They Asserted that There Was No Relationship Between the 2002 Clean Up and the November 2000 Debit Memos**

On October 5 and 10, 2006, plaintiffs deposed former Oracle Collections Manager Ian Hatada ("Hatada"). Hatada was one of six collections managers asked to implement and execute Oracle senior management's plan associated with the 2002 Clean Up. *See* Ex. 31 at 120:11-17; Ex.

32 at 107:22-108:10. In stark contrast to defendants' previous representations to the Court, Hatada testified that the 2002 Clean Up was directly related to plaintiffs' allegations. In fact, the project was initiated "because of the lawsuit" in order to "help" Oracle fix and "clean up" the debit memos and the customer overpayment issues raised in plaintiffs' complaint:

> From – from what I know from meetings that we had from – with Ryan Roberts, ***that there was a lawsuit and it was our job to clean up the unapplied plus what had been now moved in to the unapplied account from other accounts because of the lawsuit, so in an effort to – to clean that up, to – to help Oracle with this lawsuit***. That was what – my understanding.

Ex.33 at 264:12-265:6.

Importantly, Hatada testified that defendant Henley was involved in reviewing the results of the 2002 investigation: "I know Jeff Henley was – you know, we were supposed to get this information to Jeff Henley, and the – in the end. I mean, that's where it was supposed to end up." Ex. 33 at 266:10-21.

Hatada also testified that during the flurry of meetings held after plaintiffs' accounting allegations were filed on October 11, 2002, Oracle's collections managers were specifically told by senior management that the 2002 Clean Up was initiated to "resolve" debit memo items of unapplied cash as a direct result of plaintiffs' lawsuit:

> [A.] Well, the first – the first meeting that we had to actually give us a – kind of a short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, there was a lot more in the reserve that we were going to have to try to resolve ***because of a specific lawsuit that, you know, that we had money that we shouldn't have had,*** and whether it was in the reserve or the unapplied, but the best description would just be that there was money in an account that was, you know, ***unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve***.
>
> Q. ***And were those the items, as far as you know, that resulted from creation of debit memos previously?***
>
> * * *
>
> [A.] ***I believe that was one of the reasons that Mike Quinn and Greg Myers had given us.***

Ex. 32 at 128:8-129:2; 257:24-263.

Hatada further testified that Oracle's collections staff was asked to research and determine the "revenue impact" of Oracle's misuse of customer overpayments and unapplied cash which is

exactly what plaintiffs alleged in the SAC and the RSAC:

> Q. . . . [W]hat do you recall [] was the explanation of the on account problem?
>
> A. Well, I – I mean, like this first item, you know, we were called together to explain exactly what it says, that, you know, there's an unapplied account issue, there's – there's a lawsuit that's about to happen, and – and we need to resolve – you know, ***we're going to have to resolve these unapplied amounts, and, you know, there will be a meeting in the near future to explain how we're going to do it.***
>
> ***And, you know, the bottom line was that they needed to figure out if it was – if we had recognized revenue on it or we had not, so if it was revenue impacting or not revenue impacting.***

Ex. 32 at 113:19-114:7. *See also*, Ex. 33 307:5-9 ("***[R]eally you know, at a bottom line, this is really what they wanted to know – from Mike's [Quinn's] point of view, was he wanted to know after it's all said and done what's going to be revenue impacting and what's not going to be revenue impacting***.").[13]

Hatada's testimony is exactly consistent with the evidence submitted to the Court in plaintiffs' *Ex Parte* Application filed in November 2002. Ex. 10. Additionally, Hatada authenticated multiple pages of his handwritten notes that were taken contemporaneously with the management meetings discussing the 2002 Clean Up. Ex. 35. The handwritten notes confirm that the debit memos and the November 2000 Clean Up were a major part of the discussion and plan for the 2002 project. Indeed, the notes make multiple references to "debit memos," "on account" and "revenue impact" of the items pertaining to the project. The notes also refer to a "56m" amount for "2 years" which Hatada testified was the amount of unapplied cash that was transferred to Oracle's reserve during a prior period. Ex. 33 at 305:13-306:23. Oracle's own memos confirm that the total amount of customer unapplied cash transferred prior to the 2002 Clean Up was actually larger – 59.6 million. *See* Ex. 36.

The testimony of former Oracle Accounts Receivable Manager Terry Elam ("Elam") also

---

[13] Former Oracle Director of Collections Michael Quinn ("Quinn") testified that Oracle learned during 2002 that there was indeed a "revenue impact" of the bad debt transfers. Ex. 34 at 229:2-8. Hatada testified that the revenue impact was "major." Ex. 32 at 153:16-154:5. The documents belatedly produced by defendants show that many of the transfers were directly related to debit memos. However, defendants refused to produce the evidence regarding these issues until after discovery closed.

confirmed that the 2002 Clean Up was directly related to the November 2000 debit memos. Elam testified that in October 2002 he was specifically asked by Myers to research "debit memo" items contained on a "spreadsheet." Ex. 37 at 66:25-67:20. Part of the project was to issue credit memos for debit memo items and "***pull[] out some of the entries into the 12601 account in October-November 2002***." *Id.* at 186:2-11. Elam confessed that the "entries" needing to be reversed were those associated with "***debit memos***:" *Id.*

> Q. Was there more than one discussion about that, about on-account debit memos being credit memoed two years after November 17th, 2000?
>
> A. I don't recall any – how many there were.
>
> Q. Okay. Well, what do you -- just what do you recall about those discussions at all?
>
> A. Um, specifically in the – ***from Greg Myers about the process related to pulling out some of the entries into the 12601 account in the October-November of 2002 time frame***.
>
> Q. Okay. So pulling out some of the entries in 12601; is that what you said?
>
> A. Yeah. ***The associated entries with the debit memos.***

*Id.* at 185:23-186:11.

Elam also explained that during 2002 there was a specific process for ***reversing*** debit memo receipts that had been moved into Oracle's bad debt reserve (Account 12601):

> THE WITNESS: There – it's a – there's a specific process of – ***associated with a debit memo*** that you have to follow to, um, pull – there's two – there's a miscellaneous receipt that you need to – to take out or ***reverse out of this system, plus unapply a debit memo to actually process the credit memo on it***.
>
> Q. Right. But why were you – why were you processing credit memos – or why were you reversing entries into 12601 during 2002?
>
> THE WITNESS: Well, that's part of the spreadsheet that was given to myself, was ***there was a number of steps needed to credit memo the debit memo***. And part of that is to reverse out the miscellaneous receipt into 12601.

*Id.* at 187:10-188:2.

It is clear from Hatada and Elam's first-hand testimony that the 2002 Clean Up was not only related to plaintiffs' debit memo allegations, it was in direct response to plaintiffs' accounting allegations included in the SAC filed on October 11, 2002. Defendants' misleading representations regarding the 2002 Clean Up allowed defendants to shield nearly one half million pages of highly

relevant documents from plaintiffs and the Court for the entire two-year discovery period. The documents that have been altered or destroyed are irretrievable. By the time defendants finally produced the documents that remained, nearly 100 depositions had been taken, including many accounting witnesses named on the face of the new documents, such as Myers, Quinn, Tom Williams ("Williams"), Minton, Segal, Daniel Cooperman ("Cooperman"), Ryan Roberts, Sam Yohannes and Elam. Defendants' misrepresentations to the Court and their failure to produce documents regarding the 2002 Clean Up until after discovery closed have severely prejudiced plaintiffs.

### 3. Oracle Used the 2002 Clean Up to Alter Highly Relevant Accounting Records

Evidence shows that after defendants learned about plaintiffs' lawsuit in October 2002, Oracle personnel altered, overwrote and deleted certain historical electronic "notes" and comments that reflected the audit trail and accounting history of customer overpayments relating to debit memos that had been sitting in Oracle's unapplied cash account for up to 10 years:

> Q. Okay. As part of that [2002 Clean Up] research were there ever cases where collectors would find out there were incorrect notes and put the correct notes, overwrite the old notes with the new notes?
>
> A. Sure. At times we would see only one note in there on a very old invoice that had an updated date.
>
> Q. And did that occur after you learned about the lawsuit in the meeting?
>
> A. Correct.
>
> * * *
>
> Q. So these notes were -- the notes for the items of unapplied cash were changed or around October 30th, 2002, around this time period; right?
>
> A. Correct.
>
> Q: And that was after you were told about the lawsuit involving Plaintiffs in this case at the meetings involving the debit memos; right?
>
> A: Correct.

Ex. 33 at 603:25-604:14; Ex. 32 at 83:24-85:16; 129:4-131:9; 177:4-25; 179:20-180:7; *see als* Ex. 33 at 292:12-293:20; 487:9-11 ("***Sometimes it would be fully deleted, and then you'd have just the only note – the last note that was there.***"); 600:4-601:13 ("The process was to write on top of it or

in front of it to ensure that you had every note that's ever been logged on that item, but at times--sometimes it would get deleted or they would write over it."). In addition to violating the PSLRA, this intentional conduct directly violated the Final Judgment of Permanent Injunction and Other Relief Against Oracle Systems Corporation entered in the United States District Court for the Northern District of California in *Securities and Exchange Commission v. Oracle Systems Corporation*, which provided in part that Oracle and its employees:

> are permanently restrained and enjoined from, directly or indirectly, failing or causing the failure to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Oracle in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

Ex. 38 at 3

Hatada also testified that Oracle collections personnel were never instructed to preserve or save the old or deleted "incorrect" notes relating to the 2002 Clean Up. Ex. 33 at 293:20-294:17. Instead, at one point early in the 2002 Clean Up (after the filing of the SAC), Oracle personnel were told that the new electronic notes that they input into the system for certain items of unapplied cash were "incorrect" and "not good enough" and that they had to go back and rewrite them. Ex. 39, Ex. 33 at 292:18-293:9 ("Q. Were there any notes that were incorrect that were deleted and then other notes put in its place after these meetings? A. Yes, I believe that happened, because the notes weren't correct...in the first place. The first – the first notes that were in there were completely off base or incorrect, so they would go in and put the correct note in of what actually had happened with that unapplied item.").

Notably, defendants' counsel claimed in writing in May 2006 that they were not even aware of the ***existence*** of certain electronic customer notes relating to the debit memos until plaintiffs elicited testimony about the notes during a witness deposition on April 13, 2006, nearly a full year after the May 1, 2005 production deadline under the Discovery Plan. Ex. 40 ("***Defendants became aware of these notes only as a result of recent depositions of two former Oracle collections personnel.*** Defendants immediately took steps to identify ***whether this data still existed***, collect relevant data, and supplement their production consistent with their ongoing obligations under Federal Rules of Civil Procedure.").

The fact that defendants' counsel claim that they first learned of the existence of crucial electronic evidence during depositions of Oracle employees after nearly a year of discovery (and did not even know if the data "still existed" at that time) demonstrates defendants' failure to preserve key documents and prevent spoliation in this case, as well as defense counsel's lack of veracity. Defendants were made aware of this evidence over three years earlier by the declaration of Ken Keatly filed in support of plaintiffs' *Ex Parte* Application in November 2002 which provides, in relevant part:

> The current employee further informed CW49 that the Company was in the process of defining five approaches it would take on the debit memos issued in November of 2000. One of the five methods would be to log onto Oracle's 11i accounts receivable "workbench" application and pull up the "receipts/receipts" form and ***then to delete from the historical receipt notes that describe the last transaction for a particular entry***.

Ex. 41 at ¶16.[14] Moreover, the notes that were eventually produced nearly a year after the May 1, 2005 deadline are not reliable because of Oracle's systematic attempt to alter and delete notes during the 2002 Clean Up, after learning of plaintiffs' lawsuit. This conduct was intentional and resulted in the destruction of relevant evidence.

### B. Defendants' Repeated Violations of the Court's Orders Prevented Plaintiffs from Obtaining Relevant Documents Until After the Completion of Discovery and Depositions

In addition to defendants' intentional effort to withhold documents and mislead the Court about the relevance of the 2002 Clean Up, defendants also violated every accounting discovery order in this case by producing documents months after court-imposed deadlines and withholding relevant documents altogether.

#### 1. Defendants' Violations of the March 10, 2005 Discovery Plan

The March 10, 2005 Discovery Plan clearly identified the relevant scope of discovery

---

[14] Additionally, Oracle's explanation that it first "became aware" of the electronic notes in April 2006 is expressly contradicted by a statement by defendants' counsel; plaintiffs sought discovery of the electronic notes and comments a full year before the depositions took place, and Oracle's prior counsel, Mayer Brown Rowe & Maw LLP, expressly represented that all notes would be produced. Ex. 42 ("***comments entered electronically by collections department personnel will be produced as part of the electronic data production concerning the transactions***.").

pertaining to the accounting issues. Magistrate Judge Spero ordered that defendants "shall" produce all documents relating to the following:

> ***(i) the alleged "On Account Clean Up" occurring in November 2000; (ii) the 46,000 debit memoranda; and (iii) the accounting treatment of those debit memoranda, including any audit trail, and all related accounting policies.***

*See* Ex. 43 at 2. The Court-ordered deadline for the production of all accounting documents was May 1, 2005. *Id.* at 3. As set forth in §IV.B.4, *infra*, defendants were still producing highly relevant and responsive documents in April 2007, nearly ***two years*** after the deadline.

