1 │ COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2 │ MARK SOLOMON (151949)
    DOUGLAS R. BRITTON (188769)
3 │ STACEY M. KAPLAN (241989)
    655 West Broadway, Suite 1900
4 │ San Diego, CA 92101
    Telephone: 619/231-1058
5 │ 619/231-7423 (fax)
    marks@csgrr.com
6 │ dougb@csgrr.com
    skaplan@csgrr.com
7 │      – and –
    SHAWN A. WILLIAMS (213113)
8 │ WILLOW E. RADCLIFFE (200087)
    MONIQUE C. WINKLER (213031)
9 │ ELI R. GREENSTEIN (217945)
    DANIEL J. PFEFFERBAUM (248631)
10 │ 100 Pine Street, Suite 2600
     San Francisco, CA 94111
11 │ Telephone: 415/288-4545
     415/288-4534 (fax)
12 │ shawnw@csgrr.com
     willowr@csgrr.com
13 │ moniquew@csgrr.com
     elig@csgrr.com
14 │ dpfefferbaum@csgrr.com

15 │ Lead Counsel for Plaintiffs

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

| 18 │ In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) | Master File No. C-01-0988-MJJ |
|---|---|---|
| 19 │ | ) | CLASS ACTION |
| 20 │ This Document Relates To: | ) ) ) | PLAINTIFFS' NOTICE OF MOTION AND SUPPLEMENTAL SUBMISSION |
| 21 │ ALL ACTIONS. | ) ) | REGARDING DEFENDANTS' DESTRUCTION OF EVIDENCE AND |
| 22 │ | ) | REQUEST FOR SANCTIONS AND OBJECTIONS TO SPECIAL MASTER'S |
| 23 │ **PREVIOUSLY FILED ON** | | JULY 17, 2006 ORDER DENYING PLAINTIFFS' MOTION TO COMPEL THE |
| 24 │ **OCTOBER 5, 2007 DOCKET NO. 1176** | | RESTORATION OF BACKUP TAPES AND FOR MISCELLANEOUS RELIEF FOR THE |
| 25 │ **REDACTED VERSION** | | DESTRUCTION OF EVIDENCE |

26    Date:        November 16, 2007
      Time:        1:30 p.m.
27    Courtroom:   Honorable Martin J. Jenkins

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................... 1

II.   RELEVANT PROCEDURAL HISTORY ......................................................................... 2

III.  LEGAL STANDARD ....................................................................................................... 2

IV.   DEFENDANTS FAILED TO PRESERVE EVIDENCE IN BAD FAITH ........................ 8

      A.   Defendants Expected Litigation After the March 1, 2001 Disclosures ................... 8

      B.   After Service of Broad Complaint, Defendants Intentionally Excluded
           Almost All of Oracle Employees from Preservation Instructions ............................ 8

           1.   Defendants' Focus on Employees Who Communicated with
                "Speakers" Was Insufficient, Deliberate and Self-Serving ......................... 9

           2.   Defendants Intentionally Excluded Entire Categories of Employees
                Who Possessed Relevant Documents ......................................................... 11

           3.   Defendants Impermissibly Relied Upon Non-Attorneys to Carry
                Out Preservation Obligations ..................................................................... 13

      C.   The Scope of the Preservation Instructions Was Knowingly Deficient ................ 13

           1.   Evidence Created Post-Receipt of Preservation Instructions ..................... 13

           2.   E-mails Sent by Employees ....................................................................... 14

           3.   Ellison-Related Evidence ........................................................................... 15

      D.   At a Company Level, Defendants Failed to Preserve Categories of
           Information Highly Relevant to This Litigation ..................................................... 16

           1.   Defendants Failed to Preserve the Oracle Sales Online Database
                that Included Unique and Highly Relevant Material ................................... 16

           2.   Defendants Failed to Preserve Crucial Forecasting Documents ............... 18

           3.   Defendants Failed to Preserve Group E-mail Boxes and Escalated
                Customer Reports ...................................................................................... 20

V.    DEFENDANTS ALTERED/WITHHELD KEY EVIDENCE RELATING TO A
      "CLEAN UP" OF RELEVANT ACCOUNTING FILES ................................................. 21

      A.   Defendants Made False Representations to the Court Concerning the 2002
           Clean Up to Shield Highly Relevant Documents from Discovery ......................... 21

           1.   Defendants Attempted to Hide Crucial Documents Under the
                Guise of the 2002 Clean Up ...................................................................... 22

**Page**

2.      Oracle Used the 2002 Clean Up to Alter Accounting Records .................23

B.      Defendants' Repeated Violations of Court Orders Prevented Plaintiffs
        from Obtaining Relevant Documents Until After Fact Discovery ........................24

VI.     DEFENDANTS INTENTIONALLY DESTROYED THE HIGHLY RELEVANT
        *SOFTWAR*-RELATED MATERIALS ...............................................................................27

A.      Defendants Withheld the *SOFTWAR* Materials in Bad Faith.................................28

B.      Defendants Violated the Order to Produce *SOFTWAR* Materials in Bad
        Faith and Made False Representations Regarding the Materials............................29

VII.    DEFENDANTS KNOWINGLY MISREPRESENTED THEIR PRESERVATION
        EFFORTS TO THE COURT............................................................................................33

VIII.   CONCLUSION.................................................................................................................35

1

**TABLE OF AUTHORITIES**

2

Page

3 **CASES**

4 *A. Farber & Partners, Inc. v. Garber,*
 234 F.R.D. 186 (C.D. Cal. 2006) ........................................................................................28

5

*AdvantaCare Health Partners, LP v. Access IV,*
6 Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835
 (N.D. Cal. Aug. 17, 2004).....................................................................................3, 6, 7, 9

7

*Ameripride Servs., Inc. v. Valley Indus. Serv., Inc.,*
8 No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398
 (E.D. Cal. Aug. 9, 2006)......................................................................................................6, 7

9

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.,*
10 69 F.3d 337 (9th Cir. 1995) ........................................................................................3, 4, 5

11 *Computer Task Group, Inc. v. Brotby,*
 364 F.3d 1112 (9th Cir. 2004) .................................................................................. *passim*

12

*FDIC v. Fid. & Deposit Co.,*
13 45 F.3d 969 (5th Cir. 1995) ..............................................................................................7

14 *Halaco Eng'g Co. v. Costle,*
 843 F.2d 376 (9th Cir. 1988) ............................................................................................5

15

*Hamilton v. Signature Flight Support Corp.,*
16 No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088
 (N.D. Cal. Dec. 20, 2005)...............................................................................................5, 6

17

*In re Napster, Inc. Copyright Litig.,*
18 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ...................................................................... *passim*

19 *In re NTL, Inc. Sec. Litig.,*
 No. 02 Civ. 3013 (LAK)(AJP), 2007 U.S. Dist. LEXIS 6198
20 (S.D.N.Y. Jan. 30, 2007)......................................................................................6, 7, 8, 13

21 *In re Scholastic Corp. Sec. Litig.,*
 252 F.3d 63 (2d Cir. 2001)..............................................................................................14

22

*In re Tableware Antitrust Litig.,*
23 484 F. Supp. 2d 1059 (N.D. Cal. 2007) ...............................................................................7

24 *In re Telxon Corp. Sec. Litig.,*
 Case No. 5:98CV2876, 2004 U.S. Dist. LEXIS 27296
25 (N.D. Ohio July 16, 2004) ...............................................................................4, 5, 22, 23

26 *In re United States Aggregates, Inc. Sec. Litig.,*
 235 F. Supp. 2d 1063 (N.D. Cal. 2002) ...............................................................................14

27

*Juniper Networks, Inc. v. Toshiba America, Inc. et al.,*
28 Case No. 2:05-CV-047 (E.D. Tex. July 11, 2007)................................................................5

1

2                                                                                    **Page**

3  *Kronisch v. United States*,
      150 F.3d 112 (2d Cir. 1998)................................................................................6
4
   *Leon v. IDX Sys. Corp.*,
5     464 F.3d 951 (9th Cir. 2006) ......................................................................*passim*

6  *Putnam Res. v. Pateman*,
      757 F. Supp. 157 (D.R.I. 1991)...........................................................................7
7
   *Pyles v. Johnson*,
8     136 F.3d 986 (5th Cir. 1995) ...............................................................................7

9  *Rambus, Inc. v. Infineon Techs. AG*,
      222 F.R.D. 280 (E.D. Va. 2004) ........................................................................14
10
   *Residential Funding Corp. v. DeGeorge Fin. Corp.*,
11    306 F.3d 99 (2d Cir. 2002).....................................................................2, 6, 7, 8

12 *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
      982 F.2d 363 (9th Cir. 1992) ..........................................................................2, 3
13
   *Wm. T. Thompson Co. v. General Nutrition Corp.*,
14    593 F. Supp. 1443 (C.D. Cal. 1984) ..................................................................27

15 *World Courier v. Barone*,
      No. C 06-3072 THE, 2007 U.S. Dist. LEXIS 31714
16    (N.D. Cal. Apr. 13, 2007) ..............................................................................6, 7

17 *Zubulake v. UBS Warburg LLC*,
      220 F.R.D. 212 (S.D.N.Y. 2003) .........................................................................8
18
   **STATUTES, RULES AND REGULATIONS**
19
   15 U.S.C.
20    §78u-4(b)(3)(C)(i)................................................................................................9

21 18 U.S.C.
      §1512(c) .............................................................................................................32
22
   Federal Rules of Civil Procedure
23    Rule 30(b)(6)......................................................................................................26
      Rule 34...............................................................................................................29
24    Rule 37..........................................................................................................2, 3, 5
25

26

27

28

1  TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2      PLEASE TAKE NOTICE that on November 16, 2007 or as soon thereafter as the matter may
3  be heard in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs shall and hereby do move
4  this Court, pursuant to the Court's inherent power and Federal Rule of Civil Procedure ("FRCP") 37
5  for an order of default judgment for failure to preserve and maintain the integrity of evidence and
6  violation of discovery orders. This motion is based on this Notice and Supplemental Submission;
7  the supporting Supplemental Declaration of Monique C. Winkler ("Supp. Winkler Decl.") and the
8  supporting [Corrected] Declaration of Monique C. Winkler ("Winkler Decl."), filed herewith;
9  Plaintiffs' Corrected Notice of Motion and Motion to Compel the Restoration of Back-up Tapes and
10 for Miscellaneous Relief for the Destruction of Evidence ("Motion to Compel"); Plaintiffs' Reply in
11 Support of the Motion to Compel ("Reply"); Plaintiffs' Objection (Docket #575) ("Objection") and
12 all supporting documents; all pleadings and papers filed in this action; the arguments of counsel; and
13 any other matter that the Court may consider at a hearing on this motion.

