COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
        – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | )<br>)<br>) | Master File No. C-01-0988-MJJ |
| | ) | CLASS ACTION |
| This Document Relates To: | )<br>) | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY |
| ALL ACTIONS. | )<br>)<br>) | JUDGMENT |

DATE:          November 16, 2007
TIME:          1:30 p.m.
COURTROOM:     The Honorable
               Martin J. Jenkins

**PREVIOUSLY FILED ON AUGUST 27, 2007
(DOCKET NO. 1024)**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.    SUMMARY JUDGMENT STANDARD.............................................1

III.    ARGUMENT ........................................................................................1

    A.    Defendants Cannot Establish Summary Judgment on the Issue of Falsity of Oracle's 2Q01 Financial Results ....................................1

    B.    The Allegations Pertaining to the $20 Million In Bad Debt Transfers Are Not "New" or "Unpled" ...................................................4

    C.    The Accounting Misstatements Were Material ...................................6

    D.    Defendants Have Not Established the Absence of a Genuine Dispute of Material Fact on the Issue of Scienter for the Accounting Fraud ..........................8

        1.    Defendants' Intentionally Used Customer Overpayments to Generate False Earnings in 2Q01 ..................................8

        2.    The Creation of the 46,000 Debit Memos on November 17, 2000 Raises Numerous Genuine Issues of Material Fact and Evidence Spoliation ....................................11

        3.    Defendants' Knew of the Improper HP Transaction .................................13

    E.    Evidence Submitted by Defendants Themselves Cripples Their Motion for Judgment on 11i Claims.......................................15

    F.    Suite 11i Did Not "Work" as Represented, Did Not Save Customers Money Fast and Had Proven Difficult and Costly to Implement .........................18

    G.    Suite 11i Lack of Integration and Poor Quality Caused Demonstration Failures and Lost Sales .......................................21

    H.    Suite 11i Was Not Integrated and Interoperable Out of the Box, Nor Was It Designed and Engineered to Be and Was Not Tested ........................22

    I.    Suite 11i Did Not Work in Every Language as Represented................................25

    J.    Oracle's Internal 11i Implementation Was Costly Due to Defects and Lack of Functionality and Contributed to 3Q01 Revenue Shortfall ..............................26

    K.    Defendants' Public Guidance Had No Reasonable Basis – Known Undisclosed Facts Seriously Undermined Its Accuracy .......................................27

        1.    There Was Never a Reasonable Basis for Oracle's Guidance .................28

            a.    The Major Economic Change Facing Oracle Rendered Its 3Q01 Forecast Inaccurate ....................................29

**Page**

        b.     The Change in Product Mix and 11i Defects Rendered Oracle's 3Q01 Forecast Inaccurate ...................................................31

        c.     Ellison's Directive to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate ...........................................32

    2.     Defendants Had Actual Knowledge of Facts that Seriously Undermined the Accuracy of Oracle's Guidance ......................................34

        a.     Actual Results Seriously Undermined Oracle's Guidance ............34

        b.     Division Level Indicators Seriously Undermined Oracle's Guidance .....................................................................................36

        c.     Defendants Knew that the "Hockey Stick" Would Not Help ........40

        d.     Pipeline Growth Seriously Undermined Oracle's Guidance .........40

  L.     Defendants' "Cautionary" Statements Were Not Meaningful .............................41

  M.     Defendants' Knew or Recklessly Disregarded that Their Statements About the Economy Were False and Misleading ..............................................................43

  N.     The Insiders' Sales Establish Scienter ................................................................45

    1.     Oracle's Stock Repurchases Establish Scienter ........................................46

    2.     Defendants' Spoliation Establishes Scienter ............................................46

  O.     The Facts Support a Jury Finding of Loss Causation ...........................................47

IV.     CONCLUSION..................................................................................................51

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .................................................................................................6

5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................1

6

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................46, 47

7

8

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ...............................................................................6, 7

9

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .............................................................................27, 41

10

11

*In re Amylin Pharmaceuticals, Inc. Sec. Litig.*,
    No. 01cv1455, 2003 U.S. Dist. LEXIS 7667
    (S.D. May 1, Cal. 2003) .....................................................................................41, 42

12

13

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ...............................................................................49

14

*In re Daou Sys., Inc., Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ....................................................................43, 46, 47

15

16

*In re Gilead  Scis. Sec. Litig.*,
    No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893
    (N.D. Cal. May 12, 2006) ......................................................................................47

17

18

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ...................................................................41

19

*In re Impax Labs, Inc., Sec. Litig.*,
    No. C04-04802 JW, 2007 U.S. Dist. LEXIS 723
    (N.D. Cal. Jan. 3, 2007) ........................................................................................47

20

21

*In re JDS Uniphase Corp. Sec. Litig.*,
    No. 02-cv-01486-CW, slip op. (N.D. Cal. Aug. 24, 2007)......................................5

22

23

*In re Oracle Derivative Litig.*,
    867 A.2d 904 (Del. Ch. Ct. 2004) ....................................................................28, 45

24

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................................42

25

26

*In re Stellant, Inc. Sec. Litig.*,
    326 F. Supp. 2d 970 (D. Minn. 2004) .....................................................................6

27

28

Page

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) ............................................................45

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005).................47

*Morgan v. AXT, Inc.*,
  No. C04-4362, 2005 U.S. Dist. LEXIS 42346
  (N.D. Cal. May 23, 2005) ...........................................................41, 42

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
  Am. West Airlines, Inc.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................6, 42, 45

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ..........................................................44

*Nursing Home Pension Fund v. Oracle Corp.*,
  242 F. Supp. 2d 671 (N.D. Cal. 2002) ..............................................41

*Nursing Home Pension Fund v. Oracle Corp.*,
  No. C01-0988 MJJ, 2006 U.S. Dist. LEXIS 94470
  (N.D. Cal. Dec. 20, 2006) ................................................................46

*Provenz v. Miller*,
  102 F.3d 1478 (1996)...................................................6, 27, 41, 49

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).............................................................42


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78u-4(b)(4)......................................................................................46
  §78u-5(c)(1)(A)(i)..............................................................................42
  §78u-5(c)(1)(B)..................................................................................42

Federal Rules of Civil Procedure
  Rule 26................................................................................................4
  Rule 56(c)............................................................................................1

17 C.F.R.
  §230.144............................................................................................44
  §230.144(e) ......................................................................................44

## I.      INTRODUCTION

Defendants have no entitlement to summary judgment, except against them.  Consistent with plaintiffs' allegations, there are abundant facts, either indisputably in plaintiffs' favor or that, at a minimum, are reasonably disputed, that prove plaintiffs' case.  None militate in defendants' favor.

## II.     SUMMARY JUDGMENT STANDARD

On summary judgment, the moving party is required to show with some detail (a) the absence of a genuine issue of material fact; and (b) their entitlement to judgment as a matter of law on the basis of undisputed facts as set forth in Fed. R. Civ. P. 56(c).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Here, plaintiffs allege that multiple statements concerning Oracle Corporation's ("Oracle" or the "Company") financial condition, forecasts and its new applications products, E-Business ("Suite 11i" or "11i"), were false and misleading and thus actionable under securities laws.  *See* Exs. 12, 14.[1]

## III.    ARGUMENT

### A.      Defendants Cannot Establish Summary Judgment on the Issue of Falsity of Oracle's 2Q01 Financial Results

Defendants' motion on the accounting claims challenges scienter, materiality and loss causation, but does not substantively contest that Oracle overstated its 2Q01 revenue and earnings by at least $0.01 per share.  Defendants' [Corrected] Notice of Motion and Motion for Summary Judgment ("Defs' Mem.") at 46.  In 2Q01, Oracle improperly converted at least $20 million in "unapplied cash" from customer overpayments to revenue and income.  Defendants executed this accounting scheme by transferring the customer money from "Account 25005" (aptly titled "Customer Overpayments"), to "Account 12601," a sub-account of Oracle's bad debt reserve, and then applying the $20 million to fictitious "debit memo" invoices on or about November 17, 2000.  Ex. 1, ¶¶19-39.  These false transactions made it appear as if the unapplied customer cash and overpayments had been applied to new and legitimate invoices (the debit memos).  In reality, the

---

[1]      All exhibits referenced herein are attached to the Appendix of Exhibits filed concurrently herewith.  All emphasis is added and citations are omitted unless otherwise noted herein.

money belonged to Oracle's customers.  In fact, after plaintiffs filed their accounting allegations on October 11, 2002, Oracle held a flurry of secret meetings and initiated an "Unapplied Cash Clean Up" project (the "2002 Clean Up") whereby accounting data was altered, millions of dollars in debit memo overpayments were suspiciously reversed and refunded, and millions more were escheated to the state because the money did not belong to Oracle.  Ex. 1, ¶¶42-46.  One internal e-mail during the 2002 Clean Up stated: "***We need to establish new policies and procedures to ensure this never happens again***."  Ex. 2.

Defendants' accounting expert J. Duross O'Bryan ("O'Bryan") conceded that $20 million in customer overpayments was transferred from Account 25005 to Oracle's revenue and income accounts through its bad debt reserve, Account 12601.  *See* Ex. 3 at 20 ("[Oracle] learned that $20.1 million of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal year 2001.");  Ex. A at 146:19-147:1 ("[O]racle individuals made decisions to transfer from 25005 to 12601.  ***That went right into income, actually went into reserve that went into income***.");  Ex. 4 at 1610987 ($20 million "adjustment" to Account 12601 in 2Q01).[2]  Mr. O'Bryan also admitted that the improper transfers from Account 25005 to Account 12601 violate Generally Accepted Accounting Principles ("GAAP").  Ex. 3 at 6 ("Plaintiffs claim that Oracle improperly used customer overpayments to increase its bad debt reserve, thereby materially inflating reported results of operations in its second quarter of fiscal year 2001 financial statements.  ***These claims, if true, would violate GAAP***.");  Ex. 8 at 21 n.82 ("[T]o the extent that any money that was transferred to the bad debt reserve could not be matched to a previously written off invoice, ***such a transfer***

---

[2]     Oracle's former Vice President of Revenue Accounting Americas, Michael Quinn ("Quinn"), admitted that Oracle's transfers of customer overpayments impacted revenue and earnings.  Ex. B at 227:25-228:15 ("Q. Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002?  A. Yes.").  During his interview with the Special Litigation Committee of the Board of Directors ("SLC"), Tom Williams ("Williams"), Oracle's Vice President of Finance Operations admitted the same.  Ex. 5 at NDCA-ORCL 313783 ; Ex. C at 125:16-18, 177:7-15.  Jennifer Minton ("Minton"), Oracle's current CFO and former Senior Vice President and Corporate Controller during the Class Period, confirmed that Oracle's process of adjusting the bad debt reserve impacted Oracle's revenue account.  Ex. D at 143:7-12, 143:25-144:10, 216:19-25; 184:17-21.  Former Oracle Collections Manager Ian Hatada ("Hatada") testified that the revenue impact was "major."  Ex. E at 153:16-154:6.  Internal Oracle documents confirm the same.  Ex. 4 at 1610987; Ex. 6 at 140468-469, 140474; Ex. 7.

1   *represented an erroneous reclassification*.").  O'Bryan admitted that if the $20 million in transfers

2   did not occur, Oracle's EPS results for 2Q01 would have been $0.10 rather than $0.11, as reported.

3   Ex. 3 at 38.  Plaintiffs' accounting expert D. Paul Regan ("Regan") also found that the improper

4   transactions involving the debit memos and the bad debt reserve inflated Oracle's EPS results from

5   $0.10 to $0.11 per share, allowing Oracle to beat Wall Street's consensus earnings expectations by a

6   penny per share.  *See* Ex. 1, ¶¶31-39.[3]

7          Defendants have only attempted to challenge a small fraction ($2 million) of the $20 million

8   misstatement.  Ex. 3 at 32-33.  They rely entirely upon the unsupported opinion of their expert,

9   O'Bryan, without citing any substantive evidence or documents.  Defs' Mem. at 48. Plaintiffs have

10  disputed O'Bryan's unsupported testimony, however, and moved to exclude it.  *See* Ex. 16 at 10-12.

11  Indeed, O'Bryan conceded that the evidence was "not conclusive" on $500,000 of the $2 million

12  amount and that he could not determine whether the transfers were proper.  Ex. F at 203:9-14.  ("***A.***

13  ***[T]he notes were not conclusive for me, nor did I see any other type of support. We put that into***

14  ***the bucket of could be. Q. Could be. So you can't definitively say that $500,000 of transfers was***

15  ***proper; correct? A. That's correct***.").  His opinion on the other $1.5 million was similarly

16  unsupported.  Ex. 3 at 32-33.  In any event, even assuming that the entire $2 million questioned by

17  defendants is not a disputed fact (it is), if that amount is subtracted from the $20 million

18  misstatement, Oracle's debit memo fraud still inflated its EPS by $0.01 per share (Net Income

19  [$611.8 million] ÷ Shares Outstanding [5,874,987] = ***10.41 cents*** per share).[4]

20  ───────────────────

21  [3]      As discussed in §D.3., plaintiffs have also alleged that Oracle improperly recognized
22  approximately $20 million on a reciprocal "swap" deal with Hewlett-Packard Company ("HP") after
    midnight on the last day of the quarter.  This transaction, combined with the debit memo transfers
23  discussed above, resulted in over $40 million of fictitious earnings in 2Q01, inflating Oracle's
    earnings per share ("EPS") by $0.01 per share.  If plaintiffs can prove at trial that either the debit
24  memo bad debt transfers or the HP transaction was improper, standing alone, Oracle's EPS was
    overstated by $0.01 per share.

25  [4]      The falsity of Oracle's 2Q01 financial statements is also shown by the reversal or "clean up"
26  of the accounting for over $50 million in debit memo transactions ***after*** plaintiffs filed their
    accounting allegations on October 11, 2002.  Exs. 9; A at 154:7-11 ("So, if in the second Q they
27  were applying the 25005 to the 12601, that's recording income.  If – then remember during
    October/November [2002] time frame ***they reversed all of that.  It all went out of reserve.  It***
28  ***reduced revenue, basically, by that $20 million.***"); Ex. 3 at 34-35 ("On November 8, 2002, ***Oracle***

**B.     The Allegations Pertaining to the $20 Million In Bad Debt Transfers Are Not "New" or "Unpled"**

Defendants attempt to avoid the falsity of their 2Q01 financial statements by claiming that the bad debt transfer issues are "new" and "unpled" and that plaintiffs have "abandoned" their accounting allegations.  Defs' Mem. at 45.[5]  However, nearly five years ago, in November 2002, plaintiffs specifically alleged the bad debt reserve transfer issue in connection with an *Ex Parte* Application to enjoin Oracle from deleting and altering documents during the 2002 Clean Up project (the "November 2002 Allegations").  Exs. 10-11.[6]

In December 2002, plaintiffs added new debit memo allegations to the complaint, alleging that defendants "improperly recognized revenue from past customer credits and overpayments *it had held in reserve* without informing its customers."  Ex. 12, ¶8.  Plaintiffs also alleged that Oracle applied the customer cash to fictitious "debit memo" invoices in November 2000 which was "indeed money that had been *on reserve* in Oracle's 'On Account.'"  Ex. 12, ¶41(a).  Judge Spero subsequently heard extensive oral argument regarding the bad debt reserve on March 1, 2005.  Plaintiffs stated that "[o]ur investigation thus far, and even a review of these documents show that *bad debt reserve . . . .  The monies that were applied to the debit memos came from the bad debt reserve, which is where the unapplied cash went to when it came in.*").  *See* Ex. 13 at 53:10-15.

---

*reversed the processing of the November 17, 2000 debit memo*, thus switching the receipt status from 'Applied' back to 'Unapplied.'"); Ex. 1, ¶¶42-45.

[5]     Judge Infante has already admonished defendants for trying to narrow plaintiffs' accounting allegations too narrowly in order to resist discovery relating to the bad debt transfer allegations: "*I have never seen anyone read a complaint so narrowly as you do.  Rule 26 would be turned on its head if we applied your discovery rulings as you wish to make in this case.  It's just ridiculous. I'm sorry I have to be so blunt with you.*"  Ex. 15 at 86:11-16.

[6]     The November 2002 Allegations stated that Oracle had a "long-standing practice of inappropriate use of customer's overpayments and unapplied cash by doing so-called 'auto adjustments' of customer overpayments in its Unapplied Cash account and *applying the money to its bad debt accounts*."  Ex. 11, ¶6; *see also, e.g.*, Ex. 10 at 3-7.  Plaintiffs also alleged that "at the end of a month, Oracle would run an 'auto adjustment' that would *take money out of the Unapplied Cash account and would transfer it to the Reserve for Bad Debt account*," thereby "*inflat[ing] net income*."  Ex. 11, ¶12.

1   Judge Spero specifically asked defendants about the bad debt transfers and defendants misled the

2   Court:

3       Judge Spero: The question is whether or not the ongoing investigation, which is
        reflected in Mr. Quinn's declaration, which has the *account number of 12601*, has
4       documents in it that *in any way refer or relate to the 46,000 debit memos*.

5       And it does seem to me that there might be documents there because he does talk
        about impact of revenue on the last eight quarters, so that goes back into the relevant
6       period. . . .

7       [Counsel for Oracle]: The reason it is not relevant is because [t]he November
        17, 2000 transaction *had nothing to do with the 12601. It had nothing to do with*
8       *the movement of unapplied cash to the bad debt reserve account*. . . .

