COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
    – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Master File No. C-01-0988-MJJ

CLASS ACTION

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF BJORN I. STEINHOLT

DATE:        November 16, 2007
TIME:        1:30 p.m.
COURTROOM:  The Honorable
               Martin J. Jenkins

**FILED PREVIOUSLY ON AUGUST 27, 2007**
**(DOCKET NO. 1002)**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT ........................................................................................................2

        A.      Legal Standard ........................................................................................2

        B.      The Court Should Deny Defendants' Motion To Exclude The Testimony
                And Opinions Of Mr. Steinholt ...............................................................3

                1.      Mr. Steinholt Is Highly Qualified to Testify About Loss Causation
                        and Damages ...............................................................................3

                2.      Mr. Steinholt's Opinions on Materiality are Relevant and Reliable...........4

                3.      Mr. Steinholt's Opinion on Loss Causation Is Reliable and Will
                        Assist the Jury ............................................................................8

                4.      Mr. Steinholt's Calculation of Damages Under Section 10(b) is
                        Reliable and Does not Violate *Dura* .........................................10

                5.      Mr. Steinholt's Analysis of Section 20A Damages is Reliable and
                        Does not Violate *Dura* .............................................................16

III.    CONCLUSION....................................................................................................17

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abromson v. American Pac. Corp.*,
114 F.3d 898 (9th Cir. 1997) ............................................................6

*Ahlberg v. Chrysler Corp.*,
481 F.3d 630 (8th Cir. 2007) ............................................................8

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................6

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ............................................................... *passim*

*DSU Med. Corp. v. JMS Co., Ltd.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003) ......................................2, 5

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................... *passim*

*Green v. Occidental Petroleum Corp.*,
541 F.2d 1335 (9th Cir. 1976) ....................................................10, 13

*In re Boston Sci. Corp. Sec. Litig.*,
490 F. Supp. 2d 142 (D. Mass. 2007) ..............................................8

*In re Broadcom Corp. Secs. Litig.*,
No. SACV 01-275 DT
2005 U.S. Dist. LEXIS 41976 (C.D. Cal. Sept. 12, 2005)............5, 13

*In re Imperial Credit Indus. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) ...........................................5

*In re Williams Sec. Litig.*,
No. 02-cv-072-SPF-FHM
2007 U.S. Dist. LEXIS 49123 (D. Okla. July 6, 2007) ...............15, 16

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ............................................................8

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)......................................................................2, 3

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d (2d Cir. 2007)...................................................................12

*Maiz v. Virani*,
253 F.3d 641 (11th Cir. 2001) ..........................................................2

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN I. STEINHOLT - C-01-0988-MJJ

- ii -

Page

*Nursing Home Pension Fund v. Oracle Corp.*,
   No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470
   (N.D. Cal. Dec. 20, 2006) ...................................................................................5

*SEC v. MacDonald*,
   699 F.2d 47 (1st Cir. 1983).........................................................................16, 17

*Tech. Licensing Corp. v. Gennum Corp.*,
   No. 3:01-cv-4204-RS, 2004 U.S. Dist. LEXIS 10604
   (N.D. Cal. Mar. 26, 2004) ...................................................................................5

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438 (1976)........................................................................................5, 6

*U.S. v. Sandoval-Mendoza*,
   472 F.3d 645 (9th Cir. 2006) .............................................................................2

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) .............................................................................8

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.S.
   §78t-1(b) ...........................................................................................................17

17 C.F.R.
   §240.10b-5 ....................................................................................................6, 11

Federal Rule of Evidence
   Rule 401 ..............................................................................................................3
   Rule 702 ...........................................................................................................2, 3

**SECONDARY AUTHORITIES**

2001 *Litigation Services Handbook: The Role of the Financial Expert* .......................................11

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure
   Damages in Fraud on the Market Cases*, 37 UCLA L. Rev., 883, 885 (June
   1990) .................................................................................................................11

Madge S. Thorsen, Richard A. Kaplan and Scott Hakala, *Rediscovering the
   Economics of Loss Causation,* 6.J. Bus. & Sec. L. 93 ......................................14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN I. STEINHOLT - C-01-0988-MJJ

- iii -

# I.     INTRODUCTION

Defendants' Notice of *Daubert* Motion and *Daubert* Motion to Exclude Expert Reports and Testimony of Bjorn I. Steinholt ("Motion" or "Mot.") seeks to exclude plaintiffs' expert Mr. Steinholt by mischaracterizing the nature of his opinions and methodology.  Defendants' arguments are baseless.  Mr. Steinholt provides testimony and opinions related to market efficiency, materiality, loss causation and damages and is well-qualified to testify regarding these issues.[1] Mr. Steinholt's opinions, moreover, are reliable and they will aid the jury in understanding complex issues related to materiality, loss causation and damage calculations under the federal securities laws.

Defendants' challenges to Mr. Steinholt's methodologies are unsubstantiated.  Defendants, in large part, ignore the analyses performed by Mr. Steinholt in a futile effort to convince the Court that Mr. Steinholt did nothing, by manipulating and misconstruing Mr. Steinholt's testimony.  They devote a significant portion of their brief to the argument that Mr. Steinholt performed no independent legal analysis because he relies upon plaintiffs to prove their case.  However, based upon his assumption that plaintiffs will prove their allegations, Mr. Steinholt conducted his materiality and damages analyses and formed his opinions.  With respect to loss causation, Mr. Steinholt's analysis specifically included accounting for and eliminating industry and market factors.  Plaintiffs did not ask Mr. Steinholt to prove their factual allegations and the law does not require that he do so.

Similarly misguided are defendants' arguments that Mr. Steinholt applied the wrong legal standard for materiality and that Mr. Steinholt's damages calculations are inconsistent with the Supreme Court's holding in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).  In both instances defendants ignore and misinterpret case law.  The materiality definition set forth by Mr. Steinholt is entirely consistent with the law as is the methodology employed by Mr. Steinholt to calculate damages.  Thus, Mr. Steinholt's opinions and testimony are reliable and relevant.  Plaintiffs respectfully request that the Court deny defendants' Motion.

