COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
skaplan@csgrr.com
         – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
moniquew@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | )<br>)<br>) |
| This Document Relates To:<br><br>ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>) |

Master File No. C-01-0988-MJJ

<u>CLASS ACTION</u>

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF BROOKS HILLIARD

DATE:          November 16, 2007
TIME:          1:30 p.m.
COURTROOM:     The Honorable
               Martin J. Jenkins

**PREVIOUSLY FILED AUGUST 29, 2007
(DOCKET NO. 1041)**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT .......................................................................................................3

        A.      Legal Standard ........................................................................................3

        B.      Hilliard Is Qualified to Offer an Expert Opinion on the Issues Related to
                Suite 11i Software...................................................................................3

        C.      Hilliard's Declaration and Testimony Is Based on a Foundation of
                Relevant Facts and Data..........................................................................4

        D.      Hilliard Utilized a Reliable Methodology Under Fed. R. Evid. 702 ....................15

        E.      Hilliard's Testimony Is Helpful to the Trier of Fact............................................20

III.    CONCLUSION...................................................................................................22

# I.        INTRODUCTION

Plaintiffs' eminently qualified software expert, Brooks L. Hilliard ("Hilliard"), offers three relevant and reliable opinions concerning statements made by the defendants between December 14, 2000 and March 1, 2001 (the "Class Period") about their software, Oracle E-Business Suite 11i ("Suite 11i"). Accordingly, this Court should find the Declaration of Brooks L. Hilliard CMC CCP, dated May 25, 2007 (the "Hilliard Report") admissible under the relevant Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).

Hilliard opines that defendants knew or should have known that their representations to investors concerning the "functionality of the Oracle 11i E-Business Suite (and the component software modules comprising it)" were false (Opinion 1), their statements that Suite 11i's "component parts were fully integrated and interoperable 'out-of-the-box'" were false (Opinion 2), and Suite 11i was "so unstable and unsupportable, and its performance was so inferior that the product could not be considered of commercial quality" (Opinion 3). Ex. 1 at 4-5.[1]

To be admissible under Fed. R. Evid. 702, an expert must be qualified and his opinions must be relevant and reliable. Hilliard is more than qualified by both education and professional experience, a point that defendants tacitly concede by not challenging his credentials. Hilliard holds degrees from the Massachusetts Institute of Technology and Harvard Business School. He has been an information technology ("IT") and management consultant for 26 years and has evaluated and implemented complex business computer software. Hilliard has been engaged in more than 100 legal disputes and has evaluated "representations very similar to those made by Oracle regarding Oracle 11i, and whether or not the systems involved did or did not perform as represented." Ex. 1 at 61.

Hilliard's opinions are the product of a reliable, experience-based review of the documentary evidence produced in this litigation. In forming his opinions, Hilliard relied on the depositions of

---

[1]      All exhibits references ("Ex.") are to the Declaration of Shawn A. Williams in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Declarations and Testimony of Brooks Hilliard.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ                                        - 1 -

1   those closest to the development of Suite 11i, including Oracle Corporation's ("Oracle" or the

2   "Company") co-founder and Chief Executive Officer ("CEO") since 1977, Lawrence Ellison, the

3   lead application developers of Suite 11i, Executive Vice President ("EVP") Ron Wohl and Senior

4   Vice President ("SVP") Mark Barrenechea, Oracle's SVP for Application Technology Cliff Godwin,

5   an SVP in Enterprise Resource Planning ("ERP") Don Klaiss and senior developer Alan Fletcher.

6   He reviewed and relied upon thousands of pieces of contemporaneous documentary evidence, having

7   had electronic access to all Bates-stamped materials produced in the litigation.  Hilliard also relied

8   on the frank admissions of Ellison and others in the 2003 book *Softwar, An Intimate Portrait of*

9   *Larry Ellison and Oracle* by Mathew Symonds ("*Softwar*").  Hilliard applied his expertise first, to

10  interpret the technical language contained in much of the contemporaneous documentary evidence

11  and second, to evaluate whether defendants knew or should have known that their statements were

12  false or misleading.  Where Hilliard defined terms like "fully integrated" and "commercial quality"

13  he did so in a manner consistent not only with industry standards, but with definitions offered by

14  high-level Oracle employees, and Oracle's software expert Edward Yourdon ("Yourdon").

15      Defendants' arguments to exclude Hilliard on the basis of methodology are weak and should

16  be rejected by this Court.  Defendants attempt to cast Hilliard's report as one only about "quality," a

17  term defendants singularly define as a product of the number of bugs per given size of software.

18  However, this metric is inapplicable because no party to this litigation knows with any accuracy the

19  number of bugs or the size of Suite 11i.  Defendants also seek to shift the focus away from

20  defendants' false and misleading statements and toward a comparative analysis of Suite 11i to other

21  software – a comparison they have also claimed was impossible.

22      Hilliard's declaration and testimony is relevant to the litigation and will assist the trier of

23  fact.  He has offered reliable opinions based on an extensive review of the evidence and determined

24  that the defendants knew or should have known their statements were false and/or misleading as

25  made to investors.  Defendants' arguments that Hilliard offers the opinion of a lay person or failed to

26  apply his expertise are groundless and are reflective of the fact that defendants' expert, Yourdon,

27  was forced to limit his finding that the statements were not false only to those with extensive IT

28  backgrounds.  Hilliard placed no such limitations on his opinions.

## II.     ARGUMENT

### A.     Legal Standard

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which captures the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 589 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).[2]   The trial courts act as gatekeepers in determining whether to admit expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 589.  To be admissible under Fed. R. Evid. 702, an expert must be qualified, his testimony must be reliable and his testimony must be helpful to the trier of fact.  Reliable expert testimony must be:  (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) the application of the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  However, "[u]nder the liberal *Daubert* standard, the plaintiffs do not have to prove to the judge by a preponderance of the evidence that their expert's testimony is correct, they must only show that it is reliable.  The requirement of reliability is lower than the standard of correctness." *United States v. Williams*, No. 04-4267, 2007 WL 1643197, at *3 (3d Cir. June 7, 2007).  Expert opinion testimony is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).

### B.     Hilliard Is Qualified to Offer an Expert Opinion on the Issues Related to Suite 11i Software

A witness may be qualified as an expert if he possesses specialized "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  The qualification standard under Rule 702 is to be applied liberally. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) ("Federal Rule of Evidence 702 . . . contemplates a broad conception of expert qualifications.").

Hilliard's educational experience sets the groundwork for his qualifications on the issues.  He holds a Baccalaureate degree in Mechanical Engineering with Deans' List academic honors from the

---

[2]      All emphasis has been added and internal citations and quotations omitted, unless otherwise indicated.

