LATHAM & WATKINS LLP
Peter A. Wald (SBN 85705)
Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
michele.kyrouz@lw.com

LATHAM & WATKINS LLP
Patrick E. Gibbs (SBN 183174)
Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
matt.rawlinson@lw.com

LATHAM & WATKINS LLP
Jamie L. Wine (SBN 181373)
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jamie.wine@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
Dorian E. Daley (SBN 129049)
James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated)<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF LAUREN SEGAL** |

I, Lauren Segal, declare:

1. At all relevant times and until January 2006, I was an attorney licensed to practice law in the State of California. Since January 2006, I have been on inactive status with the State Bar of California. This declaration, submitted in connection with the matter entitled In re Oracle Corporation Securities Litigation, Master File No. C-01-0988-MJJ (the "Oracle Securities Litigation"), is based upon my personal knowledge, and if called to testify I could and would testify truthfully to the facts set forth below.

2. From May 1995 to May 2004, I was employed as an in-house attorney at Oracle Corporation ("Oracle"). I had previously worked for Oracle as an associate with the law firm of Orrick, Herrington & Sutcliffe. Among other assignments, while I was associated with Orrick, Herrington & Sutcliffe, I had assisted in defending Oracle in a lawsuit involving among other things allegations of state securities law violations.

3. As in-house counsel at Oracle, I had a variety of job responsibilities, including all aspects of litigation matters assigned to me, and, in particular, all aspects of securities litigation. This included supervising document preservation and collection efforts related to litigation for which I was responsible.

4. By March of 2001, I had been practicing law for over ten years, and I had worked as an attorney for Oracle on three different litigation matters involving allegations of securities law violations. I had been employed at Oracle for almost 6 years, and therefore had a solid familiarity with the overall corporate organization.

5. On or about March 12, 2001, Oracle received service of the first of several complaints asserting securities law violations by Oracle and certain of its senior executives in and around the third quarter of Oracle's 2001 fiscal year. The first such complaint was filed on March 9, 2001, by Local 144 Nursing Home Pension Fund (the "Local 144 Complaint"). In the ensuing days and weeks, several other putative class action complaints, all based on substantially similar facts, were filed and served on Oracle.

6. During approximately the same time period, shareholder derivative actions were filed in state court in Delaware and California. These derivative actions were based on

substantially the same facts as the putative securities class action complaints. In or around February 2002, Oracle's Board of Directors formed a Special Litigation Committee (the "SLC") to investigate the allegations in the Delaware derivative action. Eventually, the SLC also investigated the allegations in the California derivative action and in the then-pending putative securities class actions.

7. Beginning in March of 2001 and continuing through my employment at Oracle, I oversaw Oracle's efforts to preserve and collect documents that were potentially relevant to the securities class actions and the derivative cases. In the derivative cases, I worked closely with Oracle's outside counsel at Morrison & Foerster LLP on the collection and production of documents to the plaintiffs in the derivative lawsuits. I also oversaw Oracle's collection and production of documents in response to document requests from the SLC.

8. I first received a copy of the Local 144 Complaint on or about Monday, March 12, 2001. That same day, I began my efforts to preserve potentially relevant documents. To that end, on March 12, 2001, I contacted Oracle's Global IT group and instructed them to retain whatever disaster recovery tapes were in existence for the period between December 15, 2000 and March 1, 2001.

9. Simultaneously, I began meeting in person and on the phone with various Oracle employees who were, in my judgment and based on the information available to me at the time, likely to have potentially relevant documents. I instructed these employees to preserve broad categories of documents that might be relevant to the recently-filed complaints. Based on my prior experience preserving and collecting documents relevant to securities litigation, my initial efforts focused on preserving the documents of Oracle's most senior executives and those of their direct reports who had responsibility for the issues discussed in the complaints, namely, financial forecasting, Suite 11i, and Oracle's announcement of $1 billion in savings from its own implementation of Oracle applications.

