1    MILBERG WEISS BERSHAD
       HYNES & LERACH LLP
2    WILLIAM S. LERACH (68581)
     MARK SOLOMON (151949)
3    DOUGLAS R. BRITTON (188769)
     401 B Street, Suite 1700
4    San Diego, CA  92101
     Telephone:  619/231-1058
5    619/231-7423 (fax)
              - and -
6    SANFORD SVETCOV (36561)
     SHAWN A. WILLIAMS (213113)
7    100 Pine Street, Suite 2600
     San Francisco, CA  94111
8    Telephone:  415/288-4545
     415/288-4534 (fax)
9
     Lead Counsel for Plaintiffs
10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13
     In re ORACLE CORPORATION SECURITIES    )  Master File No. C-01-0988-MJJ
14   LITIGATION                             )
     _____    )  CLASS ACTION
15                                          )
     This Document Relates To:              )  PLAINTIFFS' SECOND AMENDED
16                                          )  CLASS ACTION COMPLAINT FOR
         ALL ACTIONS.                       )  VIOLATIONS OF THE FEDERAL
17   _____    )  SECURITIES LAWS

18                                             DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3

4   SUMMARY OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5   INSIDER TRADING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6   JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7   CONFIDENTIAL SOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9   FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD . . . . . . . . 15

10  POST CLASS PERIOD ADMISSIONS . . . . . . . . . . . . . . . . . . . . . . 58

11  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . 61

12  FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . 62

13  SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . 63

14  THIRD CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . 64

15  PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

16  JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

17

18

19

20

21

22

23

24

25

26

27

28

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of persons who purchased the publicly traded securities of Oracle Corporation ("Oracle" or the "Company") between December 14, 2000 and March 1, 2001 (the "Class Period").  The action is brought against Oracle and one of its founders, Chief Executive Officer and Board of Directors Chairman, Lawrence J. Ellison ("Ellison"), Executive Vice President and Chief Financial Officer, Jeffrey O. Henley ("Henley"), and Executive Vice President, Edward J. Sanderson ("Sanderson"), for violations of the federal securities laws for making false and misleading public statements concerning the Company's financial results for its second quarter of fiscal year 2001 ("2Q01"), ending November 30, 2000, and false and misleading statements concerning operations, products and finances for the third quarter of fiscal year 2001, ending February 28, 2001 ("3Q01").[1]

2.      Oracle sells software for enterprise information management.  The Company's main products include database management systems and enterprise business applications.

3.      Since its inception in 1977, Oracle has focused on becoming the principal vendor of high-end database management systems, and has been the leader in the database management market since the mid-1980s.  While enterprise database sales remain Oracle's core business, in 1999 the Company viewed applications, including Customer Relationship Management ("CRM") software, as offering Oracle the strongest growth prospects over the next several years.  According to Confidential Witness ("CW") 45, a former Oracle Senior Vice President of Sales, although Oracle was clearly the dominant company selling database software, by the beginning of the Company's fiscal 2001 (June 2000), the database market had become substantially saturated and the only room for growth was in applications.

4.      Indeed, a recent independent study by AMR Research has concluded that the applications software and services market will reach $264 billion in 2005, up from less than $100 billion in 2000.  The study revealed that CRM software is expected to grow to $37 billion in 2005, up from less than $14 billion in 2000.  In order for Oracle to enter the applications and CRM software market and compete with Siebel Systems, Inc. (which already owned 21% of the CRM market), i2, SAP, PeopleSoft, and Ariba, which at that time offered so-called "best of breed" applications and CRM software, Oracle's strategy was to offer

---

[1]      Oracle's fiscal year 2001 ("FY01") ran from June 1, 2000 to May 31, 2001.  Oracle's 3Q01 was the period from December 1, 2000 to February 28, 2001.

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                                                                    - 1 -

customers a purportedly complete and fully integrated package of applications (including a CRM component) - its 11i Applications Suite - that would manage all aspects of a customer's business, including financials, manufacturing, sales force, logistics, e-commerce and suppliers.

5.     The risk associated with Oracle's strategy was the alienation of applications and CRM vendors who had, throughout the 1990s, been partners with Oracle in driving 25% of Oracle's core database sales by recommending to their customers that Oracle database products be used with their applications software.   Once Oracle entered the applications market, however, these partners became competitors and would no longer recommend Oracle's database products.  In fact, Rick Berquist, a senior vice president at PeopleSoft was quoted as saying, "'I will not help Oracle make a single dime that I don't have to.'"  Pl. Ex. 18.[2]

6.     It was therefore imperative for Oracle to get out in front of its competitors to grab applications market share and thereby maintain its revenue and earnings growth momentum.   Prior to the Class Period, Oracle had enjoyed 11 straight quarters of sequential growth or level earnings.   However, eight confidential witnesses say that in its rush to release its new 11i Applications Suite, including CRM, in May 2000 and to influence customers to forego purchases of individual applications modules from its competitors, Oracle cut short the technical development and testing of 11i and prematurely released the software suite even though it was still plagued by defects ("bugs") in integrating the various modules of the suite with other systems.   In truth, the 11i suite was extremely "buggy" (defect-ridden) and some modules and interfaces had not even been developed.

7.     Further undermining Oracle's strategy, in the early summer of 2000,  the United States economy began to decline and hardest hit were Oracle's Internet customers who had made up 10%-12% of its licensing sales revenue.  By September 2000, many of those customers were no longer in business or were scrambling for funds to survive.  In addition, Oracle's database customers were cutting their information technology expenditures to brace for an unstable economy, which resulted in fewer database sales.   Witnesses also confirmed that Oracle extended deep discounts in order to fend off emerging database competitor IBM, whose products were cheaper than Oracle's.

---

[2]     Copies of the documents incorporated by reference in this Complaint are separately filed by plaintiffs and are identified as Plaintiffs' Exhibits ("Pl. Ex. __").

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                                                         - 2 -

8.      In order to mask the fact that sales of Suite 11i were not growing as expected in the second quarter of 2001 (September 1 - November 30, 2000), and to give investors the impression that sales were accelerating, defendants created phony sales invoices and improperly recognized revenue from past customer credits and overpayments it had held in reserve without informing its customers.  According to CW46, a former Financial Analyst for a global audit recovery firm working on behalf of Oracle customers, Oracle withheld customer's overpayments and credits due to at least 16 of its clients between 1991 and 2000.  Oracle held the money in what it called its "unapplied account."  On November 17, 2000, Oracle executed more than 46,000 sham invoice transactions converting the reserved overpayments to revenue totaling approximately $228 million.  As a result, on December 14, 2000, Oracle falsely reported 2Q01 revenues of $2.66 billion and EPS of $0.11, beating Wall Street analysts' consensus earnings estimate by $0.01, causing the Company's stock price to increase from $27.50 on December 14, 2000 to $32 on December 18, 2000.  Without the sham revenues, however, Oracle would only have earned $0.085 per share ($228M ÷ 5.6 billion shares).

9.      In addition to the December 14, 2000 announcement of false 2Q01 revenues and earnings, and in the face of a declining U.S. economy and 11i defects which had already slowed sales, defendants boldly asserted that Oracle was not being hurt by the slowing economy and that in 3Q01 Oracle would continue to have sequential earnings per share ("EPS") growth and would report $0.12 EPS and revenue of $2.9 billion based upon projected 75% applications sales growth and 25% database sales growth.  These false statements caused Oracle's share price to be artificially inflated to highs of more than $34 during the Class Period.

10.      Although defendants represented that the Company's revenues and earnings would continue to grow, Oracle's sales in the first half of 3Q01 were severely impacted by the weakening United States economy and the defects in the 11i software.  CW44, a former Oracle Financial Analyst in Oracle's Corporate and Planning Analysis Organization, who was responsible for analyzing the global forecasts and distributing them to senior management, is one of many witnesses that confirmed that through the summer and fall of 2000, the slowing economy had resulted in order delays and sales cancellations.  In fact, several large deals were lost in December 1999 and January 2000, including the State of Michigan ($50-100M), Bell South ($36M), Telia ($35-40M), and ADT ($10M), totaling approximately $186 million.

11.     In addition to these lost and delayed deals, according to CW1, CW13, CW18, CW21, CW27 and CW41, the defects in 11i caused several other customers to either delay planned purchases of 11i until Oracle could fix the problems or cancel deals altogether.  For example, JDS Uniphase, The Principal Financial Group, Health Net, and BellSouth each began costly implementation of 11i and cancelled either some or all of their implementation projects because of the instability of the 11i software.  Several more customers, including Citibank, Nantucket Nectars, Alliance Coal, and Motorola delayed their purchases or implementation of 11i until Oracle could fix the problems.

12.     In January and February 2001, as the United States economy continued to slide, defendants repeated that Oracle's 3Q01 growth estimates were easily achievable, because Oracle's pipeline was "never stronger," "its database and application sales were rapidly growing" and that the slowing economy was having no impact on Oracle's performance.

13.     Each of these statements was false and misleading.  As reported by numerous confidential witnesses, even as early as July 2000, the pipeline for all of Oracle's products had begun to deteriorate and the slowing economy had dramatically impacted sales in all segments of Oracle's business in all of the United States' geographic regions and had not recovered.  By December 2000, the declining sales were so widespread that defendants had no reasonable basis for their statements that Oracle was not hurt by the slowing economy or for its extravagant financial projections for 3Q01.

14.     In addition to and contemporaneous with the false revenue and earnings growth forecasts, defendants falsely and repeatedly assured investors that Oracle's new 11i suite applications product worked and required no programming systems integration to implement.  In truth, the new 11i suite, which was supposed to drive both 25% database and 75% applications sales growth in 3Q01, was plagued by defects, connection failures, and customer rejection, and needed thousands of "patches" (repairs) just to work.

15.     Ellison and the other individual defendants actually knew that the 11i suite was fraught with severe technical problems, including serious gaps in its CRM modules, and required expensive systems integration work to implement.  Industry commentators stated in March 2001 and even a year later in February 2002, that Suite 11i was "[t]he buggiest software" ever sold by Oracle and that Oracle's 11i defects remain "real and current."  Pl. Exs. 16, 27.  On August 6, 2001, Ellison admitted to *The Wall Street Journal* that he knew about the 11i software defects: "'It's a complex product ... and it's very hard to

1  discover all the bugs while testing.  The whole software-applications industry goes through this painful
2  birthing process.  *Mea culpa*.  It's true.'"  Pl. Ex. 1.

3        16.     Defendants also knew that 3Q01 sales would not meet public revenue and earnings
4  projections.  In fact, they frequently admit knowledge before, during, and after the Class Period.  In June
5  2000, Ellison admitted that he is a hands-on manager who "'love[d] getting involved in every detail of the
6  business.'"  Pl. Ex. 2.  In addition, the Company promoted 11i and its Oracle Sales Online application as
7  giving senior executives a global view of sales and revenue forecasts, including the ability to assess current
8  sales performance against targets.  On February 21, 2001, only eight days before Oracle admitted that the
9  slowing economy and weak sales would impact 3Q01 earnings and revenues,  Ellison also bragged that he
10 specifically kept track of Oracle sales on a single internal database that covered not only the United States,
11 but the entire world:  "All of our information is in one database.  We know exactly how much we have sold
12 in the last hour around the world ...."  Pl. Ex. 3 at 14:04:29.

13       17.     Then, in a March 1, 2001 press release, Oracle revealed that defendants' prior assurances
14 of Oracle's continuing "strong" revenue and EPS growth (Pl. Ex. 4), including defendants' assurances on
15 February 23, 2001, only six days earlier, that demand remained strong were inaccurate.  Instead, Oracle
16 admitted that:

17       •     Oracle would post sequential EPS ***declines*** for the first time in eight years.

18       •     Database growth would be ***flat*** or ***negative***.

19       •     Applications  growth  would  be  only  two-thirds  of  what  Ellison  had  projected  just  days
20             before.

21       18.     On March 1, 2001, defendants also revealed that Oracle had missed its $0.12 EPS forecast,
22 earning only $0.10 per share.  With 5.6 billion Oracle shares outstanding, Oracle's two-cent per share "miss"
23 represented a $112 million earnings shortfall, 17% less than defendants' forecast.  Oracle's $2.67 billion in
24 3Q01 revenues also fell short of the $2.9 billion forecast by $233 million, an 8% miss.

25       19.     These disclosures had a dramatic, negative effect on the market, causing Oracle's stock to
26 decline from $19.50 to $16.88 per share on March 2, 2001, on record volume of more than 224 million
27 shares.  Pl. Ex. 5.  This was the third largest one-day trading volume in United States market history.
28 Defendants' misleading of the market wiped out over $90 billion in Oracle's market capitalization as its stock

1   fell 50% from its Class Period high of $34.56 per share on January 19, 2001, when the truth about Oracle,

2   its operations and finances was disclosed.

3                                    **INSIDER TRADING**

4          20.    Defendants Ellison and Henley did not suffer the same fate as investors. Taking advantage

5   of the inflation in Oracle stock and prior to the March 1 failure to meet earnings forecasts, Ellison sold more

6   than 29 million shares of his Oracle stock for proceeds of almost $900 million between January 22-31,

7   2001, at artificially inflated prices of $30-32 per share, one of the largest insider trading incidents in United

8   States market history. These stock sales were dramatically out of line with Ellison's prior trading history,

9   as he had not sold any of his shares for five years prior to these sales. Moreover, as reported by Ellison in

10  his Form 4 filed with the SEC on February 9, 2001, 23 million of the 29 million shares sold by Ellison during

11  the Class Period were options that he acquired for a mere $0.23 per share. Pl. Ex. 28.

12         21.    As reported in Henley's Form 4 filed with the SEC on February 9, 2001, on January 4,

13  2001, Henley sold one million shares of his Oracle stock at the artificially inflated price of $32 per share for

14  proceeds of $32.3 million. 793,772 of these shares were options which Henley acquired at only $1.04 per

15  share. The other 206,228 shares were also options which Henley exercised at only $1.69 per share. Pl.

16  Ex. 29.

17         22.    Ellison's insider trading was suspiciously timed shortly after defendants' false statements on

18  January 5 and 8, 2001 that pushed the stock to over $30 per share. This was also only one month before

19  Oracle missed its financial forecasts on March 1, 2001 when the stock dropped to $16.88. Similarly,

20  Henley sold on January 4, 2001, only two weeks after his false forecasts on December 14-15, 2000, and

21  less than two months before Oracle missed those forecasts on March 1, 2001.

22         23.    As shell-shocked Oracle shareholders watched their shares crumble in value, the financial

23  media began to question how Ellison could, after five years of not selling any Oracle shares, sell almost $900

24  million of his own stock only one month before Oracle fell seriously short of its 3Q01 forecasted results.

25  Even though Ellison and Henley retained more than 90% of their shares, they did not incur the same large

26  losses as investors who bought at $30 or more per share. Even at the post-stock-drop price of $16.88,

27  defendants incurred no losses on stock-holdings they acquired at $0.23 to $1.69 per share. Even

28  corporate-friendly news companies like *Upside Today* were outraged and published an article following

Oracle's March 1, 2001 report entitled, '*The verdict: Did Oracle dupe investors?*" (questioning the veracity of Oracle's statements to its shareholders).  Pl. Ex. 6.

