-------------------------------------------------------------------------------------------------------

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

# CASE NO. C-01-0988-MJJ

| | |
|---|---|
| **In re ORACLE CORPORATION** | ) |
| **SECURITIES LITIGATION** | ) |
| | ) |
| **This Document Relates to:** | ) |
| | ) |
| **ALL ACTIONS.** | ) |

-------------------------------------------------------------------------------------------------------

**J. Duross O'Bryan, CPA**

**EXPERT WITNESS REPORT IN ACCORDANCE WITH RULE 26**

**Dated: May 25, 2007**

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND QUALIFICATIONS

II.     SUMMARY OF OPINIONS

III.    BACKGROUND

     A.  PLAINTIFFS' ALLEGATIONS
     B.  ORACLE'S BUSINESS
     C.  ORACLE'S ACCOUNTS RECEIVABLE PROCEDURES
     D.  ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT" FLAGS
     E.  ORACLE'S TRANSFERS OF UNAPPLIED CASH

IV.     THE LAWSUIT

     A.  SOURCES OF PLAINTIFFS' ALLEGATIONS
     B.  ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE
     C.  PRESENTATION TO THE SEC
     D.  SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES
     E.  ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

V.      KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

     A.  REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS
     B.  REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS
     C.  REVIEW OF CASE FILINGS AND TESTIMONY
     D.  REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY

VI.     KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED CASH

     A.  REVIEW SUBSET OF UNAPPLIED CASH TRANSFERS
     B.  MATERIALITY
     C.  REVIEW OF CASE FILINGS AND TESTIMONY
     D.  REVIEW OF WORK PERFORMED BY EY

VII.    REVIEW OF HEWLETT-PACKARD TRANSACTION

VIII.   CONCLUSIONS

IX.     QUALIFICATION

APPENDICES

## I.     INTRODUCTION AND QUALIFICATIONS

Oracle Corporation (the "Company" or "Oracle") and its Counsel have engaged me to opine on certain financial and accounting issues raised in the Plaintiffs' Revised Second Amended Complaint dated December 9, 2002 (the "Complaint").  These issues relate to the accounting and financial statement impact of the Company's creation of more than 46,000 debit memos on November 17, 2000.

I have also been asked to opine on several financial and accounting issues not raised by Plaintiffs in the Complaint, but which Plaintiffs subsequently detailed in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses").  These issues relate to certain transfers of unapplied cash to Oracle's bad debt reserve and a transaction Oracle entered into with Hewlett-Packard ("HP") in the second quarter of fiscal year 2001.  I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter.  In addressing these unpled accounting issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to allege these issues in the Complaint.

I have been a licensed Certified Public Accountant ("CPA") for 29 years.  During this period, I have participated in over 200 separate engagements involving accounting issues, including financial statement audits and forensic accounting investigations and accounting expert testimony.   My experience has included engagements involving companies ranging in size from thousands to billions of dollars in assets and/or revenues.   I have experience in numerous industries including hi-tech, software development and distribution, manufacturing, oil and gas,

1

educational supplies and publishing, banking and retail, among others.  I have extensive experience and have offered opinions on accounting issues in public and private company settings, performing audits and other accounting engagements in connection with private placement memoranda, initial public offering documents, U.S. Securities and Exchange Commission ("SEC") Comment letters, Form 10-K, Form 10-Q and other related filings.

I am currently a Managing Director in the Financial Advisory Services practice of AlixPartners, LLP ("AlixPartners").  I have been with AlixPartners since February of 2003.  My current business address is 515 South Flower St., Suite 3050, Los Angeles, California 90071.  My duties include those of Managing Director-In-Charge for the Los Angeles office of AlixPartners.  My client responsibilities include, but are not limited to, performing detailed analysis to provide expert accounting testimony, consulting on financial and accounting matters, economic damages, professional standard of care engagements, reorganization/bankruptcy matters and forensic accounting/fraud and SEC investigations.

Prior to joining AlixPartners, I was a Partner in PricewaterhouseCoopers LLP ("PwC"), formerly Coopers & Lybrand LLP ("C&L"), for approximately 16 years.   In 1995, I became the Partner-In-Charge of the Financial Advisory Services ("FAS") practice for the Western Region of C&L. In 1998, I became the Partner-in-Charge of the New York Metro Region FAS practice for PwC and served in that capacity until December 31, 1999.  On January 1, 2000, I became the Partner-In-Charge of the FAS practice for PwC's Los Angeles office and the Partner-In-Charge of the Dispute Analysis and Investigations practice for the Western Region of PwC.

My curriculum vitae is attached as Appendix A to this report. In addition, I have attached as Appendix B a listing of my testifying experience over the last four years. The time I spend on this

matter is being billed to Oracle at the rate of $485 per hour.  Colleagues of mine at AlixPartners have assisted me with this engagement.  Their time is being billed to Oracle at rates between $350 and $410 per hour.

I have reviewed the Complaint, certain deposition transcripts, various documents and other information produced in the litigation, correspondence, legal filings and professional literature and guidance in preparing this report.  In addition, my staff and I have conducted extensive accounting research.  The documents upon which I have relied in forming my opinion are listed in Appendix C.

## II.   <u>SUMMARY OF OPINIONS</u>

Based upon a thorough review and analysis of all of the information referred to herein, together with my knowledge of the issues and Generally Accepted Accounting Principles ("GAAP") promulgated by, among others, the Financial Accounting Standards Board and the SEC, and my more than 29 years of professional auditing, accounting and consulting experience, I have reached the following opinions regarding the allegations made in the Complaint:

1.  For each of the over 46,000 electronic receipt records that had an "On Account" flag in Oracle's Accounts Receivable Subledger, Oracle recorded three journal entries on November 17, 2000, which had simultaneous and offsetting debits and credits to the same account, for the exact same amount.

2.  Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period.

3

3. Oracle's creation of and accounting for these debit memos did not result in any revenue being recognized, and had zero impact on the income statement and balance sheet.

4. Oracle's creation of and accounting for these debit memos did not violate GAAP.

With respect to the previously unpled issues detailed by Plaintiffs in the Supplemental Interrogatory Responses, it appears that Plaintiffs are challenging certain transfers of unapplied cash to Oracle's bad debt reserve in the second quarter of fiscal year 2001.  In addition, Plaintiffs appear to be challenging a transaction with HP during the second quarter of fiscal year 2001.  With respect to the transfers, I note that at least some of the activity related to these transfers and the subsequent analysis of those transfers by Oracle appear to occur outside the class period identified in the Complaint.  Nevertheless, I have reached the following opinions regarding these unpled allegations:

1. Even if one assumes that all of the approximately $20 million in transfers to Oracle's bad debt reserve during the second quarter of fiscal year 2001 were improper, the effect of those transfers was immaterial to Oracle's reported financial statements for the second quarter of fiscal year 2001.

2. As detailed herein, at least $2 million of the transfers -- of the approximately $10.6 million for which we were able to conduct a detailed analysis -- either were properly made to Oracle's bad debt reserve or should have been previously recorded as revenue.

3. Based upon my review of the evidence, I believe that Oracle's decision to recognize revenue from the HP transaction was appropriate.

4

III.     **BACKGROUND**

A.     **PLAINTIFFS' ALLEGATIONS**

Per Paragraphs 35-43 of the Complaint, the class action Plaintiffs, those persons who purchased the publicly traded securities of Oracle between December 14, 2000 and March 1, 2001, claim that the directors of the Company caused Oracle to erroneously record more than $228 million in revenue in the second quarter of Oracle's fiscal year 2001, ending November 30, 2000, in order to mask an alleged economic downturn in Oracle's business.[1]   Based on information purportedly provided by confidential witnesses, Plaintiffs allege that certain amounts, listed as "On Account" within Oracle's accounts receivable software application were recognized as revenue by virtue of processing over 46,000 allegedly "phony invoice" debit memos.[2]   In other words, Plaintiffs' allegations, if true, suggest that Oracle recorded revenue it had not yet earned, which would be a violation of GAAP.[3]

Plaintiffs also purportedly rely upon statistical estimations made by Dr. M. Laurentius Marais, who analyzed a sample of 760 Oracle debit memos.[4]   Plaintiffs claim that Dr. Marais identified a reasonable basis to conclude that the estimated value of the more than 46,000 debit memos would be greater than $228 million.[5]   Plaintiffs further attempt to corroborate the information from certain confidential witnesses and Dr. Marais by noting that Oracle's reported balance in its

---

[1] *See* Complaint, at ¶¶ 36, 43.

