1  LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  MARK SOLOMON (151949)
   DOUGLAS R. BRITTON (188769)
3  VALERIE L. McLAUGHLIN (191916)
   GAVIN M. BOWIE (235532)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  marks@lerachlaw.com
   dougb@lerachlaw.com
7  valeriem@lerachlaw.com
   gbowie@lerachlaw.com
8        – and –
   SHAWN A. WILLIAMS (213113)
9  WILLOW E. RADCLIFFE (200087)
   ELI R. GREENSTEIN (217945)
10 JENNIE LEE ANDERSON (203586)
   MONIQUE C. WINKLER (213031)
11 100 Pine Street, Suite 2600
   San Francisco, CA  94111
12 Telephone:  415/288-4545
   415/288-4534 (fax)
13 shawnw@lerachlaw.com
   willowr@lerachlaw.com
14 elig@lerachlaw.com
   jenniea@lerachlaw.com
15 moniquew@lerachlaw.com

16 Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | **DISCOVERY MATTER** |
| ALL ACTIONS. | PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS CONCERNING AND CREATED IN PREPARATION FOR THE BOOK SOFTWAR |
| | DATE: N/A<br>TIME: N/A<br>JUDGE: The Honorable Edward A. Infante (Ret.) |

**CONFIDENTIAL**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. STANDARD OF REVIEW ...................................................................................................3

III. ARGUMENT ..........................................................................................................................4

    A. Information Contained in SOFTWAR Is Highly Incriminating and Directly Responsive to the Discovery Plan and Many of Plaintiffs' Document Requests ...................................................................................................4

    B. Plaintiffs Are Entitled to Documents Concerning and Created for SOFTWAR, Including Hundreds of Hours of Interviews with Mr. Ellison About Events Relevant to This Action. ...............................................................10

    C. Documents Concerning and Created in Preparation for SOFTWAR Are in Mr. Ellison's Control and Must Be Produced..........................................................11

    D. Plaintiffs Met and Conferred in Good Faith to No Avail .....................................12

IV. CONCLUSION....................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bank of New York v. Meridien Biao Bank Tanz.*,
    171 F.R.D. 135 (S.D.N.Y. 1997) ..................................................................................4

*Blankenship v. Hearst Corp.*,
    519 F.2d 418 (9th Cir. 1975) .........................................................................................3

*Florentia Contracting Corp. v. Resolution Trust Corp.*,
    No. 92 Civ. 1188 (PKL), 1993 U.S. Dist. LEXIS 5275
    (S.D.N.Y. April 23, 1993) ..............................................................................................4

*Hickman v. Taylor*,
    329 U.S. 495 (1947).......................................................................................................3

*Hitachi, Ltd. v. Amtran Tech. Co.*,
    No. C 05-2301 CRB (JL), 2006 U.S. Dist. LEXIS 52361
    (N.D. Cal. July 18, 2006) ..............................................................................................4

*McKesson Corp. v. Islamic Republic of Iran*,
    185 F.R.D. 70 (D.D.C. 1999).........................................................................................4

*Oakes v. Halvorsen Marine Ltd.*,
    179 F.R.D. 281 (C.D. Cal. 1998) ..................................................................................3

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978).......................................................................................................3

*Oregon Precision Indus. v. Int'l Omni-Pac Corp.*,
    160 F.R.D. 592 (D. Or. 1995) .......................................................................................3

*Synopsys, Inc. v. Ricoh Co.*,
    No. C-03-2289 MJJ, 2006 U.S. Dist. LEXIS 47827
    (N.D. Cal. July 5, 2006) ..........................................................................................4, 12

*United States v. Int'l Union of Petroleum & Industrial Workers*,
    870 F.2d 1450 (9th Cir. 1989) .......................................................................................4

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 26(b) ......................................................................................................................4
    Rule 26(b)(1) .................................................................................................................3
    Rule 34 ...........................................................................................................................4
    Rule 37(a) ......................................................................................................................1

TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that plaintiffs will and do hereby move this Court for an order compelling defendants to produce documents concerning and created in preparation for the book SOFTWAR by Matthew Symonds. The matter will be heard at the convenience of the Honorable Edward A. Infante (Ret.). This motion to compel is brought pursuant to Fed. R. Civ. P. 37(a) and 26(b) and Civil L.R. 37. Plaintiffs have attempted in good faith to meet and confer but have been unable to resolve this issue without court action. This motion is based upon this Notice of Motion, the points and authorities addressed below, the pleadings and evidence contained in the underlying record, and any other information submitted before or during the hearing on this matter.

