LATHAM & WATKINS LLP
   Peter A. Wald (SBN 85705)
   Michele F. Kyrouz (SBN 168004)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com
      michele.kyrouz@lw.com

LATHAM & WATKINS LLP
   Jamie L. Wine (SBN 181373)
633 W. Fifth Street, Suite 4000
Los Angeles, CA 90071
Tel: (213) 485-1234
Fax: (213) 891-8763
E-mail: jamie.wine@lw.com

LATHAM & WATKINS LLP
   Patrick E. Gibbs (SBN 183174)
   Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com
      matt.rawlinson@lw.com

LATHAM & WATKINS LLP
   Sean M. Berkowitz (*admitted pro hac vice*)
233 South Wacker Drive
Chicago, IL 60606
Tel: (312) 876-7700
Fax: (312) 993-9767
E-mail: sean.berkowitz@lw.com

Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

ORACLE CORPORATION
   Dorian Daley (SBN 129049)
   James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, CA 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: dorian.daley@oracle.com
      jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION <br><br> ———————————————————— <br><br> This Document Relates To: <br><br> ALL ACTIONS. | Master File No. C-01-0988-MJJ (JCS) (Consolidated) <br><br> *CLASS ACTION* <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL SUBMISSION REGARDING SPOLIATION ISSUES** <br><br> Date:    November 16, 2007 <br> Time:   1:30 pm <br> Judge:  Hon. Martin J. Jenkins |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

I.   FACTUAL BACKGROUND ..................................................................................... 2

    A.   Plaintiffs Have Received An Enormous Volume Of Discovery ........................... 2

    B.   Defendants Went To Great Lengths To Preserve Relevant
       Evidence ................................................................................................................. 3

    C.   The 2002 "Unapplied Cash Project" Did Not "Alter" Or "Destroy"
       Evidence Regarding Plaintiffs' Accounting Claims ............................................ 5

    D.   Defendants' Discovery Obligations Regarding Plaintiffs'
       Accounting Claims Evolved Over Time ............................................................... 6

    E.   Discovery of *SOFTWAR*-Related Materials ...................................................... 7

II.  PLAINTIFFS DO NOT COME CLOSE TO MEETING THE
    STANDARD FOR DEFAULT JUDGMENT ................................................................ 9

    A.   Plaintiffs Bear A Heavy Burden In Requesting Default Judgment. ................... 10

    B.   Plaintiffs' Attempt To Dilute The Standard Is Unfounded ................................ 11

III. DEFENDANTS DID NOT "FAIL[] TO PRESERVE EVIDENCE IN
    BAD FAITH" .............................................................................................................. 14

    A.   Plaintiffs' Argument That Defendants Should Have Begun
       Preserving Documents Months Before The Earnings Miss Is
       Absurd ................................................................................................................. 15

    B.   Plaintiffs' Attacks On Defendants' Preservation Efforts Are
       Unfounded ........................................................................................................... 16

    C.   Plaintiffs' Complaints About Defendants' Document Production
       Are Likewise Unfounded .................................................................................... 20

IV.  PLAINTIFFS' CLAIM THAT DEFENDANTS "ALTERED" OR
    "WITHHELD" ACCOUNTING EVIDENCE IS BASELESS ...................................... 25

    A.   There Is No Evidence That Oracle Improperly Altered Or
       Destroyed Documents During The 2002 "Unapplied Cash Project" ................. 26

    B.   Routine Discovery Disputes Do Not Support Plaintiffs' Claim That
       Defendants "Withheld Key Accounting Evidence" ........................................... 27

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

i

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

C.   Defendants Did Not Mislead The Court Regarding The November 2000 Debit Memos And The 2002 "Unapplied Cash Project" .......................... 29

V.   DEFENDANTS DID NOT "INTENTIONALLY DESTROY[]" ANY "*SOFTWAR*-RELATED MATERIALS" ............................................................. 31

A.   Defendants Did Not Destroy Any *SOFTWAR*-Related Evidence ...................... 31

B.   Plaintiffs Cannot Show Prejudice .......................................................... 32

C.   Defendants Did Not "Withhold" Any "SOFTWAR-Related Materials" At All, Let Alone In "Bad Faith" ...................................... 32

D.   Defendants' Inability To Fully Comply With The Special Master's Order Does Not Warrant Any Sanctions At All, Let Alone Default Judgment ............................................................................................ 34

E.   An Adverse Inference Against Defendants Based On Symonds' Refusal To Testify Is Impermissible ...................................................... 35

F.   Plaintiffs' Claim That The Tapes Were "Located" Is False ............................... 37

VI.  DEFENDANTS DID NOT "MISREPRESENT[]" THEIR PRESERVATION EFFORTS TO THE COURT ........................................................ 37

VII. PLAINTIFFS DO NOT EVEN ATTEMPT TO JUSTIFY SANCTIONS SHORT OF DEFAULT JUDGMENT ................................................................. 38

VIII. CONCLUSION ........................................................................................ 40

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

ii

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AdvantaCare Health Partners v. Access IV*,
  No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835 (N.D. Cal. Aug. 17, 2004)......................12

*Ameripride Servs. v. Valley Indus. Serv.*,
  No. S-00-113 LKK, 2006 U.S. Dist. LEXIS 59398 (E.D. Cal. Aug. 8, 2006)....................12

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
  69 F.3d 337 (9th Cir. 1995) .........................................................................12, 13, 14

*Commodity Futures Trading Comm'n v. Noble Metals Int'l*,
  67 F.3d 766, 770-772 (9th Cir. 1995), *cert. denied*, 519 U.S. 815 (1996) .........................39

*Computer Task Group, Inc. v. Brotby*,
  364 F.3d 1112 (9th Cir. 2004) ...................................................................11, 12

*Cowans v. City of Boston*,
  No. 05-CV-11574-RGS, 2007 U.S. Dist. LEXIS 215 (D. Mass. Jan. 4, 2007)..................36

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000) ...................................................................35, 36

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ...........................................................................35

*Halaco Eng'g Co. v. Costle*,
  843 F.2d 376 (9th Cir. 1988) ...........................................................11, 12, 13, 14

*Hamilton v. Signature Flight Support Corp.*,
  No. C 05-0490CW, 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005)........10, 14, 20

*Henry v. Gill Indus., Inc.*,
  983 F. 2d 943 (9th Cir. 1993) ...................................................................10, 13

*Hous. Rights Ctr. v. Sterling*,
  No. CV 03-859DSF, 2004 U.S. Dist. LEXIS 28877 (C.D. Cal. Dec. 6, 2004) ...................10

*Hynix Semiconductor, Inc. v. Rambus Inc.*,
  No. C-00-20905 RMW, 2006 U.S. Dist. LEXIS 30690 (N.D. Cal. 2006) ..........................15

*In re Citric Acid Litigation*,
  996 F. Supp. 951 (N.D. Cal. 1998) ...................................................................36

*In re Napster, Inc. Copyright Litig.*,
  462 F.Supp.2d 1060 (N.D. Cal 2006) .......................................................11, 12, 13, 15

LATHAM&WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

iii

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

*In re NTL, Inc. Sec. Litig.*,
No. 02 Civ. 3010, 2007 U.S. Dist. LEXIS 6198 (S.D.N.Y. Jan. 30, 2007) ........................ 39

*In re Oracle Corp. Derivative Litig.*,
867 A.2d 904  (Del. Ch. 2004) .................................................................................... 3

*In re Telxon*,
No. 5:98CV2876, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004) ..................... 12

*In re Unum Provident Corp. Sec. Litig.*,
No. 1:03-CV-049, 2003 U.S. Dist. LEXIS 24412 (E.D. Tenn. Dec. 29, 2003) ................... 12

*Juniper Networks, Inc. v. Toshiba America, Inc.*,
No. 2:05-CV-047, 2007 U.S. Dist. LEXIS 50096 (E.D. Tex. July 11, 2007) ............... 12, 14

*Kontos v. Kontos*,
968 F. Supp. 400 (D. Ind. 1997) .................................................................................. 36

*Leon v. IDX Systems Corp.*,
464 F.3d 951 (9th Cir. 2006) ............................................................................ 10, 12, 13

*LiButti v. United States*,
107 F.3d 110 (2nd Cir. 1997) ...................................................................................... 36

*Navellier v. Sletten*,
262 F.3d 923 (9th Cir. 2001) ....................................................................................... 39

*Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*,
682 F.2d 802 (9th Cir. 1982) ....................................................................................... 13

*Read v. Ulmer*,
308 F.2d 915 (5th Cir. 1962) ....................................................................................... 35

*Residential Funding Corp. v. DeGeorge Financial Group*,
306 F.3d 99 (2d Cir. 2002) .......................................................................................... 13

*Searock v. Stripling*,
736 F.2d 650 (11th Cir. 1984) ..................................................................................... 35

*Skeete v. McKinsey*,
No. 91 Civ. 8093, 1993 U.S. Dist. LEXIS 9099 (S.D.N.Y. 1993) ...................................... 20

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
357 U.S. 197 (1958) .................................................................................................... 38

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
982 F.2d 363 (9th Cir. 1992) ....................................................................................... 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

*United States v. Kitsap Physicians Serv.*,
   314 F.3d 995 (9th Cir. 2002) ............................................................................ 12

*Wachtel v. Health Net, Inc.*,
   No. 01-4183, 2007 U.S. Dist. LEXIS 26308 (D.N.J. Apr. 10, 2007) ................................... 21

*Wanderer v. Johnston*,
   910 F.2d 652 (9th Cir. 1990) ............................................................... 10, 13, 39

*Wiltec Guam, Inc. v. Kahalu Constr. Co.*,
   857 F.2d 600 (9th Cir. 1988) ............................................................................ 14

*Wyle v. R.J. Reynolds Industries, Inc.*,
   709 F.2d 585 (9th Cir. 1983) ............................................................... 13, 39

*Zubulake v. UBS Warburg LLC ("Zubulake IV")*,
   220 F.R.D. 212 (S.D.N.Y. 2003) ....................................................... 15, 18, 35, 39

*Zubulake v. UBS Warburg LLC ("Zubalake V")*,
   229 F.R.D. 422 (S.D.N.Y. 2004) ....................................................... 10, 18, 39

**STATUTES**

15 U.S.C. § 78u-4(b)(3)(C)(ii) ............................................................... 10, 11

**RULES**

Civ. L.R. 7-4(a)(5) ............................................................................ 39

Fed. R. Civ. P. 30(a)(2) ............................................................................ 3

Fed. R. Civ. P. 37 ............................................................................ 35

**CONSTITUTIONS**

U.S. Const. amend. V ............................................................... 32, 35, 36

**OTHER AUTHORITIES**

Moore's Federal Practice (Civil), § 37.51 ............................................................. 39

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SILICON VALLEY

v

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

# INTRODUCTION

Plaintiffs' opening brief cites cases in which courts imposed sanctions because one party's destruction of evidence left the opposing party with incomplete or spotty evidence on key issues, which would make it impossible to try the case. Quite remarkably, while claiming (incorrectly) that the evidence they need to fairly present their case has been destroyed, Plaintiffs simultaneously argue (again incorrectly) that that are entitled to summary judgment because of the purported mountain of evidence supporting their claims. Plaintiffs make these inherently contradictory arguments because they find themselves in the unfortunate position of having invested more than six years of time and effort in a completely meritless case. In the hopes of surviving summary judgment (and, indeed, avoiding any inquiry on the merits whatsoever), Plaintiffs have advanced every argument they can think of, including the gaggle of meritless spoliation arguments in the instant motion.

Plaintiffs cannot prove that Defendants lost or destroyed a single document that should have been produced, let alone that Defendants did so with the "culpable state of mind" necessary to impose the kind of drastic sanctions Plaintiffs seek. Nor can Plaintiffs show prejudice from any alleged "spoliation." Plaintiffs have received massive amounts of discovery, including the entire record from the related derivative cases, *plus* more than 100 additional depositions *plus* more than 2 million pages of additional documents *plus* documents subpoenaed from more than 100 Oracle customers. Plaintiffs have an extensive record relating to their allegations; the problem for Plaintiffs is that the facts do not support their case.

Because they cannot meet the heavy burden necessary to impose the sanctions they seek, Plaintiffs argue in favor of a default judgment standard that amounts to strict liability for the loss of any potentially relevant documents. Although they never clearly articulate this standard, Plaintiffs argue that default sanctions may be imposed as long as documents were destroyed and Defendants had "some notice" that the documents were "potentially relevant." Supplemental Submission ("Supp. Sub.") at 3. Plaintiffs argue, incorrectly, that there is no need to show bad faith or intentional misconduct, or that the party seeking default suffered any prejudice. *Id.* In fact, the Ninth Circuit has stressed that default sanctions are only appropriate in "extraordinary

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1

1   circumstances" where the accused party has "engaged in a pattern of deception and discovery

2   abuse" that reflects willfulness, bad faith or fault, the moving party has suffered prejudice, *and*

3   lesser sanctions would be ineffective.  Even in the case of lesser sanctions, Plaintiffs still must

4   show willful or bad faith conduct and prejudice and demonstrate a relationship between the harm

5   caused and the sanction sought.

6          Plaintiffs' Supplemental Submission does not come close to meeting these standards.

7   Plaintiffs' complaints about Defendants' preservation efforts fail because they ignore the steps

8   Defendants did take to preserve evidence, which indisputably resulted in the preservation of

9   millions of documents from the files of over 129 different custodians.  Plaintiffs' complaint that

10   certain emails were not produced from one witness's files is meritless because the emails at issue

11   were produced from the files of other witnesses; thus Plaintiffs cannot show any prejudice.  Nor

12   can Plaintiffs show any bad faith or willful misconduct because one of the first things Oracle did

13   after being sued was take steps to preserve certain disaster-recovery tapes containing the email

14   accounts of every Oracle employee.

