1   LATHAM & WATKINS LLP
      Peter A. Wald (SBN 85705)
2     Michele F. Kyrouz (SBN 168004)
      Sean P.J. Coyle (SBN 233039)
3   505 Montgomery Street, Suite 2000
    San Francisco, CA 94111-2562
4   Telephone: (415) 391-0600
    Facsimile: (415) 395-8095
5   E-mail: peter.wald@lw.com
            michele.kyrouz@lw.com
6           sean.coyle@lw.com

7   LATHAM & WATKINS LLP
      Jamie L. Wine (SBN 181373)
8   633 West Fifth Street, Suite 4000
    Los Angeles, CA 90071
9   Phone: (213) 485-1234
    Fax: (213) 891-8763
10  E-mail: jamie.wine@lw.com

    LATHAM & WATKINS LLP
      Patrick E. Gibbs (SBN 183174)
    135 Scott Drive
    Menlo Park, CA 94025
    Telephone: (650) 328-4600
    Facsimile: (650) 463-2600
    E-mail: patrick.gibbs@lw.com

11  Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
    J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
12
    ORACLE CORPORATION
13    Dorian Daley (SBN 129049)
      James C. Maroulis (SBN 208316)
14  500 Oracle Parkway
    Mailstop 5OP7
15  Redwood Shores, California 94065
    Telephone: (650) 506-5200
16  Facsimile: (650) 506-7114
    E-mail: dorian.daley@oracle.com
17          jim.maroulis@oracle.com

18  Attorneys for Defendant ORACLE CORPORATION

19  **UNITED STATES DISTRICT COURT**
20  **NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION**

21  In re ORACLE CORPORATION
    SECURITIES LITIGATION

    Master File No. C-01-0988-MJJ
    (Consolidated)

22  _____

23

24  This Document Relates To:

25  ALL ACTIONS.

**EXHIBIT 6 TO THE DECLARATION OF
SEAN P.J. COYLE IN SUPPORT OF
DEFENDANTS' MEMORANDUM
REGARDING PLAINTIFFS' MOTION TO
COMPEL TESTIMONY AND
DETERMINE THE APPLICABILITY OF
THE FIFTH AMENDMENT RIGHT
AGAINST SELF-INCRIMINATION**

26

27

**Judge:  Martin J. Jenkins
Date:    May 1, 2007
Time:    9:30 a.m.**

28  **EXHIBIT 6 PUBLICLY FILED REDACTED**

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COYLE DECL ISO DEFS' MEMO RE PLTFS' MTC TESTIMONY
AND DETERMINE THE APPLICABILITY OF 5TH AMEN
Master File No. C-01-0988-MJJ

# EXHIBIT 6

**Coyle, Sean (SF)**

| | |
|---|---|
| **From:** | Gibbs, Patrick (SV) |
| **Sent:** | Wednesday, January 10, 2007 5:06 PM |
| **To:** | 'matthewsymonds@economist.com'; 'matthewsymonds@msn.com' |
| **Cc:** | Coyle, Sean (SF) |
| **Subject:** | In re Oracle Securities Litigation - Order Compelling Production of Softwar Materials |

**Attachments:**      Scan001.PDF; cho-symonds.pdf; cho-amendment.pdf; 4072_001.pdf

Mr. Symonds:

Please see the correspondence attached immediately below regarding an order requiring the defendants in the above-referenced litigation (including Larry Ellison) to produce, by January 16, 2007, copies of all tapes and transcripts created by you in connection with your research for the book Softwar: An Intimate Portrait of Larry Ellison and Oracle:

    

Scan001.PDF (680  cho-symonds.pdf  cho-amendment.pd
KB)         (860 KB)         f (40 KB)

Please also see the letter from Larry Ellison attached immediately below regarding the order:



4072_001.pdf (42
KB)

Please feel free to contact me or my colleague, Sean Coyle (whom I've cc'd), if you have any questions about the order or the correspondence.

**Patrick E. Gibbs**

**LATHAM & WATKINS** LLP
135 Commonwealth Drive
Menlo Park, CA 94025
Direct Dial: (650) 463-4696
Fax: (650) 463-2600
Email: patrick.gibbs@lw.com
www.lw.com

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

1

NDCA-ORCL 1915550

140 Scott Drive
Menlo Park, California 94025
Tel: (650) 328-4600 Fax: (650) 463-2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

January 10, 2007

**BY EMAIL**

Matthew Symonds
16 St. Peters Road
Twickenham
TW1 1QX England

Re:    In re Oracle Corporation Securities Litigation

Dear Mr. Symonds:

As you know, this firm represents Oracle Corporation, Larry Ellison, Jeff Henley and Sandy Sanderson, each of whom is named as a defendant in the above-referenced litigation. As you also know, some months ago the plaintiffs filed a motion seeking to compel the defendants to produce copies of (among other things) any tapes or transcripts of interviews you conducted with Larry Ellison in connection with your research for the book *Softwar: An Intimate Portrait of Larry Ellison and Oracle* ("*Softwar*"). Defendants opposed the motion on several grounds, including that any tapes and transcripts created by you in connection with the book are not in the defendants' possession, custody or control.

On December 29, 2006, the Special Master appointed by the Court to oversee discovery in this litigation issued an order granting plaintiffs' motion in part and requiring defendants to produce to plaintiffs copies of any tapes or transcripts of interviews you conducted with Larry Ellison in connection with the book *Softwar*. As you can see from the Special Master's order (a copy of which I have enclosed for your reference), the order is based on the Special Master's conclusion that Mr. Ellison has the legal right to "control" these tapes and transcripts under the terms of an agreement between you and Mr. Ellison relating to the book. (I have also enclosed a copy of the final agreement for your reference.)

On Mr. Ellison's behalf, we hereby demand that you provide us with copies of any and all tapes or transcripts of any interviews you conducted with Mr. Ellison in connection with your research for the book Softwar. Please provide the materials to us as quickly as possible, as the order requires defendants to produce the tapes and transcripts to plaintiffs by January 16, 2007. If possible, we also request that you advise us, as soon as possible, of the approximate volume of tapes and transcripts in your possession.

We look forward to your anticipated cooperation. Please feel free to contact me if you have any questions.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

Matthew Symonds
January 10, 2007
Page 2

**LATHAM&WATKINS**LLP

Very truly yours,

Patrick E. Gibbs
of LATHAM & WATKINS LLP

Enclosure

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

NDCA-ORCL 1915552

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
415-774-2611
415-982-5287 (fax)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-09888-MJJ (JCS) **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS CONCERNING AND CREATED IN PREPARATION FOR THE BOOK SOFTWAR** |

On October 30, 2006, Plaintiffs submitted a motion to compel Defendants Oracle Corporation ("Oracle"), Lawrence J. Ellison ("Ellison"), Jeffrey O. Henley and Edward J. Sanderson (collectively, "Defendants") to produce documents concerning and created in preparation for the book *SOFTWAR*, written by Matthew Symonds. Defendants' opposition to the motion was submitted on November 13, 2006. Plaintiffs' reply was submitted on November 20, 2006. On December 14, 2006, the Special Master issued an order regarding the motion, attached hereto as Exhibit A. In pertinent part, the order provides that:

