# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re ORACLE CORPORATION
SECURITIES LITIGATION

Master File No. C-01-0988-MJJ

This Document Relates To:
ALL ACTIONS.
_________________________________/

---oOo---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MICHAEL DeCESARE

Thursday, February 16, 2006

---oOo---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone: (415) 321-2300
Fax: (415) 321-2301

Reported by:
LORRIE L. MARCHANT, CSR, RPR, CRR
CSR No. 10523
and
SHEILA CHASE, CSR, RPR
CSR No. 4934

I N D E X

INDEX OF EXAMINATION

PAGE
EXAMINATION BY MR. WILLIAMS 7
EXAMINATION BY MR. HARRISON 141

---oOo---

INDEX OF EXHIBITS

DESCRIPTION PAGE

Exhibit 1 E-mail string, Bates Nos. NDCA-ORCL 296485 through NDCA-ORCL 296487, 3 pages 42

Exhibit 2 E-mail string, NDCA-ORCL 055957 through NDCA-ORCL 055962, 6 pages 56

Exhibit 3 E-mail, subject: HP CRM Close Plan, 11-28-00, NDCA-ORCL 020844 through NDCA-ORCL 020849, 6 pages 67

Exhibit 4 E-mail string, 12-1-2000, NDCA-ORCL 039320, 1 page 77

Exhibit 5 E-mail string, 11-11-2000, NDCA-ORCL 020850 and NDCA-ORCL 020851, 2 pages 80

Exhibit 6 E-mail string, 10-31-2000, NDCA-ORCL 069310 and NDCA-ORCL 069311, 2 pages 85

Exhibit 7 E-mail, Subject: Gap update 11/28, 11-28-2000, NDCA-ORCL 612453, 1 page 100

Exhibit 8 E-mail, Subject: Gap update 11/28, 11-28-2000, NDCA-ORCL 298746 through 749, 4 pages 110

Exhibit 9 E-mail string, 2-22-2001, NDCA-ORCL 171019, 1 page 120

DESCRIPTION (Continued) PAGE

Exhibit 10 E-mail, Subject: High Tech High Volume Reference, 12-7-2000, NDCA-ORCL 171966 and NDCA-ORCL 171967, 2 pages 124

Exhibit 11 "Oracle Product Industries Q3 '01 and Q4 '01 Forecast Package, Week 12 - February 14th, 2000," NDCA-ORCL 084863 through NDCA-ORCL 084891, 29 pages 127

Exhibit 12 "Oracle Product Industries Q3 '01 Forecasted Deals by Cities," NDCL-ORCL 084823 and 084824, 2 pages 139

Exhibit 13 Subpoena, Notice of Deposition, and Request for Documents to Michael DeCesare, 9 pages 142

Exhibit 14 E-mail, Subject: Pipeline Snapshot from Richard Blotner to Frank Varasano, Sandy Sanderson, and copying Jim English, 12-1-2000, NDCA-ORCL 027953 to NDCA-ORCL 027954, 2 pages 191

Exhibit 15 "OPI Final Forecast Week 12," 11-16-2000, 23 pages 202

Exhibit 16 "Oracle Product Industries Q3 '01 and Q4 '01 Forecast Package, Week 14 - February 27, 2001," NDCA-ORCL 400679 to NDCA-ORCL 400706, 28 pages 213

---oOo---

QUESTIONS THE WITNESS WAS INSTRUCTED NOT TO ANS

Page Line
(None)

---oOo---

BE IT REMEMBERED that on Thursday, February 16, 2006, commencing at the hour of 9:37 a.m., thereof, at the offices of Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins, LLP, 100 Pine Street, Suite 2600, San Francisco, California, before me, LORRIE L. MARCHANT, CSR, RPR, CRR, a Certified Shorthand Reporter for the State of California, personally appeared

MICHAEL DeCESARE,

called as a witness by the Plaintiffs herein, who, being by me first duly sworn/affirmed, was thereupon examined and testified as hereinafter set forth.

---oOo---

Appearing as counsel on behalf of Plaintiffs:

SHAWN WILLIAMS, Esquire
MONIQUE C. WINKLER, Esquire
LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBIN
100 Pine Street, Suite 2600
San Francisco, California 94111
(415) 288-4545
e-mail: shawnw@lerachlaw.com
e-mail: moniquew@lerachlaw.com

Appearing as counsel on behalf of Defendants:

MATTHEW D. HARRISON, Esquire
KYRA G. BUSBY, Esquire
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 1900
San Francisco, California 94111-2562
(415) 391-0600
e-mail: matt.harrison@lw.com
e-mail: kyra.busby@lw.com

Appearing as counsel on behalf of the witness:
ALAN M. CAPLAN, Esquire
LAW OFFICES OF BUSHNELL, CAPLAN & FIELDING, LLP
221 Pine Street, Suite 600
San Francisco, California 94104-2715
(415) 217-3800
Also present: James Terrell, Videographer

THE VIDEOGRAPHER: This begins the videotaped deposition of Michael DeCesare, Tape I, Volume I, in the matter in re Oracle Corporation Securities Litigation, Master File No. C-01-0988-MJJ, as filed in the United States District Court, Northern District of California.

Today's date is February 16th, 2006. The time on the video monitor is 9:37.

The video operator today is James Terrell representing LiveNote World Service, located at 221 Main Street, Suite 1250, San Francisco, California, 94105. The phone number is (415) 321-2300.

The court reporter is Lorrie Marchant of Sheila Chase & Associates reporting on behalf of LiveNote World Service.

Today's deposition is being taken on behalf of plaintiff and is taking place at 100 Pine Street, San Francisco, California.

Will counsel now please introduce yourselves and whom you represent.

MR. WILLIAMS: Shawn Williams, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins on behalf of the Plaintiffs.

MS. WINKLER: Monique Winkler, also of Lerach, Coughlin, on behalf of Plaintiffs.

MR. HARRISON: Matthew Harrison and my colleague Kyra Busby of Latham & Watkins for Defendant Oracle Corporation and the individual defendants.

MR. CAPLAN: Alan Caplan, Bushnell, Caplan & Fielding representing the witness.

THE VIDEOGRAPHER: Thank you. The reporter may swear the witness, and you may begin.

(Witness sworn/affirmed.)

EXAMINATION BY MR. WILLIAMS

BY MR. WILLIAMS: Q. Morning.
A. Hi.
Q. Mr. DeCesare, can you state your full name and address for the record, please.
A. Michael Patrick DeCesare, [redacted]
[redacted]
Q. I know Mr. Caplan probably explained to you what's going to happen here today, and I'm just going to give you a brief overview just to be clear.
A. Okay.
Q. The reporter next, sitting to your left, is going to take down everything that is said in this room today.
Do you understand that?
A. I do.

Q. And she's -- she's not able to take down hand gestures or head nods. So I'm going to ask you to respond to all questions orally.
A. Okay.
Q. You understand that; right?
A. I understand that.
Q. Do you understand that you're testifying --
A. No head -- no -- no hand stands --
Q. Right. Nothing like that. You can do that if you talk as well.
Do you understand that you're testifying under oath today and the oath that you've taken is the very same oath that you would take in a court of law?
A. I do.
Q. We'll take several breaks today, most of which will be at your leisure. So if you ever need a break, just, you know, let me know, and we'll take a short break.
A. Great.
Q. I'm going to ask you several questions. I'm going to try to be as clear as I can. Sometimes I'll fumble. If you don't understand any question that I ask, just ask me to repeat it, and I'll do the best I can to clarify for you.
A. No problem.

Q. Throughout the deposition you may hear objections from either your lawyer or counsel for defendants. They have the right to object to certain questions -- to all questions if they want to, but unless your attorney --
A. That would be annoying.
Q. It would be annoying, but that's their right. If your attorney -- unless your attorney instructs you not to answer a specific question, you still have to answer the question.
Do you understand that?
A. I do.
Q. Do you understand everything that I've explained to you?
A. I do.
Q. Is there any reason why you can't give your full and complete testimony today?
A. There's not.
Q. Are you on any medications that might impact your ability to recall facts?
A. I am not.
Q. And you haven't been drinking this morning or anything like that?
A. Nothing --
Q. Alcohol?

A. No.
Q. At the end of your testimony sometime within the next 30 days or so, you'll have an opportunity to review your testimony to correct minor mistakes, and Mr. Caplan will talk to you more about that.
Do you understand that?
A. I do.
Q. Have you ever had your deposition taken before?
A. No.
Q. And do you know why you're here to testify today?
A. Yep, I do.
Q. And what is your understanding of why you're here?
A. Shareholders are suing Oracle, Larry, Sandy, and Jeff, for statements misleading to financial analysts that caused the stock to rise before they personally sold stock and stock fell.
Q. Okay. When you say "Larry," are you referring to Larry Ellison?
A. Larry Ellison, Sandy Sanderson, and Jeff Henley.
Q. Okay. And how is it that you learned why you would be testifying today?
A. I don't understand what you're saying.

Q. Okay. When did you learn -- when was the first time you learned that you would have to give testimony in a deposition?
A. I was called by Alan.
Q. And do you recall when -- approximately when that was? A month maybe?
A. Several months ago. No, nothing more --
Q. Okay.
A. -- thorough than that.
Q. Okay. And are you familiar at all with the particulars of this lawsuit?
A. I've read through it roughly.
Q. And when you say you read through it, you read through a complaint in this action?
A. I read through the complaint, yeah.
Q. And when --
A. Fifteen minutes' worth of reading through it. I mean, I haven't read the entire thing, but I -- I gave it the once over for sure.
Q. Okay. And when was that?
A. I read it when it first was served to me. I don't know how long ago that was --
Q. Okay.
A. -- and then I read it again --
MR. CAPLAN: Excuse me. I'm going to instruct Mr. DeCesare not to respond in any way that discloses any communications you and I had.

THE WITNESS: Okay. And then I read it again last night to familiarize myself before today.
BY MR. WILLIAMS: Q. Okay. And I know you indicated that you read it when it was first served upon you, but you don't remember when that was. Do you --
A. Several months ago.
(Discussion off the record.)
BY MR. WILLIAMS: Q. Aside from meeting with Mr. Caplan prior to your testimony, did you have any conversations about your testimony or possible testimony with anyone?
A. My wife.
Q. And did you review any documents other than the complaint that you just referred to, in preparation for your deposition today?
A. I did not.
Q. Can you just briefly describe for me your educational background after high school.
A. I went to Villanova University, '84 to '88 -- major in communication, minor in computer science. They are the No. 2 team in the country right now in basketball.
Q. Those were good years when you were there.

A. It was when they won the NCAA championship, and that's it.
Q. And did you go to work right after you graduated from Villanova?
A. I did. I moved to California. I worked at MTI Systems for six months and then got a job with Oracle in February of '89.
Q. '89?
A. I believe February of '89.
Q. And when you were hired by Oracle, what position were you hired for?
A. I was an expediter. I tracked orders in our telesales department.
Q. And that was somewhere around '89?
A. It was -- I was hired in -- I want to say it was February of '89 is when I was hired.
Q. Okay. When you say you "tracked sales in telesales," can you just describe briefly for me what that means.
A. I was an administrator that, when the orders came in, telesales would make sure they got booked and shipped and tracked and paid and all that kind of stuff.
Q. Okay.
A. That was my first job there.
Q. And "telesales" is telephone sales?

A. Telephone sales, correct.
Q. And do you recall who hired you back then?
A. Tom Siebel.
Q. Okay. And did you report directly to him at that time?
A. I did not. I reported to Vinny Smith, who reported to Tom Siebel.
Q. Okay. I don't want to go through all of the early '90s, so --
A. Sure.
Q. -- let's jump up to, say, 1997.
Was your -- had your position changed from 1989?
A. So I -- when I left Oracle, it was very clearly disclosed to me that they wanted everything that had anything to do with Oracle back. So I went through an exhaustive process and literally gave them everything down to T-shirts that I had gotten. So, you know, I -- you're going to hear this a lot from me today -- I do not have a strong recollection of what year -- you know, what this year versus that year. I can give you general time frames.
Q. Okay.
A. Around 1997, which is around when you asked, I think at that point I was vice president of sales in the

enterprise group, the enterprise group being the larger accounts that were sold to.
Q. Okay.
A. And I was always in the West. So between 1997 or so, when I left, those were years that I just had more responsibility but, for the most part, was a vice president of sales in the western region.
Q. Okay. And was it always in enterprise during that period, between 1997 and the time you left?
A. Yes.
Q. And does that sim- -- enterprise simply means large cust- -- dealing with large customers?
A. Yes.
Q. Okay. You indicated that during those years you were in California and you were always in the west; right? You were responsible for the west?
A. The territory that I was responsible for was the western portion of the U.S., and I have lived in California the entire time and worked out of our California office down in Redwood City the entire time.
Q. Very good. I'm going to direct your attention to 1999.
A. Okay.
Q. Who did you -- who did you report directly to in 1999?

A. I don't know. Oracle -- very typical, many, many bosses filtering through different positions -- it's very, very customary for the company at the time I was there.
So the last boss I had -- I believe that I left in 2001. I was trying to sort this out last -- last -- last night. Again, I -- I don't have a single thing to go back to from a record standpoint to refer to. So I believe in 2001. The last at least year that I was there I reported directly to Sandy Sanderson.
Q. Okay. And do you know what position he held?
A. I think he was executive vice president at that point. But he had -- he had enterprise sales; he had all of worldwide consulting, and I think he might have had a couple of other things as well. He was one of Larry Ellison's direct reports.
Q. And how often -- during that period -- and I'm -- it's -- withdrawn.
I want to talk about late '99 through the time you left.
A. Okay.
Q. So during that period did you speak to or communicate with Mr. Sanderson on a day-to-day basis?
A. I reported to him. So I communicated to him as often as I needed to.

Q. Did you guys -- were your offices close to one another?
A. They were not. He was over in one of the ivory towers. I worked out in one of sales offices.
Q. So when you did communicate with him, was it typically by telephone or e-mail?
A. I met with him in his office periodically to make forecast calls and things like that that we would do.
Q. Okay.
A. I don't remember how frequently, though, to be honest with you.
Q. That's fine. I just -- all I'm trying to get at is the different modes of communication. So is it fair to say that you communicated with him by e-mail?
A. E-mail, phone, and face-to-face.
Q. Okay. And during the same period did you communicate directly at all with Mr. Ellison?
MR. HARRISON: Objection. Vague and ambiguous.
I just wanted to make sure you're referring to the same period. '99 to 2001?
BY MR. WILLIAMS: Q. Currently I'm talking about late '99 through the time you left.
A. In the period of late '99 through the time I left, I definitely communicated with Mr. Ellison.

Q. Directly?
A. Directly.
Q. Is it fair to say that you communicated with him in the same manner? E-mail, telephone, and face-to-face?
A. You can never get Larry on the phone.
Q. Okay.
A. You've got to get through his 14 assistants. Most of my communication with Larry would have been through either e-mail or directly. And it was all about customers. So the only communications that I would have had with him would have been on a specific deal.
Q. And when --
A. When --
Q. -- you say -- I'm sorry. Go ahead.
A. When Ray Lane left Oracle -- I don't know what time frame that was -- I want to say that was probably around 1999 -- you guys probably know better than me -- at that point -- that -- that's when my communication with Larry would have picked up because Larry took on some of the responsibilities of executive sponsorship roles on major accounts that Ray used to have. That was my interaction with Larry.
Q. Okay. What -- what do you mean when you say "executive sponsorship"?

A. On enterprise accounts for customers that would spend a lot of money with us, it was very typical that, when they would sign up, we would formally assign one of our executives to play a role of, kind of, making sure that customer was successful inside of Oracle. And they would be anything from managing escalations to quarterly update meetings, annual update meetings, just to make that customer feel like there was someone at the executive team at Oracle that was, kind of, watching out for them.
Q. Okay. So as an executive sponsor generally, would the executive sponsor have direct contact with the customer?
A. Clearly.
Q. Okay. And just quickly to go through some of the things you indicated. One of the things that the executive sponsor would be, I guess, talked to about is escalations; is that fair?
A. Yes.
Q. What are escalations?
A. Problems. They have problems with the software -- if the consultants that were put on site were not of the skill set that was required, if the customer was to go over budget, if there was a feature the customer needed in the software that they would like

to get earlier than Oracle would have been planning -- you know, things like that.
Q. And -- can you read back his last answer, not this one, the one prior to this one.
(Record read as follows:
"Q On enterprise accounts for customers that would spend a lot of money with us, it was very typical that, when they would sign up, we would formally assign one of our executives to play a role of, kind of, making sure that customer was successful inside of Oracle. And they would be anything from managing escalations to quarterly update meetings, annual update meetings, just to make that customer feel like there was someone at the executive team at Oracle that was, kind of, watching out for them.")
BY MR. WILLIAMS: Q. What do you mean when you say quarterly updates as --
A. Meeting -- meeting -- meeting once a quarter.
Q. Just meeting with them to just do an assessment?
A. (Nods.)
Q. Okay. And that would be face-to-face by the

executive sponsor?
A. It took all different forms.
Q. Okay.
A. If it was a customer that was far away, it might be a phone call. If it was a customer that was local, it might be a meeting.
Q. And how about new sales? Was there an executive sponsor for new sales or sales that were in the pipeline, so to speak?
MR. HARRISON: Objection. Lacks foundation.
BY MR. WILLIAMS: Q. Go ahead.
A. There was -- when a customer would sign up with us, it would be more of a formal process. It's not that it happened every time. It's just that it's -- my style was to try and see if I could get somebody at the executive level to be more engaged in the company because I thought that would have a higher degree of success.
During the presales process, before the customer signed, which is what you're asking now --
(Reporter clarification.)
THE WITNESS: -- during the presales process, which is more before they signed the contract and became a customer, it was more ad hoc, as needed. So it wasn't this formal process that every deal had to have somebody

in it. It was just, you know -- it was more typical, when a customer signed with us, to have an executive sponsor than it would be in the presales process.
BY MR. WILLIAMS: Q. Okay. Now in late '99 through the time you left in -- what you're saying is 2001, was enterprise sales in any particular umbrella division at Oracle?
A. Sandy Sanderson's division.
Q. Okay. Have you heard of the acronym "NAS"?
A. We had North American Sales. I believe it was George Roberts.
Q. And was there an acronym that described Sandy Sanderson's?
A. I'm sure there was. We had acronyms for everything, but I don't remember what it was.
OPI. Is that right?
See? That's good retention after that period of time.
Q. And do you -- do you know what OPI stood for?
A. Something Process Industries -- Oracle Process Industries, Oracle -- I might be right. I'm not sure, to be honest with you.
Q. Okay.
A. George Roberts, for the most part, had the commercial business, and Sandy had the enterprise

business, which would be certain verticals and just large accounts in general. So that was segmented at that point.
Q. Okay. Can you tell me what you mean by "commercial business."
A. Smaller accounts.
Q. And is there -- is there a dollar value dividing smaller accounts and larger accounts at least when you were at Oracle?
A. I forget.
Q. And --
A. In general as far back as when Ray was there -- so I guess that would be before 1999 -- there was a very heavy motivation to try and keep sales teams on the accounts that originally sold it. So you'd have more outliers.
If there was a line, you might have more exceptions to try and keep continuity on accounts. But there was always a target line. I just forget what it was.
Q. Okay. Were you required to submit reports or updates on your sales activities during '99 through 2001 when you left?
MR. HARRISON: Objection. Vague and ambiguous.
THE WITNESS: I don't understand what you're

asking either.
Do you -- do you mean updated forecast system with dollar figures or actually update the status of accounts?
BY MR. WILLIAMS: Q. Well, did you update status of accounts?
A. Not formally. The -- the sales force automation system that we used was a -- more of a forecasting system. It didn't have the functionality to be able to use it to track steps on accounts.
Q. Okay. Now, the sales force automation system -- is that a system that you used regularly to conduct your business?
A. Yes.
MR. HARRISON: Objection. Vague.
BY MR. WILLIAMS: Q. And can you just describe --
MR. HARRISON: Sorry.
THE WITNESS: Dude.
MR. HARRISON: It's going to happen.
BY MR. WILLIAMS: Q. Can you just -- can you just describe for me, if you -- the best you can, what sales forces automation is or was.
A. I think --
MR. CAPLAN: Excuse me, guys.

THE WITNESS: Objection. Vague.

MR. HARRISON: It wasn't to you.

MR. CAPLAN: Excuse me.

MR. HARRISON: It was to his question.

MR. CAPLAN: We have the most talented court reporter in the city here, but you can't talk over people, and you've got to slow down a little so she can get all the words down.

MR. HARRISON: Just to explain -- because he just looked sideways at me -- I wasn't objecting to your answer. I just didn't get it in in time.

THE WITNESS: All good.

Can you repeat the question, please.

BY MR. WILLIAMS: Q. Can you describe for me, as best you can, what sales force automation was.

A. So the sales force automation is the concept of software that coordinates forecasts and deal activity used by sales organizations. The system specifically that we used was Oracle's sales force automation system at that point.

Q. And did it have a name? Was it referred to as anything internally?

A. Yeah. Yes, it was, but I forget the name of it.

Q. Okay. And what type of information -- well,

withdrawn.

What type of information could be found in Oracle's version of its sales force automation while you were there at Oracle?

A. Strictly account name and deal size and deal status. It was just a pure forecast roll-up system.

Q. And if you could just describe for me -- when, when you say a "forecast roll-up system," could you just tell me what you mean.

A. So it would track the name of accounts, how big the opportunity was, what sales stage we were in -- that type of thing.

Q. Okay. And did it -- when you say it showed or displayed what sales stage an account was in, were there delineations of the stage a sale may be in?

A. Yes, there was.

Q. And do you recall how that -- how those stages were delineated?

A. Every company has different methodologies; so I do not recall exactly, but it was something to the effect of prequalified, qualified, budgeted, technical win, closed.

Q. And based on your experience, using that system at Oracle, were you able to see -- withdrawn.

Based on your experience at Oracle, were you

able to determine by looking at the sales force automation system whether a deal was close to being closed or had less of a likelihood of being closed?

MR. HARRISON: Objection. Vague.

THE WITNESS: That would be the sales stages. So, yes.

BY MR. WILLIAMS: Q. And can you -- withdrawn.

Have you ever heard of the term OASIS?

A. Yes.

Q. And -- and what -- what do you understand OASIS to be?

A. OASIS goes back to 1990, which is when I joined Oracle, when Tom Siebel ran our telesales department. It was Online Automated Sales Information System. And it was the first version of CRM of the Customer Relationship Management software within Oracle.

It was designed and built for internal use, not to be a resellable product at that point, and it's the product that took us from paper leads being passed out to automating that process for the telesales and field organizations.

Q. What's the -- what is the field organization?

A. Reps that go out in the field and call on customers -- telesales being reps that are on the phone calling on customers.

Q. Were you using -- withdrawn.

Was the company using OASIS in 1999/2000?

MR. HARRISON: Objection. Vague.

THE WITNESS: No, they were not. By that point they had moved from the internal OASIS system to the commercially marketable CRM system.

BY MR. WILLIAMS: Q. Okay. And have you heard of the term Oracle Sales Online?

A. I have. So a lot of acronyms flying around here. There's two things that I want to clarify on. There's -- Oracle has a business that they do, they sell, where customers pay a subscription and log into an ASP model, a service provider model, that I thought was called Oracle Service Online. I could be wrong. They went through a lot of different names over the years.

Then there was a name for the internal CRM system that is the more current version of OASIS that I -- I -- might also be Oracle Sales Online. So I -- I don't know, to be honest with you, between those two things.

Q. Have you heard of the acronym "OSO"?

A. I -- yes. But I have no idea what it stands for anymore -- no recollection.

Q. Okay.

A. I'm trying to talk slower.

Q. During the same period, '99 till the time you left, do you know whether or not your organization used a pipeline?
MR. HARRISON: Objection. Vague.
THE WITNESS: That's the same question you just asked me. It's the same system. Okay?
BY MR. WILLIAMS: Q. So the --
A. Pipeline is a sales force automation system. A pipeline would be a pipe or a list of opportunities that we just discussed a few minutes ago.
Q. Okay. So if -- so that sales force automation system would be the same as someone saying, "Hey, that's the pipeline"?
A. Correct. The pipeline would be the list of opportunities inside the sales force automation system.
Q. Great. And did you have to use that sales force automation system to conduct your duties?
A. Yes. I had to roll it up to Sandy. So the entire company -- every account manager or sales rep in the company -- would put their information in, and then every level of management, all the way up through Larry, they would have views into that pipeline system for just their portion of the business.
Q. Okay. So is it fair to say that everyone in, say, OPI or all the sales reps in OPI input information

into that system?
A. Yes.
Q. And in -- in your position, were you able to see what other sales reps were entering into the system?
A. Only the sales reps that worked for me.
Q. Directing your attention to, you know, mid 2000, how many sales reps did you have working for you?
A. I don't remember. But if I had to -- if you want a guess, I would guess about 30.
Q. Okay. And they were all -- they were all responsible for areas in the west?
A. Major accounts in the west.
Q. Major accounts in the west.
A. From Seattle, Arizona, California, Oregon, Idaho, Washington, Colorado.
Q. When you say "major accounts," is that just a term you're using here, or was that in Oracle?
A. It would be a list of enterprise accounts, major accounts, enterprise accounts, are all the accounts that would be in the OPI area. Again, it wasn't a hard line like everything over X dollar --
Q. Okay.
A. -- figure.
So it was more of -- you know, certain industries there would be -- be a lower bar, other

industries a higher bar as far as the revenue lines and stuff. So simply it was a list of named accounts that my team covered.
Q. Okay. And in -- in mid 2000 through the time you left, what products were you and your sales team selling?
A. All of Oracle's products -- database and applications.
Q. Can you just quickly describe the difference between database and application products.
A. Yeah. So the database products are more of a repository for structured content. And the applications would be more business applications for things like finance, manufacturing, sales force automation, human resources, et cetera.
Q. Okay. Was Oracle selling, quote, unquote, "application" -- withdrawn.
Was -- were you and members of your sales staff selling applications in 1999?
A. As I just said, my team sold the entire product set, including applications.
Q. I'm just trying to determine, you know, when Oracle started selling applications. Do you know?
A. Oracle sold applications back in 1990 when I -- or '89 when I joined the company.

Q. Okay. Did -- at any point during your tenure, did Oracle expand its applications products?
MR. HARRISON: Objection v.a.gue. Sorry.
THE WITNESS: Every year they would expand their applications products. New releases, new products, new spaces. Very, very typical for a software company.
BY MR. WILLIAMS: Q. Okay. Have you heard of the acronym "ERP"?
A. Yes, I have.
Q. And do you know what it means?
A. I do.
Q. Can you tell me.
A. Enterprise Relationship Management software.
Q. And was Oracle selling ERP software in the -- the '90s?
A. Absolutely.
Q. And can you tell me what -- if you know, what types of applications are within the ERP realm?
A. Yes. ERP automates the concept of back office. That's another way that you would look at it. So it would be finance, manufacturing, and human resources. Selling against companies like SAP, PeopleSoft, Baan -- those were the major players against Oracle at that period.

Q. Okay. And have you heard of the acronym "CRM"?
A. Yes.
Q. And can you just tell me what that means.
A. It means Customer Relationship Management software.
Q. And is it fair to say that's front office?
A. Yes.
Q. Okay.
A. That would be -- that would be the front office software, which would be more sales force automation, support, marketing -- the customer-facing sides of the software.
Q. And do you know when Oracle began selling CRM software?
A. So you -- you're -- you're -- just like testing me heavily on this. It's -- mid '90s would be my guess.
You mentioned OASIS earlier. OASIS was the internal version that was built, and at some point the company decided to productize that and begin to market it. I want to say mid '90s. It could be a bit earlier than that.
Q. Okay. And you -- you listed a few competitors for the ERP software. Do you know who Oracle's competitors were for CRM in the late '90s into 2000?
A. Yeah. They were Siebel and Salesforce.com, for

the most part. PeopleSoft too.
Q. Do you know whether any of those competitors were considered to be better than others or had products that were stronger than others?
MR. HARRISON: Objection. Calls for speculation. Lacks foundation.
THE WITNESS: It was a bit of a leapfrog game. It depends upon the year. One company would come out with one release. Another company would come out and -- and -- and leapfrog that.
One -- one example for you guys would be producing a version of the product that runs on the Web. So, you know, one company would come out and produce a Web-based version, and somebody else would catch up to that. So -- but it went back and forth.
BY MR. WILLIAMS: Q. Okay. Now, directing your attention back into 2000, did Oracle have a Web-based version for its CRM -- CRM software, if you know?
A. Yes. Not everything was Web based. So parts of it were Web based, but there were certainly Web-based elements of the software.
Q. Do you recall -- do you recall what those elements are or were?
A. No.

