Exhibit 4

Donnelly, Peter  11/30/2005  3:44:00 PM

1

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE:
 5   ORACLE CORPORATION SECURITIES  )
     LITIGATION                     )
 6                                  )
                                    )
 7                                  )  No.  C-01-0988-MJJ
                                    )
 8   THIS DOCUMENT RELATES TO:      )
                                    )
 9          ALL ACTIONS            )
     _____)
10
11
12
13
14
15          VIDEOTAPED DEPOSITION
16            OF PETER DONNELLY
17          San Francisco, California
18          Wednesday, November 30, 2005
19
20
21
     Reported by:
22   TRACY L. PERRY
     CSR No. 9577
23   JOB No. 66437
24
25
```

2

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE:
 5   ORACLE CORPORATION SECURITIES  )
     LITIGATION                     )
 6                                  )
                                    )
 7                                  )  No.  C-01-0988-MJJ
                                    )
 8   THIS DOCUMENT RELATES TO:      )
                                    )
 9          ALL ACTIONS            )
     _____)
10
11
12
13
14
15          Videotaped deposition of PETER DONNELLY, taken
16   on behalf of Defendants, at 3000 El Camino Real,
17   2 Palo Alto Square, Palo Alto, California, beginning
18   at 9:34 a.m. and ending at 3:32 p.m., on Wednesday,
19   November 30, 2005, before TRACY L. PERRY, Certified
20   Shorthand Reporter No. 9577.
21
22
23
24
25
```

3

```
 1   APPEARANCES:
 2
     For Plaintiffs:
 3
        LERACH, COUGHLIN, STOIA, GELLER, RUDMAN, ROBBINS
 4      BY:  MONIQUE C. WINKLER
        Attorney at Law
 5      100 Pine Street, Suite 2600
        San Francisco, California  94111
 6      415-288-4545
 7   For Defendants:
 8      MAYER, BROWN, ROWE & MAW LLP
        BY:  LEE H. RUBIN
 9        SHIRISH GUPTA
        Attorneys at Law
10      2 Palo Alto Square, Suite 300
        Palo Alto, California  94306-2112
11      650-331-2000
12   For the witness:
13      BUSHNELL, CAPLAN & FIELDING, LLP
        BY:  ALAN M. CAPLAN
14      Attorney at Law
        221 Pine Street, Suite 600
15      San Francisco, California  94104-2715
        415-217-3800
16
     There also being present:
17
        Marty Majdoub, Videographer
18
19
20
21
22
23
24
25
```

4

```
 1                  INDEX
 2   WITNESS:                   EXAMINATION
 3   PETER DONNELLY
 4      BY MR. RUBIN              6, 186
 5      BY MS. WINKLER            129, 198
 6
 7
 8                 EXHIBITS
 9   DEPOSITION                       PAGE
10   1  Deposition subpoena for Peter N. Donnelly;   58
        10 pages
11
        2  E-mail dated 2/10/01 from Jeff Henley to   64
12      Jennifer Minton; 3 pages
13   3  E-mail string, the top e-mail dated 12/5/00   72
        from Graeme Mair to Lia Burke; 2 pages
14
        4  E-mail string, the top e-mail dated 11/15/00  77
15      from Ivgen Guner to Peter Donnelly; 4 pages
16   5  E-mail dated 9/13/00 from Peter Donnelly to   131
        Thomas Williams with attached support
17      presentation; 40 pages
18   6  E-mail dated 8/18/00 from Peter Donnelly to   142
        J. Minton with attached update on 2261
19      reconciliation; 15 pages
20   7  E-mail dated 8/21/00 from Jennifer Minton to  171
        J. Henley with attached update on 2261
21      reconciliation; 17 pages
22   8  Document titled "Education LOB, Quarterly     173
        Financial Briefing," dated 9/13/00; 19 pages
23
        9  E-mail dated 12/7/00 from John L. Hall to   176
24      Sohaib Abbasi with attached Q2 status document;
        6 pages
25
```

5

1      Palo Alto, California
2      Wednesday, November 30, 2005
3      9:34 a.m. - 3:32 p.m.
4
5              PROCEEDINGS
6      THE VIDEOGRAPHER:  Good morning.  Here begins
7   Videotape Number 1, Volume 1 in the deposition of
8   Peter Donnelly in the matter of Oracle Corporation
9   Securities Litigation in the United States District Court,
10  Northern District of California, Case Number
11  C-01-0988-MJJ  Today's date is November 30th, 2005.  The
12  time is 9:34 a.m.
13      This deposition is being taken at 3000 El Camino
14  Real, 2 Palo Alto Square, Palo Alto, California.  The
15  videographer is Marty Majdoub, here on behalf of Esquire
16  Deposition Services, 505 Sansome, Suite 502,
17  San Francisco, California.
18      Would all counsel present please identify
19  yourselves and state whom you represent?
20      MR. RUBIN:  Lee Rubin on behalf of the defendants,
21  and from the law firm of Mayor, Brown, Rowe & Maw, and
22  with me today is Shirish Gupta, also from Mayor, Brown,
23  representing Defendants.
24      MS. WINKLER:  Monique Winkler of Lerach, Coughlin,
25  Stoia, Geller, Rudman & Robbins, on behalf of Plaintiffs.

6

1      MR. GREENSTEIN:  Eli Greenstein from Lerach,
2   Coughlin, also on behalf of Plaintiffs.
3      MR. CAPLAN:  Alan Caplan, Bushnell, Caplan &
4   Fielding, representing the witness.
5      THE VIDEOGRAPHER:  Would the -- sorry.  Would the
6   court reporter please swear in the witness?
7
8          PETER DONNELLY,
9   having been first duly sworn, was examined and testified
10  as follows:
11
12          EXAMINATION
13  BY MR. RUBIN:
14  Q  Good morning.
15  A  Morning.
16  Q  Could you please state your name for the record?
17  A  Peter Donnelly.
18  Q  Where do you live, Mr. Donnelly?
19  ███████████████████
20  Q  How long have you lived at that address?
21  A  Approximately two years.
22  Q  Where did you live before that address?
23  ███████████████████
24  Q  And how long did you live there?
25  A  About 13 years.

7

1  Q  Okay.  Are you currently employed?
2  A  Yes, I am.
3  Q  Where do you work?
4  A  Symantec Corporation.
5  Q  What do you do for Symantec?
6  A  I'm the vice president of worldwide pricing and
7  licensing
8  Q  Prior to your being employed at Symantec, had
9  you been employed as Veritas?
10  A  Yes.  Veritas has recently merged with Symantec,
11  and I was employed at Veritas.
12  Q  Prior to the merger?
13  A  Correct.
14  Q  And what was your position at Veritas?
15  A  My last position was the same title.
16  Q  Okay.  And who was your direct -- who did you
17  directly report to at Veritas before the merger?
18  A  Immediately before the merger?  Will -- Bill
19  Robins, William Robins, Bill Robins.
20  Q  Are you on -- still at the Ellis Street --
21  A  Correct.
22  Q  -- building?
23  A  Correct.
24  Q  And who is your direct supervisor now?
25  A  Gary Bloom.

8

1  Q  And what is Gary's position now at Symantec?
2  A  He's the vice chairman and president of Symantec
3  Corporation.
4  Q  And you had worked with Gary at Oracle; is that
5  right?
6  A  That's correct.
7  Q  Okay.  Let me go through a few housekeeping
8  issues, and then we can talk about some of your work at
9  Oracle.
10      Have you ever been deposed before?
11  A  One time.
12  Q  Okay.  And what -- when was that?
13  A  It was in a case involving Oracle and Randy
14  Baker.
15  Q  Randy Baker?
16  A  Baker, yes.
17  Q  Okay.  What was the nature of the case?
18  A  Unfair dismissal.
19  Q  Unfair dismissal?
20  A  I believe.
21  Q  Was Mr. Baker a direct report to you?
22  A  No.
23  Q  Okay.  What was your involvement in the case?
24  A  I was -- I held a finance position at Oracle  I
25  guess I was assumed to have knowledge of circumstances

9

1  surrounding his dismissal.

2  Q  Was he in the finance organization?

3  A  No.  I served an organization -- I served the

4  organization that he ran.

5  Q  Which was that?

6  A  The support organization.

7  Q  Okay.

8  A  That was one of my responsibilities.

9  Q  And when was he dismissed from the company, do

10  you recall?

11  A  I don't recall.

12  Q  When was the deposition?

13  A  I don't recall.

14  Q  Was it --

15  A  Five years ago.

16  Q  Well, you left Oracle in December of 2000,

17  right?

18  A  Again, I don't recall specifically.

19  Q  I'm just wondering, like from December 2000, do

20  you remember, was it a year before you left Oracle, two

21  years?  Do you have any sense?

22  A  I don't recall.

23  Q  Okay.  All right.  So -- so you have at least

24  some familiarity with the deposition process?

25  A  Yes.

10

1  Q  So just to summarize, as you can already see,

2  I'll be asking you questions related to your background,

3  your work at Oracle, some other information related to

4  the issues in this case.  If you have any questions or

5  you have -- there's any confusion or any need for

6  clarification on your part based on my questions, please

7  let me know and I'll do the best I can to clarify.

8  A  Thank you.

9  Q  Okay?  And if you don't ask to clarify or don't

10  indicate to me you don't understand my question, I'll

11  assume you do when you -- when you answer.

12  A  Okay.

13  Q  Okay?  Also, we have a -- as you can see, we

14  have a videographer and a court reporter.  So because of

15  the court reporter, it's important for you to audibly

16  answer, as well as -- as well as indicate by any other

17  means that -- what your answer is.

18  So sometimes people fall into the habit,

19  including me, of nodding or just going "uh-huh."  So to

20  the extent that you can remember, if you can answer yes

21  or no, make sure that it's audibly understood.

22  A  I will.

23  Q  Okay.  Thanks.

24  Tell me, if you would, what did you do to

25  prepare for this deposition this morning, if anything?

11

1  A  I read the complaint about three weeks ago prior

2  to a meeting with my attorney, and that was it.

3  Q  And your attorney is?

4  A  Alan Caplan.

5  Q  Okay.  Prior to your reading of the complaint

6  three weeks ago, had you read the complaint prior to

7  that?

8  A  No.

9  Q  Okay.  Had you ever received a copy of the

10  complaint before reading it three weeks ago?

11  A  No.  Can I correct that?  I had not read the

12  copy prior to three weeks ago.  I received a copy from

13  Alan a few weeks before that, but I hadn't read it.

14  Sorry.  Just to clarify.

15  Q  Okay.  Thank you.

16  Before receiving a copy from Mr. Caplan, had you

17  received a copy of any version of the complaint anytime

18  before that?

19  A  No.

20  Q  What is your understanding of who the parties

21  are in this case, who is the plaintiff and who is the

22  defendant?

23  A  The defendant is Larry Ellison, Jeff Henley, and

24  Sandy Sanderson, I believe are the three people that are

25  named, and the shareholders are the -- the plaintiff.

12

1  Q  Okay.

2  A  If I got my terms right.  Defendant and

3  plaintiff.

4  Q  And it's --

5  A  I'm not a lawyer.

6  Q  It's not a test.  It's not a test.  I just

7  wanted to get a sense of what your understanding was.

8  A  I'm not a lawyer.

9  Q  At any time before today -- well, strike that.

10  At any time before Mr. Caplan gave you a copy of

11  the complaint, do you recall ever being contacted by

12  anybody that you understood to represent -- you know,

13  lawyers who are representing shareholders?

14  A  Yes.

15  Q  And -- tell me about that contact.

16  A  Sometime in 2001, I believe -- I can't recall

17  the specific timing, but it was after I left Oracle, I

18  was either made aware of or come across some information

19  in regards to this pending lawsuit, and there was a

20  number to call.  And I made an inquiry through that

21  number as to whether or not I could be considered a

22  shareholder in the context of this pending lawsuit.

23  Q  Mm-hmm.

24  A  And I asked my questions and got a response back

25  of no.  So --

13

1    Q  Tell me what questions you recall asking.

2    A  My questions were based around the fact whether

3    I could be considered a shareholder, given I held stock

4    options as opposed to stock.

5    Q  Mm-hmm.

6    A  And it was explained to me that that didn't

7    count, unfortunately.

8    Q  Okay.  So you were interested in becoming a

9    member of the class?

10   A  Yes.

11   Q  And at the time you left Oracle, you still held

12   a lot of stock options in Oracle stock, correct?

13   A  That's correct.

14   Q  Unexercised stock options?

15   A  That's correct.

16   Q  And do you still hold those?

17   A  No.

18   Q  Did they expire at some point?

19   A  Ninety days after my last day at Oracle.

20   Q  Okay.  And at the time that you left Oracle, did

21   you actually own any stock at all in Oracle?

22   A  I don't believe so.  If I did, it would be a

23   very small amount of ESPP, which is employee stock

24   purchase program, but I don't recall.

25   Q  Okay.  Do you own any Oracle stock today?

14

1    A  No.

2    Q  Okay.  So you -- you called a number that was

3    listed in some publication; is that right?

4    A  It was either a publication or a correspondence

5    that I received, I don't recall, but there was a number

6    presented to me.  It might have been on a website.  It

7    was a number presented to me and I proactively called it.

8    Q  And do you remember who you spoke to?

9    A  I don't recall the gentleman's name, but it was

10   a man.

11   Q  Okay.  And was it somebody at a law firm?

12   A  My un-- my recollection was it was an

13   investigator representing a law firm.

14   Q  You indicated you do not remember his name?

15   A  I don't recall.

16   Q  Male?

17   A  I seem to recall speaking to a gentleman, yes.

18   Q  Okay.  All right.  And you indicated that you

19   asked him whether the holding stock options would qualify

20   you as being a member of the class?

21   A  Correct.

22   Q  And he indicated that it would not?

23   A  Correct; at the end of the conversation he did.

24   Q  Okay.  Other than communications or conversation

25   about whether you would qualify as a class member, was

15

1    anything else discussed during that conversation?

2    A  Yes.

3    Q  Okay.  What else?

4    A  There were a number of questions asked as to

5    what role I played at Oracle, whether I had opinions on

6    certain items, and I expressed those opinions.  I don't

7    recall specifically every question that was asked and

8    answered.

9    Q  Mm-hmm.

10   A  But the general -- general recollection around

11   what did I do and what was my thought on a few things.

12   Q  When questions were asked of you about your

13   opinions about Oracle, did you at any time during the

14   conversation indicate to him when you had left the

15   company?

16   A  Yes.

17   Q  Okay.  And --

18   A  Yes, I believe I did.

19   Q  Yes.

20   A  I think it came up in conversation.

21   Q  And again, for the record, you left

22   approximately December 18th, 19th of 2000?

23   A  That's correct.

24   Q  And -- and you recall communicating that to the

25   investigator?

16

1    A  I recall letting him know that I wasn't at the

2    company.  I don't recall a specific date or time or

3    circumstance around my departure.  So just that I left

4    Oracle, I was holding stock options at the time, and I'd

5    lost some money.

6    Q  Did you understand at the time that you were

7    talking to the investigator that the -- that the -- that

8    the lawsuit related to Oracle's performance in the third

9    quarter of 2001?

10   A  I don't recall the specifics of the lawsuit.  I

11   just remember the number and calling to see if there was

12   an opportunity to recover some of my losses.

13   Q  You indicated that you had said that he had

14   asked you about your opinion about certain things?

15   A  Mm-hmm.

16   Q  Did you indicate to him that the -- that what

17   you were telling him was your -- was your opinion was

18   based -- was based upon what you personally believed or

19   thought?

20   MS. WINKLER:  Objection to form.

21   THE WITNESS:  I believe --

22   BY MR. RUBIN:

23   Q  Oh, I'm sorry.  That was one housekeeping matter

24   that I did not cover.

25   MS. WINKLER:  You guys seem to like to forget that

17

1   one.
2   BY MR. RUBIN:
3      Q   From time to time -- not on purpose -- from time
4   to time lawyers, perhaps your own and sometimes the
5   lawyers for the plaintiffs, will object, and they have --
6   they're fully within their rights to do so.
7      A   Mm-hmm.
8      Q   And if they ask you questions, I may do the same
9   thing.  And as a general matter, after giving them the
10  appropriate time to object, then you have an obligation
11  to go ahead and answer the question --
12     A   Okay.
13     Q   -- to the extent that you understand the
14  question.
15         Now, there could be certain -- there are
16  circumstances where you're directed not to answer the
17  question.  That would be by your own lawyer.  And in
18  those circumstances, obviously, you know, you're entitled
19  to follow your lawyer's direction.  But aside from those
20  narrow circumstances, you can go ahead and answer.
21     A   Just keep going.  Okay.
22     Q   Without attempting to avoid talking over people.
23         So, with that, so Ms. Winkler objected, and
24  now you can answer the question.
25     A   If you could repeat the question.

18

1      Q   Did you -- I think my question was, did you
2   indicate to the investigator that what you conveyed about
3   Oracle was your own personal opinion?
4      A   I believe I did.
5      Q   Okay.  Did you indicate to him that to the
6   extent there were -- that he was asking you questions
7   about how Oracle was performing or any information about
8   Oracle's financial performance after December 19th, 2000,
9   that you didn't have any personal information?
10     MS. WINKLER:  Objection; form.
11     THE WITNESS:  I had no access to information
12  subsequent to December 18th.
13  BY MR. RUBIN:
14     Q   And did you make that clear to the investigator?
15     A   I -- I don't know if I specifically made it
16  clear, but I know I didn't.  So I know I didn't have
17  access to information.  I would not have represented that
18  I did.
19     Q   That's really my question.  You wouldn't have
20  told an investigator that you had access to information
21  that you didn't have?
22     A   Not at all.
23     Q   Right.  And you wouldn't have indicated that you
24  were privy to some internal information about Oracle
25  after you had left the company?

19

1      A   Not at all.
2      Q   And -- just to confirm that point, after you
3   left Oracle in December -- mid-December of 2000, you did
4   not acquire any information from any Oracle employee
5   after you had left concerning Oracle's financial
6   performance during the rest of that quarter?
7      MS. WINKLER:  Objection; form.
8      THE WITNESS:  That's correct.  That's correct.
9   BY MR. RUBIN:
10     Q   How long did this conversation last with the
11  investigator?
12     A   I'm estimating 10 to 15 minutes.
13     Q   To the extent that there were questions asked of
14  you about what was happening at Oracle during the third
15  quarter, so -- so from December -- to the extent that
16  there were questions asked about Oracle's performance
17  from December 18th or 19th and onward, would it be fair
18  to say that any information that you were conveying about
19  Oracle's financial performance or what people knew and
20  when would be fairly described as speculation on your
21  part?
22     MS. WINKLER:  Objection; form.
23     THE WITNESS:  Again, I would call it opinion as
24  opposed to speculation.
25  BY MR. RUBIN:

20

1      Q   Okay.  Something that was based upon your own
2   opinion, not based upon any data that you had about the
3   third quarter, correct?
4      A   I would say based upon my eight and a half years
5   at Oracle.
6      Q   But it wasn't based on anything that you were
7   looking at about third quarter performance, correct?
8      A   That's correct.
9      MR. CAPLAN:  Objection as to time.  If you're
10  talking about information he got after he left --
11     MR. RUBIN:  It -- right.
12     Q   And specifically I'm talking about, you did not
13  have -- you were not privy to any information after
14  December 19th of 2000, correct?
15     A   That's correct.
16     Q   You didn't have any forecasting data?
17     A   That's correct.
18     Q   You didn't have any actual sales data?
19     A   Correct.
20     Q   You didn't have any information at all about
21  Oracle's financial condition or performance?
22     A   Correct.
23     MS. WINKLER:  Objection; form.
24  BY MR. RUBIN:
25     Q   Now, let me -- let me turn to your history at

21

1  Oracle.  You began working at Oracle in 1992?
2     A  As a full-time employee in '92 and as a -- as an
3  outside auditor in 1991.  I subsequently joined the
4  company afterwards.
5     Q  When you were serving as an outside auditor, who
6  were you working for?
7     A  KPMG.
8     Q  What was your position at KPMG during that time?
9     A  I was a -- a manager, senior manager.  It's a
10  long time ago, I'm afraid.  Senior manager.
11    Q  How long had you been at KPMG before leaving for
12  Oracle?
13    A  Five and a half years.
14    Q  Was Oracle -- you had worked for Oracle you said
15  for a year as senior manager before joining the company?
16    A  I worked at Oracle for approximately seven
17  months as part of a long-term engagement at Oracle.
18    Q  But you were an employee with KPMG at the time?
19    A  That's correct.
20    Q  But you were working on site at Oracle?
21    A  That's correct, for seven months.
22    Q  Had you been on the audit team prior to that?
23    A  I was actually part of the restatement team that
24  was working on restating Oracle's books.
25    Q  In 1991-'92?

22

1     A  Correct.
2     Q  And then how -- how did it come to pass that you
3  ended up moving over to Oracle?
4     A  I was asked by the then director of the
5  organization that I was working for inside Oracle, "Now
6  you've cleaned it up, why don't you come and work for me
7  to manage it?" basically.
8     Q  And who was that?
9     A  Kevin Wion, W-I-O-N.
10    Q  And what was your initial position at Oracle
11  when you were hired in '92?
12    A  I believe it was either manager or senior
13  manager.
14    Q  In what -- in what organization?
15    A  It was in the finance and operations
16  organization supporting channels business, our indirect
17  business.
18    Q  And how long did you stay in that position?
19    A  I recall it's about two and a half years.
20    Q  Okay.  And what did you do next at Oracle?
21    A  I became the director of corporate financial
22  planning and analysis.
23    Q  Also known as FP&A?
24    A  Correct.
25    Q  Okay.  And who did you directly report to in

23

1  that position?
2     A  Jennifer Minton, M-I-N-T-O-N.
3     Q  So that would have been approximately '94-'95,
4  that time frame?
5     A  Approximately, yeah.
6     Q  And what -- describe your role in that position.
7     A  I was responsible for forecasting, budgeting,
8  financial performance, reporting and analysis, and all
9  internal reporting inside the company.
10    Q  Were there others at your level who also
11  directly reported to Jennifer?
12    A  Yes.
13    Q  Who were those people, to the extent you can
14  recall?
15    A  I don't recall names, but the functions were
16  things like the general ledger accounting organization --
17    Q  Mm-hmm.
18    A  -- accounts payable organization, accounts
19  receivable organization.  A lot of the accounting
20  controllership functions reported to Jennifer.
21    Q  Okay.  And did -- was it your -- was part of
22  your responsibility at the time to aggregate data from
23  different parts of the company and assist in -- Jennifer
24  Minton in the forecasting process?
25    A  Yes.

24

1     Q  And you held that position for how long?
2     A  Approximately two years.
3     Q  Now, at the time, ninety -- so that would have
4  been '95-'96 to '97-'98; is that about right?
5     A  Approximately.
6     Q  Did Oracle announce guidance to the market
7  during that time period?
8     A  I don't recall.
9     Q  Do you recall the accuracy of the forecasts that
10  you worked on during that time period in terms of the
11  forecast at the beginning of the quarter and how it
12  compared to the results at the end of the quarter?
13    MS. WINKLER:  Objection; form.
14    THE WITNESS:  I have some -- I have some
15  recollection of that type of work.
16  BY MR. RUBIN:
17    Q  Okay.  And what do you remember?
18    A  There were relatively -- I'll take that back.
19       There was a process to map performance of
20  forecast against actual results that took place on a
21  quarterly basis, and that information was aggregated over
22  time to create a projected view of the quarter.
23       So as you built up, you look at forecasts to
24  actual accuracy and how much is in -- within a given
25  quarter.  You get a sense of using that information for

Donnelly, Peter  11/30/2005  3:44:00 PM

25

1  looking forward to future quarters.  You take history of
2  Q1 and how did that look for the last five years:  How
3  are we tracking in the quarter from an actual standpoint,
4  how are we tracking against forecast, and how much of
5  that forecast do we typically get in in the unknown
6  period.
7     Q  In that -- and you would help make these
8  assessments; is that right?
9     A  People -- people on my team did.  I -- I didn't
10  do a lot of the detailed work in my group.  I was
11  responsible for my organization running effectively.
12     Q  So how would -- how would you describe your role
13  compared to what you just described in terms of looking
14  at historical data, trying to see patterns?
15     A  Review.
16     Q  Review.  Okay.
17     Did you -- did you consult and confer with
18  Ms. Minton about the data that was being provided or that
19  was being analyzed?
20     A  Jennifer had an operating style that she
21  communicated directly with people in my group if needed
22  to.  So you'll have to ask her that question.  Did you
23     Q  Well, I'm asking from your perspective.  Did you
24  confer or consult with her?
25     A  I don't recall.

26

1     Q  So -- well, let me take a step back.  Did you
2  have regular meetings with Jennifer?
3     A  I had regular meetings with Jennifer, yes.
4     Q  Okay.
5     A  And we talked about a lot of different
6  financial-related matters, project-related matters, and
7  personnel/management-related matters during the course of
8  my time in her group.
9     Q  What would --
10     A  I don't recall any specific meetings or
11  conversations regarding specific data in a forecast
12  analysis.
13     Q  Do you recall observing any patterns with
14  respect to Oracle's license sales during a particular
15  quarter?  That is, was there any -- could you distill or
16  determine, after looking at some period of previous
17  quarters, when there was an up-tic or a downturn in
18  sales, you know, during any particular quarter or any
19  particular months during a quarter?
20     MS. WINKLER:  Objection; form.
21     THE WITNESS:  Yes.
22  BY MR. RUBIN:
23     Q  Okay.  And what do you recall about -- for
24  example, whether there was any discernable or observable
25  tendency during the third month of a quarter?

