# Exhibit 6

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE ORACLE CORPORATION
     SECURITIES LITIGATION,          )
 5   _____)
                                     )
 6   This Document Relates to:    )
                                     )
 7      ALL ACTIONS.            )
     _____)
 8
 9
10
11
12
13
14
15      VIDEOTAPED DEPOSITION OF PATRICIA K. SULLIVAN
16              Palo Alto, California
17              Tuesday, July 26, 2005
18
19
20
21
22
23
     Reported by:
24   SUZANNE F. BOSCHETTI
     CSR No. 5111
25   Job No. 164616
```

2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE ORACLE CORPORATION
     SECURITIES LITIGATION,          )
 5   _____)
                                     )
 6   This Document Relates to:    )
                                     )
 7      ALL ACTIONS.            )
     _____)
 8
 9
10
11
12
13
14
15      Videotaped deposition of PATRICIA K.
16   SULLIVAN, taken on behalf of Defendants, at
17   300 El Camino Real, 2 Palo Alto Square, Palo
18   Alto, California, beginning at 9:56 a.m. and
19   ending at 3:43 p.m. on Tuesday, July 26,
20   2005, before SUZANNE F. BOSCHETTI, Certified
21   Shorthand Reporter No. 5111.
22
23
24
25
```

3

```
 1   APPEARANCES:
 2
 3   For The Witness:
 4   BUSHNELL, CAPLAN & FIELDING, LLP
     BY:   ALAN M. CAPLAN
 5   Attorney at Law
     221 Pine Street, Suite 600
 6   San Francisco, California 94104-2715
     (415) 217-3800
 7
 8   For the Plaintiffs:
 9   LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
     BY:   SHAWN A. WILLIAMS
     BY:   ELI GREENSTEIN
10   Attorneys at Law
     100 Pine Street, Suite 2600
11   San Francisco, California 94111
     (415) 288-4545
12
     For Defendants:
13
     MAYER BROWN ROWE & MAW LLP
14   BY:   VINCENT P. SCHMELTZ III
     Attorney at Law
15   71 South Wacker Drive
     Chicago, Illinois 60606-4637
16   (312) 701-8531
     MAYER BROWN ROWE & MAW LLP
17   BY:   LEE H. RUBIN
     Attorney at Law
18   Two Palo Alto Square, Suite 300
     Palo Alto, California 94306
19   (650) 331-2000
20
     Videographer:
21
     DONOVAN BAUER
22   ESQUIRE DEPOSITION SERVICES
     505 Sansome Street, Suite 502
23   San Francisco, California 94111
     (415) 288-4280
24
25
```

4

```
 1                     INDEX
 2   WITNESS                       EXAMINATION
 3   PATRICIA K. SULLIVAN
 4      BY MR. SCHMELTZ                 6, 166
 5      BY MR. WILLIAMS                 115
 6
 7                   EXHIBITS
 8   SULLIVAN                        PAGE
 9   1   Letter enclosing Revised Notice of Deposition   8
         of Patty Sullivan; 5 pages
10   2   Notice of Deposition of Patty Sullivan;         8
         5 pages
11
12   3   Plaintiffs' Revised Second Amended Complaint    50
         for Violations of the Federal Securities Laws
13       and Exhibit 42; 73 pages
14   4   Letter to Vincent P. Schmeltz, III, from       105
         Jennie Lee Anderson, dated May 13, 2005, with
         enclosures; 60 pages
15
16
17
18
19
20
21
22
23
24
25
```

5

1    PALO ALTO, CALIFORNIA; TUESDAY, JULY 26, 2005
2         9:56 A.M. - 3:43 P.M.
3
4    VIDEO OPERATOR:  Here begins the deposition of
5    Patty Sullivan in the matter of Oracle Security In Re.
6    Today's date, July 26th, 2005.  The time is 10:03 a.m.
7    This deposition is being taken at the law offices of
8    Mayer and Brown, Palo Alto, California.
9    Would counsel and all present please identify
10   yourselves and state whom you represent.
11   MR. SCHMELTZ:  Vincent Schmeltz from Mayer
12   Brown Rowe & Maw on behalf of the defendants.
13   MR. WILLIAMS:  Shawn Williams from Lerach
14   Coughlin Stoia Geller Rudman & Robbins on behalf of
15   plaintiffs.
16   MR. GREENSTEIN:  Eli Greenstein from Lerach
17   Coughlin on behalf of the plaintiffs.
18   MR. CAPLAN:  Alan Caplan, Bushnell, Caplan &
19   Fielding on behalf of the witness Ms. Sullivan.
20   VIDEO OPERATOR:  And would the court reporter
21   please swear in the witness.
22
23        PATRICIA K. SULLIVAN,
24   having been first duly sworn was examined
25   and testified as follows:

7

1    she can't take down head shrugs and nods.
2    Is that fair?
3    A  Yes.
4    Q  And I'm going to do my best to ask clear and
5    concise questions.  If you don't understand something
6    that I ask, I'd be grateful if you let me know; is that
7    fair?
8    A  Yes.
9    Q  And if you answer my questions, I'm going to
10   presume that you understood them.
11   Is that okay?
12   A  Yes.
13   Q  You've just taken an oath, and do you
14   understand that that's the same oath that you'd take in
15   a court of law?
16   A  Yes.
17   Q  And that's an oath to tell the truth completely
18   and accurately.
19   Is that fair?
20   A  Yes.
21   Q  During the course of the day your lawyer may
22   make some objections to my questions.  Unless your
23   lawyer instructs you not to answer one of my questions,
24   that's just a standard procedure whereby lawyers make a
25   record.  So you just go ahead and answer my questions

6

1         EXAMINATION
2    BY MR. SCHMELTZ:
3    Q  Ms. Sullivan, do you mind stating your name and
4    spelling it for the record?
5    A  Yes.  Patricia K. Sullivan.  P-a-t-r-i-c-i-a,
6    K. S-u-l-l-i-v-a-n.
7    Q  And does the K stand for Kathleen?
8    A  Yes.
9    Q  And is that K-a-t-h-l-e-e-n?
10   A  Yes.
11   Q  Ms. Sullivan, where do you reside?
12   A  I reside at
13
14   Q  For how long have you resided there?
15   A  For approximately five plus years.
16   Q  And where did you reside prior to that?
17   A  Prior to that I resided at
18
19   Q  Have you ever sat for a deposition before?
20   A  No.
21   Q  I'm going to lay out some basic ground rules or
22   framework for the deposition just to try to make our
23   lives easier today.  The court reporter is taking down
24   everything we say, so it's important that you give
25   audible answers rather than head shrugs or nods, because

8

1    unless your lawyer tells you otherwise.
2    Is that fair?
3    A  Okay.
4    Q  Now, I see you're represented by counsel today?
5    A  Yes.
6    Q  How did you retain -- come to retain
7    Mr. Caplan?
8    A  I retained him through my contact at Lerach
9    Coughlin.
10   Q  Okay.  Who is your contact at Lerach Coughlin?
11   A  I believe it was Eli Greenstein, and there was
12   another gentleman that I can't remember his name.
13   Q  And how did you come into contact with
14   Mr. Greenstein?
15   A  He contacted me regarding this lawsuit.
16   Q  And who's paying Mr. Caplan's fee, if you know?
17   A  Lerach Coughlin.
18   MR. SCHMELTZ:  I'm going to ask the court
19   reporter to mark two exhibits as Exhibits 1 and 2 for
20   today's deposition.
21   (Sullivan Exhibits 1 and 2 were marked by
22   the court reporter.)
23   MR. SCHMELTZ:  And for the record, Exhibit 1 is
24   a July 5, 2005 cover letter from me to Mr. Caplan, and
25   it has underneath it a Revised Notice of Deposition.

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

9

1  Q  Ask you to take a look at that revised notice
2  and let me know if you recognize it.
3     MR. WILLIAMS:  Just for the record, do you
4  think that we should mark the exhibits by witness, so
5  you want to just mark it Sullivan 1 and 2?  I only say
6  that because as we go through a lot of witnesses, we're
7  just going to have numbers 1 through whatever multiple
8  times, and without that preface it may get confusing.
9     MR. SCHMELTZ:  I agree.  Let's call it Sullivan
10 1 and Sullivan 2.  And Sullivan 1 is as I've just
11 described it.  Sullivan 2 is a Notice of Deposition of
12 Patty Sullivan signed by Eli Greenstein and dated July
13 19, 2005.
14    Q  Do you see those two documents, Ms. Sullivan?
15    A  Yes.
16    Q  Have you seen either of them before?
17    A  Yes.
18    Q  And so do you understand that you're here today
19 pursuant to a notice of deposition and a subpoena from
20 my law firm, and you're here pursuant to a notice of
21 deposition from the Lerach firm?
22    A  Yes.
23    Q  Did you talk to anyone at Lerach Coughlin about
24 their notice of deposition to you?
25    A  No.

10

1  Q  Did anyone at Lerach Coughlin let you know that
2  they were going to notice up your deposition?
3     A  I believe so.
4  Q  And do you have any understanding as to why
5  Lerach Coughlin noticed up your deposition?
6     A  Their belief was that I had information
7  pertaining to this civil lawsuit.
8  Q  Separate and apart from anything that you'd
9  already discussed with them or --
10    A  It was.
11    Q  Along with the notice of deposition that we
12 sent -- and I evidently don't have it here with me -- we
13 also sent a subpoena that had some document requests.
14    Do you recall getting document requests from my
15 office?
16    A  Yes.
17    Q  And did you search for documents pursuant to
18 that request?
19    A  Yes.
20    Q  And where did you look for those documents?
21    A  I looked in some of the boxes that I had when I
22 left Oracle.
23    Q  And did you find anything responsive to our
24 request?
25    A  No.

11

1  Q  What primarily did you have in the boxes?
2     A  In the boxes were -- there were training
3  manuals and just miscellaneous objects that I had in my
4  cubicle when I worked at Oracle.
5     Q  Did you keep a laptop or any kind of computer
6  from Oracle?
7     A  No.
8     Q  While you were employed at Oracle, did you use
9  a home computer on which you did Oracle work?
10    A  No.
11    Q  Did you keep a personal data assistant or a
12 Blackberry or something of that nature?
13    A  No.
14    Q  Other than the boxes that you took away from
15 Oracle, was there anyplace else where you might have
16 kept materials from Oracle?
17    A  No.
18    Q  When did you -- how long were you employed at
19 Oracle?
20    A  I was employed at Oracle from June of 1996
21 until April of 2000.
22    Q  When you were hired in June of 1996, what was
23 your job title?
24    A  I was a senior administrative assistant.
25    Q  For whom?

12

1     A  For James Cassidy.
2     Q  What was Mr. Cassidy's title?
3     A  He was director of customer support.
4     Q  For how long were you the senior administrative
5  assistant for Mr. Cassidy?
6     A  For approximately nine months.
7     Q  And what was your next position?
8     A  My next position was client services rep.
9     Q  And what's a client services rep?
10    A  It was a customer service position.  It was
11 just a -- it was actually a created position.
12    Q  When you say a created position, created for
13 what reason?
14    A  It was created for the customer escalations
15 group.
16    Q  What's the customer escalations group?
17    A  The customer escalations group was a group that
18 was created in customer support to work with high level
19 customer accounts.
20    Q  What high level customer accounts did you work
21 on as a customer services rep?
22    A  Accounts such as CBS was one of my accounts;
23 Nike, Boeing was one of my accounts.  And then there
24 were several, several other accounts.
25    Q  For how long were you a client services

13

1 representative?
2     A  For approximately three months.
3     Q  What was your next position?
4     A  My next position was an escalation manager.
5     Q  How long were you an escalation manager?
6     A  I was an escalation manager until I left
7 Oracle.
8     Q  What does an escalation manager do?
9     A  It man- -- project managing customer support
10 accounts.
11     Q  When you say customer -- excuse me.  When you
12 say project managing customer support accounts, what are
13 the customer support accounts?
14     A  The customer support accounts were technical,
15 technical issues relating to the information -- the
16 implementation of the -- of Oracle's software.
17     Q  And as a project manager, what were your
18 responsibilities?
19     A  My responsibilities were to -- to -- to make
20 sure that the groups within Oracle were -- were
21 communicating.  And those groups were the development
22 group, sales consulting, sometimes the direct sales
23 group and then customer support.
24     Q  Essentially you coordinated Oracle departments
25 in order to make sure customers got what they needed

14

1 when they were implementing Oracle software; is that
2 right?
3     A  Yes.
4     Q  Now, when you left in April 2000, Oracle had
5 not yet introduced Suite 11i; is that right?
6     A  We actually had beta customers that were using
7 the software.
8     Q  And who were those beta customers?
9     A  One of the customers that I worked with was
10 Specialized.
11     Q  Specialized, the mountain biking company?
12     A  Yes.
13     Q  And who else?
14     A  I can't recall any of the other customers
15 because I -- actually worked with the applications
16 customers.  I worked with CRM customers.  I just took
17 over the CRM customers for one of my coworkers that was
18 focused just on CRM.
19     Q  So you're saying your primary focus was on CRM
20 customers?
21     A  My primary focus was on financial applications.
22     Q  So you're making a distinction between
23 financial applications as non-Suite 11i and CRM as Suite
24 11i, or what's the distinction you're making?
25     A  The distinction -- well, I really can't tell

15

1 you the distinction because I don't -- it was so long
2 ago I don't remember --
3     Q  Okay.
4     A  -- what exactly the release was.
5     Q  And was Specialized a Suite 11i beta customer?
6     A  I believe they were.
7     Q  Are there any other Suite 11i beta customers
8 that you recall?
9     A  No.
10     Q  Do you recall at all the terms of Specialized's
11 contract with Oracle as a beta customer?
12     MR. WILLIAMS:  Objection.  Assumes facts.
13 BY MR. SCHMELTZ:
14     Q  You can go ahead and answer.
15     A  No.
16     Q  Do you recall anything about the circumstances
17 under which Specialized became a beta customer for Suite
18 11i?
19     A  No.
20     Q  Other than working with Specialized as a Suite
21 11i beta customer, did you have any other knowledge of
22 or experience with Suite 11i software?
23     MR. WILLIAMS:  Objection.  Vague.
24     THE WITNESS:  No.
25 BY MR. SCHMELTZ:

16

1     Q  And that's true both before you left Oracle and
2 since you've left Oracle?
3     A  Yes.
4     Q  Have you had any conversations with anyone at
5 Oracle since you resigned about Suite 11i?
6     A  No.
7     Q  Have you had any conversations with anyone at
8 Oracle since you resigned about any topic?
9     MR. WILLIAMS:  I'm sorry, about what?
10 BY MR. SCHMELTZ:
11     Q  Any topic.
12     MR. WILLIAMS:  Any topic.
13     THE WITNESS:  Sure, yes.
14 BY MR. SCHMELTZ:
15     Q  Who do you maintain contact with at Oracle?
16     A  Let's see.  My old manager, Stacy.
17     Q  Is that Stacy Imhoff?
18     A  No, it's Stacy -- her last name -- I don't know
19 if she goes by it anymore, but it's Phiscator, it's
20 P-h-i-s-c-a-t-o-r.
21     Q  And what was Ms. Phiscator's position at
22 Oracle?
23     A  She was one of my managers.
24     Q  Okay.  And how often are you in touch with
25 Ms. Phiscator?

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

17

1  A  Approximately every two to three months.
2  Q  Let's -- I want to start generally and try to
3  work down to more specifics.  Generally, what's the
4  nature of your contact with Ms. Phiscator?
5  A  It's friendly.
6  Q  Just chatting about life, things like that?
7  A  Yes, yes.
8  Q  And do you ever talk about Oracle?
9  A  Only in terms of who -- who -- who I might know
10  who's still there.
11  Q  What's going on with so-and-so, things like
12  that?
13  A  Right, exactly.
14  Q  Do you ever talk about the business at Oracle?
15  A  No.
16  Q  Have you ever had any conversations with
17  Ms. Phiscator about Suite 11i?
18  A  Probably a little bit after I left.
19  Q  What would the nature of those conversations
20  have been?
21  A  Just general discussions about customers and
22  frustrations with -- with -- with the job.
23  Q  What customers, if you recall?
24  A  Just -- just --
25  Q  General?

18

1  A  About, yeah.  There was never discussions about
2  particular customers.
3  Q  And what job -- what job frustrations, if you
4  recall?
5  MR. CAPLAN:  I'm sorry, could you repeat that?
6  BY MR. SCHMELTZ:
7  Q  What job frustrations would you have talked
8  about?
9  A  Just general frustrations with the
10  organization, perhaps, and because it was a stressful
11  job, the stresses that we encountered doing that job.
12  Q  What made that job stressful?
13  A  Well, it was very unhappy customers who a lot
14  of times would scream and yell at you because they
15  weren't happy with what was going on with -- with their
16  implementation, and then there were internal pressures
17  from development and customer support to, if you will,
18  do the right thing for Oracle.
19  Q  When you talk about internal pressures to do
20  the right thing for Oracle, can you give me some
21  examples of how that would come up?
22  A  Well, a lot of times you walked a fine line
23  between being the advocate for the customer and being
24  the advocate for Oracle.  And because you had a lot of
25  contact with the customers, you felt their pain more

19

1  than -- than your coworkers at Oracle.  And so a lot of
2  times you'd bend over backwards for the customers to --
3  to get what they needed without really seeing what was
4  going on within Oracle.
5  Q  Did Ms. Phiscator ever mention any specific
6  unhappy customer to your recollection?
7  A  After -- after Oracle?
8  Q  After you left.
9  A  No.
10  Q  And before you left were there any particular
11  unhappy customers that you would have discussed with
12  Ms. Phiscator?
13  A  All of them.
14  Q  The only customer that you had, though, that
15  was implementing Suite 11i was specialized as a beta
16  customer; isn't that right?
17  MR. WILLIAMS:  Objection.  Mischaracterizes his
18  testimony.
19  THE WITNESS:  Yes.
20  BY MR. SCHMELTZ:
21  Q  So you don't remember any unhappy customers
22  complaining specifically about Suite 11i other than
23  possibly Specialized, which we'll talk about; is that
24  right?
25  A  No.  I would say -- well, I used to have

20

1  interactions with the development group, Mark --
2  particularly Mark Barrenechea's development group, which
3  was -- which they were focused on CRM.  And we would
4  have general discussions about how customers were having
5  problems with -- with their implementations.
6  Q  Who in Mark Barrenechea's group did you have
7  contact with?
8  MR. WILLIAMS:  Objection.  I'm sorry.  The time
9  frame, are you --
10  MR. SCHMELTZ:  No time frame.
11  THE WITNESS:  I don't recall what -- what their
12  names were.
13  BY MR. SCHMELTZ:
14  Q  Why did you have interactions prior to April
15  2000 with Mark Barrenechea's group?
16  A  We would have -- I believe there were weekly
17  conference calls about customer issues.  And it was a
18  forum to discuss particular problems that customers were
19  having and bring to the forefront or bring to
20  development's attention the problems that were occurring
21  with the software.
22  Q  Who led those weekly conference calls, if you
23  recall?
24  A  The person that -- that worked directly from
25  Mark Barrenechea, and I can't remember her name.

OraclePage  17 - 20

21

1    Q   Other than these weekly conference calls in
2  which you discussed problems with customers, were there
3  any other interactions that you had with Mark
4  Barrenechea's group?
5    A   No direct interaction with them, no.
6    Q   What indirect?
7    A   Indirect interaction was we had a Web site, an
8  internal Web site where we would -- we would input a
9  customer's information onto this internal Web site and
10  post it so that pretty much everybody in the company
11  could see what was going on with customers.
12    Q   All right.  What was the name of that Web site?
13    A   It was called the Escalated Customer
14  Management.  It was -- I forget what the last letter
15  stood for, but it was called the ECMS.  I guess "system"
16  was the last word.
17    Q   In your interactions with the development group
18  on these weekly conference calls, do you remember any
19  specific customer complaints about Suite 11i?  Let me
20  state that differently.
21        From your participation in the weekly
22  conference calls that included Barrenechea's group, do
23  you recall any specific customer complaints about Suite
24  11i?
25    A   Not -- not directly saying Suite 11i, because

22

1  we didn't -- we didn't -- we didn't say, you know, are
2  you having problems with Suite 11i.  It was are you
3  having problems with a component of the software.  And
4  that was usually what -- what the discussion was.  It
5  wasn't in terms of what release -- really what release
6  we were on.
7    Q   What specific customers do you recall coming up
8  in those conference calls?
9    A   The only one that I can remember was
10  Specialized.
11    Q   And not specific to complaints about Suite 11i,
12  but complaints about any implementation, what customers
13  do you recall coming up in those conference calls?
14    A   With -- with the CRM group?
15    Q   Correct.
16    A   I can't -- I can't recall.
17    Q   Okay.  So I'm being a little bit repetitive,
18  but I just want to make sure I understand and we're on
19  the same page.
20        Other than Specialized, you don't remember the
21  name of any specific customer that had a complaint about
22  a component of Oracle's software, is that right, on
23  these weekly conference calls?
24    A   Yes.
25    Q   And it's your understanding that these weekly

23

1  conference calls would be the place where a complaint
2  about Suite 11i would be discussed; is that right?
3    A   It had to be in these weekly calls.
4    Q   Was there any other forum that you recall that
5  complaints about Suite 11i would have been discussed
6  while you were at Oracle?
7    A   Not -- not then because these were beta
8  customers, and beta customers were treated differently
9  than -- than the other customers, because there wasn't a
10  process in place for the beta customers.
11    Q   What can you tell me about the forum for
12  dealing with beta customer complaints while you were at
13  Oracle?
14    A   Well, the forum -- well, prior -- prior to --
15  to this when Oracle had had prior releases of software,
16  they learned from their prior mistakes.  And so when the
17  CRM software was being released or was in the early
18  stages of release, they decided to set up their own
19  escalation group over on the development side in order
20  to deal with the CRM customers.
21    Q   What was your role with respect to that
22  separate escalation group?
23    A   My role was I -- I filled in for -- for my
24  coworker, who was working direct -- who was working only
25  CRM customers.

