# Exhibit 12

1

1  IN THE UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  ---oOo---
4
5
6  In Re ORACLE CORPORATION
   SECURITIES LITIGATION
7           FILE NO. C-01-0988-MJJ
8  This Document Relates To:
   _____/
9
10
11        CONFIDENTIAL
12  VIDEOTAPED DEPOSITION OF GARY MATUSZAK
13    Tuesday, August 1, 2006
14
15  SHEILA CHASE & ASSOCIATES
16     REPORTING FOR:
17   LiveNote World Service
18   221 Main Street, Suite 1250
19   San Francisco, California 94105
20    Phone: (415) 321-2311
21    Fax:  (415) 321-2301
22
23
24  Reported by:
25  ANDREA M. IGNACIO HOWARD, RPR, CSR NO. 9830

2

1         I N D E X
2  DEPOSITION OF GARY MATUSZAK
3              PAGE
4  EXAMINATION BY MR. GREENSTEIN          6
5  EXAMINATION BY MR. KONOVALOV         365
6         ---oOo---
7
8       E X H I B I T S
9
10  DESCRIPTION                    PAGE
11  Exhibit  1  Bates NDCA-ORCL 081711 - 814    94
12  Exhibit  2  Bates NDCA-ORCL 050370 - 382    208
13  Exhibit  3  Bates AA 000041 - 1086      289
14  Exhibit  4  Bates NDCA-ORCL 313777 - 784    301
15  Exhibit  5  Bates NDCA-ORCL 055957 - 962    320
16  Exhibit  6  Bates NDCA-ORCL 020844 - 848    320
17  Exhibit  7  Bates NDCA-ORCL 020839 - 843    320
18  Exhibit  8  Bates NDCA-ORCL 025018      320
19  Exhibit  9  Bates NDCA-ORCL 033954 - 978    352
20  Exhibit 10  Bates NDCA-ORCL 068221 - 244    360
21  Exhibit 11  Bates NDCA-ORCL 133613 - 654    360
22
23     REFERENCED EXHIBITS PREVIOUSLY MARKED
24  Chen Exhibit Nos. 2, 3, 4, 12
25

3

1  BE IT REMEMBERED that on Tuesday, August 1, 2006,
2  commencing at the hour of 9:14 a.m., at the offices of
3  Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins,
4  LLP, 100 Pine Street, Suite 2600, San Francisco,
5  California, before me, ANDREA M. IGNACIO HOWARD, CSR,
6  RPR, a Certified Shorthand Reporter for the State of
7  California, personally appeared
8            GARY MATUSZAK,
9  called as a witness by the Plaintiffs herein, who,
10  being by me first duly sworn, was thereupon examined
11  and testified as hereinafter set forth.
12            ---oOo---
13  Appearing as counsel on behalf of Plaintiffs:
14      LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
        ROBBINS LLP
15    BY:  ELI GREENSTEIN, Esq.
        KEITH MAUTNER, CPA, CMA
16      RIVA ELTANAL
      100 Pine Street, Suite 2600
17    San Francisco, California  94111
      (415)  288-4545
18    elig@lerachlaw.com
19
   Appearing as counsel on behalf of Defendants:
20
      LATHAM & WATKINS, LLP
21    BY:  PAUL V. KONOVALOV, Esq.
      650 Town Center Drive, 20th Floor
22    Costa Mesa, California 92626
      (714)  540-1235
23    paul.konovalov@lw.com
24
25

4

1  (Appearances continued.)
2
   Appearing as counsel on behalf of Gary Matuszak:
3
      CHADBOURNE & PARKE, LLP
4    BY:  ROBERT SIDORSKY, Esq.
      30 Rockefeller Plaza
5    New York, New York 10112
      (212)  408-5100
6    rsidorsky@chadbourne.com
7
   Also present:  Gary Brewer, Videographer.
8
9
            ---oOo---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1     THE VIDEOGRAPHER:  Here begins the videotaped
2  deposition of Gary Matuszak, tape one, Volume I, in
3  the matter of In Re Oracle Securities Litigation, in
4  the United States District Court, Northern District of
5  California, Case No. C-01-0988 MJJ.
6     Today's date is August 1st, 2006, and the
7  time is 9:15 a.m.
8     The video operator today is Gary Brewer
9  representing LiveNote World Service, located at
10  221 Main Street, Suite 1250, San Francisco, California
11  94105.  Phone number (415) 321-3200.
12     The court reporter is Andrea Howard,
13  reporting on behalf of LiveNote World Service.
14  Today's deposition is being taken on behalf of the
15  plaintiff and is taking place on 100 Pine Street,
16  San Francisco, California.
17     Counsel, would you please introduce
18  yourselves and state whom you represent.
19     MR. GREENSTEIN:  Good morning.
20  Eli Greenstein with Lerach, Coughlin, Stoia, Geller,
21  Rudman & Robbins, representing plaintiffs, and with me
22  are Keith Mautner, one of our friend accountants, and
23  Riva Eltanal, who is a law clerk at our firm.
24     MR. SIDORSKY:  Robert Sidorsky of
25  Chadbourne & Parke, LLP on behalf of the nonparty,

6

1  Mr. Matuszak.
2     MR. KONOVALOV:  Good morning.
3  Paul Konovalov, Latham & Watkins for the defendants.
4     THE VIDEOGRAPHER:  Would the court reporter
5  please swear in the witness.
6        GARY MATUSZAK,
7      having been sworn as a witness,
8   by the Certified Shorthand Reporter,
9        testified as follows:
10     THE VIDEOGRAPHER:  You may begin.
11
12     EXAMINATION BY MR. GREENSTEIN.
13     MR. GREENSTEIN:  Q.  Good morning,
14  Mr. Matuszak.
15  A  Good morning.
16  Q  Could you please state your full name and
17  address for the record.
18  A  Full name is Gary Howard Matuszak.  Address
19  is 4347 Lombard Avenue in Fremont, California.
20  Q  Okay.  Thanks for being here today.  We
21  appreciate your time.
22     Have you ever had your deposition taken
23  before?
24  A  Yes.
25  Q  Approximately how many times?

7

1  A  Twice, to my recollection.
2  Q  Okay.  What kinds of cases were those?
3  A  Securities litigation.
4  Q  Okay.  Were those both securities fraud
5  litigation?
6  A  I don't recall.
7  Q  Okay.
8  A  Class action lawsuits.
9  Q  Okay.  And were those against companies
10  that -- that Arthur Andersen represented or were they
11  against Arthur representatives?
12     MR. SIDORSKY:  Objection to form.
13     THE WITNESS:  They were cases where the
14  company was charged, and I believe in both situations
15  Andersen was a named defendant as well.
16     MR. GREENSTEIN:  Okay.
17  Q  Do you remember the company defendants in
18  those cases?
19  A  I do.
20  Q  Start with the first one.
21  A  The first one was Oracle.
22  Q  Okay.  And when was that litigation?
23  A  Approximately early '90s.
24  Q  And it was a shareholder class action against
25  Oracle; correct?

8

1  A  That's correct.
2  Q  And Arthur Andersen was a named defendant in
3  that case?
4  A  That's correct.
5  Q  Okay.  Do you know if that was a case
6  involving a financial restatement?
7  A  There was a financial restatement on or
8  around the early '90s, so probably was as a result of
9  that.  I don't recall the specifics of the lawsuit.
10  Q  Okay.  Do you know what the resolution of the
11  lawsuit was?  Did it go to trial?
12  A  No.
13  Q  Okay.  Do you know if it settled out of
14  court?
15  A  Yes.
16  Q  Okay.
17  A  It settled out of court.
18  Q  So the case against Andersen wasn't
19  dismissed.  It settled out of court; right?
20  A  I believe that Oracle and Andersen both
21  settled out of court.
22  Q  Okay.  Now, the second litigation that you
23  were deposed in, what company was that involving?
24  A  Digital Microwave.
25  Q  Approximately when was that litigation?

9

1     A   Again, I would say in the mid '90s, early to
2   mid '90s.
3     Q   And Andersen, Arthur Andersen -- from now on
4   I'm going to just refer to it as Andersen, sometimes
5   Arthur Andersen.
6         Was Arthur Andersen a defendant in that case
7   as well?
8     A   Yes.
9     Q   And what was the resolution of that
10  litigation, if you know?
11    A   Again, it was settled out of court for both
12  Digital Microwave and Andersen.
13    Q   Okay.  And the Oracle litigation, were there
14  any other defendants besides Oracle and
15  Arthur Andersen?  Do you recall?
16    A   Don't recall.
17    Q   Okay.  How about Digital Microwave
18  litigation?
19    A   Don't recall.
20    Q   And you were deposed in both of those cases?
21    A   That's correct.
22    Q   Okay.  Were they just one-day depositions?
23    A   One or two days.  I don't -- it's -- I don't
24  recall how long I was there --
25    Q   Okay.

10

1     A   -- to be honest.
2     Q   So you probably are aware of the procedure
3   that occurs during a deposition, but I'm just going to
4   go over some ground rules, just so we get it on the
5   record, just so we understand each other.
6         The court reporter on your right is going to
7   be taking down everything you say here today -- all my
8   questions, and all your answers, and the objections
9   that the attorneys may make.
10        I would ask that you speak verbally.  No head
11  nods, no hand gestures, no "uh-huh," "huh-uhs."  It
12  makes it hard for the court reporter to -- to get
13  everything down.
14        So I'd just ask that you answer audibly, as
15  clearly as you can.
16        I'd also ask that we don't talk over each
17  over.  So let me finish a question before you answer.
18  I'll try to do the same, let you finish your answer
19  before I follow up with a question.  It gets muddled
20  when we talk over each other.
21        Again, for the sake of the court reporter,
22  I'd ask that you don't do that.
23        Do you understand that?
24    A   Yes.
25    Q   Okay.  And you understand that the oath that

11

1   you're taking here today is the same oath that you
2   would be taking if you were sitting in a court of law
3   testifying?
4     A   I do.
5     Q   During the course of the deposition,
6   Mr. Sidorsky, your attorney, will be likely to make
7   objections.  He could object to every question that I
8   ask here.  He could object to one or two.  Those
9   objections are for lawyers to hash out later.
10        I would ask that you answer any question that
11  I ask, unless Mr. Sidorsky instructs you specifically
12  not to answer.
13        Mr. Konovalov represents Oracle.  He's also
14  here.  He might make some objections.  Without getting
15  into the standing that he may or may not have for
16  making objections.  He might do it.
17        Again, though, if I ask a question, I'm going
18  to expect that you answer the question, unless
19  Mr. Sidorsky instructs you not to answer; do you
20  understand that?
21    A   Yes.
22    Q   Okay.  If you don't understand any questions
23  that I ask here today, just tell me, and I'll try to
24  rephrase it.  But if you answer the question, I'm
25  going to assume that you understand what I was asking;

12

1   is that fair?
2     A   Okay.
3     Q   Now, if you don't remember something in
4   response to one of my questions and then later you
5   take a break, something jogs your memory, you're
6   always entitled to come back and clarify an answer
7   that you already made, or say, "You know, I remember
8   something that I didn't remember before.  Something
9   jogged my memory."  You're allowed to do that.
10        Do you understand that?
11    A   Yes.
12    Q   At the end of the deposition, you're going to
13  have a chance to review the transcript, and you can
14  make any slight changes, misspellings, you know, any
15  changes to your testimony.  Not substantive changes
16  but just minor changes, and you can make those
17  corrections and send it back.
18        So don't feel like you have to be absolutely
19  perfect with every spelling or, you know, every word
20  here today; do you understand that?
21    A   Yes.
22        MR. SIDORSKY:  I don't totally agree with
23  your characterization, but okay.  We could deal with
24  that later if there was ever an issue.
25        MR. GREENSTEIN:  Okay.

13

1    Q  And this is my favorite question:  Are you
2  under the influence of any alcohol, or drugs, or
3  medication that would inhibit your ability to
4  competently testify here today?
5    A  No.
6    Q  Okay.  So when did you first learn you were
7  being deposed in this case?
8    A  I don't recall the specific date.  It was
9  some time in early -- early to mid June.  Someone
10  showed up at my home to try to serve a deposition.
11    Q  A subpoena?
12    A  A subpoena.  Excuse me.
13    Q  Okay.
14    A  Yeah.
15    Q  And what did you do after you received the
16  subpoena?  And again, when I ask these questions about
17  the subpoena or any questions for that matter, I don't
18  want to know anything you ever told to your lawyer,
19  any conversation you had with your lawyer.
20      So I might ask you, you know, if you took
21  action, or, you know, when did you -- when did you
22  talk to your lawyer, but I don't want to know any
23  specific communications between you and your lawyer;
24  do you understand that?
25    A  Yes.

14

1    Q  So when you received the subpoena, you said
2  it was around June of this year?
3    A  Yes.
4    Q  And what did you do after you received the
5  subpoena?
6    A  I actually -- I received a phone call from an
7  attorney at Andersen first, because I was out of town.
8  She informed me that --
9      MR. SIDORSKY:  Again, I don't believe you
10  have to discuss the substance of --
11      THE WITNESS:  Okay.
12      MR. SIDORSKY:  -- what was -- what was told
13  to you by Andersen's lawyer.
14      THE WITNESS:  Okay.
15      MR. GREENSTEIN:  Q.  So you were contacted by
16  an attorney before you got the subpoena?
17    A  Yes, just to notify me that I might be served
18  a subpoena.
19    Q  Okay.  Was that -- was that attorney
20  Mr. Sidorsky?
21    A  No.
22    Q  Do you know -- who was it?
23    A  I don't recall her name.
24    Q  Okay.  And she told you -- well, strike that.
25      And then approximately how long after that

15

1  conversation did you receive the subpoena?
2    A  Two to three days.
3    Q  Okay.  And once you received the subpoena,
4  did you call your lawyers?
5    A  I called the attorney at Andersen and faxed
6  her a copy of the deposition, and I also left a phone
7  message for Mr. Cooperman at Oracle notifying him that
8  I received a subpoena as well, just so he was aware.
9    Q  Okay.  Why did you -- why did you call
10  Mr. Cooperman?
11    A  Just out of courtesy.
12    Q  Just because it was -- it was involving
13  Oracle?
14    A  Yeah.
15    Q  Okay.  Do you know Mr. Cooperman?
16    A  Well, he was general counsel at the company
17  while I was the audit partner there.
18    Q  Okay.  Well, were you friends with him?
19    A  I knew him professionally.  We were not
20  friends.
21    Q  Okay.
22    A  I haven't spoken to him in quite some time.
23    Q  So did you have his phone number?  Once you
24  got the subpoena, did you have his phone number in
25  your rolodex, or how did you get in touch with him?

16

1    A  I believe I had his phone number.  Yeah, I
2  called the company --
3    Q  Okay.
4    A  -- and just left him a message.
5    Q  And what did you say to him?
6    A  Just notifying him that I had received a
7  subpoena in the Oracle class action litigation and
8  wasn't sure what it related to but wanted him to be
9  aware that I had received one.
10    Q  Okay.  Did he call you back?
11    A  He left a message for one of his other
12  attorneys who did return the phone call, and I never
13  returned his call.
14    Q  And do you -- do you recall the name of that
15  other attorney?
16    A  No.
17    Q  Okay.  So did you ever talk to Mr. Cooperman
18  from the time you received the subpoena until today?
19    A  No.
20    Q  Okay.  Did you ever talk to any Oracle
21  lawyers after --
22    A  No.
23    Q  -- the time you received the subpoena --
24    A  No.
25    Q  -- until today?

17

1      A  No.
2      Q  Okay.  So other than lawyers for Oracle, and
3   other than Mr. Sidorsky, or any lawyers for
4   Mr. Sidorsky's firm, did you speak to anybody about
5   the subpoena from the time you received it until
6   today?
7         MR. SIDORSKY:  Object to the form.
8      I think that's a little confusing and
9   compound, but you can go ahead and answer.
10        MR. GREENSTEIN:  Your objection is noted, and
11   I'm going to ask -- I'm going to ask that when you
12   make an objection, as you know, the rules only entitle
13   you to make your objection saying.
14        Saying it's confusing or trying to coach the
15   witness is not proper under the Federal Rules of Civil
16   Procedure, so I'd just ask that you make your
17   objection.
18        MR. SIDORSKY:  Well, that's not coaching.
19   You're entitled, I think, to briefly state the nature
20   of your objection, but I -- I hear your concerns, so I
21   will --
22        MR. GREENSTEIN:  Okay.  Thank you.
23        MR. SIDORSKY:  -- be careful.
24        THE WITNESS:  The only attorneys I spoke with
25   were the Andersen attorney and Mr. Sidorsky.

18

1         MR. GREENSTEIN:  Okay.
2      Q  And when was the first time you spoke with
3   any Andersen attorney?
4      A  As I mentioned before, I received a voice
5   message prior to receiving the subpoena and then spoke
6   with her briefly within a day or two of that.
7      Q  Okay.  And did you ever -- what was the next
8   conversation you had with an Andersen attorney?  When
9   was it?
10     A  I don't recall.
11     Q  Okay.  Did you --
12     A  After I received the subpoena?
13     Q  Right.
14        Did you ever have any meetings with your
15   attorney regarding the subpoena?
16     A  Which attorneys?
17     Q  Any.
18     A  Mr. Sidorsky.
19     Q  Okay.  And when was the first meeting?
20     A  We met face-to-face yesterday.
21     Q  Okay.  For approximately how long?
22     A  The afternoon, five hours.
23     Q  Okay.  Did you review any documents yesterday
24   with Mr. Sidorsky?
25     A  Yes.

19

1      Q  Okay.  And approximately how -- what was the
2   volume of the documents you reviewed?
3      A  About three inches.
4      Q  Okay.
5      A  Two to three.
6      Q  And did -- did any of those documents that
7   you reviewed refresh your recollection about things
8   that occurred at Oracle during the, let's say, 2000,
9   2001 time frame?
10     A  General recollection.  Not specific
11   recollection.
12     Q  Okay.  And -- so it refreshed your
13   recollection generally.  How did it do that?  How did
14   reviewing the documents help you refresh your
15   recollection generally?
16        MR. SIDORSKY:  Objection to form.
17        THE WITNESS:  It's been five or six years, so
18   just looking at those documents refreshed me on some
19   of the accounts, some of the, you know, ways that
20   Oracle accounted for stuff, so....
21        MR. GREENSTEIN:  Okay.
22     Q  When you say "some of the accounts," what --
23   did it refresh your recollection about any specific
24   accounts at Oracle during that time?
25     A  No, just in going through the -- the work

20

1   papers.  We looked at some of the, you know, accounts
2   that -- receivable accounts, deferred revenue
3   accounts.  So just reading through some of the work
4   papers at Andersen refreshed my memory of what the
5   accounts were.
6      Q  Okay.  Did -- did reviewing any of those
7   documents refresh your recollection about certain ways
8   that Oracle accounted for certain transactions?
9         MR. KONOVALOV:  Objection; vague and
10   ambiguous.
11        MR. SIDORSKY:  Same objection.
12        THE WITNESS:  Yes.
13        MR. GREENSTEIN:  Q.  And how so?
14        MR. SIDORSKY:  Same objection; overly vague
15   and ambiguous.
16        THE WITNESS:  Just the way they accounted for
17   transactions.
18        MR. GREENSTEIN:  Okay.
19     Q  Well, did you look at -- did you look at the
20   work papers and you thought to yourself, "I remember
21   the way they accounted for transactions," or did you
22   look at the work papers and refresh your recollection
23   about, you know, maybe a specific type of accounting,
24   let's say, during 2000, 2001 time period?
25        MR. SIDORSKY:  Same objection; lacks

21

1  foundation.
2      THE WITNESS:  It was a recollection of how
3  they accounted for various types of transactions.
4      MR. GREENSTEIN:  Okay.
5      Q  Now, can you narrow that down to a category
6  or a type of accounting?
7      A  Well, most of the work papers that I looked
8  at were in the receivable section, and in the deferred
9  revenue section, customer advances and deferred
10  revenue.  So, by definition, my recollection would
11  have been refreshed in those two areas.
12      Q  Okay.  Now, when you -- you just said, I
13  think, "customer advances and deferred revenue."  Did
14  you mean customer advances and unearned revenue?
15      A  Sure.
16      MR. SIDORSKY:  Objection to form.
17      MR. GREENSTEIN:  Okay.
18      Q  So you looked at some work papers yesterday.
19  Did you look at any other documents, any e-mails that
20  helped refresh your recollection about accounting at
21  Oracle?
22      A  No.
23      Q  Okay.  Was it just work papers?
24      A  Just work papers, what, that I reviewed?
25      Q  Yes.

22

1      A  I reviewed the -- certain work papers.  I was
2  also provided a copy of the actual complaint that I
3  briefly reviewed and a copy of Mr. Sevier's
4  deposition, which I briefly reviewed.
5      Q  Okay.  And who is Mr. Sevier?
6      A  Jason Sevier.  He was the manager at Andersen
7  on the Oracle engagement and was deposed on or about
8  June 28th on this matter.
9      Q  Now, did you -- so did you read the whole
10  deposition yesterday?
11      A  No.
12      Q  Okay.  Are you aware that that deposition has
13  been marked "Confidential" in this case?
14      A  I guess I saw the -- the -- it did say
15  "Confidential" on it, yes.
16      Q  Okay.  Did reading Mr. Sevier's deposition
17  transcript refresh your recollection about any
18  specific topics related to Oracle in the 2000, 2001
19  time frame?
20      A  No more or less than reviewing the work
21  papers.
22      Q  So it was more general.  It refreshed your
23  recollection generally more than about specific
24  issues?
25      A  Yeah.

23

1      Q  Okay.
2      A  I didn't read through it in great detail.
3      Q  You said you looked at a complaint in this
4  action yesterday; correct?
5      A  I received a copy of the complaint, and I
6  walked through certain sections of it.  Again, I did
7  not review the entire complaint.
8      Q  Okay.  Did you walk through the sections on
9  the accounting allegations in this case?
10      A  I did review those.
11      Q  Okay.  Did that help you refresh your
12  recollection about the issues raised in the complaint?
13      A  Well, that's the only recollection I've had
14  were the issues raised in the complaint.
15      Q  Okay.  So prior to reading the complaint, you
16  were not aware of the allegations that were raised in
17  the complaint?
18      A  No.
19      Q  Okay.  Prior to receiving the subpoena in
20  this case, were you aware that this litigation existed
21  at all?
22      A  Yes, I believe I was.
23      Q  Okay.  And how did you know about it?
24      A  Well, I believe the litigation started prior
25  to my departure from Andersen.  So while I was still

24

1  involved with the Oracle -- Oracle account while at
2  Andersen, so -- but I haven't tracked it.
3      Q  Okay.  When did Andersen -- when did --
4  you're the senior part -- you were the senior partner
5  at Arthur Andersen during the 2000, 2001 time frame;
6  correct?
7      MR. SIDORSKY:  Objection to form.
8      THE WITNESS:  I was the -- the -- the lead
9  audit partner on the engagement.  I'm not sure what
10  "senior partner" means.
11      MR. GREENSTEIN:  Okay.
12      Q  Well, does lead audit partner mean you were
13  the highest ranking audit partner on the engagement?
14      A  That would be correct.
15      Q  Okay.  So what do you recall about -- when
16  you were at Andersen, you said you became aware of
17  this litigation; correct?
18      A  I -- I believe it was this litigation.
19      Q  Okay.
20      A  I don't recall specifically.
21      Q  Okay.  Well, I'll represent to you the
22  complaint -- the first complaint filed in this case
23  was March 2001.  Were you at Andersen in March 2001?
24      A  Yes.
25      Q  Were you working on an Oracle engagement at

25

1  that time?
2  A  I was.
3  Q  Okay.  And how did you learn about this
4  litigation, if you remember?
5  A  From conversations with the company.
6  Q  Okay.  What conversation -- and without
7  talking -- well, what conversations were those?
8  A  I don't recall the specific conversations.
9  Q  Did someone come in and say, "Hey, Oracle is
10  being sued," and that's it, or do you remember
11  anything about it?
12  A  I don't recall.
13  Q  Okay.  You just remember hearing about a
14  litigation?
15  A  That's correct.
16  Q  Okay.  Do you remember any specific people
17  that you talked to about it?
18  A  I don't recall specific conversations, so....
19  Q  Okay.
20  A  No.
21  Q  Were you -- when did Andersen's engagement
22  with Oracle end?
23  A  We were replaced on or around April of 2002.
24  Q  Okay.  And why were you replaced in April of
25  2002?

26

1  A  Because our firm was going out of business.
2  Q  Okay.  Were you -- were you -- was Andersen
3  fired by Oracle?
4  MR. SIDORSKY:  Objection to form.
5  THE WITNESS:  We were dismissed.  We were
6  replaced.  You can define it any way you want.
7  MR. GREENSTEIN:  Okay.
8  Q  Was that the time of the Enron -- the time
9  that the Enron case was -- was coming to light?
10  A  It was after Andersen --
11  MR. KONOVALOV:  Objection; vague and
12  ambiguous.
13  MR. SIDORSKY:  Yeah, I'll object to that.
14  THE WITNESS:  It was after Andersen was
15  indicted.
16  MR. GREENSTEIN:  Okay.
17  Q  So just to close the loop, have you ever
18  spoken to anybody -- besides your attorneys and
19  besides the general conversations you had while you
20  were at Andersen -- spoken with anybody about this
21  litigation?
22  A  No.
23  Q  Okay.  Now, after April 2002, when Andersen
24  was dismissed, do you recall having any discussions
25  with anybody about accounting allegations against

27

1  Oracle around the 2000, 2001 time frame?
2  MR. SIDORSKY:  Could I hear that question
3  again, I'm sorry.
4  (Whereupon, record read by the Reporter as
5  follows:
6  "Question:  Okay.  Now, after April 2002,
7  when Andersen was dismissed, do you recall
8  having any discussions with anybody about
9  accounting allegations against Oracle around
10  the 2000, 2001 time frame?"
11  MR. GREENSTEIN:  Q.  You can answer.
12  A  No.
13  Q  Okay.  And other than your attorneys, have
14  you spoken to anybody about this deposition, anybody
15  from Oracle?
16  A  No.
17  Q  Okay.  Now, did you write any e-mails, other
18  than to people -- well, strike that.
19  Have you written any e-mails to anyone other
20  than your attorneys about this deposition?
21  A  Nope.
22  Q  Okay.  Have you received any e-mails other
23  than from your attorneys about this deposition?
24  A  No.
25  Q  Okay.  So other than work papers, and the

28

1  complaint, and the Sevier deposition transcript, do
2  you -- what -- did you review any other types of
3  documents yesterday?
4  A  Yes.  We actually briefly reviewed a couple
5  of sections of a couple of their public filings, some
6  of the form 10-Q during a couple of the quarters in
7  fiscal '01.
8  Q  Okay.  Do you remember which quarters?
9  A  Well, we had copies of all three quarters.
10  We actually spent very little time looking at them.
11  Q  Okay.  Did you -- oh, sorry.  You finished?
12  Did you look at any specific line items in
13  the 10-Qs?
14  A  I think all I looked at was the balance sheet
15  and some selected financial data on the income
16  statement.
17  Q  Okay.  So when you looked at a balance sheet,
18  did you just look at the balance sheet generally, or
19  did you look at any specific line items on the balance
20  sheet?
21  MR. SIDORSKY:  I'm going to object to that;
22  objection to form.
23  THE WITNESS:  Generally looked at the balance
24  sheet and then looked at the customer advances and
25  unearned revenue, I think you called it, and then

29

1  looked at the receivable line item.
2       MR. GREENSTEIN:  Okay.
3    Q  So you looked at the line item in the balance
4  sheet in the 10-K, which was called customer advances
5  and unearned revenue; is that right?
6    A  Oh, go ahead.
7       MR. SIDORSKY:  Objection to form.
8       MR. GREENSTEIN:  Q.  Is that right?
9    A  I don't recall if it was the 10-K or 10-Q,
10  but --
11   Q  Okay.
12   A  -- I mean --
13   Q  I'm sorry.
14   A  -- I looked at the balance sheet.  Your eyes
15  focus in on a couple of accounts.
16   Q  So did your eyes just focus on it, or were
17  you -- is that something that you -- that when you saw
18  it, you remembered that specific line item?
19   A  Well --
20      MR. SIDORSKY:  Objection to form.
21      THE WITNESS:  -- those were the work papers
22  that I was asked or that I was given to look at, so --
23      MR. GREENSTEIN:  Okay.
24   Q  So is it fair to say --
25   A  -- that would be the only reason to look at

30

1  those line items.
2    Q  Okay.  So is it fair to say you looked at
3  line items on the balance sheet and the income
4  statement that pertained to the issues that you
5  reviewed in the work papers?
6    A  Those are the two line items that I looked
7  at.
8    Q  Okay.  And the accounts receivable line item,
9  that's the one you looked at on the balance sheet?
10   A  Yeah.
11   Q  Okay.  On the income statement, were there
12  particular line items that you focused in on?
13   A  I don't believe I looked at the income
14  statement.
15   Q  So you just looked at the balance sheet?
16   A  Yes.
17   Q  Okay.  Did you look at the statement of cash
18  flows at all?
19   A  No.
20   Q  Okay.  Now, looking at those line items that
21  helped your recollection about any issues involving
22  those two line items, customer advances, and unearned
23  revenue, or accounts receivable, that occurred at
24  Oracle during 2000, 2001?
25   A  No.

31

1    Q  Okay.  I'm going to switch gears a little
2  bit.  I'd just like to know a little bit about your
3  educational background, so why don't you tell me from
4  high school -- well, from college until now what your
5  education has been.
6    A  Okay.  I graduated from college from the
7  University of Wisconsin at Oshkosh in May of 1979 with
8  a bachelors in business administration with a
9  concentration in accounting, and that was my last
10  formal education.
11   Q  Do you have any -- do you have a CPA?
12   A  I do.
13   Q  Do you?
14      Do you have any other types of licenses or
15  certifications related to accounting?
16   A  No.
17   Q  Okay.  Any other training related to
18  accounting?
19   A  I don't know what you mean by "training."
20   Q  Strike that.
21      Any formal training of any type related to
22  accounting?
23   A  No.
24   Q  Okay.  And when were you first employed by
25  Arthur Andersen?

32

1    A  July of 1979.
2    Q  And what was your position at the time you
3  were hired?
4    A  I was hired as a staff accountant.
5    Q  And were you -- obviously you were promoted
6  at some point; correct?
7    A  Correct.
8    Q  And -- well, let's say, how long were you a
9  staff accountant?
10   A  Well, define -- depends on what you would
11  define as the next promotion.
12   Q  Well, how would you define the next
13  promotion?
14   A  The next formal promotion will be a promotion
15  to manager.
16   Q  Okay.  Is it just called manager or account
17  manager?
18   A  Just audit manager.
19   Q  Audit manager.
20      And do you remember what year that was?
21   A  1985.
22   Q  Okay.  And then how long were you a manager?
23   A  Various levels of a manager until I made
24  partner.
25   Q  Okay.  And when did you make partner?

33

1    A   1993.
2    Q   And did you make partner -- you talked about
3  a litigation involving Oracle in the early '90s.  At
4  the time of that litigation, were you -- were you a
5  partner, or were you some -- or were you a level of
6  manager?
7    A   At the time of the -- well, define what you
8  mean by time of litigation.  The time period for the
9  class period?  The time that I was deposed?
10    Q   The time period for the class period.
11    A   I would have been a manager on the
12  engagement.
13    Q   Okay.  At the time you were deposed, were you
14  a partner?
15    A   I don't recall.  I told you when I made
16  partner, 1993, but I don't recall the date of the
17  deposition.
18    Q   Okay.  And are there various levels of
19  partners at Andersen?
20    MR. SIDORSKY:  Objection to form.
21    THE WITNESS:  Not formally, no.
22    MR. GREENSTEIN:  Okay.
23    Q   Well, did you -- once you became partner in
24  1993, did you get promoted after that time?
25    A   Around 2000, I assumed the responsibility of

34

1  the managing partner of the Silicon Valley office.
2  That would have been the only formal promotion.
3    Q   Okay.  Do you -- do you recall when Andersen
4  was hired by Oracle?
5    A   Long before I was involved.
6    Q   Okay.  Is it fair to say that Andersen was
7  Oracle's auditor from approximately 19 -- early 1990s
8  through the time that they were dismissed in
9  April 2002?
10    A   No, it would not have been early 1990s.  It
11  would have been early 1980s, probably.
12    Q   1980s, okay.
13    Now, during that time, early 1980s to
14  April 2002, did Andersen do all of the fiscal year
15  audits for Oracle?
16    A   Since the time we were appointed, whenever
17  that was, up until the time we were dismissed in April
18  of 2002, we were the auditors of record for Oracle.
19  So we would have, you know, signed their audit
20  reports.  So we would have -- if that's what you mean,
21  yes.
22    Q   Okay.  Well, what I mean is did you conduct
23  the fiscal year audit and sign off on the fiscal year
24  and financial statements?
25    A   Oracle -- I mean, Andersen did, yes.

35

1    Q   Okay.  And during that time, did Andersen
2  also conduct all quarterly reviews of Oracle?  When I
3  say that, I mean the review of their financials in
4  connection with the filing of their 10-Qs.
5    MR. SIDORSKY:  Objection to form.
6    MR. KONOVALOV:  Same objection.
7    THE WITNESS:  We would have performed
8  quarterly reviews during that time period.  You know,
9  if you ask me specifics on early '80s, I -- I have no
10  way to respond.
11    MR. GREENSTEIN:  All right.
12    Q   But you don't recall any other audit firm
13  coming in and doing a quarterly review while you were
14  there; do you?
15    A   I don't recall.
16    Q   Okay.  And when did you -- when did you first
17  become involved with the Oracle account?
18    A   Late 1989.  I'd say late '89 or early '90.
19    Q   So you were a manager on the Oracle account
20  for a number of years; correct?
21    A   I was the manager on the oral -- Oracle
22  account.  I don't know what you mean by "a number of
23  years," but I was the manager on the Oracle account
24  for a period of time.
25    Q   So why don't you just describe for me if --

36

1  when you were -- when you were a manager working on
2  Oracle -- the Oracle account.  What would you do --
3    MR. SIDORSKY:  Objection.
4    MR. GREENSTEIN:  Q.  -- generally?
5    MR. SIDORSKY:  Objection to form.
6    THE WITNESS:  That's a very open-ended
7  question.  I supervised part of the audit work.
8    MR. GREENSTEIN:  Okay.
9    Q   What -- what does that mean, supervise part
10  of the audit work?
11    A   Well, we would divide up the work and
12  people -- certain people would look at certain
13  sections, other people would look at other sections.
14  I don't recall specifically what parts of the work I
15  would have had responsibility for or reviewed, but I
16  was a manager on the engagement.
17    Q   Do you remember being in charge of any
18  particular account during -- you know, let's say from
19  the time you started working on the Oracle account
20  until April 2002, do you ever recall focusing on a
21  specific area with respect to an audit?
22    A   I'm sorry --
23    MR. SIDORSKY:  Well, let him finish the
24  question, but are you finished with the question?
25    MR. GREENSTEIN:  Yes.

37

1    MR. SIDORSKY:  Okay.  I object to the form.
2  It's -- it's overly broad.  It's vague.  It's
3  ambiguous.
4    MR. GREENSTEIN:  Q.  You can answer.
5    A  Can you -- could you repeat the question or
6  define the time period?
7    Q  Okay.  When you were a manager on the -- on
8  the Oracle account, do you remember focusing on any
9  specific parts or specific issues with respect to
10  Oracle audits?
11    A  Some.
12    MR. SIDORSKY:  Same objection.
13    THE WITNESS:  I -- I don't know about issues.
14  You know, I can't answer with respect to that,
15  specific areas of the work.  I -- I don't recall
16  looking at specific work papers, if that's what
17  you're -- you're asking, but I know that I worked with
18  many areas of the audit, including receivables,
19  revenue.
20    A lot of our, you know, audit tests that were
21  performed in those areas I would have looked at, and
22  there are other areas as well looking at international
23  clearances, looking at the 10-K.  You know, there's a
24  lot of different things we go through.
25    MR. GREENSTEIN:  Okay.

38

1    Q  Well, why don't I back up and just ask you if
2  you could just describe the difference between an
3  audit of Oracle and a quarterly review.  I guess we
4  could start with -- well, why don't you just tell me
5  the difference between those two types of engagements.
6    MR. SIDORSKY:  Objection to form.
7    THE WITNESS:  You're -- you're -- I'm sorry.
8    MR. SIDORSKY:  Objecting -- objection to the
9  form of the question.
10    THE WITNESS:  You're speaking in general,
11  not --
12    MR. GREENSTEIN:  Correct.
13    THE WITNESS:  -- referencing any particular
14  period?
15    MR. GREENSTEIN:  Q.  Actually, yeah.  Why
16  don't we focus on the 2000, 2001 time frame.
17    A  Okay.
18    Q  You -- well, let me back up.
19    Andersen did all the quarterly reviews in the
20  fiscal -- fiscal year 2001; right?
21    A  That's correct.
22    Q  And it conducted the year-end audit in the
23  fiscal 2001; correct?
24    A  Correct.
25    Q  You signed the audit opinion that was

39

1  included with the 10-K for the fiscal year 2001 for
2  Oracle; correct?
3    A  That's correct.
4    Q  Okay.  So focusing on that time period,
5  what's the difference generally between what Andersen
6  did for a quarterly review and what it did for an
7  audit?
8    MR. KONOVALOV:  Objection; vague and
9  ambiguous.
10    MR. SIDORSKY:  Same objection to form.
11    THE WITNESS:  Well, a review is substantially
12  less in scope than an audit.  We don't form an opinion
13  on the financial statements or any portion of the
14  financial statements in a review.
15    Our responsibility is to perform high-level
16  analytical review and some discussions with
17  management.
18    MR. GREENSTEIN:  Okay.
19    Q  When you say you don't form an opinion, you
20  just mean you don't actually sign a formal audit
21  opinion like you do with a -- a year-end audit;
22  correct?
23    MR. SIDORSKY:  Objection to form.
24    THE WITNESS:  No, we -- we do not form an
25  opinion.  We do not issue -- we do not form an audit

40

1  opinion on the financial statements.
2    MR. GREENSTEIN:  Right.
3    Q  And what I'm asking is -- but do you form any
4  opinion at all, informal opinion, about your review?
5    MR. SIDORSKY:  Objection to form.
6    THE WITNESS:  When you say "opinion," to me,
7  I think of an audit opinion.
8    MR. GREENSTEIN:  Okay.
9    Q  What I'm trying to get at, you said you
10  didn't form an opinion for quarterly reviews.
11    A  That's correct.
12    Q  What I'm asking is, do you mean you don't for
13  a -- you don't sign a formal audit opinion during the
14  quarters?  Correct?
15    MR. SIDORSKY:  Objection to form.
16    THE WITNESS:  Correct.  We do not perform an
17  audit and do not issue an audit opinion on the
18  quarters.
19    MR. GREENSTEIN:  Right.
20    Q  But you do form some sort -- you do form
21  opinions about what you reviewed for the quarters;
22  right?
23    MR. KONOVALOV:  Objection; misstates the
24  witness's testimony.
25    MR. SIDORSKY:  Yeah, objection to form.

41

1    THE WITNESS: We have discussions with
2  management, and based on that, we form a view as to
3  whether we become aware of any material adjustments
4  that would need to be made to the financials based on
5  a fairly limited amount of work.
6    MR. GREENSTEIN: Okay.
7    Q  Why don't you just take me through. Let's
8  focus in on, let's say, the second quarter of 2001.
9    Do you remember that time period?
10    A  Generally.
11    Q  Okay. Now, do you remember what Andersen did
12  in connection with the review of that quarter?
13    MR. SIDORSKY: Objection to form.
14    THE WITNESS: Not -- not specifically. We
15  performed a quarterly review.
16    MR. GREENSTEIN: Right.
17    Q  So during a quarterly review, you said you
18  don't form an opinion. You speak with management, and
19  I think you talked about you look at any adjust --
20  adjustments made; is that fair to say?
21    MR. SIDORSKY: Objection; misstates the
22  record, and the record speaks for itself.
23    THE WITNESS: That's not what I said.
24    MR. GREENSTEIN: Okay.
25    Q  What did you say?

42

1    A  Could you repeat what I said?
2    Q  Well, why don't -- why don't you just tell
3  him what you did in -- what Andersen did in the second
4  quarter of 2001 in performing their quarterly review.
5    MR. SIDORSKY: Objection to form.
6    I don't think the witness is obligated to
7  repeat his -- his prior answer. Why don't you -- why
8  don't you --
9    MR. GREENSTEIN: I just asked --
10    MR. SIDORSKY: You got a record.
11    MR. GREENSTEIN: Is that an objection?
12    MR. SIDORSKY: Yes, it's an objection.
13    MR. GREENSTEIN: What's the objection?
14    MR. SIDORSKY: It's asked. It's answered.
15  We're not -- you can't keep asking the same question
16  when a witness has already answered the question,
17  but -- but go ahead.
18    MR. GREENSTEIN: Asked and answered is a
19  proper objection under the Federal Rules. Now,
20  everything you just said after that is not a proper
21  objection. So again, I'd ask that you make your
22  objection, and then let the witness answer.
23    MR. SIDORSKY: I think that's what I'm doing,
24  Eli.
25    MR. GREENSTEIN: So --

43

1    MR. SIDORSKY: It is a proper objection, but
2  go ahead. I'm trying to let you get it out there.
3    Go ahead.
4    MR. GREENSTEIN: Thank you. I appreciate it.
5  I appreciate it.
6    Q  Do you recall what Andersen did in connection
7  with its quarterly review of the second quarter 2001?
8    A  Again, that's a very broad question, and so I
9  find it difficult to define how you want me to answer
10  that.
11    I mean, what did we do? We performed a
12  quarterly review. What does a quarterly review
13  entail? It includes -- entails discussions with
14  management and high-level analytics. Do I recall
15  specifically what we did in that quarter? No.
16    Q  Okay. When you say "high-level analytics,"
17  what do you mean by that?
18    A  We would look at, you know, some of the
19  accounts. We would look at variation analysis in
20  certain areas. Would not look at detail that would
21  support account balances on a quarterly basis, and we
22  would have discussions with management, and at the end
23  of the quarter receive a representation letter from
24  management representing to us, you know, their
25  responsibility for the financial statements.

44

1    Q  Okay. You said you look at "variation
2  analysis in certain areas," but you would not look at
3  "detail that would support account balances on a
4  quarterly basis."
5    What do you mean by that?
6    MR. SIDORSKY: Objection to form. It --
7  it --
8    THE WITNESS: Well, in an audit -- audit
9  testing includes, on certain accounts, testing the
10  detail of the account balances.
11    In a review, we don't test the detail. You
12  look at the top-level financial statement balances or
13  general ledger account balances in some cases and have
14  some discussions with management on those, and that's
15  it.
16    MR. GREENSTEIN: Okay.
17    Q  So correct me if I'm wrong. So if you're
18  looking at a particular account, like a revenue
19  account, you look at the top line. You look at the
20  variations between quarters, but you wouldn't dig down
21  into that particular account and perform an analysis
22  on it; is that fair to say?
23    MR. SIDORSKY: Objection to form.
24    THE WITNESS: It's a -- you're correct in
25  your discussion. I mean, revenue is probably a bad

45

1  example for it.
2      MR. GREENSTEIN:  Okay.
3      Q  Just in general, if you look at an account --
4  what I'm trying to get at is or what I'm asking is, if
5  you look at a particular account, let's say an
6  accounts receivable account, during a quarterly
7  review, what -- what did you mean when you said you
8  look at the top line but you wouldn't look at the
9  detail of the account?
10     MR. SIDORSKY:  Objection to form.
11     THE WITNESS:  Well, if you take a -- I don't
12  know -- any particular line item, a general ledger
13  account balance on an audit, depending upon the nature
14  of the account, the materiality of the account, the
15  risks involved with that particular account, you may
16  look at the detail that supports that account and test
17  it.  You would not do that on a quarterly review.
18     MR. GREENSTEIN:  Okay.
19     Q  So what -- what would you do on a quarterly
20  review?
21     MR. SIDORSKY:  Objection; asked and answered
22  about three times now.
23     THE WITNESS:  I think I've already said we
24  would do variation analysis.
25     MR. GREENSTEIN:  Q.  Again, what does that

46

1  mean?  What does "variation analysis" mean?
2      A  Look at variations between quarters, and
3  based upon our -- you know, our understanding of the
4  company, would explain those variations --
5      Q  Okay.
6      A  -- have discussions with management.
7      Q  Okay.  And when you say "variations between
8  quarters," you mean if you look at a certain account
9  and it went up or down, you would discuss with
10  management why that occurred?
11     MR. SIDORSKY:  Objection to form.  Again,
12  it -- it lacks foundation; hypothetical.
13     THE WITNESS:  Possibly.
14     MR. GREENSTEIN:  Okay.
15     THE WITNESS:  Without having a specific work
16  paper, or schedule, or account balance that you're
17  referencing to, my answer would be hypothetical.
18     MR. GREENSTEIN:  Okay.
19     Q  Well, I'm just asking generally.  I'm trying
20  to get a sense of what the difference between a
21  quarterly review and an audit are.
22     So what I'm asking is, if you -- when you say
23  "variation analysis," what does that mean, generally?
24     MR. SIDORSKY:  He's answered the question
25  generally, I think, a couple of times.

47

1      MR. GREENSTEIN:  Q.  What --
2      MR. SIDORSKY:  You can answer again now.
3      MR. GREENSTEIN:  Q.  -- what kind of
4  discussions do you have with management when you
5  perform a variation analysis?
6      MR. SIDORSKY:  Again, objection to --
7  objection to the form; lacks foundation; calls for
8  speculation.
9      THE WITNESS:  There would be different levels
10  of discussion.  If it was a schedule that was
11  prepared, the staff accountants on the engagement
12  would discuss it with management, levels of
13  management, prepare the schedule, prepare explanations
14  on the schedule that would be reviewed by an
15  engagement senior, an engagement manager, possibly a
16  partner.  So there could be a number of different
17  discussions that occurred.
18     MR. GREENSTEIN:  Q.  So what is it when you
19  say a schedule was prepared?  What do you mean by
20  "schedule"?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  An audit work paper.
23     MR. GREENSTEIN:  Okay.
24     Q  Well, I didn't know that, that a schedule
25  meant an audit work paper.  I'm not an accountant.

48

1      So you mean a schedule, in general, means a
2  work paper?
3      MR. SIDORSKY:  Objection to form.
4      THE WITNESS:  In the context of my answer,
5  yes.
6      MR. GREENSTEIN:  Okay.
7      Q  What are the different -- does the schedule
8  mean something else in a different context?
9      MR. SIDORSKY:  Objection to the vagueness of
10  the question.
11     THE WITNESS:  It depends on the question you
12  ask and what I'm answering to.
13     MR. GREENSTEIN:  Q.  But what's a schedule?
14  You said -- you said if it was a schedule that was
15  prepared, the staff accountants on the engagement
16  would discuss it with management.  So when you said
17  that, what did you mean by "schedule"?
18     A  Okay.  An audit work paper schedule.
19     Q  Okay.  And that occurs during the quarterly
20  reviews; correct?
21     A  In the context of the question you're asking
22  about a quarterly review, yes.
23     Q  Okay.  Now, were you a senior -- were you the
24  lead auditor or the lead partner on the Oracle
25  engagement in -- in the first quarter fiscal year

49

1  2001?
2        MR. SIDORSKY:  Objection to form.
3        THE WITNESS:  Yes, I would have been the
4  senior audit partner on the engagement.
5        MR. GREENSTEIN:  Okay.
6     Q  And as the senior audit partner, what would
7  your specific duties be when Andersen conducted a
8  quarterly review?
9     A  I would spend time with our team in the field
10  getting at the client.  And as we were performing our
11  work, had various discussions with our team, review
12  selected areas of the work papers, and participate in
13  discussions with management.
14     Q  Okay.  And were you the primary liaison
15  between Oracle's upper management and Andersen, or did
16  everybody speak to or communicate with management?
17        MR. SIDORSKY:  Objection --
18        THE WITNESS:  Could you--
19        MR. SIDORSKY:  -- to form.
20        THE WITNESS:  -- define who you mean by
21  "upper management"?
22        MR. GREENSTEIN:  Larry Ellison.
23        MR. SIDORSKY:  Objection.
24        THE VIDEOGRAPHER:  You can continue.
25        THE WITNESS:  Okay.  We did not speak with

50

1  Larry Ellison.
2        MR. GREENSTEIN:  Q.  Have you ever spoken
3  with Larry Ellison in connection with an engagement?
4     A  An audit engagement?  Review engagement?
5  Which one?
6     Q  Either one.
7     A  What do you mean by "engagement"?
8     Q  Either one.
9     A  No.
10     Q  Have you ever talked to Larry Ellison at all?
11     A  Briefly.
12     Q  Okay.  And when was that?
13     A  I don't recall the specifics, but I attended
14  an event, along with several other people, at his home
15  at one point.
16     Q  Did you ever make presentations to Oracle
17  management while Larry Ellison was there?
18     A  Actually, I take that -- we -- was had one
19  other session I believe Larry was in when management
20  was making a presentation on a particular matter, and
21  we were in attendance, and I believe Larry was in that
22  meeting, but --
23     Q  Okay.
24     A  -- don't ask me the specifics, because I -- I
25  remember being in a room with Ray Lane and others, and

51

1  I believe Larry was in the meeting as well.
2     Q  Okay.  Do you remember when that was?
3     A  No.
4     Q  Do you remember generally what the issue --
5  you said it was an issue.
6     A  I didn't say it was an issue.  I just --
7  well, if I did, I correct myself.  There was -- there
8  was a matter that they were discussing, you know, and
9  I don't recall the specifics of the topic.
10     Q  Okay.  Do you recall generally what the
11  matter was?
12     A  No, I said I don't.
13     Q  Was it an accounting matter?
14     A  Yeah, it would have been something related to
15  accounting, or financial reporting, or else we
16  wouldn't have been there.
17     Q  Okay.  Was that unusual to have such a
18  meeting?
19        MR. SIDORSKY:  Objection to form.
20        THE WITNESS:  Again, I don't recall the
21  specifics of the meeting.
22        MR. GREENSTEIN:  Okay.
23     Q  Well, but how many meetings have you
24  attended, if you know, where Larry Ellison was
25  present?

52

1     A  I believe that was the only one.
2     Q  Right.
3        So what I'm asking, if that's un -- it's
4  obviously unusual to attend a meeting with
5  Larry Ellison --
6        MR. KONOVALOV:  Objection --
7        MR. GREENSTEIN:  Q.  -- right?
8        MR. KONOVALOV:  -- misstates the witness's
9  testimony.
10        MR. SIDORSKY:  Yeah, objection to form.
11        THE WITNESS:  I wouldn't say it's unusual.  I
12  just -- we -- we've not -- we didn't have occasion to
13  meet with him.
14        MR. GREENSTEIN:  Okay.
15     Q  Do you remember anything about -- anything
16  that was discussed in that meeting?
17     A  No.
18     Q  Do you remember approximately even the year
19  that it occurred?
20     A  No.
21     Q  Okay.  Was it when you were a senior audit
22  partner?  Do you remember that?
23     A  I believe I was the audit partner when that
24  was going on, so....
25     Q  Okay.  Do you remember if it was after you

53

1  learned about a lawsuit against Oracle that you
2  described earlier?
3      A  I believe it was before this, the time period
4  of this complaint.
5      Q  Okay.  Well, the complaint was filed in March
6  of 2001, the first complaint.  Do you recall if it was
7  before or after that?
8      A  I believe it was before that.
9      Q  Before that; okay.
10        And you say Ray Lane was there.  Do you
11  remember anybody else that attended?
12      A  Just the finance people, a couple of the
13  finance people that were there.
14      Q  Who was -- oh, sorry.
15      A  I think Jeff Henley was there, Tom Williams
16  was there, Jennifer Minton was there.
17      Q  And do you recall Ray Lane -- who is
18  Ray Lane?
19      A  Ray Lane was the president of the company for
20  a period of time.  I believe he left before this
21  complaint was filed, which is why I think the meeting
22  occurred prior to this complaint being filed.
23      Q  Makes sense.
24        And where do you work now?
25      A  I'm a partner at KPMG.

54

1      Q  Okay.  And when did you -- did you -- did you
2  join KPMG right after Andersen was dismissed, or when
3  did you join KPMG?
4      A  June of 2002.
5      Q  Okay.  So a couple of months after Oracle
6  dismissed Andersen; correct?
7      A  Correct.
8      Q  Okay.  And what's your function now for KPMG?
9      A  I'm the global chair of one of our lines of
10  business.
11      Q  Which line of business?
12      A  We call it ICE, Information Communication and
13  Entertainment.
14      MR. GREENSTEIN:  We've been going about an
15  hour.  Why don't we go off the record.
16      THE VIDEOGRAPHER:  We're going off the
17  record.  The time is 10:07 a.m.
18      (Short break taken.)
19      THE VIDEOGRAPHER:  We are back on the record.
20  The time is 10:21 a.m.
21      MR. GREENSTEIN:  Q.  Mr. Matuszak, earlier we
22  were talking about quarterly reviews and the kinds of
23  things that Andersen does during quarterly reviews.
24      I'm wondering what kind of documentation
25  there is of -- of the quarterly reviews that after a

55

1  quarterly review that you could look at to determine
2  what occurred.
3      MR. SIDORSKY:  Objection to form.
4      THE WITNESS:  Well, we prepared audit --
5  excuse me -- we prepared work papers for audits and
6  quarterly reviews.  So there would have been work
7  papers generically referred to as audit work papers,
8  but there would have been work papers prepared for the
9  quarterly review.
10      MR. GREENSTEIN:  Right.
11      Q  So is it safe to say when you say "audit work
12  papers" you may mean quarterly work papers, as well as
13  year-end work papers?
14      A  I'll try to be clear.
15      Q  Okay.  So once a quarterly review occurs,
16  there is some review work papers that are generated;
17  correct?
18      A  Correct.
19      Q  Okay.  And what do those work papers entail?
20      THE VIDEOGRAPHER:  I'm sorry, Counsel.  You
21  got the microphone on the back of your tie.  If you
22  can put it on your shirt.  Thank you.  Sorry.
23      THE WITNESS:  I'm sorry.
24      Could you repeat your question?
25      MR. GREENSTEIN:  Q.  So for quarterly work --

56

1  I'm trying to get a sense of what quarterly work
2  papers consist of.
3      A  It would have been the -- the documentation
4  of the discussions and work performed during our field
5  work and our representation letters from management,
6  any work we performed on the 10-Q public filing.
7      Q  Okay.  Do the work papers include
8  communications, e-mails that may have been sent or
9  received between Oracle and Andersen?
10      A  Certain of the communications in the work
11  papers could have been via e-mail that were printed
12  out and put in the work papers, but it's not to imply
13  that any and all e-mail communication would be in the
14  work papers.
15      Q  Okay.  And you talked about management
16  representation letters.  What are those?
17      A  There's a representation letter obtained at
18  the end of every quarterly review and one obtained at
19  the end of the audit as well that is signed by senior
20  levels of typically financial management that spells
21  out to the auditor the company's responsibility with
22  respect to the accuracy of the financial statements
23  and representing to us that they told us certain
24  things that, you know, certain account balances are
25  correct, or adequate, accurate, et cetera.

57

1  Q  And is that -- what form does that take?  Is
2  that an actual letter that says, you know, Dear
3  Mr. Matuszak, or Dear Andersen, or is it some other
4  form?
5  A  It would be addressed to Arthur Andersen.
6  Q  Okay.  And do you recall if you received
7  those or Andersen received those letters from Oracle
8  management in 2000, 2001?
9  A  We should have.  I haven't looked at the work
10 papers or seen them, but they should be in the work
11 papers.
12 Q  And does it -- so you said that it -- it may
13 represent that certain balances in certain accounts
14 are correct; did you say that?
15      MR. SIDORSKY:  Objection to form.  It's on
16 the record what he said, you know.
17      THE WITNESS:  I -- I don't recall the
18 specifics of what's in the rep letter.  I mean, it's
19 a -- I believe a three- or four-page letter or two- or
20 three-page letter.  So, in general, it would say that
21 the financial statements are accurate, that, you know,
22 they're an accurate reflection of the -- the
23 activities of the company.
24      We typically put in some other special
25 representations on certain areas, depending on, you

58

1  know, what was going on.
2      MR. GREENSTEIN:  Q.  When you say you put
3  them in, you're saying --
4  A  Andersen.
5  Q  -- Andersen puts them in the representation
6  letter?
7  A  Yes.
8  Q  Okay.  So -- but isn't the letter coming from
9  Oracle to Andersen?
10      MR. SIDORSKY:  Objection to form.
11      THE WITNESS:  The -- the letter is a letter
12 from Oracle to Andersen.  The content of the letter by
13 and large is dictated by the AICPA standards and other
14 specific representations that the auditors may request
15 of the company, so the letter is typically drafted.
16 The content of the letter is drafted by the auditor,
17 given to the company, who puts in writing their
18 representation to the auditor.
19      MR. GREENSTEIN:  Okay.
20 Q  And with respect -- the fiscal year 2001,
21 those quarterly reviews, did you participate at all in
22 drafting those participation letters?
23      MR. SIDORSKY:  Objection to form.
24      THE WITNESS:  I most likely would have
25 reviewed those letters either in draft or in final

59

1  form.
2      MR. GREENSTEIN:  Q.  But do you recall
3  actually participating in drafting the language as
4  opposed to review?
5  A  I don't -- I don't recall, no.
6  Q  Okay.  Do you recall who would be -- who
7  drafted those representation letters?
8  A  No.
9  Q  Typically would it be -- what -- what
10 position at Andersen would have the authority to draft
11 those?  Would it be a partner?  A senior manager?
12 A  It would be -- well, let me clarify.
13      The letter doesn't change that significantly
14 from quarter to quarter.  So you'd start with the
15 prior quarter level -- letter and then determine if
16 there were any changes that needed to be made to that
17 letter.
18 Q  Okay.  My question is, do you recall who had
19 the authority to -- to make changes or draft that
20 letter during the fiscal year 2001 for Oracle?
21 A  The -- the changes would have been reviewed
22 and approved by the engagement manager and possibly
23 the partner.
24 Q  Okay.  When you say changes were made --
25 A  Excuse me.

60

1  Q  -- strike that.
2      So in any of these engagement letters, do you
3  draft certain language about particular accounts, or
4  is it more general as to the financial statements and
5  accuracy of the financial statements?
6      MR. SIDORSKY:  Objection to form.  I also
7  think you meant to say representation letter, but --
8  but objection to form.
9      THE WITNESS:  There are representations in
10 the letter that are drafted which would be specific to
11 a particular client, whether it would be Oracle or
12 others.  So there would be things in -- in the Oracle
13 letter that were unique to Oracle.
14      MR. GREENSTEIN:  Okay.
15 Q  And do you recall any specific types of
16 things that were in those representation letters for
17 Oracle?
18      MR. KONOVALOV:  Are we speaking about the
19 2000, 2001 time frame still?
20      MR. GREENSTEIN:  Yeah.
21      MR. KONOVALOV:  Thank you.
22      THE WITNESS:  I don't recall specifically
23 with respect to that time frame what was in there.
24      MR. GREENSTEIN:  Okay.
25 Q  Well, since you worked on Oracle for a long

61

1  period of time, do you recall any specific things that
2  were put in those representation letters that were
3  unique to Oracle?
4      A  They were outside of the standard letter.  I
5  wouldn't -- I don't know if they were unique to
6  Oracle.  They may have been in other client's letters
7  as well, but I do know or my recollection is we had
8  representations in the -- in the Oracle letter as to
9  revenue contracts.  For example, that all contracts
10  were executed prior to the end of the quarter.
11      Q  Okay.  Well, is that something that's in
12  every representation letter for every client of
13  Andersen?
14      MR. SIDORSKY:  Objection; asked and answered.
15      THE WITNESS:  It's not part of the standard
16  representation letter, and it would not be in every
17  letter for every client.
18      MR. GREENSTEIN:  Okay.
19      Q  Why not?
20      A  Because it's not applicable to certain
21  industries, not as applicable.
22      Q  Okay.  So why would -- why would you put that
23  kind of language regarding revenue recognition in the
24  Oracle representation letter versus another company?
25      MR. SIDORSKY:  Objection to form.

62

1      THE WITNESS:  In -- in software companies, so
2  I'll speak more broadly than Oracle, there's a
3  requirement that you have evidence of an arrangement.
4  The evidence of the arrangement/the user contract is a
5  contract that's executed by both parties at the end of
6  the quarter.  So we -- we can't be on site to review
7  every signed contract at the end of the quarter.
8      MR. GREENSTEIN:  Q.  That's an element of
9  SOP 97-2; correct?
10      A  That's correct.
11      Q  Okay.  So is it fair to say that with respect
12  to software clients, you may add language regarding
13  revenue recognition because of the complexity of
14  SOP 97-2?
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  That's -- that's a fair
17  statement, that we would do that more frequently on a
18  software company than in any companies in any other
19  industries.
20      MR. GREENSTEIN:  Right.
21      Q  And do you recall adding that specific
22  language in the representation letters in connection
23  with the quarterly reviews of Oracle during fiscal
24  year 2001?
25      A  I don't recall the -- the specific letters.

63

1      In general, I recall that that was one of the --
2  the -- the specific provisions that was included in
3  the Oracle representation letter.
4      Q  Okay.  Do you recall, was there ever any
5  specific language about a specific transaction or
6  specific deal in a particular quarter?
7      In other words, Oracle is representing that
8  this particular deal was signed, had a signed contract
9  by both parties.
10      MR. SIDORSKY:  Objection to form.
11      THE WITNESS:  I don't believe so.
12      MR. GREENSTEIN:  Q.  Are you not sure of
13  that, or just don't recall it?
14      A  I don't recall ever seeing it.  I don't
15  recall ever putting it in or requesting that we have
16  language as to a specific contract being executed at
17  the end of the quarter.
18      Q  Okay.  Do you recall any -- in any management
19  representation letter Andersen asking Oracle to
20  represent that -- that a specific transaction met all
21  the requirements of revenue recognition?
22      MR. SIDORSKY:  Objection to form.
23      MR. KONOVALOV:  Vague and ambiguous.
24      THE WITNESS:  That's a pretty vague question.
25      MR. GREENSTEIN:  Q.  Well, do you recall any

64

1  specific transaction that was -- that had to be
2  addressed in one of those representation letters with
3  respect to a specific transaction or customer?
4      MR. KONOVALOV:  Same objection.
5      THE WITNESS:  I -- I don't recall.
6      MR. GREENSTEIN:  Okay.
7      Q  Do you recall ever requesting that a
8  transaction with Hewlett-Packard was ever addressed in
9  a representation letter?
10      A  I don't recall that.
11      Q  Okay.
12      A  I don't recall that being added to a rep
13  letter.
14      Q  Okay.  Do you recall whether Andersen ever
15  requested that, with respect to revenue recognition,
16  that all contracts met another element of SOP 97-2
17  other than that there was a signed contract by both
18  parties?
19      MR. KONOVALOV:  Objection; vague and
20  ambiguous.
21      MR. SIDORSKY:  Yeah, objection to form.
22      THE WITNESS:  You know, I -- I -- you asked
23  me for an example, and I gave you an example.  I don't
24  recall all of the provisions in every paragraph that
25  were in the letter.

65

1      MR. GREENSTEIN:  Q.  But generally do you
2  recall ever -- that Andersen ever requested that, say,
3  the delivery element of SOP 97-2, that they represent
4  that the delivery element for every transaction during
5  that quarter was met?
6      MR. SIDORSKY:  Objection to form.
7      THE WITNESS:  I -- I don't recall whether
8  we -- whether that was in the rep letter or not.
9      MR. GREENSTEIN:  Q.  It could have been?
10     MR. KONOVALOV:  Objection; misstates the
11 witness's testimony.
12     THE WITNESS:  I don't recall.
13     MR. GREENSTEIN:  Okay.
14     Q  Do you recall any of the other elements of
15 97-2 being addressed in a representation letter
16 specifically?
17     MR. SIDORSKY:  Objection to form.
18     THE WITNESS:  Not specific representations as
19 to the requirements of 97-2.  I don't -- I don't
20 recall those being specifically in the rep letter.
21     MR. GREENSTEIN:  Q.  But generally you recall
22 anything being in the rep letter with respect to the
23 elements of SOP 97-2?
24     MR. SIDORSKY:  Objection to form.
25     THE WITNESS:  I -- I don't recall it.

66

1      MR. GREENSTEIN:  Okay.
2      Q  Do you remember ever having issues or
3  problems that led to a specific request by Andersen to
4  -- that Oracle represent certain things with respect
5  to 97-2 in the rep letters?
6      A  Again, I apologize, but I don't recall.
7      Q  Well, since we're on 97-2, you talked
8  about -- well, is one of the elements of 97-2 that a
9  arrangement exists?  Correct?
10     A  That's correct.
11     Q  Okay.  And what does that mean?
12     A  That there's a -- a meeting of the minds, an
13 agreement between the customer and the vendor.  In
14 this case, the vendor being Oracle, and that that
15 evidence is documented in the form of whatever their
16 standard business practice is.
17     Q  Okay.  And if their standard business
18 practice is a contract, would that require that the
19 contract be signed by both parties?  Correct?
20     A  That's correct.
21     Q  And do you recall that that was a standard
22 requirement for Oracle in the fiscal year 2001?
23     MR. KONOVALOV:  Objection; lacks foundation;
24 assumes facts not in evidence.
25     THE WITNESS:  That would be part of their

67

1  revenue recognition policy.
2      MR. GREENSTEIN:  Okay.
3      Q  But do you recall that during the fiscal year
4  2001 for Oracle that there was a requirement, a
5  standard requirement from Oracle to have a signed
6  contract by both parties in order to meet the element,
7  the arrangement element of SOP 97-2?
8      MR. KONOVALOV:  Objection; lacks foundation;
9  assumes facts not in evidence.
10     THE WITNESS:  I think I answered that
11 question.  It was part of the revenue recognition
12 policy which would be the requirements that they would
13 need to meet in order to recognize revenue.
14     MR. GREENSTEIN:  Okay.
15     Q  Well, did they ever go beyond their policy?
16     MR. KONOVALOV:  Objection; calls for
17 speculation.
18     MR. SIDORSKY:  Yeah, objection to form.
19     MR. GREENSTEIN:  Q.  Well, if it -- if there
20 was a requirement in their policy that required
21 contracts signed by both parties, is it fair to say
22 that all their transactions during a quarter had to
23 meet that requirement?
24     MR. KONOVALOV:  Objection; incomplete
25 hypothetical; assumes facts not in evidence, and calls

68

1  for speculation.
2      MR. SIDORSKY:  Same objection.
3      THE WITNESS:  There -- they would either have
4  to meet all the requirements of the policy or for some
5  reason there would have to have been an approval --
6  approved approval or exception to the policy, so I....
7      MR. GREENSTEIN:  Okay.
8      Q  So it wasn't required that Oracle has to meet
9  its revenue recognition policy during the fiscal year
10 2001?
11     MR. SIDORSKY:  Objection to form.
12     THE WITNESS:  No, that's not what I said.
13     MR. SIDORSKY:  Thank you.  Let me object.  I
14 think that mischaracterizes the witness's testimony,
15 and it again is -- is completely lacking in any
16 foundation.
17     MR. KONOVALOV:  It's vague and ambiguous.
18     THE WITNESS:  What I said was they have to
19 follow the company policy.  If there was an exception
20 to the policy and there was a reason to approve an
21 exception to the policy, it would need to be approved
22 by senior financial management.
23     MR. GREENSTEIN:  Okay.
24     Q  Senior -- approved by senior Oracle
25 management?

69

1     A  Senior Oracle management.
2     Q  Did you -- did Andersen have to approve
3  exceptions to the revenue recognition policy?
4         MR. SIDORSKY:  Objection to form.
5         THE WITNESS:  They're not part of management.
6         MR. GREENSTEIN:  Okay.
7     Q  Did Andersen have to approve exceptions to
8  the revenue recognition policy?
9         MR. KONOVALOV:  Objection; lacks foundation;
10  calls for speculation.
11         MR. SIDORSKY:  And just asked and answered.
12         THE WITNESS:  No.
13         MR. GREENSTEIN:  Q.  So management could
14  decide to recognize revenue on a deal that went beyond
15  its revenue recognition policy without talking to
16  Arthur Andersen?
17         MR. SIDORSKY:  Objection to form.  That --
18  you're just, you know, putting words in the witness's
19  mouth.  Objection to form.
20         MR. GREENSTEIN:  Okay.  That's not a proper
21  objection.
22         MR. SIDORSKY:  It is.
23         MR. GREENSTEIN:  "Putting words in the
24  witness's mouth."
25         Well, if you could tell me, what if the --

70

1  where the Federal Rules say that's a proper objection
2  then, you know --
3         MR. SIDORSKY:  Leading is a -- leading --
4  improperly leading and mischaracterizing a witness's
5  testimony is a problem objection.
6         MR. KONOVALOV:  I'll make my proper
7  objection.  Calls for speculation and lacks
8  foundation.
9         MR. GREENSTEIN:  Okay.  Noted.
10     Q  You can answer the question.
11     A  Could you repeat the question?
12         MR. GREENSTEIN:  Could you read it back,
13  please?
14         (Whereupon, record read by the Reporter as
15  follows:
16     "Question:  So management could decide to
17      recognize revenue on a deal that went beyond
18      its revenue recognition policy without
19      talking to Arthur Andersen?")
20         MR. KONOVALOV:  Same objections.
21         THE WITNESS:  That would be correct, unless
22  it was a transaction that either we were -- it was
23  part of our audit testing or one that they chose to
24  talk to us about.
25         MR. GREENSTEIN:  Okay.

71

1     Q  And back to the arrangement element of 97-2.
2     A  Excuse me.
3     Q  Are you aware that Oracle's revenue
4  recognition policy required a signed contract by both
5  parties to meet that element in --
6         MR. KONOVALOV:  Objection; lacks --
7         MR. GREENSTEIN:  Q. -- in fiscal year 2001?
8         MR. KONOVALOV:  Sorry.  Objection; lacks
9  foundation.
10         MR. SIDORSKY:  Objection to form.
11         THE WITNESS:  I believe that's true.
12         MR. GREENSTEIN:  Okay.
13     Q  So if there was a case where on the last day
14  of the quarter Oracle did not have a signed contract
15  from a customer for a software license as of the night
16  on the last day of the quarter, would that preclude
17  revenue recognition under the terms of the policy?
18         MR. KONOVALOV:  Objection; assumes facts not
19  in evidence; incomplete hypothetical.
20         MR. SIDORSKY:  Objection to form.
21         THE WITNESS:  Generally, yes.
22         MR. GREENSTEIN:  Okay.
23     Q  So I think you testified earlier that in
24  April of 2002 Andersen was dismissed by Oracle;
25  correct?

72

1     A  Correct.
2     Q  Now, who took over as auditor for Oracle
3  after that time?
4     A  Ernst & Young.
5     Q  Okay.  Now, was there any sort of transition
6  that occurred between Andersen and Ernst & Young?
7     In other words, what did you have to do or
8  did you have to do anything in order to transition the
9  work to EY?
10     A  There was a transition that occurred.
11     Q  Okay.  And what occurred or -- yeah, what
12  occurred?
13     A  Well, the -- the standard practice is that
14  the auditor being replaced, in this case Andersen,
15  makes available to the -- the new auditor our audit
16  work papers, typically for the last year we audited.
17  So in this year we would have made our work papers
18  available for fiscal 2001, as well as the quarters
19  during fiscal 2001, and they would review those.
20     In this case, since we had also been the
21  auditors of record for the first three quarters of
22  fiscal 2002, we made those records available to
23  Ernst & Young as well, or those work papers available
24  to Ernst & Young as well.
25     However, ultimately Ernst & Young had to take

73

1 responsibility for all of the quarters and the
2 year-end audit in 2002. So I don't know what basis,
3 if any, they placed upon the work we had performed,
4 but -- but at the time the 10-K was filed for '02,
5 Ernst & Young had taken responsibility for the
6 quarterly reviews for 2002.
7    Q  Okay. But you provided the work papers for
8 2002, the first three quarters, at least, to Ernst &
9 Young; right?
10    A  That's correct.
11    Q  Okay. Now, other than providing them with
12 documents, do you have -- did you have any discussions
13 or meetings with Ernst & Young where you had to talk
14 about the transition or any issues with respect to
15 Oracle?
16    A  It is customary for the auditors to meet as
17 part of the transition process. I can tell you that
18 we did meet with representatives of Ernst & Young.
19 They were in our office looking at work papers,
20 various members of our teams had discussions with
21 them, including myself.
22    Q  Okay. So when -- and did that occur roughly
23 April 2002?
24    A  Whenever -- yeah, whenever we were replaced.
25    Q  Okay. How long -- oh, sorry.

74

1    How long after Andersen was dismissed did it
2 take, or how long did it take to transition to Ernst &
3 Young?
4    In other words, when was it that Andersen was
5 officially not Oracle's auditor and Ernst & Young took
6 over, and there were no more discussions, no more
7 exchange of documents?
8    MR. SIDORSKY: Objection to form.
9    THE WITNESS: To my knowledge, it all
10 happened fairly quick. Certainly no later than
11 June 1st, because there was nobody in the Silicon
12 Valley office of Andersen after June 1st.
13    MR. GREENSTEIN: Okay.
14    Q  So you said you -- or Ernst & Young employees
15 would come into your office and discuss work papers;
16 is that right?
17    A  That's correct.
18    Q  Okay. Do you remember who came into your
19 office to look at work papers?
20    A  No.
21    Q  Okay. Do you remember -- know who
22 John Banker is?
23    A  I know John. I know the name. I met him
24 once or twice.
25    Q  Okay. Did you ever talk to him in connection

75

1 with the transition between Andersen and EY?
2    A  To be honest, I don't recall if he was in the
3 meetings or not.
4    Q  Okay. Well, do you recall any discussions
5 with John Banker after April 2002 regarding Oracle?
6    A  I -- I -- I believe I spoke to John once. I
7 believe he may have been on the phone in one of the
8 meetings we held in our office with Ernst & Young, but
9 I don't believe I met him face-to-face during the
10 transition.
11    Q  Okay. What -- what did you -- what was
12 discussed during that meeting that he was on the
13 phone?
14    A  Transition. I mean --
15    Q  Do you recall any other -- anything that was
16 discussed during that meeting?
17    A  I don't recall specifics of the discussion.
18    Q  Okay. Do you -- do you recall discussing --
19 discussing unapplied cash at any time with anyone at
20 Ernst & Young?
21    A  No.
22    Q  Do you recall discussing debit memos at any
23 time with Ernst & Young?
24    A  No.
25    Q  Do you recall discussing this lawsuit at any

76

1 time with Ernst & Young?
2    A  Nope.
3    Q  Do you know if anybody -- well, I'll ask
4 these questions with respect to do you know if anybody
5 spoke to Ernst & Young from Andersen about this
6 lawsuit?
7    A  No.
8    Q  During the quarterly reviews of 2001, the
9 fiscal year 2001 reviews, were there any sort of
10 frequently held meetings between Andersen personnel
11 and Oracle personnel that would occur?
12    MR. SIDORSKY: Objection to form.
13    THE WITNESS: I -- I don't know what you mean
14 by "frequently held meetings."
15    MR. GREENSTEIN: Okay.
16    Q  Were there any meetings that were held on a
17 particular schedule for each quarter? In other words,
18 for the first quarter, there would be a meeting on
19 such and such date, and then another meeting on this
20 date, on another date, and that would happen for each
21 quarter?
22    A  You know, informally there were meetings. I
23 wouldn't say frequently. I would say recurring
24 meetings that would happen each quarter, yes.
25    Q  Okay. And those informal meetings, would

77

1    those be with -- do you recall any informal meetings
2    occurring during the quarters, the fiscal year 2001,
3    any of those quarters?
4        A   Well, it -- it's hard for me to understand
5    and define what you're -- what you're looking for,
6    what you mean.
7        So, for example, every -- you know, every
8    quarter when someone goes to do a discussion of
9    certain accounts, they're going to go talk to someone
10   from Oracle.  So that meeting will happen every
11   quarter.
12       You know, every quarter we're going to review
13   our revenue contracts.  So we're going to have
14   discussions with people in the Oracle group at --
15   revenue group at Oracle.  So, I mean, it -- the
16   question is very broad.
17       There will be meetings that will occur every
18   quarter as part of the either quarterly review or the
19   year-end audit
20       Q   Okay.  But what I'm asking is, were there any
21   regularly held meetings, such as audit and finance
22   committee meetings, things that were regularly held
23   during a quarter that were held every quarter?
24       MR. KONOVALOV:  Objection.
25       MR. SIDORSKY:  Objection to form.

78

1        MR. KONOVALOV:  Vague and ambiguous.
2        THE WITNESS:  Well, you mentioned the audit
3    and finance committee.  The company held an audit and
4    finance committee meeting every quarter.  That is --
5    that is true.
6        We would attend a portion of that meeting.
7    Meaning, representatives from Andersen.  Every quarter
8    we would have a quarterly sign-off meeting with senior
9    financial management on the results of our work either
10   as part of the end of the quarter or part of the end
11   of the year-end audit.
12       MR. GREENSTEIN:  Okay.
13       Q   So those quarterly sign-off meetings, when
14   would those occur?
15       Let's say for the second quarter 2001, which
16   ended November 30, 2000, when would that, quote,
17   "sign-off meeting occur," or when did it occur?
18       MR. SIDORSKY:  Objection to form.
19       THE WITNESS:  I -- I don't know the specific
20   dates.  I can tell you, in general, they occurred
21   prior to the company's quarterly or year-end earnings
22   release.
23       MR. GREENSTEIN:  Okay.
24       Q   Do you recall if it occurred a week before
25   the quarterly earnings -- actually, strike that.

79

1        When you say quarterly earnings release, do
2    you mean the actual press release which usually occurs
3    after the quarter is long past?  Or do you mean before
4    the end of the -- the physical end of the quarter?
5        A   No.  I mean the former, the quarterly
6    earnings release after the end of the quarter.
7        Q   Okay.  So do you recall if it would occur a
8    week prior to that earnings release?
9        A   It would not occur that early.  It would most
10   likely have occurred a day or two before the company's
11   earnings discussion and press release.
12       Q   Okay.  And when you said sign-off meetings,
13   what -- did you mean that Andersen had to sign off on
14   the quarterly earnings statement to the market?
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  Let's call it a -- a conclusion
17   of our work meeting.
18       MR. GREENSTEIN:  Okay.
19       Q   What would occur during that quarterly
20   meeting two days before the earnings release?
21       A   We would meet with financial management and
22   discuss the -- the observations/items we noted during
23   the course of our work.
24       Q   Okay.  Now, focusing on the quarters in
25   fiscal year 2001 with Oracle, who from Oracle would

80

1    attend those sign-off meetings?
2        MR. SIDORSKY:  Objection to form.
3        THE WITNESS:  I can tell you the people who
4    generally attended.  Whether they attended all the
5    meetings, I don't know.
6        MR. GREENSTEIN:  That's fair.
7        THE WITNESS:  But Jeff Henley would attend.
8    Jennifer Minton would attend.  Tom Williams would
9    attend by telephone.  Deborah Lange, who is the VP of
10   tax, would attend, and I believe the assistant
11   controller, Larry Garnick, would attend.  There may be
12   other people, but I think I've captured most of them.
13       MR. GREENSTEIN:  Okay.
14       Q   And those people generally would attend each
15   of the sign-off meetings for the quarters in 2001?
16       A   Generally, yes.
17       Q   Okay.  Now, who from Andersen would attend
18   those meetings?
19       A   Typically myself, the other engagement audit
20   partner, and typically the managers on the engagement.
21   So typically there would have been two managers, one
22   or two managers in attendance, and occasionally the
23   tax partner would attend as well.
24       Q   Do you remember who the other partner would
25   be during that time period?

81

1    A   During fiscal 2001, I believe it was
2  Angelica Caicedo.
3    Q   Now, during those meetings, would Oracle show
4  you a copy of the earnings press release that they
5  were going to achieve through investors?
6    A   No, not as part of that meeting.
7    Q   At any time?
8    A   We would typically look at the financial
9  information, you know, the income statement and
10  balance sheet that was going into the press release
11  for purposes of ensuring that it agreed with the
12  information that was in our work papers.
13       Oftentimes we looked at the verbiage, the
14  accompanying verbiage in the press release, but we
15  typically did not see the last draft of it, so we
16  would have looked at an earlier draft.
17    Q   When you say "the verbiage," what do you mean
18  by that?  What -- what kinds of verbiage did you
19  have -- did you review?
20    A   Well, normally in a press release there's the
21  cover sheet which includes a discussion of the summary
22  financials, you know, that Oracle released earnings
23  through the quarter, and revenues were X compared to
24  Y, and earnings were X compared to Y, and they have a
25  comment in it from some of the executives at the

82

1  company.
2    Q   Okay.  And you'd also make sure that the
3  numbers being published to invest -- to the market
4  were -- comported with the numbers that you concluded
5  as a result of your review in the work papers; right?
6       MR. SIDORSKY:  Objection to form.
7       THE WITNESS:  We would agree the information
8  in the press release to what was included in our
9  quarterly review work papers.
10       MR. GREENSTEIN:  Okay.
11    Q   Did Larry Ellison ever attend any of these
12  sign-off meetings?
13    A   No.
14    Q   Okay.  Did Sandy Sanderson ever attend any of
15  those sign-off meetings?
16    A   No.
17    Q   Okay.  Going back to finance and audit
18  committee meetings, you said you -- that Andersen
19  would come in during certain portions of the meetings;
20  right?
21    A   That's correct.
22    Q   Okay.  And what portions of the meetings
23  would they attend?
24    A   The portion where it was the report of
25  Arthur Andersen would be certainly where we would be

83

1  there.  At times we would be invited to attend other
2  portions of the meeting as well.
3       So, for example, if there was going to be a
4  presentation on tax matters and it was something they
5  wanted us there to provide input on or hear, we may
6  stay.  Sometimes there was presentation by internal
7  audit, and we may stay.
8       So it -- it wasn't necessarily consistent
9  from quarter to quarter other than we were there for
10  the portion where the report of the auditors was on
11  the agenda.
12    Q   Okay.  Did that occur on a regular basis or
13  was there -- during each quarter, how many finance and
14  audit committee meetings were there?
15       MR. KONOVALOV:  Objection; calls for
16  speculation.
17       THE WITNESS:  We -- we were invited to one
18  meeting per quarter.
19       MR. GREENSTEIN:  Q.  And was that after,
20  following the fiscal end of the quarter?
21    A   It was following the end of the quarter, and
22  following the company's earnings or press release.
23    Q   Okay.  And what was discussed?  When -- when
24  Andersen presented, what did they -- what was
25  discussed?

84

1       MR. SIDORSKY:  Objection to form.
2       THE WITNESS:  The -- in general what was
3  discussed was the highlights from the results of our
4  work.
5       MR. GREENSTEIN:  Okay.
6    Q   But why would that occur after the press
7  release already went out and earnings were already
8  published to the market?
9       MR. SIDORSKY:  Objection to form.
10       THE WITNESS:  You'd -- you'd have to ask the
11  company that.
12       MR. GREENSTEIN:  Okay.
13    Q   When you say the highlights, what do you mean
14  by that, the highlights of your work?
15    A   Well, we would have an agenda that we would
16  put together.  It was typically fairly similar to the
17  closing meeting agenda that I referenced earlier, not
18  identical, but some of the stuff was similar, and we
19  would lead a discussion to the audit committee
20  regarding observations during the course of our
21  rework.  I'm not sure what else you're looking for.
22    Q   So who would -- other than -- well, did the
23  same people that attended the -- the quarterly
24  sign-off meetings, did those people also attend the
25  audit and finance committee meetings, that you

85

1    remember, in 2001?  I'm going to be talking about the
2    2001 quarters.
3        A   Not all those people would attend the finance
4    and audit committee meeting, no.
5        Q   Okay.  Well, do you remember who the audit
6    committee was during fiscal year 2001 for Oracle?
7        A   My recollection, Mr. Lucas, Mr. Boskin and
8    Mr. Berg, if I remember right.
9        Q   And they would obviously attend those
10   quarterly -- well, generally they would be attending
11   those finance and auditing committee meetings;
12   correct?
13       A   Generally.
14       Q   Who else would typically attend those
15   meetings from Oracle?
16       A   Generally, again, Jeff Henley, Safra Catz,
17   Dan Cooperman, Jennifer Minton, Deborah Lange.  I
18   believe that the director of internal audit would
19   attend.  I don't -- I think that was Annica Magnusson
20   during that time period.  Those are the people that,
21   quote, "generally attended."
22       Q   Okay.  Did Larry Ellison ever attend any of
23   those meetings?
24       A   Nope.
25       Q   Now, you referenced the internal audit for

86

1    Oracle.  Are you aware that during fiscal year 2001
2    Oracle had an internal auditor?
3        A   They did.
4        Q   Okay.  And was Anna (sic) Magnusson, is
5    that -- was she kind of the head of the internal
6    audit?
7        A   I believe she was during that time period.
8        Q   Okay.  What's the role?  As far as you know,
9    what's the role of the internal auditor, let's say,
10   fiscal year 2001?
11           MR. KONOVALOV:  Objection; calls for
12   speculation.
13           MR. SIDORSKY:  Objection to form.
14           MR. GREENSTEIN:  Q.  Did Andersen ever work
15   with them in conducting their reviews or audit?
16       A   I don't believe that we looked at or relied
17   upon the work of internal audit as part of our work.
18       Q   Okay.  Well, what was the work of the
19   internal audit?
20           MR. KONOVALOV:  Objection; calls for
21   speculation.
22           MR. SIDORSKY:  Objection; form.
23           THE WITNESS:  Again, you'd have to ask the
24   company broadly what -- you know, what their purpose
25   was and what their scope of work was.

87

1            MR. GREENSTEIN:  Right.
2        Q   But I think you just said that you didn't
3    rely upon their work.  I'm just wondering what you
4    meant.  What didn't you rely upon?
5            MR. SIDORSKY:  Well, same objection.
6            MR. KONOVALOV:  Calls for speculation; lacks
7    foundation.
8            THE WITNESS:  The -- the -- there's a
9    question, in order for the auditor to rely on work of
10   internal audit, it would have to be something that was
11   part of the scope of our work, and they would be
12   performing it on our behalf, and we would have to then
13   test their work on a sample basis, and what I'm
14   suggesting or explaining is that we didn't do that on
15   a quarterly basis.  So our year-end audit as part of
16   the Oracle audit.
17           MR. GREENSTEIN:  Okay.
18       Q   Now, during the audit and finance committee
19   meetings, do you recall any specific discussions
20   during 2001, or the fiscal year 2001?  Any specific
21   discussions about revenue recognition issues?
22           MR. SIDORSKY:  Objection to form.
23           MR. KONOVALOV:  Vague and ambiguous.
24           THE WITNESS:  Our quarterly agenda items,
25   quarterly meeting agendas, included certain revenue

88

1    contracts that we would discuss with management.  I
2    don't know what you mean by "revenue issues," but
3    there were revenue contracts that we would typically
4    discuss with management in our closing meeting, and
5    then some of those we would discuss with the audit
6    committee.
7            MR. GREENSTEIN:  Okay.
8        Q   So you would discuss those before the
9    earnings press release went out and also discuss them
10   after the earnings press release went out in the
11   finance and audit committee meetings; right?
12           MR. SIDORSKY:  Objection to form.
13           THE WITNESS:  Yes, there were contracts we
14   would discuss as part of our closing meeting with
15   management.  Some of those may then be -- have been
16   discussed with the audit committee as well.
17           MR. GREENSTEIN:  Okay.
18       Q   Now, do you recall during fiscal year 2001
19   any specific contracts discussed at the quarterly
20   sign-off meetings?
21       A   I don't --
22           MR. SIDORSKY:  Is the terminology sign-off
23   meeting or closing meeting?  I just want to make sure
24   we're consistent.
25           MR. GREENSTEIN:  Okay.  Is that an objection?

89

1     MR. SIDORSKY:  Well, I'm trying to understand
2  if we're using the same terminology or not.
3     MR. GREENSTEIN:  Okay.  Well --
4     MR. SIDORSKY:  It's a potential objection.
5  I'm trying to be consistent.
6     MR. GREENSTEIN:  I'm sorry to say there is no
7  rule that allows you to make a potential objection,
8  but do you have an objection?
9     MR. SIDORSKY:  Well, I'm trying to be clear
10  though.  There is -- there is -- there is an
11  understanding and it's important to be clear on the
12  record, and that's what I'm trying to do; okay.  If
13  you want, I'll object to the form.  I'm suggesting we
14  should be clear.
15     MR. GREENSTEIN:  Thank you.
16     MR. SIDORSKY:  All right.
17     THE WITNESS:  So just to be clear, I would
18  call it a closing meeting.
19     MR. GREENSTEIN:  Okay.
20     Q  So during the closing meetings, do you
21  recall -- in fiscal year 2001, do you recall any
22  specific contract being discussed?
23     A  I don't recall the specifics of any
24  particular contract.
25     Q  Okay.  But I'm asking if you recall a

90

1  discussion of any contract -- not the specifics of any
2  contract -- of any contract during those closing
3  meetings?
4     A  Okay.  Let me answer it this way:  When I
5  reviewed yesterday some of the work papers, they
6  contained audit committee agendas, audit and finance
7  committee agendas for Arthur Andersen's presentation.
8  There were contracts that were referenced in there
9  that were part of our agenda.
10     As I was looking at those, I do recall some
11  of those contracts, and I recall that they would have
12  been contracts we would have discussed.
13     Q  Okay.  And what contracts were those?
14     MR. SIDORSKY:  Objection to form.
15     THE WITNESS:  You mentioned HP earlier.  I
16  know that was on one of the agendas.  I don't recall
17  specifically what other contracts would be on there.
18     MR. GREENSTEIN:  Okay.
19     Q  So other than the closing meetings and the
20  audit and audit committee and finance meetings, were
21  there any other regularly scheduled meetings that
22  occurred every quarter during fiscal year 2001?
23     MR. KONOVALOV:  Objection; calls for
24  speculation.
25     MR. SIDORSKY:  Objection to the extent it's

91

1  already been covered and answered.
2     THE WITNESS:  You know, again, I don't know
3  what you mean by regularly scheduled meetings.
4     MR. GREENSTEIN:  Q.  Yeah.  I don't -- I
5  don't mean informal conversations that would happen
6  during the course of a review.  I'm just talking
7  about, you know, a meeting that is regularly held like
8  the closing meetings and like the finance and audit
9  committee meetings.
10     MR. KONOVALOV:  Involving Andersen?
11     MR. GREENSTEIN:  Yes.
12     MR. KONOVALOV:  Okay.
13     THE WITNESS:  Formal meetings, no.  I mean,
14  we would meet with, for example, Jennifer Minton
15  typically and Tom Williams to prepare for the closing
16  meetings.  The -- you know, the closing meeting we
17  would have with Jeff.
18     So we would walk through some of the agenda
19  items with them, so we didn't walk into the meeting
20  and them not know what was on our agenda.  So, again,
21  that's -- that's why I have difficulty answering your
22  question, because yes, we would meet with people in
23  advance of that.  Yes, we would meet with people to go
24  through the results of our revenue or contract
25  testing.  It all leads up to the final closing

92

1  meeting.
2     Q  Okay.  So when you -- the -- the meetings
3  that you are talking about with Minton and
4  Tom Williams that occurred before you met with
5  Jeff Henley, were those -- were those meetings held
6  each of the quarters in fiscal year 2001?
7     A  There would have been various meetings with
8  Jeff and Tom -- excuse me -- Jennifer and Tom
9  throughout the quarter, yes.
10     Q  Well, meetings --
11     A  Informal meetings.
12     Q  Right.
13     Without Jeff Henley; correct?
14     A  Yes.
15     Q  And is that because the meeting -- is that
16  because Jeff Henley only attended the -- the closing
17  meetings?
18     MR. SIDORSKY:  Objection to form.
19     MR. KONOVALOV:  Misstates the witness's
20  testimony.
21     THE WITNESS:  I don't know.
22     MR. GREENSTEIN:  Q.  Did you ever have
23  meetings with Jeff Henley of the type that you're
24  talking about with Jennifer Minton and Tom Williams?
25     MR. SIDORSKY:  Objection to form.

93

1       THE WITNESS:  Not that I recall.
2       MR. GREENSTEIN:  Okay.
3     Q  So is it fair to say that Jeff Henley
4   attended, or, as far as you know, the only meetings
5   that Jeff Henley would attend would be the closing
6   meetings and the finance and audit committee meetings?
7       MR. SIDORSKY:  Objection.
8       MR. GREENSTEIN:  Q.  Is that fair to say?
9     A  Yeah.
10      MR. KONOVALOV:  Misstates the witness's
11  testimony.
12      THE WITNESS:  The -- the formal interaction
13  between Andersen and Jeff Henley at Oracle consisted
14  of the quarterly closing meeting and the finance and
15  audit committee meeting; okay.  I'm just trying to be
16  clear on, you know, the formal regularly scheduled
17  meetings.
18      MR. GREENSTEIN:  That's exactly what I wanted
19  to know.
20    Q  So other than those two meetings, there
21  weren't, as far as you know, regularly scheduled
22  meetings between Andersen and Oracle, other than
23  the -- the informal-type meetings you had with
24  Jennifer Minton?
25      MR. SIDORSKY:  Objection to form.

94

1       THE WITNESS:  I can't provide any more
2   clarification than I already have.
3       MR. GREENSTEIN:  Okay.
4     Q  Were there any other meetings where Andersen
5   would do formal presentations to Oracle?
6     A  Not as part of our normal quarterly review
7   work or year-end audit work.
8     Q  Okay.  I'd like to mark this as Matuszak
9   No. 1.  For the record -- well....
10      (Document marked Exhibit No. 1
11       for identification.)
12      MR. GREENSTEIN:  Q.  For the record, this is
13  a January 5th, 2001 -- appears to be a finance and
14  audit committee meeting agenda.  It's Bates stamped
15  NDCA-ORCL 081711 through 081814.
16      I'm actually going to direct your attention
17  to certain pages.  So you don't have to look through
18  the whole thing.  You can thumb through it.
19      The way this was produced, it appears there
20  was tabs attached to this, and all these documents
21  were part of this packet.
22      MR. SIDORSKY:  For the record, could you just
23  tell us who produced these documents?
24      MR. GREENSTEIN:  Oh, any -- any document that
25  bears the NDCA-ORCL Bates stamp were produced by

95

1   Oracle.
2     Q  So if you can just generally look at the
3   first two pages.
4     A  You're referring to page 12 and 13?
5     Q  Yeah.
6     A  Excuse me.  Okay.
7     Q  Looking at page 13, so are these -- does this
8   document -- was this the type -- or have you ever seen
9   this document before?
10    A  I believe I may have seen it yesterday, but
11  prior to that, no.
12    Q  Okay.  Did you receive these types of
13  documents before finance and audit committee meetings?
14    A  I did not receive the -- Andersen did not
15  receive the contents and everything went to that audit
16  finance committee.
17    Q  Okay.  And if you turn to the Bates stamp
18  ending in 13, see how it says "Finance and Audit
19  Committee Meeting Agenda" at the top?
20    A  Yes.
21    Q  You see it's January 5th, 2001; right?
22    A  Uh-huh.
23    Q  So is it fair to say that this -- since the
24  quarter -- the second quarter fiscal year 2001 ended
25  on November 30th, is this -- is this the agenda for --

96

1   for the presentation on that quarter?
2       MR. KONOVALOV:  Objection; lacks foundation.
3       THE WITNESS:  Well, it would have been the
4   presentation that we gave for the results of our Q2
5   review.  What else was discussed at the meeting, I
6   would be speculating.
7       MR. GREENSTEIN:  Okay.
8     Q  Now, do you recall this meeting?
9     A  I don't recall the meeting specifically, no.
10    Q  But is this the type of meeting where you
11  were describing earlier where Andersen would come in
12  and make a presentation and maybe stay for parts of
13  the meeting but wouldn't attend the whole meeting?
14    A  That's correct.
15    Q  Okay.  And you see there kind of halfway down
16  the page it says Arthur Andersen LLP Q2 fiscal year
17  '01 review?  You see that?
18    A  Yes.
19    Q  And do you see your name there?
20    A  Yes.
21    Q  And it looks like it -- well, it looks like
22  there is a time there.  Approximately -- well, a
23  little less than an hour.  Maybe 45 minutes; you see
24  that?
25    A  Yes.

97

1    Q  Okay.  Do you recall -- well, what does the
2  Q2 fiscal year '01 review -- what does that mean?  Do
3  you know?
4    A  That would have been the results of the
5  review that we perform for the quarter ending
6  November 30th, 2001.
7    Q  Okay.  Let me back up a little bit.  I'm
8  going to jump around a little bit.
9      The representation letters that you testified
10  about earlier, were those -- did you see any of those
11  in the documents you reviewed yesterday?
12    A  I did not.
13    Q  Okay.  Now, looking at this document ending
14  Bates 13, do you recall making a presentation on
15  January 5th, 2001, about the second quarter fiscal
16  year review?
17    A  If you're asking whether I specifically
18  recall, have recollection of the meeting, no.  If
19  you're asking me whether I attended this meeting, I
20  believe I did.
21    Q  Okay.  Do you remember making a slide
22  presentation to the attendees of this meeting on or
23  around January 5th, 2001?
24    A  If I looked at the slide presentation, I
25  could tell you.

98

1    Q  So without looking at the slide presentation,
2  do you remember any specifics about what you discussed
3  during that presentation?
4    A  No.
5    Q  Okay.  You see how there it says "Auditor
6  Independence" under Q2 fiscal '01 review?
7    A  Yes.
8    Q  Did you present on a topic regarding "Auditor
9  Independence" on or about January 5th, 2001?
10    A  I don't recall.
11    Q  Okay.  You see down there it says internal
12  audit quarter two, fiscal year '01 operations review?
13    A  Uh-huh.
14    Q  And the audit schedule progress, and then
15  it's presented -- well, appears to be presented by
16  Annica Magnusson; you see that?
17    A  Yes.
18    Q  She was the head of internal audit at Oracle?
19    A  I believe at the time that's correct.
20    Q  Okay.  Did you attend this portion of that
21  meeting, this presentation?
22    A  I don't recall.
23    Q  But generally it's talking about the audit
24  schedule progress.  So is it fair to say that
25  typically if that was being discussed, Andersen would

99

1  attend?
2    MR. SIDORSKY:  Objection to form.
3    MR. KONOVALOV:  Objection; lacks foundation;
4  calls for speculation; the document speaks for itself.
5    THE WITNESS:  Do I need to answer?
6    MR. SIDORSKY:  You should answer.
7    THE WITNESS:  I believe that what's
8  referenced under here is internal audit.  So they're
9  talking about the internal audit Q2 FY '01 operating
10  review in the internal audit schedule, not the
11  Andersen audit schedule.
12    MR. GREENSTEIN:  Okay.
13    THE WITNESS:  So no, I did not, would not
14  have been there for that.  Would not be required to be
15  there for that.
16    MR. GREENSTEIN:  Okay.
17    Q  So do you recall in any of these -- in any
18  quarterly finance and audit committee meeting ever
19  listening to a presentation made by Annica Magnusson?
20    A  I believe that we attended meetings where she
21  presented after us, and we would stay in while she was
22  presenting.
23    Q  Okay.
24    THE VIDEOGRAPHER:  I need to change the tape.
25    MR. GREENSTEIN:  Oh, he's got to change the

100

1  tape, so take a five-minute break.
2    Go off the record.
3    THE VIDEOGRAPHER:  We are going off the
4  record.  Here marks the end of videotape number one,
5  Volume I, in the deposition of Gary Matuszak.
6    (Short break taken.)
7    THE VIDEOGRAPHER:  We are back on the record.
8  The time is 11:28 a.m.  here marks the beginning of
9  videotape number two, Volume I, in the deposition of
10  Gary Matuszak.
11    MR. GREENSTEIN:  Q.  So, Mr. Matuszak, we
12  were looking at what's been marked as Matuszak No. 1,
13  which is a January 5th, 2001, finance and audit
14  committee meeting packet of documents.
15      It looks to be a briefing package, and we
16  were focused on Bates page 081713, and we were talking
17  about the issue there where it said Arthur Andersen
18  LLP Q2 fiscal '01 review; do you see that there?
19    A  Yes.
20    Q  Okay.  Do you recall during that second
21  quarter fiscal year '01 review, do you recall ever
22  presenting any issues discussing revenue recognition
23  in the second quarter?
24    MR. KONOVALOV:  Objection; vague and
25  ambiguous.

101

1      MR. SIDORSKY:  Objection to form.
2      THE WITNESS:  I recall discussing -- well,
3  let me rephrase that.
4      We would have normally discussed revenue
5  contracts during our meetings with the audit
6  committee.  So if you're asking whether we discussed
7  revenue contracts, the answer would be yes.  Again,
8  you -- you used the term "revenue issues," and I'm not
9  sure what that refers to
10     MR. GREENSTEIN:  Okay.
11     Q  Well, if you turn to page -- actually turn to
12  page 081715, and actually this appears to be minutes
13  of the previous audit and finance committee meeting
14  from the -- from the first quarter.  See how it's
15  dated October 13th, 2000?  Do you see that?
16     A  Yes.
17     Q  And if you look down on point number five,
18  you see it says "Arthur Andersen LLP"?
19     A  Yes.
20     Q  It says "Gary Matuszak and Guy Johnson from
21  Arthur Andersen LLP joined the meeting and presented
22  information about the results of their audit of the
23  Company's financial statements for the quarter ended
24  August 31, 2000."
25     Do you see that?

102

1      A  Yes.
2      Q  So this appears to be minutes from a meeting,
3  finance and audit committee meeting, for the first
4  quarter where you and Guy Johnson presented on the
5  results of the first quarter of '01; right?
6      MR. KONOVALOV:  Objection; lacks foundation.
7      THE WITNESS:  Yes, it -- it would have been.
8  It is what it says.  We -- we presented the results of
9  our quarter for the -- it says "results of their audit
10  for the quarter."  That's incorrect.  It would have
11  been results of the review for the quarter.
12     MR. GREENSTEIN:  Okay.
13     Q  So that language where it says "their audit"
14  is not right, because Andersen didn't perform an audit
15  of that quarter; right?
16     A  That's correct.
17     Q  Well, sorry.  At this time, there hadn't been
18  done an audit of this quarter, but eventually there
19  would in connection with your fiscal year 2001 audit;
20  right?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  That's not technically correct
23  either.
24     MR. GREENSTEIN:  Q.  Well, as part of the --
25  as part of the year-end fiscal 2001 audit, you looked

103

1  at the first quarter.  You audited the first quarter
2  fiscal year 2001; right?
3      MR. KONOVALOV:  Objection; assumes facts.
4      MR. SIDORSKY:  Objection to form.
5      Yeah, assumes facts not in evidence, and
6  incorrect facts.
7      THE WITNESS:  Again, that's not correct.
8      MR. GREENSTEIN:  Okay.
9      Q  So as part of the fiscal year 2001 audit of
10  Oracle's financial statements, did Andersen audit the
11  results of the first quarter of 2001?
12     A  No, we did not.
13     Q  Okay.  As -- and why is that?
14     MR. SIDORSKY:  Objection to form.
15     THE WITNESS:  We do not audit the quarters
16  within the year.
17     MR. GREENSTEIN:  Okay.
18     Q  So as part of the year-end audit, do you go
19  back and review all of the different quarters?
20     MR. SIDORSKY:  Objection to form.
21     THE WITNESS:  The -- the quarterly reviews
22  are performed concurrent with the end of the quarter.
23  When that quarter is finished, we're done with the
24  work on that quarter.  It's a quarterly review.  Not
25  an audit.

104

1      Our audit is for the fiscal year ending, in
2  this case, May 31, 2001.  There is never an audit
3  performed on quarters.
4      MR. GREENSTEIN:  Right.  Understood.
5      Q  What I'm asking is, during the audit, the
6  fiscal year-end audit, is there any analysis?  Do you
7  go back and do any analysis of each individual
8  quarter?
9      MR. SIDORSKY:  Objection to form.
10     THE WITNESS:  No, I don't believe so.
11     MR. GREENSTEIN:  Q.  So -- so during -- let's
12  take the fiscal year 2001 audit for Oracle.
13     In performing that audit, Andersen didn't go
14  back and review the first quarter, second quarter, or
15  third quarter, or fourth quarter results?
16     MR. SIDORSKY:  Objection to form.
17     THE WITNESS:  Not as part of the -- the
18  year-end audit.
19     MR. GREENSTEIN:  Okay.
20     Q  But you do do an analysis of the fourth
21  quarter, right, because you didn't do a quarterly --
22  it's wrapped up in the audit?  That review of the
23  fourth quarter hasn't been done as it was with the
24  three previous quarters; right?
25     MR. SIDORSKY:  Objection to form.

105

1     MR. KONOVALOV:  Vague and ambiguous.
2     THE WITNESS:  As -- as part of the audit
3  testing on Q4, auditors will normally perform some
4  type of quarter-to-quarter variation analysis, but
5  we're already looking at the May 31st financials
6  information, the year-end financial information and
7  auditing that information, and so that's more in scope
8  than review, so it becomes somewhat redundant.
9     MR. GREENSTEIN:  Q.  So during the fiscal
10  year 2001 audit, did Andersen review the quarterly
11  work papers as part of that audit?
12     MR. SIDORSKY:  Objection to form.
13     THE WITNESS:  I'm trying to be as clear as I
14  can.  We -- we perform what is called a timely review
15  of the interim financial statements.  Meaning, we
16  perform that review when the quarter ended.
17     So we performed it in September for the
18  August quarter, December for the November quarter.
19  That work is completed, and we -- we do not go back
20  and look at those quarters as part of our audit work.
21     MR. GREENSTEIN:  Okay.
22     Q  But what I was asking was as part of
23  Andersen's audit, year-end audit, fiscal year 2001 of
24  Oracle, did Andersen go back and look at the quarterly
25  review work papers?

106

1     MR. SIDORSKY:  It's been asked about three
2  times now.  Objection; objection to form.
3     THE WITNESS:  Not for purposes of looking at
4  reassessing the results of the quarterly reviews.
5     MR. GREENSTEIN:  Okay.
6     Q  For what purposes would Andersen look at
7  those work papers?
8     MR. SIDORSKY:  Object; objection to form.
9     THE WITNESS:  It is customary practice to
10  have work papers with you in the field, prior
11  quarter's work papers, the prior year's work papers
12  in the event that you want to refer to something from
13  a prior period.
14     So the work papers would have been there.
15  Would someone have referred to them?  I can't tell you
16  that nobody opened up those work papers during the
17  course of our audit, but we would have not formally
18  looked at them for purposes for reassessing the
19  results from prior quarters.
20     THE VIDEOGRAPHER:  Counsel, pardon me.  Your
21  Blackberry is just starting to really -- I'm sorry.  I
22  don't know why.
23     MR. KONOVALOV:  It hasn't moved.
24     THE VIDEOGRAPHER:  It's increased in volume.
25  I'm very sorry, but if I don't, you know --

107

1     MR. KONOVALOV:  Okay.
2     THE VIDEOGRAPHER:  -- correct it.  Sorry.
3     MR. SIDORSKY:  Wouldn't want to do this
4  again.
5     MR. GREENSTEIN:  Q.  So as part of the fiscal
6  year 2001 audit of Oracle, Andersen reviewed the --
7  did an assessment of the quarterly financial
8  statements for the fourth quarter; right?
9     MR. SIDORSKY:  Let me hear that question,
10  please.
11     THE WITNESS:  Yes, I understood --
12     MR. SIDORSKY:  Could I hear that before you
13  answer.  I want to hear the question, yeah.
14     (Whereupon, record read by the Reporter as
15  follows:
16     "Question:  So as part of the fiscal year
17     2001 audit of Oracle, Andersen reviewed
18     the -- did an assessment of the quarterly
19     financial statements for the fourth quarter;
20     right?")
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  There's very limited work or
23  little work that's done actually on the fourth quarter
24  of the fiscal year because of the fact that we're
25  already auditing the balance sheet information as of

108

1  that date, and we've already reviewed the balance
2  sheet and results for the prior quarter.
3     MR. GREENSTEIN:  Q.  For the third quarter;
4  right?
5     A  Yeah.
6     Q  Well, how do you ensure that the earnings
7  results and the income statement, the -- the numbers
8  on the income statement which are not -- which are
9  different than the items on a balance sheet -- how do
10  you ensure that those numbers are accurate for the
11  fourth quarter if you don't do any assessment of them?
12     MR. SIDORSKY:  Objection.
13     MR. KONOVALOV:  Objection; vague and
14  ambiguous.
15     MR. SIDORSKY:  Yeah, objection to form.  It
16  really mischaracterizes the witness's testimony and
17  the --
18     MR. GREENSTEIN:  I'll reask the question.
19     MR. SIDORSKY:  Okay.
20     MR. GREENSTEIN:  Q.  You just talked about
21  the balance sheet, and I'm asking whether during
22  fiscal year 2001 audit of Oracle, did Andersen do any
23  sort of assessment of the earnings of Oracle during
24  the fourth quarter?
25     A  Very limited.

109

1  Q  So -- but in prior quarters, let's say the
2  second quarter, quarterly review fiscal year 2001, did
3  Andersen do an assessment of the earnings in that
4  quarter?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  I think I stated we performed
7  timely quarterly reviews.  So we would have performed
8  a quarterly review for the August quarter, the
9  November 2000 quarter, and the February 2001 quarter,
10  and we would have performed those reviews prior to the
11  company issuing their earnings press release after the
12  end of the quarter.
13     MR. GREENSTEIN:  Q.  So would you perform the
14  same type of timely quarterly review of the fourth
15  quarter prior to the earnings press release coming out
16  for the fourth quarter and fiscal 2001 results?
17     A  We performed an -- an audit of the year-end
18  numbers, okay.  So there's really not a lot more to do
19  for the fourth quarter.
20     Q  Okay.  But --
21     A  And those numbers don't show up in a -- in a
22  public filing.  It's not -- you don't file a 10-Q for
23  your fourth quarter.
24     Q  Right.  But --
25     A  You file your audit information for the year

110

1  end.
2      Q  Sorry.
3      But when you issue the earnings press
4  release, doesn't Oracle break out its fourth quarter
5  earnings results, its revenues for that quarter, and
6  its earnings for that quarter?  Doesn't it
7      MR. SIDORSKY:  Objection to form.
8      MR. KONOVALOV:  Lacks foundation.
9      THE WITNESS:  You're asking me a factual
10  question.  Yes, they break the quarterly results out
11  in their -- in the company's press release, that's
12  correct.
13     MR. GREENSTEIN:  Right.
14     Q  For the fourth quarter?  And they did that
15  for the fourth quarter 2001; right?
16     A  Presumably, yes.
17     Q  Because they do it every quarter; right?
18     A  That's why I said, "Presumably, yes."
19     Q  All right.
20     So -- and you said before that, before the
21  earnings press releases went out, typically Andersen
22  would meet with Oracle in those closing meetings to
23  discuss the press release and the numbers, the
24  quarterly numbers in it; right?
25     MR. SIDORSKY:  Objection to form; asked and

111

1  answered.
2      THE WITNESS:  We would meet with management
3  and go over the results of our work.  So in May we
4  would meet with management and walk through the
5  results of our audit testing for the fiscal year
6  ending May 31st.
7      MR. GREENSTEIN:  Okay.
8      Q  But earlier you said during a particular
9  quarter, say, second quarter 2001, Andersen would meet
10  with Oracle and go over the second quarter results as
11  reflected in a public press release before the press
12  release went out; right?
13     MR. SIDORSKY:  Objection to form.
14     THE WITNESS:  We -- well, we would meet with
15  management and go through the results of our work,
16  which were testing either through review or audit of
17  the financial statements for that period, yes.
18     MR. GREENSTEIN:  Right.
19     Q  But I think you said you also looked at the
20  numbers, the actual results, and made sure that it
21  comported with the testing work that you did and the
22  work paper, the quarterly work papers --
23     MR. KONOVALOV:  Objection --
24     MR. GREENSTEIN:  Q.  -- right?
25     MR. SIDORSKY:  -- misstates the witness's

112

1  testimony.
2      MR. SIDORSKY:  And objection; the record --
3  the record speaks for itself.  You're really trying to
4  now --
5      MR. GREENSTEIN:  Q.  Did you --
6      MR. SIDORSKY:  -- restate the record.
7      MR. GREENSTEIN:  Q.  -- did you state that
8  during these closing meetings, Andersen would meet
9  with Oracle and look at the quarterly press release
10  and the numbers in it and make sure that it comported
11  with your testing of the quarter and the work papers?
12     MR. SIDORSKY:  It's --
13     MR. GREENSTEIN:  Q.  -- for that quarter?
14     MR. SIDORSKY:  -- not a proper question.
15  Either he did or he didn't.  It's reflected on the
16  record.
17     MR. GREENSTEIN:  That's not a proper
18  objection.  I just asked a question.  That has nothing
19  to do with prior questions.  I just asked a specific
20  question.  So if you have an objection, make it.
21     I didn't refer to a previous question.  I
22  asked a specific question.
23     Can you read it back?
24     MR. SIDORSKY:  I don't think it's a proper
25  question to ask someone, did you state earlier in the

113

1 deposition this or that?  I mean he either did or
2 didn't.  You should move on.
3     MR. GREENSTEIN:  What's the -- what's the
4 objection?
5     MR. SIDORSKY:  Ask a question.  Ask a -- ask
6 a -- ask a question.
7     MR. GREENSTEIN:  I did.  I'm asking you what
8 objection under the Federal Rules of Civil Procedure
9 are you making with respect to that question?
10     MR. SIDORSKY:  That it's been asked and
11 answered.  It's been asked and answered several times.
12 It's on the record what the test -- the witness's
13 testimony is.
14     MR. GREENSTEIN:  Okay.  Again, I'm going to
15 ask that you don't make long, speaking objections,
16 because I don't want to have to bring Mr. Matuszak
17 back to the extent that it's wasting time.
18     Can you -- can you read the question back,
19 please.
20     (Whereupon, record read by the Reporter as
21 follows:
22     "Question:  Did you state that during these
23         closing meetings Andersen would meet with
24         Oracle and look at the quarterly press
25         release and the numbers in it and make sure

114

1         that it comported with your testing of the
2         quarter and the work papers?")
3     MR. SIDORSKY:  All right.
4     So just for the record, I'm objecting to the
5 form.  I'm actually suggesting that we move on and
6 make some progress, but you can answer the question
7 certainly.
8     THE WITNESS:  Okay.  So let me -- let me be
9 clear, because I don't know if what you said is what I
10 said.  I don't believe what you said is accurate.
11     We would have our quarterly closing meeting,
12 okay.  We didn't, as part of that closing meeting, tie
13 information from the press release into financial
14 data.  Separately from that closing meeting, we would
15 receive a copy of the company's press release.
16     Prior to the press release going out, we
17 would take the press release and physically tick
18 information in there to the consolidating or
19 consolidated lead schedules that were in our quarterly
20 review work papers, and so....
21     MR. GREENSTEIN:  Q.  But wouldn't you discuss
22 the -- the result -- the actual financial results in
23 the press release?  Didn't you say -- well, would you
24 discuss, during those closing meetings with Oracle,
25 those numbers and whether they were accurate or not?

115

1     A  We would discuss results for the quarter.  We
2 typically didn't bring the financial statements or
3 press release or anything into the meeting with us.
4 We would have our agenda which would include a summary
5 of the results of our work.  It would not include
6 sitting down in the, you know, closing session with
7 Jeff and talking about revenues, operating expenses,
8 balance sheet items.  No, we would not do that.
9     Q  Okay.  Well, when you made those tick marks
10 on the press release, where -- were you making those
11 by nonfinancial statements made in the press release
12 or were you making them ticking off the financial --
13 the actual financial information in it, or both?
14     MR. SIDORSKY:  Objection to form.
15     MR. KONOVALOV:  Vague and ambiguous.
16     THE WITNESS:  I don't know what you mean by
17 financial versus nonfinancial, so let me explain to
18 you what we did.
19     MR. GREENSTEIN:  Okay.
20     THE WITNESS:  Which is the balance sheet and
21 income statement would be tied into our work papers,
22 and if the summary verbiage on the press release
23 included a revenue number, or net income number, or
24 earnings per share number, we would physically check
25 those.  It's a clerical check of the press release.

116

1 We would check those into our work papers.
2     MR. GREENSTEIN:  Okay.
3     Q  Let's take revenue, for example.
4     If the press release said Oracle earned two
5 billions dollars in revenue for a particular quarter,
6 okay, what -- would you -- would you -- and -- would
7 you tick off that number?
8     A  Typically it would be checked into our work
9 papers, yes.
10     Q  Right.
11     Because you would -- you would -- you would
12 make sure that the number that was actually in the
13 press release comported with the numbers in the
14 quarterly work papers; right?
15     A  Yeah.  Agree to the numbers in the company's
16 books and records, a copy of which the consolidating
17 income statement or consolidated income statement -- a
18 copy of which would be in our work papers.
19     Q  Okay.  Now, for the fourth quarter, did you
20 do that same -- strike that.
21     Was the process the same for the fourth
22 quarter?
23     A  In the fourth quarter, we would tie in the
24 year-to-date information, and we most likely had a
25 schedule in our work papers that calculated the fourth

117

1 quarter separate earnings release by, you know, a
2 company prepared schedule that would have calculated
3 what the fourth quarter was, or a summary of the four
4 quarters for the year that you could have derived the
5 fourth quarter stand alone earnings.
6     Q  So there was some type of assessment done of
7 the fourth quarter revenues and earnings as part of
8 the audit --
9         MR. SIDORSKY:  Objection.
10        MR. GREENSTEIN:  Q.  -- is that fair to say?
11        MR. SIDORSKY:  Objection to form.
12        THE WITNESS:  I think I stated earlier that
13 was a very high-level assessment of just looking at
14 the fourth quarter, and I don't recall what that would
15 have been, but it's very limited.
16        MR. GREENSTEIN:  Okay.
17     Q  But as part of the audit, you're auditing
18 the -- the 2001 total revenues for the company; right?
19        MR. SIDORSKY:  Objection to form.
20        MR. KONOVALOV:  Objection; vague and
21 ambiguous.
22        THE WITNESS:  Well, we issue an opinion on
23 the financial statements as a whole.  We don't issue
24 an opinion on revenue, or any single line item, or any
25 single footnote in any of the statements.  So our

118

1 opinion is issued on the consolidated financial
2 statements of Oracle.
3        MR. GREENSTEIN:  Right.
4     Q  And the consolidated financial statements --
5 well, the consolidated income statement for the year
6 includes the revenues and earnings from the fourth
7 quarter; right?
8     A  It includes a revenue earnings for all four
9 quarters.  It includes it for the year.  So yes it
10 includes it for the fourth quarter.
11     Q  Right.
12        So?
13     A  Our audit opinion does not cover the fourth
14 quarter earnings.  Our audit opinion covers the
15 consolidated financial statements for the year.
16     Q  Right.
17        So it covers the total revenues and earnings,
18 the total consolidated income statement numbers for
19 the year?
20     A  That's correct.
21     Q  Okay.  And based on your work at Oracle, was
22 the fourth quarter the quarter in which there were --
23 Oracle generated the most revenues for the year?
24     A  Historically, Oracle's revenue in the fourth
25 quarter was larger than it was in the other quarters

119

1 within that fiscal year.
2     Q  Okay.  During -- during the fiscal 2001
3 year-end audit, did Andersen perform any comparison
4 between a balance in an account in the fourth quarter
5 as compared to what it was in the third quarter?
6        MR. SIDORSKY:  Can -- can I hear that
7 question again?  Sorry.
8        (Whereupon, record read by the Reporter as
9 follows:
10 "Question:  Okay.  During -- during the
11     fiscal 2001 year-end audit, did Andersen
12     perform any comparison between a balance in
13     an account in the fourth quarter as compared
14     to what it was in the third quarter?")
15        THE WITNESS:  I don't recall specific
16 schedules.  But, in general, we would have done some
17 comparative analysis that would have looked at Q4
18 versus Q3 or, you know, prior year Q4.
19        MR. GREENSTEIN:  Q.  You know, the variance
20 or the changes between the -- the -- the balance at
21 the end of the third quarter and the balance at the
22 end of the fourth quarter, you do some kind of
23 assessment of that generally; right?
24        MR. SIDORSKY:  Objection to form.
25        THE WITNESS:  I believe some level of review,

120

1 yes.
2        MR. GREENSTEIN:  Q.  And by some level, do
3 you mean high-level review?
4     A  Yes.
5     Q  Okay.  Do you know what account 25005 at
6 Oracle was during that time?
7     A  I recall what it is based upon some review of
8 information I did yesterday.
9     Q  Okay.  Now, did that refresh your
10 recollection about any analysis performed back in --
11 during the audit of 2001, an analysis of the changes
12 in the 25005 account from the third quarter to the
13 fourth quarter?
14        MR. SIDORSKY:  Objection to form.
15        MR. KONOVALOV:  Assumes facts not in
16 evidence.
17        THE WITNESS:  Did not refresh my memory on
18 specifics.
19        MR. GREENSTEIN:  Q.  Did it refresh your
20 memory generally about any analysis performed on --
21 during the audit of the 25005 account and the variance
22 between the third quarter and the fourth quarter?
23     A  No.
24     Q  Okay.  If you turn to -- I'd like to direct
25 your attention to Bates 081752.  And, for the record,

121

1   this appears to be a slide presentation.  It has
2   Arthur Andersen on the top.  It says "Audit Committee
3   Meeting January 5, 2001."
4        Actually it goes -- it appears that it
5   goes -- well, I'll just direct your attention to that
6   page ended 752, and I'll take you through the pages
7   that I want you to look at.
8      A  Okay.
9      Q  So if you look at the -- well, have you seen
10   this?
11        Well, if you flip through, it appears to be a
12   slide presentation made by Arthur Andersen at the
13   finance and audit committee meeting; am I correct?  Is
14   that right?
15      A  Yes.
16      Q  Have you seen this slide presentation before?
17      A  I did.
18      Q  Did you make this slide presentation to
19   Oracle?
20      A  Most likely I did.
21      Q  All right.
22        Is this the -- is this kind of the standard
23   presentation that you would make during each -- during
24   the finance and audit committee meetings in the
25   quarters fiscal year 2001?

122

1        MR. SIDORSKY:  Objection to form.
2        THE WITNESS:  This looks familiar in terms of
3   the overall format and the content of what we would
4   cover in our quarterly meetings with the audit
5   committee.
6        MR. GREENSTEIN:  Okay.
7      Q  And it appears that it was made on
8   January 5th, 2001; right?
9      A  That's correct.
10      Q  So that would be -- well, if you turn to the
11   next page, 081753, see how it says "Results of Second
12   Quarter Review"?
13      A  Yes.
14      Q  And it says "Overall Results.  No adjustments
15   proposed"; do you see that?
16      A  Yes.
17      Q  What is -- okay.  What does that mean, "No
18   adjustments proposed"?
19      A  That means that as part of our quarterly
20   review, we did not come up with any differences
21   between what the company recorded in the financial
22   statements and what we felt should have been recorded
23   in the quarterly financial statements.  So we didn't
24   propose an adjustment to -- reflect changes in the
25   financial statements.

123

1      Q  So no adjustment was made to the final
2   numbers that Oracle presented as part of their
3   earnings press release at the end of the quarter --
4        MR. SIDORSKY:  Objection --
5        MR. GREENSTEIN:  Q.  -- right?
6        MR. SIDORSKY:  -- to form.
7        THE WITNESS:  I think that's -- yes, that's
8   correct.
9        MR. GREENSTEIN:  Q.  So, in other words,
10   the -- does that mean that during those closing
11   meetings when you -- when you're discussing the
12   quarter -- the quarterly results, financial results,
13   that Andersen didn't have any adjustments to those
14   results that were in that press release?
15        MR. SIDORSKY:  Objection to form.
16        THE WITNESS:  I -- yes, I believe that's
17   correct based on your -- your question.
18        MR. GREENSTEIN:  Okay.
19        THE WITNESS:  We did not propose adjustments
20   to change the balance sheet or income statement
21   presented in the press release.
22        MR. GREENSTEIN:  Q.  Well, is that -- is that
23   just the balance sheet and the income statement, or
24   does that mean any -- any information, any financial
25   information in the press release?

124

1        MR. SIDORSKY:  Objection to form.
2        THE WITNESS:  Well, this review is the result
3   of our quarterly review which entails the balance
4   sheet and the income statement.  The information in
5   the press release is the company's information, not
6   ours.  We don't have responsibility with respect to
7   the press release.
8        MR. GREENSTEIN:  Q.  But you tick -- you go
9   through the information and tick it, and you help
10   craft the language/the verbiage, as you said, in the
11   press release before it goes out; right?
12        MR. SIDORSKY:  That is not what he said, and
13   I'm going to object to rehashing what has been clearly
14   been stated on the record now several times that you
15   persist in going back over and misstating, so --
16        MR. GREENSTEIN:  I'll withdraw the question
17   so you don't continue to talk.
18        MR. SIDORSKY:  Yeah.
19        MR. GREENSTEIN:  Q.  Do you see on 081753,
20   the second -- kind of the second prong of the overall
21   results.  You see where it says "Quality of Earnings
22   discussion - no issues"?
23      A  I do see that.
24      Q  What does that mean?
25      A  My recollection is at some point in time

125

```
1    there became a requirement under the AICPA or some
2    standard for the auditor to discuss with management
3    the overall quality of earnings as part of our
4    discussion with the audit committee.  I don't remember
5    if it was AICPA or who it came from.
6         So that is the intent of this bullet, to
7    address that requirement, to have a general discussion
8    with the audit committee regarding the quality of
9    earnings.
10   Q   And when it says "no issues," does that mean
11   that Andersen is representing that the -- that there
12   are no issues with respect to the quality of earnings?
13   A   What it means is based upon the -- your
14   limited review of that quarter, we did not become
15   aware of any quality of earnings issues.  Doesn't mean
16   there were or weren't any, it just means as a result
17   of our work we didn't become aware of any.
18   Q   Okay.  At this time, after this presentation,
19   did you ever become aware of any issues?
20        MR. SIDORSKY:  Objection to form.
21        THE WITNESS:  On this quarter?  On what?
22        MR. GREENSTEIN:  Q.  On this quarter.
23   A   No.
24   Q   Okay.  On any quarter?
25   A   No.
```

126

```
1    Q   Well, why did, when I asked that question,
2    you said, "On this quarter"?  So was there another --
3    was there an issue?  I'm just asking if there was an
4    issue.
5    A   Because your question was vague.
6    Q   Agreed.
7         So was there any issue related to quality of
8    earnings that you learned of after -- with respect to
9    any quarter after this presentation was made?
10        MR. SIDORSKY:  Could you read the question
11   back?  I was distracted by the siren.  I assume we're
12   okay here.
13        THE WITNESS:  It's the noon whistle.
14        (Whereupon, record read by the Reporter as
15   follows:
16        "Question:  So was there any issue related to
17        quality of earnings that you learned of
18        after -- with respect to any quarter after
19        this presentation was made?")
20        THE WITNESS:  So our discussion that he's
21   been focussed on, fiscal 2001, so I'll answer with
22   respect to that, and the answer is no.
23        MR. GREENSTEIN:  Okay.
24   Q   So what about any fiscal year?
25        MR. SIDORSKY:  Objection to form.
```

127

```
1         THE WITNESS:  I don't recall any issues, no.
2         MR. GREENSTEIN:  Okay.
3    Q   I just want to be clear.  So you don't --
4    after making this presentation, you don't recall any
5    issues relating to the quality of earnings that arose
6    with respect to Oracle at any time?
7    A   With respect to this quarter, no.  With
8    respect to the other quarters in the fiscal year, no.
9    Q   With respect to any quarter in any fiscal
10   year?
11   A   I'm saying I don't -- I don't recall any.
12   So, I mean, it's -- it's a very broad question.
13   Q   Okay.  But why -- it seems like you're trying
14   to distinguish between 2001, the quarters in 2001 and
15   some other period, and so I'm just asking if that --
16   if you're making that distinction for some reason.
17   A   My distinction is I'm trying to -- to -- to
18   draw a distinction between the quarters which appear
19   to be the subject of the litigation versus saying any
20   quarter in the company's history which I have no basis
21   to respond to many of those quarters.
22        I'm just trying to be accurate in my
23   response.  So if you go, you know, into -- you know,
24   outside of those quarters, or outside of quarters
25   where I was involved with the engagement, I'd have no
```

128

```
1    basis to respond to most of those.  So I'm just trying
2    to be factually correct, since I'm under oath.
3    Q   I understand that, and I'm not asking about
4    the early '90s or, you know, time periods ten years
5    ago.
6         I'm asking about, let's say, 2000, 2001,
7    2002, did you become aware of any issues with respect
8    to quality of earnings during that period?
9    A   No.
10   Q   Did -- did you become aware of any issues
11   with respect to quality of issues after 2002?
12   A   I wasn't involved with Oracle after April of
13   2002.
14   Q   Right, but I'm asking if you became aware of
15   any issues.
16        MR. SIDORSKY:  Well, objection to form.
17        MR. KONOVALOV:  Calls for speculation.
18        THE WITNESS:  No.
19        MR. GREENSTEIN:  Q.  So after -- after 2002,
20   you did not become aware of any issues with respect to
21   quality of earnings at Oracle from 2002 until today?
22   A   Nope.
23   Q   Are there any issues that you want to testify
24   about that you recall hearing about?
25        MR. KONOVALOV:  Objection; it's overbroad;
```

129

1  it's vague and ambiguous.
2      THE WITNESS:  No.
3      MR. GREENSTEIN:  All right.
4      THE WITNESS:  I'm --
5      MR. GREENSTEIN:  Q.  Did you have any
6  discussions after you left -- after Andersen was
7  dismissed as Oracle's auditor, did you have any
8  discussions with anybody about quality of earnings
9  issues?
10    A  When you say "anybody," company personnel?
11    Q  No.  I mean anybody.
12    A  "Anybody" is a broad -- no.
13    Q  You didn't have any -- okay.  I'm going to
14  ask the question again, because it's -- it sounds like
15  there may be discussion.  I'm not just getting to
16  them.  I don't know.
17      I'm asking if after Andersen was dismissed
18  from the Oracle -- by Oracle, did you ever have any
19  discussions with anybody about quality of earnings
20  issues at Oracle?
21      MR. KONOVALOV:  Objection; asked and
22  answered.
23      THE WITNESS:  No.
24      MR. GREENSTEIN:  Q.  You didn't have any
25  discussions with anyone?

130

1      MR. KONOVALOV:  Same objection.
2      MR. SIDORSKY:  Yeah.  Come on.  It has really
3  been answered now.  Asked and answered several times.
4      THE WITNESS:  I think I answered this
5  question several times.
6      MR. GREENSTEIN:  Okay.
7    Q  Did you see any document that -- that made
8  you aware of any quality of earnings issues?
9      MR. KONOVALOV:  Objection; assumes facts not
10  in evidence.
11      THE WITNESS:  No.  Understand, that I really
12  have paid little or no attention to Oracle since April
13  of 2002.
14      MR. GREENSTEIN:  Q.  So have you had any
15  discussions at all about Oracle since Andersen left in
16  2002?  Have you had any discussions about quality of
17  earnings issues after that time?
18    A  No.  Other than, you know, than a general
19  discussion of the purpose for this deposition
20  yesterday.
21    Q  Okay.  See in the second bullet point it says
22  "Judgmental Reserves and Accruals"?
23    A  Yes.
24    Q  What does that mean?
25    A  It means that one of the items we would

131

1  routinely discuss with management and with the audit
2  committee, in this case, was discussing some of the --
3  you know, the judgmental reserves and accruals.  I
4  think you'll see this on most of our agendas.
5    Q  Right.  I actually have seen them on most of
6  them.
7      The term "judgmental reserves," does that
8  mean -- is that discussing some sort of judgment made
9  by Oracle with respect to reserves, or does that mean
10  some sort of judgment made by Andersen?
11    A  Oracle.
12    Q  Oracle.
13      And what types of reserves have a judgmental
14  aspect to them, let's say, in 2001, if you remember?
15      MR. SIDORSKY:  Objection to form.
16      MR. KONOVALOV:  Vague and ambiguous.
17      MR. GREENSTEIN:  Q.  Actually, in this
18  quarter.  I'll focus in on this quarter.
19    A  Let me -- let me answer more generally,
20  because I don't know that I can answer specifically
21  with this quarter.
22    Q  Okay.
23    A  But there are certain accounts in the
24  financial statements that I'll use accounts payable.
25  If you get an invoice, you book the invoice.  If

132

1  you're talking about an accrual for, you know, a
2  number, if it's a litigation accrual, a warranty
3  accrual, some of those items require more judgment
4  from management because they have to base it on less
5  precise information.
6      The same would be true for a receivable
7  reserve where you're trying to estimate the
8  realizability or recovery of receivables that have
9  been recorded in the books but not yet collected.
10  It's less precise, so there's more judgment involved.
11  That's -- that's what's intended to -- we intend to
12  mean by the -- the caption "Judgmental Reserves and
13  Accruals."
14    Q  Okay.  And you see the bullet point there
15  where it says "Domestic Reserves"?
16    A  Uh-huh.
17    Q  And it has "A/R judgment reserves," "Sales
18  return reserves," and "Accruals."
19    A  Yes.
20    Q  What does "A/R judgment reserves" mean?
21    A  I believe it refers to the account receivable
22  reserve.  And the overall reserve, I believe there was
23  a component of it that required more -- required more
24  judgment.  The whole reserve required judgment, but
25  this would be one that was not identified with

133

1  specific accounts.
2      Q  Okay.  What do you mean by that?
3          MR. SIDORSKY:  Objection to form.
4          MR. GREENSTEIN:  Q.  You said there was a
5  component of it that required more judgment.  The
6  whole reserve required judgment, but this would be one
7  that was not identified with specific accounts, and
8  I'm wondering what was the component of it that
9  required more judgment?
10     A  Well, wait.  Let me clarify.
11         I don't -- I don't recall the specific
12  discussion on this, but it says "A/R judgment
13  reserve."  It doesn't say A/R reserve, so let me
14  clarify.  I -- I'm implying, guessing, if you will,
15  that this is not related to the entire reserve.
16     Q  And when you say "entire reserve," what do
17  you mean by that?  What is the entire reserve?
18     A  Well, the reserve for collectability of
19  receivables would typically entail a portion of the
20  reserve that is very specific customer accounts, a
21  customer in bankruptcy, something along that nature
22  which would be specifically reserved, and then there
23  would be a calculation of reserves to cover items not
24  specifically identified which would typically require
25  more judgment because it's based on less precise

134

1  information.  Estimates in terms of prior history and
2  things like that.
3      Q  So when you say "estimates," do you mean a
4  reserve?  Say you were taking a reserve for
5  uncollectibles, or Oracle was, and they wanted to
6  determine what percentage of their receivables they
7  would reserve for.
8          Is that -- is that the type of judgment
9  reserve that you're talking about?
10         MR. SIDORSKY:  Objection to form.
11         THE WITNESS:  In general, yes.
12         MR. GREENSTEIN:  Okay.
13     Q  Well, what are the -- what are -- what are
14  the different types of reserves that you can think of?
15  Actually, withdraw that.
16         You said there was a type of reserve that
17  required more judgment.  There was a component of a
18  reserve that required more judgment.
19         Do you remember any specific reserve that
20  required more judgment?
21     A  No.  I mean, other than what I'll call
22  nonspecific reserves.  So reserves that aren't for a
23  specific account.  If there would be a reserve -- you
24  know, the overall reserve was based on specific
25  reserves, and then a calculation of what I'll more

135

1  broadly call general reserve, meaning, it does not
2  relate to a specific account, but it's based on prior
3  experience.
4      Q  Okay.  When you say a reserve, that doesn't
5  -- that doesn't relate to a specific account, what do
6  you mean by that?  What account?  What do you mean by
7  "account"?
8          MR. SIDORSKY:  Objection to form.  Objection
9  to form.
10         THE WITNESS:  Yeah, let me clarify by
11  "account."  I meant customer account or customer
12  invoice.
13         MR. GREENSTEIN:  Q.  Well, can you just
14  explain to me how a reserve is related to a customer
15  account or a customer invoice?
16         MR. SIDORSKY:  That's been asked and
17  answered.
18         THE WITNESS:  In general?
19         MR. GREENSTEIN:  Q.  Yeah.  I just don't
20  understand what that means.
21         MR. SIDORSKY:  Objection to form.
22         THE WITNESS:  Okay.  Do I need to answer?
23  Right?
24         So a company sells a widget.  They book a
25  receivable for the sale of that.  At a later point in

136

1  time, the customer goes bankrupt.  So that invoice,
2  that specific invoice, is deemed uncollectible and is
3  reserved for.  A reserve is set aside in the company's
4  reserve analysis.  That would be an example of a
5  specific reserve.
6          MR. GREENSTEIN:  Okay.
7      Q  And if that reserve -- and that's a reserve
8  taken to write -- is that a reserve taken to write off
9  an accounts receivable that can no longer be collected
10  because the company went bankrupt?
11     A  Just to clarify, what I was talking about
12  would be an adjustment made to reserve for potential
13  uncollectible account.  The write-off of the account
14  is a separate entry.
15     Q  Right.
16         So let's say you are establishing a reserve
17  for uncollectibles in general.  Do you know what the
18  general entries are for that?
19         MR. SIDORSKY:  I'm going to object to the
20  form as -- as overly broad and hypothetical.
21         MR. KONOVALOV:  It's an incomplete
22  hypothetical.
23         THE WITNESS:  Generally I know.  Yes, I know
24  what the entries would be for that.
25         MR. GREENSTEIN:  Okay.

137

1  Q  What are they?
2  A  Typically, if it's a bad debt expense, it's
3  a -- it's a debit, if you will, to what I'll broadly
4  call SGAE, Selling General Administrative Expense.
5  Typically, it's down in the NG&A, and a credit for
6  allowance to doubtful accounts or, quote, "reserve."
7  Q  Okay.  Is it fair to say that the entry --
8  that journal entry would be -- when you say a debit to
9  SGAE, are you talking about bad debt expense?
10  A  Yes.
11  Q  Okay.  So the debit would be bad debt
12  expense, the credit would be allowance for doubtful
13  accounts, which is a contrast for that; right?
14  A  Correct.
15  Q  Okay.  So when that reserve is taken for
16  uncollectible accounts and there's a debit to a bad
17  debt expense, a debit of an expense means it
18  increases; right?
19  A  That's correct.
20  Q  Okay.  Now, the second transaction that you
21  were describing was when you write off a bad debt.
22  And do you know the journal entries that would occur
23  for that type of write-off?
24  A  Yes.
25  MR. SIDORSKY:  Same objection.  Now, we're

138

1  really -- it's not a -- it's -- it's not an
2  appropriate question given the lack of foundation or
3  context.
4  MR. GREENSTEIN:  Q.  Do you know the journal
5  entries to writing -- to write off bad debt at
6  Oracle --
7  MR. KONOVALOV:  Objection.
8  MR. GREENSTEIN:  Q.  -- during 2001?
9  A  I don't -- I don't know the specific journal
10  entries that were made at Oracle, no.
11  Q  Okay.  But, in general, based on what you
12  know with working at Oracle for what, 20 years, do you
13  know typically what a journal entry would be to write
14  off bad debt?
15  MR. KONOVALOV:  Objection; calls for
16  speculation.
17  MR. SIDORSKY:  Objection.
18  MR. GREENSTEIN:  Sorry.  I'll withdraw that.
19  Q  In general, you just gave any general entries
20  for establishing a reserve for uncollectibles; right?
21  A  Uh-huh.
22  Q  So I'm asking generally, what would the
23  journal entries be for writing off a bad debt?
24  MR. SIDORSKY:  Objection to form.
25  THE WITNESS:  Generally, you would debit the

139

1  allowance or reserve account and credit the actual
2  accounts receivable account that whatever the -- the
3  invoice was, whatever account it resided in.
4  MR. GREENSTEIN:  Q.  And that would reduce
5  the receivable; right?
6  A  Well, the -- it -- it would have no impact on
7  the net receivable.
8  Q  Okay.  What do you mean by that?
9  A  There would be -- if you're looking at the
10  financial statement caption accounts receivable, the
11  fiscal journal entry to actually write off an account
12  would normally have no impact on that account balance.
13  Q  Would normally you say?  Would any -- would
14  there be any cases where it would have an impact on
15  that account balance?
16  MR. KONOVALOV:  Objection; calls for
17  speculation.
18  MR. SIDORSKY:  Same objection.
19  THE WITNESS:  Generally, no.  There shouldn't
20  be any, but I -- you know, again, I'm trying to be
21  factual without overstating my answer.
22  MR. GREENSTEIN:  I understand.
23  Q  So focusing on Oracle in 2001, the fiscal
24  year 2001, do you recall what the journal entries were
25  for establishing a reserve for uncollectibles?

140

1  A  Again, just in general what they would be.
2  Q  Well, yeah.  I'm talking about in general
3  with respect to Oracle, how they would establish --
4  what would the journal entries be for Oracle to
5  establish reserve for uncollectibles?
6  A  Well, I've never actually traced the entries
7  in, but -- so I'm speculating, but it would be debit
8  to bad debt expense and credit to the allowance for
9  doubtful accounts.
10  Q  Okay.  And then with respect to write-offs at
11  Oracle, would -- would it be the same journal entries
12  that you described earlier with respect to accounts
13  receivable and allowance for doubtful accounts?
14  MR. KONOVALOV:  Objection; calls for
15  speculation.
16  THE WITNESS:  It should be.
17  MR. GREENSTEIN:  Okay.
18  Q  But was there ever a case where journal
19  entries would be made that would affect revenue with
20  respect to writing off bad debts?
21  MR. KONOVALOV:  Objection; calls for
22  speculation; lacks foundation.
23  THE WITNESS:  You know, again, I -- I don't
24  recall the specifics, but there -- I believe that some
25  of the entries, like if they were going to record

141

1  possibly a sales return because there are sales return
2  reserves that are listed here, a sales return listed
3  would be different than a bad debt allowance.  A sales
4  return would normally result in a reduction of revenue
5  and not an increase in bad debt expense.
6  　　　MR. GREENSTEIN:  Okay.
7  　　　Q  I'm focusing on reserves for doubtful
8  accounts, or reserves for uncollectible receivables.
9  　　　Would that -- would the journal entries
10  associated for the establishment for those types of
11  reserves ever impact revenue?
12  　　　MR. KONOVALOV:  Objection; lacks foundation;
13  calls for speculation.
14  　　　MR. SIDORSKY:  Objection to form.
15  　　　THE WITNESS:  They should not.
16  　　　MR. GREENSTEIN:  Q.  They should not?
17  　　　A  They should not.  No, I can't answer
18  specifically in terms of looking at every entry Oracle
19  made.
20  　　　Q  That's fair.
21  　　　Now, why should -- why should it not affect
22  revenue?
23  　　　MR. SIDORSKY:  Objection to form.
24  　　　THE WITNESS:  Because an allowance for
25  doubtful accounts is typically deemed as a credit in

142

1  collection or collectability matters, and common
2  practice is to record that as a bad debt expense.
3  　　　MR. GREENSTEIN:  Q.  Now, would there ever be
4  a reason -- instead of crediting bad debt expense,
5  would there ever be a reason to reduce revenue?  So
6  debit allowance for doubtful accounts and -- sorry --
7  credit for allowance of doubtful accounts and debit
8  revenue?
9  　　　MR. SIDORSKY:  Objection to form.
10  　　　MR. KONOVALOV:  Objection; vague and
11  ambiguous.
12  　　　THE WITNESS:  Would there ever be a reason to
13  do that?  I don't know.
14  　　　MR. GREENSTEIN:  Q.  Do you know if Oracle
15  ever -- in establishing its reserves for doubtful
16  accounts -- ever made entries that impacted revenue
17  during 2001, fiscal year 2001?
18  　　　A  I don't recall.
19  　　　MR. SIDORSKY:  Objection to form.
20  　　　THE WITNESS:  I don't recall.
21  　　　MR. GREENSTEIN:  Q.  Do you remember any
22  discussions regarding establishment of reserves or
23  write-offs of bad debt that impacted revenue?
24  　　　MR. SIDORSKY:  Objection to form.
25  　　　MR. KONOVALOV:  Vague and ambiguous.

143

1  　　　THE WITNESS:  I don't recall any
2  conversations to that -- that direct.  You know, I
3  mean, I don't recall any conversations about that
4  specific topic.
5  　　　MR. GREENSTEIN:  Okay.
6  　　　Q  Do you recall any discussions at all about
7  the impact to revenue of either establishing a bad
8  debt reserve or writing off bad debt?
9  　　　MR. SIDORSKY:  Objection to form.
10  　　　THE WITNESS:  No, I don't.
11  　　　MR. GREENSTEIN:  Okay.
12  　　　Q  From 2000 until this deposition, do you
13  recall ever having any discussions with anybody about
14  potential inaccuracies in Oracle's publicly stated
15  financial statement?
16  　　　MR. KONOVALOV:  Objection; assumes facts not
17  in evidence.
18  　　　MR. SIDORSKY:  Objection to form.
19  　　　THE WITNESS:  No, I don't.
20  　　　MR. GREENSTEIN:  Q.  Have you ever had any
21  discussions from 2000 until today about potential
22  accounting fraud occurring at Oracle?
23  　　　MR. KONOVALOV:  Objection; assumes facts not
24  in evidence.
25  　　　THE WITNESS:  I don't know.

144

1  　　　MR. SIDORSKY:  Objection to form.
2  　　　THE WITNESS:  Excuse me.  No, I don't.
3  　　　MR. GREENSTEIN:  Q.  Do you recall any
4  discussion from 2000 to today about -- that any of
5  Oracle's financial statements were inaccurate?
6  　　　MR. KONOVALOV:  Objection; assumes facts not
7  in evidence.
8  　　　THE WITNESS:  Any conversations?  No.
9  　　　MR. GREENSTEIN:  Okay.
10  　　　Q  Anything?  Any documents or anything besides
11  conversations about -- from 2000 -- 2000 until today
12  about the inaccuracy of Oracle's financial statements?
13  　　　MR. KONOVALOV:  Same objection.
14  　　　THE WITNESS:  Yes; I read the complaint
15  yesterday.
16  　　　MR. GREENSTEIN:  Okay.
17  　　　Q  Besides --
18  　　　A  That's it.
19  　　　Q  Okay.  Anything besides reading the complaint
20  yesterday?
21  　　　A  No.
22  　　　Q  If you turn to the next page, it's Bates
23  stamped 081754.  You see the first bullet point.  It
24  says "Revenue Review."
25  　　　A  Yes.

145

1    Q  And it says "No changes in Scope or
2  Procedures"; do you see that?
3    A  Yes.
4    Q  So what does that mean in the context of the
5  second quarter 2001?
6    A  In the context of the quarter, what it means
7  is that we had a -- a standard scope that we would use
8  for reviewing license agreements each quarter, a
9  standard scope that we would have for reviewing
10  consulting agreements each quarter, and we would
11  typically put this in and say, if there were no
12  changes, we would reiterate to the audit committee
13  that we did not change the scope or the procedures we
14  performed, and we'd sometimes then reiterate verbally
15  what those procedures were, but this was to highlight
16  that we didn't change the scope of the work.
17    Q  Okay.  So where it says "License revenue -
18  tested 37%," is that fair to say that Andersen
19  reviewed 37 percent of the license revenue deals
20  during the second quarter of 2001?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  Let me be -- try to be more
23  factually accurate.
24    We would have reviewed contracts where
25  license revenue recognized under those contracts would

146

1  have equated to 37 percent of domestic revenue,
2  domestic license revenue.
3    MR. GREENSTEIN:  Okay.
4    Q  And testing 37 percent, what does -- what --
5  what do you mean by "tested"?  What do you test?
6    A  Well, we had a number of fairly standard
7  audit procedures we would go through with a revenue
8  contract.
9    Q  Okay.  So "audit procedures."
10    Did you mean to say quarterly review
11  procedures?
12    A  No.
13    Q  Okay.  So there were audit procedures you
14  went through to test revenue contracts; right?
15    A  Yeah, so let me clarify.  We performed our
16  revenue testing.  Our audit testing of revenue was
17  performed throughout the year.  So when we tested
18  revenue contracts, instead of coming in and auditing
19  all of the revenue in May of 2001, our process
20  included testing them on a quarterly basis so that we
21  could do them on a -- on a timely basis, so it's not a
22  requirement for a quarterly review.
23    Q  Okay.  So Andersen -- but Andersen performed
24  some sort of testing of 30 percent of the license
25  contracts during Q2 '01; right?

147

1    A  That's correct.
2    Q  Okay.  And how did Andersen go about
3  determining that 37 percent?
4    MR. SIDORSKY:  Asked -- asked and answered,
5  or -- well, objection to form.
6    THE WITNESS:  We had a -- what I'll call a
7  scope that was set as to which contracts we would
8  review.  I don't recall if it was a number of
9  contracts as in the top 20 contracts or whether it was
10  a dollar threshold in -- in terms of all contracts
11  over X million dollars, but that's how our scope was
12  set.
13    So the 37 percent was not the scope.  That
14  percentage would and did vary from quarter to quarter
15  depending upon the significance of those particular
16  contracts that we looked at.
17    MR. GREENSTEIN:  Okay.
18    Q  But how did Andersen determine which license
19  revenue contracts that it would test?  Was it random,
20  or some sort of statistical analysis, or was it by
21  amount of the contract?
22    A  For purposes of this bullet point, the
23  testing of license revenue that was done, you know, on
24  a timely basis during the quarters and at year end,
25  that was a quarterly scope that was -- it was not

148

1  random.  As I said, it was based either on a specific
2  number of contracts, or a dollar threshold cutoff on
3  contracts, and I don't recall which it was.
4    Q  Okay.  You recall that it was the top 20
5  license revenue contracts during second quarter of
6  '01?
7    MR. SIDORSKY:  Objection to form.
8    THE WITNESS:  I just said I don't recall.
9    MR. GREENSTEIN:  Okay.
10    Q  Did you ever -- did Andersen ever receive,
11  during the second quarter of '01, a -- some
12  documentation regarding the top 20 license contracts
13  during that quarter?
14    A  Again, I'm trying to be clear.  We had a
15  scope.  If that was 20 contracts, we would have
16  received the documentation for 20 contracts.  If it
17  was 15, we would have received it for 15.
18    So, you know, I've already answered the
19  question.  I don't know how many we looked at.  It was
20  whatever our scope was.
21    Q  Okay.  But you recall receiving documentation
22  on whether it was 15 or 20.  You just recall Andersen
23  receiving documentation from Oracle on certain revenue
24  contracts during that quarter that you would test;
25  right?

149

1  A  Yes.  The contracts within our scope, we
2  would have received a package of information from the
3  company on those.
4  Q  Okay.  And how would you go about testing
5  those contracts?
6  A  Let me just pause for one second.  Are we
7  going to break soon for lunch?
8  MR. SIDORSKY:  Yeah, why don't we go off the
9  record for one second.
10  MR. GREENSTEIN:  Well, actually, I just want
11  to finish this one question.
12  MR. SIDORSKY:  Yeah.  Okay.  All right.
13  So there's a question pending, so why don't
14  you answer that, and then we'll -- we'll --
15  MR. GREENSTEIN:  Right.
16  MR. SIDORSKY:  -- pause.
17  MR. GREENSTEIN:  Okay.
18  THE WITNESS:  Sorry to interrupt.
19  MR. GREENSTEIN:  No, it's okay.
20  Q  So during the second quarter of '01 wherein
21  you tested 37 percent of the contract, the license
22  contracts, and you received the documentation with
23  respect to some contracts for that quarter, what did
24  you do to test them?
25  A  Okay.  So there's -- there's a number of

150

1  procedures we would go through.  Whether I accurately
2  recollect and state all those or not, I don't know,
3  but the -- the -- the procedures would include a
4  review of the actual contract itself, a review of the
5  company's extract.  They would prepare a -- a memo
6  that, in their view, summarized the accounting for
7  that agreement, what the license revenue should be,
8  what other components of the revenue would be, and
9  whether that was recognized or deferred during the
10  quarter.
11  So we would look at their analysis of it.  I
12  believe we would trace it to the credit to make sure
13  that the customer was credit approved.  We would trace
14  the entries into, you know, the accounts.  If there
15  were deferred revenue, we would trace them -- that the
16  revenue, they said it was deferred, it was, in fact,
17  deferred.
18  I don't re -- recall what other -- what other
19  we would have done.
20  Q  Okay.  Would you look at whether the
21  contracts, the revenue con -- license contracts met
22  the requirements of SOP 97-2?
23  A  Yes.
24  Q  So you would go through the process of the
25  four elements:  Whether arrangement existed, delivery,

151

1  the fee was fixed and determinable, and whether
2  collectability was reasonably assured?  You'd go
3  through that with respect to whatever amount of deals
4  that you deemed proper during that quarter; right?
5  MR. SIDORSKY:  Objection to form.
6  THE WITNESS:  We -- we would review or
7  conclude each of those four requirements under
8  SOP 97-2.
9  MR. GREENSTEIN:  Q.  And in the second
10  quarter, do you remember doing that with respect to
11  the 37 percent of the license revenue contracts?
12  A  Do I recall specifically?  No.
13  Q  Okay.  Do you recall doing that with respect
14  to a license revenue contract with Hewlett-Packard?
15  MR. SIDORSKY:  Objection to form.
16  THE WITNESS:  I don't recall the specific
17  testing or the documentation on any particular
18  contract.  That's why I'm answering in terms of the
19  general procedures we would perform.
20  MR. GREENSTEIN:  Right.
21  Q  But there was a deal with Hewlett-Packard in
22  the second quarter of '01 that was part of those that
23  were tested in the second quarter; right?
24  MR. KONOVALOV:  Objection; lacks foundation.
25  MR. SIDORSKY:  Objection to form.

152

1  THE WITNESS:  If -- if you're telling me
2  there was in there, then I'm supposing that it was in
3  there.
4  MR. GREENSTEIN:  Q.  And I'm asking if you're
5  aware that during the second quarter of '01 Andersen
6  reviewed the top 20 license revenue contracts for that
7  quarter and that one of them was with Hewlett-Packard?
8  A  I recall, based on the review I did
9  yesterday, one of the audit committee meeting agendas
10  included an HP contract.  Now, I haven't flipped the
11  page on this, so I don't know if HP is in Q2, Q1, Q3.
12  Q  Actually, why don't you flip the page, and
13  for the record, it's Bates 081755, and it says "HP
14  30 million hardware purchase guarantee"; do you see
15  that?
16  A  Yep.
17  Q  Does this refresh your recollection, that in
18  the second quarter of '01, as part of that 37 percent
19  testing of license revenue contracts, Andersen tested
20  this deal with HP?
21  A  It, yes, refreshes my memory that it was in
22  Q2.
23  Q  And Andersen did test this deal with HP in
24  the second quarter of '01, whether it met their
25  requirements of SOP 97-2; right?

153

1     MR. SIDORSKY:  Objection to form.
2     THE WITNESS:  By virtue of the fact that it's
3  in this audit committee discussion, the answer to that
4  would be yes.
5     MR. GREENSTEIN:  Okay.
6  Q  If I show you a document of the top
7  20 license revenue contracts for the second quarter of
8  '01, and it had those 20 contracts and summaries of
9  the deal for the second quarter of '01, is it fair to
10  say that every contract on there was tested by Oracle
11  to see if it was -- met the requirements of SOP 97-2?
12     MR. KONOVALOV:  Objection; vague and
13  ambiguous.  I think you may have meant Oracle --
14  Andersen, not Oracle.
15     MR. SIDORSKY:  Objection to form.
16     MR. GREENSTEIN:  Q.  I meant Andersen
17  testing.
18  A  Oracle or Andersen?
19  Q  Andersen's testing of the top 20 license
20  contracts in 2Q (sic) '01.
21  A  There should be documentation in there
22  regarding the HP contract.
23  Q  And that -- so if that document, if that
24  documentation exists, that means Andersen reviewed the
25  HP deal and determined that it met the requirements of

154

1  SOP 97-2; right?
2     MR. SIDORSKY:  Objection to form.
3     THE WITNESS:  That would be correct.
4     MR. GREENSTEIN:  Okay.  We can take lunch, if
5  you want.
6     THE VIDEOGRAPHER:  Off the record.  The time
7  is 12:34 p.m.
8     (Lunch break taken.)
9     THE VIDEOGRAPHER:  We are back on the record.
10  The time is 1:37 p.m.
11     MR. GREENSTEIN:  Q.  Good afternoon,
12  Mr. Matuszak.  Earlier we were talking about
13  management representation letters that Andersen would
14  help draft and that Oracle would actually send to
15  Andersen in connection with quarterly reviews.
16     Do you recall testifying about that?
17  A  Excuse me.  Yes, I recall the conversation.
18  Q  Now, who signed those representation letters
19  for fiscal year 2001 on behalf of Oracle?  Do you
20  recall?
21  A  I believe they were signed by Jeff Henley,
22  Jennifer Minton, and Tom Williams, and that's my
23  recollection.
24  Q  Okay.  And -- and do you know why
25  Larry Ellison didn't sign those?

155

1     MR. SIDORSKY:  Objection to form.
2     THE WITNESS:  I -- I believe the -- the
3  letter was typically signed by the chief financial
4  officer and corporate controller.  I don't believe
5  there was a requirement that you had the CEO or
6  chairman sign those letters.
7     MR. GREENSTEIN:  Okay.
8  Q  Now, you said you had a copy of the
9  complaint in this litigation yesterday in your meeting
10  with Mr. Sidorsky; right?
11  A  We --
12     MR. SIDORSKY:  Objection to form.
13     THE WITNESS:  We reviewed some portions of
14  the complaint.  I did not read the entire complaint.
15     MR. GREENSTEIN:  Okay.
16  Q  And forgive me if I've asked -- I've already
17  asked this question, but did reading the complaint
18  refresh your recollection about anything that occurred
19  at Oracle during fiscal year 2001?
20  A  No, not the portions of the complaint that I
21  read.
22  Q  Okay.  Did the -- did seeing the complaint at
23  all refresh your recollection about events that
24  occurred at Oracle in fiscal year 2001?
25  A  No.

156

1  Q  Okay.  Going back to Matuszak No. 1, I'd like
2  to point you to page 081755.
3  A  Okay.
4  Q  So earlier we were talking about a deal with
5  Hewlett-Packard in the second quarter of 2001, and
6  this appears to be a presentation, or you discuss that
7  deal; is that fair to say?
8     MR. KONOVALOV:  I'm just going to make a
9  standing objection here.  This is well outside of the
10  scope of what's alleged in the complaint.  I've given
11  you substantial latitude.  Judge Infante talked about
12  the scope of this deposition.
13     At some point, you know, we're going to have
14  to be reasonable about how much you're going to
15  explore.  The periphery is fine, but you've devoted a
16  good deal of time to it, so I want the standing
17  objection on the record.
18     MR. GREENSTEIN:  Okay.  That's noted.
19     Just for the record -- well, your objection
20  is noted.
21     MR. KONOVALOV:  I mean -- I just -- I'm
22  not -- the issue is expressly addressed by
23  Judge Infante at the motion to quash for this
24  particular deposition.
25     MR. GREENSTEIN:  Well, I was at that hearing,

157

1    and it wasn't.  His order said that we were entitled
2    to take a deposition on the discovery plan which was
3    the accounting issues related to the discovery plan.
4    That includes debit memos.  It includes the
5    November 17, 2000, on account cleanup.
6         MR. SIDORSKY:  But he expressly talked about
7    the issue of the scope --
8         MR. GREENSTEIN:  Hold on.
9         MR. SIDORSKY:  -- of this deposition.
10        MR. GREENSTEIN:  I'm not done.
11        And there are 148 debit memos that are
12   attributed to Hewlett-Packard.  There -- there's also
13   at least one credit memo that we know about that
14   relates to those debit memos, and therefore I think
15   that Hewlett-Packard is -- is reasonably calculated to
16   lead to discovery of admissible evidence related to
17   the scope of Judge Infante's order, so --
18        MR. SIDORSKY:  We disagree.  I understand
19   your position.  We're going to have to agree to
20   disagree.  I just want the objection noted.
21        MR. GREENSTEIN:  Okay.
22   Q   So looking at this first bullet point where
23   it says "30 million hardware guarantee," do you see
24   that?
25   A   Yes.

158

1    Q   Well, let me back up.
2        Why were you -- why in this presentation were
3    you singling out this transaction?
4    A   Most likely because of the -- the purchase
5    commitment, the $30 million purchase commitment, being
6    entered into on or around the same time as the license
7    agreement.
8    Q   Okay.  When you say "purchase commitment," do
9    you mean Oracle was committing to purchase 30 million
10   in hardware from HP in connection with HP's agreement
11   to purchase software licenses from Oracle?  Right?
12   A   Well, I wouldn't say that it was in
13   connection with.  It was on or around the same time.
14   Q   Okay.  So are you testifying that the
15   commitment from Oracle to purchase 30 million in
16   hardware was not related to or not contingent upon
17   HP's -- sorry.  Let me strike that.
18        Are you testifying that Oracle's commitment
19   to purchase 30 million in hardware from
20   Hewlett-Packard was not in any way contingent upon
21   HP's commitment to purchase Oracle software?
22        MR. KONOVALOV:  Objection; assumes facts not
23   in evidence, and vague and ambiguous as to
24   "contingent."
25        MR. SIDORSKY:  Objection to form.

159

1         THE WITNESS:  What I'm suggesting is that I
2    don't think it was explicit that either one of them
3    were contingent upon the other.  Again, I don't have
4    the documents in front of me, but your -- your
5    statement, I believe, indicated that one was
6    contingent upon the other, and I don't know that
7    that's a factually correct statement.
8         There were two agreements that were entered
9    into on or around the same time.  Without the
10   agreements in front of me, it would be speculating to
11   say that one was contingent upon the other.
12        MR. GREENSTEIN:  Okay.
13        THE WITNESS:  I was trying to clarify that.
14        MR. GREENSTEIN:  Okay.
15   Q   You said expressly contingent.  So if there
16   was some implied contingency between the two companies
17   that the purchase by Oracle for 30 million of hardware
18   was contingent upon HP purchasing a certain amount of
19   software -- let me strike that question.
20        Were you aware, during this presentation, of
21   any implied contingency between Oracle's commitment to
22   purchase HP hardware and HP's commitment to purchase
23   Oracle software?
24        MR. KONOVALOV:  Objection; vague and
25   ambiguous as to "implied."  Assumes facts not in

160

1    evidence.
2         MR. SIDORSKY:  Objection to form.
3         THE WITNESS:  Again, I can't testify as to
4    contingency or implied contingency.  What I can
5    testify is to the factual statement that there were
6    two agreements that were entered into on or around the
7    same time.  Whether one was contingent upon the other,
8    I don't recall if it was, nor would I speculate
9    without specific recollection.
10        MR. GREENSTEIN:  Okay.
11   Q   Well, does it matter under SOP 97-2 if the
12   two commitments were contingent upon each other?  Does
13   that affect the analysis at all?
14        MR. SIDORSKY:  Objection to form.
15        MR. KONOVALOV:  Objection; incomplete
16   hypothetical.
17        THE WITNESS:  Without reading the specific
18   contract and reading the wording as to the
19   contingency, and what that contingency said, it would
20   be -- be speculation as to whether or not that would
21   impact the -- the revenue recognition.
22        MR. GREENSTEIN:  Q.  Well, but if -- if
23   Oracle agreed to purchase -- if Oracle agreed to
24   purchase 30 million in hardware from HP because HP
25   agreed to purchase a certain amount of software from

161

1  Oracle, would that affect your analysis under 97-2 of
2  whether revenue could be recognized on that
3  transaction?
4       MR. KONOVALOV:  Well, objection.  It's a
5  hypothetical, and it assumes facts not in evidence.
6       THE WITNESS:  We would have reviewed the --
7  the transactions as being concurrent transactions
8  entered into on or about the same time.
9       If there was specific guarantee language in
10  there, would it have impacted it?  I mean, specific,
11  you know, contingent -- one contingent on the other
12  would have impacted it, I don't know.  Possibly not.
13       MR. GREENSTEIN:  Q.  But it could potentially
14  impact it; right?
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  I -- I said possibly not.  So
17  possibly so, possibly not.
18       MR. GREENSTEIN:  Okay.
19    Q  Now, you said looking at the contract.  Now,
20  what if there was -- what if there was a contingent --
21  an agreement that wasn't in the contract that made the
22  purchase from HP contingent upon HP's purchase from
23  Oracle?
24       MR. KONOVALOV:  Objection.
25       MR. GREENSTEIN:  Q.  Would that affect the

162

1  analysis?
2       MR. KONOVALOV:  Sorry.  Objection; incomplete
3  hypothetical; assumes facts not in evidence.
4       MR. SIDORSKY:  Objection to form.
5       MR. KONOVALOV:  Calls for speculation.
6       THE WITNESS:  I'm sorry.  I don't -- I don't
7  understand the question.
8       MR. GREENSTEIN:  Okay.
9    Q  My question is, if -- setting aside the terms
10  of the actual contract, if you --
11    A  The license contract?
12    Q  Yes.
13       If you knew, at that time, that there was
14  some -- there was some agreement between Oracle and HP
15  that wasn't in the contract that made Oracle's
16  purchase of HP's hardware contingent upon HP's
17  purchase of Oracle's software, if you knew that, would
18  that affect your analysis under 97-2?
19       MR. SIDORSKY:  Objection; incomplete
20  hypothetical; assumes facts not in evidence; calls for
21  speculation; lacks foundation.
22       MR. KONOVALOV:  Objection to form.
23       THE WITNESS:  If we're aware that -- of the
24  two agreements, we would have considered the existence
25  of both agreements when we looked at the revenue

163

1  recognition on the contract.
2       The -- the fact that the first bullet under
3  there says $30 million hardware purchase implies that
4  we were aware of it and it factored into our analysis
5  of revenue recognition under that contract in the
6  quarter.
7       MR. GREENSTEIN:  Right.
8    Q  But what I'm asking is a little different.
9  What I'm asking is, if there was an agreement between
10  HP and Oracle outside of the expressed terms of the
11  contract, there was an agreement that made Oracle's
12  purchase of HP hardware contingent upon a certain
13  amount of software being purchased by HP, would that
14  affect your analysis as an auditor or reviewing this
15  quarter under 97-2?
16       MR. KONOVALOV:  Same objections.
17       MR. SIDORSKY:  Same objection.
18       THE WITNESS:  I'm sorry.  Could you repeat
19  that?  Just read back that question.  I want to make
20  sure I clearly understand, because you were talking
21  about a couple of different things.
22       (Whereupon, record read by the Reporter as
23       follows:
24       "Question:  But what I'm asking is a little
25       different.  What I'm asking is, if there was

164

1       an agreement between HP and Oracle outside
2       of the expressed terms of the contract,
3       there was an agreement that made Oracle's
4       purchase of HP hardware contingent upon a
5       certain amount of software being purchased
6       by HP, would that affect your analysis as an
7       auditor or reviewing this quarter under
8       97-2?")
9       MR. KONOVALOV:  Same objections.
10       THE WITNESS:  Purchase of -- excuse me --
11  purchase of HP's hardware contingent upon them
12  licensing Oracle's software.
13       MR. GREENSTEIN:  No, let me -- let me just
14  withdraw that.  What I meant to say --
15    A  That's what I'm trying to clarify.  That's
16  what your question said.
17    Q  Sorry.
18       What I meant to say was, if outside the terms
19  of the contract there was evidence that HP's purchase
20  of Oracle's software was contingent upon Oracle buying
21  hardware from HP, would that affect your analysis in
22  second quarter of '01 under 97-2 as to whether the
23  revenue could be recognized?
24       MR. KONOVALOV:  Incomplete hypothetical;
25  assumes facts not in evidence.

165

1       MR. SIDORSKY:  Objection to form.
2       THE WITNESS:  I don't -- I don't know.  I --
3  certainly we would have considered that factual
4  evidence.  You know, being right here, I don't know
5  specifically how that would have impacted it if one
6  was directly contingent on the other.
7       MR. GREENSTEIN:  Oh, okay.
8       THE VIDEOGRAPHER:  I was hearing tapping.  It
9  sounds like a clock.
10      MR. GREENSTEIN:  Okay.  Sorry.
11      THE WITNESS:  Nor do I know whether that's
12  factually correct or not in this case.
13      MR. GREENSTEIN:  Okay.
14      THE WITNESS:  So I prefer not to -- to
15  speculate on the facts or the answer.
16      MR. GREENSTEIN:  Okay.
17      Q  So when -- before you made this presentation
18  where -- this presentation here about this deal, what
19  did -- what did Andersen review to provide you with
20  support to make this presentation?
21      A  You mean what did Oracle present us to
22  review?
23      Q  Yeah.
24      What -- what did Andersen review in
25  connection with this transaction in the second quarter

166

1  of '01?
2      A  Well, my assumption, I don't know
3  specifically what we reviewed, would have been that we
4  would have looked at the license agreement, and we
5  would have looked at whatever agreement evidenced
6  the -- their commitment to purchase hardware.
7      The license agreement between Oracle and
8  Hewlett-Packard, and then whatever the other agreement
9  was that evidenced the commitment to purchase
10  $30 million, Oracle's commitment to purchase
11  $30 million of hardware from Hewlett-Packard.
12      Q  Okay.  And if that evidence -- well, strike
13  that.
14      What evidence did you review, do you recall,
15  in the second quarter of '01?
16      A  Well, if you're asking me do I specifically
17  recall the agreements I reviewed, the answer is no, I
18  don't; okay.  All I -- all I know is we -- we would
19  have received documents and agreements from Oracle,
20  and we would have reviewed them.  I don't recall, you
21  know, five years after the fact what specific
22  documents I reviewed and what they looked like.
23      Q  Okay.  But based on your experience, you
24  would review at least the license contract itself;
25  right?

167

1      A  That's correct.  We would have reviewed the
2  license agreement.
3      Q  Okay.  Now, would you have reviewed any
4  e-mail from Oracle to HP to determine what the
5  contingencies were, if there were any, between the two
6  commitments?
7      MR. KONOVALOV:  Objection; incomplete
8  hypothetical.
9      MR. SIDORSKY:  Yeah, objection.  That --
10  that's really lacking in foundation; hypothetical;
11  calls for speculation.
12      MR. GREENSTEIN:  Okay.
13      Q  Did you review any e-mails back in the second
14  quarter of '01 in connection with this transaction?
15      A  I don't recall.
16      Q  Okay.  Do you know if anybody reviewed any
17  e-mails between HP and Oracle regarding the
18  commitments involved in this transaction?
19      MR. SIDORSKY:  Anyone from Arthur Andersen?
20      MR. KONOVALOV:  Objection; vague and
21  ambiguous as to "commitment."
22      THE WITNESS:  Again, I don't recall what
23  specific documents were reviewed as a part of this
24  transaction.
25      MR. GREENSTEIN:  Okay.

168

1      Q  Do you recall any conversations at all about
2  this deal in the second quarter of '01?
3      A  I recall having discussions regarding this
4  contract.  I don't recall specific conversations we
5  had surrounding this contract.
6      Q  Okay.  Well, what do you recall even
7  generally about your discussions about this contract?
8      A  Well, I recall trying to obtain an
9  understanding of the commitment to purchase
10  $30 million of hardware, understanding what Oracle's
11  normal procurement budget was for capital equipment,
12  for servers and, you know, other hardware equipment,
13  what they normally purchased from Hewlett-Packard,
14  what the price was on the equipment they purchased
15  from Hewlett-Packard, and how that related to the
16  price that they would purchase equipment under this
17  arrangement; and based upon all of the discussions we
18  had and documents we reviewed, this $30 million
19  purchase was -- you know, other than the fact that it
20  was signed at the same time as the license agreement,
21  it was a normal hardware purchase.
22      They purchased a significant amount of
23  hardware from Hewlett-Packard, and the prices weren't
24  any different.  My recollection is the prices weren't
25  any different than any of the other purchases they had

169

1   with Hewlett-Packard.
2      Q   Okay.  So is it fair to say that Andersen's
3   conclusion after reviewing all the evidence and all
4   the documents provided to you regarding this deal --
5   was it Andersen's conclusion that the $30 million
6   hardware purchase -- sorry -- that HP's purchase of
7   Oracle's software was not contingent at all in any way
8   upon Oracle's $30 million hardware purchase from HP?
9      MR. KONOVALOV:  Objection.
10     MR. SIDORSKY:  Objection to form.
11     MR. KONOVALOV:  Vague and ambiguous.
12     THE WITNESS:  So earlier you asked me how I
13  would respond if it was contingent.  I told you I
14  didn't know.  Now you're asking me whether if this is
15  contingent, was it contingent, and how we conclude it?
16     So my answer is, I don't know that it was
17  contingent, but management concluded that it was
18  appropriate to recognize revenue under that license
19  arrangement.  And Andersen, after reviewing all the --
20  the evidence that was provided to us, concurred with
21  management's agreement.
22     MR. GREENSTEIN:  Okay.
23     Q   But I'm asking you if in concurring with
24  management's decision, did you conclude that there was
25  any contingency between HP's purchase of software and

170

1   Oracle's purchase of hardware?
2      MR. SIDORSKY:  Objection to form.
3      THE WITNESS:  And again I -- I think I've
4   responded that I don't know whether one was
5   specifically contingent upon the other.
6      MR. GREENSTEIN:  Q.  But I'm asking what your
7   conclusion was in order to -- to agree with
8   management.
9      In order to agree with management, Oracle's
10  management, to recognize revenue, didn't you have to
11  either conclude -- didn't you have to conclude that
12  they weren't contingent?
13     MR. SIDORSKY:  Objection.
14     MR. GREENSTEIN:  Q.  The purchases weren't
15  contingent under the -- under SOP 97-2?
16     MR. SIDORSKY:  Objection.
17     MR. KONOVALOV:  Objection; vague and
18  ambiguous; it's argumentative.
19     MR. SIDORSKY:  Yeah, objection to form.  It's
20  been asked and answered.  It is calling for
21  speculation.  It's based on facts and evidence.
22  It's -- it's -- it's assuming things that -- without
23  foundation.  Objection to form.
24     THE WITNESS:  I -- I don't know that we had
25  to specifically conclude that they were not

171

1   contingent, because I don't have the documents in
2   front of me.
3      As I said, we -- we reviewed the license
4   agreement in an effort to determine if there was value
5   associated with it.  We reviewed the license -- excuse
6   me -- the purchase commitment to see if there was
7   value associated with it.  We reviewed the license
8   agreement for its compliance under rev -- Oracle's
9   revenue policy.
10     MR. GREENSTEIN:  Okay.
11     Q   Did Andersen ever do a determination or an
12  analysis of whether the licenses sold to
13  Hewlett-Packard were for functionality that existed at
14  the time of the purchase?
15     MR. KONOVALOV:  Objection; vague and
16  ambiguous.
17     MR. SIDORSKY:  Objection to form.
18     THE WITNESS:  I can't answer with respect to
19  this specific agreement, but part of our procedures on
20  the quarterly revenue would be to look at the products
21  that were licensed and shipped under the agreement and
22  to see if they were part of the currently available
23  list of products.
24     MR. GREENSTEIN:  Okay.
25     Q   What if they weren't part of the currently

172

1   available listed product?
2      MR. SIDORSKY:  Objection; incomplete
3   hypothetical.
4      THE WITNESS:  Well, then that would impact
5   their revenue recognition.
6      MR. SIDORSKY:  Objection to form.
7      MR. GREENSTEIN:  Q.  That would preclude it?
8      THE REPORTER:  I'm sorry.  You were double --
9   you said, "Well then," and you said, "Objection"?
10     MR. SIDORSKY:  Objection to form.
11     MR. GREENSTEIN:  Q.  That would preclude
12  revenue recognition; wouldn't it?
13     A   If a product is not available, it can't be
14  shipped.  If a product cannot be shipped, it cannot be
15  recorded as revenue.
16     Q   Okay.  See there on the second bullet point
17  where it says 11th month -- "11 month term
18  license/lease that converts to the perpetual final
19  payment."
20     Do you see that?
21     A   Yes.
22     Q   Now, what does that mean, "License/lease that
23  converts to the perpetual final payment"?
24     THE REPORTER:  I need to change my disc after
25  the answer.

173

1     THE WITNESS:  My recollection of this
2  agreement is that the payment terms were somewhat
3  unique and that it was an 11th -- a 11-month -- the
4  structure of it was in the form of a lease, but at the
5  end of the final payment it converted to a perpetual
6  license.
7     MR. GREENSTEIN:  Okay.
8     Q  So -- I'm sorry.  Go ahead.
9     A  Go ahead.
10    Q  Do you need -- all right.  Should we go off
11 the record?
12    THE VIDEOGRAPHER:  This is a good time to
13 change the tape as well.  So we are going off the
14 record.  Here marks the end of videotape number two,
15 Volume I, in the deposition of Gary Matuszak.  The
16 time is 2:01 p.m.
17    (Short break taken.)
18    THE VIDEOGRAPHER:  We're back on the record.
19 The time is 2:06 p.m.
20    Here marks the beginning of videotape three,
21 Volume I, in the deposition of Gary Matuszak.
22    MR. GREENSTEIN:  Q.  Mr. Matuszak, I'm
23 looking at 081755 again.
24    A  Yes.
25    Q  We were talking about the "11 month term

174

1  license/lease that converts to the perpetual final
2  payment."
3     A  Yes.
4     Q  I think you testified that that was -- it was
5  a lease which at the end of -- which at the end of the
6  lease converted to the actual purchase of a license;
7  right?
8     MR. KONOVALOV:  Objection; misstates the
9  witness's testimony.
10    THE WITNESS:  Well, I'm not sure what you
11 mean by "purchase," so let me clarify what I -- what I
12 said is it was -- the -- the form of the agreement was
13 a lease, but at the end of the 11th payment, is my
14 recollection, the lease automatically -- the license
15 automatically converted into a perpetual license
16 agreement.
17    MR. GREENSTEIN:  Q.  And it converted if the
18 final payment was made; right?
19    A  Correct.
20    Q  So what if a final payment wasn't made?
21    MR. KONOVALOV:  Objection; incomplete
22 hypothetical.
23    MR. SIDORSKY:  Objection to form.
24    MR. KONOVALOV:  Calls for speculation.
25    THE WITNESS:  The license agreement would

175

1  have terminated, or the lease would have terminated.
2     MR. GREENSTEIN:  Okay.
3     Q  So under 97-2 -- well, strike that.
4     So are you aware that Oracle recognized all
5  the revenue with respect to this license/lease in the
6  second quarter of '01?
7     MR. KONOVALOV:  Objection; vague and
8  ambiguous, and assumes facts not in evidence.
9     MR. SIDORSKY:  Objection to form.
10    THE WITNESS:  My recollection is they -- they
11 recognized license revenue under this agreement.  I
12 don't know how much, whether it was all of it,
13 but.....
14    MR. GREENSTEIN:  Q.  Now, if it was just a --
15 if it was just a pure lease transaction, in other
16 words, there was no conversion with the final payment,
17 would Oracle be able to recognize the revenue in the
18 second quarter, or would they have to recognize it
19 ratably over the period of the lease?
20    MR. KONOVALOV:  Objection; incomplete
21 hypothetical.
22    MR. SIDORSKY:  Yeah, objection to form; just
23 hypothetical accounting questions; objection.
24    THE WITNESS:  I don't recall.  I'm not
25 being -- I don't recall how the leases or a lease

176

1  versus a license fit into 97-2 or their revenue
2  policy.
3     MR. GREENSTEIN:  Q.  Weren't you a member of
4  the AICPA task for -- on SOP 97-2 at one point?
5     A  I was, yes.
6     Q  Okay.  So just based on -- on your experience
7  on that task force and your experience, you know, as a
8  senior partner at Andersen, just generally, do you
9  know how a lease -- how the revenue for a lease
10 agreement is recognized?
11    MR. SIDORSKY:  I'm going to object.  The
12 witness is not here as an expert to testify about
13 abstract and hypothetical questions on SOP 97-2 or
14 other accounting issues.  He's really here as a -- as
15 a fact witness, so I object, and objection to the
16 form.
17    Do you have the question?
18    THE WITNESS:  Yeah, yeah.  I'm trying to
19 remember.
20    MR. SIDORSKY:  Okay.
21    THE WITNESS:  I'm not sure that the -- that
22 the form of the arrangement is -- is that critical,
23 whether it was a 11-month term agreement or an
24 11-month lease.
25    So it would depend upon the term of the

177

1   arrangement and whether or not -- yeah, it would
2   depend upon the term of the arrangement, because you
3   could recognize license upfront on a term license
4   arrangement.  If that was structured in the form of a
5   lease, I'm not sure that it would matter that you're
6   leasing versus licensing for a period of time.
7        Q   Okay.  Are you aware that this 11-month
8   license/lease in the second quarter of '01 only
9   converted to a perpetual license if HP paid a
10  $2.1 million final payment?
11       MR. KONOVALOV:  Objection; assumes facts not
12  in evidence.
13       THE WITNESS:  I don't know what the -- the
14  payment terms were over the 11-month term, so I don't
15  know what the payment -- whether it was two -- I don't
16  know.
17       MR. GREENSTEIN:  Okay.
18       Q   Did you know at the time you made this
19  presentation what the terms of the payments were?
20       MR. SIDORSKY:  Objection to form.
21       THE WITNESS:  The -- the payment terms would
22  have been included in as part of the license
23  arrangement, presumably.  So it's speculation that we
24  would have been aware of the payment terms when we
25  reviewed the -- the agreement.

178

1        MR. GREENSTEIN:  Okay.
2        Q   So in the context of this deal, if -- if at
3   the end of -- strike that.
4        Are you aware that as part of this 11-month
5   term license lease, that the final payment was -- that
6   would convert it, that would purportedly convert it,
7   was due more than 12 months after the date that the
8   contract was entered into?  Do you know that?
9        MR. KONOVALOV:  Objection; assumes facts not
10  in evidence; lacks foundation.
11       THE WITNESS:  I don't recall the specific
12  payment terms.
13       MR. GREENSTEIN:  Okay.
14       Q   If you knew that there was a, what you call,
15  a license/lease that converts to a perpetual with a
16  final payment and that -- that contract was signed on
17  the last day of the quarter, and then the final
18  payment wasn't due until more than 12 months after
19  that, the date that the contract was signed, would
20  that affect your analysis of whether the revenue could
21  be recognized under SOP 97-2?
22       MR. KONOVALOV:  Objection; incomplete
23  hypothetical.
24       MR. SIDORSKY:  Objection to form.
25       MR. KONOVALOV:  It's improperly seeking an

179

1   expert opinion from a lay witness.
2        THE WITNESS:  In the -- well, it would depend
3   on if you're -- in the case of Oracle, I believe the
4   answer is no.
5        MR. GREENSTEIN:  Q.  So that wouldn't -- you
6   wouldn't -- that fact wouldn't be part of your
7   analysis of whether to recognize revenue on a deal
8   with Oracle?
9        MR. SIDORSKY:  Objection to form.
10       MR. KONOVALOV:  Same objections.
11       THE WITNESS:  Well, Oracle had a number of
12  contracts with payment terms beyond 12 months, and the
13  license revenue was recorded on those contracts,
14  assuming they met all the criteria of 97-2,
15  irrespective of the fact that some of the payments
16  were beyond 12 months.
17       MR. GREENSTEIN:  Okay.
18       Q   Were there any license/leases that converted
19  to perpetual that had those terms?
20       MR. KONOVALOV:  Objection; calls for
21  speculation.
22       THE WITNESS:  I don't recall.
23       MR. GREENSTEIN:  Okay.
24       Q   Well, if Oracle recognized -- say the final
25  payment -- the terms of the license agreements said

180

1   that the final payment was 2.1 million, and that HP
2   had the option of either, you know, making that
3   payment or not, now, if they decided not to make that
4   payment, to convert it from a lease to a license
5   agreement, would Oracle be able to recognize that
6   final payment revenue upfront in the second quarter?
7        MR. KONOVALOV:  Objection; incomplete
8   hypothetical; assumes facts not in evidence.
9        MR. SIDORSKY:  Objection; same objection.
10       THE WITNESS:  You know, I -- I don't know.  I
11  don't recall.  I'm not -- not sure how to answer your
12  question.  You're asking me a hypothetical question.
13       MR. GREENSTEIN:  Okay.
14       Q   What if I -- well, if at the time you
15  analyzed this deal, if you knew that the contract was
16  signed on November 30th, 2000, and it was a 11-month
17  term license/lease that converted to a perpetual with
18  final payment, and that final payment, the terms of
19  that final payment, were that HP would pay 2.1 million
20  in December 2001, which is more than 12 months after
21  this -- the date that the contract was entered into,
22  if you knew those facts, would that affect your
23  analysis of whether that deal could be booked as
24  revenue in the second quarter of '01?
25       MR. KONOVALOV:  Objection; asked and

181

1   answered; assumes facts not in evidence; incomplete
2   hypothetical.
3           MR. SIDORSKY:  Same objection.
4           THE WITNESS:  If the payment terms were
5   greater than 12 months, it would -- I don't think it
6   would have impacted our conclusion.
7           MR. GREENSTEIN:  Q.  So the fact that HP
8   could decide not to make the final 2.1 million
9   payment, the fact that they had that ability to do
10  that, that didn't affect whether that 2.1 million
11  could be recognized upfront?
12          MR. KONOVALOV:  Objection; assumes facts not
13  in evidence.
14          MR. SIDORSKY:  Objection to form; asked and
15  answered as well.
16          THE WITNESS:  Well, your question was whether
17  or not the payment terms are greater than 12 months.
18  Now you're asking me the question of what would happen
19  if the final payment terms were contingent.  Those are
20  two different questions.
21          MR. GREENSTEIN:  Okay.
22       Q  Let's take the latter.
23          MR. KONOVALOV:  What's the question?  Is
24  there a pending question?
25          MR. GREENSTEIN:  Yeah, let me reask it.

182

1           MR. KONOVALOV:  Thank you.
2           MR. GREENSTEIN:  Q.  If you knew at the time
3   that you analyzed this deal that the contract was
4   signed on November 30, 2000, and that it had -- in the
5   terms of the deal it gave HP the right to make a final
6   payment of 2.1 million, more than 12 months later,
7   gave them that right, and that if they didn't purchase
8   it, that it would just -- it would never convert from
9   a lease, would that affect your analysis of revenue
10  recognition under 97-2?
11          MR. KONOVALOV:  Objection; incomplete
12  hypothetical; it's improperly seeking an expert
13  witness from this witness who is not here in an expert
14  capacity.
15          MR. SIDORSKY:  Objection to the incomplete
16  hypothetical and same continuing objection.
17          THE WITNESS:  You know, we certainly would
18  have considered it.  I -- I -- you know, sitting here
19  today, I don't know how it would have impacted it.
20  You're asking me, you know, hypothetical questions or
21  questions on transactions.
22          You know, it's been six years since I looked
23  at this.  And, you know, I'm no longer signing audit
24  reports, so I haven't even looked at SOP 97-2 in
25  probably two years.  I don't want to speculate as to

183

1   an answer on something that I'm not even sure is
2   factual.
3           MR. GREENSTEIN:  Okay.
4           THE WITNESS:  I just --
5           MR. GREENSTEIN:  Q.  So prior to this
6   presentation or during the -- during -- during Q2 '01,
7   did you ever -- Andersen ever look at the -- the terms
8   of the final payment of the 2.1 million, the option to
9   purchase -- buy out the lease?
10          MR. KONOVALOV:  Well, objection; misstates
11  the evidence.
12          MR. SIDORSKY:  Objection to form.
13          THE WITNESS:  Well, what I can tell you is we
14  reviewed agreements, license agreement, and presumably
15  there would have been payment terms in the license
16  agreement; management also reviewed it, management
17  concluded that it was appropriate to recognize
18  revenue.
19          We reviewed it and discussed it amongst our
20  team, and we also, I believe, concluded that it was
21  appropriate to recognize the revenue.  Beyond that,
22  what the specific terms were and how you would -- how
23  your accounting would change if terms were different
24  is all speculation.
25          MR. GREENSTEIN:  Okay.

184

1        Q  Earlier you testified that if the -- under
2   97-2, if the product that was -- license that was
3   sold -- if the functionality was not available, then
4   it couldn't be delivered; do you remember testifying
5   about that?
6           MR. SIDORSKY:  Objection to form.
7           THE WITNESS:  That was a response to one of
8   your questions, yes.
9           MR. GREENSTEIN:  Okay.
10       Q  Now I have a little bit of a different
11  question, which is, if -- if a license is sold by
12  Oracle to a customer and the -- what is sold under
13  that license is available but it doesn't work, would
14  that change the analysis under 97-2, the delivery
15  element?
16          MR. KONOVALOV:  Objection; incomplete
17  hypothetical.
18          MR. SIDORSKY:  Yeah, I'm going to object to
19  the incomplete hypothetical, and again it really is
20  calling for these abstract expert opinions under 97-2
21  which is not a part of Mr. Matuszak's deposition and
22  outside of the scope.
23          MR. GREENSTEIN:  Q.  You can answer.
24       A  It's -- it's a hypothetical question.  As it
25  related to Oracle, we looked to see whether the

185

1  product was on the currently available product list,
2  which meant that it went through the company's normal
3  QA testing, including beta testing and other testing
4  with customers before it was released in final
5  version.
6      Q  Okay.  So -- but did you ever perform an
7  analysis with respect to this deal as to whether the
8  functionality promised to Hewlett-Packard actually
9  worked?
10     MR. KONOVALOV:  Same objections.  Also,
11  assumes facts not in evidence.
12     MR. SIDORSKY:  Same objection.
13     THE WITNESS:  That was not within the scope
14  of our work.
15     MR. GREENSTEIN:  Okay.
16     Q  So you would look to see if it was available,
17  and how would you do that, to see if it was available?
18     A  We would have a product and price list as of
19  the date that the contract was executed and look to
20  see if whatever products they ordered were on the
21  currently available product list.
22     Q  Okay.  And -- and that's what you did with
23  respect to this?  You looked at the current product
24  list to make sure that the -- that the license
25  purchase existed, that the functionality that HP

186

1  purchased existed --
2      MR. SIDORSKY:  Objection.
3      MR. GREENSTEIN:  Q.  -- or was currently
4  available; correct?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  My assumption, based on the
7  testing we normally perform, is that with respect to
8  the HP contract, we would have looked -- checked for
9  product availability.
10     Checking for product availability in the HP
11  contract would have meant that we looked at the -- you
12  know, the list that the company had of currently
13  available products and verified that the license --
14  the products licensed under the HP agreement were on
15  that -- on that list.
16     MR. GREENSTEIN:  Okay.
17     Q  And you wouldn't perform any analysis of
18  whether the products or the module of that product on
19  that list actually worked or had been developed;
20  right?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  No.
23     MR. GREENSTEIN:  Okay.
24     Q  Would it change your analysis at all if you
25  looked -- if the products listed on Oracle's available

187

1  products list, if some of those hadn't even been
2  developed yet, would that change your analysis if you
3  knew that at the time?
4      MR. KONOVALOV:  Objection; assumes facts not
5  in evidence; incomplete hypothetical.
6      MR. SIDORSKY:  Yeah, I'm going to object to
7  the form, too, and also on the scope.
8      THE WITNESS:  If there were unavailable
9  products in the license agreement, that certainly
10  would have been a factor we would have considered.
11     MR. GREENSTEIN:  Okay.
12     Q  You see the third bullet point on Bates
13  No. 0814755?  It says "Remix/exchange rights on
14  migrated licenses."  Do you know what that means?
15     A  Generally, yes.
16     Q  Okay.  What does that mean?
17     A  Well, remix rights or exchange rights,
18  sometimes they're called, are a provisional license
19  agreement whereby the customer may license a large
20  portfolio of products, but the amount of products they
21  can use are limited to a certain dollar amount based
22  either on list price or some other formula, but the
23  customer has the right to, quote, "remix" what they
24  use within the currently available products that
25  they've licensed under that agreement, but they're not

188

1  allowed to ever exceed the dollar amount of products
2  they've licensed.
3      Q  Okay.  Did Andersen perform an analysis or
4  did they perform any analysis or assessment of the
5  terms of that remix exchange prior to this or in
6  2Q (sic) prior to Oracle's recognition of revenue on
7  the deal?
8      A  Well, I'm not sure what you mean by
9  "analysis."
10     Q  Well, how did you -- why is that -- why did
11  you have that bullet point in this presentation?
12     A  Remix and exchange rights/remix rights were
13  not uncommon in the software industry.  However, my
14  recollection is that Oracle did not have a significant
15  amount of these, so it was something we hadn't seen
16  much of, so we thought it was worthy to call it to
17  management's attention that they had remix rights in
18  this agreement.
19     Q  And what did management say?
20     A  I don't recall.
21     Q  Don't remember.
22     Do you remember any specific discussions with
23  Oracle management about this deal in the second
24  quarter of '01?
25     MR. SIDORSKY:  Objection to form.

189

1    THE WITNESS:  I don't -- I can recall
2  specific comments or conversations.  I know we
3  discussed the Hewlett-Packard transaction with
4  management.
5    MR. GREENSTEIN:  Okay.
6    Q  Did you ever discuss it with Larry Ellison?
7    A  No.
8    Q  Did you ever discuss it with Jeff Henley?
9    A  This contract would have been on our closing
10  agenda, and the audit committee agenda, both meetings
11  at which Mr. Henley attended.
12    Q  Okay.  But do you remember any general
13  discussions you had with him personally about this
14  deal?
15    A  There would have been no personal
16  discussions.  It would have been discussions in those
17  meetings, and I don't recall the specifics of the
18  discussions.
19    Q  Okay.  You know what, I'd like to go off the
20  record and take a five-minute break.
21    THE VIDEOGRAPHER:  Off the record.  The time
22  is 2:28 p.m.
23    (Short break taken.)
24    THE VIDEOGRAPHER:  We're back on the record.
25  The time is 2:38 p.m.

190

1    MR. GREENSTEIN:  Q.  Mr. Matuszak, is it --
2  is it typical for Andersen's audit clients to submit
3  management representation letters that are not signed
4  by the CEO?
5    A  Yes.
6    Q  So that's not a unique thing that
7  Larry Ellison didn't sign the representation letter;
8  right?
9    A  No.
10    Q  Okay.  Now, earlier you were testifying about
11  we were talking about payment terms under 97-2, and I
12  was asking about what if a payment term or what if a
13  payment was to be made greater than 12 months after
14  the contract was entered into.  Do you recall talking
15  about that?
16    A  I do.
17    Q  And I think you said that Oracle had -- was a
18  company where the payment terms under a contract were
19  not always -- the terms -- the payment terms and their
20  contracts weren't always within 12 months; is that
21  fair to say?
22    A  That's correct.  They had payment terms at
23  times that extended beyond 12 months.
24    Q  Okay.  And my -- under 97-2 -- well, strike
25  that.

191

1  Isn't one of the requirements of SOP 97-2
2  that fees are fixed and determinable?  Right?
3    MR. SIDORSKY:  Objection to form.
4    THE WITNESS:  That's correct.
5    MR. GREENSTEIN:  Q.  And isn't -- within that
6  umbrella -- within that element, doesn't SOP 97-2
7  require that the payment terms be within 12 months?
8    MR. SIDORSKY:  Objection to form.
9    THE WITNESS:  The -- I can't quote the
10  literature.  But, in general, the requirement is that
11  in order to be fixed and determinable, you have to
12  have a history of collecting, and any payment terms
13  beyond 12 months are -- are presumed to be not fixed
14  or determinable unless a company has a history of
15  entering into contracts with payment terms beyond
16  12 months and collecting those without a history of
17  concessions.
18    MR. GREENSTEIN:  Okay.
19    Q  And when you say "history," do you mean with
20  that particular customer that has that extended
21  payment term or in general?
22    MR. SIDORSKY:  Objection to form.
23    THE WITNESS:  It's not a customer specific
24  requirement.
25    MR. GREENSTEIN:  Q.  So you're saying if

192

1  Oracle has a history of being able to collect payments
2  that are made beyond 12 months, then that is an
3  exception to the fixed and determinable requirement of
4  SOP 97-2?
5    MR. SIDORSKY:  Objection to form; calling for
6  expert testimony.
7    THE WITNESS:  No, I wouldn't say it's an
8  exception to the requirement of fixed and
9  determinable, that they still have to have the
10  payments as fixed and determinable, but they -- they
11  could be deemed to be fixed or determinable if the
12  payment terms were -- were beyond 12 months as long as
13  the company had a history of doing those types of
14  arrangements and collecting on them.
15    MR. GREENSTEIN:  Okay.
16    Q  Now, what if a payment term went beyond
17  12 months and -- and the customer had the option of
18  paying it or not?  Would that meet the fixed and
19  determinable element of SOP 97-t?
20    MR. KONOVALOV:  Objection.
21    MR. SIDORSKY:  Again, objection; it's -- it's
22  an incomplete hypothetical; it's calling for
23  speculation and really asking for expert-type
24  testimony.
25    MR. KONOVALOV:  Join in all those objections.

193

1  THE WITNESS:  Beyond 12 months, and they had
2  the option of paying for it, it may impact the revenue
3  recognition, yes.
4  MR. GREENSTEIN:  Q.  It may preclude it;
5  right?
6  MR. KONOVALOV:  Same objections.
7  THE WITNESS:  It may impact it and preclude
8  it on that final payment.  It may impact it, yes.
9  MR. GREENSTEIN:  Okay.
10  Q  Have you ever heard of account 25005 entitled
11  "Customer Overpayments" with respect to Oracle?
12  MR. SIDORSKY:  We -- we did touch on that
13  this morning.  You did ask that, I believe, Eli, but
14  okay.
15  MR. GREENSTEIN:  Okay.  So the objection is
16  asked and answered; right?
17  MR. SIDORSKY:  Correct.
18  MR. GREENSTEIN:  Great.  Thank you.
19  THE WITNESS:  I'm generally aware of that
20  account, yes.
21  MR. GREENSTEIN:  Okay.
22  Q  Do you -- and do you know -- how are you
23  aware of that account?  Is it because of your
24  experience back in 2001 or -- strike that.
25  How did you become aware of account 25005,

194

1  customer overpayments?
2  MR. SIDORSKY:  Objection to form.
3  THE WITNESS:  Well, I was -- I was aware of
4  it in 2001, and my memory was refreshed as I reviewed
5  the work papers yesterday as to the account and the
6  general reason for the account.
7  MR. GREENSTEIN:  Q.  And what do you know
8  about account 25005?  What's the purpose of it?
9  MR. SIDORSKY:  Objection to form.
10  THE WITNESS:  Well, my recollection is that
11  it is used for payments which the company receives
12  from the customer which cannot, at the time the
13  payment is received, be identified with either a
14  particular customer, or possibly a customer but not a
15  specific invoice.  So they're -- they're put into this
16  account because it cannot be applied to a particular
17  receivable balance.
18  MR. GREENSTEIN:  Okay.
19  Q  And how do you know that that's the purpose
20  of the account?
21  MR. SIDORSKY:  Objection to form.
22  THE WITNESS:  From reviewing the audit
23  papers.
24  MR. GREENSTEIN:  Okay.
25  Q  I'm sorry.  Reviewing them yesterday or

195

1  reviewing them at the time?
2  A  Well, I know I reviewed them yesterday, and
3  I'm generally familiar with the nature of -- or was
4  familiar with the nature of the accounts.  But, you
5  know, my -- my recollection was refreshed yesterday.
6  Q  Okay.  Are you aware -- strike that.
7  Is account 25005 rolled up into any line item
8  on Oracle's financial statements?
9  MR. KONOVALOV:  Objection; vague and
10  ambiguous.
11  THE WITNESS:  Well, it's -- it's the line
12  item that we referred to earlier this morning.  I
13  believe it's called customer deposits and unearned
14  revenue.
15  MR. GREENSTEIN:  Okay.
16  Q  Did you mean customer advances and unearned
17  revenue?
18  A  That's probably what it's called.
19  Q  Okay.  So account 25005, customer
20  overpayments, is part of the line item customer
21  advances and unearned revenue on Oracle's balance
22  sheet?  Is that fair?
23  A  Yes.
24  Q  Okay.
25  A  Yes.

196

1  Q  Is that an asset or liability?
2  A  It's a liability.
3  Q  And why is it considered a liability?
4  A  Well, because unless or until they can have
5  some reasonable basis to say that it might be a
6  payment of a receivable, they may have to refund the
7  money.  So it's -- it's -- it's a liability in terms
8  of they may not have the right to that cash.
9  Q  Right.
10  Because until they -- until they're able to
11  figure out an invoice to apply to -- a customer to
12  apply that payment to, it's not Oracle's money yet;
13  right?
14  MR. SIDORSKY:  Objection.
15  MR. KONOVALOV:  Objection; calls for a legal
16  conclusion.
17  MR. SIDORSKY:  Yeah, objection to form.
18  THE WITNESS:  Well, I would say that they
19  have to have some basis for whether they classify it
20  as an asset or, excuse me, as a liability or a
21  reduction of an asset in the financial statements, but
22  we're talking about a classification on the balance
23  sheet, just to be clear.
24  MR. GREENSTEIN:  Right.
25  Q  And I was just asking why -- why it's

197

1   classified as a liability rather than an asset.  I
2   think you said because until it's -- well, correct me
3   if I'm wrong -- until it's -- until it can be applied
4   to an invoice or linked to a customer, it's -- it
5   might have to be refunded, because it's not Oracle's
6   money yet; is that right?
7        MR. KONOVALOV:  Objection; misstates the
8   witness's testimony.
9        MR. SIDORSKY:  Yeah, objection.  What he said
10  is -- is on the record.  You asked, and you got the
11  answer, and you now try and sort of restate the
12  answer, so objection to form.
13       MR. GREENSTEIN:  I'll ask the question again.
14       MR. SIDORSKY:  All right.
15       MR. GREENSTEIN:  The objection can be asked
16  and answered.
17     Q  But why is 25005 classified as a liability
18  rather than an asset?
19       MR. KONOVALOV:  Objection; asked and
20  answered.
21       THE WITNESS:  Because they receive payment
22  presumably from customers that are making payments to
23  them, and until they can either identify specifically
24  what customer or invoice that relates to or have some
25  other reasonable basis for classification on the

198

1   balance sheet, they would classify it as a customer
2   overpayment.
3        MR. GREENSTEIN:  Okay.
4      Q  And what happens if they can't, if a payment
5   comes into that account, and they can't apply it to an
6   invoice or associate it to a customer?
7        MR. SIDORSKY:  Objection to form.
8        THE WITNESS:  Hypothetical?
9        MR. GREENSTEIN:  Yeah.
10       THE WITNESS:  Well, at some point in time,
11  if -- well, if they're no longer doing business with
12  that customer, presumably at some point in time they
13  would refund them the money.
14       MR. GREENSTEIN:  Okay.
15     Q  Now, why is account 25005 classified as
16  unearned revenue on the balance sheet?
17       MR. KONOVALOV:  Objection; calls for
18  speculation.
19       THE WITNESS:  Well, I think we clarified the
20  caption of the account is customer advances and
21  unearned revenue.  So this would presumably be a
22  customer advance if they don't have -- if they can't
23  identify it with a specific invoice or possibly a
24  specific account.
25       MR. GREENSTEIN:  Okay.

199

1      Q  Do you recall ever doing an analysis during
2   the quarterly reviews or the audit -- doing an
3   analysis of the balances in account 25005?
4        MR. SIDORSKY:  Objection to form.
5        THE WITNESS:  I -- I don't recall specific --
6   I don't recall, at the time, doing an analysis of
7   either variations between quarters or an analysis of
8   what's physically in that account.  I -- I know that
9   some work was done as part of the year-end audit with
10  the composition of that account.
11       MR. GREENSTEIN:  Okay.
12     Q  What work was done as part of the audit?
13     A  My recollection is we reviewed the detail,
14  some of the detail of that account, and the offsetting
15  contra-asset account that some of it gets classified
16  into.
17     Q  And are you referring to account 12018 called
18  unapplied cash?
19     A  Yes.
20     Q  Okay.  And so what analysis did you do as
21  part of the audit in connection with those two
22  accounts?
23       MR. SIDORSKY:  Objection to form.
24       THE WITNESS:  We typically reviewed the
25  detail of 12018, I believe you said, as part of the

200

1   audit, not the quarters, just to see what was in there
2   and make sure that the -- the amount that was in 12018
3   was a reclassification of some of the items in the
4   population of the, you know, customer overpayment
5   account.
6        So we would look at that to make sure that,
7   you know, they were, in fact, in there in terms of
8   what was being reclassified out to a reduction of
9   receivables.
10       MR. GREENSTEIN:  Okay.
11     Q  And you didn't do any analysis of account
12  12018 or 25005 or during the quarterly reviews; is
13  that fair to say?
14       MR. SIDORSKY:  Objection to form.
15       THE WITNESS:  That's correct.  We wouldn't
16  look at the components of what was in those accounts
17  on the quarters.
18       MR. GREENSTEIN:  Okay.
19     Q  Now, can you just describe -- I think you
20  called it reclassification from items in 2505 (sic) to
21  12018.
22       Can you just describe what you mean by
23  "reclassification"?
24     A  Sure.  The -- the balance in 25005 -- I'm
25  sorry.  I don't remember all of the account numbers --

201

1  is a credit balance, and so some of the amounts in
2  there were used.  They were treated as a reduction of
3  that credit balance and were moved over as a
4  contra-receivable, so a credit over on the receivable
5  side.
6      So it had the impact of lowering net
7  liabilities, excuse me, lowering current liabilities
8  and lowering current assets but had no impact on net
9  current assets.
10      Q  Okay.  What -- what does that mean?  Why
11  would it have no impact on net current assets?
12      A  Well, current -- net current assets are
13  current assets less current liabilities or working
14  capital.  Some people call it working capital.
15      Q  Uh-huh.
16      A  If you reduce one side the same as you reduce
17  the other side, the difference between the two is
18  still going to be the same.
19      Q  Okay.  Because 1 -- because 25005 is a
20  liability account and 12018 is an asset account, and
21  the debit and credit cancels out; is that what you're
22  saying?
23      A  That's right.
24      Q  Okay.  Andersen didn't do any analysis of
25  those reclassifications on a quarterly basis; did

202

1  they?
2      MR. SIDORSKY:  Objection to form.
3      THE WITNESS:  I don't believe we did.
4      MR. GREENSTEIN:  Okay.
5      Q  And -- but did you -- did Andersen do a
6  fiscal year 2001 analysis of those reclassifications?
7      MR. SIDORSKY:  Objection to form.
8      THE WITNESS:  I believe that the testing that
9  I was explaining earlier was the testing performed as
10  part of the May 31, 2001, audit.
11      MR. GREENSTEIN:  Okay.
12      Q  What did you -- what did Andersen conclude as
13  a result of that analysis?
14      MR. SIDORSKY:  Objection to form.
15      THE WITNESS:  I believe we concluded that
16  we -- we believe the reclassification was appropriate.
17      MR. GREENSTEIN:  Okay.
18      Q  And what is that?  Is that based on your
19  review of work papers?
20      A  Yes.
21      Q  Okay.  And based on your review yesterday of
22  work papers?
23      A  Yeah, yes.
24      Q  Okay.  Do you remember -- other than looking
25  at the work papers, do you recall back during the

203

1  audit where an analysis of the reclassifications was
2  performed?
3      A  No.  Until I looked at the work papers
4  yesterday, I mean, the work papers refreshed my memory
5  on what was there, what work we performed during those
6  time periods.
7      Q  Okay.  Now, as a senior audit partner, would
8  you have been involved in the analysis of those
9  reclassifications at the time of the audit, or was
10  that something you would learn by looking at the work
11  papers?
12      A  I certainly would not have been involved in
13  looking at the detail, performing the testing.  May
14  have been involved in reviewing those particular work
15  papers or the particular explanation for where it was
16  discussed, what work we did.
17      Q  Okay.  Do you recall any issues arising in
18  connection with the customer overpayments account
19  during the quarterly reviews or audit in 2001?
20      MR. KONOVALOV:  Objection; vague and
21  ambiguous.
22      THE WITNESS:  Yeah, I don't -- don't know
23  what you mean by "problems," but I -- I don't recall
24  there being any issues or unusual items related to
25  those.  I don't recall seeing them on our audit

204

1  committee agenda.
2      MR. GREENSTEIN:  Okay.
3      Q  But, I mean, I'm just asking, as you sit here
4  today, do you recall any -- I said issues.  I didn't
5  say problems, actually -- but any issues or problems
6  with the 25005 account during any of the quarters in
7  2001 or during the audit?
8      A  I don't recall any.
9      MR. SIDORSKY:  Objection to form.
10      THE WITNESS:  Sorry.
11      MR. SIDORSKY:  Asked and answered.
12      MR. GREENSTEIN:  I'm sorry.
13      Q  You said you don't recall any; right?
14      A  That's correct.
15      Q  Do you recall any issues or problems arising
16  with respect to account 12018 during any of the
17  quarterly reviews or the fiscal year 2001 audit?
18      A  I do not.
19      Q  Now, during any of the quarterly reviews, did
20  Andersen ever look at the -- the total amount of
21  unapplied cash that was sitting in 25005?
22      MR. SIDORSKY:  Objection to form.
23      THE WITNESS:  When you say look at the total
24  amount, I don't -- don't know what -- we wouldn't have
25  looked at the detail of the amount.  The account

205

1  balance would have been on a schedule that we were
2  provided by the company, so we would have been aware
3  of what the balance was.
4       MR. GREENSTEIN:  Q.  And would Andersen
5  ever -- I think earlier you -- well, what happens if a
6  payment comes in from a customer and it's put into
7  account 25005 and then it's never reclassified to
8  12018 because they can't apply it to an invoice or
9  they can't apply it to a particular customer because
10  the customer may no longer be in existence?
11      What would -- what would happen to that
12  payment?
13      MR. KONOVALOV:  Objection; calls for
14  speculation.
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  It -- it is a hypothetical
17  question.  I mean, what -- what happened is the
18  payments that went into that account were the
19  responsibility of credit and collections to follow up
20  on where that payment came from, what customer it
21  applied to, and specifically what invoice it applied
22  to.
23      To ask me what they would do specifically
24  with a payment received from a company that went out
25  of business, I -- I'd be speculating.

206

1       MR. GREENSTEIN:  Okay.
2  Q.  I'm just wondering if Andersen ever did any
3  analysis of -- of what collection -- Oracle
4  collections was doing with respect to payments that
5  were put into 25005.
6       MR. SIDORSKY:  Objection to form.
7       THE WITNESS:  I -- I don't recall if we did
8  any testing on that as part of our year-end audit
9  work.
10      MR. GREENSTEIN:  Q.  Well, you certainly
11  didn't do it in the quarterly reviews; right?
12  A.  Correct.
13  Q.  Because -- okay.
14      Now, have you ever seen a report generated by
15  Oracle which has a complete list of all the items in
16  the 25005 account?
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  I have not.
19      MR. GREENSTEIN:  Okay.
20  Q.  Do you know if anybody at Andersen has ever
21  seen such a report?
22  A.  It's somewhat speculation, but I -- if we're
23  going to test the balance at the end of the fiscal
24  year, I would believe someone would have had to look
25  at the detail of that account in order to do any

207

1  testing on it.
2  Q.  And so as part of the testing for the -- the
3  2001 audit, do you recall who was in charge of doing
4  the testing with respect to account 25005?
5  A.  I do not.
6  Q.  Okay.  Would that be an account that -- well,
7  strike that.
8       Do you recall any specific testing done on
9  that account during the year-end audit 2001?
10      MR. SIDORSKY:  Objection to form.
11      THE WITNESS:  I don't recall any testing done
12  specifically on that account, no.
13      MR. GREENSTEIN:  Okay.
14  Q.  Generally on that account?
15  A.  Well, generally would be only the
16  discussion -- the answer I gave before with respect to
17  the reclassification out of that account into
18  the -- the contra-receivable account.
19  Q.  Okay.  But as part of the -- of the 2001
20  audit testing, did you ever -- did Andersen ever do an
21  assessment of the items in 25005 and whether those
22  have been sitting there for many years?
23      MR. SIDORSKY:  Objection to form.
24      MR. KONOVALOV:  Objection; assumes facts not
25  in evidence.

208

1       THE WITNESS:  I don't believe so.
2       MR. GREENSTEIN:  Okay.
3  Q.  So, in other words, Andersen wouldn't do an
4  assessment of -- wouldn't look at whether the items in
5  25005 were supposed to be there?  They would look at
6  the reclassification from 25005 to 12018; right?
7       MR. SIDORSKY:  Objection to form.
8       MR. KONOVALOV:  Objection; vague and
9  ambiguous.
10      THE WITNESS:  I don't recall, as I said,
11  doing any testing of components of that -- that
12  account balance.
13      MR. GREENSTEIN:  Okay.  I'd like to mark this
14  next as -- I think it's Matuszak No. 2.
15      (Document marked Exhibit No. 2
16       for identification.)
17      THE WITNESS:  Thank you.
18      MR. GREENSTEIN:  Q.  For the record, this is
19  Bates stamped NDCA-ORCL 050370 through 050382.  It's
20  an "Account Analysis Report.  Period:  August 1991 to
21  May 1992."  Just take a look at it.  Let me know when
22  you're finished.
23  A.  The entire exhibit?
24  Q.  No, the type of report.
25  A.  Okay.

209

1    Q  See how it says "Account Analysis Report"?
2    A  Yes.
3    Q  Have you ever seen this document before?
4    A  No.
5    Q  Okay.  Have you ever seen this type of report
6  before, account analysis reports?
7    A  I don't believe I have.
8    Q  Okay.  You see how it says -- it says
9  "Accounts From," and then it has some digits, and then
10  has 25005?  Do you see that?
11    A  Yes.
12    Q  And based on your experience at Oracle, does
13  this -- this appears to be a report, an account
14  analysis report of account 25005; right?
15    MR. KONOVALOV:  Objection; lacks foundation.
16    MR. SIDORSKY:  Objection to form.
17    THE WITNESS:  Yeah, I'm not sure what this
18  is.  I -- I don't know.
19    MR. GREENSTEIN:  Okay.
20    Q  But it appears to be an account analysis
21  report of 25005?
22    MR. KONOVALOV:  Objection; lacks foundation.
23    THE WITNESS:  I don't know.  It says
24  "Accounts From," and underneath that it says "To," so
25  I don't know --

210

1    MR. GREENSTEIN:  Right.
2    THE WITNESS:  -- if this is activity for an
3  account, and 25005 is sitting in amongst a number of
4  different zeros and digits.  So if you're telling me
5  factually that's what it is, okay.  But if you're
6  asking me what it is, I'm going to tell you I don't
7  know.
8    MR. GREENSTEIN:  Okay.
9    Q  You see how it says "Ending Balance," and it
10  has $0.26 there as a debit?
11    A  Yes.
12    Q  Based on your experience, auditing Oracle,
13  does that indicate that the ending balance for this
14  month where it says "Period August '91" the balance
15  was $0.26 in 25005?
16    MR. SIDORSKY:  Objection; lacks foundation;
17  calls for speculation; the document speaks for itself.
18    MR. SIDORSKY:  Same objections.
19    THE WITNESS:  Again, I've already gone on
20  record with saying I don't know what this piece of
21  paper is.
22    MR. GREENSTEIN:  Okay.
23    THE WITNESS:  Now you're asking me to
24  conclude on whether the ending balance represents the
25  ending -- ending GL balance for a particular account,

211

1  so I think my first answer answers that question.
2    MR. GREENSTEIN:  Okay.  Fair enough.
3    Q  So are you aware that -- well, Andersen was
4  Oracle's auditor in the early '90s; right?
5    A  In the early '90s, yes.
6    Q  And it was Oracle's auditor until April 2002;
7  right?
8    A  Correct.
9    Q  Okay.  And are you aware that the balance in
10  the 25005 account in the early '90s was smaller than
11  the balance in, say, 2001?
12    MR. KONOVALOV:  Objection; assumes facts not
13  in evidence.
14    MR. SIDORSKY:  Objection to form.
15    THE WITNESS:  I -- I would have no basis to
16  answer that.
17    MR. GREENSTEIN:  Okay.
18    Q  Were you -- were you aware that the -- the
19  balance in 25005 ever increased drastically during
20  your time at Andersen?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  I don't recall the specific
23  balances.  The account fluctuated, but it could
24  fluctuate from quarter to quarter, but it would be
25  based on specific payments that came in from

212

1  customers.
2    It could be large payments that came in at
3  the end of the quarter which would cause it to be
4  larger at the end of the quarter.  Certain quarters
5  had more activity than others.
6    MR. GREENSTEIN:  Right.
7    THE WITNESS:  You know, it's not reasonable
8  to -- to answer as to generally a balance going up or
9  down.  Particularly for this account.
10    MR. GREENSTEIN:  I'd like to mark this as
11  Matuszak No. 3.
12    (Document remarked Exhibit No. 3
13    for identification.)
14    THE WITNESS:  Thank you.
15    MR. GREENSTEIN:  Q.  For the record, actually
16  this was previously marked, why don't we stick with
17  that and take off the sticker, and we'll just call it
18  Chen No. 3.
19    MR. SIDORSKY:  Is it 3 or 2?
20    MR. GREENSTEIN:  No. 3.
21    MR. SIDORSKY:  I think it's Chen 2; right?
22    MAUTNER:  I have 2.
23    MR. GREENSTEIN:  Okay.  Well, why don't
24  you -- why don't you put that aside for now, and
25  I'll -- let's see.

213

1        So this, actually we won't mark this at all.
2    This is -- well, they spelled it wrong.  It's actually
3    Chan No. 3.  It was marked at the deposition of
4    Julie Chan.  They spelled her name wrong, and they
5    spelled it Chen.
6        MR. SIDORSKY:  It's already been marked.
7        MR. KONOVALOV:  Are you going to have these
8    all attached even though they were previously marked?
9        MR. GREENSTEIN:  All what?
10       MR. KONOVALOV:  Attached to the deposition.
11       MR. GREENSTEIN:  Sure.  I don't know how that
12   works, but --
13       MR. KONOVALOV:  Is that your normal?
14       THE REPORTER:  Yes.
15       MR. GREENSTEIN:  Yeah.  Take a look at it
16   just generally, and I'll refer you to specific areas.
17       Q   For the record, this was marked as Exhibit 4
18   to the deposition of Julie Chan, and it is Bates
19   stamped.  It starts AA 15 and the last page is
20   AA 000181.
21       It's not in consecutive -- well, it's in
22   consecutive order, but there are some missing pages,
23   but this is how it was marked in that deposition.
24   Just let me know when you've --
25       A   Oh, I'm ready, unless you want me to look at

214

1    something specific.
2        Q   Okay.  Have you seen this document before?
3        A   Not this particular document.  I -- I believe
4    this -- the information in here was part of what I
5    reviewed yesterday with counsel, with my counsel.
6        Q   Okay.  Do you recognize this type of document
7    as work papers relating to Andersen's quarterly review
8    of Q1 fiscal year 2001?
9        A   In general, they look familiar.
10       Q   Okay.  Where it says "Description" of this
11   file, it says Q1 FY 2001 on the first page?
12       A   Correct.
13       Q   So this appears to be a compilation of
14   documentation related to the quarterly review of
15   Q1 fiscal year 2001; right?
16       A   The cover sheet implies that if these are all
17   from that file, then that would be a correct
18   statement.
19       Q   Okay.  Well, you see the signature there?  It
20   says "Manager approved for filing"; do you see that?
21       A   Yes.
22       Q   Do you know what that is?
23       A   It appears to be the signature of
24   Lance Taylor.
25       Q   Okay.  And who is Lance Taylor?

215

1        A   Lance Taylor was the manager on the
2    engagement at that time period.
3        Q   When it says approved for filing, what does
4    that mean?  Filing -- what does "filing" mean?
5        A   That meant that the -- from the perspective
6    of Andersen, the work on that particular file was
7    complete and that it was ready to go into our filing
8    system, so no -- no -- no further documentation or
9    work was required on that file.
10       Q   Okay.  And you see the date?  It says
11   November 2000 there --
12       A   Yes.
13       Q   -- on the signature?
14       A   Yes.
15       Q   So it appears that these work papers or that
16   that signature of these work papers occurred in the
17   Oracle second fiscal quarter 2001; right?
18       A   Yes.
19       Q   Okay.  So it was prepared after the actual
20   quarter had ended, when Q1 had ended; right?
21       MR. SIDORSKY:  Objection to form.
22       THE WITNESS:  Well, the -- the date that it
23   was approved for filing was subsequent.  It was during
24   the second quarter which would have been the point in
25   time that all of our work was completed.

216

1        MR. GREENSTEIN:  Right.  Sorry.  Yeah.
2        Q   But the work was actually performed during
3    the first fiscal quarter, right, or shortly
4    thereafter?
5        A   Most likely shortly thereafter.
6        Q   Or concurrently; right?
7        MR. SIDORSKY:  Object.
8        MR. GREENSTEIN:  Okay.  Yeah.
9        MR. SIDORSKY:  Objection to form.  All right.
10   I don't -- I don't think the --
11       MR. GREENSTEIN:  Q.  So is this what the
12   quarterly review work papers generally look like?
13       A   This is what the file cover normally looks
14   like.
15       Q   Right.  Okay.
16       If you turn to AA 19, which is actually
17   horizontal, it's a variation analysis of the accounts
18   receivable as of August 31st, 2000, and you've seen
19   this before; right?
20       A   Yes.
21       Q   Okay.  And you see how in the top left-hand
22   corner it says "Variation Analysis Accounts
23   Receivable; right?
24       A   I'm sorry.  Where?
25       Q   In the top left-hand corner.

217

1    A  Yes.
2    Q  What does that mean, "variation analysis"?
3    A  It -- it was a schedule that listed balances
4  from one quarter to the next along with the variances,
5  and then there was a discussion that we held with
6  management on certain of those variances.
7    Q  Okay.  And how do you know there was a
8  discussion with management on certain of those
9  variances?
10    A  Because at the top right-hand corner it says
11  "Per discussion with Julie Chan, Senior -- Senior
12  Revenue Manager."
13    Q  Okay.  Now, do you -- did you ever work --
14  did you work on this work paper at the time?
15    A  I would have reviewed this work paper.
16    Q  Okay.  Do you recall reviewing it?
17    A  I re -- I recognize a couple of my comments
18  on the work paper.
19    Q  Okay.  Which comments are -- do you recognize
20  that are your comments?
21    A  Under comment B, on the right-hand side,
22  "Other receivables tech support," there is a comment
23  at the end that says "and large Q4 renewals."
24    Q  And that's your handwriting that says "and
25  large Q4 renewals"?

218

1    A  I believe that's my handwriting.
2    Q  Now, do you see any other handwriting on this
3  page?
4    A  Down at the bottom, next to the letter H,
5  where the note says "This reduction is based upon
6  relative activity for the second quarter and
7  consistent with," and appears that some comments are
8  dropped off.  I believe that's my handwriting that
9  says "and consistent with" the two words "prior
10  years."
11    Q  Okay.  Down there it says "See further
12  discussion B15"; you see that?
13    A  Yes.
14    Q  Is that your handwriting?
15    A  That is not.
16    Q  Does that appear to be "JM," whoever that
17  initial is, their handwriting?
18    A  I wouldn't know.
19    Q  Okay.  Do you know who JM is?
20    MR. KONOVALOV:  Objection; lacks foundation
21  that it is JM.
22    MR. SIDORSKY:  Yeah, I think there was
23  some -- there was -- all right.  Objection to form.
24  I'm not -- I think that's right.  I'm not sure it is
25  JM.

219

1    THE WITNESS:  I don't know.  I don't know who
2  that is or what that is.
3    MR. GREENSTEIN:  Okay.
4    Q  So since you wrote the term "prior years" on
5  there, you -- is it fair to say you reviewed this "H,"
6  this summary in "H"?
7    A  Yes.
8    Q  Okay.  And do you know when you reviewed it?
9    A  Not specifically.
10    Q  Well, or if you look at -- see the top -- or
11  sorry.  Below there which has a "B" notation on it,
12  and then it has a "PA," it looks like, and a "TM," and
13  then it has 9/01.  Do you see that?
14    MR. SIDORSKY:  Where are you now?
15    MR. GREENSTEIN:  Q.  Right in the bottom
16  right-hand corner, the notation.
17    MR. SIDORSKY:  Okay.
18    THE WITNESS:  Yeah, I see a "PA," and it
19  looks -- it could be a "9/01."  I'm not sure.
20    MR. GREENSTEIN:  Q.  Right.
21    A  But yes.
22    Q  Do you know what that means, the "B" there?
23    A  "B" would be the work paper index, I believe.
24    Q  But does "B" refer to anything?  Does it
25  refer to accounts receivable, or is it associated with

220

1  accounts receivable?
2    A  "B" would be associated with accounts
3  receivable.
4    Q  Do you know what "PA" is, or what that means?
5    A  Well, I can speculate based on the file
6  cover.  It is most likely Pam Arquelada.
7    Q  Okay.  Well, seeing those dates there --
8  well, the signatures that it looks like -- at least
9  one of them looks like to be 9/01, does that help you
10  refresh your recollection about when you reviewed this
11  particular --
12    A  Well --
13    MR. SIDORSKY:  Objection to form.
14    MR. KONOVALOV:  Lacks foundation that it says
15  9/01.
16    MR. GREENSTEIN:  Q.  Well, does it say 9/01?
17  Does it look like that to you?
18    A  I don't know what it says.  It could be 9/01,
19  I mean.
20    Q  Or it could be what else?
21    A  If this is our Q1 review, it is likely that I
22  reviewed this work paper as part of our quarterly
23  review which would have been in September of 2000.  So
24  9/01 wouldn't make sense given that this is the
25  August 31, 2000, quarter.

221

1   Q  So you said it would be in 9/2000 or
2   September 2000?
3   A  Yes.
4   Q  Okay.  Now, did you write this provision "H"
5   here, the typed notes, or was that just your
6   handwriting that said "prior years"?
7   A  That's just my handwriting at the end.
8   Q  Did you type any of these notes on here?
9   A  I did not.
10  Q  Okay.  Do you see any other of your
11  handwriting of yours on this work paper?
12  A  I do not.
13  Q  Okay.  Now, do you see where that -- this
14  subpart H is associated with the account allowance for
15  bad debt/returns?  Do you see that?
16  A  Yes.
17  Q  Okay.  Is that -- is that comment there --
18  does that relate to that line, "Allowance for bad debt
19  returns"?
20  A  It appears it does.
21  Q  Okay.  And do you know what account 12601 is
22  in those parenthesis under the title "Allowance for
23  bad debt returns"?
24  A  I don't know.  I don't know specifically what
25  any of those accounts are for other than it appears

222

1   that they roll up into the total of the allowance for
2   bad debt/returns.
3   Q  Okay.  Well, do you know, sitting here today,
4   what account 12601 is or was at Oracle during that
5   time period?
6   A  No.
7   Q  Okay.  Do you recall any -- any discussions
8   during your quarterly reviews or audit about that
9   account 12601?
10  A  I don't.  I don't know what it relates to,
11  so --
12  Q  Okay.
13  A  -- how could I recall discussions on it.
14  Q  Okay.  So you wrote here "prior years."  So
15  it says "Decreases as a result of the following:
16  Reduction in management judgement from Q4 to Q1 from
17  26 million to 14 million.  This reduction is based
18  upon relative activity for the quarter and consistent
19  with prior years."
20  Do you see that?
21  A  Yes, I do.
22  Q  So why did -- why did you write that "prior
23  years"?  What does that mean "This reduction is based
24  upon relative activity for the quarter and consistent
25  with prior years"?

223

1   A  The fourth quarter was normally the largest
2   quarter for the company's fiscal -- within their
3   fiscal quarters.  So they would normally have the
4   largest receivable balance at the end of the quarter,
5   and the receivable balance at the end of Q1 would
6   typically be less than it was at the end of the fourth
7   quarter, the prior fourth quarter.
8   So you would anticipate or not be -- not find
9   it unusual to have some corresponding reduction in the
10  reserve along with a reduction in receivables.
11  Q  Okay.  Because there's less receivables, it
12  would -- it's fair to say that there would most likely
13  be less allowance for bad debts on those receivables;
14  right?
15  A  It's -- that's -- it -- it would be
16  reasonable to expect that, yes.
17  Q  Okay.  You see at the top where it says right
18  above the part where it says "Per discussion with
19  Julie Chan," it says "Greater than $5 million variance
20  discussion; you see that?
21  A  Yes.
22  Q  Does that mean everything in here relates to
23  items greater than 5 million?
24  MR. SIDORSKY:  Objection to form.
25  MR. GREENSTEIN:  Q.  What does that mean?

224

1   A  I -- I believe it means that either within an
2   account level or a subaccount or account, you know,
3   subtotal, we would have looked at variations greater
4   than 5 million and had some discussion with
5   Julie Chan.
6   Q  Does this mean that you -- that Andersen
7   didn't have any discussions related to items less than
8   5 million?
9   A  Yeah, most likely that's true.
10  Q  Okay.  If you can turn the page, and it's
11  AA 20.
12  A  Okay.
13  Q  You see this is an Arthur Andersen memo dated
14  September 11th, 2000?  Do you see that?
15  A  Yes.
16  Q  And you see it appears to be -- it says "The
17  purpose of this memorandum is to summarize the
18  significant accounts and accounts receivable"; do you
19  see that?
20  A  Yes.
21  Q  And then it has a list of accounts, and they
22  start with "12"; do you see that?
23  A  Yes.
24  Q  Does that refresh your recollection that the
25  accounts related to accounts receivable all had

225

1  prefixes that began with "12"?
2      A  Generally, yes.
3      Q  Okay.  Now, turn the page to AA 21.
4          You see how there's a -- at the bottom it's
5  "Account 12018 unapplied cash"?
6      A  Yes.
7      Q  Do you see that?
8      A  Yes.  Sorry.
9      Q  Okay.  Now, who -- well, who drafts these
10  descriptions?  Is this something that Andersen drafts?
11     A  Well, this is -- this is an Andersen memo.
12  So I believe it would have been prepared by one of the
13  staff people on the engagement.  Most likely a
14  schedule that was carried forward and updated from
15  quarter to quarter.
16     Q  Okay.  And who's -- is Pamela Arquelada --
17  who was she at the time?
18     A  She's on the front file as one of the
19  experienced staff on the engagement.
20     Q  Okay.  So you didn't draft these
21  descriptions, the account descriptions; did you?
22     A  I did not.
23     Q  Okay.  Did you ever in any of the quarterly
24  reviews -- well, have you ever drafted any of these
25  descriptions of Oracle accounts that are -- that's in

226

1  this memo?
2      A  I did not.
3          MR. SIDORSKY:  Objection to form.
4          THE WITNESS:  Sorry.
5          MR. GREENSTEIN:  Q.  Did you ever review them
6  as part of a quarterly review?
7      A  I probably did at some point.  I don't -- I
8  don't know specifically.
9      Q  Okay.  So you don't recall.
10         Well, during any of the quarterly reviews in
11  fiscal year 2001, do you recall ever having any
12  discussions about any of these accounts?
13     A  The account descriptions in this memo?
14     Q  Yeah, or any of the accounts listed in this
15  memo.
16         MR. SIDORSKY:  I'm going to object as overly
17  broad; vague and ambiguous.
18         THE WITNESS:  Well, it's doubtful that I
19  would have had description of the -- you know, the --
20  the discussion or description of the accounts that are
21  included on B-3.  It appears that I reviewed schedule
22  B.  And whether I had specific discussions with any of
23  our staff or managers or other partners on these, I
24  don't recall.
25         MR. GREENSTEIN:  Okay.

227

1      Q  And you said it appears you saw schedule B
2  reviewed schedule B.  How do you -- why do you think
3  that?
4      A  Well, I think we already substantiated that
5  my handwriting is on it.
6      Q  Well -- oh, on?
7      A  On B, not B-3.  Sorry.
8      Q  Oh, on the -- on the previous page AA 19;
9  right?
10     A  Yes.
11     Q  Okay.  So that means you reviewed AA 20 as
12  well?
13         MR. SIDORSKY:  Objection to form.
14         THE WITNESS:  20, no, no.
15         MR. GREENSTEIN:  Okay.
16     Q  I just want to make sure.  You don't see any
17  handwriting on -- on AA 20 that would indicate that
18  you reviewed this; right?
19     A  I do not.
20     Q  Okay.  Do you recall reviewing these account
21  descriptions in the first quarter of 2001?
22     A  I do not.
23     Q  Okay.  Do you recall -- if you turn to 21,
24  and if you look at 12018 again, unapplied cash, that
25  was the account we talked about earlier; right?

228

1      A  Yes.
2      Q  Okay.
3      A  One of the accounts.
4      Q  One of the accounts, right.
5          And you see where it says "Consistent"?  In
6  the middle of it says "Consistent with the prior
7  periods, when customer overpayments are received, they
8  are posted to account 25005 - Customer Overpayments";
9  do you see that?
10     A  I see that.
11     Q  Is that consistent with your earlier
12  testimony about what you believe to be the reason for
13  account 25005?
14         MR. SIDORSKY:  Objection to form.
15         THE WITNESS:  Well, it says here "Customer
16  Overpayments."  It could just be customer payments
17  that are not yet applied to a particular invoice.
18         MR. GREENSTEIN:  Right.
19     Q  But the account is entitled "Customer
20  Overpayments"; right?
21         MR. KONOVALOV:  Objection; assumes facts not
22  in evidence.
23         THE WITNESS:  It appears as if the account is
24  entitled "Customer Overpayments."
25         MR. GREENSTEIN:  Right.

229

1    Q  Okay.  So see at the bottom, last sentence,
2  it says "When a related set of invoices are
3  identified, these overpayments are reclassified to
4  account 12018."
5        Do you see that?
6    A  I do.
7    Q  Now, do you know what it means when it says
8  "a related set of invoices are identified"?
9    A  Well, I think this is consistent with my
10  previous testimony and discussion, that when cash is
11  received for which they cannot identify a specific
12  invoice, it goes into 25005, which is entitled in the
13  GL system "Customer Overpayments."
14        Those payments are then analyzed, and when
15  they are identified with a specific customer or
16  otherwise, the company has a reasonable basis to
17  reclassify them, they're reclassified out of the
18  liability account and into account 12018 which is a
19  contra-asset account.
20    Q  Okay.  And what happens if -- it says "When a
21  related set of invoices are identified, those
22  overpayments are reclassified to account 12018"?  Do
23  you see that?
24    A  I do.
25    Q  What happens if a related set of invoices are

230

1  not identified?  What happens to those overpayments?
2        MR. SIDORSKY:  Objection to form.
3        MR. KONOVALOV:  Objection; incomplete
4  hypothetical.
5        THE WITNESS:  Yeah, this is consistent with
6  the discussion we had before.  I -- I don't know what
7  happens if, you know, they would not be reclassified.
8  The payments are investigated by credit and collection
9  to find out what customer they came from and what
10  particular invoice they came from.  If they are never
11  identified, I could only speculate on what the company
12  did.  Presumably they would refund the money.
13        MR. GREENSTEIN:  Okay.
14    Q  And were you aware of any such refunds during
15  your engagements in 2001 with Oracle?
16        MR. SIDORSKY:  Objection to form.
17        MR. KONOVALOV:  It's vague and ambiguous.
18        THE WITNESS:  The -- that was not an area
19  that we -- we focused on during our audit.  Meaning,
20  that what went out or what ultimately was the
21  disposition of overpayments or unidentified payments
22  in 25005.
23        MR. GREENSTEIN:  Okay.
24    Q  And you said as part of your audit you didn't
25  do that, so I'm assuming you didn't do that as part of

231

1  the quarterly review either?
2    A  That's correct.
3    Q  Okay.  If you turn to page AA 23.  By the
4  way, the previous document that we were looking at,
5  was that a lead sheet?
6    A  Which?
7    Q  Which is page --
8    A  Which document?
9    Q  Previous page, AA 19.
10    A  I believe this would have been the lead sheet
11  for domestic receivables.
12    Q  Okay.  Now, if you look at AA 23, does this
13  appear to be the lead sheet for unearned revenue?
14    A  It does.
15    Q  Okay.  And unearned revenue, is that a -- is
16  that the liability line item that we talked about
17  earlier?
18    A  Yes.
19    Q  It doesn't say customer advances on there;
20  does it?
21        MR. SIDORSKY:  The document speaks for
22  itself.
23        THE WITNESS:  It -- it does not in the -- in
24  the heading for the schedule, no.
25        MR. GREENSTEIN:  Okay.

232

1    Q  You see how it has account "25005 Customer
2  Overpayments" there?
3    A  Yes.
4    Q  You see that's underneath "USA Unearned
5  Revenue Accounts"; right?
6    A  That's correct.
7    Q  So why was 25005 classified as an unearned
8  revenue account?
9        MR. KONOVALOV:  Objection; lacks foundation.
10        MR. SIDORSKY:  Yeah, I think it's --
11  objection, also asked and answered a couple of times,
12  but anyway, objection to form.
13        THE WITNESS:  Well, these accounts all rolled
14  up into the same line item in the financial statements
15  which I believe we've clarified was called something
16  like customer advances on unearned revenue.
17        MR. GREENSTEIN:  Okay.
18    Q  You see how it has the balances for 53100 and
19  83100?
20    A  Yes.
21    Q  And there's a variance; do you see that?
22    A  Yes.
23    Q  Now, is it fair to say that's the variance or
24  the difference between the balances as of May 31,
25  2000, and 8/31/2000; right?

233

1    A  Yes.  Between 5/31 -- so end of fiscal year
2  -- fiscal year 2000 and the first quarter of fiscal
3  2001.
4    Q  Right.
5      And it appears that 25005 customer
6  overpayments increased by approximately 70 million;
7  right?
8      MR. KONOVALOV:  Objection; misstates the
9  evidence in the case.
10      THE WITNESS:  On this schedule it appears
11  that way.
12      MR. GREENSTEIN:  Okay.
13    Q  Is there any other schedule that would tell
14  you how much 25005 increased by?
15      MR. KONOVALOV:  Objection; calls for
16  speculation.
17      You can put the document in front of the
18  witness.
19      THE WITNESS:  I know that there was a
20  reclassification of approximately $75 million that
21  reduced this, so there was very little variation
22  between quarters.
23      MR. GREENSTEIN:  Q.  And how do -- how do you
24  know that?
25    A  Well, right now I know it because I looked at

234

1  the Q2 work papers yesterday.
2    Q  So that's in the Q2 work paper?
3    A  I believe -- well, let me restate that.  It
4  was in some work papers I reviewed yesterday.
5    Q  Okay.  Do you see any handwriting on here
6  that's yours?
7    A  I do.
8    Q  Where is that?
9    A  Next to explanation D.
10    Q  Okay.
11    A  The dark handwriting.  This is due to the out
12  of balance from Q4 which was reserved in Q1 of '01.
13    Q  Okay.  So -- and that's under the account
14  "25011 Unearned Revenue Education"; right?
15    A  That's right.
16    Q  And the note says, under D, it says "During
17  Q1 reserves were increased by 20 million," and then
18  your handwriting says "This is due to the, quote, 'out
19  of balance,' unquote, from Q4 which was reserved in Q1
20  '01"; is that what it says?
21    A  That's what it appears to say.
22    Q  Okay.  And what does that mean?
23    A  I don't recall the specifics.
24    Q  Well, what does it mean to be "out of balance
25  from Q4 which was reserved in Q1"?

235

1      MR. SIDORSKY:  Objection to form.
2      THE WITNESS:  I'm trying to remember.
3  There -- there would have been something that was,
4  quote, "out of balance," meaning, probably did not
5  reconcile to the detail, general ledger balance not
6  reconciling to the detail.  So when it was noticed, a
7  reserve was set up to -- until it was further
8  investigated and resolved.
9      MR. GREENSTEIN:  Okay.
10    Q  Do you know what the -- was it ever resolved?
11    A  Again, I -- I don't recall this specific
12  comment.
13    Q  Okay.  But to be out of balance to you means
14  what?
15      MR. SIDORSKY:  Objection; asked and answered.
16      MR. GREENSTEIN:  I'll withdraw that.
17    Q  You see above there on -- on the 25005
18  customer overpayments account, you see there's a
19  letter "A"?
20    A  I do.
21    Q  Okay.  Do you -- well, did you type any of
22  these comments here?
23    A  I did not.
24    Q  Okay.  Do you know who did?
25    A  I do not.

236

1    Q  Okay.  See how it says "Increased over Q4 due
2  to greater cash collections from higher Q4 activity
3  which had not been identified to specific accounts
4  receivable balances.  The increase was offset by the
5  adjustment for the accounts receivable out of balance
6  of 11.2 million"?  Do you see that?
7    A  Yes.
8    Q  So it appears that there was an increase in
9  25005 due to greater cash collections which had not
10  been identified to specific error balances; is that
11  right?
12    A  That's what the note says.
13    Q  Okay.  Do you know what that -- what that
14  means?
15    A  Not other than what it says.
16    Q  Well, what does it mean to you, sitting here
17  today, being the senior audit partner on this --
18      MR. SIDORSKY:  Well, I'm going to object to
19  the form.  I mean, it's written in -- in English, and
20  I don't -- I don't -- you know, I don't quite
21  understand what -- what do you mean what does it mean
22  other than what it says, but objection to form.
23      MR. KONOVALOV:  Objection; document speaks
24  for itself.
25      THE WITNESS:  It -- it implies that there

237

1  were greater cash collections in or around the end of
2  Q1 because receivables are higher at the end of Q4,
3  because there are a number of transactions that the
4  company executes near the end of the quarter, near the
5  end of the fiscal year end quarter, so the end of May.
6  So those payments would be received some time in the
7  first quarter of the subsequent fiscal year.
8       MR. GREENSTEIN:  Okay.
9       Q  Now, do you know -- did -- do you know what
10  Andersen -- what evidence Andersen had to support this
11  statement that is here under letter "A"?
12       MR. SIDORSKY:  Objection to form.
13       THE WITNESS:  There's -- there's no notation
14  on the schedule as to who these variances were
15  discussed with.
16       MR. GREENSTEIN:  Okay.
17       Q  Did you discuss this particular letter "A,"
18  this increase in 25005, with anybody at the time?
19       A  Well, I don't recall.
20       Q  Okay.
21       A  But I did not prepare this schedule.
22       Q  Okay.  You see how it says "The increase was
23  offset by the adjustment for the accounts receivable
24  out of balance for 11.2 million"?  Do you see that?
25       A  I do.

238

1       Q  What does it mean when it says "To address
2  for the A/R out of balance of 11.2 million"?
3       MR. KONOVALOV:  Objection; lacks foundation;
4  calls for speculation.
5       THE WITNESS:  Again, I believe that the,
6  quote, "A/R out of balance," end quote, refers to the
7  general ledger balance being different than the
8  accounts receivable trial balance to the extent of
9  11.2 million.
10       MR. GREENSTEIN:  Okay.
11       Q  If you turn to AA 81, which is the next page,
12  you see how it appears to be a slide presentation from
13  Arthur Andersen made at an audit committee meeting?
14  It says "Audit Committee Agenda October 2000"; do you
15  see that?
16       A  Yes.
17       Q  So it appears -- is this a slide presentation
18  provided to the audit committee for the first quarter
19  of 2001?
20       A  Yes.  It would have been the Andersen
21  presentation or discussion document that was discussed
22  as part of our meeting with the audit committee
23  meeting for Q1.
24       Q  Okay.  And this, if you recall, Matuszak
25  No. 1, was a similar presentation with respect to the

239

1  second quarter; do you recall that?
2       A  Yes.
3       Q  Okay.  Is this kind of the similar
4  presentation that you made quarterly?
5       A  This would have been, yes, the -- the similar
6  presentation, but in this case done for the first
7  quarter versus the second quarter.
8       Q  Okay.  And so you see -- the next page is AA
9  82.
10       A  Yes.
11       Q  And it says "Results of first quarter
12  review," and it says "Overall results.  No adjustments
13  proposed.  Quality of earnings discussion.  No
14  issues"; do you see that?
15       A  I do.
16       Q  That's the same language that was in the
17  second quarter presentation; right?
18       A  That's correct.
19       Q  And so it would mean the same thing as you
20  testified about earlier with respect to second
21  quarter; right?
22       A  That's correct.
23       Q  And again, did you ever have any discussions
24  with anybody about any issues with the quality of
25  earnings in this quarter?

240

1       MR. SIDORSKY:  Objection; asked and answered.
2       THE WITNESS:  Again, the -- I believe the
3  question was did you have -- did you ever have any
4  discussions with anybody?
5       Well, we would have had discussions with
6  management and certainly with the audit committee
7  because it's on this agenda.  If you're asking whether
8  I had discussions with anyone outside of the Andersen
9  engagement team or general discussions, my answer from
10  this morning still stands.  The answer is no.
11       MR. GREENSTEIN:  Okay.
12       Q  This says "Quality of earnings discussion, no
13  issues."  What I'm asking is if there was any
14  discussion of actual issues that pertained to the
15  quality of earnings?
16       MR. SIDORSKY:  I think that is what we went
17  through this morning, so objection; asked and
18  answered.
19       THE WITNESS:  There would not have been any.
20       MR. GREENSTEIN:  Okay.
21       Q  And you see it says "Judgmental reserves and
22  accruals," that appears to be the same language that
23  was in the second quarter presentation --
24       A  Yes.
25       Q  -- right?

241

1     So it has the same meaning as you testified
2  about earlier?
3     A   Yes.
4     Q   And looking at AA 83, which is the next page,
5  "Revenue Review --"
6     A   Uh-huh.
7     Q   -- you see it has the same language, "No
8  changes in scope or procedures"?  That was -- that was
9  the same language that was in the quarterly 2 -- or
10  the second quarter '01 presentation; right?
11    A   That's correct.
12    Q   And it appears that it says license revenue
13  tested 32 percent.  That's the similar testing that
14  you described with respect to the second quarter, but
15  in second quarter presentation it said you tested
16  37 percent; right?
17    A   That's correct.
18    Q   Now, what's the reason for testing 32 percent
19  in the first quarter and 37 percent in the second
20  quarter?
21    A   Again, I -- I -- my testimony from this
22  morning indicated that we did not have -- our scope
23  was set to review a certain number of contracts or
24  contracts above a certain dollar amount, so it
25  depended, you know, what percentage those were for

242

1  total domestic license revenue.  So the percentage
2  varied from quarter to quarter.
3     Q   Right.
4         And the number of customers or contracts you
5  may have reviewed per quarter was changed also; right?
6     MR. SIDORSKY:  Objection to form.
7     THE WITNESS:  You know, again, it may or may
8  not.  I just don't recall what our scope was.
9     MR. GREENSTEIN:  Okay.
10    THE WITNESS:  Whether it was set out, you
11  know, as you implied this morning, 20 contracts a
12  quarter, 15 contracts a quarter or whether it was set
13  at all contracts over $5 million.  I -- I don't recall
14  what the scope was.
15    MR. GREENSTEIN:  Okay.
16    Q   But the percentage number here means
17  percentage of what?
18    A   This means percentage of domestic license
19  revenue.
20    Q   Okay.  And that -- the procedures, when it
21  says "tested," that percent, the testing procedures
22  were the same procedures that you testified with
23  respect to Q2 '01; right?
24    A   That's correct.
25    Q   And it says "No change in scope of

243

1  procedure," so -- right?
2     A   That's correct.
3     Q   Have you ever had -- heard of the term "on
4  account" at Oracle?
5     MR. SIDORSKY:  Objection to form.
6     THE WITNESS:  I -- I don't know what you mean
7  by the term "on account."
8     MR. GREENSTEIN:  Q.  Well, do you -- do you
9  have an understanding of what "on account" means at
10  Oracle?
11    A   No, I don't.
12    Q   Have you ever heard the terminology, quote,
13  "on account," unquote, during your quarterly reviews
14  or audits at Oracle?
15    MR. SIDORSKY:  Objection to form.
16    THE WITNESS:  I don't know what context
17  you're asking the question in.  So, I mean, I don't
18  recall specific discussions of anyone saying
19  something, you know, "What is an 'on account?'"
20    I mean if you said to me, you know, customer
21  ABC made a payment on account, then I would assume
22  they made a payment on their account.  So I don't know
23  that I can testify that no one ever would have said
24  those two words put together in the entire tenure of
25  my engagement at Oracle.

244

1     MR. GREENSTEIN:  Right.
2     Q   But --
3     A   If you're implying it means something
4  specific, I don't know what --
5     Q   Okay.
6     A   -- your question is.
7     Q   Yeah.  I'm not talking about the words "on
8  account" meaning used in the normal course.  I mean a
9  specific terminology used by Oracle that something is
10  designated, quote, "on account."
11    MR. SIDORSKY:  Objection to form.
12    THE WITNESS:  I don't recall that
13  terminology.
14    MR. GREENSTEIN:  Okay.
15    Q   Now, are you aware -- from your experience
16  during the 2001 audit and quarterly reviews, are you
17  aware that any unapplied cash items were designate --
18  designated, quote, "on account"?
19    MR. SIDORSKY:  Objection to form.
20    THE WITNESS:  I -- I don't recall that
21  terminology.
22    MR. GREENSTEIN:  Okay.  Why don't we take
23  five minutes and go off record.
24    THE VIDEOGRAPHER:  This is a good time to
25  change the tape.

245

1      We are going off the record.  The time is
2  3:45 p.m.  Here marks the end of videotape number
3  three, Volume I, in the deposition of Gary Matuszak.
4      (Short break taken.)
5      THE VIDEOGRAPHER:  We are back on the record.
6  The time is 4:00 p.m.  Here marks the beginning of
7  videotape number four, Volume I, in the deposition of
8  Gary Matuszak.
9      MR. GREENSTEIN:  Q.  Mr. Matuszak, we were
10  looking at what's been previously marked as Chen
11  Exhibit No. 3, which is the quarter one fiscal year
12  2001, some work papers related to that quarter.  I'd
13  like to direct your attention to AA 181.  It's the
14  last page of the document.
15      A  Okay.
16      Q  Actually, if you just kind of flip back and
17  look at AA 23, the kind of --
18      A  Okay.
19      Q  You see the note associated with 25005
20  "Customer Overpayments," you know, on the right-hand
21  side, letter "A"; do you see that?
22      A  Yes.
23      Q  And the last sentence says "The increase was
24  offset by the adjustment for the A/R out of balance of
25  11.2M"; do you see that?

246

1      A  Yes.
2      Q  When it says "The increase," does that mean
3  the increase in the level of 25005 was offset by an
4  adjustment to the accounts receivable out of balance
5  of 11.2 million?  That's what the increase means;
6  right?
7      MR. SIDORSKY:  Objection; the document speaks
8  for itself.
9      THE WITNESS:  That's what it appears to say,
10  yes.
11      MR. GREENSTEIN:  Q.  So, in other words, the
12  increase of 74 million there was -- sorry -- the
13  increase from the balance on May 31st, '00, and the
14  balance of 8/31st 2000, that increase was then offset
15  by 11.2 million which resulted in the variance between
16  those quarters; right?
17      MR. KONOVALOV:  Objection; misstates --
18      MR. SIDORSKY:  Objection to form.
19      MR. KONOVALOV:  -- misstates the witness's
20  testimony and the evidence in the case, but --
21      THE WITNESS:  It -- it appears as if the
22  account balance was reduced by 11.2 million.
23      MR. GREENSTEIN:  Q.  That's -- oh, sorry.
24      A  I'm not -- I'm not sure actually what -- what
25  it refers to, whether there was --

247

1      Q  Okay.  Why don't you look at the last page,
2  which is AA181?
3      A  Okay.
4      Q  I think it will provide some clarity of the
5  11.2 million.
6      You see kind of in the middle of the page
7  where it has a letter "A --"
8      A  Yes.
9      Q  -- there?
10      You see it has 11.2, roughly 11.2 million?
11  You see that?
12      A  Yes.
13      Q  And then you see there's another "A" down at
14  the box there, and it says "JE done in August for
15  11.2 million to collect part of the out of balance."
16      You see that?
17      A  Yes.
18      Q  And it says "JE was correcting entry to
19  invoice --" and there's a number, invoice number --
20  and then it says "BAD."  You see that?
21      A  Yes.
22      Q  Do you know what an invoice that has "BAD"
23  after it means?
24      MR. KONOVALOV:  Objection; misstates the
25  document.

248

1      MR. SIDORSKY:  Yeah, objection to form.
2      THE VIDEOGRAPHER:  Counsel, your microphone.
3      THE WITNESS:  I don't know what that means.
4      MR. GREENSTEIN:  Okay.
5      Q  When you say that, you mean what it means
6  when there's an invoice number followed by the -- the
7  word "BAD"?
8      MR. SIDORSKY:  I'm not sure that's the word
9  "bad."  It's -- it's -- you know, it's a number, and
10  then there's letters B-A-D.
11      MR. GREENSTEIN:  Okay.
12      Q  To the extent that it's B-A-D, have you ever
13  seen that before?
14      A  No.
15      Q  If it was B-A-D, would that mean anything to
16  you if it was an invoice number followed by B-A-D?
17      A  No.
18      Q  Okay.  So you didn't type this; did you?
19      A  No.
20      Q  Okay.  Now, you see at the beginning -- well,
21  the beginning sentence says "JE, journal entry"; does
22  that mean that?  Right?
23      A  I'm sorry?
24      Q  The beginning of the sentence in that box
25  says "JE done."

249

1      A   Yes.
2      Q   That means "journal entry"; right?
3      A   I believe it means journal entry.
4      Q   Okay.  So it says "Journal entry done in
5  August for 11.2 million to correct part of the out of
6  balance"; do you see that?
7      A   Yes.
8      Q   And you see how above that it has a
9  description of an A/R agings audit trails account;
10  right?
11      A   Yes.
12      Q   And then a GL balance of account 1210; right?
13      A   1210.
14      Q   10.
15      A   Dash something.  Account 1210-12108.
16      Q   Okay.  I only -- okay.  My copy of it looks
17  like it just says account 1210, offset.  You see that?
18  I'm looking at the far left-hand side under
19  "Description."
20      A   Oh, it appears that that's what it says.
21  It's hard to read the paper.
22      Q   And then at the bottom it says "Out of
23  balance between A/R and GL"; do you see that?
24      A   Yes.
25      Q   So based on what you know of these types of

250

1  work papers or documents, and given that this was
2  produced by Andersen, does that appear that in that --
3  in the box where it says "JE done in August for
4  11.2 million to correct part of the out of balance,"
5  does that refer to the out of balance between the
6  accounts receivable and GL amount that's there,
7  14 million, approximately 14 million?
8          MR. KONOVALOV:  Objection; lacks foundation.
9          MR. SIDORSKY:  Objection to form.
10          THE WITNESS:  It appears that the out of
11  balance is the difference between the A/R aging trial
12  balance and the GL account.
13          MR. GREENSTEIN:  Q.  Well -- sorry.
14      A   What I can't tell, because I can't read the
15  numbers on there, is which one is higher.
16      Q   Right.
17          Now, so the out of balance between A/R and GL
18  appears to be approximately 14.2 million; right?
19      A   That's what it appears.
20      Q   And then the entries or the -- in the box it
21  says the journal entry for 11.2 million is then part
22  of the out of balance; right?
23      A   That's what it says.
24      Q   You see how, if you look farther to the
25  right, where it has "A" there, it says manual JEs at

251

1  the top; you see that?
2      A   I do.
3      Q   Does that mean manual journal entries?
4      A   I believe that's what it means.
5      Q   So it appears that this 11.2 million was a
6  manual journal entry made to reduce that out of
7  balance of 14.2 million; right?
8      A   That's what it appears.
9      Q   Because if you go down farther, the
10  difference is at the far right-hand side, it says
11  3.1 million approximately?
12      A   That's correct.
13      Q   Okay.  So you see in the box where it says --
14  after it says -- second sentence says "JE was
15  correcting entry to invoice," a number, "BAD," it
16  appears, and says "DR was to 25005 invoice SOL and D
17  out of A/R but still hit GL."
18          Do you see that?
19      A   It appears that's what it says.  I'm -- I'm
20  having a difficult time actually reading it because
21  it's very small.
22      Q   Right.
23          Do you know what that means, DR was to 25005?
24  Does that mean debit was to the account 25005?
25      A   I would presume that that's what it means,

252

1  yes.
2      Q   And what does "Invoice SOL or SQL and D out
3  of A/R but still hit GL"?  Do you know what that
4  means?
5      A   No, I don't.
6      Q   Okay.  And then the second line of the box
7  says "Original out of balance was in 12019 also"; do
8  you see that?
9      A   Yes.
10      Q   Do you know what 12019 is?
11      A   I don't.
12      Q   But is that an account number, so if you look
13  back to AA19, if you look back, there's an account
14  called 12019.  It says "Deals clearing"; you see that?
15      A   Yes, I do.
16      Q   Going back to the last page, so that appears
17  to be where it says "out of balance" was in that
18  account; right?
19      A   That's what it says.
20          MR. KONOVALOV:  Document speaks for itself.
21          MR. GREENSTEIN:  Okay.
22      Q   So it appears to be that account in accounts
23  receivable?
24          MR. KONOVALOV:  Same objection.
25          THE WITNESS:  That's what it appears to be

253

1  referring to.
2  　　　MR. GREENSTEIN:  Okay.
3  　　Q  And then it says "However, Dave O processed
4  an entry moving the out of balance to the 25005
5  account"; do you see that?
6  　　A  I see that.
7  　　Q  Do you know who Dave O is?
8  　　A  I do not.
9  　　Q  Okay.  Now, do you know what it means to
10  process an entry moving the out of balance to the
11  25005 account?
12  　　A  Well, I -- I don't know specifically what it
13  means.  I'm -- I'm -- it appears as if it means that
14  the -- the one account was out of balance, so they
15  moved that out balance over into -- to -- to this
16  account or into a different account, so....
17  　　Q  Into 25005?
18  　　A  Yeah, that's what it appears, or into 25005.
19  　　Q  Okay.  What did -- how -- how does that
20  occur?
21  　　　MR. KONOVALOV:  Objection.
22  　　　THE WITNESS:  It appears they recorded a
23  journal entry to move it.
24  　　　MR. GREENSTEIN:  Q.  To move --
25  　　A  He said he processed an entry, which I would

254

1  assume is a journal entry.
2  　　Q  Moving the out of balance, so that means the
3  14.2 million to the 25005 account; right?
4  　　A  Well, I don't know that it's 14.2 million.  I
5  think he might be referring to the 11.2 million that's
6  the reference in the note.
7  　　Q  Okay.  So moving the 11.2 million out of
8  balance to the 25005 account?
9  　　A  Right, moving it from one balance sheet
10  account to another.
11  　　Q  Moving it from 25005 to the out-of-balance
12  amount; right?
13  　　　MR. SIDORSKY:  Objection to form.
14  　　　MR. KONOVALOV:  Vague and ambiguous.
15  　　　THE WITNESS:  Well, moving it from one
16  account, 25005, into this account, which appears to
17  be -- you know, whether it's 1210 or 12008, I'm not
18  sure.
19  　　　MR. GREENSTEIN:  Right.
20  　　Q  But it's moving 11.2 million from 25005 to
21  the out of balance which was in 12019 deals clearing;
22  right?
23  　　　MR. SIDORSKY:  Objection to form.
24  　　　THE WITNESS:  Well, it appears that there was
25  an out of balance in 12019, and they moved that out of

255

1  balance into the 25005 account.
2  　　　MR. GREENSTEIN:  Q.  No, no.  Is -- well,
3  doesn't it appear that from 11.2 million is -- is
4  coming from the 25005 and applying it to an accounts
5  receivable invoice which is in 1210/12008; right?
6  　　　MR. SIDORSKY:  Objection to form.
7  　　　MR. KONOVALOV:  Mischaracterizes the
8  witness's testimony, and the document speaks for
9  itself.
10  　　　THE WITNESS:  I'm sorry.  Can you -- I'm not
11  sure where we're at.
12  　　　MR. GREENSTEIN:  Q.  Can you see on the top
13  left-hand corner it says "Account 1210-12008"?
14  　　A  I see that.
15  　　Q  It says as of Q1 2001; right?
16  　　A  Yes.
17  　　Q  And then it has a description of, you know,
18  the A/R agings audit trails and GL balances for
19  account 1210.  And as we said before, it appears that
20  the out of balance from those two accounts is
21  14.2 million, approximately; right?
22  　　A  Yes.
23  　　Q  And then it looks like 11.2 million from
24  25005 was applied to that out of balance to reduce it
25  so that it ended as 3.1 million on the right-hand

256

1  side; right?
2  　　　MR. SIDORSKY:  Objection to form.
3  　　　MR. KONOVALOV:  The document speaks for
4  itself.
5  　　　MR. GREENSTEIN:  Q.  In other words, you see
6  where it says "DR was to 25005"?
7  　　A  Yes.
8  　　Q  Well, since that's -- that's a liability, so
9  debit would reduce it; right?
10  　　A  That's correct.
11  　　Q  Okay.  So, in other words, money was taken
12  from 25005 to offset this out of balance of
13  14 million, right, which -- which ended up then being
14  the difference which is 3.1 million?
15  　　A  Well, the fact that they -- I mean, the fact
16  that they process the journal entry to move an out of
17  balance out of here and into another account, I mean,
18  they would still have to reconcile the detail in
19  account 25005 to whatever the detail the customer
20  overpayments was.  So I don't know from that what they
21  did.
22  　　　Yes, they processed the journal entry, but I
23  don't know what they did with the balance of account
24  25005, whether that means that the detail -- the
25  journal ledger in that balance was different than the

257

1  detail, or whether they -- they wrote off or refunded
2  some of the detail in -- in just process the entry to
3  net the two down.
4      I don't -- don't -- without understanding the
5  complete trail of the journal entries, I don't know
6  that I can conclude exactly what happened here.
7      Q  Okay.
8      MR. KONOVALOV:  I'm not trying to interfere.
9      Would it help to look at the next couple of
10  lines outside the box?  Would that help the witness?
11     MR. GREENSTEIN:  Yeah.
12     Q  Why don't you look at that.  It says "This
13  entry was done to clean up amounts that had been
14  sitting in account 25005 Customer Overpayments since
15  fiscal year 2000 due to an IT problem"; do you see
16  that?
17     A  Yes.
18     Q  Do you know whose handwriting that is?
19     A  I do not.
20     Q  Okay.  Do you know what that means, that the
21  entry was done to clean up amounts that had been
22  sitting in 25005 since fiscal year 2000?
23     A  Other than what it says there, I don't know.
24     Q  Okay.  Do you know what it is to clean up
25  accounts that reside in 25005?

258

1      A  Well, presumably they're trying to, you know,
2  clean -- clean up or dispose of some of the amounts
3  that had been sitting in an account for quite some
4  time.
5      Q  Right.  So --
6      A  So reconcile it, or -- or somehow dispose of
7  it.  I don't know.
8      Q  Right.
9      But it appears you as an auditor looking at
10  this, it appears that -- so to reduce 25005, they took
11  11.2 million to apply it to this out of balance
12  between those other two receivable accounts; right?
13     MR. SIDORSKY:  Objection to form.
14     MR. KONOVALOV:  The document speaks for
15  itself.
16     THE WITNESS:  Yeah, I -- I really don't know
17  what all this means in terms of what all -- all
18  entries were made.
19     MR. GREENSTEIN:  Okay.
20     Q  Do you know where it says "Due to an IT
21  problem," do you know what that IT problem was?
22     A  No, I don't.
23     Q  Did you ever have any discussions about that
24  IT problem?
25     A  No, I haven't.

259

1      Q  You see in the top left-hand corner it says
2  "Prepared by Greg Myers"; do you see that?
3      A  I do.
4      Q  Do you know who Greg Myers is?
5      A  No, I don't.
6      Q  Have you ever had any discussion with
7  Greg Myers?
8      A  I have not.
9      Q  But it says "Prepared by Greg Myers," so this
10  appears that this -- do you recognize any of the
11  handwriting on here as an Andersen employee?
12     A  I do not.
13     Q  Okay.  Does it appear that this document --
14  well, it was produced by Arthur Andersen.  It has --
15  see in the corner, bottom right-hand corner, it has
16  B60 and has PA9/00?  You see that?
17     A  I do.
18     Q  It appears that Andersen looked at this, and
19  it was part of the work papers for quarter one; right?
20     A  Yes.
21     Q  Okay.
22     A  But Greg Myers is not an Andersen employee.
23     Q  Right.
24     I'll represent to you that he's an Oracle
25  employee.

260

1      A  Okay.
2      Q  But this was -- this appears to be prepared
3  by Greg Myers and then was reviewed by Andersen;
4  right?
5      A  That's correct.
6      Q  Okay.  Now, is there anything -- looking at
7  the 11.2 million that appears to have been taken from
8  25005 to -- to offset this out of balance, do you see
9  any connection, or do you know of any connection
10  between that 11.2 million in 25005 in
11  connection between that and this out of balance for
12  these account receivable accounts?
13     MR. KONOVALOV:  Objection; vague and
14  ambiguous.
15     MR. SIDORSKY:  Objection to form.
16     THE WITNESS:  Yeah.  I mean, I -- I really
17  don't know where we're going with this whole
18  discussion.  You know, it -- I'm confused as to what
19  you're trying to get to, or how these accounts worked,
20  or this entry, what they did with the entry.
21     I don't know that I would get any more
22  clarity on it from continuing to ask questions about
23  the two sentences that are in here.
24     MR. GREENSTEIN:  Okay.
25     Q  I'm just wondering if you, just looking at

261

1  this and what is written here, if you understand what
2  occurred?
3      A  I don't understand completely what occurred,
4  no.
5      Q  Well, what is your best --
6      A  I told you I don't understand.
7      Q  Okay.  Put that aside.
8         I want to mark -- actually, I don't want to
9  mark this.  It's been previously marked as Chen No. 4.
10     For the record, this is a packet of work
11  papers related to the second quarter 2001 review.
12  It's Bates stamped AA 24 and the last pages AA 1638.
13     Mr. Matuszak, have you seen these documents
14  before today?
15     A  I believe that -- that these -- these
16  documents appear to be similar to the ones that were
17  provided to me by my counsel.
18     Q  Okay.  And you see on AA 27 -- well, strike
19  that.
20        And it appears that -- that this is -- well,
21  if you look down at the -- there's kind of a bar --
22  there's a bar code there, and then it has at the
23  bottom it says "Q2 FY Review 11/30/2000"; you see
24  that?
25     A  Yes.

262

1      Q  So it appears -- well, at least this page is
2  related to work papers for the Q2 review; right?
3      A  That's right.  It appears that this is the
4  file cover for the 11/30/2000 quarterly review.
5      Q  Right.
6         So if you look at AA 27, which is the fourth
7  page, you see how this appears to be the same slide
8  presentation that we looked at earlier, which is
9  Matuszak -- part of Matuszak No. 1; right?
10     A  Yes.
11     Q  Is there a reason why this presentation is a
12  part of -- well, appears to be a part of the work
13  papers for that quarter?  Do you -- was that typical?
14     A  Yes.
15     Q  Okay.  You see on AA 28, it has the same
16  language in Matuszak 1; right?
17     A  Yes.
18     Q  So it would have the same meaning?
19     A  Yes.
20     Q  You see -- if you turn to page AA 34, and you
21  see how it says "Q4 - Q1 follow-up items"?
22     A  Yes.
23     Q  And you see it says "A/R aging to GL
24  reconciliation"?
25     A  Uh-huh.

263

1      Q  Do you know what that means?
2      A  Well, I'm assuming it means at the end of Q4
3  there was a -- that the A/R aging was out of balance
4  from the GL.  So we followed up on it as part of our
5  Q1 review.  So that Q4/Q1 to me means follow-up items
6  that -- from Q4 that we followed up on in Q1.
7      Q  Okay.  And is that -- is that related to the
8  document we just looked at which had an out of balance
9  from A/R aging?
10     A  Most likely, yes.
11     Q  Okay.  And you see it says "Unearned
12  education revenue reconciliation"?
13     A  Yes.
14     Q  What does that mean?  Do you know?
15     A  Yeah, I could speculate that there's a
16  reconciliation they're doing on the detail of one of
17  the unearned education accounts.
18     Q  Okay.  Do you recall in the second quarter
19  though that -- that there was an analysis done to
20  reconcile unearned education revenue?
21     A  I'm sorry.  Let me -- let me back up one
22  second.
23        This is the results -- this is the audit
24  committee agenda for Q2.
25     Q  Right.

264

1      A  So this Q4/Q1 would have been follow-up items
2  from Q4 or Q1 that we were discussing during Q2 --
3      Q  Right.
4      A  -- or after our Q2, so I misspoke before.
5      Q  Okay.  So do you recall what was done to
6  reconcile unearned education revenue --
7      A  I don't.
8      Q  -- during Q2?
9         Do you recall what was done to -- or was any
10  analysis done with respect to A/R aging to GL
11  reconciliation?
12     A  I don't know.
13     Q  Okay.  Turn to the next page, AA 35, and does
14  this appear to be the accounts receivable lead sheet
15  for the second quarter variation analysis of accounts
16  receivable accounts?
17     A  It does.
18     Q  And it's similar to the one we looked at in
19  the quarter one work papers as far as what the
20  document purports to be; right?
21     A  It appears that way, yes.
22     Q  And do you see any of your handwriting on
23  here?
24     A  I do not.
25     Q  Do you recall reviewing this work paper

265

1   during the second quarter?
2       A   Not specifically.
3       Q   Generally, do you recall reviewing this?
4       A   I would likely have reviewed it.
5       Q   Because that was typical in every quarter to
6   review these types of work papers; right?
7           MR. SIDORSKY:  Objection to form.
8           THE WITNESS:  I -- I would not review all
9   work papers, but normally I would review the
10  receivable lead schedule.
11          MR. GREENSTEIN:  Okay.
12      Q   Why was that?
13      A   Because I would normally review some of the
14  work that was in revenue and receivables.
15      Q   Okay.  Were those critical areas at Oracle?
16          MR. KONOVALOV:  Objection; vague and
17  ambiguous.
18          THE WITNESS:  They were areas --
19          MR. SIDORSKY:  Objection to form.
20          THE WITNESS:  -- of focus.
21          MR. GREENSTEIN:  Q.  Areas of focus; right?
22      A   Areas of focus.
23      Q   Right.
24          Now, you see account 12018 unapplied cash
25  again?  Do you see that?

266

1       A   I do.
2       Q   And you see where it says "Cash payments
3   generally decrease the end of Q2 versus Q1.  As Q4
4   deals have aged 90 days as of the end of Q1 there is a
5   greater influx of cash received compared to collection
6   and receipt of Q1 transactions in Q2"; do you see
7   that?
8       A   I do.
9       Q   Now, do you know what that means?
10          MR. SIDORSKY:  Objection to form.
11          THE WITNESS:  Yes, generally.
12          MR. GREENSTEIN:  Okay.
13      Q   What does -- what does it mean generally?
14      A   Well, I think consistent with the discussion
15  or testimony I gave when we looked at this account for
16  Q1 earlier, you normally expect a larger amount of
17  payments in Q1 versus Q2 because there's -- are larger
18  revenue transactions in Q1 that's typically the
19  company's largest revenue quarter of their fiscal year
20  as contrasted to the August quarter which, for a
21  number of different reasons, is typically a -- a lower
22  revenue quarter, so I believe that's what this note is
23  trying to explain.
24      Q   Okay.  And why does that -- well, it appears,
25  doesn't it, that the balance of 12018 unapplied cash

267

1   went from 86 million to 64 million?
2       A   That's correct.
3       Q   All right.
4           And so what -- does that mean that -- well,
5   why -- why would the -- why would the description
6   there support that -- that decrease, that amount
7   decrease?
8       A   The -- what the description says is cash
9   payments generally decrease at the end of Q2 versus
10  Q1.  So in Q4 there are a number of large transactions
11  done in Q4.  That cash would be collected at the end
12  of Q1, and so there's a greater influx of cash
13  payments in Q1 versus Q2.
14          In Q2, you're collecting much of the revenue
15  from Q1, and there was less revenue in Q1, so there
16  are less receivables to collect.
17      Q   Okay.  You see down at the bottom where it
18  has allowance for bad debt returns, and it has three
19  accounts and one of them is -- says 12, I think, 600,
20  12601, and 12604?  Do you see that?
21      A   I do.
22      Q   Do you see how that -- that balance from the
23  end of the first quarter to the end of the second
24  quarter or -- yeah, the end of the first quarter to
25  the end of the second quarter increased by 26 million?

268

1   Do you see that?
2       A   I do.
3       Q   And then it says "Increase in the allowances
4   primarily result of greater activity from Q2 to Q1,
5   and the number of deals funded in-house or were
6   financed"; do you see that?
7       A   Yes.
8       Q   Do you know what that means?
9       A   Certain of the transactions that were funded
10  in-house, they would reserve for versus if they sold
11  the receivable in a nonrecourse basis, therein
12  transferring the risk of collectability to the finance
13  company.
14      Q   So why would that increase the bad debt --
15  the allowance for bad debt returns accounts?
16      A   Well, it increases their receivable balance
17  on those types of transactions.
18      Q   Okay.  You see there where it says "The
19  reserve for receivables in litigation also increase
20  greater emphasis by the collections group to refer
21  uncollectible receivables to legal and a greater
22  number of emergent companies have experienced
23  financial difficulties"?  Do you see that?
24      A   I do.
25      Q   You know whose hand -- or strike that.

269

1     So does that mean that the increase in the
2  allowance for bad debt was partially a result of a
3  greater number of companies, Oracle's customers,
4  having financial difficulties at that time?
5     A  I don't know about a greater number of
6  Oracle's customers having financial difficulty.
7  Certainly a greater number.  It says a greater number
8  of emerging companies had experienced financial
9  difficulties.
10     Q  Okay.  Oh, sorry.
11     A  Oracle did license their software to a number
12  of companies that were, you know, younger companies.
13     Q  Right.
14        And what this is saying is that there was
15  greater -- an increase in the allowance for bad debt
16  because there was an emphasis by the collections group
17  to -- to refer uncollectible receivables to legal, and
18  there were a greater number of emergent companies that
19  were experiencing financial difficulties, and
20  therefore Oracle couldn't collect on those deals;
21  right?
22     A  That's what it appears, so they appropriately
23  increased their allowance for bad debts.
24     Q  Okay.  Now, do you know if there's any
25  support for that statement there, any evidence that

270

1  Andersen had to support that?
2     A  I wouldn't know without -- no, I don't know.
3     Q  Okay.  You see how it says "See further
4  discussion of reserves at B15"?
5     A  Yes.
6     Q  Do you know -- did you see B15 yesterday when
7  you looked -- when you reviewed the document with
8  counsel?
9     A  I did not.
10     Q  Is that --
11     A  If it wasn't in this group, I likely didn't
12  look at it.
13     Q  Do you recall back during this time, and it
14  appears that this work paper was around December '00,
15  if you look at the bottom right-hand corner --
16     A  Yes.
17     Q  -- do you recall that there were a greater
18  number of emergent companies having experienced
19  financial difficulties such that Oracle had to
20  increase their reserves for uncollectibles?
21     MR. SIDORSKY:  Objection to form.
22     MR. KONOVALOV:  Calls for speculation.
23     THE WITNESS:  I don't recall specifically,
24  no.
25     MR. GREENSTEIN:  Okay.

271

1     Q  And turn to the next page, AA 36, it appears
2  to be a memo dated December 11th, 2000, from
3  Pamela Arquelada, and it says "Accounts receivable
4  account description"; do you see that?
5     A  Yes.
6     Q  Does there appear to be the same type of memo
7  that we looked at the first quarter where it has the
8  descriptions of the various accounts receivable
9  accounts?
10     A  It appears to be a similar memo.
11     Q  Okay.  And if you turn to the next page,
12  AA 37, see how there's an account called "12601 Bad
13  Debt Write-offs"?
14     A  Yes.
15     Q  And it has a number of other accounts, it
16  says "Reserve for Uncollectible Accounts."
17     A  Yes.
18     Q  And it says these are the -- "These accounts
19  are the standard accounts used to write-off and
20  provide for bad debts respectively"; do you see that?
21     A  I see that.
22     Q  Do you recall any issues arising during the
23  quarterly reviews for fiscal year 2001 audit at Oracle
24  that involved the account 12601?
25     A  I do not.

272

1     Q  Or any problems related to account 12601?
2     A  I do not.  Let me just go back to see if it's
3  on here what 12601 is.  That's one of the reserve
4  accounts.  I don't recall anything specifically with
5  that account, no.
6     Q  Or anything general?
7     A  No.
8     Q  Do you recall ever being made aware that
9  Oracle's collection staff had over time transferred
10  customer overpayments from 2505 to account 12601?
11     MR. KONOVALOV:  Objection; assumes facts not
12  in evidence.
13     THE WITNESS:  I don't recall that
14  conversation or ever being told that.
15     MR. GREENSTEIN:  Okay.
16     Q  Do you recall any documents or any evidence
17  during your quarterly reviews and audits of Oracle at
18  any time where you learned that transfers were made
19  from 25005 to 12601?
20     MR. KONOVALOV:  Same objections.
21     MR. SIDORSKY:  Yeah, I'm going to object to
22  the scope of that question.
23     THE WITNESS:  I don't recall any, no.
24     MR. GREENSTEIN:  Okay.
25     Q  If you turn to AA 39, and you see how it's

273

1   a -- it's another account 1210 document related to
2   that account and prepared by Greg -- Greg Myers; do
3   you see that?
4       A   I do.
5       Q   It has the similar A/R aging audit trails and
6   GL balances; you see that?
7       A   Yes.
8       Q   It has another out of balance between A/R and
9   GL of 947 -- looks like thousand; do you see that?
10      A   Yes.
11      Q   And then you see on the right-hand side of
12  that amount is 1.8 million?
13      A   Yes.
14      Q   Or approximately 1.9 million?
15      A   Yes.
16      Q   And you see the note under there it says
17  "Unreconciled Difference"?  It says "AA LLP."  That's
18  Arthur Andersen; right?
19      A   That's correct.
20      Q   "Noted a 1.9 difference between GL and A/R
21  aging as of or on November 30th, 2000"; do you see
22  that?
23      A   I do.
24      Q   "The company has had unreconciled difference
25  in this account since fiscal year '00 due to an IT

274

1   problem"; do you see that?
2       A   I do.
3       Q   Now, is that the same IT problem that we
4   looked at in the last set of work papers which was
5   discussing the out of balance between these two
6   accounts?
7       MR. KONOVALOV:  Objection; lacks foundation.
8       THE WITNESS:  I don't know specifically, but
9   it would appear that it is since it's the same
10  schedule.
11      MR. GREENSTEIN:  Right.
12      Q   Now, did you -- is that your handwriting
13  there?
14      A   Under the note one?
15      Q   Yeah.
16      A   Under note, no, it is not.
17      Q   Okay.  Do you know whose it is?
18      A   I do not.  The schedule is initial PA which
19  presumably is Pam Arquelada.
20      Q   Okay.  Now, were you made aware of this 1.9
21  million difference between the GL and A/R aging that's
22  referred to under this note?  Were you made aware of
23  that at the time?
24      MR. SIDORSKY:  Can I hear that?
25      MR. GREENSTEIN:  I'll ask it again.

275

1       Q   Were you -- around this time, were you --
2   which is the second quarter of '01 -- were you made
3   aware of the issue described by this note here?
4       A   I believe I was aware of that issue.
5       Q   Okay.  What do you remember?  How did you
6   become aware of it?
7       A   Well, I believe part of this package was the
8   audit committee agenda.  On there, there was a item
9   that said Q4/Q1 follow-up items, one of which is A/R
10  aging to GL reconciliation.
11      So presumably we covered it in some form with
12  the audit committee which would imply I was aware of
13  the difference.  The company had been working on
14  reconciling that difference, and it was now down to
15  1.9 million.
16      Q   Okay.  Why was -- why -- but didn't they
17  recon -- didn't they already work on that in the first
18  quarter?
19      MR. KONOVALOV:  Objection; lacks foundation.
20      MR. GREENSTEIN:  Q.  And they reduced it --
21  they reduced the out of balance of those two accounts
22  by transferring 11.2 million of unapplied cash or of
23  customer overpayments from 25005; right?
24      MR. SIDORSKY:  Objection to form.
25      MR. KONOVALOV:  Lacks foundation.

276

1       THE WITNESS:  They -- they reduced the
2   balance a certain amount in Q1, and it looks like they
3   reduced it further in Q2.
4       MR. GREENSTEIN:  Q.  So there was still an
5   out of balance in Q2; right?
6       MR. KONOVALOV:  Objection; lacks foundation.
7       THE WITNESS:  It appears that there was an
8   out of balance of 1.9 million as of November 30th,
9   2000.
10      MR. GREENSTEIN:  Q.  See how it says "Per
11  discussion," and then a note at the bottom, it says,
12  "Per discussion with Greg Myers A/R manager, the
13  company will focus its efforts to gradually reduce
14  this effort in the future"; do you see that?
15      A   I do.
16      Q   Do you know -- did you discuss this with
17  Greg Myers?
18      A   Nope.
19      Q   Because you never talked with Greg Myers;
20  right?
21      A   That's correct.
22      Q   Do you know who did talk with Greg Myers?
23      A   Again, as I said, the schedule is initialed
24  by PA, which I'm assuming is Pam Arquelada.
25      Q   Okay.

277

1    A  So I would speculate that that is her
2  handwriting, and she's -- therefore, she's the one
3  that discussed it with Greg Myers.
4    Q  Okay.  Did you ever have a discussion with
5  Pam or anybody at Andersen about this issue here?
6    A  I don't recall specific conversations.
7    Q  Okay.  Do you recall general conversations
8  about this issue?
9    A  I recall, in general, that we -- we spoke
10  about the A/R out of balance and about, you know, our
11  concern and our desire for the company to get it
12  reconciled down to a negligible amount.
13    Q  Okay.  Why were you concerned?
14    A  Because the A/R was out of balance with the
15  GL, so you would like for the A/R trial balance to
16  agree to the GL balance.
17    Q  And the AR balance is ultimately disclosed in
18  Oracle's public financial statements; right?
19    A  The A/R --
20    MR. SIDORSKY:  Objection to form.
21    THE WITNESS:  The A/R GL balance, correct,
22  net of any reserves.
23    MR. GREENSTEIN:  Q.  And do you know if the
24  company focused -- if Oracle focused its effort to
25  gradually reduce the difference in the future?

278

1    A  I don't recall as to the future.
2    Q  Okay.  Turn to the next page.
3    Does this appear to be the lead schedule for
4  variation analysis of the unearned revenue accounts as
5  of the end of the second quarter?
6    A  It does.
7    Q  It's similar to the unearned revenue lead
8  sheet that we looked at with quarter one; right?
9    A  I -- I believe it is similar; yes.
10    Q  Okay.  And do you see customer overpayments
11  line, 25005?  You see how it says that the balance
12  went from -- from August 31, 2000, to the end of the
13  second quarter, November 30, 2000, it went from
14  73 million to 125 million?  Do you see that?
15    A  I do.
16    Q  That's a difference variance of 51 million;
17  right?
18    A  That's correct.
19    Q  You see next to that it says "Letter A
20  increase as a result of a 100 million --" looks
21  like "-- wire transfer received by Oracle to Delphi";
22  do you see that?
23    A  I do.
24    Q  Is that your handwriting?
25    A  It is not.

279

1    Q  Do you recall a $100 million wire transfer to
2  Oracle received by Delphi during this quarter?
3    A  I don't specifically, no.
4    Q  Do you remember generally discussing this
5  100 million wire transfer?
6    A  Generally, no, I don't.
7    Q  So you don't remember discussing it at all;
8  right?
9    A  Nope.
10    Q  Okay.  You see where it says "The variance is
11  offset by an 11 million debit booked to this account
12  to correct a reclassification entry between 25005 and
13  1208"?  Do you see that?
14    A  I do.
15    Q  And what does it mean to correct a
16  reclassification entry between 25005 and 1208?
17    A  To correct.  Well, other than what it says
18  there, I don't know.
19    Q  Okay.  And you see how it has handwritten --
20  or it says "The balance was also offset by additional
21  cash applications," and it says in handwriting -- it
22  says "AA LLP notes that last quarter there was a SAJE
23  of 75 million.  As such, the balance is 148 million
24  approximately previous to the CAJE"; is that right?
25    A  Correct.

280

1    Q  Is that what it appears to say?
2    A  Yes.
3    Q  And CAJE is what?
4    A  Client -- client adjusting journal entry.
5    Q  Okay.  So what does this mean, that
6  Arthur Andersen notes that last quarter there was a
7  client or a CAJE of 75 million?
8    A  Well, I believe the purpose of this is to try
9  to tie the prior quarter amounts into the prior
10  quarter work papers.  So if you look at the balance
11  that's labeled 8/31/00, and you go down, and you'll
12  see there's a double tick mark next to most of the
13  numbers, there is one not next to the 73 million,
14  because that balance does not agree to the prior
15  quarters.
16    So I believe this note is explaining that,
17  and you'll see a double tick mark next to the
18  148,616,273, in the handwritten comments.  So it's
19  trying to point out that that balance doesn't tie to
20  the prior work papers because of this closing
21  adjusting entry that was made as part of the Q1 close.
22    So it was -- it was booked subsequent to the
23  client delivering to us the review work papers for Q1.
24    Q  Subsequent to the -- so what do you mean when
25  you say it was booked subsequent to the client

281

1  delivering to us the review of work papers?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  Well, at some point the company
4  would do a closing of their books, you know, first
5  pass, second pass, whatever it was, and they would
6  give to us the work papers that we would use for our
7  quarterly review.
8       That doesn't mean that they were necessarily
9  complete with all of their internal analysis and
10  reconciliation.  So they would continue to do work,
11  and in this case the results of that work resulted in
12  an adjusting journal entry of $75 million which was
13  not reflected in our work papers because it occurred
14  subsequent to us getting the work papers for the
15  August review.
16     Q  You didn't know about it until Oracle
17  provided you with the information; right?
18     A  That's correct.  Now, whether that was in the
19  August quarter or the November quarter, I don't
20  recall.
21     Q  Okay.  And you see at the bottom there it has
22  another "A" with a tick mark, and it says "Continued.
23  AA LLP notes that PDW Cynthia Chavez treasury.
24  The 100 million is a loan and should not be classified
25  as unearned revenue.  The adjustment will be posted

282

1  before the end of Q3."
2       And then it has a CAJE debit of 100 --
3  revenue of 100 million and credit of intracompany, it
4  looks like, receivable for 100 million; do you see
5  that?
6     A  That's correct.
7     Q  Now, what does that mean, the 100 million is
8  a loan and should not be classified as unearned
9  revenue?
10     A  Well --
11     MR. SIDORSKY:  Objection to form.
12     THE WITNESS:  I believe that the -- that --
13  that Delphi is a wholly owned subsidiary of Oracle.
14  So they received a payment from Delphi that appears to
15  have been misclassified and should have been treated
16  as an inner-company transaction, an inner-company
17  loan, and therefore they needed to correct that entry.
18  Otherwise, the books of Oracle Corporate and Delphi
19  would not have balanced and eliminating consolidation.
20     MR. GREENSTEIN:  Okay.
21     Q  It says "The adjustment will be posted before
22  the end of Q3."  Does that mean the adjustment wasn't
23  posted at the end of Q2?
24     MR. KONOVALOV:  Objection; lack of
25  foundation.

283

1     MR. GREENSTEIN:  Q.  In other words, that
2  adjustment, that 100 million debit and credit, was not
3  made before the results of -- 2Q '01 were released;
4  right?
5     MR. KONOVALOV:  Same objections.
6     THE WITNESS:  I don't believe that's
7  necessarily true.
8     MR. GREENSTEIN:  Okay.
9     Q  What does it mean the adjustment will be
10  posted before the end of Q3?
11     A  Well, can we look and see if F-6 is in here?
12     Q  Sure.
13       Is it fair to say you need F-6 to properly
14  analyze this -- these issues here?
15     A  Yes.  I -- it appears it's 1638 in this file,
16  in this package of information.
17     Q  Okay.  And it says -- on AA 1638, it says
18  under letter "A, Oracle booked an adjustment to
19  decrease cash and increase intracompany receivable by
20  100 million because Delphi did not record a cash
21  required transfer from Delphi to Oracle US in
22  October 2000"; do you see that?
23     A  Yes.
24     Q  It says "Reasonable"; right?
25     A  Yep.

284

1     Q  It was signed off by Andersen; right?
2     A  Yes.
3       So referring back to Schedule DD, which is
4  040, I believe what is meant by this note, and to
5  clarify the word posted, I mean, I believe that the
6  word "posted" means posted to the actual GL account
7  versus recorded in a client adjusting journal entry
8  which may not have been "posted," quote, to the GL,
9  but posted at a top level to accurately reflect it in
10  the consolidated financial statements.
11       That's why I believe that the schedule that
12  we just looked at with the entry was the schedule of
13  adjusting journal entries that were made as -- during
14  the actual final close for the quarter.  It's just
15  that it did not get, quote, "posted," end quote, to
16  the GL account
17     Q  Well, if it doesn't get posted to the GL
18  account, how does it actually impact the financial
19  statements that are released?
20     MR. SIDORSKY:  Objection to form.
21     MR. KONOVALOV:  Yeah, objection; vague and
22  ambiguous.
23     THE WITNESS:  You can record an entry without
24  actually recording it and posting it into the general
25  ledger account.

285

1     MR. GREENSTEIN:  Q.  So if you record the
2   entry, does that mean that it's actually changing the
3   publicly issued financial statements?
4     MR. SIDORSKY:  Objection to form.
5     THE WITNESS:  Yes.  I believe that this entry
6   was -- was recorded in the November quarter to
7   accurately reflect the external reported results, but
8   not technically, quote, "posted" to the actual general
9   ledger account.
10    MR. GREENSTEIN:  Okay.
11    Q   Why would it actually need to be posted to
12  the general ledger account later?
13    A   Well, at some point it would have to be
14  posted to the right GL account, or it would continue
15  to be out of balance in perpetuity.
16    Q   Okay.  You can put that -- what section is
17  it?  What is section "F"?  What does that mean?  I
18  think we said "B" refers to accounts receivable.  What
19  does "F" mean?
20    A   In what reference?  I'm sorry.
21    Q   F-6, when you said you need to look at F-6.
22    A   Oh, "F" was typically the section of the
23  audit work papers where we would have the financial
24  reporting.  So that would be the top-level
25  consolidation.  Any client adjusting entries would be

286

1   summarized up there as well.
2     Q   Okay.  I want to mark the next one or
3   actually this is Chan --
4     A   Are we done with this one?
5     Q   Yeah.  Oh, so "Section F" that you just
6   described, that's not -- it's not reflected in those
7   work papers that you just looked at; right?
8     MR. SIDORSKY:  Objection to form.
9     MR. KONOVALOV:  Misstates the witness's
10  testimony.
11    MR. GREENSTEIN:  Q.  Oh.  Is it reflected in
12  those work papers?
13    MR. SIDORSKY:  Same -- same objections.
14    MR. GREENSTEIN:  How much time left?  Time?
15    THE WITNESS:  Well, it's unclear, because
16  we -- we have a scheduling in here.
17    THE VIDEOGRAPHER:  About six hours.
18    MR. GREENSTEIN:  Okay.
19    Q   I'm sorry?
20    A   We have a schedule in here which explains the
21  100 million, but there -- and there is something in
22  the upper right-hand corner, but it's not legible.
23  Presumably that's an index.
24    Q   Okay.
25    A   And I -- you know, I would hope or -- well,

287

1   it might say F-6.
2     Q   Right.
3     But you can't be sure; right?
4     A   Well, I can't see it.
5     Q   Okay.
6     MR. SIDORSKY:  Well, I think that has to do
7   with the photocopying, quite frankly.
8     THE WITNESS:  No, I agree.
9     MR. SIDORSKY:  I mean --
10    THE WITNESS:  What I'm saying --
11    MR. SIDORSKY:  That's right, but I think that
12  the -- I think Mr. Greenstein probably does have a
13  copy where it's more legible.  It's just because it's
14  a series of photocopies.  Maybe it's not showing the
15  number there.
16    MR. GREENSTEIN:  Okay.
17    Q   Yesterday during your meetings with
18  attorneys, did you review all the work papers for the
19  fiscal 2001 audit and quarterly reviews?
20    A   No.
21    Q   Did you have a full set available to you to
22  review, or were you just reviewing parts of it?
23    MR. SIDORSKY:  Objection to form.
24    THE WITNESS:  I'm sorry.  The full set of
25  audit and quarterly work papers from Andersen?

288

1     MR. GREENSTEIN:  Right.
2     THE WITNESS:  No.
3     MR. GREENSTEIN:  Okay.  I want to mark
4   this -- oh, actually, I'm marking this one as Matuszak
5   No. 3.
6     (Document remarked Exhibit No. 3
7       for identification.)
8     MR. GREENSTEIN:  For the record, this is --
9   starts with AA 41, and the last page is AA 1086.
10    Q   Just looking at this, Mr. Matuszak, does
11  there appear to be the -- the quarterly review work
12  papers or parts of them for the third quarter of
13  fiscal year '01?
14    A   That's what it appears, yes.
15    Q   If you turn to AA 49, you see it has a
16  description of -- you see it has a description of
17  12018 again?
18    A   Yes.
19    MR. SIDORSKY:  I think -- I don't want to --
20  I mean, it's your record, Eli, but I think this is
21  maybe your notes or someone's notes on this document.
22  I'm a little --
23    MR. GREENSTEIN:  Yeah.  You know what --
24    MR. SIDORSKY:  You may want to get --
25    MR. GREENSTEIN:  Yeah, I want to get those

289

1    back.
2        THE WITNESS:  I was going to say I don't
3    recall seeing this in our work product.
4        MR. GREENSTEIN:  Why don't we take a
5    five-minute break.
6        THE VIDEOGRAPHER:  Off the record.  The time
7    is 4:55 p.m.
8        (Short break taken.)
9        (Document remarked Exhibit No. 3
10       for identification.)
11       THE VIDEOGRAPHER:  We are back on the record.
12   The time is 5:11 p.m.
13       MR. GREENSTEIN:  Q.  Mr. Matuszak, if you
14   look at what's been marked as Matuszak No. 3, which --
15   just quickly look through it.  It's Bates stamped AA
16   41, and the last page is AA 1086.  Does this appear to
17   be the quarter three '01 work papers?
18       A  It does.
19       Q  Okay.  And the quarterly review work papers
20   similar to the ones we looked at for Q1 and Q2;
21   correct?
22       A  Yes.
23       Q  Okay.  Put that aside.
24       I've also handed you what's been marked as
25   Chen Exhibit No. 2, and it's AA 1, and then it ends

290

1    with AA 1945, and does this appear to be the work
2    papers for the fiscal 2001 year-end audit?
3        A  Yes.  It appears to be sections from that
4    audit, yes.
5        Q  Okay.  And if you turn to -- I want to direct
6    your attention to AA 1925.  It says "Bad debt reserve
7    reconciliation."
8        A  Okay.
9        Q  Now, have you seen this document before?
10       A  I -- I -- I reviewed it yesterday.
11       Q  Okay.  Do you remember -- before you reviewed
12   it yesterday, do you recall seeing this document?
13       A  Not specifically, but I do recall, you know,
14   this.  You know, seeing schedules like this.
15       Q  Okay.  Did you review this particular
16   document during the fiscal year 2001 audit for Oracle?
17       A  I don't -- I don't know.  Don't recall.
18       Q  Okay.  And you see -- is any of the
19   handwriting here yours that you could tell?
20       A  I don't know.  There's a -- there's a little
21   comment between the "B" and the "C" on the side that
22   might be mine.
23       Q  Okay.
24       A  I don't even know what it says.
25       Q  Okay.

291

1        A  But it's possibly my comment.  I don't know.
2        Q  Okay.  And you see this is a bad -- it
3    appears to be a bad debt reserve reconciliation for
4    the fiscal year 2001 audit; right?
5        A  Yes, it's a -- it's a roll forward -- it's a
6    roll forward of the reserve from balances at the end
7    of the third fiscal quarter to the balance as of the
8    end of the fiscal year, so it's a quarterly roll
9    forward.
10       Q  Okay.  And you see how, as part of these
11   accounts on the left-hand side of the box, it has
12   "12/6/01 bad debt write-offs"?
13       A  Yes.
14       Q  Do you see that?
15       And it has a number of other accounts
16   receivable accounts relating to reserves; right?
17       A  Yes.
18       Q  Okay.  And it has a total reserve.
19       Now, looking down in the notes, the
20   handwritten notes, you see where it says "A"?
21       A  Yes.
22       Q  And it says "Account 12601 bad debt
23   write-off"; you see that?
24       A  Yes.
25       Q  And it says "The company reviewed application

292

1    of cash receipts in 25005 customer overpayments and
2    noted that has been aggressive in applying cash to
3    previously written off invoices.  As a result, it
4    reversed 9.5 million of reserves for which the company
5    has collected cash after they had previously written
6    off the balances"; do you see that?
7        A  I do.
8        Q  Now, were you made aware of this at the time
9    that this was written, that Oracle had been aggressive
10   in applying cash to previously written off invoices?
11       MR. SIDORSKY:  Objection to form.
12       THE WITNESS:  I'm not sure what's meant by
13   the word "aggressive."
14       MR. GREENSTEIN:  Q.  Well, it appears that
15   after Andersen reviewed transfers of or application of
16   cash to previously written off invoices, that it
17   reversed 9.5 million of reserves; right?
18       A  Now, so the way I understand this note, the
19   company was -- was actively trying to review the --
20   the accounts or, you know, the invoices in account
21   25005 and tried, to the extent that it could, to apply
22   them to particular invoices; okay.
23       If some of those invoices were invoices that
24   had already been written off, since the write-off
25   would have reduced the reserve, if they're reversing

293

1 the write-off, it would increase the reserve; okay.
2     Q   It would have increased the reserve in 12601;
3 right?
4     A   It would have increased the reserve in 12601;
5 that's correct.
6     Q   So it would increase -- as a result, if you
7 increase the reserve, I think you said you also
8 increase bad debt expense; right?
9         MR. SIDORSKY:  Objection to form.
10        THE WITNESS:  Well, it -- not -- not in this
11 case.  So if I understand this note right, so when
12 they wrote off an invoice, the write-off of the
13 invoice would have reduced the bad debt reserve.
14        After researching account 25005, they found
15 that some of the payments residing in that account
16 actually related to invoices they had written off.  So
17 in order to record that entry, the entry would be to
18 debit account 25005 and credit the allowance for
19 doubtful accounts; okay.
20        Now, that entry increases the reserve by
21 $9.5 million, but there is no reserve requirement for
22 the $9.5 million.  So the only way through the, you
23 know, accounting entries to get that out of the
24 reserve, because it doesn't need to be in the reserve,
25 would be to reverse the reserve for cash that they had

294

1 collected after they had written off the balances.
2         MR. GREENSTEIN:  Okay.
3     Q   And so -- and this says that Oracle had been
4 aggressive in applying customer overpayments from
5 25005 to previously written off invoices, and as a
6 result it reversed 9.5 million, which the companies
7 collected cash after they previously written off the
8 balances; right?
9     A   Right.
10    Q   So -- and you see up at the top, well, up in
11 that box, it has 12601 bad debt write-offs; right?
12    A   Yes.
13    Q   You see that?
14        You see in the darkened shaded box, it has --
15 it appears to say 9.5 million in there?
16    A   Yeah, I can't see what's in the shaded box,
17 but I -- in order for this schedule to roll forward
18 properly, it would have to be roughly 9.9 or
19 9. -- whatever it is -- 9.5.
20    Q   Okay.  So that -- that 9.5 reversal was taken
21 to 12601 bad debt write-offs account; right?
22        MR. KONOVALOV:  Objection; misstates the
23 document.
24        THE WITNESS:  Well, there was a -- there was
25 an adjustment made to the account that resulted in a

295

1 decrease in the reserve, but I -- but I'm -- I'm not
2 suggesting that it's an inappropriate entry.
3         MR. GREENSTEIN:  Okay.
4     Q   What I'm asking is that it appears that the
5 9.5 million of reserves that was reversed related to
6 12601; right?
7     A   Well, what I'm suggesting is that when they
8 collected the cash, it probably increased 12601, or I
9 won't say collected the cash.
10        When they recorded the payments, in order to
11 apply those payments, since they had previously
12 written off the invoices, the entry to record those
13 payments would be to debit 25005 and credit 12601.  So
14 somewhere in the activity for the quarter there's an
15 increase in 12601 of $9.5 million, but it doesn't need
16 to be there as of the end of the quarter, because
17 there are no receivables that require that
18 $9.5 million reserve.
19        So the company appropriately reduced the
20 reserve by $9.5 million to bring it in line with their
21 actual reserve requirements.
22    Q   Reduce 12601 by 9.5 million?
23    A   That's what it occurs.
24    Q   Okay.  So, in other words, during the course
25 of the quarter, they had been aggressive in applying

296

1 money, 25005 customer overpayments, to increase 12601,
2 and then as a result that it was too aggressive --
3     A   No, no.
4     Q   -- they reduced 12601 by 9.5 million?
5         MR. KONOVALOV:  Misstates the witness's
6 testimony.
7         MR. SIDORSKY:  Objection to form.
8         THE WITNESS:  I did not suggest that it was
9 inappropriate.  I don't know what is meant by the word
10 "aggressive," but it does not imply it's
11 inappropriate.
12        MR. GREENSTEIN:  Okay.
13    Q   I'll back up.  I don't think I said
14 inappropriate.
15        What I think I said is what you just
16 testified was that during the course of the quarter,
17 that Oracle had been applying amounts of -- applying
18 cash, it says, from 25005 customer overpayments, and
19 you said that increased in applying it such that it
20 increased 12601; right?
21        MR. KONOVALOV:  Objection; mischaracterizes
22 the witness's testimony.
23        MR. SIDORSKY:  Well, again, I -- I think the
24 question, to the extent you asked that question,
25 that's been answered, so let's try and --

297

```
1        THE WITNESS:  Again --
2        MR. SIDORSKY:  -- move to a -- to a question,
3    a new question.  Objection; asked and answered.
4        THE WITNESS:  I'm not suggesting that what
5    they did was, quote, "aggressive" or incorrect.  It
6    doesn't say that they inappropriately applied customer
7    overpayments to previously written off invoices.
8        MR. GREENSTEIN:  Right.
9     Q  I'm not --
10    A  It just says that's what they did.
11    Q  I'm not talking --
12    A  I'd rather not focus on the word
13   "aggressive."
14    Q  Okay.  Well, setting "aggressive" aside, what
15   I think you just said was they were applying cash from
16   25005 customer overpayments to 12601, thereby
17   increasing that account 12601, and that at the end of
18   it, they decided to reverse that by 9.5 million such
19   that they would reduce 12601 by 9.5 million which is
20   what is in this box up here --
21       MR. KONOVALOV:  Objection; vague and
22   ambiguous, but --
23       MR. GREENSTEIN:  Q.  -- right?
24    A  That's -- that's correct, but --
25    Q  Okay.
```

298

```
1     A  -- it's not inappropriate.
2     Q  Okay.  Well, that's nonresponsive.  I just
3    asked you if that's what happened, and you said that's
4    correct.  I didn't ask about the appropriateness of it
5    or not, but somebody appears to think that it was too
6    aggressive; right?
7        MR. KONOVALOV:  Objection; mischaracterizes
8    the witness's testimony and the document, and it's
9    argumentative.
10       You're quibbling with the witness now.
11       MR. SIDORSKY:  Objection to form.
12       MR. GREENSTEIN:  Q.  Well, do you know who
13   wrote that, that it was aggressive?
14    A  I don't know.
15    Q  But somebody from Andersen thought that it
16   had been aggressive, and that as a result they
17   reverse -- they forced Oracle to reverse it by
18   9.5 million?
19       MR. KONOVALOV:  Objection; misstates the
20   witness's testimony.
21       MR. SIDORSKY:  No, that does mischaracterize
22   the witness's testimony.
23       THE WITNESS:  You mischaracterized what I
24   said.
25       MR. GREENSTEIN:  Okay.  Well, I'll withdraw
```

299

```
1    that last question.
2     Q  So what does "aggressive" mean to you in the
3    context of applying cash receipts to account 12601?
4     A  This note to me means that they were actively
5    trying to clean up account 25005 and identify those
6    customer overpayments with actual invoices.  And some
7    of those invoices, because there was stuff in 25005
8    that may have been in there for quite some time and
9    hadn't been adequately or accurately identified with a
10   particular invoice, those invoices had been --
11   actually been written off by the company.
12       So they're no longer in the accounts
13   receivable trial balance, they're no longer in the
14   accounts receivable balance sheet item.  So the only
15   way to get them out of account 25005 is to debit that
16   account, and it would be inappropriate to credit
17   accounts receivable, so they credited account 12601
18   which is where the original write-off went to.
19    Q  Right.
20       When you say "the original write-off," that
21   means it increases 12601; right?
22    A  It increases 12601 as a result of the journal
23   entry they made; that's correct.
24    Q  Okay.
25    A  But that's not to imply that as a result of
```

300

```
1    these journal entries that the company's bad debt
2    reserve requirements increased by $9.5 million.
3     Q  Okay.  Did you ever have any discussions
4    about -- about this note here that -- that somebody
5    thought that the application of cash receipts in
6    account 25005, applying that cash to previously
7    written off invoices was, quote, "aggressive"?  Did
8    you ever have any discussions about that?
9     A  I don't recall.
10    Q  But I think --
11    A  I don't know what you mean by -- again, by
12   the word "aggressive."
13    Q  Well, I'm wondering if you ever had a
14   discussion about this particular 9.5 million reversal
15   as a result of the type of transactions that occurred
16   here.
17       MR. KONOVALOV:  Objection; mischaracterizes
18   the document.
19       THE WITNESS:  Well, I don't recall if I had
20   specific comments or specific discussions regarding,
21   you know, items on this schedule.
22       MR. GREENSTEIN:  Okay.
23    Q  Generally, do you recall discussing the
24   company's application of cash receipts in account
25   25005 customer overpayments to previously written off
```

301

1    invoices?  Do you recall discussing that?
2        A  No, not specifically.
3        Q  Generally do you recall?
4        A  No.
5        Q  Okay.  Now, do you -- here -- is there any
6    support -- why was it a 9.5 reversal?  Do you know if
7    there was any evidence that supported that 9.5
8    million?
9        A  I can't tell from this -- from -- from this
10   document what, if any, detail was reviewed in terms of
11   how the 9.5 million was calculated.
12       Q  So you're not aware of any calculation done
13   by Andersen to come up with that 9.5 million; right?
14       A  No.
15       Q  Okay.  I'm going to mark this as Matuszak
16   No. 4; is it?
17           (Document marked Exhibit No. 4
18            for identification.)
19           THE WITNESS:  Thank you.
20           MR. GREENSTEIN:  Q.  For the record, this is
21   Bates stamped NDCA-ORCL 313777 through 313784.
22   Interview No. 1 memo of Thomas Williams dated
23   11/12/02.
24       A  Okay.
25       Q  I'll represent to you this is an interview

302

1    memorandum of a purported interview taken by Oracle's
2    Special Litigation Committee of Tom Williams, and you
3    can see on the second page of this it says "On
4    Tuesday, November 12, 2002, counsel at the Special
5    Litigation Committee of Oracle developed a further
6    follow-up interview of Tom Williams, Vice President of
7    Finance Operations"; you see that?
8        A  Yes.
9        Q  Okay.  Now, this appears to be a
10   memorialization of that interview; is that fair to
11   say?
12           MR. KONOVALOV:  Objection; lacks foundation.
13           THE WITNESS:  Well --
14           MR. SIDORSKY:  Yeah, objection.
15           MR. GREENSTEIN:  I think the document does
16   speak for itself, so --
17           MR. SIDORSKY:  It's all right.  You can
18   represent what the document is.  I mean, as you know.
19           MR. GREENSTEIN:  Q.  I'd like to direct your
20   attention to the last sentence in there where it says
21   "He had learned --" it's the third line up.
22           It says, "He had learned from Mike Quinn and
23   Greg Myers, who were responsible for conducting the
24   investigation, that certain persons in Oracle's
25   Collections Department had, apparently on an ad hoc

303

1    basis over time, moved certain items from Oracle's
2    unapplied cash account to its bad debt reserve
3    account."
4        Do you see that?
5        A  I do.
6        Q  So were you aware of -- when you were -- as a
7    result of your reviews and audit work for Oracle, were
8    you aware that certain persons in Oracle's collection
9    department had, on an ad hoc basis over time, moved
10   certain items from Oracle's unapplied cash account to
11   its bad debt reserve account?
12       A  Nope.
13       Q  You were never aware of that?
14       A  Nope.
15       Q  Do you know if anybody at Andersen was aware
16   of that?
17       A  I have no idea.
18       Q  You had no discussions about that?
19       A  Nope.
20       Q  Would that be something -- well, strike that.
21       If you turn to page 313781, please.
22       A  I'm sorry.  Which page?
23       Q  313781.
24       A  313781; okay.
25       Q  And I'm directing your attention to the first

304

1    full paragraph.  Well, it's the small paragraph.  It
2    says "Williams also explained"; do you see that?
3        A  Yes.
4        Q  And you see it says "Williams also explained
5    that Oracle had moved certain cash receipts to Account
6    12601.  These receipts were entered on the credit side
7    of the account"; do you see that?
8        A  I do.
9        Q  Then it says, "These credits potentially
10   decrease bad debt expense when Oracle calculates its
11   reserve.  Thus, Williams explained, if there is a net
12   credit balance in 12601 for the quarter, potentially
13   less bad debt expense will be incurred if Oracle
14   decides it has to increase their reserve.  The less
15   bad debt required the smaller expenses, and therefore
16   income is correspondingly higher.
17       "In this way, Williams explained that the
18   transfers from unapplied cash to 126601 could
19   potentially have the effect from making income larger
20   than it would have been without the transfers."
21       Do you see that?
22       A  I do.
23       Q  Were you aware that there were -- at Oracle,
24   the collection staff had transferred unapplied cash
25   receipts to account 12601 such that it had the effect

305

1  of making income larger than it would have been
2  without the transfers?
3  MR. KONOVALOV:  Objection; assumes facts not
4  in evidence and mischaracterizes the record in this
5  case. The witness has testified about the specific
6  document. So it's distorted putting it in front of
7  the witness and then asking him whether or not he
8  agrees with the statements that have been disavowed.
9  Subject to that, you can answer the question.
10  MR. SIDORSKY:  Objection to form.
11  THE WITNESS:  I'm not aware of any of the
12  activities that you just read to me from the document.
13  MR. GREENSTEIN:  Okay.
14  Q  So you never had any discussions about this
15  type of activities that I just read; right?
16  A  No.
17  MR. SIDORSKY:  Objection to form.
18  MR. GREENSTEIN:  Okay.
19  MR. SIDORSKY:  Vague.
20  MR. GREENSTEIN:  Q.  Earlier you testified
21  that you weren't aware of any transfers made of
22  unapplied cash to 12601 that you recall; right?
23  MR. SIDORSKY:  Just objection to form.
24  THE WITNESS:  Inappropriate entries, no, I
25  was not aware of any.

306

1  MR. GREENSTEIN:  Q.  So were you aware of
2  appropriate transfers from 25005 to 12601?
3  A  Well, I think we just spent several minutes
4  discussing an entry from the documentation in our
5  work papers appears appropriate. Whether it was or
6  not, I mean, we just discussed an entry that was made
7  from those two accounts, and I'm not suggesting that
8  entry was inappropriate.
9  Q  Okay. But wasn't it true that in that
10  document it was talking about transfers that were made
11  of -- from 25005 that were then decided by Andersen
12  that they were -- needed to be reversed; right?
13  MR. SIDORSKY:  Objection.
14  MR. KONOVALOV:  Objection; misstates the
15  document and the witness's testimony.
16  THE WITNESS:  That's not what the note says.
17  MR. GREENSTEIN:  Okay.
18  Q  But again, if you're looking at these two
19  paragraphs on 313781, what I just read to you, you
20  weren't aware of this occurring at Oracle?
21  MR. KONOVALOV:  Objection; assumes facts not
22  in evidence.
23  MR. SIDORSKY:  And mischaracterizes what the
24  witness just testified about. Objection to form.
25  THE WITNESS:  I'm -- I'm not aware of any of

307

1  the items or practices that Mr. Williams is discussing
2  in this memorandum.
3  MR. GREENSTEIN:  Okay.
4  Q  And if you look down where -- at the bottom
5  where it has the heading "Transfers of unapplied cash
6  to 12601," do you see that?
7  A  Yes.
8  Q  And it says, "As Williams --" second
9  sentence "-- As Williams had noted earlier, he learned
10  of these transfers following the allegations in the
11  SAC."
12  I'll represent to you that the SAC is the
13  second amended complaint filed by plaintiffs in the
14  securities fraud litigation.
15  Did you ever learn after the filing of the
16  SAC that -- of the type of transfers that he was
17  describing on this page?
18  A  No.
19  MR. KONOVALOV:  Objection; lacks foundation;
20  calls for speculation; assumes facts not in evidence.
21  The document speaks for itself.
22  MR. GREENSTEIN:  Q.  I'm sorry. Did you say
23  no?
24  MR. SIDORSKY:  Same objection.
25  MR. GREENSTEIN:  Q.  Did you say no?

308

1  A  I said no.
2  Q  Okay. If you turn the page -- actually, if
3  you just start on the next line, it says -- or the --
4  sorry. The -- the last sentence, beginning sentence,
5  where it says "Williams said that the transfers --"
6  and then go to the next page "-- Williams said the
7  transfers were accomplished by designating the cash
8  receipt as 'on account,' then executing a
9  miscellaneous cash receipt to move the funds from
10  25005 to 12601"; do you see that?
11  A  I do see that.
12  Q  Now, were you aware of -- that transfers were
13  accomplished by designating cash receipts as on
14  account and executing a miscellaneous cash receipt to
15  move funds from 25005 to 12601?
16  MR. KONOVALOV:  Same objections.
17  MR. SIDORSKY:  Objection to form.
18  THE WITNESS:  No.
19  MR. GREENSTEIN:  Q.  And you don't know
20  what -- see where it says "on accounts" in quotes?
21  You don't know what that meant or means?
22  A  I believe I already testified to that earlier
23  today, but I would reiterate that no, I do not know
24  what that means.
25  Q  Okay. If you turn the page to 313783, see

309

1    where it says "Amount of the Transfers"?
2        A  I do.
3        Q  You see down at the -- the second full
4    paragraph after that heading, it says, "Williams
5    stated that he believed that the aggregate amount of
6    the transfers in the two-year period from August 2000
7    to August 2002 was approximately $48 million"; do you
8    see that?
9        A  I do see that.
10       Q  Were you aware that there was an aggregate
11   amount of transfers from 25005 to 12601 during that
12   period of 48 million?
13       MR. KONOVALOV:  Objection; assumes facts not
14   in evidence; lacks foundation.
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  Now, I think I've already
17   stated I wasn't aware of any of the transfers
18   discussed or any activity discussed in this
19   memorandum.  So, by definition, I was not aware of
20   quantifying what it would be.  I wasn't aware that
21   they happened.
22       MR. GREENSTEIN:  Okay.
23       Q  Was anybody at Andersen aware of this
24   activity that we've just been talking about?
25       MR. KONOVALOV:  Objection; calls for

310

1    speculation.
2        MR. SIDORSKY:  Objection to form.
3        THE WITNESS:  I -- I -- I don't know.
4        MR. GREENSTEIN:  Okay.
5        Q  Well, did you ever discuss it with anybody
6    during the audit or quarterly reviews in 2001?
7        A  I did not.
8        Q  Did you ever discuss it with anybody after
9    you left Andersen?
10       A  I did not.
11       Q  You see -- see there on the last sentence of
12   that second or the last full paragraph, it says
13   "Williams said he had prepared a spreadsheet that he
14   would share with the committee showing the transfers
15   from 25005 to 12601 from August 2000 to August 2002"?
16   Do you see that?
17       A  I do.
18       Q  And have you ever seen that spreadsheet that
19   he refers to there?
20       A  I have not.
21       Q  Okay.
22       A  I just want to point out that the -- the
23   ending period of that spreadsheet is after Andersen
24   was terminated as the auditors for Oracle.
25       Q  Right.

311

1        A  So the schedule was prepared after I left.
2        Q  Okay.  But the activity obviously goes from
3    August 2000 through August 2002 at which time --
4    actually, withdraw that.
5        So all of the things I just read to you out
6    of this memorandum, in conducting your audit and
7    quarterly reviews for Oracle in 2001, would you have
8    wanted to know that this was occurring --
9        MR. KONOVALOV:  Objection.
10       MR. GREENSTEIN:  Q.  -- during those reviews?
11       MR. KONOVALOV:  Sorry.  Objection; assumes
12   facts not in evidence.
13       MR. SIDORSKY:  Objection to form.
14       THE WITNESS:  I would have wanted to know,
15   yes.
16       MR. GREENSTEIN:  Okay.  For the record, I'm
17   going to mark the next exhibit.  Well, it's actually
18   already been marked as Chen No. 12.
19       Q  And just to back up, why would you have
20   wanted to know that the activities that were referred
21   to there were occurring?
22       MR. KONOVALOV:  Objection; assumes facts not
23   in evidence.
24       MR. SIDORSKY:  Yeah, objection to the --
25   objection to form.

312

1        MR. GREENSTEIN:  Actually, you know what,
2    I'll withdraw that.
3        Q  Looking at Chen 12, which is a October 21st,
4    2002, e-mail from Michael Quinn to Ryan Roberts and
5    Greg Myers, cc:  Tom Williams, if you could just go
6    ahead and read that.
7        Actually, if you could stop by where it says
8    "What needs to be done."
9        A  Okay.
10       Q  You finished?
11       A  Almost.  Okay.
12       Q  Have you ever seen this e-mail before?
13       A  No.
14       Q  Do you know who Michael Quinn is?
15       A  I do.
16       Q  And did you ever have any discussions with
17   Michael Quinn about the con -- the -- these three
18   first bullet points in this e-mail?
19       A  No, I did not.
20       Q  Okay.  You see how it says "Ryan, Greg, Below
21   is the action plan for addressing the problems
22   surrounding the unapplied cash issues that you guys
23   worked on last week."
24       Do you see that?
25       A  I see that, yes.

313

1    Q   Were you aware during the quarterly reviews
2   or audit of Oracle's 2001 results that there were any
3   problems surrounding unapplied cash?
4    A   I was not.
5    Q   You see it says "There are three
6   deliverables," and it says "We need to provide an
7   update to the Audit Committee (a subcommittee of
8   Oracle's Board of Directors) in regards to what
9   Revenue Impact this process of taking unapplied cash
10  receipts to the reserve will have on our financial
11  statements.  In addition, we need to provide what
12  impact this process has had on revenue in each of the
13  last 8 quarters"; do you see that?
14   A   I do.
15   Q   So the last eight quarters, if you look at
16  the e-mail, it's October 21st, 2002.  So that would
17  take you back approximately two years, if you were
18  looking at the impact of the past eight quarters;
19  correct?
20      MR. KONOVALOV:  Objection; assumes facts not
21  in evidence; lacks foundation.
22      THE WITNESS:  It appears that it would go
23  back into fiscal 2001, yes.
24      MR. GREENSTEIN:  Right.
25   Q   And you see where it says "what Revenue

314

1   Impact this process of taking unapplied cash receipts
2   to the reserve will have on our financial statements"?
3       Now, nobody at Oracle told you during the
4   fiscal 2001 reviews audit or the reviews that there
5   were unapplied cash receipts taken to the reserve
6   which potentially could impact revenue?
7       MR. KONOVALOV:  Objection.
8       MR. GREENSTEIN:  Q.  Were you ever told that?
9       MR. KONOVALOV:  Assumes facts not in
10  evidence; misstates evidence.
11      MR. SIDORSKY:  Objection to form.
12      THE WITNESS:  No, I was not.
13      MR. GREENSTEIN:  Okay.
14   Q   Were you ever told about any of the issues in
15  this first bullet point during your time at Andersen?
16   A   No, I was not.
17      MR. SIDORSKY:  Objection to form.
18      MR. GREENSTEIN:  Q.  You see where it says in
19  the second bullet point -- or sorry -- you see in the
20  first bullet point it says "We need to provide what
21  impact this process has had on the revenue in each of
22  the last eight quarters," and you were never informed
23  that there was any possible impact of taking unapplied
24  cash receipts to the reserve that would impact revenue
25  in the prior eight quarters; right?

315

1       MR. KONOVALOV:  Objection; assumes facts not
2   in evidence.
3       MR. SIDORSKY:  Objection to form.
4       MR. KONOVALOV:  The document -- the witness
5   testified he has never seen the document before.
6   You've got no foundation for any of these questions.
7       MR. GREENSTEIN:  Q.  And what I'm asking is,
8   were you ever made aware that there was a potential
9   impact of a process of taking unapplied cash receipts
10  to the reserve in that it could potentially impact the
11  quarterly financial statements that Andersen
12  audited --
13      MR. KONOVALOV:  Objection; assumes --
14      MR. GREENSTEIN:  Q.  -- and reviewed?
15      MR. KONOVALOV:  -- facts not in evidence.
16      MR. SIDORSKY:  Objection to form.
17      THE WITNESS:  No, I was not aware.
18      MR. GREENSTEIN:  Okay.
19   Q   Were you ever made aware at any time after
20  you left Oracle -- Andersen?
21   A   No.
22   Q   Would you have wanted to know this in
23  conducting your quarterly reviews and audit -- would
24  you have wanted to know if this was, in fact,
25  occurring and it would, in fact, have an impact on

316

1   revenue?
2       MR. KONOVALOV:  Same objection.
3       MR. SIDORSKY:  Objection to form.
4       THE WITNESS:  Yes, I would have liked to have
5   known about it while we were out doing our review and
6   audit work.
7       MR. GREENSTEIN:  Right.
8    Q   You see in the second bullet point where it
9   says "We need to clean up the ENTIRE problem prior to
10  the end of October by moving cash receipts to the
11  proper buckets (unapplied, customer overpayments, or
12  on account) as appropriate.  We need to establish new
13  policies and procedures to ensure this never happens
14  again"?
15      Were you ever made aware of this problem that
16  he's referring to here or that Oracle needed to
17  establish new policies and procedures to ensure that
18  that never happened again?
19   A   No.
20      MR. KONOVALOV:  Same objections.
21      MR. GREENSTEIN:  Q.  You weren't aware of any
22  of this in these two bullet points here; right?
23      MR. KONOVALOV:  Same objections.
24      THE WITNESS:  No.
25      MR. GREENSTEIN:  Q.  But you would have

317

1 wanted to know if Oracle had to change its policies
2 and procedures to ensure that the problem never
3 happened again?  That would be something you wanted to
4 know as Oracle's auditor in conducting your audit;
5 right?
6       MR. SIDORSKY:  Objection to form.
7       MR. KONOVALOV:  Same objection.
8       MR. MERCHANT:  I think I already testified on
9 this memo and Mr. Williams' memo that I would like to
10 have known about this practice if it had been
11 occurring.
12       MR. GREENSTEIN:  Okay.
13    Q  You see in the last paragraph -- well,
14 sorry -- the fourth bullet point says "What needs to
15 be done," it says "For items currently 'On Account,'
16 we need to continue to work through each item over
17 $10,000 to determine what should have happened to the
18 cash receipt and make the correction and put it in the
19 right place"; do you see that?
20    A  I see that, yes.
21    Q  Were you ever made aware during 2001 or
22 during 2000, 2001 -- were you ever made aware that
23 there were items currently on account at Oracle that
24 needed to be determined where -- what should have
25 happened to the cash receipt?

318

1       MR. KONOVALOV:  Same objections.
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  No.
4       MR. GREENSTEIN:  Okay.
5    Q  Do you see the paragraph under those last
6 three bullet points where it says "Greg," and that
7 refers to Myers, "For the Miscellaneous Offset Report,
8 I need you to add the date the item was moved to
9 12601.  We need to accumulate the error by quarter."
10       You see that?
11    A  I do.
12    Q  And were you aware -- were you aware that
13 Oracle tried to -- ever -- that Oracle tried to
14 accumulate the error by quarter as it relates to items
15 being moved to 12601?
16       MR. KONOVALOV:  Same objections.
17       MR. SIDORSKY:  Objection to form.
18       THE WITNESS:  I think I've already testified
19 that I wasn't aware of any of the activities in this
20 memo or Mr. Williams' memo.
21       MR. GREENSTEIN:  Okay.
22       THE WITNESS:  So I was -- you keep asking me
23 the same questions over and over again.  I'm not aware
24 of it.
25       MR. GREENSTEIN:  Okay.

319

1    Q  If you turn to the second page, the paragraph
2 that says "Greg, Please confirm that ALL ability to
3 move anything to 12601 via On Account or creating a
4 Misc receipt write-off has been turned off."
5       Do you see that?
6    A  I do.
7    Q  Were you ever aware in 2000, 2001, or any
8 time, that there was an ability to move unapplied cash
9 to 12601 via on account?
10       MR. KONOVALOV:  Same objections.
11       MR. SIDORSKY:  Objection to form.
12       THE WITNESS:  No.
13       MR. GREENSTEIN:  Okay.
14    Q  Because I think you testified you didn't know
15 what "on account" meant, so you wouldn't know that
16 there was any ability to move anything to 12601 on
17 account; right?
18       MR. SIDORSKY:  Objection to form.
19       THE WITNESS:  That would be correct.
20       MR. GREENSTEIN:  Q.  And were you ever aware
21 that this -- that Oracle ever attempted to turn off
22 the ability to move unapplied cash to 12601 via on
23 account?
24       MR. KONOVALOV:  Same objections.
25       THE WITNESS:  No.

320

1       MR. GREENSTEIN:  Put that aside.  I think I'm
2 going to take a five-minute break and then finish off.
3       THE VIDEOGRAPHER:  Off the record.  The time
4 is 5:47 p.m.
5       (Short break taken.)
6       (Documents marked Exhibit Nos. 5 - 8
7        for identification.)
8       THE VIDEOGRAPHER:  We are back on the record.
9 The time is 6:05 p.m.  This marks the end of videotape
10 number four, Volume I in the deposition of
11 Gary Matuszak.
12       (Short break taken.)
13       THE VIDEOGRAPHER:  We are back on the record.
14 The time is 6:09.  Here marks the beginning of
15 videotape number five, Volume I, in the deposition of
16 Gary Matuszak.
17       MR. GREENSTEIN:  Q.  Mr. Matuszak, we just
18 finished talking about two documents, one was an
19 interview memorandum of Thomas Williams and the other
20 was an e-mail from Mike Quinn, and they were
21 discussing certain transfers from -- of unapplied cash
22 to 12601; do you recall talking -- having that
23 discussion?
24    A  In this deposition.
25       MR. SIDORSKY:  Objection to form.

321

1    THE WITNESS:  I recall the discussion we just
2  had as part of the deposition, yes.
3    MR. GREENSTEIN:  Right.
4    Q   Now, I think I asked you if you would have
5  wanted to know that what was reflected in those two
6  documents was actually occurring during the time that
7  you were auditing and reviewing the -- Oracle's
8  financial statements.  Do you remember me asking that?
9    MR. SIDORSKY:  Objection to form.
10    THE WITNESS:  Generally, yes.
11    MR. GREENSTEIN:  And you said you would
12  have wanted to know -- you would have liked to know
13  that at the time you were auditing Oracle's financials
14  and reviewing the quarterly financials; right?
15    A   Yes.
16    MR. SIDORSKY:  Objection; asked and answered.
17    MR. GREENSTEIN:  And I just wanted to
18  know why you would have wanted to know that if those
19  issues were actually occurring during your audit and
20  quarterly reviews?
21    MR. KONOVALOV:  Well, objection; vague, and
22  assumes facts not in evidence.
23    THE WITNESS:  Based upon the documents we
24  just went through, it -- it's unclear whether this was
25  appropriate activity or not.  It appears as if some of

322

1  it may have been inappropriate activity, and therefore
2  I would want to be aware of it.
3    MR. GREENSTEIN:  Okay.
4    Q   Are you aware of -- that on November 17th
5  Oracle created 46,000 -- well, strike that.
6    Do you know what a debit memo is?
7    MR. SIDORSKY:  Objection to form.
8    THE WITNESS:  Generally, yes.
9    MR. GREENSTEIN:  Okay.
10    Q   Well, with respect to Oracle, do you know
11  what a debit memo was around the 2000 and 2001 time
12  frame?
13    A   Not specifically, no.
14    Q   Generally, what do you know a debit memo to
15  be?
16    A   A credit memo would be a reversal of an
17  invoice.  A credit memo, an invoice.  So a debit memo
18  would be an increase.  I don't know if it was an
19  increase in an invoice or debit to a customer account.
20  I -- I don't know specifically what they meant by a
21  debit memo, how it impacted a particular customer
22  account.
23    Q   Okay.  Are you aware that -- that plaintiffs
24  allege in this lawsuit that there were 46,000 --
25  approximately 46,000 debit memos created on or around

323

1  November 17th, 2000?
2    A   I recall that that was stated in the -- in
3  the complaint, yes.
4    Q   Okay.  So other than seeing that in the
5  complaint, were you ever aware around 2000 -- were you
6  ever made aware, at any time, that there were
7  46,000-plus debit memos created on or around
8  November 17, 2000, at Oracle?
9    A   No.
10    Q   Okay.  Were you ever aware that Oracle
11  conducted a, quote, "on account" clean up for USA data
12  in connection with the creation of those debit memos
13  on or around November 17, 2000?
14    MR. KONOVALOV:  Objection; vague and
15  ambiguous.
16    MR. SIDORSKY:  Objection to form.
17    THE WITNESS:  No.
18    MR. GREENSTEIN:  Q.  Were you aware of an on
19  account cleanup at Oracle while you were there?
20    MR. SIDORSKY:  Objection to form.
21    THE WITNESS:  No.
22    MR. GREENSTEIN:  Okay.
23    Q   Do you know if anybody at Andersen was aware
24  of any on account cleanup relating to debit memos
25  while you were at Andersen?

324

1    A   I'm not aware.  I don't know.
2    Q   So other than seeing it in the complaint --
3  strike that.
4    In front of you I've marked a few documents,
5  first of which is Matuszak No. 5, and it's a
6  November 9th, 2000, e-mail from -- the subject is "HP
7  Q2 Execution Plan Update for November 10 Thursday"
8  from Michael DeCesare at Oracle, to Ed Sanderson and
9  Frank Varasano.
10    You've had a chance to review that; right?
11    MR. SIDORSKY:  Objection to form.  How has --
12  he hasn't had a chance to review it.
13    MR. GREENSTEIN:  Q.  While we were off the
14  record, were you reading this?  You read this?
15    A   I did -- I did not read this --
16    Q   Okay.
17    A   -- no.
18    Q   If you could just go ahead and read the first
19  paragraph there in that first e-mail, and for the
20  record, this is Bates stamped NDCA-ORCL 055957 through
21  055962.
22    Have you had a chance to read the first
23  e-mail in the string?
24    A   Yes.
25    Q   Have you seen this e-mail, by the way?

325

1    A  No.
2    Q  Or any of the string of e-mails?
3    A  No.
4    Q  Okay.  And do you see where it says
5  "Sandy/Frank"?  Do you know who Sandy was?
6    A  I believe Sandy Sanderson was one of the
7  executives in the sales group.
8    Q  Okay.  You see there it says "HP confirmed
9  today that they will try to pull the CRM portion of
10  the order off providing we deliver what we have
11  outlined in Development and Production systems"?  You
12  see that?
13    A  I do.
14    Q  You see where it says "Since they don't need
15  ALL the license users right now they are hedging on
16  how big an order they will do until they see how much
17  production hardware Oracle comes back with.  If this
18  turns out to be a large number we could get the entire
19  order."
20    Do you see that?
21    A  I do.
22    Q  So in reading this, doesn't it appear that --
23  that this deal with HP in the second quarter, that
24  there was a -- a contingency for HP to purchase Oracle
25  products -- was based on -- in part on Oracle's

326

1  agreement to purchase AP -- HP products; right?
2    MR. KONOVALOV:  Objection; misstates the
3  document; document speaks for itself.
4    MR. SIDORSKY:  Objection to form.
5    MR. KONOVALOV:  Lacks foundation as well.
6    THE WITNESS:  It -- it -- it appears they're
7  working concurrently on two transactions.
8    MR. GREENSTEIN:  Q.  Right, but I'm not
9  saying -- well, but it -- it doesn't just appear that
10  these two transactions are occurring -- are occurring
11  concurrently.
12    Doesn't it appear from this e-mail that --
13  that HP is hedging on how big an order they will place
14  with Oracle until they see how much hardware Oracle
15  will purchase from HP?
16    MR. KONOVALOV:  Objection; it's
17  argumentative; it lacks foundation.
18    MR. SIDORSKY:  Yeah.
19    MR. KONOVALOV:  Calls for speculation.
20    MR. SIDORSKY:  Same objections.
21    This is -- this is not a document the witness
22  has seen.  It's not appropriate to ask him to
23  interpret a document he has no involvement with.
24  Objection to form.
25    THE WITNESS:  I -- I -- I read the document

327

1  the same as everyone else here, and it says they're
2  hedging on how big an order they will do until they
3  see how much production hardware we're going to buy,
4  so....
5    MR. GREENSTEIN:  Okay.
6    Q  So if you saw this e-mail at the time you
7  reviewed the Hewlett-Packard deal in the second
8  quarter, and you saw this language about hedging on
9  how big an order HP will do until they see how much
10  Oracle will purchase, would that be something that you
11  would find important in determining whether SOP 97-2
12  was met?
13    MR. SIDORSKY:  Objection to form.
14    MR. KONOVALOV:  Objection; incomplete
15  hypothetical.
16    THE WITNESS:  I don't know.  Possibly.  I
17  mean, both -- both agreements were executed by the end
18  of the quarter.
19    MR. GREENSTEIN:  Right.
20    Q  But that's not what I'm asking.  I'm asking
21  would you have wanted to know if HP was hedging on how
22  big an order they would place from Oracle until they
23  saw how much hardware Oracle would purchase from HP?
24    MR. KONOVALOV:  Objection; assumes facts not
25  in evidence.

328

1    MR. SIDORSKY:  Objection to form; calls for
2  speculation.
3    THE WITNESS:  Possibly.  I mean, it -- it
4  would have been nice to know.  I don't know if or how
5  it would have impacted the ultimate revenue recognized
6  on the transaction.
7    MR. GREENSTEIN:  Right.
8    Q  But why would you say it would have been nice
9  to know this?
10    A  Well, we like to have as much information and
11  background as we can.
12    Q  Right.
13    But this particular e-mail, why would it be
14  nice to know what -- what is --
15    A  I think I just stated it would be nice to
16  have this as background information to understand that
17  they were negotiating a license software to HP at the
18  same time HP was negotiating a purchase of hardware
19  from Oracle.
20    Q  Right.
21    But would you want to know -- do you see
22  where it says "If this turns out to be a large number
23  we can get the entire order"?
24    Now, just on the face of that, doesn't that
25  appear that what he's saying here is that if -- what

329

1   Oracle -- if it turns out that Oracle agrees to buy a
2   large number from HP, then Oracle could get the entire
3   order from HP?  Isn't that -- isn't that what it looks
4   like on the face of this?
5       MR. KONOVALOV:  Objection; I'm not sure who's
6   testifying at this point; the document speaks for
7   itself; the question lacks foundation.
8       MR. SIDORSKY:  Yeah, same objection.  You're
9   trying to interpret a document that -- that the
10  witness has no particular knowledge and has never seen
11  before, so he can't add anything.  Objection to form.
12      THE WITNESS:  Well, you're asking me to -- to
13  read a document and -- and try to interpret what it
14  means.  You know, other than reading the document, I
15  have no basis to do anything other than read the
16  document.
17      MR. GREENSTEIN:  Okay.
18  Q   Well, if you saw this document during the
19  second quarter, when you were analyzing the HP deal
20  and reviewing it for compliance with SOP 97-2, would
21  this e-mail, this document -- would it -- would it
22  have changed your analysis at all that it was proper
23  to recognize that revenue during quarter -- the second
24  quarter?
25      MR. SIDORSKY:  Objection to form.

330

1       MR. KONOVALOV:  Objection; asked and
2   answered; it's also an incomplete hypothetical.
3       THE WITNESS:  I don't know whether it would
4   have impacted our conclusion.  It may have.  It may
5   not have.
6       MR. GREENSTEIN:  Q.  But if there was, in
7   fact, a -- if -- if there was a contingency as part of
8   this deal whereby Oracle or HP's purchase of Oracle
9   product was contingent upon the amount purchased by
10  Oracle of HP hardware, if there was that contingency,
11  would that have precluded revenue recognition under
12  97-2?
13      MR. KONOVALOV:  Q.  I'm going to renew my
14  objection to this entire line of questioning.  It's
15  Judge Infante's rule that this is off limits.
16      In any event, it's asked and answered; it's
17  an incomplete hypothetical; assumes facts not in
18  evidence; the document speaks for itself.
19      MR. SIDORSKY:  Same objection.
20      THE WITNESS:  Again, I'll repeat my answer.
21  I don't know what impact this would have had on our
22  ultimate conclusion.
23      MR. GREENSTEIN:  Q.  But you would have liked
24  to know these facts; right?
25      MR. KONOVALOV:  Objection; asked and

331

1   answered.
2       THE WITNESS:  I believe I've already answered
3   that question.
4       MR. GREENSTEIN:  Q.  And that answer was yes;
5   right?
6   A   I believe it was.
7   Q   Okay.  Now, do you see where it says "Since
8   they don't need ALL of the license users right now"?
9   Do you see that?
10  A   I do see that.
11  Q   Is it proper under SOP 97-2 to recognize
12  revenue on a deal where the purchaser doesn't need all
13  the license users right now --
14      MR. KONOVALOV:  Objection; assumes facts.
15      MR. GREENSTEIN:  Q.  -- or at the time of the
16  purchase?
17      MR. KONOVALOV:  Sorry.  Objection; assumes
18  facts not in evidence.
19      MR. SIDORSKY:  Objection to form.
20      THE WITNESS:  It's not necessarily rel --
21  relevant to revenue recognition on the license
22  arrangement.
23      MR. GREENSTEIN:  Q.  So it's possible to
24  recognize revenue under 97-2 if -- even if the
25  purchaser doesn't need the license users at the time

332

1   they buy the product?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  Yeah.
4       MR. GREENSTEIN:  Okay.
5   Q   If you look at the next document, which is
6   Matuszak No. -- actually, stay with that one.
7       If you look at the second page, 055958, and
8   I'll just direct your attention to the top portion of
9   that page.  You see where it says "As you'll see in
10  the note below from Kurt Graustein, there is a lot of
11  production data that will eventually reside in lli
12  that may make the HP sizing effort more complex
13  because of application change."
14      It says "HP confirmed again today they're
15  willing to do a Q2 CRM deal in some amount if we can
16  pull together machine requirements into a binding PO
17  and resolve the development issues we're working on."
18      Then it says "According to Phil May, HP is
19  willing to buy as much CRM from Oracle as we buy in
20  HW --" which I think means hardware "-- Support and
21  other requirements from HP."
22      So my question is, looking at that last
23  sentence I just read, does that -- where it says
24  "According to Phil May, HP is willing to buy as much
25  CRM from Oracle as we buy in HW, Support and other

333

1  requirements from HP," doesn't that indicate that
2  there was some type of contingency between the two,
3  that the purchase from Oracle was -- the purchase from
4  HP was contingent on the -- Oracle's purchase of HP
5  hardware?
6       MR. KONOVALOV:  Objection; misstates the
7  document; lacks foundation.
8       MR. SIDORSKY:  Objection to form.
9       THE WITNESS:  It -- you can read the document
10  the same way I can.  I mean, it says what it says.
11       MR. GREENSTEIN:  Right.
12   Q  But I'm asking you your understanding --
13   A  You're asking --
14   Q  -- reading this, if this, to you, as an
15  auditor, and a -- and a -- and knowledgeable about SOP
16  97-2, if reading this statement leads you to believe
17  that there was some sort of contingency in the deal
18  that occurred between HP and Oracle in the second
19  quarter of 2001?
20       MR. KONOVALOV:  Same objections.
21       MR. SIDORSKY:  Objection to form; asked and
22  answered; same objections.
23       THE WITNESS:  It appears that the
24  contingency, if it -- if it did exist, was that they
25  execute a purchase order to purchase equipment from

334

1  HP.
2       MR. GREENSTEIN:  Okay.
3   Q  If you move to Matuszak No. 6, for the
4  record, this is an e-mail dated November 28th, 2000,
5  and Bates stamped 020844 through 020849 from
6  Mike DeCesare to Larry Ellison, Sandy Sanderson,
7  Safra Catz and CCing other people.
8       If you could just go ahead and read the --
9  read this e-mail, please.
10   Q  Actually, I want to focus your attention on
11  the first page.  You see where it says in the first
12  bullet point "Production Spend - Consistent with
13  Larrys conversations with Carly, HP will expect a
14  purchase order for the following amounts.  They will
15  expect this purchase order to be binding and commit
16  Oracle to using the full amounts by the dates we
17  promise"?
18       Do you see that?
19   A  I do.
20   Q  Now, reading that, does that indicate to
21  you -- well, look at the date November 28th, 2000; do
22  you see that?
23   A  Yes.
24   Q  That was two days before the close of the
25  deal; right?

335

1   A  Yes.
2   Q  And you see where it says "HP expects -- will
3  expect a purchase order for the following amounts"?
4       Now, does that indicate to you that there was
5  some type of contingency between -- whereby Oracle had
6  to agree to purchase certain amounts from HP before HP
7  would agree to the -- to purchase product from Oracle?
8       MR. KONOVALOV:  Objection; lacks foundation;
9  assumes facts not in evidence; the document speaks for
10  itself.
11       MR. SIDORSKY:  Objection to form; same
12  objections.
13       THE WITNESS:  Well, it -- it appears to me to
14  suggest that they were expecting that Oracle would
15  issue a purchase order that would bind them to the
16  purchase of HP equipment.  It does not suggest that
17  once both of those documents are executed, that the
18  payment of the license fee is contingent upon Oracle
19  executing under their obligations under the purchase
20  order.
21       MR. GREENSTEIN:  Okay.
22   Q  Well, if you turn to the next page, you
23  see -- you see where it says in the first bullet
24  "Order to Oracle.  Background - Over the past 8 weeks
25  Oracle (Mike DeCesare) and HP (Phil May --" et

336

1  cetera "-- have been working on a series of
2  concessions that has been requested by HP before they
3  move forward on the purchase of the additional CRM
4  licenses"?
5       Do you see that?
6   A  I see that.
7   Q  It says "It has been understood that this
8  would not been executed until all of the HP
9  deliverables are completed"; do you see that?
10   A  I do see that.
11   Q  So -- so doesn't it indicate that it looks
12  like there have to be concessions made by Oracle that
13  were requested by HP before they moved forward on the
14  purchase of additional CRM licenses?
15       MR. KONOVALOV:  Objection; lacks foundation;
16  assumes facts not in evidence; the document speaks for
17  itself.
18       MR. SIDORSKY:  Objection to form.
19       THE WITNESS:  Well, the -- the e-mail says
20  "concessions," so I guess I don't know what that term
21  means.  But reading the document, that's what it -- it
22  would imply.  There are concessions that have been
23  requested by HP.
24       MR. GREENSTEIN:  Right.
25   Q  Before they purchase Oracle products, there

337

1  have to be concessions made by Oracle to HP; right?
2      MR. SIDORSKY:  Objection to form.
3      THE WITNESS:  Prior to purchase of the
4  product.
5      MR. GREENSTEIN:  Right.
6    Q  So doesn't that indicate that the purchase by
7  HP of Oracle product is contingent on certain
8  concessions made by Oracle to HP --
9      MR. KONOVALOV:  Objection; misstates the
10  document.
11      MR. GREENSTEIN: Q.  -- right?
12      MR. SIDORSKY:  Objection to form.
13      THE WITNESS:  Well, it implies that the
14  concessions would be prior to the purchase of the
15  product, not concessions subsequent to the purchase of
16  the product.
17      MR. GREENSTEIN: Q.  But what I'm asking is
18  that it appears that the concessions are -- that
19  the -- before HP moves forward on a purchase, that
20  there have to be concessions made.  So, in other
21  words, the purchase is contingent on the concessions;
22  is that fair to say?
23      MR. KONOVALOV:  Objection; misstates the
24  document; the word "contingency" is nowhere in any of
25  these documents.

338

1      MR. SIDORSKY:  Objection to form.
2      THE WITNESS:  Yeah, you keep using the word
3  "contingency," but there's a number of negotiations
4  that go on in any business arrangement, any license
5  agreement, any other business arrangement, and those
6  conditions have to be met.
7      So, you know, you can imply that every deal
8  has a contingency, because until the parties have a
9  meeting of the minds and it comes together in a legal
10  contract, you know, there would be a contingency
11  involved in the event that if one didn't agree to the
12  other party's terms and conditions they wouldn't
13  execute the agreement.
14      So I'm struggling with what -- you keep
15  throwing out the word "contingency," and I -- I don't
16  know what you're trying to imply or mean by that.
17  Now, I can read the e-mail the same way you can.
18      MR. GREENSTEIN:  Okay.
19    Q  Were you aware of any concessions that were
20  what's written here, that there were concessions that
21  HP was requesting before they move forward on the
22  purchase in Q2?
23    A  I've not seen this memo before and so --
24    Q  But were you aware -- okay.  Sorry?
25    A  -- so I'm not aware of these concessions.

339

1    Q  Okay.  Were you aware of any concessions that
2  HP was requesting from Oracle that had to be met
3  before HP would agree to make the purchase in Q2?
4      MR. KONOVALOV:  Objection; assumes facts not
5  in evidence.
6      THE WITNESS:  Not that I recall.
7      MR. GREENSTEIN:  Okay.
8    Q  Would you have wanted to know that in
9  reviewing this transaction under SOP 97-2?  Would you
10  have wanted to know that there were concessions that
11  HP was requiring from Oracle before they would
12  purchase their product?
13      MR. SIDORSKY:  Objection to form.
14      THE WITNESS:  I would likely want to be aware
15  of them.  I'm not -- it's not clear to me that any of
16  them would impact my conclusion on revenue
17  recognition.
18      MR. GREENSTEIN:  Right.
19    Q  But what I was asking is, would you have
20  wanted to know that at the time you were reviewing it
21  under SOP 97-2?
22      MR. KONOVALOV:  Objection; vague and
23  ambiguous.
24      MR. SIDORSKY:  Objection to form.
25      THE WITNESS:  I would like to know the items

340

1  that would impact revenue recognition, and if some of
2  the concessions would impact, yes, I would like that.
3      MR. GREENSTEIN: Q.  Some concessions could
4  potentially impact the revenue recognition; right?
5      MR. KONOVALOV:  Objection; vague and
6  ambiguous.
7      THE WITNESS:  It's unclear whether -- if
8  they -- if HP is requesting them to do something, and
9  they do it prior to executing the license agreement,
10  whether it has any impact on the revenue recognition.
11      MR. GREENSTEIN:  Right.
12    Q  But what I'm asking is -- is, would you want
13  to know that in making this determination?  And I
14  think you said yes, because it could potentially
15  impact revenue recognition; right?
16      MR. KONOVALOV:  Objection; misstates the
17  witness's testimony.
18      MR. SIDORSKY:  Objection to form.
19      THE WITNESS:  I believe what I said is I
20  would like to understand what concessions may exist
21  that may have an impact on the revenue recognition.
22      MR. GREENSTEIN:  Okay.
23    Q  Now, if you look down to the bullet point,
24  it's kind of indented, and there's handwritten notes
25  next to it; you see that?

341

1    It says "The payments have now been moved to
2  the operating lease that will keep the expense for HP
3  out of the current quarter and align the payments and
4  expense recognition of these licenses with when HP
5  will be going live.  This will be offered at no
6  additional expense to AP -- HP"; do you see that?
7    A  I do.
8    Q  Now, based on your understanding of SOP 97-2,
9  is it normal for payments or expenses to be kept out
10 of a current quarter and aligned with actual payments
11 of the licenses in a trans -- software transaction?
12       MR. KONOVALOV:  Objection; lacks foundation;
13 assumes facts not in evidence.
14       MR. SIDORSKY:  Objection to form.
15       MR. KONOVALOV:  The document speaks for
16 itself.
17       THE WITNESS:  You're asking me to testify
18 under oath to something that I have no basis to
19 testify on.
20       MR. GREENSTEIN:  Okay.  Fair enough.
21    Q  Would you have wanted to know what's written
22 in this bold paragraph at the time you were analyzing
23 the propriety of the revenue recognition for the HP
24 deal in the second quarter of '01?  Would you have
25 wanted to know what's written here, these facts, if

342

1  they were, in fact, true?
2        MR. SIDORSKY:  Objection to form.
3        MR. KONOVALOV:  Same objections.
4        THE WITNESS:  Not necessarily.
5        MR. GREENSTEIN:  Q.  And why is that?
6     A  Because what HP does and how HP accounts for
7  this transaction is not of concern to me.  This is
8  talking about HP.
9     Q  Okay.
10    A  What would be of -- of importance to me is
11 the payment terms contained in the license agreement.
12    Q  Okay.  And this paragraph talks about the
13 payments.  Well, it talks about the timing of the
14 payments vis-a-vis the expense recognition; right?
15    A  Well --
16       MR. SIDORSKY:  Objection to form.
17       THE WITNESS:  -- it -- it appears to, yes.
18       MR. GREENSTEIN:  Okay.
19    Q  And you see down in the last bullet point, it
20 says "CRM development document"?  It says
21 "Background - To incent HP to move on the Oracle Order
22 in November and to get closer to HP as a partner
23 Oracle has committed to move the entirety of our CRM
24 development environment to HP."
25       You see that?

343

1     A  I do.
2     Q  Now, would you have wanted to know -- if
3  that's, in fact, true, would you have wanted to know
4  that fact in doing your determination under SOP 97-2?
5        MR. SIDORSKY:  Objection to form.
6        THE WITNESS:  Again, possibly.
7        MR. GREENSTEIN:  Q.  And why would you
8  possibly want to know?
9     A  Well, if -- if -- if -- if Oracle was
10 planning to move their platform to another hardware
11 vendor, and that's something they were planning to do
12 irrespective, that was something they were planning as
13 part of their normal product development and R&D
14 efforts to do, that -- that may not be important to
15 me.
16    Q  But if it was -- if -- if they committed to
17 move the entirety of CRM to -- development to HP in
18 return for HP's purchase of Oracle products, that
19 would potentially be improper; right?
20       MR. KONOVALOV:  Objection; mischaracterizes
21 the document.
22       MR. SIDORSKY:  Objection to form.
23       THE WITNESS:  Not necessarily.
24       MR. GREENSTEIN:  Q.  Well, but it could be;
25 right?

344

1        MR. SIDORSKY:  Objection to form.
2        MR. KONOVALOV:  Objection; argumentative.
3        THE WITNESS:  I just said not necessarily.
4        MR. GREENSTEIN:  Okay.
5     Q  Would you have wanted to know -- if Oracle
6  committed to move their entire CRM development to HP,
7  would you have wanted to know, at the time you're
8  reviewing this deal, whether that commitment was in
9  return for a commitment by HP to purchase Oracle
10 products?
11       MR. SIDORSKY:  Objection to form.
12       MR. KONOVALOV:  Assumes facts not in
13 evidence.
14       THE WITNESS:  Not necessarily.
15       MR. GREENSTEIN:  Q.  You wouldn't have wanted
16 to know if those commitments were quid pro quo?
17    A  Well --
18       MR. KONOVALOV:  Same objection.
19       THE WITNESS:  -- you're asking me a bunch of
20 hypothetical questions, and to answer them in a
21 30-second time period is not appropriate; okay.  I
22 mean, normally you take all the facts together, and
23 piecemeal facts, all the written documents, and you'd
24 analyze them in discussions with the company and
25 conclude on the accounting.  You're asking me very

345

1 piecemeal questions --
2      MR. GREENSTEIN: Q. Understood.
3    A  -- at the end of a long day on documents that
4 I can't -- I've never seen before.
5    Q  Okay. What I'm asking is -- so were you ever
6 made aware of this commitment that's talked about here
7 at the time you were reviewing the deal?
8      MR. KONOVALOV: Objection; lacks foundation;
9 assumes facts not in evidence.
10      MR. SIDORSKY: Objection to form.
11      THE WITNESS: I don't recall.
12      MR. GREENSTEIN: Okay.
13    Q  You see in the -- on the first page, going
14 back to the first page, where it says "CRM Functional
15 Issues - There are 14 show stoppers that HP feels are
16 keeping them from being able to achieve their global
17 rollout which is scheduled between April and October"?
18 Do you see this?
19    A  I do.
20    Q  Were you aware, at the time your reviewed the
21 HP deal in the second quarter of '01, that there were
22 14 show stoppers that Hewlett-Packard felt were
23 keeping them from being able to achieve their global
24 rollout?
25    A  I was not.

346

1    Q  Okay. If you look at Exhibit 7, Matuszak
2 Exhibit 7, please.
3      For the record, this is Bates stamped 017624.
4      MR. KONOVALOV: Actually, it's the lower
5 Bates number.
6      MR. GREENSTEIN: Oh, sorry.  020839 through
7 020843.
8    Q  For the record, this appears to be -- well,
9 if you look at 841, you see two signatures there.  It
10 appears to be a letter agreement between HP and Oracle
11 on November 30th, 2000.
12      If you could just -- have you ever seen this
13 agreement before?
14    A  I don't recall.
15    Q  Okay.  Well, in conducting your analysis of
16 this transaction in the second quarter of '01, do you
17 recall looking at this agreement?  If you look on the
18 page 841, it appears to be signed by HP and
19 Safra Catz of Oracle; do you see that?
20    A  I do.
21    Q  And do you see on the first page it says
22 "Letter agreement between Oracle and Hewlett-Packard
23 on November 30th, 2000"?  Do you see that?
24    A  I do.
25    Q  And that's the last day of the second quarter

347

1 '01; is that right?
2    A  That's correct.
3    Q  Does that refresh your recollection about --
4 that you reviewed or Andersen reviewed this agreement?
5    A  Yes, we likely reviewed this agreement as
6 part of the HP transaction, yes.
7    Q  Okay.  Do you see in the second term there it
8 says "Oracle will schedule delivery dates for these
9 products as follows:  $10.0 million in products; that
10 are not later than January 31, 2001; and $5.0 million
11 of products, that are not later than April 30, 2001"?
12 Do you see that?
13    A  I do.
14    Q  Now, under SOP 97-2, doesn't that -- doesn't
15 the delivery element require that the delivery of the
16 software occur at the time the contract or at the time
17 the revenue is recognized?
18      MR. SIDORSKY: Objection to form.
19      MR. KONOVALOV: Could you read that question
20 back, please?
21      (Whereupon, record read by the Reporter as
22 follows:
23      "Question:  Now, under SOP 97-2, doesn't
24      that -- doesn't the delivery element require
25      that the delivery of the software occur at

348

1      the time the contract or at the time the
2      revenue is recognized?")
3      MR. KONOVALOV: It's vague and ambiguous.
4      THE WITNESS: You know, I -- I may be
5 mistaken, but I believe this is referring to Oracle's
6 scheduling delivery of the HP equipment to Oracle, not
7 the licensed from Oracle to HP.
8      MR. GREENSTEIN: Okay.
9    Q  Well, if this -- if -- if there was a term in
10 the contract which -- which allowed delivery of Oracle
11 products to HP at a time after November 30th, would
12 that -- would that meet the delivery element of SOP
13 97-2?
14      MR. KONOVALOV: Objection; lacks foundation;
15 incomplete hypothetical; assumes facts not in
16 evidence.
17      MR. SIDORSKY: Same objection.
18      THE WITNESS: I'm not sure it's relevant
19 to -- to this agreement.  This agreement is
20 referencing delivery of HP hardware to Oracle.
21      MR. GREENSTEIN: Okay.
22    Q  See in point four where it says "If Oracle
23 does not complete the commitments in 1 through 3
24 above, then Oracle will pay a cancellation fee of
25 $15,000,000 (less the invoiced amount of products

349

1  delivered from this blanket purchase order and paid
2  for by June 15, 2001)"?  You see that?
3      A  I do.
4      Q  Do you recall that there was a 15 million --
5  do you recall that $15 million cancellation fee
6  provision in this agreement?
7      A  I don't recall any -- I don't recall the
8  specifics of this letter agreement, no.
9      Q  Well, do you recall that $15 million
10  cancellation fee?
11     A  I don't.  I just said I don't recall the
12  specifics.
13     Q  Okay.  Well, does that -- if there is a
14  cancellation fee that's assessed for 15 million, if
15  Oracle doesn't complete the commitments, does that --
16  strike that.
17        See on the left-hand side of the handwriting.
18  Do you recognize that handwriting?
19     A  I do not.
20     Q  Do you see where it says "Is -- this at the
21  bottom "-- Is this the way we are going to do deals?
22  Each has to buy something."  Do you see that?
23     MR. KONOVALOV:  Objection; lacks foundation.
24     THE WITNESS:  I do.
25     MR. GREENSTEIN:  Q.  So would you have wanted

350

1  to know, at the time you assessed this transaction
2  with HP, would you have wanted to know if the -- the
3  agreement required that each party had to buy
4  something from the other?
5     MR. SIDORSKY:  Objection to form.
6     MR. KONOVALOV:  Assumes facts not in
7  evidence.
8     THE WITNESS:  Well, I think we were aware at
9  the time that there were concurrent transactions
10  between HP and Oracle, so I don't know that there's
11  any further relevance to that comment.
12        We were aware that there was an agreement by
13  Oracle to buy HP equipment and that there was an
14  agreement by HP to license Oracle software.
15     MR. GREENSTEIN:  Okay.
16     Q  Were you aware at the time that Oracle's --
17  that HP's purchase of Oracle software was contingent
18  at all in any way upon Oracle buying a certain amount
19  of hardware from HP?  Were you aware of that?
20     MR. SIDORSKY:  Objection to form; that's
21  about the 20th time this has been answered, and I
22  don't -- you know, to the extent we've been over this
23  and its -- the witness has testified at length about
24  the various issues and that the need for a complete
25  record, I just, you know, object to the form of the

351

1  question.
2     MR. KONOVALOV:  Objection; assumes facts not
3  in evidence, and but for the fact we're now at 6:45 we
4  would have been calling Infante on this.  This is
5  beginning to border on the absurd.
6     MR. SIDORSKY:  Yeah, I mean, it really is
7  beyond the scope.  I mean, we've let it go for a
8  while, but this is getting to be too much.  Objection
9  to form.
10     THE WITNESS:  You keep referencing the word
11  "contingent" without putting it into any perspective
12  or basis.  Again, both of these transactions were
13  executed.  So the fact that one may have been
14  contingent on the other isn't necessarily relevant,
15  because they both have been executed.
16     MR. GREENSTEIN:  Okay.
17     Q  If you look at Matuszak No. 8, for the
18  record, this is a one-page document, 025018, dated
19  November 30th from Safra Catz to Thomas Williams.
20        If you could just read the -- it's one
21  paragraph.  Do you see that?
22     A  Yes, I do.
23     Q  Have you ever seen this e-mail before?
24     A  No.
25     Q  Were you ever aware that -- of what is being

352

1  said here, that -- were you ever aware that
2  Larry Ellison and Carly Fiarone were discussing HP's
3  purchase of Oracle products in second quarter if
4  Oracle committed to purchase 20 to 30 million of HP's
5  products over the next 18 to 24 months?
6     MR. KONOVALOV:  Objection;
7  mischaracterizes --
8     MR. GREENSTEIN:  Q.  Were you aware of that?
9     MR. KONOVALOV:  Sorry.  Objection;
10  mischaracterizes --
11     THE WITNESS:  I don't recall.
12     MR. GREENSTEIN:  Q.  Would that be
13  something -- if, in fact, that discussion occurred,
14  would that be something that you would have wanted to
15  know at the time you analyzed this transaction under
16  SOP 97-2?
17     MR. SIDORSKY:  Objection to form.
18     THE WITNESS:  Possibly, but not necessarily.
19     MR. GREENSTEIN:  Okay.  I'd like to mark
20  this, I think, as the last one, Matuszak No. 9.
21        (Document marked Exhibit No. 9
22         for identification.)
23     THE WITNESS:  Can I ask how long we've been
24  on the record?
25     THE VIDEOGRAPHER:  40 minutes.  Four zero.

353

1  40 minutes.
2      THE WITNESS:  In total?
3      THE VIDEOGRAPHER:  Oh, you mean today?  Seven
4  hours and 20 minutes or something.
5      MR. GREENSTEIN:  I only have a few more
6  minutes.  Again, Rob, I don't -- I think there were a
7  lot of speaking objections which held us up today.
8      MR. SIDORSKY:  Well --
9      MR. GREENSTEIN:  I only have a few more
10  minutes.
11      MR. SIDORSKY:  Listen, I don't agree with
12  that, because, you know, people have to make the
13  objections that are appropriate, and I think that's
14  all we did.
15      I mean, you ran over a little.  I'm not --
16  you know, Mr. Matuszak is -- you know, has been very
17  generous with his time.  If you finish up in the next
18  five or ten minutes --
19      GREENSTEIN:  Okay.
20      MR. SIDORSKY:  -- then let's do it; all
21  right.
22      MR. GREENSTEIN:  I do appreciate that.  I
23  apologize.
24  Q  If you could just take a look at this.  It's
25  been marked as Matuszak No. 10.

354

1      THE REPORTER:  It's 9.
2      MR. KONOVALOV:  Did you say 10 or 9?
3      THE REPORTER:  It's 9.
4      MR. GREENSTEIN:  Oh, sorry.  9.
5  Q  For the record, this is NDCA-ORCL 033954
6  through 033978.  It says "Top 20 License Contracts
7  Revenue Recognition Review."  If you -- actually, I
8  just want to direct your attention to the first page.
9  A  Okay.
10  Q  Okay.  Have you ever seen this document
11  before?
12  A  I -- I can't reference this specific
13  document, but this appears to be the information that
14  we would -- the package we would get from the company
15  for the -- for our revenue review during the quarter.
16  Q  Okay.  And you see how Hewlett-Packard is
17  listed as number three there?
18  A  I do, yes.
19  Q  And you see how it's for revenue recognized
20  18 million there?
21  A  I do.
22  Q  Okay.  If you turn to the fifth page there,
23  it says "Hewlett-Packard."
24  A  Okay.
25  Q  Okay.  You see -- does this appear to be a

355

1  summary provided by Oracle of the Hewlett-Packard deal
2  that was provided to Andersen in -- when they were
3  conducting their second quarter review?
4  A  It most likely is, yes.
5  Q  Okay.  And they -- they draft this language
6  and give it to Andersen; right?
7  A  That's correct.
8  Q  Okay.  See how in the issues it says "Issued
9  and signed concurrently with this transaction was a
10  blanket purchase order and letter agreement between
11  Oracle and HP for the purchase of 30 million in HP
12  hardware for Oracle's production and development
13  environments"?  Do you see that?
14  A  I do.
15  Q  It says "In consideration for this
16  commitment, HP agreed to increase the discounts from
17  our previous purchase agreement from 40 to 50 percent
18  for production hardware and from 12 to 17 percent for
19  certain classes of products within the production and
20  development environment."
21      Do you see that?
22  A  I do.
23  Q  And then the next paragraph says "Also
24  accompanying the transaction was a nonbinding letter
25  of understanding that discussed Oracle's intention to

356

1  move its CRM development environments to HP hardware.
2  The signed agreement and blanket purchase order
3  mentioned above as a result of this letter"; do you
4  see?
5  A  I do.
6  Q  Do you remember reviewing that, those two
7  paragraphs, in doing your assessment of this
8  transaction the second quarter of '01?
9  A  I -- I would have reviewed this, this page,
10  yes.
11  Q  Okay.  But do you remember reviewing that
12  specific language that says that "In consideration for
13  Oracle's commitment, HP agreed to --" what's listed
14  there?
15  A  Not specifically, but I -- I -- I'm sure
16  I would have read it.
17  Q  Okay.  If you just keep that in front of you.
18  I'm going to mark this as Matuszak 11 or 10, sorry.
19      This actually appears to be a copy of the
20  same document, but there's some differences.  These
21  were both produced by Oracle.  And if you can just
22  turn to page four, it's the same summary of the --
23  well, it's the same type of summary for the
24  Hewlett-Packard; do you see that?
25  A  I don't have the document.

357

1    Q  Oh, sorry.
2       MR. KONOVALOV:  Which page, Eli?
3       MR. SIDORSKY:  Page five.
4       THE WITNESS:  Sorry.  Which page?
5       MR. GREENSTEIN:  Q.  Page -- well, it's
6    actually Bates stamped 068225.
7       MR. SIDORSKY:  Page five.
8       MR. GREENSTEIN:  Yeah, five.
9       Q  If you put it next to the other document.
10      You see how -- where it says "Issues" in this
11   -- the -- in Matuszak No. 10?
12      A  Yes.
13      Q  Okay.  And you see how if you just look at
14   those four paragraphs, do you see anywhere in that
15   document the -- the -- the language that talks about
16   the commitments made by Oracle in consideration for
17   HP's agreements?
18      MR. SIDORSKY:  Objection to form; the
19   document speaks for itself.
20      If you want to tell us it's not there, you
21   don't need the witness to -- to compare the two.
22      MR. KONOVALOV:  It lacks foundation.
23      THE WITNESS:  Well, this -- the second
24   document does not have the same language as the first
25   document.  That's a factual statement.

358

1       MR. GREENSTEIN:  Okay.
2       Q  Do you remember which document -- well, did
3    you review the second document in the second quarter
4    when assessing the HP deal?
5       A  I don't know which document I reviewed.  I
6    don't recall reviewing either document specifically.
7    But what I can tell you is, going through the audit
8    committee agenda, there's a discussion in there of the
9    HP purchase.
10      So I think it's fair to say that Andersen was
11   aware of the HP purchase agreement and had reviewed
12   the agreement.  So I would have to speculate as to
13   which one of these is a first draft and which one is a
14   final draft.
15      Q  Okay.  Without speculating, did you know,
16   looking at Matuszak No. 9, the first paragraph, did
17   you -- were you aware of these facts in that first
18   paragraph at the time that you gave that presentation
19   regarding HP to the audit committee?
20      A  Possibly.  I mean, most likely, yes.
21      Q  Well, why would you say "most likely"?
22   Because these two doc -- you're not sure which of
23   these two you read.
24      So I just want to make sure that -- do you
25   recall one way or another whether you were aware of

359

1    these facts in the first paragraph on Matuszak No. 9
2    at the time you gave that presentation in the second
3    quarter?
4       MR. SIDORSKY:  Could I hear that question
5    again?  Sorry.
6       (Whereupon, record read by the Reporter as
7    follows:
8       "Question:  Well, why would you say "most
9       likely"?  Because these two doc -- you're
10      not sure which of these two you read.
11      So I just want to make sure that -- do you
12      recall one way or another whether you were
13      aware of these facts in the first paragraph
14      on Matuszak No. 9 at the time you gave that
15      presentation in the second quarter?")
16      MR. KONOVALOV:  Objection; mischaracterizes
17   the witness's testimony.
18      MR. SIDORSKY:  Objection to form.
19      THE WITNESS:  Yeah, I don't recall.  I'd be
20   speculating.  So if there's a copy of one of these in
21   our work papers and -- you know, I don't know which
22   one it is.
23      MR. GREENSTEIN:  Okay.
24      Q  And one last question.  Earlier we looked at
25   the letter agreement between HP and Oracle, and there

360

1    was a $15 million cancellation provision; do you
2    recall that?
3       A  I do.
4       Q  Now, were you aware at the time you gave that
5    presentation of that 15 million cancellation
6    provision?
7       A  I don't recall.  But again, if it was in the
8    agreement we reviewed, then I would have been aware of
9    it.
10      Q  Okay.  This is actually the last.  I promise.
11   I just want this to be authenticated.  This will be
12   Matuszak No. 11.
13      (Documents marked Exhibit Nos. 10 - 11
14      for identification.)
15      THE WITNESS:  Thank you.
16      MR. GREENSTEIN:  Q.  If you could, just for
17   the record, this is NDCA-ORCL 133613 to 133654.  It
18   says "Software Revenue Recognition International
19   Finance Conference October 13, 1999," and it has
20   Gary H. Matuszak.
21      Now, Mr. Matuszak, I just want to -- have you
22   seen this document before?
23      A  I generally recall the document, yes.
24      Q  Okay.  And this appears to be a presentation
25   made by you on October 13th, 1999, regarding software

361

1   revenue recognition; right?
2       A  That's correct.
3       Q  If you turn to the second page, it says
4   "Update on basic principles of SOP 97-2"; do you see
5   that?
6       A  Yes.
7       Q  And then the next -- the following page has
8   the four elements of SOP 97-2; do you see that?
9       A  Yes.
10      Q  And I think if you flip through it, it
11  appears to have each of the elements and discussions
12  about each of the elements of 97-2; is that fair to
13  say?
14      A  That's correct.
15      Q  Okay.  Do you recall giving this presentation
16  in '99?
17      A  Generally, yes.  I'm trying -- I -- I don't
18  remember this particular -- this specific
19  presentation, but I do recall having been invited to
20  the Oracle International Finance Conference on two or
21  three different occasions as an invited guest, and
22  typically as part of that they would ask me to give
23  a -- a discussion of some of the things that were
24  happening with revenue recognition at the task force.
25      Q  Okay.  Because you were a member of the

362

1   rev -- of the task force on initiatives with SOP 97-2;
2   right?
3       A  The AICPA task force, that's correct.
4       Q  Right.
5       Is that because your knowledge -- extensive
6   knowledge of software revenue recognition and your
7   experience with --
8       A  It -- it would have been as a result of my
9   firm's request that I sit on the task force, which
10  presumably was made because they felt I was qualified
11  to sit on the task force.
12      Q  Okay.  I just have -- so if you look at the
13  third -- if you look at the second, third page here,
14  and you see the third element, it says "The vendor's
15  fee is fixed or determinable."
16      A  I do.
17      Q  All right.
18      Now, when we looked at the letter agreement
19  between HP and Oracle and there was a $15 million
20  cancellation penalty if Oracle didn't fulfill its
21  commitments, doesn't that mean that -- that -- that
22  Oracle's fee from HP in that deal was not fixed and
23  determinable?
24      MR. KONOVALOV:  Objection; mischaracterizes
25  the evidence.

363

1       MR. SIDORSKY:  Yeah, objection to form;
2   misstates the record and lacks foundation.
3       I guess that's the signal.
4       MR. KONOVALOV:  It must be time to leave.
5       MR. SIDORSKY:  Yeah.
6       THE WITNESS:  The -- the fee in the license
7   agreement did not have any contingencies.  The
8   purchase order that was issued for the purchase of the
9   hardware did have a cancellation fee.
10      What I don't recall is how exactly all that
11  was addressed and resolved in the course of our review
12  of the contract.
13      MR. GREENSTEIN:  Okay.
14      Q  But a 15 million cancellation fee would --
15  would that be something you would assess and determine
16  whether Oracle's fee was fixed and determinable?
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  It is not a cancellation fee on
19  the license agreement.  There's no cancellation
20  privileges related to the license agreement.
21      MR. GREENSTEIN:  Okay.
22      Q  What do you mean by that?
23      A  Meaning --
24      MR. SIDORSKY:  I think the witness has made
25  clear what he means by this.  He's answered it very

364

1   clearly a number of times now.  Eli, really --
2       THE VIDEOGRAPHER:  Also, I have to interject.
3   We're having a technical problem.  This light coming
4   through the window is really wrecking the video.  I
5   was anticipating you're going to wrap it up, but if
6   we're going to continue for any length, we'll have to
7   take a break.
8       MR. GREENSTEIN:  Okay.  I just have one last
9   question.
10      Q  Were these slides that we're looking at, the
11  different elements of SOP 97-2, are these accurate
12  slides based on what you believe to be the
13  rules/principles of SOP 97-2 at the time you made this
14  presentation?
15      A  That would be factually correct.
16      MR. GREENSTEIN:  Okay.  I'm done.
17      MR. KONOVALOV:  I actually do have a couple
18  of minutes of questions so --
19      THE VIDEOGRAPHER:  Well, if a couple of
20  minutes is a couple of minutes, we'll be fine.  If
21  we're going to take 15, 20 minutes, we'll have to take
22  a half hour break for me to reset up.
23      MR. SIDORSKY:  Well, we're not going to do
24  that.
25      THE VIDEOGRAPHER:  I can't -- if you look at

365

1 the image, you'll see it is thoroughly ruined by the
2 striations of the light.
3     MR. GREENSTEIN:  The light.
4     THE VIDEOGRAPHER:  It's not just that.  It's
5 the sunlight moving through.
6     MR. KONOVALOV:  Let's move forward so we can
7 get Mr. Matuszak on his way.
8     THE VIDEOGRAPHER:  Mr. Matuszak, if you can
9 continue to move forward.
10     THE WITNESS:  Do you want the light on?
11     THE VIDEOGRAPHER:  That would be great.  If
12 you can pass him the microphone, that would be
13 wonderful.
14     MR. KONOVALOV:  Eli, why don't we switch.  If
15 you want to move your papers, and I can face the
16 witness so he's not looking in a different direction.
17     MR. GREENSTEIN:  Yeah, that would be fine.
18     THE VIDEOGRAPHER:  We're still on the record.
19     MR. KONOVALOV:  Yeah, just quickly.
20     MR. GREENSTEIN:  I know.  I know all the
21 stuff you've probably seen or heard.
22     THE VIDEOGRAPHER:  If you'd put that on your
23 tie.
24        EXAMINATION BY MR. KONOVALOV
25     MR. KONOVALOV:  Sure.

366

1     Q  Mr. Matuszak, I'm Paul Konovalov.
2     THE VIDEOGRAPHER:  Counsel, get it on your
3 tie first.
4     MR. KONOVALOV:  Q.  Counsel for the
5 defendants.  I very much appreciate your time today.
6 I know it's been a long time.  I'm going to try to
7 keep this quick, if that's fine with you.
8     A  That's fine.
9     Q  I want to take you back to a couple of
10 documents that were previously marked.  The first one
11 I'd like you to pull out is what was Chen or Chan, now
12 I'm doing it, Chan Exhibit 2.
13     A  Okay.
14     Q  Okay.  If you could turn to the pages Bates
15 No. AA 1925.  Just a couple from the back.
16     THE VIDEOGRAPHER:  Counsel, you're knocking
17 your documents on the microphone.
18     MR. SIDORSKY:  Sorry.
19     THE WITNESS:  Okay.
20     MR. KONOVALOV:  Q.  And you may recall,
21 Mr. Matuszak, we -- you answered a number of questions
22 with respect to the handwritten note that is next to A
23 towards the bottom third of that page.
24     A  Yes.
25     Q  Do you recall that?

367

1     Counsel, through his questions, asked you a
2 number of times about the meaning of the word
3 "aggressive" here, suggesting that it, in fact,
4 suggested it was something nefarious or inappropriate.
5     I just want to understand clearly.  Your
6 testimony is not there is anything improper about
7 these -- about this reversal of the reserves; correct?
8     MR. GREENSTEIN:  Objection; I don't want to
9 mischaracterize my questions; mischaracterizes the
10 testimony; lacks foundation; calls for speculation;
11 vague and ambiguous.
12     MR. KONOVALOV:  Q.  You can answer my
13 question.
14     A  That's correct.  The -- could you repeat the
15 question.
16     (Whereupon, record read by the Reporter as
17 follows:
18     "Question:  Counsel, through his questions,
19     asked you a number of times about the
20     meaning of the word "aggressive" here,
21     suggesting that it, in fact, suggested it
22     was something nefarious or inappropriate.
23     I just want to understand clearly.  Your
24     testimony is not there is anything improper
25     about these -- about this reversal of the

368

1     reserves; correct?")
2     THE WITNESS:  Okay.  Thank you.
3     MR. KONOVALOV:  Q.  Why don't I try to
4 restate.
5     A  No.  That is correct.  I stated a number of
6 times that I don't believe there was anything
7 inappropriate with the -- with the activity or the --
8 what they're discussing in this note.
9     Q  Indeed the use of the word "aggressive" could
10 really, instead of being a synonym for something
11 improper, it could be a synonym for just simply
12 suggesting that the company was active or proactive;
13 correct?
14     MR. GREENSTEIN:  Objection; form.
15     THE WITNESS:  That's correct.
16     MR. KONOVALOV:  Q.  That's correct?
17     A  That's the way I interpreted the word
18 "aggressive."
19     Q  Okay.  Thank you.
20     Then if you could pull out from the pile here
21 what is Matuszak No. 4.  It was the interview memo
22 from the Special Litigation Committee's interview of
23 Thomas Williams.
24     A  Thomas Williams, yes.
25     Q  Exactly.

369

1     You've never seen this document before that
2 was shown to you today here as an exhibit; correct?
3     A  That's correct.
4     Q  If you look at the first page of text, so at
5 the end of the first full paragraph, the last sentence
6 towards the end there reads "It is not and does not
7 purport to be a verbatim account of what was said"; do
8 you see that?
9     A  I do.
10    Q  Okay.  Counsel for plaintiffs asked you some
11 questions about whether or not you were aware of
12 certain statements contained in this interview memo;
13 correct?
14    A  That's correct.
15    Q  Have you ever spoken with Tom Williams about
16 any of the information contained in this interview
17 memo?
18    A  I have not.
19    Q  As you sit here today, do you have reason to
20 know one way or the other whether or not any
21 statements contained in here were attributed to
22 Thomas Williams are true?
23        MR. GREENSTEIN:  Objection to form.
24        THE WITNESS:  I do not.
25        MR. KONOVALOV:  Okay.

370

1     Q  Are you aware of the fact that
2 Thomas Williams has given testimony about this
3 document in which he has, in fact, pointed out that
4 there are a number of inaccuracies in the statements
5 that are attributed to him in this document?
6         MR. GREENSTEIN:  Objection; I think that
7 mis -- completely mischaracterizes the document and
8 the testimony.  I think it lacks foundation; calls for
9 speculation; is vague and ambiguous.
10        THE WITNESS:  I am not aware of that.
11        MR. KONOVALOV:  Okay.
12    Q  So as you sit here today -- well, strike
13 that.
14        The last thing I wanted to have you pull out,
15 please, is what is the e-mail.  It's Chan Exhibit 12.
16    A  Yes.
17    Q  Prior to today, you have not seen this
18 document before; correct?
19    A  That's correct.
20    Q  Okay.  As you sit here today, do you have any
21 way to know one way or the other whether or not any of
22 the statements that are contained in here are true?
23        MR. GREENSTEIN:  Objection; form.
24        THE WITNESS:  I do not.
25        MR. KONOVALOV:  Q.  For instance, if you look

371

1 at the middle of the page where it says "What needs to
2 be done," there are various bullets there which
3 identify items, dollar amounts, and the like, you
4 don't know one way or the other whether or not that
5 information is true; correct?
6         MR. GREENSTEIN:  Objection; form.
7         THE WITNESS:  That's correct.
8         MR. KONOVALOV:  That's correct.
9     Q  Do you happen to know to the -- let me back
10 up.
11        To the extent that any of the information or
12 items that are referenced in this document are
13 accurate, do you happen to know how they were
14 ultimately resolved?
15        MR. GREENSTEIN:  Objection; form.
16        THE WITNESS:  I do not.
17        MR. KONOVALOV:  Okay.
18    Q  Are you aware of Oracle having ever restated
19 any of its financial statements for fiscal year 2000?
20        MR. GREENSTEIN:  Objection; form.
21        THE WITNESS:  To my knowledge, they have not.
22        MR. SIDORSKY:  Okay.
23    Q  How about for fiscal year 2001?
24        MR. GREENSTEIN:  Same objection.
25        THE WITNESS:  To my knowledge, they have not.

372

1         MR. KONOVALOV:  Q.  How about fiscal year
2 2002.
3         MR. GREENSTEIN:  Same objection.
4         THE WITNESS:  To my knowledge, they have not.
5         MR. KONOVALOV:  Okay.  I think that's all I
6 have.  Thank you, Mr. Matuszak.  I appreciate it.
7         THE WITNESS:  Thank you.
8         THE VIDEOGRAPHER:  Okay.  We are --
9         MR. SIDORSKY:  I'm sorry.  If we're going to
10 go off the record, I think we should designate this --
11 this deposition transcript confidential.  I assume you
12 have no objections to that.
13        MR. GREENSTEIN:  I don't.
14        MR. SIDORSKY:  And I'd also like to make
15 clear on the record that I -- there is an order in
16 place regarding the scope of this deposition, and it's
17 very difficult during the deposition to -- to object
18 to each question on -- on the grounds of whether or
19 not it exceeds the -- the scope of the deposition, the
20 order, and I tried not to do that.
21        But we do reserve all our rights obviously
22 under the order to the extent that the deposition
23 covered areas or exceeded the scope of Judge Infante's
24 order.
25        MR. GREENSTEIN:  Okay.  That's noted.

373

1  Plaintiffs believe everything covered here was either
2  relevant or reasonably calculated to lead to the
3  discovery of admissible evidence regarding the topics
4  set forth in the order and/or that it was relevant to
5  the subject matter of those topics under Rule 26, and
6  therefore we think it was proper.
7       MR. KONOVALOV:  Okay.  Mr. Matuszak, thank
8  you for your time.
9       MR. GREENSTEIN:  Thank you.
10      THE VIDEOGRAPHER:  This is the end of
11  videotape five, Volume I, in the deposition of
12  Gary Matuszak.  The original videotapes will be
13  retained by LiveNote World Service.
14      Going off the record, the time on the monitor
15  is 7:09.
16      THE REPORTER:  Do you need a copy?
17      MR. SIDORSKY:  No, that's okay.
18      (WHEREUPON, the deposition ended at 7:09 p.m.)
19             ---oOo---
20
21
22
23
24
25

374

1            CERTIFICATE OF WITNESS
2
3       I, GARY MATUSZAK, the undersigned witness,
4  declare under penalty of perjury that I have read the
5  foregoing transcript, and I have made any corrections,
6  additions or deletions I was desirous of making; that
7  the foregoing is a true and correct transcription of
8  my testimony contained therein.
9       EXECUTED this_____day of _____,2006,
10  at _____, _____.
           (City)            (State)
11
12
13
        _____
14       GARY MATUSZAK
15
16
17
18
19
20
21
22
23
24
25

375

1            CERTIFICATE OF REPORTER
2
3       I, ANDREA M. IGNACIO HOWARD, hereby certify
4  that the witness in the foregoing deposition was by me
5  duly sworn to tell the truth, the whole truth, and
6  nothing but the truth in the within-entitled cause;
7
8       That said deposition was taken in shorthand
9  by me, a Certified Shorthand Reporter of the State of
10  California, and was thereafter transcribed into
11  typewriting, and that the foregoing transcript
12  constitutes a full, true and correct report of said
13  deposition and of the proceedings which took place;
14
15      That I am a disinterested person to the said
16  action.
17
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand this      day of August 2006.
20
21      _____
22       ANDREA M. IGNACIO HOWARD RPR, CSR No. 9830
23
24
25

376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, ANDREA M. IGNACIO HOWARD, hereby certify

 4     that the witness in the foregoing deposition was by me

 5     duly sworn to tell the truth, the whole truth, and

 6     nothing but the truth in the within-entitled cause;

 7

 8          That said deposition was taken in shorthand

 9     by me, a Certified Shorthand Reporter of the State of

10     California, and was thereafter transcribed into

11     typewriting, and that the foregoing transcript

12     constitutes a full, true and correct report of said

13     deposition and of the proceedings which took place;

14

15          That I am a disinterested person to the said

16     action.

17

18          IN WITNESS WHEREOF, I have hereunto set my

19     hand this 14 day of August 2006.

20

21          _____

22          ANDREA M. IGNACIO HOWARD CSR No. 9830

23

24

25
```