# Exhibit 13

**1**

1    page

1         UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3              - - -
4    In re ORACLE CORPORATION  )
     SECURITIES LITIGATION,   )
5                              )
     No. C-01-0988-MJJ    )
6    This Document Relates To: )    Volume I
                             )
7    ALL ACTIONS.         )
     _____)
8
9
10
11            CONFIDENTIAL
12      VIDEOTAPED DEPOSITION OF
13      ALEXANDER BENDER, III, CPA
14      SAN FRANCISCO, CALIFORNIA
15        September 22, 2006
16
17
18
19

20      SHEILA CHASE & ASSOCIATES
          REPORTING FOR:
       LiveNote World Service
21     221 Main Street, Suite 1250
       San Francisco, California 94105
22       Phone: (415) 321-2311
         Fax: (415) 321-2301
23
24   REPORTED BY:
25   RICHARD M. RAKER, CSR NO. 3445

**2**

1         BE IT REMEMBERED that, pursuant to Notice,
2    and on September 22, 2006, thereof, at Lerach
3    Coughlin Stoia Geller Rudman & Robbins, LLP, 100 Pine
4    Street, San Francisco, California, 94111 before me,
5    RICHARD M. RAKER, a Certified Shorthand Reporter,
     personally appeared
6         ALEXANDER BENDER, III, CPA,
7    called as a witness by the Plaintiffs for, who,
8    having been duly sworn, was examined and testified as
9    follows:
10             --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1         A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4    LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
5    BY: WILLOW E. RADCLIFFE, ESQ.
     100 Pine Street
6    Suite 2600
     San Francisco, California 94111
7    willowr@lerachlaw.com
     FOR THE DEFENDANTS:
8    LATHAM & WATKINS
9    BY: PAUL V. KONOVALOV, ESQ.
     650 Town Center Drive
10   20th Floor
     Costa Mesa, California 92626
11   paul.konovalov@lw.com
12
     ALSO PRESENT: CASSIA LEET, VIDEO OPERATOR
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1              I N D E X
2    WITNESS    ALEXANDER BENDER, III, CPA
3    EXAMINATION              PAGE
4      BY MS. RADCLIFFE         6, 234
5      BY MR. KONOVALOV           230
6
7
8    EXHIBITS:
9            PLAINTIFF'S
10   NUMBER      DESCRIPTION         PAGE
11   Exhibit 1  Subpoena          40
12   Exhibit 2  Audit File        52
13   Exhibit 3  Document dated September 14, 2005   52
14   Exhibit 4  Document dated June 2, 2005      60
15   Exhibit 5  Supplemental LOG of Privileged     60
16             Documents
17   Exhibit 6  Bates stamped NDCA-ORCL 144608    108
18   Exhibit 7  Subpoena          145
19   Exhibit 8  Bates stamped NDCA-ORCL 296428    161
20   Exhibit 9  Final Judgment       210
21   Exhibit 10  Bates stamped NDCA-ORCL 313777    211
22   Exhibit 11  Bates stamped NDCA-ORCL 104764    214
23
24
25

**4**

1             MORNING SESSION
2
3         THE VIDEO OPERATOR:  Here begins the videotaped
4    deposition of Alex Bender, Tape 1, Volume I, in the
5    matter of In Re Oracle Corporation Securities Litigation,
6    in the United States District Court, Northern District of
7    California, Case No. C-01-0988-MJJ.  Today's date is
8    September 21st, and the time on the video monitor is
9    9:04.
10        The video operator today is Cassia Leet
11   representing LiveNote World Service located at 221 Main
12   Street, Suite 1250, San Francisco, California 94105.
13   Phone number, (415) 321-2300.  The court reporter is
14   Richard Raker of Sheila Chase Reporting on behalf of
15   LiveNote World Service.  Today's deposition is being
16   taken on behalf of the plaintiff and is taking place at
17   100 Pine Street, Suite 3200, San Francisco, California.
18        Counsels, please introduce yourselves and state
19   whom you represent.
20        MS. RADCLIFFE:  Willow Radcliffe of Lerach
21   Coughlin on behalf of the plaintiff.  And with me is
22   Keith Maunter, our forensic accountant with our law firm.
23        MR. KONOVALOV:  Good morning.  Paul Konovalov,
24   Latham & Watkins, for the defendants.
25        THE VIDEO OPERATOR:  Would the court reporter

5

1    please swear in the witness.

2

3            ALEX BENDER, CPA,

4    having first been duly sworn, was

5    examined and testified as follows:

6

7            EXAMINATION

8

9    BY MS. RADCLIFFE:

10       Q.  Good morning.  Could you please state your

11   full name for the record?

12       A.  Alexander Bender, III.

13       Q.  And could you spell your last name, please?

14       A.  B, as in boy, e-n-d-e-r.

15       Q.  And are you represented by counsel in this

16   deposition today?

17       A.  I'm representing Latham & Watkins here on

18   behalf of the defendants.  I have -- my counsel is not

19   here, Steven Young.

20       MR. KONOVALOV:  Just to clarify, we're not

21   representing the witness in the deposition.

22       MS. RADCLIFFE:  Thank you for the clarification.

23       Q.  And could you state your business address,

24   please, Mr. Bender?

25       A.  560 Mission Street in San Francisco.  I

6

1    actually don't have the zip code memorized, but I can

2    get my business card out if you'd like.

3        Q.  And your home address, please.

4        A.  201 -- two words.  First word is just E-l.

5    Second word is spelled T-o-y-o-n-a-l.  And it's not a

6    road or a street or anything.  That's in Orinda,

7    California 94563.

8        Q.  And have you ever been deposed, Mr. Bender,

9    before?

10       A.  No, I have not.

11       Q.  Have you ever provided testimony at a trial

12   before?

13       A.  Not that I recall, no.

14       Q.  Have you ever provided any testimony at an

15   arbitration?

16       (Interruption)

17       THE WITNESS:  Not that I recall, no.

18   BY MS. RADCLIFFE:

19       Q.  We're going to start out with a few ground

20   rules since you haven't been deposed before, and

21   hopefully it will make it a little easier for the court

22   reporter and for us to get through this fairly quickly

23   and efficiently today.

24       When you respond to a question today, you need

25   to respond out loud because the court reporter cannot

7

1    take down head nods or gestures.  Do you understand that?

2        A.  Yes.

3        Q.  If you don't understand a question that I've

4    asked, please let me know, and I'll try to rephrase it

5    or clarify the question so that we're on the same page.

6    Do you understand?

7        A.  Yes.

8        Q.  Mr. Konovalov may object to some questions

9    that I ask today.  You still, however, need to answer

10   the question.  Do you understand that?

11       A.  Yes.

12       Q.  And the court reporter just noted this, but if

13   we talk over each other, it's very difficult for the

14   court reporter to take down what the question is and

15   what the answer is.  So if you can try to wait until I

16   finish the question to respond, and I'll try to wait

17   until you finish your answer to ask the next question,

18   it will make it a lot easier for the court reporter to

19   take it down.

20       At any time if you need a break, let me know,

21   and we'll finish the question that's currently pending,

22   and then we'll take a break.

23       A.  Yes.

24       Q.  Is there any reason that you cannot give full

25   and complete testimony here today?

8

1        A.  No.

2        Q.  Are you under the influence of any medication

3    or other substance that would affect your testimony

4    today?

5        A.  No.

6        Q.  Where are you currently employed, Mr. Bender?

7        A.  Ernst & Young.

8        Q.  And is your current employment at the

9    San Francisco office of Ernst & Young?

10       A.  Yes.

11       Q.  Did you attend college?

12       A.  Yes.

13       Q.  And where did you attend college?

14       A.  University of Southern California.

15       Q.  And did you receive a degree from the

16   University of Southern California?

17       A.  Yes.

18       Q.  And what was that degree?

19       A.  Bachelor of science in accounting.

20       Q.  And when did you receive that degree?

21       A.  1994.

22       Q.  Did you attend graduate school?

23       A.  No.

24       Q.  Have you attended any continuing education

25   requirements with respect to accounting?

**9**

1      A.  Yes.  As a CPA, I'm required to do mandatory
2  continuing education.
3      Q.  And how often is that required?
4      A.  It's annual.  I don't recall the actual hours
5  but it is annual.
6      Q.  And what type of education do you receive?
7      A.  It depends.  It's on accounting matters,
8  auditing matters, and also on ethics and fraud.
9      Q.  And are you a currently licensed CPA?
10     A.  Yes.
11     Q.  And when did you receive your CPA license?
12     A.  1997.
13     Q.  And after college, did you obtain employment
14  from someone other than Ernst & Young?
15     A.  No.
16     Q.  And -- so forgive me if I have the date wrong,
17  but in 1994, were you hired by Ernst & Young?
18     A.  I was hired by Ernst & Young -- I started to
19  work at Ernst & Young 1994.  I was hired by Ernst &
20  Young -- I was offered a job by Ernst & Young in 1993
21  while I was still in college.
22     Q.  And what was the first position you held at
23  Ernst & Young in 1994?
24     A.  Staff accounting in auditing.
25     Q.  And do you recall which client you -- account

**10**

1  you worked on in 1994?
2      A.  I'd have to look at my old records.
3      Q.  At some point at Ernst & Young, did you
4  receive a promotion from staff accountant?
5      A.  Yes.
6      Q.  And when was that?
7      A.  In 1996, I was promoted to senior accountant.
8      Q.  And do you recall the specific clients that
9  you were working for in 1996?
10     A.  Not the complete list, no.  I'd have to look.
11     Q.  Do you recall any of the clients who you were
12  performing services for in 1996?
13     A.  Any client?
14     Q.  Yes.
15     A.  Yes.  I was doing work for Jacobs Engineering.
16  And I'd have to go back and look at my time sheets.
17  I'm not sure -- that's the only one I can definitely
18  tell you I've worked on.
19     Q.  And how long did you hold the position as
20  senior accountant at Ernst & Young?
21     A.  Three years.
22     Q.  So through 1999; is that correct?
23     A.  Yes.
24     Q.  And what were your duties and responsibilities
25  as a senior accountant at Ernst & Young?

**11**

1      A.  Generally I was the senior accountant on
2  several audit clients.  I don't know the actual number.
3  I would manage between one and four individuals on an
4  audit engagement, and primarily responsible for doing
5  detailed review of specific account-balance work.
6      Q.  And that would be a review of account-balance
7  work at the clients who Ernst & Young was providing
8  professional services?
9      A.  Yes.
10     Q.  And in 1999, did you take a new position at
11  Ernst & Young?
12     A.  Yes.
13     Q.  And were you promoted?
14     A.  Yes.
15     Q.  And what was that position?
16     A.  Manager.
17     Q.  And how long did you hold the position of
18  manager at Ernst & Young?
19     A.  Two years.
20     Q.  So would it be accurate to say from 1999 to
21  2001?
22     A.  Yes.
23     Q.  And do you recall the specific clients who you
24  were performing professional services for during that
25  period?

**12**

1      A.  I don't recall the list of all my clients, no.
2      Q.  Do you recall any of them?
3      A.  I -- in that period, I worked on Silicon
4  Graphics, or SGI, and Autodesk and Gilead Sciences.
5      Q.  And what were your responsibilities and duties
6  as a manager at Ernst & Young during that 1999 to 2001
7  time frame?
8      A.  I would manage the audit engagements,
9  generally managing between three and six senior and
10  staff accountants, and would perform detailed or
11  general reviews of specific account balances at my
12  clients for which Ernst & Young was providing
13  professional services.
14     Q.  And were there any other responsibilities you
15  had with respect to managing audit engagements?
16     A.  I'm sorry.  I don't understand the question.
17     Q.  Certainly.  You indicated that you managed
18  audit engagements as a manager, and I'm just trying to
19  understand.  Besides providing detailed review and a
20  general review of the account balances of the clients,
21  was there anything else involved?
22     A.  I would manage the engagement economics.  So
23  the billings and the collections of our fees.
24     Q.  And did you have any interaction with the
25  audit partners at Ernst & Young while manager?

13

1    A.  On my accounts, yes.

2    Q.  And what would that interaction be?

3    A.  That interaction would be several meetings and

4  interaction with them in terms of the audit scope, the

5  result of our audit procedures and our conclusions.

6    Q.  And did you have a responsibility for

7  providing -- excuse me.  Strike that.

8    Did you have responsibility for preparing work

9  papers while you were a manager?

10   A.  Yes.  In limited circumstances, I would have,

11  yes.

12   Q.  Were you promoted in 2001 to a different

13  position at Ernst & Young?

14   A.  Yes.

15   Q.  And what was that position?

16   A.  Senior manager.

17   Q.  And how did your duties and responsibilities

18  change as a senior manager from previously being a

19  manager at Ernst & Young?

20   A.  Generally I would manage more people.  I would

21  be managing managers, senior accountants, and staff

22  accountants.  My responsibilities would be performing

23  general reviews of specific account-balance work as

24  well as managing the engagement economics of each of my

25  clients.

14

1    Q.  And how long did you hold that particular

2  position at Ernst & Young?

3    A.  Through 2006.  June 2006.

4    Q.  So is it fair to say that you held that

5  position from 2001 to mid-2006?

6    A.  Yes.

7    Q.  And do you recall when you obtained that

8  position in 2001?

9    A.  I think -- I think officially it was

10  October 1, 2001.

11   Q.  And do you recall which clients you were

12  providing professional services for as a senior manager

13  while you were at Ernst & Young?

14   A.  During the five years?

15   Q.  Yes.  Let's start with the 2001-2002 time

16  frame.

17   A.  2001-2002 I was working on Oracle Corporation,

18  Autodesk, Intertrust Technologies, Gilead Sciences.

19  Those are the ones that I recall.

20   Q.  And from 2002 to mid-2006, did any of those

21  clients change?

22   A.  Yes.

23   Q.  And which ones?

24   A.  I continued to work on Oracle Corporation.  I

25  stopped working on Autodesk in 2003, I believe,

15

1  although I don't recall exactly.  And I stopped serving

2  Gilead Sciences and Intertrust Technologies in 2003.  I

3  don't recall the exact dates.  It may have been 2004.

4    Q.  Did you take on responsibilities for any new

5  clients between 2002 and 2006?

6    A.  Yes.

7    Q.  And which clients were those?

8    A.  Salesforce.com and Riverbed Technology.

9    Q.  And did you take on responsibility for

10  Salesforce.com prior to it becoming a public company?

11   A.  Yes.

12   Q.  And so when would you have taken on that

13  responsibility?

14   A.  I don't recall.  I believe it was

15  October 2002.

16   Q.  And did you take on responsibility for

17  Salesforce.com at the same time that Ernst & Young was

18  engaged to provide professional services by

19  Salesforce.com?

20   A.  Yes.

21   Q.  And with respect to Riverbed.com, did you take

22  on the role of senior manager with respect to

23  Riverbed.com at the same time Ernst & Young was

24  initially engaged to provide professional services for

25  Riverbed.com?

16

1    A.  It's Riverbed Technology.

2    Q.  Right.

3    A.  And the answer is yes.

4    Q.  Apologize for that.

5    With respect to Gilead Sciences, did you

6  understand the reason why you were no longer providing

7  professional services as a senior manager for Gilead

8  Sciences?

9    A.  Yes.

10   Q.  And what was your understanding?

11   A.  I had scheduling issues with having too many

12  clients, and the firm wanted to make sure that I had

13  enough time to spend on my accounts to do thorough

14  audits, and so I was taken off of Gilead Sciences to

15  focus on software.

16   Q.  So I should ask you this question:  Is

17  Riverbed Technologies a software company?

18   A.  Yes.

19   Q.  And what product does it sell?

20   A.  It sells -- it's similar to Juniper products

21  where its -- its products speed up the flow of

22  information in wide-area networks.

23   Q.  And with respect to Intra Trust, do you have

24  an understanding of why as a senior manager you were no

25  longer assigned to provide professional services to

17

1    that client?

2    A.  Yes.  Intertrust.

3    Q.  Intertrust.

4    A.  Yes.

5    Q.  And what is your understanding?

6    A.  They were acquired.

7    Q.  And who acquired them?

8    A.  It was a joint venture between Sony and

9    Phillips, I believe.  I do not recall the name of the

10    joint venture.

11    Q.  And as a result of the joint venture acquiring

12    Intertrust, did Ernst & Young cease providing

13    professional services to Intertrust?

14    A.  Yes.

15    Q.  In mid-2006, did you receive a promotion?

16    A.  Yes.

17    Q.  And what was that promotion?

18    A.  Partner.

19    Q.  And would that be partner in the San Francisco

20    office of Ernst & Young?

21    A.  Yes.

22    Q.  And between 2001 to mid-2006, did you change

23    offices of Ernst & Young?

24    A.  Yes.

25    Q.  And could you explain that change?

18

1    A.  Sure.  I don't recall the exact dates.  I

2    transferred from the Palo Alto, California, office.

3    And the reason why I said I don't recall the dates is

4    because the official transfer dates may be different

5    than what I recall.  But I transferred from Palo Alto,

6    California, to our Walnut Creek, California, office.

7    And I transferred in 2005, I believe, from the Walnut

8    Creek office to the San Francisco office.

9    Q.  And do you recall approximately when you

10    transferred from the Palo Alto office to the Walnut

11    Creek office?

12    A.  2001.  Probably in May or June of that year.

13    Q.  And do you recall the reason for that

14    transfer?

15    A.  Yes.

16    Q.  And what was that reason?

17    A.  My wife and I bought a house in Orinda.

18    Q.  And the transfer in 2005 from Walnut Creek to

19    the San Francisco office, do you recall the reason for

20    that transfer?

21    A.  Yes.

22    Q.  And what was that reason?

23    A.  There were two reasons.  One, the firm

24    leadership wanted to continue to build our technology

25    practice in the San Francisco office, and a decision

19

1    had been made to close the Walnut Creek office.

2    Q.  And are you currently a partner at Ernst &

3    Young assigned to the Oracle account?

4    A.  Yes.

5    Q.  And what are your duties and responsibilities

6    in that role?

7    A.  My duties and responsibilities as a partner

8    generally are to manage the account as a partner.  I'm

9    also responsible -- there are three partners on the

10    account.  We each have our own responsibilities.  My

11    responsibilities primarily regard revenue recognition,

12    international coordination and planning, SEC reporting

13    responsibilities, acquisition, accounting, engagement,

14    economics, and stock compensation.

15    Q.  And did you have an understanding of the

16    duties and responsibilities of the two other partners

17    assigned to the Oracle account?

18    A.  Yes.

19    Q.  And why don't we start with their names?  What

20    are the names of those two individuals?

21    A.  Sure.  The coordinating partner or the partner

22    in charge is Andrew Cotton.

23    Q.  And the --

24    A.  And the other engagement partner is Guy

25    Wanger, W-a-n-g-e-r.

20

1    Q.  And do you know when Mr. Cotton took on the

2    position as the partner in charge?

3    A.  Andrew took on the position as the partner in

4    charge as part of the fiscal 2004 audit.

5    Q.  And prior to the fiscal 2004-year audit, do

6    you know who the partner in charge was?

7    A.  Yes.

8    Q.  And who was that?

9    A.  John Banker.

10    Q.  And do you have an understanding of why

11    Mr. Cotton took over Mr. Banker's position?

12    A.  Yes.

13    Q.  And what is your understanding?

14    A.  John retired.

15    Q.  Did Mr. Cotton previously work on the Oracle

16    account prior to fiscal 2004?

17    A.  Yes.

18    Q.  And in what position did he work on the Oracle

19    account?

20    A.  He was the engagement partner.  To specify, he

21    was the engagement partner for the fiscal 2002 and 2003

22    audits.  Fiscal 2002 was the first year that Ernst &

23    Young was engaged to audit Oracle.

24    Q.  And with respect to Mr. -- Wagner, is it?

25    A.  Wanger.

21

1    Q.  Wanger.  I should know that.  He's like a
2    judge: Mr. Wanger.
3        For what years, if you know, was he coordinating
4    partner on the Oracle account?
5    A.  Guy Wanger's never been a coordinating partner
6    on the Oracle account.
7    Q.  All right.  Misstated it.  My apologies.
8        For what years was Mr. Wanger a partner on the
9    Oracle account?
10   A.  Guy's been an engagement partner on the
11   account for the fiscal 2005 and fiscal 2006 audits.
12   Q.  Prior to the fiscal year 2005, did Mr. Wanger
13   have another role with respect to the Oracle account?
14   A.  No, he did not.
15   Q.  For the fiscal 2002, 2003, and 2004 audits,
16   did Ernst & Young have an engagement partner assigned
17   to the account?
18   A.  Yes.
19   Q.  And who would that person or persons be?
20   A.  Andrew Cotton.  Andrew was the engagement
21   partner -- I think officially in fiscal 2002 and 2003
22   Andrew Cotton was the engagement partner and John was
23   the coordinating partner -- John Banker was a
24   coordinating partner.  For fiscal 2004, Andrew Cotton
25   was the coordinating partner and John Banker was

22

1    designated as the engagement partner because he was
2    planning to retire that year.
3    Q.  And can you tell me what the duties and
4    responsibilities of the coordinating partner are?
5    A.  The duties and responsibilities of the
6    coordinating partner are to coordinate the worldwide
7    audit of the consolidated financial statements of
8    Oracle Corporation.  He's responsible to understand all
9    the significant accounting and auditing matters and
10   conclusions reached by his team and to review all
11   significant accounting and auditing matters and
12   conclusions reached by the team.
13   Q.  And with respect to the engagement partner,
14   what were their duties and responsibilities at Oracle?
15   A.  Generally they would be providing partner
16   reviews on certain account-balance work and assisted
17   the coordinating partner in reviewing significant
18   accounting and auditing matters and conclusions.
19   Q.  And based on your understanding of working on
20   the Oracle account, did the duties and responsibilities
21   of the engagement partner change from 2002 to the
22   present?
23   A.  Generally, no.  In terms of the roles of the
24   engagement partners, the difference between fiscal 2004
25   and 2005 and 2006 to now is we went from one engagement

23

1    partner to two engagement partners.  So for the fiscal
2    2007 audit, I would expect there to be differences as
3    we would divide the responsibilities of the engagement
4    partner from one person to two.  But that role has not
5    changed in terms of any audit that we've executed.
6    Q.  And who is the second engagement partner?
7    A.  Guy Wanger.
8    Q.  And with respect to the coordinating partner,
9    did the duties and responsibilities of the coordinating
10   partner change at all from the fiscal 2002 audit to the
11   present fiscal audit?
12   A.  No.
13   Q.  And with respect to your duties as a senior
14   manager, did those duties change at all with respect to
15   the Oracle account from the fiscal 2002 audit to the
16   present audit?
17   A.  To the May 31, 2006, audit?
18   Q.  Yes.
19   A.  Yes.
20   Q.  How did the duties and responsibilities of the
21   senior manager change?
22   A.  The role -- my role changed in terms of the
23   accounts that I was -- there were accounts in areas
24   that I was responsible to manage and review.
25   Q.  And can you explain how those changed?

24

1    A.  I was -- from fiscal 2002 through fiscal 2005,
2    I was primarily responsible for the auditing of the
3    shared service center located in Rocklin, California,
4    as well as the revenue recognition auditing.
5        In fiscal 2006, I was responsible for
6    coordinating the international locations, including the
7    international locations' testing of revenue recognition,
8    and I became responsible to audit the accounts at the
9    corporate office and not at the Rocklin shared service
10   center audit, which included acquisition, accounting, and
11   tax and SEC reporting.
12   Q.  And who do you currently report to?
13   A.  On the Oracle engagement?
14   Q.  Yes.
15   A.  Andrew Cotton.
16   Q.  And do you have any direct reports --
17   A.  Yes.
18   Q.  -- on the Oracle account?
19   A.  Yes.
20   Q.  So we can clarify here, I'm going to ask --
21   we're talking about the Oracle account unless I tell
22   you differently.  Okay?
23   A.  Okay.
24   Q.  And who are those direct reports?
25   A.  Remco Bartman is the senior manager.

25

1      Q.   Can you spell that?

2      A.   R-e-m-c-o is his first name.  Last name is

3  B-a-r-t-m-a-n.  Natalie Zimmer, Z-i-m-m-e-r, is a

4  senior manager, Tim Wilcox is a senior manager.  They

5  all report to me directly in some fashion, not

6  exclusively.

7      Q.   And with respect to Mr. Bartman, how long has

8  he been assigned to the Oracle account, if you know?

9      A.   He has been on the Oracle account since

10  January of 2005.

11     Q.   Do you know who held his position prior to

12  January 2005?

13     A.   Yes.

14     Q.   And who was that?

15     A.   Me.

16     Q.   With respect to Natalie Zimmer, do you know

17  how long she's been assigned to the Oracle account?

18     A.   She has been on the Oracle account commencing

19  November 2004.

20     Q.   Do you know who held her position prior to

21  November 2004?

22     A.   Yes.

23     Q.   And who was that?

24     A.   It was a mix between a woman, Megan Birkler,

25  Katarina -- and I forget how to spell her last name.

26

26     page

25

27

page

1      She's in EY Munich now -- and Matt Banks.

2      Q.   And when you say there was a mix, is that

3  because there was a change over time, or was that

4  because there were three different people who held the

5  functions that Ms. Zimmer now holds?

6      A.   There were different people that held it.

7  They -- responsibility was transferred due to

8  resignations of people and the way that Oracle manages

9  its business.

10     Q.   And Ms. Birkler, do you know how long she was

11  assigned to the Oracle account?

12     A.   I don't recall exactly how long.  I know she

13  was -- she was on the fiscal 2002 and 2003 audit.

14     Q.   And Katarina, do you recall how long she was

15  assigned to the Oracle account?

16     A.   She was on the account for the fiscal 2002

17  audit and I believe for a period of time during the

18  fiscal 2003 audit, but I don't recall if she was there

19  through the end.

20     Q.   And Matt Banks, do you recall how long he was

21  assigned the Oracle audit?

22     A.   He was on the Oracle audit from -- for the

23  fiscal 2002, 2003, 2004, and 2005 audit.

24     Q.   And Tim Wilcox, do you know who held his

25  position prior to Mr. Wilcox assuming the senior

28

1  manager position at the Oracle account?

2      A.   Yes.

3      Q.   And who was that?

4      A.   The -- in fiscal 2002 and fiscal 2003, that

5  position was held by Paul Charron, C-h-a-r-r-o-n.  In

6  fiscal 2005, it was held by Rebecca Carlson.

7      Q.   And is there currently a manager from Ernst &

8  Young assigned to the Oracle account?

9      A.   Yes.

10     Q.   And who is that person?

11     A.   There are -- to clarify, Natalie Zimmer was

12  promoted to senior manager or will be promoted to

13  senior manager on October 1st.  So she was the manager

14  for the audits that we've executed.

15     Tim Wilcox was promoted to senior manager on

16  October 1, 2005.  So he was the manager on the account.

17  Matt Banks was a manager on the account for the fiscal

18  2002 -- I'm sorry -- for the 2004 and 2005 audits.

19     Katarina was a manager for the fiscal 2002 and

20  for some portion of the 2003 audits.  There was a manager

21  on the account, Mareikke, M-a-r-e-i-k-k-e, Weideman,

22  W-e-i-d-e-m-a-n, I believe, for the fiscal 2006 audit.

23     There was a manager, Tara, T-a-r-a, Murphree,

24  M-u-r-p-h-r-e-e, that was on the account for the fiscal

25  2004 and 2005 audits, all with distinct responsibilities.

---

29

1    Q.  Other than speaking with your attorney,
2    Mr. Young, have you talked to anyone else about your
3    deposition here today?
4    A.  Yes.
5    Q.  And who did you speak with?
6    A.  Andrew Cotton.
7    Q.  And how many times did you speak with
8    Mr. Cotton?
9    A.  I don't recall.
10   Q.  Do you recall if it was more than once?
11   A.  No.
12   Q.  Was anyone else present besides you and
13   Mr. Cotton?
14   A.  No.
15   Q.  And what did you discuss?
16   A.  I informed him that I was scheduled to be
17   deposed.
18   Q.  Did you speak about the substance of your
19   deposition?
20   A.  No.
21   Q.  And about how long did the conversation last?
22   A.  I don't recall.
23   Q.  Was it less than fifteen minutes?
24   A.  Yes.
25   Q.  Did you speak with anyone else besides

---

30

1    Mr. Cotton regarding -- and your counsel regarding your
2    deposition here today?
3    A.  At any point?  John Banker, yes.
4    Q.  And when did you speak with Mr. Banker?
5    A.  I don't recall.  Prior to his retirement.  I'm
6    sorry.  Let me rephrase that.  I did not talk to John
7    about my deposition, only about the matter.
8    Q.  Thank you for the clarification.
9        And I believe you indicated that Mr. Banker
10   retired prior to the fiscal 2004 audit.  Is that right?
11   A.  He retired, I believe -- you'd have to
12   check -- I'd have to check the actual HR records, but I
13   believe he actually officially retired after the fiscal
14   2004 audit.
15   Q.  So sometime in 2005?
16   A.  Actually, it was probably in calendar 2004.
17   Q.  And do you recall how many times you spoke to
18   Mr. Banker regarding this matter?
19   A.  No.
20   Q.  Do you recall the substance of your
21   conversation?
22   A.  About this matter or my deposition?
23   Q.  About this matter.
24       MR. KONOVALOV:  Can I?  Is "this matter" the
25   litigation or engagement?

---

31

1        THE WITNESS:  Right.
2    BY MS. RADCLIFFE:
3    Q.  Why don't we clarify?  You indicated "this
4    matter," and I'm not sure what you indicated either.
5    And Mr. Konovalov is correct to seek clarification on
6    that.  When you were indicating "this matter," were you
7    talking about the engagement?
8    A.  When I answered your question about if I'd had
9    conversation about the litigation, I answered that
10   question in terms of had I spoken to John about the
11   litigation.
12   Q.  And so are -- am I correct to say that you had
13   a conversation with Mr. Banker about the litigation?
14   A.  Yes.
15   Q.  And do you recall when you spoke to Mr. Banker
16   about the litigation?
17   A.  No.
18   Q.  Do you recall whether it was before Mr. Banker
19   retired?
20   A.  I don't recall.
21   Q.  Do you recall if the conversation was
22   face-to-face or telephonic?
23   A.  Telephonic.
24   Q.  And do you recall the substance of your
25   conversation regarding the litigation?

