# Exhibit 14

1

```
1
2        IN THE UNITED STATES DISTRICT COURT
3    FOR THE NORTHERN DISTRICT OF CALIFORNIA
4
     In re:
5    Oracle Corporation Securities  )
     Litigation.              ) Case No. C010988 MJJ
6    This Document Relates To:  All )
     Actions.                  )
7    ------------------------------)
8
9              Wednesday, June 28, 2006
10             9:09 a.m.
11
12   * * *  C O N F I D E N T I A L  * * *
13
14       Confidential Videotaped Deposition
15   of JASON SEVIER, held at the offices of
16   David Feldman Worldwide, Inc., 805 Third
17   Avenue, New York, New York 10022, pursuant
18   to Subpoena, before Otis Davis, a Notary
19   Public of the State of New York.
20
21
22
23
24
25
```

3

```
1
2
3
4
5        IT IS HEREBY STIPULATED AND
6    AGREED, by and among counsel for the
7    respective parties hereto, that the
8    filing, sealing and certification of
9    the within deposition shall be and
10   the same are hereby waived.
11       IT IS FURTHER STIPULATED AND
12   AGREED that all objections, except as
13   to the form of the question, shall be
14   reserved to the time of the trial.
15       IT IS FURTHER STIPULATED AND
16   AGREED that the within deposition may
17   be signed before any Notary Public
18   with the same force and effect as if
19   signed and sworn to before the Court.
20
21
22
23
24
25
```

2

```
1    A P P E A R A N C E S :
2      LERACH COUGHLIN STOIA GELLER RUDMAN &
3      ROBBINS, LLP
4      Counsel for Plaintiff
5        100 Pine Street, Suite 2600
6        San Francisco, California  92101
7      BY:  SHAWN A. WILLIAMS, ESQ.
8        shawnw@lerachlaw.com
9      AND:  KEITH MAUTNER, CPA, CMA
10     AND:  ASHAR AHMED, Summer Associate
11
12     LATHAM & WATKINS, LLP
13     Counsel for Defendants
14       650 Town Center Drive, 20th Floor
15       Costa Mesa, California  92626
16     BY:  PAUL V. KONOVALOV, ESQ.
17       paul.konovalov@lw.com
18     CHADBOURNE & PARK, LLP
19     Counsel for the Witness Jason Sevier
20       30 Rockefeller Plaza
21       New York, New York  10112
22     BY:  ROBERT SIDORSKY, ESQ.
23
24   ALSO PRESENT:
25       MANUEL ABRU, Legal Video Specialist
```

4

```
1
2        THE VIDEOGRAPHER:  This is tape
3    number 1 of the videotaped deposition
4    of Jason Sevier, in the matter Oracle
5    Securities Litigation, In re:
6        This deposition is being held
7    at the offices of David Feldman
8    Worldwide, Inc., 805 Third Avenue, New
9    York, New York, on June 28, 2006 at
10   approximately 9:09 a.m.
11       My name is Manuel Abru, and I
12   am the legal video specialist.  The
13   court reporter is Otis Davis.
14       Will counsel please introduce
15   themselves.
16       MR. WILLIAMS:  Shawn Williams,
17   Lerach Coughlin Stoia Geller Rudman &
18   Robbins on behalf of plaintiffs.
19       MR. MAUTNER:  Keith Mautner
20   with Lerach Coughlin.
21       MR. WILLIAMS:  With me also is
22   Ashar Ahmed of Lerach Coughlin.
23       MR. KONOVALOV:  Good morning.
24   Paul Konovalov of Latham & Watkins for
25   the defendants.
```

5

1
2      MR. SIDORSKY:  Good morning.
3   Robert Sidorsky of Chadbourne & Park
4   on behalf of the witness Mr. Sevier.
5      THE VIDEOGRAPHER:  Will the
6   court reporter please swear in the
7   witness.
8   J A S O N    S E V I E R, called as a
9   witness, having been duly sworn by a
10   Notary Public, was examined and
11   testified as follows:
12   EXAMINATION BY
13   MR. WILLIAMS:
14   Q.   Good morning, Mr. Sevier.
15   A.   Good morning.
16   Q.   My name is Shawn Williams.  Can
17   you just state your full name for the
18   record, please.
19   A.   Yes.  Jason Marshall Sevier.
20   Q.   And your address and phone
21   number, please?
22   A.   59 Whitney Road, Short Hills,
23   New Jersey, phone number 973-467-2314.
24   Q.   Have you had your deposition
25   taken before?

6

1      Jason Sevier - Confidential
2   A.   Yes, I have.
3   Q.   So you have been through this
4   before, but I am going to go over the
5   ground rules of what I expect to happen
6   today.  Okay?
7   A.   Sure.
8   Q.   The reporter sitting to your
9   left is going to take down everything
10   that's said in the room today, my
11   questions, your answers, your counsel's
12   objections, and maybe objections from
13   Oracle's counsel Mr. Konovalov.
14      Do you understand that?
15   A.   Yes, I do.
16   Q.   We are going to need you to
17   speak audibly and not respond to my
18   questions with head nods or hand gestures,
19   just because he can't record those.
20      Do you understand that?
21   A.   Yes, I do.
22   Q.   We'll take several breaks
23   throughout the day and we'll do so at your
24   convenience --
25   A.   Okay.

7

1      Jason Sevier - Confidential
2   Q.   -- except if I am in the middle
3   of a question or in the middle of a line of
4   questioning, I would just want to complete
5   that question or line of questioning, and
6   then we can take a short break, just let me
7   know.
8      Do you understand?
9   A.   I understand, yes.
10   Q.   You understand that you are
11   testifying under oath today, and the oath
12   that you have taken is the same oath that
13   you would take in a court of law, even
14   though we are in a relatively informal
15   environment?
16   A.   I do.
17   Q.   I expect that -- withdrawn.
18      I am going to ask you a lot of
19   questions today, I'm sure there are times
20   that I'll fumble or I won't be as clear as
21   I would like to be.  If you don't
22   understand the question, just ask me to
23   repeat it, I will do the best that I can to
24   repeat it or make it clearer.
25      Do you understand that?

8

1      Jason Sevier - Confidential
2   A.   Yes, I do.
3   Q.   Your lawyer very well may
4   object to a lot of my questions, and
5   Mr. Konovalov may object as well.  Unless
6   you are instructed not to answer a
7   question, however, you still have to answer
8   the question.
9      Do you understand?
10   A.   Understand.
11   Q.   Is there any reason why you
12   can't give your full and complete testimony
13   today?
14   A.   No.
15   Q.   You are not on any medication
16   that might inhibit your ability to recall
17   facts?
18   A.   No.
19   Q.   You indicated that you had your
20   deposition taken before?
21   A.   Correct.
22   Q.   How many times?
23   A.   One time.
24   Q.   When was that?
25   A.   Approximately a year and a half

9

Jason Sevier - Confidential

1  ago.  I don't know the exact date, but that
2  
3  is approximately.
4      Q.   Were you a party to the action,
5  or were you simply a witness like you are
6  in this case?
7      A.   Similar to today.
8      Q.   Was it related to your
9  employment, or was it a personal matter?
10     A.   Employment.
11     Q.   What employment relationship
12  did it have to do with?  Who were you
13  working for?
14     A.   I was working for Arthur
15  Andersen.
16     Q.   Did it have anything to do with
17  Oracle?
18     A.   It did not.
19     Q.   When was the first time that
20  you learned that you have to testify in
21  this case?
22     A.   I was issued a subpoena, I
23  don't recall the exact date, on or about
24  maybe May 5th or 6th.
25     Q.   Of 2006?

10

Jason Sevier - Confidential

1  
2      A.   Of 2006.  An officer showed up
3  at my front door with the subpoena.
4      Q.   What did you do with it once
5  you received it?
6      A.   I read the subpoena, and then I
7  called one of the attorneys in the back to
8  find out, you know, how I go about getting
9  representation.
10     Q.   One of the attorneys listed on
11  the back of the subpoena?
12     A.   On the back of the subpoena,
13  yes.
14     Q.   Do you know who that was?
15     A.   Yes.  Willow --
16     Q.   Willow Radcliffe?
17     A.   Yes.  I believe that's correct,
18  yes.
19     Q.   And then sometime thereafter
20  you got an attorney?
21     A.   Yes, correct.
22     Q.   Did you understand why you were
23  being asked to testify when you received
24  the subpoena?
25         MR. SIDORSKY:  Objection to

11

Jason Sevier - Confidential

1  form.
2  
3      Q.   You can answer the question.
4      A.   At first, I did not.
5      Q.   But at some point, you
6  understood?
7      A.   Yes.
8      Q.   What have you done to prepare
9  for your testimony today, if anything?
10     A.   I have met with my
11  representative, Mr. Sidorsky.
12     Q.   When was that?
13     A.   We have met various times in
14  the last couple weeks.
15     Q.   Here in New York?
16     A.   Yes, in New York.
17     Q.   Did you meet yesterday?
18     A.   Yes, we did.
19     Q.   Again, here in New York?
20     A.   Yes, in New York.
21     Q.   At his offices?
22     A.   Correct.
23     Q.   Was anyone else at that
24  meeting?
25     A.   No.

12

Jason Sevier - Confidential

1  
2      Q.   Have you had an opportunity to
3  review any documents in preparation for
4  your testimony today?
5      A.   Yes, I have.
6      Q.   What did you review?
7      A.   I reviewed certain work papers
8  that were provided the first, second or
9  third quarters and file 5 and 6 from the
10  2001 audit.
11     Q.   Oracle?
12     A.   Yes, Oracle, excuse me.
13     Q.   When was that?
14     A.   Last Tuesday.
15     Q.   Did you review that in one
16  sitting, or was it over several different
17  sittings?
18     A.   The review of the work papers
19  was in one sitting.
20     Q.   Was that at your attorney's
21  office?
22     A.   No, it was not.
23     Q.   Where was that?
24     A.   It was at the offices of Latham
25  & Watkins.

13

Jason Sevier - Confidential

1
2   Q.   Was your attorney there?
3   A.   Yes, he was.
4   Q.   Who else was there when you
5   were reviewing those documents?
6   A.   Just a representative from
7   Latham.
8   Q.   Do you know who it was?
9   A.   They did not give their name,
10  no.
11  Q.   They didn't give their name at
12  all?
13  A.   No.  He was just sitting in the
14  room supervising the flipping of the work
15  papers.
16  Q.   Did you talk to that
17  representative at all about the work
18  papers?
19  A.   No.
20  Q.   How were they provided to you?
21  Were they in a box, were they on a CD or a
22  computer?  How were the work papers
23  provided to you?
24  A.   They were in a box, but when I
25  arrived, they were out of the box sitting

14

Jason Sevier - Confidential

1
2   on the conference room table.
3   Q.   How long did it take you to
4   review those work papers?
5   A.   About four hours.
6   Q.   What was the volume of paper in
7   that set that you reviewed?
8   A.   Can you clarify.
9   Q.   Would you say it was a full
10  Bankers box, two Bankers boxes, half a box?
11  A.   I don't necessarily understand
12  what a Bankers box is.
13  Q.   There isn't one here.
14  Would you say the documents
15  were four inches thick, five inches thick
16  or maybe eight inches?
17  A.   I would say that the documents
18  were maybe as thick as a telephone book.
19  That's the best way I can describe it.  And
20  they all fit in the one box that was there.
21  So if it was a Bankers box, it fit in a
22  Bankers box.
23  Q.   Were there any CDs or anything
24  that could be translated by a computer?
25  A.   Not that I saw.

15

Jason Sevier - Confidential

1
2   Q.   You indicated that you were
3   provided first, second and third quarters
4   of fiscal 2001 plus 5 and 6?
5   A.   Yes.
6   Q.   Files 5 and 6?
7   A.   Files 5 and 6 from the year-end
8   audit, yes.
9   Q.   What are files 5 and 6, if you
10  know, generally what that means?
11  A.   Yes.  File 5 was assets, file 6
12  was liabilities, equity and profit and loss
13  statement.
14  Q.   I am going to talk about your
15  background a little bit.  But based on your
16  understanding, were the files that you
17  reviewed the entirety of the work papers,
18  Oracle's work papers, for the fiscal year
19  2001?
20  A.   No.
21  MR. SIDORSKY:  Objection.
22  Objection to form.
23  Q.   What, if anything, was not
24  included in the documents that you
25  reviewed, if you know?

16

Jason Sevier - Confidential

1
2   MR. SIDORSKY:  Same objection.
3   A.   I don't recall all the exact
4   name of the files, but I know there were a
5   number of planning files, international
6   clearances.  This was I believe -- I was
7   presented with two of, based on the index,
8   I think eight total files from the year-end
9   audit.
10  Q.   Eight total files?
11  A.   From my recollection from the
12  index.
13  Q.   But there was an index with
14  what you were provided the other day, last
15  week?
16  A.   Well, when I say "index," I
17  mean on the front of each audit file, it
18  lists the total number of files for that
19  engagement, and I was presented file 5 and
20  6, which was two of the total eight files
21  for the audit.
22  Q.   Correct me if I'm wrong because
23  I don't understand this stuff as well as
24  you do, obviously.
25  For the year-end audit, there

17

Jason Sevier - Confidential

1  would be files 1 through 8 and you got 5
2  and 6?
3  A.  Correct.
4  Q.  Can you just describe for me
5  your educational background after high
6  school?
7  A.  Yes.  College at Towson
8  University in Maryland.  That's as far as I
9  have went from an education perspective.
10  Q.  What school was that?
11  A.  Towson University.
12  Q.  What year did you graduate?
13  A.  1991.
14  Q.  Can you tell me the degree you
15  received?
16  A.  Bachelor's of science, with a
17  concentration in accounting.
18  Q.  Is it fair to say at some point
19  you moved to California?
20  A.  Yes, correct.
21  Q.  When was that?
22  A.  September 2000.
23  Q.  Describe for me your --
24  withdrawn.

18

Jason Sevier - Confidential

1  After you graduated in 1991,
2  did you get a job?
3  A.  Yes.
4  Q.  Who did you work for?
5  A.  Arthur Andersen.
6  Q.  In the D.C. area, Maryland
7  area?
8  A.  Baltimore, yes.
9  Q.  And that was 1991, 1992?
10  A.  1991.
11  Q.  What position were you hired
12  for?
13  A.  Staff accountant.
14  Q.  Just generally describe what
15  your responsibilities were as a staff
16  accountant at Andersen then?
17  A.  As a staff accountant, a
18  first-year person, your responsibilities
19  vary by engagement, but you are basically
20  doing the less riskier accounts on an
21  engagement.  It's just a matter of
22  basically learning the audit methodology.
23  In your first year, you are really kind of
24  training and learning the audit process.

19

Jason Sevier - Confidential

1  Q.  When you say "less riskier
2  accounts," give me an idea of what you
3  mean?
4  A.  In the scope of an audit, it
5  varies by client, so I would say an area
6  like property plan and equipment, the tasks
7  that a first-year staff person are given
8  are to substantiate that the company
9  purchased a fleet of trucks or a copier.
10  So it's very basic tying
11  information into a purchase order or a
12  voucher.  So it's very basic non-risky --
13  as a staff person, you are not doing
14  anything judgmental, where you're making a
15  decision on accuracy of reserves or
16  balances.  It's more substantiation through
17  testing of invoices.
18  Q.  Were you at Arthur Andersen
19  from 1991 through 2000 when you moved to
20  California?
21  A.  Correct.
22  Q.  So at some point, you were
23  promoted from a staff accountant to
24  something else?

20

Jason Sevier - Confidential

1  A.  Yes.  There are various levels.
2  Q.  What was the next level that
3  you were promoted to?
4  A.  It's called senior accountant.
5  Q.  Is it fair to say that your
6  responsibilities changed, in that you were
7  given broader responsibilities with respect
8  to any particular engagement?
9  A.  Yes.  When you are promoted to
10  a senior, you are now the kind of
11  day-to-day operations person on that
12  engagement, meaning you are in the field
13  every day and you are responsible for
14  supervising your one or two staff people
15  below you, first-year-type people.  So your
16  responsibility grows substantially.
17  Q.  How long were you a senior?
18  A.  Three years.
19  Q.  So that takes us up to about
20  1994, '95 area?
21  A.  Correct.  '94, '95, correct.
22  Q.  Still in Baltimore?
23  A.  Yes.
24  Q.  And at some point you were

21

1     Jason Sevier - Confidential
2  promoted again, is that fair?
3     A.   Correct.
4     Q.   What's the next level?
5     A.   Manager.
6     Q.   Just describe for me what the
7  responsibilities are as you get to that
8  escalation?
9     A.   As a manager, you are now
10 involved in a much more senior position, in
11 that you are now responsible for more than
12 one job that's taking place at one time.
13    So there could be two or three
14 audits that are going on simultaneously,
15 and you are responsible for those three
16 audits, meaning supervising the completion
17 of those audit engagements.
18    Q.   So you are supervising seniors
19 and staff accountants?
20    A.   Correct.
21    Q.   And you had ultimate
22 responsibility for the audit?  Withdrawn.
23 Not ultimate responsibility, but --
24    A.   Yes.  Depending on the size of
25 the job, the next person that I would

22

1     Jason Sevier - Confidential
2  potentially report to is the partner who
3  has the ultimate responsibility.  But on a
4  bigger job, there are layers above the
5  manager.  So it depends on the job.
6     Q.   As the manager at that point,
7  you are applying judgment?
8        MR. SIDORSKY:  Objection to
9     form.
10    Q.   Go ahead.
11    A.   In certain cases, yes.
12    Q.   Much more than a senior or a
13 staff?
14    A.   Correct.
15    Q.   Is it fair to say that the
16 application of that judgment would be with
17 respect to adequacy of reserves or proper
18 recognition of revenue on any particular
19 type of transaction?
20        MR. SIDORSKY:  Objection.
21    A.   The judgment is judgments --
22 initial judgments is the best way to
23 characterize it.  It's not the final say.
24 You make an initial assessment, which is
25 then reviewed and signed off on by the

23

1     Jason Sevier - Confidential
2  individual -- the ranking individuals on
3  the engagement.
4     Q.   What do you mean by "initial
5  judgment"?
6     A.   So, for example, if I'm
7  reviewing a returns reserve as an example,
8  I will look at the work that was performed
9  and I will make an initial assessment of
10 whether I think based on the work that was
11 performed the reserve is adequate based on
12 the facts that are presented; and then I
13 present that to whoever has the ultimate
14 sign-off, which is either the senior
15 manager or the partner, depending on the
16 job, because there is layers, and he or she
17 has the ultimate call of whether they agree
18 or feel that additional work needs to be
19 performed.
20    Q.   So when you say that there are
21 layers, is it fair to say that on some jobs
22 there may be more than one senior manager?
23    A.   That's fair.  Like I said, it
24 all depends on the engagement.  It could be
25 a manager, it could be two managers and two

24

1     Jason Sevier - Confidential
2  senior managers, it could be a manager and
3  a senior manager.  There is an infinite
4  number of combinations.
5     Q.   Are you a CPA?
6     A.   Yes.
7     Q.   How long have you been a CPA?
8     A.   Approximately 1994.
9     Q.   Are you a member of any trade
10 organizations?
11    A.   Can you clarify.
12    Q.   AICPA?
13    A.   Currently, no.
14    Q.   Any organizations like that?
15    A.   Currently, no.
16    Q.   Were you at some point a member
17 of the AICPA?
18    A.   Yes.
19    Q.   And when was that?
20    A.   I'd say probably between '94
21 when I was initially certified and '98, I
22 guess.  I don't remember the exact dates.
23 That's an approximation.
24    Q.   Any others?
25    A.   Not that I recall.

25

Jason Sevier - Confidential

1   Jason Sevier - Confidential
2   Q.   Why aren't you currently a
3   member of the AICPA?  You didn't renew
4   or --
5   A.   I didn't renew.  I guess I
6   assessed the benefits were -- I don't want
7   to say I wasn't getting anything out of it,
8   but you get a magazine, and all the
9   information I was getting through our
10  channels.  So I didn't really see the need
11  to be a member.  And it's not required.
12  Q.   I think we got up to the point
13  where you were promoted to a manager
14  somewhere in '94, '95.
15  A.   '95 approximately.
16  Q.   Were you promoted again?
17  A.   Not until I got the -- I was,
18  yes.
19  Q.   When was that?
20  A.   That was approximately 2001.
21  Q.   After you moved to California?
22  A.   Correct.
23  Q.   Describe for me what the
24  circumstances of you moving out to
25  California were?

26

1   Jason Sevier - Confidential
2   A.   Sure.  During my time in
3   Baltimore in the time period mid to late
4   '90s, the Internet boom was kind of kicking
5   off, I had been involved in some smaller
6   Internet companies, a software company.  It
7   was an area that I kind of enjoyed, but the
8   opportunities to work on those type of
9   engagements really didn't exist except on
10  the West Coast.
11  The Silicon Valley office of
12  Arthur Andersen had recently been hit
13  pretty hard with a lot of defections to
14  start-up companies, and there was a
15  significant need for experienced managers.
16  I had requested to be transferred, and my
17  request was granted.
18  Q.   And so, you moved out to San
19  Jose?
20  A.   San Jose.
21  Q.   Sometime in 2000?
22  A.   Sometime in 2000.
23  Q.   September 2000, you were still
24  with Arthur Andersen and you were still an
25  audit manager?

27

1   Jason Sevier - Confidential
2   A.   Experienced manager.
3   Q.   What's the difference between a
4   senior manager and an experienced manager?
5   A.   In Arthur Andersen, the senior
6   manager is a significant promotion; an
7   experienced manager is just a title that
8   comes with tenure.
9   So after you have been a
10  manager for two years, you are just
11  labeled, it's not an official promotion
12  recognized within the firm, versus a senior
13  manager, which is a significant promotion.
14  Q.   You indicated that sometime
15  prior to 2000 that you had developed a
16  liking for the software industry, is that
17  fair?
18  MR. SIDORSKY:  Objection to
19  form.
20  A.   I developed an interest in
21  software and technology.
22  Q.   I know that there is a
23  difference, but from an accounting
24  perspective, how did you view the
25  difference between software and technology?

28

1   Jason Sevier - Confidential
2   MR. SIDORSKY:  I am going to
3   object to the form.
4   You can answer.
5   A.   The difference was obviously
6   software is basically an application,
7   technology is a -- it's a broad net.  It's
8   hardware, it's different components.
9   Just the whole concept was
10  interesting when you come from an area
11  where your manufacturing and distribution
12  is the dominant kind of industry.  When you
13  get into something new, like technology and
14  software, it's much more appealing than,
15  you know --
16  Q.   That's actually what I was
17  getting at.  I am assuming while you were
18  in Baltimore, you were doing
19  more manufacturing and distribution-type
20  office?
21  A.   And I was involved in the
22  broadcast industry, because there was a
23  pretty big broadcaster, which was my main
24  client when I was in Baltimore.
25  Q.   While you were in Baltimore,

29

Jason Sevier - Confidential
1
2 were you able to do any technology or
3 software?
4    A.   One small software company,
5 yes.
6    Q.   So during the time frame
7 after --
8        After you moved from Baltimore
9 to California, did you have to undergo
10 training with regard to accounting
11 provisions that applied to software
12 companies or technology companies?
13    A.   There was no specific training.
14 I mean, the firm had their standard
15 training, but I was not put in some
16 specific training program to facilitate the
17 transfer, no.
18    Q.   But is it fair to say you did
19 have to do at least some educational
20 advancement on software companies or
21 accounting provisions that applied to
22 software companies and technology
23 companies?
24    A.   It was more self-training than
25 firm-demanded training.

30

Jason Sevier - Confidential
1
2    Q.   Do you have a recollection of
3 some of the clients that you were assigned
4 to during that 2000 time frame when you
5 first moved out to California and worked
6 for Andersen?
7    A.   Yes, I do.
8    Q.   Can you tell me the ones that
9 you recall?
10    A.   Epiphany, Inc. and Broadvision.
11    Q.   Both software?
12    A.   Yes.
13    Q.   Were you the audit --
14        Were you the experienced
15 manager on those audits?
16    A.   On both, yes.
17    Q.   Do you recall any others that
18 you were assigned to when you first moved
19 out to California in 2000?
20    A.   Oracle.
21    Q.   So were you doing all three
22 right around the same time?
23    A.   That was my client list, but
24 they had different year ends, so they
25 weren't going on at the same time.

31

Jason Sevier - Confidential
1
2    Q.   Was that the total of your
3 client list in 2000?
4    A.   Yes.
5    Q.   Did it grow in 2001?
6    A.   No.
7    Q.   How about in 2002?  Let me
8 withdraw that question.
9        How long were you with Andersen
10 in California?
11    A.   June of 2002.
12    Q.   June 2002?
13    A.   Yes.
14    Q.   When you first got to Andersen
15 in California and at the time you left, had
16 your client list grown?
17    A.   Had not.
18    Q.   Had your responsibilities
19 grown?
20    A.   Define "responsibilities."
21    Q.   I think earlier you testified
22 that you got a promotion sometime in 2001.
23    A.   Correct.
24    Q.   What was that promotion?
25    A.   I was promoted to senior

32

Jason Sevier - Confidential
1
2 manager at some point in 2001.
3    Q.   Still had the same client list?
4    A.   Correct.
5    Q.   Describe for me your
6 responsibilities as a senior manager?
7    A.   As a senior manager on the
8 audit engagement, my responsibilities
9 didn't really vary, because I was already
10 the experienced manager on those
11 engagements, and I didn't have any other
12 managers in front of me.
13        So as a senior manager, as I
14 stated earlier, in the eyes of the firm,
15 it's a promotion for individuals who are
16 two years away from being a partner.
17        So your responsibilities are
18 different, in that you are now expected to
19 be more visible in the community, your
20 charity events, start to understand the
21 sale process, rainmaking aspect of the
22 business.
23        So from an audit
24 responsibility, they really didn't change;
25 but from a nonaudit responsibility

33

1      Jason Sevier - Confidential
2  perspective, they changed significantly.
3      Q.   I am going to go back a little
4  bit to cover an area I didn't cover.
5          You described for me several
6  levels of your advancement at Andersen.
7          Can you just tell me at what
8  level, if any level, did you become or did
9  you have more contact with the client, more
10  interfacing with the managers at the
11  client?
12      MR. SIDORSKY:  Objection to
13  form.
14      A.   Once again, it depends on the
15  size of the client.  On a small client, if
16  you are the experienced manager, you may
17  have a lot of contact, because the finance
18  shop in a small company may not be that
19  big.
20          On a large company, you may
21  have limited contact because their point of
22  contact is the partner on the engagement.
23          So my contact may have been the
24  assisting controller or the controller in a
25  large company, but on a small company, my

34

1      Jason Sevier - Confidential
2  main contact could have been the chief
3  financial officer.
4          So every situation, once again,
5  varies.
6      Q.   Would you say that as a staff
7  accountant you would be doing the
8  interaction with either the controller or
9  assistant controller or CFO?
10      A.   No.
11      MR. SIDORSKY:  Objection to
12  form.
13      Q.   No?
14      A.   No.
15      Q.   That's what I was actually
16  getting at.
17          At what level do the managers
18  or accountants at Andersen while you were
19  there begin to have that interaction with
20  the client?
21      A.   Usually as a manager.
22      Q.   Once you get to the manager?
23      A.   Yes.
24      Q.   So when you got out to
25  California and you were working with

35

1      Jason Sevier - Confidential
2  clients Epiphany, Broadvision and Oracle,
3  you weren't the audit partner on any of
4  those engagements, right?
5      A.   No.
6      Q.   Who was the audit partner, if
7  you recall, on the Epiphany engagement?
8      A.   Gary Matuszak.
9      Q.   How about the Broadvision
10  engagement?
11      A.   It -- the partners changed.
12  Mark Jensen was originally the partner,
13  along with Carol Palmer.  There were two
14  partners.  Mark rolled off and Gary
15  Matuszak rolled on for a short period of
16  time, and then Gary was involved in a
17  secondary role, and Angelika Caicedo was
18  the lead partner on Broadvision.
19      Q.   When you say "a second role,"
20  what does that mean?
21      A.   He did not sign the audit
22  opinion, but he was more of an advisor from
23  a technical perspective, meaning if there
24  was a software question that needed to be
25  addressed or answered, Gary was available

36

1      Jason Sevier - Confidential
2  as an advisor.  Because of his national
3  role within the firm, the client wanted
4  access to him.
5      Q.   What was his role in the firm?
6  Do you know?
7      A.   Yes.  He was the firm's
8  software representative on the AICPA
9  software revenue recognition task force.
10  So he was viewed as the firm's software
11  expert.
12      Q.   Nationally?
13      A.   Nationally.
14      Q.   And that was Broadvision?
15      A.   Yes.
16      Q.   How about Oracle?
17      A.   Gary Matuszak was the lead
18  partner, and Angelika Caicedo was the
19  second partner for the 2001 audit.  And
20  then she rolled off, and Tom Olinger was
21  the second partner after Angelika rolled
22  off.
23      Q.   Do you remember any of the
24  names of the people on the audit team for
25  the Oracle engagement in 2000 and 2001?

