# Exhibit 3

**From:** Andrew Wylie
**Sent:** Fri, 05 Jan 2001 08:49:53 GMT
**To:** Larry Ellison; carolyn.balkenhol@oracle.com
**CC:** Matthew Symonds #2
**BCC:**
**Subject:** attachments for LE

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Andrew,
I have spoken to Carolyn Balkenhol (Larry's assistant). She says to send to email to both Larry and her
(larry.ellison@oracle.com and carolyn.balkenhol@oracle.com). She will print it out and make sure that he sees it.
Could you just call me to let me know that you have safely received both attachments (Softwar revised as discussed) - I'm
back at home now.
Matthew

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

AGREEMENT made as of this _____ day of _____, 2000, by and between Larry Ellison ("Ellison") [ADDRESS] and Matthew Symonds ("Symonds") [ADDRESS], both c/o The Wylie Agency, Inc., 250 West 57th Street, Suite 2114, New York, NY 10107 ("Wylie").

WHEREAS, the parties propose that Symonds will write a book, authorized by Ellison, on Ellison and the Oracle Corporation ("the Work"), and are desirous of establishing all their rights and obligations in and to the Work and all secondary and subsidiary rights.

NOW, THEREFORE, in consideration of the execution of this Agreement, and the undertakings of the parties as hereinafter set forth, it is agreed as follows:

1.    Duties:

(a)    Ellison shall:

(i)    Make himself available in New York for a minimum of two (2) days in January 2001 (unless otherwise mutually agreed) to assist in the presentation and sale of the Work to publishers;

(ii)    Provide Symonds with office space in the vicinity of Ellison's own at the Oracle Corporation, for Symonds's use until fulfillment of his services and obligations hereunder;

(iii)    For nine (9) months beginning in March 2001, make his schedule available to Symonds on a weekly basis, and, by the 25th day of each month, Ellison and Symonds shall agree either to one ten (10)-day period or to two (2) separate

          NDCA-ORCL1053546

five (5)-day periods in the following month within which Symonds shall accompany Ellison throughout his working day with full access to business meetings provided all commercially sensitive information divulged in such meetings is subject to Clause 2 of this Agreement;

(iv)    Make himself available to Symonds within each ten (10)-day monthly meeting period (from March 2001 through November 2001) for a minimum of ten (10) hours per week of one-on-one interview time;

(v)     For an additional nine (9) months beginning in December 2001, make himself available to Symonds for a minimum of five (5) hours per month of one-on-one interview time;

(vi)    Provide Symonds with a dedicated email address and a personal telephone number for all confidential communications related to the Work;

(vii)   Consult and advise Symonds on his research, the names of other persons to be interviewed, and any other resources to the best of his knowledge;

(viii)  Provide Symonds with a letter authorizing him to conduct such interviews, when necessary;

(ix)    Grant Symonds full access both to Oracle's archives and to Ellison's personal archives, photographs, documents and any other materials necessarily related to the Work;

(x)     Grant Symonds access to Ellison's personal life insofar as such access will, in the parties' mutual opinion, inform the Work as a portrait of Ellison (e.g. Ellison's preparation for the America's Cup);

**Symonds/Ellison, page 2**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          NDCA-ORCL1053547

(xi)    Travel with Symonds when both parties agree such travel is needed for interviews and research;

(xii)    Provide Symonds with a letter confirming Ellison's authorization of the Work, subject to the obligations of both parties as set forth herein;

(xiii)    Make himself available for a minimum of one (1) week at the time of publication to promote the Work.

(b)    Symonds shall:

(i)    Conduct extensive interviews with anyone whom Symonds considers in his sole discretion to be informative to the Work, including but not limited to Ellison and other persons who may be proposed as subjects by Ellison;

(ii)    Produce written and edited materials that, in style and content, are professionally competent and fit for publication according to industry standards;

(iii)    Meet publishers' deadlines in a timely manner;

(iv)    Upon completion of the Work, return to Ellison all tapes, transcripts and working papers provided by Ellison, and not make further use of these materials without Ellison's express written consent.

2.    <u>Confidentiality:</u> Both parties understand and agree that all conversations and communications conducted by the parties to this agreement in preparation of the Work (except, to the extent to which such conversations and communications inform the Work itself; this clause shall apply to such conversations and communications until initial

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    NDCA-ORCL1053548

publication of the Work), including the terms of this Agreement, shall at all times be kept confidential.

3.  <u>Editorial Control and Approval of Manuscript</u>: Symonds shall have final approval over the text of the Work ("Symonds's Contribution"). However, Ellison shall have the right to review Symonds's Contribution and to present a different view, or different angle on an issue, which the Publisher shall (subject to the Publisher's consent) print in a footnote or inserted text set within the body of Symonds's Contribution ("Ellison's Contribution"), and Symonds shall not have final approval over Ellison's Contribution. For the purposes of the preceding sentence, Symonds shall deliver a copy of the completed text of Symonds's Contribution to Ellison no less than forty-five (45) days before the Publisher's deadline. Ellison shall be solely responsible for the delivery of Ellison's Contribution to the Publisher by the Publisher's deadline, subject to Clause 16(e), below.

4.  <u>Copyright Ownership and Grants of Rights</u>:

    (a)  It is understood that Symonds and Ellison shall share copyright in the Work. All publishing agreements and other arrangements will be made and signed by Symonds and Ellison on terms and conditions Symonds and Ellison in their mutual discretion deem desirable. It is hereby understood and agreed that the Work shall be approximately 85,000 words in length and shall be complete and suitable for delivery to an initial publisher ("Publisher") by October 31, 2002. Any other terms of agreements for publication of the Work shall be subject to good faith negotiation.

