1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   MARK SOLOMON (151949)
    DOUGLAS R. BRITTON (188769)
3   STACEY M. KAPLAN (241989)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)
    marks@csgrr.com
6   dougb@csgrr.com
    skaplan@csgrr.com
7         – and –
    SHAWN A. WILLIAMS (213113)
8   WILLOW E. RADCLIFFE (200087)
    MONIQUE C. WINKLER (213031)
9   ELI R. GREENSTEIN (217945)
    100 Pine Street, Suite 2600
10  San Francisco, CA  94111
    Telephone:  415/288-4545
11  415/288-4534 (fax)
    shawnw@csgrr.com
12  willowr@csgrr.com
    moniquew@csgrr.com
13  elig@csgrr.com

14  Lead Counsel for Plaintiffs

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17  In re ORACLE CORPORATION          )   Master File No. C-01-0988-MJJ
    SECURITIES LITIGATION             )
18  _____    )   CLASS ACTION
                                      )
19  This Document Relates To:         )   PLAINTIFFS' AMENDED [CORRECTED]
                                      )   OPPOSITION TO DEFENDANTS' MOTION
20       ALL ACTIONS.                 )   FOR SUMMARY JUDGMENT
    _____    )
21                                        DATE:          November 16, 2007
                                          TIME:          1:30 p.m.
22                                        COURTROOM:     The Honorable
                                                         Martin J. Jenkins
23
              PREVIOUSLY FILED ON SEPTEMBER 6, 2007 (DOCKET NO. 1059)
24                  AND OCTOBER 10, 2007 (DOCKET NO. 1305)

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY JUDGMENT STANDARD.............................................................1

III.  ARGUMENT .........................................................................................................1

    A.   Defendants Cannot Establish Summary Judgment on the Issue of Falsity
        of Oracle's 2Q01 Financial Results ................................................................1

    B.   The Allegations Pertaining to the $20 Million in Bad Debt Transfers Are
        Not "New" or "Unpled"...................................................................................4

    C.   The Accounting Misstatements Were Material ...............................................5

    D.   Defendants Have Not Established the Absence of a Genuine Dispute of
        Material Fact on the Issue of Scienter for the Accounting Fraud ...................8

        1.   Defendants Intentionally Used Customer Overpayments to
            Generate False Earnings in 2Q01 ......................................................8

        2.   The 46,000 Debit Memos on November 17, 2000 Raise Genuine
            Issues of Material Fact and Evidence Spoliation.............................10

        3.   Defendants Knew of the Improper HP Transaction...................................13

    E.   Evidence Submitted by Defendants Themselves Cripples Their Motion for
        Judgment on 11i Claims.................................................................................14

    F.   Suite 11i Did Not "Work" as Represented, Did Not Save Customers
        Money Fast and Had Proven Difficult and Costly to Implement ..................18

    G.   Suite 11i's Lack of Integration and Poor Quality Caused Demonstration
        Failures and Lost Sales ..................................................................................21

    H.   Suite 11i Was Not Integrated and Interoperable Out of the Box, Nor Was
        It Designed and Engineered to Be and Was Not Tested.................................22

    I.   Suite 11i Did Not Work in Every Language as Represented................................25

    J.   Oracle's Internal 11i Implementation Was Costly Due to Defects and Lack
        of Functionality and Contributed to 3Q01 Revenue Shortfall..............................26

    K.   Defendants' Public Guidance Had No Reasonable Basis – Known
        Undisclosed Facts Seriously Undermined Its Accuracy...............................27

        1.   There Was Never a Reasonable Basis for Oracle's Guidance..................27

            a.   The Major Economic Change Facing Oracle Rendered Its
                3Q01 Forecast Inaccurate ..........................................................29

**Page**

          b.      The Change in Product Mix and 11i Defects Rendered Oracle's 3Q01 Forecast Inaccurate ...................................................31

          c.      Ellison's Directive to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate .........................................32

     2.      Defendants Had Actual Knowledge of Facts that Seriously Undermined the Accuracy of Oracle's Guidance .....................................34

          a.      Actual Results Seriously Undermined Oracle's Guidance ...........34

          b.      Division Level Indicators Seriously Undermined Oracle's Guidance .................................................................................35

          c.      Defendants Knew that the "Hockey Stick" Would Not Help ........39

          d.      Pipeline Growth Seriously Undermined Oracle's Guidance .........40

  L.     Defendants' "Cautionary" Statements Were Not Meaningful ..............................41

  M.    Defendants Knew or Recklessly Disregarded that Their Statements About the Economy Were False and Misleading .............................................42

  N.     The Insiders' Sales Establish Scienter .................................................................44

     1.      Oracle's Stock Repurchases Establish Scienter .......................................45

     2.      Defendants' Spoliation Establishes Scienter ...........................................46

  O.     The Facts Support a Jury Finding of Loss Causation ...........................................46

IV.     CONCLUSION....................................................................................................................50

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................6

5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................1

6

7

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................46, 47

8

*Gebhardt v. ConAgra Foods, Inc.*,
  335 F.3d 824 (8th Cir. 2003) ................................................................6, 7

9

10

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ............................................................27, 41

11

*In re Amylin Pharms., Inc. Sec. Litig.*,
  No. 01cv1455, 2003 U.S. Dist. LEXIS 7667
  (S.D. Cal. May 1, 2003)....................................................................41, 42

12

13

*In re Apple Corp. Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ...............................................................49

14

*In re Daou Sys., Inc., Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005),
  *cert. denied*, 546 U.S. 1172 (2006)................................................43, 46, 47

15

16

*In re Gilead  Scis. Sec. Litig.*,
  No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893
  (N.D. Cal. May 12, 2006) ......................................................................47

17

18

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) .....................................................41

19

20

*In re Impax Labs, Inc., Sec. Litig.*,
  No. C04-04802 JW, 2007 U.S. Dist. LEXIS 723
  (N.D. Cal. Jan. 3, 2007) ........................................................................47

21

22

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. 02-cv-01486-CW, Slip Op.
  (N.D. Cal. Aug. 24, 2007) .......................................................................5

23

24

*In re Oracle Derivative Litig.*,
  867 A.2d 904 (Del. Ch. Ct. 2004).....................................................28, 45

25

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................42

26

27

*In re Stellant, Inc. Sec. Litig.*,
  326 F. Supp. 2d 970 (D. Minn. 2004)........................................................6

28

1

2                                                                                        **Page**

3  *Kaplan v. Rose,*
        49 F.3d 1363 (9th Cir. 1994) ...........................................................................45
4

5  *Lentell v. Merrill Lynch & Co.,*
        396 F.3d 161 (2d Cir.),
        *cert. denied,* 546 U.S. 935 (2005)..................................................................47
6

7  *Morgan v. AXT, Inc.,*
        No. C04-4362, 2005 U.S. Dist. LEXIS 42346
        (N.D. Cal. May 23, 2005) ............................................................................41, 42
8

9  *No. 84 Employer-Teamster Joint Council Pension Trust Fund*
        *v. Am. West Airlines, Inc.,*
        320 F.3d 920 (9th Cir. 2003) ...............................................................6, 42, 45
10

11 *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
        380 F.3d 1226 (9th Cir. 2004) ......................................................................44

12 *Nursing Home Pension Fund v. Oracle Corp.,*
        242 F. Supp. 2d 671 (N.D. Cal. 2002) ..........................................................41
13

14 *Nursing Home Pension Fund v. Oracle Corp.,*
        No. C01-0988 MJJ, 2006 U.S. Dist. LEXIS 94470
        (N.D. Cal. Dec. 20, 2006) ............................................................................46
15

16 *Provenz v. Miller,*
        102 F.3d 1478 (1996).........................................................6, 27, 41, 49

17 *Rombach v. Chang,*
        355 F.3d 164 (2d Cir. 2004).........................................................................42
18

19 *TSC Indus., Inc. v. Northway, Inc.,*
        426 U.S. 438 (1976).......................................................................................6

20 **STATUTES, RULES AND REGULATIONS**

21 15 U.S.C.
        §78u-4(b)(4)..................................................................................................46
22        §78u-5(c)(1)(A)(i)..........................................................................................42
        §78u-5(c)(1)(B)..............................................................................................42
23

24 **RULES**

     Federal Rules of Civil Procedure
25        Rule 26..........................................................................................................4
        Rule 56(c).......................................................................................................1
26

27 17 C.F.R.
        §230.144(e) ...................................................................................................44

28

1

## I.      INTRODUCTION

2       Defendants have no entitlement to summary judgment, except against them.  Consistent with

3  plaintiffs' allegations, there are abundant facts, either indisputably in plaintiffs' favor or that, at a

4  minimum, are reasonably disputed, that prove plaintiffs' case.  None militate in defendants' favor.

5  ## II.     SUMMARY JUDGMENT STANDARD

6       On summary judgment, the moving party is required to show with some detail (a) the

7  absence of a genuine issue of material fact; and (b) their entitlement to judgment as a matter of law

8  on the basis of undisputed facts as set forth in Fed. R. Civ. P. 56(c).  *Celotex Corp. v. Catrett*, 477

9  U.S. 317, 325 (1986).   Here, plaintiffs allege that multiple statements concerning Oracle

10  Corporation's ("Oracle" or the "Company") financial condition, forecasts and its new applications

11  products, E-Business Suite ("Suite 11i" or "11i"), were false and misleading and thus actionable

12  under securities laws.  *See* Exs. 12, 14.[1]

13  ## III.    ARGUMENT

14       ### A.      Defendants Cannot Establish Summary Judgment on the Issue of
       Falsity of Oracle's 2Q01 Financial Results
15

16       Defendants' motion on the accounting claims challenges scienter, materiality and loss

17  causation, but does not substantively contest that Oracle overstated its 2Q01 revenue and earnings by

18  at least $0.01 per share.  Defendants' [Corrected] Notice of Motion and Motion for Summary

19  Judgment ("Defs' Mem.") at 46.  In 2Q01, Oracle improperly converted at least $20 million in

20  "unapplied cash" from customer overpayments to revenue and income.  Defendants executed this

21  accounting scheme by transferring the customer money from "Account 25005" (aptly titled

22  "Customer Overpayments"), to "Account 12601," a sub-account of Oracle's bad debt reserve, and

23  then applying the $20 million to fictitious "debit memo" invoices on or about November 17, 2000.

24  Ex. 1, ¶¶19-39.  These false transactions made it appear as if the unapplied customer cash and

25  overpayments had been applied to new and legitimate invoices (the debit memos).  In reality, the

26

27  _____

[1]      All exhibits referenced herein are attached to the Appendix of Exhibits filed concurrently
herewith.  All emphasis is added and citations are omitted unless otherwise noted herein.

28

1   money belonged to Oracle's customers.  In fact, after plaintiffs filed their accounting allegations on

2   October 11, 2002, Oracle held a flurry of secret meetings and initiated an "Unapplied Cash Clean

3   Up" project (the "2002 Clean Up") whereby accounting data was altered, millions of dollars in debit

4   memo overpayments were suspiciously reversed and refunded, and millions more were escheated to

5   the state because the money did not belong to Oracle.  Ex. 1, ¶¶42-46.  One internal e-mail during

6   the 2002 Clean Up stated: "***We need to establish new policies and procedures to ensure this never***

7   ***happens again***."  Ex. 2.

8         Defendants' accounting expert J. Duross O'Bryan conceded that $20 million in customer

9   overpayments was transferred from Account 25005 to Oracle's revenue and income accounts

10   through its bad debt reserve, Account 12601.  *See* Exs. 3 at 20 ("[Oracle] learned that $20.1 million

11   of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal

12   year 2001."); A at 146:19-147:1 ("[Oracle] individuals made decisions to transfer from 25005 to

13   12601.  ***That went right into income, actually went into reserve that went into income***."); 4 at

14   1610987 ($20 million "adjustment" to Account 12601 in 2Q01).[2]  O'Bryan also admitted that the

15   improper transfers from Account 25005 to Account 12601 violate Generally Accepted Accounting

16   Principles ("GAAP").  Exs. 3 at 6 ("Plaintiffs claim that Oracle improperly used customer

17   overpayments to increase its bad debt reserve, thereby materially inflating reported results of

18   operations in its second quarter of fiscal year 2001 financial statements.  ***These claims, if true,***

19   ***would violate GAAP***."); 8 at 21 n.82 ("[T]o the extent that any money that was transferred to the bad

20   debt reserve could not be matched to a previously written off invoice, ***such a transfer represented***

21

22

23       [2]      Oracle's former Vice President of Revenue Accounting Americas, Michael Quinn, admitted that Oracle's transfers of customer overpayments impacted revenue and earnings. Ex. B at 227:25-228:15 ("Q. Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002?  A. Yes.").  During his interview with the Special Litigation Committee of the Board of Directors ("SLC"), Tom Williams, Oracle's Vice President of Finance Operations admitted the same. Exs. 5 at NDCA-ORCL 313783; C at 125:16-18, 177:7-15. Jennifer Minton, Oracle's current CFO and former Senior Vice President and Corporate Controller during the Class Period, confirmed that Oracle's process of adjusting the bad debt reserve impacted Oracle's revenue account. Ex. EEE at 143:7-12, 143:25-144:10, 216:19-217:3. Former Oracle Collections Manager Ian Hatada testified that the revenue impact was "major." Ex. E at 153:16-154:6. Internal Oracle documents confirm the same. Exs. 4 at 1610987; 6 at 140468-469, 140474; 7 at 440832.

28

1   *an erroneous reclassification*.").  O'Bryan admitted that if the $20 million in transfers did not occur,

2   Oracle's EPS results for 2Q01 would have been $0.10 rather than $0.11, as reported.  Ex. 3 at 38.

3   Plaintiffs' accounting expert D. Paul Regan also found that the improper transactions involving the

4   debit memos and the bad debt reserve inflated Oracle's EPS results from $0.10 to $0.11 per share,

5   allowing Oracle to beat Wall Street's consensus earnings expectations by a penny per share.  *See* Ex.

6   1, ¶¶31-39.[3]

7          Defendants have only attempted to challenge a small fraction ($2 million) of the $20 million

8   misstatement.  Ex. 3 at 32-33.  They rely entirely upon the unsupported opinion of their expert,

9   O'Bryan, without citing any substantive evidence or documents.  Defs' Mem. at 48.  Plaintiffs have

10  disputed O'Bryan's unsupported testimony, however, and moved to exclude it.  *See* Ex. 16 at 10-12.

11  Indeed, O'Bryan conceded that the evidence was "not conclusive" on $500,000 of the $2 million

12  amount and that he could not determine whether the transfers were proper.  Ex. F at 203:9-14 ("***A.***

13  ***[T]he notes were not conclusive for me, nor did I see any other type of support. We put that into a***

14  ***bucket of could be. Q. Could be. So you can't definitively say that $500,000 of transfers was***

15  ***proper; correct? A. That's correct***.").  His opinion on the other $1.5 million was similarly

16  unsupported.  Ex. 3 at 32-33.  In any event, even assuming that the entire $2 million questioned by

17  defendants is not a disputed fact (it is), if that amount is subtracted from the $20 million

18  misstatement, Oracle's debit memo fraud still inflated its EPS by $0.01 per share (Net Income

19  [$611.8 million] ÷ Shares Outstanding [5,874,987] = ***10.41 cents*** per share).[4]

20  _____

21  [3]     As discussed in §D.3., plaintiffs have also alleged that Oracle improperly recognized
22  approximately $20 million on a reciprocal "swap" deal with Hewlett-Packard Company ("HP") after
    midnight on the last day of the quarter.  This transaction, combined with the debit memo transfers
23  discussed above, resulted in over $40 million of fictitious earnings in 2Q01, inflating Oracle's EPS
    by $0.01 per share.  If plaintiffs can prove at trial that either the debit memo bad debt transfers or the
    HP transaction was improper, standing alone, Oracle's EPS was overstated by $0.01 per share.

24  [4]     The falsity of Oracle's 2Q01 financial statements is also shown by the reversal or "clean up"
25  of the accounting for over $50 million in debit memo transactions ***after*** plaintiffs filed their
    accounting allegations on October 11, 2002.  Exs. 9; A at 154:7-11 ("So, if in the second Q they
26  were applying the 25005 to the 12601, that's recording income.  If – then remember during
    October/November [2002] time frame ***they reversed all of that.  It all went out of reserve.  It***
27  ***reduced revenue, basically, by that $20 million***."); 3 at 34-35 ("On November 8, 2002, ***Oracle***
    ***reversed the processing of the November 17, 2000 debit memo***, thus switching the receipt status
28  from 'Applied' back to 'Unapplied.'"); 1, ¶¶42-45.

### B. The Allegations Pertaining to the $20 Million in Bad Debt Transfers Are Not "New" or "Unpled"

Defendants attempt to avoid the falsity of their 2Q01 financial statements by claiming that the bad debt transfer issues are "new" and "unpled" and that plaintiffs have "abandoned" their accounting allegations. Defs' Mem. at 45.[5] However, nearly five years ago, in November 2002, plaintiffs specifically alleged the bad debt reserve transfer issue in connection with an *Ex Parte* Application to enjoin Oracle from deleting and altering documents during the 2002 Clean Up project (the "November 2002 Allegations"). Exs. 10-11.[6]

In December 2002, plaintiffs added new debit memo allegations to the complaint, alleging that defendants "improperly recognized revenue from past customer credits and overpayments *it had held in reserve* without informing its customers." Ex. 12, ¶8. Plaintiffs also alleged that Oracle applied the customer cash to fictitious "debit memo" invoices in November 2000 which was "indeed money that had been *on reserve* in Oracle's 'On Account.'" Ex. 12, ¶41(a). Judge Spero subsequently heard extensive oral argument regarding the bad debt reserve on March 1, 2005. Plaintiffs stated that "[o]ur investigation thus far, and even a review of these documents show that *bad debt reserve . . . . The monies that were applied to the debit memos came from the bad debt reserve, which is where the unapplied cash went to when it came in.*"). *See* Ex. 13 at 53:10-15. Judge Spero specifically asked defendants about the bad debt transfers and defendants misled the Court:

---

[5]  Judge Infante has already admonished defendants for trying to narrow plaintiffs' accounting allegations too narrowly in order to resist discovery relating to the bad debt transfer allegations: "*I have never seen anyone read a complaint so narrowly as you do. Rule 26 would be turned on its head if we applied your discovery rulings as you wish to make in this case. It's just ridiculous. I'm sorry I have to be so blunt with you.*" Ex. 15 at 86:11-16.

