Westlaw.
2007 WL 3357692                                                                                                                Page 1
--- F.R.D. ----, 2007 WL 3357692 (N.D.Tex.)
**(Cite as: 2007 WL 3357692 (N.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
Jerry RYAN, et al., Plaintiffs,
v.
FLOWSERVE CORPORATION, et al., Defendants.
**Civil Action No. 3:03-CV-1769-B ECF.**

Nov. 13, 2007.

*MEMORANDUM ORDER*

JANE J. BOYLE, United States District Judge.

**\*1** This is a private securities fraud action. Two pivotal issues face the court. First, is the class certification motion by lead plaintiff, Alaska Electrical Pension Fund ("Alaska Electrical"), and named plaintiff, Massachusetts State Carpenters Pension Plan ("Massachusetts Carpenters"), (collectively, "the Funds" or "the Plaintiffs") against Flowserve Corporation ("Flowserve"); C. Scott Greer ("Greer"), its CEO during the class period; Renee J. Hornbaker ("Hornbaker"), its CFO during the class period; [FN1] PricewaterhouseCoopers LLP ("PwC"), its auditors; and Banc of America Securities LLC ("BofA") and Credit Suisse First Boston LLC ("CSFB"), two of the underwriters of Flowserve's stock offerings that were made during the class period. [FN2] Second, are four summary judgment motions: Defendants Banc of America Securities LLC's and Credit Suisse First Boston LLC's Motion for Summary Judgment (doc. 588), Defendant PricewaterhouseCoopers LLP's Motion for Summary Judgment (doc. 590), Defendant C. Scott Greer's Motion for Summary Judgment (doc. 596), and Defendants Flowserve Corporation's and Renee J. Hornbaker's Motion for Summary Judgment (doc. 640). The Court has combined its resolution of the certification and summary judgment motions in this order. Brief descriptions of the two motions and the Court's rulings follow.

>   FN1. Flowserve, Greer, and Hornbaker will be referred to collectively as the "Flowserve Defendants."

>   FN2. BofA and CSFB will be referred to collectively as the "Underwriter Defendants."

In their Motion for Class Certification (doc. 239), filed May 30, 2006. Plaintiffs move the Court to certify a plaintiff class of:
>   All persons who purchased the publicly-traded equity [ ] [FN3] securities of Flowserve Corporation between February 6, 2001 and September 27, 2002. Excluded from the Class are defendants and members of their immediate families, any entity in which a defendant has a controlling interest and the legal representatives, heirs, successors or assigns of any excluded party.

>   FN3. At the class certification hearing, Plaintiffs clarified that they are only seeking certification of a class of purchasers of equity securities as opposed to a class of purchasers of equity and debt securities.

(Mot. for Class Certification ("Class Cert.") at 2) The Court has reviewed all of the briefing on certification as well as the parties' supplemental submissions on loss causation. Because Plaintiffs cannot demonstrate loss causation on their § 10(b) and Rule 10b-5 claims, the Court DENIES their motion for class certification.

In their motions for summary judgment, Defendants raise numerous grounds for relief, all converging on the contention that Plaintiffs' loss causation evidence with respect to their § 11 claims is fatally flawed. More precisely, the Defendants uniformly maintain that Plaintiffs' § 11 claims cannot survive their affirmative defense of negative causation because they cannot demonstrate a causal connection between the alleged misstatements underlying Plaintiffs' § 11 claims and the corresponding losses those misstatements are supposed to have caused. The Court agrees and, for the reasons detailed below, GRANTS the Defendants' motions for summary judgment on Plaintiffs' § 11 claims and confines its summary judgment analysis to the negative causation issue.

**I. BACKGROUND**
**A. Factual Background**

**\*2** As recounted in numerous filings by the parties,

2007 WL 3357692                                                                                                Page 2
--- F.R.D. ----, 2007 WL 3357692 (N.D.Tex.)
**(Cite as: 2007 WL 3357692 (N.D.Tex.))**

Flowserve manufactures pumps, seals, and valves and provides a variety of flow management services to the "process industries." (Fifth Am. Compl. ("Compl.") ¶ 51) Flowserve's financial slide and resulting legal problems, according to Plaintiffs, began in fiscal year 2000 when the company "went on a massive acquisition binge more than doubling its size but saddling itself with immense debt." (Class Cert. at 3) In particular, the company purportedly faced extreme difficulties with its August 2000 acquisition of Ingersoll-Dressor Pump Co. ("IDP") and its May 2002 acquisition of the Invensys Flow Control Division ("IFC"). (Compl.¶ 4) Such difficulties purportedly led to negative cash flow, a need for equity infusion, and violations of Flowserve's various debt covenants. (*Id.* at ¶ ¶ 7-8) Defendants Greer and Hornbaker allegedly issued overly optimistic predictions of earnings per share ("EPS") to conceal the fraud. (*Id.* at ¶ 6) Flowserve's ensuing fiscal problems and stock plummet, Plaintiffs say, led to the instant suit. (*Id.* at ¶ ¶ 3-4)

The proposed class period begins on February 6, 2001 with Flowserve's report of its net income for the year 2000 as $13.2 million. (Class Cert. at 5-6) Plaintiffs contend that the overstatement of Flowserve's financial position caused the company's stock to trade at inflated levels. (*Id.* at 6) Moreover, Plaintiffs assert that Flowserve's continued concealment of inventory issues and overall mischaracterization of the company's financial status enabled Flowserve's stock price to remain inflated throughout the class period. (*Id.*) The class period ends on September 27, 2002 when Flowserve reduced its earnings guidance for 2002, which Plaintiffs maintain:

> substantially reduced investors' reliance on the prior allegedly false representations by Flowserve and substantially reduced investors' inflated expectations regarding the future prospects of the Company .... substantially reduced the inflationary impact of the alleged false and misleading statements .... [and] alerted investors to the fact that Flowserve might be in violation of its debt covenants.
> (*Id.*) [FN4]

> FN4. *But see* Pls.' Req. for Additional Judicial Notice at 2 (doc. 134).

In August 2000, Flowserve chose PwC to serve as its independent external auditors, and PwC still serves in that capacity today. (PwC's Br. in Supp. of Mot. for Summ. J. ("PwC's Br.") ¶ 1 [FN5]) Subsequently, PwC audited and issued unqualified opinions on Flowserve's annual financial statements for 2000 and 2001, and these were incorporated into registration statements for two of Flowserve's public offerings. (*Id.* ¶ 2)

> FN5. When citing to the Statement of Undisputed Facts in PwC's brief, the Court will cite to the numbered paragraphs in that section of the brief. Citations to all other portions of PwC's brief will refer to page numbers.

On April 24, 2001, Defendant Greer advised investors that the integration of IDP would have "temporarily [sic] inefficiencies [and] tend to sag a bit as we transfer production and inventory, move people and extend the learning curve at the receiving plants." (Ex. 110, Pls.' Consolidated Opp.App. 1805) In Flowserve's earnings announcement on July 24, 2001, Defendant Greer later admitted that "various temporary operating inefficiencies related to the integration of IDP have prevented facilities from ramping up." (Ex. 149, Pls.' Consolidated Opp.App. 2462-63; Steinholt Damages Rep. ¶ ¶ 39-40, Pls.' Suppl. App. 17-19) Analysts continued to track these integration issues. One commented that "[d]ifficulties mentioned last quarter at two of the IDP-imposed facilities are being addressed and management changes have been made. Flowserve is confident that these integration issues will be behind the company by year end. No new difficulties were reported." (Steinholt Damages Rep. ¶ 44, Defs.' Suppl. App. 161-62)

**\*3** On May 31, 2001 Flowserve filed a Shelf Registration Statement with the Securities and Exchange Commission that would later become the basis for their November 2001 and April 2002 public offerings. (PwC's Br. ¶ 3) Flowserve amended the Shelf Registration Statement on July 2, 2001. (*Id.*) Several months later, on November 16, 2001, Flowserve filed a Prospectus Supplement with the SEC. [FN6] (*Id.* ¶ 4) That day, pursuant to the November 2001 Registration Statement, Flowserve held a public offering of its common stock at $23.50 per share. (*Id.*) Incorporated into the November 2001 Registration Statement were Flowserve's 2000 Form 10-K--consisting of, among other things, a "Report of Management," attesting to the adequacy of Flowserve's internal controls, and Flowserve's audited 2000 year-end financial statements--and the unqualified audit opinion that PwC provided as to those financial statements. (PwC's Br. ¶ 5; Compl. ¶ 422) As mentioned, BofA and CSFB underwrote this offering along with several other underwriters.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(Underwriter Defs.' Br. in Supp. of Mot. for Summ. J. ("Underwriters' Br.") at 1)

> FN6. The November 2001 Prospectus Supplement and the Shelf Registration Statement comprised the November 2001 Registration Statement.

In April 2002, Flowserve filed a second Prospectus Supplement with the SEC. [FN7] (PwC's Br. ¶ 6) That same day, April 16, 2002, Flowserve held a public offering of its common stock at $31.50 per share, pursuant to the April 2002 Registration Statement. (*Id.*) This Registration Statement also incorporated Flowserve's 2000 Form 10-K. (*Id.* ¶ 8) Similarly incorporated into the April 2002 Registration Statement were Flowserve's 2001 Form 10-K-- consisting of, among other things, a "Report of Management," attesting to the adequacy of Flowserve's internal controls and Flowserve's audited 2001 year-end financial statements--and the unqualified audit opinion that PwC provided as to those financial statements. (*Id.* ¶ 7; Compl. ¶ 441) As they did with the November offering, BofA and CSFB partially underwrote the April offering as well. (Underwriters' Br. at 1)

> FN7. The April 2002 Prospectus Supplement and the Shelf Registration Statement comprised the April 2002 Registration Statement.

The misstatements at the core of Plaintiffs' § 11 allegations are contained in Flowserve's year-end financial statements, unqualified audit reports, and the reports of management. Plaintiffs claim that these misrepresentations inflated the value of Flowserve's stock. (Compl.¶ 486) In July and September 2002, Flowserve issued two press releases which, according to Plaintiffs, revealed the company's "true operating performance and financial condition"--triggering their losses. [FN8] (Pls.' Resp. to PwC at 28)

> FN8. In their Fifth Amended Complaint Plaintiffs staked out a different position as to the press releases, maintaining that Flowserve continued to conceal the truth about the company in the releases but that the content of the releases deflated shareholders' expectation and the value of the stock (*Id.* ¶¶ 456-57) Regardless of the theory, the Court reaches its decision based on the actual content of the press releases at issue.

