IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NURSING HOME PENSION FUND, et al.,<br><br>          Plaintiffs,<br>  v.<br><br>ORACLE CORPORATION, et al.,<br><br>          Defendants.<br>_____ / | No. C 01-00988 SI<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART PLAINTIFFS' REQUEST FOR SANCTIONS** |

       Plaintiffs have filed a motion for sanctions as well as a motion for partial summary judgment. Argument on the matters was heard on December 20, 2007, and supplemental briefing regarding the sanctions issue was requested on June 26, 2008.[1] Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART plaintiffs' request for sanctions and DENIES plaintiffs' motion for partial summary judgment.

**BACKGROUND**

       The underlying facts of this case have been discussed at length in prior decisions and need not be restated here. *See Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1227-29 (9th Cir. 2004); *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 674-75 (N.D. Cal. 2002). In brief, this is a class action brought by all persons and entities who acquired the publicly traded securities of defendant Oracle Corporation during the class period, between December 14, 2000, and March 1, 2001. Plaintiffs allege that defendant Oracle, as well as individual defendants Lawrence Ellison, Jeffrey Henley, and Edward Sanderson, violated §§ 10(b), 20(a), and 20A of the Securities

---

[1] This matter was pending before the Honorable Martin J. Jenkins until his resignation in April, 2008, at which time the matter was reassigned..

Exchange Act of 1934 by making false and misleading statements that fall into four categories. Specifically, plaintiffs claim that defendants made false statements about Oracle's financial results for the second quarter of fiscal year 2001 ("2Q01"), Oracle's forecasts for the third quarter of fiscal year 2001 ("3Q01"), the effects of the slowing economy on Oracle's business, and the functionality of Oracle's 11i Applications Suite ("Suite 11i"). On December 20, 2007, Judge Martin Jenkins held argument on defendants' motion for summary judgment with regard to these claims, as well as on plaintiffs' motion for summary judgment against defendant Ellison for trading on the basis of material non-public information and plaintiff's motion for summary adjudication regarding the false statements made about Suite 11i and financial results for 2Q01. These motions remain pending.

Also pending is plaintiffs' request for sanctions based on alleged evidence spoliation by defendants. Plaintiffs have moved for terminating sanctions or, in the alternative, for lesser sanctions in the form of adverse inference instructions and an order precluding defendants from relying on spoliated evidence. Plaintiffs put forth a long list of actions allegedly taken by defendants that led to the failure to preserve or the affirmative destruction of evidence relevant to this lawsuit. Plaintiffs allege that after they served defendants with notice of this action on March 9, 2001, defendants only sent preservation notices to about 30 out of more than 40,000 Oracle employees. In so doing, plaintiffs allege that defendants improperly focused their preservation efforts only on employees who made the allegedly false statements and those who communicated with them, and therefore did not send preservation notices to employees at the vice-president level, regional sales managers, and others who might have possessed relevant information. Plaintiffs also claim that the preservation process itself was inadequate, such that defendant Ellison, who received the preservation notice, did not preserve in his own files hundreds of emails, many of which plaintiffs discovered in other email files. Defendants contend that their preservation notices were adequate, but do not dispute that they produced an extraordinarily small number of emails sent or received by Ellison from his own email files.

Next, plaintiffs allege that defendants failed to preserve data from Oracle Sales Online ("OSO") and purged OSO backup tapes in July 2001, four months after plaintiffs filed this action. OSO is a database program used by defendants' sales force and other employees to keep track of sales and to make sales forecasts. Defendants contend that there is no evidence that any OSO files were purged or

2

not preserved, and also argue that it has already been determined that plaintiffs were not entitled to discovery of the OSO database. Plaintiffs also allege that defendants failed to preserve documents used in forecasting future sales and revenue, and that defendants altered accounting documents evidencing the audit trail of the November 17, 2000 debit memos that plaintiffs claim were created to hide customer overpayments in 2Q01. Defendants contend that there is no evidence any forecasting documents were not produced to plaintiffs or that any documents related to the debit memos were altered.

