# EXHIBIT 2

1

1   IN THE UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3   - - - - - - - - - - - - - - - - - -x
4   In re ORACLE CORPORATION
    SECURITIES LITIGATION     MASTER FILE NO.
5                             C-01-0988-MJJ
6   THIS DOCUMENT RELATES TO:
    ALL ACTIONS
7
    - - - - - - - - - - - - - - - - - -x
8
9           July 3, 2007
            8:20 a.m.
10
11      Videotaped Deposition of
12   R. GLENN HUBBARD, taken by attorneys for
13   Plaintiffs,, held at the offices of Lerach Coughlin
14   Stoia Geller Rudman & Robbins LLP, 52 Duane Street,
15   New York, New York, before Andrew Walker, a
16   Registered Professional Reporter (1991) and Notary
17   Public.
18
19
20
21
22
23
24
25

2

1   A P P E A R A N C E S :
2
3       LERACH COUGHLIN STOIA GELLER RUDMAN &
        ROBBINS LLP
4           Attorneys for Plaintiffs
            401 B Street - Suite 1700
5           San Diego, California  92101
6       BY:  MARK SOLOMON, ESQ.
             STACEY M. KAPLAN, ESQ.
7
8
        LATHAM & WATKINS LLP
9           Attorneys for Defendants and the
            Witness
10          505 Montgomery Street - Suite 1900
            San Francisco, California
11                        94111-2562
12      BY:  MICHELE F. KYROUZ, ESQ.
13           -and-
14      LATHAM & WATKINS LLP
            140 Scott Drive
15          Menlo Park, California  94025-1008
16      BY:  ANDREW M. FARTHING, ESQ.
17
18   ALSO PRESENT:
19      BRUCE DEAL
        Analysis Group
20
        DOUG BRITTON (via Internet feed)
21
        J.D. MARTINEZ, Videographer
22      LiveNote World Service
23
24
25

3

1       THE VIDEOGRAPHER:  We're on the
2   record.  Here begins the videotaped
3   deposition of Glenn Hubbard, Tape 1, Volume
4   I, in the matter of In re Oracle Corporation
5   Securities Litigation, filed in the United
6   States District Court, Northern District of
7   California, Case No. C-01-0988-MJJ.  Today's
8   date is July 3rd, 2007 and the time on the
9   video monitor is 8:20 a.m.
10      The video operator today is
11   J.D. Martinez representing LiveNote World
12   Service located at 221 Main Street, Suite
13   1250, San Francisco, California 94105, phone
14   number (415)321-2300.  The court reporter is
15   Andrew Walker, reporting on behalf of
16   LiveNote World Service.  Today's deposition
17   is being taken on behalf of the plaintiff and
18   is taking place at 52 Duane Street, New York,
19   New York.
20      Counsels, please introduce yourselves
21   and state whom you represent.
22      MR. SOLOMON:  Mark Solomon,
23   representing plaintiffs.
24      MS. KAPLAN:  Stacey Kaplan,
25   representing plaintiffs.

4

1       MS. KYROUZ:  Michele Kyrouz and Andrew
2   Farthing, of Latham & Watkins, representing
3   defendants and the witness.
4       THE VIDEOGRAPHER:  The witness may be
5   sworn.
6       R. GLENN HUBBARD,
7   having been first duly sworn by the Notary Public
8   (Andrew Walker), was examined and testified as
9   follows:
10  EXAMINATION
11  BY MR. SOLOMON::
12  Q.   Good morning, Mr. Hubbard.
13  A.   Good morning.  How are you?
14  Q.   I'm very well, thank you.  How are you?
15  A.   Great, thanks.
16  Q.   How do you prefer to be referred to, Mr.
17  Hubbard, Dr. Hubbard, Professor Hubbard, Mother
18  Hubbard?
19  A.   Anything, Glenn -- Mother Hubbard would be
20  pushing it but any of the above would be fine.
21  Q.   You are here to testify as an expert on
22  behalf of defendants, you understand that?
23  A.   Yes, sir.
24  Q.   And how did you come to be retained as an
25  expert in this case?

5

1    A.    I was retained in the fall of 2006 by counsel
2    for the defendants.
3    Q.    And at that time, had you any experience --
4    excuse me, at that time, had you ever had any
5    working relationship with anyone at Oracle before
6    that?
7    A.    Not to my knowledge, no.
8    Q.    And what do you understand the retention was
9    for?
10   A.    Really two purposes for me.  One, to opine on
11   the state of the U.S. economy as affecting Oracle
12   during the period in question; and second, given
13   that information, was the guidance offered by Oracle
14   during the quarter in question reasonable from an
15   economist's perspective.
16   Q.    You offer your services out, promote yourself
17   out as an expert in order to get retained?
18   A.    I don't promote myself, no.
19   Q.    And what you're saying is defendants found
20   you?
21   A.    Yes, sir.
22   Q.    Have you provided expert testimony in any
23   other situation before?
24   A.    Yes, I have, sir.
25   Q.    And in how many cases have you actually

6

1    provided testimony?
2    A.    I don't really recall.  We probably turned
3    over a list to you.  I can tell you the general
4    areas--in regulation, tax policy, securities and
5    antitrust.  I don't do very many but I think the
6    list from the past few years was provided to you.
7    Q.    Okay, you provided a list of engagements
8    between 2003 and 2007; do you understand that?
9    A.    Yes.
10   Q.    There were engagements before 2003?
11   A.    Well, from 2001 to 2003 I was in the
12   government.  Prior to that time, my work had been
13   principally in either telecommunications, those were
14   regulatory proceedings which generally were
15   antitrust in character, and tax cases but not very
16   many, a handful.
17   Q.    When you say "a handful," less than ten?
18   A.    Yes.
19        MR. SOLOMON:  Okay, so let's have
20   marked as the first exhibit your initial
21   report.
22        (Expert report of R. Glenn Hubbard
23   dated May 25, 2007, no Bates numbers, marked
24   Hubbard Exhibit 1 for identification, as of
25   this date.)

7

1    Q.    If we go to the back of the report to
2    appendix or to the appendices --
3    A.    Yes, sir.
4    Q.    -- please, you start off with your curriculum
5    vitae?
6    A.    Yes, Appendix A.
7    Q.    Is there anything that you want to add or
8    subtract to that CV?
9    A.    I'm sure there may be papers that I have
10   written recently, I don't think anything material.
11   Q.    This CV is almost as long as your report.
12   A.    Not quite.  I apologize for the length of the
13   report.
14   Q.    If you go to Appendix B, it provides the
15   identity of some cases you seem to have been
16   involved in?
17   A.    Yes, sir.
18   Q.    Starting at the top, with the first case, who
19   did you represent in that case -- sorry, who were
20   you appearing on behalf of in that case?
21   A.    Franklin Resources.
22   Q.    And what was the nature of that litigation?
23   A.    This matter is ongoing --
24        THE WITNESS:  Is this appropriate for
25   me to talk about?

8

1        MS. KYROUZ:  If it's subject to a
2    confidentiality order, it may not be.
3        Is there something in particular you
4    want to know?
5    A.    I can say generally perhaps what it's about
6    but --
7    Q.    Correct, that's what I'm looking for right
8    now.
9    A.    Oh, it's mutual fund litigation, it's a
10   question about the appropriateness or so-called
11   excessiveness of fees.
12   Q.    And you're testifying on behalf of Franklin
13   as to the excessive or nonexcessive nature of such
14   fees?
15   A.    Yes, sir.
16   Q.    And is it your position that the fees were
17   not excessive in that case?
18   A.    This is, again, an ongoing matter --
19        THE WITNESS:  I'm not sure what's an
20   appropriate answer.
21        MS. KYROUZ:  Yeah, I'm not --
22   Q.    We'll leave that for the moment.
23   A.    Yeah.
24   Q.    Number 2, this case involves Microsoft.  Can
25   you tell me what this case is or was about?

9

1   A.   Well, this is an antitrust case about whether
2   Microsoft's alleged market power led to charging of
3   excessive prices which would need to be disgorged,
4   it's a state court matter.
5   Q.   And which side are you on in that case?
6   A.   Microsoft.
7   Q.   And the next case is -- excuse me, what's
8   your task in the case involving Microsoft?  What's
9   your expert task?
10   A.   Well, as I indicated, to analyze the question
11   of market power that Microsoft may or may not have
12   and whether one could come to a judgment about
13   whether the prices charged for its products were
14   excessive as economists would use that term.
15   Q.   And then the third case, can you tell me
16   which side you were on in that case?
17   A.   American Century.
18   Q.   What's the nature of that litigation?
19   A.   This has concluded.  It is -- was a case
20   involving, again, mutual funds and whether or not
21   certain fees were excessive.
22   Q.   And the next one down, the fourth one
23   involves Merrill Lynch and McKesson.  Can you tell
24   me what side you're on there?
25   A.   Merrill Lynch, plaintiff.

10

1   Q.   And what's the nature of that case?
2   A.   The case was--this is also concluded--whether
3   or not McKesson had misled investors surrounding the
4   merger between McKesson and HBOC and whether these
5   two Merrill Lynch funds might have represented -- or
6   would be entitled to restitution.
7   Q.   And what was the nature of your expertise
8   that was called upon in that case?
9   A.   To examine whether the McKesson statements
10   about HBOC reflected the economic reality as was
11   known to McKesson officials at the time of the
12   acquisition.
13   Q.   And what statements in particular were at
14   issue in that case?
15   A.   Well, the issue was whether McKesson believed
16   that HBOC was worth what it paid in the acquisition,
17   did it overpay and, hence, basically harm the
18   existing McKesson shareholders among whom were the
19   Merrill Lynch funds.
20   Q.   What was the resolution?  You said it's been
21   resolved, did you?
22   A.   Yes; that case did not go to trial.  It was a
23   very favorable result but I can't describe the
24   result, I don't believe, as a legal matter.
25   Q.   And the last one on the list is Florida State

11

1   Board versus Alliance Capital.  What side were you
2   on in that case?
3   A.   Alliance Capital.
4   Q.   And what was the nature of that dispute?
5   A.   This was a state court case which has
6   concluded involving the question raised by the
7   Florida State Board of Administration, essentially
8   the pension funds, the public pension funds, as to
9   whether or not Alliance adhered to its investment
10   guidelines in its agreement with the state in two
11   particular ways, one was its purchase of Enron
12   securities, and, second, whether the risks generally
13   taken by Alliance were consistent with the
14   investment management agreement to which it agreed
15   with the state.
16   Q.   And can you describe the resolution of that
17   case?
18   A.   A total win for the defendants, the
19   plaintiffs even had to pay the costs of the court
20   proceedings.
21   Q.   Now, prior to these testimonies, you gave
22   testimony in a handful of antitrust or tax-related
23   cases; is that fair?
24   A.   Yes, sir.
25   Q.   Have you, in connection with any of the

12

1   testimonies you've given in the past, ever changed
2   your mind?
3   A.   No, sir.
4   Q.   And have you been on the losing side of any
5   of the litigations that you've been involved in?
6   A.   In -- I don't know what you mean by losing
7   side.  If you mean a verdict against my side, I
8   don't recall any, no.
9   Q.   And have any of the cases in which you've
10   testified gone to trial?
11   A.   Sir, we just discussed the trials.
12   Q.   A jury trial?
13   A.   Yes, sir.
14   Q.   And how many cases have gone to jury trial?
15   A.   Well, certainly the Florida State Board of
16   Administration is a jury trial.  The others --
17   American Century would have been a jury trial, it
18   was not.  Franklin Resources has not yet been tried.
19   So the tax and telecom cases are regulatory or tax
20   court which aren't jury cases.
21   Q.   When did you begin to prepare your report
22   that was submitted initially in this case?
23   A.   In the fall of 2006.
24   Q.   And between the fall and the submission of
25   the report, did you meet with defendants' lawyers to

13

1    prepare the report?

2          MS. KYROUZ:  Objection; vague.

3    A.    I certainly didn't meet with counsel in terms

4    of preparing the report.  I did have some

5    conversations with counsel toward the end of my

6    preparation of the report to describe, you know,

7    what I was doing.  Counsel would have been aware, of

8    course, at the beginning of the outlines of what I

9    planned to do in the report.

10   Q.    When you first learned of the engagement,

11   were you aware of the facts that are in dispute in

12   this litigation?

13   A.    I was certainly --

14         MS. KYROUZ:  Objection; vague.

15   A.    -- I was sent a copy of the complaint.

16   Q.    Okay.  Now, before being sent a copy of the

17   complaint and reviewing it, did you know about this

18   litigation?

19   A.    Just from general events.  No, I didn't have

20   any specific knowledge of the litigation.

21   Q.    And subsequent to submitting your report in

22   this case, did you review the report of Dr. Goedde?

23   A.    Yes, sir, I did.

24   Q.    And you responded with a rebuttal; is that

25   right?

14

1    A.    Yes, sir, I did.

2    Q.    And you know that Mr. or Dr. Foster has also

3    submitted a rebuttal report; are you aware of that?

4    A.    Yes, I'm aware of that.

5    Q.    Why was it that Dr. Foster, instead of you,

6    prepared a separate rebuttal --

7          MS. KYROUZ:  Objection.

8    Q.    -- on certain issues?

9    A.    It's not a question that I can answer,

10   Mr. Solomon.  I was asked to prepare a report and a

11   rebuttal report on a particular topic, and I did.

12   I'm not aware of the conversations with Dr. Foster.

13   Q.    Have you had any conversations with

14   Dr. Foster?

15   A.    None.

16   Q.    Were you aware at the time of preparing your

17   rebuttal that Dr. Foster was preparing a separate

18   rebuttal?

19   A.    I don't recall.  I may have but I certainly

20   don't recall.  As I say, we had no conversation

21   about it.

22   Q.    Were there any issues in Dr. Goedde's report

23   that you did not respond to?

24         MS. KYROUZ:  Objection; vague.

25   A.    Well, I considered that I addressed the

15

1    macroeconomic issues and industry issues, which was

2    the subject of my original report.  Dr. Goedde also

3    made references to product-specific issues which was

4    beyond the purview of my report.

5    Q.    And when you say it was beyond the purview,

6    in what way was it beyond the purview?

7    A.    To assess the quality issues with certain

8    products.  For example, 11i was not assigned to me

9    as a macroeconomist.

10   Q.    Do you think product issues are relevant to

11   the forecasting that's in dispute in this case?

12         MS. KYROUZ:  Objection; vague.

13   A.    It certainly depends on what you mean by that

14   question.  A forecasting process, that is, a method

15   of gathering and evaluating information, need not be

16   product specific, but, of course, information on how

17   well or how poorly any product is doing is an input

18   into a reasonable forecasting process.

19   Q.    But in performing your task, that wasn't an

20   input that you considered; is that fair?

21   A.    No, sir, that's not fair.

22   Q.    And what's unfair about that?

23   A.    The forecasting process at Oracle involved at

24   its base the collection of information by

25   salespeople in the field, which leads to something

16

1    called a field forecast.  Taking, say, the license

2    business for the moment, which is your question,

3    that information would have aggregated up all kinds

4    of product information.  So that would certainly be

5    there.  It was not my task, as a macroeconomist, to

6    provide a technical product evaluation of 11i or any

7    other individual product.

8    Q.    And you testified that product information is

9    relevant to the forecasting process.

10         Would a technical evaluation of 11i be

11   relevant to forecasting?

12         MS. KYROUZ:  Objection; vague.

13   A.    It isn't what I said.  What I said was that

14   you can think of inputs in a forecasting process.  A

15   forecasting process is an analytical tool that takes

16   inputs and produces an estimate.  Inputs include the

17   quality and any other attribute of products that are

18   being sold and, of course, it's relevant as an input

19   and, of course, salespeople would have taken a look

20   at that.  My task as an economist was not to opine

21   at the very micro level on every single product but

22   really to look at the aggregate inputs and

23   forecasting process.

24   Q.    Do you think of the 11i suite as being more

25   than one product?

17

1 A. 11i, as I understand it--this is an
2 economist, not being an engineer--as I understand
3 it, it is the attempt to create a suite of
4 products -- a suite to replace a series of
5 relationship management products, so you could call
6 that one product or several but, again, I'm not an
7 engineer.
8 Q. In the third fiscal quarter of 2000, do you
9 know what percentage of the pipeline was comprised
10 of 11i?
11 A. No, sir, I don't recall that.
12 Q. Would that figure be relevant to the
13 forecasting process in fiscal year -- in the third
14 fiscal quarter of '01?
15     MS. KYROUZ: Objection; vague.
16 A. I think I've answered that. If you were
17 looking at the -- that line of business, you'd have
18 to look at both databases and applications,
19 applications being the smaller of the two and 11i
20 being a component of that, so, yes, it is an
21 element, it would have gone into sales forecasts.
22 I'm not sure there's much more I could say.
23 Q. Do you know what the difference in the
24 percentage of the pipeline was between third fiscal
25 quarter '00 and third fiscal quarter '01 with

18

1 respect to 11i?
2 A. I don't recall that, no. Applications as a
3 whole were moderately higher but I don't recall 11i.
4 Q. When you say "moderately higher," what do you
5 mean?
6 A. Yeah, I don't remember the numbers in my
7 head, but certainly as a fraction of business
8 there's a modest increase in applications relevant
9 to database although database remains the dominant
10 of the two as components of the licensed business.
11 Q. And where there's a difference, moderate or
12 otherwise, how would that be taken into account
13 appropriately in forecasting for the third fiscal
14 quarter of 2001?
15 A. Much as it would be in any other quarter.
16 Salespeople have to come to a judgment about the
17 likelihood of sales and concluding sales of any
18 particular product, and that would be part of their
19 forecast.
20 Q. Have you ever heard of -- step back a bit.
21     Have you ever met Larry Ellison?
22 A. No, sir. I've seen Mr. Ellison at
23 conferences, but I have not met him, no.
24 Q. What conferences have you seen him at?
25 A. Oh, I don't know. I recall seeing him at

19

1 industry events where he would have been a speaker,
2 a business conference, but I don't believe I've ever
3 met him.
4 Q. And can you recall which business
5 conferences?
6 A. No, sir, I can't.
7 Q. Were they associated with Oracle or
8 associated with --
9 A. General business conferences.
10 Q. General business?
11 A. Yeah.
12 Q. Did you form an impression of him when you
13 saw him?
14     MS. KYROUZ: Objection; vague.
15 A. I don't have an impression of him one way or
16 another.
17 Q. And you've had no conversations with him at
18 all ever, correct?
19 A. No, sir, never.
20 Q. You reviewed his deposition that was taken in
21 this case?
22 A. Yes, sir, I did.
23 Q. Which days of his deposition did you review?
24 A. I don't recall.
25 Q. How many days of deposition did you review?

20

1 A. Of Mr. Ellison? I really don't recall.
2 Q. Did you review the deposition testimony of
3 other people in preparation for your report other
4 than Mr. Ellison?
5 A. Yes, sir, I did.
6 Q. Just before I go into those other people, did
7 you review Mr. Ellison's deposition testimony before
8 you had submitted your initial report?
9 A. Yes, sir.
10 Q. And did you rereview it in connection with
11 your rebuttal?
12 A. I don't recall doing that. It wasn't that
13 much of an issue.
14 Q. And can you tell me the other depositions you
15 read before you submitted your initial report,
16 please.
17 A. Yes, sir. I recall Mr. Henley, the CFO,
18 Ms. Minton, the controller, Mr. Nugent,
19 Mr. Classick, Mr. Winton, maybe others -- that's
20 what I recall, sitting here right now.
21 Q. Okay.
22     If you go to page 15 of Appendix C --
23 A. Oh, Appendix C. yes, sir.
24 Q. -- there's an indication on that page of the
25 depositions you looked at; is that right?

21

1    A.   Yes, sir.
2    Q.   Can you tell me where Mr. Ellison appears?
3    A.   I don't see it here but I do recall taking a
4    look at it.
5    Q.   So your testimony is that you did read it but
6    you've forgotten to put it down here?
7    A.   I did take a look at it, yes.
8    Q.   So why is it not here?
9    A.   I apologize, sir.
10        MS. KYROUZ:  Mark, I just note that
11   the parties' stipulation in the case is as to
12   what documents get listed here.
13        MR. SOLOMON:  I'm sorry?
14        MS. KYROUZ:  I just note that the
15   parties' expert stipulation in this case
16   is -- would specify certain documents that
17   are disclosed in the report, so it's a
18   narrower set than just anything that someone
19   used, so...
20   BY MR. SOLOMON::
21   Q.   I just want to be straight.  Did you read
22   Mr. Ellison's deposition testimony before you wrote
23   your initial report and is this wrong or did you not
24   and it's right?
25   A.   I do, as I said to you, I do recall looking

22

1    at Mr. Ellison's deposition.
2    Q.   What about Mr. Ellison's deposition in the
3    derivative proceedings associated or that have been
4    associated with this case, have you ever looked at
5    that?
6    A.   I don't recall ever having seen that if I'm
7    remembering the difference.
8    Q.   And what about interviews that were conducted
9    by the Special Litigation Committee in this case of
10   Mr. Ellison, have you ever looked at those?
11   A.   I don't recall having looked at those, no.
12   Q.   The deposition of Mr. Henley that you say
13   that you read, was that the deposition that was
14   taken in this case?
15   A.   Yes, sir.
16   Q.   Did you read the deposition transcript of his
17   testimony in the derivative case?
18   A.   I don't recall doing so, no.
19   Q.   And did you read any of the interview
20   transcripts from the SLC?
21   A.   I don't recall doing that, no.
22   Q.   How did you choose which deposition
23   transcripts to read and which not to?
24   A.   Well, really from thinking about the
25   forecasting process and who the central players were

23

1    in the forecasting process, so I wanted to get a
2    sense of top management view in talking about the
3    economy but also the sense of people involved at
4    other levels in the organization.  So most of the
5    people I identified below the top folks were part of
6    the NAS division, so it gave me an example, if you
7    will, of how information was transcribed.
8    Q.   Do you know who Safra Catz is?
9    A.   I'm sorry?
10   Q.   Do you know who Safra Catz is?
11   A.   I don't recall.
12   Q.   Would you recall who Safra Catz was, do you
13   think, if he or she were a top official at Oracle?
14   A.   I know the name is part of this litigation; I
15   just don't recall the position.
16   Q.   You say in your report that you worked for
17   President Bush.
18        When did you become associated with President
19   Bush?
20   A.   Well, originally my association with him was
21   as Governor Bush during his campaign for the
22   presidency.  I then joined the government when he
23   became elected president.
24   Q.   How did you get involved with him as
25   governor?

24

1    A.   Well, through two channels.  I worked for his
2    father, I was in charge of the tax policy part of
3    the Treasury Department when his father was
4    president of the United States.  His policy advisory
5    group was chaired by two individuals, for the 2000
6    campaign was chaired by two individuals, Allen
7    Hubbard, no relation to me, same name, and Steve
8    Goldsmith who had brought me in to see Governor
9    Bush.
10   Q.   And it was Goldsmith who you knew?
11   A.   I knew both of them.
12   Q.   And what time frame is this?
13   A.   This would have been very late 1998/early
14   1999.
15   Q.   Prior to that, had you been active in
16   politics?
17   A.   I'm not a politician, no.  I follow politics,
18   I've been a government official, politically
19   appointed official but I'm not a politician.
20   Q.   You were appointed by the first Bush --
21   A.   Yes, sir.
22   Q.   -- into a position?
23        And by the second Bush?
24   A.   Yes, sir.
25   Q.   Have you been appointed by any Democrats?

25

1  A.   No, sir, I think that would be rather
2  unlikely but –
3  Q.   Why would that be unlikely?
4  A.   Because I'm a Republican.  Typically
5  political appointees are the same party.
6  Q.   Do you have views on the propriety or lack
7  thereof of securities class action litigation?
8         MS. KYROUZ:  Objection; vague.
9  A.   Are you asking my opinion as an individual,
10  as an economist?
11  Q.   I'll take both.
12  A.   I've certainly offered the opinion in the
13  context of the national commission that I recently
14  co-chaired with John Thornton that securities class
15  action litigation has some problematic elements.
16  Q.   And what do you believe those problematic
17  elements are?
18  A.   The question in the report, which was the
19  report of the Committee on Capital Markets
20  Regulation, was really to offer advice to regulators
21  and our committee, not my personal view, but my
22  corporate views speaking for the committee is that
23  the SEC should offer clarification in so-called
24  10b-5 litigation.
25  Q.   What clarification?

