COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
        – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | )<br>)<br>)<br>) | Master File No. C-01-0988-SI |
| | ) | CLASS ACTION |
| This Document Relates To: | )<br>)<br>) | PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GEORGE FOSTER |
| ALL ACTIONS. | )<br>)<br>) | |
| | | DATE:      January 9, 2009<br>TIME:      9:00 a.m.<br>CTRM:    The Honorable Susan Illston |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND .................................................................................................2

III.  LEGAL STANDARD...........................................................................................3

IV.  ARGUMENT .......................................................................................................5

    A.  Foster's Opinions Are Biased from His Numerous Personal and Professional Connections to Oracle .......................................................5

    B.  Foster's Opinions Should Be Excluded as He Lacks Fundamental Knowledge of the Facts Underlying His Opinions ..................................8

    C.  Foster Failed to Consider Critical Facts that Undermine the Reliability of His Methods and Opinions...................................................13

    D.  Foster Admits to Developing Several Opinions Specifically for Purposes of Testifying in This Litigation ............................................17

    E.  Foster's Opinions that Rely on Securities Analysts Should Be Excluded............18

    F.  Foster's Opinions on the Predictive Quality of Oracle's Intra-Quarter Pipeline Growth Should Be Excluded as Unreliable .............................20

    G.  Foster's Opinions Improperly Rely upon Data Inputs from Oracle's Field Sales Force ........................................................................22

    H.  Foster's Opinions Should Be Excluded Under Rule 403......................................23

V.  CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

Page

**CASES**

*Bourjaily v. United States*,
   483 U.S. 171 (1987)..........................................................................................................4, 8

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993)........................................................................................... *passim*

*Daubert v. Merrell Dow Pharms.*,
   43 F.3d 1311 (9th Cir. 1995) .........................................................................................17

*DSU Med. Corp. v. JMS Co., Ltd.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...........................................................................4

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)....................................................................................................5, 15

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
   No. 5:96:MD:1122, 1999 U.S. Dist. LEXIS 17153
   (W.D. Mich. Sept. 29, 1999), *aff'd*,
   2000 U.S. Dist. LEXIS 1318 (W.D. Mich. Feb. 8, 2000)..................................................9

*In re Oracle Corp. Derivative Litig.*,
   824 A.2d 917 (Del. Ch. 2003)................................................................................1, 6, 7, 8

*Jinro Am., Inc. v. Secure Invs., Inc.*,
   266 F.3d 993 (9th Cir. 2001) ...........................................................................................5

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................3, 4, 5, 20

*Lust by & Through Lust v. Merrell Dow Pharms.*,
   89 F.3d 594 (9th Cir. 1996) .........................................................................................4, 8

*Mukhtar v. Cal. State Univ.*,
   299 F.3d 1053 (9th Cir. 2002) ........................................................................................3

*Sheehan v. Daily Racing Form*,
   104 F.3d 940 (7th Cir. 1997) .........................................................................................20

*Trigon Ins. Co. v. United States*,
   204 F.R.D. 277 (E.D. Va. 2001) ..................................................................................9, 10

*United States v. Fuentes-Cariaga*,
   209 F.3d 1140 (9th Cir. 2000) .......................................................................................22

1

2                                                                                               **Page**

3   *United States v. Scholl*,
            166 F.3d 964 (9th Cir. 1999) ...............................................................................4
4

5   *Watkins v. Telsmith, Inc.*,
            121 F.3d 984 (5th Cir. 1997) .............................................................................22
6

7   *Weisgram v. Marley Co.*,
            528 U.S. 440 (2000)............................................................................................4

8

9   **STATUTES, RULES AND REGULATIONS**

10  15 U.S.C.
            §78j(b)...................................................................................................................2
11

12  Federal Rules of Civil Procedure
            Rule 26(a)(2)...................................................................................................9, 10
13          Rule 104(a)...............................................................................................................4
            Rule 401...............................................................................................................1, 2
14          Rule 402...................................................................................................................4
            Rule 403........................................................................................................4, 23, 25
15          Rule 702 ...................................................................................................... *passim*
            Rule 704.............................................................................................................13, 15
16

17

18

19

20

21

22

23

24

25

26

27

28

1    TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2           PLEASE TAKE NOTICE that on January 9, 2009, at 9:00 a.m., in the Courtroom of the

3    Honorable Susan Illston, plaintiffs will and hereby do move this Court to preclude the testimony of

4    George Foster ("Foster").  This motion is made pursuant to Federal Rules of Evidence 401 to 403

5    and 702 on the grounds that Foster's opinions are unreliable, would serve to mislead and confuse the

6    jury, waste the Court's time, and will not assist the trier of fact to understand the evidence or

7    determine a fact at issue.  This motion is based upon this notice, the following memorandum of

8    points and authorities, the pleadings and records on file herein, and such further evidence and

9    argument as may be presented to the Court.

10                     **MEMORANDUM OF POINTS AND AUTHORITIES**

11   **I.     INTRODUCTION**

12          Plaintiffs move to exclude the opinions of Foster as expressed in his expert rebuttal report,

13   dated June 22, 2007.  The opinions offered by Foster do not rest on a reliable foundation and

14   therefore should be excluded pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow*

15   *Pharmaceuticals*, 509 U.S. 579 (1993).  Expert testimony is admissible only if it is relevant and

16   reliable.  *Id.*  Speculative opinions, or those that simply characterize the evidence, should be

17   excluded as they will not assist the trier of fact, and opinions based on unreliable or non-existent

18   methodologies must themselves be excluded as unreliable and unhelpful.  *Id.*  Foster's opinions

19   violate each of these principles.

20          By this motion, plaintiffs seek to exclude the opinions of Foster, whom defendants have

21   retained despite (and perhaps because of) his connections to Oracle Corporation ("Oracle" or the

22   "Company") and Oracle's executives (including the defendants in this case and executives who

23   faced similar allegations in the related *In re Oracle Corp. Derivative Litig.*) through his position as a

24   Stanford University professor.  The Delaware Court of Chancery under similar facts already

25   determined that Oracle's Special Litigation Committee (the "SLC") was "fraught" with "bias-

26   creating relationships" because of its connection to Stanford and through it Oracle.  Foster has a

27   similar bias-creating relationship that destroys his credibility and should serve to exclude his

28   opinions from this litigation.

Apart from his conflicted relationships, Foster's opinions should also be excluded as unreliable as he lacks fundamental knowledge of the facts underlying his opinions (the opinions do not appear to be his own) and employed an unreliable methodology by failing to consider critical facts that directly undermine his opinion.  In fact, despite opining about the reasonableness of Oracle's forecasting process and its historical accuracy, Foster simply disregards the fact that Oracle's forecasting process had changed prior to the period at issue in this case.  He also failed to consider the reliability of the metric that his report says was a "reasonableness check" on Oracle's forecast, and failed to consider the economic change between Oracle's Q3'00 and Q3'01 despite testifying that the economic environment is a data point in the forecasting process and that Oracle utilized its Q3'00 financial results as a baseline for its Q3'01 public guidance.  These fundamental flaws in Foster's methodologies render his opinions about Oracle's forecast process unreliable and undermine Rule 702's requirement that an expert apply methods reliably to the facts of the case.  His opinions about Oracle's forecasting process should be excluded.

