# EXHIBIT 12

# INTERIM REPORT OF THE COMMITTEE
# ON CAPITAL MARKETS REGULATION

November 30, 2006

# COMMITTEE ON CAPITAL MARKETS REGULATION

| | |
|---|---|
| Peter C. Clapman | President & CEO, Governance for Owners USA Inc |
| Samuel DiPiazza | Global CEO, PricewaterhouseCoopers |
| Donald L. Evans | CEO, The Financial Services Forum; Former U.S. Secretary of Commerce |
| Scott C. Evans | Executive Vice President of Asset Management, TIAA-CREF |
| Robert Glauber | Visiting Professor, Harvard Law School; Former Chairman & CEO NASD |
| Kenneth Griffin | President & CEO, Citadel Investment Group LLC |
| Glenn Hubbard | Dean, Columbia Business School; Russell L. Carson Professor of Finance and Economics; Co-Chair, Committee |
| Cathy Kinney | President & Co-COO, NYSE |
| Ira M. Millstein | Partner, Weil, Gotshal & Manges |
| Steve Odland | Chairman & CEO, Office Depot |
| William Parrett | CEO, Deloitte |
| Jeffrey M. Peek | Chairman & CEO, CIT Group Inc. |
| Robert Pozen | Chairman, MFS Investment Management |
| Arthur Rock | Principal, Arthur Rock & Company |
| Wilbur L. Ross Jr. | Chairman & CEO, WL Ross & Co. LLC |
| James Rothenberg | Chairman & PEO, Capital Research and Management Co. |
| Thomas A. Russo | Vice Chairman, Chief Legal Officer, Lehman Brothers |
| Leonard Schaeffer | Founding Chairman, WellPoint Health Network |
| Hal S. Scott | Nomura Professor and Director of the Program on International Financial Systems, Harvard Law School; Director, Committee |
| John L. Thornton | Chairman, The Brookings Institution; Co-Chair, Committee |
| Peter Tufano | Sylvan C. Coleman Professor of Financial Management, Harvard Business School |
| Luigi Zingales | Robert C. McCormack Professor of Entrepreneurship and Finance, University of Chicago Graduate School of Business |

# CONTRIBUTORS

## PRIMARY AUTHORS

| | |
|---|---|
| Luigi Zingales | Section I, Competitiveness |
| Robert Glauber | Section II, Regulatory Process |
| Robert Litan | Section III, Enforcement |
| Allen Ferrell | Section IV, Shareholder Rights |
| Andrew Kuritzkes | Section V, Sarbanes-Oxley (404) |

## TASK FORCE MEMBERS

**Section I**
Paul Bennett
Howard Davies

**Section II**
Adam Cooper
Robert Merton
Kenneth Scott
Peter Tufano

**Section III**
Jack Coffee
Reinier Kraakman
William F. Lloyd
Robert Pozen
Thomas A. Russo
John Villa

**Section IV**
Steve Odland
James Rothenberg

**Section V**
Richard R. Kilgust
William Parrett
Jeffrey M. Peek
Greg Weaver
Samuel DiPiazza

**Senior Advisors**
Robert Kaplan
John L. Kelly

ii

## RESEARCH ASSISTANTS

**RA Coordinator**
Stavros Gkantinis

**Section I**
Vincent Cannon
Oscar Hackett
Pengyu He
Colin D. Lloyd

**Section II**
Pamela Foohey

**Section III**
Kathleen McArthur
Pierre-Hugues Verdier

**Section IV**
C. Wallace de Witt

**Section V**
Ellen Ching

## LEGAL ADVISORY GROUP

| | |
|---|---|
| John T. Bostelman | Sullivan & Cromwell LLP |
| Adam D. Chinn | Wachtell, Lipton, Rosen & Katz |
| Kris F. Heinzelman | Cravath, Swaine & Moore LLP |
| Leslie N. Silverman | Cleary Gottlieb Steen & Hamilton LLP (Chairman) |
| Jeffrey Small | Davis Polk & Wardwell |

## COMMITTEE STAFF

| | |
|---|---|
| Peter W. McClean | Deputy Director, Committee |
| J Weinstein | Deputy Director of the Program on International Financial Systems |
| Judith Polgar | Program on International Financial Systems Administrator |
| Jennifer M. Grygiel | Project Manager, Committee |
| Jenepher Moseley | Editor |

# TABLE OF CONTENTS

Preface...................................................................................................vii

Introduction .........................................................................................ix

Executive Summary ............................................................................. 1

Section I: Competitiveness................................................................. 23

Section II: Reform of the Regulatory Process ................................... 59

Section III: Enforcement.................................................................... 71

Section IV: Shareholder Rights......................................................... 93

Section V: Sarbanes-Oxley Section 404......................................... 115

# PREFACE

The Committee on Capital Markets Regulation is an independent, bipartisan committee composed of 22 corporate and financial leaders from the investor community, business, finance, law, accounting, and academia. Announced on September 12, 2006, its purpose is to explore a range of issues related to maintaining and improving the competitiveness of the U.S. capital markets. Our objective is to recommend policy changes that should be made, or areas of research that should be pursued, to preserve and enhance the balance between efficient and competitive capital markets and shareholder protection. This interim report focuses on equity capital markets. During the next two years, our Committee will continue to explore issues affecting other aspects of the competitiveness of U.S. capital markets.

Although this is the Committee's Report, a few Committee members had varying degrees of comfort with a few of the recommendations advanced in this Report. Nevertheless, the Report reflects a fair consensus of Committee members' viewpoints. The Report represents the work of the Committee and not the institutions of which the members are a part.

Our Executive Summary is just that – a summary. The issues discussed there are dealt with in further detail in the main body of the report and we strongly urge you to read the full discussions as they provide important context and data without which the summary would convey too quick a treatment of these complex issues.

We recognize that our recommendations will undoubtedly be met by some disagreement. We would not expect that there would be absolute consensus on any of them. Nevertheless, we believe the collective expertise and experience of the Committee brings an important perspective to the issues addressed.

Glenn Hubbard
CO-CHAIR

John L. Thornton
CO-CHAIR

Hal S. Scott
DIRECTOR

# INTRODUCTION

The United States has for many years been recognized as having the largest, most liquid, and most competitive public equity capital markets in the world. These well-functioning capital markets play a vital role in our economy. For years, established American companies, the dominant users of these markets, have raised capital on better terms—rates up to one percent lower, according to academic estimates. U.S. investors across the country have the opportunity to invest in familiar home markets with the prospect of higher profits. Not surprisingly, there is considerable evidence that countries with better financial markets, like the United States, enjoy more rapid economic growth, which creates more new jobs nationwide. The U.S. legal and regulatory regimes that promote accountability, disclosure, and transparency are an important element in the success of U.S. capital markets.

The venture capital industry is a particular beneficiary of the large, deep U.S. capital markets. Venture capitalists, who identify and incubate so many of the innovative start-up firms, can more easily and profitably sell their maturing investments in order to obtain funds for reinvestment into new start-ups. The growing, smaller firms these venture investors identify are important sources of new jobs: about 40 percent of all employment in publicly traded companies is in firms launched by venture capitalists.

The financial services industry across the country is the home of an important share of high-paying, attractive U.S. jobs. This industry contains 5 percent of private-sector jobs but produces 8.1 percent of GDP. The securities industry, including the stock markets, while relatively small, provides even better paying jobs nationwide: although it contains only 0.65 percent of private-sector employment, it is responsible for 1.4 percent of GDP.

Although the securities industry and the stock markets are important nationally, they are even more important for financial centers in concentrated geographical areas. For example, in New York City, the securities industry accounts for 4.7 percent of the jobs but 20.7 percent of total wages and 15.8 percent of non-property taxes. In New York State overall, this industry is responsible for 2.2 percent of the jobs, 12.5 percent of total wages, and 18.7 percent of total tax receipts.

The capital markets are important to the nation's economic growth and the creation of well-paying jobs, both across the country and in regional financial centers. But the evidence presented here suggests that the United States is losing its leading competitive position as compared to stock markets and financial centers abroad. A key measure of competitiveness, one particularly relevant to the growth of new jobs, is where

new equity capital is being raised—that is, in which market initial public offerings (IPOs) are being done.  The trend in so-called "global" IPOs, *i.e.*, IPOs done outside a company's home country, provides evidence of a decline in the U.S. competitive position.  As measured by value of IPOs, the U.S. share declined from 50 percent in 2000 to 5 percent in 2005.  Measured by number of IPOs, the decline is from 37 percent in 2000 to 10 percent in 2005.

When foreign companies have chosen not to do IPOs in the United States, they often have raised capital elsewhere in the U.S. equity markets.  The United States continues to provide an important source of capital for new equity offerings.  But more often foreign companies accessed this pool through the private rather than the public markets.  In 2005, foreign companies raised 10 times as much equity in the private U.S. markets as in the public markets ($53.2 billion vs. $4.7 billion).  Further, of the global IPOs that raised money in non-U.S. markets, 57 percent of these companies (94 percent of the capital raised) chose to raise additional capital in the U.S. private markets.  Although it is difficult to know the weight of considerations that gives rise to this preference for private over public markets, there is one consideration of great relevance to the concerns raised in this Report.  When foreign companies raise U.S. equity in the private market from qualified institutional investors (using so-called "Rule 144A" offerings), they avoid all the mandated disclosure requirements, Sarbanes-Oxley Act ("SOX") Section 404 requirements, and the strict liability provisions of the Securities Act of 1933 (the "1933 Act").  Just as importantly, the average U.S. investor cannot participate directly in these private markets.

Foreign companies are not the only firms showing a preference for U.S. private markets over public markets.  Going-private transactions have risen dramatically in recent years, topping 25 percent of public takeovers in the last three years.  To fund these transactions, private equity funds have grown significantly, raising $200 billion in 2005 and more new capital in the last several years than net flows into mutual funds.  The decision to "go private" or to access the private equity markets is a further suggestion of the regulatory and liability costs and burdens of accessing the public U.S. markets.

The loss of U.S. public market competitiveness compared to global public markets results from a number of factors:  foreign markets have closed the technology, investor confidence, and liquidity gaps that traditionally favored U.S. markets; significant pools of capital around the world have developed (more money is now raised outside than inside the United States); and the ease with which investors can invest abroad has increased.  Even so, certainly one important factor contributing to this trend is the growth of U.S. regulatory compliance costs and liability risks compared to other developed and respected market centers.

Said a bit differently, for much of the 60 years since the end of World War II, firms raising capital did not so much choose to come to the United States, they came *naturally*.  Today, the forces at work are increasingly different.  Firms must *choose* to come to the United States to raise capital: they do not have to come.  U.S. financial

markets need to <u>attract</u> business that has a choice, and therefore how our markets are regulated by rules and laws really does matter today.

There should be no doubt that obtaining and sustaining competitive advantage in financial services by managing regulatory costs and burdens while maintaining the confidence of investors has become an explicit focus of government policy in competing market centers. In a recent statement, Ed Balls, Economic Secretary to the U.K. Treasury, said: "Our system of principles and risk-based regulation provides our financial services with a huge competitive advantage and is regarded as the best in the world." It is worth noting that London, for many years lacking the dominant position in worldwide capital or investment opportunities (which arguably it once held), has been able to retain its position as a leading financial center by *choice*, not necessity. It has done so, in the view of many, by providing the protection to investors of well-crafted, effective laws properly enforced without unnecessary cost and undue exposure to liability risk.

Few would argue that the level of regulatory intensity, in the form of new laws such as SOX, outcomes of shareholder and government litigation, and the behavior of securities regulators, has increased markedly in recent years. Many would say it was entirely merited by the (mis)behavior of companies and securities firms in the market-bubble period of the 1990s. Regulatory intensity almost inevitably increases after periods of market euphoria and the subsequent market collapse. The question is: "Has the shift in intensity gone too far?"

It is the Committee's view that in the shift of regulatory intensity balance has been lost to the competitive disadvantage of U.S. financial markets. Yet, to make a reduction of regulatory intensity an end in itself would be self-defeating. Investors and companies raising capital participate in markets where they feel safe by virtue of effective laws and rules vigorously enforced by knowledgeable, transparent courts and even-handed, vigilant regulators.

A regulatory "race to the bottom" will serve no useful competitive purpose. What is needed is the proper balance among mechanisms that protect investors—regulatory laws and rules, the activities of the courts and regulators, shareholder voting rights—and the cost, burden, and intrusion that these mechanisms inevitably impose on firms and individuals that participate in the capital markets. Shareholder rights, where the United States has traditionally set the standard but in the view of some is falling behind, are particularly important in achieving the needed balance. The better shareholders can protect themselves by using their voting power to hold management and directors responsible, the less they or the markets need to rely on actions of the courts and regulators. In striking this needed balance, the United States needs to be mindful that it is ultimately the shareholders who have the greatest interest in efficient regulation because they pay the price, in reduced share value, when the cost of such regulation exceeds its benefits.

In the Report that follows, the Committee examines four areas in which it believes adjustments need to be made to prevent a further erosion of the competitive position of U.S. capital markets. As an overall matter, the Committee concludes that the solution to the competitive problem of U.S. capital markets lies, on the one hand, in reducing the burden of litigation and regulation and, on the other hand, in increasing shareholder rights.

These areas, and the key recommendations in each, are:

1. <u>Regulatory Process</u>. We conclude that the SEC and self-regulatory organizations ("SROs") should engage in a more risk-based process, focused explicitly on the costs and benefits of regulation. To the extent possible, regulations should rely on principles-based rules and guidance, rather than the current regime of detailed prescriptive rules. We also recommend better coordination among national regulators and between federal and state authorities.

2. <u>The Private and Public Enforcement System</u>. A vigorous enforcement system makes financial markets safer and more competitively attractive. We support continued civil and, where justified, criminal enforcement against individual wrongdoers, including CEOs with whom the buck should stop. While applauding the reforms enacted by the Sarbanes-Oxley Act of 2002, we conclude that the private litigation system needs modification in some dimensions and that the criminal enforcement system needs better balance.

   First, there needs to be greater clarity to private litigation under Rule 10b-5, as regards the definition of materiality and other matters. Needless uncertainty will drive participants to competitor market centers. Second, criminal enforcement against companies, in light of the experience of Arthur Andersen, should truly be a last resort reserved solely for companies that have become criminal enterprises from top to bottom. Third, the prospect of the failure of another major auditing firm troubles public officials in many market centers. The prospect of such a failure can have a significant impact on auditing costs through adoption of overly conservative practices. We believe Congress needs to address these serious matters by carefully examining the case for caps on liability or safe harbors to prevent the failure of another auditing firm, while at the same time providing that responsible individuals are held fully accountable. (The European Union Commissioner for Internal Affairs has recently indicated his desire to adopt such an approach.)

3. <u>Shareholder Rights</u>. We conclude there is a danger that the United States, compared with other countries, is falling behind best practices in shareholder rights. Because the market for corporate control is of central importance to the health of a capital market, shareholders should be given the right to approve poison pills in companies with staggered boards. We also note with approval the increasing number of companies that have adopted majority

voting requirements.  Majority, rather than plurality, voting by shareholders is a cornerstone of shareholder rights.  And the SEC needs to address and resolve, in its upcoming hearings, appropriate access by shareholders to the director nomination process.  Finally, shareholders should have the right, if they choose, to adopt alternatives to traditional litigation by instituting alternative dispute resolution mechanisms such as arbitration (with or without class actions) or judge-conducted trials.

4.  <u>Implementation of Sarbanes-Oxley</u>.  We recommend no statutory changes in the Sarbanes-Oxley Act, including Section 404.  Investors have benefited from the stronger internal controls, greater transparency, and elevated accountability that have resulted from this new law.  However, we do believe that the implementation of SOX 404 by the SEC and the PCAOB, together with the prospect of catastrophic liability faced by auditors, has produced a regime that is overly expensive.  The same benefits can be produced at lower cost.  We conclude that there need to be changes to SOX 404 implementation, including a redefinition of materiality, more guidance from the PCAOB, and multi-year rotational testing permitted within an annual attestation.

The Committee hopes that the analysis and recommendations in this Report will influence public policy affecting the competitiveness of capital markets.  Due to the importance of these issues, we recommend that the President direct his Working Group on Financial Markets to examine the legal and regulatory concerns we raise and to propose whatever reforms it views necessary and appropriate.

The Committee intends this Report to be the first of its evaluations of the legal and regulatory underpinnings of U.S. public capital markets.  Future reports may evaluate the competitiveness of mutual fund and derivative markets, measures to avoid "short-termism," and further issues related to shareholder rights.

# EXECUTIVE SUMMARY

Section I of this summary presents the major points on competitiveness from Section I of the Report. This section only contains one specific recommendation concerning "capital controls." Sections II-V contain recommendations, respectively, on the regulatory process, the private and public enforcement system, shareholder rights, and SOX 404.

Our recommendations are addressed to the President of the United States. We urge the President to sign an Executive Order directing the President's Working Group on Financial Markets to implement reforms to protect the competitiveness of the U.S. public capital markets.

## SECTION I:  COMPETITIVENESS

The U.S. public capital markets play a vital role in the U.S. economy. They are the principal vehicle through which companies raise and price their capital. They are the principal repository for individual and institutional investment. The competitiveness of the U.S. economy and the global economic leadership of the United States depend on the strength of these markets. We should, therefore, be concerned by the United States' loss of competitiveness. The evidence presented here suggests that, while there may be a number of factors at work, the threat to U.S. competitiveness appears to be real and growing.

### I.  The Strength of U.S. Capital Markets is Crucial to the U.S. Economy

A vibrant stock market is an essential prerequisite for the success of the venture capital industry. The growing, smaller firms in which these venture capitalists invest are an important source of new jobs in our economy. About 40 percent of U.S. employment in publicly traded firms as of 2000 was accounted for by firms that were nurtured by venture capital ("VC") and subsequently listed in the 1980s and 1990s. By 2003, VC-backed companies were directly responsible for about 10 million jobs and $1.8 trillion in revenue—9.4 percent of total U.S. private sector employment and 9.6 percent of company sales. Venture capitalists must be able to sell their maturing companies easily and profitably in the public market. Increased costs in the public markets may make these exits more difficult.