During the March 1, 2005 discovery conference, defendants represented to the Court and plaintiffs that all documents relating to the November 2000 Clean Up and 46,000 debit memos would be produced:

> THE COURT: Well, if you get every piece of paper or every record that is on these 46,000 debit memos or any piece of paper that is related to those 46,000 debit memos, why isn't that enough?
>
> [Plaintiffs]: I didn't understand that to be the position.
>
> [Defendants]: ***That is our position. That's exactly what we are offering.***

Ex. 14 at 44:2-11.

On May 1, 2005, instead of producing all responsive documents as ordered, defendants produced a single data file or "script output" purportedly containing the history and audit trail of the 46,000 debit memos (the "May 1, 2005 Script Output"). Ex. 44. The May 1, 2005 Script Output was severely incomplete, inconsistent and inaccurate. Indeed, defendants later produced at least five additional versions of script output, all of which were incomplete and had to be replaced or revised. Defendants refused to produce the underlying source documents, transactions, and other accounting information ordered by the Discovery Plan.

On October 7, 2005, after defendants refused to produce any additional documents, plaintiffs were forced to file a motion to compel ("Motion #1"). Ex. 45. On October 18, 2005, Magistrate Judge Spero held a hearing on plaintiffs' Motion #1. He expressed concern that defendants' refusal to produce the underlying documents related to the 46,000 debit memos was inconsistent with defendants' previous representations:

> ***I'm concerned that during the course of setting up the very detailed discovery plan in this case, the defendants argued and obtain[ed] a narrower scope of discovery in exchange for a commitment that all of the documents regarding all of these debit memos, including all the underlying documents would be committed.*** And that, to my mind, is clear as day in the transcript that that was the position taken at the time. ***And you are changing your position.***

Ex. 46 at 4:13-21.

Consequently, on October 19, 2005, Magistrate Judge Spero issued a supplemental order granting plaintiffs' Motion #1. The October 19, 2005 Order required defendants to immediately produce – within 30 days – all relevant accounting documents, including underlying source documents previously ordered, related to the 776 largest debit memo transactions. Ex. 47. The Court also ordered the parties to agree on a "sampling" of smaller debit memo transactions in addition to the 776 largest debit memos. Ex. 46 at 18:11-13. The deadline for production was November 18, 2005.

**2. Defendants' Violations of Magistrate Judge Spero's October 19, 2005 Accounting Order**

Defendants' document productions pursuant to the October 19, 2005 Order were again severely deficient. As an initial matter, defendants' productions were scattershot and untimely – despite the November 18, 2005 deadline, defendants continued to produce documents subject to the Order in February, April, June and August 2006 and into 2007. In fact, defendants' most recent productions in April 2007 admittedly contained documents responsive to the October 19, 2005 Order. Ex. 48. Below is a chart of defendants' belated productions in connection with the October 19, 2005 Order.

| Date of Production | Approximate Number of Pages |
|---|---|
| November 21, 2005 | 31,444 pages |
| November 23, 2005 | 94,555 pages |
| February 13, 2006 | 4,646 pages |
| February 16, 2006 | 209 pages |
| April 27, 2006 | 2,697 pages |
| June 26, 2006 | 1,357 pages |
| August 3, 2006 | 51 pages |
| September 12, 2006 | 47 pages |
| April 17, 2007 | 9 pages |
| April 24, 2007 | 99 pages |

Defendants' document productions were not only untimely, but also substantively deficient. Defendants failed to produce all of the underlying documents relating to the 776 largest debit memos, including entire categories of reports, spreadsheets and underlying source documents relating to the debit memos transactions. Ex. 49.[15] Defendants also failed to comply with the October 19, 2005 Order by refusing to produce any documents relating to a "sampling" of the smaller debit memo items. Defendants simply disregarded the Court's directive on that point and argued that no further discovery was needed.

Defendants' refusal to produce the documents required by the March 10, 2005 Discovery Plan and the supplemental October 19, 2005 Order forced plaintiffs to file a second motion to enforce the prior accounting orders on May 25, 2006 (Motion #2). Motion #2 sought the same documents already ordered to be produced by the Court in the March 10, 2005 Discovery Plan and the supplemental October 19, 2005 Order. Ex. 49.

During the July 10, 2006 hearing on Motion #2, defendants asserted that they had complied with all prior accounting orders. Special Master Infante disagreed and admonished defendants for trying to shield discovery from plaintiffs by reading the complaint too narrowly: "***I have never seen anyone read a complaint so narrowly as you do. Rule 26 would be turned on its head if we applied your discovery rulings as you wish to make in this case. It's just ridiculous. I'm sorry I have to be so blunt with you.***" Ex. 9 at 86:11-16

On July 17, 2006, Special Master Infante granted plaintiffs' Motion #2 in substantial part and

---

[15] At the July 10, 2006 hearing where these issues were addressed, Special Master Infante opined, "They're entitled to all, just as Judge Spero ordered, all electronic information, including electronic images of documents relating to the debit memos at issue in this case and all transactions that underlie those debit memos where the debit memos are in amounts of $100,00 or more. . . . That was Judge Spero's order. I find that the order has not been fully complied with." Among the categories of debit memo source documents that defendants failed to produce in response to Magistrate Judge Spero's October 19, 2005 Order are: (1) the general ledger audit trail; (2) credit memos and refunds; (3) cash receipts and customer remittance advices; (4) call notes and customer notes (from collections, A/R and sales); (5) various customer accounts receivable reports, including A/R Aging Reports and Billing & Receipt Histories; (6) account-level debit memo data, including summaries and reconciliations; (7) A/R Reports, Trial Balance Aging and 7-Bucket reports; and (8) documents concerning A/R reserves and write-offs. *See* Ex. 50. Some of these document categories were never produced (for example, the general ledger audit trail and customer remittance advices).

ordered defendants to produce (for the third time) all relevant accounting documents ordered in the March 10, 2005 Discovery Plan and the supplemental October 19, 2005 Order, including summary-level accounting reports and underlying transactional documents that defendants refused to produce. Ex. 50. The deadline for production was August 31, 2006. Special Master Infante also ordered that defendants produce documents relating to 150 smaller amount debit memos selected by plaintiffs. *Id.* at 17. Plaintiffs selected 150 debit memos in a letter dated July 21, 2006. *See* Ex. 51.

### 3. Defendants' Violations of the Special Master's July 17, 2006 Accounting Order

Despite being faced with a ***third*** consecutive order requiring the production of all relevant accounting documents relating to the debit memos, defendants again attempted to prevent plaintiffs from obtaining the information ordered by the Court. First, defendants violated the Court's production deadline of August 31, 2006 by producing documents months after the deadline as follows:

| Date of Production[16] | Approximate Number of Pages |
|---|---|
| September 1, 2006 | 2,640 pages |
| September 8, 2006 | 137,888 pages |
| September 15, 2006 | 92,774 pages |
| October 27, 2006 | 14,809 pages<br>69 pages<br>6,507 pages |
| November 3, 2006 | 197 pages |
| November 9, 2006 | 66,898 pages |
| December 15, 2006 | 3,636 pages |

The productions were also substantively deficient. Instead of withholding the documents in their entirety (as defendants did in response to prior accounting orders), defendants tried to obscure

---

16 In fact, nearly all of these documents were improperly redacted (and/or had serious electronic issues that had not been resolved by meeting and conferring with defendants) and Special Master Infante subsequently ordered defendants to reproduce all of the documents again, in unredacted form, by January 17, 2007. *See* Discussion of December 19, 2006 Order, § IV.B.4, *infra*. Notably, these documents were subject to the original March 10, 2005 Discovery Plan, were then ordered produced by no later than November 18, 2005, and again on August 31, 2006. The January 17, 2007 reproduction comprised more than 400,000 documents. Defendants' discovery misconduct deprived plaintiffs of highly relevant data for the entire discovery period.

the substantive information by heavily redacting thousands of pages of responsive material, including entire spreadsheets, reports and accounting data. The result was thousands of blank and incomplete documents that effectively prevented the usage of the data – even the minimal data that was not redacted.

Defendants' improper redactions forced plaintiffs to file a third motion to enforce the Court's prior orders on October 30, 2006 ("Motion #3"). Motion #3 sought unredacted copies of all documents produced pursuant to the previously issued July 17, 2006 Order. Further, as detailed *supra*, plaintiffs also renewed their prior motion to compel documents related to the 2002 Clean Up and Oracle's improper transfers of customer overpayments to its bad debt reserve. This renewed part of the motion was based on new deposition testimony and evidence discovered subsequent to the Court's July 17, 2006 Order. Ex. 52.

On December 19, 2006, Special Master Infante granted plaintiffs Motion #3 in its entirety and issued the ***fourth*** court order requiring the production of all relevant accounting documents. The December 19, 2006 Order required defendants to produce, by no later than January 17, 2007, the following documents: (a) unredacted copies of all documents previously produced pursuant to the July 17, 2006 Order; (b) all documents relating to the 2002 Clean Up; and (c) all documents relating to Oracle's transfer of unapplied cash for its bad debt reserve in connection with 2Q01. Ex. 13.

With respect to defendants' heavy redactions, Special Master Infante's order stated: "Defendants' unilateral redaction of information from the supplemental accounting documents on the grounds it is not relevant or is 'non-responsive' is improper." *Id.* at 16. With respect to the 2002 Clean Up, Special Master Infante found that the new evidence provided by plaintiffs "raise substantial questions about the relationship between the November 2000 debit memos and the 2002 Clean Up." *Id.* at 19. Notably, Special Master Infante also joined in Magistrate Judge Spero's concern that defendants kept changing their position on accounting discovery during the course of the litigation:

> Judge Spero has already voiced concern that Defendants have made statements to the Court regarding discovery of accounting documents and then later changed their position. ***Here, again, Defendants have stated one position (that there is no link between the debit memos and the 2002 Clean Up project) and later shifted that position (by claiming that all linked documents have been produced and that the***

> ***link is not substantial).*** Given the Defendants' former position and the new evidence offered by Plaintiffs, the Special Master concludes that information relating to events concerning the October 2002 unapplied cash project are reasonably calculated to lead to discovery of admissible evidence regarding Plaintiffs' accounting allegations and Defendants' scienter during the Class Period.

*Id.*[17]

**4. Defendants' Violation of the December 19, 2006 Order and Other Sanctionable Discovery Conduct Thereafter**

Despite the January 17, 2007 production deadline ordered by the Court (which was, in part, extended to January 30, 2007 pursuant to defendants' request), defendants continued to belatedly produce documents in February, March and April 2007. The volume of new documents produced by defendants pursuant to the December 19, 2006 Order was shocking – over 800,000 total pages, (265 boxes) of new accounting documents. As set forth in §IV.A.1, *supra*, hundreds of those new documents expressly reference the November 2000 debit memos and the corresponding "On Account Clean Up," the two most fundamental accounting topics enshrined in the March 10, 2005 Discovery Plan. Defendants' withholding of such fundamentally relevant documents until after discovery closed based on the false assertion that the documents were "not related" to the November 2000 events has severely prejudiced plaintiffs.

**a. Defendants' Belated Production of E-mails on April 17, 2007 Regarding Plaintiffs' Accounting Allegations**

In addition to the discovery abuses outlined above, defendants recently made some disturbing admissions that they inexplicably withheld highly relevant and never-before-seen (by plaintiffs) e-mails and board of directors meeting memos relating to the fundamental accounting issues in this case. On April 17 and 24, 2007, defendants produced for the first time several key documents that had apparently been sitting in defendants' files for the entire discovery period.

The first production, on April 17, 2007, consisted of several e-mails that were written contemporaneously with the November 2000 Clean Up. The e-mails contained specific discussions

---

[17] Following the issuance of the December 19, 2006 Order, defendants filed a "motion for modification" seeking to delete the first two sentences quoted above from the December 19, 2006 Order. Defendants' motion was denied on January 12, 2007 and Special Master Infante's findings remain as quoted above. Ex. 53.

of Oracle's debit memos and the misuse of customer overpayments and unapplied cash. Ex. 54. One e-mail, dated November 6, 2000 from Oracle's "Unapplied Cash Specialist," Neil Menon ("Menon"), to various Oracle personnel, contains a discussion of Oracle's end-of-the-quarter practice of manipulating its unapplied cash via its bad debt reserve to inflate its financial results.

> We are currently trying to resolve as many unapplied items before the end of the quarter [sic] There are a total of 1826 unapplied items of which 102 are labeled "OCC" and total $16,985,508.87. . . .
>
> As you can see, resolving the "OCC" items would help us in achieving our quarter goal. Please take a look at this spreadsheet and instruct me how these items should be applied. Since we are approaching the end of the quarter, we would like to resolve these items as quickly as possible. If there is no response by **November 20, 2000**, we will review the items and place them in our reserve account.