14 **I.      INTRODUCTION**

15     The facts here demonstrate, beyond any doubt, that from the date Oracle Corporation
16 ("Oracle" or the "Company") announced its failure to meet its fiscal third quarter 2001 ("3Q01")
17 forecast, defendants have deliberately engaged in a scheme to destroy, alter and withhold evidence
18 relevant to this litigation, including crucial evidence related to plaintiffs' accounting allegations and
19 virtually all evidence related to Lawrence J. Ellison. Defendants have intentionally destroyed
20 evidence that would demonstrate Ellison's knowledge and mental state at all relevant times –
21 hundreds of hours of tapes and transcripts of interviews with Ellison created in preparation for the
22 book *SOFTWAR: An Intimate Portrait of Larry Ellison and Oracle* ("*SOFTWAR*") by Matthew
23 Symonds that were directly relevant to plaintiffs' allegations of technical problems with Suite 11i
24 and the resulting customer concessions and settlements, Ellison's January 2001 $900 million insider
25 sales, Oracle's forecasting process and the effect of the declining economy on Oracle's business, and
26 Oracle's billion dollar savings claims. The spoliation detailed in the Motion to Compel, while
27 egregious, was merely the tip of the iceberg. Defendants' conduct has been multifarious in nature,
28 beginning with their failure to adequately issue a preservation instruction to Oracle employees at the

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ      - 1 -

1 time that they reasonably anticipated litigation and continuing with their deliberate destruction of
2 relevant evidence, and their knowing misrepresentations to the Court and plaintiffs regarding the
3 relevance of evidence and preservation, and their violations of multiple Court orders. Defendants'
4 misconduct here warrants terminating sanctions.

5 **II. RELEVANT PROCEDURAL HISTORY**

6       On May 16, 2006, plaintiffs filed their Motion to Compel. Ex. 1.[1] On June 9, 2006,
7 defendants filed their Corrected Opposition to the Motion to Compel ("Opposition to Motion to
8 Compel"). On June 16, 2006, plaintiffs filed their Reply. Ex. 3. On July 10, 2006, Special Master
9 Honorable Edward A. Infante (Ret.) heard arguments on plaintiffs' Motion to Compel. On July 17,
10 2006, Judge Infante issued an order denying plaintiffs' Motion to Compel without prejudice. Ex. 4.
11 The *only* basis Judge Infante found for denying plaintiffs' request for sanctions in the Motion to
12 Compel was plaintiffs' failure to show prejudice. Ex. 9 at 39:20-25. On August 7, 2006, plaintiffs
13 timely filed their Objection which is pending before this Court. Ex. 5.

14 **III. LEGAL STANDARD**

15       This Court possesses the inherent power to sanction defendants for their destruction of
16 evidence. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.
17 1992); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (imposing dismissal sanction upon
18 party who destroyed electronic documents). Where a party breaches its duty to preserve as
19 defendants did here, the opposing party may move for sanctions. *In re Napster, Inc. Copyright*
20 *Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006). Rule 37 also provides for sanctions against a
21 party failing to obey an order to provide or permit discovery. *Leon*, 464 F.3d at 958; *Residential*
22 *Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). Rule 37 permits this Court
23 to enter a default judgment. *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir.
24 2004).

25

26 [1]   All numerical and alphabetical "Ex." references are to the Winkler Decl. and Supp. Winkler
27 Decl., respectively. All emphasis is added and citations and quotations are omitted unless otherwise
noted.

28

> When choosing among possible sanctions, the Court should consider a sanction designed to: (1) penalize . . .;(2) deter . . .;(3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence. . . .

*AdvantaCare Health Partners, LP v. Access IV*, Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835, at *12-*13 (N.D. Cal. Aug. 17, 2004).

Defendants' knowing and intentional destruction of relevant evidence, calculated withholding of relevant evidence until well after the close of discovery, failure to comply with the PSLRA document preservation provisions and orders of the Court, including the March 10, 2005 Amended Order Setting a Discovery Plan ("Discovery Plan"), and ongoing efforts to obscure their misconduct including repeated misrepresentations to the Court and plaintiffs, justify the entry of default judgment. *Napster*, 462 F. Supp. 2d at 1066; *Brotby*, 364 F.3d at 1115.

> Dismissal is an available sanction when a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings because courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.

*Leon*, 464 F.3d at 958; *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995); *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *11.

In order to impose the sanction of default judgment upon defendants, the Court must make "a finding of willfulness, fault, *or* bad faith." *Leon*, 464 F.3d at 958; *Brotby*, 364 F.3d at 1115. Bad faith is not required. *Napster*, 462 F. Supp. 2d at 1066. Instead, this Court has the power to impose sanctions for the destruction of evidence against a litigant who knew or should have known that the evidence was relevant to litigation or potential litigation. *Unigard*, 982 F.2d at 368. Willfulness is shown if defendants had "some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (emphasis in original).

The following factors should be taken into consideration in imposing terminating sanctions where imposed under the Court's inherent power or Rule 37: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348); *see*

1  *also Brotby*, 364 F.3d at 1115. The Court is not required to make explicit findings as to each of the

2  factors. *Leon*, 464 F.3d at 958. Where a party has violated a court order, the first two factors favor

3  terminating sanctions. *Id.*; *see also Brotby*, 364 F.3d at 1115. Further, where there is "ample

4  evidence of . . . time and resources [having been] spent in investigating and resolving the spoliation

5  issues," the first two factors support terminating sanctions. *Leon*, 464 F.3d at 958 n.5.[2]

6         In *Leon*, the Ninth Circuit affirmed the district court's finding of prejudice and dismissal of

7  plaintiff Leon's claims of violations of the False Claims Act, Title VII, the Americans with

8  Disabilities Act and state law, and imposition of monetary sanctions against Leon based upon Leon's

9  spoliation of evidence.  464 F.3d at 955.  Leon had deleted 2,200 files from his laptop computer

10  issued by his employer, defendant IDX Systems Corporation ("IDX").  *Id.*  The court found that the

11  failure to preserve and indeed destruction of the files "threatened to distort the resolution of the case,

12  because any number of the 2,200 files could have been relevant to IDX's claims or defenses,

13  although it is impossible to identify which files and how they might have been used." *Id.* at 960.

14         The Ninth Circuit also affirmed the imposition of terminating sanctions in *Brotby*, 364 F.3d

15  at 1117. There, the plaintiff sought damages for defendants' alleged breach of a non-disclosure/non-

16  solicitation agreement and a variety of business torts. *Id.* at 1114. The district court affirmed and

17  adopted the magistrate judge's recommendation to dismiss Brotby's counterclaims, strike his answer

18  and enter default against him on plaintiff's claims, finding that defendant's failure to produce

19  documents as ordered by the court was sufficient prejudice. *Id.* at 1115-16.

20         Indeed, prejudice can take myriad forms as in *In re Telxon Corp. Sec. Litig.*, Case No.

21  5:98CV2876, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004), where the court found

22  that the parties seeking sanctions had been prejudiced from third-party defendant auditor

23

24  [2]  With respect to the risk of prejudice, the Court should consider "whether the [spoiling
25  party's] actions impaired the [non-spoiling party's] ability to go to trial or threatened to interfere
with the rightful decision of the case." *Id.* at 959 (alteration in original). Prejudice sufficient to
26  support sanctions has been found where a party's withholding of evidence forced the opposing party
to "rely on incomplete and spotty evidence" at trial (*Anheuser-Busch*, 69 F.3d at 354) and where a
27  party produced responsive documents after key depositions had been taken. *Brotby*, 364 F.3d at
1116-17.

28

1  PricewaterhouseCoopers LLP's ("PwC") failure to cooperate in discovery in at least three ways:

2     (1) PwC's failure to [properly] produce [evidence] *adversely affected [their]*
       *decisions as to whom to depose and which questions to ask deponents*; (2) . . .
3     *deprived [them] of the opportunity to examine how PwC's audit evolved and the*
       *timing, nature, extent, and purpose of changes in the audit*; and (3) . . . *slowed*
4     *[their] discovery of relevant information and increased the cost of discovery*.

5  *Id.* at *114-*115. In *Telxon*, the court entered default judgment pursuant to Rule 37, specifically

6  rejecting lesser sanctions because they would result in the "unwinding [of] over three years' of

7  litigation," requiring basically that discovery start over. *Id.* at *119. Among the considerations that

8  the court found militating against imposing lesser sanctions were the fact that "beginning discovery

9  again would mean additional lengthy delay before the case reaches a resolution" unfairly prejudicing

10 Telxon and plaintiffs who already suffered undue delay because of PwC's bad-faith conduct; that

11 PwC's late numerous delayed productions "undercut[] any belief that PwC [had or ever would]

12 produce all relevant material in its possession;" and that "there [was] strong evidence that documents

13 [had] been destroyed, placing plaintiffs and Telxon in a situation which [could not] be remedied."

14 *Id.* at *119-*120. The Court concluded that "[b]ecause PwC's conduct has made it impossible to try

15 this case with any confidence in the justice of the outcome, PwC should bear the burden created by

16 its conduct." *Id.* at *116, *120.

17     Other Ninth Circuit and Northern District decisions have held that prejudice to the wronged

18 party is an optional consideration when determining the appropriateness of default sanctions. *See,*

19 *e.g.*, *Anheuser-Busch*, 69 F.3d at 353; *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 382 (9th Cir.

20 1988); *Napster*, 462 F. Supp. 2d at 1066.[3]  In any event, as discussed *infra*, plaintiffs proffer

21 abundant evidence of prejudice suffered here by plaintiffs as a result of defendants' misconduct.

22     Defendants' reliance on *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW

23 (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005), in their Opposition to Motion to

24

25  [3]  In *Juniper Networks, Inc. v. Toshiba America, Inc. et al.*, Case No. 2:05-CV-047, Order (E.D.
     Tex. July 11, 2007), the court imposed severe sanctions for the willful and intentional violation the
26  amended discovery order, finding that defendants misrepresented the existence and availability of
     evidence and failed to produce. Ex. 8 at 5-6. Among other sanctions, the court prohibited the
27  defendants "from proffering *any* expert testimony or opinion from *any* source during trial regarding
     non-infringement." *Id.* at 7-8 (emphasis in original). The court did not make a finding of prejudice.
28

1   Compel as requiring plaintiffs to show through extrinsic evidence that the destroyed evidence would

2   have supported plaintiffs' claims in order to establish prejudice is misplaced. Ex. 2 at 28; *see also*

3   Ex. 9 at 22:7-24. Decisions of the Ninth Circuit and other courts have clearly not required such a

4   showing prior to imposing spoliation sanctions. *See, e.g., Leon,* 464 F.3d at 959 (finding that the

5   relevance of destroyed documents cannot be clearly ascertained because the documents no longer

6   exist); *Napster*, 462 F. Supp. 2d at 1066 ("courts may impose sanctions against a party that merely

7   had notice that the destroyed evidence was potentially relevant to litigation").[4]

8           Instead, documents actually preserved and produced by defendants are probative of the

9   relevance of lost documents. *Napster*, 462 F. Supp. 2d at 1076-77. Where a party destroys evidence

10  with knowledge of impending litigation, such behavior suggests "that the evidence would have been

11  threatening to the defense of the case and that it is therefore relevant in an evidentiary sense."

12  *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *22; *Ameripride Servs., Inc. v. Valley Indus. Serv.,*

13  *Inc.*, No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398, at *32 (E.D. Cal. Aug. 9, 2006);

14  *World Courier v. Barone*, No. C 06-3072 THE, 2007 U.S. Dist. LEXIS 31714, at *5 (N.D. Cal. Apr.

15  13, 2007).

16          Where as here bad faith destruction is evident, "that bad faith alone is sufficient

17  circumstantial evidence from which a reasonable fact finder could conclude that the missing

18  evidence was unfavorable to that party." *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK)(AJP),

19  2007 U.S. Dist. LEXIS 6198, at *76 (S.D.N.Y. Jan. 30, 2007) (quoting *Residential*, 306 F.3d at 109).