9       Judge Spero: You know, you say that, but look at the e-mail. The e-mail
        says exactly the opposite of that.
10

11      [Counsel for Oracle]: No, no. *It has nothing to do with the debit memo*
        *transactions* which they say were used to recognize revenue. It involves two entirely
        distinct inquiries.
12

13  *Id*. at 51:9-53:23. [7] Moreover, plaintiffs detailed the bad debt transfer allegations in their contention

14  interrogatory responses. Ex. 14. Defendants never challenged these responses and they addressed

15  the issue in extensive briefing and expert discovery. Defendants thus cannot demonstrate prejudice

16  or lack of notice.[8]

17

18  [7]      Judge Spero recognized that the bad debt reserve allegations were relevant if plaintiffs could
    demonstrate a connection to the debit memos during discovery (which they did): ("[Judge Spero]:
19  You are going to look at every piece of paper that has to do with these debit memos up and down
    and *if it goes through the accounts that you suspect it is going through, well, then, that will be one*
20  *thing*. . . . I mean if it turns out that none of this money passes through the 12601 account, why isn't
    that the answer?"). Ex. 13 at 53:3-54:9. As it "turned out," Judge Infante ordered discovery on the
21  bad debt transfers on December 19, 2006 (Ex. 193), and the documents show unequivocally that $20
    million in transfers and other customer funds were applied to November 2000 debit memos. Ex. 1,
22  ¶¶24-29, 44.

23  [8]      Defendants have also been fully aware of the HP allegations for most of discovery. They
    attended hours of depositions of HP and numerous Oracle witnesses. The HP allegations were also
24  detailed in plaintiffs' contention interrogatory responses, and defendants' expert provided an opinion
    on it (albeit an improper opinion based on documents never produced to plaintiffs). Exs. 3; 8; 14.
25  Thus, defendants cannot argue prejudice, undue delay, bad faith, or dilatory motive in addressing the
    HP allegations at summary judgment. *See In re JDS Uniphase Corp. Sec. Litig.*, No. 02-cv-01486-
26  CW, Slip Op. at 11-12 (N.D. Cal. Aug. 24, 2007) (finding that issues not specifically alleged in the
    complaint were part of the case at summary judgment). Ex. 200. If anything, plaintiffs have been
27  prejudiced by defendants' use of "new" documents in their expert rebuttal report regarding HP that
    were never produced to plaintiffs. *See* Ex. 16.

28

C.    The Accounting Misstatements Were Material

Because defendants cannot genuinely dispute that Oracle's revenue and earnings were inflated by at least $0.01 per share in 2Q01, they argue that the overstatement is immaterial.  Defs' Mem. at 46-47.  To fulfill the materiality requirement, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Airlines, Inc.*, 320 F.3d 920, 934 (9th Cir. 2003) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *TSC Indus., Inc.*, 426 U.S. 438 (1976)).  Materiality is a mixed question of law and fact and, accordingly, courts generally reserve questions of materiality for the jury.  *TSC Indus.*, 426 U.S. at 450.  Indeed, as the Ninth Circuit stated: "only if materiality is 'so obvious that reasonable minds [could] not differ' is summary judgment appropriate." *Provenz v. Miller*, 102 F.3d 1478, 1489 (1996).

Defendants claim that a reasonable investor would not have found it significantly important if Oracle only reported earnings of $0.10 per share, rather than the $0.11 per share in 2Q01.  Defs' Mem. at 46-47.  This contention ignores that Wall Street analysts' consensus earnings expectations for 2Q01 were $0.10 per share and Oracle's earnings were intentionally manipulated to report $0.11 and "beat" those expectations.  The SEC's rule on materiality states that intentional earnings manipulations are presumptively material:  "***[t]he evidence may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements***."  Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB 99"), Ex. 18.  In fact, Ellison himself admitted that beating the street was material:

> ***Ellison had said to me more than once that the one thing that would make a difference was a quarter that beat expectations.***  "Analysts don't try to foretell the future; they try to explain the recent past. . . . ***It's that simple – they just look at the numbers.***"

Ex. 17 at 431.  Defendants' forecasting expert R. Glen Hubbard ("Hubbard") also admitted that managing earnings using "deliberate creation of reserves" is not proper.  Ex. G at 45:16-46:11.

1    Courts too have acknowledged the "common-sense presumption that accurate earnings information

2    is meaningful and important to investors."  *In re Stellant, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985

3    (D. Minn. 2004); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("Most

4    investors would consider it significant, no matter what the mix of information available, that a

5    company was not earning as much as it was claiming to earn.  The onus is [therefore] on the

6    defendants to demonstrate why this assumption should not stand.").[9]

7          Further, the $20 million "adjustment"  would not have been made in 2Q01 if it was not

8    material to Oracle's financial statements.  Tom Williams, Oracle's VP of Finance admitted that "If

9    there was a significant difference between the requirements and the reserve then an adjustment

10    would be booked.  *If it was not a significant difference then no adjustment would be booked.*"

11    Ex. C at 124:23-125:1-2.  Oracle's accounting manipulations were also material in that they caused

12    Oracle to violate the SEC's 1993 Consent Decree which enjoined Oracle from accounting

13    improprieties and misstatements of its financial results.  Ex. 20 at 3-4.[10]

14          Oracle's improper $20 million deal with HP was material because, *inter alia*, (i) it was the

15    second largest applications deal in 2Q01; (ii) it inflated Oracle's applications growth from 54% to

16    66%; (iii) it conveyed the false impression that Oracle's new Suite 11i software was growing faster

17

---

18    [9]    Leading up to 2Q01, Oracle had "beat the street" for four quarters in a row, including nine of
the previous ten quarters. Ex. A at 290:12-19.  During the single quarter in which Oracle merely

19    "met" Wall Street expectations, Oracle's stock dropped 6% the following trading day. *Id.* at 290:16-
291:1.  Further, during 2Q01 Oracle and the entire market were facing a huge macroeconomic

20    downturn and the infamous bursting of the "dot.com bubble."  In the four months preceding the
Class Period (August 2000 - November 2000), the NASDAQ plummeted 1300 points or

21    approximately 30% of its market capitalization. Ex. 175.  Oracle's mantra during that time, which it
expressly touted to investors, was that the slowing economy was "not impacting" Oracle's business

22    because its new Suite 11i software product would help companies cut costs. Ex. 12, ¶45.  Thus,
Oracle recognized that any negative "impact" on its business was material to the investment

23    community.  It allayed those fears by artificially inflating its earnings to beat expectations.

24    [10]    None of the cases cited by defendants address a situation where a Company intentionally
inflates its revenue and income with the specific purpose of beating the street by $0.01. Defs' Mem.

25    at 46.  Here, Oracle's accounting manipulations intentionally overstated its net income by 4%, its
applications growth by 12%, and its EPS by $0.01 (10%).  Further, the SEC has rejected a

26    quantitative percentage threshold for determining materiality, finding that "qualitative factors may
cause misstatements of quantitatively small amounts to be material." Ex. 12 at 45153.  Plaintiffs'

27    accounting expert carefully analyzed the SEC's factors and found that Oracle's accounting
misstatements were qualitatively material. Ex. 19 at 3-9.

28

---

1   than expected; and (iv) helped Oracle inflate its earnings in 2Q01 by $0.01 per share to beat Wall

2   Street expectations.  Ex. 19 at 6-7.  Numerous high-profile securities analysts reported that both the

3   66% applications growth and the HP transaction were material to Oracle's 2Q01 results.[11]  Indeed in

4   an internal e-mail to Ellison and Henley, four days after the close of 2Q01, Oracle executives

5   admitted that the HP deal was material:  "*Without HP, it would have been different.  The East did*

6   *not bring in any business*."  Ex. 25.[12]

7           **D.      Defendants Have Not Established the Absence of a Genuine Dispute
                      of Material Fact on the Issue of Scienter for the Accounting Fraud**

8
9                   **1.      Defendants' Intentionally Used Customer Overpayments to
                            Generate False Earnings in 2Q01**

10          It is undisputed that Oracle's top executives were well aware of the Company's customer

11  unapplied cash problem in 2Q01.  Henley knew that "there was a similar problem when I joined the

12  company . . . so I was disappointed when I found out about it because *here we were repeating sins*

13  *of the past many years later*."  Ex. H at 465:7-21.  Oracle Collections Manager Hatada testified that

14  Oracle's "large" balance of unapplied cash was a "*very, very large problem, the biggest problem*

15  *that anybody in collections or accounts receivable had*."  Ex. E at 78:20-25-79:9.  Other Oracle

16  managers agreed.  Ex. I at 198:10-14.  Documents confirm knowledge of the problem.  Exs. 27-29.

17  _____

18  [11]     Ex. 21 (**Thomas Weisel:** "Oracle made up for disappointing applications license sales in Q1
19  by posting 66% growth in Q2.  Notable wins at American General, Hewlett Packard . . . highlighted
    solid demand for the company's 11i e-business suite."); Ex. 22 (**Merrill Lynch:** "Oracle began to
20  show traction again in its applications business, and the company spoke confidently about improving
    its growth in applications through the remainder of FY01. . . . [N]ew wins with HP (thought to be a
21  $20 mil deal) . . . ."); Ex. 23 (**Goldman Sachs:** "Oracle delivered strong earnings, benefiting from . .
    . growing traction in the application market fueling applications revenue growth of 66% . . . .");
22  Ex. 24 (**Deutsche Banc Alex Brown:** "Applications license growth of 66% solidly outpaced Street
    expectations in the *50-60% range*.  The outperformance should also allay concerns about the
23  viability of Oracle's applications business and the relative immaturity of release 11i . . . .").

24  [12]     Oracle's accounting misstatements on December 14, 2000 were also material because they
    allowed Oracle to inflate its forecasts for *3Q01*.  Indeed, on the same day that Oracle issued its' false
25  $0.11 earnings results for 2Q01, defendant Henley also issued 3Q01 earnings forecasts of $0.12,
    premising those forecasts on 2Q01 results: "*[H]istorically, the third quarter is slightly better than*
26  *the second quarter.  That's the way, sequentially, it's worked here. . . .  So I would assume, 12*
    *cents would be a reasonable number.*").   Ex. 26 at 234427.   Thus, Oracle's accounting
27  manipulations in 2Q01 allowed the Company to issue 3Q01 earnings forecasts that it knew were
    misleading and significantly undermined by its inflated 2Q01 results.

28

1    Defendants claim that the earnings manipulations were "simple accounting errors by

2    members of Oracle's collections staff." Defs' Mem. at 48-49.  However, Executive Committee

3    documents show that the Individual Defendants knew at the end of 2Q01 that Oracle would not beat

4    Wall Street consensus expectations of $0.10 per share unless it transferred $20 million in customer

5    overpayments and booked the improper swap deal with HP to inflate its revenues and earnings so it

6    could report to $0.11.  Oracle's executive "Upside Reports" printed on Monday, November 27,

7    2000, (three days before the quarter closed), and December 1, 2000 (the day *after* the quarter

8    closed), show Oracle's actual EPS number for 2Q01 was only 9 cents, with a best case "potential"

9    scenario of *10.34 cents*.  Ex. 30 at 1532779; Ex. 7 at 440830.  Oracle's top executives admitted that

10   the Upside Reports were reviewed on Mondays each quarter. Exs. H at 116:25-117:18; 31 at 31; J at

11   143:17-145:11; 32 at 3; D at 105:22-25; K at 25:23-26:24, 38:1-40:20; 193.

12   A December 4, 2000 "Executive Committee" report issued four days *after* 2Q01 closed

13   shows Oracle's actual EPS results based on field-level data was only *9.05 cents* per share, far below

14   what Oracle needed to report 0.11 per share.  Ex. 205.  On December 5, 2000, Oracle's Upside

15   Report reported an actual earnings result of 9.1 cents with a best-case "potential" number of only

16   *10.22 cents*, far short of the 10.5 cents needed to round up to $0.11.  Ex. 33.  Thus, five days *after*

17   the quarter closed, Oracle's Executive Committee, including defendants Ellison and Henley, were

18   well aware  that Oracle had not earned $0.11 and needed to fraudulently pull the money from other

19   sources, which they did.[13]  Defendants failed to address these crucial documents. Defs' Mem. at 47-

20   48.

21

22

---

23   [13]    On December 8, 2000, the Company's "final version of the Bad Debt Analysis" was e-mailed
     to Oracle's Senior VP and Controller Minton and VP of Finance Williams, both of whom reported to
24   Henley and the Executive Committee.  Ex. 4.  The section entitled "Bad Debt Reserve
     Reconciliation 2QFY01," shows Oracle's final improper $20 million "adjustment" to the bad debt
25   reserve in the "November-00" column.  *Id.* at 1610987.  The $20 million adjustment allowed Oracle
     to increase revenue and earnings by reducing its "Total Reserve" balance to approximately $163
26   million from the inflated $183 million.  *See id.*; Ex. 34 at 140463, 140468-69; Ex. 1, ¶¶33-38.
     Minton confirmed that Oracle's process of adjusting the bad debt reserve changed Oracle's revenue
27   account.  Ex. D at 143:7-12, 143:25-144:10, 216:19-25, 184:17-21.

28

1    Defendants ignore the evidence demonstrating that during the Class Period, Oracle had a

2  pattern and practice of conducting end-of-the-quarter "clean up drills" to conceal its accounting

3  manipulations, making it appear as if customer overpayments had been properly applied to invoices.

4  According to one email sent during the 2002 Clean Up:

5         The application that I made to invoice 6057195 is definitely a misapplication.  I'm
          not big on intentionally misapplying funds.  *However, being a Feb. 2001*
6         *application, I'm pretty sure I was involved in one of our routine "Q-end unapplied*
          *clean up" drills, as we used to do on the final months of each Q back then.*  Please
7         do unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195.

8  *See* Ex. 35.  Further, on November 6, 2000, the final month of 2Q01, Oracle employees were

9  directed to "resolve as many unapplied items before the end of the quarter," which "would help us in

10  achieving our quarter goal."  Ex. 27 at 3042910.  The e-mail explained:

11        Since we are approaching the end of the quarter, we would like to resolve these items
          as quickly as possible.  *If there is no response by November 20, 2000, we will*
12        *review the items and place them in our reserve account*. . . .

13  *Id.*[14]  These e-mails do not evidence "simple accounting errors" as Oracle contends; they suggest

14  Oracle's deliberate misuse of customer money to inflate earnings.[15]

15

16

17

18  _____

19  [14]    Incredibly, defendants did not produce this highly relevant and incriminating e-mail until
     April 17, 2007, nearly two full years after the deadline to produce all relevant documents under the
20   Discovery Plan.  Defendants claimed that "*these documents mistakenly never were loaded on to*
     *our database at the time the documents originally were gathered.*"  Ex. 36 at 1.  Thus, plaintiffs
21   were severely prejudiced and precluded from using this highly relevant document during the entire
     discovery period.

22  [15]    Evidence also shows that Oracle intentionally used an "auto-adjustment" process to sweep
23   small amounts of unapplied cash and customer overpayments into its bad debt reserve (Account
     12601).  Ex. B at 205:16-206:11("Q.  Is that the only account that the auto adjustments would
24   impact?  A. Other than the unapplied account because *it would be taken out of the unapplied*
     *account and put into the bad debt reserve account*.  Q. Bad debt reserve account. A. *The 12601.*");
25   *see also id.* at 212:11-23.  ("Q.  Some of the money that was in unapplied cash was less than 30 days
     old, which was part of the auto adjustments, right?  A.  Yes.  Q. *Was Oracle doing these auto*
26   *adjustments prior to May of 2001?*  A. *Yes.*"); *see also* Ex. 37.  After plaintiffs filed their
     accounting allegations on October 11, 2002, Oracle attempted to shut off the auto-adjustment
27   process.  Ex. 2 ("Greg, please confirm that ALL ability to move anything to 12601 via On Account
     or creating a Misc receipt write off *has been turned off*.").

28

1

2

### 2.     The Creation of the 46,000 Debit Memos on November 17, 2000 Raises Numerous Genuine Issues of Material Fact and Evidence Spoliation

3      Although much of the original evidence surrounding the creation of the debit memos has

4   been withheld, altered and/or destroyed during the 2002 Clean Up, the remaining evidence confirms

5   plaintiffs' allegations.  Oracle claims that the "On Account" cash receipts that were applied to debit

6   memos on November 17, 2000, were items that had already been "resolved" and were not available

7   for customer refund.  Defs' Mem. at 43.  This is simply not true.  Documents created by Oracle's

8   own "Unapplied Cash Specialist," stated that the debit memos were customer overpayments that

9   were available for refund.  Ex. 38 (***"All invoices that start with '550' are actually debit memo #'s.***

10  ***These were created to clean up our unapplied account at the time.  They were more than likely***

11  ***overpayments."***); *see also* Ex. 39 (***"All 10 of the invoices that start with '550' are on 'account***

12  ***clean up.'  These funds are available for refund or to apply to future or past due invoices."***).[16]

13  Further, millions of dollars of unapplied cash items that Oracle claims to have been "resolved" were

14  actually reversed, credited, refunded and/or escheated as part of the 2002 Clean Up project.  Exs. 42-

15  44; L at 66:25-67:20; 185-188; 191-192; 204.  Internal Oracle documents confirm that Oracle

16  reversed and removed over $50 million in improper debit memo customer overpayments that were

17  transferred to the bad debt reserve.  Ex. 9; Ex. 3 at 19-20; Ex. 1, ¶¶43-44; Ex. 45 (script output

18  database); Ex. 46 at 1534024, 1534049, 1534169 (journal entries reversing receipts from 12601).[17]

19  ─────────────────────

20  [16]     Plaintiffs' expert Regan testified that the November 2000 Clean Up of customer

21  overpayments and unapplied cash consisted of creating 46,000+ fictitious debit memo invoices and "applying" the "on Account" customer overpayments to the fake invoices.  Ex. 1, ¶¶24-25.

22  Applying the On Account items to a debit memo converted each "unapplied" cash receipt to "applied" thereby making it appear in Oracle's books as if the items were legitimately applied to real

23  invoices.  *Id.*, ¶26.  In fact, the application of customer overpayments to the debit memos caused the overpayments to literally disappear from customer's aging reports and allowed Oracle to conceal

24  customer overpayments.  *Compare* Ex. 40 at 313985-86 *to id.* at 313987-89; Ex. 1, ¶27.  This improper use of "On Account" was contrary to its intended purpose in Oracle's internal policy

25  manuals.  Ex. 41.  Regan specifically cited individual debit memo transactions that were improper including customers Ameritrade and K-Force.  Ex. 1, ¶¶47-50.