---

[1]     Defendants do not challenge Mr. Steinholt's qualifications; nor do they challenge his opinion on market efficiency.

1  **II.     ARGUMENT**

2        **A.      Legal Standard**

3        Federal Rule of Evidence 702 governs the admission of expert testimony and states that:

4        If scientific, technical, or other specialized knowledge will assist the trier of fact to
         understand the evidence or to determine a fact in issue, a witness qualified as an
5        expert by knowledge, skill, experience, training, or education, may testify thereto in
         the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
6        or data, (2) the testimony is the product of reliable principles and methods, and
         (3) the witness has applied the principles and methods reliably to the facts of the
7        case.

8  Federal Rules of Evidence ("Rule") 702.

9        In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the United States Supreme Court

10 explained the requirements under Rule 702 for the admission of expert testimony.  Under *Daubert*, a

11 trial judge assesses the expert's "qualifications" and the "reliability" of the proposed testimony to

12 determine whether the expert will assist the trier of fact to understand or determine a fact in issue.

13 509 U.S. at 592.  The objective is to "make certain that an expert, whether basing testimony upon

14 professional studies or personal experience, employs in the courtroom the same level of intellectual

15 rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v.*

16 *Carmichael*, 526 U.S. 137, 152 (1999).

17       However, "*Daubert* makes the district court a gatekeeper, not a fact finder."  *U.S. v.*

18 *Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  "[A] district court's gatekeeper role under

19 *Daubert* is not intended to supplant the adversary system or the role of the jury."  *DSU Med. Corp. v.*

20 *JMS Co., Ltd.*, 296 F. Supp. 2d 1140 (N.D. Cal. 2003) (citing *Maiz v. Virani*, 253 F.3d 641, 666

21 (11th Cir. 2001)).  The court's sole gatekeeping responsibility is to determine the reliability of expert

22 opinions through a preliminary assessment of the methodologies underlying the opinion.  *Daubert*,

23 509 U.S. at 592-593.  In performing its gatekeeping role, the court does not focus on the correctness

24 of the conclusions of the expert's testimony.  *See, e.g.*, *DSU Med. Corp.*, 296 F. Supp. 2d at 1146-

25 47.  Rather, the court focuses on whether the methodology used by the expert to reach his

26 conclusions is sufficiently reliable for submission of that testimony into evidence.  *Id*.  If the

27 threshold of reliability is met, "[v]igorous cross-examination, presentation of contrary evidence, and

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN STEINHOLT - C-01-0988-MJJ                          - 2 -

1  careful instruction on the burden of proof are the traditional and appropriate means" of challenging

2  the testimony. *Daubert*, 509 U.S. at 596.

3      Under *Daubert* and *Kumho*, only relevant expert opinion testimony is admissible. Expert

4  opinion testimony is relevant if the knowledge underlying it has a "valid . . . connection to the

5  pertinent inquiry . . . . " *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The relevance

6  of an expert's opinion is determined by Rule 401 and by the "fit" of the testimony. *Daubert*, 509

7  U.S. at 591. Relevant evidence under Rule 401 is "evidence having any tendency to make the

8  existence of a fact that is of consequence to the determination of the action more probable than less

9  probable than it would be without the evidence." Fed. R. Evid. 401. Under *Daubert*, Rule 702

10  requires that the expert's knowledge will "assist the trier of fact to understand the evidence or to

11  determine a fact in issue." *Daubert*, 509 U.S. at 591-592 (holding that the requirement that the

12  expert testimony "'assist the trier of fact' . . . goes primarily to relevance").

13      **B.  The Court Should Deny Defendants' Motion To Exclude The
        Testimony And Opinions Of Mr. Steinholt**

14

15          **1.  Mr. Steinholt Is Highly Qualified to Testify About Loss
            Causation and Damages**

16      A review of Mr. Steinholt's education and experience demonstrates that he is highly qualified

17  to testify on matters relating to market efficiency, materiality, loss causation, and damages.

18  Mr. Steinholt is the founding member of Financial Markets Analysis, LLC ("FMA"), an economic

19  consulting and valuation firm. Declaration of Monique C. Winkler in Support of Plaintiffs'

20  Opposition to Defendants' *Daubert* Motion to Exclude Expert Reports and Testimony of Bjorn I.

21  Steinholt ("Winkler Decl."), Ex. A. FMA provides financial analyses and related economic

22  consulting services to clients. As a principal at FMA, Mr. Steinholt provides a broad range of capital

23  markets consulting, including financial and economic analyses relating to mergers and acquisitions,

24  initial public offerings, fairness opinions and private placements. *Id.* Mr. Steinholt's practice area

25  includes the valuation of whole businesses, financial securities and intangible assets. *Id.*

26  Additionally, Mr. Steinholt provides consulting related to complex securities litigation. *Id.*

27  Mr. Steinholt previously served as a principal at Business Valuation Services, Inc., where he

28  provided financial and economic analyses for a variety of purposes relating to: mergers and

1    acquisitions; initial public offerings; fairness opinions; bank financing; financial reporting

2    requirements, tax-related issues; general advisory services and shareholder disputes, among other

3    responsibilities.  *Id.*  Mr. Steinholt also served as Senior Vice President of Princeton Venture

4    Research, Inc., where he provided various financial and economic analyses for venture capital,

5    investment banking and consulting assignments, including shareholder disputes.  *Id.*

6         Mr. Steinholt received a Master of International Business degree from the University of San

7    Diego and a Bachelor of Science, Computer Science degree from California State University, Long

8    Beach.  *Id.*  Additionally, Mr. Steinholt has received the professional designation of Chartered

9    Financial Analyst awarded by the CFA Institute.  *Id.*  Mr. Steinholt has also provided expert

10   opinions numerous times on issues related to market efficiency, materiality, loss causation and

11   damages in similar securities class actions.  *Id.*  Indeed, defendants do not challenge Mr. Steinholt's

12   qualifications.  Accordingly, Mr. Steinholt is highly qualified to testify on issues related to market

13   efficiency, materiality, loss causation, and damages.