1    Massachusetts Institute of Technology and an M.B.A. from Harvard Business School. Ex. 1 at 1.

2    Additionally, Hilliard has been a lecturer as a Faculty Associate on the issues relating computer

3    systems and programming for the Arizona State University School of Business, and has taught

4    seminars for the American Management Association. *Id*. Prior to becoming a consultant, Hilliard

5    held positions at several major computer companies in the areas of product design and software

6    development. *Id*. at 2.

7         Hilliard has extensive experience specifically relevant to this inquiry. He has been an

8    information technology and management consultant for 26 years. *Id*. at 1. He is one of only 15

9    professionals in the world to be both a Certified Management Consultant and Certified Computing

10   Professional. *Id*. As a consultant, he has assisted more than 200 entities in the "evaluation, selection

11   and implementation of business computer software to perform enterprise-wide computing functions

12   . . . of comparable functionality and complexity to those in the Oracle E-Business Suite 11*i*." *Id*.

13        Hilliard has been engaged by both customers and vendors in "more than 100 legal disputes,"

14   the most common type relating to "the implementation and/or performance of various enterprise

15   software products." *Id*. at 2. Hilliard has "***been qualified as an expert in both federal and state***

16   ***courts and testified in more than two dozen lawsuits dealing with issues relating to representations***

17   ***very similar to those made by Oracle regarding Oracle 11i, and whether or not the systems***

18   ***involved did or did not perform as represented***." *Id*. at 61. Hilliard's education, professional

19   experience and litigation experience leave no doubt that he is qualified as an expert under Fed. R.

20   Evid. 702, a point that defendants tacitly concede by not even challenging his extensive

21   qualifications.

22        **C.    Hilliard's Declaration and Testimony Is Based on a Foundation of**
          **Relevant Facts and Data**

23        Foundational reliability requires an expert to show that his opinion is supported by an

24   adequate foundation of relevant facts, data or other opinions. *Weinstein's Fed. Evid.*, §702.05[2][b].

25   Weakness in the factual basis of an expert's proffered testimony go to the weight of the evidence,

26   not its admissibility. *See McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 900-01 (6th Cir. 2000).

27

28

Hilliard relied on the depositions of key Oracle employees responsible for the overall development and engineering of Suite 11i and its individual modules. These included: **Lawrence Ellison**, the Company's co-founder, a former software developer and Oracle's CEO since 1977. Ex. 2 at 56-60. **Ron Wohl**, Oracle's EVP and the top executive with responsibility for the ERP portion of Suite 11i. In this position he "led the group that prepared the design of the product, wrote the code, the documentation, the product management, and all the associated activities involved with bringing out a product to market." Ex. 3 at 27:24-28:2. **Mark Barrenechea**, SVP and the top executive with responsibility for the CRM portion of Suite 11i. Barrenechea and Wohl reported directly to Ellison and oversaw the entirety of the development of Suite 11i. Barrenechea stated "Between Ron [Wohl] and myself, we embodied application development." Ex. 4 at 32:16-17. **Edward Sanderson**, who was EVP for Oracle Americas Consulting division (Canada, United States and Latin America) and Oracle Product Industries ("OPI") and responsible for Suite 11i implementations at customer sites. Ex. 5 at 19:3-20:4; 20:20-24:4; 32:19-35:3. **Charles Kendig**, Vice President ("VP") for Quality and Customer Satisfaction, who described his role at the Company as "kind of like an ombudsman role, if you will, of if the system doesn't work to the extent that it needs to resolve problems I would get involved." Ex. 6 at 55:6-10. And **Alan Fletcher**, who was the VP of Operations for Customer Relationship Management ("CRM") Development and "was responsible for the development methodology and infrastructure . . . for the CRM division." Ex. 7 at 20:1-4; Fletcher Declaration at 1. Fletcher was "responsible for the development methodology for Oracle's Suite 11i CRM software applications, which included the fundamental design and coding of these products." *Id*. He was also "responsible for designing a methodology for testing Suite 11i's CRM applications" and "interacted on a regular basis with software developers in the ERP group." *Id*. Their sworn testimony was heavily relied upon by Hilliard.

Hilliard also relied upon the frank admissions of Ellison as detailed in the 2003 biography *Softwar* authored by Matthew Symonds. *See* Ex. 1 at 31-32, 34, 43, 45, 48, 50, 58-59, 79, 81. Ellison provided Symonds with "a very high degree of access to both him and Oracle" and Ellison

1   personally wrote unedited commentary which appears as footnotes throughout the book.  Ex. 2 at xi.

2   In *Softwar*, Ellison admits to significant deficiencies and defects in Suite 11i.[3]  For instance, he

3   stated:  "***The new order management system . . . hadn't been tested yet***."  Ex. 2 at 192.  "[*O*]*ur stuff*

4   ***needs to not break all the time***."   Ex. 28 at NDCA-ORCL 1529175.   Symonds also interviewed

5   other high level employees in the process of researching *Softwar* who also provided illuminating

6   commentary on Class Period events.  For example, Barrenechea stated with respect to Oracle's own

7   internal upgrade to Suite 11i in January 2001, "Everyone except Ron [Wohl] knew that we could not

8   place an order with the new [Order Management] system."  Ex. 2 at 196.  To which Ellison

9   responded in a footnote contradicting Barrenechea, "Of course Ron knew about the problems with

10  our internal order management implementation."  *Id.*

11        Hilliard reviewed "thousands" of documents in both hard copy and electronic form as he had

12  electronic access to every Bates-numbered piece of evidence produced in this litigation.  Ex. 8 at

13  48:11-15.  Attached to Hilliard's extensively-referenced report are over 100 contemporaneously

14  created documents and communications, evidencing the facts that helped form the basis of his

15  findings.[4]  Hilliard relied on internal e-mail correspondence between Oracle employees responsible

16  for the development, demonstration and sale of Suite 11i.  These correspondence revealed the

17  defects in Suite 11i functionality.  *See* Ex. 1 at 40 ("Even as of today [June 7, 2001], [version 4 of

18  Oracle 11i] which is the first stable release is ***NOT AVAILABLE in local language and we will***

19  ***only get it between July and October 2001***.") (quoting Ex. 45).  They revealed the lack of full

20  integration and interoperability.  *Id.* at 68 ("***We cannot show what the customer wants to see when***

21  ***it comes to the combination of CRM and ERP***.") (quoting Ex. 9); Ex. 1 at 69 ("I think ***the products***

22  ***have not undergone any form of integration testing and [they are] failing in this area***.") (quoting

23  ───────────────────

24  [3]      Defendants' suggestion that "Mr. Hilliard asks this court to 'simpl[y] tak[e] [his] word for

25  it,'" that defendants knew or should have known their representations to be false couldn't be less
    accurate.  *See* Defendants' Notice of Motion and Motion to Exclude Declarations and Testimony of
    Brooks Hilliard ("Defs' Mot.") at 12.  The extensive evidence relied upon and cited by Hilliard

26  shows that, ***in fact, Hilliard wants the Court to take defendants' words for it***.