10. I also prepared and sent written directions to various Oracle employees instructing them to preserve relevant documents. Specifically, beginning on March 13, 2001, I sent a series of written document preservation notices, primarily by e-mail, to a number of senior

Oracle executives, certain of their direct reports, and other Oracle employees. One such e-mail, which I sent on March 13, 2001, is attached hereto as Exhibit A.

11. In the March 13, 2001, e-mail, I informed the recipients that securities class action lawsuits had been filed against Oracle, and I described the nature of the allegations in the complaints. I informed them that Oracle was required to retain "all documents that might pertain to the allegations of the lawsuits." I instructed the recipients to retain "all documents for the relevant period relating to financial results, forecasts, revenue expectations, budgets, business plans, market analyses, operating costs, cost reduction plans, 11i and CRM implementations, or otherwise relating to the allegations [in the complaints]." I directed the recipients to "be over-inclusive in what you are saving," and I invited them to contact me if they had any questions about what documents should be retained. Finally, I asked the recipients to "[p]lease also forward this note to anyone in your organization who may have relevant documents," and to "[p]lease copy me on your note when you forward it on." See Exh. A. (As discussed in more detail below, some recipients of my March 13 e-mail forwarded it to others and copied me on the forwarding e-mails. I became aware that other recipients had forwarded my March 13 e-mail without copying me.)

12. I sent my March 13, 2001, document preservation e-mail to the Oracle executives and employees that I believed at the time, based on the allegations in the complaints and the information available to me, were likely to have potentially relevant documents. To that end, I sent the March 13, 2001, e-mail to several of Oracle's most senior executives, as well as the direct reports of those executives with responsibility for the matters discussed in the complaints, namely, financial forecasting, Oracle's Suite 11i products, and Oracle's $1 billion savings marketing campaign.

13. In particular, I sent the March 13, 2001, e-mail to Chief Executive Officer Larry Ellison, Chief Financial Officer Jeffrey Henley, Executive Vice Presidents Edward "Sandy" Sanderson and George Roberts, and Chief Marketing Officer Mark Jarvis. In the initial class action complaints, each of Messrs. Ellison, Henley, Sanderson, Roberts and Jarvis was alleged to have made false or misleading statements on behalf of Oracle during the third quarter

of Oracle's 2001 fiscal year.

14. I also sent the e-mail to Carolyn Balkenhol, an executive assistant to Mr. Ellison, and Sharon Montoya, an executive assistant to Mr. Henley. I worked very closely with Susan Marks, an executive assistant to Mr. Sanderson, in securing Mr. Sanderson's documents, and I contacted executive assistants to George Roberts and Mark Jarvis regarding document preservation, but I do not know whether I sent the March 13 e-mail (or a similar e-mail) directly to any of them.

15. In addition, I sent the March 13, 2001, e-mail to several executives who reported to Mr. Ellison or Mr. Henley, and who had responsibility for various aspects of financial forecasting and related financial matters. This group included Jennifer Minton, who was responsible for Company-wide financial forecasting, and one of Ms. Minton's direct reports, Daniel Sharply. This group also included Stephanie Aas, Bruce Lange, Deborah Lange, and Thomas Williams, all of whom reported to Mr. Henley. (In the initial securities class action complaints, Ms. Aas was alleged to have made certain false and misleading statements on behalf of Oracle during the third quarter of Oracle's 2001 fiscal year.)

16. I also sent the March 13, 2001, e-mail to the heads of various revenue-producing business units at Oracle, each of whom would have had forecasting responsibility in connection with his or her business unit. This group included Messrs. Sanderson and Roberts, both of whom are discussed above. Mr. Sanderson was responsible for, among other things, the Oracle Products Industries (or "OPI") unit of Oracle's sales organization and Oracle's Consulting division. Mr. Roberts was responsible for the North American Sales (or "NAS") unit of Oracle's sales organization. This group also included Jay Nussbaum, who was responsible for the Oracle Service Industries (or "OSI") division of Oracle's sales organization; Sohaib Abbasi, who was responsible for Oracle's Education division; and Michael Rocha, who was responsible for Oracle's Support division. Each of Messrs. Sanderson, Roberts, Nussbaum, Abbasi, and Rocha reported to Mr. Ellison.