24.    A summary of defendants Ellison and Henley's Class Period stock sales (adjusted for stock splits) follows:

|            | Date                | Shares     | Price    | Proceeds      |
|------------|---------------------|------------|----------|---------------|
| L. Ellison | 01/22/01            | 3,100,000  | $32.010  | $99,231,000   |
|            | 01/23/01            | 5,100,000  | $31.640  | $161,364,000  |
|            | 01/24/01            | 4,900,000  | $30.730  | $150,577,000  |
|            | 01/25/01            | 3,825,000  | $30.140  | $115,285,500  |
|            | 01/26/01            | 4,225,000  | $30.090  | $127,130,250  |
|            | 01/29/01            | 1,082,000  | $30.030  | $32,492,460   |
|            | 01/29/01            | 815,000    | $30.220  | $24,629,300   |
|            | 01/29/01            | 1,500,000  | $30.490  | $45,735,000   |
|            | 01/30/01            | 352,000    | $30.540  | $10,750,080   |
|            | 01/30/01            | 1,560,000  | $30.440  | $47,486,400   |
|            | 01/30/01            | 25,576     | $30.250  | $773,674      |
|            | 01/30/01            | 1,000,000  | $30.830  | $30,830,000   |
|            | 01/30/01            | 300,000    | $30.210  | $9,063,000    |
|            | 01/31/01            | 1,300,000  | $30.350  | $39,455,000   |
|            | Class Period totals | 29,084,576 |          | $894,802,664  |
| J. Henley  | 01/04/01            | 206,228    | $32.310  | $6,663,227    |
|            | 01/04/01            | 793,772    | $32.310  | $25,646,773   |
|            | Class Period totals | 1,000,000  |          | $32,310,000   |

## JURISDICTION AND VENUE

25.    The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a), 78t-1 and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

26.    Venue is proper in this district pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred in this district.

**CONFIDENTIAL SOURCES**

27.     The allegations of falsity and actual knowledge pled herein are made on information and belief and are supported by the first-hand accounts of 48 confidential witnesses, including new witnesses. These 48 witnesses are comprised of former Oracle employees and some of its customers, each of whom were interviewed by plaintiffs' investigators since March 2, 2001.  Each of the employees was employed at Oracle between summer 2000 and the end of the Class Period and provided facts from numerous departmental and geographic vantage points within the Company:

(a)     Confidential Witness #1 ("CW1") is a former Oracle Account Manager for sales of Oracle database products and CRM products.  CW1 was responsible for sales in the General Business West department (sales to customers that generate up to $100 million in revenue per year). CW1 was a part of a six-team group consisting of ten sales representatives each and responsible for the western United States.  The General Business West teams sold database products, applications products and 11i CRM modules.  In addition, General Business West was responsible for Oracle's "Dot Com" customers.  CW1 also worked on the same floor at Oracle's Redwood Shores headquarters as account managers and sales representatives for the "Named Account" Group (customers who generate $100 – $500 million in revenue per year) and "Majors" Group (customers that generate $500 million or more in revenue per year).

(b)     Confidential Witness #2 ("CW2") is a former Oracle Director of E- Business Consulting Services responsible for sales and consulting in the northwest region of the United States consisting of Oregon, Washington, Utah, Idaho and Colorado.  CW2 primarily sold consulting services for database and applications products.  Consulting services, according to CW2, included implementation of Internet business applications, including 11i CRM modules.  CW2 reported that he had visibility into all sales in his territory because product sales triggered sales in the Company's consulting business.  CW2 personally used and accessed Oracle's internal (CRM) database pipeline system which was used to monitor and forecast sales for both product and consulting services. According to CW2, Oracle's pipeline database reflected every sales opportunity that sales representatives were required to enter in the database, together with the price of the deal, and percentage likelihood the deal would close.  CW2 added that the CRM pipeline database also reflected the percentage of deals booked against the number forecast.

(c)     Confidential Witness #3 ("CW3") is a former Oracle Corporate Account Manager in Major Accounts (accounts whose customers generate more than $500 million per year). Working out of Oracle's Boston headquarters, CW3 was responsible for Major Accounts in New England, New York, New Jersey and Pennsylvania, the Eastern Majors Sales Organization.

(d)     Confidential Witness #4 ("CW4") is a former Oracle Staff Consultant in the Company's I-Services Vertical Group working out of Oracle's Atlanta facility.  CW4 was responsible for consulting and building Internet applications for companies in the southeast region of the United States.

(e)     Confidential Witness #5 ("CW5") is a former Oracle Practice Director for state and local governments.  CW5 was responsible for consulting services on state and local government contracts in Oracle's nine-state Mountain Desert region. During the Class Period, CW5 participated in weekly conference call meetings which were attended by all of Oracle's State and Local Practice Managers in the entire nation.

(f)      Confidential Witness #6 ("CW6") is a former Oracle Sales Administrative Assistant in Oracle's New York City office.  CW6 provided support for Regional Managers Bob Seelandt and Steve Frank by maintaining their sales spreadsheets and travel schedules.  According to CW6, both Seelandt and Frank were responsible for state and local government sales in New England, New York and New Jersey.  CW6 also accessed Oracle's CRM pipeline projections for her region.  CW6 also personally used the 11i timesheets module and 11i CRM module.

(g)      Confidential Witness #7 ("CW7") is a former Oracle Vice President of Finance responsible for finance operations of technical support, education, development, and marketing.  As a Vice President of Finance, it is reasonable to infer that he had high-level management insight into all aspects of Oracle's finances and operations affecting finances.

(h)      Confidential Witness #8 ("CW8") is a former Oracle Practice Director for Oracle's Worldwide CRM Consulting Group.  CW8 was part of a specialized group of four Practice Directors and two Senior Practice Directors that managed various teams of consultants as "virtual groups" which specialized in all of the applications that make up Oracle's CRM module.  The Worldwide CRM Consulting Group was deployed to provide assistance to Oracle sales teams worldwide for demonstrations of Oracle's CRM products to prospective customers, as well as to perform implementation support once deals were closed.  CW8 also worked in conjunction with sales teams to facilitate potential CRM deals in the pipeline by performing demonstrations at customer sites.

(i)      Confidential Witness #9 ("CW9") is a former Oracle Senior Practice Director in charge of Business Development Consultants for Higher Education customers in the southeastern United States.  CW9 was specifically responsible for installation, customization and implementation of database and application products, including the 11i applications suite which included the troubled CRM module.

(j)      Confidential Witness #10 ("CW10") is a former Oracle 11i CRM Marketing and Development Strategist who reported to Senior Vice President of CRM, Mark Barrenechea, who reported directly to defendant Larry Ellison.  CW10 was responsible for engineering and development of a CRM module that would be appropriate for large telecommunications companies such as AT&T or BellSouth.

(k)      Confidential Witness # 11 ("CW11") is a former Oracle Procurement Manager and Senior CRM Consultant responsible for installation and implementation of Oracle CRM applications.  CW11 was responsible for CRM projects in the southern United States.  During the Class Period, CW11 worked specifically on the implementation of 11i CRM suite at Oracle's largest CRM customer, BellSouth.

(l)      Confidential Witness #12 ("CW12") is a former Oracle Practice Director for Consulting Services responsible for implementation of projects at telecommunications and utilities customers in the southeastern United States.  During the Class Period, CW12 was primarily working at BellSouth.  At BellSouth, CW12 was responsible for implementation of 11i and the CRM module.

(m)      Confidential Witness #13 ("CW13") is a former Oracle Technology Director.  CW13 was responsible for performing data analysis and creating "conversion solutions" for prospective Oracle customers, including writing proposals based upon customers' specific data requirements.  During the Class Period, CW13 was specifically involved in developing CRM integration strategies for large telecommunications companies, including BellSouth and a Swedish telecommunications company, Telia AB.

(n)      Confidential Witness #14 ("CW14") is a former Systems Analyst at GE Capital Commercial Equipment Financing Group.  CW14 was responsible for overseeing the conversion

from the Oracle 10.7 product to the Oracle 11i application. CW14 was also a part of the support team at GE Capital responsible for researching the conversion process prior to actual conversion and implementation to 11i, which began in January 2001.

(o)     Confidential Witness #15("CW15") is a former Oracle Consultant and Third Party Consulting Service Provider. Prior to the Class Period, CW15 worked as an Oracle Consultant responsible for installation and implementation of Oracle software products. During the Class Period, CW15 worked as a third-party consultant, working with Oracle sales staff to cultivate sales of 11i and the CRM module which were then referred to Oracle. As a third-party consultant, CW15 would be guaranteed the follow-on consulting engagement.

(p)     Confidential Witness #16 ("CW16") is a former Oracle Staff Consultant and Consulting Director for Oracle's Application Service Provider Services responsible for creating business models based on the specification and capabilities of Oracle 11i. These business models were used by Oracle consultants during demonstrations of 11i at customer sites. During the Class Period, CW16 worked specifically with Oracle sales personnel on business models for Motorola and Health Net, both of which at the time were considering upgrades to the 11i suite.

(q)     Confidential Witness #17 ("CW17") is a former Oracle Applications User Group Executive Vice President and CRM expert. CW17 is also a former Applications and CRM expert for Eaton Corporation, where CW17 was responsible for Oracle's databases and applications which were purchased by Eaton.

(r)     Confidential Witness #18 ("CW18") is a former Oracle Managing Principal Consultant responsible for developing and presenting e-business and CRM strategies for Oracle customers.

(s)     Confidential Witness #19 ("CW19") is a former Oracle Finance Director and Manager of Revenue Accounting responsible for managing revenue recognition issues for the support group in the Americas. In addition to managing revenue recognition on support agreements and contracts, CW19 personally used the 11i CRM suite internally at Oracle, which had been implemented in September 2000, to consolidate accounting functions. CW19 also accessed Oracle's CRM Oasis sales pipeline database, Oracle's internal Financial Analyzer and conversed with product sales personnel about market demand.

(t)     Confidential Witness #20 ("CW20") is a former Oracle Principal Consultant responsible for installation and implementation of Oracle products, specifically 11i, in the Central Region and worked out of the Company's Boston headquarters, which also housed consultants responsible for the Eastern and Southern Regions.

(u)     Confidential Witness #21 ("CW21") is a former Oracle Senior Consultant in the Performance Architecture Group responsible for installation, implementation and configuration of Oracle 11i at customer sites primarily in Southern California.

(v)     Confidential Witness #22 ("CW22") is a former Oracle Senior Director in Oracle's Consulting Organization responsible for managing a group of 20 consultants, primarily in the San Francisco Bay Area, who performed demonstrations and implementation of Oracle 11i CRM modules.

(w)     Confidential Witness #23 ("CW23") is a former Oracle Senior Consultant responsible for installation and implementation of Oracle products, specifically 11i, in the eastern United States. CW23 describes his duties during the Class Period as mainly "fixing problems" with the 11i module and teaching customers how to use the system. CW23 spent a large part of February 2001 testing Oracle applications at General Electric – a large Oracle customer.

(x)     Confidential Witness #24 ("CW24") is a former Senior Technical Analyst responsible for providing technical support for all of Oracle's consultants in the southeastern United States who were implementing Oracle 11i and other Oracle products. CW24 also specifically handled support requests from Oracle consultants at BellSouth and from BellSouth employees themselves.

(y)     Confidential Witness #25 ("CW25") is a former Oracle Senior Principal Consultant primarily responsible for installation and implementation of Oracle applications, including 11i, for state and local governments in Ohio and Michigan.

(z)     Confidential Witness #26 ("CW26") is a former Consultant in Oracle's Southern Internet Service Group, a group of consultants, managers and vice presidents performing installation and implementations at customer sites for those customers that were transitioning from server-based operations to using the Internet for both database and applications. CW26 specifically worked on projects involving upgrades from Oracle 10.7 applications to 11i applications.

(aa)    Confidential Witness #27 ("CW27") is a Hewlett-Packard Strategic Procurement Specialist responsible for research and purchase of Oracle applications for implementation at Hewlett-Packard.

(bb)    Confidential Witness #28 ("CW28") is a former Oracle CRM Program Director responsible for managing the Senior North American Sales Force of more than 25 salespeople. CW28 was also responsible for developing and authoring Solution Plans to achieve revenue and profit margin projections. CW28 was also a training advisor for Oracle sales force and implementation consultants.

(cc)    Confidential Witness #29 ("CW29") is a former Oracle CRM e- Commerce Practice Manager responsible for installation and implementation of Oracle applications, specifically 11i CRM at BellSouth during the Class Period.

(dd)    Confidential Witness #30 ("CW30") is a former Oracle Project Account Escalation Manager responsible for establishing and managing relationships with Oracle customers and represented senior management to clients. CW30 was also responsible for long term business relationships with customers and providing customers with a conduit for executive level communication.

(ee)    Confidential Witness #31 ("CW31") is a former Oracle Applications Sales Specialist working out of Florida and responsible for sales to 50 East Coast Oracle customers, half of whom purchased Oracle 11i.

(ff)    Confidential Witness #32 ("CW32") was a former Oracle Senior Sales Consultant responsible for supporting the 11i CRM Direct Sales group and creating demonstrations of CRM products for account executives worldwide.

(gg)    Confidential Witness #33 ("CW33") is a former Oracle Client Services Director responsible for senior level business development and selling the full spectrum of Oracle Consulting and Implementation Services Solutions to Fortune 500 companies. CW33 was responsible for "strategic accounts" in New England.

(hh)    Confidential Witness #34 ("CW34") is a former Oracle Senior Principal Consultant and Technical Manager with first-hand experience installing and upgrading Oracle 10.7 applications to 11i.

(ii)    Confidential Witness #35 ("CW35") is a former Oracle Business Solutions Architect responsible for business development and return on investment analysis, focusing primarily on supply chain management and CRM, working out of Oracle's Virginia office.

(jj)    Confidential Witness #36 ("CW36") is a former Oracle Sales Manager in General Business responsible for sales and support of 20 customers in the New York area and cultivating new business for database and applications sales.

(kk)    Confidential Witness #37 ("CW37") is a former Oracle Channel Manager who worked with Oracle distributors' partners and third-party resellers.

(ll)    Confidential Witness #38 ("CW38") is a former Oracle Practice Manager responsible for sales and support for Oracles' 11i products on the East Coast and management of all aspects of the implementation projects, including customizing applications, integration of new hardware and technical troubleshooting.

(mm)    Confidential Witness #39 ("CW39") is a former Oracle Practice Manager responsible for sales of Oracle consulting services used to educate corporate executive on the value of e-business.  The Oracle service run by CW39 provided seminars for chief executive officers, chief information officers and chief financial officers of companies generating more that $500 million in revenue per year.

(nn)    Confidential Witness #40 ("CW40") is a former Oracle Financial Analyst responsible for  tracking and maintaining Oracle consulting engagements and recording project revenues. CW40 was responsible for invoicing clients and submitted weekly forecasts as compared to actual revenue to management.

(oo)    Confidential Witness #41 ("CW41") is a former Information Technology Specialist at JDS Uniphase responsible for implementation of Oracle's field sales module at JDS Uniphase.

(pp)    Confidential Witness #42 ("CW42") is a former Director of Information Systems for Hostcentric, Inc. in Houston, Texas.  CW42 was responsible for overseeing installation and implementation of Oracle 11i suite at Hostcentric.

(qq)    Confidential Witness #43 ("CW43") is a former Oracle Senior Technical Consultant based in Toronto, Canada and responsible for implementation of 11i CRM module and integrations into existing ERP systems.

(rr)    Confidential Witness #44 ("CW44") is a former Oracle Financial Analyst in the corporate financial planning and analysis organization which was responsible for rolling up forecasts and budgets on a worldwide basis using information which was input into the OASIS database and Oracle Financial Analyzer program. CW44 was also responsible for distributing rolled-up forecasts to Ellison, Sanderson and Henley.

(ss)    Confidential Witness #45 ("CW45") is a former Oracle Senior Vice President of Sales in the state and local government sector and was responsible for all sales related to business in that sector.

(tt)    Confidential Witness #46 ("CW 46") is a former Financial Analyst for a global recovery, audit and cost containment firm, and was responsible for servicing clients of the firm by reviewing their invoices, purchase orders and shipping documents to uncover payment errors and recover inadvertent payments.  As a financial analyst, CW46 reviewed the billing and payment histories of 17 separate Oracle customers and spoke directly with Oracle employees concerning customer overpayment and credits.

(uu)    Confidential Witness #47 ("CW47") is a former Oracle Vice President of Field Sales responsible for Oracle's large account sales in the western half of the United States and reported to defendant Sanderson.

(vv)    Confidential Witness #48 ("CW48") is a former Oracle collections analyst at Oracle's credit collection facility in Rocklin, California.

**THE PARTIES**

28.    (a)    Lead Plaintiffs are Local 144 Nursing Home Pension Fund, UFCW Local 56 Retail Meat Pension Fund, Drifton Finance Corporation, and Robert D. Sawyer, all of whom purchased Oracle publicly traded securities during the Class Period and were damaged thereby.

(b)    Plaintiffs Oleg "Alex" Trepetin, Thomas Wright, Dzung Chu, Ryan Kuehmichel, Misop Lessard, and Ke Wan purchased Oracle publicly traded securities during the Class Period and were damaged thereby.

29.    Defendant Oracle supplies software for business information management.  During the Class Period, Oracle had approximately 5.6 billion shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ National Market System.