[2] *Id*. at ¶¶ 36-38.

[3] *Id*. at ¶ 42.

[4] *Id*. at ¶ 39.

[5] *Id*. at ¶ 40.

Customer Advances and Unearned Revenue account declined by $215 million between the first and second quarters of its fiscal year 2001.[6]

In addition to the debit memo allegations in the Complaint, Plaintiffs make reference to other purported accounting issues in recent written discovery responses.  In their Supplemental Interrogatory Responses, Plaintiffs claim that Oracle improperly used customer overpayments to increase its bad debt reserve, thereby materially inflating reported results of operations in its second quarter of fiscal year 2001 financial statements.[7]  These claims, if true, would violate GAAP.  Plaintiffs also challenge Oracle's recognition of revenue from a transaction with HP during the second quarter of fiscal year 2001.

## B.      ORACLE'S BUSINESS

In its fiscal year 2001 annual report, Oracle described itself as the world's leading supplier of software for business information management.  Founded in 1977, the Company developed, manufactured, marketed and distributed computer software that helped corporations manage and grow their businesses.

As further discussed in the fiscal year 2001 annual report, the Company's software products were categorized into two broad areas: systems software and business applications software.  Systems software was a complete Internet platform for developing and deploying applications on the Internet and on corporate intranets.  System software products included database management

---

[6] *Id*. at ¶ 41.

[7] *See* Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs ("Sawyer Response"), at 21, 89; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21-22, 90; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21, 89.

software, application server software and developmental tools.    Business applications software automated the performance of business processes for customer relationship management, supply chain management, financial management, project management and human resource management.

In addition to computer software products, the Company offered its customers a wide range of consulting, education and support services.  Oracle also offered its business applications as an online service to customers who chose not to install their own applications.

## C.      ORACLE'S ACCOUNTS  RECEIVABLE PROCEDURES

During the relevant time period, Oracle used a separate Accounts Receivable software application (the "A/R Subledger") to, among other things, track the receipt of cash, as well as how that cash was applied to invoices.   In general, checks or wire transfers sent from customers to Oracle were received in "lock boxes," and temporarily recorded to a liability account, entitled "Customer Advances and Overpayments" ("Account 25005").[8] These receipts were initially flagged in the A/R Subledger as "Unapplied" cash.[9]  If Oracle's systems or Accounts Receivable and Collections Departments were able to match the receipt against an open or unpaid invoice for goods and/or services rendered, the amount initially posted to Account 25005 would be reclassified to the appropriate customer's account receivable balance signifying a proper payment,

---

[8] *See* Deposition of Greg Myers, dated Apr. 12, 2005 ("Myers Dep.") at 26:17-23 ("Generally customers would make a payment to one of two different [bank] lock boxes…and then those banks would send us a file of the payments that were received…and we would take the file sent from the bank and upload it into our accounts receivable module.").

[9] *See* Deposition of Alexander Bender, dated Sept. 21, 2006 ("Bender Dep.") at 93:25-94:4 ("Oracle…would upload lockbox information from a bank…and it would initially be a debit to cash, a credit to the 25005 account….").

and the receipt flag in the A/R Subledger would be changed from "Unapplied" to "Applied."[10] Most of Oracle's cash receipts were processed and applied in this manner.

However, not all cash receipts could be matched to outstanding invoices.[11]  For instance, some companies prepaid certain service contracts, before Oracle had issued invoices over the course of the respective contract.[12]  In these cases, Oracle would not apply the cash payments until an invoice for the respective period's service had been issued, thus leaving the payment in Account 25005 as "Unapplied" until the invoice was processed, and the payment could be applied to the invoice.[13]

Sometimes, Oracle received cash that did not apply to an outstanding customer invoice for goods and services.[14]  Examples of these types of cash receipts include cash received from customers for subleased office space, rental space at Oracle Open World trade shows, duplicate payments or overpayments for an invoice, and cash received from current and former employees for such items as reimbursements and COBRA continuation payments.[15]  Additionally, customers occasionally put a "stop payment" on a check or wire transfer, which meant that while the credit

---

[10] *See* Myers Dep. at 98:6-8 ("I use the term applied to mean that the -- that the payment, the receipt has been applied or has netted down the receivable that -- that was referenced in the invoice.  So, you know, debit, cash, credit, unapplied cash, as the invoice is determined where that unapplied needs to go, that invoice would be applied in the system to that payment.").

[11] Deposition of Michael Quinn, dated Apr. 18, 2006 ("Quinn Dep.") at 250:12-14 ("The unapplied cash account is the account that includes all the cash payments from customers that have not been applied to invoices.").

[12] Deposition of Thomas Williams, dated Jun. 7, 2007 ("Williams Dep.") at 64:16-19 ("I believe there was a listing of customer receipts that could…include customer deposits.").

[13] Myers Dep. at 92:16-21 (stating that items would stay in unapplied cash until they were resolved).

[14] *See id.* at 76:17-19; Deposition of Molly Venkataramana, dated Apr. 13, 2006 ("Venkataramana Dep.") at 107-108:24-17

[15] *See* Venkataramana Dep. at 107:24-108:17.

8

balance in Account 25005 might still be listed as "Unapplied," the amount was not really a cash receipt that could be used.[16]

Once Oracle's Collections Department determined the appropriate disposition of a receipt, and the disposition was not an application to a customer invoice, the collectors generally did several things.  First, they processed a journal entry with offsetting debits and credits to Account 25005, which changed the receipt flag in the A/R Subledger from "Unapplied" to "On Account."[17]  This change in flag status was important because it signified to the Accounts Receivable and Collections Departments that the receipt should not be applied to an open invoice.[18]  The change of the status from "Unapplied" to "On Account," which was accomplished by recording a debit and a credit to Account 25005 for the exact same amount, did not change the balance of Account 25005.[19]

Second, a journal entry was posted to reclassify the credit amount in Account 25005 to the appropriate account, such as to Accounts Payable in the case of a customer refund.[20]  However, even though the disposition of the cash receipt had been resolved through these journal entries,

---

[16] Myers Dep. at 76:12-13 ("For example a customer had made a duplicate payment but caught the duplicate prior to it clearing their bank and they put a stop payment on that check….").

[17] *Id*. at 77:19-21 ("[T]he first step was that the accounts receivable analyst would have placed the item into an On Account status….").

[18] Declaration of Greg Myers, dated Jun. 6, 2006 ("Myers Decl.") at ¶ 25. ("[T]he 'on account' flag at that time was utilized by Oracle Accounts Receivable Analysts to notify other employees that the disposition of the amount had been identified and the amount could not be utilized for another purpose.").

[19] Myers Dep. at 91:4-7 ("The next step they would take, the accounts receivable analyst would move the cash from status unapplied to status of On Account.  That generates net, net, no accounting impact, 25005, 25005 debit, credit.").

[20] *Id*. at 87:9-15.

the "On Account" flag remained within the A/R Subledger, in Account 25005, in some cases for many years.[21]

While the "On Account" flag originally was intended to designate a credit to a customer's account, as noted above, Oracle actually used the flag for another purpose.[22]  Within the United States, Oracle used the "On Account" flag to signal to the Accounts Receivable and Collections Departments that the credit balance in Account 25005 had been or would be used for a purpose other than the satisfaction of an invoice.[23]  Over the years, a substantial number of "On Account" flags accumulated.