## I. INTRODUCTION

Just days after Oracle Corporation's ("Oracle or the Company") third quarter 2001 earnings announcement shocked its investors and sent the Company's stock plummeting, Matthew Symonds joined Larry Ellison in Hong Kong to begin nine months of virtually unlimited access to both Ellison and Oracle. During that nine month period commencing in March 2001, Symonds spent at least ten days each month alongside Ellison throughout his working day, with full access to every kind of business meeting with colleagues and customers all over the world. In the course of his travel, Symonds also interviewed past and present employees of Oracle and business rivals and colleagues. In Symonds's words, he was "present in all parts of [Ellison's] business." *See* Declaration of Mark Solomon in Support of Plaintiffs' Motion to Compel Defendants' Production of Documents Concerning and Created in Preparation for the Book SOFTWAR ("Solomon Decl."), Ex. 1 at NDCA-ORCL 1053853.[1] Symonds's access also included office-space at Oracle on the same floor as Ellison, review of previously confidential Company memoranda and e-mail and full access to Oracle's archives. Finally, Symonds was guaranteed, within each ten day monthly period, at least ten hours per week of one-on-one interview time with Ellison.

---

[1] All "Ex._" references are to the Solomon Decl. unless otherwise noted.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR – C-01-0988-MJJ - 1 -

1   The result of Symonds's labor was *SOFTWAR: An Intimate Portrait of Larry Ellison and
2   Oracle*, which was published in 2003. *See* Ex. 2. However, it was not just Symonds's labor which
3   contributed to SOFTWAR. In fact, Ellison himself drafted commentary which is footnoted
4   throughout the book. As part of their agreement, Ellison was provided with a right of reply or
5   commentary within the book, to be used either to express a counterpoint to any statements that he
6   disagreed with or to amplify things he thought important. Neither Symonds nor Ellison could alter
7   the words of the other. As a result, SOFTWAR is co-authored by Ellison and Symonds and the two
8   hold joint copyright to the work. The book covers a variety of topics ranging from Ellison's
9   childhood to his love of sailboat racing to Oracle's history. Most importantly, the book contains
10  hundreds of pages of material directly related to plaintiffs' allegations in this case.

11  SOFTWAR discusses, in great detail, the release of 11i, the months of hardships that
12  accompanied its release (both from Oracle's perspective and from the perspective of the customers
13  affected by the software's shortcomings), sales by insiders including Ellison's January 2001 sales,
14  Oracle's forecasting process and the effect of the dot-com bubble burst on the Company, and
15  Oracle's billion dollar savings claims, just to name a few. These discussions are informed by
16  Symonds intimate access to the highest levels of the Company and to Ellison himself, beginning just
17  days after Oracle announced the earnings shortfall which forms the basis for this action.

18  On September 21, 2006, at Ellison's second day of deposition in this matter, plaintiffs
19  questioned him regarding several extremely relevant statements contained in SOFTWAR and either
20  written by him or attributed to him. The resulting testimony is highly incriminating, to say the least.
21  Just days later (on October 2, 2006), defendants produced, for the first time, documents concerning
22  SOFTWAR. These documents included January 2001 e-mails between Ellison, Symonds, Ellison's
23  attorneys, Safra Catz, and Carolyn Balkenhol (Ellison's executive assistant) discussing the
24  agreement between Ellison and Symonds to co-author SOFTWAR, a draft of that agreement, and an
25  article titled "Softwar – The Rewards of Recklessness: A Portrait of Larry Ellison and Oracle
26  Corporation at War" which discusses proposed book. These documents reveal that not only were
27  transcripts, notes, and hundreds of hours of interviews tapes provided by Ellison, but the draft
28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                           - 2 -

1  agreement also reveals that upon completion of the work, Symonds must return these tapes,
2  transcripts, and working paper to Ellison.  *See* Ex. 1 at NDCA-ORCL 1053825.