15          Further, Plaintiffs' claim that Defendants "altered" accounting evidence fails because no

16   such evidence was altered.  Plaintiffs' claim that Defendants improperly "withheld" accounting

17   evidence fails because it is based on a series of routine discovery disputes that were resolved by

18   Magistrate Judge Spero and Special Master Infante, whose orders Plaintiffs did not appeal.  And

19   Plaintiffs' claims regarding the "*SOFTWAR*-related materials" fail because those materials were

20   destroyed by a third party despite Defendants' efforts to produce them, and there is no basis for

21   entering default judgment or evidentiary sanctions against Defendants based on that third-party's

22   conduct.  Plaintiffs' request for sanctions should be denied.

23   **I.      FACTUAL BACKGROUND**

24          **A.      Plaintiffs Have Received An Enormous Volume Of Discovery**

25          Plaintiffs' request for sanctions must be judged against the voluminous discovery

26   Plaintiffs have received, a subject Plaintiffs carefully avoid.  By any measure, that volume of

27   information is enormous.  Plaintiffs initially received all of the discovery produced by Oracle

28   and the individual defendants in two related derivative cases in Delaware and California, an

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    evidentiary record that the Delaware Chancery Court described as "massive."  *In re Oracle Corp.*

2    *Derivative Litig.*, 867 A.2d 904, 908  (Del. Ch. 2004).  Plaintiffs also received the report of the

3    Special Litigation Committee established by Oracle's board to investigate the claims in this case

4    and in the derivative case—more than 20,000 pages.  *See* Defs' Ex. 45.  Through discovery in

5    this case, Oracle has produced to Plaintiffs over 2.1 million pages of documents from the files of

6    at least 129 different custodians, as well as 209 disks of electronic data.  *See* Pls' Ex.[1] 62.

7    Through May 2006, well before the end of discovery, Defendants had incurred over $10 million

8    in costs producing documents to Plaintiffs.

9          Plaintiffs also subpoenaed documents from over 100 of Oracle's customers (Pls' Ex. 43

10   at § V.C.1) and took over 70 depositions, seven times the limit set by Fed. R. Civ. P. 30(a)(2).

11   Citing the sheer volume of the evidence, Plaintiffs repeatedly moved for additional deposition

12   time with Oracle's most senior executives, many of whom sat for two or three times the seven-

13   hour limit.  Plaintiffs' own summary judgment briefing reflects the volume and breadth of the

14   information Plaintiffs have received—they have submitted over 450 exhibits numbering several

15   thousand pages.

16       **B.     Defendants Went To Great Lengths To Preserve Relevant Evidence**

17         The enormous volume of information Plaintiffs have received in this case is the result of

18   a document preservation process that began as soon as Oracle was first served with lawsuits

19   arising out of its 3Q01 miss and continued over the course of several years.  That process is

20   described below.[2]

21            **1.     Initial Preservation Efforts**

22         Oracle was served with the first of several lawsuits on March 10, 2001.  *See* Defs' Ex. 1

23   at ¶ 5.  On March 12, 2001, the Oracle in-house lawyer principally responsible for Oracle's

24   document preservation efforts, Lauren Segal, began to identify employees likely to have relevant

25
26   [1] Where possible, Defendants have cited to evidence attached to the Winkler Declaration in
     support of Plaintiffs' Supplemental Submission.  Evidence not contained in the Winkler
     Declaration is attached hereto as exhibits to the Declaration of David C. Fortney.  Defendants
27   cite to these two groups of evidence as "Pls' Ex." and "Defs' Ex.," respectively.

28   [2]  Defendants' document preservation efforts are also recounted in more detail in Defendants'
     oppositions to Plaintiffs' prior motions.  *See* Pls' Ex. 2 at § II; *see also* Pls' Ex. 12 at § I.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

documents, contacted them by phone or in person to instruct them to retain such documents, and started to collect the documents. *See id.* at ¶ 5-7. That same day, Segal instructed Oracle's IT department to preserve any existing disaster recovery tapes covering the time period at issue in the complaints. *See id*. at ¶ 8. The next day, Segal sent an email with the first of several written document preservation notices to a group of Oracle's most senior executives, as well as those of their direct reports with responsibility for the matters discussed in the complaint, namely, financial forecasting, Oracle's Suite 11i products, and Oracle's $1 billion savings marketing campaign. *See id.* at ¶ 10. This initial e-mail indisputably went to the "key players" likely to have relevant documents. The group included CEO Larry Ellison; CFO Jeffrey Henley; EVPs Edward "Sandy" Sanderson and George Rogers; Chief Marketing Officer Mark Jarvis; and Controller Jennifer Minton, each of whom was alleged to have made false or misleading statements during the class period, as well as to many of their executive assistants. *See id*. at ¶¶ 9-15. These persons are collectively referred to as "the Speakers."

Segal also sent this initial preservation e-mail to persons likely to have communicated with the Speakers regarding the matters in the complaint. Segal sent this initial notice to those of the Speakers' direct reports who had responsibility for various aspects of financial forecasting and other financial matters, and to the heads of various business units, who were responsible for forecasting his or her unit's results. This included the heads of the three U.S. sales divisions (OSI, OPI and NAS). *Id.* at ¶¶ 13-15. Segal also sent the email to the heads of Oracle's Education and Support divisions, as well as to the several executives responsible for developing Suite 11i. *See id.* at ¶ 16. This initial e-mail also went to Safra Catz; SVP and General Counsel Daniel Cooperman; and others. *See id.* at ¶ 17-18; 27.

### 2.   Follow-Up Preservation Efforts

Segal's initial emails were just the beginning of Oracle's preservation efforts. Segal and her staff conducted much of the follow-up preservation and collection efforts in person, investigating the facts and collecting potentially relevant documents as they were discovered. *See id.* at ¶ 22. Through this process, Segal identified a number of additional employees with potentially relevant documents. *Id.* After identifying these employees, Segal either gathered

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

4

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

potentially relevant documents immediately, without sending a written notice, or sent them preservation notices and collected documents later. *See id.* at ¶¶ 22-26, 28. Moreover, while Segal and her staff were preserving documents for this case, they were also collecting and producing documents to plaintiffs in the California and Delaware derivative lawsuits and to the Special Litigation Committee ("SLC"). *See id.* at ¶¶ 38-39. Given the substantially overlapping factual issues, the collection and production of documents in those matters further ensured that documents relevant to this case were preserved.

As Plaintiffs filed several amended complaints with new allegations, Segal and her staff continued their efforts to locate and secure potentially relevant documents. On October 11, 2002, for example, Plaintiffs filed a Second Amended Complaint that included allegations concerning Oracle's accounting during the second quarter of fiscal year 2001. Segal issued new document preservation notices to employees responsible for the relevant accounting functions, then followed up with a reminder and preservation notice to a broader group. *Id.* at ¶ 34.

### C. The 2002 "Unapplied Cash Project" Did Not "Alter" Or "Destroy" Evidence Regarding Plaintiffs' Accounting Claims

The accounting fraud claim Plaintiffs first asserted in October of 2002 was based on the creation of approximately 46,000 "debit memos" on November 17, 2000. Plaintiffs alleged that through these debit memos, Oracle improperly recognized more than $228 million in revenue in a single day. *See* Defs' Ex. 2, at ¶¶ 36-43. Two years of discovery have revealed what Defendants have said all along: the debit memos involved simultaneous and offsetting debits and credits to the same account in the same amount, and therefore did not have any impact on Oracle's financial statements. Pls' Ex. 15 at ¶ 5; Pls' Ex. 34 at 165:2-11; Pls' Ex. 55 at 143:3-23; Defs' Ex. 3 at 10-14; Defs' Ex. 4 at 149:4-17. Plaintiffs' own accounting expert conceded this fact. Defs' Ex. 5 at 208:22-209:12, 213:11-20, 214:24-215:11. The purpose of the debit memos was to eliminate "On Account" flags from the company's accounts receivable subledger. Pls' Ex. 15 at ¶ 5. These flags had been used by Oracle's collections staff to notify others that they should not attempt to apply a "flagged" receipt to an open invoice because it already had been resolved. *Id.* at ¶ 25; Defs' Ex. 6 at 15. Oracle's accounting staff decided to eliminate the

flags in anticipation of Oracle's internal upgrade to Suite 11i.  Pls' Ex. 55 at 109:24-110:10.

When Plaintiffs first asserted the "debit memo" claim, Oracle began investigating it.  In the process, Oracle discovered a separate accounting issue.  Defs' Ex. 3 at 19-20. Beginning as early as 1998 (and continuing into 2002), certain receipts had been transferred to a bad debt reserve account.  *Id.* at 14; Pls' Ex. 11 at ¶ 4. To ensure that the transfers were proper, Oracle's accounting staff reversed many of the transfers and investigated each transfer in detail.  Defs' Ex. 4 at 214:23-215:3; Defs' Ex. 3 at 19-20.  This project (the "2002 'unapplied cash project'") was not a "second accounting clean up."  Supp. Sub. at 21.  More importantly, as discussed below, the project did not impact the accounting for the November 2000 debit memos or alter the audit trail of any transaction.

### D. Defendants' Discovery Obligations Regarding Plaintiffs' Accounting Claims Evolved Over Time

As discovery commenced in late 2004 and early 2005, Plaintiffs sought documents regarding the now-discarded "debit memo" claim.  Plaintiffs also sought discovery regarding the 2002 "unapplied cash project" and the transfer of certain unapplied cash to a bad debt reserve account during the second quarter of Oracle's 2001 fiscal year.  Contrary to Plaintiffs' suggestion that Defendants were ordered to produce the same materials several times (Supp. Sub. at 24-27), the scope of Defendants' accounting-related discovery obligations evolved substantially during more than two years of fact discovery.

As part of the Discovery Plan, Magistrate Judge Spero ordered Defendants to produce all documents relating to the November 17, 2000 "On Account" cleanup.  Pls' Ex. 43 at 2. However, on October 19, 2005, Judge Spero limited Defendants' obligations by requiring them only to produce electronic information relating to debit memos in amounts exceeding $100,000, and paper documents for debit memos exceeding $1 million.  Pls' Ex. 47.[3]  Not satisfied, on May 24, 2006, Plaintiffs moved to compel additional discovery into *all* 46,000-plus debit memos, as

---

[3] Although Plaintiffs contend that Defendants "failed to comply with the October 19, 2005 Order by refusing to produce any documents relating to a 'sampling' of the smaller debit memo items" (Supp. Sub. at 25), the October 19, 2005 Order did not require Defendants to produce a "sampling"—indeed, Plaintiffs never proposed a sample— of documents relating to smaller debit memos.  Pls' Ex. 47.  That production was not called for until a subsequent order by Special Master Infante.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   well as discovery into two new areas—namely, the transfer of certain unapplied cash to a bad

2   debt reserve account in 2000 and the 2002 "unapplied cash project."  Pls' Ex. 50 at 10.  On July

3   17, 2006, the Special Master granted Plaintiffs discovery into a sample of 150 debit memos in

4   amounts less than $100,000, and allowed discovery into the bad debt transfers *only* to the extent

5   that the accounting history of the underlying transactions also included one of the 776 debit

6   memos covered by the October 19, 2005 Order (*i.e.*, over $100,000).  *Id*. at 17.  However, the

7   Special Master denied Plaintiffs' request for discovery into all 46,000-plus debit memos and

8   Plaintiffs' request for documents relating to the 2002 "unapplied cash project."  *Id.*

9        On October 30, 2006, Plaintiffs moved yet again for additional discovery into the 2Q01

10  bad debt transfers and the 2002 "unapplied cash project."  On December 19, 2006, Special

11  Master Infante granted Plaintiffs' request for additional discovery relating to the bad debt

12  transfers and, for the first time, allowed discovery into the 2002 "unapplied cash project."  Pls'

13  Ex. 13 at 23.  The Special Master's order did not suggest that either the additional documents

14  regarding the bad debt transfers or documents concerning the 2002 "unapplied cash project" had

15  been called for by any prior orders.  Instead, the Special Master simply concluded that the

16  evidence was "reasonably calculated to discovery of admissible evidence" and that the burden of

17  producing the evidence was outweighed by its likely benefit.  *Id.* at 19-20.

18        **E.    Discovery of *SOFTWAR*-Related Materials**

19        The book *SOFTWAR: An Intimate Portrait of Larry Ellison and Oracle* was published in

20  September 2003.  *See* Pls' Ex. 110.  The book's author, Matthew Symonds, is the political editor

21  of *The Economist* magazine and lives in the United Kingdom.  *Id*. at back flap.  Ellison, who was

22  interviewed for the book (*id*. at xi-xii, 1-11), also submitted commentary on the text of the book.

23  *See, e.g., id.* at 3, 48-49, 63, *passim*.  Although Plaintiffs had long been aware of the book (and

24  spent several hours questioning Ellison about it during his September 21, 2006 deposition (*see*

25  Pls' Ex. 117 at 334:14 – 414:10), Plaintiffs never specifically requested documents regarding

26  *SOFTWAR* during the course of fact discovery.  The book is not mentioned in a single one of the

27  seventy-four document requests or forty-nine interrogatories that Plaintiffs issued during the

28  nearly two years of fact discovery after the book's publication.  *See* Pls' Exs. 199, 200; Defs'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  Exs. 7, 8, 9, 10.  On October 10, 2006—after the twice-extended close of fact discovery—

2  Plaintiffs made their very first request for the transcripts, working papers, and interview tapes

3  created in preparation for *SOFTWAR*. Defs' Ex.11.