> The book, co-authored by Mr. Ellison, is clearly relevant to the issues identified in the Discovery Plan. Documents concerning and created for the book appear reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b)(1). The primary question for the Special Master for purposes of this motion is whether Ellison has control over the tapes and transcripts of interviews sought by Plaintiffs. In order to answer this question, the Special Master must review the final agreement between Ellison and Symonds regarding the book. The document plainly is relevant to Plaintiffs' claims, and Defendants have failed to justify any objection to the production of the final agreement. Accordingly, the Special Master, in order to finally resolve the present motion, will require Defendants to submit a copy of the final agreement between Symonds and Ellison for *in camera* review. The Special Master will review the agreement and then determine whether any further documents should be produced.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

1

Defendants were ordered to provide the Special Master with a copy of the final agreement within five business days of receipt of the order.  On December 20, 2006, Oracle submitted a copy of the final agreement and an amendment to the final agreement.  The Special Master has considered the final agreement and the papers and arguments of counsel and rules as follows:

<u>Background</u>

The final agreement between Ellison and Mr. Symonds is dated February 8, 2001 ("the agreement").  Section 1 of the agreement addresses the duties of the parties to the agreement, wherein Ellison agreed that (1) Symonds would have full access to business meetings provided all commercially sensitive information divulged in such meetings is subject to Clause 2 of the this Agreement; and (2) that he would grant Symonds full access both to Oracle's archives and to Ellison's personal archives, photographs and documents and any other materials necessarily related to the Work.  Agreement, § 1(a)(iii & ix).   Symonds agreed that:

> Upon completion of the Work, [Symonds will] return to Ellison all tapes, transcripts and working papers provided by Ellison, and not make further use of these materials without Ellison's express written consent.

Agreement, § 1(b)(iv).  The agreement's confidentiality clause provides that:

> Both parties understand and agree that all conversations and communication conducted by the parties to this agreement in preparation of the work (except, to the extent which such conversation and communications inform the Work itself; this clause shall apply to such conversations and communications until publication of the Work), including the terms of this Agreement, shall at all times be kept confidential.  Symonds agrees to execute the Nondisclosure Agreement by and between Symonds and Oracle Corporation that is attached hereto as Exhibit A.



> In all cases of this Agreement's termination, regardless of the basis for such termination, Symonds shall promptly upon such termination surrender to Ellison the original copy of all manuscripts, drafts, notes, and other material prepared by him for the Work learned during the course of researching and/or in connection with the Work as well as all audio and video tapes of all interviews conducted in connection with the preparation of the Work and the original and all copies of, all letters, photographs, diaries, and other material furnished by or on behalf of Ellison to Symonds in connection with his preparation of the

Work and shall not retain copies thereof. Neither Symonds nor Ellison shall have the right whatsoever to make any use of any material prepared by Symonds hereunder. Ellison's possession of the original copy of such materials is merely intended to permit the enforcement of this use restriction which, both parties agree, may be enforced by injunctive relief. Symonds shall have no right to use in any way the materials furnished by and on behalf of Ellison.

In the attached Nondisclosure Agreement, Symonds agreed to use Confidential Information solely for the purpose of preparing the Work, and that he will not make Confidential Information available (subject to paragraph 4 of the Nondisclosure Agreement, "Mandatory Disclosure") to any third party. Nondisclosure Agreement, ¶ 3. The Nondisclosure Agreement defines "Confidential Information" to include any information including but limited to that which related to business information disclosed by Oracle to Symonds, either directly, indirectly, in writing or orally. *Id.*, ¶ 2.

<u>Discussion</u>

Plaintiffs' motion seeks to compel production of documents concerning and created in preparation for the book. More specifically, Plaintiffs seek production of: (1) a final copy of the agreement; (2) any other communications or drafts created in preparation for that agreement; and (3) the transcripts, working papers and interview tapes relating to the book.

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." Fed. R. Civ. P. 26(b)(1). "The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

NDCA-ORCL 1915555

1      "Any party may serve on any other party a request .. to produce and permit the party
2  making the request ... to inspect ... any designated documents or electronically stored
3  information ... which constitute or contain matters within the scope of Rule 26(b) and which are
4  in the possession, custody or control of the party upon whom the request is served." Fed.R.Civ.P.
5  34(a).  "Control is defined as the legal right to obtain documents upon demand." *United States v.*
   *Int'l Union of Petroleum & Industrial Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989).
6      Plaintiffs' request for production of the agreement and any interview notes, transcripts or
7  recordings relating to the book appear reasonably calculated to lead to the discovery of admissible
8  evidence.  The requested information is responsive to numerous requests for production
9  propounded upon Defendants by Plaintiffs.  With respect to these materials, the primary question
10 for the Special Master is whether Ellison has control over the tapes and transcripts of interviews
11 sought by Plaintiffs.  The Special Master has reviewed the agreement between Ellison and
12 Symonds.  The agreement provides Ellison with "control" over "all tapes, transcripts and working
13 papers provided by Ellison."  Defendants' interpretation of the term "provided" is unduly
14 restrictive.  The agreement, read as a whole, gives Ellison the legal right to obtain all tapes and
15 transcripts of interviews with Ellison created in the course of the preparation of the book for
   publication.
16     The tapes and transcripts likely will contain both relevant and irrelevant information.
17 However, the fact that the tapes and transcripts may include irrelevant or non-responsive
18 information does not provide a basis for the Special Master to order production of less than all
19 tapes and transcripts at issue.  Any redaction of "irrelevant" information from the tapes would be
20 burdensome and time consuming.  Moreover, as previously noted in other orders, Defendants are
21 not permitted to unilaterally redact information on the basis of relevance.  Accordingly, Plaintiffs'
22 motion to compel production of the agreement and any interview notes, transcripts or tape
23 recordings relating to the book is GRANTED IN PART.  Defendants shall provide Plaintiffs with
24 a copy of:  (1) the final agreement; and (2) any and all tape recordings and/or transcripts of
25 interviews with Ellison created in the preparation of the book.
26     Plaintiffs' requests for the production of "documents concerning and created for the book"
27 and "any other communications or drafts created in preparation for that agreement," which would
28 include tapes of other interviews created in preparation of the book, do not appear to be
29 reasonably calculated to lead to the discovery admissible evidence, are overbroad, and any

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

4

response to such requests would be unduly burdensome.  Accordingly, the Plaintiffs' motion to compel production of documents responsive to these requests is DENIED.  Plaintiffs' request for production of Symonds's written interview notes likewise is DENIED.

Defendants shall provide Plaintiffs with a copy of the final agreement and copies of any and all responsive tapes and/or transcripts no later than January 16, 2007.

IT IS SO ORDERED.

Dated: _12-29-06_

Hon. Edward A. Infante (Ret.)
Special Master

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

5

NDCA-ORCL 1915557

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
415-774-2611
415-982-5287 (fax)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-09888-MJJ (JCS) |
| | **ORDER RE:  PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS CONCERNING AND CREATED IN PREPARATION FOR THE BOOK SOFTWAR** |

On October 30, 2006, Plaintiffs submitted a motion to compel Defendants Oracle Corporation ("Oracle"), Lawrence J. Ellison ("Ellison"), Jeffrey O. Henley and Edward J. Sanderson (collectively, "Defendants") to produce documents concerning and created in preparation for the book *Softwar*. Defendants' opposition to the motion was submitted on November 13, 2006. Plaintiffs' reply was submitted on November 20, 2006. The Special Master has considered the papers and the arguments of counsel and rules as follows:

### Background

The book *SOFTWAR: An Intimate Portrait of Larry Ellison and Oracle* by Matthew Symonds ("the book") was published in 2003. Both parties assert that work on the book commenced in March 2001 and proceeded for the next nine months. Symonds was accorded full access to accompany Ellison throughout his working day into every kind of business meeting with colleagues and customers all over the world. Symonds states: "I will spend at least 10 days each month with Ellison and will record up to 200 hours of one-to-one interviews. I will have office-space at Oracle on the same floor as Ellison and...will also travel with him and be present in all parts of his business.... I will interview past and present employees of Oracle as well as Ellison's wide circle of business and personal friends...." *See* NDCA-ORCL 1053853. Additionally,

## EXHIBIT A

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

1

NDCA-ORCL 1915558

Symonds states that Ellison agreed to make available "previously confidential company memoranda and e-mail." *Id.*

Plaintiffs describe the book as discussing "in great detail, the release of 11i, the months of hardships that accompanied its release…, sales by insiders including Ellison's January 2001 sales, Oracle's forecasting process and the effect of the dot-com bubble burst on the Company, and Oracle's billion dollar savings claims…." Plaintiffs' Motion to Compel at 2.   Plaintiffs further detail the contents of the book, stating:

> In Chapter 9, titled "The Laboratory," Symonds writes (and Ellison provides commentary) on the development of 11i, including information refuting Oracle's marketing mantra throughout the Class Period that it had saved over a billion dollars implementing 11i. Chapter 10, … titled "Ready or Not," chronicles the release of 11i and the problems associated with that release. Chapter 11, titled "Taking Stock," discusses Ellison's insider selling …in January 2001 as well as Oracle's earnings shortfall announcement in March 2001 and the effects of the macroeconomic climate on Oracle's earning in late 2000 and early 2001.  Chapter 12, titled "Hungarian Lessons," details Ellison's relationship with GE and GE Power System's experience with the Class Period implementation of 11i in a small Hungarian plant …

Plaintiffs' Motion to Compel at 4.

On March 10, 2005, Judge Spero issued an Amended Order Setting a Discovery Plan ("the Discovery Plan").  The Discovery Plan provides in pertinent paRt that Defendants shall produce:

> (1) "documents and communications…concerning the United States economy and its impact or potential impact on Oracle's revenues, earnings and expenses; its impact or potential impact on customer purchasing decisions of IT products and services in general; and specifically the purchase of products or services from Oracle"; (2) High level documents describing the scope and dimension of 'bug problems' with Suite 11i and/or any of its modules other than integration and interoperability"; (3) "Documents regarding any lost or deferred sales of an Oracle product, as well as any material expense with respect to any Oracle product—such as refunds, rebates or remediation"; (4) documents relating to Oracle's forecasts, including any mention of the economy as it relates to Oracle's forecasting during the Relevant Time Period and as it relates to the Company's pipeline and its growth or decline'" and (5) "documents and communications regarding Defendants' sales or contemplated sales of Oracle securities during January 2001."

During Ellison's September 21, 2006 deposition, Plaintiffs questioned Ellison extensively about statements contained in the book. The book is unusual in that, unlike most biographies, it contains footnotes and comments by one of its subjects, Mr. Ellison. *See, e.g.,* Coyle Decl., Ex. 2 (*SOFTWAR* Excerpts) at 63. Ellison and Symonds are joint copyright holders of the work.

Subsequent to Ellison's deposition, on October 2, 2006, Defendants produced, for the first time, a January 5, 2001 e-mail discussing the book and attaching: (1) a draft contract between Ellison and Symonds and (2) a promotional story titled "Softwar: The Rewards of Recklessness" used to interest prospective publishers. *See* Solomon Reply Decl., Ex. B. The e-mail establishes that any personal access Ellison provided to Symonds began before the close of the Class Period. The draft contract also attached to the January 5, 2001 email contains the following provisions:

- "Upon completion of the Work, [Symonds will] return to Ellison all tapes, transcripts and working papers provided by Ellison, and not make further use of these materials without Ellison's express written consent." *See* Ex. B. at NDCA-ORCL 1053825.

- "The next ██████ net of agent's commissions and expenses, pursuant to grants of publication and allied rights to the Work shall be deposited in an interest-bearing account to be administered by Wylie for the sole purpose of reimbursing Symonds for all reasonable expenses incurred by Symonds in connection with the Work (including but not limited to…transcription, employment of assistants, recording equipment, copying and printing…." *Id.* at NDCA-ORCL 1053828.

- "Any reasonable expenses incurred by Symonds in connection with this Agreement prior to the establishment of such escrow account shall be reimbursed by Ellison within thirty (30) days of Ellison's approval of an itemized invoice documenting such expenses, and the sum of such reimbursements shall be deducted from the budget of ██████ upon establishment of such interest-bearing account. *Id.* at NDCA-ORCL 1053829.

- "In all cases of this Agreement's termination, regardless of the basis for such termination, Symonds shall promptly upon such termination surrender to Ellison the original copy of all manuscripts, drafts, notes, and other material prepared by him for the Work, learned during the course of researching and/or in connection with the Work as well as all audio and video tapes of all interviews conducted in connection with the preparation of the Work and the original and all copies of, all letters, photographs, diaries, and other material furnished by or on behalf of Ellison to Symonds in connection with his preparation of the Work and shall not retain copies thereof. Neither Symonds nor Ellison shall have the right whatsoever to make any use of any material prepared by Symonds hereunder. Ellison's possession of the original copy of such materials is merely intended to permit the enforcement of this use restriction which, both parties agree, may be enforced by injunctive relief." *Id.* at NDCA-ORCL 1053838.

Plaintiffs subsequently requested that defendants produce documents concerning and created in preparation for the book. Specifically, Plaintiffs requested production of: (1) a final copy of the agreement between Symonds and Ellison concerning their work on the book; and (2) any other communications or drafts created in preparation for that agreement as well as the transcripts, working papers, and hundreds of hours of interview tapes which were to be returned

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

3

NDCA-ORCL 1915560

to Ellison pursuant to the agreement between Symonds and Ellison. On October 17, 2006, Defendants stated that because "plaintiffs have provided absolutely no basis for this demand" and that "no such [document] request exists]," Defendants would not produce the requested documents. On October 30, 2006, Plaintiffs filed the present motion to compel production of documents concerning and created in preparation for the book.

<u>Legal Standard</u>

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." Fed. R. Civ. Proc. 26(b)(1). "The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

"Any party may serve on any other party a request .. to produce and permit the party making the request ... to inspect ... any designated documents or electronically stored information ... which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served." Fed.R.Civ.P. 34(a). "Control is defined as the legal right to obtain documents upon demand." *United States v. Int'l Union of Petroleum & Industrial Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989). The party seeking production of the documents bears the burden of proving that the opposing party has such control. *Id.*

<u>Discussion</u>

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

4

Plaintiffs assert that documents concerning and created in preparation for the book are directly relevant to Plaintiffs' allegations, and are responsive to the Discovery Plan and many of Plaintiffs' document requests.[1]  Plaintiffs assert that documents concerning and created for the book include: (1) a final copy of the agreement; (2) any other communications or drafts created in preparation for that agreement; and (3) the transcripts as well as the transcripts, working papers and hundreds of hours of interview tapes that Plaintiffs assert were returned to Ellison pursuant to his agreement with Symonds.  Plaintiffs assert that these documents, including the tapes, are in Mr. Ellison's control and must be produced.  Plaintiffs' "control" argument is based upon the terms of the draft agreement between Ellison and Symonds.  Plaintiffs assert that if the quoted clauses (see above) are contained in the final agreement, Ellison has control of the documents because he has the legal right to obtain those documents on demand.