Q. No?
A. No. There's a lot of screens inside of an application package, and not all of it would come out in a Web-based version at once. It was very typical for any of the companies to release versions that would have incremental functionality, and that was a big -- in 2000 that was a very big issue for companies is a version that could run on the Web.
Q. Okay. Have you heard of a -- an Oracle product called 11i?
A. Absolutely.
Q. And can you describe what that is or what it was?
A. Just the 11th version of the application products that came out.
Q. And do you know whether or not it was -- well, withdrawn.
Have you heard of the -- the 11i suite software?
A. Again, every time Oracle came out with a major -- when they had enough major functionality built up, they would rename it a new release. Very typical for a software company. And 11i was just one of those releases.
Q. I was focusing on the word "suite." Did --

have you heard of it -- have you heard that it was called the 11i suite?
A. From a marketing perspective, that was the first time that I recall Oracle marketing the whole thing as ERP, CRM, et cetera. But it was just another update to the same softwares -- an update to finance, manufacturing, CM, HR -- all those things.
Q. Do you know whether or not the 11i suite included CRM and ERP together?
A. Yes, it did.
Q. And do you know whether prior to 11i Oracle was selling ERP and CRM together in a suite?
A. Yes, we were.
Q. And do you know what, if any -- if it -- withdrawn.
Do you know what that may have been called?
A. No.
Q. And --
A. I mean, again, you -- you could go back and look, and there's every major release. Prior to 11 was 10. I mean it's -- every time that major functionality comes out, a company typically relaunches that and renames it and remarkets it around a new acronym.
Q. Okay. Do you -- withdrawn.
In 2000 was your sales team selling 11i suite

of applications?
A. I don't remember when 11i came out.
Q. Okay.
A. I'm pretty sure it was out by 2000, and if it was, we would have been selling it. But I don't remember exactly the date that 11i came out.
Q. And do you know what -- withdrawn.
A. Between you withdrawing and you objecting, you guys have a -- must have a hard time getting through conversations.
MR. WILLIAMS: Only formal conversations.
MR. CAPLAN: Just lawyers being lawyers.
THE WITNESS: Just trying to keep it light.
MR. RUBIN: I appreciate it.
BY MR. WILLIAMS: Q. Now, had you heard or -- withdrawn.
Had you heard whether or not 11i was so-called "preintegrated," meaning the CRM and ERP modules could talk to one another?
MR. HARRISON: Objection. Vague and ambiguous.
THE WITNESS: So I -- I read the complaint, and that was certainly a big piece of the marketing campaign back then. But from my perspective, it was no more integrated than any of the previous releases were. They were built by separate development organizations; they

were, for the most part, sold to separate customers.
11i was the first release that Oracle was trying to get the larger customer base to purchase the entire thing. It was more of a marketing message from my perspective.
BY MR. WILLIAMS: Q. And when you say they were "built by different organizations," what do you mean?
A. Mark Barrenechea owned the CRM organization, Ron Wohl owned the ERP organization, and, for the most part, they didn't speak.
Q. The organizations or the people --
A. The leaders.
Q. The leaders --
A. The leaders in the organizations.
Q. Okay. And do you know how that impacted the development of the suite? Meaning ERP and CRM together?
MR. HARRISON: Objection. I'm sorry. Objection. Calls for speculation. Lacks foundation.
THE WITNESS: As I -- as I said a second ago, from my perspective, the 11i suite was no more integrated or worked together than the previous releases. There were certainly customers that were using both ERP and CRM from Oracle. And there were with 11i as well, but there was quite a bit of integration

that needed to take place between those products to make them work effectively together.
BY MR. WILLIAMS: Q. Okay. And from a sales perspective, what did -- what did -- what do you mean when you say "integrated"?
A. Well --
Q. Withdrawn.
When you say that there was "quite a bit of integration that needed to be done" for them to work together, what do you mean?
A. Customers -- if you look at Oracle as a large consulting business, as does Accenture, BearingPoint, et cetera, these companies bill somewhere between, in my opinion, three to five dollars of service dollars for every license dollar to make the products work with the implementation, the configuration of those products, and the integration of those products to other systems they needed to speak to. So that's what integration would mean to me.
Q. And when your salespeople were selling 11i, were they selling it as a preintegrated suite of software?
A. We were.
Q. And --
A. That's what the marketing messages were at that

point. So, again, around the 2000 time frame, when the Internet caused a bit of a crash, customers were looking to do business with less vendors. So I think the marketing message that Oracle came out with was the integration of the entire suite was for companies to realize they could buy all of it from one vendor.
Previous to the Internet crashing it was more in favor for customers to go buy "best of breed" from different vendors and integrate those things themselves. So to me that preintegrated was just a message to the market that was the right timing for the -- for the market at that point.
Q. Okay. And in your sales organiza- -- or -- withdrawn.
Did -- was anyone in your sales organization also responsible for consulting, or were you guys just selling the product?
A. Just the product. So we sold the consulting.
Q. Okay.
A. But the consulting organization, the delivery organization, which was the folks that actually did the consulting, were managed in a separate organization.
Q. And -- did Oracle know during 2000 that the quote, unquote, "marketing message" of -- of 11i being preintegrated -- withdrawn.

Did Oracle know that the marketing message was different from the actual capability of the products of 11i?

MR. HARRISON: Objection.

I'm sorry. I thought you were through.

Objection. Calls for speculation. Lacks foundation.

THE WITNESS: I -- I have no idea if Oracle knew that at that point or not.

BY MR. WILLIAMS: Q. Did you know?

A. Sales --

MR. HARRISON: Objection. Misstates testimony.

THE WITNESS: Sales organizations are always going to paint the brightest picture possible for what a product can and cannot do. So SAP, Oracle, PeopleSoft -- all of the vendors in that space were all pitching a more integrated suite; yet every one of them still had heavy consulting services to deliver on that promise.

BY MR. WILLIAMS: Q. Okay. Do you know whether Oracle had -- in 2000 had implemented 11i internally?

A. Again, I -- I don't know exactly when 11i came out. So assuming that 11i was out by 2000, Oracle always used their own products internally.

Q. Do you -- did you personally use any of the 11i modules internally?

A. So I personally would have used the sales force automation portion of 11i. I used every version of it that came out that was implemented for internal use.

MR. WILLIAMS: Let's take five minutes.

THE VIDEOGRAPHER: Off record at 10:21.

(Recess was taken from 10:21 a.m to 10:33 a.m.)

THE VIDEOGRAPHER: On record at 10:33.

MR. WILLIAMS: I'm going to ask the reporter to mark this document as DeCesare No. 1. It's Bates-numbered NDCA-ORCL 296485 through -- -487.

(Marked for identification purposes, Exhibit 1.)

BY MR. WILLIAMS: Q. I'm just going to ask you, Mr. DeCesare, to just take a look at what's been previously marked as DeCesare No. 1. If you could just review it and just let me know when you're done.

A. Got it.

Q. Do you recognize what's been marked as DeCesare No. 1?

A. I mean I don't remember it, but I'm on it.

Q. It's an e-mail.

A. Julie -- Julie worked for me. Julie still

works for me, by the way.

Q. Does it -- is it an e-mail, the document, an e-mail that --

A. It's an e-mail, yes.

Q. And -- and you indicated that you're on it; right?

A. I'm copied on it, correct.

Q. Okay. And --

A. As are, by the way, Tom Thimot and Steve Mclaughlin, who are my counterparts in the Central and East.

Q. Okay. And -- well, you're actually on the bottom half of the first page, right, ending -485?

A. Correct.

Q. And can you just tell me who is Julie Cullivan or was Julie Cullivan?

A. Is or was?

Q. Well, at the time in January of 2001, you indicated she worked for you?

A. She worked for me, and she ran all of my presales reps. So the sales reps have a counterpart that is more technical, that is a presales rep that is responsible for demonstrations, presentations, et cetera.

Q. And that was Julie Cullivan?

A. Correct.

Q. And she reported directly to you?

A. She did.

Q. And what's the general topic of this e-mail?

A. The lack of integration between the ERP and CRM products within Oracle suite of products.

Q. And this e-mail is January 31, 2001?

A. Correct.

Q. Does that help you recall when you actually left the company?

A. Yeah. Definitely after January 31, 2001. I -- I -- I think that I left right after the third quarter, which would have been the end of February.

Q. Okay. And just directing your attention to the second half of page 1, do you see the subject line?

A. I do.

Q. And what is it -- and -- and what is a -- what is the subject?

A. It says "OPI demonstration environment product issues."

Q. And do you know generally what -- well withdrawn. What is -- what was a demonstration? What is a demonstration?

A. A customer that buys any application company's products will usually take somewhere around a year to

implement those products. So the demonstration environment is intended to try in a week or a month mirror what the customer will look like when they get live -- trying to slow down.

So that's what that the demonstration is. It's an environment to try and convince and show customers what the product will look like when they are eventually live.

Q. And that's part of the sales process?

A. Very standard in any application sales process.

Q. Okay. And it looks like this e-mail is sent to you -- well, to Sandy Sanderson?

A. Correct.

Q. And you're CCed on there?

A. I am CCed?

Q. M-hm.

A. Yes.

Q. And can you just tell me who Tom Thimot is, if you know?

A. Tom Thimot was my counterpart in OPI that ran the Central region.

Q. Okay.

A. And Steve Mclaughlin was my counterpart that ran the East region.

Q. Okay.

A. We all reported to Sandy Sanderson in this period of time.

Q. And do you recognize any of the other e-mail addresses in the CC line?

A. You know, I don't, except Julie. Those aren't names that I remember.

Q. Okay. And directing your attention to the very first paragraph of the e-mail, can you read that first paragraph beginning with "the consistent themes."

A. "The consistent themes continue to be poor performance, inability to prove our E-business suite integration story, and product stability/quality issues."

Q. Okay. Did you know at the time what Julie Cullivan meant -- Julie Cullivan meant by what's in the first paragraph?

MR. HARRISON: Objection. Calls for speculation.

THE WITNESS: I have opinions on it. The performance was because of the -- it would take a long time over the Internet. You would be out at the customer and you would try and enter something, and it could hang for five or ten minutes before it would return your answer. So that would be poor performance.

Inability to prove our E-business suite

integration story is spelled out in much more depth below, but as I mentioned to you guys earlier, these products were built by very different business teams. Their integration issues were -- there was lots to do to get these products integrated. So that's what the integration issues are that are down there. And there are very specific things in this e-mail that -- that call exactly that out.

And the product stability/quality issues, again, that's the -- that's a bit of a repeat. It's -- the -- the stability would be the ability for you to enter a business flow and not have the system crash.

BY MR. WILLIAMS: Q. And what you've reviewed in this e-mail -- was that your experience during this period, January of 2001, as well?

MR. HARRISON: Objection. Calls for speculation. Vague and ambiguous.

THE WITNESS: So I -- I tended to rely on Julie very heavily for this. I've never considered myself a very technical person; so I surround myself with very strong technical folks. Julie was my individual that worked for me that represented all these issues.

So I couldn't comment on all the little bullets under order management or manufacturing or that type of stuff. I do tend to trust Julie. But overall there was

definitely a concern in the field that there was a lot still to be done to make the products work together in an integrated fashion.

BY MR. WILLIAMS: Q. And was that something that was communicated to you by your sales reps in late 2000/early 2001?

A. I don't remember specifically about whether it was communicated to me by my sales reps in that period or not, but it was a general feeling about the products in both 11i as well as the releases that were prior to that.

Q. Okay.

A. Which, by the way, I mean the proof point is the consulting organization; right? If everything worked out of the box perfectly, you wouldn't need thousands of consultants.

Q. And did Oracle need thousands of consultants to implement 11i?

A. As I said to you earlier, when I sold an application deal, for the most part, it took between three and five service dollars to every one license dollar, and those service dollars were to configure, integrate, and customize.

Q. And do you know where Julie Cullivan is now?

A. She works for me still. So I work at EMC now.

I run worldwide operations for the software side of EMC, and Julie runs all of my worldwide presales and sales operations. She's worked with me for ten-plus years -- worked for me for ten-plus years.
Q. Is she doing basically the same type of work that she was doing for you at Oracle?
A. She's got a much bigger job. She's got about 500 people working for her now. But it would be still presales, but she has a lot of other functions that report to her now that she never had at Oracle.
Q. I'm going to direct your attention to the top half of DeCesare No. 1.
A. Okay.
Q. Do you know who Ron Wohl is?
A. Yes.
Q. And who is he?
A. As I mentioned to you earlier, Ron went -- Ron was in charge of the development organization at that point for the back office applications.
Q. Is that ERP?
A. ERP. And Mark was his peer on the CRM or front office side.
Q. And who is George Roberts?
A. George Roberts was Sandy's counterpart that ran NAS, or the North American Sales organization.

Q. And did you -- did you meet with Ron Wohl or Mark Barrenechea during, I guess, 2000 and early 2001 to discuss sales of the CRM or ERP?
A. So I don't remember specifically meeting with them during the year 2000 or 2001. But I spent quite a bit of time with both those individuals over the 12 years I was at Oracle. Mark, more in the later years; Ron, the entire time.
Again, it was usually -- I mean, again, it was, as I mentioned to you earlier, the executive sponsorship role. It was -- that's a role that I tended to play in a lot of our deals, and it was just, you know, "They need this." "There are 63 things that you're going to produce in the next release, and this customer wants these five done first" kind of stuff; right?
So Mark and Ron were both very willing to engage in specific customer situations to try and make the implementations go more smoothly.
Q. Okay. I'm going to show you a bunch of documents. And we may jump around, you know, in terms of dates and subjects; so bear with me.
A. Okay. And also, again, as I ask, is this the first thing I've seen in eight or six years now that would give me a refresher on when I left. So I mean dates and things will get -- get easier for me if I can

start to get context of -- of certain activities and e-mails so --
Q. That's great. I want to direct your attention to late 2000. I know that you're -- you're having some difficulty remembering what was happening during certain periods of time.
But do you recall working with Hewlett-Packard in late 2000?
A. Hewlett-Packard was one of my biggest customers. So I -- I did a lot of business with Hewlett-Packard. We did several major, major transactions with Hewlett-Packard around that time frame. So I -- I can't tell you exactly what deal came down in what quarter or year, but I -- I know a lot about HP, yeah.
Q. So how long were they your customer?
A. I was the global account manager on HP back in '98, '97, '96. It would be right before I became vice president. The last job I had was the global account mana- -- or the enterprise account manager for HP. So I spent a lot of time with them. It's probably one of the accounts I know better than most.
Q. And do you know someone by the name of Phil May?
A. Yeah. That name sounds familiar. I think he

might have been the alliance manager at HP that handled Oracle.
Q. How about Karen Slatford?
A. Yeah. She ran sales for them, I think, at that point.
Q. And were those people that you would have interfaced with?
A. Definitely.
Q. Do you know whether in 2000 you were trying to sell HP their database or applications or both?
A. I did two major transactions in my last five years at Oracle. So I'm going to give myself a little bit of padding, okay, here. Okay?
Q. Okay.
A. So somewhere between '97 and 2001, we did two major transactions with HP: One to standardize our database product that crossed the organization.
Q. Standardize the Oracle database?
A. Oracle's database product as the standard across Hewlett-Packard.
Q. M-hm.
A. Was done with a guy named Mike Rose, who was the CIO at that point -- now the CIO of Shell.
And the second was to sell them the CRM products.

Q. Okay. And do you have -- do you know when or around the time frame in which you sold them the CRM products?
A. I -- I -- if I had to guess, I would say that that was late 2000, early 2001. And I'm sorry for not having a better recollection on this. This is a long time ago. I haven't really thought about this much in the last six years. But we did a big CRM deal with them right when I was about to leave. I -- I -- I think it might have been the reason I stayed through the last quarter was to help get that deal done before I left Oracle. But I could be off by a year on that. It's -- it's been a while.
Q. Now, do you -- do you recall what the, I guess, sales environment was for your division during the quarter or the quarter before you left? And what I'm -- what I'm referring to is demand for Oracle products or customers willing to purchase Oracle products.
MR. HARRISON: Objection. Vague.
THE WITNESS: I don't understand the question either.
BY MR. WILLIAMS: Q. Okay. Do you -- do you know -- withdrawn.
Earlier you said that in 2000 that, you know, the -- you know, the economy or the dot com, sort of,

busted. And what I'm trying to determine whether that occurred during your last quarter or two at Oracle, if you recall.
A. Within my organization specifically?
Q. Sure.
A. I don't remember, to be honest with you. I -- I was in -- since I was in the enterprise team, one big deal could put us at a huge growth rate over the prior quarter or not getting that deal could make us have a horrible quarter. So my specific small slice of the pie probably would not be indicative of the demand for Oracle's products overall.
Q. M-hm.
A. There was definitely more pressure in 2000 and early 2001 -- and still today -- but I mean you'll notice in that period specifically, there was more pressure to try and get the larger transactions done because they meant more to the company than they would have previously.
Q. And -- and why is that? Do you know?
A. Because times were tough. Customers were pulling back on budgets, you know, spending less, kicking small vendors out, trying to consolidate their -- you know, trying to protect their cash. So that was across all companies, you know, all industries

at that point.
Q. And did you -- did you and your sales organization recognize that happening at Oracle as well?
A. Big companies with large market share like Oracle were more insulated from that than the general companies would be. But, yes, my general impression is that it hit Oracle just like it hit everybody else.
MR. HARRISON: I'm sorry. Could you repeat that answer. I couldn't hear it with him --
(Record read as follows:
"A Big companies with large market share like Oracle were more insulated from that than the general companies would be. But, yes, my, general impression is that it hit Oracle just like it hit everybody else.")
MR. WILLIAMS: All right. Let me ask the reporter to mark this document as DeCesare No. 2 for identification.
THE WITNESS: Can I just have all the documents now?
MR. WILLIAMS: No. I wish I could give them all to you now, but ... maybe we should have sent you documents so you could review them all. This process would be a little easier but --
THE WITNESS: I took very seriously returning

everything when I left, and, unfortunately, it didn't give me much to go back and try to get familiarized on.
MR. WILLIAMS: Okay.
(Marked for identification purposes, Exhibit 2.)
THE WITNESS: So this is November, 2000. Okay. This helps.
MR. WILLIAMS: And for the record, DeCesare No. 2 is Bates-numbered NDCA-ORCL 055957 through 055962.
BY MR. WILLIAMS: Q. Just let me know after you've reviewed that document.
A. Okay. Okay.
Q. Okay. And do you recognize DeCesare No. 2?
A. I don't. I mean, I -- I -- I certainly can read it, but I don't remember it.
Q. Okay. Do you --
A. I remember the whole process going through. This is right about the applications deal; so I guess the deal was Q2 2000.
Q. And this is an e-mail that -- that you wrote back in 2000?
A. Yes.
Q. Who is Frank Varasano?
A. So Frank Varasano was my boss for -- I don't

know how long -- six months, a year. So Ray Lane had brought Frank Varasano in, when he was still there. Frank used to work with Ray. Frank ran OPI, working for Sandy. Tom, myself, and Steve reported to Frank for a period of time.

Frank left, and that's when I reported directly to Sandy until I left. So, again, as I mentioned earlier, I -- I -- I've got to believe I had 20 bosses, 30 bosses at Oracle in the 12 years I was there. Reorganization was a common practice. But Frank was my boss, and I'm going to guess at this point that he was still there and my boss because he's on this e-mail.

Q. Okay. And who's Kurt Speck?

A. Kurt Speck worked for me and was the sales manager that handled HP.

Q. Okay. And when you say he was a sales manager, can you describe what his responsibilities would have been for --

A. The individual --

Q. -- that deal?

A. Sorry. I talked over.

The individual sales reps that handled HP reported to Kurt. Kurt reported to me.

Q. Okay. And if you recall, how --

A. Yeah.

Q. -- how many sales?

A. Let me clarify something there.

So there was -- Kurt went from being the account manager on HP to the manager that handled HP, and I don't have any recollection if, during this time, what one of those two roles he was in. But he was either the account manager specifically on HP, the sales rep on HP, or he was the manager that handled -- the first-line manager that handled HP.

Q. Okay. And what are the responsibilities of the account manager generally?

A. Make the sales and service the customer.

Q. And what about the line sale? You mentioned the line sales rep?

A. Individual sales rep?

Q. Yeah.

A. So the individual sales rep would be the person that actually has HP. The first-line manager would be one that might have a rep that handled HP, one that handled Cisco, one that handled Sun -- the hierarchy.

Q. Okay. And you would be above them, responsible for an even broader range of customers?

A. Correct.

Q. Okay. Directing your attention to the text of this e-mail that you wrote on November 9th, can you just

read that for me, please.

A. "Sandy, Frank, HP confirmed today that they will try and pull the CRM portion of the order off, providing we deliver what we have outlined in development and production systems. Since they don't need all of the license users right now, they are -- they are hedging on how big an order they will do until they see how much production hardware Oracle comes back with. If this turns out to be a large number, we could get the entire order."

Q. Okay. Do you know what you meant when you wrote that they -- that HP confirmed that they will try to pull the CRM portion of the order off?

A. Clearly.

Q. What did you -- what did you mean?

A. HP agreed that they would buy a huge CRM order for us, from Oracle, if in return Oracle flipped all of the production and development systems from Sun over to HP.

Q. Okay. And -- and was that something that you knew about prior to the date of this e-mail?

A. Clearly. I -- this is something that I worked with Larry, Safra, Ray -- he was still there at this

point.

Q. M-hm.

A. This was -- I mean I can go through every bit of this. The who's who of Oracle is in this e-mail trail.

Q. You can if you'd like.

A. I mean, you can go down this. It's -- our CIO Gary Roberts is in -- was in the loop on this.

Q. So all the people on -- on the e-mail knew that there was this transaction brewing?

A. Yes.

MR. HARRISON: Objection. Calls for speculation.

THE WITNESS: At this point Oracle CRM products were not being very well accepted in the marketplace. Most of the application business was being done around the ERP products. So we had an opportunity with HP to get them to make a huge public deal on the CRM products. I want to say it was $20 million of license, but it could have even been larger than that.

But in return for that, what HP wanted was Oracle to move away from developing all the products on Sun to developing those products on HP. This e-mail note goes through a very detailed and well-publicized discussion inside the company around exactly what

systems would move from what to what.

BY MR. WILLIAMS: Q. And --

A. And they were all to HP.

Q. Sorry.

Do you know why Oracle CRM was not being well accepted?

MR. HARRISON: Objection. Calls for speculation.

THE WITNESS: It was lacking in major areas of functionality that Siebel had at that point.

BY MR. WILLIAMS: Q. Okay.

A. As I mentioned to you earlier when you asked the question, a fully functional CRM system allows sales reps to collaborate online about an opportunity, notes -- if you were a customer of ours, what -- you know, what sports teams you like on down to what meals you want us to take you out to and the rest of those things.

So if a sales rep was to move off an account and someone else was to move onto an account, you'd have all that history. Oracle CRM product was, for the most part, a forecasting system. It's -- all it allowed you to do was put in the name of your law firm and your name and how much you were going to spend with us.

So to get a big company like HP, with such a

global, large sales organization, using the CRM products was generally perceived as a huge, huge win.

BY MR. SOLOMON: Q. And is it -- is it fair to say that was -- the HP purchase was dependent on Oracle moving its development over to HP or the HP hardware?

A. Absolutely. Because that's -- I mean, that's -- I -- I needed to make sure this was not something I wanted to drive without having complete sponsorship from everyone in the organization. So you can see all the players that are involved in this. This is something that Sandy knew about, it's something that Larry knew directly about, and it was something that Slatford knew about and worked directly with them on it.

Q. Do you know what you meant when you wrote, "since they do not need all of the license users right now, they're hedging on how big" -- the order will be or "how big an order they will do"?

A. They bought many, many more users from Oracle than they needed. The transaction size was more about how much Oracle was going to buy from HP than it was about how many users HP needed from Oracle.

Q. And when you say "users," are you meaning, like, licensed users?

A. It's very typical for Oracle or any company to try and go out and get the customer to license all of

their users upon execution of contract, even though there will be a period of time when they're implementing the rest of those things.

So I'll make sure I'm clear about that. Every software company tries to go out and license customers for what they will look like, not for what they will be using in the first month or year.

Q. Okay.

A. But on this transaction specifically the number of users that we licensed HP for was I think probably more than HP had total employees worldwide.

Q. And was the deal executed?

A. It was. I don't remember if it was executed in November. I do believe it was.

Q. Do --

A. But I don't remember for sure that it was executed in -- in November.

Q. Do you know whether or not this particular transaction was one which, say, OPI needed to make its quarterly goal or forecast?

A. It was --

MR. HARRISON: Objection. Calls for speculation.

THE WITNESS: It was a very large deal, and there was a lot of visibility on it. I had no access to

Oracle's worldwide forecast; so I can't tell you specifically it was required to make the quarter, but this was a very, very big deal, and there was a lot of visibility on it. And that, by the way, is not unusual. A lot of the deals that I worked on -- they'd be big enough so they could move the meter more than an average transaction.

BY MR. WILLIAMS: Q. Okay. That's fine. What I asked was whether or not it was needed to -- for OPI to make its goal for the quarter, if you know.

A. So it was needed for me to make my goal for the quarter, but I was only one third of OPI, and, again, I didn't have access to all of OPI's forecast.

MR. HARRISON: I don't want to interrupt, but objection. Vague and ambiguous. And calls for speculation.

BY MR. WILLIAMS: Q. Do you know who Marquesa Lloyd is?

A. I don't remember that name. Would it help you if I told you who I did know in this --

Q. Absolutely.

A. So Juan Jones was on the alliance team responsible for HP. So he was in our alliances organization. He would be responsible for the relationship between Oracle and HP. Mike Rocha ran

server development. So he was on the database side. He was one of the -- he's a very senior guy. Gary Roberts was the CIO. Steve Janicki reported, I think, to Gary Roberts, and he was responsible for a lot of the production systems. Those are the ones that I know as we get deeper into this. And then there's another one back here, Conway Snyder, who was also in the alliance organization. I think he reported to Juan Jones.

Q. Okay.

A. But -- okay.

Q. I just want to direct your attention to 055960, which is about four pages in.

A. Yep.

Q. Do you know what this document is or what it describes?

A. Was this document attached to the e-mail?

Q. Well, they were produced sequentially. So --

A. I don't remember seeing this specifically, this document. It's been too long. But part of the transaction was a commitment to move two things over to HP. One, every production application in Oracle; so there was a list -- at that -- at that point, it was -- I'm not sure it was every, but it was the majority of the production applications. So when we -- when you look at things like OASIS, which, I, guess, was still in

production at that point. I didn't even realize it was around at that point. When you run down this list, these are internal applications at Oracle that Oracle was committing to run on HP hardware instead of Sun or DEK or whatever other hardware it ran on.

There was a second commit, which was to move the entire CRM development platform to HP as well. So that was the -- I don't think that's captured. This is production schedule. There would be another commitment out of this, which was all of Mark Barrenechea's people would now develop on HP instead of Sun.

Q. And what do you mean when you say "develop on HP"?

A. All of the engineers that built the CRM products would build it on HP. They -- they would log in, like you're on a PC here, to an HP server instead of a Sun server, which is a very desirable thing for a hardware company because that means the first release comes out on their hardware. It doesn't have to be ported. And then it would get ported to Sun and all the other hardware platforms that were out there.

Q. Okay.

A. So that's a very large thing for -- for hardware companies is to get that.

MR. WILLIAMS: I'm going to ask the reporter to

mark this document as DeCesare No. 3.

(Marked for identification purposes, Exhibit 3.)

THE WITNESS: Okay. Here we go. So this was November 9th, and this is November 28th.

BY MR. WILLIAMS: Q. If you could take a look at DeCesare No. 3, which is Bates-numbered NDCA-ORCL 020844 through -849.

Just let me know when you're done.

A. Okay. What an incredibly well-written e-mail.

Q. It must be written by you.

A. Do you want me to go through every -- every bit of this?

Q. No. You can just take a look at it, and I'll ask you about the sections I'm interested in.

A. Okay.

Q. Okay. Do you recognize what's been marked as DeCesare No. 3?

A. Yeah. Same as the last one. I mean I don't -- I don't remember the e-mail specifically, but this is very consistent with what I've been describing and the process that was going on at that point.

Q. Is it an e-mail written by you?

A. Yes, it is.

Q. And what date was it?

A. It was November 28th, 2000, three days before the end of the quarter.

Q. Do you know what -- I'm sorry?

A. Three days before the end of the quarter.

Q. And what is the subject of the e-mail?

A. Subject of the e-mail is "HP CRM Close Plan."

Q. Do you know what that meant?

A. Yes.

Q. What -- what did it mean?

A. It was our -- it was the steps that we needed to get the HP CRM deal closed in the second quarter.

Q. And -- and who did you send the e-mail to?

A. To Larry Ellison, Sandy Sanderson, Safra Catz. You know who they are?

Q. Yeah. But why don't you tell me who Safra Catz is.

A. Safra Catz at that point was introduced as Lorrie's -- as Larry's chief of staff. When Ray left, she, for the most part -- when Ray Lane left, she, for the most part, took over all of the approvals and field responsibilities and things like that. She now has gone on to be one of Oracle's presidents.

Shelley Curtis is -- I think she's counsel. She's one of the main lawyers at Oracle.