27

1     A  There's something commonly known as the hockey
2  stick effect in the software industry.
3     Q  And what is that?
4     A  Essentially customers know a software vendor
5  needs to report their earnings for -- on a quarterly
6  basis -- public software company needs to report earnings
7  on a quarterly basis.  They -- vendors -- customers use
8  this as an opportunity to extract a better price for
9  software.  And therefore, deals can be pushed further and
10  further back into the quarter, making -- making the final
11  number difficult to determine exactly.
12     So there was -- but -- but over time -- Oracle's
13  been in this business for 25 years.  You create patterns,
14  and the forecast analysis that I gave you, mentioned to
15  you tracked these patterns.  So there's a different
16  pattern in Q1 then there was in Q4.
17     Q  And that had something to do with seasonality?
18     A  Seasonality.  And again, the larger hockey stick
19  effect, the big quarter for most software companies is
20  their fourth quarter.  There's a bigger hockey stick
21  effect in that quarter.  We know that because we tracked
22  that for the last X number of years, possibly 25.
23     Q  Were there -- did you also see the hockey stick
24  phenomenon in quarters 1 through 3?
25     A  There's a hockey stick effect every quarter.

28

1     Q  Right.  And that was observed over time,
2  correct?
3     A  That's correct.
4     Q  You indicated that this was a phenomenon in the
5  software industry generally?
6     A  Correct.
7     Q  And was Oracle a part of that?
8     A  Given they're the second largest software
9  company in the world, yes.
10     Q  So Oracle in that sense was no different than
11  the industry-wide phenomenon?
12     A  It was an industry phenomenon, of which Oracle
13  participates in the industry, yes.
14     Q  Do you remember any specific data on average
15  during the time that you were working in this area in
16  '90 -- I'm just going to use -- say '95 to '97, but I
17  understand that's not a precise term.  We're estimating.
18     A  Sure.
19     Q  What percentage of Oracle sales occurred in the
20  last couple weeks of a quarter over time?
21     MS. WINKLER:  Objection.
22  BY MR. RUBIN:
23     Q  Do you remember any percentage, like, you know,
24  of the total amount of license sales, how much occurred
25  in the last two weeks of the quarter?

29

1    MS. WINKLER:  Objection; form.
2    THE WITNESS:  Okay.  I don't recall specific
3  numbers.  I'm just aware that the last two weeks was a
4  very important period.  If I had access to analysis, I
5  could better recall it, but I don't have access to that.
6  BY MR. RUBIN:
7    Q  And when you say "important period," important
8  meaning that Oracle could miss or make its quarter based
9  upon performance in the last two weeks?
10    MS. WINKLER:  Objection; form.
11    THE WITNESS:  It has a significant impact on the end
12  results of -- of the company, yes.
13  BY MR. RUBIN:
14    Q  So would -- would it be fair to say that it
15  could -- that based upon the performance of the last two
16  weeks, it could make or miss its quarter?
17    MS. WINKLER:  Objection; form.
18    THE WITNESS:  I think that's a fair statement, yes.
19  BY MR. RUBIN:
20    Q  Within the forecasting group, did this -- did
21  you ever observe any anxiety that came from this hockey
22  stick phenomenon where people -- did people become
23  increasingly nervous as the quarter went on, as these
24  deals drag farther and farther into the quarter, in
25  connection with whether Oracle was going to make its

30

1  internal forecast?
2    MS. WINKLER:  Objection; form.
3    THE WITNESS:  Well, let me restate your question.
4  Was there anxiety near the end of a quarter?  Yes.
5  BY MR. RUBIN:
6    Q  Yeah.  And why was that?
7    A  A desire to meet a specific target number for
8  the street.
9    Q  And sometimes it was unclear right up to the
10  last days, right?
11    MS. WINKLER:  Objection; form.
12    THE WITNESS:  Can you ask me that question again?  I
13  don't really understand exactly --
14  BY MR. RUBIN:
15    Q  I said sometimes during the time -- again,
16  during the time that you were in forecasting, it was
17  unclear whether Oracle would make its quarter until the
18  final days of the quarter?
19    MS. WINKLER:  Objection; form.
20    THE WITNESS:  So I don't think that people held
21  their breath for two weeks and said, "Let's just wait
22  till the end of the two weeks and then we'll
23  see."  There's a constant daily process whereby forecasts
24  were collected from the field, actuals were reported from
25  assistants, and a gap analysis was done.  So if that gap

31

1  was large two days before the end of the quarter, then
2  absolutely.
3  BY MR. RUBIN:
4    Q  Right.
5    A  If that gap had narrowed, as it often did, then
6  there wouldn't be as much anxiety.
7    So -- so it's not a cut and dried the last
8  couple of days always counted.
9  BY MR. RUBIN:
10    Q  Sure.  But when in those situations where you're
11  up to the last few days, last week of the quarter, there
12  are a lot of deals in that are -- that are what I'll call
13  in the pipeline.  We haven't used that term, but you
14  understand what that term means?
15    A  Yes.
16    Q  There are a lot of deals in the pipeline but
17  have not yet closed.  That's where the anxiety is most
18  pronounced, correct?
19    MS. WINKLER:  Objection; form.
20    THE WITNESS:  Correct.  And there is detailed
21  knowledge of every single one of these material
22  transactions that has closed, will close, and may not
23  close.
24  BY MR. RUBIN:
25    Q  And, in fact, the forecast, during the time that

32

1  you were working on it, it's being updated by the sales
2  organization, correct?
3    A  Yeah, constantly.
4    Q  So if they get an indication that somebody is
5  given some negative feedback about whether they plan
6  to -- whether they plan to actually purchase the software
7  during that quarter, then there would be a change in the
8  percentage assigned to the likelihood that that deal
9  would close in the quarter, correct?
10    A  Correct.
11    MS. WINKLER:  Objection to form.
12  BY MR. RUBIN:
13    Q  And that information -- and that information is
14  then taken into account, as you say, on a daily basis in
15  looking at the numbers?
16    A  Correct.
17    Q  During your time at Oracle, did you -- did
18  the -- did that system appear to be working as intended,
19  that as information would come in from the sales
20  organization that would -- that would change or impact
21  the likelihood that a deal would close, did that appear
22  to be integrated into the numbers?
23    MS. WINKLER:  Objection; form.
24    THE WITNESS:  I would say it was a reasonably good
25  system at the time that I was in that organization.

33

BY MR. RUBIN:

Q  Is your sense -- did you ever encounter any phenomenon or any perceived phenomenon that the people at Oracle referred to as "sandbagging" by a sales organization?

A  I'm familiar with the term.  I did not support the sales force directly.  So the level of sandbagging, you know, I wasn't involved in that on a day-to-day basis.  Sandbagging is a natural tendency for -- for sales reps to do.

Q  Why is that?

A  Well, a forecast is a statement of obligation for the sales rep to deliver a number.  And when you put something in the forecast, it's like in blood.  And if you don't put it on the forecast and you come in and bring it in later, you're a hero.  That's -- that's the concept of sandbagging.  Why put your neck out too far.  So -- so sandbagging was something that occurred.

Q  And did -- were any steps taken within the -- within your organization to account for that in any way?  If to the extent that you had a belief that some sandbagging was occurring and people were not reporting the -- giving an accurate assessment of what the real potential pipeline was, what the real potential revenue was from sales, did you do anything to account for that?

34

MS. WINKLER:  Objection; form.

THE WITNESS:  So -- sorry.

So that wasn't done by my organization.  The content of the -- or the size of the sandbagging wasn't something performed by my group.  It was performed by the geographic leaders within the sales force, and it was done through something called management judgment.

So you add up all the bits coming from your people, and you either lower it because you think they're being overly aggressive or you increase it because you think they're sandbagging.  And that management judgment line was culled out in the reports that went to senior management.

BY MR. RUBIN:

Q  Okay.  Now, at the time that you were in Jennifer Minton's organization, did Jennifer Minton herself provide any -- make any adjustment to the sales forecast based upon her own judgment, whether based upon sandbagging or some other information or indication?  Did she add her own -- did she make any changes on her own, whether up or down, to any numbers?

A  I don't recall.

Q  Would you have been privy to that had she been doing that?

A  No.

35

Q  And why is that?

A  Jennifer managed the relationships up to the executive group directly.

Q  So to the extent that Jennifer made any adjustments to -- to the forecast, you would not have actually been privy or seen the document that she made the adjustment to?

A  Again, I don't recall seeing any adjustments made specifically by Jennifer Minton to the forecast.

Q  Okay.

A  They may have occurred; they may not have occurred.  I don't recall seeing any.

Q  Okay.  Did you get a copy of the forecast that was distributed or circulated to the executive committee?

A  Yes.

Q  Okay.  During that period of time?

A  Yes.

Q  Okay.  Did you take part in any executive committee meetings?

A  No.  Sorry.  Not on the forecast.  Not specifically related to the forecast.

Q  Right; to the forecast.

Did you take part in any executive committee meetings generally?

A  Yes; budgets, analysis.

36

Q  And -- and distinguish, if you would, at Oracle between budgets and forecasting.  What's the difference?

A  So a budget -- the budget process sets out a target number, both on the revenue and spend side, at the beginning of a year, expense side.  And that lays out the targets for the year, and they remain fixed in stone as a baseline for the year.

A forecast is a representation of, well, what actually is going to happen.  How much revenue do you think we're actually going to get in this quarter.  How much expense do you think we're going to have in this quarter.  And those will change as you progress through the quarter.  You rachet back expense, you increase revenue.  Those forecasts will adjust.

So forecast is really a real-time measure of performance, whereas a budget is a prediction of future performance at the beginning of a fiscal year.

Q  And budget does not change once it's set for the year?

A  Very rarely changes.  You would have to go through a re-budgeting process specifically because there had been a material change in the business.

Q  Is budget largely for the expense side of the business?

A  Both revenue and expense so you can create

37

1   earnings projections.
2       Q   And during your period of time when you were in
3   the -- Jennifer Minton's organization, what was the
4   relationship between budget and forecasting?  Did
5   forecasting typically exceed the budget during the years
6   that you were there?  Was it -- was it on target?  Was it
7   lower?
8       MS. WINKLER:  Objection; form.
9       THE WITNESS:  I don't recall specifically.
10   BY MR. RUBIN:
11      Q   Do you remember any pattern or trend?
12      A   People generally kept to the expense budget,
13   generally.  On the revenue side, I don't recall
14   specifics.
15      Q   Did you have -- you said I think earlier that
16   you were not specifically in the sales organization.
17      A   Mm-hmm.
18      Q   So explain, if you would, when you were in
19   Jennifer Minton's organization, what role, if any, you
20   had in analyzing or preparing or working on the sales
21   forecast.
22      A   Okay.  So the sales forecast was managed by the
23   sales organization, and the sales organization had a
24   sale -- sales finance support group that did the -- that
25   helped support the organization.

38

1       My responsibility was for the systems and the
2   processes for aggregating forecasts across the company.
3   So I had relatively -- well, I had no inherent interest
4   in the data.  It was just numbers to me.
5       Q   I see.
6       A   Okay?
7       Q   So substantively you were not providing feedback
8   or why is this too high, this seems too low?
9       A   Just at a macro level.  When you bring billions
10   of dollars worth of revenue and expense together, what
11   does it look like.
12      Q   Mm-hmm.  And you were primarily oriented toward
13   the process side?
14      MS. WINKLER:  Objection; form.
15      THE WITNESS:  I had the system -- I had
16   responsibility for the system that aggregated the
17   forecast and for the process of aggregating it and for
18   the corporate-level analytics associated with the
19   forecast.  We ran a report and did comparisons.
20   BY MR. RUBIN:
21      Q   Mm-hmm.  And your responsibility was to make
22   sure that the data runs were as they were intended to be?
23      A   Correct.  We had a forecast due every Monday
24   morning.
25      Q   A forecast --

39

1       A   -- due every Monday morning or every other
2   Monday morning, depending where we were in the quarter.
3       Q   Okay.
4       A   So...
5       Q   Was it every other Monday for the first couple
6   months, and then every Monday after -- for the last --
7       A   That's why I paused in my response.  At the end
8   of the quarter, it was every -- every week and sometimes
9   interims, but other times I think it was every two weeks,
10   I believe.
11      Q   Okay.  And your job was to make sure that the
12   forecast data was correctly prepared and distributed?
13      MS. WINKLER:  Objection; form.
14      THE WITNESS:  I was responsible for aggregating the
15   information and presenting it to the management team with
16   some commentary.
17   BY MR. RUBIN:
18      Q   And -- did you personally provide the
19   commentary?
20      A   I did not provide it verbally.  I provided
21   comments to the forecast that went with the forecast
22   package.
23      Q   And what would be examples of the kind of
24   commentary you would provide?
25      A   Expenses are up, run rates higher, revenue is

40

1   doing well, those types of things.
2       Q   Other than the sales organization, what other
3   organizations fed into the forecast that you were
4   aggregating?
5       A   The whole company.
6       Q   So what were the other -- do you remember how it
7   was divided at the time?
8       A   So we have a services organization, consulting,
9   education, support.  There were all of the expenses
10   associated with both sales and the service organizations.
11   It was R&D, marketing --
12      Q   Mm-hmm.
13      A   -- IT, and F&A.  So legal, finance, HR, those
14   types of expenses.
15      Q   Service organizations, what would that be?
16      A   So support and maintenance.
17      Q   Oh, okay.
18      A   Consulting.
19      Q   So there -- service organization is a
20   broad umbrella under which support --
21      A   Correct.
22      Q   -- consulting.
23      A   Correct.
24      Q   Education also fell under service orgs?
25      A   Correct.

41

1    Q   Okay.  And would it be fair to say that your
2    role with respect to any of the other organizations was
3    the same as it was with the sales organization?
4        MS. WINKLER:  Objection; form.
5    BY MR. RUBIN:
6        Q   That is, that you were aggregating data that was
7    provided by them, and then your job was to make sure that
8    it was being collated and processed and presented in a
9    way that the company -- that the executive committee
10   sought?
11       MS. WINKLER:  Objection; form.
12       THE WITNESS:  At that time, yes.
13   BY MR. RUBIN:
14       Q   At that time?
15       A   Yes.
16       Q   Okay.  Why don't we move to another time.
17           So after you left, after -- at some point you
18   left Jennifer Minton's organization, correct?
19       A   Correct.
20       Q   And where did you go next in Oracle?
21       A   I became the senior director of finance and
22   operations for Gary Bloom, working for Gary Bloom.
23       Q   Do you remember approximately when that took
24   place, that change?
25       A   I'm struggling a bit, but '96-'97, somewhere in

42

1    that time frame.
2        Q   Okay.  And describe, if you would,
3    organizationally what your new role entailed.
4        A   Okay.  So I was responsible for supporting the
5    finance and operations needs for the groups that Gary was
6    running.  At that time, he was running a portion of the
7    R&D group and the alliances organization, which is our
8    partner relationships.  And quickly thereafter, he
9    started accumulating other parts of the company.  He was
10   a rising star at that time.
11       Q   Gary?
12       A   Gary.
13       Q   Right.
14       A   Correct.  And my responsibilities grew as his
15   did.
16       Q   Okay.  So -- and how long did you serve in that
17   role?
18       A   Until I left the company.  Actually, until Gary
19   Bloom left the company.
20       Q   And when was that?
21       A   The fourth quarter, calendar quarter of 2000.
22   So I'm guessing --
23       Q   The calendar year?
24       A   October.  I'm guessing October.
25       Q   And he left to become CEO of Veritas; is that

43

1    right?
2        A   That's correct.
3        Q   There was -- was there a short period of time
4    after Gary left and before you left where you were -- had
5    been placed back under Jennifer Minton's organization?
6        A   That's correct.
7        Q   And that was a short period of time?
8        A   Very short.
9        Q   What, month or --
10       A   Couple of months, few months.
11       Q   All right.  So if you could, explain for me how
12   Gary's responsibilities or Gary's sphere of -- or
13   organizational sphere, how it intersected with -- with
14   other groups at Oracle.  Like did it -- did it overlap or was it
15   separate from sales?  How did it -- and did you have
16   support or marketing within your division?  If you could
17   just connect the two for me.
18       MS. WINKLER:  Objection; form.
19       THE WITNESS:  Probably the easiest thing to do is
20   explain where it ended up because it changed over time.
21   If you take away the sales organization, which is the
22   license sales organization, if you take away consulting,
23   and you take away our applications R&D area, Gary was
24   responsible for the rest of the company.  So that would
25   include the support organization, which is a technical

44

1    support, support and maintenance, education, the balance
2    of R&D, which is around our -- Oracle's premier products,
3    such as the database and --
4        Q   Technology?
5        A   -- tools.  The technology side of the business.
6        Q   Mm-hmm.
7        A   Marketing, IT, alliances, and I think that's it.
8    And my responsibility -- in my sphere of influence, I was
9    responsible for the finance and operations for those
10   groups, plus the finance and operations responsibility
11   for applications R&D.
12       Q   I see.
13       A   Which reported to a different executive in the
14   company.
15       Q   Okay.  And from the time that you joined
16   Gary Bloom's organization to the time that Gary left, was
17   he your -- did you directly report to him?
18       A   Yes, I did.
19       Q   Was it -- did you ever have any other
20   individuals who you directly reported to during that time
21   period?
22       A   No.
23       Q   To what extent, if any, did you interface with
24   the finance organization for sales?
25       A   With -- for sales?  Very limited.

45

1  Q  Okay.

2  A  Direct -- directly.  I was -- I was -- I knew

3  the people in the organization, but on a professional

4  capacity, very limited.

5  Q  Yeah.  I was asking to the extent that did you

6  have to interact with them in order to do your job?

7  A  No.

8  Q  Okay.  Who was the -- who was your position --

9  who filled your role in the sales organization?

10  A  This is where my memory gets a little bit vague,

11  but I believe Graeme Smith was still at the company at

12  the time I took my role, and Graeme was responsible for

13  finance for the sales organization.  He may have left by

14  that point in time, but I believe it was still Graeme.

15  Q  Okay.  Now, during that time period, did -- for

16  those organizations that were within your sphere, did you

17  play any role in the forecasting process?

18  A  Directly?  No.

19  Q  Directly.

20  A  No.

21  Q  Okay.  Who was responsible for forecasting for

22  these -- for the organizations that you were working on?

23  A  So I had either director-level or vice-president

24  level people responsible for each of the different

25  organizations.

46

1  Q  So for support, for example, do you remember who

2  it was?

3  A  At the time it was Priscilla Morgan.

4  Q  And education?

5  A  Dan Sharpley.

6  Q  Mm-hmm.  And consulting is under you?

7  A  Consulting was not under me.

8  Q  Consulting was outside of you, right.  So -- and

9  then you said marketing.  Marketing didn't -- did

10  marketing have a forecasting component?

11  A  Yes.

12  Q  Okay.

13  A  I can't recall who was -- at that time.

14  Q  Okay.

15  A  I'll remember it in a minute.

16  Q  R&D database, do you remember?

17  A  There were a number of people that reported to

18  an individual called Kelie Ginastet.

19  Q  And for -- so let's take Priscilla Morgan just

20  as an example.

21  A  Mm-hmm.

22  Q  So Priscilla Morgan was -- what was her position

23  within support?

24  A  She was the vice president of finance for

25  technical support, and she was the business partner to

47

1  the executive for technical support.

2  Q  Business partner to?

3  A  Randy Baker at the time.

4  Q  Oh, okay.

5  A  That's the connection to the earlier

6  conversation.

7  Q  Gotcha.

8    So now -- so what -- what did Priscilla Morgan

9  do in connection with the forecast?  What was her

10  responsibility?

11  A  She was responsible for helping Randy Baker

12  create a forecast.  So the ultimate responsibility for

13  the forecast data resided with the business executive.

14  The creation and collation of the information necessary

15  to do that was managed by Priscilla.

16  Q  And -- and did you have any oversight or

17  supervisory role in the preparation of the forecast

18  during the time that you were working with Gary?

19  A  I -- again, I managed people.  I had about 130

20  people in my group, and they did the stuff and I managed

21  them.

22  Q  Okay.

23  A  So...

24  Q  So -- so, again, taking a concrete example for

25  support, after Priscilla Morgan worked with the business

48

1  side to create a support forecast for any particular

2  quarter between '98 to 2000, was there ever a time that

3  you would intervene and say, "No, I think that's too

4  low," "I think that's too high," "You need to revisit

5  those numbers"?

6    MS. WINKLER:  Objection; form.

7    THE WITNESS:  Again, the forecast data, the actual

8  numbers were the responsibility of the business

9  executive.

10  BY MR. RUBIN:

11  Q  So you didn't play any role in that?

12  A  So I got visibility to this, I was aware of

13  trends and differences, but at no point in time did I

14  make changes to the forecast.

15  Q  During -- during the time that you were working

16  for Gary, did you ever see any sales forecasts

17  personally?

18  A  No.

19  Q  No?

20  A  No.  Not forecasts.

21  Q  Did you ever see any consulting forecasts?

22  A  No.

23  Q  Did anyone in your organization?

24  MS. WINKLER:  Objection; form.

25  THE WITNESS:  I -- I --

49

1  BY MR. RUBIN:
2     Q  Well, did any -- let me restate my question.
3  That's a -- you can't answer that.  I understand.
4        But did anybody in your organization need that
5  data for their responsibilities or their jobs, as far as
6  you understand?
7     A  As far as I understand, there wasn't a need
8  except perhaps in the marketing side, but even then I
9  think it would be very tenuous.  It was a pretty closely
10  guarded set of data that was given to those that need to
11  know.
12     Q  That was -- that was the policy as Oracle of not
13  spreading the forecast data beyond those people that
14  specifically --
15     A  Correct.
16     Q  -- needed it?
17     A  Correct.  As it is in almost any company.
18     Q  All right.  That's not unusual for Oracle?
19     A  That's not unusual.
20     Q  To Oracle.  Excuse me.
21     A  It's not unusual, based upon my experience.  I
22  just want to clarify.  You met -- you stated forecast a
23  number of times.  There was -- I had access to
24  non-forecast information.  So actuals --
25     Q  Sure.

50

1     A  -- analysis for analytical purposes across a
2  much broader range of information.
3     Q  So when you say "actuals," actual booked
4  licenses?
5     A  How much we sold in a given period and what the
6  trends were and what products we sold and what ratios
7  and -- which is more relevant to our R&D teams so they
8  could determine how successful they were being.
9     Q  And did you have access to that information on
10  an aggregate monthly basis or some other time period?
11     A  I got reports from my old team, from the
12  corporate FP&A.  I had access to analytical tools that
13  were available to us during non-closed months because
14  they also contained forecast data.
15     Q  So explain that to me.  I'm not clear what
16  you're saying.
17     A  There's an online analytical tool that gives you
18  access to actual results.  That's available to you in
19  month 1 and in month 2, but in month 3 your access gets
20  limited to only historical information.  So you're not
21  getting visibility to the actuals to date in a quarter
22  and what the -- any forecast projections, which were also
23  in the same system.  So you didn't get access to that
24  data.
25     Q  So for the third month of the quarter, you did

51

1  not get access to the actual performance during those
2  final weeks?
3     A  Correct.
4     Q  And you did not get any access to the
5  forecasting data?
6     A  No.
7     Q  And -- but that was true during the entire --
8     A  That was true, but for other people that may get
9  access to it, their access got switched off, as well,
10  because they're -- again, a need-to-know basis.
11     Q  But for you, there was no access to forecast
12  information --
13     MR. CAPLAN:  Excuse me.  You guys are talking over
14  one another, for the court reporter.
15     MR. RUBIN:  Sorry.
16     THE WITNESS:  Sorry.
17  BY MR. RUBIN:
18     Q  For you personally.
19     A  I had no access to license and consulting
20  forecast information in my role working for Gary.  I did
21  have access to forecast information for expenses for my
22  team, for the groups that I supported, and forecast
23  information for the support and education organizations
24  that were both revenue-generating.
25     Q  Right.

52

1        Okay.  Now, you indicated that your memory is
2  Gary left October/November of 2000.
3     A  Around -- around about that time.
4     Q  Okay.  Now, you -- and then you were transferred
5  back into Jennifer Minton's organization at that point?
6     A  That's correct.
7     Q  Was there an effort at Oracle to consolidate the
8  finance organization after Gary left the company?
9     A  That's correct.
10     Q  Okay.  Did you have a position in Jennifer
11  Minton's organization during that short period of time
12  that you were there?
13     A  Yes.
14     Q  What was it?
15     A  Same position.
16     MR. CAPLAN:  Do you want to take a break?
17     MR. RUBIN:  Why don't we -- yeah, why don't -- we've
18  been going for like an hour.  So want to take like a
19  ten-minute break?
20     THE VIDEOGRAPHER:  We are now going off the video
21  record.  The time is 10:34 a.m.
22        ( Recess taken:  10:34 until 10:50 a.m.)
23     THE VIDEOGRAPHER:  We are now back on the video
24  record.  The time is 10:50 a.m.
25  BY MR. RUBIN:

53

1      Q   Okay.  Mr. Donnelly, I think we had left off, I

2   was asking you about your transition over to Jennifer

3   Minton's organization shortly before you left the

4   company.

5      A   Yeah.

6      Q   You said you essentially carried the same title.

7      A   That's correct.

8      Q   What -- what happened during that period of time

9   that led to your departure from the company?

10     A   Okay.  Well, probably -- probably there's two

11  things.  One is some philosophical differences between my

12  opinion on how financial -- the financial support team

13  should be managed and those of Jennifer's.  That's one

14  aspect.