24

1    Q   Who was that coworker?
2    A   Melissa, last name is Aslaksen,
3  A-s-l-a-k-s-e-n.
4    Q   Is Ms. Aslaksen still with Oracle?
5    A   No.
6    Q   Do you know where Ms. Aslaksen is now?
7    A   I believe she's with Lucent.
8    Q   And do you happen to have any idea, even
9  generally, where Ms. Aslaksen lives?
10    A   Yes, she lives in Albuquerque, New Mexico.
11    Q   For how long did you fill in for Ms. Aslaksen?
12    A   It varied.  Anytime she went on vacation or she
13  took time off.
14    Q   In between the time that you became an
15  escalation manager and when you left Oracle in April
16  2000, approximately how many times did you fill in for
17  Ms. Aslaksen?
18    A   Can you repeat that?
19    Q   Yes.  From the time you became an escalation
20  manager until the time you left Oracle in April 2000,
21  about how many times, if you recall, did you fill in for
22  Ms. Aslaksen?
23    A   Probably -- well, I filled in -- I worked with
24  her for -- for probably a year and a half, so anytime
25  that she was gone in that time period, I -- I filled in

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

25

1  for her.  So I can't even tell you how many times.
2      Q   What was an average period of time that you
3  would fill in for Ms. Aslaksen?
4      A   I think -- I think the longest amount of time
5  was about two weeks.
6      Q   Do you recall when Mr. Barrenechea's group set
7  up a separate escalation group for CRM customers?
8      MR. WILLIAMS:  Objection.  Assumes facts.
9      THE WITNESS:  I believe -- and this is kind of
10  fuzzy -- I believe it was in October of 1999.
11  BY MR. SCHMELTZ:
12      Q   In between October of '99 and April 2000, how
13  many times did you fill in for Ms. Aslaksen, if you
14  recall?
15      A   Probably five or six times.
16      Q   Other than filling in for Ms. Aslaksen -- let
17  me ask it differently.
18      Were the only instances in which you
19  participated in these weekly CRM calls instances in
20  which you were filling in for Ms. Aslaksen?
21      A   Yes.
22      Q   So it's fair to say that there were no more
23  than five or six times that you participated in one of
24  these weekly conference calls with the CRM escalation
25  group?

26

1      A   I'm not sure.
2      Q   Did any of this sort of two-week periods you've
3  described filling in for Ms. Aslaksen occur between
4  October '99 and April 2000?
5      A   Yes.
6      Q   And how many two-week periods between October
7  '99 and April 2000?
8      A   Probably one or two at the most.
9      Q   Other than the two-week periods, is it fair to
10  say that you only filled in for Ms. Aslaksen for a
11  couple of days here and there within this time frame
12  between October '99 and April 2000?
13      A   I couldn't say.
14      Q   Would you characterize your experience filling
15  in for Ms. Aslaksen between October '99 and April 2000
16  as being about 20 days, more or less?
17      A   Probably 20 days give or take, yeah.
18      Q   And during those 20 days, do you have any
19  recollection of how many weekly conference calls with
20  the CRM escalation group you would have --
21      A   Well, there were weekly conference calls, but
22  there were also a lot of email exchanged with -- with
23  people in Mark Barrenechea's group.
24      Q   Let's focus on the weekly conference calls.
25  About how many weekly conference calls do you recall

27

1  being on in those 20 days?
2      A   Between three and five maybe.
3      Q   Talking about e-mail exchange with Mark
4  Barrenechea's group, who do you recall e-mailing with in
5  Mark Barrenechea's group?
6      A   I don't recall her name.
7      Q   Do you recall her position?
8      A   She -- she was a project manager.
9      Q   For what customer?
10      A   She was for the entire -- the entire CRM group.
11      Q   And what project was she the manager of?
12      A   All of them.  So she was -- I would say she was
13  the project manager for the beta customers at that time.
14      Q   What was the nature of your e-mail exchanges
15  between this project manager and yourself?
16      A   Usually it was updates on customer issues.
17  Usually bugs in the software.
18      Q   Do you recall what specific customer you had
19  these e-mail exchanges about customer issues and bugs in
20  the software?
21      A   The only one that I can recall was Specialized.
22      Q   Do you recall any specific bugs that you
23  discussed with the CRM project manager?
24      A   Not specifically.
25      Q   Other than the three to five weekly conference

28

1  calls and the e-mail exchanges with the project manager
2  for the CRM group, do you recall any other interactions
3  with Mark Barrenechea's group?
4      A   And then there were phone calls.
5      Q   With whom did you have phone calls?
6      A   The same person.
7      Q   And what did you discuss generally in those
8  phone calls?
9      A   The same issues, the -- the -- status of
10  the bugs.  And I believe there were -- there were a few
11  calls directly with the developers over in CRM too, or
12  one developer, and I can't recall his name.
13      Q   What was that conversation or those
14  conversations about?
15      A   Those were regarding the status of fixing --
16  fixing the bug issue.
17      Q   And that's status of fixing the bug issue for
18  Specialized?
19      A   Yes.
20      Q   And you don't recall what the specific bug was;
21  is that right?
22      A   No.
23      Q   Other than the weekly conference calls that
24  took place three to five times, the e-mail exchanges
25  with the project manager for the CRM group, phone calls

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

29

1 with the project manager for the CRM group and phone
2 calls with one developer, do you recall any other
3 interaction with Mark Barrenechea's group?
4     A  No.
5     Q  And out of the e-mail exchanges, the three to
6 five weekly conference calls and the phone
7 conversations, the only customer complaints you recall
8 were from Specialized; is that correct?
9     A  In respect to the CRM product, yes.
10     Q  And with respect to the three to five weekly
11 conference calls, the e-mail exchange with the CRM
12 project manager, the phone calls with the CRM personal
13 manager and the phone calls with the CRM developer, you
14 don't recall any specific bugs?
15     A  No.
16     MR. WILLIAMS:  Objection.  Vague and compound.
17 BY MR. SCHMELTZ:
18     Q  Why don't you tell me if you recall the nature
19 of the complaints that Specialized had.
20     A  Specifically I -- I couldn't tell you.  I mean
21 they -- they were implementing software, and when they
22 were -- usually when we -- when we were dealing with
23 customized software -- the customized software
24 application, there were a lot of problems.  So it could
25 be anything.

30

1     Q  Do you recall what software Specialized was
2 implementing?
3     A  iStore.
4     Q  What does iStore do?
5     A  iStore, I believe, was software that was -- a
6 piece of the software that enabled you to set up an
7 online store, if you will.
8     Q  To allow people to purchase product off the
9 Internet?
10     A  Correct.
11     Q  You've described iStore as customized software
12 application.  What does that mean?
13     A  Well, it's not -- it's not customized until the
14 customer customizes it.  So the software was made to
15 enable the customer to set up their own online store,
16 and then it had to be customized to -- to what their --
17 they wanted their store to look like on the Internet.
18     Q  So is it fair to say that iStore has to be
19 tailored specifically for each customer?
20     A  I believe -- I believe it did.  Most -- most of
21 the software that I -- most of the customers and the
22 software that I -- that I worked with at Oracle had to
23 be customized.
24     Q  And did customers know that the software they
25 were purchasing -- let me reask -- let me ask that

31

1 differently.
2     Q  Did customers know in advance that the software
3 they were purchasing would have to be customized to meet
4 their specific needs?
5     MR. WILLIAMS:  Objection.  Form.
6     THE WITNESS:  Well, Oracle didn't sell it as
7 a -- as software that they wanted you to customize, but
8 you had to customize it in order to make it workable in
9 your environment.  They sold it as an -- you know, an
10 out of the package piece of software, but every customer
11 that I ever worked with had to customize the software to
12 make it work in their environment.
13 BY MR. SCHMELTZ:
14     Q  So my question was did customers know in
15 advance that they were going to have to customize this
16 software?
17     MR. WILLIAMS:  Objection.  Form.
18     THE WITNESS:  If they --
19     MR. WILLIAMS:  Go ahead.
20     THE WITNESS:  If they were prior Oracle
21 customers, I would say definitely yes.  They knew that
22 it wasn't going to be an out of the package solution for
23 them.  If they were not, then a lot of times, no.
24 BY MR. SCHMELTZ:
25     Q  When you say a lot of times, no, on what do you

32

1 base that answer?
2     A  I base that answer on the fact that when I was
3 working with some of Oracle's customers, they were not
4 happy with what they had purchased, being that they were
5 going to have to purchase sales consulting hours in
6 order to implement their software.
7     Q  You don't recall that complaint being raised
8 with respect to any Suite 11i beta customer, though, do
9 you?
10     A  Not directly from the customer.  From my
11 coworkers there was discussion over what, you know, what
12 the customer -- there were discussions about the
13 customer being unhappy with what they thought was going
14 to work a certain way.  But these were like, you know,
15 third party -- third party discussions.  I never heard
16 this directly from the customers.
17     Q  All right.  With respect to Suite 11i beta
18 customers, what -- what customers do you recall having
19 conversations about with your coworkers?
20     A  Specialized.
21     Q  Anyone other than Specialized?
22     A  Not that I can recall.
23     Q  And do you recall what Specialized's complaints
24 were about Suite 11i with respect to these consulting
25 hours?

33

1    A   I can't recall whether they had consulting out
2  there.  I do know that we had somebody from the customer
3  support team.  We had somebody from the Center of
4  Expertise, which meant that that person was the
5  experti- -- the expert on that particular product, and
6  we sent them out to work with the customer on their
7  implementation.
8    Q   Who was the person from customer support that
9  was at Specialized?
10    A   There were -- there were several people from
11  the center of expertise that were sent out, and I can't
12  recall any of their names.
13    Q   At whose cost were the people from the center
14  of expertise sent to Specialized?
15    A   At Oracle's cost, at no cost to the customer.
16    Q   So the customization work done for Specialized
17  was done at Oracle's cost; is that right?
18    A   Yes.
19    Q   And fixing any problems with iStore for
20  Specialized was done at Oracle's cost; is that right?
21    A   Yes.
22    Q   Back up for just a minute.  We were talking
23  about Ms. Phiscator and conversations you had with
24  Oracle employees since the time you've resigned.  Other
25  than Ms. Phiscator, is there anyone else that you keep

34

1  in contact with at Oracle?
2    A   Melissa Aslaksen.
3    Q   And when did Ms. Aslaksen leave the company?
4    A   I believe it was probably maybe six to nine
5  months after I left Oracle, but I can't be sure.
6    Q   In between the time that you left the company
7  in April 2000 and the time that Ms. Aslaksen left the
8  company, did you have any conversations with her about
9  Suite 11i?
10    A   I can't recall.
11    Q   Generally what were the -- what was the nature
12  of the conversations you have -- you had with
13  Ms. Aslaksen?
14    MR. CAPLAN:  Vague as to time.
15  BY MR. SCHMELTZ:
16    Q   Since the time you left -- let me just start
17  over.
18    Since April 2000, what are the general
19  conversations that you had with Ms. Aslaksen?
20    A   Just about life -- yeah, life.
21    Q   Do you recall any conversations with
22  Ms. Aslaksen since you left the company about Oracle
23  itself?
24    A   There probably were little conversations, but
25  not really anything -- anything in depth about Oracle.

35

1    Q   What would the subject of the little
2  conversations have been?
3    A   Conversations about -- I mean, for both of us
4  it was about how less stressful our job -- our current
5  positions were because -- because our positions at
6  Oracle were very stressful.
7    Q   Did you ever talk with -- well, other than
8  Ms. Phiscator and Ms. Aslaksen, are there any other
9  Oracle employees that you keep in touch with?
10    A   Not -- well, no, no, not -- not current Oracle
11  employees.
12    Q   Since the time you left in April 2000, other
13  than Ms. Aslaksen and Ms. Phiscator, have there been
14  employees who were then current Oracle employees at the
15  time you were keeping in touch with them?
16    MR. WILLIAMS:  Objection.  Vague.
17  BY MR. SCHMELTZ:
18    Q   So setting the time --
19    A   Yes.
20    Q   Okay.  So you left in April 2000.  And since
21  April 2000, you had contact with some Oracle employees
22  other than Ms. Aslaksen and Ms. Phiscator; is that
23  right?
24    A   Yes.
25    Q   And who were those Oracle employees?

36

1    A   They were people that I interviewed with,
2  because I went back to Oracle and had interviewed
3  probably two or three times.
4    Q   In what positions did you interview for?
5    A   I interviewed for a -- an escalation manager
6  position.  And then the other one was -- I can't
7  remember -- I can't recall the name of the position, but
8  it was working for somebody in Safra Catz's
9  organization?
10    Q   Do you recall the Oracle employees with whom
11  you interviewed for those positions?
12    A   The escalation manager position I interviewed
13  with Anil Thakar.
14    Q   Is that the same as Ian Thacker?
15    A   No, no.
16    Q   How do you spell Anil Thakar?
17    A   A-n-i-l, last name is T-h-a-k-a-r.
18    Q   What was Anil Thakar's position?
19    A   He was senior director of -- of -- of one of
20  the customer support groups.
21    Q   And what happened as a result of that
22  interview, if you recall?
23    A   Oracle had a hiring freeze.
24    Q   With whom did you interview in Safra Catz's
25  organization?

37

1     A   Her first name is Ellen, and I can't recall
2   what her last name is, but she's a direct report of
3   Safra Catz.
4     Q   And what was the nature of that position?
5     A   It was a project coordinator administration
6   job.
7     Q   What would the nature of your responsibilities
8   have been in that role?
9     A   General administrative tasks for Ellen and her
10  group.
11    Q   Do you recall what Ellen's group was
12  responsible for?
13    A   I believe -- my recollection is that it was --
14  they were part of the contracts group.
15    Q   What does that mean?
16    A   They worked on customer contracts.
17    Q   And what happened as a result of that
18  interview?
19    A   A hiring freeze.
20    Q   Other than the interview with Anil Thakar and
21  Ellen who reports to Safra Catz, have you had any other
22  interviews with Oracle?
23    A   No.
24    Q   Other than the contact with Ms. Phiscator,
25  Ms. Aslaksen, Mr. Thakar and Ellen who reports to Safra

38

1   Catz, since April 2000 have you had contact with any
2   other Oracle employees?
3     A   With one other person.
4     Q   Who's that?
5     A   His first name is Darryl, last name is Presley.
6     Q   What's Mr. -- what is or was Mr. Presley's
7   position at Oracle?
8     A   Mr. Presley works in the applications group.
9   He's a developer.
10    Q   A developer of what kind of software?
11    A   Financial applications, I believe.  I can't --
12  I can't --
13    Q   How did you come to know Mr. Presley?
14    A   I worked with him in customer support.
15    Q   Mr. Presley is still with the company; is that
16  right?
17    A   I believe so.
18    Q   How often are you in touch with Mr. Presley?
19    A   I haven't been in touch with him probably for
20  maybe two years.
21    Q   From April 2000 until you stopped talking with
22  Mr. Presley, what were the nature of your conversations?
23    A   Friendly, sometimes discussions about people,
24  general discussions about people that were in support
25  services and, you know, what -- what they were up to.

39

1     Q   Do you recall conversations with Mr. Presley
2   since April 2000 about what was going on at Oracle other
3   than friendly conversations about people?
4     A   There were general discussions about maybe some
5   of the politics at Oracle, but they were just -- it was
6   just general politics within the organizations.
7     Q   Like what?
8     A   Usually management issues, who was managing
9   him, and his frustration with -- with his organization,
10  perhaps.
11    Q   What, if you recall, was his frustration with
12  his organization?
13    A   I don't recall.
14    Q   Do you recall generally?
15    A   Usually it was his manager.
16    Q   I can't imagine someone being frustrated with
17  their manager.
18        Other than frustrations with his manager, do
19  you recall Mr. Presley expressing any other frustrations
20  about Oracle?
21    A   No.
22    Q   Did you ever have any conversations with
23  Mr. Presley about Suite 11i?
24    A   When I worked at Oracle, probably.
25    Q   When you worked at Oracle, what would the

40

1   nature of your conversations with Mr. Presley have been
2   about Suite 11i?
3     A   Just general discussion about perhaps customer
4   problems.
5     Q   Do you recall any specific customer problems?
6     A   No.
7     Q   Do you recall any specific customers that you
8   discussed with Mr. Presley?
9     A   No.
10    Q   Have you ever discussed this lawsuit with
11  Ms. Phiscator?
12    A   No.
13    Q   Have you ever discussed this lawsuit with
14  Ms. Aslaksen?
15    A   No.
16    Q   Have you ever discussed this lawsuit with Anil
17  Thakar?
18    A   No.
19    Q   Did you ever discuss this lawsuit with Ellen
20  who reports to Safra Catz?
21    A   No.
22    Q   Did you ever discuss this lawsuit with
23  Mr. Presley?
24    A   No.
25    Q   It's fair to say that while you were at Oracle,

41

1    you weren't involved in forecasting, right?
2        A   No.
3        Q   No, you were not involved?
4        A   No, I was not.
5        Q   Okay.  And it's fair to say that while you were
6    at Oracle, you weren't involved in accounting; isn't
7    that right?
8        A   That is correct.
9        Q   And is it fair to say that while you were at
10   Oracle, you didn't have any knowledge of what your
11   group's revenue forecasts were?
12       A   No, I did not.
13       Q   Since you resigned from Oracle in April of
14   2000, have you had any conversations with any Oracle
15   customers?
16       A   No.
17       Q   By whom are you currently employed?
18       A   EVault Incorporated.
19       Q   What is the nature of EVault's business?
20       A   We are a technology company and our focus is
21   data backup and data storage.
22       Q   Do you have any interaction with Oracle as a
23   result of your job duties at EVault?
24       A   No.
25       Q   Have you had any occasion to learn about any

42

1    issues at Oracle, whether they be customer complaints or
2    politics, etcetera, as a result of your job at EVault?
3        A   No.
4        Q   Where were you -- how long have you been
5    employed by EVault?
6        A   I've been employed since November of 2004.
7        Q   Where did you work prior to November of 2004?
8        A   Silicon Valley Bank.
9        Q   Let me back up.  What were your job duties --
10   what are your job duties at EVault?
11       A   I'm the executive assistant to the CEO and the
12   assistant secretary to the board of directors.
13       Q   When you were hired in November of 2004, what
14   were you hired on as?
15       A   The executive assistant to the CEO.
16       Q   When did you become assistant secretary to the
17   board as well?
18       A   I believe it was back in February of 2005.
19       Q   What were your -- when did you start working at
20   Silicon Valley Bank?
21       A   March of 2003.
22       Q   What were you hired on as at Silicon --
23       A   Actually, that was -- sorry, that's March of
24   2004.
25       Q   So you worked at Silicon Valley Bank between

43

1    March of '04 and November of '04?
2        A   Correct.
3        Q   And what were you hired on as at Silicon Valley
4    bank?
5        A   The executive assistant to the director -- to
6    the director of marketing.
7        Q   Why did you leave Silicon Valley Bank?
8        A   I hated working in finance.
9        Q   Any other reason?
10       A   No, not at all.
11       Q   Prior to March of 2004, where were you
12   employed?
13       A   I was unemployed from -- let's see.  April of
14   2001 -- well, no.  I shouldn't say that.  Prior to that
15   I worked at AtMail, and I was at AtMail from September
16   of 2001 until April of 2002.  And in between the time of
17   Silicon Valley Bank and AtMail, I was unemployed.
18       Q   So from essentially April of '02 to March of
19   '04, you were unemployed?
20       A   Yes.
21       Q   What was your job at AtMail?
22       A   I was the customer service rep.
23       Q   Why did you leave AtMail?
24       A   Well, at that time I was interviewing at
25   Oracle, and I thought I had a job offer.