---

32

1    A.  No, I do not.
2    Q.  Do you recall generally what was discussed
3    between you and Mr. Banker?
4    A.  Can you define "generally"?
5    Q.  In other words -- taking you back to the
6    conversation, do you recall what Mr. Banker said about
7    the litigation?
8    A.  No, I do not.
9    Q.  Do you recall what you said about the
10   litigation?
11   A.  No, I do not.
12   Q.  Do you recall anything about the conversation
13   other than the fact that it was about the litigation?
14   A.  I recall that we spoke briefly on the
15   matters -- the procedures that we did that were
16   documented in a memorandum and to obtain all the work
17   papers that had been subpoenaed.
18   Q.  And do you recall that there was a memo --
19   memorandum -- excuse me -- that set forth the
20   procedures related to the engagement that you believe
21   pertained to the litigation?
22       MR. KONOVALOV:  Objection; vague and ambiguous.
23   BY MS. RADCLIFFE:
24   Q.  You can go ahead and answer.  He'll do that a
25   lot.

---

**33**

1    A.  I am -- I know there is a memo that detailed
2  the procedures that we performed.
3    Q.  Do you know where that memo is?
4    A.  I don't know exactly where that memo is right
5  now, no.
6    Q.  Did you review that memo prior to this
7  deposition?
8    A.  Yes.
9    Q.  And approximately when did you review the
10  memo?
11    A.  I've reviewed the memorandum within the last
12  month, and I have reviewed the memo before that
13  certainly as part of the procedures and when it was
14  subpoenaed.
15    Q.  Do you know if that memo was part of Ernst &
16  Young's production of documents with respect to this
17  litigation?
18    A.  I don't know.  I'd have to refer you to
19  general counsel's office.
20    Q.  Did you speak with your attorney about this
21  deposition prior to coming here today?
22    A.  Is that client privilege?
23    Q.  The fact that -- I can't advise you.  I'm not
24  your lawyer.  But I'm asking you a yes-or-no question
25  of whether or not you talked to him, and I don't

**34**

1  believe that's privileged, but I'm not giving you legal
2  advice.
3    A.  Yes, I have spoken to him.
4    MR. KONOVALOV:  She said -- I think she's
5  looking for whether or not it happened as opposed to the
6  substance of the communication.
7    Is that correct?
8    MS. RADCLIFFE:  Correct.
9    THE WITNESS:  Yes, I've spoken to him.
10  BY MS. RADCLIFFE:
11    Q.  How many times?
12    A.  I don't recall.
13    Q.  Was it more than once?
14    A.  Yes.
15    Q.  Do you recall when that first conversation
16  was?
17    A.  No.
18    Q.  Do you recall if it was in the last year?
19    A.  Yes.
20    Q.  Did you speak with him within the last month?
21    A.  Yes.
22    Q.  Do you recall how many times within the last
23  month?
24    A.  No.
25    Q.  And so we can just clarify:  When we're

**35**

1  speaking about your attorney, are we speaking about
2  Mr. Young?
3    A.  Yes.
4    Q.  Are there any other attorneys that you have
5  representing you with respect to this matter?
6    A.  No.
7    Q.  And did you speak with Mr. Young this week
8  regarding your deposition?
9    A.  Not this week, no.
10    Q.  When was the last time you spoke with
11  Mr. Young?
12    A.  Last Friday.
13    Q.  And about how long was that conversation?
14    A.  I don't recall.
15    Q.  Was it less than an hour?
16    A.  Yes.
17    Q.  Less than fifteen minutes?
18    A.  I don't recall.
19    Q.  Was anyone else present when you spoke with
20  Mr. Young?
21    A.  Yes.
22    Q.  And who else?
23    A.  Andrew Cotton.
24    Q.  Anyone else besides Mr. Cotton?
25    A.  No.

**36**

1    Q.  In preparing for your deposition today, did
2  you review any documents?
3    A.  Yes.
4    Q.  And did you review those documents in presence
5  of counsel?
6    A.  No.
7    Q.  And what documents did you review?
8    A.  I reviewed our memorandum on the procedures
9  that we performed.
10    Q.  Any other documents?
11    A.  No.
12    Q.  The memorandum with respect to the procedures
13  that you performed, do you know who prepared that
14  document?
15    A.  I don't recall who actually prepared it.
16    Q.  Was it someone at Ernst & Young?
17    A.  Yes.
18    Q.  Did you help prepare that document?
19    A.  Yes.
20    Q.  And do you recall when the document was
21  prepared?
22    A.  I don't recall exactly when the document was
23  prepared, no.
24    Q.  Do you recall approximately when it was
25  prepared?

37

1    A.  It was prepared approximately in October 2002.

2    Q.  And can you explain your understanding of the

3    procedures that Ernst & Young performed as set forth in

4    that document?

5    A.  I don't recall the specific procedures.  I'd

6    have to look at the memo.  All the procedures that we

7    performed are documented in the memo.

8    Q.  Are there any other procedures that were

9    performed by Ernst & Young that are not documented in

10   that memo?

11   A.  Not that I recall.

12   Q.  And to your knowledge, does a copy of this

13   memo still exist today?

14   A.  Yes, to my knowledge.

15   Q.  And is the memo a handwritten document?

16   A.  No.

17   Q.  Is it a typed document?

18   A.  No.

19   Q.  Is it a computer-generated document?

20   A.  Yes.

21   Q.  And do you know what software program it was

22   generated by?

23   A.  Yes.

24   Q.  And what would that be?

25   A.  Microsoft Word.

38

1    Q.  Besides yourself, do you know who helped

2    prepare the memorandum?

3    A.  Yes.

4    Q.  And who would that be?

5    A.  Megan Birkler and John Banker.

6    Q.  Can you spell that last name?

7    A.  Which last name?

8    Q.  Banker.

9    A.  Birkler?

10   Q.  I'm sorry.  You said John Banker; is that

11   correct?

12   A.  Yes.

13   Q.  And at the time the memorandum was prepared,

14   were you a senior manager assigned to the Oracle

15   account?

16   A.  Yes.

17   Q.  And at the time the memorandum was prepared,

18   was Ms. Birkler the manager assigned to the account?

19   A.  No.

20   Q.  What was her title?

21   A.  Supervising senior.

22   Q.  And at the time the memorandum was prepared,

23   was Mr. Banker assigned to the Oracle account?

24   A.  Yes.

25   Q.  And what was his title at that time?

39

1    A.  Coordinating partner.

2    Q.  Was anyone at Oracle consulted about the

3    procedures set forth in the memorandum?

4    MR. KONOVALOV:  Objection; vague and ambiguous.

5    THE WITNESS:  I don't know.

6    BY MS. RADCLIFFE:

7    Q.  Did you speak with anyone at Oracle regarding

8    the preparation of the memorandum?

9    A.  No.

10   Q.  Do you know if Mr. Banker spoke with anyone at

11   Oracle regarding the preparation of the memorandum?

12   A.  I don't know.

13   Q.  Do you know if Ms. Birkler spoke to anyone at

14   Oracle regarding the preparation of the memorandum?

15   A.  I don't know.

16   Q.  Who was the manager assigned to the Oracle

17   account at the time this memorandum was prepared?

18   A.  I don't recall exactly which managers were

19   assigned.  I'd have to look at the staffing at that

20   particular point in time.

21   Q.  Do you know if Ernst & Young's national office

22   was consulted with respect to the procedures set forth

23   in the memorandum?

24   A.  I don't know.

25   Q.  Do you know generally if Ernst & Young's

40

1    national office is consulted with respect to the

2    procedures set forth in an engagement?

3    MR. KONOVALOV:  Could you read that question

4    back, please.  I'm sorry.

5    (The record was read back as follows:

6    "Q.  Do you know generally if Ernst & Young's

7    national office is consulted with respect to

8    the procedures set forth in an engagement?")

9    MR. KONOVALOV:  Objection; lacks foundation,

10   calls for speculation.

11   BY MS. RADCLIFFE:

12   Q.  You can answer.

13   A.  I don't know.

14   Q.  Do you know if a copy of the memorandum was

15   ever provided to anyone at Oracle?

16   A.  I don't know.

17   Q.  Do you know who would know that?

18   A.  I don't know who would know that if there was

19   a copy provided.

20   MS. RADCLIFFE:  I'm going to mark an exhibit.

21   For the record, we're going to mark as Exhibit 1.

22   (Exhibit No. 1 was marked for identification by

23   the reporter.)

24   BY MS. RADCLIFFE:

25   Q.  If you could just take a minute to familiarize

41

1   yourself with that document.
2       A.   (The witness reviews the document.)
3           MS. RADCLIFFE:  For the record, what's been
4   marked as Exhibit 1 is a subpoena in the Oracle
5   Corporation securities litigation to Ernst & Young.
6           THE WITNESS:  (The witness reviews the
7   document.)
8           MS. RADCLIFFE:  If you want to go off the record
9   for a minute while Mr. Bender reviews it, we can.
10          (There is a pause in proceedings.)
11  BY MS. RADCLIFFE:
12      Q.   Mr. Bender, have you seen this document
13  before?
14      A.   I've seen the memo that's attached in the
15  back.
16      Q.   Have you seen the subject matters listed as 1
17  through 15 on pages 1 through 4 of the attachment?
18      A.   I have not seen this before, no.
19      Q.   Do you have an understanding that you're
20  testifying as a representative of Ernst & Young today
21  in this deposition?
22      A.   Yes.
23      Q.   Do you have an understanding that you're
24  testifying as the person most knowledgeable as to the
25  subject matters listed in Items 1 through 15 of the

42

1   attachment to the document before you?
2       A.   Yes.
3       Q.   And have you -- strike that.
4           Do you believe that you're the most -- strike
5   that.
6           Do you believe that you're the most qualified
7   person to talk about each of the subject matters listed
8   at 1 through 15 in this document?
9       A.   I believe I'm the most qualified person to
10  talk about it that's currently employed at Ernst &
11  Young.
12      Q.   With respect to Item -- or Subject Matter
13  No. 1 of this particular document, there is a reference
14  in this subject matter to an engagement.  Do you see
15  that?
16      A.   Yes.
17      Q.   Are you familiar with that engagement?
18      A.   Yes.
19      Q.   Do you know if there was an engagement letter
20  prepared with respect to that engagement?
21      A.   I don't recall, no.
22      Q.   Do you recall if there is any documentation
23  setting forth the scope of the engagement?
24      A.   I don't recall, no.
25      Q.   What is your understanding of the scope of the

43

1   engagement as a representative of Ernst & Young?
2       A.   My understanding was that Ernst & Young was
3   asked to perform certain procedures related to 46,000
4   debit memos that were created by Oracle in
5   November 2000.
6       Q.   And do you know who asked Ernst & Young to
7   perform these procedures?
8       A.   There was a special committee of the board of
9   directors.
10      Q.   And do you know who conveyed that request to
11  Ernst & Young?
12      A.   No.
13      Q.   Do you know when that request was conveyed?
14      A.   I don't know exactly when the request was
15  conveyed, no.
16      Q.   Do you know approximately when it was
17  conveyed?
18      A.   Approximately September or October 2002.
19      Q.   Do you know what form that request came in?
20      A.   No.
21      Q.   How did you learn of that request?
22      A.   John Banker informed me.
23      Q.   John Banker informed you.
24          And how did Mr. Banker inform you?  By telephone
25  or in person?

44

1       A.   In person.
2       Q.   And what did Mr. Banker specifically say to
3   you?
4       A.   I don't recall what he specifically told me.
5       Q.   Do you recall generally what he told you?
6       A.   Generally he told me that we were asked to go
7   and perform certain procedures on the 46,000 debit
8   memos.
9       Q.   And what is your understanding of those
10  procedures?
11      A.   My understanding of those procedures were to
12  review a sample of the debit memos that were created
13  and to review what the actual accounting was as part of
14  those debit memos.
15      Q.   And were these procedures performed by Ernst &
16  Young?
17      A.   Yes.
18      Q.   And over what time period were they performed?
19      A.   I don't recall the exact time period.  It was
20  in October 2002.
21      Q.   Do you recall approximately how long it took
22  to perform these procedures?
23      A.   I don't recall, no.
24      Q.   And were the procedures that Ernst & Young set
25  out to perform concluded?

45

1   A.  Yes.  Concluded in the sense they were
2   finished, yes.
3   Q.  Beside yourself, Ms. Birkler, and Mr. Banker,
4   was there anyone else assigned to this engagement?
5   A.  Yes.
6   Q.  Who was that?
7   A.  Ashley Gemma, G-e-m-m-a.
8   Q.  And what was her title?
9   A.  Senior.
10   Q.  Anyone else that you recall?
11   A.  Not that I recall, no.
12   Q.  Were there other people assigned to the
13   engagement that you don't recall at this time?
14   A.  I'm sorry.  I don't understand the question.
15   Q.  Certainly.  I'll rephrase it.  Were there
16   other people at Ernst & Young assigned to this
17   engagement who you don't recall as you sit here today?
18   A.  I don't know.  I don't remember.
19   Q.  If you needed to find out, do you know where
20   you would look?
21   A.  Yes.
22   Q.  And where would that be?
23   A.  We would have time-sheet records.
24   Q.  And are those accessible to you now?  Not as
25   you sit here, but as you're employed at Ernst & Young.

46

1   A.  I don't know how long we hold those records.
2   Q.  Did you make an effort to review those
3   time-sheet records before your deposition here today?
4   A.  No.
5   Q.  Do you know if anyone else at Ernst & Young
6   made the effort to look at those time-sheet records --
7   (Interruption)
8   THE REPORTER:  "Do you know if anyone else at
9   Ernst & young made the effort" --
10   BY MS. RADCLIFFE:
11   Q.  -- to review those time-sheet records in
12   preparation for your deposition today.
13   A.  I don't know.
14   Q.  So is it accurate to say that sitting here
15   today you're not able to identify all of the people who
16   were assigned to this engagement?
17   MR. KONOVALOV:  Objection; mischaracterizes the
18   witness's testimony.
19   THE WITNESS:  I don't recall absolutely who was
20   assigned to the engagement.
21   BY MS. RADCLIFFE:
22   Q.  Were your duties as a senior manager at the
23   time -- is that correct?
24   A.  Yes.
25   Q.  -- with respect to this engagement different

47

1   than we discussed previously today?
2   A.  Yes.
3   Q.  And how are they different?
4   A.  This was a -- this was not an audit.  This was
5   a -- there were certain procedures that were performed
6   on a period that we did not audit.
7   Q.  And so what were your duties and
8   responsibilities with respect to this engagement?
9   A.  My duties and responsibilities for this
10   engagement were to help the team prepare and plan our
11   work steps around what we were going to do and review
12   the results of those procedures and prepare this
13   memorandum.
14   Q.  And when you say "prepare this memorandum,"
15   what are your referring to?
16   A.  I'm sorry.  The memorandum prepared by Ernst &
17   Young that is attached to Exhibit 1.
18   Q.  You indicated that you would have helped the
19   team prepare work steps.  Would those work steps be
20   documented?
21   A.  They're documented in the memo.
22   Q.  In the memo attached?
23   A.  Attached to Exhibit 1.
24   Q.  Anywhere else are they documented?
25   A.  Not that I recall.

48

1   Q.  Are there any other duties and
2   responsibilities you had with respect to this
3   particular engagement?
4   A.  No.
5   Q.  You mentioned Mr. Banker was assigned to this
6   engagement.  Do you know what his duties and
7   responsibilities were with respect to this engagement?
8   A.  I don't know what all of his duties and
9   responsibilities were on this engagement.
10   Q.  Do you know what any of them were?
11   A.  I do know that he reviewed the results of our
12   procedures and he reviewed the memorandum attached to
13   Exhibit 1.
14   Q.  Do you know who had drafted the memorandum
15   attached to Exhibit 1?
16   A.  Who initially drafted it?  Megan Birkler
17   initially drafted it.  I was also part of drafting of
18   the memorandum.
19   Q.  Anyone else?
20   A.  John Banker would have had input into the
21   memorandum.
22   Q.  Are the results of the procedures you
23   performed documented anywhere else besides the
24   memorandum attached to Exhibit 1?
25   A.  Not that I'm aware of.

49

1     Q.  And so we can clarify just for the record:
2  When we're referring to the memorandum -- attached as
3  Exhibit 1 -- is it the document with the little numbers
4  at the bottom of the right-hand corner at the Bates
5  stamp EY 000010 through -112?
6     A.  I actually have EY 00143, 000144, 000145,
7  000146, and 000232.
8     Q.  That's why we had to clarify.
9        MR. KONOVALOV:  Counsel, when it's a good
10  time -- I don't want to interrupt your flow -- let's take
11  a short break.
12        MS. RADCLIFFE:  I just have one little follow-up
13  question.
14     Q.  With respect to Ms. Birkler, do you know what
15  her duties and responsibilities were with respect to
16  this particular engagement?
17     A.  Yes.
18     Q.  And what were they?
19     A.  Her duties and responsibilities were to
20  perform a detailed review of the work performed by
21  Ashley Gemma on the procedures detailed in the
22  memorandum.
23     Q.  And with respect to Ms. Gemma, what were her
24  duties and responsibilities with respect to this
25  engagement?

50

1     A.  Her duties and responsibilities were to
2  perform the procedures, prepare the work papers, and
3  document the initial result of those procedures as
4  documented in Exhibit 1 -- in the attachment to
5  Exhibit 1.  I'm sorry.
6     Q.  Is that 143 to 146?
7     A.  Yes.
8     Q.  And 232?
9        MS. RADCLIFFE:  Why don't we go ahead and go off
10  the record and take a break?
11        THE VIDEO OPERATOR:  Going off the record, the
12  time is 10:11.
13        (A break was taken.)
14        THE VIDEO OPERATOR:  Back on the record, the
15  time is 10:25.
16  BY MS. RADCLIFFE:
17     Q.  Prior to the break, we were discussing a
18  memorandum attached to Exhibit 1 before you, starting
19  at EY 000143.  And I believe you mentioned that
20  Mr. Banker reviewed the results of the procedures
21  related to the engagement and also the memo attached to
22  Exhibit 1, starting at EY 143?  Is that correct?
23     A.  What I said was that John reviewed the memo at
24  EY 00143.  I don't know if he reviewed the document
25  before.

51

1     Q.  Okay.  Do you know if there are other results
2  of the procedures performed that are documented that's
3  described in the document starting at EY 00143 through
4  -146?
5     A.  Not that I recall, no.
6     Q.  You mentioned that Ms. Gemma documented the
7  initial results of the procedures performed in the
8  document attached to Exhibit 1, starting at EY 143.  Do
9  you know if there were subsequent results of the
10  procedures performed by Ernst & Young that are not
11  documented in this exhibit, starting at EY 00143 to
12  -146?
13     A.  Not that I recall, no.
14     Q.  So just so I have this clear:  Based on your
15  recollection, the totality of the results of the
16  procedures performed by Ernst & Young with respect to
17  this engagement are documented at EY 00143 through
18  -146?
19     A.  Yes.
20     Q.  And is there any other documentation that was
21  created with respect to the procedures performed by
22  Ernst & Young with respect to this engagement?
23     A.  There would be specific work papers that would
24  be -- that would have been prepared.  I do not recall
25  what those were exactly.

52

1     Q.  Do you recall reviewing those work papers?
2     A.  I recall reviewing certain of those work
3  papers, yes.
4     Q.  Which ones do you recall reviewing?
5     A.  I recall reviewing a sample of the actual
6  journal entry that was recorded on certain of the
7  samples that we selected.  I recall reviewing the
8  analytical review that we performed on the deferred
9  revenue balances between the first quarter and second
10  quarter of fiscal 2001.  Outside of that, I don't
11  recall specifically what work papers I reviewed.
12        MS. RADCLIFFE:  Okay.  I think this might make
13  things a little easier, so I'm going to mark as Exhibit 2
14  the next document.
15        (Exhibit No. 2 was marked for identification by
16  the reporter.)
17        MS. RADCLIFFE:  At the same time, I'm also going
18  to mark as Exhibit 3 because we may need to reference it.
19        (Exhibit No. 3 was marked for identification by
20  the reporter.)
21        MS. RADCLIFFE:  And for the record, I'll
22  represent that Exhibit 2 consists of all of the documents
23  provided to plaintiffs in this litigation by Ernst &
24  Young.  And Exhibit 3 consists of some excerpts of
25  documents also produced by Ernst & Young that are

53

1  represented to be the best copies that Ernst & Young
2  possesses with respect to these documents.
3      Q.  Mr. Bender, you can take off the binder clip
4  if that's easier.  And I'm going to go ahead and ask
5  you a couple more questions.  And you may need to refer
6  to Exhibit 2, so if you can go ahead and take your time
7  to familiarize yourself with that exhibit.
8      A.  (The witness reviews the document.)
9      Q.  I'm going to -- you might want to use tags to
10  make marks where you want to make breaks.  Make it
11  easier to go through these.  Go ahead.
12          Did you have an opportunity to review what's
13  been marked as Exhibit 2?
14      A.  Yeah.  Quickly I have, yes.
15      Q.  And does that refresh your recollection of
16  which work papers you reviewed with respect to this
17  engagement?
18      A.  Yes.
19      Q.  And besides those that you mentioned earlier,
20  the sample journal entry and the analytical review of
21  deferred revenue balances, what other work papers did
22  you review in connection with this engagement?
23      A.  I reviewed a work paper that is the
24  reconciliation of Account 25005 for the period in
25  question.

54

1      Q.  And could you -- you're referencing a
2  document.  Could you provide the record with the little
3  number at the corner, of the Bates number of that
4  document?
5      A.  Sure.  000150, 000151.  There is a copy of the
6  complaint filed, starting with 000162 through -229,
7  that I had read.
8      Q.  Is the copy of the complaint part of the work
9  paper?
10      A.  I would have to go back and look at our
11  binder, but I believe it was, yes.
12          On EY 000231, there is a reconciliation --
13  another reconciliation of the 25005 account for
14  November 2000, which we were -- which we reviewed.  And I
15  reviewed this work paper as well as the supporting
16  journal entries at 000234, -235, -236, and -237.
17          And there is a memo that was written -- EY
18  000261 that was written by a -- one of our IT specialists
19  that actually reviewed the script that was used to
20  effectively eliminate these debit memos from the system,
21  and I had reviewed the memo.
22      Q.  And who was that IT specialist?
23      A.  That was David Roque.
24      Q.  And is he --
25      A.  R-o-q-u-e.

55

1      Q.  Was he employed at Ernst & Young during the
2  engagement?
3      A.  Yes.
4      Q.  And do you recall what his title was?
5      A.  At that point in time, he was a senior
6  manager.  We call it TSRS.  Unfortunately, I don't know
7  what that stands for because it changes all the time,
8  but it's effectively IT auditor.
9      Q.  And do you know if he had any specialized
10  training with respect to IT?
11      A.  He is -- he was a specialized IT auditor, yes.
12  I can't comment on his particular skill set on this
13  particular script, but he would have been the
14  appropriate person at the time that we felt to use.
15      Q.  And was he also assigned to this engagement to
16  perform the review of the computer script?
17      A.  Yes.
18      Q.  Do you know if he's currently employed at
19  Ernst & Young?
20      A.  He is.
21      Q.  Do you know what his current title is?
22      A.  He's a partner in San Francisco.
23      Q.  Do you know if he still performs professional
24  services for Oracle on behalf of Ernst & Young?
25      A.  He does.

56

1      Q.  Do you know in what capacity?
2      A.  He is the partner in charge of the auditing
3  aspects related to the company's information technology
4  and IT general controls.
5      Q.  You mentioned that one of the work papers you
6  recalled reviewing was a sample of the journal entry
7  created.  In your review of Exhibit 2, did you locate
8  that work paper?
9      A.  No.  What I had -- what I -- the journal entry
10  that I recall reviewing that is in there, that has to do
11  with specific -- a specific journal entry that was part
12  of our review of the reconciliation of Account 25005.
13      Q.  And the sample of the journal entry created,
14  do you know if that was documented by Ernst & Young?
15      A.  It's in our memorandum, yes.
16      Q.  Other than the reference in the memorandum,
17  was there other documentation kept of that sample of
18  the journal entry?
19      A.  I don't know.  I don't recall.
20      Q.  Do you recall reviewing the sample of the
21  journal entry in another form besides what is depicted
22  in the memorandum at EY 143 to 146?
23          MR. KONOVALOV:  Objection; vague and ambiguous.
24          THE WITNESS:  I recall reviewing journal entries
25  that are discussed in the memorandum.  Those journal

57

1    entries may not have been kept in our final work papers.

2    They would not be required to be in the final work

3    papers.

4    BY MS. RADCLIFFE:

5    Q.  Do you know if those journal entries were kept

6    by Ernst & Young, whether in the work papers or in

7    another location within Ernst & Young?

8    A.  I don't know.

9    Q.  Do you know who would know?

10   A.  No.

11   Q.  Do you know where -- strike that.

12   Do you know who you would ask to find out?

13   A.  I would have to -- I would probably ask the

14   file room if they have any records of it.  But I don't

15   know who specifically I would ask, no.

16   Q.  Is there a location within Ernst & Young that

17   you would look for these documents?

18   A.  There is a file room, yes.

19   Q.  Do you know how long the file room maintains

20   documents related to engagements?

21   A.  I don't know, but I believe it's seven years.

22   Q.  Did you ask anyone in the file room to search

23   for these documents prior to your deposition here

24   today?

25   A.  Yes.

58

1    Q.  And who was that person?

2    A.  I don't recall who was managing the file room

3    at the time I made the request as part of the subpoena

4    of all the documents.

5    Q.  And maybe we should make the record clear.  Is

6    it your understanding that the subpoena for documents

7    is separate from the subpoena to appear here for

8    deposition today?

9    A.  I don't understand the distinction.  I can

10   clarify my answer.  I was instructed to send everything

11   related to this investigation to general counsel's

12   office, which is what we did.

13   Q.  And do you recall what the response was from

14   the file room with respect to your request to search

15   for everything related to this investigation?

16   A.  The response was "Okay," and they pulled

17   everything out, and I went and reviewed all the files

18   in the Oracle section to ensure that we had everything.

19   Q.  So is it your understanding that there are no

20   other documents, related to this investigation, in the

21   file room?

22   A.  That's my understanding, yes.

23   Q.  You also mentioned that you reviewed a work

24   paper regarding the analytical review of deferred

25   revenue balances?

59

1    A.  Yes.

2    Q.  And did you locate that work paper in your

3    review of Exhibit 2?

4    A.  I did, yes.  EY 000147, -148, -149.

5    Q.  And do you recall reviewing any other

6    documentation with respect to this investigation that

7    we haven't discussed that is not contained within

8    Exhibit 2?

9    A.  I do not recall, no.

10   Q.  You mentioned before that -- a binder.  What

11   were you referring to?

12   A.  There is a binder that looks exactly like this

13   front page, which is Exhibit 00001, and included in

14   that binder would be work papers related to this -- the

15   procedures.

16   Q.  And is it your understanding that Exhibit 2

17   consists of copies of that binder?

18   A.  Yes.

19   Q.  And is it your understanding that Ernst &

20   Young maintains that binder in the ordinary course of

21   its business?

22   A.  Yes.

23   Q.  And do you -- I'm actually going to do it this

24   way because -- this is not meant to trick you, so I'm

25   going to mark next as Exhibits 4 and 5 two documents.

60

1    MR. KONOVALOV:  Which one is 4, Exhibit 4?

2    MS. RADCLIFFE:  Exhibit 4 appears to be the

3    letter.

4    (Exhibit Nos. 4 and 5 were marked for

5    identification by the reporter.)

6    BY MS. RADCLIFFE:

7    Q.  And Mr. Bender, the reason I'm showing you

8    these is Exhibit 4 appears to be a letter from Ernst &

9    Young's office, paralegal there, indicating that there

10   are certain documents being withheld and referencing

11   Bates numbers that are being withheld on certain

12   grounds.

13   And then if you turn to Exhibit 5, this

14   document I'll represent to you was actually received by

15   counsel for Oracle, the defendants in this action.  And

16   it also references some Ernst & Young Bates numbers

17   that are being withheld on certain grounds.

18   And so the reason why I'm going to show you

19   Exhibits 4 and 5 was to ask you whether you believed

20   Exhibit 2 contained a complete set of the documents

21   related to the investigation with the caveat that the

22   documents referenced in Exhibit 4 and 5 are missing from

23   that set.

24   MR. KONOVALOV:  Objection.  It calls for a legal

25   conclusion from a lay witness, but --

61

1        THE WITNESS:  I would have to see the binder to

2    definitively tell you the answer to that question.

3        BY MS. RADCLIFFE:

4        Q.  Do you know if desk files were kept with

5    respect to this engagement?

6        A.  Can you please define a desk file?

7        Q.  Certainly.  Do you know if any documents were

8    kept by anyone on the engagement, outside the work

9    papers, related to this investigation?

10       A.  I am not aware of any, no.

11       Q.  Do you know if you kept any documents, related

12   to this investigation, that are not contained within

13   Exhibit 2?

14       A.  I'm not aware.  I don't recall.

15       Q.  If you could turn briefly to Exhibit 5 again.

16   The first line on Exhibit 5, the first row, indicates a

17   description of a document, a confidential memorandum

18   from Oracle's general counsel to Oracle board members

19   and senior executives, analyzing and providing legal

20   advice regarding the Oracle Corporation securities

21   litigation.

22       Do you know if Ernst & Young ever reviewed a

23   memorandum from Oracle's general counsel to Oracle board

24   members relating to this litigation?

25       MR. KONOVALOV:  Objection; lacks foundation.  I

62

1    don't think we've established the witness has ever seen

2    this document before.

3        MS. RADCLIFFE:  I'm just asking if he knew.

4        Q.  Do you know if Ernst & Young ever reviewed the

5    memorandum from Oracle's general counsel to Oracle

6    board members relating to this litigation?

7        A.  I don't recall definitively.

8        Q.  Do you recall reviewing any documents from

9    Oracle relating to this litigation?

10       A.  I recall reviewing a memorandum that

11   documented the background of --

12       MR. KONOVALOV:  Well, can I just stop here.  I'm

13   not sure if you're seeking to get to the substance of a

14   document that's been withheld by the company on the basis

15   of privilege, and I wouldn't want the witness to describe

16   the substance of it.  That's not what you're looking for.

17   And I would assert the privilege that -- as we have in

18   the log on behalf of the company, of the documents.

19       So you're not allowed to testify about the

20   substance of the document.

21       THE WITNESS:  Okay.

22       MR. KONOVALOV:  She is just asking, first of

23   all, if you have ever received the document.