37

Jason Sevier - Confidential

1
2     A.   Can you clarify.  You mean from
3  the Andersen team?
4     Q.   Yes, that's what I meant.
5     A.   I don't remember everybody, but
6  I do remember some folks.
7     Q.   Can you just tell me the ones
8  that you do remember?
9     A.   Elisa Lambourne, Pam Arquelada,
10 Shin Honma, Paul Yoo, Staci Kawakami,
11 Vivian Chang, and Christina Knauss.
12    Q.   There may be some that you
13 don't remember, but approximately how many
14 people were on the Andersen audit team for
15 Oracle?
16    A.   I don't know the exact number,
17 I can give you an approximation.
18    Q.   That's good, that's fine.
19    A.   I'd say maybe six to eight
20 people.
21    Q.   Among the people that you just
22 recalled, were you senior to all of those
23 people?
24    A.   Yes.
25    Q.   And you reported to Gary

38

Jason Sevier - Confidential

1
2  Matuszak on the audit?
3     A.   I reported to Angelika and
4  Gary, because there were two partners.
5     Q.   Angelika?
6     A.   Caicedo.  So there were two
7  partners on the job.
8     Q.   What was Angelika's role?
9     A.   She was the second partner.
10 That was her role.
11    Q.   You described Gary Matuszak as
12 kind of the expert on AICPA revenue
13 recognition for software companies.
14    A.   Right.
15    Q.   Or software.
16    A.   Right.
17    Q.   Did Angelika have a similar
18 type of status or role?
19    A.   No, that's not the way she was
20 viewed.  Her role was different.
21    Q.   Can you describe how it was
22 different?
23    A.   The makeup -- Gary is the lead
24 senior partner, he signs the audit opinion.
25 Angelika is the second partner, which means

39

Jason Sevier - Confidential

1
2  she also has responsibilities, meaning she
3  will review certain areas of the engagement
4  and sign-off, and there are certain areas
5  that Gary is going to handle firsthand
6  himself.
7        So I don't want to say it's a
8  complete division of responsibility, but
9  there are different roles in that respect.
10 And Gary was the main contact with the
11 company, due to his history on the Oracle
12 engagement.
13    Q.   You said that there are some
14 things that Gary would have particular
15 responsibility upon.  What do you mean when
16 you say that?
17    A.   Gary was the point person for
18 revenue and any matters that came up.  If
19 the client wanted to talk to someone from
20 the engagement team, Gary was the point of
21 contact.
22        So the client would not call
23 Angelika, they called Gary.  So he was
24 viewed as the point person from
25 management's perspective.

40

Jason Sevier - Confidential

1
2     Q.   Even if he wasn't actually
3  physically on site for the audit?
4        MR. SIDORSKY:  Objection to
5  form.
6     Q.   You can answer.
7     A.   Correct.
8     Q.   Do you know how long Gary had
9  been the audit partner for the Oracle
10 audit?
11    A.   I don't know his exact tenure,
12 no.
13    Q.   Based on your knowledge, was it
14 more than two years?
15    A.   Yes.  Based on my knowledge,
16 yes.
17    Q.   Would you say more than five?
18    A.   I can't say accurately.  I
19 could guess.  I don't know exactly.
20    Q.   But you would say at least more
21 than two years, right?
22    A.   Yes.
23    Q.   You indicated that last week
24 you had a chance to look at some documents,
25 right?

41

1        Jason Sevier - Confidential
2        A.    Correct.
3        Q.    At least part of the '01 audit,
4   right?
5        A.    Correct.
6        Q.    Did any of those documents
7   refresh your recollection about the matters
8   occurring back then in Oracle's fiscal
9   2001?
10       A.    Can you --
11       MR. SIDORSKY:  Objection to
12   form.  It's very broad and vague.
13       A.    Can you clarify or refresh.
14       Q.    You indicated a few minutes ago
15   that you remembered some people's names but
16   not everyone, and that's what I'm talking
17   about.
18          Is there anything that you
19   reviewed that refreshed your recollection
20   on any issue relating to Oracle's audit
21   during that period?
22       MR. SIDORSKY:  Same objection.
23   That could encompass a lot of things.
24   Objection to vagueness.
25       Q.    You can answer.

42

1        Jason Sevier - Confidential
2        A.    It's been six years.  Flipping
3   work papers, I remember some things that I
4   had not seen in six years or some things I
5   had forgotten.  I remembered some people
6   who -- I had seen people's names that I had
7   forgotten and just kind of seeing how the
8   work papers were made up, because I have
9   been out of auditing for three or four
10   years now.
11          So it did refresh my memory on
12   some things.
13       Q.    Did it refresh your
14   recollection on any particular transactions
15   or any particular events?
16       MR. SIDORSKY:  Same objection,
17   overly broad and vague.
18       A.    I wouldn't say specifically.
19       Q.    Maybe if we talked about some
20   of the documents themselves, which we'll do
21   at some point, we can kind of go through
22   that again.
23       A.    Right.
24       Q.    Have you ever seen --
25   withdrawn.

43

1        Jason Sevier - Confidential
2          Do you know what this case is
3   about?
4       MR. SIDORSKY:  Objection to
5   form.
6       A.    I read the subpoena.
7       Q.    Have you ever seen a Complaint
8   in this action?
9       A.    Yes.
10       Q.    When was the first time that
11   you saw a Complaint in this action?
12       A.    When I met with Mr. Sidorsky
13   for the first time.
14       Q.    And that was couple months ago,
15   maybe a month or so go, a little longer
16   than that?
17       A.    I don't remember the exact
18   date.
19       Q.    Do you remember if the
20   Complaint that you saw had any version like
21   First Amended or Second Amended or Third
22   Amended?
23       A.    I don't remember exactly.
24       Q.    Did you read it?
25       A.    Not in its entirety.

44

1        Jason Sevier - Confidential
2       Q.    What did you read?
3       A.    I read certain sections that
4   were pointed out to me.
5       Q.    Now, when you --
6          So when you moved out to
7   California and worked for Andersen, it was
8   in the fall of 2000, right?
9       A.    Correct.
10       Q.    Were you immediately put on the
11   Oracle engagement?
12       A.    I was not.
13       Q.    When did you begin working on
14   the Oracle engagement?
15       A.    The second quarter of that
16   fiscal year.
17       Q.    Second quarter of Oracle's
18   fiscal year?
19       A.    Yes, Oracle was May 31st.  So
20   when I arrived -- Andersen was performing a
21   first-quarter review when I arrived.  When
22   that first quarter was completed, I began
23   my involvement with the second quarter.
24       Q.    So you may not have --
25   withdrawn.

45

1        Jason Sevier - Confidential
2        So your actual work probably
3    started in December, January, somewhere
4    around there?
5        A.    Correct.
6        Q.    Do you know who held -- and you
7    were the senior manager?
8        A.    Experienced manager at the
9    time.
10        Q.    Do you know who was the
11    experienced manager on the engagement prior
12    to you taking on that role?
13        A.    I know who the manager was, I
14    don't know if his title was experienced
15    manager or not.  But I know who the manager
16    was.
17        Q.    And who was that?
18        A.    Lance Taylor.
19        Q.    Did he leave Andersen or
20    something?
21        A.    Yes, he did.
22        Q.    Do you know where he went?
23        A.    I do not know the name of the
24    firm he went to.
25        Q.    Had you ever met him?

46

1        Jason Sevier - Confidential
2        A.    Yes.
3        Q.    Did he kind of help give you
4    some background on the Oracle engagement?
5        A.    Yes.
6        Q.    What did that entail, the
7    contact people at Oracle who is likely to
8    have information, things of that nature?
9        MR. SIDORSKY:  Objection to
10    form.
11        A.    Yes.  Who our main contacts
12    are, who we notify when we need something,
13    what kind of plan, when we typically start,
14    how the whole process goes.  So it's more
15    like transition type of conversations that
16    we had.
17        Q.    When you started on the Oracle
18    engagement, who were your contacts at the
19    company, if you recall?
20        A.    When I started, I really didn't
21    have any contacts, because I was new.  Once
22    I was out there for a little while and was
23    introduced, then I started to develop.  But
24    I didn't start day 1 when I stepped on foot
25    at Oracle's campus with contacts.  So they

47

1        Jason Sevier - Confidential
2    developed over time.
3        Q.    Between 2000 when you started
4    with the Oracle engagement and the end of
5    calendar 2001, who were your primary
6    company contacts at Oracle?
7        A.    My primary contacts were Mike
8    Quinn, Tom Williams, and there was another
9    individual, Brad, and I cannot remember
10    Brad's last name.  And to a lesser extent,
11    and much lesser extent, Jennifer Minton,
12    who was the corporate controller.  But as I
13    said, it was a much lesser extent.
14        Q.    Among the people that you told
15    me that you recalled were on the engagement
16    team, would any of those people have more
17    contact with company representatives than
18    you as the experienced manager?
19        MR. SIDORSKY:  Objection to
20    form.
21        A.    Can you clarify "company
22    representatives."
23        Q.    People at the company
24    like Julie -- I'm sorry, withdrawn, Mike
25    Quinn, Brad, Jennifer Minton.

48

1        Jason Sevier - Confidential
2        A.    The individuals that I had
3    mentioned previously would not have had
4    more contact with the people I previously
5    mentioned than myself.
6        Q.    Have you heard of Julie Chan?
7        A.    Yes.
8        Q.    Was she one of the people that
9    you had contact with at the company?
10        A.    Not direct contact.
11        Q.    I am assuming that means you
12    had some indirect contact with her?
13        A.    That means I knew who she was
14    and I may have had a conversation, but she
15    was not a direct contact of mine.
16        Q.    Do you know if she was a direct
17    contact of anyone else?
18        A.    Depending on who worked on the
19    area that she was in charge of, I believe
20    Julie had involvement with accounts
21    receivable.
22        So whoever on the engagement
23    from Andersen's side who was responsible
24    for working on that area would have had the
25    primary contact with Julie.

Jason Sevier - Confidential

Q. So correct me if I'm wrong, some of the engagement -- some members of the engagement team would have contact with people at the company that would impact the work papers, but that didn't necessarily mean that you had direct contact with the company representative, is that fair?

MR. SIDORSKY: I am going to object.

A. Can you clarify "impact the work papers."

Q. It's true that people on the engagement team would talk to people at the company and make notes in the work papers about their conversations, right?

A. That's correct.

Q. And that's what I mean.

A. Okay.

Q. So people on your engagement team might have contact with members of the client staff that actually impact the work papers by either notes or -- notes that you may not have contact with?

A. That's correct.



Jason Sevier - Confidential

Q. So you remembered Mike Quinn, Brad somebody, Jennifer Minton?

A. Yes.

Q. Anyone else?

MR. SIDORSKY: Asked and answered. That's on the record.

Q. Do you know Tom Williams?

A. I knew Tom Williams.

Q. Did you have contact with Tom Williams as part of your role as the experienced manager in the Oracle engagement?

A. Yes.

Q. Did you just not recall him a few minutes ago?

MR. SIDORSKY: I think he did say it.

A. I did say Tom Williams.

MR. WILLIAMS: My mistake.

Q. I'm not trying to trick you or anything. You did say Tom Williams?

A. I did say Tom Williams.

Q. When you first began working on the Oracle engagement, a few minutes ago,



Jason Sevier - Confidential

you indicated that you might be on Oracle's campus.

A. Yes.

Q. Where exactly did the audit take place, if you recall?

A. When I first started, the first-, second-quarter review is what I first got involved in, that took place at the corporate headquarters, which was in Redwood Shores, California.

Subsequent to that, a lot of the work was done in Rockland, California, which is where a majority of the accounting personnel were located.

Q. Now, when you started on the quarterly -- second-quarter review, did you have access to any of Oracle's electronic systems, accounting systems, in order to conduct the audit?

A. No. During the review, which is a review, we didn't have access to any of the systems.

Q. Describe for me generally the review process as opposed to the audit, the



Jason Sevier - Confidential

year-end audit?

A. Well, in the year-end audit, with the exception of the revenue contract review work, because what we did in the quarters was similar to what we did at year end because of the magnitude but exclusive of revenues, on a quarterly basis, you are not doing substantive testing.

Q. You are not, I'm sorry?

A. During a quarterly review, you are not. A review, by definition, in the AICPA guidelines is less in scope, which means you are not actually testing and vouching, you are doing a lot of analytical procedures. But revenue was different due to just its nature. So we did different procedures on revenue.

Q. When you say "a lot of analytical procedures," what do you mean?

A. I mean variation analysis, why did balances go up, why did balances go down, that type of thing.

Q. During the review, let's say, of a variation analysis, what level of

53

1      Jason Sevier - Confidential
2  detail does the auditor go through during a
3  review to determine the reasons for
4  variations, if they exist?
5      MR. SIDORSKY:  Objection to
6  form.
7      A.   Typically, there is not detail,
8  it's reviewed during the quarterly review,
9  because it's a review, it's analytical, you
10  get an explanation.
11      If you feel the explanation
12  makes sense based on your prior year's
13  activities because you start understanding
14  cycles, if it makes sense, then you move
15  on.
16      You design your year-end audit
17  test to potentially go back and look at
18  some things if you think they warrant
19  additional work.  But during the
20  (inaudible), you are really not digging
21  into what I call the detail, it's really
22  just analytical in nature, exclusive of
23  revenue.  I want to make sure I'm clear on
24  that.
25      Q.   Tell me what you mean since you

54

1      Jason Sevier - Confidential
2  said that a couple times, "exclusive of
3  revenue"?
4      A.   What I mean is revenue was a
5  specific process.  Every quarter, we looked
6  at the top 20 revenue contracts, we were
7  provided copies of the contracts and the
8  supporting documentation.  Typically on
9  average, we looked at between 30 and 40
10  percent of the revenue in each period.
11      So we basically in the quarters
12  audited revenue.  So it was an area that we
13  did what I would call audit procedures
14  versus analytical procedures, just because
15  of the size and the magnitude of the
16  revenue.
17      Q.   Why don't we just go through
18  that for a minute.
19      What you are saying is during
20  the quarterly reviews, the engagement would
21  include an audit-type review of revenue?
22      A.   That's correct.
23      Q.   Can you describe for me the
24  audit-type review of the revenue during the
25  quarterly reviews?

55

1      Jason Sevier - Confidential
2      A.   I am being specific to license
3  revenue, because there is a number of
4  different types of revenue.  There is
5  license revenue, there is professional
6  services revenue, there is maintenance
7  revenue.  I am talking about license
8  revenue.
9      So typically, what we would do
10  is the company would provide for us a list
11  of the top 20 revenue contracts that were
12  generated -- when I say "generated,"
13  meaning were entered into that quarter --
14  we are given an executed copy of the
15  revenue contract, we are given a write-up
16  by the company about the contract and any
17  potential issues that may exist.  When I
18  say "exist," meaning in the company's eyes,
19  if they thought that there was a situation
20  where one of the contracts didn't
21  specifically meet the accounting rules and
22  some of the revenue had to be deferred to
23  another quarter.
24      Oracle had a standard revenue
25  checklist which had the specific guidelines

56

1      Jason Sevier - Confidential
2  of the technical literature that needed to
3  be signed off on by the company to make
4  sure they met the recognition criteria.
5      So we would read the contracts
6  in their entirety, review the company's
7  work, we would tie the contract to
8  supporting invoices, and we would tie the
9  revenue into the general ledger.
10      So we would do audit testing on
11  the contracts versus just discussing or
12  looking at the contract with the company, a
13  much more in-depth process.
14      Q.   During the quarterly reviews,
15  you didn't have access to any of the
16  company's systems, though?
17      MR. SIDORSKY:  Objection to
18  form.
19      A.   Can you define "access."
20      Q.   Let me withdraw that.
21      Awhile ago, I asked if during
22  the quarterly reviews the Oracle -- the
23  Andersen engagement team had access to
24  Oracle's electronic systems.  Do you recall
25  that?

57

Jason Sevier - Confidential
1
2    A.   Yes, I recall the question.
3    Q.   I think what you indicated was
4    that -- I think you said no.
5         I understood from your answer
6    that you may have access to them at the
7    year-end review, is that fair to say?
8         MR. SIDORSKY:  I am going to
9    object.  I think it's misleading.
10        You should clarify what you
11   mean by access to electronic systems.
12   That could mean different things, at
13   least in my mind, but you can answer.
14   A.   Maybe I can clarify what I
15   meant by "access" or "not access."
16        What I meant by "access" is
17   during the year-end audit, we do controlled
18   testing and testing of the system, meaning
19   we select transactions and we track them
20   through the system.
21        During the quarter, if we need
22   to tie a balance into the general ledger,
23   well, we can see a hard copy of the general
24   ledger or we can go online, meaning the
25   company will sit us down at a terminal and

58

Jason Sevier - Confidential
1
2    show us a balance online.
3         So when I say "access to the
4    system," I mean we can look at a balance on
5    the system; but during the quarter, we
6    don't actually test transactions going
7    through and seeing how the internal
8    accounting system processes the
9    transaction.
10        So that's how I was
11   differentiating between access to a system
12   and not.  No auditor ever has carte blanche
13   access to a company's system.
14   Q.   But you had at least limited
15   access during the year-end audit?
16        MR. SIDORSKY:  Objection to
17   form.
18   Q.   Go ahead.
19   A.   For specific tests that we
20   performed.
21   Q.   Did you have terminal access
22   during quarterly reviews for any specific
23   tests on license revenue?
24        MR. SIDORSKY:  Same objection.
25   A.   We were never given our own

59

Jason Sevier - Confidential
1
2    terminal.  If we went to one of the
3    employees and said, here is a report, we
4    would like to see online this amount in the
5    general ledger or in the customer's
6    account, they would bring it up and we can
7    look at it on their screen.  But we never
8    had our own terminal where we had a login
9    name and password that gave us access to
10   the system, not that I recall, at least I
11   never did.
12   Q.   Just to recap a little bit,
13   during the quarterly reviews, you did
14   audit-type review on just revenue?
15   A.   Correct.
16   Q.   And that would include a review
17   of the top 20 license deals --
18   A.   Correct.
19   Q.   -- that were done in that
20   quarter?
21   A.   Well, I need to clarify that.
22   Depending if in the prior quarter there was
23   a significant contract and the revenue was
24   required to be deferred and that deferral
25   meant that revenue was recognized in, say,

60

Jason Sevier - Confidential
1
2    the second quarter, then that contract
3    would have probably popped up in the second
4    quarter, even though it was technically
5    entered into in the first quarter.
6         So it's the top 20 contracts
7    that are either entered into or the revenue
8    is recognized in that quarter.
9         So I just want to make sure I
10   clarify that's not exactly what I said
11   before.  I said "entered into," but the way
12   the rules work, the revenue could carry
13   over to another quarter.
14   Q.   So is it fair to say that you
15   didn't audit revenue -- withdrawn.
16        Is it fair to say you didn't
17   audit total revenue balances in the
18   quarterly reviews?
19        MR. SIDORSKY:  Objection to
20   form.
21   A.   That's correct.
22   Q.   Is it fair to say that the
23   Andersen engagement team did not audit
24   variations in revenue during quarterly
25   reviews?

61

1       Jason Sevier - Confidential
2           MR. SIDORSKY:  Objection to
3   form.
4       A.   Can you -- I don't really
5   understand the question.
6       Q.   Say, for example, there is a
7   huge spike or a huge decline in revenues
8   from the prior quarter.
9       A.   Okay.
10      Q.   Is that a variation that the
11  Andersen engagement team would review
12  during quarterly reviews?
13          MR. SIDORSKY:  Objection to
14  form.
15      A.   Yes.  If there was a spike or a
16  decline, we would ask a question.
17      Q.   Would that be it, just ask a
18  question?
19      A.   Well, for example, the fourth
20  quarter is the biggest quarter.  So we get
21  to the first quarter and revenue declines,
22  we know that makes sense, because the
23  fourth quarter is the highest volume
24  quarter, and the first quarter is the
25  lowest volume.

62

1       Jason Sevier - Confidential
2       So when you see a decline, we
3   ask the question, but we know the reason
4   behind it.  That's as far as you take it.
5   That's the best way I can kind of explain
6   the process.
7           MR. SIDORSKY:  Would this be a
8   good time to take a short break?
9           MR. WILLIAMS:  Sure.
10          THE VIDEOGRAPHER:  The time is
11  10:08 a.m.  We're going off the
12  record.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  The time is
15  10:27 a.m., and we're back on the
16  record.
17      Q.   We left off talking a little
18  bit about revenue testing in the quarterly
19  reviews.
20      A.   Right.
21      Q.   Did the Andersen engagement
22  team do any testing of support revenue
23  during quarterly reviews?
24      A.   Not audit testing from what I
25  recall.

63

1       Jason Sevier - Confidential
2       Q.   Did the Andersen engagement
3   team do any audit testing of service
4   revenues during quarterly reviews?
5       A.   Not that I recall.
6       Q.   Is it fair to say the only
7   audit testing of revenue during quarterly
8   reviews was license revenue?
9       A.   To the best of my recollection,
10  yes.
11      Q.   With respect to the license
12  revenue testing, you indicated that the
13  Andersen team would look at the top 20
14  license deals, right?
15      A.   Correct.
16      Q.   When those -- withdrawn.
17          Is it fair to say that the
18  audit team would apply SOP 97-2 to the
19  sales and revenue recognition of those top
20  20 license deals?
21          MR. SIDORSKY:  Objection to
22  form.
23      A.   Can you clarify what you mean
24  by "apply 97-2."
25      Q.   Are you familiar with SOP 97-2?

64

1       Jason Sevier - Confidential
2       A.   Yes.
3       Q.   Just generally, what are the
4   requirements of SOP 97-2 with respect to
5   revenue recognition on software sales?
6           MR. SIDORSKY:  I am going to
7       object.  I don't know if the witness
8       is here to testify in that capacity
9       about GAAP or accounting standards.  I
10      also think that may be beyond the
11      scope of your examination under the
12      Order governing this deposition.  But
13      subject to those objections, go ahead.
14      A.   I don't know the -- I don't
15  remember the specific requirements.  I
16  haven't worked in that arena for awhile.  I
17  have a vague idea.
18      Q.   I am entitled to your best
19  recollection.  If you only recall one
20  element, that's fine.
21      A.   I do remember delivery has
22  occurred, fixed and determinable price,
23  collectability is assured, I think three of
24  the four I remember.
25      Q.   Is it fair to say back then

65

```
1        Jason Sevier - Confidential
2    when you were doing that type of work,
3    auditing of software companies, that that
4    stuff would have been more fresh in your
5    mind?
6        A.   It's very accurate, yes.
7        Q.   So back to my earlier question,
8    is the testing that -- withdrawn.
9            Was the testing on revenue for
10   the top 20 license deals conducted during
11   the quarterly reviews tested in conformance
12   with SOP 97-2?
13       MR. SIDORSKY:  Objection to
14   form.
15       A.   I think that's accurate, yes.
16       Q.   So during the quarterly
17   reviews, you would look to make sure that
18   there was a contract?
19       A.   Correct.
20       Q.   And that the fees were fixed
21   and determinable?
22       A.   Correct.
23       Q.   And that delivery had occurred?
24       A.   Correct.
25       Q.   How would you test whether
```

66

```
1        Jason Sevier - Confidential
2    delivery had occurred on those top 20
3    license deals?
4        A.   What we would do is each
5    quarter we would actually go at the end of
6    the quarter and we would have one or two
7    people actually go to the shipping docks
8    and verify and do shipping procedures.
9            So while you may not
10   specifically see that those --
11           In the top 20, they may have
12   been shipped in the middle of the quarter.
13   So there wasn't a procedure to say in the
14   middle of a quarter go verify that it was
15   shipped, because the risk is at the end of
16   the quarter, there is stuff sitting on the
17   dock that doesn't get out.
18           So we would have procedures at
19   the end of the quarter that were done to
20   verify that everything that was supposed to
21   be shipped was, in fact, shipped at the end
22   of the quarter.  But we would also
23   verify -- on those top 20 contracts, we
24   would have the actual shipping invoice to
25   show that the disk was sent or
```

67

```
1        Jason Sevier - Confidential
2    authorization was given.
3            So we didn't visibly stand at
4    the dock, because those happened
5    sporadically, but there were procedures
6    that were done at the end of the quarter in
7    the general shipping process.
8        Q.   Did you -- withdrawn.
9            Are you familiar with SAB 101?
10       A.   Yes.
11       Q.   Are you familiar with SAB 101
12   as it relates to SOP 97-2 and delivery?
13       MR. SIDORSKY:  Objection to
14   form.
15       A.   Presently, I don't remember; at
16   the time, I'm confident that I did.
17       Q.   During the quarterly reviews of
18   the top 20 license deals, did the Andersen
19   engagement team test to see whether the
20   software had been accepted by the buyer?
21       A.   Can you clarify.  I'm sorry.
22       Q.   With respect to the top 20
23   license deals that were reviewed at the
24   quarterly reviews, was there any testing as
25   to whether there were any future
```

68

```
1        Jason Sevier - Confidential
2    obligations of the company with respect to
3    the sale?
4        A.   When you go through and you do
5    the revenue contract, you look -- review
6    during the quarters, you look to see for
7    specific language which says that the
8    company has to specifically accept this,
9    meaning they have to notify the company,
10   because there could be what's called
11   quote/unquote "non-standard terms."  In a
12   situation where a contract contained a term
13   that this was not accepted until the
14   company notifies Oracle, that would be
15   considered a non-standard term.  If it
16   wasn't in there, then FOB shipping point
17   basically satisfied delivery and
18   acceptance.
19           So we would review the contract
20   for non-standard terms, and that's how we
21   would get comfortable with acceptance.
22       Q.   So you wouldn't test whether
23   the customer actually received the product
24   that it bargained for?
25       MR. SIDORSKY:  Objection to
```

69

Jason Sevier - Confidential

1    form.
2    
3        A.   In our eyes, the FOB -- I'm
4    sorry, the review of the shipping document
5    showing that the document was shipped
6    during the quarter; and then at the year
7    end, we would send confirmations, which
8    would verify receivable balances.  And
9    through a customer who is sending back
10   saying they agreed, that shows that they've
11   actually received the product.
12       So during the quarter, we
13   looked at the shipping documents, but there
14   was no conversation with a company that
15   verified a disk was received.
16       Q.   Or accepted?
17       A.   Well, as I stated earlier --
18       MR. SIDORSKY:  Objection to
19   form.
20       A.   As I stated earlier, by not
21   having any language in the contract that
22   required the customer to notify the company
23   of acceptance, acceptance was deemed to
24   have happened upon shipment by Oracle.
25       Q.   You indicated that at the year

70

Jason Sevier - Confidential

1    end, you would send confirmations.
2        A.   Correct.
3        Q.   What does that mean?
4        A.   The confirmations were a --
5    there was a couple different ways we did
6    it.  We would send confirmations for the
7    specific revenue contracts that we audited,
8    and then we would do a statistical sample
9    of the overall accounts receivable balance
10   and send out confirmations to customers to
11   verify the outstanding balance, as well as
12   have a section for any other non-standard
13   terms that they might want to tell us
14   about, meaning to verify side agreements
15   and such and alike.
16       Q.   Oracle had a lot of deals,
17   though, in each quarter or year end, is
18   that fair?
19       MR. KONOVALOV:  Objection,
20   vague and ambiguous, calls for
21   speculation.
22       A.   Define "a lot."
23       Q.   Withdrawn.
24       In your recollection for

71

Jason Sevier - Confidential

1    Oracle's year end for fiscal '01,
2    approximately how many confirmations would
3    Andersen send out?
4        A.   I don't recall the exact
5    amount.
6        Q.   And that's what I was trying to
7    get at when I said there are a lot of
8    deals.  Would it just be for the top 20
9    license deals, or would it be randomly
10   selected?
11       A.   Not randomly.  We judgmentally
12   selected the top 20 deals, and then we ran
13   a monetary unit sampling statistical
14   package that generated the number of
15   confirmations for us to send.
16       Q.   What do you mean by "a monetary
17   unit sampling"?
18       A.   What that entails is you --
19   it's a statistical package, whereby you
20   enter certain information, i.e. total
21   account balance, the firm's materiality,
22   the firm's tolerable error, and the
23   monetary unit sampling, otherwise known as
24   MUS, will tell you to select every certain

72

Jason Sevier - Confidential

1    dollar amount, meaning it will tell you to
2    pick every fifty thousandth dollar.
3        So what you do is you then take
4    the A/R trial balance and you load it into
5    an Excel spreadsheet, you go down and you
6    have it flagged.  It just starts counting
7    from dollar one, and as soon as it hits
8    fifty thousand, whatever invoice that is,
9    it gets picked, and it starts counting
10   fifty thousand and one up to a hundred
11   thousand, and it picks the next invoice.
12       So basically, what you are
13   confirming is specific invoices for various
14   customers.
15       Q.   Are you working now?
16       A.   Yes.
17       Q.   Who are you working for now?
18       A.   Currently, I work for a company
19   called Huron Consulting Group.
20       Q.   What type of work are you
21   doing?
22       A.   I am a managing director in the
23   finance and economic consulting practice.
24       Q.   What are your job

73

1        Jason Sevier - Confidential
2    responsibilities?
3        A.   I have only been there for
4    three weeks, so I am still getting familiar
5    with my responsibilities.  But I kind of
6    oversee various consulting projects,
7    transaction advisory, M and A type work,
8    that type of thing.
9        Q.   When you left Andersen in, what
10   did you say, June '02?
11       A.   June 2002.
12       Q.   What did you do then?
13       A.   Then I went to KPMG.
14       Q.   Was that in California?
15       A.   Yes.  Well, I need to clarify
16   that.  I went to KPMG in the California
17   office, but they transferred me to their
18   national accounting office here in New
19   York.
20            So it was a two-year rotation,
21   but technically, I was still on the payroll
22   of the California office.  That's just a
23   technicality.
24       Q.   Still doing the same type of
25   work?  Were you an experienced manager?