**Symonds/Ellison, page 4**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(b)    With respect to all motion picture rights (i.e. film and television and all ancillary and allied rights) to the text of the Work, it is understood that such rights are shared by Symonds and Ellison and shall be sold jointly with Ellison's life rights, if at all.  It is understood and agreed that Ellison retains his life rights. It is agreed that Ellison shall not enter into any agreement involving film or allied rights in the Work other than the arrangement provided for herein while the Work remains in print and for a period of two (2) years thereafter. 

 Each party shall promptly notify the other of any interest for such rights to the Work or to Ellison's life or to both and the parties shall negotiate all other terms in good faith at the time of exploitation. All motion picture rights-related agreements and other arrangements are to be signed by both Symonds and Ellison.

(c)    Symonds shall have the right of first and last refusal to write a treatment for a motion picture based on the Work, subject to terms of such writing services to be negotiated in good faith.

(d)    If it is understood and agreed that a second, short book on a single subject for a business leaders series may be drawn from the transcripts of conversations conducted in preparation of the Work. In such event, the arrangement for that book shall be subject to a new agreement under mutually agreeable terms.

5.    

**Symonds/Ellison, page 5**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    NDCA-ORCL1053550



Symonds/Ellison, page 6

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          NDCA-ORCL1053551



(c)

6.   <u>Agent:</u> All sums of money due Symonds and Ellison under the terms of this agreement shall be paid to The Wylie Agency, Inc., 250 West 57th Street, Suite 2114, New York, NY 10107, and the receipt of said agent shall be a good and valid discharge of all indebtedness; and the said agent is hereby empowered to act as Symonds's and Ellison's exclusive agent on Symonds's and Ellison's behalf in all matters arising from and pertaining to this agreement.

**Symonds/Ellison, page 7**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    NDCA-ORCL1053552

For services rendered and to be rendered, Symonds and Ellison do hereby irrevocably assign and transfer to The Wylie Agency, Inc., its executors, administrators and assigns, and the said The Wylie Agency, Inc. which is an intended third party beneficiary under this agreement, shall retain a sum equal to ten percent (10%) as an agency coupled with an interest out of all gross monies accruing to the account of Symonds and Ellison under this agreement pursuant to the sale of North American rights to the Work and a sum equal to twenty percent (20%) of all gross monies accruing to the account of Symonds and Ellison under this agreement pursuant to the sale of British and foreign-language rights to the Work, prior to deductions from or charges against such monies for travel and entertainment, international faxes, express mail, postage, photocopying, and any other expenses incurred directly related to the Work. The sale of any and all rights to the Work shall be subject to the prior approval of both Symonds and Ellison.

7.   <u>Authorship Credit:</u>     Symonds shall receive sole authorship credit in the form "By Matthew Symonds" for the Work on the cover, jacket, title page, and any other place where the authorship is customarily included on a book and in advertising and promotion of the Work.  This provision applies to all editions of the Work published by the Publisher and/or by any publisher and to all editions of the Work or portions of the Work licensed for publication by any publisher and any licensee or purchaser of any subsidiary rights, including but not limited to all print publication, film and television allied and ancillary rights, audio, radio, live stage, and multimedia rights.

8.   <u>Representations:</u>

**Symonds/Ellison, page 8**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER     NDCA-ORCL1053553

(a)    Ellison  warrants and represents that he has the right to enter into this Agreement, to perform as hereby required, and to grant the rights herein granted. Ellison further warrants and represents that Ellison's Contribution (i) will not infringe upon any copyright or any other proprietary right at common law of any third party; (ii) all necessary permissions for Ellison's Contribution will be obtained; (iii) Ellison's Contribution will contain no matter whatsoever that is obscene or libelous, violates any third party's right of privacy or publicly, or is otherwise in contravention of law or the right of any third party.

(b)    Symonds warrants and represents that he has the right to enter into this Agreement, to perform as hereby required, and to grant the rights herein granted.  Symonds further warrants and represents that (i) Symonds's Contribution will not infringe upon any copyright or any other proprietary right at common law of any third party; (ii) all necessary permissions for Symonds's Contribution will be obtained; and (iii) Symonds's Contribution will contain no matter whatsoever that is obscene or libelous, violates any third party's right of privacy or publicly, or is otherwise in contravention of law or the right of any third party.

9.    Competitive Works:   Beginning with the date of this Agreement, Ellison will not hereafter authorize any work or enter into any agreement or understanding with any person or entity which might conflict with this Agreement (i.e., Ellison will not, without the Publisher's permission, enter into another agreement regarding the publication of a book based upon his life story for a period of three (3) years after the initial hardcover publication of the Work).

**Symonds/Ellison, page 9**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          NDCA-ORCL1053554

10.   <u>Indemnification:</u>        Each party hereto shall indemnify, defend and hold harmless the
other party hereto from any and all claims, debts, demands, suits, actions, proceedings,
and/or prosecutions ("Claims") based on allegations which, if true, would constitute a
breach of any of that party's warranties and representations hereunder, and any and all
liabilities, losses, damages, and expenses (including attorneys' fees and costs) in consequence
thereof.  The indemnifying party's obligations are conditioned upon the indemnified party:
(i) giving the indemnifying party prompt written notice of any Claim for which the
indemnified party is seeking an indemnity; (ii) granting control of the defense and settlement
to the indemnifying party; and (iii) reasonably cooperating with the indemnifying party at the
indemnifying party's expense.  The protection of any licensee's Errors & Omissions Policy
as provided in any such license agreement shall extend to both parties.

11.   <u>Assignment:</u>   This agreement is not assignable by either party without the prior written
consent of the other except to assign the receipt of payments, such assignment to be made
effective by sufficient prior written notice.  This agreement shall be binding upon and inure
to the benefit of the parties and their respective heirs, executors, successors or permitted
assigns.