[6]  The November 2002 Allegations stated that Oracle had a "long-standing practice of inappropriate use of customer's overpayments and unapplied cash by doing so-called 'auto adjustments' of customer overpayments in its Unapplied Cash account and *applying the money to its bad debt accounts*." Ex. 11, ¶6; *see also, e.g.*, Ex. 10 at 3-7. Plaintiffs also alleged that "at the end of a month, Oracle would run an 'auto adjustment' that would *take money out of the Unapplied Cash account and would transfer it to the Reserve for Bad Debt account*," thereby "*inflat[ing] net income*." Ex. 11, ¶12.

Judge Spero: The question is whether or not the ongoing investigation, which is reflected in Mr. Quinn's declaration, which has the **account number of 12601**, has documents in it that **in any way refer or relate to the 46,000 debit memos**.

And it does seem to me that there might be documents there because he does talk about impact of revenue on the last eight quarters, so that goes back into the relevant period. . . .

[Counsel for Oracle]:  The reason it is not relevant is because [t]he November 17, 2000 transaction **had nothing to do with the 12601.  It had nothing to do with the movement of unapplied cash to the bad debt reserve account**. . . .

Judge Spero:  You know, you say that, but look at the e-mail.  The e-mail says exactly the opposite of that.

[Counsel for Oracle]:  No, no.  **It has nothing to do with the debit memo transactions** which they say were used to recognize revenue.  It involves two entirely distinct inquiries.

*Id*. at 51:9-53:23.[7]  Moreover, plaintiffs detailed the bad debt transfer allegations in their contention interrogatory responses.  Ex. 14 at 100-01.  Defendants never challenged these responses and they addressed the issue in extensive briefing and expert discovery.  Defendants thus cannot demonstrate prejudice or lack of notice.[8]

## C.    The Accounting Misstatements Were Material

Because defendants cannot genuinely dispute that Oracle's revenue and earnings were inflated by at least $0.01 per share in 2Q01, they argue that the overstatement is immaterial.  Defs'

---

[7]    Judge Spero recognized that the bad debt reserve allegations were relevant if plaintiffs could demonstrate a connection to the debit memos during discovery (which they did): ("[Judge Spero]: You are going to look at every piece of paper that has to do with these debit memos up and down and **if it goes through the accounts that you suspect it is going through, well, then, that will be one thing**. . . . I mean if it turns out that none of this money passes through the 12601 account, why isn't that the answer?").  Ex. 13 at 53:3-54:9.  As it "turned out," Judge Infante ordered discovery on the bad debt transfers on December 19, 2006 (Ex. 194 at 22), and the documents show unequivocally that $20 million in transfers and other customer funds were applied to November 2000 debit memos. Ex. 1, ¶¶24-29, 44.

[8]    Defendants have also been fully aware of the HP allegations for most of discovery.  They attended hours of depositions of HP and numerous Oracle witnesses.  The HP allegations were also detailed in plaintiffs' contention interrogatory responses, and defendants' expert provided an opinion on it (albeit an improper opinion based on documents never produced to plaintiffs).  Exs. 3 at 41-42; 8 at 25-50; A at 46:16-47:17.  Thus, defendants cannot argue prejudice, undue delay, bad faith, or dilatory motive in addressing the HP allegations at summary judgment.  *See In re JDS Uniphase Corp. Sec. Litig.*, No. 02-cv-01486-CW, Slip Op. at 11-12 (N.D. Cal. Aug. 24, 2007) (finding that issues not specifically alleged in the complaint were part of the case at summary judgment) (Ex. 200).  If anything, plaintiffs have been prejudiced by defendants' use of "new" documents in their expert rebuttal report regarding HP that were never produced to plaintiffs.  *See* Ex. 16 at 16-17.

Mem. at 46-47.  To fulfill the materiality requirement, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Airlines, Inc.*, 320 F.3d 920, 934 (9th Cir. 2003) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)).  Materiality is a mixed question of law and fact and, accordingly, courts generally reserve questions of materiality for the jury.  *TSC Indus.*, 426 U.S. at 450.  Indeed, as the Ninth Circuit stated: "only if materiality is 'so obvious that reasonable minds [could] not differ' is summary judgment appropriate." *Provenz v. Miller*, 102 F.3d 1478, 1489 (1996).

Defendants claim that a reasonable investor would not have found it significantly important if Oracle only reported earnings of $0.10 per share, rather than the $0.11 per share in 2Q01.  Defs' Mem. at 46-47.  This contention ignores that Wall Street analysts' consensus earnings expectations for 2Q01 were $0.10 per share and Oracle's earnings were intentionally manipulated to report $0.11 and "beat" those expectations.  The SEC's rule on materiality states that intentional earnings manipulations are presumptively material:  "*[t]he evidence may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements*."  Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) (Ex. 18 at 5).  In fact, Larry Ellison himself admitted that beating the street was material:

> *Ellison had said to me more than once that the one thing that would make a difference was a quarter that beat expectations.*  "Analysts don't try to foretell the future; they try to explain the recent past. . . . *It's that simple – they just look at the numbers.*"

Ex. 17 at 431.  Defendants' forecasting expert R. Glen Hubbard also admitted that managing earnings using "deliberate creation of reserves" is not proper.  Ex. G at 45:16-46:11.  Courts too have acknowledged the "common-sense presumption that accurate earnings information is meaningful and important to investors." *In re Stellant, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("Most investors

1   would consider it significant, no matter what the mix of information available, that a company was

2   not earning as much as it was claiming to earn.  The onus is [therefore] on the defendants to

3   demonstrate why this assumption should not stand.").[9]

4          Further, the $20 million "adjustment" would not have been made in 2Q01 if it was not

5   material to Oracle's financial statements.  Williams, Oracle's VP of Finance admitted that "If there

6   was a significant difference between the requirements and the reserve then an adjustment would be

7   booked.  ***If it was not a significant difference then no adjustment would be booked.***"  Ex. C at

8   124:23-125:1-2.  Oracle's accounting manipulations were also material in that they caused Oracle to

9   violate the SEC's 1993 Consent Decree which enjoined Oracle from accounting improprieties and

10  misstatements of its financial results.  Ex. 20 at 3-4.[10]

11         Oracle's improper $20 million deal with HP was material because, *inter alia*, it (i) was the

12  second largest applications deal in 2Q01; (ii) inflated Oracle's applications growth from 54% to

13  66%; (iii) conveyed the false impression that Oracle's new Suite 11i software was growing faster

14  than expected; and (iv) helped Oracle inflate its earnings in 2Q01 by $0.01 per share to beat Wall

15  Street expectations.  Ex. 19 at 6-7.  Numerous high-profile securities analysts reported that both the

16

17

_____

18  [9]       Leading up to 2Q01, Oracle had "beat the street" for four quarters in a row, including nine of
19  the previous ten quarters.  Ex. A at 290:12-19.  During the single quarter in which Oracle merely
    "met" Wall Street expectations, Oracle's stock dropped 6% the following trading day.  *Id.* at 290:16-
20  291:1.  Further, during 2Q01, Oracle and the entire market were facing a huge macroeconomic
    downturn and the infamous bursting of the "dot.com bubble."  In the four months (August 2000-
    November 2000) preceding the Class Period, the NASDAQ plummeted 1300 points or
21  approximately 30% of its market capitalization.  Ex. 175.  Oracle's mantra during that time, which it
    expressly touted to investors, was that the slowing economy was "not impacting" Oracle's business
22  because its new Suite 11i software product would help companies cut costs.  Ex. 12, ¶45.  Thus,
    Oracle recognized that any negative "impact" on its business was material to the investment
23  community.  It allayed those fears by artificially inflating its earnings to beat expectations.

24  [10]      None of the cases cited by defendants addresses a situation where a company intentionally
    inflates its revenue and income with the specific purpose of beating the street by $0.01.  Defs' Mem.
25  at 46.  Here, Oracle's accounting manipulations intentionally overstated its net income by 4%, its
    applications growth by 12%, and its EPS by $0.01 (10%).  Further, the SEC has rejected a
26  quantitative percentage threshold for determining materiality, finding that "qualitative factors may
    cause misstatements of quantitatively small amounts to be material."  Ex. 18 at 4.  Plaintiffs'
27  accounting expert carefully analyzed the SEC's factors and found that Oracle's accounting
    misstatements were qualitatively material.  Ex. 19 at 3-9.

28

1   66% applications growth and the HP transaction were material to Oracle's 2Q01 results.[11]  Indeed in

2   an internal e-mail to Ellison and Jeff Henley, four days after the close of 2Q01, Oracle executives

3   admitted that the HP deal was material:  "*Without HP, it would have been different.  The East did*

4   *not bring in any business*."  Ex. 25 at 021389.[12]

5           D.   **Defendants Have Not Established the Absence of a Genuine Dispute**
                **of Material Fact on the Issue of Scienter for the Accounting Fraud**

6

7                **1.   Defendants Intentionally Used Customer Overpayments to**
                        **Generate False Earnings in 2Q01**

8           It is undisputed that Oracle's top executives were well aware of the Company's customer

9   unapplied cash problem in 2Q01.  Henley knew that "there was a similar problem when I joined the

10  company . . . so I was disappointed when I found out about it because *here we were repeating sins*

11  *of the past many years later*."  Ex. H at 465:7-21.  Oracle Collections Manager Hatada testified that

12  Oracle's "large" balance of unapplied cash was a "*very, very large problem, the biggest problem*

13  *that anybody in collections or accounts receivable had*."  Ex. E at 78:20-25-79:9.  Other Oracle

14  managers agreed.  Ex. I at 198:10-14.  Documents confirm knowledge of the problem.  Ex. 27 at

15  3042910; Ex. 29 at 1607434-37.

16

17

---

18  [11]    Exs. 21 (**Thomas Weisel**: "Oracle made up for disappointing applications license sales in Q1
19  by posting 66% growth in Q2.  Notable wins at American General, Hewlett Packard . . . highlighted
    solid demand for the company's 11i e-business suite."); 22 at 308891 (**Merrill Lynch**: "Oracle
20  began to show traction again in its applications business, and the company spoke confidently about
    improving its growth in applications through the remainder of FY01. . . . [N]ew wins with HP
21  (thought to be a $20 mil deal) . . . ."); 23 (**Goldman Sachs**: "Oracle delivered strong earnings,
    benefiting from . . . growing traction in the application market fueling applications revenue growth
22  of 66% . . . ."); 24 at 420588 (**Deutsche Banc Alex. Brown**: "Applications license growth of 66%
    solidly outpaced Street expectations in the *50-60% range*.  The outperformance should also allay
23  concerns about the viability of Oracle's applications business and the relative immaturity of release
    11i . . . .").

24  [12]    Oracle's accounting misstatements on December 14, 2000 were also material because they
    allowed Oracle to inflate its forecasts for *3Q01*.  Indeed, on the same day that Oracle issued its false
25  $0.11 earnings results for 2Q01, defendant Henley also issued 3Q01 earnings forecasts of $0.12,
    premising those forecasts on 2Q01 results: "*[H]istorically, the third quarter is slightly better than*
26  *the second quarter.  That's the way, sequentially, it's worked here. . . .  So I would assume, 12*
    *cents would be a reasonable number.*").  Ex. 26 at 234427.  Thus, Oracle's accounting
27  manipulations in 2Q01 allowed the Company to issue 3Q01 earnings forecasts that it knew were
    misleading and significantly undermined by its inflated 2Q01 results.

28

1   Defendants claim that the earnings manipulations were "simple accounting errors by

2   members of Oracle's collections staff." Defs' Mem. at 48-49. However, Executive Committee

3   documents show that the individual defendants knew at the end of 2Q01 that Oracle would not beat

4   Wall Street consensus expectations of $0.10 per share unless it transferred $20 million in customer

5   overpayments and booked the improper swap deal with HP to inflate its revenues and earnings so it

6   could report $0.11 per share. Oracle's executive "Upside Reports" printed on Monday, November

7   27, 2000 (three days before the quarter closed), and December 1, 2000 (the day *after* the quarter

8   closed), show Oracle's actual EPS number for 2Q01 was only 9 cents, with a best case "potential"

9   scenario of *10.34 cents*. Ex. 30 at 1532779; Ex. 7 at 440830. Oracle's top executives admitted that

10  the Upside Reports were reviewed on Mondays each quarter. Exs. H at 179:15-19, 397:24-398:12;

11  31, ¶¶3-4, 31; 32, ¶¶3-5; GG at 127-129; EEE at 105:1-107:5; K at 25:23-26:24, 38:1-40:20; 193 at

12  208835.

13  A December 4, 2000 "Executive Committee" report issued four days *after* 2Q01 closed

14  shows Oracle's actual EPS results based on field-level data was only *9.0 cents* per share, far below

15  what Oracle needed to report 0.11 per share. Ex. 205 at 1532805. On December 5, 2000, Oracle's

16  Upside Report reported an actual earnings result of 9.1 cents with a best-case "potential" number of

17  only *10.22 cents*, far short of the 10.5 cents needed to round up to $0.11. Ex. 33 at 440761. Thus,

18  five days *after* the quarter closed, Oracle's Executive Committee, including defendants Ellison and

19  Henley, were well aware that Oracle had not earned $0.11 and needed to fraudulently pull the

20  money from other sources, which they did.[13] Defendants failed to address these crucial documents.

21  Defs' Mem. at 47-48.

22

23  ───────────────────

24  [13]   On December 8, 2000, the Company's "final version of the Bad Debt Analysis" was e-mailed to Oracle's Senior VP and Controller Minton and VP of Finance Williams, both of whom reported to

25  Henley and the Executive Committee. Ex. 4. The section entitled "Bad Debt Reserve Reconciliation 2QFY01," shows Oracle's final improper $20 million "adjustment" to the bad debt reserve in the "November-00" column. *Id.* at 1610987. The $20 million adjustment allowed Oracle

26  to increase revenue and earnings by reducing its "Total Reserve" balance to approximately $163 million from the inflated $183 million. *See id.*; Exs. 34 at 140463, 140468-69; 1, ¶¶33-38. Minton

27  confirmed that Oracle's process of adjusting the bad debt reserve changed Oracle's revenue account. Ex. EEE at 143:7-12, 143:25-144:10, 216:19-217:3.

28

1    Defendants ignore the evidence demonstrating that during the Class Period, Oracle had a

2  pattern and practice of conducting end-of-the-quarter "clean up drills" to conceal its accounting

3  manipulations, making it appear as if customer overpayments had been properly applied to invoices.

4  According to one e-mail sent during the 2002 Clean Up:

5       The application that I made to invoice 6057195 is definitely a misapplication.  I'm
        not big on intentionally misapplying funds.  **However, being a Feb. 2001**
6       **application, I'm pretty sure I was involved in one of our routine "Q-end unapplied**
        **clean up" drills, as we used to do on the final months of each Q back then.**  Please
7       do unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195.

8  *See* Ex. 35.  Further, on November 6, 2000, the final month of 2Q01, Oracle employees were

9  directed to "resolve as many unapplied items before the end of the quarter," which "would help us in

10 achieving our quarter goal."  Ex. 27 at 3042910.  The e-mail explained:

11      Since we are approaching the end of the quarter, we would like to resolve these items
        as quickly as possible.  **If there is no response by November 20, 2000, we will**
12      **review the items and place them in our reserve account. . . .**

13 *Id.*[14]  These e-mails do not evidence "simple accounting errors" as Oracle contends; they suggest

14 Oracle's deliberate misuse of customer money to inflate earnings.[15]

15              **2.      The 46,000 Debit Memos on November 17, 2000 Raise Genuine**
                        **Issues of Material Fact and Evidence Spoliation**
16
               Although much of the original evidence surrounding the creation of the debit memos has
17
   been withheld, altered and/or destroyed during the 2002 Clean Up, the remaining evidence confirms
18

19 [14]       Incredibly, defendants did not produce this highly relevant and incriminating e-mail until
   April 17, 2007, nearly two full years after the deadline to produce all relevant documents under the
20 Discovery Plan.  Defendants claimed that "*these documents mistakenly never were loaded on to*
   *our database at the time the documents originally were gathered*."  Ex. 36 at 1.  Thus, plaintiffs
21 were severely prejudiced and precluded from using this highly relevant document during the entire
   discovery period.
22
   [15]       Evidence also shows that Oracle intentionally used an "auto-adjustment" process to sweep
23 small amounts of unapplied cash and customer overpayments into its bad debt reserve (Account
   12601).  Ex. B at 205:16-206:11 ("Q.  Is that the only account that the auto adjustments would
24 impact?  A. Other than the unapplied account because *it would be taken out of the unapplied*
   *account and put into the bad debt reserve account*.  Q. Bad debt reserve account.  A. *The 12601.*");
25 *see also id.* at 212:11-23 ("Q.  Some of the money that was in unapplied cash was less than 30 days
   old, which was part of the auto adjustments, right?  A.  Yes.  Q.  *Was Oracle doing these auto*
26 *adjustments prior to May of 2001?*  A.  *Yes.*"); *see also* Ex. 37.  After plaintiffs filed their
   accounting allegations on October 11, 2002, Oracle attempted to shut off the auto-adjustment
27 process.  Ex. 2 at 2 ("Greg, please confirm that ALL ability to move anything to 12601 via On
   Account or creating a Misc receipt write off *has been turned off*.").
28

1    plaintiffs' allegations.  Oracle claims that the "On Account" cash receipts that were applied to debit

2    memos on November 17, 2000, were items that had already been "resolved" and were not available

3    for customer refund.  Defs' Mem. at 43.  This is simply not true.  Documents created by Oracle's

4    own "Unapplied Cash Specialist," stated that the debit memos were customer overpayments that

5    were available for refund.  Ex. 38 (***"All invoices that start with '550' are actually debit memo #'s.***

6    ***These were created to clean up our unapplied account at the time.  They were more than likely***

7    ***overpayments."***); *see also* Ex. 39 (***"All 10 of the invoices that start with '550' are on 'account***

8    ***clean up.'  These funds are available for refund or to apply to future or past due invoices."***).[16]

9    Further, millions of dollars of unapplied cash items that Oracle claims to have been "resolved" were

10   actually reversed, credited, refunded and/or escheated as part of the 2002 Clean Up project.  Exs. 42-

11   45; 46 at 1534169; L at 66:25-67:20; 191-192; 204.  Internal Oracle documents confirm that Oracle

12   reversed and removed over $50 million in improper debit memo customer overpayments that were

13   transferred to the "bad debt reserve.  Exs. 9; 3 at 19-20; 1, ¶¶43-44; 45 (script output database); 46 at

14   1534024, 1534049, 1534169 (journal entries reversing receipts from 12601).[17]

15

16   [16]    Plaintiffs' expert Regan testified that the November 2000 Clean Up of customer
17   overpayments and unapplied cash consisted of creating 46,000+ fictitious debit memo invoices and
     "applying" the "On Account" customer overpayments to the fake invoices.  Ex. 1, ¶¶24-25.
18   Applying the On Account items to a debit memo converted each "unapplied" cash receipt to
     "applied" thereby making it appear in Oracle's books as if the items were legitimately applied to real
19   invoices.  Ex. 1, ¶26.  In fact, the application of customer overpayments to the debit memos caused
     the overpayments to literally disappear from customers' aging reports and allowed Oracle to conceal
20   customer overpayments.  *Compare* Ex. 40 at 313985-86 *to id.* at 313987-89; Ex. 1, ¶27.  This
     improper use of "On Account" was contrary to its intended purpose in Oracle's internal policy
21   manuals.  Ex. 41 at 048672.  Regan specifically cited individual debit memo transactions that were
     improper including customers Ameritrade and K-Force.  Ex. 1, ¶¶47-50.