The Funds identify two specific Flowserve press releases as revealing the misrepresentations and thereby precipitating the drops in the value of Flowserve stock that led to their losses. After the market had closed on July 22, 2002, Flowserve issued a press release (the "July Release"), which stated in relevant part:

> Flowserve Corp. (N.Y.SE:FLS) today reported net income of 28 cents a share in the second quarter of 2002, compared with 7 cents a share in the year ago quarter.
>
> **\*4** Excluding special items, net income was 46 cents a share in the second quarter of 2002, an increase of 31 percent compared with the prior year period, and within the range of the company's previously announced estimates.
>
> ...
>
> Results for the second quarter of 2002 primarily reflect weakening in the quick turnaround business, particularly the chemical and industrial sectors, specifically affecting industrial pumps, manual valves and service. Furthermore, quarterly revenues had a higher proportion of project business compared with the prior year period. Project business generally has thinner margins than other types of business. Currency translation also had an unfavorable impact in the second quarter of 5 percent on operating income. These unfavorable factors were partially offset by the $4.7 million, or 7 cents a share, benefit of compliance with SFAS 141 and 142.
>
> Outlook
>
> "Looking at our key end-markets, we see very much a mixed picture," Greer said. "While petroleum and water look good, other sectors cause us some concern. Project shipments for the power business remain good due to our current backlog though bookings for new projects have slowed, consistent with our previous outlook. Service projects and upgrades for existing power plants are down. [sic]
>
> "Of particular concern is the deterioration of the quick-ship business in the chemical and industrial sectors. At the beginning of the year, we had expected this business to be flat to slightly down for the year. During the second quarter, bookings for this sector experienced double-digit year-over-year declines. Considering the importance of this business to our margins, this type of volume decline coupled with our planned inventory reductions will make profit improvement difficult. [sic]
>
> "While there has been an increase in the level of inquiries, we don't foresee much in the way of real spending increases until 2003. As a result of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

decline in chemical and industrial bookings in the second quarter coupled with the resulting drop in backlog, it is only prudent to estimate earnings per share, excluding special items, in the range of 38 to 43 cents in the third quarter of 2002 and $1.70 to $1.90 for the full year," Greer said.

(App. to PwC's Mot. at 005, 007, 010-11; *see also* Ex. 332, Pls .' Consolidated Opp.App. 5260-70) The following trading day, the price of Flowserve's stock declined to $14.55 per share, approximately a 37 percent decrease from the previous day. (PwC's Br. ¶ 14) Analyst coverage of the announcement and stock drop was naturally active.

On September 27, 2002, prior to the opening of the market, Flowserve again lowered its earnings estimates in a press release (the "September Release"), which read in part:

Citing market-related factors, Flowserve Corp. (N.Y.SE:FLS) today lowered its 2002 earnings estimates to 30 to 32 cents for the third quarter and $1.45 to $1.55 for the full year, excluding special items, which relate to the May 2002 acquisition of the Invensys Flow Control Division (IFC). The company's previous guidance had been 38 to 43 cents for the third quarter and $1.70 to $1.90 for the full year, on the same basis.

**\*5** These market-related factors include unanticipated further deterioration of typically higher margin book-and-ship, or quick turnaround, business, particularly in the chemical, power, and general industrial sectors, and an unfavorable mix of lower margin project business.

"While I am disappointed to reduce our earnings estimates, I am pleased to report that we plan to repay about $85 to 90 million of debt, which includes an optional repayment of about $70 million, at the end of the third quarter," said Flowserve Chairman, President and Chief Executive Officer C. Scott Greer. "Our debt paydown projections continue to look very good for future periods. Our current focus is squarely on cash flow and debt reduction. We are working on improving our working capital efficiency and controlling capital expenditures, in order to increase cash flow and improve our financial leverage. [sic]

"In some of our end-markets particularly upstream petroleum and water, bookings have held up," Greer added. "Additionally, I remain optimistic about the company's prospects for 2003 and beyond. We are continuing to make important progress in strengthening the company's balance sheet and operational processes. That said, we are not comfortable at this point projecting more than marginal earnings improvements in 2003, unless markets start to improve. And, we believe they will."

(App. to PwC's Mot. at 039-40; *see also* Ex. 362, Pls.' Consolidated Opp.App. 5572-75) Later that day, Flowserve held an investor conference call in which Defendant Greer and Mark Dishop, Plaintiffs' investment manager at Boston Company, participated. (Ex. 361, Pls.' Consolidated Opp.App. 5516-71) Flowserve stock closed that day at $8.70 per share, which was a decline of approximately 38 percent. (PwC's Br. ¶ 20) Analyst coverage of the announcement and stock drop was likewise active. (*See, e.g.,* Exs. 363, 364, 366, 367, 368 and 369, Pls.' Consolidated Opp.App. 5576-5627)

On February 3, 2004, Flowserve announced "[e]stimated restated results for the nine months ended Sept. 30, 2003 and for the full year 2002, 2001 and 2000 include aggregate pretax charges of approximately $11 million, predominantly to correct inventory and related balances which resulted in cost of sales adjustment." (Ex. 414, Pls.' Consolidated Opp.App. 6812) That day, the price of Flowserve's stock declined by $0.12 to $19.18 per share. (PwC Br. ¶ 25) On April 26, 2004, Flowserve filed its Form 10-K for the fiscal year 2002 with the Securities Exchange Commission. (Ex. 426, Pls.' Consolidated Opp.App. 7022- 7186)

**B. Procedural Background**

Against this factual backdrop, on August 7, 2003, Plaintiffs filed suit against Flowserve Corporation, C. Scott Greer, and Renee J. Hornbaker. On May 14, 2004, Plaintiffs added claims against PricewaterhouseCoopers LLP, Banc of America Securities LLC and Credit Suisse First Boston LLC. After numerous amendments to their complaint, the operative pleading for purposes of this analysis is Plaintiffs' 153-page Fifth Amended Complaint. The complaint contains fraud claims against the Flowserve Defendants under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder. (Compl.¶ ¶ 463-472) The essence of the case against the Flowserve Defendants is that they concealed key information from the investing public through misstatements and omissions. Specifically, Plaintiffs charge that Flowserve made "material misrepresentations and/or omissions [ ] done knowingly or recklessly for the purpose and effect of concealing Flowserve's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

securities." (*Id.* ¶ 468) Those material misrepresentations and/or omissions can be grouped into four general categories:

**\*6** (1) "Dis-synergies"--Flowserve's growth-by-acquisition binge was an ill-conceived plan, particularly concerning its integration of IDP and IFC, which saddled the company with over $1.1B in debt (Compl.¶ 4);

(2) "False Financials"--Flowserve falsely reported financial results in the fiscal years 2000, 2001, 2002 and the first three quarters of 2003 by "improperly understating current cost sales expenses, improperly overstating inventory, managing earnings using 'cookie jar' reserves, and disguising operating expenses as one-time charges." (Compl.¶ 129);

(3) "Violation of Debt Covenants"--Flowserve violated its debt covenants under its "senior credit facilities for three consecutive quarters (3Q01, 4Q01 and 1Q02), namely the 'maximum leverage ration' and the 'interest coverage ratio.' " (Compl.¶ 155); and

(4) "Optimistic EPS"--Flowserve, through Greer and Hornbaker, falsely predicted a 40-50% increase in earnings per share ("EPS") for fiscal year 2002 despite their knowledge of earnings and revenue shortfalls. (Compl.¶ 6).

Allen Decl. 30-31, Defs.' Suppl. App. 37-38. Plaintiffs lodge separate claims against Greer and Hornbaker as controlling persons under § 20(a) of the Exchange Act, 15 U.S.C. 78t. (PwC Br. ¶¶ 473-476) Lastly, Plaintiffs include claims against the Flowserve Defendants, the Underwriter Defendants, and PwC under § 11 of the Securities Act of 1933, 15 U.S.C. 77k, for their roles in the November 2001 and April 2002 offerings made under the defective registration statement. (*Id.* ¶¶ 477-493) Additionally, Plaintiffs seek to hold Greer and Hornbaker liable for wrongful conduct as controlling persons under § 15 of the Securities Act, 15 U.S.C. § 77o. (*Id.* ¶¶ 494-497) The Defendants filed motions to dismiss under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, which the Court denied at a hearing on November 18, 2005.

Four years into the litigation and volumes of papers later, the Court now decides class certification and summary judgment.

## II. CLASS CERTIFICATION
### A. Legal Standard

Under Rule 23(a), a plaintiff may only sue as the representative of a larger class if:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The party seeking certification bears the burden of proof and must demonstrate that the proposed class and its representative(s) satisfy the requirements of Rule 23(a). 10 *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir.2001). But satisfying Rule 23(a) does not alone transform the case into a class action. Plaintiffs seeking status as a class must also meet one of the requirements of Rule 23(b). Here, Plaintiffs rely on Rule 23(b)(3)'s *predominance* element. But, as will be discussed, Plaintiffs cannot satisfy the predominance requirement and that shortcoming forecloses class status. Thus the Court begins and ends its Rule 23 discussion with the predominance issue.

### 1. *Fraud on the Market Presumption*

**\*7** To hurdle Rule 23(b)(3)'s predominance requirements, Plaintiffs must show that "questions of law or fact common to the members of the class predominate over [ ] questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The predominance query begins with a review of the basic elements of § 10(b) and Rule 10b-5 actions. To prove a private securities fraud claim under these provisions, Plaintiffs must demonstrate, in connection with the purchase or sale of securities, (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which they *relied;* and (5) that proximately caused their injuries. *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657, 661 (5th Cir.2004) (citations omitted) (emphasis in original) Transforming an *individual* § 10(b) and Rule 10b-5 action to a *class* action-- utilizing Rule 23(b)(3)'s predominance factor--hinges on whether plaintiffs can utilize the fraud-on-the-market theory of collective reliance. *Unger v. Amedisys, Inc.,* 401 F.3d 316, 322 (5th Cir.2005).