In May 2006, plaintiffs asked Special Master Edward Infante for relief regarding some of these spoliation allegations. Specifically, plaintiffs moved for default judgment against defendants for failing to produce certain evidence and failing to preserve or intentionally destroying evidence. *See* Winkler Decl. ex. 1. Special Master Infante denied the motion on July 10, 2006. The special master did not make any factual findings regarding plaintiffs' allegations of spoliation, but did rule that "plaintiffs' motion fails at this time" because plaintiffs had failed to demonstrate prejudice. Winkler Decl. ex. 9 at 39.

Plaintiffs additionally allege that defendants failed to preserve or destroyed documents created in preparation for a book entitled *Softwar: An Intimate Portrait of Larry Ellison and Oracle* ("*Softwar*"). The book was written by Matthew Symonds, an author and editor with *The Economist*, who conducted at least 135 hours of recorded interviews between March 2001 and August 2002 with defendant Ellison. In October 2006, plaintiffs moved to compel defendants to produce the transcripts and audio files of these *Softwar* interviews. Defendants argued that the materials were not in their custody or control, and Symonds also asserted that the materials were his sole property. On January 2, 2007, Special Master Infante determined that although such materials were in the physical possession of Symonds, Ellison had legal control of them pursuant to a contract between Symonds and Ellison. Winkler Decl. ex. 194. As a result, Special Master Infante ordered defendants to produce copies of "any interview notes, transcripts or tape recordings relating to the book." *Id.* at 4. Shortly thereafter, it was revealed that Symonds no longer had the materials in question, and it appears that Symonds may have discarded the laptop computer containing the transcripts and audio files after he learned of plaintiffs' motion to compel.

The Court will now address plaintiffs' motion for partial summary judgment as well as plaintiffs'

3

current motion for sanctions.

**LEGAL STANDARD**

**I.  Summary judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

**II.  Sanctions**

The Court has inherent powers to arising out of "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Unigard*

4

*Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 2132 (1991)); *see also Toste v. Lewis Controls, Inc.*, 1996 WL 101189, *2 (N.D. Cal. Feb. 27, 1996). In this regard, "[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Federal courts also have authority to sanction a party "who fails to obey an order to provide or permit discovery" under Federal Rule of Civil Procedure 37(b)(2)(A). *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks omitted). The Court need not find bad faith by the offending party before issuing sanctions for destruction of evidence; willfulness or fault can suffice. *Id.*; *Unigard*, 982 F.2d at 368 n.2 (citing *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)). Sanctions may be appropriate when a party knew or should have known that the destroyed evidence was potentially relevant to litigation. *Glover*, 6 F.3d at 1329 ("Surely a finding of bad faith will suffice, but so will simple notice of potential relevance to the litigation.") (internal quotation marks omitted).

Courts have developed three types of sanctions for destruction of evidence. First, a court can instruct the jury that it may infer that evidence made unavailable by a party was unfavorable to that party. *See*, *e.g.*, *id.*; *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991); *Cedars-Sinai Med. Ctr. v. Superior Court of Los Angeles*, 18 Cal. 4th 1, 11-12 (1998); *Trevino v. Ortega*, 969 S.W.2d 950, 960 (Tex. 1998). Second, a court can exclude witness testimony based on the spoliated evidence. *See*, *e.g.*, *Unigard*, 982 F.2d at 368-69; *BTO Logging Inc. v. Deere & Co.*, 174 F.R.D. 690, 692-93 (D. Or. 1997). The third and harshest of sanctions is to dismiss the claim of the party responsible for the spoliation. *See*, *e.g.*, *Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806-07 (7th Cir. 1995); *see also Chambers*, 501 U.S. at 45 (noting that "outright dismissal . . . is a particularly severe sanction, yet is within the court's discretion"); *Cedars-Sinai Med. Ctr.*, 18 Cal. 4th at 12.