26

1  A.   As to materiality, scienter.
2  Q.   Are these views presented in a written
3  report?
4  A.   Yes, sir.  The report of the Committee on
5  Capital Markets Regulation is available on the
6  committee's website and was presented to the
7  president on November 30th of last year.
8  Q.   And how did you describe yourself in the
9  drafting process, were you one of the drafters?
10  A.   Well, I was co-chair.  I certainly
11  participated in the drafting process, so did other
12  individuals.  The staff director for the committee
13  was Professor Hal Scott from Harvard Law School but
14  there were 22 members of the committee.
15  Q.   Now, let's just break down your personal
16  views, opinions and your what you'd say are your
17  expert opinions.
18        Your personal opinions about securities class
19  action litigation are what?
20        MS. KYROUZ:  Objection; vague.
21  A.   Well, I've certainly offered in the context
22  of the report discussion the observation that,
23  certainly not unique to me as an economist, that
24  this would not be where economists might start as a
25  way of redress because it's taking money from

27

1  shareholders and giving it back to shareholders with
2  a number of leakages in between.  Many economists
3  have questioned whether that's the most efficient
4  mechanism.
5  Q.   And that's one view.
6        Any other views?
7  A.   That's principally what I had offered in the
8  context of the report.
9  Q.   And is it fair to say as a result of that
10  view you're more comfortable sitting here testifying
11  for defendants than you would be testifying for any
12  plaintiffs –
13        MS. KYROUZ:  Objection; vague.
14  Q.   – in this type of litigation?
15  A.   No, sir.
16  Q.   And why is that – why am I not right when I
17  suggest that that would be the case?
18  A.   My view is not that there is no grounds for
19  securities litigation.  My question as an economist
20  is whether the class action framework for handling
21  securities litigation is optimal.  Those are two
22  very different questions.
23  Q.   Have you spoken with Paulson about this?
24        MS. KYROUZ:  Objection; vague.
25  A.   Secretary Paulson is certainly aware of my

28

1  views and I of his.
2  Q.   Have you ever shared any other criticisms of
3  securities class action litigation with anyone other
4  than saying that there's a problem because it takes
5  money from one shareholder and gives it to others,
6  to another?
7  A.   I don't recall.  I mean, the work on this was
8  in the context of the report.  I've certainly
9  offered commentary on the subject, but it's
10  derivative of the points that I have already made.
11  Q.   Do you believe this is abusive litigation in
12  any way?
13        MS. KYROUZ:  Objection; vague.
14  A.   It's not for me to draw that opinion and I'm
15  here as an expert on a particular issue.
16  Q.   But can you answer the question?  Do you
17  believe this is abusive litigation in any way?
18        MS. KYROUZ:  Objection; vague.
19  A.   There's no way I could come to that
20  conclusion from the facts that I know.
21  Q.   Do you think reasonable people could take a
22  different view than the view you've presented of the
23  macroeconomic environment going into Q3 '01?
24  A.   Certainly in economists are a group that
25  there are reasonable people with reasonable

29

1 differences. The issue in this case, of course, is
2 something quite different, whether a particular view
3 is reasonable but, yes, reasonable people may
4 disagree.
5 Q. What is the particular view that you were
6 talking about in this case?
7 A. Well, the issue that I was asked to examine
8 was whether, given the macro information I would put
9 into two groups, aggregate U.S. economy information
10 or information about a sector, whether that
11 information was reasonably reflected in guidance
12 that a particular firm, Oracle here, happened to
13 give. That's different from the question about
14 whether there could be other interpretations from
15 the same data.
16 Q. Let's ask that question: Could there be
17 other interpretations from the same data?
18 A. Anything is possible, Mr. Solomon. But I
19 must tell you, having watched this matter
20 exquisitely at the time, I recall not that many
21 alternative views from Wall Street or from the
22 policy-making committee -- committees. With the
23 lens of hindsight, many views are possible. In
24 realtime, there was enormous uncertainty, some
25 disagreement, but I don't recall any particular

30

1 favoritism that the view I expressed was, you know,
2 somehow out of bounds.
3 Q. When there is enormous uncertainty, rapid or
4 sudden changes in the economic environment, do you
5 have an understanding of what Mr. Ellison has
6 testified you can do or not do in terms of
7 extrapolating?
8 MS. KYROUZ: Objection; misstates
9 testimony.
10 A. That was not my recollection of Mr. Ellison's
11 description of his testimony. I know he refers
12 sometimes in other writings that he isn't an
13 economist and I think that's clear in the way he
14 speaks.
15 My recollection is he referred to concern
16 what I would call more about events than the
17 economy, I think he refers to major macroeconomic
18 events like a 9/11 which, of course, wasn't there at
19 the time, or a war, or some particular disruption --
20 events as opposed to general conditions that reflect
21 those events.
22 Q. I noticed that in your report actually you
23 actually say that, that what Mr. Ellison was talking
24 about was something like war in the Middle East.
25 Is that right?

31

1 A. I believe that's what Mr. Ellison himself
2 says, yes.
3 Q. But is there a reason why you don't also add
4 that Mr. Ellison also said that if there was a
5 sudden change in the economy, extrapolating would
6 become difficult, if not impossible?
7 A. My reading of his deposition testimony, sir,
8 that he was centered mainly on events. Sudden
9 change in economy is not a term of art as economists
10 would use that term. You'd need to describe what
11 you mean, either some event, which he does spend
12 time talking about, or some change in what you could
13 think of as the propagation mechanism, so I have an
14 event and then how does that filter through to the
15 economy. I don't give the color that you just gave
16 to his words.
17 Q. You don't disagree, do you, that if there
18 were, for example, a sudden deceleration in the
19 growth rate in the economy, that that would have an
20 impact on forecasting?
21 MS. KYROUZ: Objection; vague.
22 A. Let's parse that out because one has to be
23 careful.
24 It is certainly true that a deceleration in
25 the economy is an input one considers. A

32

1 forecasting process, remember, is a mechanism for
2 evaluating data, but certainly your inputs might
3 change with your views on the economy. Remember,
4 that there's no such thing as the economy. There's
5 thousands and millions of individual decisions of
6 consumers and firms and governments, that's what the
7 economy is. It's the job of a business to take a
8 look at these aggregate numbers and figure out how
9 those numbers would affect this business. Remember,
10 the stock market had peaked in March of 2000 and the
11 sector had continued to do very well. So the usual,
12 you know, aggregate linkages didn't seem so obvious.
13 MR. SOLOMON: Could you just go back
14 to the question, please.
15 (Pause for review of realtime record)
16 Q. And my question was, "You don't disagree, do
17 you, that if there were, for example, a sudden
18 deceleration in the growth rate in the economy, that
19 would have an impact on forecasting?" And let's
20 just see if we can get a more precise answer.
21 A sudden deceleration in the growth rate in
22 the economy, on the one hand, and a forecast that
23 preceded that knowledge of that fact, would that
24 forecast typically be impacted by a sudden
25 deceleration in the growth rate in the economy?

33

1      MS. KYROUZ:  Objection; asked and
2   answered, incomplete hypothetical.
3   A.    Well, let me try to break down the
4   hypothetical.
5      There exists no hypothetical the way you
6   actually put it.  We don't know in real life whether
7   we see known sudden accelerations, decelerations in
8   the economy, no one has a direct line to some
9   supreme being telling them that.  So the question is
10   how do you ascertain in realtime whether that's
11   likely that's the element here.
12      Your views on that would certainly be an
13   input into your forecasting, that is, inputs into
14   your forecasting mechanism but not in a rigid
15   formulaic way.  In other words, you shouldn't think
16   of the U.S. economy as being millions of identical
17   agents who add up mechanically, multiply one of them
18   times all the others and get to the top; it's many
19   thousands and millions of heterogenous decisions and
20   it's actually quite complicated for businesspeople,
21   let alone economists just looking at the data, to
22   figure out where we are.  So the hypothetical is not
23   one that you observe in the real world.
24   Q.    You're saying war in the Middle East is
25   something tangible that you can get your arms around

34

1   but a sudden change in the economy you can't?
2      MS. KYROUZ:  Objection; misstates
3   testimony.
4   A.    No, I'm merely saying you can't use 20/20
5   hindsight and call it forecasting.  So you have to
6   ask yourself in realtime what would your views be
7   about the macroeconomy or sector of your own
8   business.  You know, looking back, you can say you
9   had periods in which growth accelerated or
10   decelerated, those are known things.  They're not
11   known at the time, so I'm just cautioning you,
12   saying I knew there's a deceleration, what do I do
13   about it, that's not the hypothetical that a
14   businessperson actually looks at.
15      Even in the case of a war in the Middle East,
16   what a businessperson can observe is that there's a
17   war in the Middle East.  There's still a question
18   about what the propagation mechanism is that takes
19   the war in the Middle East to macroeconomic
20   outcomes.
21   Q.    Have you ever been employed in the position
22   where you've had to provide forecasts in the
23   business environment?
24   A.    Well, certainly in government twice a bulk of
25   my job consisted of forecasting, one of revenues

35

1   when I was at the Treasury and the second, the
2   economy when I was in the White House.  In my
3   service as a corporate director, because of my
4   background, I'm called upon to take a look at the
5   way we do forecasts and to try to evaluate those
6   forecasts.
7   Q.    And do you consider that those roles
8   establish your expertise in this case?
9      MS. KYROUZ:  Objection; vague.
10   A.    I consider my expertise as coming from a
11   number of factors.  One, I was asked to consider
12   effects of the macroeconomy on a business' decision;
13   that is certainly a subject area of which I am
14   significantly familiar in my academic and practical
15   work.  My experience as a corporate director has
16   given me direct business experience with forecasting
17   and processes.  And my two stints at the government
18   were, as I say, centered in large part on
19   forecasting.
20   Q.    And have -- strike that.
21      After reading Dr. Goedde's rebuttal, is there
22   anything that you want to change in either of your
23   reports?
24   A.    No, sir.
25   Q.    Anything you want to add?

36

1   A.    Not sitting here today.  The opinions I
2   offered there are the opinions I have right now.  I
3   understand Dr. Goedde hasn't yet been deposed but if
4   he offers up new material, I may well want to
5   comment on that but I have no revision based on what
6   I have seen.
7   Q.    Okay.
8      Now, have you seen reference to a directive
9   by Mr. Ellison to put more risk in the forecast?
10   A.    I have seen reference to, you know, an
11   exhortation to try to raise the field forecast, yes.
12   Q.    When was the first time you ever became aware
13   of that reference?
14   A.    Oh --
15      MS. KYROUZ:  Objection; vague.
16   A.    -- I don't remember, sir.  It's certainly
17   something I looked at in preparing the report or
18   description of it.
19   Q.    Right, but did you know that in the fall or
20   was it something you learned about recently?
21   A.    Oh, I recall knowing that fact during the
22   presentation of my -- the preparation of my report,
23   yes.
24   Q.    Which report, your first report?
25   A.    The original report, yes.

37

1   Q.   And you don't mention that in your report.
2   Is there a reason for that?
3   A.   Frankly, I think a bit less of the
4   observation than Dr. Goedde seems to.  We can
5   discuss that if you like.  It would not have seemed
6   to me to be first order important.
7   Q.   That Larry Ellison would want more risk in
8   the forecast doesn't really have much to do with the
9   forecasting issues in this case; that's your
10  testimony?
11      MS. KYROUZ:  Objection; misstates the
12      record, argumentative.
13  A.   It's not what I said.  What I said was --
14  Q.   But is that --
15  A.   -- given the incentives in forecasting and
16  statements from CEOs periodically, nothing in that
17  dialogue would have struck me as exceptional or
18  contravening my description either of the inputs in
19  the field forecast or the so-called upside
20  adjustments that were done by Ms. Minton and her
21  colleagues.
22  Q.   Did you rely in any way on that knowledge,
23  the knowledge of the directive, in preparing your
24  report?
25      MS. KYROUZ:  Objection; vague.

38

1   A.   I'm not quite sure what you mean.  I
2   certainly was aware of it and, you know, it did not
3   influence me to change the opinion from what you
4   saw.  That's all I can say.
5   Q.   Were you aware when you prepared your initial
6   report that the product mix in Q3 '01 was
7   significantly different from the product mix in Q3
8   '00?
9       MS. KYROUZ:  Objection; vague,
10      misstates the record.
11  A.   I'm not sure what you mean by
12  "significantly."  Certainly if you think about the
13  license business going back to the conversation we
14  had a few minutes ago, there would have been some
15  changes at the margin database applications in terms
16  of components of that business, but I don't recall
17  anything I would classify as, you know, a sudden
18  major shift in the business.
19  Q.   Do you have an understanding what products
20  were available for sale by or license by Oracle in
21  the third fiscal quarter of '00?
22  A.   I'm sorry, of '00 or '01?
23  Q.   Of '00.
24  A.   I can't tell you product names.  They really
25  fell into, you know, big enterprise databases that

39

1   were sort of Oracle's traditional stock-in-trade
2   firm reputation, and then applications for customer
3   relationship management, enterprise relationship
4   management, that is, linking applications, I can't
5   name the literal product names for you but that's my
6   understanding.  That's within licenses, there are
7   other lines of businesses but within licenses those
8   would be the products.
9   Q.   Okay, and would your answer be any different
10  with respect to the third fiscal quarter of '01?
11  A.   Well, there's, of course, I'm sure different
12  products at any given time.  My understanding is
13  those are still basically the lines of business for
14  Oracle within licenses with, of course, the other
15  businesses, consulting and education and support.
16  Q.   And you're not aware of any change in the mix
17  of those products that would suggest that the
18  forecasting process utilized by Oracle in the third
19  fiscal quarter of '01 was inappropriate?
20  A.   Let me break that up because it's got several
21  parts.
22      It's certainly a case there was some change
23  in the mix, as I recall, of database and
24  applications.  I didn't recall that as being
25  significant.

40

1       Now, to your question -- those inputs.
2       Now, to your question about the process, the
3   process itself I think is structured in a way in
4   which judgment would be applied to whatever the mix
5   of products is because the senior management
6   obviously are familiar with the components of the
7   field forecast.
8   Q.   Do you know what sandbagging is in the
9   context of this case?
10  A.   Sandbagging is beyond Oracle.  It's a
11  familiar phenomenon, yes.
12  Q.   And sandbagging in the forecasting sense is
13  where a person doesn't necessarily give 100 percent
14  of what he or she believes is obtainable because
15  they want to be sure that they can attain the amount
16  they're going to forecast and so they go under a
17  hundred percent; is that fair?
18  A.   That's generally right.  I mean, it's linked
19  to whatever your incentive system is.  I mean the
20  more I tell you I reward you for beating what you
21  told me, then, of course, your incentive is to tell
22  me something below what you think you can actually
23  deliver.  This is a common problem with sales
24  organizations.
25  Q.   And is it your understanding that Ms. Minton

41

1  added her potential in order to mitigate the effects
2  of sandbagging?
3        MS. KYROUZ:  Objection; vague.
4  A.   Well, I think that's a narrower description
5  in my understanding from Ms. Minton's deposition of
6  what she did.  Certainly an element was her taking
7  into account, based on her own experience and
8  knowledge and others, potential sandbagging but she
9  might make adjustments for other reasons as well.
10  Q.   When you prepared your report, were you aware
11  of any facts that suggested that in the third fiscal
12  quarter of '01 there was likely to be less
13  sandbagging than there had been in the past at
14  Oracle?
15  A.   I guess I don't understand that question.  It
16  would require knowledge of the answer -- to say
17  someone is sandbagged, you'd have to say relative to
18  what.  So is your question was there a greater
19  difference between the field forecasts and what
20  actually happened, is that what you mean by
21  sandbagging?  Because that wouldn't be a traditional
22  use of the term.
23  Q.   No, what I'm asking is, did you see anything
24  in preparing your report that informed you that
25  going into the third fiscal quarter of '01 there was

42

1  likely to be less sandbagging at Oracle than there
2  had been beforehand?
3  A.   I don't recall.  It's certainly the case that
4  Ms. Minton was relatively conservative that quarter
5  in her so-called upside adjustments compared with
6  previous quarters, but it would require me to draw
7  an inference from her head to answer your question.
8  Q.   Have you ever heard what the purpose was of
9  Ellison's directive that more risk be put into the
10  forecast?
11        MS. KYROUZ:  Objection; misstates the
12  record.
13  A.   I don't recall.  And in my reading of it and
14  understanding of it, it was more just to try to
15  remove or to mitigate sandbagging, which is a
16  chronic problem.
17  Q.   Are you aware of the insider trading
18  allegations in this case?
19  A.   I am -- if I understand the question
20  narrowly, no, you'd have to help me with what you're
21  asking.
22  Q.   Okay.
23        You've read the complaint; is that right?
24  A.   Yes.
25  Q.   So in the complaint, did you see some

43

1  references to trading by Henley and Ellison?
2  A.   Yes, you mean of Mr. Ellison's sales of
3  securities and Mr. Henley, yes.
4  Q.   And beyond reading the allegations in the
5  complaint, do you have any further understanding
6  concerning those allegations?
7  A.   No, sir, I don't.
8  Q.   And you haven't been asked to opine in any
9  way concerning those allegations; is that right?
10  A.   Well, I'm not quite sure what you mean.  It
11  could be that the input I provide them where the
12  guidance is reasonable is an input to that
13  discussion but the narrow task was not mine if
14  that's what you're asking.
15  Q.   Do you have an understanding what the law is
16  concerning insider trading?
17        MS. KYROUZ:  Objection; vague.
18  A.   I'm sorry, in what sense?
19  Q.   Do you understand what prohibition there is
20  on trading while in possession of inside
21  information?
22  A.   Yes, of course.
23  Q.   And what's your understanding?
24  A.   That one cannot trade on inside information.
25  Q.   You've heard of the Covisint transaction?

44

1  A.   Yes, sir.
2  Q.   Were you asked to opine in any way on the
3  impact that Covisint had on the forecasting process
4  at Oracle?
5        MS. KYROUZ:  Objection; vague.
6  A.   Well, again, let's take the transaction,
7  break it up into data and forecasting process --
8  Q.   Sorry, if you just answer the question, were
9  you asked to opine in any way on the impact on the
10  forecasting process of the Covisint transaction?
11  A.   Well, as a general matter, yes, because any
12  transaction affects the outcomes.  If you let me
13  finish, I'll answer.
14        That transaction was, my recollection, was
15  the largest single sale that Oracle had had and I
16  think it was in the $60 million range within
17  license.  In this business, there are a number of
18  lumpy transactions that come from time to time and
19  it's always a question of how do you take that into
20  account in your forecast.
21        So certainly I know that management did look
22  at the size of the Covisint transaction, if that's
23  what you're asking me.  I was not asked narrowly to
24  follow that transaction through the forecast, if
25  that's what you're asking.

45

1  Q.   Do you have any understanding as to why it
2  was recognized as revenue in Q3 as opposed to Q2?
3  A.   No, sir, I don't recall that.
4  Q.   Have you ever heard of earnings management?
5  A.   Of course.
6  Q.   What's your understanding when I say earnings
7  management?
8  A.   Now, earnings management unfortunately could
9  mean different things to different people.  It
10  really refers to, you know, timing issues in
11  earnings as opposed to revenue recognition issues on
12  the top line.  Typically it would be having reserves
13  or some other mechanism that might allow you to move
14  accounting earnings from one quarter or reporting
15  period to the next.
16  Q.   Do you have a view as to whether earnings
17  management is a good or bad thing?
18        MS. KYROUZ:  Objection; vague.
19  A.   Well, it certainly wasn't something I was
20  asked to opine upon here.  Economists generally
21  caution "Watch the cash."  As a profession and
22  finance, we teach students to value the present
23  discounted value of free cash flows but, yes, there
24  is an accounting literature on earnings management.
25  It is not unambiguous in its conclusion on effects

46

1  on share prices.  Many businesspeople at a point in
2  time seem to believe it was valuable.
3  Q.   Are you one of those people?
4  A.   I'm not a businessperson, sir, I'm a
5  professor.
6  Q.   Well, when you're a director on a
7  corporation, are you a professor or a
8  businessperson?
9  A.   I don't think earnings management is
10  appropriate in the sense in which I just used it,
11  which is the deliberate creation of reserves.
12  Q.   And have you heard of allegations in this
13  case that amount to allegations that Oracle engaged
14  in earnings management?
15  A.   I don't recall that, no.
16  Q.   If Oracle was managing its earnings, would
17  that have any impact on your analysis in this case?
18        MS. KYROUZ:  Objection; vague,
19     incomplete hypothetical.
20  A.   Well, the two things I was asked to do were
21  to comment on the state of the economy and then,
22  second, to say whether the guidance of 12 cents per
23  share in this particular quarter in this particular
24  company was reasonable.  So I don't think those are
25  related.

47

1  Q.   So the answer is no?
2  A.   Well, as I understand your question, whether
3  or not there is earnings management is not this
4  assignment.
5  Q.   You mentioned that in fiscal '00 part of
6  Oracle's product mix was ERP and CRM.
7        Can you tell me what particular CRM and ERP
8  applications you're talking about?
9  A.   I really don't recall.  As I say, I wasn't
10  assigned the task of looking at the individual
11  products.
12        MR. SOLOMON:  Let's go off the record
13     for five minutes.
14        THE VIDEOGRAPHER:  Going off the
15     record 9:19, end of Tape No. 1.
16     (Recess taken)
17        THE VIDEOGRAPHER:  Returning to the
18     record, 9:38 a.m., beginning of Tape No. 2.
19  BY MR. SOLOMON::
20  Q.   Mr. Hubbard, when did you first start working
21  for President Bush on his presidential election
22  campaign?
23  A.   I would say the first direct campaign meeting
24  I recall was early February 1999, might have been
25  late January but somewhere around there.

48

1        Oh, you mean the reelection or election?  I'm
2  sorry.
3  Q.   Election, first election.
4  A.   Yes, February '99.
5  Q.   And you stayed with that team through the
6  election; is that right?
7  A.   Well, I was a faculty member, I didn't take a
8  leave to move to Austin but I was in Austin a fair
9  amount and certainly, you know, helping him develop
10  his budget and policies.
11  Q.   And between his election and him becoming
12  president, were you part of a transition team?
13  A.   Yes.  Remember, there was uncertainty about
14  who the president of the United States was.  We had
15  a transition office that was in McLean, Virginia as
16  a result of that uncertainty and I was there working
17  on the budget for what I thought would be the
18  president.
19  Q.   You said earlier that you dealt with the
20  issue, I guess the issue of the macroeconomy,
21  exquisitely at the time.
22        Are you talking about immediately after the
23  election?
24  A.   Well, for the period after the election, you
25  know, really through my tenure as CEA chairman, it

49

1  was one of the most uncertain times in the economy
2  that economists had seen in a generation so that
3  entire period was one of great focus.
4  Q.    And it's true, isn't it, that people in the
5  Bush camp at that time were talking about the
6  economy suddenly deteriorating; isn't is that true?
7          MS. KYROUZ: Objection; vague as to
8  time.
9  A.    It's certainly the case that, you know, in
10  the campaign and in the transition team we talked
11  with a number of businesspeople, a number of
12  economists, there certainly were people with that
13  view. My colleague Larry Lindsey, who was one of
14  the president's advisors, certainly had that view.
15  My own view was this was a time of extreme
16  uncertainty and it was difficult to tell where we
17  were headed.
18  Q.    So Mr. Lindsey would be more likely to be an
19  expert for plaintiffs in this case than defendants,
20  do you think?
21  A.    I can't speak to what Mr. Lindsey would or
22  wouldn't say. He tends to generally have a
23  pessimistic view on the American economy.
24  Q.    And what about your leader at the time,
25  Mr. Bush, didn't he have the view that the economy

50

1  was suddenly deteriorating?
2          MS. KYROUZ: Objection; vague as to
3  time.
4  Q.    And I'm talking post-election and those first
5  few weeks and months.
6  A.    Well, certainly the president heard views
7  from businesspeople -- he had meetings with business
8  leaders in which in some quarters, you know, concern
9  about the economy was expressed. Our economic team,
10  you know, we certainly expressed to the president
11  that there was substantial uncertainty about the
12  outlook in part because obviously the preparation of
13  his budget requires an economic set of assumptions
14  to know what to base revenue on, spending on, so we
15  had that discussion with him and with the vice
16  president-elect. Both the president and the vice
17  president did at times during the transition make
18  public comments of concern about the economy.
19  Q.    And, in fact, by the middle of January 2001,
20  isn't it true that Mr. Bush was telling the media at
21  least that he was very pessimistic about the
22  economy?
23  A.    I think that's an overstatement of the
24  president's remarks. I do think he made reference
25  to growth prospects slipping. He came close to if

51

1  not using the word "recession" in his public
2  remarks, certainly the vice president-elect had done
3  so.
4  Q.    At the time, were you in disagreement with
5  him?
6  A.    I said to him that nothing in the data at
7  that time could be construed as suggesting the
8  economy was in a recession, I said that that just
9  simply wasn't a reasonable reading of the data. As
10  to whether the economy might enter a recession,
11  that, of course, is a possibility.
12  Q.    And, again, just back to Mr. Lindsey, you
13  were in disagreement with Mr. Lindsey at that time?
14  A.    You know, I think disagreement is too strong
15  a word and it depends on the timing of when a
16  recession might happen. I think that most
17  professional economists, you know, were of the view
18  that the growth rate of the economy was slowing and
19  the question was to what level.
20  Q.    Is it your view that Mr. Greenspan panicked
21  in January of 2001?
22          MS. KYROUZ: Objection; vague.
23  A.    I certainly wouldn't have that criticism of
24  Mr. Greenspan as panicking any time, January 2001 or
25  any other time.