Foster's opinions should also be excluded as they were specifically created for purposes of testifying in this litigation, have not been subject to or appeared in any peer-reviewed publications, and have not been generally accepted in his field.  In fact, Foster employed methodologies that do nothing but characterize the evidence, result in rank speculation, and result in opinions that are largely duplicative of the opinions offered by defendants' other forecasting "expert" R. Glenn Hubbard ("Hubbard"), who is Chair of the Paulson Committee dedicated to eliminating shareholder actions.  Plaintiffs have moved separately to exclude Hubbard's opinions.  As discussed herein, Foster's opinions should be excluded under *Daubert* and under Fed. R. Evid. 702 and 401 to 403.

## II.    BACKGROUND

This case arises out of defendants' use of fraud and deception to portray Oracle's business as healthy through numerous false and misleading statements concerning financial data, earnings guidance, and the performance of Oracle's product Suite 11i.  Accordingly, a central issue in this case is whether defendants made false and misleading public statements in violation of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act").  In support of their defense, defendants offer Foster's opinions to rebut the opinions of plaintiffs' expert, Dr. Alan G. Goedde ("Goedde"), as set

forth in Dr. Goedde's May 25, 2007 report.  Foster only submitted a rebuttal report, dated June 22, 2007.[1]

Foster now offers the following central opinions in his rebuttal report:

- "Contrary to Dr. Goedde's conclusions, Oracle's financial forecasting process met relevant quality criteria and incorporated relevant economic and business information in a timely and appropriate manner."

- "Dr. Goedde's conclusion that Oracle's internal measures indicated that Oracle would miss its public guidance is not supported by the data."

Declaration of Douglas R. Britton in Support of Plaintiffs' Motion to Exclude the Expert Testimony of George Foster ("Britton Decl."), Ex. 1 at 4-5.[2]  Foster's opinions are patently unreliable under the *Daubert* framework as he fails to consider relevant data, his methodology is unreliable or non-existent, and he is biased in favor of defendants.

## III.    LEGAL STANDARD

The trial courts act as gatekeepers in determining whether to admit expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 589.  This is a critical function of the court because "[m]aintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony."  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).

Expert testimony may be admitted as evidence only when the testimony (1) "will assist the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 588-89.  A witness may be qualified as an expert by """"knowledge,

---

[1]      Foster also submitted a rebuttal declaration to the Declaration of Alan Goedde in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.  Given that the parties are re-briefing summary judgment, this motion will not address that rebuttal declaration.  Plaintiffs will address any rebuttal declarations if and when Foster elects to re-submit one.

[2]      All "Ex." or "Exs." references herein are to the Britton Decl.

1  skill, experience, training,''" or education.  *Id.*[3]  Expert testimony is also subject to the limitations of

2  Fed. R. Evid. 402 and 403.  *See, e.g.*, Fed. R. Evid. 402, 403; *United States v. Scholl*, 166 F.3d 964,

3  971 (9th Cir. 1999) (finding that admissibility of expert testimony should be evaluated under Fed. R.

4  Evid. 402 to 403).  Relevance, in this context, requires that the expert's proposed opinion would

5  assist the trier of fact to understand or determine a fact in issue.  *Daubert*, 509 U.S. at 591 (holding

6  that the requirement that the expert testimony "'assist the trier of fact' . . . goes primarily to

7  relevance").

8        Moreover, to be admissible under Rule 702, an expert's opinion must be "'not only relevant,

9  but reliable.'"  *See Kumho Tire*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589; Fed. R. Evid. 104(a),

10  702.  A proponent of expert testimony bears the burden of establishing by a preponderance of the

11  evidence that the proposed testimony meets both *Daubert*'s reliability and relevancy requirements.

12  *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *Lust by & Through Lust v.*

13  *Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996); *DSU Med. Corp. v. JMS Co.*, *Ltd.*, 296 F.

14  Supp. 2d 1140, 1146 (N.D. Cal. 2003) (granting in-part motion to exclude expert testimony as

15  unreliable).  The Supreme Court has characterized the reliability inquiry as an "exacting" one.

16  *Weisgram v. Marley Co.*, 528 U.S. 440, 451 (2000).  In performing its gatekeeping role, the court

17  does not focus on the correctness of the conclusions of the expert's testimony.  *See, e.g.*, *DSU Med.*,

18  296 F. Supp. 2d at 1146-47.  Rather, the court focuses on whether the methodology used by the

19  expert to reach his conclusions is sufficiently reliable for submission of that testimony into evidence.

20  *Id.*

21        In determining reliability, *Daubert* held that a trial court may: (1) assess whether the expert's

22  technique or theory has been tested; (2) assess whether the technique or theory has been subject to

23  peer review and publication; (3) evaluate the known or potential rate of error of the technique or

24  theory when applied; (4) ascertain the existence and maintenance of standards and controls; and (5)

25  determine whether the technique or theory has been generally accepted in the scientific community.

---

27  [3]      Citations and footnotes are omitted, and emphasis is added, unless otherwise stated.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI          - 4 -

*Daubert*, 509 U.S. at 590-94.   As the Supreme Court emphasized, however, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one" (*id*. at 594), and must be """"tied to the facts'" of a particular 'case.'" *Kumho Tire*, 526 U.S. at 150.  Other factors may also be relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury, such as: (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.  *See* Fed. R. Evid. 702 advisory committee's notes.

"When [expert] opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." *Id.*; *see, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (the evidence must be excluded if the court finds "that there is simply too great an analytical gap between the data and the opinion proffered"); *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) ("impressionistic generalizations" are inadmissible).  Opinions based on mere speculation or lacking the requisite methodological rigor should be excluded at trial.

## IV.    ARGUMENT

### A.    Foster's Opinions Are Biased from His Numerous Personal and Professional Connections to Oracle

As a business professor at Stanford University actively involved in the Silicon Valley business community, Foster has numerous connections to Oracle that serve to undermine his impartiality – and therefore his reliability as an expert witness in this case.[4]  Indeed, the substantial ties between Stanford and Oracle are well-documented and have already served as the basis for the

---

[4]    Foster testified that he has been affiliated with Stanford University since 1978.  Ex. 2 at 53:15-17.

1  Delaware Court of Chancery to find Oracle's SLC conflicted.  *In re Oracle Corp. Derivative Litig.*,

2  824 A.2d 917 (Del. Ch. 2003).  There, professors at Stanford were charged with investigating Oracle

3  for the same conduct that partially gave rise to the instant case and, unsurprisingly, found no

4  wrongdoing.  In reaching its decision, the court stated:

5          [B]y requiring SLC members to consider accusing a fellow professor and two large
          benefactors of their university of conduct that is rightly considered a violation of
6          criminal law was unnecessary and inconsistent with the concept of independence
          recognized by our law.  The possibility that these extraneous considerations biased
7          the inquiry of the SLC is too substantial for this court to ignore.

8  *Id.* at 921.  The same rationale that served to reject the SLC's independence is readily applicable to

9  Foster's opinions here because, much like the SLC, under no plausible scenario would Foster render

10  opinions adverse to fellow Stanford professors and significant donors to Stanford.  Absent the ability

11  to independently evaluate Oracle's conduct, Foster's opinions should be excluded as unreliable.

12  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589; *Oracle Derivative*, 824 A.2d 917.

13          Currently, two Stanford professors serve on Oracle's Board of Directors, Michael Boskin

14  ("Boskin") and Hector Garcia-Molina ("Garcia-Molina").   A third, Joseph A. Grundfest

15  ("Grundfest"), recently resigned.  Grundfest and Garcia-Molina led the SLC's investigation.  Boskin

16  is a professor of economics – a job that has natural overlap with Foster's position within Stanford's

17  business school.  Ex. 2 at 28.  When asked whether he knew Boskin, Foster testified: "I have met

18  him several times" because "[a]s a Stanford professor, whose area – he's in business, economics."