The U.S. financial markets are also a critical sector of the U.S. economy. The U.S. financial services industry's GDP exceeded $1 trillion in 2005, accounting for 8.1

percent of U.S. GDP. The securities industry accounted for more than $175 billion, about 17 percent of the total. The financial services sector employed about six million workers in the United States in 2005, accounting for five percent of total private sector employment.

The well-being of public capital markets is especially important to New York State and the Tri-State area. In New York State and New York City last year, respectively, the securities industry accounted for 2.2 percent and 4.7 percent of total employment, 12.5 percent and 20.7 percent of total wages, and 9.2 percent and 14.1 percent of total annual gross income.

## II. There Are Signs that the U.S. Public Equity Capital Market is Losing Competitiveness

### A. Increasing Use of Foreign Markets

By one obvious measure, the U.S. share of global stock market activity, there seems to be little concern. The U.S. share in 2005 was about 50 percent, slightly higher than the 47 percent 10 years earlier, yet understandably down from the peak of 60 percent reached in 2000, which marked the peak of the U.S. dot.com bubble. The sheer size of the U.S. total share of trading activity might provide some sense of security, but the numbers must be read carefully.

A better measure of competitiveness is where new equity capital is being raised— that is, in which markets initial public offerings ("IPOs") are being done. These companies do have a choice of where to trade. In the late 1990s, the U.S. exchange listed capital markets were attracting 48 percent of all global IPOs. Since then, the United States has seen its market share of all global IPOs drop to 6 percent in 2005 and is estimated, year to date, to be only 8 percent in 2006. This loss of market share exists in both the high-tech and non-high tech sectors and is not restricted to firms from China or Russia, whose companies have been a major source of IPOs in recent years.

The headline numbers most often quoted are that last year, 24 of the 25 largest IPOs were done in markets outside the United States and 9 of the 10 largest IPOs in 2006 to date took place outside the United States. The one large IPO that took place in each year in the United States was a company domiciled in the United States. While striking, these numbers may simply reflect the fact that companies prefer to do IPOs in their home countries. Last year's numbers, to some extent, reflect where large IPOs done by Asian companies in their home countries and a cyclical low in U.S. IPOs. Although IPOs within a given country can be cyclical, the decline of issuance in the U.S. capital market does not appear to be an accident but rather a sign of a competitiveness shift away from the United States. This can be seen by focusing on where those companies that were issuing internationally decided to place their first issuances when raising capital outside their home markets. In 2000, the answer was that 50 percent of the dollars raised in these global IPOs was raised on a U.S. exchange. By 2005, the figure was down to 5 percent.

Further, where foreign companies are cross-listed on U.S. and foreign markets, particularly those from developed countries, their principal trading volume is increasingly located in their home market. A recent study of trading volume for cross-listed stocks over the period 1980–2001 shows a greater portion of cross-listed volume in the United States during the 1980s that gradually shifted to a much larger portion in home markets throughout the 1990s. The historical competitive advantage of liquidity that has been a feature of the U.S. market has diminished.

After more than a decade of declining market share, in the past three years, London has increased its share of the global IPO market from 5 percent to almost 25 percent. Furthermore, London has begun to attract a greater share of IPOs from U.S. domiciled companies. Starting in 2002, a handful of U.S. companies bypassed the U.S. equity markets to list in London. In the first nine months of 2006, 11 U.S. companies chose to list in London instead of the United States, raising approximately $800 million. These U.S. companies made this choice despite the fact that they may still have (depending on their total number of shareholders) many of the same responsibilities as U.S.-listed companies have under the Securities Exchange Act of 1934, including the Sarbanes-Oxley Act. This observation is consistent with what has already been shown: there are many considerations that interact in complex ways when companies decide where to raise new capital.

Some argue that the United States is well served by losing some foreign IPOs, at least those that pose unacceptable risks to U.S. investors (for example, as some believe, Chinese and Russian IPOs). However, the United States permits any company to issue stock publicly in our market, provided the company makes the mandatory disclosures provided for in our registration requirements. The 1933 and 1934 Acts rejected "merit" regulation. In any event, the United States' loss of foreign IPOs is even more severe when attention is restricted to global IPOs from developed countries (Western Europe, Australia, Canada, Japan, and New Zealand), where risk profiles are more likely to resemble those of U.S. companies.

## B. Rising Importance of Private Markets

When foreign companies have chosen not to do IPOs in the United States, they often have raised capital elsewhere in the U.S. equity markets. In 2005, foreign companies raised $83 billion in 186 equity issues in the private so-called Rule 144A market—a market in which only large institutional investors can participate—compared to $5.3 billion in 34 public offerings.

Although it is difficult to determine the weight of particular considerations that gives rise to the preference for private markets, the Committee is concerned with the possibility that the preference may, in significant part, be due to the fact that these private offerings are free from mandated disclosure requirements, the provisions of the Sarbanes-Oxley Act, and the strict liability provisions of the 1933 Act.

Foreign companies are not the only firms showing a preference for U.S. private markets over public markets. Going-private transactions have risen dramatically in recent years, topping 25 percent of public takeovers in the last three years. To fund these transactions, private equity funds sponsored more than $200 billion in capital commitments in 2005 alone. While still small in total size compared to the public equity market, since 2003, its growth rate has outstripped that of the public market. One must consider whether the decision to "go private" or to access the private equity market is a response to the regulatory and liability costs and burdens of the public U.S. market.

Private equity firms are increasingly exiting investments through sales in the private equity market, rather than through the traditional public IPO. While a number of factors may bear on this trend (cyclical contraction of public market multiples or higher values offered by strategic buyers), it is understood that managers of private equity investments are concerned about the costs of being a publicly listed company. In any case, the magnitude of this activity warrants consideration. Since 2001, the number of VC-backed acquisition exits with disclosed values has exceeded the number of VC-backed IPO exits by more than ten-to-one (1919-to-171). The difference in the total value of these exits has been almost as great. From 2001 to 2005, VC-backed acquisition exits reaped a total of about $95 billion, while VC-backed IPO exits raised only about $12 billion, albeit that IPO exits typically involve the sale of only a portion of the company.

## C.  Cost of Capital: An Indicator of Problems?

Companies are attracted to list in the market that offers them the best valuation—that is, the best multiple of their cash flow (or earnings). The magnitude of this multiple is determined by two factors: the cost of capital and the risk that current and/or future cash flow will be reduced by market-specific risks, which include regulatory actions. Recent studies have shown that the U.S. markets have up to a 1 percent cost of capital advantage. But the positive difference in U.S. multiples has declined in recent years. In the 2003–2005 period, the average listing premium for foreign companies in the United States dropped by 19 percentage points and dropped more for companies from more developed markets. One must consider whether the market-specific risks that may be reducing what would otherwise be the United States' cost of capital advantage are at least in part attributable to regulatory costs and the risk of litigation that are features of the U.S. capital markets.

## III.  Why is the U.S. Public Equity Capital Market Losing Competitiveness?

The Committee concludes that four factors are responsible for loss of U.S. competitiveness to foreign and private markets: (i) an increase in the integrity of and trust in major foreign public markets resulting from more transparency and better disclosure; (ii) a relative increase in the liquidity of foreign and private markets, thus making it less necessary to go to the U.S. public equity capital markets for funding; (iii) improvements in technology, making it easier for U.S. investors to invest in foreign

markets; and (iv) differences in the legal rules governing the U.S. public markets and the foreign and private alternatives.

There is little public policy can do to reverse the impact of the first three factors, which are discussed at greater length in this Report. There are opportunities, however, to make adjustments to our regulatory and litigation framework so that public markets are less burdensome. Such changes require a strengthening of the rights of shareholders to assure greater accountability of directors and management, a point reiterated throughout this Report.

## A.  Regulatory and Litigation Burden in U.S. Markets

The Rule 144A market for large institutional investors permits issuers to raise capital free of most U.S. securities regulation, including liability under the 1933 Act and the Sarbanes-Oxley Act of 2002. In 2005, approximately 90 percent of the volume of international equity issues in the United States was done in the private market, compared with about a 50-50 split between the public and private markets in 1995. This is particularly telling given the lower cost of capital in the public markets. Companies that cross-list on U.S. exchanges face a 2.47 percent lower cost of capital, on average, than those using the Rule 144A market (Hail and Leuz, 2006). This strongly suggests that the regulatory and litigation burden is an important factor in the choice between public and private markets.

Class action settlement costs have increased from $150 million in 1995 to $3.5 billion in 2005 (leaving out the $6.1 billion settlement in WorldCom), and directors and officers' insurance rates are six times higher in the United States than in Europe. While securities class action filings have recently decreased and while a major cause of the post-2000 rise in settlements was the serious frauds of the bubble period, there can be no denying that securities class actions do not exist in other major markets or that the level of enforcement in these markets is lower (See Section III: Enforcement). Litigation is a factor to be seriously considered.

The average costs of SOX Section 404 in 2004, its first year of implementation, were $4.36 million for an average company. Although these costs are coming down, new entrants into the U.S. public markets still will face these large initial costs. These costs can be especially significant for smaller companies and foreign companies contemplating entry into the U.S. market.

## B.  Higher Listing Costs and Underwriting Fees Do Not Explain Loss of U.S. Competitiveness

The NYSE has significantly higher listing costs than its competitors. A recent study conducted by the London Stock Exchange (the "LSE") finds that a typical £100 million ($187 million) market cap company pays about $85,000 to list on the LSE (equal to 0.05 percent of its value) and about $153,000 to list on the NYSE (equal to 0.08 percent). Annual fees are also more expensive: about $36,000 in New York versus about

$7,500 in London.  The absolute magnitude of these costs, however, is trivial, and it is difficult to imagine that they would play any significant role in the decision to list in New York versus London.

Another oft-mentioned competitive disadvantage of the United States is the higher underwriting fees companies have to pay to make public offerings here.  The LSE study finds that the gross spread in the United States (5.6 percent) is 60 percent higher than the gross spread outside the United States (3.5 percent).  This difference is not likely to drive the listing decision either.  First, all U.S. IPOs are sold with extensive book-building (a method for determining the best offering price), and companies are willing to pay higher fees to get better pricing on their equity.  Second, most of the firms that cross-list do not do an IPO in the United States, because they are already public in their own country.  The gross spread difference for a follow-on offering is less, ranging from a 3.0 percent higher spread in the United States for small offerings down to a 0.93 percent higher spread for large offerings.

Third, even when they do an IPO in the United States, issuers rarely sell more than 10–15 percent of the equity in the initial offering.  Hence, the 2.1 percent difference in spread between a U.S. and non-U.S. offering is only paid on 10–15 percent of the equity, reducing the cost differential to a one-time fee of 20 basis points.  Finally, this difference in cost also was present in the 1990s, when companies were flocking to list in the United States.  Hence, underwriting fees alone cannot explain the significant drop in the U.S. share of global IPOs.

## IV.  The United States Should Maintain Open Markets

Companies want to maintain flexibility and control over the regulatory environment to which they are subject.  As long as foreign companies cannot maintain easy exits from the U.S. capital market and its regulatory structure, they will be less likely to come here in the first place.

Foreign companies already listed in the United States cannot exit from the U.S. marketplace and regulation as long as they are owned by 300 or more U.S. shareholders.  While in December 2005 the SEC proposed to make it easier for foreign companies to exit, some analyses indicate that these "relaxed" requirements will still be difficult for most foreign companies to meet.  Based on a study of 64 large European issuers by Cleary Gottlieb Steen & Hamilton and Citigroup, fewer than 10 percent of European companies could benefit from the proposed changes.  Current regulatory restrictions on exiting the U.S. public equity market are a major factor that prevents the U.S. market from feeling the full consequences of its declining relative competitiveness.

The requirements for U.S. companies to deregister and avoid U.S. regulatory requirements by moving listings abroad are even more onerous than those for foreign companies.  A U.S. company wishing to avoid U.S. regulation must certify that the relevant class of its securities is held of record by no more than 500 persons, whether U.S. or foreign investors.  Although the number of record holders has decreased with the

increasing holding in street name, it remains unlikely that any sizable U.S. company could meet this test.  In addition, while a foreign company that only lists abroad can avoid U.S. regulatory requirements through an SEC exemption (Rule 12g3-2(b) under the Exchange Act), even if its shares become owned by more than 300 U.S. shareholders, no such exemption is available for U.S. companies.

## V.  Specific Recommendation

**1.  Loosen Capital Controls.**  The Committee recommends that the SEC loosen these capital controls, at least for foreign issuers.  If foreign companies know they can leave U.S. markets, they will be more willing to come in the first place.  Thus, the SEC should permit foreign companies newly entering the public markets to provide in their offering documents that they have the right to deregister as long as they provide adequate notice to U.S. investors and a reasonable transition period.

For foreign companies that are currently trading in public markets, there is a legitimate concern for protecting retail investors who may have bought their stock in reliance on U.S. regulation and reporting requirements.  However, these retail investor concerns should not apply to large institutional investors.  Thus, the Committee recommends that the SEC revise its proposal to exclude these institutional investors from the calculation of the U.S. shareholder base.

## SECTION II:  REFORM OF THE REGULATORY PROCESS

**Specific Recommendations**

### A.  Improved Cost-Benefit Analysis by the SEC and Self-Regulatory Organizations (SROs)

**2.**  The SEC should establish explicit principles of effective regulation that will guide its activities to meet its statutory obligations.  These principles should include the systematic implementation of a carefully applied cost-benefit analysis of its proposed rules and regulations.  Rules should not only be evaluated initially at the front-end, but also should be reviewed periodically to ensure that they are achieving their intended effect at an acceptable cost.

**3.**  SROs (that is, NASD, Inc., the New York Stock Exchange ("NYSE"), and other exchanges), which are responsible for writing detailed rules that guide the behavior of securities firms, should also implement a systematic cost-benefit analysis of the rules they write.

**4.**  The SEC should create an internal staff group of qualified economists and business analysts to perform a systematic cost-benefit analysis as a regular part of the rule-writing process.  Adopting this approach will allow rapid development of a set of cost-effective regulatory principles.

### B.  The SEC and SROs Should Adopt More Principle-Based Rules and Different Rules for Dealings with Wholesale and Retail Investors

**5.**  Prescriptive rules should be fashioned, where sensible, more in terms of outcomes, performance, and results rather than inputs and mandated processes.  Regulations and the oversight of such regulations by the regulatory authority should be risk-based and principles-based.  Recognizing that a principles-based regime gives regulated firms less guidance about expected behavior, the SEC and the SROs must be sensitive to this heightened ambiguity.  In some areas of mandated behavior, it will be particularly important that the regulators accompany principles-based rules with well-articulated guidance to firms and that regulators be mindful of this guidance in their enforcement activities.

**6.**  The SEC and the SROs should systematically review their rules with the goal of developing different sets of rules for transactions by firms with wholesale (institutional) and retail customers.  (Regulation NMS has already dealt with handling individual and institutional stock trades on exchanges.  The Committee does not propose to modify this rule.)

### C. The SEC Should Adopt More Bank-Like Prudential Regulation for Securities Firms

**7.** Fortunately, legislation adopted in the last decade to allow the integration of a wide range of financial services under one corporate roof (the Gramm-Leach-Bliley Act of 1999) has required increased cooperation of bank and securities regulators. This cooperation is leading naturally to some convergence in regulatory philosophies between bank and securities regulators. The Committee views this convergence as a healthy trend and recommends that the pace accelerate. Significant benefits are likely to ensue from the further application to regulated entities such as broker-dealers and investment advisers of more prudential regulation, as in banking, together with less publicity surrounding enforcement actions. These benefits include greater willingness of securities firms to step forward with self-identified problems, earlier identification and better understanding by regulators of high-risk issues, and generally greater cooperation between the regulators and the regulated.

### D. Federal and State Enforcement Should Not be Used for *Ad Hoc* Rule Writing

**8.** Enforcement actions in recent years have been used as a basis for *ad hoc* rule-writing. The Committee views this trend with concern and strongly encourages the SEC and other securities regulators to abide by the stated procedures for rule development and promulgation, which require the usual notice and comment process. When rules are found deficient, they should be changed by the accepted regulatory process, which should not be short-circuited by enforcement actions.

### E. There Should be Increased Coordination at the Federal and Federal-State Levels

**9.** Pending a more thorough revamping of the federal regulatory system, there should be effective communication and cooperation among federal regulators, including SROs. The President's Working Group on Financial Markets is one natural venue for ensuring such coordination takes place.

**10.** Both the NASD and the NYSE have recognized the benefits of merging their firm-regulation activities into a single organization and have conducted ongoing discussions. If and when these discussions succeed in producing a single, merged SRO charged with the responsibility for all firm regulation, unnecessary costs and inconsistent rules will be eliminated to the great benefit of investors and firms. SEC Chairman Cox has recently supported a merger along these lines. The Committee encourages both organizations to overcome whatever hurdles still remain and, without further delay, to create a single SRO for all firm regulation activities. The Committee further urges that this merger not merely result in the merger of two rule books but that the new rules of the merged SRO be principles-based.

**11.** Congress should take steps to improve enforcement coordination between the Federal Government and the States. There are two driving concerns: (i) that the States be able to pursue civil enforcement in the absence of parallel SEC action and (ii) that the

SEC be able to have the final say on settlements involving structural remedies of national importance. These objectives can be reconciled by allowing the States to act when the SEC does not, but by requiring the States to notify the SEC of their enforcement actions and permitting the SEC to have the final say on a settlement involving a structural remedy when it determines that the matter is of national importance. No implication about the SEC's view of the state action, in either a positive or negative direction, should be drawn from the SEC's refusal to intervene.

**12.** State criminal indictments of a financial or auditing firm can have important national consequences. The Committee believes the Department of Justice should receive advance notice of all state indictments of financial or auditing firms with a national clientele and be able to prevent an indictment on the grounds of national interest. Absent federal objection, the States would be free to proceed.