*Id.* at NDCA-ORCL 3042910 (emphasis in original).

Another two e-mails produced for the first time on April 17, 2007 were written by Myers on November 8, 2000, and November 21, 2000. Myers was designated by Oracle as its Federal Rule of Civil Procedure 30(b)(6) witness on the accounting issues in this case, and was deposed on April 12, 2005. Ex. 55. The e-mails specifically reference the November 2000 Clean Up and the issues surrounding the 46,000 debit memos. Exs. 56-57. Magistrate Judge Spero expressly ordered defendants to produce these documents more than two years ago as part of the March 10, 2005 Discovery Plan. Ex. 43 (ordering production of all documents relating to "(i) the alleged 'On Account Clean Up' occurring in November 2000; (ii) the 46,000 debit memoranda. . . ").

The documents produced on April 17, 2007 also should have been produced seven days prior to Myers' deposition on April 12, 2005, as the March 10, 2005 Discovery Plan required. Moreover, both e-mails were sent to CW49, one of the witnesses relied upon by plaintiffs in the RSAC and the November 11, 2002 *Ex Parte* Application, who reported the fraudulent accounting activities occurring at Oracle during 2Q01 and the subsequent clean up in 2002.

When asked for an explanation of why the documents produced on April 17, 2007 were not produced earlier, defendants stated: "with respect to the three e-mails produced on April 17, 2007, these documents ***mistakenly never were loaded onto our database at the time the documents originally were gathered. As a result, we did not know about those documents until the time we produced them to Plaintiffs.***" Ex. 58.

Further, when plaintiffs inquired about why these e-mails were sourced to "Oracle Corporation" but were not found in the files of the authors or recipients of the e-mails (*e.g.*, Myers and Menon), defendants admitted that ***"[w]e cannot determine with certainty from whose files the two e-mails originally were gathered.***" Ex. 59. In other words, defendants claim to have no idea where the documents came from and no explanation for how or why the relevant documents were purportedly "gathered" but then withheld from production until after discovery closed.

**b. Defendants' Belated April 24, 2007 Production of Relevant Board Meeting Memos and E-mails**

On April 24, 2007, defendants inexplicably produced another batch of new e-mails and memos reflecting Oracle's board meetings held during 2002. These documents expressly reference plaintiffs' lawsuit, the November 2000 debit memos and other relevant issues pertaining to plaintiffs' lawsuit. These documents were requested by plaintiffs in their first document requests on December 9, 2004 and were ordered produced as part of the March 10, 2005 Discovery Plan. Defendants' purported explanation for why these fundamentally relevant documents were not produced earlier was as follows: "***These documents were not produced earlier in the case because they were not located in the custodian files of any individual who participated in the 2002 'unapplied cash project.***'" Ex. 58.

The problem with defendants' explanation is that regardless of where these documents were kept, Oracle as a corporation knew of their existence but hid them from plaintiffs for years. Further, the board minutes and corresponding e-mails are not exclusively related to the "unapplied cash project" as defendants seem to imply; the board meetings reflected discussions about plaintiffs' lawsuit, the specific debit memo allegations in the SAC, and other issues surrounding the November 2000 Clean Up. Ex. 60. The documents are, on their face, responsive to the March 10, 2005 Discovery Plan and were ordered produced by no later than May 1, 2005.

If defendants really did preserve all documents relating to plaintiffs' lawsuit as represented, the board minutes should still be preserved in the electronic files of the recipients of the minutes (Ellison, Safra Catz, Henley, Minton, Williams, Segal, Cooperman, *et al.*) and the author of the e-mail itself (Linda Leanes ("Leanes")). Defendants have represented that the documents were not

found in those individual's files. Incredibly, according to defendants, the only person's files in which the documents were found was Segal – Oracle's in-house lawyer. That fact, in and of itself, confirms that relevant e-mail accounts of important witnesses – even the few to whom defendants claim to have sent preservation instructions – were not preserved. *See* §V.B., *infra*.

When plaintiffs inquired about why the new documents sourced to Segal were not produced seven days before her September 26, 2006 deposition as required under the March 10, 2005 Discovery Plan, defendants rotely stated that the documents "***were not identified at the time Oracle conducted its review of Ms. Segal's files***." Ex. 59 at 2. It is unclear how documents now sourced to Oracle's corporate lawyer who was responsible for supervising document preservation and collection in this matter "were not identified" before her deposition if they were in fact in her custodian file. Defendants' explanation makes no sense and underscores the fundamental lack of proper preservation efforts in this case along with abusive discovery practices.

Defendants have also been unable to explain why a belatedly produced February 7, 2003 e-mail from Leanes which attached board meeting memos and was entitled "F&A Committee Minutes" was not sourced to Leanes herself as the custodian, but rather, was sourced to Oracle's counsel, Segal. Defendants' explanation was again non-responsive. *Id.* at 1 ( "[d]efendants have not produced any documents from Ms. Leanes' files. Accordingly, she does not appear as a custodian on the updated consolidated source log."). If defendants had properly preserved all documents related to plaintiffs' lawsuit, the February 7, 2003 e-mail should at least have been found and produced from corporate and board files, as well as the author's files (Leanes). The fact that it was not indicates first, that defendants intentionally withheld it until after the close of discovery and second, that defendants failed to preserve the e-mail from Leanes' files, or it was destroyed. Indeed, the fact that such fundamentally relevant board meeting documents were not produced until April 2007 is patently unreasonable, prejudicial and in direct violation of the previous Court orders in this case.

### c. Defendants Changed the Source of Documents After the Discovery Cutoff

On May 14, 2007, defendants sent plaintiffs a letter asserting that they had updated their

"Consolidated Source Log" to reflect the belated productions on April 17, 2007 and April 24, 2007. In their letter, defendants stated the following:

> "In performing a quality review of the enclosed source log, we discovered that our prior consolidated source log, which Defendants produced on March 28,2007, ***incorrectly sourced certain documents to a few individuals***. Notably, these documents were sourced for the first time on the consolidated source log that Defendants produced on March 28, 2007. We have corrected the issue in the enclosed consolidated source log. ***However, as a result of this correction, the names of nine Oracle employees no longer appear on the updated consolidated source log because we have not produced documents from their files.***"

Ex. 61. As an initial matter, despite plaintiffs' immediate request for an explanation that same day, defendants did not provide plaintiffs with the names of the "nine Oracle employees" who were removed from the source log until two weeks later. Ex. 59. Furthermore, the information provided raises serious questions about defendants' preservation efforts. Documents previously sourced to one of Oracle's in-house lawyers, Dorian Daley, are now inexplicably sourced to non-lawyer personnel. *Id.*; *see also* Ex. 62. Other documents that were originally sourced to witnesses who were not deposed (Lea Erickson; Kerry Fitzpatrick; John Hall; Lori Hayword; Jeff Johnson; Chuck Linn) are now suddenly sourced to witnesses that have already been deposed (Molly Littlefield-Venkataramana; Sohaib Abbasi; Elam). Ex. 59. Defendants have provided no explanation for why the source of documents keeps changing. Nor have defendants explained why the documents were not produced prior to the depositions of the "new" sources.[18] At this late stage, plaintiffs have no way of determining the accuracy of defendants' source logs. This type of discovery abuse leaves plaintiffs with no real remedy save evidentiary sanctions.

---

[18] Defendants' May 14, 2007 communication was not the first time defendants admitted to incorrectly sourcing documents. On November 13, 2006, defendants sent plaintiffs a letter advising that defendants mistakenly sourced 353 documents to Ellison. Ex. 63. Although not expressly admitted, defendants letter also indicates that the incorrectly sourced documents were produced and sourced to four witnesses months after their depositions. Id. Defendants state that the documents were appropriately sourced to Kirsten Shaw, Gayle Fitzpatrick, Cliff Godwin and Ron Wohl, who had been deposed on September 19, 2006, February 24, 2006, March 3, 2006 and May 31, 2006 respectively.

### C. Defendants Electronically Altered Many Accounting Documents Before They Were Produced

#### 1. Defendants Altered the Electronic Filenames and Metadata Associated with Documents as Kept in the Ordinary Course of Business

As plaintiffs and their experts continue to analyze the 265 boxes of new accounting documents produced since January 2007, it has become apparent that defendants have electronically altered documents and e-mails such that the documents no longer appear as they were kept in the ordinary course of business, as Fed. R. Civ. P. 34 requires. This alteration has taken several forms. Defendants have changed the electronic filenames that identified the documents at the time they were created and altered metadata. A filename is a unique identifier created by the author of the document at the time it was created. Filenames often contain valuable descriptive information about the nature and purpose of the document and its contents. Metadata also provides invaluable information about a document including the author(s), creation date and last date modified.

When defendants produced electronic documents, they deleted the original filename of documents and replaced the original name with Bates numbers. Defendants deleted the original filename of virtually every accounting spreadsheet they produced – more than 1,000 in all – and replaced the filename with a Bates number such as "NDCA-ORCL 1472684." The original filenames have not been produced, thus depriving plaintiffs of valuable evidence. For example, in 2002, plaintiffs obtained from a confidential witness the last page of an October 21, 2002 e-mail which showed that a spreadsheet with the filename "Greater_Than_100K in 1260151 Version 3" had been attached to the e-mail. *See* Ex. 64. The first page of the same e-mail references another spreadsheet, "12601_Detail," that was not attached to the e-mail. *See* Ex. 65 at NDCA-ORCL 1609399. Defendants never produced spreadsheets with these filenames.

Also, in ordinary circumstances, filenames and related metadata help corroborate that files represented to be attachments to specific e-mails are in fact, the same files that were actually attached to the original e-mails. However, in this litigation, hundreds of e-mail attachments produced by defendants raise substantial issues about file and data integrity that plaintiffs cannot resolve, and defendants have refused to remedy. For example, according to metadata of e-mail attachments

produced by defendants, most accounting filenames and last date saved were materially altered after the e-mails were sent, but ***before*** they were produced to plaintiffs. These circumstances – and numerous other anomalies, including dozens of missing and corrupted e-mail attachments – combined with defendants' persistent failure to correctly cross-index e-mails with their file attachments, headers and footers, leave substantial doubt regarding the reliability of the e-mail attachments. Defendants' actions constitute fundamental violations of the Federal Rules of Civil Procedure and the March 10, 2005 Discovery Plan.

**2. Defendants Electronically Altered and Failed to Preserve Relevant E-mails**

Another discovery abuse committed by defendants is the production of identical e-mails that inexplicably have different dates and electronic characteristics. For example, Ex. 66 is a crucial e-mail dated October 21, 2002 that was first obtained by one of plaintiffs' confidential witnesses. The e-mail is from Quinn to Myers and other accounting personnel regarding the 2002 Clean Up and the specific tasks to be completed. This document was first submitted in connection with plaintiffs' *Ex Parte* Application on November 11, 2002. Since that time, defendants have produced at least ***17 different versions*** of this same e-mail in many different forms, with many different dates and electronic characteristics. Some copies of the e-mail are dated in 1970 or other arbitrary dates prior to the actual creation date. *See, e.g.*, Exs. 65, 67-68.

Additionally, defendants have not preserved copies of many important e-mails that are "embedded" in other e-mail strings as replies or forwarded copies of the original e-mail. Examples of these e-mails are Exs. 24, 69-73. These e-mails were not produced on their own, and the embedded versions lack fundamental data such as the date and time of the e-mail , the senders, recipients and significantly, whether there were file attachments.

Defendants' failure to produce e-mails embedded in other e-mail strings is a violation of the March 10, 2005 Discovery Plan. Indeed, Section II.B.a. of the Discovery Plan requires the parties to produce electronic documents and e-mails pursuant to strict formatting parameters as follows:

> (a) The parties shall produce e-mails in searchable TIFF format. E-mails shall include the following information: sender, recipient, blind and carbon copies, date sent, e-mail box from whom the document is produced, and the date and time it was opened, deleted, responded to or forwarded. Furthermore, the parties shall

> produce all attachments to or documents embedded in such e-mails in native format, readily accessible from each e-mail.

Ex. 43 at 4.

Defendants have consistently failed to adhere to this production requirement under the Discovery Plan. If defendants had properly preserved all electronic documents as they claim, each e-mail in the strings on Exhibits 24 and 69-73 should have been produced independently, with the proper header, footer, date and other information, as it was kept in the ordinary course of business. In other words, if five people replied to or forwarded a single e-mail at different times, each of those e-mails should have been produced from the replying person's files. But defendants failed to do this; plaintiffs therefore cannot discover some of the most simple facts such as when certain e-mails were sent, when received, and forwarded and whether there were any attachments. This is just another example of the improper and incomplete document productions and failed preservation efforts taken by defendants in this case.