20

21  ⁴   Indeed, to require "concrete" evidence would be contrary to the premise that "holding the
22  prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed
    evidence would . . . allow parties who have intentionally destroyed evidence to profit from that
23  destruction." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998); *see also Residential*, 306
    F.3d at 109. *Hamilton* is also factually inapposite because here, the PSLRA codified preservation
24  responsibilities, but in *Hamilton*, there was no such statute. Ex. 5 at 16. Moreover, in *Hamilton*, the
    spoliation claim was based only on the alleged destruction of a portion of a surveillance video that
25  recorded an incident between two individuals and, as noted by the court, the plaintiffs had the
    statements of two witnesses who claimed to have seen the entire incident which "confirm[ed] that
26  the existing video [was] accurate." 2005 U.S. Dist. LEXIS 40088, at *24-*25. This evidence was a
    factor in the court's finding that the "[p]laintiffs [had] failed to establish through 'concrete' evidence
27  that the missing video would have favored their case and that [defendant] destroyed the [video]
    because the evidence would have been harmful to it." *Id.* at *25.

28

1  The same holds true for evidence destroyed or untimely produced in a grossly negligent manner.
2  *Id.* at *76-*77; *Residential*, 306 F.3d at 109.

3  In the unlikely event this Court finds that defendants' conduct warrants a sanction less than
4  default judgment, adverse inference instructions and the exclusion of testimony, as set forth in
5  plaintiffs' Proposed Order, would be appropriate. Plaintiffs have established beyond doubt that (1)
6  defendants had an obligation to preserve destroyed evidence at the time it was destroyed; (2)
7  defendants destroyed the evidence with a culpable state of mind; and (3) the evidence destroyed by
8  defendants was relevant to plaintiffs' claims such that a reasonable trier of fact could find that the
9  destroyed evidence would support plaintiffs' claims, warranting at least the imposition of adverse
10  inference instructions. *Barone*, 2007 U.S. Dist. LEXIS 31714, at *4; *Napster*, 462 F. Supp. 2d at
11  1078; *see also NTL*, 2007 U.S. Dist. LEXIS 6198, at *48-*49. Two rationales support the
12  imposition of adverse inference instructions, an evidentiary rationale and a punitive/preventative
13  rationale. *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *21-*22. "The evidentiary rationale is
14  the common sense observation that a party who has notice that a document is relevant to litigation
15  and who destroys the document is more likely to have been threatened by the document than is a
16  party in the same position who does not destroy the document." *Id.* at *21. Moreover, it is well
17  settled law that courts may draw adverse inferences against parties in a civil litigation based on a
18  non-party witness' invocation of the Fifth Amendment. *See, e.g.*, *Pyles v. Johnson*, 136 F.3d 986,
19  997 (5th Cir. 1995); *FDIC v. Fid. & Deposit Co.*, 45 F.3d 969, 977-78 (5th Cir. 1995); *Putnam Res.*
20  *v. Pateman*, 757 F. Supp. 157, 167 (D.R.I. 1991); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d
21  1059, 1077 (N.D. Cal. 2007).

22  A finding of bad faith is not necessary – "simple notice of potential relevance to the
23  litigation" is sufficient to satisfy the culpable state of mind requirement. *Ameripride*, 2006 U.S.
24  Dist. LEXIS 59398, at *31; *see also Barone*, 2007 U.S. Dist. LEXIS 31714, at *5 (negligence
25  satisfies culpable state of mind requirement); *Residential*, 306 F.3d at 108 (culpable state of mind
26  requirement satisfied by demonstrating that destruction of or failure to produce evidence was
27  negligent); *Napster*, 462 F. Supp. 2d at 1078 (finding gross negligence to be sufficient culpability to
28  justify an adverse inference); *NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72 (culpable state of mind

1 | requirement satisfied where no adequate litigation hold was ever put in place). Evidence of bad faith
2 | or grossly negligent destruction/untimely production will satisfy both the culpable state of mind
3 | requirement and the relevance factor considered in imposing adverse inference sanctions. *NTL*, 2007
4 | U.S. Dist. LEXIS 6198, at *77; *Residential*, 306 F.3d at 109-10. Here there is overwhelming
5 | evidence that defendants destroyed relevant evidence and delayed the production of relevant
6 | evidence in bad faith.

7 | **IV.  DEFENDANTS FAILED TO PRESERVE EVIDENCE IN BAD FAITH**

8 | **A.  Defendants Expected Litigation After the March 1, 2001 Disclosures**

9 | The Company was aware that the specter of litigation was raised when Ellison started his
10 | massive stock sales on January 22, 2001. *See, e.g.*, Ex. 81 at 69:24-71:21, 77:5-12; Exs. 83-84. The
11 | Company believed that it "*was quite likely*" and senior executives "*expected*" that it would be sued
12 | for securities fraud upon the March 1, 2001 disclosure that Oracle would miss its 3Q01 financial
13 | forecasts. Ex. 78 at 276:1-6, 277:5-11; Ex. 79 at 43:23-45:9. But, defendants took no action until
14 | March 13, 2001 when they issued a limited preservation instruction to only a few select employees
15 | excluding large swaths of the Company's sales and consulting organizations whose files are critical
16 | to the litigation. *See* Ex. 79 at 114:17-121:15; Ex. 80. Defendants should have preserved relevant
17 | evidence at the latest, on March 1, 2001, if not January 22, 2001, and their failure at a minimum
18 | constitutes gross negligence and most appropriately bad faith, and supports the imposition of
19 | sanctions. *Napster*, 462 F. Supp. 2d at 1070; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218,
20 | 220 (S.D.N.Y. 2003). As a result of defendants' delay, Oracle's employees sent, received and
21 | deleted e-mails for almost two weeks – undoubtedly concerning the events surrounding the earnings
22 | shortfall and applications miss, including Suite 11i defects, and thus highly relevant – while under no
23 | internal executive directive to preserve evidence. The relevance of the destroyed documents is
24 | indisputable. *Leon*, 464 F.3d at 959.

25 | **B.  After Service of Broad Complaint, Defendants Intentionally Excluded Almost All of Oracle Employees from Preservation Instructions**

26

27 | Once defendants were actually served with the March 9, 2001 Complaint ("Complaint") they
anticipated, defendants wholly failed to preserve documents in accordance with the requirements of

28

the FRCP and the PSLRA, which expressly imposes the duty on defendants to "treat all documents, data compilations (including electronically recorded or stored data) . . . that are relevant to the allegations, as if they were the subject of a continuing request for production of documents." 15 U.S.C. §78u-4(b)(3)(C)(i). Defendants acknowledge that Oracle did not follow the PSLRA preservation requirements, and concede that they could have complied with ease by sending out a company wide e-mail. Ex. 2 at 6-9; Ex. 78 at 222:18-23. Instead, they claim to have complied with California law. Ex. 78 at 85:1-89:8; Ex. 85. Despite the concession that their attorneys could not determine upon receipt of the Complaint which documents might be relevant or who might possess relevant information, defendants sent the March 13, 2001 preservation notice to only 30 out of more than 40,000 employees.[5] Ex. 78 at 57:25-58:25, 92:9-93:5; Ex. 85. A wholesale failure to preserve the relevant files of the majority of employees at Oracle in direct violation of the PSLRA ensued. The imposition of sanctions is warranted. *See, e.g.*, *Leon*, 464 F.3d at 958-59; *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *11.

### 1. Defendants' Focus on Employees Who Communicated with "Speakers" Was Insufficient, Deliberate and Self-Serving

Rather than follow the law, defendants after the fact claim to have focused their preservation efforts on the so-called "Speakers," defined by them as Ellison, Jeff Henley, Edward J. Sanderson, Stephanie Aas, Mark Barrenechea and Jennifer Glass, and those who communicated with the "Speakers." Ex. 9 at 25:14-26:4; Ex. 78 at 117:21-123:25. The flaw in this approach, other than the

---

[5] Additionally, defendants' March 16, 2007 privilege log included four entries dated in May 2002 with the following description: "E-mail chain between in-house counsel Lauren Segal, Esq. and Oracle employees analyzing accounting allegations in the Second Amended Complaint." Ex. 74. The communications could not possibly have addressed the accounting allegations in the Second Amended Complaint, filed October 11, 2002 ("SAC") because it was not filed until five months after the e-mails were written. When plaintiffs asked defendants about this discrepancy, defendants changed their story, stating that "the four entries in the privilege log dated May 2002 reflect confidential communications among members of Oracle's in-house legal department and other Oracle employees regarding Plaintiffs' investigation with respect to the debit memo allegations." Ex. 75. In other words, it is clear that defendants were fully aware of the debit memo issues in May 2002; yet, defendants did not attempt to preserve documents relating to these allegations until October and November 2002 and even then inexplicably failed to include most individuals involved, including one of the key participants in the 2002 Clean Up – Molly Littlefield-Venkataramana – who Oracle itself claimed was a "Collections Manager who supervised certain aspects of the October 2002 'clean up' effort." Exs. 76-77.

1  obvious fact that it could not possibly preserve all relevant documents, was that Lauren Segal
2  apparently had no idea which employees communicated with the "Speakers" and made no real effort
3  to determine who did. Ex. 78, *passim.* Segal never considered that an employee more than one level
4  removed from the "Speakers" – for example a vice-president ("VP") – might communicate with the
5  so-called "Speakers" so she never communicated preservation instructions to them.

6  Segal conceded (in order to maintain any level of credibility) that documents located in the
7  files of many employees to whom she did not provide preservation instructions, including Michael
8  Cochran, Gayle Fitzpatrick, Keith Block, Ken Hamel, and Kirsten Shaw, all of whom were deposed
9  in this litigation, are indeed relevant. *Id.* at 93:6-110:17, 149:3-159:21, 159:25-163:22, 165:11-
10 166:8, 172:2-176:9; Exs. 86-90. These and innumerable other Oracle employees undoubtedly had
11 many more relevant documents in their files that were not preserved. For example, during the
12 relevant time period (June 1, 2000 to June 1, 2001), Shaw, who did not receive a preservation notice,
13 was the Director or Senior Director of Triage, and her duties included *working on customer issue*
14 *for customers who were either "in really, really bad shape" or customers who were "very, very*
15 *important, and usually that would be measured by how many millions of dollars they spend on*
16 *Oracle software.*" Ex. 91 at 16:15-18, 29:2-11, 30:18-31:16.

17 In an even more stark example, during the March 15, 2001 conference call regarding the
18 3Q01 miss, Henley told investors that "[r]ight up to the end of the quarter, we said we felt pretty
19 good about the quarter – *hadn't seen any indication of an erosion in our internal forecast or heard*
20 *of significant issues in regular conversations with the U.S. sales and management,*" but
21 defendants made no effort to preserve documents in the possession of the "U.S. sales and
22 management" to whom Henley referred. Ex. 92. Segal did not know to whom Henley was referring,
23 and thus could not have ensured that such individuals preserved all relevant documents given the
24 lack of a company wide or even a sales division wide preservation instruction. Ex. 78 at 182:23-
25 183:7, 184:23-185:1.