26  [17]     Oracle's contention that its accounting must have been proper because neither the SEC nor

27  Ernst & Young LLP ("E&Y") took action is meritless.  Defs' Mem. at 44.  E&Y did not review the historical transactions underlying the debit memos or the $20 million impact of the bad debt transfers

28  on 2Q01.  Ex. 184; Ex. BB at 179:18-180:2, 182:2-9, 184; 209:6-13.  In fact, in the draft interview

1    Further, contrary to defendants' assertion that the "On Account" was merely a "remnant flag"

2    that had no accounting significance, Oracle's VP of Accounting Quinn testified that the unapplied

3    cash items that had been transferred to Account 12601 were put "On Account," Ex. 117 at 231:24-

4    232:16 ("Q.  So are you saying that the movements that you described in bullet point 1, taking

5    unapplied cash receipts to the reserve account first goes to the on account?  A.  *First goes to the on*

6    *account.  That's how they got there.  That's how they got to the reserve account*."); *see also*

7    Ex. 128 at 103:24-104:11 ("[P]utting an amount on account . . . it would erase it from the unapplied

8    account and *move it to the reserve or another account*.").  Oracle admitted that the "On Account"

9    designation signaled to Oracle employees "do not touch" the customer funds.  Ex. M at 83:1-5.  This

10   allowed Oracle to conceal customer overpayments.  Ex. 1, ¶¶23, 43-44.[18]

11   Henley supervised the improper 2002 Clean Up.  Ex. E at 266:10-21; 105:1-106:3.  Minton,

12   Oracle's Controller and Senior VP, testified falsely that she was "not involved in the investigation"

13   and "[did] not know of any details of the investigation," because "*I was told – I think it was*

14   *appropriate for legal to keep me uninvolved in the investigation.*").  Ex. D at 162:23-163:4, 174:25-

15   175:19.  Minton later changed her story and claimed that she was aware of the "results" of the 2002

16   Clean Up but was "not involved in the actual underlying investigation itself."  *Id*. at 278:15-279:20.

17   This was untrue – Henley testified that Minton was involved.  Ex. H at 437:1-6 ("I think the people

18

19   memo that the SLC sent to John Banker, E&Y's senior audit partner, Banker deleted and changed
20   certain language in the memo which improperly misrepresented what E&Y reviewed and concluded,
     including the representation that "there was nothing in the materials that E&Y reviewed that
21   indicated to E&Y that plaintiffs' claims had any veracity."  Ex. 185.  Further, there is no evidence
     the SEC did any formal review of Oracle's accounting and Oracle's October 2003 presentation to the
22   SEC withheld key evidence.  Ex. 176.  Oracle told the SEC that the debit memo overpayments,
     including those for customer Household Finance were refunded "years ago."  *Id*.  As explained by
23   plaintiffs' expert Regan, that presentation failed to disclosed that Oracle refunded the same
     Household debit memos in 2002 and millions of dollars of additional debit memos were reversed,
24   refunded and escheated after plaintiffs filed their accounting allegations in October 2002.  Ex. 1,
     ¶¶51-54.

25   [18]    Oracle affirmatively attempted to conceal overpayments from customers and alter the
     accounting history even when it knew the money should be refunded.  Ex. 1, ¶44 n.92; Ex. 47 at
26   1895745 ("*We actually have the unapplied cash.  We never booked the order but the customer
     paid.  We want to book it or try to get upper management to agree that we should keep this*
27   *money*.").  One employee suggest fraud: "If this isn't enough to close out the [purchase order], *could
     it end up in a fire under mysterious circumstances?*"  *Id*.; *see also* Exs. 48 at 1886317; 49.

28

1    that, first of all, got into more of the detail and reviewed it were our **corporate controller, Jennifer**

2    **Minton,** and the previous corporate controller Tom Williams."); Ex. 50 at 313792 ("Henley

3    additionally said that **he expected Minton and Williams** to get to the bottom of the issue and take

4    any necessary action to resolve it."); Ex. H at 451:10-17 ("Q. Who at Oracle, in fiscal 2001, would

5    have been responsible for making adjustments to Oracle's bad debt reserve?  A. **Certainly the review**

6    **was done by Jennifer Minton** . . . .").[19]  The totality of the evidence surrounding the 2002 Clean Up

7    reinforces scienter.[20]

8    **3.     Defendants' Knew of the Improper HP Transaction**

9           Oracle's recognition of $20 million in revenue from the HP transaction after 2Q01 ended was

10   knowingly false for countless reasons. First, defendants knew that the $20 million in revenue was

11   entirely contingent on Oracle's concurrent $30 million purchase commitment of HP hardware, a

12   classic sign of an improper reciprocal swap deal.   On November 9, 2000, Michael DeCesare,

13   Oracle's Area VP closely involved in the HP deal, wrote to defendant Sanderson: "HP confirmed

14   today that they will try and pull the CRM portion of the order off providing we deliver what we have

15   outlined . . . .  **Since they don't need ALL the license users right now they are hedging on how big**

16   **an order they will do until they see how much production hardware Oracle comes back with. If**

17   **this turns out to be a large number we could get the entire order.**"  Ex. 60.  On November 30,

18   2000, the last day of 2Q01, George Roberts, an EVP wrote: "I understand Larry [Ellison] and Carly

19

20

21

---

22   [19]      *See*, *e.g.*, Ex. 51 at 1727980 ("I have also tried to summarize the open questions **Jennifer had**
     **from our meeting earlier this week** . . . . **Jennifer has initiated a project to cover our work in this**
23   **area** . . . . **Jennifer would like to meet next week on our progress.**"); Ex. 54 (**"We have Jennifer's**
     **[Minton] approval to expand the scope of the [escheatment] project up to $20K."**); *see also* Ex. 47
24   at 1895745; Ex. 52 at 1733103-105; Ex. 53 at 1886329; Ex. 187 at 1892686-87.

25   [20]      The full record surrounding the 2002 Clean Up is set forth in plaintiffs' spoliation briefing.
     Ex. 55 at 11-20. Plaintiffs incorporate all of the evidence contained in Ex. 55 by reference herein.
26   Plaintiffs' expert also set forth in detail the reasons why Oracle's document production on the debit
     memos was incomplete, inaccurate and raised questions of disputed facts about the financial impact
27   of the 46,000 debit memo transactions.  Ex. 1, ¶¶55-61.

28

1   [Fiorina] are discussing their purchase of our products this quarter *if we commit* to purchase $20M-

2   $30M of their product over the next 18-24 months." Ex. 57 at 025018.[21]

3          The HP deal was knowingly improper for additional reasons: (i) the deal was not signed and

4   executed until after midnight on November 30, 2000, the last day of 2Q01 (Exs. 1 at ¶¶97-101; 80 at

5   260105, 260118, 260120-21); (ii) Oracle had to agree to $30 million in cash, purchases or a

6   cancellation fee before HP would commit (Ex. 57); (iii) Oracle never delivered the product and

7   functionality promised (Exs. 1 at ¶¶45-48, 53-57; 188), and (iv) the deal was re-signed after 2Q01.

8   Exs. 181 at 259035-038; 183 at 257416 ("this is a reapproval request for a Q2 deal that didn't

9   close."). [22]  Further, contrary to defendants' contentions, Oracle did not provide its outside auditor

10  AA, or its audit committee with the facts necessary to determine proper revenue recognition under

11  GAAP, including evidence of the reciprocal commitments and concessions.  *See* Exs. 59 at 020845;

12  P at 328:21-330:5, 332:7-334:1, 339:19-340:21, 343:20-25.   AA approved the deal without

13  reviewing crucial evidence and there is no evidence showing that the audit committee reviewed or

14  approved the deal prior to January 5, 2001.  Ex. 182 at 081713, 081755.  All of these facts

15  demonstrate that the HP transaction was knowingly improper.[23]

16  _____

17  [21]       Numerous other e-mails confirm the improper reciprocal nature of the transaction. Ex. 58
18  ([email to Ellison]: "Given the size of our software sales opportunity, you may want to agree that
    we'll purchase the [HP] hardware."); Ex. 59 at 020844 ("Consistent with Larry's conversations with
19  Carly, HP will expect a purchase order for the following amounts [$20 million]. They will expect
    this purchase order to be binding and commit Oracle to using the full amounts by the dates we
20  promise."); Ex. 60 at 055958; Ex. 61 at 020850-51; Ex. 62 at HP00020 ("These licenses were bought
    as an 'incentive' for Oracle to help us increase HP's revenue").  Indeed, defendant Sanderson
21  admitted to writing the following handwritten notes on an HP transactional document: "*THE REAL
    STORY . . . Is this the way we are going to do deals. Each has to buy something [from each
22  other]!.*"  Ex. K at 521; 63 at 028737-38; N at 59:18-21, 62:3-6.

23  [22]      Ellison, Henley and Oracle's Board of Directors held a "Special Meeting" on the last day of
    2Q01 to specifically "authorize" the HP transaction which it knew was contingent upon Oracle's $30
24  million purchase from HP.  Ex. 64 at 044458. Numerous documents and deposition testimony
    confirm that defendant Ellison was personally involved in negotiating the deal. Exs. O at 112:6-8;
25  K at 503:2-5; N at 60:23-61:1, 62:10-13 ("[A]ll the players that are involved in this. This is
    something that Sandy knew about it, it's something that Larry knew directly about . . . .").

26  [23]       There are also numerous disputed facts that were raised by Mr. O'Bryan's expert opinion on
    the HP Transaction. In his opening report, Mr. O'Bryan provided a single paragraph opinion that he
27  admitted was "light."  Exs. 3 at 41; A at 56:8-22. Mr. O'Bryan subsequently tried to cure his
28  unsupported opinion by relying on new documents related to the HP Transaction that were never

1

2

### E. Evidence Submitted by Defendants Themselves Cripples Their Motion for Judgment on 11i Claims

3        Defendants never identify which false statements they contend cannot be proven.  Nor do

4 they detail any admissible undisputed facts which supports their contention.  Defendants do not

5 mention the false statements that "Suite 11i was pre-integrated and fully interoperable out of the

6 box."  *See* Ex. 12 at 58, 63.  Nor does the MSJ mention statements that Suite 11i was "Plug and

7 Play" and "up and running in months, you get the savings in months, it costs you less and takes less

8 time to install."  *Id.* at 50.  Defendants do not address at all, specific statements that Suite 11i,

9 including Oracle's CRM was "complete," that it "worked in every country, in every language."  *Id.*

10 at 63.  Instead, defendants manufacture statements, attribute them to plaintiffs then assert that they

11 cannot be proven.  *See* Defs' Mem. at 37 ("Plaintiffs cannot prove that Suite 11i was somehow

12 defective").  Plaintiffs have not explained how 11i was so defective that "it was like a car without

13 wheels."  *Id.* at 39.[24]  Plaintiffs never alleged that 11i was "defective" like a "car without wheels."

14 Defs' Mem. at 37.  Defendants concede that plaintiffs have identified "a few dozen" 11i customers

15 experiencing costly 11i defects due to poor quality or lack of stability.  Defs' Mem. at 39.

16 Defendants incorrectly suggest more is necessary to defeat summary judgment.  *Id.*  (11i defects

17 experienced by customer have not been shown to be indications of a broader population).  However,

18 the failure of Suite 11i to function in the manner Oracle represented – creating a disputed issue of

19 fact – is unequivocally demonstrated by evidence of failed or failing 11i implementations,

20 deteriorating consulting margins, customer concessions, refunds and threatened lawsuits – all as a

21 direct result of 11i defects.  Exs. 72, 74, 80, 86, 119.  Moreover, a "few dozen" customers

22

23 produced to plaintiffs or their expert until ***after*** rebuttal expert reports were exchanged. Ex. 16 at 16-17. These facts establish genuine disputes that cannot be decided as a matter of law.

24 [24]    Defendants' assertion that plaintiffs cannot prove that 11i had more bugs than "competing"

25 products is irrelevant. *Id.* at 38.  Even according to defendants, there were no competing software offerings.  Oracle is "***the only vendor***" to offer such a suite of "***tightly integrated*** applications,"

26 including ERP and CRM. Exs. 66-67; *see also* Defs' Mem. at 17, 39.  Defendants also make the bald assertion that "not every [defect] bug affected every customer." Defs' Mem. at 39.  Even if that

27 were true, so what?  Defendants do not explain what relevance this might have, whether it is disputed fact or whether it shows the absence of one.

28

1    experiencing effects of 11i's defects during the Class Period is nearly **half** of the claimed 85

2    customers purported to have been "**live**" on Suite 11i as of December 14, 2000.  *See* Declaration of

3    Mary Ann Anthony ("Anthony Decl."), Exs. 44-45, 48, 53; *see also* Declaration of Matthew D.

4    Harrison ("Harrison Decl."), Ex. 192.  Defendants add that there were 11i "success stories," using a

5    "wide range of modules" including CRM and ERP.  Defs' Mem. at 36, n.22.[25]  This is far from

6    undisputed and false in any event.  For example, Oracle says that by February 2001, "Imation was

7    **live** on 11i using multiple European countries" and "the United States, includ[ing] the 11i Order

8    Management module."  *Id.* at 36, n.22, 37.[26]  Even as late as May 2001, Oracle sought to pacify

9    Imation with huge discounts because: "[T]he R11i software as released didn't work; they have

10   compromised there [sic] reputation with the SEC associated with a write-off for the upgrade to R11i

11   that couldn't happen due to product quality issues; . . . Imation's cost to upgrade $6.5M which the

12   CEO states the majority of cost is to fix a product that should not have been released; . . . poor

13   product quality (many products didn't work, 1000's of patches . . . is unacceptable."  Exs. 68;[27] 71.

14         Defendants claim that increasing numbers of "**live**" customers on 11i demonstrates plaintiffs'

15   inability to prove falsity is similar to the misleading representations during the Class Period.  Defs'

16   Mem. at 21 (customers "**live**" on 11i grew from 85 to 200, by the end of the Class Period); *see also*

17   Anthony Decl.  However, Oracle's many so-called "**live**" customers were in fact experiencing

18   massive 11i defects and demanded refunds or free services from Oracle as a result 11i defects.

19   Oracle claims that ValueVision was "**live**" as of December 13, 2000.  Anthony Decl. at 44; *see also*

20

21   [25]    Defendants incorrectly assert that plaintiffs do not deny that Suite 11i was "integrated as
22   compared to best of breed products from different vendors."  Defs' Mem. at 39.  The evidence shows
     that in fact 11i simply was not pre-not integrated and fully interoperable as represented and "exposed
23   Oracle's 11i development environment as best of breed, rather than a unified solution."  Ex. 149.

24   [26]    In support of this contention, defendants submit the Anthony Decl. who purports to have
     been keeping track of "live" customers on 11i.  The documents are disputed and the facts they assert
25   are demonstrably wrong.

26   [27]    Defendants also say POSCO was a successful 11i customer in **September 2001** – ten months
     after the beginning of the Class Period.  Defs' Mem. at 36.  Moreover, even in June 2001, POSCO
27   was experiencing "showstopper" bugs and had already applied **674** patches to the ERP alone.
     Exs. 69, 70.

28

1   Exs. 72-73.  But, ValueVision demanded nearly ***$1.5 million*** in refunds because of 11i defects and

2   instability.  Exs. 74; 114.  Papa John's was publicly reported "***live***" on 11i as of December 15, 2000.

3   Harrison Decl. at 173.[28]  But, Oracle had to pay Papa John's implementation cost Oracle $852,000

4   because of 11i.  Ex. 114.  Ingersoll Rand was claiming publicly to have been "***live***" in December

5   2000.  Harrison Decl. at 173; Anthony Decl. at 44; *see also* Ex. 72.  However, Oracle had to pay

6   Ingersoll Rand $2 million, due to 11i defects.  Exs. 77, 114.  Zap Media was reported as "live" as of

7   December 13, 2000.  Anthony Decl. at 44.  But, Zap Media implementation cost Oracle $553,000

8   due to 11i defects.  Ex. 114.  New Zealand Dairy is claimed to have been a "***live***" customer as of

9   December 13, 2000.  Anthony Decl. Exs. 44- 46.  But on January 31, 2001, New Zealand Dairy was

10  reportedly "voicing loud concerns over the poor quality over [their] 11i implementation."  *See* Ex. 79

11  Chipotle Mexican Grill ("Chipotle") was publicly reported as "***live***" on December 15, 2000.  Ex. 80.

12  But, Chipotle had massive technical difficulties with 11i, and ordered Oracle not to reference them

13  as a customer "***until the reality meets the hype***."  Ex. 81.  In February 2001, UPS was reported as

14  starting to go "live" on 11i Order Management.  But even in June 2001, UPS' 11i "OM  [Order

15  Management] installation was at the point of ***meltdown***" due to 11i defects.  *See* Exs. 82-84; *see also*

16  Harrison Decl., Ex. 46.[29]  These facts, which cannot be disputed wholly undermine Oracle's motion

17  for summary judgment.[30]

18  _____

19  [28]    In March 2001, Papa John's was in "crisis mode" of getting 11i installed.  Exs. 75, 76

20  ("[Papa John's] feels as though they have paid for some of 'fixing bad software.'").

    [29]    Defendants claim Xerox as a "live" implementation customer at the same time that they said

21  that the economy was not having any negative impact on the company.  However, both statements
    were false.  On December 1, 2000, Xerox, due to 11i's instability sought recovery from Oracle of

22  $390k in consulting fees because of their costs debugging 11i Oracle software.  *Id.*  Apart from the
    lack of stability of 11i, Jeff Henley knew that Xerox had been substantially impacted by the slowing

23  economy, laid off thousands of employees in November 2000 and sought extended payment term
    because of it.  Ex. 197 ("Xerox is under heavy cost cutting pressure [extended payment terms] and

24  this will ease their economic burden in 2001 . . . ."); *see* Ex. 86 at 169718 ("At this time we have put
    in every available patch for CRM up to 10/17 (this is over 100 CRM patches in the last 2½  [sic]

25  weeks!) . . . Xerox is threatening to write a letter to Larry and will be asking for their money
    back.").  Exs. 86, 114.