14                      **2.    Mr. Steinholt's Opinions on Materiality are Relevant and**
                               **Reliable**

15

16        Mr. Steinholt's opinions regarding materiality are the product of scientific and reliable

17   methodology and are highly relevant to this case.  Defendants' arguments to the contrary lack

     foundation.  Defendants' arguments that Mr. Steinholt applied an incorrect legal standard and failed

18

19   to perform the necessary analysis to determine materiality demonstrate a fundamental

     misunderstanding of the law and the work performed by Mr. Steinholt.

20

21        Using an event study and regression analysis, Mr. Steinholt analyzed the materiality of

22   Oracle Corporation's ("Oracle" or the "Company") December 14, 2000 earnings announcement and

     guidance.  His analysis demonstrates that Oracle's stock price increase upon the December 14, 2000

23

24   announcement of earnings and guidance for the third fiscal quarter 2001 was statistically significant.

     Winkler Decl., Ex. A, ¶35.  Mr. Steinholt also analyzed the stock price movement when the relevant

25

26   truth was revealed on March 1, 2001 through the Company's pre-announcement of its third quarter

     2001 results and found that there was a statistically significant price decline following the

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN STEINHOLT - C-01-0988-MJJ              - 4 -

1    announcement, a conclusion also reached by that defendants' own expert, Christopher M. James

2    ("James") (Winkler Decl., Ex. B, ¶49), demonstrating materiality.  Winkler Decl., Ex. A, ¶¶43-46.

3           The event study methodology employed by Mr. Steinholt is well-established and relevant.

4    *See, e.g.*, *In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); *In re*

5    *Broadcom Corp. Secs. Litig.*, No. SACV 01-275 DT (MLGx), 2005 U.S. Dist. LEXIS 41976, at *10

6    (C.D. Cal. Sept. 12, 2005).   This Court recognized the utility of an event study in quoting

7    Mr. Steinholt and determining that "loss causation is susceptible to proof on a class-wide basis" in its

8    December 20, 2006 Order Re Motion for Class Certification.  *Nursing Home Pension Fund v.*

9    *Oracle Corp.*, No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *38 (N.D. Cal. Dec. 20, 2006).

10   Moreover, defendants' expert James endorses and, in fact, used the very same method of assessing

11   materiality.  Winkler Decl., Ex. B, ¶¶12-20.

12          Defendants ignore Mr. Steinholt's utilization of the event study methodology in favor of red

13   herring arguments – that Mr. Steinholt applies the wrong definition of materiality and that

14   Mr. Steinholt performed no independent analysis to determine whether defendants' false statements

15   and omissions were material.  Mot. at 4-8.  Defendants specifically argue that Mr. Steinholt's

16   opinions regarding materiality should be excluded because he applied an incorrect legal standard –

17   he defined information as material if there is a substantial likelihood that a reasonable shareholder

18   would consider it to be important or if it would alter the total mix of information, *id.* at 4-5, and that

19   Mr. Steinholt's opinions regarding materiality are irrelevant because he did not compare the specific

20   alleged false statements and omissions to the underlying truth.  *Id.* at 5-8.

21          First, defendants' argument that Mr. Steinholt applies an incorrect legal standard is simply

22   wrong.[2]  Defendants selectively quote from the United States Supreme Court's decision in *TSC*

23

---

24   [2]      Defendants reliance upon *DSU*, 296 F. Supp. 2d 1140 and *Tech. Licensing Corp. v. Gennum*

25   *Corp.*, No. 3:01-cv-4204-RS, 2004 U.S. Dist. LEXIS 10604 (N.D. Cal. Mar. 26, 2004), here and
     throughout their motion for the proposition that Mr. Steinholt's testimony should be excluded

26   because he "applies an incorrect legal standard" is misplaced.  *See* Mot. at 5; *see also* Mot at 3.  Both
     *DSU* and *Tech Licensing Corp.* involved an expert's deviation from the application of specific court-

27   approved methodologies for determining damages in patent cases.  *DSU*, 296 F. Supp. 2d at 1148;
     *Tech. Licensing Corp.*, 2004 U.S. Dist. LEXIS 10604, at *12-*15.  In *Tech Licensing Corp.*, the

28   court noted that the *DSU* court had concluded the expert's testimony was "so divorced from the

1   *Indus. v. Northway, Inc.*, 426 U.S. 438 (1976), in arguing that Mr. Steinholt erroneously defined

2   material information, but characteristically omit relevant portions of the opinion.[3]  Mot. at 4.  The

3   paragraph from which defendants quote provides in its entirety:

> ***An omitted fact is material if there is a substantial likelihood that a reasonable
> shareholder would consider it important in deciding how to vote***.  This standard is
> fully consistent with Mills' general description of materiality as a requirement that
> "the defect have a significant propensity to affect the voting process."  It does not
> require proof of a substantial likelihood that disclosure of the omitted fact would
> have caused the reasonable investor to change his vote.  What the standard does
> contemplate is a showing of a substantial likelihood that, under all the circumstances,
> the omitted fact would have assumed actual significance in the deliberations of the
> reasonable shareholder.  Put another way, there must be a substantial likelihood that
> the disclosure of the omitted fact would have been viewed by the reasonable investor
> as having significantly altered the "total mix" of information made available.