27  [4]      In comparison, Yourdon attaches 150 analyst reports but almost no evidence of actual usage
    of the software.

28

1   Ex. 10).  They revealed Suite 11i's instability and poor performance.  *See* Ex. 1 at 84 ("***No real***

2   ***performance testing*** . . . The ***11.5.2 upgrade CD has been broken until this week***.") (quoting Ex.

3   11); Ex. 1 at 86 ("***We've had to repeatedly advise NT customers to delay go live [and they] are livid***

4   ***with us***.") (quoting Ex. 12); Ex. 1 at 88 ("***We are still having very significant problems with the 11i***

5   ***roll out of Indirect Procurement***. . . .") (quoting Ex. 13); *see also* Ex. 1 at 28-31, 40-42, 46-47, 53-

6   55, 59, 62, 65, 68-69, 71, 83-86, 88-96, 98, 101, 103-104, 107-109.

7        Hilliard relied on internal Oracle documents, including the July 2001 "GE Get Well Plan"

8   (Ex. 14 ("***Software quality for initial 11i releases was not what we hoped it would be***.")); the

9   "Fiscal 2002 Budget Presentation" of Jeffrey Henley (Ex. 15 ("Critical products (modules) are not

10  implemented in several countries . . . ***creating an incomplete technology solution***.")); and the June

11  2002 "E-Business Suite High Level Requirements Document" (Ex. 16 ("***The capabilities to perform***

12  ***an integrated planning (sic) in the E-Business Suite is broken***.")).

13       He relied on internal e-mails between Oracle employees discussing problems experienced by

14  Suite 11i customers including Brock Tool (Ex. 17 ("The customer is continuing to have ***major***

15  ***problems*** with Oracle Order Management.")); Paxar (Ex. 18 ("Paxar's Vice Chairman first

16  expressed his ***dissatisfaction with the 11i quality and stability***.")); and Chipotle (Ex. 46 ("They are

17  experiencing ***major performance problems with 11i***.")); *see also* Ex. 1 at 36, 39, 91-92, 97-98, 100,

18  103-107.

19       Hilliard relied on relatively few direct customer complaints to Oracle in forming his

20  opinions, in contrast to defendants' claims.  *See* Defs' Mot. at 5, 17.  He did rely on Pepsi ("***Our***

21  ***oracle project has been an unmitigated disaster***."); Ingersoll Rand ("***We have little confidence in***

22  ***Oracle's ability to provide a stable working environment***."); and Liberty Mutual ("***The situation***

23  ***here is dire***.").  Ex. 1 at 46, 83, 97 (quoting Exs. 19-21); *see also* Ex. 1 at 52, 92, 99.

24       Hilliard also relied on analyst reports.  Ex. 1 at 43-44 ("Memo to Oracle: Stop Blaming

25  Customers") (quoting Ex. 22).  He relied upon the Special Litigation Committee Report.  *Id.* at 27

26  n.49.  And he reviewed the relevant pleadings.  *Id.* at 6; Ex. 8 at 44:21-46:8.  The extensive factual

27  record leaves little doubt that Hilliard's report is supported by not just an "adequate" but extensive

28  "foundation of relevant facts, data [and] other opinions."  *Weinstein's Fed. Evid.* §702.05[2][b].

1
2

        **a.**    **Defendants' Attempt to Label the Evidence Relied upon by Hilliard as "Anecdotal" Misinterprets the Case Law and Mischaracterizes the Evidence**

3

        Defendants repeatedly mischaracterize the evidence relied on by Hilliard as "anecdotal," or

4

refer to his "anecdotal methodology."[5]  *See* Defs' Mot. at 1-3, 6-7, 10-11, 19.   However, the

5

evidence relied upon by Hilliard is clearly not "anecdotal" as the term is used in the case law cited

6

by defendants.  *See Recreational Dev. of Phoenix, Inc v. City of Phoenix*, 220 F. Supp. 2d 1054,

7

1061 (D. Ariz. 2002) (anecdotal evidence is "by definition, non-systematic and non-generalizable");

8

*Democratic Party of Wash. State v. Reed*, No. C00-5419FDB, 2002 WL 32925223, at *15 (W.D.

9

Wash. Mar. 27, 2002) ("The danger here is that . . . the witnesses' conclusions are supported by their

10

experience . . . isolated anecdotal evidence, or belief."); *Cavallo v. Star Enter.*, 892 F. Supp. 756,

11

767 (E.D. Va. 1995) ("[C]ase reports are not reliable scientific evidence of causation, because they

12

simply describe[] reported phenomena without comparison to the rate at which the phenomena occur

13

in the general population or in a defined control group."), *aff'd in pertinent part*, 100 F.3d 1150 (4th

14

Cir. 1996).   These cases demonstrate that courts' concern about anecdotal evidence is based on

15

avoiding "unfounded extrapolation," a situation which is not present in this case.  *Reed*, 2002 WL

16

32925223, at *15; *see also Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1373 (N.D. Ga.

17

2001).

18

        In contrast to the case law cited by defendants, Hilliard's opinions are supported by an

19

extensive body of evidence, much of which was generated by those Oracle employees closest to, and

20

most knowledgeable about, Suite 11i and its defects.   The statements of these individuals are

21

anything but "casual observations."  *See* fn.4, *supra*.  For example, Hilliard found that the defendants

22

knew or should have known that their statements regarding support for global operations were false,

23

including the claims that "every application works in every country, every major language, and

24

every major currency" and "our applications are written in 23 different languages."  Ex. 1 at 15

25

(quoting Exs. 23-24).  Hilliard's opinion is directly supported by Ellison's attempt at his deposition

26

27

[5]      "Anecdotal" is defined as "based on casual observations or indications rather than rigorous scientific analysis."  *The American Heritage Dictionary* (4th ed. 2004).

28

1  to retract his representation that Suite 11i worked in "every country," in favor of the more limited

2  statement, in "every major country." Ex. 25 at 130:13-14, 131:17-18. Hilliard's opinion is also

3  supported by the contemporaneous documentation generated by Oracle's high level employees. A

4  January 2001 internal e-mail from EVP for Sales and Consulting in Europe, the Middle East and

5  Africa, Sergio Giacoletto, to Ellison stated that National Language Support "will not be fully

6  translated" until May 2001 and that there were "almost 5,000 translation issues to be fixed." Ex. 1 at

7  40 (quoting Ex. 26). Internal documents also reveal that as late as June 6, 2002 certain modules

8  "lack multi-byte support," which Hilliard explained is "required to do the Asian, like Japanese and

9  Chinese Korean, character sets." Ex. 8 at 214:21-25.[6] More generally, Hilliard relied on Ellison and

10  Wohl's admissions that Suite 11i was rushed to market and was not adequately tested. Ex. 2 at 189.

11  Ex. 3 at 106:17-21. The concerns of "anecdotal" evidence are simply not raised here because

12  Hilliard is relying on the words of the defendants and/or the defendants' highest-ranking employees.

13  This is representative of the extensive support which the factual record provides for all the opinions

14  Hilliard offers in his report.

15          **b.**    **Hilliard Reviewed and Considered All Evidence in an Impartial Manner**