17. I also sent the March 13, 2001, e-mail to several executives and other employees responsible for software development relating to Suite 11i. This group included two

of Mr. Ellison's direct reports, Ron Wohl (who was responsible for the development of the enterprise resource planning or "ERP" products within Suite 11i), Mark Berenechea (who was responsible for development of the customer relationship management or "CRM" products within Suite 11i). This group also included three of Mr. Wohl's direct reports (John Wookey, who was responsible for financial management products; Joel Summers, who was responsible for human resources management products; Donald Klaiss, who was responsible for manufacturing and supply chain products; and Cliff Godwin, who was responsible for applications technology products) and two senior software developers within Mark Berenechea's CRM organization (Christopher Balkenhol and Holger Mueller). I also sent the March 13, 2001, e-mail to Charles Rozwat, who was responsible for the development of Oracle's database products, and Edward Screven, who was responsible for software architectural issues. Messrs. Rozwat and Screven both reported to Mr. Ellison.

18. I also sent the March 13, 2001 e-mail to Safra Catz, an Executive Vice President who worked closely with Mr. Ellison, as well as Senior Vice President and General Counsel Daniel Cooperman, and Joseph Lockhart, who was responsible for certain public relations matters.

19. I did not send the March 13, 2001 e-mail directly to Jennifer Glass, who was alleged in the complaints to have made a false or misleading statement during the class period, and I do not recall when I first sent Ms. Glass a written document preservation notice. I sent Ms. Glass a written document preservation e-mail in July of 2001, but well before July I had discussed the litigation with Ms. Glass and instructed her to preserve documents that might be relevant to the complaint, including documents in her own files and in those of her group (which consisted of Ms. Glass and a few other employees).

20. I did not send the March 13, 2001 e-mail directly to all of Stephanie Aas's direct reports, although I sent a substantially similar e-mail to Jennifer Bicho in July of 2001. As with Ms. Glass, however, I directed Ms. Aas to preserve documents from her own files as well as those of her group (which consisted of Ms. Aas and a handful of other employees). I also spoke to Ms. Bicho directly about the need to preserve relevant documents.

21. I also arranged to have a separate set of shared documents maintained by the Investor Relations group searched for potentially relevant documents.

22. Throughout the rest of March 2001 and the ensuing months, I continued to investigate the location of potentially relevant documents. As I identified additional Oracle employees who might possess such documents, I sent them document preservation notices, collected potentially responsive documents from them, or both.

23. On March 22, 2001, for example, I sent a copy of my March 13 e-mail to eight employees responsible for certain of Oracle's international operations. On April 16, 2001, I sent a document preservation notice to one of Ron Wohl's direct reports, Mary Ann Anthony, after learning from Mr. Wohl that she might have potentially relevant documents.

24. Among many others, I recall discussing the lawsuits and the need to preserve relevant documents with Richard Blotner, Stephen McLaughlin, Mark Salser, and Shari Simon. I also recall collecting documents from Nicholas Classick.

25. I also sent reminder notices to the employees who had received prior preservation notices. For example, on May 31, 2001, I resent my March 13, 2001 e-mail to the same group (except for Joe Lockhart, who did not have any relevant documents), along with information about the process of gathering potentially relevant e-mails. A copy of my May 31, 2001 e-mail is attached hereto as Exhibit B.

26. Similarly, on May 1, 2002, I sent a reminder notice to several employees I had previously notified of the need to preserve documents (either orally or in writing), including Keith Block, Sebastian Gunningham, Steven Perkins, Valerie Borthwick, Nicholas Classick, and John Nugent (among others).