30.    Defendant Lawrence J. Ellison was, during the Class Period, Chief Executive Officer and Chairman of Oracle's Board of Directors.

31.    Defendant Jeffrey O. Henley was, during the Class Period, Executive Vice President and Chief Financial Officer and a Director of the Company.

32.    Defendant Edward J. Sanderson was, during the Class Period, Executive Vice President, Consulting and Latin American Division of Oracle.  He described himself as being responsible for all products, the entire 13,000 member consulting organization, and all business-to-business ("B2B") initiatives.

33.    Defendants Ellison, Henley and Sanderson (collectively "Individual Defendants") ran Oracle as "hands-on" managers dealing with important issues at the Company, including new product development, marketing of Oracle products, performance and sales of Oracle's database, applications and e-business products.  In fact, Ellison admits he micro-manages the Company and that he tracks all sales through a single global database.  In June 2000, Ellison stated, "'I love running the business now .... I love getting involved in every detail of the business.  I was never interested in the sales force before.  Now we control the sales force or choreograph the sales force by using computers.  It's all programmed.'"  Pl. Ex. 2.

34.    Defendants were personally familiar with Oracle's diminished revenue prospects as 3Q01 progressed, as they continually monitored Oracle's sales and revenues via the Company's live global CRM

database of pipeline, sales and financial activity called "Oracle Sales Online." During his February 21, 2001 keynote address at the AppsWorld conference in New Orleans, Louisiana, Ellison bragged about the worldwide capability of the database:

> We have one customer database. We have one way of billing a customer. We have one set of support processes. We have one way of filling out expense reports. All of our information is on one database. **We know exactly how much we have sold in the last hour around the world** and we're paying less to know more.

Pl. Ex. 3 at 14:04:29.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

35.    <u>False and Misleading Statement</u>: In a December 14, 2000 press release, Oracle announced $2.66 billion in revenues and earnings of $0.11 per share for its 2Q01, ending November 30, 2000, and falsely stated (falsity in bold throughout):

> ***Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19% ....***
>
> ***Today, Oracle Corporation announced that second quarter net income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion.***

Pl. Ex. 30.

36.    <u>Reasons Why 2Q01 Revenue and Earnings Were False and Misleading</u>: A witness, CW46, has reported that Oracle's 2Q01 reported revenues and earnings were false when made, and were the result of the improper conversion of more than $228 million of customer cash "On Account" to revenue in 2Q01. As a result, the Company was able to disguise the slowdown in product sales reported by plaintiffs' other witnesses, evident on Oracle's internal global database, and falsely report revenue and earnings growth and thus maintain its streak of 11 straight quarters of EPS growth. CW46 described Oracle's improper 2Q01 accounting as follows:

(a)    CW46 is a former financial analyst for a global recovery audit and cost containment company that offers its clients software and auditing services to review sales databases, related invoices, purchase orders and shipping documents to uncover billing or payment errors. CW46's company also pursues recovery of inadvertent overpayments and earns its fees contingent on recovery.

1

2

3

4

(b)      As a financial analyst, CW46 was responsible for examining the billing histories and accounts payable records of client companies to identify and reclaim lost profits resulting from overpayments to their vendors.  Pursuant to his/her duties, CW46 obtained from Oracle billing histories for the following clients that were also Oracle customers:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| Hewlett-Packard | Motorola | Texas Instruments |
| General Motors | SBC, Southwestern Bell and affiliates | Sprint and affiliates |
| Cargill | Dupont Photomask | Phillips Petroleum Company |
| Pharmacia | Eli Lilly & Company | Pacificare Health Systems |
| Household Finance | First Hawaiian Bank | Cummings Engine Company |
| Kemet Electronics | | |

(c)     CW46's review of those client billing histories, some of which ranged from 1991-2001 and detailed the invoice, date, amount, balance due, and cash applied to the invoice, revealed that each of the above clients – Oracle customers – inadvertently overpaid Oracle invoices or made double payments on Oracle invoices during that period.  According to CW46, Oracle did not inform its customers of the overpayments, and did not refund the customers' overpayments.  Instead, Oracle maintained a fund of its customers' overpayments as unapplied cash "ON A" (meaning "On Account").

(d)     CW46 reported that s/he spoke with Ryan Roberts, an Oracle collection manager, about this practice who confirmed that Oracle usually did not refund money and then only did so at the request of the customer.

37.     According to CW46, his/her continued review of these 16 customer account billing histories revealed that each and every account history examined listed identical transactions on November 17, 2000.  Each transaction had a corresponding transaction number beginning with the prefix "550" followed by "ON A."  In response to an inquiry as to what the November 17, 2000 "550" transactions on the billing histories were, Raul Campos, an Oracle collections analyst, confirmed the following in a fax:

> All invoices that start with "550" are actually debit memos #'s [rather than invoices for real sales].  These were created to clean up our unapplied account at the time.  They were more than likely overpayments.

(a)     In reviewing the customer billing histories, CW46 uncovered 760 of the "550" type debit memos/invoices that were created on November 17, 2000.  Each was numbered between 55000387 to 55046825.  CW46 confirms that his/her review of pages in Oracle's "Financials" documents called "Implementing Document Sequences" and "Automatic and Manual Sequences," indicates that Oracle kept these customer billing records in sequence.  By subtraction (46,825 - 387), this range sequence reveals there were a total of 46,438 debit memos or phony invoices created on that date reflecting customer overpayments in Oracle's unapplied cash account.  The mean debit memo among the 760 memos uncovered

1   by CW46 was for $19,103 with the smallest being $1.81 and the highest being $4,847,389.  The 760

2   memos total $14.5 million.

3          (b)     According to CW46, the financial impact of a "550" debit memo was the same as

4   the creation of an actual invoice for a real product sale.  In these 760 instances, however, there were no real

5   sales.  Each transaction created a phony sales invoice which was then cleared or satisfied from unapplied

6   cash "On Account."

7          (c)     CW46 then obtained from the employee in charge of tracking unposted customer

8   cash receipts, Neil Menon, from the Company's Rocklin, California office, a spreadsheet detailing unapplied

9   cash receipts which confirmed that Oracle's "unapplied cash" is in fact money received from customers

10  which had not been credited to the customer accounts.

11         (d)     CW46 reported that the effect of Oracle's conversion from "On Account" cash,

12  which consisted of overpayments, to these phony invoices is the same as standard accounting practices for

13  creating and clearing an invoice.  According to Oracle's own internal "Accounting for Transactions"

14  instructions, accounting for transactions for applications invoices, a payment on the invoice (receivable)

15  creates the following journal entry (DR Increase Receivables - CR Increases Revenue).  CW46 reported

16  that all 760 of the November 17, 2000 "550" debit memo transactions followed this same transaction

17  sequence for satisfying open invoices.  Thus DR (increase) receivables and CR (increase) revenues.

18         38.    CW46 further identified specific instances of inadvertent overpayments by customers that

19  Oracle was holding in its unapplied cash account for which a "550" phony invoice was created on November

20  17, 2000, and the funds from the prior overpayment in the unapplied cash account applied to satisfy the

21  phony invoice.

22         (a)     For example, CW46 reported that when reviewing the Oracle billing and receipt

23  history for Eli Lilly ("Lilly"), a major pharmaceutical company, s/he encountered an unusual invoice dated

24  November 17, 2000.  The debit memo/invoice number was 55033928.  The amount of the debit invoice

25  was for $15,582.55.  Pl. Ex. 31.  According to CW46, his/her investigation revealed that the same exact

26  amount was overpaid by Lilly to Oracle on June 23, 1997.  Lilly's billing history also revealed that Oracle

27  created a $15,582.55 credit for the overpayment on June 23, 1997, but did not notify Lilly of the credit and

28  did not refund the money.  Pl. Ex. 32.  On November 17, 2000, however, Oracle created the phony "550"

1   invoice and applied the 1997 overpayment to satisfy the phony invoice and booked the $15,582.55 as

2   revenue.  CW46 inquired about the transaction and Oracle Credit Analyst, Marisa Christie, confirmed that

3   the November 17, 2000 transaction "55033928" – "ON A," was, in fact, an On Account "debit memo" (not

4   an invoice for a real sale) and that no money was actually due from Lilly.  When CW46 asked how the debit

5   memo/invoice was cleared or satisfied, Christie stated that $15,582.55 had been "on reserve" and that

6   Adam Hahn, head of all Oracle Credit Managers, had authorized creation of the debit memo for that amount

7   even though Lilly had not made a new purchase.

8           (b)     While researching the account history of Household International ("Household"),

9   CW46 uncovered yet another series of November 17, 2000 transactions which illustrated how Oracle

10  retained an inadvertent overpayment of invoices dated October 1994 and never refunded or notified

11  Household of the overpayment.  Pl. Ex. 33.  On November 17, 2000, Oracle created phony "550" debit

12  memo/invoice No. 55040598, then applied the $76,645.04 money it held from the overpayment to satisfy

13  the phony invoices on November 17, 2000.  Pl. Ex. 34.

14          (c)     CW46 contacted Oracle to inquire about the Household transaction and spoke with

15  Oracle's Kate Schwermann who told him/her that the debit memos/invoices were not amounts actually due,

16  but she would not clarify how the invoices had been satisfied.  CW46 then contacted Kevin Russ, an Oracle

17  credit analyst to further inquire about additional November 17 debit memos 55043990 (Pl. Ex. 39) and

18  5504461 (Pl. Ex. 40), and how they were satisfied.  Both of these appeared to originate from Household

19  payment adjustments which were credited in 1990 but not refunded.  Pl. Ex. 41.  Russ confirmed that the

20  November 17, 2000 debit memo 5504461 totaling $45,000 was satisfied by check #94073.  CW46

21  reported, however, that check #94073 was issued on January 4, 1991.  CW46 further researched the

22  transaction and determined that the January 4, 1991 check from Household was an inadvertent

23  overpayment.  Oracle never informed Household and had not refunded the money.  Russ did not confirm

24  how 5504390 was satisfied though it was clear from Ex. 39 that Oracle had applied the $25,000 cash it held

25  On Account.  Therefore, Household's unapplied cash remained at Oracle for nearly 10 years, then it was

26  used to satisfy a phony invoice and booked as revenue.

27

28

(d)     CW46's review of the billing histories for Phillips Petroleum revealed 10 separate "550" phony invoices on November 17, 2000 totaling more than $105,300 which the Company then converted to revenue.

(e)     CW48, a former Collections Analyst at Oracle's Rocklin, California facility corroborates the account of CW46.  CW48 confirmed that Oracle retained funds actually belonging to its customers and that the "ON A" entries in customer billing histories identified customers' "unapplied cash." CW48 further confirmed that the unapplied cash resulted from customer double payments or overpayment of invoices and that Oracle's policy was to refund that money only as "the last resort."  CW48 also reported that certain specific large resellers, including Avnet and Pioneer Standard Electronics had very large amounts of On Account – "unapplied cash" – owed to them.

(f)     In addition, CW48 further confirmed that on November 17, 2000, the Company executed a "huge sweep of old cash" and all of the debit memos all began with "550" identification numbers. When asked if the November 17 transactions could have been 46,000 in number, CW48 confirmed that a batch of 40 thousand plus transactions would be a reasonable estimate.

(g)     Further corroborating CW46's account is the report of CW19, a former Oracle Finance Director and Manager of Revenue Accounting responsible for revenue recognition on support agreements.  According to CW19, because Oracle incurred significant costs related to excessive technical problems with Suite 11i, many support agreements turned into money losing engagements for Oracle. CW19, while prefacing his comments with "I really shouldn't be talking about this," confirmed that "we had a fund we could pull from" to compensate for Oracle's money losing engagements.

39.     A statistics expert, Dr. M. Laurentius Marais, has reviewed the 760 debit memos/invoices and the information reported by CW46 in order to determine what they reveal about the average dollar amount of the broader population of transactions from which they were drawn.  Dr. Marais has previously offered expert testimony in the area of mathematical and statistical analysis in at least 20 matters, including expert testimony on behalf of President Bush in *Gore v. Harris*, No. 00-2808, Circuit Court of the Second Judicial Circuit, Leon County, Florida, Civil Division.  Pl. Ex. 35.

40.     Marais has determined from his application of generally accepted mathematical and statistical principles to the 760 transactions he reviewed that they provide a reasonable basis for the following

inference: The average dollar amount of the broader population of transactions exceeds $4,970 and, hence, that the total value of the broader population of transactions exceeds $228 million, based upon a population of 46,000 sequential debit memos. Marais has further concluded, based upon mathematical and statistical sampling theory, that this inference could be incorrect only if the 760 transactions discovered by CW46 were among a set of especially unrepresentative samples which number fewer than 1% of all possible samples from the broader population. Thus, under a selection mechanism of pure chance, *i.e.,* simple random selection, the incorrectness of the inference of above $228 million would have a probability of less than 1%.

41.     Corroborating CW46's account of numerous customer credits unapplied to invoices, and Dr. Marais' analysis, are Oracle's balance sheet entries in its Form 10-Q filed with the SEC for 1Q01, ending August 31, 2000, which reported more than $1.26 billion in "Customer Advances and Unearned Revenue." Pl. Ex. 36. Further corroborating CW46's account is the precipitous reduction in Oracle's balance sheet for the same category reported on its Form 10-Q filed with the SEC for its 2Q01, ending November 30, 2000, which reported only $1.05 billion in Customer Advances and Unearned Revenue, a reduction of $215 million - almost equal to Dr. Marais' $228 million determination. Pl. Ex. 37.

42.     Oracle's recognition of the $228 million as revenue was a violation of Generally Accepted Accounting Principles ("GAAP"), because Oracle had not earned the revenue it was reporting and was not entitled to retain the overpayments it had previously received from its customers. The most fundamental concept for revenue recognition under GAAP is that revenue must be both earned and realizable prior to recognition. "Earned" refers to the requirement that an entity should have accomplished what it must do to be entitled to the income. *See* Financial Accounting Standards Board ("FASB") Statement of Concepts No. 5, ¶¶83-84. Thus, for 2Q01, Oracle improperly recorded $228 million in revenue to which it was not entitled. In fact, Oracle owed its customers refunds for that amount.

43.     As a result of Oracle's improper conversion of customer credits to revenue as reported by CW46, Oracle overstated 2Q01 revenue by more than $228 million, which represented 8.5% of its total reported revenues in the quarter. Based on 5.6 billion diluted shares outstanding, the after-tax effect would represent $0.025 per share. Thus, instead of reporting $0.11 per share as forecast, the Company would have reported only $0.085 per share.

44.     Scienter: As alleged in ¶¶16, 34, 49(d) and 79, defendants Ellison, Sanderson and Henley admitted that they micro-managed and were aware of all aspects of Oracle's business, sales and earnings, which supports a strong reference that they were aware of and authorized the recognition of $228 million in revenue in 2Q01 – a substantial component of Oracle's quarterly earnings, without which the Company would have missed its forecast.

45.     False Statements that Slowing Economy Did Not Affect Oracle:  In addition to the false financial results, on December 14 and 15, 2000, Henley made false statements (in bold) to the market that the slowing of the overall economy would not hurt Oracle's third quarter financial results, as follows:

(a)     In a December 14, 2000, transcribed telephone conference call with analysts, portfolio manager and investors, Henley falsely stated:

And then lastly ... [about] the economy ... *[a]t this point, we see no impact or slowing in our business.  We have seen no slowing of our business.*

Pl. Ex. 7 at 4.

(b)     In a December 14, 2000 statement quoted in a *Bloomberg* article, Henley falsely stated:

"*The economy is slowing .... It's just not having a negative impact on our business*."

Pl. Ex. 8

(c)     In a December 15, 2000 interview with *Radio Wall Street*, Henley falsely stated:

*[T]he economy right now even though it's slowing doesn't seem to be affecting us. We see no difference in demand for our upcoming third fiscal quarter.*

*             *             *

*[S]o far we look pretty hard at indicators.  We're seeing no softening in our business.*

Pl. Ex. 9 at 1-2.

(d)     In a December 15, 2000 interview with *Bloomberg*, Ellison falsely stated:

*The economic slowdown isn't hurting Oracle, said Oracle Chief Executive Larry Ellison, because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs and boost efficiency.*

Pl. Ex. 10.