## D.   ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT" FLAGS

In May 2000, the Company released Suite 11i, which was to be implemented by Oracle on a global basis.  In advance of this implementation, Oracle analyzed its accounting practices to ensure that each department was following global "best practices."[24]  Oracle determined that the

---

[21] *See id*. at 87:3-9 ("The On Account items would be sitting in 25005, but the thing with On Account in the examples I discussed is that there was generally a separate entry that cleared the item out of – though it still sat in On Account as far as the flag, from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet.").

[22] Williams Dep. 167:8-2 ("[O]n account is you give me $1,000 and you say, 'I haven't bought product yet,' or, 'I am prepaying $500 for an invoice that it outstanding,' and it gets applied.…This wasn't the way that on-account was being used at Oracle.…They used on-account for something other than what is defined here.").

[23] Myers Dep. 83:1-5 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice….").

[24] Declaration of Michael Quinn, dated Nov. 4, 2002 ("Quinn Dec.") at ¶ 4. ("In 2000 my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications.  As part of that conversion it was determined that the previous functionality of assigning on account notations…was no longer required.").

domestic use of "On Account" receipt flags was different from the practice of other territories, and that those differences should be reconciled prior to Suite 11i's implementation.[25]

Furthermore, as noted above, thousands of "On Account" flags had accumulated within Oracle's A/R Subledger over the years.[26]  Even though these flags were maintained in the A/R Subledger (with no financial statement impact) to provide an audit trail for the resolution of all receipts, there was concern that these remnant "On Account" flags could cause confusion with Oracle's customers, as well as its Collections Department staff, who might mistakenly believe that these "On Account" amounts represented payments that could be applied against open and unpaid invoices.[27]  As such, the Accounts Receivable Department decided that the "On Account" flags, which, as discussed above, had no financial statement impact, should be eliminated within the A/R Subledger in anticipation of the roll-out of Suite 11i.[28]

The Accounts Receivable Department instructed Oracle's Information Technology ("IT") Department to create a software program to address the accumulated "On Account" flags.[29]  The IT Department worked for two months to develop a Structured Query Language ("SQL") software program, which was designed to accomplish the standardization in a manner that would have no accounting impact whatsoever, through three simultaneous steps:

---

[25] Myers Decl. at ¶ 5 ("Oracle decided to remove the 'on account' flag…in anticipation of the Company-wide software upgrade.").

[26] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] (reflecting a total of 44,029 "on account" designations).

[27] *See* Myers Dep. at 129:23-130:21.

[28] *See id.* at 110:8-10 ("[W]e would not use On Account as a process going forward once we went to 11i and we started standardizing our processes.").

[29] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] ("Receipts with 'On Account' transaction for refunds should off set [*sic*] by creating a debit memo in AR.  Following was the two step solution proposed by product development: a) create debit memos for all old data sitting in AR for refunds b) apply these debit memos to receipts which has [*sic*] 'On Account' entries….  Because of the volume of the data, it is not possible to do debit memo [*sic*] manually through [*sic*] application screen, so there must be some sort of the script need [*sic*] to be written to achieve a) and b).").

**Step One** – Submit an entry,[30] which would switch the receipt flag in the A/R Subledger from "On Account" to "Unapplied"[31]:

| 25005 - Customer Advances & Overpayments | |
| --- | --- |
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"On Account"  ⟶  "Unapplied"

**Step Two** – Generate a debit memo in the A/R Subledger, again through the use of offsetting entries to Account 25005.  The receipt flag in the A/R Subledger remained as "Unapplied"[32]:

| 25005 - Customer Advances & Overpayments | |
| --- | --- |
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"Unapplied"
(debit memo created)

**Step Three** – Submit a final entry, which applies the amount for which the receipt flag had been changed to "Unapplied" in Step One, to the debit memo created in Step Two. This changed the receipt flag from "Unapplied" to "Applied"[33]:

| 25005 - Customer Advances & Overpayments | |
| --- | --- |
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"Unapplied"  ⟶  "Applied"
(against new debit memo)

---

[30] For purposes of illustration, we assumed a transaction relating to an "On Account" balance of $10,000.

[31] Myers Dep. at 143:3-8 ("So the first step was to move the item from On Account to unapplied.  And again, that generated a debit/credit in 25005.  No accounting impact, no different than when we applied it to On Account, a debit/credit to 25005….").

[32] *Id.* at 143:9-14 ("The second step was to create the debit memos in the system….  And by raising the debit memos in the system, we debited and credited 25005 as well.  So no accounting impact, no net accounting impact by the debit memos being raised.").

[33] *Id.* at 143:15-21 ("Then the third step was to apply the items that were previously On Account, now sitting in unapplied, to the debit memos, such that now the items that were On Account were now in applied status to these open debit memos.  And when we did the applications of the unapplied to the debit memos, again, debit/credit 25005, no accounting entries….").

12

For each of the three steps, the corresponding journal entries reflect simultaneous offsetting debits and credits to the same Account 25005.  *As offsetting debits and credits for the same amount were posted to the same account, which was a liability account and not a revenue account, there necessarily could be no impact to the balance sheet or income statement.*[34]

The IT Department tested the SQL program to ensure that there would be no balance sheet or income statement impact.[35]  Once their testing was complete, the IT Department ran the SQL program on or about November 17, 2000, and in the process systematically generated over 46,000 sequentially numbered debit memos, which corresponded to the approximately $692 million of cash receipt records that previously had been flagged "On Account."[36]  These 46,000-plus debit memos appear throughout Oracle's Accounts Receivable system, and in several reports that are used by the Company and were occasionally provided to customers upon request.[37]

Gregory Myers, who supervised the creation of the debit memos, correctly indicated that there was no income statement or balance sheet effect from the creation of the debit memos on

---

[34] Williams Dep. at 80:11-16 ("I knew that when they processed those debit memos one of the first things that Greg [Myers] told me is that they booked an equal and offsetting debit and credit through 25005.  So by definition it did not affect the balance sheet and could not have affected the income statement."); Quinn Dep. at 168:17-19 ("Greg Myers did his 46,000 debit memos that had no accounting impact [and] cleaned out the on account item,…freed it up to use it for its intended purpose….").

[35] *See* NDCA-ORCL 048716-18 [Email from S. Kumar to G. Myers, dated Nov. 14, 2000] ("I ran the job to create the debit memos on [*sic*] test system [*sic*] a couple times….").

[36] *See* NDCA-ORCL 005006 [Oracle Transaction Register listing 46,000-plus debit memos totaling $692 million].

[37] *See id.*; *see also* NDCA-ORCL 0123157 [Account Analysis Report with Payable's Detail showing entries of offsetting credits and debits totaling $692 million]; *see also* NDCA-ORCL 0127994-128107, 0127995 [sample screen shot for Household Finance debit memo, number 55043990].

13

November 17, 2000; the creation of the debit memos merely assisted in the removal of the "On Account" receipt flag.[38]

## E.    ORACLE'S TRANSFERS OF UNAPPLIED CASH

As noted above, during the relevant time period, not all cash received by Oracle could be applied to open and unpaid invoices.  Many times, amounts were paid to Oracle without corresponding remittance information.[39]  Without a remittance advice, or some other supporting documentation, it was difficult for a collector to determine how the payment should be applied.[40]

If a cash receipt remained unapplied for an extended period of time, and the Collections Department exhausted its various resolution procedures, the Collections Department sometimes concluded that the unapplied cash related *not* to an existing invoice, but to one which may have previously been written off.[41]  Accordingly, beginning as far back as 1998, some receivables were written off to the bad debt reserve.[42]

---

[38] Myers Dep. at 143:21-23 ("So at the end of the day, all we really did was move the status from On Account to a debit memo with no accounting impact.").

[39] *Id*. at 72:10-13 ("[T]he customer makes a payment to Oracle Corp. and they don't reference any information that we can use in order to determine where those funds or that payment should be applied.").

[40] *Id*. at 93:6-13 ("[T]he payment comes in, we don't know where to apply the cash to…the next step would be to call the customer and request information as to where they wanted it to go or what invoice or receivable they wanted it applied to.").