3       Plaintiffs have requested a final copy of the agreement and any other communications or
4  drafts created in preparation for that agreement as well as the transcripts, working papers, and
5  hundreds of hours of interview tapes which were returned to Ellison pursuant to his agreement with
6  Symonds.  Such documents clearly fall within the discovery plan and are responsive to many of
7  plaintiffs' document requests. However, despite their recent production of numerous documents
8  concerning SOFTWAR, defendants now refuse to produce additional relevant documents concerning
9  and created in preparation for the book.  Plaintiffs respectfully request that the Court order
10  defendants to produce these highly relevant documents.

11  **II.   STANDARD OF REVIEW**

12       Federal Rule of Civil Procedure 26(b)(1) provides for discovery of any information that is
13  "relevant to the claim or defense of any party," or for good cause shown, any matter that is "relevant
14  to the subject matter involved in the action."  Relevant evidence need not be admissible at trial if the
15  discovery "appears reasonably calculated to lead to the discovery of admissible evidence." *Id*.  The
16  permissible scope of discovery includes information that might reasonably assist a party in
17  evaluating the case, preparing for trial or facilitating settlement.  *Hickman v. Taylor*, 329 U.S. 495,
18  507 (1947); *Oregon Precision Indus. v. Int'l Omni-Pac Corp*., 160 F.R.D. 592, 594 (D. Or. 1995)
19  (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

20       A party seeking to withhold discovery has a "heavy burden" to show why discovery should
21  be denied and the objecting party must make a strong showing before a party will be denied the right
22  to obtain discovery.  *Blankenship v. Hearst Corp*., 519 F.2d 418, 429 (9th Cir. 1975).  Indeed, courts
23  interpret the rules addressing discovery liberally in order "to remove surprise from trial preparation
24  so the parties can obtain evidence necessary to evaluate and resolve their dispute." *See Oakes v.*
25  *Halvorsen Marine Ltd*., 179 F.R.D. 281, 283 (C.D. Cal. 1998) (observing that "[r]ule 26(b) is
26  liberally interpreted to permit wide-ranging discovery of all information reasonably calculated to
27  lead to discovery of admissible evidence; but the discoverable information need not be admissible at
28  the trial").

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                                          - 3 -

1	Any litigant may request documents under Fed. R. Civ. P. 34 that are within the scope of
2	Rule 26(b) and are within the "'possession, custody or control of the party upon whom the request is
3	served.'" Fed. R. Civ. P. 34.  Federal courts have interpreted "'control'" broadly.  *Hitachi, Ltd. v.*
4	*Amtran Tech. Co.*, No. C 05-2301 CRB (JL), 2006 U.S. Dist. LEXIS 52361, at *3 (N.D. Cal. July
5	18, 2006) (citing *Florentia Contracting Corp. v. Resolution Trust Corp.*, No. 92 Civ. 1188 (PKL),
6	1993 U.S. Dist. LEXIS 5275, at *3 (S.D.N.Y. April 23, 1993)).  "'Control' can also be defined as
7	the 'legal right to obtain documents on demand.'" *Hitachi,* 2006 U.S. Dist. LEXIS 52361, at *4
8	(citing *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 78 (D.D.C. 1999); *United States*
9	*v. Int'l Union of Petroleum & Industrial Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)).  Finally,
10	this Court has held that "[a]ctual physical possession is not relevant, the question is whether the
11	party has the 'right, authority or practical ability to obtain the documents from a non-party to the
12	action.'" *Hitachi*, 2006 U.S. Dist. LEXIS 52361, at *4 (citing *Synopsys, Inc. v. Ricoh Co.,* No. C-
13	03-2289 MJJ, 2006 U.S. Dist. LEXIS 47827, at *2 (N.D. Cal. July 5, 2006); *Bank of New York v.*
14	*Meridien Biao Bank Tanz.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997)).