4        On October 30, 2006, Plaintiffs filed a motion to compel all of the materials created in

5  preparation for *SOFTWAR*.  *See* Defs' Ex. 12.  Shortly thereafter, Defendants' counsel, Patrick

6  Gibbs, called Symonds to inform him of the motion and ask him not to dispose of any

7  *SOFTWAR* materials.  Pls' Ex. 214.  Symonds then called Ellison and told him that he was upset

8  because he is a journalist and Plaintiffs were pursuing his personal notes and files.  Pls' Ex. 179

9  at 573:1-5.  Ellison told Symonds that there was nothing he could do about Plaintiffs seeking

10  these records.  *Id.* at 573:6-11.

11        The Special Master largely denied Plaintiffs' motion, finding that most of the requested

12  materials were not reasonably calculated to lead to the discovery of admissible evidence.  Defs'

13  Ex. 13, at 4-5.  However, the Special Master found that a portion of what Plaintiffs requested—

14  namely, "tape recordings and/or transcripts of interviews with Ellison created in preparation of

15  [*SOFTWAR*]"—appeared reasonably calculated to lead to the discovery of admissible evidence.

16  *Id.*  The Special Master ordered Defendants to produce those interview recordings and transcripts

17  after concluding that, although Ellison did not have physical possession of them, he had the legal

18  right to obtain them from Symonds.  *Id.* at 4.

19        After Defendants received the order and considered their response, Defendants' counsel

20  contacted Symonds, provided him with the Order, and demanded that he turn over copies of any

21  and all tapes and transcripts of interviews with Ellison.  Pls' Ex. 213.  Additionally, Ellison

22  personally contacted Symonds in early January to ask him to produce the materials.  Pls' Ex. 179

23  at 574:1-576:13.  During this call, Ellison said he suspected that Plaintiffs would harass him

24  about certain personal information that he had disclosed in the course of the interviews that was

25  unrelated to this litigation.  *Id.* at 576:5-7.  Symonds expressed the view that nothing in the

26  materials supported Plaintiffs' case, as well as his frustration, as a journalist, that the Special

27  Master had ordered production of his materials.  *Id.* at 575:13-18.  Ellison followed up this call

28  with a letter repeating his request that Symonds produce the materials (*Id.* at 574:1-23; 578:22-

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

8

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

579:3; Defs' Ex. 14), and repeated this request in subsequent conversations. Pls' Ex. 179 at 643:8-645:13.

One day after being informed of the Special Master's Order, Symonds told Defendants' counsel that, although he still had hard copy transcripts of certain interviews with Ellison, he no longer had possession of the laptop computer on which he had stored electronic copies of the recordings and transcripts of his interviews. Pls' Ex. 214. Defendants' counsel relayed this information to Plaintiffs' counsel, and then spent several days trying to convince Symonds to turn over the hard copy transcripts still in his possession. *Id.*; *see also* Pls' Exs. 216, 222. After learning of Symonds' statements, Plaintiffs requested leave to issue Letters Rogatory to the United Kingdom High Court so that they could seek discovery from Symonds and the computer repair shop where he claimed he left the computer on which the audio files and transcripts were stored. See Defs' Ex. 15. Defendants did not object to this discovery.

Though he continued to argue that the materials were his sole property, Symonds provided Defendants with approximately 200 pages of transcripts, which Defendants produced to Plaintiffs the next business day. Defs' Exs. 16, 17; Pls' Ex. 222. Symonds' cover letter to this production, which Defendants also produced to Plaintiffs, referred specifically to Symonds' communications with Ellison. *See* Pls' Ex. 206.

In the following days and weeks, Symonds told Defendants' counsel a series of different stories about the computer. Defendants relayed the content of these conversations to Plaintiffs' counsel in real time. *See* Pls' Ex. 220; Defs' Exs. 16, 18, 19. In so doing, Defendants made clear that they were merely relaying what Symonds had said. *See* Defs' Exs. 18, 19.

## II.   PLAINTIFFS DO NOT COME CLOSE TO MEETING THE STANDARD FOR DEFAULT JUDGMENT

Plaintiffs' Supplemental Submission focuses almost exclusively on Plaintiffs' request for a default judgment.[4] *See* Supp. Sub. at 3-7. Plaintiffs never clearly articulate a single standard

---

[4]  As discussed in section VII below, Plaintiffs' Supplemental Submission briefly alludes to sanctions short of default judgment, but does not identify any specific lesser sanctions, nor does it include any argument or authority in support of sanctions other than default judgment.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

9

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

for terminating sanctions based on alleged spoliation of evidence, but instead cherry-pick bits and pieces of different formulations, all for the apparent purpose of diluting the standard. However, the standard for entering default judgment for spoliation is daunting, and is reserved for cases involving egregious conduct that fundamentally undermines the integrity of judicial proceedings.  Plaintiffs cannot meet this standard here.

### A.    Plaintiffs Bear A Heavy Burden In Requesting Default Judgment.

As an initial matter, Plaintiffs cannot obtain *any* spoliation sanctions absent proof that: (1) Defendants destroyed evidence they controlled and were obligated to preserve (*i.e.*, evidence Defendants knew or should have known was relevant to a pending or threatened lawsuit); (2) Defendants destroyed the evidence with a "culpable state of mind" that was at least "willful"; and (3) the allegedly destroyed evidence, as judged by a reasonable trier of fact, "would have supported" Plaintiffs' claims.  *Zubulake v. UBS Warburg LLC* ("*Zubulake V*"), 229 F.R.D. 422, 430 (S.D.N.Y. 2004)[5]; *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490CW, 2005 U.S. Dist. LEXIS 40088, *10 (N.D. Cal. Dec. 20, 2005); *Hous. Rights Ctr. v. Sterling*, No. CV 03-859DSF, 2004 U.S. Dist. LEXIS 28877, *35-36 (C.D. Cal. Dec. 6, 2004); *see also* 15 U.S.C. § 78u-4(b)(3)(C)(ii).  Whether Plaintiffs can show prejudice is a "key factor" in evaluating sanctions.  *Henry v. Gill Indus., Inc.*, 983 F. 2d 943, 948 (9th Cir. 1993); *see also Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990); Pls' Ex. 9 at 39:20-22.

A request for the most severe sanction available—a default judgment—imposes an even higher burden.  This drastic remedy is appropriate only where a party has "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings…, willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  Thus, in addition to the *Zubulake* factors, the court must consider:

> (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, and (4) the relationship or nexus between the misconduct drawing the default sanction and the matters in controversy in the case.

---

[5] Plaintiffs previously agreed that *Zubulake* sets the standard for obtaining sanctions for alleged spoliation.  *See* Pls' Ex. 5 at 5.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

10

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

*In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1070 (N.D. Cal. 2006) (*citing Halaco Eng'g Co. v. Castle*, 843 F.2d 376, 380 (9th Cir. 1988)).  Finally, appellate courts consider whether, before entering a default judgment for alleged spoliation, the trial court "(1) explicitly discussed the alternative of lesser sanctions and explained why it would be inappropriate; (2) implemented lesser sanctions before ordering the case dismissed; and (3) warned the offending party of the possibility of dismissal."  *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004).

### B.  Plaintiffs' Attempt To Dilute The Standard Is Unfounded

Plaintiffs' Supplemental Submission attempts to dilute this standard on two fronts.  First, Plaintiffs attempt to eliminate any meaningful state of mind requirement, arguing for a standard that approaches strict liability as long as a party "should have known" or had "some notice" that documents were potentially relevant.  *See* Supp. Sub. at 3.  Second, having failed to demonstrate prejudice below (*see* Pls' Ex. 9 at 39:20-22), Plaintiffs now seek to eliminate any consideration of prejudice, arguing that consideration of prejudice is "optional."  Supp. Sub. at 5.  In each case, Plaintiffs grossly distort the relevant case law.

### 1.  Default Is Inappropriate Absent Highly Culpable Conduct

While purporting to acknowledge that the Court make a finding of "willfulness, fault *or* bad faith" to enter default judgment as a sanction, Plaintiffs go on to suggest that "fault" requires nothing more than that a party's failure to preserve evidence it "knew or should have known" was relevant to "litigation or potential litigation."  *Id.*  Plaintiffs also argue that "willfulness" means only that the non-moving party had "some notice" that the allegedly destroyed documents were "potentially relevant" to the litigation.  *Id.*  Plaintiffs' proposed "state of mind" requirement is flatly inconsistent with both the PSLRA and the common law.

The plain language of the PSLRA sets a baseline requirement of a "willful[]" violation, providing that "[a] party aggrieved by the *willful* failure of an opposing party to comply with [the preservation requirements] may apply to the court for an order awarding appropriate sanctions."  15 U.S.C. § 78u-4(b)(3)(C)(ii) (emphasis added).  Given Plaintiffs' own claim that the PSLRA imposes broader preservation obligations than the common law (Supp. Sub. at 9), Plaintiffs

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

11

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    cannot ignore the mental state requirement embodied in the statute.  *Id.*; *see also In re Unum*

2    *Provident Corp. Sec. Litig.*, No. 1:03-CV-049, 2003 U.S. Dist. LEXIS 24412 (E.D. Tenn. Dec.

3    29, 2003).

4         Even setting aside the PSLRA, Plaintiffs' proposed state of mind requirement has no

5    basis in the case law.  Plaintiffs argue, for example, that "[b]ad faith is not required" for default

6    sanctions.  Supp. Sub. at 3.  For that proposition, however, Plaintiffs cite language from Judge

7    Patel's opinion in *Napster* discussing the standard for spoliation sanctions generally, not

8    terminating sanctions.  *See Napster*, 462 F.Supp. 2d at 1066.  In fact, Plaintiffs do not cite a

9    single case imposing default sanctions without a finding of bad faith.[6]  Plaintiffs mis-cite *Leon*

10   for the proposition that "some notice" of potential relevance is enough to prove "willfulness."

11   Supp. Sub. at 3.  As the cited passage makes clear, however, the *Leon* court was discussing the

12   degree of relevance necessary to support sanctions, not the degree of culpability required.  *Leon*,

13   464 F.3d at 959 (quoting *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1001 (9th Cir.

14   2002)).  This is clear both from the *Leon* court's discussion of the issue, *see Leon*, 464 F.3d at

15   959 (citing "some notice" language from *Kitsap*, rejecting any "presumption of irrelevance," and

16   specifically rejecting plaintiffs' claim that the destroyed materials was not relevant because they

17   were "personal"), as well as the *Kitsap* opinion cited by the *Leon* court.  *See Kitsap*, 314 F.3d at

18   1001 (noting that spoliation requires "some notice" of potential relevance to litigation and

19   finding that the records in question were destroyed before defendant had any reason to anticipate

20   litigation involving those records).

21

22

---

23   [6]  Plaintiffs cite only four cases where a Court imposed default judgment, and all of them
     involved findings of intentional, egregious, and bad faith conduct.  *See Brotby*, 364 F.3d at 1115;
24   *Anheuser-Busch*, 69 F.3d at 350-52; *Leon*, 464 F.3d at 958; *In re Telxon*, No. 5:98CV2876, 2004
     U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004).  The remaining cases Plaintiffs cite either
25   declined to impose default judgment or never even considered it.  *See Halaco Engineering Co. v.*
     *Costle*, 843 F.2d 376, 378 (9th Cir. 1988); *AdvantaCare Health Partners v. Access IV*, No. 03-
26   04496 JF, 2004 U.S. Dist. LEXIS 16835, at *16-17 (N.D. Cal. Aug. 17, 2004); *Napster*, 462 F.
     Supp. 2d at 1066; *Juniper Networks, Inc. v. Toshiba America, Inc.*, No. 2:05-CV-047, 2007 U.S.
27   Dist. LEXIS 50096, at *10-*11 (E.D. Tex. July 11, 2007); *Ameripride Servs. v. Valley Indus.*
     *Serv.*, No. S-00-113 LKK, 2006 U.S. Dist. LEXIS 59398, at *31-32 (E.D. Cal. Aug. 8, 2006);
28   *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

12

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    In *Leon*, moreover, the plaintiff admitted he had destroyed electronic files intentionally;

2  the only issue before the court was whether he was aware that electronic files on his employer-

3  issued computer were potentially relevant to litigation over the termination of his employment.

4  *Leon*, 464 F.3d at 959.  The district court found that the plaintiff had acted in bad faith, a finding

5  the Ninth Circuit did not disturb.  *Id.*  Nothing in *Leon* supports Plaintiffs' argument that "some

6  notice" of potential relevance, without more, is enough to show a "culpable state of mind" for

7  purposes of default sanctions.  On the contrary, the Ninth Circuit and other courts have made

8  clear that the harsh sanction of default judgment is reserved for "extraordinary circumstances"

9  involving the very highest degree of culpability, regardless of whether it is characterized as "bad

10 faith" or "fault" or "willfulness."  *See id.* at 958; *Anheuser-Busch v. National Bev. Distribs.*, 69

11 F.3d 337, 348 (9th Cir. 1995).

12         **2.        Default Is Inappropriate Absent Proof Of Prejudice**

13         "[S]anctions which interfere with the litigants' claim or defenses violate due process

14 when they are imposed merely for punishment of an infraction that did not threaten to interfere

15 with the rightful decision of the case."  *Wanderer*, 910 F.2d at 656 (citing *Wyle v. R.J. Reynolds*

16 *Industries, Inc.*, 709 F.2d 585, 591 (9th Cir. 1983))  Thus, the Ninth Circuit repeatedly has "held

17 the element of prejudice to be *essential*" in cases involving terminating sanctions.  *Id.*; *see also*

18 *Henry*, 983 F. 2d at 948 (prejudice a "key factor" that "must be considered"); *Phoceene Sous-*

19 *Marine, S.A. v. U.S. Phosmarine, Inc.,* 682 F.2d 802, 806 (9th Cir. 1982) (reversing default

20 where deception was "peripheral" and did not cause prejudice).  The Special Master in this case

21 agreed (Pls' Ex. 9 at 39:20-22), as have courts in other jurisdictions.  *See*, *e.g.*, *Residential*

22 *Funding Corp. v. DeGeorge Financial Group*, 306 F.3d 99, 108-09 (2d Cir. 2002).