Defendants contend that:  (1) the final agreement between Symonds and Ellison is not relevant to issues in this case; (2) Ellison does not have (and never did have) possession, custody or control of any interview notes, transcripts or recordings relating to the book;[2]  (3)  Plaintiffs' demand for all other documents "concerning and created in preparation for" the book is vague, overbroad (several chapters of the book do not discuss information relevant to this action) and not reasonably calculated to lead to the discovery of admissible evidence; (4) Defendants have never agreed that documents concerning the book are responsive or relevant; and (5) Plaintiffs have been provided "voluminous contemporaneous emails and other materials" by Defendants and have had a "full and fair opportunity to examine Mr. Ellison about the book."

---

[1]  Plaintiffs assert that documents concerning and created in preparation for the book are responsive to *inter alia* requests 1-16, 18-21, 23-27 and 35 in Plaintiffs' first set of requests for production of documents and requests 10, 11 and 21 in Plaintiffs' third set of requests for production documents.  Request 6 seeks "all documents and communications relating to the United States economy and its impact on sales of Oracle's database and applications products, including, but not limited to, order cancellations, order or purchase delays, and discounts offered on Oracle products or services."  Request 21 seeks "all documents and communications relating to the timing or release of 11i, including, but not limited to, each subsequent version of 11i, for example, 11i5 and 11i5.3."  Request 24 seeks "all documents and communications relating to customer or potential customer complaints, concerns or dissatisfaction with the functionality, implementation or integration of 11i or any of its individual modules, including, but not limited to, the CRM module."  Request 27 seeks "all documents and communications supporting, or relating to Oracle's claim that it had already saved $1 billion through the internal implementation of its applications software."

[2]  Defendants assert that Ellison did not provide Symonds with any "tapes" or "transcripts" or "working papers," and therefore Symonds never returned any such materials to Mr. Ellison and Ellison has no right to access any of the materials Symonds created during this research and writing of the book.  See Symonds Decl. at ¶¶ 2-3.  Defendants further argue that because Symonds lives and works in London, England, he is beyond the subpoena power of this Court and any attempt to subpoena Mr. Symonds would require the Court to issue a letter of request to a British court, which would, in turn, raise the question of whether the requested discovery is proper under the Hague Convention.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

5

NDCA-ORCL 1915562

In reply, Plaintiffs assert that: (1) Defendants admit to the relevance of the requested information by failing to present a serious argument to the contrary in their opposition; (2) the lone document created in preparation for the book which has been produced confirms the relevance of the requested documents; (3) if the final contract resembles the draft contract, Ellison has the legal right to seek and obtain possession of the requested documents; (4) Defendants do not have the right to argue they have no legal control of the requested materials while they continue to refuse to produce the final draft of the agreement between Symonds and Ellison; and (5) independent of the final contract, Ellison has the legal right to endeavor to obtain the requested materials and therefore must at a minimum show that he has endeavored to do so.

### Production of the Final Contract between Ellison and Symonds

The book, co-authored by Mr. Ellison, is clearly relevant to the issues identified in the Discovery Plan. Documents concerning and created for the book appear reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b)(1). The primary question for the Special Master for purposes of this motion is whether Ellison has control over the tapes and transcripts of interviews sought by Plaintiffs. In order to answer this question, the Special Master must review the final agreement between Ellison and Symonds regarding the book. The document plainly is relevant to Plaintiffs' claims, and Defendants have failed to justify any objection to the production of the final agreement. Accordingly, the Special Master, in order to finally resolve the present motion, will require Defendants to submit a copy of the final agreement between Symonds and Ellison for *in camera* review. The Special Master will review the agreement and then determine whether any further documents should be produced.

Defendants shall provide the Special Master with a copy of the final agreement within five business days of receipt of this order.

IT IS SO ORDERED.

Dated: _12-14-06_

Hon. Edward A. Infante (Ret.)
Special Master

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

6

NDCA-ORCL 1915563

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 2,

2007, I served the attached amended ORDER GRANTING IN PART AND DENYING  IN

PART PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' PRODUCTION OF

DOCUMENTS CONCERNING AND CREATED IN PREPARATION FOR THE BOOK

SOFTWAR in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Mark Solomon Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | marks@lerachlaw.com |
| Douglas Britton Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | dougb@lerachlaw.com |
| Valerie McLaughlin Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | valeriem@lerachlaw.com |
| Gavin Bowie Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | gbowie@lerachlaw.com |
| Shawn Williams Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | shawnw@lerachlaw.com |
| Willow Radcliffe Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | willowr@lerachlaw.com |
| Eli Greenstein Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | elig@lerachlaw.com |
| Jennie Anderson Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | jenniea@lerachlaw.com |
| Monique Winkler Esq. | Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP | moniquew@lerachlaw.com |
| Peter Wald Esq. | Latham & Watkins | peter.wald@lw.com |
| Michele Kyrouz Esq. | Latham & Watkins | michele.kyrouz@LW.com |
| Patrick Gibbs Esq. | Latham & Watkins | patrick.gibbs@lw.com |
| Matthew Harrison Esq. | Latham & Watkins | matt.harrison@LW.com |
| Sean Coyle Esq. | Latham & Watkins | sean.coyle@lw.com |

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

**ORACLE**

L A W R E N C E   J .   E L L I S O N
*Chief Executive Officer*

Corporate Headquarters     phone     650.506.5366
500 Oracle Parkway          fax       650.506.7171
M/S 5opCEO
Redwood Shores
California 94065

January 10, 2007

**Via Email and First-Class Mail**

Matthew Symonds
16 St Peters Road
Twickenham
TW1 1QX England

Dear Matthew:

I'm writing to request your help in responding to a court order that recently was issued in the *In re Oracle Securities Litigation.* As I'm sure you remember, that case is a class action pending in federal court in San Francisco. Both Oracle and I are defendants.

Plaintiffs have sought very broad discovery, and one of the discovery motions they made concerned any tapes or transcripts of interviews you conducted with me in connection with your research for *Softwar.* We opposed this motion because, quite frankly, we believed those materials were yours, not Oracle's or mine. In a recent order (which my attorneys will send to you), the court disagreed with our view. The court has ruled that I can and must get copies of these materials from you. I've been ordered to produce these materials to plaintiffs next week.

Although I understand that my lawyers will be sending you a more formal letter, I wanted to write to you separately to request that you cooperate with my counsel and forward these materials as quickly as you can. I apologize for any burden or inconvenience that this request creates.

Sincerely,

Larry Ellison

cc:    Peter Wald, Esq.
        Daniel Cooperman, Esq.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

*Philip Simon*

AGREEMENT made as of this 8th day of February 2001, by and between Larry Ellison ("Ellison") and Matthew Symonds ("Symonds") both c/o The Wylie Agency, Inc., 250 West 57th Street, Suite 2114, New York, NY 10107 ("Wylie").

WHEREAS, the parties propose that Symonds will write a book, authorized by Ellison, on Ellison and the Oracle Corporation ("the Work"), and are desirous of establishing all their rights and obligations in and to the Work and all secondary and subsidiary rights.