Conway Snyder, as I mentioned earlier --

Q. Right.
A. -- is on the alliance team.
And then Kurt Speck, Mark Barrenechea -- I've already explained.
Q. Okay. I want to direct your attention down to the first bullet point in the e-mail.
Do you see that?
A. Yeah. Where it says "Production Spend"?
Q. M-hm. And can you read that for me.
A. It says
"Consistent with Larry's conversations with Carly, HP will expect a purchase order for the following amounts. They will expect this purchase order to be binding and commit Oracle to using the full amounts by the dates we promise. 10 million by December 31 (I asked for this to give us time to scope out the configurations we currently need) and 10 million by May 31."
Q. Does that refresh your recollection as to the amount of the deal, the dollar amount?
A. Clearly.
Q. And what was it?
A. It was $20 million.
Q. And --

A. My -- my -- my guess is the 20 million also corresponded to the deal that we got in that period from HP. There was two or three deals that came down that -- it wasn't like one time -- a one-time purchase. So -- but that was big one, 20 million.
Q. And do you know what you wrote when you said that they will expect this purchase order to be a binding commit?
A. Yes.
Q. What does that mean?
A. They expected Oracle to in writing commit that this order would get done. There was a period Oracle wanted the order in November, which would be the end of their quarter. HP -- per the previous e-mail, there was still some things that Oracle's team was fleshing out as exactly what they needed to order from HP. So the intention I recall on this was to give ourselves -- give Oracle a month, December 31st, to be able to scope all that out and still get the order placed to HP, but HP wanted to make sure that that order was coming to them in December.
Q. And who's Carly?
A. Carly Fiorina, the CEO of HP.
Q. I want to ask -- just direct your attention direct your attention to the second bullet point for --

where it says "CRM Development."
A. Yes.
Q. Can you read that for me.
A. "As a follow-up to Larry's conversation with Carly, Mark Barrenechea will be sending me a note tonight which will spell out exactly what Oracle will do within our CRM development environment to move to HP. Shelly Curtis will then draft this into a binding agreement. I will need to deliver this to HP tomorrow so that their legal can review."
Q. Are you describing here what you testified to about Oracle moving its CRM development over to HP hardware?
A. Yes.
Q. Did you ever see the -- an agreement or a contract between Oracle and HP regarding this issue?
A. I don't remember.
Q. I'm going to direct your attention down to the last bullet point. See where it says "CRM Functional Issues"?
A. Yep.
Q. Can you read that for me.
A. "There are 14 showstoppers that HP feels

are keeping them from being able to achieve their global rollout, which is scheduled between April and October. Although this has nothing to do with this deal, the project manager is using the leverage of this deal to get more attention from Oracle development. Consistent with the weekly meetings that Mark Barrenechea has hosting over the past year, Mark is preparing a response that will enable HP to hit their internal dates."
Q. Do you know what a showstopper is?
A. Yeah. A piece of functionality that the customer requires that isn't currently in the product.
Q. Okay. I'm going to ask you to turn the page to 020845.
A. Yes.
Q. And down in the middle of the page, where you see there's a bullet point in bold, beginning "The payments have now been moved."
A. Yes.
Q. Can you just read that section to yourself and then explain to me, if you can, what that means.
A. So what HP wanted to do, instead of giving Oracle $20 million up front, was to sign a lease for

that $20 million that would have allowed an operating lease. An operating least shifts the burden of the payments into out quarters. It's like buying a car. You don't actually own the car until you've paid off the end of the lease.

So by using an operating lease, what HP was enabled to do is to sign the deal for Oracle but not have that 20 million begin to hit their books and be accrued until they went live on the software. So it's very standard for us in larger deals is to try and structure things where the customer takes the expense in the out periods when they actually go live on the software, not when they sign the original deal.

Q. Do you know whether or not Oracle would actually get payment upon signing of the deal, though?

A. They would.

MR. HARRISON: Objection. Vague and ambiguous. Lacks foundation.

THE WITNESS: So actually it's very clear to me. It's when -- when -- when you sign a lease, the -- it gets farmed out, given to a third-party financial institution. That company cuts Oracle the check that day.

BY MR. WILLIAMS: Q. For the entire amount?

A. The entire amount. And then the obligation is

between the customer, HP, and the financial institution instead.

Q. Okay. Do you know whether Oracle was the financial institution in this instance?

A. My understanding of the situation at that point was that 100 percent of the paper was sold to third parties.

Q. Okay.

A. And if it was kept by Oracle -- hold on. Hold on. Hold on. Hold on.

So the typical business practice would have been to sell that to a third-party institution. I think on this that, when we put the leasing document in front of HP, they objected to the language, and Oracle had to carry that internally. But I could be wrong on that. I -- I don't remember, to be honest with you.

Q. All right. That's fine.

A. In which case you would just see these three bullet points in the contract instead of another third-party leasing document, but I don't remember that. That's -- I think that's what happened on this transaction.

Q. And --

A. By the way, I don't think this is my document.

Q. You don't know if this is --

A. I don't think it is. The e-mail is mine for sure, which is the front page, but I have no recollection of writing this. My guess is this was written by Conway.

Q. Conway Snyder?

A. Yes.

Q. Why is that? Because he was the manag- -- the account manager?

A. Because this was a deal that wasn't just as simple as them buying software from us. There was heave, heavy involvement from the alliance team that managed the relationship; right? Getting HP to use the -- to get Oracle to use HP's products was very attractive to both alliance teams as well, because it furthered the partnership. So there's a lot of documents that are in here and things that, you know -- I -- I -- you know, I just don't remember writing this.

Q. Looking at 020845, do you recognize the handwriting on that document?

A. I do not.

Q. If you can just go through that -- the entire document through 849 and let me know if you recognize any of the handwritten notes on -- on these documents.

A. No, I don't.

Q. Okay.

A. It's definitely not my writing. I'm far messier.

Q. Okay.

A. I'm on this last page.

Q. I'm going to ask you to just turn to the last page of the document.

A. Okay.

Q. 020849. Look at the very last bullet point there, where it says "Q2 CRM order."

Do you see that?

A. M-hm.

Q. Can you just read that for me.

A. So

"HP will not require the additional licenses until January 2001 to" -- January -- or "to June 2002 but is willing to commit to these licenses in exchange for the above points. The list price on these new licenses is $46 million and we" -- currently -- "we are currently in front of them at a 50 percent discount for a net license deal of 23 million."

Q. Okay. Where it says "HP will not require additional licenses until January 2001 through June 2002," is that what you were referring to, when --

where a customer may not need the actual licenses until some later date --
A. Yes.
Q. -- but you sell them to them now?
A. The term in the software industry would be called "shelfware," where in return for a much larger discount and better terms, the customer will commit to the entire production load upon signature and -- even though that might be phased out over a period of time.
This one is a bit more complicated than that because HP was not just looking at this based on their internal return on investment. They were factoring into it the order that Oracle was going to place from them as well.
Q. Okay.
A. Time for DeCesare 4?
MR. WILLIAMS: Yes, it is. Time for DeCesare 4. I'll ask the reporter to mark this as DeCesare 4.
(Marked for identification purposes, Exhibit 4.)
MR. WILLIAMS: Which is Bates-numbered NDCA-ORCL 039320.
BY MR. WILLIAMS: Q. I'll just ask you to take a look at DeCesare 4 and let me know when you're done.

A. Okay. So where's the date on here? December 1. Okay.
Q. Do you recognize DeCesare No. 4?
A. Again, same as everything. I don't remember the specific e-mail, but very much consistent with what was going on at that point in the process.
Q. And who's the e-mail from?
A. Originally it's from me, and then this e-mail on top of it is from Mark Barrenechea.
Q. And can you -- who -- who else was CCed on the e-mail?
A. Larry Ellison, Safra Catz, Sandy Sanderson, and Frank Varasano.
Q. And these are among the people you indicated earlier were knowledgeable about the deal?
A. Yes.
Q. Can you just read the text of the -- of the e-mail for me?
A. Mine or the one on top of mine?
Q. Yours.
A. So mine says for -- "HP is in" is the title, and then it says "for over 20 million in CRM license. Thanks to everyone, Mike."
Q. Does that refresh your recollection as to when the HP deal --

A. Yeah.
Q. -- actually occurred?
A. November -- the last day of November in Q2 of 2000. Yeah.
Q. And do you know whether that -- withdrawn.
That deal was all for CRM? CRM applications?
A. All for CRM.
Q. And do you know whether or not Oracle booked the 21 million in license or somewhere around that amount in Q2 of fiscal '01, which ended November 30, 2000?
A. I know the transaction came in in time to count the order in Q2, but I don't have any visibility -- didn't have any visibility into how Oracle closed and reported. So I -- I -- I can't comment on that.
Q. Do you see above your e-mail, where it says "It's like" -- de ja vu all -- "de ja view," it says -- "all over again."
A. Yes.
Q. Who wrote that?
A. Mark Barrenechea.
Q. Do you know what he meant?
A. We did two -- I think we did two orders with HP for CRM: One order that happened earlier in the year, and then this order, which was the bigger order, which

happened in November, I think. Again, as I said to you, we did a lot of big orders with HP. So it's a little fuzzy for me on what came in when.
DeCesare 5.
MR. WILLIAMS: DeCesare No. 5. I'll have the reporter mark this as DeCesare No. 5.
(Marked for identification purposes, Exhibit 5.)
MR. WILLIAMS: DeCesare No. 5 is Bates-numbered NDCA-ORCL 020850 through -851.
BY MR. WILLIAMS: Q. I'll ask you to just take a look at DeCesare No. 5 for me and let me know when you're done.
A. Okay.
Q. Do you recognize DeCesare No. 5?
A. Sure.
Q. And is it an e-mail?
A. It is an e-mail.
Q. And who is it from?
A. Originally it's from me and then more recently from Mark Barrenechea.
Q. And who are you sending it to?
A. It doesn't have any of the text of my e-mail originally. It just says "Mike DeCesare wrote." So it doesn't have who I sent it to.

Q. And that's on the bottom there?
A. Yeah.
Q. And do you know what the date of the e-mail is?
A. I don't have my -- the date of my original e-mails because it's not on here, but Mark's was November 11, 2000.
Q. And can you just read the section that you wrote.
A. Yeah.
Q. I'm sorry. Withdrawn.
Just the section you wrote that's on the first page, -850?
A. Yes.
"We have an opportunity to move a Q3 $15 million-plus CRM order into Q2. For this to occur, we will need tight coordination between all the needed Oracle parties. Because of this I am copying all the Oracle executives I believe need to be involved to make this happen."
Q. And is that just pretty much consistent with what you've described about the HP deal and who was involved in it?
A. Yes. I mean this was sent three weeks earlier so this is a precursor to the e-mail we just went

through. You will note it was 22 million, not 15-.
Q. M-hm. Do you know whether or not the CRM that was sold to HP was actually installed and implemented at HP?
A. Yes. It was -- parts of it were installed. As you can see down here -- my recollection on this is that we did one order that says the MOU back in the summer that we did -- HP placed an order with us based off that Memorandum of Understanding and began the implementation.
So now that you've showed me this, if you start taking a look at some of these documents -- you see the 14 showstoppers and things like that -- I think those were things that HP was running into problems on that they wanted better and stronger commits on to place the second order, which is the one that happened in November.
Q. Okay. Well, with respect to the one that happened in November, do you know when that was installed and implemented at HP, if at all?
A. So I think I might have left Oracle right after that quarter. I might have left Oracle in December of 2000. I either left after the second quarter or after the third quarter.
Q. But you might recall one of these exhibits had

an e-mail from you in January --
A. Okay. There -- there --
Q. -- January of '01?
A. -- there -- there you go then.
So I wouldn't have left Oracle in the middle of a quarter. So, again, this is interesting for me. I should probably know that; right? I -- I -- I don't remember, to be honest with you. They bought so much CRM software. How much of it was this order versus the last order -- I -- I have heard, since I still sell to HP, that a lot of that was written off.
Q. By HP?
A. By HP by not getting live on it. But that is just speculation from what I've heard out there, not anything grounded in -- in a conversation with anyone about this specific order. So I don't know.
MR. WILLIAMS: Okay. I think we have to change the tape. So it might be a good time for a short break.
THE VIDEOGRAPHER: The marks the end of Tape 1 of Volume I in the deposition of Michael DeCesare at 11:28. Going off the record.
(Recess was taken from 11:28 a.m. to 11:36 a.m.)
THE VIDEOGRAPHER: On record at 11:36.
This marks the beginning of Tape 2, Volume I,

in the deposition of Michael DeCesare.
BY MR. WILLIAMS: Q. You indicated earlier that you were responsible for large customers in the western region?
A. Yes.
Q. Did you make sales to JDS Uniphase in, say, the second quarter of 2000? Do you remember?
A. I don't think that was in my territory. I think they're based in the Central region.
Q. Okay. How about Compaq?
A. Compaq would be based in the Central region.
Q. And do you recall any other large customers that you worked with, say, in 2000?
A. I don't remember 2000 specifically. Again, most of the deals I did were -- this was a -- the HP one was a very large one amongst big deals, but most of the deals we did were in the larger size.
Q. How about Kaiser Foundation Hospitals?
A. I don't remember that one specifically, but that is in the West.
Q. If it was a large deal in the West, would -- does that nec- -- is it -- can one presume that you were a part or -- of that transaction or --
A. Most often, as I mentioned to you earlier, there could easily be large accounts that were still

handled by the North American group, the commercial group, just because somebody may have been on that account for many years. But, yes, as a general statement, that would be a fair assumption.
Q. Okay. How about SAP?
A. Nope. Not mine. Back -- back in New York. Based in -- based in the East.
Q. Okay.
MR. WILLIAMS: I'm going to ask the reporter to mark this document as DeCesare 6.
(Marked for identification purposes, Exhibit 6.)
MR. WILLIAMS: DeCesare 6 is Bates-numbered NDCA-ORCL 069310 to -311.
BY MR. WILLIAMS: Q. If you could just take a look at DeCesare 6 for me and let me know when you're done.
A. Okay. Got it.
Q. Do you recognize what's been marked as DeCesare No. 6?
A. I don't remember this e-mail, but it's not -- I -- I recall the whole situation with AMD.
Q. Let me just direct your attention down to the center of 069310.
A. Okay.

Q. Do you see your name there?
A. Yes, I do.
Q. And is this -- was this e-mail sent to you?
A. Um -- am I copied on this? Yeah. It was sent to my.
Q. And that's the "mdecesar@us.oracle.com; right?
A. Correct.
Q. Who's it from?
A. Mark Flessel.
Q. Who's Mark Flessel -- Flessel?
A. Mark was a first-level sales manager that reported to me.
Q. What do you mean "first level"?
A. As I said to you earlier, it's a manager that is one level above the individual account managers that handle an account. So the rep who handled AMD is John Barranco, who's on here. He reported to Mark Flessel, who's the first-level sales manager, who reported to me.
Q. Let me just ask you a quick question about that structure. Was it typical for you to get information about customers from your sales reps?
A. Definitely.
Q. And how did you communicate with them? By phone? E-mail?

A. All the above. But e-mail was pretty prevalent.
Q. And so if a customer was having difficulty, you know, installing software or implementing software, would that be communicated to you?
A. M-hm.
Q. Possibly by e-mail?
A. Definitely.
Q. And how often would you personally get involved with the customers and communicating with the customers regarding installations or things of that nature?
A. More of my interaction with the customers would have been on, like, scheduled quarterly meetings and things like that versus it blew up and you need to be here tomorrow.
Our sales -- individual sales teams tended to handle more of the day-to-day interaction. But I probably spent 25 percent of my time out in front of customers in a pre or post sales situation.
Q. Now, if one of your -- one of the members of your sales team had an issue with a customer having a problem with installation or implementation, would members of your sales team communicate directly with Oracle development -- Oracle's development team?
A. Definitely.

Q. The CRM team?
A. Definitely.
Q. The ERP team?
A. I -- I had the big advantage of being in the West. So my sales reps, for the most part, were in the same building as the developers, the same campus; right? So the interactions between my team and the engineers or the development team would be far more frequent than, say, somebody who lived in Texas or in New York or Florida.
Q. So would it be fair to say it wasn't in your office?
A. I think it was -- no.
The person engaged with them.
Q. Would it be fair to say that there would be more of those types of communications -- and I'm talking about communications between the sales staff and development -- at that level below you?
A. Definitely.
Q. Rather than you with development or people in your level?
A. Yeah. Julie, who we talked about earlier, Julie Cullivan, would -- would -- was, kind of, responsible for me in driving those conversations.
Q. Okay.

A. But, yeah. That -- that's a fair assessment.
If you look at the different functions inside of Oracle you have engineers, you have folks in support and you have folks in consulting, you have folks in presales. Those are a technical positions.
Many of the folks that I hired in the presales came from the engineering organization. They wanted to get into sales. So the amount of relationships that would happen between those organizations would be -- would be a lot. There's -- there's quite a few of those.
Q. Okay. I just want to direct your attention -- well, withdrawn.
You said that you recalled the AMD situation; right?
A. Yeah.
Q. What do you recall?
A. This -- this whole thing. I forget if they actually bought from Oracle or not. But we didn't do very well on the demonstration process. And this letter -- to my best guess, this is a pretty standard -- things are going bad, and it's a "hail Mary" as they use in football -- the last chance to try and get a customer to consider you. It was ghost written for Sandy to send to Fred Mapp. Fred Mapp was CIO, chief information

officer, of AMD at that time.
Q. All right. Sorry.
Before you go on, you said it was ghost written for Fred --
A. This is -- what you're looking at here is an internal note that says "First draft of note to Fred Mapp."
Q. I see.
A. So Mark Flessel is writing a note that he wants Sandy Sanderson to put on letterhead and send to Fred Mapp and sign.
Q. I see. Okay. And what is your recollection of the issue, aside from what you just testified to?
A. I actually forget if AMD performed from us or if we had lost the deal to somebody else. I don't -- I don't -- I don't remember. It was not a very large deal. AMD was not a very fast-growing company at that point. If we had closed it, it would probably be less than a half a million dollars or something. So my recollection is far lower than it would be on bigger deals like HP.
Q. Okay.
A. But with that said, it looks like we didn't do very well in the demos, demonstrations, and that we were committing executive sponsorship in a fixed-bid proposal

to try and overcome their concerns.
Q. What is a "fixed-bid proposal"?
A. It means that you go out in the consulting world, you generate a statement of work, which is, in any consultant engagement, the necessary consulting people, time, dollars, assumptions, to deliver a project. And if you say it's a million dollars, it's a million dollars, whether it takes you a month to do it, as you had estimated, or eight months.
So you take the mystery in -- sorry -- in the -- in the application space -- Oracle SAP, any of them -- it's -- it's very, very similar -- is -- the horror stories that you hear out there are more about customers who buy the software, begin the implementation, and then need many, many times the amount of services they originally expected to actually get live.
Q. And --
A. So a fixed bid just takes that out. It says we'll do it for this amount of money no matter how long it takes us.
Q. Okay. And is that -- what happens generally -- withdrawn.
While you were at Oracle, did you encounter situations, where a customer bought a fixed-bid proposal

or engaged in a fixed-bid proposal and the implementation or installation took much longer than initially expected?
A. It's hard to say "No" to that because that's not an uncommon occurrence, but when we did fixed-bid proposals, you would pad them. So you would take whatever you thought the real amount of consulting is and maybe up it by 20 or 25 percent, which is very common. All the other consulting companies do the same thing.
But it -- it forced the sales team up front to be far more accurate about what we really believed it would cost because, if it went over, it's -- it's a very bad situation inside the organization.
Q. But what happens if it goes over?
A. The company loses money. You know, a consulting organization will run somewhere between 10, 30 percent margin. So if it goes over by 10 to 30 percent, you're going to be losing money on the consulting portion of the order.
I had the added benefit of working for Sandy, who also ran the consulting organization. So to not have an unhappy boss, you would want to make sure you got those scoped out correctly up front.
Q. And where would -- if a -- if a -- if a

fixed-bid proposal went over cost, how -- how would a company adjust for it? Where -- where would the funds come from?

MR. HARRISON: Objection. Lacks foundation.

THE WITNESS: It's been a while.

MR. HARRISON: Thanks. Yeah. I was doing good.

THE WITNESS: Consultants work full-time for Oracle, and they would just become nonbillable consultants on the engagement until it's complete.

BY MR. WILLIAMS: Q. And "nonbillable" means?

A. The customer doesn't pay anything for them.

Q. Do you know what a cost center is?

A. M-hm.

Q. What is that?

A. A cost center is a -- an individual business unit inside a company -- specific to Oracle you're asking?

Q. Yes.

A. So it's a -- it's an organization that has -- inside Oracle that you can bill things to. So in my organization I had my own cost center. I'd have each one of my managers actually have their own cost center. Whether it's a new PC, pencils, their share of the sales conference, reloc- -- you know, the cube space, or

sometimes on deals, you know, things that other organizations would agree to do if you paid for them -- those would get billed to it.

Q. It's, kind of, like just an expense account or something you bill your expenses to?

A. Oracle at the time that I was there really only measured their sales organization by the revenue they produced, not the expense. But if you were to run a P&L, it would be -- you produced this amount of revenue, and you spent this much to get it. All the expense associated with that would bill to your cost center.

Some of the items in your cost center are things you control, and some are not. So each month I would get, you know, an allocation from Jeff Henley on my fair share of the real estate for the company or my fair share of, you know, whatever it might be.

And there's other things that I had direct control over, like the travel of my teams, sales, you know, events that I might do, customer dinners -- that type of stuff.

Q. Okay.

A. Okay?

Q. You said that, during your time at Oracle, Oracle didn't measure your division by the amount -- Oracle measured the division by the amount of revenue it

made, not by the expense that it ran up; is that fair?

A. Uh-huh. Measured me personally.

Q. Oh -- oh, you personally?

A. Different companies handle this different ways. My compensation plan was strictly based off of what -- how I did against the revenue numbers. It did not factor my expense below that.

It doesn't mean that nobody paid attention to that. It just means that that -- I -- I wasn't on -- like I am now in my -- looking at my organization, I wasn't on a P&L plan at that point. I think that was held at Sandy's level, but that is my best guess.

Q. Was one of your customers the Gap?

A. Yes.

Q. And where are they located?

A. They're right down in -- down in the -- no, they're down in -- they're -- they're here, and then they're also -- the IT location is down in -- like right near Oracle -- like Redwood City or something like that.

Q. Well, is the -- was the Gap one of your division's larger or smaller customers?

A. So I forget. They're a huge customer of mine now for EMC's, but most of my interaction has been -- mostly going out there in my current dealings, but they were definitely a customer.

Q. Do you still deal with the same people?

A. Some.

Q. Some of them?

A. They tend to move around quite a bit. New CIOs.

Q. All right. Do you know Elizabeth Baker?

A. Yes.

Q. Who's Elizabeth Baker?

A. Probably Oracle's top sales rep from 1990 to 2000.

Q. Ten years?

A. She's amazing. Incredible.

Uh-oh. What do you have here? Oh, it's a note to you. It's not a Decesare note off a pad. I should be quiet.

Q. Before we get too far away from the issue, let me just go back quickly. When -- we were talking about when a fixed-bid proposal goes over, you know, what was expected. Do you know what cost center at Oracle that was billed to?

A. It wasn't billed.

Q. Or expensed to?

A. The consulting organization, okay, has the people that they have hired for them, and then all of the consulting revenue the company bills out. So when

we would do a fixed-bid proposal -- come back to AMD for a second.

On this note you're going to see "H. Singh." That's Sonny Singh. Sonny was my counterpart that ran consulting for my territory. So when we would agree to a fixed-bid proposal, Sonny was the one that was effectively agreeing to the amount of resources that would be required and the revenue.

So if Sonny -- if it ran over, Sonny got all the revenue, Sonny just stopped getting revenue until it was done on that proposal, okay? More often than not in the fixed-bid proposals, it would be a good thing for the company, not a bad thing. You would get that padding that you had because you still got that, but you would still deliver it on time and on budget.

It's very common, when you see somebody who says the software is too complex, to counter that objection with a fixed-bid proposal, which takes some of the mystery of whether it's going to cost too much out of it.

Q. Do you know, were there reports that -- in your organization at least, which identified which of the deals were fixed-bid proposals?

A. It was a big -- a big deal to do a fixed-bid proposal; so I can't say there were reports that exactly

tracked that. I don't remember that. But anytime that we did a fixed-bid proposal, that would require approval fairly high in the organization because of the risk, the potential risk.

Q. Because of the risk.

A. It wasn't like a lot of deals were done on fixed bids, but, you know, they -- they were taken more seriously for sure.

Q. Okay. All right. Let me just jump back to Elizabeth Baker really quickly.

Was she in your organization?

A. Yes.

Q. And what level was -- what level of salesperson was she?

A. She was an account manager, an individual account manager that managed accounts. An account manager reports to a first-level sales manager reports to me.

Q. So she was on the ground?

A. Yes.

Q. And --

A. She was just one of the best of those people.

Q. What made her the best -- one of the best?

A. She's incredibly tenacious.

You probably don't want stories here, but

she -- she had a child and was back at a demo the next day.

Q. Oh, really?

A. I mean, that's hard core as you can ever imagine a sales rep being.

MR. CAPLAN: That's fairly tenacious.

THE WITNESS: Tenacious. I mean she would -- she would sign up a customer and give her cell phone as the front level of support for that customer to call. And she would deal with the interactions with development or support.

BY MR. WILLIAMS: Q. Is she still at Oracle?

A. She -- no. She left and went to SAP.

Q. Do you know when?

A. Yeah. It was, like, less than a year ago.

Q. Oh, okay. How -- well, was she -- if you know, did she remain as an account manager, or did she move up into, like, a senior-level position?

A. She refused every promotion and stayed as an account manager because I don't think she ever made less than a million dollars a year.

MR. WILLIAMS: Do you guys want to stop now?

THE WITNESS: She is the top 1 percent of what is an already pretty talented sales organization.

MR. WILLIAMS: All right. I'll show you

what's -- ask the reporter to mark that document as DeCesare 7.

(Marked for identification purposes, Exhibit 7.)

MR. WILLIAMS: Which is Bates-numbered NDCA-ORCL 612453.

BY MR. WILLIAMS: Q. I'll ask you to just take a look at a document. Let me know when you're done.

A. Okay.

Q. Do you recognize what's been marked as DeCesare No. 7?

A. Again, it's been a while, but I certainly understand the situation about this.

Q. Okay. And is it an e-mail?

A. It is.

Q. Are -- were you one of the recipients of this e-mail?

A. I was.

Q. And who is the e-mail from?

A. Elizabeth Baker.

Q. Is that the person we were just talking about?

A. It is.

Q. And what's the subject matter of the e-mail?

A. "Gap update 11/28."

Q. And you said you are familiar with the

situation?
A. (Nods head.)
Q. Now, you -- now, just tell me what you remember about the situation, if you can.
A. So this is a close plan similar to the one we talked about for HP. This would be a close plan for the Gap in that same quarter -- a deal with the Gap in that that same quarter. And it was sent to Larry Ellison, Sandy Sanderson, myself, and Nelson Chen.
A little bit weird, but Elizabeth tended to work across. Even within my organization, she was on the biggest of the big deals. So Nelson Chen was the first-level sales manager that worked for me on the Gap .
Q. Okay.
A. Elizabeth reporting to him for that deal. And it is to -- regarding the situation. I mean I -- I know all the names of everybody on here so --
Q. Okay. Who is Marilyn Disbrow?
A. She's a VP that was in Ken Harris's organization. Ken Harris was the CIO of the Gap at that point. Marilyn Disbrow was a VP that was obviously driving this transaction with Elizabeth and reported to Ken.
Q. And do you know why Elizabeth sent this e-mail

to Larry Ellison and Sandy Sanderson?
A. I don't remember how big it was, but it was a big deal at the time. And I think Ken -- Ken -- Ken Harris and Elizabeth were very, very close, and we were trying to see if we could get this transaction pulled in that same period. And they told us "No." So this was a reasonable as to why it was not going to close in that second quarter.
Q. Do you remember them telling you "No," or do you just recall that from looking at the document?
A. I am just recalling it now. I -- I -- I don't remember them telling us "No."
Q. Okay.
A. I think I was pretty focused on HP --
Q. Okay.
A. -- around this same time.
Q. Okay.
A. So this was another one that we were working.
Q. Okay. And let me just ask you to go down to, I guess, the first -- it should -- it should be a bullet point, where it says "Gap will be unable"?
A. Yeah.
Q. Can you just read that for me.
A. "Gap will be unable to be closed by 11/30."
Q. And 11/30 was the last day of the quarter;

right?
A. Correct.
Q. And -- and you see two lines down, where it says "Gap is sold"?
A. Yes.
Q. Can you read that for me?
A. It says "The Gap is sold 100 percent on database and 80 percent on financials."
Q. Do you know what that meant?
A. Yes. It means they had selected Oracle as the technology for the database, which would be underneath SAP or Oracle. Everybody buys the Oracle database. Most customers buy Oracle database. Either way that was a done -- a decision that was already made, but that they were 80 percent sold on the financials. They had not made the full decision yet on the financials.
(Reporter clarification.)
THE WITNESS: On purchasing the financial applications.
BY MR. WILLIAMS: Q. I'll ask you to just go further down, where it says -- well, just read the next portion "I stated."
A. "I stated that Ken originally told us that the Board had approved $500 million for the entire purchase. Marilyn stated that due

to the financial climate Gap is having to justify every project in the organization."
Q. Okay.
A. "Each" -- is that enough?
Q. Yeah. You can stop there.
Was this supposed to be a $500 million deal?
A. No.
Q. Was that a typo possibly?
A. No, no. It's not a typo. I -- I don't remember how big it was, but, again, as you mentioned earlier, you know, when a customer purchases a major applications deal, the license is just a very small piece of the overall cost. The rest of this would have been hardware, other software packages that might need to also complement Oracle. Whose application server? Whose operating system? Whose portal? Other applications that would be part of that that needed to be integrated. All the consulting services and then all of the internal costs, which is usually very significant in these.
So the Gap might have had to pull 30 people out of their full-time jobs, back-fill them for a year, and put those 30 people out of order management or the general ledger or accounts receivable full-time on the project.

Q. I see.
A. So all of those costs rolled up is what -- is what we'd be -- should be talking about here.
Q. Do you know what Marilyn meant when she wrote -- withdrawn.
Do you know what Elizabeth meant when she wrote "Marilyn stated that due to the financial climate Gap is having to justify every project in the organization"?
A. Absolutely.
Q. What did -- what did she mean?
A. At -- at that time, when the Internet had -- had crashed, companies were putting far more control mechanisms in place on every purchase. So whereas something might have breezed through the final month of approvals, you know, previously, most deals that were of any size now were having to go through every level of IT business review and even the board of directors, in a lot of cases, like this one.
Q. Had -- was that something that you had experienced in your organization at the time, say, around November, December 2000?
A. When -- when the Internet crashed, that was a very common thing for us on every deal. You know, we, kind of, jokingly said that you should enter the quarter in procurement -- the first day of the quarter all the

way through technical select and the rest and be in procurement to have any chance of getting that transaction done by the end of the quarter.
Q. Can you tell they what you mean when you say "in procurement."
A. Already through all the evaluations and strictly now with procurement on the terms and conditions, the price -- those type of things. Demonstration's done. Everybody voted for us. They picked you. That's the tech selection portion. Business unit says the budget's there.
And you'd still need 90 days to get through that.
Q. And was that -- and that was, from your perspective, at least due to the -- I guess, the economy downturning?
A. Absolutely. Absolutely. For the Gap specifically, as they say here, and they wanted to specifically wait until they -- they got through the Christmas season, which for a retailer is the busiest season, to see how their business did because Mickey Drexler, who they're asking to call down below, the CEO of the Gap -- Larry knew him well -- depending on how their season might have gone, may have decided less or more IT spending overall.