15         Second aspect, in my capacity working for Gary,

16  I was asked to get things done.  And in the course of

17  that, you know, it ruffled a few feathers.  But it was

18  what I was asked to do and proved valuable.  I had a very

19  effective finance organization.  It was well liked by the

20  business teams, the business units that it supported, and

21  in order to achieve that, I had to go head to head

22  against some established ways of thinking.

23         And when -- when Gary left, I was left staring

24  the dragon in the face, to coin a phrase, and it created

25  a problem.

54

1      Q   So -- so I gather from your response that

2   some -- that there was some tension or some friction

3   between you and Jennifer's organization before you were

4   placed in her organization?

5      A   That's correct.  No, let me correct that.  It's

6   between myself and Jennifer, not Jennifer's organization.

7   I was well-regarded and well-liked through the vast

8   majority of Oracle's finance organization.

9      Q   So it was between the two of you personally?

10     A   Correct.

11     Q   And had there been clashes or tensions while you

12  were working in Gary's organization between you and

13  Jennifer personally?

14     A   Yes, and while I was working for Jennifer.

15     Q   Okay.  And am I correct that there was -- before

16  you left there, you had spoken to somebody in another

17  organization to attempt to transfer out of Jennifer's

18  organization to work with -- work with him?

19     A   I was offered an opportunity, yes.

20     Q   And who was that?

21     A   Mark Jarvis.

22     Q   And what organization was he in?

23     A   He was the CMO, chief marketing officer.

24     Q   And what -- what position had he offered you?

25     A   An operational role.  So head of operations for

55

1   marketing.

2      Q   Let me go back, and I want to ask you a little

3   bit more about that, but before our break we spoke a lot

4   about the distinction between the -- your -- the units or

5   the groups that you had responsibility for -- support --

6   support, education, marketing, R&D -- and then what was

7   outside of your sphere, which was -- and I think I

8   referred to it as "sales consulting," or maybe each of us

9   did.

10     A   License sales and consulting.

11     Q   Right.  So I just wanted to clarify, when we

12  spoke about sales, both of us, you were speaking about

13  license sales, correct?

14     A   Correct.

15     Q   And that includes database sales and

16  applications sales?

17     A   Correct.

18     Q   Okay.  So what happened that -- that didn't

19  allow you to take that position that Mr. Jarvis offered

20  you?

21     A   I was asked to leave the company and was told I

22  didn't have an opportunity to look elsewhere.

23     Q   Was it Jennifer who asked you to leave the

24  company?

25     A   Correct.

56

1      Q   And that was right around December 18th?

2      A   I believe it was December 18th.

3      Q   Did you believe that you had -- you were being

4   treated unfairly at the time that Jennifer asked you to

5   leave?

6      A   Yes.

7      Q   Did you believe that it was basically just about

8   a personality conflict?

9      A   Yes.

10     Q   Was there any litigation that arose over your

11  dismissal?

12     A   No.

13     Q   Was there any threat to litigate over your

14  dismissal?

15     A   In the course of the time after I was asked to

16  leave, there was some dialogue around my exit payment and

17  the terms of that exit payment.  And during that time I

18  mentioned that I may seek legal action because I think it

19  was unfair dismissal.

20     Q   Did -- did the company respond in any way to

21  that?

22     A   I -- can you clarify your question?

23     Q   Well, did -- did there come a point in time

24  where some agreement was reached about the terms of your

25  dismissal where you were provided some additional

57

1 compensation or severance and you, in turn, agreed not to
2 pursue any legal actions?  Did that ever come about?
3      A  Yes, it did.
4      Q  Okay.  And what do you remember generally about
5 that?
6      A  So I was paid a certain amount of money and I
7 was allowed to resign from the company and I signed a
8 full release.
9      Q  Do you recall in that release whether there was
10 any language about providing any information to those who
11 were -- have a legal dispute with Oracle or cooperating
12 with those who have a legal dispute with Oracle?
13      MS. WINKLER:  Objection.
14      MR. CAPLAN:  Objection to the extent it calls for a
15 legal opinion or legal conclusion about terms in an
16 agreement.
17      MR. CAPLAN:  With that, he can answer.
18      THE WITNESS:  So I don't recall.  It was something I
19 was asked to sign, and then I got my money and I left and
20 have had a fantastic career since, so...
21 BY MR. RUBIN:
22      Q  Do you -- do you have a copy of that settlement
23 agreement?
24      A  I may have it somewhere, somewhere in the depths
25 of my useless past paperwork, but it serves no purpose to

58

1 me.
2      Q  Yeah, you had received a subpoena in connection
3 with the deposition today, correct?
4      A  Correct.
5      Q  And let me just go ahead and mark that.
6      A  I received two, actually.
7      Q  One from Oracle and one from the plaintiffs,
8 correct?
9      A  Correct.
10      Q  Okay.  I'm going to mark the one that you
11 received from us.
12      A  Okay.
13      (Deposition Exhibit 1 was marked.)
14      (Discussion off the record.)
15 BY MR. RUBIN:
16      Q  Okay.  I've handed you what we've marked as
17 Exhibit 1 for this deposition, and do you recognize this
18 document?
19      A  It looks similar to the front page of the
20 document that I received.
21      Q  Okay.
22      A  I did not read the document.
23      Q  You did not read the document at all?
24      A  I did not.
25      Q  Okay.  Well, if you could, turn to page -- let's

59

1 see.  First -- first look at the front page, and there's
2 a little check mark in the middle of the page.  You can
3 see two check marks actually.  One, you were commanded to
4 appear at the place, date, and time specified below --
5      A  Mm-hmm.
6      Q  -- to testify to the taking of a deposition.  Do
7 you see that?
8      A  Yep.
9      Q  That's checked, right?
10      A  Yes.
11      Q  And then the second check is your command to
12 produce and permit inspection and copying of the
13 following documents or objects.  And it says, "See
14 attached Schedule A."
15      A  Okay.
16      Q  Okay.  So if you could, turn to Schedule A,
17 which is page 3 of the numbered pages.
18      A  Okay.
19      Q  Now, is it your testimony you had not -- until
20 looking at this right now, you had not actually reviewed
21 this Schedule A?
22      A  No, I had not.
23      Q  Okay.  Were you aware that there -- that this
24 subpoena asks you for -- to search and produce, if
25 available, documents related to the items listed in

60

1 Schedule A?
2      A  So I received two subpoenas and I received a
3 phone call offering legal assistance.  After that I've
4 done nothing.
5      Q  Okay.  Well, probably what we should do then is
6 we can -- we can take a break before you answer this
7 question, but I'd like you to take a look at Schedule A.
8      A  Okay.
9      Q  You don't have to do it right this second, but
10 before -- maybe we'll take a break after I'm done with
11 questions otherwise.  Take a look at Schedule A and
12 then --
13      A  Is it in here?
14      Q  Yeah, that's -- that's the page 3.
15      A  Okay.
16      Q  And then I'll ask you about any of the items.
17 And we may have to determine whether it's appropriate for
18 you to go back and search for documents that --
19      A  I can read it now if you would like.  It won't
20 take long.
21      Q  Yeah.  Why don't we wait, and then we'll come
22 back to it.  But -- but other than what you described,
23 you haven't taken any steps to search or look for
24 documents that might be sought after in this schedule?
25      A  No.  So I would not have put my departure

61

1  document as something relevant to this -- this case.
2     Q  No, I'm not speaking specifically about the
3  departure document.  I'm just asking you generally, you
4  haven't done any search in connection with the request?
5     A  I have absolutely no documentation from Oracle
6  Corporation or my time during the eight and a half years
7  I was there.  I took nothing.  I wasn't allowed to take
8  anything.  I didn't take anything.  I have nothing that's
9  relevant to what you may be asking me questions about.
10    Q  Okay.
11    A  If that's what Schedule A is asking for, I don't
12  have any.
13    Q  Okay.  Well, what I'll ask you to do is, again,
14  just at a short break, read it over and then we'll come
15  back on the record and you'll confirm that.
16    A  Sure.  Okay.
17    Q  All right.  What -- what, if anything, do you
18  remember, Mr. Donnelly, about the second quarter of 2001,
19  the second quarter fiscal year of 2001 at Oracle?  So
20  that would have been -- I'll represent to you that that
21  would have been September, October, November of 2000.
22    A  In what regard?
23    Q  Do you remember whether -- first of all, do you
24  remember whether Oracle made its global forecast or not?
25    A  Can't remember.

62

1     Q  Okay.  Do you remember whether there were any --
2  whether you observed any slow-down or economic issues
3  affecting the company in the second quarter?
4     A  I don't recall.
5     Q  Do you remember any unusual hockey-stick-effect
6  activity at the -- phenomenon in that quarter even
7  compared to other quarters?
8     MS. WINKLER:  Objection; form.
9     THE WITNESS:  No.
10  BY MR. RUBIN:
11    Q  Going back to our original -- not original --
12  earlier conversation, do you remember any anxiety in the
13  company about whether the company was going to make its
14  quarter or not in the second quarter of 2001?
15    MS. WINKLER:  Objection to form.
16    THE WITNESS:  I think I stated there was anxiety
17  every single quarter, as there is for any publicly traded
18  software company.
19  BY MR. RUBIN:
20    Q  I had thought -- and maybe I misunderstood.  I
21  thought you had said sometimes, you know, a few weeks
22  out, because as the gap between the forecast and the
23  actual performance starts to close, it becomes clear then
24  in other quarters where the company is.  Whereas in other
25  quarters, because of the hockey stick phenomenon and

63

1  other reasons, there are really still a lot of open sales
2  in the pipeline right at the end.
3     So I'm asking you do you have any specific
4  memory whether second quarter fell on one end of the
5  spectrum or the other?
6     MS. WINKLER:  Objection to form.
7     THE WITNESS:  I don't recall if the anxiety levels
8  were higher or more sustained in Q2 than they were in any
9  other period.
10  BY MR. RUBIN:
11    Q  Do you recall having any conversations at Oracle
12  during the second quarter of 2001 about to what extent,
13  if any, the economics -- the economic -- any economic
14  downturn in the economy generally was affecting Oracle's
15  performance?
16    MS. WINKLER:  Objection; form.
17    THE WITNESS:  Not at a professional level, no.
18  BY MR. RUBIN:
19    Q  When you say "not at a professional level" --
20    A  Sorry.  Not in the course of my responsibilities
21  at Oracle, but as an employee, as a holder of stock
22  options, as a monitor of stock price, as a monitor of the
23  NASDAQ and monitor of the economy, yeah.  I mean we were
24  doing great.
25    Q  As of the second quarter?

64

1     A  That's correct.  Yeah, we --
2     Q  Okay.  All right.  And so your -- in that role,
3  your memory is you were very bullish about Oracle?
4     A  We seemed to be immune from the circumstances
5  affecting other companies.  And there were lots of good
6  reasons.
7     Q  And what were those?
8     A  Long-established company, product that's
9  required by everybody, information needs gather -- you
10  know, continuing to grow.  You know, this was why we were
11  protected.
12    Q  And that was your view, as well?
13    A  After working eight and a half years at Oracle,
14  you get to absorb the -- you get to be -- be a believer.
15    Q  Okay.  And did you -- okay.  Let me have the...
16  Yeah, this one.  Okay.  I'm going to mark another
17  document as Exhibit 2.
18    (Deposition Exhibit 2 was marked.)
19    THE WITNESS:  Do I read this?
20  BY MR. RUBIN:
21    Q  Yes.  So what I've marked as Exhibit 2 is a
22  document with Bates stamp range -- with a Bates stamp
23  range of NDCA-ORCL 503837 through 503839.
24    So, yeah, why don't you take a minute to look at
25  this, and I'll just have a few questions for you.

Donnelly, Peter  11/30/2005  3:44:00 PM

65

1    A   Okay.
2    Q   Okay.
3    A   Mm-hmm.
4    Q   Now, this is an e-mail from you to Jeff Henley;
5    is that right?
6    A   Correct.
7    Q   Do you recognize the e-mail?
8    A   Yeah.  Yes.
9    Q   Yeah, yes, that's okay.
10        Now, as I understand it, this actually relates
11   back to our earlier exchange about when you had called
12   the class plaintiffs because you said you had some stock
13   options but they hadn't been exercised, correct?
14   A   Correct.
15   Q   So at the beginning of the e-mail, is it
16   accurate or is my understanding accurate -- excuse me --
17   that when you left the company, you had vested stock
18   options that were going to expire on March 19th, which
19   was 90 days after you left the company?
20   A   Correct.
21   Q   Right.  Now, so I gather that at the time you
22   left the company on approximately December 18th or 19th,
23   you did not immediately exercise your stock options?
24   A   Not on that day, no.
25   Q   No.  But -- and that soon after that, you sat

66

1    down with a broker, investment advisor to set out a plan
2    for --
3    A   Correct.
4    MS. WINKLER:  Objection to form.
5    BY MR. RUBIN:
6    Q   -- for exercising the options in the first
7    instance and then selling them?
8    A   Could you --
9    Q   For exercising your options?
10   A   Correct.
11   Q   You exercise your option at a strike price,
12   correct?
13   A   Correct.
14   Q   And then you were going to sell the -- sell the
15   stock once you exercised it?
16   A   Correct.
17   Q   That was going to be immediate?
18   A   Correct.
19   Q   Okay.  And when you say that -- and in the -- in
20   your e-mail to Jeff, you say that, "At the time, I did
21   not anticipate this to be a problem and sat down with my
22   broker to establish a reasonable price target in the mid
23   30s and a schedule to exercise my stock through
24   March 19th."  Is that accurate?
25   A   Correct.

67

1    Q   So you had sat down with your broker to come up
2    with a schedule from the time you left through March 19th
3    to sell your options?
4    A   I don't know if it --
5    MS. WINKLER:  Objection to form.
6    THE WITNESS:  I don't know if it was through that
7    particular date, but it was some date between the day
8    that I met him and the end date of disposition.  So it
9    wasn't necessarily March 19th was the last date, but that
10   was --
11   BY MR. RUBIN:
12   Q   And you -- and you -- right.  But at some
13   point --
14   A   Some point before they expired, I would have
15   sold all of them.
16   Q   And did you have a particular date in mind about
17   when you wanted to sell all of them before March 19th?
18   A   I had no date in mind.  My broker advised me to
19   average cost selling -- whatever that term is, basically
20   to even out the ups and downs.
21   Q   And you say you had a reasonable price target in
22   the mid-30s?
23   A   Correct.
24   Q   So it would be fair to say when you were leaving
25   Oracle, you did not expect any significant price change

68

1    in the stock between the time you left and March 19th?
2    A   Absolutely not.
3    Q   And am I correct that March 1st or February 28th
4    or 29th, depending on the year, would have been the end
5    of a third quarter of a fiscal year for Oracle?
6    A   Correct.
7    Q   So it would also be fair to say that you did not
8    expect any big price drop as of that date at the time you
9    left the company?
10   A   There was no anticipation of the stock going
11   down, if that's -- if that's your question.
12   Q   Yeah, that's my question.  You did not
13   anticipate at the time you left the company that as of
14   March 1st, the stock would -- the stock would drop?
15   A   No.  Business was good and there was a positive
16   buzz around how we were responding to the economy.  So my
17   assumption was things were going to continue that way.
18   Q   And you didn't have any reason to anticipate
19   that Oracle would miss its projected -- projected market
20   guidance for the quarter?
21   MS. WINKLER:  Objection; form.
22   BY MR. RUBIN:
23   Q   As of the time you left?
24   A   As of the time I left, I had no specific
25   knowledge as to why they might miss.  And subsequent to

69

1  leaving, I carefully followed the press and analyst
2  discussions and statements by the company as to how
3  business was going.
4  Q  Right.
5  A  I was a shareholder.
6  Q  But as of the time you left -- I'm speaking
7  about December 19th -- you had no anticipation that
8  Oracle would be unable to meet its guidance as of March
9  1st?
10  MS. WINKLER:  Objection to form.
11  THE WITNESS:  No.  Too early in the quarter.
12  BY MR. RUBIN:
13  Q  And based upon everything else you said, you
14  were bullish about the company based on everything you
15  knew as of December 19th?
16  MS. WINKLER:  Objection to form.
17  THE WITNESS:  Yes.
18  BY MR. RUBIN:
19  Q  Now, did this actually -- were you able to get
20  the extension?
21  A  No.
22  Q  And you didn't end up vesting any of your -- you
23  had not -- I assume -- this is dated February 10th.  So
24  as of this e-mail, you had not exercised any of your
25  options?

70

1  A  So this is --
2  MS. WINKLER:  Can I just -- Lee, just as a formality
3  here, this e-mail on the front page that you're basing
4  this on, February 10th, is an e-mail from Jeff Henley to
5  Jennifer Minton.  It's not Mr. Donnelly's --
6  MR. RUBIN:  Oh, I'm sorry.  You're right.  You're
7  right.
8  MR. CAPLAN:  Excuse me.  You guys to have talk one
9  at a time.
10  BY MR. RUBIN:
11  Q  Go ahead.
12  A  My comment was going to be I don't know the date
13  that I sent this to him, and the date on this note is
14  when Jeff sent this to Jennifer.  And the response -- his
15  comments are actually on the last page, 503839.  So there
16  seems to be some disconnection in the paperwork.
17  Q  Right.  This is the response you received back
18  from Jeff?
19  A  I received no response back from Jeff, and I
20  don't believe I received response back from Jeff in
21  writing.  I think I may have spoken to him in person.
22  Q  I see.  Okay.  So you don't know the date.  I
23  understand what you're saying.  You don't know the date
24  that you actually sent the e-mail?
25  A  Correct.

71

1  Q  But whatever the date is, it's fair to -- is
2  it -- is it -- is it accurate that you had not exercised
3  any of the options as of the date of the e-mail?
4  A  I had not exercised all of my options as of the
5  date of the -- I may have exercised some under the
6  structured selling program advised by my financial
7  advisor.
8  Q  And you say later in the e-mail that this
9  constituted a significant portion of your family's
10  savings?
11  A  Yes.
12  Q  With that, I don't want you to -- I don't need
13  to know, as with companies, how much that was in actual
14  terms, but was there a percentage, like how much of your
15  savings this constituted?
16  A  Like, all of it.
17  Q  All of it?
18  A  Well, I may be being a bit facetious.  I mean we
19  had a house, and -- but from a cash reserve -- but we
20  didn't have an awful lot of money.  So this was our nest
21  egg.
22  Q  So it would be fair to say that, based upon your
23  reading of the market or other information that you had
24  about Oracle, that if you thought that the price was
25  going to drop materially, you would have -- you would

72

1  have tried to sell earlier, correct?
2  MS. WINKLER:  Objection; form.
3  THE WITNESS:  Yes.
4  BY MR. RUBIN:
5  Q  Do you -- at the -- oh, let me have that e-mail
6  about support.
7  ( Deposition Exhibit 3 was marked.)
8  THE WITNESS:  Okay.
9  BY MR. RUBIN:
10  Q  So I've handed you what we've marked as
11  Exhibit 3; is that right?
12  A  Correct.
13  Q  Okay.  And this is -- this is a document Bates
14  stamped range of NDCA-ORCL 097810 to 097811.  And this is
15  an e-mail traffic between Lia Burke and Graeme Mair; is
16  that correct?
17  A  Correct.
18  Q  And you're cc'd on the e-mails?  At least one of
19  them?
20  A  I'm cc'd on the response from Graeme to Lia.
21  Q  Okay.  And who was Lia Burke?  Who is Lia Burke
22  and what did she do at Oracle?  I'm not suggesting she no
23  longer exists.
24  A  I believe Lia is still alive, and at this time
25  she was the director of FP&A.  So she had my old role,

73

1  although it had changed in substance a little bit, but
2  essentially the aggregation part of my role.
3      Q   And this is an e-mail exchange with -- with
4  Graeme Mair; is that right?
5      A   Correct.
6      Q   And Mr. Mair served what function within the
7  support group?
8      A   He took over from Priscilla Morgan as the head
9  of finance.  I believe he was a VP, head of finance for
10  the support organization.
11      Q   Okay.  And the -- and the chart that is
12  contained in this e-mail purports to be the Q3 '01
13  forecast for support, is that right, as of November 30th?
14      A   Correct.
15      Q   And -- now, it refers to OFA.  Is that one of
16  the tools that you were talking about earlier?
17      A   Oracle financial analyzer.
18      Q   Right.
19      A   That's the tool.
20      Q   Right.  That's the tool you described earlier?
21      A   Correct.
22      Q   Where you had access to actuals but not
23  forecasts?
24      A   In my capacity, yes.
25      Q   Personally, yeah.

74

1      A   But in FP&A, in my FP&A capacity, I had access
2  to all information.
3      Q   When you worked directly with Jennifer?
4      A   That's correct.
5      Q   In the '95-'97 period?
6      A   Correct.
7      Q   Right.  Okay.  So this is -- this chart that
8  contains the forecast, did you provide any input into
9  this particular -- these particular forecasted numbers?
10      A   I don't believe so.
11      Q   Okay.  Do you recall whether you had any view
12  one way or the other whether these numbers were too high
13  or too low or about right?
14      MS. WINKLER:  Objection; form.
15      THE WITNESS:  I don't recall, but if I read this
16  e-mail correctly -- I want to make sure I'm getting this
17  right -- Jeff was probably preparing to report Q2
18  results and he was wanting to get an initial estimate of
19  what Q3 was looking like.  So it would be right at the
20  very beginning of the quarter.  And in a lot of cases,
21  the expense forecast directly mirrored the budget, and
22  the revenue forecast was a -- you know, an adjustment to
23  budget based upon what the pipeline was looking like.  It
24  wasn't a rigorous or scientific analysis that early in
25  the quarter.

75

1      So the discipline around the accuracy of the
2  forecast, as it got more accurate, the closer it got to
3  the end of a quarter.
4      Q   Mm-hmm.
5      A   So this would be one of the hundred e-mails a
6  day I get cc'd on.  So, no.
7      Q   Right.  So no, meaning you didn't have any
8  direct input?
9      A   I had no cause to have it.  It was a very
10  preliminary number for a coming quarter.
11      Q   Okay.  Were there -- were there ever occasions
12  in your role -- this -- well, let me strike that.
13      This was a time you had already transferred over
14  to Jennifer's organization, correct?
15      A   Yes.
16      Q   Okay.  But during your time working with Gary,
17  was there ever a time where -- you said this was typical
18  for you to get e-mails like this at the end of a quarter,
19  beginning of a quarter, correct?
20      A   Correct.
21      Q   Were there ever occasions in which you reviewed
22  the data and said, "I just can't believe this would be --
23  this is right," whether too low -- too high or too low?
24      A   So I have to believe in my three and a half
25  years with Gary I made comments about the accuracy of

76

1  information.  Does anything come to my mind specifically?
2  No.
3      Q   Okay.
4      A   But yes, I had a management and review
5  responsibility.
6      Q   And if you thought something was materially too
7  low, you would have made a comment to Gary?
8      A   Yes.
9      Q   Okay.
10      A   Or the appropriate business leader.
11      Q   And you don't have any memory one way or the
12  other making a comment about this particular -- this
13  particular set of data?
14      A   I don't believe so.  And, in fact, I think I was
15  actually out of the country at the time.
16      Q   Yeah, I was going to ask you about that.  You --
17  you left December 19th.  Had you been in Denmark or
18  Scandinavia somewhere before that?
19      A   I'd been around the world.  I had a global
20  finance organization, and I was out doing a trip.
21      Q   And when was that trip?
22      A   I don't remember exactly, but I believe it was
23  for somewhere between ten days and 14 days, and I arrived
24  back on the 17th, I believe.  And I might have actually,
25  in fact, arrived back on the 18th.

77

1    Q  Of December?

2    A  Yeah.  It's a little fuzzy, but --

3    Q  So you have a general memory that ten days or

4  two weeks prior to being asked to leave the company, you

5  were out of the country?

6    A  Correct.

7        (Deposition Exhibit 4 was marked.)

8    THE WITNESS:  Okay.

9  BY MR. RUBIN:

10   Q  Okay.  Did you have a chance to look at this

11  document?

12   A  Yep.

13   Q  Okay.  What I've marked as Exhibit 4 is a

14  document Bates stamped range NDCA-ORCL 503840 to 503843.

15       And Mr. Donnelly, this is -- this document

16  reflects an e-mail series of exchanges between you and

17  Ivgen Guner; is that right?

18   A  Correct.

19   Q  And who is Ivgen Guner?

20   A  She held a finance position under

21  Jennifer Minton.  Again, not sure how she fit in exactly,

22  but, again, in the FP&A arena.

23   Q  And the e-mail traffic is dated around --

24  at least one of the e-mails from you to Ivgen is on

25  page 503841, the second page of the composite --

78

1    A  Yep.

2    Q  -- is dated November 6th, 2000, correct?

3        Does that refresh your memory that would have

4  been right about the time that you were transferring back

5  over to Jennifer's group after Gary had left?

6    A  About that time frame, yes.

7    Q  Okay.  And you wrote to Ivgen, "Since being in

8  my new role, I have had license LOB access to actuals and

9  forecasts.  Are you saying I'm going to have this taken

10  away?  My question to Carrie related to license pipeline

11  information, which I had the distributions for but didn't

12  have any data for."  Is that right?  I mean, did I read

13  it accurately?

14   A  Yes.  Sorry.  You read it accurately, yes.

15   Q  Right.  So -- and -- and now, just to summarize,

16  this is an e-mail in which you're seeking to obtain

17  access to certain information on OFA; is that right?