44

1        Q   So is it fair to say you left AtMail in April
2    2002 because you thought you had a job offer with
3    Oracle?
4        A   Correct.
5        Q   And was that a job offer by Anil Thakar or
6    Ellen who reports to Safra Catz?
7        A   Anil Thakar.
8        Q   And that job offer didn't materialize because
9    of the hiring freeze?
10       A   Correct.
11       Q   How do you feel about that?
12       A   I don't feel one way or the other.  I know the
13   inner workings of Oracle, and that happens.
14       Q   Were you unemployed between April of 2001 and
15   September of 2001?
16       A   I was employed at Asera.
17       Q   What is Asera?
18       A   Asera was an application service provider, so
19   essentially it was a software -- a software type of
20   company.
21       Q   Does Asera compete with Oracle?
22       A   I guess they could be considered or they could
23   have been considered a small -- a tiny competitor of
24   Oracle.
25       Q   What happened to Asera?

45

1     A   I believe they eventually got acquired.
2     Q   Why did you stop working at Asera?
3     A   I was laid off in April of 2001.
4     Q   April of 2001 is when you left -- okay.  I see.
5     A   Yes.
6     Q   So we're talking about April of 2000 to April
7  of 2001, you were at Asera?
8     A   Correct.
9     Q   And then from April of 2001 to September of
10  2001, what did you do?
11     A   I was unemployed.
12     Q   Okay.  What is Luxuria Music LLC?
13     A   Luxuria Music is my husband's Internet radio
14  company.
15     Q   And how are you involved with Luxuria Music?
16     A   Not really involved.  I -- I guess I'm
17  considered one of the board members and owner, but I
18  don't do anything.
19     Q   You generate any revenue from Luxuria Music?
20     A   No.
21     Q   In your roles and responsibilities with Silicon
22  Valley Bank, AtMail and Asera, did you come to learn of
23  anything going on at Oracle?
24     A   Not -- not anything that I didn't read in the
25  papers.

46

1     Q   At Silicon Valley Bank, did you learn anything
2  about complaints about Suite 11i software?
3     A   No.
4     Q   At AtMail, did you learn anything about
5  complaints about Suite 11i software?
6     A   No.
7     Q   At Asera, did you learn anything about
8  complaints about Suite 11i software?
9     A   In a general sense when I was talking to my old
10  coworkers, it was -- it was in that context.  But not --
11  we weren't using it at any of the companies that I was
12  working for.
13     Q   And by conversations with your old coworkers,
14  you mean Ms. Phiscator, Ms. Aslaksen and Mr. Presley; is
15  that right?
16     A   Yes.
17     Q   Other than Ms. Phiscator, Ms. Aslaksen and
18  Mr. Presley, are there other coworkers that you keep in
19  touch with?
20     A   Yes.
21     Q   Who?  Who?
22     A   One of them is Munira, M-u-n-i-r-a.  Oh,
23  actually her last name is Webb now.  It's W-e-b-b.  And
24  she works at Cisco.
25     Q   When did Ms. Webb leave Oracle?

47

1     A   I believe she left in October of 2000.
2     Q   What conversations, if any, do you remember
3  having with Ms. Webb about Suite 11i while she was
4  employed at Oracle?
5     A   We never had --
6         MR. WILLIAMS:  Objection.  Vague.
7         THE WITNESS:  None.
8         MR. WILLIAMS:  I'm sorry, are you asking while
9  she was employed at Oracle, Ms. Munira, or while the
10  witness was employed at Oracle?
11         MR. SCHMELTZ:  I don't have a habit of
12  referring to someone in the third person that I'm
13  sitting across the table from.
14         MR. WILLIAMS:  Would you read the question
15  back, please?
16         (Record read as follows:
17            "QUESTION:  What conversations, if any,
18         do you remember having with Ms. Webb about
19         Suite 11i while she was employed at
20         Oracle?")
21         MR. WILLIAMS:  Thank you.
22  BY MR. SCHMELTZ:
23     Q   You understood my question?
24     A   Yes.
25     Q   Thank you.  In addition to Ms. Webb,

48

1  Ms. Phiscator, Ms. Aslaksen and Mr. Presley, what other
2  former coworkers do you keep in touch with?
3         MR. WILLIAMS:  Objection.  Vague as to time.
4  Are you talking about currently, or are you talking
5  about starting in April of 2000 over the last five years
6  or four years?
7  BY MR. SCHMELTZ:
8     Q   You understand what I'm talking about, don't
9  you?  I'm talking about former coworkers.  They wouldn't
10  have been former coworkers when you were at Oracle.
11  Since you left.
12     A   I can't think of anybody else.
13     Q   Okay.  So since you left Oracle in April 2000,
14  is it fair to say that you don't remember any specific
15  conversations about complaints with respect to Suite 11i
16  in your conversations with Ms. Phiscator, Ms. Aslaksen,
17  Ms. Webb or Mr. Presley?
18     A   Yes, that's correct.
19     Q   And whether it be before April 2000 or since
20  April 2000, you don't recall any customers having
21  complaints about Suite 11i except for Specialized; is
22  that right?
23     A   That is correct.
24     Q   And whether it be before April 2000 or after
25  April 2000, with respect to Specialized, you don't

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

49

1  recall any of their specific complaints; is that right?
2      A  That is correct, yes.
3      Q  And whether it be before April 2000 or after
4  April 2000, is it fair to say that you don't know one
5  way or the other what the revenue impact to Oracle was
6  of having to do any work with respect to customizing
7  software for Specialized?
8      MR. WILLIAMS:  Objection.
9      MR. GREENSTEIN:  Vague.
10      THE WITNESS:  Yes, that's correct.
11      MR. SCHMELTZ:  Just for the record, you guys
12  have made this point to me before that there are two
13  attorneys here.
14      MR. WILLIAMS:  I'll make the objections.
15      MR. SCHMELTZ:  All right.  I know that was a
16  hard one to resist, but I'd be grateful for it.
17      Q  And is it fair to say that you don't have any
18  insight as to the revenue impact of Oracle having to fix
19  any problems with Suite 11i whatsoever?
20      MR. WILLIAMS:  Objection.  Form.
21      THE WITNESS:  No.
22  BY MR. SCHMELTZ:
23      Q  No, you don't know of any revenue?
24      A  No, I don't.  I don't know of any revenue
25  impact.

50

1      Q  And is it fair to say that you don't know of
2  any revenue impact with respect to any customer
3  complaints at Oracle with regard to Suite 11i?
4      MR. WILLIAMS:  Objection.  Form.
5      THE WITNESS:  No, I do not.
6      MR. SCHMELTZ:  Let's take a short break if
7  that's all right.
8      VIDEO OPERATOR:  Off the record.  The time is
9  11:16.
10      (Recess.)
11      (Sullivan Exhibit 3 was marked by the court
12      reporter.)
13      VIDEO OPERATOR:  Back on the record.  The time
14  is 11:29.
15  BY MR. SCHMELTZ:
16      Q  I'm going to have the court reporter hand
17  you -- or she's handed you Sullivan Exhibit 3, and ask
18  you to take a look at that, Ms. Sullivan, and let me
19  know if you recognize that document.
20      A  Yes, I do.
21      Q  When was the first time that you saw Sullivan
22  Exhibit 3 which, for the record, is Plaintiff's Revised
23  Second Amended Complaint for Violations of the Federal
24  Securities Laws?
25      A  I believe I received a copy of this a few years

51

1  ago, but I can't recall exactly when.
2      Q  From whom did you receive a copy of Sullivan 3?
3      A  I believe from the gentlemen that I had been in
4  touch with, so the investigator.  I don't recall what
5  his name was.
6      Q  This person was an investigator or an attorney?
7      A  An invest- -- I believe an investigator.
8      Q  And by whom was the investigator employed; do
9  you recall?
10      A  I don't -- I don't recall who told me he was
11  employed by.
12      Q  Do you recall if he was employed by Milberg
13  Weiss?
14      A  Yes, that's correct.
15      Q  And how -- when did you first come in contact
16  with the investigator from Milberg Weiss?
17      A  He contacted me a few years back, found my
18  resume on the Internet, and asked me if he could ask me
19  some questions.
20      Q  So is it fair to say that sometime after April
21  2000?
22      A  Yes.
23      Q  And was it before or after April 2002?
24      A  I can't recall.
25      Q  Did the investigator tell you what it was about

52

1  your resume that attracted his interest?
2      A  Escalation manager.
3      Q  Did you meet with the investigator on the phone
4  or in person?
5      A  On the phone.
6      Q  How many times did you meet with the
7  investigator?
8      A  I believe it was once.  I can't be certain,
9  though.
10      Q  About how long did that conversation last?
11      A  Maybe an hour.
12      Q  Did the investigator provide you with any
13  documents prior to the conversation?
14      A  No.
15      Q  Where were you when you took the call?
16      A  At home at 1746 9th Avenue.
17      Q  And was it a prearranged call?
18      A  I don't recall.
19      Q  You don't recall if you were sitting by the
20  phone waiting for the investigator to call?
21      A  Oh, no, no, it wasn't.  He contacted me kind of
22  out of the blue, and we started having a conversation.
23      Q  So the conversation in which the investigator
24  said, "I found your resume on the Internet, could I
25  speak with you," and then the full hour, that was all

53

1  the same conversation?
2      A  I believe so.
3      Q  Okay.  Do you recall what questions the
4  investigator asked you?
5      A  I don't.
6      Q  Do you recall whether or not the investigator
7  asked you when you had resigned from the company?
8      A  I don't recall.
9      Q  Do you recall if you told the investigator that
10  you had resigned from Oracle in April of 2000?
11      A  I believe I told him I resigned.  I don't
12  believe I told him specifically when I resigned.
13      Q  Do you recall what if anything the investigator
14  asked you about Suite 11i?
15      A  He didn't ask me anything specifically about
16  11i.  He asked me questions about working with the
17  Oracle customers.
18      Q  What if anything do you recall about questions
19  about working with Oracle customers?
20      A  He -- I believe -- I believe he asked -- well,
21  he asked me what my job was in relation to Oracle
22  customers.  And he asked me what -- what my role -- you
23  know, what my role was at Oracle.  I don't -- it's hard
24  for me to even recall the first conversation I had with
25  him.

54

1      Q  When you say the first conversation, do you --
2  are you thinking now that there was a second
3  conversation?
4      A  Not at that time.  I had a second conversation
5  with him a few months -- probably a few months ago when
6  he contacted me again.
7      Q  The same investigator contacted you a few
8  months ago?
9      A  Correct.
10      Q  In the first conversation you had a few years
11  ago with the investigator from Milberg Weiss, did he
12  tell you that a lawsuit had already been filed against
13  Oracle?
14      A  Yes.
15      Q  And did he share with you the specifics of that
16  lawsuit?
17      A  He told me a little bit about it, but he didn't
18  really go in depth.
19      Q  What if anything do you recall him telling you
20  about the lawsuit?
21      A  He -- he told me something along the lines of
22  that the lawsuit was being filed because -- because
23  they -- because the plaintiffs felt that Larry had
24  inside information about whether Oracle was going to
25  make their numbers or not, and that he sold a lot of his

55

1  stock knowing that they weren't going to make their
2  numbers.
3      Q  And did he tell you -- he being this
4  investigator from Milberg Weiss -- tell you that time
5  period that the lawsuit covered?
6      A  I believe he did, but I -- oh, he did, yes, he
7  did.
8      Q  And you didn't have any conversation about the
9  fact that you weren't an Oracle employee during the time
10  frame of the lawsuit?
11      A  No, we did.  I told him that I -- that I had
12  not been working at Oracle during that time.
13      Q  What if anything did the investigator say about
14  the fact that you had not been working at Oracle during
15  the time frame of the complaint?
16      A  Well, when we were talking about my position at
17  Oracle, he -- we talked about the fact that -- that our
18  position was put in place to work with Oracle customers
19  that were having difficulties, and he -- I believe he
20  asked me if there were still people in those roles.
21      Q  With respect to the conversation with the
22  investigator from Milberg Weiss a few years ago, do you
23  recall anything else that you discussed other than the
24  lawsuit and the role of an escalation manager?
25      A  I don't recall.

56

1      Q  Do you recall discussing with the investigator
2  from Milberg Weiss, Larry Ellison's knowledge of things
3  going on in the company?
4      A  I don't recall specifically talking about
5  Larry's understanding of what was going on with the
6  customers.  I -- I'm sure I told him that I know Ray
7  Lane always knew what was going on with Oracle's
8  customers.
9      Q  Did you make the statement about Ray Lane to
10  the Milberg Weiss investigator in response to a question
11  from the Milberg Weiss investigator?
12      A  I'm sure I did.
13      Q  Do you recall at all what the Milberg Weiss
14  investigator's question was?
15      A  Probably was something along the lines of
16  who -- when we were talking about the -- the Web page or
17  the ECMS system and who had access to that, who could
18  see what was going on with customers.
19      Q  How did you start talking about the ECMS with
20  the Milberg Weiss investigator?
21      A  I believe it was -- it probably started with
22  the -- what my roles and responsibilities were and what
23  tools we were using to -- to make sure or to allow
24  senior management to see what was going on with
25  customers.

57

1    Q   What did you tell the Milberg Weiss
2   investigator about tools that would allow senior
3   management to know what was going on with customers?
4    A   I just described the -- the Web page and
5   what -- what was -- what was on the Web page.
6    Q   When you say the Web page, you mean ECMS?
7    A   Yes.
8    Q   Other than ECMS, did you describe any other
9   tools that would allow senior management to know what
10  was going on with customers?
11   A   Well, there was the ability in the Web page,
12  the technical assistance reports, which were the --
13  where the customers logged their issues, they were
14  hyperlinked on the Web page.  So you could click on them
15  and you could actually see what the -- what the status
16  was or what was going on with their -- their technical
17  issue.
18   Q   What was the basis for your statement that Ray
19  Lane always knew what was going on with Oracle's
20  customers?
21   A   Ray Lane always knew because -- well, I
22  shouldn't say he always knew, but Ray originally
23  established -- or I shouldn't say that.  Randy Baker,
24  who reported to Ray Lane, established this customer
25  escalation group.  And then my manager at the time came

58

1   up with the idea that we needed something that was
2   virtual so that everybody in the company could see what
3   was going on.
4    Q   Who was your manager that came up with the idea
5   that --
6    A   His name was Mike Mills.
7    Q   Was Mike Mills your manager before
8   Ms. Phiscator was your manager?
9    A   Yes.
10   Q   And what time period was Mike Mills your
11  manager?
12   A   He was my manager from -- he was my manager for
13  approximately two years, and I can't recall exactly what
14  the time period was.
15   Q   Was he the manager -- was he your manager
16  immediately prior to Ms. Phiscator?
17   A   Yes.
18   Q   And how long was Ms. Phiscator your manager?
19   A   Ms. Phiscator was my manager for probably about
20  a year.
21   Q   So April '00 to April-ish '99?
22   A   Yes, approximately, yeah.
23   Q   Is it fair to say that Mike Mills was your --
24  let me ask that differently.
25       Other than Ms. Phiscator and Mr. Mills, did you

59

1   have any other managers while you were an escalation
2   manager with Oracle?
3    A   Yes.  One other manager for a brief period of
4   time, and I can't remember what -- what his name was.
5    Q   Do you know who Greg Blanda is?
6    A   Yes.
7    Q   Who is Greg Blanda?
8    A   Greg Blanda is Stacy Phiscator's manager and
9   was my -- was my senior director.
10   Q   How often were you in touch with Greg Blanda?
11   A   I think I had --
12       MR. WILLIAMS:  Objection.  Vague.  What period?
13  BY MR. SCHMELTZ:
14   Q   At any point in time.
15       MR. WILLIAMS:  Vague.
16       THE WITNESS:  I think I had lunch with him once
17  after I left Oracle, and I had -- when I worked at
18  Oracle, I probably had sometimes daily interactions with
19  him.
20  BY MR. SCHMELTZ:
21   Q   On -- when did you have lunch with Greg Blanda
22  after you left Oracle?
23   A   Sometime in 2002.
24   Q   Why did you have lunch with Greg Blanda?
25   A   I had lunch with Greg Blanda and Stacy

60

1   Phiscator, just as a friendly lunch.
2    Q   Did you talk with Greg Blanda about Suite 11i?
3    A   No.
4    Q   Did you talk to Greg Blanda about this lawsuit?
5    A   No.
6    Q   Did you learn anything from Greg Blanda that
7   would give you insight into the revenue impact of
8   customer complaints on Oracle?
9    A   No.
10   Q   Did you learn anything from Greg Blanda about
11  customer complaints about Suite 11i?
12   A   No.
13   Q   Did you discuss any -- scratch that.
14       Who is Peter Schott?
15   A   Peter Schott was Greg Blanda's manager.
16   Q   What was his title, if you know?
17   A   I believe he was vice president of support
18  services.
19   Q   How often were you in contact with Peter Schott
20  while you worked at Oracle?
21   A   His office was right near where I sat, so I'd
22  see him and just say hi to him.
23   Q   Have you been in touch with Mr. Schott since
24  you left Oracle?
25   A   No.

61

1  Q  Who is Allen Snyder?
2  A  Allen Snyder was or is -- I don't -- or yeah,
3  was -- I believe he was senior vice president of support
4  services.
5  Q  During the time that you worked at Oracle, how
6  much were you in contact with Allen Snyder?
7  A  Rarely.  I probably would see him in the
8  hallway.
9  Q  Who is Ian Thacker?
10  A  Ian -- Ian Thacker, I can't tell you what he
11  did at Oracle.  I remember his name, but he was an
12  Oracle employee, but -- I can't remember exactly what he
13  did.
14  Q  What about Gary Bloom?
15  A  Gary Bloom was for -- I believe a brief period
16  of time he was Randy Baker's senior manager.
17  Q  Who is Randy Baker?
18  A  Randy Baker was the senior vice president of
19  Oracle support services.
20  Q  Before or after Allen Snyder?
21  A  He brought Al -- Al Snyder in.  So before and
22  during.
23  Q  I'm sorry.  I thought you had said Allen Snyder
24  was the SVP of support services?
25  A  He was -- he was.  Randy was fired by Oracle

62

1  when I was there, and I can't remember when he was
2  fired.
3  Q  Okay.  How long were you -- or how often were
4  you in touch with Randy Baker while you were at Oracle?
5  A  Well, I used to see him in the hallway, and I
6  think we had maybe a couple of interactions regarding
7  customer issues.
8  Q  During what time period would you have had
9  interaction with Randy Baker about customer issues?
10  A  Well, from the time that I went to work in the
11  group until the time that he was let go of the company.
12  And I can't recall when he was let go.
13  Q  Is it fair to say that he was let go prior to
14  Suite 11i's beta issue?
15  A  I believe so.  I can't -- I can't be sure,
16  though.
17  Q  With respect to Randy Baker and Allen Snyder,
18  do you recall any specific customer complaints or
19  customer escalation issues you discussed with him?
20  A  No.
21  Q  Who is the most senior person at Oracle that
22  you recall having conversations with about escalation
23  issues?
24  A  Well, as far as senior, I mean, my -- my
25  understanding -- well, my interaction with senior was

63

1  I -- I actually spoke to Larry Ellison's assistant and
2  spoke to Ray Lane's assistant, so I consider them senior
3  people because they were the right-hand person.
4  Q  What was the typical nature of your interaction
5  with Peter Schott?
6  MR. WILLIAMS:  Objection.  Vague.
7  BY MR. SCHMELTZ:
8  Q  While you worked at Oracle.
9  A  My -- my interactions with him were just
10  friendly, hi, see you in the hallway, that type of
11  thing.
12  Q  Did you ever deal with customer complaint or
13  customer escalation issues with Peter Schott?
14  A  With him directly, no.
15  Q  Did you ever deal with customer support or
16  customer escalation issues with Greg Blanda?
17  A  Yes.
18  Q  How frequently?
19  A  Sometimes on a daily basis and sometimes on a
20  monthly basis and sometimes on a weekly basis.  It
21  depended on who -- who the customer was really.
22  Q  Did you ever deal with customer complaints or
23  customer escalation issues with respect to Specialized
24  with Greg Blanda?
25  A  I don't recall.

64

1  Q  You mentioned that you had contact with Larry
2  Ellison's assistants and Ray Lane's assistants.  Did you
3  discuss customer escalation or customer complaint issues
4  with Larry Ellison's assistants?
5  A  They were always customer issues.
6  Q  And which of Larry Ellison's assistants did you
7  have customer --
8  A  Usually Carolyn Balkenhol.  I think once I
9  spoke to Joyce Hagashi, and there were -- there were a
10  couple of other people that kind of came and went.
11  There was -- Cynthia Turner was one of his assistants,
12  and then there was another woman.  I believe her first
13  name was Ashley, but I can't be for sure.
14  Q  Which of Ray Lane's assistants did you have
15  conversations with about customer complaints or customer
16  escalation issues?
17  A  Usually it was all -- well, it was all of them.
18  I -- I carried a pager for in part -- well, part of my
19  responsibilities were being the customer advocate, if
20  you will, for Larry's office, and -- but it wasn't -- it
21  wasn't on my -- it wasn't on my job title.  And I used
22  to carry a pager, and I would get paged when a customer
23  issue was escalated to Larry's office.
24  Q  How often did you get paged -- let me -- let me
25  start differently.