24       BY MS. RADCLIFFE:

25       Q.  Let's start with -- in the course of your

63

1    investigation, did you receive any documents from

2    Oracle that assisted Ernst & Young in performing its

3    procedures?

4        A.  Yes.

5        Q.  And do you recall what those documents are?

6        A.  I recall them being memorandums prepared by

7    the company.

8        Q.  Any other documents?

9        A.  No.

10       Q.  And maybe I should make my question clearer.

11   Do you recall receiving any other documents from the

12   company that assisted Ernst & Young in performing its

13   procedures?  For example, general ledgers, account

14   analysis reports, anything of that nature, from the

15   company.

16       A.  Yes.  We would have received a general ledger.

17   We would have -- all of our requests to do our testing

18   would have come from the company, specifically the

19   journal entries themselves.  We received a copy of the

20   complaint.

21       Q.  And do you know who at Oracle provided Ernst &

22   Young this documentation?

23       A.  No, I don't recall.

24       Q.  Do you know who at Oracle Ernst & Young would

25   have made those requests for documentation to?

64

1        A.  I don't recall specifically, no.

2        Q.  Do you recall generally there being a subset

3    of people at Oracle that Ernst & Young would have

4    requested these documents from?

5        A.  Yes.

6        Q.  And who were those people?

7        A.  Greg Meyers would -- Greg Meyers would have

8    helped us with the journal entries related to the debit

9    memos, and I actually don't recall who would have

10   provided us other documents.

11       Q.  Do you know if Ernst & Young communicated with

12   other individuals at Oracle related to this

13   investigation besides Greg Meyers?

14       A.  Yes.

15       Q.  And who would those individuals be?

16       A.  I don't know who the individuals were

17   specifically.  There would have been -- there is

18   somebody that was referenced in the script-review memo,

19   I believe.  I believe his name is Sanjay Kumar.

20   Outside of Sanjay Kumar, I don't recall anyone else.

21       Q.  Do you know if the results of Ernst & Young's

22   engagement were ever conveyed to Oracle?

23       A.  I don't know.

24       Q.  Do you know if they were conveyed to anyone

25   else?

65

```
 1        A.  I don't know.
 2        Q.  Did Ernst & Young ever discuss the results of
 3   its investigation, the investigation we've been
 4   discussing, with respect to the Securities and Exchange
 5   Commission?
 6            MR. KONOVALOV:  Objection; calls for
 7   speculation.
 8            THE WITNESS:  I don't know.
 9   BY MS. RADCLIFFE:
10        Q.  Do you know who would know that?
11        A.  No.
12        Q.  Do you know if there were work papers that
13   were created during the course of the investigation
14   that are not contained within Exhibit 2 that you've
15   reviewed today?
16        A.  I'm not aware of any, no.
17        Q.  Do you know who has the authority to remove
18   work papers from Ernst & Young's binders?
19            MR. KONOVALOV:  Objection; lacks foundation,
20   assumes facts not in evidence.
21            THE WITNESS:  No.
22   BY MS. RADCLIFFE:
23        Q.  Is it generally Ernst & Young's policy that
24   work papers are not to be removed from binders?
25        A.  Absolutely.
```

66

```
 1        Q.  And is that a documented policy?
 2        A.  I don't know.  I believe so, yes.
 3        Q.  If you look at Exhibit 1 and if you look at
 4   the very first page of what says "Schedule A" at the
 5   top, which is the third page of the document.
 6        A.  Um-hmm.
 7        Q.  And if you'd look at what is 2-D.  And are you
 8   the person most knowledgeable with respect to
 9   communications with the United States Securities and
10   Exchange Commission concerning any aspect of the
11   investigation Ernst & Young performed?
12        A.  No.
13        Q.  And who would be the person most knowledgeable
14   at Ernst & Young?
15        A.  I don't know.
16        Q.  Do you know who would know?
17        A.  I don't know who would know.
18        Q.  Who would you ask if you wanted to find out?
19        A.  I'd ask John Banker.
20        Q.  With respect to what is Item 2-E, are you the
21   person most knowledgeable with respect to the existence
22   of documents obtained or prepared in connection with
23   the engagement that were not part of the original work
24   papers?
25        A.  That's still at Ernst & Young, I would be the
```

67

```
 1   only person.
 2        Q.  Is Ms. Birkler no longer with Ernst & Young?
 3        A.  No.  Neither is Ashley Gemma.
 4        Q.  Do you know where Ms. Birkler is currently?
 5        A.  Oracle.
 6        Q.  And Ms. Gemma?
 7        A.  Oracle.
 8        Q.  And do you know what positions they hold at
 9   Oracle?
10        A.  Both Ashley Gemma and Megan Birkler left
11   Ernst & Young to go work at PeopleSoft and were --
12   PeopleSoft was acquired by Oracle, and they are now
13   working in the Oracle revenue recognition group.
14        Q.  And do you know approximately when Ms. Birkler
15   left to become employed at PeopleSoft?
16        A.  I don't remember the exact date, no.
17        Q.  And do you know approximately when Ms. Gemma
18   left to become employed at PeopleSoft?
19        A.  I don't remember the exact date.  Ashley Gemma
20   actually left to go work for BMC Software and then went
21   to PeopleSoft and then consequently Oracle.  I do not
22   recall the exact date, no.
23        Q.  Do you recall the year?
24        A.  Megan Birkler left in 2003.
25        Q.  And --
```

68

```
 1        A.  And Ashley Gemma left in 2004.
 2        Q.  And in the course of your duties with respect
 3   to the audit of Oracle's fiscal years, did you have the
 4   opportunity to correspond with Ms. Birkler and
 5   Ms. Gemma?
 6        A.  Yes.
 7        Q.  And just generally what do those
 8   communications entail?
 9        A.  The results of our review of revenue contracts
10   and the company's conclusion on the accounting as well
11   as testing of certain internal controls related to
12   Sarbanes-Oxley 404.
13        Q.  And is there anyone else who performed
14   engagements for Oracle while at Ernst & Young that is
15   now employed at Oracle, to your knowledge?
16            MR. KONOVALOV:  Objection; vague and ambiguous
17   as to "engagement."  Are you speaking about the
18   procedures?
19   BY MS. RADCLIFFE:
20        Q.  Any engagement, fiscal audit review, the
21   particular investigation engagement.
22        A.  Not that I'm aware of, no.
23        Q.  Do you have an understanding of how Ernst &
24   Young became Oracle's independent auditors?
25        A.  I do, yes.
```

69

1    Q.  And what's that understanding?

2    A.  Arthur Andersen -- at the time of our

3   appointment, Arthur Andersen was -- I don't know

4   exactly legally what was happening with Arthur

5   Andersen, but there was significant concern as to their

6   ability to continue as an independent public accounting

7   firm, and Oracle had requested the other -- certain

8   other firms -- I don't recall exactly who -- to come

9   in, bid on the work for the May 2002 audit.

10   Q.  And do you recall when that bidding process

11  occurred?

12   A.  It was in -- I believe it was in March of

13  2002.

14   Q.  And do you know approximately when Ernst &

15  Young was informed that it would be Oracle's

16  independent auditor?

17   A.  Approximately?

18   Q.  Yes.

19   A.  April 2002.

20   Q.  And do you know if anyone formerly with Arthur

21  Andersen that worked on the Oracle engagement is now

22  employed at Ernst & Young and works on the Oracle

23  account?

24   A.  No, there is nobody.

25   Q.  Do you know of anybody who was formerly with

70

1   Arthur Andersen that worked on the Oracle account who

2   is now currently employed at Oracle?

3    A.  That previously had worked on the Oracle

4   engagement?  Yes.

5    Q.  And who is that person?

6    A.  Tom Olinger is the corporate controller.

7    Q.  And do you know when Mr. Olinger became

8   employed at Oracle?

9    A.  I don't know.

10   Q.  Do you know approximately when?

11   A.  Approximately 2002.

12   Q.  Do you know who Mr. Paul Yoo is?  Y-o-o.

13   A.  The name is familiar.  I don't recall who that

14  is.

15   Q.  Did Ernst & Young review Arthur Andersen's

16  work papers for the quarterly reviews of fiscal 2001?

17   A.  Yes.

18   Q.  Do you know when that review took place?

19   A.  Approximately April 2002.

20   Q.  Do you know if Ernst & Young reviewed Arthur

21  Andersen's work papers for the fiscal 2001 audit of

22  Oracle?

23   A.  Yes.  We are required to.

24   Q.  And do you know when that was?

25   A.  Same time.

71

1    Q.  Do you know if Ernst & Young maintained copies

2   of the quarterly reviews for fiscal 2001 Andersen work

3   papers?

4    A.  I do not recall Ernst & Young retaining copies

5   of quarterly work papers for fiscal 2001.

6    Q.  Do you recall if Ernst & Young maintains --

7   I'm going to strike that because I've gone over my five

8   minutes of tape time.  We're going to go off the

9   record.

10   THE VIDEO OPERATOR:  This marks the end of

11  Videotape No. 1, Volume I, in the deposition of Alex

12  Bender.  Going off the record, the time is 11:09.

13       (A break was taken.)

14   THE VIDEO OPERATOR:  This marks the beginning of

15  Videotape No. 2, Volume I, in the deposition of Alex

16  Bender.  The time is 11:26.  We're back on the record.

17  BY MS. RADCLIFFE:

18   Q.  Do you recall if Ernst & Young retained copies

19  of Arthur Andersen's fiscal 2001-year audit?

20   A.  There were copies that were made available to

21  us.

22   Q.  And do you recall what copies were made

23  available to Ernst & Young?

24   A.  There is a list.  Not off the top of my head,

25  no.

72

1    Q.  And where's that list maintained?

2    A.  We have a work paper.  We have a binder that

3   will have -- that would have -- or binders perhaps that

4   would have all of them.

5    Q.  And did Ernst & Young review any of these work

6   papers in connection with its investigation related to

7   the debit memorandums?

8    A.  No.

9    Q.  Do you know if Ernst & Young reviewed any of

10  Arthur Andersen's documentation when it performed its

11  procedures related to the investigation of the debit

12  memos?

13   A.  We did not.

14   Q.  Do you know if Ernst & Young discussed with

15  anyone at Andersen any of the work that Andersen

16  performed for Oracle when Ernst & Young was

17  investigating the debit memos?

18   A.  No, we did not.

19   Q.  I believe you mentioned Mr. Olinger is now the

20  controller at Oracle.  Do you know what position he

21  held at Arthur Andersen?

22   A.  I believe he was a partner.

23   Q.  And is that partner assigned to the Oracle

24  account while he was at Andersen, to your knowledge?

25   A.  To my knowledge he was, yes.

73

1    Q.  And do you know if Mr. Olinger was assigned to
2    the Oracle account during Andersen's fiscal 2001-year
3    audit?
4    A.  I don't know definitively.
5    Q.  Do you have an understanding?
6    A.  I believe he was, yes.
7    Q.  Going back to the -- what's titled the
8    Schedule A and No. 2-D.  You mentioned with respect to
9    the item listed there that you might inquire of John
10   Banker regarding the -- any communication Ernst & Young
11   might have had with the United States Securities and
12   Exchange Commission concerning any aspect of the
13   engagement related to the debit memos.
14       Is there anyone currently at Ernst & Young who
15   you might discuss whether such communications took place?
16   A.  Not at Ernst & Young, no.
17   Q.  Do you know if Ernst & Young's counsel might
18   have that information?
19   A.  I don't know.
20   Q.  Do you know if Mr. Cotton might have that
21   information?
22   A.  I don't know.
23   Q.  Did you ask Mr. Cotton if he had that
24   information?
25   A.  No.

74

1    Q.  If you look at Item 2-F there, it indicates
2    "originals or copies of any engagement documents
3    provided by Ernst & Young to Oracle or its
4    representatives."  Are you the person most
5    knowledgeable with respect to that topic?
6    A.  No.
7    Q.  And who would be the person most
8    knowledgeable?
9    A.  John Banker.
10   Q.  And is there anyone else currently at Ernst &
11   Young who would have more knowledge than you regarding
12   the topics set forth in 2-F of the schedule?
13   A.  Currently at Ernst & Young?
14   Q.  Yes.
15   A.  No.
16   Q.  Do you know if there is any documentation at
17   Ernst & Young that would reflect whether or not
18   engagement documents were provided by Ernst & Young to
19   Oracle's representatives?
20   A.  I'm not aware of any, no.
21   Q.  Do you know if a review of email might reflect
22   whether or not there were -- let me strike that.
23       Do you know whether a review of email was done
24   to ascertain whether or not engagement documents were
25   provided by -- in any way to Oracle or its

75

1    representatives?
2    A.  I'm not aware of that, no.
3    Q.  Do you know if Ernst & Young communicated with
4    Oracle by email?
5    A.  I don't know.
6    Q.  Do you know if you personally communicated
7    with Oracle by email?
8    A.  Not that I recall.
9    Q.  While you were performing the engagement with
10   respect to the debit memos, did you communicate
11   internally at Ernst & Young with other members of the
12   engagement team by email?
13   A.  Yes.
14   Q.  And do you recall what subject matters you
15   would communicate by email?
16   A.  No.
17   Q.  Did you review your email regarding the
18   engagement prior to being deposed today?
19   A.  No.
20   Q.  Do you know if it still exists?
21   A.  No.
22   Q.  Do you know who you would ask to find out if
23   it still exists?
24   A.  No.
25   Q.  Do you know where it would be maintained at

76

1    Ernst & Young?
2    A.  No.
3    Q.  Is there any policy or practice at Ernst &
4    Young that requires that copies of email communications
5    regarding engagements be printed in hard copy and
6    placed in a file?
7        MR. KONOVALOV:  Objection; calls for
8    speculation.
9        THE WITNESS:  I don't know.
10   BY MS. RADCLIFFE:
11   Q.  Do you know who would?
12   A.  General counsel's office would, probably.
13   Q.  If you turn the page of that schedule, and if
14   you look at Item No. 4, which states, "E&Y's retention
15   by Oracle for the engagement or for all accounting and
16   related engagements with respect to Oracle debit memos,
17   customer overpayments, funds 'on account' or unapplied
18   cash, including any agreed-upon procedures."
19   A.  Um-hmm.
20   Q.  Are you the person most knowledgeable at
21   Ernst & Young with respect to Subject Matter 4?
22   A.  At Ernst & Young, yes.
23   Q.  Would Mr. Banker be the person that would be
24   more knowledgeable than you with respect to Item No. 4?
25   A.  I don't know if he would or wouldn't.  I

77

1  believe he would, though, yeah.
2      Q.  I guess I'd like to try to clarify something.
3  Do you know if Ernst & Young was retained by Oracle
4  itself with respect to the investigation and engagement
5  related to debit memos or whether it was obtained by
6  Oracle's special litigation committee?
7      A.  My understanding, it was a special litigation
8  committee.
9      Q.  And how did you come to that understanding?
10     A.  I believe it's in our memo.
11     Q.  When you say the memo, are you referring to
12  the one that starts at page 143, EY 00143?
13     A.  Yes.  Actually, it doesn't.  So I honestly
14  don't know it being absolutely.
15     Q.  If you'd turn to Subject Matter 5, which says,
16  "The scope and content of E&Y's professional services
17  performed for Oracle relating to the engagement," which
18  was defined earlier.
19         Are you the person most knowledgeable at Ernst &
20  Young with respect to Subject Matter 5 --
21     A.  Yes.
22     Q.  -- that portion that I just read?
23     A.  Um-hmm.
24     Q.  Other than the document -- that memo starting
25  at page 143 that is attached to the schedule, is there

78

1  any other documentation of the scope and content of
2  E&Y's professional services relating to Oracle with
3  respect to the debit memo investigation?
4      A.  Not that I'm aware of.
5      Q.  Do you have any understanding of the scope and
6  content of E&Y's professional services performed that
7  is not contained within the memo starting at 143?
8      A.  As it relates to the debit memos?
9      Q.  Yes.
10     A.  The only other thing that I'm familiar with
11  outside of the memo attached at 000143 is the memo
12  referred to in the script review that is EY 000264 and
13  -265.
14     Q.  And was the review of the script referenced at
15  EY 000264 to 00265 a separate engagement?
16     A.  No.
17     Q.  And if I understand, your testimony is that
18  the memo at EY 00264 to -265 is not part of the initial
19  agreed-upon procedures.  Is that correct?
20     MR. KONOVALOV:  Objection; misstates the
21  witness's testimony.
22     THE WITNESS:  That's not correct, no.
23  BY MS. RADCLIFFE:
24     Q.  So --
25     A.  It's just documented in a separate place.

79

1      Q.  So if we turn to what -- the memo that starts
2  at EY 00143.  And that continues through -146.
3      A.  Um-hmm.
4      Q.  This memo accurately reflects the scope of the
5  procedures performed by Ernst & Young with the addition
6  of the memo referenced at EY 00264 to -265?
7      A.  Yes.
8      Q.  So there are no other procedures that were
9  performed by Ernst & Young with respect to the
10  investigation of the debit memo engagement; is that
11  correct?
12     A.  Not that I'm aware of.
13     Q.  Do you know if anyone at Ernst & Young would
14  be aware of any other procedures performed besides
15  yourself?
16     A.  No.
17     Q.  Do you know if Mr. Banker would be aware of
18  any other procedures performed?
19     A.  I don't know if he would be.
20     Q.  Do you know if there are any other procedures
21  performed that were documented by Ernst & Young with
22  respect to the investigation of the debit memo
23  engagement?
24     A.  In addition to the two memos?
25     Q.  Correct.

80

1      A.  No.
2      Q.  Do you know when Ernst & Young reviewed the
3  script referenced at EY 00264 and -265?
4      A.  No.
5      Q.  Do you know who would know?
6      A.  David Roque might know.  We would probably
7  have to review time-sheet records, if they still exist,
8  to determine that.
9      Q.  Do you know approximately when it was
10  reviewed?
11     A.  October or November 2002.
12     Q.  If you turn to -- back to Schedule A, and it's
13  No. 5-A and on page 2 of that schedule, and it says:
14  The identification by debit memo number, customer name,
15  and amount of debit for the 195 debit memos referenced
16  in EY 000011 and EY 000092, which are attached to this
17  schedule.
18     A.  Where are they attached?
19     Q.  If you keep flipping pages, it's probably
20  about the sixth page in.  It's EY 00011.
21     A.  Okay.
22     Q.  And then if you flip three more pages, it's
23  EY 00092.
24     A.  Okay.
25     Q.  And you can go ahead and take a minute to look

81

1    at those.  But on each of those documents, you see a

2    reference to "195 items"?

3    A.  Um-hmm.

4    Q.  And I guess the first question I should ask

5    you is, do you understand EY 00011 and EY 00092 to be

6    discussing the same 195 items?

7    A.  Yes, they are.

8    Q.  And do you know -- can you identify by debit

9    memo number the 195 items that Ernst & Young reviewed?

10    A.  No.

11    Q.  Do you know if there was a list --

12    A.  I don't --

13    Q.  -- by Ernst & Young of the 195 items reviewed?

14    A.  I don't recall.

15    Q.  Do you know if it's documented anywhere by

16    Ernst & Young the 195 items that Ernst & Young

17    reviewed?

18    A.  I don't recall.

19    Q.  Is there anywhere within Ernst & Young

20    presently that you could obtain that information?

21    A.  Not that I'm aware of, no.

22    Q.  At the time of the investigation in

23    October-November 2002, were you aware of which 195

24    items Ernst & Young had reviewed?

25    A.  I don't recall.

82

1    Q.  Do you recall any of the customer names

2    related to the debit memos that Ernst & Young reviewed?

3    A.  No.

4    Q.  Do you know if the customer names were

5    documented by Ernst & Young?

6    A.  I don't remember.

7    Q.  Do you recall any of the amounts of debit for

8    any of the 195 items reviewed by Ernst & Young?

9    A.  Individually, no.

10    Q.  In the aggregate, do you recall the debit memo

11    amount?

12    A.  As stated in the memo starting with 00014

13    through -144 -- I'm sorry -- 1 -- yeah, -144, we had a

14    145 with a total debit memo value of $398,731.34.  And

15    the additional 50, we didn't document the total.

16    Q.  And going back to the schedule -- and this is

17    in reference to Item 5-B -- do you know who selected

18    the debit memos to be reviewed by Ernst & Young?

19    A.  Ernst & Young selected the debit memos.

20    Q.  Do you recall how Ernst & Young set about

21    selecting debit memos?

22    A.  In our memo starting at EY 000144, we selected

23    every debit memo that was generated on December 17,

24    2000, greater than $500,000, and we selected an

25    arbitrary sample of an additional 50 between a thousand

83

1    and 499,000.

2    Q.  And do you know how that sample set was agreed

3    upon by Ernst & Young as the proper set to review?

4    MR. KONOVALOV:  Objection; vague and ambiguous

5    as to "agreed upon."

6    THE WITNESS:  I don't recall exactly.  I do

7    recall the team discussing the process we were going to

8    take to test the debit memos, and this is what we felt

9    was the best approach.

10    BY MS. RADCLIFFE:

11    Q.  Do you know if Oracle had any input in the

12    process which Ernst & Young was going to take with

13    respect to testing the debit memos?

14    A.  I don't recall, no.

15    Q.  Do you know who would know?

16    A.  I wouldn't know who would know.

17    Q.  Do you know if the 195 debit memos selected is

18    a statistically significant sample?

19    A.  I don't know what the statistical conclusion

20    would be.

21    Q.  Do you know if that analysis was done by

22    Ernst & Young?

23    A.  We didn't take a statistical sample approach

24    to this testing.

25    Q.  Can you explain the approach you did take?

84

1    A.  We took an approach of testing the larger

2    items to get what we considered was coverage of the

3    total amounts in question.  And the arbitrary sample

4    was to take a reasonable representation of the balance

5    that wasn't included in our testing of large items or

6    what we had defined as large items.

7    Q.  And who determined whether or not -- let me

8    strike that.

9    Who determined what a reasonable representation

10    of the balance would be?

11    A.  Our team.

12    Q.  And do you recall who on your team made that

13    decision?

14    A.  It would have been John Banker, Megan Birkler,

15    Ashley Gemma, and me.

16    Q.  And do you recall if the method by which that

17    determination was made was documented?

18    A.  It's documented in this memo.

19    Q.  Other than the conclusions of what was

20    reviewed, is there any other documentation?

21    A.  No.

22    Q.  If you look at Item 5-C, the "agreed-upon

23    procedures with respect to the engagement and/or

24    Account No. 25005."

25    Absent the memo that starts at EY 00143 and the

85

1    script memo that we also talked about, are there any

2    other agreed-upon procedures with respect to the

3    engagement?

4         A.   Not that I'm aware of, no.

5         Q.   And were there any other procedures done with

6    respect to Account 25005 that are not documented in the

7    memo at EY 00143 and the script memo?

8         MR. KONOVALOV:  Would you read that question

9    back, please.

10        (The record was read back as follows:

11        "Q.   And were there any other procedures done

12             with respect to Account 25005 that are not

13             documented in the memo at EY 00143 and the

14             script memo?")

15        THE WITNESS:  No.

16   BY MS. RADCLIFFE:

17        Q.   If you look at Item 5-D, other than the memo

18   in EY 00143 and the script memo, were there any other

19   procedures performed by Ernst & Young with respect to

20   accounting fraud allegations?

21        A.   As relates to the debit memos?

22        Q.   Correct.

23        A.   No.

24        Q.   Has Ernst & Young performed any other analysis

25   of accounting fraud allegations besides the debit memo

86

1    allegations?

2         MR. KONOVALOV:  Objection; vague, ambiguous as

3    to time.

4         THE WITNESS:  Accounting fraud allegations?  Not

5    that I'm aware of, no.

6    BY MS. RADCLIFFE:

7         Q.   Has Ernst & Young performed any other analysis

8    of inquiries regarding fraud besides the debit memo

9    allegations?

10        A.   We're required to under SAS 99.

11        Q.   And is --

12        (Interruption)

13        THE WITNESS:  We are required to under SAS 99.

14   BY MS. RADCLIFFE:

15        Q.   And is that in connection with the year-end

16   fiscal audits of Oracle?

17        A.   Yes.

18        Q.   And has Ernst & Young uncovered any critical

19   matters with respect to its analysis required under

20   SAS 99?

21        MR. KONOVALOV:  Objection; vague and ambiguous.

22        THE WITNESS:  No.

23   BY MS. RADCLIFFE:

24        Q.   Did you understand what I refer to when I mean

25   "critical matter"?

87

1         A.   I interpret it as a material matter.

2         Q.   If you look at Item 5-E, which is "the

3    accounting and customer refund processes at Oracle," do

4    you have an understanding of what the accounting and

5    customer refund processes at Oracle were in fiscal

6    2001?

7         A.   Generally, no.  We were not the auditors.

8         Q.   In connection with the debit memo engagement,

9    did Ernst & Young obtain an understanding of what the

10   accounting and customer refund processes were at

11   Oracle?

12        A.   Yes.

13        Q.   And what is Ernst & Young's understanding of

14   what those processes were?

15        A.   I would have to review their policy again.

16   And they had -- they had documented it.  I believe it

17   was in a policy.  And I don't recollect exactly where

18   it was documented but it was documented.

19        Q.   And did Ernst & Young maintain a copy of that

20   documentation in its work papers?

21        A.   I don't recall.

22        Q.   In your review of Exhibit 2, did you see a

23   copy of that policy?

24        A.   There was a policy with regards to unapplied

25   cash.  That doesn't necessarily relate to customer

88

1    refunds, although it could.  But outside of that --

2         Q.   And which EY number is that?

3         A.   I'm sorry.  EY 000250 through -251 and -252

4    and -253.

5         Q.   Do you recall reviewing any other Oracle

6    written documentation with respect to Oracle's customer

7    refund processes in connection with the debit memo

8    engagement?

9         A.   I vaguely remember reading a document -- I

10   don't recall what the document was -- specifically that

11   gave a brief description as to the general process that

12   Oracle would apply as it related to customer refunds.

13        Q.   And do you have a recollection of what your

14   understanding is with respect to that process?

15        A.   Not specifically, no.

16        Q.   Generally?

17        A.   I generally don't know that I could give you

18   an accurate description of the process as it was in

19   November 2000.

20        Q.   And I guess my question is:  What is your best

21   recollection of that process?

22        A.   My best recollection of the process at that

23   point in time was that Oracle would receive a -- would

24   upload lockbox information from a bank -- I don't

25   recall what bank it was -- and it would initially be a

89

1    debit to cash, a credit to the 25005 account, and as
2    that cash would be applied to outstanding accounts
3    receivable balances, it would debit the 25005 account
4    and it would credit accounts receivable.
5        If the cash wasn't applied for whatever reason,
6    it would be either categorized as unapplied cash or a
7    description of "on account," both of which were recorded
8    in Account 25005.
9        Q.  And did you understand Oracle to have changed
10   this process after fiscal 2001?
11       A.  I generally believe they changed this process
12   as part of their implementation of Oracle 11i.
13       Q.  And do you know when that was?
14       A.  No.
15       Q.  Do you know when it was generally?
16       A.  No.
17       Q.  Do you recall the year?
18       A.  No.
19       Q.  And do you have an understanding of what the
20   refund process is currently at Oracle?
21       A.  I don't off the top of my head.  I'd have to
22   review our work papers.
23       Q.  And the -- the refund process that you just
24   described starting with the lockbox and going forward,
25   do you know if Ernst & Young documented that process

90

1    anywhere?
2        A.  No, we did not.
3        Q.  Do you know if Ernst & Young discussed that
4    process with anyone at Oracle?
5        A.  I don't recall.
6        Q.  Do you know who would know?
7        A.  I don't know who would know.
8        Q.  If you'd look at what is Item 5-F on the
9    Schedule A.  And it's Exhibit 1 for the record.  It
10   says, "The methodology that Oracle employed to
11   redesignate the 'on account' items on November 17,
12   2000."
13       Do you have an understanding of what methodology
14   Oracle employed to redesignate the "on account" items on
15   November 17, 2000?
16       MR. KONOVALOV:  Objection; vague and ambiguous
17   as to "redesignate."  Assumes facts not in evidence.
18       THE WITNESS:  In our memo on 000144, we state
19   that in November 2000, in an effort to remove these "on
20   account" transactions from company's subledgers, the
21   company wrote an SQL script that completed the following
22   steps:  One, unapply the cash from the "on account"
23   status, which was a debit and credit to Account 25005.
24       Two, generate a debit memo for the amount
25   previously applied as "on account" with a debit to 25005

91

1    and a credit to 25005, and then apply the cash to a debit
2    memo, which was also a debit and a credit to 25005.
3    BY MS. RADCLIFFE:
4        Q.  And do you have an understanding of how
5    Ernst & Young learned of that methodology that you just
6    described?
7        A.  The company told us.
8        Q.  Do you know who at the company?
9        A.  I don't recall who it was at the company.
10       Q.  Are there a set of individuals who come to
11   mind that might have conveyed that information to
12   Ernst & Young?
13       A.  Greg Meyers is one person that I would look
14   to.
15       Q.  And do you know what Greg Meyers' title was at
16   Oracle?
17       A.  At that time, he was senior manager accounts
18   receivable, global process owner.
19       Q.  And other than what you read from in the memo
20   at EY 00144, do you know if there was any other
21   documentation of Ernst & Young's understanding of the
22   methodology that Oracle employed to redesignate the "on
23   account" items on November 17, 2000?
24       MR. KONOVALOV:  Objection; vague and ambiguous.
25       THE WITNESS:  Not that's documented in this memo

92

1    or the memo that is discussed in the SQL script.
2    BY MS. RADCLIFFE:
3        Q.  And would there be any other documentation
4    besides the memo starting at EY 00143 and the SQL
5    script that we've been referencing?
6        A.  Not that I'm familiar with, no.
7        Q.  And if you look at Item 5-G, which is,
8    "Changes in Oracle's customer advances, unapplied cash,
9    funds 'on account,' and unearned revenue accounts for
10   the second-quarter fiscal year 2001."
11       Do you know if Ernst & Young reviewed the
12   changes in those accounts?
13       A.  Yes.  As I previously stated, we did do
14   analytical reviews on the unearned revenue account in
15   that quarter, as well as Account 25005, which
16   encompasses customer advances, unapplied cash, and
17   funds "on account."
18       Q.  And in Exhibit 2 -- and for the record, could
19   you indicate where that is documented?
20       A.  Yes.  EY 000147 is our analytical review of
21   unearned revenue.  And EY 00230, -231, -232, -233,
22   -234, -235, -236, -237 would be part of our analytical
23   review on Account 25005.  If you give me a second, I'll
24   find the other one.  And EY 000151, that's also the
25   analysis of Account 25005.