74

1        Jason Sevier - Confidential
2        A.   Senior manager.
3        Q.   Senior manager?
4        A.   Yes.  The work was completely
5    different.
6        Q.   What were you doing?
7        A.   I did not have audit engagement
8    responsibilities.  It was more of a -- the
9    best way to describe it is an
10   advisory/ivory tower position, meaning you
11   answered technical questions on a daily
12   basis that engagement teams would have.
13            The national office is a
14   technical think tank, is the best way to
15   describe it.
16       Q.   Do you still speak to people
17   that were on the engagement team at Oracle?
18       A.   From Andersen?
19       Q.   Yes.
20       A.   No, I do not.
21       Q.   I am just going to show you
22   some of the work papers that I have gotten,
23   and maybe you can help me sort of
24   understand them.
25       A.   Sure.

75

1        Jason Sevier - Confidential
2        Q.   I am going to show you what's
3    been previously marked as Chan number 3.
4        A.   I'm sorry, marked as what?
5        Q.   It's just a mark on there.  It
6    has been previously marked as Chan number
7    3.  Actually, they spelled the name wrong.
8            MR. SIDORSKY:  In other words,
9        this was Exhibit 3 at Julie Chan's
10       deposition.
11           MR. WILLIAMS:  Chan number 3 is
12       Bates numbered AA 00015 -- I am not
13       going to put the Bates numbers on
14       here, because they actually skip
15       around a little bit.  But it goes from
16       000015 through 23, and then jumps from
17       AA 000081 through 87, and then finally
18       000181.
19       Q.   Do you recognize any portion of
20   the document that has been previously
21   marked as Chan number 3?
22       A.   Yes.
23       Q.   Which portions do you
24   recognize?
25       A.   I recognize from my review of

76

1        Jason Sevier - Confidential
2    the work papers last week.
3        Q.   Looking at the first page, AA
4    15, does this first page have a term or a
5    name, like a lead sheet or something along
6    those lines?
7        A.   It just would be called a file
8    front.
9        Q.   You see in the Description in
10   the middle of the page it says "Q1 fiscal
11   '01," "Q2 fiscal '01," and "Q3 fiscal '01"?
12   What does that refer to?
13       A.   The first quarter of fiscal
14   year 2001, and the same for Q2 and Q3.  I
15   believe this signifies that this was on the
16   front of the first-quarter review file for
17   fiscal year 2001.
18       Q.   How would one know that it was
19   only for the first quarter of fiscal '01?
20       A.   Because at the top where it
21   says "nature of job and period covered," it
22   says "FY 2001 quarter review," and then it
23   says in the middle "Q1 FY 2001 description
24   of this file."
25       Q.   Tell me why then, if you know,

77

```
1          Jason Sevier - Confidential
2    it has the first, second and third quarters
3    in the Description?
4        A.   That I can't tell you.  It
5    could be standard firm index and policy.
6    But what the focus is on is the
7    "description of this file."
8        Q.   Do you recognize the signature
9    on the bottom right with the underline and
10   then it says "manager" there?
11       A.   Yes, that's Lance Taylor.
12       Q.   That's the person that was the
13   senior manager prior to you getting on the
14   engagement?
15       A.   I don't know if his title was
16   senior manager, but he was the ranking
17   manager prior to my arrival.
18       Q.   Do you recognize the other
19   names on the first page here in the Name
20   and Rating section?
21       A.   Yes, I do.
22       Q.   How do you recognize them?
23       A.   Can you clarify.
24       Q.   Did you work with them?
25       A.   Yes, I did.
```

78

```
1          Jason Sevier - Confidential
2        Q.   You didn't indicate the names
3    of these people when we talked earlier as
4    people that you recalled, right?
5          MR. SIDORSKY:  Objection to
6    form.  That's not the record.
7        A.   I mentioned Paul, Pam and Shin
8    Honma, I did not mention Tara.
9        Q.   You didn't mention Tara?
10       A.   Tara, that's correct.  And
11   also, when I -- go ahead, I'm sorry.
12   Strike that.
13       Q.   I am going to ask you to turn
14   to the third page in the document Bates
15   numbered 000019.
16       A.   Okay.
17       Q.   Do you recognize this page?
18       A.   Can you clarify "recognize."
19   I'm not trying to be -- it's just that I
20   recognize the form of this page because
21   it's in the other quarters, but I didn't
22   work on this quarter.
23       Q.   That's fine.
24       A.   But I do recognize it from my
25   review.  I just want to clarify that.
```

79

```
1          Jason Sevier - Confidential
2        Q.   That's fine.
3          Do you recognize the form of
4    this page?
5        A.   I recognize the form, but not
6    the content, because I did not work on this
7    quarter.
8        Q.   What does the form appear to
9    be?
10       A.   This form depicts the
11   composition of accounts receivable.
12       Q.   Is it a variation analysis, if
13   you know?
14       A.   There are descriptions of the
15   variances between periods, but this would
16   be classified as the accounts receivable
17   lead sheet in audit terminology.
18       Q.   Looking up at the top, the
19   left-hand corner, you see it looks like a
20   title of a document there, right?
21       A.   Yes.
22       Q.   It says "Oracle Corporation
23   various analysis accounts receivable."
24       A.   Right.
25       Q.   Other than your experience with
```

80

```
1          Jason Sevier - Confidential
2    the Oracle audit, is there any -- anything
3    else on this document that would indicate
4    that it was a lead sheet?
5        A.   Just by the standard indexing,
6    Schedule B is typically the accounts
7    receivable lead sheet.  That's just
8    standard firm indexing.
9        Q.   Do you see Schedule B on the
10   page somewhere?
11       A.   Yes.
12       Q.   Where on the page?
13       A.   On my sheet, it's the --
14       Q.   Bottom right-hand corner?
15       A.   Yes.
16       Q.   So is it fair to say that in
17   review of the Oracle audit work papers, at
18   least for fiscal 2001, if I see a "B" down
19   in the bottom right-hand corner, it's the
20   lead sheet?
21       A.   That's correct.
22       Q.   Do you know whether or not --
23   withdrawn.
24          You said you didn't prepare
25   this document, right?
```

81

Jason Sevier - Confidential
1
2      A.   Correct.
3      Q.   And that's because you didn't
4  start working on the Oracle audit until
5  sometime in the -- toward the end of the
6  year, calendar year 2000?
7          MR. SIDORSKY:  Objection to
8  form.
9      A.   Well, this is not a document
10  that anyone from Andersen would have
11  prepared.  It's a document that's prepared
12  by Oracle.
13          So the answer to your first
14  question is yes.  But even if I would have
15  been on the job, I wouldn't have prepared
16  this.
17      Q.   That's fine.  That's exactly
18  the type of information that I'm looking
19  for.  Okay?
20      A.   Sure.
21      Q.   This is a document that appears
22  to be created by someone at Oracle?
23      A.   Correct.
24      Q.   Does that include the
25  handwritten notes, if you know?

82

Jason Sevier - Confidential
1
2      A.   The handwritten notes are notes
3  written by whatever Andersen team member
4  was working on the accounts receivable
5  section.
6      Q.   Help me understand, is it fair
7  to say that Oracle would provide kind of
8  the form to the Andersen engagement team
9  prior to the review or audit, and then
10  Andersen would use the form as a guide to
11  the audit?
12          MR. KONOVALOV:  Objection,
13      vague and ambiguous.
14          MR. SIDORSKY:  Same objection.
15      Q.   Is that fair?
16      A.   Can you be a little clearer,
17  because we're talking about a review.  I
18  just don't want my terms, "review" and
19  "audit," to get --
20      Q.   I'm sorry, I understand.  I
21  meant to say "review."
22          So is it fair to say that
23  Oracle would provide the form and Andersen
24  would use the form as a guide to the
25  review?

83

Jason Sevier - Confidential
1
2          MR. KONOVALOV:  Same objection.
3      A.   We would -- Andersen would use
4  this schedule or this lead sheet as part of
5  its overall review process.  It's one form
6  in the overall process.  There is others as
7  well in addition to accounts receivable.
8  So it's all part of the overall review.
9      Q.   Describe for me, if you can
10  recall, what forms would be provided to
11  Andersen by the company prior to the
12  review?
13      A.   Well, prior, typically, we got
14  these when we showed up on the first day.
15  So it's not like these were sent to us in
16  our office a week before and then we showed
17  up with them.  We would show up that day
18  and there would be a file for us.
19          So the schedules varied from a
20  cash lead sheet, accounts receivable,
21  prepaids, property, accounts payable,
22  accrued liabilities, stock owners equity.
23          I'm sure I am leaving out some,
24  because I just can't remember, but that's
25  the general theme.

84

Jason Sevier - Confidential
1
2          Usually there is a lead sheet
3  that support each balance sheet account.
4  So if you look in the financial statement,
5  each financial statement line item that
6  appears in the financial statements would
7  have a -- would have typically a lead
8  sheet.  That's the best way to think about
9  it.
10      Q.   This particular one we are
11  looking at now would just be for accounts
12  receivable?
13      A.   Correct.
14      Q.   Do you know whether this was a
15  document that --
16          Do you know whether this is a
17  document that you reviewed back in 2001 to
18  provide background for you as you began the
19  Q2 '01 review?
20      A.   Not to my recollection.
21      Q.   Would it be typical for someone
22  on the engagement team to look at the prior
23  quarter's review as it began the current
24  quarter review?
25      A.   Typically, before the

85

1     Jason Sevier - Confidential
2   subsequent quarter's review begins, there
3   really is no reason to go back and look at
4   the prior quarter.
5       Once you begin the quarter, the
6   subsequent quarter, if something comes up
7   and the response is, well, this is
8   consistent with a prior quarter, then you
9   may go back in a prior quarter to verify
10  that it is, in fact, consistent.  But there
11  is no mandatory step to go back and review
12  prior quarters.
13      Q.   Looking down on the bottom of
14  this document, you see where there appears
15  to be an initial, it looks like maybe J.M.?
16      A.   Yes.
17      Q.   Do you recognize this initial?
18      A.   I do not.
19      Q.   Do you know or do you recall
20  whether there was a J.M. on the engagement
21  team, the Oracle engagement team?
22      A.   I do not.  That signature is
23  not recognizable to me.
24      Q.   I am going to show you what's
25  been previously marked as Chan number 4.

86

1     Jason Sevier - Confidential
2       MR. WILLIAMS:  Chan number 4
3   begins with Bates number AA 000024 and
4   ends with AA 001638.
5       Q.   I just ask you to take a moment
6   to look at this document.  Let me know when
7   you're done, then I'll ask you --
8       MR. KONOVALOV:  I'm sorry,
9   Shawn, did you notice that this was
10  non-consecutively numbered?
11      MR. WILLIAMS:  Yes.  That's why
12  I only did the first page and the last
13  page.
14      A.   Okay.
15      Q.   Do you recognize generally
16  what's been marked as Chan number 4 as
17  being documents within the Oracle audit and
18  quarterly reviews for fiscal '01?
19      A.   Just from reviewing the top
20  index, it's not clear.  I have to flip a
21  couple pages to figure out where the
22  contents came from.
23      Q.   By flipping through it, are you
24  able to tell where the contents came from?
25      A.   Yes.  It appears they came from

87

1     Jason Sevier - Confidential
2   the second-quarter review file.
3       Q.   Looking at the first page, do
4   you see your signature on that page?
5       A.   I do.
6       Q.   You were the engagement manager
7   at least for -- at least as of January 1 of
8   2001, right?
9       A.   Correct.
10      Q.   Now, are you able to tell
11  looking at the first page what review this
12  is?
13      A.   Honestly, from the first page,
14  I'm not.  I mean, I can only guess by my
15  signature of 1/01, but I can't really tell
16  from the first page.
17      Q.   Just going down to the bottom,
18  you see that there is a bar code and some
19  numbers down there?
20      A.   Yes.  Down at the bottom, it's
21  stamped "Q2 fiscal year review 11/30/2000."
22      Q.   Is that a stamp that Andersen
23  puts on the document, the bar code?
24      A.   Yes.  Once the manager signs
25  the work papers, which means signs the file

88

1     Jason Sevier - Confidential
2   on the bottom there, that means that it's
3   approved for filing, and then to get filed
4   into the internal filing system, you submit
5   the work papers and they put that stamp on
6   that.
7       Q.   Was Christina Knauss someone
8   you mentioned earlier?
9       A.   Yes, she was.
10      Q.   If you signed this and approved
11  it for filing in January of '01, does that
12  help you recall when you actually began
13  working on the audit?
14      MR. SIDORSKY:  Objection to
15  form.
16      Q.   On the review?
17      A.   It gives me a better idea, yes.
18      Q.   Can you tell me when that may
19  have been?
20      A.   Most likely because it's a
21  second-quarter review, and the second
22  quarter ends in November, it would have
23  been the beginning of December at some
24  point, the middle of December of that year.
25      Q.   Going two pages in looking at

89

1        Jason Sevier - Confidential
2    Bates ending 26, again, it has Q1, Q2 and
3    Q3 on that page.  Does that indicate that
4    each quarterly review would have been in
5    this packet?
6        MR. SIDORSKY:  Objection to
7    form.
8        A.   No, it does not.
9        Q.   How about -- withdrawn.
10        You see on top of that page and
11    even on the very first page it indicates
12    2000-2.  Do you know what that means?
13        A.   I can speculate, but I don't
14    necessarily -- I don't know for sure.
15        Q.   What do you think it means?
16        A.   It could mean that it's the
17    second quarter file and that's the year
18    that the work was performed, but I don't
19    necessarily recall.
20        Q.   Going to the next page ending
21    in 27, it looks like a PowerPoint
22    presentation, right?
23        A.   Yes.
24        Q.   Do you know whether you did a
25    PowerPoint presentation for Oracle's audit

90

1        Jason Sevier - Confidential
2    committee in January of 2001?
3        A.   Can you clarify.  "You" as in
4    me specifically, or "you" as in --
5        Q.   I am asking you, and then I
6    will ask you if you know whether Andersen
7    did one.
8        A.   I did not prepare this audit
9    committee agenda.
10        Q.   Did you appear at an audit
11    committee meeting on behalf of Andersen in
12    January of 2001?
13        A.   I did not.
14        Q.   Do you know if one occurred?
15        A.   Yes, one did occur.
16        Q.   How do you know that?
17        A.   Because there was standard
18    procedure that at the end of every quarter,
19    there was an audit committee meeting, and
20    this was prepared for Gary Matuszak for his
21    attendance at the meeting.
22        Q.   Would he be the only one on
23    behalf of Andersen to appear at the audit
24    committee meetings?
25        A.   It's possible that the other

91

1        Jason Sevier - Confidential
2    partner on the job, whether it was Angelika
3    or, as I mentioned later, Tom Olinger
4    appeared.  But typically, with respect to
5    Oracle, only the partner went to the audit
6    committee meeting.
7        Q.   Do you know who prepared the --
8    withdrawn.
9        Do you know who prepared the
10    PowerPoint presentations for Gary Matuszak?
11        A.   You know, I do not.  I know
12    that based on the individual slides, based
13    on the sections that we knew were to be
14    included, we may have -- individuals may
15    have wrote some things on a piece of paper
16    and said, here, this needs to be in here.
17    But the actual physical prepare, I don't
18    recall who that would be.
19        Q.   Going to the next page ending
20    in 28, do you know what it means when it
21    says "overall results - no adjustments
22    proposed"?
23        A.   Yes, I do.
24        Q.   What does that mean?
25        A.   That means based on the work

92

1        Jason Sevier - Confidential
2    that we performed, there were no amounts
3    that rose above our audit -- I'm sorry,
4    strike that, that our materiality scope that
5    would require a proposed entry to adjust
6    the financial statements.
7        Q.   So when it says "no adjustments
8    proposed," does it really seem to indicate
9    that no material adjustments proposed?
10        MR. KONOVALOV:  Objection.
11    Misstate the witness's testimony.
12        A.   No.  It means there were no
13    adjustments, period.
14        Q.   Does it --
15        A.   Because there could be
16    adjustments that were proposed that get
17    passed.  This means there were no
18    adjustments proposed at all.
19        Q.   What do you mean there could be
20    adjustments that were passed?
21        A.   There could be adjustments that
22    you potentially -- that don't get made, but
23    this just means if you look on the sheet
24    where you typically put adjustments, it
25    would be blank.

93

1        Jason Sevier - Confidential
2      Q.   When it says "'quality of
3   earnings' discussion - no issues," do you
4   know what that means?
5      A.   Not precisely.  I have a guess,
6   but I don't know precisely what that means.
7      Q.   What's your guess?
8        MR. SIDORSKY:  Objection to
9   form.  I don't think the witness is
10   here to guess.
11      A.   My guess is that statement
12   means that the earnings are fairly stated
13   and there are no aggressive positions taken
14   by the company with respect to various
15   accounts, so the earnings quality is good.
16      Q.   Is the quality of earnings
17   something that's tested during the
18   quarterly reviews?
19      A.   Considering that revenue is the
20   most significant aspect of the engagement
21   and on a quarterly basis we test or we look
22   at 35 to 40 percent of the revenue, and
23   then in connection with the analytical
24   procedures, it's an overall statement based
25   on the work that was performed, the

94

1        Jason Sevier - Confidential
2   combination of the review and audit work on
3   the contracts, it was Andersen's belief
4   that the earnings had no quality issues
5   based on the work that was performed.
6      Q.   Going down to the next bullet
7   point, "Judgmental reserves and accruals,"
8   what does that refer to?
9      A.   It refers to the items that are
10   stated below, accounts receivable, sales
11   return reserves, and just your general
12   accruals, whether it's vacation, payable,
13   any other accruals that fall in the accrual
14   section.
15      Q.   So when it says "judgmental,"
16   does that refer to the company's judgment
17   as to whether reserves and accruals are
18   appropriate?
19      A.   Yes.
20        MR. SIDORSKY:  Just to be
21   clear, it says "judgment."
22        MR. WILLIAMS:  Actually, it
23   says "judgmental."
24        THE WITNESS:  "Judgmental" in
25   the caps.

95

1        Jason Sevier - Confidential
2        MR. SIDORSKY:  Okay.
3      A.   Yes, the "judgmental" refers to
4   the reserves that are determined by the
5   company.
6      Q.   Just based on this page, there
7   does not appear to be an opinion by
8   Andersen with respect to the reserves and
9   accruals?
10      A.   That is --
11        MR. SIDORSKY:  Objection to
12   form.
13      A.   Clarify "opinion," because in
14   the audit world, "opinion" is more of you
15   are opining from an audit opinion
16   perspective.
17      Q.   I understand.  But when it
18   comes to the overall results on the page,
19   it looks like Andersen has made an
20   assessment that no adjustments were
21   proposed.
22      A.   Right.
23      Q.   There are no issues with
24   quality of earnings.
25      A.   Correct.

96

1        Jason Sevier - Confidential
2      Q.   It's a little different, as the
3   document reflects, the judgmental reserves
4   and accruals?
5      A.   Yes.
6      Q.   It doesn't seem to be a
7   position -- well, let me withdraw that.
8        Let me ask you to turn to the
9   next page, which is Bates ending 29.
10        It looks like another page in
11   the same PowerPoint presentation, right?
12      A.   Correct.
13      Q.   With the first bullet point
14   stating "Revenue Review"?
15      A.   Correct.
16      Q.   What does that mean, if you know,
17   when the document states "No changes in
18   scope or procedures"?
19      A.   What that means is that, once
20   again, consistent with every quarter, we
21   pick the top 20 and the work that we do has
22   not changed between quarters.
23        As I explained earlier, we look
24   at the contracts, we look at the company's
25   write-up, the company's checklist, we tie

97

1    Jason Sevier - Confidential
2  out the sales invoices, et cetera. It's
3  the same process, no change from quarter to
4  quarter.
5    Q.   For the second-quarter review,
6  Andersen didn't do anything different than
7  it had done in the past for the quarterly
8  reviews?
9    A.   Not to my recollection, no.
10    Q.   The next bullet point indicates
11  there was -- withdrawn.
12    Is it fair to say the next
13  bullet point indicates that Andersen tested
14  30 percent of the license revenue?
15    A.   37.
16    Q.   I'm sorry, 37 percent?
17    A.   Correct.
18    Q.   Explain to me what the next
19  bullet point means, "Consulting revenue -
20  tested 16 percent (in process)"?  Explain
21  to me what the next bullet point means?
22    A.   I know what consulting revenue
23  is, but I can't -- I can't speak to the
24  bullet.  I don't recall what that means.
25  "In process" means obviously what was being

98

1    Jason Sevier - Confidential
2  done wasn't finished, it's still in
3  process.  That's all I remember.
4    Q.   Do you know whether it was
5  typical for Andersen to test consulting
6  revenue?
7    A.   As part of the review process?
8    Q.   Yes, as part of the review.
9    A.   I don't recall the exact
10  procedures that were done on consulting.  I
11  guess the crux was the testing done on
12  licensing revenue, and I don't recall the
13  exact procedures on consulting.  I just
14  don't.
15    Q.   The next section says "'VSOE'
16  of fair value."  What does that mean?
17    A.   Vendor specific objective
18  evidence of fair value.
19    Q.   How does that apply or how does
20  that relate to the quarterly review?
21    A.   Back earlier when you had asked
22  the question, do we apply SOP 97-2, vendor
23  specific objective evidence is one of the
24  focal points of 97-2.
25    So if you apply 97-2, you are

99

1    Jason Sevier - Confidential
2  assessing whether a contract or elements
3  contain vendor specific objective evidence.
4  So I classify it as -- it's a by-product
5  upon 97-2.
6    Q.   Does that relate to the price
7  that Oracle sells the license at?
8    MR. SIDORSKY:  Objection to
9  form.
10    A.   It pertains to every component
11  of license, consulting, maintenance, it
12  pertains to all aspects of the various
13  revenue contracts.
14    Q.   What does it mean when the
15  document refers to "Discounts on license
16  transactions" and how many does it apply to
17  quarterly review?
18    A.   What that means is if you look
19  at a specific contract, pick a customer,
20  and you actually priced out what the
21  quote/unquote "retail price" is of all the
22  licenses that were purchased, and then you
23  compare that to what Oracle actually
24  charged, because no one pays full price.
25    So your discount relates to how

100

1    Jason Sevier - Confidential
2  much off the list price a customer pays for
3  everything that they bought.
4    Q.   Do you know what the analytical
5  purpose of looking at the discounts is
6  during the quarterly review?
7    MR. SIDORSKY:  Objection to
8  form.
9    A.   Yes.  I do know what that
10  means.  Analytical purpose is if the
11  discount is not consistent, the vendor
12  specific objective evidence is in jeopardy,
13  which jeopardizes the revenue.
14    Q.   Going down to the last section
15  where it says "Migration of licenses," what
16  does that mean generally?
17    A.   Once again, I don't recall
18  specifically.
19    Q.   It's something that your team
20  looked at in Q2 '01 obviously, though,
21  right.
22    A.   Once again, I don't
23  specifically recall.  I don't.
24    Q.   Would information regarding
25  migration of licenses be within the work

101

1          Jason Sevier - Confidential
2    papers for the quarterly review?
3          A.   Possibly, but once again, I
4    don't recall.
5          Q.   Did you see them yesterday?
6          A.   I don't --
7          Q.   I'm sorry, withdrawn.
8               Did you see them when you
9    reviewed the work papers?
10         A.   I don't remember specifically.
11   I mean, there may be a memo or a stray
12   note, but once again, I just don't recall
13   that particular item.
14         Q.   If it existed -- withdrawn.
15              If an analysis of migration of
16   licenses existed in the work papers, do you
17   know where it would be found within the
18   work papers?
19         A.   Once again, not specifically.
20   But if I had to speculate, it would be
21   wherever all the other revenue testing was
22   done.
23         Q.   The next bullet point where it
24   says there are "several transactions with
25   'cancellation' or 'migration' rights," do

102

1          Jason Sevier - Confidential
2    you know what that means?
3          A.   I don't know necessarily what
4    the "cancellation" means, and I have a
5    vague idea what the "migration" means.
6          Q.   Can you tell me your idea of
7    what the migration rights means?
8          A.   Oracle has various versions of
9    software.  It starts out with -- I forgot
10   what the first one was, all the way up
11   to -- the last one I remember is 11-I.
12              So if you buy version 8.0, you
13   have a right to migrate -- based upon your
14   contract and your maintenance, you can
15   migrate to version 9.0 when it comes out or
16   10.0.
17              So the contract tells you you
18   have the explicit right to migrate to the
19   new version, typically at no cost, because
20   you are an existing customer, whereby if
21   you are a new customer, you may not have
22   that migration right, you got to pay for
23   the software.
24              That's my recollection of what
25   the migration rights meant or means.

103

1          Jason Sevier - Confidential
2          Q.   If a transaction had
3    cancellation rights, how would that impact
4    the recording of revenue on the transaction
5    as Andersen would analyze it in quarterly
6    reviews?
7               MR. KONOVALOV: Objection,
8    incomplete hypothetical.
9               MR. SIDORSKY:  Same objection.
10         A.   The "cancellation" language is
11   very broad.  It means different things in
12   different contracts.  Unless I had a
13   contract with the specific language, it's
14   all speculation of what "cancellation"
15   means.
16         Q.   Would the backup for this
17   representation be in the work papers
18   somewhere?
19              MR. KONOVALOV:  Same objection.
20         A.   If a contract we looked at had
21   the language, then it should be in there;
22   but if it didn't, I can't recall where it
23   would be.
24         Q.   It would be somewhere in the
25   revenue testing?