12.   <u>Notices:</u>       Formal business and financial notices given hereunder will be given by (i)
personal delivery, (ii) overnight courier, (iii) telecopy followed by first class mail, or (iv)
certified mail, return receipt requested, to the following addresses:

    (a)  If to Symonds:

**Symonds/Ellison, page 10**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER        NDCA-ORCL1053555

Matthew Symonds

_____

_____

_____

(b)  If to Ellison:

Larry Ellison

_____

_____

_____

With a copy to:

Andrew Wylie
The Wylie Agency, Inc.
250 West 57th Street
Suite 2114
New York, NY 10107

A party may change its address by written notice to the other party.  Notices will be deemed

to be received and effective (i) when personally delivered, (ii) one (1) day after the date of

forwarding by overnight courier, (iii) on the date of telecopy with confirmation, provided a

copy is also sent by U.S. Mail, or (iv) if sent via certified mail, on the date of receipt.

13.    Applicable Law:        The validity, construction and performance of this Agreement shall

be governed and interpreted in accordance with the laws of the State of New York.

Symonds/Ellison, page 11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14.   <u>Arbitration:</u>   Any controversy or claim arising out of this agreement or the breach thereof shall be settled by arbitration in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award may be entered in the highest court of the forum, State or Federal, having jurisdiction.  Such arbitration shall be held in the City of New York unless otherwise agreed by the parties.

15.   <u>Term of Agreement:</u>   If the Work is published, this agreement shall be in force and continue for the copyright therein and any renewals of such copyright.

16.   <u>Termination:</u>

(a)   Ellison reserves the absolute right to terminate this Agreement at any time with or without cause. Termination without cause shall be effective immediately upon Symonds's receipt of written notice from Ellison provided (i) neither Symonds nor Ellison shall make any use whatsoever of Symonds's work product completed at that point; (ii) Symonds shall be entitled to keep all amounts and expense reimbursements theretofore paid to him for his services rendered hereunder; (iii) Symonds shall receive his share of advances paid as of the effective date of termination under any publication agreement entered into by Ellison in respect to the Work; (iv) Symonds shall receive his share of any advances due on delivery of all or part of the Work to the Publisher or on publication of any edition of the Work provided Symonds has fulfilled all of his services and obligations hereunder and the Work is deliverable or, if already delivered, acceptable to the Publisher (v) Ellison shall be solely responsible for terminating the Publisher's agreement and any other grants of rights in the Work

**Symonds/Ellison, page 12**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          NDCA-ORCL1053557

in place and repaying the Publisher and any other licensees any paid advances and fees in full. In the event of such termination, Symonds shall make no claim to any portion of advances or royalties paid or to be paid subsequent to the effective date of termination except as provided in (iii) of the preceding sentence.

(b)   Ellison may terminate this agreement upon thirty (30) days written notice if, for any reason other than Ellison's fault, the publisher has rejected the manuscript of the Work as unacceptable or Symonds has been unable to deliver a manuscript by the mutually agreed upon deadline unless another publisher acceptable to Ellison agrees to publish the Work based on Symonds's work product then completed and to repay all advances to the Publisher. In such event, Symonds shall return to Ellison any monies paid to him and, upon such repayment, this Agreement shall be terminated.

(c)   If the Publisher terminates the Publisher's agreement either because Symonds's manuscript was not timely delivered or was, in the Publisher's opinion, unsatisfactory, Ellison may elect not to terminate this Agreement. In such event, Ellison shall not demand repayment of sums previously paid hereunder and Symonds shall use his best efforts to cooperate with Wylie in negotiating an agreement with a new publisher by meeting with prospective publishers and making available excerpts of the manuscript of the Work. If an agreement is executed with a new publisher, Symonds shall use his best efforts to produce a manuscript acceptable to such publisher within the required schedule.

(d)   In the event Symonds is unable to deliver a satisfactory manuscript of the Work to the Publisher within the time limits established by the Publisher as the same may be extended due to Ellison's failure to cooperate with Symonds, Symonds may

**Symonds/Ellison, page 13**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

terminate this Agreement immediately on written notice to Ellison and retain all sums theretofore paid to him hereunder. Ellison shall be solely responsible for terminating the Publisher's agreement and any other grants of rights in the Work in place and repaying the Publisher and any other licensees any paid advances and fees in full. The retention of sums previously paid to him shall be Symonds's sole and exclusive remedy in the case of termination under this section.

(e)   In the event Symonds delivers a satisfactory manuscript of Symonds's Contribution to the Publisher within the time limits established by the Publisher as the same may be extended and has delivered the same to Ellison no later than forty-five (45) days prior to the Publisher's deadline in accordance with Clause 3 hereinabove and Ellison fails to deliver Ellison's Contribution to the Publisher by the Publisher's deadline, should the Publisher withhold any advance payments as a result of Ellison's nondelivery of Ellison's Contribution, Symonds shall, in addition to having the right to terminate this Agreement and retaining all sums previously paid to Symonds hereunder, receive from Ellison his share of any advances due on delivery of all or part of the Work to the Publisher and on publication of any edition of the Work. In the event of Symonds's termination, Ellison shall be solely responsible for terminating the Publisher's agreement and any other grants of rights in the Work in place and repaying the Publisher and any other licensees any paid advances and fees in full.

(f)   Should Symonds die or become disabled so as to make it impossible for him to complete the Work within the time provided, then in the case of Symonds's death this Agreement shall immediately terminate or, in the case of Symonds's disability,

**Symonds/Ellison, page 14**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Ellison may, upon thirty (30) days written notice, terminate this Agreement. Upon such termination, neither party shall make any use of Symonds's work product completed at the date of termination. Ellison may however negotiate with Symonds or his estate, as the case may be, for the use of his work on the Work completed as of the date of termination. The parties shall negotiate with each other in good faith for such use and shall be guided by the principle that Symonds or his estate should receive that portion of the compensation which would have been due to Symonds had he been able to complete the Work corresponding to the portion of the Work which Symonds was, in fact, able to complete.