22   [17]    Oracle's contention that its accounting must have been proper because neither the SEC nor
23   Ernst & Young LLP ("E&Y") took action is meritless.  Defs' Mem. at 44.  E&Y did not review the
     historical transactions underlying the debit memos or the $20 million impact of the bad debt transfers
24   on 2Q01.  Exs. 184 at EY000011; BB at 179:18-180:2, 182:2-9, 209:6-13.  In fact, in the draft
     interview memo that the SLC sent to John Banker, E&Y's senior audit partner, Banker deleted and
25   changed certain language in the memo which improperly misrepresented what E&Y had reviewed
     and concluded, including the representation that "there is nothing in the materials that E&Y
26   reviewed that indicated to E&Y that plaintiffs' claims about the November 17, 2000 debit memos
     had any veracity."  Exs. 184 at EY000011; 185 at EY0000143-46.  Further, there is no evidence the
27   SEC did any formal review of Oracle's accounting and Oracle's October 2003 presentation to the
     SEC withheld key evidence.  Ex. 176.  Oracle told the SEC that the debit memo overpayments,
28   including those for customer Household Finance were refunded "years ago."  *Id.* at 050221.  As
     explained by plaintiffs' expert Regan, that presentation failed to disclosed that Oracle refunded the

1    Further, contrary to defendants' assertion that the "On Account" was merely a "remnant flag"

2    that had no accounting significance, Oracle's VP of Accounting Quinn testified that the unapplied

3    cash items that had been transferred to Account 12601 were put "On Account," Ex. B at 231:24-

4    232:16 ("Q. So are you saying that the movements that you described in bullet point 1, taking

5    unapplied cash receipts to the reserve account first goes to the on account? A. *First goes to the on*

6    *account. That's how they got there. That's how they got to the reserve account*."); *see also* Ex. E

7    at 103:24-104:11 ("[P]utting an amount on account . . . it would erase it from the unapplied account

8    and *move it to the reserve or another account*."). Oracle admitted that the "On Account"

9    designation signaled to Oracle employees "do not touch" the customer funds. Ex. M at 83:1-5. This

10   allowed Oracle to conceal customer overpayments. Ex. 1, ¶¶23, 43-44.[18]

11   Henley supervised the improper 2002 Clean Up. Ex. E at 266:10-21; 105:1-106:3. Minton,

12   Oracle's Controller and Senior VP, testified falsely that she was "not involved in the investigation"

13   and "[did] not know of any details of the investigation," because "*I was told – I think it was*

14   *appropriate for legal to keep me uninvolved in the investigation*." Ex. EEE at 162:23-163:4,

15   174:25-175:19. Minton later changed her story and claimed that she was aware of the "results" of

16   the 2002 Clean Up but was "not involved in the actual underlying investigation itself." *Id*. at

17   278:15-279:20. This was untrue – Henley testified that Minton was involved. Exs. H at 437:1-6 ("I

18   think the people that, first of all, got into more of the detail and reviewed it were our *corporate*

19   *controller, Jennifer Minton,* and the previous corporate controller Tom Williams."); 50 at 313792

20   ("Henley additionally said that *he expected Minton and Williams* to get to the bottom of the issue

21

22   _____

23   same Household debit memos in 2002 and millions of dollars of additional debit memos were
     reversed, refunded and escheated after plaintiffs filed their accounting allegations in October 2002.
     Ex. 1, ¶¶51-54.

24

25   [18]   Oracle affirmatively attempted to conceal overpayments from customers and alter the
     accounting history even when it knew the money should be refunded. Exs. 1, ¶5 nn.10-14; 47 at
     1895745 ("*We actually have the unapplied cash. We never booked the order but the customer*

26   *paid. We want to book it or try to get upper management to agree that we should keep this*
     *money*."). One employee suggest fraud: "If this isn't enough to close out the [purchase order], *could*

27   *it end up in a fire under mysterious circumstances?*" *Id*.; *see also* Exs. 48 at 1886317; 49 at
     1865593.

28

1    and take any necessary action to resolve it."); H at 451:10-17 ("Q. Who at Oracle, in fiscal 2001,

2    would have been responsible for making adjustments to Oracle's bad debt reserve?  A. *Certainly the*

3    *review was done by Jennifer Minton . . . .*").[19]  The totality of the evidence surrounding the 2002

4    Clean Up reinforces scienter.[20]

5                   **3.      Defendants Knew of the Improper HP Transaction**

6            Oracle's recognition of $20 million in revenue from the HP transaction after 2Q01 ended was

7    knowingly false for countless reasons. First, defendants knew that the $20 million in revenue was

8    entirely contingent on Oracle's concurrent $30 million purchase commitment of HP hardware, a

9    classic sign of an improper reciprocal swap deal. On November 9, 2000, Michael DeCesare, Oracle's

10   Area VP closely involved in the HP deal, wrote to defendant Edward Sanderson: "HP confirmed

11   today that they will try and pull the CRM portion of the order off providing we deliver what we have

12   outlined . . . . *Since they don't need ALL the license users right now they are hedging on how big*

13   *an order they will do until they see how much production hardware Oracle comes back with. If*

14   *this turns out to be a large number we could get the entire order.*" Ex. 60 at 055957. On November

15   30, 2000, the last day of 2Q01, George Roberts, an EVP wrote: "I understand Larry [Ellison] and

16   Carly [Fiorina] are discussing their purchase of our products this quarter *if we commit* to purchase

17   $20M-$30M of their product over the next 18-24 months." Ex. 57 at 025018.[21]

18   _____

19   [19]      *See, e.g.*, Exs. 51 at 1727980 ("I have also tried to summarize the open questions *Jennifer*
     *had from our meeting earlier this week* . . . . *Jennifer has initiated a project to cover our work in*
20   *this area* . . . . *Jennifer would like to meet next week on our progress.*"); 54 (*"We have Jennifer's*
     *[Minton] approval to expand the scope of the [escheatment] project up to $20K."*); *see also* Exs. 47
21   at 1895745; 52 at 1733103-105; 53 at 1886329; 187 at 1892686-87.

22   [20]      The full record surrounding the 2002 Clean Up is set forth in plaintiffs' spoliation briefing.
     Ex. 55 at 11-22.  Plaintiffs incorporate all of the evidence contained in Ex. 55 by reference herein.
23   Plaintiffs' expert also set forth in detail the reasons why Oracle's document production on the debit
     memos was incomplete, inaccurate and raised questions of disputed facts about the financial impact
24   of the 46,000 debit memo transactions.  Ex. 1, ¶¶55-61.

25   [21]      Numerous other e-mails confirm the improper reciprocal nature of the transaction.  Ex. 58 at
     028736 ("Given the size of our software sales opportunity, you may want to agree that we'll
26   purchase the [HP] hardware."); Ex. 59 at 020844  ("Consistent with Larry's conversations with
     Carly, HP will expect a purchase order for the following amounts [$20 million]. They will expect
27   this purchase order to be binding and commit Oracle to using the full amounts by the dates we
     promise."); Ex. 60 at 055958; Ex. 61 at 020850-51; Ex. 62 at HP00020 ("These licenses were bought
28   as an 'incentive' for Oracle to help us increase HP's revenue.").  Indeed, defendant Sanderson

1      The HP deal was knowingly improper for additional reasons: (i) the deal was not signed and

2   executed until after midnight on November 30, 2000, the last day of 2Q01 (Ex. 1, ¶¶97-101; Ex. 180

3   at 260105, 260118, 260120-21); (ii) Oracle had to agree to $30 million in cash, purchases or a

4   cancellation fee before HP would commit (Ex. 57); (iii) Oracle never delivered the product and

5   functionality promised (Ex. 1, ¶¶112, 114-117; Ex. 188), and (iv) the deal was re-signed after 2Q01.

6   Exs. 181 at 259035-038; 183 at 257416 ("This is a reapproval request for a Q2 deal that didn't

7   close.").[22]  Further, contrary to defendants' contentions, Oracle did not provide its outside auditor

8   Arthur Andersen LLP ("AA"), or its Audit Committee with the facts necessary to determine proper

9   revenue recognition under GAAP, including evidence of the reciprocal commitments and

10  concessions.  *See* Exs. 59 at 020845; P at 328:21-330:5, 332:7-334:1, 338:19-340:21, 343:20-25.

11  AA approved the deal without reviewing crucial evidence and there is no evidence showing that the

12  Audit Committee reviewed or approved the deal prior to January 5, 2001.  Ex. 182 at 081713,

13  081755.  All of these facts demonstrate that the HP transaction was knowingly improper.[23]

14      **E.      Evidence Submitted by Defendants Themselves Cripples Their**
               **Motion for Judgment on 11i Claims**

15      Defendants never identify which false statements they contend cannot be proven.  Nor do

16  they detail any admissible undisputed facts which supports their contention.  Defendants do not

17  mention the false statements that "suite [11i was] pre-integrated and fully interoperable out of the

18

19  _____

20  admitted to writing the following handwritten notes on an HP transactional document: ***"THE REAL
    STORY . . . Is this the way we are going to do deals. Each has to buy something [from each
    other]!."*** Exs. K at 521; 63 at 020839; N at 59:18-21, 62:3-6.

21

22  [22]    Ellison, Henley and Oracle's Board of Directors held a "Special Meeting" on the last day of
    2Q01 to specifically "authorize" the HP transaction which it knew was contingent upon Oracle's $30
    million purchase from HP.  Ex. 64 at 044458. Numerous documents and deposition testimony

23  confirm that defendant Ellison was personally involved in negotiating the deal. Exs. O at 112:6-8;
    K at 503:2-5; N at 60:23-61:1, 62:10-13 ("[A]ll the players that are involved in this. This is

24  something that Sandy knew about it, it's something that Larry knew directly about . . . .").

25  [23]    There are also numerous disputed facts that were raised by O'Bryan's expert opinion on the
    HP transaction. In his opening report, O'Bryan provided a single paragraph opinion that he admitted

26  was "light." Exs. 3 at 41; A at 56:8-22.  O'Bryan subsequently tried to cure his unsupported opinion
    by relying on new documents related to the HP transaction that were never produced to plaintiffs or

27  their expert until ***after*** rebuttal expert reports were exchanged. Ex. 16 at 16-17. These facts establish
    genuine disputes that cannot be decided as a matter of law.

28

1   box." *See* Ex. 12 at 58, 63.  Nor does their motion for summary judgment mention statements that

2   Suite 11i was "Plug and Play" and "up and running in months.  You get the savings in months.  It

3   costs you less, and it takes less time to install." *Id.* at 50, 68.  Defendants do not address at all,

4   specific statements that Suite 11i, including Oracle's CRM was "complete," that it "worked in every

5   country, in every language." *Id.* at 63.  Instead, defendants manufacture statements, attribute them to

6   plaintiffs then assert that they cannot be proven.  *See* Defs' Mem. at 37 ("Plaintiffs cannot prove that

7   Suite 11i was somehow defective.").  Plaintiffs have not explained how 11i was so defective that "it

8   was like a car without wheels." *Id.* at 39.[24]  Plaintiffs never alleged that 11i was "defective" like a

9   "car without wheels." *Id.* at 37.  Defendants concede that plaintiffs have identified "a few dozen"

10  11i customers experiencing costly 11i defects due to poor quality or lack of stability. *Id.* at 39.

11  Defendants incorrectly suggest more is necessary to defeat summary judgment. *Id.*  (11i defects

12  experienced by customer have not been shown to be indications of a broader population).  However,

13  the failure of Suite 11i to function in the manner Oracle represented – creating a disputed issue of

14  fact – is unequivocally demonstrated by evidence of failed or failing 11i implementations,

15  deteriorating consulting margins, customer concessions, refunds and threatened lawsuits – all as a

16  direct result of 11i defects.  Exs. 72, 74, 80, 86, 119.  Moreover, a "few dozen" customers

17  experiencing effects of 11i's defects during the Class Period is nearly **half** of the claimed 85

18  customers purported to have been "***live***" on Suite 11i as of December 14, 2000.  *See* Declaration of

19  Mary Ann Anthony ("Anthony Decl."), Exs. 44-45, 48, 53; *see also* Declaration of Matthew D.

20  Harrison ("Harrison Decl."), Ex. 192.  Defendants add that there were 11i "success stories," using a

21  "wide range of modules" including CRM and ERP.  Defs' Mem. at 36, n.22.[25]  This is far from

22

---

23  [24]     Defendants' assertion that plaintiffs cannot prove that 11i had more bugs than "competing"
   products is irrelevant. *Id.* at 38.  Even according to defendants, there were no competing software
24  offerings.  Oracle is "***the only vendor***" to offer such a suite of "***tightly integrated*** [applications],"
   including ERP and CRM.  Exs. 66-67; *see also* Defs' Mem. at 17, 39.  Defendants also make the
25  bald assertion that "not every [defect] bug affected every customer." Defs' Mem. at 39.  Even if that
   were true, so what?  Defendants do not explain what relevance this might have, whether it is
26  disputed fact or whether it shows the absence of one.

27  [25]     Defendants incorrectly assert that plaintiffs do not deny that Suite 11i was "integrated as
   compared to best of breed products from different vendors." Defs' Mem. at 39.  The evidence shows
28  that in fact 11i simply was not pre-not integrated and fully interoperable as represented and

1    undisputed and false in any event.  For example, Oracle says that by February 2001, "Imation was

2    *live* on 11i using multiple European countries" and "the United States, includ[ing] the 11i Order

3    Management module."  *Id.* at 36, n.22, 37.[26]  Even as late as May 2001, Oracle sought to pacify

4    Imation with huge discounts because: "[T]he R11i software as released didn't work; they have

5    compromised there [sic] reputation with the SEC associated with a write-off for the upgrade to R11i

6    that couldn't happen due to product quality issues; . . . Imation's cost to upgrade $6.5M which the

7    CEO states the majority of cost is to fix a product that should not have been released; . . . poor

8    product quality (many products didn't work, 1000's of patches) . . . is unacceptable." Ex. 68.[27]

9        Defendants claim that increasing numbers of "*live*" customers on 11i demonstrates plaintiffs'

10   inability to prove falsity is similar to the misleading representations during the Class Period.  Defs'

11   Mem. at 21 (customers "*live*" on 11i grew from 85 to 200, by the end of the Class Period); *see also*

12   Anthony Decl.   However, Oracle's many so-called "*live*" customers were in fact experiencing

13   massive 11i defects and demanded refunds or free services from Oracle as a result of 11i defects.

14   Oracle claims that ValueVision was "*live*" as of December 13, 2000.  Anthony Decl. at 44; *see also*

15   Ex. 73.  But, ValueVision demanded nearly *$1.5 million* in refunds because of 11i defects and

16   instability.  Exs. 74; 114 at 25.  Papa John's was publicly reported "*live*" on 11i as of December 15,

17   2000.  Harrison Decl. at 173.[28]  But, Papa John's implementation cost Oracle $632,000 because of

18   11i.  Ex. 114 at 25.  Ingersoll Rand was claiming publicly to have been "*live*" in December 2000.

19   Harrison Decl. at 173; Anthony Decl. at 44; *see also* Ex. 72.  However, Oracle had to pay Ingersoll

20

---

21   "expose[d] [Oracle's 11i] development environment as 'best of breed' rather than one unified"
     solution.  Ex. 149 at 069913.

22   [26]    In support of this contention, defendants submit the Anthony Decl. which purports to have
23   been keeping track of "live" customers on 11i.  The documents are disputed and the facts defendants
     assert are demonstrably wrong.

24   [27]    Defendants also say POSCO was a successful 11i customer in *September 2001* – ten months
25   after the beginning of the Class Period.  Defs' Mem. at 36.  Moreover, even in June 2001, POSCO
     was experiencing "showstopper" bugs and had already applied *674* patches to the ERP alone.
26   Exs. 69-70.

27   [28]    In March 2001, Papa John's was in "crisis mode" of getting 11i installed.  Exs. 75-76 ("[Papa
     John's] feels as though they have paid for some amount of 'fixing bad software.'").

28

1    Rand $2 million due to 11i defects.  Exs. 77; 114 at 24.  Zap Media was reported as "live" as of

2    December 13, 2000.  Anthony Decl. at 44.  But, Zap Media implementation cost Oracle $553,000

3    due to 11i defects.  Ex. 114 at 25.  New Zealand Dairy is claimed to have been a "*live*" customer as

4    of December 13, 2000.  Anthony Decl., Exs. 44-46.  But on January 31, 2001, New Zealand Dairy

5    was reportedly "voic[ing] loud concern over the poor quality of [their] 11i implementation."  *See* Ex.

6    79.  Chipotle Mexican Grill was publicly reported as "*live*" on December 15, 2000.  Ex. 81.  But,

7    Chipotle had massive technical difficulties with 11i, and ordered Oracle not to reference them as a

8    customer "*until the 'reality meets the hype.*'"  Ex. 80.  In February 2001, UPS was reported as

9    starting to go "live" on 11i Order Management.  Ex. 84.  But even in June 2001, UPS' 11i "OM

10   [Order Management] installation [was] at the point of *meltdown*" due to 11i defects.  *See* Exs. 82-83;

11   *see also* Anthony Decl., Ex. 46.[29]  These facts, which cannot be disputed wholly undermine Oracle's

12   motion for summary judgment.[30]

13         The declaration of Greg Seiden is equally unavailing.  Rather than demonstrate the absence

14   of disputed facts, Seiden corroborates admissions of Ron Wohl who testified to the lack of 11i

15   integration and testing, resulting in gaps and poor quantity.  *See also* Ex. R at 217-219; *compare* Ex.