In order to secure the fraud-on-the-market presumption, Plaintiffs in § 10(b) and Rule 10b-5 cases must show:
(1) the defendant made public material misrepresentations;
(2) the defendant's shares were traded in an efficient market; and
(3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

*Greenberg,* 364 F.3d at 661 (citing *Basic,* 485 U.S. at 224).

The fraud-on-the-market theory supplies a blanket presumption "that each class member has satisfied the reliance element of their 10b-5 claim." *Oscar Private Equity Investments v. Allegiance Telecom., Inc.,* 487 F.3d 261, 264 (5th Cir.2007). "The central premise of the [fraud-on-the-market] theory is that, in an efficient capital market, the market price reflects all public information; hence an investor who purchases a stock in such a market is harmed if the price reflects false information as a consequence of a material misrepresentation." *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 309 n. 2 (5th Cir.2005) (citing *Basic v. Levinson,* 485 U.S. 224 (1988). Without this collective presumption, each plaintiff would have to show individual reliance which will doom the action's chances for class treatment. *Id.* at 310 & n. 2.

The fraud-on-the-market presumption may be rebutted by "any showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff." *Nathenson v. Zonagen,* 267 F.3d 400, 414 (5th Cir.2001) (quoting *Basic,* 485 U.S. at 228). A defendant may rebut the presumption by showing that: (1) the stock market price was not "actually affected" by the alleged fraud; (2) plaintiffs would have purchased the stock even with knowledge of the nondisclosure; or (3) plaintiffs actually knew the information that had not been publicly disclosed. *Fine v. Am. Solar King Corp.,* 919 F.2d 290, 299 (5th Cir.1990). A district court must "perform sufficient analysis to determine that class members' fraud claims are not predicated on proving individual reliance." *Unger v. Amedisys, Inc.,* 401 F.3d 316, 321 (5th Cir.2005).

**2. Fifth Circuit Fraud-on-the Market Rules**

**\*8** The Fifth Circuit, taking its cue from *Basic,* developed its own fraud-on-the-market rules. *Oscar,* 487 F.3d at 264-65 (citing cases). [FN9] In *Nathenson,* the Fifth Circuit found that plaintiffs could show that a purported fraud "actually affected" the stock by showing either an increase in price after the release of "false positive" news or a decrease in stock price after a corrective disclosure. 267 F.3d at 418-19. The court also emphasized that confirmatory statements, *i.e.* information already known to the market, could not actually affect the stock price because the market would not "double-count" and react to the same information. *Id.* at 419.

FN9.   *See   generally   Finkel   v. Docutel/Olivetti Corp.,* 817 F.2d 356 (5th Cir.1987); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988), *vacated on other grounds sub. nom. Fryar v. Abell,* 492 U.S. 914 (1989); *Nathenson v. Zonagen,* 267 F.3d 400 (5th Cir.2001); *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657 (5th Cir.2004).

The Fifth Circuit fine-tuned *Nathenson* in *Greenberg.* If plaintiffs rely on a decline in stock price, they must "show that the false statement causing the increase was related to the statement causing the decrease." 364 F.3d at 665. Translated-- plaintiffs cannot merely rely on the acute drop in price as proof that the fraud actually moved the market. *See In re Initial Pub. Offering Sec. Litig.,* 399 F.Supp.2d 261, 266 (S.D.N.Y.2005) ("fact that an event ... disabused the market of [a belief] does not mean that the event disclosed the alleged scheme to the market). This relatedness inquiry comports with the core goals of securities law. Securities law is intended to maintain public confidence in the marketplace, in part, by deterring fraud and protecting against resulting losses from actual fraud. [FN10] *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 345 (2005).

FN10. In *Dura,* the Court warned that if a plaintiff could forego the relatedness requirement, the private securities action "would bring about harm of the very sort the statutes seek to avoid ... transform[ing] a private securities action into a partial downside insurance policy." 544 U.S. at 347-48 (citing H.R. Conf. Rep. No. 104-369, at 31). Consequently, the *Dura* Court found the alleged falsehoods (likelihood of FDA approval of new asthmatic spray device) and the alleged "truth" (lower earnings announcement due to slow drug sales) were not related and thus insufficient to allege loss causation. *Id.* at 348; *see also Greenberg,* 364 F.3d at 665-69 (finding many alleged falsehoods unrelated to corrective disclosure).

Greenberg addresses the added wrinkle of mixed "bad news" scenarios where related corrective disclosures are concurrently made with unrelated "bad news." In such cases, plaintiffs must also prove that there is a "reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information." 364 F.3d at 666; *see also United States*

v. Olis, 429 F.3d 540, 546 (5th Cir.2005) ("there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines."). The related corrective disclosure must have played "a significant role" in the price drop. [FN11] Id. at 667.

> FN11. The *Greenberg* court ultimately found that the related bad news (interoperability of routers) was "by far the least negative information released" and could not form the basis of the fraud on the market claim. Id. at 667. On the other hand, the court found that the other related bad news (missing analyst estimates by two-thirds) did play a significant role in causing the decline in stock price. Although plaintiffs offered no evidence in support, the Fifth Circuit reasoned that company's miss of the general analyst estimate by 66% was the type most likely to cause the stock price fall. Id. at 666-69.

Finally, during the pendency of the instant motion for class certification, the Fifth Circuit sorted out the evidentiary burdens for the fraud-on-the-market presumption. [FN12] Oscar, 487 F.3d at 264-65. Bottom line--the Fifth Circuit now requires *plaintiffs* to show not only proof that a defendant's fraud was material but also proof that the fraud actually moved the market. Id. at 265 (adding to *Abell* requirement for proof of material effect). The court must make this empirical judgment drawing largely from publicly available data thereby leaving minimal need for discovery. Id. at 267. The underlying justification is the *in terrorem* power of class certification, the extraordinary leverage bestowed upon plaintiffs with certification and the due process rights of the parties. Id. at 266-67; see also Castano, 84 F.3d at 746 ("class certification creates insurmountable pressure on defendants to settle"). In practical terms, plaintiffs must prove loss causation at the class certification stage by a preponderance of all admissible evidence. Id. at 269.

> FN12. The majority opinion in *Oscar* acknowledges that *Basic* imposes the burden on defendants to rebut the presumption, but, as a matter of practice, the "oft-chosen defensive move is to make *'any* showing that severs the link.' " Id. at 265 (emphasis in original). Accordingly, the court now requires plaintiffs to demonstrate loss causation. In dissent, Judge Dennis decries this "bursting bubble" presumption. He reads *Basic* to impose the burden on defendants of producing evidence and persuasion that the alleged fraud did not and could not have affected the market price. Id. at 273-74 (citing Basic, 485 U.S. at 248 and Nathenson, 267 F.3d at 413). Here, the disagreement is not pertinent because the Flowserve Defendants have submitted a plethora of admissible evidence, particularly with event studies and analyst reports, that demonstrate that the Flowserve Defendants have not only made "any showing" but have met Judge Dennis's stricter reading of the *Basic* evidentiary burden.

**\*9** In sum, plaintiffs who seek class status by showing collective reliance through the fraud-on-market presumption must show that the defendant made public, material misstatements, that the stocks traded in an efficient market, and that the stock price was actually affected by the purported fraud. To show that a stock price was actually affected, plaintiffs must show that false, non-confirmatory positive statements caused a positive effect on the stock price. Alternatively, plaintiffs must show: (1) that an alleged corrective disclosure causing the decrease in price is related to the false, non-confirmatory positive statement made earlier, and (2) that it is more probable than not that it was this related corrective disclosure, and not any other unrelated negative statement, that caused the stock price decline.

### 3. Plaintiffs' Evidence

Plaintiffs contend that the Flowserve stock traded in an efficient market and that the alleged material falsehoods, none of which are non-confirmatory, actually affected the Flowserve stock. (Class Cert.at 20-23; Pls.' Reply to Flowserve Defs.' Opp'n to Pls.' Mot. for Class Cert. at 30-33, 36-40 ("Pls.' Reply") (doc. 319)) Plaintiffs predominantly rely on the precipitous stock price drops of 37% on July 22, 2002 and 38.8% on September 27, 2002 to show the fraud actually affected the stock price. Plaintiffs claim that the attendant press releases, "while not a full disclosure," were nevertheless corrective disclosures that relate to the alleged fraud. (Pls.' Reply at 41-47; Pls.' Supplemental Briefing in Supp. of Class Cert. at 8-10 ("Pls.' Suppl. Br.") (doc. 608)) Plaintiffs add that the related "bad news" in July and September 2002 played significant roles in causing the acute price drops. (Pls.' Suppl. Br. at 10) The heart of Plaintiffs' evidence is the expert opinion and event studies of Bjorn Steinholt CFA. [FN13]

Plaintiffs also proffer a host of Flowserve memoranda, e-mail, and deposition testimony in support. [FN14]

> FN13. App. in Supp. of Pls.' Mot. for Class Cert. ("Class Cert. App .") (doc. 240) Ex. J ("Steinholt Rep."); Ex. K ("Steinholt Rebut. Rep."); Ex. L ("Steinholt Second Rebut. Rep."), App. 042-153; App. of Non-Confidential Documents in Supp. of Pls.' Reply ("Pls.' Reply Non-Confidential App.") (doc. 320) Ex. 16 ("Steinholt Third Rebut. Rep."), App. 272-296; App. of Confidential Documents in Supp. of Pls.' Supplemental Briefing in Support of Class Cert. ("Pls.' Suppl. App.") (doc. 610) Ex. A-1 ("Steinholt Damages Rep." and "Steinholt Damages Rebut. Rep."), App. 1- 205; *see also* Pls.' Reply at 34; Pls.' Suppl. Br. 1-3.

> FN14. *See generally,* Pls.' Reply Non-Confidential App. 1-240; App. of Confidential Documents in Support of Pls.' Reply ("Pl. Reply Confidential App.") (doc. 330), App. 297-382; Pls.' Supp.App. Exs. 1-80, App. 273-2223; Pls.' Suppl. App. 387-2161.