In determining whether and what type of sanctions to issue, the Third Circuit has explained that courts should consider three factors: 1) "the degree of fault of the party who altered or destroyed the evidence," 2) "the degree of prejudice suffered by the opposing party," and 3) "whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Schmid v. Milwaukee*, 13 F.3d 76, 79 (3rd Cir. 1994); *see also Toste*, 1996 WL 101189 at * 2 ("[A] party's motive or degree of fault

5

in destroying evidence is relevant to what sanction, if any, is imposed."). The Ninth Circuit has also explained that "[b]efore imposing the 'harsh sanction' of dismissal," courts should consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958. However, district courts "need not make explicit findings regarding each of these factors." *Id.*

**DISCUSSION**

**I.     Plaintiffs' motion for partial summary judgment**

Plaintiffs have moved for partial summary judgment on the question whether defendants made false or misleading statements regarding Suite 11i and financial results for 2Q01. Summary judgment on these claims is not appropriate because defendants have put forth evidence demonstrating that genuine issues of material fact remain, including whether plaintiffs can establish loss causation as to the Suite 11i and 2Q01 claims. The Court therefore DENIES plaintiffs' motion for summary judgment [Docket No. 1259].

**II.    Plaintiffs' motion for sanctions**

Defendants' motion for summary judgment and plaintiffs' motion for summary judgment against Ellison remain before the Court. Before deciding these motions, the Court believes it is necessary to address plaintiffs' motion for sanctions because the outcome of that motion could affect the outcome of the summary judgment motions. Plaintiffs have brought a motion for terminating or lesser sanctions against defendants for the alleged spoliation of evidence occurring over the course of this litigation. As mentioned in its June 30, 2008 Order, the Court does not find that default sanctions are appropriate because the actions alleged to have been taken by defendants "do not eclipse entirely the possibility of a just result." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1071 (N.D. Cal. 2006) (internal quotation marks omitted). First, the Court agrees, for the most part, with the special master's conclusion that plaintiffs have not demonstrated the degree of prejudice necessary to warrant terminating sanctions, *see* Winkler Decl. ex. 9 at 39, primarily because plaintiffs have received a large

quantity of materials through the discovery process. In addition, public policy strongly favors deciding this case on its merits, and less drastic sanctions can be imposed that will permit a decision on the merits while also ensuring that defendants do not benefit from any spoliation. *See generally Leon*, 464 F.3d at 958 (listing factors that should be considered when deciding whether dismissal is warranted).

As to lesser sanctions, the Court finds that adverse inferences in plaintiffs' favor are warranted with regard to some categories of evidence that defendants concede was not produced or preserved. In order for a court to impose an adverse inference sanction, plaintiffs must demonstrate "'(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Napster*, 462 F. Supp. 2d at 1078 (quoting *Hamilton v. Signature Flight Support Corp.*, 2005 WL 3481423, *3 (N.D. Cal. Dec. 20, 2005)). Here, the parties agree that the culpable state of mind is willfulness, because plaintiffs' claims arise under the Private Securities Litigation Reform Act ("PSLRA"), which provides that a party may apply for an award of appropriate sanctions where it is "aggrieved by the willful failure of an opposing party to" preserve relevant evidence. 15 U.S.C. § 78u-4(b)(3)(C)(ii).

The parties debate whether plaintiffs must demonstrate prejudice before the Court can impose lesser sanctions. The Ninth Circuit has recognized that it has sent conflicting signals regarding whether prejudice must be shown in order for the sanction of *dismissal* to be appropriate. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 353 (9th Cir. 1995) (collecting cases). A court in this district recently clarified that the Ninth Circuit has required a showing of prejudice only when courts are acting under Federal Rule of Civil Procedure 37, which applies when a party disobeys a court order regarding discovery. *Napster*, 462 F. Supp. 2d at 1075 n.4; *cf. Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 382 (9th Cir. 1988) (prejudice is an optional factor when courts are acting under their inherent authority); *with Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993) (prejudice is a "key factor[]" when courts are acting under the authority of Rule 37); *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990) (showing of prejudice is essential when courts are acting under the authority of Rule 37). When acting under its inherent authority, however, a district court need not consider prejudice to the party moving

7

for sanctions, *Napster*, 462 F. Supp. 2d at 1075 & n.4, and prejudice has not been required when a party moves for lesser sanctions, *id.* at 1078. Here, the Court is considering lesser sanctions in the form of an adverse inference, and even assuming prejudice is required, the Court notes that it would be quite difficult for plaintiffs to demonstrate how they were harmed by evidence to which they do not have access.