52

1  Q.    So when he led the two rate cuts in January,
2  that wasn't a panic move, that was just a reflection
3  of the deteriorating economy or it reflected the
4  deteriorating economy, correct?
5          MS. KYROUZ: Objection; misstates
6  evidence.
7  A.    I think one has to be much more careful in
8  looking at the Feds moves at the time. The federal
9  funds rate had gone as high as 6-1/2 percent, and I
10  think there had been concern among economists even
11  in the fall of 2000 as to whether the funds rate was
12  too high for the current state of the economy. The
13  Fed was certainly making adjustments. It outlined
14  its own reasons for doing so in minutes. Not the
15  first rate cut, which was an intermeeting cut, but
16  in the January 30th rate cut the observations the
17  Fed had were that they did believe fundamentals were
18  deteriorating, but they also opined that they
19  thought the economy was still on its long-term
20  potential growth pattern.
21  Q.    But both of your bosses in a sense of Cheney
22  and Bush thought that and said that you were on the
23  verge of a recession at that time or the economy
24  was, not you, on the verge of a recession, the
25  economy was on the verge of a recession at the time,

Hubbard, R. Glenn  7/3/2007  8:20:00 AM

53

1  did they not?
2  A.   Both certainly made statements to that
3  regard. To the extent that the argument was whether
4  we were in a recession, the National Bureau has told
5  us we were not in a recession at the time those
6  statements were made, and there's considerable --
7  there was considerable discussion among economists
8  at the NBER as to when a recession began. But even
9  well into the spring of 2001, virtually no member of
10 the Business Cycle Dating Committee had any inkling
11 that we were in a recession.
12 Q.   It's true, though, isn't it, that both in
13 December of 2000 and January of 2001 the refrain
14 from the White House was that there had been a
15 sudden slowing and that we were on the verge of a
16 recession?
17       MS. KYROUZ:  Objection; vague.
18 A.   "Refrain" is a term I'm not sure what you
19 mean. It is certainly the case that on at least one
20 occasion I recall both the vice president-elect and
21 the president-elect making that statement. The
22 question is more, you know, what were the views of
23 professional economists, of market-makers,
24 financiers, people who were close -- it was clear
25 that was a time of significant uncertainty. It was

54

1  by no means clear that the economy was on the verge
2  of a recession.
3  Q.   Well, in fact, it was and it turns out they
4  were right and you were wrong, surely?
5       MS. KYROUZ:  Objection; argumentative.
6  A.   Well, the fact that there was a recession
7  that we now are dating it as March 2001 in no way
8  violates my statement that we were not in a
9  recession. Whether we were on the verge, as I said
10 to you earlier, depended on highly uncertain factors
11 in the economy. You can look back with a lens of
12 hindsight but I can assure you my record is better
13 than the president's in judging movements in the
14 economy and I mean no disrespect in that, simply to
15 say that the fact that a leader makes a statement I
16 don't think is construed as expertise in making that
17 statement the way it might be with a Fed chairman.
18 Q.   There's a lot I'm very tempted to say that I
19 won't say, but is it not true that this may be one
20 of the rare occasions when President Bush's judgment
21 was right?
22       MS. KYROUZ:  Objection; argumentative.
23 A.   I'm not sure what President Bush's judgment
24 was. He certainly made a statement on a number of
25 occasions that he thought the economy was on the

55

1  verge of a recession and mentioning the word
2  "recession" in his statements. Ex post, with the
3  lens of hindsight, we did have a recession that the
4  National Bureau tells us commenced that spring.
5  Q.   Now, you wouldn't tell people in the business
6  of forecasting for their businesses that you have to
7  wait for a, quote-unquote, recession before you take
8  any note of a deteriorating economy in your
9  forecasting process, would you?
10 A.   No, of course not.
11 Q.   You don't dispute, do you, that people at
12 Oracle, within Oracle at the end of calendar 2000
13 and the beginning of fiscal 2001 were of the view
14 that the economy was deteriorating?
15 A.   Well, it's certainly the case that Mr. Henley
16 uses the expression "the economy is a wild card" in
17 the December 14th, if I'm remembering the date,
18 announcement. So, yes, there had been a recognition
19 and a continued recognition during the quarter, for
20 Oracle what would have been the third quarter of its
21 fiscal year, that the economy was a set of
22 conditions worth watching.
23 Q.   Is that all you remember Mr. Henley saying
24 about the economy, the wild card, or do you remember
25 him saying anything else about the economy?

56

1  A.   He may have made other observations; I don't
2  recall.
3  Q.   And you don't know whether they were positive
4  or negative observations?
5  A.   I really don't recall. I mean to the extent
6  that they're observations about the macroeconomy,
7  they would have likely been ones of doubt,
8  uncertainty.
9  Q.   Is it fair to say that as of the beginning of
10 January, all of the indicators at least -- strike
11 that.
12      At the beginning of January, Mr. Henley was
13 of the view that all of the economic indicators were
14 suggesting an economic slowdown and that we were in
15 an economic slowdown; are you aware of that?
16 A.   I don't recall that. It depends what you
17 mean by an economic slowdown, there's a big
18 difference between --
19 Q.   I'm talking about slowed growth.
20 A.   For GDP or for Oracle?
21 Q.   I'm talking about, first of all, for GDP.
22 A.   For GDP I don't recall that although
23 certainly that would have been, you know,
24 professional economists' view at the time.
25 Q.   And as to the indicators that Henley

57

1 perceived, do you know what his view was at the
2 beginning of January as to whether or not the
3 economy and Oracle was heading in the right or the
4 wrong direction?
5 A.    Well --
6         MS. KYROUZ:  Objection; vague.
7 A.    -- I do recall Mr. Henley I believe using the
8 expression, things like kicking the tires, pushing
9 back, making sure that when forecasts are made that
10 they actually do reflect the conditions that people
11 are seeing, you know, are salespeople getting this,
12 I recall that discussion, yes.
13 Q.    And that discussion, is that consistent with
14 Mr. Ellison's directive to put more risk in the
15 forecast?
16         MS. KYROUZ:  Objection; misstates the
17 record.
18 A.    I don't recall any such linkage, no.
19 Q.    Were you a member of the FOMC in 2000?
20 A.    No, sir, the FOMC are federal reserve
21 governors and a set of regional bank presidents.
22 Q.    So you had no involvement in preparing any of
23 their reports?
24 A.    That's correct, the Fed's independent of the
25 government.

58

1 Q.    You read their reports in preparation -- in
2 preparing your report?
3 A.    Well, I read the minutes of the FOMC
4 meetings, at the time when I was in the government I
5 saw the Green Books, the full presentation.
6 Q.    Now, you say that neither Cisco nor Sun
7 Microsystems are competitors of Oracle, correct?
8 A.    I don't think I put it quite so finely but
9 they are fundamentally earning their living in
10 different businesses, yes.
11 Q.    Are you also aware that Mr. Ellison has
12 stated that their stocks tend to perform similarly
13 to Oracle's stock?
14 A.    He may have said that; I don't recall.
15 Q.    Does that fact have any impact on your
16 opinions in this case?
17         MS. KYROUZ:  Objection; vague.
18 A.    Not particularly.  I'm being asked to opine
19 on whether guidance is reasonable.  If your question
20 is some piece of information about Sun or Cisco of
21 value to me, it would only be insofar as it would
22 help me inform the judgment about Oracle's business.
23 Q.    You noted in your report that plaintiffs
24 assert that Mr. Ellison has admitted that he did not
25 take any notice really of Ms. Minton's potential.

59

1 Q.    Do you recall that issue?
2 A.    I'm aware of that allegation, yes.
3 Q.    And Mr. Ellison has referred to Ms. Minton's
4 potential as a mood ring, are you aware of that?
5 A.    I'm aware of that allegation, yes.
6 Q.    And then you query if that's the case, why
7 are we talking about the forecasting process; is
8 that right?
9 A.    Well, I think --
10         MS. KYROUZ:  Objection; vague.
11 A.    -- what I queried was where you or Dr. Goedde
12 seems to want to wind up would be at a very
13 different number than the forecasting process would
14 have even without Ms. Minton's adjustment.  So you
15 can't square that circle; that was my logical
16 retort.
17 Q.    But let's break that down.
18         If Mr. Ellison did not take any notice or did
19 not rely upon Ms. Minton's upside of her potential,
20 what does that inform you as to what Mr. Ellison
21 would have perceived based on what he was looking at
22 at the time?
23         MS. KYROUZ:  Objection; misstates the
24 record, incomplete hypothetical.
25 A.    You're asking me to get inside Mr. Ellison's

60

1 head.  My recollection certainly from Mr. Henley's
2 discussion as CFO was that he did take quite
3 explicitly Ms. Minton's forecast into account and I
4 restate my logical retort, that if you believed that
5 it shouldn't be taken into account at all, how could
6 Dr. Goedde reach the conclusions of his report?
7 It's logically not possible.
8 Q.    Is it not possible that the forecasting
9 process was flawed and that Mr. Ellison had
10 information outside of the normal -- beyond the
11 information that would be in the formal forecast and
12 that you have a situation where Mr. Ellison would
13 have known, based on what he was looking at, that
14 the forecast was unreliable independently of whether
15 or not the forecasting process itself was
16 unreliable?
17         MS. KYROUZ:  Objection; vague,
18 misstates the record.
19 A.    Two, two points there.  One, of course, I
20 can't be inside Mr. Ellison's head and it's highly
21 unlikely that his knowledge could exceed that of all
22 of the salespeople talking to all of the customers.
23 Second, Dr. Goedde himself puts great credence in
24 the field forecast; hence, my comment that you can't
25 square that circle because the field forecast is

61

1  substantially higher than where Oracle wound up.
2  Q.    You're saying the field forecast throughout
3  months one and two was --
4  A.    Close to the bloody end.
5  Q.    And give me the process by which you arrive
6  at that.
7  A.    Looking at the numbers. I have -- in the
8  upside reports, I know what the field forecast is, I
9  know what her upside is and I know what the
10  so-called potential adding the two is.
11  Q.    And what's the difference -- what was the
12  difference in January, then, between the potential
13  and the field?
14  A.    I really don't remember. I remember that the
15  upside started out a little over two cents and then
16  shrinks so I don't remember exactly where it was in
17  January.
18  Q.    You say you doubt that he would have any more
19  information, Mr. Ellison would have any more
20  information than the field.
21        But, again, going back to his directive, it's
22  true, is it not, that Mr. Ellison made an attempt to
23  get the field to stop sandbagging and give
24  information that was realistic; is that not true?
25        MS. KYROUZ: Misstates the record.

62

1  A.    Sir, to your hypothetical if Mr. Ellison knew
2  everything and then some from the field, what would
3  it profit him to give that directive? Again, you
4  can't square the circle logically. Either
5  Mr. Ellison had all the information and not the
6  field or you go back to the forecasting process but
7  you can't assert both. Just as a matter of logic.
8  Q.    Have you looked at the directive?
9        MS. KYROUZ: Objection; vague.
10  A.    I think directive is not a term that I would
11  use but certainly I'm familiar with the exhortation.
12  Q.    And what was the date of the exhortation?
13  A.    I don't recall.
14  Q.    Do you know if it was before or after the
15  third fiscal quarter of '01?
16  A.    I really don't remember the exact date.
17  Q.    Would it not be important to you to know that
18  date?
19  A.    I think I've already answered that when I
20  said that I didn't think the exhortation was
21  material.
22  Q.    And I don't know if you've explained why it's
23  not material, but if you have, I apologize, can you
24  tell me again?
25  A.    Again, it's -- sandbagging, as we discussed

63

1  earlier, is a chronic problem, it's one that senior
2  managers deal with all the time. The typical
3  solution of sandbagging isn't saying don't sandbag;
4  it's to either change incentives or to make
5  adjustments. Oracle had done this through the
6  so-called upside adjustment process.
7        MR. SOLOMON: Can I just see that
8    answer again, please.
9        (Pause for review of realtime record)
10  Q.    Well, what do you mean the typical solution,
11  tell me how you say that's the typical solution? I
12  don't know where that comes from.
13  A.    I'm sorry, typical solution to sandbagging?
14  Q.    The typical solution isn't to say don't
15  sandbag, why -- I don't understand why that wouldn't
16  be a typical solution. If there's sandbagging going
17  on, you don't want it and you're Larry Ellison, why
18  don't you tell your people not to do it?
19  A.    In theory you never want your employees to
20  sandbag but the question of sandbagging arises
21  because you have different incentives and different
22  information sets. I'm in the field, you're in the
23  head office, I know what's going on in the field,
24  you have to judge from a distance, you have to try
25  to get me to be as direct with you about what I'm

64

1  actually seeing. To the extent that, you know, I
2  can gain some benefit by consistently exceeding the
3  expectations that I bring to you, I'm going to
4  sandbag. I mean that's the basic sandbagging
5  problem, it's not an Oracle problem, it's a general
6  problem.
7        The way businesses typically deal with that
8  is to either do central adjustments or to try to
9  design compensation systems that don't reward
10  sandbagging.
11  Q.    Right, but that -- but what happened here--I
12  know you want to talk about the typical
13  situation--what happened here, though, was
14  Mr. Ellison issued a directive so it's not typical
15  anymore, we're talking about this situation and what
16  I'm asking you is, why is it that you won't credit
17  that that directive was most likely adhered to?
18        MS. KYROUZ: Objection; misstates the
19    record.
20  A.    Yeah, again, I think it's too strong a term.
21  And, second, I could this afternoon send out a memo
22  to the Columbia Business School faculty telling them
23  to work harder. I do not expect that that directive
24  in and of itself, with no change in my behavior or
25  auditing or incentives, will have much of an effect.

65

1   If you could solve information problems by
2   directives, as you call it--I don't think it's a
3   directive--business leaders would simply issue
4   directives and we would have no information or
5   incentive problems in the economy. It would be
6   great if that were true.
7   Q.   So, in other words, Mr. Ellison was kind of
8   being silly, what was the point?
9   A.   I can't say that.  I can't be in his head, I
10   can't know the color of what he's saying.  It's
11   certainly the case he might want to set a tone that
12   says, you know, I'm serious, I'm going to be looking
13   at this closely, but I wouldn't interpret from what
14   you call a directive that this is, you know, a law
15   that will now suddenly radically alter behavior.
16   Q.   Do you believe that his directive that more
17   risk be put in the forecast was within
18   Oracle-sensitive information?
19      MS. KYROUZ:  Objection; lacks
20   foundation, misstates the record.
21   A.   Well, first of all, I don't interpret it as
22   being, first, a directive and, second, to put more
23   risk in the forecast as opposed to won't sandbag.
24   I've already told you that I don't think it's
25   particularly important, and so I'm -- not being an

66

1   attorney, not knowing the sense in which you're
2   using "sensitive," it wouldn't strike me as first
3   order information.
4   Q.   If you saw that directive and an Oracle
5   employee describing it as sensitive and this
6   document, you know, basically needs to be destroyed
7   rather than it sees the light of day, would that
8   change your opinion in any way as to the import of
9   the directive?
10      MS. KYROUZ:  Objection; misstates the
11   record.
12   A.   And I don't know the record and with that
13   hypothetical as a basis, all I'm saying is that as
14   an economist looking at this, did it affect my
15   judgment?  No.
16   Q.   And as an economist looking at it, you can't
17   tell me whether the directive was put in place
18   before or after the third fiscal quarter of '01; is
19   that right?
20   A.   Given that I think it isn't material --
21   Q.   You don't care?
22   A.   -- it wouldn't matter to me but as a matter
23   of fact, no, I don't recall.
24   Q.   Okay, are you aware that it's -- that at
25   Oracle it took a lot longer to close applications

67

1   deals in 2000 and 2001 than it took to close
2   database deals?
3      MS. KYROUZ:  Objection; vague.
4   A.   I don't know if I'd characterize it -- I do
5   know, yes, that on balance, there are conversion
6   differences between the two, pipeline to actual,
7   whether it's taking longer or just harder to do, I
8   can't parse out but yes, there's a difference.
9   Q.   Assuming there was, I just want you to assume
10   this, assuming there was a significant change in the
11   product mix, what would that lead a reasonable
12   forecaster to do, if anything, in relation to
13   forecasted conversion rates?
14      MS. KYROUZ:  Objection; vague,
15   incomplete.
16   A.   Yeah, it's a hypothetical because I'm not
17   sure that you could describe this as significant.
18   I've already said I do think there's a change in the
19   applications database --
20   Q.   I've asked you to assume it's significant.
21   A.   It's a hypothetical.  We could state other
22   hypotheticals that aren't meaningful either but if
23   you assume that, you would expect that the field
24   forecast, you know, as salespeople are generating
25   their numbers, would take that into account because

68

1   salespeople, remember, are getting case -- you know,
2   a range of potential outcomes.
3   Q.   So, in other words, you're saying it wouldn't
4   and shouldn't and need not affect the process?
5      MS. KYROUZ:  Objection; misstates
6   testimony.
7   A.   No, that's not what I said.  Certainly the
8   information would be coming into the process and
9   really, you know, materially affecting the numbers,
10   the field forecast is going to be very importantly
11   affected by this alleged or hypothetical change in
12   the product mix.
13   Q.   Can you conceive of a situation in which
14   Ms. Minton, for example, would be best advised to
15   adjust her projected conversion or forecasted
16   conversion ratio to take account of new realities?
17      MS. KYROUZ:  Objection; vague.
18   A.   My impression is, from Ms. Minton's
19   deposition of what she did, testimony as to what she
20   did, was that she did alter her so-called
21   conversions from pipeline to business so that she
22   would be reacting to events, not necessarily in a
23   formulaic way but during the quarter she would make
24   changes.
25   Q.   So the answer is yes?

69

1   A.   Well, yes, Ms. Minton did that is my answer.
2   Q.   And what is your understanding that prompted
3   Ms. Minton to do what you just testified you believe
4   she did?
5   A.   Well, what Ms. Minton says I believe in her
6   deposition testimony is obviously she's trying to
7   produce her best possible estimate.  If she gets
8   information over time that suggests there's a bigger
9   or smaller gap, you know, she changes her
10  conversions.
11  Q.   Is the only way in your view that Ms. Minton
12  should account -- is the only way in your view that
13  Ms. Minton should have accounted for the
14  macroeconomic situation by relying on the field?
15  A.   I don't think that's quite what I said.  Keep
16  in mind, go back to your counterfactual, your
17  baseline, there exists no known macro situation so
18  it's not as if I draw a ball from the urn and I know
19  what I'm looking at.  So what Ms. Minton has to do
20  is look at a series of possible outcomes for the
21  macroeconomy, for the sector, for Oracle, and make
22  her judgment.  She describes that she does that.
23      The principal way in which that will feed
24  into the process is for the change in the field
25  forecast.  If it were the case, for example, that

70

1   the macroeconomy's alleged weakness is discouraging
2   people from buying products, applications,
3   databases, whatever, that will show up, a field will
4   come back and say, you know what, we're seeing a lot
5   smaller pipeline than we did in previous quarters,
6   so it will definitely have an effect and be seen in
7   that forecast.
8   Q.   Now, can you conceive of a situation in which
9   Ms. Minton, faced with a change in the product mix,
10  would be best advised to adjust the conversion
11  ratios that are being assumed?
12      MS. KYROUZ:  Objection; vague,
13      incomplete hypothetical.
14  A.   Yeah, again, my understanding is that
15  Ms. Minton does vary the conversion ratio -- if you
16  take any particular upside report for a particular
17  quarter and just go down the list of weeks, you
18  know, sort of I think almost the rightmost column
19  there or penultimate column there, you'll see that
20  she does change her conversions during a quarter, as
21  she's getting information she makes changes.  Some
22  of that may reflect the macroeconomy, some of it may
23  reflect her judgment about other things.
24      If you're asking me do businesspeople
25  typically use formulas, you know, if GDP does this,

71

1   I'll do that, well, typically not.
2   Q.   In other words, you're saying you've never
3   heard of a situation where sort of top-down, in
4   reaction to information that's been received by
5   senior level forecasters, that that senior level
6   forecaster would then make adjustments to the
7   conversion ratio that's being assumed; is that what
8   you're saying?
9   A.   No, that's not at all what I'm saying.  Let
10  me give you a simple example.
11      Suppose I were in two lines of business, one
12  has a high margin and one a low margin.  Now you're
13  telling me that I no longer have the high margin
14  business, they were both 50/50 but I now double the
15  low margin business, the top line is identical.  I
16  would certainly be making changes to my forecasting
17  process.  That is a very radical change, a discrete
18  change and a known change.
19      Ms. Minton says that she, of course, is
20  looking at all of these things in making her
21  adjustments but there's no kind of simple formulaic
22  exercise like the one that I just laid out.
23  Q.   Are you familiar with the January 17th
24  Garnick Flash Report?
25  A.   I don't remember particular Flash Reports.

72

1   Yes.
2   Q.   Do you remember noting that, adjusting for
3   Covisint, that all of the American divisions in
4   January were showing negative growth?
5   A.   I don't recall that but it's certainly, given
6   the size of that particular transaction, that's
7   possible.
8   Q.   And are you aware that that information was
9   made available to Mr. Ellison who then engaged in
10  almost a billion dollars worth of sales; are you
11  aware of that?
12      MS. KYROUZ:  Objection; argumentative.
13  A.   That's way too many dots for me to connect.
14  I don't know when or under what motivation Larry
15  Ellison sold stock.  If you're asking me how does
16  that get into the forecasting process, that's
17  certainly an input.  I would remind you in many
18  of the previous quarters Oracle found itself short
19  at various parts in the quarter relative to its
20  guidance and had always beaten it.  So that
21  information in and of itself has little value.
22  Q.   And you've looked at that carefully, have
23  you?
24  A.   Well, did I perform an analysis over a set of
25  quarters preceding the 3Q FY'01, the quarter at

73

1   issue, yes.
2   Q.   And you noticed in prior quarters all three
3   divisions in the U.S. showing negative growth six
4   weeks, seven weeks into the quarter?
5   A.   I didn't say that, sir.  What I said was that
6   if you look at the firm itself, you find situations
7   that Oracle had found itself in many times in which
8   it had wound up beating expectations despite at some
9   point showing that it was significantly in the hole
10  vis-a-vis those expectations.
11          MR. SOLOMON:  Can you just give me the
12      answer, the second part of that answer,
13      please.
14          (Pause for review of realtime record)
15  Q.   Okay, can you tell me what points they were?
16  What quarters you're talking about?
17  A.   My recollection was, if you look at the six
18  quarters prior, four of the six, I think fell into
19  that pipe -- I discuss this in my report, that's my
20  recollection.
21  Q.   Are you aware that Oracle insiders believed
22  that the pipeline figures in December were simply
23  too good to be true?
24  A.   I'm not aware of that, no.
25  Q.   And this is the first time you've heard that

74

1   today?
2          MS. KYROUZ:  Objection; vague.
3   A.   I mean I may have seen allegations to that
4   effect, but I'm certainly not aware that that has
5   any basis in fact whatsoever.
6   Q.   So if I told you Mr. Henley's admitted that,
7   that would be the first you've heard of that?
8   A.   One, I'm not sure that's true.  Second, I'd
9   have to see the context of what Mr. Henley is
10  talking about.  There's always uncertainty about
11  pipeline numbers, so...
12  Q.   Sounds like you're hedging a bit now.
13  A.   No, I think it's asked and answered but I'm
14  trying to be polite.
15  Q.   Do you believe the pipeline figures in
16  December of 2000 were too good to be true?
17          MS. KYROUZ:  Objection; vague.
18  A.   In order to have a basis to answer that, I or
19  anybody else would have to have some inside
20  knowledge that was unavailable to the preparers of
21  field forecasts or the upside potential.  I
22  certainly don't have that inside information about
23  Oracle, I couldn't answer that.
24  Q.   And it's fair to say the investors in Oracle
25  didn't have that information in December 2000 or

75

1   January 2001?
2          MS. KYROUZ:  Objection; argumentative.
3   A.   An investor would be in the same position
4   that I am but, again, I don't understand even what
5   the counterfactual is but they're certainly in the
6   position I am, if that's your point.
7   Q.   Do you know that Ms. Minton decided to,
8   nonetheless, issue forecasts based on a pipeline
9   that was, quote-unquote, too good to be true?
10          MS. KYROUZ:  Objection; misstates the
11      record.
12  A.   Again, I'm not accepting it's a pipeline
13  that's too good to be true.  What Ms. Minton did
14  was, you know, if you look at each of her upside
15  reports, she does have a pipeline that comes from
16  the underlying field forecasts at a relatively micro
17  level, you know, by division.  She does obviously
18  use that as an input into her process.  I don't have
19  any recollection of Ms. Minton ever saying that she
20  lacked confidence in that.
21  Q.   Is it appropriate in your view to issue
22  forecasts using, in order to make your forecast, a
23  figure, a pipeline figure that you believe is too
24  good to be true?
25          MS. KYROUZ:  Objection; misstates the

76

1   record.
2   A.   You've assumed a conclusion in proposing your
3   question.  Obviously --
4   Q.   I don't know what your answer is.
5   A.   -- you should not misrepresent.  That's a
6   simple truism in capital markets and, fortunately,
7   the law.
8       Having said that, nothing I see in the record
9   suggests to me that Ms. Minton believed that she was
10  doing that.
11  Q.   Have you seen anything in the record that
12  causes you to question Ms. Minton's honesty?
13  A.   I've seen nothing that would lead me to
14  question her honesty, no.
15  Q.   And I assume that's the same with everybody
16  else that you've been able to identify as being at
17  Oracle at the time in question?
18  A.   Yes, sir.  I know none of these as
19  individuals; I can only judge based on what I read.
20  Q.   As you're aware, Mr. Goedde referenced a book
21  called Principles of Forecasting.  Are you familiar
22  with that book?
23  A.   I'm aware that he referenced it.  I don't
24  recall the book particularly.
25  Q.   Do you have any problem with his references?