19  *Id.* at 28:6-12.  Grundfest is a business law professor and, like Boskin, Foster has met him several

20  times because their positions at Stanford overlap.

21          Q:   Do you ever work with Mr. Grundfest?

22          A:   I have met him several times . . . .

23          Q:   And in what context have you met Professor Grundfest?

24          A:   He's a law professor, our areas overlap somewhat, and I have heard him talk.

25  *Id.* at 26:3-9.  Foster also has colleagues that work extensively with Grundfest.  Foster has "been

26  research colleagues and just colleagues for over 20 years" with a Professor Maureen McNichols

27  ("McNichols") at Stanford and has a "close working relationship" with her.  *Id.* at 27:6-7, 26:19-21.

28  McNichols teaches at both Stanford's business school and law school, and has taught a joint course

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI                                                          - 6 -

1   with Grundfest.  McNichols had defendant Jeffrey O. Henley ("Henley") speak to one of her classes.

2   *Id*. at 21:14-18.  Grundfest is also co-director of Stanford's Rock Center for Corporate Governance

3   with Professor David Larcker ("Larcker") – who is also a professor at the business school with

4   Foster and whose office is across the hall from Foster's.  *Id*. at 29.

5           Beyond the immediate academic connections Foster and Stanford have to Oracle, they also –

6   perhaps more importantly – have strong financial connections.  Donald J. Lucas ("Lucas") currently

7   serves on Oracle's Board, and is a large contributor to Stanford as well as a loyal alumnus.  Exs. 3-6;

8   *Oracle Derivative*, 824 A.2d at 931-32.  As chair of the Richard M. Lucas foundation, Lucas has

9   personally directed over $5 million to Stanford through the foundation between 2003 and 2005

10  alone, including millions to the Stanford Institute for Economic Policy Research ("SIEPR").  Exs. 4-

11  6.  Boskin serves as a faculty member of SIEPR and Grundfest is formerly a senior fellow at SIEPR.

12  Ex. 7; *Oracle Derivative*, 824 A.2d at 931.  SIEPR has a conference center named after Lucas.  *Id*. at

13  932.  Defendant Lawrence J. Ellison ("Ellison") also has given over $20 million between 2002 and

14  2005 to Stanford through his foundation, The Ellison Medical Foundation.  Exs. 8-11.  Foster

15  testified that his research is funded by alumni donations and that such donations "are important to

16  the university."  Ex. 2 at 22-23.  Indeed, such donations are the lifeblood of academic institutions.

17          Under similar facts, the Delaware Chancery Court found the SLC to be "fraught with" "bias-

18  creating relationships," and stated "I find this to be the case because the ties among the SLC, the . . .

19  Defendants, and Stanford are so substantial that they cause reasonable doubt about the SLC's ability

20  to impartially consider whether the . . . Defendants should face suit."  *Oracle Derivative*, 824 A.2d at

21  942, 947-48.  The court recognized that "[e]ven though Boskin was in a different academic

22  department from either SLC member, it is reasonable to assume that the fact that Boskin was also on

23  faculty would – to persons possessing typical sensibilities and institutional loyalty – be a matter of

24  more than trivial concern."  *Id*. at 942.  And "[a]lthough they were not responsible for fundraising, as

25  sophisticated professors they undoubtedly are aware of how important large contributors are to

26  Stanford, and they share in the benefits that come from serving at a university with a rich

27  endowment."  *Id*. at 943.  By virtue of Foster's connections to Stanford, Grundfest, Boskin, Garcia-

28  Molina, Lucas, Ellison, and Oracle, a similar conclusion should be reached here as to that found in

1    the derivative case – namely that Foster's opinions are biased and unreliable.  Fed. R. Evid. 702;

2    *Daubert*, 509 U.S. at 589; *Oracle Derivative*, 824 A.2d 917.

3         Rendering anything other than an opinion directly in line with defendants' version of the

4    facts would result in Foster: (1) directly conflicting the findings of his Stanford colleagues Grundfest

5    and Garcia-Molina in the derivative case; (2) adversely opining on conduct by large donors to

6    Stanford; (3) adversely opining on conduct by Oracle's Board – including colleagues; (4)

7    jeopardizing personal and professional relationships with Professors McNichols and Larcker; and

8    (5) jeopardizing donations to Stanford.  With the weight of these considerations, Foster is not

9    independent and his opinions should accordingly be excluded as unreliable.  Defendants bear the

10   burden of establishing by a preponderance of the evidence that Foster's opinions are reliable and

11   relevant, a burden they cannot meet here.  *See, e.g.*, *Bourjaily*, 483 U.S. at 175-76; *Lust*, 89 F.3d at

12   598.

13       **B.    Foster's Opinions Should Be Excluded as He Lacks Fundamental
                 Knowledge of the Facts Underlying His Opinions**

14

15         Foster testified at his deposition that he did not write most of his report or create the exhibits

16   attached thereto. Ex. 2 at 19-20, 37:2-3.  In fact, Foster testified that he never even met with defense

17   counsel throughout the entire time his report was being drafted for him.  *Id*. at 20:15-17.  Rather,

18   employees of a professional legal services group, Analysis Group ("AGE"), met with defense

19   counsel and drafted Foster's report for him to sign.  *Id*.at 18:10-20:21.  Foster testified that he spent

20   only 40-50 hours working on his report between May 25, 2007 and June 22, 2007 – a truly amazing

21   feat given his claim of reliance upon hundreds of documents and 17 deposition transcripts.  *Id*. at

22   6:1-4; Ex. 1 at Appx. C.  A careful reading of the 17 deposition transcripts alone should have taken

23   most, if not all, of the 40-50 hours – added to which Foster testified he did "several" very detailed

24   reads of Goedde's May 25, 2007 report. Ex. 2 at 19:13-14.  Yet Foster also was purportedly actively

25   involved in his 55-page report, complete with numerous detailed charts and tables.  However,

26   Foster's claim of 40-50 hours of work cannot be reconciled with the sheer volume of his report and

27   supposed preparation efforts absent the conclusion that AGE did almost all the work for him – a

28   conclusion that undermines the reliability of his report.

1   This is not the first case in which AGE has prepared a report for its experts.  In *Trigon Ins.*

2   *Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001), AGE and its owner Bruce Deal (who attended

3   the depositions of Hubbard, Foster, and Goedde in this case) were found to have intentionally

4   destroyed documents to cover up the fact that "AGE had participated extensively in the drafting

5   (both preparation and editing) of the testifying experts' reports."  *Id.* at 281.  The court explained

6   that documents had been destroyed as a result of AGE's document retention policy for purposes of

7   denying meaningful cross-examination into the preparation of the reports:

8           And, the United States and AGE certainly were aware of the value of the
        documents which were spoiled.  In fact, the rather obvious effect, and perhaps even
9       the purpose, of AGE's document retention policy was to eliminate this source of
        undeniably meaningful cross-examination resource about the substance of the expert
10      opinions and about the ghost writing of the opinions.

11  *Id.* at 290.  While the court held that Trigon had not met its burden of proof that AGE provided the

12  substance of the opinions of the testifying experts, it noted that it would consider the issue at trial.