**F. There Should be More International and Interagency Collaboration on Regulation of Exchanges by Increased Reliance on the President's Working Group on Financial Markets**

**13.** Effectively governing trades on globally-merged exchanges will ultimately require cooperation among international regulators to produce harmonized trading rules, coordinated to assure consistency with the standards and laws of the involved national regulators. Achieving harmonized rules will be easier to the extent that rules are principles-based. Yet, reaching these harmonized rules will require compromise and cooperation. The U.S. regulator (or for that matter, any regulator) cannot impose its rules on others. Cooperation will not be easy, because national regulators are, after all, national, subject to national political oversight and pressures. But failure to produce harmonized trading rules and integrated trading platforms will deny much of the benefit of globalized exchanges. Here again, the President's Working Group can produce energy and focus for this task, which will require leadership and hard work. The Committee urges the Working Group to make the task of international coordination and rule harmonization a major priority.

### SECTION III:  THE PUBLIC AND PRIVATE ENFORCEMENT SYSTEM

The United States has the toughest administrative enforcement of securities laws in the world, arguably one of the strengths of our markets, but the penalties have grown disproportionately large relative to their deterrent benefit.  In 2004, civil penalties amounted to approximately $4.7 billion.  This compares with penalties in the United Kingdom for all financial sectors of approximately $40.5 million in the same year.  In addition to administrative penalties, private class actions in the United States in 2004 resulted in an additional $3.5 billion in liability.  Securities class actions do not exist in the United Kingdom or in the markets of other major competitors.  Indeed, directors and officers' insurance costs are six times higher in the United States than in Europe.  Foreign companies commonly cite the U.S. class action enforcement system as the most important reason why they do not want to list in the U.S. market.  Tough enforcement is essential for a strong securities market because it ensures that wrongdoers are punished and are forced to forfeit any benefits obtained by violations.  Perhaps even more importantly, it deters future violations.  It is particularly important to ensure that individuals who violate the law, including CEOs, are held responsible.  However, over-enforcement (enforcement in excess of that needed to deter and/or compensate) can have serious costs.  Fines and damages imposed on corporations are borne by innocent shareholders, thus reducing their returns.

Securities class actions are fundamentally different from class actions of other kinds of cases, such as environmental, consumer, or antitrust actions, where third parties incur harm.  Fundamentally, a securities class action deals with a suit by shareholders victimized by fraud against shareholders who happen to own the company at the time the suit is brought—indeed, shareholders, and particularly institutional investors, are often on both sides.  To the extent enforcement results are uncertain and unpredictable, further costs are added to the system. In addition, the transaction costs of obtaining these damages, plaintiffs' attorney fees—typically 25 to 35 percent of recovery,  averaging 19 percent for settlements over $100 million compared with 33 percent for settlements under $5 million, are substantial.  The Committee concludes that these costs can be addressed in three ways:  clarifying uncertainties in the application of Rule 10b-5, eliminating double recoveries against companies in both SEC and private actions, and prohibiting "pay to play" abuses in the bringing of private actions.  More fundamentally, as discussed in the section on shareholders rights, the Committee believes that shareholders of companies should have the right, if they choose, to limit the exposure of their companies by adopting remedies that would reduce their costs from securities law litigation, whether through the adoption of arbitration or a trial in which a judge decides.

In addition, the Committee concludes that the criminal prosecution of corporations should be reserved for truly exceptional circumstances (currently, the Department of Justice weighs nine factors in making such a decision).  Criminal prosecution of a corporation, as in the case of Arthur Andersen, can result in losses to all stakeholders in a company, owners and employees, and result in additional substantial losses to society.  In the Andersen case, the loss of a major audit firm further

concentrated the audit industry.  Moreover, this can all occur as a result of an indictment, let alone a conviction (Andersen's conviction was overturned by the Supreme Court).

The Committee also is concerned that the present level of auditor liability could result in further concentration of the industry.  There are currently suits pending against audit firms with an aggregate of billions of dollars in potential claims; these claims could result in the bankruptcy of an additional audit firm, with adverse consequences for corporate governance in the United States and the rest of the world.  Auditor risk is currently largely uninsurable by third-party insurers due to the high level of uncertainty regarding catastrophic claims and the concentration of this risk in a few firms.  The EU Commissioner for Internal Affairs has announced his desire to cap auditor liability in order to make these risks insurable, following the publication of a comprehensive study. Insurability would provide a benefit not only for the firms but also potential victims of auditor wrongdoing.  The Committee concludes that Congress should seriously examine this approach, as well as alternatives, such as safe harbors from liability.  At the same time, it should ensure that any invocation of such limitations generates a thorough federal investigation that results in mandated corrective action, which could include a corporate monitor taking over the firm.

Finally, the Committee is concerned that the crucial role of outside directors in the governance system not be undermined by imposing requirements on them that they cannot meet, despite acting in good faith.  This risk makes it more difficult to recruit highly qualified outside directors.  The Committee recommends that the SEC recognize the practicalities facing an outside director by making an outside director's good faith reliance on audited financial statements or an auditor's SAS 100 review report conclusive evidence of due diligence.  In addition, the Committee recommends that the SEC permit companies, without qualification, to indemnify outside directors who have acted in good faith (but not for more egregious conduct) in connection with securities offerings.  This indemnification would serve as an additional source of protection to outside directors over and above the protection they now obtain from directors and officers' insurance.

**Specific Recommendations**

**A. Private Enforcement**

**14. Resolve Existing Uncertainties in Rule 10b-5 Liability.**  Although claims under Rule 10b-5 account for the vast majority of securities litigation, considerable uncertainty exists about many of the elements of Rule 10b-5 liability as a result of conflicting interpretations by courts.  Recognizing that Rule 10b-5 cases are factually complicated, the SEC should attempt to provide more guidance, using a risk-based approach, where it is able to do so.  This review should include materiality, *scienter*—the requisite knowledge the wrongdoer needs to have about his/her wrongdoing—and reliance.

**15. Prevent Duplication of Recoveries in Private Lawsuits and SEC Fair Funds Action.**  Section 308 of the Sarbanes-Oxley Act—"Fair Funds for Investors"— establishes the SEC's authority to order that civil penalties obtained from a defendant be

added to a fund used to compensate victims of the securities fraud. This authority has allowed the SEC to streamline the regulatory process, since the deterrent effect of penalties imposed on wrongdoers can, at the same time, have a compensating effect for the victims of the wrongdoers' fraud. The Commission should require that private damage awards be offset by any amount the SEC has collected from the defendants and distributed to investors under its Fair Funds authority.

**16. Prohibit "Pay to Play" Practices.** Under the rules of the Municipal Securities Rulemaking Board (MSRB), when an investment bank makes a political contribution to any elected official (or undertakes to solicit others), it may not be hired for a period of two years thereafter to underwrite the municipal bonds of the political subdivision to which that official belongs. In addition, banks must make quarterly disclosures about any consultant relationships they maintain. In 2005, the rules were expanded further to prohibit direct or indirect payments to any person for solicitation of municipal securities business if that person is not an affiliated person of the dealer. Taken together, the MSRB's rules have largely put an end to the old "pay to play" practices in municipal underwriting.

A similar prohibition should apply to securities litigation attorneys. When political contributions are made by lawyers to individuals in charge of a state or municipal pension fund, the attorneys should not be permitted to represent the fund as a lead plaintiff in a securities class action. Following the lead of the municipal bonds industry, the securities litigation regulations should be comprehensive and should cover any direct contributions as well as indirect contributions (made through "consultant" or other similar arrangements) and should likewise prohibit the practice of using "professional" plaintiffs (such as has been alleged in the Milberg Weiss indictment). Although there is no equivalent to the MSRB to provide a similar rule for attorneys, the Department of Labor could adopt such a rule under ERISA or legislation simply could ban such practices. At a minimum, the SEC, as an *amicus*, should ask courts to require disclosure of all political contributions or fee-sharing arrangements between class counsel and a lead plaintiff (or controlling individuals within the lead plaintiff organization). This disclosure should occur prior to the court's appointment of either counsel or plaintiff and should be followed by a similar disclosure at the fee award hearing.

## B. Criminal Prosecutions

**17. Indict Entire Firms Only In Exceptional Circumstances.** Extant guidelines of the U.S. Department of Justice (the "Thompson Memorandum") on whether to prosecute a firm  fail to take into account the damage to innocent employees and shareholders and, in some cases, to the entire economy. The Committee recommends that the Justice Department revise its prosecutorial guidelines so that firms are only prosecuted in exceptional circumstances of pervasive culpability throughout all offices and ranks.

**18. Modify Factor Four in Justice Department's Prosecutorial Guidelines.** The fourth factor in the Justice Department's Thompson Memorandum makes the decision to prosecute a firm turn in part on whether the firm is willing to refuse to advance attorneys'

fees to employees that are being prosecuted and is willing to waive its attorney-client privilege. A district court has held these restrictions to be unconstitutional. The Committee recommends that the Justice Department revise its prosecutorial guidelines to *prohibit* federal prosecutors from seeking waivers of the attorney-client privilege or the denial of attorneys' fees to employees, officers, or directors.

## C. Gatekeeper Litigation: Auditors and Outside Directors

### Auditors

**19. Congress Should Explore Protecting Auditing Firms from Catastrophic Loss.**
The United States and the rest of the world are highly dependent on audit firms. Audit firms play a key role in ensuring the integrity of financial statements and the effectiveness of internal controls of public companies. The demise of another U.S. audit firm would impose huge costs on U.S. shareholders. Also, the prospect of catastrophic liability can have a significant impact on auditing costs through the adoption of overly conservative practices. Taken to an extreme, these practices will continue to impact the competitiveness of the U.S. markets versus the European Union, even when worldwide accounting principles converge.

There are various approaches Congress could take in addressing this problem. One would be to create a safe harbor for certain defined auditing practices. Another approach would involve setting a cap on auditor liability in specified circumstances, an approach that some European countries already take and that the EU Commissioner for Internal Markets Charlie McGreevy has recommended the EU pursue. Any protection from catastrophic loss should be premised on a firm's satisfying minimum capital levels as a condition for receiving protection. After all, such protection is intended to remove the risk of catastrophic loss—not all liability.

Preventing damage awards against audit firms and their employees at a level that could destroy a firm would allow insurers to reenter this market. Insurance would be in the interest of both audit firms and shareholders. It would allow audit firms to price risk and create a source of recovery for shareholders.

The possible misconduct of auditors could encompass a range of culpable behavior, from negligence to intentional fraud, and could involve a few persons or many. Congress would have to consider which particular types of misconduct would permit a cap or safe harbor to be invoked. Any invocation of protection should automatically trigger a thorough investigation of the case by federal regulators. Those regulators would be required to impose appropriate sanctions on the audit firm or its employees, based on their findings. In a case involving systemic deficiencies in the audit firm's processes, management or personnel, the sanction should include, depending on the circumstances, replacement of the audit firm's management with a monitor appointed by the regulator.

**20. Clarify Section 10A Liability.**  Section 10A of the Securities Exchange Act of 1934 (the "1934 Act") requires auditors to undertake certain measures when they become "aware of information indicating that an illegal act . . .has or may have occurred."  This provision has not to date resulted in auditor liability but has led auditors to require their issuer clients to conduct expensive and time-consuming investigations.

The language in Section 10A arguably is too broad and should be narrowed by Congress to focus on activities that pose a serious risk of harm to investors.  In particular, the section could be amended as follows: (i) to apply only to *material* misstatements or omissions, which by definition are only those that affect investors' decisions; (ii) to limit liability only to situations where the misstatement implicates management's integrity; and (iii) to require auditors to investigate potential illegalities only when they uncover information indicating a "substantial likelihood" that an illegal act has been committed (currently the SEC's regulations under Section 10A do not distinguish information by level of probability that an illegal act has occurred).  Such limited amendments would focus auditor responsibility under Section 10A on matters of true importance to investors.

### Outside Directors

**21. Modify SEC Rule 176.**  The SEC should modify Rule 176, issued pursuant to Section 11 of the Securities Act, to make an outside director's good-faith reliance on an audited financial statement or an auditor's SAS 100 review report conclusive evidence of due diligence.  Further, the modification could make good faith reliance by outside directors on representations of senior officers—after boardroom discussion—conclusive evidence of good faith as to other parts of the prospectus.

**22. Modify SEC Indemnification Policy.**  Outside directors who have acted in good faith should also be insulated against out-of-pocket damages through changes in indemnification policy.  The SEC could accomplish this by reversing its longstanding position that indemnification of directors for damages awarded in Section 11 actions is against public policy, at least insofar as the outside directors have acted in good faith. This change would help ensure the continued recruitment of high quality independent directors who play such a crucial role in corporate governance.  This recommendation would not have the effect, however, of barring shareholder derivative suits against directors.

## SECTION IV:  SHAREHOLDER RIGHTS

The strength of shareholder rights in publicly traded firms directly affects the health and efficient functioning of U.S. capital markets.  Overall, shareholders of U.S. companies have fewer rights in a number of important areas than do their foreign competitors.  This gap creates an important potential competitive problem for U.S. companies.  To the extent such rights enhance corporate value, capital will be invested, at the margin, in foreign companies and in the foreign capital markets in which such foreign companies principally trade.  Strong shareholder rights go hand in hand with reduced regulation or litigation, as strong shareholder rights invite greater dependence on shareholders to discipline management and directors.

Shareholder rights serve the critical function of reducing the agency costs associated with the potential divergence of interests between professional managers and dispersed public shareholders.  Without adequate shareholder rights that provide accountability of directors and managements to shareholders, rational investors will reduce the price at which they are willing to purchase shares, capitalizing into the stock price these expected agency costs.  This discount implies reduced valuations for firms that are publicly traded and lower valuations than would otherwise be the case for firms considering an entrance into the public markets.  Firms, therefore, would have an incentive either not to enter the U.S. public markets in the first place or to exit them in response to inadequate legal protection of shareholder rights.  Indeed, firms that depend on the public capital markets for financing might find it prohibitively expensive to raise necessary capital for funding net present value projects.  Even ignoring the entry and exit decisions of firms, public capital markets will be less efficient as a result of inadequate shareholder rights, given the reduced valuations resulting from higher agency costs.

The Committee focuses on two aspects of shareholder rights:  the right to vote on takeover defenses and the adoption of dispute resolution procedures.  In addition, the Committee supports majority rather than plurality voting by shareholders.

There are few areas in which shareholder rights can play a more productive role than in the takeover context.  It is here that the potential divergence of professional managers and dispersed public shareholders is most acute.  Shareholder rights can ensure that value-enhancing takeovers occur even when this is not in the self-interest of incumbent management.  As a result, shareholder rights can help to ensure that a healthy market for corporate control exists in the U.S. capital markets.

The Committee proceeds from the premise that sound policy changes in the area of shareholder rights should only be made with solid empirical evidence that documents the shortcomings of the current regime that are supposedly being remedied.  Such evidence would show that shareholder value would be enhanced by change.  Perhaps the strongest evidence of a serious problem in the current allocation of power is the use of a particular type of takeover defense:  the indefinite deployment by management of a "poison pill" in conjunction with a classified board of directors.

**23.  Shareholders of Corporations with Classified Boards Should be Able to Vote on the Adoption of Poison Pills.**  A well-functioning market for corporate control is crucial to an efficient and competitive capital market.  The combination of a poison pill and a staggered board effectively prevents hostile bids and thereby greatly impairs the market for corporate control.  The Committee also observes that staggered boards, in their own right, quite apart from the market for corporate control, decrease shareholder value, and thus companies should have good reasons for adopting them.

The Committee recommends that classified boards of U.S. companies should be required, as a matter of course, to obtain shareholder authorization prior to the adoption of a poison pill, unless the company is the target of a takeover.  In the latter event, a firm with a classified board may unilaterally adopt a poison pill but must obtain shareholder authorization within three months of the poison pill's adoption.  In the absence of *ex post* shareholder ratification within the three-month period, the poison pill must be automatically redeemed.  The Committee further recommends that Delaware and other states adopt such a rule, or, failing such change, that exchanges make compliance with such a rule a condition for listing.

**24.  Majority Voting is a Key Feature of Shareholder Rights.**  The Committee further notes with approval the increasing number of companies that have adopted majority voting requirements, some through the use of shareholder-led amendments to corporate by-laws.  Delaware law now permits such shareholder initiatives.  Majority voting is a cornerstone of any effective system of shareholder rights, including the right of shareholders to vote on poison pills and alternative remedies.  It provides greater management and director accountability.  The Committee will commission a study to investigate whether and to what extent different forms of majority voting have affected shareholder value.

The Committee supports the New York Stock Exchange's proposed Rule 452 to eliminate broker voting for directors as applied to corporate issuers in order to assure fairness in the majority vote process.  The Committee also believes that the application of Rule 452 to voting by mutual fund shareholders should be reconsidered in light of the practicalities of such situations.

**25.  Ballot Access Issues Should be Clarified.**  The question of the ability of shareholders to place their own director nominees on the company's proxy has been a source of controversy.  The SEC addressed this issue a few years ago with a rule proposal that lay dormant until a recent court decision[1] brought the issue once again to the fore.  SEC Chairman Cox has acknowledged the need to address the issue, and the SEC needs to address and resolve, in its upcoming hearings, appropriate access by shareholders to the director nomination process.

---

[1] American Federation of State, County & Municipal Employees, Employees Pension Plan v. American International Group, Inc., 462 F.3d 121 (2d Cir. 2006).

With respect to executive compensation, the impact of a number of recent regulatory changes—perhaps most importantly the SEC's new executive compensation disclosure requirements—should be assessed prior to making further policy changes in this area.

**26. Shareholder Choice of Remedies.**   The SEC should permit shareholders to adopt alternative procedures for resolving disputes with their companies.   These procedures might include arbitration (with or without class actions) or the waiver of jury trials (a waiver commonly made in a variety of circumstances).   The Committee recognizes the difficulties that will be faced by shareholders in deciding whether to adopt alternative procedures.   For example, arbitration usually does not permit summary judgment, and there is no appeal.   These costs would have to be weighed against the possible benefits of reducing burdensome litigation.   Although the decisions may be difficult, the Committee believes that shareholders should have the right to choose, particularly given the current high cost to shareholders of litigation.