In sum, defendants have repeatedly violated no less than four court orders regarding accounting discovery which has severely prejudiced plaintiffs' ability to develop their accounting allegations. Plaintiffs had to wait nearly ***two years*** to obtain hundreds of thousands of pages of the most fundamentally relevant accounting discovery ordered by the March 10, 2005 Discovery Plan. Both Magistrate Judge Spero and Special Master Infante have found that defendants have changed their position on accounting discovery during the litigation in order to withhold relevant documents from plaintiffs. Defendants have succeeded in withholding hundreds of thousands of pages of crucial accounting documents until after nearly 100 depositions have already concluded, including witnesses who created and received or were named on documents belatedly produced. Additionally, as set forth above, documents produced by defendants in connection with the 2002 Clean Up reveal an intentional effort by defendants to mislead the Court about the nature of the 2002 Clean Up in order to prevent plaintiffs from obtaining relevant e-mails and documents related to plaintiffs' debit memo allegations. Defendants' violations of the Court's accounting orders and their withholding of relevant documents under false pretenses justify the most severe sanctions.

**D. Defendants Recently Admitted They Were Aware of Plaintiffs' Accounting Allegations in May 2002 at Least Five Months Before Defendants Sent Preservation Notices to a Select Few Accounting Employees**

On April 23, 2007, plaintiffs requested that defendants explain four entries in their March 16, 2007 privilege log which were dated in May 2002 and included the following description: "E-mail chain between in-house counsel Lauren Segal, Esq. and Oracle employees analyzing accounting allegations in the Second Amended Complaint." Ex. 74. Defendants withheld those four documents pursuant to the Attorney-Client Privilege and the Work Product doctrine. These entries were erroneous. The communications could not possibly address the "accounting allegations in the Second Amended Complaint" because that complaint was not filed until October 11, 2002, five months ***after*** the e-mails were written. When plaintiffs asked defendants about this discrepancy, defendants changed their story, stating that "the four entries in the privilege log dated May 2002 reflect confidential communications among members of Oracle's in-house legal department and other Oracle employees ***regarding Plaintiffs' investigation with respect to the debit memo allegations***." Ex. 75.

In other words, it is clear that defendants' counsel, as well as its top accounting personnel, were fully aware of, and were indeed communicating about the debit memo issues in May 2002, four months before plaintiffs filed their accounting allegations on October 11, 2002. ***Yet, defendants did not attempt to preserve documents relating to these allegations until October and November 2002.*** And, even though defendants claim to have sent preservation notices out to a select few of its accounting personnel involved in the November 2000 events and the 2002 Clean Up after plaintiffs filed the SAC, defendants inexplicably failed to send a preservation notice to one of the key participants in the 2002 Clean Up – Molly [Littlefield] Venkataramana – who Oracle itself claimed was a "Collections Manager who supervised certain aspects of the October 2002 'clean up' effort." Ex. 76. Despite plaintiffs' specific request for an explanation of this preservation failure, defendants failed to explain why Venkataramana did not receive a preservation notice. Ex. 77.

## V. DEFENDANTS FAILED TO PROPERLY PRESERVE EVIDENCE IN BAD FAITH

### A. Defendants Expected Litigation Surrounding the March 1, 2001 Disclosures But Did Nothing

Defendants' scheme to destroy relevant evidence commenced immediately upon the March 1, 2001 disclosure that Oracle would miss its fiscal 3Q01 financial forecasts. According to Segal, Oracle's in-house counsel responsible for all aspects of securities litigation, including supervising document preservation and collection for this matter, the Company believed that it "***was quite likely***" that Oracle would be sued for securities fraud at that time. Ex. 78 at 276:1-6. Indeed, defendants ***expected*** that Oracle would be sued as a result of its earnings miss. *Id.* at 277:5-11.

Cooperman, Oracle's general counsel at that time, testified that in 3Q01 the missed earnings forecast and Ellison's massive stock sales raised the risk of litigation. Ex. 79 at 43:23-45:9. Cooperman characterized 3Q01 as "unusual" because the Company "pre-announced results" and "missed our expected results, our guidance," and that those facts raised his concern about the potential for securities lawsuits. *Id.* at 43:23-44:10. Likewise, Cooperman admitted that Ellison's $894 million January 2001 stock sales "raise[d] a risk of litigation," but did nothing in January or February to ensure that potentially relevant information would be preserved. *Id.* at 44:11-45:9. In fact, defendants took no action – not on March 1, 2001 after their announcement, not on March 5, 2001 upon notice that the 3Q01 miss and Ellison's stock sales were being questioned, and not on March 9, 2001 upon receipt of notice of this lawsuit.[19] Defendants should have undertaken efforts to preserve relevant evidence, including the issuance of a litigation hold, at the latest, immediately after their March 1, 2001 announcement, if not January 22, 2001.[20] *Napster*, 462 F. Supp. 2d at 1070; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably

---

[19] Cooperman's files produced by defendants in this case included European press articles questioning Oracle's miss and Ellison's stock sales dated as early as March 5, 2001, and a March 9, 2001 announcement of the filing of this lawsuit. Ex. 79 at 114:17-121:15 and Ex. 80.

[20] The evidence of the Company's scurry to explain Ellison's stock sales to investors, including efforts to convince investors that Ellison still had confidence in the Company's financial condition, suggests there was a growing concern of lawsuits in January 2001. *See, e.g.*, Ex. 81 at 69:24-71:21, 77:5-12; Ex. 82; Ex. 83; Ex. 84.

anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.").

Instead, defendants admittedly waited until March 13, 2001 to issue even a limited preservation instruction to only select employees excluding large swaths of the Company's sales and consulting organizations whose files have proved critical to the litigation.[21] This conduct at a minimum constitutes negligence and most appropriately bad faith, and supports the imposition of sanctions. *Napster*, 462 F. Supp. 2d at 1070; *Zubulake*, 220 F.R.D. at 220. Indeed, as a result of defendants' delay in taking any action at all to preserve relevant evidence, Oracle's employees sent, received and deleted e-mails for almost two weeks – undoubtedly concerning the events surrounding the earnings shortfall and applications miss, including Suite 11i defects, and thus highly relevant to this litigation – while under no internal executive directive to preserve evidence whatsoever. As detailed herein and in the Motion to Compel, the relevance of the destroyed documents is indisputable: "[B]ecause the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon*, 464 F.3d at 959 (alteration in original).

### B. Even After Service of Broad Based Complaint Allegations Defendants Intentionally Excluded the Vast Majority of Oracle Employees from a Document Preservation Instructions

Plaintiffs have confirmed with certainty that once defendants were actually served with the securities class action complaint defendants anticipated, defendants began what can only be described as a document preservation ruse. Defendants wholly failed to preserve documents in accordance with the requirements of the Federal Rules of Civil Procedure and the PSLRA, which expressly imposes the duty on defendants involved in securities cases to preserve all evidence:

> [The parties] shall treat all documents, data compilations (including electronically recorded or stored data) . . . that are relevant to the allegations, as if they were the subject of a continuing request for production of documents . . . .

15 U.S.C. §78u-4(b)(3)(C)(i). Indeed, notwithstanding the plain language of the statute, defendants

---

21 When asked why Oracle waited almost two weeks to take action to preserve evidence, Segal responded dismissively, "because there was no pending litigation." Ex. 78 at 277:12-23.

ignored the fact that document preservation requirements for lawsuits subject to the PSLRA were more stringent than those for California state court derivative actions and did not make any distinction in their efforts to preserve documents in this case. Ex. 78 at 85:1-89:8; Ex. 85. Defendants in fact acknowledge that Oracle did not carry out the PSLRA preservation requirements. Ex. 2 at 6-9.

Nonetheless, defendants admittedly could have complied with the document preservation requirements of the PSLRA with ease. Oracle could have sent out a company wide e-mail. Ex. 78 at 222:18-23. But instead, despite the concession that their attorneys could not determine upon receipt of the March 9, 2001 Complaint for Violations of the Federal Securities Laws ("March 9, 2001 Complaint") which documents might be relevant or all employees who possessed relevant information, defendants elected to only send the March 13, 2001 preservation notice to 30 individuals in a company of more than 40,000 employees, two of whom were senior attorneys who approved the e-mail prior to sending. Ex. 78 at 57:25-58:25; 92:9-93:5; Ex. 85. What ensued was a haphazard, unsupervised and leisurely approach to document preservation – and in provable instances intentional alteration of evidence – that resulted in violation of the PSLRA and the wholesale failure to preserve the relevant files of the majority of employees at Oracle.

### 1. Defendants' Focus on Employees Who Communicated with "Speakers" Was Knowingly Faulty Because Defendants Failed to Determine Who Actually Communicated with the "Speakers" and Employees Admittedly Possessed Relevant Evidence, Regardless of Whether They Communicated Within the "Speakers"

Rather than follow the law and preserve all relevant documents from all potential sources, a task that could have been instigated simply by sending a group e-mail notifying all employees of the preservation requirements, defendants after the fact claim to have focused on the so-called "Speakers," defined by them as Ellison, Henley, Edward J. Sanderson ("Sanderson"), Stephanie Aas, Mark Barrenechea ("Barrenechea") and Jennifer Glass, and those who communicated with the "Speakers." Ex. 9 at 25:14-26:4; Ex. 78 at 117:21-123:25. The flaw in this approach, other than the obvious fact that it could not possibly preserve all relevant documents, was that Segal apparently had no idea which employees communicated with the "Speakers" and made no real effort to determine

who did. Ex. 78, *passim*.

More importantly, Segal never considered the possibility that an employee more than one level removed from the "Speakers" – for example a vice-president – might communicate with the so-called "Speakers" and even do so on a regular basis. Segal testified that, "I don't believe that some junior salesperson somewhere who had a document that suggested to them one way or the other about closing a deal, if that document did not go up the chain, no, that was not a relevant document." *Id.* at 120:10-14.

But during her deposition, Segal later conceded (in order to maintain any level of credibility) that documents located in the files of many employees to whom she did not provide preservation instructions are indeed relevant. These individuals include Paul Seminara, Michael Cochran (*id.* at 93:6-104:11; Ex. 86); James McHugh, Gayle Fitzpatrick, Grant Franjione, James Walker, John Reilly (Ex. 78 at 104:12-110:17; Ex. 87); John Boucher, David Handy, Bob Crochetiere, Lisa Cometa, Steven Vakulskas, Keith Block, Ron Bunting, Ken Hamel (Ex. 78 at 149:3-159:21; Ex. 88); Kirsten Shaw, Courtney Shaw (Ex. 78 at 159:25-163:22, 165:11-166:8; Ex. 89); and Julie Thiemann and Steve Miranda (Ex. 78 at 172:2-176:9; Ex. 90). These and innumerable other Oracle employees undoubtedly had many more relevant documents in their files that were not preserved by them or anyone else at Oracle in the three and one-half years between defendants' receipt of the March 9, 2001 Complaint and authorized discovery.

For example, during the relevant time period,[22] Kirsten Shaw served as either the Director or Senior Director of Triage and her duties included ***working on customer issues, specifically for customers who were either "in really, really bad shape" or customers who were "very, very important, and usually that would be measured by how many millions of dollars they spend on Oracle software."*** Ex. 91 at 29:2-11; 30:18-31:16. Nonetheless, defendants failed to instruct Kirsten Shaw to preserve evidence. *Id.* at 16:15-18.

In a more stark example, during the Company's March 15, 2001 conference call regarding

---

[22] The Discovery Plan provides that the relevant time period shall be from June 1, 2000 to June 1, 2001. Discovery Plan, §I.A.

the 3Q01 miss, defendant Henley told investors that "[r]ight up to the end of the quarter, we said we felt pretty good about the quarter – ***hadn't seen any indication of an erosion in our internal forecast or heard of significant issues in regular conversations with the U.S. sales and management***," but defendants made no effort to preserve documents in the possession of the "U.S. sales and management" to whom Henley referred. Ex. 92. Indeed, despite very likely having listened to this call and certainly negligent if she had not, and having document preservation responsibilities in the litigation arising in part from the miss, Segal did not even know to whom Henley was referring, and thus could not have ensured that such individuals preserved all relevant documents given the lack of a company wide or even a sales division wide preservation instruction. Ex. 78 at 182:23-183:7; 184:23-185:1.

Defendants did know that the "Speakers" communicated in various methods, including orally, with employees from all levels of the Company as evidenced by the testimony of Cooperman, but did nothing to identify those individuals in order to capture potentially relevant evidence:

> Q: Okay. You recognize that Mr. Ellison would have had access to information in late 2000/2001 from the sales force itself; is that fair?
>
> A: Yes.
>
> Q: From managers in the sales force?
>
> A: Certainly.
>
> Q: That Mr. Ellison's sources of information wouldn't be limited simply to the people who directly reported to him formally?
>
> A: Correct.
>
> Q: And that, in fact, Mr. Ellison would speak with people at levels below the AVP level on occasion; is that true?
>
> A: My understanding is that he does, yes.

Ex. 79 at 273:18-274:6.