26 Defendants did know that the "Speakers" communicated with employees from all levels of
27 the Company, including area VPs ("AVPs"), as explicitly acknowledged by Daniel Cooperman, but
28 did nothing to identify those individuals in order to capture potentially relevant evidence. Ex. 79 at

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ          - 10 -

1  273:18-274:6.  Sanderson admitted that he regularly communicated with AVPs, regional managers

2  and even account managers. Ex. 93 at 261:8-263:2. When asked about how he would determine the

3  status of quarterly sales in progress, Sanderson responded, *"I would talk to the AVPs. I'd talk to*

4  *the regional managers. . . . I'd hear it directly from the account managers."*  Ex. 94 at 565:23-

5  566:3; Ex. D. Nevertheless, defendants made no effort to ensure that regional sales managers or

6  salespersons in general, preserved evidence. Ex. 78 at 120:10-14, 131:10-132:1, 186:24-187:7. Nor

7  did defendants communicate preservation instruction to AVPs, a fact about which defendants later

8  deceived the Court and plaintiffs. *Id.* at 135:5-9; §VII., *infra.* Defendants also ignored obvious

9  methods of reaching large groups of employees that communicated with the "Speakers," including a

10  predefined e-mail group for Henley's organization (henleyorg_us@oracle.com). Ex. 95 at 203:25-

11  204:10. Defendants similarly failed to notify employees on various sales distribution lists such as

12  allsales_us@oracle.com, sales_us@oracle.com, and ww_sales_us@oracle.com that no doubt

13  encompassed the entire sales organization to preserve documents. Ex. 96 at 150:11-151:21.

14  The crucial nature of this lost evidence is exemplified by the reports proffered by defendants'

15  proposed forecasting expert witness, R. Glenn Hubbard, who relied on the fact that, in preparation of

16  Upside Reports, upon which the forecast and guidance were based primarily according to Hubbard,

17  Jennifer Minton, Sanderson and sometimes Henley, would have weekly Americas conference calls

18  with the "Americas senior sales personnel and their support staff" wherein "senior sales personnel

19  updated call participants on any changes to their forecasts, any significant changes to the status

20  and/or timing of large deals." Ex. 98, ¶183; Ex. 99, ¶58. Hubbard also relied on Minton and her

21  staff's reliance upon "additional forecast data that was provided in the America's [sic] conference

22  call," and opined that one way "[m]acroeconomic conditions were incorporated in the forecast" was

23  through "sales representatives' estimates of the likely purchasing behavior of their prospective

24  customers." Ex. 98, ¶¶185, 159; *see also* Ex. 99, ¶¶34, 40, 52, 55.

25  **2.  Defendants Intentionally Excluded Entire Categories of Employees Who Possessed Relevant Documents**

26  
27  Defendants failed to communicate preservation instructions to entire categories of employees

28  who would have been in the possession of evidence related to defendants' 3Q01 miss and the

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ      - 11 -

1   persistent problems with Suite 11i. Indeed, based upon defendants' omissions with respect to
2   individuals in possession of information related to Suite 11i, defendants' intent must have been that
3   little evidence critical of Suite 11i be preserved. These intentional omissions inevitably resulted in
4   the destruction of relevant evidence demanding the imposition of sanctions.

5        During the March 1, 2001 conference call, Ellison said that *the general business dot.com*
6   *mid-market forecast went down each of the last four days of the quarter* and Henley repeated this
7   during the Company's March 15, 2001 conference call. Ex. 92. General Business AVPs began to
8   voice concern about sales no later than January 2001. Ex. I at 179337. Remarkably, according to
9   Segal, defendants made no categorical effort to preserve the documents of any level of employee in
10  General Business – the Company's largest sales organization – or to even talk to the General
11  Business employees. Ex. 78 at 132:5-135:9, 186:9-187:7.

12       Although Segal acknowledged that the Complaint included specific allegations related to the
13  CRM component of Oracle's Suite 11i software, and that Oracle's consulting division was
14  responsible for CRM implementations, defendants admittedly made no categorical effort to identify
15  individuals within the consulting organization for preservation efforts. Ex. 85; Ex. 78 at 136:3-
16  137:22; *see also* Ex. 101, ¶¶3, 22. Defendants – with the click of a button – admittedly could have
17  notified the entire consulting staff in North American Sales to preserve documents by e-mail. Yet
18  Segal recalled only notifying one, Sanderson, who himself testified that he relied on and
19  communicated with AVPs and regional managers. Ex. 78 at 136:3-137:22.

20       Despite knowledge that "the support organization had generally the responsibility for
21  providing support services to customers who were using Oracle software," defendants took no action
22  to ensure that evidence in the possession of employees of the support organization was preserved.
23  *Id.* at 71:20-23; 249:22-250:12; Ex. 102 at 25:13-17. Defendants also failed to preserve the
24  documents of "escalation managers" who were assigned to customers who had difficulties
25  implementing Suite 11i. *See, e.g.*, Ex. 103 at 13:8-14:3; Exs. 104-106. Escalated accounts were
26  identified as hot, warm or cold. Hot accounts included "Highly Volatile or visible" customers,
27  accounts where there was potential for "Negative public relations" or "revenue loss to the customer
28  or Oracle" and accounts where there were "Pending major sales." Ex. 104. Plaintiffs have identified

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ          - 12 -

1  over 40 escalation managers at Oracle, including individuals who worked with Oracle customers
2  General Electric Company ("GE") and POSCO, for example, both of which had documented
3  problems with Suite 11i. Not a single one of these critical managers received a preservation
4  instruction. This was true even though the escalation managers played highly visible and critical
5  roles at the Company. *See, e.g.*, Ex. 105. For example, Steve Cox led the escalation team for
6  implementations. *Id.* Phillip Tate worked on high profile Suite 11i escalations that were escalated to
7  Ellison during the Class Period, including those at GE and Liberty Mutual. Exs. 106-107.

8  ### 3.  Defendants Impermissibly Relied Upon Non-Attorneys to Carry Out Preservation Obligations

9

10  Defendants asked the mere 30 recipients of the March 13, 2001 preservation e-mail, to
   forward the e-mail "to anyone in your organization who may have relevant documents." Ex. 85.
11  This approach (which failed) constituted a bad faith dereliction of preservation duties because as
12  Segal admitted, it impermissibly put the admittedly difficult relevancy determination on non-
13  attorneys. Ex. 78 at 199:22-200:1, 58:6-25; *see NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72. For
14  example, Barrenechea, a recipient of the March 13, 2001 e-mail, testified that he did not request that
15  members of his Suite 11i CRM product development team preserve documents relevant to this
16  litigation. Ex. 109 at 29:18-25, 32:18-23, 292:12-20 ( "I think that was a legal function to do that.");
17  Ex. 85. Sanderson also did not ensure that his direct reports preserved documents. Ex. 94 at 58: 6-25.
18

19  ### C.  The Scope of the Preservation Instructions Was Knowingly Deficient

20  #### 1.  Evidence Created Post-Receipt of Preservation Instructions

21  With respect to instructing Oracle employees to preserve documents created after March 1,
22  2001 that were relevant, defendants did nothing – impermissibly relying on the lay employees to
23  understand and interpret legal requirements. Ex. 78 at 195:24-196:24. The documents, or lack
24  thereof, produced from Ellison's files confirm defendants' utter failure to preserve post-Class Period
25  evidence. Although Ellison received "more than a hundred e-mails a day, most of which he answers
26  himself or forwards to the appropriate person," less than 15 e-mails, all self-serving, have been
27  produced from Ellison's files, only two of which are dated after March 13, 2001. Ex. 110 at 286.
28  The failure to preserve is shocking and unexplained. *See* Ex. 79 at 145:3-147:17; Exs. 115-116. For

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ    - 13 -

1  example, Segal could not explain why an admittedly relevant e-mail from Minton to Ellison with a

2  "Dot.com Revenue Analysis" for 3Q01, sent on March 14, 2001 – just days after Segal sent her

3  preservation e-mail to Ellison, was not produced from Ellison's files. Ex. 78 at 326:9-327:16; Ex.

4  111. Also missing were admittedly relevant e-mails received by Ellison on March 19 and March 29,

5  2001 discussing ongoing Suite 11i problems at customer Papa Johns and the ramifications of a

6  Forrester Research report critical of Suite 11i, respectively, and a relevant e-mail sent by Ellison on

7  March 23, 2001 regarding escalated customers and product quality. Ex. 78 at 270:18-275:5, 327:17-

8  331:25; Exs. 112-114. Numerous other highly relevant e-mails received and sent by Ellison after the

9  Class Period were inexplicably not in his files. *See, e.g.*, Ex. E.[6]

10  And Ellison is simply one example. Given defendants' clear failure to properly instruct

11  Ellison to preserve evidence sent or received after the issuance of the preservation instruction, the

12  magnitude of the resultant destroyed relevant evidence for the rest of the Company must necessarily

13  be huge and the prejudice to plaintiffs extreme. *See In re United States Aggregates, Inc. Sec. Litig.*,

14  235 F. Supp. 2d 1063, 1068 n.3 (N.D. Cal. 2002); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73

15  (2d Cir. 2001). Indeed, it is simply fortuitous that another Oracle employee happened not to destroy

16  the examples above.[7]

17  ## 2.  E-mails Sent by Employees

18  Defendants had "a duty to suspend, as to documents that may be relevant . . . any routine

19  document purging system that might be in effect; [the] failure to do so constitutes spoliation."

20  *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 288 (E.D. Va. 2004). The default setting on

21  Oracle's e-mail system was set to automatically delete sent e-mails. Ex. 78 at 278:21-279:9. In

22  order to save sent items, an affirmative step had to be taken – the default setting had to be changed.

23  _____

24  [6]  *See also* Ex. 117 at 272:19-24, 274:10-275:21, 283:16-22, 284:11-18, 306:20, 293:19-
296:17, 297:9-297:23, 299:25-301:5, 301:16-303:2-305:10, 310:11, 330:9-14, 331:18-333:12,

25  326:12-329:11; Exs. 118-136.

26  [7]  Defendants have a peculiar view of the relevance of post-Class Period documents, ignoring
that if Oracle continued to be unable to implement Suite 11i just two months after the Class Period

27  and that Suite 11i was not working after the Class Period, these facts *would be highly probative of
whether Suite 11i worked during the Class Period* or even earlier. Ex. 78 at 203:6-210:10; Ex. 137.

28

1  *Id.* But, ***defendants did not instruct employees to change their settings so that outgoing mail***
2  ***would be retained.*** *Id.* at 320:20-321:6. Thus, the result, as Ellison testified, was, "if I didn't send a
3  copy to myself, then it wouldn't be in my file." Ex. 117 at 304:9-305:10; Ex. 134; *see also* Ex. 117
4  at 328:12-329:11; Ex. 135. Defendants' failure to instruct employees to change their default settings
5  or better yet, instruct the Company's information systems employees to do so, taken together with
6  the failure to instruct employees to preserve post-Class Period evidence, very likely resulted in the
7  destruction of the majority of relevant evidence created post-Class Period. Such failure could only
8  have been in bad faith; sanctions therefore must be imposed. *Leon*, 464 F.3d at 958.

9  ### 3.  Ellison-Related Evidence

10  A striking demonstrative example of the results of defendants' failure to properly preserve
11  are the documents sourced to Ellison in this litigation. In addition to the *SOFTWAR* and post-Class
12  Period information discussed herein, defendants failed to ensure that Ellison complied with the
13  preservation instructions and failed to preserve Ellison's website utilized during the Class Period.
14  These actions constitute nothing less than the bad faith destruction of evidence highly relevant to
15  scienter, among other topics. Terminating sanctions are thus appropriate. *Leon*, 464 F.3d at 958.