26  [30]    The same analysis requires the exclusion and disregard of any argument or reference that

27  Oracle saved $1 billion by implementing Suite 11i.  Oracle had no objective evidence that the
    software saved money.  *See* Exs. 87-90.

28

The declaration of Greg Seiden ("Seiden") is equally unavailing.  Rather than demonstrate the absence of disputed facts, Seiden corroborates admissions of Ron Wohl ("Wohl") who testified to the lack of 11i integration and testing, resulting in gaps and poor quantity.  *See also* Ex. R at 217-219; *compare* Ex. 91, ¶4 ("[M]y team performed high-level quality assurance, or 'QA,' audits to test integration. . . .  *This . . . was not a substitute for the integration testing* . . . .").  Wohl, Seiden's boss, testified that "Quality Assurance" for 11i, Seiden's responsibility, failed too: "*our QA procedures didn't work*."  Ex. 17 at 203.  As to whether 11i worked in "every language," Seiden makes blanket assertions, unsupported by *any* factual evidence other than his word and never says that 11i actually "worked" in every language.  It did not.  *See* Exs. 67, 149, 152-153.  Finally, Seiden attempts to explain away clear evidence that even though on December 14, 2000 and prior, Oracle said Suite 11i was "pre-integrated and fully interoperable out of the box," in truth it was not until the third version of 11i in January 2001 that the Company issued their "*first integrated ERP/CRM release*" of 11i.  *See* Exs. 91 at 5; 92.  The Fletcher Declaration does not help either.  He agrees that so called "business flow audits" "did not serve as a substitute for *extensive integration testing*."  Fletcher Decl. at 4.  Further, Fletcher contradicts evidence that "regression testing" was not done.  *See* Exs. 148-149 (patches being released without being tested in 2001). Fletcher further concedes that after the Class Period, the Company had to buy a "third party program from Mercury Interactive to do regression testing.  *Id.*  Fletcher merely highlights facts that are clearly in dispute *i.e.*, the meaning of tars and bugs.  *See* Exs. 74, 101, 148, 185.  Defendants' declarations are factually weak and ignore documentary evidence that contradict them.

### F. Suite 11i Did Not "Work" as Represented, Did Not Save Customers Money Fast and Had Proven Difficult and Costly to Implement

During the Class Period, Oracle had *not* "delivered" 11i and it was not easy to implement nor saving money in a slowing economy. [31]  Customers attempting to implement 11i demanded

---

[31]  One is left puzzled as to how Oracle could have properly recognized revenue on 11i software licenses in 1Q01-3Q01 under SOP 97-2, which requires evidence of 1) arrangement; 2) delivery; 3) fixed and determinable fee; and 4) collectability is reasonably assured.  All must be satisfied to before revenue on a software license is properly recognized.  *AICPA Statement of Position* 97-2.

1  millions of dollars of concessions from Oracle citing defects and lack of functionality in Suite 11i.

2  Others lodged complaints ranging from poor quality, lack of testing, instability, to too many bugs.

3  Liberty Mutual Group, wrote directly to Ellison detailing "basic functionality" flaws with Suite 11i.

4  Ex. 94 ("To put it bluntly, we have encountered multiple software quality problems . . . .  [T]he

5  bottom line is that we have a product that ***does not work*** . . . ."); *see also* Exs. 95-96.  On December

6  16, 2000, Pepsi Co. wrote Ellison: "***Our Oracle [11i] project has been an unmitigated***

7  ***disaster*** . . . ."  Ex. 99.  Appstech.com wrote to Ellison about a failing implementation of Suite 11i

8  ("[W]e ordered R11i Financials for our internal use. . . . ***We have never been able to implement it***

9  ***and have decided to return it. . . .  We have [also] lost close to $200K so far on our implementation***

10  ***of 11i for Brock Tool***."); *id.*; *see also* Ex. 100 at 035263-64.  Paxar refused to pay nearly $2 million

11  in fees and threatened legal action "after hundreds of patches and a significant number of severity 1

12  bugs."  Ex. 100 at 039327; *see also* Ex. 75.  News America Marketing purchased 11i in 1Q01.  In

13  January 2001, Oracle sales staff summarized their experience as follows:  The "[m]ajor issue is that

14  CRM and Order Management are ***not integrated as we told them. . . .*** "***Customer is really upset***

15  ***about the lack of integration*** . . . ").  Ex. 101.

16  TMP Worldwide wrote to Oracle in January 2001 that "Oracle's software is still not ready for

17  production. . . .  TMP spent $1,780,000 on the financials software and another $719,520 for the HR

18  system, which is also unusable at this time."  Ex. 102.  On January 25, 2001, Chipotle had "major

19  performance problems with 11i as well as . . . feature/function gaps."  Ex. 104.  These problems put

20  a large deal with McDonald's at risk.  Ex. 81 at 014105.  On March 22, 2001, Chipotle removed

21  itself from the reference program: "***We have decided to suspend any participation in Oracle PR***

22  ***initiatives . . . .  The hype doesn't meet reality. . . .***"  Ex. 103.  Before the Class Period, Block told

23  Sanderson that Suite 11i quality problems would "***significantly***" impact sales and consulting

24  revenues, and had already cost his support division millions in free consulting.  Exs. 66, 106-108.

25  BellSouth, another 11i customer, cost Oracle millions in free consulting.  In January, 2001, Bill

26  Baghsaw forwarded Wohl an e-mail describing "6000" 11i CRM patches at BellSouth ("[T]hey do

27  not see how any one could survive without automating this process, . . . in light of how 'broken' 11i

28  is.").  Exs. 109; 97; 22; Q.  Though Ellison had bragged of 11i's implementation at GE, in January

1  and February 2001, GE experienced 11i problems as well.  Ex. 110 at 052637.  On March 8, 2001,

2  Gary Reiner of GE wrote Ellison again directly, "We are still having very significant problems with

3  the 11i roll out of Indirect Procurement. . . .  They have caused us to halt continuation of the roll out

4  until they are fixed."  Ex. 111.  (On January 25, 2001, Sanderson was informed of another failing

5  implementation at Hudson Bay ("We have a product quality problem at Hudson's Bay . . . [T]he

6  customer is threatening to: pull out SSE due to product instability and look to Oracle to recover

7  product and implementation costs.").  Ex. 112.  Even after the Class Period, Barrenechea wrote:

8  "From 11i.1 to 11i.3 CRM – [t]oo many patches, [i]mplementations too costly, [i]ncomplete, thus

9  complex."  Ex. 113.

10      By April 2001, Suite 11i product defects had resulted in a two-point deterioration of FY01

11  margin percentage and *$21 million* in unbilled consulting revenue.  Ex. 114; *see also* Ex. K at 187:8-

12  10.  In May 2001, Dave Natelson described 11i implementations at the City of San Diego, "[t]he

13  customer upgraded from 11.0 to 11i when 11i shipped and we have been fighting 11i fires all year."

14  Ex. 115.  With respect to the business overall, Natelson wrote, "*failed [11i] implementations are*

15  *putting us out of business*".  *Id*.  Dick Sellers, Group VP of the Company's support organization in

16  2001 outlined some of customer credits to be issued to 11i customers due to technical problems.

17  Some of those customers had been reported as "*live*."  For example, Oracle had to give Beckman

18  Coulter *$1 million* in credits due to 11i.  Ex. 116.  The others include GE Aircraft Engines and

19  American Trans Air.  Ex. 116; Anthony Decl. at 44.  Indeed, rather than being a technical and

20  marketplace success, Suite 11i cost Oracle and its customers millions.  Ellison agreed ("Our top

21  priority is to get Oracle users . . . delighted with the quality and functionality [of] our [11i] CRM

22  products.  Until that happens, I doubt we will achieve success in the market.").  Ex. 117.[32]  A post-

23  mortem of 3Q01 by SVP Nugent to Oracle's managers described issues with 11i ("*Our products*

24  . . . .  *Bad News.  11i quality issues, lack of references/demo issues*.").  Ex. 171; *see also* Ex. 120.

25

26  [32]    On March 26, 2001, Mark Jarvis wrote Catz, Barrenechea and Wohl, "We are being hit on all
   sides by the press on 11i quality – the bugs in the software (generally quoted as more than *5000*
27  *bugs*) have started a flurry of press articles about how IBM's approach of integration is better than
   our approach of soup to nuts."  Ex. 118.

28

1   In July 2001, Mark Jarvis, the Company's head of marketing wrote: "*[U]nless we make our revenue*
2   *numbers in Q1[02], executives stop leaving and we get 11i customers that actually save money . . .*
3   *, no journalist is going to   care. . . .   We are going through a rough patch because 11i did not*
4   *work . . . .*"  Ex. 119.[33]

5     In December 2001, Chuck Phillips of Morgan Stanley, one of the Company's biggest analyst
6   supporters wrote Henley, Wohl and Mark Barrenechea ("Barrenechea'") about 11i stating "two of
7   the most influential analysts at key firms are decidedly negative on the quality of the apps suite [11i]
8   and . . . I can see why." Ex. 195.  Phillips was specifically citing to a customer using 11i "fairly out
9   of the box" with more than 100 severity 1 tars causing "manual workarounds, financial adjustments
10   and general pain."  *Id.*  According to Charles Kendig, VP of Quality and Customer Satisfaction,
11   Suite 11i created a "Big Quality Black Eye for Oracle."  Ex. 121.

12     **G.   Suite 11i Lack of Integration and Poor Quality Caused Demonstration**
       **Failures and Lost Sales**
13
14     Due to 11i's defects impacting quality, integration and stability, the Company could not even
15   demonstrate a working and fully integrated Suite 11i.  In December 2000, Oracle told investors it
16   had fixed demos ("we got those all ready now").  Ex. 26.[34]  However, failure to demonstrate an
17   integrated suite of 11i resulted in lost deals to large customers: "We cannot show what the customer
18   wants to see when it comes to the  combination of CRM and ERP; Not only have we lost deals in
19   which we were the new player, many deals have been lost with installed base customers." Ex. 12;
20   *see also* Exs. 123-125.  Sales consultants were "*essentially doing integration work in the field*."
21   Ex. U at 81:1-6; *see also* Ex. 124 ("lack of integration between IP and Purchasing was inconvenient
22   since we could not show the entire flow without using fake data").  In February 2001, the Company
23   "still could not  [p]rove our EBusiness Suite Integration Story" in demonstrations.  Ex. 127 at

24   [33]    Yourdon did not offer an opinion on whether any Suite 11i customer actually saved any
25   money months after implementing Suite 11i. Ex. 135 ("I don't recall offering my own opinion about
   the savings in months."). Ex. 202, ¶¶12, 143.

26   [34]    Securities analysts had reported on December 15, 2000 after 2Q01 financial results, that
27   "functional product demos . . . on the eBusiness Suite should propel growth in the applications
   division going forward."  Ex. 129 at 308932; *see also* Ex. 26 at 234436.

28

617970-74; *see also* Ex. 380 ("*[we] cannot show a complete integrated CRM demo let alone a complete EBiz Suite (CRM/ERP) integrated demo*").   Throughout the Class Period, Oracle continued to lose sales due to failing Suite 11i in demonstrations.  *See* Ex. 131 ("[a]nother deal lost primarily to demo system performance").   On January 30, 2001, Barrenechea wrote Ellison and Wohl, "we have blown apps world Paris for 11i CRM html demos.")  Ex. 199.  Henley understood that if 11i application demonstrations "[did] not improve, it [would] *continue to impact our [sales] conversion rate*."  Ex. 133; *see also* Ex. H at 400:1-3.  Roberts confirmed that "*if you can't give a good demo, then you are not going to win as much business*."   Ex. V at 301:17-23, 176:1-5.  In April 2001, Oracle still had not fixed "integration gaps between ERP and CRM."   Ex. 134 at 061370; Exs. 128, 136-137; *see also* Ex. H at 400-402; Ex. 138 ("*[W]e have halted the demonstration of Schneider's . . . problems with the functionality of the software, integration between OM and OPM . . . .*"); *see also* Ex. 7 at 0616523.  These facts created a genuine issue of material fact concerning the accuracy of defendants' statements regarding 11i's functionality, ease of implementation and integration and interoperability.

**H.   Suite 11i Was Not Integrated and Interoperable Out of the Box, Nor Was It Designed and Engineered to Be and Was Not Tested**

Defendants claimed that because Suite 11i was pre-integrated and interoperable out of the box, no systems integration would be required.  Ex. 12.  Oracle's Area VP DeCesare testified that Suite 11i did *not work out of the box* in part because it was not engineered to work together.  Ex. N ("*It does not operate as integrated out of the box.  That's – that's false*.") ("*Ron Wohl still ran ERP.  Mark Barrenechea ran CRM.  They didn't communicate very effectively.  There is noting more – more integrated or coordinated about 11i than there was about the previous releases*."); *id.* at 234:17-253:3, 236:17-237:13, 239:7-10, 252:12-14.   Suite 11i modules, built by separate organizations, were never fully tested against one another (a critical component of engineering) to determine whether the suite modules actually functioned in an integrated fashion.  Ex. 40 at 295346.  Three months after release of 11i, in August 2000, Sergio Giacolletto ("Giacoletto"), in reaction to internal cheerleading about "*live*" customers, demanded to know from Wohl "*precisely* which modules are running in each customer.  *We have a hard time to believe they have ERP and CRM*

1   *running together*." Ex. 139 (emphasis in original).  Wohl confirmed that none were.  *Id.*  Oracle did

2   not fully test for integration and certainly not whether it could do so "***out of the box***" as represented.

3   Wohl connected integration defects to lack of testing and separate engineering groups, especially the

4   integration points at the boundary between the ERP and CRM modules.  Ex. R at 106:14-21 ("In

5   terms of the interaction between the groups, clearly in retrospect as well, just as there should have

6   been more testing of the ERP product stand-alone, there should have been more testing of the CRM

7   product stand-alone, there should have been more testing of the boundary points between ERP and

8   CRM, and there should have been better – there should have been better coordination of

9   processes.").  The admitted lack of testing evident here resulted in the software not being "fully

10  integrated" or "fully interoperable" out of the box.  Ex. S . at 57 ("The overall process of software

11  engineering [includes] design/architecture, coding . . . creation of database tables, testing . . .

12  deployment and so forth.").[35]  According to Yourdon, integration bugs, bugs "associated with the

13  interface between components of a system," are found by doing integration testing.  Ex. S at 212;[36]

14  *see also* Ex. Y (Godwin's corroboration that no individual or group was responsible for the critical

15  ERP/CRM integration.).  Wohl also admits that "he knew little about CRM" at the time Suite 11i

16  was released: ("***I had very limited information about the testing completeness of CRM.***").  Ex. 145;

17  Ex. R at 79:24-82:23.  Barrenechea offered less.  Order Management, the key module necessary for

18  Suite 11i CRM and ERP to work in an integrated fashion (Exs. 17, 67) was not fully tested either.

19  Ex. 17 at 192 ("***We had just finished a complete rewrite of our order management system*** . . . .  ***But***

20  ***it hadn't been tested yet so*** . . . .").[37]  11i Order Management "hadn't been used anywhere it had just

21

---

22  [35]     P1 severity bugs, *i.e.*, showstopper bugs, also delayed many "go lives" for 11i NT operating

23  system customers, and Oracle was dropped by customers who were seeking damages.  Exs. 140-141
    ("Customers using these products should not go live with 11i until a fix is available.").  On February

24  6, 2001, Wohl warned Ellison about quality complaints re: 11i for NT systems "we will get at the
    Apps World . . . some customers may ask us why we didn't withdraw the product from the market

25  once we became aware of the problems."  Ex. 143.

26  [36]     As alleged, Oracle developers told consultants "do not install" patches that could destabilize
    demonstration systems.  Ex. 144; Ex. W at 243:10.

27  [37]     In a January 18, 2002 interview with Matthew Symonds, author of *Softwar an Intimate*

28  *Portrait of Larry Ellison and Oracle*, Ellison is quoted as follows regarding Order Management, "Oh

---

1   been finished, *the paint was drying*." Ex. 146 at 1529167.  Order Management bugs and defects

2   were pervasive in their impact on 11i's functionality.  *See generally* Ex. 201.  As late as July 2001,

3   Oracle was still shipping Suite 11i and patches *without integration testing*.  Exs. 147-148.  Don

4   Klaiss warned of the problem: We do not have a system "where complete integrated systems testing

5   for the whole ERP and CRM suite can take place . . . that can prove that all of the integrated flows,"

6   wrote about the Company's inability to test integration.  Ex. 147 at 056441 ("***Today's situation is***

7   ***that we cannot test integrated business flows prior to customer shipment.  We are releasing new***

8   ***ERP & CRM Family Packs regularly but do not test them against each other – clearly a bad***

9   ***situation***."); Ex. 148.[38]

10      Two years after the release of 11i, in 2002, Oracle engineers concluded that 11i's integration

11  and technical gaps were "so fundamental that it exposes [Oracle's] development environment as

12  'best of breed' rather than one of a unified software vendor."  Ex. 149 at 069913.  The report noted

13  that fixing "Integration issues" between ERP and CRM was critical for Oracle to "overcome the lack

14  of integration between the E-Business Suite Modules (ERP/CRM)."  Ex. 149 (***The capabilities to***

15  ***perform an integrated planning in the E-Business Suite is broken.***), ("***The integration between***

16  ***HRMS / Payroll and CRM is not complete***.")   Indeed, in 2002 CRM and ERP still lacked a

17  common User Interface in design and functionality ("Within the different teams (CRM/ERP) the

18  development is drifting in different directions.  This is the case due to the underlying technology

19  differences but also due to different approaches in the UI design."  *Id.*  Ellison admits that "[N]ot all

20  the pieces [of Oracle 11i] worked together as well as they could have. . . .  using that plug [and play]

21

22

---

23  I knew there was a huge risk up front . . . .  I can't plead ignorance on this . . . . "  Ex. 146 at
24  1529168.

25  [38]    Defendants also suggest without any authority that plaintiffs must show that 11i had more
    defects than one would expect from a "typical" application suite or competing products. Defs' Mem.
26  at 38.  They never address the fact that Oracle excluded 11i from "competing" products, never
    identify what is "typical application suite" nor do they address the fact whether it was bugs, gaps,
27  lack of integration, lack of completeness, or failure to perform in every language, each of these
    factors which were known to defendants, and materially impacted sales.