10   *TSC*, 426 U.S. at 449 (emphasis in original).  In *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32

11   (1988), the Supreme Court "expressly adopt[ed] the TSC Industries standard of materiality for the

12   §10(b) and Rule 10b-5 context."  The Ninth Circuit has also affirmed the definition utilized by

13   Mr. Steinholt:  "[a]n omitted fact is material if there is a substantial likelihood that a reasonable

14   shareholder would consider it important."  *Abromson v. American Pac. Corp.*, 114 F.3d 898, 902

15   (9th Cir. 1997).

16          Second, defendants' argument that Mr. Steinholt performed no independent analysis to

17   determine whether defendants' false statements and omissions were material is mistaken and

18   unsupported by legal authority.  Mr. Steinholt analyzed this very issue and found that Oracle's stock

19   would have traded at substantially lower levels had the underlying truth been disclosed.  *See* Winkler

---

21   economic realities of the situation as to be speculative."  2004 U.S. Dist. LEXIS 10604, at *12
     (citing *DSU*, 296 F. Supp. 2d at 1156).  Here, defendants can point to no specific court-approved
22   methodologies that Mr. Steinholt has violated.  Indeed, as set forth *infra* with respect to damages,
     Mr. Steinholt follows court-approved methodologies.  Moreover, defendants have not even come
23   close to demonstrating that Mr. Steinholt's testimony was "so divorced from the economic realities
     of the situation as to be speculative."

24   [3]     Defendants' citation to Mr. Steinholt's deposition testimony in support of this argument is
25   likewise misleading.  For example, in support of defendants' statement that "Mr. Steinholt's
     definition assumes that likewise reasonable investors would deem information to be important (and,
26   therefore 'material' for the purposes of securities fraud) even if that information were already known
     to them," defendants omit a large portion of the question, including the part where counsel states,
27   "I'm not asking you what the legal test for materiality [sic]."  *Compare* Mot. at 4 *with* Winkler Decl.,
     Ex. C at 121:23-123:4.

28

1   Decl., Ex. A.  As set forth *supra*, Mr. Steinholt conducted an event study as part of his materiality

2   analysis and determined that both defendants' December 14, 2000 earnings announcement and

3   guidance and defendants' March 1, 2001 pre-announcement of Oracle's third quarter 2001 results

4   resulted in statistically significant price movements.  Mr. Steinholt also explains the economic

5   rationale behind the importance of the allegedly false and misleading statements to investors –

6   because they relate to Oracle's ability to generate future cash flows and thus directly relate to the

7   value of the common stock.  Winkler Decl., Ex. A, ¶31.  Again, defendants ignore Mr. Steinholt's

8   work.  Rather, defendants erroneously and without legal support suggest that Mr. Steinholt should

9   have independently determined whether the false statements as alleged by plaintiffs were indeed

10  false or should have specified what defendants "should have said" in place of the false statements,

11  instead of assuming that plaintiffs will prove their allegations.  Mot. at 5-6.  But Mr. Steinholt was

12  not asked to prove plaintiffs' allegations; nor does the law require him to do so.

13          Defendants also manipulate Mr. Steinholt's report and testimony to falsely suggest that he

14  assumes the materiality conclusion by relying on plaintiffs to "demonstrate that the stock drop was

15  caused by the revelation of the alleged misrepresentations and omissions, and if that is proven, those

16  misrepresentations and omissions were in fact material."  Mot. at 6.  The testimony relied upon by

17  defendants for this assertion provides in context:

18          Q.  We discussed the fact that in forming your opinion with regard to materiality
            you've assumed that the Plaintiffs will succeed in proving the allegations that you
19          discuss in the report.  *And that that proof will include a showing that the true facts
            impacted the value of the company; correct*?
20
            A.  That the true facts impacted – that they are going to show that the true facts --
21
            Q.  Uh-huh.
22
            A.  *No.  I think that they have to prove the assumptions in my -- you know, they
23          have to prove -- you know, prove the assumptions that I rely on in order to, you
            know, conduct my analysis*.
24
            Q.  But that includes some proof that the undisclosed true facts actually have an
25          impact on the value of the company; correct?

26          A.  Well, I mean, *I provide that opinion because I look at the stock price reaction*,
            as I just said, on March 2nd to see whether or not it has an impact on the stock price.
27          When you have an omission, you know, you do not have a stock increase.  But what
            you can do is look at the price decline following the dissemination of that
28

1    information and see whether or not it impacts the stock price.  So -- so I mean it
2    would be material.

Winkler Decl., Ex. C at 138:21-139:24 (objections omitted).  As Mr. Steinholt makes clear, he

assumes that plaintiffs' allegations are true and based upon those assumptions, he conducted his

materiality and damages analyses.[4]  Thus, defendants' reliance upon *Zenith Elecs. Corp. v. WH-TV*

*Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005), and *Ahlberg v. Chrysler Corp.*, 481 F.3d 630 (8th Cir.

2007), is misplaced.[5]  Because Mr. Steinholt's methodologies are reliable and comport with

applicable legal standards, and his testimony will assist the trier of fact in determining materiality,

his opinions are admissible.

### 3.    Mr. Steinholt's Opinion on Loss Causation Is Reliable and Will Assist the Jury

Defendants again misconstrue Mr. Steinholt's report and testimony in an effort to convince

the Court that Mr. Steinholt performed no analysis in support of his loss causation opinion.  In fact,

Mr. Steinholt's opinion on loss causation is based upon the event study methodology that is widely

favored by courts and well-established in the scientific community.  Again, as set forth *supra*,

Mr. Steinholt was retained to analyze and provide expert testimony related to market efficiency,

materiality, loss causation, and damages.  He was not asked to prove plaintiffs' allegations.