16

17         Hilliard's analysis was impartial and rigorous and he clearly articulated at his deposition why

18  certain evidence – both positive and negative – was not relevant to his inquiry. Defendants argue

19  that Hilliard excluded data which was inconsistent with his thesis and label his report as biased

20  because he did not look at the data from all "2,500 customers implementing 11i during the Class

21  Period" but instead cites only 40 difficult implementations.[7] Defs' Mot. at 14 (quoting Ex. 27).

22

23  [6]     It should be noted that this evidence also refutes Yourdon's claim, which was an attempt to recast the defendants' claims of global support as one of *capability* for global support. The lack of

24  UTF-8 multi-byte support meant that not only was Suite 11i not translated into all languages, but it was not even *capable* of being translated into certain key languages.

25  [7]     "Moreover, as a general rule, bias is not a permissible reason for the exclusion of expert

26  testimony." *United States v. Thompson*, 2007 U.S. App. LEXIS 17355, at *5 (9th Cir. July 16, 2007). *See also United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001) ("Generally,

27  evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury.").

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ          - 9 -

1    First, defendants rely on a February 20, 2001 press release for their claim that 2500 customers were

2    implementing Suite 11i during the Class Period, but that purported fact is not substantiated by the

3    evidence produced in this litigation and is therefore meaningless.  Ex. 27.  Hilliard did a thorough

4    review of all of the evidence related to Suite 11i which defendants produced.  *See* §II.C., *supra*

5    (Hilliard had electronic access to all Bates-stamped documents); Ex. 8 at 59:12-20 ("[Hilliard]

6    evaluated all accounts.").  Second, defendants' claim that Hilliard only looked at select problematic

7    implementations is undermined by Ellison's admission that "[Suite 11i] was just too hard to install . .

8    . the customer got in trouble because the installation was too complex."  Ex. 28 at NDCA-ORCL

9    1529173.  The widespread nature of the problems suffered by customers implementing Suite 11i

10   during the Class Period is further evidenced by the same February 20, 2001 press release which

11   states that only "180 customers have gone live" on Suite 11i.  Ex. 27 at NDCA-ORCL 102009.

12   Thus, there were almost 15 customers struggling through implementation for every one so-called

13   "live" customer on Suite 11i.[8]

14        Third, while Hilliard reviewed all accounts of Suite 11i implementations, not all accounts

15   were relevant to his inquiry.  Hilliard stated:

16        I evaluated ***all*** accounts.  Almost all of the positive accounts I saw dealt with very
          limited implementations that weren't relevant to my opinions because my opinions
17        were more focused on the implementations that included the breadth of functionality
          described by Oracle's representatives, Mr. Ellison's and the other senior executives
18        in the company.

19   Ex. 8 at 59:12-20.  While Suite 11i contained approximately 75 modules, "Oracle listed a customer

20   as 'live' when it had fully implemented at least one module of Suite 11i."  Ex. 29, ¶205 n.277.  A

21   customer implementing, or "*live*," on just a single module would not utilize the "tight integration" of

22   ERP and CRM which Oracle trumpeted as the hallmark of Suite 11i because integration involves

23   _____

24   [8]    Defendants suggest that the post-Class Period completion of problematic Suite 11i
         installations demonstrates a flaw in Hilliard's analysis.  *See* Defs' Mot. at 15.  Defendants are
25   incorrect and deliberately attempt to steer any debate away from the fact that Hilliard found that the
     defendants knew or should have known that their statements were false or misleading when made
26   during the Class Period.  By rushing the defect-ridden Suite 11i to market, Oracle was able to lock in
     customers.  Later claims of stabilization of the software do not make defendants' Class Period
27   statements true, nor should it exonerate their insider trading.

28

1   "the ability of modules of Suite 11i to work together and share information."  *See* Ex. 30 at 8;

2   Ex. 31.  Thus, accounts of limited installations were not as relevant to whether the defendants'

3   statements were false and misleading.

4       Fourth, Hilliard explained that, based on his experience, he approached appraisals from

5   people in marketing with "a certain level of skepticism."  Ex. 8 at 57:1.  He explained:

6       Salesmen, and in particular marketing people – and I was a marketing person – and
        people involved in implementations have a predilection to give a positive spin on
7       what . . . they're doing or what they're seeing or what they're expecting.

8   *Id.* at 57:2-6.  High level Oracle employees were likewise skeptical.  For example, the EVP for

9   EMEA expressed disbelief that a new implementation actually used CRM and ERP (and the director

10  of product planning for application development confirmed the disbelief was not unwarranted, "I'm

11  not aware of any customers live on CRM at this time.").  *See* Ex. 32.  Hilliard excluded those

12  accounts that conflicted with other, more reliable accounts.  "There were certainly instances of third

13  party accounts that were not reliable.  Because they were conflicting accounts of the same situations

14  giving different appraisals."  Ex. 8 at 56:13-17.  Hilliard was also able to view customer and

15  marketing accounts in light of later evidence.

16      Finally, Hilliard excluded evidence of customer problems ***which supported his opinions***

17  where his experience indicated to him that the problem may have been caused by something other

18  than a software defect in Suite 11i.  Ex. 8 at 113:3-144:25, 119:23-122:16.  Hilliard used customer

19  reports as "confirmatory" of problems detailed in other documentary evidence.[9]  Ex. 8 at 122:5.

20  Hilliard testified, "[s]o the user experiences in many cases were confirmatory of what was the

21  inevitable result of those things not having been in the product during the class period."  *Id.* at 80:20-

22  23.  For instance, despite the fact that Ellison admitted that Order Management was placed into Suite

23  11i without adequate testing, Hilliard continued to look for alternative explanations for customer

24  problems.  *See* Ex. 1 at 31-37.

25

26  [9]      Hilliard's use of customer reports in a "confirmatory" manner demonstrates the impartial
        nature of his work and addresses arguments that defendants raise about the reliability of customer
27      reports.  *See* Defs' Mot. at 14 n.10.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ                                    - 11 -

1

2

> Sometimes you can just tell from the description that even though it's an order
> management problem, it wasn't caused by a software defect.  And if that was the
> case, I disregarded that.

3

4

Ex. 8 at 122:12-16.  Defendants' claim that Hilliard used a biased sample because he did not

consider all "2500 customers implementing 11i" is baseless.  The alleged 2500 implementations

5

were not part of the discovery here and thus not available to Hilliard.  Hilliard carefully reviewed all

6

of the evidence to find those accounts, whether positive or negative, which were the most reliable,

7

responsive and relevant to his inquiry.  Ex. 8 at 59:12-20.