27. In addition, as I had requested, several of the people to whom I sent document preservation notices forwarded the notices to other employees in their departments. On March 13, 2001, for example, one of the senior CRM developers to whom I sent the March 13 e-mail, Holger Mueller, forwarded my e-mail to seven employees and asked them to comply with my instructions. Similarly, on March 14, 2001, Jennifer Minton forwarded my e-mail to 14 other employees within the finance organization. One of them, Graeme Mair, forwarded my e-

mail to another eight employees (one of whom had already received my March 13 e-mail) on March 15, 2001. Another, William Plant, forwarded my March 13 e-mail to eleven additional employees on March 17, 2001. During my search for documents, I also learned that certain employees forwarded on my preservation notices to additional employees without copying me.

28. Shortly after sending these initial document preservation notices, I began to collect potentially relevant documents from various executives and employees at Oracle, including the core group to whom I sent the March 13 e-mail, as well as many other executives and employees.

29. In response to my March 13, 2001 e-mail, for example, Jennifer Minton and her forecasting group gathered a complete set of forecast packages that were prepared and provided to the Executive Committee during the third quarter of fiscal year 2001. This included forecasts submitted by the field, as well as the "upside" analyses that the forecasting group prepared, lists of large deals that the forecasting group tracked during the quarter and e-mails regarding the status of large contracts. These collection efforts began immediately after I sent the March 13 e-mail.

30. The work of reviewing and gathering potentially relevant documents was done by me, with assistance from certain of the legal assistants who worked for me, as well as by other attorneys for Oracle (including in-house and outside counsel) working with me. In some cases, we worked with the relevant Oracle employees to identify and collect documents, both hard copy and electronic. In others, we were given direct access to the relevant employees' files (again, both hard copy and electronic) in order to identify and collect documents. In some cases, we arranged to have copies made of certain employees' hard drives. To the best of my knowledge and recollection, in every instance an attorney for Oracle (in-house or outside counsel) was directly involved in the process of selecting the appropriate documents to preserve.

31. We used a variety of methods to store the electronic documents we gathered. At least some of the documents that I collected in electronic form (including e-mails) were copied to a secure server for temporary storage, then later copied to CD's, DVD's, or other

storage media. The secure server, in other words, was used for temporary storage, not long-term storage.

32. The hard copy and electronic documents that I gathered were made available to Oracle's counsel (again, both in-house and outside counsel) for review and production in connection with this lawsuit, the related derivative litigation, and the Special Litigation Committee's investigation.

33. I expanded the scope of my document preservation and collection efforts in response to various developments in the litigation, including amended pleadings. For example, in or around August of 2001, Plaintiffs filed a Consolidated Complaint that cited, for the first time, statements attributed to a number of "confidential witnesses." The confidential witnesses allegedly included several current or former employees from Oracle's consulting division. After receiving and reviewing the Consolidated Complaint, I sent document preservation notices to certain Oracle consulting executives I believed might have potentially relevant documents, including Keith Block, Sebastian Gunningham, Steve Perkins, and Valerie Borthwick. In addition, I interviewed witnesses within Oracle's consulting division, including Terrence Ford and Brad Scott, and to the extent that they had any relevant documents, I collected them or arranged to have them collected.

34. Similarly, in or around October 11, 2002, the plaintiffs filed a second amended complaint that included, for the first time, allegations regarding Oracle's accounting for revenue in the second quarter of its 2001 fiscal year. On October 14, 2002, after receiving and reviewing the second amended complaint, I contacted several employees with responsibility for the relevant accounting functions, including Ryan Roberts, Michael Quinn, Raul Campos, and Neal Menon, and instructed them not to delete documents pertaining to the newly-added allegations. On November 18, 2002, I followed up with a written document preservation notice to at least 15 employees with responsibility for the relevant accounting functions. Those employees included, among others, Michael Quinn, Greg Myers, Ian Hatada, Raul Campos, Sanjay Kumar, Molly Littlefield, and Neal Menon.

35. In or around November 2002, Plaintiffs' filed an *ex parte* motion claiming that Oracle was destroying documents relevant to Plaintiffs' accounting claims. After receiving and reviewing the motion, among other things, I arranged to have the hard drives of several potentially relevant employees copied, including, among others, Ryan Roberts, Raul Campos, Neal Menon, and Ian Hatada.