46.   <u>False Statements Regarding 3Q01 Forecasts</u>:  In the December 14, 2000 transcribed conference call (Pl. Ex. 7), Henley also made false statements (in bold) to the market that Oracle would enjoy third quarter 2001 earnings of $0.12 EPS, and growth of 75% in sales of applications, 20%-25% in database sales, 25% in licensing and 15%-20% in service, as follows:

> [S]o the numbers I'm going to give you here, *for database* ... we're thinking, you know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar growth, or *20-to-25*.  Applications, we're thinking *75, or potentially better*.  You'd have to add five points to that.

> *       *       *

> *So I would assume, 12 cents would be a reasonable number at this point.  I don't think history is going to be a lot different, here.*

> *       *       *

> *The good news about applications, this quarter, is that every part of the little sub-markets that we're in, we're strong.  And every geography, (we're) strong, Europe, Asia, U.S.  So there's nothing that we – no weakness in our applications business and the pipelines at every one of these geographies looks astounding for this next quarter.*

*Id.* at 7-8, 11.

47.   <u>Reasons Why No Impact from Declining Economy Statements and 3Q01 Forecasts Were False When Made</u>:  Oracle's revenue and earnings forecast for 3Q01 and Ellison and Henley's statements (interrelated with those forecasts) that Oracle was not seeing any impact or slowing in Oracle's business due to the slowing economy were false when made.  The following accounts of at least 15 sales and consulting personnel from various departments and regions within the Company confirm that, in truth, the impact of the slowing economy had dramatically slowed all segments of Oracle's business, including sales of database and applications, and therefore would adversely impact the 3Q01 revenue and earnings forecasts upon which those sales depended:

(a)   CW44, a former Oracle Financial Analyst in Corporate Planning and Analysis, who was responsible for synthesizing global forecasts and budgets from the Company's internal database and distributing them to senior management, reported that by October 2000, market conditions had negatively impacted the software tech industries, and that Oracle was experiencing sales cancellations and delays in orders "in the same manner as everyone else."  CW44 further reported that the impact of market conditions

were typically factored into the overall sales forecast and frequently resulted in management adjustments to the sales forecast.

(b)     CW13, a former Oracle Technology Director, reported that the economic slowdown impacted Oracle's earnings opportunities beginning in September of 2000.  As a result of the dot.com crash and general slowdown in tech spending among large companies, Oracle suffered from greatly reduced revenue opportunities because customers were not willing to invest their limited dollars in Oracle 11i software which had yet to be proven in the marketplace.

(c)     CW1, a former Account Manager who was responsible for database and CRM sales for the western United States, reported that during October-November 2000, when media reports of an economic slowdown in the United States became increasingly noticeable, the symptoms of that slowdown were already being felt and well known within Oracle.  The impact of the economic slowdown had begun to affect the Company's pipelines and revenues as early as July 2000.  CW1 reported that among the many factors evidencing the slowdown in her region were: (1) a dramatic reduction in the pipeline for new sales and sales to Oracle's existing customers in comparison to fiscal 2000; (2) customers in the dot.com sales sector of Oracle were going out of business and defaulting on their debts to Oracle, and thus not buying any new product; (3) the reduction in the rate at which the Company was converting prospective deals in the pipeline to actual sales; and (4) competition from other database companies caused Oracle to give deep discounts on its products, thus reducing revenues.

(d)     Specifically, CW1 reported that, by way of comparison, her General Business Group for the western United States had a banner year in fiscal 2000, which was fueled by sales to dot.com customers and had been 200%-300% above quota.  However, in fiscal 2001 (beginning in June 2000), General Business sales and revenues declined dramatically and continued to do so through February 2001. She added that Oracle management monitored each salesperson's progress toward meeting sales quotas, which were based on 20% projected growth of database sales in FY01, through a live video board at Oracle's Redwood Shores headquarters which listed and tracked sales for all sales teams in the western United States.

(e)     CW1 reported that the effect of the slowdown in the economy was evident from the facts indicated on the live video board.  By August 2000, the video board indicated that over 90% of

the sales force in General Business West were severely below quota, and some sales persons were as low as 20%. Indeed, CW1 reports that by February 2001, she had only reached 40% of her own $2.4 million quota.

(f)   CW3, a former Oracle Corporate Account Manager in the Company's Boston office responsible for sales in Major Accounts (up to $500 million) in New England, New York, New Jersey and Pennsylvania, reported that the Boston office had a similar video monitor as the one reported by CW1. That database was also updated daily and identified each sales representative in the region (50 sales reps for eastern Majors) and their sales percentage toward attaining annual quotas. CW3 reported that the average sales representative's annual quota was $2 million and that even after the end of the Class Period in May 2001, near the end of the fiscal year, most sales reps had only reached 50%. Indeed, CW3 reported that some sales representatives did not make a single sale in 3Q01. CW3 said that some salespersons found solace in the knowledge that other sales representatives even in good territories were not selling anything either.

(g)   According to CW1, evidence that the economic slowdown had slowed demand for Oracle products was also shown by Oracle's CRM Pipeline forecasting system which, according to CW2, the former E-Business Consulting Services Director, encompassed every deal or potential deal in the Company's sales pipeline. According to CW1, in addition to her own experience and working in close proximity to other sales personnel in the Named Accounts and Majors Groups at the Redwood Shores headquarters, after May 2000, sales representatives in her region would go days at a time without entering any potential sales opportunity into the pipeline system, whereas during FY2000, the sales representatives would enter at least one deal each day. CW1 disclosed that by the summer 2000, the telephones in General Business West "went dead." CW1 reported that even existing customers informed the sales staff that because of budgetary constraints and tightened belts, they were not making any new purchases.

(h)   In addition to fewer potential deals entered into the pipeline, CW1 reported that the ratio of deals in the CRM pipeline forecasting system that actually closed had dropped commensurate with the reduction of prospective sales coming into the pipeline. The decline in closed sales was also easily viewed on the video monitor. CW1 reported that Oracle sales managers used the percentage of deals likely

1    to close to make their own forecasts which were incorporated into sales projections by Oracle executive

2    management.

3            (i)     According to CW1 and CW3, the slowdown in the economy also negatively

4    impacted the pricing of Oracle's database products, and Microsoft's database became more competitive

5    because it was cheaper then Oracle's.  Because customers were consistently speaking of tighter budgets,

6    Oracle had to offer huge discounts in order to "catch" sales from going to its competitors, like Microsoft and

7    IBM whose databases are priced at 1/5 that of Oracle's.  For example, CW1 reported several deals that

8    had been entered into the pipeline at six-figure levels were reduced to $10,000 in order to keep Oracle sales

9    from going to a database competitor. Thus, according to CW1 and CW3, not only had the potential for new

10   deals suffered from the impact of the slowing economy, but the deals that did close represented average

11   dollar values significantly lower than originally entered into the pipeline compared to what Oracle had

12   experienced in fiscal 2000.

13           (j)     CW2, a former Oracle Director of E-Business Consulting Services for 11i

14   applications in the northwest region, confirmed that there was a significant and deep decline in sales

15   beginning in the summer of 2000 (corroborating CW1's account) and trending downward through 3Q01

16   in the northwest region.  CW2 further stated that because all of the consulting sales in his region were

17   triggered by product sales, his consulting group was aware of virtually all products sales as well as consulting

18   sales in the region.  CW2 reported that the downturn in the economy compounded a significant drop in

19   demand for 11i suite sales, which slowed throughout FY01 and completely "fizzled out" by

20   November/December 2000.  According to CW47, the former Vice President of Field Sales, 2Q01 "was

21   the time of the pipeline collapse" for Oracle's business and for 3Q01 and 4Q01 "very little remained in the

22   pipeline in the western states territory."

23           (k)     CW8, a former Practice Director for Oracle's Worldwide CRM Consulting Group,

24   corroborated the account of CW2 and reported that the performance of the consulting organization is a

25   mirror image of sales activity and directly related to product sales, and that by 2Q01, because of the slowing

26   economy, business in the entire consulting organization was so slow that the Company implemented a hiring

27   freeze.

28

(l)　　According to CW45, a former Senior Vice President of State and Local Government Sales, by May 2000, due to the lack of 4Q00 sales opportunities in the pipeline, Oracle's internal FY01 plan for that business sector was reduced by 20%. CW45 reported that despite the need to rapidly sell 11i to maintain revenue and earnings growth, sales and installation of 11i during the summer of 2000 slowed to only a very few. In addition to the slowdown in the economy, CW45 reported that Suite 11i and CRM "just plain did not work." CW45 stated that one of the key factors that illustrated slow applications sales was the lack of backlog in the consulting organization. CW45 reported that beginning in June 2000, backlog in the entire Oracle service industries consulting business was only 37 days compared to an average of 90 days in prior quarters. This fact was telling of the state of product sales because the "rule of thumb" at Oracle was that consulting work on an applications sale would result in a revenue ratio of 4:1 meaning that a $5 million sale of applications should result in $20 million for the consulting organization for implementation services.

(m)　　CW45 reported that sales were so slow that the consulting organization missed its 2Q01 projections by at least 30% (corroborating CW2 and CW8), and that the depression in consulting was due to lack of demand for Oracle's new 11i release which the Company was banking on to capture new market share and sustain future growth.

(n)　　CW39, a former Oracle Practice Manager responsible for East Coast sales and support for the 11i product, reported that from his viewpoint, the slowdown in sales began at the end of 2000 and that by January 2001 "everything had stopped."

(o)　　CW2 further reported that by fall of 2000, the downturn in the economy had impacted the Company's dot.com sector, which according to CW1 had been performing at 200%-300% above quota in fiscal 2000. CW2 reported that by January 2001, it was well known within the Company that the dot.com business had slowed severely and many of those customers failed to pay their bills altogether. CW2 reported the revenue and earnings miss in 3Q01 should have been easy to call because beginning in 1Q01, all internal sales trends were downward, including product sales, consulting sales and consulting revenue, and they continued down through 3Q01. According to CW2, consulting sales had missed Q1 and Q2 sales projections. CW8 and CW45 corroborated CW2's account of the slowdown in consulting sales and disclosed that the Worldwide CRM Consulting Group missed its 2Q projected sales

target by 20%-30%.  In addition, CW8 identified several large deals the Company expected to close between July 2000 and March 2001 that did not close, including deals with Federal Express, Mutual of Omaha, Foster's Beer, Telecom New Zealand and GE in New York.

(p)     CW33, a former Oracle Client Services Director responsible for business development to Fortune 500 companies in New England, reported that he also recognized a dramatic slowdown in sales in September and October 2000.  CW33 reported that because of the severe sales slowdown, there is no doubt that defendants knew that Oracle was not going to make its 3Q projected growth earnings.

(q)     CW4, a former Oracle Staff Consultant responsible for consulting sales and services in the southeast region based in Atlanta, reported that the economic slowdown which affected sales of products had likewise resulted in a severe slowdown of consulting work in his region.  CW4 explained that typically there would only be two to three people "on the bench" (meaning an employee who was in-between projects), but as early as 1Q01, there were several dozen consultants on the bench in his region alone. CW4 further stated that the Company's internal database "Oracle Resource Browser," used for listings of managers that needed consultants for their products installations across the country and internationally, revealed the slowdown in consulting work and had dwindled to only one or two listings when typically it would advertise at least 40 opportunities.

(r)     CW20, a former Oracle Principal Consultant based in Chicago, Illinois, responsible for sales in the central region of the United States, corroborated CW2's, CW8's, and CW45's accounts of slowing consulting sales.  He also reported that the internal consulting database, Oracle's Resource Request Browser, was a good indication of a sales slowdown in the Company because service listings meant more consultants on the bench and less opportunities available being posted.  Indeed, CW20 reported that consulting services were typically needed by customers after the customer had purchased Oracle databases and applications and that, therefore, the slowdown in consulting would be preceded by a slowdown in product sales.  CW20 also reported that the slowdown in product sales and the consulting work had become evident in the consulting database by September 2000 when there were only 20 jobs listed.  By January 2001, the listings resource browser "dropped to a couple here or there."  CW20 reported that in

January 2001, in addition to consultants sitting on the bench, central region consultants were being laid off because of a slowdown in sales.

(s)    CW16, a former Oracle Staff Consultant in California, corroborated CW2, CW8, CW45 and CW20, and reported that Oracle's consulting business which was directly tied to product sales "dried up in September 2000." Because of slow sales, the organization that she worked in, Oracle's Application Provider Services Organization, had been reduced from 50 to 20 consultants by December 2000. CW16 also reported business was so slow in her organization that she too accessed the Oracle Resource Request Browser (as had CW4 and CW20), but by January 2001, there were only two to ten postings and by March 2001, there were no postings at all. Indeed CW21, a former Oracle Senior Consultant in Southern California, reported that by October 2000, he was only working 50% of the time, and the rest of the time he was "on the bench." CW23, a former Oracle senior consultant, corroborates the accounts of CW4, CW16 and CW20 and reported that demand for support extended to the period after the Class Period and that during March and April 2001, he spent weeks at a time "on the bench."

(t)    CW43, a former Oracle Senior Technical Consultant based in Toronto, confirmed that even in Canada there was a dramatic drop in consulting for CRM products in November 2000. Indeed, he reported that in September 2000 there were calls for support everyday, but after November 2000, there was nothing.

(u)    In addition to crippling sales in multiple geographic regions, the slowing economy also impacted sales in entire vertical segments within Oracle. For example, CW5, a former Oracle Practice Director responsible for sales of consulting services to state and local governments for the Mountain Desert Region of the United States, reported that by fall of 2000, product sales personnel in her region had become so desperate to make sales that they were "backstabbing" consulting sales personnel in order to meet their own quotas. Specifically, CW5 reported that product sales personnel were giving away consulting services for free in order to close deals. CW5 reported that product sales and consulting sales were slow in her region and throughout the Company and that by fall 2000, none of the Oracle Consulting Practice Managers across the country were making their quotas. Indeed, CW5 reported that she participated in weekly conference calls which included all of Oracle's state and local government Practice Managers nationwide

and disclosed that each consistently reported declining sales.  This is corroborated by the report of CW8 and CW45, who reported that consulting services missed Q2 forecasts by 20%-30%.

(v)  CW37, a Channel Manager who worked with Oracle distributors and third parties regarding sellers, reported that even in the distributor channel there was a slowdown in business in December 2000, which developed into a complete collapse by February 2001.  In fact, according to CW37, sales had become so scarce that competition among Oracle's sales staff was such that the distributor channel deals were being stolen by the direct sales group.

(w)  CW5 also reported that during 3Q01, Oracle was eagerly anticipating a large deal with the State of Michigan Human Services Department to close.  In fact CW5 reported that the State of Michigan deal was "probably the biggest deal nationwide" in the state and local government vertical during the quarter.  However, CW5 reported that the deal "folded in the last week of December."  CW25, a former Oracle Senior Principal Consultant,  corroborated the account of CW5 and reported that Oracle had been cultivating this deal with the State of Michigan and that Oracle hoped to earn between $50-$100 million in combined product sales, consulting services and database sales.  However, the deal fell through at the end of December 2000.  CW25 states that failure of this deal to close was well known throughout the state and local government vertical.

(x)  Sales in the education vertical dropped as well.  CW9, the former Oracle Senior Practice Director, was responsible for sales of all of Oracle's software and services to Oracle's higher education customers in the southeastern region of the United States.  He reported that sales to education customers in January 2001 dropped to zero.  Because there was no business, he was fired in February 2001.

(y)  According to CW19, a former Oracle Finance Director and Manager of Revenue Accounting, the federal government sector of his state and local government organizations did not close one major deal between June 2000 and December 2000.  The slowing economy also manifested itself in increasingly limited earnings opportunities that were visible in all of Oracle's major revenue sources, including product sales, consulting and support.  CW19, a former Oracle Finance Director and Manager of Revenue Accounting, reported that he regularly tracked product sales in Oracle's CRM Oasis System and read

spreadsheets that reported information using Oracle's Financial Analyzer, which generated various sales forecasting reports and recognized in December 2000 that product and consulting sales were weak.

(z)     CW22, a former Oracle Senior Consulting Director, reported that the consulting business for Northern California, including the Bay Area, declined significantly in September 2000, and that going into 3Q01 there were very limited deals in the pipeline and no likely prospects for large deals. Indeed, CW22 reported that by the end of 2Q01, there was no question that Oracle would miss 3Q01 forecasted growth projections.