[41] Williams Dep. at 212:6-10 ("I believe that at some point if you have done everything you can to try and identify it then you are going to have to dispose of that item similar to how you have to dispose of an invoice.  Eventually you write it off."); *id*. at 176:17-22 ("I can say that if there was an unapplied cash item that was $150 and it had been there for two years, you know, we should just write it off because the reality is that, like the $150 invoice that we were writing off from that same customer as they aged out….").

[42] *See* NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

14

The bad debt reserve was used to estimate the amount of Oracle's receivables that Oracle ultimately would not collect,[43] and was used to offset the debit balance of Accounts Receivable, as reflected on Oracle's financial statements.[44]

To the extent that unapplied cash can be linked to an invoice that previously has been written off as uncollectible, the movement of that cash from the unapplied cash account to the bad debt reserve does not violate GAAP.[45]   However, to the extent that unapplied cash cannot be specifically matched to either a previously written-off receivable, or some other item that should have already been recognized as income (e.g., licensing royalties), Oracle's transfers to its bad debt reserve are considered to be erroneous reclassifications.[46]

## IV.   <u>THE LAWSUIT</u>

## A.     <u>SOURCES OF PLAINTIFFS' ALLEGATIONS</u>

Plaintiffs added their accounting-based allegations to the Complaint in Fall 2002.   Some of the allegations are attributed to a confidential witness, CW49, a former Oracle employee who is currently the target of a criminal proceeding concerning purported embezzlement at Oracle, and who invoked the Fifth Amendment and refused to testify in this case.   Other allegations are

---

[43] Myers Decl. at ¶ 27 ("Oracle has historically used bad debt reserve accounts (including Account 12601, during the relevant time period) to estimate the amount of Oracle's accounts receivable that will prove to be uncollectible.").

[44] *See* Deposition of Jason Sevier, dated Jun. 28, 2006 ("Sevier Dep.") at 186:9-11 ("The first process is the allowance is set up, so you debit expense and you credit allowance for doubtful accounts."); *see also* Deposition of Gary Matuszak, dated Aug. 1, 2006 ("Matuszak Dep.") at 137:11-19.

[45] *See* Williams Dep. 178:11-17 ("[T]here were items that were…written off the company's books, charge taken against revenues that were subsequently found out to be in unapplied cash.  The appropriate entry in that particular instance would, in fact, be to restore revenue, which is effectively what you do when you move it through 12601.").

[46] *See* Accounting Principles Board ("APB") Opinion No. 10, *Omnibus Opinion*, 1966 at ¶ 7 ("It is a general principle of accounting that the offsetting of assets and liabilities in the balance sheet is improper except where a right of setoff exists.").

purportedly based on another confidential witness, CW46, a former financial analyst for a global recovery audit and cost containment company, but who never worked for Oracle.[47]   In this capacity, CW46's role was to work for Oracle's customers in an effort to seek reimbursement of possible overpayments.  If CW46 could convince Oracle that a payment was an overpayment that needed to be refunded to a customer, CW46's employer earned a contingent fee, based on the amount of the alleged overpayments being refunded.[48]   More recently, CW46 earned $200 per hour working as a paid consultant for Plaintiffs' Counsel, with responsibilities related solely to this matter.[49]

Plaintiffs allege that CW46 reported, based on a review of 760 debit memos, that Oracle's reported revenue and earnings for the second quarter of fiscal year 2001 were false when made, as a result of the improper conversion of more than $228 million of "On Account" cash to revenue in the same period.  Some of CW46's allegations are summarized below:

- Oracle did not refund customer overpayments;

- Oracle created debit memos, which had the same financial impact as an actual invoice for a real product sale; and

- Oracle cleared these debit memos by using non-refunded customer overpayments.

Plaintiffs provided Dr. Marais with the 760 debit memos noted above, and asked him to determine if any statistically-valid inference could be made from these debit memos, such that a total dollar amount could be attached to the 46,000-plus debit memos processed on November 17,

---

[47] See Complaint, at ¶ 8; Deposition of CW46, dated Jun. 24, 2006 ("CW46 Dep.") at 66:5-6.

[48] Deposition of David Cochenour, dated Mar. 6, 2006 ("Cochenour Dep.") at 79:17 ("Typically we get a negotiated percentage of the economic benefit that the client got from our work.").

[49] CW46 Dep. at 51:13-23, 52:11-21.

16

2000.[50]  Per the Complaint, Plaintiffs characterize Dr. Marais as having estimated that the total

dollar value of the more than 46,000 debit memos was at least $228 million.

As will be discussed in a later section, these allegations have no merit.

## B.      ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE

Ernst & Young LLP ("EY") was hired in 2002 to replace Arthur Andersen LLP ("AA") as

Oracle's external financial statement auditors.  At the request of the Audit Committee of Oracle's

Board of Directors (the "Audit Committee"), EY performed a series of agreed upon procedures

related to the November 17, 2000 debit memo project, which included the following:[51]

- EY reviewed the Plaintiffs' allegations in the Complaint.

- EY interviewed Gregory Myers regarding how the debit memo transactions were
  processed by Oracle.

- EY obtained an electronic listing of the more than 46,000 debit memos.

- EY reviewed the details relating to 145 debit memos greater than $500,000, and 55
  arbitrarily-chosen debit memos between $1,000 and $500,000; EY found no financial
  statement impact from these selected debit memos.

- EY created three test transactions in Oracle's system with the same accounting
  distribution lines as the debit memos, noting that no amount was recorded to revenue.

- EY reviewed general ledger analysis reports, related to Account 25005, for the month of
  November 2000, as well as domestic reconciliations for Account 25005 for November

---

[50] Deposition of Dr. M. Laurentius Marais, dated Sept. 12, 2006 ("Marais Dep.") at 91:15-93:10; *see also*
Complaint, at ¶ 39.

[51] *See* EY000143-6 [EY Agreed Upon Procedures Memo].

and August of 2000, and found no amounts recorded to revenue related to the debit memos, as well as no unusual reconciling items.

- EY obtained and read Oracle's Corporate and Accounting policy related to unapplied cash and refunds.

- EY reviewed the Company's analysis of the Customer Advances and Unearned Revenue account[52] for the previous nine quarters, and found that the decline in the second quarter fiscal year 2001 balance was consistent with the Company's historical trends.

As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project.


## C.    PRESENTATION TO THE SEC

At the request of the SEC, Oracle made a presentation in October 2003 regarding Plaintiffs' allegations made in Paragraphs 36-43 of the Complaint.[53]  Since this presentation was made, I am aware of no other action having been taken by the SEC regarding these allegations.  As such, it is reasonable to conclude that the SEC did not find merit in Plaintiffs' allegations and was satisfied with Oracle's response to these allegations with respect to the accounting treatment of these debit memos.


## D.    SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES

In response to the Court's October 19, 2005 Order, Oracle produced hundreds of thousands of pages of documentation related to the 776 debit memos generated for electronic receipt records greater than $100,000.  This production included a script output, which was designed by Oracle's

---

[52] This financial statement account incorporates amounts contained within Account 25005, plus cash received for revenue not yet earned, as of the respective financial statement date.

[53] *See* NDCA-ORCL 971461-971507.

IT Department to compile a step-by-step audit trail for each transaction which contained a debit memo, using data from Oracle's accounting system.[54]  These 776 debit memos comprise roughly $528.2 million, or about 76% of the total value of the November 17, 2000 debit memos.[55]  In addition, Plaintiffs have received, in accordance with the Court's July 17, 2006 Order, similar information and documents related to an additional subset of 150 debit memos selected by Plaintiffs, which represents another $6.6 million, or about 1% of the total value of the November 17, 2000 debit memos.[56]

Therefore, Oracle has produced script output and related documents for at least 926 debit memos (i.e., 776 plus 150), accounting for about $534.8 million, or 77% of the total value of the November 17, 2000 debit memos.  Our work in connection with these 926 debit memos, will be discussed in a later section.