15	**III.	ARGUMENT**

16	**A.	Information Contained in SOFTWAR Is Highly Incriminating and
	Directly Responsive to the Discovery Plan and Many of Plaintiffs'**
17	**Document Requests**

18	SOFTWAR contains a plethora of information which is relevant to plaintiffs' allegations in
19	this action.  For example, in Chapter 9, titled "The Laboratory," Symonds writes (and Ellison
20	provides commentary) on the development of 11i, including information refuting Oracle's marketing
21	mantra throughout the Class Period that it had saved over a billion dollars implementing 11i.
22	Chapter 10, aptly titled "Ready or Not," chronicles the release of 11i and the problems associated
23	with that release.  Chapter 11, titled "Taking Stock," discusses Ellison's insider selling binge in
24	January 2001 as well as Oracle's earnings shortfall announcement in March 2001 and the effects of
25	the macroeconomic climate on Oracle's earnings in late 2000 in early 2001.  Chapter 12, titled
26	"Hungarian Lessons," details Ellison's relationship with GE and GE Power System's experience
27	with the Class Period implementation of 11i in a small Hungarian plant (contrary to Ellison's Class
28	Period claims that all of GE Power Systems was live on 11i).  These chapters contain information

1  directly relating to plaintiffs allegations regarding insider trading, forecasting and the economy,

2  Oracle's billion dollar savings claim, and problems with 11i.

3        Included in the chart below are a few more specific examples of the highly relevant

4  information contained in SOFTWAR and the incriminating testimony that such information elicited

5  from Mr. Ellison:

| SOFTWAR QUOTE | ELLISON TESTIMONY |
|---|---|
| "The final qualification about Oracle's story of transforming its efficiency by using its own E-Business Suite is that the claim is only partly true, because the first billion dollars of savings was pretty much in the bag before 11i was finished." (182) | Q: Okay. So you are in agreement with that first sentence; is that fair or not?<br>A: Yeah. I'm in agreement with the second half of the sentence starting "because."<br>(336: 6-11) |
| "Ellison says, 'That's absolutely right. The software that saved Oracle a billion dollars in the first year was a combination of our standard applications products plus prototype applications that had not yet been integrated into the E-business Suite . . . integrated into what would become the E-Business Suite." (183) | Q: And do you agree with that?<br>A: Yes.<br>(339: 21-22) |
| "But in one sense, the marketing claims were misleading. The reassuring message to prospective customers was that Oracle had been successfully running the same E-Business Suite that they would buy for at least a year." (183) | Q: Do you agree with that?<br>A: No.<br>Q: But you didn't clarify it, did you?<br>A: No.<br>Q: And you didn't correct it?<br>A: That's correct.<br>(340: 4-9) |
| "I had already delayed the 11i release date, and that forced our customers to revise their implementation plans. There was tremendous pressure not to delay again. Our customers had their resources all lined up and were ready to install our software as soon as we released it. It was a bit like the beginning of World War I: once the troop mobilizations began, there was no turning back." (191) | Q: Do you see that?<br>A: I do.<br>Q: Is that your language?<br>A: Yes.<br>(342: 3-6) |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | "There were five stages to the order management decision. Stage one: We have time to put the new order system into the suite; let's do it. Stage two: No, too risky; we have to go with the old order system. Stage three: Let's put them both in; absolutely fantastic idea. Stage four: Fantastic idea, but we can't make it work. Stage five: Well, then, let's put in the new one." (192) | Q: Okay. And is that all accurate?<br>A: I think so.<br>(343: 20-21) |
| 7<br>8 | "It was my decision. It's in my nature to go for the highest-risk/highest reward option. That's my cross to bear." (192) | Q: Did you say that?<br>A: I did.<br>(344:1-2) |
| 9<br>10<br>11 | "We went from having an average order management product to having the premier order management program on the planet. The only problem was it was brand new and we hadn't done enough testing." (192) | Q: Do you see that?<br>A: Yes, I do.<br>Q: Was it accurate?<br>A: Yes.<br>(344: 8-11) |
| 12<br>13<br>14<br>15<br>16<br>17 | "Ellison had no illusions about how critical the order management system was: 'The order management system is the heart of the sell side of our e-business suite. Order management is the funnel that captures the information about the sale. The better your order management system, the more information it captures.... It's a great system. But when it first came out, it had a lot of bugs." (192) | Q: And did you say all that?<br>A: I did.<br>(345: 8-9) |
| 18<br>19<br>20<br>21<br>22<br>23 | "At that point I became acutely aware of the customer dissatisfaction and immediately started drilling down into the implementations we were doing." (quote by Mark Barrennechea) (196) | Q: Now, were you aware at that time that Mark had become – Mark Barrenechea had become acutely aware of customer dissatisfaction?<br>A: I would have hoped he would have been aware before then. I mean, we were having – you know, I asked that we go over all of the dissatisfied customers and keep – you know, keep track of them.<br>(350: 18-24) |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | "Over the next couple of months, customer complaints poured in.  Instead of working on the planned features and functions to flesh out the suite's capabilities as planned, development was increasingly engaged in a feverish attempt to produce patches that would fix the bugs that seemed to be flying at them from all sides. . . . (quoting Ellison) 'I was way too optimistic.  It just kind of got away from us, and that became a very big problem.'" (195) | Q: Is that an accurate quote?<br>A: It certainly took – and what I mean by that, it took longer, you know, to fix the all – the bugs than I thought.<br>Q: And did you say, "It just kind of got away from us, and that became a very big problem"?<br>A: I said it, yeah.<br>(358: 16-22) |
| 8<br>9<br>10 | "The mood at Oracle was bloody but unbowed.  There was an embarrassed realization that it had fallen down badly on execution in sending a hugely important new product out to customers in an unfit state." (202) | Q: Do you agree with that?<br>A: I do not.<br>Q: But you didn't qualify or correct it, did you?<br>A: No.  That's Matthew's opinion.<br>(373: 11-15) |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21 | "As I've said before, our forecasting system is not clairvoyant.  Our forecasting does statistical extrapolations based on historical trends.  If something that's outside our mathematical model of the business changes, like a war in the Middle East, our forecasting becomes inaccurate." (quoting Ellison) (226) | Q: Okay.  And you stand by that?<br>A: Absolutely.<br>Q: Now, it wouldn't – a war in the Middle East is just one example.  There could be who knows how many examples; right?<br>A: Price of oil goes over a hundred dollars a barrel, lots of things.<br>Q: And the point you are making is that while your forecasting system extrapolations based on historical trends, if something is happening that would suggest that the historical trend is not necessarily reliable, then your forecasting will not be reliable, is that right?<br>A: Right.  Major macroeconomic change; sudden – sudden growth in the economy or sudden shrinkage in the economy would cause – you can't extrapolate anymore.<br>(384:16-385:7) |

| | |
|---|---|
| "We were getting a lot of pressure from our customers to deliver the 11i applications. I made a lot of them mad by delaying the release for several months. I should have delayed it even longer." (Ellison footnote) (189) | Q: Is that your footnote?<br>A: Yeah. Again, in more detail, let me repeat what I said. I would have released it exactly the same time, but in terms of our existing customer base, who were planning to migrate, I should have slowed that process down. It's just a little – a little more meat on the bones here. Just slowed that process down so we could have done a better job of managing them through the early – the early versions of 11i.<br>(412:17-413:1) |
| "A typical day for Ellison starts when he gets up at about seven o'clock and checks his overnight e-mails. Unlike many CEOs, Ellison has only one e-mail address. He gets more than a hundred e-mails a day, most of which he answers himself or forwards to the appropriate person.... Also part of the routine is a visit to Oracle Sales Online, which might prompt him to leave a message questioning the status of a particular sales opportunity." (286-87) | Q: Is that true?<br>A: Not true.<br>Q: Okay. Now, although you do enter a footnote on this page, you do not clarify or correct this statement, do you?<br>A: No, I don't. We can prove it's not true.<br>Q: How can you prove it?<br>A: We have logs of everyone who's accessed OSO and when they have accessed it.<br>Q: That's excellent. So I can – you can prove that you didn't log on to OSO in Q301; right?<br>A: I don't know if we have them going back to Q301.<br>Q: Because you destroyed the logons, logon records, didn't you, or someone did at your company? Do you know the SLC references the fact that the login records have been destroyed?<br>A: No.<br>(462:5-463: 2) |