23         Plaintiffs nonetheless argue that an evaluation of prejudice is "optional" in the Ninth

24 Circuit.  *See* Supp. Sub. at 12 (citing *Anheuser-Busch* and *Halaco*).[7]  As an initial matter, the

25 weight of authority in the Ninth Circuit declines to impose spoliation sanctions absent prejudice,

26 even when the accused party has acted with a high degree of fault.  *See Leon*, 464 F.3d at 959-60

27 _____

[7]  Judge Patel's opinion in *Napster* does not support the entry of default judgment absent a
28 showing of prejudice.  The court in *Napster* expressly considered the question of prejudice, and
in any event declined to enter default judgment.  462 F. Supp. 2d at 1075-77.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   (sanctions appropriate because Leon's destruction of "at the heart of IDX's defense…threatened

2   to distort the resolution" of the case); *see also Wiltec Guam, Inc. v. Kahalu Constr. Co.*, 857 F.2d

3   600, 603-04 (9th Cir. 1988) (prejudice inquiry must "look[] to whether the [spoiling party's]

4   actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the

5   rightful decision of the case.").  Plaintiffs do not cite a single case imposing default judgment—

6   or even lesser sanctions—without a finding of prejudice.  To the extent that *Anheuser-Busch* or

7   *Halaco* suggests that prejudice is "optional" in this context, the language is dicta.  The *Halaco*

8   court *reversed* the entry of default (843 F.2d at 378), and the *Anheuser-Busch* case included

9   specific findings of prejudice.  69 F.3d at 353-54.  Moreover, *Anheuser-Busch* involved a clear

10  finding of deceptive, bad faith conduct: one party refused to take possession of her own

11  documents back from the police after a fire and then lied to the court and the opposing party,

12  claiming they had been destroyed in the fire.  69 F.3d at 350-51.[8]  Thus, even without a finding

13  of prejudice, the result in *Anheuser-Busch* is consistent with the view that prejudice may be

14  inferred from bad faith conduct.  *See, e.g., Hamilton*, 2005 U.S. Dist. LEXIS 40088 at *23.

15          Even if prejudice were an "optional" consideration, Plaintiffs articulate no reason why

16  this Court should not consider it (as the Special Master properly did).  Plaintiffs are requesting

17  default judgment for alleged spoliation despite having received millions of pages of documents

18  and dozens of depositions, all on top of a record characterized as "massive" by the Delaware

19  court.  Surely even if "optional," it would be both fair and appropriate for the Court to consider

20  (as the Special Master did) the question of whether Plaintiffs can show any prejudice.

21  **III.     DEFENDANTS DID NOT "FAIL[] TO PRESERVE EVIDENCE IN BAD FAITH"**

22          Plaintiffs first argue that default judgment should be entered because Defendants "failed

23  to preserve evidence in bad faith."  Supp. Sub. at 8-20.  This portion of Plaintiffs' Supplemental

24  Submission largely repeats the arguments that Plaintiffs first made in their Motion to Compel

25  before the Special Master (and in their Objection to the Special Master's order denying their

26  Motion to Compel).  *See* Pls' Ex. 1; Pls' Ex. 5.  As discussed below, Plaintiffs' attacks on

27

28
_____
[8]  *Juniper Networks, Inc. v. Toshiba America, Inc.*, likewise involved a "willful and intentional"
violation of a discovery order.  *See Juniper Networks*, 2007 U.S. Dist. LEXIS 50096, at *10-*11.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

14

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

Defendants' document preservation efforts do not come close to justifying a default judgment or any kind of evidentiary sanction. Plaintiffs cannot identify a single document that they should have received in discovery, but did not, as a result of any deficiencies in Defendants' document preservation efforts. Plaintiffs also cannot show that any of the Defendants acted with a "culpable state of mind" or that Plaintiffs suffered any prejudice from the loss of any evidence.

## A.   Plaintiffs' Argument That Defendants Should Have Begun Preserving Documents Months Before The Earnings Miss Is Absurd

Plaintiffs' argument begins with the ridiculous suggestion that Defendants should have begun preserving documents as soon as Ellison began trading on January 22, 2001, months before the earnings miss or any litigation arising out of it. Supp. Sub. at 8. Plaintiffs go on to argue that Defendants should have begun preserving documents when the earnings miss was announced, even though no lawsuits had been filed or even threatened. *Id.* While courts have held that document preservation duties may begin prior to the filing of litigation, such cases have arisen in the context of a specific threatened lawsuit involving identifiable parties and likely claims. *See, e.g., Napster*, 462 F.Supp. 2d at 1070; *Zubulake V*, 220 F.R.D. at 218. Specific litigation must be "probable" to impose a preservation duty; where "the path to litigation [is] neither clear nor immediate," a party is not yet under a duty to preserve. *Hynix Semiconductor, Inc. v. Rambus Inc.*, No. C-00-20905 RMW, 2006 U.S. Dist. LEXIS 30690 (N.D. Cal. 2006) (duty to preserve had not attached even though party had begun "to plan a litigation strategy").

Here, there was no clear or immediate path to litigation. How were Defendants to predict what claims a hypothetical shareholder might assert? How were Defendants supposed to know how long a class period the hypothetical shareholder might seek to have certified? How was a Defendant such as Sandy Sanderson, who sold no stock during 3Q01, supposed to know he would be named in these yet-to-be filed lawsuits? Plaintiffs do not cite a single authority for the proposition that the abstract possibility of a shareholder strike suit is enough to impose a duty to preserve documents. In any event, Plaintiffs cite absolutely no evidence that any relevant documents were lost between March 1 and 13, 2001. *Compare, e.g., Napster*, 462 F. Supp. at 1070 (three-year delay between date the duty to preserve arose and date complaint was filed).

**B.    Plaintiffs' Attacks On Defendants' Preservation Efforts Are Unfounded**

Plaintiffs' claim that Defendants failed to preserve evidence is based largely on a series of attacks on the process through which Defendants preserved documents.  Ignoring the far more important question of what documents were, in fact, preserved and produced to them, Plaintiffs complain instead about who received formal document preservation instructions (and who allegedly did not), and which internal groups were "categorical[ly]" included in Defendants' document preservation efforts.  *See* Supp. Sub. at 12.  These arguments fail for several reasons.

First, they are based on a blatant mischaracterization of Defendants' preservation efforts.  Plaintiffs suggest, for example, that if an employee did not receive a written preservation memo, that employee's documents were necessarily lost.  *Id.* at 9, 11, 12.  Plaintiffs know this is not true.  Segal, the Oracle in-house attorney responsible for overseeing Oracle's preservation of documents for this case, testified that the written preservation memos were just the first step in an ongoing process of instructing witnesses to preserve evidence, gathering potentially relevant documents, and continually investigating whether additional employees might have relevant materials.  *See* Pls' Ex. 78 at 234:20-236:1.  In many cases, after learning that an employee might have relevant documents, Segal collected the documents immediately rather than first sending a formal preservation memo.  *See id.* at 244:5-8; Defs' Ex. 1 at ¶ 22-26, 28.  Plaintiffs' focus on the written preservation memos, to the exclusion of Segal's other efforts, is deceptive.[9]

Indeed, Plaintiffs' reference to Michael Cochran, Gayle Fitzpatrick, Keith Block, Ken Hamel, and Kirsten Shaw (Supp. Sub. at 10) is particularly misleading.  Segal agreed that documents from the files of these employees were relevant, but she also testified that she and her

---

[9]  For the same reason, Plaintiffs' claim that Defendants "relied upon non-attorneys" to carry out document preservation is baseless.  Segal's initial preservation email instructed the recipients to pass along the document preservation instructions to other employees who might have relevant documents, but Segal's testimony makes clear that she did not "rel[y]" on them to do so.  Instead, Segal and her staff personally investigated to determine whether any additional Oracle employees had potentially relevant documents, and when they did, she secured them.  *See* Pls' Ex. 78 at 289:6-290:2; Defs' Ex. 1 at ¶¶ 28, 34.  Although Plaintiffs complain that Sandy Sanderson did not direct his direct reports to preserve documents, Segal testified that she spoke directly with many of Sanderson's direct reports after the claims were filed, including Richard Blotner, Susan Marks, Stephen McLaughlin, Mark Salser, and Shari Simon.  Defs' Ex. 1 at ¶¶ 14, 24.  Moreover, Oracle has produced over 6,500 pages of responsive documents from the files of Mr. Sanderson's direct reports.  *See* Pls' Ex. 2 at 26-27; Pls' Ex. 62.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

16

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    team met with each of them to secure any relevant materials in their possession.  *See* Pls' Ex. 78

2    at 217:6-218:2.  The proof is in Defendants' actual production, which included over 5,000 pages

3    of documents from the files of these witnesses.  *See* Pls' Ex. 62.

4          Moreover, none of the "escalation managers" Plaintiffs reference (Supp. Sub. at 12-13)

5    was within the scope of the Discovery Plan; they were lower-level employees in the development

6    group, none of whom Plaintiffs ever sought to depose.  *See* Pls' Ex. 43 § I.B.  Plaintiffs did not

7    seek any discovery relating to "escalation managers" until late in 2006, at which time the

8    Discovery Plan was amended to require Oracle to search the files of just six "escalation

9    managers" identified by Plaintiffs.  *See* Defs' Ex. 20.  Given that Plaintiffs only identified six

10   "escalation managers" when they requested this discovery, Plaintiffs' reference to "over 40

11   escalation managers" they "identified" at Oracle is disingenuous – Plaintiffs never moved to

12   compel (and Defendants were never ordered to produce) documents from "over 40" escalation

13   managers, so Plaintiffs have no idea whether documents from those 40 plus escalation managers

14   were preserved.[10]  After the Discovery Plan was modified, Defendants produced over 1,200

15   pages of documents from the files of two of the six individuals added to the Discovery Plan,

16   including Cox, whose documents clearly were preserved.  Pls' Ex. 62.  Defendants also produced

17   over 380 pages of documents sent to or received by Tate (though not from his files).  *See*

18   Declaration of Jennifer A. Kolin, filed herewith, at ¶ 3.  Plaintiffs do not cite a shred of evidence

19   that any relevant documents sent or received by these witnesses (or any other Oracle custodian)

20   were lost, let alone any evidence of prejudice from the purported loss of any such documents.

21          Second, Plaintiffs complain about various categories of employees that did not receive

22   document preservation notices.  But they make absolutely no showing that all employees within

---

23   [10]  Plaintiffs initially demanded that Oracle search the entire company for all "escalation reports"

24   and all "documents and communications relating to 'hot' or 'warm' . . . customer escalations . . .
     ."  *See id.* at Ex. A; Defs' Ex. 51 at 18:12-19:15 and Defs' Ex. 52 at 1.  The Special Master

25   correctly rejected this request because "[t]his is not a case involving customer lawsuits" but "is a
     case of alleged securities fraud in which [Plaintiffs] allege forecasts were known by ***senior***

26   ***management*** well before the end of the class period to be problematic, somewhat caused by the
     Suite 11i product."  Defs' Ex. 51 at 18:12-19:15 (emphasis added).  The Special Master ordered

27   Oracle to search the files of the six escalation managers Plaintiffs had identified as a "cross-
     check" on a the broader production of documents related to a specific list of customers to be

28   identified by Plaintiffs.  Defs' Ex. 51 at 19:2-15; 21:1-7 (emphasis added); Defs' Ex. 20.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    those categories would have had relevant documents, let alone that any specific relevant

2    documents were lost.  For example, based solely on Segal's inability to recall—over five years

3    after the fact—the names of the "U.S. sales and management" personnel with whom Jeff Henley

4    discussed Oracle's sales during the quarter (Supp. Sub. at 10), Plaintiffs simply assume that the

5    files of those personnel were not preserved.  But the record is clear that Segal sent written

6    document preservation instructions to, among others, the heads of Oracle's U.S. sales units;

7    finance personnel both at headquarters and within the U.S. sales divisions; as well as Jennifer

8    Minton (the Senior Vice President who was responsible for Oracle's internal forecast) and her

9    staff.  *See* Defs' Ex. 1 at ¶ 15-16.  Segal also collected documents from a number of additional

10   employees, including employees with sales and forecasting-related responsibilities.  *See id*.

11   Despite the fact that Plaintiffs have received millions of pages of paper documents and deposed

12   dozens of Oracle witnesses, Plaintiffs' Supplemental Submission does not identify a single

13   member of "U.S. sales and management" whose documents were not preserved, much less that

14   those documents "would have supported" Plaintiffs' case.

15           In that regard, Plaintiffs' suggestion that Oracle should have issued a preservation notice

16   to all 40,000 of its employees, or even all of its salespeople (*see* Supp. Sub. at 10) is absurd.