NOW, THEREFORE, in consideration of the execution of this Agreement, and the undertakings of the parties as hereinafter set forth, it is agreed as follows:

1.   Duties:

(a)   Ellison shall:

(i)   Make himself available in New York for a minimum of two (2) days in January 2001 (unless otherwise mutually agreed) to assist in the presentation and sale of the Work to publishers;

(ii)   Provide Symonds with office space in the vicinity of Ellison's own at the Oracle Corporation, for Symonds's use until fulfillment of his services and obligations hereunder;

(iii)   For nine (9) months beginning in March 2001, make his schedule available to Symonds on a weekly basis, and, by the 25th day of each month, Ellison and Symonds shall agree either to one ten (10)-day period or to two (2) separate

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

five (5)-day periods in the following month within which Symonds shall accompany Ellison throughout his working day with full access to business meetings provided all commercially sensitive information divulged in such meetings is subject to Clause 2 of this Agreement;

(iv)     Make himself available to Symonds within each ten (10)-day monthly meeting period (from March 2001 through November 2001) for a minimum of ten (10) hours per week of one-on-one interview time;

(v)      For an additional nine (9) months beginning in December 2001, make himself available to Symonds for a minimum of five (5) hours per month of one-on-one interview time;

(vi)     Provide Symonds with a dedicated email address and a personal telephone number for all confidential communications related to the Work;

(vii)    Consult and advise Symonds on his research, the names of other persons to be interviewed, and any other resources to the best of his knowledge;

(viii)   Provide Symonds with a letter authorizing him to conduct such interviews, when necessary;

(ix)     Grant Symonds full access both to Oracle's archives and to Ellison's personal archives, photographs, documents and any other materials necessarily related to the Work (Ellison shall either grant / clear permissions or provide/obtain releases, as such permissions and releases are appropriate and required for publication, for the inclusion of any and all such materials in the Work);

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

(x)     Grant Symonds access to Ellison's personal life insofar as such access will, in the parties' mutual opinion, inform the Work as a portrait of Ellison (e.g. Ellison's preparation for the America's Cup);

(xi)    Travel with Symonds when both parties agree such travel is needed for interviews and research;

(xii)   Provide Symonds with a letter confirming Ellison's authorization of the Work, subject to the obligations of both parties as set forth herein;

(xiii)  Make himself available for a minimum of one (1) week at the time of publication to promote the Work.

(b)     Symonds shall:

(i)     Conduct extensive interviews with anyone whom Symonds considers in his sole discretion to be informative to the Work, including but not limited to Ellison and other persons who may be proposed as subjects by Ellison;

(ii)    Produce written and edited materials that, in style and content, are professionally competent and fit for publication according to industry standards;

(iii)   Meet publishers' deadlines in a timely manner;

(iv)    Upon completion of the Work, return to Ellison all tapes, transcripts and working papers provided by Ellison, and not make further use of these materials without Ellison's express written consent.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

2.  <u>Confidentiality</u>: Both parties understand and agree that all conversations and communications conducted by the parties to this agreement in preparation of the Work (except, to the extent to which such conversations and communications inform the Work itself; this clause shall apply to such conversations and communications until initial publication of the Work), including the terms of this Agreement, shall at all times be kept confidential. Symonds agrees to execute the Nondisclosure Agreement by and between Symonds and Oracle Corporation that is attached hereto as Exhibit A.

3.  <u>Editorial Control and Approval of Manuscript</u>: Symonds shall have final approval over the text of the Work ("Symonds's Contribution"). However, Ellison shall have the right to review Symonds's Contribution and to present a different view, or different angle on an issue, which the Publisher shall (subject to the Publisher's consent) print in a footnote or inserted text set within the body of Symonds's Contribution ("Ellison's Contribution"), and Symonds shall not have final approval over Ellison's Contribution. For the purposes of the preceding sentence, Symonds shall deliver a copy of the completed text of Symonds's Contribution to Ellison no less than forty-five (45) days before the Publisher's deadline. Ellison shall be solely responsible for the delivery of Ellison's Contribution to the Publisher by the Publisher's deadline, subject to Clause 16(e), below.

4.  <u>Copyright Ownership and Grants of Rights</u>:

    (a)   It is understood that Symonds and Ellison shall share <u>equally</u> copyright in the Work. All publishing agreements and other arrangements will be made and signed by Symonds and Ellison as the equal shareholders of copyright in the Work and on

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

terms and conditions Symonds and Ellison in their mutual discretion deem desirable. It is hereby understood and agreed that the Work shall be approximately 85,000 words in length and shall be complete and suitable for delivery to an initial publisher ("Publisher") by October 31, 2002. Any other terms of agreements for publication of the Work shall be subject to good faith negotiation.

(b)   With respect to all motion picture rights (i.e. film and television and all ancillary and allied rights) to the text of the Work, it is understood that such rights are shared equally by Symonds and Ellison and shall be sold jointly with Ellison's life rights, if at all. It is understood and agreed that Ellison retains his life rights. It is agreed that Ellison shall not enter into any agreement involving film or allied rights in the Work other than the arrangement provided for herein while the Work remains in print and for a period of two (2) years thereafter. If motion picture rights to the Work are sold, Symonds and Ellison shall each receive fifty percent (50%) of all revenue, net of agent commission and expenses, pursuant to the acquisition of such rights to the Work. Each party shall promptly notify the other of any interest for such rights to the Work or to Ellison's life or to both and the parties shall negotiate all other terms in good faith at the time of exploitation. All motion picture rights-related agreements and other arrangements are to be signed by both Symonds and Ellison as the equal shareholders of copyright in the Work.

(c)   Symonds shall have the right of first and last refusal to write a treatment for a motion picture based on the Work, subject to terms of such writing services to be negotiated in good faith.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

(d)   If it is understood and agreed that a second, short book on a single subject for a business leaders series may be drawn from the transcripts of conversations conducted in preparation of the Work. In such event, the arrangement for that book shall be subject to a new agreement under mutually agreeable terms.

(e)   It is understood and agreed that Symonds shall have the first right of refusal to write any future editions or revisions of the Work, subject to terms to be negotiated in good faith. It is further understood and agreed that neither Ellison nor the Publisher nor another publisher in negotiation with Ellison may offer any other author terms more favorable than those offered Symonds to write or revise a future edition of the Work without first offering such terms to Symonds.

5.   <u>Compensation and Expenses:</u>

(a)   The first ▆▆▆▆▆ in revenue, net of agent's commissions and expenses, pursuant to grants of publication and allied rights to the Work shall be paid to Symonds.

(b)   The next ▆▆▆▆▆, net of agent's commissions and expenses, pursuant to grants of publication and allied rights to the Work shall be deposited in an interest-bearing account to be administered by Wylie for the sole purpose of reimbursing Symonds for all reasonable expenses incurred by Symonds in connection with the Work (including but not limited to the cost of renting of a house in the San Francisco Bay area in the summer of 2001, business-class travel and reasonable accommodations, transcription, employment of assistants, recording equipment, copying and printing, communications, health insurance for the duration of Symonds's leave from THE ECONOMIST, if Symonds's insurance from THE

ECONOMIST is withdrawn for any period of time pursuant to Symonds's fulfillment of his services and obligations hereunder). Such reimbursements shall be payable to Symonds upon Wylie's receipt of an itemized invoice and supporting receipts documenting such expenses, such documentation to be submitted by Symonds not more than once per month. Ellison or a designated representative shall have the right to inspect such documentation upon reasonable notice to Wylie and for the purposes of confirming that all expenses are reasonably related to the Work.

(c)     If the sum of reimbursements payable to Symonds is less than ████████ as of Symonds's fulfillment of all services and obligations hereunder, the balance shall be paid to Ellison. If the total expenses incurred by Symonds exceed ██████ the amount in excess shall be borne by Symonds unless otherwise agreed by Ellison. Any interest earned by such account shall be paid to Ellison.