Q. Can you just read the -- the next -- withdrawn.
You left off with the word "organization." Do you see where it says "each project"?
A. Yes.
Q. Can you just read that.
A. You mean "every project"?
Q. I think it says "each project is being reviewed by the board."
A. Okay.
Q. Can you just read from there down to the end of the paragraph.
A. Okay. Sorry.
"Each project is being reviewed by the Board. Stated that 'off the 'record' they want to see how their holiday season goes. Also, Marilyn believes that the timing is late December, early January (in time for their year end January 29.)"
Q. Is that what you were referring to when you said they wanted to wait until their holiday season?
A. Yes.
Q. Is that something that -- withdrawn.
Do you recall any other customers communicating the same types of concerns to members of your sales staff during late 2000, early 2001?

A. Very much so. I mean, again, once the Internet -- assuming that the Internet burst was before that period, which I'm gathering from all of this is a pretty likely assumption, every deal slowed down. I mean every company stop- -- either stopped IT spending or slowed it down until they realized how their own business was doing. A lot of projects were put on hold.
Q. And how would you -- how would you get that information at your level?
A. Notes like this.
Q. Do you know --
A. Conversations with my sales teams. I mean that's what we do for a living; right?
Q. Let me just ask you to go down to the next section.
A. Shoot.
Q. Can you just read where it says "I believe"?
A. "I believe that Gap is holding off due to financial reasons. It would be helpful if you could call either Micky, Steve Jobs, or John Lillie."
Q. Okay. Do you know whether or not Larry Ell- -- well, withdrawn.
You said Larry Ellison was close to who? Mickey -- what's his last name?
A. Mickey Drexler was the CEO of the Gap -- Larry

was on some board with him; so he knew him -- Steve Jobs is the CEO of Apple, and then John Lillie is from Lillie Pharmaceuticals.

Q. Was --

A. I believe they were all on the board of the Gap.

Q. Okay. And do you know whether or not Larry called either one of these individuals to help get this deal closed?

A. I don't know definitively, but my guess is "No." Larry did not tend to want to get involved in the dirty work to try and get a transaction closed. I mean Larry was great at the technical vision and why they should buy and the rest of those things, but the navigation -- Elizabeth -- this is why she's so good -- learned about the relationships that were out there and was trying to leverage them, but my guess on this is that Larry would not have made any of those phone calls.

Q. And --

A. This is where you missed Ray Lane being at Oracle.

Q. Why is that?

A. Because he knew the same people, and he would have made the calls absolutely trying to get transactions done for us.



Q. And do you know whether that deal closed at the end of November?

A. No recollection.

Q. Do you know -- do you know whether -- withdrawn.

I'll have to ask this again even though I think you've answered it. Do you -- do you know whether that Gap deal closed at the end of 2Q, '01, which ended November 30, 2000?

A. I don't remember definitely. I -- if -- if it did, it wasn't a major ten-plus-million-dollar deal. That's for sure. I don't think anything closed in that quarter, and I don't really have any recollection of whether it closed in the balance of the fiscal year, which would be Q3 or Q4.

Q. Okay. I'll ask you to mark this document as DeCesare No. 8.

(Marked for identification purposes, Exhibit 8.)

MR. WILLIAMS: DeCesare No. 8 is Bates-numbered NDCA-ORCL 298746 through -749.

THE WITNESS: February, 2001, I was still there. You don't think that's funny. I do.

BY MR. WILLIAMS: Q. I'll just ask you to take a look at that and let me know when you're done.



A. Okay.

Q. Okay. Do you recognize DeCesare No. 8?

A. I don't remember this e-mail at all. I remember the situation with the Gap, but I don't remember this e-mail at all.

Q. Are you -- are you identified as a sender or a recipient on this e-mail?

A. I was CCed on it.

Q. Okay. And who is it from?

A. Elizabeth Baker.

Q. And who's it to?

A. To Sandy Sanderson.

Q. And that's -- what was the date?

A. It's February 22nd, 2001.

Q. Do you know who Sue Baker is or Sus- -- I'm sorry -- Susan Marks?

A. Yeah. Susan Marks was my first-level sales manager that this deal rolled up through. Again, Elizabeth was the one rep that tended to cherry-pick deals across different regions.

Q. And do you know who Sue Baker is?

A. Sue Baker? Where is Sue Baker on here?

Q. Okay. The first paragraph.

A. Oh. I'm sure she was somebody internal at the Gap. I don't recall the name, no.



Q. Okay. There's no -- no reason to believe that you didn't get this e-mail, though; right?

A. No, no. I'm sure -- again, I had hundreds of deals going on at any given time. So I would think 13.5 million would have refreshed my memory. When I left Oracle, I felt like I left a very fat, rich pipeline, which was a very reassuring thing for me. So this could easily be one of the deals that was still there when I left but not closing.

Q. Do you see where it says "The Technology deal will stay at $13.5 million, we receive" --

A. Yes.

Q. -- "$12 million due to buy down"?

A. M-hm.

Q. Do you know what means?

A. M-hm.

Q. What does it mean?

A. So it means that what we're going to do is we're going to position it where there's a payment scheduled. And the Gap -- the Gap thinks they're paying for it over time. So the Gap might pay 4 million now, 4 million in six months, 4 million in a year, and 1 1/2 million in two years; right?

The Gap wants that because the Gap wants to make sure that Oracle has skin in the game to continue

to stay on top of the sale and not book the whole thing in the current quarter.

Oracle has every intention of selling the paper off, taking all 12 million, paying a million and a half dollars of finance buydown to the financial institution.

So the Gap pays 13 1/2 million, a million and a half goes to the institution that carries the paper, and 12 1/2 million gets cut and quartered to Oracle.

Again, very common practice in larger software deals -- IBM, Oracle, anybody that does that -- does that type of thing.

Q. What happens later then if, for instance, a -- a customer is unhappy with the products that they've been sold and they want their money back?

MR. HARRISON: Objection. Lacks foundation.

THE WITNESS: So the customer has an obligation to the financial institution, right, whether it be Morgan, Merrill -- whoever it might be sold off to. They don't care if you're having problems. You know, a hard binding contract and a commitment, and the contract would absolutely be specific to say that no matter what happens you still owe us the money.

Customers -- many big customers would like to see the payment spread out so that at least there is an event. Okay, we owe Oracle six more million so if

something's going wrong, it's a good time to bring up, you know, this issue or that issue; right?

Just like you saw in HP earlier, where it said, you know, "The project manager's taking advantage of this deal to try and get the 14 things he'd like to see in the products." That's very, very common.

So the sales team will put a very positive spin on this and say, hey, look you've got a phased payment, you know, we're accountable, but the reality is, if you read the fine print, you get into the contract, it's very clear to the customer it's going to get sold off to a third party and -- and a month later they're going to get a note from some financial institution saying, you know, "You owe this on this day," right?

BY MR. WILLIAMS: Q. So --

A. That's my speculation based on "We do not want the Gap to know this." That would be the only reason that you would want to try to keep something from the customer on that scenario.

Q. Okay. I want to just direct your attention to the bottom half of the first page there, ending in -746. The -- see where it says "'Elizabeth A. Baker' wrote"?

A. Uh-huh.

Q. Can you just read the first sentence or -- yeah, the first two sentences.

A. "Sandy, our WMS product did not meet" --
their -- "basic functionality. Our WMS product managers said that we are not a good functional fit and would probably be there in a year."

Q. Does that say "meet the basic functionality" or "their basic"?

A. "Does not meet the basic functionality."

Q. What is "WMS," do you know?

A. I was thinking about that when you gave it to me. I don't remember that acronym being specific to a certain product. But when you read further, it talks about the competition being Retech. Retech is a manufacturing solution very specific for the retail industry. So my only guess is that WMS is Oracle's version of that retail-specific product.

Q. Have you heard that Oracle recently bought Retech?

A. M-hm. Oracle should have bought them a long time ago.

Q. Yeah?

A. You asked a question earlier about integration. This is the big thing. You know, if you're a law firm -- you know, no matter what industry you sell into -- if you're buying a general ledger or a sales

force automation system, no matter what industry, there's integration that has to be done to legacy systems.

Every industry has some unique application that an SAP or an Oracle can't produce a product for that needs to be integrated; right? So in the retail industry, it's very -- manufacturing is very different than what Oracle's ERP products do. You know, it's -- there's just different terminology, there's different concepts and the rest of those things.

Q. That's -- that's -- Retech -- well, the software we're talking about right now, that's an ERP -- that's part of an ERP --

A. So -- so ERP, again, is -- is back office, which is like financials and like general ledger accounts payable/accounts receivable. Those things tend to be fairly constant across all companies. You have a general ledger, chart of accounts -- things like that.

But when you get into the manufacturing side, a milk manufacturer that's process manufacturing; HP, who's -- who's discrete manufacturing; and a retailer that might want to do just-in-time manufacturing are three very different things.

Retech was specifically for the retail industry. So when you're talking about -- the Gap, is

that who this is for? -- right, yeah, the -- the Gap -- it's -- Retech was the niche player that had a -- that had the highest degree of functional fit for that industry.

Q. Kind of, a best of breed?

A. It would -- yeah. Best of breed, yes. So you might pick them for this and somebody else for this and string them together yourself; right?

So my guess is WMS is what Oracle was calling at that point the products that were being -- intended to compete with Retech, but I don't remember that acronym.

Q. Was Boeing one of your customers?

A. They were.

Q. And do you recall -- well, actually, let me just show this to you.

What is a reference?

A. What is a reference?

Q. As it -- as it -- as it relates to Oracle back in late 2000, early 2001, for its CRM products?

A. So I -- I can't comment specific on 2000/2001. But a reference in general is a customer who has had a positive experience that is willing to say nice things to other prospects on your behalf.

Q. And I think earlier in your testimony you

indicated that Oracle CRM was not being well accepted and that one of the good things about the HP deal was that it would be publicized?

A. Yes.

Q. Do you know whether or not the intent was to use HP -- HP as a reference?

A. Oh, yeah. Most definitely. When a customer implements software, if they have a good experience, they'll say good things, and if they have bad experience, they will sometimes say bad.

The reason that Oracle was more optimistic on HP was for two reasons. One, it was a gigantic order. I don't remember the -- I have no idea what Oracle -- if they'd even broke out CRM, but it was a very large percentage of the CRM license revenue that quarter, and that was a hot market. Siebel was in there. Oracle wanted to be -- you know, be very successful in that place. So -- so -- so you have that going.

Q. Do you know -- do you know Don Klaiss?

A. Klaiss.

Q. Klaiss.

A. Yeah. I think he was a presales rep. I forget if he was a presales rep or if he was in engineering. I think he was in engineering. I think -- I think he worked for Ron Wohl in our engineering organization.

Q. Did you work with him at all?

A. I remember -- yeah, I'm sure I did at the time. I remember the name pretty well. Somebody that Julie probably would have interacted with much more frequently than I would have.

Q. How about Ron Bunting?

A. Yeah, Ron -- Ron Bunting was a sales manager, I think, on the East Coast. It's sort of like "Names from my past."

Q. You don't deal with some of the same people?

A. What's that?

Q. You don't deal with some of the same people?

A. Anymore? It's a different company, different group, different names, different people.

Q. Was Lockheed Martin one of your customers?

A. Lockheed Martin is all over the world. There's big locations on the east coast, which are -- were not mine, and then there's some aerospace locations down in Southern California that would have been mine.

Q. Do you know Ken Feeney?

A. Yeah. Ken Feeney reported to me for a while. He was in Chicago. He was a first-level sales manager in Chicago.

Q. Is an 85 percent discount -- well, withdraw.

Was an 85 percent discount on the license

unusual at Oracle?

MR. HARRISON: Objection. Lacks foundation. Vague and ambiguous.

THE WITNESS: It depends on the size of the deal. If you look at software -- if a customer wanted to buy your entire price list, wanted an enterprise license agreement, which enabled them to deploy all your software, you would have to theoretically take every product and multiply it times the number of employees in that company, which would get a list price that was, you know, a billion dollars plus. So an 85 percent discount might -- might be required to get it back to what's actually commercially reasonable.

Whereas, if one department knew they had 30 people and wanted to buy one product, you would never see an 85 percent discount because the -- the -- the list price would be far more realistic out of the gates.

If you start producing documents where I did 85 percent discounts, it's just embarrassing.

MR. WILLIAMS: Well, you asked for it. I'll ask the reporter to mark this document as DeCesare No. 9.

(Marked for identification purposes, Exhibit 9.)

MR. WILLIAMS: Number 9, the Bates-numbered

NDCA-ORCL 171019.
A. So this isn't about Lockheed Martin. This is about USG. Lockheed Martin would be a systems integrator in this case.
Q. Okay. What's USG?
A. United -- U.S. Gibson, a Sheetrock manufacturer out of Chicago.
Q. Okay.
A. I'm pretty glad I remembered that.
MR. HARRISON: Shawn, I'm sorry to interrupt. Do I have the whole document?
MR. WILLIAMS: It's just one page. It's all I have right now. I don't have the second page. If --
MR. HARRISON: Just -- just for the record, then, I'll note -- I'll note that there's an e-mail that precedes this in time, it appears.
MR. WILLIAMS: Okay.
MR. HARRISON: Okay. Thanks.
THE WITNESS: From me. Okay. Got it.
BY MR. WILLIAMS: Q. What is -- do you recognize DeCesare 9?
A. Sure.
Q. And what is it?
A. It's -- well, my e-mail, which is, as you see down at the bottom, is not attached here, but this is

OPI info. So this is a team of people that is for Sandy in charge of business practices. So we would submit our orders to this team and they would go through the approvals and approve most stuff on Sandy's behalf.
"HQAPP" it talks about here -- that would have been Safra, which is H -- headquarters approvals, if it had to go to even a higher level inside the organization. So that's who it's from, and this is just the basic constructs of a deal we were trying to do for USG.
Q. And who's Mark Guettler?
A. I think he was our sales rep.
Q. And how about David Jinnett -- Jinnett?
A. Jinnett was the contracts guy that drafted the order.
Q. Okay. Did it all con- -- well, did all orders go through contracting?
A. All the ones that had any kind of unique terms on them. Oracle has tried real hard to do as much of it over the Web as possible, but that's more for just, kind of, shrink wrap. I'm going to go buy -- like Microsoft products -- I'm going to buy something that doesn't require any negotiations. Anything that had unique terms -- price holds, like it asks about here, need to be drafted by a contract rep.

Q. And what's a -- what is a price hold?
A. A price hold would be -- okay, you're going to buy, whatever, $5.4 million of net licenses from us, and then if you need any more licenses over the next three years, you get 85 percent discount on those licenses as well. Very customary in the software world on big orders.
Q. So I guess at times it makes sense to make a large purchase if you intend to buy more a few years down the line?
A. That's how software companies get companies to buy a lot up front is they make the discount higher, the maintenance rate lower, and then they -- that up-front purchase tends to protect those prices for a period of time.
If they didn't do that, everybody would buy them as they needed them because a maintenance clock starts when you buy software. So if you buy $5.4 million and you're going to spend a million dollars a year or 20 percent of that roughly in maintenance, it has to be more economical than buying that 5.4 million over three years and not having that maintenance clock start until the individual purchases kicked in.
Q. There's your 85 percent discount.
A. All right. Thanks, man. I appreciate that. I

wish I had a folder on you.
Q. Gosh, who knows what would be in it.
I'm going to ask the reporter to mark this as DeCesare No. 10.
(Marked for identification purposes, Exhibit 10.)
MR. WILLIAMS: DeCesare No. 10 is Bates-numbered NDCA-ORCL 171966 through -- I'm sorry -- through -97.
A. There's your Oracle Business Online. I can answer that question now.
Q. Good.
A. Okay. Got it.
Q. Do you recognize DeCesare 10?
A. I don't remember this e-mail, no. But I'm on it; so I assume it's legitimate.
Q. Who is it from?
A. Max Hill.
Q. And who is Max Hill?
A. Max Hill was a first-level sales manager that networked for me out of Southern California.
Q. And it's to you and Steve Mclaughlin, and Tom Thimot?
A. Yes.
Q. Why did he send this also to Steve and Tom?

A. I have no idea.
Q. Do you know who the people are in the CC line?
A. So it's weird because it doesn't have any names in here. It just says "Lisa" and "Bryan." Maybe that's an acronym he set up for people that were close to him. I have no idea who those would be.
Q. So -- well, it has the full name of Frank Varasano.
A. Who is -- again, as we talked about earlier, was my boss for a period of time, but I don't know who the other two are -- not by "Lisa" and "Bryan."
(Reporter clarification.)
THE WITNESS: So "Lisa" and "Bryan" are in here as individual names. I have no idea who they are. And Frank Varasano was my boss for a period of time.
BY MR. WILLIAMS: Q. Okay. Do you -- well, do you know what an ECMS notice is?
A. No.
Q. Do you -- do you -- did you work with a customer, Virtual Ink?
A. I don't remember them.
Q. Do you see down about a third of way down where it's -- on the -- on the first page, where it says "Escalation Status: WARM"?
A. M-hm.

Q. Do you know what that means?
A. No.
Q. And do you know what an escalation is?
A. Yeah. I -- I think this is something that is out of our support system about a customer who is dealing with our technical support organization -- that's my guess for ECMS, but I don't know -- who has an issue. And this is something that's printed out of the system about -- about what the issue is.
That's it on this?
Q. Do you have more to say about it? It sounded liked you didn't recognize any of the stuff in there.
A. I don't -- I don't know much about this one, sorry.
MR. WILLIAMS: I'm going to be done by 1:00, but a need to take a five-minute break.
THE WITNESS: I need to take a 30-minute break.
MR. WILLIAMS: Right now or should we --
THE WITNESS: I have a -- I have a business call that I have to take --
MR. WILLIAMS: Right now?
THE WITNESS: -- at 12:30. It would be really helpful.
MR. WILLIAMS: Okay.
THE WITNESS: Is that a possibility for us to break until 1:00?

MR. WILLIAMS: Okay. It's up to you. All right.
MR. HARRISON: We'll go off and chat.
THE VIDEOGRAPHER: Off record at 12:31.
(Recess was taken from 12:31 p.m. to 1:23 p.m.)
THE VIDEOGRAPHER: On record at 1:23 p.m.
MR. WILLIAMS: I'll ask the reporter to mark this document as DeCesare No. 11.
(Marked for identification purposes, Exhibit 11.)
BY MR. WILLIAMS: Q. The Bates number is NDCA-ORCL 084863 through -891. I don't expect you to read this entire document. Just kind of --
A. This could take some time.
Q. -- skim through it, and then I'll try to direct you to the areas that I think are important for us to talk about.
A. Do you want me to go through all these deals? I think most of it is just going to be the deals; right?
Q. Well, let's see. Why don't we just -- well, have you taken a look at it generally?
A. Yeah.
Q. Have you seen this document prior to today?

A. I don't think this is something I got.
Q. Just take a look at the first --
A. This is going to have -- I'm sorry -- this is all three regions rolled up here; so my guess this is Sandy's report.
Q. M-hm. Now, just take a look at the cover page and -- you see the title there?
A. Yes.
Q. What is it?
A. "Oracle Product Industries Q3 '01 and Q4 '01 Forecast Package, Week 12 - February 14th, 2000."
Q. Was this a document that you typically received while you were at Oracle?
A. No.
Q. And do you know why?
A. Because my guess is it had more than my data in it. It was a rollup of all three of the regions.
Q. Did -- did you know whether or not a document like this existed or was circulated among certain people at Oracle while you were there?
A. It's not surprising to me. I would have guessed it. But, no, I -- I didn't know the format or anything like that.
Q. Did you know whether or not the information you input into, I guess, the Oracle sales automation

system --
A. Sure.
Q. -- was used for a higher level rollup?
A. Yes. I would guess that would be the case, sure.
Q. And -- okay.
A. What's ironic is that it's a paper document and not the -- it doesn't use the CRM system.
Q. How can you --
A. You would think that -- I would have thought Larry would have actually logged into our CRM system and looked at all of this and not had to get some Excel document sent to him that rolled all this stuff up.
Q. Is that what this is?
A. That's what it looks like to me. The second page is in Word format. That certainly didn't come out of the system. Down at the bottom it says blank of whatever "dot XLS." That's an Excel acronym. All these other pages down in the lower corner say "dot XLS." So all the data was pulled out of the sales force automation system and rolled into a manual Excel document.
(Reporter clarification.)
THE WITNESS: Out of -- I would guess was -- because I -- I never turned anything in in paper format.

So my -- my -- my guess on this is that it was pulled out of the sales force automation system, put into an Excel file, and that is what rolled up to Larry.
Again, I didn't have visibility into this, but it's not surprising that it happens; right? I mean, Sandy's got to pull all of my stuff together. I would imagine that somebody then pulls Sandy's and George Roberts's and Europe's and Asia's together in order to be able to have a company forecast.
BY MR. WILLIAMS: Q. Okay.
A. Okay.
Q. Did you know that -- did you know whether or not Larry Ellison had some sort of electronic database that he used to track sales?
MR. HARRISON: Objection. Lacks foundation.
THE WITNESS: I think it lacks foundation too. I'm just kidding.
I honestly would have thought that Larry would have logged into our sales force automation system and just had access to all of it instead of parts of it. So, no, I -- I didn't know that he had a different database that he would have used to track the forecast.
BY MR. WILLIAMS: Q. Well, I'm not representing that this is Larry Ellison's document. So --

A. It talks about the Jennifer sheet on the front pages, which is his assistant so --
Q. I'm just saying that I'm not representing that. But I do want to get to the next page, which is Bates-number 084864.
A. Yep.
Q. You see the top where it references OPI for Q3 and Q4; right?
A. Yes.
Q. And it's dated February 14th, 2001.
A. Yes.
Q. I'm just going to ask you do you see where it says "Revenue"?
A. M-hm.
Q. On the second line do you see where it says "worst remains the same at 120" --
A. Yes.
Q. -- "120 million"? Do you have -- do you know what that means?
MR. HARRISON: Objection. Lacks foundation.
THE WITNESS: My speculation would be that that means it's going to come in no lower than 120, that the forecast is 144, and that there is $195 million upside. That's very typical forecast nomenclature.
BY MR. WILLIAMS: Q. What about the next line?

Do you see where it says "best drop 30 million to 195 million"?
A. Yes.
MR. HARRISON: Objection. Lacks foundation. Sorry.
THE WITNESS: Yes.
BY MR. WILLIAMS: Q. Do you know what that means?
A. This is exactly how I run my business today. So I can't -- I never saw this document so I don't know what these numbers are, but very typical in a forecast is my -- I'm going to do 145 million. If the sky falls apart, if things go badly, it could be as low as 120 million, and if things go really well, my upside is $195 million. That's how I would interpret those top four lines on the revenue column.
Q. Okay. But during -- in February -- on or around February 14th, 2001, you were still vice president in OPI; is that right?
A. Yes.
Q. And did you have the same responsibilities that you had -- that you had prior to that date, meaning updating the sales automation system with status of your deals?
A. Yes.

Q. And -- in OPI?
A. Yes.
Q. And did you know -- withdrawn.
And at the time did you know that that information was used for a higher level rollup than you could see?
A. I never had that conversation specifically, but, yes, it was my understanding that my information would get rolled into the company's forecast.
Q. Okay. I want to just direct your attention down one other line.
You see where it says "pipeline"?
A. Yes.
Q. And -- okay. What does it say next to that?
A. It says "Pipeline is 295 million, down 63 million from last week. See below for details."
Q. Now, did you know -- withdrawn.
Were you experiencing in your division a decrease in the sales pipeline in February of 2001?
A. I don't remember. I mean, based on what you've spoken me here today, it sounds like the Gap fell out; right? So, you know, I mean certainly at the end of any quarter, which this would have been the end of a quarter -- at the end of any quarter, especially on the 15th -- which is about Week 11, Week 10, of the

forecast -- it's either happening or it isn't, and when it isn't, it gets moved out.
So it's very common at that point for the -- for the pipeline to come down.
Q. Okay.
A. That's what that means by "pipeline," right? So it says "forecast coverage is 204 percent," which means that the pipeline of 295 million gives you a 204 percent coverage over what their forecast would be.
Those numbers don't make sense, by the way. Since the forecast is 144,000, 204 percent would be $290 million -- I guess it is, yeah.
Q. Okay.
A. Yeah. It would be 204 percent.
Q. I'm just going to direct your attention to the next page.
A. Okay.
Q. About a third of the way down, do you see where it says "Pipeline" again on that page?
A. M-hm. Hold on one second.
Q. Okay.
A. Yes. I'm sorry. I'm with you now.
Q. Do you see where it says "Pipeline"?
A. Yes.
Q. "Pipeline 295, down 63 million"?

A. M-hm.
Q. And just below that do you see a bunch of company names there?
A. Yes.
Q. With dollar amounts next to them?
A. Yes.
Q. What are -- withdrawn.
Do you know what dollar amount would be considered a big deal?
MR. HARRISON: Objection. Lacks foundation.
THE WITNESS: A million dollars or --
MR. HARRISON: Vague and ambiguous.
Sorry.
THE WITNESS: A million dollars or higher would be, in my opinion, a big deal.
BY MR. WILLIAMS: Q. Okay. So at Oracle, did Oracle have a -- a delineation as to what was a big deal?
A. For my sales reps, a couple hundred grand would be a big deal. For my first-level managers, it might be 500,000. For me, it would be a million. For Sandy, it would be 5 million. For Larry, it would be -- I mean at the level that you're at in the organization, it's whether it has a material impact on your number or not.
So I think that would be interpreted

differently at different levels in the organizations.
Q. Okay. I'm going to drop down in that -- in that same section. Do you see where that bullet point says "West"?
A. Got it.
Q. Can you just read that.
A. I plan to increase by 9 million to 100 million due to moves in Q4, including Broadcom, 1.7; Albertsons, 1.2; Nordstrom, 1 million. Also Cisco -- Cisco Systems service contracts decreased $1 million.
Q. Were any of those deals your deals?
A. Those would all be my deals.
Q. And would it be fair to say that you or someone on your staff provided the information that went into this -- withdrawn.
Would it be fair to say that some -- you or someone on your staff put this type of information into the Oracle sales automation system?
A. Definitely.
MR. HARRISON: Objection. Lacks foundation.
Sorry.
THE WITNESS: Yes, definitely.
BY MR. WILLIAMS: Q. Okay. Would you at the time that Oracle had considered these deals in -- in this section -- Broadcom at 1-7 million -- 1.7 million,

Albertsons at 1.2 million, and Nordstrom at 1 million -- big deals?

MR. HARRISON: Objection. Vague and ambiguous.

THE WITNESS: Yes. With -- with HP being a $20 million deal, there's definitions of big; right? But, yeah, I -- I would qualify anything over a million dollars as being a big deal.

BY MR. WILLIAMS: Q. Okay. I'm going to ask you to turn just a couple more pages into Bates No. 084866.

A. Yep.

Q. Do you recognize the format of that spreadsheet?

A. No.

Q. Do you see on, I guess, across the top there are several columns, one of which says "win probability percentage"?

A. Yes.

Q. Was "win probability percentage" one of the ways in which Oracle determined the strength or the likelihood of a deal closing within a quarter?

A. Yes.

Q. And do you know whether, say 50 -- withdrawn.

What did a win probability of, say, 50 percent mean?

A. It means it had a half a chance of closing.

Q. Okay.

A. It's not a science, though; right? I mean it's -- it's my job as a manager was to know that Elizabeth was very conservative and might put something to 90 percent, when it was very far into the sales cycle but somebody else, who was a sandbagger -- he might call it 90 percent when it had no chance of closing.

So that's the whole hierarchy of sales management is to know your team and apply the appropriate weighting of those things.

Q. Okay.

A. I'm not trying to be smart.

Q. No. That's fine.

I'm going to ask the reporter to mark this document.

A. So we did close -- so we did close AMD.

Q. Do you see it? Where is it?

A. Yeah. It's down there at the bottom.

Q. What page?

A. Same page you just had. January 31, '01. AMD, 978,000 of ERP. It says "closed one order number."

Q. Cool.

I'm going to ask the reporter to mark this document as DeCesare No. 12.

(Marked for identification purposes, Exhibit 12.)

THE WITNESS: If you go back another page or so, it -- it labels itself 048868. It then switches to be called "Large deal summary."

MR. WILLIAMS: M-hm.

THE WITNESS: So I guess if you're looking for what deals they qualify as large, that would be it; right? I'm sure you already caught that.

MR. WILLIAMS: I saw that.

DeCesare 12 is NDCA-ORCL 084823, I guess, through 824.

BY MR. WILLIAMS: Q. Do you recognize what's been marked as DeCesare 12?

A. No.

Q. Can you turn to the -- the page ending -4824?

A. Yep.

Q. Do you see your name there?

A. Yes.

Q. Do you know what "West OPI bad debt" means?

A. I don't see it.

Q. It's --

A. Oh, yeah, yeah, yeah. Got it. Yeah.

Q. What does it mean?

A. So West OPI bad debt would be a reserve that we

took each quarter for orders that would not end up being paid and, therefore, recognizable by the company. So an order is classified as booked when it comes in and closes, but that doesn't mean the order is going to get paid; right? A customer could just back out of their obligations and the rest of those things.