18   A  It appears to be, yes.

19   Q  Okay.  And as I had understood it, you had --

20  are you indicating here that you had access to forecasts

21  when you had previously been with Jennifer?

22   A  It certainly indicates that, but to the best of

23  my knowledge, I did not have -- I personally did not have

24  access to forecast information.

25   Q  That's your memory?

79

1    A  That's -- that's my memory.

2    Q  Okay.  All right.  And -- but you asked to get

3  access as of November 6th?

4    A  Apparently so, yes.

5    Q  And they turned you down?

6    A  Then yes, definitely.

7    Q  And it says at the top "Yes, I have

8  discussed" -- "I have and discussed it with Jennifer and

9  Larry as well."

10   A  Mm-hmm.

11   Q  "I cannot provide you visibility to WW license

12  LOB for security reasons."

13   A  Correct.

14   Q  Is that worldwide license LOB?

15   A  Correct.

16   Q  So?

17   A  Larry, by the way, it's Larry Garnick as opposed

18  to Larry Ellison.

19   Q  Larry Ellison.  Okay.  Thank you for that

20  clarification.

21       LOB is line of business?

22   A  Correct.

23   Q  And so what would be the worldwide license line

24  of businesses?

25   A  That would be the license sales.

80

1    Q  OPI?  Is that one of them, or do you remember?

2    A  Basically all of the geographies, license sales

3  business.

4    Q  Okay.  So then to summarize, your memory is you

5  didn't have access to it before you came over to Jen --

6  back to Jennifer's group, right?

7    MS. WINKLER:  Objection; form.

8    THE WITNESS:  My memory is I did not have access to

9  license forecast information.

10  BY MR. RUBIN:

11   Q  While you were working for Gary?

12   A  While I was working for Gary.

13   Q  And then is this also consistent with your

14  memory that after coming back to Jennifer's group in

15  November 2000, you continued not to have access, correct?

16  Again, it seems like I'm asking for it here, so yes,

17  that's my recollection.

18  BY MR. RUBIN:

19   Q  Right.  I'm asking you separate from the

20  document, is it your recollection that you continued not

21  to have access, you did not have any access to license

22  forecast -- to worldwide license line of business

23  forecasts from November of 2000 until the time you left

24  the company?

25   MS. WINKLER:  Objection; form.

81

1    THE WITNESS:  So since leaving my role as director
2  of corporate FP&A, my access to the license side of
3  business from a forecast standpoint, I don't believe I
4  had that access.
5  BY MR. RUBIN:
6    Q  Right.
7    A  I had no reason to have it for my job.  I didn't
8  support those organizations.  I didn't access the
9  database for that information, and therefore it was my
10  assumption that I didn't have it.
11    Q  Okay.  So if -- given that, if -- if the
12  investigator indicated -- the investigator who you spoke
13  to when you called about your stock options -- if the
14  investigator indicated that you had stated that as of
15  mid-December the sales forecasts looked really bad, did
16  he just simply misunderstand you --
17    MS. WINKLER:  Objection to form.
18  BY MR. RUBIN:
19    Q  -- about your access to -- to that information?
20    MS. WINKLER:  Objection to form.
21    THE WITNESS:  You need to state -- you need to state
22  your question more specifically.
23  BY MR. RUBIN:
24    Q  So if the investigator indicated to the public
25  at large that you had said in that conversation that

82

1  you -- that you had stated to him that the sales forecast
2  in mid-December of 2000 -- that the sales forecast looked
3  bad, was that the product of a misunderstanding?
4    MS. WINKLER:  Objection; form.
5    THE WITNESS:  It must be.
6  BY MR. RUBIN:
7    Q  Because you wouldn't have said that?
8    A  I wouldn't have said that.  If it had been that
9  bad, I would have kept my stock -- sorry -- not kept my
10  stock.
11    Q  Right.
12    A  I'm not stupid.  So it must be a result of a
13  misinterpretation.
14    Q  But you didn't tell him that?
15    A  I don't recall nor would I have a reason to say
16  that.
17    Q  Okay.  And do you recall providing the
18  investigator with your opinion or providing any
19  observations about the database forecast for the third
20  quarter of 2001?
21    A  I don't recall any specific comments regarding
22  database or applications or other parts of the business.
23  I do recall making comments that the management team
24  should have known where they were from a performance
25  standpoint that close to the end of the quarter.

83

1    Q  When you say "that close," meaning?
2    A  You know, as -- as you progress through the --
3  through the quarter, you get -- again, remember back to
4  my earlier comments about trends and the access to
5  pipeline and the analysis of pipeline, there are people
6  employed on a day-to-day basis to look at those
7  relationships and provide feedback to management.  I mean
8  I think Larry makes public statements about having
9  immediate access to every license sales rep's forecast.
10    Q  And you I think had testified earlier than in
11  some quarters, as the quarter progresses, the actual
12  sales and the -- and the forecast becomes closer and
13  closer because deals are closing?
14    A  Correct.
15    Q  And in other quarters it doesn't -- the gap
16  doesn't necessarily close until the last few days; is
17  that right?
18    A  Correct.
19    Q  Right.  And so you're saying that you told the
20  investigator that Oracle management should have known
21  what time period you're talking about?  They should have
22  known?
23    A  So in the last two weeks, they should have known
24  that the -- a miss was possible.
25    Q  Mm-hmm.

84

1    A  And at a minimum, shouldn't have been out there
2  making statements to the fact that everything is
3  fantastic.
4    Q  And do you know of any particular statements in
5  the last two weeks that were made?
6    A  So Sandy Sanderson made some comments at a -- in
7  a public forum.
8    Q  Do you know what date?
9    A  I don't.
10    Q  Okay.
11    A  Larry Ellison made some comments about, you
12  know, we're -- we're immune to the economic problems of
13  the other companies and have visibility into -- you know,
14  into the forecast.
15    Q  And do you know what date that was, those
16  comments?
17    A  I don't recall.
18    Q  So if those comments were made in December, that
19  would be different from your vantage point than if they
20  were made in late February?
21    MS. WINKLER:  Objection; form.
22    THE WITNESS:  I think they would have a different
23  impact on that quarter's results, yes.
24  BY MR. RUBIN:
25    Q  Well, no.  What I'm asking is in terms of your

85

1    suggesting about what knowledge people would have.  And
2    I'm -- I gather from what you're saying, that somebody
3    making that statement in December or January, earlier in
4    the quarter, is different than making it in the last week
5    of the quarter?
6        MS. WINKLER:  Objection to form.
7    BY MR. RUBIN:
8        Q  Because you have more information in the last
9    week of the quarter?
10       A  You have more information in the last two
11   weeks -- and I want to get the periods right.
12       Q  Uh-huh.  Last two weeks is what you're focusing
13   on?
14       A  There's more information in that period than you
15   would at the beginning of a quarter.  So if somebody made
16   those comments on December 1 about a February 28th period
17   end, they would be less accurate.  As you get closer and
18   closer to that February 28th period end, one would assume
19   they were based upon more accurate information.
20       Q  When you say "less accurate," you mean you have
21   less information to go on when you're making the
22   statements?
23       A  Yeah.  You have basically no idea apart from
24   your collation of early forecast data.
25       Q  Well, it's -- it's not quite accurate to say you

86

1    have no idea.  I mean, as you said, Oracle has a
2    forecasting system that had been honed and developed over
3    many years, correct?
4        MS. WINKLER:  Objection to form.
5        THE WITNESS:  I wouldn't bet on a forecast that's
6    delivered on the first week of a new quarter.
7    BY MR. RUBIN:
8        Q  Isn't it true that Oracle had made its earnings
9    forecasts for 11 straight quarters before the third
10   quarter of '01?
11       A  I don't recall.
12       Q  Do you know whether that's true or not?
13       MS. WINKLER:  Objection to form.
14       THE WITNESS:  Again, I don't recall.
15   BY MR. RUBIN:
16       Q  Okay.  But you -- but during the time that you
17   were working on the forecast, you believe that the
18   forecast for what it was had integrity; is that correct?
19       A  There was a process and an analytical component
20   that looked at trends and compared them to forecasts, and
21   from what I can recall, we met numbers pretty
22   consistently.  Whether we met every one for the last
23   eleven quarters, I don't know the answer to that.
24       Q  And, in fact, do you recall in the second
25   quarter of 2001, it was not clear that the company was

87

1    going to make its quarter till the last couple days?
2        MS. WINKLER:  Objection to form.
3        THE WITNESS:  Yeah, I don't recall.
4    BY MR. RUBIN:
5        Q  Okay.  And what you just described, talking
6    about sort of this last two weeks as having more
7    information, having a better sense of information than
8    before because of the progress of the quarter, do you
9    recall conveying that to the investigator?
10       A  Yes.
11       Q  Do you recall ever using the benchmark of six
12   weeks out?
13       MS. WINKLER:  Objection to form.
14       THE WITNESS:  I don't remember using the benchmark
15   of six weeks out.
16   BY MR. RUBIN:
17       Q  And six weeks out, in fact, based upon your
18   experience and knowledge, would be a long time out in
19   terms of having reliable information, correct?
20       THE WITNESS:  It would be --
21       MS. WINKLER:  Objection to form.
22       THE WITNESS:  It would be more accurate than the
23   beginning of the quarter, less accurate than the end of
24   the quarter.
25   BY MR. RUBIN:

88

1        Q  But would -- is it your testimony here today
2    that in any particular quarter in which you worked at
3    Oracle, the Oracle executives would have known six weeks
4    out whether they were going to miss or make their
5    quarter?
6        MS. WINKLER:  Objection; form.
7        THE WITNESS:  I don't think any company executive
8    would know six weeks out to a -- to a, you know, hundred
9    percent certainty.
10   BY MR. RUBIN:
11       Q  Right.
12       A  I mean, it's impossible.
13       Q  And, in fact, as you said, two weeks out you may
14   know that a miss is possible, but you don't know -- there
15   could be certain quarters you still don't know, given the
16   amount of the pipeline and how close you are to the
17   forecast, whether you're going to miss or make the
18   quarter even two weeks out; is that correct?
19       MS. WINKLER:  Objection; form.
20       THE WITNESS:  So, again, I want to make sure I'm
21   clear here.  At some point in time in a quarter, you know
22   you're going to miss.
23   BY MR. RUBIN:
24       Q  Sometimes that's not until the last two days,
25   correct?

89

1   MS. WINKLER:  Objection to form.
2   THE WITNESS:  Sometimes it's not then.  Sometimes it
3   could be earlier.
4   BY MR. RUBIN:
5   Q  Right.
6   A  If you take a look at your actuals and your
7   pipeline and they don't add up to a hundred percent, then
8   you're going to miss.
9   Q  Can you --
10   A  And you can do that arithmetic on day one and
11   say, "Okay.  I'm going to have to re -- I'm going to have
12   to change guidance."  And the earnings call for the
13   previous quarter.  You will guide down.  You will say,
14   "My revenues will be lower."
15   So there's enough evidence at the beginning of a
16   quarter to make a judgment call as to where you are going
17   to be at the end.
18   As you progress through the quarter and you look
19   at deals and you look at actuals and you look at
20   pipeline, you will get closer and closer.
21   Q  Now, one of the things that -- that Oracle uses
22   is something called a conversion ratio, correct?
23   A  Correct.
24   Q  And what is that?
25   A  I don't know the specific measures, but based

90

1   upon the assessment by the sales rep of the state of a
2   deal in its life cycle, it's assigned a certain
3   percentage.  I believe there are -- and this is where my
4   knowledge is a little limited.  There's, you know, 25
5   percent, 50 percent, 90 percent, you know, and 100
6   percent.  And those ratios have been used for years to
7   assign probabilities of a particular transaction being
8   closed.
9   And depending on the methodology used, items
10   below a certain percentage were excluded; items above a
11   certain percentage, you include it on that percentage
12   basis, and items above another percentage were included
13   entirely.
14   Q  And so did the company try to do some kind of
15   weighted average?
16   A  A weighted average would be a simple way of
17   putting it, yes.
18   Q  Right.  And so the conversion ratio was useful,
19   am I correct, as the quarter progressed and you
20   looked at the amount of pipeline left, you would
21   historically take the conversion ratio to try to get a
22   sense of, as you pointed out, how much of the pipeline is
23   left and how much we expect to convert into actual
24   revenue before the end of the quarter, correct?
25   MS. WINKLER:  Objection to form.

91

1   THE WITNESS:  That was a way -- that was an
2   empirical way used to determine the gap between projected
3   revenue and actual revenue.
4   In addition, there were other things such as
5   management judgment that were put in there to say I think
6   they're underestimating or overestimating or it doesn't
7   feel quite right.
8   BY MR. RUBIN:
9   Q  And in terms of management judgment, is it your
10   understanding that one of the things that Jennifer Minton
11   did was she would talk to all the license sales
12   organization heads about this -- trying to elicit this
13   kind of information about their view of the numbers that
14   were being produced by their organizations?
15   MS. WINKLER:  Objection to form.
16   THE WITNESS:  There was a process by which
17   management judgment was collected.  You'll have to ask
18   Jennifer on what her direct involvement was in collecting
19   this.
20   BY MR. RUBIN:
21   Q  But did you understand that was one of the
22   things that she did?
23   MS. WINKLER:  Objection to form.
24   BY MR. RUBIN:
25   Q  Speak directly to the heads of the license sales

92

1   organizations about their sense of the numbers, whether
2   any adjustment needs to be made?
3   MS. WINKLER:  Objection --
4   THE WITNESS:  Again, that's a question you should
5   probably forward to Jennifer.
6   BY MR. RUBIN:
7   Q  Well, I'm just asking you do you have any
8   personal knowledge one way or the other of any
9   communications between her and the sales -- license sales
10   organization?
11   A  I have no --
12   MS. WINKLER:  Objection; asked and answered.
13   THE WITNESS:  I have no direct knowledge of her
14   involvement on the communications with the license
15   leaders, sales leaders.  There may have been some, there
16   may not have been some.  Her group was responsible for
17   collecting the data elements that were put into the
18   forecast.
19   BY MR. RUBIN:
20   Q  So back to the conversion ratio, if you're
21   coming toward the end of a quarter and have an amount of
22   pipeline that, if you multiply it by the conversion
23   ratio, would allow you to make your quarter, would you
24   agree that that would be -- that at least one data point
25   that would indicate that making the quarter is still a

93

1 reasonable possibility?

2    MS. WINKLER:  Objection; form.

3    THE WITNESS:  It's a data point.

4 BY MR. RUBIN:

5    Q  Right.

6    A  But again, there's no exact sciences here.  You

7 can't --

8    Q  It's an art, right?

9    A  It's interpretation, yes.

10    Q  Right.

11    A  There's an interpretation element that -- and

12 you have to look at the -- as you get closer and closer,

13 looking at something that has a 90 percent probability

14 but the guy who signs the PO is on vacation, don't

15 include it.  That's a judgment -- that becomes a judgment

16 thing.  You can have an empirical answer that says

17 include it, but then you just know that you can't find

18 the guy.

19    Q  Right.  And that's the kind of information that

20 rises up from the -- from the sales reps themselves,

21 correct?

22    A  Each of these deals tracked individually.  Each

23 material deal is tracked individually.

24    Q  And so your methodology depends or relies to

25 some extent on the accurate information flow coming from

94

1 the sales reps who have the most direct contact with the

2 customers?

3    MS. WINKLER:  Objection; form.

4    THE WITNESS:  Correct.

5 BY MR. RUBIN:

6    Q  Is that right?

7    A  Correct.

8    Q  Right.  But going back to the -- this issue of a

9 conversion rate, as -- I think you said as a data point,

10 you would agree that if you had a couple weeks left in

11 the quarter and you took the pipeline number and you

12 multiplied it by the conversion ratio that historically

13 had been in place for the company, and that number

14 exceeded the amount of your earnings guidance, then that

15 would be one indication that you were still on track to

16 make your quarter?

17    MS. WINKLER:  Objection; form.

18    THE WITNESS:  That would be an indication, yes.

19 BY MR. RUBIN:

20    Q  Right.  And so -- and so the -- and the question

21 of whether a conversion ratio -- you don't know whether

22 you're going to sustain that conversion ratio or be above

23 it or below it until the quarter ends, correct?

24    MS. WINKLER:  Objection form.

25    THE WITNESS:  Correct.  You have historical trends

95

1 by which to make those judgments.

2 BY MR. RUBIN:

3    Q  And is it reasonable for Oracle to rely on those

4 historical conversion trends as part of its analysis of

5 where it stands in the quarter?

6    MS. WINKLER:  Objection; form.

7    THE WITNESS:  I think it's reasonable to use those

8 as a measure of their estimate.

9 BY MR. RUBIN:

10    Q  All right.  And you don't personally -- you did

11 not have any knowledge, personal knowledge of any of the

12 forecast reports that were being developed and circulated

13 through the third quarter of 2001?

14    A  No.

15    Q  And so when you told the investigator that two

16 weeks out, you know, executives would have a sense of

17 whether it's going to make its quarter or not, that was a

18 comment in the abstract, not about the third quarter of

19 2001 in particular?

20    MS. WINKLER:  Objection; form.

21    THE WITNESS:  I believe my comment was two weeks

22 out, they should have a pretty good idea as to how the

23 quarter is looking.

24 BY MR. RUBIN:

25    Q  In general?

96

1    A  In general.

2    Q  Right.  Because you didn't have any specific

3 information about they should have known in the third

4 quarter of 2001, two weeks out?

5    MS. WINKLER:  Objection; form.

6    THE WITNESS:  That would be a comment that would

7 apply to any questioner.

8 BY MR. RUBIN:

9    Q  And you had said earlier that there can be

10 particular quarters where -- where, because of the amount

11 of pipeline out there and the historical conversion

12 ratio, it's still possible to make a quarter and you just

13 don't know two weeks out, correct?

14    MS. WINKLER:  Objection; form.

15    THE WITNESS:  It's still possible, but again, as you

16 get closer --

17 BY MR. RUBIN:

18    Q  As each day passes --

19    MR. CAPLAN:  Excuse me, Lee.  Can he finish his

20 answer?

21    MR. RUBIN:  Oh, sure.

22    THE WITNESS:  As you get closer, whether it be the

23 beginning of the quarter, the middle of the quarter, two

24 weeks, one week, you get a feeling -- and you can do all

25 the math you want -- that shows you a possible answer,

Donnelly, Peter  11/30/2005  3:44:00 PM

97

1  but you get a feeling as to where this is heading.
2  BY MR. RUBIN:
3      Q   Right.  And so you're essentially stating a
4  truism:  As each day passes and you get closer and closer
5  to the end of the quarter, you acquire more information
6  about where you're likely to end up?
7      A   Correct.
8      Q   And two weeks is sort of the beginning of that
9  time period you think that there's some sense of that?
10      MS. WINKLER:  Objection; form, misstates prior
11  testimony.
12      THE WITNESS:  As I stated earlier, I think at two
13  weeks out, the company executives would have a pretty
14  good idea as to where they're going to land.
15  BY MR. RUBIN:
16      Q   And again, in the second quarter of 2001, do you
17  have any recollection of where things stood for the --
18  for Oracle two weeks out?
19      A   I don't recall.  Again, I was traveling and
20  going through a job change and not involved in the
21  license business.
22      Q   Mm-hmm.  So if I told you that there was a
23  enormous, record amount of sales that occurred in the
24  last couple days of the quarter, the second quarter of
25  2001, does that refresh your memory at all?

98

1      A   No.
2      Q   If that happened and would -- would that be a
3  quarter in which you would say that might be an exception
4  to your general rule about having a good sense two weeks
5  out?
6      MS. WINKLER:  Objection; form.
7      THE WITNESS:  Can you ask me the question again?
8  BY MR. RUBIN:
9      Q   Yeah.  If you had -- if you had a substantial
10  amount of pipeline but they were not closed, and you
11  add -- but you applied a conversion ratio to that that
12  would have allowed you to make the quarter, if converted,
13  and then on the last day or two of the quarter you
14  actually get a disproportionate amount of the sales that
15  allow you to make your quarter or that put you over the
16  top, would that be a situation in which, looking back two
17  weeks out wouldn't necessarily have given you a
18  particular good indication one way or the other?
19      MS. WINKLER:  Objection to form.
20      THE WITNESS:  So given I wasn't privy to any of the
21  specifics, I can only go on what I know.  As trends were
22  analyzed through quarters, some of which there was a lot
23  of money in the last few days and there was some where
24  they made the quarter early --
25  BY MR. RUBIN:

99

1      Q   Right.  Both occurred.
2      A   Both occurred and they were trended over a
3  number of years as doing business and they were used for
4  analytical purposes.
5      Q   Do you remember any difference on that -- on
6  that spectrum between the second quarter and the third
7  quarter?
8      A   I'm -- I'm trying not to mix up my companies now
9  because I'm with Symantec and previously Veritas and then
10  with Oracle.
11      Q   Sure.
12      A   The -- the best quarter for Oracle was Q4.  The
13  worst quarter was Q1.  And I believe the government
14  quarter ended in Q2.  So Q3 was kind of a -- a
15  nondescript quarter.
16      Q   Did that make Q3 a little bit harder to predict
17  than the other quarters?
18      MS. WINKLER:  Objection; form.
19      THE WITNESS:  No.  It just wasn't a quarter that was
20  renowned for any specific reason.  Q2 was a government
21  quarter.  Q1 was the first quarter of a year, which is
22  typically bad for any software company, and Q4 is
23  typically the best quarter for any software company.
24  BY MR. RUBIN:
25      Q   Do you remember any ratio between Q2 and Q3 in

100

1  terms of how much additional earnings typically were --
2  were made in Q3 compared to the quarter before?
3      A   I don't recall.
4      Q   Okay.  And earnings guidance is typically -- at
5  least in terms of the earnings guidance offered to the
6  public, is usually a year-over-year guidance; is that
7  correct?
8      A   It's typically year over year, but companies
9  sometimes incorporate quarter-over-quarter trends.  And I
10  believe Oracle has made some of those comments in its
11  earnings forecasts.
12      Q   Do you know -- remember whether it did at the
13  time that you were at Oracle?
14      A   I don't recall.
15      Q   Okay.  All right.  He has to change tapes, and
16  then why don't we just use this occasion for you to spend
17  five minutes looking at that Schedule A, and then we'll
18  come back on the record after looking at the documents.
19      THE VIDEOGRAPHER:  This is the end of Videotape
20  Number 1.  We are now going off the video record.  The
21  time is 11:48 a.m.
22      ( Recess taken:  11:48 until 11:56 a.m.)
23      THE VIDEOGRAPHER:  This is the beginning of
24  Videotape Number 2.  We are now back on the video record.
25  The time is 11:56 a.m.

101

1  BY MR. RUBIN:

2      Q   Okay.  Mr. Donnelly, at the break I had asked

3  you to review Donnelly Exhibit 1, and in particular, the

4  schedule, Schedule A that's attached to it that requested

5  that you produce documents, certain documents that are

6  described in the -- in the request, and I believe the

7  specific requests are on page 5.

8      A   Yes.

9      Q   Did you have a chance to review that?

10     A   Yes, I did.

11     Q   Okay.  And you had indicated you had not looked

12  at this particular request before today, correct?

13     A   That's correct.

14     Q   And now you've had a chance to look at it?

15     A   Yep.

16     Q   Okay.  And reviewing the requests, do you

17  believe, sitting here today, you have any documents that

18  are responsive to the requests on page 5?

19     A   No.

20     Q   Okay.  And your -- I believe your prior

21  testimony was that you don't have any Oracle documents in

22  your possession at your home?

23     A   Relevant to this case, yes.

24     Q   Well, any -- well --

25     A   Relevant to any of the matters listed.

102

1      Q   Relevant to any of the items?

2      A   Sorry.  Relevant to any of the items listed on

3  here.

4      Q   Or I should say responsive or that would be

5  called for in any of the items?

6      A   Correct.

7      Q   Okay.  Now, and is it -- and do you know within

8  a reasonable degree of certainty whether that would be

9  true for your electric -- any computer or laptop or any

10  other electronic information that you have?

11     A   That's correct.

12     Q   So did you ever use your computer at home for

13  work purposes?

14     A   Yes, I did.

15     Q   Okay.  And did you -- and was any Oracle

16  information on the computer the day after you were

17  dismissed from the company?

18     A   I had a laptop that I used at work and at home.

19     Q   Mm-hmm.

20     A   So there wasn't another computer at home.

21     Q   I see.  So there was no separate home computer

22  that had Oracle information on it?

23     A   No.

24     Q   Okay.  Okay.  And so your testimony here today

25  is you don't have any documents responsive to the

103

1  subpoena?

2      A   Correct.

3      Q   Okay.  And Mr. Donnelly, back -- if I had -- if

4  I had touched upon this already, I apologize.  I just

5  can't remember.

6      A   That's okay.

7      Q   But for the -- for the third quarter of '01, do

8  you remember having any opinion about the projection for

9  database growth that Oracle had indicated they expected

10  to achieve as of -- for the third quarter of '01?  And

11  when I say that Oracle said they expected to achieve, in

12  their December 14th market guidance announcement, do you

13  remember having any knowledge of what their estimate for

14  database growth was?

15     MS. WINKLER:  Objection; form.

16     THE WITNESS:  So I don't have any specific

17  recollection of growth rates.  I have a recollection that

18  the management team was pretty positive on the outlook

19  for the third quarter.

20  BY MR. RUBIN:

21     Q   How about with respect to database in

22  particular?

23     A   I believe both the applications and database

24  business were communicated as being healthy, and that's

25  what they were communicated as.