65

1       When did you get assigned the responsibility of
2   customer advocate for Larry Ellison's office?
3       A   Sometime in the year -- let's see.  I want to
4   say in the year -- either in late 1998 or early 1999.
5       Q   And for how long did you have that position?
6       A   Until I left Oracle.
7       Q   On a monthly basis, how often would you say you
8   got paged because a customer issue had been escalated to
9   Larry Ellison's office?
10      A   It varied.  Some months it was maybe five
11  times, and then there were months where I -- I would get
12  paged as much as like once every other day.  So maybe
13  like three -- three times a week.
14      Q   If you had to pick an average number of times
15  in a month you were paged over the time period from late
16  '98, early '99 through April 2000 when you left, what
17  would that number be?
18      A   Maybe ten times.
19      Q   Do you remember any specific customers for whom
20  you were paged?
21      A   Not from Larry's office.  They all kind of ran
22  together after awhile.
23      Q   Do you have any memory of specific customer
24  complaints about which you were paged?
25      A   Well, they -- yeah, they ran the gamut.  I

66

1   worked with customers that were unhappy about -- about
2   their purchase of software.  And not -- I mean, I can't
3   recall anything specifically, but I remember a customer
4   being upset and wanting to return their software, just
5   said it didn't work.
6       Q   And what time frame was that; do you recall?
7       A   It was probably in -- sometime in 1999.
8       Q   Do you recall if that was a CRM beta test
9   customer or not?
10      A   I don't believe so.
11      Q   Do you recall whether or not that customer
12  ultimately returned their software?
13      A   They did not.
14      Q   Do you have any knowledge of the revenue impact
15  of that customer's complaints to Oracle?
16      A   I do not.
17      Q   Is that the only specific complaint that you
18  recall with respect to times you were paged?
19      A   No, there were customers that had paid for
20  training, and they felt that the training had been
21  inadequate and they wanted their money back.  There were
22  customers that -- I mean, there were other customers
23  that called because they felt that -- not that they
24  wanted to return their software, but they felt that --
25  that our sales group had been dishonest with them when

67

1   they were sold the Oracle software.
2       Q   Anything else?
3       A   And then there were probably -- I know there
4   were some like technical -- technical customer problems
5   that were mixed in there.
6       Q   Anything else?
7       A   There were a couple where Oracle hadn't paid
8   bills, and they were getting no response from our
9   accounts payable department.
10      Q   Anything else?
11      A   No.
12      Q   With respect to customers who paid for training
13  and wanted their money back, do you recall specific
14  customers?
15      A   No.
16      Q   Do you recall whether or not Oracle returned
17  their money?
18      A   One customer I believe Oracle did not return
19  their money but offered them other classes.
20      Q   Do you recall the time frame in which that
21  occurred?
22      A   Sometime in '99, I would think.
23      Q   Is it fair to say that you don't know the
24  revenue impact to Oracle offering those additional
25  classes --

68

1       A   No.
2       Q   -- or the expense impact of offering those
3   classes?
4       A   No.
5       Q   With respect to issues with the sales group
6   selling Oracle software, do you recall the specific
7   customers who made those complaints?
8       A   No.
9       Q   Do you recall the time frame?
10      A   1999 to the 2000 time frame.
11      Q   Do you know what Oracle's solution was to those
12  issues?
13          MR. WILLIAMS:  Objection to form.
14          THE WITNESS:  Well, the solution -- well, I
15  wasn't involved in the total resolution of the issue.
16  But I know that somebody in sales -- and usually what
17  happened was somebody sold the deal and then left the
18  company, and so whoever it kind of fell under their
19  umbrella, they were in charge of kind of cleaning up the
20  mess, if you -- you know, so to speak.  And then their
21  responsibility, once they had come up with some sort of
22  resolution, was just to let me know to give me a summary
23  of it so I could report it back to Larry's office.
24  BY MR. SCHMELTZ:
25      Q   Is it fair to say that you don't know the

69

1    revenue impact of any of those solutions --
2        A   That's correct.
3        Q   -- to Oracle?  And you don't know the expense
4    impact of any of those solutions to Oracle?
5        A   No.
6        Q   With respect to technical customer problems, do
7    you remember any specific technical customer problems?
8        A   No, not offhand.
9        Q   Do you recall any specific customers who had
10   technical problems?
11       A   Not the names of them.
12       Q   And is it fair to say that you don't know
13   either the revenue or the expense impact to Oracle for
14   solving any of those technical problems?
15       A   That's correct.
16       Q   With respect to situations in which Oracle
17   hadn't paid bills, do you recall specific vendors to
18   which Oracle hadn't paid bills?
19       A   Well, one that sticks out in my memory was an
20   organization that does the dragon boats out in -- out
21   in -- out in the bay or in the marina -- I mean the
22   Oracle marina.
23       Q   What are dragon boats?
24       A   The dragon boats -- well, actually, it's over
25   in Foster City.  They race these dragon boats and Oracle

70

1    was supposed to -- they were sponsoring one of the
2    dragon boats.
3        Q   Oracle racing or Oracle --
4        A   No, I think it was just a group that asked
5    Oracle for sponsorship.  They were some nonprofit group,
6    and Oracle was supposed to deliver a check for a certain
7    amount of money and they didn't.
8        Q   Did Oracle ultimately --
9        A   They -- they ultimately did, but it did -- it
10   took about six months for us to get the whole issue
11   cleared up.
12       Q   Do you recall about the time frame of the
13   dragon boat issue?
14       A   I believe that was like 1998 to the 1999 time
15   frame because it was right when I had taken over for
16   my -- for my old coworker.
17       Q   And do you recall the size of the check Oracle
18   had to write in the dragon boat incident?
19       A   No, I don't.
20       Q   Did you discuss these types of scenarios in
21   which you had been paged on behalf of Larry Ellison's
22   office with the Milberg Weiss investigator?
23       A   Not those specifically.
24       Q   Did you discuss the fact that you had been a
25   customer -- advocate for Larry Ellison's office --

71

1        A   Yes.
2        Q   -- with the Milberg Weiss --
3        A   Yes.
4        Q   And is there anything other than what you've
5    told me today that you told the Milberg Weiss
6    investigator with respect to your position as a customer
7    advocate for Ellison's office?
8            MR. WILLIAMS:  Objection.  Form.
9            THE WITNESS:  No, I don't believe so.
10   BY MR. SCHMELTZ:
11       Q   How did you come to have regular con- --
12   have -- pardon me.  How did you come to have contact
13   with Ray Lane's assistants?
14       A   I believe once it was on the phone, and I
15   believe I sent her e-mails on just status updates.
16       Q   Why were you having telephone and e-mail
17   contact with Ray Lane's assistants on status updates?
18       A   Well, I'd have e-mail and telephone updates
19   with some of the other assistants in the -- in Oracle's
20   organization.  Usually it was e-mails because I had to
21   ensure that I had, you know, backup information in case
22   somebody came back to me and said well, you never -- you
23   never sent that to me.
24       Q   But with specific -- specifically with respect
25   to Ray Lane, why did you have occasion to have phone and

72

1    e-mail contact with Ray Lane's office?
2        A   Usually it was my manager at the time, one of
3    my -- well, my manager would ask me to send an update.
4        Q   How often did you have contact with Ray Lane's
5    office?
6        A   I probably had contact with them maybe three or
7    four times.
8        Q   Three or four times during the entire time you
9    were employed by Oracle?
10       A   I believe so, yes.
11       Q   Did you ever have contact with Ray Lane's
12   office about Suite 11i?
13       A   No, I did not.
14       Q   We were talking earlier about how you had told
15   the Milberg Weiss investigator something about Ray Lane
16   knowing what was going on at Oracle with Oracle
17   customers.
18           Do you recall our conversation about that?
19       A   Yes.
20       Q   And we kind of got off on this tangent because
21   we started talking about Randy Baker and Mike Mills.
22           Do you recall that?
23       A   Mm-hmm.
24       Q   Based on your -- based on what I've understood,
25   you said that Mike Mills came up with the concept for

73

1  ECMS; is that correct?
2     A  Yes.
3     Q  And do you know one way or the other whether or
4  not Ray Lane used ECMS?
5     A  I do know.
6     Q  How do you know that?
7     A  I do know because my -- my boss -- well, part
8  of our job responsibility and part of -- one of the
9  things that -- that we were evaluated on was making sure
10  that we were updating the page so that senior management
11  could -- could, you know, could review what was going on
12  with customers.
13     Q  How do you specifically know that Ray Lane
14  regularly used --
15     A  I know his assistant was aware of what the
16  problems were because there was also a component in on
17  the Web page where you could put in people's e-mail
18  addresses, and it would automatic- -- every time you
19  updated it, it would generate an e-mail, if you will,
20  with all the status update information. So I know that
21  she was aware of what was going on.
22     Q  In every instance there was a customer
23  complaint?
24     A  No, it depended on what the status of the
25  customer was.

74

1     Q  How often do you know that -- how -- if you
2  recall, how often was it that you would put this e-mail
3  address in with respect to a Ray Lane assistant?
4     A  I probably put it in maybe two to three times.
5     Q  So you just know for sure that on two or three
6  occasions, one of Ray Lane's assistants got this e-mail
7  off of ECMS?
8     A  Yes.
9     Q  Is that right?
10     A  Yes. I don't know whether she read it, but I
11  would definitely say she got it.
12     Q  And with respect to Mr. Ellison, do you have
13  any knowledge one way or the other as to whether
14  Mr. Ellison accessed ECMS?
15     A  No, no firsthand knowledge.
16     Q  What about secondhand or thirdhand knowledge?
17     A  No.
18     Q  With respect to the Milberg Weiss investigator,
19  we've talked about your conversations about being an
20  escalation manager, we've talked about your
21  conversations about ECMS, and we've talked about your
22  role with Larry Ellison's office. Are there any other
23  topics you recall talking about with the Milberg Weiss
24  investigator?
25     A  Not -- not that I can recall.

75

1     Q  Turn with me, if you would, to page 12 of
2  Sullivan 3. If you'd look at paragraph (dd). I'll
3  represent to you that this is the paragraph that
4  purports to describe you and your job responsibilities.
5     A  Yes.
6     Q  Does that look like generally your job
7  responsibilities?
8     A  Yes.
9        MR. CAPLAN: Sorry, Counselor, what page are
10  you on?
11        MR. SCHMELTZ: Page 12.
12     Q  It notes in that paragraph that you are
13  responsible for providing customers with a conduit for
14  executive level communication. What does that mean to
15  you?
16     A  Well, I would say that we were the -- we were
17  the executive level interface with the customer, and our
18  job was to -- to act -- to step in for senior management
19  and make sure that the customers were -- were taken care
20  of.
21     Q  With respect to this phrase "providing
22  customers with a conduit for executive level
23  communication," other than what you've just told me, do
24  you have any other understanding of what that phrase
25  means?

76

1     A  No, not really.
2     Q  This paragraph notes that you represented
3  senior management to clients. Other than what we've
4  talked about, how did you represent senior management to
5  clients?
6     A  I would say by making -- making decisions that
7  senior management would have -- would have approved of
8  in regards to, you know, getting -- getting issues
9  resolved. So for some customers it was doing whatever
10  needed to be done, and going to whatever groups we
11  needed to go to get -- to get the problems resolved.
12     Q  But you didn't -- you didn't personally
13  directly report to senior management about what you were
14  doing; is that correct?
15     A  Well, I mean, I didn't verbally tell them, you
16  know, what I was doing, but the Web page usually told
17  them what we were doing. I didn't have conversations
18  with them about that.
19     Q  So if senior management accessed the ECMS, they
20  would know what you were doing; is that fair to say?
21     A  Yes.
22     Q  And if they didn't access ECMS, they might not
23  know what you were doing; is that fair to say?
24     A  Right, that's correct.
25     Q  And certainly you didn't report directly to

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

77

1  senior management at Oracle; is that fair to say?
2      A  No, I did not.
3      Q  Let's take a break while the videographer
4  changes the tape.
5          THE WITNESS:  Okay.
6          VIDEO OPERATOR:  This concludes tape 1.  We're
7  going off the record.  The time is 12:15.
8          (Lunch recess.)
9          VIDEO OPERATOR:  Here begins tape 2 in the
10 deposition of Patricia Sullivan.  On the record.  The
11 time is 1:14.
12 BY MR. SCHMELTZ:
13     Q  Ms. Sullivan, if you'd do me a favor and turn
14 to page 36 of Sullivan 3, which for the record is
15 paragraph 48(k).  Read that paragraph to yourself if you
16 would, and let me know when you're done.
17     A  Wait a minute.
18     Q  It's paragraph (k).
19     A  Oh, okay.  All right.
20     Q  Do you recall in words or substance saying
21 what's described in paragraph (k) to the Milberg Weiss
22 investigator?
23     A  I probably said something in this context, but
24 this doesn't sound like my language.
25     Q  Let me ask you first, with respect to

78

1  subparagraph (k), is the internal Web site referred to
2  here the ECMS we've talked about?
3      A  Yes, that is correct.
4      Q  Are there any other internal Web sites that you
5  can think of that you would have referenced to the
6  Milberg Weiss investigator?
7      A  No.
8      Q  And we've established that you don't know one
9  way or the other whether or not Mr. Ellison actually did
10 get on ECMS, right?
11     A  Yes, that's correct.
12     Q  And ECMS doesn't track every deal, it tracks
13 customers; isn't that right?
14     A  If there was a deal associated with a customer,
15 it was tracked in the system.
16     Q  How does that work?
17     A  Usually there was a piece in the summary where
18 it would say something to the effect that -- something
19 like this is a strategic customer or there's a deal --
20 there's a $30 million deal contingent upon -- upon
21 getting these customer issues resolved.
22     Q  Did the ECMS monitor each customer's
23 progression of sales?
24     A  Not unless the salesperson that was attached --
25 attached to, let's say, a deal like that was involved.

79

1      Q  Do you know -- well, it's fair to say that you
2  don't know of any sales or technical deals that ECMS
3  would have tracked in the third quarter of 2001, right,
4  because you weren't there?
5      A  Correct.
6      Q  And it's fair to say that you don't know of any
7  specific sales that ECMS tracked at all, right?
8          MR. CAPLAN:  Vague as to time.
9  BY MR. SCHMELTZ:
10     Q  At any time.
11     A  No, there were -- there were some -- some deals
12 that were tracked in the ECMS that were -- that were --
13 that were on the Web site and we had -- we being the
14 escalation managers -- had contact with those
15 salespeople.
16     Q  And which specific deals were those?
17     A  I couldn't tell you which ones, but I remember
18 viewing -- I mean, part of my job at one point was to
19 make sure that people were updating their -- their
20 customer issues.  And if they weren't updating them, my
21 job was to call them and tell them you know what, you
22 haven't updated it in, you know, in the amount of time
23 that you were supposed to.  Please do so.
24     Q  My question was it's fair to say that you don't
25 remember any specific customer deals that were tracked

80

1  by the ECMS at any time, right?
2      A  I can't remember the names of them, but I
3  remember seeing them on the Web site.
4      Q  None specifically?
5      A  None specifically, no.
6      Q  And you don't remember any specific revenue
7  associated with any of those deals -- with any deal you
8  saw tracked on ECMS?
9      A  Not an exact number amount.
10     Q  And you don't know one way or another whether
11 ECMS tracked all sales, right?
12     A  No, I know that it did not track all sales.
13     Q  How did ECMS function as an early warning
14 system that a customer was going to cancel an order?
15     A  Well, it didn't -- as far as it functioned as a
16 warning system, as an early warning system that -- that
17 really wasn't what -- isn't really true in that as far
18 as a customer cancelling an order, that isn't something
19 I would have said.  Because they -- it wasn't specific
20 to an order.
21     Q  Is it fair to say that you wouldn't have told
22 the Milberg Weiss investigator that ECMS was created to
23 monitor each customer's progression of sales?
24     A  No, I wouldn't have said that.
25     Q  And is it fair to say that you wouldn't have

81

1  told the Milberg investigator that Ellison kept track of
2  every deal through ECMS?
3      A  No, I would have never said that.
4      Q  Did the Milberg investigator tell you in
5  that first conversation that he wanted to use
6  information from you to put into a complaint that would
7  be filed in court?
8      A  I don't recall.
9      Q  Did the Milberg Weiss investigator or anybody
10  from Milberg Weiss ask your permission to have your
11  statements used in a complaint that was filed in court?
12      A  I don't recall.
13      Q  Did the Milberg Weiss investigator or anyone
14  from the Milberg Weiss law firm ever send you a copy of
15  Sullivan 3 and ask you to review statements in it that
16  they were attributing to you?
17      A  No, they did not.
18      Q  With respect to paragraph 27(dd) which is at
19  page 12, did anyone at the Milberg Weiss law firm ever
20  ask you to approve that description of yourself?
21      A  No, they did not.
22      Q  And with respect to paragraph 48(k) which is
23  back on page 36, did anyone from the Milberg Weiss law
24  firm ask for you -- for your permission to use these
25  comments?

82

1      A  No.
2      Q  And did anyone from the Milberg Weiss law firm
3  ask for your approval of the comments as they are
4  related in paragraph 48(k)?
5      A  No.
6      Q  If asked, would you have approved the comments
7  attributed to you in paragraph 48(k)?
8      A  I would have approved parts of the comments but
9  not everything.
10      Q  What parts of the comments would you have
11  approved?
12      A  I would have approved the part where it says
13  "internal website created to monitor each customer's
14  progression of" -- I may have said "sales and technical
15  issues" because they could have been combined together.
16  And I would have said that "the system could be viewed
17  24 hours a day, 7 days a week," and then the rest of
18  that sentence I wouldn't have -- I wouldn't have said.
19  I may have said parts of it but not --
20      Q  After you met the first time with the Milberg
21  investigator, did you have a subsequent meeting with
22  that investigator?
23      A  In this time frame or just in general?
24      Q  At any point.
25      A  Yes, I had a subsequent conversation with him a

83

1  few months back when he contacted me again to let me
2  know that they were moving forward and that I would
3  probably be contacted by Eli.
4      Q  Let me ask you this:  At the time the Milberg
5  Weiss investigator contacted you the first time, did he
6  tell you that Milberg Weiss would not ever reveal your
7  name?
8      A  I -- I don't remember.  He may have asked me if
9  I was okay with them revealing my name.
10      Q  And what did you say?  What would you have
11  said?
12      A  Well, at that time, I probably -- I probably
13  was interviewing at Oracle and was afraid that it
14  would -- it might impact my being rehired by them.  And
15  that's probably what I would have said to him.
16      Q  Did anyone at either Milberg Weiss or Lerach
17  Coughlin call you to tell you that they were going to
18  reveal your name in this lawsuit?
19      A  I'm not sure.
20      Q  When you say you're not sure --
21      A  I don't -- I don't recall having a conversation
22  like that.
23      Q  You didn't ever -- you don't recall giving
24  permission to Lerach Coughlin or Milberg Weiss to
25  provide your name; is that right?

84

1      A  That's correct.
2      Q  Did anyone from Milberg Weiss or Lerach
3  Coughlin offer you anything of value for your time on
4  the phone with the Milberg investigator?
5      A  No.
6      Q  Did anyone from Milberg Weiss or Lerach
7  Coughlin offer you anything of value for using
8  statements attributed to you in a legal proceeding?
9      A  No.
10      Q  Has anyone at Lerach Coughlin or Milberg Weiss
11  offered you anything of value other than paying for
12  Mr. Caplan's time, which is very valuable, I trust, to
13  participate in this lawsuit, to be in any way involved
14  in this lawsuit?
15      A  Well, not so much -- I mean, I -- I get -- I
16  was paid for, you know, parking and things like that,
17  but that -- that was it.  And it was a small amount of
18  money.
19      Q  Okay.  Sounds like you've had -- if they had
20  paid you for parking, you've been to the Lerach offices
21  in San Francisco?
22      A  Oh, no, no, no.  Not Lerach directly, no, no.
23      Q  Where were you paid for your parking?
24      A  At Mr. -- Mr. Caplan's office.
25      Q  Tell me about the time frame that the Milberg

85

1 investigator called you to say that they were going
2 forward and that Mr. Greenstein would be getting in
3 touch with you.
4      A   Well, he -- this gentleman contacted me and
5 just said that -- that the case was moving forward and
6 that Eli would be contacting me, and he just asked for a
7 time frame.
8      Q   Okay.  Is this in January, February '05?
9      A   I believe so.  I can't --
10      Q   Okay.
11      A   Yes, I'm pretty positive, because it was after
12 I had started at eVault, so --
13      Q   Okay.  Would it have been as late as May of
14 2005?
15      (Mr. Rubin enters the room.)
16      THE WITNESS:  I don't think so.  I'm not sure.
17 No, no.
18 BY MR. SCHMELTZ:
19      Q   Okay.  How come you're sure?
20      A   Because my birthday is in May, and I would have
21 remembered if it -- there's a lot of events in May, so I
22 would have remembered if it was in May.
23      Q   Okay.  Could it have been in April of '05?
24      A   Could have been.
25      Q   And so could have been anytime between January

86

1 and April of '05; is that right?
2      A   That's correct.
3      Q   Okay.  And when did Mr. Greenstein contact you?
4      A   In the evening.
5      Q   About -- about what date, approximately?
6      A   Oh, I seriously cannot tell you.  The times
7 have like merged all together.
8      Q   Still in that January to April time frame?
9      A   I believe so.
10      Q   How long did you and Mr. Greenstein talk?
11      A   We had about a two-hour conversation.
12      Q   And what did you and Mr. Greenstein talk about?
13      A   We talked about my duties as an escalation
14 manager.  I'm sure he asked me questions about customers
15 that I had worked with.  We talked about the -- the CRM
16 group at Oracle.  And then I think we talked about the
17 history of the escalation group at Oracle.
18      Q   Anything else that you recall talking to
19 Mr. Greenstein about?
20      A   We talked about the ECMS page.  He asked me
21 some questions about that.
22      Q   Anything else?
23      A   Not that I can recall.
24      Q   Is there anything that you told Mr. Greenstein
25 about your duties as an escalation manager that you and

87

1 I have not talked about today to the best of your
2 recollection?
3      A   To the best of my recollection, I don't think
4 so.
5      Q   What customers did you tell Mr. Greenstein
6 about?
7      A   I probably talked to him about customers like
8 Tektronix, Conway Freight, probably most of the
9 financial applications customers that I worked with.  I
10 probably mentioned the one CRM customer, but I never
11 really had a lot of interaction with them, because I had
12 left the company right before I started on their
13 project.  Veritas was one of those customers.
14      Q   Veritas was a CRM customer?
15      A   Yes.
16      Q   And were they a beta customer?
17      A   No.  But I really -- I didn't get into the --
18 this was -- this was in the early stages of their
19 project, so I don't even -- I don't even think I knew
20 what components they were going to be implementing.
21      MR. CAPLAN:  Mr. Schmeltz, could you identify
22 who entered the room?
23      MR. SCHMELTZ:  Absolutely.  This is a colleague
24 of mine, Lee Rubin from the Mayer Brown, Palo Alto
25 office.