93

1    Q.  And do you know if there was any other
2  analysis of the items listed at 5-G besides those
3  documents that you just referenced?
4    A.  No.
5    Q.  And do you know if there is any other
6  documentation of the review of those items listed in
7  5-G besides the ones you just mentioned?
8    A.  No.
9    Q.  If you look at Item 5-H, "Oracle's refunds of
10  customer overpayments."  Did Ernst & Young do an
11  analysis of Oracle's refunds of customer overpayments?
12    A.  Not in addition to the analysis that we
13  previously spoke about.
14    Q.  Do you know if Or- -- excuse me -- if Ernst &
15  Young ever did a reconciliation of Oracle's refunds of
16  customer overpayments in connection with its debit memo
17  engagement?
18    A.  Well, we did -- what's documented on EY 000145
19  was that we obtained the company -- from the company
20  the domestic general ledger account analysis report for
21  Account 25005, made inquiries as to the nature of the
22  transactions as part of that analysis report.
23    We noted that all debits to 25005 were
24  recorded with a corresponding credit to Account 25005.
25  That's to a financial statement impact or to a

94

1  different nonrevenue account.
2    We also reviewed large transactions, and we
3  obtained the domestic reconciliation for Account 25005
4  for November 2000 and August 2000.
5    Q.  And are any of those reviews that you just
6  mentioned referenced in EY 00145 -- are those
7  documented anywhere in Ernst & Young's work papers?
8    A.  In addition to the memo?
9    Q.  In addition to the memo.
10    A.  They are part of EY 000150 and I believe -151,
11  although it's hard to read, and EY 00231, -232, -233,
12  -234, -235, -236, and -237.
13    Q.  Other than those references to EY 000150 to
14  -151 and EY 00231 through -236, was there any other
15  documentation by Ernst & Young?
16    A.  No.
17    Q.  And you indicated that the company reviewed
18  the domestic general ledger account analysis report?
19    A.  The company provided us the domestic general
20  ledger account analysis report.
21    Q.  And is a copy of that report in what has been
22  marked as Exhibit 2?
23    A.  Yes, it starts at 000231 and it goes through
24  -234 --3 -- I'm sorry -- -233.
25    Q.  And is that document the totality of what

95

1  Ernst & Young reviewed with respect to Oracle's
2  domestic general ledger account analysis reports in
3  connection with the debit memo engagement?
4    A.  I believe so, yes.
5    Q.  You also indicated that Ernst & Young made
6  inquiries to the nature of the transactions as part of
7  its review.  And are you referring specifically to the
8  inquiries referenced in the tick marks on the analysis
9  report?
10    A.  Yes, I believe so.
11    Q.  And do you know what I mean when I refer to
12  "tick marks"?
13    A.  Yes, I do.
14    Q.  And why don't you just explain for the record
15  what your understanding of tick marks is so there is no
16  confusion by anyone reading it later on?
17    A.  Sure.  We generally use tick marks to identify
18  an item that we will be performing some procedures on.
19  The tick mark will define what it is we did.
20    Q.  And besides the notations after the tick marks
21  on the general ledger account analysis report starting
22  at EY 00231 through -234, is there any other
23  documentation of what Ernst & Young did with respect to
24  its inquiries of the nature of the transactions?
25    A.  Not that I recall, no.

96

1    Q.  If you look at EY 00231 and you look at the
2  title of it, do you see where it says "Account Analysis
3  Report with Payables Detail" at the top?
4    A.  Um-hmm.
5    Q.  Is it your understanding that that is a
6  reconciliation report?
7    MR. KONOVALOV:  Objection; vague and ambiguous.
8    THE WITNESS:  My understanding is that this
9  details the activity that went through this account for
10  that period, not necessarily the reconciliations, because
11  I don't see a reconciliation to the general ledger on
12  here.
13  BY MS. RADCLIFFE:
14    Q.  So do you know if there is any separate
15  documentation that would reflect a reconciliation to
16  the general ledger?
17    MR. KONOVALOV:  Objection; calls for
18  speculation.
19    THE WITNESS:  I don't remember we put that --
20  the note "the ending balance properly agreed to the
21  general ledger."
22  BY MS. RADCLIFFE:
23    Q.  I'm just going to ask you, when you say
24  "ending balance," what are you referring to?
25    A.  The balance as of the end of the month for

97

1    November 2000 and August 2000.

2       Q.  The -- and so I just want to clarify.  The

3    balance of each debit memo or --

4       A.  The subtotal, the general ledger.

5       Q.  Do you know where -- I'm going to strike that.

6       Do you know if there is any documentation of

7    the reconciliation to the general ledger?

8       A.  In addition to the memo?

9       Q.  Besides -- in addition to the memo.

10      A.  I don't recall.  On -- it's hard to read.  On

11    150 and 151, these are also what seem to be

12    reconciliations of that account, as well, that shows

13    the ending balance.  It doesn't indicate on here

14    specifically that we agreed with the general ledger,

15    but we did in our memo.

16      Q.  So is the reference in your memo the only

17    documentation with respect to the reconciliation to the

18    general ledger?

19      A.  Yes.

20      Q.  Do you know who performed that analysis at

21    Ernst & Young?

22      A.  I don't recall who did it, no.

23      Q.  Do you know if you performed that analysis?

24      A.  I believe I reviewed it.

25      Q.  Of the subset of people who were performing

98

1    work on the engagement for Ernst & Young, which people,

2    to the best of your knowledge, would have prepared that

3    reconciliation?

4      A.  Megan Birkler or Ashley Gemma.  They wouldn't

5    have prepared the reconciliation.  They would have

6    reviewed the reconciliation prepared by Oracle.

7      Q.  Do you know if Ernst & Young did an

8    independent reconciliation to the general ledger?

9      A.  We did not perform a separate reconciliation,

10    no.  We obtained the reconciliation and verified that

11    it did, in fact, agree to the general ledger.

12      Q.  Do you know what procedures were done to

13    verify that it agreed to the general ledger?

14      A.  I don't know specifically what we did, no.

15      Q.  Do you know if there is any documentation of

16    that verification besides the sentence in the memo you

17    just read?

18      A.  No.

19      Q.  Do you know who would have performed that

20    verification?

21      A.  Either Ashley Gemma or Megan Birkler.

22      Q.  Do you know if there would have been any

23    discussions with Oracle about the reconciliation?

24      A.  I don't recall there being a discussion with

25    Oracle.

99

1      Q.  Do you know if Oracle maintained a detail of

2    Account 25005?

3      MR. KONOVALOV:  Objection; vague and ambiguous.

4      THE WITNESS:  I don't know.

5    BY MS. RADCLIFFE:

6      Q.  Do you know if Ernst & Young ever reviewed a

7    detail of Account 25005?

8      MR. KONOVALOV:  Same objection.

9      THE WITNESS:  You mean in addition to the

10    account analysis that we referenced?

11    BY MS. RADCLIFFE:

12      Q.  Yes.

13      A.  No.

14      Q.  Do you see on EY 000150 there is a -- I don't

15    know what you call it, sort of a Post-it appears on

16    this document that says:  To Alex Bender, From Julie

17    Chan?

18      A.  Yeah, I saw that.

19      Q.  Do you recall who Julie Chan is?

20      A.  I don't recall her title, but Julie Chan

21    worked at Oracle in the revenue recognition group.

22    Actually -- strike that.

23      I don't know if she was in that group at that

24    point in time, but she was working for Oracle in

25    Rocklin, California, and she was apparently assisting

100

1    pulling information for us.

2      Q.  And when you say assisting and pulling

3    information for Ernst & Young, are you referring to in

4    connection with the debit memo investigation?

5      A.  Yes.

6      Q.  Did you ever discuss the debit memo

7    investigation with -- in terms of Ernst & Young's

8    conclusions with Ms. Chan?

9      A.  No.

10      Q.  Other than the document referenced at EY

11    00150, and it appears to also go to -151, do you know

12    if Ms. Chan provided other documents to Ernst & Young

13    in connection with its investigation of the debit

14    memos?

15      A.  I don't recall.

16      Q.  Do you know who Ms. Chan's supervisor was?

17      A.  At that time I don't remember.

18      Q.  Do you know who her supervisor is currently?

19      A.  I don't know officially who she reports to,

20    no.

21      Q.  With respect to Greg Meyers, do you know who

22    his supervisor was at the time of the debit memo

23    investigation?

24      A.  I don't know the reporting lines for Greg

25    Meyers at that time.

101

1    Q.  If you look at what is 5-I back on Exhibit 1.

2    And it says:  Any conclusions reached as to whether

3    Oracle's debit memo transactions on or about

4    November 17, 2000, had any impact on Oracle's financial

5    statements, revenue, or balance sheet for fiscal --

6    strike that -- revenue or balance sheet for

7    second-quarter fiscal year 2001 or fiscal year 2001.

8        Are you the person at Ernst & Young most

9    knowledgeable regarding the conclusions that it reached

10   regarding that matter?

11   A.  Yes.

12   Q.  And other than the memo starting at EY 000143

13   and the script memo we discussed, is there any other

14   documentation of those conclusions?

15   A.  No.

16   Q.  Are there any other conclusions reached by

17   Ernst & Young that are not documented?

18   A.  Not that I'm aware of, no.

19   Q.  If you look at Item 5-J, which is the

20   preparation, existence, maintenance, location,

21   organization -- I'll let you read it.

22   A.  Okay.

23   Q.  Are you the person most knowledgeable with

24   respect to that topic?

25   A.  At Ernst & Young?

102

1    Q.  At Ernst & Young.

2    A.  Yes.

3    Q.  And did you do anything prior to your

4    deposition to prepare yourself as a representative of

5    Ernst & Young to respond to that subject matter?

6    A.  No.

7    Q.  Other than what you've testified regarding the

8    maintenance of the documents related to the engagement,

9    is there any other location within Ernst & Young that

10   documents related to the engagement would be currently

11   located?

12       MR. KONOVALOV:  Objection; asked and answered

13   several times.

14       But you can answer it again.

15       THE WITNESS:  Not that I'm aware of.

16   BY MS. RADCLIFFE:

17   Q.  Do you know what Ernst & Young's destruction

18   and retention policy is with respect to its

19   engagements?

20   A.  I don't know specifically.  We did receive --

21   I recall receiving an email from our general counsel's

22   office --

23   Q.  I'm just going to stop you because that's a

24   communication from your general counsel.  That's most

25   likely privileged and we don't want to elicit that --

103

1    A.  So I was informed in what to do and what not

2    to do.

3    Q.  And was it your understanding that the

4    documents related to this engagement were maintained in

5    accordance with Ernst & Young's document-retention

6    policy?

7    A.  They were, yes.

8    Q.  And do you know when you were advised to

9    retain documents related to this investigation?

10   A.  I don't recall the date, no.

11   Q.  Do you recall the year?

12   A.  No.

13   Q.  Do you recall if it was prior to 2003?

14   A.  Calendar 2003, yes.

15   Q.  Do you recall if it was during the winter of

16   2002?

17   A.  I don't remember.

18   Q.  Can you recall if it was your understanding

19   that notes related to the debit memo engagement were to

20   be preserved?

21   A.  Yes.

22   Q.  Did you preserve those notes?

23   A.  I preserved everything that was required of

24   me.

25   Q.  Did you have any notes related to the debit

104

1    memo investigation at the time that you were instructed

2    to preserve all documents related to the engagement?

3    A.  I don't recall.

4    Q.  If you had those notes, would they still be

5    located at Ernst & Young?

6       MR. KONOVALOV:  Objection; incomplete

7    hypothetical, assumes facts not in evidence.

8       THE WITNESS:  I don't remember having notes.  If

9    I did have notes, I would expect them to be in my office.

10   But I'm not aware of any.

11   BY MS. RADCLIFFE:

12   Q.  Did you look in your office to ascertain

13   whether or not you had any notes related to this

14   engagement?

15   A.  At the time that I was instructed to retain

16   documents?  Yes.

17   Q.  At any time since the -- since the time you

18   were told to retain documents related to the

19   engagement.

20       MR. KONOVALOV:  Would you read the question

21   back, please.

22       (The record was read back as follows:

23      "Q.  Did you look in your office to ascertain

24        whether or not you had any notes related to

25        this engagement at any time since the --

105

1        since the time you were told to retain
2        documents related to the engagement?")
3            THE WITNESS:  I don't recall, no.
4    BY MS. RADCLIFFE:
5        Q.  You don't recall looking?
6        A.  I don't recall looking after I initially had
7    been told to look and retain all of our information
8    related to this investigation -- related to this
9    matter.
10       Q.  Do you recall looking at the time that you
11   were told to retain documents related to the
12   engagement?
13       A.  I generally recall making sure that our team
14   had all of the work papers preserved and maintained in
15   one spot.
16       Q.  Beyond the work papers, do you recall making
17   efforts to retain notes or other documents that were
18   not contained within the work papers?
19       A.  I don't recall there being any at that time.
20       Q.  Are you familiar with the term "discard
21   files"?
22       A.  Discard files?
23       Q.  Yes.
24       A.  I am understanding what it means, but I'm not
25   sure I understand the question.

106

1        Q.  I'm just asking if you have ever heard the
2    term "discard files."
3        A.  No.
4        Q.  In the course of your engagement -- or Ernst &
5    Young's engagement with respect to the debit memos,
6    are -- let me strike that -- were there documents that
7    were generated during that engagement that no longer
8    exist today?
9            MR. KONOVALOV:  Objection; calls for
10   speculation.
11           THE WITNESS:  I don't recall if there were or
12   were not.
13   BY MS. RADCLIFFE:
14       Q.  Do you know who at Ernst & Young would know?
15       A.  Me.
16       Q.  Do you know if a review of your computer files
17   would reflect whether or not there were documents
18   related to the engagement that existed at the time of
19   the engagement but no longer exist?
20       A.  I don't know.
21       Q.  Do you know if a review of Ernst & Young's
22   computer files was conducted with respect to preserving
23   or retaining documents related to the engagement with
24   respect to Oracle's debit memos?
25       A.  Not that I'm aware of, no.

107

1        Q.  Do you know who would know?
2        A.  I don't know who would know.
3        Q.  Do you know if there was a review of Ernst &
4    Young's email servers with respect to preserving
5    documents related to Ernst & Young's investigation of
6    the debit memos?
7        A.  I don't know.
8        Q.  Do you know who would know?
9        A.  I don't know.
10       Q.  If you look at what's item subject matter 5-K
11   of the Schedule A to Exhibit 1.  Other than the
12   individuals who we've discussed related to the
13   engagement earlier today, are there any other
14   individuals that you recall who performed professional
15   services for Ernst & Young related to the debit memo
16   transactions at Oracle?
17       A.  Not that I recall, no.
18       Q.  If you turn to EY 00232 -- or also attached to
19   the schedule, an Item L of Subject Matter 5 is
20   Comment B at EY 00232.  And if you look at Item B,
21   there appears to be a number that was highlighted
22   that's unreadable, at least on my copy, of EY 00232.
23   Do you see that?
24       A.  Oh, for B?  Yes.
25       Q.  Yes.  And Item B says, "Entry relates

108

1    primarily to miscellaneous receipts which have been
2    either refunded or applied to a separate expense
3    account"?
4        A.  Um-hmm.
5        Q.  "Oracle World, for example.  We reviewed a
6    sample of ten entries noting no entry made to" --
7        A.  Revenue.
8        Q.  -- "revenue."  Is that your handwriting?
9        A.  Yes.
10       Q.  And the handwriting on EY 00232, is that
11   anyone else's handwriting besides yours?
12       A.  I don't think so, no.
13           MS. RADCLIFFE:  I'm going to mark as the next
14   exhibit, which is Exhibit 6.
15           THE VIDEO OPERATOR:  Going off the record, the
16   time is 12:32.
17
18   AFTERNOON SESSION
19
20           THE VIDEO OPERATOR:  Back on the record, the
21   time is 1:18.
22           MS. RADCLIFFE:  I'm going to mark for the record
23   what I believe is Exhibit 6 next in order.
24           (Exhibit No. 6 was marked for identification by
25   the reporter.)

109

```
1      BY MS. RADCLIFFE:
2         Q.  If you could just take a minute, Mr. Bender,
3     to review Exhibit 6.
4         A.  (The witness reviews the document.)
5         Q.  And specifically I'm going to ask you to
6     compare it to Ernst & Young's work paper with the same
7     title.
8         A.  Okay.
9         Q.  And the reason why I'm asking you to compare
10    them is it appears that the document that is marked
11    Exhibit 6 is the same document that's contained within
12    Ernst & Young's work papers with the exception of the
13    handwritten notes that we've established are actually
14    your notes.
15            MR. KONOVALOV:  Objection; lacks --
16    BY MS. RADCLIFFE:
17        Q.  I just want you to compare the two to see if
18    that is your understanding.
19            MR. KONOVALOV:  Objection; lacks foundation
20    unless you're asking the witness to go line by line
21    through the document.  Are you representing that they're
22    the same but for the handwriting?
23            MS. RADCLIFFE:  I do not know that they're the
24    same.  I'm not making that representation.
25        Q.  But if you look at the report date at the
```

110

```
1     right hand of Exhibit 2, at 00231, and if you look at
2     the report date at what's been marked as Exhibit 6, it
3     appears to be the same date and time.
4             And if you look at the title of the document,
5     it also appears to be the same title.  They both read
6     "Account Analysis Report with Payables Detail from 01
7     NOV-00 through 30 NOV-00."
8             And if you want to familiarize yourself with
9     the documents, you can certainly take the time to do
10    that.
11            MR. KONOVALOV:  I don't mean to quibble.  When
12    you say exclusively the handwritten comments, you mean on
13    all three of the pages, correct?
14            MS. RADCLIFFE:  Yes, all of the handwritten
15    notations on EY 00231 through EY 000233.
16        A.  (The witness reviews the document.)
17    BY MS. RADCLIFFE:
18        Q.  Did you have an opportunity to review the two
19    documents, Mr. Bender?
20        A.  Yes.  I can't tell what's blacked out on
21    what's EY 000232 to compare those -- one, two, three,
22    four, five -- six amounts that are probably black
23    highlighted but come over as blacked out.  But other
24    than that, the totals are the same.
25        Q.  And precisely why on Exhibit 6, which at page
```

111

```
1     NDCA-ORCL 144609 -- if you take a look at the items
2     that are, for lack of a better word, blacked out on the
3     Ernst & Young work paper -- so, for example, where
4     there is a tick mark B, above that is the number
5     690,250 -- well, far more than that, but
6     692,415,514.97.
7         A.  Right.
8         Q.  And then below that on the Ernst & Young work
9     paper, it appears to be blacked out.  And then on the
10    document that's been marked as Exhibit 6, that number
11    reads $16,708,409.19?
12        A.  Um-hmm.
13        Q.  Do you have a recollection of whether this
14    approximately $16.7 million is the number that is
15    referenced in the Ernst & Young work paper with respect
16    to tick mark B?
17            MR. KONOVALOV:  Objection; calls for
18    speculation.  The document speaks for itself.
19            THE WITNESS:  I'd have to see the original work
20    paper.
21    BY MS. RADCLIFFE:
22        Q.  And do you believe that that information is
23    contained in the original work paper --
24        A.  Yes.
25        Q.  -- in readable form?
```

112

```
1         A.  Yes.
2         Q.  And if we make the assumption that the
3     $16.7 million referenced in Exhibit 6 is the same
4     number that's in the Ernst & Young work paper, and you
5     look at tick mark B and it says, "Entry relates
6     primarily to miscellaneous receipts which have been
7     either refunded or applied to a separate expense
8     account.  Oracle World, for example.  We reviewed a
9     sample of ten entries noting no entry made to revenue."
10            I believe we established that that's your
11    handwriting; is that correct?
12        A.  Right.
13        Q.  Do you know what ten entries Ernst & Young
14    reviewed?
15        A.  I don't recall, no.
16        Q.  Do you know where that's documented?
17        A.  I don't know.
18        Q.  Do you know if it was documented?
19        A.  I don't remember.
20        Q.  Do you recall any discussion about documenting
21    those entries?
22        A.  I don't recall, no.
23        Q.  Did anyone tell you not to document those
24    entries?
25        A.  No.
```

113

1    Q.  And if we make the assumption that it's the
2    approximately 16.7 million number, do you know how many
3    items -- how many cash receipts added up to the 16.7
4    million?
5        MR. KONOVALOV: Objection; incomplete
6    hypothetical and assumes facts not in evidence.
7        THE WITNESS: I don't know.
8    BY MS. RADCLIFFE:
9    Q.  Do you know if on EY 000232 -- if the entries
10   on the column which is marked "debits" --
11   A.  Yes.
12   Q.  -- consists of single-item entries or if they
13   are multiple items consolidated into a single entry?
14       MR. KONOVALOV: Objection; vague and ambiguous.
15       THE WITNESS: I don't know.
16   BY MS. RADCLIFFE:
17   Q.  With respect to tick mark B -- and it
18   indicates the entry relates primarily to miscellaneous
19   receipts?
20   A.  Um-hmm.
21   Q.  And it goes on to say, "Reviewed a sample of
22   ten entries." Would that indicate to you that that
23   entry was made up of multiple items?
24   A.  Yes.
25   Q.  And do you recall with respect to tick mark B

114

1    how many items that entry consisted of?
2    A.  I do not, no.
3    Q.  Do you know if it is documented anywhere in
4    Oracle's -- I mean -- excuse me -- Ernst & Young's work
5    papers?
6    A.  Not that I'm aware of, no.
7    Q.  Do you know if tick mark B was more than a
8    thousand items?
9    A.  I do not know.
10   Q.  Do you know how the sample of ten entries was
11   determined?
12   A.  It was not documented how we did it.
13   That's why I'm not sure how we did it. I don't recall.
14   Q.  Do you know if you performed the review of the
15   ten entries?
16   A.  I don't recall. But because I wrote the tick
17   mark, I would presume that I did, yes.
18   Q.  And do you have a recollection of what that
19   review entailed?
20   A.  Other than what's documented here, I don't
21   recall specific, no.
22   Q.  So the entry -- the tick mark B to the right
23   of it, it could have been more than a thousand entries;
24   you just can't determine from this work paper. Is that
25   correct?

115

1        MR. KONOVALOV: Objection; mischaracterizes the
2    witness's testimony.
3        THE WITNESS: I don't know how many items there
4    were.
5    BY MS. RADCLIFFE:
6    Q.  If you turn to EY 00234, -235, and -236 and
7    -237, which appear -- and correct me if I'm wrong -- to
8    be supporting documentation with respect to the tick
9    marks; is that correct?
10   A.  Yes.
11   Q.  Do any of those documents refresh your
12   recollection as to how many entries the number
13   designated at tick mark B consisted of?
14   A.  No.
15   Q.  And I'm actually -- actually -- I believe some
16   of these documents are also produced at Exhibit 3,
17   which was Ernst & Young's --
18   A.  Okay.
19   Q.  -- production of the best copies that it had
20   of these documents. And if you'd also look at those
21   because they're a little more readable than the ones
22   contained in Exhibit 2.
23       MR. KONOVALOV: You're again referring to 234
24   through 237, right?
25       MS. RADCLIFFE: Correct.

116

1        THE WITNESS: I'm sorry. Did you ask me a
2    question?
3    BY MS. RADCLIFFE:
4    Q.  Sure. Did that assist you at all in
5    determining whether the number of items -- that the
6    number which is blacked out next to tick mark B refers
7    to?
8    A.  No.
9    Q.  And do any of the documents at 235 -- excuse
10   me -- 234 to 237 document the ten entries that were
11   reviewed by Ernst & Young as referenced at tick mark B?
12   A.  I can't tell by these copies which tick mark
13   they relate to.
14   Q.  Do you know if there was a determination of
15   the items at tick mark B with respect to whether these
16   items were refunded?
17   A.  I'm sorry. Rephrase the question.
18   Q.  Do you know if the items -- the debits which
19   would consist of the number next to tick mark B which
20   we can't read, do you know if those -- if Ernst & Young
21   did an analysis of which of those items had been
22   refunded to customers?
23   A.  I don't recall doing that, no.
24   Q.  Do you know if there is any documentation
25   regarding any analysis by Ernst & Young with respect to

117

1   miscellaneous receipts being refunded to Oracle
2   customers?
3        A.   Not that's documented here, no.
4        Q.   Do you know if there was any analysis with
5   respect to the items next to tick mark B with respect
6   to whether miscellaneous receipts were applied to a
7   separate expense account as referenced in tick mark B?
8        A.   I'm sorry.  Rephrase the question.
9        Q.   Sure.  Do you know if there is any analysis by
10  Ernst & Young with respect to whether the items -- the
11  debits which consist of the number in tick mark B that
12  we can't read were applied to a separate expense
13  account?
14       A.   I don't recall doing a separate analysis, no.
15  I only recall what's documented here.
16       Q.   You know what the -- do you know where the
17  debits which are referenced next to tick mark B -- do
18  you know which accounts that those debits related to?
19       A.   Other than what's documented on this
20  EY 000232, I don't know.
21       Q.   And do you know -- I guess I -- strike that.
22       Do you know the approximate percentage of the
23  dollar value that would have been -- item next to tick
24  mark B, the ten entries that were sampled consisted of?
25       A.   No.

118

1        Q.   Do you know how you would find that out?
2        A.   Do I know how I would find that out?  I don't
3   know.
4        Q.   Did you know at the time that you performed
5   the engagement?
6        A.   I don't know if we did analysis on how much --
7   what percentage it was or not.
8        Q.   Do you know who was involved in identifying
9   the sample of ten entries?
10       A.   I don't recall.
11       Q.   Do you see under tick mark C?
12       A.   Um-hmm.
13       Q.   And we'll establish that's your handwriting,
14  correct?
15       A.   Yes.
16       Q.   Sorry.
17       A.   Sorry.
18       Q.   Under which looks like a number 2, there is a
19  reference to an additional discussion in the company
20  memo.
21       A.   Okay.  Yeah, I see that.
22       Q.   Do you know what the reference to "the company
23  memo" refers to?
24       A.   I don't recall specifically which memo it is.
25       Q.   And when it says "company memo," is that an

119

1   Ernst & Young memo or an Oracle memo?
2        A.   Oracle.
3        Q.   Do you recall if there were more than one
4   Oracle memos that Ernst & Young reviewed?
5        A.   I don't recall there being more than one memo
6   that was talking about the $692 million debit memos.
7        Q.   Do you know who provided Ernst & Young that
8   memo?
9        A.   I do not know.
10       Q.   Did you review that memo?
11       A.   I don't recall, although this tick mark
12  implies that we did.
13       Q.   Do you know if anyone else at Ernst & Young
14  reviewed that memo?
15       A.   I don't know.
16       Q.   Did you rely on the memo in -- strike that.
17       Did Ernst & Young rely on that memo in its
18  analysis of the debit memo transactions at Oracle?
19            MR. KONOVALOV:  Objection; calls for
20  speculation.
21            THE WITNESS:  Can you expand on "rely"?
22  BY MS. RADCLIFFE:
23       Q.   Sure.  The note here says, "The remaining 700
24  million relates to" -- and I think it says "normal
25  processing of cash receipts during month.  See

120

1   additional discussion in company memo."
2        A.   Okay.
3        Q.   Would the company memo be part of Ernst &
4   Young's documentation of the procedures that it
5   performed?
6            MR. KONOVALOV:  Objection; incomplete
7   hypothetical, assumes facts not in evidence.
8            THE WITNESS:  I don't recall.  When we refer to
9   it in a tick mark, generally it is.
10  BY MS. RADCLIFFE:
11       Q.   And on the first part of No. 2, it says --
12  under C-2, I should say -- it says, "Apply cash to
13  debit memo.  See memo from Oracle for further
14  discussion."
15       Do you know if that's separate from the memo
16  that's described below?
17       A.   I don't know.
18       Q.   Is it your understanding that Ernst & Young's
19  review of the debits at tick mark C consisted of a
20  review of memos from Oracle based on this notation?
21       A.   I'm sorry.  Can you rephrase the question?
22       Q.   Sure.  Is it your understanding that Ernst &
23  Young's review of the debits at tick mark C consisted
24  of a review of the memos provided by Oracle?
25            MR. KONOVALOV:  Objection; lacks foundation.

121

1   The document speaks for itself.

2        THE WITNESS:  To answer your question, the way I

3   read it, the memo discusses $692 million of debit memos.

4   And what we looked at was noting that since they made

5   that entry twice in this particular line item, that 1.4

6   billion that is discussed in the company memo.

7   BY MS. RADCLIFFE:

8        Q.   You see below it says that, "We further

9   reviewed a sample of ten other entries noting

10  allocation of cash receipt and that no amount was

11  recorded as revenue"?

12       A.   I see that, yes.

13       Q.   Do you recall reviewing a sample of ten

14  additional entries as described in this tick mark?

15       A.   I don't recall -- I don't recall right now.

16  But if we said we did it, we did it.

17       Q.   Do you know if there is any documentation with

18  respect to the review of ten additional entries as

19  noted in this tick mark?

20       A.   Other than what's documented here, no.

21       Q.   Do you know who would have performed that

22  review?

23       A.   I don't know who performed it.  But it's my

24  tick mark, so I may have.

25       Q.   Do you recall which customers the debit memos

122

1   that were reviewed related to?

2        A.   No.

3        Q.   Do you recall if there was a minimum threshold

4   that was used as a sample for the ten entries?

5        A.   No.

6        Q.   Do you know if that review of the sample of

7   the ten entries was discussed with Oracle?

8        A.   It would not have been discussed with Oracle.

9        Q.   Do you know if it was discussed internally at

10  Ernst & Young?

11       A.   I don't know.

12       Q.   Do you know who would know?

13       A.   At Ernst & Young?

14       Q.   Yes.

15       A.   Me.

16       Q.   And do you know who would know outside of

17  Ernst & Young?

18       A.   I don't know if the members of the team would

19  remember that, no.

20       Q.   If you'd review Exhibit 2, can you tell me if

21  the company memo referenced in tick mark C is part of

22  the documents contained within Exhibit 2?

23       A.   I don't believe it is, no.

24       Q.   Do you recall reviewing a copy of that memo

25  when you drafted tick mark C?