104

1          Jason Sevier - Confidential
2          A.   I guess --
3               MR. SIDORSKY:  Object to form.
4          A.   I can't recall specifically,
5    but theoretically, yes.
6          Q.   Why don't we go to the next
7    page.
8               MR. WILLIAMS:  He actually has
9    to change the tape, so we have to take
10   five minutes so he can change the
11   tape.
12              THE WITNESS:  Okay.
13              THE VIDEOGRAPHER:  The time is
14   11:16 a.m., this completes tape number
15   1 of the videotaped deposition of
16   Jason Sevier.
17              (Recess taken.)
18              THE VIDEOGRAPHER:  The time is
19   11:28 a.m., and this is the beginning
20   of tape number 2 of the videotaped
21   deposition of Jason Sevier.
22         Q.   I am going to ask you to turn
23   to the next page, which is Bates ending 30.
24         A.   Yes.
25         Q.   This page seems to depict the

105

1      Jason Sevier - Confidential
2  transaction with HP, right?
3      A.   Correct.
4      Q.   Do you know what it means in
5  the first bullet point where it states "$30
6  million hardware purchase guarantee"?
7      A.   Yes.
8      Q.   What does it mean?
9      A.   It means that Oracle had an
10 arrangement that they were going to
11 purchase $30 million worth of hardware from
12 Hewlett Packard, i.e. whether it's
13 computers, printers, whatnot.
14     Q.   Did you know when that purchase
15 guarantee was supposed to take place?
16     A.   I do not recall.
17     Q.   Some portion of it clearly was
18 in the second quarter of 2001, is that
19 fair?
20         MR. KONOVALOV:  Objection,
21     lacks foundation.
22     A.   I don't recall.  It was in the
23 contract.  I can't recall when the actual
24 purchase was required or did take place.
25     Q.   Do you know whether Oracle had

106

1      Jason Sevier - Confidential
2  agreed to the $30 million purchase
3  guarantee in exchange for an agreement to
4  purchase Oracle software in Q2 '01?
5      A.   That I don't recall.
6      Q.   But you do recall this $30
7  million hardware purchase guarantee being
8  in the contract?
9          MR. SIDORSKY:  Objection to
10     form.
11     A.   I recall from the standpoint
12 that it was laid out in the audit committee
13 package as a highlight in the contract.
14 These bullets reflect the highlights from
15 the specific contract.
16     So that's how I recall it.  I
17 don't recall at the time, I recall based on
18 seeing it in this presentation.
19     Q.   But this page is titled
20 "Results of Second-Quarter Review Revenue -
21 Review Continued," right?
22     A.   Correct.
23     Q.   Does that suggest there was
24 revenue recorded in the second quarter of
25 2000 related to the HP $30 million hardware

107

1      Jason Sevier - Confidential
2  purchase guarantee?
3          MR. SIDORSKY:  Objection to
4     form.
5      A.   It implies that HP was a
6  contract that we looked at.  Without seeing
7  the specific contract or financial
8  statements, I can't tell you how much of
9  the HP contract was recognized or was
10 deferred.  It just means that it was a
11 contract we looked at.
12     Q.   For the second quarter?
13     A.   For the second quarter.
14     Q.   And that it was related to
15 revenue for the second quarter?
16     A.   Correct.
17     Q.   Do you know what a barter
18 transaction is?
19     A.   I do.
20     Q.   Can you tell me what it is?
21         MR. SIDORSKY:  Objection to
22     form.
23     Again, I don't believe the
24     witness is here in his capacity to
25     testify about hypothetical

108

1      Jason Sevier - Confidential
2  transactions or give you testimony in
3  a capacity as an expert about contract
4  or accounting terms.
5     You can answer.
6         MR. KONOVALOV:  I'll join the
7     objection.
8      A.   A barter transaction is when
9  one party gives up a good or service in
10 return from another party for a good or
11 service, so no cash changes hand.
12     Q.   How does that impact revenue in
13 any given quarter?
14         MR. KONOVALOV:  Same
15     objections, also an incomplete
16     hypothetical.
17         MR. SIDORSKY:  I join in that
18     objection, it's hypothetical and
19     calling for speculation and vague.
20     But go ahead.
21     A.   You want to know in the context
22 of this contract, or just in general how it
23 works?
24     Q.   Why don't we first talk about
25 how it impacts this contract and then

109

1      Jason Sevier - Confidential
2  generally how it works.
3      A.   Okay.  Once again, without
4  having the details of the HP contract, I
5  can't talk to how it impacts this contract,
6  but I can talk to in general how it happens
7  when it appears.
8      Q.   Okay.
9      A.   In general, typically, if there
10 is a barter transaction, or what sometimes
11 is referred to as a round-trip transaction,
12 whereby there really is no business
13 purpose, typically, the revenue isn't
14 recognized.  But if the company actually
15 has a legitimate need or purpose for what
16 they are requiring, then it may not impact
17 the revenue recognition.
18      Meaning, for example, if a
19 company has systems that are significantly
20 outdated and they were going to have to go
21 out and buy new systems or computers anyway
22 and you can get comfortable with that, then
23 there could be a valid business purpose for
24 the exchange, so it may impact it.
25      So, once again, it's kind of

110

1      Jason Sevier - Confidential
2  facts and circumstances based on every
3  situation.  There are rules that are
4  followed, but every situation has different
5  fact patterns which dictate the application
6  and the rules.
7      Q.   Does timing of the exchange
8  play into the analysis of whether it is a
9  barter transaction or a round-trip
10 transaction that does, indeed, have a
11 legitimate business purpose?
12      MR. SIDORSKY:  Continuing
13      objection based upon the hypothetical
14      nature and calling for expert
15      testimony that's beyond the scope of
16      the deposition.
17      A.   Once again, I am speaking of a
18 hypothetical example and not HP, because as
19 I said, I don't recall.
20      Hypothetically, if they both
21 happened very close to each other, when I
22 say "close," I mean within a couple of
23 days, then it calls into question the
24 revenue, because it calls into question
25 that we exchange our product for yours, so

111

1      Jason Sevier - Confidential
2  each party could recognize revenue, whereby
3  if there is a fair amount of time that goes
4  by, weeks or months, then it would show
5  that there may be more of a business
6  purpose to the transaction.
7      Q.   Do you know what the next
8  bullet point here means, "11-month term
9  license/lease that converts to perpetual
10 with final payment"?
11      A.   11-month term license means
12 that they have the right to use the
13 software for an 11-month period, and then
14 when HP makes the final payment, it becomes
15 a perpetual license, which means they have
16 the right to use the software in
17 perpetuity, forever.
18      But currently, the way the deal
19 is structured based on what I read is that
20 at this point in time, they only have a
21 right to use it until they make the
22 final -- on a term basis until they make
23 the final payment.
24      So if they don't make the final
25 payment, then they wouldn't have the rights

112

1      Jason Sevier - Confidential
2  anymore to use the software.
3      Q.   What about the next bullet
4  point where it says "Remix exchange rights
5  on migrated licenses"; do you know what
6  that means?
7      A.   Once again, not specifically to
8  HP, but I know what that means in general.
9      Q.   Can you tell me?
10      A.   It means that based on Oracle's
11 software, they have a suite of software,
12 which means there is a bunch of different
13 applications, which means if you have a
14 remix or an exchange right, you can take
15 one piece of software and exchange it or
16 remix it for another that's in the kind of
17 suite where you go onto their -- when you
18 look at their list of products, you can
19 kind of flip-flop what you want or what you
20 don't need.  So you have a remix.
21      Q.   If, for example, HP never
22 purchased the hardware in the agreement,
23 how would that impact the revenue
24 recognized in Q2 '01 on the transaction?
25      MR. SIDORSKY:  Objection to

113

1      Jason Sevier - Confidential
2    form.  Again, hypothetical, calls for
3    speculation.
4         MR. KONOVALOV:  Same
5    objections.
6      A.    Two things.  First, it's Oracle
7    purchasing the hardware from HP, not HP
8    purchasing the hardware.
9      Q.    I'm sorry.
10     A.    Once again, hypothetically, if
11   Oracle would purchase the hardware and we,
12   through audit testing, believed that the
13   purchase was valid, meaning Oracle has a
14   specific plan, they have identified the
15   hardware that's being replaced, that needs
16   to be replaced, and they have specifically
17   earmarked it in the budget, then
18   hypothetically, based on that fact set, you
19   would look at that and say it's a valid
20   business purpose, so there is no revenue
21   implication.
22        But if it was just extra stuff
23   that was going to sit around in some supply
24   room because they really didn't need it, it
25   would call into question the revenue.

114

1      Jason Sevier - Confidential
2      Q.    But if Oracle had agreed to a
3    $30 million hardware purchase guarantee,
4    would it have to record an expense in Q2
5    '01 for that guarantee?
6         MR. KONOVALOV:  Objection,
7    assumes facts not in evidence and it's
8    an incomplete hypothetical.
9      A.    Once again, hypothetically
10   speaking, since I don't know the specific
11   fact set, I don't recall a specific fact
12   set.
13        Now, it's no different than any
14   purchase.  If you say you are going to go
15   purchase a copier, it's a capital purchase,
16   so if anything, there is no expense, it's a
17   balance sheet, you would capitalize it, you
18   would spend the cash and you would put an
19   asset on your books, so there is no expense
20   that would take place.  The expense would
21   happen through the routine depreciation and
22   amortization.
23     Q.    Now, with respect to the remix
24   that we talked about in the third bullet
25   point and exchange rights, how would that

115

1      Jason Sevier - Confidential
2    impact the -- withdrawn.
3         How would that impact SOP 97-2
4    standards on the fee being fixed and
5    determinable?
6         MR. SIDORSKY:  Same objection,
7    same continuing objection.
8      A.    Once again, hypothetically
9    speaking, not specifically addressing HP,
10   but in general, if someone has a remix or
11   an exchange right, you have to look to see
12   if there is a specific identifiable value
13   for the exchange right, meaning has Oracle
14   charged other customers the same amount for
15   the exchange right.  And if you can
16   identify that the exchange right has value,
17   then what you do is you carve that value
18   out of the overall agreement.
19        So, for example, if another
20   customer had paid a million dollars and
21   that was consistent across all customers
22   and the total contract was $50 million, you
23   would carve $1 million out of the 50 and
24   allocate it to the remix right.  So it all
25   depends on what their policies were or what

116

1      Jason Sevier - Confidential
2    they consistently did with other customers.
3         If they didn't have a value for
4    it, then it could require that the entire
5    arrangement gets deferred or recognized
6    ratably over the contract term.
7      Q.    And that's the VSOE analysis,
8    right?
9         MR. SIDORSKY:  Objection to
10   form.
11     A.    Yes.
12     Q.    Turning to 000034.
13     A.    34?
14     Q.    Yes, ending 34.  It's about two
15   pages later.
16     A.    Okay.
17     Q.    It looks like this page is
18   titled "Results of Second-Quarter Review -
19   Other," Not "Revenue," right?
20     A.    Yes.
21     Q.    Can you describe for me or
22   explain to me what that first entry means,
23   "Q4/Q1 follow-up items"?
24     A.    I know what the words mean, but
25   I don't recall in the context of the Oracle

117

1       Jason Sevier - Confidential
2   review what that means.
3       Q.   Do you know generally what an
4   A/R aging to G/L reconciliation is?
5       A.   Yes, I do.
6       Q.   Can you describe for me what
7   that is?
8       A.   The A/R aging is a document
9   that takes each customer and ages the
10  receivable balance.  Meaning if the invoice
11  is sent and payment terms are net 60, the
12  aging shows where that customer is in the
13  process, meaning they haven't paid yet
14  within the 60 days, so they are in the
15  90-day bucket.
16      And in the reconciliation, the
17  G/L is you just take the overall total in
18  the aging and it should tie out, because it
19  represents total accounts receivable, it
20  should tie out to the general ledger
21  balance for accounts receivable.
22      So this is just a step that tie
23  the two documents together.
24      Q.   It appears at least that
25  something occurred in Q4 '00 that was

118

1       Jason Sevier - Confidential
2   followed up in Q1 '01, is that fair?
3       A.   That's what it appears based on
4   the wording on the slide, yes.
5       Q.   Looking at the second bullet
6   point, "Unearned education revenue
7   reconciliation," do you know what that
8   means?
9       A.   I do not.
10      Q.   I am going to ask you to turn
11  to the next page, which is Bates ending 35.
12      A.   Okay.
13      Q.   This is another lead sheet, is
14  that what this is?
15      A.   Yes.
16      Q.   It looks like the same type of
17  lead sheet as we looked at earlier for
18  Oracle variation analysis accounts
19  receivable, right?
20      A.   Yes.
21      Q.   A different date, though, is
22  that fair?
23      A.   That's fair, yes.
24      Q.   Do you recognize any of the
25  handwriting on this page?

119

1       Jason Sevier - Confidential
2       A.   I do not.
3       Q.   Looking at the top right-hand
4   corner, there are some letters there, does
5   that say "IBC"?
6       A.   I think it's "PBC."
7       Q.   What does that mean?  Do you
8   know?
9       A.   Yes, prepared by client.
10      Q.   Except for the handwriting,
11  correct?
12      A.   Yes, except for the
13  handwriting, correct.
14      Q.   This is one of those sheets
15  that is given to the engagement team at the
16  beginning of the quarterly review?
17      A.   Correct.
18      Q.   How about the bottom left-hand
19  corner, there is some handwriting there, do
20  you know what that is?
21      A.   Can you clarify.
22      Q.   It looks like there are some
23  initials there.
24      A.   Yes.
25      Q.   Do you know whose initials

120

1       Jason Sevier - Confidential
2   those are?
3       A.   I do not.
4       Q.   And the date looks like 12,
5   2000?
6       A.   Yes.  I can make out the date,
7   yes.
8       Q.   How about the -- there appears
9   to be a bunch of checks and symbols on the
10  bottom left-hand corner.  Do you know what
11  those are?
12      A.   "STM" stands for standard tick
13  marks, and that means these are standard
14  office-wide tick marks.  I do not recall
15  specifically what they represent, but they
16  have a meaning that is used on all
17  engagements.
18      So any work paper you picked up
19  and saw that double-check, it means the
20  same thing for every engagement, but I
21  don't recall what they specifically mean
22  anymore.
23      Q.   Looking at the top of this page
24  where there is some handwritten notes
25  saying, "Scope, per discussion with Julie

121

1     Jason Sevier - Confidential
2  Chan, senior revenue manager," do you see
3  that?
4     A.   Yes, I see it.
5     Q.   Does that suggest that someone
6  on your team spoke with Julie Chan?
7     A.   Yes, it does.
8     Q.   For purposes of scope --
9  withdrawn.
10        Do you have an understanding
11 what "scope" means there?
12    A.   The "scope" here means that
13 someone in Oracle, whether it was Julie
14 Chan or not, I can't say, provided the
15 explanation for all variances greater than
16 $5 million.
17    Q.   So with respect to those
18 variances, was that the limit on the
19 variances that were tested so -- withdrawn.
20        Was $5 million, if you know,
21 the level at which variances were tested,
22 so anything below that may not have been
23 tested, but things above that would have
24 been?
25        MR. KONOVALOV:  Objection.

122

1     Jason Sevier - Confidential
2        MR. SIDORSKY:  Objection to
3  form.
4     A.   With respect to this particular
5  schedule only, that was the scope that
6  Oracle provided variance explanations.
7     Q.   What if there was a variance
8  below $5 million; do you know whether or
9  not there would be an explanation?
10       MR. SIDORSKY:  Objection to
11 form.
12    A.   Once again, unless we went back
13 and specifically asked for that
14 explanation, no.  But that was the point of
15 the scope, for them to address $5 million
16 and above.
17    Q.   It appears that every account
18 on this page begins with a 12.  Do you see
19 that?
20    A.   Yes, I do.
21    Q.   Do you understand accounts
22 beginning with 12 to be receivable accounts
23 within the Oracle general ledger or chart
24 of accounts?
25    A.   I do not recall the specific

123

1     Jason Sevier - Confidential
2  numbering of Oracle's chart of accounts.
3     Q.   But you are looking at this
4  document and all of these accounts
5  beginning with -- beginning with 12, right?
6     A.   Yes.  It appears that --
7        MR. SIDORSKY:  I don't hear a
8  question there.  Yes, that's what --
9        MR. WILLIAMS:  You are not
10 testifying either, right?
11       MR. SIDORSKY:  No, I'm not, but
12 you have to ask the witness a
13 question.
14       MR. WILLIAMS:  I understand
15 that.  You can object, and if you want
16 me to ask the question again, I will,
17 but I don't want you to testify about
18 what you see on the page, because
19 that's going to be inappropriate.
20       MR. SIDORSKY:  I'm not.
21 Believe me, I'm not testifying.
22 That's the last thing I want to do.
23       MR. WILLIAMS:  I understand.
24 I'll ask the question again.
25       MR. SIDORSKY:  I objected to

124

1     Jason Sevier - Confidential
2  the form.  Let's get a question out.
3  That's all I want to say.
4     Q.   Does it appear based on looking
5  at this document Bates ending 35 that the
6  Oracle receivables accounts each begin with
7  12?
8     A.   Yes, it does.
9     Q.   And you don't have any
10 recollection that differs from that, do
11 you?
12    A.   I don't have a recollection of
13 any of the numerical systems for their
14 account balances.
15    Q.   Why don't we go to the next
16 page.
17    A.   Okay.
18    Q.   The next page is AA 000036.
19        Do you know what this document
20 is?
21    A.   Yes, I do.
22    Q.   What is it?
23    A.   It's a memorandum to the files
24 that explain each accounts receivable --
25 the nature of each accounts receivable

125

1        Jason Sevier - Confidential
2    account.
3        Q.   They appear to be similar to
4    the accounts that we looked at on the
5    previous page, is that fair?
6        A.   Correct.
7        Q.   Pam Arquelada created this?
8        A.   Yes.
9        Q.   Would this be part of the
10   review that you signed off on?
11       MR. KONOVALOV:  Objection,
12   vague and ambiguous.
13       A.   Define you signing off.
14       Q.   If we go back to the first
15   page, you were the engagement manager, and
16   you approved, I guess, the Q2 '01 quarterly
17   review for filing, right?
18       MR. KONOVALOV:  Objection,
19   vague and ambiguous.
20       A.   Yes. By signing --
21       MR. SIDORSKY:  Objection to the
22   form.
23       A.   By signing the file, I signed
24   that the file contains all the required
25   contents that needed to be included in

126

1        Jason Sevier - Confidential
2    order for the file to be filed.  It doesn't
3    mean that I have signed and approved every
4    document in the file.
5        Q.   I understand that. What I'm
6    asking is, this memo, would this be part of
7    the file that you approved for filing?
8        A.   Yes. This would be a component
9    of the file that I approved, yes.
10       Q.   You see where I guess the first
11   entry on the page says, "Purpose. "The
12   purpose of this memorandum is to summarize
13   the significant accounts in accounts
14   receivable"?
15       A.   Yes.
16       Q.   "(See variation analysis at A/R
17   lead schedule @ B)"?
18       A.   Yes.
19       Q.   Now, the "@ B," is that on the
20   previous page?  Are you referring to the
21   lead schedule depicted by AA Bates ending
22   35?
23       A.   Yes.
24       Q.   Just take a look at the entry
25   for 1/20/04.  Do you see that?

127

1        Jason Sevier - Confidential
2        A.   Okay.
3        Q.   You see where it says -- well,
4    withdrawn.
5        What does it mean when it says
6    "accrued revenue"?  What is accrued
7    revenue?
8        A.   What that means -- once again,
9    my recollection of what that means is that
10   there are certain situations I am taking
11   from the language here where the books or
12   the system gets closed, and then there are
13   transactions that the company is aware of
14   or timing after the system is closed that
15   relate to this period that get accrued,
16   meaning that they are valid receivables or
17   revenues and it gets accrued after the
18   account has been closed.
19       Q.   "After the account has been
20   closed," what does that mean?
21       A.   That means there comes a point
22   in time when the system -- it's called
23   basically a soft close or you close out the
24   system, and then you become aware of
25   accruals for various liabilities or whatnot

128

1        Jason Sevier - Confidential
2    that relate to the period that you need to
3    get into the system, because they relate to
4    the period.
5        So it doesn't make it into the
6    general course of batch processing, because
7    you are at a point in time where the system
8    doesn't handle the transaction, so you
9    close it out.
10       So what this means is that's
11   how you accrue for receivables/revenue that
12   were not entered into the trade A/R
13   account.
14       Q.   Is it fair to say that means
15   that the account is closed when the quarter
16   is closed?
17       A.   Correct.
18       Q.   And so, there are items that
19   didn't make it in for one reason or another
20   and they are later recognized and so this
21   12004 is an account where you capture
22   those?
23       A.   Yes.
24       Q.   How does that end up being
25   reported for the quarter?

129

1      Jason Sevier - Confidential
2          MR. SIDORSKY:  Objection to
3    form.
4      A.   Once again, depending on the
5    type of account.  If we are talking about
6    revenue, then what would happen is you
7    would record an accounts receivable and a
8    revenue for a valid transaction -- for a
9    contract or whatever the nature may be of
10   the situation.
11     Q.   What I am asking is, how do you
12   actually do it if the account or the
13   quarter is closed?  Is it done via journal
14   entry?  How does it actually get done?
15     A.   I don't know -- not being an
16   Oracle employee, I don't know the steps
17   they take to process transactions through
18   the system.
19     Q.   In that paragraph there -- I
20   guess Pamela created this document, right?
21     A.   Yes.
22     Q.   -- it says in the
23   parenthetical, "Netting A/R against
24   deferred revenue to the extent that they
25   overlap for a given customer."

130

1      Jason Sevier - Confidential
2          Do you know what that means?
3      A.   No, I don't know what she
4    means.  I don't know what that means.
5      Q.   Do you know what the trade A/R
6    account is?
7          MR. SIDORSKY:  Are you asking
8    in general?
9          MR. WILLIAMS:  Yeah.
10     A.   In general, trade A/R is your
11   accounts in the normal course -- normal
12   customer accounts.
13     Q.   Going down to the next account,
14   12005, "Other receivables - cash in
15   transit," what does that mean?
16     A.   Based on the wording underneath
17   the heading, it's cash that's apparently
18   received before the end of the period, but
19   they haven't been able to actually post it
20   to the accounts receivable trial balance.
21         So they know they have got the
22   cash, but they haven't been able to post it
23   to a specific accounts receivable, the
24   trial balance, yet.  So it sits in the
25   12005 account.

131

1      Jason Sevier - Confidential
2          So you can see that --
3      Q.   What are you looking at?
4      A.   I am looking at the lead
5    schedule, which is 35.  12005 is a
6    credit -- it's a balance in parentheses,
7    which means it's a quote/unquote
8    "contra-receivable," which means if you
9    refer back to 36, it says, "This account
10   represents cash received before period end
11   but not yet posted to the trial balance,"
12   which means it hasn't been posted to a
13   specific customer account, but they know
14   they got the cash.  So you put it into
15   12005 so at the end of the day it reduces
16   your account receivable balance.
17         So it's the same thing as
18   applying to the individual accounts, it's
19   just that you haven't been able to identify
20   who it goes to, but it nets out at the end
21   with overall receivable.
22     Q.   You said you know -- withdrawn.
23         You said so it's the same thing
24   as applying to the individual accounts,
25   it's just that you haven't been able to

132

1      Jason Sevier - Confidential
2    identify who it goes to, but it nets out at
3    the end with overall receivable, is that
4    fair?
5      A.   Let me --
6          MR. SIDORSKY:  Objection.
7      A.   Let me restate that.
8      Q.   Okay.
9      A.   Hypothetically, Jason Sevier
10   submits his $500,000 payment for his
11   software that he purchased, the money comes
12   in, and they have the money, but they don't
13   know which invoices it applies to, but they
14   know they received a check from me for what
15   I purchased.
16         So from a timing perspective
17   and trying to close a (inaudible), they
18   don't have time to go back and figure out
19   my invoices.  So what they do is they put
20   it in 12005, they say, okay, we got paid,
21   so we need to show that our receivable
22   balance is now reduced by the $500,000
23   payment, and we'll go back later and figure
24   out what invoices they applied to, and then
25   in the sub-trial balance where it says

133

1       Jason Sevier - Confidential
2  Jason Sevier and his 50 invoices, then
3  they'll start applying it to those
4  accounts.
5       Q.   So at least in that instance
6  for this account, Oracle knows who paid,
7  but they just don't know what invoice was
8  being paid?
9       MR. SIDORSKY:  Objection to
10  form.
11      A.   I don't recollect whether they
12  know specifically.  It appears based on the
13  language that they do, but I don't know
14  that for sure.  They know they got the
15  cash, but they don't know yet -- it just
16  says yet hasn't been posted to accounts
17  receivable trial balance.
18       I can't say beyond a shadow of
19  a doubt that they know it exactly came from
20  me, but they know they have the cash in my
21  example.
22      Q.   When Pamela creates this
23  document, do you know where the information
24  in here comes from?
25      A.   My speculation is that this

134

1       Jason Sevier - Confidential
2  document is a carry-over document from the
3  prior quarter.
4       Typically, what happens is Pam
5  will update this, she will talk to a
6  certain Oracle employee and ask if there
7  are any changes to the account, and if
8  they say no, then this is basically a
9  carry-forward memo, if there are changes,
10  then she'll make changes.
11      Q.   Still talking about 12005, do
12  you understand the phrase "cash in transit"
13  as it relates to how you explained what you
14  believe this account to be?
15      A.   I don't know exactly what is
16  meant by "cash in transit" as it relates to
17  12005.
18      Q.   Why don't you turn to the next
19  page -- I'm sorry, two pages in ending 38.
20  Go down to, I guess, halfway down the page,
21  you see where it says "12018"?
22      A.   Yes, I do.
23      Q.   Can you just read that section
24  for me?
25      A.   Out loud, or to myself?

135

1       Jason Sevier - Confidential
2       Q.   Read it out loud.
3       A.   "This represents customer
4  payments that have not yet been applied
5  against their account balance.  (These
6  amounts have been reclassified from account
7  25005 - customer overpayments.)  Consistent
8  with prior periods, when customer
9  overpayments are received, they are posted
10  to account 25005 - customer overpayments.
11  When a related set of invoices are
12  identified, these overpayments are
13  reclassified to account 12018."
14      Q.   So 12018, at least in this
15  document, is titled "Unapplied Cash"?
16      A.   Yes.
17      Q.   Do you know if that's different
18  from the parenthetical that we looked at in
19  12005 on Bates ending 36 where it states
20  "Unapplied Cash"?
21      MR. KONOVALOV:  Objection,
22  vague and ambiguous.
23      MR. SIDORSKY:  Same objection.
24      A.   My recollection is that 12018
25  and 12005 are similar, but the way the

136

1       Jason Sevier - Confidential
2  money -- the way amounts get into those
3  accounts is different.
4       Q.   What's your recollection as to
5  how money gets into 12018?
6       A.   My recollection is that when
7  the money is sent to the lockboxes and then
8  it's sent to Oracle, the money goes into
9  account 25005, and then it's identified --
10  if they don't know where it goes
11  specifically, it goes into 25005.
12       When it originally comes in the
13  lockbox, if there is no specific invoice
14  detail, if it's just money that comes in,
15  until they figure out where it goes, they
16  put it into 25005, then they go through a
17  process of trying to identify who it
18  pertains to.
19       So if they know it pertains to
20  customer X but they don't know which
21  invoices of customer X, then they put it
22  into 12018, unapplied cash.
23      Q.   How is that different from what
24  you explained with respect to 12005?
25      A.   Because I think the difference

137

1         Jason Sevier - Confidential
2    is, based on reading 12018, that when the
3    money comes in the prior example, they know
4    who it pertains to, but not the specific
5    invoices yet, or they can't apply it to the
6    specific invoices.
7        Q.   And with respect to 12018?
8        A.   Originally, it goes in the
9    25005, because they didn't know who --
10       Q.   Sent it?
11       A.   They didn't know exactly what
12   it pertained to or who sent it.  So when
13   they go back and they start to look at
14   these accounts and they figure out where
15   the money came from and who it came from,
16   then it gets transferred into 12018, and
17   then they start to apply specific invoices.
18       So they need to keep 12005 and
19   12018 separate, because the way the cash
20   gets into each account is based on a
21   different set of facts and circumstances.
22       Q.   I just want to make sure I
23   understand your testimony, because it's
24   important.
25       A.   Sure.

138

1         Jason Sevier - Confidential
2        Q.   It appears that you made a
3    differentiation between the two accounts,
4    between when Oracle knows who sent the
5    money and when they didn't, right?
6        A.   Yes.
7        Q.   So you are saying with respect
8    to 12005 when they received cash, they knew
9    who it came from, but didn't know
10   immediately what invoice it may apply to?
11       A.   Correct, based on my reading of
12   this description on 36, that's my
13   understanding, yes.
14       Q.   With respect to 12018, your
15   recollection was that money comes into the
16   lockbox and it goes into 25005 because
17   Oracle can't identify who paid it or what
18   invoice it applies to?
19       A.   Correct.
20       Q.   Staying on 12018, you see where
21   Pamela writes, "This represents customer
22   payments that have not yet been applied
23   against their account balance."
24       Do you see that?
25       A.   Yes.