(g)     Should Ellison die or become disabled so as to make it impossible, in Symonds's sole and reasonable discretion, for Symonds to complete the Work within the time provided, then in the case of Ellison's death this Agreement shall immediately terminate or, in the case of Ellison's disability, Symonds may, upon thirty (30) days written notice, terminate this Agreement. Upon such termination, neither party shall make any use of Symonds's work product completed at the date of termination. Symonds may however negotiate with Ellison or his estate, as the case may be, for the use of his work on the Work completed as of the date of termination. The parties shall negotiate with each other in good faith for such use.

(h)     Should Ellison die or become disabled before Symonds's completion of the Work and Symonds determines in his sole and reasonable discretion that it is possible for him to complete the Work within the time provided, the parties shall negotiate with each other in good faith for such continuation and use of the Work and shall be guided by the principle that (i) if Ellison or his estate continues to fulfill Ellison's

**Symonds/Ellison, page 15**

obligations hereunder inasmuch as is necessary for Symonds to complete the Work within the time period provided, and (ii) if Ellison or his Estate continues to fulfill all obligations of any Publisher agreement or other licenses granting rights in the Work in place as of the date of termination, Ellison or his estate should receive the compensation which would have been due to Ellison pursuant to Clause 5 herein.

(i)   In all cases of this Agreement's termination, regardless of the basis for such termination, Symonds shall promptly upon such termination surrender to Ellison the original copy of all manuscripts, drafts, notes, and other material prepared by him for the Work learned during the course of researching and/or in connection with the Work as well as all audio and video tapes of all interviews conducted in connection with the preparation of the Work and the original and all copies of, all letters, photographs, diaries, and other material furnished by or on behalf of Ellison to Symonds in connection with his preparation of the Work and shall not retain copies thereof. Neither Symonds nor Ellison shall have the right whatsoever to make any use of any material prepared by Symonds hereunder. Ellison's possession of the original copy of such materials is merely intended to permit the enforcement of this use restriction which, both parties agree, may be enforced by injunctive relief. Symonds shall have no right to use in any way the materials furnished by and on behalf of Ellison.

17.   <u>Entire Agreement:</u>   The terms and conditions herein contained constitute the entire agreement between the parties and supersede any and all previous communications and understandings, whether oral or written, between the parties hereto with respect to the

Symonds/Ellison, page 16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

subject matter of this Agreement. No amendment or modification of this Agreement shall be valid unless in writing and signed by both parties. If all parties have not signed this agreement by January 31, 2001, the terms offered herein shall be null and void.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date and year first above written.


_____        _____
Matthew Symonds          Date                    Larry Ellison          Date

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Dear Larry & Carolyn: I attach for Larry's attention the draft collaboration agreement and proposal.  Matthew's lawyer will review the document on Monday, but I don't expect him to have any substantial problems with it, and I thought you, Larry, should have both to review over the weekend.



I hope you find this solution agreeable; the rest of the document, I believe, accurately reflects our understanding.

  Of course I'm most eager to hear your response to the propolsal. I will be returning to NY (from St John) on Sunday, and will be in the NY office Monday. I hope that on Monday or Tuesday, we can arrange a suitable time for you to come to New York to meet with prospective publishers.

  Yours, Andrew
>
>
>.
>Matthew

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Softwar

## The Rewards of Recklessness: A Portrait of Larry Ellison and Oracle Corporation at War

### By Matthew Symonds

### A shifting landscape

The Nasdaq index, one-time proud symbol of America's high-tech boom, has more than halved since March. All around, the dot.coms lie dead and dying. Amazon and Yahoo, the names that launched a thousand business magazine covers in the late 1990s survive, but now exist in some sad Internet twilight zone, their shares worth little more than a tenth of their value a year ago. Even the mighty Lords of Wintel – Microsoft and Intel – have lost two-thirds of their value in the last 12 months as PC growth has slumped. Shares in WorldCom, so recently the very model of next-generation telecoms, are down to $14 compared with $55 at the beginning of 2000. Wherever you look, whether at once-fashionable Internet business software firms such as Ariba, Commerce One and i2 or those paragons of New Economy management cool, Cisco and Dell, the rule is the same: lowered expectations, and investors stampeding for the exit.

An exception to that rule is Oracle, the number one database software supplier and second biggest vendor of applications for automating businesses. Despite a run-up of 600% in its stock during the year to July, and the shock departures of two of its most senior and high profile executives, Ray Lane and Gary Bloom, Oracle is still worth five times more than it was eighteen months ago. And since announcing a blow-out quarter in mid-December, its shares have risen as the Nasdaq slumped still further. Contrasting those 2nd quarter numbers with a profit warning from Microsoft on the same day, the influential Lex column in the *Financial Times* observed: "Oracle beat profit forecasts yesterday and talked of accelerating sales. Microsoft is still a strong, profitable company. But in terms of both growth and significance for the technology sector, the baton has well and truly passed to a new generation."

In fact, Oracle is the only big-cap high-tech stock that has not seen its value pretty much cut in half in recent months. But if the market is smiling on Oracle, much of the

2

rest of the computing industry is not. Many fear it and see it as intent on becoming the new Microsoft, equally dominant and rapacious. And Microsoft itself, bloodied from the antitrust case that Larry Ellison has cheered on, and still threatened by the wave of change unleashed by the Internet, is getting ready to fight back with its huge resources and unmatched capacity for focused aggression.

What is it that has made Oracle both one of the hottest and most controversial companies in the world today? The answer lies in two bets made by Larry Ellison, Oracle's founder and chief executive. The first, in 1997, was to gamble that the Internet would make possible a new form of computing that could sweep aside the prevailing client/server architecture of the 1990s – the form of computing that had been created by the Microsoft-led PC revolution – and that Oracle's industrial-strength databases would be at its heart.