16   91, ¶4 ("[M]y team performed high-level quality assurance, or 'QA,' audits to test the

17   integration. . . .  *This . . . was not a substitute for the integration testing* . . . .").  Wohl, Seiden's

18   boss, testified that "Quality Assurance" for 11i, Seiden's responsibility, failed too: "*[O]ur QA . . .*

19   *procedures didn't work . . . .*"  Ex. 17 at 203.  As to whether 11i worked in "every language," Seiden

20

21   _____

22   [29]    On December 1, 2000, Xerox, due to 11i's instability sought recovery from Oracle of
      $390,000 in consulting fees because of their costs debugging 11i Oracle software.  Apart from the
23   lack of stability of 11i, defendant Henley knew that Xerox had been substantially impacted by the
      slowing economy, laid off thousands of employees in November 2000 and sought extended payment
24   term because of it.  Ex. 197 ("Xerox is under heavy cost cutting pressure and [extended payment
      terms] will ease their economic burden in 2001 . . . ."); *see* Exs. 86 at 169718 ("At this time we have
25   put in every available patch for CRM up to 10/17 (this is over 100 CRM patches in the last 2-1/2
      weeks!) . . . .  Xerox is threatening to write a letter to Larry and will be asking for their money
26   back."); 114 at 24.

      [30]    The same analysis requires the exclusion and disregard of any argument or reference that
27   Oracle saved $1 billion by implementing Suite 11i.  Oracle had no objective evidence that the
      software saved money.  *See* Exs. 87-90.

28

1    makes blanket assertions, unsupported by *any* factual evidence other than his word and never says

2    that 11i actually "worked" in every language.  It did not.  *See* Exs. 149, 152-153.  Finally, Seiden

3    attempts to explain away clear evidence that even though on December 14, 2000 and prior, Oracle

4    said Suite 11i was "pre-integrated and fully interoperable out of the box," in truth it was not until the

5    third version of 11i in January 2001 that the Company issued their "***first integrated ERP/CRM***

6    ***release***" of 11i.  *See* Exs. 91 at 5; 92 at 028638.  The Declaration of Alan J. Fletcher ("Fletcher

7    Decl.") does not help either.  Alan Fletcher agrees that so called "business flow audits" "did not

8    serve as a substitute for ***extensive integration testing***."  Fletcher Decl. at 4.  Further, Fletcher

9    contradicts evidence that "regression testing" was not done.  *See* Exs. 148-149 (patches being

10   released without being tested in 2001). Fletcher further concedes that after the Class Period, the

11   Company had to buy a "third party program from Mercury Interactive" to do regression testing.

12   Fletcher Decl., ¶17.  Fletcher merely highlights facts that are clearly in dispute *i.e.*, the meaning of

13   tars and bugs.  *See* Exs. 74, 101, 148, 185.  Defendants' declarations are factually weak and ignore

14   documentary evidence that contradict them.

15        **F.    Suite 11i Did Not "Work" as Represented, Did Not Save Customers**
               **Money Fast and Had Proven Difficult and Costly to Implement**

16

17        During the Class Period, Oracle had ***not***  "delivered" 11i and it was neither easy to

18   implement nor saving money in a slowing economy. [31]  Customers attempting to implement 11i

19   demanded millions of dollars of concessions from Oracle citing defects and lack of functionality in

20   Suite 11i.  Others lodged complaints ranging from poor quality, lack of testing, instability, to too

21   many bugs.  Liberty Mutual Group, wrote directly to Ellison detailing "basic functionality" flaws

22   with Suite 11i.  Ex. 94 ("To put it bluntly, we have encountered multiple software quality

23   problems . . . . [T]he bottom line is that we have a product that ***does not work*** . . . ."); *see also*

24   Exs. 95-96. On December 16, 2000, Pepsi Co. wrote Ellison: "***Our Oracle [11i] project has been an***

25

26   _____

     [31]    One is left puzzled as to how Oracle could have properly recognized revenue on 11i software
27   licenses in 1Q01-3Q01 under AICPA SOP 97-2, which requires evidence of 1) arrangement; 2)
     delivery; 3) fixed and determinable fee; and 4) collectability is reasonably assured.  All must be
28   satisfied to before revenue on a software license is properly recognized.  AICPA SOP 97-2.

1   *unmitigated disaster* . . . ." Ex. 97.  Appstech.com wrote to Ellison about a failing implementation

2   of Suite 11i ("[W]e ordered R11i Financials for our internal use. . . . *We have never been able to*

3   *implement it and have decided to return it*"). Ex. 98 at 012414. *"We have [also] lost close to $200K*

4   *so far on our implementation of 11i for Brock Tool."*  Ex. 99 at 35244; *see also* Ex. 99 at 035263-

5   64.   Paxar refused to pay nearly $2 million in fees and threatened legal action "after hundreds of

6   patches and a significant number of severity 1 bugs."  Ex. 100 at 039327; *see also* Ex. 75.  News

7   America Marketing purchased 11i in 1Q01. In January 2001, Oracle sales staff summarized their

8   experience as follows:  The "[m]ajor issue is that CRM and Order Management are *not integrated as*

9   *we told them. . . . Customer is really upset mostly about the lack of integration* . . . ." Ex. 101.

10        TMP Worldwide wrote to Oracle in January 2001 that "Oracle's software is still not ready for

11   production. . . .  TMP spent $1,780,000 on the financials software and another $719,520 for the HR

12   system, which is also unusable at this time." Ex. 102.  On January 25, 2001, Chipotle had "major

13   performance problems with 11i as well as . . . feature/function gaps." Ex. 104.  These problems put

14   a large deal with McDonald's at risk. Ex. 80.  On March 22, 2001, Chipotle removed itself from the

15   reference program: "*We have decided to suspend any participation in Oracle PR*

16   *initiatives . . . . The hype doesn't meet reality. . . .*" Ex. 103.  Before the Class Period, Keith Block

17   told Sanderson that Suite 11i quality problems would "*significantly*" impact sales and consulting

18   revenues, and had already cost his support division millions in free consulting.  Exs. 107-108.

19   BellSouth, another 11i customer, cost Oracle millions in free consulting.  In January, 2001, Bill

20   Baghsaw forwarded Wohl an e-mail describing "6000" 11i CRM patches at BellSouth ("[T]hey do

21   not see how any one could survive without automating this process, . . . in light of how 'broken' 11i

22   is."). Exs. 109, Q at 68:7-70:22.  Though Ellison had bragged of 11i's implementation at General

23   Electric Company ("GE"), in January and February 2001, GE experienced 11i problems as well.  Ex.

24   110 at 052637.  On March 8, 2001, Gary Reiner of GE wrote Ellison again directly, "We are still

25   having very significant problems with the 11i roll out of Indirect Procurement. . . .  They have

26   caused us to halt continuation of the roll out until they are fixed." Ex. 111.  On January 25, 2001,

27   Sanderson was informed of another failing implementation at Hudson Bay ("We have a product

28   quality problem at Hudson's Bay . . . . [T]he customer is threatening to: pull out SSE due to product

1    instability and look to Oracle to recover product and implementation costs."). Ex. 112. Even after

2    the Class Period, Mark Barrenechea wrote: "From 11i.1 to 11i.3 CRM – [t]oo many patches,

3    [i]mplementations too costly, [i]ncomplete, thus complex." Ex. 113.

4            By April 2001, Suite 11i product defects had resulted in a two-point deterioration of FY01

5    margin percentage and ***$21 million*** in unbilled consulting revenue. Ex. 114; *see also* Ex. K at 187:8-

6    10. In May 2001, Dave Natelson described 11i implementations at the City of San Diego: "The

7    customer upgraded from 11.0 to 11i when 11i shipped and we have been fighting 11i fires all year."

8    Ex. 115. With respect to the business overall, Natelson wrote, "***failed [11i] implementations are***

9    ***putting us out of business***." *Id.* Dick Sellers, Group VP of the Company's support organization in

10   2001 outlined some of customer credits to be issued to 11i customers due to technical problems.

11   Some of those customers had been reported as "***live***." For example, Oracle had to give Beckman

12   Coulter ***$1 million*** in credits due to 11i. Ex. 116. The others include GE Aircraft Engines and

13   American Trans Air. *Id.*; Anthony Decl. at 44. Indeed, rather than being a technical and marketplace

14   success, Suite 11i cost Oracle and its customers millions. Ellison agreed ("Our top priority is to get

15   Oracle users . . . 'delighted' with the quality and functionality [of] our [11i] CRM products. Until

16   that happens, I doubt we will achieve success in the market."). Ex. 117.[32] A post-mortem of 3Q01

17   by SVP Nugent to Oracle's managers described issues with 11i ("***Our products*** . . . . ***Bad News. 11i***

18   ***quality issues, lack of references/demo issues***."). Ex. 171 at 179355; *see also* Ex. 120. In July

19   2001, Mark Jarvis, the Company's head of marketing wrote: "***[U]nless we make our revenue***

20   ***numbers in Q1[02], executives stop leaving and we get 11i customers that actually save money . . .,***

21   ***no journalist is going to care. . . . We are going through a rough patch because 11i did not work***

22   ***. . . .***" Ex. 119.[33]

23   _____

24   [32]    On March 26, 2001, Mark Jarvis wrote Safra Catz, Barrenechea and Wohl, "We are being hit
         on all sides by the press on 11i quality – the bugs in the software (generally quoted as more than
25   ***5000 bugs***) have started a flurry of press articles about how IBM's approach of integration is better
         than our approach of soup to nuts." Ex. 118.

26   [33]    Edward Yourdon did not offer an opinion on whether any Suite 11i customer actually saved
27   any money months after implementing Suite 11i. Ex. S at 89:1-11 ("I don't recall offering my own
         opinion about the savings in months."). Ex. 202, ¶¶12, 143.

28

1    In December 2001, Chuck Phillips of Morgan Stanley, one of the Company's biggest analyst

2    supporters wrote Henley, Wohl and Barrenechea about 11i, stating, "two of the most influential

3    analysts at key firms are decidedly negative on the quality of the apps suite [11i] and . . . I can see

4    why." Ex. 195.  Phillips was specifically citing to a customer using 11i "fairly out of the box" with

5    more than 100 severity 1 tars causing "manual workarounds, financial adjustments and general

6    pain." *Id.*  According to Charles Kendig, VP of Quality and Customer Satisfaction, Suite 11i created

7    a "Big Quality Black Eye for Oracle."  Ex. 121 at 621428.

8    **G.      Suite 11i's Lack of Integration and Poor Quality Caused
              Demonstration Failures and Lost Sales**

9

10   Due to 11i's defects impacting quality, integration and stability, the Company could not even

11   demonstrate a working and fully integrated Suite 11i.  In December 2000, Oracle told investors it

12   had fixed demos ("we got those all ready now").  Ex. 26 at 234436.[34]  However, failure to

13   demonstrate an integrated suite of 11i resulted in lost deals to large customers: "We cannot show

14   what the customer wants to see when it comes to the  combination of CRM and ERP; Not only have

15   we lost deals in which we were the new player, many deals have been lost with installed base

16   customers."  Ex. 12; *see also* Exs. 123-125.  Sales consultants were "***essentially doing integration***

17   ***work in the field***."   Ex. U at 81:1-6; *see also* Ex. 124 ("lack of integration between IP and

18   Purchasing was inconvenient since we could not show the entire flow without using fake data").  In

19   February 2001, the Company still could not "[p]rove our EBusiness Suite Integration Story" in

20   demonstrations.  Ex. 127 at 617971; *see also id.* ("***[we] cannot show a complete integrated CRM***

21   ***demo let alone a complete EBiz Suite (CRM/ERP) integrated demo***").   Throughout the Class

22   Period, Oracle continued to lose sales due to failing  Suite 11i in demonstrations.  *See* Ex. 131

23   ("[a]nother deal lost primarily to demo system performance").  On January 30, 2001, Barrenechea

24   wrote Ellison and Wohl, "we have blown AppsWorld Paris for 11i CRM html demos."  Ex. 199.

25   Henley understood that if 11i application demonstrations "[did] not improve, it [would] ***continue to***

26   ─────────────────────
     [34]      Securities analysts had reported on December 15, 2000 after 2Q01 financial results, that

27   "functional product demos . . . on the eBusiness Suite should propel growth in the applications
     division going forward."  Ex. 129 at 308932; *see also* Ex. 26 at 234436.

28

1   *impact our [sales] conversion rate*." Ex. 133; *see also* Ex. H at 400:1-3.  Roberts confirmed that "*if*

2   *you can't give a good demo, then you are not going to win as much business*." Ex. V at 301:17-23,

3   176:1-5.  In April 2001, Oracle still had not fixed integration gaps between ERP and CRM.  Exs.

4   128, 134, 137; *see also* Exs. H at 400-402; 138 ("*[W]e have halted the demonstration to Schneiders*

5   *. . . problems with the functionality of the software, integration between OM and OPM . . . .*").

6   These facts created a genuine issue of material fact concerning the accuracy of defendants'

7   statements regarding 11i's functionality, ease of implementation and integration and interoperability.

8           **H.**    **Suite 11i Was Not Integrated and Interoperable Out of the Box, Nor**
                **Was It Designed and Engineered to Be and Was Not Tested**

9

10           Defendants claimed that because Suite 11i was pre-integrated and operable out of the box, no

    systems integration would be required.  Ex. 12, ¶¶50, 58, 63.  Oracle's Area VP DeCesare testified

11   that Suite 11i did ***not work out of the box*** in part because it was not engineered to work together.

12   Ex. N at 234:24-25 ("*It does not operate as integrated out of the box.  That's – that's false.*"); *id.* at

13   237:10-13 ("*Ron Wohl still ran ERP.  Mark Barrenechea ran CRM.  They didn't communicate*

14   *very effectively.  There is noting more – more integrated or coordinated about 11i than there was*

15   *about the previous releases.*"); *see id*. at 234:17-253:3, 236:17-237:13, 239:7-10, 252:12-14.  Suite

16   11i modules, built by separate organizations, were never fully tested against one another (a critical

17   component of engineering) to determine whether the suite modules actually functioned in an

18   integrated fashion.  Ex. 40 at 295346.  Three months after the release of 11i, in August 2000, Sergio

19   Giacolletto, in reaction to internal cheerleading about "*live*" customers, demanded to know from

20   Wohl "*precisely* which modules are running in each customer.  *We have a hard time to believe they*

21   *have ERP and CRM running together*." Ex. 139 (emphasis in original).  Wohl confirmed that none

22   were.  *Id.*  Oracle did not fully test for integration and certainly not whether it could do so "***out of the***

23   ***box***" as represented.  Wohl connected integration defects to lack of testing and separate engineering

24   groups, especially the integration points at the boundary between the ERP and CRM modules.  Ex. R

25   at 106:14-21 ("In terms of the interaction between the groups, clearly in retrospect as well, just as

26   there should have been more testing of the ERP product stand-alone, there should have been more

27   testing of the CRM product stand-alone, there should have been more testing of the boundary points

28

1   between ERP and CRM, and there should have been better – there should have been better

2   coordination of processes.").  The admitted lack of testing evident here resulted in the software not

3   being "fully integrated" or "fully interoperable" out of the box.  Ex. S at 56:25-57:5 ("The overall

4   process of software engineering [includes] design/architecture, coding . . . creation of database

5   tables, testing . . .  deployment and so forth.").[35]   According to Yourdon, integration bugs, bugs

6   "associated with the interface between components of a system," are found by doing integration

7   testing.  *Id*. at 212:11-12;[36] *see also* Ex. Y (Clifford Godwin's corroboration that no individual or

8   group was responsible for the critical ERP/CRM integration.).  Wohl also admits that "he knew little

9   about CRM" at the time Suite 11i was released: (*"I had very limited information about the testing*

10   *completeness of CRM."*).   Exs. 145; R at 79:24-82:23.   Barrenechea offered less.   Order

11   Management, the key module necessary for Suite 11i CRM and ERP to work in an integrated fashion

12   (Exs. 17, 67) was not fully tested either.  Ex. 17 at 192 (*"We had just finished a complete rewrite of*

13   *our order management system. . . . [B]ut it hadn't been tested yet so. . . ."*).[37]   11i Order

14   Management "hadn't been used anywhere it had just been finished, *the paint was drying*."  Ex. 146

15   at 1529167.   Order Management bugs and defects were pervasive in their impact on 11i's

16   functionality.  *See generally* Ex. 201.  As late as July 2001, Oracle was still shipping Suite 11i and

17   patches *without integration testing*.  Exs. 147-148.  Don Klaiss warned of the problem about the

18   Company's inability to test integration: "We do not have a system where complete integrated

19   systems testing for the whole ERP/CRM suite can take place . . . that can prove that all of the

20   _____

21   [35]      P1 severity bugs, *i.e.*, showstopper bugs, also delayed many "go lives" for 11i NT operating
        system customers, and Oracle was dropped by customers who were seeking damages. Exs. 140-141
22   ("Customers using these products should not go live with 11i until a fix is available."). On February
        6, 2001, Wohl warned Ellison about quality complaints regarding: 11i for NT systems "we will get
23   at the Appsworlds . . . . Some customers may ask us why we didn't withdraw the product from the
        market once we became aware of the problem." Ex. 143.

24   [36]      As alleged, Oracle developers told consultants "do not install" patches that could destabilize
25   demonstration systems. Exs. 144; W at 243:10.

26   [37]      In a January 18, 2002 interview with Matthew Symonds, author of *Softwar an Intimate
        Portrait of Larry Ellison and Oracle*, Ellison is quoted as follows regarding Order Management, "Oh
27   I knew there was a huge risk up front . . . .  I can't plead ignorance on this . . . ."  Ex. 146 at
        1529168.