**4. The Flowserve Defendants' Evidence**

The Flowserve Defendants counter that Plaintiffs cannot utilize the fraud on the market presumption, reliance must necessarily be individual and class certification improper. First, they dispute Flowserve stock traded in an efficient market. (Opp'n of Flowserve Defs.' at 43-44 ("Defs.' Opp.") (doc. 296)) Second, the Defendants argue that the admissible evidence shows that the alleged misrepresentations did not actually affect Flowserve's stock price. (Defs.' Opp. 44-56; Defs.' Supplemental Br. in Opp'n to Class Cert. ("Defs.' Suppl. Br.") (doc. 713)) Specifically, the Flowserve Defendants parse the 47 purported falsehoods into three categories: (1) 21 statements are confirmatory and therefore non-actionable; (2) 3 statements are non-confirmatory, had a positive effect on the stock but resulted in no damages; and (3) 23 are non-confirmatory but neither relate to the corrective disclosures nor played a substantial role in causing the acute price drops. (Defs.' Opp. 46-52; Defs.' Suppl. Br. 4-8) In support, the Flowserve Defendants principally rely on the expert opinions and event studies of Lucy P. Allen and Christopher M. James, Flowserve press releases, and various analyst commentary. [FN15] The Court also considers relevant public data referenced by the experts and submitted in connection with other dispositive motions. [FN16]

> FN15. App. of Confidential Exhibits in Supp. of Defs.' Supplemental Br. ("Defs.' Suppl. App.") (doc. 716) Defs.' Suppl. App. 1-117 ("Allen Decl."); Defs.' Suppl. App. 118-141 ("James Decl."); *see also* App. of Non-Confidential Exhibits in Supp. of Opp'n of Flowserve Defendants ("Defs.' Non-Confidential Opp.App.") (doc. 288); App. of Confidential Exhibits in Supp. of Opp'n of Flowserve Defs.' ("Defs.' Confidential Opp.App.") (docs.297, 383).

> FN16. *See* App. of Non-Confidential Documents in Supp. of Plaintiffs' Consolidated Opp'n to Defs.' Mots. for Summ. J. ("Pls.' Consolidated Opp.App.") (docs.795-99).

**B. Analysis**

**\*10** Based on the admissible evidence, the Court finds that Plaintiffs have failed to meet their burden of proving loss causation by a preponderance of the evidence. At the class certification stage, the swell of false statement allegations can no longer mask the noticeable gaps and inconsistencies in the record evidence, particularly with the public data. Plaintiffs stumble in showing the alleged fraud actually affected the market at several hurdles: (1) relying, in part, on non-actionable confirmatory statements; (2) failing to show loss after a positive increase; (3) not adequately demonstrating the relation between the alleged fraud and the alleged corrective disclosures; and (4) not showing that any related corrective disclosure did and could have played a significant role in precipitating the stock price drops. [FN17] Defendants, on the other hand, present admissible evidence, grounded in public data, that decidedly rebuts the fraud-on-the-market presumption. [FN18]

> FN17. Given the dispositive nature of this finding, the Court will assume *arguendo* that Flowserve traded in an efficient market and that the alleged fraudulent statements were material. *See Unger,* 401 F.3d at 324 (finding district court devoted insufficient attention to market efficiency factors).

> FN18. Of course, this is not surprising given Defendants' burden on proving negative causation for § 11 claims. *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 505

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(5th Cir.1999) (noting that defendant "must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto").

### 1. Actually Affected Market: Confirmatory Statements

At the threshold of class certification, the Court looks for alleged falsehoods that are capable of moving the market. Here, the Court finds that almost half of the alleged falsehoods are re-publications of financial statements, earnings projections, and confirmation of debt covenant compliance, i.e., "classic examples of confirmatory information." Greenberg, 364 F.3d at 668 n. 16. As set forth fully in the Flowserve Defendants' Opposition, the Court agrees that those 21 identified statements are confirmatory, had already been digested by the market, and cannot serve as the basis for a fraud-on-the-market presumption. (Defs.' Opp. at 46-47 nn. 139-141) As a practical matter, however, this finding is no moment here because the Court also finds that these confirmatory statements are unrelated to the alleged corrective disclosure. *See infra* Part II.B.3.

### 2. Actually Affected Market: Positive Increase

Following the Fifth Circuit's rules, Plaintiffs have two options to show that an alleged fraud actually affected the market: (1) relying on a positive increase after the release of "false positive news" or (2) relying on a negative decrease after a corrective disclosure. Plaintiffs appear to have pursued the second route in *Greenberg* of relating the fraud to the 2002 stock drop. (Class Cert. at 21 ("by alleging that they were harmed by a 'plummet' in Flowserve's stock price following [defendants' disclosures]")) Notwithstanding this direction, the Flowserve Defendants still concede that three statements on October 22, 2001 concerning the 2001 earnings would be in a range of $1.38 and $1.55 per share had an immediately positive increase on stock. (Defs.' Opp. at 47) The Flowserve Defendants' expert further acknowledges that the "truth"--that the actual 2001 earnings would be $1.42-- was disclosed on February 4, 2002. (Allen Decl. at 34, Defs.' Suppl. App. 41; Allen Decl. Ex. 4, Defs.' Suppl. App. 107-08) However, the Court finds that following this disclosure, there was no statistically significant price reaction. (*Id.*) Without any price reaction, particularly a negative one, no investor could have suffered a loss. To the extent Plaintiffs attempt to somehow relate these 2001 earnings statements to the July and September 2002 press statements and subsequent price drops, that relation is untenable. These three statements therefore cannot serve as a basis for a fraud-on-the-market presumption.

### 3. Actually Affected Market: Related to Negative Decrease

*11 Following the second route, the Court must then assess whether the corrective disclosure and corresponding negative decrease is related to the purported falsehoods. Thus, to start the related inquiry, the Court must first identify the corrective disclosure that Plaintiffs contend relate to the alleged falsehoods. To briefly recap Plaintiffs' allegations, the four basic tenets are:

  (1) dis-synergies;
  (2) false financials;
  (3) violation of debt covenants; and
  (4) optimistic EPS.

(Compl. ¶¶ 180-349; *see also* Allen Decl. at 30-31, Defs.' Suppl. App. 37-38) In 2004, the alleged fraud was unquestionably made known to the market because Flowserve announced its intention to and then filed its restated financials for the fiscal years 2000, 2001 and 2002. [FN19] In fact, Plaintiffs have largely relied on the 2004 restatements to meet the PSLRA requirements. [FN20] Despite the appeal of the 2004 restatement, Plaintiffs insist that the truth was revealed in the July and September Releases, and that the claimed falsehoods are "directly linked" to these 2002 corrective disclosures. [FN21] (Pls.' Suppl. Br. at 9) The Court, however, finds that this claim rings hollow when measured against the admissible evidence.

> FN19. The unchallenged consensus opinion of Defendants' experts is that February 3, 2004 is the earliest date of the revelation of information related to the alleged fraud. (Allen Decl. at 12, Defs.' Suppl. App. 19; James Decl. ¶ 5, App. 119) A review of the analyst commentary is consistent. (Allen Decl. at 13, Defs.' Suppl. App. 20; James Decl. ¶ 8, Defs.' Suppl. App. 120)

> FN20. The PSLRA requires securities fraud complaints to specify, *inter alia,* why a given statement is false or misleading. 15 U.S.C. § § 78u-4 (b)(1) (1995). Plaintiffs' reliance on the 2004 restatements in its Plaintiffs' Fifth Amended Complaint to show that an allegation is false, while necessary under the PSLRA, appears to be inconsistent with their attempt to relate the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

alleged falsehoods to the July and September 2002 statements. (*See, e.g.,* Compl. ¶ ¶ 151, 188, 189, 194, 196, 204, 205, 207, 212, 242, 245, 247, 249, 252 and 253) Nowhere do Plaintiffs allege that any statement is false by citing to the July or September 2002 press releases when the "truth" was supposedly revealed.

Additionally, Flowserve expressly admitted to dis-synergies associated with IDP in April and July 2001, but Plaintiffs opt not to identify this statement as a corrective disclosure. (Ex. 110, Pls.' Consolidated Opp.App. 1805; Ex. 149, Pls.' Consolidated Opp.App. 2462-63)

> FN21. Interestingly, at the time of the 2004 disclosures, there was no statistically significant market reaction. (Allen Decl. Ex. 1A (February 3, 2004 market-adjusted stock price reaction), Defs.' Suppl. App. 85; Allen Decl. Ex. 1F (April 26, 2004 market-adjusted stock price reaction), Defs.' Suppl. App. 90)

As an initial observation, Plaintiffs' position is belied by their prior submission to the Court. Plaintiffs have previously represented that the September Release "illustrates continued concealment by Flowserve of the falsity of its financial statements filed with the SEC" and "further assured investors that they could rely on Flowserve's past financial statements." (*See* Pls.' Req. for Additional Judicial Notice at 2 (doc. 134)) This contradiction can only be excused under Rule 11 scrutiny in light of Plaintiffs' prior gambit to dispute the relevancy of *Greenberg* at the class certification stage. (*See* Pls.' Reply at 43-44)

Separating the wheat from the chaff, the Court finds virtually all of the purported false statements-- confirmatory or non-confirmatory--are unrelated to any of the tenets of Plaintiffs' alleged fraud. First, the Court finds no direct revelation from Flowserve in 2002. A straightforward comparison between the allegations and the 2002 press releases indicate no credible relation. The July Release, titled "Flowserve Second Quarter EPS; Cash Flows from Operations Improve--Chemical and Industrial Outlook Lower," shows just that. [FN22] It focuses on the decline in chemical and industrial bookings, a decline in the quick-turnaround business, the financial results for the second quarter for 2002, and the reduced forward-looking EPS projection for 2002 to $1.70-$1.90. The September Release expounds on the unanticipated further deterioration of the chemical, power, and general industrial sectors and again revised its 2002 EPS guidance to $1.45-$1.55. Nowhere in these alleged corrective disclosures does the Court find any tenable relation, general or specific, to dis-synergies, false financials, violations of debt covenants, or optimistic EPS.