Having examined the original briefs of the parties, as well as the parties' supplemental letter briefs regarding lesser sanctions, the Court finds that while some of plaintiffs' contentions regarding spoliated evidence do not present adequate grounds for adverse inferences, other contentions are meritorious and the Court is prepared to take plaintiffs' arguments into account in ruling on the parties' motions for summary judgment. In their supplemental letter brief, plaintiffs ask for lesser sanctions with regard to five categories of evidence: (1) documents that may have been in the possession of employees who did not receive document preservation instructions from Oracle after this action was filed; (2) defendant Ellison's email files; (3) materials created during preparation for the book *Softwar*; (4) documents relating to the audit trail of the November 17, 2000 debit memos; and (5) backup tapes of the OSO database.

With respect to defendants' alleged failure to communicate document preservation instructions to a sufficient number of employees, plaintiffs have failed to convince the Court that sanctions are warranted. As defendants note, plaintiffs have not identified any particular documents that were not preserved as a result of defendants' preservation efforts, and, as mentioned above, plaintiffs received a great deal of evidence despite any shortcomings in defendants' efforts. Plaintiffs also have not demonstrated that any such shortcomings in the preservation efforts were willful. The Court therefore declines to impose sanctions based on defendants' preservation efforts.

As to Ellison's email files, the Court finds that sanctions are appropriate. It is undisputed that defendants produced only 15 emails sent or received by Ellison from Ellison's own email files, and defendants do not contend that all of Ellison's emails were preserved in his files. Instead, defendants note that over 1,650 of Ellison's emails were produced to plaintiffs from the files of other Oracle employees. Defendants, relying on *Wachtel v. Health Net, Inc.*, 2007 WL 1101436 (D.N.J. Apr. 10, 2007), argue that plaintiffs are not entitled to receive multiple copies of Ellison's emails. The Court

8

disagrees. It could have been helpful to plaintiffs to demonstrate that certain emails were discovered in Ellison's files; otherwise, for instance, Ellison could argue that he never actually read or received an email that was sent to him, and thus had no knowledge of its contents. Moreover, having established with certainty that numerous emails were not produced from Ellison's email files – because the emails *were* produced from other files or accounts – it is impossible to know whether additional unproduced emails were also deleted or not turned over. This uncertainty about the existence of other emails is precisely the reason all of Ellison's emails should have been preserved and produced.

Turning to the factors that should be examined before granting an adverse inference sanction, *see Napster*, 462 F. Supp. 2d at 1078, the Court finds that defendants had an obligation to preserve Ellison's emails at least as of March 13, 2001, when preservation instructions were sent to certain employees, including Ellison, or as of March 9, 2001, when plaintiffs filed suit. For purposes of the evidence at issue here, the Court need not determine the exact date that defendants should have been on notice of imminent litigation, because many missing emails were dated after March 13, 2001. *See* Winkler Decl. ex. 78 at 326-28; Winkler Supp. Decl. ex. E. As of that date, defendants were "under a duty to preserve evidence which [they] kn[ew] or reasonably should [have known was] relevant to the action." *Napster*, 462 F. Supp. 2d at 1067. Defendants also had an obligation to preserve relevant evidence during any stay of discovery pursuant to the PSLRA, which provides that "any party to the action with actual notice of the allegations . . . shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents." 15 U.S.C. § 78u-4(b)(3)(C)(I). Second, defendants destroyed or failed to preserve Ellison's emails wilfully, because they had "some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (internal quotation marks omitted). The emails put forth by plaintiffs regarding revenue analysis for 3Q01 and ongoing problems with Suite 11i, for example, were clearly of potential relevance, *see* Winkler Decl. ex. 78 at 270-76; Winkler Supp. Decl. ex. E, and other emails that plaintiffs may never have received at all may also have been relevant, although it is impossible to know, *see Leon*, 464 F.3d at 959 ("Moreover, because the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer

9

1 exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents.") (internal
2 quotation marks omitted) (alteration in original). For the same reasons, the Court finds that the emails
3 were relevant under the third *Napster* factor because they could have supported the argument that
4 Ellison himself had knowledge of problems with the third quarter forecast or Suite 11i, and the Court
5 presumes that any additional emails that plaintiffs did not receive could have supported plaintiffs'
6 claims.