77

1     MS. KYROUZ: Objection; vague.
2     A.    Not as a general rule. Remember, my job
3     wasn't to opine on the micro forecasting process.
4     Dr. Goedde does wade into that territory; I do not.
5           MR. SOLOMON: Let's go off the record
6     for five minutes.
7           THE VIDEOGRAPHER: Going off the
8     record, 10:19 a.m.
9     (Recess taken)
10          THE VIDEOGRAPHER: We're returning to
11    the record, 10:39 a.m.
12    BY MR. SOLOMON::
13    Q.    With respect to the third fiscal quarter of
14    2000, Mr. Hubbard, was there anything out of the
15    ordinary in that quarter as it affected Oracle?
16          MS. KYROUZ: Objection; vague.
17    A.    I really -- you're talking 2000, not 2001?
18    Q.    Yeah.
19    A.    I really don't recall, sorry.
20    Q.    You have testified that the year-over-year
21    comparisons that Ms. Minton was making in the third
22    quarter of fiscal 2001 were appropriate; is that
23    fair to say?
24    A.    I don't re --
25    Q.    Maybe you haven't testified, maybe it's your

78

1     report; is that right?
2     A.    What I said was that she did use that as a
3     check in her procedure to take -- because the
4     seasonality of the business to go from same quarter
5     last year to same quarter this year for conversions
6     as a check, yes, she did that.
7     Q.    If the third fiscal quarter of 2000 was
8     nonrepresentative, in other words, if it was an
9     outlier quarter, would that affect the propriety of
10    doing that year-over-year analysis in the third
11    fiscal quarter of 2001?
12          MS. KYROUZ: Objection; vague.
13    A.    If I understand the question, no. Remember,
14    what Ms. Minton is doing is doing this upside
15    adjustment that's her judgmental forecast or add
16    factor, if you will. What we were just speaking of
17    was one of the checks that she does for
18    reasonableness, it's not the answer.
19    Q.    So your -- so, in other words, your answer is
20    no, even if the third fiscal quarter of 2000 was
21    nonrepresentative, it would not affect the propriety
22    of using that as a comparison in fiscal 3 '01?
23          MS. KYROUZ: Objection; vague.
24    A.    Let's break that up. To be clear what I'm
25    saying, I don't recall that it was an exceptional

79

1     quarter. Second, that's not what the upside does,
2     that's the check, the conversion check. So it
3     really wouldn't affect her calculation of the
4     upside, only of the check.
5     Q.    And what if it's not a check, the application
6     of the conversion ratio, what if that's part of the
7     process?
8           MS. KYROUZ: Objection; vague.
9     A.    It is part of the process since it's one of
10    the checks that she does.
11    Q.    How would that function as a reliable check
12    if the third fiscal quarter of '00 was
13    nonrepresentative?
14    A.    Again, I'm not accepting that it is
15    nonrepresentative, but it's certainly somewhat less
16    valuable as a check to the extent of which it's
17    atypical but that, again, isn't what she's doing in
18    the upside adjustment. I think there's a confusion
19    in Dr. Goedde's report on that.
20    Q.    And you say that isn't what she's doing
21    because that's what she told -- that's what she told
22    you? How do you make that understanding?
23    A.    Well, I have her numbers, so I am aware of
24    what her upside adjustment is.
25    Q.    Let's assume that fiscal -- the third fiscal

80

1     quarter of 2000 was a nonrepresentative highly
2     successful quarter.
3           Would it have been appropriate, in those
4     circumstances, for Ms. Minton or others when
5     conducting this check to account for the fact in
6     some way that that quarter was an extraordinarily
7     good quarter that's being compared to?
8           MS. KYROUZ: Objection; vague,
9     incomplete.
10    A.    Well, again, I can't necessarily accept the
11    hypothetical, but certainly the check is more
12    valuable to the extent to which the quarters are
13    more comparable, you know, all other things equal,
14    but for time. But the real question is how is she
15    doing her upside adjustment, which is not that way,
16    and there's substantial variation in the upside
17    adjustment within the quarter, not just across
18    quarters.
19    Q.    When you talk about the field forecast, does
20    that include management judgment?
21    A.    Depending on what you mean by management,
22    yes. The -- if you think about the layers of this,
23    there are the salespeople out in the field, then
24    there's sales management, and then there are
25    higher-ups, the NAS management or the executive

81

1   management committee for whom Ms. Minton is
2   preparing the report. There's judgment all along
3   there. So if you mean by -- is sales management
4   judgment reflected? Yes, it's my understanding.
5   Q.   And you said sales management judgment, is
6   that what you said?
7   A.   That's my understanding from Mr. Classick's
8   description and Mr. Nugent's.
9   Q.   So is it fair to say that everything below
10  Ms. Minton represents the field?
11       MS. KYROUZ: Objection; vague.
12  A.   Well, again, I'm not sure how one parses it
13  because I just said the managers of the salespeople
14  are also involved in that. But I think the way
15  Oracle viewed the process, as Ms. Minton described
16  it and Mr. Henley in depositions, is you could think
17  of there being a field that is bottoms-up and then a
18  central top management adjustment for the executive
19  management committee that reflects their judgment
20  ranging from sandbagging that we talked about
21  earlier to their own independent views of the
22  business and so on. That's the so-called upside
23  that then gives you potential.
24  Q.   Now, you've testified that you have not
25  looked into the product issues in this case,

82

1   correct?
2   A.   What I said was I wasn't assigned the task of
3   looking at the individual products that comprise
4   these categories we spoke of, yes.
5   Q.   And you don't know when the executive -- the
6   Ellison directive to put more risk in the forecast
7   was issued, correct?
8   A.   I don't -- would not describe it as a
9   directive but I don't recall that date, as I already
10  said.
11  Q.   And you don't know to what extent there was a
12  change in product mix between third fiscal quarter
13  of 2000 and 2001; is that correct?
14  A.   Well, certainly documented in the report the
15  different mixes of applications and database but if
16  you're asking at the micro product level among micro
17  products, I didn't put that in the report, wasn't my
18  assignment.
19  Q.   Do you know the relative mix of database and
20  applications in the third fiscal quarter of 2000
21  compared to the third fiscal quarter of 2001?
22  A.   What I reported was in Figure 2 in the report
23  on page 11, which was an annual comparison, it was
24  in the section which is describing Oracle's business
25  which breaks out license revenue by applications and

83

1   systems but I didn't report it at the level of the
2   quarter.
3   Q.   Okay.
4        And why did you not?
5   A.   I was simply trying to summarize Oracle's
6   business in these tables and I think I submitted a
7   lot of figures and tables so I tried to be
8   economical.
9   Q.   But you concede for the forecasting process
10  in the third fiscal quarter of 2001 that the data
11  for the third fiscal quarter of 2000 would be
12  relevant?
13       MS. KYROUZ: Objection; vague.
14  A.   I'm sorry, I didn't understand the question.
15  Q.   Do you agree that notwithstanding the fact
16  that you've only done this -- you haven't done this
17  on a quarterly basis, do you agree, though, that the
18  data, in other words, the product mix in the third
19  fiscal quarter of 2000 is relevant to the forecast
20  in 2001 if there was a significant change in the
21  product mix?
22       MS. KYROUZ: Objection; hypothetical,
23       vague.
24  A.   But I think the answer before is that I'm not
25  accepting there is such a significant change, to use

84

1   your term, but, yes, of course, that should be
2   figured into the forecast.
3   Q.   And you didn't know, correct me if I am
4   wrong, you didn't know that as of January 17,
5   adjusting for Covisint, each of the U.S. license
6   divisions was showing negative growth?
7        MS. KYROUZ: Objection; misstates
8        testimony.
9   A.   I said that I didn't recall, found it
10  potentially plausible because of the size of the
11  transaction that you mentioned, but I also reminded
12  you that Oracle had been in a position many times
13  before in which it was short of guidance.
14  Q.   Okay, that's fine. And you didn't know until
15  today and you still don't necessarily believe me, I
16  understand that, but you didn't know until today
17  that Mr. Henley has admitted he thought the
18  pipeline in 2000 was too good to be true?
19       MS. KYROUZ: Objection; misstates the
20       record.
21  A.   Well, I don't recall that but you have to
22  understand that he made a very direct adjustment
23  himself. Recall, that the internal -- if you look
24  at what the so-called potential is at the beginning
25  of the quarter at issue, I'm going from memory, but

85

1  I think it was 12.8 cents, close to 13 cents,
2  Mr. Henley doesn't say 13 cents, he's quite
3  conservative and he says 12.  To the extent that he
4  may have had views about the pipeline, he took them
5  into account.  So I -- without recalling your
6  specific statement, it's hard to believe that there
7  was any nefarious use of that information given that
8  Mr. Henley was extremely conservative.
9  [MO]        MR. SOLOMON:  Okay, and I'll move
10       to strike that as nonresponsive because
11  my question is:
12  Q.    Were you aware, before today, of an admission
13  by Mr. Henley that he knew that the pipeline in
14  2000, in December 2000 was too good to be true?
15            MS. KYROUZ:  Objection;
16       mischaracterizes the record.
17  A.    I think I just answered that.  I said I don't
18  recall but given that Mr. Henley took a very
19  conservative stance in his guidance relative to what
20  the potential number is, he may or may not have
21  believed that, but he took a conservative stance
22  possibly in response.
23  Q.    And just so I can get an answer to the
24  precise question:  You didn't know until today that
25  there was this issue at least of this admission?

86

1  A.    I don't recall is what I say.
2  Q.    Now, given that those are some of the things
3  that you either don't recall or you haven't looked
4  at or don't know that we've just been through, can
5  you arrive at an expert opinion, not that the
6  forecasting process at Oracle was reasonable but
7  that the guidance itself was appropriate?
8            MS. KYROUZ:  Objection; vague.
9  A.    Those are two sides of a coin, Mr. Solomon.
10  If -- as long as the forecasting process is
11  reflecting accurately the information
12  available--whether it's company-specific,
13  sector-specific, macro information--and that
14  information, you know, at least meets or exceeds the
15  actual guidance being offered by the firm, I can't
16  rule that out as unreasonable.  Nothing in the
17  plaintiffs' record or Dr. Goedde's report has said
18  what is reasonable, nothing can be unreasonable if
19  something is not also reasonable as a matter of
20  logic.  But if you're asking me, I as an economist,
21  I would not think that unreasonable, no.
22  Q.    Can you, given what you've told me over the
23  last few minutes, you either don't know, you don't
24  recall, can you affirmatively say that guidance in
25  the third fiscal quarter of 2001 was reasonable?

87

1  A.    Yes.
2  Q.    And you can say that without knowing the
3  change in the product mix, you can say that without
4  knowing the impact of the directive or whether it
5  were issued, you can say that without knowing or
6  conceding that Mr. Ellison thought the pipeline was
7  too good to be true, all those things that you
8  either don't know or don't recall don't change your
9  view that the actual guidance was reasonable and
10  you're willing to say that?
11            MS. KYROUZ:  Objection: misstates the
12       record, argumentative.
13  A.    Let's break down your question.
14       As to Mr. Ellison's directive, I've already
15  stated I view it as immaterial, so I'm not --
16  Q.    What Mr. Ellison wants is immaterial, what he
17  says is immaterial?
18  A.    That's not what I said.  I said if your
19  question was the mechanical effect of that
20  directive, I view it as immaterial.  I'm trying to
21  answer your question, sir.
22       On the issue of the field forecast, my view
23  is changes in the product mix are in the field
24  forecast, so that's there.
25       And then the third part was the question

88

1  about Mr. Henley and the pipeline.  I already said
2  to you I don't recall that Mr. Henley said that or
3  the context in which he said it but I do know from
4  the data that he was extremely conservative in his
5  guidance in Q3 of FY '01.
6       So, yes, I think that guidance was
7  reasonable.
8       It is also the case that the analyst
9  community virtually unanimously accepted that
10  guidance.
11  Q.    The analyst community pretty much does what
12  the issuer says, does it not?
13            MS. KYROUZ:  Objection; argumentative.
14  A.    I think that's an allegation.  It might be
15  the subject of other inquiries or proceedings, but
16  24 of 25 analysts who regularly followed Oracle,
17  wrote Oracle's guidance and didn't budge for the
18  entire quarter, the one who didn't was 11 cents, not
19  12 cents, not materially different.  It's also the
20  case, my recollection is, that Oracle was not
21  heavily into investment banking business during this
22  period so to the extent that you're casting
23  aspersions on the industry, I'm querying you on
24  means, motive and opportunity.
25  [MO]        MR. SOLOMON:  I'll move to strike

89

```
1    as nonresponsive.
2    Q.    The fact that the analysts reflected Oracle's
3    guidance throughout the quarter may simply be a
4    reflection of Oracle's continuing a fraud, no?
5         MS. KYROUZ: Objection; argumentative.
6    A.    As a matter of logic you're trying to square
7    circles again. You cannot have as a theory that it
8    is macroeconomic information being ignored.
9    Macroeconomic information is by construction
10   available to everyone, including the analysts. So
11   they have to be similarly duped, dumb, incapable of
12   forecasting, to meet your observation -- I can't
13   imagine a world in which what you're saying is true.
14   Q.    You can't imagine a world in which the
15   analyst would be, "Looks difficult to us but
16   Oracle's saying they can do it so we're going to
17   take them at their word"; that's an unrealistic
18   world, is it?
19   A.    Oh, that's a very different characterization
20   than the aspersion you just cast. That
21   characterization is more akin to "The significant
22   uncertainty in all of the previous quarters that we
23   have recent history Oracle has been able to do this
24   and we do believe management that, indeed, is
25   possible." That's very different than the aspersion
```

90

```
1    you cast before.
2    Q.    And if in those preceding quarters Oracle had
3    made its numbers through managing its earnings,
4    would that be an issue that gave you any concern?
5         MS. KYROUZ: Objection.
6    Q.    Would that be a fact that caused you any
7    concern?
8         MS. KYROUZ: Objection; argumentative.
9    A.    I have no --
10   Q.    I know you have no information, I'm asking
11   you to assume that.
12        MS. KYROUZ: Incomplete hypothetical.
13   A.    It's a totally -- first of all, there's
14   nothing in the record that suggests that. Second,
15   that's a hypothetical that's very hard to imagine
16   because it's hard to know what you mean by earnings
17   management as you're defining it and over what
18   period.
19   Q.    Have you read the reports of the accounting
20   experts in this case?
21   A.    No, sir.
22   Q.    And are you aware of an issue in the second
23   fiscal quarter of 2001 in this case, an issue
24   concerning accounting or issues -- excuse me,
25   concerning accounting, are you aware of that?
```

91

```
1    A.    I'm not aware of it in the specifics, I know
2    that there is an issue but...
3    Q.    But whatever that issue is hasn't fed into
4    your analysis at all; is that right?
5    A.    It wasn't my assignment, no.
6    Q.    So you haven't heard of any inappropriate
7    transfers to Oracle's bad debt reserves at the end
8    of the second fiscal quarter of '01; is that right?
9    A.    I'm not aware of specific allegations, no.
10   Q.    And are you aware of a swap transaction with
11   Hewlett-Packard at the very end of the second fiscal
12   quarter of 2001?
13        MS. KYROUZ: Objection; misstates the
14        record.
15   A.    Again, I'm not aware of that. It's an
16   allegation.
17   Q.    If it turned out that Oracle improperly
18   recognized revenue at the end of the second fiscal
19   quarter of 2001, assume that's the case, would that
20   affect your analysis that you performed?
21        MS. KYROUZ: Objection; incomplete
22        hypothetical.
23   A.    It's too much of a hypothetical to answer.
24   But I can say that, without condoning any such
25   alleged behavior, that it would depend. You know,
```

92

```
1    it need not affect the numbers for 3Q '01 even if
2    the behavior had been bad, and I'm not conceding
3    that any such behavior occurred.
4    Q.    Do you know who Mr. Nussbaum is?
5    A.    I believe that Mr.Nussbaum -- he's in the
6    NAS -- he may be the manager of the NAS, he's one of
7    the managers.
8    Q.    Do you know if he's still at the company?
9    A.    I do not, no.
10   Q.    You haven't heard that he was fired shortly
11   after the class period?
12   A.    I hadn't heard that, no.
13   Q.    Have you ever read any testimony by Mr. --
14   that Mr. Nussbaum has given?
15   A.    Oh, I don't recall. I may well have because
16   I was looking at NAS and it's in the list here.
17   Since I chose NAS and I believe he's the head of
18   NAS, I might well have. Let's see.
19        MS. KYROUZ: I think he's OSI.
20        THE WITNESS: Is he OSI? Then in all
21        likelihood --
22        MS. KYROUZ: It's in the list.
23   A.    Yeah, he's there but --
24   Q.    We'll swear Ms. Kyrouz in.
25        You've listed him on page 15.
```

93

1  A.  Yes.

2  Q.  And you've listed a deposition taken in 2004.

3      Is that the only deposition of his that

4  you've reviewed?

5  A.  You know, I don't recall, I recall a

6  deposition.

7  Q.  And do you recall what Mr. Nussbaum had to

8  say about forecasting in that deposition?

9  A.  I do not, no.

10  Q.  Did he say anything?

11  A.  I don't recall, sorry.

12  Q.  If it turned out that people at Oracle in the

13  third fiscal quarter of 2001, including senior

14  management, were unwilling to or reluctant to

15  forecast for 11i because of the product problems,

16  would that be something you'd want to know in

17  conducting your analysis?

18      MS. KYROUZ:  Objection; vague,

19      incomplete hypothetical.

20  A.  You know, again, my assignment isn't to look

21  at 11i specifically versus any other suite of

22  applications.  That should show up in the field

23  forecasts and I'm not aware of any such criticism

24  that you've alleged.

25  Q.  Okay.

94

1      Did you understand Dr. Goedde's report to

2  essentially be saying that in the third fiscal

3  quarter of 2001 the economy was already in a

4  recession?

5  A.  I don't recall that Dr. Goedde actually

6  described that.  One might infer that but that

7  wasn't the thesis of his argument.

8  Q.  You understood that the thesis was that there

9  was a sudden contraction in growth?

10  A.  Yes, those were the words that he used.

11  Whether that's accurate across the board is another

12  matter, looking at data in realtime, but yes, I do

13  understand that that's his thesis.

14  Q.  And you disagree with that thesis?

15  A.  Well, yes, in simple terms, if the question

16  is sitting there in realtime looking at all of the

17  macro and industry data, I don't think one can

18  unequivocally say that.  I make reference in my

19  report to still quite reasonable health in the

20  software sector.  There is still, you know,

21  considerable uncertainty from labor market data,

22  which still looks very, very strong.

23      What is decelerating during the period at

24  interest are some things that are observable in

25  realtime--consumer confidence comes to mind,

95

1  declines in the PMI for production--other things

2  that aren't really as observable in realtime like

3  the Federal Reserve minutes which come out later but

4  Dr. Goedde cites them as if they were a realtime

5  observation.

6      So I don't think -- if you're asking me with

7  the lens of hindsight was there a deceleration, of

8  course, that's not the question.

9  Q.  Without the lens of hindsight, do you not

10  think that if halfway through the quarter all of

11  your U.S. divisions are showing negative growth,

12  that that would be indicative of the company being

13  affected negatively --

14      MS. KYROUZ:  Objection; vague,

15      incomplete.

16  Q.  -- by the status of the economy?

17  A.  Well, a couple of comments.  Remember, that

18  both the stock market peak and the software peak had

19  occurred prior to this and Oracle had managed to do

20  quite well, a fact known to Oracle as well as to the

21  investing public.

22      Second, Oracle's senior management did make

23  statements that more questions need to be asked.

24  You have Henley saying, you know, let's make sure

25  that we're on top of this, let's kick the tires, I

96

1  think were his terms.  You did see that kind of

2  inquisitiveness on the part of senior managers

3  during that period.

4  Q.  You may have seen statements to that effect.

5      Have you seen documents that evidence

6  Mr. Henley kicking the tires?

7  A.  We know that Mr. Henley's guidance is less

8  than the potential through much of the quarter.

9  Q.  Is that the extent of his tire kicking that

10  you've seen?

11  A.  Well, we know Mr. Henley says that that's

12  what he says.  I can't be in his head, I can only

13  observe what he says.

14  Q.  Do you know what Mr. Henley's view was of

15  Oracle's stock price in November and December of

16  2000?

17  A.  I do not, no.

18  Q.  Do you care?

19      MS. KYROUZ:  Objection; argumentative.

20  A.  I have no idea what that question is about.

21  Q.  If he was very upset at the price of the

22  stock because it was too low and had expressed that

23  around November or December of 2000, would that be

24  of any concern to you?

25  A.  Sir, I can't imagine a businessperson alive

97

1   who doesn't express the frustration that his or her
2   stock price is too low.  Rarely do I hear
3   businesspeople walking around complaining that their
4   stock price is too high.
5   Q.   What about being satisfied that the stock
6   price is about right, does that never happen?
7   A.   Businesspeople are by their nature quite
8   optimistic and, you know, tend to have very
9   favorable views of their firms.  You know, I don't
10  read anything into that without knowing the context
11  you're talking about.
12  Q.   You could imagine a situation, couldn't you,
13  where an executive is upset that the stock price of
14  a stock is too low and goes and starts telling lies
15  to the market to inflate the price of the stock and
16  then sell some of it; could you imagine a situation
17  like that?
18        MS. KYROUZ:  Objection; vague.
19  Q.   Or do American businessman just not do that?
20        MS. KYROUZ:  Misstates the record,
21  argumentative.
22  A.   Well, it's certainly a hypothetical.  It
23  would also be value-destroying for that individual
24  if you sold --
25  Q.   Some go to jail, don't they?

98

1   A.   Well, yes, but if you sell stock and you
2   still are holding a lot of stock and you lose value,
3   it's hard to argue that you're very economically
4   wise to have done so.  If you're asking me is there
5   any economic incentive to do that in this case?
6   Hard to see.
7   Q.   For either Mr. Henley or for Mr. Ellison?
8   A.   Well, you know, I'm not being asked to offer
9   an opinion on that.  I will tell you that it would
10  be by no means obvious without a series of very
11  complicated calculations, particularly for
12  Mr. Ellison who holds so much stock.
13  Q.   Why did Mr. Ellison sell, do you know?
14  A.   Mr. Ellison doesn't confide in me his
15  financial transactions.
16  Q.   And, again, you haven't been asked to look at
17  the sales in any way, shape or form; is that true?
18  A.   I was not asked to do that, no.
19  Q.   You've talked about the hockey stick effect a
20  little bit.
21       Are you familiar with that?
22  A.   Yes, sir.
23  Q.   And you know that Oracle claims -- well, it's
24  hard to keep up with their claims but at one point
25  Oracle claimed that they had just lost a few large

99

1   deals at the end of the quarter; are you familiar
2   with that claim?
3   A.   Yes, I am.
4   Q.   And is that true?
5   A.   Yes.
6   Q.   How do you know that's true?
7   A.   Well, I've seen information about several of
8   them.  One that comes to mind is the Lucent
9   transaction because Lucent was one that had actually
10  been agreed to by management but then the bankers
11  had said no at the last minute.  And any of these
12  things, when you have lumpy investments like this,
13  you know, you can have a few wins at the end that
14  are very surprising and a few losses at the end that
15  are very surprising.  One deal, as I recall, closed
16  the next day but it was too late for this quarter.
17  Things like that happen.
18  Q.   What deal was it that closed the next day?
19  A.   Oh, I'm going from memory.  It starts with an
20  A, Axterra, something like that.
21  Q.   I'm sorry, A?
22  A.   Axterra perhaps, I'd have to go back.
23  Q.   So that closed the next day and the other
24  deal you talked about was Lucent?
25  A.   Lucent.

100

1   Q.   Other than those deals, can you identify any
2   others?
3   A.   I recall another that was I believe a firm in
4   Ohio where it just sat on a desk, didn't make the
5   quarter, in other words, the approval.
6   Q.   And how do you know about Lucent, first of
7   all?
8   A.   You know, I don't recall.
9   Q.   You don't know how you know?
10  A.   No, I don't recall.
11  Q.   And how do you know about the one that began
12  with an A that closed the next day?
13  A.   Again, I don't recall.  I asked to see some
14  of this information because the question that I
15  asked was, you know, what would you need to know
16  about so-called big deals at the end that come to
17  some conclusion about whether there might be some
18  prospects, and I did get a list of which I don't
19  recall all of them.
20  Q.   Okay.
21       And when you say you got a list, was that a
22  list that was prepared particularly for you by the
23  lawyers, do you know, or was it a document that was
24  prepared --
25  A.   I --

101

1   Q.   -- in the ordinary course?

2   A.   I really don't recall.

3   Q.   And what about Ohio, same answer?

4   A.   Yes.

5   Q.   Can you think of any others other than those

6   three?

7   A.   No, sir, not off the top of my head, no.

8   Q.   And do you know the amount of those

9   transactions?

10   A.   Well, Lucent I referred to in my report, I

11   don't remember the number, 20, 30 million dollars,

12   something like that.  I don't remember the others.

13   Q.   Now, is that your -- is it your understanding

14   that that is Oracle's explanation for what happened

15   at the end of the third fiscal quarter of 2001,

16   that, unexpectedly, a few large deals at the very

17   end of the quarter didn't get closed; is that your

18   understanding?

19        MS. KYROUZ:  Objection; vague,

20   misstates testimony.