13  *Id.* at 295.  For the destruction of evidence, however, the court held that it was appropriate to "draw

14  adverse inferences respecting the substantive testimony and credibility of the experts," which it

15  would do at trial.  *Id.* at 291.  Notably, AGE was foreclosed from "further participation in any aspect

16  of the development and presentation of the expert testimony to be offered by the United States."  *Id.*

17      While the parties have entered a stipulation in this case limiting the scope of permissible

18  expert discovery, Foster's anemic involvement in the preparation of his report (40-50 hours) and his

19  lack of knowledge about even basic foundational facts reveal that AGE "participated extensively in

20  the drafting (both preparation and editing) of the testifying experts' reports."  *Id.* at 281.  In fact, the

21  reports of Hubbard and Foster cover the same issues and give the same opinions and some of the

22  charts that each "expert" cite as support are identical.  *Compare* Ex. 1 at 23-25, ¶¶57, 61, *with* Ex. 13

23  at 78, ¶159, *and* Ex. 14 at 21-22, ¶¶56, 58; *compare* Ex. 1 at 18-20, 53, Figures 1-3, 13, *with* Ex. 13

24  at 84 & 100, Figures 44, 50; *see also* §IV.A.8, *supra*.  The substantial overlap between these reports

25  combined with Foster's lack of basic knowledge of the case (discussed below) reveals that he did not

26  prepare the report within the meaning of Fed. R. Evid. 26(a)(2).  Courts have excluded expert

27  testimony under similar circumstances.  In *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, No.

28  5:96:MD:1122, 1999 U.S. Dist. LEXIS 17153 (W.D. Mich. Sept. 29, 1999), *aff'd*, 2000 U.S. Dist.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI                                                              - 9 -

1    LEXIS 1318 (W.D. Mich. Feb. 8, 2000), the court excluded an expert report on the grounds that the

2    report had not been prepared by the expert within the meaning of Rule 26(a)(2) where "the

3    substantial similarity among the three expert witness reports derived from the authorship of their

4    common language by plaintiffs' counsel." *Id.* at *3.  The similarity between the Hubbard and Foster

5    reports, the duplicative Figures, and Foster's lack of knowledge require the exclusion of his report.

6            Foster's lack of knowledge also reveals that the opinions that he offers are those of AGE and

7    not his own.  *Trigon*, 204 F.R.D. at 294 ("[I]f opinions expressed in an expert report are not the

8    opinions of the expert, the expert will not be able to satisfy the requirements of [Fed. R. Evid.] 702

9    and *Daubert* that the report be based on the expert's own valid reasoning and methodology.").

10   Foster's deposition testimony revealed that he has only a limited knowledge of Oracle's forecasting

11   process – the very process for which defendants have offered him as an expert.  Foster testified that

12   he was supplied information by AGE, such as highlighted deposition transcript excerpts that were

13   selected by AGE.  Ex. 2 at 31:19-32:2, 33:5-9.  Foster testified that he managed to only "skim"

14   through the deposition transcripts of Jennifer Minton ("Minton"), the Oracle executive in charge of

15   forecasting during the relevant time.  *Id*. at 32:23-25, 33:1.  Absent from the depositions that Foster

16   listed as having "reviewed" were George Roberts' ("Roberts") March 17, 2004, June 22, 2006, and

17   August 8, 2006 depositions (Roberts served as the Executive Vice President of Oracle's NAS

18   division), defendant Ellison's July 13, 2006 deposition, defendant Henley's July 27, 2006

19   deposition, Executive Vice President of OSI Jay Nussbaum's ("Nussbaum") June 22, 2006

20   deposition, and scores of other relevant depositions. Ex. 1 at Appx. C.[5]

21           Foster's knowledge of Oracle's forecasting process is inadequate for his opinions to be

22   considered reliable.  At his deposition, Foster was unfamiliar with numerous simple facts that

23   undermine the reliability of his opinions.  For example, Foster's report concludes that pipeline

24   growth was not used as a forecasting measure and when asked where Oracle's pipeline growth data

25

26   [5]       While the parties' expert stipulation limited the scope of documents to be disclosed to those
27   that the expert actually relied upon in reaching his opinions, Foster testified that he did not review
     anything other than what was listed in his Appendix of Documents Relied On.

28

could be found, Foster did not know. Ex. 1 at 49, ¶108; Ex. 2 at 178:16-19. Foster was surprised to learn that pipeline growth data appears on the first page of Oracle's central forecasting tool, the Upside Report. Ex. 2 at 178-79. Foster had no knowledge of what percentage Oracle's U.S. license sales composed of total company license sales. *Id.* at 199-200. And he did not know that Oracle's NAS and OSI license divisions had negative growth rates in December 2000 and January 2001. *Id.* at 200. And the list goes on:

- Foster did not know what two divisions composed Oracle's NAS line of business. *Id.* at 223:14-20.

- Foster did not know what sales divisions were responsible for Oracle's Q3'01 earnings miss. *Id.* at 224:3-12.

- Foster did not know whether Minton had ever applied a negative upside adjustment prior to Q3'01. *Id.* at 224:13-18.

- Foster did not know the dollar amount of Oracle's dot.com revenues in Q3'00 even though in Q3'01 Oracle expected its dot.com revenues to decline year-over-year. *Id.* at 225:4-10; Ex. 12.

- Foster did not know what internal forecasting calls defendant Ellison participated in. Ex. 2 at 229:2-4.

Foster also testified he did not know who John Nugent ("Nugent") is, even though Nugent oversaw the Oracle sales division most affected by the collapse of dot.com spending that significantly contributed to Oracle's Q3'01 earnings miss. *Id.* at 202.

> Q:  Now, you saw the evidence from John Nugent, didn't you, about what the AVPs were saying in the field?
>
> *          *          *
>
> A:  I can't remember the specific thing you are referring to.
>
> Q:  Do you know who John Nugent is?
>
> A:  No, I don't.
>
> Q:  You have no idea who John Nugent is?
>
> A:  I can't recollect.

*Id.* at 202:1-11. Foster also had no knowledge of Oracle's products, despite admitting that the products were "factors that you would consider in terms of the forecasting." *Id.* at 46:2-3. In fact,

1   absent from his report is any mention of Oracle's products, including the troubled Suite 11i, or the

2   impact that the problems with Suite 11i had on Oracle's attempts to sell the product.

3          Finally, Foster's deposition made clear that he did not have an independent recollection of

4   the facts giving rise to his opinions, and that he was confused about the content of his report.  Foster

5   even gave testimony conflicting with his report, at one point admitting that pipeline growth was a

6   forecasting factor.  *Id.* at 176.  However, his report states that no executive at Oracle used pipeline

7   growth as a forecasting measure.  Ex. 1 at 49, ¶108.  When confronted with his conflicting opinions,

8   Foster testified, "Well, I misstated then."  Ex. 2 at 177:17.  Foster also testified that the difference

9   between pipeline growth and projected revenue growth (the "growth gap") was used in Oracle's

10  forecasting process, but his report states that the growth gap was not used.  *Id.* at 158:13-20; Ex. 1 at

11  44, ¶101.  The record is replete with evidence that Foster has almost no independent recollection of

12  basic relevant information that relate to his opinions:

13          •      Foster does not remember critical statements that Oracle made to investors
                 concerning the pipeline during Q3'01 even though he utilizes analysts and the
14               purported information that analysts utilize in support of his opinions.  Ex. 2 at
                 187:15-188:12, 189:19-190:11; Ex. 1 at 25-27, ¶¶62, 64.
15
            •      Foster does not remember testimony by Minton concerning why she reduced her
16               upside adjustment in Q3'01 even though his report specifically analyzes Minton's
                 upside adjustments as a percentage of the field forecast to explain that they usually
17               decline.  Ex. 2 at 206:22-207:1; Ex. 1 at 50-53, ¶¶113-116.