With respect to IPOs, there could be a vote on amending the corporate charter and by-laws at the first shareholder meeting after the IPO, which could be a special meeting. Requiring a vote on a charter amendment, rather than dealing with the issue through a covenant in the IPO, will help ensure that the issue receives the required attention apart from the multiplicity of factors that influence the decision to buy stock in an IPO.   For existing companies, shareholders would be free to vote on alternative remedies at a properly called meeting.

*Executive Summary*

## SECTION V:  SARBANES-OXLEY SECTION 404

The Committee believes in the importance of strong internal controls.  Internal controls play an essential role in protecting investors and the value of their investments. The Committee is, however, in favor of reducing the costs of the implementation of Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") by making implementation adjustments without changing the statute or undermining its fundamental objectives.

**27.  Redefine "Material Weakness".**  The starting point for reform should be to revise the scope and materiality standards in Auditing Standard No. 2 ("AS2") to ensure that reviews are truly risk-based and focus on significant control weaknesses.  This path has already been embraced by the SEC and the Public Company Accounting Oversight Board ("PCAOB").

The Committee recommends that the definition of materiality in AS2 be revised as follows:  "A material weakness exists if it is reasonably possible that a misstatement, which would be material to the annual financial statements, will not be prevented or detected."  The Committee's proposed formulation would change the probability threshold for the detection of control weaknesses from AS2's existing "more than remote likelihood" standard to "reasonably possible" that a material misstatement could occur. Recently, it has been reported that SEC Chairman Cox also recommended that the PCAOB adopt a "reasonably possible" standard.

In terms of impact on the financial statements, the Committee believes that materiality for internal control reviews should be defined consistently with the definition of materiality in financial reporting.  The Committee recommends, therefore, that the SEC revise its guidance on materiality for financial reporting so that scoping materiality is generally defined, as it was traditionally, in terms of a five percent pre-tax income threshold.  This standard is consistent with the general risk-based approach of the Committee.  In cases where the five percent test would not be meaningful, the SEC should allow companies and their auditors to exercise reasoned judgment in choosing other measures to evaluate materiality that would be relevant to investors.  The proposed standard also would clarify that materiality is defined relative to the annual, rather than interim, financial statements.

**28.  Develop Enhanced PCAOB and SEC Guidance.**  The Committee recommends that the SEC and PCAOB further enhance guidance by:

- clarifying and permitting greater judgment as to the auditor's role in understanding and evaluating management's assessment process;

- confirming that auditors, in attesting to management's assessment, are not required to perform similar assessments to those needed in issuing their own opinions;

- reinforcing the appropriateness of the auditor's use of judgment throughout the audit of internal controls over financial reporting, including in the evaluation of strong indicators of material weakness;

- • clarifying that the auditor attestation does not require the auditor to report separately on management's own internal control assessment process ; and

- • incorporating the frequently-asked questions guidance into the text of AS2.

In addition, the PCAOB should pursue its announced change in focus in its inspection process to consider auditor efficiency in its evaluations and should continue to take steps to provide timely, targeted feedback regarding the application of AS2. The PCAOB should accelerate the development of an Audit Guide for smaller issuers and could consider other measures—particularly in instances where an auditor is required to issue an adverse report due to a material weakness in internal control—that could help improve efficiencies.

**29. Permit Multi-Year Rotational Testing and Increased Reliance on Work of Others.** Consistent with the objective of focusing control reviews primarily on higher risk components of financial processes, the SEC and the PCAOB should give guidance to management and auditors to allow multi-year rotational testing, as part of an annual attestation. Critical components of financial processes and higher risk areas such as procedures for preparing the annual financial statements and related disclosures should be tested each year. For lower risk components of financial processes and other areas, such as certain elements of the information technology environment, management and the auditor should be allowed to use a multi-year rotational testing approach within an annual attestation.

The SEC and PCAOB also should confirm that auditors may increase reliance on the work of others and give guidance to both management and auditors regarding the auditor's maximum reliance on inputs from existing sources in performing their control work (for example, inputs from internal auditors and management). Such guidance would help eliminate redundancies and allow auditors to use more judgment and risk-based control testing in their attestation, as opposed to repeating tests similar to those used in management's assessment of internal controls.

**30. Small Companies Should Either Be Subject to the Same (Revised) Section 404 Requirements as Large Companies or Congress Should Reshape 404 for Small Companies.** In the near-term, application of Section 404 to non-accelerated filers (companies with less than $75 million of market capitalization) should continue to be deferred until the changes in materiality, enhanced guidance, and multi-year rotational testing take effect. At such time, the SEC should reassess the costs and benefits of extending Section 404 to small companies. To the extent that the SEC finds that, even with the proposed reforms, the costs are still too high relative to the benefits, it should ask Congress to consider exempting small companies from the auditor attestation requirement of Section 404 while at the same changing the management certification requirement to one requiring reasonable belief in the adequacy of internal controls. Without the comfort of auditor attestation, management would not be able to make a stronger certification.

Conversely, the Committee does not believe that a "design-only" standard should be adopted for small companies, under which outside auditors would generally assess the

overall adequacy of the design of controls and only test effectiveness in limited areas.  In the Committee's view, such a standard is not workable because a reliable judgment about design cannot be made without testing effectiveness.  To maintain otherwise risks seriously misleading investors.  Further, available evidence suggests that small companies have significantly more problems with internal controls than large companies.

**31.  Do Not Apply Section 404 to Foreign Companies Subject to Equivalent Home Country Requirements.**  The Committee recommends that the SEC not apply Section 404 to foreign firms that could demonstrate that they were subject to equivalent home country internal control regulation.  The Committee also recommends that, in any event, the SEC should not apply the Section 404 review to the U.S. GAAP reconciliation.   The Committee applauds the fact that the SEC has publicly reassured all concerned that Section 404 would not apply to a company listed only on an overseas exchange simply because that exchange is owned by a company incorporated in the United States.

**32.  Provide for More Data Collection and Ongoing Monitoring.**  With only two years of experience, the fact base relating to Section 404 implementation is still fairly limited. The SEC and PCAOB should collect better and more complete information relating to the costs and benefits of Section 404–including the causal links between internal controls and accounting errors, restatement frequency and severity, compliance costs for different sizes and types of firms, and possible competitive consequences.

# SECTION I:  COMPETITIVENESS

The public U.S. equity capital markets play a vital role in the U.S. economy. They are the principal vehicle through which companies raise and price their capital. They also are the principal repository for individual and institutional investment.  Indeed, the average individual investor is unfamiliar with foreign markets and is barred by regulation from participating directly in private markets.  The competitiveness of the U.S. economy depends on the strength of the public markets.  Moreover, the strength of these capital markets plays an important role in the global economic leadership of the United States.  The Committee believes that there are several productive steps that can be taken to help assure that the United States remains the leading capital market for both issuing companies and investors.

## I.  The Strength of U.S. Capital Markets is Crucial to the U.S. Economy

Financial markets, including capital markets, play a crucial role in economic growth.  There is a vast body of economic research documenting the importance of financial institutions and markets in facilitating economic growth.[1]  Weaker U.S. capital markets mean higher costs of capital for U.S. companies, reduced asset values, fewer jobs, and less economic activity across the entire country.

### A.  The Financial Sector Plays a Key Role in Economic Growth

Everything else being equal, countries with higher initial levels of financial development subsequently exhibit higher rates of *per capita* income growth.  This relationship has been documented using various measures of financial development and various econometric techniques.  All the evidence points toward a causal relationship between financial development and economic growth.  Moving from the first quartile of the distribution of financial development to the third quartile can lift a country's rate of *per capita* income by a full percentage point per year (King and Levine, 1993).

The U.S. financial services industry plays a key role in the U.S. economy.  The U.S. financial services industry's GDP reached about $1 trillion in 2005, accounting for 8.1 percent of U.S. GDP.  The securities industry accounted for more than $175 billion, about 17 percent of the total.  The financial services sector employed about 6 million workers in the U.S. in 2005, accounting for 5 percent of total private sector employment in the United States.

---

1 See King and Levine (1993), Jayaratne and Strahan (1996), Rajan and Zingales (1998a) and Guiso, Sapienza and Zingales (2004) and for a summary Levine (2005).

National securities industry employment has gradually increased during the 31 months since the end of the last cyclical employment downturn, when the industry lost 89,900 jobs, or 10.7 percent, of its total workforce. From the October 2003 nadir of 751,000 jobs through July 2006, the securities industry gained 48,000 jobs. This increase represents a recovery of 53.4 percent of the jobs lost between the peak of 840,900 in March 2001 and the trough of October 2003 (Figure I.1).

**FIGURE I.1**
### Profits & Employment in the U.S. Securities Industry



*Source: Securities Industry Trends, Vol. XXXI, No. 2 (March 9, 2005)*

## B. Stock Markets Are a Key Component of the Financial Sector

The benefits of financial development depend on active stock markets. Levine and Zervos (1998) show that the level of stock market liquidity (measured as the total value of shares traded on a country's stock exchanges divided by stock market capitalization) has beneficial effects on growth even after controlling for the level of institutional development. Indeed, a thirty percentage point increase in the initial level of stock market liquidity increases per capita income growth by 0.8 percent per year. Hence, a reduction in the efficiency of the domestic equity market can have large negative consequences on the economy.

These estimates have been obtained by comparing the effect of financial development on growth in a large panel of countries which differ in their level of economic development. There are strong reasons, however, to believe that a reduction in the efficiency of the U.S. stock market would have even more severe effects on the U.S. economy. The role played by the stock market in promoting growth depends on the level of economic development (Rajan and Zingales, 1998 and Acemoglu *et al*., 2005). When a country is in a catching-up phase and the choice of what investments to make is not in doubt, there is not as much need for stock prices to direct the allocation of resources. But

when a country is close to the technological frontier and it is more uncertain what the "right" investments are, the guide provided by the stock market becomes invaluable.

If one examines recent data on growth in the most advanced economies, one sees that countries with a bigger stock market (like the United States and the United Kingdom) enjoyed a much better record of economic growth than other similarly developed European economies (such as Germany, France, and Italy) with less developed stock markets (Carlin and Mayer, 2000). Hence, the impact of a decline in the efficiency of the U.S. equity markets could severely impact growth, especially in those sectors where we would like growth to be more vibrant.

A vibrant stock market is particularly important for the success of the venture capital industry. As Black and Gilson (1998) argued, it is the ability to take the most successful portfolio companies public and fetch high valuations for them that drives the venture capitalists to invest in early stage deals that are little more than a promise. Their intuition has been supported by Kukies (2001), who finds that venture capital investments increased more in European countries that introduced specialized markets for small companies.

About 40 percent of U.S. employment in publicly traded firms as of 2000 was accounted for by firms that were nurtured by venture capital (VC) and subsequently listed in the 1980s and 1990s (Davis *et al.*, 2006). By 2003, VC-backed companies were directly responsible for 10.1 million jobs and $1.767 trillion in revenue—9.4 percent of total U.S. private sector employment and 9.6 percent of company sales (Global Insight, 2004). Even as the U.S. economy stumbled between 2000 and 2003, both jobs and wages at VC-backed companies continued to grow, by 6.5 percent and 12 percent, respectively (*id.*).

In Britain, one-fifth of the workforce outside the public sector is employed by firms that are, or have been, invested in by a private-equity firm (The Economist, 2004). Private equity and VC-backed companies employed close to 6 million people in Europe in 2004, representing about 3 percent of the 200 million person European workforce. VC-backed firms employed close to one million Europeans, or about 0.5 percent of the workforce (Achleitner & Klöckner, 2005).

Not only are IPO exits much more profitable than exits in the private market, but they also affect the profitability of acquisition exits. The *value* of VC acquisition exits is correlated with the number of IPO exits: when there is a "hot IPO window," the average value of acquisition exits increases. For example, in 1999, there were 304 disclosed VC-backed acquisition exits, with a disclosed average valuation of $142 million; in 2004, there were 413 with an average valuation of $57 million. The failure of the U.S. "IPO window" to reopen after 2001 has caused considerable anxiety among American VCs. Indeed, according to Mark Heesen, president of the National Venture Capital

Association, "This situation needs to show signs of improvement before [the end of 2006] or we will begin to feel the effects on a much broader scale."[2]

## C. Public Capital Markets are Essential to the Economy of New York

### 1. Employment

At the end of January 2006, the New York State securities industry directly employed 194,000 individuals, 89.5 percent of them in New York City. This represents 24.5 percent, or nearly one in every four, of securities industry jobs nationwide. The industry's share of the state and local workforce has also been rising since late 2003 (Figure I.2).

**FIGURE I.2**



New York State
Annual Securities Industry Employment

Thousands

Source: Bureau of Labor Statistics, U.S. D.O.L. (Year-end data)

As the end of July, New York City had regained a total of 19,900 securities industry jobs, or 48.2 percent, of the 41,300 jobs lost between the peak of 200,300 in December 2000 and the trough of 159,000 in April 2003.[3] The jobs gained over the past 39 months represent a 12.5 percent increase of the New York City securities industry employment. Employment in New York City's securities industry has been trending upward, though still 10.7 percent below its peak level (Figure I.3).

---

2 National Venture Capital Association, Venture-Backed IPO Market Languished While Acquisitions Market Maintained Bullish Pace in First Quarter of 2006 (April 3, 2006), *at* http://www.nvca.org.
3 *See* www.sia.com/research/pdf/NYMonthly.pdf, last accessed 10/23/06

**FIGURE I.3**



Source: Bureau of Labor Statistics, U.S. D.O.L. (Year-end data)

In New York State and New York City last year, the securities industry accounted for 2.2 percent and 4.7 percent of total employment 2.5 percent and 20.7 percent of total wages, and 9.2 percent and 14.1 percent of total annual gross income, respectively.

The industry also accounts for a disproportionate and expanding share of the local and state economies. Over the past 15 years, growth in the securities industry in New York State has outpaced activity in all other sectors of the state economy. During this period, the securities industry's share of the Gross State Product (GSP) rose to a currently estimated 7.0 percent from 4.3 percent and accounted for more than one-quarter of all economic growth in the state.

## 2. Tax Revenue

A vibrant and growing securities industry is vital to both the national and state budgets, particularly those of New York City (NYC) and New York State (NYS) (Figure I.4). At its peak in fiscal 2001, tax revenue generated by the securities industry accounted for 15.8 percent of NYC's total non-property tax payments in that year.[4] Benefits to NYS are even more pronounced, since the state personal income tax applies not only to NYC residents but also to residents in the rest of the state and to all out-of-state commuters (Figure I.5). In the same year, NYS collected $8.2 billion, or 18.7 percent of total tax receipts.[5]

---

4 Alan G. Hevesi, New York State Comptroller, Report, "The Impact of Wall Street on Jobs and Tax Revenues," (April 2004). Tax payments from the securities industry consist of general corporation, unincorporated business, and personal income taxes, including payments on realized capital gains.
5 *Id.*

**FIGURE I.4**



Source: Alan G. Hevesi, New York State Comptroller, Report, "The Impact of Wall Street on J Revenues," (April 2004).

**FIGURE I.5**



Source: Alan G. Hevesi, New York State Comptroller, Report, "The Impact of Wall Street c Revenues," (April 2004).; NYS Dept of Taxation and Finance

    After a severe two-year downturn, the securities industry has been the driving force behind NYC's economic recovery. "More than half of the fiscal 2004 surplus comes from unanticipated tax revenues from increased Wall Street activity and real

estate-related transactions," the NYS Comptroller noted.[6]  In fiscal 2005, NYC's total securities industry tax payments reached almost $2.1 billion—nearly 11 percent of non-property tax revenues—and are anticipated to reach a record $2.4 billion in fiscal 2006.[7] "When we look at tax revenues," former President of the New York Federal Reserve Bank William McDonough reflected, "the major swings in New York City revenues reflect the fortunes of the securities industry."[8]

## II. The U.S. Public Equity Market is Losing Competitiveness to Foreign and Private Markets

### A. Foreign Markets

A leading indicator of the competitiveness of U.S. public equity markets is the ability of the U.S. market to attract listings of foreign companies engaging in initial public offerings—so-called global IPOs.  During the 1990s the number of foreign companies listed on the NYSE increased from 100 to almost 400 (Pagano *et al.*, 2002). NASDAQ enjoyed similar fortunes, while the European exchanges, including London, lost market share.  In the new millennium the trend seems to have reversed.  After some lean years (between 2001 and 2003), this segment of the market is booming again.  In 2005, 352 companies issued equity outside of their home market for the first time, raising a total of $92 billion.  In just the first nine months of 2006, 230 companies raised $86 billion, substantially above the numbers in 1999 and close to the 2000 levels.

Figure I.6 reports the percentage of these global IPOs that listed in the U.S. equity market.  It shows that during 2000, one of every two dollars raised globally was raised in the United States, while, in 2005, approximately one in every 20 dollars was raised in the United States.  Similarly, during the same period the percentage of global IPOs that chose to list in the United States declined from 37 percent to 10 percent.

---

6  Alan G. Hevesi, New York State Comptroller, Press Release, "City Will End 2004 With Surplus, Balanced Budget Seen in 2005." (February 12, 2004), *available at* http://www.osc.state.ny.us/press/releases/feb04/021204.htm
7  Alan G. Hevesi, New York State Comptroller, Report, "The Securities Industry in New York City" (October 2006).
8  William J. McDonough, President and CEO of the Federal Reserve Bank of New York from 1993-2003, "Remarks before the New York State Bankers Association Annual Financial Services Forum" (March 20, 2003).

**FIGURE I.6**
**Share of Global IPOs Captured by U.S. Exchanges**

Percentage of global IPOs listed in a U.S. exchange (NYSE, NASDAQ, AMEX). An IPO is defined as global if a company goes public in a market other than its domestic market, regardless of whether the company was already public in the home market or not. The source of the data is Dealogic.



Twenty-four of twenty-five of the largest IPOs in 2005 and nine of the ten largest IPOs in 2006 to date took place outside the United States. The two large IPOs in the United States during these two years were U.S. domiciled companies. Although IPOs within a given country can be cyclical, this U.S. capital market decline does not appear to be a statistical accident, but rather a sign of declining competitiveness of the U.S. markets. We can see this difference by focusing on where companies that were issuing internationally decided to place their first issuances when raising capital outside their home markets.