Defendant Sanderson admitted that he regularly communicated with area vice-presidents ("AVPs"), regional managers and even account managers. Ex. 93 at 261:8-263:2. When asked about how he would determine the status of quarterly sales in progress, defendant Sanderson responded:

> ***I would talk to the AVPs. I'd talk to the regional managers.*** Oftentimes I was talking to the customers. The sales reps like it when you came out and visited their customers, bringing an executive out to the customer. So, ***I'd hear it directly from the account managers.*** And the fact that I visited the customer, I'd oftentimes get the input of that.

Ex. 94 at 565:23-566:5.

Nevertheless, despite defendants' knowledge, they made no effort to ensure that regional sales managers, no matter the division, or salespersons in general, preserved evidence. Ex. 78 at 120:10-14, 131:10-132:1, 186:24-187:7. Nor did defendants make any effort to communicate preservation instruction to AVPs, a fact about which defendants would later deceive the Court and plaintiffs. *Id.* at 135:5-9; §VII.C, *infra.*

Defendants also elected to ignore obvious methods of reaching large groups of employees that communicated with the "Speakers," including a predefined group of e-mail recipients at Oracle that included all of the people in defendant Henley's organization that could have been reached by simply e-mailing henleyorg_us@oracle.com. Ex. 95 at 203:25-204:10. Defendants similarly failed to notify employees on various sales distribution lists that no doubt encompassed the entire sales organization to preserve documents. Ex. 96 at 150:11-151:21. These lists included, for example, allsales_us@oracle.com, sales_us@oracle.com, and ww_sales_us@oracle.com. *Id.*; Ex. 97.

The crucial nature of this lost evidence is exemplified by the reports proffered by defendants' proposed expert witnesses. Defendants' proposed expert witnesses relied upon the fact that defendants received information from the Company's sales staff and other lower level employees in reaching their opinions. For example, defendants' proposed forecasting expert R. Glenn Hubbard ("Hubbard") relied on the fact that, in preparation of the Company's Upside Reports,[23] Minton, Sanderson and others, sometimes including defendant Henley, would have weekly Americas conference calls on Thursdays with the "Americas senior sales personnel and their support staff" wherein "senior sales personnel updated call participants on any changes to their forecasts, any significant changes to the status and/or timing of large deals . . . ." Ex. 98 at ¶183. Indeed, Hubbard

---

[23] Hubbard states that "Oracle's forecast and guidance were based primarily on the Upside Report[s]." Ex. 98 at ¶162.

cited to the testimony of Sanderson referenced above. Ex. 99 at ¶58. Hubbard further relied on the fact that "Minton made adjustments to the forecast based on the information she received on the Thursday calls," and that Ivgen Guner ("Guner"), the member of Minton's staff "who was responsible for preparing underlying forecast analyses for Minton, and Minton would discuss in detail any additional forecast data that was provided in the America's [sic] conference call on Thursdays." Ex. 98 at ¶185. Hubbard also opines that one way "[m]acroeconomic conditions were incorporated in the forecast" was through "sales representatives' estimates of the likely purchasing behavior of their prospective customers." *Id.* at ¶159.[24]

Defendants' proposed product expert Edward Yourdon ("Yourdon") also relies on direct evidence from sales personnel or the so-called lack thereof in the record in reaching his opinions. With respect to issues related to demonstrations of Suite 11i, Yourdon opines that "I have not seen anything in the evidentiary record in this case suggesting that any salesperson at Oracle misled a customer by rigging a demonstration or misrepresenting Suite 11i's capabilities." Ex. 100 at ¶213. However, Yourdon fails to acknowledge, or perhaps was not informed, that defendants failed to preserve evidence from sales personnel. Regarding quality problems with Suite 11i during 3Q01, Yourdon concluded that the "product issues" in 3Q01 were not any different from any other quarter at Oracle. *Id.* at ¶231. In reaching this conclusion, Yourdon relied upon the fact that "complaints by the sales force about the products . . . all appeared on the record in other quarters" and were "nothing out of the ordinary." *Id.* Setting aside the inherent problems with such a conclusion given the relevant time period for document production in this case, Yourdon's conclusion fails to consider the distinct possibility that any such evidence would not have been preserved by defendants based upon their preservation strategy.

Clearly, because they did not know with whom the "Speakers" communicated, assuming *arguendo* that the "Speakers" strategy was legitimate, defendants should have issued preservation

---

[24] *See also* Ex. 99 at ¶34 (the forecasting process at Oracle involves judgment by salespeople); ¶40 (same); ¶52 (economic information is incorporated into Oracle's forecasting process through information from individual salespeople); ¶55 (same)

instructions to all employees or, at the very least, defendants should have taken immediate concrete steps to ascertain the identity of ***all employees*** with whom the defendants communicated in any manner. Defendants' willful failure to do so resulted in the destruction of the files of very likely the majority of individual employees at Oracle with whom defendants communicated, *i.e.*, the destruction of highly relevant evidence. Moreover, based upon Cooperman's knowledge, defendants should have preserved the files of all of the sales force and all AVPs. Defendants' failure to do so clearly constitutes bad faith. Thus the imposition of sanctions is warranted. *See, e.g., Leon*, 464 F.3d at 958-59; *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *11.

**2. Defendants Intentionally Excluded Entire Categories of Employees Who Possessed Relevant Documents from the Preservation Instructions**

Defendants failed to communicate preservation instructions to entire categories of employees. The evidence that would have been in the possession of the individuals in these categories is highly relevant to plaintiffs' claims as the individuals would have been in possession of evidence related to defendants' 3Q01 miss and the persistent problems with Suite 11i. Indeed, based upon defendants' omissions with respect to individuals in possession of information related to Suite 11i – specifically problems with Suite 11i, it appears that defendants' intent was that no evidence critical of Suite 11i be preserved. In sum, these intentional omissions again inevitably resulted in the destruction of relevant evidence demanding the imposition of sanctions. *See, e.g., Leon*, 464 F.3d at 958-59; *Brotby*, 364 F.3d at 1115; *see also NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72.

**a. Defendants Did Not Instruct Employees of Certain Divisions to Preserve Evidence**

**(1) Defendants Failed to Instruct Employees in General Business – the Company's Largest Sales Organization – to Preserve Evidence**

During the March 1, 2001 conference call, during which defendants attempted to explain the revenue and earnings miss, defendant Ellison said that ***the general business dot-com mid-market forecast went down each of the last four days of the quarter*** and defendant Henley repeated this during the Company's March 15, 2001 conference call: "As Larry said on the March 1 conference call, ***the crack started to appear in the last four days of the quarter. At first, it showed in our***

***general business dot-com mid-market forecast, which came down each of the last four days***." Ex. 92. Remarkably, according to Segal, employees of the North American Sales division (also known as "General Business"), no matter their level, would not necessarily have relevant documents, and thus defendants made no categorical effort to preserve the documents of any level of employee in General Business. Ex. 78 at 132:5-135:9. Nor did defendants make any attempt to talk to all of the General Business employees. *Id.* at 186:9-187:7.

**(2) Defendants Failed to Instruct Consulting Employees Who Installed Suite 11i to Preserve Evidence**

Although Segal acknowledged that the March 9, 2001 Complaint included specific allegations related to the CRM component of Oracle's Suite 11i software, and that Oracle's consulting division was responsible for CRM implementations, defendants again admittedly made no categorical effort to identify individuals within the consulting organization for preservation efforts.[25] Ex. 78 at 136:3-137:22; *see also* Ex. 101, ¶¶3, 22. Defendants admittedly could have notified the entire consulting staff in North American Sales to preserve documents by e-mail. Nonetheless, the only individual from the consulting organization on the March 13, 2001 preservation e-mail or that Segal recalled notifying of preservation requirements was defendant Sanderson, who himself testified that he relied on and communicated with AVPs and regional managers. Ex. 78 at 136:3-137:22.

**(3) Defendants Failed to Instruct Employees of the Support Division Who Supported Suite 11i Customers to Preserve Evidence**

The same is true for Oracle's support division. Despite clearly knowing that the March 9, 2001 Complaint included specific allegations related to Oracle's Suite 11i software, and that "the support organization had generally the responsibility for providing support services to customers who were using Oracle software," defendants took no action to ensure that evidence in the possession of employees of the support organization was preserved. *Id.* at 71:20-23; 249:22-250:12.

---

[25] Defendants' March 13, 2001 preservation e-mail specifically referenced documents relating to "11i and CRM implementations" as documents to be preserved. Ex. 85.

As Richard Sellers, a group vice-president in the support division during the relevant time period testified, employees in the support organization supported Oracle's software and served as the first point of contact at the Company for customers after sales. Ex. 102 at 25:13-17. Nevertheless, the documents evidencing such work were not preserved.

**(4) Defendants Failed to Instruct Escalation Managers to Preserve Evidence**

Defendants also failed to preserve the documents of Oracle's escalation managers. Escalation managers coordinated among Oracle departments in order to ensure that customers got the assistance they needed when they were implementing Oracle software. *See, e.g.*, Ex. 103 at 13:8-14:3; Ex. 104, Ex. 105, Ex. 106. Oracle assigned escalation managers to customers who had difficulties implementing Suite 11i. Escalated accounts were identified as hot, warm or cold with hot accounts being described as follows:

- Highly Volatile or visible customer
- Critical negative impact to customer
- Negative public relations or potential for revenue loss to the customer or Oracle
- Pending major sales dependent on Support's performance
- Customer has requested escalation process; and immediate Oracle attention is required

Ex. 104. Thus, the escalation managers had first-hand knowledge of the problems with Oracle's Suite 11i software.

Plaintiffs have identified over 40 escalation managers at Oracle, including individuals who worked with Oracle customers General Electric ("GE") and POSCO, for example, both of which had documented problems with Suite 11i. Not a single one of these escalation managers received a document preservation instruction.[26] This was true even though the escalation managers played

---

[26] The escalation managers identified by plaintiffs include Steve Cox, Beth Ann Ziebarth, Barry Stephens, Julie Thiemann, Tom Vera, Howard Edelstein, Robert Ewbank, Peter Winter, Robert Hunt, Robert Paino, Dave Vandenberg, Tom Zerbe, Ian Barnor, Valerie Milligan, Jim Cairn, Rich Ware, Scott Saunders, Jean Denis, Mona Motz, Gary Kerber, Solie (Stilley) Berg, Jim Hruby, Sherman Terry, Joe Oppelt, Robin Moss, Edwin Wiggins, Scott McCall, Bernadette Aquino, Charlie Freeman, Tim Collier, Cindy Eastwood, Marcia Hill, Linda Lam, Rich Ware, Berna Lowenstein, Phillip Tate, Gerald Horvatz, Anna Gonzalez, Sarina Hasegawa, Angela Scott, Michael Fleck, Rich Pierce and Patricia Sullivan.

highly visible and critical roles at the Company. *See, e.g.*, Ex. 105. For example, Steve Cox led the escalation team for implementations. *Id.* Phillip Tate worked on high profile Suite 11i escalations that were escalated to Ellison during the Class Period (December 14, 2000 to March 1, 2001), including those at GE Corporate and Liberty Mutual. Ex. 106; Ex. 107. Moreover, plaintiffs' RSAC specifically identified one of its confidential witnesses as having been an escalation manager at Oracle. Ex. 108, ¶27(dd).

**b. Defendants Impermissibly Relied Upon Oracle's Non-Attorney Employees to Determine Who Should Receive Preservation Instructions and to Communicate the Instructions**

In the March 13, 2001 e-mail, defendants asked a certain few employees to forward the preservation e-mail "to anyone in your organization who may have relevant documents." Ex. 85. This approach constituted a bad faith dereliction of preservation duties – first because, as Segal admitted, it impermissibly put the relevancy determination on the non-attorney recipients. Ex. 78 at 199:22-200:1; *see NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72. Indeed, Segal herself admitted that she could not even anticipate what would be relevant in the lawsuit. Ex. 78 at 58:6-25.

Moreover, counsel's delegation of their duties utterly failed. For example, Barrenechea, a recipient of the March 13, 2001 e-mail, one of Ellison's direct reports, and a senior vice-president of applications development and as such the head of Suite 11i CRM development with hundreds of employees reporting to him, testified that he did not request that members of the product development team preserve documents relevant to this litigation. Ex. 109 at 29:18-25; 32:18-23; 292:12-20; Ex. 85. In fact, Barrenechea testified, "I think that was a legal function to do that." Ex. 109 at 292:12-20. Defendant Sanderson had no recollection of being involved in ensuring that his direct reports preserved documents. Ex. 94 at 58-6-25.

**C. The Scope of Defendants' Preservation Instructions Was Knowingly Deficient**

**1. Defendants Failed to Instruct Employees Regarding the Preservation of Evidence Post-Receipt of Preservation Instructions**

With respect to instructing Oracle employees to preserve documents created after March 1, 2001 that were relevant, defendants did nothing. Once again, defendants relied on the lay employee

to understand and interpret legal requirements. When asked about her efforts to preserve documents created after the Class Period at her deposition, Segal referred to her so-called preservation e-mail sent to 30 Oracle employees:

> Well, I asked them to save any documents that talk about that period. I don't tell them – I don't put a time limitation on what the date of the document they're preserving, just the date – the date of the class.