16  The production of documents from Ellison's files demonstrates that he could not possibly
17  have obeyed the preservation instructions. Defendants produced less than 15 e-mails from Ellison's
18  files in total. From June 2000 to March 13, 2001, defendants produced only ten e-mails. Ellison
19  could not explain this dearth of documents, particularly damaging pre-March 13, 2001 e-mails.[8] For

---

21  [8]  When presented with numerous relevant documents which he received and/or sent prior to
22  March 13, 2001 that were produced from the files of others, but not from his files, Ellison became
   duplicitous. He initially explained that his practice with respect to e-mail was generally one time per
   year to go through and do a cleanup and that such cleanup permanently purged documents from
23  Oracle's servers; but that he did not recall whether he did such cleanups in 2000 and 2001 and was
   not aware of any available method of ascertaining when he did the cleanups – thus insinuating that
24  perhaps he did a cleanup prior to receiving the March 13, 2001 e-mail from Segal. Ex. 139 at 96:1-
   13, 98:11-99:10. When presented with a document from January 2001, a version of which was
25  produced from his files, Ellison offered the following speculation:  "Well, I made a point of not
   throwing away things. During a cleanup period I wouldn't throw away things that I would need later
26  on, that would be useful later on." *Id.* at 179:9-23; Ex. 140. Ellison's explanation rings hollow
   particularly given that the mere ten e-mails dated prior to March 13, 2001 that were produced from
27  his files comprise printouts of self-serving widely distributed marketing materials. *See, e.g.*, Exs.
   141-143.
28

1  example, a document evidencing that Oracle in fact paid customers to serve as references for Suite

2  11i was not in his files even though he was the sender of the e-mail message. Ex. 117 at 248:2-

3  251:23; Ex. 233. A February 1, 2001 e-mail to Ellison regarding a downward revision in the 3Q01

4  forecast was not in his files. Ex. 117 at 258:10-259:18; Ex. 234. An e-mail Ellison sent regarding

5  the delay in the internal implementation of a module of Suite 11i was not in his files. Ex. 118 at

6  470:24-471:4; Ex. 235. A January 17, 2001 e-mail to Ellison providing negative revenue growth

7  results for the first month of 3Q01 excluding Covisint was not in Ellison's files. Ex. 144; Ex. 117 at

8  440:2-441:1; *see also* Ex. 139 at 96:14-22, 101:8-102:12, 111:23-112:1, 116:9-15, 141:4-9, 148:19-

9  25, 155:2-8, 158:18-22, 161:16-20, 166:9-15, 168:1-7, 171:14-20, 177:5-10, 190:9-20, 194:7-15,

10 208:19-209:2, 211:6-12, 218:4-10, 219:3-12, 222:19-223:1; Ex. 117 at 246:8-14, 253:10-16, 256:20-

11 25, 258:3-9, 268:14-20, 270:7-9, 416:24-417:19, 464:20-466:3, 468:19-24, 469:21-470:1, 525:4-

12 526:24; Exs. 138, 145-175.

13       Defendants failed to preserve materials from a website that Ellison maintained during the

14 Class Period – larryellison.com – that admittedly contained "transcripts of interviews and things of

15 that nature." Ex. 176 at 114:12-16; *see also* Ex. 177 at 297559; Ex. 178 at 178069. The website

16 "*was developed for the purpose of posting [Ellison's] interviews and statements*." Ex. 177 at

17 297559. According to defendants, that website was purged of all information after this lawsuit was

18 filed and they cannot retrieve the information that would have been on the website. Ex. 176 at

19 78:12-79:21; 97:6-14. Ellison unsuccessfully attempted to cover up this destruction by claiming that

20 the website was never used – he simply reserved the Internet name. Ex. 179 at 597:20-598:10. But

21 e-mails from others belie that claim. *See, e.g.*, Ex. 178. This intentional spoliation and an attempted

22 cover up warrants the most severe sanctions.

23     **D.**    **At a Company Level, Defendants Failed to Preserve Categories of**
              **Information Highly Relevant to This Litigation**

24

25         **1.**    **Defendants Failed to Preserve the Oracle Sales Online**
                  **Database that Included Unique and Highly Relevant Material**

26       Defendants used Oracle Sales Online ("OSO") during the relevant time period for forecasting

27 and financial reporting purposes – indeed, *it contained critical relevant information*. Ex. 95 at

28 42:11-19. Both Ellison and Henley described OSO as a "*mission critical system*." *Id*. at 163:24-

165:9, 168:23-169:8. Oracle's sales force input their pipeline into OSO and finance employees used OSO. Ex. 93 at 247:16-21; Ex. 95 at 166:17-21. OSO included prospective deals data, win probability percentages and was used to create forecasts. Ex. 93 at 248:1-10, 255:12-256:12.

OSO literally provided the individual defendants with real-time forecasting information, including specific pipeline information at the account manager level, anywhere and any time. Ex. 117 at 474:2-475:1; Ex. 95 at 43:7-12; Ex. 93 at 272:4-10, 274:12-19. Sanderson testified, "*it gave us a lot – all of us a lot more visibility. It gave Finance more visibility. It gave Larry more visibility. It gave me more visibility to my respective areas of responsibility.*" Ex. 93 at 274:20-23. Ellison testified that he held meetings where the attendees looked at the output from OSO and that he looked at the forecast results from OSO. Ex. 117 at 459:16-21. Henley also testified that he used the output from OSO that was included in financial reporting and internal manager reporting and that the Company relied heavily upon OSO for analyst calls. Ex. 95 at 42:20-43:6, 168:23-169:8. Ellison and Henley were both involved in compelling Oracle sales employees to input all information into OSO and keep it up to date as early as September 2000. Ex. 117 at 421:15-423:6; Ex. 181. Defendants' proposed forecasting experts, Hubbard and George Foster, relied upon the fact that Oracle sales representatives entered their sales projections, including deals, potential values and closing probabilities, into OSO. *See, e.g.*, Ex. 98, ¶¶162, 171; Ex. 182, ¶31. Moreover, OSO contained unique data that was not available from any other infallible source.[9] Ellison has blamed the 3Q01 miss in part on deals that fell off due to the economy. Ex. 183. However, when asked to name any of the customers who were involved in such deals, *Ellison could not, and pointed to OSO as the only certain way to retrieve the information*. Ex. 117 at 364:25-367:9, 369:3-21.

*But defendants failed to preserve OSO or even the documents in the possession of the employees who input data into OSO*. In response to an inquiry as to whether she took steps in March 2001 to preserve OSO, Segal responded that she did not "recall when [she] started to try to

---

[9]     Defendants have also failed to produce weekly revenue information that as of 2002 was still maintained by defendants in a database. *See* Ex. K. Defendants provided certain weekly revenue information to the SLC, but either destroyed the source information prior to discovery here or have intentionally withheld the information. *See Id.*

1 preserve Oracle Sales Online." Ex. 78 at 192:15-20. Segal admitted to knowing that "there was a
2 great effort made to transition to using Oracle Sales Online," but nonetheless did not instruct the
3 entire sales organization to preserve documents. *Id.* at 192:22-193:9. Nor did she successfully
4 preserve the backup tapes that contained OSO data from the Class Period. *Id.* at 262:5-264:3.
5 Indeed, OSO was purged in July 2001, a fact that concerned even Ellison. Ex. 117 at 367:10-368:15.
6 Despite the insurmountable evidence about *usage of OSO during the Class Period*, Ellison
7 attempted to distance himself – *denying that he used OSO during the Class Period*. *Id.* at 461:23-
8 462:6. Again Ellison's veracity is questionable. *SOFTWAR reported that Ellison utilized OSO*
9 *daily* without caveat, and Ellison took no action to correct this statement even though it was clearly
10 his prerogative to do so. Ex. 110 at 286-87; Ex. 117 at 461:23-462:10. Faced with this
11 contradiction, Ellison testified that Oracle kept login records. Ex. 117 at 461:23-464:5. But the
12 login records have also been destroyed. *Id.*

13                           **2.    Defendants Failed to Preserve Crucial Forecasting Documents**

14         The Discovery Plan required defendants to produce documents and communications relating
15 to Oracle's forecasts and Oracle's sales pipeline and pipeline conversion rates/ratios. Ex. 43, §I.C.
16 Said documents were to be produced for the relevant time period (fiscal quarters 3Q00 through
17 4Q01), including documents created outside the relevant time period that refer to events within the
18 relevant time period. *Id.*, §I.A. As set forth in the Motion to Compel, as of May 16, 2006, Oracle's
19 production omitted numerous critical forecasting documents that Oracle used every quarter during
20 the relevant time period. Plaintiffs continued to seek the missing information, including by serving a
21 third set of requests for production on May 31, 2006. On August 16, 2006, plaintiffs moved to
22 compel further responses to certain requests, and on September 15, 2006, Judge Infante ordered
23 defendants to produce by September 29, 2006 "all sales forecast reports (periodic or otherwise) from
24 1999-2001 and all deal reports from 1999-2001." Ex. 184 at 4.

25         Defendants produced limited documents on October 2 and 16, 2006. Plaintiffs moved to
26 compel again on October 30, 2006 – this time to enforce Judge Infante's September 15, 2006 Order.
27 Judge Infante then issued an order that in part required defendants to submit a sworn declaration
28 regarding the completeness of their production addressing each of the reports detailed in Plaintiffs'

1  motion. Ex. 185 at 8. In response, defendants provided the declaration and amended declaration of

2  James C. Maroulis (the "Maroulis Declarations"). Exs. 186-187. Plaintiffs then challenged the

3  evasive language of the Maroulis Declarations that in essence indicated that missing reports may or

4  may not have existed. Judge Infante issued an order requiring that defendants provide a sworn

5  declaration detailing whether the reports ever existed, which of the reports that existed have been

6  produced and "which of the reports that at one time existed were not produced . . . because they are

7  no longer in Oracle's possession, custody or control." Ex. 188 at 10-11. After requesting an

8  extension, defendants provided the Declaration of Ivgen Guner Regarding Forecasting Reports

9  ("Guner Declaration") to plaintiffs on March 20, 2007. Ex. 189.

10  Although the Guner Declaration in part continues to dodge the question of whether the

11  reports identified by plaintiffs ever existed, the Guner Declaration, taken together with what

12  plaintiffs have determined to be an established historical pattern of creating the reports in question,

13  indicates that defendants failed to preserve innumerable critical relevant forecasting documents,

14  including Upside Reports, Monthly Financial Reference Books, Americas Forecast Packages,

15  Garnick Flash Reports, Monthly Flash Reports, Pipeline Reporting Packages, NAS Forecasts,

16  General Business Forecasts, Majors Forecasts, Deal Reports used during Americas forecast calls,

17  Americas Reporting Packages, Executive Committee Worldwide Forecasts, NAS Big Deal

18  Scenarios, Big Deal Updates, OSI Pipeline History reports, OPI Forecast Packages, OSI Forecast

19  Packages, OSI Big Deal Scenarios, and OPI Big Deal Scenarios, as well as complete relevant

20  e-mails.[10] *See* Exs. F, J. Given that Oracle's records retention schedule required the forecasting

21  documents to be preserved for three years – and thus all of the reports defendants were ordered to

22  produce (dating back to 1999) should have been in existence as of the filing of the Complaint – the

23  only possible conclusion is spoliation. *See* Ex. 191 at 045874. The SLC, which investigated

24  allegations made in the derivative actions filed against defendants Ellison, Henley and others and the

25

26  [10]    *Compare* Ex. 189 (Guner Declaration) *with* Ex. 190 (Corporate Forecast Schedule). Further
    evidencing problems with defendants' preservation and production of relevant forecasting reports
27  and defendants' failure to comply with Court orders is the Rebuttal Expert Report of George Foster
    which identifies numerous upside reports not identified by the Guner Declaration. *See* Ex. 182.