28

analogy, you know, there would be the receptacle but no prong in one of the plugs, just – it was a pretty new product. You know, the plug wasn't complete." Ex. J at 534:4-9, 535:14-21.

ValueVision, previously reported as "***live***," summed up lack of testing, inability of CRM and ERP to function in an integrated fashion, 11i defects and lack of interoperability:

> [W]e have been struggling and continue to struggle is with ***the stability of the CRM and ERP applications, the level of integration between CRM and ERP***. Since June of last year, we have applied no fewer than ***2,000 patches to the system and the pace continues unabated. We have documented our costs for patching alone at nearly $1.3 million***.
>
> ***It appears evident that there has been a gross lack of coordination between the CRM and ERP development organizations. We have identified significant gaps in the integration of the applications throughout our project again delaying our progress***.
>
> • ***We estimate the financial impact to ValueVision to be $5 million***. . . . Ex. 74.

Finally, Yourdon admittedly never analyzed whether the suite was integrated in terms of user "interface integration" or "functional integration," two of the four forms of integration he identified as necessary for full integration. *See* Ex. 202 at 36 n.38; *see* Ex. S at 236:17-22, 238:5-7 ("I have not evaluated the functional integration characteristics or capabilities of Suite 11i or the user interface capabilities."); *see also* Ex. 150 at 7-8.

### I.     Suite 11i Did Not Work in Every Language as Represented

Oracle said Suite 11i "worked" in "every country and every language." Ex. 37, Exs. 46, 151, 156 at 03285. Suite 11i did ***not work*** in every language, and it hurt sales. At the end of 2Q01, sales staff in Europe, Middle East, and Africa were unwilling or unable to sell Suite 11i effectively because of product defects and incomplete language translations ("***[W]e are loosing [sic] a bit of momentum; sales people are reluctant to engage to the product problems, lack of references and local language issues. . . . Hopefully the situation will turn in January once we get 11.5.3 running in local language.***"). Ex. 152. A January 21, 2001 e-mail from Giacolletto to Ellison stressed the need to get the language issues in Suite 11i to work in order to "grow revenue" ("NLS will not be fully translated including help until May 2001 for the first languages and August 2001 for the last language"). Ex. 153. It is no surprise that on March 15, 2001, the Company reported that EMEA had exceptionally weak 11i application results. Ex. 203. Even later, 11i still had not been translated

1    into ("***R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will***

2    ***only get it between July and October 2001***."). Ex. 154 at 162215-16. [39] Wohl admittedly did not

3    translate every module into every language. Ex. R at 220:13-15. As demonstrated by an Oracle

4    2002 High Level Technical Requirements Document, Suite 11i was not built with the architectural

5    capability to work in ***every*** language. Exs. 155-156. "[L]ack of multibyte support across the various

6    front office systems is going to be a significant impediment to our success in China, Taiwan, Korea

7    and Japan." Ex. 149 at 069921, 069930. The document further noted, "***[t]he lack of functionality***

8    ***within projects, for example, severely impacts the ability to successfully deploy a global solution***

9    ***involving projects spanning multiple countries with multiple languages***." *Id*. at 069938. Ellison

10   admits that Suite 11i did not in fact work in every language: "***I suppose, to make it very precise, it***

11   ***should say every major country. . . . [Y]ou can take exception that it was general rather than –***

12   ***general and imprecise, and it didn't work*** . . . ." Ex. J at 131:9-21.

13       **J.    Oracle's Internal 11i Implementation Was Costly Due to Defects and
               Lack of Functionality and Contributed to 3Q01 Revenue Shortfall**

14       Defendants' claim that Oracle itself "upgraded to significant portions of the Suite [11i]"

15   cannot support their motion. Defs' Mem. at 37. Oracle fails to acknowledge the Suite 11i upgrade –

16   including 11i's OM caused the Company to experience much of the same technical difficulties

17   experienced by its customers. Barrenechea stated "What happened was one of the most dramatic

18   moments I'd seen during my five years at Oracle everyone knew that we could not place an order

19   with the new system. . . . So we upgraded [to 11i], and Oracle went down. We were down for

20   fourteen days. It was frightening. . . . At that point I became acutely aware of the customer

21   dissatisfaction . . . ." Exs. 17 at 196; 157-158. In November 2000, Barrenechea wrote an e-mail

22   discussing 11i and the upgrade received by Ellison and Henley stating "11.5.2 upgrade CD has been

23   broken until this week. Yup, the 11.5.2 CD does not work out of the box for upgrades."

24   Barrenechea communicated further about 11i: "***The bug counts are at an 11 week high . . . 18 OM,***

25

26

27   [39]     SVP Godwin conceded that Oracle did not deliver translated applications with the release
         that would allow the software to work in multiple or every language. Ex. Y at 136-38.

28

*P1's, and 4 OP2's . . . no real performance testing*." Ex. 85.  Oracle's January 2001 upgrade to Suite 11i left Oracle's financial staff unable to properly track sales of support renewals in the new 11i software.  Ex. 160.  By January 24, 2001, the problems with the internal upgrade impacted forecasting for multiple reporting lines.  Sharon Prosser wrote in an e-mail sent to Wohl "we are starting to feel the impact across all areas of our business (GB, Majors, OPI, OSI) on the forecast because of the reporting limitations with R11i Order Management."  Ex. 161.  The lack of functionality caused the Company to lose millions in revenues in 3Q01.  *See, e.g.*, Exs. 164-166.  On February 15, 2001 Minton wrote Barrenechea the following:

> Mark –The support organization missed their Dec and Jan revenue forecast by $20 million dollars, and are seriously at risk of missing additional support revenue in the month of February if we do not get immediate visibility to the status of support contracts up for renewal.  We cannot afford to miss our revenue forecast this quarter. . . . Ex. 165 at 101417-18.

On February 19, 2001, Henley, in response to a Minton e-mail on the issue, wrote: "seems like a disaster based on the large drop in support revenue growth for Q3[01] . . . We'll need an extraordinary effort until we get caught up – I doubt we can catch up in time for Q3 . . . ." Ex. 166.  According to the SLC, "***Oracle's business may have been affected by the internal implementation of Suite 11i. . . .  First, it is possible that the implementation of the OKS module of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001***. . . ." Ex. 40 at 295356.  Knowing these facts, on February 20 and 21, 2001, defendants specifically reiterated the Company's revenue and earnings forecast including 75% applications growth failing to disclose that the internal implementation was likely causing a substantial revenue decline.  Exs. 162-163.  Oracle's CRM Technical Whitepaper had bragged about Suite 11i's CRM completeness and capability of managing their global forecast "***including all licenses, product renewals, support contracts***." Ex. 155 at 106694; *see also* Ex. 167.

### K.     Defendants' Public Guidance Had No Reasonable Basis – Known Undisclosed Facts Seriously Undermined Its Accuracy

A projection is actionable "'if (1) [it] is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine [its] accuracy.'" *Provenz*, 102 F.3d at 1487; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001).

### 1.    There Was Never a Reasonable Basis for Oracle's Guidance

On December 14, 2000, Oracle issued 3Q01 guidance: 25% revenue growth, 15%-20% database growth, 75% applications growth and 12¢ earnings per share ("EPS").  Ex. 206.  Oracle reiterated this guidance throughout 3Q01.  Exs. 207 at Exs. C-D; 208 at 091536; 209 at 091532; 210 at 141677; 211, 212-217; V at 229:16-230:3, 341:20-343:6; 218.[40]  These were aggressive forecasts; growth rates were defined year-over-year, and Oracle's 3Q00 results were extraordinary.  Ex. 223.  Defendants knew that Oracle's forecast had been rendered inaccurate by numerous internal and external changes, and that the internal metrics that they relied on disclosed that Oracle would likely miss guidance.[41]

Oracle's guidance was based on its Potential Forecast ("Potential"), which Minton calculated by adding "[u]pside" to the field forecast to account for "sandbagg[ing]."  *See* Ex. 225 at §II.A.; Ex. FFF at 101:8-18; EEE at 104:15-105:11, 123:14-125:4, 126:7-15; Defs' Mem. at 7.  Minton's upside (and Potential) was based almost entirely on a simple extrapolation – she applied the prior year's historical conversion ratio to the current year's quarterly pipeline.  Exs. 17 at 226; J at 384:16-385:7; 17 at 211; Goedde Decl., ¶¶3-5 (Ellison: "'Our sales-forecasting system tells us how many deals are in the pipeline and multiplies their value by a historic close rate.'"); Ex. 226 (***Minton***: "***to determine what the true forecast was [Jeff and I applied] historical conversion rates to the pipeline***").  Plaintiffs' expert, Dr. Alan Goedde, confirms that the Potential was a year-over-year extrapolation.  Goedde Decl., ¶¶3-5 & Exs. 1-3 (showing a 97% correlation between the Potential

---

[40]    Defendants deny falsely that Henley reiterated guidance on February 20, 2001 at 14:125.  Defs' Mem. at 25 n.12.  *But see* Exs. 212-214; 216; 219 at 14, ¶125; H at 239:5-259:20; 220; 221-223.

[41]    Defendants rely almost exclusively on the Potential Forecast to argue that Oracle's projections were not false or misleading.  Defs' Mem. at 23-25.  They cite Judge Strine's opinion and argue that that Potential was purportedly the "best predictor" of Oracle's actual results.  Defs' Mem. at 7 (quoting *In re Oracle Derivative Litig.*, 867 A.2d 904, 949 (Del. Ch. Ct. 2004)).  Defendants even disingenuously claim that "the record on Oracle's 3Q01 guidance has not changed."  Defs' Mem. at 2.  Unlike the Delaware plaintiffs, plaintiffs here establish that the Potential was rendered inaccurate by changes in 3Q01.  Defendants have admitted that such changes rendered Oracle's Potential (and guidance) inaccurate, disclosing any possibility that it can be the basis for summary judgment.  Exs. 224 at 609541; 17 at 226; J at 384:6-385:7.

1   and a forecast based on a mechanical application of the historical conversion ratio with 94% of any

2   variation in the Potential explained by similar variations in the mechanical conversion ratio forecast).

3   Still, defendants deny that Minton based the Potential on the conversion analysis (according

4   to them, it was merely a reasonableness "check").  Exs. G at 77:20-79:19, 121:6-125:9, 126:5-128:7;

5   227 at 81; 228 at §IV.D.d.; Defs' Mem. at 7; PP at 76:23-77:25, 78:1-85:7, 85:20-86:1, 110:14-

6   114:15.  The reason for defendants' retreat is clear.  Defendants knew that the extrapolated Potential

7   (and guidance) was inaccurate because of major changes facing Oracle in 3Q01.[42]  Ex. 17 at 226

8   ("Our forecasting does statistical extrapolations based on historic trends.  If something that's outside

9   our mathematical model of the business changes . . . our forecasting becomes inaccurate."); Ex. J at

10   384:6-385:7 (a major economic change means "you can't extrapolate anymore"); *see also* Exs. G at

11   86:10-16; PP at 95:10-96:5.[43]  In particular, defendants knew that: (1) a major economic change was

12   affecting Oracle; (2) the pipeline contained a higher percentage of applications (with lower

13   conversion rates and product problems); and (3) Ellison had changed the forecast process in 2Q01 by

14   directing the field to add risk.  Exs. EEE at 122:1-24; 17 at 211, 226; J at 384:6-385:7; 224; Ex. 207

15   at Ex. B; 229 at 2-65 & Exs. 6-7; 230 at 4-8; 231; Goedde Decl., ¶¶6-10.

16         **a.**      **The Major Economic Change Facing Oracle Rendered**
                        **Its 3Q01 Forecast Inaccurate**

17   Ellison knew that a major economic change would render Oracle's forecast inaccurate.  Exs.

18   17 at 226; J at 384:6-385:7.  Oracle was facing just that when defendants issued guidance.  Exs. 229

19   at 2-65 & Exs. 6-7; 230 at 4-8.  In 3Q00, Oracle took advantage of frenzied technology spending and

20   new dot.com customers, increasing its sales to unprecedented levels and exceeding its 3Q00 forecast

21   substantially.  Exs. 17 at 185; 230 at 4-8 & Ex. 5; 232; 233 at 0122080; 234 at 1914019; EEE at

22

23

24

---

25   [42]   Minton testified that she extrapolated without adjusting for these changes.  Exs. J at 19:17-19; EEE at 135:7-136:12.

26   [43]   *See also* Exs. 224 at 609541 ("Minton explained that prior to Q3 of FY 2001, Oracle thought

27   that it could model out its business, but with the current economic downturn, no analytical models can predict one quarter to the next."); FFF at 123:18-126:19.

28

85:16-17; 229 at 2-65 & Exs. 6-7; SS at 163:2-8; V at 313:15-315:13; 235.[44]  A year later, by 3Q01, however, the NASDAQ had collapsed, the dot.com bubble had burst, and technology spending was down considerably.  Ex. 230 at 4-8 & Ex. 6; Exs. 237 at 1053564; 238 at 2-3; 229 at 2-65; 239 at 13; 240; 241 at 350302; V at 315:6-13; 235.  Minton noted in early January 2001 that "the general macroeconomic environment was suffering" and Henley noted on January 4, 2001 (the day he sold shares for $32.3 million) that "*all data* since the [December 14 earnings] call *point to more economic softening* so there is risk of slippage in deals."  Exs. FFF at 223:14-18; 242; 243.  Sanderson identified the "dot.com falloff" as a "*major macroeconomic event*" that was likely discussed at EMC meetings.  Ex. KK at 88:5-17.  Indeed, Oracle has claimed that there was a recession by December 2000.[45]  Ex. 251 at 120:2-123:3.

Defendants knew that Oracle was converting fewer opportunities into sales in FY01 than it had in FY00.  Ex. 228 at 27.  The conversion ratio had declined year-over-year in 1Q01 and 2Q01 by 11% and 8%, respectively.  *Id*.  This was amplified in 3Q01 by the application of these ratios to a pipeline near $3 billion – a 10% decline meant a loss of $300 million in revenue.  Ex. 230 at Ex. 10.  Ellison also testified that in a downturn, companies require more approvals, resulting in slowed or cancelled deals and making pipeline hard to convert.  Ex. H at 245:18-247:4.  Defendants also knew that Oracle's dot.com business was projecting to lose $70 million in revenue, year-over-year.  Ex. 230 at 5.  Ellison testified: "you're absolutely right that our dot-com business was certainly off by [3Q01]" and this "put a lot of pressure on [Oracle's] database" for 3Q01 because Oracle had a "very, very high hurdle.  So for the business to grow, it meant that we had to overcome the fact that a

---

[44]   Oracle's stellar 3Q00 led to difficult growth comparisons for 3Q01, unlike 1Q01 and 2Q01.  Exs. 236; SS at 176:10-179:10.  This undermines defendants' reliance on Oracle's performance in those quarters to argue that their 3Q01 forecast was reasonable.  Defs' Mem. at 24.

[45]   Cisco and Sun, the competitors that defendants tracked as proxies for Oracle's business, were also faltering in 3Q01 and lowered earnings expectations as a result of the economy.  Exs. 244 (Henley: "Cisco and Sun have said they are seeing [a slowdown] so I don't know why we wouldn't too."); 245; 17 at 157 FN; 246 at 156724; 247; 237 at 1053564; 248.  In 3Q01, defendants spoke with executives at both companies regarding the health of their businesses.  Ex. 249 at 609422-23.  Sun pre-announced on January 19 (the day that Ellison first instructed his financial advisor to sell 40 million shares of Oracle stock) and Cisco pre-announced even earlier.  Exs. 237 at 1053564; 248; 247; GG at 69:1-70:3; LL at 59:15-60:6; 250 at 300606.

1   lot of our dot-com companies – customer, our ex-customers, were gone." Exs. GG at 178:9-179:1;

2   HH at 255:21-256:21, 385:10-22.  This was the exact sort of change that Ellison testified would

3   render Oracle's forecast inaccurate. Exs. 17 at 226; J at 384:6-385:7.  Defendants knew that Oracle

4   was facing a major economic change and could not expect to convert as much of its pipeline in 3Q01

5   as it had in the boom economy of 3Q00. Exs. 17 at 226, 287; J at 384:5-385:7; 224; 237 at 1053564;

6   FFF at 223:14-18; 242; I at 26:13-27:21,179:5-20; EE at 18:1-25:10, 35:4-14, 94:17-95:5, 108:25-

7   109:8; TT at 92:15-95:11, 102:1-104:24; QQ at 57:3-61:8.  Defendants also knew that Oracle's

8   guidance was based on a forecast that predicted just that. Goedde Decl., ¶¶3-5 & Exs. 1-3; Exs. 226

9   at 132079-80; 17 at 211, 226; J at 384:6-385:7; 224.[46]

10          **b.     The Change in Product Mix and 11i Defects Rendered
                     Oracle's 3Q01 Forecast Inaccurate**

11

12          When Oracle issued 3Q01 guidance, the percentage of applications in its pipeline had jumped

13   13% from 3Q00 (from 29% to 42%).[47]  Ex. 229 at 85-86 & Ex. 6.  Defendants knew that

14   applications had a much lower conversion ratio (38.7%) than technology (63.3%). *Id.* at 85-86 &

15   Ex. 7; Ex. 252 at 609246.  Ellison admitted that Oracle's sales force "was not very good at selling

16   applications." Exs. 17 at 114 FN, 173; 252 at 609246.[48]  Given these facts, defendants knew that

17   ───────────────

18   [46]    Defendants' argument that a repeat of the 3Q00 conversion ratio would have resulted in
         revenues exceeding Oracle's guidance is unavailing. Defs' Mem. at 8-9.  First, this was not the case

19   throughout 3Q01. Goedde Decl., Ex. 2.  During parts of 3Q01, Oracle was actually forecasting to
         convert a higher percentage of deals than it had in the boom economy of 3Q00.  *Id.*  Defendants also

20   knew that using historical conversion rates to predict revenue was unreasonable in times of major
         change. Ex. 17 at 226.