Mr. Steinholt, rather, assumed that plaintiffs would be able to prove the allegations and then

determines the amount of economic loss resulting from the alleged fraud.  Mr. Steinholt does not

however, assume that defendants' misrepresentations and omissions caused any economic harm to

---

[4]    Defendants also misinterpret Mr. Steinholt's opinion and testimony here to suggest that he concedes "specific statements and omissions alleged in the Complaint may still be immaterial." Mot. at 7.  Simply reading the quoted testimony makes clear that Mr. Steinholt was not asked about statements and omissions alleged in the Complaint, and his response was thus not an acknowledgement that statements and omissions alleged in the Complaint may be immaterial.  *Id.* Moreover, the quoted testimony could not have been a concession with respect to plaintiffs' allegations, because as stated numerous times, Mr. Steinholt assumes that plaintiffs' allegations are true.

[5]    Similarly, defendants reliance upon *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994), and *In re Boston Sci. Corp. Sec. Litig.*, 490 F. Supp. 2d 142 (D. Mass. 2007), is misplaced because those cases address plaintiffs' burden at trial and plaintiffs' burden in responding to a motion to dismiss, respectively, not the admissibility of expert testimony.

1   investors.  Rather, he properly conducts an event analysis and next, afterf taking into account market

2   and industry factors, quantifies the portion of the price decline related to the revelation of the alleged

3   truth.  Subsequently, he quantified damages per share under the well-established out-of-pocket

4   measure of damages, using a methodology to determine the price at which Oracle's stock would

5   have traded absent the alleged fraud.  Winkler Decl., Ex. A, ¶56.

6          Mr. Steinholt, through his event study's regression analysis, analyzes the materiality of

7   Oracle's earnings announcements and guidance during the Class Period (December 14, 2000 to

8   March 1, 2001).  This analysis shows that Oracle's stock price reflected statistically significant

9   movement upon the December 14, 2000 announcement of earnings and guidance.  His analysis

10  demonstrates that when Oracle pre-announced its third quarter 2001 results on March 1, 2001, the

11  Company's stock price declined, and the disclosures revealed the true economic facts about the

12  Company's performance and prospects.  The net price decline, as a result of this disclosure, was

13  statistically significant.  Mr. Steinholt's analysis accounted for and eliminated industry and market

14  factors, and, accordingly, plaintiffs' losses were proximately caused by Company-specific factors.

15         Despite this detailed and rigorous analysis, defendants continue to beat a dead horse by

16  erroneously arguing that, "Mr. Steinholt performed no analysis to determine what caused the loss –

17  he merely assumes that Plaintiffs will prove it."  Mot. at 8.  Defendants then mistakenly argue that

18  because Mr. Steinholt assumes that plaintiffs will prove their allegations, his opinion regarding loss

19  causation does not assist the trier of fact.   *Id.* at 9.  Defendants egregiously manipulate

20  Mr. Steinholt's testimony here – yet again omitting a highly relevant portion of a question posed to

21  Mr. Steinholt by counsel to support their statement that "Mr. Steinholt went so far as to admit that he

22  had no 'opinion as to what specifically caused' Oracle to miss its guidance."  *Id.* at 9.  The actual

23  exchange follows:

24         Q.   And I think this is clear, but I want to ask it a different way to make sure.
       ***Independently of the assumptions you make about the plaintiffs proving the case***,
25     you're not offering an opinion as to what specifically caused Oracle to miss its third
       quarter 2001 guidance; is that correct?

26
       A.   That is correct.  I mean – yes.  I mean, I haven't looked at internal documents,
27     and I don't know what deals did not go through and so on.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN STEINHOLT - C-01-0988-MJJ                    - 9 -

1   Winkler Decl., Ex. C at 108:3-11.  As Mr. Steinholt stated multiple times and as was explicit in the

2   question posed here, Mr. Steinholt assumed that the plaintiffs would prove their allegations

3   regarding Oracle's third quarter 2001 miss.  Based upon those assumptions, he performed an event

4   study and regression analysis in support of his opinions, including his opinion that Oracle's March 1,

5   2001 disclosure eliminated the inflation in Oracle's common stock resulting from the alleged false

6   and misleading statements and omissions.  As such, Mr. Steinholt's experience and expertise in

7   financial analysis and the relationship between the alleged misstatements and their effect on Oracle's

8   stock price will assist the jury.

9           **4.      Mr. Steinholt's Calculation of Damages Under Section 10(b) is
                       Reliable and Does not Violate *Dura***

10          In calculating damages here, Mr. Steinholt performed an event study-regression analysis and

11  value-line calculation.  After accounting for market and industry factors, Mr. Steinholt calculated the

12  portions of the price declines related to the revelation of the Company's true financial performance,

13  condition and prospects.  He then calculated damages under the out-of-pocket measure using an

14  event-study methodology to determine the price at which Oracle's stock would have traded absent

15  the alleged fraud.  The difference between Oracle's actual trading price and its value represents the

16  inflation per share, also commonly referred to as the damages per share.  In *Green v. Occidental*

17  *Petroleum Corp.*, 541 F.2d 1335, 1344 (9th Cir. 1976), the court discussed and approved

18  Mr. Steinholt's methodology:

19          [I]t becomes necessary to establish, for the period between the date of the
            misrepresentations and the date of disclosure, data which when arranged on a chart
20          will form, on the one hand, a "price line" and, on the other, a "value line." The price
            line will reflect, among other things, the effect of the corporate defendant's wrongful
21          conduct. The establishment of these two lines will enable each class member
            purchaser who has not disposed of his stock prior to disclosure of the
22          misrepresentations to compute his damages by simply subtracting the true value of
            his stock on the date of his purchase from the price he paid therefor.
23

24          As explained in Mr. Steinholt's report, the out-of-pocket measure of damages for shares held

25  through March 1, 2001 is computed by "simply subtracting the true value of [class member's] stock

26  on the date of [class member's] purchase from the price he paid therefor."  Winkler Decl., Ex. A,

27  ¶¶49-50 (citing *Green*, 541 F.2d 1335).  To determine the true value of Oracle's stock during the

28  Class Period, Mr. Steinholt employed an event study methodology which resulted in a constant

1   percentage inflation, reflecting that Oracle's stock would have traded as it did during the Class

2   Period, just at a lower level.  The event study methodology employed by Mr. Steinholt to construct

3   the value line has been recognized as "[t]he most common method of calculating damages in Rule

4   10b-5 cases," is fully supported by academic literature, and will necessarily result in a constant

5   percentage inflation during periods with no fraud-related disclosures.  *See* Winkler Decl., Ex. A, ¶48

6   (quoting Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in*

7   *Fraud on the Market Cases*, 37 UCLA L. Rev., 883, 885 (June 1990)); *see also* Winkler Decl., Ex.