8

               c.      **Experts in Hilliard's Field Rely on Communications
from Customers**

9

10

The use of customer communications about software functionality or other documentary

evidence does not raise any hearsay issues which would preclude Hilliard from providing his opinion

11

or testifying as an expert witness under Fed. R. Evid. 703.  First, as demonstrated above, Hilliard

12

relied on very few direct customer communications in forming his opinion, refuting defendants'

13

claim that the "vast majority" of the data relied upon was customer trouble reports.  Defs' Mot. at 3,

14

17.  Second, customer complaints are not hearsay.  Hilliard opines that the defendants ***knew or***

15

***should have known*** their Class Period representations about Suite 11i were false or misleading.  Ex.

16

1 at 4-5.  Thus, customer complaints are not presented only to prove the truth of the matter asserted,

17

but are used to demonstrate customers' experiences in implementations – which defendants said

18

would be easy, ***nearly risk free and inexpensive***.  Ex. 33.  Further, customer complaints are utilized

19

to confirm what one would expect from admissions that the software was not fully tested and to

20

demonstrate whether it actually performed in an integrated fashion, and finally to demonstrate

21

defendants' knowledge of those facts at the time they made statements at issue.  *See* Fed. R.

22

Evid. 801.  As to defendants' contention that experts in the management and consulting field do not

23

use customer input in forming their conclusions, the defendants are contradicted by their own expert.

24

*See* Fed. R. Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in

25

forming opinions [] the facts or data need not be admissible.").  Yourdon stated that to see beyond

26

27

28

1   the architecture and design of Suite 11i "I had to look at actual implementations *and reports from*

2   *customers to see whether it was operating as designed*."[10]   Ex. 34 at 230:4-12.

3                   **d.   Hilliard's Opinions Concerning the Lack of Testing Are**
                          **Based on Contemporaneous Documentation, the**
4                         **Majority of Which Was Generated by the Defendants**

5           Hilliard based his opinions on the *affirmative representations made by high level Oracle*

6   *executives* that Suite 11i was not adequately tested. *See* Ex. 1 at 65-66 (quoting an e-mail from D.

7   Campbell to D. Klaiss explaining: "'At this time, *we do not have a controlled environment where*

8   *complete integrated systems testing for the whole ERP/CRM suite can take place*.'"); Exs. 35-36

9   (subsequent e-mail from Klaiss to Barrenechea and Wohl attaching Campbell's e-mail and adding:

10  "'***Today's situation is that we cannot test integrated business flows prior to customer shipment***'").

11  What little integration testing that was performed was described by Oracle employees as "limited

12  'rifle shot' tests" and "rifle shot through the system,"[11] and described by Hilliard as not "any

13  _____

14  [10]       Defendants further attempt to undermine Hilliard's opinions because he did not speak to
    customers or attend product demonstrations in the process of drafting his report. *See* Defs' Mot. at
15  16. Defendants' attacks are baseless. First, much of this evidence is unavailable as Hilliard drafted
    his report approximately six years after the relevant period (June 1, 2000-June 1, 2001). Many
16  customers have since gone out of business, or are no longer using the relevant software, and the
    demo system is no longer available. Second, Hilliard used more reliable sources of information in
17  forming his opinion: the admissions of the defendants in their depositions; the book *Softwar*
    annotated by Ellison himself; the defendants' contemporaneous internal communications with each
18  other; the contemporaneous communications between defendants and Oracle's customers and finally
    the complaints of customers. From CEO to customer, this information told a consistent story:
19  Defendants knew or should have known that their statements about Suite 11i were false or
    misleading.
20
    [11]       Defendants audaciously misrepresent the content of the same e-mail exchange which Hilliard
21  relies upon to support their position that "Oracle did perform integration testing of Suite 11i prior to
    release." Defs' Mot. at 19-20 n.14. While defendants' counsel (but tellingly not defendants' expert,
22  though he did consider the evidence) attempt to use the post-Class Period statement that: "This
    testing will be beyond integration testing which may be a rifle shot through the system," to support
23  their claim that Oracle properly performed integration testing, Hilliard's more thorough, reliable and
    experienced analysis reveals that *Oracle sought to avoid "rifle shot" testing post Class Period*.
24  Ex. 36 at NDCA-ORCL 056440. This is confirmed in the very same e-mail conversation: "[T]here
    is really a need for a more thorough and repeatable set of tests that can prove that that all of the
25  integrated flows . . . work completely through the entire system." *Id.* This provides an excellent
    example of how Hilliard used his expertise to interpret the jargon of software developers and IT
26  professionals in forming his opinions. Indeed, courts have recognized that experts can reliably
    interpret specialized language based on experience and methodology. *See United States v. Freeman*,
27  488 F.3d 1217, 1223-25 (9th Cir. 2007) (finding "drug jargon" to be a subject for expert testimony
    and the detective's interpretations admissible based on his experience and methodology).
28

1   substantive testing that anyone knowledgeable about testing would consider to be a real test

2   regarding integration." Ex. 36; Ex. 8 at 160.  Hilliard is further supported by the admission of Wohl,

3   who stated:

> [T]here should have been more testing of the CRM product stand-alone, there should
> have been more testing of the boundary points between ERP and CRM, and there
> should have been better . . . coordination of the processes.

6   Ex. 3 at 106:17-21.  Ellison admitted not only that Suite 11i was rushed to market and "should have

7   delayed [] even longer," but that "[Order Management] hadn't been tested."  Ex. 2 at 189, 192.

8   Oracle's SVP for Applications Technology, Cliff Godwin, admitted that "no single person" had been

9   assigned the responsibility for integration testing.  Ex. 37 at 32-33.  This was confirmed by the

10  testimony of Oracle's VP of Application Integration, Greg Seiden.  Ex. 38 at 65, 67-68, 79.  Hilliard

11  did not rely solely on an absence of evidence regarding testing, as defendants claim.  Defs' Mot. at

12  19-20; Ex. 8 at 160:12-16.

13              e.      **Installing and Implementing the Software Was a Red
                        Herring**

15          Hilliard offers a detailed explanation of the factors he considered in deciding not to install,

16  implement and test the Suite 11i software produced by defendants.  Ex. 1 at 6-8.  The size and

17  complexity of Suite 11i made effective testing prohibitive as evidenced by Oracle's inability to

18  properly test Suite 11i for nearly one year after release.  *Id.* at 65.  The software fills approximately

19  300 CDs and is designed to have hundreds of options which can be configured into thousands of

20  permutations.  *Id.* at 6-8.  Even using round-the-clock testing,

> [Hilliard] concluded that such a test could not provide more valid information
> regarding the characteristics of the Oracle 11*i* product or how it operated as
> ***compared to its documentation than what was already available in the
> contemporaneous documentation of actual Oracle 11i use and experience of
> Oracle's sales, consulting and development organizations before, during and after
> the Class Period***.