36. Throughout this process, my strategy was to cast a wide net in order to include any Oracle employees who might have documents that were potentially relevant to the litigation. In so doing, I was aware of the possibility that some of the employees I instructed to preserve documents might not turn out to have any relevant documents. My intent, however, was to be over-inclusive in the preservation of potentially relevant documents. As such, I sent document preservation notices to and/or otherwise directed that document preservation efforts be taken by each Oracle employee who was, in my judgment and based on the information available to me at the time, likely to have potentially relevant documents.

37. As part of my efforts to preserve documents that might be relevant to this litigation, I arranged to receive periodic reports circulated to managers at Oracle identifying employees who were about to leave the company. When the report identified employees I had previously identified as having potentially relevant documents (and therefore instructed to retain any such documents), I arranged to have the employees' e-mail accounts frozen rather than deleted in the ordinary course under Oracle's document retention policy. The departing employees whose e-mail accounts I arranged to have frozen when they left the company included, among others, John Nugent, Valerie Borthwick, and Stephanie Aas.

38. In addition to my efforts to gather and collect documents potentially relevant to this lawsuit, during 2002 I worked closely with Oracle's outside counsel at Morrison & Foerster to collect documents for production to the plaintiffs in the California and Delaware derivative litigation.

39. I also oversaw Oracle's collection of documents for production to the SLC in connection with its investigation. As part of that process, when the SLC requested interviews with Oracle employees (other than those named as defendants in the derivative cases), I always interviewed the employees before their SLC interviews, and as part of my interviews, I always inquired about potentially relevant documents. If the employee had any such documents, I gathered copies and made them available to the SLC and Oracle's outside counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on June 6, 2006 in Palo Alto, California.

Lauren Segal

EXHIBIT A

**Message-ID:** <3AAE882C.706CE5D3@oracle.com>
**Date:** Tue, 13 Mar 2001 12:50:52 -0800
**From:** Lauren Segal <lauren.segal@oracle.com>
**Organization:** Oracle Corporation
**X-Mailer:** Mozilla 4.61 [en] (Win95; U)
**X-Accept-Language:** en
**MIME-Version:** 1.0
**To:** "Ellison,Lawrence" <LARRY.ELLISON@ORACLE.COM>, "Balkenhol,Carolyn" <CAROLYN.BALKENHOL@ORACLE.COM>, "Henley,Jeffrey" <JEFF.HENLEY@ORACLE.COM>, "Montoya,Sharon" <SHARON.MONTOYA@ORACLE.COM>, "Sanderson,Edward" <SANDY.SANDERSON@ORACLE.COM>, "Roberts,George" <GEORGE.ROBERTS@ORACLE.COM>, "Jarvis,Mark" <MARK.JARVIS@ORACLE.COM>, "BARRENECHEA,M." <MARK.BARRENECHEA@ORACLE.COM>, "Abbasi,Sohaib" <SOHAIB.ABBASI@ORACLE.COM>, "Cooperman,Daniel" <DANIEL.COOPERMAN@ORACLE.COM>, "Catz,Safra" <SAFRA.CATZ@ORACLE.COM>, "Lockhart,Joseph" <JOE.LOCKHART@ORACLE.COM>, "Nussbaum,Jay" <JAY.NUSSBAUM@ORACLE.COM>, "Rozwat,Charles" <CHARLES.ROZWAT@ORACLE.COM>, "ROCHA,MICHAEL" <MICHAEL.ROCHA@ORACLE.COM>, "Screven,Edward" <EDWARD.SCREVEN@ORACLE.COM>, "Wohl,Ronald" <RON.WOHL@ORACLE.COM>, "Wookey,John" <JOHN.WOOKEY@ORACLE.COM>, "SUMMERS,JOEL" <JOEL.SUMMERS@ORACLE.COM>, "Klaiss,Donald" <DON.KLAISS@ORACLE.COM>, "Godwin,Clifford" <CLIFF.GODWIN@ORACLE.COM>, "Minton,Jennifer" <JENNIFER.MINTON@ORACLE.COM>, "Aas,Stephanie" <STEPHANIE.AAS@ORACLE.COM>, "Lange,Deborah" <DEBORAH.LANGE@ORACLE.COM>, "Lange,Bruce" <BRUCE.LANGE@ORACLE.COM>, "Sharpley,Daniel" <DAN.SHARPLEY@ORACLE.COM>, "Thomas,Williams" <THOMAS.WILLIAMS@ORACLE.COM>, "Balkenhol,Christopher" <CHRIS.BALKENHOL@ORACLE.COM>, "Holger,Mueller" <HOLGER.MUELLER@ORACLE.COM>
**CC:** "Daley,Dorian" <DORIAN.DALEY@ORACLE.COM>, "Segal,Lauren" <LAUREN.SEGAL@ORACLE.COM>
**Subject: New Securities Suits--Document Retention**
**X-Priority: 1 (Highest)**
**Content-Type:** multipart/mixed;boundary="------------92D877C672756C319653040F"

CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION

As you probably have heard, securities class action lawsuits have been filed against Oracle. We are required to retain all documents that may pertain to the allegations of the lawsuits. PLEASE READ AND COMPLY WITH THE FOLLOWING NOTE REGARDING TREATMENT OF ANY DOCUMENTS -- INCLUDING EMAIL -- THAT MAY RELATE TO ISSUES IN THE SECURITIES LITIGATION. Please also forward this note to anyone in your organization who may have relevant documents. Please copy me on your note when you forward it on.

The lawsuits allege that Oracle misrepresented the Company's

expectations for revenue growth between Dec. 15, 2000 and March 1, 2001 when it allegedly projected it would have sequential EPS growth of 9%, or $0.12, and revenue of over $2.9 billion for its Q3 2001. The suits also allege that Oracle misled investors about the 11i Suite and its $1 billion savings. Accordingly, all documents for the relevant period relating to financial results, forecasts, revenue expectations, budgets, business plans, market analyses, operating costs, cost reduction plans, 11i and CRM implementations, or otherwise relating to the allegations must be saved. This includes email and any documents stored in soft copy. Destruction or alteration of any of these documents may subject Oracle, and you personally, to contempt of court and other civil and criminal penalties. "Documents" includes all written materials, such as notes, memoranda, work papers, spreadsheets, press releases, correspondence, calendars for the relevant period, and handwritten notes (even if on the back of a napkin or a Post-It), as well as email and any other information stored in computer memory. Please retain all documents falling within these general categories or any other document you believe is relevant to the lawsuit until you are asked to turn the documents over to the Legal Department or are instructed by me that the documents are no longer needed. Please be over-inclusive in what you are saving. We will determine later whether the documents have any relevance to the litigation. If you have any questions about what documents must be saved, please feel free to contact me.

If you are contacted by anyone outside of Oracle and asked to provide information regarding the case, please also refer that person to me. Thank you for your attention to this very important issue.

--
Lauren Segal
Senior Corporate Counsel
(650) 506-9221
(650) 506-7114 (fax)
**note new email address**
lauren.segal@oracle.com