(aa)     CW26, a former consultant in the Company's Southern Internet Services Division, reported that in the southern region, Oracle's consulting business slowed tremendously in 1Q01, which indicated to him that 11i sales were not "taking hold." CW26 reported that from his perspective, the general downturn in the economy, dot.com failures, and rumors about the instability of 11i significantly impacted sales.

48.     By December 2000, Defendants Knew that Sales Were in Serious Decline Due to the Slowing Economy and that 3Q01 Forecasts Were Overstated:  Based on the reports of numerous witnesses, all of whom were former sales account and consulting employees of Oracle in various regions, it was known throughout the Company that sales were declining in the second half of 2000 due to the slowing economy. The witness accounts were confirmed by admissions made by the individual defendants. Ellison and Sanderson admitted that they had actual knowledge of Oracle sales because they monitored the Company's worldwide sales database on a daily basis. Thus, because the database disclosed the declining sales, Ellison and Sanderson actually knew that the economy was severely affecting sales and revenues, and that the pipeline was suffering from the lack of new sales.  Specifically:

(a)     CW1, the former Western Account Manager, stated that the live video sales board monitored by management revealed that at the end of 2Q01 (November 30, 2000) in the specialized dot.com group, many representatives were only at 20% of quota.  In fact, according to CW1, management knew that the economic slowdown had severely impacted its dot.com customers and many of them could not pay their outstanding bills to Oracle.  According to CW1, in order to salvage some of the revenue lost from dot.com customer defaults, Oracle began reversing commissions paid to its own sales staff on accounts that customers did not pay.  The process by which the Company revised commissions was called "credit

backs." CW1 reported that in late summer 2000, members of the dot.com sales staff suffered increasing numbers of "credit backs." CW1 also reported that by the end of 1Q01, the reduction in deals in the pipeline was clearly apparent to management as sales reps would go several days without "piping" a single deal and that "prospective" deals were few and farther between.

(b)     CW1 added that General Business West's Group sales forecasts fell continuously through 1Q01 and even missed Q1 projected forecast by 35%.  In addition to weak prospects for new sales, CW1 reported that Oracle's existing customers were dramatically reducing their purchases and after Q1 the sales slowdown "spread like wildfire." CW1 reported that management monitored all of those trends through the Company's CRM system for sales forecasting and management, the same CRM tool it was selling to customers, namely 11i Oracle Sales Online.  According to CW1, the system is live and updated as events occur.  The forecasting element also extends beyond the current period into future quarters, further identifying the status of sales performance versus projections.

(c)     CW2, the former Oracle Director of E-Business, corroborated CW1.  CW2 reported that he had access to virtually all product and consulting sales in the northwest territory through Oracle's internal CRM system which the Company used to monitor and forecast sales for both product and consulting services.  According to both CW1 and CW2, the CRM pipeline key indicators of performance: (1) number of deals pending; (2) number of deals closed; and (3) dollar value closed through the first three quarters of 2001 showed severe and continuous declines in product sales.

(d)     CW2 further stated that for Q1 and Q2, consulting sales in his region missed projections by 7% and that product sales missed by 20%.  CW2 explained that because invoicing of consulting services occurs when different stages of performance are completed, by the first week of a quarter defendants knew with relative certainty whether the consulting organization would meet revenue projections.  Moreover, according to CW2 and corroborated by CW1, by 2Q01 it was well known within Oracle that many of the Company's dot.com customers had slowed in payment or failed to pay altogether. Indeed, on March 15, 2001, defendants admitted that the dot.com business reported sales down 66% for 3Q01.  *See* ¶79.

(e)     CW8, a former Practice Director for Worldwide CRM Consulting, reported that practice directors were required to ensure that all sales information related to each individual deal had been

input into spreadsheets at the end of each week and finalized on Mondays. Each "practice" group submitted a weekly report in the spreadsheet format to upper management. These reports were all sent to Brad Scott, Consulting Group Vice President. The CRM group report was incorporated into an overall consulting organization report which was then sent upward to executive management.

(f)     CW8 reported that by the beginning of 3Q01, it was evident to him that "there was no way that we were going to make our projections." CW8 was certain that the CRM group missed its projected target by at least 20%-30% in 2Q01, that business in the pipeline for 3Q01 looked even worse and that the CRM business was so slow throughout that he held no hope that any such rebound would occur in February or even later. According to CW19, a former Oracle Finance Director and Manager of Revenue Accounting, going into 3Q01 he reviewed the pipeline information in Oracle's own CRM system and Excel spreadsheets, and spoke directly with sales personnel. To him, product sales and consulting sales were weak. If the slippage of sales and revenues was evident to so many sales and consulting employees based on their own experience and review of the databases, it is reasonable to infer it was evident to senior management, including the defendants.

(g)     CW45, a former Senior Vice President of Sales, reported that the consulting organization had been functioning below plan all of FY01 and that as early as June 2000 Oracle's entire backlog for its consulting business was a meager 37 days. CW45 reported that the Company had averaged a backlog of 90 days or more of contracted work for its consulting organization, and as early as June 2000 there were consultants "on the bench" everywhere. CW45 also reported that by December 2000 the pipeline for the consulting business clearly indicated that the business sector could not meet 3Q01 expectations.

(h)     CW28, a former CRM Program Director, reported that because sales for CRM were so soft, defendants knew in February 2001 that they were not on track to meet 3Q01 projections. CW28 stated that Ellison's statement on March 1, 2001 that he did not know until the last few days of the quarter is a "bold faced lie" and that defendants had access to a "revenue recognition" system which enables management to see on a daily basis what revenue was booked on closed sales and what was still in the pipeline. CW28's account is confirmed by defendants' admissions that sales and pipeline information was available to defendants at all times via Oracle Sales Online

(i)      According to CW19, a former Oracle Finance Director and Manager of Revenue Accounting, Ellison "dug his own grave" by bragging publicly about how informed he was about the status of Oracle's pipeline and financial condition and then claiming that he knew nothing until the last four days of the quarter.

(j)      CW32, a former Oracle Senior Sales Consultant for 11i sales, reported that in January 2001 a large deal valued at approximately $10 million with ADT did not close.  CW32 reports that the activity in this prospective sale, as well as all other sales activity, including every customer contact or action, was reported to management through Oracle Sales Online.  According to CW31, a former Oracle Applications Sales Specialist in Florida who was responsible for at least 25 customers, Oracle Sales Online was used by all of the sales staff to report and track quarterly sales against forecasts and gave management complete sales numbers in the pipeline at all times.  CW36, a former Oracle Sales Manager in New York, reported that through the sales automation database, Ellison was able to sit at his desk and see how each region was doing against the sales plan.  CW36 reported that this system was the same one that was the basis for projections for the last eight quarters.  CW36 believed that Ellison and Henley knew by January and February 2001 that the quarter was going to miss.

(k)      CW30, a Project Accountant Escalation Manager, reported that Ellison kept track of every deal through an internal website created to monitor each customer's progression of sales or technical issues.  CW30 reports that the system could be reviewed 24 hours a day, 7 days a week, and functioned as an early warning system that a customer was going to cancel an order.

(l)      CW40, a former Oracle financial analyst responsible for tracking Oracle's consulting engagements and record project revenues, reports that the number of consulting deals between January 2001 and February 2001 went to zero and resulted in her being laid off in March 2001.

(m)      CW7, the former Oracle Vice President of Finance, disclosed from his high-level management vantage point within the Company that when he heard defendants' projections of database growth of 20%-25% for 3Q01, he believed it to be "high."  In fact, according to CW7, by mid-December, the sales forecast for the quarter looked "really bad" and that, because of the economic downturn, the Company had barely made 2Q forecasts.  CW7 reported that in the ordinary course, given the information available and the fact that database was a core and mature business, defendants would have known that

growth would be negative or flat.  CW7 further stated that defendants would have known at least six weeks prior to the end of 3Q01 that application growth would miss by 50%.

49.    <u>Defendants Admit Knowledge of the Adverse Effect of the Economy</u>: In addition to the numerous former employees from various segments of Oracle's business who disclosed that the economic slowdown had severely impacted product and consulting sales and revenue earnings growth entering 3Q01, defendants admit that they, and Ellison in particular, were able to see every aspect of sales in every segment of the Company, worldwide,  on a continuing basis.  Ellison knew that pipelines for both applications and database sales could not and would not support publicly projected earnings growth.  A strong inference of knowledge is based upon the following combination of facts that confirm defendants knew well before March 2001 that sale of its products would not meet expectations:

(a)    <u>Oracle Sales Online</u>:  Oracle markets and sells a Sales Online Application as part of its 11i E-Business Suite.  According to CW31 and CW32, Application Sales Consultants, Oracle also used the Sales Online Application internally to manage its own worldwide sales.  CW47 also confirmed that Oracle Sales Online, which is part of the 11i CRM suite is the forecasting tool that Ellison "brags about" and allows him to view all sales and choreograph the sales force.  Oracle's own data sheet describing the product confirmed that defendants knew exactly what the status of sales were in the quarter.  The data sheet describes Oracle Sales Online (11i) as follows:

Complete Views of Customers

Oracle Sales Online provides sales professionals with complete customer overviews at each stage of the sales process.

*    *    *

Global Forecast Reporting

Oracle Sales Online consolidates divisional forecasts within multiple currencies to provide sales executives with a global view of their company revenue forecast.  Senior executives can view global roll-ups of sales forecasts across geographic regions, currencies, sales organizations, and product lines....

*    *    *

Integration with Oracle Business Intelligence System

Oracle Sales Intelligence provides sales teams with a real-time, enterprise *view of sales to help them meet quotas,* assess current performance, and make continuous improvements.

Pl. Ex. 11 at 2-3.

(b)     On or about February 6, 2001, Oracle published its CRM Technical WhitePaper in which Oracle admitted that **all** of its direct sales representatives were using Oracle Sales Online for pipeline management and forecasting, the same system that confidential witnesses report reflected a severe slowdown in sales:

> Oracle employs more than 7,000 direct sales representatives in 60 countries and in seven global business units.  All Oracle sales reps are using Oracle Sales Online for customer management, pipeline management, forecasting, and external financial reporting....

> Oracle's financial organization also uses this application to prepare reports for management and for analyst calls.  The company does business in 25 local currencies, with one reporting currency (U.S. dollars).  After e-mail, Sales Online is the most-used application at Oracle.

Pl. Ex. 38 at 39.

(c)     Oracle's CRM Technical WhitePaper also advertised the capabilities of Suite 11i CRM, and challenged customers to examine whether they could adequately manage their global forecast with their existing software:

> Global Sales Forecast

> Can you state your exact global sales forecast, up to the minute?...covering all geographies, all lines of business, all products, all services, all customers, all partners – and including all licenses, product renewals, support contracts, Web-based sales, call center telebusiness, direct business, mail catalogs, and business through partners and other channels?  Can the forecast reflect management judgements as well as the estimates of the sales reps?  Can you review opportunity data and identify which opportunities your sales organizations are committed to?  Can you see multiple views of that information – one by manager and one by salesperson?

> The Oracle CRM suite enables you to do these things.

*Id.* at 10.

(d)     On February 13, 2001, defendant Sanderson gave a presentation at the Goldman conference where he admitted the defendants had a global view of the sales forecasts around the world.

> For example, in the sales area, in the sales automation area, I can now – Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the minute at any level of detail that you want to see....

> And if we go back in five minutes later and look at what our forecast is, it's different.  Because some rep around he world has changed the forecast.

*             *             *

Now I can see every deal out there that my reps around the world are working.

Pl. Ex. 12 at 13-14.

(e)     Ellison Admits Knowledge:  On February 21, 2001, Larry Ellison appeared at the AppsWorld Conference in New Orleans, Louisiana to promote the 11i suite of software and its capabilities. Defendant Ellison told attendees that Oracle had internally implemented the 11i E-Business Suite and went to a Global database to manage sales.  Ellison specifically told attendees that defendants knew everything about Oracle sales and finances globally up to the last hour:

> We have one customer database.  We have one way of billing a customer.  We have one set of support processes.  We have one way of filling out expense reports.  All of our information is on one database.  We know exactly how much we have **sold** in the last hour around the world and we're paying less to know more.

Pl. Ex. 3 at 14:04:29.

(f)     Defendants' Admissions in March 15, 2001 Conference Call:  On March 15, 2001, defendants held a transcribed conference call for analysts and investors during which they admitted facts reported by plaintiffs' confidential sources as existing prior to and during the Class Period, namely: (1) the economy had a negative impact on the Company's applications and database sales; (2) the pipeline reporting system was "real-time" giving management a global view of sales; and (3) the dot.com sales shortfall was 66%.  Pl. Ex. 13.  Defendant Henley acknowledged:

> I'd stand by what we said that we knew that the dot-coms would have an affect. But clearly, I think it was the economy that really did us in.

> Since the Americas represent over 50 percent of the worldwide license revenues, the impact on the total company license growth was obviously very significant.

> As Larry said on the March 1 conference call, the crack[s] started to appear in the last four days of the quarter. At first, it showed in our general business dot-com mid-market forecast, which came down each of the last four days.

*Id.* at 4.  But, CW1 and CW2 said that this is the same sector that was down a huge percentage even before the Class Period.  ¶47(c)-(e), (g), (j)-(k), (o).

> And in the applications space, clearly, I think part of the reason we did so poorly was because of the slowdown in the U.S. economy.

> *   *   *

> [T]his pipeline system is real-time.  We give constant updates as we did with Q3.  But I think the conversion rates were much less than normal in Q3, we have to assume something like that will probably happen again ....

Pl. Ex. 13 at 5-6.  This confirmed plaintiffs' witnesses who said the pipeline is real-time.  This also corroborates witnesses who saw much earlier that the conversion rates were slipping badly.  ¶47(c), (h).

> How – you know, if pipeline is X, how much of it – will we convert 60 percent of the pipeline, 30 percent of the pipeline, 40 percent of the pipeline – we had to change that variable in light of the slower economy.  So, it's just changing one number – but the actual pipeline management was very accurate, albeit misleading, because of the changing, you know, the changing economy.

Pl. Ex. 13 at 38.

> (g)  At the same March 15, 2001 taped conference call, Ellison admitted:

> Again, the impression I got – again, this is Larry – and I was involved in an awful lot of these deals and looking at them both during, you know, the closed cycle and after the fact, as a post mortem.  And it seemed to be very broad based.  It seemed to be extremely broad based and caused by just a general lack of confidence in the economy, where executives wanted to be, you know, to be very conservative in their expenditures.

*Id*. at 38.

> (h)  <u>Defendants' Admissions in Delaware Answer</u>:  In their Answer filed on February 8, 2002 (Pl. Ex. 14), to the complaint in a Delaware state court derivative suit, defendants, including Oracle, Ellison and Henley, made the following judicially binding admissions:

> (i)  "Defendants admit that Oracle maintained one or more systems for monitoring the pipeline and certain closed deals, which was updated regularly and to which Mr. Ellison had access." *Id.* ¶34.

> (ii)  "Defendants admit that Oracle sales representatives regularly prepared and submitted sales reports." *Id.* ¶35.

> (iii)  "Defendants admit that consulting practice directors regularly reported to upper management as to the status of their business, and that Mr. Scott and the Individual Defendants [including Ellison and Henley] were privy to such information." *Id.* ¶62.

> (iv)  "Defendants admit that Oracle's finance department generated reports concerning Oracle's financial performance, to which the Individual Defendants were privy." *Id.* ¶94.

50.  <u>December 14, 2000 False Statement Concerning Functionality of 11i</u>: During the December 14, 2000 transcribed conference call, defendant Ellison made the following false statements concerning the functionality of 11i:

*[Y]ou can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required. It's up and running in months. You get the savings in months. It costs you less, and it takes less time to install.*

Pl. Ex. 7 at 11.

51. <u>December 15, 2000 False Statement Regarding Functionality of 11i</u>: On December 15, 2000, Ellison was interviewed by Dylan Ratigan and again made false statements about the functionality of 11i:

*There's no systems integration required. No software modifications required to use our E-Business Suite.*

Pl. Ex. 15 at 2.

52. <u>Reasons Why Statements Concerning Functionality of 11i Were False</u>: Defendant Ellison's statements that "you can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required" were false and misleading for the following reasons provided by no less than 17 witnesses:

(a) CW10, a former 11i CRM Marketing and Development Strategist, reported that Oracle faced its own integration and compatibility issues integrating 11i with non-Oracle products and with Oracle products. CW10 confirmed that the integration problems were related to the deficiencies of the Applications Program Interface ("API").