## E.     ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

Following the filing of the Complaint, and in connection with its investigation into Plaintiffs' allegations concerning debit memos and unapplied cash generally, in the Fall of 2002 Oracle discovered that certain unapplied cash amounts had been transferred to the bad debt reserve.[57]  These transfers occurred independently of and prior to the creation of the 46,000 plus debit

---

[54] Myers Decl. at ¶ 14 ("The script output lays out, step-by-step, the accounting treatment of each debit memo covered by the Court's October 19, 2005 Order….").

[55] *Id*. at ¶ 8 ("There are 776 debit memos in excess of $100,000; these debit memos account for $528 million of the $692 million total of the debit memos created on November 17, 2000.").

[56] *See* Declaration of Judy Hui, dated Nov. 13, 2006, at ¶¶ 3-11.

[57] Quinn Decl. at ¶ 5 ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601."); Myers Decl. at ¶ 4 ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601.").

memos which, as noted above, were created via simultaneous and offsetting debits and credits to Account 25005. [58]   Oracle's Accounts Receivable Department, in collaboration with its Collections Department, learned that $20.1 million of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal year 2001.[59]  As a precautionary initial step, Oracle reversed these transfers from the bad debt reserve account back to the unapplied cash account.  Thereafter, Oracle tasked the Collections and Accounts Receivable Departments with researching many of the transfers, to ascertain whether the transfers were properly made during the second quarter of fiscal year 2001.[60]

\* \* \* \*

The following three sections relate to key procedures performed related to the November 17, 2000 debit memos, the transfers of unapplied cash during the second quarter of fiscal year 2001, and Oracle's transaction with HP during the second quarter of fiscal year 2001.

## V.     KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

I performed numerous independent procedures in order to arrive at my opinions that a) Oracle processed over 46,000 sets of journal entries on November 17, 2000, with debits and credits to the exact same account in the exact same amount, b) this process did not result in any revenue

---

[58] Williams Dep. at 149:11-19 ("The debit memos had no effect on the company's financial statements. The debit and credit went exactly the same place, 25005….Separate from that was an additional issue which is, 'Okay.  Have things moved out of 25005 to 12601?'").

[59] *See* NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

[60] *See* Venkataramana Dep. at 231-232:25-3 (stating that Myers and Quinn explained to lower-level employees the need to address the unapplied cash that was transferred from Account 12601 back into Account 25005); Williams Dep. at 215:1-3 ("[I]f there was an error made in moving something from 25005 to 12601 we put it back where it belonged.").

being recorded, c) this process did not impact any part of the financial statements, and d) this process did not violate GAAP.

## A.    REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS

*Review of Summary Reports*

I reviewed various accounting system reports produced by Oracle, for the purpose of understanding the total impact of the November 17, 2000 accounting entries.  The first report I reviewed was a Transaction Register, which listed all debit memos generated for that day.  I found that the 46,000-plus debit memos added up to over $692 million.  I inspected the Account Analysis Report, and noted that on November 17, 2000, there was a debit to Account 25005 of $692,396,224.73, and a credit to Account 25005 for the exact same amount.  As a result, it would be impossible from an accounting perspective for the debit memos to have any impact on the financial statements, or to any income statement or balance sheet account.

I also reviewed a Sales Journal by GL Account Report, which listed all revenue recorded in the general ledger for November 17, 2000.  I found that only $10.1 million of revenue was recorded on November 17, 2000.  If Plaintiffs' allegations were to be believed, then I would have expected revenue recorded on that day to be at least $228 million (and, more likely, $692 million as the sum total of the debit memos), which did not happen.

*Review of Sample "On Account" Transactions*

I then reviewed Oracle-produced source documentation related to two of the larger debit memo transactions, in order to understand how, on a detailed level, the "On Account" receipt flag was initially generated and eventually removed through the November 17, 2000 debit memo project.

21

Based on my review of the source documentation, including the aforementioned script output for these debit memos, I noted the following:

*Debit Memo 55003965, related to Texas Instruments, for $4,847,389:*

- The Company issued a March 31, 1998 invoice to Texas Instruments for $4,847,389.[61]

- This invoice was paid by Texas Instruments on May 1, 1998.[62]

- Texas Instruments submitted a duplicate payment on May 26, 1998, resulting in a general ledger entry recognizing a cash receipt.  This duplicate payment was recorded as "Unapplied" within Oracle's A/R Subledger, since the first payment had already been applied to the invoice in full.[63]

- Texas Instruments immediately recognized that this was a duplicate payment and issued a "stop payment" with its bank on the same day.  As such, the duplicate payment never actually cleared through Oracle's lock box account.[64]  Once Oracle was notified of the "stop payment," the Collections Department staff changed the receipt flag within Oracle's A/R Subledger to "On Account."  The "On Account" flag signaled to other collectors that this amount had been accounted for and should not be used for the satisfaction of an invoice.  In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel that "there should be a stop payment on this check."

---

[61] *See* NDCA-ORCL 050391-92.

[62] *See* NDCA-ORCL 597773 [bank statement from May 1, 1998 showing receipt of cash, not listed separately but within the lockbox amount of $7,065,243.72].

[63] *See* NDCA-ORCL 531500 [bank statement from May 26, 1998 showing duplicate receipt of cash, not listed separately but included within the lockbox amount of $114,124,259.09].

[64] *See* NDCA-ORCL 139191 [bank statement from May 29, 1998 showing a stop payment of $4,847,389].

22

- On June 6, 1998, Oracle recorded a journal entry to reverse the initial receipt of the duplicate Texas Instrument payment, effectively eliminating any financial statement impact from the duplicate payment.  However, even though the duplicate payment had been resolved by June 1998, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[65]

Since Oracle never actually received the cash in question, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Debit Memo 55008470, related to Sprint Communications, for $2,582,382:*

- The Company issued three invoices to Sprint Communications – on September 23, 1997 for $1,233[66]; on April 9, 1998 for $1,260[67]; on May 31, 1998 for $2,582,382.[68]

- These invoices were paid by Sprint Communications on one combined remittance, for $2,584,875, on July 1, 1998.[69]

- Sprint Communications submitted a duplicate payment for the third invoice, in the amount of $2,582,382, on August 12, 1998, resulting in a general ledger entry recognizing a cash receipt.  This duplicate payment was recorded as "Unapplied"

---

[65] *See* NDCA-ORCL 531517.

[66] *See* NDCA-ORCL 535815 [invoice]; NDCA-ORCL 535818-20 [order documents].

[67] *See* NDCA-ORCL 535814 [invoice]; NDCA-ORCL 535872-73 [order documents].

[68] *See* NDCA-ORCL 535816 [invoice]; NDCA-ORCL 535830-71 [order documents].

[69] *See* NDCA-ORCL 597890 [bank statement from July 1, 1998 showing receipt of funds, not listed separately but included within the lockbox amount of $4,723,086].

within Oracle's A/R Subledger, since the first payment had already been applied to the third invoice in full.

- On September 25, 1998, Oracle's Collections Department staff recognized the existence of the duplicate payment, and changed the receipt flag to "On Account" within the A/R Subledger.  In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel demonstrating that this was a duplicate payment, and that a refund should be issued.

- On October 10, 1998, Oracle recorded a general ledger entry reflecting that  a refund check for the duplicate payment was sent to Sprint Communications,[70] thereby eliminating any financial statement impact from the duplicate payment. However, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[71]

Since Oracle refunded the duplicate payment in question in October 1998, over two years before the debit memos were created, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Review of Script Output and Source Documents*

I also reviewed script output for each of the 926 debit memos, created in response to the Court's orders and Plaintiffs' requests, as noted above, to confirm my understanding of how the transactions in question were posted to Oracle's general ledger.  I found that that the three

---

[70] *See* PLF-ORC 000775; NDCA-ORCL 535793 [bank statement from Oct. 29, 1998 showing refund].