*See* Ex. 9. The information contained in SOFTWAR is clearly responsive to a large number of plaintiffs' document requests and to the Discovery Plan. Defendants themselves are obviously aware of this responsiveness as they recently produced to plaintiffs documents concerning nothing but SOFTWAR. In any event, as demonstrated above, SOFTWAR contains information relating to, among other things, problems with 11i, forecasting and the economy's effect on Oracle, Oracle's billion dollar savings claim, and insider trading.

The Discovery Plan calls for: (1) "documents and communications . . . concerning the United States economy and its impact or potential impact on Oracle's revenues, earnings and expenses; its

1   impact or potential impact on customer purchasing decisions of IT products and services in general;
2   and specifically the purchase of products or services from Oracle"; (2) "High level documents
3   describing the scope and dimension of 'bug problems' within Suite 11i and/or any of its modules
4   other than integration and interoperability"; (3) "Documents regarding any lost or deferred sales of
5   any Oracle product, as well as any material expense with respect to any Oracle product – such as
6   refunds, rebates or remediation"; (4) "documents relating to Oracle's forecasts, including any
7   mention of the economy as it relates to Oracle's forecasting during the Relevant Time Period and as
8   it related to the Company's pipeline and its growth or decline"; and (5) "documents and
9   communications regarding Defendants' sales or contemplated sales of Oracle securities during
10  January 2001." *See* Ex. 3 at 2-3.  The information contained in SOFTWAR is clearly related to these
11  portions of the Discovery Plan, among others.

12          In addition, the information contained in SOFTWAR is responsive to, among others,
13  document requests nos. 1-16, 18-21, 23-27 and 35 in Plaintiffs' First Set of Requests for Production
14  of Documents and requests nos. 10-11 and 21 in Plaintiffs' Third Set of Requests for Production of
15  Documents. *See* Exs. 4-5. These requests call for documents concerning 11i, insider trading,
16  forecasting and the economy, and Oracle's billion dollar savings claim, among other issues.  For
17  example, in plaintiffs' first set of requests, Request No. 6 calls for: "All documents and
18  communications relating to the United States economy and its impact on sales of Oracle's database
19  and applications products, including, but not limited to, order cancellations, order or purchase
20  delays, and discounts offered on Oracle products or services." *See* Ex. 4 at 7.  Request No. 21 calls
21  for: "All documents and communications relating to the timing or release of 11i, including, but not
22  limited to, each subsequent version of 11i, for example, 11i.5 and 11i5.3." *Id.* at 10.  Request No. 24
23  calls for: "All documents and communications relating to customer or potential customer complaints,
24  concerns or dissatisfaction with the functionality, implementation or integration of 11i or any of its
25  individual modules, including, but not limited to, the CRM module." *Id.*  Request No. 27 calls for:
26  "All documents and communications supporting, or relating to Oracle's claim that it had already
27  saved $1 billion through the internal implementation of its applications software." *Id.*  As
28  demonstrated above, the information contained in SOFTWAR is clearly responsive to such requests.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                                                - 9 -

**B.     Plaintiffs Are Entitled to Documents Concerning and Created for SOFTWAR, Including Hundreds of Hours of Interviews with Mr. Ellison About Events Relevant to This Action.**

Based on the information contained in SOFTWAR, it is clear that transcripts of interviews, notes, working papers, and hundreds of hours of interview tapes provided by Mr. Ellison in preparation for the creation of the book will contain information that is highly relevant to plaintiffs' allegations in this action. While plaintiffs can only begin to speculate about what other incriminating information is contained in those documents (as such, these documents may be responsive to every single one of plaintiffs' document requests), one thing is crystal clear: plaintiffs are clearly entitled to discover the content of those documents and tapes.