17   Plaintiffs' own authorities make clear that only the files of "key players" must be preserved.  *See*

18   *Zubulake V*, 229 F.R.D. at 433-34 (*citing Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-

19   18 (S.D.N.Y. 2003) ("*Zubulake IV*").  Indeed, after extensive briefing and argument over the

20   scope of the files Oracle would have to search, Magistrate Judge Spero only required Oracle to

21   search the files of a limited number of "Custodians" identified in the Discovery Plan.  *See* Pls'

22   Ex. 43 at § I.B.  Thus, in effect, Plaintiffs are complaining about Defendants' alleged failure to

23   produce documents that Defendants were never required to produce.[11]

24           The same is true of Plaintiffs' complaint that Defendants made no "categorical" effort to

25   preserve the documents of all employees within various business units, such as General

26   Business, the "support organization," "escalation managers," the "consulting organization,"

27   _____

[11]  Plaintiffs' citation to Dr. Hubbard's report (Supp. Sub. at 11) does not change this analysis.
28   Plaintiffs' expert had access to the same materials as Dr. Hubbard, and nothing in Dr. Hubbard's
     opinion suggests that Defendants should have preserved the documents of its entire sales force.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    "regional sales managers" and—most absurdly—"salespersons in general."  *See* Supp. Sub. at

2    10-11.  Oracle was not required to produce documents from the files of most of these individuals,

3    and the notion that Defendants should suffer default judgment for failing to "categorically"

4    preserve files it was not even required to preserve under the Discovery Plan is absurd.  Indeed,

5    the fact that Oracle did not systematically send formal document preservation memos to entire

6    business units does not mean that any relevant documents were lost at all.  On the contrary,

7    Defendants' document production did, in fact, include documents from the very business units

8    and organizations Plaintiffs cite, including the General Business unit (*e.g.*, George Roberts, Jay

9    Nussbaum); the support organization (*e.g.,* Michael Rocha, Dick Sellers); and the "escalation

10   managers" (*e.g.*, Kristen Shaw, Steve Cox).  *See* Pls' Ex. 62.

11        The Discovery Plan entered in 2005 required Oracle to search the files of its Area Vice

12   Presidents (or "AVPs") for responsive documents.  *See* Pls' Ex. 43 at § I.C; Defs' Ex. 21 at 2.

13   Oracle preserved and produced documents from the files of many AVPs (*see* Pls' Ex. 62), but

14   did not categorically preserve the files of every AVP in 2001, since it is the state of mind of the

15   Speakers – not every low-level employee at Oracle – that Plaintiffs must prove in a securities

16   case.[12]  *See* Pls' Ex. 14 at 14:9-15:25.  Communications between AVPs and the Speakers and

17   their direct reports were preserved and produced from the files of such persons.  *See id*. at 14:4-8.

18   And as the Special Master recognized in denying Plaintiffs' Motion to Compel, Plaintiffs cannot

19   show prejudice from Oracle's failure to categorically preserve the AVP files.  Pls' Ex. 9 at

20   39:20-23.  Plaintiffs' Supplemental Submission presents no reason to disturb the Special

21   Master's holding.  Plaintiffs have not cited a single, specific AVP document that was lost, let

22

23

---

24   [12]  As to emails, at least, Segal's March 12, 2001 instruction to the IT department to preserve
     disaster recovery backup tapes would have preserved emails from the files of the AVPs.  *See*
25   Defs' Ex. 1 at ¶ 8.  Below, however, the Special Master declined Plaintiffs' request to compel the
     restoration of those backup tapes because, among other things, Plaintiffs failed to show that the
26   tapes contained any relevant materials not already produced to Plaintiffs.  *See* Pls' Ex. 9 at 40:1-
     7 ("[T]he Court finds that there's not a sufficient showing that the backup tapes are likely to
27   yield additional useful information, considering what [Plaintiffs] do have in [their]
     possession…").  Plaintiffs do not appear to have appealed that aspect of the Special Master's
28   order.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

19

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  alone "extrinsic evidence" that such documents would have supported Plaintiffs' claims.[13]  *See*

2  *Hamilton*, 2005 U.S. Dist. LEXIS 40008 at *23 ("The moving party usually sets forth some type

3  of extrinsic evidence….This corroboration is especially important where the destruction is

4  merely negligent since there is no bad faith in such cases from which to infer the evidence would

5  have been detrimental to the spoliator.") (*citing Skeete v. McKinsey*, No. 91 Civ. 8093, 1993 U.S.

6  Dist. LEXIS 9099 at *7 (S.D.N.Y. 1993)).

7        Given Defendants' otherwise massive preservation efforts, there is absolutely no basis for

8  Plaintiffs' claim that the failure to systematically preserve the files of every AVP at the company

9  reflects the kind of "bad faith" or "willful" conduct necessary to justify default sanctions, or even

10 evidentiary sanctions.  Indeed, in ordering Oracle to search the AVP files, Magistrate Judge

11 Spero acknowledged that he was making a "gross call," and he expressed concern that he was the

12 person with the "least knowledge" about the "marginal utility" of the information from the

13 AVPs' files.  Pls' Ex. 14 at 17:4-8.   Judge Spero did not by any means suggest that Plaintiffs

14 were obviously entitled to the AVPs documents or that the AVPs' documents obviously should

15 have been preserved.  Indeed, the California and Delaware courts overseeing the related

16 derivative litigation did not order Oracle to produce documents from the files of the AVPs.  *See*

17 Defs' Ex. 22; Defs' Ex. 23.  The fact that some "Speakers" (such as Sanderson) sometimes

18 communicated with AVPs (Supp. Sub. at 10-11) does not mean that the AVPs' documents

19 should have been preserved *in toto*.

20        **C.    Plaintiffs' Complaints About Defendants' Document Production Are
             Likewise Unfounded**

21        Although Plaintiffs complain about various aspects of Defendants' document production,

22 Plaintiffs do not identify specific materials that should have been produced in discovery but were

23

24

25 _____

26 [13]   In that regard, it is telling that in trying to show that documents were lost, Plaintiffs repeatedly
    refer to oral communications between Speakers and AVPs (among others).  Supp. Sub. at 10-11.
27 Plaintiffs had ample opportunity to depose the Speakers and those who worked with them, but
    Plaintiffs have adduced no evidence that the AVPs regularly communicated important
    forecasting information to the Speakers in writing, let alone that any such documents were lost
28 because Oracle did not systematically preserve the files of every single AVP at the company.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  not, and Plaintiffs offer absolutely no evidence that Defendants acted with a "culpable state of

2  mind" or that any allegedly lost evidence "would have supported" Plaintiffs' claims.

3                    **1.       Ellison's Emails**

4         Plaintiffs complain, in various contexts, about the number of emails produced and

5  sourced to Ellison's files.  Supp. Sub. at 13-16.  In some instances, Plaintiffs claim that Ellison is

6  merely an example of a broader issue (*id.* at 14-15), although Plaintiffs cite no other examples,

7  and no evidence that any of their claims regarding Ellison applies to any other custodians.  But in

8  any event, as to Ellison, Plaintiffs' complaints fall into two categories—emails Ellison sent or

9  received before the lawsuit was filed and he received the preservation memo (*id.* at 15-16), and

10  emails Ellison sent or received after he received the preservation memo (*id.* at 13-14).

11         As an initial matter, Plaintiffs' reference to "less than 15 e-mails" from Ellison's files (*id.*

12  at 13) is misleading.  From the files of the Custodians as a group, Plaintiffs have received over

13  1,650 documents sent or received by Ellison before, during, and after the Class Period.  *See*

14  Declaration of Jennifer A. Kolin, filed herewith, at ¶ 4. When Plaintiffs refer to "less than 15 e-

15  mails," they are referring to emails sent or received by Ellison and sourced to him under the

16  Discovery Plan.  *See* Pls' Ex. 43 at §§ II.C.  The law is clear that Defendants had no duty to

17  preserve multiple copies of identical documents.  *See Wachtel v. Health Net, Inc.*, No. 01-4183,

18  2007 U.S. Dist. LEXIS 26308, at *10 (D.N.J. Apr. 10, 2007) ("Defendants are not required to

19  produce duplicates.").  As such, even if some of Ellison's post-March 13, 2001 emails were not

20  preserved (a fact Plaintiffs cannot prove), it would not support an award of sanctions at all, much

21  less the drastic remedy of default sanctions.[14]  Indeed, Plaintiffs are arguing that sanctions

22  should be imposed here because certain emails in one account were not preserved, and that

23  Plaintiffs believe this to be true because Plaintiffs *have the emails* from another account.  Special

24  Master Infante correctly rejected this argument because Plaintiffs have shown no prejudice

25  whatsoever.

26

27  _____

[14]  Likewise, the fact that Ellison, a non-lawyer who was not involved in the production process,
28  was unable to explain why specific documents were not sourced to him (Supp. Sub. at 15-16), is
   not evidence that Ellison or anyone else destroyed them.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   As to the emails that Ellison received before the lawsuit was even filed, Plaintiffs offer

2   absolutely no evidence that these emails were still in Ellison's files at the time the lawsuit was

3   filed, let alone when he was directed to preserve documents.  Plaintiffs' convoluted theory about

4   Ellison's email practices, and their unfounded attack on his credibility (Supp. Sub. at 15, n.15)

5   does not change the fact that after deposing Ellison and all of the executives who worked most

6   closely with him, Plaintiffs have failed to cite any evidence that any emails Ellison sent or

7   received before March 13, 2001 were still in his files at that time.

8              **2.      The Ellison Website**

9   Plaintiffs also claim that Defendants' failed to preserve the contents of a web site called

10  www.larryellison.com, which allegedly contained transcripts of interviews with Ellison.  Supp.

11  Sub. at 16.  Indeed, Plaintiffs claim that Defendants have acknowledged that the website was

12  "purged of all information after this lawsuit was filed."  *Id.*  Plaintiffs' only "evidence" of such

13  an acknowledgement, however, is the transcript of their own lawyer arguing before the Special

14  Master.  *See id.* (citing the September 11, 2006 Discovery Hearing Transcript at 78:12-79:21).

15  In fact, although this issue was discussed with the Special Master, it was never briefed, and

16  Plaintiffs never even attempted to meet and confer with Defendants about the website.  If they

17  had, they would have learned that the documents posted to the website have, in fact, been

18  preserved and reviewed by Defendants' counsel for documents responsive to the Discovery Plan

19  and other discovery orders.  Because there were no responsive documents, Defendants produced

20  none.  Local Civil Rule 37-1 requires a party to meet and confer before bringing a discovery

21  motion in order to avoid precisely the sort of waste of time raised by Plaintiffs' allegations here.

22             **3.      The "OSO Database"**

23  Plaintiffs cannot in good faith continue to complain that the Oracle Sales Online (or

24  "OSO") Database contained "highly relevant material" that should have been but was not

25  preserved.  Plaintiffs moved to compel the production of the OSO database and, in an order

26  Plaintiffs have not appealed, the Special Master denied Plaintiffs' request.  *See* Pls' Ex. 184 at 4.

27  Again, Plaintiffs are complaining about the alleged failure to preserve evidence that Plaintiffs

28  were not entitled to receive.  In any event, there is no factual basis for Plaintiffs' claim that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

22

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   Defendants failed to preserve the OSO database or that backup tapes of the database were

2   "purged" after this lawsuit was filed.  This claim is based entirely on a double-hearsay SLC

3   witness interview memo that Plaintiffs have completely mischaracterized.[15]

4              **4.**       **"Crucial Forecasting Documents"**

5        Plaintiffs also claim that "crucial forecasting documents" were not preserved.  Supp. Sub.

6   at 18-20.  As an initial matter, Plaintiffs make no effort at all to explain why the allegedly

7   missing forecasting documents are "crucial."  In fact, the Delaware Chancery Court performed a

8   thorough analysis of Oracle's forecasting process pertaining to the very forecasts at issue in this

9   case, and Plaintiffs received all of those documents as well as a vast quantity of additional

10   forecasting documents and testimony.  Plaintiffs have more than enough information on Oracle's

11   forecasting process.

12        In any event, there is no evidence that any of these forecasting documents ("crucial" or

13   not) are missing.  Plaintiffs' claim is based on pure speculation that is contrary to the record and

14   ignores the proceedings before the Special Master on this very issue.  Plaintiffs cite absolutely no

15   evidence that the allegedly "missing" forecasting reports were ever created at all, let alone that

16   they still existed at the time the lawsuit was filed.  Instead, Plaintiffs have simply assumed these

17   facts despite clear evidence that the reports were not always created on a regular schedule.  *See*

18   Pls' Ex. 189 at ¶ 5.  Based on that assumption, Plaintiffs moved to compel these reports before

19   the Special Master, who noted that "Plaintiffs' assertions regarding allegedly missing documents

20   is insufficient to allow the Special Master to determine that Defendants' production was

21   inadequate" and resolved the matter by ordering Defendants to submit declarations from Oracle

22   employees about the reports.  *See* Pls' Ex. 185 at 8.  Defendants complied, submitting a detailed

23   declaration from Ivgen Guner, Oracle's Vice President of Global Services and Corporate

24

---

[15]  The interview memo Plaintiffs cite says only that the OSO database was backed up on a daily
basis, and that *if* any back up tapes existed as of July 2001, they ***would have been*** purged as part
of an IT system change.  *See* Defs' Ex. 24, at NDCA-ORCL 299056.  In language the Plaintiffs
carefully omitted from their brief, however, the memo indicates that Oracle did not save the
backup data for long periods of time:  "Kirby explained that although OSO data was backed up
daily, ***Oracle did not save this data***."  *See id.* (emphasis added).  Nothing in the memo suggests
that any backup tapes did, in fact, exist as of July 2001 (or, for that matter, in March 2001), let
alone that any such tapes were actually "purged" in July 2001.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  Financial Planning & Analysis.  *See* Pls' Ex. 189.  Plaintiffs have never appealed that order, and

2  they offer no new evidence here to show that any of the allegedly "missing" reports ever existed,

3  much less that they were destroyed.