(i)     Any reasonable expenses incurred by Symonds in connection with this Agreement prior to the establishment of such escrow account shall be reimbursed by Ellison within thirty (30) days of Ellison's approval of an itemized invoice and supporting receipts documenting such expenses, and the sum of such reimbursements shall be deducted from the budget of ██████ upon establishment of such interest-bearing account.

(ii)    Ellison shall be responsible for his own expenses incurred in connection with the Work, including but not limited to travel, accommodations, and communications expenses. It is agreed that neither party herein shall have the right to borrow money on the credit of the other or to pledge the credit

of the other; and neither party shall be responsible for any debts or obligations incurred by the other.

(c) All revenue in excess of ▮▮▮▮ net of agent's commissions and expenses, pursuant to grants of publication and allied rights to the Work shall be paid as follows:

(i) ▮▮▮▮▮▮ to Ellison; and

(ii) ▮▮▮▮▮▮ to Symonds.

6. <u>Agent:</u> All sums of money due Symonds and Ellison under the terms of this agreement shall be paid to The Wylie Agency, Inc., 250 West 57th Street, Suite 2114, New York, NY 10107, and the receipt of said agent shall be a good and valid discharge of all indebtedness; and the said agent is hereby empowered to act as Symonds's and Ellison's exclusive agent on Symonds's and Ellison's behalf in all matters arising from and pertaining to this agreement. For services rendered and to be rendered, Symonds and Ellison do hereby irrevocably assign and transfer to The Wylie Agency, Inc., its executors, administrators and assigns, and the said The Wylie Agency, Inc. which is an intended third party beneficiary under this agreement, shall retain a sum equal to ten percent (10%) as an agency coupled with an interest out of all gross monies accruing to the account of Symonds and Ellison under this agreement pursuant to the sale of North American rights to the Work and a sum equal to twenty percent (20%) of all gross monies accruing to the account of Symonds and Ellison under this agreement pursuant to the sale of British and foreign-language rights to the Work (such 20% shall be inclusive of co-agent commissions, if applicable), prior to deductions from or charges against such monies for travel and entertainment, international faxes,

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

express mail, postage, photocopying, and any other expenses incurred directly related to the
Work. The sale of any and all rights to the Work shall be subject to the prior approval of
both Symonds and Ellison.

7.  <u>Authorship Credit:</u>    Symonds shall receive sole authorship credit in the form "By
Matthew Symonds" for the Work on the cover, jacket, title page, and any other place where
the authorship is customarily included on a book and in advertising and promotion of the
Work. This provision applies to all editions of the Work published by the Publisher and/or
by any publisher and to all editions of the Work or portions of the Work licensed for
publication by any publisher and any licensee or purchaser of any subsidiary rights, including
but not limited to all print publication, film and television allied and ancillary rights, audio,
radio, live stage, and multimedia rights.

8.  <u>Representations:</u>

(a)   Ellison  warrants and represents that he has the right to enter into this Agreement, to
perform as hereby required, and to grant the rights herein granted. Ellison further
warrants and represents that Ellison's Contribution (i) will not infringe upon any
copyright or any other proprietary right at common law of any third party; (ii) all
necessary permissions for Ellison's Contribution will be obtained; (iii) Ellison's
Contribution will contain no matter whatsoever that is obscene or libelous, violates
any third party's right of privacy or publicly, or is otherwise in contravention of law
or the right of any third party.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

(b)     Symonds warrants and represents that he has the right to enter into this Agreement, to perform as hereby required, and to grant the rights herein granted.  Symonds further warrants and represents that (i) Symonds's Contribution will not infringe upon any copyright or any other proprietary right at common law of any third party; (ii) all necessary permissions for Symonds's Contribution will be obtained; and (iii) Symonds's Contribution will contain no matter whatsoever that is obscene or libelous, violates any third party's right of privacy or publicly, or is otherwise in contravention of law or the right of any third party.

9.     <u>Competitive Works:</u>   Beginning with the date of this Agreement, Ellison will not hereafter authorize any work or enter into any agreement or understanding with any person or entity which might conflict with this Agreement (i.e., Ellison will not, without the Publisher's permission, enter into another agreement regarding the publication of a book based upon his life story for a period of three (3) years after the initial hardcover publication of the Work).

10.     <u>Indemnification:</u>       Each party hereto shall indemnify, defend and hold harmless the other party hereto from any and all claims, debts, demands, suits, actions, proceedings, and/or prosecutions ("Claims") based on allegations which, if true, would constitute a breach of any of that party's warranties and representations hereunder, and any and all liabilities, losses, damages, and expenses (including attorneys' fees and costs) in consequence thereof.  The indemnifying party's obligations are conditioned upon the indemnified party: (i) giving the indemnifying party prompt written notice of any Claim for which the indemnified party is seeking an indemnity; (ii) granting control of the defense and settlement

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

to the indemnifying party; and (iii) reasonably cooperating with the indemnifying party at the indemnifying party's expense. The protection of any licensee's Errors & Omissions Policy as provided in any such license agreement shall extend to both parties.

11.   <u>Assignment:</u>   This agreement is not assignable by either party without the prior written consent of the other except to assign the receipt of payments, such assignment to be made effective by sufficient prior written notice. This agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, successors or permitted assigns.

12.   <u>Notices:</u>   Formal business and financial notices given hereunder will be given by (i) personal delivery, (ii) overnight courier, (iii) telecopy followed by first class mail, or (iv) certified mail, return receipt requested, to the following addresses:

   (a)  If to Symonds:

        Matthew Symonds

        _____

        _____

        _____

   (b)  If to Ellison:

        Larry Ellison

        _____

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

_____

_____

With a copy to:

Andrew Wylie
The Wylie Agency, Inc.
250 West 57th Street
Suite 2114
New York, NY 10107

A party may change its address by written notice to the other party. Notices will be deemed

to be received and effective (i) when personally delivered, (ii) one (1) day after the date of

forwarding by overnight courier, (iii) on the date of telecopy with confirmation, provided a

copy is also sent by U.S. Mail, or (iv) if sent via certified mail, on the date of receipt.

13.    Applicable Law:       The validity, construction and performance of this Agreement shall

be governed and interpreted in accordance with the laws of the State of New York.

14.    Arbitration:    Any controversy or claim arising out of this agreement or the breach thereof

shall be settled by arbitration in accordance with the rules then obtaining of the American

Arbitration Association, and judgment upon the award may be entered in the highest court

of the forum, State or Federal, having jurisdiction.  Such arbitration shall be held in the City

of New York unless otherwise agreed by the parties.

15.    Term of Agreement:    If the Work is published, this agreement shall be in force and

continue for the copyright therein and any renewals of such copyright.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

16.   Termination:

(a)   Ellison reserves the absolute right to terminate this Agreement at any time with or without cause. Termination without cause shall be effective immediately upon Symonds's receipt of written notice from Ellison provided (i) neither Symonds nor Ellison shall make any use whatsoever of Symonds's work product completed at that point; (ii) Symonds shall be entitled to keep all amounts and expense reimbursements theretofore paid to him for his services rendered hereunder; (iii) Symonds shall receive his share of advances paid as of the effective date of termination under any publication agreement entered into by the parties in respect to the Work; (iv) in addition, Symonds shall receive his share of any advances due on delivery of all or part of the Work to the Publisher or on publication of any edition of the Work provided Symonds has fulfilled all of his services and obligations hereunder and the Work is deliverable or, if already delivered, acceptable to the Publisher (v) Ellison shall be solely responsible for terminating the Publisher's agreement and any other grants of rights in the Work in place and repaying the Publisher and any other licensees any paid advances and fees in full. In the event of such termination, Symonds shall make no claim to any portion of advances or royalties paid or to be paid subsequent to the effective date of termination except as provided in (iii) and (iv) of this sub-clause.