So as a percentage of business, there was a percentage that was just automatically taken as bad debt and held in accrual to account for those orders that might not commit.

Do you know what "ISD" means, by the way? Do you want to know that?

Q. I'm hoping you'll tell me.

A. Inside sales division. So that -- that -- that's the role of telesales within my territory.

Q. Okay.

A. Just to give you a heads up.

Q. So every territory has an ISD?

A. (Nods head). You're going to see that across a lot of different places. It's inside sales division.

Q. Inside sales. Great. I thought it was Internet sales division.

A. Inside. It's the telesales group. That's the revenue that comes into the telesales organization. They're still, like, 1500 strong down at Oracle. It's a

big organization.
MR. WILLIAMS: Okay. Well, I think I'm done, Mr. DeCesare. I appreciate your time.
THE WITNESS: Excellent.
THE VIDEOGRAPHER: Go off record.
MR. WILLIAMS: Yeah. We should go off so he can come over here and --
THE VIDEOGRAPHER: Off record at 1:40.
(Recess was taken from 1:40 p.m. to 1:44 p.m.)
(Mr. Williams leaves deposition.)
THE VIDEOGRAPHER: On record at 1:44.
EXAMINATION BY MR. HARRISON
BY MR. HARRISON: Q. Mr. DeCesare, as I introduced myself before, I'm Matt Harrison, representing Oracle Corporation and the individual defendants in this case. I'm going to ask you some follow-up questions based on what Mr. Williams asked and I'm going to ask you a few background questions that I wanted to follow up on. So if I -- I may restate or ask you about what you testified earlier. I don't mean to misstate what you said so please just point it out if I inadvertently do so.
One thing I wanted to point out is that we would move to have the whole transcript and documents

marked as confidential. And I believe counsel agrees?
MS. WINKLER: Yes.
MR. HARRISON: Okay. The first thing I'd like to do is mark as Exhibit DeCesare No. 13 the subpoena.
(Marked for identification purposes, Exhibit 13.)
THE WITNESS: This was -- this was fun, by the way, when they came to my house.
BY MR. HARRISON: Q. So I take it you've seen the document before?
A. Yes.
Q. I'll give you a chance to take a look at it, but I'm going to direct your attention to the page marked Schedule A at the top. It's on pleading paper.
A. Yes.
Q. And if you look on the page that's marked page 5 of this document, it says "Document request." Did you review these document requests when you received this -- this document?
A. I read them roughly.
Q. And did you find any responsive documents to these requests?
A. I don't understand what you're asking me.
Q. These document requests ask you for certain documents that relate to the topics on this page; right?

And what I was asking is that you -- did you review this when you received this document?
A. No. I didn't read this in depth when I -- when I received this document, no.
Q. Did you understand, when you received it, that there was a request for documents that's attached here, page 5?
A. No. I never even got to the last page and read it. I just knew I needed to be here and -- and -- and go through the process.
Q. Okay. Since that's the case, I -- I'll just have you review this page briefly and let me know if you have any documents that are responsive to these requests, in your possession.
A. No. I don't have any documents. Again, as I mentioned, I -- when I left Oracle, I went through 12 years and got everything that I could find. I gave my backup to my hard drive, my PC back -- everything -- and I turned all that over to our HR department when I left the company.
Q. And that's something that they asked you to do when you left?
A. Yes. They were very thorough about it, which is why I'm very resolute about having given everything back.

Q. Did you review -- I know earlier you mentioned that you reviewed the complaint a couple of times before this deposition.
A. I read -- I'm sorry. I -- I read it roughly. I didn't read it word for word like, I'm sure, you have. But I read it roughly.
Q. And you said you read it last night before your deposition?
A. I tried to familiarized myself with it again just to be prepared for today.
Q. How much time did you spent doing that?
A. Last night.
Q. Yes.
A. About 30 minutes.
Q. Did it refresh your recollection about any of the topics we've been discussing today?
A. No. To be honest with you, no. Most of what's refreshed me is the e-mails and stuff that have been provided.
Q. Okay. Besides the complaint, did you review any other documents to prepare for your deposition today?
A. No.
Q. All right. I just want to follow up on a few background points that were raised earlier. I know

you -- you discussed that currently you work for a company called -- is it EMC?

A. Correct.

Q. And before that you worked at a company that was purchased by EMC?

A. Correct.

Q. And the name -- what was the name of that company?

A. Documentum.

Q. Do you hold the same position now at EMC that you did when you were at Documentum?

A. No.

Q. What -- what position do you hold now at EMC?

A. I run worldwide field operations for the software side of EMC. So EMC has bought VMware, Documentum, Legato -- a bunch of other companies. And I run sales, consulting, presales, the partner groups, technical support -- all the customer-facing side of the software group for EMC.

Q. Does your current job involve working with any Oracle software?

A. We're about to go live on Oracle CRM, May 1st.

Q. Is that Suite 11i?

A. Yeah. I don't know what it is at this point. Is there a new version that's come out since then?

Q. Well -- well I'm not going to represent -- but you know that there's different versions of Suite 11i, in your experience, at Oracle; right?

A. It's -- it's -- Oracle -- similar to the HP transaction that we talked about earlier, there was one with EMC many years back, where EMC agreed to standardize on Oracle applications and Oracle agreed to buy a lot of EMC storage.

And that deal is still the software that we're about to go live on. So we're putting the entire company on the CRM product.

Q. Now, before your employment at the company that was purchased by EMC, which -- the name of which I should have written down --

A. Documentum.

Q. Documentum. Thank you.

Where were you employed before that?

A. I went for six months -- about six months to a company called Ascera, A-S-C-E-R-A. It's a small startup that Ray Lane was on the board of directors of.

Q. And Ray Lane was the gentleman who you worked under previously at Oracle; is that right?

A. Ray was the --

MS. WINKLER: Object to the form.

MR. CAPLAN: Go ahead.

THE WITNESS: Ray was the COO, chief operating officer, and president. And when he left Oracle, Sandy Sanderson and others assumed his respons- -- Safra Catz assumed his responsibility. So ultimately he was my manager, but I worked for people underneath him.

BY MR. HARRISON: Q. Okay. What was your position at Ascera?

A. I ran worldwide sides. It was a very small company.

Q. What caused you to leave Ascera and move on?

A. What I was --

MS. WINKLER: Object to the form.

MR. CAPLAN: Go ahead.

THE WITNESS: You're objecting -- sorry.

It was sold to me as a much more profitable and successful company than it was, and I realized that quickly and decided that I did not want to be part of that environment. About a year later it went under.

BY MR. HARRISON: Q. What caused you to leave Oracle to go to Ascera?

A. Sandy Sanderson.

Q. Could you expand on that answer.

A. He's a horrible person to work for.

Q. And why is that?

A. Unethical, backstabbing, did not promote an

environment that I felt matched up with my personal values.

Q. Do you have any -- you said "unethical."

Do you have any specific examples of --

A. Telling me I own a territory, letting me have my team put cycles into that territory, and then turning around and giving accounts to different people; giving me an excellent performance review and then saying things behind my back.

At -- at Oracle, to me, Ray -- Ray Lane was the -- as much the company as Larry Ellison was. A lot of us that had worked at Oracle in the years in the when -- '90s were there much more because Ray made it a much healthier culture.

And I found that, when Ray left, I was viewed as one of "Ray's guys"; so I think that was probably something to do with it. But I just didn't mesh with Sandy. I had a very hard time with Sandy. I -- he made it very awkward work environment for -- for me and for many of the folks that I worked with.

Q. So is it fair to say that, during your time working for -- directly under Sandy Sanderson, that you two did not get along that well?

A. Having worked at Oracle for 12 years and having so many different bosses, I'd learned to somewhat stay

immune to it. I was making good money. I never finished less than at the top 5 percent of the sales organization any job I had any year I was there. I was making good money. I was successful, but it was -- it was -- it was not a good mix between Sandy and I.
Q. And was that the -- the case for the entire time that you worked together?
A. No. I really like Sandy. Sandy -- I -- I -- I went from thinking Sandy was going to be a great place for me to work, when Ray had left the company, to realizing that Sandy wasn't quite what I had made him out to be originally.
So the beginning of the time I worked for him, I thought, was very -- was very good. It's just that -- it would have taken a lot to get me to leave Oracle, and Sandy gave me that motivation.
Q. It's fair to say, that -- then that your relationship went sour at some point when he was directly supervising you; is that correct?
A. Yes.
Q. How long into -- into -- let me see. He became your direct supervisor in -- do you recall when he --
A. No. I don't recall.
Q. I'm sorry.
A. Do you have that?

Q. Well, I can ask you if a certain date refreshes your recollection, okay? And does -- does January of 2001 refresh your recollection?
A. It's earlier. I would have thought it would have been earlier than that. Frank Varasano was in that management chain for a period of time but wasn't very active. Sandy was on the west coast; Frank was on the east coast. So even if I worked for Frank for a period of time, more of my interaction would have been directly with Sandy as per the e-mails and deals and stuff we were working on. So that could very well be, but -- but that seems later than I would have thought.
Q. Okay. Do you recall -- you're -- you're direct -- when you're directly supervised by Sandy and not Frank in the middle, do you recall that being a short or a long time frame?
A. Fairly short.
Q. And at some point Frank -- we talked about this earlier, I believe, Frank left the company; is that right?
A. M-hm.
Q. What was the reason for that, if you know?
A. Didn't get along with Sandy.
Q. Did you generally get along with Frank Varasano?

A. Yes.
Q. Now, you said that Sandy Sanderson was the reason you left Oracle. Is there any other reasons why you terminated your employment?
A. I was being recruited very heavily by Ray. You know, Ray had given me a lot of opportunities for promotion within Oracle. So I was very loyal to Ray. I didn't like the way that Ray was dismissed by Larry. Ray was fired by Larry. He didn't leave on his own organization -- he didn't leave on his own accord.
And he was a mentor to me, and a lot of us, kind of, had the attitude that, if you can treat Ray like that, the rest of us are pretty dispensable. So I went from, kind of, bleeding Oracle blood at that point to being more open-minded to opportunities outside of Oracle. And at that same point an opportunity came up that I thought was -- was a good opportunity for my family.
Q. Now, you said that Sandy fired Ray?
A. No. I said Larry fired Ray.
Q. Oh, I'm sorry? I misunderstood.
A. Larry Ellison fired Ray.
Q. I -- I misunderstood you then. Thank you.
So you said that you were recruited by Ray into Ascera, and that was part of the reason why you left?

A. Yes.
Q. But it turned out that that opportunity fizzled up, if you will, after six months to a year; right?
A. Yes.
Q. I want to talk a little bit about your -- the -- the last position you held while you were at Oracle.
A. Okay.
Q. And you said before that you were the area vice president of western sales for OPI; is that right?
A. Correct.
Q. So if I say -- if I refer to it as "OPI West" as your division, do you understand what I'm saying?
A. Absolutely.
Q. Okay. And, if I say "AVP," you understand what that means too; right?
A. Yes, I do.
Q. Just for purposes of being brief.
A. Got it.
(Discussion off the record.)
BY MR. HARRISON: Q. You mentioned before that you had some contact with Larry Ellison at your time at Oracle. And I didn't get a sense for how often you did have contact with him. If you could explain that, I'd appreciate it.

A. I feel like I had contact with him more than probably anybody else in -- in my position in the organization because I was the guy on the west coast and I'd been there for a long, long time. Most of the interaction that I had I -- my -- my interaction -- you're talking about the whole time I was at Oracle, not just the last two years; right?

Q. Well, let's -- let's just focused right now on the last two years and your position at AVP.

A. Okay. So my interaction with him would have come in two flavors. The primary bulk of it would be through -- through deals.

When Ray did leave the organization, Larry was awesome at stepping up and helping me keep deals moving forward by going out and visiting customers and the rest of those things, which was great.

The second is Ray would periodically bring me in to Larry's staff meetings to emphasize some point of something that might have been working well or not working at all. So those would be my two interactions.

Q. And when you had contact with Larry Ellison, was it in person or by the phone or e-mail or all of the above?

A. Hardly by the phone. I joke about this but he's got an assistant who has an assistant, and he's a

very high individual in the industry. So most of my interaction would either be what you've seen here like being copied an e-mail and get a two-word reply back or something or -- or going over to his office and sitting down and talking about deals in person. That would be more -- more of it would have been that.

Q. And as far as, you know, forecasting your -- your sales for OPI West, that went through Sandy and not Larry Ellison; right?

MS. WINKLER: Objection. Form.

THE WITNESS: I don't think Larry ever asked me a question about how I was doing against my numbers. It was more "I would like you to help me on the HP deal.

"Great. What can I do?"

But he didn't -- he wasn't the kind of guy that was going to be, like, on the way down, in the car, "Hey, how's the quarter going? How's Cisco? How's" -- you know, what -- whatever the deals might be that are out there.

So I don't recall ever having a conversation specifically with Larry about how my -- my quarter or forecast was going.

BY MR. HARRISON: Q. How about Jeff Henley? Did you have any contact with him while you were at Oracle?

A. A ton of contact with Jeff.

Q. Okay. Let's focus on the last two years you were there. Let's just focus -- or actually, perhaps let's just focus on 2000 and 2001, when you were AVP. What sort of contact did you have generally with -- with Jeff Henley?

A. Again, I -- I can't tell you that I remember specifically in that period any contact with Jeff. But Jeff was a very good friend of mine inside the organization. I talked to him all the time when I'd see him out in the parking lot or whatever. Jeff was the exact opposite. Exactly how's the quarter going, how's this deal going? Are we doing okay?

Jeff -- Jeff was -- as I mentioned earlier and we talked about executive sponsors, Jeff was a great executive sponsor.

So he took on that role. And he would really go out of his way to try and make those customers successful. So more -- more of my interaction with Jeff was around that, which is just sales calls, but mostly after the sales happened. So I can't tell you specifically about any of them, but -- but that would be the interactions.

Q. And I think you mentioned earlier that -- and I want to just make sure I didn't mishear you, misconstrue

your testimony, that you also acted as an executive sponsor as well on some sales; is that right?

A. Correct.

Q. And that was because, as an area VP, you were able to come in and act as a -- in a role that the sales manager couldn't have with the customer; is that right?

MS. WINKLER: Objection. Form.

THE WITNESS: Yes.

BY MR. HARRISON: Q. We discussed earlier the contact that you had with Mr. Sanderson during the time that you were AVP, and I just want to get a sense for how often you interacted with him on the issues that -- such as forecasting and pipeline budgets?

A. I don't really remember, to be honest with you, about forecasting. Budgets would happen once a year. In the April/May/June time frame, when the fiscal year was ending and the new one was starting.

But as far as the forecast goes, I don't think he even logged onto the forecast calls. He would have his operations team more do the forecast calls with me. But if I -- if I had to conjure a guess, I would say twice a month, three times a month.

Q. When you say "operations team," who do you -- who are you talking about?

A. I saw an e-mail note earlier from OPI West,

157

which was, like, Jay Bailey. He had -- Sandy had a team of people that would basically do approvals for him and roll-up forecasts and things like that. So more of my interaction would have been with his finance team than it would have been directly with him.

Q. So when you had -- did you have weekly forecast calls?

A. I had weekly forecast calls with my team, but I don't -- don't believe I had weekly forecast calls up with Sandy or anybody on his team.

Q. When --

A. Less frequent.

Q. I'm sorry. I didn't mean to interrupt.

And when you say "less frequent," do you -- how about does biweekly -- is that --

A. I'd say two, three times a month, something like that. It would get to be more frequent towards the end of a quarter than it would be at the beginning of the quarter.

Q. And that typically was with Mr. Sanderson's operation team?

A. Sometimes with Sandy directly, sometimes with his operations team. It would be either both or would -- it would be either the operations team and Sandy or just the operations team.

158

Sandy traveled quite a bit. Again, he had the consulting organization too; so there was just often scheduling issues and he wasn't around. He wasn't "on the ground," quote, unquote, during -- during the calls.

Q. And on those calls, was it just you on the call as -- as AVP of your -- of -- of West -- OPI West, or were there others on the call as well that were parallel to you?

A. I don't remember. I don't remember if I brought anybody on the calls or not.

Q. And I -- I guess what I'm getting at is were -- were there other AVPs on those calls along with you, reporting what they did?

A. So what Sandy would do is have a call with me and then a different call with Tom and a different call with Steve so that we all didn't get visibility in each other's forecasts. We didn't do them together as an organization.

Q. So on these calls you didn't discuss with other AVPs what their forecasts were or what they thought their pipelines were?

MS. WINKLER: Objection. Form.

BY MR. HARRISON: Q. Because you were -- they weren't on those calls; right?

A. Yes. They weren't on those calls. It isn't

159

that I had no discussions with those guys. They were friends of mine. They'd want to use my account as a reference on a big $20 million deal.

And I certainly had some visibility into the transactions that were going down in OPI in East and West -- and Central. But I didn't see the forecast. I didn't know what was being rolled up. I didn't -- I didn't -- I didn't have the visibility into that report that we looked at a couple of minutes ago.

Q. Okay. Just a few more background questions. Then I'll continue on with some of these questions we've been talking about.

Were you ever disciplined while you were at Oracle?

A. Was I what?

Q. Were you ever disciplined for any reason?

A. Yes. Once when I was at Oracle back in '95, '94, somewhere in that time frame. Kathy Downing was the vice president of the West at that point. I had a run-in with Anne Liung-Stevens, who was another account manager, who tried to steal an account from me, and we got into a bit of a tiff, in the -- a verbal tiff in the -- in the office, and we both got reprimanded for it. That's it.

Q. That's the only record of discipline?

160

A. M-hm. I think so. Got any e-mails? No. I think -- I think that was it.

Q. Since leaving Oracle, have you remained in contact with any current employees of Oracle or who were current at the time that you had contact with them?

A. Yes. I have lots of friends over there. I was there 12 years. I've hired a lot of them. I mean a lot of folks that are in here like Julie Cullivan and Kurt Speck all work for me now at different -- at -- at EMC. So I've hired quite a few folks over the years. I've still got some friends over there. Not as many anymore. Elizabeth Baker was one of the ones that was -- now she's gone. But she was at Oracle. She used to call me all the time.

Q. So what you're saying is you -- you had contact with a wide variety of people?

A. Definitely.

Q. After you left, did you have any contact with customers of Oracle for any reason?

A. There's only so many companies out there; so, you know, I sell to a lot of same companies today that I sold to when I was at Oracle but in a different capacity. I -- somebody might be three or four levels down in my organization onto the account.

But people know that I know people. So in --

in my current capacity, I'll get brought in. Ken Harris -- you saw him when he was at the Gap, and now he's over at Safeway. So they know I know him. So I'll contact the same people that are out there. But it's mostly the big accounts, and there's only so many of them.

Q. Would you say that, after you left Oracle, that you had any knowledge or information about any aspect of Oracle's business or Suite 11i?

A. No more than the market hears, you know.

Q. Now, as I said, I want to get back into your role as AVP after going through a few just general background questions, and I'm trying plow through this.

So I just want to ask a little about western -- OPI West, as I've been calling it. That covered the western region, and I think you named some cities that it covers. And some of those were -- I think you mentioned Seattle, the Bay Area as one city that's covered by west.

A. In California, Oregon, Washington, Utah, Idaho, Colorado, and Arizona and New Mexico?

MR. CAPLAN: The ninth circuit.

MR. HARRISON: That's lawyer humor.

MS. WINKLER: That's a lawyer joke.

THE WITNESS: I don't get it. Just because

you -- you're jogging me on one of the notes that was in here. At one point I had Ken Feeney reporting to me. He was actually out of Chicago. It was just -- as part of one of the reorgs, I had him for a while. So there was a couple of periods where I might have had a slightly broader territory than that. But, for the most part, that was my territory, yes.

BY MR. HARRISON: Q. What do you mean by "reorgs"?

A. Oracle reorganized every six months or a year.

Q. So as part of that --

A. Verticals, geographic, big accounts, small -- small accounts.

Q. Who was --

A. The reason that I had as many managers as I had is there's constantly tweaking to the sales model, and those would be the reorganizations.

Q. During fiscal year 2001 did you have -- excuse me. Let -- let me restate that.

During fiscal year 2000/2001, you -- you're primarily -- I'll restate that again. Sorry.

During fiscal year 2000/2001, your sole responsibility, however, was for OPI West, is that right?

A. I think so.

Let me rephrase that. Yes. What made up OPI West might have slanged -- changed slightly during that period, though. It would still be called OPI West if something else was rolled up underneath me.

Q. What kind of financial information did you have access to outside of OPI West for Oracle?

A. Just availability into some of the larger transactions that were in other parts of OPI or the Americas.

Q. When you say "visibility," do you mean through conversations with others or seeing it in the media?

A. Through conversations with others; right? You know, we'd know there's a $30 million deal coming down with, you know, AT&T or something.

Because I had a lot of accounts that were in the west and because of the customer visit center was in the west, other regions would bring customers out, take them through demos and things, and then want to go see a local customer. So I got asked to do references a lot, which would give me visibility into other major transactions that were coming down.

Q. Is it fair to say that you weren't familiar with all the sales that was going on in Central and in East regions of OPI?

A. Definitely.

Q. And is it fair to say that you weren't familiar with the pipeline -- pipelines of Central and East that was going on during each quarter?

A. Definitely.

Q. Earlier we discussed some of Oracle's other business units, such as OSI and NAS.

Do you remember that?

A. M-hm.

Q. And you weren't familiar with all the transactions and sales that were going on during the -- throughout the quarter in those business units either; is that right?

A. I would have even less visibility into those business units since those were not my peers under -- under my organization.

Q. And, similarly, you weren't familiar with what were -- what was in the pipelines for those other business units during -- throughout the quarter; right?

A. Correct.

Q. You didn't receive anything called a "global forecast" for all of Oracle, did you?

A. No.

Q. Did you ever receive anything called an "upside report"?

A. I heard the term. But, no, I never received

it.
Q. And you never received anything called a "flash report," did you?
A. Nope.
Q. You didn't receive forecasts for other business units either; is that right?
A. Not -- the only thing that I would receive would be insight into larger transactions that was happening. No other reports.
Q. Okay. So during -- you said that you have insight into other larger transactions; right? During any given quarter, however, you wouldn't have known, one way or the other, whether another region or even another -- let's -- let's stick with that -- another region was going to hit its forecasted numbers; is that correct?
MS. WINKLER: Objection. Form.
BY MR. HARRISON: Q. So do you -- do you understand the question?
A. Yeah, I do.
Q. Because -- okay.
A. I do understand it.
If the Central region was working the deal with Compaq for $30 million, I'm smart enough to realize that, if they close that, it's going to have a material

impact on them making their quarter; right? Just the very, very largest ones. But those were not all the time. Those were kind of few and far between.
The average deal for us -- you know, the average big deal for us was a million dollars, and I might know one or two of them that are going on out of 50 in the region at any point in time, but I'm being asked to help on them. But, no, I didn't have any visibility into the transactions beyond those.
Q. We may have covered this question, and if we did, I apologize. But I -- you didn't help prepare forecasts for the other areas of OPI; right?
A. No.
Q. And you certainly didn't -- I'm not going to say "certainly."
You didn't help fore- -- you know, prepare forecasts for other business units -- units of Oracle, did you?
A. No.
Q. Now, in preparing your quarterly sales forecast for OPI West, what sort of information did you use to -- to compile that -- that data?
A. Forecast calls and the personal customers I went and saw.
Q. When you say "forecast calls," these are the

calls that you had with the managers who were working for you; right?
A. The managers and the reps and sometimes that were working for me. So I would listen to those, decide which ones I wanted to roll up, which ones I didn't -- as you saw earlier, things like the forecast percentage. You know, I -- I might put a 50 percent weighting on one and a 50 percent weighting on another, assuming one of the two closed. I mean that -- that -- that's the process I went through.
So it was my forecast calls. And then I tended to get brought into the -- more of the bigger ones, which would give me personal perspective whether I thought it was going to close or not -- those two things.
Q. Earlier we were talking about something called an Oracle sales force automation system.
A. M-hm.
Q. Did you use data from that to assist in your forecasting?
A. That would be the system I used.
Q. Okay.
A. So we tried to keep it as automated as possible. We still had phone calls to talk about things, but that would be the tool that would be -- that

would be used. That's where I rolled my actual forecast up.
Q. At what points in the -- the quarter did you prepare sales forecasts?
A. I don't remember.
Q. I'm sorry?
A. I don't remember.
Q. Early? Late?
A. Early, late, middle --
Q. Was it a constant process?
A. Oh, gosh, yes. Gosh, yes.
Q. Besides that --
A. That's the job; right? The job is to prepare fore- -- is to make your numbers. So it would be typical to start the quarter off with a forecast, have one in the middle, do one at the end. It might have been more frequent than that. I don't remember.
Q. And I think that earlier you -- you testified that your forecasts incorporated some level of your judgment based on what you knew about your sales reps; is that right?
A. Absolutely.
Q. Any other form of judgment used when preparing your forecasts besides what you knew about your sales reps?

MS. WINKLER: Objection. Form.
THE WITNESS: What I knew about the deals themselves.
BY MR. HARRISON: Q. Anything else?
A. If I was in a good mood that day?
No. Nothing else.
MR. HARRISON: Would it be convenient to stop the tape to switch the tape now?
THE VIDEOGRAPHER: Anytime you want.
MR. HARRISON: I think we need a new tape.
THE VIDEOGRAPHER: This Marks the end of Tape 2 of Volume I in the deposition of Michael DeCesare at 2:16. Going off the record.
(Recess was taken from 2:16 p.m. to 2:21 p.m.)
THE VIDEOGRAPHER: On record at 2:21 p.m. This Marks the beginning of Tape 3, Volume I, in the deposition of Michael DeCesare.
THE WITNESS: Can I -- can I clarify one thing first that you guys asked me. You asked me earlier when I was contacted about this.
I actually I think I got contacted earlier than that by someone from the -- was it plaintiff? Is that the right term?
MR. HARRISON: Yeah.

THE WITNESS: Somebody called me and said that Alan would be calling me, and then Alan called me to follow up on this about the deposition.
BY MR. HARRISON: Q. All right. Well, I was going to follow up on that.
A. It's just -- as I say, it was a while ago. So I had forgotten about it, but --
Q. All right. I was going to follow up on that. But since you thought of it, why don't we talk about it really quickly?
A. Okay.
Q. Was that the first time you became aware of this lawsuit?
A. Somebody called me a long time ago. They said they were doing research for something. They -- to be honest with you, I almost felt like it was misrepresented on the phone. Like nobody came and said there was a lawsuit going on. We'll ask you a bunch of questions. It was just -- they started firing a couple of things off.
I thought it was something to do with Ray, to be honest with you. Then I got called some number of years later saying, "You might be called" -- "You might be deposed on this, and we can provide counsel for you." So -- I forget who it was. To be honest with you, I

didn't write any of this down or anything like that -- the first formal conversation I really had with Alan would have to be -- I said on the phone --
MR. CAPLAN: Okay.
THE WITNESS: -- that I wanted -- the first -- I said on the phone -- they said, "Would you" -- "Do you want to have your own counsel or should we provide counsel?"
And I said "You can provide counsel."
And then at some point later you followed up with me on behalf --
MR. CAPLAN: That's enough. That gives him all the information he's entitled to or wants.
THE WITNESS: Just trying to clarify.
MR. CAPLAN: That's good.
BY MR. HARRISON: Q. Do you recall anything further about when that initial conversation was with the person that called, you said, a couple of years ago?
A. I don't remember.
Q. Was it within a year after you left Oracle?
A. Timing's -- timing's fuzzy for me on this. There was a long gap between when the original conversation happened on the phone and then somebody followed back up. So I -- I really don't remember, to be honest with you.

Q. Do you recall if it was an investigator?
A. I think the first person was an investigator. Josh? Jay? I -- I'm sorry. I -- I never even thought to write it down, to be honest with you. So I don't remember.
Q. And what did Josh say to you?
A. So the original conversation was just asking a bunch of questions about things that were going on. Again, I thought it was related more to Ray Lane. I was it was a reporter more than it was anything else. I -- I had to end the conversation abruptly because somebody called for work or a customer or something like that, and then I didn't hear anything back for a long, long time.
I forget when that second conversation happened. It might have been the same person -- it could have been somebody different -- called me back some numbers of years later and said, "There's a lawsuit coming down. You might be deposed."
And that's when they asked if I wanted counsel or not. I don't remember when that was.
Q. During that initial conversation, do you remember any of the specific topics that were discussed?
A. No, I don't.
Q. Did that person, who may or may not be Josh --

to the best of your recollection, did he send you any documents?
A. No.
Q. Did he -- did anyone contact you via e-mail?
A. No.
Q. I don't mean to delve into any conversations you had with your attorney, but when was the first time you received the complaint in this action?
A. I don't even remember, to be honest with you. To be candid, I never paid much attention to it until, all of a sudden, I was told that I'm going to be served and have to come talk to you guys.
Q. Do you remember who sent you the complaint?
A. No.
Q. How long was it? How long ago was it that you received it?
A. The complaint? I don't even remember, to be honest with you.
Q. You said, during that second call, someone asked you if you would like to be represented by your own counsel or by a counsel that would be provided to you.
Did they say that that counsel would be paid for?
A. Yes.