104

1      Q   And did you have any information concerning

2  database growth that contradicted that or in any way

3  caused you to doubt that estimation?

4      A   So, again, I didn't have access to forecasts,

5  but working in a company for a period of time, you have

6  conversations and you form opinions.  And both seemed to

7  be very pos- -- surprisingly positive given the economic

8  conditions.  We were -- I believe we were projecting

9  growth in both the applications and database business.

10     Q   Did you indicate to anyone that you thought that

11  those projections were incorrect?

12     MS. WINKLER:  Objection; form.

13     THE WITNESS:  I believe I mentioned to the

14  inspector -- the inspector? -- the investigator --

15  BY MR. RUBIN:

16     Q   Clouseau.

17     A   Yeah, Mr. Clouseau.

18         -- the investigator that they were surprisingly

19  high and probably exaggerated.

20     Q   The --

21     A   I don't know the specific words I -- words I

22  used.

23     Q   The -- the -- going back to your stock options,

24  though, those numbers did not cause you to believe that

25  as of March 1st, Oracle would miss its quarter as a

105

1　company, though, correct?
2　　　MS. WINKLER:  Objection; form.
3　　　THE WITNESS:  As of March 1st?
4　BY MR. RUBIN:
5　　　Q　In other words, when you left, December 19th,
6　right?  You left on December 19th?
7　　　A　I left on December 19th, correct.
8　　　Q　Right.  As of that date, did you have a belief
9　about whether the database projections were high or
10　low -- high or --
11　　　A　So let me put this into perspective.  I had just
12　gotten fired after coming back on a worldwide trip.
13　The -- the forecast projections of various parts of
14　Oracle's business was not front and center in my mind.
15　　　Q　Okay.  So would it be fair to say that then --
16　so do you -- what is your testimony today of what your
17　view was as of -- to the extent you had any -- and maybe
18　your testimony is because of other things that were
19　occupying you, you didn't have one.  But did you have a
20　view as of December 14th, approximately December 14th,
21　when Oracle issued its market guidance, whether the
22　database numbers were high, about right, low?
23　　　MS. WINKLER:  Objection; form, asked and answered.
24　　　THE WITNESS:  I -- I think I already responded to
25　this.  I thought that they were very positive, perhaps

106

1　overly positive.  But the company's got a pretty good
2　track record of delivering what it says it's going to be.
3　I wasn't involved in those sides of the business, so
4　therefore I assumed that that was accurate.
5　BY MR. RUBIN:
6　　　Q　And you --
7　　　A　I had no reason to believe it was inaccurate,
8　apart from general buzz around the company that said,
9　"Man, these are pretty aggressive."  And I didn't put two
10　and two together around that earnings release and my
11　disposition of the stock.
12　　　Q　Because you didn't have any reason to think that
13　Oracle -- well, you had -- you did not have any reason to
14　believe that Oracle was not going to perform as -- as the
15　market guidance provided?
16　　　A　I had no specific evidence of this data being
17　incorrect, apart from, again, the comments that they were
18　aggressive or overly, you know, positive.  And again, I
19　think I mentioned earlier, I started looking as an
20　outsider, as a shareholder, and listening to analyst
21　comments, public comment by executives, et cetera.
22　　　Q　And as you said earlier --
23　　　MR. CAPLAN:  Excuse me, Lee.  I don't think he's
24　finished.
25　　　MR. RUBIN:  Oh, I'm sorry.

107

1　　　THE WITNESS:  And message boards.
2　BY MR. RUBIN:
3　　　Q　Right.
4　　　A　Typical things.
5　　　Q　And as you said I believe earlier, that as of
6　December 19th, had you believed that Oracle was not going
7　to make its market guidance, you're not stupid and you
8　would have tried to sell earlier, correct?
9　　　MS. WINKLER:  Objection; form.
10　　　THE WITNESS:  If I'd known something specific on the
11　19th, if I'd had evidence on the 19th, then I -- given
12　that I wasn't an employee, it wouldn't be inside
13　information and I could go off and do what I want to do.
14　I had no specific information that would guide my change
15　of selling the stock on the 19th of December.
16　BY MR. RUBIN:
17　　　Q　And, in fact, based upon your e-mail to
18　Mr. Henley, you believed that the mid-30s was a
19　reasonable price for the stock all the way through --
20　through March 1st and thereafter?
21　　　MS. WINKLER:  Objection; form.
22　　　THE WITNESS:  That's what the analysts, the
23　financial advisor, the market data, and the public
24　comment would lead me to believe.
25　BY MR. RUBIN:

108

1　　　Q　And again, I'm focusing on the time that you
2　left the company.  As of the time that you left, you
3　didn't have any reason to believe that the mid-30s was an
4　inaccurate target for the company?
5　　　MS. WINKLER:  Objection; form.
6　　　THE WITNESS:  On the day that I left, I wasn't
7　thinking about the stock price of the company.
8　BY MR. RUBIN:
9　　　Q　Or the days that you left, you know, in the days
10　following when you left --
11　　　A　So in early January, once I'd gotten through
12　that time period, the holidays, I set up a time in early
13　January to start thinking about disposing of the stock.
14　Then started looking at the market price, the
15　projections, the public comments, all of the pieces of
16　information a normal shareholder might look at.  All of
17　the publicly available information.
18　　　Q　And you didn't have any information from your
19　time at Oracle that caused you to believe that the
20　mid-30s target was unreasonable?
21　　　MS. WINKLER:  Objection; form.
22　　　THE WITNESS:  There was nothing that -- sorry.
23　There was nothing that I added to my analysis that would
24　make me go sell that immediately.
25　BY MR. RUBIN:

109

1    Q   From what you knew while you were at Oracle?
2    MS. WINKLER:  Objection; form.
3    THE WITNESS:  Correct.
4    BY MR. RUBIN:
5    Q   Okay.  Now, did the -- are you aware that or
6    have you become aware that at some point Mr. Ellison made
7    a comment about some savings that had occurred as a
8    result of the implementation of Suite 11i, some savings
9    that occurred internally at the company?
10    A   Yes.
11    Q   Okay.  And were you ever personally privy to any
12    data analysis or examination of -- internally of any
13    savings that had resulted from Suite 11i's
14    implementation?
15    A   I was involved in providing data to help support
16    that analysis.
17    Q   Okay.  And tell me specifically what data you
18    provided and who --
19    A   I don't recall specifically what I provided, but
20    I do recall being part of the conversations around
21    supporting that number.
22    Q   And were you providing any information related
23    to particular organizational units or particular parts of
24    the company?
25    A   Yes.

110

1    Q   Which ones?
2    A   The ones that I supported.
3    Q   Okay.  And was there a Suite 11i implementation
4    that related to the ones you supported?
5    A   Well, 11i is an umbrella name for a suite of
6    applications that cover many different aspects of the
7    business, whether it be the general -- general ledger and
8    accounting systems, all the way through sales force
9    automation.
10    Q   And were there any particular modules or
11    applications that were implemented during the period of
12    time you were working at Oracle?
13    A   General ledger was -- the whole accounting suite
14    was implemented during that time period.  I believe there
15    are some marketing suites, marketing automation, program
16    automation that was implemented --
17    Q   Okay.
18    A   -- in the areas that I'm familiar with.
19    Q   And did you -- and what did you do to provide
20    any data or analysis to support, you know, the --
21    Oracle's estimation of cost savings from Suite 11i?
22    A   I was asked numerous questions and gave certain
23    pieces of information.
24    Q   Do you remember what the pieces of information
25    you gave --

111

1    A   No, I don't recall specifically.
2    Q   Do you remember providing any information that
3    indicated there had been some efficiencies or cost
4    savings that had come from the implementation?
5    A   I remember providing responses to the requests I
6    gave.
7    Q   Do you remember one way or the other whether
8    they indicated that there were some savings or
9    efficiencies that had been -- that had been obtained?
10    A   There -- what's the best way to put this?  You
11    can make numbers say many different things.  I've been
12    around numbers most of my life, and you can make analysis
13    communicate whatever you want it to communicate.
14    Q   Well, were you providing the best data that you
15    had available in terms of any efficiencies or savings
16    that had resulted?
17    A   Again, I was providing responses to questions
18    that I was asked about.
19    Q   Okay.
20    A   And one could use that information to support or
21    refute a position on savings related to 11i.
22    Q   But do you remember which way your numbers would
23    have cut; that is, would they have supported the notion
24    that they -- that Suite 11i resulted in cost savings, or
25    would they have resulted in undermining or refuting the

112

1    notion that it did?
2    A   So I guess it -- I want to make sure I get this
3    communicated properly.  You can attribute whatever you
4    want to a particular goal.  Whether or not it's truly
5    attributable is a -- is a different question.
6    Q   Your -- your -- is it -- is it your testimony
7    that you're saying that the causative or the causal link
8    is what's subject to interpretation?
9    A   Correct.
10    Q   Okay.  So -- so with that qualification
11    understood, did the numbers that you provided about the
12    modules or the applications that you were personally
13    working with, did they indicate that there had been some
14    savings or efficiencies?
15    MS. WINKLER:  Objection; form.  Are you asking him
16    to assume the causal link, or what are you asking him to
17    tell you?
18    BY MR. RUBIN:
19    Q   No.  I'm asking you whether, just based upon
20    data -- you're saying you responded to questions.
21    A   Correct.
22    Q   Somebody who was putting together this analysis
23    or this report asked you certain questions, and you
24    provided it.  What I'm asking you, without getting into
25    whether you -- I understand your qualification that --

113

1  you know, so your responses were driven by their
2  questions, I think is what you're saying, correct?
3     A  So, an example --
4     Q  Yes.  Maybe give me a concrete example.
5     A  So one could -- one could look at the past
6  relationship between revenue and expense at the beginning
7  of an exercise, and then at the end of the exercise, look
8  at that relationship once again.  And if there's been an
9  improvement in the ratio of expense to revenue, you could
10  use that and say, well, that was entirely 11i-related,
11  and I believe that's what happened, as opposed to turning
12  around and say we put this module in and it saved us a
13  specific amount of money.
14        Second thing to consider is this billion-dollar
15  savings was being projected as, you know, what other
16  companies might reasonably go save -- that they might
17  reasonably save proportionately similar amounts of money.
18        Well, we got our software for free.  We
19  implemented it essentially for free because it was part
20  of the, you know, R&D cycle.  And implementation like
21  that could have cost hundreds of millions of dollars for
22  someone to implement.
23     Q  Is that -- when you say hundreds of millions, is
24  that based on any particular implementation that you're
25  talking about?

114

1     A  Size of the company and the cost of the software
2  and the cost of the consulting services.  An ERP
3  implementation for Oracle could cost 50 million dollars.
4     Q  Are you including the purchase of the license
5  itself?
6     A  Correct.
7     Q  Oh, I see.  You're not talking about just the
8  consulting side?
9     A  No.  The cost to implement the whole thing might
10  be 50 million dollars, I'm guessing.
11     Q  At a big company with lots of --
12     A  Correct.
13     Q  -- CAPPLICATIONS, et cetera?
14     A  That wasn't factored into the way this was
15  presented by Larry Ellison as a, you know, component part
16  of the savings.
17     Q  Did you -- once you -- so going back then, when
18  you provided the data, is it fair then to assume that
19  you -- that putting aside, again, the causative effect,
20  the causation conclusion that -- that Oracle determined
21  to be present, did your numbers indicate that for a
22  certain period of time, the ratio between revenue and
23  expenses had been -- had positive movement after the
24  implementation of Suite 11i?
25     MS. WINKLER:  Objection; form.

115

1     THE WITNESS:  In some cases it did, in some cases it
2  didn't.
3  BY MR. RUBIN:
4     Q  And you provided that data?
5     A  Correct.
6     Q  Right.  And your understanding was this -- there
7  was an internal -- this was part of an internal analysis
8  being done, correct?
9     A  Correct.
10     Q  Right.  And now, did you ever see the actual
11  final product of that analysis?
12     A  I seem to recall some discussions with Jeff and
13  other members of the finance community around this topic,
14  but I can't recall a specific document or a specific time
15  or a specific number.  Clearly, it was a billion dollars,
16  but that's what the analysis stated.
17     Q  Did you ever have -- did you ever have in your
18  hands a report or a document that -- that provided the
19  underlying analysis?
20     A  I may have, but I don't recall specifically when
21  or the content.
22     Q  You don't have any details --
23     A  No.
24     Q  -- about it?
25        Now -- and when you talked to the investigator,

116

1  did you describe the -- Ellison's claim of the
2  billion-dollar savings as a marketing gimmick?
3     A  Yes.
4     Q  As a Wall Street marketing gimmick?
5     A  Yes.
6     Q  Those were the terms, that was the phrase that
7  you used?
8     MS. WINKLER:  Objection; asked and answered.
9     THE WITNESS:  I believe I used those terms.
10  BY MR. RUBIN:
11     Q  And when you say "gimmick," what do you mean by
12  that?
13     A  Larry's a flamboyant guy who likes to make wild,
14  you know, broad statements.  I find that to be gimmicky.
15     Q  And do you think a customer in the marketplace
16  would think that Oracle purchases its own software when
17  it implements it internally?
18     A  I -- I don't believe they would -- looking at
19  this marketing material, I don't think that would
20  necessarily be the first thing that they'd think about.
21     Q  No.  But I'm asking you -- an I -- an I -- a
22  sophisticated IT customer who is purchasing a
23  20-million-dollar license, Oracle license, do you think
24  they would believe that Oracle purchases its own
25  software?

117

```
1      A  No.
2      Q  All right.  So it would be fair to say that
3   anybody who is a customer of Oracle's would understand
4   that Oracle uses its own software for free, right?
5      MS. WINKLER:  Objection; form.
6      THE WITNESS:  If -- if -- so ask me the question one
7   more time, please.
8   BY MR. RUBIN:
9      Q  Would -- would an IT procurement officer, a
10  purchaser of Oracle software for a Fortune 500 company,
11  would he believe that Oracle purchases its own software
12  to use internally?
13     MS. WINKLER:  Objection; form.
14     THE WITNESS:  I'm not sure why they'd have an
15  opinion on it, but if they did, I would assume that the
16  answer would be no.
17  BY MR. RUBIN:
18     Q  Right.  Because they're sophisticated enough to
19  know that companies wouldn't charge themselves internally
20  for the software they make, right?
21     MS. WINKLER:  Objection to form.
22     THE WITNESS:  That's correct.
23  BY MR. RUBIN:
24     Q  Right.
25     A  But in the context of a marketing statement,
```

118

```
1   that was something that wasn't factored into that
2   billion-dollar savings.
3      Q  Right.  And I'm asking you -- all I'm asking you
4   is when a company -- when an IT officer hears that a
5   company internally saves some money from using its own
6   software, do you believe that they would think that they
7   had -- that that included any money that they had to pay
8   for the software themselves to use their own software?
9      MS. WINKLER:  Objection; form.
10     THE WITNESS:  I -- I don't know what they might be
11  thinking.
12  BY MR. RUBIN:
13     Q  Well, would you think that if you were
14  purchasing something for Symantec, that if somebody
15  advertised that they achieved some cost savings from
16  their own software, would you assume that they had to pay
17  for it?
18     MS. WINKLER:  Objection; form.
19     THE WITNESS:  The way the --
20  BY MR. RUBIN:
21     Q  Well, if you could just answer that question
22  first.
23     MR. CAPLAN:  I think he is answering, Lee, and
24  you're interrupting him.
25     MR. RUBIN:  No, I don't think --
```

119

```
1      MS. WINKLER:  You just don't like his answer.  Will
2   you let him answer the question?
3      MR. RUBIN:  No, I don't.  I just -- "the way" didn't
4   sound like an answer to my question.
5      Q  But go ahead.
6      A  The way the marketing message was presented was
7   to allude to the fact that you could save a similar
8   amount of money by implementing this software, just like
9   we did.  We saved a billion dollars.  You could save the
10  same amount.
11     Q  Right.
12     A  It didn't say you could save 880 million dollars
13  after you factor in the cost of the software.
14     Q  Right.  And that's -- that's really -- I think
15  that was nonresponsive.  So, but what I'm trying to --
16  what I'm trying to ask you -- I understand your position
17  on what the marketing -- what the -- what -- your belief
18  about the marketing representation, but what I'm asking
19  you is that if Symantec was advertising -- representing a
20  product and indicated "We've used this Veritas storage
21  net backup and have achieved particular cost savings or
22  in terms of costs that are needed to retrieve backup
23  information," for example -- if you made that
24  representation to a customer, would you assume that the
25  customer thought that when you talked about those
```

120

```
1   savings, that you actually had to purchase the software?
2      MS. WINKLER:  Objection; form.
3   BY MR. RUBIN:
4      Q  Just it's a yes or no.  What do you think what a
5   Symantec customer would think?
6      A  So if -- I'm going to be unresponsive again.
7      Q  Right.  I can see that.
8      A  If -- if it was projected as you could save 30
9   percent on your storage costs by using our software,
10  that's a reasonable statement.
11     Q  No, no.  But I'm asking you a different
12  question, with all due respect.  I'm asking you if you
13  indicated -- and I don't have any reason to think
14  Symantec ever has -- but if you indicated that "we saved
15  X percent from implementing our net backup," would an
16  I -- would the average IT customer believe that you
17  didn't -- that you paid for that software and that was
18  part of your formulation?
19     MS. WINKLER:  Objection; form.
20     THE WITNESS:  If they -- if they stated, "We saved X
21  percent," then I don't think the cost of the software is
22  relevant to the analysis.
23  BY MR. RUBIN:
24     Q  Okay.
25     A  If they turn around and said, "We saved 500
```

121

1  million dollars using our backup software," I would say a
2  reasonable IT person would ask, "Does that include the
3  cost of the software or not?" or, "Is that true benefit?"
4  So going --
5      Q  Do you have any reason -- do you have any
6  knowledge of whether, when -- to the extent customers
7  asked about the savings that came from Suite 11i, whether
8  they asked the exact question that you just asked?
9      MS. WINKLER:  Objection; form.
10     THE WITNESS:  I have no specific knowledge of
11  questions asked by customers in relation to this matter.
12  BY MR. RUBIN:
13     Q  And some customers have sophisticated IT
14  purchasers, correct?
15     A  You obviously know more than I do.
16     Q  Well, I mean, based upon your experience at
17  Oracle and Symantec, do people who purchase 10, 20
18  million dollars' worth of license software -- are they
19  typically sophisticated in the world of information
20  technology?
21     MS. WINKLER:  Objection; form.
22     THE WITNESS:  I'm probably not the best person to be
23  answering that question.  I don't deal directly with
24  customers who buy stuff from us.
25  BY MR. RUBIN:

122

1      Q  Well --
2      MR. CAPLAN:  I think that's a speculation objection.
3      THE WITNESS:  That's my point.  Yeah, I don't know.
4  BY MR. RUBIN:
5      Q  Were -- would you consider Oracle -- purchases
6  of Oracle software big ticket items for companies that
7  were purchase -- for its IT department?  Was it a large
8  portion of their IT sale -- spending --
9      MS. WINKLER:  Objection --
10  BY MR. RUBIN:
11     Q  -- when they purchased the Oracle software?
12     MS. WINKLER:  Objection; form.  He's already said
13  that he doesn't -- didn't deal with customers.
14  BY MR. RUBIN:
15     Q  Go ahead.  You can answer.
16     A  As a percentage of their IT sale, I would say
17  it's not a major component.  As a dollar amount of a
18  company sale, it's significant.
19     Q  I'm sorry.  As a dollar amount of the company
20  sale, did you say?
21     A  Yeah, of purchasing.  So -- so it might be five
22  percent of a vendor's wallet, but that five
23  percent -- of a customer's wallet, but it's still a lot
24  of money, because they buy other things like network
25  routers and servers and, you know, all that stuff.

123

1      Q  Right.
2      A  So as a percent, no, it's not necessarily the
3  largest line item.
4      Q  For IT?
5      A  Correct.
6      Q  Did -- other than the conversation that you
7  indicated that you had with the investigator in which you
8  had called about your stock options, did you have any
9  subsequent conversation with any investigator?
10     A  I want to try and get the timing right here.  I
11  received two subpoenas.
12     Q  Recently?
13     A  I received two subpoenas recently.  Whether I
14  received a phone call at that point in time or I had a
15  conversation --
16     Q  Okay.  So I want to ask you about that in a
17  second.  But before receiving the subpoenas indicating
18  that you were going to need to sit for a deposition, so
19  between the time that you spoke to him initially and
20  called him about the stock options and you had your 10-
21  or 15-minute conversation -- so after that time but
22  before you received the subpoenas, did you have any
23  conversation with -- with that or any other investigator?
24     A  So I don't recall any other specific
25  conversation.  But having said that, there could have

124

1  been a second time that we spoke, but the same response
2  would have been given at that point.  I can't remember.
3  I mean, this is five years ago.  I don't remember every
4  single conversation I have.  I remember speaking to an
5  investigator.  It may have been on one occasion or two
6  occasions, but it was around about the same time, and the
7  content of those conversations were the same.  So, you
8  know, if you have a record of another conversation --
9      Q  I don't.  I mean they may, but I don't.  So I'm
10  really asking -- I'm completely asking you for your best
11  memory.
12     A  I'm not aware of a separate conversation, but
13  there could quite well have been one around about the
14  same time.
15     Q  But you don't have any memory of it?
16     A  No.
17     Q  Okay.  Then you said that other than what may
18  have been a second conversation but you have no memory
19  of, specific memory of, the next time you talked to an
20  investigator was in connection with the service of the
21  subpoenas?
22     A  I received two subpoenas, didn't really have a
23  clue what to do, and then a guardian angel calls me and
24  says, "Hey, do you want some help with this?"
25     Q  Who was the guardian angel?

125

1    A   Representing one side or the other, I don't know

2  which side.

3    Q   Did the person identify themselves to you?

4    A   I'm sure they did, but I -- you know, I don't

5  know what their name was.

6    Q   And did the person offer you legal assistance,

7  offer to retain a lawyer for you?

8    A   Correct.

9    Q   And did you accept?

10    A   Yes.

11    Q   Okay.  And then what happened next in terms of

12  the lawyer?

13    A   I corresponded with Alan.

14    MR. CAPLAN:  You don't have to say anything about

15  our correspondence.  That's a sufficient answer.

16    THE WITNESS:  Okay.

17  BY MR. RUBIN:

18    Q   Did the individual -- when this individual

19  offered you legal assistance, did -- did you -- did they

20  give you Mr. Caplan's name?

21    A   They said I could pick the attorney of my

22  choice, "Or if you don't have one, we can make -- we can

23  suggest one to you."

24    Q   Okay.  And you said what?

25    A   I don't have a need for an attorney, so sounds

126

1  good to me.

2    Q   And they suggested then Mr. Caplan?

3    A   Correct.

4    Q   Or he -- I should say he suggested.  This is one

5  person who you were talking to, correct?

6    A   I believe it was one person.  There may have

7  been two different people in the course of the

8  discussions.  I don't recall.

9    Q   And now, are you paying Mr. Caplan his legal

10  fees?

11    MR. CAPLAN:  Excuse me.  Don't answer that question.

12  BY MR. RUBIN:

13    Q   I'm just asking you if -- are you?

14    MR. CAPLAN:  It's an improper question.

15    MR. RUBIN:  You've allowed that question before,

16  Mr. Caplan.

17    MR. CAPLAN:  Well, I shouldn't have.

18  BY MR. RUBIN:

19    Q   Do you know if someone else is paying

20  Mr. Caplan's legal fees?

21    MR. CAPLAN:  Objection.

22  BY MR. RUBIN:

23    Q   Go ahead.  You can answer.

24    A   Oh.  I can answer that one?

25    MR. CAPLAN:  Yeah.

127

1    THE WITNESS:  Yes.

2  BY MR. RUBIN:

3    Q   And who is?

4    A   The plaintiff lawyers.

5    Q   Okay.  Now, you had said that Mr. Caplan sent

6  you the complaint.  That was the first time you had read

7  the complaint, correct?

8    A   Yes.

9    Q   So I gather that that was the first time you had

10  learned that you had been identified as a confidential

11  witness in the complaint?

12    MR. CAPLAN:  I'll object to that to the extent it

13  calls for communications between Mr. Donnelly and myself,

14  and I don't know how he can answer that, so I'm going to

15  instruct him not to answer.

16    MR. RUBIN:  Well, I asked him whether it was the

17  first time he had learned, not what you said to him.  I

18  mean, we've already established that he got the document

19  at that time, so I don't think there's any privileged

20  communication in asking him, "Was that the first time you

21  learned?"

22    MR. CAPLAN:  Well, you're asking him if that's when

23  he learned.  I'll allow that question, but I don't want

24  that to be considered a waiver --

25    MR. RUBIN:  Yeah, I understand.

128

1    MR. CAPLAN:  -- of the privilege.

2    THE WITNESS:  Yes.

3  BY MR. RUBIN:

4    Q   Okay.  So is it -- is it fair to assume then

5  that at the time that you spoke to the investigator, he

6  did not indicate to you that you -- that any statements

7  you made would be part of a complaint?

8    MS. WINKLER:  Objection; form.

9    THE WITNESS:  I -- I don't recall.

10  BY MR. RUBIN:

11    Q   Okay.  Did you ask for any confidentiality in

12  connection with the information you were providing him?

13    A   I don't recall.  I don't recall.  I called the

14  number to see if I could get some of the money back that

15  I lost and found out I couldn't and there was a

16  conversation end.

17    Q   Right.  And I'm asking you if -- do you have a

18  memory of asking him to be -- asking him for an assurance

19  of confidentiality concerning the information that you

20  were providing him about the questions he was asking

21  about the company?