88

1      MR. CAPLAN:  Thank you.
2 BY MR. SCHMELTZ:
3      Q   With respect to Veritas as a CRM customer, what
4 if anything do you recall telling Mr. Greenstein?
5      A   Just that I had been brought on to manage the
6 project.  But I knew when I was brought on to manage the
7 project that I was leaving the company, but my manager
8 had me go to the meeting anyway.
9      Q   You resigned from Oracle; is that right?
10      A   No, I had -- well, I was -- I think I had given
11 my two weeks' notice, but it was discussed that I would
12 go, and one of my coworkers would go with me just for
13 transitioning purposes.
14      Q   I mean, say sort of generally, you resigned as
15 opposed to some other action terminating you, you
16 resigned?
17      A   Correct.
18      Q   Okay.  Now, you said Veritas was not a beta
19 customer of CRM.  They were not an 11i customer; is that
20 right?
21      A   I believe they would have been an 11i customer,
22 but I didn't -- I didn't talk about them because I
23 really wasn't involved.
24      Q   In April of 2000, did Oracle have any 11i
25 customers other than beta customers?

89

1      A  I believe they did, but I wasn't focused on
2   those customers.
3      Q  So you're not sure one way or the other whether
4   or not software had actually been released in terms
5   of --
6      A  I believe it had been released.
7      Q  And is it your understanding that there were
8   customers implementing Suite 11i as of April 2000?
9      A  I can't say for certain.  These could have been
10  early -- early stage customers that were doing the
11  project planning.
12     Q  You don't know anything one way or the other
13  about customer complaints from these early stage CRM
14  customers?
15     A  No, no.
16     Q  What did you tell Mr. Greenstein about the
17  financial apps customers you had worked with?
18     A  Well, I probably told him that part of the
19  reason why our group was established was because when
20  they rolled out the financial applications, they
21  had cut -- they -- we had hundreds of customers that
22  were buried in technical problems and Oracle had to
23  figure out a way to manage those customers, manage their
24  problems and make them happy customers, make them
25  referenceable customers because that was part of our

90

1   job.  So I probably talked to him about that, and I'm
2   sure he probably asked me how many, you know, how many
3   customers I handled, how many application customers I
4   was handling at a given time.
5      Q  Did he ask you whether or not you dealt with
6   Suite 11i while you were at Oracle?
7      A  I believe he did.
8      Q  And what did you tell him?
9      A  I believe I told him that -- well, this is kind
10  of where things get fuzzy for me because I don't
11  remember -- because applications was completely separate
12  from CRM.  So there could have been 11i financial
13  applications customers, and then we're talking about 11i
14  CRM customers.  And so I can't really specifically say
15  what release -- what release I was working with.
16     Q  Do you know what release Suite 11i was, the
17  software?
18        MR. WILLIAMS:  Objection.  Vague.
19        THE WITNESS:  I can't recall what was -- what
20  was under that, that entire release.
21  BY MR. SCHMELTZ:
22     Q  Do you recall if Suite 11i -- let me ask it
23  differently.  Do you recall if you worked on financial
24  applications that were release No. 11.5.1?
25     A  I probably did.

91

1      Q  When you say you probably did, why do you think
2   that?
3      A  Because I remember when -- well, I really can't
4   tell you what releases we were on.  I mean, it all kind
5   of like moved together at a certain point.
6      Q  So is it fair to say that your -- you don't
7   recall any customer complaints with respect to release
8   11.5?
9      A  Yeah, I can't -- I can't recall specifically
10  that release.
11     Q  Did Mr. Greenstein ask you about release 11.5
12  during your conversation?
13     A  I don't believe so.
14     Q  Did Mr. Greenstein suggest to you any dates in
15  which Oracle released Suite 11i software?
16     A  I don't think we talked about specific dates.
17     Q  About how long was your specific conversation
18  with respect to Suite 11i with Mr. Greenstein?
19     A  I couldn't tell you.
20     Q  Was it more than ten minutes?
21     A  I really couldn't tell you.
22     Q  Was it a focus of your conversation?
23     A  It could have been.  I don't -- I really don't
24  recall the entire conversation.
25     Q  You mentioned two specific customers.  Take

92

1   them one at a time.  Tektronix, what did you tell
2   Mr. Greenstein about Tektronix?
3      A  I may -- I may have told him that I worked with
4   them as a customer.  I don't even know if he
5   specifically asked me what customers I worked with at
6   Oracle.
7      Q  Why did you bring up Tektronix specifically?
8      A  Because we may have had a conversation about
9   that.
10     Q  I mean, why did you bring it up specifically
11  with Mr. Greenstein?
12     A  Well, if he asked what -- I mean, those are
13  like customers that -- that would register in my mind
14  because they were really difficult customer accounts.
15     Q  Why was Tektronix particularly difficult?
16     A  Well, Tektronix was -- they were a
17  referenceable account, and they had a lot of problems
18  when I was brought on to work through their issues.  And
19  they turned out to be a customer that we turned around.
20  You know, it took awhile but we turned them around, and
21  they were -- they were happy with -- with the work that
22  Oracle did for them.
23     Q  Do you know at whose cost it was that
24  Tektronix's problems were solved?
25     A  Some of it was the customer's costs and some of

93

1    it was Oracle's.
2        Q   Is it fair to say that you don't know one way
3    or the other what the balance sheet impact of fixing
4    those problems would have been to Oracle?
5        A   No, I would not have.
6        Q   By what time frame would you say that Tektronix
7    had become a satisfied customer?
8        A   Probably took about six months.
9        Q   And do you know if that would have been by
10   January 2000 they would have been satisfied?
11       A   No, this was prior to that because they were an
12   applications customer.  So it could have been '99, 2000
13   time frame.
14       Q   When you make a distinction between their being
15   an applications customer so they would have been
16   satisfied by '99, 2000, what are you basing that
17   distinction on?
18       A   Well, they were a financial applications
19   customer, and they were what I consider kind of an early
20   customer of mine.
21       Q   When were financial applications first released
22   that -- well --
23       A   Well, I started working with financial
24   applications customers when I moved over to -- to the
25   escalations group, but I believe my coworkers were

94

1    working with them sometime prior to that.  I know they
2    were.
3        Q   So when you mentioned Tektronix as being '99,
4    early 2000, was that because it was one of the first
5    accounts you worked on, or what is it that sort of puts
6    you in that time frame?
7        A   Well, no, it's just in relation to customers
8    that I worked with.  And certain customers have always
9    like stuck out in my mind.  And that would have been
10   one.  Nike would have been one.  Boeing would have been
11   one.  Conway Freight would have been one.  And it was
12   also like my interactions with the -- the customer, you
13   know, building that relationship with the customer.  So
14   that's why they would have stood out.
15       Q   And what are the specific issues with respect
16   to Conway Freight that make them stand out in your mind?
17       A   Well, Conway Freight was a financial
18   applications customer, and they were -- their accounts
19   payable and their accounts receivable, they could
20   never -- they could never balance either side.
21           And they had so many problems with the software
22   that it got to the point where their senior management
23   and the senior management from development all had to
24   meet down in Redwood Shores.  And we had to have a
25   meeting with like 40 people in the room to discuss, you

95

1    know, what we were going to do so that the head of this
2    like this group there wouldn't lose his job.  Because
3    that's what it came down to.  He called us and said if I
4    don't get this fixed, I'm going to lose my job.
5        Q   What time frame was that?
6        A   I believe that was in probably late 1999.
7        Q   Were the problems at Conway Freight resolved?
8        A   Yeah, as much as they -- as they could be,
9    enough so that the gentleman didn't lose his job.
10       Q   Were they able to get AP and AR to balance?
11       A   Not fully.
12       Q   At whose expense were those problems addressed?
13       A   Those were addressed -- I think eventually
14   Oracle consulting had to eat all the costs.
15       Q   And by what time frame were those problems
16   resolved?
17       A   Well, to the customer's satisfaction in
18   probably fall of '99.
19       Q   Are there any financial applications, customer
20   issues that you're aware of or that you -- pardon me,
21   that you recall after January 2000?
22       A   Not -- not specific customers.
23       Q   Did Mr. Greenstein comment one way or the other
24   that you didn't have any specific customer complaints
25   that you recalled after January of 2000?

96

1            MR. WILLIAMS:  Assumes facts.
2            THE WITNESS:  I don't know.  I don't know if we
3    spoke specifically about that.  I don't know if he -- if
4    he asked me after this point, you know, can you recall
5    anything.  I don't remember.
6    BY MR. SCHMELTZ:
7        Q   Mr. Greenstein wasn't concerned about the dates
8    of the customer complaints you were raising; is that --
9            MR. CAPLAN:  Calls for speculation.
10           THE WITNESS:  No, I'm sure he was.  I just -- I
11   can honestly say I just don't recall our entire
12   conversation.
13   BY MR. SCHMELTZ:
14       Q   You don't recall Mr. Greenstein asking you
15   about specific dates one way or other?
16       A   He could have, but I don't recall.
17       Q   You mentioned that you talked to Mr. Greenstein
18   about the CRM group?
19       A   Mm-hmm.
20       Q   What did you tell Mr. Greenstein about the CRM
21   group?
22       A   Well, my recollection was I told him that the
23   CRM group or the group under Mark Barrenechea was
24   established because Oracle had had prior problems with
25   other software releases; and from lessons learned, they

97

1   had decided to establish their own development
2   escalation group, if you will.
3        Q   Essentially you recounted some of the same
4   things to him that we talked about earlier today; is
5   that right?
6        A   I believe so.
7        Q   What else, other than the reasons for
8   establishing the CRM escalation group, did you talk to
9   Mr. Greenstein about CRM -- excuse me, with respect to
10  CRM?
11       A   I -- I -- I don't recall.
12       Q   You mentioned that you talked about the history
13  of the escalation group with Mr. Greenstein.  What did
14  you tell him about the history of the escalation group?
15       A   Well, as far as the history, I probably
16  discussed with him how -- how our group came about in
17  the support organization.  So that's probably what
18  our -- what our discussion was about.
19       Q   Anything separate from what you've told me
20  today?
21       A   I don't believe so.
22       Q   And with respect to the ECMS page, is there
23  anything with respect to the ECMS page that you talked
24  to Mr. Greenstein about that we haven't talked about
25  today?

98

1        A   I don't believe so.
2        Q   Other than Tektronix, Conway Freight and
3   Veritas, are there other specific customers that you
4   recall mentioning to Mr. Greenstein?
5        A   I probably did, but I couldn't tell you which
6   ones.
7        Q   Do you know what the TAR database is?
8        A   Yes.
9        Q   What's the TAR database?
10       A   Well, a TAR is a technical assistance report,
11  and I don't -- it wasn't specifically called a TAR
12  database, but it was a database that -- that the
13  technical analysts inputted customer -- customers'
14  technical problems.
15       Q   And during the time that you were at Oracle,
16  would -- would problems that arose on accounts for which
17  you were responsible have been recorded in that TAR
18  database?
19       A   Yes.  Yes.
20       Q   And do you understand the various -- do you
21  know what a bug is?
22       A   Yes.
23       Q   What's a bug?
24       A   A bug is -- a bug is an issue -- it's a known
25  issue that -- that has to go back to development to

99

1   write code to correct the problem.
2        Q   And do you know what levels the bugs are
3   arrived at?
4        A   I can't -- I can't recall.
5        Q   After your two-hour telephone conference with
6   Mr. Greenstein, did you have any other contact with the
7   Lerach Coughlin firm?
8        A   I believe -- yes, I did.  I had one more, very
9   brief conversation with Eli when he told me that they
10  would help me find an attorney, that I was going to be
11  deposed.
12       Q   How did that -- how did that conversation come
13  about?
14       A   Eli contacted me -- well, wait a minute.  It
15  could have been the investigator that contacted me.  I
16  don't really remember.  I think it was Eli, though.  He
17  just contacted me and said that I was going to be
18  deposed and that I should -- that I would need -- that I
19  would probably need an attorney.  And that they -- they
20  would help me secure an attorney or they knew of an
21  attorney that I could -- that I could use.  And they
22  asked me if -- if I wanted them to obtain an attorney.
23  And I said, you know, that I would -- that I did.  And
24  then -- and then I was in contact with Mr. Caplan.
25       Q   Absent Mr. Greenstein's suggestion that you

100

1   would probably need an attorney, would you have sought
2   an attorney out on your own in response to the subpoena?
3        A   Yes.
4            MR. WILLIAMS:  I'm going to object to the last
5   question.  It assumes facts.
6   BY MR. SCHMELTZ:
7        Q   Would you have sought out Mr. Caplan absent
8   Mr. Greenstein's suggestion?
9        A   I would have probably sought out a suggestion
10  from my uncle, who's an attorney.
11       Q   Absent Mr. Greenstein's suggestion that Lerach
12  front your legal fees, would you have sought -- would
13  you have asked Lerach to pay your legal fees?
14       A   Yes, I would have.
15       Q   Why?
16       A   Because I felt if they were -- if they were
17  bringing me in as one of their -- as one of -- one of
18  the people for their case, that they should provide
19  counsel for me.
20       Q   Did Lerach ever author -- pardon me.
21           Did Lerach or anyone from the Lerach Coughlin
22  firm offer to represent you --
23       A   No.
24       Q   -- directly?  Do you remember the time frame
25  that you were contacted by either the Milberg

101

1   investigator or Mr. Greenstein about the provision of
2   counsel?
3       A  I don't recall.
4       Q  Do you recall whether it was before or after
5   you received our subpoena?
6       A  It was before.
7       Q  And at the time you talked to Mr. Greenstein,
8   did you let him know that you would be willing to accept
9   his suggestion for counsel?
10      A  I believe so.
11      Q  And did you consult with anyone about accepting
12  Mr. Greenstein's suggestion that you accept counsel?
13      A  I believe I probably spoke to one of my friends
14  as an attorney and, you know, just about being deposed
15  in general.  Or I may have spoken to my uncle and
16  they -- they really didn't have an opinion one way or
17  the other.  They said, you know, this is just something
18  that happens.
19      Q  Did Mr. Greenstein offer to accept the service
20  of the subpoena on your behalf?
21      A  No, he did not.
22      Q  Do you know one way or the other whether you
23  retained Mr. Caplan prior to receiving our subpoena?
24      MR. CAPLAN:  Would you repeat that?
25  BY MR. SCHMELTZ:

102

1       Q  Do you know one way or other whether you had
2   retained Mr. Caplan or Mr. Caplan had been retained by
3   Lerach on your behalf prior to your receiving our
4   subpoena?
5       A  I'm not sure.
6       MR. CAPLAN:  I'll object.  It calls for a legal
7   conclusion.
8       THE WITNESS:  I'm not sure exactly.  I mean, I
9   had -- I had a couple of conversations with Alan, and I
10  don't know in that -- when I was talking to him
11  whether -- whether the subpoena -- whether we had the
12  subpoena or not.
13  BY MR. SCHMELTZ:
14      Q  After your last conversation with
15  Mr. Greenstein where he offered to provide you with
16  counsel, did you have any other conversation with anyone
17  from the Lerach Coughlin firm?
18      A  No, I did not.
19      Q  When did you first meet with Mr. Caplan?
20      A  I believe it was sometime in June.  No, maybe
21  May.  I don't remember.
22      Q  Where did you meet with Mr. Caplan?
23      MR. CAPLAN:  I'm sorry?
24  BY MR. SCHMELTZ:
25      Q  Where did you meet with Mr. Caplan?

103

1       A  In his office.
2       Q  And for how long was your first meeting with
3   Mr. Caplan?
4       A  About 45 minutes to maybe an hour.
5       Q  When did you meet -- let me rephrase that.
6       Is that the meeting at which Lerach paid for
7   your parking?
8       MR. CAPLAN:  Objection.
9       THE WITNESS:  Lerach --
10      MR. CAPLAN:  Excuse me, excuse me.  It might
11  call for attorney-client privilege, so I'm going to
12  instruct her not to answer.  And assumes facts not in
13  evidence.
14  BY MR. SCHMELTZ:
15      Q  My understanding was your testimony earlier was
16  that Lerach had paid for your parking; is that correct?
17      A  No, no.  No, I never -- I said that my
18  parking had been paid for, but I don't know -- I don't
19  know if the money came from Lerach or not.  No, it came
20  from my attorney to me.
21      Q  Fair enough.  After your first 45-minute
22  conversation with Mr. Caplan, did you meet with him
23  again?
24      A  Once, one more time.
25      Q  Before we get to that conversation, had you

104

1   retained Mr. Caplan as your lawyer prior to that
2   conversation -- that first 45-minute conversation?
3       A  Yes.
4       Q  It was your anticipation at that time that you
5   were talking to Mr. Caplan as your lawyer; is that
6   right?
7       A  Yes.
8       Q  After that conversation, did you have a
9   subsequent conversation with Mr. Caplan?
10      A  I had short conversations with him.  I'm not --
11  they weren't even conversations.  It was talking.
12      MR. CAPLAN:  Excuse me, Ms. Sullivan.  You
13  don't have to testify and you shouldn't testify as to
14  anything that you and I talked about.
15      THE WITNESS:  Okay.
16      MR. CAPLAN:  So the answer is yes or no.
17  BY MR. SCHMELTZ:
18      Q  And the answer is yes?
19      A  Yes.
20      Q  And you had a follow-up meeting with
21  Mr. Caplan; is that right?
22      A  Yes.
23      Q  And when was that follow-up meeting?
24      A  Yesterday.
25      Q  And how long did that follow-up meeting last?