123

1        MR. KONOVALOV:  Objection; asked and answered.

2        THE WITNESS:  I don't recall, no.

3   BY MS. RADCLIFFE:

4        Q.   Do you recall with respect to tick mark B how

5   you determined what the entry related to?

6        A.   I don't recall, no.

7        Q.   Do you recall the entry related to

8   miscellaneous receipts?

9        A.   I'm sorry?

10       Q.   Do you recall the entry at tick mark B, the

11  number, relating to miscellaneous receipts?

12       A.   I don't recall the specifics of any of the

13  items.

14       Q.   Do you recall discussing the issue of

15  miscellaneous receipts with anyone at Oracle?

16       A.   I don't recall, no.

17       Q.   Do you recall issuing the -- do you recall

18  discussing the issue of miscellaneous receipts with

19  anyone at Ernst & Young related to the debit memos?

20       A.   I don't recall, no.

21       Q.   With respect to the debits on this report, do

22  you know if E&Y determined how old each of these items

23  were?

24       A.   I don't recall.  It's not a document that we

25  did.

124

1        Q.   If Ernst & Young had made that determination,

2   would it be documented?

3        MR. KONOVALOV:  Objection; incomplete

4   hypothetical.

5        THE WITNESS:  If we decided that it was an

6   important procedure in this matter, we would have

7   documented it, yes.

8   BY MS. RADCLIFFE:

9        Q.   Do you know if that determination was made?

10       MR. KONOVALOV:  Same objection; assumes facts

11  not in evidence.

12       THE WITNESS:  I don't recall making that

13  determination, no.

14  BY MS. RADCLIFFE:

15       Q.   Do you recall any discussion with anyone about

16  how old the debits were?

17       A.   No.

18       Q.   Tick mark B, do you recall the source from

19  which the ten entries were selected?

20       MR. KONOVALOV:  Objection; vague and ambiguous

21  as to "source."

22       THE WITNESS:  I don't recall, no.

23  BY MS. RADCLIFFE:

24       Q.   Do you recall if they were selected from

25  Oracle's general ledger reports?

125

1      A.  I don't recall exactly where they came from,

2    no.

3        Q.  Do you know if it is documented anywhere where

4    those items came from?

5        A.  I don't recall.

6        Q.  Do you know why the source of those ten

7    entries was not documented?

8        MR. KONOVALOV:  Objection; vague and ambiguous.

9        THE WITNESS:  I don't know why we didn't

10   document where they came from.

11   BY MS. RADCLIFFE:

12       Q.  Do you recall with respect to the item at tick

13   mark B, the one we can't read -- but the other

14   document, Exhibit 6, refers to it as 6.7 million.  And

15   you've indicated that the original work papers -- that

16   you probably could review that number.  Would that be

17   correct?

18       MR. KONOVALOV:  Objection; assumes facts not in

19   evidence.

20       Sorry.  Go ahead.

21       THE WITNESS:  The tick mark B number?

22   BY MS. RADCLIFFE:

23       Q.  Yes.

24       A.  I think we could, yes.

25       MR. KONOVALOV:  Just for the record, I think the

126

1    number is 16.7, not 6.7.

2        MS. RADCLIFFE:  Thank you for the clarification.

3    16.7 million.

4        Q.  Do you recall whether the entry next to tick

5    mark B was routine with respect to Oracle?

6        MR. KONOVALOV:  Could you read that question

7    back, please.

8        (The record was read back as follows:

9        "Q.  Do you recall whether the entry next to

10       tick mark B was routine with respect to

11       Oracle?")

12       MR. KONOVALOV:  Objection; lacks foundation and

13   calls for speculation.

14       THE WITNESS:  I don't recall having a

15   conversation about whether or not those were routine.

16   BY MS. RADCLIFFE:

17       Q.  Do you recall whether there was any analysis

18   by Ernst & Young of whether or not the debits next to

19   tick mark B were routine?

20       A.  No.

21       Q.  Do you recall whether there was any analysis

22   by Ernst & Young with respect to whether any of the

23   debits listed on EY 00232 were routine?

24       A.  No.

25       Q.  With respect to the account analysis report at

127

1    EY 00231 to -233, do you know if Ernst & Young reviewed

2    the corresponding credit entries to the debits listed

3    on these pages?

4        A.  We didn't do anything on 231, and the

5    procedures that we performed on 232 are noted.

6        Q.  And is there any reference in those procedures

7    that Ernst & Young reviewed the corresponding credit

8    entries?

9        A.  Tick mark C indicates that no amount was

10   recorded as revenue, which would indicate that we

11   looked at debits and credits.  We were looking at the

12   journal entries, and tick mark B has the same note

13   noting no entry made to revenue.

14       Q.  And do you know if Ernst & Young documented

15   the review of the corresponding credit entries?

16       A.  You mean in addition to the documentation

17   here?

18       Q.  Correct.

19       A.  No.

20       Q.  Do you know if Ernst & Young reviewed Oracle's

21   board minutes in 2Q '01 in performing its engagement

22   with respect to the debit memos?

23       A.  Not that I recall, no.

24       Q.  If Ernst & Young had reviewed the board

25   minutes, would that be something that would typically

128

1    be maintained in Ernst & Young's work papers?

2        MR. KONOVALOV:  Objection; incomplete

3    hypothetical.

4        THE WITNESS:  Yes.

5    BY MS. RADCLIFFE:

6        Q.  And can you explain Ernst & Young's practice

7    with respect to maintaining board minutes in its work

8    papers in its engagement that it has been hired to

9    perform professional services?

10       A.  When we perform audits or quarterly reviews,

11   the professional standards require that we look at

12   minutes of the board of directors or committees of the

13   board of directors, and we generally retain those

14   minutes in our work papers.

15       Q.  And with respect to this engagement, was this

16   an agreed-upon procedure, this engagement?

17       A.  Not in a technical sense, no.

18       Q.  Could you explain what you mean by "not in a

19   technical sense"?

20       A.  We were engaged to perform specific

21   procedures.  We didn't issue any report or any findings

22   to the company in writing, is my recollection.

23       Q.  Do you know if there was any oral report to

24   the company of findings or conclusions?

25       A.  Not that I was part of, no.

129

1      Q.  Do you know if anyone else at Ernst & Young

2 was part of an oral report conveyed to Oracle?

3      A.  I don't know.

4      Q.  Do you know who would know?

5      A.  John Banker.

6      Q.  Do you know if Mr. Cotton would know?

7      A.  I don't know.

8      Q.  Did you ask Mr. Cotton?

9      A.  No.

10      Q.  Are you familiar with the AICPA attestation

11 standards?

12      A.  Yes.

13      Q.  Do you know if E&Y conducted this engagement

14 in accordance with the AICPA attestation standards?

15      A.  I would have to go back and look at our work

16 papers to what exactly we had agreed to do in terms of

17 this procedure.

18      Q.  And other than what has been marked as

19 Exhibit 2, are there additional work papers that are

20 not contained in Exhibit 2 that would provide you that

21 information?

22      A.  Not that I'm aware of, no.

23      Q.  So is there anything in Exhibit 2 that would

24 indicate to you that Ernst & Young conducted this

25 engagement in accordance with the AICPA attestation

130

1 standards?

2      A.  I believe that we did, yes.

3      Q.  And what leads you to believe that Ernst &

4 Young did?

5      A.  I would have to review the actual attestation

6 standards to determine which -- how these procedures

7 would fit into those models.

8      Q.  And which portions of the attestation

9 standards would you have to review?

10      A.  I'd have to look at the listing.  I don't know

11 it off the top of my head.

12      Q.  Do you know if Ernst & Young obtained an

13 engagement letter or obtained a written agreement from

14 Oracle defining the terms in the scope of the

15 engagement?

16      A.  As I indicated earlier, I'm not aware of it.

17      Q.  Do you know if Ernst & Young obtained an

18 assertion from Oracle which E&Y agreed to report on?

19      A.  I'm not aware of that, no.

20      Q.  Do you know what the purpose of the engagement

21 was?

22      A.  Other than --

23      MR. KONOVALOV:  Objection; calls for

24 speculation.

25      MS. RADCLIFFE:  I asked him if he knew.

131

1      MR. KONOVALOV:  Same objection.

2      THE WITNESS:  Other than what's documented in

3 our memo.

4      BY MS. RADCLIFFE:

5      Q.  And the memo beginning at 143.

6      A.  Yes.  At 143, yes.

7      Q.  And did you have an understanding of why

8 Oracle engaged Ernst & Young to perform this

9 engagement?

10      A.  I don't know specifically why they asked

11 Ernst & Young, no, other than the fact that we were

12 their current existing independent auditors.

13      Q.  And do you know if Ernst & Young issued a

14 report to Oracle concerning its procedures that it

15 would perform with respect to this engagement?

16      MR. KONOVALOV:  Could you read that back,

17 please.

18      (The record was read back as follows:

19      "Q.  And do you know if Ernst & Young issued a

20        report to Oracle concerning its procedures

21        that it would perform with respect to this

22        engagement?")

23      MR. KONOVALOV:  Well, vague as to time.

24 You can answer the question.

25      THE WITNESS:  Not that I'm aware of.

132

1      BY MS. RADCLIFFE:

2      Q.  Do you know if E&Y provided any assurance to

3 Oracle concerning the work performed in connection with

4 the engagement?

5      MR. KONOVALOV:  I'm sorry.  Was it "assurance"

6 or "insurance"?

7      MS. RADCLIFFE:  Assurance.

8      THE WITNESS:  Not that I am aware of, no.

9      BY MS. RADCLIFFE:

10      Q.  Do you know if there were any communications

11 between E&Y and Oracle's audit committee in connection

12 with this engagement?

13      A.  I was not part of any, no.

14      Q.  Do you know if anyone else at Ernst & Young

15 was part of any communication with the Oracle's audit

16 committee with respect to this engagement?

17      A.  Not that I'm aware of.

18      Q.  Did you ask Mr. Cotton if he was -- if he

19 participated in communication with Oracle's audit

20 committee?

21      A.  I did not, no.

22      Q.  I believe you testified earlier -- and please

23 correct me if I'm wrong -- that the engagement team at

24 Ernst & Young determined what procedures E&Y would

25 perform with respect to this engagement.  Is that

133

1    correct?

2         A.  A subset of total engagement team.

3         (Interruption)

4    THE WITNESS:  A subset of the entire Oracle

5    engagement team.

6    BY MS. RADCLIFFE:

7         Q.  And that was Mr. Banker, yourself, and --

8         A.  Megan Birkler and Ashley Gemma and David Roque

9    on the script review.

10        Q.  And is there anyone else on the engagement

11   team that we missed?

12        A.  No.

13        Q.  So you said there was a subset, and I'm just

14   trying to understand if it's a subset -- if there was

15   anyone else beyond the individuals you just mentioned

16   who were part of that determination.

17        A.  The only individuals that worked on this

18   engagement were John Banker, Ashley Gemma, Megan

19   Birkler, David Roque, and myself, to the best of my

20   knowledge.

21        Q.  So the entire engagement team participated in

22   determining what procedures Ernst & Young would perform

23   with respect to this engagement?

24        A.  No.  Just the people associated with this

25   matter.  The five people I just noted to you.

134

1         Q.  Okay.  I just -- we're probably going to have

2    to clarify something.  When you say -- when we refer to

3    "Oracle's engagement team," are you also considering

4    Oracle's engagement team with respect to its reviews,

5    accounting reviews quarterly and fiscal 2001?

6         A.  Yes.

7    MS. RADCLIFFE:  Okay.  And so we're just going

8    to change the tape, and we'll go with that further.

9    THE WITNESS:  Okay.

10   THE VIDEO OPERATOR:  This marks the end of

11   Videotape No. 2, Volume I, in the deposition of Alex

12   Bender.  Going off the record, the time is 1:57.

13        (A break was taken.)

14   THE VIDEO OPERATOR:  This marks the beginning of

15   Videotape No. 3, Volume I, in the deposition of Alex

16   Bender.  The time is 2:09.  We are back on the record.

17   BY MS. RADCLIFFE:

18        Q.  Before the break, we were discussing

19   Oracle's -- I apologize -- Ernst & Young's -- the

20   members of Ernst & Young who were performing work on

21   this particular engagement regarding debit memos.  Do

22   you recall that?

23        A.  I do.

24        Q.  And do you know if Ernst & Young was ever

25   asked to determine whether any of the debit memos

135

1    related to customer overpayments?

2         A.  I don't recall that request, no.

3         Q.  Do you recall whether Ernst & Young ever

4    performed any analysis with respect to whether any of

5    the debit memos related to customer overpayments?

6         A.  I don't recall that specifically, no.

7         Q.  Do you know if that is documented anywhere in

8    Ernst & Young's work papers?

9         A.  The only documentation that it -- I don't

10   think we documented anything as it relates to an

11   analysis of customer overpayments, no.

12        Q.  Do you know if there was any review of -- with

13   respect to customer overpayments by Ernst & Young?

14        A.  Not specifically, no.

15        Q.  Was there generally a review with respect to

16   over-- -- customer overpayments by Ernst & Young?

17   MR. KONOVALOV:  In connection with this

18   engagement or --

19   MS. RADCLIFFE:  Yes.

20   THE WITNESS:  In connection with this

21   engagement?

22   BY MS. RADCLIFFE:

23        Q.  Yes.

24        A.  No.  But when you look at Account 25005,

25   customer overpayments would be part of that.  But we

136

1    didn't specifically test or review anything related to

2    customer overpayments specifically.

3         Q.  Did you ever look at any remittances?

4         A.  I don't recall looking at remittances, no.

5         Q.  Do you know if Oracle provided Ernst & Young

6    with any information regarding customer overpayments?

7         A.  No.  On EY 000236, there is something noted as

8    "Refund to Ford," but I don't know if that was for a

9    customer repayment or not.

10        Q.  And do you know, based on the materials that

11   Oracle provided Ernst & Young, if Ernst & Young could

12   make the assessment whether any of the cash receipts

13   that had been applied to the debit memos were actually

14   customer overpayments?

15        A.  I don't recall that, no.

16        Q.  Do you recall any discussion with respect to

17   Ernst & Young increasing the scope of its procedures?

18        A.  In general?

19        Q.  With respect to this particular engagement.

20        A.  No.

21        Q.  Do you know when the procedures were defined

22   by Ernst & Young with respect to this engagement?

23        A.  I don't remember the specific time frame, no.

24        Q.  Were the procedures defined before Ernst &

25   Young began work with respect to this particular

---

137

1    engagement?
2        A.  Yes.
3        Q.  And do you recall the length of time between
4    when the procedures were finalized and when Ernst &
5    Young began work with respect to this particular
6    engagement?
7        A.  I don't recall a specific time frame, no.
8        Q.  Do you recall if it was more than a week?
9        A.  It wouldn't have been more than a week, no.
10       Q.  Do you recall if it was more than a day?
11       A.  I think -- my recollection is that we talked
12   about what we were going to do in an afternoon and we
13   went to the company the next day.
14       Q.  When you say you went to the company the next
15   day, you're referring to Oracle, right?
16       A.  I'm sorry.  Yes.  Went to their shared service
17   center in Rocklin, California.
18       Q.  Do you know why Ernst & Young began their
19   procedures at the shared service center in Rocklin?
20       A.  That's where the information was.
21       Q.  And what information are you referring to?
22       A.  The information that we needed to do the
23   procedures as outlined in our memo at Exhibit 143.
24       Q.  And do you recall what form that information
25   that you reviewed at the shared service center in

---

138

1    Rocklin came in?
2        A.  Uh.
3        Q.  In other words --
4        A.  I don't recall any more than what's documented
5    in our memo.
6        Q.  Do you know if Ernst & Young ever made any
7    determination that the debit memos related to customer
8    overpayments?
9        A.  No.
10       Q.  With respect to Item No. 6 on Exhibit 1, the
11   Schedule A --
12       A.  Okay.
13       Q.  -- are you the person most knowledgeable at
14   Ernst & Young to testify about Item 6?
15       A.  Yes.
16       Q.  Do you know if Ernst & Young performed work
17   for Oracle relating to internal controls in Oracle's
18   fiscal year 2001?
19       A.  We did not.
20       Q.  Do you know if Ernst & Young performed any
21   professional services related to Oracle's accounting
22   systems in Oracle's fiscal year 2001?
23       A.  Not that I'm aware of, no.
24       Q.  Do you know if E&Y performed any work related
25   to Oracle's fiscal year 2001 with respect to Oracle's

---

139

1    accounting policies and procedures?
2        A.  We did not, no.
3        Q.  Do you know if E&Y provided any accounting
4    advice or recommendations with respect to Oracle's
5    fiscal year 2001 or its quarterly filings?
6        A.  Not that I recall, no.
7        Q.  With respect to Item No. 7 on Schedule A, "Any
8    consultations or communications between E&Y's audit or
9    review personnel assigned to engagement and E&Y's
10   department of professional practice," are you the
11   person most knowledgeable at Ernst & Young to discuss
12   that topic?
13       A.  At Ernst & Young I would be, yes.
14       Q.  Is there anyone besides yourself who would be
15   more knowledgeable?
16       A.  John Banker would.
17       Q.  Do you recall if there were any consultations
18   or communications between E&Y's audit or review
19   personnel assigned to the debit memo engagement and
20   E&Y's department of professional practice?
21       A.  Regarding the debit memo procedures?
22       Q.  Yes.
23       A.  I don't know.
24       Q.  If there was such a communication, would it be
25   documented at Ernst & Young?

---

140

1        MR. KONOVALOV:  Objection; incomplete
2    hypothetical.
3        THE WITNESS:  It depends on the -- it depends on
4    the consultation.
5    BY MS. RADCLIFFE:
6        Q.  If you needed to determine whether or not
7    there was a consultation with respect to this
8    engagement, do you know how you would go about
9    obtaining that information at Ernst & Young?
10       A.  I don't know that I could at Ernst & Young.
11       Q.  Is this something that Ernst & Young's
12   department of professional practice could be consultant
13   related?
14       A.  In terms of whether or not we did consult with
15   them?
16       Q.  Yes.
17       A.  The only way I would believe you could do that
18   would be to look at time-sheet records to see if
19   someone had noted it on their time sheet.
20       Q.  And do you know if the time-sheet records for
21   this engagement, related to the debit memos, were
22   reviewed prior to this deposition?
23       MR. KONOVALOV:  Objection; asked and answered.
24       THE WITNESS:  I do not know.  I did not, no.
25   BY MS. RADCLIFFE:

---

141

1    Q.  With respect to Item No. 8 on Schedule A, were
2    there any communications, relating to the engagement,
3    between Ernst & Young and Arthur Andersen or
4    individuals formerly at Arthur Andersen?
5    A.  Not that I'm aware of, no.
6    Q.  Do you know if there were any communications,
7    relating to this engagement, between Ernst & Young and
8    the SEC?
9    A.  Not that I'm aware of, no.
10   Q.  Do you know if there were any communications,
11   related to this engagement, between Ernst & Young and
12   the AICPA?
13   A.  No, I don't know.
14   Q.  Do you know if there were any communications,
15   relating to the engagement, between Ernst & Young and
16   the Department of Justice?
17   A.  Not that I recall, no.
18   Q.  Do you know if there were any communications,
19   relating to the engagement, between Ernst & Young and
20   the Federal Bureau of Investigation?
21   A.  No.
22   Q.  Has Ernst & Young ever been consulted, with
23   respect to its services performed for Oracle, by the
24   Federal Bureau of Investigation?
25        MR. KONOVALOV:  I think you may want to rephrase

142

1    that.  I think things got a little turned around there.
2    BY MS. RADCLIFFE:
3    Q.  Sure.  Has Ernst & Young ever been consulted
4    by the Federal Bureau of Investigation with respect to
5    Oracle?
6    A.  Not that I'm aware of.
7    Q.  Are you aware of any communications, relating
8    to this engagement, between Ernst & Young and Oracle's
9    attorneys?
10   A.  No.
11   Q.  Are you aware of any communications, relating
12   to this engagement, between Ernst & Young and Oracle
13   other than the communications we discussed earlier
14   today?
15   A.  No, not that I'm aware of.
16   Q.  Are you aware of any communications, relating
17   to the engagement, between Ernst & Young and Larry
18   Ellison?
19   A.  No, not that I'm aware of.
20   Q.  Are you aware of any communications, relating
21   to this engagement, between Ernst & Young and Jeff
22   Henley?
23   A.  Not that I'm aware of, no.
24   Q.  Do you know if Mr. Henley was consulted at all
25   with respect to the conclusions that Ernst & Young

143

1    reached with respect to this engagement?
2    A.  Not that I was a part of, no.
3    Q.  Do you know if Mr. Cotton might know if there
4    were communications with Mr. Henley regarding this
5    engagement?
6    A.  I don't know.
7    Q.  Did you ask Mr. Cotton if there were
8    communications with Mr. Henley regarding this
9    engagement?
10   A.  No.
11   Q.  Do you know if there were any communications,
12   relating to this engagement, between Ernst & Young and
13   Edward "Sandy" Sanderson?
14   A.  No, I'm not aware of any.
15   Q.  And with respect to the communications we just
16   went over, A through J -- and feel free to reference
17   those -- are you the person most knowledgeable at
18   Ernst & Young with respect to those communications?
19   A.  I don't know.
20   Q.  Do you know who would know?
21   A.  John Banker would know.
22   Q.  Would Mr. Cotton know?
23   A.  Maybe.  I don't know.
24   Q.  Do you know if Ernst & Young's counsel would
25   know?

144

1    A.  I don't know.
2    Q.  Did you do anything, prior to this deposition,
3    to inquire as to communications, relating to this
4    engagement, with those entities and individuals listed
5    in A through J in the schedule?
6    A.  No.
7    Q.  With respect to Item No. 9 on the schedule,
8    "The identification and content of all communications
9    between E&Y and Oracle or its representatives regarding
10   the production of documents responsive to the subpoena
11   issued to E&Y on December 8, 2004," are you the person
12   most knowledgeable at Ernst & Young with respect to
13   that topic?
14   A.  I don't know.
15   Q.  Do you know who would know?
16   A.  I believe John Banker would know.  I'm not
17   sure if Andrew Cotton would know.
18   Q.  Do you know if Ernst & Young's counsel would
19   know?
20   A.  I don't know.
21   Q.  Did you do anything, prior to this deposition,
22   to inquire about these communications, if any?
23   A.  No.
24   Q.  Have you seen the subpoena issued to Ernst &
25   Young on or about December 8, 2004, regarding

145

1   documents?
2       A.  No.
3       MS. RADCLIFFE:  I'm just going to mark the next
4   exhibit in order, which I believe is Exhibit 7.
5       (Exhibit No. 7 was marked for identification by
6   the reporter.)
7   BY MS. RADCLIFFE:
8       Q.  If you could just take a minute, Mr. Bender,
9   to review that document.
10      A.  Okay.
11      Q.  Were you ever asked to preserve the documents
12  that are requested in Items 1 through 12 of this
13  document?
14      MR. KONOVALOV:  Well, I feel like, out of
15  respect for the witness, who doesn't have counsel
16  present, he should at least be advised the scope of the
17  subpoena was significantly limited by the discovery plan
18  in the case.  If you want to represent that to him, that
19  might be helpful.
20      MS. RADCLIFFE:  I'm just asking him if he was
21  ever asked to preserve the documents listed on Items 1
22  through 12.
23      MR. KONOVALOV:  That would suggest he had a
24  legal obligation to do that when, in fact, he didn't
25  since it was narrowed in scope, but --

146

1       MS. RADCLIFFE:  Well, we can disagree between
2   production and preservation, but I'm just asking if he
3   was ever requested to preserve the documents listed on
4   Items 1 through 12.
5       THE WITNESS:  I was requested to keep all the
6   documents that we had related to this matter, yes.
7   BY MS. RADCLIFFE:
8       Q.  And do you recall when that request was made?
9       A.  I don't recall, no.
10      Q.  Do you recall what year it was made?
11      A.  No, I'm sorry, I don't know.
12      Q.  Do you recall if it was prior to December of
13  2004?
14      A.  I really don't remember.
15      Q.  And when I asked you previously if you knew
16  about communications between E&Y and Oracle regarding
17  the production of documents responsive to the subpoena
18  issued on December 8, 2004, this is the subpoena I was
19  referring to.  In reviewing this subpoena, does that
20  change your response in any way?
21      A.  No.
22      Q.  If you could turn the page of the schedule
23  which is attached to Exhibit 1.
24      A.  In the subpoena?
25      Q.  Yes.  We have two subpoenas now, so you're

147

1   going to want Exhibit 1 instead of Exhibit 7.
2       A.  Okay.  I'm sorry.  What page?
3       Q.  It's page 4 of the Schedule A.
4       A.  Starting with 10?
5       Q.  Correct.
6       A.  Okay.
7       Q.  Are you the person most knowledgeable at
8   Ernst & Young with respect to documents provided to
9   Ernst & Young by Oracle in connection with the
10  engagement related to the debit memos?
11      A.  Yes.
12      Q.  And are you the person most knowledgeable at
13  Ernst & Young with respect to any online access to
14  Oracle's general ledger or accounting modules provided
15  to Ernst & Young?
16      A.  Yes.
17      Q.  And with respect to the documents provided to
18  Ernst & Young by Oracle in connection with the debit
19  memo engagement, are there any other documents beyond
20  those that we discussed today that were provided by
21  Oracle to Ernst & Young?
22      A.  Not that I recall.
23      Q.  And we haven't discussed this previously, but
24  did Ernst & Young have any access to Oracle's general
25  ledger or accounting modules via computer?

148

1       A.  Yes.
2       Q.  And could you explain that access?
3       A.  We were granted access -- I don't recall
4   specifically -- I don't recall specifically.
5       In our memo on page 000144, we note:  We
6   obtained online access to the company's, Oracle,
7   applications, and in parentheses, its online GL or
8   GSIAP, end parens, and reviewed the accounting
9   distribution lines for all debit memos issued on
10  November 17, 2000, greater than.  Then it goes into
11  what our population was that we tested.
12      Q.  And to your knowledge, is that the extent of
13  the access that Ernst & Young was provided to Oracle's
14  general ledger or accounting modules?
15      A.  Yes.
16      Q.  And was it that access that required Ernst &
17  Young to be on-site at Oracle?
18      A.  Yes.
19      Q.  And was Ernst & Young supervised when it was
20  provided access to Oracle's general ledger and
21  accounting modules?
22      A.  I don't recall.
23      Q.  Do you know who at Ernst & Young reviewed
24  Oracle's information electronically?
25      A.  Ashley Gemma and Megan Birkler.

149

1    Q.  Did you yourself?

2    A.  I don't recall.  But I was out there, and I

3  wouldn't be surprised if I had been shown how they were

4  doing it.

5    Q.  And you mentioned -- I think it was GSIAP.  Is

6  that a correct reference in 144?

7    A.  Yes.

8    Q.  Do you know what that refers to?

9    A.  I don't know exactly what it refers to, no.

10   Q.  Do you know if that's documented anywhere else

11  besides page 144 of Ernst & Young's documents that are

12  in Exhibit 2?

13   A.  No.

14   Q.  Do you know who would know?

15   A.  I believe anyone in the accounting department

16  at Oracle would know.

17   Q.  Do you recall whether Ernst & Young requested

18  of Oracle online access to the company's applications?

19   A.  I don't recall how we got access, no.

20   Q.  Do you recall if Ernst & Young required access

21  to the company's applications in order to perform its

22  procedures?

23   A.  I don't believe it was required.  The company

24  could have generated screen-shot prints of every

25  selection that we had if that would have been requested

150

1  by Ernst & Young.

2    Q.  Do you know if Ernst & Young had requested

3  screen-shot prints?

4    A.  I don't recall, no.

5    Q.  Do you know specifically what data Ernst &

6  Young looked at with respect to Oracle's applications

7  online?

8    A.  I don't recall exactly what data we were

9  looking at other than what's documented in our memo,

10  which is the data -- the accounting distribution lines.

11   Q.  Do you know what that refers to?

12   A.  That refers to the debits and the credits of

13  journal entries.

14   Q.  Do you know if Ernst & Young looked at the

15  debits and credits for all 46,000 -- approximately

16  46,000 debit notes?

17   A.  No.  Our memo specifically states we did a

18  sample.

19   Q.  And it also indicates in EY 00144 that Ernst &

20  Young reviewed the online GL.  Do you know what that

21  refers to?

22   A.  General ledger.

23   Q.  And do you know why Ernst & Young reviewed

24  Oracle's online general ledger?

25   A.  I don't recall why, no.  As I previously

151

1  mentioned, it may have been a way for us to -- it may

2  have been facilitation of our testing.

3    Q.  Do you know what the purpose of reviewing the

4  general ledger was?

5    A.  Yes.

6    Q.  Ernst & Young.  And what was that?

7    A.  To look at the accounting distribution lines

8  for the sample -- the journal entries that we had

9  selected.

10   Q.  And other than this memo, starting EY 00143,

11  is there anything else that documents what Ernst &

12  Young did with respect to reviewing Oracle's online

13  applications?

14   A.  No, not that I'm aware of.

15   Q.  With respect to Item 11 of Exhibit 1, the

16  Schedule A, do you know how many hours Ernst & Young

17  spent on the engagement with respect to the debit

18  memos?

19   A.  I don't know.

20   Q.  Do you know the compensation that Ernst &

21  Young received with respect to the engagement related

22  to the debit memos?

23   A.  I don't know.

24   Q.  Do you know how you would obtain that

25  information?

152

1    A.  I would have to go back to our time-sheet

2  information for the hours spent, and I would look to

3  see if we have records of our internal billing system

4  that go back that far to see what -- and I'd have to

5  pull up a sample of invoices to see which invoices we

6  had submitted for compensation.

7    Q.  And did you or anyone at Ernst & Young

8  undertake that task prior to your deposition here

9  today?

10   A.  No, not that I'm aware of.

11   Q.  Were you asked?

12   A.  No.

13   Q.  With respect to Item No. 12, the

14  "identification of the hard-copy and electronic files

15  searched for production of documents responsive to

16  plaintiffs' December 8, 2004, subpoena issued to

17  Ernst & Young."

18        And so the record's clear, that that subpoena's

19  been previously marked as Exhibit 7.  So if you need to

20  refer to it, go ahead.

21        Do you know which hard-copy files were searched

22  at Ernst & Young for documents responsive to that

23  subpoena?