139

1         Jason Sevier - Confidential
2        Q.   Does that suggest there that
3    the customer payments are identified
4    specifically to a customer?
5        MR. SIDORSKY:  Objection to
6    form.
7        A.   Based on that wording, that is
8    what it suggests.  That's how it gets into
9    12018.
10       Q.   In the parenthetical, she
11   writes, "These amounts have been
12   reclassified from account 25005 - customer
13   overpayments."
14       A.   Correct.
15       Q.   Can you tell me what is meant
16   by "reclassified"?
17       A.   Yes.  It means that you
18   transfer from one balance sheet account to
19   the other.  So 25005 is an account that
20   sits in a liability section on the balance
21   sheet and it gets transferred out of that
22   account and into unapplied cash.
23       Q.   Into 12018?
24       A.   Correct.
25       Q.   So once it's moved from 25005

140

1         Jason Sevier - Confidential
2    to 12018, it becomes an asset?
3        MR. SIDORSKY:  Objection.
4        MR. KONOVALOV:  That's not the
5    witness's testimony.
6        Q.   Is that right?
7        A.   No.  Let's clarify.
8        Q.   Okay.
9        A.   In both situations, and
10   unfortunately, I only think it's helpful if
11   you look at the actual sheet that 25005
12   resides on to make it clear.
13       If you remember, 12018 sits in
14   the accounts receivable lead schedule and
15   carries a balance in parentheses, which
16   means it's a contra-account, which means it
17   reduces the overall receivable balance.
18       So when it gets transferred
19   from 25005, which sits in the deferred
20   revenue account, I believe, it increases
21   the amount of unapplied cash.  So that
22   credit balance gets bigger, which in effect
23   reduces your overall receivable balance.
24       So it's not creating an asset,
25   it's reducing the overall asset balance in

141

1     Jason Sevier - Confidential
2  accounts receivable.
3     Q.  We'll talk about 25005 later.
4     A.  Okay.
5     Q.  In this section, she describes
6  it as customer overpayments, right?
7     A.  Yes.
8     MR. SIDORSKY:  Object to form.
9     A.  Yes, that's her description.
10    Q.  Do you know what "customer
11  overpayments" means?
12    A.  Not specifically, no.  I know
13  what the words mean, I don't know what they
14  mean in this context.
15    Q.  What do the words mean to you?
16    A.  Well, customer overpayments
17  means that someone overpaid, but I'm not
18  saying that's what it means in respect to
19  this account.
20    Q.  You talked a little bit about
21  your recollection of how money moved from
22  25005 to 12018.
23    A.  Yes.
24    Q.  Do you have any recollection
25  concerning how customer overpayments were

142

1     Jason Sevier - Confidential
2  treated when they were received by Oracle?
3     MR. KONOVALOV:  Objection,
4  vague and ambiguous.
5     MR. SIDORSKY:  Could I hear
6  that question again.  Could you read
7  it back.
8     (The record was read back as follows:)
9     THE COURT REPORTER:  "QUESTION:
10  Do you have any recollection
11  concerning how customer overpayments
12  were treated when they were received
13  by Oracle?"
14     MR. WILLIAMS:  I'll withdraw
15  it.
16    Q.  Do you have any recollection of
17  where customer overpayments resided in
18  Oracle's chart of accounts when they were
19  received?
20     MR. KONOVALOV:  Objection,
21  vague and ambiguous, calls for
22  speculation.
23     MR. SIDORSKY:  Objection to
24  form.
25    A.  At the time, I don't recall.

143

1     Jason Sevier - Confidential
2  Based on my review of the work papers a few
3  weeks ago, account 25005, customer
4  overpayments, resides in the unearned
5  revenue section of the charter accounts.
6    Q.  Do you know whether 25005
7  included customer overpayments and payments
8  by customers that had not yet been
9  identified --
10     MR. SIDORSKY:  Objection to
11  form.
12    Q.  -- as applying to a particular
13  invoice?
14    A.  Once again, I don't recall at
15  the time; I recall after reviewing the
16  papers two weeks ago that 25005 was a
17  combination of true overpayments and cash
18  that had just not been identified yet.
19    Q.  Do you know whether 25005
20  included anything other than what you have
21  called true overpayments and cash that had
22  not been identified?
23    A.  Not to my knowledge.
24    Q.  What is unearned revenue?
25     MR. SIDORSKY:  Objection to

144

1     Jason Sevier - Confidential
2  form.
3     In general?
4     MR. WILLIAMS:  Yes.
5    A.  In general, it relates to
6  monies you have received, but you have not
7  yet fulfilled your obligation, the earnings
8  process isn't complete, you can't recognize
9  the revenue.
10    Q.  Have you heard of the phrase
11  "customer advances"?
12     MR. SIDORSKY:  Same objection.
13    A.  Can you clarify.  I don't
14  understand.
15    Q.  Do you know whether or not
16  Oracle had an account called customer
17  advances and unearned revenue?
18    A.  That does not sound familiar to
19  me.
20    Q.  I am going to ask you to turn
21  to Bates ending 37, I think it's one back.
22    A.  Okay.
23    Q.  You see maybe two-thirds of the
24  way down the page account 12009?
25    A.  Yes.

145

Jason Sevier - Confidential

1
2     Q.    What's the title of that
3   account, at least as it's depicted on this
4   page?
5     A.    "Other receivables - revenue
6   backouts."
7     Q.    Do you know what that means?
8     A.    I do not recall specifically
9   what that means.
10    Q.    Do you know what a revenue
11  backout is generally?
12    A.    Yes.  Typically, when a company
13  does their contract reviews, if there is an
14  adjustment that needs to be made to reduce
15  revenue and receivables, they will track
16  those adjustments in the revenue backouts
17  accounts.
18        So once again, the backouts
19  carries a balance in parentheses, which
20  means --
21    Q.    What are you looking at?
22    A.    I am looking at 35, halfway
23  down, 12009, revenue backouts has a
24  parenthetical, it means it reduces the
25  receivable balance.

146

Jason Sevier - Confidential

1
2         So the company makes an
3   adjustment to reduce the receivable and
4   reduce the revenue.  It's just tracked in a
5   separate account.
6     Q.    What are some of the reasons
7   why a receivable would be backed out?
8     A.    I don't recall specific
9   reasons.
10    Q.    Still looking at AA Bates
11  ending 37 --
12    A.    Yes.
13    Q.    -- you see account 12601 --
14    A.    Yes.
15    Q.    -- "Bad debt write-offs"?
16    A.    Yes.
17    Q.    Do you know why there are
18  several accounts in that one description?
19  Are they related, if you know?
20    A.    I don't recall.  I can
21  speculate, but I don't recall specifically,
22  no.
23    Q.    Do you know --
24        Just under that, it says,
25  "These accounts are the standard accounts

147

Jason Sevier - Confidential

1
2   used to write off and provide for bad
3   debts, respectively."
4         Can you tell me what that
5   means?
6         MR. SIDORSKY:  Objection to
7     form.
8     A.    Once again specifically, no.  I
9   have a guess based on the wording what it
10  means, but I can't say specifically.
11    Q.    What do you believe that it
12  means?
13    A.    I believe that it means that
14  each one of these accounts to the right
15  relates to specific accounts and the
16  write-offs are tracked, and then they are
17  rolled up into this 12601 account.  Once
18  again, it's just done for tracking
19  purposes.
20    Q.    Same page, just above that,
21  12600, "Bad debt recoveries," can you just
22  read that for me?
23    A.    "This account is used when
24  Oracle receives payment on an invoice that
25  has been previously written off."

148

Jason Sevier - Confidential

1
2     Q.    What does that mean?
3     A.    That means when Oracle does
4   their bad debt review and they decide to
5   write off an account because they believe
6   it's not collectible and then a customer
7   pays, then they actually receive money for
8   a receivable that was written off.
9         So the bad debt recovery shows
10  how much of that bad debt has been
11  recovered.
12    Q.    Is this an expense account?
13        MR. KONOVALOV:  Objection,
14    vague and ambiguous.
15    A.    No, because a recovery means
16  you are recovering something you have
17  already written off .  The write-off is an
18  expense account, the recovery is not -- the
19  recovery would be considered, for lack of a
20  better term, contrary expense accounts.
21    Q.    Do you know why the accounts
22  for bad debt write-offs would be an account
23  beginning with 12?
24        MR. SIDORSKY:  Objection to
25    form.

149

1         Jason Sevier - Confidential
2      A.   Yes.  Because when you write
3   off an account, it reduces your account
4   receivable balance.  So once again, it's an
5   amount that relates to receivables and it
6   reduces your receivable balance.
7         So for tracking purposes, it's
8   kind of kept under the same umbrella.
9      Q.   When there are bad debt
10  recoveries, does that increase receivables
11  balance?
12      MR. SIDORSKY:  Objection, asked
13      and answered.
14      A.   No, it doesn't.  Without
15  getting into an accounting lesson to
16  explain this, what happens is when you
17  actually write it off, you actually take
18  the receivable off the books.  You record
19  an expense, the receivable comes off the
20  books.
21         When you actually get the cash
22  in, since you already wrote the receivable
23  off the books, you don't put the receivable
24  back on the books, because you already
25  wrote it off and once you got paid.

150

1         Jason Sevier - Confidential
2         So what you do is, you just
3   record the cash and you reverse the expense
4   that you previously booked.  That's the
5   mechanics behind the recovery.
6      Q.   So the expense that you booked
7   would have been when you wrote it off?
8      A.   Right, when you get a bad debt
9   write-off.  So Company X is not going to
10  pay us, we are going to write it off.  So
11  we expense and we write this off.
12         So if you look in the books,
13  Company X doesn't appear anymore on the
14  receivables, but then tomorrow Company X
15  sends in a check, you don't put Company X
16  back on the books, you just record the cash
17  that you got, and you reverse the expense
18  you booked yesterday for Company X.
19      Q.   So there would be a reversal to
20  12601?
21      MR. SIDORSKY:  Objection to
22      form.
23      A.   No, because 12601 is the
24  receivable side of it.  There is a reversal
25  in whatever the income statement account

151

1   for "bad debt" expense would be.  You would
2   see a credit balance, you would see a
3   credit in that expense account.
4      Q.   A credit in that expense
5   account?
6      A.   In the expense account in the
7   income statement.
8      Q.   Let's look at the next page,
9   39.  You see page Bates ending 39?
10      A.   Yes, I do.
11      Q.   What is this document?  What
12  does it appear to be?
13      A.   It says "account 1210," but I
14  don't know what that means.
15         It appears that this is a
16  reconciliation between the A/R aging and
17  the G/L balance.
18      Q.   How are you able to draw that
19  inference?
20      A.   Two reasons:  One, the first
21  line says "A/R aging" and the second says
22  "G/L balance," and then when we looked at
23  the audit committee presentation, I talked
24  about an A/R G/L reconciliation.

152

1         Jason Sevier - Confidential
2         So I'm not a hundred percent
3   sure, but I'm just connecting the dots.
4   And then the note, it says, "AA, LLP noted
5   a $1.9 million difference between the G/L
6   and A/R aging at 11/30/2000."
7         So based on that, that's my
8   interpretation.
9      Q.   Do you know whose handwriting
10  this is?
11      A.   I do not.
12      Q.   You see up in the, I guess,
13  bottom right-hand corner it says "B-60"?
14      A.   Yes.
15      Q.   Do you know what that means?
16      A.   Once again, "B" represents
17  accounts receivable, Section 60 is just the
18  number of this schedule, where it fell out.
19  It just follows 55 or 50.
20         So 60 doesn't have a specific
21  significance.  It just was the next
22  schedule in the accounts receivable
23  section.
24      Q.   Does it go 1 through whatever?
25      A.   It all depends on the -- they

153

1       Jason Sevier - Confidential
2   were indexing 5.  So it depends on how much
3   were in the file.
4       Q.   I'm sorry, say that again.
5       A.   The indexing would be B-5,
6   B-10, B-15, B-60.  So I don't know.  There
7   could have been B-200, there could have
8   been B-60.  That's it.  I don't know.
9       Q.   Is that the number for this
10  page, this is B-60, or is it referencing
11  B-60?
12      A.   No, this is B-60.
13      Q.   In the first row, there are a
14  bunch of column headings, do you know what
15  "invoices and deposits" refers to?
16      MR. SIDORSKY:  Where are you
17  reading now?
18      THE WITNESS:  The first line.
19      MR. WILLIAMS:  The first row in
20  the column headings.
21      A.   I don't know specifically.
22  Once again, I have a guess, but I don't
23  know specifically.
24      Q.   That's okay.
25      A.   You want my guess?

154

1       Jason Sevier - Confidential
2       Q.   Yes.
3       MR. SIDORSKY:  If you have a
4   reasonable basis, otherwise don't
5   guess.
6       A.   My reasonable basis kind of
7   following the flow across is it means
8   "invoices" are what was invoiced in the
9   quarter.  I don't know what "deposits"
10  mean, but that's what "invoices" mean.  So
11  it's in addition to the balance.
12      Q.   Couple columns over, you see
13  where it says "credit memos"?
14      A.   Yes.
15      Q.   Do you know what credit memos
16  generally are?
17      A.   Generally speaking, yes.  In
18  this context, I don't know specifically
19  what they pertain to.
20      Q.   What are -- go ahead.
21      A.   Generally, it means a credit
22  was issued to a customer for any number of
23  reasons.
24      Q.   Couple of columns over, it says
25  "cash receipts."  Do you know what cash

155

1       Jason Sevier - Confidential
2   receipts are?
3       A.   That's the cash that they
4   received in the quarter from customers.
5       MR. WILLIAMS:  It's 12:30, I
6   don't know if you guys want to take
7   lunch or continue.
8       MR. SIDORSKY:  If this is a
9   good time for you, we can take lunch.
10      MR. WILLIAMS:  Why don't we go
11  off for a moment.
12      THE VIDEOGRAPHER:  The time is
13  12:29 p.m., and we're going off the
14  record.
15      (Discussion off the record.)
16      (One-hour luncheon break taken.)
17      A F T E R N O O N   S E S S I O N
18      (Time noted: 1:33 p.m.)
19      THE VIDEOGRAPHER:  The time is
20  1:33 p.m.  We're back on the record.
21  J A S O N     S E V I E R, resumed and
22      testified as follows:
23  EXAMINATION BY (Cont'd.)
24  MR. WILLIAMS:
25      Q.   Mr. Sevier, I am still looking

156

1       Jason Sevier - Confidential
2   at Chan Exhibit number 4, and I am at Bates
3   ending 40.
4       A.   Okay.
5       Q.   This is another lead sheet?
6       A.   Correct.
7       Q.   What is this lead sheet for,
8   what section of the work papers?
9       A.   This is unearned revenue.
10      Q.   You testified earlier that
11  unearned revenue is money that the company
12  has but the earnings cycle has not yet been
13  completed.
14      MR. SIDORSKY:  Objection to
15  form.
16      A.   Correct.
17      Q.   Right?
18      A.   Correct.
19      Q.   Is this another one of those
20  forms that Oracle created before the review
21  began?
22      A.   Correct.
23      Q.   On the top right-hand corner
24  here, it says "Greater than $5 million
25  variance discussion," right?

157

1      Jason Sevier - Confidential
2      A.    Correct.
3      Q.    Does that suggest that that was
4   the only analysis that was done by Andersen
5   during the review with respect to
6   variances, that it only looked at variances
7   above $5 million?
8          MR. SIDORSKY:  Objection to
9   form.
10     Q.    Is that right?
11     A.    Can you clarify.  I'm sorry.
12     Q.    What does it mean at the top of
13  this document where it says "Greater than
14  $5 million variance discussion"?  What does
15  that mean?
16         MR. SIDORSKY:  Objection, asked
17  and answered.
18     A.    That means that Oracle provided
19  typewritten explanations for all variances
20  greater than $5 million, and Andersen have
21  the ability, if it so desired, to ask
22  additional questions.
23     Q.    Earlier in your deposition, you
24  said that there are times when you spoke
25  with Jennifer Minton generally.

158

1      Jason Sevier - Confidential
2      A.    Yes.
3      Q.    For what purposes was that?
4      A.    It varied.
5      Q.    From what to what?
6      A.    When is the draft press release
7   going to be ready, when is the audit
8   committee meeting scheduled, when is Jeff
9   available to participate in an audit
10  committee meeting.  There were various
11  matters.
12     Q.    Did you talk to her about the
13  substance of your reviews?
14     A.    I typically did --
15         MR. SIDORSKY:  Objection to
16  form.
17     A.    I typically did not.
18     Q.    Do you know who, if anyone, on
19  your team did?
20     A.    I know Gary Matuszak had the
21  most contact with Jennifer.
22     Q.    Did you have contact with Jeff
23  Henley?
24     A.    Can you define "contact."
25     Q.    Did you communicate with him

159

1      Jason Sevier - Confidential
2   with respect to Oracle's quarterly reviews
3   and year-end audit done by Andersen?
4      A.    I did not specifically myself,
5   no.
6      Q.    Do you know if anyone did?
7      A.    Yes.
8      Q.    And who is that?
9      A.    Gary Matuszak.
10     Q.    Looking at Bates ending 40, you
11  see account 25005, customer overpayments?
12     A.    Yes.
13     Q.    As of August 31, 2000, there is
14  a -- is that a credit balance or a debit
15  balance to that account?
16     A.    It's actually a credit balance.
17     Q.    It increases between August and
18  November 30th, it appears to at least; is
19  that correct?
20     A.    Based on the schedule, yes.
21     Q.    Do you know based -- withdrawn.
22         Looking at this document, can
23  you tell why it increased?
24     A.    I can read the explanation, but
25  I don't recall at the time why it did.

160

1      Jason Sevier - Confidential
2      Q.    Which explanation is it?
3      A.    It's letter note A.
4      Q.    Can you read it for me?
5      A.    Yes.  It says, "Increase is a
6   result of a $100 million wire transfer
7   received by Oracle from Delphi.  The
8   variance is offset by an $11 million debit
9   booked to this account between account
10  25005 and 12008.  The balance was also
11  offset by additional cash applications."
12  Then there is an -- that's the text that
13  was written by Oracle.
14     Q.    Do you know who at Oracle wrote
15  that text?
16     A.    Do not.
17     Q.    What about the handwriting?
18     A.    As best as I can make it out,
19  it says "AA, LLP notes that last quarter
20  there was a CAJE of $75 million.  As such,
21  the balance was $148,616,273 previous to
22  the CAJE."
23     Q.    Based on your review of that,
24  can you explain to me what that means?
25     A.    Based on my --

161

1      Jason Sevier - Confidential
2      MR. SIDORSKY:  Objection to
3  form.
4      A.   Based on my reading of this,
5  no.  What that means is that there was an
6  adjusting journal entry made by the company
7  in the first quarter of $75 million, which
8  brought this balance at August 31 down from
9  148 to 73.
10      Q.   Based on this note, are you
11  able to tell what the basis of that $75
12  million CAJE was?
13      MR. SIDORSKY:  Objection to
14  form.
15      A.  I'm not.
16      Q.   Based on looking at this
17  document, are you able to tell where that
18  $75 million went, what account it went to?
19      A.   Based on reading this document,
20  I only can tell where I believe for certain
21  one side of the entry went to.
22      Q.   Can you tell me that?
23      A.   The $75 million reduced account
24  25005.
25      Q.   That was one side of the entry,

162

1      Jason Sevier - Confidential
2  you can't see the other side?
3      A.   I can't see it.
4      Q.   So it debited 25005?
5      A.   Correct.
6      Q.   But you can't see where it was
7  credited?
8      A.   No, I cannot see that from this
9  document.
10      Q.   Now, do you know whether there
11  was any explanation of this transfer or
12  this -- withdrawn.
13      Do you know if there was any
14  explanation of this debit provided to
15  Andersen that was more than the text that's
16  offered here?
17      MR. KONOVALOV:  Objection,
18  vague and ambiguous.
19      A.   Can you clarify.  Are you
20  referring to the $75 million?
21      Q.   That's what I'm referring to,
22  yes.
23      A.   Based on my review of the
24  working papers two weeks ago, I recall that
25  in the first quarter of review file, there

163

1      Jason Sevier - Confidential
2  was a page that depicted the $75 million
3  entry.
4      Q.   Is that the review file that
5  was marked Chan number 3 which I showed you
6  earlier beginning with AA 000015?
7      A.   Once again, I didn't flip
8  through this packet.  The first quarter
9  file that I reviewed in Latham's office, it
10  was contained in there, in that file.  So I
11  don't know if it's actual --
12      Q.   Why don't you take a look at
13  that.
14      A.   I do not see it in this
15  document.
16      Q.   Can you describe for me what
17  the document look like that you reviewed
18  that showed the other side of the
19  transaction?
20      MR. SIDORSKY:  Objection to
21  form.
22      A.   The best way I can describe it
23  is in a form similar to --
24      Q.   To this one?
25      A.   No.  The document was similar

164

1      Jason Sevier - Confidential
2  in form to what's contained on 001631.
3      Q.   So it had a picture on it and
4  some handwritten notes as far as you
5  remember?
6      A.   Once again, from my
7  recollection of the review of the work
8  papers, yes.
9      Q.   Did you recognize any of the
10  handwritten notes?
11      A.   I recall the person's signature
12  who wrote a note on the page, but that's
13  it.
14      Q.   Whose signature was it?
15      A.   Lance Taylor's.
16      Q.   What did it say?
17      A.   I don't remember verbatim.
18      Q.   That's okay.  Generally, what
19  did it say?
20      A.   Something to the effect --
21      MR. SIDORSKY:  I am going to
22  object to the form.
23      A.   Something to the effect that
24  the $75 million is below Andersen's
25  tolerable error, therefore, no further work

165

1       Jason Sevier - Confidential
2   required.
3       Q.   What does that mean, if you
4   know?  Was there -- withdrawn.
5       What does it mean to be below
6   Andersen's tolerable error, if you know?
7       A.   With respect to that item, or
8   in general?
9       Q.   Generally.
10      A.   Generally, for each engagement,
11  whether it's a review or a year-end audit,
12  Andersen completes a materiality tool,
13  which outlines our materiality threshold
14  and tolerable error, and based on the
15  inputs, it generates a number.
16      So that note means that the $75
17  million fell below whatever the tolerable
18  error was for that period.
19      Q.   So that means that there
20  wouldn't be any further inquiry or testing
21  on that specific transaction?
22      A.   Correct.
23      Q.   Looking back on Bates ending
24  40, do you know whether the $75 million
25  reduction to customer overpayments as it's

166

1       Jason Sevier - Confidential
2   depicted here was above or below Andersen's
3   tolerable error number?
4       MR. SIDORSKY:  Objection to
5   form.
6       A.   Based on my review of the first
7   quarter work papers, that's what the note
8   said.  I did not see the materiality tool
9   in my reading of Lance's note indicated
10  that, and I also don't know in Q2 what
11  Andersen's thresholds were, because it
12  wasn't in the files that I looked at.
13      Q.   However, based on what we
14  looked at thus far, especially in Chan
15  number 4, since it appears that no
16  adjustments were proposed by Andersen
17  during the Q3 -- Q2 review, it would be
18  below Andersen's error number?
19      MR. KONOVALOV:  Objection,
20  vague and ambiguous.
21      MR. SIDORSKY:  Objection.
22      A.   That would be pure speculation
23  on my part.  I can't say with certainty.
24  It's an assumption that can be drawn, but I
25  can't say for sure.

167

1       Jason Sevier - Confidential
2       Q.   You see on 25005, customer
3   overpayments, still looking at AA ending
4   40, the variance between, it looks like, Q1
5   '00 and Q2 '01 is $51,760,900, right?
6       A.   Correct.
7       Q.   Would it be fair to say that
8   that number -- that variance was below
9   Andersen's error threshold?
10      MR. SIDORSKY:  Objection to
11  form.
12      A.   Once again, I don't know what
13  Andersen's threshold was.  That's the
14  variance amount, but that doesn't
15  necessarily mean that it was below the
16  threshold.  I don't know for sure.
17      Q.   If it was above the threshold,
18  would there be some notation of that in the
19  work papers somewhere?
20      MR. KONOVALOV:  Objection,
21  incomplete hypothetical.
22      MR. SIDORSKY:  Same objection.
23      A.   Typically, if an item is above
24  or below, it's not noted unless there is a
25  testing and there is a potential journal

168

1       Jason Sevier - Confidential
2   entry or whatnot.
3       So the work papers just don't
4   reflect every balance that's above, meaning
5   if there is a number that's above a
6   threshold, it doesn't say this number is
7   above the threshold, so therefore, we are
8   going to test it.  That's not the way --
9   it's just if you come across a difference
10  and you are going to record an entry, you
11  say it's above our threshold, therefore, we
12  are going to record, or it's below, we are
13  going to pass.
14      Q.   So that may not be necessarily
15  recorded on paper?
16      A.   Right, because this is a
17  variation, it's not a -- the $51 million is
18  a variance, it's not a journal entry.
19      Q.   You see the column where it
20  describes the variance, it says Q1 '00, Q2
21  '01, is that correct?  Is it comparing Q1
22  '00 to Q2 '01, or is it comparing Q1 '01 to
23  Q2 '01?
24      A.   It appears that the Q1 '00 is a
25  typo based on the 8/31/00 date.

169

1       Jason Sevier - Confidential
2       Q.   I want to direct your attention
3    down to the bottom of the page.  It looks
4    like the tick mark A is continued there; is
5    that right?
6       A.   Just for clarification, A is
7    not a tick mark, it's a lettered note.  So
8    there is a difference.  But yes, A is
9    continued at the bottom.
10       Q.   Can you read that for me?
11       A.   Yes.  It says, "Continued, AA,
12    LLP notes that per discussion with Cynthia
13    Chavez, Treasury, the $100 million is a
14    loan and should not be classified as
15    unearned revenue.  The adjustment will be
16    posted before the end of Q3."
17       And then it says, "CAJE debit
18    unearned revenue 100.  Credit intercompany
19    receivable $100 million."
20       Q.   Does the note suggest that any
21    of the balances in customer overpayments
22    depicted on this page is actually
23    incorrect?
24       MR. SIDORSKY:  Objection to
25    form.

170

1       Jason Sevier - Confidential
2       A.   It states that there is an
3    amount contained within the 125 that is
4    misclassified.  I wouldn't say incorrect,
5    it's misclassified.
6       Q.   But if it's misclassified, that
7    note suggest that the true balance of this
8    account for November 30th of 2000 should be
9    $100 million less than what the number
10    depicts there?
11       MR. KONOVALOV:  Objection,
12    assumes facts not in evidence,
13    misstates the document.
14       A.   Based on the note, the note
15    indicates that the 125 is -- the 100 is
16    misclassified, yes, so it's off by 100.
17       Q.   Would it be fair to say then
18    that the balance from the end of August of
19    2000 to the end of November of 2000 dropped
20    from $148 million to approximately $25
21    million?
22       MR. KONOVALOV:  Objection,
23    assumes facts not in evidence.
24       A.   I don't think that's correct.
25       Q.   Where has my analysis gone

171

1       Jason Sevier - Confidential
2    awry?
3       A.   My opinion is that the opening
4    balance was reduced by the $75 million.  So
5    if anything, you are going from 73 down to
6    25.  So it's basically still off
7    approximately 50.
8       Q.   In your opinion, did you
9    consider the $148,616,273 that's mentioned
10    in this note under, I guess, letter A?
11       MR. KONOVALOV:  Could you read
12    that back, please.
13       (The record was read back as follows:)
14       THE COURT REPORTER:  "QUESTION:
15    In your opinion, did you consider the
16    $148,616,273 that's mentioned in this
17    note under, I guess, letter A?"
18       MR. KONOVALOV:  Objection,
19    vague and ambiguous.
20       A.   I did not, because I did not
21    perform any work on this schedule.  So the
22    answer for me is no, because I wasn't
23    involved with the schedule.
24       Q.   I am just talking about right
25    now.  I think you gave your opinion in your

172

1       Jason Sevier - Confidential
2    last answer.
3       A.   I just wanted to clarify the
4    point in time, if you mean right now.
5       Q.   You said in your opinion, the
6    opening balance was reduced.
7       A.   Yes.  So what I did was I
8    considered that the beginning balance was
9    approximately $148 million, was reduced by
10    a client adjusting entry of 75, which gives
11    you an adjusted beginning balance of 73,
12    and then you have $125 million balance,
13    which includes a misclassification of a
14    hundred.  So if you back that out, that
15    would give you an adjusted balance of 25.
16       So to go from 73 to 25, you are
17    approximately $48 million, and the variance
18    that's on the page is 51.  So to me, it's
19    the same variance.
20       Q.   Are you making any --
21    withdrawn.
22       You see in note A where it
23    indicates that the balance was also offset
24    by additional cash applications?
25       A.   Yes.