While other rival software firms, such as the German business applications powerhouse, SAP, and Siebel, the leader in sales automation, were only prepared to nod in the direction of the Internet, Ellison decreed, to the dismay of many in the company, that Oracle would simply cease building client/server software. Although it seemed reckless to the point of irresponsibility at the time, it's now clear that Ellison won that bet. Oracle lost application sales in the short-term, but as e-business took off, Oracle had both the vision of computing and the products that customers were suddenly wanting.

Then last spring, Ellison rolled the dice for the second time: Oracle shipped Release 11i – a complete suite of integrated e-business applications that is the product of one of the most ambitious engineering projects in software history, with GE and Citigroup as early customers. Ellison's new bet was that companies were sick of the expense and complexity involved in trying to make so-called "best-of-breed" software work (laboriously stitching together the best products of myriad different firms) and would see the advantages of a single standardised package – courtesy of Oracle – that would do everything. One of the principle reasons for today's fashionable disillusion with the Internet is that the reliability of the software underpinning early attempts at e-commerce has been abysmal, promising far more than has actually been delivered. Ellison is saying that the only way to fix the problem is by using software that was engineered from the outset to work as a tightly integrated package: software that is designed, built, configured and tested by Oracle.

If the first bet was daring, this second bet is even reckless. For Ellison and Oracle are going to war not only with every other business software firm on the planet, including the old enemy, Microsoft – a dangerous thing to do in an industry in which

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

3

"co-opitition" and alliances are the rule – but also with the giant consulting and systems integration companies, such as IBM, Andersen Consulting and EDS, who make their billions from the very complexity Ellison is determined to banish. These are not firms that will allow their highly lucrative franchises to be diminished without a bitter struggle.

Ellison says he's only happy when everyone else thinks he's wrong, when he's "walking way out to the end of the limb, and then jumping up and down." But now that the prospect of overhauling Microsoft is both real and close – Oracle's market value is within spitting distance of Microsoft's at about $200 billion versus $250 billion – even that is not enough. For Ellison, it will always be a matter of "win or die". He says: "Without recklessness, you can't innovate. The rewards of recklessness are enormous."

### The origins of the war

The beginnings, if not the causes, of most wars are obscure. But this one has a time and a date. As Intel's Andy Grove has it, major transitions in high technology are triggered by "inflection points" that are often only apparent after the event. In September 1995, at a conference in Paris, just a month after the release of Windows 95, one of the most hyped marketing events in history, Ellison announced the imminent death of the PC, "a ridiculous device", and, by implication, predicted the pending decline in the power and influence of the company most associated with it, mighty Microsoft. The PC was just too complicated and too expensive, Ellison argued; in the coming age of the Internet, all you needed was a simple appliance that would get all its information and applications simply by plugging into the network. In short, you needed a *network computer* rather than a personal computer.

There followed a dazzling digression. Ellison was right about the importance of the Internet, but it turned out that most people thought the best way of getting to it was through a PC. A few network computers were made by Oracle and a loosely-knit coalition of Microsoft's enemies, such as IBM and Sun Microsystems, but tumbling PC prices and the limitations imposed by slow dial-up connections quickly condemned them to irrelevance. Microsoft crowed; Ellison was made to look a bit foolish. But in some ways, the PC versus the NC was a side-show that attracted attention away from the core struggle for the future of computing, a struggle that was also taking place within Oracle itself.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053566

4

By 1997 Oracle was not just a database company. Ray Lane, the chief operating officer, had been brought in from the consultants, Booz Allen, five years earlier to provide a steadying hand after an accounting scandal that nearly engulfed the company. In an effort to make Oracle more stable and "mature", Lane built a 12,000-strong consulting organisation selling complete "solutions" around the database. In addition, Oracle had a fast-growing, albeit under-performing, business in the software applications, known as "enterprise resource planning", that large firms were increasingly using to automate their back-offices. The big player in this market was SAP, with over 60 percent, while Oracle was a distant second with 15 per cent. Some of these applications could run on mainframe computers and be accessed with "dumb" terminals; but all the growth was coming from the form of computing that took the world by storm in the late 1980s,  called "client/server".

The idea of client/server was to use the processing power and local storage of PCs (the client) in conjunction with large numbers of quite small servers that were linked together to form a local area network. Applications resided on both the client and the server. People liked it because it was standards-based, highly flexible and decentralised. It liberated departments within companies from the tyranny exercised by high priests of the datacenter to do their own computing thing. Client/server was, in a nutshell, the reason for the rise of Microsoft and the decline of IBM.

But Ellison's conviction was that client/server had unleashed a nightmare of "distributed complexity"; it was not only appallingly labour-intensive to run, but also committed the cardinal heresy of fragmenting corporate data to the point where it was no longer possible to get fast answers to simple questions. The solution was Internet computing. Information and applications could be consolidated in one place and be accessed by hundreds of thousands of users by means of a standard web browser running on a PC, or on the simpler devices Ellison favoured.

While Internet computing had the potential to make the PC a great deal less important, it would have the reverse effect on the databases that Oracle built. In the Internet computing universe in which everything and everybody would be connected to everything else, the demand for bigger, faster and more capable databases would be insatiable. In fact, the database might become the essential platform for Internet computing, effectively displacing and commoditising the operating system. "For the first time in my life," Ellison says, "I realised we had a chance to beat Microsoft and be first on the Internet."

But for Ellison, there was a further reason for extending the war on the PC to the whole client/server paradigm. As long as client/server ruled, it would be impossible to

NDCA-ORCL1053567

5

break SAP's stranglehold on the market. The relatively poor showing of Oracle's applications had already led to a major battle in the Oracle board-room and was undermining Ellison's position in the company. Under pressure from Lane (who was by now seen by many, both inside and outside the company, as the man who was really running the company day-to-day), Ellison promised to do something about it. It wasn't what Lane or anyone else at Oracle was expecting. Ellison says: "The first thing I did was cancel projects a year from completion: I said, 'we're cancelling the next version (of Oracle applications) after (Release) 10.7. It doesn't even work. Stop it. Kill it. Go to the next generation.' This was very controversial. I told the engineers, 'It's too late to finish. It's irrelevant.' I made the announcement at Oracle that we were no longer doing client/server. 'With client/server we will never beat Microsoft. From now on, we will only do Internet applications.' Ray disagreed, he was violently opposed. His view was that it was much too risky."