28

1  integrated flows."  Exs. 147 at 056441; *see also id.* at 056440 (**"Today's situation is that we cannot**

2  **test integrated business flows prior to customer shipment.  We are releasing new ERP & CRM**

3  **Family Packs regularly but do not test them against each other – clearly a bad situation."**); 148.[38]

4  Two years after the release of 11i, in 2002, Oracle engineers concluded that 11i's integration

5  and technical gaps were "so fundamental that, it exposes [Oracle's] development environment as

6  'best of breed' rather than one [of a] unified software vendor."  Ex. 149 at 069913.  The report noted

7  that fixing "Integration Issues" between ERP and CRM was critical for Oracle to "overcome the lack

8  of integration between the E-Business Suite Modules (ERP/CRM)."  *Id.* at 069920; *see also id.* at

9  069922 (**"The capabilities to perform an integrated planning in the E-Business Suite is broken."**);

10  *id.* at 069925 (**"The integration between HRMS / Payroll and CRM is not complete."**).  Indeed, in

11  2002, CRM and ERP still lacked a common User Interface in design and functionality ("Within the

12  different teams (CRM/ERP) the development is drifting in different directions.  This is the case due

13  to the underlying technology differences . . . but also due to different approaches in the UI design.")

14  *Id.* at 069929.  Ellison admits that "[N]ot all the pieces [of Oracle 11i] worked together as well as

15  they could have. . . .  Using that plug [and play] analogy, you know, there would be the receptacle

16  but no prong in one of the plugs, just – it was a pretty new product. You know, the plug wasn't

17  complete."  Ex. J at 534:4-9, 535:14-21.

18  ValueVision, previously reported as "*live*," summed up lack of testing, inability of CRM and

19  ERP to function in an integrated fashion, 11i defects and lack of interoperability:

20  [W]e have been struggling and continue to struggle is with ***the stability of the CRM
   and ERP applications, the level of integration between CRM and ERP***.  Since June

21  of last year, we have applied no fewer than ***2,000 patches to the system and the pace
   continues unabated.  We have documented our costs for patching alone at nearly***

22  ***$1.3 million***.

23

24

---

25  [38]    Defendants also suggest without any authority that plaintiffs must show that 11i had more
   defects than one would expect from a "typical" application suite or competing products.  Defs' Mem.

26  at 38.  They never address the fact that Oracle excluded 11i from "competing" products, never
   identify what is "typical application suite" nor do they address the fact whether it was bugs, gaps,

27  lack of integration, lack of completeness, or failure to perform in every language, each of these
   factors which were known to defendants, and materially impacted sales.

28

> *It appears evident that there has been a gross lack of coordination between the CRM and ERP development organizations.  We have identified significant gaps in the integration of the applications throughout our project again delaying our progress.*

- We estimate the financial impact to ValueVision to be $5 million. . . .  Ex. 74.

Finally, Yourdon admittedly never analyzed whether the suite was integrated in terms of user "interface integration" or "functional integration," two of the four forms of integration he identified as necessary for full integration.  *See* Ex. 202 at 36 n.38; *see* Ex. S at 236:17-22, 238:5-7 ("I have not evaluated the functional integration characteristics or capabilities of Suite 11i or the user interface capabilities.").

**I.      Suite 11i Did Not Work in Every Language as Represented**

Oracle said Suite 11i "worked" in "every country and every language."  Exs. 151 at 4; 155 at 106691; 156 at 03285.  Suite 11i did ***not work*** in every language, and it hurt sales.  At the end of 2Q01, sales staff in Europe, Middle East, and Africa were unwilling or unable to sell Suite 11i effectively because of product defects and incomplete language translations (***"[W]e are loosing [sic] a bit of momentum; sales people are reluctant to engage to the product problems, lack of references and local language issues. . . . Hopefully the situation will turn in January once we get 11.5.3 running in local language."***).  Ex. 152.  A January 21, 2001 e-mail from Giacolletto to Ellison stressed the need to get the language issues in Suite 11i to work in order to "grow revenue" ("NLS will not be fully translated including help until May 2001 for the first languages and August 2001 for the last language").  Ex. 153.  It is no surprise that on March 15, 2001, the Company reported that EMEA had exceptionally weak 11i application results.  Ex. 203 at 050623.  Even later, 11i still had not been translated into many languages (***"R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will only get it between July and October 2001."***).  Ex. 154 at 162215.[39]  Wohl admittedly did not translate every module into every language.  Ex. R at 220:13-15.  As demonstrated by an Oracle 2002 High Level Technical Requirements Document,

---

[39]     SVP Clifford Godwin conceded that Oracle did not deliver translated applications with the release that would allow the software to work in multiple or every language.  Ex. Y at 136-38.

Suite 11i was not built with the architectural capability to work in *every* language.  "[L]ack of multibyte support across the various front-office systems is going to be a significant impediment to our success in China, Taiwan, Korea and Japan." Ex. 149 at 069921, 069930.  The document further noted, "*[t]he lack of functionality within projects, for example, severely impacts the ability to successfully deploy a global solution involving projects spanning multiple countries with multiple languages*." *Id.* at 069938.  Ellison admits that Suite 11i did not in fact work in every language: "*I suppose, to make it very precise, it should say every major country. . . . [Y]ou can take exception that it was general rather than – general and imprecise, and it didn't work . . . .*" Ex. J at 131:9-21.

**J.    Oracle's Internal 11i Implementation Was Costly Due to Defects and Lack of Functionality and Contributed to 3Q01 Revenue Shortfall**

Defendants' claim that Oracle itself "upgraded to significant portions of the Suite [11i]" cannot support their motion. Defs' Mem. at 37.  Oracle fails to acknowledge the Suite 11i upgrade – including 11i's OM caused the Company to experience much of the same technical difficulties experienced by its customers.  Barrenechea stated "What happened was one of the most dramatic moments I'd seen during my five years at Oracle.  Everyone knew that we could not place an order with the new system. . . .  So we upgraded [to 11i], and Oracle went down.  We were down for fourteen days. . . .  It was frightening. . . .  At that point I became acutely aware of the customer dissatisfaction . . . ." Exs. 17 at 196; 157-158.  In November 2000,  Barrenechea wrote an e-mail discussing 11i and the upgrade received by Ellison and Henley stating "11.5.2 upgrade CD has been broken until this week.  Yup, the 11.5.2 CD does not work out of the box for upgrades."  Ex. 85. Barrenechea communicated further about 11i: "*The bug counts are at an 11 week high . . . 18 OM, P1s, 40 P2s . . . no real performance testing.*"  Ex. 85.  Oracle's January 2001 upgrade to Suite 11i left Oracle's financial staff unable to properly track sales of support renewals in the new 11i software.  Ex. 160.  By January 24, 2001, the problems with the internal upgrade impacted forecasting for multiple reporting lines.  Sharon Prosser wrote in an e-mail sent to Wohl: "[w]e are starting to feel the impact across all area(s) of our business (GB, Majors, OPI, OSI) on the forecast because of the reporting limitations with R11i Order Management."  Ex. 161.  The lack of

1   functionality caused the Company to lose millions in revenues in 3Q01.  *See, e.g.*, Exs. 164-166.  On

2   February 15, 2001, Minton wrote Barrenechea the following:

> Mark –The support organization missed their Dec and Jan revenue forecast by $20
> million dollars, and are seriously at risk of missing additional support revenue in the
> month of February if we do not get immediate visibility to the status of support
> contracts up for renewal.  We cannot afford to miss our revenue forecast this
> quarter. . . .  Ex. 165 at 101417-18.

6   On February 19, 2001, Henley, in response to a Minton e-mail on the issue, wrote: "[s]eems

7   like a disaster based on the large drop in support revenue growth for Q3[01] . . . .  We'll need an

8   extraordinary effort until we get caught up – I doubt we can catch up in time for Q3 . . . ."  Ex. 166.

9   According to the SLC, "***Oracle's business may have been affected by the internal implementation***

10  ***of Suite 11i. . . . First, it is possible that the implementation of the OKS module of Suite 11i***

11  ***contributed to a shortfall in Support revenue in Q3 FY 2001***. . . ."  Ex. 40 at 295356.  Knowing

12  these facts, on February 20 and 21, 2001, defendants specifically reiterated the Company's revenue

13  and earnings forecast including 75% applications growth failing to disclose that the internal

14  implementation was likely causing a substantial revenue decline. Exs. 162-163. Oracle's CRM

15  Technical Whitepaper had bragged about Suite 11i's CRM completeness and capability of managing

16  their global forecast "***including all licenses, product renewals, support contracts***."  Ex. 155 at

17  106694.

### K.   Defendants' Public Guidance Had No Reasonable Basis – Known Undisclosed Facts Seriously Undermined Its Accuracy

A projection is actionable "'if (1) [it] is not actually believed, (2) there is no reasonable basis

for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine [its]

accuracy.'"  *Provenz*, 102 F.3d at 1487; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001).

### 1.   There Was Never a Reasonable Basis for Oracle's Guidance

On December 14, 2000, Oracle issued 3Q01 guidance: 25% revenue growth, 15%-20%

database growth, 75% applications growth and $0.12 EPS.  Ex. 206 at 03218, 03221-22, 03224.

Oracle reiterated this guidance throughout 3Q01.  Exs. 207 at Exs. C-D; 208 at 091536; 209 at

1   091532; 210 at 141677; 211-216; 217 at 03279-80; V at 229:16-230:3, 341:20-343:6; 218.[40]  These

2   were aggressive forecasts; growth rates were defined year-over-year, and Oracle's 3Q00 results were

3   extraordinary.  Ex. 223 at 005609.  Defendants knew that Oracle's forecast had been rendered

4   inaccurate by numerous internal and external changes, and that the internal metrics that they relied

5   on disclosed that Oracle would likely miss guidance.[41]

6           Oracle's guidance was based on the Potential, which Minton calculated by adding "[u]pside"

7   to the field forecast to account for "sandbagg[ing]."  *See* Exs. 225 at §II.A.; FFF at 101:8-18; EEE at

8   104:15-105:11, 123:14-125:4, 126:7-15; Defs' Mem. at 7.  Minton's upside (and Potential) was

9   based almost entirely on a simple extrapolation – she applied the prior year's historical conversion

10  ratio to the current year's quarterly pipeline.  Exs. 17 at 226; J at 384:16-385:7; 17 at 211 (Ellison:

11  "'Our sales-forecasting system tells us how many deals are in the pipeline and multiplies their value

12  by a historic close rate.'"); 226 (***Minton***: "***to determine what the true forecast was [Jeff and I***

13  ***applied] historical conversion rates to the pipeline***").  Declaration of Alan G. Goedde ("Goedde

14  Decl."), ¶¶3-5.  Plaintiffs' expert, Dr. Alan Goedde, confirms that the Potential was a year-over-year

15  extrapolation.  Goedde Decl., ¶¶3-5 & Exs. 1-3 (showing a 97% correlation between the Potential

16  and a forecast based on a mechanical application of the historical conversion ratio with 94% of any

17  variation in the Potential explained by similar variations in the mechanical conversion ratio forecast).

18          Still, defendants deny that Minton based the Potential on the conversion analysis (according

19  to them, it was merely a reasonableness "check").  Exs. G at 77:20-79:19, 121:6-125:9, 126:5-128:7;

20  227 at 81; 228 at §IV.D.1.d.; Defs' Mem. at 7; PP at 76:23-77:25, 78:1-85:7, 85:20-86:1, 110:14-

21

22  [40]     Defendants deny falsely that Henley reiterated guidance on February 20, 2001.  Defs' Mem.
        at 25 n.12; *but see* Exs. 212-214, 216, 219 at 14, ¶125 and 47, ¶125; H at 239:5-259:20; 221-222.

23
    [41]     Defendants rely almost exclusively on the Potential Forecast ("Potential") to argue that
24  Oracle's projections were not false or misleading.  Defs' Mem. at 23-25.  They cite Judge Strine's
    opinion and argue that the Potential was purportedly the "best predictor" of Oracle's actual results.
25  *Id*. at 7 (quoting *In re Oracle Derivative Litig.*, 867 A.2d 904, 949 (Del. Ch. Ct. 2004)).  Defendants
    even disingenuously claim that "the record on Oracle's 3Q01 guidance has not changed."  *Id*. at 2.
26  Unlike the Delaware plaintiffs, plaintiffs here establish that the Potential was rendered inaccurate by
    changes in 3Q01.  Defendants have admitted that such changes rendered Oracle's Potential (and
27  guidance) inaccurate, foreclosing any possibility that it can be the basis for summary judgment.  Exs.
    224 at 609541; 17 at 226; J at 384:6-385:7.

28

114:15.  The reason for defendants' retreat is clear: Defendants knew that the extrapolated Potential (and guidance) was inaccurate because of major changes facing Oracle in 3Q01.[42]  Exs. 17 at 226 ("Our forecasting does statistical extrapolations based on historic trends.  If something that's outside our mathematical model of the business changes . . . our forecasting becomes inaccurate."); J at 384:6-385:7 (a major economic change means "you can't extrapolate anymore"); *see also* Exs. G at 86:10-16; PP at 95:10-96:5.[43]  In particular, defendants knew that: (1) a major economic change was affecting Oracle; (2) the pipeline contained a higher percentage of applications (with lower conversion rates and product problems); and (3) Ellison had changed the forecast process in 2Q01 by directing the Field to add risk.  Exs. EEE at 122:1-24; 17 at 211, 226; J at 384:6-385:7; 224; 207 at Ex. B; 229 at 2-65 & Exs. 6-7; 230 at 4-8; 231; Goedde Decl., ¶¶6-10.

### a.    The Major Economic Change Facing Oracle Rendered Its 3Q01 Forecast Inaccurate

Ellison knew that a major economic change would render Oracle's forecast inaccurate.  Exs. 17 at 226; J at 384:6-385:7.  Oracle was facing just that when defendants issued guidance.  Exs. 229 at 2-65 & Exs. 6-7; 230 at 4-8.  In 3Q00, Oracle took advantage of frenzied technology spending and new dot.com customers, increasing its sales to unprecedented levels and exceeding its 3Q00 forecast substantially.  Exs. 17 at 185; 230 at 4-8 & Ex. 5; 232; 233 at 0122080; 234 at 1917; EEE at 85:16-17; 229 at 2-65 & Exs. 6-7; SS at 163:2-8; V at 313:15-315:13; 235 at 180188.[44]  A year later, by 3Q01, however, the NASDAQ had collapsed, the dot.com bubble had burst, and technology spending was down considerably.  Exs. 230 at 4-8 & Ex. 6; 237 at 1053564; 238 at 2-3; 229 at 2-65; 239 at 13; 240; 241 at 350284-87, 350302; V at 315:6-13; 235 at 180188.  Minton noted in early

---

[42]    Minton testified that she extrapolated without adjusting for these changes.  Exs. J at 19:17-19; EEE at 135:7-136:12.

[43]    *See also* Exs. 224 at 609541 ("Minton explained that prior to Q3 of FY 2001, Oracle thought that it could model out its business, but with the current economic downturn, no analytical models can predict one quarter to the next."); FFF at 123:18-126:19.

[44]    Oracle's stellar 3Q00 led to difficult growth comparisons for 3Q01, unlike 1Q01 and 2Q01.  Exs. 236; SS at 176:10-179:10.  This undermines defendants' reliance on Oracle's performance in those quarters to argue that their 3Q01 forecast was reasonable.  Defs' Mem. at 24.

1    January 2001 that "the general macroeconomic environment was suffering" and Henley noted on

2    January 4, 2001 (the day he sold shares for $32.3 million) that "***all data*** since the [December 14

3    earnings] call ***point to more economic softening*** so there is risk of slippage in deals." Exs. FFF at

4    223:14-18; 242-243. Sanderson identified the "dotcom falloff" as a "***major macroeconomic event***"

5    that was likely discussed at EMC meetings. Ex. KK at 88:5-17. Indeed, Oracle has claimed that

6    there was a recession by December 2000.[45] Ex. 251 at 120:2-123:3.

7           Defendants knew that Oracle was converting fewer opportunities into sales in FY01 than it

8    had in FY00. Ex. 228 at 27. The conversion ratio had declined year-over-year in 1Q01 and 2Q01 by

9    11% and 8%, respectively. *Id.* This was amplified in 3Q01 by the application of these ratios to a

10   pipeline near $3 billion – a 10% decline meant a loss of $300 million in revenue. Ex. 230 at Ex. 10.

11   Ellison also testified that in a downturn, companies require more approvals, resulting in slowed or

12   cancelled deals and making pipeline hard to convert. Ex. H at 245:18-247:4. Defendants also knew

13   that Oracle's dot.com business was projecting to lose $70 million in revenue, year-over-year.

14   Ex. 230 at 5. Ellison testified: "you're absolutely right that our dot-com business was certainly off

15   by [3Q01]" and this "put a lot of pressure on [Oracle's] database" for 3Q01 because Oracle had a

16   "very, very high hurdle. So for the business to grow, it meant that we had to overcome the fact that a

17   lot of our dot-com companies – customer, our ex-customers, were gone." Exs. GG at 178:9-179:1;

18   HH at 255:21-256:21, 385:10-22. This was the exact sort of change that Ellison testified would

19   render Oracle's forecast inaccurate. Exs. 17 at 226; J at 384:6-385:7. Defendants knew that Oracle

20   was facing a major economic change and could not expect to convert as much of its pipeline in 3Q01

21   as it had in the boom economy of 3Q00. Exs. 17 at 226, 287; J at 384:5-385:7; 224; 237 at 1053564;

22   FFF at 223:14-18; 242; I at 26:13-27:21,179:5-20; EE at 18:1-25:10, 35:4-14, 94:17-95:5, 108:25-

23

---

24   [45]      Cisco and Sun, the competitors that defendants tracked as proxies for Oracle's business, were
     also faltering in 3Q01 and lowered earnings expectations as a result of the economy. Exs. 244
25   (Henley: "Cisco and Sun have said they are seeing [a slowdown] so I don't know why we wouldn't
     too."); 245; 17 at 157 FN; 246 at 156724.0001; 247; 237 at 1053564; 248. In 3Q01, defendants
26   spoke with executives at both companies regarding the health of their businesses. Ex. 249 at
     609422-23. Sun pre-announced on January 19 (the day that Ellison first instructed his financial
27   advisor to sell 40 million shares of Oracle stock) and Cisco pre-announced even earlier. Exs. 237 at
     1053564; 248; 247; GG at 69:1-70:3; LL at 59:15-60:6; 250 at 300606.