> FN22. Plaintiffs' expert even expressly admits that the July and September 2002 press releases do not mention any violation of debt covenants. (Steinholt Rep. ¶ 42 ("neither of these disclosures revealed that the earlier reported financial results were false"); ¶ 46 ("the September 27, 2002 announcement did not disclose that the Company was in violation of its debt covenant"); Class Cert.App. 58-59)

**\*12** To the contrary, the Court finds more statements within the July and September Releases that are consistent with Plaintiffs' claimed falsehoods that could be related to the 2004 corrective disclosures. For example, in the July 2002 press release, the 2001 financial statement was republished and the debt-to-capital ratios from Q4 2001 and Q1 2002 were reiterated. Additionally Flowserve also stated that it had "incremental benefit from the synergy savings from the acquisition of IDP which helped offset" some of the negative news. Additionally, the September 2002 press release also republished historical earnings for 4Q 2001 to 2Q 2002. Flowserve further assured investors that it had "upped its annual synergy savings estimates from the IFC acquisition to $15 to $20 million, from $10 to $15 million, as the integration continues to progress smoothly and additional synergy savings opportunities are being identified." (Ex. 29, Defs.' Non-Confidential Opp'n App. A423) In the September 2002 investor conference call, Defendant Greer even added that the IFC integration "continues to be on track." (Ex. 361 at 6; Pls.' Consolidated App. 5521)

Secondly, the Court finds no direct or indirect revelation from any third-party. The analysts covering Flowserve, constantly monitoring Flowserve, expressed no concerns over Plaintiffs' claimed fraud. There is no evidence that analysts changed their quantitative earnings models, an indirect but telling signal that historical financials might be questionable. Even Plaintiffs' investment manager, Mark Dishop of Boston Company, publicly stated on the September 2002 conference call that he did not believe that the debt covenants were an issue and testified in this litigation that he relied on the

financial statements as accurate. (Ex. 361 (Flowserve Investor Conference Call on Sept. 27, 2002), Pls.' Consolidated Opp.App. 5559; Ex. 48 (Dishop Dep. 174:18-17; 186-200), Defs.' Non-Confidential Opp.App. A764, A767-69) This is in direct contrast to 2001 analyst commentary when Flowserve actually disclosed preliminary integration problems. [FN23] In short, the collective silence by analysts in 2002 is noticeably deafening.

> FN23. *See* Allen Decl. at 33, n. 27, Defs.' Suppl. App. 40. The Court finds that, given Defendant Greer's express statements on integration difficulties in April 2001, the integration issues were on the analysts' radar. Thus, it is implausible that the analysts would then be silent on continued integration issues in 2002 if the truth were somehow directly or indirectly revealed.

Above all, the Court finds that Plaintiffs' evidence is insufficient to carry their burden. The Court finds, in particular, the opinions of Plaintiffs' expert to be flawed and underwhelming in several aspects. [FN24] The flawed thread interwoven throughout Steinholt's opinions is his results-oriented approach to the public data often discounting inconvenient but relevant facts.

> FN24. Defendants have challenged the admissibility of the opinions of Plaintiffs' expert under *Daubert v. Merrill Dow Pharm, Inc.,* 509 U.S. 579, 595 (1993) (docs.646, 662). Even if these opinions are admissible, the Court still finds that Plaintiffs cannot satisfy the Rule 23 reliance element.

The noticeable flaw is Plaintiffs' expert's central assumption that the alleged fraud and the July and September 2002 press releases are, in fact, related. (*See* Steinholt Damages Rep. ¶ 7, Pls.' Suppl App. 4) Even in rebuttal, he is steadfast in his assumptions. (Steinholt Damages Rebut. Rep. ¶ 37, Pls.' Suppl. App. 191 ("According to plaintiffs' allegations, the integration problems relate, at least in part, to why the Company had to reduce guidance regardless of whether the Company stated so at the time."); *id.* ¶ 47, Pls.' Suppl. App. 195-96 ("regardless of what the Company stated in its press release, plaintiffs allege that Flowserve's reduction in its financial projections on July 22 and September 27, 2002 was a result of the integration and operation problems allegedly concealed in prior periods.")) As a consequence, the Court finds that Plaintiffs' expert offers only "well-informed speculation." *See Oscar,* 487 F.3d at 271; *see, e.g., In re Zonagen Inc. Securities Litigation,* 322 F.Supp.2d 764, 781-82 (S.D.Tex.2003) (finding fatal flaw in plaintiffs' expert because he assumed very fact being proffered to prove).

 *13 The more serious shortcoming, however, is the use of Plaintiffs' expert of the "true financial condition" theory. [FN25] He opines that the acute price drops in July and September 2002 were a "revelation of the Company's true financial condition" and, at rebuttal, re-emphasizes this "even if the fraudulent conduct itself is not revealed." (Steinholt Rep. ¶ 47, Class Cert.App. 60; Steinholt Damages Rebut. Rep. ¶ 43, Pls.' Supp.App. 193-94) Specifically, Plaintiffs' expert equates the 2002 earnings miss or a reduction in guidance to the 2004 restatement of previously reported financials and concludes that both amount to a "disclosure of the relevant truth." (Steinholt Damages. Rep. ¶ 57, Pls.' Suppl. App. 25) His reasoning is:

> FN25. *See* Ferrell & Saha, *The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implication of Dura Pharmaceuticals v. Broudo,* Harvard John M. Olin Center for Law, Economics and Business, at 13 (Aug.2007). This theory is problematic for the very reasons set forth in *Greenberg* and *Oscar,* that is, loss causation would be lacking without the disciplining effect of a concrete link. *Id.* at 13-14; *cf. Congregation of EzraSholom v. Blockbuster,* 504 F.Supp.2d 151, 168 (N.D.Tex.2007) (rejecting plaintiff's unduly broad standard that "lower than expected earnings constitutes an admission that the company's prior positive statements about its financial health and business were false.").

Where a company discloses reduced operating performance, financial condition and prospects as a result of problems that previously had been concealed by some fraudulent conduct, then the resulting price decline is directly tied to the fraudulent conduct, even if the fraudulent conduct itself is not revealed.

(Steinholt Damages Rebut. Rep. ¶ 43, Pls.' Suppl. App. 194) In effect, Plaintiffs' expert leads the Court to a dangerous precipice. Under his logic, the relatedness tests set forth in *Dura* and *Greenberg* are optional. Rather than follow precedent, a plaintiff, like here, with debatable evidence of fraud can pick the largest stock drop irrespective of the actual reason and still relate the fraud because the stock drop is

nevertheless a revelation of the company's true financial health. The "true financial condition" theory, if accepted, threatens to undermine the objective of securities law and disregards precedent. *See* Greenberg, 364 F.3d at 667-68 (finding no tenable relationship). Taking Plaintiffs' position to its logical consequences reveals the inherent dangers. In the face of a plain reading of the 2002 press releases and the contemporaneous market commentary, Plaintiffs' expert is undeterred in postulating that, upon seeing the "true financial condition," the market learned:

   (1) significant concerns about defendant's credibility;
   (2) questions regarding the Company's internal controls and substantially reduced the extent the Company's historical financials would be relied on to forecast its future performance;
   (3) contradicted the Company's previous guidance;
   (4) provided an improved insight into the true earnings prospects of the Company given its internal integration problems; and
   (5) revealed that Flowserve might be in violation of its debt covenants.

 (Steinholt Damages Rep. ¶ 65, Defs.' Suppl. App. 171; *see also* Defs.' Suppl. App. Ex. D at 377 (Steinholt Dep. 247:10-25)) The Court finds this to be emblematic of well-informed speculation. Plaintiffs' expert, with no supporting public data and in the face of inconvenient facts, nevertheless freely surmises what the market knew in 2002 with the benefit of hindsight and from the comfort of a litigation armchair. Allowing Plaintiffs to proceed under this theory leads to what the *Dura* Court expressly proscribed: an insurance policy for investors.

**\*14** Plaintiffs' expert's opinions contain other defects. His interpretations of analyst commentary to extrapolate market knowledge of the fraud is without reason. For example, his reliance on analyst predictions of possible non-compliance with debt covenants, particularly the restrictive debt/EBITDA covenant, to show the market learned of actual debt covenant violations is misplaced. The concerns were forward-looking based on Flowserve's just announced September 2002 revised forecast earnings over Flowserve's ability to stay within its debt covenants in 2003. [FN26] Any attempt to blur the distinction between actual and predicted debt covenant violations would overlook the significant impact that would have on the market in 2002 and the relatedness inquiry in this case. Plaintiffs' expert's rebuttal that "had investors been informed that Flowserve was in violation of its debt covenants prior to the July 22 and September 27, 2002 disclosures, then investors would not have been surprised to find out that the Company may also violate the debt covenants in the future" is based on pure conjecture. (Steinholt Damages Rebut. Rep. ¶ 46)

> FN26. For example, a Wachovia Securities analyst predicted that a debt covenant could be violated if "first half results 2003 were to be weaker than expected." (Ex. 363, Pls.' Consolidated Opp.App. 5577) A Robert Baird analyst, relied upon by Plaintiffs' expert, remarked that "[t]he primary concern weighing on the stock today is Flowserve's ability to stay within its debt covenants," Steinholt ¶ 63, Pls.' Suppl. App. 29, and added that "we calculate that Flowserve has 11%-15% cushion in its debt-EBITDA covenant." (Ex. 32, Defs.' Non-Confidential Opp.App. A433) A Bear Stearns analyst acknowledged Flowserve's highly leveraged position but "[o]ur calculations support management's contention that the company will not violate these [debt] covenants in 2003." (Ex. 366 (Sept. 28, 2002 Bear Stearns), Pls.' Consolidated Opp.App. 5587)
> Indeed, the collective analyst opinion was Flowserve could continue its debt covenant compliance. (*See* Allen Decl. 19-22, Defs.' Suppl. App. 26-29 *citing* Robert Baird (July 24, 2002) ("Flowserve is still in compliance with its debt covenants"); Merrill Lynch (July 23, 2002) (Flowserve is not "even close to butting up against its debt covenants"); Merrill Lynch (Sept. 27, 2002) ("cash flows should enable the company to stay within its debt covenants"); Bear Stearns (Sept. 28, 2002) (compliance with debt/EBITDA covenant is "well within compliance"))
> Other market commentary seemed to quell concerns over possible non-compliance. (Ex. 363 (Sept. 27, 2002 Wachovia Securities) (lenders "would be flexible about its debt covenants" because of voluntary $70 million debt payment); Ex. 368 (Sept. 30, 2002 CSFB) (Flowserve had a "good working relationship with its banks"), Pls.' Consolidated Opp.App. 5577, 5603) Plaintiffs' investment manager testified that he "became more comfortable that they would be able to revise those covenants if need be with the banks." (Ex. 48 (Dishop Dep. 186:21-23), Defs.' Non-Confidential