7 The Court also finds that an adverse inference is appropriate with regard to materials created in
8 connection with the drafting of the book *Softwar*. The materials in question, according to plaintiffs, are
9 "at least 135 hours of tapes and transcripts of [] interviews with Ellison on topics such as Suite 11i,
10 insider trading, forecasting, the economy, and Oracle's billion dollar savings claim." Plaintiff's
11 Supplemental Motion at 27. Plaintiffs first moved to compel production of these materials on October
12 30, 2006, and on December 29, 2006, Special Master Infante granted plaintiffs' motion to compel
13 production of "any interview notes, transcripts or tape recordings relating to the book." Winkler Decl.
14 ex. 194 at 4. Many of these materials were never produced to plaintiffs, however, because it appears
15 that sometime in late 2006 or January 2007, Symonds, the author of *Softwar*, destroyed the materials
16 in question by directing a computer repair shop to dispose of the laptop on which Symonds had stored
17 the recorded audio files of interviews with Ellison. Winkler Decl. ex. 214. It is undisputed that
18 defendants were able to produce to plaintiffs roughly 200 pages of transcripts from interviews conducted
19 in 2002, but were not able to produce any recordings or transcripts from interviews conducted in 2001.[2]

21 The primary dispute between the parties in relation to the motion for sanctions concerns whether
22 defendants could have retrieved the materials from Symonds sooner or whether defendants could have
23 prevented Symonds from destroying the materials. Defendants argue that no one at Oracle, including
24 Ellison, ever had physical custody or control over the materials, and thus should not be sanctioned for
25 failure to produce them. The Court need not reach the question whether defendants had possession of

---

[2] At the time they worked out their agreement regarding the book, in February 2001, Symonds and Ellison contemplated that numerous interviews of Ellison would take place during 2001 and 2002. Winkler Decl. ex. 196 at 1-3.

10

the materials or whether defendants could have prevented Symonds from destroying the materials, however. Even assuming defendants did have copies of the materials and were powerless to prevent their destruction, the Court finds sanctions necessary because Ellison knew of the litigation at the time most interviews were conducted, and failed to take any efforts to preserve the materials despite his obligation to do so. As Special Master Infante concluded, the agreement signed by Symonds and Ellison in February 2001 does not provide that the materials produced in connection with *Softwar* would be the exclusive property of Symonds, and states that in the event the partnership between Symonds and Ellison is terminated, "Symonds shall promptly . . . surrender to Ellison the original copy of all manuscripts, drafts, notes, and other material prepared by him for the Work . . . as well as all audio and video tapes of all interviews conducted in connection with the preparation of the Work." Winkler Decl. ex. 196 at ¶ 16(I). The contract also states that "Symonds and Ellison shall share equally copyright in the Work." *Id.* at ¶ 4. This means that at the time the litigation commenced in March 2001, Ellison had authority over the materials and the ability to preserve them, and defendants have pointed to no evidence suggesting otherwise.

Indeed, it appears that Ellison had the ability to preserve the *Softwar* materials at least until sometime in 2003. Symonds stated, in a January 2007 letter to defendants' attorney, that Ellison "waived all his contractual rights to [the transcripts and audio files] when the work on the book was finished. He said they were mine to do whatever I wanted with." Winkler Decl. ex. 206. In the same letter, Symonds reiterated that Ellison waived his rights to the materials only four years prior to January 2007, which, under any accounting, would have been after plaintiffs filed this lawsuit. *Id.* ("But I repeat, Larry waived all his rights in this regard four years ago."); *see also* Winkler Decl. ex. 209 at 5 (defendants' motion stating that the book was published in 2003). It is therefore of no consequence that Symonds, not defendants, destroyed the materials in question. Spoliation includes not only the destruction of evidence, but also "the failure to preserve property for another's use as evidence." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *see also id.* at 780 (sanctions short of dismissal were appropriate when plaintiff sold tire equipment evidence to a third party, who in turn left the items outside during the winter, making it impossible for defendants' experts to determine the condition of the equipment when plaintiff still owned it). As with the email files, the Court finds that

11

defendants had an obligation to preserve these materials, that their failure to preserve them was willful because they had "some notice that the documents were *potentially* relevant to the litigation," *Leon*, 464 F.3d at 959 (internal quotation marks omitted), and that these materials were relevant to plaintiffs' claims, as demonstrated by some of the transcript materials that were produced, *see* Winkler Decl. exs. 202 & 203, and the fact that Symonds began interviewing Ellison shortly after the events at issue in this litigation had transpired.