21   A.   That's not my understanding, no.

22   Q.   Okay.

23   A.   I mean I think that's the symptom, not the

24   underlying concern.  I think what Mr. Henley says in

25   mid-March in diagnosing what went wrong was to refer

102

1   to things like that but mainly in the context of,

2   you know, near the end it became apparent that they

3   had a larger problem, meaning some combination of

4   the economy being weaker than had been thought or

5   the probability that given deals closed.  I think it

6   was both of those, I don't think they were simply

7   saying oh, well, we just missed these deals

8   idiosyncratically, the economy definitely played a

9   role.

10   Q.   Just so we're clear on your understanding,

11   then, your understanding is that at the very end of

12   the quarter a few large deals unexpectedly fell out

13   and the economy played a role in explaining why

14   those few large deals fell out; is that your

15   understanding?

16   A.   Not precisely.

17   Q.   Okay.

18   A.   That a few large deals didn't close at the

19   end factually is correct.  As to why Oracle missed

20   its guidance for that or any other reason, Henley

21   says, "I said to you the economy was a wild card

22   going back," he refers to other points in time at

23   which he had referred to the economy and says, "Yes,

24   indeed we were surprised."  As it turns out later,

25   other firms in the industry were surprised.

103

1   So I think that there's quite a heavy weight

2   on the economy, not just on, you know, idiosyncratic

3   deal losses or at least that's my reading of what

4   Mr. Henley says.

5   Q.   Again, I sort of want to understand that so

6   aside from what you call the idiosyncratic deal

7   losses, what else happened at Oracle that affected

8   it negatively and made it miss its estimate?

9        MS. KYROUZ:  Objection; vague.

10   A.   Yeah, it's hard to know what you're asking

11   but what Henley says in the March 15th I think it is

12   call is that the economy did play a larger role,

13   particularly near the end.  He doesn't say that

14   simply in the context of a handful of deals but more

15   generally, that people may have become more cautious

16   about spending in this area, that the firm is

17   learning that this situation may have been worse

18   than it initially had feared.

19   Q.   Do you have an understanding why there was --

20   so you're saying there was a difference between the

21   initial announcement and the announcement on the

22   15th; is that fair?

23   A.   Not really.  I mean what Henley says at the

24   beginning is that "It's a wild card and I haven't

25   turned it over yet" --

104

1   Q.   No, no, I'm talking about the beginning of

2   March -- the middle of March, excuse me.

3        MS. KYROUZ:  Objection; misstates his

4   testimony.

5   A.   That's not what I talked about.  What I just

6   talked about was going from December 14th to

7   March 15th, if I'm getting the dates right, I do

8   believe that in around, on or around the beginning

9   of March, you know, the company is still obviously

10   reaffirming its guidance at 12 cents.  If you look

11   at the exhibit that I presented in the report where

12   you have the field forecast, upside, and then

13   obviously what ultimately happens, it's not until,

14   going from memory, not even two weeks before the end

15   that you start to fall out of the 12-cent range,

16   given that Oracle rounds up from 11-1/2, you don't

17   fall out of an 11-1/2 bound until right at the end.

18        MS. KYROUZ:  You said on or around the

19   beginning of March the company is still

20   reaffirming its guidance.  You don't mean

21   March, do you?

22        THE WITNESS:  No, I'm sorry --

23        MR. SOLOMON:  We can clean that up

24   separately.  There's no need to interrupt the

25   witness, so please don't do it again.

105

1 BY MR. SOLOMON::
2 Q. So let's focus again on March of 2001.
3 A. Right.
4 Q. There was an announcement at the beginning of
5 March 2001, agreed?
6 A. Right.
7 Q. How did they explain the quarter miss in that
8 announcement?
9 A. You know, again, I don't recall but I think
10 the economy played a significant role --
11 Q. Okay.
12 A. -- in that announcement.
13    MR. SOLOMON: Let's go off the record
14 because we need to change tapes.
15    THE WITNESS: Take a break?
16    MR. SOLOMON: Absolutely.
17    THE VIDEOGRAPHER: 11:15 a.m., end of
18 Tape No. 2.
19    (Recess taken)
20    THE VIDEOGRAPHER: Returning to the
21 record 11:21 a.m., beginning of Tape No. 3.
22 BY MR. SOLOMON::
23 Q. Okay, I just want to go back to March 2001
24 again and see if we can get on the same page.
25    Do you understand there were two

106

1 announcements in March, right?
2 A. Right.
3 Q. And the first announcement, the explanation
4 for the miss was a few large deals unexpectedly not
5 closing at the end of the quarter; yes or no?
6 A. I recall it's in the announcement. I think
7 that there's more shading than that, certainly there
8 is by the 15th.
9 Q. Okay, that's what I'm getting at. When we
10 get to the 15th, what is that increased shading?
11 A. A significant discussion of the economy,
12 almost a time line of, I'm going from memory, but
13 going back to the December 14th wild card remark
14 through various other times in which the economy was
15 mentioned by senior management and then very much a
16 pointing to the economy, you know, as explaining
17 things toward the end. That's my recollection from
18 the conference call.
19 Q. Was there any change, notwithstanding that,
20 though, was there any change in the explanation
21 that -- sorry, not the explanation, any change in
22 the representation that a few large deals fell out
23 at the end of the quarter and it was the economic
24 consequence of losing those deals that caused Oracle
25 to miss its estimate in that quarter?

107

1 A. I don't recall that change, no. You know,
2 the large deals issue is a subset of the economy
3 issues, it's the most visible but...
4 Q. Okay, so you're not aware that Oracle later
5 amended its explanation to say, "Well, it wasn't
6 really just large deals falling out at the end of
7 the quarter, it was we've lost all sorts of deals,
8 small and large, throughout February," you never
9 heard that?
10 A. Well, I think I just said that there was
11 significantly more color on the economy in the
12 March 15th conference call. I don't view those as
13 contradictory. As I said, one is a subset of the
14 other.
15 Q. No, but I did ask you, didn't I, that was
16 there a change in the focus of big deals falling out
17 at the end of the quarter as being the explanation
18 and I think you thought that that didn't change, and
19 now I'm saying, well, do you not understand, in
20 fact, that the explanation did appear to change to
21 one that it wasn't just large deals falling out at
22 the end of the quarter, it was all sorts of deals
23 falling out throughout February?
24    MS. KYROUZ: Who's testifying now,
25 Mark?

108

1    MR. SOLOMON: I'm asking.
2 Q. Is that something that you recall?
3 A. That's not how I recall it at all,
4 Mr. Solomon. I recall it all being part of the same
5 story, which is about the economy with first flash
6 illustration and then a more colored illustration
7 but I don't see those as being different stories,
8 no.
9 Q. Now, I kind of don't understand how you're
10 sitting here as an expert saying that guidance was
11 reasonable when you can't even tell me -- you can't
12 even identify by name more than one company that
13 supposedly fell out unexpectedly at the end of the
14 quarter. Isn't that surprising that you don't
15 really have those facts at your fingertips?
16    MS. KYROUZ: Objection; argumentative.
17 A. I'm sorry, I don't even know what you're
18 asking there.
19 Q. All these deals supposedly fell out, what
20 were they? You've told me one was Lucent, you don't
21 know much about that, one began with an A and the
22 other involved Ohio, and you can't even give me
23 numbers.
24    MS. KYROUZ: Objection; argumentative.
25 A. That it would have no bearing -- if you go

109

1 back to the chart, maybe it's useful to follow
2 through this. If you look, it's somewhere in the
3 nineties, let me find it for you.
4 Yeah, if you look at page 94 and let's have a
5 look at Figure 44 so we can sort of track what's
6 going on during the quarter. You know, it's very,
7 very clear that, you know, up until the very end,
8 nothing much is happening here.
9 So whether I can name which handful of deals
10 it is or which piece of news in the economy is not
11 really central. You can see it even more clearly
12 perhaps on page 95 when you look at the potential
13 forecast and upside adjustments relative to the band
14 range, you're not even falling out of the band until
15 not even two weeks before the end.
16 So this is, you know, prima facie reasonable
17 guidance given the economic information that was
18 there. The fact that something happens at the
19 end--as, by the way, Oracle had been through this
20 many other quarters before--is simply no assertion
21 of the contrary nor have you offered an assertion of
22 what is reasonable.
23 Q. Just on page 94, if you look at 4Q '00, does
24 that not sort of tell you that that was a remarkable
25 quarter, an outlier?

110

1 MS. KYROUZ: Objection; vague.
2 A. I'm not sure how I could infer that. In
3 order for me to infer it, I'd have to have a time
4 series of significance of 4Qs. We already know that
5 4Q is in more difficult economic times, we know that
6 4Q '99 is in a big boom, so I'm not sure how I could
7 ascertain that from this picture, no. It is the
8 highest dark line in the picture -- is that what
9 you're asking me? But that in no way could convey
10 exception.
11 Q. And, again, that doesn't tell you, then, just
12 this chart doesn't suggest to you that the fourth
13 quarter of '00 was an outlier in terms of comparable
14 quarters?
15 MS. KYROUZ: Objection; asked and
16 answered.
17 A. I don't think you could infer that because
18 you would need, given the seasonality of the
19 business, you'd need a time series of 4Qs and
20 unfortunately the other two 4Qs in the picture are
21 periods that are decidedly not comparable.
22 Q. Now, just back to what would not make a
23 difference, it wouldn't make any difference to your
24 analysis or your opinion, you're saying, whether you
25 knew the companies -- whether you knew the details

111

1 of any of the companies that supposedly were unable
2 to close their transactions with Oracle in the third
3 fiscal quarter?
4 A. The question at issue and the question on
5 which I'm opining is how the forecasting process
6 treated that information, was that information
7 there, could there have been a reasonable
8 expectation based on past performance and knowledge
9 of the economy, whether the deals are called A, B, C
10 or D, E, F is orthogonal to that point, unrelated to
11 that point.
12 Q. Okay.
13 You've told us about your testimonies but I
14 don't know that you've told us about all of your
15 engagements as an expert in the past four years to
16 start with.
17 Are there any other engagements in which
18 you've been retained but you haven't given
19 testimony?
20 A. There was another matter from Microsoft in
21 which I didn't give testimony. There are some other
22 matters for which I have been engaged but they're at
23 a much earlier stage than we are in this proceeding.
24 Q. And who have you been engaged by?
25 A. Again, I'm not sure whether that's -- I'm not

112

1 disclosed --
2 MS. KYROUZ: You haven't been
3 disclosed in those cases --
4 THE WITNESS: No.
5 MS. KYROUZ: -- so it's confidential
6 information.
7 A. Yes, there are. Not a lot.
8 Q. What areas of your expertise have been sought
9 in those cases?
10 A. Antitrust.
11 Q. Antitrust?
12 Have you ever worked for Latham & Watkins
13 before?
14 A. I may well have a long time ago but I don't
15 recall. I think it's possible that I did in a case,
16 another securities matter case in the '90s.
17 Q. Do you remember the name of that case?
18 A. I believe, if I'm going -- this is from dark
19 memory, the Hilton Bally's case, Delaware Chancery
20 Court case, and I don't remember that it was
21 Latham & Watkins but it's enough of a correlation it
22 might well be.
23 Q. Okay, and what side were you on?
24 A. Defendant, and we won.
25 Q. It's not hard in Delaware Chancery for a

Hubbard, R. Glenn  7/3/2007  8:20:00 AM

113

1  defendant to win, is it?
2  A.   I haven't studied the actions for Delaware
3  Chancery Court.
4  Q.   Although I'm sure you did a great job.
5      What was the nature of your testimony?
6  A.   I don't remember, sir.  I remember it was in
7  the '90s but I don't remember when.  It would have
8  been between '97 and '99, somewhere in that time
9  frame.
10      MR. SOLOMON:  Okay, let's go off the
11  record.
12      THE VIDEOGRAPHER:  Going off the
13  record, 11:31.  Take five minutes.
14      MS. KYROUZ:  Sure.
15      (Recess taken)
16      THE VIDEOGRAPHER:  Returning to the
17  record, 11:47 a.m.
18  BY MR. SOLOMON:
19  Q.   In preparing your report, have you worked
20  with other people -- your reports, excuse me, have
21  you worked with other people?
22  A.   There were staff and Analysis Group who
23  certainly worked under my direction on my report,
24  the initial report and the rebuttal.
25  Q.   And which individuals assisted you?

114

1  A.   Mr. Deal who is here today, Mr. Ortenzi,
2  O-r-t-e-n-z-i, Mr. Hess, H-e-s-s, and Mr. Rosberg, I
3  believe R-o-s-b-e-r-g.
4  Q.   And did any of those individuals do any of
5  the drafting of your reports?
6  A.   No, I was the draftsperson of my report.
7  What the AG team did under my direction was help
8  with many presentations of exhibits, finding data,
9  information.
10  Q.   And is that the same for both your initial
11  report and your rebuttal?
12  A.   That's my general practice, yes.
13  Q.   Nothing changed in the way you prepared your
14  rebuttal from the way you prepared your first
15  report; is that fair?
16  A.   Same process, yes.
17  Q.   And you don't have any kind of list that
18  would identify the deals that supposedly didn't
19  close in the third fiscal quarter of '01 thereby
20  causing Oracle to miss its quarter?
21  A.   Sitting here today, no.  As I told you, I
22  asked about this information, I recall some, but no,
23  I don't have a list here.
24  Q.   And you don't have a list back at the office
25  or anywhere; is that right?

115

1  A.   No, I don't save things -- if I don't have
2  them, I don't have them.
3  Q.   I notice you said you didn't save anything.
4  My real concern is did you ever get such a list?
5      MS. KYROUZ:  Objection; vague.
6  A.   No, I did ask about the big deals and a list
7  and I do remember some of them suggesting that I saw
8  that list or heard that list, I just don't recall.
9  Q.   And, again, you don't know if it was in a
10  conversation or if it was in a document?
11  A.   I really don't recall, sorry.
12  Q.   And do you recall how many companies were on
13  that list, whether it be an oral list or a written
14  list?
15  A.   I don't, but not a large number.  Ten or
16  fewer.
17  Q.   Are you aware that during the class period,
18  which is December 14 through March 1, are you aware
19  that Oracle had a stock repurchase program in
20  effect?
21  A.   I don't recall that, no.
22  Q.   Would Oracle's repurchasing activity have any
23  impact on the opinions or the preparation for the
24  opinions you've given here today?
25  A.   As a general rule, no.

116

1  Q.   Could you conceive circumstances when it
2  would affect analysis of whether a forecasting
3  process was appropriate?
4      MS. KYROUZ:  Objection; vague.
5  A.   Honestly, I can't.  I suppose I can sit here
6  and torture myself and try but none comes to mind,
7  no.
8  Q.   Do you know who Ray Lane is?
9  A.   I know that he filed an affidavit in this
10  proceeding and once worked for Oracle in a
11  relatively senior job.  That's my only recollection,
12  I'm sorry, I don't recall more.
13  Q.   Okay.
14      And the affidavit, what do you know about the
15  affidavit?
16  A.   My recollection was, you know, it was quite
17  critical of Oracle during this period although I
18  don't recall the specifics.
19  Q.   But you did read it?
20  A.   I recall looking at the Lane affidavit.  But
21  I -- as I say, it's not -- I don't recall well
22  enough to know when or in what form.
23  Q.   Let's try and talk in generalities then.
24      Around when did you first see the Lane
25  affidavit?

117

1   A.   You know, I don't recall.  If I had a chance
2   to really review it, it probably would have been
3   more recently.  As I recall, I believe, again, I'm
4   going from memory, that this comes up in the second
5   Goedde report.
6   Q.   Okay.  And is it your belief that that was
7   the first time that you heard of the Lane affidavit?
8   A.   Again, I don't recall.  I know it's top of
9   mind as of that but I don't recall.
10  Q.   And you don't recall its contents?
11  A.   I recall that it was quite critical of Oracle
12  by somebody who had had a difficult relationship
13  with Oracle.  I, you know -- frankly, it wasn't
14  necessarily germane for what I was doing.
15  Q.   When you say it wasn't germane, is that
16  because it didn't talk about forecasting?
17  A.   Well, I recall actually that it may have made
18  references to forecasting.
19  Q.   But forecasting that wasn't germane to your
20  forecasting report?
21  A.   Well --
22       MS. KYROUZ:  Objection; vague.
23  A.   -- keep in mind I'm not assigned to develop a
24  forecast but to look at a forecasting process and a
25  set of guidance and offer my opinion as an economist

118

1   as to whether it's reasonable.  I can do that
2   without knowing the opinion of disgruntled former
3   employees of Oracle.
4   Q.   And that's how you were meaning to
5   characterize Mr. Lane's affidavit pretty much,
6   right, "Oh, that's the affidavit a disgruntled
7   former employee," right?
8   A.   Given that I had deposition testimony from so
9   many other individuals with a different point of
10  view, yes.
11  Q.   And, therefore, you credited the ones with a
12  different point of view and you assumed Mr. Lane is
13  lying, right?
14  A.   I don't need to do any such thing.  All I'm
15  assigned to do is to look at facts and circumstances
16  about the U.S. economy which, by the way, rely on
17  none of these individuals for their assessment, and
18  to look at the forecasting process that Oracle used
19  and to opine as to whether it's reasonable from an
20  economic perspective.
21  Q.   Are you offering the opinion, though, not
22  just that the forecasting process was reasonable but
23  also that the guidance given in this case was
24  reasonable?
25  A.   Yes, for this quarter at issue, that is

119

1   indeed what I'm offering.
2   Q.   So if Mr. Lane addressed forecasting and
3   guidance for the third fiscal quarter of '01,
4   wouldn't one ordinarily expect that to be relevant
5   to your inquiry?
6   A.   Well, first and foremost, recall,
7   Mr. Solomon, that I have all of the quantitative
8   data that go into that through the so-called upside
9   reports, I have the testimony of several layers of
10  people in Oracle, more junior to more senior, and I
11  have to form my opinion based on the totality of the
12  evidence I see, principally the quantitative
13  evidence of what was done in the upside, how field
14  forecasts were generated and so on.
15  Q.   And do you believe that it's necessary to be
16  an expert in that field to arrive at an informed
17  opinion?
18       MS. KYROUZ:  Objection; vague "field."
19  A.   I'm not sure what you're asking about is the
20  field or the opinion.
21  Q.   Is your expertise necessary for the opinion
22  you've reached?
23  A.   I believe that my expertise as an economist
24  is absolutely necessary as to whether or not what
25  was the state of the macroeconomy, what was knowable

120

1   at that time and did Oracle appear to be taking
2   these considerations into account, yes, I think you
3   would need an economist.
4   Q.   So aside from the fact that Mr. Lane is a
5   former disgruntled employee, as you've described
6   him, is there anything that you can recall in his
7   declaration that has any relevance to your inquiry?
8   A.   As I said, I don't really recall all the
9   substance of his declaration.
10  Q.   So you can't say yes or no?
11  A.   Obviously I believed at the time of looking
12  at it that it did not as I did not choose to
13  incorporate it.
14  Q.   If you had chosen to incorporate it, how
15  would you have incorporated it?
16       MS. KYROUZ:  Objection; vague,
17       incomplete hypothetical.
18  A.   It's actually an excellent question because
19  it gets to the heart of why this isn't particularly
20  useful.  What I'm trying to ascertain is what was
21  actually done in the forecasting process by which I
22  can look at the numbers, I can see what a field
23  forecast was, I can look quarter by quarter at what
24  Ms. Minton does, I, of course, have her own
25  testimony as to what she says she does and

121

1    Mr. Henley's and then those who are feeding into
2    her, and I can reach an opinion.
3        So what somebody's views of the process are
4    doesn't shed much light given that I had the actual
5    data that was being used.
6    Q.    Back to that for a second, to Ms. Minton.
7    What if instead of it being a check, as you call her
8    analysis of the conversion forecast, conversion
9    ratios, what if that was the process that she
10   utilized, in other words, what if it wasn't that she
11   was going to the field all the time but that she was
12   just automatically plugging in the rate from the
13   previous year, would that have any impact on your
14   analysis?
15       MS. KYROUZ:  Objection; vague,
16       incomplete hypothetical.
17   A.    But that's not my understanding of what she
18   does --
19   Q.    No, I know it's not, that's --
20   A.    She does have a mechanical conversion process
21   but that's not the up -- what the output of this is
22   what's called the upside, and she does a check
23   called the conversion that does reach back and
24   compare it to the previous four quarters but that's
25   in no sense a locked-in thing that the term is the

122

1    upside.  I think this was a confusion in
2    Dr. Goedde's report as well.
3    Q.    And so to the extent that Ms. Minton forecast
4    revenues that are arrived at exactly as a result of
5    applying the last year's conversion ratio, that's
6    just a very happy coincidence?
7    A.    Well, again, many pieces of that question.
8    My understanding is that that isn't what she does.
9    She has a check, she comes up with the answer.  My
10   recollection was I couldn't replicate Dr. Goedde's
11   calculations so whether it's happy coincidence or an
12   arithmetic error, that I can't say sitting here
13   today, but it is not my understanding that that's
14   what Ms. Minton does as the upside.
15   Q.    If that were the case, would it alter your
16   analysis?
17   A.    I don't know, there's so much going on
18   there --
19       MS. KYROUZ:  Objection; vague.
20   A.    -- it's a hypothetical because there are so
21   many inputs into a forecast and all I can say is
22   that my understanding is that she does both across
23   quarters and within a quarter vary her upside based
24   on the latest information, that it is not simply
25   mechanical.  What is mechanical is the check.

123

1    Q.    And what I'm trying to say is, what if all
2    the field stuff didn't really happen the way you
3    think it happened and it was just the mechanical
4    application of the conversion ratio that she was
5    doing, would that affect your analysis?
6        MS. KYROUZ:  Objection; incomplete
7        hypothetical, contradicts the record.
8    A.    Also understand it's not even the -- the
9    question I think you were asking before, there are
10   two things going on here, there's a field forecast
11   and there's an upside.  And you seem to be asking
12   is -- your latest question is is there something
13   wrong with the field forecast, your previous
14   question was is there something mechanical that
15   converts the field to potential.
16       I don't know which of those questions it is
17   you want me to answer.
18   Q.    Answer them both.
19   A.    The answer would be the same--she describes
20   that she takes into account something in the field
21   forecast, she does an upside which varies both
22   across and within quarters, and does do a check on
23   conversions based on lagged information for same
24   quarter to get at seasonality.  That is my
25   understanding of what she has done and what I

124

1    believe is in her numbers.
2    Q.    And that's because you do not believe that
3    her application of the conversion ratios was
4    anything more than a check, correct?
5        MS. KYROUZ:  Objection; misstates
6        testimony.
7    A.    I don't know about anything more than but it
8    was principally there for a check, she does an
9    upside adjustment which varies within the quarter.
10   If something varies within a quarter, it can't
11   simply be mechanical across quarters.  It's just a
12   matter of arithmetic.
13   Q.    Well, doesn't it depend if she's applying the
14   conversion ratio from fiscal '00 to the forecast in
15   fiscal year '01, if that's what she's automatically
16   doing and arriving at precisely the numbers that
17   you'd expect by making that --
18   A.    Well, keep -- whoa.  Keep in mind that what
19   you see in these reports is also she's doing this at
20   different weeks, right, this isn't like a one-time
21   thing.  That's why I said there's considerable
22   variation within a quarter, not simply across a
23   quarter.  I illustrate this in the report.
24   Q.    So, again, you won't accept--this is my
25   understanding--you won't accept the premise that

125

1  Ms. Minton may have been slavishly applying an
2  historical conversion ratio in fiscal year one not
3  as a check but, in fact, as a forecasting tool?
4  A.   It is my understanding that that was not the
5  thrust of her process.  To the extent that the
6  numbers compare that way, you know, they do --
7  Q.   Happy coincidence?
8  A.   Well, perhaps.  As I say, I couldn't in my
9  quick look even replicate what Dr. Goedde did, so...
10  Q.   Have you read Softwar?
11  A.   No, I have not.
12  Q.   Have you read parts of it?
13  A.   I've seen snippets of it.
14  Q.   And did that factor into your -- the contents
15  of that book factor into your analysis in any way?
16  A.   No.
17  Q.   Have you relied on it in any way?
18  A.   I think I possibly just answered that
19  question, but, no.
20  Q.   Okay.
21       MR. SOLOMON:  We'll have marked as the
22  next -- go off the record, we need to copy an
23  exhibit.
24       THE VIDEOGRAPHER:  Going off the
25  record, 12:03.

126

1       (Recess taken)
2       THE VIDEOGRAPHER:  Returning to the
3  record, 12:12 p.m.
4  BY MR. SOLOMON::
5  Q.   I just want to go back to the issue of
6  Ms. Minton and her application of conversion rates.
7       Again, I want to ask you, if the field
8  forecast was the field forecast just as it was in
9  third fiscal quarter of '01 but what Ms. Minton did
10  to arrive at her upside was to mechanically apply
11  the corresponding weakened month and quarters
12  conversion rates in the prior year to get the upside
13  to get the potential, would that alter your
14  analysis?
15       MS. KYROUZ:  Objection; incomplete
16  hypothetical.
17  A.   Well, two things.  One, I don't believe
18  that's what she did --
19  Q.   No, I know, you say that every time, you
20  don't have to say that because I'm asking you to
21  assume.
22  A.   Second, it would depend, as a statistical
23  answer, because it would depend, you know, how
24  representative the quarters are that you're
25  comparing, how close you are, how far off you are.