18          •      Foster does not remember testimony by defendant Henley concerning Minton's
                 January 29, 2001 upside adjustment to reach 11.58 earnings per share ("EPS") even
19               though he offered an opinion that the Potential Forecast falling below guidance was
                 not a source of concern (Henley testified that that it did cause him concern and made
20               him believe that the quarter was going to be "more of a horse race").  Ex. 2 at 209:9-
                 18; Ex. 1 at 51, ¶114; Ex. 15 at 266:20-267:11.
21
            •      Foster does not remember whether the hockey stick effect impacted Minton's
22               forecasting process even though he opines extensively that it did (Minton testified
                 that it did not).  Ex. 2 at 213:11-17; Ex. 1 at 27-34, ¶¶65-76; Ex. 16 at 139:10-
23               140:15.

24          •      Foster does not remember what defendant Ellison used as key forecasting indicators
                 even though that testimony contradicts many of Foster's opinions about what Ellison
25               considered important in measuring the quarter.  Ex. 2 at 221:20-23; Ex. 1 at 38-39,
                 44, 49, ¶¶88-89, 101-102, 108; Ex. 17 at 179:6-19.
26
           Without sufficient knowledge of Oracle's forecasting process, a jury should not be subjected

27  to Foster's "expert" opinions. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.

28

### C.   Foster Failed to Consider Critical Facts that Undermine the Reliability of His Methods and Opinions

One of the *Daubert* factors readily applicable to Foster's opinions is whether the expert has adequately accounted for obvious alternative explanations.  *See* Fed. R. Evid. 702 advisory committee's notes.  Here, Foster improperly failed to consider critical facts that not only offer obvious alternative explanations but also undermine his opinions.  At its most egregious level, Foster's opinions are unreliable because he fails to consider or account for the fact that Oracle's forecast process had changed prior to Q3'01.  Instead of analyzing how that change could have affected the forecasting process and the reliability of public guidance, Foster elected to dispute the evidence – and nothing more.  He employed no methodology, let alone a reliable one, in his reaching his opinions and instead plays the role of oath helper.  Fed. R. Evid. 704 advisory committee's notes (stating the trial court must protect "against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day").

As set forth in the reports of Goedde, in the quarter prior to the class period, Ellison directed Oracle's sales representatives to add additional risk (*i.e.*, amount) to the field-level forecast.  Ex. 18 at 22-23; Ex. 19 at 81-84.  According to an e-mail between OPI Finance personnel, Ellison's directive required the inclusion in the forecast of certain deals having a lower probability of winning than were included in previous forecasts.  *Id*.  Numerous documents and testimony from Oracle's executives reveal that this directive was intended to adjust for the practice of salespeople and executives underestimating their quarterly sales in order to consistently meet or exceed their forecasts, a practice called "sandbagging."  *Id*.  Prior to the directive, Oracle compensated for this practice through "upside" adjustments by Oracle's controller Minton.  *Id*.  Minton added the "upside" adjustment to the field-level forecast to generate what she termed the "Potential Forecast."  Ex. 18 at 10.  The directive was therefore intended to increase the amount of the field-level forecast.

1    It also rendered Minton's upside adjustments and her "Potential Forecast" unnecessary and

2    unreliable.  Ex. 19 at 81-84.[6]

3         Despite this fundamental change and its affect on the forecast process, Foster focuses his

4    rebuttal report largely on the accuracy of Minton's "Potential" forecast.  In fact, he dismisses all of

5    the metrics that Oracle's executives actually utilized to gauge Oracle's performance throughout the

6    quarter as either inferior predictors or not predictive at all and instead focuses on the predictive

7    nature of Minton's Potential Forecast.  Ex. 1 at 39-43, ¶100 ("monthly actual results were a less

8    accurate predictor of Oracle's quarterly results than was the Potential Forecast"); *id*. at 50, ¶111

9    ("the Potential-based EPS Forecast was historically more accurate than EPS estimates based on the

10   Field Forecast").  According to Foster, the metrics that Oracle's executives actually utilized to gauge

11   performance are meaningless because the Potential Forecast was in line with historical practice.

12   Ex. 1 at 17-20, ¶¶44-48.

13        But in reaching these opinions, Foster simply dismisses the significant change to the

14   forecasting process directed by Ellison, which rendered irrelevant the historical accuracy of the

15   Potential Forecast, because he "disagree[s] with Dr. Goedde that any such increase in risk occurred."

16   *Id*. at 34-35, ¶¶77-78.  That is the extent of Foster's analysis and methodology – reviewing evidence

17   to conclude that the directive did not occur.  *Id.* at 34-37.  He cites Ellison's statement that he did not

18   want more risk in the forecast because he "'always wanted the forecast to be accurate'" but ignores

19   the explanation in the e-mail showing that the directive changed the field-level forecast.  *Id*. at 36,

20   ¶81.  He says that "Jeff Henley did not recall any such change occurring."  *Id.*  He says that Minton

21   "did not recall the field including additional judgment in its forecasts beginning in Q2 FY2001."  *Id.*

22   And he disagrees with the very language in the e-mail describing the change – "The e-mail requested

23   ***additional*** information to be provided to Ms. Minton, not a ***substitution*** of one kind of forecast for

24   another."  *Id.*, ¶83 (emphasis in original).  This is the sum total of Foster's analysis.  He did not test

25   _____

26   [6]    Plaintiffs incorporate herein by reference their motion for summary judgment against Ellison, which provides further evidentiary support for plaintiffs' arguments.  *See* Plaintiffs' Notice of

27   Motion and Motion for Summary Judgment Against Lawrence Ellison for Trading on the Basis of Material Non-Public Information at §III.C.1.-4.

28

1  to see whether any additional risk was, in fact, included in the field forecast and simply disbelieved

2  the evidence because it was not the type that he wanted to see:

3      Q:      But your testimony was is that if it is a directive from Ellison and he wanted
                to do it company-wide, there would have been a directive from him.  But

4               you've seen testimony from him where he admits, "Yeah, that was me."

5      THE WITNESS:  He states he wanted more information in the process.

6      Q:      Right.  So the directive came from him?

7      THE WITNESS:  It wasn't a company-wide statement.

8      Q:      So you would want to see a company-wide e-mail before you would believe
                that, in fact, the directive had been made?

9
    A:      I would want to see – I would look for that. That would be one piece of
10              evidence.

11  Ex. 2 at 127:7-24.[7]  Foster applied no methodology to support his opinions on defendant Ellison's

12  directive to change the field forecast.  Ex. 1 at 34-37, ¶¶77-85.  By failing to do so, all of his

13  opinions concerning the Potential Forecast are unreliable since he failed to account for (or even

14  consider) a critical fact that bears directly on his opinions.  *See* Fed. R. Evid. 702 advisory

15  committee's notes; *Gen. Elec.*, 522 U.S. at 146 (the evidence must be excluded if the court finds

16  "that there is simply too great an analytical gap between the data and the opinion proffered").

17  Foster's opinions concerning the directive should be excluded as improper "oath helping" and his

18  opinions about Oracle's forecasting process and his reliance on the Potential Forecast should be

19  excluded as unreliable.  Fed. R. Evid. 704 advisory committee's notes (stating the trial court must

20  protect "against the admission of opinions which would merely tell the jury what result to reach,

21  somewhat in the manner of the oath-helpers of an earlier day"); Fed. R. Evid. 702; *Daubert*, 509

22  U.S. at 589.

23          Foster also failed to analyze another meaningful measure that undermines the reliability of

24  his opinions.  Foster opines that the historical conversion ratio (the percentage by which Oracle

25  converted its pipeline for the same week in the prior year) applied by Minton to generate her

26  _____

27  [7]      The Court's finding that Ellison willfully destroyed his e-mail further undermines Foster's
    dispute of these facts and supports the exclusion of his testimony.