The loss of market share exists in both the high-tech and non-high tech sectors. In 2000, 50 percent of the global IPOs by value (30 percent by number) were in high-tech sectors (telecommunications, computers, internet, and biotech). In 2005-2006, those percentages declined to less than half. However, dividing the global IPOs into high-tech and non-high-tech reveals that the loss in market share is present in both, albeit smaller in the high-tech sector (Figures I.7A and I.7B). Hence, the overall drop is not due solely to changes in the sector composition of global IPOs.

*Competitiveness*

**FIGURE I.7**
**Share of Global IPOs Captured by U.S. Exchanges in High-Tech
and Low-Tech Sectors**

Percentage of global IPOs listed in a U.S. exchange (NYSE, NASDAQ, AMEX) in high-tech and low-tech sectors An IPO is defined as global if a company goes public in a market other than its domestic market, regardless of whether the company was already public in the home market or not. The list of high-tech and low-tech sectors is provided in the appendix. The source of the data is Dealogic.





Nor is the overall drop due to the loss of IPOs from emerging markets like China and Russia.  Chinese companies may seek to list in Hong Kong because Hong Kong is part of China, or London may become the natural place for Russian companies because

London has become a second home for Russian tycoons.  However, as Figure I.8 shows, even if one excludes from the pool of global IPOs those coming from China, India, and Russia (and it is not obvious why we should) the loss in market share is not much less severe: from 50 percent to 10 percent.

## FIGURE I.8
### Share of Global IPOs Captured by U.S. Exchanges, Excluding IPOs from China, India, and Russia

Percentage of global IPOs excluding those coming from India, China and Russia that  listed in a U.S. exchange (NYSE, NASDAQ, AMEX)  An IPO is defined as global if a company goes public in a market other than its domestic market, regardless of whether the company was already public in the home market or not. The source of the data is Dealogic.



After more than a decade of declining market share, in the past three years, London has increased its share of the global IPO market from 5 percent to almost 25 percent.  Furthermore, London has begun to attract a greater share of IPOs from U.S. domiciled companies.  Starting in 2002, a small number of U.S. companies abandoned the U.S. equity markets to list in London.  In the first nine months of 2006, 11 U.S. companies chose to list in London instead of in the United States, raising approximately $800 million.  If one adds the IPO of closed-end private equity funds done by KKR and AP Alternative Assets in the Euronext market in Amsterdam, 23 percent of all the IPO funds raised by domestic U.S. companies have been raised outside the United States.

*Competitiveness*

In 1996, global advisory and underwriting fees in the United States accounted for 58 percent of the total of $27 billion; by 2005, they were only 42 percent of $59.1 billion. The compound annual growth rate in underwriting fees for the United States was 4 percent as compared to 10 percent in Europe over the same period (Figure I.9).

**FIGURE I.9**

**Europe is catching up**
GLOBAL ADVISORY AND UNDERWRITING FEES BY GEOGRAPHY, %



| | 1996 | 1997 | 1998[1] | 1999[1] | 2000[1] | 2001 | 2002 | 2003[1] | 2004 | 2005[1] | CAGR[2] % 1996-2005 | CAGR[2] % 2001-05 | CAGR[2] % 2004-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100%, $ million = | 27,051 | 33,648 | 38,190 | 47,691 | 51,516 | 38,336 | 31,957 | 37,479 | 45,838 | 51,904 | 8 | 8 | 13 |
| Europe | 29 | 28 | 28 | 33 | 34 | 30 | 32 | 33 | 31 | 36 | 10 | 13 | 33 |
| United States | 58 | 58 | 59 | 54 | 49 | 54 | 50 | 49 | 48 | 42 | 4 | 1 | -1 |
| Asia - Pacific | 8 | 7 | 6 | 8 | 10 | 9 | 11 | 13 | 14 | 13 | 14 | 19 | 12 |
| Other | 5 | 7 | 6 | 5 | 6 | 7 | 7 | 6 | 7 | 8 | 19 | 14 | 26 |

[1] Figures do not sum to 100% because of rounding
[2] Compound annual growth rate.

Source: Dealogic

One possible reaction to the U.S. loss of global IPOs is to dismiss its importance to the U.S. economy. In 2000, 100 foreign companies were listing in the United States, raising $55 billion in capital. Last year only 34 foreign companies listed here, raising only $5 billion in capital.

The direct impact on the U.S. economy is small, albeit not trivial. A loss of $50 billion in fund raising implies a loss of at least $2.8 billion in underwriting fees and an annual loss of $3.3 billion in trading revenues.[9] Because IPOs are very likely to raise more equity in subsequent years, one can estimate an additional loss in revenues of roughly a billion dollars.[10] The real significance of this development is what it may indicate for the future loss of U.S. IPOs and trading revenue from foreign companies deciding to delist. As discussed below, these developments may not be materializing faster due to restrictions on U.S. and foreign companies leaving the U.S. market. If our capital markets prove unattractive, U.S. companies will demand the right to use cheaper foreign alternatives.

Some argue that the United States is well served by losing foreign IPOs, precisely because they pose unacceptable risks—for example, Chinese and Russian IPOs—to U.S. investors. The United States permits any company to issue stock in our market that makes the mandatory disclosures provided for in our registration requirements. The 1933 and 1934 Acts rejected "merit" regulation. In any event, our loss of foreign IPOs is even more severe when we restrict our attention to global IPOs from developed countries (Western Europe, Australia, Canada, Japan, and New Zealand), which may be less likely to pose these risks (Figure I.8, *supra*).

## B. Private Markets

This section discusses the growth of the private equity market. Generally, only institutions and wealthy individuals can participate directly in this market. Any shrinkage of the public equity market, whether from lack of foreign or private investor interest, will leave the average investor in increasingly less liquid and more expensive markets than those enjoyed by institutions and the wealthy. And if small companies are staying out of the public markets, individual investors lose the opportunity to invest in this important sector of the economy.

Although almost nonexistent in 1980, the private equity market sponsored more than $200 billion in capital commitments in 2005. Although still small in total size compared to the public equity market (Figure I.10), since 2003 private equity fundraising has outpaced net cash flows into mutual funds (Welch, 2005) and going private transactions have accounted for over a quarter of public takeovers (Figure I.11). Buyout volume has exhibited substantial growth and, in 2003, surpassed global levels relative to mergers and acquisitions (M&A) (Figure I.12).

---

9 These figures have been obtained in the following way. For underwriting fees we use the Oxera (2006) estimate of 5.6 percent of the funds raised. For trading fees we assume that on average the amount raised is 15 percent of a company's market capitalization. This translates into a listing loss of $333 billion. Assuming an annual turnover of 100 percent and a trading commission of 1 percent we arrive at the amount of $3.3 billion.

10 This is calculated assuming that new listed companies raise a similar amount of funds in seasoned equity offerings in the three following the IPO. Since the underwriting fee for seasoned equity offerings (SEOs) is smaller, we assume a 2 percent underwriting fee.

**FIGURE I.10**



**FIGURE I.11**



**FIGURE I.12**



The growing private equity market is increasingly substituting for the public market. Spurred on by the availability of inexpensive debt financing, private equity funds (including VC, leveraged buyout (LBO), and other funds) accounted for nearly $500 billion in deal volume, 17 percent of the global total.  Syndicates of LBO funds began to act together to undertake unprecedented "mega buyouts," like the $31.6 billion buyout of HCA, a healthcare services company.

Private equity firms are increasingly exiting investments through negotiated private sales (so-called "acquisition exits") rather than the traditional public IPO (Figure I.13).  Since 2001, the number of acquisition exits with disclosed values has exceeded the number of IPO exits by more than ten-to-one (*Id.*).  The difference in the total value of these exits has been almost as great.  From 2001 to 2005, VC-backed private equity exits reaped a total of $94.85 billion, while VC-backed IPO exits raised only $12.06 billion (*Id.*), albeit that IPO exits typically involve the sale of only a portion of the company.

**FIGURE I.13**



Sources: Thomson Venture Economics & NVCA (1995-1996); VentureOne (1997-2005)

Thomson Venture Economics records 110 acquisitions in which financial sponsors were on both sides of an acquisition, with an aggregate value of $14.9 billion, in 2005 (Figure I.14). Dow Jones & Co., however, reportedly estimated 279 such deals, with a value of more than $33.2 billion, in 2005 (Fraidin and Sorabella, 2005). If the latter figure is correct, secondary buyouts accounted for around 16 percent of global private equity deals completed last year. The number and value of secondary buyouts have increased so much that one observer has wondered whether this "secondary market" in private equity is "the new stock market."(Bushrod, 2005).

**FIGURE I.14**



Source: Thomson Venture Economics

Like the secondary buyout market, a market in "secondaries"—previously acquired limited partnership (LP) interests sold by private equity investors—has expanded enormously in recent years. Where secondary buyouts provide liquidity to private equity funds, sales of secondaries provide liquidity for investors. As with secondary buyouts, the market in secondaries historically was populated by distressed sellers and opportunistic buyers able privately to negotiate purchases at steep discounts.[11] Today, however, secondaries have been transformed from a sign of financial distress into an asset class traded by institutional investors, corporations, and specialist secondary (or "vintage") funds (Cannon, 2006).

## C.  Cost of Capital and Listing Premiums

Companies are attracted to list in the market that provides them the best valuation—that is, the best multiple of their cash flow (or earnings). The magnitude of this multiple is determined by two factors: (i) the cost of capital and (ii) the risk that current and/or future cash flow will be reduced by market-specific regulatory actions.[12] Recent studies have shown that the U.S. markets have a cost of capital advantage.  But the positive difference in the multiples has declined in recent years, especially relative to developed markets.  Excessive regulatory costs and risk of litigation are the most likely causes of this decline.

Doidge *et al.* (2004) examine the valuation premium of foreign companies listed in a U.S. exchange vis-à-vis similar companies from the same country that are not cross listed.  In the pre-SOX environment they estimate the premium to be 37 percent. Unfortunately, this premium might in part be due to unobservable differences in the quality of the companies that cross list that are correlated with the listing decision.[13]

By contrast, Hail and Leuz (2006) look at changes in the cost of capital implicit in a company's valuation and its earnings forecast around the listing decision.  They find that cross listing on a U.S. exchange before 2000 reduces the cost of capital by 70 to 110 basis points.  Using Hail and Leuz's estimate, a company with $300 million in market capitalization would save $2.7 million a year in capital cost by listing in the United States.  Unfortunately, Hail and Leuz's analysis ends in 2003, making it impossible to assess whether the benefits of bonding have changed in recent years.  It is not also clear whether Hail and Leuz's estimates include the regulatory risk.  If it is assumed that analysts include in their expected earnings forecasts the cost of regulatory actions (as

---

11 Borel (2006), at 69.

12 The traditional valuation formula with a constant growth rate is $V = FCF/(r-g)$, where $V$ is the value of the enterprise, FCF is the free cash flow in the current period, $r$ the cost of capital, and $g$ the rate of growth of the free cash flow. If one introduces, however, a regulatory risk, where with probability $p$ (which for simplicity we assume constant over time and independently distributed), the free cash flow of a period is reduced to zero by some regulatory intervention, then $V = (1-p)FCF/(r-g)$. So even if technically the risk of a legal suit does not enter into the cost of capital, it does affect the value of the multiple of cash flows in the valuation.

13 Doidge *et al.* (2004) try to account for this problem by using a Heckman selection model. But it is not obvious that this adjustment is able to eliminate this problem.

they should), then their estimates represent just the cost of capital, ignoring the possible cost imposed by the regulatory environment.

Even if one believed that cheaper cost of capital or higher premiums for cross-listings continue to make the U.S. market attractive, the fact remains that foreign companies are simply not coming—thus there must be other factors (which are discussed below) that are keeping these companies away.

### III.  Why is the U.S. Public Equity Capital Market Losing Competitiveness?

The Committee believes that four factors are responsible for loss of U.S. competitiveness to foreign and private markets: (i) an increase in the integrity of and trust in major foreign public markets resulting from more transparency and better disclosure; (ii) a relative increase in the liquidity of foreign and private markets, thus making it less necessary to go to the U.S. public equity capital markets for funding; (iii) improvements in technology that make it easier for U.S. investors to invest in foreign markets; and (iv) differences in regulation between the U.S. public markets and the foreign and private alternatives.

There is little public policy can do to reverse the impact of the first three factors, but the United States could try to adjust its litigation and regulatory system so that we can continue to protect investors, but at a lower cost.

### A.  Better Regulated Foreign Public Markets

London's system of regulation has been completely reformed over the last 20 years (Table I.1).  The "Big Bang" reforms instituted on October 27, 1986 modernized and liberalized the (briefly renamed) International Stock Exchange and ended the stagnation of the London equity market.  Fixed commissions and restrictions on membership by commercial banks were eliminated, and traders moved from open-outcry to screen-based trading.[14]

On May 20, 1997, the regulatory system established by the Financial Services Act of 1986 was again completely revamped.  Until that date, the British system split responsibility between the Bank of England, the Securities and Investments Board (SIB), various Self-Regulatory Organizations (SROs), and a number of so-called Recognized Professional Bodies.  This system was inefficient, confusing, and lacked a clear allocation of responsibility and accountability; moreover, it had failed to adequately protect investors.[15]  In 2000, a further consolidation resulted in the creation of the Financial Services Authority (FSA).

---

14 Michie (1992) at 142.  *See also*, J. Coakley (1992) at 65.
15 Gordon Brown, MP, *The Chancellor's Statement To The House Of Commons On The Bank Of England* (May 20, 1997), *available at* http://www.hm-treasury.gov.uk/newsroom_and_speeches/press/1997/press_49_97.cfm. *See also*, Ferran (2003) at 257.

Sir Howard Davies, now Director of the London School of Economics and Political Science and former Chairman of the FSA, describes the establishment of the FSA as "the key step" in the United Kingdom's effort to secure London's financial leadership.  The Financial Services and Markets Act (2000) brought not just the clarity and efficiency of a single regulator but a greatly increased degree of regulatory transparency and accountability.  Among other things, the legislation requires the FSA to publish cost-benefit analyses of any proposed regulatory change, solicit comments on the proposal, and publish an account of its responses to those comments along with the final rule—that is, the FSA must explain itself if it takes action to which market participants object.[16]  The FSA also is subject to cost-effectiveness reviews by H.M. Treasury.[17]

Even more important to the effectiveness of the FSA is the Authority's independence and the "market ownership of the system."[18]  First, by delegating expansive rulemaking power to the FSA and taking care not to give the appearance of interference (particularly regarding supervision issues affecting individual firms), the British government and its ministers have attempted to instill practitioners and consumers with confidence in the system.  Furthermore, by taking over Listing Authority from the LSE in 2000, the FSA reduced duplication and separated the roles of market and regulation.  In addition to ensuring the independence of the FSA, the Financial Services and Markets Act makes practitioners and consumers stakeholders in the Authority.  Half of the Independent Directors of the FSA are from City firms.  Moreover, the Financial Services and Markets Act establishes both practitioner and consumer panels to represent the interests of these constituencies.[19]  The practitioner panel has regular access to FSA staff, with which it consults regarding policy and regulatory initiatives.  The FSA's decision to create separate divisions responsible for retail markets and institutional markets grew out of such a process.  Finally, the FSA controls its own budget, based upon fees paid by market participants;[20] thus, it can make improvements without demanding increased funding from the government.

In a November 2005 Oxera study, financial services professionals identified "regulatory environment" as the second most important determinant of financial center competitiveness (availability of skilled personnel was first).[21]  These practitioners preferred the regulatory environment of London to that of New York on two counts: first, practitioners felt that "there are too many regulatory bodies in USA and that there is a lack of consistency between them"; second, practitioners preferred the more flexible, principles-based regulatory philosophy adopted by the FSA to the prescriptive, rules-based approach of the SEC.[22]

The Hong Kong securities regulatory environment also has improved substantially in recent years, although some still consider the regime too lax.  According

---

16 Financial Services and Markets Act, 2000, c. 8, 65 (Eng.).
17 *Id.*, 12 (Eng.).
18 Sir Howard Davies, *Why is London a Successful Financial Centre?* unpublished manuscript (2006).
19 Financial Services and Markets Act, 2000, c. 8, 8-10 (Eng.).
20 *Id.*, 99 (Eng.).
21 Oxera Consulting Ltd. (November 2005) at 21.
22 *Id.*, 21-22.

to studies by the International Institute for Management Development ("IMD") and World Economic Forum ("WEF"),[23] seven measures are identified as closely related to the regulatory environment and government responsiveness, as among them efficiency of legal framework, regulatory intensity, regulatory burden, and adaptability of government policies to economic changes. Among the 13 countries in Asia, the Chinese market in Hong Kong ranks very high on all measures.

Major regulatory changes have occurred during the last few years. In particular, the Securities and Futures Ordinance ("SFO"), which came into effect on April 1, 2003, was implemented to revamp Hong Kong securities regulation, by consolidating and modernizing ten existing ordinances into one composite piece of legislation.[24] The SFO extended the Securities and Futures Commission's ("SFC") regulatory powers by bringing companies into the SFC's jurisdiction under a dual filing system where listed companies submit documents to both the exchange and the SFC, instead of solely the exchanges.[25] The law also extended the SFC's powers to inspect and investigate companies and to impose sanctions. Other key provisions include establishing a market misconduct tribunal and improving an investor compensation fund that provides some relief to injured market participants.

## B. More Liquid Foreign Public Markets

The NYSE has always marketed itself as the most liquid market in the world. International comparisons (e.g., Jain, 2005) show that the NYSE indeed has the lowest effective percentage spread (measured as twice the absolute difference between transaction prices and midpoint quoted spreads divided by midpoint quoted spread) in the world. Even if one takes the U.S. equity markets overall (NYSE, NASDAQ and AMEX), its total transaction costs (given by the sum of commissions and price impact of trade) are second only to Paris (Domowitz et al., 2002). Hence, liquidity has always been indicated as one of the main reasons why foreign companies want to be listed in the United States.