Ex. 78 at 195:24-196:24.

The documents, or lack thereof, produced from Ellison's files confirm defendants' utter failure to preserve post Class Period evidence: "A typical day for Ellison starts when he gets up at about seven o'clock and checks his overnight e-mails. Unlike many CEOs, Ellison has only one e-mail address. He gets more than a hundred e-mails a day, most of which he answers himself or forwards to the appropriate person." Ex. 110 at 286. Nonetheless, less than 15 e-mails have been produced from Ellison's files, only two of which are dated after March 13, 2001.

The failure to preserve is shocking. For example, Segal could not explain why an admittedly relevant e-mail from Minton to Ellison with a "Dot.com Revenue Analysis" for 3Q01, sent on March 14, 2001 – just days after Segal sent her preservation e-mail to Ellison, was not produced from Ellison's files. Ex. 78 at 326:9-327:16; Ex. 111. Nor could she explain why admittedly relevant e-mails received by Ellison on March 19 and March 29, 2001 discussing ongoing Suite 11i problems at customer Papa Johns and the ramifications of a Forrester Research report critical of Suite 11i, respectively, were not in Ellison's files. Ex. 78 at 270:18-275:5, 329:12-331:25; Exs. 112-113. Nor could she explain why a relevant e-mail sent by Ellison on March 23, 2001 regarding escalated customers and product quality was not produced from his files. Ex. 78 at 327:17-329:11; Ex. 114. Segal's boss, Cooperman, likewise could not explain why these documents sent and/or received by Ellison were not in Ellison's files. Ex. 79 at 145:3-146:9; Ex. 115; Ex. 79 at 146:10-147:17; Ex. 116.

Numerous additional highly relevant e-mails received by Ellison after the Class Period were

not in his files:[27]

- an e-mail forwarded to him on March 20, 2001 from one of Oracle's customers that included an article critical of Suite 11i (Ex. 117 at 272:19-24 and Ex. 118);

- a March 23, 2001 e-mail that provided in part:

  Mark (Jarvis),

  ***we need your help to counter an increasing number of negative comments on the quality of our applications products***. The latest is the attached PUBLIC note from Forrester of March 19th. If this continues it will slow down our sales and the migration of existing customers until 11.5.4 or 11.5.5.

  This has just costed [sic] us one loss at a client! Unfortunately many new prospects listen to and believe to analysts [sic].

Ex. 119 and Ex. 117 at 274:10-275:21; *see also id.* at 284:11-18 and Ex. 120.

- an e-mail from the Executive Vice- President of EMEA (Europe, Middle East and Africa) to the head of Suite 11i CRM development that provided in part:

  Mark,

  I also disappointed by the results . . . but . . . as you know, we had six-nine months of product issues which caused loss of confidence by sales, partners, analysts and customers.

  ***Even as of today, R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will only get it between July and October 2001***.

  This continued delay between the American English release and the local language is hurting us.

Ex. 121 and Ex. 117 at 306:20-308:18;

- an e-mail regarding a "very escalated" situation with Suite 11i customer Value Vision (Ex. 117 at 293:19-294:17 and Ex. 122);

- an e-mail detailing a behind schedule Suite 11i CRM implementation at customer Pizza Hut (Ex. 117 at 294:18-295:11 and Ex. 123);

- an e-mail about General Business demo scores that were not "heading in the right direction" because ***"[p]erformance and product issues continue to hinder us every day"*** (Ex. 117 at 295:12-296:2 and Ex. 124);

- an e-mail describing "growing concerns" surrounding Suite 11i CRM demos

---

27 Ellison was unable to explain the absence of these documents.

(Ex. 117 at 297:9-297:23 and Ex. 125);

- an escalated customer management report with over 20 Suite 11i CRM and ERP customers listed with a "HOT" escalation status (Ex. 117 at 299:25-301:5 and Ex. 126; *see also* Ex. 117 at 308:19-310:11 and Exs. 127-128);
- an e-mail regarding a delayed Suite 11i ERP implementation at customer NCR (Ex. 117 at 330:9-14 and Ex. 129);
- an e-mail pulling the Company's "#1 in CRM" advertisement because it was not true (Ex. 117 at 331:24-333:12 and Ex. 130).

*See also* Ex. 117 at 296:3-17 and Ex. 131; Ex. 117 at 331:18-23 and Ex. 132.

Similarly, countless e-mails Ellison sent after March 13, 2001 were not in his files.[28] For example, the following e-mail Ellison sent on March 23, 2001 was not in his files:

> OK. I want all escalated customers to belong to development managers. Mark B. will own Papa John. Mark, I need daily reports until the customer is happy.
>
> ***I need a list of the other escalated customers and I need it now. And I need support to resurrect the reports grading whether products are within the agreed quality parameters.*** Mike R. is responsible for delivering the reports.
>
> ***We will meet on this on Wednesday to review every escalated customers and every product quality rating. Until further notice every Thursday applications meeting will begin with a review of all escalated customers and application product quality. The only allowed topics will be demo status and internal implementation requirements.***

Ex. 133 and Ex. 117 at 283:16-22.

Also missing from Ellison's files were an e-mail he sent in response to a critical situation at a customer, Tropicana: "I want a detailed postmortem on why Tropicana was taken down in the middle of the day. First who [was] responsible for keeping that computer up. I need a name – and I need it now;" (Ex. 117 at 303:3-305:10 and Ex. 134; *see also* §V.C.2, *infra)*; and an e-mail he sent regarding Suite 11i CRM that stated, "Our top priority is to get Oracle users are 'delighted' [sic] with - the quality and functionality our CRM products. ***Until that happens I doubt we will achieve success in the market.***" Ex. 135 and Ex. 117 at 326:12-329:11; *see also* §V. C.2, *infra*; *see also* Ex. 117 at 301:16-303:2 and Ex. 136.

---

[28] Ellison was also unable to provide any plausible explanation as to why the documents he sent after the Class Period were not preserved.

And Ellison is simply just one example. Given defendants' clear ***failure to instruct one of the individual defendants to preserve evidence sent or received after the issuance of the preservation instruction***, the magnitude of the resultant destroyed evidence for the rest of the Company must necessarily be huge and the prejudice to plaintiffs extreme. *See In re United States Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1068 n.3 (N.D. Cal. 2002) (finding post-class period information relevant to establishing motivation); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period."). Indeed, it is simply fortuitous that another Oracle employee happened not to destroy the examples above.[29]

**2. Defendants Failed to Instruct Oracle Employees to Preserve Sent Items/Turn off Autodelete Function in Outboxes**

Defendants had "a duty to suspend, as to documents that may be relevant . . . any routine document purging system that might be in effect; [the] failure to do so constitutes spoliation." *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 288 (E.D. Va. 2004). According to Segal, the default setting on Oracle's e-mail system was set to automatically delete sent e-mails. Ex. 78 at 278:21-279:9. In order to save sent items, an affirmative step had to be taken – the default setting had to be changed. *Id.* Nonetheless, after the filing of this lawsuit, ***defendants did not instruct employees to change their settings so that outgoing mail would be retained***. *Id.* at 320:20-321:6. Thus, the result, as Ellison testified, was, "if I didn't send a copy to myself, then it wouldn't be in my file." Ex. 117 at 304:9-305:10 and Ex. 134; *see also* Ex. 117 at 328:12-329:11 ("Again, I think because I authored it and didn't send myself a copy, it was never in my file.") and Ex.135. In sum,

---

[29] Defendants apparently had a skewed view of the relevance of documents created after the Class Period. For example, when presented with a document produced in this lawsuit by defendants discussing that "***failed implementations are putting [Oracle's] state/local vertical out of business***," and "***[t]here are just too many problems with the software***" dated May 29, 2001, less than two months after the end of the Class Period, Segal, despite being specifically made aware of these statements in the document and the recipients, several of whom Segal professed to having some familiarity with, stated that ***she could not even say that she would have preserved the document***. Ex. 78 at 203:6-210:10, Ex. 137. In so doing, it is apparent that Segal did not even consider the fact that the Company continued to be unable to implement Suite 11i even after the Class Period and that Suite 11i was not working even after the Class Period ***would be highly probative of whether Suite 11i worked during the Class Period*** or even earlier.

defendants' failure to instruct employees to change their default settings regarding sent items or better yet, instruct the Company's information systems employees to do so, taken together with the failure to instruct employees to preserve post-Class Period evidence, very likely resulted in the destruction of the majority of relevant evidence created post-Class Period. Such failure could only have been in bad faith; sanctions therefore must be imposed. *Leon*, 464 F.3d at 958.

**3. Defendants Failed to Ensure that All Evidence in Ellison's Control and Related to Ellison Was Preserved**

A striking demonstrative example of the individual results of defendants' document preservation scheme are the documents sourced to Ellison in this litigation. In addition to the *SOFTWAR* and post-Class Period information discussed herein, defendants failed to ensure that Ellison complied with the preservation instructions and failed to preserve Ellison's website utilized during the Class Period. These actions constitute nothing less than the bad faith destruction of evidence highly relevant to scienter, among other topics. Terminating sanctions are thus appropriate. *Leon*, 464 F.3d at 958.

**a. Defendants Failed to Ensure that Ellison Observed the Preservation Instructions**

Although Ellison apparently received a preservation e-mail, the production of documents from Ellison's files demonstrate that he could not possibly have obeyed the instructions. As set forth *supra*, defendants produced less than 15 e-mails from Ellison's files in total. From the time period prior to March 13, 2001, defendants produced only ten e-mails. Ellison could not explain this dearth of documents. Indeed, when presented with numerous relevant documents which he received and/or sent prior to March 13, 2001 that were produced from the files of others, but not from his files, Ellison became duplicitous.

Ellison initially explained that his practice with respect to e-mail was generally one time per year to go through and do a cleanup and that such cleanup permanently purged documents from Oracle's servers; but that he did not recall whether he did such cleanups in 2000 and 2001 and was not aware of any available method of ascertaining when he did the cleanups – thus insinuating that perhaps he did a cleanup prior to receiving the March 13, 2001 e-mail from Segal. Ex. 139 at 96:1-13, 98:11-99:10. When presented with a document from January 2001, a version of which was

produced from his files, Ellison offered the following speculation: "Well, I made a point of not throwing away things. During a cleanup period I wouldn't throw away things that I would need later on, that would be useful later on." *Id.* at 179:9-23 and Ex. 140. Ellison's explanation though certainly cannot account for the mere ten e-mails dated prior to March 13, 2001 that were produced from his files. Indeed, given that the few e-mails produced from Ellison's files from prior to March 13, 2001 seem mainly to share a theme of being of a self-congratulatory nature, Ellison's explanation rings hollow. *See, e.g.*, Exs. 141-143.

Undeniably, Ellison could not explain the absence of the more damaging pre-March 13, 2001 documents from his files. For example, a document evidencing that Oracle in fact paid customers to serve as references for Suite 11i was not in his files even though he was the sender of the e-mail message. Ex. 117 at 248:2-251:23 and Ex. 233. A February 1, 2001 e-mail to Ellison regarding a downward revision in the 3Q01 forecast was not in his files. Ex. 117 at 258:10-259:18 and Ex. 234. An e-mail Ellison sent regarding the delay in the internal implementation of a module of Suite 11i was not in his files. Ex. 118 at 470:24-471:4 and Ex. 235. The following January 17, 2001 e-mail summarizing the weak revenue results for the first month of 3Q01 was not in Ellison's files:

> Summarized below are the December FY01 revenue results for your review. Please note:
>
> - The license revenues growth rate was 35% in USD, 25 points better than the 10% growth we experienced in December FY00 over December FY99. ***However, excluding the $60 million Covisint license deal, the USD growth rate would have been only 6%. Excluding Covisint, OPI license revenue would have been (85%)***.
>
> * * *
>
> - Applications product growth was 216% [ERP=365%, CRM=(58%)] while database product growth was 17% [Server=21%, Tools=(26%)]. ***Excluding Covisint, Applications product growth would have been (46%) and database product growth would have been 13%.***

Ex. 144 and Ex. 117 at 440:2-441:1; *see also* Ex. 139 at 96:14-22 and Ex. 145; Ex. 139 at 101:8-22 and Ex. 146; Ex. 139 at 101:23-102:12 and Ex. 147; Ex. 139 at 111:23-112:1 and Ex. 148; Ex. 139 at 116:9-15 and Ex. 149; Ex. 139 at 141:4-9 and Ex. 150; Ex. 139 at 148:19-25 and Ex. 151; Ex. 139 at 155:2-8 and Ex. 152; Ex. 139 at 158:18-22 and Ex. 153; Ex. 139 at 161:16-20 and Ex. 154; Ex. 139 at 166:9-15 and Ex. 155; Ex. 139 at 168:1-7 and Ex. 156; Ex. 139 at 171:14-20 and Ex. 157; Ex.