28

1    accounting fraud allegations in the SAC similarly concluded: "If any documents that should have

2    been retained were not produced, the Committee could reasonably infer either that the documents

3    had been destroyed or that the Company was not cooperating in the Committee's investigation." *See*

4    Ex. 192 at 294808-23. Defendants have also ***never produced*** the damning Affidavit of Raymond J.

5    Lane addressing forecasting and other issues filed in the Delaware derivative action.   Ex. G.

6    Plaintiffs obtained the affidavit from the Delaware Court only because the seal was removed.

7    Defendants have all along feigned ignorance as to the existence of the affidavit.

8                              **3.    Defendants Failed to Preserve Group E-mail Boxes and
                                       Escalated Customer Reports**
9

10           In addition to failing to preserve individual e-mail boxes, defendants also failed to preserve

11   group e-mail boxes that were used by groups within Oracle to send and receive relevant information.

     Indeed, the only such box that Segal claims to have preserved was a box for the organization
12
     Headquarters Approvals, and for that box, she could not even recall when it was preserved. Ex. 78
13
     at 267:18-268:22. Other group e-mail boxes used at Oracle included revrec@us.oracle.com (revenue
14
     recognition group) and arinfo@oracle.com (accounts receivable group).
15
             Oracle utilized its Escalated Customer Management System ("ECMS") as a reporting tool for
16
     the critical accounts division of support. Ex. 91 at 86:4-88:1.   When information was entered into
17
     ECMS, the system would generate reports that would be distributed via e-mail.   *Id.*   The ECMS
18
     included escalated customers and information on technical assistance requests. Ex. 193.   Escalated
19
     Customer Reports were generated weekly, and were sorted by hot, warm and cool escalations and by
20
     product, including Suite 11i CRM products and Suite 11i ERP products.   *See* Ex. 126.  Ellison and
21
     others received these reports and the reported information was also available via the web at Oracle.
22
     *Id.*; Ex. 193.  Despite the purpose and the users of this information, defendants have only produced
23
     five Escalated Customer Reports dated weekly from May 21, 2001 to June 18, 2001.  Not a single
24
     Escalated Customer Report was produced from the Class Period.
25

26

27

28

**V. DEFENDANTS ALTERED/WITHHELD KEY EVIDENCE RELATING TO A "CLEAN UP" OF RELEVANT ACCOUNTING FILES**

**A. Defendants Made False Representations to the Court Concerning the 2002 Clean Up to Shield Highly Relevant Documents from Discovery**

On October 11, 2002, plaintiffs filed their SAC, which included detailed allegations of accounting fraud committed by Oracle in connection with its 2Q01, including that Oracle engaged in an "On Account Clean Up" in November 2000 (the "November 2000 Clean Up") and created over 46,000 fictitious "debit memo" invoices in order to hide millions in customer overpayments that had been improperly converted to revenue and earnings in 2Q01. Evidence now confirms that immediately after plaintiffs filed the SAC, Oracle initiated a second accounting "Clean Up" beginning in late October 2002 to cover up and alter the evidence relating to plaintiffs' accounting allegations ("2002 Clean Up") by (1) altering key accounting documents and historical accounting data, including the audit trail, (2) reversing thousands of debit memo transactions, including illegal transfers of millions in customer cash to revenue and earnings, and (3) crediting, refunding and escheating millions in customer overpayments and unapplied cash that Oracle had been illegally converting to revenue and concealing from its customers. *See* Exs. 10, 16-24, 26-27, 31, 35-36, 39, 66, 69 70-73; *see also* §I. A.2, *infra*.

On November 11, 2002, plaintiffs filed an *Ex Parte* Application seeking to enjoin defendants from altering or destroying accounting evidence, to order defendants to preserve all documents relating to the accounting allegations and for discovery ("*Ex Parte* Application"). Exs. 10, 31. That motion was denied, in part because defendants submitted sworn declarations falsely claiming that the ongoing 2002 Clean Up had "***nothing to do***" with the November 2000 Clean Up or the 46,000 debit memos. Ex. 11, ¶7. Defendants stated in their opposition: "***Oracle is not deleting, destroying, or altering any documents or evidence relating to the allegations in this case – period.***" Ex. 12. For most of the litigation, defendants resisted discovery concerning the 2002 Clean Up by falsely representing to the Court that there was "***no connection whatsoever***" between the 2002 Clean Up and plaintiffs' debit memo allegations, and that the 2002 Clean Up was "***not related***" to the November 2000 debit memos. Ex. 14 at 52:13-16; Ex. 15, ¶28; Ex. 9 at 79:11-19, 80:9; Ex. 12.

On December 19, 2006, Judge Infante ordered defendants to produce all documents related to

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ     - 21 -

1  the 2002 Clean Up and Oracle's transfers of unapplied cash to its bad debt reserve in 2Q01 (the

2  "December 19, 2006 Order"). Ex. 13. The Order stated that the evidence "*raise substantial*

3  *questions about the relationship between the November 2000 debit memos and the 2002 Clean*

4  *Up.*" *Id.* at 19. Pursuant to the Order, defendants produced over 800,000 pages of new documents

5  which indeed relate to the November 2000 debit memos and plaintiffs' accounting allegations.

6  Plaintiffs were forced to take nearly two years of discovery and nearly 100 depositions, including

7  many top accounting executive witnesses and Oracle lawyers named on the new documents, such as

8  Tom Williams, Minton, Greg Myers, Michael Quinn, Segal, Cooperman, Ryan Roberts, Sam

9  Yohannes and Terry Elam, without these highly relevant documents. Defendants' improper

10  withholding of the documents is sanctionable. *See, e.g.*, *Brotby*, 364 F.3d at 1116-17; *Telxon*, 2004

11  U.S. Dist. LEXIS 272296, at *119-*120.

12  **1.  Defendants Attempted to Hide Crucial Documents Under the**
        **Guise of the 2002 Clean Up**

13

14       Documents produced pursuant to the December 19, 2006 Order show a direct connection

15  between the 2002 Clean Up and the November 2000 debit memos and confirm that defendants

16  misled the Court when they asserted "no connection whatsoever" between the two clean ups. Many

    of the 2002 Clean Up documents expressly refer to "11/17 debit memos" and specifically discuss
17
    *plaintiffs' lawsuit* and the events on "November 17, 2000." Ex. A; Ex. 16 ("listing of the 47k debit
18
    memo's created on November 17, 2000"); Ex. 17 ("List of *11/17 debit memo's*"); Ex. 18 ("modified
19
    *list of debit memos* for the customers mentioned in the document"); Ex. 19 ("*Debit Memo Report*
20
    *for 11/17/00* and the *Debit Memo Report* for post 11/17/00 activity"); Ex. 20 ("A list of all Debit
21
    Memo's for November 17"); Ex. 21. These documents contradict defendants' representations to the
22
    Court and testimony of Oracle's top accounting witnesses. For example, the belatedly produced
23
    documents demonstrate that Oracle's former Controller and current CFO Minton was directly
24
    involved in the 2002 Clean Up. *See, e.g.*, Ex. 22 at 1727980; Ex. 23 at 1895745; Ex. 24 at 1733103,
25
    1733105; Ex. 25 at 1886329; Ex. 26 at 1892686-87; Ex. 27 at 1885840-41. Minton testified
26
    unequivocally that she was *not* involved in the 2002 Clean Up and had no knowledge of the
27
    corresponding investigations ("*I was told – I think it was appropriate for legal to keep me*
28

1  ***uninvolved in the investigation."***). Ex. 29 at 162:23-163:4, 174:25-175:19. Later, Minton

2  attempted to change her story, testifying that she was in fact told about the "results" of Oracle's 2002

3  investigation, but was not involved in the "underlying investigation itself." Ex. 30 at 279:1-5.

4  Plaintiffs were prejudiced by not having the documents to confront Minton and could not assess

5  whether to call and question other witnesses who were specifically named in the Minton e-mails.

6  This conduct severely prejudiced plaintiffs' ability to properly develop their case during discovery.

7  *See, e.g.*, *Brotby*, 364 F.3d at 1116-17; *Telxon*, 2004 U.S. Dist. LEXIS 272296, at *119-*120.

8  ## 2. Oracle Used the 2002 Clean Up to Alter Accounting Records

9  Evidence surrounding the 2002 Clean Up shows that Oracle personnel altered, overwrote and

10  deleted certain historical electronic "notes" and accounting information that reflected the audit trail

11  and accounting history of customer overpayments relating to debit memos. Ex. 33 at 603:25-604:14,

12  Ex. 32 at 83:24-85:16, 129:4-131:9, 177:4-25, 179:20-180:7; *see also* Ex. 33 at 292:12-293:20,

13  487:9-11, 600:4-601:13. Oracle collections personnel were never instructed to preserve or save the

14  old or deleted "incorrect" notes relating to the 2002 Clean Up. Ex. 33 at 293:20-294:17. Instead, at

15  one point early in the 2002 Clean Up (after the filing of the SAC), Oracle personnel were told that

16  the new electronic notes that they input into the system for certain items of unapplied cash were

17  "completely off base or incorrect" and that they had to go back and rewrite them. Ex. 33 at 292:18-

18  293:9; Ex. 39. In addition to violating the PSLRA, this intentional conduct directly violated the

19  Final Judgment of Permanent Injunction and Other Relief Against Oracle Systems Corporation

20  entered in the Northern District of California in *SEC v. Oracle Sys. Corp.*[11] Ex. 38 at 3.

21  In October 2006, plaintiffs deposed former Oracle Collections Manager Ian Hatada who had

22  been directed to implement Oracle senior management's 2002 Clean Up plan. *See* Ex. 31 at 120:11-

23

---

24  [11] In May 2006, defendants' counsel claimed that they were unaware of electronic customer notes relating to the debit memos until plaintiffs elicited testimony about the notes during an April

25  13, 2006 deposition. Ex. 40. In fact, defendants were made aware of this evidence in 2002 by a declaration in support of the *Ex Parte* Application which specifically referenced Oracle's deletion of

26  "historical receipt notes." Ex. 41 at 16. In 2005, Oracle's counsel stated "comments entered electronically by collections department personnel will be produced as part of the electronic data

27  production concerning the transactions." Ex. 42. Yet Oracle withheld these notes for over a year of discovery.

28

17; Ex. 32 at 107:22-108:10. He was told by senior management that the 2002 Clean Up was initiated to "resolve" debit memo items of unapplied cash and to "help Oracle" address plaintiffs' lawsuit.[12] Ex. 32 at 128:8-129:2, 257:24-263; Ex. 33 at 264:12-265:6. Oracle's collections staff was asked to research and determine the "revenue impact" of Oracle's misuse of customer overpayments and unapplied cash. Ex. 32 at 113:19-114:7; *see also* Ex. 33 at 307:5-9, Exs. 39, 66.[13] Hatada also testified that Henley was involved in reviewing the results of the 2002 investigation. Ex. 33 at 266:10-21. Former Accounts Receivable Manager Elam also testified that in October 2002, he was specifically asked by Myers to research "debit memo" items contained on a "spreadsheet." Ex. 37 at 66:25-67:20. Part of the project was to issue credit memos for debit memo items and "*pull[] out some of the entries into the 12601 account in October-November 2002*." *Id.* at 186:2-11. Elam confessed that the "entries" needing to be reversed were those associated with "*debit memos*" and explained that there was a specific process for *reversing* debit memo receipts that had been moved into Oracle's bad debt reserve (Account 12601). *Id.* at 185:23-186:11, 187:10-188:2. In total, nearly $60 million in transactions were reversed. Ex. 36.