21   [47]    Its forecast also included more applications: 31.5% of the 3Q01 forecast compared to 18.6%

22   of 3Q00 license revenues.  Ex. 229 at 85 & Ex. 7.

23   [48]    Oracle's database was easier to sell because Oracle had few competitors and could secure
         approval at the technology staff and CIO level, whereas Oracle's "relatively new" applications

24   business competed head-to-head with the industry leaders and required approval by the CEO and
         CFO (increasing the likelihood that a deal would not close on time). Exs. 358 at 609246; 17.  And to

25   make matters worse, in 3Q01, "[t]he Oracle sales force wasn't used to dealing with senior
         management, nor did it have the expertise about . . . what functionality was likely to be most

26   important to [Oracle's applications customers]." Ex. 17 at 115. Also, companies consulted with Big
         Five firms to decide which brand of applications to purchase.  Oracle built its own consulting

27   organization that competed directly with these Big Five firms and could not hope to get much
         needed references for applications.  *Id.* at 116.

28

Oracle's pipeline would not convert at historic rates. Minton's application of the 3Q00 conversion ratio to the heavily applications-weighted 3Q01 pipeline rendered the Potential inaccurate. Exs. 226; Goedde Decl., ¶¶3-5 & Exs. 1-3; 229 at 85-87; J at 19:17-19. Also, Oracle's applications products themselves had changed, further rendering extrapolation inaccurate. Ex. J at 101:7. As discussed in §III.F.-J., 11i was beset by defects, which affected Oracle's ability to sell both 11i and database. *See* Exs. 253-255; Ex. J at 171:24-177:10; 17 at 189, 192, 194-196, 202-203, 424; Q at 68:7-74:13; J at 640:12-21; 256 at 039325. Due to these problems, Oracle had virtually no 11i references by November 2000 and only nine 11i CRM references by June 2001. Exs. 257 at 153367; 258. This impeded Oracle's ability to convert its applications pipeline because, as Ellison put it, "[t]he first year of selling [11i] was the hardest year. It's difficult to sell without customer references." Exs. 17 at 239, 249; J at 251:1-16; V at 105:6-17, 237:13-238:1, 353:18-354:15; 259 at 179355.[49]

### c. Ellison's Directive to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate

In 2Q01, Ellison directed the Field to add more risk (and amount) to its forecast and, as a result, defendants knew that Minton's $160 million 3Q01 upside adjustment was no longer necessary. Exs. 230 at Ex. 11; 231. Ellison's directive, designed to eliminate sandbagging, rendered that upside (historically applied to eliminate the same problem) obsolete. Exs. 231; FFF at 101:8-18, 123:14-125:4. Also, in 2Q01, for the first time, field finance directors reported directly to Minton (instead of the EVPs). Exs. 265; FF at 139:20-141:24. Minton quickly told these new direct reports to implement Ellison's directive. According to Minton's October 2000 e-mail, "Larry [Ellison] made it clear that he wants everyone to submit realistic forecasts – he is not interested in 'commit' numbers." Exs. 266 at 151961-62; FFF at 105:10-21.[50] Numerous executives, including Sanderson

---

[49]     Defendants also knew that Oracle could not demonstrate 11i and that the Field was reluctant to sell CRM due to instability. Exs. J at 68:7-74:13; 260, 261; J at 105:7-8; V at 76:19-78:9, 79:14-80:8, 80:24-81:7, 91:5-8, 175:19-176:5, 300:11-23, 328:19-329:18, 298:12-22; 262; 263; 264.

[50]     Although defendants claim that Oracle's process was "bottoms-up," Oracle's budgeting process (30% license growth target for FY01) played a role in the setting of targets at the field level. Defs' Mem. at 6; Exs. 227 at 79-80; 228 at 13; G at 81:9-23; PP at 96:13-15; 267; 268; QQ at 27:18-28:6, 33:5-36:2. In fact, Ellison increased the U.S. budget targets by 25%-30% through a "replan" only weeks before 3Q01. Exs. 269; 270. The directive, which instructed the Field to include deals

1   (OPI) and Nussbaum (OSI), forwarded this e-mail chain and discussed methods for implementing

2   Ellison's directive. Exs. 231; 271; 272. On October 4-5, Minton met with her new finance team.

3   Ex. 265. Managers were assigned to prepare training ***for all of the North America divisions*** for

4   Oracle's new forecasting system, OSO. *Id.* Specifically, they were to work with Ellison to

5   determine new forecasting methodology for that training. *Id.* On October 6, manager McManus e-

6   mailed manager English:

7         Recently Larry has changed the way he is interpreting our forecast.

8         This is a change from our current thinking in that ***our forecast has not usually had a***
        ***significant amount of judgment***. It was the amount that you believed you could
9         deliver at a minimum. That emphasis has shifted . . . and ***now our forecast is a***
        ***number that includes more risk than in the past***.

10

11   Ex. 231 at 203683; *see also* Exs. 271; J at 423:24-425:1. Minton testified that she did not take the

12   directive into account when adding upside to the Field Forecast in 3Q01 even though evidence

13   shows that this directive was in effect before 3Q01 – "[w]e will incorporate this [change] into our

14   OSO 11i training that is tentatively scheduled the week of 10/23." Exs. 231; J at 19:17-19; 265.[51]

15   Defendants ignore this internal change. Defs' Mem. at 6-8. Defendants' experts' sole response has

16   been, inexplicably, that they do not believe that Ellison's directive was adhered to. Exs. G at 61:18-

17   66:23; 228 at 35; PP at 116:3-119:2, 125:9-130:11, 147:6-23. This, despite the e-mails from Minton

18   instructing her direct reports to implement the directive, the e-mails between executives and heads of

19   finance discussing specific ways to implement the directive, and the fact that those executives took

20   the directive so seriously that they regarded it as "sensitive information" and demanded that it not be

21

22   that they previously would not have felt comfortable enough to include, made Oracle's process even
  more "top-down." Exs. 231; PP at 56:15-57:4; 229 at §V.D.2.b.

23   [51]     The move to OSO caused significant changes – it inflated Oracle's pipeline. Exs. K at 270:2-
  14; CCC at 226:5-227:25; SS at 48:9-19. As a result, Minton applied her inaccurate conversion
24   analysis in 3Q01 to a pipeline that Henley testified was "too good to be true." Ex. H at 354:15-
  355:3. This overstated pipeline, which defendants touted in December 2000 as a reason for their
25   belief in the strength of Oracle's business, was actually caused by the move to OSO, which increased
  the 3Q01 pipeline by adding deals that the Field would previously not have felt comfortable
26   including. Exs. 273; K at 270:2-14; 225 at §II.A.4.; CCC at 226:5-227:25. Henley testified (and
  defendants admit) that this overstated pipeline was the reason that Oracle issued guidance of 12¢
27   EPS instead of the 12.8¢ Potential Forecast. Ex. H at 354:5-14.

28

forwarded.  Exs. 266; 231; 271; 272; 17.  Not surprisingly, in the months following the directive, the judgment applied by the Field in each of the U.S. divisions suddenly skyrocketed.  Goedde Decl., ¶¶6-10; Exs. 4-6.[52]

### 2. Defendants Had Actual Knowledge of Facts that Seriously Undermined the Accuracy of Oracle's Guidance

The very indicators that Ellison testified that he relied on (actual sales and pipeline data), "told" defendants that Oracle's guidance was inaccurate.  Ex. HH at 279:1-11.  Ellison admitted actual knowledge of these indicators.  Exs. GG at 76:25-77:12, 77:13-16, 113:25-114:25, 115:1-116:19, 122:1-25, 127:24-129:25, 143:12-144:3, 144:18-128:2, 156:4-159:21; HH at 268:5-13; 17 at 179-80, 285; 17 at 287; 276 at 84-85.  Given their receipt of weekly reports and attendance at the weekly EMC meetings, Henley and Sanderson also knew this.  Exs. K at 333:22-334:1, 466:20-467:19, 551:1-553:18; II at 64:15-65:20, 114:5-116:10, 116:25-118:9, 120:4-13, 222:18-223:24; KK at 40:7-42:23, 43:7-44:25, 72:7-73:12, 74:8-78:3, 88:5-17; V at 72:17-73:15.

### a. Actual Results Seriously Undermined Oracle's Guidance

Actual results for December 2000 informed defendants that Oracle was tracking to miss guidance.  Exs. 277; Ex. 278; GG at 76:25-77:12; II at 222:18-223:4.  On January 17, 2001, defendants received the Flash Report with Oracle's actual results for December 2000.  Exs. 277; 278.  The Flash Report disclosed that the NAS and OSI lines of business had revenue growth of *negative* 24% and *negative* 81%, respectively,[53] and that Oracle Product Industries ("OPI") had

---

[52] Despite these changes, which caused Oracle's forecast to be inaccurate and overstated, by February 5 the Potential Forecast was still informing defendants that Oracle would miss guidance – projecting EPS of just 11.29¢.  Ex. 230 at 39-40 & Exs. 11 & 23; 232; 274-275.  Minton decreased her upside in January 2001 by over $115 million.  *Id.*  Generally, upside decreases were accompanied by increases in the field forecast as deals closed.  Ex. 230 at 40 & Ex. 11.  Defendants knew that the decrease in January 2001 was not accompanied by an increase in the Field Forecast.  These facts alerted defendants, early in 3Q01, that deals were slipping.  *See also* Ex. H at 374:2-378:5; II at 265:25-267:11.

[53] Ellison testified that adverse results in one of Oracle's license divisions after the first month of a quarter (his example was Europe, which accounts for a lower percentage of revenue than NAS and OSI) was exactly the type of information that would prevent him from trading.  Exs. GG at 43:12-44:6; 277; 230 at Ex. 24; *see e.g.*, Exs. 232; 274; 279.  Within 36 hours of receiving these adverse results for OSI and NAS for the first month of 3Q01, Ellison instructed his financial advisor

growth of **negative** 85% excluding Covisint.[54]  *Id*.  Accordingly, as of January 17, defendants were aware that each U.S. division (50% of license revenues) had negative growth trends.  *Id*.  The December Flash Report also informed defendants that Oracle's U.S. divisions had sold virtually no applications and insufficient database, excluding Covisint.  *Id*.  Although its U.S. divisions were **forecasting $323 million** (excluding Covisint) in applications, in December 2000, Oracle's U.S. divisions **sold less than $1.3 million** in applications ($805,000 of CRM and $458,000 of ERP, excluding Covisint).  *Id*.  **This represented year-over-year applications license growth of negative 92%**.  *Id*.  In December 2000, the U.S. divisions had **negative** 33% growth in database.  *Id*.  Excluding Covisint, U.S. database sales had **negative** 44% growth.  *Id*.  By January 17, defendants knew of the negative trends that accounted for Oracle's shortfall.  *Id*.  The December Flash Report also disclosed that, excluding Covisint, total company license growth was 1% (guidance was 25%) and total applications growth was **negative** 46% (guidance was 75%).  *Id*.  According to Henley, the Flash Report disclosed that Oracle was "off to a slow start irrespect [sic] – you know, excluding Covisint."  Ex. II at 226:6-7.

On February 8, 2001, defendants received the Flash Report with January actual results.  Exs. 281; 282.  It disclosed that all of Oracle's U.S. divisions still had negative growth trends.  NAS and OSI had revenue growth of **negative** 33% and **negative** 17%, respectively.  *Id*.  Excluding Covisint, OPI had growth of **negative** 63%, total license revenue growth was just 8% (compared to 25% guidance) and Oracle's U.S. divisions **had sold just $16.6 million in applications compared to**

---

to unload 40 million shares of Oracle stock.  Exs. GG at 69:1-70:3, 76:25-77:12; J; LL at 59:15-60:6; 250 at 300606.

[54]  Covisint was a $60 million applications deal that was the largest transaction in Oracle's history.  Garnick removed Covisint from his analysis because the size and one-time nature of the transaction skewed Oracle's trends.  Ex. GGG at 312:2-313:4; Ex. 280 at 2, ¶9.  Ellison and Henley testified that removing Covisint was proper in analyzing December 2000 trends.  Exs. J at 436:13-437:6; II at 216:25-218:23.

1   *a forecast of $323 million* (*negative* 26% applications growth).  *Id*.  Oracle's U.S. divisions had

2   database growth of *negative* 29% and, excluding Covisint, *negative* 34%.  *Id*.[55]

3           **b.**     **Division Level Indicators Seriously Undermined Oracle's Guidance**

4

5          Throughout 3Q01, defendants knew of severe problems in its largest license division, which

6   accounted for at least $106 million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  At the

7   outset of 3Q01, defendants knew that NAS's pipeline was not where it needed to be to meet its

8   targets because "NAS results took off last year in Q3" (largely due to dot.com sales, which had

9   disappeared by 3Q01).  Exs. 236; OO at 33:19-34:21; 283; SS at 173:10-15; VV at 53:5-18; 284; V

10  at 291:8-292:6, 293:12-23.  NAS noted, however, that "[g]iven the past trends, [NAS] should add

11  incremental Pipe during the next three weeks."  *Id*.  By January 11, NAS reported that "[t]he Pipe

12  has not grown as [NAS] had anticipated.  We're actually slightly down from December end

13  reporting."  Ex. 240.  Defendants received this information weekly.  Exs. 232; 285-291, 292-298.

14  Defendants also knew from the outset of 3Q01 that NAS's pipeline contained no big deals.  Henley

15  noted this fact in early December and received updates in December and January that NAS's

16  pipeline still had few big deals (and just one above $5 million).  Exs. 236; 240; 299 at 610124; II at

17  214:2-19.  And contrary to defendants' claim that this was somehow good news, NAS informed

18  defendants that the lack of big deals was problematic because big deals had allowed NAS to make its

19  numbers in Q101 and Q201 (when comparisons were not as difficult).  Exs. 236; 240.  Defendants

20  also learned from Minton and Roberts at EMC meetings that AVPs in NAS "began to voice

21  concern" in December 2000 and "were reluctant to raise their forecast" in January as "deals began to

22  shrink and get delayed"  Ex. 259 at 179337.  NAS managers reported a "sluggish economic outlook"

23  where the "focus [is] on profits" and "reduc[ing] . . . costs" and CIOs on a "shorter leash" with

24  CEOs more involved in purchasing decisions.  Exs. 241; WW at 133:14-141:7, 146:6-18, 155:8-

25

26  _____

    [55]     According to Ray Lane, the flash reports informed defendants that Oracle was not on track.
27  Ex. 280, ¶¶6-12.  Dr. Goedde establishes that standard forecast analysis would have disclosed to
    defendants that Oracle was not on track to meet guidance.  Ex. 230 at 28-35 & Exs. 14-19.

28

157:1, 206:10-208:3; NN at 161:16-20, 161:21-162:1, 162:2-25, 163:9-17.  On January 11, David

Winton, NAS's director of finance, reported:

> 3.    Drop in Technology.  As reflected in the softening Pipe, both GB and
> Majors see a slow down in both Q3 and Q4.  GB's dot com bubbles has burst (they
> expect the West to end the year $30-$40M behind their original Budget for
> Technology).  Majors sees a slow down in spend along with smaller deal sizes.  Also,
> the change in the ASP model for Generic Tech hosting lic's coupled with the dot
> com crash is impacting projected Tech results in that segment.

Ex. 240.  Minton received this e-mail and Ellison testified that he was aware of these facts.  *Id*.; Ex.

J at 429:12-432:6.

NAS's stellar 3Q00 results resulted largely from dot.com sales.  In 3Q00, dot.com business

made up 36% of NAS's revenues and 74.6% of GB's revenues.  Ex. 124.5; 230 at Ex. 5.  But in

early January, NAS managers reported that larger dot.coms had already acquired Oracle's database

so Oracle was attempting to sell to lower-tier dot.coms, which were quickly disappearing.  Exs. 241;

OO at 78:7-79:1, 86:21-88:11, 94:7-94:24; NN at 114:13-21, 166:23-167:17, 195:3-199:9; VV at

54:2-55:5, 69:23-70:24.  On January 11, NAS reported that its dot.com bubble had burst and by

January 29 forecasted dramatically lower dot.com sales – $41 million (3% of revenues) compared to

$111.5 million (11%) one year earlier.  Exs. 240; 301; V at 48:13-23, 151:5-152:3, 188:24-189:8;

NN at 197:9-199:11, 206:10-208:3; VV at 48:13-23, 61:20-62:6; SS at 206:6-14, 212:2-17 .  This

amounted to negative 54% growth for 3Q01 in NAS's dot.com and ASP technology revenue.

Ex. 301.  In total, NAS projected *negative* 6% growth in technology for 3Q01.  *Id*.  Henley admitted

that this evidenced that the dot.com fallout was having a "progressively more negative impact" on

Oracle than in prior quarters.  Ex. JJ at 308:3-311:9.

These adverse facts manifested themselves in dismal performance in December and January.

NAS's license revenue growth was *negative* 24% in December 2000 and *negative* 35% for the first

two months of 3Q01.  Exs. 277-278; 281-282.  As of January 15, 2001, NAS had reported only $1.4

million in total sales for the month to date, for a total of $31.4 million for the quarter to date (its

forecast was $365 million).  Exs. 302 at 038498-99; 232; 274.