8   D. [6]

9        Defendants nonetheless argue that Mr. Steinholt fails to limit damages to those recoverable

10   under *Dura*, 544 U.S. 336, and thus his testimony must be excluded.  Mot. at 10-12.  First,

11   defendants argue that Mr. Steinholt's testimony should be excluded because he did not eliminate

12   portions of the stock price decline attributable to non-fraud related factors.  *Id.*  Specifically,

13   defendants argue that he "did not specifically examine Oracle's competitors."  *Id.* at 11.  But

14   Mr. Steinholt's analysis did account for and eliminate industry and market factors, and, accordingly,

15   plaintiffs' losses were proximately caused by Company-specific factors.  Mr. Steinholt used the

16   NASDAQ 100 index – a capitalization-weighted index of the 100 largest and most active non-

17   financial domestic and international companies listed on the NASDAQ that includes large

18   technology companies – to remove such factors.  Winkler Decl., Ex. A, ¶53; Winkler Decl., Ex. C at

19   179:8-19.  Mr. Steinholt also specifically looked at the so-called peer group referred to by James and

20

21   _____

22   [6]     Defendants' criticism of Mr. Steinholt's reference to the June 1990 UCLA Law Review
      article *Using Finance Theory to Measure Damages in Fraud on the Market Cases* and the 2001
23   *Litigation Services Handbook: The Role of the Financial Expert* is unfounded.  *See* Mot. at 15 n.9.
      First, defendants fail to take into account the fact that one of the authors of the law review article,
24   Bradford Cornell, was a finance professor at the time, not a lawyer, and the article was reviewed by
      several economists, including Dr. Myron Scholes.  Second, the simple fact that reference material
25   predates *Dura* does not invalidate the material as defendants would suggest.  And lastly, defendants
      cite to a similar piece of academic literature in their challenge to Mr. Steinholt – an article titled *Just*
26   *How Much Damage Did Those Misrepresentations Actually Cause And To Whom?: Damages*
      *Measurement In "Fraud On The Market" Securities Class Actions*, 1505 PLI/Corp. 285 (2005),
27   which, in turn, cites to the UCLA Law Review article.  *See* Mot. at 14-15 (erroneously cited at 15
      PLI/Corp. 285 (2005) by defendants).

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN STEINHOLT - C-01-0988-MJJ          - 11 -

1    determined that the use of the NASDAQ 100 produced superior results.[7]  *See* Winkler Decl, Ex. E,

2    ¶10.

3          Mr. Steinholt particularly considered the competitors identified by James and determined that

4    James' analysis was of little utility as the companies must be looked at individually:

> [Y]ou have to analyze these companies on a company-specific basis because there
> are just too many variables . . . with each company.  And . . . when one company
> goes up, the other one goes down so the index may look like it's flat, but that's not
> really the story here.  [T]here's a reason why some companies decline and other
> companies increase.

8    Winkler Decl., Ex. C at 114:7-14; *see also* Winkler Decl., Ex. C at 115:8-20.  Also, with respect to

9    defendants' unsupported allegation in footnote 5, in particular, that Mr. Steinholt's analysis "fails to

10   properly account for the significant market and industry-wide news that was revealed on March 1," it

11   is important to note that, as admitted by James, other software stocks declined in response to the new

12   information disclosed by Oracle – not the other way around.  *See* Winkler Decl., Ex. B, ¶3c.

13         Defendants also seek to disqualify Mr. Steinholt because he "assumed the entire portion of

14   the price drop that he determined to be Oracle-specific was related to the alleged fraud."  Mot. at 11.

15   Mr. Steinholt made no such assumption; rather based upon his analysis and assumption that

16   plaintiffs will prove their case, Mr. Steinholt concluded that the entire price drop was caused by

17   factors that relate to the alleged fraud.  Winkler Decl., Ex. C at 178:13-179:13; Winkler Decl., Ex. A,

18   ¶¶52-53.  But that conclusion does not disqualify Mr. Steinholt; it simply suggests defendants do not

19   like his conclusion.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d at 158 (2d Cir. 2007), the only

20   authority cited by defendants, certainly does require that an expert or even a plaintiff "allege[] facts

21   that would allow a factfinder to ascribe some rough proportion of the whole loss" to the fraud.  In

22   other words, the *Lattanzio* decision on motion to dismiss allows that the fraud caused the entire loss,

23   as Mr. Steinholt concluded here.  *See id.* ("Plaintiffs have not alleged facts to show that Deloitte's

24   misstatements, among others (made by Warnaco) that were much more consequential and numerous,

25   were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder

---

[7]     Note James' estimate of the price decline on March 2, 2001 net of market and industry
factors is ***greater*** than Mr. Steinholt's estimate.  *See* Steinholt Rebuttal ¶12.

1    to ascribe some rough proportion of the whole loss to Deloitte's misstatements."). Neither

2    defendants nor their experts have identified, let alone quantified, any Company-specific factors

3    unrelated to the alleged fraud disclosed March 1, 2001.

4         Defendants also incorrectly argue that Mr. Steinholt should have provided "means to

5    apportion the alleged damages among the alleged fraudulent misstatements and omissions." Mot. at

6    12. However, no legal authority requires such apportionment by an expert. Although defendants

7    suggest the *Dura* includes such a requirement, it does not, as is demonstrated by defendants' failure

8    to specifically cite the decision. *See* Mot. at 12-13.