1   *Id.* at 7.  Most telling, however, is the fact that Yourdon, expert for defendants, including Oracle –

2   *the vendor of the software* – did not test the software either.  Ex. 34 at 40:12-16. The actual use of

3   the software was not a pre-requisite for offering a reliable opinion.[12]

4         **D.**      **Hilliard Utilized a Reliable Methodology Under Fed. R. Evid. 702**

5           Where expert testimony is not based in scientific expertise, but rather in technical knowledge,

6   skill or experience, the *Daubert* factors are difficult, if not impossible to apply.[13]  *Kumho*, 526 U.S.

7   at 150.  "[P]ersonal experience can be a reliable and valid basis for expert testimony.  This is

8   *particularly true with non-scientific testimony* . . . ."  *Groobert v. President & Dirs. of Georgetown*

9   *College*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (quoting *Kumho*, 526 U.S. at 149; *Ambrosini v.*

10  *Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996)).  Ultimately, the court's gatekeeping function must

11  ensure that an expert witness "employs in the courtroom the same level of intellectual rigor that

12  characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.

13          Hilliard used the same rigorous and standardized methodology in forming his opinions in this

14  case that he uses as an IT and management consultant, with adjustments for the fact that expert

15  assignments occur after the fact, whereas his consulting work is done prospectively. Ex. 1 at 9 n.8;

16  Ex. 8 at 34:13-14.   Hilliard stated at his deposition: "Now, the process that I use in expert

17  engagements is essentially the same as the process that I use and that literally hundreds or thousands

18  of other IT consultants use in the selection of software." Ex. 8 at 35:4-7.  This involved: (a) defining

19  the needs of the client (*id*. at 34:23-35:14); (b) identifying potential vendors (*id*. at 35:8-9); and (c)

20

---

21  [12]      Defendants attempt a sleight of hand by equating the use of the Suite 11i software with a

22  review of the Suite 11i documentation in an effort to avoid throwing their own expert under the proverbial bus.  Defs' Mot. at 1 ("[Hilliard] did not study the suite 11i software or its technical

23  documentation").  Plaintiffs note, once again, that the documentation reviewed by Yourdon in forming his opinions represented only the *desired* or *intended* structure of Suite 11i and such a

24  review would not capture the effect of the *thousands* of software defects experienced by end-users.

25  [13]      *Daubert* offers a list of non-exclusive, non-mandatory factors bearing on the determination of reliability: (1) whether the theory or technique will be, can be or has been tested; (2) whether the

26  theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error experienced in the application of the particular theory or technique; and (4) the degree

27  of acceptance of the theory or technique in the relevant scientific community, *i.e*., widespread versus minimal.  *Daubert*, 509 U.S. at 593-94.

28

evaluating the suitability of the vendor's software to the client's needs (*id*. at 35:8-10).[14]  Ultimately,

based upon extensive contemporaneous evidence produced in this litigation, Hilliard evaluated

whether Suite 11i performed as defendants claimed during the Class Period.  Hilliard stated:

> I look at the vendor qualifications, I look at the software reliability, I look at references, I look at . . . demonstrations of the software.  I talk to users of the software in the consulting environment.
>
> In the litigation environment, I look at those exact same types of issues. ***However, in the litigation environment, I have to look at them through the documentation of them rather than . . . being able to do them prospectively by talking to the individuals***.

*Id*. at 36:5-14.  "[T]he gatekeeping inquiry must be tied to the facts of a particular case."  *Kumho*,

526 U.S. at 150.  Here, Hilliard has employed an adapted version of his consulting methodology in

reviewing "thousands" of pieces of documentary evidence produced in this litigation.  Ex. 8 at

47:11-15.  Defendants argue that Hilliard's process is not repeatable, but this is incorrect.  Defs'

Mot. at 13.  An expert of similar educational and professional experience could repeat Hilliard's

analysis by evaluating each and every piece of evidence relevant to Suite 11i produced in the

litigation.  Hilliard undertook a rigorous, thorough and impartial review of the evidence generated in

the course of this litigation.

### a.  Hilliard Employed Industry Accepted Standards and Practices in Forming His Opinions

Defendants claim that Hilliard cannot cite a source for the "industry-accepted guidelines"

which he utilized in drafting his report.[15]  However, as Hilliard demonstrates, those with extensive

software experience apply the same standards which Hilliard applied in forming his opinions.

Furthermore, courts have acknowledged that certain expert testimony is not the subject of extensive

writings.  *See Kumho*, 526 U.S. at 151 ("It might not be surprising in a particular case, for example,

---

[14]     The final steps which Hilliard mentions, contracting and implementation, are not relevant to the litigation context.  *Id*. at 34:25-35:3.

[15]     Defendants make the snide – yet ironic – suggestion that the guidelines which Hilliard was seeking were found in Capers Jones's ("Jones") books and detailed by defendants' expert Yourdon. Defs' Mot. at 13 n.8.  This is ironic because Yourdon then undertook an analysis which was completely insensitive to any software defects. *See infra* at 19.  To suggest that Yourdon somehow based his conclusions on Jones's metrics would create the most-voluminous of "analytical gaps."

1   that a claim made by a scientific witness has never been the subject of peer review."); *see also*

2   *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246 (5th Cir. 2002).

3         Hilliard and Yourdon agree on their definitions of integration.  Hilliard states:

4         I do not dispute Yourdon's definitions and characteristics, indeed they are not that
        different from the definition of integration offered in my declaration dated 25 May
5         2007 and the Oracle employee definitions quoted therein.

6   Ex. 39 at 5; *see also* Ex. 1, §5.2; Ex. 40 at 36.

7         Hilliard and the defendants employ a very similar definition of commercial quality which

8   requires a piece of software to "provide a level of reliability and functionality suitable for

9   commercial usage for the purposes it is promoted and sold to perform."  Ex. 1 at 77-78; Ex. 8 at

10  194:20-195-3.  Hilliard stated that this definition was "vetted . . . with many of [his] peers."  Ex. 1 at

11  77-78.  Hilliards' defintion is substantiated by the fact that Oracle's own CRM Chief Barrenechea

12  stated that commercially viable software is "***tested***, . . . it's functionally complete, documented.  It's

13  in a position to be sold, in a position for customers to go live on."  Ex. 4 at 233:23-25.  Furthermore,

14  Hilliard specifically identifies the elements of commercial quality, evaluating each individually.

15  Defendants cannot refute Hilliard's opinions on Suite 11i's instability, unacceptable customer

16  support, and performance deficiencies.  *See* Ex. 1, §§5.3.1-5.3.3.  Defendants' assertion that "Mr.