Lauren Segal <lauren.segal@oracle.com>

ORCL 0107985

CONFIDENTIAL

9/30/2002 11 29 AM

EXHIBIT B

**Return-Path:** <lauren.segal@oracle.com>
**Received:** from oracle.com (dhcp-5op6-5op6-west-144-25-178-75.us.oracle.com [144.25.178.75])by gmgw01.us.oracle.com (Switch-2.1.1/Switch-2.1.0) with ESMTP id f4VJkBX09885,Thu, 31 May 2001 12:46:11 -0700 (PDT)
**Message-ID:** <3B16A0EA.658B9DEC@oracle.com>
**Date:** Thu, 31 May 2001 12:52:11 -0700
**From:** Lauren Segal <lauren.segal@oracle.com>
**Organization:** Oracle Corporation
**X-Mailer:** Mozilla 4.61 [en] (Win95; U)
**X-Accept-Language:** en
**MIME-Version:** 1.0
**To:** "Ellison,Lawrence" <LARRY.ELLISON@oracle.com>, "Balkenhol,Carolyn" <CAROLYN.BALKENHOL@oracle.com>, "Henley,Jeffrey" <JEFF.HENLEY@oracle.com>, "Montoya,Sharon" <SHARON.MONTOYA@oracle.com>, "Sanderson,Edward" <SANDY.SANDERSON@oracle.com>, "Roberts,George" <GEORGE.ROBERTS@oracle.com>, "Jarvis,Mark" <MARK.JARVIS@oracle.com>, "BARRENECHEA,M." <MARK.BARRENECHEA@oracle.com>, "Abbasi,Sohaib" <SOHAIB.ABBASI@oracle.com>, "Cooperman,Daniel" <DANIEL.COOPERMAN@oracle.com>, "Catz,Safra" <SAFRA.CATZ@oracle.com>, "Nussbaum,Jay" <JAY.NUSSBAUM@oracle.com>, "Rozwat,Charles" <CHARLES.ROZWAT@oracle.com>, "ROCHA,MICHAEL" <MICHAEL.ROCHA@oracle.com>, "Screven,Edward" <EDWARD.SCREVEN@oracle.com>, "Wohl,Ronald" <RON.WOHL@oracle.com>, "Wookey,John" <JOHN.WOOKEY@oracle.com>, "SUMMERS,JOEL" <JOEL.SUMMERS@oracle.com>, "Klaiss,Donald" <DON.KLAISS@oracle.com>, "Godwin,Clifford" <CLIFF.GODWIN@oracle.com>, "Minton,Jennifer" <JENNIFER.MINTON@oracle.com>, "Aas,Stephanie" <STEPHANIE.AAS@oracle.com>, "Lange,Deborah" <DEBORAH.LANGE@oracle.com>, "Lange,Bruce" <BRUCE.LANGE@oracle.com>, "Sharpley,Daniel" <DAN.SHARPLEY@oracle.com>, "Thomas,Williams" <THOMAS.WILLIAMS@oracle.com>, "Balkenhol,Christopher" <CHRIS.BALKENHOL@oracle.com>, "Holger,Mueller" <HOLGER.MUELLER@oracle.com>, "Daley,Dorian" <DORIAN.DALEY@oracle.com>, "Segal,Lauren" <LAUREN.SEGAL@oracle.com>, David Salow <david.salow@oracle.com>, JOAN_VALLARINO <JOAN.VALLARINO@oracle.com>
**Subject:** **Securities Suits--email collection**
**References:** <3AAE882C.706CE5D3@oracle.com>
**Content-Type:** multipart/mixed;boundary="------------108B99A3A71142F6B70429C3"
**X-Mozilla-Status:** 8001
**X-Mozilla-Status2:** 00000000

We are beginning our document collection for the recently-filed securities suit. For now, we are only going to focus on email. Joan Vallarino of the



ORACLE CONFIDENTIAL





CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

legal dept. will contact you or your assistant in the next week to work out the best way to get your relevant email. We plan to set up a secured area on our server to store the email, rather than initially printing hard copies. Thanks in advance for your cooperation. Lauren

Lauren Segal wrote:

> *CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION*
>
> *As you probably have heard, securities class action lawsuits have been filed against Oracle. We are required to retain all documents that may pertain to the allegations of the lawsuits. PLEASE READ AND COMPLY WITH THE FOLLOWING NOTE REGARDING TREATMENT OF ANY DOCUMENTS -- INCLUDING EMAIL -- THAT MAY RELATE TO ISSUES IN THE SECURITIES LITIGATION. Please also forward this note to anyone in your organization who may have relevant documents. Please copy me on your note when you forward it on.*
>
> *The lawsuits allege that Oracle misrepresented the Company's expectations for revenue growth between Dec. 15, 2000 and March 1, 2001 when it allegedly projected it would have sequential EPS growth of 9%, or $0.12, and revenue of over $2.9 billion for its Q3 2001. The suits also allege that Oracle misled investors about the 11i Suite and its $1 billion savings. Accordingly, all documents for the relevant period relating to financial results, forecasts, revenue expectations, budgets, business plans, market analyses, operating costs, cost reduction plans, 11i and CRM implementations, or otherwise relating to the allegations must be saved. This includes email and any documents stored in soft copy. Destruction or alteration of any of these documents may subject Oracle, and you personally, to contempt of court and other civil and criminal penalties. "Documents" includes all written materials, such as notes, memoranda, work papers, spreadsheets, press releases, correspondence, calendars for the relevant period, and handwritten notes (even if on the back of a napkin or a Post-It), as well as email and any other information stored in computer memory. Please retain all documents falling within these general categories or any other document you believe is relevant to the lawsuit until you are asked to turn the documents over to the Legal Department or are instructed by me that the documents are no longer needed. Please be over-inclusive in what you are saving. We will determine later whether the documents have any relevance to the litigation. If you have any questions about what documents must be saved, please feel free to contact me.*
>
> *If you are contacted by anyone outside of Oracle and asked to provide information regarding the case, please also refer that person to me. Thank you for your attention to this very important issue.*
>
> --
> *Lauren Segal*
> *Senior Corporate Counsel*
> *(650) 506-9221*
> *(650) 506-7114 (fax)*
> ***note new email address***
> *lauren.segal@oracle.com*

--
Lauren Segal
Senior Corporate Counsel
(650) 506-9221
(650) 506-7114 (fax)
**note new email address**
lauren.segal@oracle.com



ORACLE CONFIDENTIAL



NDCA-ORCL 063401

CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

---

Lauren Segal <lauren.segal@oracle.com>









CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

**PROOF OF SERVICE**

I am employed in the County of San Francisco, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, Ca 94111.

**On June 6, 2006**, I served the following document described as:

**DECLARATION OF LAUREN SEGAL**

by serving a true copy of the above-described document in the following manner:

**BY HAND DELIVERY**

I am familiar with the office practice of Latham & Watkins for collecting and processing documents for hand delivery by a messenger courier service or a registered process server. Under that practice, documents are deposited to the Latham & Watkins personnel responsible for dispatching a messenger courier service or registered process server for the delivery of documents by hand in accordance with the instructions provided to the messenger courier service or registered process server; such documents are delivered to a messenger courier service or registered process server on that same day in the ordinary course of business. I caused a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins for collecting and processing documents for hand delivery by a messenger courier service or a registered process server

Shawn A. Williams
Willow E. Radcliffe
Lerach, Couglin, Stoia, Geller, Rudman
& Robbins LLP
100 Pine Street, Suite 2600
San Francisco, California 94111-5238

**BY US MAIL**

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service. Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents with the United States Postal Service; such documents are delivered to the United States Postal Service on that same day in the ordinary course of business, with postage thereon fully prepaid. I deposited in Latham & Watkins LLP' interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service:

Mark Solomon
Lerach Coughlin Stoia Geller
Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**BY FACSIMILE**

I am familiar with the office practice of Latham & Watkins LLP for collecting, processing, and transmitting facsimiles. Under that practice, when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted that same day in the ordinary course of business. I deposited the above-described document for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for collecting and processing facsimiles. The facsimile of the above-described document was transmitted to the following parties from Los Angeles, California on March 6, 2006, at the times noted on the attached confirmation sheet:

Mark Solomon
Lerach Coughlin Stoia Geller
Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
Fax No.: (619) 231-7423

Shawn A. Williams
Willow E. Radcliffe
Lerach, Couglin, Stoia, Geller, Rudman
& Robbins LLP
100 Pine Street, Suite 2600
San Francisco, California 94111-5238
Fax No.: (415) 288-4534

The facsimile number of the sending machine is (415) 395-8095. Said transmission was complete and without error. All parties on whom this facsimile transmission has been served have agreed in writing to such form of service pursuant to agreement.

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **June 6, 2006**, at San Francisco, California.

John M. Eastly