(b) CW11, a former Oracle Procurement Manager and Senior CRM Consultant, reported that in November 2000 Oracle had not yet developed an API for the CRM module and, as a result, the various components of the CRM module could not communicate with one another.

(c) CW11, the former Procurement Manager, confirmed that because 11i API codes were not written, Oracle could not determine whether 11i's modules would be compatible because without establishing communication between the modules, Oracle could not even test for compatibility. Indeed, CW11 reported that the API codes had not even been completed in January 2001. Thus, the statement that the Suite was pre-integrated, interoperable and did not require any programming or systems modification was false when made. According to CW8, the former Worldwide Consulting Practice Director, the gaps in the software became immediately evident during implementation of customer sites when consultants would attempt the integration of various applications, especially the CRM.

(d)     According to CW8, it was clear that the Company had not done any testing of the interfacing capabilities so that the application could work together.  Although Oracle advertised that CRM applications chosen by a customer could be "snapped together," according to CW8 the interface capability was "just not there."  In addition, many of the "mega patches" released to fix individual applications ended up "breaking" interface capability with others, and Oracle's development organization had to produce interface fixes for the integration effort at customer sites.  CW8 stated that once deployed at a customer site, various modules would not share data, or could not find data required to perform applications that were dependent upon the integration of various functions.  CW8 indicated that there were literally hundreds of integration problems between different applications, which had to be resolved during the installation process at customer sites for CRM modules through his tenure with the CRM group.

(e)     CW26, a former consultant in Oracle's Southern Internet Service Group responsible for customer installations and implementation, corroborated CW8 and reported that during the fall of 2000, he was involved in an implementation of 11i at Chevron which required hundreds of patches.  In addition, CW26 reported that the installation of patches would affect other areas of the application, which would then require the problem to be escalated to Oracle's development organization.  CW26 also confirmed, as reported by CW8, that the CRM module of 11i was extraordinarily problematic.

(f)     Problems with the implementation of 11i, and particularly the CRM module, are illustrated by difficulties at BellSouth which had begun integrating the 11i suite into its digital subscriber line ("DSL") business in the summer of 2000.  BellSouth intended to implement 11i into six separate business units, but wanted a successful implementation into its digital subscriber line business unit before implementing it into other units.  CW11, a former Procurement Manager and Senior CRM Consultant, reported that the BellSouth deal was so important to the Company that Oracle was willing to pay anything to keep the deal alive.  However, according to CW11, the entire project was in chaos through at least January 2001.  CW11 reported that the biggest problem was that CRM modules could not communicate with one another due to the lack of an API interface.  Oracle sent nearly 100 consultants and engineers to BellSouth locations to write API codes to attempt to get the various modules to interface with one another.

(g)     CW24, a former Oracle senior technical analyst who specifically handled technical support requests for Oracle consultants at BellSouth, reported that the implementation of BellSouth was "a

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ                                                      - 39 -

disaster" and that the software problems were so substantial that they would have to be referred to the original software developers at Oracle's Redwood Shores headquarters.

(h)      CW12, the former Practice Director for Consulting Services for the southeast, corroborated CW11's account and reported that BellSouth intended to implement 11i into six business units, but deferred doing so until it could successfully implement it in its DSL business unit.  CW12 confirmed that 11i and "had huge gaps" in the CRM module and that Oracle "oversold" 11i's capabilities and readiness to BellSouth.  During implementation, serious problems with 11i's "base code" caused persistent implementation delays through the end of 2000.  The problems with implementation, according to both CW11 and CW12, resulted in Oracle sending a so-called "swat team" of nearly 100 consultants, headed by Senior Vice President John Wheeler, to BellSouth to fix the problems.  CW12 reported that the BellSouth implementation was not completed until January 2001 and that BellSouth had deferred implementation in six other business units.

(i)      CW11 and CW12 were corroborated by CW13, a former Oracle Technology Director.  He said Oracle had expected to close at least two of the additional business units at BellSouth in 3Q01, which would have been $40 million in combined revenue.  However, the only one that did close was a small transaction for an accounts receivable product at BellSouth's Birmingham facility.  CW12 reported that the other project that did not close, valued at $36 million, was another unit at BellSouth's Atlanta Facility – The Virtual Private Network.

(j)      CW29 also corroborated witness accounts regarding expected large deals at Bell South which failed to close and implementation and integration problems at BellSouth.  CW29 stated that the implementation at BellSouth required thousands of patches and that when he was terminated in March 2001, the system at BellSouth was still not completely functional.  According to CW29, these problems resulted in the termination of Senior Vice President John Wheeler and the cancellation of additional sales to Bell South.

(k)      CW8 disclosed that Oracle's development organization and the vice presidents heading the CRM group devised a scheme where the CRM consultants worked at an Oracle office to put together certain demonstration screens which would appear to be functional.  At a local Oracle office closest to the client's facility, the consultants utilized patches created by the development organization that would

allow certain screens for a given application on the client's list to "come up and work" in a limited fashion. The consultants rigged these demonstrations to appear to be operating in a full-blown database, but in actuality were only a limited version of a limited group of screens processing limited data. According to CW8, the customers were not told of the limited nature of these pre-prepared demonstrations, or that other screens of the application were still riddled with bugs and deficiencies and would not work until the development organization completed additional patchwork.

(l)     According to CW1, a former Account Manager at Oracle, Ellison's positive statements about 11i E-Business Suite allowing companies to compete in today's markets were not supported by what the sales force actually experienced. When Oracle introduced 11i in May 2000, the software was by no means ready to go to market, and even in November 2000 when the supposed full suite was released, customers still complained that it was buggy and incomplete. CW1 reported that members of her sales group – technical sales representatives – responsible for demonstrating the product to prospective customers reported to CW1 that the CRM module alone was "so anemic it was pathetic" and that Oracle should not even bother continuing to sell it. CW1 reported that customers who purchased 11i and the CRM module had such bad implementation problems that they would not buy licenses for any other Oracle products. Indeed, customers were angry that they had paid so much for a product that did not work. CW1 reported that as sales continued to slow throughout 2Q and 3Q, customers who had purchased 11i "wouldn't even talk to me."

(m)     According to CW4, an Oracle Staff Consultant, Oracle had difficulty implementing 11i internally as well. CW4 reported that the Company implemented the "time and expense" module of 11i in late 2000 and early 2001. CW4 reported that the program often locked up and a white screen filled with hieroglyphics would appear rendering the system useless. According to CW4, everyone complained about the system and employees frequently asked "how can we sell this thing [11i] if we're having trouble with it ourselves!"

(n)     CW6, a former Sales Administrative Assistant in the New York Office, corroborated CW4's account and reported that the internal implementation of the time-billing and expense application "was always down." CW5, a former Practice Director in state and local governments, further reported that Oracle frantically tried to rectify the problem and it got marginally better in May 2001, but that

1    she too often heard Oracle employees complaining, "how can we sell this thing if it doesn't work at our own

2    company?"

3            (o)     CW19, a former Oracle Finance Director and Manager of Revenue Accounting,

4    reported that Oracle had implemented 11i CRM internally in order to consolidate accounting functions and

5    that the software "had an increasingly excessive number of bugs" and stated that the problems amounted to

6    "months of hell."  CW39, a former Practice Manager in New York, reported that internal implementation

7    of time and billing did not work and caused major accounting problems.  CW31, CW36 and CW38

8    reported also that the time and expense reporting application used internally was flawed and caused serious

9    delays in customer billing.  CW39 reported that he used the time and expense reporting system internally

10   because management demanded that people use it, but that it was so buggy it caused serious accounting

11   problems.

12           (p)     CW34, a former senior principal consultant responsible for implementation of 11i

13   upgrades, reported that Oracle had forced many of its internal groups to use 11i, but that the software was

14   so buggy that it was of no use.  CW34 specifically noted the bugginess of the travel application of 11i.  He

15   further reported that any savings that the Company attributed to 11i was really from staff reductions because

16   their software did not work.

17           (q)     CW9, a former Oracle Senior Practice Director, stated that "it's true" 11i CRM

18   module was incomplete as of the end of 2000 and early 2001 and that the I-Procurement B2B Internet

19   purchasing system was entirely missing.  CW9 reported that this fact was widely known within the

20   Company.

21           (r)     CW15, a former Oracle Consultant, reported that 11i suite released in November

22   2000 was so bug-ridden that customers would have to be crazy to consider an implementation.  CW15

23   reported that Oracle sales personnel deliberately misled customers regarding the functionality of 11i and the

24   ease in which it could be implemented, and simply left it to the consultants to "clear up the mess in the

25   implementation process."

26           (s)     CW25, a former Oracle Senior Principal Consultant, reported that conceptually 11i

27   represented a major advance in design and architecture, but that the product "simply didn't work."  CW25

28

characterized Oracle's positive statements about the product as false – "not just selling a car without tires, they sold it without wheels!"

(t)     The incompleteness of and incapabilities of the 11i suite were so apparent that CW8 reported that during the fall of 2000, Larry Ellison made a personal visit to customer sites to allay concerns about the software's instability.  CW8, a former Practice Director for Worldwide CRM, reported that AmeriCredit in Dallas purchased the CRM and financial applications, but that integration between the two was so problematic that the excessive amount of hours that consultants spent trying to implement 11i significantly eroded Oracle's profit margins.  Ultimately, AmeriCredit pulled the plug and refused to pay for consulting integration work done through 3Q01.  CW8 further reported that in fall 2000, potential customers Telecom of New Zealand and Foster's of Australia were so concerned about the instability of 11i and the CRM that Ellison was scheduled to meet personally with each company in order to provide them with the necessary assurances.

53.     Corroborating these numerous confidential witness accounts, in March 2001, InformationWeek.com published the article, "*Apps Made Easy*?" Walter Stokes, a database administrator for Electronic Data Systems called 11i "'the buggiest software I've ever seen come out of Oracle ....'"  Pl. Ex. 16 at 2.  Even a year later, in February 2002, eWeek.com published an article titled, "*Oracle 11i Still Bugging Users,*" noting that Oracle's "Family Pack," which patches dozens of known bugs at one time, often breaks more than it fixes and that Oracle's 11i problems "are real and current."

> "The 11i quality problems ... are causing companies to delay purchases, product
> rollouts and upgrades, and in some cases, consider alternatives for new installations ...."

Pl. Ex. 27.

54.     <u>Customer Difficulties with the 11i Suite Stopped Major Sales</u>:  Numerous witnesses disclosed that as a result of the integration problems experienced by Oracle in implementing the 11i suite, several major sales expected in the third quarter fell through:

(a)     <u>Telia AB-Sweden</u>: During the fall of 2000, Telia AB, a Swedish telecommunications company, was negotiating a deal to buy 11i for approximately $35-$40 million.  The deal was managed by Oracle Senior Vice President Gary Moore.  A former Oracle Technology Director (CW13), who was involved in and on location in Stockholm, said Telia AB had been negotiating with Oracle to purchase the

11i suite CRM module and Oracle Financials.  However, Telia AB had also been waiting to see a United States telecommunications company commit to Oracle products, applications and consulting services before doing so themselves.  By January 2001, on the heels of the failures at BellSouth, the Telia AB deal completely fell through.

(b)    Hewlett-Packard:  CW27, a Hewlett-Packard Strategic Procurement Specialist responsible for implementation of 11i software at Hewlett-Packard, reported that Hewlett-Packard began the upgrade to 11i suite in January 2001 and that it was unusually buggy and required numerous patches.  CW27 further reported that the upgrade required a huge data conversion to make the system operable.  Consistent with that, CW15 and CW32 reported about Oracle overselling 11i and disguising problems with the software.  CW27 stated that Oracle had not disclosed during its sales presentations that implementation required data conversion.  Rather, they had falsely advertised 11i suite being pre-integrated and interoperable out-of-the-box, meaning that the system had the ability to use the parts of another system without conversion.  Because the software was unusually buggy and required numerous patches, and the data conversion requirement, Hewlett-Packard decided to stop the upgrade to the 11i suite.

(c)    JDS Uniphase:  CW41, an Information Technology Specialist at JDS Uniphase Corporation ("JDS"), informed plaintiffs that JDS went live with Oracle's Field Sale module in January 2001.  That witness states that even that module has hundreds of bugs.  Moreover, Oracle promised JDS that the Field Sales module would work off-line, allowing sales people to use the software even when they were not connected to the Internet.  However, the software did not work off-line.  Further, not until after Oracle installed the software did they inform JDS of the truth that it would not work on the existing JDS 3i system.  Because of these compatibility issues, JDS also deferred upgrading to the 11i suite until there was demonstrable functionality.

(d)    The Principal Financial Group:  CW18, a former Oracle Managing Principal Consultant responsible for developing and presenting e-business and CRM strategies for Oracle customers, reports that, like JDS, a deal that Oracle had begun in 3Q01 with The Principal Financial Group also fell through because Oracle had promised certain features of 11i suite that just were not substantiated.  Defendant Ellison would have had specific knowledge about the progress of this account because of its value of more than $1 million in product sales alone.

(e)     <u>Nantucket Nectars</u>:  Nantucket Nectars purchased Oracle's 11i E-Business Suite in December 2000.  However, before implementation of the 11i Suite, the soft drink maker also got cold feet after hearing of implementation problems at other company sites.  Nantucket decided to wait to upgrade to 11i Suite, giving Oracle time to "work out the kinks" of the troubled software.

(f)     <u>Alliance Coal</u>:  Alliance Coal, LLC, an Oracle customer that had been using Oracle's 10.7 application, has decided to wait to attempt an upgrade to 11i suite.  Oracle has announced, however, that it will no longer support 10.7.

(g)     <u>New York City</u>:  A former Oracle Sales Administrative Assistant (CW6) reported that during December 2000, Oracle had been projecting to close a deal with the New York City Housing Authority.  That deal also failed to close, and although Ellison in the March 1, 2001 conference call stated that the deals that did not close in the quarter were merely delayed for a few days, the New York City Housing Authority did not close in 4Q01 either.  CW6 also confirmed that business in the state and local government division had been very slow throughout this time frame, and that he accessed the pipeline projections by using Oracle Sales Online and it reflected the same thing.

(h)     <u>GE Capital</u>:  A former Systems Analyst at GE Capital (CW14) reported that in November 2000, GE Capital decided to purchase and implement the 11i Suite.  GE Capital started the implementation process in early January 2001.  CW14 stated that the implementation from the beginning was exceptionally difficult because of an unusual number of bugs with the 11i suite software.  CW14 reported that never before had Oracle released an application that was not compatible with its own databases.  Each of the problems was documented and submitted to Oracle.  Though GE Capital could download patches directly from Oracle's Technical Support website, often the patches would "fix" too much and cause other errors.  CW14 stated that 11i suite was rushed to market and GE Capital should have waited.  Plaintiffs are informed that the conversion process at GE Capital completely failed in April 2001, requiring a completely fresh installation.

(i)     <u>Motorola</u>:  CW16, a former Oracle Staff Consultant responsible for creating business models base on 11i's specifications and capabilities, reported in February 2001 that Oracle sales representatives prepared a demonstration of the 11i suite for Motorola.  CW16 reported that the demonstration angered Motorola representatives who walked out on the demonstration instead of taking

on the risky and expensive challenge documented by other companies who had difficulty with 11i suite upgrades and conversions.

(j)     Health Net: CW21, a former Oracle Senior Consultant, informed plaintiffs that Oracle confronted huge integration problems with Health Net in Los Angeles, an account managed by Executive Vice President John Wheeler.  In March 2001, implementation difficulties had risen to a level where Health Net was so angered by the fact that it was millions of dollars over budget that they were withholding payments for Oracle's consulting services and ultimately cancelled parts of the implementation project. CW16, who also worked on the Health Net account corroborated CW21. CW16 reported that the project was extremely costly and that there were "huge problems with implementation" and that "the 11i applications just did not work, there were too many problems."

(k)     Citibank: According to CW25, a former Senior Principal Consultant, reported even Citibank, one of the early purchasers of 11i suite and frequently cited as one of Oracle's references that have purchased and implemented the product, has given up on parts of its implementation. Citibank had originally intended to use 11i suite in its services division, which creates software to support thousands of other bank customers.  Even as late as April 2001, Citibank has not decided where to implement it.