[71] *See* NDCA-ORCL 535817.

simultaneous, offsetting standardization steps, as noted in an earlier section, functioned as designed and intended.  That is, I found the three sets of transactions for each debit memo removed the "On Account" flag, and did not result in any revenue recognition, nor did they result in any impact to any financial statement account, and therefore did not violate GAAP.

From these 926 debit memos, I then randomly chose a subset of 60 debit memos[72] to review the actual source documents relating to each transaction.[73]  I found no evidence that revenue was recorded as a result of the November 17, 2000 debit memo project.

## B.    REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS

I reviewed a listing of Oracle's reported balances of Customer Advances and Unearned Revenues, for the first and second quarters of fiscal years 1997 through 2002, detailed as follows ($ in millions):[74]

| Fiscal Year | First Quarter | Second Quarter | % Change |
|---|---|---|---|
| 1997 | $   475 | $   444 | (6.5%) |
| 1998 | 694 | 616 | (11.2%) |
| 1999 | 956 | 800 | (16.3%) |
| 2000 | 1,090 | 925 | (15.1%) |
| **2001** | **1,270** | **1,054** | **(17.0%)** |
| 2002 | 1,367 | 1,085 | (20.6%) |

As evident above, the 17% decline for the second quarter of fiscal year 2001 is consistent with the percentage changes for the second quarters of prior fiscal years, as well as for fiscal year 2002.  If

---

[72] Not including the Texas Instruments and Sprint Communications debit memos detailed above.

[73] The sample size of 60 was sufficient to confirm my understanding of how debit memos were processed.

[74] *See* EY000147.

25

Plaintiffs' allegations were to be believed, I would not have expected to see similar declines in the second quarter balances for the other fiscal years, which there clearly are.

Further, had the debit memos resulted in the recognition of revenue such that they caused a corresponding reduction in the Customer Advances and Unearned Revenues account in the second quarter, that reduction would be commensurate with the sum total of the debit memos. Stated differently, if Plaintiffs' claim had any merit, the reduction in this account balance would not have been $216 million, but instead $692 million.  As Plaintiffs point out in the Complaint, however, the reduction in Customer Advances and Unearned Revenues in the second quarter of fiscal year 2001 was less than three times the sum total of the 46,000-plus debit memos.

## C.       REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and depositions of certain Oracle personnel (including Oracle personnel with knowledge of the accounting issues) and all of the other documents listed in Appendix C.  Based on my review of these documents, there is no evidence that any revenue had been recorded, or even that any general ledger account had been impacted on a net basis, as a result of the November 17, 2000 debit memo project.

In addition, I reviewed the deposition transcripts and related exhibits for the two witnesses upon whom Plaintiffs' appear to rely for most of their allegations, CW46 and Dr. Marais.  As noted above, CW49 refused to testify.

26

*Accounting-based allegations made by CW46:*

I reviewed CW46's deposition transcript, as well as a findings report that appears to have been prepared by CW46, in order to evaluate his/her accounting-based allegations.  As for his/her sworn testimony, I noted the following:

- CW46 conceded that he/she had no first-hand knowledge of how Oracle posted accounting entries to its general ledger, nor how Oracle recognized revenue.[75]

- CW46 conceded that he/she did not know, or did not speak with, anyone from Oracle who had participated in the November 2000 debit memo process.[76]

- CW46 is not a CPA, and does not appear to have ever worked as an accountant responsible for posting entries to a general ledger.[77]

- When presented with an actual general ledger transaction stemming from one of the November 2000 debit memos, CW46 failed to recognize that the debit and credit amounts were posted to the same identical general ledger account, and instead incorrectly insisted that the transaction resulted in revenue being generated within Oracle's accounting system.[78]

- CW46 conceded that the recording of a debit and credit to the same account for the exact same amount would result in a net zero impact on that account.[79]

- CW46's incorrect assumption that debit memos were accounted for in the same manner as unpaid invoices is based solely on an Oracle accounting software instruction manual that he/she downloaded from the Internet.[80]

---

[75] CW46 Dep. at 85:16-22; 114:24-116:1.

[76] *Id*. at 156:18-157:20.

[77] *Id.* at 59:18-21.

[78] *Id*. at 98:1-110:10.

[79] *Id*. at 98:1-8.

[80] *Id.* at 88-4-25.

27

- CW46 worked at a global recovery audit and cost containment company that was paid contingent fees based on the amounts recovered for its clients.[81]  Thereafter, CW46 worked as a paid consultant for Plaintiffs' Counsel, at the rate of $200 per hour.[82]

As for the written report apparently prepared with the assistance of CW46, I noted the following:

- CW46 had purportedly reviewed 149 debit memo transactions at the time of this report, with one being for what appears to be a $909,728 cancelled check.  Even though CW46 points out that funds were never received, he/she still contends that the related debit memo somehow generated revenue.[83]  This is in direct contradiction of his/her primary allegation that Oracle booked revenue related to customer overpayments.  CW46 does not attempt to reconcile this significant inconsistency.

- CW46 claims that Oracle imposed a series of institutional "roadblocks" to prevent its customers from recovering funds owed to them, providing Oracle with the opportunity to claim these funds as its own revenue.[84]  CW46 does not appear to have produced any documentation to support this series of allegations.  Furthermore, as noted above, CW46 never worked at Oracle.

Based on my review, CW46's allegation that Oracle improperly recognized revenue, as a direct result of the November 17, 2000 debit memo project, is unfounded and incorrect.  I found no evidence to support his/her allegation.  On the contrary, I found overwhelming evidence, as noted above, confirming that no revenue was generated through this process.  As noted above, even when presented with evidence which directly refuted his/her allegations, CW46 was unable to

---

[81] *Id*. at 80:19-24.

[82] *Id*. at 51:13-23, 52:13-21.

[83] *See* MAR004391.

[84] *See* MAR004395-401.

28

recognize that the transaction in question was being made to the same general ledger account, and therefore could have had no revenue or financial statement impact.

Considering that CW46's prior employer was paid contingent fees based on successful recoveries of possible overpayments from Oracle, and that CW46 worked as a paid consultant of Plaintiffs' Counsel on this matter, CW46 may not be completely objective in making these allegations.  In summary, based on the lack of evidence supporting these allegations, coupled with his/her apparent lack of training and experience as it relates to general ledger accounting, it is my professional opinion that no reliance should be placed on CW46's allegations.

*Statistical Estimation of Debit Memos by Dr. Marais:*

I reviewed Dr. Marais' deposition transcript, in order to evaluate his allegations related to the statistical estimation of the 46,000-plus debit memos.  Notably, Plaintiffs engaged Dr. Marais to opine only on the narrow issue of the total amount of the 46,000-plus debit memos.  Thus, nothing in his testimony is relevant to the issue of whether the debit memos had any financial statement impact.  Regarding the narrow issue upon which Dr. Marais opined, as explained below, his testimony has been rendered both wrong and irrelevant because the sum total of the debit memos is known (i.e., $692 million).  As for his sworn testimony, I noted the following:

- Dr. Marais conceded that, if the total population of debit memos were known (which it is), then his estimations would be irrelevant.[85]

- Dr. Marais indicated that the sample population was heavily skewed by a few very large debit memos, and as such, would have required a sample size of at least 10,000 observations before he could safely rely on the mathematics underlying a statistically-

---

[85] Marais Dep. at 89:2-100:1.

29

valid estimation.[86]  Notably, Dr. Marais looked at data from only 760 debit memos, not 10,000.

- Dr. Marais indicated that he applied a $100,000 cap on the 13 largest debit memos, which had the effect of lowering the skewness of the 760 debit memos to such a degree that a statistically-based estimation could be made.[87]

Since the population of the more than 46,000 debit memos is known, we know that the total amount of debit memos processed on November 17, 2000 was $692 million.  As acknowledged by Dr. Marais, if he had the data for the total population of debit memos, his estimations would be irrelevant.