Ellison provided hundreds of hours of interviews and almost a year worth of notes beginning just days after the events which form the basis for plaintiffs' claims. As demonstrated by the information contained in SOFTWAR, Ellison, numerous other high-level Oracle executives, Oracle's customers and business partners provided information to Symonds regarding the events during and leading up to the Class Period. Just as SOFTWAR contains information regarding the release of 11i, problems with 11i and the effect of those problems on customers, Oracle's billion dollar savings claim, Oracle's forecasting process and the effect of the economy on its business, and trades by insiders including Ellison's January 2001 sales, so will the documents created in preparation for writing SOFTWAR.

In addition, although Ellison has already confirmed several of the incriminating statements attributed to him throughout the book, interview tapes would provide the most accurate picture of Ellison's exact statements and admissions. Ellison sold nearly a billion dollars of Oracle stock just a month prior to the interviews conducted by Symonds. Just days before commencing preparation for SOFTWAR he announced one of the most shocking earnings shortfalls in Oracle's history. Clearly, hundreds of hours of tapes recounting Ellison's mindset, his experience, and his recollection of those events created almost simultaneous to their occurrence would be invaluable to plaintiffs.

Accordingly, documents concerning and created in preparation for SOFTWAR would clearly contain information "that might reasonably assist [plaintiffs] in evaluating the case, preparing for trial or facilitating settlement." In addition, these documents are responsive to both the Discovery

Plan and plaintiffs' document requests. As such, defendants should be ordered to produce these documents.

### C. Documents Concerning and Created in Preparation for SOFTWAR Are in Mr. Ellison's Control and Must Be Produced

Plaintiffs have not received a copy of the final agreement between Symonds and Ellison. Surely Ellison must have possession or control of an executed agreement, which is likely still in effect, granting him rights to revenues generated by SOFTWAR's publication.

In addition, according to the draft agreement recently produced by defendants, Symonds shall: "Upon completion of the Work, return to Ellison all tapes, transcripts, and working papers provided by Ellison, and not make further use of these materials without Ellison's express written consent." *See* Ex. 1 at NDCA-ORCL 1053825. Because defendants have not produced a final copy of the agreement between Ellison and Symonds, it is unclear to plaintiffs whether Symonds was obligated under the agreement to return the documents requested by plaintiffs to Ellison. If the above-mentioned clause was contained in the final agreement, Ellison has control of the documents because he has the "legal right to obtain [those] documents on demand."

Even if the above-mentioned clause was not contained in the final agreement, Ellison still has "control" of the documents and tapes as defined by this Court. "Control" does not require physical possession (in fact, such possession is not even relevant), but merely that "the party has the 'right, authority or practical ability to obtain the documents from a non-party to the action.'" Aside from being business partners, Ellison and Symonds "became friends and developed a relationship of trust" over the course of their time spent together. *See* Ex. 1 at NDCA-ORCL 1053853. Symonds has continued to meet with Ellison and, since the publication of SOFTWAR, has written another article about Ellison, titled "Absolutely Excessive!" which was published in *Vanity Fair* in October 2005. *See* Ex. 6. Clearly, Ellison has the "practical ability" to obtain interview tapes and notes that he provided from a close friend and colleague.

Defendants' production of the final agreement between Ellison and Symonds should shed light on the question of which individual currently possesses the transcripts, notes, and hundreds of

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR – C-01-0988-MJJ - 11 -

hours of highly relevant interview tapes. Either way, Ellison has "control" of such materials as defined by this Court and defendants should be ordered to produce them to plaintiffs.[2]

### D.    Plaintiffs Met and Conferred in Good Faith to No Avail

During the meet and confer on October 13, 2006, plaintiffs requested that defendants produce documents concerning and created in preparation for the book SOFTWAR. Plaintiffs explained that their bases for seeking documents concerning SOFTWAR are both the sections of the Discovery Plan relating to forecasting, the economy, Suite 11i and insider trading and numerous document requests relating to forecasting, the economy, Suite 11i and insider trading, among others. In response, defendants stated they would speak with their client and promptly get back to plaintiffs.