4      Plaintiffs' complaint that "Defendants have also ***never produced*** the damning Affidavit

5  of Raymond J. Lane" is patently absurd – particularly because Plaintiffs concede that they have

6  this document.  Supp. Sub. at 20.  That document was filed under seal by another party in the

7  Delaware derivative litigation.  When the Delaware court unsealed it, Plaintiffs obtained it.  The

8  suggestion that Defendants should have produced a publicly-filed (but sealed) court document to

9  Plaintiffs makes no sense.[16]

10          **5.      "Group Email Boxes"**

11      Plaintiffs also claim that Defendants failed to preserve documents in what Plaintiffs refer

12  to as "group email boxes."  Supp. Sub. at 20.  This issue was briefed before the Special Master,

13  who ordered Oracle to produce documents from only two of the supposed "group email boxes"

14  (which Defendants did in compliance with the order), and rejected Plaintiffs' request regarding

15  the rest.  *See* Pls' Ex. 184.  Plaintiffs never appealed that order, so again, Plaintiffs are

16  complaining about the alleged failure to preserve files Defendants were not required to search for

17  responsive documents.  In any event, there would not have been anything for Defendants to

18  search.  As Defendants explained to the Special Master, the remaining addresses that Plaintiffs

19  characterized as "group email addresses" were, in fact, email distribution lists.  *See* Defs' Ex. 25.

20          **6.      Documents Related to Customer Escalations**

21      Plaintiffs claim that Defendants failed to produce reports generated during the

22  Class Period from the Escalated Customer Management System ("ECMS").  Supp. Sub. at 20.

23  According to Plaintiffs, Defendants only produced five weeks of reports from May and June of

24  2001, even though these reports were generated on a "weekly" basis.  *Id.*  This claim is incorrect.

25  In support of this claim, Plaintiffs cite the testimony of Kirsten Shaw, a Triage Manager in

26  Oracle's ERP development group, who testified that ECMS was a program located on a single

27

28  ---

[16]  This argument is of a piece with Plaintiffs' continued complaint that Defendants failed to
produce a copy of *SOFTWAR*, a book published in 2003 and widely available for sale.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

24

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   computer at Oracle that generated reports on particular customers, which were sent out to various

2   people at Oracle via email. Pls' Ex. 91 at 87:16-88:1. But the documents Plaintiffs purport to

3   identify as ECMS reports (Pls' Exs. 126 and 193) are not the reports that Shaw testified about.

4   *See* Pls' Ex. 91 at 86:4-88:1; 131:3-20; Defs' Ex. 50; *see also* Defs' Ex. 51. In fact, when

5   Plaintiffs asked Shaw about one of the very documents they now claim is an ECMS report, she

6   testified that she had never seen the report before. *See* Pls' Ex. 91 at 184:22-185:8; Pls' Ex. 193.

7   Shaw's testimony also makes clear that the information contained in the ECMS reports would

8   not have been available "via the web at Oracle" as Plaintiffs claim; instead, all of the information

9   pertaining to the customers monitored by Oracle's ECMS system was located on the computer of

10  Mike Mills (Pls' Ex. 91 at 184:22-186:20), whose files Oracle was not required to search under

11  the Discovery Plan. Plaintiffs have cited absolutely no evidence that the reports reflected in their

12  Exhibits 126 and 193 (which are called "escalated customer reports") were ever created or

13  circulated before May of 2001, or that Plaintiffs are missing any of these escalated customer

14  reports. As for the ECMS reports that Shaw actually described, Defendants produced dozens of

15  these reports, including a substantial number during the Class Period, and there is no evidence

16  that Plaintiffs are missing any of these reports, either. *See* Defs' Ex. 52.

17  **IV.    PLAINTIFFS' CLAIM THAT DEFENDANTS "ALTERED" OR "WITHHELD"**

18  **ACCOUNTING EVIDENCE IS BASELESS**

19          Plaintiffs also claim Defendants "altered" or "withheld" evidence regarding Plaintiffs'

20  accounting allegations. This claim is based in large part on Plaintiffs' allegation that Defendants

21  altered or destroyed accounting records in the Fall of 2002, after Plaintiffs first added their

22  accounting fraud claim. Supp. Sub. at 21-23. This claim, which Plaintiffs first asserted in an *ex

23  parte* application that the Court denied five years ago (Defs' Ex. 26 at 1), is baseless. Now, as

24  then, there is absolutely no evidence that Defendants altered or destroyed any accounting

25  records. Plaintiffs' claim to the contrary is based entirely on the deposition testimony of a single

26  former collections employee Ian Hatada, who admitted he had no personal knowledge that any

27  accounting records were altered or destroyed.

28          Plaintiffs' remaining arguments are nothing more than a rehash of every discovery

dispute regarding Plaintiffs' accounting claims.  Although they do not clearly explain the relevance of these disputes, Plaintiffs appear to be arguing that the discovery disputes are evidence that Defendants "withheld" discovery regarding this claim or "misled" the Court. Apparently, in Plaintiffs' view, the mere fact that Defendants disagreed with Plaintiffs over the proper scope of discovery is tantamount to bad faith.  But in truth, the record reflects nothing more than a series of routine discovery disputes, all of which were resolved by Magistrate Judge Spero or Special Master Infante, some in Plaintiffs' favor, and some in Defendants' favor.  None of them supports Plaintiffs' argument that Defendants "withheld key evidence."

### A.     There Is No Evidence That Oracle Improperly Altered Or Destroyed Documents During The 2002 "Unapplied Cash Project"

Despite Plaintiffs' allegation that Defendants used the 2002 "unapplied cash project" to "alter and cover up" evidence relating to Plaintiffs' debit memo claim (Supp. Sub. at 21), Plaintiffs have identified only one category of evidence they contend was altered or destroyed in the Fall of 2002:  electronic "notes" maintained by Oracle's collections staff.  *Id.* at 23.  As an initial matter, these "notes" did not impact the accounting treatment or the audit trail of any transaction.  Pls' Exs. 31 at 145:4-7; 40 at 2; 11 at ¶ 11.  Thus, Plaintiffs' claim that Defendants "alter[ed] key accounting documents and historical accounting data, including the audit trail," is false.  In fact, in the wake of the 2002 "unapplied cash project," the "audit trail" for the affected transactions remained intact.  Pls' Exs. 15 at ¶ 28; 31 at 339:4-13, 346:15-22.

In any event, Plaintiffs' claim that Defendants altered the electronic "notes" relating to Plaintiffs' accounting allegations is wrong.  For this claim, Plaintiffs again rely upon Hatada's testimony (Supp. Sub. at 23), even though Hatada admitted that:  (i) he never deleted any notes; (ii) he never witnessed anyone else delete any notes; and (iii) he could not provide a single example of a note that had been deleted or altered as part of the 2002 "unapplied cash project." Pls' Ex. 33 at 488:6-490:22.  In fact, Hatada testified that the practice of updating prior notes that were incomplete or inaccurate was performed in a manner that *preserved* historical notes, thereby undercutting any suggestion that the 2002 "unapplied cash project" altered or destroyed

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

26

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    any relevant information. *Id.* at 488:19-25.[17]

2          Plaintiffs also refer to Defendants "reversing thousands of debit memo transactions" and

3    "crediting, refunding and escheating" customer overpayments as part of the 2002 "unapplied

4    cash project."  Supp. Sub. at 21.  But none of that has anything to do with Plaintiffs' claim that

5    accounting records were "alter[ed]" or "cover[ed] up."  Indeed, the fact that Oracle took those

6    steps is reflected in the audit trail that Oracle preserved following the 2002 "unapplied cash

7    project."  In fact, Plaintiffs have been in possession of the SLC Report, which discusses both the

8    bad debt transfers and the 2002 "unapplied cash project," for more than two years.  Accordingly,

9    any suggestion that Defendants have tried to conceal the "unapplied cash project," or that it was

10   part of some purported "cover up," is groundless.

### B.   Routine Discovery Disputes Do Not Support Plaintiffs' Claim That Defendants "Withheld Key Accounting Evidence"

12         Plaintiffs also accuse Defendants of "repeated violations of court orders" regarding

13   accounting discovery, and they complain that certain accounting documents were produced after

14   fact discovery closed.  Supp. Sub. at 24-27.  To that end, Plaintiffs have mischaracterized the

15   discovery process relating to their accounting claims.  What Plaintiffs try to characterize as

16   Defendants "withholding" discovery amounts to nothing more than a series of disputes over the

17   proper scope of accounting discovery and Defendants' obligations under various orders.  Those

18   disputes were resolved by Magistrate Judge Spero and Special Master Infante (not always in

19   Plaintiffs' favor), and neither Magistrate Judge Spero nor Special Master Infante ever suggested

20   that Defendants' conduct warranted the imposition of sanctions (as Plaintiffs seek here).

21         To read Plaintiffs' Motion, one would think Defendants had been ordered to produce the

22   very same accounting records four times.  Supp. Sub. at 26.  However, each of the purported

23   "violations" chronicled in the Motion were legitimate disputes over the scope of fact discovery

24   that subsequently were addressed and resolved.  As discussed above, Defendants' obligations to

---

26   [17] Hatada also conceded that he did not know whether the practice of updating notes had any
27   impact on the accounting treatment for the 46,000-plus debit memos.  *Id.* at 494:3-495:9.  In
     stark contrast, Venkataramana, who supervised a portion of the 2002 "unapplied cash project,"
28   confirmed that this project did not impact the accounting for or the audit trail of any of the
     November 17, 2000 debit memos.  Pls' Ex. 31 at 339:4-341:3, 346:15-22.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

27

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  produce accounting-related evidence evolved significantly over the course of this case.  If

2  Plaintiffs truly believed that Defendants engaged in discovery abuses warranting sanctions,

3  Plaintiffs clearly could have (and should have) moved for such relief before the Special Master.

4  To the extent Plaintiffs complain that Defendants produced documents too late to be used

5  during discovery (Supp. Sub. at 22), these arguments also fail.  The documents Plaintiffs cite

6  relate to the 2002 "unapplied cash project" and were not required to be produced prior to the

7  Special Master's December 19, 2006 order.  *Id.* (citing Pls' Exs. 22-27).  And in any event,

8  Plaintiffs can claim no prejudice from the timing of this production.  When Plaintiffs initially

9  raised this issue, Defendants offered to discuss re-opening certain depositions to allow Plaintiffs

10  to inquire about the newly-produced documents.  Pls' Ex. 75 at 3-4.  Plaintiffs rejected this offer,

11  claiming it was "too late," making clear that Plaintiffs were far more interested in trying to lay

12  the groundwork for a sanctions motion than in obtaining relevant information.  Defs' Ex. 27 at 1.

13  Plaintiffs further assert that Defendants "belatedly" produced two sets of documents in

14  April 2007.  Supp. Sub. at 26-27.  As Defendants explained to Plaintiffs, the *three* emails

15  Defendants produced on April 17, 2007 inadvertently never were loaded onto Defendants'

16  database, and Oracle produced them immediately upon realizing that they had not been produced

17  previously.  Pls' Ex. 58 at 1.[18]  With respect to the documents Defendants produced on April 24,

18  2007, these *four* documents were produced specifically in response to a request Plaintiffs made

19  on April 10, 2007.  Defs' Ex. 28.  As Defendants explained to Plaintiffs, these documents—

20  which consist only of Audit Committee minutes for four meetings in Fall 2002—were not

21  produced before because they were not located in the files of anyone who participated in the

22  2002 "unapplied cash project."  Defs' Ex. 29; Pls' Ex. 58 at 1-2.  None of the documents that

23  Defendants produced in April 2007 contained new or additional facts regarding Plaintiffs'

24

---

25  [18]  In an attempt to show prejudice from the late production of these documents, Plaintiffs badly

26  mischaracterize one of the emails in question.  Supp. Sub. at 26 (citing Pls' Ex. 54).  Nothing in
the email suggests that Oracle improperly manipulated unapplied cash to inflate its 2Q01
financial results.  To the contrary, the email reflects an effort to resolve a list of unapplied items

27  by the end of the quarter.  Moreover, none of the receipts listed on the spreadsheet attached to
this email actually was transferred to Oracle's bad debt reserve, and therefore, could not possibly

28  support a claim that Oracle improperly "manipulated" unapplied cash.  Defs' Ex. 30 at 1534183-
301.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    accounting allegations.  Pls' Ex. 75 at 3.  Plaintiffs cannot possibly claim they were prejudiced

2    by the timing of Defendants' production.[19]

3        Plaintiffs' remaining complaints regarding the timing and content of Defendants'

4    accounting productions are baseless.  Some of the productions Plaintiffs cite were voluntary

5    *reproductions* made for Plaintiffs' convenience at their request.  *See, e.g.*, Defs' Exs. 31, 32.

6    Given the volume and nature of the accounting documents, understandably, there were some

7    unforeseen technical issues concerning the formatting and organization of certain documents.

8    However, even in those instances where Defendants had to reproduce documents because of such

9    issues, Oracle created a series of detailed charts to assist Plaintiffs in tracking and understanding

10   precisely what was being reproduced.  Defs' Exs. 33; 34 at 2; 35.[20]

11       **C.    Defendants Did Not Mislead The Court Regarding The November 2000 Debit
                 Memos And The 2002 "Unapplied Cash Project"**

12       Finally, Plaintiffs accuse Defendants of misrepresenting the relationship (or lack thereof)

13   between the creation of the 46,000-plus debit memos and the 2002 "unapplied cash project."

14   Supp. Sub. at 21-22.  Contrary to Plaintiffs' argument, however, there is no link from an

15   accounting perspective between the creation of and accounting for the debit memos on

16   November 17, 2000, and the subsequent 2002 "unapplied cash project."  Defs' Ex. 3 at 19-20;

17

18   [19] Plaintiffs' argument that Defendants "altered" the "electronic filenames" associated with
     certain documents is meritless.  Supp. Sub. at 26 n.14.  As Defendants previously explained to
19   Plaintiffs, Oracle never was under any obligation to produce "file name" metadata.  Pls' Ex. 43,
     at 3-4; *see also* Defs' Ex. 36 at 6.  Moreover, Defendants have produced thousands of documents
20   with the exact same metadata since the beginning of fact discovery.  If Plaintiffs had an issue
     with the metadata, they should have raised it during fact discovery, not a year after fact discovery
21   closed.