(b)   Ellison may terminate this agreement upon thirty (30) days written notice if, for any reason other than Ellison's fault, the publisher has rejected the manuscript of the Work as unacceptable or Symonds has been unable to deliver a manuscript by the

mutually agreed upon deadline unless another publisher acceptable to Ellison agrees to publish the Work based on Symonds's work product then completed and to repay all advances to the Publisher; in such event, Symonds shall return to Ellison any advance payments paid to him and, upon such repayment, this Agreement shall be terminated.

(c)    If the Publisher terminates the Publisher's agreement either because Symonds's manuscript was not timely delivered or was, in the Publisher's opinion, unsatisfactory, Ellison may elect not to terminate this Agreement. In such event, Ellison shall not demand repayment of sums previously paid hereunder and Symonds shall use his best efforts to cooperate with Wylie in negotiating an agreement with a new publisher by meeting with prospective publishers and making available excerpts of the manuscript of the Work. If an agreement is executed with a new publisher, Symonds shall use his best efforts to produce a manuscript acceptable to such publisher within the required schedule.

(d)    In the event Symonds is unable to deliver a satisfactory manuscript of the Work to the Publisher within the time limits established by the Publisher as the same may be extended due to Ellison's failure to cooperate with Symonds, Symonds may terminate this Agreement immediately on written notice to Ellison and retain all sums theretofore paid to him hereunder. Ellison shall be solely responsible for terminating the Publisher's agreement and any other grants of rights in the Work in place and repaying the Publisher and any other licensees any paid advances and fees in full. The retention of sums previously paid to him shall be Symonds's sole and exclusive remedy in the case of termination under this section.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

(e)     In the event Symonds delivers a satisfactory manuscript of Symonds's Contribution

to the Publisher within the time limits established by the Publisher as the same may

be extended and has delivered the same to Ellison no later than forty-five (45) days

prior to the Publisher's deadline in accordance with Clause 3 hereinabove and

Ellison fails to deliver Ellison's Contribution to the Publisher by the Publisher's

deadline, should the Publisher withhold any advance payments as a result of Ellison's

nondelivery of Ellison's Contribution, Symonds shall, in addition to having the right

to terminate this Agreement and retaining all sums previously paid to Symonds

hereunder, receive from Ellison his share of any advances due on delivery of all or

part of the Work to the Publisher and on publication of any edition of the Work. In

the event of Symonds's termination, Ellison shall be solely responsible for

terminating the Publisher's agreement and any other grants of rights in the Work in

place and repaying the Publisher and any other licensees any paid advances and fees

in full.

(f)     Should Symonds die or become disabled so as to make it impossible for him to

complete the Work within the time provided, then in the case of Symonds's death

this Agreement shall immediately terminate or, in the case of Symonds's disability,

Ellison may, upon thirty (30) days written notice, terminate this Agreement. Upon

such termination, neither party shall make any use of Symonds's work product

completed at the date of termination. Ellison may however negotiate with Symonds

or his estate, as the case may be, for the use of his work on the Work completed as

of the date of termination. The parties shall negotiate with each other in good faith

for such use and shall be guided by the principle that Symonds or his estate should

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

receive that portion of the compensation which would have been due to Symonds had he been able to complete the Work corresponding to the portion of the Work which Symonds was, in fact, able to complete.

(g)     Should Ellison die or become disabled so as to make it impossible, in Symonds's sole and reasonable discretion, for Symonds to complete the Work within the time provided, then in the case of Ellison's death this Agreement shall immediately terminate or, in the case of Ellison's disability, Symonds may, upon thirty (30) days written notice, terminate this Agreement. Upon such termination, neither party shall make any use of Symonds's work product completed at the date of termination. Symonds may however negotiate with Ellison or his estate, as the case may be, for the use of his work on the Work completed as of the date of termination. The parties shall negotiate with each other in good faith for such use.

(h)     Should Ellison die or become disabled before Symonds's completion of the Work and Symonds determines in his sole and reasonable discretion that it is possible for him to complete the Work within the time provided, the parties shall negotiate with each other in good faith for such continuation and use of the Work and shall be guided by the principle that (i) if Ellison or his estate continues to fulfill Ellison's obligations hereunder inasmuch as is necessary for Symonds to complete the Work within the time period provided, and (ii) if Ellison or his Estate continues to fulfill all obligations of any Publisher agreement or other licenses granting rights in the Work in place as of the date of termination, Ellison or his estate should receive the compensation which would have been due to Ellison pursuant to Clause 5 herein.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

NDCA-ORCL 1915581

(i)    In all cases of this Agreement's termination, regardless of the basis for such termination, Symonds shall promptly upon such termination surrender to Ellison the original copy of all manuscripts, drafts, notes, and other material prepared by him for the Work learned during the course of researching and/or in connection with the Work as well as all audio and video tapes of all interviews conducted in connection with the preparation of the Work and the original and all copies of, all letters, photographs, diaries, and other material furnished by or on behalf of Ellison to Symonds in connection with his preparation of the Work and shall not retain copies thereof. Neither Symonds nor Ellison shall have the right whatsoever to make any use of any material prepared by Symonds hereunder. Ellison's possession of the original copy of such materials is merely intended to permit the enforcement of this use restriction which, both parties agree, may be enforced by injunctive relief. Symonds shall have no right to use in any way the materials furnished by and on behalf of Ellison.

17.    <u>Entire Agreement</u>:    The terms and conditions herein contained constitute the entire agreement between the parties and supersede any and all previous communications and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement. No amendment or modification of this Agreement shall be valid unless in writing and signed by both parties. If all parties have not signed this agreement by January 31, 2001, the terms offered herein shall be null and void.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date and year first above written.

_____     _____
Matthew Symonds          Date            Larry Ellison          Date

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (the "Agreement") is made on _____ by and
between Matthew Symonds, c/o The Wylie Agency, Inc. 250 West 57th Street, Suite 2114, New
York, NY 10107 ("Recipient") and Oracle Corporation, a Delaware corporation located at 500
Oracle Parkway, Redwood Shores, CA 94010 ("Company").

1.  **Purpose.**  Recipient has entered into an Agreement with Lawrence J. Ellison ("Ellison") dated
    _____ (the "Book Collaboration Agreement") pursuant to which
    Recipient will write a book on Ellison and Company (the "Work").  In connection with Recipient's
    preparation of the Work, certain of Company's Confidential Information may be disclosed to
    Recipient.

2.  **Definition.**  "Confidential Information" means any information, technical data or know-how,
    including, but not limited to, that which relates to research, product plans, products, services,
    customers, partners, customer lists, markets, software, developments, inventions, marketing,
    strategy, finances, financial results or other business information disclosed by Company to
    Recipient either directly, indirectly, in writing or orally.  Confidential Information does not
    include information, technical data or know-how which: (i) was in the public domain at the time
    it was disclosed or falls within the public domain, unless it falls into the public domain as a result
    of actions of Recipient; or (ii) was known to Recipient at the time of disclosure, which
    knowledge Recipient shall have the burden of establishing by clear and convincing evidence; or
    (iii) was independently developed by Recipient without the benefit of data received from
    Company, which independent development Recipient shall have the burden of establishing by
    clear and convincing evidence.