Q. And in line with that -- that representation, are you paying your counsel today for his representation of you?
A. No.
Q. Do you know who is paying him?
A. I believe these guys are. That's my understanding.
Right?
Q. Have you received any money or anything else of value for anyone in connection with this case?
A. Somebody sent me a check for coming here today for $30 or something like that, which is like --
MR. CAPLAN: He asked anything of value.
THE WITNESS: Yeah. Like that was insulting.
BY MR. HARRISON: Q. Yeah. Besides that?
A. No.
Q. Did anybody promise you any money or anything of value for testifying?
A. No.
Q. I wanted to go back to what we were talking about before, but I appreciate you clarifying.
A. Sorry about that. I just had forgotten about that earlier.
Q. I just wanted to ask you a couple more questions about the database that you recall, which I

think you recall being called -- being called Oracle sales force automation system.
A. OASIS.
Q. OASIS. Is that OASIS?
A. Oracle Automation Sales Information System, O-A-S-I-S.
Q. Right. That was the -- the database that you recall being used ear- -- in the early '90s?
A. Correct.
Q. And then there was another database that was used after that; right?
A. Yes.
MS. WINKLER: Objection. Form.
BY MR. HARRISON: Q. And that dat- -- database took the places of OASIS?
A. So back in 1989 we would run a trade show and people would fill out paper forms, and they would walk around on Monday morning and they would hand them out to all the people to call and follow up as leads. We -- we built the OASIS system to put those into a system and have them electronically distribute those. That was an internal application.
And then some number of years later Oracle decided to productize that and sell that as the CRM system, as the Customer Relationship Management system.

Q. Could you repeat that, I'm sorry, the last thing you said.
A. Some number of years later Oracle decided to productize that internal application and sell it, and that became the Customer Relationship Management suite of products. Now, lots of innovations since then, but that was the basics of it.
Q. All right. Now, that database, which -- do you recall the name of the actual database that took the place of OASIS?
MS. WINKLER: Objection. Form.
THE WITNESS: Oracle CRM. I'm sure the IT department had some name like, you know, SQR12.Z -- I mean a physical name for the database. But you're asking about what the application was called; right?
BY MR. HARRISON: Q. Right. I'm just trying to get a -- make sure we're talking about the same thing here. The thing I'm talking about is -- I think the database we discussed earlier that had deals in it, the deals status.
Are we talking about the same thing?
A. Yes.
Q. Okay.
A. So if -- if -- if you look at anything what Oracle does as a business. They have a database

product, which is software that sits and holds data -- that could be anything from an airline reservation to a hotel reservation to an employee record to anything -- and then there's a form or something that sits on top of it that is what you as a user will interface with. Those two things together are an application; right?

So when you ask about the database, they'll -- the Oracle customer information system, what we would do is go into a form and put in "Hewlett-Packard $22 million will close in November '00." All those records become the database.

Does that make sense?

Q. It does. Thank you.

And in looking at that database, you could see where the deal was along the -- throughout the quarter; is that correct?

A. Yes. I could go online any -- at any time and look at it and, assuming the sales rep had updated it, which is a big assumption sometimes, then you could tell where the deal was.

Q. And besides the stage of the deal, where it was in its -- in its stage, that database wouldn't give you any indication of whether or not that deal was going to close during the quarter; is that right?

MS. WINKLER: Objection. Asked and answered.

THE WITNESS: There's always the potential for user error; right? I mean, if the rep said it was going to close, then they would say it's going to close. It doesn't mean it's going to close.

So I mean you're dependent upon the sales reps having a good understanding of the opportunity and being able to forecast that correctly. But that's what the tool was there for is to show you what the sales rep's thought was at any given time in a deal.

BY MR. HARRISON: Q. So it reflected what the sales rep thought about their deal?

A. Yes.

Q. And isn't it true that regardless of what the sales rep thought about the likelihood of closing, at the end of the quarter, say, the deal could fall out for various reasons; is that right?

A. Very much so.

Q. I think something you said earlier was the fact that, when you left Oracle -- and I want to make sure I get this correct -- that when you left Oracle, at least for OPI West, there was a -- a rich, fat pipeline; is that right?

A. There's a lot of big deals left.

Q. And looking at all these documents today -- did it -- did it refresh your recollection about the precise

date that you left or --

A. If I was to guess, based upon this today, I would say that I left in early March '01.

Q. And that's because you -- as you said earlier, you wouldn't have left in the middle of a quarter?

A. I wouldn't have left in the middle of a quarter?

Q. And we saw documents that indicated that --

A. I was still there in January and February.

Q. Thank you.

A. Unless I was copied on an e-mail note that I -- you know, it's very possible that I could get copied on e-mail notes for months after I was there. I don't know where Oracle turned off my user ID. So you can't -- I can't control that; right?

Q. Right.

A. But do you when I left? Can you ask me a date and say, "See if that sounds familiar." I'm just curious.

Q. Does March 1st ring a bell?

A. Yeah. March 1 would have rang a big bell.

Q. The March 1 the first day of -- of fiscal fourth quarter of 2001?

A. Yes.

Q. At least for that year?

A. Yes.

Q. So you were there during -- you were AVP during the second quarter and third quarter of 2001?

A. Yes.

Q. Of OPI West?

A. Yes.

Q. And it's true, isn't it, that at no time during those two quarrels the pipeline for OPI West collapsed; isn't that right?

A. A lot of --

MS. WINKLER: Objection. Lacks foundation.

THE WITNESS: A ton of deals fell out. A ton of deals fell out. I mean when the Internet burst, things went away. You know, many customers just completely pulled back their IT budgets. So there was a ton of deals. I probably had a better chance of surviving it from a business perspective because I still had HPs or some of these bigger deals that could have made up for a lot of falling out of business, but, no, absolutely, it collapsed. There's a lot of business that fell out.

BY MR. HARRISON: Q. When you say "collapse," how do you define that?

A. A lot of business either moved out a quarter for two or went away entirely.

Q. Was it uncommon for -- for deals to -- to slip quarters, in your experiences at OPI?

MS. WINKLER: Object to the form.

THE WITNESS: Yes, it was common. But nowhere near as common as it happened when the Internet hit.

BY MR. HARRISON: Q. Did your division, OPI West, involve a lot of Internet clients?

A. What's an Internet client?

Q. Well, I'll rephrase that. A dot com client.

MS. WINKLER: Objection to the form.

BY MR. HARRISON: Q. Do you know what I mean when I say --

A. A customer who, his main business is to be a dot com company.

Q. Right.

A. No. Mine did not. There was a whole division under NAS, called the "dot com group," that called on most of the dot coms -- eBay, eTrade, you know, Yahoo -- all the bigger companies that were out there. So I didn't have many of those. I might have had some, but I didn't have as many -- not as many of them.

Now, every high tech company had some Internet something they were trying to do; right? You know, Cisco, Quantum, Hitachi -- all these companies were trying to take advantage of that, but when you're

talking about, like, you know, grocerystore.com or Amazon or one of these companies -- those were all in one other group.

Q. During the second quarter and third quarter of 2001, were you comfortable that the pipeline was -- was adequate enough to -- to provide coverage for your forecast?

MS. WINKLER: Objection. Form.

THE WITNESS: This is a tough one because a lot of business slipped. I mean, that was a very, very tough time. By the same token, I had the potential because of deals like HP or EMC, where we might be able to do a "I'll do a deal with you, you do a deal with me" type of scenario, that I was probably better insulated than -- than -- than the commercial or other organizations would have been; right?

But, you know, look at the quarter that we talked about. I'm not -- besides HP, I don't know what else had closed. Besides that HP deal, it would have been a pretty dismal quarter for me if we hadn't gotten that one transaction done.

BY MR. HARRISON: Q. How often did you monitor the pipeline for OPI West?

A. Beginning of the quarter, twice a week; end of the quarter, every four minutes. I mean that's -- it

gets to a point where it's like you're getting calls from Ray, asking if this deal is closing, you know, once an hour type of stuff. So it got a little bit more crazy as the quarter got closer to the end.

Q. Isn't it true that the pipeline for each quarter -- and I think you may have said before, but it would be reduced as the quarter went along because deals would either fall out or deals would be signed?

A. Very much --

MS. WINKLER: Object to the form.

THE WITNESS: Very -- very much so. I mean as -- as -- as you saw in Sandy's thing in there, the target was 2.73, 273 percent. That means he was trying at any point in the quarter to get your pipeline to be 273 percent of what you had to finish at. There we're 204 percent in that note; right?

So obviously at the end of the quarter, it's -- it's 100. I mean whatever it -- it closes at is -- they're not going something in pipeline March 1 and still think if it's going to close February 28; right? So, you know, it gets down to be one-to-one by the time the quarter is over.

In that specific period, though, it was worse than ever because you had companies that were just

categorically shutting off their IT budgets -- you know, budgets for a quarter or two. Like the Gap -- "It doesn't matter if it's a good ROI or not, we're not spending money right now."

So there was more of that than there was in previous quarters.

But, yes, it was definitely customary for things to slip out during the quarter.

BY MR. HARRISON: Q. What -- what was the use -- how did you use your pipeline in creating your forecast for a rollup to Sandy Sanderson?

MS. WINKLER: Objection. Form.

BY MR. HARRISON: Q. Do you understand the question?

A. I understand the question perfectly.

MR. CAPLAN: You can answer.

THE WITNESS: I would look at the transactions. I would understand my people. I would go visit customers, and then I would say, "It's going to be 22 million."

So all those factors.

BY MR. HARRISON: Q. Okay. And so the -- the pipeline that you analyzed by talking with customers and your reps -- that had a factor into what your forecast was that you rolled up to Sandy Sanderson; right?

A. Oh, clearly.
Q. Now, if you had felt that the pipeline had collapsed, is that something that you would have factored into your -- your forecasting report that was rolled up to Sandy Sanderson?
A. Clearly.
Q. So that, if you felt that there was slippage or anything like that, that's something that was reflected in the numbers that you passed upwards?
A. Yes. I -- I -- I always motivated to be as accurate as possible, not to put a number out there that -- you know, that is going to surprise those guys the last day of the quarter. So those things all would have been factored into my numbers that I rolled up.
Q. And just going back to the word "collapse" -- I -- I want to make sure we're on the same page here -- when you say "collapse," do you mean that the entire pipeline went away?
MS. WINKLER: Objection. Asked and answered.
THE WITNESS: Did I -- did I say the word "collapsed"?
BY MR. HARRISON: Q. Well, I'll represent to you that that's been attributed to you.
A. Okay. I'm -- it's so long ago I don't remember the conversation; right?

"Collapsed" would have meant that the majority of the deals moved out. That's what collapsed would mean to me.
Q. And that means -- when you say "majority of the deals," what do you -- what do you mean by that?
A. Over 51 percent.
Q. And would that mean that you wouldn't have enough coverage to cover your forecast?
A. It would have meant that I probably would have been more dependent on the one or two big deals; right? You know, in a -- in a -- in a good, solid quarter, you'd like to have, kind of, what we call "dogs and cats" -- littler deals that would have gotten you there. And then the big one would have been either -- made you wildly successful or -- or just barely successful.
I think, in that time frame, so many things were going away that we were more dependent upon the bigger deals, the really giant deals, than we were previously.
Q. Now, earlier you'd said that you felt that there was a -- a fat, rich pipeline as of the very beginning of fourth quarter, 2001; right?
A. Sorry? Can you repeat the question.
Q. Yeah. Absolutely.
Earlier you testified that you felt there was a

fat, rich pipeline at the end of third quarter, 2001.
A. There was a couple of big deals that I felt was leaving my region in -- in better shape. The person that took my territory over when I left was a very good personal friend of mine. So I felt good about the timing of when I left because there was a couple of big deals that were still left there for him to close out. I think he did very well the quarter I left too. But, again, it would be contingent upon a couple of those bigger deals closing.
Q. Now, if you felt that the pipeline collapsed in second quarter, 2001, or was slowing down, is that something you would have reported to your supervisor, Sandy Sanderson?
MS. WINKLER: Objection. Asked and answered.
THE WITNESS: "Asked and answered," she said.
MR. CAPLAN: You can answer.
THE WITNESS: I honestly don't remember making the comment about the pipeline collapsing. My guess would be that I was talking more about what I was hearing across all of Oracle than my own specific pipeline.
But there's no doubt that lots of stuff was moving out of the pipeline from companies who had gone through a serious downturn and were stopping IT budgets.

And, yes, I would have reported that to my supervisor.
BY MR. HARRISON: Q. Do you recall reporting that?
A. I recall being as honest and straightforward about my pipeline as I could every time I was asked during the years I was there.
Q. And -- what you felt about the pipeline was reflected in the numbers that you provided upwards.
A. Clearly.
Q. They were aggregated; right?
A. Clearly.
Q. And along that line, after you gave your forecast to Mr. Sanderson and discussed it with him, do you know what he did with it?
MS. WINKLER: Objection. Form.
THE WITNESS: I have no idea what he did with it.
BY MR. HARRISON: Q. Do you know whether he applied management judgment to the forecast that he created using yours and the other AVPs?
A. You would need to ask him. I have no idea what he did with it. But that is what I do for my team; so it would be logical you could do the same.
Q. In your view, were you more of a conservative forecaster for OPI West, or were you more aggressive?

A. I prefer the word "accurate." Either extreme is not a good -- is not a good thing. So I had a little bit more of a challenge than most in how do you forecast HP; right? If it comes in, it's a wildly different percentage than if it doesn't and, you know, I would tend to put those more in upside until I was really sure they were going to come in so as to not misrepresent too high the numbers.

Q. I know you said that you don't know what Mr. Sanderson did with your report. Do you know who analyzed the data after Mr. Sanderson got it from you for your forecast?

A. I would have guessed either Sandy or his financial team.

Q. You're not -- you don't know for a fact who looked at it or who analyzed it to roll it up into an aggregated --

A. No, I don't.

Q. -- forecast?

A. There was a guy who used to be his financial guy. I'd recognize the name if you said it, but I don't remember what his name is now.

Keep striking.

Q. Now, we've been talking about using the word "collapse" or, you know, if I may slow down -- and I --

I just want to analyze this a little bit more.

How did that -- I know you said that you used it in your forecasts and you -- you also used pipelines, but how did your view that -- that things were slowing down -- how did that affect the financial results for OPI West in second quarter and third quarter, 2001?

MS. WINKLER: Objection. Form.

THE WITNESS: I don't remember.

BY MR. HARRISON: Q. Do you recall that in those quarters that you hit your forecasted numbers?

A. Per our earlier conversation, we closed HP in the second quarter, right, that was -- yeah, the second quarter. So I absolutely made my numbers during that period. I don't remember what the rest of it was like put beneath that, to be honest with you. We went through deals like AMD and some of these others.

I don't remember some of those deals going during through the period, but I'm on e-mails and stuff. So -- and I don't remember what the third quarter -- I don't know how well I did in the third quarter. So I don't remember.

Q. You don't remember if you came in over your forecast --

A. No, I don't.

Q. You don't remember if you left on a high note?

A. I feel like I did, but I also remember HP was such a big deal for us that would have put me ahead for a long period not just for the quarter that I was in. So I feel like I did.

But, you know, again, if you look a deal like HP, understand we got that deal because we promised HP an equal amount of hardware in return; right? That -- HP wasn't out there doing big deals like that with anybody. They did it because they were going to get a $22 million hardware order back to help their business; right?

So I had more of those opportunities since the customers I called on were IT business partners of Oracle's than the Oracle sales rep would have had or average sales VP would have had.

MR. HARRISON: I'd like to mark -- I think we're at --

MR. CAPLAN: 14.

MR. HARRISON: -- 14.

THE WITNESS: Uh-oh.

(Marked for identification purposes, Exhibit 14.)

THE WITNESS: Rich Blotner. That's the guy. That's Sandy's operations guy. That's the guy who would pull this stuff together. Sorry. These like -- these

names from my past -- I forgot about them.

BY MR. HARRISON: Q. I'll just give you a chance to take a look at it. Let me know when you're done.

A. Okay.

Q. Okay. First of all, let me ask you -- I know we -- earlier we discussed the whole dot com bubble and anything, and I don't think you could place a date on when you recall the whole thing burst is that, looking at these documents that you've looked at today, does it refresh your recollection a specific date when you felt that that happened?

A. No, it doesn't. And that shouldn't be too hard a thing for you guys to figure out; right? I just didn't think to look it up for today, to be honest with you. Sometime around 2000? Beginning of 2000?

Q. You don't recall specifically?

A. I don't recall specifically.

MS. WINKLER: Objection. Asked and answered.

BY MR. HARRISON: Q. If you take a look at this document, which is Bates-numbered --

A. Front page or two?

Q. I -- I'm just going to describe the document really quick for the record.

NDCA-ORCL 027953 to -54. It's a December 1,

2000, e-mail from Richard Blotner to Frank Varasano, Sandy Sanderson, and copying Jim English. I believe a second ago you said that you remembered who Richard Blotner was?

A. Yeah. Blotner was the ops guy, and English was the finance guy. Those are the two guys that would have pulled all this stuff together for Sandy. That long arduous package that we looked at earlier were -- my guess is those guys built that in their teams.

Q. Now, this -- in pulling this stuff together, as you say, they used the information that was rolled up from, for example, OPI West; right?

A. Definitely.

Q. And Jim English was the finance guy, you said?

A. I think so. I think English was the finance guy and Blotner was the ops guy.

Q. Did you have interaction with either of those two?

A. Both of them.

Q. How frequently?

A. A couple -- every couple of days on something. They -- they did everything from the business reviews to deal approvals to kickoffs. Everything -- there's lots of stuff that we were all working on. So we'd deal with those guys a lot more frequently than Sandy.

Q. Now, the first paragraph of this e-mail, which is dated December 1, 2000, are you aware that December 1, 2000, was the first day of the third quarter?

A. Yeah.

Q. It says

"Fyi, attached is an update to the file i sent you earlier on pipeline compared to budget & last year."

Budget was -- in other words, is it fair to say that that was the first forecast of the quarter?

A. I would think so, yeah.

Q. And it also compares to last year if you see that in that line I just read. It was common in this -- at least for Oracle, to compare financial information to the same quarter of the year prior; is that right?

A. As it would be for all companies, yes.

Q. When you say "all companies," do you mean in this industry or --

A. I -- I -- I think any company, and certainly in high tech, is the most incredibly relevant point is same period last year.

Q. And why is that?

A. It shows your over-year growth. Seaonality is taken into consideration. A company like Oracle, who

closes their year in May, you know, might do 35 to 40 percent of their business in the fourth quarter.

My new company that I'm at now -- we do 21, 24, 26, 29 percent of our business in Q1, Q2, Q3, and Q4 respectively. So you naturally expect Q1 to be better than -- or Q2 to be better than Q1, and Q3 to be better than Q2, et cetera.

So when you look at Q2 of this year compared to Q2 of last year, that is better indicator of how the business is growing versus just the seasonality. So it's a very common -- common metric.

Q. It says, next line,

"Key to remember, is that many deals that fell out of q2 will have moved into q3 so the numbers will only get better. Key points are:

"Q3 pipe looks great, increasing 57 million over last look (all areas up)."

Now, looking at that line, do you know what Mr. Blotner is referring to when he says "All areas up"?

MS. WINKLER: Objection. Form. Lacks foundation.

THE WITNESS: My guess is he means all three regions -- West, Central, and East.

I can tell you one thing, though, you need to

think about on this. Okay? So there was a reorg going on; so people would put things in the pipeline system because, if it was in the pipeline, you would get to keep it and, if it wasn't, you wouldn't.

So one thing that you have to dig into on this is you could very easily have people putting deals in the quarter that were never going to close in the quarter, strictly so that they would not either get fired, if there were terminations, or, B, so they wouldn't lose that account if there was a reorganization going on.

BY MR. HARRISON: Q. What was --

A. It was a problem around this time of the year in general for Oracle because there was uncertainty about layoffs at Oracle, that that was the rumor mill inside the organization. When I left, it was an uncertain time, as it was for every company during that time in the high tech; right? But also there was the whole reorganization going on.

So I -- I'm not saying that that had an effect on this. I'm just saying that one of the things that you need factor into this is that -- that sales reps were a little bit scared during this time and you could easily have had to go artificially inflate numbers in the system for job preservation.

Q. Do you have any specific knowledge that that actually happened?
A. Not in my territory -- I'm not aware of it happening. I mean I -- I would have gone and zero'd that out as I rolled them up because I felt like I knew transactions better, but it was definitely something that people were dealing with across the company at that point.
Q. And that was -- when you said you zero'd them out, that was an exercise of your judgment when providing the forecast upwards?
A. Yes.
Q. Was it your policy to tell your managers and sales reps to include every deal in the pipeline?
A. Every deal that we were putting any kind of resource on. So the opposite effect is even worse, where a sales force ends up out the work deal and doesn't it in the pipeline so any time -- a country presales weapon they couldn't sign to it until any put night the system as a check balance to make sure that everything was in there so, yes.
Q. The next line here says that the "pipe shows 2.75x coverage of budget, 3.8x compared to last year (excellent position).
Do you see that?

A. M-hm.
Q. And where it refers to 2.75x coverage, is it fair to say that that refers to the coverage that the pipeline has for the forecast?
A. Yes.
MS. WINKLER: Objection. Form. Lacks foundation.
THE WITNESS: Yes.
BY MR. HARRISON: Q. As far as you know?
A. Yes. That's -- that's -- that's what they mean by it. That's what you asked me; right?
Q. Yes. And you used the same metric in -- in your experience in your division; right?
A. Absolutely. Industry common term.
Q. The next line said that "all three areas are over 2x even without" -- GRN -- "Enterprise deal." or G -- excuse me -- GM --
A. "General Motors Enterprise deal."
Q. I think there's a misspelling.
A. Yeah. A deal that went down that was tagged as General Motors was called Coviscent (phonetic), which was a joint venture between General Motors, Chrysler, and Ford, but it was an ASP deal. So even if it was closed, it was going to be recognized over time, not up front. That's why it had to be zero'd out of forecasts.

That was one of the ones I was aware of that was happening in the Central region.
Q. Mr. Blotner refers to the fact that all three areas are over 2X. And I'm wondering if, in your experience -- so I'm asking for your personal knowledge in OPI West -- if 2X was a standard you were familiar with?
THE WITNESS: I tried to get to 5X. That was our target was to have five times the pipeline coverage that you would need. We would routinely get to about 3X. It depends how you want to look at it. It's the high water mark. So, you know, you might -- December 1, is, as Rich is saying here, is -- there's probably a whole bunch of deals that are still in the system as being a Q3 -- a Q2 deal. Q2 deal.
That had just -- the rep hasn't gone and said, "It didn't close last night. So now it has to move into a, you know, December, January, or February close. So those wouldn't be reflected in here.
You know, by the same token, when you're working a deal during the quarter and it doesn't close, you tend to just move it out to the next quarter, even if it's a deal that might not close in the next quarter.
It's just a common practice to stick it out, and then clean the forecast up in the first couple of

weeks of the quarter. So I -- I -- I never put very much credence into what the first rollup was.
You would come back, take a couple of days to clear your head, and then okay reps cri- -- you know, get deals classified correctly -- that kind of stuff. So it wasn't uncommon to see it go up or down by 1X in the first couple of weeks of the quarter.
Then you see his last bullet there. It says "q4 will still be a big challenge to show growth"; right?
Q. Do you -- do you understand that Q4, 2000, was an extremely high year as far as revenue for Oracle?
A. It what? It was a high year?
Q. Q4, 2000.
A. Yeah. It's the comparables; right?
Q. Yeah.
A. That's what you're saying? Yeah. Oracle does so much of their business in the fourth quarter. They've engineered the sales organization with price holds and things that really incent customers to wait until May that whether they show growth in the fourth quarter or not is going to have a very material impact when they show growth for the year.
So my guess out of that is, again, is that Q4, '00, was so strong that, even with good Q4, '01, it

might not still show sequentially you're over your growth. But that's just my speculation.
Q. Now, I think you mentioned this earlier, but isn't it true that -- that your understanding at least is that Mr. Blotner and Jim English would use the information that you provided and roll it up into more global forecasts for Oracle; is that right?
A. I -- I don't know that for a fact, but that would make sense for sure.
Q. Because they did -- are you aware that they worked on such forecasts?
A. That's -- that's Sandy's operations team. So, you know, I had my person that would roll my managers up -- and it's just common practice for any sales leader to have an operations team that is going to pull together the forecast. My only difference in this is I -- my understanding that Oracle was that it -- that was done via the CRM system, which was advertised to do that, not via a manual set of spreadsheets.
Q. Now, based on, in part at least, the information that you had rolled up from your forecast, Mr. Blotner is indicating that the Q3 pipe looks great.
Do you see that?
A. I do.
Q. Do you have any reason to believe that he was

misrepresenting what -- the information that he received and rolled up?
A. Not at all.
MR. HARRISON: You know, why don't we take a five-minute break if that's okay.
THE VIDEOGRAPHER: Off record at 3:00 o'clock.
(Recess was taken from 3:00 p.m. to 3:06 p.m.)
THE VIDEOGRAPHER: On record at 3:06.
MR. HARRISON: I would like to mark as the next exhibit DeCesare 15.
(Marked for identification purposes, Exhibit 15.)
MR. HARRISON: Which is an e-mail, entitled "OPI Final Forecast Week 12," dated Thursday, the 16th of November, 2000, from Darren Lauter to Frank Varasano and others, with an attachment -- several attachments. They're included behind the document.
I'll let you take as much time as you need to review this, but I'll let you know that the page I'm interested in is the page 4 of 17 and 5 of 17 internally in this -- in the attachment.
A. Okay.
MR. CAPLAN: I'm sorry. Which number?
MR. HARRISON: The internal page 4, which is

Bates No. -948. And I guess, for the record, I'll note that the Bates number of this document is NDCA-ORCL 038944 to -966.
THE WITNESS: Page 4?
MR. CAPLAN: -948.
THE WITNESS: Got it.
BY MR. HARRISON: Q. Ending in Bates No. -948.
A. It shows the November 16. Okay.
Q. Okay. So you've turned to the Bates number ending in -948? Do you --
A. Yes. I -- I'm there.
Q. Okay. I would just like to direct you to the column -- well, the -- the title that says "West - Mike DeCesare."
Do you see that?
A. I do.
Q. And it goes through from Week 2 to Week 13.
A. Yes.
Q. And actually the title of this page is "Oracle Product Industries Q2 '01 Pipeline Trend Including Commercial ISD."
I -- I wanted you to take a look at under the column "Pipeline" for -- under "Total," sub- -- subcolumn "Total." If you look next to your name, there's a -- there's a list under each week for what the

pipeline was.
Do you see that?
A. Yeah. I look incredibly accurate.
Q. What do you mean by that?
A. Consistent across the weeks.
Q. Oh, with your forecast? Is that what you're referring to?
A. I'm just -- I'm just joking around. I'm sorry.
Q. That's -- I was going to get there next. Is that -- are you -- are you looking at the forecast --
A. Yeah. I was looking at the total forecast.
Q. You made that observation that you're incredibly consistent. What -- what do you mean by that? Is that -- besides the fact that it's -- represents 27 until the very last week?
A. 27?
Q. Are you looking at "Forecast" or -- or the "Pipeline"? I'm sorry.
A. So it's confusing to me, if this was done after the end of quarter, which Week 13 would indicate, why there'd be one thing in "Forecast" and one thing in "Pipeline."
You certainly shouldn't still have something in pipeline that didn't -- those should be the same thing come Week 13. And so I'm just confused about the

context of when this was generated. All right. Week 13 is after the quarter is over; so how -- how did I do 35 and have 93 in pipeline a week after the end of quarter? It doesn't make much sense to me.

Q. Let me ask you a question. Have you ever seen a -- an atta- -- a document like the one that's attached here?

A. No. I -- this was never shared with us. This was -- this wasn't something that I was given, I guess. It was something that maybe measured us and shared among our -- my boss and his peers.

Q. Okay. So to understand what you just told me, it's your understanding that the very last week of the quarter the pipeline would hit the forecast exactly?

A. 100 percent.

Q. Do you mean forecast or actual sales?

A. They're all the same thing; right? When the quarter's over, if you close 35, then your forecast is 35, your pipeline's 35 -- all deals as closed.

When I -- I don't have a lot of context. This isn't something that was shared with me, but when I run my business today, you know, there might be a billion dollars of pipeline today, and then by the end of the quarter you might do $400 million. But when the quarter's over, by midnight of that last day of the

quarter, only the 400 million that we closed is still in there, and everything else has been moved out because it didn't close; right?

So that's -- the only thing that's a little bit weird to me is how did I finish at 35, and -- and it shows 93 in pipeline after the quarter is over. It's just confusing. Plus you showed me earlier that I did a $22 million applications deal at HP, but you only have me down as 17 million of applications in here, which doesn't make any sense; right?

Q. So does that suggest to you that that -- the $35 million forecast is not the total actual final sales for -- for --

MS. WINKLER: Objection. Sorry.

MR. HARRISON: That's okay.

For --

THE WITNESS: Wait till he's done.

MR. HARRISON: For OPI West.

MS. WINKLER: Objection. Form.

THE WITNESS: I don't know what we're looking at here. From the way you described this, this would have indicated, kind of, an end-of-the-quarter review. This would be something that you'd want to look at the end of quarter to see where you started and where you ended and stuff. But the fact that it's got 17 million

of applications in here for me and we already showed that I had a $22 million deal close in the quarter that we're talking about here indicates there's some flaw in this report.

BY MR. HARRISON: Q. Do you -- if you look at the -- the forecast for apps, it goes from 16 for the first six weeks and then 17 for the last three weeks; right?

A. Yes.

Q. Does that indicate to you that, instead of this actually being the ac- -- the final number, that this was the forecast for the quarter?

MS. WINKLER: Objection. Form. Lacks foundation.

BY MR. HARRISON: Q. Is that how you interpret it?

A. I don't -- I don't know how to interpret that. I -- I knew HP would have been closing before the last day of the quarter. So at some point it would have been at least in here as pipeline. You know, I don't know.

Knowing that HP closed for 22 million in the quarter, I don't understand how it would be at 17 all the way until the end. Again, I don't understand. Week 13 isn't the last end of the quarter. Week 13 is when the quarter's over.

Q. If you -- if you look at the e-mail on the first page, maybe that'll shed some light into it. It says "Attached is the final forecast for Week 12, the summary document and the scenario sheet."

Does that say to you that --

A. That's the end.

Q. That going -- that is actually for the week -- under Week 13, that that's a forecast and not actual numbers?

A. This look like it's something that shows what it would be -- this is the last week of the quarter.

Q. But it's -- the e-mail is talking about the fact that it's the forecast for Week 12.

Do you see that?

A. What -- what's the difference?

Q. It's -- I'm sorry?

A. What's the difference?

Q. Are you asking --

A. Yeah. The forecast in the Week 12 -- it's the last week of the quarter. The forecast should be fairly accurate at that point.

Q. Okay.

A. There's not very many moving parts. There's, kind of, to use the way that you talked about it earlier. Most of the stuff that you know isn't going to

close is out, and most of the stuff that's still in is very, very likely.

So this doesn't surprise me in the slightest. The only thing that's -- that's weird to me is there's no factor for HP in here. So I don't understand it.

Q. Looking at the pipeline total under "West - Mike DeCesare" as it progresses over the span of all those weeks, can you indicate to me where deals generally fell out of the pipeline?

MS. WINKLER: Objection. Form. Lacks foundation.

THE WITNESS: You can look at around Week 6 to Week 7. It fell by 14 million or roughly 20 percent between Week 7 and 8. Mine fell by another $3 million or about a little bit less than 5 percent.

Then it climbed back up, at the end, to 93, which is weird because it jumped in technology -- again, to go back to what we talked about this morning here, you had deals like the Gap and some of these other deals that somebody could have put into the pipeline, the snapshot could have gotten run, it could have gotten moved out the next day -- I mean some of the deals that I was working on were fairly big so they could have had an impact on this.

But the only thing weird on here to me is is

the fact that we've already proven that HP closed for 22 million doesn't seem to be represented anywhere here.

BY MR. HARRISON: Q. Right. And if you -- if you look at the -- the numbers going -- progressing on in time, do you see a steady decline in the pipeline going to 93?

A. Steady decline until the end when it jumped back up to 93.

(Reporter clarification.)

THE WITNESS: Until it jumped back up to 93.

BY MR. HARRISON: Q. And as we discussed earlier, it was -- I think you testified that, during the course of the quarter, the pipeline would decrease as the quarter went along because deals would close and some other deals would fall off; is that right?

A. Yes.

Q. If you could turn to the next page, please. I don't know if you had a chance to take a look at it, but I'll give you as much time as you need.

A. What -- what's this? This next one here is the year? I don't -- the header isn't very indicative, so ...

Q. I really -- I just want to make sure we're on the same page.

A. I got it. Okay.

Q. Okay. All right. The numbers that -- you know, as you can see, the title of this is "Oracle Product Industries Pipeline History, Including Commercial ISD."

And it gives data for Q1 and Q2 of fiscal year -- well, if you look at the title, it says it compares fiscal year '01 pipeline to fiscal year '00 pipeline.

Do you see that?

A. M-hm.

Q. Now, under the total for fiscal year '01 pipeline for Quarter 2 pipeline is at 252 average.

Do you see that at the bottom of the column?

A. Yes.

Q. And if you look under fiscal year 2000, the total is 150. Do you see that?

A. M-hm.

Q. That turns out at 68 percent in the growth of the pipeline from the prior quarter of the year before?

A. M-hm.

Q. And I -- I may have misstated that. What I meant to say is the same quarter of the prior year; is that right?

A. Yes. Yes.

Q. And do you have any reason to believe that

that's not correct?

A. No. Not at all.

Q. Thank you.

A. What does the minus 39 mean in the FY -- the Q2 2001 pipeline in the lower right-hand corner, it says "negative 39."

What is that? Change prior from what? Do you see?

Q. I do see that.

A. Next to the 252, it says minus 39 --

Q. Let me ask you --

A. Because I don't -- I don't know. This is a weird report. But I think what you were saying is the 150 on average that was in '00 up to 252 would be a 67 percent increase. I'm not doing the math, but it seems pretty close to it.

Q. Right. And I didn't say that. I was just --

A. Yeah. No, no, I think that's what -- but then this over here says 39 percent down. But I don't understand what it's down from, to be honest with you. Anyway.... We -- we agree it went from 150 up to 250. That's what you were trying to get to; right?

Q. I was asking you, yeah.

A. Yeah. I never saw this. This isn't something that I --

Q. Right.
A. -- that I ever took a look at.
Q. Understood. Understood.
A. Okay.
MR. HARRISON: Let me mark as -- I think it's DeCesare 16. Is that right?
(Marked for identification purposes, Exhibit 16.)
BY MR. HARRISON: Q. I'll let you take as much time as you want to look at this. But I would just like to let you know that I will direct you -- direct my questions to the Bates number ending -691 and -692.
For the record, this is a -- the Bates number of this document is NDCA-ORCL 400679 to -706. And it's titled "Oracle Product Industries Q3 '01 and Q4 '01 Forecast Package, Week 14 - February 27, 2001."
A. What page did you want me to look at?
Q. Bates number ending -691.
A. Okay. Just give me a couple of seconds. Okay?
Q. Sure.
A. Okay.
Q. And I just want to direct you to a column that's similar to the one we looked at previously, which is "Pipeline total" under "West, Mike DeCesare."
A. Yep.

Q. And I was wondering if, looking at this data -- well, let me -- let me start by saying have you seen this document before?
A. No.
Q. Is this the sort of report that you would have received in your --
A. No.
Q. -- during your time at Oracle?
Okay. Now, looking at the column "Pipeline total" under Mike DeCesare, can you point to me at all where you believe deals fell out of the pipeline for your -- for OPI West or that there was a collapse in the pipeline?
A. Yeah. In week -- between week 4 and week 6. And then after -- so if you look at this, just to get a perspective on it, you've got $85 million in week 6 of which you have 56 million in three transactions. Go back up to page -- the one ending in -82. And you're going to see Select Run, $20 million; Intel, $14 million; and the Gap, $10 million? Right? So 45 million right there alone. Sun, another 5. So I mean you're going to have $50 million on four transactions out of $85 million.
So when you look at the three or four largest deals that you've got in the organization, the change to

the balance of the pipeline was radical between Weeks 4 and 6.
Again, mine -- mine is a really hard one to trend because, you know, you move $20 million out, it might show a bad trend, you add 20 million, it might show a good trend, but is it -- that isn't indicative of the overall pipeline; right? So my -- my recollection of this time is a lot of the smaller average, mid-size, you know, deals were moving out -- just categorically customers shutting down budgets -- but that we still had four or five really big deals that, if we were able to get done, could have had a pretty profound impact on the quarter, good or bad; right?
Q. Right. And -- and your knowledge about that fact was -- went into your forecast for the quarter; right?
A. It would have, yes.
Q. And that went into whether or not you felt you -- OPI West was going to hit its -- its budgeted numbers?
A. Yes. So in parallel with this, though, at this time -- one of the reasons why I left the company -- there was a huge power struggle. Ray had left the company. Sandy, Jay Nussbaum -- I think he was still there at the time although he might be gone, who ran

OSI -- and George Roberts all wanted to run the Americas sales.
So there was a tremendous amount of pressure to leave things in the pipeline at that point because there was some competition going on between NE, NAS, OSI, and OPI. It got -- good solid pressure for a sales organization is expected, but there got -- it gets to a point where it get unhealthy as well. And at that point it was getting unhealthy.
So we were encouraged to have deals in there that might be more logically a Q4 deal or something like that but continue to track and press for them just because there was incredible importance of those deals in Q3. I'm not saying that's specific to Q3. That could have been Q1 to Q2, Q2 to -3. It wasn't like it was just that one quarter, but that was one of the general reasons why I chose to leave the organization.
Q. You notice several times in this pipeline report that the pipeline increased?
A. Yes.
Q. That would happen when more deals were placed in the pipeline by sales reps?
A. Yes.
Q. And you would monitor that too as well?
A. Definitely.

Q. And that would be something that you would consider in whether or not you would make your forecasting numbers for the quarter?
A. Of course.
Q. If you look at the next page, it's similar to another page we looked in the last document.
A. Yep.
Q. I'll let you take a look, but I'll tell you I'm going to direct you to Q3.
A. The 47 percent growth?
Q. I don't see where you get -- where you're seeing 47?
A. I'm looking at 222 is the average across '00 and then 268 is the average across '01 with a 47 percent growth for the year.
Q. I see. For tech. Because I think that the total is 53.
A. Yes. 53. I'm sorry. I'm reading the wrong column, right.
Q. Do you have any reason to believe that that's not accurate?
A. No. I have every reason to believe that it's accurate.
(Reporter clarification.)
THE WITNESS: I believe it is accurate.

BY MR. HARRISON: Q. I want to switch gears here. And, again, I'll do my best to speed it up.
I wanted to ask you about a database called Oracle Sales Online, and I believe that you've been asked about that earlier. And I just want to make sure I understand the fact that you don't recall that name at all?
A. I read it one of the notes that was out -- it was one of the things I saw -- I saw the comments that were down in the bottom of my subpoena as well. So sales online -- I -- I misinterpreted sales online.
"Sales online" is the terminology that Oracle uses for the online system this guy Tim Chou ran, which was an ASP offering, where a customer could come pay you X dollars per month and that would be a hosted environment, right, where Oracle maintained the hardware. And all you did was basically pay for it like you would pay a phone company for dial tone service on your phone.
So in my comments that I made about Oracle online being the sales system, I was referring to the forecast system on -- instead.
Q. The forecast system?
A. The global implementation of the CRM system at Oracle that the sales management used. Everything

you're talking about here are reports that are being pulled in some way out of that system.

Q. And that's --
A. Just -- just to clarify.
Q. Sure. And that's what -- did you know that to be called Oracle Sales Online?
A. I thought it was, but obviously Oracle Sales Online was the -- was the ASP offering. So I'm sure that the forecast system itself has some other name that I just forget.
Q. Are you aware of whether -- if I say "OSO," do you recognize -- will you realize that I'm talking about Oracle Sales Online?
A. Yes.
Q. Are you aware of whether OSO captured actual sales?
A. OSO is an ASP offering run by a guy named Tim Chou. I know nothing about it. It had nothing to do with the forecast system at Oracle. I used the wrong term.
Q. If you look at -- I heard you make reference to your subpoena, and if you take a look at that -- well, you know, if you pull it out, it says
"Oracle Sales Online, which is a part

of the 11i CRM suite, is the forecasting tool that Ellison, quote, 'brags about,' unquote, that allows him to view all sales and choreograph the sales force."
Do you see that?
A. Yes. Wrong term.
Q. Do you recall making that statement?
A. Sure. I don't really, to be honest with you, remember the interview, but referring not to Oracle Sales Online but to the forecast system, that's what I'm talking about there. But it's not called Oracle Sales Online. I missed -- I missed acronyms on that. So I don't know what Oracle calls their forecast system that's internal.
Q. Right.
A. OASIS was a 1990 term. There is -- there is a name for it. I just forget. But that's what I was referring to there in the subpoena instead. And that just means Larry's view into the worldwide forecast.
Q. Do you understand that the language I read has been attributed to you in this lawsuit?
A. Yes, I understand that.
Q. And what you're saying is that the name is -- "Oracle Sales Online" is not what you were -- you were actually referring to?

A. Correct.
Q. Do you recall saying that Ellison brags about OSO?
A. Yes.
Q. What did you mean by that?
A. He talks about it all the time, about how automated his sales organization is and how he can look -- the whole benefit of a CRM system, in general, is that -- you've mentioned this a hundred times today -- I -- I -- reps put in information, managers then put some discretion on top of it, and so on and so on and so on. And if you have a really conservative management chain, you can underforecast, and if you have a very zealous management chain, you can overforecast.
What -- what Ellison used to talk about was the fact that he could see the total AM entries, account managers; the total first-level managers; the total second-level managers would allow him a lot more visibility into that whole process of who's conservative and who's zealous in their forecasting. That's what he bragged about.
Q. And --
A. What's interesting is now -- as you show me today, now it's actually all done via manual spreadsheets instead. I -- I -- I'd assumed all of that

was done in the sales force automation system, not in -- in Excel files. But maybe these are Excel files made off of the system. Who knows? Right? But they all say "xls" on the bottom. It's ironic. That's all.
Q. And so what you're saying is you don't know one way or the other whether Larry Ellison actually reviewed the data that was in the online database; right?
MS. WINKLER: Objection. Form.
THE WITNESS: I -- I don't know for a fact because I wasn't standing over his shoulder, but I do know for a fact that he would talk very openly about how powerful the CRM system is and how he, as a user of it, could see all the way down into the organization. I didn't see him do it, but I heard him talk about that to prospects quite often.
BY MR. HARRISON: Q. Sure. So you -- yeah, you heard him talk about the database, but whether or not --
A. I didn't -- I didn't see him online looking at the worldwide data; right?
Q. Right.
A. And by the way, Tom Siebel -- I mean you could go to any of the companies that are out there. Every one of their CEOs who sells CRM is going to try and, you know, leverage and make that same comment; right?

Q. For sales purposes?
A. It's -- you know, you're trying to convince -- one sales guy trying to convince another sales guy to buy their sales product. So that's not unusual at all.
Q. Do you know whether or not he even had an OSO account?
MS. WINKLER: Objection. Form.
THE WITNESS: No. I don't know that for a fact.
BY MR. HARRISON: Q. Do you know whether Jeff Henley had an OSO account?
A. I don't know that for a fact.
Q. How about Sandy Sanderson?
A. I'm pretty certain that Sandy Sanderson had an OSO account, only because I believe that, when you put an approval in, it would go to Sandy Sanderson's user ID as the next account. But I don't know for a fact, no.
Q. Now, in your role as AVP of OPI West, did you have any software development responsibilities?
A. No. I feel like I did because of the Hewlett-Packard transaction. They wanted some functionality from us that I had to push our development team very, very hard to actually do after they said they would do. But, no, I didn't run development.
Q. Were you ever involved in any testing of the

products or releases that Oracle had of its software?
A. Only as a beta user.
Q. What do you mean by that?
A. A user that had to get on the system and -- and be a user on it before it went general availability and shipped to the paying customers.
Q. And what you're referring to is in- -- sort of, an internal implementation of the product before it went out to customers?
A. We would use the products, as an internal audience, every time before they went out to the customers.
Q. And --
A. The note that you showed earlier from Julie Cullivan would be feedback directly from that. All the problems in order entry and things were because she was a user of the system trying to organize people on it and things like that.
Q. Are you referring to the exhibit -- we'll take a look again -- where she was talking about problems with demonstrations?
A. Yes.
Q. Do you know whether and what sorts of testing Oracle did before it released a product?
A. Vaguely.

Q. What's your understanding?

A. So it went through, you know, development. Then the code was frozen. It went through regression testing. Then it went through porting. It was a very rigorous -- fairly arduous process.

Q. And they used that process for each subsequent software release?

A. To my understanding, yes.

Q. Did you have any involvement in that testing?

A. No.

Q. Were you ever involved in any product demonstrations to customers?

A. Yes.

Q. Did you accompany your sales managers on -- or presales managers on trips where they would demonstrate the capabilities of certain software releases?

A. Not so much in the period 2000 and 2001. At that point I was brought in more at the negotiation level at the end after the demos done. But sometimes.

Q. You said not so much in 2000 and 2001. So is it fair to say that you -- well, you tell me.

Did you ever demonstrate Suite 11i to customers?

A. Myself personally?

Q. M-hm.

A. No. And I never demo'd any product in 12 years myself personally. They don't let the sales guys touch it.

Q. But you -- but you accompanied?

A. That's not what you asked. You asked if I ever demonstrated it myself.

Q. All right. Did you ever instruct any of your sales managers to rig demos -- demonstrations to show capabilities that weren't available in Suite 11i?

A. Yes.

Q. How is that?

A. Customers would constantly ask us to mock up what a demonstration -- in a demonstration environment what it would look like when they were to get live a year later or something like that.

Q. Sure.

A. So it was very, very common for someone to say,

"Hey, we have a very unique capability in the retail industry or in this industry and we need to understand what it's going to look like."

Q. So that was at the customer's request?

A. The customer's request.

Q. Were you ever aware of any situation where it was done to mislead a customer?

A. There's a -- there's a thin line here. I mean you're trying -- in -- in an application demo environment, you're trying to take what's going to take a hundred people and $20 million and a year of work and show them in two weeks of a -- one presales rep in a room what it's going to look like.

So there's no doubt that there are screen cams and things done that will mirror what the software looks like and there -- and no doubt that there's times when customers were not aware they were looking at something that was more of demoware than real production software. I don't recall any scenario where we sat down and said, "Hey, we know it's not going to do this. We're still going to try and show them that." That's not -- not -- not -- not -- not -- not quite so direct.

Q. So is -- if I'm understanding what you're saying is that Oracle would use still screens and things like that to show what its product was that wasn't actually running the -- the different releases of the software?

A. Very much so. Because demos would come out six months before the software shipped. So you would get a demonstration environment that was six months ahead of when the product was done. So the only way you could do that was, you know, things like -- I don't know

the tools they use are, but they'll do a flow, where it's actually -- you're -- you're more like watching a movie. And you can see the mouse come over and click and a field go in and stuff. And the RSCs would rehearse trying to do that in a way where the customer didn't know that they weren't on the real software.

It's very common for all application companies, by the way. It's not -- it's not something unique to Oracle.

Q. And the actual installation of new software would take months and extremely large dollar amounts to do. So you were trying to demonstrate what it looked like before you even sold it; is that correct?

A. Yes.

MS. WINKLER: Objection. Form.

THE WITNESS: Yes. The -- the more of that you would see would be the industries that it was farther away from what the vanilla product did.

So Oracle Manufacturing, as a for instance, is designed for a manufacturing company, but also process manufacturers, retailers would all use the same product. So in the industries that you got in that were further outside of the base industry, you had to be more creative in how you -- how you demonstrated that environment.

That scenario that you just described would be applicable in, like, retail in some places than it would be in a discrete manufacturing organization.

BY MR. HARRISON: Q. Do you have an understanding of what the term "bug" means in a software context?

A. Oh, yes.

Q. What is your understanding of what a bug is?

A. Defect.

Q. Would you agree that the term "bug" refers to a situation in which the software does not perform in the manner described in the software documentation?

A. Clearly.

Q. Would you agree that it's -- it's not unusual for a large-scale release of software to encounter bugs?

MS. WINKLER: Objection. Form.

THE WITNESS: Absolutely.

BY MR. HARRISON: Q. In your experience at Oracle -- or even now, is -- is it true that, with a large release of software, including CRM and ERP or one of the other, involves -- there's always bugs; is that right?

A. Oh, absolutely.

Q. In fact, you'd be surprised if a large-scale release of software didn't have any bugs at all?

A. I don't believe any software company in the world has a product that doesn't have any bugs in it. And I use Microsoft XP. It's been out for two years. I still have screen freezes and have to reboot and stuff, which are bugs. So yes.

Q. I hear that. Do you know what -- understanding that you didn't have a role in software development and documentation, are you aware of the software documentation at Suite 11 -- for Suite 11i at least, are you aware of whether it was called the technical reference manual or TRM?

A. Yeah. Those would be the documentation manuals. But what -- the way that software companies, and Oracle specifically, gets around -- or -- or deals with customers on functionality is you certify in the contract that it will operate as specified in the manual -- in the user manuals, and that's the user manuals.

So that's the place where, if it doesn't operate as specified -- it's the check and balance between what the software does and what it's supposed to do. Those are like -- they're, like, this big (indicating) when they're printed out. I mean they're gigantic -- very, very technical manuals.

Q. "This big" being 4 inches his fingers were

apart. We got it on film.

In your role at Oracle, you weren't involved in fixing software bugs, were you?

A. Not personally.

Q. Have you ever witnessed or personally dealt with a bug in Oracle software?

A. I've witnessed, but I've never personally dealt with it, if you mean by that "fix."

Q. When you were at Oracle, were you familiar with the system of rating bugs according to severity -- severity. I'm sorry.

A. Yes.

Q. Do you remember what that was called? What -- what the different ratings were?

A. Priority one, two, and three or something like that.

Q. Right. Or have you heard P1, P --

A. Yeah. P1. That's it. P1 stands for Priority 1. P1, P2, P3.

Q. Do you know what those different ratings mean?

A. One means your production system is down. Two means something bad is happening. Three is an enhancement request.

Q. Do you know P1 has also been called a showstopper? Is that a term you've maybe seen that

before?

A. Showstopper is a term that some customers will put on everything that they need. But Priority 1 is intended to be -- it's something in production, and your -- and your business environment is down because of this and we're going to work on it 7 by 24 but you as a customer have to be available 7 by 24 to work with us too.

Priority 2 is slightly less business-critical.

And then Priority 3 is more -- more what they want to see the software do in the future versus something that is perceived as a bug.

Q. Going back to something you said in that statement. So a showstopper -- a customer calling something a showstopper could be something like functionality that they feel that the -- they want but the product doesn't have; right?

MS. WINKLER: Objection. Form.

THE WITNESS: Yes, it could be.

BY MR. HARRISON: Q. For example, with Gap the fact that Retech had more functionality for retail-specific businesses? Does that make sense?

A. Could.

Q. So "showshopper" wasn't always a bug, in your experience?

A. No. Well, in the context of the Gap -- I mean the Gap was saying there's 14 showstoppers -- they hadn't -- they hadn't bought the software yet.
Q. Right.
A. So that -- that -- what -- what they meant was that there were showstoppers, meaning there were things that they felt as requirements that in their analysis of the tool it didn't do. Nothing to do with a P1, P2, or P3.
They wouldn't have discovered that until they thought it did something and tried to implement it and realizes that it didn't.
Q. In other words --
A. Very different things. One's presales. One's post sales.
Q. Sure. And in your understanding -- in your dealings with Gap -- I know that it was a client of yours -- in that specific scenario, they're referring to things that they needed for their business that they felt Oracle can provide?
A. Correct.
Q. Similarly -- well, first of all, have you heard -- have you ever heard of the phrase a "TAR" or a Technical Assistance Report?
A. Oh, most definitely.

Q. What is that?
A. It's a call from a customer into the support center that generates either a P1, P2, or P3 issue.
Q. Have you ever sent a TAR for any reason?
A. Personally I never did one, but my reps and my presales reps would have -- all the time, be logging them on behalf of their customers.
Q. And when you say that, you're referring to the entire time you were at Oracle?
A. The entire time I was at Oracle.
Q. All software releases that -- that you experienced while you were there?
A. Absolutely.
Q. Not just Suite 11i?
A. Absolutely. Suite 11i was no better or worse than any other release Oracle came out with, with the exception of the CR products. CR products were heavily overmarketed.
As you saw in Julie's note, there was major pieces of functionality that were advertised that just did not exist.
I read through the complaint and look at that statement by Mark Barrenechea in there. It's not factual. It's not true. It does not operate as integrated out of the box. That's -- that's false.

Q. What do you base your -- your statement -- that statement on?
A. Lost deals. Customers like HP that were furious after they started implementations. There's, you know, quite a -- quite a few examples of that. You guys have hit on a lot of the customers. So you know them, and you're seeing them.
Q. Well, let's -- let's --
A. By the way, when you look at the database and the financial applications, 11i was a notable improvement, solid release.
Q. Did you say -- I think I heard you earlier today say that your company today is going to use some CRM applications?
A. Yeah. We get to go live on it in three months. I'm telling you it's the sins of my past catching up with me. It's been six years. So my -- my expectation on the product is that it is a very different product today than it was six years ago.
Q. So in -- in your experience that, was typical was any new software release -- that each new release of that -- of that version will get better and better -- right?
MS. WINKLER: Objection. Form.
BY MR. HARRISON: Q. As far as bugs and TARs?

THE WITNESS: It's very typical that what software companies typically do when they move from a 9 to a 10 to an 11 type of thing -- and every company has got their own numbering systems; right? -- there'll be a big spike in bugs when it first comes out because a lot's new. But then as the point releases come out -- like 11.1, 11.2, 11.3 -- then it will get better and better and better because those point releases are typically taking bugs, fixing them, and then packaging those fixes.
But again outside of CRM, there was nothing about 11i, in my opinion, that was, like, notably worse or better than the other releases Oracle had come out with. It was just a big release.
BY MR. HARRISON: Q. In fact, wasn't CR- -- excuse me -- let me rephrase that.
Wasn't Suite 11i, sort of, a revolutionary release in that included CRM and ERP for the first time ever?
MS. WINKLER: Objection. Form.
THE WITNESS: No. Not in my opinion. There was no -- there was no better coordination between the ERP and CRM groups in release 11 than there was other releases. That was just marketed that way.
BY MR. HARRISON: Q. So this wasn't the first

time that it -- that it implemented a -- an entire suite of CRM and ERP together as one package?

MS. WINKLER: Objection. Form.

BY MR. HARRISON: Q. Instead of including "best of breed" applications, which had to be inputted together?

MS. WINKLER: Objection. Form.

THE WITNESS: The way the applications were built in 11i was no better integrated than the previous releases. Ron Wohl still ran ERP. Mark Barrenechea ran CRM. They didn't communicate very effectively. There is nothing more -- more integrated or coordinated about 11i than there was about the previous releases.

Now, all of the releases -- 10, 9, et cetera -- were all built by one company; so there was certainly integration points between products. But it wasn't that -- there wasn't something, as you said, "revolutionary" about 11i, in my opinion, that, all of a sudden, made it, you know, way better and more integrated than it was previously.

BY MR. HARRISON: Q. At the time Suite 11i was released, are you aware of any other competitors that were offering an entire package of CRM and ERP bundled together?

MS. WINKLER: Objection. Form vague.

THE WITNESS: SAP, PeopleSoft.

BY MR. HARRISON: Q. Now, I wanted to touch on something you testified about the integration problems. And you said that there were problems because -- I'm going to -- I'll let you say it. Is it -- is it Mark Barrenechea?

A. Mark -- Mark Barrenechea.

Q. Barrenechea.

That Mark Barrenechea and Ron Wohl didn't talk or didn't communicate; is that right?

A. As I mentioned to you guys earlier, there was quite a bit of political infighting at the top levels of Oracle, in my opinion, which was one of the reasons that I chose to move on.

You had the sales leaders in George Roberts and Sandy Sanderson and Jay Nussbaum that might all potentially want the bigger job. You had Ron Wohl and Mark Barrenechea that might both potentially want each other's jobs.

So it wasn't -- there just wasn't the best of communication within the organization. There's competition between the ERP and CRM teams more than there was collaboration.

Q. I'd just like to explore that a little bit how you -- what's the basis for your knowledge of the

relationship between Mr. Barrenechea and Mr. Wohl?

A. I knew them both. As you saw in Sandy's note, he -- this is an executive VP in the company that's trying to put this out to the two application leads and say "This is what's wrong with the integration points between your products." It wasn't -- it wasn't -- it wasn't done then. It wasn't built in the right way. There wasn't people on the general ledger applications that also sat on the CRM team or things that would have helped bring those things together.

Q. Were you involved in developing either side of the CRM or anything --

A. I was not.

Q. Did you -- were you part of making a decision of when the product would be released?

A. Definitely not.

Q. Did you have any input or discussions with Mark Barrenechea or Ron Wohl about that?

A. I talked to them all the time.

Q. And did you -- did you have any experience in developing software that was entitled -- intended to integrate those?

A. No.

MS. WINKLER: Objection. Form. Vague.

THE WITNESS: No.

MR. HARRISON: I'm sorry. What was the objection?

MS. WINKLER: Form. Vague. I thought it was --

MR. HARRISON: Okay. I didn't hear it. I didn't hear it. I just wanted to make sure.

THE WITNESS: I was thinking to myself the same thing. I understood the question perfectly.

MR. HARRISON: That's okay. It's just preserving objections. It's understandable.

THE WITNESS: I'm going to come up to my wife tonight, "Objection. Form. Vague." She's going to crack --

MR. CAPLAN: Don't do that.

BY MR. HARRISON: Q. Okay. Are you aware that Suite 11i was intended to serve as an e-business suite for companies, that wouldn't require companies to choose "best of breed" applications and combine them together in one approach?

A. Clearly.

MS. WINKLER: Objection. Form.

THE WITNESS: Clearly. Yes.

BY MR. HARRISON: Q. You don't debate that was that was the intention of the --

A. Absolutely not. When the -- when the Internet

bubble burst, every company -- the majority of companies across the world had to write off investments from tiny little companies that were no longer in business, and there was a natural -- as there still is today -- movement towards trying to buy more from less suppliers.

So whether it's SAP or Oracle -- the only two left at this point -- people would much prefer Oracle to come out with all that integration on their own and have applications that span all of their business needs versus having to go out and buy that from lots of vendors and do it themselves.

My only issue is the claim that -- that Oracle's product comes -- you know, without consulting, it comes integrated out of the box is absurd.

Q. Do you -- do you get that from your view of the complaint? Is that what you're basing your statement on?

A. I get it from my view of the way that business was -- the way that I -- my customers were implementing my products; right?

Q. Right.

A. My -- one of my last deals that I did while I was there was with a company called Agilent -- we didn't talk about them today, but it's a $15 billion spin-off from HP. It was the medical equipment side of HP.

We did a deal for almost $100 million with Agilent, of which 80 million was consulting and 12 or 15 million was license and the rest was support. That 80 million was to make all of our own products work together.

If it worked as ad- -- if it's integrated out of the box, they wouldn't have had to spend that $80 million; right? So that -- that's my only issue is -- I'm not -- I'm not saying the intent of 11i wasn't to provide one integrated business suite. I -- I get it that that's where the market's heading, for sure.

But it's a -- it's a big stretch to say it does that the way that -- the only thing in the complaint that I read is from Mark Barrenechea. And the only issue I looked at on that was -- that that doesn't -- that's not -- that's not right.

Q. You're aware that -- of the fact that -- that anytime there's new software -- software implementation, including with Suite 11i, that it would take a lot time and a lot of money to implement the system into the company's legacy software?

MS. WINKLER: Objection. Form.

THE WITNESS: Clearly.

BY MR. HARRISON: Q. And that's part of the -- the software fees that are -- excuse me. Let me

rephrase that.

That's part of consulting fees that are wrapped up in the deal?

A. Clearly. So when -- when -- when -- when you did -- you come back to the Agilent deal a couple of seconds ago; right? Those dollars are -- are not strictly to integrate back and front office. There's all kinds of legacy systems that they just couldn't afford to have to migrate that data into -- Oracle's had to integrate to those systems.

There's -- think of it, kind of, switches. There's probably a million switches inside the entire suite of products that need to be set so that it's configured for a company's business. A lot of the fees are for those things, which are natural implementation fees. I get that loud and clear.

But there's also a fairly big chunk of the money that was spent trying to make order entry talk to -- you know, try -- try -- trying to put some of the pieces together like Julie talks about in her note -- you can go down -- we can go through that one by one if you wanted to, but there's lot of areas in that that it's just like "this doesn't speak to this, you know, and this doesn't speak to this" type of thing. So that -- that -- that -- that's -- that's the only issue.

Q. And you'd agree with me, wouldn't you, that that could have been caused by the fact that it's implemented into a client's existing database; right?

A. Existing database?

MS. WINKLER: Objection. Form. Misstates prior testimony.

(Reporter clarification.)

MS. WINKLER: Misstates prior testimony.

THE WITNESS: Existing database?

MR. HARRISON: I'll -- I'll -- I'll restate that.

BY MR. HARRISON: Q. The, you know -- I didn't want to say existing database. I mean home-grown applications and customer specifications that the actual customer requires for its implementation of Suite 11i or part of Suite 11i?

MS. WINKLER: Same objection.

BY MR. HARRISON: Q. Or any -- or any software released by Oracle.

A. As I said a few seconds ago, there's no doubt that a portion of those consulting fees was either to configure the software, which is what you're saying -- make it work to their environment -- or to integrate to legacy systems.

But there was also some substantial portions of

that order that were spent to put pieces together within the own Oracle application set that did not come integrated out of the box. Because they were built by separate development teams, it -- it's -- are you better off than trying to buy SAP Back Office and Oracle Front Office and integrate those things? Absolutely.

But if I read that correctly, the statement is that, hey, it works exactly as it comes. Put it in, press "Go," and it works. And that might be a little bit of a stretch.

Q. Did you ever -- at -- at the time did you discuss anything like this with Mr. Barrenechea?

A. I had a lot of conversations with Mark. Mark was -- Mark and I were more about HP than Agilent, and Larry was the executive sponsor on Agilent, did an amazing job of sticking with that one. I mean Agilent got incredibly live, by the way. They got -- they got live. They were very successful. I'm not suggesting that. Mark and I were more working on HP, and Mark attended weekly calls.

And I can't fault these guys; right? Barrenechea kept his chin out there the entire time. He stayed with HP until they got live on these products clearly. So that's -- my interaction with those guys was more through them keeping them in the deals until

the customers got what they expected out of the software.

Q. Do you know what an early adopter is of software?

A. Sure.

Q. In your experience at Oracle, what did that mean to you as far as the releases that someone at Oracle would release, if you will?

A. An early adopter would be someone who needed the functionality a new release had to offer so badly that they were willing to take it early. Okay? An early adopter would be someone that required the function -- the new functionality at such a high level for their business that they were willing to take the release, knowing it was buggy, and be one of the first implementers of it.

Q. So in your experience in -- perhaps with your clients that were earlier adopters you -- well, let me -- let me rephrase that.

Do you -- did you have clients that were early adopters of Oracle software in general?

A. Sure.

Q. How about earlier adopters of Suite 11i?

A. I don't remember.

Q. Was HP an early adopter?

A. I don't remember.

Q. You don't know one way or the other?

A. The HP transaction was not as much about business users that wanted to use the software as it was the bidirectional deal. So I'm -- my guess is that -- I mean with Mark Barrenechea being as involved in HP and they had to put a lot of releases in, I think by default they became an earlier adopter. But that's not what you were looking for. What you're asking is the people who really want to -- to be first; right?

Q. I'm just curious, out of your clients, if you --

A. Clearly, I had early adopters. I couldn't give you names and numbers, but clearly I had customers that -- that -- that were early adopters.

Q. In your experience, did those clients understand that, in getting the software early before it was commercially released, that it would have problems such as bugs?

A. Definitely.

Q. But they -- they wished to forego getting a later release that was less buggy for the benefit of getting it early?

A. Yes.

Q. Do you know when Suite 11i was released

commercially?

A. As I said earlier, I don't remember the Compaq date.

Q. Do you remember the general time frame?

A. Early 2000 would be a guess.

Q. When I say "commercial," how do you interpret the word "commercially"?

A. General availability.

Q. And that would be after early adopters?

A. Correct.

Q. Isn't it true that, as opposed to early adopters, there are other customers, at least in your experience, that knew that software was buggy early and would wait until subsequent releases before purchasing it?

MS. WINKLER: Objection. Form.

THE WITNESS: The IT industry is a small industry. People have been in it for a long time. Anybody who's implemented enterprise applications knows that every release, when it comes out, is going to have a higher bug rate and if you don't need -- you're not dying for the new piece of functionality, then you wait. So I think big customers are pretty savvy about that.

BY MR. HARRISON: Q. Now, is it fair to say, in your experience, that, when a new release of software

came out, there was not enough internal testing at Oracle that Oracle could do to get every single bug out before it went to the clients?

A. Definitely.

Q. So no matter what amount of testing Oracle did to find all the bugs, they'd have to wait until that software was implemented at the client or the customer?

A. It never is free of bugs. There's different kinds of bugs. There's bugs that -- that's why the HP deal again. When you develop on HP, the likelihood is you're only going to find bugs that are functional bugs.

But then, all of sudden, somebody else wants to deploy it on Sun. Well, there's going to naturally be things about the Sun operating system -- that same release that worked on HP now doesn't work on Sun.

You can do as much testing as you want, but the reality is -- that's why there's a support organization -- is it's very understood that there will a decent bug rate in software and it just gets worked through.

I don't think Oracle is any buggier than anybody else.

Q. And because it's such a large undertaking to install enterprise software to a customer, there's -- bugs are inherent and finding bugs inherent in the

process of when it is installed with that customer; is that correct?

A. Correct.

Q. And is it fair to say that bugs that are discovered when implementing it into the customer's existing database or legacy software are those that would not be discovered no matter how much testing Oracle would do?

MS. WINKLER: Objection. Form.

THE WITNESS: I can't answer that question. I don't know.

BY MR. HARRISON: Q. You don't know one way or the other?

A. Because what I -- if Oracle tested for five years on a release, would it have less bugs? Yeah, it would have less bugs. But it's not practical, right, because customers are demanding the functionality. So I think Oracle, like every good software company, does a lot of testing and does the best job they can and deals with the rest of it out in the field.

BY MR. HARRISON: Q. And it uses early adopters to find -- you know, to get --

A. Early adopters, their own consultants, the customers -- I mean there's all kinds of ways for you figure them out, and Oracle is real good about sticking

on those bugs and getting them fixed until they're done.

You asked the question earlier about whether my sales teams and I, kind of, knowingly were out in front of customers doing demos and things on things that didn't exist. I feel pretty good about the answer of saying "no" to that.

But as I come back to the CRM products -- I mean there was things there were advertised to our own field that that product did that it didn't do. And that's where it got a little bit sticky, right, because, you know, it's -- it's -- 11i made a lot of claims on the CRM side that the reality is that there's going to be lots of problems with it, and everybody knew it.

Q. Everybody knew it, what do you mean by that?

A. The field knew it.

Q. The field?

A. The field. Notes that we've read here today; right? I mean there's umpteen pieces of data from you guys on things that the development team was saying the product did that, when you went out into the field, it didn't do.

Q. Because of bugs?

A. Not because of bugs. Because it was put in a document saying it did this and just didn't build the functionality.

Q. And that functionality would have to be built through patches, for example?

A. Into patches, yes.

Q. And --

A. Let me -- let me -- let me give you an example. If you were to use Microsoft Word, right, and you know how to italicize something and, if you were to highlight a row and hit the italicize button and it just didn't italicize, is that a bug?

I mean a bug is usually where something hangs and there's a problem or something like.

In the CRM product specifically there was things that it was advertised to do that just weren't built in the production software. That's why you're seeing some of the hairy issues that you're dealing with around some of the customers is that there's a lot of people and a lot of effort put on CRM, but there was some problems with it.

Outside of that, everything that you're saying is correct, which is it's just the natural course of implementations on all the bugs and things that we're coming across.

Q. Would you agree with me that there's different types of bugs?

A. Yes.

Q. Do you know any, off the top of your head, that -- different types?
A. Definitely. So one would be performance.
Q. How would you define --
A. I go and I -- I'm an ent- -- a clerk from America Airlines entering airlines reservations, and you're on the phone with me buying a ticket. And I go to hit commit, you give me a credit card, and it hangs for ten minutes. And you're on the phone and you're ready to hang up and call United instead. All right? That would be a performance bug.
And the system is just doing some loop in the back end that it's not coming back and -- and closing things out. That would be one kind of bug. A second one would be a -- a functional bug.
You know, I get to a certain field, I hit the tab button, and my screen freezes. And you hit those on Microsoft sometimes; right?
And then a third would be a functional bug, which is, you know, it's -- you put a 6 in this field and then a 4 in this field and it's supposed to put 6 times 4 are 24 over here and it says 28. So it was just the code's bad behind it; right? Those would be different kinds of bugs.
Q. Isn't that the same thing you were talking

about about -- well, let me strike that.
Did you say --
A. On CRM?
Q. Did you say the functionality bug twice, or -- did you give me three categories?
A. So there's -- there's different -- different ways -- you asked about different bugs. Okay?
Q. Sure.
A. One -- one would be that you'd go try to commit a transaction and it just hangs; another would be that you hit a certain key in a wrong place, and it puts you into a -- a locked -- a locked place that you have to reboot; and the third would be a calculation is in the system and the calculation is just simply wrong.
And, again, some are small, some are big. Yes, as you con- -- to confirm what you've been asking for the last half-hour, many of these things are very expected, you know, to be resolved. There's -- there's no way Oracle or anybody else could engineer all this stuff out of their software before it gets put into production.
Q. Do you know whether or not Suite 11i modules use a common data schema?
A. I don't.
Q. To your knowledge, did Suite 11i modules use a

simple database?
A. To my knowledge, they do not. And I base that off Julie's note, where it says it requires separate instances. "Instances" mean databases.
Q. Do you know whether or not Suite 11i modules were constructed from the same computer language?
A. I'd guess they were.
Q. To your knowledge -- to the best of your knowledge, you're aware that CRM modules in Suite 11i were intended to share data with the ERP modules?
MS. WINKLER: Objection. Form.
THE WITNESS: What do you mean by "intended"?
BY MR. HARRISON: Q. That was the purpose of the product that was sold, Suite 11i; right?
A. That was probably the --
MS. WINKLER: Same objection.
THE WITNESS: -- probably the original design objective. I'm not sure that it manifested itself in the reality of what was put into the market, but that was the original design objective.
BY MR. HARRISON: Q. Okay. Something you mentioned earlier that I wanted to come back to on a topic you mentioned earlier is we were discussing the implementation problems that you'd been talking about, and you mentioned that there were lost sales due to --

to problems.
Do you remember saying that?
A. M-hm.
Q. In third quarter, 2001, which was December -- first of December to the end of February; right?
Do you -- do you agree with me?
A. Yes.
Q. Do you recall any lost sales as a result of --
A. I don't recall, no.
Q. How about Quarter 2, 2001?
A. I don't recall.
Q. You can't point me to any specific customers that refused to purchase Suite 11i because of bugs or any other problems?
A. I don't recall. I guess the one that would be would be on here would be Gap, right, which documented that Elizabeth says that there's problems with WLS product and that's why they aren't going to move forward this quarter. She also goes on in the same note to say they've got to get board approval and stuff like that, though. So it's very, very hard to quantify; right?
Q. Sure. And just so we're clear, I think, when I'm talking about problems, I'm not talking about differences in what Gap wanted for their business. And I think -- does that make sense to you?

A. M-hm.
Q. So you'll agree with me that, in the Gap situation, Gap wanted some functionality that was better provided by another vendor; right?
A. Correct.
Q. Do you have any knowledge in second -- excuse me -- in third quarter of 2001 of customers having implementation problems with Suite 11i?
A. Yes.
Q. Which customers?
A. HP, for starters. Anybody who was implementing the CRM products was having major implementation issues. So --
Q. What was --
A. -- categorically everybody in my territory who was putting CRM in was having issues.
Q. What was the nature of the -- the issues with CRM?
A. The functionality they believed the product was supposed to have -- it just fundamentally didn't have.
Q. And are you talking specifically about HP or are you referring to --
A. HP is by far the most high profile for me, but that's a common -- would have been a common issue at that point.

Q. And --
A. And to differ- -- I'm sorry. Let me differentiate. Database: Very, very stable. Hardly ever had an escalation from customers. Financials: Very stable. Rarely was there a escalation that came out of the financials.
The issues that I'm talking about here for you -- and the reason I keep coming back to this is is that CRM was -- was a different level of quality than the rest of the products.
Q. Just referring to HP -- and then I'll ask you if you can give me more examples because I want to exhaust your knowledge on this -- is -- for -- for HP, were there any issues -- it sounds to me like you're saying there are issues with integration between the -- the different 11i modules; is that right?
A. Yes.
Q. And that was between the ERP and CRM modules?
A. Jul- -- there's -- there's other people that would be a much better source for you on this like Julie on the note that she came back with because she can talk to each one of those bullets and explain to you the Compaq integration issues.
But, yes, I -- I would generally characterize that the issues were more between the integration points

of CRM and ERP because they were managed as separate teams and had been an issue within those teams.
But within the CRM product specifically, there was issues amongst the products. Like HP was having problems about support-to-sales-force automation, marketing-to-sales-force automation and those type of things, in addition to problems with the rest of the ERP integration.
Q. So besides those applications, are there any more that you can think of that there are problems with?
A. In that period, no.
Q. And I'm talking about HP specifically right now.
A. Those are big ones. That's -- that's -- those are general categories that would encompass quite a few problems.
Q. Were you involved in dealing with those problems?
A. Yes.
Q. How?
A. I was on calls constantly with Mark Barrenechea, trying to figure out how to make these guys right, putting engineers on site, working issues by 7 by 24, putting my presales reps on these.
I was generally deemed as being accountable and

responsible, by HP, for -- for the implementation. So, you know, I pledged to my teams that, if they were going to sell something, they were going to stick with it until the customer went live. So our -- our sales teams would tend to be very involved until the customers got -- got live.
MR. HARRISON: Okay. With that answer I'm going let the tape be switched here.
THE WITNESS: Okay. So if we're not close to done at this point because you had said -- I -- I'd been led to believe that at 1:30 --
(Reporter clarification.)
MR. HARRISON: We can go off the record.
THE VIDEOGRAPHER: This marks the end of Tape 3 in Volume I in the deposition of Michael DeCesare at 4:11, going off the record.
(Recess was taken from 4:11 p.m. to 5:17)
(Whereupon, Sheila Chase, CSR, RPR, took over reporting the proceedings)
THE VIDEOGRAPHER: On the record at 5:15. This marks the beginning of tape four, Volume I, in the deposition of Mike DeCesare.
Our court reporter is now Sheila Chase recording for LiveNote World Service.

You may begin.
BY MR. HARRISON: Q. Mr. DeCesare --
A. Hi.
Q. -- we are back.
I have not a whole lot of follow-up questions, but bear with me, and we'll get you out of here as soon as possible.
We have been talking about -- a little bit today about -- well, maybe not a little bit -- about ERP and CRM integration, and you have said that you don't believe that the ERP and CRM modules of Suite 11i were integrated; is that right?
A. Just give me one second, and I'll bring up the exact --
Q. I'm just asking you generally about the document and --
A. The thing I was reacting to is the statement in the big thick thing that you sent me by -- from Mark Barrenechea about it being out of the box and everything works as integrated.
Q. I didn't send you anything. But what I'm asking you is that's what you are saying today; right?
A. I'm saying that there are holes in the integration between the ERP and the CRM integration. Absolutely.

Q. Okay. By "holes," you don't mean that the -- and by "holes," you don't mean that the ERP and the CRM modules were not able to share data across the two categories at all; right?
A. Correct.
MS. WINKLER: Objection to the form.
THE WITNESS: The applications absolutely can share some data across the applications. Just like SAP and Oracle can share data across the applications.
But the statement that it is completely integrated out of the box is, in my opinion, a false statement.
BY MR. HARRISON: Q. So you're saying that --
And tell me if this is a fair characterization, because I just want to make sure we are perfectly clear on the record.
-- is that the ERP and CRM modules were not as integrated as they could have been had Mr. Wall and Mr. Barrenechea --
A. Bar.
Q. -- worked together better; is that right?
MS. WINKLER: Objection to the form. Asked and answered.
THE WITNESS: The fact that they were running as separate development organizations definitely, in my

opinion, hindered the amount of organization that could have occurred had they been organized and run as one unified development team.
BY MR. HARRISON: Q. Okay. So what you are saying is you felt because they didn't work together well or their divisions didn't work together well because of their -- let me strike that.
What you are saying is because they didn't work together well in the two different modules --
And when I say "modules," I mean ERP and CRM.
-- that there were problems with the integration? Is that what you're saying?
A. I'm being more general than that, which is, there are holes in the integration. There are areas that still require consulting to come build the integration bridges between those areas. And every bit of integration does not exist out of the box.
Q. Okay.
A. That's how I would like to characterize it.
Q. Observing. Thank you.
Now, is it fair to say that when you heard about these problems, you were dealing with it from a customer relation-management standpoint --
A. That is correct.
Q. -- because you were the area VP in charge of

all your salespeople, who are in charge of these companies; right?
A. Yes.
Q. These clients?
A. The clients would come to the person they signed the contract with, the sales rep, which is reported up to my organization. So I would naturally get engaged in it.
And, obviously, you heard more from the unhappy customers than you did the happy customers; right?
So certainly, when I talk about HP in some are these, it's because they pay -- they spend more money with us and they had bigger issues.
Q. Okay. So you weren't on the ground fixing any bugs or problems with integration; is that right?
A. Absolutely not.
Q. And you weren't issuing TARs? And you don't know what I mean by TARs; right?
A. I was not issuing TARs, correct.
Q. You were hearing about it from your sales force, primarily?
A. I was hearing about it from the customers and from my sales force.
Since I was, as I mentioned earlier, the executive sponsor on many of these accounts, I tended to

get a lot of the escalations pushed up to me very quickly.

Q. When you say "escalations," do you mean --

A. Unhappy customers that are having problems via TARs, or whatever the issue might be.

Q. A wide variety of issues?

A. A wide variety of issues.

To be balanced and fair about this, as we mentioned earlier, in every software package, Oracle and others, in every release, 11i and others, there's always going to be bugs and problems. It's just inherent in the business with the software.

There's nothing unique to 11i about that.

But specifically on some of the CRM stuff and 11i, it seemed to be more than the average would have yielded.

Q. You had mentioned that -- and correct me if I'm wrong -- Julie Cullivan would be more knowledgeable about some of the specifics on the issues like this.

A. Definitely.

Q. And why is that? Why do you say that?

A. Because she was my technical person. I have always -- you know, not being a terribly technical person -- my job is more sales operations -- Julie has always been my technical kind of right-hand man, for

lack of a better word.

So they -- I would always have her go out and drive the specifics around the deals. That's why she wrote the mail note.

Even though she didn't report to Steve or Tom, Sandy had her running that from the entire country to kind of under-characterize and understand what all the issues were.

You'll see in her note she said this is a summarization of data from the east, west, and central. Right? So that list of issues is very specific on the areas that 11i had problems on.

And just to clarify that further, it's not as much about the integration between ERP and CRM that I saw the problems on. It's the lack of functionality in CRM versus what was advertised.

So a lot of those things you are going to see on there are things that the product was supposed to do that, when the customers installed it, it didn't do.

That might have been completely irrelevant from whether they were using the ERP or not. Just functional holes inside the product.

I should be clear about that. The concerns the customer is having were lack of functionality in the CRM and potential integration issues to the ERP side.

Q. When you say "lack of functionality of CRM," are you talking about functionality bugs?

A. I'm talking about things that were advertised as functionality that just didn't work in the product.

Q. When you say "advertised," you mean in the technical resource manual?

A. Yes, in the technical resource manual as functionality. When you see Julie -- I mean, it's a precursor here.

When you see Julie's comments that she puts out there, she is talking about it from the demo environment. So, since the demo N. comes out before the product comes out, she was trying to surface things that she, as an internal user, was noticing weren't there and hoped that those things would get fixed before the product went general availability.

And it then very well could have, by the way.

I mean, there's -- could be things on that list that she surfaced that, you know, three months later or something like that, they got fixed before customers started to run into it. I don't know.

Q. Let's take a look at it. It's the first exhibit, actually, DeCesare one.

Just because you brought it up.

A. Yeah.

Q. I think Mr. Williams read through this earlier, so I don't want to repeat it.

But do you recall reading through this and noting that this was a request from Sandy Sanderson, this response was a request to get feedback on the demos that Julie Cullivan was attempting to --

A. Correct.

Q. You know, actually, that was a very badly phrased question.

This e-mail chain, having reviewed it, shows that Sandy Sanderson was requesting information on demos from Julie Cullivan; right?

MS. WINKLER: Objection to the form of the question.

Also, it lacks foundation.

THE WITNESS: So, as I read through this, given that it was written in January of 2001, and as you have stated, it's -- all day I was out at that point. This is more likely them demo -- or us demo-ing, at that point, the production product.

So the demonstration environments would be one and the same with the release the customers were getting at that point.

BY MR. HARRISON: Q. When you say demo-ing the production product, could you explain that to me,

please.
A. Okay. 11i came out when? Do you have the dates, the exact dates?
Q. Which, no. Do you recall?
A. Early 2000? Somewhere around that time frame.
This was written in 2001, so at that point we would be demo-ing the same product our customers were getting.
If this had been mid-1999, you might have still had a demonstration issue.
But just -- Julie is going to be bumping into issues here that customers would also be experiencing at think point. So you have got to get out the list, you know.
"Order management continues to be very buggy and slow." Those would be bugs.
Customers, like I mentioned earlier, tried to enter things and would then cause it to be very slow.
Q. Did you have a conversation with Julie after receiving this e-mail, the first one in time, on this document?
A. I don't remember it.
To be honest with you, I used to kind of let Julie kind of run with these things directly. She would have more of a relationship with the development folks.

She would have more of a relationship with the support organization, that type of stuff.
Q. So, is it fair to say --
A. Go to the second page -- I'm sorry -- for one second.
"Shipping: Containers do not work."
That's not a bug. That's the fact that we have containers, a piece of functionality, that just doesn't work.
A bug would be something that is there, but doesn't -- you know, has a problem with it. This just didn't exist (indicating).
Q. Did you talk with Julie about that specific problem?
A. Not much. You know, these things are familiar to me. I mean, this is a flashback here.
But customers that were pretty upset about feeling that we, as a sales team had sold them one thing, and then when they started to deploy it, they found it to be something very different.
Q. Would it be fair to say that, to get more detail about the report that Julie set forth in here, we should talk with her; she had more knowledge about it?
A. I think so, yes. I think this -- because you have been drilling it for the last hour or so on kind of

the functionality and bugs and stuff, I'm going to provide you speculation based on my conversations with customers and what they are saying.
I can't tell you exactly what each one of these things meant. She could still go through every one of these things and tell you exactly what kind of bug it was and what the issue was and the rest of those things.
Q. Okay.
A. Being that she's all over these e-mails (indicating), my guess is she's probably on your list, and she would be able to provide better context for you on these things, I think, than I would.
Q. Before we broke, we were actually talking about the HP account, and I was asking if there was implementation problems. And you were telling me some of the things that were wrong with it, the implementation.
A. Okay.
Q. I just wanted to back up one step.
A. Okay.
Q. HP was the client that signed the 22-million-dollar deal at the end of the second quarter 2001; right?
A. Correct.
Q. Okay. I just wanted to make sure.

A. It's a different set of issues with HP, though; right.
Q. I'm sorry?
A. There's a different set of issues with HP, which is, when an executive of a company, like Carly, decides to buy something for more strategic reasons, you can expect the users of that company not to be quite as "bought-in" to the solution as if they had gone out and done the evaluation and bought it on their own.
So I think they tended to be a bit more of a noisy customer. More of them had issues because it had been decided for them. Right?
Folks in some pretty senior positions in HP did not get a vote on whether they did that deal with Oracle or not. So I think some of that is to be expected.
By the same token, HP is a very, very large organization. When they put thousands and thousands of sales reps on a system and not have it work, it's going to cost them, and it's going to cause some concerns.
Q. Besides HP, are there any other clients that you were personally involved with that you can tell me, sitting here today, that you recall implementation problems that you became involved with?
A. I certainly was involved with the implementation problems.

But, you know, to be -- if I look across 2002-2001, which is the last couple of years here (indicating), nobody comes to mind from that issue that is outside of what the normal run rate would have been of bugs and issues and things like that.

Q. You mean for other software releases by Oracle?

A. Releases by Oracle, other companies, that are -- if you go back to the early '90s, you know, and read articles about Schlumberger about a billion-dollar overrun to SAP -- I mean, every one of the big enterprise software companies has had their share of issues there. So I'm sure I characterize that fairly.

I think, as I said, there's a clear run rate of those things that are to be expected in any release at any software company, and I was trying to point out to you things that might be outside of that.

Sorry. You are so quiet over there.

Q. Okay. Let me ask you a couple -- let me switch gears here. Have you ever owned any Oracle stock?

A. Oh, yes.

Q. When was that?

A. I still own Oracle stock. I have had the full amount that I could have invested in the employee stock purchase plan and 401K for every year that I was there.

Q. Okay. How much do you own currently?

A. Less than a couple hundred thousand dollars.

Q. Market value?

A. Yeah, market value today.

I don't think I have sold any in the last five years or so.

I sold a pretty large chunk before I left. I had a bunch of stock options, which I exercised before I left the company so I didn't pay the money myself out.

E-trade account, which was the employee stock purchase -- I think I still have a chunk in there. It could be significant, but less than a couple hundred thousand, but no more than a couple hundred thousand.

Q. Do you remember the date or generally when you exercised your options before you left?

A. Not at a good time. I always feel like I missed the highest.

I didn't sell, I don't think, any stock in the first ten years I was there. So all the stock I sold was at a pretty good buy-in price for everything I did sell.

Q. Okay.

A. Whatever it was in end of 2000, early 2001, I probably sold a chunk at some point in there, because that's --

When I was getting ready to leave the company,

I wanted to get rid of my options, because the options had to come from my own money and pay for the basis price, or I had to cash them out. So I liquidated them all at that point.

Q. Do you remember what the amount was?

A. I don't. As much as a couple of million dollars worth of stock over the entire time I was at Oracle, over 12 years.

Q. Do you recall, after you left your employment with Oracle, that you became involved in a dispute with the company?

A. Yeah, about solicitation of employees.

Q. Could you explain what happened?

A. Yeah. So, when I went over to Ascera, I had a lot of people that wanted to leave and come with me, and Oracle did not find that to be very desirable.

I had probably ten people or so that left in a very short period of time to come join me.

Q. Did they feel that you were acting improperly?

A. They did.

Q. Did they determine that you were recruiting employees likely you were still employed by Oracle?

A. They did.

Q. How was that dispute resolved?

A. Agreed not to hire anybody from Oracle for a

couple of years.

Q. You signed an agreement?

A. I did sign an agreement. That was when I was at Ascera, so we had Ascera's attorney working on it.

You know as I think back, I'm not sure if I signed anything or not, but I think I did.

MR. HARRISON: I have nothing further.

MS. WINKLER: I don't have any questions.

THE VIDEOGRAPHER: This marks the end of videotape No. 4, Volume I, in the deposition of Michael DeCesare.

The videotape will be retained by LiveNote World Service.

At 5:33, going off the record.

(Deposition concluded at 5:33 p.m.)

CERTIFICATE OF WITNESS

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____________ day of _______________, 20___, at ____________________, ____________________.
(City) (State)

______________________________
MICHAEL DECESARE

CERTIFICATE OF DEPOSITION OFFICER

I, LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed by me or under my direction by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto subscribed by my hand this ________ day of ________________, 2006,

________________________________________
LORRIE L. MARCHANT, RPR, CRR, CSR NO. 10523

CERTIFICATE OF DEPOSITION OFFICER

I, SHEILA CHASE, RPR, CSR NO. 4934, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed by me or under my direction by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto subscribed by my hand this ________ day of ________________, 2006,

________________________________________
SHEILA CHASE, RPR, CSR NO. 4934

CERTIFICATE OF DEPOSITION OFFICER

I, SHEILA CHASE, RPR, CSR NO. 4934, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed by me or under my direction by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto subscribed by my hand this 28 February, 2006.

[signature]

SHEILA CHASE, RPR, CSR NO. 4034