22    MS. WINKLER:  Objection; asked and answered.

23    THE WITNESS:  I don't recall.

24    MR. RUBIN:  Hold on one sec.  Give me one minute.

25      Okay.  I don't have anything further at this

129

1    point.

2

3        MS. WINKLER:  We should probably take a lunch break.

4        THE VIDEOGRAPHER:  Okay.  We are now going off the

5    video record.  The time is 12:28 p.m.

6        ( Recess taken:  12:28 until 1:27 p.m.)

7        THE VIDEOGRAPHER:  We are now back on the video

8    record.  The time is 1:27 p.m.

9

10            EXAMINATION

11   BY MS. WINKLER:

12       Q  Mr. Donnelly, this morning you testified about

13   philosophical differences you had with certain people in

14   the company, and I believe you specifically mentioned

15   Jennifer Minton?

16       A  It was -- it was only Jennifer Minton.

17       Q  Only Jennifer Minton.

18          Could you elaborate on what you meant when you

19   said "philosophical differences"?

20       A  In the context of how you support -- how you

21   support a large corporation, we had different opinions on

22   organizational structure, we had different opinions on

23   the manner in which you talk to individuals, the manner

24   in which you develop individuals, the manner in which you

25   develop talent inside your organization.  Basically we

130

1    just didn't see eye to eye on a number of things.

2        Q  What do you mean when you say the manner in

3    which you talk to individuals?

4        A  Well, put it bluntly, she's an absolute

5    nightmare and she's rude to her staff, she's

6    inconsiderate, and just it's not how I am.

7        Q  Do you recall having any specific incidents

8    where you -- you clashed with Ms. Minton?

9        A  Yes.

10       Q  Anything specific other than -- what you just

11   told me seemed to be kind of general areas about the

12   manner in which you talked to people, the manner in which

13   you developed people.  But any specific incident over

14   some way that the business was run?

15       A  Not specifically the business.  How the finance

16   organization was structured, yes, we had differences.

17       Q  What were your differences about how the finance

18   organization was structured?

19       A  Well, I principally believe finance is there to

20   support the business and to be a business partner.  She

21   had a different opinion.

22       Q  And what was her opinion?

23       A  That -- that they were there to count numbers,

24   to be an accountant, to make sure the numbers were

25   accurate.  And I had a different opinion.

131

1        Q  Was it your opinion that she tried to limit the

2    role of finance?

3        A  I think she had a narrow -- narrower view of

4    finance.  Whether she took actions to purposefully limit

5    it, I don't know.

6        Q  Okay.  You also testified that when you were

7    working for Gary you had ruffled a few feathers.  Did you

8    mean anyone other than Ms. Minton when you said that?

9        A  In addition to some people that represented her

10   organization.

11       Q  Do you recall any specific individuals?

12       A  One individual was -- I'm going to -- I forgot

13   his name now, as soon as you said this.  He was a VP of

14   finance for Asia Pacific.  I think it was Greg Davies, I

15   believe.  It was one individual that I didn't see eye to

16   eye to.  But the vast majority of people in the finance

17   arena I got along with very well.

18       Q  Anyone other than Mr. Davies that you recall

19   specifically?

20       A  Not -- not specifically.

21       Q  Okay.  Let's mark that as 5.

22          (Deposition Exhibit 5 was marked.)

23       THE WITNESS:  I thought this was a list of people.

24   BY MS. WINKLER:

25       Q  Sorry.  It's not.

132

1        A  You got me worried there:  "Well, what about all

2    these people?"  Sorry.

3        Q  Mr. Donnelly, you've just been handed what's

4    been marked as Exhibit 5, which is NDCA-ORCL 503848

5    through 503887, although I believe the actual Bates

6    numbers don't appear on the spreadsheet portion of the

7    document.  And I'll represent to you that Oracle produced

8    this document and described it as having come from your

9    files.  Could you --

10       A  Okay.

11       Q  -- just take a minute to flip through there?

12       A  Okay.

13       Q  Can you tell me what this document is?

14       A  It's a document that we produced to provide a

15   summary status of the business on a line-of-business

16   basis.  So this one specifically here was for the support

17   line of business, which is one of the groups that I was

18   responsible for.  It was produced by Graeme Mair, who

19   replaced Priscilla Morgan as the head of finance and

20   operations for that group.  And it's something that's

21   typically -- sorry -- typically done every quarter.

22       Q  Okay.  And did Graeme Mair report to you?

23       A  Yes, he did.

24       Q  Okay.  And if you'll look at the first page of

25   the document, which is 503848, can you identify what that

133

1    describes?
2    A   5038 --
3    Q   The very top page where the sticker --
4    A   This one?
5    Q   Yes.  Yes.
6    A   It looks like I'm addressing this from myself to
7    Tom Williams, who's the -- who was at the time the
8    corporate controller.  I believe he was still a corporate
9    controller at that time.  Actually, I take that back.  I
10   think he was still with the company but used to be the
11   corporate controller.  I'm not sure when the time change
12   happened.
13   Q   And when you say that change -- what was his --
14   what other position did Mr. Williams have with the
15   company?
16   A   At some point in time, I don't remember the
17   exact timing, he -- the controllership position moved to
18   Jennifer Minton, who used to report to Tom, and Tom
19   became an advisor to Jennifer.
20   Q   And did that happen while you were still with
21   the company?
22   A   I believe so, yeah.  I'm just recalling that.
23   Q   When you say he became an adviser to Jennifer,
24   would you call that a promotion or a demotion?
25   A   He moved to more of a part-time status and

134

1    decided -- and agreed to stay on for a period of time to
2    transfer knowledge to Jennifer.
3    Q   Okay.  And what is the date on that e-mail?
4    A   Wednesday, the 13th of September, 2000.
5    Q   And why did you send this document to
6    Mr. Williams?
7    A   I'm assuming he asked for it.
8    Q   Was this something that you did on a regular
9    basis, send these type documents to Mr. Williams?
10   A   I would not say on a regular basis, but the way
11   I introduced this e-mail, "As promised, please find
12   attached," I'm assuming he asked for a copy of this and I
13   sent it to him.
14   Q   Okay.  But you don't recall having sent these to
15   him on a quarterly or regular basis?
16   A   In his position as controller, he may have
17   received these on a more regular basis.  In his position
18   as an advisor, I don't recall sending them on a regular
19   basis.
20   Q   Okay.  And who is Dan who is mentioned in your
21   e-mail?
22   A   That's Dan Sharpley.  He was the vice president
23   of finance and operations for the education line of
24   business.
25   Q   And Dan also reported to you; is that correct?

135

1    A   Correct.
2    Q   Do you recall the meeting that you mentioned in
3    the text of the e-mail?
4    A   I don't.
5    Q   Did you have any type of regular meetings with
6    Mr. Williams?
7    A   Not -- not in his position as an advisor.
8    Q   What about in his position as corporate
9    controller?
10   A   Well, at the point I worked in the controller's
11   organization for Jennifer, I had a regular meeting with
12   Tom.  And subsequent to moving to Gary's organization, I
13   continued a professional relationship with him.  So we
14   may consult on -- may have consulted on matters
15   periodically.  There wasn't a recurring one-on-one
16   meeting.
17   Q   And that's when you were in Gary's organization?
18   A   That's correct.
19   Q   Would you turn to page 2 of the PowerPoint
20   presentation?  I believe there are page numbers on the
21   bottom right corner.
22   A   Okay.
23   Q   And is it correct that this is a document that
24   was -- type document that was produced every quarter?
25   A   Yes.

136

1    Q   Please turn to page 8 next.  If you'll take a
2    look at the first bullet point that says, "Significant
3    increase in iTAR activity compared to Q400 and
4    accelerating."  What does "iTAR" stand for?
5    A   Okay.  When somebody calls in for a problem with
6    a software, they're recorded in something called a
7    Technical Assistance Request, TAR.  And iTAR we put "i"
8    in front of everything or at the end of everything.  It
9    was part of our naming.  So 11i, you know, type of --
10   Q   Mm-hmm.  Was there a point in time when it was
11   called just a TAR and then it became an iTAR?
12   A   Yes.
13   Q   And why did that happen?
14   A   I'm recalling it may have something to do with
15   the name it was given inside the 11i application.
16   Q   Okay.  Do you recall why there was a significant
17   increase in iTAR activity in Q1 '01?
18   A   No.
19   Q   Do you know why this type of information would
20   have been relevant or why Tom Williams would have wanted
21   this type of information?
22   MR. RUBIN:  Objection; form, foundation.
23   BY MS. WINKLER:
24   Q   I think you need to answer out loud.
25   A   I'm sorry.  No.  I mean, he was a professional

137

1   colleague and he asked for it, and I gave it to him.
2       Q   I'll ask you to turn to page 15 next.  And if
3   you'll take a look at the third bullet point and read
4   that, please.
5       A   The third major bullet point?
6       Q   Yes.  Yes.
7       A   "Increase in escalations from customers
8   migrating from 10.7 to 11i and from 7.34 to 8.X.  ERP
9   study" --
10      Q   I think you can stop there.
11      A   Oh, okay.
12      Q   What -- do you recall the increase in
13  escalations from customers migrating from 10.7 to 11i?
14      A   Without you asking the question, it wasn't
15  forefront in my mind, but yes.
16      Q   And can you explain what you recall about that?
17      A   That there were increased escalations around
18  that time.
19      Q   Do you know what those escal- -- increased
20  escalations were attribute -- attributed to?
21      A   Well, most escalations relate to -- well, in
22  fact, all escalations relate to technical or performance
23  problems related to our software.
24      Q   And do you recall that there were technical and
25  performance problems related to 11i?

138

1       A   Yes, but there are also technical and
2   performance issues related to any piece of software.
3       Q   Do you recall that the technical and performance
4   issues related to 11i were any different from other
5   previous software released by Oracle?
6       A   Based on this information, yes.  But again, it
7   wasn't something forefront in my mind if you'd asked me
8   that separately.
9       Q   Mm-hmm.  And what -- what do you recall about
10  that, if anything?
11      A   Well, we were trying to put together an
12  integrated suite of products that all seamlessly, you
13  know, matched.  And it doesn't work that easily.
14      Q   Okay.
15      A   It's not -- it's not as easy as it sounds.
16      Q   And if you'll read the last line or the last
17  sentence under that bullet point.
18      A   "Lack of ERP/CRM integration is becoming a key
19  customer concern."
20      Q   What -- do you know what that sentence means?
21      A   It wasn't working the way it was supposed to
22  work.
23      Q   Specifically, with the ERP and CRM integration.
24      A   So, again, the company was promoting the
25  11i suite of applications, which covered a broad range of

139

1   ERP and CRM-related products, and it was being presented
2   as an integrated suite.  And the reality was it wasn't as
3   integrated as the marketing message might have intimated.
4       Q   Do you recall that there were customer
5   complaints about that?
6       A   Again, there were customer complaints about --
7       Q   I'm asking specifically about the lack of
8   integration.
9       A   -- any piece of software.
10      I wasn't in a position to be listening to those
11  complaints.  Was I aware that we had some integration
12  challenges?  Yes.  Did I have any specific customer
13  statements or speak to customers?  No.
14      Q   Do you know what "ERP" or "CRM" stand for?
15      A   Enterprise resource planning and customer
16  resource management.
17      Q   Again, I'm assuming from your prior testimony
18  you don't know specifically why Tom Williams wanted this
19  information.  Is that correct?
20      A   No, I have no idea.
21      Q   If you'll turn to page 19, and take a look at
22  the third bullet point that says, "iTAR volume up by 121
23  percent on Q400."
24      A   That would be Q4 --
25      Q   I'm sorry.  Q4 2000.

140

1       Do you recall whether that was a significant
2   increase with respect -- as it related to other quarters?
3       A   Well, any increase in activity of triple-digit
4   percentage is significant.  Bear in mind this is in the
5   context of EMEA as opposed to the company as a whole.
6   EMEA is a small portion of our business, so therefore its
7   impact on the total company, I don't know if it's
8   material or not without having looked at more data.
9       Q   Are these types of numbers that Graeme Mair
10  tracked on a regular basis?
11      A   Yes.
12      I should -- I should clarify one thing.  Graeme
13  was the finance and operations lead our EMEA division of
14  support.
15      Q   Mm-hmm.
16      A   He got promoted to the global position and
17  started doing these things at that point in time.
18      Q   Do you know -- I'm sorry.  You were going to say
19  something else?
20      A   Prior to that, I don't recall if the work
21  Priscilla did was exactly the same as this, but there was
22  a similar performance package.  So whether the same
23  statistics were covered in the same way, I can't tell
24  you.
25      Q   Okay.

141

1    A  I don't remember.
2    Q  Do you recall when Graeme Mair assumed that
3   position, the global position?
4    A  I knew that was going to be your question.  I
5   don't, I'm afraid.
6    Q  But at least as of -- we know he was in that
7   position at least as of September 13th, 2000 --
8    A  Correct.
9    Q  -- is that correct?
10   A  Correct.
11   Q  Did any of the work that you did in the latter
12  half of 2000 involve 11i?
13   A  You have to ask the question --
14   Q  Did you use 11i in your work?
15   A  Yes.
16   Q  What parts or subsets of 11i did you use?
17   A  So, I mean, 11i was the system to record all
18  expenses, you know, online expense reporting.  So I used
19  it in that context.  The data that came out of it fed our
20  data warehouse.  So the results of the 11i work came out
21  of that.  The marketing organization support ran its
22  programs using a component of 11i.  The support system
23  that ran the support organization used a component of the
24  11i.  So me personally, did I use it?  Well, yeah,
25  online, you know, web expense, web reporting.  Did the

142

1   groups that I was responsible for use it?  Yes.
2    Q  Do you recall if the groups that you were
3   responsible for encountered problems using 11i?
4    A  Yes, they did, but I'll caveat that with I was
5   there eight and a half years and there wasn't a single
6   instance when we didn't experience a problem with
7   software.  It's the nature of the game.
8    Q  Did they experience problems implementing 11i?
9    A  Again, the same, same answer.
10   Q  Okay.  You can set that one aside.
11       (Deposition Exhibit 6 was marked.)
12  BY MR. RUBIN:
13   Q  Mr. Donnelly, the court reporter has just handed
14  you what's been marked Exhibit 6, which is NDCA-ORCL
15  200032 through 200046.  And I apologize.  Although it's a
16  long document, I'm going to ask you to take a pretty
17  thorough look at it, particularly the e-mail in the back,
18  because I'm going to have quite a few questions about it.
19   A  Okay.  All right.
20       Okay.  I've read the e-mail, but I'm sorry, I'm
21  a slow reader.
22   Q  That's all right.  Take as much time as you
23  need.  I'll let you -- you can take a look at the
24  presentation.  I'll have questions about it.  If you want
25  to wait until I have questions, or if you want to just

143

1   flip through.
2        Have you had a chance to take a look at the
3   document?
4    A  Yes.
5    Q  First I'm going to ask you, if you would, just
6   explain to me in layman's terms what was going on here.
7    A  Okay.  So when a customer buys some education
8   classes, they will get an invoice for that from our
9   general accounting system.  Let's say it's for $5,000
10  worth of classes.  They get 5,000 credits.  They'll get
11  an invoice for $5,000.  And a $5,000 entry will be posted
12  to a completely separate system that keeps track of paid
13  hours.  So for that $5,000, you get a certain number of
14  class hours.
15       The two systems were not connected except for
16  the one-way push of data when an invoice was recorded.
17  If for some reason the customer came back and said,
18  "There was an error on my invoice," the process on the
19  accounting side would be to credit the invoice and rebill
20  it in the correct way.  So you'd have it taken care of
21  that balance, and then a new one created.  So it's like
22  wiping out the original invoice.
23       Well, in wiping out the original invoice in the
24  accounting system, it did not go back to this other
25  system and say, "Hey, that's not real money, so take it

144

1   out."  It left it there.
2        When the second invoice come in, the
3   correction -- the corrected invoice came in, it would
4   also post an entry over to this separate unintegrated
5   system.  So now you've -- the customer's paid $5,000, but
6   they have two lots of $5,000 credited to their bank of
7   usable hours.
8        In the normal course of duty, if we'd found that
9   out before the customer had used it, we can take them
10  away and say, "Hey, that was a mistake.  No harm, no
11  foul."  If the customer uses them, then we spend more
12  money on that customer than we ought to.  They get more
13  value for money.  The worst thing that could happen is
14  they expire and we record revenue for them.
15       Now, let's assume the customer only took $2,500
16  worth of classes during the year that they had these
17  credits.  $2,500 would have been recorded as of when they
18  took the class, and $2,500 would have been recorded at
19  the end.  Well, if they had this unknown balance of
20  $5,000 and it was undiscovered by Oracle, another $5,000
21  would have been recorded as revenue.  Make sense?
22   Q  Basically, yeah.  But I think I'm going to ask
23  you some more -- more specific questions.
24   MR. CAPLAN:  She's got it.
25  BY MS. WINKLER:

145

1    Q  If you'll take a look at the original e-mail, I
2  think it's the one from Jim Stein to Dan Sharpley --
3    A  Yep.
4    Q  -- dated August 3rd, 2000.
5      First I'm going to ask you, we've already
6  discussed Dan, but what was Jim Stein's position at
7  Oracle?
8    A  So Jim Stein was responsible for Americas
9  Education.  So the education business, finance and
10  operations support for a work -- working for Dan.  So Dan
11  had three geographic leaders of which Jim was one of
12  them.
13    Q  And who were the other two?
14    A  I don't recall.
15    Q  Okay.  In the subject line of the e-mail, it
16  says, "Recon comments."  What is "recon" referring to?
17    A  It's an abbreviation for reconciliation.
18    Q  And what was the reconciliation that was going
19  on at that time?
20    A  So this was reconciling how much did we bill and
21  how much hours were on the other side.  So if we
22  billed -- using the example that I had, if we billed
23  5,000, one would hope to see 5,000 or less on this side
24  because they'd used some hours.  So the hours used plus
25  the remaining balance should equal the amount that they

146

1  were invoiced.  And they didn't.
2    Q  And what brought about this reconciliation
3  process?
4    A  Well, in layman's terms, it's like writing
5  checks.  Okay.  I've got plenty of checks.  Everything's
6  good.  And then suddenly the bank calls and says, "Well,
7  you don't have any money left."
8      So in the context of this, there was a -- you
9  know, a piece of analytics that said why is our education
10  balance growing disproportionately to the revenue being
11  recorded?  So there was -- some alert went up.  The bank
12  manager called and said this doesn't add up.
13    Q  And do you know who first noticed that within
14  Oracle?
15    A  I don't.  I think it was some -- I think it was
16  an ongoing conversation -- it was an ongoing
17  conversational part of the review when we showed or Dan
18  showed the increasing education pool and relative to the
19  number of -- you know, the revenue and the bookings and
20  billings for the education business, someone said, "Well,
21  that doesn't seem to make sense.  Can you go away and
22  look at it?"
23    Q  When you say -- what are you referring to when
24  you say, "education pool"?
25    A  So this is the number of hours that have been

147

1  put in this separate non-integrated off-line system --
2    Q  Okay.
3    A  -- that's then used to -- as a basis from which
4  customers can draw down, like a prepaid card.
5    Q  Okay.  What is ERS that's referred to in this
6  e-mail?
7    A  I don't know.  It's probably something like
8  education resource system or education resource services.
9  It's -- it's an acronym related to education.
10    Q  Was it -- what was it?  Was it a separate
11  computer system?  What was ERS?
12    A  It was a separate application that again was not
13  integrated with the general ledger system, the accounting
14  system.  It was an old application which was being
15  replaced as part of the 11i suite.  So it was a necessary
16  evil until the new product came -- came along.
17    Q  As an aside, other than ERS, were there other
18  applications that weren't integrated with the general
19  ledger?
20    A  Yes.
21    Q  And which -- what were those applications?
22    A  I don't know, but there are plenty.
23    Q  And you don't recall any specific ones?
24    A  No.
25    Q  Do you recall any reconciliations going on with

148

1  respect to other applications?
2    A  There were reconciliations around the balance
3  sheet being out of balance.  That was a normal one.
4  Balance sheets are supposed to balance, and sometimes
5  they get out of balance and you have to figure out why.
6    Q  Was that due to a specific application that
7  wasn't tied in properly with the general ledger?
8    A  Could be a million and one different reasons.
9    Q  Okay.
10      Going back to Jim's e-mail, the first point
11  number 1 that he makes there, sub A, he talks about the
12  credit memo issue.  What is a credit memo?
13    A  So going back to my example, if the customer
14  says you've sent the invoice to the wrong site or it has
15  the wrong billing name on it, the process of a credit
16  memo essentially is the reversal of an invoice.  So I'm
17  going to remove that invoice from the system.  So you
18  have a plus 5,000 and a minus 5,000 equals zero.
19  Fantastic.  We're all cleaned up.  So the credit memo
20  process, the customer would have gotten back a minus
21  $5,000 invoice.  Their account is now clear.  They get a
22  new invoice for the -- corrected in a way that needed to
23  be corrected.  You can correct for many different
24  reasons.
25    Q  And can you explain more specifically what he's

149

1  talking about here when he talks about the credit memo
2  issue, 1, sub A?
3      A  So I believe he's referring to the example that
4  I gave you where on a number of occasions, an original
5  invoice was credit memo'd and rebilled, resulting in
6  double balances being recorded in a separate system.
7      Q  What does he mean when he says, "These must be
8  manually posted to ERS"?
9      A  Again, because they're not connected, if a -- if
10  an invoice flows through but a credit memo doesn't flow
11  through, you have to manually go in and remove that
12  original balance.
13      Q  And I apologize if these questions seem overly
14  simple, but what happened -- so what happened when a
15  credit memo was not posted to ERS?
16      A  Then you would have two balances.
17      Q  Okay.  And what was the greater financial impact
18  of that?
19      MR. RUBIN:  Objection; form.
20      THE WITNESS:  Based upon reading through this
21  e-mail, there may have been an overstatement of education
22  revenues to the tune of 20 million dollars.
23  BY MS. WINKLER:
24      Q  Okay.
25      A  But again, I'm not the accountant.  I'm a

150

1  finance person.  There is a difference.
2      Q  Do you know who the two customers were that he
3  referenced in this e-mail?
4      A  No.
5      Q  And then going on down to 1, sub B in the same
6  e-mail where he talks about new sale holds, can you
7  explain that issue more in layman's terms?
8      A  So it's not something I'm familiar with, but
9  what I -- what I conclude from this is if an item entered
10  into OOE, which is Oracle order entry, was somehow not
11  posting correctly to the separate education system, then
12  there would be a need to put it on hold and have someone
13  investigate why it wasn't posting correctly.
14      Q  And what were the consequences of something not
15  posting correctly?
16      A  So this would understate the amount of hours
17  available to a customer.  So in the example I gave you,
18  if it was a $5,000 transaction that for some reason did
19  not post correctly, the customer would come in and say,
20  "I'd like to take a class."  And they'd say, "Well, you
21  have no hours."  So it would be an understatement of
22  hours, whereas the first one was an overstatement of
23  hours.
24      Q  Mm-hmm.  Okay.  And then the same question about
25  1, sub C, the T-R-U-N-I-T payments.  Could you explain

151

1  that issue in layman's terms?
2      A  I -- I can't.  Sorry.
3      Q  Do you know what T-R-U-N-I-T stands for?
4      A  No.
5      Q  Do you know what --
6      A  Probably training unit.
7      Q  Okay.  And when Mr. Stein says, "This refers to
8  situations where units are used to pay off an invoice
9  that has already been generated," what units are -- is he
10  referring to?
11      A  Again, unfortunately, I can't explain any better
12  than how it's been written.
13      Q  Okay.  Do you see on the third line of
14  page 200046 he references someone named Mina.  Do you
15  know who -- do you recall --
16      A  No.
17      Q  With respect to 2, sub A, "Duplicate items
18  appearing on ERS," do you have any specific recollection
19  about that issue?
20      A  So it's referring to the same issue as the
21  credit memo one, where two balances were showing up on
22  the report.
23      Q  Okay.  Then what about 2, sub B, "Items that
24  show up on ending balance of month A but do not show up
25  in the beginning balance of month B"?  Do you recall that

152

1  issue?
2      A  Vaguely.  There was some issues with the
3  reporting module of this product -- this application that
4  created some discrepancies when looking at monthly
5  reporting.
6      Q  And by "this application," you're referring to
7  the ERS --
8      A  ERS.
9      Q  -- application?
10      A  It wasn't a -- it didn't have very good
11  reporting capabilities.  This was a weakness.
12      Q  And finally, sub 3, "GL entries."  Can you
13  explain what Mr. Stein is talking about there?
14      A  So specific to these two items, I can't add any
15  more information, but a general ledger entry is
16  essentially an entry in the accounting system that
17  involves a debit and a credit.  So there was a posting in
18  the amount of 260 and 250 respectively that was made that
19  they couldn't account for.  They didn't know what they
20  related to.
21      Q  But other than that, you don't have any specific
22  recollection --
23      A  No.
24      Q  -- of this issue?
25      A  No.

153

1    Q   Okay.  And from this e-mail, it sounds like you
2   and Mr. Stein were going to have a meeting.  Do you
3   recall meeting with Mr. Stein about this issue?
4    A   Only based upon reading this -- this note.  And
5   I think he gave me a briefing of what was included in
6   here.
7    Q   And moving up to the second e-mail in this
8   string chronologically, which appears to be
9   Dan Sharpley's August 11th, 2000 e-mail to you and a
10  J.L. Hall.
11   A   Mm-hmm.
12   Q   Who is J.L. Hall referred to there?
13   A   John Hall is the senior vice president of the
14  education organization.  So essentially his business
15  partner, Dan's business partner.
16   Q   Okay.  And then what about the cc's?  We've
17  already talked about James Stein.  Who is Dennis Bonilla?
18   A   Dennis Bonilla was the counterpart business
19  partner of Jim Stein.  He worked -- he worked for
20  John Hall as the head of the Americas Education
21  organization, and Jim was his business partner.
22   Q   Okay.  And this e-mail appears to be titled,
23  "Forward:  2261 reconciliation update."  What does the
24  2261 in that subject refer to?
25   A   That's the balance sheet account, I believe.

154

1    Q   Can you explain that in more detail?  The
2   balance sheet account relating to what?
3    A   Okay.  So back to -- back to the accounting.  If
4   you take an invoice for something, record revenue for
5   something for which you don't deliver the goods, you have
6   a -- it's not a deferred -- is it -- it's -- you have to
7   maintain it as a liability on your -- on your balance
8   sheet.  It's something -- you owe that money back to
9   those customers if you don't deliver the services.  And
10  as you deliver the services, you can reduce that
11  liability.
12       So account 2261 I believe was a liability
13  account on the balance sheet.
14   Q   Was account 2261 specifically related to
15  education or was it a general --
16   A   It was I believe specifically related to
17  education.
18   Q   Do you know whether there were other accounts
19  like 2261 for other divisions of the company?
20   A   I believe there were.
21   Q   Do you know any of those by name or number?
22   A   No.
23   Q   Take a look at the bottom of page 200043,
24  starting with, "The bad news," and read that -- you don't
25  have to read it out loud.  Read it to yourself on through

155

1   to the next page, ending with, "revenue should not have
2   been created in the first place."
3    A   Where is that?
4    Q   It's on the next page, down about 12 lines.
5       Is this simply another explanation of the credit
6   memo issue that you explained previously?
7    A   Yes.
8    Q   And what does it mean where it says it could be
9   used by the customer for classroom registrations?
10   A   So once again, in the example I gave you, a
11  customer is invoiced $5,000.  They get a $5,000 credit in
12  this separate system in addition to the $5,000 liability
13  in the balance sheet.  A credit memo happens, that wipes
14  out everything in the accounting system.  So now that's
15  zero, but you've still got this $5,000 credit in
16  classroom hours over here.
17       You re-book the $5,000 -- it creates the $5,000
18  entries, including the liability, and another $5,000 back
19  over here.  So now you've got $5,000 liability over here,
20  $10,000 class hours.
21   Q   Okay.
22   A   So they're available to the customer unless we
23  go correct it.  They may not know it's available.  They
24  may never, ever use it.  We may correct it, but it's
25  there.  And if a customer went aggressively and wanted to

156

1   train a bunch of people and they saw they had credit
2   hours, they could use that.
3    Q   And again, if they didn't use it and it expired,
4   then what happened?
5    A   It would be released as revenue.  But then there
6   becomes the accounting difference.  You can't make two
7   lots of revenue.  So an alarm bell goes off at some point
8   in time when it gets big enough to notice.
9    Q   And at that point the customer is not billed
10  again --
11   A   No.
12   Q   No.
13       This e-mail discusses people working on
14  analyzing and researching the discrepancies.  Do you
15  recall who specifically worked on doing that?
16   A   I don't recall every name, but there were --
17  Carrie Fitzpatrick was somebody who worked on this, I
18  believe, Jim Stein worked on it, and people in Jim's
19  organization worked on it.  There was probably I'm
20  guessing three or four people that were involved with
21  this.  It was quite a fire drill.
22   Q   And when you say they worked on it, were they
23  basically working on it on a full-time basis for some
24  period of time?
25   A   Yes.

157

1    Q  And who was in charge of that, analyzing and

2  researching the discrepancies?

3    A  So Jim Stein was in charge of the analytics

4  because it was a problem inside the Americas system.

5    Q  Mm-hmm.  And who -- who is Carrie Fitzgerald?

6    A  Carrie Fitzpatrick.

7    Q  I'm sorry.  Fitzpatrick.

8    A  Carrie was somebody that worked for Jim Stein at

9  that point in time.

10    Q  Do you know how long it took them to do this

11  research and analysis?

12    A  I don't recall how long it took to solve the

13  whole problem, but I do know it took approximately a week

14  per month to -- to figure out how to do this.

15    Q  Do you know if they had completed this at the

16  time you left the company?

17    A  I don't know.

18    Q  So you don't know when the project was finished?

19    A  No.

20    Q  Do you know the result of the project?

21    A  No.

22    Q  And who was the senior finance manager that

23  was super -- I'm sorry -- supervising the effort as

24  discussed on page 200045?

25    A  Can you point me to that, please?  Oh, I see.

158

1        I believe, and you'd have to get Dan to answer

2  this, but that was Carrie Fitzpatrick.

3    Q  Okay.  And she was someone under Dan?

4    A  Yeah, either under Dan or under Jim.  I can't

5  remember the exact reporting structure, but she was in

6  that organization.

7    Q  And do you know who the person in corporate

8  accounting or person or persons in corporate accounting

9  who were dealing with this issue were?

10    A  No, I don't.

11    Q  Do you know who was responsible for forecasting

12  the placeholder revenue adjustment of 20 million as

13  discussed on that same page?

14    A  I don't, but I would have to believe it was a

15  combination of Dan, Jim, and the corporate accounting

16  team.  It would not have been a unilateral number.

17    Q  Do you know what, if any, adjustment was

18  actually made for the purpose of the Q1 2000 results?

19    A  No, I don't.

20    Q  Same question for Q2 2000?

21    A  No, I don't.

22    Q  And then turning to your e-mail, which is on

23  page 200043.

24    A  Okay.

25    Q  And it appears -- I apologize for the order of

159

1  these, but this is how they were produced to us.  But it

2  appears from the very first page of that document that

3  you sent that e-mail to Jennifer Minton on August 18th,

4  2000, with a copy to Dan Sharpley?

5    A  Mm-hmm.

6    Q  Who are Jeff, Tom, and Gary to whom you refer to

7  in this e-mail?

8    A  That would be Jeff Henley, H-E-N-L-E-Y, Tom

9  Williams, and Gary Bloom.

10    Q  Do you recall having discussions with Jeff, Tom,

11  and/or Gary about this issue?

12    A  I recall having discussions.  I don't recall

13  exactly whether they were all in the same room or the

14  same time, but I had discussions with one -- at least one

15  of them on this topic and possibly all of them.

16    Q  Do you recall any specific conversation with Tom

17  Williams on this topic?

18    A  There was -- there was a discussion around the

19  fact we needed to figure this stuff out.  That's

20  basically it.

21    Q  Was that basically a directive from Tom to you?

22    A  Well, I don't know if it was like specifically a

23  directive, go -- go figure this out.  But it's like, we

24  need to go figure this out together.  So I did my side,

25  he was working on his side, and we figured it out.  It

160

1  was -- it was an issue that needed to be resolved.  It

2  wasn't like --

3    Q  Do you know anyone in Tom's division who was

4  working with Tom on this issue?

5    A  Again, I don't recall the names of the people in

6  the general accounting group.

7    Q  Do you recall how Jeff Henley became involved in

8  this issue?

9    A  He was like the CFO, so he get's to hear about

10  these things.

11    Q  Do you know who involved Jeff in this?

12    A  I don't know.

13    Q  Would it have been something that you would have

14  taken directly to Jeff?

15    A  I would have no reason to take this directly to

16  Jeff.  It may have come up in a conversation with Dan, it

17  may have come up in a conversation with Tom, but I

18  believe I spoke to him about this at one point.

19    Q  You believe you spoke to Jeff about this at one

20  point?

21    A  I believe so.

22    Q  Okay.  Then if you'll go down about seven or

23  eight lines where you say, "Also Dan and I spoke with Tom

24  on Wednesday to get his input on what to do with the

25  placeholder of 20 million dollars that Tom requested be

161

1  included as a corporate adjustment in the current
2  education forecast."
3      A  Mm-hmm.
4      Q  Do you know why that became a corporate
5  adjustment as opposed to something else in the education
6  forecast?
7      MR. RUBIN:  Objection; form.
8      THE WITNESS:  It's -- it's an adjustment against the
9  corporate number as opposed to, you know, any particular
10  line.  It's -- corporate adjustment is like a high-level
11  adjustment.  It would be put in as a placeholder so that
12  the aggregate numbers look right, as opposed to
13  necessarily going into the Americas forecast, making a
14  whole bunch of detailed changes that sum up to 20 million
15  dollars, and then have that aggregate up.  It's a simple
16  way of putting a placeholder amount in.
17  BY MS. WINKLER:
18      Q  And when you say "placeholder amount," that was
19  because no one had determined yet at that point how much
20  it was actually going to be; is that correct?
21      A  Correct.  And a forecast is to guide, you know,
22  to get an idea as to where we're going to end up.  So put
23  it in.  It will raise people's attention to this matter
24  and they won't forget it.
25      Q  And again, you don't know where it ended up, if

162

1  20 million was correct or not?
2      A  I don't recall.
3      Q  And do you recall any specific discussions you
4  had with Gary about this issue?
5      A  It was most likely part of a normal one-on-one
6  update on what was happening inside his organization.
7      Q  Later on in that e-mail you say, "We also
8  discussed at a high level some of the content of the
9  attached presentation, specifically the identified
10  deficiencies."  Who are you referring to when you say,
11  "we"?
12      A  I'd have to read this again, if you'd bear with
13  me.
14      Q  Sure.  Take as much time as you need.
15      A  I would be referring to Dan and Tom.  Dan
16  Sharpley and Tom Williams.
17      Q  Did you ever discuss this issue directly with
18  Ms. Minton?
19      A  I don't recall.  Obviously I included
20  communication-wise to her.  I didn't report to her at
21  that time.  I didn't have reason to deal with her at that
22  time, so -- but I may have.
23      Q  You don't recall any specific conversation?
24      A  No.  I was dealing with Tom on this one.
25      Q  Do you know if Ms. Minton ever responded to you,

163

1  to this e-mail?
2      A  I have no way of telling.
3      Q  Do you recall what your involvement was in this
4  process after you sent this e-mail?
5      A  Just making sure Dan kept doing the work.
6      Q  And then if you'll turn to the -- what looks
7  like a PowerPoint presentation that starts on 20034.
8      A  Mm-hmm.
9      Q  In the sequence of events on page 200036, you
10  say the issue was raised to you by Tom Williams.  Does
11  that refresh your recollection about how this issue was
12  raised initially?
13      A  Again, if this is what it says, then yeah,
14  that's the way it was.
15      Q  And is this a presentation that you prepared?
16      A  It looks like my style, yeah.
17      Q  Do you know what you're referring to when
18  it's -- when you say, "Press release prep meeting"?
19      A  Sure.  At the -- at the end of every quarter
20  you've got to report your results to the financial
21  community and the public.  There's a process to get
22  prepared for that, both on a -- you know, accounting and
23  records perspective, but also looking at the state of the
24  business.
25      So there was always a regular communication

164

1  between Jeff's office, either Jeff or people on his team,
2  to say, "Give us an update on what's happening in your
3  business so that we're aware of it and can present it to
4  the public if need be."
5      Q  Did you regularly have meetings with Jeff before
6  each one of these press release occurrences?
7      A  I don't know if we regularly had meetings, but
8  if he asked for information on -- "give me an update on
9  the state of the support business," then I would send in
10  the latest and greatest report.  If he had a specific
11  question about a specific issue, then I would respond to
12  that.  I think it would be incorrect to say we had a
13  regularly scheduled meeting.
14      Q  Okay.  And when you talk about work plan at the
15  end of this sequence of events, are you referring to what
16  was going to be done to analyze and research what was
17  going on?
18      A  Correct.  It was our plan of attack to solve
19  this problem.
20      Q  Turning to the next page under "Actions Taken,"
21  what do you mean when you say, "System reports reviewed
22  and updated.  Improvements made but still flawed"?
23      A  So I mentioned to you that there was some
24  reporting deficiencies in the ERS system.
25      Q  Mm-hmm.

165

1    A  Well, some work was done to try and improve the
2    effectiveness of those reports, and whilst they got
3    better, they still had identified problems.
4    Q  Given that you were still -- the group was still
5    using ERS at this time, can one assume that you had
6    not -- that 11i hadn't been implemented yet?
7    A  I think that's reasonable to assume.
8    Q  Turning to the next page, 200038, what are you
9    referring to when you say, "Timing differences exist and
10   are difficult to keep track of"?
11       So this is where one part of the transaction
12   happens in one accounting period and another part of it
13   happens in another accounting period.  So an example
14   might be the credit memo -- the invoice happening on the
15   30th of a month, and the credit memo happening on a --
16   you know, the 5th of the next month.
17       So you typically run reports on a monthly basis.
18   Well, you'd only have half the picture here and half the
19   picture here, and trying to marry those timing
20   differences together is just hard to do in a
21   reconciliation.
22       Q  So is that something that was unique to people
23   using the ERS system, or did that happen in other areas
24   of the company?
25       A  The concept of timing differences is a common

166

1    challenge in any type of financial reconciliation.
2    Q  What are you referring to when you say,
3    "Postings to the GL that appear incorrect"?
4    A  I believe that's referring to the two items that
5    were previously mentioned in the e-mail that needed to be
6    looked into further.
7    Q  Do you know if any changes were ever actually
8    made to the GL as a result of the investigation that took
9    place?
10   A  I don't know.
11   Q  On the next page under, "Identify Deficiencies,"
12   you mention "No backward integrity."  Do you recall what
13   you were referring to here?
14   A  So there was a one-way posting for an invoice.
15   There was no -- if that invoice was removed, there was no
16   backward integrity to ensure it was removed from the
17   other system.
18   Q  And what is the alert mechanism -- mechanism
19   that you refer to?
20   A  Based upon my recollection, there was a manual
21   process that took place when a credit memo was issued
22   that sent an alert, which was a -- usually an
23   e-mail-based message to a catcher somewhere in the
24   organization to say this has happened.  There was an
25   inconsistent process to manage those manual alerts.  And

167

1    oftentimes, again, through timing differences or work
2    loads, things weren't done correctly.  So it wasn't done
3    systematically, and the manual work-around processes to
4    try and patch this hole were not perfect.
5    Q  And by "catcher," you're meaning some specific
6    individual was --
7    A  Correct.
8    Q  -- supposed to do this?
9    A  Somebody in the education group should have
10   gotten these alerts and done something with them.  Maybe
11   they didn't get them.  Maybe they got them and didn't
12   have time to deal with them.  Maybe they got them and
13   didn't deal with them correctly.  So there were a number
14   of flaws in that alert process.
15   Q  And then on the next page you discuss the
16   reconciliation process.
17   A  Mm-hmm.
18   Q  Prior to the investigation that's the subject of
19   these e-mails, what was the reconciliation process?
20   A  My understanding is there was a process that was
21   transacted once a year to look at the general ledger
22   balances, look at the education balances, and make sure
23   they were reasonably in sync.  In theory, there should
24   only be as much liability as there is credit hours left.
25   Q  And do you know whether they had been reasonably

168

1    in sync in prior years?
2    A  My understanding is they were materially
3    consistent.  Again, there are lots of little things that
4    could happen, including timing differences, et cetera,
5    but typically the reconciliation process would be to a
6    degree of materiality, not an exact measure.
7    Q  And so what was it that triggered this new way
8    of reconciling, this actual investigation of what was
9    happening?
10   A  Well, somewhere between the last reconciliation
11   and the point in time that it got out of whack, something
12   didn't work right.  Now, what it was, I can't tell you.
13   I can't tell you what prompted it, but, you know.
14   Q  What do you mean when you say, "Internal audit
15   doesn't perform audit work in U.S."?
16   A  Well, there is an internal audit team whose
17   charter was to audit the operations of geographic
18   businesses.  So they didn't actually perform any audit
19   work in the U.S. and they performed it in the U.K.,
20   Germany, France, et cetera.
21   Q  And this internal audit, are you talking about
22   the company's internal audit team?
23   A  Correct.
24   Q  Do you know why they didn't perform any internal
25   audits in the U.S.?

Donnelly, Peter  11/30/2005  3:44:00 PM

169

1    A  You'll have to ask the head of internal audit.

2    Q  Who was the head of internal audit at the time

3  that you left?

4    A  I knew you were going to ask me that.  I think

5  it was Anika, and I don't want to say Sorensen because

6  she's the golfer.  It was Anika somebody, so...  But

7  there's been a number of changes since then.

8    Q  Did you have any understanding of -- strike

9  that.  Let me start over.

10    Did you have any understanding of the

11  relationship between internal audit and external audit?

12    A  Very limited.

13    Q  How did you conclude that the external audit

14  process didn't pick it up, other than the fact that it

15  hadn't been flagged or raised before as an issue?

16    A  That was the only --

17    Q  That was the only reason?

18    A  Yeah.

19    Q  I apologize if I asked you this already, but do

20  you know why internal audit didn't do any work in the

21  U.S.?

22    MR. RUBIN:  Asked and answered.

23    MS. WINKLER:  Thanks, Lee.

24    MR. CAPLAN:  Somebody remembered.

25    THE WITNESS:  It just wasn't part of their charter.

170

1  The only financial operations in the U.S. were at

2  headquarters, and I guess they felt they did everything

3  right, so...

4    BY MS. WINKLER:

5    Q  On the last page, 200041, the last line, you

6  have an entry that says, "Adjust financial records as

7  necessary.  Estimated 30 million to 45 million."

8    A  Mm-hmm.

9    Q  Do you know why that figure is 30 million to

10  45 million, but in the e-mails you discuss a placeholder

11  of 20 million?  Why the discrepancy?

12    A  So the placeholder was designed to raise

13  visibility.  It wasn't designed to make an accounting

14  entry.  It was Tom wanted a big red flag added to the

15  forecast so management knew about this.

16    Based upon an extrapolation of the work that had

17  been done against subsequent months, we said it could be

18  anywhere in this range.  The 20 million dollars was as

19  good a guess as the 30- to 45-million-dollar guess.

20    Q  And when you say "this," you're referring to the

21  revenue could have been overstated by this amount; is

22  that correct?

23    A  Correct.

24    Q  And once again, you don't know what the ultimate

25  determination was with respect to how much revenue had

171

1  been overstated?

2    A  No.

3    Q  And do you know whether that was because it

4  hadn't been completed yet when you left, or did you

5  somehow become detached from the project?

6    MR. RUBIN:  Objection; form.

7    THE WITNESS:  I don't recall.

8    MS. WINKLER:  Let's take a short break.  Maybe a

9  five-, ten-minute break.  Does anyone need a break now?

10  I can go a little longer.

11    MR. RUBIN:  I can keep going.

12    THE REPORTER:  I actually do need a break.

13    THE VIDEOGRAPHER:  This is the end of Videotape

14  Number 2.  We are now going off the video record.  The

15  time is 2:37 p.m.

16    ( Recess taken:  2:37 until 2:44 p.m.)

17    THE VIDEOGRAPHER:  This is the beginning of

18  Videotape Number 3.  We are now back on the video record.

19  The time is 2:44 p.m.

20    BY MS. WINKLER:

21    Q  Mr. Donnelly, the court reporter has just handed

22  you what's been marked as Exhibit 7.

23    (Deposition Exhibit 7 was marked.)

24    BY MS. WINKLER:

25    Q  And I just wanted you to take a look at the

172

1  first page of that.  You'll see it's an e-mail from

2  Jennifer Minton to Jeff Henley dated August 21st, 2000?

3    A  Mm-hmm, yes.

4    Q  And I'll represent to you that the remainder of

5  this until the last page is the same as the document we

6  just discussed.

7    A  That's correct.

8    Q  If you'll take a look at the last page -- and

9  the document, for the record, is NDCA-ORCL 2000 -- I'm

10  sorry -- 200189 through 200205.  If you'll take a look at

11  200205, which is Minton's message to Henley, do you have

12  any understanding of why she would have sent this

13  message?

14    A  No.

15    Q  Do you know why she would have been concerned

16  that you were spending time focusing on who knew what

17  when?

18    A  No.

19    Q  Do you know what she's referring to when she

20  says, "especially given Gary's last response"?

21    A  No.

22    Q  Do you recall Gary ever having any specific

23  opinions on the issue with respect to the 2261 account?

24    A  I don't recall.

25    Q  We discussed credit memos briefly.  Do you know

Donnelly, Peter  11/30/2005  3:44:00 PM

173

1    what a debit memo is?

2        A  In what context?

3        Q  In any context of work that you did at Oracle.

4        A  Work that I did?  No.

5        Q  Do you have any knowledge of debit memos being

6    used at Oracle?

7        A  I have no specific knowledge of debit memos

8    being used.

9        Q  Do you have any general knowledge of debit memos

10   being used at Oracle?

11       MR. RUBIN:  Objection; form.  I don't know what

12   "general knowledge" means.

13       THE WITNESS:  The term is not an uncommon term, but

14   again, I was not involved in the accounting side.

15   Whenever you hear the term "debit memo" or "credit memo,"

16   it's an accounting term.  I'm not an -- I am an

17   accountant, but I'm not an accountant anymore.

18   BY MS. WINKLER:

19       Q  Do you recall any issues surrounding or with the

20   use of debit memos in November of 2000?

21       A  I don't recall anything specific.

22       (Deposition Exhibit 8 was marked.)

23   BY MS. WINKLER:

24       Q  Mr. Donnelly, the court reporter has just handed

25   you Exhibit 8, which is NDCA-ORCL 085149 through 085167.

174

1    Do you recognize this document?

2        A  This looks like a similar document that we

3    looked at from the support line of business.  It's a

4    briefing on the financial and business status of the

5    education line of business.

6        Q  And is this something that Dan Sharpley prepared

7    when he worked for you at Oracle?

8        A  That's correct.

9        Q  Take a look at the second page of this document,

10   085150, and at the bottom line that says, "Revenue

11   includes 19 million dollars in adjustments, 20 million

12   2261, and one million other."  I'm sorry.  It looks like

13   it's minus 20 million 2261, and one million other."

14       A  Mm-hmm.

15       Q  Do you recall whether the review process was

16   complete at this time?

17       A  I don't believe the review process was complete

18   at this time.

19       Q  Do you know how Dan derived the

20   19-million-dollar -- I'm sorry -- the 20-million-dollar

21   2261 figure?

22       A  This is, again, referring back to the previous

23   document that stated 20 million dollars as the accounting

24   estimate.

25       Q  So it was simply the placeholder --

175

1        A  Correct.

2        Q  -- that he's using in this document?

3        Do you know whether anyone directed Dan

4    specifically to use that number in this document?

5        A  If this is a -- no.  So I do not know if anyone

6    specifically asked him to put this in there.

7        Q  Take a look at the -- starting on page 11,

8    there's a Q2 fiscal year '01 forecast, fiscal year 2001

9    forecast.  I'll represent to you that for the remainder

10   of this document in the Q2 forecast there doesn't appear

11   to be any reference to the 2261.  Do you know why it

12   would have been included as a placeholder in the Q1

13   slides but nothing in the Q2 slides?

14       A  My assumption is the 20 million dollars is a

15   good-faith estimate of solving that problem.  That was

16   used as a placeholder to fix that problem and forever put

17   it to bed.

18       The Q2 forecast is a forward-looking projection

19   as to what the business looked like in the future.  If we

20   assume that this problem is done, there should be no need

21   to make a further adjustment.

22       Q  Do you recall whether people believed that they

23   were going to resolve this issue before the beginning of

24   Q2?

25       A  I don't recall.

176

1        (Deposition Exhibit 9 was marked.)

2    BY MS. WINKLER:

3        Q  Mr. Donnelly, the court reporter has just handed

4    you Exhibit -- 9?  Is that it?

5        A  9.

6        Q  Which is NDCA-ORCL 154007 through 154012.  Can

7    you identify this document?

8        A  So this appears to be an e-mail note from --

9    well, something -- the order of this is kind of funky.

10       Q  Yeah.  Yeah, I apologize.  This is the way they

11   are provided to us.

12       A  It's okay.

13       Q  It's not in the expected order.

14       A  So this is a note from John Hall to

15   Sohaib Abbasi forwarding on a note that was sent from

16   Dan Sharpley to myself and John.

17       Q  And it's -- John's e-mail is dated December 7th,

18   2000; is that correct?

19       A  Correct.

20       Q  And who was Sohaib Abbasi?

21       A  Sohaib Abbasi was the senior vice president or

22   executive vice president of the tools group that at this

23   point in time took over responsibility for the education

24   organization.  And I believe Sohaib at the time reported

25   to Gary Bloom.  Actually, sorry.  I take that back.  Gary

177

1   had left, so this was the reorganization, and Sohaib
2   picked up education.  My apologies.
3       Q   Prior to the reorganization, do you recall
4   Sohaib's position?
5       A   It was the senior vice president or executive
6   vice president of the tools division.
7       Q   And then -- I'm sorry.
8       A   Which is part of the R&D group.
9       Q   And at that point, did he report to Gary Bloom?
10      A   I'm a bit vague about this because there was
11  some strange reporting relationships that occurred.  I
12  believe he did, but I may be -- I may be wrong.  He may
13  still have reported to Larry Ellison.  I provided
14  financial support to his group, so to me it was seamless.
15      Q   Okay.  Take a look at the actual e-mail,
16  154000 -- 154009.  What is the 11-million-dollar revenue
17  offset referred to in the second line?
18      A   I don't know.
19      Q   Do you know whether that relates to the 2261
20  issue?
21      A   I don't know.
22      Q   Is it possible that that does?
23      A   I -- I don't know.  If I could read the rest of
24  the e-mail, I'll be a bit more --
25      Q   Sure.  Take your time, please.

178

1       A   Again, I -- unfortunately, I don't know.
2       Q   Okay.  When we were initially discussing the
3   2261 account issues, you talked about how certain
4   registrations might expire, classroom registrations might
5   expire if they weren't used at the end of the year?
6       A   Mm-hmm.
7       Q   Were certain of those customers government
8   customers?
9       A   I don't know.  I'd have to see them.  Some of
10  them might have been.
11      Q   Do you know if Oracle had any issues with the
12  way they billed government customers with respect to
13  these -- these corporate training issues?
14      A   I don't know.
15      Q   Was it Oracle's practice to invoice or bill all
16  of their customers prior to them actually using the
17  training so they were pre-billed or it was prepaid for?
18      A   Well, everything had to be billed before it was
19  used.  There were some customers that bought credits in
20  advance, and there were some customers that bought a
21  class at a time.  But in every case, you get billed for
22  it before you can use it.
23      Q   And in every case, if it wasn't used, did it
24  expire?
25      A   There were expiration rules around the use of a

179

1   class -- prepaid classes.
2       Q   And do you have any particular understanding of
3   how that worked with respect to the federal government or
4   the general services administration?
5       A   I have no specific knowledge.
6       Q   Do you know if any refunds were ever made of
7   credits, prepaid credits that had actually -- that had
8   expired, if that money was ever refunded to customers?
9       MR. RUBIN:  Objection; form.
10      THE WITNESS:  I'm not aware.
11  BY MS. WINKLER:
12      Q   Have you ever talked to Defendants' counsel
13  about this case?
14      A   No.
15      Q   Have you ever been interviewed by any federal
16  agency such as the FBI or the SEC about this case?
17      A   No.
18      Q   Have any of them ever attempted to contact you?
19      A   I don't know if they've attempted.
20      Q   Have -- have they contacted you and you refused
21  to be interviewed?
22      MR. RUBIN:  If a tree falls in the woods...
23      MR. CAPLAN:  That's a good objection.
24      MR. RUBIN:  It is.  It's excellent.  You can go now.
25      THE WITNESS:  I don't believe anybody has tried to

180

1   contact me.
2   BY MS. WINKLER:
3       Q   Thank you.
4           Earlier, whenever Mr. Rubin was asking you
5   questions, you discussed a process that was used to
6   historically map how the forecasts matched up with the
7   actuals.
8       A   Mm-hmm.
9       Q   Do you recall that testimony?
10      A   Yes.
11      Q   If I wanted to see the result of that process,
12  see those documents, what would I -- what would I ask for
13  or what would I want to look at?
14      A   I don't know if they had specific names, but you
15  would be asking for the forecast actual trends for
16  license sales.  And then you'd also be asking for
17  conversion trends of the pipeline.  So again, you're
18  mapping the known to the unknown and trying to make the
19  unknown a good estimate.  Those are the two things, and
20  then there was the management judgment, which was a line
21  item in the forecast.
22      Q   Now, when you -- so it's my understanding from
23  your testimony that there was some -- some document that
24  actually compared the historical forecast with the
25  actuals.  Is that correct?

181

1     A  So there were analytics that were prepared.  I
2 don't know if it -- I don't think it's correct to say
3 there was a formal document that was presented, though
4 that information was available in our systems.
5     Q  And then was there a formal document that
6 demonstrated the use of that information to make future
7 forecasts?
8     A  Again, I don't know if there was a formal
9 document on any of this.  There was a lot of information
10 available that was drawn together that -- based on past
11 trends and current situation, to come up with a -- an
12 estimate of where we're going to end up.
13     Q  And if I wanted to see that information, for
14 example, with respect to the third quarter, what would I
15 ask for to see how that information was used to come up
16 with a forecast?
17     A  So, again, I'm not sure if there's a specific
18 document that you'd ask for, but you'd specifically ask
19 for the actual trends and the forecast trends within a
20 given time period.
21     Now, there are date stamps of all of this
22 information.  A forecast is done in week -- you know,
23 week zero, week two, week four, week six, week eight, and
24 then in the last month it's every week -- the last month
25 of a quarter it's every week.  So those are documents

182

1 that you could gather and do your own trending analysis.
2 And we -- there were people that did this trending
3 analysis and figured that out.  I don't know what the
4 document was that you put it in.  It wasn't anything
5 published.
6     Q  How far back did the trending analysis go
7 whenever you were working with it?
8     A  I don't recall.
9     Q  Was it more than five years?
10     A  I would -- I would say five years would be a
11 reasonable estimate.
12     Q  Do you know whether Ivgen Guner was a direct
13 report of Jennifer Minton's?
14     A  Yes.
15     Q  She was?
16     A  Yes.  Actually, I'm going to take that back.
17 She was at one point in time, but I think she ended up
18 working for Larry Garnick, who was a direct report of --
19 again, strange organization.
20     Q  So at some point in time Larry and Ivgen were on
21 the same level, and then -- is that correct?
22     A  At one point in time they were both VPs, vice
23 presidents.  I don't know if they both reported in to
24 Jennifer at that time, but they were at the same level.
25     Q  Okay.  And also you testified this morning about

183

1 what management was saying about the third quarter,
2 correct?
3     A  Mm-hmm.
4     Q  Do you recall what your coworkers were saying
5 about the third quarter?
6     A  So I didn't have any coworkers.
7     Q  I'm talking about the period shortly before you
8 left.  Let's say December 2000.
9     A  So we were 18 days into that quarter, of which I
10 spent about two weeks on the road.  So I didn't really
11 have many conversations about the third quarter.  It was
12 more anticipation of the second quarter's results, if I'd
13 had any conversations about performance.
14     Q  What about conversations about the third quarter
15 forecasts?
16     A  Be more specific.
17     Q  What were any comments that your coworkers or
18 people you came into contact with when you were traveling
19 in December 2000 made about the company's third quarter
20 forecasts?
21     A  The general sort of buzz out there is, how are
22 we so immune from these economic downturns?  How can our
23 numbers still be in line with expectations?  You know, it
24 seems almost too good, but hey, we're delivering.  That
25 type of commentary, but nothing specific to a forecast.

184

1 I didn't have access to forecasts and have a desire to
2 talk about forecasts.  I didn't know I was leaving the
3 company at that time.  It wasn't part and parcel of my
4 normal responsibilities.  So nothing specifically about a
5 specific forecast.
6     Q  And when you say "the economy," what was going
7 on in the economy at that time?
8     A  It's like the tumbling of the NASDAQ.  I think
9 it was pretty prominent around that time.  Companies
10 missing their results, that type of thing.
11     Q  Do you recall whether you talked about the
12 economy with the investigator?
13     A  I don't recall one way or the other.
14     Q  Did you attend any, like, Oracle holiday events
15 in that December -- in December 2000 before you left the
16 company when you were traveling or -- or back at home?
17     A  I'm trying to think.  I don't believe I did.
18     Q  Do you recall any buzz among the -- your
19 coworkers, anyone else at the company along the lines of
20 "Santa won't be coming to Oracle next year"?
21     MR. RUBIN:  Objection; form.  I don't know what the
22 term "buzz" means.
23     MS. WINKLER:  It's a term that he used in his prior
24 testimony.
25     MR. RUBIN:  I'm just making the objection.

185

1      THE WITNESS:  I don't recall anyone saying Santa's

2   not coming this Christmas, or next Christmas, to be

3   specific.

4      BY MS. WINKLER:

5      Q   Okay.  After you left the company, did you keep

6   in touch with any of your former coworkers, colleagues?

7      A   A small number of them.

8      Q   Did you talk to them about how the company was

9   doing, forecasts, things like that?

10      A   Don't recall.

11      Q   And you testified earlier that you don't recall

12   anything that you talked about with the investigator; is

13   that correct?

14      A   Again, this was five years ago.  The reason why

15   I called was answered in a way that was unfavorable to

16   the reason why I was calling, so it was more being polite

17   than anything else.

18      MS. WINKLER:  Let's take a -- just a very short,

19   five-minute break, and I might be close to being done.

20      THE VIDEOGRAPHER:  We are now going off the video

21   record.  The time is 3:06 p.m.

22      ( Recess taken:  3:06 until 3:13 p.m.)

23      THE VIDEOGRAPHER:  We are now back on the video

24   record.  The time is 3:13 p.m.

25      MS. WINKLER:  Mr. Donnelly, I think I am done with

186

1   my questioning.  I thank you for your time today.  And

2   Mr. Rubin may have --

3      MR. RUBIN:  Just a couple.

4      MS. WINKLER:  -- a few more questions.

5      THE VIDEOGRAPHER:  Do you want to go off the record

6   to switch?

7      MR. RUBIN:  I can do that from here.

8      (Discussion off the record.)

9      MR. RUBIN:  That's fine.  Let's go ahead and switch.

10   It only takes one minute.

11

12          EXAMINATION (Further)

13   BY MR. RUBIN:

14      Q   Mr. Donnelly, just a few follow-up questions in

15   connection with some -- some of the areas that

16   Ms. Winkler asked you about.

17      In terms of this -- Ms. Winkler showed you a lot

18   of documents related to the issue that had arisen in

19   connection with the education revenue, correct?

20      A   Yes.

21      Q   Now, would it be fair to characterize Oracle's

22   efforts as essentially just trying to get to the right

23   answer?

24      A   That was certainly my approach, yes.

25      Q   And did you -- and was it your understanding

187

1   that that was -- that was the approach of your colleagues

2   at Oracle?

3      A   Seemingly most of them, until today.

4      Q   Until today, meaning who?

5      A   The comment that was referenced in one of the

6   exhibits from Jennifer Minton.

7      Q   Oh, I see.

8      A   Seemed surprising to me when I read it.

9      Q   But in terms of Dan Sharpley's work, for

10   example, was he making an effort to try to get to the

11   bottom of what had happened?

12      A   Yes.

13      Q   And Mr. -- or Ms. Fitzpatrick's work?

14      A   Yes.

15      Q   Would you character it in the same way?

16      A   Yes.

17      Q   Yes.  And this was an issue that had arisen.

18   Everyone was trying to figure out how much of an

19   adjustment should be made and then make it, correct?

20      MS. WINKLER:  Objection; form.

21      THE WITNESS:  Again, yes, except with the one caveat

22   that I learned about today.  It didn't seem to be as

23   important to one person.

24   BY MR. RUBIN:

25      Q   You're talking about Ms. Minton's comment?

188

1      A   Correct.

2      Q   But at the time that you were working on it, did

3   you have any sense that anybody -- did you have any sense

4   that anybody was attempting to try to push this under the

5   rug?

6      A   Not anybody in my group, no.

7      Q   Anybody trying to conceal it in any way?

8      A   Not that I'm aware of.

9      Q   Did you have any -- at the -- based upon your

10   knowledge of the ERS issue, did you -- was there any

11   indication based on any of the information that you

12   became privy to that the original error was the result of

13   any intentional misconduct?

14      A   No.

15      Q   This was a systems error?

16      A   It was a systems and a process reconciliation

17   error, yes.

18      Q   Right.  And when the -- at some point in time,

19   was a Suite 11i module implemented to replace the ERS

20   system?

21      A   I believe so, but the timing is a bit fuzzy.

22   I'm not sure whether that happened in the second half of

23   2000 or whether it happened -- was being planned for at

24   that time and happened subsequent to my departure.  I

25   can't remember.  But certainly there was dialogue around

189

1    replacing the system with part of the 11i suite.
2        Q   And do you have any memory sitting here today of
3    whether that improved the processes?  And when I say
4    "improved," I mean address some of the deficiencies that
5    have been identified because of a separate system that
6    didn't link into the general ledger.
7        MS. WINKLER:  Objection; form.
8        THE WITNESS:  I don't have any specific memories.
9    BY MR. RUBIN:
10       Q   Do you have any general memory --
11       A   No.
12       Q   -- of it being improved?
13       A   No.
14       MS. WINKLER:  Objection; "general memory."
15       MR. RUBIN:  Okay.  Goose, gander.
16       THE WITNESS:  Is this a game you guys play here?
17   BY MR. RUBIN:
18       Q   Now, you had indicated that -- I believe
19   Ms. Winkler asked you a few questions about Suite 11i.
20       A   Yes.
21       Q   And I think specifically she showed you some
22   bullet points in a PowerPoint presentation?
23       A   Yes.
24       Q   And specifically, I think she drew your
25   attention to some items relating to customer concerns or

190

1    customer feedback about integration.  Do you remember
2    that?
3        A   Yes.
4        Q   Now, did you play any role in designing
5    Suite 11i from a computer --
6        A   Any role or --
7        Q   Did you play any -- did you play any role in
8    terms of the software, writing of the code, or any of the
9    software production?
10       A   So I did not -- I was not involved in any of the
11   software production.  However, as part of the process of
12   developing an application, they typically ask business
13   users around the type of functionality they would like to
14   see in these products.  And I believe I provided some
15   input to -- to that process, but I was not involved in
16   the building, testing, release of that product.
17       Q   And do you remember which particular modules or
18   functions you were asked to provide feedback about?
19       A   I don't recall.
20       Q   Okay.  Do you remember when that was?
21       A   I provided input to the general ledger
22   application when I was in corporate FP&A group at that
23   time.  I believe I provided some input for the marketing
24   application.  Beyond that, I don't remember any of the
25   specific comments from me personally.  But my team were

191

1    also asked to input on this.  So I have to believe Dan
2    would make comments on the education system, et cetera.
3        Q   And did you understand that the -- that -- what
4    did you understand the term "integration" to mean from a
5    design vantage point for Suite 11i?  What did you
6    understand Oracle's design integration to be or to relate
7    to?
8        MS. WINKLER:  Objection; form.
9        THE WITNESS:  So a couple of things.  One is you
10   could plug and play.  So if -- you didn't have to buy the
11   whole thing; you could buy modules and they would work.
12       And the second thing is they would talk to each
13   other.  So when you required a transaction to move from
14   one part of the suite to another, it did so in a
15   seamless, integrated way.
16   BY MR. RUBIN:
17       Q   Now, do you have any knowledge about how -- how
18   the code was written with respect to business processes
19   or business flows?  And when I ask that, I mean did it --
20   did the software as -- as produced and as sold, did it
21   have a finite number of business flows?  Did it have an
22   infinite amount of business flows, do you know?
23       MS. WINKLER:  Objection; form.
24       THE WITNESS:  I don't know.  I don't know.
25   BY MR. RUBIN:

192

1        Q   Do you know as you're sitting here today whether
2    any particular software could -- before being
3    implemented, could it anticipate or be able to
4    immediately communicate with any system that's in place
5    in a particular company or customer?
6        A   So I -- I think I understand your question.
7    Could you put in a piece of software and expect it to be
8    able to communicate with any other unrelated piece of
9    software?
10       Q   Yeah.
11       A   No.
12       Q   Okay.
13       A   But if it was part of a integrated suite, then
14   yes.  As an example, Microsoft Excel and Microsoft Word
15   have compatibilities with each other.  You can copy and
16   paste from one to the other; they work.
17       Q   Now, in terms of Suite 11i, like, let's take,
18   for example, the order management module.  Do you know
19   whether that module was built with some sort of default
20   settings?  I'll use "default" for lack of a better word.
21   That is, that it assumed -- so without doing anything
22   more, just based upon the code as written, that there
23   were a certain number of business flows within order
24   management that it was written to integrate with or to
25   deal with?

193

1     MS. WINKLER:  Objection; form.

2     THE WITNESS:  So based upon my understanding of the

3  applications, they all required some level of

4  configuration.

5  BY MR. RUBIN:

6     Q   So -- so -- and when you say "configuration,"

7  that could be configuration either by the customer or of

8  the Oracle software itself, correct?

9     A   I don't understand the difference between the

10  two.

11     Q   Well, so if you have -- let me give you an

12  example.  So if you had a customer that had six fields in

13  their order management.

14     A   Mm-hmm.

15     Q   And the Suite 11i software had a default setting

16  of four, when you say "configuration," are you talking

17  about the customer configuring so that they convert their

18  business flows to four fields, or are you talking about

19  Oracle converting to six or either/or?

20     MS. WINKLER:  Objection; form.

21     THE WITNESS:  So what I meant in my comment was in

22  order to use the software, the customer needed to make

23  certain decisions around how they wanted to integrate the

24  software.  As an example, the accounting flex fields.  I

25  probably got the term wrong.  Sorry.  Standard chart of

194

1  accounts.  My apologies.

2     The standard chart of accounts for a company

3  could be 1 through N in length.  There was probably a --

4  an end parameter for the 11i system.  I don't know, 64

5  characters, whatever it may be.  There was a finite

6  number of characters.  However, within that, a customer

7  could choose to have 2, 10, 15 or 20.  But they would

8  have to choose to have those.  The product did not come

9  with a quote/unquote standard chart of accounts.

10  BY MR. RUBIN:

11     Q   Is that your understanding?

12     A   That's my understanding.

13     Q   So you don't have an understanding that if they

14  happened to have the range that Suite 11i had a default

15  setting to, then it would actually not need to be

16  configured for that particular customer?

17     MS. WINKLER:  Objection; form.

18     THE WITNESS:  So, again, in the example that I gave

19  you, I don't believe the standard Oracle general ledger

20  came with a standard chart of accounts to start with.

21  And if it did, it would be of no use to 99.999 percent of

22  the companies because they all have their own.

23  BY MR. RUBIN:

24     Q   Right.

25     A   It's a customizable part of the application.

195

1     Q   And anybody in GL would understand that there is

2  almost an infinite array of alternatives within that

3  range, correct?

4     A   Correct.

5     Q   So now, do you -- is it your understanding that

6  Suite 11i was built essentially on a common language?

7     A   My understanding is it was built on a common

8  language.  However, I want to clarify one thing.  We've

9  used the term "Suite 11i."  There's really two components

10  to that.  There was the ERP component and the CRM

11  component.  I think there was a tenuous link between the

12  two, bringing the two together as one suite, fully

13  integrated.

14     Q   But they were -- they were all modules that

15  would -- that had the same common language within both

16  ERP and CRM?

17     A   So they -- they were sold as modules of a common

18  suite.  I don't know if they each had common code.

19     Q   Do you know one way or the other whether they

20  each had common code?

21     A   No.

22     Q   Do you know whether they had common language?

23     A   No.

24     Q   You don't know one way or the other?

25     A   I'm not a technical person so I can't tell you

196

1  whether every one of both pools of products had the same

2  structure and language and code.

3     Q   And I gather from your testimony just now and

4  previously that you were not in any way involved in

5  responding to customer escalations regarding

6  implementation?

7     A   No.

8     Q   You did not specifically respond to any TARs?

9     A   No.

10     Q   And you don't have any personal knowledge of

11  whether, in response to a particular customer concern,

12  that -- whether there was any code -- there were any

13  changes in the code or whether the customer was making a

14  user error?  You don't know one way or the other?

15     A   So I was aware of the -- what's called the bug

16  database, which is when a customer calls -- actually,

17  let's take about -- when a product is released, a product

18  is typically released with known bugs, of which -- of a

19  lower classification.  It's rare for a product to be

20  released with a priority 1 bug, which means it don't

21  work.  But it may be released with a priority 2 or 3 or 4

22  bug, a lower-level bug, a known problem.  The screen

23  twitches when you move to this screen; that's a bug.  We

24  don't know why.  Can't fix it.  Let's get the code out.

25  So products are released with bugs.  Those bugs are

197

1  tracked in something called the bug database.
2      When technical assistance requests come in, when
3  TARs come in, they are -- a lot of questions are asked
4  about the thing.  In some cases they may be user error.
5  In some case they may be instructional error in the
6  instructions that were given.  In some case it may be a
7  bug with the product.  If it's a bug with the product, it
8  will get added to the bug database.
9      So if you wanted to see how many bugs a
10  particular product has, you would run a report from the
11  bug database.
12      Q  And did you monitor or use that in any fashion
13  during your time at Oracle?
14      A  I did not.  I was aware of the existence of
15  this.  It was used by the groups that I supported, and
16  hence, the comment.
17      Q  And do you -- so it would also be safe to say to
18  the extent a complaint or a report was labeled internally
19  at Oracle as an integration-related bug, do you know the
20  factors that went into categorizing it as an integration
21  related bug as opposed to another kind of bug?
22      MS. WINKLER:  Again, I'm not technical, so I would
23  just assume that this is the ability for one application
24  to work in unison with another application or a module.

198

1  BY MR. RUBIN:
2      Q  Were you ware of customers, quote, "going live"
3  with one or more Suite 11i modules after the product was
4  rolled out?
5      A  I'm not aware of specific customers, but a lot
6  of people bought the stuff.
7      Q  As far as you knew, did people start to use it?
8      A  One would hope they did.
9      Q  Was it your understanding that they were using
10  it?
11      A  Yes.
12      Q  Yeah.  And in -- I think you answered that
13  question.
14      Okay.  Did you ever have any -- you personally
15  ever have any conversations with customers about concerns
16  about Suite 11i?
17      A  No.
18      MR. RUBIN:  All right.  I don't have anything
19  further.  Thank you.
20      THE WITNESS:  Thank you.
21      MR. RUBIN:  Thank you for your time.
22
23          EXAMINATION (Further)
24  BY MS. WINKLER:
25      Q  I just have a couple follow-up questions, and

199

1  I'll do it from here because I won't have that many.
2      MR. CAPLAN:  You've heard that before.
3  BY MS. WINKLER:
4      Q  In the -- in Graeme Maher's support
5  presentation, are you aware of who would have provided
6  him the information about 11i that went into that
7  presentation?
8      MR. CAPLAN:  Which number exhibit is it?
9      MS. WINKLER:  It is the one that starts out with
10  document number 503848.
11      THE WITNESS:  Yep.  Who would have provided him with
12  what information?
13  BY MS. WINKLER:
14      Q  The information related to 11i.  And first of
15  all, just the information related to 11i.
16      A  So the system that tracks the technical
17  assistant -- technical assistance requests would have
18  that information in there.
19      Q  So he would have -- the information with --
20  specifically information in the iTARs he would have
21  gotten from that system?
22      A  Correct.
23      Q  Do you know whether 11i was released with any
24  priority 1 bugs?
25      A  I don't know.

200

1      Q  What about the information regarding the
2  customer complaints about the lack of integration that is
3  contained within this document?  Where would Graeme have
4  obtained that information?
5      A  Again, the most likely place he would have got
6  it would have been from the records of the conversations
7  with the customers, and that would -- that would have
8  been included in the notes section of the iTARs.
9      MS. WINKLER:  That's all I have.
10      MR. RUBIN:  Thank you, Mr. Donnelly.
11      THE VIDEOGRAPHER:  This concludes today's
12  proceedings.  The number of videotapes used was three.
13  We are now off the video record.  The time is 3:31 p.m.
14      THE REPORTER:  For the written record, Counsel,
15  would you like a copy of the transcript with an ASCII,
16  mini, and rough ASCII?
17      MR. RUBIN:  We have a standard order.  Yes.
18      MR. CAPLAN:  We'd also like a 30-day chance to
19  review that, so --
20      THE REPORTER:  Counsel, for you?  Copy, ASCII, mini,
21  and rough ASCII?
22      MS. WINKLER:  Yes.
23      THE REPORTER:  Are there any time constraints on
24  this transcript?
25      MR. RUBIN:  No.

Donnelly, Peter  11/30/2005  3:44:00 PM

201

1
2
3
4
5
6
7
8
9    I, PETER DONNELLY, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript of my deposition, consisting of page 1 to 200,
12   inclusive; that I have made such corrections as noted
13   on any errata sheet(s) attached hereto; that my testimony
14   as contained herein, as corrected, is true and correct.
15       EXECUTED this _____ day of _____,
16   20___, at _____, _____.
17       (City)       (State)
18
19

      _____

20       PETER DONNELLY
21
22
23
24
25

202

1       STATE OF CALIFORNIA   )
             : ss
2       COUNTY OF CONTRA COSTA)
3
4       I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby
6   certify:
7       That the foregoing proceedings were taken
8   before me at the time and place herein set forth; that
9   any witnesses in the foregoing proceedings, prior to
10   testifying, were placed under oath; that a verbatim
11   record of the proceedings was made by me using machine
12   shorthand which was thereafter transcribed under my
13   direction; further, that the foregoing is an accurate
14   transcription thereof.
15       I further certify that I am neither
16   financially interested in the action nor a relative or
17   employee of any attorney of any of the parties.
18       IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
21   Dated: December 16, 2005
22
23

      _____

24       TRACY L. PERRY
         CSR No. 9577
25

1            STATE OF CALIFORNIA   )
                          :   ss
2          COUNTY OF CONTRA COSTA)

3

4            I, the undersigned, a Certified Shorthand

5          Reporter of the State of California, do hereby

6   certify:

7            That the foregoing proceedings were taken

8   before me at the time and place herein set forth; that

9   any witnesses in the foregoing proceedings, prior to

10  testifying, were placed under oath; that a verbatim

11  record of the proceedings was made by me using machine

12  shorthand which was thereafter transcribed under my

13  direction; further, that the foregoing is an accurate

14  transcription thereof.

15            I further certify that I am neither

16  financially interested in the action nor a relative or

17  employee of any attorney of any of the parties.

18            IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21            Dated: December 16, 2005

22

23

24                           TRACY L. PERRY
                            CSR NO. 9577

25