105

1       A   About an hour.
2       Q   Have you had any other conversations with
3   either Lerach Coughlin or the Milberg investigator other
4   than the ones we've talked about?
5       A   No.
6           MR. SCHMELTZ:  I'm going to have a document
7   marked as Sullivan 4.
8           (Sullivan Exhibit 4 was marked by the court
9           reporter.)
10          MR. SCHMELTZ:  After we've marked that, let's
11  take a two-minute break.  And while we're on our break,
12  if you don't mind taking a look at this.  I'm going to
13  ask you some questions after.
14          VIDEO OPERATOR:  Off the record.  The time is
15  2:00 p.m.
16          (Recess.)
17          VIDEO OPERATOR:  We're back on the record.  The
18  time is 2:14.
19          THE WITNESS:  Trace, can I just clarify
20  something?
21  BY MR. SCHMELTZ:
22      Q   Please.
23      A   As far as obtaining an attorney, Lerach also
24  told me I could obtain my own attorney, but Alan was
25  just recommended, so I -- I just wanted to clarify

106

1   that -- that he wasn't -- that he certainly wasn't
2   pushed on me.
3       Q   Earlier we had a conversation about Tektronix
4   and Conway Freight and some of these customer
5   escalations.  It's fair to say that your job was to take
6   customer complaints and try to turn complaining
7   customers into happy customers; isn't that right?
8       A   Essentially, yeah.  In the nutshell, yeah.
9       Q   And it's sort of standard, at least for Oracle,
10  to have unhappy customers that need to be turned into
11  happy customers; isn't that right?
12          MR. WILLIAMS:  Objection.  Vague.
13          THE WITNESS:  Yes.
14  BY MR. SCHMELTZ:
15      Q   And what you were dealing with with respect to
16  financial apps was certainly something that the company
17  had dealt with in the past; isn't that right?
18      A   Yes, that's correct.
19      Q   With respect to Sullivan 4 -- for the record,
20  Sullivan 4 is a May 13, 2005 letter from Jennie Lee
21  Anderson to Vincent P. Schmeltz, and it encloses
22  information responsive to interrogatories No. 15 of
23  Defendants' Second Set of Interrogatories to Plaintiffs
24  as modified by the court's order.
25          If you would, take a look at page 51 of the

107

1   document, No. 452. Sullivan, Patty.  Take a look at that
2   paragraph for me, if you would, and tell me when you've
3   had a chance to read it.
4       A   Okay.
5       Q   This is a paragraph that purports to describe
6   testimony that you might be expected to give in the
7   case.  Does this look like testimony that you think you
8   could give in this lawsuit or in any lawsuit?
9           MR. WILLIAMS:  Objection.  Assumes facts.
10          THE WITNESS:  Well, I would say relating to
11  Suite 11i is -- I mean, there's a small segment of that
12  that's true, but it's -- it's -- I didn't work with
13  those customers all the time.
14  BY MR. SCHMELTZ:
15      Q   And with respect to Suite 11i, you only recall
16  Specialized as a specific customer, right?
17      A   Right.
18      Q   And you don't recall any specific complaints
19  that Specialized had with respect to Suite 11i; isn't
20  that right?
21      A   Not specific.
22      Q   And the customization issues that you recall
23  were addressed by Oracle; isn't that right?
24          MR. WILLIAMS:  Objection.  Vague.
25          THE WITNESS:  I mean, it wasn't the cus- -- it

108

1   wasn't -- the whole thing wasn't the customization, it
2   was the implementation of the software.  The customizing
3   of the software was only a component of software
4   implementation.
5   BY MR. SCHMELTZ:
6       Q   Do I understand your testimony earlier
7   correctly that Oracle paid for consultants to address
8   implementation issues at Specialized?
9       A   They paid for consultants as far as people that
10  came from consulting and came from support services,
11  because there were different types of consultants at
12  Oracle.  I mean -- so yes, Oracle paid for those
13  consultants, so to speak.
14      Q   And you don't know the balance sheet impact of
15  any of that consulting one way or the other, do you?
16      A   No.
17      Q   And you don't know the balance sheet impact to
18  Oracle of any of Specialized's complaints about Suite
19  11i, do you?
20      A   No.
21      Q   And again, you don't remember specifically any
22  Specialized complaints; is that right?
23      A   No.
24      Q   And you don't remember any specific problems
25  with implementation or functioning of Suite 11i; is that

109

1  correct?
2      A   Nothing specifically.
3      Q   And with respect to this last sentence in
4  paragraph 452, do you anticipate giving testimony about
5  slowdown in demand, pipeline and/or sales for Oracle
6  products or services resulting from customer complaints?
7          MR. CAPLAN:  Object.  It calls for a legal
8  conclusion.
9          THE WITNESS:  I can't say that I saw a slowdown
10  in demand.  I know when I worked at Oracle, slowdown
11  meant that we didn't make our numbers.
12  BY MR. SCHMELTZ:
13      Q   Was there ever a time that you didn't make your
14  numbers while you worked at Oracle?
15      A   Yes.  I can't recall which quarters we didn't
16  make our numbers, but there were quarters where we
17  didn't make our numbers.
18      Q   You certainly don't know about the third
19  quarter of 2001, whether there was a slowdown in demand;
20  isn't that right?
21      A   That's correct.
22      Q   Did anyone at Lerach Coughlin -- excuse me, did anyone
23  at Lerach Coughlin talk to you about the substance of
24  this paragraph 452 in Sullivan 4?
25          MR. CAPLAN:  Objection.  Vague.

110

1          THE WITNESS:  I can't recall.
2  BY MR. SCHMELTZ:
3      Q   Did anyone at Lerach Coughlin ask if you were
4  willing to testify in this lawsuit with respect to the
5  topics outlined in paragraph 452 of Sullivan 4?
6      A   I can't recall.
7      Q   In any of your conversations with Eli
8  Greenstein, did any of these subjects in paragraph 452
9  come up?
10      A   I'm sure they did, but I don't really recall --
11  recall the entire conversation.
12      Q   Did Mr. Greenstein ask you about problems with
13  the implementation and functioning of Suite 11i?
14      A   I believe he did.
15      Q   And what did you tell him?
16      A   I just -- I probably talked -- spoke to it in
17  relation to the -- the customers or my coworkers'
18  customers.
19      Q   Did you tell him that you didn't know of any
20  specific --
21          MR. WILLIAMS:  Can you say that a little bit
22  louder because I'm having a really difficult time
23  hearing you.
24  BY MR. SCHMELTZ:
25      Q   Did you tell him that you didn't know of any

111

1  specific problems with the implementation and
2  functioning of Suite 11i?
3      A   I don't think we ever spoke about specific
4  problems, no.
5      Q   Did you tell Mr. Greenstein that you didn't
6  know of any specific customer complaints with respect to
7  Suite 11i?
8          MR. WILLIAMS:  Excuse me, can you read that
9  back, please?
10          (Record read as follows:
11          "QUESTION:  Did you tell Mr. Greenstein
12          that you didn't know of any specific
13          customer complaints with respect to Suite
14          11i?")
15          MR. WILLIAMS:  Thank you.
16  BY MR. SCHMELTZ:
17      Q   Can you repeat your question, please?
18          MR. SCHMELTZ:  Do you mind reading it back one
19  more time?
20          THE WITNESS:  Or is that the same -- that's the
21  same question?
22          MR. WILLIAMS:  That's the same.
23          THE WITNESS:  Oh, that's the same question?
24  Okay.
25          No, we didn't speak specifically about those

112

1  problems, so no.
2  BY MR. SCHMELTZ:
3      Q   Did you tell Mr. Greenstein that you weren't
4  aware of a slowdown in demand during the third quarter
5  of Oracle's fiscal year 2001?
6      A   I don't know if we spoke about that specific
7  issue.
8      Q   In the course of your job as an escalation
9  manager, did you have reason to know what was in the
10  pipeline for sales for Oracle products?
11      A   For -- sometimes we did and sometimes we
12  didn't.  So yes, there were periods where we did.
13      Q   When you say there were periods when you did,
14  what do you mean by that?
15      A   That was probably a situation where somebody
16  was giving us the heads up on that we were going to have
17  to proactively manage a customer and their problems.
18  Because we were -- our job in the past had been
19  reactive, so we were trying to be more proactive.
20      Q   So on a -- on a project-by-project basis, you
21  might know what deals were in the pipeline; is that fair
22  to say?
23      A   Yes.
24          MR. CAPLAN:  That misstates testimony, I
25  thought.

113

1   BY MR. SCHMELTZ:
2       Q   But you wouldn't know for any one division what
3   their sales pipeline was; is that right?
4       A   No.
5       Q   And you wouldn't know for any particular region
6   what the sales pipeline was, right?
7       A   No.
8       Q   And you wouldn't know what the totality of the
9   sales pipeline was for anybody, right?
10      A   No.
11      Q   Do you know of any customer that canceled its
12  order for Suite 11i software with Oracle Corporation?
13      A   No.
14          MR. WILLIAMS:  Objection.  Vague.
15  BY MR. SCHMELTZ:
16      Q   Do you have any information relating to whether
17  or not Oracle knew or could have known that it was not
18  going to make its earnings forecasts in the third
19  quarter of 2001?
20          MR. CAPLAN:  Compound.
21          THE WITNESS:  No.
22  BY MR. SCHMELTZ:
23      Q   Do you have any information about debit memos
24  that were issued in Oracle in November of 2000?
25      A   No.

114

1       Q   Do you know what an upside report is?
2       A   No.
3       Q   Do you know what a flash report is?
4       A   Yes.
5       Q   What's flash report?
6       A   Flash report, from my understanding, is a
7   financial report on, you know, what -- numbers on what's
8   going on in a company.
9       Q   Did you ever see a flash report at Oracle?
10      A   No.
11      Q   Do you know what a pipeline report is?
12      A   No.  I should say I do know what a pipeline
13  report is, but I never saw one.
14      Q   Never saw one at Oracle?
15      A   No.
16      Q   With respect to ECMS, do you have any
17  knowledge -- scratch that.
18          Let me just take a break and talk to my
19  colleague.  I'm almost out of gas.
20          VIDEO OPERATOR:  Off the record.  The time is
21  2:27.
22          (Recess.)
23          VIDEO OPERATOR:  Back on the record.  The time
24  is 2:32.
25  BY MR. SCHMELTZ:

115

1       Q   Is it fair to say that you don't know anything
2   about a slowdown in demand in the second quarter of 2001
3   either?
4       A   Yes.
5           MR. SCHMELTZ:  I have no further questions.
6           MR. CAPLAN:  Thank you.
7           MR. WILLIAMS:  I have some, so I was going to
8   switch with you so I can be in front of the witness, if
9   you don't mind.
10          MR. SCHMELTZ:  I do not mind.
11          (Discussion off the record.)
12          VIDEO OPERATOR:  Back on the record.  The time
13  is 2:34.
14
15              EXAMINATION
16  BY MR. WILLIAMS:
17      Q   Good afternoon, Ms. Sullivan.  My name is Shawn
18  Williams, and I'm an attorney with Lerach Coughlin Stoia
19  Geller Rudman & Robbins.  I've just got some follow-up
20  questions to the questions and answers that Mr. Schmeltz
21  asked you throughout the day.
22          I'll probably jump around a little bit because
23  I did not know what your testimony would be and how the
24  questions would line up, so if I seem to kind of get off
25  track and you want to bring me back, that's fine.  Okay?

116

1   I'll try to be as loud and as clear as possible.  And if
2   you don't understand anything I ask, just ask me,
3   please.
4       A   Okay.
5       Q   I understand that a lot of what we talked about
6   today, or a lot of what you and Mr. Schmeltz talked
7   about today happened a long time ago.
8       A   That's correct.
9       Q   Several years ago.  And you indicated that you
10  left Oracle sometime in April of 2000?
11      A   Yes.
12      Q   That's fair?  And so that's more than five
13  years ago?
14      A   Yes, that's correct.
15      Q   We also talked about -- well, you also gave
16  testimony about some things that happened more recently,
17  for example, conversations with my colleague, Eli
18  Greenstein.
19          Is that fair to say?
20      A   Yes.
21      Q   And so I'm going to kind of start from the back
22  and then go back, if I can, only because some of these
23  things you talked about more recently in deposition.
24  Okay?
25      A   Okay.

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

117

1    Q   You indicated you had a couple of conversations
2    with Eli Greenstein recently, right?
3    A   Yes.
4    Q   And is it fair to say that one of those
5    conversations happened within the last three months?
6    A   I believe so.
7    Q   And I think you indicated that one of those
8    conversations was relatively long, about approximately
9    two hours.  Was that your testimony?
10   A   Yes.
11   Q   Okay.  Was anyone else on that telephone call?
12   A   I believe there was, but I can't remember who
13   was on the line with us.  I believe it was the
14   investigator.
15   Q   Same person that spoke to you back in 2000?
16   A   Correct.
17   Q   I'm sorry, back in 2001?
18   A   My recollection is yes.
19   Q   Okay.  And have you ever met me before?
20   A   No.
21   Q   Have you ever spoken with me before?
22   A   Never.
23   Q   Okay.  Mr. Schmeltz asked you several questions
24   about the conversation you had in that -- in that -- the
25   conversation you had with Eli Greenstein.

118

1        MR. SCHMELTZ:  Objection.  Vague as to which
2    conversation.
3    BY MR. WILLIAMS:
4    Q   Well, we're talking about the two-hour
5    conversation that you mentioned.
6    A   Yes.
7    Q   You mentioned two conversations, one relatively
8    long and one relatively short, where he indicated that
9    Mr. Caplan might, you know, be somewhat available for
10   you.
11       Is that your testimony?
12   A   Yes.
13   Q   Right now I'm talking about the longer
14   conversation.
15   A   Okay.
16   Q   Okay?  And I think your testimony to
17   Mr. Schmeltz was -- and correct me if I'm wrong -- I
18   think he asked you if there were any -- if there was
19   anything that you talked about with Eli that you did not
20   testify about today?
21   A   Yes, he did ask me.
22   Q   Right.  And I think your answer to that
23   question was that you believed that you covered today
24   the topics that you talked about with Eli in that long
25   conversation; is that fair?

119

1        MR. SCHMELTZ:  Objection.  Misstates the
2    witness's testimony.
3    BY MR. WILLIAMS:
4    Q   Is that fair?
5    A   To my recollection, yes.
6    Q   Okay.  I don't expect you to remember this
7    stuff verbatim because I don't either.  But I want to
8    talk about some things that -- that may have been
9    discussed in that conversation.  And just let me know if
10   it's accurate.
11       Do you recall discussing with Mr. Greenstein
12   the amount or frequency of problems communicated by
13   customers to Oracle after applications were released?
14   A   I'm sure I probably told him something, yes.
15   Q   Mm-hmm, yeah.  And do you have any
16   recollection, not necessarily of the conversation with
17   Mr. Greenstein, but that after applications were
18   released at Oracle, that customer complaints exploded or
19   increased or anything like that?
20       MR. SCHMELTZ:  Objection.  Vague as to
21   applications release.  There's no framework for which
22   applications.
23   BY MR. WILLIAMS:
24   Q   Go ahead.
25   A   Yes.

120

1    Q   Okay.  And what is that recollection?
2    A   The recollection was that yes, in fact, when --
3    when we did -- when Oracle did release a new release
4    of -- of software, that there were, in fact, a large
5    amount of customer complaints.
6    Q   Mm-hmm.  And do you recall discussing that
7    topic generally with Mr. Greenstein in your latest -- in
8    that two-hour conversation?
9    A   I believe I did.
10   Q   Okay.  And do you recall discussing with
11   Mr. Greenstein that in 2000 -- late '99 and 2000,
12   obviously up until the time you left, that there were
13   indeed customers that threaten to cancel their
14   contracts with Oracle because of problems that they were
15   experiencing with -- with implementations?
16       MR. SCHMELTZ:  Objection.  Vague as to
17   customers for what product.
18       THE WITNESS:  There were -- there were
19   customers that did threaten to -- as far as contract
20   that -- yeah, I mean, I guess -- I guess in terms of
21   sales there were customers that -- that were going to
22   cancel their support contracts.
23   BY MR. WILLIAMS:
24   Q   Mm-hmm.
25   A   And they basically wanted to get their money

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

121

1  back.
2      Q  Okay.
3      A  Sometimes with --
4      Q  Okay.  And do you recall -- do you recall
5  having a general discussion about that topic with
6  Mr. Greenstein during that conversation that happened a
7  few months ago?
8      A  I believe so.
9          MR. SCHMELTZ:  Objection.  Asked and answered.
10 BY MR. WILLIAMS:
11     Q  Go ahead.
12     A  I believe we did have a conversation about
13 that.
14     Q  Thanks.  Do you -- did you discuss customers
15 who refused to pay, who may have refused to pay because
16 they were experiencing problems with Oracle's software
17 back in, say, 2000?
18         MR. SCHMELTZ:  Objection.  Vague as to what
19 software.
20         THE WITNESS:  I believe -- yes, yes, we did, we
21 did discuss customers, yeah.
22         MR. WILLIAMS:  Can you just read back my
23 question for me?
24         (Record read as follows:
25          "QUESTION:  Did you discuss customers who

122

1          refused to pay, who may have refused to pay
2          because they were experiencing problems with
3          Oracle's software back in, say, 2000?")
4  BY MR. WILLIAMS:
5      Q  Can you just answer that again?  I don't think
6  the record was clear.
7      A  Yes.
8      Q  Okay.  And you and Eli --
9          MR. SCHMELTZ:  I lodge the same objection,
10 obviously.
11 BY MR. WILLIAMS:
12     Q  And you and Eli discussed that generally a
13 couple of months ago?
14         MR. SCHMELTZ:  Asked and answered.
15 BY MR. WILLIAMS:
16     Q  Is that fair?
17     A  Yes.
18     Q  Okay.  Do you recall discussing with
19 Mr. Greenstein at all the quantity of the increase in
20 customer complaints after applications were released in
21 2000?
22         MR. SCHMELTZ:  Objection.  Vague.
23         THE WITNESS:  Specific like amounts?
24 BY MR. WILLIAMS:
25     Q  Mm-hmm.

123

1      A  No.  At least I don't remember.
2      Q  Okay.  Do you recall discussing -- do you
3  recall indicating that sometimes customer problems
4  increased, tripled or went from 50 to 60 per day,
5  something along those lines?
6          Do you recall having a conversation about that?
7          MR. SCHMELTZ:  Objection.  Vague as to went
8  from 50 to 60.
9          THE WITNESS:  I -- I don't recall talking about
10 that specifically.  I probably put it in context of some
11 of the -- some of the customers that we were working
12 with had probably 50 or 60 technical assistance reports.
13 BY MR. WILLIAMS:
14     Q  Okay.
15     A  And our job was to help -- help them prioritize
16 those issues --
17     Q  Okay.
18     A  -- because there was no way we could work on
19 that many issues.
20     Q  I understand.  Now, did you remember that
21 earlier today and just not testify about it, or did my
22 question to you help refresh your recollection?
23         MR. SCHMELTZ:  Objection.  Vague.
24         THE WITNESS:  I don't remember that -- that
25 specific question being asked or --

124

1  BY MR. WILLIAMS:
2      Q  Okay.  But you indicated that that conversation
3  was approximately two hours?
4      A  Yes.
5      Q  And during that conversation, did you do most
6  of the talking or did Mr. Greenstein do most of the
7  talking?  Do you remember?
8      A  I probably did most of the talking.
9      Q  Okay.  Do you remember everything that you said
10 during that conversation?
11     A  No.
12     Q  You indicated earlier in your testimony that
13 you met with Mr. Caplan a couple of times before this
14 deposition today?
15     A  That's correct.
16     Q  All right.  And the first time was when?  I
17 just don't remember what your testimony was.
18     A  I don't recall the exact month and date --
19     Q  Okay.
20     A  -- that it happened, you know, the first
21 meeting.
22     Q  Okay.  It's all right if you don't remember.
23 But is it fair to say it happened sometime within the
24 last three months?
25     A  I believe it did.  Oh, yes, definitely.

125

1    Q  It didn't happen last year?
2    A  Oh, no, not at all.
3    Q  And during that first meeting with Mr. Caplan,
4  was that by telephone or -- well, withdrawn.
5       During your first face-to-face meeting with
6  Mr. Caplan, did you review any documents in order to
7  prepare for your deposition in this case?
8       MR. CAPLAN:  Objection.  Calls for
9  attorney-client privilege and instruct Ms. Sullivan not
10  to answer.
11  BY MR. WILLIAMS:
12    Q  Any of the documents that you've been shown
13  today -- you've seen a few documents today?
14    A  Mm-hmm.
15    Q  I think there may be five exhibits here.
16    A  Mm-hmm.
17    Q  Now when was the last time -- withdrawn.
18       Have you seen any of those documents before
19  today --
20       MR. SCHMELTZ:  Asked and answered.
21  BY MR. WILLIAMS:
22    Q  -- outside -- excuse me -- outside of your
23  communication with Mr. Caplan?
24       MR. SCHMELTZ:  Asked and answered.
25       THE WITNESS:  I -- yes.

126

1  BY MR. WILLIAMS:
2    Q  Okay.
3    A  I believe I received copies of -- I mean, I
4  look at these, and they all look the same to me.
5    Q  I understand.  Why is that?
6    A  Because they're -- they're attorney documents.
7  I just --
8    Q  Not familiar to you?
9    A  Yeah.
10    Q  Okay.
11    A  I mean, I skim through them and I look at them,
12  but yeah.
13    Q  I understand.  Now, have you had a chance to
14  review any of, for instance, your e-mail correspondence
15  that you may have transmitted while you were an employee
16  at Oracle in the year 2000?
17       MR. SCHMELTZ:  Asked and answered.
18       THE WITNESS:  E-mail correspondence between
19  people?
20  BY MR. WILLIAMS:
21    Q  You and other Oracle employees during 2000.
22    A  Have I reviewed any of them?
23    Q  Right.  When was the last time you have seen
24  any of those documents?
25    A  When I left Oracle.

127

1    Q  And so that's a little more than five years
2  ago?
3    A  Yes.
4    Q  Do you think that a review of any of those
5  documents might help refresh your recollection as to
6  what was happening at least -- at Oracle, at least
7  within your division at the time?
8       MR. SCHMELTZ:  Compound, vague.  Assumes facts.
9       THE WITNESS:  I mean, there might be, I don't
10  even --
11  BY MR. WILLIAMS:
12    Q  Okay.  That's fine.  And -- but you didn't
13  review any of that stuff before you testified today?
14    A  No.
15       MR. SCHMELTZ:  Asked and answered.
16  BY MR. WILLIAMS:
17    Q  Okay.  Now, you talked a little -- we talked a
18  little bit about or -- I'm sorry.
19       You were asked a little bit about the
20  escalation group early in the deposition today.  Can you
21  just describe for me what the escalation group was as it
22  existed in 2000?
23    A  As it existed in 2000, we -- we being the
24  escalation group, were -- we were regional, so there
25  were three -- three groups of us.  In our particular

128

1  group there were -- there were four or five of us that
2  were in the group here on the West Coast.  And we -- we
3  were broken out into products, if you will.  And so when
4  an issue would come in, depending on which product it --
5  it focused on, usually our manager would shoot us an
6  e-mail or call us into our office, and we'd sit down and
7  talk about it.
8    Q  Okay.  Now, was your office here in California?
9    A  My office -- well, yeah, my office was up at
10  One Davis Drive.
11    Q  And where is that?  Is that in Redwood City or
12  is it --
13    A  It's in Belmont.  It's up the hill from Oracle.
14  That's where our support services was located.
15    Q  Okay.  And the people that you mentioned, you
16  said there were about four of you in this group?
17    A  About, yes.
18    Q  And did you all sit together --
19    A  Yes.
20    Q  -- have offices next to one another?
21    A  We did.  We all had cubicles near one another.
22    Q  So there weren't closed door offices, were
23  there?
24    A  Just our manager.
25    Q  Okay.  And do you recall the names of the

129

1    individuals that were in your escalation group here on
2    Davis Drive?
3        A  Yes.  One of them was Melissa Aslaksen.  Justin
4    Cassidy was another one, Shawna McKenna and
5    Bernadette -- I don't remember what her last name was.
6        Q  Okay.  Now, did you -- did you all work
7    individually or did you work together?  What I mean is
8    did you -- in order to do your job, did you need to
9    communicate with the other people in the escalation
10   group?
11       A  Yes, yes.
12       Q  Okay.  In what manner?
13       A  Well, we -- we kind of collaborated on -- when
14   issues would come up, we would -- we would interact in
15   that we'd talk about some of these issues, and sometimes
16   what would happen was you'd find that somebody else who
17   was working with the same type of software customers in
18   that particular release, that they were having the same
19   problem or something close to the same problem.  So then
20   you could direct the technical analyst who was working
21   on the issue to possibly look at theirs and maybe
22   piggyback off of theirs.
23       And if it was a bug, sometimes when we had a
24   couple of customers with, you know, something close to
25   the same problem, it was easier to push it through to

130

1    development to get them to fix the problem.
2        Q  Okay.  So is it fair to say that because you
3    had to communicate with these -- with your colleagues
4    there, that sometimes you would learn about issues that
5    weren't necessarily -- that you weren't necessarily
6    responsible for?
7        A  Yes.
8        Q  Okay.  And would you say that occurred on a
9    day-to-day basis, or would it be maybe a week-to-week or
10   month-to-month basis?
11       A  I would say it probably happened on a
12   day-to-day basis.
13       Q  Okay.  And how did you -- while you were at
14   Oracle and specifically in 2000, how did you typically
15   communicate with other people within Oracle?  Was it by
16   telephone or by electronic mail?
17       A  It was both.
18       Q  And would you characterize one being used any
19   more than another?
20       A  I tended to be more of a telephone person.
21       Q  Mm-hmm.  And what about -- well, did you
22   receive a lot of e-mail?
23       MR. SCHMELTZ:  Objection.  Vague as to a lot.
24   BY MR. WILLIAMS:
25       Q  Go ahead.

131

1        A  I would say yes.  Well, it depended on who you
2    were interacting with.  Some people, that was their --
3    that was their way that they -- that they communicated
4    was e-mail.  Everything was e-mail.
5        Q  And I still want to kind of focus on the
6    escalation group a little bit.  Is it fair to say that
7    the escalation group was created so that customers could
8    interface with Oracle management through the escalation
9    group?
10       A  Yes.
11       Q  Okay.  And do you know why that was created?
12       MR. SCHMELTZ:  Asked and answered.
13       THE WITNESS:  Yes, because -- well, the group
14   was set up because there were so many customers that had
15   had problems with the software, and management wanted to
16   have -- have them -- have the customer be able to
17   interface with somebody, have contact if they needed it
18   on a daily basis.
19   BY MR. WILLIAMS:
20       Q  Mm-hmm.  And so when you testified earlier
21   that -- that that that -- well, withdrawn.
22       When you were asked earlier about what it meant
23   to represent senior management to clients, is it fair to
24   say that when the escalation group dealt with customers,
25   it was the interfacing with senior management to them?

132

1        Is that fair to say or is that confusing?
2        MR. SCHMELTZ:  Objection.  Vague.
3        MR. CAPLAN:  Object as to confusing.
4    BY MR. WILLIAMS:
5        Q  Was it confusing?  I'll --
6        A  No, it's not confusing.  I mean, the way -- the
7    way -- our job -- I mean, our job was to act as though
8    we were Ray Lane or Randy Baker.  And because we
9    interacted -- a lot of times we weren't just interacting
10   with the technical people, we were interacting with the
11   chief operating officers, the chief -- the chief
12   information officers, the chief financial officers.  So
13   our -- our job was to act as though, you know, we were
14   the Ray Lanes of the company.  We were given the
15   clout --
16       Q  Of -- well --
17       A  -- to make those decisions.
18       Q  Okay.  And at the time, say in 2000, Ray Lane
19   was -- do you remember what his position was?
20       A  Ray Lane was the chief operating officer.
21       Q  Mm-hmm.  And if you know, do you know if he was
22   referred to as the number two guy at Oracle?
23       A  Yes.
24       Q  Okay.  And did you understand that to be the
25   case at the time?

133

1    A  Well, I think in support, our understanding of
2  him was that he was the number one guy.  He was the one
3  that was running the company.  It wasn't Larry at all.
4    Q  Okay.  And so the -- and so when you say he
5  represents senior management, at the time you're saying,
6  I guess, Oracle and Ray Lane?
7    A  Mm-hmm.
8    Q  Okay.  And did you -- you indicated also that
9  you -- as -- as a participant or an employee of the
10 escalation group, that you frequently had contact with
11 the assistance of senior management; is that fair to
12 say?
13   A  Yes.
14        MR. SCHMELTZ:  Objection.  Misstates the
15 witness's testimony.
16 BY MR. WILLIAMS:
17   Q  Was that a fair characterization of your
18 testimony?
19   A  Yes, we did.  We had interactions with the
20 executive assistants.
21   Q  Okay.  And as far as you knew, did Ray Lane
22 have different -- a different executive assistant from
23 Larry Ellison?
24   A  Yes.
25   Q  Yeah.  And do you know how many assistants that

134

1  Ray Lane had at the time, let's say 2000?
2    A  Ray had one assistant.
3    Q  Mm-hmm.  And how about Larry Ellison?
4    A  Larry had, let's see, one, two -- one, two,
5  three -- I think Larry had between three and four
6  assistants.
7    Q  And I think your prior testimony was that you
8  had contact with Larry Ellison's assistants --
9    A  Yes.
10   Q  -- during the time that you worked there,
11 right?
12   A  Yes.
13   Q  Now, what was the purpose of your
14 communications with his assistants, let's just say in
15 '99, 2000?
16        MR. SCHMELTZ:  Asked and answered.
17        THE WITNESS:  In '99 and 2000 my interactions
18 with them were when they would get a call in relation to
19 a customer issue, and it could be anything, then they
20 would either page me or they would call me.
21 BY MR. WILLIAMS:
22   Q  Okay.  And when you say it could be anything,
23 do you mean -- what do you mean when you say it could be
24 anything?
25   A  It ran the gamut.  It was -- like I said, it

135

1  was on accounts payable issues, it was technical issues,
2  it was sales issues, it was -- it was anything and
3  everything in the company.
4    Q  Okay.  And when you talked to them or if they
5  paged you, for instance, what would be the purpose of
6  that?  Was it for you to address a customer problem or
7  situation?
8        MR. SCHMELTZ:  Compound, vague.
9        THE WITNESS:  Yes.  The purpose -- well, when I
10 would have -- when they would contact me -- well,
11 sometimes I would get a live customer.  They would --
12 what they called it was a warm transfer.  And they would
13 transfer the customer directly to me.  And they would
14 just give me a summary of what the call was regarding.
15 And then I would take the call from there.
16 BY MR. WILLIAMS:
17   Q  Okay.  And was it -- and was it expected that
18 during the conversation you were representing Oracle --
19   A  Yes.
20   Q  -- and senior management?
21   A  Yes.  I was representing Larry's office.
22   Q  Okay.  And I think you testified earlier that
23 you are a customer advocate, was it?
24   A  Yes, yes.
25   Q  Was that the title that you indicated?

136

1    A  It wasn't -- it wasn't -- it was part of my
2  title, but it was never really --
3    Q  Written?
4    A  Yeah, it was never a written title.
5    Q  Mm-hmm.  And that was -- and as a customer
6  advocate, you were representing Larry Ellison's office?
7    A  Yes.
8    Q  And during the period where you were customer
9  advocate, is it fair to say you had frequent
10 communication with at least his assistants?
11   A  Yes.
12   Q  Is that fair?
13   A  Yes.
14   Q  Okay.  And so which way would the
15 communications go?  I'll explain that.  Would you
16 typically receive communications directly from Larry
17 Ellison's office which required you to do something, or
18 did you have information that you ultimately reported to
19 Larry Ellison's office to his assistants?
20        MR. SCHMELTZ:  Asked and answered.
21        THE WITNESS:  It was both.
22 BY MR. WILLIAMS:
23   Q  It was both?  And would you say that either one
24 was more frequent than the other?
25   A  No.

137

1   Q  Okay.  And did you -- were you friendly at all?
2  And let me take that back.  Withdrawn.
3       Were you cordial at all with Larry Ellison's
4  assistants?
5       MR. SCHMELTZ:  Vague.
6       THE WITNESS:  Yeah.
7       MR. WILLIAMS:  Mm-hmm.
8       THE WITNESS:  Some of them -- some of them we
9  had more friendly conversations, and some of them I
10  didn't have friendly conversations with them.
11  BY MR. WILLIAMS:
12   Q  Typical, right?
13   A  Yeah.
14   Q  And do you recall any of those -- any of the
15  names of those individuals?
16   A  Yes.
17   Q  Can you tell me what they were?
18   A  Well, one of Larry's assistants that I had
19  several interactions with was Carolyn Balkenhol.  He
20  had -- his personal assistant who ran his household was
21  Joyce Hagashi.  And I had some conversations with her.
22  And then he had -- at one point Cynthia Turner was one
23  of his assistants.  And then another name, I believe
24  her name was Ashley.  She worked in his office.
25   Q  Okay.  And so let's take, for instance, Carolyn

138

1  Balkenhol.  Who did you understand her to be?
2   A  I understood her to be Larry's executive
3  assistant.  And she was considered the number one -- the
4  top dog, if you will, of -- of his assistants in the
5  office.
6   Q  Right.  Okay.  And you said that you can recall
7  frequent, I guess, communications with her --
8   A  Mm-hmm.
9   Q  -- during the period that you were there?
10   A  Mm-hmm.
11   Q  And were the communications with Carolyn
12  Balkenhol necessary to do your job at the time?
13   A  Well, I mean, the conversations were usually
14  she would kind of drop the issue in my lap, and then all
15  she wanted me to do was just report back to her what had
16  happened with the issue.
17   Q  Okay.
18   A  And she really didn't care about the
19  particulars.
20   Q  Okay.  She just said I need you to deal with
21  this, deal with it --
22   A  Exactly.
23   Q  -- and then report back to me?
24   A  Exactly.  It's been closed.
25   Q  And would you say that the relationship was the

139

1  same with the other executive -- well, withdrawn.
2       Would you say that the relationship with Larry
3  Ellison's other assistants were the same as the one you
4  had with, say, Carolyn Balkenhol?
5       MR. SCHMELTZ:  Vague.
6       THE WITNESS:  I would say it was more friendly
7  with the -- with his other assistants.  And the way that
8  I communicated with them was different.  And I could pick up
9  the phone and I would call them whereas with Carolyn, I
10  just would send her an e-mail.
11  BY MR. WILLIAMS:
12   Q  You were more --
13   A  Friendly.
14   Q  -- familiar with the other --
15   A  Yeah, yeah.
16   Q  -- the other assistants?
17   A  Yeah.
18   Q  Okay.  I skipped something, and I just want to
19  jump back to something else really quickly.
20       Earlier I was asking you about whether or not
21  you recalled the details of the conversation you had
22  with Mr. Greenstein a couple of months ago, right?
23   A  Mm-hmm.
24   Q  And you were asked during Mr. Schmeltz' direct
25  examination of you whether or not you ever received a

140

1  copy of the complaint.  Do you recall him asking you
2  that question?
3   A  Yes, yes.
4   Q  And you indicated that you received a copy of
5  the complaint a couple of years ago, a few years ago.  I
6  think that was your testimony?
7   A  Yeah.  And now when I think about it, I don't
8  know -- I mean, I remember getting this huge document,
9  and then like a year or two went by, and I found it in
10  my garage and I threw it in the garbage.
11   Q  Okay.  That was the complaint?
12   A  Well, yeah.  I just figured it wasn't going
13  forward so --
14   Q  I understand.  So I just wanted -- so do you
15  recall getting a letter with that complaint a couple of
16  years ago?
17   A  I could have.
18   Q  Could have?
19   A  I don't recall.
20   Q  Not sure if you recall.
21       So after you got the complaint, did you call
22  anyone at Lerach Coughlin?
23   A  No.
24   Q  Did you call the investigator that you spoke
25  with back in 2001?

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

141

1     A  I don't think that I did.
2     Q  Mm-hmm, okay.  And did you read the complaint
3  at the time?
4     A  I probably skimmed through it --
5     Q  I'm sorry.
6     A  -- but I didn't do anything.
7     Q  A lawyer document that really wasn't that --
8     A  Yeah, yeah.
9     Q  Okay.  Did you have any impression one way or
10  another of its content at the time?
11    A  Not really.
12    Q  Okay.  But you threw it away?
13    A  I did.
14    Q  You indicated to Mr. Schmeltz that you got a
15  telephone call from an investigator working for Milberg
16  Weiss several years ago, right?
17    A  Mm-hmm.
18    Q  And I think your testimony was that you spoke
19  with that investigator for maybe an hour?
20    A  Yes.
21    Q  Is that fair to say?
22    A  Yeah.
23    Q  Okay.  And I think your testimony was -- and
24  correct me if I'm wrong -- that he explained to you that
25  the complaint or the case was about whether or not

142

1  Oracle knew it was going to make its number --
2     A  Mm-hmm.
3     Q  -- or something like that?  I wasn't on the
4  call.
5         MR. SCHMELTZ:  I'm just going to lodge the
6  objection that her testimony is the testimony.  This
7  sort of continued attempt to recast the witness's
8  testimony from earlier isn't doing anything but delaying
9  the process, and it's objectionable.  The testimony is
10  the testimony.
11        MR. WILLIAMS:  Thank you.
12    Q  Do you recall that testimony generally?
13    A  Yes.
14    Q  And did that investigator say anything to you
15  about sales forecast or suggest that the case was about
16  sales forecast and whether Oracle knew that it would not
17  make its number?
18    A  He may have said something about Oracle not
19  making its number, but I don't remember anything about
20  sales forecast.
21    Q  Mm-hmm.  Now, could that have been part of the
22  conversation but you don't remember, or are you saying
23  it just didn't happen?
24    A  It could have been.
25    Q  Okay.  You indicated that you talked for about

143

1  an hour?
2     A  Yeah, give or --
3     Q  Give or take?
4     A  Yeah.
5     Q  I don't expect you to --
6     A  Yeah.
7     Q  During that conversation, do you recall whether
8  or not he did most of the talking or you did most of the
9  talking?
10    A  I believe I did most of the talking.
11    Q  Okay.  And he probably was asking you
12  questions --
13    A  Yes.
14    Q  -- and you were responding to them?
15    A  Yes.
16    Q  Was he nice to you?
17    A  Yes.
18    Q  Did you think that he was prying into your
19  personal business or business he shouldn't be prying
20  into?
21    A  No, huh-uh.
22    Q  Did you ever communicate to him that you did
23  not want to talk about these issues or whatever it was
24  he was asking you about?
25    A  No.

144

1     Q  So was it a relatively friendly conversation?
2     A  Yeah, yeah.
3     Q  Okay.  All right.
4        Did you ever call him -- well, withdrawn.
5        Let's exclude 2005.  Did he ever call you or
6  you ever call him between 2001 when you initially spoke,
7  and the end of 2004?
8     A  No, I don't think so.
9     Q  Okay.  Did you ever feel at the time that you
10  needed to call him to clarify anything?
11        MR. SCHMELTZ:  Vague.
12  BY MR. WILLIAMS:
13    Q  I'm sorry.  Withdrawn.
14        During that period were you ever inclined to
15  call him for any reason?
16    A  No.
17    Q  Did he leave you his number?
18    A  He may have.
19    Q  May have?  Did you throw that away possibly?
20    A  Probably.
21    Q  Let me just go -- can you just take a look at
22  Sullivan 3 for me, please.  That's the complaint.  I'm
23  going to ask you to turn to page 12 for me, please.
24    A  Okay.  All right.
25    Q  Okay.  I'm going to just direct your attention

145

1  to section (dd) on page 12.
2      A  Okay.
3      Q  And you gave some testimony about this little
4  paragraph here earlier today, and I think your testimony
5  was that it was generally accurate?
6      A  Mm-hmm.
7      Q  And is that fair to say?
8      A  Mm-hmm.
9      Q  It doesn't -- it may not be the way you would
10  word it --
11      A  Right.
12      Q  -- but it's not -- is it generally accurate?
13      A  Yes.
14      Q  Okay.  And it accurately describes what you did
15  while you were at Oracle?
16      A  Yes.
17      Q  Okay.  And I'm just going to ask you to turn to
18  page 36 for me because it seemed as if this -- this
19  section here was less clear about what -- what was
20  discussed during your conversations with that
21  investigator.  Okay.
22      Your testimony earlier -- well, you indicated
23  that you might change some of this to more accurately
24  reflect what you knew at the time.  You're shaking your
25  head?

146

1      A  Yes, yes, yes.
2      Q  Okay.  And I think what you -- I just want to
3  start with the first part of that.  The first line
4  there, "CW30, a Project Accountant Escalation Manager,"
5  that's correct, right?
6      A  Well, the accountant part, it's account.
7      Q  It's account?
8      A  Yeah.
9      Q  All right.  I guess you would change that too,
10  and we need to change that.
11      And I'm going to get back to the next part
12  about the "Ellison kept track of," because I think that
13  was the part that you indicated earlier you might have
14  difficulty.  So the other part, "the internal website
15  created to monitor each customer's progression of sales
16  or technical issues," do you see that?
17      A  Mm-hmm.
18      Q  Is it fair to say that your testimony earlier
19  is you may have said "sales and technical issues"?
20      MR. SCHMELTZ:  Objection.  Asked and answered.
21  Misstates.
22      MR. WILLIAMS:  It's not asked and answered.
23      MR. SCHMELTZ:  Misstates.
24      THE WITNESS:  Yes.  I mean, sales and technical
25  issues may have been intertwined in the ECMS page.

147

1  BY MR. WILLIAMS:
2      Q  Okay.  And that's fine.  And so during that
3  discussion you had with the investigator a few years
4  ago, you -- it's possible that you may have discussed
5  these things?
6      A  Sure.
7      MR. SCHMELTZ:  Objection.  Vague as to these
8  things.
9      THE WITNESS:  Yes.
10  BY MR. WILLIAMS:
11      Q  And you indicated that -- well, the next
12  section it says "that the system could be reviewed 24
13  hours a day, 7 days a week."  Is that something that you
14  recall discussing?
15      A  Yes.
16      Q  Do -- withdrawn.
17      Do you recall discussing that with the
18  investigator, or do you recall that that is actually
19  true that the system could be reviewed 24 hours a day, 7
20  days a week?
21      MR. SCHMELTZ:  I'm sorry.  Could you just read
22  back his testimony -- I mean his question, his testimony
23  and question?
24      (Record read as follows:
25      "QUESTION:  Do you recall discussing that

148

1      with the investigator, or do you recall that
2      that is actually true that the system could
3      be reviewed 24 hours a day, 7 days a week?")
4      MR. SCHMELTZ:  Compound.  What's the question?
5  There are two questions.
6      MR. WILLIAMS:  No, no, no.
7      Q  Did you understand the question?  And I'll ask
8  it again if this has confused you.
9      A  Yes, can you ask it again?
10      Q  Okay.  I'm asking whether you recall this to be
11  true that the system could be reviewed 24 hours a day, 7
12  days a week, or whether you recall discussing that with
13  the investigator?
14      MR. SCHMELTZ:  Compound.
15      THE WITNESS:  Yes, this is factual in that it
16  could be reviewed, but I don't recall mentioning this.
17  BY MR. WILLIAMS:
18      Q  To the investigator?
19      A  Exactly.
20      Q  Okay.
21      A  Yes.
22      Q  And so is it fair to say that you could have
23  talked about that with the investigator and you just
24  don't recall --
25      A  Yes.

149

1    Q  -- today?
2    A  Yes.
3    Q  And this last section here, you indicated
4  earlier that you were pretty clear that you didn't say
5  that functioned as an early warning system or something
6  like that, right?
7    A  Mm-hmm.
8    Q  Now, I wasn't on that telephone call with the
9  investigator.  Was there a discussion that you had with
10  the investigator that one could conclude that that's
11  what you were saying?
12    A  The only part of that that I can say that
13  probably -- that might have come out of my mouth was
14  that it functioned as an early warning system, but as
15  far as cancelling an order, I never had -- I didn't -- I
16  wasn't involved in orders.
17    Q  I see.  Okay.
18    A  Yeah.
19    Q  So it's not that -- so part of this is
20  something that you possibly could recall saying?
21    A  Mm-hmm.
22    Q  But the cancel an order part, you don't really
23  know if you could have said something like that; is that
24  your testimony?
25    A  Well, yes, but it also could -- like I look at

150

1  this, and I think that the customer was going to cancel
2  their support agreement.
3    Q  Mm-hmm.
4    A  Because when we worked as escalation managers,
5  part of our job was to make sure that the customer
6  renewed their support because Oracle was -- was
7  generating a huge amount of revenue from support.
8    Q  Mm-hmm.
9    A  And each customer had their support level
10  agreement or their SLAs, and we had to meet their SLAs.
11    Q  Okay.
12    A  And so some of them said they weren't going to
13  renew their support.
14    Q  Okay.  And that could be part of what you were
15  discussing?
16    A  And that was considered an order.
17    Q  Oh, it was?  Okay.
18    A  Yeah, it was.  It was considered an order.
19    Q  So -- that's fine.  So I want to get back to
20  the -- internal Web site and what it was used for.
21  Okay?  And did -- did -- was it it -- withdrawn.
22    Was it used by Larry Ellison's assistants; do
23  you know?
24    A  I don't know if they looked at it.
25    Q  Mm-hmm.

151

1    A  I know they were aware that it existed.
2    Q  Mm-hmm.
3    A  Because I had conversations with them.  For
4  example, there were a couple of instances where we had a
5  customer -- had somebody within an organization call us
6  and say, you know, we're having problems with -- with --
7  with these issues.  And it would, you know, kind of fall
8  down on my lap, and I -- sometimes they would already be
9  up on ECMS, but it was just that their internal groups
10  were not communicating.  And so I would let them know,
11  well, you know what, it's out on our Web page.
12    Q  You would let the assistants -- Larry Ellison's
13  assistants know?
14    A  Yeah, I would tell them it's out on the Web
15  page.
16    Q  Mm-hmm, okay.  And they all had access to it?
17    A  Yes.
18    Q  And you indicated earlier in your testimony
19  that with the Web site, although it would track
20  technical issues, sometimes it would also track a sale
21  if there was a sale associated with it?  I think that
22  was your testimony.  I don't want to mischaracterize it,
23  though.
24    MR. SCHMELTZ:  Could you reread that testimony?
25    MR. WILLIAMS:  Hold on a second.  What are you

152

1  asking for, my question, or do you want to go back --
2    MR. SCHMELTZ:  Your -- your characterization of
3  testimony.
4    MR. WILLIAMS:  So you want the question back?
5    MR. SCHMELTZ:  Please.
6    (Record read as follows:
7    "QUESTION:  And you indicated earlier in
8    your testimony that with the Web site,
9    although it would track technical issues,
10    sometimes it would also track a sale if
11    there was a sale associated with it?  I
12    think that was your testimony.  I don't want
13    to mischaracterize it, though.")
14    MR. SCHMELTZ:  Misstates.
15  BY MR. WILLIAMS:
16    Q  Go ahead.
17    A  The -- it wouldn't -- it wouldn't track it --
18  it wouldn't track it in the way that sales would track
19  it.
20    Q  Sure.
21    A  But there was -- there was a field in there
22  that gave a summary.  And in the summary you would
23  see -- you would see language like this is a huge deal.
24  You know, for example, Oracle stands to make, you know,
25  30 or 40 million on this deal to make it highly visible.

153

1    Q  Okay.  And so -- and so the -- withdrawn.
2        The Web site could track those types of deals,
3    ones that were actually input in here into that system?
4    A  Yeah, you could see it.  You could see it on
5    the Web page.  It was like clearly visible in the
6    customer's summary what was -- what was going on in the
7    account.
8    Q  Now the ECMS, was that just for the escalation
9    group?
10   A  No.
11   Q  Okay.
12   A  Sales, the sales consulting group used it.  I
13   think it was just sales, sales consulting.
14   Q  So what did sales -- sales and consulting used
15   it for what purpose; do you know?
16   A  Well, sales consulting used it because they --
17   the sales consultants were working on customer projects,
18   because a lot of the sales consultants did the
19   customizing of the applications.  So they could use it.
20   They didn't always use it.
21   Q  But they could?
22   A  Yes.
23   Q  And gosh, lost my train of thought.  Oh, what's
24   the first word in ECMS mean?  I'm sorry.
25   A  Escalated.

154

1    Q  And what did escalated mean at Oracle?
2    A  It meant that it was highly visible --
3    Q  Okay.
4    A  -- to senior management.  That it had been --
5    that it had been brought to our attention because it
6    was -- it needed to be a focal point in the company.
7    Q  I'm sorry.  So is it fair to say the entire
8    purpose of ECMS was to feed information to senior
9    management?
10   A  Yes.
11   Q  Okay.  And at the time while -- you know, in
12   2000 while you were there, is it fair to say that senior
13   management was Larry Ellison, Randy Baker, Ray Lane?
14   Anybody I'm missing there?
15   A  Sandy Sanderson.
16   Q  Sandy Sanderson.  How about Gary Bloom?
17   A  Yes.
18   Q  Okay.  And so that's -- sorry.  And the purpose
19   of the ECMS was to move information up to those people
20   so that they could do whatever they're going to do with
21   it?
22   A  Yes.  For them and for other people so that
23   people were on the same page.
24   Q  Okay.
25   A  Because what would happen was they'd get a call

155

1    out of the blue from somebody, from like a senior level
2    manager.  And if they didn't know what was going on,
3    they looked like an idiot.
4    Q  Okay.  So -- so is it fair to say that they
5    would track deals that were escalated?
6    A  It could.
7    Q  Mm-hmm.  Okay.  Okay.  I'd like to take five
8    minutes.  Is that okay?
9    A  Okay.
10       MR. WILLIAMS:  Okay.  Let's take five.
11       VIDEO OPERATOR:  Off the record.  The time is
12   3:19.
13       (Recess.)
14       VIDEO OPERATOR:  Back on the record.  The time
15   is 3:27.
16   BY MR. WILLIAMS:
17   Q  Can you just look at Sullivan 4 for
18   identification, please.  That's the letter from Jennie
19   Lee Anderson to Mr. Schmeltz here.
20   A  Okay.
21   Q  Had you ever seen this document before today?
22   A  No.
23   Q  Okay.  I'm going to ask you just to turn to
24   page 1, the page right after the letter.  And do you see
25   the top line there where it says "Witnesses Identified

156

1    in Plaintiffs' Initial Disclosures"?
2    A  Mm-hmm.
3    Q  Do you know what that means?
4    A  Yes.
5    Q  You do?  Okay.  What does it mean?
6    A  It means that these -- these are -- these are
7    people that were identified in -- in the plaintiffs'
8    initial information.
9    Q  Mm-hmm.  And do you know what the purpose of it
10   is?
11   A  I don't.
12   Q  And do you know it to be something that is a
13   document that plaintiffs choose to create or whether
14   it's court ordered?
15   A  I don't.
16   Q  You don't know?
17   A  No.
18   Q  And so is it fair to say you have no idea what
19   the purpose of this document is?
20   A  Yes.
21   Q  And I want to go back to a little bit about
22   your experience at Oracle again.  And you testified a
23   lot about Specialized.
24   A  Mm-hmm.
25   Q  It was a customer that you recall dealing with.

157

1  Generally, how many customers did you deal with on a
2  day-to-day or a month-to-month basis?
3      A  Well, I would say at any given time I had
4  probably between eight and ten customers I was working
5  with.
6      Q  Mm-hmm.  And they would -- some would fall off
7  and you would get new ones?
8      A  Correct.
9      Q  Is that how the list would continually evolve
10  while you were at Oracle?
11      A  Correct.
12      Q  Mm-hmm.  And you indicated earlier that the
13  only one you really remembered details about was
14  Specialized?
15      MR. SCHMELTZ:  Objection.  Misstates.
16      MR. WILLIAMS:  Okay.  Withdrawn.
17      Q  The only one that you could recall specifically
18  was Specialized?
19      A  Correct.
20      Q  Is that fair?
21      A  Yes.
22      Q  Why is that?
23      A  Because they were one of the first customers
24  that was trying to roll out that module or the iStore
25  module.  And I sat right next to Melissa who handled the

158

1  account, and I used to hear her -- she'd be -- she'd be
2  on conference calls from the time she got in in the
3  morning till the time she left.
4      Q  Right.  And so it's not that -- withdrawn.
5      So your testimony is that you dealt with a lot
6  of customers, this just happened to be the one -- one
7  that you remember?
8      A  Yes.
9      MR. SCHMELTZ:  Objection.  With respect to what
10  software?
11      MR. WILLIAMS:  That's not -- no, no, no.  No,
12  no, no.  I didn't interrupt you during your
13  questioning.
14      MR. SCHMELTZ:  No, no.  I'm posing an
15  objection.
16      MR. WILLIAMS:  Okay.  What is it?
17      MR. SCHMELTZ:  Vague as to what line of
18  software you're talking about with the one customer she
19  recalls.
20      MR. WILLIAMS:  Okay.
21      Q  Do you recall -- withdrawn.
22      That was the only customer that you recalled
23  for that specific line of software?
24      A  Yes.
25      Q  Okay.

159

1      A  That's correct.
2      Q  Now, but is it fair to say that -- withdrawn.
3      When did you become an escalation manager
4  again?
5      A  I became an escalation manager in -- oh, boy.
6  I believe it was in ninety -- well, I went to work in
7  the escalation group in like '97.
8      Q  Okay.  You don't recall all the customers that
9  you dealt with from '97 to --
10      A  No, there's no way I could ever remember.
11      Q  Even if you talked -- withdrawn.
12      Would it be fair to say that some of those
13  customers you dealt with or talked to more than one time
14  to handle one of their problems?
15      MR. SCHMELTZ:  Objection.  Vague.
16      THE WITNESS:  Yes.
17  BY MR. WILLIAMS:
18      Q  Because -- is it fair to say that the -- at
19  times a customer issue could not be resolved in one
20  conversation with you?
21      A  Oh, no, there were no customer issues with the
22  exception of the ones that came from Larry's office that
23  could be resolved in one call.
24      Q  Mm-hmm.  And -- but you don't necessarily
25  remember those even if they consisted of more than one

160

1  phone call?
2      MR. SCHMELTZ:  Vague.
3      THE WITNESS:  No.  I wouldn't.
4  BY MR. WILLIAMS:
5      Q  Okay.  You were asked a lot of questions about
6  11i.  Do you know what 11i is or was in 2000?
7      A  I did know in 2000, but I've been so far
8  removed from it that I can't remember which release was
9  which release, and what customer was on which release.
10      Q  Okay.  So is it fair to say that what you
11  handled were people who had problems with specific
12  applications modules rather than quote/unquote 11i?
13      A  Yes.
14      Q  Okay.  And do you have -- aside from iStore,
15  which I think is one you talked about, what other
16  applications modules do you remember handling or dealing
17  with customer issues about?
18      A  Well, the financial applications.  And those
19  were general ledger, accounts payable, accounts
20  receivable, anything that fell into the financial -- the
21  financials package.
22      Q  Okay.
23      A  And then I worked with database customers, too.
24      Q  Okay.  So database and applications customers
25  you worked with?

Sullivan, Patricia K.  7/26/2005  10:08:00 AM

161

1    A  Yes.  And then Web server customers.
2    Q  Okay.  So when -- when you're asked about
3  quote/unquote 11i, is it fair to say that you don't --
4  as you sit here today, you don't necessarily know what
5  that means or what it consists of?
6    A  Yeah, today, no.
7    Q  Okay.  So is it fair to say that some of those
8  customers that you dealt with may have been having a
9  problem with an application that was ultimately included
10  in 11i, but you just don't know?
11       MR. SCHMELTZ:  Objection.  Vague.  Misstates.
12       THE WITNESS:  I can't say --
13  BY MR. WILLIAMS:
14    Q  Okay.  That's fine.
15    A  -- for certain.
16    Q  You indicated earlier about pressure -- or
17  withdrawn -- about the job being very stressful and you
18  and your friends or coworkers feeling like the job was
19  very stressful.
20    A  Mm-hmm.
21    Q  Do you recall that testimony generally?
22    A  Yes.  Yes, I do.
23    Q  And do you recall testifying that some of that
24  pressure was to quote/unquote do the right thing for
25  Oracle?

162

1    A  Yes.
2    Q  Okay.  And was that a phrase that people used
3  at Oracle at the time?
4    A  It wasn't -- it wasn't verbally --
5    Q  Okay.  What did you mean by that when you said
6  do the right thing for Oracle, creating some pressure?
7    A  Well, sometimes -- sometimes internally you
8  knew that development -- a lot of times it was
9  development that they weren't going to solve -- that
10  they weren't going to fix the problem.  And -- and so
11  what -- what -- you -- you felt for the customer.  And
12  so even though you were told no, you'd go back and you'd
13  try and figure out a way for them to say yes.
14    Q  To go back and figure out a way to get
15  development to say yes?
16    A  Yes.
17    Q  Oh, okay.  And when you say that development
18  wouldn't fix a problem, what do you mean?
19    A  Well, if there -- if there was an issue -- if
20  there was an issue and they really didn't feel that it
21  was justified for them to spend the time to fix it,
22  then --
23    Q  Then they just wouldn't fix it?
24    A  -- then they wouldn't do it.  It really had to
25  have a business impact, a serious business impact on the

163

1  customer.
2    Q  Okay.  I understand.  So is it fair to say that
3  development would know of problems and would
4  specifically decide that it wasn't going to fix the
5  problem unless it had like a large impact on the
6  customer?
7    A  Yes.
8       MR. SCHMELTZ:  Speculation.  She's not in
9  development.
10  BY MR. WILLIAMS:
11    Q  You testified earlier that much of your
12  communication was with development, didn't you?
13    A  Yes, I had daily communication with
14  development.
15    Q  Right.  And it's because some of your customers
16  had problems with development issues, right?
17    A  Right, right.
18    Q  And that was your job?
19    A  Right.  And our job was also to help the
20  customer to understand, you know, without divulging too
21  much information, what the inner workings of Oracle's
22  groups were, I mean what we all did together, so that
23  the customer understood that just because they reported
24  an issue, that it wasn't going to be solved right away,
25  that there were steps --

164

1    Q  Sure.
2    A  -- that needed to happen.
3    Q  And part of this was -- you indicated that
4  there were times when you were on conference calls with
5  Mark Barrenechea?
6       MR. SCHMELTZ:  Objection.
7       MR. WILLIAMS:  Or withdrawn.
8    Q  Mark Barrenechea's CRM group?
9    A  Yes.
10    Q  I didn't mean to make that mistake.
11    A  Yes.
12    Q  And that's CRM development, right?
13    A  Correct, yes.
14    Q  And you understood Mark Barrenechea to be in
15  charge of CRM at the time?
16    A  Yes.
17       (Discussion off the record.)
18  BY MR. WILLIAMS:
19    Q  You indicated earlier that some customers
20  complained because Oracle's sales staff was dishonest
21  with them?
22    A  Yes, there were issues that arose.
23    Q  Mm-hmm.  And could you just explain what you
24  mean by that?
25    A  Well, they were -- there were customers that

165

1  were told that the software would -- would do certain
2  things that in fact were not true.
3      Q   Okay.
4      A   And this was usually the out of the package
5  solution and that they were going to have to pay for
6  customizing that.
7      Q   Sure.  So when -- the customer might be led to
8  believe that software application would work out of the
9  box, so to speak --
10     A   Mm-hmm.
11     Q   -- and it wouldn't?
12     A   No.
13     Q   And the sales staff knew that?
14     A   Yes.
15         MR. WILLIAMS:  I have nothing further.  Thanks.
16  Thank you for your time.  Appreciate it.
17         MR. SCHMELTZ:  I've got a few follow-up.
18         (Discussion off the record.)
19         VIDEO OPERATOR:  This concludes tape 2.  We're
20  going off the record.  The time is 3:40.
21         (Recess.)
22         VIDEO OPERATOR:  Here begins tape 3 in the
23  deposition of Patricia Sullivan.  On the record.  The
24  time is 3:41.
25

166

1              FURTHER EXAMINATION
2  BY MR. SCHMELTZ:
3      Q   Thank you, Ms. Sullivan.
4         At the time you received the Revised Second
5  Amended Complaint as Sullivan No. 3, did anyone tell you
6  that you were CW No. 30?
7      A   No.
8      Q   Did anyone ask you to review allegations
9  attributed to CW30 to determine whether they were
10  accurate?
11         MR. WILLIAMS:  Objection.  Asked and answered.
12         THE WITNESS:  No.
13  BY MR. SCHMELTZ:
14     Q   You mentioned earlier that Oracle received a
15  huge amount of revenue from support.  Tell me if you
16  know what the approximate amount of revenue Oracle
17  received from support was in 2000?
18     A   I don't even think I could say.  I would --
19         MR. WILLIAMS:  Objection.  Calls for
20  speculation as the witness was not even at Oracle for at
21  least seven months of 2000.
22         THE WITNESS:  Right.  I really couldn't say.
23  BY MR. SCHMELTZ:
24     Q   Ms. Sullivan, is it fair to say you don't know
25  one way or the other if senior management used ECMS as

167

1  an early warning system that a customer was going to
2  cancel an order, right?
3      A   Yes, I would not know.
4      Q   And it's fair to say that you don't know if
5  senior management asked for ECMS to be designed for the
6  purpose of acting as an early warning system that
7  customers would cancel orders, right?
8      A   No.  I mean, yes, that's correct.
9         MR. SCHMELTZ:  I have nothing further.
10         MR. WILLIAMS:  I think that's it.
11         MR. CAPLAN:  Okay.  Thank you.
12         MR. SCHMELTZ:  Thank you very much.
13         VIDEO OPERATOR:  This concludes today's
14  proceeding in the deposition of Patricia Sullivan.  Off
15  the record.  The time is 3:43 p.m.
16  //
17  //
18
19
20
21
22
23
24
25

168

9         I, PATRICIA K. SULLIVAN, do hereby declare
10  under penalty of perjury that I have read the foregoing
11  transcript of my deposition; that I have made such
12  corrections as noted herein, in ink, initialed by me, or
13  attached hereto; that my testimony as contained herein,
14  as corrected, is true and correct.
15         EXECUTED this _____ day of _____,
16  20____, at _____, _____.
17           (City)          (State)
18
19         _____
            PATRICIA K. SULLIVAN
20
21
22
23
24
25

169

1  STATE OF CALIFORNIA)
           : ss
2  COUNTY OF SAN MATEO)
3       I, the undersigned, a Certified Shorthand
4  Reporter of the State of California, do hereby certify:
5       That the foregoing proceedings were taken
6  before me at the time and place herein set forth; that
7  any witnesses in the foregoing proceedings, prior to
8  testifying, were placed under oath; that a verbatim
9  record of the proceedings was made by me using machine
10 shorthand which was thereafter transcribed under my
11 direction; further, that the foregoing is an accurate
12 transcription thereof.
13      I further certify that I am neither financially
14 interested in the action nor a relative or employee of
15 any attorney of any of the parties.
16      IN WITNESS WHEREOF, I have this date subscribed
17 my name.
18
19 Dated: _____
20
21
22      _____
        SUZANNE F. BOSCHETTI
23      CSR No. 5111
24
25

PATRICIA K. SULLIVAN    JULY 27, 2005

```
 1  STATE OF CALIFORNIA)
                            : ss
 2  COUNTY OF SAN MATEO)

 3         I, the undersigned, a Certified Shorthand

 4  Reporter of the State of California, do hereby certify:

 5         That the foregoing proceedings were taken

 6  before me at the time and place herein set forth; that

 7  any witnesses in the foregoing proceedings, prior to

 8  testifying, were placed under oath; that a verbatim

 9  record of the proceedings was made by me using machine

10  shorthand which was thereafter transcribed under my

11  direction; further, that the foregoing is an accurate

12  transcription thereof.

13         I further certify that I am neither financially

14  interested in the action nor a relative or employee of

15  any attorney of any of the parties.

16         IN WITNESS WHEREOF, I have this date subscribed

17  my name.

18

19  Dated: _____

20

21

22                  _____
                    SUZANNE F. BOSCHETTI
23                  CSR NO. 5111

24

25
```