24   A.  I don't know.

25        MR. KONOVALOV:  Once again, I think we -- since

153

1   the witness isn't represented by counsel, I think we have
2   an obligation to inform him that the scope of that
3   subpoena has been narrowed.  This question is now going
4   beyond just preservation.  You're asking for now his
5   search for responsive documents.  So I would just suggest
6   that if you're going to state the question as you are,
7   it's misstating the record.
8   BY MS. RADCLIFFE:
9       Q.  Do you know if hard-copy files -- which
10  hard-copy files were searched for documents to be
11  produced by Ernst & Young to plaintiffs in this
12  litigation?
13      A.  I don't know.
14      Q.  Do you know which electronic files, if any,
15  were searched for production of documents to plaintiffs
16  in this litigation?
17      A.  I don't know.
18      Q.  Do you know who would know?
19      A.  I don't know who would know.
20      Q.  Who would you ask if you wanted to find out?
21      A.  General counsel's office.
22      Q.  Do you know who would undertake the task of
23  physically looking at hard-copy or electronic files in
24  response to a document request or subpoena in a
25  litigation?

154

1       A.  I'm not aware of that person, no.
2       Q.  Do you know who -- I should ask you first,
3   where are the -- where is the engagement work papers
4   and binder related to this engagement currently kept?
5   In which Ernst & Young office?
6       A.  To the best of my knowledge, it's in the
7   Los Angeles office, in our general counsel's office.
8       Q.  And do you know where it was kept prior to it
9   being moved to the Los Angeles office?
10      A.  Yes.  It would have been in a locked file
11  cabinet in the Walnut Creek office.
12      Q.  And I think you mentioned the Walnut Creek
13  office no longer exists.  Is that correct?
14      A.  That's correct.
15      Q.  So was it -- do you know if it was moved --
16  these files were moved prior to the closure of the
17  Walnut Creek office?
18      A.  They were.
19      Q.  And you indicated that they would have been
20  maintained in a locked file cabinet.  Do you know who
21  had access to that file cabinet?
22      A.  I do know who had access to it.
23      Q.  Who was it?
24      A.  Me and one other senior manager.
25      Q.  And who would that be?

155

1       A.  Paul Charron.
2       Q.  And is Mr. Charron involved at all with the
3   Oracle account?
4       A.  Not anymore.
5       Q.  Was he at one time?
6       A.  He was, yes.
7       Q.  And what was his involvement with the Oracle
8   account?
9       A.  As I previously mentioned, he was one of the
10  senior managers on the fiscal 2002 and 2003 audits.
11      Q.  And was he consulted at all with respect to
12  the engagement related to the debit memos?
13      A.  He was not.
14      Q.  Did you ever discuss the engagement related to
15  the debit memos with Mr. Charron?
16      A.  No.
17      Q.  Do you know who physically took the documents
18  from the locked file cabinet and provided them to the
19  general counsel's office in Los Angeles?
20      A.  I did.
21      Q.  And do you recall when that happened?
22      A.  I don't.
23      Q.  Do you recall approximately when it was?
24      A.  I'm sorry.  I don't.
25      Q.  But it was prior to the closure of the Walnut

156

1   Creek office, correct?
2       A.  Absolutely.  Yes.
3       Q.  With respect to Item No. 13 of Schedule A,
4   "The addition of all communications relating to or with
5   Oracle's special litigation committee."
6           Are you the person most knowledgeable at Ernst &
7   Young with respect to communications Ernst & Young had
8   with Oracle's special litigation committee?
9       A.  No.
10      Q.  Who would be the most knowledgeable?
11      A.  John Banker would be the most knowledgeable.
12      Q.  Anyone else?
13      A.  I don't know.
14      Q.  If you wanted to find out, who would you ask
15  at Ernst & Young?
16      A.  I would ask Andrew Cotton or general counsel's
17  office.
18      Q.  Did you ever have any communications while you
19  were at Oracle --
20      A.  At Ernst & Young?
21      Q.  Thank you.
22          Did you ever have any communications at Ernst &
23  Young with anyone about Oracle's special litigation
24  committee?
25      A.  No, other than people on the engagement team

157

1  related to this matter.

2       Q.  And who on the engagement team did you have

3  conversations with related to this matter?

4       A.  John Banker, Megan Birkler, and Ashley Gemma.

5       Q.  And do you recall any of those communications?

6       A.  Not specifically, no.  They would have all

7  been about the procedures that we were performing and

8  our findings.

9       Q.  Did you have any conversations with Mr. Banker

10 about his interview with the special litigation

11 committee?

12      A.  No.

13      Q.  Did you have any conversations with

14 Ms. Birkler about the -- about Mr. Banker's interview

15 with the special litigation committee?

16      A.  No, I wouldn't know anything about it.

17      Q.  Did you know that Mr. Banker was interviewed

18 by the special litigation committee?

19      A.  I don't know that he was.  We never talked

20 about if and when he was or what was discussed at the

21 special litigation committee.

22      Q.  Do you have an understanding that Mr. Banker

23 was interviewed?

24      A.  My understanding was that he was, yes.

25      Q.  And how did you come to that understanding?

158

1       A.  I honestly don't know.  Probably through

2  discussions with general counsel's office.

3       Q.  And with respect to Mr. Banker, do you recall

4  generally any communications you had with him related

5  the Oracle's special litigation committee?

6       A.  No.

7       Q.  And with respect to Ms. Birkler, did you

8  recall -- do you recall any communications that you had

9  with her related to Oracle's special litigation

10 committee?

11      A.  I don't recall ever having a communication

12 with her about the special litigation committee.

13      Q.  What about Ms. Gemma?

14      A.  Ms. Gemma is the same.  I do not recall having

15 a conversation with her about it.

16      Q.  With respect to Item No. 14, which is "The

17 identification of all documents exchanged between E&Y

18 and its representatives and Oracle's special litigation

19 committee," are you the person most knowledgeable at

20 Ernst & Young with respect to the identification of

21 those documents?

22      A.  No.

23      Q.  Who would be?

24      A.  John Banker.

25      Q.  Anyone else?

159

1       A.  I don't know.

2       Q.  Did you inquire of anyone at Ernst & Young

3  regarding the identification of documents exchanged

4  between Ernst & Young and its representatives and

5  Oracle's special litigation committee prior to your

6  deposition here today?

7       A.  No.

8       Q.  Did you review any documents related to the

9  exchange of documents between Ernst & Young and its

10 representatives and Oracle's special litigation

11 committee prior to your deposition here today?

12      A.  No, I'm not aware of any.

13      Q.  Did you see Subject Matter 15?

14      A.  Yes.

15      Q.  John Banker's interview with the Oracle's

16 special litigation committee and any changes to the

17 memorandum at -- and it references EY 00010 to EY 0012,

18 which is attached to the schedule as well.

19      A.  Oh, okay.

20      Q.  Prior to today, did you review the documents

21 at EY 00010 to EY 00012?

22      A.  No, I did not.

23      Q.  Were you aware that the Oracle special

24 litigation committee had submitted a report related to

25 Oracle's debit memo transactions in the second quarter

160

1  of Oracle's fiscal year 2001?

2           MR. KONOVALOV:  Objection; mischaracterizes the

3  evidence.

4           THE WITNESS:  No.

5  BY MS. RADCLIFFE:

6       Q.  With respect to Item No. 15, are you the

7  person most knowledgeable with respect to John Banker's

8  interview with Oracle's special litigation committee?

9       A.  No.

10      Q.  And is your answer the same with respect to

11 the changes reflected on EY 10 through 12?

12      A.  Yes.

13      Q.  And do you know if anyone else at Ernst &

14 Young would be more knowledgeable than yourself?

15      A.  I don't know.

16      Q.  Did you inquire of anyone whether or not they

17 had information related to Mr. Banker's interview

18 and/or changes to the memorandum at 10 to 12 prior to

19 your deposition here today?

20      A.  No.

21      Q.  Were you asked to inquire with anyone at

22 Ernst & Young prior to your deposition today with

23 respect to these matters in Subject Matter 15?

24      A.  No.

25      Q.  If you could turn to EY -- actually, we're

161

1  going to mark the next document in order, which I think
2  we're on Exhibit 8.
3      (Exhibit No. 8 was marked for identification by
4  the reporter.)
5  BY MS. RADCLIFFE:
6      Q.  If you could take a minute to review that
7  document, Mr. Bender.
8      A.  Okay.
9      Q.  Did you have an opportunity to review what's
10  been marked as Exhibit 8?
11      A.  Yes.
12      Q.  And I think we can make the safe assumption
13  based on your testimony earlier that you have not seen
14  that document before.  Is that correct?
15      A.  That's correct.
16      Q.  And for the record, the document is the
17  interview of John Banker by the special litigation
18  committee of Oracle Corporation.
19      MR. KONOVALOV:  Counsel, is the handwriting on
20  the first page on the original document, or is that
21  something that's been added to it?
22      MS. RADCLIFFE:  I believe that that's on the
23  original copy that we have.
24      MR. KONOVALOV:  Okay.
25      MS. RADCLIFFE:  And that the Bates numbers are

162

1  NDCA-ORCL 296428 through 296434.  And so that the record
2  is clear, it's a summary of the interview and not an
3  actual verbatim transcript.
4      THE WITNESS:  Okay.
5  BY MS. RADCLIFFE:
6      Q.  And I'm going to ask you a series of questions
7  about the information in this document.  And I know you
8  haven't seen it before, so if you don't know the
9  answer, let us know.  Okay?
10      Under the heading "E&Y's General Relationship to
11  Oracle," which is on page 2 of the document, at the third
12  and fourth sentences, it says, "As a standard part of the
13  initial audit of a new client, E&Y reviewed the work
14  papers of the prior auditor.  Banker stated that this
15  review was limited to ensuring that beginning balances of
16  accounts for FY 2001 appeared reasonable."
17      Is that your understanding of Ernst & Young's
18  review -- the scope of its review of Arthur Andersen's
19  work papers?
20      A.  I would agree with the requirement and the
21  purpose for the review of the Andersen work papers,
22  although it would have been the beginning balances for
23  the fiscal 2002 audit.  It would have been the ending
24  balances for fiscal 2001.
25      Q.  And so you disagree with this document to the

163

1  extent it says, "Banker stated that this review was
2  limited to ensuring that the beginning balances of
3  accounts for FY 2001 appeared reasonable"?  And you
4  would make the modification that it would be for FY
5  2002?
6      A.  What I would do is just clarify that.  What
7  we're doing is looking at work papers for fiscal 2001
8  such that the beginning balances of fiscal 2002 or the
9  day after the end of fiscal 2001 were appropriate -- or
10  were reasonable.
11      Q.  And do you recall what Ernst & Young did to
12  determine whether the beginning balances for fiscal
13  2002 were reasonable?
14      A.  Do I remember what we did?
15      Q.  Yes.
16      A.  We reviewed Arthur Andersen's work papers.  We
17  did what John said we did here.
18      Q.  And with respect to Andersen's work papers,
19  what did you look at within those work papers to
20  determine that the beginning balances for FY 2002
21  appeared reasonable?
22      A.  We looked at their audit work papers for
23  fiscal 2001, and we would have looked at their
24  internal-control work papers, their planning work
25  papers, the conclusion work papers to the degree they

164

1  made them available, their information technology work
2  papers, and all of their work papers related to the
3  account-balance testing and the conclusions reached.
4      Q.  And you mentioned before that some of
5  Andersen's work papers for fiscal 2001 may have been
6  retained by Ernst & Young, hard copies.  Is that
7  correct?
8      A.  Yes.
9      Q.  And of the work papers that you just
10  mentioned, do you recall if any of those were retained
11  by Ernst & Young?
12      A.  They -- there would be a subset of work papers
13  regarding all of the categories that I mentioned with
14  the exception of their planning documents.  They
15  probably wouldn't share that with us.
16      Q.  Do you recall the volume of the work papers
17  that was provided by Andersen to Ernst & Young for its
18  review?
19      A.  Not specifically, but generally it's two to
20  four audit binders.
21      Q.  Do you recall if there were any electronic
22  work papers?
23      A.  I don't recall there being electronic work
24  papers.
25      Q.  And do you know if E&Y documented what it did

165

1    to determine if the beginning balances for FY 2002

2    appeared reasonable?

3        A.   We had a memorandum in our work papers as part

4    of the fiscal 2002 audit.

5        Q.   If you turn to the top of the next page, and

6    it reads, "Banker's primary contacts at Oracle are

7    Jennifer Minton," and then it provides her title, "Tom

8    Williams," provides his title, and "Mike Quinn"?

9        A.   Yes.

10       Q.   Do you recall, besides the individuals you

11   mentioned earlier today, Greg Meyers and Julie Chan, if

12   there were any other contacts Ernst & Young had at

13   Oracle?

14       A.   No.

15       Q.   Do you know if these individuals listed on

16   this document, Jennifer Minton, Tom Williams, and Mike

17   Quinn, were Ernst & Young's contacts related to the

18   debit memo engagement?

19       A.   This document indicates that they were John's

20   primary contacts, yes.  And Mike Quinn was located in

21   Rocklin.  I believe he was -- he was part of getting us

22   documentation as part of these procedures, yes.

23       Q.   And do you know how Ernst & Young communicated

24   with these individuals, Jennifer Minton, Tom Williams,

25   and Mike Quinn, whether it was face-to-face, email, in

166

1    person, telephone?

2        A.   I don't know specifically.  Mike Quinn -- I

3    interacted with Mike Quinn face-to-face and via

4    telephone.  I don't recall communicating with him via

5    email.

6        Q.   Do you recall what your conversations were

7    with Mr. Quinn?

8        A.   Not specifically, no.

9        Q.   Do you recall generally?

10       A.   Generally it would have been about the

11   procedures we were performing in getting the

12   appropriate information.

13       Q.   Did you ever have any difficulty obtaining the

14   information that you were requesting from Oracle?

15       A.   No.

16       Q.   If you go to the next section, under

17   "Accounting Fraud Allegation in Second Amended

18   Class-Action Complaint."  First, have you ever read the

19   second amended class-action complaint filed in the

20   northern district of California?

21       A.   I did, yes.

22       Q.   And do you see the portion that says:  The

23   committee summarized for Banker the accounting fraud

24   allegations in the second amended complaint,

25   specifically with regard to the November 17, 2000,

167

1    debit memos and the alleged 228 million increase to

2    revenue?

3        A.   Um-hmm.

4        Q.   Do you know if that summary was in written

5    form?

6        A.   I don't know.

7        Q.   Did Mr. Banker ever convey to you that he was

8    provided a summary of the allegations in the second

9    amended complaint by the special litigation committee?

10       A.   No.

11       Q.   Did you ever have an understanding that the

12   special litigation committee had provided Ernst & Young

13   a summary of the accounting fraud allegations in the

14   second amended complaint?

15       A.   I don't recall that, no.

16       Q.   The next section says, "The committee and

17   Banker also discussed the general background of the

18   Oracle accounting processes that caused the

19   accumulation of the 'on account' items, as well as the

20   use of the debit memos to redesignate the 'on account'

21   flags."

22           Do you know what Ernst & Young's understanding

23   was of the accounting processes that caused the

24   accumulation of "on account" items at Oracle?

25       A.   I don't recall other than what's documented in

168

1    our memos.

2        Q.   Other than what's documented in Exhibit 2, is

3    there any other documentation of those processes by

4    Ernst & Young?

5        A.   No, not by Ernst & Young.

6        Q.   Do you know why Mr. Banker would not have

7    documented his communications with Oracle's special

8    litigation committee?

9           MR. KONOVALOV:  Objection; assumes facts not in

10   evidence, calls for speculation.

11          THE WITNESS:  I don't know.

12   BY MS. RADCLIFFE:

13       Q.   Do you know if documentation exists with

14   respect to Mr. Banker's communications with the

15   Oracle's special litigation committee?

16       A.   I don't know.

17       Q.   Prior to your deposition here today, did you

18   consult with anyone at Ernst & Young whether or not

19   Mr. Banker had communications with anyone at Oracle

20   related to the debit memos?

21       A.   No.

22       Q.   And just so the record is clear, which

23   documents in Ernst & Young's work papers reflect its

24   understanding of Oracle's accounting processes that

25   cause the accumulation of the "on account" items?

169

1  　　　A.  I'm sorry.  Rephrase the question.

2  　　　Q.  Sure.  If you could identify which documents

3  in Ernst & Young's work papers reflect Oracle's

4  accounting processes that cause the accumulation of "on

5  account" items.

6  　　　A.  In what you provided me here in Exhibit 2, I

7  don't see anything other than the company's policy as

8  it relates to unapplied cash, starting with 000250

9  through -259 in our memo.

10  　　　Q.  And did Ernst & Young have an understanding

11  that Oracle used debit memos to redesignate "on

12  account" items?

13  　　　A.  We knew they did this in this particular

14  matter.  Yes, we did know that.

15  　　　Q.  And how did Oracle come to that understanding?

16  　　　A.  As part of our testing and interaction with

17  the client.

18  　　　Q.  And where is that documented?

19  　　　A.  In our memo.

20  　　　Q.  Is there anywhere else it's documented?  And

21  the memo is starting at 143.

22  　　　A.  No.  Well, the script review clearly shows

23  that's what they are doing as well.

24  　　　Q.  Do you know if there was any analysis of

25  whether the script that Oracle ran altered historical

170

1  data with respect to the debit memos?

2  　　　MR. KONOVALOV:  Objection; assumes facts not in

3  evidence.

4  　　　THE WITNESS:  I'm not aware of it altering

5  historical data, no.

6  BY MS. RADCLIFFE:

7  　　　Q.  If you move down this memo, it says, "The

8  committee reviewed with Banker its conclusions."  And

9  it goes on into the first, second, third, and fourth

10  conclusions.

11  　　　Were you aware that Mr. Banker had reviewed the

12  special litigation committee of Oracle's conclusions with

13  respect to the second amended complaint as of what

14  appears to be an interview on November 13th and

15  November 18th?

16  　　　A.  No.

17  　　　Q.  Do you know if Ernst & Young's engagement with

18  respect to the debit memos began prior to November 13,

19  2002?

20  　　　A.  It did.

21  　　　Q.  And how do you know that?

22  　　　A.  Our memo's dated October 22, 2002.

23  　　　Q.  And would that be the date that the engagement

24  ended or the date the engagement started?

25  　　　A.  It may not be indicative of either.  It's

171

1  indicative of when the memo was written.  So it's --

2  generally speaking, we would have certainly started by

3  this point.  Whether or not we were absolutely done --

4  it probably wasn't.  I see John's signature on 11/02,

5  so it wouldn't have been completed by then.

6  　　　Q.  It wouldn't have been completed by

7  November 13th?

8  　　　A.  I don't know if it was completed by

9  November 13th or not.  It was completed in November at

10  some point.

11  　　　Q.  Do you recall -- only because it's kind of a

12  landmark -- if it was completed by Thanksgiving of

13  November 2002?

14  　　　A.  I don't recall specifically, no.

15  　　　Q.  Did Ernst & Young, to your knowledge, have an

16  understanding that it was the special litigation

17  committee's position that Oracle had refunded customer

18  overpayments, including those items identified in the

19  second amended complaint, prior to November 17, 2000?

20  　　　MR. KONOVALOV:  Objection; assumes facts not in

21  evidence, mischaracterizes the document.

22  　　　THE WITNESS:  I'm not aware of that, no.

23  BY MS. RADCLIFFE:

24  　　　Q.  Do you know if there was any analysis or

25  testing done by Ernst & Young whether Oracle had

172

1  refunded customer overpayments with respect to the

2  debit memos prior to November 17, 2000?

3  　　　A.  Not that I recall, unless they were part of

4  the samples that we had selected that were referenced

5  in Exhibit 000232.

6  　　　Q.  And based on your review of Ernst & Young's

7  work papers, which I believe 00232 then references back

8  to -234 to -237, is there any indication from that

9  documentation that Oracle had refunded customer

10  overpayments prior to November 17, 2000?

11  　　　A.  I can't tell from looking at these documents,

12  no.

13  　　　Q.  Other than the documents you just mentioned,

14  is there any other documentation that would reflect

15  Ernst & Young reviewed or tested whether Oracle had

16  refunded customer overpayments related to the debit

17  memos prior to November 17, 2000?

18  　　　A.  Not that I'm aware of, no.

19  　　　Q.  Do you know if in the course of Ernst &

20  Young's engagement with respect to the debit memos

21  whether it had reviewed Oracle's daily revenue for 2Q

22  '01?  Second quarter of '01.

23  　　　A.  If we reviewed the daily revenue?

24  　　　Q.  Yes.

25  　　　A.  I don't recall reviewing daily revenue, no.

173

1      Q.  Do you know if -- with respect to Ernst &

2   Young's engagement with respect to the debit memos

3   whether E&Y ever reviewed the variance between the

4   first quarter of fiscal '01 and the second quarter of

5   fiscal '01 with respect to Oracle's unapplied cash?

6          MR. KONOVALOV:  Objection; lacks foundation.

7          THE WITNESS:  What we had reviewed was a

8   roll-forward of the Account 25005 for November of 2000 as

9   well as August 2000.

10  BY MS. RADCLIFFE:

11     Q.  And is that documented in Ernst & Young's work

12  papers?

13     A.  It's hard to read, but I believe it's 000150

14  and -151.

15     Q.  Do you know if there is any other

16  documentation?

17     A.  Our memo is the only one I can refer to.  It

18  has memo 143.

19     Q.  If you look at the -- what's been marked as

20  Exhibit 3.  There is also copies of 150 and 151, and

21  that might be easier to read, though I'm not making any

22  promises.

23     A.  It's hard to read.  It doesn't clarify it for

24  me, no.

25     Q.  Do you believe it would be easier to read on

174

1   the original work papers?

2      A.  Unless I look at them, I can't definitively

3   answer that, but --

4      Q.  That's a fair answer.

5          Do you know if E&Y ever reviewed a list of items

6   that comprised the 25005 account balance?

7      A.  I'm sorry.  Rephrase the question.

8      Q.  Sure.  Do you know if E&Y ever reviewed a list

9   of items that comprised the 25005 account balance?

10     A.  I believe, if you look at the account analysis

11  of 25005 as shown in 231, it showed the listing of all

12  the different entries during the month of November with

13  the ending balance that we've previously discussed.

14     Q.  And it is that -- do you know if that's a

15  complete list of the items that comprise the 25005

16  account balance?

17     A.  This is what was provided to us and this is

18  what -- this is the document that I believe was agreed

19  to the general ledger.  So I do believe it's complete.

20     Q.  Do you know if Ernst & Young ever performed

21  any reviews or tests of the committee's conclusions as

22  set forth in Exhibit 8?

23     A.  I'm not sure how to answer that question other

24  than we did perform separate, independent procedures as

25  documented in our memorandum that relate to certain of

175

1   those conclusions.

2      Q.  I guess I should clarify the question.  Do you

3   know if Ernst & Young was ever asked to test or review

4   the conclusions that the special litigation committee

5   made with respect to the second amended complaint, as

6   set forth on page 2, on that third paragraph down in

7   Exhibit 8?

8      A.  I don't recall, no.

9      Q.  Do you know who would know?

10     A.  If anyone would know, it would be John Banker.

11     Q.  And if you go down, there is -- on Roman

12  numeral -- or No. 1 there -- actually No. 1, it says,

13  "November 17, 2000, Debit Memos and the 'On Account'

14  Items."  And it says, "Banker noted that he was

15  initially skeptical because Oracle had allowed the 'on

16  account' items to accumulate for so long."

17         Do you know if Ernst & Young had an

18  understanding of how long the "on account" items had

19  accumulated?

20     A.  I'm not aware of that, no.

21     Q.  Do you know if there was any testing done or

22  review done by Ernst & Young with respect to how long

23  the items had accumulated?

24     A.  No.  As I mentioned earlier, we did not.  I

25  don't recall doing that, no.

176

1      Q.  Were you aware that Mr. Banker had expressed

2   some skepticism regarding the accumulation of the "on

3   account" items?

4          MR. KONOVALOV:  Objection; mischaracterizes the

5   document.  You might want to encourage the witness to

6   read the entire paragraph in context.

7   BY MS. RADCLIFFE:

8      Q.  You can go ahead and answer the question.

9          MR. KONOVALOV:  And the objection is it

10  misstates the document.

11         THE WITNESS:  I'm sorry.  Can you rephrase the

12  question?

13  BY MS. RADCLIFFE:

14     Q.  Sure.  Were you aware that Mr. Banker had

15  noted some skepticism regarding Oracle allowing the "on

16  account" items to accumulate?

17     A.  I don't recall John having skepticism, no.

18     Q.  Did he ever express any skepticism to you?

19     A.  No.

20     Q.  Were you aware that Mr. Banker had -- if

21  Mr. Banker had discussed the accumulation of the "on

22  account" items with Tom Williams of Oracle?

23     A.  Other than what's noted in this memo, no.

24     Q.  And prior to reading this memo, were you aware

25  that Mr. Banker had a communication with Mr. Williams

177

1   regarding the accumulation of the "on account" items?
2       A.   Not that I recall, no.
3       Q.   Do you know who at Oracle -- excuse me.  Do
4   you know who at Ernst & Young would know?
5       A.   John Banker.
6       Q.   Anyone currently at Ernst & Young would have
7   more knowledge than yourself?
8       A.   I don't know.
9       Q.   Do you know who you would ask to find out?
10      A.   Andrew Cotton or general counsel's office.
11      Q.   As you see on the next page, page 3, on the
12  first full paragraph, it says, "Banker informed the
13  committee that, pursuant to principles agreed to with
14  Oracle, E&Y has performed its own testing of the
15  November 7, 2000, debit memos to observe their effect
16  on General Ledger Account 25005 and Oracle's revenue."
17          Does that refresh your recollection whether or
18  not there were any principles with respect to Ernst &
19  Young's engagement that were agreed to with Oracle?
20      A.   No.
21      Q.   Do you know if there is any documentation
22  regarding principles agreed to with Oracle regarding
23  its debit memo engagement?
24      A.   Not that I recall, no.
25      Q.   Do you believe that sentence to be inaccurate?

178

1       A.   I have no reason to believe it's inaccurate.
2       Q.   Do you have any reason to believe it's
3   accurate?
4       A.   Just from reading this, no, I have no
5   recollection of any discussion between John and the
6   committee.
7       Q.   See the next sentence.  It says, "E&Y reviewed
8   a set of debit memos selected from the November 17,
9   2000, debit memos.  The set comprised 200 items."
10          Now, if you turn to EY 00023 --
11      A.   143?
12      Q.   143.
13      A.   144?
14      Q.   143 and 144 -- there is a reference in this
15  particular document to what appears to be 195 debit
16  memos.
17      A.   There's 195.  Yes.
18      Q.   Do you know if there were any debit memos
19  which Ernst & Young reviewed but could not reconcile
20  the debit and credits as offsetting?
21      A.   No.
22      Q.   Do you believe this statement that Ernst &
23  Young reviewed a set of debit memos comprising of 200
24  items is inaccurate?
25      A.   It's 195 items.  Yes.

179

1       Q.   Do you know if Ernst & Young in the course of
2   its engagement related to the debit memos -- whether it
3   looked at the increase in miscellaneous receipts from
4   2000 to 2001?
5           MR. KONOVALOV:  Objection; assumes facts not in
6   evidence.
7           THE WITNESS:  I don't recall doing that
8   specifically.
9   BY MS. RADCLIFFE:
10      Q.   Do you recall whether there was an increase in
11  the miscellaneous receipts from 2000 to 2001?
12      A.   I don't recall that, no.
13      Q.   Do you know if that is documented at all in
14  Oracle's work papers?
15      A.   In Ernst & Young's work papers?
16      Q.   Ernst & Young.  Thank you.
17      A.   Not that I -- not that I recall, no.
18      Q.   Do you know if Ernst & Young in the course of
19  its review or engagement related to the debit memo
20  transactions ever looked at the transfers to
21  Account 12601?
22      A.   No, I don't recall that specifically.  No.
23      Q.   Do you recall if they looked at the transfers
24  to the bad-debt reserve?
25      A.   For which period?

180

1       Q.   All.
2       A.   I don't recall, no.
3       Q.   Do you know if Ernst & Young would have
4   documented any review of transfers to the bad-debt
5   reserve with respect to its engagement related to the
6   debit memos?
7           MR. KONOVALOV:  Objection; incomplete
8   hypothetical, assumes facts not in evidence.
9           THE WITNESS:  If we would have done something, I
10  believe we would have documented it, yes.
11  BY MS. RADCLIFFE:
12      Q.   And I believe earlier you testified that if
13  Ernst & Young believed something was important, it
14  would be documented.  Is that correct?
15      A.   It's generally true, yes.
16      Q.   Do you know if Ernst & Young did any analysis
17  with respect to the debit memo engagement where -- I'm
18  sorry -- which account the miscellaneous receipts came
19  from?
20      A.   No, I don't recall us doing that.
21      Q.   Do you know if that is documented anywhere in
22  Ernst & Young's work papers?
23      A.   EY 000150 and -151 shows the rule for 25005.
24  It appears to indicate miscellaneous receipts, refunds,
25  trade receivables, and journal entries to roll forward

181

1    the balance for those two months. So that's when we

2    would have reviewed it, I would believe.

3        Q. And is there any supporting documentation in

4    Ernst & Young's work papers regarding that review?

5        A. There's a paragraph on page 000145 and the

6    beginning of page starting at "We further obtained"

7    that would document what we looked at the items that

8    were part of the beginning and ending balances for

9    November 2000 and August 2000 and looking at the

10    similarity of those items.

11        Q. And was that for each specific item or -- it

12    appears here to be looking at the balance.

13        A. It looks like the roll-forward of the

14    Account 25005.

15        Q. And if you go back to what's been marked

16    Exhibit 8, I believe -- and this is in the part that

17    E&Y reviewed a set of debit memos selected from the

18    November 17, 2000, debit memos. Does that comprise 200

19    items, 145 of them greater than 500,000 and the

20    remainder randomly selected? And I believe we've

21    established that's 195 items.

22        And the document goes on to say, "E&Y observed

23    that all of the debit memos tested had equal and

24    offsetting debits and credits with zero effect on

25    Account 25005. In addition, E&Y observed that the debit

182

1    memos had no effect upon Oracle's revenues."

2        Do you know if Ernst & Young reviewed the

3    underlying transactions related to the debit memos?

4        A. Can you be more specific.

5        Q. Do you know if it reviewed the receipts

6    related to the debit memos?

7        A. I don't believe we looked at that. We looked

8    at the journal entries to process the debit memos

9    referred to here.

10        THE VIDEO OPERATOR: This marks the end of

11    Videotape No. 3, Volume I, in the deposition of Alex

12    Bender. The time is 3:26. We are off the record.

13        (A break was taken.)

14        THE VIDEO OPERATOR: This marks the beginning of

15    Videotape No. 4, Volume I, in the deposition of Alex

16    Bender. The time is 3:35. We're back on the record.

17    BY MS. RADCLIFFE:

18        Q. Before the break, we were -- I was asking you

19    whether Ernst & Young ever looked at the underlying

20    transactions related to the general -- related to the

21    debit memos, and we started with receipts, whether

22    Ernst & Young ever looked at the receipts related to

23    the debit memos.

24        I also asked you if Ernst & Young ever looked at

25    the general ledger activity with respect to each of the

183

1    debit memos that it reviewed.

2        A. When you say "general ledger activity," we did

3    look at the journal entries to remove these items from

4    the "on account" status --

5        Q. And --

6        A. -- which would be reviewed in the general

7    ledger.

8        Q. Is there anything else that you looked at?

9        A. Nothing that I recall, no.

10        Q. And is there any documentation of Ernst &

11    Young ever looking at anything else besides the journal

12    entries?

13        A. On Exhibit 232 we talked about looking at ten

14    other entries for both tick marks B and C. That would

15    have included that as well.

16        Q. And I think we discussed earlier that there is

17    no documentation with respect to the review of those

18    ten entries identified in B and C beyond what is on

19    those tick marks; is that correct?

20        A. I don't recall if there is, no.

21        Q. Do you recall if the sample of 195 items that

22    Ernst & Young looked at was the number that Ernst &

23    Young initially sought to review when it began to

24    undertake the procedures related to its engagement?

25        A. Yes.

184

1        Q. And I asked a slightly different question

2    earlier, but do you know if Ernst & Young looked at the

3    remittance invoices for each of the cash receipts

4    related to the debit memo that it reviewed?

5        A. We didn't look at their remittances for each

6    debit memo, no.

7        (Interruption)

8        THE WITNESS: We did not look at their

9    remittance advices for the debit memos, no, not that I

10    recall.

11    BY MS. RADCLIFFE:

12        Q. Do you know if Ernst & Young looked at any

13    general activity preceding the debit memos to determine

14    why specific items were put "on account"?

15        MR. KONOVALOV: Was that proceeding?

16        THE WITNESS: Preceding?

17        MS. RADCLIFFE: Preceding.

18        THE WITNESS: No. Not that I recall, no.

19    BY MS. RADCLIFFE:

20        Q. Do you know if there is any documentation of

21    Ernst & Young undertaking that effort?

22        A. I'm not -- I am not familiar with that, no.

23        Q. Do you know why Ernst & Young did not

24    undertake that effort with respect to the debit memo

25    transactions?

185

1      A.  I don't know why specifically, no.

2      Q.  Do you know why generally?

3      A.  I don't think we were requested to do so.

4      Q.  And who would have made that request?

5      A.  Based on what I've read here, I presume the

6  special committee -- the special litigation committee.

7      Q.  And do you have any understanding that it was

8  a special litigation committee who set forth the

9  parameters of Ernst & Young's review of the debit

10  memos?

11      A.  As I mentioned before, only through reading

12  this memo that -- and talking with general counsel that

13  that's how it came about.  But I was not part of those

14  conversations, no.

15      Q.  Do you know in Ernst & Young's review of the

16  debit memos whether the debit memos transactions had any

17  effect on Oracle's income for fiscal quarter 2001?

18      A.  Based on procedures performed, it did not.

19      Q.  And are those procedures the ones set forth in

20  the memo at EY 00143 and the script?

21      A.  Yes.

22      Q.  Do you know if there was any evidence that

23  Ernst & Young uncovered in its review that the

24  underlying debit memo transactions had any effect on

25  income?

186

1      A.  Say it one more time.  I'm sorry.

2      Q.  Sure.  Do you know if Ernst & Young ever

3  learned in its review that the underlying debit memo

4  transactions had any effect on income?

5      A.  Based on our procedures, they did not have any

6  impact on income.

7      Q.  And do you know where that's documented in the

8  work papers?

9      A.  On page 144.  Just give me one second.  I'll

10  read this.

11      Q.  Certainly.  Take your time.

12      A.  So on page 144, in the middle of the page, it

13  says, "The accounting distribution lines for all items

14  tested show the debit to Account 25005 and a

15  corresponding credit to Account 25005."  And in

16  parentheses, "We note no financial statement impact."

17      Q.  And is your understanding that that means

18  no impact on the income?

19      A.  Yes, income part of the financial statements.

20      Q.  And I just want to clarify.

21      A.  And I was going to finish my answer.

22      Q.  Go ahead.

23      A.  On page 145, "In the review of Account 25005,

24  we note, based upon our review and testing, it appears

25  that no revenue was booked as a result of reversing

187

1  amounts from Account 25005."

2          And then under the deferred revenue analysis,

3  "Based upon our review of the company's deferred

4  revenue balances in Q2 '01, the changes in the balance

5  appeared reasonable and consistent with similar

6  quarters of previous and subsequent years, indicating

7  no inappropriate activity with revenue."

8      Q.  Let me see if I can clarify two things.

9      A.  Sure.

10      Q.  Is there a difference between an impact on

11  income and impact on revenue?

12      A.  Sure.

13      Q.  And so can there be an impact on income but

14  not an impact on revenue?

15      A.  There could, yes.

16      Q.  Do you know if Ernst & Young specifically

17  tested whether or not there was an impact on Oracle's

18  income in the second quarter of fiscal 2001?

19      A.  Yes.  We looked at the credits, and the

20  credits were always the balance sheet -- the same

21  balance-sheet account.

22      Q.  And other than this memo, is there any other

23  documentation of that?

24      A.  No, not that I'm aware of.

25      Q.  And when I say "memo," EY 00143, just so the

188

1  record's clear.

2      A.  Right.

3      Q.  And I think I asked two different questions,

4  and I want to make sure your answer is the same for

5  both.  I first asked with respect to whether there was

6  any impact on income with respect to the debit memo

7  transactions that Ernst & Young tested.

8          The second question is whether or not there

9  was any -- if Ernst & Young learned whether or not

10  there was any impact from the underlying transactions

11  to the debit memos on income.

12          MR. KONOVALOV:  Objection; vague and ambiguous.

13          THE WITNESS:  To answer the first question, we

14  did not note any items that impacted income as part of

15  our testing.  And the answer to your second question, we

16  did not become aware of any items in the underlying

17  transactions that had an impact on income.

18  BY MS. RADCLIFFE:

19      Q.  And did you -- did Ernst & Young test those

20  underlying transactions, the invoices, the receipts for

21  each of the debit memos?

22      A.  No.  I'd already answered that.  No, we did

23  not.

24      Q.  And if you could look back to the Banker memo,

25  which is Exhibit 8, there is a portion that says -- and

189

1   it starts on page 3, third -- or second full paragraph
2   down.
3        It says, "In addition, E&Y examined transfers
4   from Account 25005 to see whether there was a single
5   large entry that would be consistent with the
6   accounting fraud allegations claim that Account 25005
7   was the source of $228 million in revenue on
8   November 17th.
9        "Banker stated that E&Y found nothing to
10  indicate any such transfer.  Banker also stated that
11  there was nothing in the materials that E&Y reviewed
12  that indicated to E&Y that plaintiffs' claims about the
13  November 17, 2000, debit memos had any veracity."
14       Do you see that?
15  A.  I do.
16  Q.  If you turn to E -- what is attached to
17  Schedule A or you can look at Exhibit 2, EY 0010 to --
18  to -12.  Exhibit 1, the subpoena, it's attached to that
19  document.
20  A.  Okay.
21  Q.  And EY 00010.
22  A.  Okay.
23  Q.  And this particular document in Ernst &
24  Young's work papers, EY 00010 to EY 0012, do you know
25  whose files this document came from?

190

1   A.  I do not know.
2   Q.  If you turn to EY 00011.  At the bottom of the
3   first paragraph there, the full paragraph -- it goes
4   almost to the bottom of the page -- do you see where
5   it's crossed out?
6        It says, "Banker stated that E&Y found nothing
7   to indicate any such transfer.  Banker also stated that
8   there's nothing in the materials that E&Y had reviewed
9   that indicated to E&Y that plaintiffs' claim about the
10  November 17, 2000, debit memos had any veracity."
11  A.  Are we back in the memo or this document?
12  Q.  Well, it's the same language in both
13  Exhibit 8, the memo, and --
14  A.  Yeah.  I read it in the memo, yes.
15  Q.  -- EY 0011.  Do you see where it's crossed out
16  in EY 0011, that -- those particular sentences?
17  A.  I see that, yes.
18  Q.  Do you know why it was crossed out?
19  A.  I don't know.
20  Q.  Do you know who crossed off that?
21  A.  No.
22  Q.  Do you know who you would ask in Ernst & Young
23  to find out why it was crossed out?
24  A.  I don't know who I'd ask.
25  Q.  Do you know if Ernst & Young performed any

191

1   testing to indicate whether or not there was a large
2   entry debiting Account 25005 and crediting revenue in
3   the amount of 228 million on November 17, 2000?
4        MR. KONOVALOV:  Objection; assumes facts not in
5   evidence.
6        THE WITNESS:  We performed an analysis -- the
7   account analysis on 25005 in November 2000 as well as the
8   account roll-forward in August and November of 2000.
9   BY MS. RADCLIFFE:
10  Q.  And do you recall what Ernst & Young's
11  conclusions were with respect to any such transfer
12  based on that analysis?
13  A.  Based on that analysis, we didn't find any --
14  we didn't note any inappropriate activity in those
15  accounts.
16  Q.  And is that based solely on the documentation
17  in Ernst & Young's work papers?
18  A.  To my recollection, yes.
19  Q.  Do you know -- if you turn to EY 00011, the
20  sentence that said -- that is crossed out that says,
21  "Banker also informed the committee that E&Y had no
22  material questions that remain unanswered by Oracle on
23  this issue."
24  A.  I see that's crossed out.
25  Q.  And you see down at the bottom, there is a

192

1   date stamp on EY 00011.
2   A.  Um-hmm.
3   Q.  And it appears that this document has three
4   different date/time stamps on it, and that the last one
5   on this document is 10-16-03, 4:42 p.m.?
6   A.  Um-hmm.
7   Q.  And based on your understanding of Ernst &
8   Young's accounting -- I mean -- I'm sorry -- software
9   systems, does that reflect the date in which the
10  document was modified?
11       MR. KONOVALOV:  Objection; lacks foundation and
12  calls for speculation.
13       THE WITNESS:  I don't know.
14  BY MS. RADCLIFFE:
15  Q.  Do you know who you would ask to find out?
16  A.  No.
17  Q.  Do you know if Ernst & Young's analysis of the
18  roll-forwards in August 2000 and November 2000 included
19  September 2000?
20  A.  I'd have to go back and look at our memo.
21  Based on our memo, it indicates that we did not.
22  Q.  Do you know if it included October 2000?
23  A.  I don't believe it did.  I believe what we
24  were trying to do was look at the third month of a
25  quarter for consistency.

193

```
1      Q.   And what leads you to believe that as you sit
2   here today?
3      A.   Most of their activity as it relates to
4   revenue, specifically license revenue but also
5   maintenance revenue due to maintenance renewals
6   associated with license contracts, generally occurs in
7   the third month of a quarter in a software company.
8      Q.   And I guess because the transactions you were
9   looking at actually occurred in the second quarter of
10  the fiscal year 2001, did you take that into
11  consideration when you looked at the roll-forward
12  relating to the third month of each quarter?
13     A.   What we were looking at was the most recent
14  quarter.  That was the third month of the quarter.
15  That would have been August.
16     Q.   And so you didn't -- Ernst & Young didn't
17  actually review the quarter in which it was reviewing
18  the debit memo transactions; is that correct?
19     A.   Every transaction in the quarter?
20     Q.   Of fiscal 2001, the second quarter.
21     A.   No.
22          MR. KONOVALOV:  Objection; vague and ambiguous.
23  You can answer.
24          THE WITNESS:  Sorry.  No.
25  BY MS. RADCLIFFE:
```

194

```
1      Q.   If you look at Exhibit 8 again, which is the
2   Banker memo, the one without the cross-outs, if you go
3   on, it says to that same full paragraph -- second
4   paragraph down, it says, "Banker also stated that E&Y
5   found nothing to indicate any such transfer.
6          "Banker also stated there was nothing in the
7   materials that E&Y had reviewed that indicated to E&Y
8   that plaintiffs' claims about the November 17, 2000,
9   debit memos had any veracity."
10          Do you know if there were any other documents
11  that Ernst & Young reviewed with respect to the debit
12  memos other than what's contained in its work papers
13  found here at Exhibit 2?
14     A.   Not that I'm aware of, no.
15     Q.   The next paragraph down says, "Banker
16  described the additional testing procedures that E&Y
17  also performed on the debit memos," and then he goes on
18  to describe those.  It says that "Ernst & Young
19  obtained a complete set of the approximately 46,000
20  debit memos created on November 17th."
21          Is it your understanding that Ernst & Young
22  received a complete set of the 400 -- and approximately
23  460 --
24     A.   46,000.
25     Q.   -- 46,000 debit memos created on
```

195

```
1   November 17th?
2      A.   Yes.  In our memo on 000144, it says, "We
3   obtained a download detail of 46,876 debit memos issued
4   on November 17, 2000."  So I do believe that's true.
5      Q.   Do you know what that download detail
6   consisted of?
7      A.   I'd have to -- I don't know specifically, but
8   by reading that, I would believe that we got a listing
9   of all of the debit memos.
10     Q.   And do you know if that listing was documented
11  in Ernst & Young's work papers?
12     A.   Outside of this memo?
13     Q.   Correct.
14     A.   I don't recall, no.
15     Q.   Do you know what happened to that list?
16     A.   No.
17     Q.   Do you know when Ernst & Young received this
18  complete -- this list of the approximately 46,000 debit
19  memos?
20     A.   I don't know a specific date, no.
21     Q.   Do you believe it to be in
22  October-November 2002?
23     A.   I do.
24     Q.   It says here in this document -- and I know
25  this is not an Ernst & Young document per se -- it
```

196

```
1   says, "a complete set."  Did that include the invoices
2   and receipts for each of the 46,000 debit memos?
3      A.   I don't believe it did, no.
4      Q.   Do you know which summary trial balances
5   Ernst & Young reviewed in connection with its review of
6   the debit memos?
7      A.   On Exhibit 238, 239, 240 through 248 is a
8   summary trial balance that shows the beginning balance
9   and the ending balance for November 2000.
10     Q.   And is that the totality of the summary and
11  trial balances Ernst & Young reviewed in connection
12  with the debit memos?
13     A.   To my recollection.
14     Q.   And with respect to the download detail that
15  you received with respect to the 46,000 debit memos, do
16  you recall who you received that from at Oracle?
17     A.   I don't recall, no.
18     Q.   And do you recall how reviewing that download
19  detail of the 46,000 debit memos provided Ernst & Young
20  with comfort that the debit memos did not have any
21  impact on Oracle's revenue?
22     A.   We took a sample from that complete listing to
23  test the individual underlying journal entry to show
24  that the debit and the credit was accounted for --
25  well, the debit and credit went to Account 25005.
```

197

1     Q.  And this is the same offsetting of the debit
2  and credits that we discussed earlier today; is that
3  correct?
4     A.  Yes, that's correct.
5     Q.  Going down to the next page.  On top of
6  page 4, it goes on to say, "Based upon E&Y's review of
7  the summary trial balances, E&Y has requested that
8  Oracle review certain monthly balances and provide an
9  explanation for the increases and decreases in them."
10    Do you know if Ernst & Young ever received an
11  explanation for the increases and decreases in the -- in
12  monthly balances?
13    MR. KONOVALOV:  Objection; lacks foundation.
14    THE WITNESS:  I don't recall specifically what
15  we got -- in what specific context the request was made.
16  BY MS. RADCLIFFE:
17    Q.  Do you recall why the request was made?
18    A.  I wasn't there.  I don't know why.
19    Q.  Do you recall whether the information was
20  obtained by Oracle?
21    A.  I don't recall, no.
22    Q.  Do you know if the request was documented?
23    A.  I don't recall.  I don't know.
24    Q.  Do you know who would know?
25    A.  I don't know who would know.

198

1     Q.  Typically, if a request is made for additional
2  information from a client at Ernst & Young, is that
3  request documented?
4     A.  Depends on the request.
5     Q.  Would a request of this nature regarding an
6  explanation for increases and decreases in monthly
7  balances be the type of request that would be
8  documented by Ernst & Young?
9     MR. KONOVALOV:  Objection; incomplete
10  hypothetical.
11    THE WITNESS:  As I mentioned before, I'm not
12  exactly sure the context of this request.  I'm not sure
13  if it's indicating that Ernst & Young felt it was
14  appropriate for Oracle to perform monthly balances and
15  provide explanation to the special litigation committee
16  or to provide an explanation to Ernst & Young.  It's not
17  clear to me.
18  BY MS. RADCLIFFE:
19    Q.  Do you know if Ernst & Young ever -- Ernst &
20  Young ever reviewed Oracle's monthly trial balances to
21  ascertain explanations for the increases and decreases
22  in those balances?
23    A.  We reviewed the summary trial balance that
24  shows the debits and the credits with the beginning
25  balance and the ending balance.

199

1     Q.  And could you identify that by Bates number?
2     A.  I'm sorry.  It's 000238.
3     Q.  And is there any other documentation?
4     A.  Monthly changes would also be reflected in our
5  review.  Since it isn't specific which accounts, it
6  also would be part of our review of the deferred
7  revenue balances starting at 148 through 149 as well as
8  the account balance roll-forward for 25005 as noted on
9  150 and 151.
10    We also reviewed the account analysis on 231
11  that would show monthly increases and decreases in that
12  account.
13    Q.  Do you know if there were any conclusions
14  reached by Ernst & Young with respect to the increases
15  and decreases in Account 25005?
16    A.  In our memo starting at 143 where we have a
17  section called "Review of Account 25005," we note that
18  we did not note any nonstandard or unusual reconciling
19  items.  We also note that we noted no revenue was
20  booked as a result of reversing amounts from Account
21  25005.
22    Q.  And --
23    A.  And -- I'm sorry -- the deferred revenue
24  analysis has the same -- the conclusion that based upon
25  our review of the company's deferred revenue balances

200

1  in Q2 '01, the changes in the balance appeared
2  reasonable and consistent with similar quarters of
3  previous and subsequent years.
4     MR. KONOVALOV:  Mr. Bender, I think you
5  misspoke.  I think you said 143, but I believe it's 145
6  is the page you're referencing.
7     THE WITNESS:  I'm sorry.  You're right.  It's
8  145.  And the last sentence that I just read is on
9  page 146.  Thank you.
10  BY MS. RADCLIFFE:
11    Q.  And I just want to clarify for the record.
12  Ernst & Young, however, did not look at the changes in
13  account balances for September 2000 and October 2000;
14  is that correct?
15    A.  That is correct.
16    Q.  Do you know why not?
17    A.  We were looking at November 2000 because that
18  was the month in which the alleged debit memo activity
19  took place, and that's why we selected November to
20  review.  And it was also the month that was, I believe,
21  specified in the complaint.  And as I mentioned
22  earlier, we were looking at August because we felt
23  August was a more representative -- or I should say a
24  more comparative month than September or October.
25    Q.  And do you know if the methodology which

201

1  Ernst & Young employed in determining which month's
2  account balances that it would review is documented in
3  Ernst & Young's work papers?
4      A.  The methodology?
5      Q.  Yes.
6      A.  I don't know that we documented that, no.  I
7  don't see where we did.
8      Q.  If you go on in Exhibit 8, a little further
9  down, it says, "Other testing" -- it's the second
10  paragraph -- "E&Y is currently performing includes a
11  review of the account analysis report provided by
12  Oracle.  E&Y is still waiting for additional supporting
13  documentation, but Banker expressed that this area was
14  not a matter of concern."
15      Other than what we looked at, at EY 00231 to --
16  I believe it's -234 and the documents that follow that,
17  -237, which I believe is the supporting documentation, do
18  you know if Ernst & Young requested any other supporting
19  documentation with respect to the account analysis report
20  provided by Oracle?
21      A.  Not that I'm aware of, no.
22      Q.  Do you know if anyone else at Ernst & Young
23  would have more information regarding additional
24  requests to Oracle other than yourself?
25      A.  No.

202

1      Q.  If you look down a little farther, it says,
2  "Also, Banker informed the committee that they are
3  performing testing on customer refunds.  This includes
4  reviewing Oracle's refund policy for customer
5  overpayments in addition to examining specific customer
6  refunds.  These procedures are still in progress."
7      Other than what we discussed earlier today about
8  customer refunds, is there any other analysis that
9  Ernst & Young performed with respect to customer refunds
10  related to the debit memos?
11      A.  Not that I can recall, no.  I don't know.
12      Q.  Do you know when the transfers to
13  Account 12601 happened?
14      MR. KONOVALOV:  Objection; assumes facts not in
15  evidence, lacks foundation.
16      THE WITNESS:  I'm not familiar with the account
17  balance you just referenced and the transfers to that
18  account.
19  BY MS. RADCLIFFE:
20      Q.  We can follow that up in just a minute.  I
21  think it will become clearer.
22      Do you know who authorized the debit memo
23  transactions at Oracle on or about November 2000?
24      A.  I don't know.  I don't recall.
25      Q.  Do you know if Ernst & Young ever inquired who

203

1  authorized the debit memo transactions at Oracle?
2      A.  No.
3      Q.  If you go a little further in the -- in
4  Exhibit 8, starting at page 5 of Exhibit 8, which is
5  296433.  And I'm looking at the first full paragraph
6  there.
7      A.  Um-hmm.
8      Q.  Do you know if Ernst & Young was asked to look
9  at any of the claims made in the Keatly declaration
10  referenced in this paragraph?
11      A.  No, I don't know.
12      Q.  Do you know if -- strike that.
13      Did you ever have any discussions regarding the
14  Keatly declaration referenced in this paragraph?
15      A.  Not that I recall, no.
16      Q.  Do you recall reviewing the Keatly
17  declaration?
18      A.  No.
19      Q.  Do you recall that Oracle made transfers from
20  unapplied cash to its bad-debt reserve in Q3 of fiscal
21  2001?
22      MR. KONOVALOV:  Objection; assumes facts not in
23  evidence.
24      THE WITNESS:  I don't recall that, no.
25  BY MS. RADCLIFFE:

204

1      Q.  Do you know if Oracle transferred unapplied
2  cash to its bad-debt reserve in the third quarter of
3  fiscal 2001?
4      A.  I don't know.
5      Q.  Would you want to -- would you have wanted to
6  know that information when you were performing the
7  analysis of the debit memos related to the second
8  quarter of fiscal 2001?
9      A.  No.
10      MR. KONOVALOV:  Objection; incomplete
11  hypothetical.  Sorry.
12      THE WITNESS:  No.
13  BY MS. RADCLIFFE:
14      Q.  And why is that?
15      A.  Generally $5 million is immaterial to Oracle,
16  for one; and, two, I'm not sure that there was -- by
17  reading this, I'm not sure there is relevance between
18  the two.
19      Q.  If you go on to that second paragraph where
20  "Banker noted that it would be a useful test to compare
21  the written-off accounts receivable debt against the
22  written-off unapplied cash, even if the write-offs
23  occurred in different periods."
24      And then it goes on to say, "Banker explained
25  that this could be a potentially useful exercise that

205

1    Oracle could demonstrate the certain cash receipts
2    written off were actually unmatched customer payments for
3    accounts receivable items that also were eventually
4    written off."
5        Do you know if Ernst & Young ever performed
6    these tests with respect to the transfers referenced in
7    this document in Q3 of fiscal 2001?
8        MR. KONOVALOV:  Objection; vague and ambiguous
9    as to "tests."
10       THE WITNESS:  I don't recall seeing anything in
11   this regard.
12   BY MS. RADCLIFFE:
13       Q.  And with respect to what I just read where
14   Mr. Banker noted it would be useful to test -- a useful
15   test to compare the written-off accounts receivable
16   debts against the written-off unapplied cash, do you
17   know if there were any -- there was testing done by
18   Ernst & Young with respect to a comparison of the
19   written-off accounts receivable debts against the
20   written-off unapplied cash in Q2 of fiscal 2001?
21       A.  Not that I'm aware of, no.
22       Q.  Do you know why not?
23       A.  I don't know why not, no.  I don't recall
24   being requested to do so.
25       Q.  And do you know if Ernst & Young was ever

206

1    requested to do so?
2        A.  I don't know.  I don't recall that, no.
3        Q.  Who at Ernst & Young had the ultimate
4    authority with respect to what procedures would be
5    performed in connection with the engagement related to
6    the debit memos?
7        MR. KONOVALOV:  Objection; vague and ambiguous.
8        You can answer the question.
9        THE WITNESS:  John Banker.
10   BY MS. RADCLIFFE:
11       Q.  Do you know what it means to write off
12   unapplied cash?
13       A.  Yes.  I mean, it depends on the circumstance.
14   It could be several things.  To write it off would
15   be -- sometimes you have sheet issues, that if you do
16   write off unapplied cash, you have to give certain
17   monies to Delaware.  It's actually a legal term.  That
18   could happen.
19       It could result in -- in the company just
20   having cash on hand and not knowing what it relates to,
21   and so you write it off generally.  I've seen it happen
22   too often now.
23       Q.  Have you ever seen it happen at Oracle?
24       A.  I've seen them clean up their unapplied cash
25   balance, yeah.  I don't know if it would be a

207

1    write-off, but I've seen them go through and spend a
2    significant amount of time trying to reconcile the
3    unapplied cash.  And when things were certainly -- or
4    were absolutely determined to be uneven in terms of
5    where the cash came, I've seen them distribute that to
6    the State of Delaware from a sheetment perspective.
7        Q.  And do you know when that occurred?
8        A.  I don't recall which year.
9        Q.  Do you know if that occurred in 2002?
10       A.  I don't recall.
11       Q.  Do you know how the write-off of the unapplied
12   cash would affect the financial statements?
13       A.  Generally speaking, it would impact cash --
14   generally speaking, it would impact accounts receivable
15   and cash.  It generally wouldn't impact credit because
16   they wouldn't take a credit from the P & L forward.  It
17   would just be additional cash.
18       Q.  Do you know what an accrual account is?
19       A.  Yes.
20       Q.  Could you explain what it is?
21       A.  An accrual account is generally an account
22   that's set up for a liability, an incurred liability.
23       Q.  And do you know if Oracle's Account 25005 is
24   an accrual account?
25       A.  The account that they've set up is a liability

208

1    account.  Yes, it is an accrual account.  The 2000 is
2    generally what they have as their liability accounts,
3    yes.
4        Q.  And I just want to reference you back to
5    EY 00010.  And at the very end of EY 0012, the last
6    sentence, see where it says -- and there is some
7    cross-outs, so this is not verbatim -- "Banker, who has
8    reviewed this language and approved its inclusion in
9    this report, believes that it accurately reflects the
10   substance of the discussions described in the second
11   preceding paragraph."
12       A.  Okay.
13       Q.  And if you look at Exhibit -- what's been
14   marked Exhibit 8, do you see any language in Exhibit 8
15   that Mr. Banker has reviewed the language in Exhibit 8
16   and believes that accurately reflects the substance of
17   discussions?
18       A.  Sorry.  I'm trying to figure out where you are
19   on this document.
20       Q.  Take your time.
21       A.  I don't see it, no.
22       Q.  Do you know if Mr. Banker ever reviewed
23   Exhibit 8?
24       A.  I don't know.
25       Q.  And prior to today, I think you previously had

209

1    testified you never reviewed Exhibit 8.

2    A.   That's correct.

3    Q.   Did you ever review any drafts of an interview

4    with John Banker?

5    A.   No.

6    Q.   Do you know if E&Y had an understanding based

7    on its debit memo engagement of how Oracle recorded

8    customer overpayments in fiscal 2001?

9    A.   Not really, no.  We understood that customer

10    repayments would be one of the items that would

11    potentially go into the "on account" status as part of

12    25005.  But since we didn't audit that period, I

13    wouldn't know.

14    Q.   Do you know if -- how Oracle records

15    customer overpayments currently in its financials

16    differs from how they were reported in fiscal

17    2001?

18    A.   I don't know.  I'd have to look at our work

19    papers.

20    Q.   Do you know that Oracle is under a consent

21    decree with respect to retaining certain accounting

22    documents?

23    A.   I did not know that.

24    MS. RADCLIFFE:  I'm going to mark the next

25    exhibit in order, Exhibit 9.

210

1    (Exhibit No. 9 was marked for identification by

2    the reporter.)

3    BY MS. RADCLIFFE:

4    Q.   And I'll just actually ask you to briefly

5    review this because I know we're going to let you out.

6    If you've ever seen this document before.

7    A.   I've never seen this document.

8    MS. RADCLIFFE:  You can go ahead and put that

9    aside.  I'm going to take a break, and then we can see if

10    we can wrap things up.

11    THE VIDEO OPERATOR:  Going off the record, the

12    time is 4:20.

13    (A break was taken.)

14    THE VIDEO OPERATOR:  Back on the record, the

15    time is 4:29.

16    BY MS. RADCLIFFE:

17    Q.   We discussed a little bit earlier about the

18    effect of the debit memo transactions on income, and I

19    just wanted to clarify with respect to debit memo

20    transactions with the understanding that a debit memo

21    transaction equals -- or is equal to the transaction

22    underlying the debit memo which would also contain the

23    receipt history and all related general ledger

24    activity.

25    With that understanding, do you know if

211

1    Ernst & Young determined whether the debit memo

2    transactions had no impact on income?

3    MR. KONOVALOV:  Objection; vague and ambiguous

4    and incredibly compound.

5    But if you understand the question, answer it.

6    BY MS. RADCLIFFE:

7    Q.   And I will clarify that it is.  I am referring

8    to 2Q of 2001.

9    A.   Based on the procedures we performed -- based

10    on the testing we did on these debit memos, I do not

11    believe it had an impact on income.

12    I wasn't clear if your question was when they

13    initially had received cash at some point of over the

14    past ten years if that ever had an impact on income.

15    In that particular year, I don't know.  But as it

16    relates to what they did in November 2000, I do not

17    believe that it had an impact on income.

18    Q.   Do you know if Ernst & Young reviewed anything

19    else besides the November 17, 2000, transactions?

20    A.   Other than what's documented in this memo, no.

21    MS. RADCLIFFE:  I'm going to mark as the next

22    exhibit in order.

23    (Exhibit No. 10 was marked for identification by

24    the reporter.)

25    BY MS. RADCLIFFE:

212

1    Q.   And in the interest of brevity, I'm going to

2    ask you about something on page 4 --

3    A.   Okay.

4    Q.   -- which is NDCA-ORCL.  And for the record,

5    this document is entitled "#1 Interview Memorandum of

6    Thomas Williams, Interview 3, 11/12/02."  And if you'd

7    look at the section entitled "Transfers from Unapplied

8    Cash to 12601."  And it also goes to the next page.

9    A.   Okay.

10    Q.   Okay.  And I don't know if you've read all the

11    way through to the end of what's Bate-stamped 313783.

12    A.   Um-hmm.  I have.

13    Q.   Including in the section regarding the amount

14    of transfers.  Do you know if Ernst & Young was aware

15    of the information attributed to Mr. Williams in the

16    section that you just read relating to "Transfers from

17    Unapplied Cash to 12601" -- and the next section is

18    "Amount of the Transfers," and that's listed on

19    NDCA-ORCL 313783 -- when it performed its analysis of

20    the debit memo transactions?

21    A.   I don't recall specifically.  I'd have to look

22    at our work papers -- our audit work papers.

23    Q.   Do you know if that is documented anywhere in

24    the audit work papers?

25    A.   In these work papers?

213

1   Q.  Yes.

2   A.  No.  I was referring to the fiscal 2002 and

3   2003 audit work papers.  I don't see it documented in

4   these work papers.

5   Q.  And if you look at the last paragraph, it's

6   313783, and it says, "Williams stated that he believes

7   the aggregate amount of the transfers in the two-year

8   period from August 2000 to August 2002 was

9   approximately 48 million."

10   Do you know if Ernst & Young was aware of those

11   transfers when it performed its analysis of the debit

12   transactions?

13   MR. KONOVALOV:  Well, objection; assumes facts

14   not in evidence.

15   THE WITNESS:  I don't recall.

16   BY MS. RADCLIFFE:

17   Q.  Is that information that Ernst & Young would

18   have wanted to consider when it was analyzing the debit

19   memo transactions in -- related to November 2000?

20   A.  From my reading of this one page, I'm not sure

21   that there is a relevance between the two.  Depending

22   on the amount that would have impacted fiscal 2002, we

23   would have wanted to know for our audit.  And I'm not

24   saying we didn't know.  I just don't remember.

25   Q.  If E&Y knew about these transfers when it

214

1   performed its debit memo engagement, would they be

2   documented in the work papers related to the

3   engagement?

4   A.  If we did specific work on this as it related

5   to the debit memos, I believe they would be, yes.

6   MS. RADCLIFFE:  I'm going to mark next in order.

7   (Exhibit No. 11 was marked for identification by

8   the reporter.)

9   MS. RADCLIFFE:  And for the record, this is a

10   document with multiple pages, and it's Bate-stamped

11   NDCA-ORCL 14 -- 104764 to 104765, and it's entitled at

12   the top "12601 Reserve Activity."

13   THE WITNESS:  Okay.

14   BY MS. RADCLIFFE:

15   Q.  If I could just direct your attention to the

16   top row, and the second item down says miscellaneous

17   receipt, or m-i-s-c receipt.  And if you look at

18   August 2000, it appears to be approximately 3.5

19   million?

20   A.  Um-hmm.

21   Q.  And then if you look at October 2000,

22   approximately 15.8 million.

23   A.  Um-hmm.

24   Q.  Do you know what attributed to the increase in

25   the transfers -- I'm sorry -- attributed to the

215

1   increase in the miscellaneous receipt item listed on

2   this document?

3   MR. KONOVALOV:  Objection; lacks any semblance

4   of foundation.

5   THE WITNESS:  No.

6   BY MS. RADCLIFFE:

7   Q.  Were you aware of the transfers into this

8   account when Ernst & Young performed its analysis of

9   the debit memos?

10   MR. KONOVALOV:  Objection; assumes facts not in

11   evidence that there were any transfers into any account.

12   THE WITNESS:  I guess I would reiterate the

13   question.  Are you indicating that the miscellaneous

14   receipts is a transfer?  Because I don't see that it is.

15   BY MS. RADCLIFFE:

16   Q.  If you look back at what was the Tom Williams

17   interview memo, at page 6 of that, which is 313783,

18   at the bottom, it indicates -- and that's under the

19   amount of the transfers, it says, "Williams said he had

20   prepared a spreadsheet that he would share with the

21   committee showing the transfers from 25005 to 12601

22   from August 2000 to August 2002."

23   A.  Okay.

24   Q.  And do you know if the transfers to 12601 --

25   first of all, we'll start off:  Do you know that there

216

1   were transfers from Account 25005 to 12601 by Oracle

2   from August 2000 to August 2002?

3   A.  As I indicated previously, I don't recall.

4   I'd have to look at our work papers from the fiscal

5   2002 audit.

6   Q.  Do you know in connection with Ernst & Young's

7   debit memo engagement whether or not it looked at

8   transfers from Account 25005 to Account 12601?

9   A.  As I indicated earlier, I don't recall doing

10   that, no.

11   Q.  Do you recall ever seeing this document that

12   has been marked as Exhibit 10?

13   MR. KONOVALOV:  Ten or eleven?

14   MS. RADCLIFFE:  I apologize.  Eleven.

15   Q.  The reserve-activity document.

16   A.  I don't recall.

17   Q.  If -- hypothetically, if Oracle had moved

18   unapplied cash to its bad-debt reserve, would that be

19   characterized as writing off the unapplied cash?

20   MR. KONOVALOV:  Objection; incomplete

21   hypothetical.

22   THE WITNESS:  I don't know.  I'd have to really

23   understand what they did and why they did it to know if

24   that's what you would do to write off unapplied cash.  I

25   mean, in a general sense, that's not what you would do

217

1 absolutely. So I'd have to know more and understand a
2 bit more around it as to why they would do that.
3 BY MS. RADCLIFFE:
4    Q. And did you know -- or did Ernst & Young know
5 at the time it was doing its review of subsequent
6 conclusions related to the debit memo transactions that
7 Oracle had transferred unapplied cash to its bad-debt
8 reserve?
9    A. I didn't know. I don't recall knowing. But
10 as I mentioned, I would want to go back and look at our
11 fiscal 2002 work papers because we may have looked at
12 it for the fiscal 2002 audit for the impact in fiscal
13 2002, so I can't definitively tell you we didn't know.
14    Q. Is that something you would have wanted to
15 know in looking at the debit memo transactions?
16        MR. KONOVALOV: Objection; asked and answered
17 several times.
18        THE WITNESS: Yeah. It depends on the relation.
19 I don't -- by looking at these two documents, I don't
20 know that there is a relation between the two.
21 BY MS. RADCLIFFE:
22    Q. Do you know if Ernst & Young inquired of
23 Oracle whether or not there was a relation between the
24 two?
25    A. I don't recall, no.

218

1    Q. If Ernst & Young had inquired of Oracle in
2 connection with Ernst & Young's engagement related to
3 the debit memo transactions, would that be documented?
4    A. Would the inquiry be documented or the results
5 of the inquiry be documented?
6    Q. We can start with the inquiry.
7    A. Probably not.
8    Q. Would the results of the inquiry be
9 documented?
10    A. Generally. Yes.
11    Q. And do you believe that those are documented
12 in Ernst & Young's work papers related to the debit
13 memo engagement?
14    A. I don't believe that there -- that any
15 procedures we may have done or questions we may have
16 asked as it relates to what Tom Williams is referring
17 to in this memo is documented in the matters in the
18 debit memo, but I'm not saying it may not be documented
19 elsewhere.
20    Q. And where would you believe that it might be
21 documented?
22    A. In our audit work papers.
23    Q. For fiscal 2002?
24    A. In 2003. And/or 2003.
25    Q. And I'm just going to state for the record

219

1 because it's something that we're going to have to
2 address with your counsel, but we would request any
3 reference to those to the extent they exist in the
4 fiscal 2002 and 2003 audits.
5        MR. KONOVALOV: Judge Onfontes recently ruled on
6 that very request, but you can revisit it.
7 BY MS. RADCLIFFE:
8    Q. If you could turn -- and it's Exhibit 2 -- and
9 it's E -- the big stack of Ernst & Young's work papers.
10    A. I have it sort of scattered, so it depends on
11 what document you want.
12    Q. It's EY 000250.
13    A. Okay.
14    Q. And at the bottom of EY 00250, I just want to
15 know if you recognize that handwriting.
16    A. Looks like mine.
17    Q. Do you see -- it's the second sentence. It
18 says: Per discussion with -- I believe it says Mike
19 Quinn -- it is not the company policy to not contact
20 customer if payment is considered a refund, as alleged
21 in paragraph 36-D of the complaint.
22    A. (The witness nods his head.)
23    Q. Do you recall having a conversation with Mike
24 Quinn about the company's policies related to
25 contacting customers regarding refunds?

220

1    A. Not specifically, no.
2    Q. Do you understand that it was the company's
3 policy to contact customers regarding refunds?
4    A. Yes, that was their policy as I understood it.
5    Q. And you understood -- Ernst & Young understood
6 that when it reached its conclusions regarding the
7 debit memo engagement; is that accurate?
8    A. Based upon this inquiry, yes.
9    Q. And now I'm going to start -- sorry we're
10 bouncing around here, but I just want to finish up.
11 It's EY 000144, which is part of Exhibit 2.
12    A. Okay.
13    Q. And going to the second -- it's actually the
14 first subheading there, "Procedures With Respect to
15 Debit Memos," and I believe we've discussed this
16 paragraph before. And at the bottom, it says, "We
17 noted no exceptions in our testing." What is the
18 meaning of "exceptions" with respect to this document?
19    A. We didn't note any items in our testing that
20 didn't have a debit and a credit to 25005.
21    Q. And where is your understanding that the term
22 "exception" is defined in Ernst & Young's work papers?
23    A. In this memo.
24    Q. And it's your understanding of the definition
25 based on reading the sentences preceding that sentence;

221

1 is that correct?

2 　　A.　That's correct, yes.

3 　　Q.　If you wanted to reperform the work that

4 Ernst & Young did with respect to this debit memo

5 engagement today, would you be able to undertake that

6 performance?

7 　　　　MR. KONOVALOV:　Objection; incomplete

8 hypothetical.

9 BY MS. RADCLIFFE:

10 　　Q.　And I guess I can narrow it a bit to

11 specifically the 195 items that Ernst & Young tested as

12 set forth at EY 00144.

13 　　　　MR. KONOVALOV:　Same objection.

14 　　　　THE WITNESS:　I believe if we got a detail, a

15 download detail of the 46,876 debit memos, we could

16 certainly test 145 greater than 500,000.　I'd have to see

17 if we have the listing of the other 45 -- or the 50 --

18 I'm sorry -- that we tested; otherwise, I think we could

19 test an additional 50.

20 BY MS. RADCLIFFE:

21 　　Q.　I believe we established that to the best of

22 your knowledge no written or oral report was ever

23 provided to Oracle regarding E&Y's conclusions.

24 　　A.　Not that I was aware of, no.

25 　　Q.　And do you know if E&Y determined how many of

222

1 the debit memos, those transactions, related to

2 customer overpayments that were kept by Oracle?

3 　　A.　No, I don't recall doing that.

4 　　Q.　And do you know as to the procedures performed

5 by Ernst & Young whether these procedures would have

6 provided that information to Ernst & Young?

7 　　A.　Sorry.　Can you rephrase the question?

8 　　Q.　Certainly.　Based on the procedures E&Y set

9 forth with respect to this engagement, would those

10 procedures have elicited how many debit memos were

11 related to customer overpayments that were kept by

12 Oracle?

13 　　　　MR. KONOVALOV:　Objection; incomplete

14 hypothetical, assumes facts not in evidence.

15 　　　　THE WITNESS:　I'm a little bit confused by the

16 question, so -- are you asking based on procedures we

17 performed can we determine how many were related to

18 customer repayments?

19 BY MS. RADCLIFFE:

20 　　Q.　That were kept by Oracle, correct.

21 　　A.　No.

22 　　　　MR. KONOVALOV:　Objection; assumes facts not in

23 evidence.

24 BY MS. RADCLIFFE:

25 　　Q.　And do you know if E&Y determined the dollar

223

1 value of the debit memos related to customer

2 overpayments that were kept by Oracle?

3 　　　　MR. KONOVALOV:　Same objection; assumes facts

4 not in evidence.

5 　　　　THE WITNESS:　Not specific to customer

6 repayments, no.

7 BY MS. RADCLIFFE:

8 　　Q.　Do you know if the procedures set forth in

9 Ernst & Young's work papers -- let me strike that.

10 　　　　Do you know if Ernst & Young ever tested whether

11 the dollar value of the debit memos related to customer

12 overpayments that were kept by Oracle?

13 　　　　MR. KONOVALOV:　Same objection; assumes facts

14 not in evidence.

15 　　　　THE WITNESS:　Not that I recall, no.

16 BY MS. RADCLIFFE:

17 　　Q.　Do you know whether Oracle ever kept customer

18 overpayments?

19 　　A.　Do I know if they ever kept them?　I don't

20 know.

21 　　Q.　Do you know with respect to the procedures

22 that E&Y performed with respect to this engagement --

23 do you know if those procedures have elicited any

24 information with respect to whether Oracle kept

25 customer overpayments?

224

1 　　　　MR. KONOVALOV:　Objection; assumes facts not in

2 evidence.　It's also vague and ambiguous.

3 　　　　THE WITNESS:　Yeah, I don't -- I don't know.

4 BY MS. RADCLIFFE:

5 　　Q.　Do you know if E&Y ever concluded that the

6 debit memos did not relate to customer overpayments

7 that were kept by Oracle?

8 　　　　MR. KONOVALOV:　Same objections.

9 　　　　THE WITNESS:　Not specifically.　Not that I'm

10 aware of.

11 BY MS. RADCLIFFE:

12 　　Q.　Do you know if Ernst & Young ever inquired of

13 Oracle whether or not it kept customer overpayments

14 related to the debit memos?

15 　　A.　The only thing I'm aware of is that this tick

16 mark you just referred me to, that they make every

17 effort to contact the customer.　That's the only

18 knowledge that I recall.

19 　　Q.　Do you know if the procedures performed by E&Y

20 would have uncovered whether or not the transactions

21 underlying the debit memos did not increase Oracle's

22 income?

23 　　　　MR. KONOVALOV:　Objection; incomplete

24 hypothetical, assumes facts not in evidence.

25 　　　　THE WITNESS:　Can you please rephrase the

225

1  question.  I'm not sure I understood the question.

2  BY MS. RADCLIFFE:

3     Q.  Sure.  Let me start with:  Do you know if

4  Ernst & Young -- let me strike that.

5        Do you know if Ernst & Young ever determined

6  whether or not there were debit memo transactions with

7  dates other than November 17, 2000?

8        MR. KONOVALOV:  Objection; vague and ambiguous.

9        THE WITNESS:  As it relates to this matter?

10  BY MS. RADCLIFFE:

11    Q.  Yes.

12    A.  This matter, we were specifically looking at

13  those dates, and then we were looking at other activity

14  in those account balances and roll-forwards.  But I

15  don't know -- I can't specifically tell you if there

16  were debit memos at different dates.

17    Q.  Do you know if there were debit memos with

18  other dates in Q2 of 2001?

19    A.  Not that I recall, no.

20    Q.  Do you know if Oracle created debit memos in

21  connection with an "on account" cleanup in December of

22  2000?

23    A.  In December of 2000?

24    Q.  Correct.

25    A.  The only one I'm familiar with is the one in

226

1  November of 2000.

2     Q.  Do you know if Ernst & Young performed any

3  review for engagement with respect to debit memos

4  created in connection with an "on account" cleanup

5  apart from the November 17, 2000, debit memos?

6        MR. KONOVALOV:  Objection; vague and ambiguous.

7        THE WITNESS:  Not that I'm familiar with, no.

8  BY MS. RADCLIFFE:

9     Q.  Do you know if Oracle ever asked E&Y to

10  conclude or report whether transactions underlying the

11  debit memos did not increase Oracle's income in Q2 of

12  2001?

13    A.  Not that I'm aware of.

14    Q.  Any other period?

15    A.  Not that I'm aware of.

16    Q.  If -- do you know, if Ernst & Young had been

17  asked to report on whether transactions underlying the

18  debit memos increased Oracle's income, whether E&Y

19  would have been willing to do this?

20        MR. KONOVALOV:  Objection; assumes facts not in

21  evidence.

22        THE WITNESS:  I don't know and I don't recall.

23  BY MS. RADCLIFFE:

24    Q.  Do you know if Ernst & Young performed any

25  procedures to determine whether Oracle properly

227

1  recognized revenue in 2Q '01?

2     A.  Analytical procedures on the changes in

3  unearned revenue would have been the only procedures we

4  would have done that would have had any relation to

5  revenue.

6     Q.  And where would those be documented?

7     A.  000148 and 000149, and in our memo, 000145 and

8  -46 -- -146.

9     Q.  And do you know if Ernst & Young performed any

10  procedures to determine whether Oracle properly

11  recognized revenue in fiscal 2001?

12    A.  Outside of what I just mentioned, no, we

13  wouldn't have.  We weren't the auditors.

14    Q.  Do you know if Ernst & Young in connection

15  with the debit memo engagement reviewed any of Oracle's

16  fiscal 2001 sales transactions?

17    A.  We did not, no.

18    Q.  Do you know if those were reviewed in

19  connection with the 2002 audit?

20    A.  Fiscal 2001 transactions?

21    Q.  Yes, sales transactions.

22    A.  Not that I'm aware of, no.

23    Q.  Do you know if Ernst & Young ever reviewed any

24  agreements entered into with Hewlett-Packard on or

25  about November of 2000?

228

1     A.  I don't recall reviewing that, no.

2     Q.  Do you know if Ernst & Young ever reviewed any

3  agreements with Hewlett-Packard since it's been brought

4  on as Oracle's independent auditors in 2002?

5     A.  Ever?

6     Q.  Yeah.

7     A.  Yes.  We've reviewed a contract with HP in Q4

8  of '06.

9     Q.  Do you recall the dollar amount of that

10  transaction?

11    A.  Approximately $70 million.

12    Q.  And do you recall why it was reviewed?

13    A.  It was a material contract under our audit

14  period.

15    Q.  Do you recall whether there were any

16  conclusions reached by Ernst & Young with respect to

17  whether the contract was proper?

18        MR. KONOVALOV:  Objection.  You're way beyond

19  the scope of the discovery plan at this point.  You can

20  ask -- I'm not going to block him from answering the

21  question, but you're way far afield at this point.  I've

22  given you a little latitude and you've exploited it, but

23  you're fishing now.

24        THE WITNESS:  We did not find any errors in the

25  company's accounting for its revenue contracts as part of

229

1    our fiscal 2006 audit.
2    BY MS. RADCLIFFE:
3        Q.  Do you know if Ernst & Young ever reviewed
4    Oracle's 2001 quarterly financial statements?
5        A.  I don't recall reviewing the quarters in
6    fiscal 2001.
7        Q.  And does that include the second quarter of
8    2001?
9        A.  These are Andersen's work papers?
10       Q.  No.  Actually, if you've ever reviewed
11   Oracle's quarterly financial statements.
12       A.  No, we did not.  I'm sorry.  I thought you
13   meant Andersen's work papers.  No, we did not.
14       Q.  Thank you for clarifying.  And promise it's
15   very short.
16           Is Ernst & Young able to provide any assurance
17   with respect to whether Oracle's quarterly financial
18   statements in fiscal 2001 were materially misstated?
19       A.  No, we would not be able to do that.
20       Q.  Do you know if Ernst & Young ever attempted to
21   determine whether the receipts underlying the debit
22   memos belonged to Oracle?
23           MR. KONOVALOV:  Objection; calls for a legal
24   conclusion, assumes facts not in evidence.
25           THE WITNESS:  No, I don't believe we did.  I

230

1    don't recall.
2    BY MS. RADCLIFFE:
3        Q.  If you did, would it be documented in the
4    engagement work papers related to the debit memos?
5            MR. KONOVALOV:  Objection; incomplete
6    hypothetical.
7            THE WITNESS:  Not necessarily.
8    BY MS. RADCLIFFE:
9        Q.  Where else would it be documented?
10       A.  I don't know that it is.  I don't know where
11   else it would be documented.  I don't know that we did
12   anything like that.
13       Q.  Do you know who would know?
14       A.  John Banker.  Andrew Cotton might know if we
15   did.
16           MS. RADCLIFFE:  I don't have any further
17   questions on direct right now.  I may have one or two
18   after Mr. Konovalov is finished, but this part usually
19   goes really quick.
20           MR. KONOVALOV:  I will keep you very brief here
21   just to be clear.
22
23                       EXAMINATION
24
25   BY MR. KONOVALOV:

231

1        Q.  Two issues I wanted to just clarify with you.
2    A couple of times during the questioning today, counsel
3    has referred to the November 17th debit memos as "debit
4    memo transactions," and I won't purport to represent to
5    you that it's not contained anywhere in your summary
6    memo, which is 143 through 146, but I didn't see
7    anywhere that you'd referred to them as "debit memo
8    transactions."
9            My question for you is:  Did you understand that
10   the November -- the creation of the November 17th debit
11   memo was a transaction, or was it something else?
12           MS. RADCLIFFE:  Objection; leading.
13           THE WITNESS:  My understanding was that it
14   was --
15           MR. KONOVALOV:  I can lead.  It's not my
16   witness.
17       Q.  Go ahead and answer the question.
18       A.  My understanding was that the debit memo
19   cleanup or the "on account" balance cleanup was a -- I
20   wouldn't go so far as call it a "transaction" per se.
21   I typically define a transaction as some actual
22   accounting event between Oracle and a separate third
23   party.  This was an internal accounting cleanup
24   exercise.
25       Q.  So to be clear, because it didn't -- it was an

232

1    internal bookkeeping -- internal -- how did it go,
2    record-keeping?
3        A.  Right.
4        Q.  Is that the words you used?  Record-keeping
5    exercise as opposed to some transaction with a third
6    party --
7        A.  Right.
8        Q.  -- it wouldn't be a, quote, unquote,
9    transaction as you would colloquially use the word,
10   correct?
11       A.  That's correct.
12       Q.  The other thing that I wanted to just -- to
13   see if we could get clarification is a couple of times
14   today I think you testified that you understood that
15   E&Y with respect to this debit memo engagement was
16   retained by the special litigation committee, and then
17   I think at one point you also said that you weren't
18   sure if that was true.
19           And I wanted to direct you to two different
20   exhibits and see if we can get clarification.  And if
21   we can, that's great; and if we can't, that's fine,
22   too.
23           If you take a look at Exhibit 2, the
24   Bates-numbered document EY 143.  It's the memo that
25   you've testified about at length today.  If you look at

233

1    the -- towards the bottom half of the page, it says

2    "Discussion."

3        A.   Yes.

4        Q.   And then there is a paragraph that begins, "In

5    October 2002"?

6        A.   Yes.

7        Q.   If you look at the end of the second line

8    there, it says, "At the request of the company, E&Y

9    performed the following procedures that were agreed to

10    with the company."

11        Does that provide you any clarification or

12    confirmation in your mind as to whether or not E&Y was

13    retained by the company as opposed to by the special

14    litigation committee?

15        A.   I'm not sure who engaged us specifically.

16        Q.   And just to see if anything further reinforces

17    your recollection or otherwise, if you look at

18    Exhibit 8, which was the interview memo of John Banker,

19    and if you take a look at what is at the top right

20    "page 3," which the bottom right, the Bates number is

21    296431.

22        In that first full paragraph, it says, "Banker

23    informed the committee that pursuant to principles agreed

24    to with Oracle, E&Y performed its own testing," blah,

25    blah, blah, blah.

234

1        Again, does that -- as you read that, does that

2    clarify in your mind at all whether or not you were

3    retained by the SLC versus the company versus some other

4    entity in performing this debit memo analysis?

5        A.   In performing this -- I was not present or

6    part of the conversation.  But if I read this, I would

7    interpret that to mean Oracle and not the special

8    litigation committee.

9        MR. KONOVALOV:  Okay.  That's all I have.

10

11               FURTHER EXAMINATION

12

13    BY MS. RADCLIFFE:

14        Q.   This will be real quick.  With respect to the

15    last answer you just provided, I believe that you

16    testified that prior to today you had never seen

17    Exhibit 8.  Is that correct?

18        A.   That's correct.

19        Q.   And you didn't have any knowledge with respect

20    to Exhibit 8 prior to today; is that correct?

21        A.   That's correct.

22        Q.   And then just quickly to follow up on one

23    other point, did Ernst & Young understand that there

24    was general ledger activity prior to November 17, 2000,

25    that related to the debit memos when it performed its

235

1    engagement?

2        MR. KONOVALOV:  Objection; vague and ambiguous.

3        THE WITNESS:  Did we know there were debit

4    memo -- that Oracle would issue debit memos prior to

5    November 17th or that there were transactions -- that

6    these transactions were recorded prior to November 17th?

7    BY MS. RADCLIFFE:

8        Q.   That there was general ledger activity related

9    to these transactions prior to November 17, 2000.

10        MR. KONOVALOV:  Same objection.

11        THE WITNESS:  I'm not sure specifically we

12    talked about it, but you generally wouldn't have an

13    account unapplied or on account if it wasn't part of the

14    general ledger before when you tried to clean it up.

15    BY MS. RADCLIFFE:

16        Q.   So there would be a history of that debit

17    memo?

18        A.   It wouldn't be a debit memo per se.  It would

19    be a transaction that was accounted for.  And there was

20    an entry that was in 25005 that they applied a debit

21    memo against.  It won't have been a debit memo

22    transaction.  It would have been a transaction.

23        Q.   And did Ernst & Young's procedures with

24    respect to this engagement intend to include a review

25    of that prior activity related to the debit memo?

236

1        A.   No.  As I mentioned earlier, our procedures as

2    documented in our memo were to look at the journal

3    entries that were used to clean up the "on account"

4    balance.  They were -- it was journal entries related

5    to the 46,000 debit memos.

6        Q.   So would it be accurate to say that if that

7    prior activity, related to the debit memos, improperly

8    increased income, E&Y would not have uncovered that in

9    its procedures performed with respect to this

10    engagement?

11        MR. KONOVALOV:  Objection; incomplete

12    hypothetical and assumes facts not in evidence.

13        THE WITNESS:  Not necessarily, no.

14    BY MS. RADCLIFFE:

15        Q.   And I just want to clarify.  I believe you

16    previously stated Ernst & Young did not look at

17    activity in September or October 2000 related to these

18    debit memo transactions; is that correct?

19        MR. KONOVALOV:  Objection; vague and ambiguous.

20        THE WITNESS:  These -- I'm sorry.  These debit

21    memos were in November.  So did we look at Account 25005

22    in September and October?  The answer is no.

23        MS. RADCLIFFE:  I don't have any further

24    questions of this witness.

25        I just want to state for the record that we

237

1  believe that Ernst & Young has not satisfied its

2  obligations under the subpoena, but we'll take that up

3  with your counsel.

4  MR. KONOVALOV:  And then why don't we just go

5  ahead and stipulate on the record we're designating the

6  transcript as confidential?

7  MS. RADCLIFFE:  I can agree to temporarily

8  designate it as confidential until counsel for the

9  defendants and counsel for Ernst & Young have had an

10  opportunity to review it.  And I think that we can agree

11  that you can have that same 30-day window, and then you

12  can inform us whether it's your intent to designate the

13  transcript confidential on a permanent basis.

14  MR. KONOVALOV:  That's fine.  I just -- and

15  we're happy to do that.  I don't want to belabor the

16  witness's time.  I mean, given that the examination has

17  been almost exclusively about work papers, I can't

18  imagine we wouldn't not designate the majority of this

19  transcript as confidential, but we'll be happy to review

20  it.

21  MS. RADCLIFFE:  I note your statement for the

22  record.

23  We can go off the record.

24  THE VIDEO OPERATOR:  This is the end of

25  Videotape No. 4, Volume I, in the deposition of Alex

238

1  Bender.  The original videotapes will be retained by

2  LiveNote World Service.  Going off the record, the time

3  on the monitor is 5:09.

4  (Deposition concluded at 5:09 p.m.)

239

1  STATE OF CALIFORNIA    )

2                         )  ss.

3  COUNTY OF SAN FRANCISCO )

4

5

6

7  I, the undersigned, declare under penalty of

8  perjury that I have read the foregoing transcript,

9  and I have made any corrections, additions, or

10  deletions that I was desirous of making; that the

11  foregoing is a true and correct transcript of my

12  testimony contained therein.

13  EXECUTED this _____ day of _____,

14  2006, at _____, _____.

15      (City)       (State)

16

17

18

19

20

21  _____

ALEXANDER BENDER, III, CPA

22

23

24

25

240

1  REPORTER'S CERTIFICATE

2

3  I, RICHARD M. RAKER, CSR #3445, Certified

4  Shorthand Reporter, certify:

5  That the foregoing proceedings were taken before

6  me at the time and place therein set forth, at which

7  time the witness was put under oath by me;

8  That the testimony of the witness and all

9  objections made at the time of the examination were

10  recorded stenographically by me and were thereafter

11  transcribed;

12  That the foregoing is a true and correct

13  transcript of my shorthand notes so taken.

14  I further certify that I am not a relative or

15  employee of any attorney or of any of the parties,

16  nor financially interested in the action.

17  I declare under penalty of perjury under the laws

18  of the State of California that the foregoing is true

19  and correct.

20  Dated this 26th day of September, 2006.

21

22

23  _____

RICHARD M. RAKER, C.S.R. No. 3445

24

25

1          REPORTER'S CERTIFICATE

2

3          I, RICHARD M. RAKER, CSR #3445, Certified

4    Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8          That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12         That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14         I further certify that I am not a relative

15   or employee of any attorney or of any of the parties,

16   nor financially interested in the action.

17         I declare under penalty of perjury under the

18   laws of the State of California that the foregoing is

19   true and correct.

20         Dated this _____ day of _____, 2006.

21

22

23

24   _____
     RICHARD M. RAKER, C.S.R. No. 3445
25

                                                        1