173

```
1        Jason Sevier - Confidential
2    Q.   Do you know what that means?
3    A.   Do not.
4    Q.   Going down to, I guess, letter
5  C, can you read that note for me?
6    A.   Yes.  "Decrease is due to a
7  larger DSO reclass in Q2 versus Q1 as Q4
8  and Q1 tech support was collected in Q2."
9    Q.   Do you know what a DSO reclass
10 is?
11   A.   I do not recall what that
12 stands for.
13   Q.   Just going down a little
14 further in the "Greater than $5 million
15 variance discussion," there is a section of
16 handwritten notes describing tieout of
17 subtotal.
18   A.   Yes.
19   Q.   Do you understand this
20 transaction here or what's depicted by
21 these notes?
22   A.   Yes, I do.
23   Q.   Can you explain them for me,
24 please?
25   A.   Sure.  As you can see, under
```

174

```
1        Jason Sevier - Confidential
2  the 8/31/00 column, there is a subtotal and
3  a total for unearned revenue, and those
4  correspond to the right with the 708 and
5  the 710.
6        Now, based on what we read in
7  A, we are saying that the beginning balance
8  was adjusted by $75 million.  So this
9  exercise is adding the 75 back to tie out
10 to the ending balances on the first
11 quarter --
12   Q.   Did you just turn the page?
13   A.   -- which tie to, or should tie
14 to I should say --
15   Q.   Number 3?
16   A.   -- 0023.  And if you look at
17 the balance as of 8/31/00, subtotal 783,
18 total 785, this exercise in Chan 4 just
19 ties out to the ending balance from the
20 prior quarter.
21   Q.   Do you know whose handwriting
22 this is on Bates ending 40?
23   A.   I do not.
24   Q.   Now, with respect to the
25 balance in customer overpayments 25005
```

175

```
1        Jason Sevier - Confidential
2  after November 30th of 2000, you indicated
3  that the variance was -- appeared to be
4  correct at about $51 million, is that
5  fair?
6    A.   Give or take a few million,
7  yes.
8    Q.   Do you know whether that
9  balance or variance impacts what is
10 reported publicly to the -- publicly in
11 Oracle's financial statements and what's
12 reported internally on the G/L?
13       MR. KONOVALOV:  Objection,
14   calls for speculation.
15       MR. SIDORSKY:  Objection to
16   form.
17   A.   I don't understand the
18 question.
19   Q.   Is there a difference between
20 what's reported publicly on the financial
21 statements with respect to customer
22 overpayments and what's reported internally
23 on Oracle's general ledger?
24       MR. KONOVALOV:  Same objection.
25       MR. SIDORSKY:  Objection.
```

176

```
1        Jason Sevier - Confidential
2    A.   Technically, customer
3  overpayments aren't reported externally.
4  It's part of unearned revenue, which is all
5  rolled up.  So unearned revenue is what's
6  reported externally.
7        So this variance, it just means
8  that's the difference between the period,
9  it doesn't mean that there is an amount
10 that's reported one way versus what's
11 reported internally.
12   Q.   The balance is rolled up into
13 unearned revenue which is reported
14 publicly?
15   A.   Yes.
16       MR. SIDORSKY:  Objection.
17   Q.   I am going to ask you to turn
18 to the next page, 1631.
19   A.   Okay.
20   Q.   Do you know what's depicted by
21 this page?
22   A.   I don't.  It looks like it's a
23 journal entry made by the company, but I
24 don't recall what it relates to.
25   Q.   It looks like another
```

177

1          Jason Sevier - Confidential
2     reclassification, right?
3          A.   Once again, I'm not a hundred
4     percent sure.  It just says "journal entry"
5     on the top left, so I don't know whether
6     it's a -- I can't say for certain.
7          Q.   You see where in the little
8     photo or top of the page --
9          A.   It says "reclass liberating
10    U.S."  So yes, it's a reclass journal
11    entry.
12         Q.   Do you know what a reclass is?
13         MR. SIDORSKY:  Objection to
14    form.
15         A.   I know what a reclass is, I
16    don't know what this reclass is.
17         Q.   Just describe for me what a
18    reclass is?
19         A.   A reclass is an entry between
20    accounts that has no impact on the income
21    statement.  So if you go from one balance
22    sheet account to another or one liability
23    account to another, there is no impact on
24    the income statement.
25         Q.   Do you see down in the

178

1          Jason Sevier - Confidential
2     handwritten paragraph it says "PDW"?
3          A.   Yes.
4          Q.   Does that mean per discussion
5     with?
6          A.   Yes.
7          Q.   Who is the person that's noted
8     there?  Do you know?
9          A.   Char Wiklund.
10         Q.   Do you know Char?
11         A.   I have met her, but I don't
12    know her personally.
13         Q.   She is an Oracle or was an
14    Oracle employee?
15         A.   At the time, yes.
16         Q.   Do you know whether this
17    document was, indeed, part of the quarterly
18    review that you approved for filing?
19         A.   I don't recall all the
20    contents.  I am assuming based on where it
21    is that it was, but I don't recall for
22    sure.
23         Q.   Let me ask you to just turn to
24    the last page of the exhibit.  The last
25    page, AA 001368, just review that, the

179

1          Jason Sevier - Confidential
2     notes on that page, and let me know when
3     you're done.
4          A.   Okay.
5          Q.   Does that appear to be an
6     additional explanation of the Delphi
7     transaction referred to on AA Bates ending
8     40 in note A?
9          A.   Yes.
10         Q.   Can you just --
11         I guess this is an additional
12    continuation of note A, is that fair?
13         MR. SIDORSKY:  Objection to
14    form.
15         A.   That's what -- yes, that's what
16    it appears to be, yes.
17         Q.   It says, "Oracle booked an
18    adjustment to decrease cash and increase
19    intercompany receivable by $100 million
20    because Delphi did not record a cash wire
21    transfer from Delphi to Oracle in October
22    2000."  And someone wrote "reasonable"
23    there, right?
24         A.   Yes.
25         Q.   Do you know who that is?

180

1          Jason Sevier - Confidential
2          A.   "P.Y." I believe is Paul Yoo.
3          Q.   I just want to go back for a
4     moment to Bates ending 35, which we
5     discussed earlier.
6          A.   Okay.
7          Q.   Just going down to the bottom
8     of the page, where it says "Corporate
9     debt/returns reserve provision."
10         A.   Yes.
11         Q.   You see where it appears to
12    relate to three separate reserve accounts?
13         A.   Yes.
14         Q.   Is that right?
15         A.   Yes.
16         Q.   12600, 12601, and 12604?
17         A.   Yes.
18         Q.   Can you read the note in "K"
19    next to that for me, please?
20         A.   "Increase in the allowance is
21    primarily a result of greater activity from
22    Q2 versus Q1 in the number of deals funded
23    in-house or were financed.  The reserve for
24    receivables in litigation also increased as
25    a result of a greater emphasis by the

Sevier, Jason  6/28/2006  9:09:00 AM

181

1     Jason Sevier - Confidential
2  collections group to" -- I can't make out
3  the next word -- something "uncollectible
4  receivables to legal and a greater number
5  of emerging companies have experienced
6  financial difficulties."
7     Q.   Does that say "refer
8  uncollectible receivables?"
9     A.   Okay, yes, "to refer
10  uncollectible receivables to legal."
11     Q.   Can you describe in layman's
12  terms, if you can, what's depicted by the
13  balance from August 31, 2000 and the
14  balance on November 30, 2000?
15     MR. SIDORSKY:  Objection to
16     form.
17     A.   What's depicted is an increase
18  in the reserve by, it looks like, almost
19  $27 million.
20     Q.   It indicates in the handwritten
21  portion in the notes, it says, "See further
22  discussion of reserves at B-15."
23     A.   Correct.
24     Q.   Did you review B-15 when you
25  looked at the work papers a couple weeks

182

1     Jason Sevier - Confidential
2  ago?
3     A.   I don't specifically recall
4  B-15.
5     Q.   Do you know if it was there?
6     A.   Once again, I don't recall.
7     Q.   Would B-15 based on what you
8  see in this section here include discussion
9  on 12601, on account 12601?
10     MR. KONOVALOV:  Objection,
11     calls for speculation.
12     A.   I don't know for certain.  The
13  speculation is it may, it may not.  I don't
14  know for sure.
15     Q.   I'm trying to understand why
16  all of these accounts were bunched together
17  here in the "Corporate debt/returns reserve
18  provision."
19     A.   I think -- let me rephrase
20  that.  I don't know for sure.  My
21  speculation is that it's just -- each
22  account relates to probably a specific
23  item, and they are just for tracking
24  purposes.  The entire reserve is just
25  lumped together.  There is no need to have

183

1     Jason Sevier - Confidential
2  it broken out separately on the lead sheet.
3     Q.   Just going up on the same page
4  to 12015, "Lease receivables in-house,"
5  what does that refer to?
6     A.   I'm not sure.
7     Q.   Can you read the note next to
8  it for me?
9     A.   Sure.  "The increase is due to
10  the following new in-house deals negotiated
11  in Q2 '00.  Intereliant $4.2 million, Clear
12  Data $1.3 million, EGL, Inc. $2 million,
13  Prodigy $1.2 million, My Family.com $1.1
14  million, E-Cash Technology $1 million.  The
15  remaining increase is a result of general
16  increase in the number of in-house deals
17  for the quarter.  Related bad debt
18  allowance has increased accordingly."
19     Q.   It appears that the bad debt
20  allowance that has been increased is
21  depicted in the increase in, I guess, 12605
22  that we just talked about at the bottom of
23  the page, is that fair to say?
24     MR. KONOVALOV:  Objection,
25     lacks foundation.

184

1     Jason Sevier - Confidential
2     Q.   I'm sorry, or the 12600, 12601,
3  12604?
4     A.   I think it's the latter.
5     Q.   Can you describe the
6  relationship between those two accounts, if
7  you know?
8     A.   Between which two accounts?
9     Q.   I'm sorry, not two accounts,
10  the 12015 that you just read to me and the
11  combination of the allowance for bad debt
12  and returns 12600, 12601 and 12604.
13     MR. SIDORSKY:  Objection to
14     form.
15     A.   The relationship is the same as
16  with all the other accounts.  That's where
17  the bad debts are tracked.  There is some
18  reason for the three, which I don't recall,
19  the three separate accounts, I don't recall
20  why there are three.  But all the reserves
21  for the A/R accounts are contained in those
22  three bad debt accounts at the bottom.
23     Q.   In the note to 12015, it says,
24  I guess in the last sentence, "The
25  remaining increase is a result of general

185

1    Jason Sevier - Confidential
2    increase in the number of in-house deals
3    for the quarter.  Related bad debt
4    allowance has increased accordingly."
5        A.   Yes.
6        Q.   Does that relate to the
7    increase in the bad debt allowances in the
8    combination of 12600, 12601 and 12604?
9        A.   It's a component of the
10   increase, yes.
11       Q.   Do you know why that would
12   increase?
13       A.   I don't know specifically why,
14   no.
15       Q.   Earlier I asked you about what
16   occurs when one credits bad debt
17   write-offs.
18       Do you recall that discussion
19   generally?
20       A.   Yes.
21       Q.   I just want to clarify either
22   my understanding of your response or your
23   response.
24       When you credit bad debt
25   write-offs, what is the other side of that

186

1    Jason Sevier - Confidential
2    transaction?
3        MR. SIDORSKY:  Objection to
4    form.  I think we did go through this,
5    but okay.
6        A.   Let's take a step back, because
7    we talked about when the account is written
8    off directly.  There is a two-step process.
9    The first process is the allowance is set
10   up, so you debit expense and you credit
11   allowance for doubtful accounts.
12       When the account is actually
13   written off, then you debit allowance and
14   you credit the actual A/R account.  That's
15   the direct write-offs, you are actually
16   writing the account off, you are deeming it
17   at that point as you are not going to get
18   it.
19       Q.   And so, you debit the allowance
20   and you credit the A/R account?
21       A.   Correct.
22       Q.   The allowance account is the
23   reserve, right?
24       A.   Correct.
25       Q.   I show you what has been marked

187

1    Jason Sevier - Confidential
2    as Chan number 2.  Chan number 2 begins
3    with Bates number AA 000001 and ends at AA
4    001921 -- I'm sorry, 1945.  They are not
5    consecutive.
6        Do you recognize at least the
7    first page of Chan number 2?
8        A.   Yes.
9        Q.   What is it?
10       A.   It's the file front for the
11   asset file.
12       Q.   For what period?
13       A.   The fiscal 2001 audit.
14       Q.   This is the year-end audit?
15       A.   Yes, May 31st audit.
16       Q.   Is it fair to say that all
17   these people listed on the engagement team
18   worked on the audit?
19       A.   Yes.
20       Q.   Maybe you mentioned her, but
21   did you mention Vivian Chang earlier?
22       A.   Yes, I did.
23       Q.   How about Staci Kawakami?
24       A.   I believe I did.  I believe the
25   only one I didn't mention was Tara

188

1    Jason Sevier - Confidential
2    McDonough.
3        Q.   On the description of the file,
4    5, "Reduce risks to an acceptable level -
5    assets," what does that mean?  Is that just
6    the title?  Does it have any meaning as it
7    relates to the substance of the audit?
8        A.   With respect to this file, no.
9    It was the standard way the files were
10   labeled.
11       Q.   Do you know whether in the
12   fiscal '01 audit it was done
13   electronically, the audit --
14       MR. SIDORSKY:  Objection.
15       Q.   -- or if Andersen kept the
16   results of the audit electronically?
17       MR. KONOVALOV:  Objection,
18   vague and ambiguous.
19       A.   There were planning documents
20   and stuff, what we called the business
21   audit tool set that was electronic.
22   Everything got printed out and got put into
23   the work papers.  But the majority of the
24   work was all done hard copy, manually I
25   should say.

Sevier, Jason  6/28/2006  9:09:00 AM

189

1          Jason Sevier - Confidential
2      Q.   Do you have experience doing
3  audit work electronically?
4      A.   No, I do not.
5      Q.   Do you know that audit work is
6  sometimes done electronically?
7      A.   Just based on what some friends
8  of mine who are still in the business tell
9  me.
10      Q.   Yes, they say yes or --
11      A.   Yes, they say yes.
12      Q.   But you hadn't done any of that
13  prior to --
14      A.   I had not.
15      Q.   I am just going to direct your
16  attention to Bates ending 04.
17      A.   Yes.
18      Q.   Does this appear to be another
19  lead sheet?
20      A.   Yes.
21      Q.   On the bottom right-hand
22  corner, you see some initials there?
23      A.   Yes.
24      Q.   Is that your initials?
25      A.   Yes, they are.

190

1          Jason Sevier - Confidential
2      Q.   And there is, it looks like, a
3  date under there of 6/1/01, is that what
4  that is?
5      A.   6/1/01.
6      Q.   So June '01?
7      A.   Yes.
8      Q.   The "B, P.A., 60," what does
9  that refer to?
10      A.   The "B" is, once again, the
11  standard indexing for accounts receivable;
12  the "P.A." I believe is Pam Arquelada; and
13  the "60," I don't know if that's 60 or
14  6/01, maybe it's 6/01, that's just a date
15  that she logged in the work paper to the --
16  or the sheet to the work papers.
17      Q.   Do her initials indicate that
18  the handwriting on the document is hers?
19      A.   It does not.  It could be, but
20  that doesn't necessarily mean that that's
21  her handwriting.
22      Q.   How does one determine whose
23  handwriting is on the work papers?  Is
24  there a requirement that the note taker
25  actually initial their notes?

191

1          Jason Sevier - Confidential
2      A.   Standard procedure was whoever
3  worked on the section initialed their
4  notes.
5      Q.   Do you see any other initials
6  aside from yours and Pam's on this
7  document?
8      A.   It's not an initial, but it's
9  an indication that the document was
10  reviewed.
11      Q.   Yours?
12      A.   No, not mine.  In the far
13  left-hand corner above the double-check
14  mark, you'll see it looks like a long
15  checkmark, that's the signature of Angelika
16  Caicedo, indicating that she reviewed and
17  signed off on this work paper.
18      Q.   That's her signature, or is
19  that just a checkmark that you understood
20  to be a notation from her that she checked
21  it?
22      A.   Yes, that was her notation that
23  she reviewed the work paper.
24          MR. KONOVALOV:  Could you
25  actually direct me where you are.

192

1          Jason Sevier - Confidential
2          THE WITNESS:  The bottom
3  left-hand corner directly below the 4,
4  you'll see a double-check mark, and
5  then above that you'll see what looks
6  like a longer checkmark.  If you look
7  through the files, you'll see that's a
8  consistent signature, and that's her
9  signature, or her notation.
10      Q.   Her notation throughout the
11  file?
12      A.   Throughout the file.
13          MR. WILLIAMS:  I am being told
14  that he has to change the tape.
15          THE WITNESS:  That's fine.
16          THE VIDEOGRAPHER:  The time is
17  2:22 p.m., and this completes tape
18  number 2 of the videotaped deposition
19  of Jason Sevier.
20          (Recess taken.)
21          THE VIDEOGRAPHER:  The time is
22  2:38 p.m., and this is the beginning
23  of tape number 3 of the videotaped
24  deposition of Jason Sevier.
25      Q.   Do you know what a reversing

193

1         Jason Sevier - Confidential
2    journal entry is?
3         MR. SIDORSKY:  Objection to
4    form.
5         You mean in general?
6         MR. WILLIAMS:  Yes.
7         MR. KONOVALOV:  Vague and
8    ambiguous.
9    A.   In general --
10        MR. SIDORSKY:  And I am also
11   going to continue to object to this
12   process of sort of asking the witness
13   about general audit theory, general
14   questions about audit practice
15   unrelated to this audit.
16        MR. WILLIAMS:  You understand
17   that's not unrelated to this
18   audit, right?  Maybe you don't
19   understand that.  And that's fine, you
20   can object, but the journal entries
21   and what they mean with respect to
22   this audit are integral to this case.
23        The Order allows us to discuss
24   with this witness the meaning of the
25   text, numbers, handwriting and all the

194

1         Jason Sevier - Confidential
2    facts in these work papers.
3         You are sitting here as he
4    testified to handwritten notes from
5    people on his engagement team
6    regarding journal entries, and I am
7    asking if he knows what a reversing
8    journal entry is.
9         So if you think that objection
10   has a real basis in fact, that's fine,
11   but it certainly is related to what we
12   are entitled to question the witness
13   on.
14        MR. SIDORSKY:  I think it has a
15   basis, because -- my objection has a
16   basis, because you are asking in the
17   abstract, you are asking in a vacuum.
18   I am objecting to the form.
19        MR. WILLIAMS:  I understand.
20   Q.   Do you know what a reversing
21   journal entry is?
22   A.   In general terms, yes.
23   Q.   Can you tell me, please?
24   A.   A reversing journal entry
25   reverses an entry that was previously

195

1         Jason Sevier - Confidential
2    booked.
3         Q.   As we were talking about the
4    $75 million journal entry earlier, if that
5    were a reversing general entry, what would
6    the balance have been to customer
7    overpayments after the journal entry
8    reversed at the beginning of Q2 '01?
9         MR. KONOVALOV:  Objection,
10   incomplete hypothetical.
11        MR. SIDORSKY:  Same objection.
12   A.   I am confused, because we are
13   talking about reversing journal entries,
14   and this is labeled as a client adjusted
15   journal entry, and the two are totally
16   unrelated.
17   Q.   Do you know whether any Oracle
18   revenue manager has testified that that $75
19   million entry was, indeed, a reversing
20   journal entry?
21   A.   That I don't know.
22   Q.   If you knew that that journal
23   entry was a reversing journal entry, what
24   would the balance have been after the
25   journal entry reversed at the beginning of

196

1         Jason Sevier - Confidential
2    2Q '01, if you know, if you are able to
3    determine that?
4         MR. KONOVALOV:  Objection,
5    hypothetical.
6         MR. SIDORSKY:  Same objection.
7    A.   I am not able to determine
8    that.
9    Q.   I think I had directed your
10   attention to Bates ending 04.
11   A.   Correct.
12   Q.   We discussed that this was a
13   lead sheet for the '01 audit.
14   A.   Correct.
15   Q.   Have you met Julie Chan?
16   A.   I believe I have, yes.
17   Q.   You see at the top of this
18   document it says, "Per Julie Chan, senior
19   A/R manager"?
20   A.   Correct.
21   Q.   Do you know what statement on
22   this page is the "Per Julie Chan"?  Can you
23   tell?
24   A.   My understanding is that all
25   the typewritten text was prepared by Julie.

197

1          Jason Sevier - Confidential
2    So the notes is just basically saying
3    that's where the typewritten text came
4    from.  She is the creator of that.
5          Q.   I don't know if you can read
6    this, it's pretty light.  But does it say
7    "note 1 SUB3," do you -- "see B-3"?
8          A.   "See B-3," yes.
9          Q.   Can you read what's under that?
10         A.   It says, "Note 1.  See B-3 for
11   account descriptions."  And then underneath
12   that, it says, "Note 2.  Greater than $5
13   million for quarter-to-quarter and greater
14   than $10 million for year-to-year variance
15   discussion."
16         So consistent with the other
17   schedules we saw, that is referring to
18   scope of this page.
19         Q.   I am just going to direct your
20   attention to the 12540 account, "Unearned
21   revenue in receivables - consulting"?  Do
22   you see that?
23         A.   No, not yet.
24         Q.   It's about six --
25         A.   Okay, I got it.

198

1          Jason Sevier - Confidential
2          Q.   What are "Unearned revenues in
3    receivables - consulting"?  Do you know?
4          A.   I don't know specifically.  I
5    have a general idea, but I don't know
6    specifically.
7          Q.   What's your general idea?
8          A.   My general idea is in a
9    consulting arrangement, there could be
10   agreed-upon billing arrangements, whereby
11   you bill every two weeks or every quarter
12   based on a fixed fee and you haven't earned
13   the money yet.
14         So you billed it, but it's not
15   earned, so it sits in A/R and unearned
16   revenue.
17         Q.   Let me take you over to note D.
18   It says, "The year-to-year increase is as a
19   result of a change in reclassifications
20   between unearned and unbilled consulting."
21         You see that?
22         A.   Yes.
23         Q.   What is the difference, if you
24   know, between unearned and unbilled
25   consulting?

199

1          Jason Sevier - Confidential
2          A.   Well, "unearned" is we have
3    billed it, but we are not entitled to
4    recognize the revenue; and "unbilled" is we
5    have done the work, but we haven't actually
6    sent the bill out to the customer yet.
7          Q.   So the unbilled is actually
8    revenue that could or should be reported,
9    it's earned based on your answer to that
10   question?
11         MR. SIDORSKY:  Objection to
12   form.
13         A.   Based on my answer to that
14   question, yes.
15         Q.   You see another sentence down,
16   "In Q3 '01, an analysis was performed on
17   these amounts to identify unearned but paid
18   balances"?
19         A.   Yes.
20         Q.   Do you know what that analysis
21   was?
22         A.   I do not.
23         Q.   Do you know whether anyone on
24   your engagement team would have known what
25   that analysis was?

200

1          Jason Sevier - Confidential
2          A.   I do not.
3          Q.   Because the variance appears to
4    be greater than $5 million, it looks like
5    it's a little bit more than $18 million, do
6    you know whether or not anyone on your team
7    would -- withdrawn.
8          Do you know whether that would
9    have reached a level that someone on your
10   team would have done more analysis?
11         MR. SIDORSKY:  Objection to
12   form.
13         A.   Once again, without actually
14   knowing what that -- what those thresholds
15   were, it's difficult for me to answer that.
16         Q.   The next sentence says, "This
17   amount remained as a liability in 25010 and
18   the credit was not reclassified to 12540.
19   The decrease in the account from quarter to
20   quarter is associated with the decrease in
21   the amount of unbilled receivables from Q3
22   to Q4."
23         A.   I don't know what that means.
24         Q.   Does that make sense as an
25   accountant or auditor?

201

```
1        Jason Sevier - Confidential
2        MR. SIDORSKY:  Objection to
3    form.
4        MR. KONOVALOV:  Objection,
5    lacks foundation.
6        A.   I can't answer that based on
7    what -- just by reading this.  It's not
8    enough information for me to kind of figure
9    out whether it makes sense or not.
10       Q.   What else would you need?
11       A.   I don't know.  I would probably
12   have to understand more about the accounts
13   and everything that was going into the
14   accounts.  I just don't know enough about
15   it or remember enough about it, just a
16   couple sentences.
17       Q.   A decrease in unbilled
18   receivables would suggest that --
19       A.   Just in general that it was
20   billed.
21       Q.   That it was billed that it was
22   earned?
23       MR. KONOVALOV:  Objection,
24   lacks foundation.
25       A.   Well, not necessarily earned,
```

202

```
1        Jason Sevier - Confidential
2    because as we talked about, you could have
3    something that was earned and you did the
4    work, but you just hadn't billed it yet.
5    So it sits in unbilled and then you
6    actually get around to billing it.
7        Q.   Meaning the work was done and
8    it was earned?
9        A.   Meaning the work was done.  If
10   you don't go back tomorrow and bill your
11   time for this, it's earned, you just
12   haven't billed it, so then you bill it, it
13   comes out unearned and goes in, you know,
14   the bill.
15       Q.   It impacts the balances in
16   unearned revenues in receivables, right?
17       MR. KONOVALOV:  Objection, lack
18   of foundation.
19       MR. SIDORSKY:  What does?  I am
20   losing the thread here.
21       Q.   Whether or not an item is
22   billed or unbilled.
23       MR. KONOVALOV:  Objection,
24   lacks foundation.
25       A.   Yes.  The way the accounts are
```

203

```
1        Jason Sevier - Confidential
2    connected, if it's unbilled but it's been
3    earned, then once it's billed, then the
4    actual A/R balance will go up and the
5    unbilled goes down, if it's been earned.
6        If it hasn't been earned, then
7    once it's earned, the revenue accounts are
8    impacted.
9        So you have to just be careful
10   what relating accounts we are talking
11   about.
12       Q.   Right now, I am only talking
13   about 12540 as it relates to the note, note
14   D, and 25010.
15       A.   What was the second account?
16   I'm sorry.  I know 12540, but what was the
17   other account?
18       Q.   If you look at the note there,
19   it says 25010.
20       A.   That's in the liability
21   account.  This account carries a debit
22   balance which means it's an asset account,
23   the other account is a liability.
24       So if it has been unbilled but
25   earned -- I'm sorry, if they record the
```

204

```
1        Jason Sevier - Confidential
2    receivable and they had a corresponding
3    credit to a liability, which is the 25010
4    account, then depending on -- I don't know,
5    I'm kind of losing the thread here of what
6    you are saying they do next.  But whatever
7    they would do next would decrease this
8    liability account and most likely -- I
9    would have to know the specific, what are
10   they doing.
11       Q.   It looks like in this line item
12   it increased revenue, is that fair?
13       A.   If the unearned revenue account
14   goes down, the offsetting entry is
15   typically revenue, yeah.
16       Q.   You see the handwritten note
17   next to it, where it says, "Consultants
18   have been more proactive in billing
19   customers as it directly ties to their" I
20   think that says "compensation," but I don't
21   know?
22       A.   It does.
23       Q.   Wouldn't that suggest that they
24   were billing customers more proactively for
25   consulting that had been earned?
```

205

```
1          Jason Sevier - Confidential
2          MR. SIDORSKY:  Objection to
3    form.
4          MR. KONOVALOV:  Calls for
5    speculation, assumes facts not in
6    evidence.
7          A.    Based on my reading of that
8    sentence, that's how I would interpret it.
9          Q.    That would reduce the liability
10   account and increase 12540?
11         A.    Yes.
12         Q.    Did you or any of your
13   engagement team -- withdrawn.
14         You indicated earlier that you
15   can't tell who wrote these notes, right?
16         A.    Right, I can't, right.
17         Q.    Do you know whether anyone on
18   your engagement team determined what
19   consultants being more proactive in billing
20   customers meant?
21         MR. SIDORSKY:  Objection to
22   form.
23         A.    No.  I don't recall if anyone
24   looked in or did any testing of what that
25   exactly means.
```

206

```
1          Jason Sevier - Confidential
2          Q.    If you could just go down to
3    the very last handwritten note in the
4    bottom right-hand corner.
5          A.    Yes.
6          Q.    There is an arrow that goes
7    there, and I'm trying to determine where it
8    begins.  Can you?
9          A.    It appears to me that it goes
10   in and -- it relates to note D.
11         Q.    Note D?
12         A.    That's what it looks like.  It
13   looks like the line goes down and somehow
14   it gets cut off in the -- maybe not.
15         It's hard to tell, because this
16   line that starts in D comes down here into
17   J, but there is really nothing that it
18   relates to, and then there is this other
19   line.  It looks like maybe it got cut off
20   to me.  I can't specifically tell.
21         Q.    Take a look at "Unapplied Cash"
22   at 12018 as it goes across.
23         A.    Yes.
24         Q.    And the note next to it I
25   think -- is that a K?
```

207

```
1          Jason Sevier - Confidential
2          A.    Well, there are two notes,
3    there is P and there is K.  There is P next
4    to the 112, and then there is K next to the
5    variance.
6          Q.    Can you find either one of
7    those notes?
8          A.    The K is right there, the P is
9    on the next page.
10         Q.    Looking at K, is it fair to say
11   that it says, "The increase is a result of
12   A/R reviewing unapplied cash on a more
13   timely basis and identifying cash to be
14   applied to a particular receivable
15   balance"?  Do you see that?
16         A.    I do.
17         Q.    What is the increase that
18   appears to be referring to?  Can you
19   describe it for me?
20         A.    The increase relates to the
21   identification of specific receivable
22   balances and therefore amounts transferred
23   from 25005 into 12018.
24         Q.    What is the value of the
25   increase that's referred to here?
```

208

```
1          Jason Sevier - Confidential
2          MR. KONOVALOV:  Objection,
3    vague and ambiguous.
4          A.    There are two increases.  There
5    is an increase from quarter to quarter of
6    $7 million, there is an increase from year
7    to year of $47 million.
8          Q.    So the year to year is 4Q '01
9    and 4Q '00, that's a $47 million increase?
10         A.    Yes.
11         Q.    It appears that Julie Chan said
12   or wrote that, "This increase is a result
13   of A/R reviewing unapplied cash receipts on
14   a more timely basis and identifying cash to
15   be applied to a particular receivable
16   balance."
17         MR. KONOVALOV:  Objection,
18   lacks foundation.
19         Q.    Right?
20         MR. KONOVALOV:  Same objection.
21         A.    Going on the assumption we
22   previously talked about, that she wrote
23   it --
24         Q.    Somebody at Oracle did, right?
25         A.    Yes, someone at Oracle.
```

Sevier, Jason  6/28/2006  9:09:00 AM

209

1       Jason Sevier - Confidential
2   Assuming it was Julie, then yes.
3       Q.    And this related to what we
4   talked about earlier with respect to 12018.
5   I think you testified that items in that
6   account were items that were -- that the
7   company had been unable to identify what
8   invoice it was related to, knew the
9   customer, but didn't know what receivable
10  it was related to.
11          MR. SIDORSKY:  Objection to
12      form.
13      A.    No.  I thought that originally
14  I said that when a company can't identify
15  the customer or the invoice, everything
16  goes into the 25005, and then when they
17  identify a customer, it goes into 12018,
18  and then once it sits in there, then they
19  identify the particular invoice.
20      Q.    You mean the invoice itself?
21      A.    Yes.
22      Q.    Do you know how you learned
23  that?
24      A.    Originally, I believe it was --
25  originally, it was from reading the

210

1       Jason Sevier - Confidential
2   description of all the accounts when I got
3   on the engagement, that we saw on the
4   account descriptions.
5       Q.    Did anyone tell you that?
6       A.    I don't recall a specific
7   person, no.
8       Q.    There is a handwritten note
9   that appears to be written by somebody on
10  your team.  It says, "After the company
11  identifies the customer associated with the
12  payment, they are moved from 25005 into
13  this account."
14      A.    Right.
15      Q.    That's what you just said?
16      A.    That's what I just said, right.
17      Q.    So is it fair to say that --
18  withdrawn.
19          The note that we were trying to
20  associate at the bottom of the page, it
21  looks like it's almost the same text,
22  right?
23      A.    It could be.
24      Q.    You see where it says, "After
25  the company identifies the invoices

211

1       Jason Sevier - Confidential
2   associated with the payment, they are moved
3   from this account and applied against the
4   trade A/R balance"?
5       A.    Yes.
6       Q.    And the trade A/R balance is
7   just -- that's the -- just general A/R?
8       A.    Yeah.  You see it's account
9   12000, gross trade.
10      Q.    How do you know it's 12000?
11  Does it say there?
12      A.    Well, all those accounts that
13  say gross trade, license gross trade,
14  support gross trade, consulting gross
15  trade, education.  So whatever trade
16  account that applies to, it goes into one
17  of those.
18      Q.    Going down to the bottom of the
19  page, the entries by Oracle, again, looking
20  at the allowance for bad debt, it appears
21  that the allowance for bad debt goes up
22  year over year approximately $99.9 million,
23  right?
24      A.    Correct.
25      Q.    Can you just read the note

212

1       Jason Sevier - Confidential
2   there for me?
3       A.    "Allowance increased due to
4   greater reserve for in-house leases.
5   Specific reserves for trade receivables in
6   management judgment.  See bad debt analysis
7   for further detail at B-15."
8       Q.    Do you know what is in B-15 as
9   it relates to that increase?
10      A.    I do not.
11      Q.    Do you have an independent
12  knowledge of the -- withdrawn.
13          Do you have an independent
14  knowledge of the reason for that increase?
15      A.    I do not.
16      Q.    Do you know whether that
17  increase was related to a deteriorating
18  economy?
19          MR. KONOVALOV:  Objection,
20      lacks foundation.
21          MR. SIDORSKY:  Objection to
22      form.
23      A.    I do not.
24      Q.    How about dot-com customers
25  going out of business?

213

```
1        Jason Sevier - Confidential
2        MR. KONOVALOV:  Same objection.
3    Q.  Do you know?
4        MR. SIDORSKY:  Objection to
5    form.
6    A.  Don't know specific accounts it
7    relates to.
8    Q.  Is that the type of
9    information -- withdrawn.
10       Would the reasoning for the
11   increase or the analysis of it be in B-15?
12   A.  I don't know for sure, but it's
13   possible.
14   Q.  If it was anywhere in the work
15   papers, is it most likely going to be in
16   B-15?
17       MR. KONOVALOV:  Objection,
18   calls for speculation.
19   A.  Once again, speculating, if it
20   would be anywhere, that's probably where it
21   would be.
22   Q.  Just going to the next page,
23   ending in Bates 05, just looking at the
24   note P-1, and that refers to the note for
25   the balance of unapplied cash at the end of
```

215

```
1        Jason Sevier - Confidential
2    Q.  Can you read the first sentence
3    of that handwritten note, if you can
4    actually read the handwriting there?
5    A.  P-1?
6    Q.  Yes.
7    A.  "Per discussion with Julie
8    Chan, and per review of the 5/31/01 reclass
9    worksheet, this account represents the
10   amount of unapplied cash that the company
11   believes will be properly applied in the
12   future."
13   Q.  What is a reclass worksheet?
14   Is that what we were just looking at?
15   A.  No, that's not what we were
16   just looking at.
17   Q.  What we were looking at was the
18   lead sheet, right?
19   A.  Yes.
20   Q.  What's a reclass worksheet?
21   A.  Don't know.  Don't recall ever
22   seeing one.
23   Q.  Your team members wouldn't
24   write that there if it didn't exist,
25   though, would they?
```

214

```
1        Jason Sevier - Confidential
2    May 31, 2001, fiscal '01, right?
3    A.  Correct.
4    Q.  Do you know whose handwriting
5    this is?
6    A.  I do not.
7    Q.  There is a check on the bottom
8    of this page.  Does that suggest that some
9    portion of this handwriting belongs to
10   Angelika?
11   A.  No, it does not suggest that,
12   it just suggests that she reviewed --
13   signed off on this page.
14   Q.  Do you see it appears that
15   there are two different types of -- at
16   least two different types of handwriting on
17   the page, right?
18   A.  Correct.
19   Q.  Is any of it yours?
20   A.  It is not.
21   Q.  Have you seen any of your
22   handwriting on any of these documents that
23   we have looked at today?
24   A.  So far, only my signature on
25   that one page.
```

216

```
1        Jason Sevier - Confidential
2        MR. SIDORSKY:  Objection to
3    form.
4    A.  No, I don't -- no, they
5    wouldn't write that if it didn't exist,
6    it's just not a worksheet I have ever seen.
7    Q.  Do you know what's meant by the
8    writer's statement that the account
9    represents the amount of unapplied cash
10   that the company believes will be properly
11   applied in the future?
12   A.  Yes, I believe I know what is
13   meant by that.
14   Q.  What does that mean?
15   A.  It just means that since it's
16   in unapplied cash, a customer has been
17   identified, and that once the specific
18   invoices are identified, then it will be
19   applied to that trade A/R balance for
20   specific invoices.
21   Q.  If it's identified?
22   A.  If it's identified, yes.  If
23   the invoices are identified, yes.
24   Q.  We talked a little bit about
25   the lockbox earlier.
```

217

```
1          Jason Sevier - Confidential
2      A.   Yes, just a little bit.
3      Q.   And the lockbox is where checks
4  come in from customers, right?
5      A.   Yes.
6      Q.   Have you ever seen any of those
7  lockbox checks?
8      A.   I have not, no.
9      Q.   Would you think it's unusual
10 for a check to come in without a customer
11 name on it?
12         MR. KONOVALOV:  Objection,
13     calls for speculation.
14     A.   My personal opinion?
15     Q.   Yes.
16     A.   No.
17     Q.   What's the basis of your
18 opinion?
19     A.   Just knowing that as many
20 checks as Oracle receives and as many
21 customers as they have, sometimes the
22 salespeople are trying to track down
23 payments, they call up a customer and say I
24 need to get paid, they just send in a check
25 to their lockbox.  I don't think it's
```

218

```
1          Jason Sevier - Confidential
2  uncommon.
3      Q.   But wouldn't the customer name
4  be on the check?  Wouldn't there be
5  something on the check indicating that it's
6  from somebody?
7          MR. SIDORSKY:  Objection to
8      form.
9      A.   In theory, it should be, being
10 issued by a company.  But if Oracle's
11 system doesn't have the exact company name
12 written down properly, or if it's "co."
13 instead of "company" and it comes in, it's
14 like okay, is this the same thing, is it a
15 match.
16         So it's not unusual if there
17 are checks coming into the lockbox that are
18 unidentified.
19     Q.   You can't identify the
20 customer?
21     A.   Right.  Specifically, right.
22     Q.   But you have never seen any of
23 those?
24     A.   I have not, no.
25     Q.   You see the next sentence where
```

219

```
1          Jason Sevier - Confidential
2  it says, "This account is not made up of
3  individual invoices, but it's calculated by
4  the company on a quarterly basis"?
5      A.   Yes.
6      Q.   What does that mean?
7      A.   No idea.
8      Q.   Doesn't that suggest that they
9  have not identified the customer?
10         MR. SIDORSKY:  Objection to
11     form.
12     A.   No, that's not the way I
13 interpret it.
14     Q.   How do you interpret it?
15     A.   I interpret it that a check is
16 coming, they have identified that Company X
17 had sent in $20 million, but has not
18 identified what invoices the $20 million
19 relates to; and therefore, it goes into
20 that account until the individual invoices
21 are identified.
22         That's why they say "not made
23 up of individual invoices," meaning you
24 would not look at an account and see
25 Company X with these 50 invoices associated
```

220

```
1          Jason Sevier - Confidential
2  with it.
3      Q.   Just the money from the
4  company?
5      A.   Just the $20 million in my
6  example there.
7      Q.   Can you read the next sentence?
8      A.   Yes.  "When cash is initially
9  received by the company and cannot be
10 immediately identified, it is entered into
11 account 25005, the customer overpayments."
12     Q.   It looks like the handwriting
13 changed there.
14     A.   Yes.
15     Q.   So what's in 25005 --
16 withdrawn.
17         So what's in 25005 based on
18 this is all customer cash that can't be
19 identified?
20     A.   Did you say can or cannot?
21     Q.   Cannot.
22     A.   Yes, cannot.
23     Q.   Can you read the next sentence
24 for me?
25     A.   Yes.  "Every quarter, the
```

221

1          Jason Sevier - Confidential
2     company reviews all amounts of unapplied
3     cash greater than $100,000 by customer."
4          Q.   Do you know what that means?
5          A.   Based on reading the sentence,
6     as we discussed, once it hits unapplied
7     cash, a customer has been identified, so
8     everything greater than a hundred, the
9     company tries to review by customer to
10    match up with a corresponding invoice so
11    the amount can be taken from unapplied and
12    applied to the trade A/R accounts.
13         Q.   25005 also has unapplied cash
14    in it, as far as you know, right?
15         MR. SIDORSKY:  Objection to
16    form.
17         A.   Yes, that is a true statement.
18         Q.   Can you read the next sentence?
19         A.   "100 percent of amounts the
20    company believes will be applied in the
21    future are reclassed to this account."
22         Q.   Do you know what that means?
23         A.   No, I don't.  It doesn't make
24    sense to me.
25         Q.   Somebody edited the sentence,

222

1          Jason Sevier - Confidential
2     though, right to add "in the future"?
3          A.   Yes.
4          Q.   Is that a reclassification
5     from -- withdrawn.
6          100 percent of the amounts the
7     company believes will be applied in the
8     future are reclassed to this account?
9          A.   See, what's misleading is when
10    it says, "Every quarter, the company
11    reviews all amounts of unapplied cash."
12         The unapplied cash in the
13    context of this sentence is not 12018, it's
14    being used, as you had mentioned earlier,
15    in the context of 25005.  That's the way it
16    appears.
17         Q.   That's the way it appears?
18         A.   Yes.  But reading it, it's
19    confusing, because unapplied cash is a
20    recognized term on Schedule B, and it's a
21    note related to unapplied cash.  So it's
22    confusing the way it's used in this
23    sentence.
24         Q.   As you know, 25005 also
25    included unapplied cash?

223

1          Jason Sevier - Confidential
2          A.   Yes, that's true.
3          Q.   You see the next sentence, can
4     you read that for me, "For amounts"?
5          A.   I'm sorry, I have lost you
6     here.
7          I'm sorry, "For amounts less
8     than $100,000, 80 percent of the amounts
9     less than three months old, 60 percent of
10    the amounts three to six months old, and 20
11    percent of the amounts over six months old
12    are reclassified to this account."
13         Q.   What does that mean?
14         A.   Based on reading this note, my
15    interpretation is that there are certain
16    aging categories within the account they
17    are mentioning, and the amounts that are
18    less than -- 80 percent of amounts less
19    than three months old are reclassified in
20    this account, and 60 percent of the
21    accounts that are age three to six months
22    are reclassified into this account.
23         So that account that we are
24    talking about --
25         Q.   25001?

224

1          Jason Sevier - Confidential
2          A.   Yes -- is aged, and based on
3     these bands, there are reclass amounts,
4     entries that -- reclasses that are made.
5          Q.   As we have discussed, at least
6     based on your testimony, 25005 unapplied
7     cash was unapplied cash that had not been
8     identified to a customer, correct?
9          A.   Correct.
10         Q.   And based on this, the last
11    sentence that you read to me and then the
12    work papers, Oracle was reclassifying those
13    unapplied and unidentified cash receipts to
14    12018?
15         MR. KONOVALOV:  Objection,
16    vague and ambiguous.
17         MR. SIDORSKY:  Objection to
18    form.
19         A.   Based on the reading of the
20    note, that's what it appears has taken
21    place.
22         Q.   That's a reclassification from
23    25005, which is a liability to 12018, which
24    is a receivable?
25         MR. SIDORSKY:  Objection to

225

1        Jason Sevier - Confidential
2    form.
3        A.   Correct.
4        Q.   Do you know whether or not any
5    of your -- members of your engagement team
6    looked -- withdrawn.
7            Do you know whether anyone on
8    your engagement team drilled down on the
9    basis of that movement other than what's
10   written here?
11           MR. SIDORSKY:  Objection to
12   form.
13       A.   When you say "basis," do you
14   mean the 80 percent, the 60 percent?
15       Q.   Um-huh.
16       A.   I do not recall if they drove
17   down on the basis.  My assumption is this
18   is consistent with what Oracle has always
19   done.
20           So there is nothing unusual
21   about it, because it's consistent with
22   prior periods and something they have
23   always done.
24       Q.   Do you know whether the $75
25   million reclassification that we were

226

1        Jason Sevier - Confidential
2    talking about earlier was a
3    reclassification of unapplied and
4    unidentified cash in 25005 to 12018?
5        A.   I don't know for sure.  I don't
6    recall.
7        Q.   Is that something you may have
8    known at the time?
9        A.   Once again, that took place in
10   a quarter I was not involved in, so I don't
11   know.
12       Q.   The $75 million?
13       A.   The $75 million yes.
14       Q.   Can you read the next sentence
15   for me?
16       A.   "The company believes that
17   these percentages of cash payments will be
18   applied to the right account in the
19   future."
20       Q.   That's consistent with the fact
21   that, at least based on your review of
22   these notes, the reclassifications were of
23   unidentified and unapplied cash?
24       A.   Correct.
25       Q.   The next sentence, which says,

227

1        Jason Sevier - Confidential
2    "Per Julie Chan, these percentages to
3    reclass are consistent with the prior year"
4    suggested they had done something similar
5    to the year before?
6            MR. KONOVALOV:  Objection,
7    calls for speculation.
8        A.   You're right, the percentages
9    are the same as they were in the past, and
10   they did it in the prior year.
11       Q.   Can you read the next sentence
12   for me?
13       A.   "AA, LLP reviewed the detailed
14   listing by customer of all unapplied cash,
15   noting the total was approximately $119
16   million, which includes amounts in both
17   this account (12018) and in 25005."
18       Q.   Have you seen a detailed
19   listing by customer of all unapplied cash?
20       A.   I have not.
21       Q.   Did you see it in the work
22   papers that you reviewed last week or two
23   weeks ago?
24       A.   I do not recall seeing a list.
25       Q.   No one on your engagement team

228

1        Jason Sevier - Confidential
2    would have written this if that list did
3    not exist, would they?
4            MR. SIDORSKY:  Objection to
5    form.
6            MR. KONOVALOV:  Objection,
7    calls for speculation.
8        A.   Consistent with the earlier
9    response, no.  The staff would not say they
10   saw something if they didn't.
11       Q.   Based on that sentence, it
12   appears that the detailed listing by
13   customer of all unapplied cash included
14   12018 and 25005, right?
15       A.   Yes.
16       Q.   Based on that sentence, it
17   appears that even the 25005 amounts were
18   listed by customer?
19       A.   Based on this sentence, yes,
20   that's what it implies.
21       Q.   So based on this sentence,
22   Oracle knew which customer had unapplied
23   cash in either 12018 or 25005 that at least
24   made up $115 million?
25           MR. KONOVALOV:  Objection,

229

1    Jason Sevier - Confidential
2    vague and ambiguous, assumes facts
3    that are not in evidence.
4        MR. SIDORSKY:  Same objection.
5    Q.  Based on this sentence.
6        MR. SIDORSKY:  That wasn't the
7    question.  Objection to form.
8    A.  Based on the way the sentence
9    is written, that's the way it appears, but
10   that's not my recollection of the way the
11   accounts worked.
12       Q.  As you indicated, no one on
13   your engagement team would write this if it
14   weren't true, right?
15       MR. SIDORSKY:  Objection to
16   form.
17   A.  No.  I said no one would say
18   that there is an unapplied cash, a detailed
19   listing by customer if it didn't exist.
20       I am just saying that to my
21   knowledge, knowing the way the accounts
22   worked, I didn't know that customers were
23   identified in 25005.
24       So what I am saying is reading
25   that is somewhat new news to me.  But I'm

230

1    Jason Sevier - Confidential
2    not saying that what they wrote is not
3    true, because, you know --
4        Q.  They wrote it and you signed
5    off on it?
6    A.  They wrote it.  Well, I didn't
7    sign off on it, someone did.  This isn't my
8    signature at the bottom of the page.
9        Q.  Isn't your signature on the
10   cover sheet?
11       MR. SIDORSKY:  Objection to the
12   form.
13   A.  As I stated earlier, my
14   signature on the file front indicates that
15   all documents that are required to be in
16   the file are there, not that I approved
17   everything.
18       Q.  The page before has your
19   signature on it, right, Bates ending
20   000004?
21   A.  Yes, it does.  That's true.
22       Q.  Was it typical, if you know,
23   for your engagement staff to leave spaces
24   in the notes for later notes to be weaved
25   in?

231

1    Jason Sevier - Confidential
2        MR. KONOVALOV:  Objection,
3    assumes facts not in evidence.
4        MR. WILLIAMS:  That's a
5    question.
6    A.  I think O was the last
7    typewritten note, and then U, P.  I don't
8    think anyone -- my recollection is space
9    wasn't really left.  We created space if we
10   needed it.
11       Q.  Is that a Q or an O?  I'm
12   sorry, withdrawn.
13   A.  O at the top, Q at the bottom.
14       Q.  Can you help me find where Q is
15   on the previous page?
16   A.  I don't think it's on the
17   previous page.  I think that says --
18   actually, I can't tell if that says "Q2 of"
19   or "3 of."  It doesn't look like it says
20   Q1M.
21       I don't see it on the previous
22   page.  I think it's referenced on a
23   different page.  I can't read it.
24       Just typically, there is a
25   method to the notes, the way they flow on

232

1    Jason Sevier - Confidential
2    the page.  You start A, B, you wouldn't
3    have A and B, and then F.
4        So if P is the last one on the
5    bottom, you can generally tell that the
6    next note would be below that.  I can't
7    find it.
8        Q.  Did you know Greg Myers?
9    A.  I have heard the name, I didn't
10   know him.
11       Q.  Have you ever met him?
12   A.  I may have met him in passing,
13   but I don't recall his title.
14       Q.  Do you recall ever talking to
15   him?
16   A.  I don't recall ever talking to
17   him specifically about an audit-related
18   item, no.
19       Q.  Do you recall ever talking to
20   him?
21   A.  I recall being introduced,
22   saying hi, I'm the engagement manager, but
23   I don't recall having a conversation about
24   a specific matter with him.
25       Q.  Do you recall having a

233

1      Jason Sevier - Confidential
2    conversation with him about anything?
3      A.    No.
4      Q.    I am going to ask you to turn
5    to the next page, which is AA 000007.
6      A.    Okay.
7      Q.    Can you just describe for me
8    what this document is?
9      A.    It appears to be a memo
10    prepared by Elisa and Vivian Chang,
11    outlining the accounts receivable testing
12    that Andersen performed for the year-end
13    audit.
14      Q.    Up on the top right-hand
15    corner, is that Elisa's initials?
16      A.    Yes.  E.L., yes.
17      Q.    Just looking at the third
18    paragraph down, where it says "To review
19    the company's DSO," can you just read that
20    for me?
21      A.    "To review the company's DSO as
22    of each quarter end, AA, LLP documented
23    explanations for all countries with DSO of
24    over 100 days (and over $5 million for Q4.)
25    See related documentation B-30 in each of

234

1      Jason Sevier - Confidential
2    the quarterly review files and B-70 in the
3    year-end file."
4      Q.    Do you know if B-30 is among
5    any of the documents that you and I have
6    discussed today?
7      A.    I don't recall seeing a B-30,
8    no.
9      Q.    Did you see it when you
10    reviewed the work papers a couple weeks
11    ago?
12      A.    Once again, I don't recall
13    reviewing B-30.
14      Q.    Do you recall reviewing DSOs in
15    the work papers?
16      A.    No.
17      Q.    How about B-70, same thing?
18      A.    Same answer, it may have been
19    there. I don't recall it.
20      Q.    You haven't seen it today?
21      A.    Not today, no.
22      Q.    Looking at the next paragraph,
23    can you read that for me?
24      A.    "To test the A/R reserves as of
25    Q1 through Q3 2001, we performed a

235

1      Jason Sevier - Confidential
2    variation analysis on all changes in the
3    reserve categories over $5 million from
4    quarter to quarter.  See related
5    documentation at B-15 in each of the
6    quarterly review files."
7      Q.    That's in the B-15 section, we
8    haven't seen that today, right?
9      A.    Have not.
10      Q.    Do you know under what, if any,
11    circumstances variations in Oracle's
12    reserves might impact reported income?
13      MR. SIDORSKY:  Objection to
14      form.
15      MR. KONOVALOV:  Objection,
16      incomplete hypothetical.
17      A.    Can you repeat the question.  I
18    don't understand.
19      Q.    If reserves were increased --
20    I'm sorry.
21      If reserves were decreased in
22    any given quarter, would that have a direct
23    correlation with reported income?
24      MR. KONOVALOV:  Objection,
25      incomplete hypothetical.

236

1      Jason Sevier - Confidential
2      MR. SIDORSKY:  Same objection.
3      A.    Hypothetically, if a reserve
4    is -- if a reserve is reduced directly,
5    then yes.  But if the bad debt reserve is
6    lower than it was the prior quarter, it
7    doesn't mean that income has been impacted,
8    it just means that there were write-offs
9    and the company didn't replenish the
10    reserve.
11      Q.    Would you say the same if bad
12    debt expense was decreased; would that
13    cause income to be increased?
14      MR. KONOVALOV:  Same objection.
15      MR. SIDORSKY:  Same objection
16      to the hypothetical nature of the
17      question.
18      A.    Hypothetically speaking, you
19    reduce an expense and income goes up.
20      Q.    Do you know whether any
21    analysis of the variations in A/R reserves
22    was greater than $5 million in Q1 through
23    Q3 of '01?
24      MR. SIDORSKY:  Objection to
25      form.

237

```
1          Jason Sevier - Confidential
2       A.   Are we talking specifically to
3   the accounts receivable reserves or all
4   variances?
5       Q.   I am talking about specifically
6   to accounts receivable reserves, as
7   indicated in the fourth paragraph down in
8   07.
9       A.   Based on my recollection of the
10  quarterly files we previously looked at,
11  the scope was greater than $5 million.  I
12  would have to go back to be sure, but my
13  recollection is that there were variances
14  in the A/R reserves that were above that
15  threshold.  But I would have to go back and
16  look to be a hundred percent sure.
17      Q.   Understood.  Going to the next
18  page, Bates ending 08.
19      A.   Yes.
20      Q.   This memo, does it relate to
21  the quarterly review or the year ends?
22      A.   It relates to the quarterly
23  reviews, the preliminary work, and the
24  year-end audit.
25      Q.   Does the preliminary work come
```

239

```
1          Jason Sevier - Confidential
2   largest revenue transactions, you make sure
3   that there is a valid invoice, the creator
4   of the invoice is the same person who
5   approved it, who processed it through the
6   system, it relates to a valid customer in
7   the G/L system, it relates to a customer
8   who is on the approved customer list, the
9   amount ties out to the actual hard copy of
10  the revenue contract, the A/R balance ties
11  to the general ledger, the revenue amount
12  ties to the general ledger, any deferrals
13  tie out to deferred revenue.  That's kind
14  of it in a nutshell.
15      Q.   At the end of that paragraph,
16  it says, "See testing at 10 in the prelim
17  file."
18          Have we seen the prelim file
19  today?
20      A.   No, it's not one of the files
21  we have.
22      Q.   Did you see it a couple weeks
23  ago?
24      A.   I did not.
25      Q.   Was it not in there, or you
```

238

```
1          Jason Sevier - Confidential
2   before the year-end audit but after the
3   quarterly reviews?
4       A.   Correct.
5       Q.   Can you read for me the second
6   paragraph on Bates ending 08, just the
7   first sentence?
8       A.   "At prelim, AA, LLP selected
9   invoices from Q1 through Q3 2001 to test
10  the overall effectiveness of the company's
11  controls over the sales of invoicing
12  process.  We judgmentally selected the 10
13  largest transactions from this time period
14  to test, and 20 other invoices were
15  selected randomly."
16      Q.   How does one -- withdrawn.
17          How did Andersen test controls
18  over sales and invoicing process once those
19  selections were made?
20      A.   I don't remember specifically.
21  I have a general idea, but I don't remember
22  specifically.
23      Q.   Can you tell me generally?
24      A.   If we're testing controls over
25  sales of invoicing and you select the ten
```

240

```
1          Jason Sevier - Confidential
2   don't recall it?
3       A.   It was not part of the work
4   papers that were presented.
5       Q.   Do you know why?
6       A.   I don't know the reason why on
7   that.
8       Q.   They were created, though,
9   right?  At the time, there was a prelim
10  file?
11      A.   Yes, at the time there was.
12      Q.   What's typically in the prelim
13  file?
14      A.   Confirmation selections,
15  control testing, any other audit work
16  that's done before we get to the field for
17  the final audit.
18          So it varies by engagement
19  depending on how much work you do at
20  prelim.
21      Q.   Let me direct your attention to
22  the last paragraph.
23      A.   Yes.
24      Q.   Can you just read that for me?
25      A.   "AA, LLP reviewed all A/R
```

Sevier, Jason  6/28/2006  9:09:00 AM

241

1       Jason Sevier - Confidential
2   amounts over 90 days old and over $500,000,
3   by customer.  We noted that these balances
4   selected were either specifically reserved
5   for, or did not require a reserve per
6   discussion with credit and collections.
7   See B-18 for documentation."
8       Q.   Have we seen B-18 today?
9       A.   I have not.
10      Q.   Was it in the files that you
11  reviewed a couple weeks ago?
12      A.   Once again, it might have been.
13  I don't specifically recall B-18.
14      Q.   Do you know why Andersen would
15  talk with credit and collections to
16  determine whether or not a specific amount
17  required a reserve?
18      A.   That's what credit and
19  collections were tasked to do, determining
20  which customers had good credit history,
21  bad credit history, which customers were
22  paying, which customers they believed based
23  on follow-up were not going to pay.
24       So that was the department that
25  had the most insight in the collectability.

242

1       Jason Sevier - Confidential
2       Q.   It appears that as of June 15
3   there were some customers that had A/R
4   balances that had more than half a million
5   dollars that were also more than 90 days
6   old, right?
7       A.   Yes.
8       Q.   And they had not been reserved
9   for?
10      A.   Correct.
11      Q.   Do you know whether Andersen
12  proposed that reserves be increased to
13  account for those collectibles?
14       MR. SIDORSKY:  Objection to
15  form.
16      A.   I do not.  I do not know.
17      Q.   I am going to ask you to turn
18  to the next page, ending 09.
19      A.   Yes.
20      Q.   Can you read the first
21  paragraph for me?
22      A.   "For the reserve for CPG and
23  other A/R with claims, AA, LLP performed a
24  variation analysis on changes in the
25  reserve for specific customer balances over

243

1       Jason Sevier - Confidential
2   $1.6 million from Q3 2001 to Q4 2001. AA,
3   LLP also reviewed any customer reserve
4   balance that decreased from Q3 2001 to Q4
5   2001. See work at B-25."
6       Q.   Have you seen B-25 today?
7       A.   No.
8       Q.   Did you see it a couple weeks
9   ago?
10      A.   I don't specifically recall
11  B-25.
12      Q.   What's "A/R with claims"?
13      A.   I'm not really sure.  I don't
14  remember.
15      Q.   The document says, "For the
16  reserve for CPG and other A/R with claims."
17       Do you know what "reserve for
18  CPG" is?
19      A.   I believe CPG is consumer price
20  goods or consumer product goods.  But
21  that's just a guess.  I don't specifically
22  know.
23       MR. WILLIAMS:  Why don't we
24  take five minutes.
25       THE VIDEOGRAPHER:  The time is

244

1       Jason Sevier - Confidential
2   2:40 p.m., and we're going off the
3   record.
4       (Recess taken.)
5       THE VIDEOGRAPHER:  The time is
6   3:55 p.m., and we're back on the
7   record.
8       Q.   Mr. Sevier, I am going to ask
9   you to turn to Bates ending 14, it's about
10  10 pages in.
11      A.   Okay.
12      Q.   This appears to be part of the
13  March 9 memo, right?
14      A.   Yes.
15      Q.   It looks like it's created by
16  Vivian Chang.
17       Actually, if you go to AA Bates
18  ending 10, it says June 30, 2001, it looks
19  like she may not have changed the date on
20  the next page, unless this is different.
21      A.   No.  It's just a carry-over
22  from the prior quarter.  She just changed
23  the date to reflect it's June, she didn't
24  change the header on the other pages.
25      Q.   Going to 14, four paragraphs

245

1      Jason Sevier - Confidential
2   down, do you see where it says
3   "12530/12540/12550"?
4      A.   Yes.
5      Q.   That's "Unearned revenue in
6   receivables - support/consulting/education,"
7   right?
8      A.   Correct.
9      Q.   Those are only a few of the
10  receivable accounts, though, right?
11     A.   Yes.
12     Q.   Can you read that paragraph for
13  me?
14     A.   "This account consists of
15  invoices that have been billed but for
16  which the related revenues have not been
17  earned.  (Accounts 25030/25010/25020 -
18  unearned revenues - support/consulting/
19  education).  Consistent with prior
20  quarters, these accounts are netted against
21  25030/25010/25020 to reduce DSO."
22     Q.   What does it mean "consistent
23  with prior quarters, these accounts are
24  netted against 25302/25010/25020 to reduce
25  DSO"?

246

1      Jason Sevier - Confidential
2      MR. SIDORSKY:  Objection to
3   form.
4      A.   What this means is that --
5   interpreting "DSO" is days sales
6   outstanding based on the context of this
7   note.
8      What they are saying is since
9   it has been billed, it had been billed but
10  which has not been earned, which means it's
11  not going to get paid, because it hasn't
12  been earned yet, even though they billed
13  it, they do that netting so it doesn't
14  distort the days sales outstanding.  Since
15  you haven't earned it, it's technically
16  quote/unquote not a sale.
17     Q.   What do you mean by not distort
18  days sales outstanding?  It says it's to
19  reduce days sales outstanding.
20     MR. SIDORSKY:  Objection to
21  form.
22     A.   What I mean is that in your
23  days sales outstanding, you want it to be a
24  true reflection of the actual sales you
25  have incurred and the revenue you are

247

1      Jason Sevier - Confidential
2   entitled to receive.  And if through
3   various consulting arrangements you billed
4   it but you haven't earned it, you are not
5   going to get paid for it.
6      So if it's sitting in DSO, it's
7   going to show your days sales outstanding
8   much higher, when that's not truly the
9   case, because it's not a sale that you are
10  getting paid for yet, because you haven't
11  earned it.
12     Q.   Do you know why it would be
13  billed if it has not been earned?
14     A.   Well, as we discussed earlier,
15  typically, in education situations, someone
16  may pay for a hundred online classes and
17  they've only used five of them, so they
18  have 95 left.
19     The consulting arrangement is
20  we bill weekly and we haven't done a week's
21  worth of work.  So the arrangements dictate
22  the billing arrangements.
23     Q.   Can you take a look at AA
24  ending 4.
25     A.   Okay.

248

1      Jason Sevier - Confidential
2      Q.   You see the account 12530?
3   It's like the third line down.
4      A.   Yes.
5      Q.   Is that one of the accounts
6   that is netted down to one of those
7   liability accounts to reduce days sales
8   outstanding?
9      MR. KONOVALOV:  Objection,
10  calls for speculation.
11     A.   Based on the wording on 14,
12  yes.  This is on the assumption that I'm
13  interpreting "DSO" as days sales
14  outstanding, and that is, in fact, what it
15  is.  I don't know for sure, I'm just
16  speculating based on the wording.
17     Q.   Do you know "DSO" to mean
18  anything other than days sales outstanding
19  in accounting jargon?
20     A.   I can't say for sure whether it
21  does or it doesn't.  People use different
22  acronyms for different things all the time.
23     Q.   I understand.  I'm just asking
24  you if you know "DSO" to mean anything
25  other than days sales outstanding in

249

```
1        Jason Sevier - Confidential
2   accounting jargon.
3        A.   I do not.
4        Q.   Earlier you -- withdrawn.
5            Do you know what a debit memo
6   is?
7            MR. SIDORSKY:  Objection to
8   form.
9            In general?
10           MR. WILLIAMS:  Yeah, in
11  general.
12           MR. SIDORSKY:  I am going to
13      object to this kind of general
14      question unrelated to any context of
15      the audit or the work papers.
16      A.   In general, no.
17      Q.   Have you ever used the term
18  "debit memo"?
19      A.   Myself personally?
20      Q.   Yes.
21      A.   No.
22      Q.   I am going to ask you to turn
23  to AA 001938, it's the second to the last
24  page.
25      A.   Okay.
```

250

```
1        Jason Sevier - Confidential
2        Q.   You see in that first row with
3   all the column headings --
4        A.   Yes.
5        Q.   Well, tell me what this
6   document is first?
7        A.   Once again, this is consistent
8   with the documents we have seen previously,
9   which it looks like it's a -- it's showing
10  a balance per the A/R aging and the balance
11  per the general ledger, which shows a
12  $500,000 difference.
13      Q.   Do you see where --
14           Do you see the column heading
15  that says Debit Memos?
16      A.   Yes, I see it.
17      Q.   Do you know what that means?
18      A.   I do not.
19      Q.   Or what it refers to?
20      A.   Do not.
21      Q.   You indicated earlier that you
22  saw a copy of the Complaint in this action.
23  Was it yesterday or during a meeting with
24  your lawyer?
25      A.   When I first met --
```

251

```
1        Jason Sevier - Confidential
2            MR. SIDORSKY:  I don't know
3       that you have to answer if you saw it
4       with me or how he saw it.
5            MR. WILLIAMS:  I think he
6       testified to that.
7            MR. SIDORSKY:  He did testify
8       to it.  So that's what I'm saying.
9       It's whatever he said -- I don't think
10      you are entitled to get more into
11      detail than that.
12           MR. WILLIAMS:  No, I'm not.
13      A.   Can you repeat the question.
14      Q.   I'm just asking you if you
15  recall testifying that you saw a copy of
16  the Complaint in this action.
17      A.   Yes.
18      Q.   Was that yesterday or a few
19  weeks ago?
20      A.   A few weeks ago.
21      Q.   You indicated you read some
22  allegations in there, but not all.
23      A.   Yes, I read some.
24      Q.   Do you recall reading the
25  allegations regarding the creation of many
```

252

```
1        Jason Sevier - Confidential
2   thousand debit memos in November of 2000?
3        A.   I recall reading something to
4   that effect in the Complaint.
5        Q.   Did you know prior to reading
6   the Complaint that Oracle had created
7   46,000 debit memos in November 2000?
8        A.   Did not.
9        Q.   No one mentioned that to you --
10           MR. SIDORSKY:  Objection to
11      form.
12      Q.   -- prior to you seeing that
13  Complaint, aside from your attorney?
14           MR. SIDORSKY:  Objection to
15      form.
16      A.   I don't have it in front of me,
17  but the Subpoena may have said something to
18  that effect.  I don't remember
19  specifically, but prior to receiving the
20  subpoena, I had no knowledge of debit
21  memos.
22      Q.   Did anybody on your engagement
23  team mention anything about debit memos
24  created in November of 2000 to you?
25      A.   No one did.
```

253

1       Jason Sevier - Confidential
2    Q.   Look on Bates ending 1938.  Do
3  you know what "debit memo" means as it
4  relates to this document?
5    A.   Do not.
6    Q.   You see there is a letter A
7  there on the bottom of the page, it says
8  "Per Terry Elam"?
9    A.   Yes.  "Per Terry Elam, A/R
10  department, the company booked a $117
11  million invoice in error in May; therefore,
12  a credit memo was processed for the same
13  amount in May.  The net of the new invoices
14  and the credit memo is approximately $810
15  million, which is a reasonable amount of
16  invoices to be processed into the license
17  trade A/R account during the last month of
18  the quarter."
19    Q.   Where it states, "The company
20  booked a $117 million invoice in error in
21  May; therefore, a credit memo was processed
22  for the same amount," does that suggest
23  that the booking of the invoice increased
24  revenue, but then the credit memo fixing
25  the error would have decreased revenue in

254

1       Jason Sevier - Confidential
2  the same amount?
3     MR. SIDORSKY:  Objection to
4  form.
5     MR. KONOVALOV:  Objection,
6  lacks foundation.
7    A.   That's what the note indicates,
8  yes.
9    Q.   It looks like a billion, right?
10  There are a lot of zeroes or a lot of
11  numbers there.
12    A.   Okay, I'm sorry, maybe it is a
13  billion, yeah.
14    Q.   Going to the next page, can you
15  read note 1 for me?
16    A.   Yes.  "To test the 5/31/01 A/R
17  rec's, AA, LLP reviewed the detail of
18  activity for invoices, credit memos, debit
19  memos, and cash receipts in total for all
20  A/R accounts in the month of May.  AA, LLP
21  traced and agreed the sum of all invoices,
22  credit memos, debit memos, and cash
23  receipts from the individual
24  reconciliations for accounts 12000, 12008,
25  12013, 12500, 12510 and 12520 for the month

255

1       Jason Sevier - Confidential
2  of May, to the detail of activity for each
3  category, within an immaterial amount.  See
4  detail below."
5    Q.   Now, it appears that the debit
6  memos that are referenced here only relate
7  to the month of May, is that fair?
8    A.   Based on the note, yes.
9    Q.   The checkmarks on this page
10  indicates that Angelika looked at them?
11    A.   Yes.  That check in the bottom
12  right-hand corner indicates she reviewed
13  this work paper.
14    Q.   I am going to ask you to turn
15  to Bates ending 1925, which is about three
16  pages from the back.
17    A.   Okay.
18    Q.   Can you tell me what this page
19  depicts?
20    A.   It depicts a roll-forward of
21  the bad debt reserve.
22    Q.   What do you mean by "a
23  roll-forward"?
24    A.   Beginning balance, activity,
25  ending balance.

256

1       Jason Sevier - Confidential
2    Q.   That's just for the quarter,
3  not for the full year, right?
4    A.   Yes, based on the heading Q4
5  fiscal '01.
6    Q.   Are there --
7     Is this done every quarter, a
8  reconciliation of bad debt reserve?
9    A.   That I don't recall.
10    Q.   Go down to --
11     You see the note on -- the
12  first bullet point note, it says "bad debt
13  reserves"?
14    A.   Yes.
15    Q.   Can you read that for me?
16    A.   "See B-5 for a discussion of
17  client procedures related to the
18  determination of bad debt reserves."
19    Q.   Have we seen B-5 today?
20    A.   I don't recall seeing B-5, no.
21    Q.   Did you see it a couple of
22  weeks ago?
23    A.   Once again, I don't
24  specifically recall B-5.
25    Q.   Right next to that sentence

257

1        Jason Sevier - Confidential
2   there, it says "P.A. 6/01."
3        A.   Yes.
4        Q.   The "P.A." is Pamela?
5        A.   Yes.
6        Q.   Is that Pamela's handwriting
7   there?
8        A.   I can't say that for sure.
9        Q.   Just going down to the next
10  section, I guess it's note A --
11       A.   Yes.
12       Q.   -- account 12601, "Bad debt
13  write-offs."
14       A.   Yes.
15       Q.   Can you read that for me?
16       A.   "The company reviewed
17  application of cash receipts in account
18  25005 - customer overpayments, and noted
19  that it has been aggressive in applying
20  cash to previously written off invoices.
21  As a result, it reversed $9.5 million of
22  reserves for which the company has
23  collected cash after they had previously
24  written off the balances."
25       Q.   Now, do you know what that

258

1        Jason Sevier - Confidential
2   means in layman's term?
3        A.   It means that there were
4   accounts that were previously written off,
5   and then based on the note, upon review of
6   account 25005, they had recognized payments
7   that related to accounts that they had
8   previously written off.
9        Q.   When you say "written off,"
10  it's the context of written off as a bad
11  debt, something that was uncollectible at
12  one point, is that fair?
13       MR. KONOVALOV:  Objection,
14  vague and ambiguous.
15       A.   Can you clarify.
16       Q.   The bad debt write-offs are for
17  amounts that the company can't collect for
18  one reason or another?
19       A.   Right.  It's related to a
20  specific balance or invoice, yes.
21       Q.   Do you see where she
22  wrote that -- "Per Julie Chan," someone
23  writes that, "The company has been
24  aggressive in applying cash to previously
25  written off invoices"?

259

1        Jason Sevier - Confidential
2        A.   Yes.
3        Q.   Do you know whether the company
4   had identified cash in 25005 as being
5   associated with those invoices and then
6   applied them in that aggressiveness?
7        MR. KONOVALOV:  Objection,
8        vague and ambiguous.
9        MR. SIDORSKY:  Same objection.
10       It's confusing.
11       A.   That I don't know.
12       Q.   Do you know how they went about
13  aggressively applying cash to previously
14  written off invoices?
15       MR. KONOVALOV:  Objection,
16       lacks foundation.
17       A.   I am not.
18       Q.   I am going to ask you to turn
19  to Bates ending 684.  It's about maybe 10
20  or 12 pages in.
21       A.   Okay.
22       Q.   Can you help me find note L on
23  this page if that's there?
24       A.   Note L is on 686.
25       Q.   Note L is there, but where is

260

1        Jason Sevier - Confidential
2   the reference?
3        A.   It's 25008, "Unearned revenue -
4   support manual adjustment," third column.
5        Q.   Do you know what "Unearned
6   revenue - support manual adjustment" is or
7   means?
8        A.   No, I don't know what the
9   "support manual adjustment" means.
10       Q.   Can you read note L for me,
11  just the first paragraph?
12       A.   Sure.  "AA, LLP traced and
13  agreed this amount to the 5/31/01 detail,
14  noting that there is a reclass made to this
15  account monthly for DSO purposes to debit
16  this account and credit the A/R account for
17  unearned and unpaid balances.  This account
18  is used to manually defer revenue for items
19  such as support shortfall from large
20  license contracts."
21       Q.   What does it mean to reclass
22  this account monthly for DSO purposes,
23  debiting that account and crediting A/R?
24       A.   What happens here is support is
25  the post-contract customer support, so --

261

Jason Sevier - Confidential
1
2    Q.   You are looking at page --
3    A.   I am looking at the note and I
4  am looking at 684 concurrently.
5    Q.   Okay.
6    A.   So when you enter into a
7  license arrangement, you pay for
8  maintenance for two, three, five years at a
9  time.
10       So it's unearned, because the
11  customers either billed for five years
12  worth of maintenance or the customers pay
13  you for five years worth of maintenance.
14  So you haven't earned it yet, because you
15  have to earn it over a five-year period.
16       What they are saying is in the
17  unearned, it sits in A/R and it sits in
18  unearned.  So at the end of the quarter,
19  once again, they do a reclass to reduce the
20  unearned and reduce accounts receivable.
21       So it's a balance sheet
22  reclass, because they are not -- it's not
23  due.  They haven't earned it yet, so it's
24  technically not a sale.
25    Q.   I am going to ask you to take a

262

1       Jason Sevier - Confidential
2  look at Chan number 3, Bates ending
3  000019.
4    A.   Okay.
5    Q.   I am going to ask you to again
6  take a look at the unapplied cash, 12018?
7    A.   Yes.
8    Q.   It appears that there is a
9  variance between first quarter -- I'm
10  sorry, fourth quarter of 2000 and first
11  quarter of '01 of $17.4 million?
12    A.   Correct.
13    Q.   Is that right?
14    A.   Based on the sheet, yes.
15    Q.   Can you read the note that
16  explains that for me?
17    A.   "Overall decrease is a result
18  of a reclass by LOB to the gross trade A/R
19  accounts of $26 million.  Decrease is
20  offset by increase in identification of
21  cash to be applied to a particular
22  receivable balance."
23    Q.   Do you know whose handwriting
24  that is?
25    A.   I do not.

263

1       Jason Sevier - Confidential
2    Q.   Do you know how Oracle went
3  about identifying cash to be applied to a
4  particular receivable?
5       MR. SIDORSKY:  Objection to
6  form.
7    A.   I do not know those specific
8  procedures, no.
9    Q.   Go down to the bottom of the
10  page, again, looking at the allowances for
11  bad debt and returns.
12    A.   Yes.
13    Q.   It looks like it's a variance
14  between 4Q '00 and 1Q '01 of about $7.5
15  million, right?
16    A.   Yes.
17    Q.   The note, is that an H there?
18    A.   Yes.
19    Q.   Are the letters out of order,
20  F, something, I, then H on the bottom?
21    A.   Yes.  It looks like the letter
22  is not in order.
23    Q.   You see where it says,
24  "Decreases were -- withdrawn.
25       It says, "Decrease is a result

264

1       Jason Sevier - Confidential
2  of the following:  Reduction in management
3  judgment from Q4 to Q1 from $26 million to
4  $14 million."
5    A.   Yes.
6    Q.   What does that mean?
7    A.   Don't recall.
8    Q.   Do you know who it's referring
9  to when it says "management judgment"?
10    A.   I do not.
11    Q.   And this is that -- that
12  typewritten portion is by somebody at
13  Oracle, right?
14    A.   Yes.
15    Q.   I am just going to ask you to
16  go down to the next section in the note
17  where it says "Decreases," can you read
18  that for me?
19    A.   "Decreases were noticed in the
20  OCC loss pool reserve as a result of Oracle
21  basing reserve amounts on actual historical
22  losses versus total recourse amount.  These
23  decreases were offset by increase in A/R
24  balances due to the residual of Q4
25  activity."

265

1          Jason Sevier - Confidential
2      Q.    What's the OCC loss pool
3  reserves?
4      A.    Not sure.
5      Q.    Do you know what is meant by --
6  withdrawn.
7          It says, "The decreases were
8  noted in the OCC loss pool reserves as a
9  result of Oracle basing reserve amounts on
10  actual historical losses versus total
11  recourse amount."
12          Do you know what "historical
13  losses versus total recourse amount"
14  means?
15      A.    No, I do not.
16      Q.    It looks like that is at B-15
17  as well, right?
18      A.    That's what it's referencing,
19  yes.
20      Q.    And we haven't seen B-15 today?
21      A.    No.
22      Q.    In the quarterly review in the
23  year-end audit, is there accounts payable
24  testing?
25      A.    In the year-end audit, not

266

1          Jason Sevier - Confidential
2  necessarily in the quarters.
3      Q.    When you say "not necessarily,"
4  what do you mean?
5      A.    I mean there is variation
6  analysis that's performed, but there is no,
7  you know, substantive audit testing in the
8  quarters.
9      Q.    So there is a variation
10  analysis done on accounts payable in the
11  quarterly reviews?
12      A.    If the amounts are over
13  whatever the scope may be, yes.
14      Q.    And then what is entailed in
15  accounts payable testing?
16          MR. SIDORSKY:  Objection to
17  form.
18      A.    For the year-end audit?
19      Q.    Um-huh.
20      A.    This is just based on my
21  recollection in general, not necessarily
22  Oracle, but in general.
23          You basically test for
24  unrecorded amounts and you tie out to the
25  general ledger.  The risk in accounts

267

1          Jason Sevier - Confidential
2  payable is understated, so you are looking
3  for unrecorded amounts.
4      Q.    What do you mean by "unrecorded
5  amounts"?
6      A.    I mean there is an invoice for,
7  you know, an expense item that is sitting
8  in a drawer and hasn't been paid, so you
9  have to search for unrecorded payables, so
10  to speak.
11      Q.    Would you also review credit
12  memos that the company has created to
13  refund customers?
14          MR. SIDORSKY:  Objection to
15  form.
16          I object to this sort of
17  hypothetical open-ended nature of the
18  question without any context.
19      A.    Credit memo testing would have
20  been part of revenue testing.
21      Q.    Why is that?
22      A.    Because the credit relates
23  to --
24      Q.    Previously recorded revenue?
25      A.    -- previously recorded revenue

268

1          Jason Sevier - Confidential
2  on accounts receivable.  So there is a
3  credit memo issue, it's typically reducing
4  in theory revenue.  It's all tied into the
5  overall revenue testing.
6      Q.    Would any testing of accounts
7  payable relate to liability accounts like
8  25005?
9      A.    Once again, in answer to your
10  question, not that I recall.
11          MR. WILLIAMS:  I am going to
12  take five minutes, see if I have
13  anything else, and then I will be
14  wrapping up.
15          THE VIDEOGRAPHER:  The time is
16  4:29 p.m., and we're going off the
17  record.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  The time is
20  4:41 p.m., and we're back on the
21  record.
22      Q.    Do you know if any of your
23  engagement team members during the
24  quarterly reviews in fiscal '01 or the
25  year-end review for fiscal '01 analyzed

269

1        Jason Sevier - Confidential
2    customers' unapplied cash quote/unquote on
3    account?
4        MR. KONOVALOV:  Objection,
5    vague and ambiguous.
6        MR. SIDORSKY:  Objection to the
7    form.
8        A.   Can you clarify what you mean
9    by "on account."
10       Q.   Have you ever heard the term?
11       A.   No, I have not.
12       MR. WILLIAMS:  I have nothing
13   further.
14       MR. KONOVALOV:  I just have one
15   or two questions for you, Mr. Sevier.
16   EXAMINATION BY
17   MR. KONOVALOV:
18       Q.   Once again, I am Paul
19   Konovalov.  I am counsel for the defendants
20   in this case.
21       You were asked questions over
22   the course of the day by counsel for the
23   plaintiffs about reclassifications between
24   accountants.
25       Do you recall that?

270

1        Jason Sevier - Confidential
2        A.   I do.
3        Q.   I just want to confirm what I
4    think you said.  I just want to make sure I
5    got it straight.
6        Insofar as there are
7    reclassifications between accounts, that
8    has no income statement impact, correct?
9        MR. WILLIAMS:  Objection to
10   form.
11       A.   That is correct.
12       MR. KONOVALOV:  I would just
13   ask before we go off the record if we
14   can stipulate to the transcript being
15   designated confidential.
16       MR. WILLIAMS:  Okay.
17   EXAMINATION BY
18   MR. WILLIAMS:
19       Q.   I just want to see if I
20   understood his question and your answer.  I
21   think the question that he was trying to
22   clarify, Mr. Konovalov was trying to
23   clarify, was whether or not a
24   reclassification of money in accounts would
25   have any income statement impact.

271

1        Jason Sevier - Confidential
2        A.   Correct.
3        Q.   And your answer is that it
4    would not?
5        A.   It does not.
6        Q.   Under no circumstances?
7        A.   Reclasses would not impact the
8    income statement, only the balance sheet.
9        Q.   It would impact the financial
10   statements?
11       A.   The balance sheet.
12       MR. SIDORSKY:  Object to the
13   form.
14       A.   It does not have an impact on
15   earnings, only on balance sheet accounts.
16       Q.   So it's your testimony that a
17   reclassification from any account to an
18   accounts receivable account would not
19   impact revenue?  Is that your testimony?
20       A.   Can you clarify the question.
21   It's somewhat vague.
22       Q.   I am asking you if a
23   reclassification of money in any account,
24   say, from a liability account to an A/R
25   account, is it your testimony that that

272

1        Jason Sevier - Confidential
2    would not impact revenue?
3        A.   That's correct.
4        MR. WILLIAMS:  I have nothing
5    further.
6        THE VIDEOGRAPHER:  The time is
7    4:45 p.m., and this completes the
8    videotaped deposition of Jason
9    Sevier.
10       (Time noted: 4:45 p.m.)
11
12       _____
13           JASON SEVIER
14
15   Subscribed and sworn to before me
16   this ___ day of _____ 2006.
17
18   _____
19
20
21
22
23
24
25

Sevier, Jason  6/28/2006  9:09:00 AM

273

1
2       *** ERRATA SHEET ***
3       NAME OF CASE:  Oracle Securities Litigation
4       DATE OF DEPOSITION:  June 28, 2006
5       NAME OF WITNESS:  JASON SEVIER
6       PAGE  LINE       FROM         TO
7       ___|___|_____|_____
8       ___|___|_____|_____
9       ___|___|_____|_____
10      ___|___|_____|_____
11      ___|___|_____|_____
12      ___|___|_____|_____
13      ___|___|_____|_____
14      ___|___|_____|_____
15      ___|___|_____|_____
16      ___|___|_____|_____
17      ___|___|_____|_____
18      ___|___|_____|_____
19      ___|___|_____|_____
20
21              _____
22              JASON SEVIER
23      Subscribed and sworn to before me
24      This ____ day of _____, 2006.
25      _____   _____

275

1               OTIS DAVIS
2
3       -------------------I N D E X-------------------
4       WITNESS       EXAMINATION BY       PAGE
5       J. SEVIER     MR. WILLIAMS     5, 270
6                     MR. KONOVALOV     269

274

1       (Notary Public)       My Commission Expires:
2
3           C E R T I F I C A T E
4       STATE OF NEW YORK   )
5                       : ss.
6       COUNTY OF NEW YORK   )
7
8           I, OTIS DAVIS, a Notary Public
9       within and for the State of New York, do
10      hereby certify:
11          That JASON SEVIER, the witness
12      whose deposition is hereinbefore set
13      forth, was duly sworn by me and that such
14      deposition is a true record of the
15      testimony given by the witness.
16          I further certify that I am not
17      related to any of the parties to this
18      action by blood or marriage, and that I
19      am in no way interested in the outcome of
20      this matter.
21          IN WITNESS WHEREOF, I have hereunto
22      set my hand this 5th day of July 2006.
23
24
25          _____

Oracle

Page  273 - 275