The disagreement with Lane came to a head in early 1998. Ellison recalls: "I got a call from Ray at about midday. He wanted me to come and hear what the sales-force felt about giving up client/server and what the customers were saying. They were having a big meeting at the Hyatt in Burlingame (a few miles north along Highway 101 from Oracle's Redwood Shores base). There were about 200 of them, and they had choreographed everything to tell me how wrong I was and how our customers wouldn't tolerate going to the Internet. I really didn't care about that: the customer doesn't know what he wants, all he knows is what he doesn't like.

But I didn't say that. I felt my position at Oracle was a bit precarious. I wasn't sure whether the board would support me or Ray. And I didn't want to discourage the sales-force, so I said: 'Just tell me what all the problems with applications are.' And I listened to all their comments, and I said: 'You know, you guys are right. I promise you, we'll go on doing client/server. You guys are right, we can't force our customers to go this way.' But I was lying: I had no intention of doing that. I lied because I wanted to appear balanced and reasonable and because I needed time. I never had a problem lying. I knew I was right."

And it seems that he was. Few people now argue about the merits of the transition to Internet computing from client/server. The PC still dominates as the main means of access to the Internet (although other devices are at last starting to appear in numbers), and a debate still rages about how much computing power to keep on the desktop. But even Microsoft has embraced Internet computing to the extent of trying to create a version of it in its own image called "dot. NET". And despite having had to fight within Oracle to "socialise" the idea of Internet computing – "I'd tell people to do something and they literally wouldn't do it" – Oracle shipped its first suite of Internet

applications well ahead of the pack in 1999 and for the first time in years started stealing market share from SAP, who were not only later to the Internet but were also a lot quieter about it. Crucially, Ellison's gamble did not just give it an edge in enterprise applications, it also made Oracle seem like not just a big company, but, for the first time in years, a cool one.


### Declaration of war


Ellison depicts the fight against client/server as a Manichean struggle against Microsoft. He says: "I pick a fight, as I have done with Gates and (Microsoft CEO) Ballmer, to make it impossible to go back. If you land on the opposite shore and burn your boats, there's no going back. It's win or die." It was an act of calculated recklessness for a firm of Oracle's size to stop making products that customers still demanded, one that effectively bet the company. But Ellison was hardly alone in realising that "the Internet changes everything"; the sheer speed of the Internet's adoption after 1996 gave him a strong following wind.

However, Ellison's next bet, albeit from a position of greater strength for both himself and Oracle, is far larger and potentially more dangerous. "We're going to war with everyone," he says cheerfully. "Software is and always will be a winner takes all business." With the rules of the game having changed in his favour; Ellison's bet positions Oracle to snatch from Microsoft the mantle it had previously claimed from IBM as the dominant force in computing. And while the reign of Microsoft was temporary, Ellison reckons Oracle could be on top for a very long time. The vision is of "one network, one database"; Ellison says, "You will need a really powerful reason to move away from that. If we win, I really don't know what the next paradigm shift will be."

When Ellison says that Oracle is going to war with everyone, he means it. For the war that he has declared is against the complexity, and consequent cost and unreliability, that is the foundation of the current computing industry and the model, he argues, to which Microsoft remains devoted. The way enterprise computing works today is that big firms call in consultants and systems integrators to work out what will be the ideal mix of software – it's known as selecting the "best of breed" – to run their business and streamline their operations. . Notoriously, companies undergoing an SAP implementation to automate internal processes such as financial systems, human resources and manufacturing, spent several years and tens, or even

                    NDCA-ORCL1053569

7

hundreds, of millions of dollars trying to get the new software to integrate with all
their old kit, yet still ended up with something that didn't work as described on the
box.

But if that was complicated, the Internet has taken it all to a new level. Companies
are now being encouraged by computing firms to create highly integrated value
chains that extend their own processes, via their existing ERP (enterprise resource
planning) backbones, deep into those of their customers and business partners. The
idea is that from the moment an order is taken, from a webstore or from a
salesperson on the road with an Internet connection, an entire series of complex
interactions ripples instantaneously through to the remotest link in the value chain.
All of it theoretically choreographed by software from a host of different vendors –
some from the client/server era, some new ones carried in on the Internet tidal wave.
And all of it creating unprecedented amounts of new data that (again theoretically)
can be retrieved by managers to inform their decisions and increase efficiency still
further. If only.

Ellison believes that this is just the latest example of the computing industry's
celebration of complexity. He says: "At Oracle, we used to be fervent about best of
breed; but it doesn't work. IBM has 130,00 consultants trying to get this stuff to work,
and even they can't do it. It's absolutely unique to our industry that in the end it's
usually left to the customer to try and make it work. It's completely crazy. The
equivalent would be if you wanted a best of breed car and you decided on Honda
suspension, a Mercedes engine, a BMW exhaust system, Ford brakes and so on,
and you bought all these parts and then tried to build a car out them. Unless you're
an engineer, you've got a problem. So you hire an engineer, and you hope he knows
what he's doing. That's how companies buy their software today."

Oracle's answer has echoes of the strategy that Microsoft used to dominate the
market for desktop productivity software: to provide all the pieces and integrate them
so tightly that it no longer makes any sense for a customer to go to different
suppliers for word processing, spread sheet or presentation programmes. Ellison is
betting that only Oracle has the programming resources and the distribution clout,
thanks to the ubiquity of its database, to create a complete soup-to-nuts package of
Internet-based integrated business applications – hence the first release of the e-
business suite, Oracle 11i, shipped in the middle of last year (2000).

Ellison calculates that the advantages to customers in terms of speed to market,
money saved on never-ending systems integration (which always carries with it a
risk of failure) and data consolidation will outweigh any fears they might have of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

8

being "captured" by one over-mighty vendor. He argues that it doesn't matter if the software product of a more specialised rival, such as Siebel, the top sales automation firm, or Commerce One, a leader in procurement and Internet exchanges, is individually slightly better than Oracle's offering. He says: "The best parts don't yield the best system." The prize of seamless interoperability, out of the box reliability, and holding all data in one place (while each best of breed application needs its own dedicated database) overwhelms everything. To the same end, increasingly Oracle is embedding new features into its database and application servers – a strategy designed to erode the role and importance of the operating system, thus striking at Microsoft's attempts to colonise the corporate datacentre with its new server version of Windows 2000.

And another thing. As e-business is all about connecting with other companies, how much more effective will that be if they are also using Oracle software? For the same reason that Microsoft's Office makes collaboration between individuals easier – because it has become a de facto standard that everybody else in the world uses – so Ellison reckons that the same will be true for companies if Oracle's e-business suite becomes their default choice.

Ellison's new mantra is: "It can't be simple if it's not complete." It's a message that seems to be striking a chord with the kind of blue chip clients Oracle must win over – GE and Citigroup are early 11i customers. But perhaps the most powerful piece of propaganda Ellison has to hand is the transformative effect that "eating its own dog-food", as it is elegantly known in Silicon Valley, has had on Oracle itself. By using its own software and massively consolidating its data, Oracle has become an e-business exemplar, extracting $1 billion of cost savings in one year and automating its operations to such an extent that a swathe of senior managers has been fired and its tetosterone-charged salesforce placed in a computerised straitjacket. Ellison claims that the newly-streamlined Oracle has become "a fact-based organisation" that can respond far faster than its competitors to rapid changes in the marketplace.

Those competitors are well aware of the threat and are not standing still themselves. SAP has struck technology deals with Commerce One and Clarify, a specialist in call centre software, to strengthen its offering against the threat from 11i. Siebel has formed a close partnership with IBM and is increasingly violent in its denunciation of Oracle and Ellison's "pathological" behaviour. Microsoft, in a surprise move just before Christmas, announced the $1.1 billion purchase of the business applications vendor, Great Plains, with the clear intention of heading off Oracle's push into the small and mid-sized business market. With the needs of its forthcoming dot.NET software and business services platform in mind – Gates describes dot.NET as his

9

bet-the-company initiative – it's safe to say that Great Plains won't be the last acquisition of its kind that Microsoft makes.

In the past, Microsoft has been able to dismiss Ellison as a bombastic crank. Although Microsoft still uses the same sneering rhetoric, it now takes the danger posed by Oracle far more seriously. Microsoft knows that Oracle is coming for it, and Gates' firm intends to fight back with every thing it has. Right now, the two giants of the software industry are circling each other, probing for weaknesses and looking for easy opportunities to strike at each other's businesses. But the years of grudging coexistence and détente between Microsoft and Oracle are over: full-scale hostilities are about to begin.

But to win on the scale Ellison intends, Oracle must defeat not just other software firms, it must also take on and pummel into submission the entrenched armies of highly-paid consultants and systems integrators, an industry in itself that turns over hundreds of billions of dollars worth of business each year. What makes that so dangerous is that it is the likes of IBM, Andersen Consulting and EDS who are the kingmakers of the software industry, whose recommendations to clients drive sales. By making enemies of them, Ellison may not only undermine channel support for Oracle's applications, but even for its dominant database, allowing rival offerings from IBM and Microsoft to gain traction.

Not surprisingly, many consulting industry analysts are sceptical to the point of hostility. They believe that Oracle  has become too big for its boots and that best of breed is here to stay. Still more to the point, if Oracle succeeds, it eats a large part of their lunch. Ellison is not impressed: "The forward-looking analysts in this industry – like the Gartners and the MetaGroups – all they do is try to explain the past and treat it as some kind of prognostic. It's preposterous. All their money comes from people who don't like change. They don't understand any of this. But I'm glad they don't. That makes it easier for us."


The next two or three years will decide who is right – Ellison or the rest. Thousands of jobs and billions of dollars are at stake. But Ellison has no doubts: "I feel slightly dizzy sometimes when I walk away, because I know that unless we screw up, this is going to happen."

10

**The book**

When business history is being made, you can either wait till the results are clear, and write the story with the benefit of hindsight, or you can attempt to discover what is going on and report it as it happens. Both methods are valid, both have disadvantages: the  former lacks suspense, the latter may lack insight. During the writing of this book, I will do something different and more unusual. I will ride alongside Larry Ellison as he makes a high stakes bid for dominance in a war with the rest of an industry that shapes our world. I will narrate from the field the story of how Oracle does battle. Whatever the outcome, it will be a story of high drama and deep significance.

I will also provide an intimate portrait of Ellison himself, how he works and plays, what he thinks and cares about. And he is a man very different from the way in which he is conventionally portrayed. Magazine and newspaper profiles of Ellison invariably regale readers with accounts of his cars, boats, planes and affairs. The all-too obvious theme of the "bad boy of software", still carrying the psychological wound of abandonment by a teenage mother, has been re-worked many times.

He is actually far more interesting than that. He is, above all, very *funny* – and yes: intuitive, vain, charming, passionate, and manipulative, with beautiful manners and a capacity for appalling rudeness. He is extremely clever, at times almost exhaustingly intense, especially when talking of his two principal charitable interests: biotechnology and education. But while his great rival, Gates, is relentless (Gates *grinds*), Ellison dazzles. "I am a sprinter," he observes. "I rest, I sprint, I rest, I sprint again."

Though the narrative of the book will chart Ellison's final sprint to what he sees as the summit of Oracle's achievement, it will also trace two great projects running parallel to the main field of battle. In the course of the book, I will travel with Ellison through those other parts of his life that are key to understanding him: to Kyoto, to examine the influences that ignited the profound interest in Japanese art and culture that finds its apotheosis in the Japanese imperial village that he is replicating in the hills at Woodside, just twenty minutes drive from Oracle's gleaming towers at Redwood Shores; and to Long Beach and New Zealand as Ellison's challenge for the next America's Cup gathers in intensity. Both the final stages of constructing the estate at Woodside and the bid for the America's Cup reach their conclusions near the publication of this book.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

11

The houses at Woodside, crafted entirely by hand from unfinished pine and cedar, although not exactly tiny, have a powerful simplicity and elegance. Like the palaces and gardens of Kyoto that Ellison first saw more than 25 years ago, they are designed to be human in scale and in harmony with their surroundings. Two ornamental bridges, waterfalls surging over huge boulders brought from Yosemite, steaming hot-tubs hollowed from stone and innumerable cherry trees will complete the artfully crafted Zen landscape. The only detail to be resolved is the purchase and demolition of the one house left in the surrounding area that intrudes upon the pastoral perfection of the scene. Just Ellison's luck that it happens to be owned by a lawyer.

The buildings themselves are full of sensual delights and surprises: the smell of natural oils from the wood, the sheer pleasure of running a hand along a cedar roof set to resemble the sweep of a bird's wing, the ease with which wall-sized panels smoothly slide to reveal a grove of redwood trees. This will be, Ellison says, "a refuge from the battle."

As with Oracle, so it is with the America's Cup: winning is the only thing that matters. And Ellison is equally clear that this is also a battle he expects to win and in the same way: by outgunning the competition with more resources, better people and a clearer strategy. The challenge for the 2003 America's Cup comes after several successful years campaigning his Maxi yacht, Sayonara, including a brush with death while winning the tragedy-struck 1998 Sidney-to-Hobart race. But in the race for the America's, the object is to leave nothing to chance: the physical assets of last year's(2000) losing AmericaOne team have been purchased, including its two race boats; Sayonara's proven crew, most of whom were a part of last year's winning New Zealand team, have been put on long-term contracts along with Sayonara's brilliant, if temperamental skipper, Chris Dickson; the world's greatest designer of 12-metre yachts, Bruce Farr, has been engaged to build the two new boats that will actually contest the 2003 series, as has Mickey Ickert, the man who cut the sails for Team New Zealand. It's a potent combination of money (about $80m and counting), continuity, strong management and sailing talent that has already established Oracle Racing as the favourite to win.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12

*The collaboration*

I have known Ellison for over three years, since becoming Technology and Communications Editor of *The Economist*. During that time, based in part on a shared belief about what was wrong with today's computing industry and the potential of the Internet to make it better, we became friends and developed a relationship of trust.

During the writing of the book, I will spend at least 10 days each month with Ellison and will record up to 200 hours of one-to-one interviews. I will have office-space at Oracle on the same floor as Ellison and will sit in on every kind of business meeting. I will also travel with him and be present in all parts of his business, and much of his non-business, life. I will interview past and present employees of Oracle as well as Ellison's wide circle of business and personal friends (including Steve Jobs, John Chambers, Scott McNealy, Bill Clinton, Michael Milken and Sandy Weil). I will seek meetings with others who may take a different and less positive view, such as business rivals and colleagues whom Ellison fired. Wherever possible and appropriate, Ellison will help me gain the access I require. Ellison will make available personal documents and photographs as well as previously confidential company memoranda and e-mail.

Ellison and I will be joint copyright holders, but I will be the sole author and will have absolute editorial control; Ellison has no right of approval over content. If, however, Ellison and I take an opposing view of an important event, he will have a right of reply within the pages of the book, over which I will have no right of approval. Ellison fully understands that despite the book's "authorised" status, it is vital that the picture of himself and Oracle that readers will see must be true, honest and whole. The price for that, he realises, is that there will inevitably be aspects of the book that he will not like. Inescapably, there is some tension between intimacy and objectivity. To be frank, this is not a project I could embark upon if I did not like Ellison personally and enjoy spending time with him. But for all that, this will be the work of a candid and, at times, critical observer, not the account of a partisan. While admiring his ambition, I have an open mind as to whether Ellison will win his war. And were he to lose, the consequences for both himself and Oracle will be confronted.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    NDCA-ORCL1053575

13

*Matthew Symonds has been Technology and Communications Editor of* The Economist *since 1997. During that time he has frequently visited Silicon Valley and has met nearly all the major players in the computing industry. He also advises the group chief executive on Internet strategy and is chairman of the advisory board of CFO.com, a subsidiary of the Economist Group. In April 2000, he won the Wincott Prize for Financial Journalism (the premier award for business writing in Britain) for a number of articles analysing the rise of e-business, the Microsoft antitrust case and the phenomenon of "dot.com" hype. When he returns to* The Economist *after leave of absence to write this book, it will be to an entirely different editorial role. Symonds was educated at Balliol College, Oxford and worked first at the* Financial Times *and then at the* Daily Telegraph *(as chief economics commentator)until leaving in 1986 to co-found* The Independent *– the first new British quality newspaper for 130 years. After nine years at* The Independent *as Editorial Director and Executive Editor, he cashed out  after helping to organise a successful bid for the company by a consortia of European newspapers. In 1995 he became Director of Strategy at BBC Worldwide (the commercial arm of the BBC) and took the BBC into commercial digital television by negotiating a $300m  joint venture – UKTV – with Flextech Television (the European programming arm of TCI). He left the BBC in 1997 to help establish UKTV in the market, but missing journalism, moved to* The Economist *when offered the chance to write about the coming Internet revolution. Forty-seven years old, he lives in London with his wife and three children.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          NDCA-ORCL1053576

14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053577