28

109:8; TT at 92:15-95:11, 102:1-104:24; QQ at 57:3-61:8.  Defendants also knew that Oracle's guidance was based on a forecast that predicted just that.  Goedde Decl., ¶¶3-5 & Exs. 1-3; Exs. 226 at 132079-80; 17 at 211, 226; J at 384:6-385:7; 224.[46]

### b.    The Change in Product Mix and 11i Defects Rendered Oracle's 3Q01 Forecast Inaccurate

When Oracle issued 3Q01 guidance, the percentage of applications in its pipeline had jumped 13% from 3Q00 (from 29% to 42%).[47]  Ex. 229 at 85-86 & Ex. 6.  Defendants knew that applications had a much lower conversion ratio (38.7%) than technology (63.3%).  *Id.* at 85-86 & Ex. 7; Ex. 252 at 609246.  Ellison admitted that Oracle's sales force "was not very good at selling applications."  Exs. 17 at 114 FN, 173; 252 at 609246.[48]  Given these facts, defendants knew that Oracle's pipeline would not convert at historic rates.  Minton's application of the 3Q00 conversion ratio to the heavily applications-weighted 3Q01 pipeline rendered the Potential inaccurate.  Exs. 17 at 226; Goedde Decl., ¶¶3-5 & Exs. 1-3; 229 at 85-87; J at 19:17-19.  Also, Oracle's applications products themselves had changed, further rendering extrapolation inaccurate.  Ex. J at 101:7.  As discussed in §III.F.-J., 11i was beset by defects, which affected Oracle's ability to sell both 11i and database.  *See* Exs. 253-255; J at 171:24-177:10; 17 at 189, 192, 194-96, 202-03, 424; Q at 68:7-74:13; J at 640:12-21; 256 at 039325.  Due to these problems, Oracle had virtually no 11i references

[46]    Defendants' argument that a repeat of the 3Q00 conversion ratio would have resulted in revenues exceeding Oracle's guidance is unavailing. Defs' Mem. at 8-9. First, this was not the case throughout 3Q01. Goedde Decl., Ex. 2. During parts of 3Q01, Oracle was actually forecasting to convert a higher percentage of deals than it had in the boom economy of 3Q00. *Id.* Defendants also knew that using historical conversion rates to predict revenue was unreasonable in times of major change. Ex. 17 at 226.

[47]    Its forecast also included more applications: 31.5% of the 3Q01 forecast compared to 18.6% of 3Q00 license revenues. Ex. 229 at 85 & Ex. 7.

[48]    Oracle's database was easier to sell because Oracle had few competitors and could secure approval at the technology staff and CIO level, whereas Oracle's "relatively new" applications business competed head-to-head with the industry leaders and required approval by the CEO and CFO (increasing the likelihood that a deal would not close on time). Exs. 253 at 609246; 17 at 114-16. And to make matters worse, in 3Q01, "[t]he Oracle sales force wasn't used to dealing with senior management, nor did it have the expertise about . . . what functionality was likely to be most important to [Oracle's applications customers]." Ex. 17 at 115. Also, companies consulted with Big Five firms to decide which brand of applications to purchase. Oracle built its own consulting organization that competed directly with these Big Five firms and could not hope to get much needed references for applications. *Id.* at 116.

by November 2000 and only nine 11i CRM references by June 2001.  Exs. 257 at 153367; 258.  This impeded Oracle's ability to convert its applications pipeline because, as Ellison put it, "[t]he first year of selling [11i] was the hardest year.  It's difficult to sell without customer references."  Exs. 17 at 239, 249; J at 251:1-16; V at 105:6-17, 237:13-238:1, 353:18-354:15; 259 at 179355.[49]

### c. Ellison's Directive to Increase the Risk in Oracle's Forecast Rendered It Unreliable and Inaccurate

In 2Q01, Ellison directed the Field to add more risk (and amount) to its forecast and, as a result, defendants knew that Minton's $160 million 3Q01 upside adjustment was no longer necessary.  Exs. 230 at Ex. 11; 231.  Ellison's directive, designed to eliminate sandbagging, rendered that upside (historically applied to eliminate the same problem) obsolete.  Exs. 231; FFF at 101:8-18, 123:14-125:4.  Also, in 2Q01, for the first time, field finance directors reported directly to Minton (instead of the EVPs).  Exs. 265; FF at 139:20-141:24.  Minton quickly told these new direct reports to implement Ellison's directive.  According to Minton's October 2000 e-mail, "Larry [Ellison] made it clear that he wants everyone to submit realistic forecasts – he is not interested in 'commit' numbers."  Exs. 266 at 151961-62; FFF at 105:10-21.[50]  Numerous executives, including Sanderson (OPI) and Nussbaum (OSI), forwarded this e-mail chain and discussed methods for implementing Ellison's directive.  Exs. 231, 271-272.  On October 4-5, 2000, Minton met with her new finance team.  Ex. 265.  Managers were assigned to prepare training *for all of the North America divisions* for Oracle's new forecasting system, OSO.  *Id*.  Specifically, they were to work with Ellison to determine new forecasting methodology for that training.  *Id*.  On October 6, 2000, manager Patricia McManus e-mailed manager James English:

---

[49]     Defendants also knew that Oracle could not demonstrate 11i and that the Field was reluctant to sell CRM due to instability.  Exs. J at 68:7-74:13, 105:7-8; V at 76:19-78:9, 79:14-80:8, 80:24-81:7, 91:5-8, 175:19-176:5, 300:11-23, 328:19-329:18, 298:12-22; 260-264.

[50]     Although defendants claim that Oracle's process was "bottoms-up," Oracle's budgeting process (30% license growth target for FY01) played a role in the setting of targets at the field level.  Defs' Mem. at 6; Exs. 227 at 79-80; 228 at 13; G at 81:9-23; PP at 96:13-15; 267; 268; QQ at 27:18-28:6, 33:5-36:2.  In fact, Ellison increased the U.S. budget targets by 25%-30% through a "replan" only weeks before 3Q01.  Exs. 269-270.  The directive, which instructed the Field to include deals that they previously would not have felt comfortable enough to include, made Oracle's process even more "top-down."  Exs. 231; PP at 56:15-57:4; 229 at §V.D.2.b.

1          Recently Larry has changed the way he is interpreting our forecast.

2                   *       *       *

3          This is a change from our current thinking in that **our forecast has not usually had a significant amount of judgment**.  It was the amount that you believed you could deliver at a minimum.  That emphasis has shifted . . . and **now our forecast is a number that includes more risk than in the past**.

4

5    Ex. 231 at 203683; *see also* Exs. 271; J at 423:24-425:1.  Minton testified that she did not take the directive into account when adding upside to the Field Forecast in 3Q01 even though evidence shows that this directive was in effect before 3Q01 – "[w]e will incorporate this [change] in our OSO 11i training that is tentatively scheduled the week of 10/23."  Exs. 231; J at 19:17-19; 265.[51]  Defendants ignore this internal change. Defs' Mem. at 6-8.  Defendants' experts' sole response has been, inexplicably, that they do not believe that Ellison's directive was adhered to.  Exs. G at 61:18-66:23; 228 at 34-37; PP at 116:3-119:2, 125:9-130:11, 147:6-23.  This, despite the e-mails from Minton instructing her direct reports to implement the directive, the e-mails between executives and heads of finance discussing specific ways to implement the directive, and the fact that those executives took the directive so seriously that they regarded it as "sensitive information" and demanded that it not be forwarded.  Exs. 266, 231, 271, 272.  Not surprisingly, in the months following the directive, the judgment applied by the Field in each of the U.S. divisions suddenly skyrocketed.  Goedde Decl., ¶¶6-10; Exs. 4-6.[52]

---

[51]    The move to OSO caused significant changes – it inflated Oracle's pipeline. Exs. K at 270:2-14; CCC at 226:5-227:25; SS at 48:9-19.  As a result, Minton applied her inaccurate conversion analysis in 3Q01 to a pipeline that Henley testified was "too good to be true."  Ex. H at 354:15-355:3.  This overstated pipeline, which defendants touted in December 2000 as a reason for their belief in the strength of Oracle's business, was actually caused by the move to OSO, which increased the 3Q01 pipeline by adding deals that the Field would previously not have felt comfortable including.  Exs. 273; K at 270:2-14; 225 at §II.A.4.; CCC at 226:5-227:25.  Henley testified (and defendants admit) that this overstated pipeline was the reason that Oracle issued guidance of $0.12 EPS instead of the $0.128 Potential.  Ex. H at 354:5-14.

[52]    Despite these changes, which caused Oracle's forecast to be inaccurate and overstated, by February 5, 2001, the Potential was still informing defendants that Oracle would miss guidance – projecting EPS of just $0.1129.  Ex. 230 at 39-40 & Exs. 11 & 23; 232, 292 at 3747.  Minton decreased her upside in January 2001 by over $115 million.  *Id*.  Generally, upside decreases were accompanied by increases in the Field Forecast as deals closed.  Ex. 230 at 40 & Ex. 11.  Defendants knew that the decrease in January 2001 was not accompanied by an increase in the field forecast.  These facts alerted defendants, early in 3Q01, that deals were slipping.  *See also* Exs. H at 374:2-378:5; II at 265:25-267:11.

2.      **Defendants Had Actual Knowledge of Facts that Seriously Undermined the Accuracy of Oracle's Guidance**

The very indicators that Ellison testified that he relied on (actual sales and pipeline data), "told" defendants that Oracle's guidance was inaccurate.  Ex. HH at 279:1-11.  Ellison admitted actual knowledge of these indicators.  Exs. GG at 76:25-77:12, 77:13-16, 113:25-114:25, 115:1-116:19, 122:1-25, 127:24-129:25, 143:12-144:3, 144:18-128:2, 156:4-159:21; HH at 268:5-13; 17 at 179-80, 285, 287; 276 at 84-85.  Given their receipt of weekly reports and attendance at the weekly EMC meetings, Henley and Sanderson also knew this.  Exs. K at 333:22-334:1, 466:20-467:19, 551:1-553:18; II at 64:15-65:20, 114:5-116:10, 116:25-118:9, 120:4-13, 222:18-223:24; KK at 40:7-42:23, 43:7-44:25, 72:7-73:12, 74:8-78:3, 88:5-17; V at 72:17-73:15.

a.      **Actual Results Seriously Undermined Oracle's Guidance**

Actual results for December 2000 informed defendants that Oracle was tracking to miss guidance.  Exs. 277-278; GG at 76:25-77:12; II at 222:18-223:4.  On January 17, 2001, defendants received the Flash Report with Oracle's actual results for December 2000.  Exs. 277-278.  The Flash Report disclosed that the NAS and OSI lines of business had revenue growth of ***negative*** 24% and ***negative*** 81%, respectively,[53] and that Oracle Product Industries ("OPI") had growth of ***negative*** 85% excluding Covisint.[54]  *Id.*  Accordingly, as of January 17, 2001, defendants were aware that each U.S. division (50% of license revenues) had negative growth trends.  *Id.*  The December Flash Report also informed defendants that Oracle's U.S. divisions had sold virtually no applications and

---

[53]     Ellison testified that adverse results in one of Oracle's license divisions after the first month of a quarter (his example was Europe, which accounts for a lower percentage of revenue than NAS and OSI) was exactly the type of information that would prevent him from trading.  Exs. GG at 43:12-44:6; 277; 230 at Ex. 24; *see e.g.*, Exs. 232, 274, 279.  Within 36 hours of receiving these adverse results for OSI and NAS for the first month of 3Q01, Ellison instructed his financial advisor to unload 40 million shares of Oracle stock.  Exs. GG at 69:1-70:3, 76:25-77:12; LL at 59:15-60:6; 250 at 300606.

[54]     Covisint was a $60 million applications deal that was the largest transaction in Oracle's history.  Larry Garnick removed Covisint from his analysis because the size and one-time nature of the transaction skewed Oracle's trends.  Ex. GGG at 312:2-313:4; Ex. 280 at 2, ¶9.  Ellison and Henley testified that removing Covisint was proper in analyzing December 2000 trends.  Exs. J at 436:13-437:6; II at 216:25-218:23.

1    insufficient database, excluding Covisint.  *Id.*  Although its U.S. divisions were ***forecasting $323***

2    ***million*** (excluding Covisint) in applications, in December 2000, Oracle's U.S. divisions ***sold less***

3    ***than $1.3 million*** in applications ($805,000 of CRM and $458,000 of ERP, excluding Covisint).  *Id.*

4    ***This represented year-over-year applications license growth of negative 92%***.  *Id*.  In December

5    2000, the U.S. divisions had ***negative*** 33% growth in database.  *Id.*  Excluding Covisint, U.S.

6    database sales had ***negative*** 44% growth.  *Id.*  By January 17, 2001, defendants knew of the negative

7    trends that accounted for Oracle's shortfall.  *Id.*  The December Flash Report also disclosed that,

8    excluding Covisint, total company license growth was 1% (guidance was 25%) and total applications

9    growth was ***negative*** 46% (guidance was 75%).  *Id.*  According to Henley, the Flash Report

10   disclosed that Oracle was "off to a slow start irrespect [sic] – you know, excluding Covisint." Ex. II

11   at 226:6-7.

12        On February 8, 2001, defendants received the Flash Report with January actual results.

13   Exs. 281-282.  It disclosed that all of Oracle's U.S. divisions still had negative growth trends.  NAS

14   and OSI had revenue growth of ***negative*** 33% and ***negative*** 17%, respectively.  *Id.*  Excluding

15   Covisint, OPI had growth of ***negative*** 63%, total license revenue growth was just 8% (compared to

16   25% guidance) and Oracle's U.S. divisions ***had sold just $16.6 million in applications compared to***

17   ***a forecast of $323 million*** (***negative*** 26% applications growth).  *Id.*  Oracle's U.S. divisions had

18   database growth of ***negative*** 29% and, excluding Covisint, ***negative*** 34%.  *Id.*[55]

19                    **b.    Division Level Indicators Seriously Undermined**
                            **Oracle's Guidance**
20

21        Throughout 3Q01, defendants knew of severe problems in its largest license division, which

22   accounted for at least $106 million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  At the

23   outset of 3Q01, defendants knew that NAS's pipeline was not where it needed to be to meet its

24   targets because "NAS results took off last year in Q3" (largely due to dot.com sales, which had

25   disappeared by 3Q01).  Exs. 236; OO at 33:19-34:21; 283; SS at 173:10-15; VV at 53:5-18; 284 at

26   [55]    According to Ray Lane, the flash reports informed defendants that Oracle was not on track.
27   Ex. 280, ¶¶6-12.  Dr. Goede establishes that a standard forecast analysis would have disclosed to
     defendants that Oracle was not on track to meet guidance.  Ex. 230 at 28-35 & Exs. 14-19.
28

033449; V at 291:8-292:6, 293:12-23.  NAS noted, however, that "[g]iven the past trends, [NAS] should add incremental Pipe during the next three weeks."  Ex. 283.  By January 11, NAS reported that "[t]he Pipe has not grown as [NAS] had anticipated.  We're actually slightly down from December end reporting."  Ex. 240.  Defendants received this information weekly.  Exs. 232, 285-298.  Defendants also knew from the outset of 3Q01 that NAS's pipeline contained no big deals.  Henley noted this fact in early December and received updates in December and January that NAS's pipeline still had few big deals (and just one above $5 million).  Exs. 236, 240; 299 at 610124; II at 214:2-19.  And contrary to defendants' claim that this was somehow good news, NAS informed defendants that the lack of big deals was problematic because big deals had allowed NAS to make its numbers in 1Q01 and 2Q01 (when comparisons were not as difficult).  Exs. 236, 240.  Defendants also learned from Minton and Roberts at EMC meetings that AVPs in NAS "began to voice concern" in December 2000 and "were reluctant to raise their forecast" in January as "deals began to shrink and get delayed"  Ex. 259 at 179337.  NAS managers reported a "sluggish economic outlook" where the "focus [is] on profits" and "reduc[ing] . . . costs" and CIOs on a "shorter leash" with CEOs more involved in purchasing decisions.  Exs. 241; WW at 133:14-141:7, 146:6-18, 155:8-157:1, 206:10-208:3; NN at 161:16-20, 161:21-162:1, 162:2-25, 163:9-17.  On January 11, 2001, David Winton, NAS's director of finance, reported:

> 3.    Drop in Technology.  As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4.  GB's dot com bubbles has burst (they expect the West to end the year $30-$40M behind their original Budget for Technology).  Majors sees a slow down in spend along with smaller deal sizes.  Also, the change in the ASP model for Generic Tech hosting lic's coupled with the dot com crash is impacting projected Tech results in that segment.

Ex. 240.  Minton received this e-mail and Ellison testified that he was aware of these facts.  *Id.*; Ex. J at 429:12-432:6.

NAS's stellar 3Q00 results resulted largely from dot.com sales.  In 3Q00, dot.com business made up 36% of NAS's revenues and 74.6% of GB's revenues.  Exs. 300 at 131789; 230 at Ex. 5.  But in early January, NAS managers reported that larger dot.coms had already acquired Oracle's database so Oracle was attempting to sell to lower-tier dot.coms, which were quickly disappearing.  Exs. 241; OO at 78:7-79:1, 86:21-88:11, 94:7-94:24; NN at 114:13-21, 166:23-167:17, 195:3-199:9;

1    VV at 54:2-55:5, 69:23-70:24.  On January 11, 2001, NAS reported that its dot.com bubble had burst

2    and by January 29, 2001, forecasted dramatically lower dot.com sales – $41 million (3% of

3    revenues) compared to $111.5 million (11%) one year earlier.  Exs. 240, 301; 230 at Ex. 5; V at

4    48:13-23, 151:5-152:3, 188:24-189:8; NN at 197:9-199:11, 206:10-208:3; VV at 48:13-23, 61:20-

5    62:6; SS at 206:6-14, 212:2-17.  This amounted to negative 54% growth for 3Q01 in NAS's dot.com

6    and ASP technology revenue.  Ex. 301.  In total, NAS projected ***negative*** 6% growth in technology

7    for 3Q01.  *Id*.  Henley admitted that this evidenced that the dot.com fallout was having a

8    "progressively more negative impact" on Oracle than in prior quarters.  Ex. JJ at 308:3-311:9.

9         These adverse facts manifested themselves in dismal performance in December and January.

10   NAS's license revenue growth was ***negative*** 24% in December 2000 and ***negative*** 35% for the first

11   two months of 3Q01.  Exs. 277-278, 281-282.  As of January 15, 2001, NAS had reported only $1.4

12   million in total sales for the month to date, for a total of $31.4 million for the quarter to date (its

13   forecast was $360 million).  Exs. 302 at 038498-99; 232; 274 at 440114.

14        In 3Q01, defendants knew of OSI's severe problems, which accounted for at least $67

15   million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  Like NAS, defendants knew in early

16   3Q01 that OSI's pipeline had problems.  Henley noted in early December that the technology

17   pipeline for OSI was down "a lot" since the last report.  Exs. 299 at 610124; II at 214:2-215:16.

18   OSI's technology pipeline continued to fall throughout the quarter.  *See* Exs. 299 at 610124; II at

19   214:2-19.  By December 25, 2001, its applications pipeline had also plunged ($200 million) and ***OSI***

20   ***was forecasting more applications than were in its pipeline***.  Exs. 232, 288.  This is despite Jay

21   Nussbaum's testimony that he would not forecast CRM due to its instability.  Ex. Q at 74:2-13.  In

22   3Q01, despite its negative pipeline growth, OSI's revenue growth was forecasted as high as 32%.

23   Exs. 285-298.  Ellison testified that this was "incautious."  Ex. GG at 86:21-87:5.

24        OSI and its verticals were also forecasting conversion rates (the percentage of the pipeline

25   that OSI was forecasting to convert) that were dramatically high and far beyond the 30%-40% rate

26   with which Nussbaum was comfortable.  OSI's verticals forecasted conversion rates over 60% for

27   much of December and January.  Exs. 303 at 096158; 304 at 096175.  They even forecasted

28   conversion rates as high as 132% (forecasting more revenue than was in the pipeline). Ex. 303 at

1   096158.  On January 18, Sarah Kopp (head of OSI finance) informed defendants that conversion

2   rates across the board in OSI were north of 50%.  Ex. 305.  Oracle has produced only the first page

3   of this two-page e-mail discussing OSI's problems.

4          Defendants knew that OSI was coming nowhere near these extreme conversion rates.  OSI

5   had revenue growth of *negative* 84% for December 2000 and *negative* 17% for the first two months,

6   combined.  Exs. 277, 281-282, 278.  It booked just $22.7 million in December and January,

7   combined, compared to a forecast of $73.6 million for those two months (and $225 million for the

8   quarter).  Ex. 306 at 323593; Ex. 281; Ex. 232; Ex. 274 at 440114.  As of February 13, 2001, OSI

9   had booked just $34 million, which Nussbaum said caused "everyone [to have] great anxiety."

10  Exs. Q at 66:16-67:11; 307 at 095912.  At the same time, each of OSI's verticals was reporting

11  dismal results and large gaps between forecasts and field commit numbers – the Field was

12  committing to just $120 million.  Exs. 307 at 095912; 308.  And defendants knew that February was

13  not likely to make up for OSI's dismal start.  By January 18, 2001, OSI's field was forecasting just

14  $134 million (with $180 million best case), however, Oracle's guidance was based on a $225 million

15  forecast.  Exs. 305, 232, 274.  The $91 million difference was Nussbaum's management judgment.

16  Ex. 305.  Defendants knew that this was unrealistic.  Not only did they know that Nussbaum was

17  overly aggressive in forecasting, but they also knew that the $91 million in judgment was

18  uncharacteristically high, even for Nussbaum.  Exs. 280, ¶17; KK at 170:25-171:13; Goedde Decl.,

19  ¶9 & Ex. 5.  Prior to 3Q01 (and Ellison's directive), Nussbaum had applied minimal or no judgment.

20  Goedde Decl., ¶9.  According to Ray Lane, the $91 million in judgment and the reliance on large

21  deals, especially BellSouth, would have raised red flags.  Ex. 280, ¶17.

22          Defendants knew that large deals would not save OSI.  Henley noted concern at the

23  beginning of 3Q01 because all of OSI's upside was in telecom (the telecom "bubble burst" was

24  becoming publicly known).  Exs. 299 at 610124; II at 209:19-210:23, 214:2-215:16; 309-312.  On

25  January 18, 2001, Kopp e-mailed Minton that OSI would make its forecast only if "*none*" of its very

26  large opportunities dropped out.  Ex. 305.  Defendants knew that Nussbaum was relying heavily on

27  deals with the University of Texas and Capital One (both of which Kopp had informed defendants

28  "MUST close" for OSI to make its forecast) and deals in the troublesome telecom industry.

1   Exs. 305; 299 at 610124; II at 214:2-215:16; 313 at 293931, 293938.  By January 2001, defendants

2   knew that almost all of these deals had fallen out or were "long-shots" that were "not likely to

3   close."  Exs. 315; J at 373:22-376:5; 314 at 293931; 316 at 090542; 317-320; 312; 321 at 252257;

4   322 at 156558.0001; 323-326; 305; 327 at 081828; UU at 118:10-119:3, 150:14-153:24; Q at 58:1-7,

5   66:13-69:2, 77:19-78:2; XX at 153:24-154:2; TT at 153:18-154:4; QQ at 44:25-45:6; 299 at 610124.

6        Indicators in OPI also informed defendants of the dismal state of Oracle's U.S. license

7   business.  Excluding Covisint, OPI grew **negative** 85% in December and **negative** 63% for the first

8   two months of 3Q01.  Exs. 277-278, 281-282.  Without Covisint, OPI had booked just $2.6 million

9   in license revenue in December and, as of January 26, **no license revenue in January 2001**.

10  Exs. 277; 328 at 039193.  Not surprisingly, OPI informed defendants on January 17, 2001, that it

11  was seeing client delays on decisions and had "a lot of pipe at challenging clients."  Ex. 329.  OPI

12  further evidenced the negative trends in Oracle's U.S. division and informed defendants that Oracle

13  was unlikely to recover from its slow start.[56]

14          c.   **Defendants Knew that the "Hockey Stick" Would Not Help**

16       Oracle's 4Q01 forecast also rebuts defendants' claim that they expected to miraculously cure

17  Oracle's dismal start with a strong February performance.  Throughout 3Q01, defendants knew that

18  the Field was forecasting revenue growth for 4Q01 that was far below Oracle's growth targets.  For

19  example, on January 15, 2001, OSI and OPI forecasted 4Q01 growth of **negative** 7% and **negative**

20  16%, respectively.  Ex. 330 at 099014.  Only NAS forecasted positive growth (19%), but its 4Q01

21  forecast had just decreased by $65 million.  *Id.*  In total, the U.S. divisions forecasted just 3% growth

22  for 4Q01 (target was 30%).  *Id.*  The 4Q01 forecasts remained low and defendants were consistently

23  alerted to them throughout 3Q01.  Exs. 331 at 089102; 332 at 078857; 333 at 078990; 334 at

24  080066; 335 at 079232.  The 4Q01 forecasts were a strong indication that Oracle's problems were

[56]   Oracle's projected expenses rose throughout December and January, in contrast to declines in prior quarters.  Ex. 230 at 41 & Ex. 23.

deep seated and that the divisions did not expect business to strengthen as the quarter or the year progressed.

### d. Pipeline Growth Seriously Undermined Oracle's Guidance

In 3Q01, defendants knew that pipeline growth seriously undermined Oracle's guidance. Exs. GG at 113:25-114:3, 122:1-15; HH at 252:4-10, 286:15-18; II at 64:15-65:20; H at 261:10-15; J at 457:8-17; KK at 43:7-44:25; 232; 286; 288; 274-275; 279, 292-298; 336-338.[57] Year-over-year pipeline growth, while as high as 52% in Week 1, dropped precipitously to 34% (by $328 million) by December 25. Exs. 286, 288. Defendants knew by December 25 that Oracle's sales opportunities were evaporating. The pipeline collapse continued throughout 3Q01, decreasing $544 million by February 5 and $807 million for the entire quarter ($600 million from applications). Ex. 230 at Ex. 20. In contrast, the 3Q00 pipeline increased $69 million in December and January and lost only $340 million for the entire quarter. *Id.* Historically, Oracle's pipeline tended to increase in the quarter before declining at the end, and even those end-of-quarter declines were nowhere near the size of the declines throughout 3Q01. *Id.* The uncharacteristic decline in 3Q01 indicated that more deals were being lost. Defendants, who touted Oracle's "astounding pipeline" to analysts as evidence of the strength of Oracle's business, knew throughout 3Q01 that Oracle's pipeline growth seriously undermined Oracle's guidance. Exs. 206 at 03224; 210 at 141677; 339 at 005787; 340 at 141677.[58]

---

[57]   "Pipeline" referred to all the deals that "had an opportunity to close during the quarter," including deals that had already closed. Ex. EEE at 110:22-111:1, 128:11-21.

[58]   Additionally, Oracle's "comfort gap," the difference between forecasted revenue growth and pipeline growth, was uncharacteristically narrow in 3Q01. Ex. 230 at 35 & Ex. 30. Between December 25 and January 29, the gap was never higher than 4% and was negative half the time. *Id.* (Defendants misleadingly rely on the small but positive gap on January 15, but fail to mention that the gap was negative for much of 3Q01.) Defs' Mem. at 8-9; Ex. 230 at Ex. 13. Oracle had a negative gap only once prior to 3Q01 and an average gap of 13.4%. *Id.* Ellison stated, "as long as the pipeline growth is greater than . . . the revenue growth, you should be able to meet your numbers" and that a negative gap was problematic because it would be "incautious to . . . forecast sales growth without underlying pipeline growth." Exs. GG at 86:21-87:5; HH at 420:12-14. Defendants knew that the gap was negative for half of December and January. Exs. GG at 86:3, 88:17; HH at 417:17-421:22; II at 103:14-104:25; KK at 44:11-45:23; 232; 285; 286; 288; 274-275; 279.

1          **L.     Defendants' "Cautionary" Statements Were Not Meaningful**

2          The PSLRA's safe harbor does not apply unless a forward-looking statement is accompanied

3   by ***meaningful*** cautionary statements. *Morgan v. AXT, Inc.*, No. C04-4362, 2005 U.S. Dist. LEXIS

4   42346, at *18-*19 (N.D. Cal. May 23, 2005).  Vague or boilerplate disclaimers are insufficient.  *In*

5   *re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455, 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal.

6   May 1, 2003).  "'The cautionary statements must be precise and directly address . . . the defendants'

7   future projections.'"  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal.

8   2005); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001).  "[T]he cautionary statement must

9   discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to

10  nil.'"  *Immune Response*, 375 F. Supp. 2d at 1033.[59]

11         Defendants' warnings here were not meaningful.  Defendants cite to just a single statement

12  by Henley on Oracle's December 14, 2000 conference call and a few references in Oracle's Form

13  10-Q.  Defs' Mem. at 27-28.  None of these "disclosures" support defendants' argument.  While

14  Henley noted that a "recession" "could have some impact," he dedicated his talk to persuading

15  investors that Oracle would not be impacted by the economy because Oracle was "in a sector, I

16  think, that is, you know, much more immune to economic issues."  Harrison Decl., Ex. 56 at

17  003218-19.  Henley's statements led investors to believe that Oracle was not and would not be

18  affected by the economy and, in context, were not meaningful.  Defendants also argue that investors

19  were meaningfully warned by select statements in seven pages of risk disclosures in Oracle's Form

20  10-Q referencing various general possibilities that "may" or "could" adversely affect Oracle's

21  business "if" they happened.  Defs' Mem. at 27-28; Defs' Ex. 60 at 24182-83, 24185.  These general

22  disclosures of contingent risks clearly did not discredit defendants' false or misleading projection to

23  such an extent that risk of deception dropped close to nil.  *Immune Response*, 375 F. Supp. 2d at

24  1033.  Furthermore, because the risks about which they supposedly warned had already materialized,

25

26  [59]     Whether defendants' cautionary language was meaningful should not be resolved at summary
    judgment.  *See Provenz*, 102 F.3d at 1493.  This Court already held that whether Oracle's disclosures
27  were meaningful raised a fact question.  *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp.
    2d 671, 679 (N.D. Cal. 2002).  That fact question remains.

28

1    Oracle's risk disclosures cannot qualify as meaningful cautions that offset defendants' false

2    statements.  *Amylin*, 2003 U.S. Dist. LEXIS 7667, at *20 (disclosures not meaningful where they did

3    not provide information about the very facts that defendants knew at the time made their statements

4    false and misleading); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[60]

5            Oracle's warnings that its hockey-stick pattern of revenue "could cause quarterly revenues

6    and net income to fall significantly short of anticipated levels" (Defs' Ex. 160 at 24185) fails for a

7    different reason – it is not what caused the miss.   Oracle missed guidance for two reasons:

8    (1) Oracle's forecast produced inaccurate guidance as a result of major internal and external

9    changes; and (2) Oracle's U.S. license business had experienced adverse results throughout 2Q01

10   and 3Q01 (not just in the last month or last few days).  §III.K., *supra*; 15 U.S.C. §78u-5(c)(1)(A)(i)

11   (requires disclosure of important facts that could cause "actual results to differ materially from those

12   in the forward-looking statement").[61]

13           **M.      Defendants Knew or Recklessly Disregarded that Their Statements
                       About the Economy Were False and Misleading**

14

15           Throughout 3Q01, defendants told investors that Oracle was seeing "no impact or slowing in

16   its business" from the declining economy. Exs. 206, 216, 341-342; 343 at Ex. A; 339.  Defendants

17   have admitted that these statements were not forward-looking. Defs' Mem. at 32.  A discrepancy

18   between a defendant's statement and the true state of affairs will render a statement misleading for

19   _____

20   [60]      Defendants reiterated guidance throughout February. *See* §III.K., *supra*.  These projections
     are not protected by the safe harbor both because defendants knew that they were false and because
     they were not identified as a forward-looking statements or accompanied by meaningful cautions.
21   15 U.S.C. §78u-5(c)(1)(B).

22   [61]      Defendants cite *Morgan* to suggest that there is confusion about whether the safe harbor
     gives defendants a license to lie. Defs' Mem. at 26 n.13.  Defendants are mistaken. The Ninth
23   Circuit is clear – making a projection with actual knowledge that it is false or misleading will
     "except[] statements from the safe harbor rule altogether." *Am. West*, 320 F.3d at 937 n.15; *In re
24   SeeBeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1163-64 (C.D. Cal. 2003), which this
     Court referenced in *Morgan* as an alternative view, supports plaintiffs.  It holds that the safe harbor
25   does not give a defendant a "license to lie" because "[i]f the forward-looking statement is made with
     actual knowledge that it is false or misleading," the accompanying cautionary language must
26   disclose that it is false or misleading. *Id.* at 1165 ("accompanying cautionary language can only be
     meaningful if it either states the belief of the speaker that it is false or misleading or, at the very
27   least, clearly articulates the reasons why it is false or misleading"). Defendants' risk disclosures did
     not disclose that Oracle's guidance was false and misleading.

28

     PLTFS' AMENDED [CORRECTED] OPP TO DEFS' MOTION FOR SUMMARY JUDGMENT - C-01-
     0988-MJJ                                                                          - 42 -

1    purposes of §10(b).  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1020 (9th Cir. 2005), *cert.*

2    *denied*, 546 U.S. 1172 (2006).  As discussed in detail in §III.K., defendants knew that the slowing

3    economy ***was*** impacting Oracle's business at the time of each statement.[62]  Even before defendants'

4    first statement, Oracle had lost millions in revenue due to the dot.com implosion, its FY01

5    conversion ratios had declined sharply, and the two U.S. divisions that caused its 3Q01 miss were

6    reporting adverse information.  *See* §III.K., *supra*.  NAS reported that the number of big deals

7    (which had driven results in 1Q01 and 2Q01) were virtually nonexistent and that its pipelines could

8    not support its Potential Forecast.  *Id*.  OSI's pipeline was "down a lot" at the beginning of 3Q01 and

9    included long-shot deals in troubled sectors.  *Id*.  Defendants knew all of these facts when they told

10   investors that the economy was having "no" impact on Oracle's business.  *Id*.[63]

11        That was only the beginning.  The metrics that defendants relied on, including actual results

12   and pipeline growth, grew worse after December 14, 2000, even as defendants repeated their false

13   and misleading tale.  §III.K.2.a.d., *supra*.  The pipeline collapsed by $328 million by December 25,

14   2000 and continued to plummet throughout 3Q01.  §III.K.2.d., *supra*.  By the beginning of January

15   2001, NAS reported that its pipeline had fallen (when it was expected to increase) and its dot.com

16   bubble had "burst."  §III.K.2.b., *supra*.  OSI reported that its applications pipeline had collapsed (by

17   $200 million) and that extremely far-fetched conversion rates (even over 100%) would be necessary

18   for the division to achieve its potential.  *Id*.  Negative reports from each U.S. division caused Minton

19   to reduce her upside by uncharacteristically high amounts (from $159.5 million down to $0)

20   _____

21   [62]    Taken in context, defendants' economy statements also conveyed to investors that Oracle
      ***would not*** be affected by the ongoing economic slowdown, absent a recession or depression.
22   Throughout the Class Period, defendants reiterated Oracle's 2H01 guidance, which included both
      3Q01 and 4Q01.  *See* §III.K.1., *supra*; Exs. 342; 343 at Ex. B; 206 at 03222.  Defendants knew that
23   even with the inflation caused by the directive, throughout 3Q01, Oracle's U.S. divisions were
      forecasting 4Q01 growth that was either negative or far below targets (and guidance).  *See* §III.K.2.,
24   *supra*.  In 3Q01, either Oracle was predicting a recession by 4Q01 or the current economic
      slowdown was affecting Oracle's business.  Either way, defendants' economy statements were false
25   and misleading when made.

26   [63]    Defendants rely almost exclusively on the 3Q01 Potential in bootstrap fashion to argue that
      Oracle was not currently feeling the effect of the economic slowdown, however, as discussed in
27   §III.K.1, defendants knew that Oracle's 3Q01 forecast was inaccurate and unreliable as a result of
      external and internal changes, including the economic slowdown.

28

1    throughout 3Q01.  Ex. 230 at Ex. 11.  The collapsing pipeline caused Oracle to forecast growth rates

2    **higher** at times than Oracle's pipeline growth – again, highly unusual given historic practice.

3    Ex. 230 at Ex. 13.  To top it off, each of Oracle's U.S. divisions had reported severe negative growth

4    trends through the first two months of 3Q01 and were reporting nearly non-existent actual revenues.

5    §III.K.2., *supra*.  It took an extraordinary one-time transaction with Covisint to save the OPI division

6    from the same fate as the NAS and OSI divisions.  *Id*.  Finally, in 3Q01, Oracle's field forecasts,

7    which were inflated as a result of the directive, were still projecting negative or non-existent growth

8    for 4Q01.  *See* §§III.K.1.c. & III.K.2.c., *supra*.  Defendants knew all of this information.

9    Accordingly, defendants' economy statements amounted to an "extreme departure" from the

10   standards of ordinary care that misled investors.

11        **N.    The Insiders' Sales Establish Scienter**

12        Ellison's stock sales support an inference of scienter.  *See* Ex. 225 at §III.D.  *Nursing Home*

13   *Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  Ellison's trades

14   were dramatically out of line with his trading history – he had not sold for five years – and were

15   suspicious in amount as Ellison sold a "truly astronomical" 29 million shares for proceeds of $895

16   million.[64]  *Id*. at 1232; Exs. 344; GG at 28:2-4; 345.  Ellison's trades were also suspiciously timed.

17   He decided to unload early (before January 19, 2001, every indication was that he would sell in April

18   or August 2001), only 36 hours after receiving the Garnick Flash Report, and when he knew that his

19   metrics showed that Oracle's business was suffering from the economy and product problems and

20   that 2Q01 earnings were false – making him one of the last investors to sell Oracle stock above $30

21   per share.  *See* Exs. 225 at §II.C.; GG at 33:2-5, 69:1-70:3; LL at 59:15-60:6; 250 at 300606,

22   300609; 277, 346-350; 351 at 092603, 092608; 352 at 050621-24, 050655-56; 353 at 038232; 354-

23   355.  Ellison's use of proceeds – to pay for a $100 million home and a $250 million yacht – also

24

25

26   [64]     Ellison's massive trading must also be viewed in light of SEC rules.  Ellison sold 16.34% of
27   the maximum allowed by SEC Rule 144 and authorized up to 22.47% of that maximum.  Exs. 250;
     344; GG at 50:5-52:20; LL at 65:4-67:19; 17 C.F.R. §230.144(e).

28

1   compels a finding that he acted with scienter.  Exs. 17 at 485-86, 369-70; 356 at 318, 323; HH at

2   353:24-354:8; *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994).

3          Defendants argue that a lack of sales by other Oracle executives negates any inference of

4   scienter.  Defs' Mem. at 33.  Defendants' argument fails.  First, the Ninth Circuit rejected this

5   argument in *Am. West*, 320 F. 3d at 944.  Moreover, other Oracle executives either sold stock in

6   January 2001 or had plans to do so.  Henley sold one million Oracle shares for proceeds of $32

7   million on January 4, 2001 when he knew of adverse information regarding Oracle's products and

8   financial condition, that Oracle's 2Q01 earnings were false and that its 3Q01 guidance was

9   inaccurate.  Ex. 243; *see* §III.K., *supra*; *see also* Ex. 357 at 017086; 358 at 6.[65]  Nussbaum and

10  EMEA EVP Giacoletto, sold stock in 3Q01 while in possession of adverse information and Minton,

11  Sanderson, Catz, and Daniel Cooperman all had plans to sell theirs in January 2001.  Exs. 359 at

12  609547-48; 360 at 611349; CCC at 196:20-197:21, 198:15-24, 209:22-210:18; AAA at 105:24-

13  119:13; ZZ at 23:15-25:20; 361-364; DDD at 204:9-210:1; 365 at 297312; 366-368; BBB at 230:1-

14  244:25; 369 at 609420-421; 370-372.  Cooperman and Catz did not sell in late January (Cooperman

15  had already sold 5,000 shares on January 4, 2001 and had plans to sell more) because they found out

16  that Ellison was selling and both Minton and defendant Sanderson planned to trade because of the

17  declining economy.  *Id.*  These planned sales (either consummated or abandoned) by virtually all of

18  Oracle's top executives establish scienter.

19              **1.      Oracle's Stock Repurchases Establish Scienter**

20         In 3Q01, defendants caused Oracle to repurchase 12.6 million of its shares for over $350

21  million to drive up or stabilize Oracle's stock price.  Exs. 373 at 140861; 374; BBB at 270:13-23; H

22  at 289:11-294:15; 375.  3Q01 repurchases were timed to allow defendants to unload their shares at

23  higher prices.  Exhibit 376 evidences this trend, with repurchases clustered just prior to and during

24

25  [65]      Defendants cite to Judge Strine's opinion (in what turned out to be a very different case) to
26  argue that Henley's sales do not establish scienter.  Defs' Mem. at 33-34.  But Judge Strine relied
    largely on the inaccurate and unreliable Potential to reach this conclusion, and discovery in this case
27  has revealed that Henley possessed far more adverse information than the Delaware plaintiffs
    presented.  *Oracle Derivative*, 867 A.2d at 943-44.

28

1 │ Ellison's and Henley's sales.  Ex. 376.  Defendants also used Oracle's repurchases to mitigate

2 │ negative market information.  In 3Q01, repurchases were clustered after publicity regarding Ellison's

3 │ sales caused the stock price to decline.  *Id*.  On February 9, 2001, negative press coverage caused

4 │ Oracle's stock to plummet.  *Id*.; Exs. 377-379.  As defendants reassured the market and reiterated

5 │ guidance on February 8 and 9, 2001, they caused Oracle to repurchase almost three million shares of

6 │ stock for $69 million.  *Id*.; Ex. 374.  Defendants' use of Oracle's repurchase program in 3Q01

7 │ establishes scienter.

8 │ **2.      Defendants' Spoliation Establishes Scienter**

9 │ Defendants' spoliation establishes scienter and supports an adverse inference on summary

10 │ judgment.  Defendants have destroyed or altered accounting records, failed to preserve the files of

11 │ executives, intentionally destroyed hundreds of hours of directly-relevant tapes and transcripts of

12 │ interviews with Ellison after being ordered to produce them (and most other evidence of Ellison's

13 │ knowledge), and purged databases, websites, and back-up tapes containing information directly

14 │ relevant to this lawsuit.  *See* Exs. 225 at §III.E.; 55.

15 │ **O.      The Facts Support a Jury Finding of Loss Causation**

16 │ "A private plaintiff who claims securities fraud must prove that the defendants' fraud caused

17 │ an economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-44 (2005) (citing 109 stat.

18 │ 747, 15 U.S.C. §78u-4(b)(4)).  Loss causation can be proved with evidence of a stock price decline

19 │ when the facts revealing the company's true financial condition are disclosed.  *See Daou*, 411 F.3d at

20 │ 1026.  Defendants apparently concede loss causation on the issue of alleged false statements

21 │ concerning the economy and the 3Q01 forecasts.  However, without identifying a single undisputed

22 │ fact, they contend that plaintiffs cannot prove loss causation with respect to Suite 11i's

23 │ misrepresentations or the material overstatement of 2Q01 revenues and earnings.  Defs' Mem. at 40,

24 │ 45.  Defendants incorrectly assert that plaintiffs must show that the failure to meet 3Q01 earnings

25 │ forecast revealed new "specific" information about "cancelled or delayed purchases due to alleged

26 │ defects Suite 11i," or that "the very same facts" alleged to have been concealed actually caused

27 │ Oracle to miss its earnings forecast.  *Id*. at 40-42, 46.  Defendants' argument has been rejected time

28 │ and again by the district and appellate courts, including this Court.  *Nursing Home Pension Fund v.*

1   *Oracle Corp.*, No. C01-0988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *36 (N.D. Cal. Dec. 20, 2006)

2   ("[A]s to Defendants' argument that Plaintiffs have failed to identify a corrective disclosure with

3   regard to Plaintiffs' Accounting Claim and Design Claim, the Court finds them without merit.").

4          Defendants also misinterpret both the Supreme Court's ruling in *Dura* and *Daou*.  Neither

5   case requires such a specific disclosure tied to a specific representation but rather require only that

6   plaintiff proves that misrepresentations proximately caused the loss.  Defendants' reliance on *In re*

7   *Gilead  Scis. Sec. Litig.*, No. C03-4999 MJJ, 2006 U.S. Dist. LEXIS 32893 (N.D. Cal. May 12,

8   2006) and *In re Impax Labs, Inc., Sec. Litig.*, No. C04-04802 JW, 2007 U.S. Dist. LEXIS 723 (N.D.

9   Cal. Jan. 3, 2007), is misplaced.  *Gilead* (which is on appeal) is factually inapposite.  In *Gilead*,

10  plaintiffs alleged that an August 8, 2003 disclosure caused a stock price decline that occurred nearly

11  ***three months later***, on October 28, 2003.   2006 U.S. Dist. LEXIS 32893, at *22.  In *In re Impax*

12  *Labs., Inc. Sec. Litig.*, No. C04-04802 JW, 2007 U.S. Dist. LEXIS 52356 (N.D. Cal. July 18, 2007),

13  Judge Ware found that the Impax's announcement of lower than expected financial results ***was***

14  indeed sufficient to infer the markets understanding that the forecast miss was connected to the

15  accuracy of the Company's financial statements.  *Id*. at *17.[66]

16         Here, on December 14, 2000, Oracle, announced 2Q01 (false) revenues and earnings results

17  – overstating earnings by a penny – with projections of its future revenues and earnings, specifically

18  with respect to 3Q01.  Ex. 105.  The announcement specified that Oracle had ***earned*** $0.11 per share

19  for 2Q01 and achieved 66% applications [11i] growth – beating analysts expectations for both

20  earnings and applications sales.  Exs. 26, 105.  These results caused a statistically significant

21  increase in the price of Oracle stock.  Ex. 168.  Oracle did not disclose the accounting fraud that

22

23  ──────────────────

24  [66]    Notwithstanding two versions of their motion for summary judgment (weeks apart), defendants also rely on Judge Ware's January 2007 decision in *Impax*, 2007 U.S. Dist. LEXIS 723, granting defendants' Motion to Dismiss Second Amended Complaint for the proposition that

25  plaintiffs must identify the "specific truth" that was revealed.  Defs' Mem. at 39-40.  However, on July 18, 2007, Judge Ware issued an order denying Defendants' Motion to Dismiss Third Amended

26  Complaint further addressing loss causation.  Judge Ware's July 18, 2007 Order is indeed consistent with *Dura* and *Daou* and cites *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.), *cert.*

27  *denied*, 546 U.S. 935 (2005), for the proposition that only the ***subject*** of the fraudulent statement or omission was the cause of the actual loss."  *Impax*, 2007 U.S. Dist. LEXIS 52356, at *10.

28

1    enabled Oracle to reach those numbers.[67]  Instead, Henley specifically cited the false $0.11 and used

2    it as the basis for future earnings and specifically to set 3Q01 of $0.12 earnings ("Historically, the

3    third quarter is slightly better than the second quarter. . . .  So I would assume, 12 cents would be a

4    reasonable number . . . .").  Ex. 26 at 234427.[68]  Oracle also made false representations regarding the

5    functionality of Suite 11i and growth forecasts.  *Id*.  Forecasting 75% 11i applications growth on

6    December 14, 2000 and $0.12 per share, defendants claimed that Oracle had met the challenge of

7    "delivering" the 11i.  Ex. 26 ("The question that everyone had had, including their existing

8    customers is could we in fact deliver this enormously, you know, comprehensive suite of

9    applications . . . and we did and they're seeing it ***and they're buying everywhere***.").  *Id*. at 15.

10         On March 1, 2001, Oracle reported only $0.10 per share and 11i applications growth was

11   only 50% rather than 75%.  Ex. 196.  Oracle's stock price suffered an immediate and statistically

12   significant decline from $21.38 to $16.88.  *See* Exs. 168 at 43; 169.  Investors also learned that

13   issues concerning the functionality, *i.e.*, bugs and lack of stability of Suite 11i which had entered the

14   marketplace during Oracle's 1Q01 and 2Q01, had not in fact been cured as defendants had reported

15   at the end of 2Q01.  And contrary to defendants assurances that the economy was not affecting the

16   Company, defendants specifically attributed the shortfall to the economy, and Suite 11i had not

17   driven sales providing new opportunities.  *See* Exs. 196, 203.  The 11i defects hurt sales.  Failure to

18   demonstrate 11i cost sales.  Oracle's internal 11i implementation admittedly contributed to the 3Q01

19   revenue shortfall.  "***It did not take a genius to see that not everything that was going on could be***

20   ***explained by the weakening economy and edgy CEO's waiting for visibility to return***."  Ex. 17 at

21   _____

22   [67]     *See* Ex. 170 (December 15, 2000 Deutsche Bank, Alex.Brown report: "Applications license
     growth of 66% solidly outpaced Street expectations in the 50-60% range.  The ***out performance***
23   ***should also allay concerns about the viability of Oracle's, applications business and the relative***
     ***immaturity of release*** 11i, following last quarter's decent, but slightly disappointing growth."); *see*
24   *also* Ex. 129 (December 15, 2000 Solomon Smith Barney report: "We anticipate the ***applications***
     ***division will continue to accelerate*** given the Company has exhibited significant traction since
25   release of Version 2 of its E-business Suite in October.  We are under the impression that the first
     version had considerable bugs and the most recent version is really gaining traction.").

26   [68]     Henley further connected the Company's ability to make its 3Q01 forecast to Suite 11i,
27   including stability, demonstrations and references ("11i is much more stable than it was in Q2 . . . so
     better demos and number of references should help our apps business in Q3.").  Ex. 198.

28

1    201; *see* Ex. 172, summarizing Gartner Executive Briefing ("Oracle's current CRM products are

2    technically unstable.  There are gaps in functionality.").  Defendants' expert Christopher James

3    agrees with plaintiffs:

4            I would view material new information ***regarding both the applications business as***
             ***well as Oracle's other businesses and how they were faring in the then current***
5            ***economic environment***.

6            Q.    And what was the new information regarding how the applications business
                   was faring . . . ?

7            A.    I think ***it is clear to me that the market and market participants were***
                   ***concerned about the earnings miss and what it conveyed in terms of future***
8                  ***business prospects in the then current economic environment***.  Ex. AA at 137:14-
                   138:1.[69]

9            Finally, defendants suggest that the market knew the facts plaintiffs say Oracle failed to

10   disclose.  Defs' Mem. at 41.  But an omission is materially misleading only if the information has

11   not already entered into the market.  *In re Apple Corp. Computer Sec. Litig.*, 886 F.2d 1109, 1114

12   (9th Cir. 1989).  A defendant can escape liability only where defendant can show that the market was

13   not affected by a misrepresentation because the truth of the matter was already factored into the

14   market price.  *Provenz*, 102 F.3d at 1492.  Before the truth on the market doctrine can be applied,

15   however, defendants must prove that the information that was misrepresented was transmitted with

16   the degree of intensity and credibility to counterbalance any misleading impression by the

17   representations.  Summary judgment is proper only if they show that no rational jury could have

18   been misled.  *Id*.  Defendants make no attempt however to prove that 11i bugs, defects, and overall

19   poor quality had reached the market with the necessary degree of intensity and credibility required.

20   Defendants simply attach analyst and news reports (most of which are inadmissible hearsay) to

21   support their motion.  Eleven of the fifteen reports cited by Oracle in relation to 11i are dated ***prior***

22   to the false statements alleged during Class Period, some dating back to February 2000.  Harrison

23   Decl., Exs. 91, 112, 117, 140, 154, 206-208, 211-212, 215.  Indeed, defendants affirmatively

24   reiterated false statements regarding the functionality of 11i and refuted any suggestion of serious

25

26   [69]       Defendants also ignore that the Court has recognized plaintiffs' claims to include false
            statements that demand 11i was so strong that the slowing economy would not hurt sales.  *See*
27          September 6, 2002 Order Granting Defendants' Motion to Dismiss Plaintiffs' First Amended
            Complaint.

28

1  instability or bugs in Suite 11i before and during the Class Period.[70]  The remainder or the reports

2  also reiterate the false impression resulting from the misstatements.  *See*, *e.g.*, Harrison Decl., Ex.

3  147 ("**Application Momentum Continues** . . . .  ***11i continues to gain momentum despite the***

4  ***weakening macro environment.  Oracle got the message right – companies are responding to and***

5  ***intrigued by the one stop shopping and pre-integrated application suite.***").

6  **IV.    CONCLUSION**

7         For all the foregoing reasons, defendants' motion should be denied.

8  DATED:  November 14, 2007              Respectfully submitted,

9                                        COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
10                                       MARK SOLOMON
                                         DOUGLAS R. BRITTON
11                                       STACEY M. KAPLAN

12                                                    /s/
13                                        MARK SOLOMON

14                                       655 West Broadway, Suite 1900
                                         San Diego, CA  92101
15                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)

16

17

18

19

20

21

22

23  _____

24  [70]      *See also* Exs. 173 (December 15, 2000 Credit Suisse First Boston Report) ("Picture Perfect
    Q2: FY01 Should Even Convert the Skeptics . . . .  [A]pplications revenue of $279 million also
25  exceeded our expectations of $252 million. We believe these results were solidly better than
    published expectations and should be strong enough to convince the skeptics that ORCL's products
26  business is capable of greatness. . . .  ***We expect ORCL's applications revenue to grow at a healthy***
    ***pace as ORCL  continues to penetrate its installed base of applications customers, . . . and also***
27  ***attracts new customers with its integrated 'one stop shop' value proposition*** . . . ."); 173; *see also*
    Harrison Decl. at 145.

28

1

2                                  COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP

3                                  SHAWN A. WILLIAMS
                                  WILLOW E. RADCLIFFE

4                                  MONIQUE C. WINKLER
                                  ELI R. GREENSTEIN

5                                  100 Pine Street, Suite 2600
                                  San Francisco, CA  94111

6                                  Telephone:  415/288-4545
                                  415/288-4534 (fax)

7                                  Lead Counsel for Plaintiffs

8  T:\CasesSF\Oracle3\BRF00046978_Corrected_Opp MSJ_2.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on November 14, 2007, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List.

5

I further certify that I caused this document to be forwarded to the following designated

6

Internet site at:  http://securities.csgrr.com/.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on November 14, 2007.

9

10

$\phantom{XXXXXXXXXXXX}$                                    /s/
$\phantom{XXXXXXXXXXXX}$ MARK SOLOMON

11

COUGHLIN STOIA GELLER

12

$\phantom{XXXX}$ RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900

13

San Diego, CA  92101-3301
Telephone:  619/231-1058

14

619/231-7423 (fax)
E-mail:marks@csgrr.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:01-cv-00988-MJJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Valerie McLaughlin**

valeriem@lerachlaw.com,kellyb@lerachlaw.com

- **Brian P Murray**
  bmurray@rabinlaw.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_s

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

- **Monique C. Winkler**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sd@csgrr.com,E_File_SF@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Dorian Daley
500 Oracle Parkway
Redwood City, CA 94065

Corey D. Holzer
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

Raymond Lane
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

PRG-Schultz USA, Inc.
Paul Hastings Janofsky & Walker LLP
55 Second Street
```

```
24th Floor
San Francisco, CA 94105
```

**Darren Jay Robbins**
```
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
```

**Sanna Rachel Singer**
```
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111
```