Opp.App. A767)

Finally, Plaintiffs' proffered liability evidence is largely immaterial to class certification. [FN27] *See Oscar,* 487 F.3d at 268 (noting merits are relevant only to the extent they overlap with this Court's Rule 23 inquiry). Plaintiffs' attempt to use a merits-based argument as a bridge for the gap in relatedness between the alleged fraud and the July and September 2002 statements is without support. Such evidence that was never disclosed to the public would not produce market reaction, analyst commentary, and harm to investors in 2002. The use of undisclosed internal knowledge to impute implicit market knowledge undermines the "actual affect" requirements. For example, Plaintiffs may have adduced evidence that Flowserve may have been in violation of its debt covenants in January 2002 or that Flowserve managers or outside auditors of integration problems knew of integration problems. Such internal knowledge, however, is not relevant if the market never learned directly or indirectly of the debt covenant or integration problems. As Plaintiffs' expert aptly testified, "[t]he market does not react to information that it does not know." (Ex. D (Steinholt Dep. at 227:10-11), Defs.' Suppl. App. at 372)

> FN27. On June 28, 2007, the Court permitted "additional briefing" on loss causation. (doc. 583). Plaintiffs, without leave, proceeded to supplement the record with an additional 80 exhibits, totaling over 2000 pages. (*See* Pls.' Suppl. App. (docs.609-16)) However, this submission, comprised largely of internal Flowserve documents, is of little relevance. *Oscar,* 487 F.3d at 267 (noting loss causation proof is "drawn from public data and public filings"); *Castano,* 84 F.3d at 744 ("the strength of a plaintiff's claim should not affect the certification decision").

The record evidence ultimately forces Plaintiffs into two logically exclusive scenarios. As pointed out by the Flowserve Defendants, another district court illustrates the situation:
> If the FY97 misstatements were successfully covered up, they were never disclosed to the market and therefore could not have caused a loss. Alternatively, if the cover-up did not succeed, and the market became aware at some time that the accounting statements were incorrect, then proof of the market's awareness and proof of loss caused is still required.
> *In re Ikon Office Solutions, Inc.,* 131 F.Supp.2d 680,

691 (E .D.Pa.2001). Plaintiffs naturally would not rely on a successful cover-up scenario. However, given the 2002 press statements and the accompanying analyst reports, the proof of the market's awareness in 2002 is largely absent thereby eliminating the second scenario. Plaintiffs' solution therefore is the "true financial condition theory" which combines the best of both scenarios--a successful cover-up with a market nevertheless implicitly learning of the "truth" of Flowserve's "true financial condition." Allowing this solution to solve Plaintiffs' loss causation problem would violate precedent and undermine a core goal of securities law.

**\*15** Fundamentally, Plaintiffs miss the import of this Court's prior Opinion, *Greenberg* and *Oscar.* That error best explains Plaintiffs' ill-advised tactical decisions discussed *supra.* The Court previously found that, at the pleading stage, it did not read *Dura* to require " 'fact-for-fact' loss causation pleading." *Ryan v. Flowserve,* 444 F.Supp.2d 718, 728 (N.D.Tex.2006); *cf. In re Retek,* No. 02-4209, 2005 WL 3059566, at \*4 (D.Minn. Oct. 21, 2005) ("While the thread of causation may be long and somewhat tortured, at [the pleading stage], the Court finds that plaintiffs have alleged enough to survive *Dura* "). Plaintiffs have misjudged the Court to permit a far too lax standard at the class certification stage. *See Unger,* 401 F.3d at 319 (vacating class certification because district court "erroneously applied 'too lax' a standard of proof to the plaintiffs' fraud-on-the-market allegations"). Likewise, Plaintiffs' resistance to address *Greenberg* have led to miscalculations on their requisite evidentiary burden. [FN28] On the other hand, as discussed above, the Flowserve Defendants' principal reliance on public data leads the Court to find that they have decidedly rebutted the presumption of fraud-on-the-market by showing the alleged fraud does not relate to the July and September 2002 press releases.

> FN28. Initially, Plaintiffs disputed the relevance of *Greenberg* because it was decided at the summary judgment stage and discovery had just begun. (*Compare* Defs.' Opp. at 45 *with* Pls.' Reply at 43-44) However, Plaintiffs' emphasis on the "preliminary stage" of the case and the need for discovery of Flowserve overlooks the *Greenberg* court's review of the public data in assessing relatedness. 364 F.3d at 665-67.

**4. Actually Affected Market: Significant Role Inquiry**

Assuming *arguendo* the unlikely scenario that some related truth did leak out, the Court still finds that the claimed falsehoods did not and could not have played a significant role in causing the July and September 2002 price declines. The Court finds Defendants' event studies and review of analyst commentary particularly persuasive. *Oscar,* 487 F.3d at 265 n. 22 (affording district courts latitude in considering the type of proof needed to show actual movement). Like *Greenberg,* the July 22, 2002 statement of the decline in chemical and industrial bookings, the financial results for the second quarter for 2002, the reduced forward-looking guidance for 2002, and the September 27, 2002 statement that Flowserve was lowering its earnings estimates due to market and industry factors more likely than not played the substantial roles in precipitating the respective 37% and 38.3% stock price declines.

The Flowserve Defendants' event studies and review of the analyst commentary belies any argument to the contrary. (*See* Allen Decl. 16-22, Defs.' Suppl. App. 23-29) Contemporaneous market commentary in July 2002 cited the reduced earnings guidance due to market and industry factors, missed EPS consensus earnings estimates for 2Q 2002, and market overreaction as the underlying root of the price drop. (Allen Decl. at 17-19, Defs.' Suppl. App. 24-26; *see, e.g.,* Ex. 32 (Sept. 30, 2002 Robert Baird analyst report), Defs.' Non-Confidential Opp.App. A433 ("The shortfall stems from unexpected, further deterioration of Flowserve's quick-turn maintenance business.")) Likewise, analysts in September 2002 attributed the stock price drop to Flowserve's further lowering of its earnings guidance. (Allen Decl. at 20-21, Defs'. Suppl. App. 27-28) After September 2002, the market commentary appears consistent--the market overreacted to the deterioration in market and industry. (Allen Decl. at 23-24, Defs.' Suppl. App. 30-31; Ex. 2, Defs.' Suppl. App. 94-101)

*16 The event studies concerning Flowserve's peer companies, such as Sulzer, KSB and Weir are corroborative. (Ex. 3A (*KSB v. Flowserve stock price graph* ), Ex. 3B (*Robbins & Myers v. Flowserve stock price graph* ); Ex. 3C (*Sulzer v. Flowserve stock price graph* ); Ex. 3D (*Weir v. Flowserve stock price graph* ), Defs.' Suppl. App. 102-105) Analysts note that these peer companies suffered similar fates at the time of Flowserve's September 2002 press release and in the following months. [FN29] These peer companies, not accused of engaging in any fraud, declined on average by 35% (more than Flowserve) because of the very same reasons publicly announced by Flowserve: market-related conditions. (Allen Decl. 36, Defs.' Suppl.App. 43)

> FN29. *See* Ex. 32 (Sept. 30, 2002 Robert Baird), Defs.' Non-Confidential Opp.App. A434 ("Management convincingly explained that the sequential deterioration in its quick-turn maintenance business was solely to blame; this seems to reconcile for the most part with comments from CIRCOR, Crane and others"). For example, on April 23, 2003, a Robert Baird analyst commented that the "process industries remain mired in excess capacity and paralyzed demand. (Allen Decl. at 25, Defs.' Suppl. App. 32) A Banc of America Securities, on July 23, 2002, noted that "Flowserve's experience is similar to many comparable companies." (*Id.*)

One event study, in particular, shows that there was *no* statistically significant decline in response to the February 2004 announcement and a non-statistically significant *positive* increase of $0.48 to the April 2004 restatement. (Allen Decl. at 12, App. 19; Ex. 1A (February 3, 2004 market-adjusted stock price reaction), App. 85; Ex. 1F (April 26, 2004 market-adjusted stock price reaction), Defs.' Suppl. App. 90) Additional related bad news disclosures marshaled similar non-statistically significant market reaction. (Ex. 1B (SEC inquiry into Flowserve announcement of financial restatement); Ex. 1C (delayed filing of 2003 10-K); Ex. 1D (mid-April filing of 2003 Form 10-K); Ex. 1E (late-April filing of 2003 Form 10-K), Defs.' Suppl. App, 86-89) Admittedly there are significant market differences in July and September 2002, on the one hand, and, on the other, February 2004. However, coupled with the other public data and studies proffered by the Flowserve Defendants, the Court finds that alleged fraud did not and could not have played a significant role in causing the July and September 2002 stock price drops.

Notwithstanding *Oscar, Greenberg,* and the Flowserve Defendants' rebuttal, Plaintiffs' expert opines that "there is no need" to distill the effect of the purported corrective disclosure from the effect of the other unrelated revised earnings shortfall in 2002. (Steinholt Damages Rebut. Rep. ¶ 54, Pls.' Suppl. App. 199-200) Under his approach, the revised earnings shortfall is necessarily related to the alleged fraud, and *any* revised earnings shortfall, regardless of the stated cause, would necessarily be caused by any subsequent discovery of an undisclosed fraud. In practical terms, if any corporate defendant ever files a

restatement, it will virtually guarantee investors the ability to recoup for any loss. Any plaintiff can review the company's performance, selectively pick the steepest stock price fall, certify a class, and collect a windfall on the ad-hoc insurance policy. This approach dooms any chance for class certification of Plaintiffs' claims under the Securities Exchange Act.

### III. SUMMARY JUDGMENT
#### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. Hart v. Hairston, 343 F.3d 762, 764 (5th Cir.2003). Generally, the burden lies with the movant to prove that no genuine issue of material fact exists. Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir.2001). As in the instant case, if the movant asserts an affirmative defense in its motion for summary judgment, it bears the ultimate burden of persuasion and "must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." Rushing, 185 F.3d at 505. To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and all inferences must be drawn in its favor. See Chaplin v. NationsCredit Corp., 307 F.3d 368, 371-72 (5th Cir.2002). If the evidence submitted would allow a reasonable jury to return a verdict for the non-movant, a genuine issue remains and the court cannot grant summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Alternatively, a movant may meet its burden by showing that its opponent failed to present sufficient evidence to establish an essential element of the case where the opponent bears the burden of proof for that element. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). With this standard in mind, the Court now turns to the parties' arguments.

#### B. Analysis

##### 1. Section 11 Legal Principles

*17 Under § 11 of the Securities Act, a plaintiff may bring suit against any signatories to a registration statement, underwriters of the offering, and accountants who have prepared or certified any part of the registration statement if, at the time the registration statement became effective, it contained "an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Thus, a plaintiff who purchased a security pursuant to a registration statement may establish a prima facie § 11 claim by showing a material misstatement or omission in that registration statement. Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983). For the purposes of this motion, the Court will assume that Plaintiffs have established a prima facie case for violations of § 11 of the Securities Act.

Once the plaintiff establishes a prima facie claim for a § 11 violation, the court must presume loss causation--that the defendant's material misstatement or omission caused the plaintiff's economic harm. McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir.1995) ("any decline in value is presumed to be caused by the misrepresentation in the registration statement"); In re The Loewen Group Inc. Sec. Litig., 395 F.Supp.2d 211, 217 (E.D.Pa.2005) (explaining loss causation). However, and significant to this case, is the provision in § 11(e) of the Securities Act which provides an affirmative defense to § 11 claims when a defendant can prove that all or a portion of plaintiff's damages "resulted from factors other than the material misstatement in the registration statement." Akerman v. Oryx Communications, Inc., 810 F.2d 336, 340 (2d Cir.1987). While the defendant's burden is heavy, it is not insurmountable. Id. at 341. In fact, Congress intended this burden to place the costs of uncertainty on defendants. Id. Notwithstanding, one must also remember that Congress did not intend for the securities laws to serve as "broad insurance against market loss," but rather simply to "protect [investors] against those economic losses that misrepresentations actually cause." Congregation of EzraSholom, 504 F.Supp.2d at 168 (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. at 345).

##### 2. Section 11 Legal Principles--Applied To This Case

Plaintiffs claim that Defendants have violated § 11 of the Securities Act by including misstatements in the offering documents for the November 2001 and April 2002 public offerings of Flowserve stock. Plaintiffs allege that these offering documents included audited financial reports which misstated Flowserve's financial results and their verification, reports of management that misrepresented Flowserve's internal controls, and misstatements

regarding Flowserve's compliance with its debt covenants. (Compl.¶ ¶ 401-45) According to Plaintiffs, these misstatements caused Flowserve stock to trade at inflated prices until press releases issued by Flowserve in July and September of 2002 deflated investors' expectations, causing the stock price to drop and Plaintiffs to lose money on their investments. (*Id.* ¶ ¶ 456-57)

**\*18** The Court begins it analysis by sorting out which Defendants are potentially liable for the various misstatements that Plaintiffs allege appeared in the November 2001 and April 2002 Registration Statements. Under § 11(a), PwC could only be responsible for the misstated financials themselves, whereas the Underwriter Defendants and the Flowserve Defendants could be liable for the misstated financials, representations about Flowserve's internal controls, and representations about Flowserve's compliance with its debt covenants at the time the Registration Statements became effective. [FN30] *See* 15 U.S.C. § 77k(a). Defendants all move for summary judgment based upon the affirmative defense of negative causation, contending, *inter alia,* that the two press releases that Plaintiffs claim revealed the truth behind the alleged misstatements, in fact, contained no such revelations and that there is otherwise no causal connection between the alleged misrepresentations and Plaintiffs' losses.

> FN30. In their briefing, Defendants express concern that Plaintiffs will pursue § 11 claims against them because the offering documents did not sufficiently disclose the fact that affiliates of the Underwriter Defendants served as lenders for Flowserve. (*See, e.g .,* Underwriters' Br. in Support of Mot. for Summ. J. ("Underwriters' Br.") at 3) Because Plaintiffs have represented to the Court that the alleged omissions are not the gravamen of their § 11 claims, the Court will not further address the alleged omissions in its summary judgment ruling. (*See,* Tr. of Class Cert. Hr'g at 127)

It is well-established that "[l]oss causation requires disclosure" and that defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed. *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.,* 2005 U.S. Dist. LEXIS 32164, at \*26-27 (D.N.J. June 30, 2005); *Akerman,* 810 F.2d at 342. Defendants maintain that summary judgment must be granted in their favor because the July and September Releases do not disclose the truth about the alleged misrepresentations at the center of Plaintiffs' claims. (PwC's Br. at 13-14; Flowserve's & Hornbaker's Br. in Support of Mot. for Summ. J. ("Flowserve's Br.") at 49-50; Underwriters' Br. at 6) Moreover, Plaintiffs do not dispute that Flowserve's first public announcement that its 2000 and 2001 audited financial statements might be misstated did not occur until February 3, 2004. (Pls.' Resp. to PwC at 9) The Court, already having examined them in detail for the loss causation analysis, is intimately familiar with the statements. (App. to PwC's Mot. at APP005-15, APP039-42) Quite similar to loss causation, nothing in the July Release reveals or even suggests that misstatements appeared in the November 2001 or April 2002 Registration Statements. (*Id.* at APP005-15) However, Flowserve did utilize the July 2002 Release to communicate to the market a reduction of the company's earnings estimates to "38 to 43 cents in the third quarter of 2002 and $1.70 to $1.90 for the full year." (*Id.* at APP011) Similarly, as mentioned *supra,* the September Release does not indicate in any way that Flowserve's historical financials were misstated or that Flowserve misrepresented its internal controls or debt covenant compliance. (*Id.* at APP039-42) Nevertheless, in the September Release, Flowserve announced a further reduction in its earnings estimates to "30 to 32 cents for the third quarter and $1.45 to $1.55 for the full year." (*Id.* at APP039) While the evidence establishes that the July and September Releases had a *negative* effective on the price of Flowserve stock, the Releases, standing alone, do not demonstrate a *corrective* effect on the price of Flowserve stock. [FN31] Therefore, the announcements in the July and September Releases, standing alone, do not go far enough to suggest the existence of problems with the statements and representations appearing in the November 2001 and April 2002 Registration Statements.

> FN31. The Southern District of New York provides superb analysis distinguishing between an announcement's negative effect on the price of a stock and its corrective effect on the price of a stock in the context of loss causation:
> The fact that an event--in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure--disabused the market of that belief [that the securities were valuable] does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect. Such a

failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices. It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.
*In re Initial Pub. Offering,* 399 F.Supp.2d at 266.

**\*19** Plaintiffs, however, contend that the securities laws do not require an express, corrective disclosure and, in response to Defendants' use of the *McKowan* case, explain that the July and September Releases indirectly disclosed the misstatements in the November 2001 and April 2002 Registration Statements. (Pls.' Resp. to PwC at 20, 28) Although fraud may be disclosed to the market indirectly--through another event, this adds a step to the loss causation/negative causation analysis. *McKowan,* 2005 U.S. Dist. LEXIS 32164, at \*26-27. When fraud is revealed through indirect disclosure, "plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud" in order to establish loss causation. *Id.* at 27. In the instant case, Defendants bear the burden of proof on negative causation, so they must provide summary judgment evidence establishing that the market did not recognize a relationship between the reduced earnings estimates and other information announced in the Press Releases and the fraud. In turn, Plaintiffs must then introduce evidence to create a genuine issue of material fact as to whether the market perceived a relationship between the July and September Releases and the misstatements forming the basis of Plaintiffs' fraud claims. Although closely related to the Court's review of the July and September Releases for loss causation purposes, the Court must now determine whether the evidence shows that the July or September Releases caused the market to question Flowserve's historical financials or the way they were verified, the company's representations regarding its internal controls as addressed in the Reports of Management that were incorporated into each Registration Statement, or Flowserve's compliance with its debt covenants at the time the Registration Statements became effective.

Defendants again rely on the Declaration of Christopher James to support their proposition that the market did not view the July Release or the September Release as a corrective disclosure revealing potential misstatements in the November 2001 or April 2002 Registration Statements. (PwC's App. at APP016-19) James reviewed public press following the July and September Releases as well as all market analyst reports [FN32] made between July 22, 2002 and February 3, 2004 that were identified by Plaintiffs' expert, Bjorn Steinholt, in his expert report and that comprised Exhibit 2058 for Steinholt's deposition. (*Id.* at APP017, APP020-38) Despite close inspection of these reports, James found no reference to a possible restatement of Flowserve's historical financials, nor any mention of questions regarding the accuracy of Flowserve's historical financial results. (*Id.*)

> FN32. Reports of market analysts serve as a good indication of the knowledge of the market as a whole.

Defendants also rely again on the expert report of Lucy Allen. (Flowserve's App. at APP 11124-94) Allen evaluated analyst reports to identify whether, in response to the July and September Releases, the market recognized "any inaccuracies in Flowserve's historical financial statements, deficiencies in Flowserve's controls over financial reporting, or that Flowserve was out of compliance with any of its debt covenants." (*Id.* at APP11136) After completing her study, Allen concluded that the stock price declines were not caused by the market learning or suspecting that Flowserve's historical financials were misstated, that its internal controls were deficient, or that the company had violated its debt covenants. (*Id.* at APP 11146-47) Instead, Allen determined that "the stock price declines were caused by Flowserve lowering its earnings projections due to market and industry factors, stock price overreaction, and potentially due to Flowserve having missed analysts' 2Q 2002 earnings consensus by $0.01." (*Id.* at APP11147)

**\*20** Finding no support in the analysts' reports for the proposition that the market suspected that Flowserve had previously misrepresented its historical financials, internal controls, or debt compliance, Allen did find support in the analysts' reports for the proposition that the market reacted to the announcement of reduced earnings estimates, concern for *future* debt covenant compliance, and possibly even to the missed earnings consensus. (*Id.* at APP11147-52) Although the Court has mentioned a multitude of analyst commentary consistent with Defendants' negative causation defense, the Court will only highlight a few of those excerpts submitted in connection with the summary judgment motions.

In response to the July Release, a Banc of America analyst commented on July 23, 2002, "In our opinion, the primary reason that Flowserve's second quarter results and outlook were lower than previously

estimated is weakness in the chemical and general industrial end markets. We believe Flowserve's experience is similar to many comparable companies...." (*Id.* at APP 11147) Similarly, on the same day, Morgan Stanley announced, "We are lowering our 2002 and 2003 EPS estimates to $1.80 and $2.35 from $2.05 and $2.65, respectively. Our lower estimates reflect the continued weakness of the industrial and chemical industries with spending pushed out and not increasing until 2003." (*Id.*) Statements such as these show that the market gave credence to Flowserve's explanation for its reduced earnings estimates even though they were displeased by the reduction. Also on July 23rd, Merrill Lynch noted the market's overreaction to the reduction in guidance, "The market reaction--a 37% drop in the stock vs. last night's close--appears severe even in light of the new levels for earnings. FLS is not losing money, nor is it even close to butting up against its debt covenants." (*Id.* at APP11148)

Analyst reports following the September Release also demonstrated that the market accepted Flowserve's explanations for its additional reduction in earnings guidance and did not question the company's past financials, the internal controls in place at the time the Registration Statements became effective, or Flowserve's past compliance with its debt covenants. As one of the first analysts to respond to Flowserve's announcement on September 27, 2002, SunTrust Robinson Humphrey reported:

> In our initial downgrade piece, prior to the company's press release, we detailed a view that key end use markets in Flowserve's business have been slumping and that our outlook for a recovery was basically non-existent in the next six to nine months. Incidentally, these fears were confirmed with the company's revised 3Q02 outlook issued this morning before the market opened. Within the release the producer warned that conditions in its book and ship (quick-turn) chemical, power and general industrial markets had weakened versus prior expectations. For example, year-over-year demand in these end use markets are currently tracking anywhere from 20%-30% declines. We noted our belief that volumes were slipping in these end use markets in our downgrade piece, but we were surprised to some extent at the level that these businesses were declining, upon reviewing the press release and the conference call with management. Meantime, we have not wavered from our view that the end use demand will not improve before the second half of 2003.

 ***21** (*Id.* at APP11151) On September 30, 2002, Robert W. Baird also exhibited trust in Flowserve's explanation for its downward revision, "Management convincingly explained that the sequential deterioration in its quick-turn maintenance business was solely to blame; this seems to reconcile for the most part with comments from CIRCOR, Crane and others." (*Id.* at APP11150) Likewise, Banc of America expressed its belief in the veracity of Flowserve's announcement:

> End markets remain challenging. In our opinion, Flowserve is struggling with difficult conditions in key end markets, such as chemical and power generation. We believe management is taking aggressive steps to improve the company's cost structure and earnings power when the economy improves. However, we do not expect a near-term recovery in capital spending from key end markets.

(*Id.*) Additionally, with regard to debt covenants, Allen points out that all analyst commentary seemed to be directed towards future performance. (*Id.; see also supra* pp. 16-18) For example, the day of the September Release, Merrill Lynch commented, "Even on these lower estimates, we believe Flowserve's cash flows should enable the company to stay within its debt covenants.... The shares have declined by 40% today, partly (although incorrectly, we believe) reflecting a concern about the covenants." (*Id.* at APP11152)

The commentary of market analysts at the time of Flowserve's restatement announcements also supports the conclusion that the market did not recognize a connection between the July and September Releases and the alleged misstatements in Flowserve's historical financials. In addition to reviewing market analyst commentary after the July and September Releases, Allen also examined the comments made by analysts around the time of Flowserve's restatement announcements in April 2004 and February 2006. (*Id.* at APP 11158) Allen's review revealed that no market analyst indicated that the market already knew or suspected the need for a restatement or drew a connection between the restatement and Flowserve's July and September 2002 downward revisions of its forward-looking earnings estimates. (*Id.*) Defendants have provided sufficient summary judgment evidence to support their contention that the market did not recognize a relationship between the July and September Releases and the alleged misstatements/misrepresentations in Flowserve's November 2001 and April 2002 Registration Statements. Thus, the Court now turns to Plaintiffs' rebuttal of this evidence.

Plaintiffs primarily rely on the transcripts of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

conference calls held after the July and September Releases in their attempt to create a genuine issue of material fact and avoid an adverse summary judgment ruling. The connection between the discussion during the conference calls and the alleged misstatements in the Registration Statements is far too attenuated to support the conclusion that a reasonable juror could find that "the market recognized a connection between the event disclosed and the fraud." *McKowan,* 2005 U.S. Dist. LEXIS 32164, at *27. These questions tend to demonstrate concern for the company's current and future performance rather than concern over past financials, Flowserve's internal controls prior to that time, or whether Flowserve had been in compliance with its debt covenants when the Registration Statements became effective. The closest Plaintiffs come in this regard is the question asked by analyst Scott Volkmann during the July 23, 2002 conference call as to whether Flowserve had thought about certifying past financial results because several companies had recently begun discussing the issue. (Pls.' App. to Resp. to PwC's Mot. at APP0372) This single question is not significant probative evidence and fails to satisfy Plaintiffs' summary judgment burden. Providing "a scintilla of evidence is not enough; 'there must be evidence on which the jury could reasonably find for the plaintiff.' " *Rushing,* 185 F.3d at 513 (quoting *Anderson,* 477 U.S. at 252). Plaintiffs also direct the Court to portions of the rebuttal report of their expert, Bjorn Steinholt, in an effort to counter Defendants' evidence and create a genuine issue of material fact. (Pls.' Resp. to Underwriters at 12) In answer to the expert report of Lucy Allen, Steinholt highlights an excerpt from a Credit Suisse First Boston analyst report on July 24, 2002, in which the analyst commented, "stock was down approximately 37% at close, insinuating that the market believes something is fundamentally wrong with Flowserve's core business or that expectations were not adequately handled." (Pls.' Non-Confidential App. to Resp. to Underwriters at APP4990) Although the report suggests that the market was concerned about Flowserve's core business and overly optimistic estimates, nothing in that report indicates that the market drew a connection between the reduced earnings estimates and problems with the company's 2000 and 2001 financials, issues with internal controls around the time the Registration Statements became effective, or Flowserve's compliance with debt covenants during that time period. Consequently, Plaintiffs have failed to create a genuine issue of material fact that would prevent the Court from granting summary judgment in favor of Defendants.

**\*22** Plaintiffs further contend that Defendants have not carried their own summary judgment burden, maintaining, "it is defendants' burden to prove that the price decline was caused by some factor unrelated to the alleged misrepresentations, not simply state that plaintiffs will not be able to prove a causal link to a corrective disclosure." (Pls.' Resp. to PwC at 18) As the Court has already explained above, the evidence provided by Defendants indicates that the market failed to recognize a relationship between the July and September Releases and the misstatements in the Registration Statements, thus showing that the price decline was caused by some factor other than the alleged misstatements in the offering documents. *See supra* pp. 37-41. Furthermore, Defendants' evidence also demonstrates that Plaintiffs' losses were caused by the reduction in earnings guidance announced in the July and September Releases, which also is a factor other than the misstated Registration Statements. *Id.* This case is analogous to *In re Alamosa Holdings, Inc.,* where the district court held that a press release containing negative news unrelated to the misstatements in a registration statement was "a circumstance other than the untrue Registration Statement" and subjected the plaintiffs' claims to the negative causation defense. 382 F.Supp.2d 832, 866 (N.D.Tex.2005) (Cummings, J.). Because Defendants have established that Plaintiffs' losses were not caused by the misstatements in the November 2001 and April 2002 Registration Statements, but rather by negative information announced by Flowserve in its July and September Releases, and because Plaintiffs fail to create a genuine issue of material fact as to Defendants' showing, the Court GRANTS summary judgment in favor of Defendants on Plaintiffs' § 11 claims.

### C. Plaintiffs' Motion to Strike

At the very end of their response to PwC's motion, Plaintiffs move in passing to strike the Declaration of Christopher James under Federal Rule of Civil Procedure 37(c)(1). The Court has reviewed both James's declaration and his Rule 26 report and finds the documents to be consistent with each other. Therefore, the Court declines to strike the declaration and DENIES Plaintiffs' motion.

### IV. CONTROLLING PERSON LIABILITY

In conjunction with their primary claims, Plaintiffs also seek to hold Defendants Greer and Hornbaker liable for the alleged violations as controlling persons under § 15 of the Securities Act and § 20 of the Exchange Act. Because the underlying claims have

been resolved against Plaintiffs, their the Court's rulings apply equally to Plaintiffs' claims regarding controlling person liability. *See Alamosa, 382 F.Supp.2d at 866*. Necessarily, the Court also DENIES certification of a class as to Plaintiffs' § 20 claims and GRANTS summary judgment in favor of Defendants on Plaintiffs' § 15 claims.

## V. CONCLUSION

In sum, this action exemplifies the rationale of *Oscar*. Plaintiffs' initial salvo of forceful allegations of corporate fraud and misconduct drove the litigation through discovery and up to summary judgment. Defendants have borne the financial brunt of four years of litigation, which included 90 expert and fact depositions, document production topping 13 million pages, and the issuance of over 54 third-party subpoenas. Both sides have engaged in numerous discovery disputes and motion practice. To date, there are over 800 docketed entries, most of which are substantive. Herein lies the *in terrorem* power of the class action and the extraordinary leverage Plaintiffs wield in this type of litigation, the very essence of the Fifth Circuit's concern in *Oscar*.

**\*23** For the foregoing reasons, the Court DENIES Plaintiffs' motion to certify the instant case as a class action and GRANTS Defendant PricewaterhouseCoopers LLP's Motion for Summary Judgment in its entirety and GRANTS in part the summary judgment motions of Defendants BofA, CSFB, Flowserve, Greer, and Hornbaker as to Plaintiffs' claims under §§ 11 and 15 of the Securities Act. All other dispositive motions are DENIED as moot.

SO ORDERED.

--- F.R.D. ----, 2007 WL 3357692 (N.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.