As for plaintiffs' request for sanctions for the spoliation of evidence relating to the audit trail of the November 17, 2000 debit memos and the OSO database, the Court finds that adverse inferences are not warranted. The parties dispute what really happened with regard to this evidence, and there have been no factual findings demonstrating that spoliation occurred. It also appears that plaintiffs have abandoned their claim regarding the debit memos. Plaintiffs do not suggest otherwise, and do not clearly explain how this evidence is relevant to any of their other claims. As to the OSO database, it appears that Special Master Infante already denied plaintiffs' request to compel its production, a ruling that plaintiffs failed to appeal. *See* Defendants' Opposition at 22. As a result, any spoliation of this evidence cannot meet the requirements for an adverse inference. *See Napster*, 462 F. Supp. 2d at 1078.

To summarize, the Court holds that plaintiffs are entitled to adverse inference instructions with regard to Ellison's emails and the *Softwar*-related materials, but not with regard to other evidence. The Court will take these adverse inferences into account when deciding the parties' summary judgment motions. Specifically, the Court believes that it is appropriate to infer that the emails and *Softwar* materials would demonstrate Ellison's knowledge of, among other things, problems with Suite 11i, the effects of the economy on Oracle's business, and problems with defendants' forecasting model, but the Court notes that such inferences will not assist plaintiffs in demonstrating the existence of genuine issues of material fact for every element of their § 10(b) claims, such as the element of loss causation. To assist the Court with the resolution of these issues, the Court asks that both parties revise and re-file their motions for summary judgment to clearly specify the precise contours of the adverse inferences that should be drawn from the emails and *Softwar* materials, and to take these inferences into account

12

with regard to the propriety of summary judgment.[3]

The Court also asks that in revising their briefs, the parties address the effect, if any, of recent Ninth Circuit opinions on the issue of loss causation. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 2008 WL 3905427 (9th Cir. Aug. 26, 2008); *In re Gilead Sciences Sec. Litig.*, 2008 WL 3271039 (9th Cir. Aug. 11, 2008). Accordingly, defendants' motion for administrative relief to submit recent authority is DENIED as moot. Plaintiffs are also advised that their expert statements should be sworn and that all of their exhibits should be authenticated by attorney or witness declarations. In addition, the Court believes that particular legal questions were not adequately addressed by the parties in their prior motions, and asks that the parties address: (1) with respect to the PSLRA's safe harbor provision, whether evidence of suspicious stock sales by defendant Ellison are relevant to the actual knowledge element for defendants' 3Q01 projections; (2) whether cautionary statements must accompany a reiteration of public guidance numbers if those numbers had already been published with cautionary statements; and (3) what scienter or state of mind plaintiffs must demonstrate to establish § 20A liability for defendant Ellison.

**CONCLUSION**

For all of the foregoing reasons, the Court hereby DENIES plaintiffs' motion for partial summary judgment [Docket No. 1259] and GRANTS IN PART and DENIES IN PART plaintiffs' request for sanctions [Docket Nos. 1301, 1302 & 1465]. The Court DENIES defendants' motion for summary judgment [Docket No. 1406] and plaintiffs' motion for summary judgment against defendant Ellison [Docket No. 1257] without prejudice to reconsideration once the parties re-file their motions in accordance with this order. The Court also DENIES AS MOOT defendants' motion for administrative relief [Docket No. 1471]. All evidentiary motions and motions *in limine* are also DENIED without prejudice to reconsideration once the parties re-file them along with their revised motions for summary judgment [Docket Nos. 1189, 1194, 1199, 1248, 1249, 1250, 1255 & 1402].

---

[3] This does not include plaintiffs' motion for partial summary judgment regarding statements about Suite 11i and 2Q01 results, because this order denies that motion.

13

**IT IS SO ORDERED.**

Dated: September 2, 2008

_____
SUSAN ILLSTON
United States District Judge