127

1  Q.   You just don't want to say that it would have
2  affected your analysis because it would depend on
3  stuff that's not in the hypothetical; is that what
4  you're saying?
5       MS. KYROUZ:  Objection; argumentative.
6  A.   Hypotheticals are hypotheticals, I'd prefer
7  to look at what somebody actually did.
8  Q.   I understand that but the nature of expert
9  testimony, as you probably know, often involves a
10  lot of hypotheticals to test your thesis.
11       And what I'm trying to ask you now is, would
12  your thesis change, would your analysis, the report
13  that you've given, would it change in any
14  significant way if, in fact, the underlying facts
15  were as I ask you to assume them?
16       MS. KYROUZ:  Objection; asked and
17  answered, incomplete hypothetical.
18  A.   I can't give a yes or no answer to that for
19  the simple reason that I'm not sure of the extent to
20  which that's true or the extent of any error that
21  might have been introduced.
22  Q.   All right, let's put it another way.  Would
23  you have done anything different if defense counsel
24  had represented to you that that was how Ms. Minton
25  arrived at her potential?

128

1       MS. KYROUZ:  Same objections.
2  A.   Again, it would depend on how far off I
3  thought that was from the process.  I mean there's
4  no simple yes or no answer.  Ultimately, my opinion
5  is a zero one, do I think the guidance is reasonable
6  or not.  You're asking me a continuous, not a
7  discrete question, and it doesn't necessarily map.
8       MR. SOLOMON:  Let's have marked as the
9  next exhibit the declaration -- the affidavit
10  of Ray Lane.
11       (Affidavit of Raymond Lane sworn to
12  April 10, 2003, no Bates numbers, marked
13  Hubbard Exhibit 2 for identification, as of
14  this date.)
15       MR. SOLOMON:  Now, Ms. Kyrouz,
16  defendants have never produced this document
17  to us.  In fact, we've been told throughout
18  the years that you don't really know what
19  we're talking about when we've asked for this
20  document.
21       Do you have any explanation as to why
22  this has never been produced?
23       MS. KYROUZ:  I don't know whether your
24  representations are accurate or not so I'm
25  happy to take up later with you.

129

```
1        Obviously this is the first I'm
2    hearing of your question.
3    BY MR. SOLOMON::
4    Q.   So this is an affidavit by Ray Lane.
5        Do you see this?
6    A.   Yes, sir.
7    Q.   And is this the document you think you may
8    have seen but you can't recall the contents of?
9    A.   I can't recall, it was something from Ray
10   Lane, so...
11   Q.   Have you at any time taken the time to read
12   this affidavit from the beginning to the end?
13       MS. KYROUZ:  Objection; asked and
14       answered.
15   A.   Yeah, I don't, I don't recall giving it so
16   careful a scrutiny, just that I saw it.
17   Q.   Have you ever heard of the company Booz Allen
18   Hamilton?
19   A.   Yes, sir.
20   Q.   What is that entity?
21   A.   They're a management consulting firm,
22   everything from strategic consulting to operations,
23   implementation.
24   Q.   Are they respectable?
25   A.   Yes, sir.
```

130

```
1        I write a column in their magazine.
2    Q.   I'm looking at the second page.
3    A.   Yes, sir.
4    Q.   At paragraph 9, Mr. Lane says in part the
5    following, "To accurately assess the license revenue
6    and the direction of the license revenue business,
7    Covisint's results should have been backed out of
8    the December revenue actuals."
9        Do you see that?
10   A.   Yes, sir.
11   Q.   Do you agree with that?
12   A.   You're asking me do I agree with the first
13   sentence?
14   Q.   Yes.
15   A.   Well, the first thing isn't a sentence, I'm
16   not sure what it is but -- is that a comma?  You're
17   asking me do I agree that Covisint's results should
18   have been backed out of the December?
19   Q.   Yes.  In the forecasting process.
20   A.   Well, that's asking me for knowledge about
21   the timing of that transaction.
22   Q.   Okay, okay.
23       Let's go on a little bit further.
24       "Except for the technical timing of the
25   booking of the revenues, the Covisint deal was not a
```

131

```
1    Q3 deal, and was not indicative of the business at
2    the time or relevant in assessing its prospects
3    going forward."
4        Do you see that?
5    A.   I do.
6    Q.   Were you aware of a view, prior to today,
7    that Covisint was not a Q3 deal?
8        MS. KYROUZ:  Objection; vague.
9    A.   I think we've discussed this, this is
10   Mr. Lane's view.  You yourself asked me a line of
11   inquiry what if we excluded Covisint and we've
12   already talked about a world without Covisint, so
13   this statement adds nothing to that conversation.
14   Q.   And the world without Covisint was still a
15   good world, as far as you're concerned, right?
16   A.   It may well have given four of the previous
17   six quarters I believe was our discussion.
18   Q.   Have you looked at what is called the comfort
19   gap?
20   A.   I'm sorry?
21   Q.   The comfort gap.  Do you know what that is?
22   A.   I don't recall that term.
23   Q.   Have you opined on -- strike that.
24       Go to page 3.
25   A.   Yes, sir.
```

132

```
1    Q.   Paragraph 11, "The most important gauges of
2    the company's business and its prospects were actual
3    performance data, including license revenue and
4    pipeline data, combined with realtime interface with
5    the division heads regarding their sales."
6        Do you see that?
7    A.   Yes, sir.
8    Q.   Is that consistent with your understanding of
9    the most important gauges of the company's business
10   and prospects?
11       MS. KYROUZ:  Objection; vague.
12   A.   It's very loosely worded.  You know, I would
13   think that if prospects is in your area that you're
14   trying to define importance, you might want to have
15   some forecasts for your sector for the economy but
16   certainly these would be among factors that would be
17   important, if that's what you're asking.
18   Q.   Okay.
19       Then he goes on to say, "These were the
20   gauges Larry Ellison and I routinely relied on in
21   assessing the company, both on an intraquarter basis
22   and going forward."
23       Do you see that?
24   A.   Yes, that's simply consistent with looking at
25   the upside reports would have conveyed that
```

133

1 information.

2 Q. Okay.

3 And you say simply looking at the upside

4 reports. That would be looking at the "actual

5 performance data, including license revenue and

6 pipeline data, combined with realtime interface with

7 the division heads regarding their sales"?

8 A. Yes, sir, because the interface is occurring,

9 you know, as part of that process.

10 Q. Okay.

11 And then he goes on to say, "The fact that,

12 absent Covisint, the USD license revenue growth rate

13 for December 2000 over December 1999 was flat, as

14 reflected in the Garnick e-mail, was a red flag

15 indicating softening in the license business."

16 Do you see that?

17 A. Yes, sir I see that.

18 Q. And do you have any reason to dispute that?

19 A. Yes. We've discussed this earlier this

20 morning. These deals are lumpy, this happens to be

21 the largest but there are lumpy deals from time to

22 time and the question is, you know, is this one that

23 Oracle is going to pull out relative to their

24 experience and having done it in the past. So I --

25 factually, Covisint is a big deal but whether it's a

134

1 red flag is -- requires much more inference than

2 Mr. Lane seems to have provided here.

3 Q. The next paragraph reads, "In assessing the

4 trend for the quarter and thereafter, analysts would

5 have been interested in the fact the license revenue

6 growth absent Covisint was flat on a year-over-year

7 comparative basis."

8 Do you see that?

9 A. Yes, it's essentially a restatement of the

10 previous sentence, yes.

11 Q. And the next paragraph talks about additional

12 red flags and it talks about Ms. Minton lowering her

13 upside.

14 Do you see that?

15 A. Yes, I see this is evidence that Ms. Minton

16 is actually reacting to things and moving her

17 upside. That's, as I said to you, she does that

18 within a quarter.

19 Q. Okay.

20 And, in fact, the upside was reduced in

21 January on a number of occasions, correct?

22 A. Yes. I believe she sort of steadily reduced

23 it at that point.

24 Q. If you go to paragraph 14 on page 4, it

25 starts with the following language, "Pipeline data

135

1 included in Q301 upside reports provided another

2 indication of weakening in the license business. In

3 evaluating Oracle's intraquarter revenue figures, it

4 was understood by Oracle's senior management that

5 the closer the relationship between the average of

6 the forecasted growth and potential growth figures

7 ('average forecasted growth') on the one hand and

8 the pipeline growth figures on the other hand, the

9 less comfort there would be that the forecasted

10 growth figures would actually be met."

11 Do you see that?

12 A. I see that.

13 Q. And that's known as the comfort gap? Do you

14 recognize it as such?

15 A. That's what he calls it, yes, uh-huh.

16 Q. And do you agree with that statement?

17 A. As a statistical matter, it needn't be true.

18 Suppose I told you there are two series, one

19 correlation of two variables I know with perfect

20 certainty and the other is subject to some

21 uncertainty, one could be quite close, indeed

22 identical, and I could be confident, and the other

23 not. So, again, I'd need to know something about

24 certainty in the environment.

25 Q. If you go below the chart --

136

1 A. Uh-huh.

2 Q. -- he says, "At the beginning of Q301 there

3 was a 'comfort gap' of 22 percent, but that gap

4 narrowed on December 25 to 4 percent and remained

5 between 3 and 6 percent in January of 2001."

6 Do you see that?

7 A. Yes, I see that.

8 Q. Is that indicative of negative trends

9 affecting Oracle's business?

10 MS. KYROUZ: Objection; vague.

11 A. I don't know how I could infer that. What I

12 can say is my recollection of what Ms. Minton did,

13 which was to continue to reduce her upside so that

14 she is taking into account that information,

15 whatever coloration we want to put on it.

16 Q. How is she reducing her upside mechanically,

17 how does that happen?

18 MS. KYROUZ: Objection; vague.

19 A. My understanding is it's judgmental.

20 Q. You've never spoken to her about why she

21 reduced her upside or how she went about it,

22 correct?

23 A. I have not personally spoken to her, this is

24 from her deposition testimony.

25 Q. And in her deposition, does she explain how

137

1 she goes about reducing the upside?
2 A.   She talked about a series of judgment, of
3 conversations, of the processes essentially that she
4 would go through.  Again, she starts the quarter I
5 think somewhere like 2.7 cents and, you know,
6 shrinks during the quarter quite substantially.
7 Q.   He goes on to say, "On December 25, 2000 and
8 January 22, 2001, the projected 'potential growth'
9 percentage was actually higher than the pipeline
10 growth percentage, an event that should only happen,
11 if at all, during the last two or three weeks of a
12 quarter when the 'potential growth' figures can be
13 more accurately predicted."
14     Do you see that?
15 A.   I see that.
16 Q.   Do you agree with that?
17 A.   There's no way -- I haven't done any of these
18 calculations.  I'm accepting Mr. Lane's arithmetic
19 as well as his coloration to answer a question like
20 that.  Again, we know Ms. Minton is reducing her own
21 upside during that period, so she's clearly taking
22 into account that something seems to be
23 deteriorating for her but I can't verify these
24 unless I were to do his math.
25 Q.   It goes on to say, "The narrow gap starting

138

1 on December 25, 2000 and throughout January 2001
2 indicated an increased difficulty in meeting
3 Oracle's forecasted revenue."
4     Do you agree with that statement?
5 A.   Well, that would require me doing his math.
6 I do, however, do my own math in my report that
7 shows up until roughly, memory, last two, two and a
8 half weeks, you're within the bounds and then yes,
9 in that last part there is a disagreement.
10 Q.   I'm looking at paragraph 17.  And halfway
11 into that paragraph it says, "Nussbaum was
12 consistently aggressive in his forecasts, and was
13 viewed as such by Henley and me.  This level of
14 judgment," referring to a $91 million level of
15 judgment, "combined with the forecasts' reliance on
16 large deals, in particular a prospective Bell South
17 deal, and the historical aggressiveness of this
18 division head's forecasts, calls into question the
19 reliability of the $225 million forecast."
20     Have you seen that sentence before?
21 A.   I don't recall.
22 Q.   And do you have a view as to its accuracy?
23 A.   Well, this is clearly Mr. Lane's opinion.
24 OSI, which is the service part, we know through the
25 lens of the hindsight through which he's looking in

139

1 April of 2003 that telecommunications that were part
2 of that OSI sector fared worse than manufacturing,
3 which was an OPI, we know that with the lens of
4 hindsight.  To say this he would have to believe
5 that the field forecasts in realtime were
6 systematically flawed.  I have no basis for
7 believing that that's the case.  This is his view
8 and unsubstantiated at that.
9 Q.   And you say it's unsubstantiated because he
10 had left the company by then; is that the reason
11 you're saying that?
12 A.   No, I see no evidence.  He simply --
13 historical aggressiveness, I don't see any
14 statistical analysis.  Level of judgment, ex post
15 forecasting.  He --
16 Q.   He would know that because he was an insider
17 and you wouldn't; is that fair?
18 A.   I'm sorry, the lens of hindsight are
19 available to all of us.  We can all be outstanding
20 two years after the fact.
21 Q.   But I'm talking about his experience with
22 Mr. Nussbaum when he worked with him, you agree that
23 he would have insights into Mr. Nussbaum's habits
24 that would be --
25 A.   What I'm expressing doubt is that he has

140

1 unique insights.  This process aggregated
2 information from the sales reps, from their
3 managers, up through the firm so to believe what
4 you're saying, that there's some unique insight that
5 Mr. Lane has, that's not obvious and certainly not
6 substantiated here.
7 Q.   And you notice that this is a sworn
8 affidavit?
9 A.   I see that.
10 Q.   And you have no reason to believe that
11 Mr. Lane is deliberately telling untruths in this
12 declaration, do you?
13 A.   I can certainly say that these could well be
14 Mr. Lane's opinions, that's what he's swearing.
15 Q.   And, again, you have not spoken to anybody at
16 the company concerning the forecasting process, your
17 knowledge is derived solely from the documents that
18 you've listed that you've relied upon; is that
19 correct?
20 A.   That's correct.
21     MR. SOLOMON:  Let's take a break, five
22 minutes, and then we'll finish up.
23     THE VIDEOGRAPHER:  Off the record,
24 12:31.
25     (Recess taken)

141

1      THE VIDEOGRAPHER: Returning to the
2      record, 12:37 p.m.
3  BY MR. SOLOMON::
4  Q.  Okay. Now, I know, Mr. Hubbard, that we all
5  have the benefit of hindsight now, but I want to
6  just see if I can go back to the comparable fiscal
7  periods or supposedly comparable fiscal periods Q3
8  '01 and Q3 '00.
9  A.  Yes, sir.
10  Q.  And sitting here today, just with respect to
11  the application of conversion ratios, was Q -- was
12  fiscal 3 '00 an appropriate quarter in which to
13  conduct comparables with Q3 '01?
14      MS. KYROUZ: Objection; vague.
15  A.  I think we've also talked about it this
16  morning. You know, to -- any check with a previous
17  quarter is always going to be subject to some risk,
18  if you've had any change in your product or
19  whatever, but it is still a check one might want to
20  do. I have no reason to suggest that it's prima
21  facie unreasonable. In the report I gave you sort
22  of pipeline factors by quarter so you could see
23  where the '01 quarter fit into usual patterns.
24  Q.  I'm just trying to really limit your answer
25  to the precise question and that is, and I'm not

142

1  even at the moment trying to take you back to Q3 '01
2  as if you were making the judgment then, I'm asking
3  now, when you sit here and look at it now, was it
4  appropriate to use FY '00 comps to use as a
5  comparison with fiscal 3 '01?
6      MS. KYROUZ: Objection; vague.
7  A.  Well, I think I've already said it's a check,
8  it is still something you'd want to do as an input
9  into this kind of a process, so I -- same answer --
10  same question, same answer.
11  Q.  Okay, what if it wasn't a check, what if this
12  is what Ms. Minton used to get at her potential,
13  would using fiscal 3 '00 to compare with fiscal 3
14  '01 be appropriate?
15      MS. KYROUZ: Objection; asked and
16     answered, incomplete hypothetical.
17  A.  I answered that in theory and in practice,
18  and I'll repeat what I said. It is not my
19  understanding at all what Ms. Minton did, and as a
20  matter of statistical practice, it would depend how
21  far off you were doing in doing that, you could do
22  that in error and still not affect things very much.
23  But the bottom line, the more important conceptual
24  point, is it's not what she did, Dr. Goedde asserts
25  it but it doesn't make it so.

143

1  Q.  And the basis for you saying that's not what
2  she did is what? What it is you've listed that
3  you've relied upon?
4      MS. KYROUZ: Same objections.
5  A.  Same thing, looking at the numbers, looking
6  at what Ms. Minton said, and noticing the errors in
7  Dr. Goedde's calculations.
8  Q.  How many hours have you devoted to this case
9  so far?
10  A.  I would guess a little over a hundred.
11  Q.  And your rate is a thousand dollars an hour?
12  A.  Yes, sir.
13  Q.  Do you know until Dr. Foster came along you
14  won the prize but I think he's now beating you at
15  1,100?
16  A.  That's great. It's a wonderful country.
17  Q.  Do you plan on devoting many more hours to
18  the case?
19  A.  That depends on what happens obviously from
20  Dr. Goedde's deposition, whether the case goes to
21  trial.
22  Q.  Do you plan on attending the trial and giving
23  testimony if you're adjudged to be sufficiently
24  expert?
25  A.  If I'm adjudged to be sufficiently expert and

144

1  asked to do it, yes, I will be there.
2  Q.  Then in the meantime, I have no further
3  questions. Thank you very much.
4  A.  Great, thank you.
5      MS. KYROUZ: Okay.
6      THE WITNESS: Going off the record,
7     12:41 p.m. End of today's questioning.
8     (Time noted: 12:41 p.m.)
9
10     _____
11     R. GLENN HUBBARD
12
13  Signed and subscribed to before me
14  this_____day of_____, 2007.
15  _____
16     Notary Public
17
18
19
20
21
22
23
24
25
26
27

145

1         C E R T I F I C A T E

2

3       I, ANDREW WALKER, a Registered

4 Professional Reporter and Notary Public, do hereby

5 certify:

6       I reported the proceedings in the

7 within-entitled matter, and that the within

8 transcript is a true record of such proceedings.

9       I further certify that I am not related,

10 by blood or marriage, to any of the parties in

11 this matter and that I am in no way interested in

12 the outcome of this matter.

13       IN WITNESS WHEREOF, I have

14 hereunto set my hand this_____day

15 of_____, 2007.

16

17       _____

18           ANDREW WALKER, RPR

19

20

21

22

23

24

25

26

146

1       I N D E X

2      E X H I B I T S

3              FOR

4 HUBBARD          IDENT

5

6   1    Expert report of R.   7

7       Glenn Hubbard dated

8       May 25, 2007, no

9       Bates numbers

10

11   2    Affidavit of    129

12       Raymond Lane sworn

13       to April 10, 2003,

14       no Bates numbers

15

16

17     MOTIONS TO STRIKE

18     Pages:   85, 88

19

20

21

22

23

24

25

26

27

28

29

30

147

1       ERRATA SHEET

2 PAGE/LINE     CORRECTION

3 _____   _____

4 _____   _____

5 _____   _____

6 _____   _____

7 _____   _____

8 _____   _____

9 _____   _____

10 _____   _____

11 _____   _____

12 _____   _____

13 _____   _____

14 _____   _____

15 _____   _____

16 _____   _____

17 _____   _____

18 _____   _____

19 _____   _____

20 _____   _____

21 _____   _____

22 _____   _____

23 _____   _____

24 _____   _____

25 _____   _____

26 _____   _____

27 _____   _____

28 _____   _____

29 _____   _____

30 _____   _____

31 _____   _____

32 _____   _____

33 _____   _____

34 _____   _____

35 _____   _____

36 _____   _____

37 _____   _____

38 _____   _____

39 _____   _____

40 _____   _____

41 _____   _____

42 _____   _____

43 _____   _____

44 _____   _____

45 _____   _____

46

47

EXHIBIT 3

**In re ORACLE CORPORATION SECURITIES LITIGATION**
**Class Action**

United States District Court
Northern District of California
Master File No. C-01-0988-MJJ

**EXPERT REPORT OF ALAN G. GOEDDE, PH.D.**

Freeman & Mills, Incorporated
350 South Figueroa Street, Suite 900
Los Angeles, CA 90071

Alan G. Goedde

May 25, 2007

1

2

from the Q3 FY01 internal forecast which formed the basis for Oracle's December 14, 2000 Public Guidance. Oracle ignored, among other factors, directives to the sales force by Larry Ellison, one-time events, and quarterly and monthly information which indicated that the Q3 FY01 Public Guidance would not be attainable.

### C. Oracle Failed to Make Adjustments to Its Forecast Process to Account for the Negative Impact of the Changes in the Economy and the Market for Oracle Products in Violation of Accepted Forecast Principles

The forecast process that Oracle used during the Class Period was described in a deposition by Jennifer Minton, Senior Vice President of Global Finance and Operations.[25] Ms. Minton, along with her staff, was in charge of consolidating the forecasts submitted from the field, analyzing the forecasts and making adjustments as necessary.[26] According to Ms. Minton, every business unit at Oracle created a revenue forecast (the "Field Forecast") that they submitted to the corporate financial planning and analysis department (the "Corporate Finance Department").[27] The Field Forecasts were based upon an input process where each sales representative input all of the deals that might possibly close in the quarter into what Oracle termed the "Pipeline."[28] The Field Forecast for each respective business unit included input from salespeople, financial assistants, and middle management (once salespeople had inputted their forecasts, several layers of division level managers added their "judgment" before the Field Forecast was submitted to Corporate Finance).[29]

The Corporate Finance Department would then take the Field Forecasts and make management judgment adjustments called "upside" adjustments to those Field Forecasts to come up with what they considered the "real company consolidated forecast" (the "Potential Forecast").[30]

---

[25]     Minton 4/21/05 Tr. at 23-24.

[26]     *Id.*

[27]     *Id.* at 102-103.

[28]     *Id.* at 110-111.

[29]     *Id.* at 110-111, 118; NDCA-ORCL 221509-221517; NDCA-ORCL 096184-096193; NDCA-ORCL 096056-096071.

[30]     Minton 4/21/05 Tr. at 104-105.

10

3

The Corporate Finance Department distributed the company's Field Forecast to upper-management in what is termed an "Upside Report," which was discussed and reviewed at weekly Executive Management Committee meetings that were attended by Oracle's senior executives, including each of the defendants.[31]   According to Ms. Minton, every Executive Management Committee meeting started with a discussion of the forecast.[32]

Ms. Minton gave a detailed explanation of her forecast methodology and the manner in which she calculated the upside adjustment.   My opinions will be directed toward this upside adjustment process as it was this process that Oracle apparently relied on for setting the sales and earnings targets issued to investors on December 14, 2000 ("Public Guidance").   Ms. Minton described the upside process as follows:

> The upside adjustments were based on a variety of factors: One was the license pipeline conversion analysis.  We would take a look at the pipeline for the same corresponding prior year period, and look at what actually closed as a percentage of that pipeline to come up with a historical pipeline conversion ratio. And we would apply that to the current pipeline in order to predict what we thought would be the actual conversion or the actual – the actual conversion of that pipeline for the current quarter.  And we broke it down by geography or business unit.  And it was in totality a fairly good – had proven to be a fairly good predictor of what our true forecast and actual reports would be.[33]

Ms. Minton testified that she then increased the Field Forecasts based on a combination of the aforementioned historical conversion analysis, information about prospective deals from weekly conference calls among North and Latin America executives called the "Americas' Forecast" conference calls, and from "talk[ing] to the field finance folks reporting to [her], or eventually reporting to [her], and get[ting] their independent thinking as to whether – whether or not the forecast was a likely outcome or if there was more upside to the forecast."[34]  Minton testified that she did not consider any macroeconomic factors in this process:

---

[31]     *Id.* at 104-105.

[32]     *Id.* at 108.

[33]     *Id.* at 122:3-15.

[34]     *Id.* at 123-124, 178-179.

11

4

Q.    . . . Now going back to the pipeline calculation that you performed, or that you looked in connection with the upside report, did you adjust that conversion rate to take into account any external factors that may cause one year's results to be different than the prior year's results?

A.    No.

Q.    Any economic factors whatsoever?

A.    No.

Q.    No. Okay. So even though the market had changed significantly in terms of like dot-com business, the conversion rate, you didn't adjust for that at all when you converted it over for purposes of making your upside adjustments?

*        *        *

THE WITNESS: I did not consider any economic factors when performing the license – when we prepared the license pipeline conversion package, it is solely based on applying the historical conversion rates for the same prior year corresponding period to the current pipeline to determine what the upside would be.

Q.    Okay. And then you would make your adjustments upward based upon that conversion rate, plus talking to the financial heads in other conversations that you had with business heads; is that fair?

A.    Yes. I would use a variety of data inputs to come up with what I felt was the appropriate upside number to get to the total consolidated forecast for the quarter.[35]

Ms. Minton failed to make adjustments to the upside process in Q3 FY01 despite the fact that Oracle had already begun to experience the effect of the economic downturn before the beginning of that quarter.[36] Oracle executives were well aware of this fact. Mr. Henley told Mr. Ellison that he was concerned with the economy and Ms. Minton testified that she "'was a bit nervous entering Q3 FY '01.'"[37] Additionally, Oracle's dot com business, which had represented 10.63% of Oracle's total revenue in Q3 FY00 (nearly $112M), had been declining leading up to Q3 FY01.[38] After

---

[35]    *Id.* at 135:7-136:12.

[36]    *Id.*

[37]    Ellison 2/26/04 Tr. at 177-178; Minton 4/1/04 Tr. at 188:4-13.

[38]    *See* Expert Report Exhibit 5.

12

reaching $172M in Q4 FY00, dot com sales fell to 6.01% or just $66M in Q2 FY01. *Id.* By the end of December 2000, North American Sales ("NAS")[39], the division that sold primarily to Oracle's dot com customers, reported that its dot com bubble had burst.[40]  As of January 29, 2001, Oracle was projecting only 3.17% of its sales to dot com customers compared to 11% one year earlier.[41]  Despite its public growth projections, in fact Oracle had not seen these diminished levels since 1999:[42]

| Quarter | Dot com Revenue | NAS License Revenue | Dot com as a % of NAS | Oracle Total License Revenue | Dot com as a % of Oracle |
|---------|-----------------|---------------------|-----------------------|------------------------------|--------------------------|
| Q1 FY99 | $4.01M | $159.336M | 2.52% | $559.666M | .72% |
| Q2 FY99 | $5.596M | $166.660M | 3.36% | $720.102M | .78% |
| Q3 FY99 | $24.505M | $229.448M | 10.68% | $780.867M | 3.14% |
| Q4 FY99 | $35.873M | $382.274M | 9.38% | $1,487.903M | 2.41% |
| Q1 FY00 | $42.021M | $127.692M | 32.90% | $616.144M | 6.82% |
| Q2 FY00 | $56.492M | $197.401M | 28.62% | $886.783M | 6.37% |
| Q3 FY00 | $111.464M | $3 09.533M | 36.01% | $1,048.445M | 10.63% |
| Q4 FY00 | $172.631M | $523.108M | 34.87% | $1,805.676M | 9.56% |
| Q1 FY01 | $51.905M | $199.483M | 33.00% | $785.109M | 6.61% |
| Q2 FY01 | $66.146M | $278.636M | 23.74% | $1,099.960M | 6.01% |
| Q3 FY01 (Projected as of 1/29) | $41.175M | $346.000M | 11.9% | $1,296.843M | 3.17% |

---

[39]  Oracle's U.S. License Sales force was divided into three divisions which together represented, on average, 52% of Oracle's license revenues.  NAS, headed by Executive Vice President ("EVP") George Roberts, generated approximately 25% of Oracle's annual license revenues and was the division that primarily sold to Oracle's dot com customers.  Oracle Service Industries ("OSI"), headed by EVP Jay Nussbaum, generated approximately 17% of Oracle's annual license revenues and was the division that primarily sold to Oracle's telecommunications customers.  Oracle Product Industries ("OPI"), headed by defendants and EVP Sandy Sanderson, generated approximately 9% of Oracle's annual license revenues.  NAS and OSI were the main sources of Oracle's miss in Q3 FY01.  *See* Expert Report Exhibit 24, discussed *infra*.

[40]  Winton 5/26/06 Exhibit 49.

[41]  *See* Expert Report Exhibit 5.

[42]  *Id.*

13

The evidence that I have reviewed shows that defendants were aware of the dot com effect on Oracle's business at the beginning of FY01 and certainly well before Q301. Nicholas Classick, who was an assistant vice president ("AVP") in Oracle's General Business West division with a focus on sales to dot com companies, began notifying Oracle's management as early as April 2000 that the dot com business was softening.[43] He notified Mr. Roberts (who attended EMC meetings and reported to defendants on the forecast and business prospects for NAS) in October 2000 of a slowdown in his dot com business.[44] In addition, Mr. Classick gave a presentation at the NAS Q2 FY01 Operations Review in October 2000 that contained a slide titled "Slowdown in .Com Space," which summarized the dot com situation facing Oracle as follows:

- VC Funding tougher: Refocus on profitability, cost sensitive IPOs, soft market, increases electivity

- Merger/Acquisitions: Consolidation, business failures, layoffs, firesales

- Software rental: Rent vs Buy, Buy as you grow, ASP/Hosting, conserve cash, smaller deal size, term

- Stock prices: 52 week lows, below IPO price[45]

Shortly after this presentation, on December 11, 2000 (just three days before Oracle issued public guidance), the NAS division prepared a "Dot com analysis," which tracked dot com sales in Oracle's General Business division dating back to Q1 FY99.[46] This analysis was sent to Ms. Minton's assistant Ivgen Guner and attached data reflecting a significant downward trend in dot com sales following Q4 FY00.[47] And by January 29, 2001, David Winton (NAS Senior Finance

---

[43]    Classick 4/12/06 Tr. at 109-110, 110:2-5 ("Q: You saw this [slowdown in venture capital funding] prior to your preplanning meeting with John Nugent in April of 2000? . . . A: We were seeing it, yes.").

[44]    Classick 4/12/06 Tr. at 114:13-21; Minton 7/7/06 Tr. at 31.

[45]    Classick 4/12/06 Exhibit 3 at 10; Classick 4/12/06 Tr. at 115-116, 124-130.

[46]    Winton 5/26/06 Exhibit 39.

[47]    *Id.*

14

Director) notified defendants, through an e-mail to Ms. Minton and Mr. Roberts, that dot com and ASP revenues were projected to be a mere $51M (down 54% year-over-year).[48] Removing the ASP revenue from the analysis, dot com revenue was only 11.9% of NAS's projected revenue at the time and 3.17% of Oracle's license revenues as a whole.[49] These percentages compared to 36.01% and 10.63%, respectively, a year earlier.[50] Despite these clear indicators, defendants informed investors and the market repeatedly that the economy was having no effect on its business and issued aggressive growth targets.

Testimony from Messrs. Ellison and Henley also show that they knew about the dot com effect on Oracle's business. Mr. Ellison testified that "I'm sure we had [seen an effect of the downturn in the economy in Oracle's dot-com sales by Q3'01]" and that "you're absolutely right that our dot-com business was certainly off by that point in time."[51] Mr. Henley testified that "I believe that we knew that the dot-com growth was starting to change, absolutely. Again, I don't see this – but George Roberts is a very honest guy. I think he represented a lot of detail about what he did in his meetings with all of his people."[52] Mr. Henley gave this testimony in response to questions about Mr. Winton's January 11, 2001 e-mail to Ms. Minton summarizing Mr. Roberts' Operations Review in Q2 FY01, which clearly stated that the General Business division of NAS had reported that its dot com bubble had burst.[53]

Mr. Ellison himself acknowledged the pressure that losing such a significant part of Oracle's business would have on results going forward. He testified that the dot com collapse put a "'lot of pressure on [Oracle's] database'" for Q3 FY01.[54] And he said that Oracle had a "very, very high hurdle. So for the business to grow, it meant we had to overcome the fact that a lot of our dot-com

---

[48]   Winton 5/26/06 Exhibit 51.

[49]   Expert Report Exhibit 5.

[50]   *Id.*

[51]   Ellison 2/26/04 Tr. at 178:9-179:1.

[52]   Henley 11/16/06 Tr. at 356:1-5.

[53]   Henley 11/16/06 Tr. at 355-356; Henley 11/16/06 Exhibit 64.

[54]   Ellison 2/26/04 Tr. at 254-257.

15

8

companies – customers, our ex-customers, were gone."[55] In fact, Mr. Henley stated that the dot.com erosion had a "negative comparison effect" on Oracle.[56] And an email from Mr. Winton stated that "growth comparisons [would be] tougher in Q3&Q4 [because] NAS results took off last year in Q3."[57]Despite the very real effect of the economic change on Oracle, defendants did not adjust the forecast process that they used as the basis for Public Guidance – and continued to represent that the economy was having no negative effect on Oracle's business.

Consistent with Mr. Ellison's testimony, the dot com collapse meant that the lost dot com sales had to be recaptured through other technology sales or applications sales in order for Oracle to reach Public Guidance. Ms. Minton forecasted that Oracle would replace the lost sales through sales of Oracle's applications products. Applications sales comprised 31.5% of Oracle's forecast on December 11, 2000[58] – three days before Oracle issued guidance to investors – but had totaled only 18.1% of Oracle's license sales in Q3 FY99 and 18.6% in Q3 FY00.[59] Applications were therefore a much more significant part of Oracle's forecast during Q3 FY01 than they had been historically. But, as will be discussed later in this report, Oracle's Pipeline declined considerably throughout Q3 FY01 because of lost Applications deals. In addition, I understand that defendants were well aware that problems with Oracle's new applications product, Suite 11i, including inoperable demos and a lack of references that made it extremely difficult to sell, combined with decreased technology spending by customers as a result of the declining economy, made this applications growth very

---

55  Ellison 2/27/04 Tr. at 386.

56  Henley 3/3/04 Tr. at 309-311.

57  Winton 5/26/06 Exhibit 43.

58  Expert Report Exhibit 7.

59  *See* Expert Report Exhibit 7.

16

unlikely.[60]  Despite these facts, Minton attributed nearly 30% of Oracle's forecast to Applications sales even into February 2001.[61]

In my opinion, Oracle failed to adjust its forecast to account for the negative impact that the changes in the economy and disappointing applications sales were having on Oracle's business. Minton failed to consider market information critical to an accurate forecast. For example, she did not account for the serious macroeconomic changes facing Oracle.  She ignored the collapse of Oracle's sales to the dot com sector of the market.  As a result, the forecast process described by Ms. Minton that generated the Potential Forecast was inconsistent with sound and accepted forecasting principles and was therefore unreasonable given the significant changes facing Oracle in Q3 FY01.

Ms. Minton also failed to address obvious judgmental bias in the Upside Reports.  All of the information sources used by Ms. Minton were internal Oracle sources. According to her testimony she explicitly excluded any independent information sources. Accepted forecasting methodology requires that if judgmental adjustments are made to a forecast that bias be addressed. For example, numerous banks and research organizations regularly report on the software industry and can provide independent sources of information.  Yet, according to Ms. Minton, she did not consider any external factors in preparing her upside adjustment.[62]

**D.      Defendants Knew that Failing to Adjust for the Negative Impact of the Changes in the Economy Made Its Public Guidance Unreliable**

Based on the evidence that I have reviewed, defendants knew that failing to adjust for the negative impact of the changes in the economy made its Public Guidance unreliable. Ellison himself acknowledged that the very type of macroeconomic change that Oracle was facing in Q3 FY01 would render its forecasting process unreliable.[63]  He apparently acknowledged this fact in his comments to the book *Softwar* and confirmed it in his deposition:

---

[60]      I understand that plaintiffs will be submitting an expert report that addresses the status of and prospects for the Suite 11i.  To the extent that report further informs my opinions, I will supplement this report.

[61]      *See* Expert Report Exhibit 7.

[62]      Minton 4/21/05 Tr. at 135-136.

[63]      Ellison 9/21/06 Tr. at 384-385.

17

Q      Okay.  And then you enter a footnote or clarification which reads:  "As I've
said before, our forecasting system is not clairvoyant.  Our forecasting does statistical
extrapolations based on historical trends.   If something that's outside our
mathematical model of the business changes, like a war in the Middle East, our
forecasting becomes inaccurate."

Do you see that?

A      Yes, I do.

Q      Okay.  And you stand by that?

A      Absolutely.

Q      Now, it wouldn't – a war in the Middle East is just one example.  There could
be who knows how many examples; right?

A      Price of oil goes over a hundred dollars a barrel, lots of things.

Q      And the point you are making is that while your forecasting system does
extrapolations based on historic trends, if something is happening that would suggest
that the historical trend is not necessarily reliable, then your forecasting will not be
reliable; is that right?

A      Right.  Major macroeconomic change; sudden – sudden growth in the
economy or sudden shrinkage in the economy would cause – you can't extrapolate
anymore.[64]

Both Mr. Ellison and Mr. Henley also explained why an economic downturn can influence a

company's business and, consequently, its forecast process.  Mr. Ellison explained that in times of

major recessions, "businesses get very reluctant to spend a lot of money on large new capital

projects.  And a lot of our software sales were part of an even larger IT development project.  So

these were large capital items, which are often deferred in times of recession."[65]  He testified that

"[l]arge deals fall out more quickly" in a declining economy and that "[w]hen the telecom's bubble

got burst or the dot-com bubble burst, I would expect that sales to those industries would decline."[66]

---

[64]     Ellison 9/21/06 Tr. at 384:6-385:7

[65]     Ellison 2/26/04 Tr. at 176:2-7.

[66]     Ellison 2/26/04 Tr. at 187; Ellison 2/27/04 Tr. at 246.

18

Mr. Henley explained in an email to the audit committee on January 4, 2001, that he had told investors that "we had seen no slowdown in our business yet (Q2 license growth or initial pipeline growth rate)."[67] Despite his public statements, he noted in the email that "all data since the call point to more economic softening so there is risk of slippage in the deals." *Id.* When presented with this exhibit in deposition, Henley confirmed that he acknowledged a softening because of the economy in January and explained that he even remembers reports about softening in Q2 FY01:

Q.      . . . "At this point, all data since the call point to more economic softening, so there is risk of slippage in deals."

Do you see that?

A.      I do see that.

Q.      Do you recall holding this view in early 2001?

A.      I think whatever I said is what I thought at the time.

*      *      *

There's pros and – you know, there's ups and downs, but I definitely remember, even in the second quarter, that there were reports about the economy and, gee, are things getting worse and so forth.[68]

The economic downturn rendered Oracle's forecasting process particularly faulty because in calculating her "upside," Ms. Minton only analyzed data over a one-year period of time.[69]  As explained in Section V.C., above, the basis for the "upside" portion of Oracle's Potential Forecast in Q3 FY01 was the ratio of the dollar value of license deals closing by the end of the quarter to the dollar value of license deals in the Pipeline at the various times during the quarter. This ratio was called the "conversion rate." For example, if there are potential deals worth $1 billion in the Pipeline

---

[67]     Henley 7/27/06 Exhibit 7.

[68]     Henley 7/27/06 Tr. at 49:2-19.

[69]     Ms. Minton's forecast approach has been labelled the "naïve forecast" approach.  J. Holt Wilson and Barry Keating, *Business Forecasting* 28 (5th ed. McGraw-Hill/Irwin 2007).  This approach assumes that conditions are identical between the last observation of the variable of interest and the present observation of the variable of interest, such that the next period will be identical to the last period. Ms. Minton's forecasting procedures followed the naïve approach at a time when the environment facing Oracle had changed dramatically.

19

at week 2 of the quarter, and $500 million of deals close by the end of the quarter, the conversion rate is 50% as of week 2.  According to Ms. Minton's testimony, the week 2 conversion rate for Q3 FY00 multiplied by the Pipeline at week 2 of Q3 FY01 was the underlying basis for the "upside" portion of the Q3 FY01 revenue forecast that formed the basis of Oracle's Public Guidance.[70]  Predictably, that analysis projected a forecasted pipeline conversion rate that was in line with the same conversion rate that Oracle achieved in Q3 FY00 (when the economy was at its height):

Pipeline Conversion Rates[71]

| Q3 FY00 Actual | Q3 FY01 Potential Forecast | Q3 FY01 Actual |
|---|---|---|
| 52.8% | 48.0% | 37.4% |

On its face, the application of this historical conversion ratio (from a time when the economy and dot coms were at their height) to the Q3 FY01 pipeline, given the major change in the economy, was improper and defendants knew that it would produce unreachable projections.  Although the application of the historic conversion ratios (from FY99) had yielded accurate forecasts throughout the quarters in FY00, this methodology had not been an accurate predictor in either of the first two quarters of FY01.  Accordingly, defendants were aware that the shrinking economy rendered Minton's "upside" calculation process unreliable.

In addition, once the actual license revenue figures for December 2000 became available, it was clear to defendants that Oracle's conversion rate was lower than in previous years. In fiscal years 1999 and 2000 Oracle had an average conversion rate of 9.8% by the end of December.[72]  That is, actual revenue earned in the quarter was 9.8% of the Pipeline at the start of the quarter. However, the conversion rate in December 2000 was only 6.3% (excluding Covisint).[73]   By January, the

---

[70]    Minton 4/21/05 Tr. at 122.

[71]    *See* Expert Report Exhibit 8.

[72]    *See* Expert Report Exhibit 9.

[73]    *See* Expert Report Exhibit 9.

20

conversion rate was even further from the historical average. The average January QTD conversion rate for fiscal years 1999 and 2000 was 18.3%. Yet it was only 12.8% in fiscal year 2001.[74]

Additionally, internal Pipeline data available to defendants before and throughout the quarter would have disclosed to defendants that the dramatic decline in the economic environment – a major macroeconomic change – rendered this type of year-over-year analysis inherently unreliable and inaccurate, especially in Oracle's Q3 FY01. From Q3 FY99 (the earliest data made available by Oracle) through Q4 FY00, the Pipeline at the beginning of the quarter and the Pipeline at the end of the quarter changed very little.[75] Beginning in Q1 FY01, however, the Pipeline declined from the beginning of the quarter to the end of the quarter. In the six quarters prior to FY01, the Pipeline declined an average of 9% from the start of the quarter - roughly $174M.[76] By contrast, the Pipeline deteriorated by 31% in Q1 FY01, representing a dollar decline of over $548 million.[77] In Q2 FY01 the Pipeline deteriorated by over $426 million (19%) and in Q3 FY01 the Pipeline deteriorated by over $800 million (27%).[78] Such a decline indicates that potential deals in the Pipeline were being canceled or postponed during the quarter.

Ms. Minton's forecast was only effective in an economic situation similar to the previous year. It was misleading for Oracle to base Public Guidance on Ms. Minton's forecast given the major changes in the marketplace. As Mr. Ellison recognized in his deposition testimony, Ms. Minton's forecast becomes "inaccurate" in periods of major macroeconomic change.[79] The successive declines in the Pipeline during FY01 were obvious indicators that Ms. Minton's forecasting approach would generate unreliable results.

---

[74]  *See* Expert Report Exhibit 9 ("December and January QTD Conv. Rates").

[75]  *See* Expert Report Exhibit 10.

[76]  *See* Expert Report Exhibit 10.

[77]  *See* Expert Report Exhibit 10.

[78]  *See* Expert Report Exhibit 10.

[79]  Ellison 9/21/06 Tr. at 384-385.

Faced with the downturn in the economy, as evidenced by the dramatic change in the behavior of Oracle's Pipeline, it is my opinion that defendants knew that failing to adjust Oracle's forecast process made Oracle's Public Guidance unreliable.

### E.  In Q2 FY01, Ellison Directed Significant Changes to Oracle's Forecast Process that Resulted in More "Risk" Being Included in Future Field Forecasts and Rendered Minton's Upside Adjustments Unreliable

In Q2 FY01, Ellison directed significant changes to Oracle's forecast process that resulted in more "risk" being included in future Field Forecasts. I have reviewed an October 6, 2000 email from Patricia McManus to James English (OPI Finance Director and Finance Vice President, respectively) noting that Larry Ellison had demanded that the field include more risk in its forecast number:

"Recently Larry has changed the way that he is interpreting our forecast . . . our forecast has not usually had a significant amount of judgment. It was the amount that you believed you could deliver at a minimum . . . ***now our forecast is a number that includes more risk than in the past.***"[80]

There is no evidence that I have reviewed to indicate that the field did not follow Ellison's directive. To the contrary, there is reason to believe that it did. In addition to the October 6, 2000 email, Ellison's testimony also confirms that the business units implemented his directive:

Q      What drove you to make this change?

A      The – we were going to put the three numbers in the computer system. What I wanted to see – I've done – to get more information, just getting more – you know, getting more data rather than one number, which usually was someplace between the best case and the most likely – what they used to call a commit forecast; one we could count on. I was trying to, you know, get a better idea of what, you know – get more data – more data to work with.[81]

The practical impact of Ellison's directive was to reduce the amount of "sandbagging" that had apparently plagued Oracle in the past. Ms. Minton explained in her deposition that the rationale for upside adjustments that historically had reached into the hundreds of millions of dollars was to adjust the practice in the field of always exceeding the Field Forecast – "Jay Nussbaum and George

---

[80]      Ellison 9/21/06 Exhibit 110 (emphasis added). Mr. Ellison confirmed that the reference to "Larry" in this email was to him. Ellison 9/21/06 Tr. at 423-426; Ellison 9/21/06 Exhibit 110.

[81]      Ellison 9/21/06 Exhibit 110; Ellison 9/21/06 Tr. at 425:23-426:7.

22

Roberts both historically always exceeded their forecast. And so that's one of the reasons why we had to put these upside adjustments in . . . ."[82]  By directing the field to include riskier deals in the forecast, Ellison directed a significant change that rendered Minton's upside adjustments unnecessary and unreliable.

Ms. Minton's upside adjustments at the end of Q3 FY01 and throughout Q4 FY01 also indicate that the field followed Ellison's directive.  Though not until months after Ellison announced his directive, Ms. Minton appears to have adjusted to the changes by the end of Q3 FY01 when she removed most of her upside adjustments from the Potential Forecast. By January 15, 2001, she removed the entire upside from OSI ($25M) and reduced NAS's upside by $36M.[83]  By January 29, 2001, she removed all upside from NAS ($50M) and estimated a negative upside for OSI ($35M).[84] By February 5, 2001, she eliminated her upside adjustments entirely for Oracle's U.S. license divisions.[85]  She appears to have made similar adjustments to her policy of "upside" adjustments in Q4 FY01 as her upside adjustments only ranged between (-$6,000,000) and $25,000,000 (as compared to hundreds of millions in the four quarters leading up to Q3 FY01).[86]  Accordingly, by the end of Q3 FY01, Ms. Minton had remedied her forecast methodology to account for the extra risk in the Field Forecast per Ellison's directive. However, in the several months leading up to this change, she added upside in line with her common practice.[87]  Thus, as the field added more judgment and Ms. Minton continued to add the same judgment as before, the Potential Forecast became overstated, unreasonable and unreliable.

In my opinion, the changes directed by Mr. Ellison that resulted in the field including more risk in its forecast significantly altered Oracle's forecasting process and made Ms. Minton's forecast overstated and unreliable.

---

[82]     Minton 4/21/05 Tr. at 126.

[83]     *See* Expert Report Exhibit 11.

[84]     *See* Expert Report Exhibit 11.

[85]     *See* Expert Report Exhibit 11.

[86]     *See* Expert Report Exhibit 11.

[87]     *See* Expert Report Exhibit 11.

23

16

Mr. Ellison's directive also impaired the reliance of the Field Forecast. As reflected in the upside reports that were distributed to defendants weekly, the Field Forecast was below Public Guidance of 12¢ for the entire quarter. The field forecasted only 10.7¢ earnings per share in the beginning of the quarter and did not increase that forecast until the second week of February, when its EPS forecast increased to 10.9¢. The highest the field ever reached was 11.0¢ at the end of February.[88]

In addition, the behavior of the Field Forecast was out of line with historical practice and was thus a red flag that Oracle would not meet Public Guidance. The field historically tended to increase its forecast early in the quarter as deals became more certain. In Q3 FY01, however, the behavior of the Field Forecast remained generally flat during December and January.[89] In addition, feedback from the Field also revealed problems. One of the senior executives in Oracle's NAS division commented at the end of the Q3 FY01 "AVPs [were] Beginning to Voice Concern" in the month of December and that the "AVPs [were] Reluctant to Raise Their Forecast" in the month of January.[90] It is my opinion that especially given Ellison's directive, the Field (and the behavior of its forecast) disclosed that Oracle would not achieve its Public Guidance.

It is also my opinion that Ellison's directive made the Potential Forecast unreliable. Despite the virtual removal of "sandbagging" through Ellison's directive, Ms. Minton added $159.5M of "upside" (typically added to account for "sandbagging") to the Field Forecast at the beginning of Q3 FY01 – an amount that was included in Oracle's Public Guidance for the quarter.[91] She added $25M in judgment to the OSI license forecast, another $50M in judgment to the NAS license forecast, and another $35M to the OPI license forecast.[92] Ms. Minton's $159.5M upside adjustment was in line with the same type and amount of upside adjustments that she had added in the past, despite the additional risk included in the Field Forecast (effectively doubling the amount of risk that had

---

[88]     *See* Expert Report Exhibit 12.

[89]     *See* Expert Report Exhibit 12.

[90]     Roberts 6/22/06 Exhibit 27 at NDCA-ORCL 179337.

[91]     *See* Expert Report Exhibit 11; Minton 4/21/05 Tr. at 124.

[92]     Minton 7/7/06 Exhibit FR 22A

24

previously been in the forecast).[93]  This upside put Public Guidance out of reach and disseminated a consolidated forecast that was based on flawed methodology and disregarded facts that would certainly impact Oracle's forecast.  In addition to completely failing to consider the effects of the declining economy and market for Oracle's products, Ms. Minton's practice inflated Public Guidance by adding $159.5M in management judgment to a Field Forecast that already included additional risk to account for "sandbagging."[94]

Metrics that Oracle used in the forecast process demonstrated that Ms. Minton's upside adjustments were producing unreliable results.  The spread between forecasted license revenue growth rates and the Pipeline growth rates showed that Oracle was forecasting license revenues to grow at a more rapid rate than the Pipeline was growing.[95]  Compared to prior quarters, the gap between Pipeline growth and forecasted revenue growth was shrinking in Q3 FY01.[96]  The gap between Pipeline growth and the Potential growth rate was negative at the end of December and into January.[97]  Between December 25, 2000 and January 29, 2001, the gap never reached higher than 4% and was negative half the time.[98]  This was out of line with Oracle's historical experience, which showed a negative gap only once prior to Q3 FY01, and an average spread of 13.4%.[99]  A negative gap is important because it indicates that the forecast target is less likely to be met. As Larry Ellison noted, it would be "incautious to . . . forecast sales growth without underlying pipeline growth."[100]

Ms. Minton's upside adjustments suggest that she failed to adjust for this red flag and made Public Guidance far too aggressive and consequently unreachable.  The evidence that I have

---

93      *See* Expert Report Exhibit 11.

94      Minton 9/25/06 Exhibit FR 22A.

95      *See* Expert Report Exhibit 13.

96      *Id.*

97      *Id.*

98      *Id.*

99      *See* Expert Report Exhibit 13.

100     Ellison 2/26/04 Tr. at 87:4-5.

25

reviewed indicates that the difference between Pipeline growth and revenue growth was a closely watched indicator at Oracle.[101]  In my opinion, the forecast process described by Ms. Minton was inconsistent with sound and accepted forecasting principles and was therefore unreasonable.  Minton did not account for Ellison's directive to the field to increase the risk in the Field Forecast and she ignored internal indicators showing that the Potential Forecast was too aggressive.

F.     **The Numerous Internal Measures Available to Defendants Throughout Q3 FY01, Including Field Forecasts, Disclosed that Oracle Was Being Impacted Adversely by the Declining Economy and That Oracle Would Not Achieve Its Public Guidance**

On December 14, 2000, Oracle held its quarterly conference call for the second quarter of its 2001 fiscal year.  During that call, defendant Henley discussed Oracle's results for Q2 FY01 and gave Public Guidance on Oracle's expected license revenue growth for Q3 FY01, which he presented in year-over-year terms.  Henley forecasted 15%-to-20% growth for Database sales (5 points for real (constant) dollar growth brought it to 20%-to-25%), 75% growth for Applications sales (80% real (constant) dollar growth), and 12 cents earnings per share.[102]  I refer to these growth rates collectively as Public Guidance.  Jeff Henley disseminated Oracle's Public Guidance on December 14, 2000 and reiterated Public Guidance between February 7 and 9, 2001, and again at

---

[101]     Ellison 2/26/04 Tr. at 86:3-87:9, 201-202; Henley 3/24/04 Tr. at 102-104; DC 137 at CA ORCL 022290; DC 138 at CA ORCL 003227.

[102]     NDCA-ORCL 03317-03361 at 03323-24. Defendant Henley claims 12¢ per share as his EPS forecast was reasonable because, in Q2 FY01 Oracle reported 11¢ per share. "[I]f you look back at the last three years, sequentially, the third quarter, split adjusted, has been one cent better than the second quarter. So we did 11 cents in the second quarter. So I would assume, 12 cents would be reasonable number at this point. I don't think history is going to be a lot different, here." However, I am informed by counsel for plaintiffs that Oracle's true EPS in 2Q FY01 was 10¢ per share. I am informed that Oracle's reported 11¢ per share was false as a result (1) of the transfer of approximately $20 million from Oracle's customer overpayments account to its bad debt reserve account and then transferring approximately $20 million to revenue via a "bad debt reserve" adjustment. (I recognize, for example, ORCL 440829-440845 as Oracle's final Upside Report for 2Q FY01 that actually forecasts such transfers and includes them as "upside" for EPS calculation) and (2) improperly recognizing $19.9 million in revenue and $12.9 million in net income from a "round-trip" transaction with Hewlett Packard at the end of Q2 FY01. I understand that plaintiffs will be submitting an expert report that addresses Oracle's false financial reporting. To the extent that report further informs my opinions, I will supplement this report.

26

important indicators for measuring Oracle's business in any quarter include: (1) actual results for the first and second months of the quarter; (2) year-over-year Pipeline growth; (3) field sales forecasts; (4) financial department forecasts; and (5) the number and size of the big deals that are potentially going to close in the quarter:

> Q.      What are the key intra-quarter forecasting indicators for Oracle?
>
> A.      Early on, the Pipeline – year over year pipeline growth, field sales forecast, financial – financial department forecast, sometimes called the upside report. Again, I'm trying to steer away from those funny names.
>
> I would say an actual results for the first and second months of the quarter and then going into the last ten business days of the quarter, the big deal report, the size of the – of the pipeline, if you will, or the size – the number – the number and size of the big deals that are potentially going to close this quarter.  I think that's a pretty complete list.[109]

The evidence that I have reviewed in this case suggests that these measures informed defendants that the economic downturn was negatively affecting Oracle's business and its forecast and that Oracle was not likely to meet Public Guidance.

## ACTUAL RESULTS

Actual results throughout a quarter are an important measure for evaluating a forecast.  This is especially true for established companies like Oracle that enjoy a track record of historical trends. While actual results throughout a quarter may not enable a forecaster to perfectly predict quarterly results, they are an important measure that enables a forecaster to determine trends in a company's business and whether or not it is on track to meet its projected numbers.  Apart from Mr. Ellison's testimony, the monthly flash report described below containing monthly actual results (that was delivered to defendants on a monthly basis) shows that this was an important measure at Oracle.

In my opinion, the evidence that I have reviewed shows that monthly actual revenue was an accurate predictor of total quarterly revenues at Oracle.  Monthly results at Oracle were distributed by email from Larry Garnick to the executive committee, including Mr. Ellison, Mr. Henley, and Mr. Sanderson.  Larry Garnick sent the results for December 2000 in an email dated January 17, 2001 (the "January Garnick Flash Report") and the results through January 2001 in an email dated

---

[109]      Ellison 2/26/04 Tr. at 179:6-19.

February 8, 2001 (the "February Garnick Flash Report").[110]  These Flash Reports updated Oracle's management about the monthly actual revenues and growth rates in Q3 FY01 in the various lines of business in comparison to the third quarter in Oracle's previous two fiscal years.  Mr. Garnick analyzed Oracle's business in Q3 FY01 with and without $60M in revenue from Oracle's license deal with Covisint.[111]  It is my understanding that defendants Henley and Ellison were in agreement that Oracle should have analyzed the quarter with and without the license revenue from the Covisint transaction.[112]  The reason why Covisint is left out of the forecast is that it is a one-time event not likely to be duplicated . Therefore, from a forecasting perspective leaving this one-time event in the forecast would distort growth trends and future forecasts of revenue for the quarter.

The January Garnick Flash Report disclosed to defendants that Oracle was feeling the impact of the economy and that it was likely to miss Public Guidance. [113]  The e-mail notes that the NAS and OSI lines of business (the divisions that were ultimately responsible for Oracle's Q3 FY01 miss) had *negative* growth of 24% and 81% respectively, and that the OPI division had negative growth of 85% after adjusting for Covisint.[114]  Accordingly, as of January 17, 2001, defendants were aware that all three of Oracle's U.S. divisions (representing approximately 52% of its license revenues) had negative growth trends.

The e-mail also notes that "excluding the $60 million Covisint license deal, the USD growth rate would have been only 6%."[115]  Mr. Garnick's 6% figure appears to be calculated based on

---

[110]    Minton 9/25/06 Exhibits 43, 45.

[111]    In the first week of December 2000, Oracle closed the $60 million Covisint transaction, which was a massive – the Company's largest ever – one-time transaction.  Of the total $60 million, $54 million was attributed to revenue from applications and $6 million to revenue from database license.  All $60 million was attributed to OPI.  It had no impact on NAS or OSI revenues.  Ellison 2/26/04 Tr. at 212-213; DC 134.

[112]    Henley 11/16/06 Tr. at 367; Ellison 9/21/06 Tr. at 436; Minton 9/25/06 Tr. at 312.

[113]    Minton 9/25/06 Exhibit 43.

[114]    *Id.*

[115]    *Id.*

29

Constant Dollar figures, which Oracle did not use for public guidance purposes.[116] As Mr. Ellison was aware, Oracle's USD license growth rate would have been only 1% after adjusting for Covisint, using results in US Dollars.[117] This growth rate was anemic compared to the 25% license growth in Oracle's Public Guidance. The e-mail also informed defendants that Applications and database were also down significantly for the month without the one-time Covisint transaction:

> Applications product growth was 216% [ERP=365%, CRM=(58%)] while database product growth was 17% [Server=21%, Tools=(26%)]. Excluding Covisint, Applications product growth would have been (46%) and database product growth would have been 13%.[118]

Like license revenues, these growth rates were well below the growth rates that Oracle forecasted for the quarter (15-25% database growth; 75% applications growth).

Analyzing this data using accepted forecasting principles, Oracle was feeling the negative impact of the economy and by the end of December 2000 was not on track to reach Public Guidance:

> December license results represent 19% of the total forecast for Q3 FY01. In FY00 and FY99, December represented 16% and 19%, respectively, of the quarter total.[119]

The "total forecast" referenced in the December Garnick Flash Report appears to reference the Field Forecast. I reach this conclusion by calculating 19% of the Field Forecast referenced in the January 15, 2001 Upside Report. The $240.5M represents 19.1% of the Field Forecast and only 17.8% of the Potential Forecast as of that date.[120] Ms. Minton also confirmed that the reference to "total forecast" in the January Garnick Flash Report was to the Field Forecast.[121] It appears that despite relying on the Potential Forecast when creating Public Guidance, Oracle's management used the Field Forecast, which was far short of Public Guidance, as the basis for many of their internal measures.

---

[116]    *Id.*

[117]    *See* Expert Report Exhibit 14.

[118]    Minton 9/25/06 Exhibit 43.

[119]    *Id.*

[120]    *See* Expert Report Exhibit 15.

[121]    Minton 9/25/06 Tr. at 313-314.

30

I have performed an analysis of Oracle's monthly results similar to the analysis performed by Mr. Garnick to determine whether defendants knew that Oracle would miss Public Guidance. I note at the outset that analyzing Oracle's financial results for the quarter without adjusting for the Covisint transaction would present unreliable results given the size and one-time nature of the transaction (as such, it was not indicative of trends in Oracle's business). I therefore analyze Oracle's intra-quarter results as Oracle did – by adjusting for the Covisint transaction. While the deal is excluded for the purposes of projecting, it is not ignored as it represented revenue for the quarter. The $60 million is added back to the revenue calculation after the projection is calculated to credit the revenue in a way that would enable (and that did enable) Oracle to analyze its monthly results and the effect that those results would have on the quarter. This is a standard analytical procedure when a single transaction can skew the results for the period under analysis. Mr. Ellison confirmed that the $60M Covisint deal was the largest transaction for Oracle in its history at the time and both Messrs. Ellison and Henley agreed that it had to be removed from calculations in order to understand growth trends more accurately.[122]

Historical analysis enabled Oracle to determine whether its actual results for the month were on track or out of line with historical results. Data for fiscal years 1996 through 2000 show that Oracle earned an average of 21% of total third quarter license revenue in the month of December.[123] As reflected in the December Flash Report that Ivgen Guner distributed to the executive committee on January 17, 2001, Oracle's management was provided data dating back to 1996.[124] By assuming that the actual revenue earned in December 2000 would be 21% of the total revenue for the quarter, which is standard in forecast analysis, defendants could assess for themselves whether Oracle was on track to meet guidance.

Historical analysis for the time period analyzed internally at Oracle disclosed to defendants following December's results that Oracle was projecting to miss Public Guidance by $390.9M.[125]

---

[122]   Ellison 9/21/06 Tr. at 436, 450; Henley 4/6/06 Tr. at 367.

[123]   See Expert Report Exhibit 16.

[124]   December Flash Report (NDCA-ORCL 088715-32.).

[125]   Expert Report Exhibit 17.

31

Adjusting for the Covisint deal, Oracle's December 2000 license revenue was $180,524,000 – 13.3% of the most recent Potential Forecast and 14.4% of the most recent Field Forecast.[126]  Using December's historic 21% contribution to the quarter, the actual results for December of $180,524,000 projected to $859,638,095.  When the $60 million in revenue for Covisint is added back to the analysis, Oracle was projecting revenues of $919,638,095 for the quarter compared to the $1,310,556,250 in license revenue that it needed to meet Public Guidance (a shortfall of approximately $391M).  This simple calculation, which is standard in forecasting analysis, disclosed to defendants that Oracle would miss Public Guidance.[127]  Based on this analysis, it is my opinion that December results informed defendants that Oracle would have to rely on chance events or unexpected revenue in order to achieve its publicly projected results.

The February Garnick Flash Report, distributed February 8, 2001, disclosed to defendants that matters had improved little for Oracle in January.[128]  NAS and OSI still had negative growth of 33% and 17% respectively, and OPI had negative growth of 63% after adjusting for Covisint.[129]  Excluding the $60 million Covisint license deal, the USD license growth rate was only 8% – far behind the license 25% growth rate that Oracle projected as Public Guidance (25%).[130]

Like December, historical analysis for the time period analyzed internally at Oracle disclosed to defendants following January that Oracle was projecting to miss Public Guidance by $314.5M.[131]  Data for fiscal years 1996 through 2000 show that Oracle earned an average of 40% of total third quarter license revenue through the end of January.[132]  Adjusting for the Covisint deal, Oracle's

---

[126]    See Expert Report Exhibit 18.

[127]    See Expert Report Exhibit 17. The outcome is similar using the two-year period that Mr. Garnick presented to the executive committee in the January Garnick Flash Report.  Using the average for that time period, Oracle projected to miss Public Guidance by $300M (see Expert Report Exhibit 19).

[128]    Minton 9/25/06 Exhibit 45.

[129]    Id.

[130]    Minton 7/7/06 Exhibit 45.

[131]    Expert Report Exhibit 17.

[132]    Expert Report Exhibit 16.

32

quarter-to-date license revenue through January 2001 was $374,408,000 – just 29.7% of the most recent Potential Forecast and 30.5% of the Field Forecast.[133]  Using Oracle historic 40% QTD contribution to the quarter, Oracle's license revenue through January of $374.4M projected to $936,020,000.[134]  When the $60 million in revenue for Covisint is added back to the analysis, Oracle was projecting revenue of $996,020,000 for the quarter compared to the $1,310,556,250 that it needed to reach Public Guidance.[135]  Based on this analysis, it is my opinion that results through January informed defendants that Oracle would not achieve its publicly projected results.

Mr. Garnick performed a similar analysis and informed defendants that Oracle was projecting to miss Public Guidance:

> The analyst community is expecting 23% license revenue growth . . . for Q3 FY01. To deliver 23% USD license revenue growth we need $1,341 million in CD license revenue for the quarter, $95 million (8%) more than our current forecast.[136]

Given that Mr. Garnick appears to have conducted an analysis of the Field Forecast for presentation to the executive committee, the projected shortfall in the February Garnick Flash Report would be even greater when compared to the Potential Forecast in the Upside Report.  This analysis is consistent with my opinion that forecasting analyses informed defendants that Oracle would miss Public Guidance.

The performance in Oracle's U.S. license divisions also informed defendants that Oracle was being affected by the economic downturn and the market for Oracle's products.  According to the January 15, 2001 NAS Forecasting Package, NAS had reported only $27 million in sales for the month to date, for a total of $31.4 million quarter-to-date.[137]  In December and January 2001, NAS

---

[133]    *See* Expert Report Exhibit 18

[134]    *Id.*

[135]    *See* Expert Report Exhibit 17. Like December, the outcome is similar using the two-year period analyzed in the February Garnick Flash Report.  Using that period, Oracle projected a miss of $196M (*see* Expert Report Exhibit 19).

[136]    Minton 9/25/06 Exhibit  45.

[137]    Minton 9/25/06 Exhibit 46 at NDCA-ORCL 038491; Winton 5/26/06 Exhibit 53 at NDCA-ORCL 039499.

33

only had total license revenue of $56 million, which was far short of the $79.1 million that NAS had earned in the first two months of Q3 FY00.[138] NAS experienced a combined year-over-year license revenue growth rate for December and January of negative 33%, compared to its negative 24% growth rate in December.[139]

The same analysis shows that Oracle's OSI division was being adversely affected by the declines in the economy and the market for Oracle's products. According to the January 9, 2001 OSI Forecast Package, OSI forecasted $73.6M in license revenue for December 2000 and January 2001.[140] But OSI fell short by $51M (69%).[141] OSI only had sales of $22.7M in December 2000 and January 2001 combined.[142] OSI license revenue through January 2001 had negative growth of 17%.[143]

Oracle's OPI division was similarly being affected by the decline in the economy and the market for Oracle's products. As of January 26, 2001, OPI had booked no license revenue in January 2001.[144] Excluding Covisint, OPI generated only $7.4 million in license revenue through January 2001.[145] Without the benefit of the Covisint transaction, OPI's performance in December and January was nearly non-existent.

In my opinion, the actual results and negative growth trends in all three of Oracle's U.S. license divisions show that Oracle was being adversely affected by the economic downturn and applications shortfalls and was not on track to meet Public Guidance. It is my opinion that

---

[138]    Minton 9/25/06 Exhibit 45.

[139]    NDCA-ORCL 292485-292488; NDCA-ORCL 292509-292511.

[140]    Minton 9/25/06 Exhibits 43, 45.

[141]    NDCA-ORCL 610989-93.

[142]    Minton 9/25/06 Exhibit 45.

[143]    *Id.*

[144]    *See* NCDA-ORCL 160665-991 at 160667.

[145]    Minton 9/25/06 Exhibit 45.

34

defendants' claim that Oracle would make Public Guidance is inconsistent with the evidence that any rational forecaster would consider when evaluating a forecast.

**GROWTH GAP**

The difference between forecasted license revenue growth rates and the Pipeline revenue growth rates also indicated that the economy was adversely affecting Oracle's operations and that its Public Guidance was out of reach. My analysis, which mirrors the analyses done within Oracle, compares the growth rate in the Potential Forecast with the Pipeline growth rate (given that Oracle utilized the Potential Forecast to issue Public Guidance for the quarter). Unlike the four quarters prior to the Class Period, the gap between these measures was extremely narrow in Q3 FY01. In fact, between December 25, 2000 and January 29, 2001, the gap never reached higher than 4% and was negative half the time.[146] This behavior informed defendants that the financial department was forecasting license revenues to grow at a more rapid rate than the Pipeline was growing for most of December and January. This was out of line with Oracle's historical experience, which showed a negative gap only once prior to Q3 FY01, and an average spread of 13.4%.[147] A negative gap is important because it indicates that the forecast target is less likely to be met. As Larry Ellison noted, it would be "incautious to . . . forecast sales growth without underlying pipeline growth."[148]

This evidence is inconsistent with Oracle's claims about its Public Guidance and its Economy Statements. Testimony from Mr. Ellison supports my opinion on this point. Ellison stated, "as long as the pipeline growth is greater than – than the revenue growth, you should be able to meet your numbers."[149] As the converse occurred in significant parts of December and January, Ellison's own measure indicated Oracle was not on track to reach Public Guidance. Since both metrics appeared on the first page of the Upside Report, defendants were informed of these facts throughout the quarter.[150]

---

[146]   Expert Report Exhibit 13.

[147]   *See* Expert Report Exhibit 13.

[148]   Ellison 2/26/04 Tr. at 87:4-5.

[149]   Ellison 2/27/04 Tr. at 421:12-14.

[150]   Minton 9/25/06 Exhibit FR 24A.

35

previous quarters were nowhere near the size of the declines in Q3 FY01 (for the company as a whole as well as for Oracle's U.S. license divisions).[157]

The rapid and uncharacteristic decline in the pipeline indicated more deals were being lost than in prior years. With the declining stock market, tightening credit and reduced venture capital, Oracle's customers were unable or unwilling to make purchases.

Significant Pipeline declines were not isolated to Q3 FY01 but in fact had begun occurring in Q1 FY01 and continued through Q4 FY01.  For example, in Q1 FY01 the licensing Pipeline declined by 31% or $548 million from the beginning to the end of the quarter.[158]  The licensing Pipeline decline in Q2 FY01 was 19% or $426 million, 27% or $807 million in Q3 FY01, and 31% or $1.3 billion in Q4 FY01.[159]  For FY01 the average quarterly Pipeline decline from the beginning to the end of the quarter was over 27%, while the average decline in the six quarters prior to Q1 FY01 was only 9%.[160]

These pipeline declines indicated that potential customers were making decisions to either postpone purchases or cancel them during the course of the quarter; whereas in FY00 and in FY99, these potential deals generally remained in the Pipeline indicating that customers were still considering a purchase throughout the quarter.  Therefore, not only did the behavior of the Pipeline in Q3 FY01 inform defendants that Oracle was being adversely affected by the economic environment, but this same Pipeline behavior had informed defendants of deteriorating economic conditions since Q1 FY01.

The behavior of the Pipeline in Q3 FY01 therefore informed defendants throughout the quarter that Oracle was being adversely affected by the economic environment.

## FIELD FORECAST

The behavior of the Field Forecast, which Ellison described as a key metric, (he testified that he relied on this instead of Minton's "upside," which he characterized as a "mood ring") not only

---

| | |
|---|---|
| [157] | *See* Expert Report Exhibit 21. |
| [158] | Expert Report Exhibit 10. |
| [159] | *See* Expert Report Exhibit 10. |
| [160] | Expert Report Exhibit 10. |

37

informed defendants from the beginning of the quarter that Oracle would miss Public Guidance, but also that Oracle was being affected by the economy.[161]   The Field Forecast was below Public Guidance for the entire quarter.[162]   The field forecasted only 10.7¢ earnings per share in the beginning of the quarter and increased that forecast to only 11.0¢ at the end of February – at all times at least a penny below guidance. They forecasted EPS of 10.7¢ on December 11, 2000 (three days before Oracle issued guidance), 10.6¢ on December 25, 2000, 10.6¢ on January 15, 2001, 10.7¢ on January 22, 2001, 10.7¢ on January 29, 2001, 10.5¢ on February 5, 2001, 10.9¢ on February 12, 2001, 11.0¢ on February 19, 2001, 11.0¢ on February 26, 2001, 11.0¢ on February 27, 2001, and 10.7¢ on February 28, 2001.[163]

Indeed, in December and January, contrary to historical practice, none of the U.S. license divisions increased their forecasts.[164]   The field historically tended to increase its forecast as the quarter progressed and as deals became more certain.[165]   In each of the four quarters leading up to Q3 FY01, the Field increased its forecast throughout the quarter, often quite dramatically (for example, in Q4 FY00 the Field Forecast increased by $157M and in Q2 FY01 the Field Forecast increased by $95M).   In contrast, in Q3 FY01 the Field Forecast remained steady for the first two months before plummeting in February.[166]

Like the difference between the Pipeline growth and the growth in the Potential Forecast, the behavior of the Field Forecast was out of line with historical practice.   In addition, reports from the Field confirmed the problems.   One of the senior executives in Oracle's NAS division commented at the end of the quarter that "AVPs [were] Beginning to Voice Concern" in the month of December

---

[161]   Ellison 2/27/04 Tr. at 279-281.

[162]   Expert Report Exhibit 12.

[163]   Expert Report Exhibit 12.

[164]   Expert Report Exhibit 22.

[165]   Expert Report Exhibit 22.

[166]   Expert Report Exhibit 22.

and that the "AVPs [were] Reluctant to Raise Their Forecast" in the month of January.[167] These facts further informed defendants that Oracle would miss Public Guidance.

**POTENTIAL FORECAST**

The behavior of the Potential Forecast was also highly unusual compared to historical trends and informed defendants that Oracle was forecasting to miss guidance. Ms. Minton added $159.5M in "upside" to the Field Forecast in December.[168] On January 15, 2001, Ms. Minton lowered her total company license upside by $64.6 million (from $159.5 million to $94.91 million).[169] She also lowered the upside for NAS by $36 million and eliminated all upside for OSI.[170] By January 29, 2001, Minton lowered her total company license upside by $51.5 million (from $94.91 million to $43.41 million), eliminated the upside for NAS entirely, and applied a negative $35 million upside to OSI.[171] This was the first time in the four quarters prior to Q3 FY01 that she had ever applied a negative upside adjustment to a U.S. Division in the first two months of the quarter.[172] By contrast, in Q3 FY00 Minton reduced her upside by only $35M in December and January, and only $66M for the entire quarter.[173] By January 29, 2001, the Finance Department's Potential Forecasts for total license revenue growth, database license revenue growth, and EPS were all below Public Guidance.[174]

The behavior of the Potential Forecast was inconsistent with defendants' claims that the economic downturn was not affecting Oracle's business. In fact, Mr. Henley testified that the

---

[167]    Roberts 6/22/06 Exhibit 27 at NDCA-ORCL 179337.

[168]    Expert Report Exhibit 11.

[169]    *Id.*

[170]    *Id.*

[171]    *Id.*

[172]    *Id.*

[173]    *Id.*

[174]    Minton 9/25/06 Exhibit FR 27A.

39

Finally, as discussed above, many other internal Oracle key indicators informed defendants that Oracle would not meet its Public Guidance. Defendants were consistently informed of these facts throughout Q3 FY01. Accordingly, defendants' claim that they were not aware of the likely miss until the very end of the quarter is not supported by the facts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of October, 2008, at Los Angeles, California.

_____

ALAN G. GOEDDE

52

31