28  PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
    GEORGE FOSTER - C-01-0988-SI                                                            - 15 -

1  Potential Forecast was merely a "reasonableness check" on Oracle's forecast (he later changed his

2  testimony to "it is one factor that you use"). Ex. 1 at 22, ¶54; Ex. 2 at 85:14-86. In fact, he opines

3  that "the use of historical Conversion Ratios as a check on the reasonableness of the current forecast

4  was a strength of Oracle's forecasting process." Ex. 1 at 22, ¶54. But in reaching this opinion,

5  Foster performed no analysis or study of the reliability of the historical conversion ratio even though

6  Goedde provided graphs and charts showing that the historical conversion ratio was growing less

7  and less reliable as each quarter passed between Q3'00 and Q3'01. *See* Ex. 19 at 78. Foster admits

8  that the composition of Oracle's pipeline had changed between Q3'00 and Q3'01 to include a higher

9  percentage of application deals with longer sales cycles, but ignored the impact of this change on the

10  conversion ratio. Ex. 2 at 87:12-23. Foster's methodologies are unreliable and his opinions

11  concerning Oracle's forecast process should be excluded.

12       Another important flaw in Foster's methodology was his failure to consider the economic

13  change between Oracle's Q3'01 and its Q3'00 – the quarter in which Oracle compared for purposes

14  of its Public Guidance. Despite testifying that "macroeconomic conditions are an input into the

15  forecasting process," Foster failed to perform any analysis of whether Oracle's Q3'00 was an

16  appropriate input for Oracle's Q3'01 forecast even though Oracle experienced extraordinary growth

17  in that quarter. Ex. 2 at 41-42, 93-95. Indeed, Minton testified that Oracle's fiscal 2000 was a "very

18  high growth period" and internal documents and statements by defendants acknowledge that

19  comparisons were difficult because Oracle's sales "took off" in Q3'00. Ex. 16 at 85:9-17; Ex. 18 at

20  4-8. Despite the dramatic difference in the economic environment (which would certainly impact

21  Oracle's conversion ratio), Foster testified that "I have not looked into" whether Q3'00 was an

22  outlier quarter. Ex. 2 at 175:13-16. It is fatal to Foster's analysis that he chose not to "look into it."

23  It establishes that Foster has utilized an unreliable methodology to inform his opinions.

24       Foster's refusal to properly test and evaluate his conclusions directly undermines the

25  reliability of his opinions, and they should accordingly be excluded.

26

27

28

1

### D. Foster Admits to Developing Several Opinions Specifically for Purposes of Testifying in This Litigation

2

3   As the Ninth Circuit has noted, "[o]ne very significant fact to be considered is whether the

4   experts are proposing to testify about matters growing naturally and directly out of research they

5   have conducted independent of the litigation, or whether they have developed their opinions

6   expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th

7   Cir. 1995).  Here, Foster admitted that his experience as a testifying expert typically concerns

8   "management systems, [] cost accounting systems, the budgeting systems of companies[] [a]nd . . .

9   valuation." Ex. 2 at 8:18-22.  Notably absent from his purported expertise is forecasting processes,

10  with the exception of one prior occasion.  *Id*. at 16:14-17.  In fact, Foster has never been involved in

11  business forecasting, other than as an outside observer.[8]  Beyond his limited experience are his

12  flawed methods, which serve to undermine the reliability of his opinions – as set forth below.

13  In evaluating the reasonableness of Oracle's forecasting process, Foster purports to define

14  "what is a reasonable forecast process." Ex. 1 at 11, ¶29.  He offers three criteria in his evaluation:

15  - "Is there a structured, broad-based process for collecting and evaluating information?"

16  - "Does the process have appropriate checks and balances?"

17  - "Is the process historically validated?"

18  *Id*.  Foster's reliance upon these criteria here fails under the *Daubert* standard, as this approach has

19  not been subject to peer review or achieved general acceptance in the field. Ex. 2 at 97-98; *Daubert*,

20  509 U.S. at 590-94.  Foster even testified that he has never once checked with another scholar in the

21  field to discuss whether his criteria are reasonable or completely wrong.  Ex. 2 at 98:24-25.  By

22  electing to apply a novel forecasting standard that has not been accepted or even reviewed, Foster's

23  conclusions are inherently unreliable and are exactly the sort that should be excluded under *Daubert*.

24  Foster also utilizes another novel approach to opine that Oracle's actual results, which

25  revealed severe negative growth rates in all U.S. license divisions at the end of December 2000 and

26

27  [8]     "I have not been part of a forecasting team.  I've been asked to look at the forecasts of small and large companies, but I've not prepared them." Ex. 2 at 64:18-22.

28

the end of January 2001 (compared to 25% projected growth), did not inform defendants that Oracle was being adversely affected by the economic downturn and was tracking to miss guidance.  Ex. 1 at 32-34, ¶¶71-75.  Foster manufactures "an appropriate test of intra-quarter growth rate relationships" to "mirror situations in which Oracle might try to predict its total quarter revenue from either its first month's revenue or its first and second month's revenue combined." *Id.* at 32, ¶¶72, 73 and Tables 6 and 6A.  He then proceeds to describe a regression analysis comparing the relationship between the months within a quarter (*e.g.*, months 1 and 2 compared to month 3), instead of comparing the months to the quarter (*e.g.*, month 1 compared to the overall quarter).  *Id.* at 33, ¶74.

Foster's analysis fails under *Daubert*.  509 U.S. at 590-94.  Like his criteria to evaluate a "reasonable forecast process," Foster testified that his approach has not been subject to peer review, does not have a known error rate, has not achieved general acceptance in the field, and was prepared solely for the purposes of this litigation.  Ex. 2 at 154-56.  In fact, he testified that this case was the first time he had ever measured the predictive quality of monthly revenues in this manner.  *Id.* at 156:12-25.  These are all factors that contribute to a finding of unreliability under *Daubert* and Rule 702. 509 U.S. at 590-94.  His novel theories must be excluded and his opinions based on those theories must be excluded.

## E.    Foster's Opinions that Rely on Securities Analysts Should Be Excluded

Foster also relies upon external anecdotal commentary from securities analysts in formulating his opinions.  Ex. 1 at 25, ¶62.  He opines that if Oracle's forecast process failed to take market information into account in Q3'01, "one would expect to see a clear divergence between what Oracle was forecasting internally and what security analysts were forecasting." *Id.*  Like the methodology of Hubbard based on the commentary of securities analysts, Foster's methodology is similarly unreliable as he relies on facts and data outside of Oracle to prove what was happening within Oracle at the time.  And he does so without citing any testimony from or interviews with any of the analysts on which he relies.  He does not offer their respective processes, what they considered important, what they did not consider important, or whether they relied on Company data.  In fact, as discussed above, Foster did not even remember what Oracle was saying to analysts throughout the quarter

1   about the strength of its pipeline.  Ex. 2 at 187:23-188:10.  He also disregards that Oracle was

2   repeatedly telling analysts that its business was not being impacted by the economic environment at

3   the time because of an "astounding" pipeline.  Ex. 20 at 7-8, 11.

4          As discussed in the reports of both Goedde and Hubbard, analyst reports often reflect the

5   information provided by management, and do not have the benefit of internal documentation and

6   sales data.  Ex. 19 at 54; Ex. 13 at 35.  As such, analyst reports are inherently unreliable as a gauge

7   of an internal forecasting process as they generally follow the guidance provided by the companies

8   being followed.  As described in plaintiffs' motion to exclude the testimony of Hubbard, Foster's

9   own writing reflects the reality that securities analysts are not a reliable gauge of Oracle's

10  forecasting process or its guidance.  *See* Plaintiffs' Notice of Motion and Motion to Exclude the

11  Expert Testimony of R. Glenn Hubbard at §IV.F.  In his book entitled *Financial Statement Analysis*,

12  Foster explains that "[i]n any one calendar month, only a minority of security analysts will report a

13  revision of their earnings forecasts" because "(1) most analysts follow a large number of securities

14  and do not have the time to do a detailed analysis of each company each month, and (2) only a small

15  set of stocks in any one month have significant unexpected information releases that prompt analysts

16  to revise their forecasts."  Ex. 21 at 271-74.  In fact, Foster noted that "[a]nalyst[s] may have an

17  incentive not to provide an unbiased forecast (*e.g.*, due to pressure to conform to consensus

18  forecasts)" and that "[a]nalyst[s] may be manipulated by company officials (at least in the short

19  run)."  *Id.* at 278.

20         And if these traits of security analysts forecasts were not enough to call into question the

21  reliability of Foster's opinion, his book also directly undermines his opinion in this case based on

22  "discussions with analysts" (which he chose not to do in this case):

23             ***Discussions with analysts*** indicate that forecast revisions made by other
               analysts are important revision cues.  Individuals in some industries develop
24             reputations as "lead analysts" and much interest attaches to the direction of their
               forecast revisions.  ***Analysts also report that high penalties are placed on taking***
25             ***positions that diverge markedly from the consensus when the consensus***
               ***subsequently turns out to be 'correct.'  The result can be that analysts make***
26             ***forecasts that diverge less from the consensus than what they would report in the***
               ***absence of these penalties***.

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI                                                          - 19 -

1   *Id.* at 289.  The foregoing article simply highlights the unreliable methodology that Foster applied to

2   reach his opinions that Oracle's forecast process incorporated economic data.  The fact that he chose

3   not to confirm his assumptions in this case by reviewing analyst testimony or speaking to analysts

4   (even though he did so to support his opinion in *Financial Statement Analysis* (Ex. 21)) requires the

5   exclusion of his opinions.  *See Kumho Tire*, 526 U.S. at 152 (*Daubert* requires the trial court to

6   assure itself that the expert "employs in the courtroom the same level of intellectual rigor that

7   characterizes the practice of an expert in the relevant field"); *Sheehan v. Daily Racing Form*, 104

8   F.3d 940, 942 (7th Cir. 1997) (finding an expert must be "as careful as he would be in his regular

9   professional work outside his paid litigation consulting").  Foster did not inquire of a single analyst

10  about the model they used, what influenced their decisions, who they spoke to, why they spoke to

11  those individuals, or why not.  Like Hubbard, the list of tasks that Foster did not do to ensure

12  reliability is lengthy.  His opinions are unreliable and speculative and should be excluded.  Fed. R.

13  Evid. 702; *Daubert*, 509 U.S. at 589.

14      F.    **Foster's Opinions on the Predictive Quality of Oracle's Intra-Quarter Pipeline Growth Should Be Excluded as Unreliable**

15

16      Despite testimony from several executives (and his own testimony) that pipeline growth was

17  a forecasting indicator for Oracle, Foster offers the opinion in his report that "[t]o my knowledge, no

18  executive at Oracle has testified to using the change in the pipeline or change in the pipeline growth

19  during the quarter as a forecasting measure."  Ex. 1 at 49, ¶108.  He then performs a regression

20  analysis that attempts to refute a positive correlation between pipeline growth and year-over-year

21  actual license revenue growth.  *Id.*, ¶109 and Figure 11.  In fact, Foster goes so far as to suggest that

22  "there is actually a counterintuitive negative relationship between the two, where greater year-over-

23  year revenue growth is correlated with more rapidly declining Pipeline growth."  *Id.*  In other words,

24  Foster would expect revenues to increase as opportunities fall.  *Id.*

25      Foster's opinions must be excluded as the methodology that he utilizes is unreliable.  Apart

26  from the wealth of evidence establishing that Oracle actually used intra-quarter pipeline growth to

27  measure its performance against guidance, Foster utilized an insufficient amount of data to reach his

28

1   opinions about the positive correlation studied in his Figure 11.[9]  In fact, he admitted that the number

2   of data points used to dispel the positive correlation (six) were insufficient to perform an adequate

3   regression:

4          Q:      The data the other way, if you only have six data points here, your testimony
                   is that it becomes less and less reliable.  The less and less data points you
5                  have –

6          A:      The fewer observations, the less confidence you have of the results; that is
                   correct.
7
           Q:      Your testimony is, the less data points you have, the less reliable your
8                  regression is; right?

9          A:      The fewer the data points; that's correct.

10  Ex. 2 at 194:8-16; *id*. at 192:13-15 (Q:  Now, you testified that in Figure 11 you had six data points;

11  right? A:  Right.).  The methodology that Foster used to calculate the positive correlation between

12  pipeline growth and revenue growth is unreliable and should be excluded.  Fed. R. Evid. 702;

13  *Daubert*, 509 U.S. at 589.

14          So too should Foster's opinions about the counterintuitive relationship described by the

15  regression in Figure 11.  Ex. 2 at 185-91.  Foster admitted to not testing this part of his regression

16  through an appropriate "F test," which would have enabled Foster to test the reliability of his data:

17         Q:      So this is the data that you produced.  Can you tell me at what confidence
                   level you reached the conclusion that there is a counterintuitive negative
18                 relationship between pipeline growth and growth in license revenues?

19         A:      I can't with this data.  I have not reported the T statistics.

20         Q:      There is no way for you to tell me that?

21  _____

22  [9]    Q:      And what does that – what does R-squared with a number of 0.1792 tell you
                   about the data?
23
           A:      There is, over just these six data points, there is approximately about a .35
24                 negative correlation.

25         Q:      And what does that mean in English?

26         A:      With six observations, that's not a strongly significant result.
27
    Ex. 2 at 185:21-186:2.
28

1       A:      No, not from this data.

2  Ex. 2 at 185:7-15, 190-91.  If Foster is not aware of the reliability of his calculations, surely a jury

3  should not be subjected to them.  His testimony should therefore be excluded concerning the

4  relationship, either positive or negative, between pipeline growth and revenue growth.  Foster's

5  opinions on whether Oracle actually utilized the data in its forecasting process should also be

6  excluded.  It is well established that an expert must bring to the jury more than the lawyers can offer

7  in argument.  *See United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 n.3 (9th Cir. 2000) (expert

8  testimony not admissible if the testimony is "about an issue within the ken of the jury's

9  knowledge").

10      **G.**    **Foster's Opinions Improperly Rely upon Data Inputs from Oracle's Field Sales Force**

11

12      Rule 702 does not permit even a qualified expert witness to offer speculation in the guise of

13  expert testimony.  "[T]he word 'knowledge' [in Rule 702] connotes more than subjective belief or

14  unsupported speculation."  *Daubert*, 509 U.S. at 590; *accord Watkins v. Telsmith, Inc.*, 121 F.3d

15  984, 990 (5th Cir. 1997).  Nevertheless, like Hubbard, Foster offers the opinion that "[b]y virtue of

16  relying on sales representatives' estimates of likely purchases by potential customers, Oracle's

17  forecasting process incorporated relevant macroeconomic, product, and customer information."  *See*

18  Ex. 1 at 24-25, 13, 22-23, ¶¶61, 35, 56-57.  And like Hubbard, Foster relies on the same general

19  references to conversations with customers and sales representatives regarding their interaction with

20  customers.  *Id.* at 23, ¶57.  Absent from any of this testimony is specifics on what information the

21  executives learned, whether Oracle's customers were forthcoming with information, or whether and

22  how that information formed the basis of the field-level forecasts.  Without these specifics, Foster's

23  opinions are equally as speculative as Hubbard's and are unreliable.  Fed. R. Evid. 702; *Daubert*,

24  509 U.S. at 589.  They must therefore be excluded as speculative opinions that will not assist the

25  trier of fact to understand the evidence or determine a fact in issue.  Fed. R. Evid. 702.

26      Foster should also be precluded from testifying about how the field-level forecasts

27  incorporated economic and business information given the discovery limitations that defendants

28  demanded in this case.  Early in the litigation, plaintiffs were specifically precluded during the

1   discovery process from obtaining evidence from the files of the regional sales managers who

2   specifically participated in the weekly forecast calls with Oracle's Area Vice Presidents:

3       So my . . . first ruling will be that the files to be searched are the . . . 53 individuals
        that the defendants have identified, plus the area-vice presidents' files in the three
4       sales and consulting divisions listed in the letter.

5                           *        *        *

6       I'm not giving you . . . the regional managers.

7   Ex. 22 at 16:16-22, 26:15-16.

8       Foster repeatedly cites the field's contact with customers as the basis for his belief that

9   Oracle took into account the macroeconomic climate:

10      •   "Because the forecasting process involves the salespeople doing that as they
            speak to the customers, that is where that [macroeconomic] information
11          comes into the process." Ex. 2 at 41:14-16.

12      •   "Because my opinion is that the forecasting process enables that
            [macroeconomic] information to be put in right from the start in terms of the
13          grass-roots level, so that if there are changes in the economic environment,
            then that will be reflected into the inputs into the system." *Id*. at 49:18-22.

14      Absent the ability by plaintiffs to obtain discovery refuting these opinions, it is manifestly

15  unfair to permit defendants to advance opinions concerning topics which were beyond the realm of

16  discovery.  Because of the discovery limitations that defendants demanded (and received), plaintiffs

17  were unable to adequately discover evidence to rebut these arguments.  Foster's opinions should

18  therefore be excluded.

19      **H.    Foster's Opinions Should Be Excluded Under Rule 403**

20      Should the Court decide not to exclude the opinions of Hubbard regarding Oracle's forecast

21  process, it should exclude Foster's opinions about Oracle's forecast process under Fed. R. Evid. 403

22  as they are duplicative of the opinions that defendants' offer through Hubbard.  As discussed in

23  plaintiffs' motion to exclude Hubbard's opinions, Foster gives identical opinions about economic

24  information informing the sales process and even cites to the same evidence to support that opinion:

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI                                                      - 23 -

| Foster Rebuttal Report | Hubbard Opening Report |
|---|---|
| "It is my view that Oracle's forecasting process incorporated macroeconomic, customer, and product market information in two ways – through sales representatives' direct interactions with customers and the application of management judgment."<br><br>       \*     \*     \*<br><br>"By virtue of relying on sales representatives' estimates of likely purchases by potential customers, Oracle's forecasting process incorporated relevant macroeconomic, product, and customer information." | "Macroeconomic conditions were incorporated in the forecast through both sales representatives' estimates of likely purchasing behavior of their prospective customers and the informed judgment of more senior executives based on their critical review of forecasting information received from their direct reports." |

*See* Ex. 1 at 23-24, ¶¶57, 61; Ex. 13 at 78, ¶159; *compare* Ex. 1 at 23, ¶57 (quoting testimony of Nussbaum and Edward Sanderson ("Sanderson") regarding general conversations with customers and sales representatives), *with* Ex. 14 at 21-22, ¶¶56, 58 (quoting same testimony of Nussbaum and Sanderson regarding general conversations with customers and sales representatives).

        The reports of Foster and Hubbard are duplicative in several additional respects. Both purport to outline the forecasting process at Oracle in determining that the forecast process was reasonable, including overlapping opinions on historical validation of the process, Minton's upside adjustments, and "appropriate" checks and balances. Ex. 1 at 11-20, ¶¶31-48; Ex. 13 at 78-93, ¶¶157-196. Foster and Hubbard also use similar charts to convey similar opinions – which is unsurprising given that AGE created the charts for both reports. Ex. 23 at 113-14; Ex. 2 at 6, 31, 37. For example, Foster's Figure 3 addresses Oracle's EPS guidance, forecasts, and actual results – the exact same topic as that addressed by Hubbard's Figure 44. Ex. 1 at 20 and Appx. D, Figure 3; Ex. 13 at Appx. D, Figure 44. Hubbard's Figures 43 and 45 also address the topics of Oracle's EPS and analyst forecasts, which are covered by Foster's Figure 3. Ex. 13 at Appx. D, Figures 43 and 45; Ex. 14 at Appx. D, Figure 3. Foster's Figure 1 gauges, in part, Oracle's potential forecast – which Hubbard addresses at his Figure 46. Ex. 1 at 18 and Appx. D, Figure 1; Ex. 13 at Appx. D, Figure 46. Foster's Figure 13 measures conversion ratios in the same manner as Hubbard's Figure 50 measures conversion ratios. Ex. 1 at 53 and Appx. D, Figure 13; Ex. 13 at Appx. D, Figure 50.

1   Foster's Figure 12 analyzes Oracle's upside adjustment as a percentage of license forecast, the exact

2   same metric also considered in Hubbard's Figure 42.  Ex. 1 at 50 and Appx. D, Figure 12; Ex. 13 at

3   Appx. D, Figure 42.

4         The reports of Hubbard and Foster are replete with duplicative opinions and charts.  Should

5   the Court decide to admit the testimony of Hubbard on Oracle's forecast process, it should exclude

6   the opinions of Foster on the same topics under Rule 403.  Fed. R. Evid. 403 ("evidence may be

7   excluded if its probative value is substantially outweighed by . . . considerations of . . . needless

8   presentation of cumulative evidence").

9   **V.      CONCLUSION**

10        For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs'

11  motion to preclude the opinions of Foster.

12  DATED:  October 20, 2008                    Respectfully submitted,

13                                              COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
14                                              MARK SOLOMON
                                                DOUGLAS R. BRITTON
15

16                                                    s/ DOUGLAS R. BRITTON
17                                              DOUGLAS R. BRITTON

18                                              655 West Broadway, Suite 1900
                                                San Diego, CA  92101
19                                              Telephone:  619/231-1058
                                                619/231-7423 (fax)
20
                                                COUGHLIN STOIA GELLER
21                                                RUDMAN & ROBBINS LLP
                                                SHAWN A. WILLIAMS
22                                              WILLOW E. RADCLIFFE
                                                ELI R. GREENSTEIN
23                                              DANIEL J. PFEFFERBAUM
                                                100 Pine Street, Suite 2600
24                                              San Francisco, CA  94111
                                                Telephone:  415/288-4545
25                                              415/288-4534 (fax)

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
STACEY M. KAPLAN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Oracle3\BRF00054915_Exclude Foster.doc

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
GEORGE FOSTER - C-01-0988-SI                                                                              - 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2008.

<u>s/ DOUGLAS R. BRITTON</u>
DOUGLAS R. BRITTON

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111