This advantage seems to be fading. First, although the trading value on the U.S. market has been increasing (Figure I.15A), the percentage of trading on foreign markets outside the United States has also been steadily increasing since 2000, from less than 50 percent in that year to over 55 percent in 2005 (Figure I.15B) However, looked at over a longer period, the U.S. share of trading volume is roughly the same today as it was in 1995.

---

23 IMD conducts an annual survey to assess the competitiveness of some 60 major economies and the results are published in the *World Competitiveness Yearbook*. WEF conducts an annual survey to assess the competitiveness of 117 economies and the results are published in the *Global Competitiveness Report*.
24 See *"Hong Kong as a Leading Financial Center in Asia"*, Research Department of SFC, Supervision of Markets Division, August 2006; *See also "Legally Bypassing U.S. Capital Markets: Chinese Privatization, IPO Flight to Hong Kong and U.S. Securities Regulation"*, Rose Xu, Princeton Senior Thesis, unpublished manuscript (April 2006).
25 SFC, https://www.sfc.hk/sfc/doc/EN/intermediaries/trading/licensed/sfo_n_u_word.pdf

**FIGURE I.15A**
**Trading Value on U.S. and European Secondary**
**Equity Markets ($ bil)**



*Source: World Federation of Exchanges*

**FIGURE I.15B**
**Share of Global Stock Market by Region (Traded Value)**



Second, a greater portion of trading of cross-listed companies, particularly those from developed countries, is now taking place in home markets as compared to the United States, indicating that the U.S. liquidity advantage is eroding. Halling *et al.* (2006) analyze the location of trade volume between domestic and U.S. market for cross-listed stocks over the period 1980–2001. As Figure I.16 shows, in the early 1980s, a greater fraction of the trading volume was taking place in the United States. Over time, however, this allocation has reverted. By the end of the 1990s, a much larger fraction of the volume was taking place in the domestic market. Interestingly, if one looks at companies cross-listed from emerging markets there is not a similar pattern (in fact, there is no pattern at all).

### FIGURE I.16
### Relative Attractiveness of Trading in the United States vs. Trading in the Domestic Market

These figures report the value of the time dummies in a regression whose dependent variable is the log of the ratio of trading volume in the United States to domestic trading volume for companies cross-listed. Explanatory variables are insider trading law enforcement, investor protection, the time elapsed since cross-listing, geographical distance, asset growth, volatility and the Baruch-Karolyi-Lemmon incremental information measure. The base year in these specifications is 1980, and the base region is Australia and Asia. The regressions are estimated with random effects and a correction for AR(1) disturbances on a panel of monthly data. The results are from Halling *et al.* (2006) who kindly provided this information not contained in their paper.



Another indication of the increasing relative attractiveness of foreign markets is the fact that U.S. equity markets are supplying ever less of the world's capital (Figure I.17A).  Of total equity raised in the top 10 countries thus far in 2006, the United States supplied $144.4 billion or 27.9 percent.  In 1995, the U.S. supplied about $95 billion or 41 percent.  The compound annual growth rate since 1995 in the share of equity capital supplied by the United States is 4.95 percent compared with 11.28 percent for the non-U.S. countries (Figure I.17).

**FIGURE I.17**
Equity Capital Flow





**FIGURE I.17** (continued)

| 2006 YTD Equity Capital Flow for Top 10 Countries | | | | |
|---|---|---|---|---|
| Nation | Deal Value (US$ Mil) | Mkt. Share | Number of Issues | CAGR in % (1995-2005) |
| **United States of America** | **144,612.1** | **27.7** | **577** | **4.95** |
| Japan | 56,015.9 | 10.7 | 353 | 6.99 |
| China | 55,007.8 | 10.5 | 114 | 34.25 |
| United Kingdom | 34,326.9 | 6.6 | 308 | 9.49 |
| Germany | 24,670.2 | 4.7 | 67 | 16.46 |
| Russian Federation | 14,563.4 | 2.8 | 14 | 51.70 |
| Canada | 14,073.8 | 2.7 | 206 | 5.40 |
| France | 13,308.6 | 2.6 | 67 | 15.85 |
| South Korea | 12,132.5 | 2.3 | 90 | 9.68 |
| Brazil | 11,671.7 | 2.2 | 37 | 13.17 |
| **Non-US Countries Total** | **377,947.6** | **72.3** | **2,256.0** | **11.28** |
| **World Total** | **522,559.5** | **100.0** | **2,833** | **9.03** |

*Source: SDC Unit: U.S. $ Millions*                                    *Citigroup*

## C. Technological Improvements Facilitating Cross-Border Portfolio Investment

In 1997, the SEC issued a "Concept Release" on the "Regulation of Exchanges" in which it documented a 4,700 percent increase in the trading of foreign securities by U.S. residents between 1980 and 1995, and noted the important role played by "advanced technology" in facilitating such trading (see Steil, 2002). As Alan Greenspan remarked in a speech delivered the same year, information and communications technology had enabled "customers in one part of the world to avail themselves of borrowing, depositing, or risk-management opportunities offered anywhere in the world on a real-time basis" (Greenspan, 1998).

Over the last decade, technology has continued to enhance information transfer and to reduce information asymmetry, driving the further "globalization of finance" (see Häusler, 2002) and breaking down the "home bias" of investors (McCaughrin, 2004).

## D. Regulatory and Litigation Burden in U.S. Markets

### 1. Evidence from the Rule 144A Market

The Rule 144A market for large institutional investors permits issuers to raise capital free of most U.S. securities regulation (with the notable exception of Rule 10b-5), including the necessity of registration and liability under the 1933 Act and the Sarbanes-Oxley Act. As Figure I.18 shows, 94 percent (by value) of the global IPOs that do not list in the United States (57 percent by number) still choose to market their issues in the United States.

**FIGURE I.18**

International 144A IPOs as a Percentage of All International IPOs
Raising Capital in the United States



* First Half 2006. Sources: NYSE,   Dealogic , Bloomberg, Exchanges

The number of exchange-listed U.S. public offerings of international equity securities since the late 1990s has declined markedly, as the Rule 144A market has become foreign issuers' market of choice for U.S. equity issues.  In 2005, foreign companies raised $83 billion in 186 equity issues in the Rule 144A market compared to $5.3 billion in 34 public offerings—that is, 90 percent of the volume of international equity issues in the United States were done in the private market.  This compares with about a 50-50 split between these two markets in 1995.

This increasing preference for the Rule 144A private market is particularly telling given the lower cost of capital in the public markets.  According to Hail and Leuz, companies cross-listing on U.S. exchanges face a 2.47 percent lower cost of capital, on average, than those using the Rule 144A market (Hail and Leuz, 2006 and Karolyi, 2006).  This finding strongly suggests that the regulatory and litigation burden is an important factor in the choice between public and private markets.

As we detail in Section III of this Report, class action settlement costs have increased from $150 million in 1995 to $3.5 billion in 2005 (leaving out the $6.1 billion settlement in Worldcom), and Director and Officer (D&O) insurance rates are six times higher in the United States than in Europe.  There are no securities class actions in other major markets, and the level of official enforcement is lower.

The average costs of SOX Section 404 in its first year of implementation, 2004, were $4.36 million for an average company.  Although these costs are coming down, new entrants into our public capital markets will face these large initial costs.  These costs can be especially significant for smaller companies.

In contrast, the United Kingdom has been relentless in stressing its regulatory advantage and indicating its commitment to maintaining a "light-touch" in regulation.

## 2.  Evidence from Listing Premiums, Pre- and Post-SOX

Doidge *et al.* (2006) have updated their analysis of the premium of cross-listed firms to 2005.  They document that while fluctuating over time, the premium, defined as the difference in the market-to-book value of assets between cross listed and non-cross-listed stocks, persists even in 2003, 2004, and 2005.  More interesting than its level is its variation over time.  If the sample of cross-listed companies remains relatively homogenous (as it should given the paucity of new cross listings in recent years) the difference between the listing premiums pre- and post-2002 can give us a sense of the changes in the relative benefits of cross-listings.[26]  Table I.2 shows the difference between the average listing premium in the 1997-2001 and 2003-2005 periods.

On average the listing premium almost halves, dropping by 0.19, a difference which is statistically significant at the ten percent level. As Table I.2 shows, however, this drop in the premium is not homogeneous across countries. The difference in the change can be due to two reasons. One is that the degree of regulation offered by the United States after SOX is particularly harmful (and thus counterproductive from a valuation point of view) for countries with poor corporate governance (usually developing countries).

Alternatively, the additional degree of regulation offered by SOX can be beneficial but too costly. If this were the case, the companies that should suffer the most from the passage of SOX are the ones from countries with a good corporate governance record, since these companies will bear the additional cost of SOX while getting less benefit—that is, they already have good corporate governance.

Figure I.19 plots the changes in the listing premium against the premium paid in control-based transactions as calculated by Dyck and Zingales (2004).  Because the control premium is a measure of how much private benefit insiders extract at the expense of minority shareholders, the control premium is inversely related to the quality of a country's corporate governance (at least in terms of protection of minority shareholders).  As Figure I.19 shows, countries with larger control premia (and hence worse corporate governance) exhibit a smaller decline in the listing premium.  This correlation is statistically significant at the five-percent level.  Similar results are obtained if the quality of country corporate governance is measured by the quality of accounting standards.

---

26 A difference estimator will eliminate any bias due to the unobserved heterogeneity as long as this is constant over time.

**FIGURE I.19**
**Explaining the Decline in Listing Premiums**

    This figure plots the country average decline in the listing premium between the 2003-2005 period and the 1997-2001 on the country average premium in control block transactions, which is a measure of the quality of a country corporate governance (higher premium lower quality). The listing premia (from Doidge *et al.* (2006)) are the differences in the market to book value of assets between cross listed and non cross listed stocks. We compute the difference between the average listing premium between the 2003-2005 period and the average in the 1997-2001 period. The control premium is from Dyck and Zingales (2004) and represents the control premium paid when a large block is sold. The interpolated line shows the predicated values of a linear regression of the changes in the listing premia on the control premia.



    One possible interpretation of Figure I.19 is that the decline is indeed a reflection of an improvement in the quality and efficiency of European markets. Because some European countries arguably have improved their corporate governance regimes, this might account for the observed correlation. Yet, if one inserts a dummy variable for European countries, one finds that the result is due to the quality of governance, not to the improvement in European markets.

    With all the caveats associated with the limited number of observations, these results suggest that the changes in the U.S. regulatory environment post-SOX decreased the benefit of a U.S. cross-listing, particularly for countries that have good governance standards. If the loss in premium was driven by the developing countries, one could still argue that SOX was good for U.S. companies but bad for the ones from developing countries. However, the data show that the companies from developed countries with good corporate governance suffer the loss premium, suggesting that SOX is costly for U.S. as well as for foreign companies.

### E. Higher Listing Costs and Underwriting Fees Do Not Explain Loss of U.S. Competitiveness

The NYSE has significantly higher listing costs than its competitors (Table 3A). A recent study conducted by the London Stock Exchange finds that a typical £100 million ($187 million) company pays £45,390 ($84,880) to list on the LSE (equal to 0.05 percent of its value) and £81,900 ($153,150) to list on the NYSE (equal to 0.08 percent). Annual fees are also more expensive: £19,110 ($35,735) in New York versus £4,029 ($7,534) in London (Table 3B). The absolute magnitude of these costs, however, is trivial, and it is difficult to imagine that they would play a significant role in the decision to list in New York versus London.

Another oft-mentioned competitive disadvantage of the United States is the higher underwriting fee companies have to pay to list there. The LSE study finds that the gross spread in the United States (5.6 percent) is 60 percent higher than the gross spread to list for an offering outside the United States (3.5 percent) (Table I.3C). This difference is not likely to drive the listing decision. First, all U.S. IPOs are sold with extensive book building, which helps improve the price at which a stock is sold—so companies are willing to pay higher fees to get better pricing on their equity. Second, most of the firms that cross-list do not do an IPO in the United States, because they are already public firms in their own country. Most of the time they only do a seasoned equity offering ("SEO"), on which the gross spread difference is much less ranging from a 3.0 percent higher spread in the United States than the United Kingdom for small offerings down to 0.93 percent higher spread for large offerings (Table I.3D). Third, even when they do an IPO in the United States, they rarely sell more than 10-15 percent of the equity in the initial offering. Hence, the 2.1 percent difference in spread between a U.S. and non-U.S. offering is only paid on 10-15 percent of the equity, reducing the cost differential to a one-time fee of 20 basis points. Last, this difference in cost also was present in the 1990s when companies were flocking to list in the United States. Hence, underwriting fees alone cannot explain the significant drop in the U.S. share of global IPOs.

## IV. The United States Should Maintain Open Markets

In the short term, several factors prevent the U.S. equity market from feeling the full consequences of its lack of competitiveness. First, IPOs tend to list in the country where their business is located, even if this is not the most competitive market. Second, foreign companies already listed in the United States cannot exit from the U.S. marketplace and U.S. regulation as long as they are owned by 300 or more U.S. shareholders. Although the SEC in December 2005 proposed to make it easier for foreign companies to exit, some analyses indicate that these "relaxed" requirements will still be difficult for most foreign companies to meet. A study by Cleary Gottlieb Steen & Hamilton and Citigroup of 64 large European issuers shows that fewer than 10 percent of European companies could benefit from the proposed changes. As long as foreign companies cannot obtain easy exits from the U.S. capital market, they will be less likely to come here in the first place.

Third, U.S. companies engaging in IPOs abroad will find it difficult to avoid the requirements of the 1934 Act, including application of Sarbanes-Oxley. A U.S. company wishing to avoid U.S. regulation must certify that the relevant class of its securities is held of record by no more than 500 persons, whether U.S. or foreign investors. Thus, the few U.S. companies who have done IPOs on AIM (the small cap market) in London risk being covered by U.S. regulation once they become owned by more than 500 shareholders worldwide.

Fourth, it would be even more difficult for U.S. companies currently listed and traded in the U.S. market to deregister and move abroad to avoid U.S. regulation. Although the number of record holders has decreased with the increasing holding in street name, it remains unlikely that any U.S. company could meet this test. In addition, while a foreign company that only lists abroad can avoid U.S. regulatory requirements through an SEC exemption (Rule 12g3-2(b)) even if its shares become owned by more than 300 U.S. shareholders, no such exemption is available for U.S. companies.

At present, even if U.S. equity markets become less competitive, these quasi-capital controls prevent the United States from losing a significant fraction of its listings or new U.S. IPOs any time soon. Rather than helping, however, these controls delay a prompt response, letting the problem grow to a point where it will be very difficult to address. If foreign markets become more attractive, we will in the end have to let our own companies go abroad. In the meantime, the damage to the economy can be substantial. For this reason, the sign embedded in foreign companies' decisions to desert the U.S. equity markets cannot be ignored. It is a sign that the U.S. equity markets have become less competitive and something should be done before investors and the economy experiences more adverse consequences.

**Recommendation:** The Committee recommends that the SEC loosen these capital controls, at least for foreign issuers. If foreign companies know they can leave U.S. markets, they will be more willing to come in the first place. Thus, the SEC should permit foreign companies newly entering the public markets to provide in their offering documents that they have the right to deregister as long as they provide adequate notice to U.S. investors and a reasonable transition period.

For foreign companies that are currently trading in public markets, there is a legitimate concern for protecting retail investors who may have bought their stock in reliance on U.S. regulation and reporting requirements. However, these retail investor concerns should not apply to large institutional investors. Thus, the Committee recommends that the SEC revise its proposal to exclude these institutional investors from the calculation of the U.S. shareholder base.

# References

Acemoglu, Daron, Philippe Aghion, and Fabrizio Zilibotti. 2005. "Distance to Frontier, Selection, and Economic Growth." *Journal of the European Economic Association* 4:37-74.

Achleitner, Ann-Kristin and Oliver Klöcker.  2005. "Employment contribution of private equity and venture capital in Europe." European Private Equity and Venture Capital Association Working Paper (November).

Black, Bernard S. and Ronald J. Gilson. 1998. "Venture Capital and the Structure of Capital Markets: Banks versus Stock Markets." *Journal of Financial Economics* 47:243.

Borel, Philip. 2006. "High-speed Evolution." *Private Equity Annual Review 2005*: 68, 69.

Bushrod, Lisa, 2005, "Secondary Buyouts: The New Stock Market?" *European Venture Capital Journal*, July 1.

Cannon, Vincent Thomas. 2006. "Secondary Markets in Private Equity and the Future of Public Capital Markets." Harvard Law School seminar paper.

Carlin, Wendy and Colin Mayer. 2000. "Finance, Investment and Growth." University of Oxford working paper.

Coakley, J. 1992. "London as an International Financial Centre." In *Global Finance and Urban Living: A Study of Metropolitan Change.* Eds., Leslie Budd and Sam Whimster  65.  New York: Routledge.

Davis, Steven J., John Haltiwanger, Ron Jarmin, C.J. Krizan, Javier Miranda, Alfred Nucci, and Kristin Sandusky. 2006. "Measuring the Dynamics of Young and Small Businesses: Integrating the Employer and Nonemployer Business Universes." U.S. Bureau of the Census working paper.

Doidge, Craig, G. Andrew Karolyi, and René Stulz. 2004. "Why are Foreign Firms that are Listed in the U.S. Worth More?" *Journal of Financial Economics* 71:205– 238.

Doidge, Craig, G. Andrew Karolyi, Karl V. Lins, Darius P. Miller, and René M. Stulz, 2006, "Private Benefits of Control, Ownership, and the Cross-listing Decision." Study (February 2005, revised April 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=668424.

Domowitz, Ian, Jack Glen, and Ananth Madhavan. 1998. "International Cross-listing and Order Flow Migration: Evidence from an Emerging Market." *Journal of Finance* 53: 2001-27.

Domowitz, Ian, Jack Glen, and Ananth Madhavan. 2002. "Liquidity, Volatility, and Equity Trading Costs Across Countries and Over Time," *Journal of International Finance* 4:221-55.

Dyck, Alexander & Luigi Zingales, 2004, "Private Benefits of Control: An International Comparison," *Journal of Finance* 59(2):537-600.

Economist, 2004, "The new kings of capitalism." Nov 25, 2004.

Ferran, Ellis. 2003. "Examining the UK's Experience in Adopting the Single Financial Regulator Model." *Brooklyn Journal of International Law* 28:257.

Fraidin, Stephen, and William Sorabella. 2005. "Secondary Buyouts" 1517 PLI/Corp 235.

Global Insight. 2004. "Venture Impact 2004: Venture Capital Benefits to the U.S. Economy.".National Venture Capital Association Study, June.

Greenspan, Alan. 1998. "The Globalization of Finance." *Cato Journal* 17(3): 243–250.

Guiso, Luigi, Paola Sapienza, and Luigi Zingales. 2004. "Does Local Financial Development Matter?" *Quarterly Journal of Economics* 119: 929-969.

Hail, Luzi and Christian Leuz. 2006. "Cost of Capital Effects of U.S. Cross-Listings." University of Chicago working paper.

Halling, M., M. Pagano, O. Randl, and J. Zechner. 2006. "Where is the Market? Evidence from Cross-Listings in the U.S." University of Vienna working paper.

Häusler, Gerd. 2002. "The Globalization of Finance" *Finance & Development* 39(1): 10–12.

Jain, Pankaj. 2005. "Institutional Design and Liquidity at Stock Exchanges around the World." University of Memphis working paper.

Jayaratne, Jith and Philip E. Strahan. 1996. "The Finance-Growth Nexus: Evidence from Bank Branch Deregulation." *Quarterly Journal of Economics*, 111:639-671.

Karolyi, G. Andrew. 2006. "The World of Cross-Listings and Cross-Listings of the World: Challenging Conventional Wisdom." *Review of Finance*, 10(1):99-152.

King, Robert G. and Levine, Ross. 1993. "Finance and Growth: Schumpeter Might Be Right." *The Quarterly Journal of Economics,* August 1993a, 108(3):681-737.

Kukies, Jorg. 2001. "Stock Markets for High Technology Firms and Venture Capital Financing: Evidence from Europe." University of Chicago dissertation.

Levine, R., and S. Zervos. 1998. "Stock Markets, Banks, and Economic Growth." *American Economic Review* 88(3):537–558.

Levine, Ross. 2005. "Finance and Growth: Theory and Evidence." Forthcoming in Philippe Aghion and Steven Durlauf, eds. *Handbook of Economic Growth*. The Netherlands: Elsevier Science.

McCaughrin, Rebecca 2004. "Global: There's No Place Like Home." Morgan Stanley Global Economic Forum, May 10.

Michie, R. C. 1992. The *City of London: Continuity and Change, 1850–1990.* Basingstoke, Hampshire: Macmillan Academic and Professional.

Oxera Consulting Ltd. 2005. "The Competitive Position of London as a Global Financial Centre." Study.

Oxera Consulting Ltd. 2006. "The Cost of Capital: An International Comparison." Study.

Pagano, Marco, Ailsa A. Röell, and Josef Zechner. 2002. "The Geography of Equity Listing: Why Do Companies List Abroad?" *Journal of Finance* 57(6):December.

Rajan, Raghuram, and Luigi Zingales. 1998a. "Financial Dependence and Growth". *The American Economic Review* 88:559–586.

Rajan, Raghuram and Luigi Zingales. 1998b. "Which Capitalism? Lessons From the East Asia Crisis." *Journal of Applied Corporate Finance* 11(3:40).

Steil, Benn. 2002. *Building a Transatlantic Securities Market.* Council on Foreign Relations Report.

Welch, Chris P. 2005. "The U.S. Private Equity Market." Meketa Investment Group, *available at* http://www.altassets.net/pdfs/theusprivateequitymarket.pdf.

**TABLE I.1**
**Evolution of UK Capital Markets Regulation 1986-2006**

**1986**   **"Big Bang" Deregulation of London Stock Exchange (LSE)**
Prior to the "Big Bang" reforms enacted on October 27, 1986, the LSE was a "closed shop" marked by antiquated, anticompetitive regulation.  Brokers charged fixed commissions, and the jobs of broker and jobber (dealer) were separated.

After the "Big Bang":
- Member firms may be owned by outside institutions, including merchant banks.
- All firms are broker/dealers able to operate in a dual capacity.
- No minimum commissions.
- Individual members no longer have voting rights.
- The Exchange becomes a private limited company.

**1991**   **LSE Governance Reforms**
The governing Council of the Exchange is replaced with a Board of Directors drawn from the Exchange's executive, customer and user base.

**1995**   **Alternative Investments Market (AIM) Established**
AIM allows smaller companies to list shares without being subject to the regulations of the LSE's Main Market.  Listed companies do not need particular financial or trading records, and are not subject to minimum capitalization or minimum float requirements.

**1998**   **Financial Services Authority (FSA) Becomes UK Banking Regulator**
Pursuant to the Bank of England Act, regulatory and supervisory authority over the banking industry is transferred from the Bank of England to the FSA.

**2000**   **FSA Becomes UK Listing Authority**
The FSA takes over LSE's role as UK Listing Authority, consolidating responsibility for exchange regulation and banking supervision in a single regulator.

LSE shareholders vote to become a public limited company.

**2001**   **FSA Becomes Single UK Regulator of Investment Services**
The implementation of the Financial Services and Markets Act formally transfers to the FSA the responsibilities of several predecessor organizations:
- Building Societies Commission
- Friendly Societies Commission
- Investment Regulatory Organization
- Personal Investment Authority
- Register of Friendly Societies
- Securities and Futures Authority

Responsibility for the prevention of market abuse also is transferred to the FSA.

**2004** **FSA Introduces Wholesale and Institutional Markets Business Unit**

In order to more effectively pursue its twin goals of protecting consumers and maintaining efficient, orderly financial markets, the FSA created a separate division to regulate firms and markets whose business is conducted among financial professionals in the wholesale or institutional sectors.

**2006** **FSA Announces Shift to Principles-Based Regulation of Investment Services**

The FSA announces its "flagship" project, a strategic shift from a prescriptive to a principles-based approach to the regulation of investment services.  By the end of 2007, the existing Conduct of Business (COB) rules will be replaced by a "new COB" reflecting the principles-based approach.

**TABLE I.2**
**Declines in Listing Premiums**

This table reports the country average decline in the listing premium between the 2003-2005 period and the 1997-2001 one. All values are expressed in percentage terms. The listing premia (from Doidge *et al.* (2006)) are the differences in the market to book value of assets between cross listed and non cross listed stocks. The difference is computed between the average listing premium between the 2003-2005 period and the average in the 1997-2001 period.

| Country | Difference in the premia |
|---|---|
| India | -3.48 |
| Taiwan | -1.33 |
| Singapore | -1.23 |
| Finland | -0.98 |
| Hungary | -0.84 |
| Ireland | -0.71 |
| Denmark | -0.67 |
| Hong Kong | -0.55 |
| France | -0.51 |
| Germany | -0.49 |
| South Korea | -0.39 |
| Netherlands | -0.38 |
| Spain | -0.31 |
| Sweden | -0.26 |
| United Kingdon | -0.26 |
| Brazil | -0.21 |
| Canada | -0.21 |
| New Zealand | -0.19 |
| Portugal | -0.13 |
| Chile | -0.11 |
| Japan | -0.08 |
| Switzerland | -0.08 |
| Norway | -0.01 |
| Mexico | -0.01 |
| Indonesia | 0.01 |
| Italy | 0.02 |
| Israel | 0.07 |
| Russia | 0.12 |
| Australia | 0.19 |
| Argentina | 0.25 |
| Venezuela | 0.31 |
| Philippines | 0.36 |
| Austria | 0.41 |
| South Africa | 0.44 |
| Belgium | 0.45 |
| Luxembourg | 0.52 |
| Greece | 0.52 |
| Turkey | 0.59 |
| Peru | 0.61 |
| China | 0.72 |

## TABLE I.3
## Listing Costs and Underwriting Fees

All these tables are from Oxera, "The Cost of Capital An International Comparison (2006), with the exception of 3D, which is provided by Goldman Sachs.

### Table I.3A: Admission Fees for Different Exchanges, 2005

|  | Market capitalisation of £100m | | Market capitalisation of £500m | |
|---|---|---|---|---|
|  | (£) | % of value | (£) | % of value |
| LSE Main Market | 45,390 | 0.05 | 115,023 | 0.02 |
| LSE Aim | 4,180 | 0.00 | 4,180 | 0.00 |
| NYSE[1] | 81,900 | 0.08 | 104,887 | 0.02 |
| Nasdaq National[1] | 54,600 | 0.05 | 81,900 | 0.02 |
| Nasdaq Small Cap[1] | 51,870 | 0.05 | 27,300 | 0.01 |
| Euronext | 56,512 | 0.06 | 200,912 | 0.04 |
| Deutsche Boerse | 3,440 | 0.00 | 3,440 | 0.00 |

Notes: The table documents only initial fees that are classified by exchanges as 'admission fees.' In some instances, exchanges, or the competent authorities, charge additional fees (e.g., vetting and introduction fees). [1] The admission fee on NYSE and Nasdaq is calculated with reference to the number of shares outstanding; for the purpose of this illustration, a median level of share prices observed on the NYSE (c. £14) and Nasdaq (c. £7) is assumed to enable estimation of admission fees.
*Source:* Oxera calculations based on information available from the exchanges.

### Table I.3B: Annual Fees for Different Exchanges, 2005

|  | Market capitalisation of £100m | | Market capitalisation of £500m | | Market capitalisation of £10 billion | |
|---|---|---|---|---|---|---|
|  | (£) | % of value | (£) | % of value | (£) | % of value |
| LSE Main Market | 4,029 | 0.00 | 8,235 | 0.00 | 34,515 | 0.00 |
| LSE Aim | 4,180 | 0.00 | 4,180 | 0.00 | n/a | 0.00 |
| NYSE[1] | 19,110 | 0.02 | 19,110 | 0.00 | 273,000 | 0.00 |
| Nasdaq National[1] | 16,653 | 0.02 | 24,297 | 0.00 | 40,950 | 0.00 |
| Nasdaq Small Cap[1] | 11,466 | 0.01 | 11,466 | 0.00 | n/a | 0.00 |
| Euronext | 2,752 | 0.00 | 8,256 | 0.00 | 13,760 | 0.00 |
| Deutsche Boerse | 5,160 | 0.01 | 5,160 | 0.00 | 5,160 | 0.00 |

Notes: [1] The annual fee on NYSE, Nasdaq and Euronext is calculated with reference to the number of shares outstanding; for the purpose of this illustration, a median level of share prices observed on the NYSE (c. £14) and Nasdaq (c. £7) is assumed to enable estimation of annual fees.
*Source:* Oxera calculations based on information available from the exchanges.

**Table I.3C: Underwriting Fees for Domestic and Foreign IPOs**

| | Domestic companies | | Foreign companies | |
|---|---|---|---|---|
| | Sample size | Gross spread (%) | Sample size | Gross spread (%) |
| UK—Main Market | 28 | 3.3 | 5 | 3.5 |
| UK—AIM | 43 | 3.5 | 8 | 4.9 |
| USA—NYSE | 74 | 6.5 | 14 | 5.6 |
| USA—Nasdaq | 192 | 7.0 | 28 | 7.0 |
| Euronext | 7 | 1.8 | - | - |
| Deutsche Boerse | 6 | 3.0 | - | - |

Notes: No data was available for foreign IPOs on Euronext and Deutsche Boerse. On Euronext, foreign IPOs include IPOs by companies outside France, the Netherlands, Belgium and Portugal. Median values of gross spreads are reported.
*Source:* Oxera calculations based on Bloomberg.

**Table I.3D: Underwriting Fees for U.S. and U.K. Secondary Offerings**

| | Gross Spread | |
|---|---|---|
| Average Range ($MM) | United States | United Kingdom |
| 100-250 | 4.83 | 2.53 |
| 250-500 | 4.31 | 2.55 |
| 500-1,000 | 3.74 | 2.71 |
| 1,000+ | 2.83 | 1.87 |
| | | |
| Median Range ($MM) | United States | United Kingdom |
| 100-250 | 5.00 | 2.00 |
| 250-500 | 4.25 | 2.25 |
| 500-1,000 | 3.53 | 2.74 |
| 1,000+ | 2.75 | 1.82 |

Notes: Data is from November 14, 1996 to November 14, 2006. It is for follow-ons, excluding blocks.

## SECTION II:  REFORM OF THE REGULATORY PROCESS

Effective regulation that creates a hospitable climate for both investors and companies seeking to raise capital depends on the laws passed by Congress and on the rules written by the SEC and other regulators to implement the legislated mandates.  It also depends importantly on the regulatory process used by the regulators.  Much has been written to suggest that the pendulum shaping the regulatory process has in recent years swung toward unnecessarily costly, burdensome, and intrusive rules and procedures.  If this swing has indeed occurred, it would not be the first time in history.  For example, after the bursting of the "South Sea Bubble" in 1720, many of the King's ministers went to jail for fraud or insider trading, and Parliament outlawed the formation of new corporations; it subsequently outlawed the use of short selling and options trading for more than 100 years.

Many commentators have suggested that other financial centers have gained a competitive advantage over the United States by adopting less intrusive regulatory regimes.  But to make such a regime an end in itself would be self-defeating.  Investors and companies raising capital participate in markets where they feel safe by reason of effective laws that are vigorously enforced by fair, alert regulators.  A regulatory "race to the bottom" will serve no useful long-term competitive purpose.  What is needed is the proper balance between investor protection and the creation of market integrity on the one hand, and a respect for the cost, burden, and intrusion that regulation inevitably imposes on firms and individuals that participate in the financial markets on the other.  And it is important to realize that it is investors who ultimately bear most of the costs of unnecessary regulation.  Firms participating in the markets suffer modest profit erosion and pass most of these costs on to investors.

The Committee concludes that regulatory balance in some areas has been compromised.  In addition to revisions in laws and rules, the Committee believes that changes in regulatory processes and procedures (primarily at the level of the SEC, but also including the SROs) can make significant contributions to enhancing the competitive position of U.S. capital markets.  The ensuing sections discuss these changes in the SEC's approach in the following areas: (i) the adoption of a systematic cost-benefit analysis in the design of its rules; (ii) the use of more principles-based rules and the distinction between retail and wholesale investors and transactions in its rule writing; (iii) the adoption in its supervisory regime for securities firms of a more prudential "safety and soundness" approach which characterizes bank regulators; and (iv) greater cooperation among securities regulators both domestically and internationally.

## I.  The SEC Should Adopt More Formal Principles of Effective Regulation and Procedures for Cost-Benefit Analysis

In support of its mission "to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation" (SEC website), the SEC has never developed an extensive, formal program of cost-benefit analysis with explicit guidelines.  At present, analysis starts with some nonpublic staff consideration of costs and benefits in developing rules and regulations.  It is followed by a description of the cost-benefit analysis accompanying the publication of the rule in the Federal Register, as part of the several statements indicating conformance with Congressional mandates.  This cost-benefit analysis varies in detail from rule to rule but is generally "short and qualitative, lacking the depth and analytical rigor required of other federal agencies" ( Sherwin, 2005).  The SEC also reports to the Government Accountability Office (GAO), as is required by law, whatever cost-benefit analysis it chooses to execute, for later publication.  Finally, under the National Securities Market Improvement Act (NSMIA) of 1996, the SEC is required to consider in its rulemaking process, and in the review of SRO rule proposals, "in addition to the protection of investors, whether the action will promote efficiency, competition and capital formation."  Although not explicitly mandating cost-benefit analysis, this requirement does give some guidance to the SEC on how to develop its regulatory process.

The SEC's somewhat informal and less-than-consistent use of cost-benefit analysis is in full compliance with the requirements imposed by Congress.  Federal executive regulatory agencies are under considerably more formal and rigorous requirements to execute a cost-benefit analysis of the rules they promulgate.  Starting with executive orders issued by President Reagan in 1981 and subsequently updated by all succeeding presidents, all executive agencies are required for each "significant regulatory action" to submit to the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs (OIRA) an assessment of the potential costs and benefits of the proposal.  The assessment must include an underlying analysis containing the quantification of costs and benefits to the extent possible.  "Independent" agencies, including the financial regulators, are exempt from these executive orders.

Guidelines for agencies to use in regulatory analysis are detailed in the original Reagan executive order and have been updated over the years by the OMB, most recently in 2003.  These include "a statement of the need for the proposed action," "an examination of alternative approaches," and "an evaluation of the benefits and costs of the proposed action and the main alternatives."  There is also a presumption about the regulatory process that agencies should exercise their discretion to regulate only where there is a "compelling need" to do so.

Congress also has imposed requirements to perform a cost-benefit analysis on federal executive agencies but has exempted the independent agencies, including the SEC.  The Unfunded Mandates Reform Act (1995) requires each federal agency to prepare a "written statement" containing "a qualitative and quantitative assessment of the anticipated costs and benefits of the federal mandate" for any rulemaking likely to result

in public or private sector costs exceeding $100 million in a single year.  Additionally, the SEC, as well as each federal agency, both executive and independent, is required by the Congressional Review Act of 1996 to submit to the GAO any cost-benefit analysis it might *choose* to execute.  The GAO is to publish such analyses; however, this Act does not mandate that any cost-benefit analysis be performed.  Finally, the government Performance and Results Act of 1993 mandates that all federal agencies, including the SEC, perform an *ex post* analysis.  Agencies must execute a five-year strategic plan and report annually to the GAO how well it is meeting its performance goals and any remedial steps it is taking.  The analysis required does not, however, address the detail of individual rules and regulations.

In contrast to the environment in which the SEC operates, financial regulators in other market centers with which the United States competes operate under far more comprehensive and explicit principles of effective regulation, which include the requirement to perform a cost-benefit analysis.  For example, the Financial Services Authority (FSA), the U.K. financial industries regulator, has enunciated explicit regulatory principles that guide its operations.  The FSA principles include: (i) "efficiency and economy" ("when addressing a specific risk, the FSA will aim to select the options which are most efficient and economic"); (ii) "role of management" ("a firm's senior management is responsible for ... ensuring that its business is conducted in compliance with regulatory requirements.  This principle is designed to guard against unnecessary intrusion into firms' business and requires us to hold senior management responsible for risk management and controls within the firms."); (iii) "proportionality" ("restrictions imposed on firms and markets should be in proportion to the expected benefits for consumers and the industry ... FSA will use analysis of the costs and benefits of proposed regulatory requirements.  This proportional approach will manifest itself in particular in different regulatory requirements applied to wholesale and retail markets"); (iv) "the international character of financial services and markets and the desirability of maintaining the competitive position of the UK" ("FSA must take into account the international mobility of much financial business and must avoid damaging the competitive position of the U.K. ..."); and (v) "competition" ("avoid unnecessarily distorting or impeding competition.  Competition and innovation considerations play a key role in our cost-benefit analysis work.").  The FSA also commits itself to performance evaluation (post-audit analysis) to determine whether it is achieving its statutory objectives and complying with its own principles of good regulation.  For the purposes of this report, it is worth noting that the FSA commits itself explicitly to concern about the United Kingdom's international competitive position in financial services.

The SEC should establish explicit principles of effective regulation that will guide its activities to meet its statutory obligations.  These principles should include the systematic implementation of a carefully applied cost-benefit analysis of its proposed rules and regulations.  Rules should not only be evaluated initially at the front-end, but also should be reviewed periodically to ensure they are achieving their intended effect at an acceptable cost.

The Committee also recommends that the self-regulatory organizations (that is, NASD, Inc., the New York Stock Exchange ("NYSE"), and other exchanges), which are responsible for writing detailed rules that guide the behavior of securities firms, should also implement a systematic cost-benefit analysis of the rules they write.

The Committee is well aware of the challenges in developing effective cost-benefit analyses and the inherent biases to which such analyses are exposed. But the Committee believes the adoption of well crafted principles of effective regulation and the proper use of cost-benefit analysis will inevitably lead to a regime in which the SEC fully meets its statutory obligations of investor protection, maintaining market integrity, and facilitating capital formation while significantly reducing the unnecessary regulatory costs and burdens placed on securities firms and markets. These costs and burdens will be little reduced if the implementation of cost-benefit analysis is accompanied by a further delay in the rule review and adoption process, which is already often protracted. There is no reason why systematic cost-benefit analysis need further slow down the rule-making process.

To implement a systematic, consistent cost-benefit analysis of its rules, the SEC could choose among several paths. First, it could request that the OMB (through OIRA), which already executes a cost-benefit analysis of federal executive agencies' proposed rules, prepare analyses of proposed SEC rules. Such analyses would become one input, a wholly advisory one, into the Commission's rule-writing process. The obvious advantage of this mechanism is that OIRA is well staffed and has developed over many years considerable experience in performing cost-benefit analyses of government rules. However, there are several shortcomings. OIRA to date has experience mainly in reviewing health, worker safety, and environmental rules, but virtually no experience with financial rules. More importantly, because OMB and OIRA are offices of the White House, this mechanism would bring an "independent" agency under the political influence, if not control, of the Executive Branch.

A second mechanism available to the SEC is to create a wholly new agency, separate from itself, to execute a cost-benefit analysis of its rules. The agency could perhaps obtain benefits of scale by performing the same kind of analysis for other independent government financial regulators. The advantage of this mechanism is that it would be independent of the political oversight or influence of the Executive Branch. The primary disadvantages are that it likely would be costly, certainly slow and difficult to bring into being, and perhaps less well informed of the intricacies of financial regulation than the SEC staff and commissioners it would be advising.

A third, and perhaps most obvious, alternative is for the SEC to perform the analysis internally. The SEC has the statutory and budgetary authority to create a group within the Commission charged with performing a systematic cost-benefit analysis of rules as they are developed. The communications, cooperation, and knowledge benefits of internalization are clear. But there are challenges as well. The SEC culture is overwhelmingly dominated by lawyers, and the SEC staff has relatively few economists, statisticians, and business analysts. Developing an in-house analytical capability would

require a major and costly recruiting effort, and there would be a concern that the perspective of lawyers would co-opt the perspective of economists and business analysts. The use of seconded personnel with experience from securities firms could speed the development of an in-house analytic capability and make it more effective.

The adoption by the SEC of regulatory principles and a cost-benefit analysis could be effected either by legislation or Commission decision.  Legislatively, the regulatory principles in NSMIA (promoting effective competition and capital formation) could be amended to include other principles (for example, efficiency, proportionality, maintaining the competitive position of the U.S. markets).  Also, the Unfunded Mandates Reform Act could be amended to require a cost-benefit analysis of all federal agencies, including independent agencies.  But such a path would be politically fraught and certainly time-consuming.  Nevertheless, if pursued successfully, it would likely assure that the SEC would remain committed to this regime for a long time.  The alternative would be for the SEC to adopt voluntarily a set of regulatory principles and a commitment to a systematic cost-benefit analysis of its proposed rules by some mechanism.  Such decisions could be taken by the present Commission quickly, although any voluntary decisions could be modified, or indeed revoked, just as quickly by later Commissions.

Taking into account the arguments for and against the alternative procedures for adopting regulatory principles and implementing a cost-benefit analysis, the Committee recommends that the SEC create an internal staff group of qualified economists and business analysts to perform a systematic cost-benefit analysis as a regular part of the rule-writing process.  Adopting this approach will allow rapid development of a set of cost-effective regulatory principles.

Although perhaps slower and less insulated from internal influence than outsourcing the task of a cost-benefit analysis to OIRA, an internal group will avoid the suggestion of any political oversight or influence by the Executive Branch.  Evaluations of regulation should not only be done on the front-end but should be undertaken periodically to ensure that regulations are having their intended effect and are still justified by cost-benefit analysis.

## II. The SEC and SROs Should Adopt More Principles-Based Rules and Different Rules for Dealings with Wholesale and Retail Investors

Over the years, experts on regulation have debated the relative advantages of principles-based versus prescriptive rules as the basis for setting regulatory standards and guiding the supervisory and enforcement activities of regulators.  In auditing standards, advocates of a principles-based regime would require that financial statements present a "true and fair" view of financial conditions and reduce, insofar as possible, the extensive Financial Accounting Standards Board (FASB) rulebook under which the profession presently operates.  Similarly, the corporate governance process in much of the European Union adheres to the principles-based "comply or explain" process, requiring a company to adhere to a set of accepted governance principles or explain why it has not.

The FSA in the United Kingdom has long advocated a principles-based rather than a prescriptive, rules-based regime for regulating financial services firms. Early on, it published a set of behavioral principles to which firms should adhere (among them, conduct business with integrity, skill, care, and diligence; maintain adequate risk management systems; adhere to proper standards of market conduct; manage conflicts of interest) and then require compliance with these principles in its supervisory and enforcement activities. Although it is true the FSA has developed an extensive rulebook prescribing behavior in considerable detail, it is in the process of editing down the rulebook by as much as 50 percent and placing greater emphasis on adherence to principles.

Advocates (including the FSA and others) of a principles-based approach based on high-level requirements emphasize the following primary benefits: flexibility for a firm to develop its own compliance ethos; reducing the cost and burden of regulation; promoting competition by reducing entry barriers that such costs impose; and reducing (unproductive) compliance activity aimed at exploiting loopholes in detailed rules. On the other side of the debate, those advocating a more extensive prescriptive, rules-based regime point to primary advantages including greater clarity of behavioral expectations, more consistent behavior across firms, more assurance that (less sophisticated) consumers will be given needed information about (complex) investment products, and finally, greater ease in performing compliance inspections and bringing enforcement actions. Of course, even principles-based advocates appreciate the need for some detailed rules, but they would provide that the rules, insofar as possible, be based on outcomes or results rather than prescribed processes and inputs. For example, in mandating that brokers not "churn" a client's investment account, they would have the rule and its enforcement look to whether or not brokers actually churn accounts; this would be in preference to mandating extensive supervisory and broker-training procedures aimed at preventing churning.

U.S. regulatory practice has been overwhelmingly focused on detailed prescriptive rules, both by the SEC and the SROs. On the one hand, the SROs recently have begun experimenting with more principles-based rules, including, for example, the rules promulgated by the NASD and NYSE dealing with business entertainment expenses. But those are the exception. On the other hand, the Commodity Futures Trading Commission ("CFTC") has widely adopted a principles-based approach.

The Committee believes the time has come for securities regulators to push with more determination in the direction of principles-based rules, with the consequent reduction in the size of the present, primarily prescriptive rulebooks. And in keeping with the cost-benefit analysis advocated earlier, these rules should be risk-based, reflecting anticipated dangers to investors and markets. This process must, of course, start with the enunciation of a set of principles intended to guide proper behavior. These principles would form the foundation on which the new rules approach would be built.

The Committee recommends that prescriptive rules be fashioned, where sensible, more in terms of outcomes, performance, and results rather than inputs and mandated processes. Regulations and the oversight of such regulations by the regulatory authority should be risk-based and principles-based. Recognizing that a principles-based regime gives regulated firms less guidance about expected behavior, we encourage the SEC and the SROs to be sensitive to this heightened ambiguity. In some areas of mandated behavior, it will be particularly important that the regulators accompany principles-based rules with well-articulated guidance to firms and that the regulators be mindful of this guidance in their enforcement activities.

The Committee recognizes that principles-based rules work best when the behavior mandated can be well defined and where compliance examination is more continuous than episodic (as is more the case with bank regulation and inspection). But expected behavior can, and should, be well defined. Indeed, regulators are using technology to move toward more continuous monitoring. The Committee believes there are important benefits to firms and investors from more outcomes-based rules, and such an approach is certainly more consonant with a principles-based regime.

In addition to distinguishing between principles-based and prescriptive-based rule regimes, other financial regulators have often found it useful to develop different sets of rules for corporate transactions with wholesale (institutional) customers and retail customers. In the United States, this distinction is rarely made. The SEC does designate categories of "qualified institutional buyers" and "accredited investors" who, because they are viewed to be more sophisticated in investment matters, are permitted to purchase privately placed securities. But that type of distinction in rule-writing is the exception. By contrast, SRO rules, which govern broad ranges of securities firms' behavior, make even fewer distinctions between the responsibilities of firms dealing with wholesale (institutional) and retail clients. For example, "suitability" requirements (that impose on the broker the obligation to determine that an investment has the proper risk and other characteristics for a client) are applied to brokers dealing with both retail and institutional clients.

Sensible principles of good regulation, including efficiency, economy, and proportionality, suggest that rules reflect the differing needs for protection, both in types and amount, of various investors whose knowledge, sophistication, and understanding varies. Therefore, these same principles would dictate different, at least in part, rulebooks for dealings with wholesale and retail investors. No doubt, the proper application of a cost-benefit analysis would lead to the same conclusion.

The Committee recommends that the SEC and the SROs should systematically review their rules with the goal of developing different sets of rules for transactions by firms with wholesale (institutional) and retail customers. (Regulation NMS has already dealt with handling individual and institutional stock trades on exchanges. The Committee does not propose to modify this rule.)

### III. SEC and SROs Should Adopt Modifications in Supervisory and Enforcement Approach

The supervisory and enforcement approaches of securities regulators and banking regulators have provided a remarkable contrast. Departing from the mandate to protect investors, enhance market integrity, and facilitate capital formation, securities regulators (both the SEC and SROs) focus supervision on compliance with specific rules and broadly publicize enforcement actions. By contrast, bank regulators, concentrating on the "safety and soundness" of the financial system, take a prudential approach to supervision and generally do not broadly publicize their enforcement actions.

The securities regulators' high-profile approach to enforcement is probably due partly to a "competition in toughness" that has developed during the post-bubble investigations by federal, state, and private-sector regulators into the abundant bubble-era abuses. But this high-profile approach has also been justified by the securities regulators' need first to engender investor confidence, which is enhanced by headlines advertising enforcement actions, and then to reduce the potential misbehavior by other firms, which is also effected by enforcement headlines. Yet, bank regulators must also create the confidence of consumer protection (for example, by policing "fair lending" provisions), but nevertheless follow a lower-profile approach.

Fortunately, legislation adopted in the past decade to allow the integration of a wide range of financial services under one corporate roof (the Gramm-Leach-Bliley Act of 1999) has required increased cooperation of bank and securities regulators. This cooperation is leading naturally to some convergence in regulatory philosophies between bank and securities regulators. The Committee views this convergence as a healthy trend and recommends that the pace accelerate. Significant benefits are likely to ensue from the further application to regulated entities such as broker-dealers and investment advisers of more prudential regulation, as in banking, together with less publicity surrounding enforcement actions. These benefits include greater willingness of securities firms to step forward with self-identified problems, earlier identification and better understanding by regulators of high-risk issues, and generally greater cooperation between the regulators and the regulated.

At the same time, the very active enforcement environment of recent years has also witnessed, many believe, the increased willingness of securities regulators to use enforcement actions as a basis for *ad hoc* rule-writing. This is undesirable. Rules should be clearly stated and developed through the accepted process of notice and comment by interested parties, then rigorously enforced. When new standards are introduced through specific enforcement actions and only later codified as explicit rules, confusion and distrust are likely to be the consequences.

There are numerous examples in recent years of enforcement actions being used to refashion existing rules. Standards requiring the separation of investment bankers and security analysts inside integrated investment banking firms first appeared as "voluntary" undertakings in the Global Settlement among ten major securities firms and federal, state,

and industry regulators, and only later were codified as rules. The same is true of standards prohibiting the allocation by investment banks of IPO shares to CEOs of client firms. In mutual fund enforcement, the SEC brought a series of cases for improper payments from funds to securities firms selling fund shares under so-called "revenue sharing" and "directed brokerage" arrangements. Revenue-sharing payments have been a well known, quite visible practice for years and are permissible so long as they are properly disclosed by the funds making the payments and the securities firms receiving them. Many were surprised that the SEC recently found insufficient disclosure practices that appear little different from those that had been acceptable over many years. Further, programs under which funds direct brokerage commissions to certain securities firms selling their funds have long existed and are permissible, so long as they are properly disclosed, and under SRO rules, are not part of an explicit *quid pro quo* arrangement. Again, during this period the SEC and SROs brought directed brokerage cases where disclosure was little changed from past practices and where *quid pro quo* arrangements were hard to discern. And again, only after these cases were brought did the SROs change their rules to prohibit all kinds of directed brokerage payments, whether or not they are part of an explicit payment-for-services arrangement.

Much in the SEC's enforcement regime—the use of "no-fault" settlement agreements (in which the target of an investigation agrees to settlement terms without admitting or denying guilt) to avoid protracted litigation, and the extension of rules through enforcement actions—has the effect of engendering greater uncertainty in the marketplace about just what is allowed, and what is not. Such uncertainty inevitably raises costs to firms, issuers, and, ultimately, to investors.

The Committee views with concern this trend toward using enforcement actions for *ad hoc* rule writing. And the Committee strongly encourages the SEC and other securities regulators to abide by the stated procedures for rule development and promulgation, which require the usual notice and comment process. When rules are found deficient, they should be changed by the accepted regulatory process, which should not be short-circuited by enforcement actions.

## IV. SEC Should Take Steps to Increase Federal Regulatory Cooperation

Compared with the regulatory structure for overseeing financial institutions in other developed countries, the U.S. regulatory system is complex and highly fragmented. Its present form is the consequence of constitutional tensions (federal versus state authority) and a preference for "functional regulation" which mandates that regulators be created along business-activity lines. Thus, the U.S. financial regulation system has federal, state, and private-sector regulatory bodies in securities and banking, but total state jurisdiction in insurance; federal and state law enforcement officials (the Department of Justice, state attorneys-general); and myriad federal financial regulators (the SEC, the CFTC, and four banking regulators). Over time, as legislation has permitted and commercial imperatives have encouraged, more business lines have been operated out of single firms. As a consequence, the fragmented U.S. financial regulatory system has become increasingly filled with friction, and even dysfunctional.

There are many inhibitions to rationalization and simplification of this complex system, and change is likely to come slowly. The Committee recommends that pending a more thorough revamping of the federal regulatory system, there should be effective communication and cooperation among federal regulators, including SROs. The President's Working Group on Financial Markets is one natural venue for ensuring such coordination takes place.

Although elimination of duplication and overlap in the U.S. regulatory system may generally be difficult, there is one area on which there has been much recent focus and progress is quite possible. As much by virtue of the historical evolution of legislation as conscious intent, both the NYSE and NASD have self-regulatory responsibility for the oversight of the roughly 200 largest securities firms. Despite serious, recent efforts of both organizations to cooperate in rule writing and the discharge of their duties, this duplicate structure leads to both inconsistent rules and a waste of resources. Both SROs have recognized the benefits of merging their firm-regulation activities into a single organization and have conducted ongoing discussions. If and when these discussions succeed in producing a single, merged SRO charged with the responsibility for all firm regulation, unnecessary costs and inconsistent rules will be eliminated to the great benefit of investors and firms. SEC Chairman Cox has recently supported a merger along these lines. The Committee encourages both organizations to overcome whatever hurdles still remain and, without further delay, to create a single SRO for all firm regulation activities. The Committee further urges that this merger not merely result in the merger of two rule books but that the new rules of the merged SRO be principles-based.

## V.  Congress Should Take Steps to Improve Enforcement Coordination Between the Federal Government and the States

The recent enforcement actions of the state attorneys general in New York and elsewhere against abusive practices in the securities and mutual fund industries give rise to concerns that state actions may result in structural reforms that affect the nation and the world. The former was the result in cases brought by the New York State Attorney General under state law involving abuses by securities analysts, traders, and certain mutual fund complexes. These cases have effectively set national rules in these areas. Defenders of parallel state enforcement authority point to the fact that the New York authorities uncovered the abuses before the SEC and only proceeded after the SEC refused to act. Thus, they argue, there is a strong need for States to act when their citizens are not protected by the federal government.

The Committee recommends that Congress should take steps to improve enforcement coordination between the Federal Government and the States. There are two driving concerns:  (i) that the States be able to pursue civil enforcement in the absence of parallel SEC action and (ii) that the SEC be able to have the final say on settlements involving structural remedies of national importance. These objectives can be reconciled by allowing the States to act when the SEC does not, but by requiring the States to notify the SEC of their enforcement actions and permitting the SEC to have the final say on a