139 at 177:5-10 and Ex. 158; Ex. 139 at 190:9-20 and Ex. 159; Ex. 139 at 194:7-15 and Ex. 160; Ex. 139 at 208:19-209:2 and Ex. 161; Ex. 139 at 211:6-12 and Ex. 138; Ex. 139 at 218:4-10 and Ex. 162; Ex. 139 at 219:3-12 and Ex. 163; Ex. 139 at 222:19-223:1 and Ex. 164; Ex. 117 at 246:8-14 and Ex. 165; Ex. 117 at 253:10-16 and Ex. 166; Ex. 117 at 256:20-25 and Ex. 167; Ex. 117 at 258:3-9 and Ex. 168; Ex. 117 at 268:14-20 and Ex. 169; Ex. 117 at 270:7-9 and Ex. 170; Ex. 117 at 416:24-417:19 and Ex. 171; Ex. 117 at 464:20-466:3 and Ex. 172; Ex. 117 at 468:19-24 and Ex. 173; Ex. 117 at 469:21-470:1 and Ex. 174; Ex. 117 at 525:4-526:24 and Ex. 175.

**b. Defendants Failed to Preserve Ellison's Website larryellison.com**

In addition to the *SOFTWAR* materials discussed *infra*, defendants failed to preserve materials from a website that Ellison maintained during the Class Period – larryellison.com – that admittedly contained "transcripts of interviews and things of that nature." Ex. 176 at 114:12-16; *see also* Ex. 177 at NDCA-ORCL 297559; Ex. 178 at NDCA-ORCL 178069. Indeed, the website "***was developed for the purpose of posting [Ellison's] interviews and statements***." Ex. 177 at NDCA-ORCL 297559. Defendants have informed plaintiffs that the website was purged of all information after this lawsuit was filed (destroyed) and defendants cannot retrieve the information that would have been on the website. Ex. 176 at 78:12-79:21; 97:6-14. Ellison unsuccessfully attempted to cover up this destruction by claiming that the website was never used – he simply wanted to reserve the Internet name. Ex. 179 at 597:20-598:10. This is but one more example of intentional spoliation and an attempted cover up warranting the most severe sanctions.

**D. At a Company Level, Defendants Failed to Preserve Categories of Information Highly Relevant to This Litigation**

**1. Defendants Failed to Preserve the Oracle Sales Online Database that Included Unique and Highly Relevant Material**

The defendants used Oracle Sales Online ("OSO") during the relevant time period for forecasting and financial reporting purposes – indeed, ***it contained critical relevant information***. Ex. 95 at 42:11-19. Both Ellison and Henley described OSO as a "***mission critical system***." *Id.* at 163:24-165:9; 168:23-169: 8; Ex. 180. Oracle's sales force input their pipeline into OSO. Ex. 93 at 247:16-21. OSO included information about prospective deals and win probability percentages and

was used to create the Company's forecasts. *Id.* at 248:1-10, 255:12-256:12. OSO was also used by finance employees. Ex. 95 at 166:17-21.

OSO provided the individual defendants with real-time forecasting information anywhere and any time. Ex. 117 at 474:2-475:1; Ex. 95 at 43:7-12. As defendant Sanderson testified:

> One of the things that OSO did is gave global visibility. Larry, for example, could sit in his office or at home and go on OSO and see what the pipeline was in OPI. He could see what the pipeline was for a particular account manager. He could do that around the world.
>
> * * *
>
> And, again, as we rolled out OSO, I could sit down, I could go online right at my desk or when I was traveling and go online. I could go into OSO, and I could see what Max Hill, who's one of the regional managers we talked about earlier, I could go see what his deals are. I could see what he's saying is the latest around Bechtel – or Beckman, as an example. ***And it gave us a lot – all of us a lot more visibility. It gave Finance more visibility. It gave Larry more visibility. It gave me more visibility to my respective areas of responsibility.***

Ex. 93 at 272:4-10; 274:11-23.

Ellison testified that he held meetings where the attendees looked at the output from OSO and that he looked at the forecast results from OSO. Ex. 117 at 459:16-21. Defendant Henley also testified that he used the output from OSO that was included in financial reporting and internal manager reporting and that the Company relied heavily upon OSO for analyst calls. Ex. 95 at 42:20-43:6; 168:23-169:8. Ellison and Henley were both involved in compelling Oracle sales employees to input all information into OSO and keep it up to date as early as September 2000. Ex. 117 at 421:15-423:6 and Ex. 181. Moreover, defendants' proposed forecasting experts, Hubbard and George Foster, relied upon the fact that Oracle sales representatives entered their sales projections, including deals, potential values and closing probabilities, into OSO. *See, e.g.*, Ex. 98 at ¶¶162, 171; Ex. 192 at ¶31.

Moreover, OSO contained unique data that was not available from any other infallible source. Indeed, Ellison has blamed the Company's 3Q01 miss in part on deals that fell off due to the economy:

> It's very disappointing. A bunch of deals were approved at the senior vice president level, but once they got to the CFO and CEO level, they were pushed off. We have a lot of nervous executives looking at this economy and being very cautious. They want to wait thirty to sixty days so they can get a better read on this economy.

Ex. 183. However, when asked to name any of the customers who were involved in such deals, ***Ellison could not, and pointed to OSO as the only certain way to retrieve the information***. Ex. 117 at 364:25-367:9; 369:3-21.

***But defendants failed to preserve OSO or even the documents in the possession of the employees who input data into OSO***. In response to an inquiry as to whether she took steps in March 2001 to preserve OSO, Segal responded that she did not "recall when [she] started to try to preserve Oracle Sales Online." Ex. 78 at 192:15-20. Segal admitted to knowing that "there was a great effort made to transition to using Oracle Sales Online," but nonetheless did not instruct the entire sales organization to preserve documents. *Id.* at 192:22-193:9. Nor did she successfully preserve the backup tapes that contained OSO data from the Class Period. *Id.* at 262:5-264:3. Indeed, OSO was purged in July 2001, a fact that concerned even Ellison. Ex. 117 at 367:10-368:15.

Moreover, despite the insurmountable evidence about the ***usage of OSO during the Class Period***, Ellison attempted to distance himself from OSO –***denying that he used it during the Class Period***. Ex. 117 at 461:23-462:6. Here again Ellison's veracity is questionable. *SOFTWAR* author Symonds, who accompanied Ellison throughout his working day over the course of nine months in 2001, ***reported that Ellison utilized OSO on a daily basis***, and Ellison took no action to correct this statement published in *SOFTWAR* even though it was clearly his prerogative to do so. *Id.* at 461:23-462:10. When faced with this contradiction, Ellison cleverly testified that the Company kept logs, very likely knowing full well that the logs too were destroyed. *Id.* at 461:23-464:5. Indeed, the only conclusive proof as to whether Ellison utilized OSO during the Class Period – the OSO log-in records – have also been destroyed. *Id.*

#### 2. Defendants Failed to Preserve Crucial Documents Relating to Oracle's Forecasting Process

Defendants' spoliation of forecasting materials went much further than the OSO database. The Discovery Plan required defendants to produce documents and communications relating to Oracle's forecasts and Oracle's sales pipeline and pipeline conversion rates/ratios. Ex. 43, § I.C. Said documents were to be produced for the relevant time period, including documents created outside the relevant time period that refer to events within the relevant time period. *Id.*, § I.A. As

set forth in the Motion to Compel, as of May 16, 2006, Oracle's production omitted numerous critical forecasting reports and documents that Oracle used every quarter during the relevant time period.[30] Even though Oracle had taken the position that its production was complete – and the Discovery Plan required defendants to complete their production by ***May 1, 2005*** (Ex. 43, § II.A.), plaintiffs continued to seek the missing information, including by serving a third set of requests for production on May 31, 2006. Defendants continued to evade the discovery. On August 16, 2006, plaintiffs moved to compel further responses to certain requests, and on September 15, 2006, Special Master Infante ordered defendants to produce by September 29, 2006 "all sales forecast reports (periodic or otherwise) from 1999-2001 and all deal reports from 1999-2001." Ex. 184 at 4.

Defendants produced certain documents on October 2 and 16, 2006, but even then, over five months after the original production deadline, defendants' production was extremely deficient. Plaintiffs moved again on October 30, 2006 – this time to enforce Special Master Infante's September 15, 2006 Order, therein detailing numerous deficiencies in defendants' production. Special Master Infante then issued an Order that provided in part:

> Defendants shall provide Plaintiffs with a sworn declaration from an Oracle representative with knowledge clearly indicating whether Defendants have produced all responsive, non-privileged documents in their possession, custody or control. The declaration shall address each of the reports [detailed in] Plaintiffs' motion. To the extent that responsive documents are not in Defendants' possession, custody or control, the declaration shall clearly so indicate on a report-by-report basis.

Ex. 185 at 8. In response, defendants provided the declaration and amended declaration of James C. Maroulis (the "Maroulis Declarations"). Exs. 186-187. Plaintiffs then challenged the evasive language of the Maroulis Declarations which in essence indicated that missing reports may or may not have existed. Thereafter, Special Master Infante issued an Order requiring that defendants, within seven days:

> [P]rovide Plaintiffs with a sworn declaration from an Oracle representative (or representatives) clearly indicating, on a report-by-report basis, whether the reports identified by Plaintiffs ever existed, which of the reports that existed have been

---

[30] The relevant time period consisted of Oracle's fiscal quarters 3Q00 through 4Q01.

> produced to Plaintiffs and which of the reports that at one time existed were not produced to Plaintiffs because they are no longer in Oracle's possession, custody or control.

Ex. 188 at 10-11. After requesting an extension, defendants provided the Declaration of Ivgen Guner Regarding Forecasting Reports ("Guner Declaration") to plaintiffs on March 20, 2007.

Although the Guner Declaration in part continues to dodge the question of whether the reports identified by plaintiffs ever existed, the Guner Declaration, taken together with what plaintiffs have determined to be an established historical pattern of creating the reports in question, supports what plaintiffs have suspected all along – that defendants failed to preserve the critical relevant forecasting documents detailed in the tables below:[31]

| **UPSIDE REPORTS[32]** | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 4, 6, 8 |
| Q2'99 | weeks 2, 6, 8, 11, 12, 13 |
| Q3'99 | weeks 2, 4 |
| Q4'99 | weeks 4, 6, 8 |
| Q1'00 | weeks 2, 4, 11 |
| Q3'00 | week 4 |
| Q4'01 | week 8 |

---

31 The Guner Declaration includes language to the effect that after ascertaining Oracle's collective knowledge, defendants still do not know the frequency with which the following reports were created: Deal Reports used during Americas Forecast Calls for fiscal years 2000 and 2001; Garnick Flash Reports for fiscal years 1999 and 2000; Monthly Flash Reports for fiscal years 1999 and 2000; OPI Big Deal Scenarios for fiscal years 1999, 2000 and 2001; OSI Pipeline Reporting Packages for fiscal years 1999, 2000 and 2001; Upside Reports for fiscal years 1999 and 2000; Americas Forecast Packages for 1999, 2000 and April and May of Q4 2001; Executive Committee Worldwide Forecasts for 1999 and Q1 2000; Oracle Support Services USA GAP Analysis for Q3 and Q4 2000; and Pipeline Reporting Packages for fiscal 1999, 2000, Q3 and Q4 2001. Ex. 189.

32 *Compare* Ex. 189 (Guner Declaration) *with* Ex. 190 (Corporate Forecast Schedule). Further evidencing the problems with defendants' preservation and production of relevant forecasting reports and defendants' refusal to fully comply with the Court orders is the Rebuttal Expert Report of George Foster which identifies numerous upside reports not identified by the Guner Declaration. *See* Ex. 182.

| MONTHLY FINANCIAL REFERENCE BOOKS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| 3Q'00 | December, January |

| AMERICAS FORECAST PACKAGES | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11, 13 |
| Q3'00 | week 4 |
| Q4'00 | week 10 |
| Q4'01 | weeks 8, 10, 11, 12, 13 |

| GARNICK FLASH REPORTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | June, July |
| Q2'99 | September, October |
| Q3'99 | December, January |
| Q4'99 | March, April |
| Q1'00 | June, July |
| Q2'00 | September, October |
| Q3'00 | January |
| Q4'00 | March |

| MONTHLY FLASH REPORTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | August |
| Q2'99 | November |
| Q3'99 | January, February |
| Q4'99 | March, April, May |
| Q1'00 | June, July, August |
| Q2'00 | September, October, November |
| Q3'01 | January, February |
| Q4'01 | March, April |

| PIPELINE REPORTING PACKAGE | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6 |
| Q2'00 | weeks 11, 12, 13 |
| Q3'00 | weeks 4, 8, 10, 12, 13 |
| Q4'00 | weeks 4, 8, 11, 12, 13 |
| Q3'01 | weeks 4, 8, 11, 12, 13 |
| Q4'01 | weeks 4, 8, 10, 11, 13 |

| NAS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q2'00 | weeks 2, 4, 6, 13 |
| Q4'00 | week 14 |
| Q2'01 | week 8 |

| GENERAL BUSINESS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'01 | weeks 2, 4, 6 |
| Q3'01 | weeks 2, 6, 11, 12, 13 |
| Q4'01 | weeks 2, 8, 10, 11, 12, 13 |

| MAJORS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11 |
| Q3'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |

| DEAL REPORTS USED DURING AMERICAS FORECAST CALLS | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All but four |

| AMERICAS REPORTING PACKAGES | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | All |
| Q2'99 | All |
| Q3'99 | All |
| Q4'99 | All |
| Q1'00 | All |

| EXECUTIVE COMMITTEE WORLDWIDE FORECAST | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | June 8, 1998<br>June 22, 1998 |
| Q2'99 | September 21, 1998<br>November 16, 1998 |
| Q4'99 | April 5, 1999<br>May 3, 1999 |
| Q2'00 | November 15, 1999 |
| Q3'00 | December 13, 1999<br>December 27, 1999 |
| Q2'01 | November 6, 2000 |

| NAS BIG DEAL SCENARIOS | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY '99 | All |
| FY '00 | All |

| BIG DEAL UPDATE | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'00 | All |
| Q2'00 | All |
| Q3'00 | All but three (should be at least 8 reports) |
| Q1'01 | missing three |
| Q2'01 | missing two |
| Q4'01 | missing four |

| OSI PIPELINE HISTORY REPORT | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

| OPI FORECAST PACKAGE | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | All |
| Q2'99 | All |
| Q3'99 | All |
| Q4'99 | All |
| Q1'00 | All |
| Q2'00 | All |
| Q3'00 | All |
| Q4'00 | All |
| Q1'01 | weeks 2, 6, 11, 13 |
| Q4'01 | week 10 |

| OSI FORECAST PACKAGE | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All but one |

| OSI BIG DEAL SCENARIOS | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

| OPI BIG DEAL SCENARIOS | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

*See* Ex. 189.

Given that Oracle's records retention schedule required that such forecasting documents be preserved for three years – and thus all of the reports defendants were ordered to produce (dating back to 1999) should have been in existence at the time plaintiffs filed their March 9, 2001 Complaint – the only possible conclusion is spoliation. *See* Ex. 191 (Oracle Approved Records Retention Schedule) at NDCA-ORCL 045874. Indeed, as part of its investigation into events that in part form the basis of this litigation, the SLC requested and received certain documents from Oracle and defendants Ellison and Henley, including many of the same documents requested by plaintiffs, and requested and received the Company's document retention policies to determine whether documents relevant to the allegations against defendants should still exist pursuant to Company policy.[33] *See* Ex. 192 at NDCA-ORCL 294808-23. Based upon the Company's document retention policy, the SLC concluded that "[i]f any documents that should have been retained were not produced, the Committee could reasonably infer either that the documents had been destroyed or that the Company was not cooperating in the Committee's investigation." *Id.* at NDCA-ORCL 294822-23.

### 3. Defendants Failed to Preserve Group E-mail Boxes

In addition to wholly failing to preserve individual e-mail boxes, defendants also failed to

---

33 The SLC specifically investigated the allegations made in the various derivative actions filed against defendants Ellison, Henley and others and the allegations of accounting fraud included in the SAC.

preserve group e-mail boxes that were used by groups within Oracle to send and receive relevant information. Indeed, the only such box that Segal claims to have preserved was a box for the organization Headquarters Approvals, and for that box, she could not even recall when it was preserved. Ex. 78 at 267:18-268:22. Other group e-mail boxes used at Oracle included revrec@us.oracle.com (revenue recognition group) and arinfo@oracle.com (accounts receivable group).

### 4. Defendants Failed to Preserve Escalated Customer Reports

During the relevant time period, Oracle utilized its Escalated Customer Management System ("ECMS") as a reporting tool for the critical accounts division of support. Ex. 91 at 86:4-88:1. When information was entered into ECMS, the system would generate reports that would be distributed via e-mail. *Id.* The ECMS included escalated customers and information on technical assistance requests. Ex. 193. Escalated Customer Reports were generated by the system weekly, and were sorted by hot, warm and cool escalations and by product, including Suite 11i CRM products and Suite 11i ERP products. *See* Ex. 126.

Ellison and others received these reports. *Id.* The information included on the reports was also available via the web at Oracle. Ex. 193. Ellison was provided with the URL for the webpage. *Id.* Despite the purpose and the users of this information, defendants have only produced five Escalated Customer Reports dated weekly from May 21, 2001 to June 18, 2001. Not a single Escalated Customer Report was produced from the Class Period.

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

35

36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[37]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[38]

39

40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

[42]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43

44

45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## VII. DEFENDANTS KNOWINGLY MISREPRESENTED THEIR PRESERVATION EFFORTS TO THE COURT

Plaintiffs now know with certainty that representations made by defendants to the Court regarding their document preservation efforts were knowingly false when made. And, in fact, defendants made these statements to the Court with the specific purpose of concealing defendants' scheme to destroy evidence both through actual destruction and failure to preserve. Dismissal is the most appropriate sanction. *Leon*, 464 F.3d at 958.

### A. Oracle's Representations to the Court in Its Request to Stay Discovery in Parallel State Court Proceedings Were False

As set forth in the Motion to Compel, in June 2002, Oracle filed a motion in this case requesting that the Court invoke its power under the PSLRA to stay discovery in the parallel state court derivative proceedings on behalf of Oracle then pending in San Mateo Superior Court. Ex. 232 at 14. In its motion, Oracle falsely assured the Court and plaintiffs that plaintiffs would suffer no prejudice from loss of evidence because "***all defendants must preserve all documents just as if they were the subject of a continuing request for production.***" *Id.* Indeed, as detailed in the Motion to Compel and herein, this statement could not have been further from the truth. For example, at the time defendants made this statement, they were fully aware of the minimal extent of their document preservation efforts, including the following confirmed facts: (1) defendants sent the March 13, 2001 document preservation e-mail to a mere 30 individuals; (2) defendants failed to preserve evidence in the possession of the majority of individuals who communicated with the individual defendants; (3) the few employees who had received preservation instructions, including Ellison, had not been instructed to retain post-Class Period evidence, nor had they been instructed to change their computer setting in order to retain sent items; (4) neither OSO nor the OSO backup tapes had been preserved – indeed, by that time the OSO backup tapes had been affirmatively destroyed by defendants; and (5) the contents of larryellison.com had not been preserved.

### B. Oracle's Representations Regarding Its Non-Destruction of Accounting Evidence Made in Response to Plaintiffs *Ex Parte* Application for Relief Were False

Additionally, again as set forth in the Motion to Compel and *supra*, plaintiffs moved the

Court for an order enjoining Oracle from destroying evidence and demanding particularized discovery in November 2002, shortly after plaintiffs filed the SAC. Ex. 19. Defendants responded in opposition: "***Oracle is not deleting, destroying, or altering any documents or evidence relating to the allegations in this case – period.***" Ex. 12 at 1. In support of their opposition defendants submitted the sworn Declaration of Greg Myers which provided:

> Our ongoing investigation into the origin and disposition of cash receipts contained in Oracle's Accounts Receivable (A/R) reserve account (known as Account 12601) has ***nothing to do*** with the approximately 46,000 debit memo transactions that occurred on November 17, 2000 . . . .

Ex. 11 at 2. The Court denied plaintiffs' motion.

Evidence and an Order of Special Master Infante have confirmed that both of these representations made by defendants with the stated intent of prohibiting plaintiffs from obtaining necessary discovery were false. Indeed, in addition to all the other evidence plaintiffs have discovered that defendants either purposefully destroyed or failed to preserve, former Oracle employee Hatada confirmed that as part of what Myers referred to as the "investigation" related to Account 12601, the collectors working on the project were going in and changing and deleting notes and that ***prior versions were not maintained***, as set forth in *supra*. Ex. 32 at 82:15-85:14. Moreover, in the December 19, 2006 Order, ***Special Master Infante specifically found that defendants "later shifted that position"*** referring to the sworn statement by Myers. Ex. 13 at 19.

### C. Statements Made by Defendants to Magistrate Judge Spero at Hearing to Determine the Files to Be Searched Were Patently False and Intentionally Omitted the True Facts of Defendants' Preservation Efforts

Lastly, as plaintiffs detailed in the Motion to Compel, defendants assured the Court that they had preserved electronic evidence during the March 1, 2005 hearing conducted by Magistrate Judge Spero to determine the parameters of the discovery in this case, a statement that was demonstrably false. Ex. 14 at 74. Moreover, at that same hearing, defendants vociferously advocated for the scope of discovery to be based upon and limited by the so-called "Speakers" group fashioned by defendants. *See, e.g.*, *id.* at 7-10, 13-16, 32, 39, 87-88. In so doing, defendants blatantly misrepresented to the Court the sources of Ellison's information – arguing that so-called "Speakers" (including Ellison) received their information only from their direct reports and, as such, all

communications with and information received by the "Speakers" would necessarily be captured if the Court were to limit document production to the files of the "Speakers" and their direct reports. *Id.* at 7-10, 13-16. Defendants also argued that in the event someone at a level below the direct reports at the Company communicated with one of the "Speakers," the documents would necessarily be in the possession of the "Speakers" and thus plaintiffs would get such documents. *Id.* at 14.

However, defendants failed to inform the Court of the true reason for their pursuit of this limitation – they had not sent preservation notices to any Oracle employees other than the direct reports of the "Speakers." Moreover, defendants did not advise the Court or plaintiffs that defendants had not, in fact, made any effort to determine who did communicate with the "Speakers." Nor did defendants inform the Court of the fact that not even the files of the "Speakers" and their direct reports were properly preserved.

Magistrate Judge Spero found defendants' proposal to be too narrow but, based upon defendants' representations about the nature of communications with Oracle's "Speakers," limited the required production to "Speakers," their direct reports, and AVPs – Oracle employees who were generally one rank below direct reports. Despite their duty to do so, however, defendants had sent a preservation notice to less that 25% of the AVPs. Indeed, defendants made no categorical effort to preserve the files of Oracle employees at the AVP level. As such, the files of the AVPs had not been preserved and defendants' production was necessarily limited to any documents which may have, by chance or luck, survived over the four years since the commencement of this litigation. At no time during the hearing did defendants inform Magistrate Judge Spero that the files of the AVPs had not been preserved.

## VIII. LESSER SANCTIONS

In the unlikely event this Court finds that defendants' conduct warrants a sanction less than default judgment, an adverse inference instruction and the exclusion of testimony would be appropriate. Plaintiffs have no doubt established that (1) defendants had an obligation to preserve destroyed evidence at the time it was destroyed; (2) defendants destroyed the evidence with a culpable state of mind; and (3) the evidence destroyed by defendants was relevant to plaintiffs' claims such that a reasonable trier of fact could find that the destroyed evidence would support

plaintiffs' claims, warranting the imposition of an adverse inference instruction. *Napster*, 462 F. Supp. 2d at 1078; *see also NTL*, 2007 U.S. Dist. LEXIS 6198, at *48-*49. Two rationales support the imposition of an adverse inference instruction, an evidentiary rationale and a punitive/preventative rationale. *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *21-*22. "The evidentiary rationale is the common sense observation that a party who has notice that a document is relevant to litigation and who destroys the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." *Id.* at *21.

As with terminating sanctions, a finding of bad faith is not necessary – "simple notice of potential relevance to the litigation" is sufficient to satisfy the culpable state of mind requirement. *Ameripride*, 2006 U.S. Dist. LEXIS 59398, at *31; *see also Residential*, 306 F.3d at 108 (culpable state of mind requirement satisfied by demonstrating that destruction of or failure to produce evidence was negligent); *Napster*, 462 F. Supp. 2d at 1078 (finding gross negligence to be sufficient culpability to justify an adverse inference); *NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72 (culpable state of mind requirement satisfied where no adequate litigation hold was ever put in place). Evidence of bad faith or grossly negligent destruction/untimely production will satisfy both the culpable state of mind requirement and the relevance factor considered in imposing adverse inference sanctions. *Id.* at *77; *Residential*, 306 F.3d at 109-10. Here there is overwhelming evidence that defendants destroyed relevant evidence and delayed the production of relevant evidence in bad faith.

## IX. CONCLUSION

Based on the foregoing, plaintiffs respectfully request that the Court enter an order imposing sanctions relating to the destruction of evidence as proposed in the attached [Proposed] Order Granting Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants' Destruction of Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006 Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence.

DATED: October 10, 2007

Respectfully submitted,

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
DANIEL J. PFEFFERBAUM

/s/
SHAWN A. WILLIAMS

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
STACEY M. KAPLAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\Oracle3\10-10-07 continuation of under seal docs\BRF00046325_Redacted.doc

CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 10, 2007.

/s/

SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

E-mail:shawnw@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

       bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111