## B.   Defendants' Repeated Violations of Court Orders Prevented Plaintiffs from Obtaining Relevant Documents Until After Fact Discovery

Defendants violated every accounting discovery order in this case by withholding crucial documents and producing documents months after court-imposed deadlines. The Discovery Plan clearly identified the relevant scope of discovery pertaining to the accounting issues to be produced by May 1, 2005. *See* Ex. 43 at 2-3. The Court ordered and defendants agreed to produce "every

---

[12]   Hatada authenticated his handwritten notes taken contemporaneously with the management meetings discussing the 2002 Clean Up that confirm that the debit memos and the November 2000 Clean Up were a major part of the discussion and plan for the 2002 project. Ex. 35. The notes also refer to a "56m" amount for "2 years" which Hatada testified was the amount of unapplied cash that was transferred to Oracle's reserve during a prior period. Ex. 33 at 305:13-306:23. Oracle's own memos confirm that the total amount of customer unapplied cash transferred prior to the 2002 Clean Up was actually larger – $59.6 million. *See* Ex. 36.

[13]   Former Oracle Director of Collections Quinn testified that Oracle learned during 2002 that there was indeed a "revenue impact" of the bad debt transfers. Ex. 34 at 229:2-8. Hatada testified that the revenue impact was "major." Ex. 32 at 153:16-154:5. The documents belatedly produced by defendants show that many of the transfers were directly related to debit memos. However, defendants refused to produce the evidence regarding these issues until after discovery closed.

1  piece of paper that has to do with these debit memos up and down." Ex. 14 at 54:1-9, 44:2-11. On
2  May 1, 2005, defendants produced only a single data file or "script output" purportedly containing
3  the history and audit trail of the 46,000 debit memos which was severely incomplete, inconsistent
4  and inaccurate (defendants later produced at least five additional versions). Ex. 44.

5  On October 7, 2005, plaintiffs filed a motion to compel ("Motion #1"). Ex. 45. During the
6  hearing on Motion #1, the Honorable Magistrate Judge Joseph C. Spero expressed concern that
7  defendants were "changing [their] position" with respect to producing documents related to the
8  46,000 debit memos. Ex. 46 at 4:13-21. On October 19, 2005, Judge Spero granted Motion #1,
9  requiring defendants to produce, no later than November 18, 2005, all relevant accounting
10  documents, including underlying source documents previously ordered, related to the 776 largest
11  debit memo transactions. Ex. 47. The court also ordered the parties to agree on a "sampling" of
12  smaller debit memo transactions in addition to the 776 largest debit memos. Ex. 46 at 18:11-13.

13  Despite the deadline, defendants continued to produce documents subject to the October 19,
14  2005 Order in February, April, June and August 2006 and even into April 2007. *See* Ex. B; Ex. 48.
15  Defendants failed to produce all of the underlying documents relating to the 776 largest debit
16  memos, including entire categories of reports, spreadsheets and underlying source documents. Ex.
17  49. Defendants also refused to produce any documents relating to a "sampling" of the smaller debit
18  memo items. Plaintiffs filed a second motion to enforce the prior accounting orders on May 25,
19  2006 (Motion #2). Ex. 49. During the hearing on Motion #2, defendants falsely asserted that they
20  had complied with all prior accounting orders. Judge Infante disagreed and on July 17, 2006,
21  ordered defendants to produce (for the third time) all relevant accounting documents ordered in the
22  Discovery Plan and the supplemental October 19, 2005 Order, including summary-level accounting
23  reports and underlying transactional documents that defendants refused to produce, by August 31,
24  2006. Ex. 9 at 86:11-16; Ex. 50. Judge Infante also ordered that defendants produce documents
25  relating to 150 smaller amount debit memos selected by plaintiffs. Ex. 9 at 17; *see* Ex. 51.

26  Defendants again violated the Court's production deadline of August 31, 2006 by producing
27  heavily redacted documents months after the deadline. *See* Ex. C. Defendants' improper redactions
28  forced plaintiffs to file a third motion to enforce the Court's prior orders, on October 30, 2006

PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ          - 25 -

("Motion #3"). Ex. 52. On December 19, 2006, Judge Infante granted plaintiffs Motion #3 in its entirety and issued the *fourth* court order that required defendants to produce unredacted documents and documents related to the 2002 Clean Up by no later than January 17, 2007. Ex. 13; *see also* §V.A, *supra*. Judge Infante also joined in Judge Spero's concern that defendants kept changing their position on accounting discovery during the course of the litigation, specifically noting that defendants "changed" and "shifted" their position.[14] Ex. 13.

On April 17, 2007, defendants inexplicably produced new documents, including key e-mails written contemporaneously with the November 2000 Clean Up that specifically discuss Oracle's debit memos and the misuse of customer overpayments and unapplied cash. Exs. 54, 58. One e-mail, from Oracle's "Unapplied Cash Specialist," Neil Menon, specifically discusses the manipulation of unapplied cash via its bad debt reserve to inflate its financial results in 2Q01. Ex. 54 at 3042910. More e-mails by Myers, Oracle's FRCP 30(b)(6) witness on the accounting issues (who was deposed two years earlier on April 12, 2005), specifically reference the November 2000 Clean Up and the issues surrounding the 46,000 debit memos.[15] Exs. 55-57. Incredibly, defendants claimed that *"these documents mistakenly never were loaded on to our database at the time the documents originally were gathered."* Ex. 58. On April 24, 2007, defendants belatedly produced more highly relevant documents which expressly reference plaintiffs' lawsuit and the

---

[14]  Defendants also altered the electronic filenames and metadata associated with documents as kept in the ordinary course of business in violation of the FRCP and the Discovery Plan. *See* Ex. 43 at 4. Defendants replaced the filenames of documents, including the 1,000 plus accounting spreadsheets, with Bates numbers, thus depriving plaintiffs of valuable evidence, including the ability to cross-reference documents and confirm that document attachments were accurately produced. *See, e.g.*, Ex. 64; Ex. 65 at 1609399. Defendants also produced identical e-mails that inexplicably have different dates and electronic characteristics. *Compare, e.g.*, Exs. 65, 67-68. And defendants have not preserved copies of many important e-mails that are "embedded" in other e-mail strings as replies or forwarded copies of the original e-mail. *See, e.g.*, Exs. 24, 69-73.

[15]  Defendants claim that they do not know from whose files the documents came. Ex. 59. In fact, in May 2007, defendants revealed further problems with document sourcing. Documents previously sourced to Oracle's in-house lawyer, Dorian Daley, were changed to be sourced to non-lawyers. Exs. 59, 62. Other documents originally sourced to witnesses who were not deposed are now sourced to witnesses that have already been deposed (*e.g.*, Littlefield-Venkataramana; Sohaib Abbasi; Elam). *Id.* Also, on November 13, 2006, defendants sent plaintiffs a letter advising that defendants mistakenly sourced 353 documents to Ellison and admitting that the incorrectly sourced documents were produced and sourced to Kirsten Shaw, Gayle Fitzpatrick, Cliff Godwin and Ron Wohl months after their depositions. Ex. 63.

1  November 2000 debit memos. Ex. 60. Defendants' purported explanation for why these
2  fundamentally relevant documents were not produced earlier was *"because they were not located in*
3  *the custodian files of any individual who participated in the 2002 'unapplied cash project.'"*
4  Ex. 58. However Ellison, Safra Catz, Henley, Minton, Williams, Segal, Cooperman and others were
5  referenced on the documents as having received the documents. *See, e.g.*, Ex. 60. The documents
6  were found only in Segal's files. The documents were not produced prior to Segal's deposition
7  because they allegedly had "*not been identified*." Ex. 59 at 2.

8  **VI.   DEFENDANTS INTENTIONALLY DESTROYED THE HIGHLY
        RELEVANT *SOFTWAR*-RELATED MATERIALS**

9
10          Defendants intentionally spoliated *SOFTWAR*-related materials. *SOFTWAR* is a unique
    chronicle of events relating directly to plaintiffs' allegations, and much of the material underlying
11
    *SOFTWAR* was developed contemporaneously with Oracle's 3Q01 earnings miss, the filing of this
12
    litigation (and reactions to both), as well as during the Class Period.[16] *See* Ex. 110 at 11; Ex. 196 at
13
    1529371-72; Ex. 197 at 1053575. The underlying materials include at least 135 hours of tapes and
14
    transcripts of Symonds' interviews with Ellison on topics such as Suite 11i, insider trading,
15
    forecasting, the economy, and Oracle's billion dollar savings claim. *See* Ex. 196 at 1529372.
16
    Although restricted from making changes to the portions of *SOFTWAR* written by Symonds, Ellison,
17
    a co-author and joint copyright holder, was free to comment, via footnote, on any portion of the book
18
    with which he disagreed or wished to clarify. Ex. 196 at 1529374-75; Ex. 179 at 674:11-25.
19
            Judge Infante found that *SOFTWAR*, a document never even produced by defendants, "is
20
    *clearly relevant*" and ordered defendants to produce "any and all tape recordings and/or transcripts
21
    of interviews with Ellison created in the preparation of the book."[17] Ex. 195 at 6; Ex. 194 at 4; *see*
22
23

24  [16]    Symonds also interviewed Ellison prior to March 2001 for an article to promote *SOFTWAR*,
        "The Rewards of Recklessness," which contains a variety of quotes from Ellison regarding issues
25      directly relevant to this litigation. *See, e.g.*, Ex. 198 at 1053573.

26  [17]    All defendants have had a specific affirmative obligation to preserve the *SOFTWAR* materials
        under both the FRCP and the PSLRA since the commencement of this litigation. *See, e.g., Wm. T.*
27      *Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Henley sat for
        interviews with Symonds at Ellison's request, and read a fair amount of the book. Ex. 95 at 488:25-
28      490:7. Cooperman advised Ellison as to whether or not he should engage in the *SOFTWAR* project,

1   *also, e.g.*, Ex. 110 at 161-232. But ultimately, defendants produced only a minute portion of the

2   relevant material, well after the close of fact discovery, even though the materials were indisputably

3   relevant, and defendants' obligation to produce the materials in response to plaintiffs' discovery

4   requests and pursuant to the Discovery Plan was obvious. *A. Farber & Partners, Inc. v. Garber*, 234

5   F.R.D. 186, 189 (C.D. Cal. 2006); *see also, e.g.*, Ex. 43 at 2-3; Ex. 199 at Nos. 1-16, 18-21, 23-27,

6   35; Ex. 200 at Nos. 10-11, 21; §VI.A, *supra*. Just over 200 pages of interview transcripts from 2002

7   were produced; defendants did not produce a single tape or transcript from 2001 when two-thirds of

8   the underlying materials were created and the period most relevant to this litigation.[18] Even the

9   contents of the scant 2002 transcripts, which defendants claimed were not discoverable (and

10  withheld until January 2007), plainly display the relevance of the majority of the tapes and

11  transcripts which defendants claimed were not discoverable and destroyed. *See, e.g.*, Ex. 202 at

12  1529352-54; Ex. 203 at 1529171; *see also* Ex. 201 at 13:14-22. Plaintiffs' product expert Brooks L.

13  Hilliard cited to the transcripts numerous times in his opening report, and during his deposition,

14  described one of Ellison's admissions to Symonds during the 2002 interviews as a "*smoking gun*"

15  with respect to Suite 11i. *See* Ex. 204 at 31-32, 34, 48, 58, 81; Ex. 205 at 237:23-239:21.

16  Defendants' intentional failure to preserve and timely produce the hundreds of hours of

17  contemporaneous interviews with Ellison regarding events in this litigation directly violated the

18  PSLRA, the Discovery Plan, the FRCP and Judge Infante's order, and presumptively has severely

19  prejudiced plaintiffs. *Brotby*, 344 F.3d at 1116-17; *Leon*, 464 F.3d at 960.

20      **A.    Defendants Withheld the *SOFTWAR* Materials in Bad Faith**

21      The only *SOFTWAR* materials voluntarily produced by defendants, an e-mail relating to

22  *SOFTWAR* with attachments, were produced just days before the end of fact discovery on October 2,

23  ─────────────────────────────────────────────

24  helped negotiate and provide advice regarding the terms of the final agreement relating to the book
    and read the book. Ex. 79 at 234:3-236:11.

25  [18]   This is not surprising given Ellison's conduct. Ellison made absolutely no effort to preserve
    the *SOFTWAR* materials while he was sitting for the interviews (even when he was discussing this

26  very litigation with Symonds). Ex. 179 at 595:25-596:18. Likewise, Ellison made no effort to
    preserve his own footnotes or any drafts of the footnotes he typed, electronically or otherwise. *Id.* at

27  674:11-675:17. Symonds has claimed that Ellison attempted to willfully spoliate the *SOFTWAR*
    materials by waiving his rights to the materials under his contract with Symonds. *See* Ex. 206.

28

2006 – after two full days of Ellison's deposition.[19] Ex. 198. The e-mail forwards to Ellison and others a draft of the contract between Symonds and Ellison for the book as well as the article titled "The Rewards of Recklessness," which was authored by Symonds to promote *SOFTWAR* to potential publishers. *Id.* Upon this production, plaintiffs immediately requested that defendants produce all documents and materials concerning and created in preparation for *SOFTWAR*.

Defendants refused to produce the materials and opposed MTC #3, setting forth a series of completely frivolous arguments that the materials created in preparation for *SOFTWAR* were neither relevant nor responsive to plaintiffs' document requests. *See* Ex. 207; Ex. 208 at 2. And defendants urged that, despite the contractual language requiring their return, Ellison was not required to produce the materials because they were not in his "possession, custody or control" as required by FRCP 34. On December 29, 2006, Judge Infante ordered the production of the underlying interview tapes and transcripts, holding that the "agreement provides Ellison with 'control' over 'all tapes, transcripts and working papers provided by Ellison.'" Ex. 194 at 4. Defendants appealed the finding of "control," misrepresenting to the Court both the terms of the agreement and that both Ellison and Symonds interpreted the agreement in such a way that it did not grant Ellison a legal right of access to the materials in question ("Motion to Reverse"). *Compare* Ex. 209 at 14-15 *with* Ex. 179 at 731:21-25, 732:1-2, 582:16-25; Ex. 210 at 6, 8; Ex. 206. The Court again rejected defendants' proffered "interpretation," finding that Ellison did have control. Ex. 210 at 4.

**B.    Defendants Violated the Order to Produce *SOFTWAR* Materials in Bad Faith and Made False Representations Regarding the Materials**

The December 29, 2006 Order directed defendants to produce the Ellison interview materials created in the preparation of *SOFTWAR* by January 16, 2007. Ex. 194. The Order was served on January 2, 2007 and plaintiffs immediately and repeatedly communicated with defense counsel to obtain information regarding the anticipated production. Defendants failed to take any action to

---

[19] Even this belated production was not sourced to Ellison, but instead to Carolyn Balkenhol, whom plaintiffs deposed on September 12, 2006. These documents should have been produced seven days before her deposition, in response to discovery requests, and pursuant to the key categories of the Discovery Plan. Ex. 43 at 5. Defendants failed to do so.

1  obtain the materials until January 10, 2007 when their counsel sent Symonds a letter purporting to
2  introduce themselves to Symonds, and informing Symonds, *for the first time*, that the *SOFTWAR*
3  materials had been ordered produced. *See* Exs. 211-213. A week earlier, defendants' counsel had
4  advised plaintiffs that he did not yet know whether defendants would take the position that Symonds
5  was refusing to turn over the materials or that they no longer existed. Ex. 212; Ex. H.

6        On January 11, 2007, defendants informed plaintiffs that most of the *SOFTWAR* materials
7  had been intentionally destroyed after plaintiffs had moved for their production. *See* Ex. 214.
8  Defendants claimed that Symonds had attempted to access the laptop computer containing the
9  materials and found that the computer had become inoperable (he believed due to a virus); that
10  because he was not able to access the materials, he took the laptop to a repair shop which told him
11  that the cost of fixing the computer would be approximately the same as buying a new computer; and
12  that he then instructed the repair shop to dispose of the computer. *Id.*

13        Plaintiffs immediately and continually demanded information about the alleged destruction,
14  including the name of the unidentified "repair shop" and the dates on which the alleged destruction
15  occurred. *See* Exs. 215, 217-218. Five days later, defendants finally identified the "repair shop" as
16  PC World in Brentford, UK and represented that PC World had no record of Symonds or his
17  computer, allegedly because Symonds did not pay for any services. Ex. 216. Defendants confirmed
18  that the only steps they had taken to recover the computer were to contact Symonds and ask him to
19  confirm that he had attempted to retrieve the computer, despite clear contradictions in Symonds'
20  story (defendants' January 11, 2007 letter represented that Symonds had contacted the "repair shop"
21  and the shop had confirmed disposal of the computer, while their January 16, 2007 letter represented
22  that the "repair shop" had absolutely no record of Symonds or his computer). *Id.* Defendants have
23  failed to provide any information regarding Symonds' laptop or the date that the alleged destruction
24  took place (which begs the question – how were they searching for it?). *See* Exs. 216, 219.

25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

20

24

25

26

27

28

1
2
3
4
5
6
7
8
9



10  **VII.  DEFENDANTS KNOWINGLY MISREPRESENTED THEIR
       PRESERVATION EFFORTS TO THE COURT**

11
12       Plaintiffs now know with certainty that representations made by defendants to the Court

regarding their document preservation efforts were knowingly false when made and made with the
13
specific purpose of concealing defendants' scheme to destroy evidence both through actual
14
destruction and failure to preserve.  In addition to the proven falsity of statements made by
15
defendants in opposition to the *Ex Parte* Application (*see* §V.A, *supra*), in June 2002, Oracle filed a
16
motion in this case requesting that the Court invoke its power under the PSLRA to stay discovery in
17
the parallel state court derivative proceedings on behalf of Oracle then pending in San Mateo
18
Superior Court. Ex. 232 at 14. In its motion, Oracle falsely assured the Court that plaintiffs would
19
suffer no prejudice from loss of evidence because "*all defendants must preserve all documents just*
20
*as if they were the subject of a continuing request for production*." *Id.* This statement was
21
demonstrably false – by June 2002, defendants were fully aware of the following confirmed facts:
22
(1) defendants sent the March 13, 2001 document preservation e-mail to a mere 30 individuals
23
initially and just a smattering thereafter; (2) defendants failed to preserve evidence in the possession
24
of the majority of individuals who communicated with the individual defendants; (3) the few
25
employees who had received preservation instructions, including Ellison, had not been instructed to
26
retain post-Class Period evidence, nor had they been instructed to change their computer setting in
27
order to retain sent items; (4) neither OSO nor the OSO backup tapes had been preserved – indeed,
28
PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ          - 33 -

1 by that time the OSO backup tapes had been affirmatively destroyed by defendants; and (5)
2 larryellison.com had not been preserved.

3      Moreover, defendants falsely assured Judge Spero that they had preserved electronic
4 evidence during the March 1, 2005 hearing conducted to determine the parameters of discovery. Ex.
5 14 at 74. At that same hearing, defendants vociferously advocated for the scope of discovery to be
6 based upon and limited by the so-called "Speakers" group fashioned by defendants. *See, e.g., id.* at
7 7-10, 13-16, 32, 39, 87-88. In so doing, defendants blatantly misrepresented to the Court the sources
8 of Ellison's information – arguing that so-called "Speakers" received their information only from
9 their direct reports and, as such, all communications with and information received by the
10 "Speakers" would necessarily be captured if the Court were to limit document production to the files
11 of the "Speakers" and their direct reports. *Id.* at 7-10, 13-16. Defendants also argued that if
12 someone at a level below the direct reports communicated with one of the "Speakers," the
13 documents would necessarily be in the "Speaker's" possession and would be produced. *Id.* at 14.
14 However, defendants failed to inform the Court of the true reason for their pursuit of this limitation –
15 they had not sent preservation notices to any Oracle employees other than the direct reports of the
16 "Speakers." Defendants did not advise the Court that they had not made any effort to determine who
17 communicated with the "Speakers." Nor did defendants inform the Court that not even the files of
18 the "Speakers" and their direct reports were properly preserved. Judge Spero found defendants'
19 proposal to be too narrow but, based upon defendants' representations about the "Speaker's"
20 communications, limited the required production to "Speakers," their direct reports, and AVPs –
21 employees who were generally one rank below direct reports. However, defendants had sent
22 preservation notices to just a handful of the AVPs and made no categorical effort to preserve the files
23 of employees at the AVP level. As such, the files of the AVPs had not been preserved and
24 defendants' production was necessarily limited to any documents which may have, by chance or
25 luck, survived over the four years since the commencement of this litigation. At no time during the
26 hearing did defendants inform Judge Spero that the files of the AVPs had not been preserved.
27 Dismissal is the appropriate sanction. *Leon*, 464 F.3d at 958.

28

1    **VIII.  CONCLUSION**

2          Based on the foregoing, plaintiffs respectfully request that the Court enter an order imposing

3    sanctions relating to the destruction of evidence as proposed in the [Proposed] Order Granting

4    Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants' Destruction of

5    Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006 Order

6    Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous Relief

7    for the Destruction of Evidence, filed herewith.

8    DATED: October 10, 2007                        Respectfully submitted,

9                                                    COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
10                                                   MARK SOLOMON
                                                     DOUGLAS R. BRITTON
11                                                   STACEY M. KAPLAN

12                                                                   /s/
                                                            MARK SOLOMON
13
                                                     655 West Broadway, Suite 1900
14                                                   San Diego, CA 92101
                                                     Telephone: 619/231-1058
15                                                   619/231-7423 (fax)

16                                                   COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
17                                                   SHAWN A. WILLIAMS
                                                     WILLOW E. RADCLIFFE
18                                                   MONIQUE C. WINKLER
                                                     ELI R. GREENSTEIN
19                                                   DANIEL J. PFEFFERBAUM
                                                     100 Pine Street, Suite 2600
20                                                   San Francisco, CA 94111
                                                     Telephone: 415/288-4545
21                                                   415/288-4534 (fax)

22                                                   Lead Counsel for Plaintiffs

23   T:\CasesSF\Oracle3\10-10-07 continuation of under seal docs\BRF00046324_Redacted.doc

24

25

26

27

28
     PLTFS' NOT OF MOT AND SUPP SUBM RE DFNTS' DESTRUCTION OF EVIDENCE AND REQ
     FOR SANCTIONS AND OBJS TO SPECIAL MASTER'S JULY 17, 2006 ORDER - C-01-0988-MJJ        - 35 -

1

CERTIFICATE OF SERVICE

2    I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List.

5    I certify under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct. Executed on October 10, 2007.

7

8                                                        /s/
                                                   MARK SOLOMON

9                                                   COUGHLIN STOIA GELLER
                                                       RUDMAN & ROBBINS LLP
10                                                 655 West Broadway, Suite 1900
                                                   San Diego, CA 92101-3301
11                                                 Telephone: 619/231-1058
                                                   619/231-7423 (fax)
12

13                                                 E-mail:marks@csgrr.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**

bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111