In 3Q01, defendants knew of OSI's severe problems, which accounted for at least $67

million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  Like NAS, defendants knew in early

1   3Q01 that OSI's pipeline had problems.  Henley noted in early December that the technology

2   pipeline for OSI was down "a lot" since the last report.  Exs. 299 at 610124; II at 214:2-215:16.

3   OSI's technology pipeline continued to fall throughout the quarter.  *See* Exs. 299 at 610124; II at

4   214:2-19.  By December 25, its applications pipeline had also plunged ($200 million) and ***OSI was***

5   ***forecasting more applications than were in its pipeline***.  Exs. 232; 288.  This is despite Nussbaum's

6   testimony that he would not forecast CRM due to its instability.  Ex. Q at 74:2-13.  Throughout

7   3Q01, despite its negative pipeline growth, OSI's revenue growth was forecasted at 31%.  Exs. 209;

8   212; 214-215; 219-220; H; 292-298.  Ellison testified that this was "incautious."  Ex. GG at 86:21-

9   87:5.

10          OSI and its verticals were also forecasting conversion rates (the percentage of the pipeline

11   that OSI was forecasting to convert) that were dramatically high and far beyond the 30%-40% rate

12   with which Nussbaum was comfortable.  OSI's verticals forecasted conversion rates over 60% for

13   much of December and January.  Ex. 303 at 096158; 304 at 096175.  They even forecasted

14   conversion rates as high as 132% (forecasting more revenue than was in the pipeline).  Ex. 303 at

15   096158.  On January 18, Sarah Kopp (head of OSI finance) informed defendants that conversion

16   rates across the board in OSI were north of 50%.  Ex. 305.  Oracle has produced only the first page

17   of this two-page e-mail discussing OSI's problems.

18          Defendants knew that OSI was coming nowhere near these extreme conversion rates.  OSI

19   had revenue growth of ***negative*** 84% for December 2000 and ***negative*** 17% for the first two months,

20   combined.  Exs. 277; 281; 282; 278.  It booked just $22.7 million in December and January,

21   combined, compared to a forecast of $73.6 million for those two months (and $225 million for the

22   quarter).  Exs. 306 at 323593; 281; 232; 214.  As of February 13, OSI had booked just $34 million,

23   which Nussbaum said caused "everyone [to have] great anxiety."  Exs. Q at 66:16-67:11; 307 at

24   095912.  At the same time, each of OSI's verticals was reporting dismal results and large gaps

25   between forecasts and field commit numbers – the Field was committing to just $120 million.

26   Exs. 307 at 095912; 308.  And defendants knew that February was not likely to make up for OSI's

27   dismal start.  By January 18, OSI's field was forecasting just $134 million (with $180 million best

28   case), however, Oracle's guidance was based on a $225 million forecast.  Exs. 305; 232; 274.  The

1    $91 million difference was Nussbaum's management judgment.  Ex. 305.  Defendants knew that this

2    was unrealistic.  Not only did they know that Nussbaum was overly aggressive in forecasting, but

3    they also knew that the $91 million in judgment was uncharacteristically high, even for Nussbaum.

4    Exs. 280, ¶17; KK at 170:25-171:13; Goedde Decl., ¶9, Ex. 5.  Prior to 3Q01 (and Ellison's

5    directive), Nussbaum had applied minimal or no judgment.  Goedde Decl., ¶9.  According to Lane,

6    the $91 million in judgment and the reliance on large deals, especially BellSouth, would have raised

7    red flags.  Ex. 280, ¶17.

8         Defendants knew that large deals would not save OSI.  Henley noted concern at the

9    beginning of 3Q01 because all of OSI's upside was in telecom (the telecom "bubble burst" was

10   becoming publicly known).  Exs. 299 at 610124; II at 209:19-210:23, 214:2-215:16; 309-312.  On

11   January 18, Kopp e-mailed Minton that OSI would only make its forecast only if "*none*" of its very

12   large opportunities dropped out.  Ex. 305.  Defendants knew that Nussbaum was relying heavily on

13   deals with the University of Texas and Capital One (both of which Kopp had informed defendants

14   "MUST close" for OSI to make its forecast) and deals in the troublesome telecom industry.

15   Exs. 305; 299 at 610124; II at 214:2-215:16; 313 at 093689; 314.  By January 2001, defendants

16   knew that almost all of these deals had fallen out or were "long-shots" that were "not likely to

17   close."  Exs. 315; J at 373:22-376:5; 314 at 293931; 316 at 090542; 317-320; 312; at 252257; 322 at

18   156558.0001; 323-326; 305; 327 at 081828; Ex. UU at 118:10-119:3, 150:14-153:24; Q at 58:1-7,

19   66:13-69:2, 77:19-78:2; XX at 153:24-154:2; TT at 153:18-154:4; QQ at 44:25-45:6; 299 at 610124.

20        Indicators in OPI also informed defendants of the dismal state of Oracle's U.S. license

21   business.  Excluding Covisint, OPI grew *negative* 85% in December and *negative* 63% for the first

22   two months of 3Q01.  Exs. 277-278; 281-282; .  Without Covisint, OPI had booked just $2.6 million

23   in license revenue in December and, as of January 26, *no license revenue in January 2001*.

24   Exs. 277; 328 at 039193.  Not surprisingly, OPI informed defendants on January 17 that it was

25   seeing client delays on decisions and had "a lot of pipe at challenging clients."  Ex. 329.  OPI

26

27

28

1   further evidenced the negative trends in Oracle's U.S. division and informed defendants that Oracle

2   was unlikely to recover from its slow start.[56]

3                 **c.**     **Defendants Knew that the "Hockey Stick" Would Not Help**

4

5          Oracle's 4Q01 forecast also rebuts defendants' claim that they expected to miraculously cure

6   Oracle's dismal start with a strong February performance.  Throughout 3Q01, defendants knew that

7   the Field was forecasting revenue growth for 4Q01 that was far below Oracle's growth targets.  For

    example, on January 15, 2001, OSI and OPI forecasted 4Q01 growth of ***negative*** 7% and ***negative***

8   16%, respectively.  Ex. 330 at 099014.  Only NAS forecasted positive growth (19%), but its 4Q01

9   forecast had just decreased by $65 million.  *Id*.  In total, the U.S. divisions forecasted just 3% growth

10   for 4Q01 (target was 30%).  *Id*.  The 4Q01 forecasts remained low and defendants were consistently

11   alerted to them throughout 3Q01.  Ex. 331 at 089102; 332 at 078857; 333 at 078990; 334 at 080066;

12   335 at 079232.  The 4Q01 forecasts were a strong indication that Oracle's problems were deep

13   seated and that the divisions did not expect business to strengthen as the quarter or the year

14   progressed.

15                 **d.**     **Pipeline Growth Seriously Undermined Oracle's Guidance**

16

17          In 3Q01, defendants knew that pipeline growth seriously undermined Oracle's guidance.

18   Exs. GG at 113:25-114:3, 122:1-15; HH at 252:4-10, 286:15-18; II at 64:15-65:20; H at 261:10-15; J

19   at 457:8-17; KK at 43:7-44:25; 232; 286; 288; 274-275; 279, 292-298; 336-338[CHECK].[57]  Year-

20   over-year pipeline growth, while as high as 52% in Week 1, dropped precipitously to 34% (by $328

21   million) by December 25.  Exs. 286; 288.  Defendants knew by December 25 that Oracle's sales

22   opportunities were evaporating.  The pipeline collapse continued throughout 3Q01, decreasing $544

23   million by February 5 and $807 million for the entire quarter ($600 million from applications).

24   _____

25   [56]     Oracle's projected expenses rose throughout December and January, in contrast to declines in

26   prior quarters.  Ex. 230 at 41 & Ex. 23.

27   [57]     "Pipeline" referred to all the deals that "had an opportunity to close during the quarter," including deals that had already closed.  Ex. EEE at 110:22-111:1, 128.

28

Ex. 230 at Ex. 20.  In contrast, the 3Q00 pipeline increased $69 million in December and January and lost only $340 million for the entire quarter.  *Id.*  Historically, Oracle's pipeline tended to increase in the quarter before declining at the end, and even those end-of-quarter declines were nowhere near the size of the declines throughout 3Q01.  *Id.*  The uncharacteristic decline in 3Q01 indicated that more deals were being lost.  Defendants, who touted Oracle's "astounding pipeline" to analysts as evidence of the strength of Oracle's business, knew throughout 3Q01 that Oracle's pipeline growth seriously undermined Oracle's guidance.  Exs. 379 at 03224; Ex. 210 at 141677; Ex. 339 at 005787; Ex. 340 at 03309.[58]

## L.   Defendants' "Cautionary" Statements Were Not Meaningful

The PSLRA's safe harbor does not apply unless a forward-looking statement is accompanied by **meaningful** cautionary statements.  *Morgan v. AXT, Inc.*, No. C04-4362, 2005 U.S. Dist. LEXIS 42346, at *18-*19 (N.D. Cal. May 23, 2005).  Vague or boilerplate disclaimers are insufficient.  *In re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455, 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal. May 1, 2003).  "'The cautionary statements must be precise and directly address . . . the defendants' future projections.'"  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005); *Helwig*, 251 F.3d at 559.  "[T]he cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'"  *Immune Response*, 375 F. Supp. 2d at 1033.[59]

---

[58]   Additionally, Oracle's "comfort gap," the difference between forecasted revenue growth and pipeline growth, was uncharacteristically narrow in 3Q01.  Ex. 230 at 35 & Ex. 30.  Between December 25 and January 29, the gap was never higher than 4% and was negative half the time.  *Id.* (Defendants misleadingly rely on the small but positive gap on January 15, but fail to mention that the gap was negative for much of 3Q01.  Defs' Mem. at 8-9; Ex. 230 at Ex. 13.  Oracle had a negative gap only once prior to 3Q01 and an average gap of 13.4%.  *Id.*  Ellison stated, "as long as the pipeline growth is greater than the revenue growth, you should be able to meet your numbers" and that a negative gap was problematic because it would be "incautious to . . . forecast sales growth without underlying pipeline growth."  Ex. GG at 86:21-87:5; Ex. HH at 420:12-14.  Defendants knew that the gap was negative for half of December and January.  Exs. GG at 86:3-88:17; Ex. HH at 417:17-421:22; II at 103:14-104:25; KK at 44:11-45:23; 232; 285; Exs. 286-288; 274; 275; 279.

[59]   Whether defendants' cautionary language was meaningful should not be resolved at summary judgment.  *See Provenz*, 102 F.3d at 1493.  This Court already held that whether Oracle's disclosures were meaningful raised a fact question.  *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 679 (N.D. Cal. 2002).  That fact question remains.

1    Defendants' warnings here were not meaningful.  Defendants cite to just a single statement

2  by Henley on Oracle's December 14, 2000 call and a few references in Oracle's 10-Q.  Defs' Mem.

3  at 27-28.  None of these "disclosures" support defendants' argument.  While Henley noted that a

4  "recession" "could have some impact," he dedicated his talk to persuading investors that Oracle

5  would not be impacted by the economy because Oracle was "in a sector, I think, that is, you know,

6  much more immune to economic issues."  Defs' Ex. 56 at 003218-19.  Henley's statements led

7  investors to believe that Oracle was not and would not be affected by the economy and, in context,

8  were not meaningful.  Defendants also argue that investors were meaningfully warned by select

9  statements in seven pages of risk disclosures in Oracle's 10-Q referencing various general

10  possibilities that "may" or "could" adversely affect Oracle's business "if" they happened.  Defs'

11  Mem. at 27-28; Defs' Ex. 60 at 24182-83, 24185.  These general disclosures of contingent risks

12  clearly did not discredit defendants' false or misleading projection to such an extent that risk of

13  deception dropped close to nil.  *Immune Response*, 375 F. Supp. 2d at 1033.  Furthermore, because

14  the risks about which they supposedly warned had already materialized, Oracle's risk disclosures

15  cannot qualify as meaningful cautions that offset defendants' false statements.  *Amylin*, 2003 U.S.

16  Dist. LEXIS 7667, at *20 (disclosures not meaningful where they did not provide information about

17  the very facts that defendants knew at the time made their statements false and misleading);

18  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[60]

19    Oracle's warnings that its hockey-stick pattern of revenue "could cause quarterly revenues

20  and net income to fall significantly short of anticipated levels" (Defs' Ex. 160 at 24185) fails for a

21  different reason – it is not what caused the miss.  Oracle missed guidance for two reasons:

22  (1) Oracle's forecast produced inaccurate guidance as a result of major internal and external

23  changes; and (2) Oracle's U.S. license business had experienced adverse results throughout 2Q01

24  and 3Q01 (not just in the last month or last few days).  §III.K., *supra*; 15 U.S.C. §78u-5(c)(1)(A)(i)

25

26  [60]   Defendants reiterated guidance throughout February.  *See* §III.K., *supra*.  These projections
are not protected by the safe harbor both because defendants knew that they were false and because

27  they were not identified as a forward-looking statements or accompanied by meaningful cautions.
15 U.S.C. §78u-5(c)(1)(B).

28

1   (requires disclosure of important facts that could cause "actual results to differ materially from those

2   in the forward-looking statement").[61]

3       **M.   Defendants' Knew or Recklessly Disregarded that Their Statements
            About the Economy Were False and Misleading**

4

5           Throughout Q301, defendants told investors that Oracle was seeing "no impact or slowing in

    its business" from the declining economy.  Exs. 206; 216; 341-343; 339.  Defendants have admitted

6
    that these statements were not forward-looking.  Defs' Mem. at 32.  A discrepancy between a
7
    defendants' statement and the true state of affairs will render a statement misleading for purposes of
8
    §10(b).  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1020 (9th Cir. 2005).  As discussed in
9
    detail in §III.K., defendants knew that the slowing economy ***was*** impacting Oracle's business at the
10
    time of each statement.[62]  Even before defendants' first statement, Oracle had lost millions in
11
    revenue due to the dot.com implosion, its FY01 conversion ratios had declined sharply, and the two
12
    U.S. divisions that caused its 3Q01 miss were reporting adverse information.  *See* §III.K., *supra*.
13
    NAS reported that the number of big deals (which had driven results in 1Q01 and 2Q01) were
14
    virtually nonexistent and that its pipelines could not support its Potential Forecast.  *Id.*  OSI's
15

16   _____

17   [61]     Defendants cite *Morgan* to suggest that there is confusion about whether the safe harbor
    gives defendants a license to lie.  Defs' Mem. at 26 n.13.  Defendants are mistaken.  The Ninth
18   Circuit is clear – making a projection with actual knowledge that it is false or misleading will
    "except[] statements from the safe harbor rule altogether."  *America West*, 320 F.3d at 937 n.15; *In
19   re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1163-64 (C.D. Cal. 2003), which this
    Court referenced in *Morgan* as an alternative view, supports plaintiffs.  It holds that the safe harbor
20   does not give a defendant a "license to lie" because "[i]f the forward-looking statement is made with
    actual knowledge that it is false or misleading," the accompanying cautionary language must
21   disclose that it is false or misleading. *Id.* at 1165 ("accompanying cautionary language can only be
    meaningful if it either states the belief of the speaker that it is false or misleading or, at the very
22   least, clearly articulates the reasons why it is false or misleading").  Defendants' risk disclosures did
    not disclose that Oracle's guidance was false and misleading.

23   [62]     Taken in context, defendants' economy statements also conveyed to investors that Oracle
    ***would not*** be affected by the ongoing economic slowdown, absent a recession or depression.
24   Throughout the Class Period, defendants reiterated Oracle's second half FY01 guidance, which
    included both 3Q01 and 4Q01.  *See* §III.K.1., *supra*; Exs. 342-343; 206 at 03222.  Defendants knew
25   that even with the inflation caused by the directive, throughout 3Q01, Oracle's U.S. divisions were
    forecasting 4Q01 growth that was either negative or far below targets (and guidance).  *See* §III.K.2.,
26   *supra*.  In 3Q01, either Oracle was predicting a recession by 4Q01 or the current economic
    slowdown was affecting Oracle's business.  Either way, defendants' economy statements were false
27   and misleading when made.

28

_____

1   pipeline was "down a lot" at the beginning of 3Q01 and included long-shot deals in troubled sectors.

2   *Id.*  Defendants knew all of these facts when they told investors that the economy was having "no"

3   impact on Oracle's business.  *Id.*[63]

4          That was only the beginning.  The metrics that defendants relied on, including actual results

5   and pipeline growth, grew worse after December 14, 2000, even as defendants repeated their false

6   and misleading tale.  §III.K.2.a.d., *supra*.  The pipeline collapsed by $328 million by December 25

7   and continued to plummet throughout 3Q01.  §III.K.2.d., *supra.*  By the beginning of January, NAS

8   reported that its pipeline had fallen (when it was expected to increase) and its dot.com bubble had

9   "burst."  §III.K.2.b., *supra*.  OSI reported that its applications pipeline had collapsed (by $200

10  million) and that extremely far-fetched conversion rates (even over 100%) would be necessary for

11  the division to achieve its Potential Forecast.  *Id.*  Negative reports from each U.S. division caused

12  Minton to reduce her upside by uncharacteristically high amounts (from $159.5 million down to $0)

13  throughout 3Q01.  Ex. 230 at Ex. 11.  The collapsing pipeline caused Oracle to forecast growth rates

14  ***higher*** at times than Oracle's pipeline growth – again, highly unusual given historic practice.

15  Ex. 230 at Ex. 13.  To top it off, each of Oracle's U.S. divisions had reported severe negative growth

16  trends through the first two months of 3Q01 and were reporting nearly non-existent actual revenues.

17  §III.K.2., *supra*.  It took an extraordinary one-time transaction with Covisint to save the OPI division

18  from the same fate as the NAS and OSI divisions.  *Id.*  Finally, in 3Q01, Oracle's field forecasts,

19  which were inflated as a result of the directive, were still projecting negative or non-existent growth

20  for 4Q01.  *See* §§III.K.1.c. & III.K.2.c., *supra*.  Defendants knew all of this information.

21  Accordingly, defendants' economy statements amounted to an "extreme departure" from the

22  standards of ordinary care that misled investors.

23

24

25  _____

26  [63]     Defendants rely almost exclusively on the 3Q01 Potential Forecast in bootstrap fashion to
        argue that Oracle was not currently feeling the effect of the economic slowdown, however, as
27  discussed in §III.K.1, defendants knew that Oracle's 3Q01 forecast was inaccurate and unreliable as
        a result of external and internal changes, including the economic slowdown.

28

1

**N.**     **The Insiders' Sales Establish Scienter**

2     Ellison's stock sales support an inference of scienter.  *See* Ex. 225 at §III.D.  *Nursing Home*

3  *Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  Ellison's trades

4  were dramatically out of line with his trading history – he had not sold for five years – and were

5  suspicious in amount as Ellison sold a "truly astronomical" 29 million shares for proceeds of $895

6  million.[64]  *Id*. at 1232; Exs. 344; GG at 28:2-4; 345.  Ellison's trades were also suspiciously timed.

7  He decided to unload early (before January 19, every indication was that he would sell in April or

8  August 2001), only 36 hours after receiving the Garnick Flash Report, and when he knew that his

9  metrics showed that Oracle's business was suffering from the economy and product problems and

10  that 2Q01 earnings were false – making him one of the last investors to sell Oracle stock above $30

11  per share.  *See* Exs. 225 at §II.C.; GG at 33:2-5, 69:1-70:3; LL at 59:15-60:6; 250 at 300606,

12  300609; 277; 346-350; 351-352; 353 at 038232; 354-355.  Ellison's use of proceeds – to pay for a

13  $100 million home and a $250 million yacht – also compels a finding that he acted with scienter.

14  Exs. 17 at 485-86, 369-70; 363 at 323; HH at 353:24-354:8; *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir.

15  1994).

16     Defendants argue that a lack of sales by other Oracle executives negates any inference of

17  scienter.  Defs' Mem. at 33.  Defendants' argument fails.  First, the Ninth Circuit rejected this

18  argument in *America West*, 320 F. 3d at 944.  Moreover, other Oracle executives either sold stock in

19  January 2001 or had plans to do so.  Henley sold one million Oracle shares for proceeds of $32

20  million on January 4 when he knew of adverse information regarding Oracle's products and financial

21  condition, that Oracle's 2Q01 earnings were false and that its 3Q01 guidance was inaccurate.  Ex.

22  243; *see* §III.K., *supra*; *see also* Ex. 357 at 017086; 358 at 6.[65]  Nussbaum and EMEA EVP, Sergio

23

24

25  [64]     Ellison's massive trading must also be viewed in light of SEC rules.  Ellison sold 16.34% of
the maximum allowed by SEC Rule 144 and authorized up to 22.47% of that maximum.  Exs. 250;
26  344; GG at 50:5-52:20; LL at 65:4-67:19; 17 C.F.R. §230.144(e).

27  [65]     Defendants cite to Judge Strine's opinion (in what turned out to be a very different case) to
argue that Henley's sales do not establish scienter.  Defs' Mem. at 33-34.  But Judge Strine relied
28  largely on the inaccurate and unreliable Potential Forecast to reach this conclusion, and discovery in

1    Giacoletto, sold stock in 3Q01 while in possession of adverse information and Minton, Sanderson,

2    Catz, and Cooperman all had plans to sell theirs in January 2001.  Exs. 359 at 609547-48; 360 at

3    611349; CCC at 196:20-197:21, 198:15-24, 209:22-210:18; AAA at 105:24-119:13; ZZ at 23:15-

4    25:20; 361; 362-364; DDD at 204:9-210:1; 365-368; BBB at 230:1-244:25; 369 at 609420-421; 370;

5    371; 372.  Cooperman and Catz did not sell in late January (Cooperman had already sold 5,000

6    shares on January 4, 2001 and had plans to sell more) because they found out that Ellison was selling

7    and both Minton and defendant Sanderson planned to trade because of the declining economy.  *Id*.

8    These planned sales (either consummated or abandoned) by virtually all of Oracle's top executives

9    establish scienter.

10               **1.      Oracle's Stock Repurchases Establish Scienter**

11              In 3Q01, defendants caused Oracle to repurchase 12.6 million of its shares for over $350

12   million to drive up or stabilize Oracle's stock price.  Exs. 373 at 140861; 374; BBB at 270:13-23; H

13   at 289:11-294:15; 375.  3Q01 repurchases were timed to allow defendants to unload their shares at

14   higher prices.  Exhibit 375 evidences this trend, with repurchases clustered just prior to and during

15   Ellison's and Henley's sales.  Ex. 376.  Defendants also used Oracle's repurchases to mitigate

16   negative market information.  In 3Q01, repurchases were clustered after publicity regarding Ellison's

17   sales caused the stock price to decline.  *Id*.  On February 9, negative press coverage caused Oracle's

18   stock to plummet.  *Id*.; Exs. 377-379.  As defendants reassured the market and reiterated guidance on

19   February 8 and 9, they caused Oracle to repurchase almost three million shares of stock for $69

20   million.  *Id*.; Ex. 374.  Defendants' use of Oracle's repurchase program in 3Q01 establishes scienter.

21               **2.      Defendants' Spoliation Establishes Scienter**

22              Defendants' spoliation establishes scienter and supports an adverse inference on summary

23   judgment.  Defendants have destroyed or altered accounting records, failed to preserve the files of

24   executives, intentionally destroyed hundreds of hours of directly-relevant tapes and transcripts of

25   interviews with Ellison after being ordered to produce them (and most other evidence of Ellison's

26   _____

27   this case has revealed that Henley possessed far more adverse information than the Delaware
     plaintiffs presented.  *Oracle Derivative*, 867 A.2d at 943-44.

28

1   knowledge), and purged databases, websites, and back-up tapes containing information directly

2   relevant to this lawsuit.  *See* Exs. 225 at §III.E.; 55.

3       **O.    The Facts Support a Jury Finding of Loss Causation**

4       "A private plaintiff who claims securities fraud must prove that the defendants' fraud caused

5   an economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-44 (2005) (citing 109 stat 747,

6   15 U.S.C. §78u-4(b)(4)).  Loss causation can be proved with evidence of a stock price decline when

7   the facts revealing the company's true financial condition are disclosed.  *See Daou*, 411 F.3d at

8   1026.  Defendants apparently concede loss causation on the issue of alleged false statements

9   concerning the economy and the 3Q01 forecasts.  However, without identifying a single undisputed

10  fact, they contend that plaintiffs cannot prove loss causation with respect to Suite 11i's

11  misrepresentations or the material overstatement of 2Q01 revenues and earnings.  Defs' Mem. at 40,

12  45.  Defendants incorrectly assert that plaintiffs must show that the failure to meet 3Q01 earnings

13  forecast revealed new "specific" information about "cancelled or delayed purchases due to alleged

14  defects Suite 11i," or that "the very same facts" alleged to have been concealed actually caused

15  Oracle to miss its earnings forecast.  *Id*. at 40-42, 46.  Defendants' argument has been rejected time

16  and again by the district and appellate courts, including this Court.  *Nursing Home Pension Fund v.*

17  *Oracle Corp.*, No. C01-0988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *36 (N.D. Cal. Dec. 20, 2006)

18  ("[A]s to Defendants' argument that Plaintiffs have failed to identify a corrective disclosure with

19  regard to Plaintiffs' Accounting Claim and Design Claim, the Court finds them without merit.").

20      Defendants also misinterpret both the Supreme Court's ruling in *Dura* and *Daou*.  Neither

21  case requires such a specific disclosure tied to a specific representation but rather require only that

22  plaintiff proves that misrepresentations proximately caused the loss.  Defendants' reliance on *In re*

23  *Gilead  Scis. Sec. Litig.*, No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893 (N.D. Cal. May 12,

24  2006) and *In re Impax Labs, Inc., Sec. Litig.*, No. C04-04802 JW, 2007 U.S. Dist. LEXIS 723 (N.D.

25  Cal. Jan. 3, 2007), is misplaced.  *Gilead* (which is on appeal) is factually inapposite.  In *Gilead*,

26  plaintiffs alleged that an August 8, 2003 disclosure caused a stock price decline that occurred nearly

27  ***three months later***, on October 28, 2003.  *Id*.  In *In re Impax Labs., Inc. Sec. Litig.*, No. C04-04802

28  JW, 2007 U.S. Dist. LEXIS 52356 (N.D. Cal. July 18, 2007), Judge Ware found that the Impax's

announcement of lower than expected financial results *was* indeed sufficient to infer the markets understanding that the forecast miss was connected to the accuracy of the Company's financial statements. *Id*. at *17.[66]

Here, on December 14, 2000, Oracle, announced 2Q01 (false) revenues and earnings results – overstating earnings by a penny – with projections of its future revenues and earnings, specifically with respect to 3Q01. Ex. 105. The announcement specified that Oracle had *earned* $0.11 per share for 2Q01 and achieved 66% applications [11i] growth – beating analysts expectations for both earnings and applications sales. Exs. 26; 105. These results caused a statistically significant increase in the price of Oracle stock. Ex. 168. Oracle did not disclose the accounting fraud that enabled Oracle to reach those numbers.[67] Instead, Henley specifically cited the false $0.11 and used it as the basis for future earnings and specifically to set 3Q01 of $0.12 earnings ("Historically, the third quarter is slightly better than the second quarter. . . . So I would assume, 12 cents would be a reasonable number . . . ."). Ex. 26 at 234427.[68] Oracle also made false representations regarding the functionality of Suite 11i and growth forecasts. *Id*. Forecasting 75% 11i applications growth on December 14, 2000 and $0.12 per share, defendants claimed that Oracle had met the challenge of

---

[66]    Notwithstanding two versions of their motion for summary judgment (weeks apart), defendants also rely on Judge Ware's January 2007 decision in *Impax*, 2007 U.S. Dist. LEXIS 723, granting defendants' Motion to Dismiss Second Amended Complaint for the proposition that plaintiffs must identify the "specific truth" that was revealed. Defs' Mem. at 39, 40. However, on July 18, 2007, Judge Ware issued an order denying Defendants' Motion to Dismiss Third Amended Complaint further addressing loss causation. Judge Ware's July 18, 2007 is indeed consistent with *Dura* and *Daou* and cites *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005), for the proposition that only the *subject* of the fraudulent statement or omission was the cause of the actual loss." *Impax*, 2007 U.S. Dist. LEXIS 52356, at *10.

[67]    *See* Ex. 170 (December 15, 2000 Deutsche Bank, Alex.Brown report: "Applications license growth of 66% solidly outpaced Street expectations in the 50-60% range. The *out performance should also allay concerns about the viability of Oracle's, applications business and the relative immaturity of release* 11i, following last quarter's decent, but slightly disappointing growth."); *see also* Ex. 129 (December 15, 2000 Solomon Smith Barney report: "We anticipate the *applications division will continue to accelerate* given the Company has exhibited significant traction since release of Version 2 of its E-business Suite in October. We are under the impression that the first version had considerable bugs and the most recent version is really gaining traction.").

[68]    Henley further connected the Company's ability to make its 3Q01 forecast to Suite 11i, including stability, demonstrations and references ("11i is much more stable than it was in Q2 . . . so better demos and number of references should help our apps business in Q3."). Ex. 198.

1    "delivering" the 11i.  Ex. 26 ("The question that everyone had had, including their existing

2    customers is could we in fact deliver this enormously, you know, comprehensive suite of

3    applications . . . and we did and they're seeing it **and they're buying everywhere**.").  *Id.* at 15.

4    　　　　On March 1, 2001, Oracle reported only $0.10 per share and 11i applications growth was

5    only 50% rather than 75%.  Ex. 196.  Oracle's stock price suffered an immediate and statistically

6    significant decline from $21.38 to $16.88.  *See* Exs. 168 at 43; 169.  Investors also learned that

7    issues concerning the functionality, *i.e.*, bugs and lack of stability of Suite 11i which had entered the

8    marketplace during Oracle's 1Q and 2Q, had not in fact been cured as defendants had reported at the

9    end of 2Q.  And contrary to defendants assurances that the economy was not affecting the Company,

10   defendants specifically attributed the shortfall to the economy, and Suite 11i had not driven sales

11   providing new opportunities.  *See* Exs. 196, 203.  The 11i defects hurt sales.  Failure to demonstrate

12   11i cost sales.  Oracle's internal 11i implementation admittedly contributed to the 3Q01 revenue

13   shortfall.  "***It did not take a genius to see that not everything that was going on could be explained***

14   ***by the weakening economy and edgy CEO's waiting for visibility to return***."  Ex. 17 at 201; *see*

15   Ex. 172, summarizing Gartner Executive Briefing ("Oracle's current CRM products are technically

16   unstable.  There are gaps in functionality").  Defendants' expert Christopher James agrees with

17   plaintiffs:

18   　　　　I would view material new information ***regarding both the applications business as***
     ***well as Oracle's other businesses and how they were faring in the then current***
19   ***economic environment***.

20   　　　　Q.　　And what was the new information regarding how the applications business
     was faring . . . ?

21
22   　　　　A.　　I think ***it is clear to me that the market and market participants were***
     ***concerned about the earnings miss and what it conveyed in terms of future***
     ***business prospects in the then current economic environment***.
23
24   Ex. AA at 137:14-138:1.[69]

25

26   [69]　　　　Defendants also ignore that the Court has recognized plaintiffs claims to include false
     statements that demand 11i was so strong that the slowing economy would not hurt sales.  *See*
27   September 6, 2002 Order Granting Defendants' Motion to Dismiss Plaintiffs' First Amended
     Complaint.

28

1    Finally, defendants suggest that the market knew the facts plaintiffs say Oracle failed to

2    disclose. Defs' Mem. at 41. But an omission is materially misleading only if the information has

3    not already entered into the market. *In re Apple Corporation Computer Sec. Litig.*, 886 F.2d 1109,

4    1114 (9th Cir. 1989). A defendant can escape liability only where defendant can show that the

5    market was not affected by a misrepresentation because the truth of the matter was already factored

6    into the market price. *Provenz*, 102 F.3d at 1492. Before the truth on the market, doctrine can be

7    applied, however, defendants must prove that the information that was misrepresented was

8    transmitted with the degree of intensity and credibility to counterbalance any misleading impression

9    by the representations. Summary judgment is proper only if they show that no rational jury could

10   have been misled. *Id*. Defendants make no attempt however to prove that 11i bugs, defects, and

11   overall poor quality had reached the market with the necessary degree of intensity and credibility

12   required. Defendants simply attach analyst and news reports (most of which are inadmissible

13   hearsay) to support their motion. Eleven of the fifteen reports cited by Oracle in relation to 11i are

14   dated ***prior*** to the false statements alleged during Class Period, some dating back to February 2000.

15   Harrison Decl., Exs. 91; 112; 117; 140; 154; 206-208; 211-212; 215. Indeed, defendants

16   affirmatively reiterated false statements regarding the functionality of 11i and refuted any suggestion

17   of serious instability or bugs in Suite 11i before and during the Class Period.[70] The remainder or the

18   reports also reiterate the false impression resulting from the misstatements. *See*, *e.g.*, Harrison Decl.,

19   Ex. 147 ("Application Momentum Continues" . . . "***11i continues to gain momentum despite the***

20   ***weakening macro environment. Oracle got the message right – companies are responding to and***

21   ***integrated by the one stop shopping and pre-integrated application suite***").

22

23

24   [70]     *See also* Ex. 173 (December 15, 2000 Credit Suisse First Boston Report) ("Picture Perfect,

25   Q2 FY01 Should even convert the Skeptics" application revenue of $279 million also exceeded our
     expectations of $252 million. We believe these results were solidly better than published

26   expectations and should be strong enough to convince the skeptics that ORCL's products business is
     capable of greatness . . . ***We expect ORCL's applications revenue to grow at a healthy pace as***

27   ***ORCL continues to penetrate its installed base of applications customers and attract new***
     ***customers with its one stop shop value proposition***.) Ex. 173; *see also* Harrison Decl. at 145.

28

PLTFS' OPPOSITION TO DEFS' MOTION FOR SUMMARY JUDGMENT - C-01-0988-MJJ          - 50 -

1    **IV.    CONCLUSION**

2         For all the foregoing reasons, defendants' motion should be denied.

3    DATED: October 10, 2007                Respectfully submitted,

4                                           COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
5                                           MARK SOLOMON
                                           DOUGLAS R. BRITTON
6                                           STACEY M. KAPLAN

7

8                                           _____
                                                     s/MARK SOLOMON
                                                    MARK SOLOMON
9

10                                          655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
11                                          619/231-7423 (fax)

12                                          COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
13                                          SHAWN A. WILLIAMS
                                           WILLOW E. RADCLIFFE
14                                          MONIQUE C. WINKLER
                                           ELI R. GREENSTEIN
15                                          DANIEL J. PFEFFERBAUM
                                           100 Pine Street, Suite 2600
16                                          San Francisco, CA  94111
                                           Telephone:  415/288-4545
17                                          415/288-4534 (fax)

18                                          Lead Counsel for Plaintiffs

19    \\netapp1b.lc.local\docs\edoc\CasesSD\Oracle3\Refiled Pleadings\BRF00044937_SJ OPPOS.doc

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 10, 2007.

     s/MARK SOLOMON
MARK SOLOMON

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:MarkS@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com
- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com
- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com
- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com
- **Stacey Marie Kaplan**
  SKaplan@csgrr.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com
- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com
- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com
- **William S. Lerach**
  e_file_sd@lerachlaw.com
- **James C. Maroulis**
  jim.maroulis@oracle.com
- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com
- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com
- **Brian P Murray**
  bmurray@rabinlaw.com
- **Shinyung Oh**
  shinyungoh@paulhastings.com
- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com
  ,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com
- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com
- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111