9         Lastly, defendants criticize Mr. Steinholt's use of the constant percentage inflation method as

10   inconsistent with *Dura* notwithstanding the fact that *Dura* focused upon pleading and proving loss

11   causation, which is a different concept than the measurement of damages. Mot. at 13-15. Despite

12   defendants' unsupported criticisms of Mr. Steinholt's report of the inflation per share damages – that

13   the damages per share fluctuate during the class period and that the damages can exceed the residual

14   drop – Mr. Steinholt's methodology, as approved by the Ninth Circuit in *Green*, 541 F.2d 1335,

15   remains viable post-*Dura*. *See, e.g., Broadcom*, 2005 U.S. Dist. LEXIS 41976, at *9 ("The most

16   venerable and widely followed explanation of how to calculate such damages comes from this

17   Circuit in Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corp*. . . . .").

18        Indeed, defendants' critique of Mr. Steinholt's event study methodology used to construct the

19   value line, and the resulting constant percentage inflation, is simply an unsupported assertion by

20   defendants that there is "no reason to believe . . . that this inflation remained a constant percentage of

21   the company value." Mot. at 14 (emphasis omitted). The constant percent inflation is a

22   mathematical certainty when a stock, absent the alleged fraud, would have traded as it did, just at a

23   lower level, and is a reality that is fully supported by the academic literature.

24        Instead of providing academic support, or even an economic rationale, why Mr. Steinholt's

25   analysis of Oracle's true value during the Class Period is incorrect, defendants argue that damages

26   should be based on the fraud-related dollar decline (not percentage) in Oracles' stock price following

27   the March 1, 2001 disclosure. Defendants find no support in academic literature for a constant dollar

28   inflation in a case such as this which involves Oracles' growth rates. Defendants' argument is not

based on any economic evidence; rather it is based on **defendants'** so-called legal interpretation of

*Dura.* However, *Dura* did not address the issue of how to calculate damages. In fact, the Supreme

Court simply determined that price inflation alone is not sufficient to demonstrate loss causation, and

then expressly stated that it "need not, and do[es] not, consider other proximate cause or loss related

questions." *Dura*, 544 U.S. at 588. Nowhere in *Dura* does the Court require plaintiffs to calculate

damages based on fraud-related dollar decline in the stock, as opposed to the traditional out-of-

pocket methodology. An alternative and more sensible interpretation of *Dura*, fully consistent with

the out-of-pocket methodology used by Mr. Steinholt, is found in Madge S. Thorsen, Richard A.

Kaplan and Scott Hakala, *Rediscovering the Economics of Loss Causation,* 6. J. Bus. & Sec. L. 93,

95:

> Loss causation exists whenever fraud leads the stock price to be higher than it should
> be, the buyer pays "too much" for the stock, and the buyer is unable to recover that
> overpayment in the marketplace.

Winkler Decl., Ex. D.

Following the above definition, because class members who held their Oracle stock through

March 1, 2001 were unable to recover the amount they overpaid for their stock, the entire

overpayment represents class members' damages. In this case, class members overpaid more than

$160 million for the more than 30 million shares sold by defendants Ellison and Henley, thereby also

benefiting these individual defendants by more than $160 million at the expense of the class

members. *See* Winkler Decl., Ex. A, ¶55. Just because Oracle's price declined subsequent to the

sales, so that the dollar price decline when the truth was revealed was less what it would have been

when the shares traded at higher prices, this does not mean that defendants did not benefit from their

insider sales at the expense of the class members to the tune of $160 million.

The out-of-pocket methodology is a long-established, comprehensive methodology that can

be used to calculate damages in even the most complex scenarios. Simply calculating damages

based on the fraud-related portion of the price decline is not. For one thing, simply calculating

damages based on the fraud-related portion of the price decline would mean that all Oracle investors

would have damages, not only the ones that purchased their shares at artificially inflated prices

during the Class Period. It also would mean that class members could have greater damages than the

1   amount they overpaid for their shares, which is generally the case in an upward trending market.

2   This is why defendants generally argue that damages should be the *lesser* of the amount overpaid for

3   the stock and the fraud related portion of the price decline.[8]  In fact, even defense experts advocating

4   this proposition admit that "[u]sing the minimum of these two measures results in lower average

5   damages than using either measure alone," and that "[w]hile this may be unfair to plaintiffs, laws are

6   not always designed to be fair."  Winkler Decl., Ex. E (Exhibit A at 13).

7          Defendants try to apply the recent decision in *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-

8   FHM, 2007 U.S. Dist. LEXIS 49123 (D. Okla. July 6, 2007), to Mr. Steinholt's analysis in this case

9   to support their claim that Mr. Steinholt's methodology is no longer viable after *Dura*.  This attempt

10  fails.  First, the *Williams* decision is factually inapposite.  In *Williams*, the proffered expert's analysis

11  included damages resulting from leakage – not simply from the price declines resulting from fraud-

12  related event days.   2007 U.S. Dist. LEXIS 49123, at *171.   The damages described by

13  Mr. Steinholt, rather, simply flow from the revelation of the relevant truth on March 1, 2001

14  following the less than three month Class Period.  The *Williams* decision is factually distinguishable

15  on numerous other grounds.  For example, the Class Period was approximately 21 months.  *Id.* at

16  *172.  In addition, at the end of the Class Period the stock was trading in the penny stock range.  *Id.*

17  at *211-12.  The court noted this fact when it reached the fact-specific conclusion that defendants

18  quote out-of-context:

19          Where, as in the case at bar, the value of a common share is driven down to the
            penny stock range by forces unrelated to revelation of the fraud . . . , the application
20          of the constant percentage inflation approach would give the equity investor the
            "partial downside insurance policy"" which *Dura* counsels that the securities law
21          should not provide.

22  *Id.*  Indeed, the court expressly allowed that the constant percentage inflation approach remained

23  viable particularly in a case like here – with a short Class Period:

24  _____

25  [8]      Ultimately, whether or not to limit Mr. Steinholt's calculated out-of-pocket damages by the
    fraud-related price decline following the March 1, 2001 disclosure is a legal issue.  In other words,
26  even if the Court decided that damages should be limited to the lesser of the amount overpaid and
    the fraud related portion of Oracle's price decline following March 1, 2001, Mr. Steinholt's
27  economic analysis remains the same.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT
REPORTS AND TESTIMONY OF BJORN STEINHOLT - C-01-0988-MJJ                    - 15 -

1

2

3

> The court can conceive of a case, involving a short class period, in which the constant percentage inflation approach would at least clear the *Daubert* hurdle, leaving the final determination of the merits of the matter to be resolved by the finder of fact. But, given the tortured history of [defendant's] securities in the 18 months before the first asserted corrective disclosure January 29, 2002, this is not that case.

4

*Id.* at *212 n. 54.

5

In sum, Mr. Steinholt's calculation of damages is reliable and does not violate *Dura*.

6

### 5.   Mr. Steinholt's Analysis of Section 20A Damages is Reliable and Does not Violate *Dura*

7

8

Mr. Steinholt's analysis of Section 20A damages is reliable and comports with all applicable

9

law.  Defendants do not contest the two types of damages calculated by Mr. Steinholt – profits made

10

and losses avoided.  Mot. at 15.  Rather, in a desperate attempt to avoid the staggering resultant

11

amounts – more than $160 million and approximately $451.8 million respectively by type –

12

defendants again challenge Mr. Steinholt's "assum[ption] that 100% of the residual price drop was

13

fraud-related and [his] fail[ure] to account for any Oracle-specific, non-fraud related information that

14

was disclosed on March 1." Mot. at 16.  Again, defendants offer no legal support for this contention

15

– they simply do not like it.   Nonetheless, the fact remains that based upon his analysis and

16

assumption that plaintiffs will prove their case, Mr. Steinholt concluded that the entire price drop

17

was caused by factors that relate to the alleged fraud.  Winkler Decl., Ex. C, 178:13-179:13; Winkler

18

Decl., Ex. A, ¶¶52-53.  Thus, he concluded that no Oracle-specific, non-fraud related information

19

that was disclosed on March 1.  As set forth in section II.B.4, *supra*, no legal authority, including

20

*Dura*, requires an expert or even a plaintiff to apportion fraud.  Moreover, neither defendants nor

21

their experts have identified, let alone quantified, any Company-specific factors unrelated to the

22

alleged fraud disclosed March 1, 2001.

23

Even more frivolous is defendants' challenge to Mr. Steinholt's use of the average closing

24

price between March 16, 2001 and April 30, 2001 to calculate loss-avoided damages.  Defendants

25

ignore the fact that this period represents the first trading window during which defendants Ellison

26

and Henley could trade after the March 1, 2001 disclosures and claim that Mr. Steinholt was

27

required to use March 2, 2001.  Mot. at 16.  Defendants rely solely upon *SEC v. MacDonald*, 699

28

F.2d 47, 55 (1st Cir. 1983), which rather than providing that "the date used to measure loss avoided

1   damages shall be *no later* than the date on which the information has been reasonably disseminated"

2   (Mot. at 16), simply provides that the date should be within a "reasonable time after the inside

3   information had been generally disseminated." 699 F.2d at 55.  Moreover, the relevant statutory

4   provision provides that "[t]he total amount of damages imposed under subsection (a) shall not

5   exceed the profit gained or ***loss avoided*** in the transaction or transactions that are the subject of the

6   violation."  15 U.S.C.S. §78t-1(b) (emphasis added).  Because Ellison and Henley were subject to

7   trading windows, March 16, 2001 and April 30, 2001 was the ***first available period*** during which

8   Ellison and Henley could have traded their stock after March 1, 2001 ***in order to avoid loss***.  *See*

9   Winkler Decl., Ex. F.  Thus, the period used by Mr. Steinholt was indisputably within a "reasonable

10  time after the inside information had been generally disseminated."  In sum, Mr. Steinholt's analysis

11  of Section 20A damages is reliable and comports with all applicable law; defendants challenge to the

12  methodology used by Mr. Steinholt to calculate Section 20A damages fails.

13  **III.     CONCLUSION**

14         For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants'

15  *Daubert* Motion to Exclude Expert Reports and Testimony of Bjorn I. Steinholt.

16  DATED:  October 10, 2007                    Respectfully submitted,

17                                              COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
18                                              MARK SOLOMON
                                                DOUGLAS R. BRITTON
19                                              STACEY M. KAPLAN

20

21                                                      s/SHAWN A. WILLIAMS
                                                      SHAWN A. WILLIAMS
22
                                                655 West Broadway, Suite 1900
23                                              San Diego, CA  92101
                                                Telephone:  619/231-1058
24                                              619/231-7423 (fax)

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MONIQUE C. WINKLER
ELI R. GREENSTEIN
DANIEL J. PFEFFERBAUM
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Oracle3\Refiled Pleadings\OPP00044922_Daubert.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 10, 2007.

<u>s/SHAWN A. WILLIAMS</u>
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ShawnW@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com
- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com
- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com
- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com
- **Stacey Marie Kaplan**
  SKaplan@csgrr.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com
- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com
- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com
- **William S. Lerach**
  e_file_sd@lerachlaw.com
- **James C. Maroulis**
  jim.maroulis@oracle.com
- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com
- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com
- **Brian P Murray**
  bmurray@rabinlaw.com
- **Shinyung Oh**
  shinyungoh@paulhastings.com
- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com
- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com
- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111