17  Hilliard believes that all of Defendants' statements . . . must have been false because customers were

18  experiencing to many bugs" blatantly mischaracterizes and ignores the rigorous and reliable

19  methodology which Hilliard applied in forming his opinions.  Defs' Mot. at 3.  The evidence

20  supports both Hilliard's and Barrenechea's similar definitions of commercial quality because Ellison

21  and Wohl admit that Suite 11i was inadequately tested before it was released, and Ellison himself

22  stated, more than a year after release, that "Until [users are delighted with Suite 11i] I doubt we will

23  achieve success in the market."  Ex. 1 at 92 (quoting Ex. 47).

24        In an attempt to undermine Hilliard, defendants define a test for "quality" which they are

25  aware no expert in this litigation could evaluate:

26        [I]n order to analyze software quality in a reliable and principled way, it is necessary
        to understand several factors, including (1) the size of the software, (2) the actual
27        quantity and type of errors experienced by the users of the software as a class (3) the
        performance (including actual quantity and type of errors) of software of a similar
28        class and size.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ          - 17 -

Defs' Mot. at 9-10 (citing Ex. 40 at §VI.5.; Ex. 41 at 32:13-23, 33:12-25).[16]  At this point in the litigation, it is undisputed that neither party knows with any degree of accuracy either the size of Suite 11i or the number of defects the software contained. Ex. 42 at Conclusion Nos. 1, 4; Ex. 41 at 21:1-25.  Furthermore, data for the relevant product class – *i.e.*, ERP/CRM suites – is proprietary and confidential and hence, not available. Ex. 8 at 95:3-11. Thus, defendants' motivations are clear, they seek to back Hilliard into an impossible inquiry, in which his conclusions flow from a flawed finding about the "quality" of Suite 11i.[17]  Other than distracting the Court, it is unclear why the defendants would articulate or support such an inquiry. [18]  It does nothing to undermine Hilliard.  Furthermore, Yourdon offers no "comparative" or "quality" analysis which would be bolstered by defendants' claims that it is a necessary element to reliable expert testimony.

---

[16]     Defendants suggest that because "Plaintiffs offer no basis to contest this analytical framework put forward in Mr. Jones' books and described by Mr. Yourdon" plaintiffs accept it as the rule. Defs' Mot. at 10. This is of course, ludicrous. Yourdon is free to define his inquiry in this manner. However, if he does so, as defendants now suggest, then he must be excluded because it is now established that no party can determine either the size of Suite 11i or the number of defects with any level of accuracy. Thus, in a desperate attempt to derail plaintiffs' expert, defendants have once again undermined their own expert with greater force.

[17]     To this end, defendants spend almost six pages quarreling with analyses that Hilliard did not perform, including a "comparative analysis of Suite 11i's quality" or taking into account the "ERP context" when considering "quality." *See* Defs' Mot. at 7, 9.  None of these arguments support defendants' claim that Hilliard should be excluded *because they do nothing to undermine Hilliard's qualifications, the reliability or relevance of the opinions which he does offer*.  Where it was appropriate, Hilliard took into account the "ERP context."  For instance, defendants represented that Suite 11i could be implemented "in a matter of days rather than months" which Hilliard interpreted appropriately given the typical installation times for ERP/CRM software suites. Ex. 33 at NDCA-ORCL 014907.

> [I]t would not be reasonable to interpret this as meaning 30 days or less.  Instead I interpreted it to mean some period of time – quoted in days – that is considerably shorter than the minimum amount of time that is has historically taken to implement such applications.

Ex. 1 at 16.  As Hilliard states about his methodology: "As is my normal practice, I have taken care to apply my expertise related to the computer industry customs and practices and accepted standards of care *relevant to this matter in an objective manner*." *Id*. at 9.

[18]     Contrary to the defendants' claims, "The judge does not have to determine that [an expert's] methods are necessarily the best grounds to ascertain certain facts, but only that the evidence presented will help the trier of fact." *Williams*, 2007 WL 1643197, at *3.

1     Instead, unable to satisfy the test for quality which defendants propound, Yourdon undertook

2  an analysis of technical documentation alone which was completely non-responsive to the level of

3  defects in Suite 11i by examining only technical documentation. Ex. 34 at 230:4-12. It is "*look[ing]*

4  *at actual implementations and reports from customers*" which would have allowed Yourdon "to

5  see whether it was operating as designed." *Id*. Thus, it is the exact evidence which defendants label

6  as "anecdotal" and "unreliable" in their motion to exclude Hilliard which defendants' expert

7  Yourdon states is *necessary to determine whether the software "operat[ed] as designed*." Defs'

8  Mot. at 6, 10, 18.

9          **b.      Hilliard Found Defendants' Statements that Suite 11i
                     Was "Designed" or "Engineered" to Have Certain**
10                   **Functionality Were Misleading**

11     Defendants suggest that Hilliard "does not contest that Suite 11i was designed to include all

12  the 'functionality' that Defendants represented; he merely contends that, for various reasons, the

13  software 'did not work.'" Defs' Mot. at 3 (quoting Ex. 1 at 62). First, Hilliard does not "*merely*

14  *contend[]*" that the software did not work. Oracle's own high level employees contend that it

15  doesn't work. As Chief Marketing Officer M. Jarvis wrote in August 2001, "[w]e are going through

16  a rough patch *because 11i did not work* . . . and *we pissed off a lot of customers*." Ex. 1 at 62

17  (quoting Ex. 43). Second, Hilliard states "[t]he relevant issue is not what engineering goals may or

18  may not have been set for the software, *but whether the product did what it was represented to do*."

19  *Id*. at 38. Thus, he found the statement that Suite 11i "is integrated" to be false, and found the

20  statement that Suite 11i "is designed [or engineered] to be integrated" to be misleading. *Id*. at 75.

21  "The reason the second statement was misleading was that it broadly and falsely implied that the

22  'Oracle 11i is integrated' statement was true." *Id*.

23          **c.      Neither Hilliard Nor Yourdon Has Counted the
                      Function Points in Suite 11i and Oracle Does Not Know**
24                   **the Size of the Software**

25     Defendants introduce Jones to much fanfare, but he has not been designated as an expert in

26  this case or given any testimony. Defs. Mot. at 8-9. Defendants use Jones to substantiate their claim

27  that Suite 11i has 250,000 or 267,000 function points. Ex. 40 at 31. Defendants are contradicted by

28  Jensen, whose primary opinion here is that to be reliable a count of function points must come from

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ                                                    - 19 -

1   a counter certified by the International Function Point Users Group.  Ex. 42 at Conclusion No. 1.  As

2   to Jones's estimates of defects per function point, Jensen states that Jones's numbers are "coarse . . .

3   really crude" tools for estimating.  *See* Ex. 41 at 44:13-21.  Jones himself states that these "rules of

4   thumb are ***not*** accurate . . . and should ***not*** be used for contracts, bids, or serious business purposes."

5   Ex. 44 at 101.  Because neither function points nor defeats have been reliably counted, Jones is

6   irrelevant.  Furthermore, Hilliard's "opinion on the quality of the Oracle 11*i* product is based on the

7   ***severity and the criticality*** of the software defects (*i.e.*, bugs) in the Oracle 11*i* software, not on the

8   sheer number of such defects alone."  Ex. 1 at 79.  Jones is also not relevant to Hilliard's Report

9   because Suite 11i did not work: it was not designed or engineered to be integrated because

10  defendants failed to adequately test the software.

11              **d.      Defendants Have Held Out Suite 11i as a**
                        **"Revolutionary" Product Rendering Any Comparative**
12                      **Analysis Inherently Flawed**

13          Defendants challenge Hilliard's opinion because he did not compare Suite 11i to other

14  software.  Defs. Mot. at 6.  Defendants' own representations that Suite 11i was a revolutionary

15  product render any comparative analysis unreliable.  "Oracle is the only vendor to offer a fully

16  integrated and comprehensive suite of e-business applications."  Ex. 33.  Barrenechea stated "the

17  Oracle E-business Suite is the only one that combined tightly integrated ERP and CRM."  *Id.* at

18  NDCA-ORCL 014908.   Yourdon admitted to not being aware of any comparable product in

19  existence in the marketplace from June 2000 to June 2001: "I'm not aware of any [other vendor] that

20  offered or provided, [sic] marketed the extent of CRM and ERP products integrated together into one

21  product during that period of time."  Ex. 34 at 67:25-68:19.  Accepting defendants' characterization

22  as true, there was nothing in the marketplace to which Hilliard could have compared Suite 11i.  Any

23  suggestion that a comparative analysis would yield meaningful results is without merit.

24          **E.      Hilliard's Testimony Is Helpful to the Trier of Fact**

25          An expert witness must provide testimony which "will assist the trier of fact to understand

26  the evidence or determine a fact in issue."  Fed. R. Evid. 702.  "This condition goes primarily to

27  relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo,

28  not helpful."  *Daubert*, 509 U.S. at 591 (quoting 3 *Weinstein & Berger* ¶702[02], at 702-18; *United*

1   *States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Despite defendants' deliberate efforts to

2   misread Hilliard's declaration and deposition testimony, his opinions are clearly articulated and will

3   assist the trier of fact in this litigation.  *See* Defs' Mot. at 16-17.

4           Defendants grossly mischaracterize Hilliard's declaration and deposition testimony.  They

5   claim that "he evaluated the evidence not as a technical expert, but as a person with no expertise in

6   the software field."  Defs' Mot. at 16.  ***This is patently false***.  Hilliard applied his 26 years of

7   experience as an IT and management consultant to the evidence in this case: "I have taken care to

8   apply my expertise related to the computer industry customs and practices and accepted standards of

9   care relevant to this matter in an objective manner."  Ex. 1 at 9.  There is simply no evidence to

10  suggest that Hilliard approached this engagement as a lay person.  It runs antithetical to his very

11  assignment as an expert in this litigation and his educational and professional background.

12          Hilliard evaluated whether the representations made to investors by defendants regarding

13  Suite 11i were false and/or misleading.  He states:

14          So I was looking at [the veracity of defendants' claims about Suite 11i] not from the
            perspective of someone in the IT industry or from a customer, but from the
15          perspective to those people to whom that statement was made.

16  Ex. 8 at 228:24-229:5.  This was necessary because this case is a securities class action where at

17  issue is the falsity of statements made to a class of purchasers of Oracle's stock.  Defendants are

18  simply trying to confuse the issue because Yourdon inexplicably narrowed his findings to "IT

19  Professionals."[19]  Hilliard appropriately offers an expert's opinion that the evidence demonstrates

20

21  [19]     Indeed, defendants' claims are reflective of problems Yourdon encountered when he limited
    his findings only to "IT professionals."  *See, e.g.*, Ex. 40, ¶¶146, 160, 177, 181.  Hilliard's report
22  does not suffer from the same defects.  Though Yourdon found the defendants' statements not to be
    false or misleading, he was forced to limit his findings only to investors who were IT professionals,
23  *i.e.*, "people who had a background and education in the field of computer hardware or software and
    most likely people who were employed by or somehow directly involved in companies that provide
24  computer products and services."  Ex. 34 at 30:23-31:6; *see also id.* at 37:2-7.  That Yourdon could
    not offer the same opinion that the statements were not false or misleading when made to the
25  investing public is testament to the lengths he went to craft an opinion in support of defendants'
    desired arguments.  Hilliard places no such limitation on his findings.  He found that the defendants
26  knew or should have known that their "public representations" were false and misleading.  The fact
    that some of the investors who heard these representations were "IT professionals," and some were
27  not, does not change Hilliard's analysis or undermine the reliability of his opinions.

28

1    that defendants knew or should have known that the statements they made to lay investors were false

2    or misleading.   Hilliard is not attempting to place himself in the position of a lay person or

3    attempting to interpret evidence as a lay person.   In sum, it is clear that Hilliard properly applied his

4    expertise to the facts in this litigation and offered the opinion that defendants' statements were false

5    and misleading to the investing public.

6    **III.      CONCLUSION**

7          For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants'

8    motion.

9    DATED:  October 10, 2007                    Respectfully submitted,

10                                               COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
11                                               SHAWN A. WILLIAMS
                                                 WILLOW E. RADCLIFFE
12                                               MONIQUE C. WINKLER
                                                 ELI R. GREENSTEIN
13                                               DANIEL J. PFEFFERBAUM

14

15                                                    s/SHAWN A. WILLIAMS
                                                      SHAWN A. WILLIAMS
16
                                                 100 Pine Street, Suite 2600
17                                               San Francisco, CA  94111
                                                 Telephone:  415/288-4545
18                                               415/288-4534 (fax)

19                                               COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
20                                               MARK SOLOMON
                                                 DOUGLAS R. BRITTON
21                                               STACEY M. KAPLAN
                                                 655 West Broadway, Suite 1900
22                                               San Diego, CA  92101
                                                 Telephone:  619/231-1058
23                                               619/231-7423 (fax)

24                                               Lead Counsel for Plaintiffs

25   S:\CasesSD\Oracle3\Refiled Pleadings\brf00044717-3.doc

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-MJJ                                          - 22 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 10, 2007.

s/SHAWN A. WILLIAMS
SHAWN A. WILLIAMS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:  ShawnW@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com
- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com
- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com
- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com
- **Stacey Marie Kaplan**
  SKaplan@csgrr.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com
- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com
- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com
- **William S. Lerach**
  e_file_sd@lerachlaw.com
- **James C. Maroulis**
  jim.maroulis@oracle.com
- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com
- **Valerie McLaughlin**
  valeriem@lerachlaw.com,kellyb@lerachlaw.com
- **Brian P Murray**
  bmurray@rabinlaw.com
- **Shinyung Oh**
  shinyungoh@paulhastings.com
- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com
  ,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com
- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com
- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Dorian Daley**
500 Oracle Parkway
Redwood City, CA 94065

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111