(l)     Eaton Corporation: CW17 is a former Vice President of the Oracle Applications User Group. CW17 is also a former Applications and CRM Expert for Eaton Corporation. According to CW17, the upgrade to 11i suite at Eaton Corporation was a nine-month disaster of problematic integration and implementation. CW17 reported that while some of the individual modules were good, they were lacking in the area of integration and the modules did not integrate into a "working system." CW17 further reported that the upgrade required thousands of patches to fix bugs.

(m)    Hostcentric: CW42 reported that Hostcentric, a Houston, Texas information technology company, began installation and implementation of 11i as part of Oracle's Authorized Application Provider program.  CW42 reported that the implementation of 11i (the standard suite – requiring no customization) began in May 2000, but after 12 months of applying patches, the only module that was successfully implemented was the financials. CW8 corroborated CW42's account and reported that the integration problems at Hostcentric were so severe that Oracle sent more than 30 consultants and even research and development engineers to Hostcentric to try to get the applications "working together." CW8

reported that Ellison knew of these integration problems and visited Hostcentric, personally assuring Hostcentric that Oracle would "make this right" and get the software integrated.  According to CW42, the implementation of the other modules in the suite, including the CRM application, failed and the entire implementation project was stopped in June 2001.

55.  <u>Defendants Knew of Customer Problems with 11i Suite Implementation</u>: Defendants' knowledge of Suite 11i defects is confirmed by several witnesses, and by defendants' admissions in their Delaware Answer, which are binding as judicial admissions:

(a)  According to CW15, Oracle records and stores all problems suffered by all of its customers on a database consisting of all of the technical assistance requests ("TAR") submitted by its field consultants for technical support as they encounter problems at customer sites.  These TAR reports must be submitted when Oracle's Metalink web page does not have a solution to the problem that can be downloaded from the website.  Plaintiffs are further informed by a former Oracle consultant (CW15) that every implementation is given a number and that all of the TARs for a specific customer can be accessed by the number.  Plaintiffs are informed that in some cases it was impossible to get a solution to a TAR.  Instead, Oracle would admit to its consultants in the field that the product was released prematurely and that "nothing could be done."

(b)  CW8 confirmed that Oracle management knew that 11i was not ready – most modules did not work – and Oracle did not want customers to know it.  Indeed, from the time of release in May 2000 through at least January 2001, the CRM group, as well as other consulting groups, were continuously notified by the Company in e-mail memos that although certain modules of 11i had been released they did not work, and consultants were instructed "DO NOT INSTALL."  These memos would "flat out tell you – the product does not work; don't install it."  Usually, the memos identified dates when "mega patches" for identified applications were scheduled to be released, so the consulting groups were on notice to "drag their feet" and "stall however we could" until the patches were actually deployed.

(c)  Defendants' admissions in the Delaware derivative suit (Pl. Ex. 14) confirm that they had actual knowledge of the 11i defects.  In their February 8, 2002 Answer in the Delaware case, they made the following judicially binding admissions:

1          (i)          "Defendants admit that, as with all software, Oracle's 11i Suite required

2    certain patches and bug fixes, including consolidated patches." *Id.* ¶56.

3          (ii)          "Defendants ... admit that consultants typically utilized Technical Assistance

4    requests [TAR's] to obtain assistance in resolving problems experienced by Oracle customers." *Id.* ¶66.

5          (iii)          "Defendants admit that Oracle had several consultants working with Bell

6    South, most of whom were not working on Bell South's Custom APIs." *Id.* ¶74.

7          (iv)          "Defendants admit that Motorola has not upgraded to 11i Suite." *Id.* ¶85.

8    56.    <u>Knowledge of 11i Defects</u>: In summary, as detailed above, nearly 20 witnesses, all former

9    Oracle sales or consultant personnel in different regions, reported declining sales due to the economy during

10   late 2000 to early 2001.  ¶47.  This was known to them based on their own sales experiences and based

11   on their review of regional and Company-wide databases reporting declining sales.  It is reasonable to

12   conclude that these declining sales were also reflected on the global database updated daily that Ellison and

13   the other defendants admitted they monitored.  At the same time, another 15 former employee witnesses

14   reported that Oracle's flagship 11i product was encountering integration problems, that big sales were being

15   lost as a result and defendants knew it.  Indeed, defendants later admitted that big sales were lost due to the

16   economy, and Ellison admitted he was aware of the bugs.  When he said, "'*[m]ea culpa*,'" it  means "it's

17   my fault."  Thus, when defendants stated in December that the economy was not hurting Oracle sales and,

18   based on that, defendants reaffirmed growth, revenue and earnings forecasts, such statements and forecasts

19   were knowingly false when made.

20   57.    Nevertheless, defendants' false statements drove Oracle stock from below $25 in early

21   December to over $30.  On January 4, 2001, defendant Henley sold 1 million shares of his Oracle stock

22   at $32 per share and pocketed $32.3 million.

23   58.    <u>Oracle Repeats False Statements Regarding Functionality of and Demand for 11i</u>:  On

24   January 8, 2001, defendant Sanderson visited the offices of Salomon Smith Barney and made the following

25   false statements (in bold) to securities analysts, which were repeated in a report issued by Salomon Smith

26   Barney:

27          * ***The suite is pre-integrated and fully interoperable out of the box***, helping
    to lower consulting costs and time-to-value.

28

* * *

*Oracle sees robust demand for both its database and applications business*. Specifically, *Sanderson noted demand* for ERP *is surprisingly robust* while advanced planning and scheduling, CRM, and SCM products are also performing well.  *Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets.  Sanderson noted two trends driving demand for databases is demand for the 11i applications that are typically bundled with the database as well as applications of other vendors that rely on the functionality of the Oracle database.*

Pl. Ex. 17.

59.     <u>Reasons Why Sanderson's Statements Were Knowingly False When Made</u>:

(a)     Sanderson's statement that the 11i suite is pre-integrated and fully interoperable out of the box was knowingly false when made.  As detailed above, numerous witnesses reported that the Company's new flagship software suite was encountering massive integration problems and that, as a result, large sales were being lost and other prospective buyers were deferring purchases until Oracle could demonstrate that the product worked. ¶54(q)-(aa).  For example, CW11 and CW12 reported that the 11i suite was released without the critical API interface necessary for the different modules to communicate with one another and work together.  Notwithstanding the countless bugs which required thousands of patches to fix, the missing API interface alone required the Company to send nearly 100 consultants to BellSouth to write API codes.  ¶52(a)-(c), (f).

(b)     Sanderson's statement that Oracle was seeing robust and sustained demand for database products – despite industry-wide concern over contracting IT budgets, was also knowingly false when made.  Again, as detailed above, numerous witnesses, all former Oracle sales or consulting personnel in different regions, reported declining sales due to the economic slowdown during late 2000 to early 2001.  For example, CW1 and CW2 reported that the economic slowdown not only impacted sales opportunities in the pipeline, but it also increased pricing competition which compressed margins on the Company's core database products.  In addition, Oracle was losing significant market share in its database products, because with the release of 11i Oracle was in direct competition with "best of breed" applications providers which had previously driven 25% of Oracle's database sales.  Pl. Ex. 18.  These facts were known to the witnesses based on their review of and entries into regional and worldwide databases reporting declining sales and detailed the status of each site around the world "in the last hour."  Thus, it is reasonable to conclude that

1 these declining sales were also reflected on the global database updated daily that Sanderson, Ellison and

2 Henley admitted they monitored.

3       60.     <u>Oracle Repeats False Statement that Weak Economy Was Not Affecting the Company</u>:

4 On January 11, 2001, defendants directed Oracle spokeswoman Stephanie Aas to publicly rebut any

5 suggestion that the economic slowdown would negatively impact Oracle.  Ms. Aas falsely told analysts and

6 reporters the following (in bold) which was published in a *Bloomberg News* article on Thursday, January

7 11, 2001:

8              Company spokeswoman Stephanie Aas today said ***Oracle has yet to see any***
             ***signs that its business is being hurt by the economic slowdown*** or reported cuts to

9              information-technology budgets.

10              "Obviously the economy is a wild card.  So if we went into a recession or there is
             a sharp downturn [in the economy], we could be impacted....  ***But we're not seeing it***

11              ***now***."

12 Pl. Ex. 19.

13       61.     <u>Reasons Why Statement in ¶60 Was False</u>:  The statement that Oracle had yet to see any

14 signs that its business was being hurt by the economic slowdown was false when made.  As reported in

15 detail by at least 15 witnesses from various segments within the Company and multiple geographic regions,

16 the impact of the slowing economy resulted in fewer potential sales in the pipeline; compressed profit margins

17 on its core database products; and weak demand for the Company's new 11i software suite.  ¶¶47, 52.

18 Indeed, witnesses report that declining sales in database, applications and consulting plagued the Company

19 since June 2000.  Such facts were known to the witnesses based upon their review of and entries into the

20 Company's regional and worldwide databases which detailed the status of each sale around the world "in

21 the last hour."  Thus, it is reasonable to conclude that the declining sales reported by the witnesses were

22 reflected on the global database that Ellison and the other defendants admittedly monitored.

23       62.     Nevertheless, by January 19, 2001, defendants' false and misleading statements had the

24 desired effect as the price of Oracle shares spiked from $31.80 to $34.56.  Defendant Ellison wasted no

25 time as he intended to immediately profit from his insider trading activity and on Monday, January 22, 2001

26 began his eight-day sale of 29 million shares of stock for nearly $900 million.

27

28

63.     <u>False and Misleading Statement</u>: On or about February 6, 2001, Oracle made the following false statements specifically concerning Oracle's CRM module in its technical WhitePaper written by Mark Barrenechea:

> ***Oracle's CRM suite is both complete and integrated .... No systems integration is required to install the Oracle CRM suite.***
>
> ***In fact, systems integration labor usually runs many times the cost of the software or the hardware needed to run the system – and the customer gets to pay for it. To install the Oracle CRM suite, no systems integration is required. And because the CRM suite consists of true Internet applications, every application works in every country, every major language, and every major currency.***

Pl. Ex. 38 at 6-7.

64.     <u>Reasons Why Statements from Oracle's CRM Technical WhitePaper Were Knowingly False and Misleading</u>: As reported by CW8, CW12, CW32 and CW45 and others in ¶52 above, Oracle's, 11i including the CRM module, was fraught with bugs and instabilities which required hundreds of patches to fix. Even a year later, Oracle still had not fixed the software. In February 2002, eWeek.com published an article reporting that 11i's problems remained "real and current" and the "Family Pack" patches still break other things. Pl. Ex. 27.

(a)     According to CW8, Oracle knew that the CRM module was not complete and integrated and could not be installed without any systems integration. In fact, in order to sell the CRM, Oracle consultants "rigged" customer demonstrations of the CRM just to give potential customers the appearance that the software actually worked. ¶52(k). In fact, even through January 2001 Oracle warned its own CRM consulting group not to install certain modules of 11i, including CRM, because they did not work. CW9 reported that even in early 2001 the I-Procurement application of the CRM was entirely missing and the Company had not developed the API. CW1 reported that the CRM was "so anemic that it was pathetic" and that the Company should "not even bother" selling it. According to CW45, 11i and CRM "just plain did not work."

(b)     In addition to individual CW accounts, the Company was experiencing troubled and failing implementations at customer sites around the country including at BellSouth, Hostcentric, Health Net, AmeriCredit, and others.

65.   <u>Oracle Repeats False Statements About the Economy and 3Q01 Growth Forecasts</u>: During February 2001, defendants' falsehoods continued.  They: (1) claimed that the Company was on track to meet its forecasts, was seeing rapid adoption and implementation of its e-business software and thus was not feeling the effects of the economic downturn; and (2) that 11i suite worked and was pre-integrated and interoperable out-of-the-box.  These statements were consistently repeated by Ellison, Henley and Sanderson as they endeavored to convince the public and potential customers that while it may have been true that other technology and computer related companies would suffer from the slowdown in demand for computer and PC products, Oracle would thrive:

(a)   On February 7, 2001, analyst First Union Securities, Inc. visited Oracle headquarters and met with Oracle Management, including defendant Henley.  During that meeting, Henley falsely stated that: (1) Oracle was not seeing the effects of the economy; (2) database revenue would grow 15%-20% year-over-year; (3) applications revenue would grow 75% year-over-year; (4) the applications sales and revenue pipeline were strong.  Defendant Henley's false statements (in bold) were conveyed to the market in a February 8, 2001 First Union analyst report, as follows:

On February 7th, we met with management of Oracle, including CFO Jeff Henley at Oracle Headquarters.  We note the following points regarding our meeting:

*   *   *

*__Oracle is not seeing the effects of a slowing economy at this point__*, but next several weeks will be critical.

*   *   *

*__Management reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301__*.

Pl. Ex. 20.

(b)   On February 7, 2001, Deutsche Banc Alex. Brown also visited Oracle headquarters and spoke with defendant Henley and Oracle management for a mid-quarter update.  During the meeting, Henley and Oracle management made the following false statements: (1) management had not seen any weakness in its business; and (2) in 3Q01, Oracle would report application growth of 75%, Database growth of 20%-25%, licensing growth of 25% and service growth of 15%-20%.  On February 8, 2001,

Deutsche Banc issued a report conveying to the market the false statements (in bold) made by defendant Henley on February 7, 2001, as follows:

> VISIT WITH MANAGEMENT.  Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff Henley and VPs in the server and applications development organizations.

> PERSPECTIVE ON THE MACRO ENVIRONMENT.  **According to management, it has yet to see macro-related weakness in its business**....

> ... **Barring a severe economic downturn, management sees continued growth driven by strong demand** in key segments such as supply chain, customer relationship management and collaboration.

> NO CHANGE TO OUTLOOK, RECENT GUIDANCE.  **Mr. Henley reiterated that the company's outlook and guidance were unchanged for F3Q'01** (Feb).

Pl. Ex. 21.

(c)     On February 9, 2001, defendant Oracle caused spokeswoman Jennifer Glass to issue the following false statement (in bold) concerning the effect of the slowdown in the economy on Oracle projections conveyed to the market.  Glass's false statements were repeated in a *Bloomberg News* article on the same day:

> Oracle is still upbeat about its prospects for earnings growth, which will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i, spokeswoman Jennifer Glass said.

> **"We haven't changed our projections at all," Glass said.  "This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy**."

Pl. Ex. 22.

66.     Reasons Why Statements Concerning the Effect of the Economy and Growth Projections Were Knowingly False When Made:  The statements that Oracle had not seen any effects of the slowing economy and that the Company would still report record database and applications growth were false when made for the following reasons:

(a)     As reported in detail by numerous witnesses from various segments within the Company and multiple geographic regions, the impact of the slowing economy had already resulted in fewer potential sales in the pipeline, compressed profit margins on Oracle's core database products and weakened demand for the Company's new 11i software suite.  ¶47.  Indeed, these witnesses reported that declining

sales in database, application and consulting plagued the Company since June 2000.  Such facts were known to the witnesses based upon their review of and entries into the Company's regional and worldwide databases which detailed the status of each sale around the world "in the last hour."  Thus, it is reasonable to conclude that the declining sales reported by the witnesses were reflected on the global database that Ellison and the other defendants admittedly monitored.

(b)     In addition to the impact of the economy on Oracle's product sales, the functional instability of 11i had already resulted in several large lost deals in December 2000 and January 2001, early in the third quarter.  The lost deals included the State of Michigan ($50-$100M), BellSouth ($36M), Telia ($35-$40M), and ADT ($10M).  These deals alone add up to nearly $186 million in lost revenue.  Confidential witnesses also identified at least 10 more deals that were lost to 11i's defects, including a $1M deal to The Principal Financial Group, and deals with Foster's, New Zealand Telecom, Federal Express, Mutual of Omaha and GE.  In fact, even though the Company was relying upon sales of 11i to fuel growth and claimed that the software would "help companies cut costs in tough times," 11i actually cost its early purchasers millions in installation and implementation costs in addition to lost business.

67.     Despite functionality problems encountered in Oracle's internal implementation and countless troubled or failed customer implementations, defendants  continued to falsely represent that 11i needed no integration and was "literally plug and play" and would fuel future growth.

68.     <u>False Statement Regarding 11i Integration and Functionality</u>: On February 21, 2001, defendant Ellison gave a keynote address at the Oracle AppsWorld Conference in New Orleans in which he made the following false statement (in bold) concerning the implementation and integration of the 11i suite:

> We were the first company to use this eBusiness suite and in the very first year we put it in, we saved $1 billion.
>
> *      *      *
>
> In fact, we recommend that you start with, you try a component of the suite and then you add it in.  Now the nice thing is it's like Lego blocks.  Once you have one piece in, ***the other pieces just snap together.  There's no systems integration required.  The key thing is, you can install just one piece and then again install another piece.  No systems integration.  You just basically turn it on or snap it together....  Plug and play.  It is absolutely, all the pieces within the suite are literally plug and play.***

Pl. Ex. 3 at 13:33:31, 14:54:52.

69.   <u>Reason Why Statement in ¶68 Was False</u>:   Notwithstanding Ellison's inconsistent representations regarding 11i throughout the Class Period, whether a customer purchased the complete Suite or a customer purchased it in pieces, the software did not work.   Thus, the statement in ¶68 was false for the following reasons:

(a)   As reported in detail by at least 14 witnesses, 11i was encountering massive integration problems.   According to CW8, CW32 and CW33, the CRM module alone was so buggy, Oracle's own specialists could not get it to work and resorted to "rigging" customer demonstrations.   Indeed, Ellison later admitted that he was aware of the bugs, explaining that "'[i]t's a complex product ... *[m]ea culpa*.   It's true.'"   In addition, Ellison claimed that the Company had saved $1 billion by implementing its own 11i software internally.   But, many witnesses (CW2, CW7, CW8, CW17, CW28, CW33, CW35, and CW36) stated Ellison's claim was just a Wall Street marketing gimmick and that the 11i suite didn't work internally any better than externally.   Instead, these witnesses stated the major portion of the savings came from firing more than 2,000 employees.

(b)   The lack of a working 11i suite had also taken a toll on Oracle's applications business as well as its core database business.   With the shipment of the 11i suite, a purported integrated applications solution, Oracle placed its product in direct competition with "best of breed" application sellers like Siebel Systems, Inc., Ariba, Inc. and PeopleSoft, Inc.   These companies had driven 25% of Oracle's core database sales throughout the 1990's by recommending Oracle databases to their software customers. Pl. Ex. 18.   IBM, which had stopped competing with the same software companies in 1999, has now gained market share against Oracle.   Indeed, as of May 2001, IBM has signed 59 alliances with application makers such as Siebel, Ariba, and PeopleSoft – all Oracle rivals.   Many had worked with Oracle for years, but were happy to align with a company they don't compete with.   "I will not help Oracle make a single dime that I don't have to,'" said Rick Berquist, a senior vice president at PeopleSoft.   *Id*.

(c)   Shortly after the Class Period, market analysts confirmed that in the first six months of its release through the summer and fall of 2000, the 11i suite product required an incredible 5,000 patches (repairs), leading one industry expert to call it "'the buggiest software I've ever seen come out of Oracle ....'" *See* Steve Konicki and Jennifer Maselli, *Apps Made Easy?*, InformationWeek.com News (Mar. 12, 2001), *available at* http://www.informationweek.com/828/entapps.htm.   Pl. Ex. 16.

70.   <u>Oracle Reiterates False Growth Forecasts</u>: On February 21-23, 2001, Ellison and Henley met with analysts, money and portfolio managers, institutional investors and large Oracle shareholders at the AppsWorld Conference in New Orleans, Louisiana to discuss Oracle's 3Q results, its business and its prospects.  They falsely stated that:

- •  Oracle would report EPS for 3Q01 of $0.12.

- •  Oracle would report Q3 revenue of $2.9 billion.

- •  Oracle was not seeing an impact on its results due to the slowdown in the United States  economy.

71.   <u>False Statement</u>:  On February 21, 2001, Deutsche Banc issued an analyst report which repeated defendant Henley's false statements (in bold) made at the AppsWorld Conference:

> CFO Jeff Henley gave a brief presentation to the financial community, but offered no commentary on the current quarter (company is in its quiet period) and no change to guidance.  ***Management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters***.

Pl. Ex. 23.  In their February 8, 2002 Answer to the revised Amended Shareholder Derivative Complaint pending in the Delaware Chancery Court, defendants admitted that Messrs. Ellison and Henley appeared at the AppsWorld Conference between February 21-23, 2001, and that Mr. Henley reaffirmed Oracle's financial projections.  Pl. Ex. 14, ¶125.

72.   <u>Reasons Why February 21-23 Forecasts Were False</u>: Defendants' statements in ¶¶70-71 were false when made for the same reasons (witness accounts, admissions) pled in detail above.  ¶¶47-48. As also detailed above (¶¶52, 54), defendants knew throughout Q2 and Q3 that: (1) Oracle's new software 11i suite was broken and needed massive integration and implementation work to be functional; (2) potential customers were increasingly reluctant to risk upgrading to the software because of high implementation costs related to bugs and poor integration; (3) the slowing United States economy was severely impacting all business sectors at Oracle; and (4) demand for Oracle products was weak due to poor functionality of the 11i suite and the economy.

73.   Even as late as the morning of March 1, 2001, defendants' false statements continued to reach the market as BlueStone Capital issued an analyst report based upon management's statement of the week prior: "[M]anagement indicated last week that Oracle had not experienced any slowdown in business

this quarter" and "Oracle's business continues to grow; the current pipeline is as strong as it has ever been, according to management."  Pl. Ex. 24.

74.    Later that same day, March 1, 2001, Oracle revealed that contrary to prior assurances by defendants of Oracle's continuing "strong" revenue and EPS growth, including defendants' assurances only eight days earlier that demand remained strong, Oracle would in fact post revenue and EPS *declines*.  In a March 1, 2001 press release (Pl. Ex. 4), Oracle stated:

- •    Oracle would post sequential EPS declines.

- •    Database growth would be *flat* to slightly *negative*.

75.    These disclosures shocked the market, causing Oracle's stock to decline in one day from $19.50 on March 1 to $16.88 per share on March 2, 2001, on record volume of more than 224 million shares, inflicting billions of dollars of damage on plaintiffs and the Class.  Defendants' fraud has reduced Oracle's market capitalization by over $90 billion as Oracle stock has fallen 50% from its Class Period high of $35 per share as the truth about Oracle, its operations and finances reached the market.

## POST CLASS PERIOD ADMISSIONS

76.    Thereafter, on March 15, 2001, Oracle issued a press release announcing 3Q01 revenue of $2.67 billion, $233 million and 8% less than the $2.9 billion forecast.  Oracle also announced EPS of only $0.10, 17% and $112 million less than the $0.12 earnings forecast.  Pl. Ex. 25.  Defendants also held a conference call with securities analysts and attempted to explain how Oracle's quarterly results could be so far below what defendants publicly projected.  Defendants admitted that despite strong results in Europe, Asia and other international geographies there was an enormous slowdown in the Americas, particularly the United States.  Pl. Ex. 13.

77.    Defendants also acknowledged that as opposed to the 75% applications growth projection, applications grew only 25% (a 66% miss) and slid from $279 million in 2Q01 to $249 million in 3Q01.  As opposed to a 25% projected database growth, database grew a mere 6% (a 76% miss).  As opposed to a 25% projected license growth, license revenues grew only 6%.  Pl. Ex. 26.  Defendants conveniently claimed that the "cracks" did not really begin to show until the last four days of the quarter (in a lame attempt to explain their false claims uttered on February 23, 2001, only six days before the end of the quarter).  Defendants also attempted to distance themselves from the pipeline reporting systems that they had so

strongly asserted would support their aggressive earnings results.  Instead of referring to their business as being immune from the slowdown in the economy and providing new opportunities, management now admitted the economy was a "wildcard" and that the Company's performance in the future would be in line with United States economic performance.

78.    On April 12, 2001, Oracle filed its Form 10-Q for 3Q01 with the Securities and Exchange Commission ("SEC").  In that filing, defendants admitted what they had been denying all along.  The Form 10-Q reads that the  "slowdown in license revenues in the third quarter of fiscal 2001 was primarily due to uncertainty related to economic conditions in the United States of America, that negatively impacted demand for the Company's systems and business application products."  Pl. Ex. 26 at 12.

79.    On March 15, 2001, defendants held a transcribed conference call for investors (Pl. Ex. 13), during which Ellison and Henley attempted to explain the reasons for the financial shortfall and made the following admissions:

> [Jeff Henley]: I'd stand by what we said that we knew that the dot-coms would have an affect. But clearly, I think it was the economy that really did us in.
>
> Since the Americas represent over 50 percent of the worldwide license revenues, the impact on the total company license growth was obviously very significant.
>
> As Larry said on the March 1 conference call, the crack started to appear in the last four days of the quarter. At first, it showed in our general business dot-com mid-market forecast, which came down each of the last four days.

*Id.* at 4.  CW1 and CW2 reported that this is the same sector that was down a huge percentage even before the Class Period.

> [Jeff Henley:]  And in the applications space, clearly, I think part of the reason we did so poorly was because of the slowdown in the U.S. economy.
>
> *            *            *
>
> [T]his pipeline system is real-time.  We give constant updates as we did with Q3.  But I think given that the conversion rates were much less than normal in Q3, we have to assume that something like that will probably happen again ....

*Id.* at 5-6.  Thus, Henley confirmed and corroborated plaintiffs' witnesses (CW1 and CW31) who said the pipeline was maintained on a continuing real-time basis.  Henley also corroborated the witness (CW1) who saw much earlier that the conversion rates were slipping badly.

[Jeff Henley:]  [W]ell, first of all, if you segmented the dot-com number in the third quarter in terms of the affect on the Americas license – first of all, the dot-com[s] dropped 66 percent  year-over-year....  So it was obviously huge.

\*    \*    \*

Larry Ellison:  It's both, I mean it – you know, because database is a much bigger than apps number, it had more total dollar effect.  But it affected both.  And we had – we did a lot of apps business with dot-coms.  That all went away too.

\*    \*    \*

And you know, CRM ... is global. Right now, the entire sales force is on CRM.

\*    \*    \*

I was involved in an awful lot of these deals ....

(referring to deals that did not close)

We always sell portions of the suite, as well as the whole suite.  We've never said you have to take the whole thing at once.  We've never really ... sold it that way.

Pl. Ex. 13 at 14, 17, 20, 38-40.

80.    In the March 15, 2001 press release, Oracle acknowledged that its revenues from 3Q01 application software sales increased only 25% over the same quarter in 2000 to $249 million, and that its database sales revenues grew only 6% to $823 million.  Pl. Ex. 25.  Thus, using simple arithmetic, Oracle's revenues from application sales in 3Q00 were some $200 million, and were about $775 million from database sales.

81.    Oracle had, however, projected 75% applications growth for 3Q01 which would have produced $350 million in revenues.  But actual revenue was only $249 million.  The difference, $101 million, accounts for nearly one-half of the $233 million revenue shortfall for the quarter ($2.9 billion projected, $2.67 billion actual).  Oracle also projected a 25% database revenue increase, which at $775 million in 3Q00 would have produced $970 million in revenues in 3Q01.  Since actual revenues were only $823 million (only 6% growth), the difference is $147 million and accounts for the rest of the revenue shortfall.

82.    Sanderson had previously claimed that 11i applications sales would also serve to drive database sales growth in 3Q01.  ¶58.  That view was consistent with analyst reports that 25% of Oracle's database sales had historically been driven by application software makers like Siebel, Ariba and PeopleSoft, whose products were built to run on Oracle databases.  They would promote Oracle database

sales in selling their applications. Pl. Ex. 18. With the 11i suite, however, Oracle was now competing with Siebel, et al., and had to promote database sales itself when pitching the 11i application. Accordingly, it is reasonable to conclude that the combined effect of the defects and integration problems and the slowing economy dramatically reduced sales of the 11i suite. Thus, the defects and the economy were the main reasons for the revenue shortfalls in both applications and database sales, and for the accompanying 17% earnings miss.

**CLASS ACTION ALLEGATIONS**

83.     This is a class action on behalf of purchasers of Oracle publicly traded securities between December 14, 2000 and March 1, 2001, excluding defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

84.     Common questions of law and fact predominate and include whether defendants: (a) violated the 1934 Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; and (d) artificially inflated the prices of Oracle's publicly traded securities and the extent of and appropriate measure of damages.

85.     Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FIRST CLAIM FOR RELIEF**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

86.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

87.     Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Oracle securities, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     During the Class Period, defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to

and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Oracle securities; (b) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (c) cause plaintiffs and other members of the Class to purchase Oracle's securities at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89.     In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Oracle's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

90.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

91.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Oracle's securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Oracle's publicly traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the integrity of the market in which the securities traded, plaintiffs and other members of the Class purchased Oracle securities during the Class Period at artificially high prices and were damaged thereby.

92.     Had plaintiffs and the other members of the Class and the marketplace known of the true facts, which were not disclosed by defendants, plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Oracle securities during the Class Period, or if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

93.     By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act
### Against Defendant Oracle and the Individual Defendants

94.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

95.     The Individual Defendants acted as control persons of Oracle within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, Board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's global database, internal reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

96.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

97.     Oracle controlled each of the Individual Defendants.

98.     By reason of such wrongful conduct, the Individual Defendants and Oracle are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM FOR RELIEF

### For Violation of §20A of the 1934 Act
### Against Defendants Ellison and Henley

99.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

100.     While Oracle securities traded at artificially inflated and distorted prices, defendants Ellison and Henley personally profited by selling 30,084,576 shares of their holdings in Oracle securities while in

possession of adverse, material non-public information about Oracle, pocketing over $900 million in illegal insider trading proceeds, as detailed above.

101.    By contrast, plaintiffs purchased on the same day, as follows:

(a)    Plaintiff Oleg "Alex" Trepetin and members of the Class traded contemporaneously with defendant Henley by purchasing Oracle securities at artificially inflated prices on January 4, 2001 and were damaged thereby.

(b)    Plaintiff Thomas Wright and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 22, 2001 and were damaged thereby.

(c)    Plaintiff Dzung Chu and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 23, 2001 and were damaged thereby.

(d)    Lead Plaintiff UFCW Local 56 Retail Meat Pension Fund and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 24, 2001 and were damaged thereby.

(e)    Lead Plaintiff UFCW Local 56 Retail Meat Pension Fund and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 25, 2001 and were damaged thereby.

(f)    Plaintiff Ryan Kuehmichel and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 26, 2001 and were damaged thereby.

(g)    Plaintiff Misop Lessard and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 29, 2001 and were damaged thereby.

(h)    Plaintiff Ke Wan and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 30, 2001 and were damaged thereby.

(i)    Plaintiff Oleg "Alex" Trepetin and members of the Class traded contemporaneously with defendant Ellison by purchasing Oracle securities at artificially inflated prices on January 31, 2001 and were damaged thereby.

102.    These plaintiffs and all the other members of the Class who purchased Oracle securities contemporaneously with the sales of Oracle securities by the Individual Defendants:

(a)    have suffered substantial damages in that they paid artificially inflated prices for Oracle securities as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein described; and

(b)    would not have purchased Oracle securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by defendants' false and misleading statements.

103. As a result of the wrongful conduct alleged herein, these plaintiffs and other members of the Class have suffered damages.

104. By reason of the foregoing, defendants Ellison and Henley violated §20A of the 1934 Act and are liable to these plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchase of Oracle securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiffs and other members of the Class damages together with interest thereon;

C. Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

D. Awarding plaintiffs and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 11, 2002

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
MARK SOLOMON
DOUGLAS R. BRITTON

_____
MARK SOLOMON

401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
SANFORD SVETCOV
SHAWN A. WILLIAMS

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ

- 64 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

<u>DECLARATION OF SERVICE BY FACSIMILE</u>
PURSUANT TO NORTHERN DISTRICT LOCAL RULE 23-2(c)(2)

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Alameda, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 100 Pine Street, 26th Floor, San Francisco, California 94111.

2.      That on October 11, 2002, declarant served by facsimile the PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to the parties listed on the attached Service List and this document was forwarded to the following designated Internet site at:

**http://securities.milberg.com**

3.      That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of October, 2002, at San Francisco, California.

_____
Mary Grace Halatsis

G:\CASES\Oracle3\MGH80114.cpt

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS- C-01-0988-MJJ