Even still, based on my review, it appears that Plaintiffs mischaracterized Dr. Marais' work, and should not have relied upon his findings in the first place.  It appears that Dr. Marais arbitrarily manipulated the data from the sample of 760 debit memos in order to achieve, in his opinion, a statistically-valid estimation.  Other than indicating that the process of truncating certain sample outliers is a commonly used practice by statisticians, I found no evidence that Dr. Marais had any factual foundation or support to cap those 13 largest debit memos, or why he chose to use a cap of $100,000.

As such, Plaintiffs should not have placed any reliance on Dr. Marais' findings, either as a basis for estimating the total value of the more than 46,000 debit memos, or as a basis for corroborating the decline in Oracle's Customer Overpayments and Unearned Revenue account in the second quarter of fiscal year 2001.  However, it appears that Plaintiffs did rely on Dr. Marais' findings,

---

[86] *Id.* at 177:6-178:2, 204:8-17.

[87] *Id.* at 177:24-180:14.

and compounded this error by not indicating in the Complaint that Dr. Marais' findings were a direct result of his arbitrary data manipulation.  When presented with the portion of the Complaint attributed to him, Dr. Marais failed to correct Plaintiffs' factual oversight in characterizing his findings.[88]

## D.    REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY

I reviewed the work performed by EY related to its agreed upon procedures.  I also reviewed the deposition of EY's then-senior manager on the engagement, as it relates to the agreed upon procedures work performed.  I found that EY's conclusions were consistent with my own, and that EY did not find any independent evidence that revenue had been recorded resulting from the November 17, 2000 debit memo project.

## VI.    KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED CASH

In order to arrive at my opinions that Oracle's transfer of unapplied cash to bad debt reserve during the second quarter fiscal year 2001 was not material to its financial statements, and some of these transfers either properly were made or should have been recorded as revenue, I performed numerous independent procedures, and reviewed, among other things, a number of documents and other materials produced in this matter, as summarized below.

---

[88] *Id.* at 173:18-174:3.

## A.    REVIEW OF SUBSET OF UNAPPLIED CASH TRANSFERS

As noted above, Oracle generated script output for 926 debit memos processed on November 17, 2000, in response to certain Court orders.  I reviewed the script output for the 926 debit memos, to determine which of the transactions that had debit memos in their accounting histories also had a transfer to the bad debt reserve within their audit trail.  Within the accounting histories of the transactions relating to the 926 debit memos, I found 121 transfers to the bad debt reserve during the second quarter of fiscal year 2001.  These 121 transfers accounted for approximately $10.6 million of the $20.1 million transferred to bad debt reserve during this quarter.  Notably, for the reasons discussed above, the creation of the debit memos on November 17, 2000 did not move any dollar amounts to or from Oracle's bad debt reserve.  Indeed, all of these transfers occurred prior to November 17, 2000, when the 46,000-plus debit memos were created.

I then reviewed the script output and various documents related to a number of these transactions, in order to understand, on a detailed level, how:  a) the balance of unapplied cash originated; b) the balance was then transferred to bad debt reserve; and c) the balance was later reconciled by Oracle as being properly recorded as revenue.

Based on my independent review, I noted the following:

- Of the $10.6 million in transfers subject to my review, almost $700,000 of unapplied cash transferred to bad debt reserve during the second quarter of fiscal year 2001 related to certain royalties paid to Oracle.  These amounts should have been recorded directly to revenue at the time payments were received, but were not.  Therefore, insofar as the result of the transfer of these amounts had a positive impact on income, that impact was appropriate.

- In addition, over $800,000 of other transfers to the bad debt reserve during this period were appropriate, in that Oracle had already reduced its revenues for certain open and unpaid invoices, either all or in part, through the use of credit memos and/or inclusion in Oracle's general bad debt reserve as of the second quarter of fiscal year 2001.

My independent review included analyzing available source documentation, which served to confirm my understanding of each respective transaction.  In addition to these above amounts, I found some evidence which suggests that at least another $500,000 of these transfers were appropriate, although the evidence relating to these transfers is not as complete as the evidence I reviewed in connection with the $1.5 million in transfers noted above.  Thus, I believe there is evidence that at least $2.0 million of the $10.6 million transfers capable of review were appropriate.

By way of example, the following represents chronological details supporting one of the royalty payments and one payment related to a previously credited invoice:

*Unapplied Cash Transfer of $176,487, related to Structural Dynamics Research:*
- On May 31, 2000, a payment of $176,487 from Structural Dynamics Research was recorded.  The balance could not immediately be applied to an open and unpaid invoice.
- On October 1, 2000, this balance was transferred to the bad debt reserve.
- On October 5, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[89]

- On November 2, 2002, Oracle reversed the unapplied cash transfer and moved the credit balance from the bad debt reserve back to Account 25005.

- On November 8, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[90]

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes indicate, "Needs to go to Royalties Gigi to be booked."[91]

- On August 11, 2003, Oracle processed invoices totaling $176,487 to recognize previously unrecorded royalty revenues,[92] based on a royalty statement provided by Structural Dynamics Research.[93]

Since revenue should have been recorded related to the payment as far back as May 2000, but was not, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.

*Unapplied Cash Transfer of $91,254, related to Caltrans:*

- On May 31, 2000, Oracle recorded an invoice for $242,400, relating to onsite services for an expected period of May 31, 2000 through May 30, 2001.[94]

---

[89] *See* NDCA-ORCL 471528.

[90] *See* NDCA-ORCL 471529.

[91] *See* NDCA-ORCL 1623795-4264.

[92] *See* NDCA-ORCL 471519-27.

[93] *See* NDCA-ORCL 471502-07.

[94] *See* NDCA-ORCL 776634.

- On August 18, 2000, a payment of $112,464 was received from Caltrans. The balance could not be applied to an open and unpaid invoice.

- On August 24, 2000, Oracle recorded a credit memo of $242,400, effectively providing a full concession related to the May 31, 2000 invoice, despite being well into the expected service period.[95]

- On September 22, 2000, Oracle applied $14,850 to fully satisfy an open and unpaid invoice, leaving an unapplied cash balance of $97,614.[96]

- On November 5, 2000, a balance of $91,254 was transferred to the bad debt reserve, leaving an unapplied cash balance of $3,180.

- On November 10, 2000, Oracle applied $3,180 to fully satisfy an open and unpaid invoice, fully applying the August 18, 2000 cash receipt.[97]

- On November 13, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[98]

- On November 11, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[99]

- On November 24, 2002, Oracle reversed the unapplied cash transfer, thereby moving the credit balance from the bad debt reserve back to Account 25005.

---

[95] *See* NDCA-ORCL 776635.

[96] *See* NDCA-ORCL 776636.

[97] *See* NDCA-ORCL 776638.

[98] *See* NDCA-ORCL 776637.

[99] *See* NDCA-ORCL 776633.

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes state "Rebill one of the concessions for the amount in reserve stating that too much of concession was given to customer due to the customer sending in a payment for $91K."[100]

- On January 31, 2003, Oracle reinstated the $91,254 amount to the original May 31, 2000 invoice, following its research and conclusion that excessive concessions were made to Caltrans.

Since revenue was understated related to this payment as far back as August 2000, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.


## B.    MATERIALITY

According to Accounting Principles Board Opinion No. 20, if a company discovers that an accounting error was made after the issuance of financial statements, it must determine whether the financial statements would be materially misstated absent correction of the error.  If the error is determined to be material, the company needs to restate its prior financial statements, and disclose the nature of the error and its impact on the financial statements.[101]


According to SEC Staff Accounting Bulletin 99 ("SAB 99"), it is important for a company to assess materiality from both a quantitative and qualitative perspective.  In defining materiality,

---

[100] *See* NDCA-ORCL 1623795-4264.

[101] *See* APB Opinion 20, 1971.

SAB 99 refers to the following excerpt from the Statement of Financial Accounting Concepts No. 2, as published by the Financial Accounting Standards Board:

> "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

SAB 99 also refers to a Supreme Court decision, which held that a fact was material if there is "a substantial likelihood that the…fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[102]

As a preliminary matter, I note that the $20.1 million in transfers were solely a second quarter of fiscal year 2001 event, and had no accounting impact in the third quarter of fiscal year 2001.

Assessing the issue from a quantitative perspective, we start with the following reported second quarter Net Income and Earnings Per Share, from Oracle's fiscal year 2001 10-K report:

|  | In $000s |
|---|---|
| Net Income | $ 622,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $   0.1060 |
| Reported As (Rounded) | $     0.11 |

---

[102] SAB 99 (citing *TSC Industries v. Northway, Inc*. 426 U.S. 438, 449 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1998)).

As noted earlier, $20.1 million of unapplied cash was transferred to the bad debt reserve during this quarter.  Notwithstanding the above examples -- which establish that at least $2 million of the $10.6 million in transfers to the bad debt reserve either were properly made or should have previously been recorded as revenue -- if we make the most conservative assumption, that the entire amount of the transfers represents an accounting error, this would represent roughly a $13.0 million overstatement in Net Income, after taking into account an incremental tax rate of 35.5%.[103]  As such, Net Income and Earnings Per Share would be adjusted as follows:

|  | In $000s |
| --- | --- |
| Net Income | $ 609,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $   0.1038 |
| Reported As (Rounded) | $     0.10 |

The conservative adjustment used above would merit only a 2% reduction in reported Net Income.  This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent.  As such, this adjustment is not material from a quantitative sense, and I do not believe it would have influenced the users of Oracle's financial statements.

Further, I note that in the second quarter of fiscal year 2001, Oracle reported revenue of $2.66 billion.[104]  Even if the entire $20.1 million in transfers to the bad debt reserve during the second quarter of fiscal year 2001 were improper -- which they were not -- any resulting revenue

---

[103] Calculated from Oracle's 10-Q Report, dated January 16, 2001.

[104] *See* Oracle's Form 10-Q for the quarter ending November 30, 2000.

from the transfers would constitute less than 1% (approximately .75%) of reported revenue for the quarter.

Assessing the issue from a qualitative perspective, SAB 99 lists a number of considerations, detailed below, which "may render material a quantitatively small misstatement of a financial statement item."  I reviewed each of these considerations, noting the following:

- *Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate* – The bad debt reserve is clearly an estimate, based on the likelihood of ultimate collections.  As noted in a previous section, the challenges inherent in applying cash, accompanied by incomplete remittance information, make it less likely that precise measurements could be obtained.

- *Whether the misstatement masks a change in earning or other trends* – I found no evidence of this issue.

- *Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise* – The consensus analyst earnings opinion regarding the second quarter fiscal year 2001 was $0.10 per share.[105]  As noted above, even if the full $20.1 million were deemed to have been transferred improperly, the Earnings Per Share would decrease to $0.1038 per share, which would still meet analysts' consensus expectations.

- *Whether the misstatement changes a loss into income or vice versa* – I found no evidence of this issue.

- *Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's*

---

[105] *See* Beartlein, L. "Update 2-Oracle Profits Come in Just Ahead of Expectation" (Reuters December 14, 2000) ("An average of analyst estimates called for earnings of 10 cents per share, according to a survey by First Call/Thompson Financial").

*operations or profitability* – The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.

- *Whether the misstatement affects the registrant's compliance with regulatory requirements* – I found no evidence of this issue.

- *Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements* – I found no evidence of this issue.

- *Whether the misstatement has the effect of increasing management's compensation* – I found no evidence of this issue.

- *Whether the misstatement involves concealment of an unlawful transaction* – There is no evidence that suggests that an orchestrated attempt to unfairly inflate the results of operations existed.  Furthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions.  On the contrary, Oracle preserved these transfers within its A/R Subledger.

In short, I found no evidence, from a qualitative or quantitative perspective, that Oracle's transfers to its bad debt reserve would be considered material, with respect to its reported second quarter fiscal year 2001 financial statements.  In the absence of any quantitative or qualitative evidence, I do not believe that the judgment of a reasonable investor would have changed.

## C.     REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and certain depositions of Oracle personnel (including personnel who had knowledge of the accounting issues) and all of the other documents listed in Appendix C.  Based on my review of these documents, I found no evidence that the Defendants had ordered the Company to transfer unapplied cash to the bad debt reserve, or any evidence that

40

any of Oracle's senior management was even aware of the transfers to the bad debt reserve when made.

## D.      REVIEW OF WORK PERFORMED BY EY

As noted above, EY was hired to replace AA as the external auditors of Oracle in April of 2002. EY was made aware of the transfers to the bad debt reserve.[106]  Based on my understanding of Generally Accepted Auditing Standards, promulgated by the American Institute of Certified Public Accountants, and my years of experience in performing financial statement audits, EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements.  If that had been true, Oracle would have been required to restate its past financial statements.

There have been no such restatements.  Furthermore, during Oracle's investigation into these transfers, EY informed the Company's Audit Committee that no audit adjustments were necessary.[107]  As such, EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements.

## VII.    REVIEW OF HEWLETT-PACKARD TRANSACTION

In the Supplemental Interrogatory Responses, Plaintiffs suggest that the HP transaction, whereby HP purchased software licenses and services from Oracle, had "little economic value" and

---

[106] *See* Deposition of Jennifer Minton, dated Sept. 25, 2006 ("Minton Dep.") at 283:22-24, 285:20-286:4; *see also* Deposition of Jeffrey Henley, dated Nov. 16, 2006, at 452:21-453:7.

[107] *See* NDCA-ORCL 3043015; *see also* Minton Dep. at 284:25-285:4.

41

allowed Oracle to achieve earnings per share of $0.11 in the second quarter of fiscal year 2001.[108]

Plaintiffs have not offered any evidence to support this statement, and instead merely point out

that the sale occurred on the last day of the quarter and that Oracle had also agreed to purchase

product from HP.[109]  I understand that HP purchased these additional software licenses so that it

could complete a global roll-out of Oracle's Customer Relationship Management software.[110]  I

note that AA, Oracle's prior financial statement auditors, specifically looked at the HP transaction

from a revenue recognition perspective, and even discussed it with Oracle's Audit Committee on

January 5, 2001.[111]  AA did not recommend that any adjustment be made to the accounting for the

HP transaction.[112]  Based upon the foregoing, I do not believe that there was anything improper in

Oracle's recognition of revenue from the HP transaction.


## VIII.  CONCLUSIONS


Based on my review of the documentation produced in this matter, I found that Plaintiffs'

allegations that the November 17, 2000 debit memo project resulted in more than $228 million of

revenue erroneously recorded in Oracle's financial statements during the second quarter of fiscal

year 2001 are unfounded and incorrect.  On the contrary, I found overwhelming evidence to

---

[108] *See* Sawyer Response, at 17; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18.

[109] *See* Sawyer Response, at 17, 46-47; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18, 47-48; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18, 46-47.

[110] Deposition of Safra Catz, dated Jul. 20, 2006, at 19-20:23-1 ("At the same time HP had already bought and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have to buy more software.").

[111] *See* AA000027-34.

[112] Matuszak Dep. 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under the license arrangement.  And Andersen, after reviewing all the…evidence that was provided to us, concurred with management's agreement.").

support the opinion that the Company's removal of these "On Account" receipt flags, and the creation of the associated debit memos had no impact on Oracle's financial statements, and therefore did not violate GAAP.

I also found evidence demonstrating that some of the transfers of unapplied cash to bad debt reserve in second quarter of fiscal year 2001 were appropriate, and that some of the unapplied cash should have been previously recorded as income. Nevertheless, even if one assumed that all of these transfers were improper, the effect of those transfers to Oracle's reported financial statement for that period is not material. In addition, I found no evidence that Oracle's senior management was involved with or even knew about the transfers to the bad debt reserve when made.

Finally, I do not believe that there was anything improper in Oracle's recognition of revenue from the HP transaction.

## IX.   <u>QUALIFICATION</u>

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review. I may independently, or be asked by counsel to create exhibits after the issuance of this report. These exhibits may then be used as demonstratives during trial. I will be available for further comment on my opinions contained herein at my deposition at some point in the future. Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.

Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director