On October 17, 2006 defendants stated that they would not produce SOFTWAR documents because "plaintiffs have provided absolutely no basis for this demand." *See* Ex. 7. Despite their production just days before of documents concerning SOFTWAR, defendants went on to argue that "no such [document] request exists" which would require defendants to produce documents concerning SOFTWAR. *Id.* Plaintiffs responded on October 20, 2006 by providing defendants with sections of the Discovery Plan as well as a lengthy list of document requests which SOFTWAR documents are responsive to. Defendants have failed to further respond. *See* Ex. 8. As demonstrated above, documents concerning and created in preparation for SOFTWAR are highly relevant to plaintiffs' allegations and responsive to the Discovery Plan and many of plaintiffs' document requests. Accordingly, plaintiffs should be granted the opportunity to examine these important materials.

---

[2]    In the event that Ellison lacks the practical ability to obtain the materials requested, plaintiffs respectfully request this Court allow plaintiffs the opportunity to subpoena such material from Symonds. In *Synopsys*, 2006 U.S. Dist. LEXIS 47827, at *15, the court held that even if plaintiff ultimately lacked the practical ability to obtain documents from a third party, it would permit defendants to issue a subpoena to obtain the documents from that third party. The court reasoned that, even though discovery was already closed, it was a reasonable position for defendants to believe that plaintiff had control over the documents.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                                                    - 12 -

## IV.     CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs' motion.

DATED: October 30, 2006

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
VALERIE L. McLAUGHLIN
GAVIN M. BOWIE

_____
MARK SOLOMON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
ELI R. GREENSTEIN
JENNIE LEE ANDERSON
MONIQUE C. WINKLER
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Oracle3\NOT00036261.doc

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                                                - 13 -

## PROOF OF SERVICE BY E-MAIL

I, Kelly Brennan, not a party to the within action, hereby declare that on October 30, 2006, I served the attached **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS CONCERNING AND CREATED IN PREPARATION FOR THE BOOK SOFTWAR** on the parties in the within action by e-mail addressed as follows:

**COUNSEL FOR PLAINTIFFS:**

| | | |
|---|---|---|
| Mark Solomon, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP - SD | marks@lerachlaw.com |
| Douglas Britton, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP - SD | dougb@lerachlaw.com |
| Valerie McLaughlin, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP - SD | valeriem@lerachlaw.com |
| Gavin Bowie, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP - SD | gbowie@lerachlaw.com |
| Shawn Williams, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | shawnw@lerachlaw.com |
| Willow Radcliffe, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | willowr@lerachlaw.com |
| Eli Greenstein, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | elig@lerachlaw.com |
| Jennie Anderson, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | jenniea@lerachlaw.com |
| Monique Winkler, Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP – SF | moniquew@lerachlaw.com |

**COUNSEL FOR DEFENDANTS:**

| | | |
|---|---|---|
| Peter Wald, Esq.* | Latham & Watkins<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA  94111 | peter.wald@lw.com |
| Michele Kyrouz, Esq. | Latham & Watkins – SF | michele.kyrouz@lw.com |
| Matthew Harrison, Esq. | Latham & Watkins – SF | matthew.harrison@lw.com |
| Patrick Gibbs, Esq. | Latham & Watkins – Menlo Park | patrick.gibbs@lw.com |
| Brian Glennon, Esq. | Latham & Watkins –LA | brian.glennon@lw.com |
| Jamie Wine, Esq. | Latham & Watkins – NY | jamie.wine@lw.com |

* Denotes service via hand delivery and e-mail.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RE: SOFTWAR –  C-01-0988-MJJ                                                                                    - 14 -