22   [20] Plaintiffs' arguments regarding Defendants' production of emails do not support their
     argument that Defendants destroyed, altered or withheld "key" evidence.  Supp. Sub. at 26 n.14.
23   With respect to Plaintiffs' assertion that emails "inexplicably have different dates and electronic
     characteristics," Defendants explained to Plaintiffs over a year ago that when electronic data is
24   pulled from a custodian's computer, and the date cannot be ascertained through the metadata, the
     computer system used by Oracle's vendor places a default date on the data.  Defs' Exs. 37; 38 at
25   2.  In any event, Defendants produced hard copies of the same emails cited in the Motion
     containing the correct date.  Defs' Ex. 39 at 1125473-74.  Plaintiffs' complaint that Defendants
26   have not preserved copies of certain emails that are "embedded" in email chains also is
     groundless.  Supp. Sub. at 26 n.15.  It should come as no surprise to Plaintiffs that an email may
27   appear in one custodian's files, but was not produced from the files of another custodian,
     especially since nearly all of the evidence Plaintiffs cite relates to the 2002 "unapplied cash
28   project," which never was alleged in the RSAC and was not a focus of discovery until December
     19, 2006.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SILICON VALLEY

29

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   Pls' Exs. 15 at ¶ 28; 31 at 346:15-22.  As Defendants explained to the Court, there is some

2   linkage between the *transactions* underlying the debit memos and the 2002 "unapplied cash

3   project," in the sense that some transactions that were researched as part of the 2002 "unapplied

4   cash project," also include in their respective histories a November 2000 debit memo.  Defs' Ex.

5   40 at 1-2, 4-5.  However, this does not change the fact that the November 2000 debit memos had

6   absolutely no financial statement impact (which Plaintiffs now concede), or the fact that the 2002

7   "unapplied cash project" did not alter the accounting for the debit memos.  Defs' Ex. 5 at

8   208:22-209:12, 213:11-20, 214:24-215:11; Pls' Ex. 31 at 346:15-22.[21]  The fact that Special

9   Master Infante ordered discovery regarding the 2002 "unapplied cash project" does not change

10  this analysis.  Applying Rule 26's liberal discovery standard, Special Master Infante found only

11  that there were "substantial questions" about the relationship between those two events.  Pls' Ex.

12  13 at 19.

13          In any event, every Oracle employee who was involved in both the creation of the

14  46,000-plus debit memos and the 2002 "unapplied cash project" testified unequivocally that the

15  two projects were, in fact, separate events.  Pls' Exs. 15 at ¶ 28; 34 at 177:21-178:6; Defs' Ex. 4

16  at 149:4-150:2.  In arguing to the contrary, Plaintiffs rely primarily on Hatada's deposition

17  testimony (Supp. Sub. at 23-24), but as with the alleged alteration of the "notes," Hatada

18  ultimately conceded that he had no relevant personal knowledge.  Specifically, Hatada conceded

19  that:  (i) he had no involvement in the creation or accounting treatment of the November 2000

20  debit memos (Pls' Ex. 33 at 384:25-385:4); (ii) he was unaware until years later that Oracle even

21  had created the 46,000-plus debit memos (*id.* at 383:6-15; Pls' Ex. 32 at 150:5-8); (iii) he did not

22  know what the debit memos were or how they were used (*id.*; Pls' Ex. 33, at 383:23-384:13); and

---

23  [21]  Plaintiffs cite a series of so-called "critical" documents in support of their claim that there was

24  a "direct connection" between the 46,000-plus debit memos and the 2002 "unapplied cash
    project."  Supp. Sub. at 22.  None of these documents is "critical," none of these documents

25  demonstrates that the November 2000 debit memos were "directly connect[ed]" to the 2002
    "unapplied cash project," and none of these documents supports the argument that Defendants

26  altered or destroyed any accounting data.  Indeed, only two documents (a memorandum
    describing the "12018/25005 Reconciliation Project" and an email from Greg Myers regarding

27  "Misc Documents" even reference both the November 2000 debit memos and the 2002
    "unapplied cash project."  Pls' Exs. 19-20.  However, neither document suggests that the former

28  project was "directly connect[ed]" to the activities in 2002.

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

(iv) he learned about the debit memos during a meeting in Fall 2002 and he did not understand

the explanation that was provided during that meeting. *Id.* at 440:23-442:3. Hatada's testimony,

which was based entirely upon comments from other Oracle employees that he admittedly did

not understand, does not establish that there was a "direct connection" between the November

2000 debit memos and the 2002 "unapplied cash project."[22]

## V.   DEFENDANTS DID NOT "INTENTIONALLY DESTROY[]" ANY "*SOFTWAR*-RELATED MATERIALS"

Plaintiffs claim the Defendants "intentionally destroyed" materials relating to *SOFTWAR*.

Supp. Sub. at 1, 27-33. This assertion is false. To the extent that any *SOFTWAR*-related

materials were destroyed, they were destroyed by the book's principal author, Matthew

Symonds, who had sole physical possession, custody and control of the materials. Indeed, the

missing materials—recordings and transcripts of interviews Symonds conducted of Ellison—

were never in the physical possession, custody or control of Ellison or any other Defendant, and

none of the Defendants "intentionally destroyed" any of those recordings or transcripts. There is

no factual or legal basis for holding Defendants responsible for whatever Symonds may have

done with the materials. And in any event, Plaintiffs can demonstrate no prejudice from the loss

of any missing transcripts or recordings.

### A.   Defendants Did Not Destroy Any *SOFTWAR*-Related Evidence

Plaintiffs take as established fact their assertion that Defendants "intentionally destroyed"

the *SOFTWAR* materials. Supp. Sub. at 1, 27. But Defendants did no such thing; they never had

physical possession of the materials on Symonds' computer. Indeed, the notion that Symonds

and Ellison worked together to destroy the materials is undercut by the conduct of both parties.

First, Symonds refused to comply with repeated requests, including from Ellison, to produce the

materials. Second, he misled Defendants' counsel and Ellison repeatedly about the status of the

computer on which the materials were stored. *See* Pls' Ex. 220; Defs' Exs. 16, 18, 19. Third,

while Defendants did not object to Plaintiffs' request for leave to seek deposition testimony from

---

[22]  Plaintiffs also mischaracterize the testimony of Terry Elam. Supp. Sub. at 19. Elam testified that the 2002 "unapplied cash project" *did not* alter the accounting for the 46,000-plus debit memos. Pls' Ex. 37 at 330:5-13.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

31

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    Symonds months after the close of fact discovery, Symonds himself refused to testify.  And after

2    refusing to testify on Fifth Amendment grounds, Symonds argued to this Court that there was no

3    need for him to testify because, among other things, the Court could simply grant an adverse

4    inference against Ellison—an action clearly contrary to Ellison's interest and flatly inconsistent

5    with the suggestion that Symonds is acting at Ellison's behest.

6    **B.    Plaintiffs Cannot Show Prejudice**

7        As discussed *supra* in section II(B)(2), Plaintiffs have cited no case in which terminating

8    sanctions were granted absent a showing of prejudice.  With regard to the recordings and

9    transcripts of Symonds' interviews with Ellison, Plaintiffs make no real effort to demonstrate

10   prejudice, nor could they.  On top of the massive volume of discovery Defendants have produced

11   from the relevant time period, Plaintiffs have access to *SOFTWAR* itself, including Ellison's own

12   commentary, and they have received over 200 pages of hard copy transcripts of Symonds'

13   interviews with Ellison.  Having made no showing that the missing recordings or transcripts

14   would have been anything other than cumulative of the materials otherwise available to them,

15   Plaintiffs cannot seriously claim that the loss of those materials has "severely impaired" their

16   ability to present their case.

17   **C.    Defendants Did Not "Withhold" Any "SOFTWAR-Related Materials" At
              All, Let Alone In "Bad Faith"**

18       Plaintiffs argue that Defendants should be sanctioned because they "withheld" the

19   "*SOFTWAR*-related materials"[23] in "bad faith."  Supp. Sub. at 28-29.  With regard to the

20

21   ───────────────────────

22   [23] Plaintiffs' repeated references to the "*SOFTWAR*-related materials" (Supp. Sub. at 27-33)
     obscure the fact that Defendants were only ordered to produce a small fraction of the
23   "*SOFTWAR*-related materials" that Plaintiffs demanded after the close of discovery.  *See supra*
     sections I(E); Defs' Ex. 13 at 4-5.  Under the Special Master's ruling—which Plaintiffs did not
24   appeal—Plaintiffs were not entitled to receive anything other than the recordings or transcripts of
     Symonds' interviews with Ellison and the final agreement between Symonds and Ellison.
25   Plaintiffs' reference to an email produced on October 2, 2006 (Supp. Sub. at 28-29), is a red
     herring.  That email was not produced because it pertained to *SOFTWAR*.  The email was
26   produced because one of its attachments referred to statements by industry analysts regarding
     Suite 11i.  *See id.* at 8-9.  As such, it was produced in response to the Court's September 15,
27   2006 order to produce documents concerning research or securities analysts, along with other
     documents responsive to that order.  For the same reason, Plaintiffs are incorrect in asserting that
28   the email should have been produced seven days before the deposition of Carolyn Balkenhol,
     from whose files it was produced.  At the time of Ms. Balkenhol's deposition, Defendants were

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

32

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

recordings and transcripts of Symonds' interviews with Ellison (the only "*SOFTWAR*-related materials" Defendants were required to produce), it is undisputed that they have never been in Ellison's **physical** possession, custody or control (let alone that of any other Defendant). Although the Special Master and this Court concluded that the contract between Symonds and Ellison gave Ellison the *legal* right to obtain the interview recordings and transcripts, Defendants did not previously believe that Ellison had any such rights.  *See* Defs' Ex. 41, at 4-6; Ex. 42; Pls' Ex. 209 at 1-3, 5.  Plaintiffs' claim that Defendants "withheld" these materials thus rests on the ridiculous premise that in response to several generic document requests (none of which mentioned *SOFTWAR*, Symonds, or any transcripts or recordings of Symonds' interviews with Ellison), Defendants should have produced a set of recordings and transcripts that Defendants did not have in their physical possession, and even though both Symonds and Ellison believed they belonged to Symonds.  And the notion that Defendants' failure to do so amounts to having "withheld" these materials "in bad faith" is beyond absurd.  The truth is that no one involved in this litigation, including Plaintiffs, believed that Defendants were required to produce anything relating to *SOFTWAR* until after the close of discovery, when Plaintiffs first requested them.

Plaintiffs' own conduct belies their claim that Defendants' obligation to produce these materials was "obvious."  Plaintiffs were clearly aware of the book long before the close of fact discovery.  Though Plaintiffs have claimed they had no reason to believe Ellison had any legal right to control the materials until they received a draft version of the contract between Symonds and Ellison on October 2, 2006 (Supp. Sub. at 28-29), the book includes a number of footnotes written by Ellison.  *See, e.g.,* Pls' Ex. 110, *passim*.  If, as Plaintiffs claim, it was "obvious" any "*SOFTWAR*-related materials" were called for by the Discovery Plan (and, indeed, were so obviously called for that Defendants' failure to produce them amounts to "bad faith"), Plaintiffs would have requested such materials, by name, long before fact discovery closed.  Likewise, if the *SOFTWAR* materials really were as crucial as Plaintiffs now claim, then Plaintiffs would have sought to obtain them directly from Symonds well before October, 2006.  Doubtless,

---

under no obligation to produce the email at all because it was not responsive to the Discovery Plan or any of the Special Master's orders.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

33

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1    Plaintiffs chose not to pursue such discovery because they believed the tapes and transcripts

2    would merely corroborate the statements attributed to Ellison in the book.

3           Moreover, Defendants' opposition to Plaintiffs' motion to compel the "*SOFTWAR*-

4    related materials" does not suggest any bad faith, as Plaintiffs claim.  Supp. Sub. at 29.  Contrary

5    to Plaintiffs' repeated assertion, Defendants did not argue that the materials created in

6    preparation for *SOFTWAR* were completely irrelevant.  Defendants argued only that certain

7    portions of *SOFTWAR* are irrelevant, and therefore Plaintiffs' demand for "all" documents

8    "concerning and created for *SOFTWAR*" was clearly overbroad.  *See* Defs' Ex. 41 at 2, 6-8.

9    Given the Special Master's finding that none of the requested materials other than the final

10   agreement and transcripts and recordings of interviews with Ellison were reasonably calculated

11   to lead to the discovery of admissible evidence (a finding Plaintiffs did not appeal), Plaintiffs

12   cannot credibly argue that Defendants took this position in "bad faith."

13          Nor is there any basis for Plaintiffs' suggestion (Supp. Sub. at 29) that Defendants acted

14   in bad faith in arguing that they did not have "possession, custody or control" over the materials

15   Symonds created in researching the book.  Indeed both Special Master Infante's and this Court's

16   rulings refute this suggestion.[24]  *See supra* section I(E).  The mere fact that the Court ruled in

17   Plaintiffs' favor does not suggest that Defendants acted in "bad faith" in opposing the motion.

18          **D.      Defendants' Inability To Fully Comply With The Special Master's Order**
             **Does Not Warrant Any Sanctions At All, Let Alone Default Judgment**
19

20          Plaintiffs also argue that Defendants "violated" the Special Master's December 29, 2006

21   order (which was served on January 2, 2007) to produce the recordings and transcripts of

22   Symonds' interviews with Ellison, again "in bad faith."  Supp. Sub. at 29-33.  But there is no

23   basis for Plaintiffs' accusation of bad faith, and in any event, Plaintiffs have wildly exaggerated

24   the degree to which Defendants have been unable to comply with that Order.

25          The Ninth Circuit, like other courts, has made clear that sanctions, and especially default

26   sanctions, are not appropriate where a party is prevented from complying with a discovery order

27   _____
     [24]  Plaintiffs characterize Defendants' arguments about the meaning of the agreement as
28   "misrepresenting" the terms of the contract, notwithstanding the fact that this Court agreed
     Defendants' interpretation had support in the language of the contract.  Supp. Sub. at 29.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

34

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   due to circumstances beyond the party's control.  *Falstaff Brewing Corp. v. Miller Brewing Co.*,

2   702 F.2d 770 (9th Cir. 1983).  Rule 37 is not a "legal requirement of the impossible," and its

3   penalties are unavailable "in the *absence of an ability* to produce."  *Read v. Ulmer*, 308 F.2d 915,

4   918 (5th Cir. 1962) (emphasis added); *see also Searock v. Stripling*, 736 F.2d 650 (11th Cir.

5   1984) (dismissal sanction reversed where plaintiff's original records were destroyed when ship

6   caught fire and sank, and plaintiff had been unable to procure duplicates from third parties

7   despite good-faith efforts to do so; the court doubted whether *any* sanction was justified).[25]

8        In this case, Defendants took all reasonable steps to comply with the Special Master's

9   Order.  *See supra* section I(E).  Plaintiffs argue that "it is too much to ask to believe that one of

10   the world's largest law firms with 140 lawyers in its London offices, one of the most prominent

11   technology companies, and one of the wealthiest individuals on earth, were all helpless to

12   prevent and did not by their conduct facilitate the destruction of the materials."  Supp. Sub. at 33.

13   But Plaintiffs do not explain how any of these things would have enabled Defendants to prevent

14   Symonds from destroying the materials.

### E.    An Adverse Inference Against Defendants Based On Symonds' Refusal To Testify Is Impermissible

        Plaintiffs' Supplemental Submission refers in passing to Symonds' invocation of the

Fifth Amendment.  Supp. Sub. at 7:16-21, 32:12-16 and note 20.  Though they offer no argument

or authority on this point, Plaintiffs appear to be suggesting that the Court should infer that

Ellison was involved in the destruction of Symonds' computer based on Symonds' invocation of

the Fifth Amendment.  Such an adverse inference here would be both unfair and improper.

        Even where a party to civil litigation refuses to testify on Fifth Amendment grounds, an

adverse inference against that party is allowed only "when *independent evidence* exists of the

fact to which the party refuses to answer."  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258,

1264 (9th Cir. 2000) (emphasis added).  Plaintiffs have presented no independent evidence that

Ellison had any involvement in Symonds' destruction of his computer.  In fact, Ellison's direct

---

[25]  Indeed, "destruction caused by events outside of the party's control" cannot establish culpability or be the basis even for "lesser" sanctions.  *Zubulake IV*, 220 F.R.D. at 220.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

35

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1  testimony is that *he told Symonds to produce the materials*.  Pls' Ex. 179 at 574:1-23, 643:23 –

2  648:10.

3       Moreover, when a party seeks an adverse inference based on the invocation of the Fifth

4  Amendment by a non-party witness, courts are even more reluctant to draw adverse inferences

5  against a party.  Above all else, an adverse inference must be "trustworthy under all the

6  circumstances."  *LiButti v. United States*, 107 F.3d 110, 120-125 (2nd Cir. 1997).  In this case, an

7  adverse inference against Ellison based on Symonds' refusal to testify would not be trustworthy

8  or fair.  Having apparently destroyed evidence that had been ordered produced in a federal civil

9  proceeding, Symonds had every reason to refuse to testify on Fifth Amendment grounds, even if

10  (as is the case) he acted entirely on his own.  *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d

11  1258, 1263 (9th Cir. 2000) (holding that in the civil context, "the invocation of the privilege is

12  limited to those circumstances in which the person invoking the privilege reasonably believes

13  that his disclosures could be used in a criminal prosecution, or could lead to other evidence that

14  could be used in that manner.")  Where there is any doubt about the witness' motivation for

15  refusing to testify, an adverse inference is not appropriate because it is not "trustworthy."  *See*

16  *Kontos*, 968 F. Supp. at 408 (defendant's willingness to be deposed, contrasted with sister's

17  invocation of the Fifth, indicated possibility that "sister may have reason to invoke her privilege

18  against self-incrimination while Defendant has none.").  This is particularly true where, as here,

19  the witness declined to answer ***any*** questions, not just those that might have implicated a litigant.

20  *In re Citric Acid Litigation*, 996 F. Supp. 951, 961 (N.D. Cal. 1998) (Smith, J.) (no adverse

21  inference allowed where witness invoked protection as to all questions asked).  Indeed, courts

22  have repeatedly stressed that an adverse inference is not trustworthy absent an extremely close

23  relationship between the non-testifying witness and the party against whom the inference is

24  sought, such as "co-conspirator," "de facto agency relationship," or at the least, an employer-

25  employee or family relationship. *Cowans v. City of Boston*, No. 05-CV-11574-RGS, 2007 U.S.

26  Dist. LEXIS 215, at * 9 (D. Mass. Jan. 4, 2007) ; *Kontos v. Kontos*, 968 F. Supp. 400, 406-409

27  (D. Ind. 1997) (surveying leading circuit cases.  No such relationship exists between Symonds

28  and Ellison, let alone between Symonds and any other Defendant.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

36

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

### F.   Plaintiffs' Claim That The Tapes Were "Located" Is False

Plaintiffs claim that in mid-February, Defendants "were informed that the transcription service for Symonds had been identified and the tapes had been located."  Supp. Sub. at 31. Plaintiffs further claim that Defendants "concealed" this information from Plaintiffs.  *Id.*  Again, this is simply untrue.  On February 13, 2007, Symonds received an email from an individual identifying himself as "Jason Wright," who claimed to have bought the rights to a domain name previously used by a typing service that transcribed some of Symonds' interviews for the book. *See* Defs' Ex. 43.  As the emails make clear, Wright had been "located" by *Plaintiffs*' investigator; Defendants concealed nothing, as they learned of Wright only after Plaintiffs were aware of him.  *See id.*  Both Symonds and Defendants' counsel requested his assistance in locating the transcripts; however, Wright refused to cooperate or provide contact information. *Id.*  Regardless, Wright never suggested that he had "located" or possessed any tapes or transcripts.  *Id.*  Although Plaintiffs' counsel denied to Defendants' counsel that he was in personal contact with Wright, this was (as Defendants' counsel pointed out) contrary to Wright's emails.  *See* Defs' Exs. 44, 43.  It remains unclear that Wright is who he claimed to be, but in any event there is no evidence that Wright ever had any of the *SOFTWAR* materials.

## VI.   DEFENDANTS DID NOT "MISREPRESENT[]" THEIR PRESERVATION EFFORTS TO THE COURT.

Unable to show that Defendants failed to preserve any documents or that Plaintiffs suffered any prejudice, Plaintiffs try to shoehorn this case into the sanctions case law by claiming that Defendants "misrepresented" their document preservation efforts and misled the Court. Supp. Sub. at 33-34.  This accusation is false.

As an initial matter, Defendants' general statement about their obligation to preserve documents under the PSLRA (Supp. Sub. at 33) was true.  Defendants had an obligation to preserve documents, and moreover, Defendants believed they were complying with those obligations.  Plaintiffs have cited absolutely no evidence to the contrary.

Plaintiffs' claim that Defendants misled them or the Court about the scope of their preservation efforts is both false and disingenuous.  Just after the March 2005 hearing on the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

37

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   Discovery Plan, counsel for the parties had a series of communications about the scope of

2   Defendants' preservation efforts.  As early as May 4, 2005, Plaintiffs' counsel wrote a letter

3   confirming those communications and making clear that Plaintiffs knew certain files had not

4   been systematically preserved.  Plaintiffs' counsel wrote:

5           [Y]ou have admitted in no uncertain terms that certain individuals'
            files, including several of the area vice presidents whose files were
6           recently ordered produced, were not part of the group of
            individuals whose files were preserved in 2001.  Judging from
7           your comments, it appears as though only selected individuals'
            files were preserved at the time that this case was initiated.

8

9   *See* Defs' Ex. 48.  Shortly thereafter, Defendants sent to Plaintiffs a comprehensive letter

10  describing the persons from whom Defendants were preserving and collecting documents.  *See*

11  Defs' Ex. 49.  After receiving that letter, Plaintiffs had the opportunity to seek leave from the

12  Court for a deposition regarding the preservation and collection efforts, if they thought there was

13  good cause for one.  *See* Pls' Ex. 2 at 15-16; Pls' Ex. 43 at § III.B.  However, Plaintiffs never

14  requested such a deposition, and they did not complain about the scope of Defendants'

15  preservation efforts until a year later, when they filed their Motion to Compel.  *See* Pls' Ex. 2 at

16  18.

17  **VII.    PLAINTIFFS DO NOT EVEN ATTEMPT TO JUSTIFY SANCTIONS SHORT OF**

18  **DEFAULT JUDGMENT**

19          With regard to any request for sanctions short of default judgment, Plaintiffs'

20  Supplemental Submission does not identify any lesser sanctions, and their Notice of Motion does

21  not formally request any sanctions other than default judgment.  Supp. Sub. at 1.  Although

22  Plaintiffs' Proposed Order sets forth a number of proposed evidentiary sanctions, Plaintiffs'

23  Supplemental Submission contains no argument or authorities in support of the proposed

24  sanctions.  *Id.* at *passim*.  Indeed, other than reciting the basic standard for imposing spoliation

25  sanctions of any kind, Plaintiffs never discuss the specific requirements for evidentiary sanctions.

26          Not surprisingly, those standards are strict as well.  Evidentiary sanctions are "drastic"

27  and must be supported by a finding of willfulness, bad faith, or fault.  *Societe Internationale*

28  *Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 210-12 (1958).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

38

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   If deeming certain facts established, or prohibiting the introduction of certain evidence, is

2   tantamount to disposing of claims, appellate courts require the same justification that is required

3   for a dismissal or default sanction.  7-37 MOORE'S FEDERAL PRACTICE (Civil), § 37.51;

4   *Commodity Futures Trading Comm'n v. Noble Metals Int'l*, 67 F.3d 766, 770-772 (9th Cir.

5   1995), *cert. denied*, 519 U.S. 815 (1996).  Likewise, an "adverse inference instruction is an

6   extreme sanction and should not be given lightly" as it often is "too difficult a hurdle for the

7   spoliator to overcome."  *Zubulake IV*, 220 F.R.D. at 219-220.  Furthermore, a finding of

8   prejudice is "essential" in order to impose sanctions, such as evidentiary or adverse inference

9   sanctions, that "interfere with the litigants' claim or defenses."  *Wanderer v. Johnston*, 910 F.2d

10  652, 656 (9th Cir. 1990).  Indeed, when imposed "merely for punishment of an infraction that did

11  not threaten to interfere with the rightful decision of the case," these sanctions are a violation of

12  due process  *Id*. (citing *Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d 585, 591 (9th Cir. 1983));

13  *cf. Zubulake V*, 229 F.R.D. at 422, 431 (requiring culpability and a showing of prejudice through

14  relevance).  A party seeking sanctions for spoliation "must demonstrate that the evidence

15  destroyed was 'relevant' to its claims and defenses.  At least where more severe sanctions are at

16  issue, this means that the moving party must show that the lost information would have been

17  favorable to it."  *In re NTL Sec. Litig.*, No. 02 Civ. 3010, 2007 U.S. Dist. LEXIS 6198, at *74,

18  (S.D.N.Y. Jan. 30, 2007).  Finally, issue sanctions are only available under Rule 37(b) "as long

19  as the established issue bears a reasonable relationship to the subject of discovery that was

20  frustrated by sanctionable conduct."  *Navellier v. Sletten*, 262 F.3d 923, 947 (9th Cir. 2001).

21      Plaintiffs' Supplemental Submission contains no authority or argument supporting any of

22  the evidentiary sanctions set forth in the Proposed Order.  *But see* Civ. L.R. 7-4(a)(5) (briefs

23  must contain "argument by the party, citing pertinent authorities").  As such, Plaintiffs have

24  necessarily failed to meet their burden for seeking such sanctions, and they have not offered the

25  Court any of the information it would need to justify any such sanctions.  To the extent that

26  Plaintiffs intend to offer any such information in reply or at oral argument, moreover, they will

27  have deprived Defendants of an opportunity to respond in writing.  Because Plaintiffs do not

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

39

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)

1   even try to justify any evidentiary sanctions in their Supplemental Submission, Plaintiffs' request
2   for such sanctions must be denied.

3   **VIII.   CONCLUSION**

4          For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'
5   Motion And Supplemental Submission Regarding Defendants' Destruction Of Evidence And
6   Request For Sanctions And Objections To Special Master's July 17, 2006 Order Denying
7   Plaintiffs' Motion To Compel The Restoration Of Backup Tapes And For Miscellaneous Relief
8   For The Destruction Of Evidence.

9   Dated:  October 19, 2007                              Respectfully submitted,

10                                                        LATHAM & WATKINS LLP
11                                                            Peter A. Wald
                                                             Michele F. Kyrouz
12                                                           Sean M. Berkowitz
                                                             Patrick E. Gibbs
13                                                           Jamie L. Wine
                                                             Matthew Rawlinson
14
15                                                    By:_____/s/_____
16                                                           Patrick E. Gibbs
                                                           Attorneys for Defendants ORACLE
17                                                         CORPORATION, LAWRENCE J.
                                                           ELLISON, JEFFREY O. HENLEY,
18                                                         and EDWARD J. SANDERSON
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

40

DEFENDANTS' OPP'N TO PLAINTIFFS' SUPPLEMENTAL
SUBMISSION REGARDING SPOLIATION ISSUES
CASE NO. C-01-0988-MJJ (JCS)