3.  **Non-Use and Non-Disclosure of Confidential Information.**  Recipient agrees not to misuse
    or misappropriate any Confidential Information, and Recipient agrees to notify Company of any
    misuse or misappropriation of Confidential Information that comes to his attention.  Recipient
    agrees to use Confidential Information solely for the purpose of preparing the Work.  Recipient
    will not make Confidential Information available to any third party including, but not limited to,
    by disclosing it in the Work, except as specifically authorized in writing by Company.  Recipient
    agrees that he will take all reasonable measures to protect the secrecy of and avoid the
    unauthorized disclosure or use of Confidential Information in order to prevent it from falling
    into the public domain, which measures shall include the highest degree of care that Recipient
    utilizes to protect his own confidential information.

4.  **Mandatory Disclosure.**  In the event that Recipient is requested or required by legal process to
    disclose any Confidential Information, he shall give prompt notice to Company so that
    Company may seek a protective order or other appropriate relief.  In the event that such
    protective order is not obtained, Recipient shall disclose only that portion of the Confidential
    Information which his counsel advises that he is legally required to disclose, provided that he
    shall exercise his reasonable efforts to preserve confidentiality of the Confidential Information
    including, without limitation, by cooperating with Company to obtain an appropriate order or

other reliable assurance that confidential treatment will be accorded the Confidential Information by such tribunal.

5. **Insider Trading.** Recipient acknowledges that he has received, read and understood Company's policy against trading in Company stock while in the possession of inside information (i.e., material nonpublic information) as attached hereto. Recipient agrees to sell or otherwise dispose of Company stock strictly in compliance with this policy and all related securities laws.

6. **Term.** The foregoing commitments of Recipient in this Agreement shall survive any termination of relationship between the parties until such time as all Confidential Information disclosed hereunder becomes publicly known and made generally available through no action or inaction of Recipient.

7. **Governing Law and Jurisdiction.** This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of California, and shall be binding upon the parties hereto. The federal and state courts within the State of California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement and Recipient consents to personal jurisdiction in such courts.

8. **Remedies.** Recipient agrees that his obligations hereunder are necessary and reasonable in order to protect Company, and expressly agrees that monetary damages would be inadequate to compensate Company for any breach by the Recipient of any covenants or agreements set forth herein. Accordingly, each party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to Company and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, Company shall be entitled to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages.

9. **Waiver, Entire Agreement.** Failure or inability of any party to enforce any right hereunder shall not waive any right with respect to any other or future rights or occurrences. This Agreement sets forth the entire agreement between the parties and supersedes prior proposals, agreements and representations between them, whether written or oral. In the event of any conflict between this Agreement and the Book Collaboration Agreement, this Agreement shall control. This Agreement may be changed only if agreed to in writing.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

MATTHEW SYMONDS

_____
Matthew Symonds

ORACLE CORPORATION

Name: _____

Title: _____

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

# INSIDER TRADING POLICY

## Insider Trading

We expect you to comply with federal and state securities laws governing your transactions in Oracle or other company securities.

## Legal requirements

Federal and state securities laws and regulations prohibit you from using material, non-public company information for personal advantage and from disclosing this information to any other person before it is broadly available. You expose yourself and Oracle to civil and criminal liability if you or members of your immediate family trade in securities while you possess inside information gained through your work at Oracle or if you provide others with inside information for their use in securities trading. Individuals can be liable for civil penalties of up to three times the gain in any trade, including profits made and losses avoided, as well as criminal fines of up to $1 million and prison terms of up to 10 years.

## Definitions

Material information includes any information-positive or negative-that a reasonable investor would consider important in the decision to buy, hold, or sell securities. Material information includes: financial or key business data; merger, acquisition, or divestiture discussions; award or cancellation of a major contract; key management changes; forecasts of unanticipated financial results; significant litigation; gain or loss of a substantial customer or supplier.

Trading includes the purchase, sale, or exercise of options in securities.

Securities include common stock, bonds, employee stock options, futures, and other financial instruments.

Trading on material, inside information may include making a single purchase or sale, or engaging in a pattern of transactions which might appear to take advantage of inside information possessed by others at Oracle. Possessing inside information at the time of the trade-- whether or not you actually use or rely on it-- may be considered trading on inside information. The number of shares or the dollar amounts involved need not be large, nor must you hold the securities directly to be considered trading on inside information. It is enough that the securities are beneficially owned or controlled by or for you through family members, partnerships, trusts, or other such entities.

## General guidelines

Keep inside information confidential at all times and do not "tip" inside information to anyone. Be particularly careful about communicating any information about Oracle to brokers and others involved in trading Oracle securities.

If you are aware of inside information, you should not trade in Oracle securities. And, you should hold the inside information confidential until Oracle has disclosed it to the general public through a press release, the press has circulated it, and investors have had time to evaluate it. Generally, you should refrain from trading from the time you become aware of the inside information until two full trading days after Oracle has issued a press release disclosing the information. For example, if Oracle issues its press release on Thursday, you should refrain from trading until the following Tuesday.

### "No trading" periods (Revised February 2000)

If you have access to earnings and revenue information, you should refrain from trading in Oracle securities during the following period of time: from two weeks before the end of each quarter through two full trading days after Oracle releases its earnings report for that quarter. For example, if Oracle issues a press release announcing earnings at the close of market on Tuesday, you should continue to refrain from trading until the market opens on Friday.

### Speculative transactions

We strongly discourage you from engaging in speculative transactions in Oracle securities, such as short sales, puts, calls, straddles, or similar transactions. In most instances, such transactions provide none of the benefits of traditional stock ownership, and, in the case of "short sales," represent a wager against Oracle's success. For these reasons, we ask that you refrain from any short sale or from any purchase or sale of any put, call, straddle, or other publicly traded option in Oracle securities. This policy does not apply to the exercise of any employee stock options granted by Oracle.

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

AMENDMENT DATED FEBRUARY 21, 2001 TO THE AGREEMENT DATED FEBRUARY 8, 2001 BETWEEN LARRY ELLISON AND MATTHEW SYMONDS, C/O THE WYLIE AGENCY, INC. ("Agreement")

The parties hereby understand and agree as follows:

Paragraphs 5(a) and 5(b) of the Agreement shall be replaced with the following:

5.      **Compensation and Expenses:**

(a)  The first ▮▮▮▮▮ of revenue, net of agent's commissions and expenses, pursuant to grants of

publication and allied rights to the Work shall be deposited in an interest-bearing account

to be administered by Wylie for the sole purpose of reimbursing Symonds for all

reasonable expenses incurred by Symonds in connection with the Work (including but

not limited to the cost of renting of a house in the San Francisco Bay area in the summer of

2001, business-class travel and reasonable accommodations, transcription, employment of

assistants, recording equipment, copying and printing, communications, health insurance for

the duration of Symonds's leave from THE ECONOMIST, if Symonds's insurance from THE

ECONOMIST is withdrawn for any period of time pursuant to Symonds's fulfillment of his

services and obligations hereunder). Such reimbursements shall be payable to Symonds upon

Wylie's receipt of an itemized invoice and supporting receipts documenting such expenses,

such documentation to be submitted by Symonds not more than once per month. Ellison or a

designated representative shall have the right to inspect such documentation upon reasonable

notice to Wylie and for the purposes of confirming that all expenses are reasonably related to

the Work.

(b)  The next ▮▮▮▮▮ in revenue, net of agent's commissions and expenses, pursuant to grants of

publication and allied rights to the Work shall be paid to Symonds.

All other terms and provisions of the Agreement shall remain in full force and effect.

Agreed:

_____

Matthew Symonds

Larry Ellison

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER