settlement involving a structural remedy when it determines that the matter is of national importance. No implication about the SEC's view of the state action, in either a positive or negative direction, should be drawn from the SEC's refusal to intervene.

State criminal indictments of a financial or auditing firm can have important national consequences. The Committee believes the Department of Justice should receive advance notice of all state indictments of financial or auditing firms with a national clientele and be able to prevent an indictment on the grounds of national interest. Absent federal objection, the States would be free to proceed.

## VI. Need For More International Regulatory Cooperation

Important as cooperation and coordination is among U.S. regulators, it is even more important today among international securities regulators. After years of unfulfilled expectations, globalization of equity markets is finally becoming a reality. Corporations and investors both have much to gain. By being able to list simultaneously on multiple exchanges worldwide, corporations will gain access to geographically disparate pools of liquidity. Investors will reap the benefits of reduced trading costs through international competition, the ability to invest seamlessly across the globe, and easy access to needed portfolio diversification. One of the keys to being able to realize these benefits is appropriate convergence of trading rules and regulatory frameworks.

But the globalization of equity markets is proving difficult, as regulators raise objections—some no doubt legitimate, some perhaps no more than economic protectionism masquerading as regulatory concerns. Regulators in the United Kingdom and Europe have voiced concerns about the extra-territorial reach of U.S. laws and rules, should a U.S. exchange merge with a U.K. or European exchange. For example, a senior officer in the U.K. Treasury has announced that the government will introduce legislation to impose a barrier against the imposition of Sarbanes-Oxley on firms trading in London should the London exchange merge with a U.S. exchange. As Ed Balls, the economic secretary to the Treasury, said with understatement: "The Sarbanes-Oxley regime in the United States is not a regime that some companies find easy to deal with." Similarly, the premiers of France and Germany have expressed a preference for intra-European exchange mergers over trans-Atlantic mergers because of regulatory concerns.

U.S. proponents of equity markets globalization—both market officials and regulators—have countered that extraterritorial reach should not be a problem. They argue that even after a trans-Atlantic merger, trades executed in the United Kingdom or European venues of the merged exchange, and issuers listed there, will not be subject to U.S. laws or rules. Many in Europe remain skeptical.

Distinctions based on geographical trading venues are at best an adequate stop-gap measure, but face challenges over time. The full benefits of global exchange mergers will occur when trading platforms are fully integrated based on computer technology. When this integration happens, trades will not take place in New York or London or

Paris. They will take place on a satellite over the Atlantic Ocean. What home-country regulator will be responsible for, and what home-country laws will apply to, those trades?

Effectively governing these trades on globally-merged exchanges will ultimately require cooperation among international regulators to produce harmonized trading rules, coordinated to assure consistency with the standards and laws of the involved national regulators. Achieving harmonized rules will be easier to the extent that rules are principles-based. Yet, reaching these harmonized rules will require compromise and cooperation. The U.S. regulator (or for that matter, any regulator) cannot impose its rules on others. Cooperation will not be easy, because national regulators are, after all, national, subject to national political oversight and pressures. But failure to produce harmonized trading rules and integrated trading platforms will deny much of the benefit of globalized exchanges. Here again, the President's Working Group can produce energy and focus for this task, which will require leadership and hard work. The Committee urges the Working Group to make the task of international coordination and rule harmonization a major priority.

## References

Sherwin, Edward. 2005. "The Cost-Benefit Analysis of Financial Regulation: What the SEC Ignores in the Rulemaking Process, Why It Matters, and What To Do about It." Unpublished draft (December 19, 2005), *available at* http://www.law.harvard.edu/faculty/hjackson/pdfs/CBA.article.doc.pdf.

# SECTION III:  ENFORCEMENT

The United States has the toughest administrative enforcement of securities laws in the world.  In 2004, civil penalties amounted to $4.74 billion (Table III.1, Jackson, 2005).  This compares with penalties in the United Kingdom for all financial sectors of $40.48 million in the same year (Table III.2, Savov, 2006).  On top of administrative penalties, private class actions in the United States in 2004 resulted in an additional $3.5 billion in liability (Figure III.1).  Securities class actions do not exist in the United Kingdom, or in the markets of our major competitors.  Indeed, Director and Officer (D&O) insurance costs are six times higher in the United States than in Europe.  Foreign companies commonly cite the U.S. enforcement system as the most important reason why they do not want to list in the U.S. market.

## TABLE III.1
### Summary of U.S. Enforcement Actions in Securities Regulations

| | Annualized Data: 2002-2004 | | 2004 Data | |
|---|---|---|---|---|
| | Total Monetary Sanctions | Percentage of Grand Total | Total Monetary Sanctions | Percentage of Grand Total |
| *Public Actions:* | | | | |
| SEC | 2,164,666,667 | 24.6% | 3,100,000,000 | 29.8% |
| DOJ | 766,525,000 | 8.7% | 16,850,000 | 0.2% |
| State Agencies (estimated) | 1,114,949,985 | 12.7% | 931,212,489 | 9.0% |
| Subtotal | 4,046,141,652 | 46.1% | 4,048,062,489 | 39.0% |
| NASD | 1,078,282,572 | 12.3% | 232,024,058 | 2.2% |
| NYSE | 163,059,260 | 1.9% | 464,834,281 | 4.5% |
| Subtotal | 1,241,341,832 | 14.1% | 696,858,339 | 6.7% |
| Total Public Actions | 5,287,483,484 | 60.2% | 4,744,920,828 | 45.7% |
| *Private Actions* | | | | |
| Class Actions | 3,336,333,333 | 38.0% | 5,456,000,000 | 52.5% |
| NASD Arbitrations | 162,333,333 | 1.8% | 186,000,000 | 1.8% |
| NYSE Arbitrations | missing | n/a | missing | n/a |
| Total Private Actions | 3,498,666,666 | 39.8% | 5,642,000,000 | 54.3% |
| Grand Total -- Private & Public | 8,786,150,150 | 100.0% | 10,386,920,828 | 100.0% |
| Adjusted Grand Total* | 8,176,733,485 | 93.1% | 8,616,920,828 | 83.0% |

*Adjusted to deduct sanctions reported under two or more agencies*

**TABLE III.2**
**Sanctions in U.K. Securities Regulations Enforcement Actions**

| | |
|---|---|
| No. of sanctions | 79 |
| No. of fines for capital market violations | 29 |
| No. of fines for capital market violations (adjusted for stock market capitalization) | 29 |
| Amount of fines from all financial sectors, USD million | 40.48 |
| Amount of fines from all financial sectors per billion of GDP in USD | 18,908 |
| Normalization factor for stock market capitalization | 1 |

Tough enforcement is essential for a strong securities market since it ensures that wrongdoers are punished and relinquish any benefits obtained by violations. A tough enforcement system is essential to preserve the integrity of our markets. The corporate failures of Enron, WorldCom, Adelphia, Tyco, HealthSouth, and a number of other companies underscore this point. Perhaps even more importantly, enforcement deters future violations. However, over-enforcement (enforcement in excess of that needed to deter) can entail serious unnecessary costs. Fines and damages imposed on corporations are borne by innocent shareholders, thus reducing their returns. Securities class actions are fundamentally different from class actions for other kinds of cases, such as environmental, consumer or antitrust actions where third parties incur harm. In securities class actions, one is fundamentally dealing with a suit by shareholders victimized by fraud against shareholders who happen to own the company at the time the suit is brought; indeed, shareholders, particularly institutions, are often on both sides. In addition, the transaction costs of obtaining these damages, plaintiffs' attorney fees, — typically 25 to 35 percent of recovery, averaging 19 percent for settlements over $100 million compared with 33 percent for settlements under $5 million, are substantial.

To the extent enforcement results are uncertain and unpredictable, further costs are added to the system.

The Committee believes that regulatory adjustments need to be made in the private enforcement system to reduce damages to innocent shareholders, and to reduce transaction and uncertainty costs. These benefits will greatly help U.S. competitiveness. The strong SEC and state civil enforcement systems, as well as the strong criminal prosecution of individual wrongdoers, together with a revamped system of private class actions, will still provide a full measure of deterrence of violations in our market. Given the circular shareholder effect of private class actions and the clear negative impact such cases have on our competitiveness, the Committee believes that shareholders of companies should have the right to decide to adopt remedies, such as arbitration or non-jury trials, that would reduce the negative impact of class actions.

In addition, the Committee believes that the criminal prosecution of corporations should be reserved for truly exceptional circumstances—currently the Justice Department

weighs nine factors in making such a decision. Criminal prosecution of a corporation, as in the case of Arthur Andersen, can result in losses to all stakeholders in a company, owners and employees, and result in additional substantial losses to society—in the Andersen case, the loss of a major audit firm further concentrated the audit industry—and this can all occur as a result of an indictment as opposed to a conviction (Andersen's conviction was overturned by the Supreme Court).

The Committee is also concerned that the present level of auditor liability—there are currently more than three dozen suits pending against audit firms involving tens of billions of dollars of claimed potential damages—could result in the bankruptcy of an additional audit firm, with devastating results to corporate governance in the United States and the rest of the world. Auditor risk is currently largely uninsurable by third party insurers due to the high level of uncertainty regarding catastrophic claims and the concentration of risk in a few audit firms. Following the publication of a comprehensive study, Europe has announced its intention to cap auditor liability in order to make these risks insurable. Insurability would provide a benefit for not only the firms but also potential victims of auditor wrongdoing. The Committee believes that Congress should seriously examine this approach.

Finally, the Committee is concerned that the crucial role of outside directors in the governance system not be undermined by imposing requirements on them that they cannot meet, despite acting in good faith. This risk makes it more difficult to recruit highly-qualified outside directors. The Committee recommends that the SEC recognize the practicalities facing an outside director by making an outside director's good faith reliance on an audited financial statement or an auditor's SAS 100 review report[27] conclusive evidence of due diligence. In addition, the Committee recommends that the SEC permit companies, without qualification, to indemnify outside directors who have acted in good faith (but not for more egregious conduct) in connection with securities offerings. This indemnification would serve as an additional source of protection to outside directors over and above the protection they now obtain from D&O insurance.

---

[27] Rule 10-01(d) of Regulation S-X requires that prior to filing a quarterly report on Form 10-Q, the unaudited interim financial statements included in the report must be "reviewed by an independent public accountant using professional standards and procedures for conducting such reviews." This requirement is satisfied by auditors complying with Statement of Auditing Standards No. 100 ("SAS 100") *Interim Financial Information*, which was adopted in 2002 and establishes a uniform set of procedures (short of an audit) for accountants to follow in order to provide negative assurance that interim financial statements comply with GAAP. The procedures required by SAS 100 include comparing disaggregated revenue data for the current interim period with that of comparable prior periods, obtaining evidence that the interim financial information agrees or reconciles with the accounting records and inquiring of members of management who have responsibility for financial and accounting matters about their knowledge of any fraud or suspected fraud affecting the entity. If, as a result of conducting a SAS 100 review, the auditor becomes aware that any material modification should be made to the interim financial information for it to conform with generally accepted accounting principals, the auditor is required to communicate such deficiency to the "appropriate level of management" as soon as practicable. In addition, the auditors may, if requested, provide a review report stating that they have reviewed the Company's interim financials statements and that they are not aware of any material modification that should be made to such financial statements for them to be in conformity with accounting principals generally accepted in the United States.

## I. Civil Enforcement

## A. Enforcement In Private Securities Litigation

One recent study concludes that the average public company has nearly a 10 percent probability of facing at least one shareholder class action lawsuit over the course of a five-year period.[28]  Clearly, the threat of private liability is something any public company must take seriously.  While much is in dispute about securities class action litigation, the prevalence of the lawsuits, the enormous size of their settlement values, and the large burden they impose on companies and their shareholders are not.

### 1. Securities Class Action Lawsuits are a Very Important Kind of Class Action Litigation in Federal Courts

On an unconsolidated basis, securities class actions accounted for roughly 48 percent of all class actions pending in federal court in 2004 and 2005, as set forth in Table III.3.  However, since most securities class actions are consolidated for purposes of discovery and few of even the consolidated cases are ever tried, these statistics may overstate the scope of the judicial burden imposed by securities class action lawsuits.[29]

### TABLE III.3
### Class Actions Pending in Federal Courts as of September 30

| Type of Case | 2002 | 2003 | 2004 |
|---|---|---|---|
| Contract | 282 | 290 | 289 |
| Real Property | 33 | 38 | 34 |
| Tort Actions | 529 | 604 | 600 |
| Antitrust | 249 | 231 | 202 |
| Employment Rights | 164 | 159 | 173 |
| Other Civil Rights | 298 | 274 | 266 |
| Prisons, Prisoners | 66 | 64 | 82 |
| RICO | 53 | 76 | 46 |
| ERISA | 134 | 183 | 216 |
| Other Labor Suits | 180 | 204 | 262 |
| *Securities/Commodities/Exchange* | *2,325* | *2,339* | *2,480* |
| Others | 522 | 514 | 529 |
| **Total** | **4,835** | **4,977** | **5,179** |
| | | | |
| **Securities Class Actions as a percentage of total** | **47.5%** | **47%** | **47.9%** |

---

28 Buckberg *et al.* (2006) at 3.

29 *See* The Administrative Office of the United States Courts, *Annual Reports on the Judicial Business of the United States Courts* for the years 2002—2004, Table X4 (hereinafter "U.S. Courts Annual Reports"). However, even cases consolidated under this provision must be remanded back to the origin2al district court at the conclusion of the pretrial proceedings. *See* Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). Moreover, even if unconsolidated class actions are an inexact measure of the judicial burden, they do show the number of attorneys involved.

2. **Although the Filing Rate for Securities Class Action Lawsuits has Fallen in 2005 and 2006, the Drop in Filings has been Accompanied by a Rise in Settlement Sizes to New and Unprecedented Levels.**

In 2005, U.S. public companies paid more than $3.5 billion to settle securities class action lawsuits, not including the $6.156 billion settlement incurred by WorldCom as of the end of that year.  The average settlement size paid by each of these companies was higher than in years past.  Excluding the mega-settlements in Enron and WorldCom, the average settlement in 2005 was $71.1 million—an increase of 156 percent over the $27.8 million average settlement in 2004.[30]  Figure III.1 below provides an inflation-adjusted look at the growth in total settlement payments related to securities class action lawsuits since 1997.

**FIGURE III.1**



### Securities Class Action Settlement Trends
*Dollars in Millions*

Notes
Settlement dollars adjusted for inflation; 2005 dollar equivalent figures shown
Settlement data for 2000 does not include Cendant Corporation's $3.1 billion Common Stockholder Class Settlement
Settlement data for 2005 does not include Worldcom, Inc.'s $6.156 billion Total Settlement as of Year-End 2005

Source
Laura E. Simmons and Ellen M. Ryan, Post-Reform Act Securities Settlements: 2005 Review and Analysis (Cornerstone Resear-

---

30 PricewaterhouseCoopers 2005 Securities Litigation Study, website summary.  A similar study by the National Economic Research Association excludes data related to both Worldcom and Enron, as well as any settlements reached by year-end 2005 but not yet finalized.  Because this approach omits from the 2005 calculations many large settlements, it suggests a much smaller growth in the average settlement value between 2004 and 2005—approximately 28 percent.  Although the NERA study suggests that, underneath the mega-settlements, there may be some stabilization occurring in average settlement values, it also shows the scope of the upward shift in these values.  According to NERA's study, the average settlement value for the period 1996 – 2001 was $13.3 million.  The average settlement value for the period 2002 – 2005 was $22.3 million.  Buckberg *et al.* (2005) at 6.

A similar study by the National Economic Research Association (NERA)[31] observes that, although average and median settlement amounts have increased significantly from the 1996–2001 period to the 2002–05 period, much of the increase is driven by the large investor losses during the 2000–02 period. This is due to the fact that securities class actions take about five years on average to settle. When these suits are excluded there is a much smaller growth in the average settlement value between 2004 and 2005—approximately 28 percent. According to NERA's study, the average settlement value for the period 1996–2001 was $13.3 million. The average settlement value for the period 2002–2005 was $22.3 million. Of course, 28 percent growth is still quite significant.

The reason for the soaring settlement values is less clear, but the data are equally undeniable. The ten largest securities class action settlements since the passage of the Private Securities Litigation Reform Act (PSLRA) in 1995 are set forth in Table III.4 below.[32]

**TABLE III.4**
**Ten Largest Securities Class Action Settlements Since 1995**

| Rank | Issuer | Maximum Asserted Valuation |
|------|--------|---------------------------|
| 1 | Enron | $7,160.5 Million |
| 2 | WorldCom | $6,156.3 Million |
| 3 | Cendant | $3,528.0 Million |
| 4 | AOL Time Warner | $2,500.0 Million |
| 5 | Nortel Networks | $2,473.6 Million |
| 6 | Royal Ahold | $1,091.0 Million |
| 7 | IPO Allocation Litigation | $1,000.0 Million |
| 8 | McKesson HBOC | $960.0 Million |
| 9 | Lucent Technologies | $673.4 Million |
| 10 | Bristol-Myers Squibb | $574.0 Million |

*Source:* Stanford Securities Class Action Litigation Clearinghouse.

---

31 Buckberg *et al.* (2006).
32 Compiled by the Stanford Securities Class Action Litigation Clearinghouse.

*Enforcement*

As average settlement values climb, so too do the incentives for companies to try to evade private litigation under the U.S. securities laws by simply choosing to sell their shares elsewhere.

Although the figure above shows a rise in the number of securities class action settlements, the number of federal cases actually filed declined from about 230 in 2004 to about 205 in 2005, about 17 percent, and it appears filings will fall further in 2006 (Figure III.2). Numerous and varied explanations have been proposed for the recent decline. First, the stock market rose for most of 2005 and 2006, reducing the number of sudden stock price drops that might have fueled securities litigation. The 2006 indictment of Milberg Weiss, once dominant in representing class plaintiffs, may also have affected the filing rate. The indictment may have deterred other firms from filing lawsuits, and it may have become more difficult for those firms that did still wish to file securities class action lawsuits to find or use "professional" plaintiffs—that is, plaintiffs who are (probably) paid to participate.[33] Finally, it is possible that the lower filing rate reflects the success of the 2002 Sarbanes-Oxley legislation in curbing managers' incentives to recognize income prematurely or engage in other dubious accounting manipulations.

**FIGURE III.2**
**Federal Filings of Securities Class-Action Lawsuits, Jan. 1, 1991 – Aug. 31, 2006**



Source: "Recent Trends in Shareholder Class Action Ligitigation", Todd Foster et al., NERA.

[33] These professional plaintiffs still appear in a large percentage of securities class actions, even if institutional investors now serve as the lead plaintiffs in the largest securities class actions.

Compared to Europe, the high level of liability in the U.S. system results in substantially higher insurance costs. D&O insurance limits purchased by Fortune 500 companies are typically $500 million in the United States compared with $250 million in Europe. The rate paid in the United States is about four percent, for a total cost of $20 million. In Europe, this rate is 1.3 percent, or a total cost of $3.25 million. Thus, insurance costs for a Fortune 500 company are over six times higher in the United States than in Europe. As Figure III.3 shows, European and U.S. rates started diverging after 2001.

### FIGURE III.3
### Public D&O Industry Pricing



*Source: Major Reinsurance Company*

## B.  Cost-Benefit Analysis of Shareholder Litigation

The modern securities class action lawsuit creates a heavy burden for public companies; without a substantial social benefit, this burden cannot be justified. As discussed in greater detail below, however, the public value of the securities class action litigation is questionable. First, the potential deterrent function of private securities litigation is debatable because virtually all the costs fall on the corporation and its insurer, which means they are ultimately borne by the shareholders.[1]  Only in the rare case in which the corporation becomes insolvent *and* its insurance coverage is inadequate do the costs fall on individuals (this was the case in *Enron* and *WorldCom* where, almost

---

1 A 1995 study by NERA found that even when officers and directors were named as defendants, settlements were funded 68.2 percent by liability insurance and 31.4 percent by payments from the corporation—leaving at most 0.4 percent to be paid by individual defendants or others. Dunbar *et al.* (1995) at 9. Since then, the extent to which the insurers bear the entire settlement has probably increased.' There is a likely reason for this: beginning in 1996, D&O insurers began to offer insurance directly to the corporation (now referred to as "entity insurance" or "Side C" insurance). Previously, D&O insurers had insured only the directors and officers as individuals and the corporation's obligation to make indemnification payments to them. But with the marketing of entity insurance (which virtually all public corporations now carry), all liabilities flow back to a single insurer (who thus need make no allocation).

*Enforcement*

uniquely, outside directors did contribute to the settlement, a situation discussed later in this section).[35]

Second, the notion that securities class actions do a good job of compensating injured parties is belied by data suggesting that the average securities class action settles for between two percent and three percent of the investors' economic losses. NERA found the ratio of settlements to investor losses in 2002, 2003, and 2004 to be 2.7 percent, 2.9 percent, and 2.3 percent, respectively.[36] Moreover, any apparent recovery must be reevaluated in light of the high transaction costs of this kind of litigation. Plaintiffs' attorneys customarily are awarded between 25 percent and 35 percent of any recovery (although this percentage is declining).[37] Although less evidence is available about defense costs, some recent evidence suggests they are in the same range.[38] If one adds to these numbers the admittedly hard-to-quantify costs of D&O insurance and business disruption, it is not clear that there is any positive recovery in the average securities class action.

Finally, even if there is a net recovery, contemporary securities class action litigation is still suffering from a problem of circularity. The recovery is largely paid by diversified shareholders to diversified shareholders and thus represents a pocket-shifting wealth transfer that compensates no one in any meaningful sense and that incurs substantial wasteful transaction costs in the process. Any recovery in a securities class action goes to the shareholders who traded (either bought or sold the stock) during the class period when the market price allegedly was affected by fraud. The damages these investors receive essentially are paid by those shareholders who did not trade during the class period. If a shareholder in a stock drop case bought shares both inside and outside the class period, in equal quantities, he or she would be on both sides of the division in time and would be both paying and receiving the recovery. The shareholder would have no net recovery; indeed, he or she will not even be in a neutral position, having lost money as a result of the transaction costs.[39]

---

35 The twelve outside directors of WorldCom paid some $25 million to settle the securities class action against them. WorldCom was, of course, insolvent and its potential liabilities (over $70 billion) exceeded the D&O insurance coverage.

36 *See* Buckberg, *et al.* 2005 at 6.

37 Buckberg, *et al.* 2005.

38 *See* Baker and Griffith (2006) at 10 n. 28.

39 To illustrate, assume that a large pension fund holds substantial positions in some 1,000 stocks and that over the course of a five-year period some 100 of these companies are the subject of securities class actions (the actual rate has been 2.1 percent per year–or 10.5 percent over five years). Of these 100 stocks, the hypothetical pension fund bought its securities within the class period in 50 cases and outside the class period in another 50 cases (for a total of 100), and perhaps it bought in both periods in some 25 cases. No matter how "successful" the plaintiffs' attorneys believe they have been in this hypothetical litigation, they have not improved the welfare of the diversified investors. However high the settlement is, it comes from the pockets of the same investors who receive it—unless some third party (for example, the auditors or underwriters) bears a significant share of the settlement. Finally, the legal system will tax these transfer payments that investors are making to themselves heavily—with both plaintiffs' and defense counsels' fees being borne by the shareholders. The contrary case is WorldCom, where underwriters and auditors paid billions in settlements. If these third parties pay, they will pass the costs back to clients in the form of higher fees. This means shareholders in the end probably pay much of the costs imposed on third parties.

To be sure, not all shareholders are diversified, and those who are not might benefit from the private litigation. But in order to benefit, the shareholder must have acquired shares during the class period. Undiversified investors (and retail investors generally) tend to be investors who "buy and hold" and do not trade actively, while the typical class period is just under one year in length. As a result, the average buy and hold investor is likely to have acquired his shares before the class period commenced.[40] Ironically, therefore, securities litigation systematically may transfer wealth from buy and hold investors to more actively trading investors. These actively trading investors may not benefit from securities litigation, but at least they lose less.

## C. Recommended Reforms

In light of the foregoing assessment, policymakers should seek enforcement reforms that will remove the unnecessarily burdensome features of private securities litigation. The Committee recommends the following reforms to the civil liability system, most of which the SEC could adopt by practice or rule:

- resolve the uncertainties inherent in liability in litigation under Rule 10b-5 due to conflicting court decisions;

- limit the amount of damages recoverable through class actions when the SEC provides victim compensation with funds obtained through a Fair Funds remedy; and

- establish a rule that will limit so-called pay-to-play practices in which plaintiffs' attorney law firms make political contributions in exchange for being named as class counsel for state and local pension funds in private shareholder litigation.

## D. Recommendations

## 1. Resolve Existing Uncertainties in Rule 10b-5 Liability

Although claims under Rule 10b-5 account for the vast majority of securities litigation, considerable uncertainty exists about many of the elements of Rule 10b-5 liability as a result of conflicting interpretations by courts. Recognizing that Rule 10b-5 cases are factually complicated, the SEC should attempt to provide more guidance, using a risk-based approach, where it is able to do so. This review should include materiality, *scienter*—the requisite knowledge the wrongdoer needs to have about his/her wrongdoing)—and reliance.

The Circuit Courts of Appeals have issued conflicting opinions on a number of Rule 10b-5 issues. On materiality, the Third and Ninth Circuits are split in their willingness to consider a disclosed misrepresentation as "immaterial" as a matter of law if it does not produce any effects on the market. The Ninth Circuit has held that a

---

40 For a fuller statement of this argument and the supporting data, see Coffee, Jr. (forthcoming).

*Enforcement*

misrepresentation may be material even if the market has failed to react to it, and that such a determination is not purely a matter of law but requires a fact-specific inquiry.[41] The Third Circuit, on the other hand, has held that a court can deem a misrepresentation to be immaterial as a matter of law if the misrepresentation fails to affect the market.[42]

The SEC also should clarify whether the *scienter* element requires plaintiffs to establish a strong inference of fraudulent intent on the part of the defendant, as required by the Second Circuit,[43] or merely "deliberate recklessness," as required by the Ninth Circuit,[44] which is a much more nebulous (if not oxymoronic) concept to prove (as a plaintiff) or prevent (as an actor seeking to avoid liability).[45]

Further, the SEC should clarify use of the fraud-on-the-market theory by defining more sharply the circumstances under which a plaintiff is excused from proving reliance on the defendant's alleged material misstatement or omission. The fraud-on-the-market theory stems from the U.S. Supreme Court's plurality decision in *Basic v. Levinson*. In that case the Court held that, because prices in efficient markets reflect available information about the issuer, an efficient market creates a presumption that the plaintiff relied on the material misstatement or omission when purchasing the security—and so plaintiffs need only prove an efficient market and not particular reliance on the defendant's alleged misrepresentation or omission.[46] Courts disagree, however, about what factors to consider in determining whether the plaintiff has established the existence of an efficient market. The First Circuit's recent formulation is that a market is efficient only if the market price of the stock *fully reflects all* publicly available information.[47] While many courts have applied the five factors of the so-called *Cammer* test to determine whether the plaintiff has proved an efficient market,[48] the First Circuit held that this test is not enough and that plaintiffs must not merely show that the market reflected "most" publicly announced material statements about companies.[49] Rather, the

---

41 No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003).

42 Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000).

43 Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir.), *cert. denied*, 531 U.S. 102 (2000).

44 In re Silicon Graphics, Inc. Sec. Lit., 183 F.3d 970, 977 (9th Cir. 1999).

45 Recklessness has been defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875 (1977).

46 Basic, Inc. v. Levinson, 485 U.S. 224, 243-44 (1988).

47 In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 26 (1st Cir. 2005).

48 *See Securities Law—Fraud-on-the-Market—First Circuit Defines an Efficient Market for Fraud-on-the-Market Purposes*, 119 HARV. L. REV. 2284, 2288 (May 2006); Cammer v. Bloom, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (describing five-factor test for market efficiency that considers average weekly trading volume, number of securities analysts who follow the stock, number of market makers active in the stock, company's eligibility to file an S-3 registration statement, and historical showing of immediate price response to unexpected events or financial releases). *See also* Bell v. Ascandant Solutions, Inc., 422 F.3d 307, 313-14 (5th Cir. 2005); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 368 (4th Cir. 2004); Freeman v. Laventhol & Horwath, 915 F.2d 193, 198-99 (6th Cir. 1990) (all following five-factor test set in *Cammer*).

49 In re PolyMedica, *supra* note 47, at 419.

court explained, plaintiffs must prove that "prices respond so quickly to new information that it is impossible for traders to make trading profits on the basis of that information," that is, an informationally efficient market.[50]  The fraud-on-the-market theory provides plaintiffs with a logical presumption of reliance only when a market processes information in such a way as to justify investor reliance, and such justification is warranted only when the market reflects *all* publicly available information, the court reasoned.[51]

## 2.  Prevent Overlap of Private Lawsuits and Fair Funds Compensation

Section 308 of the Sarbanes-Oxley Act—"Fair Funds for Investors"—establishes the SEC's authority to order that civil penalties obtained from a defendant be added to a fund used to compensate victims of the securities fraud.  This authority has allowed the SEC to streamline the regulatory process, since the deterrent effect of penalties imposed on wrongdoers can, at the same time, have a compensating effect for the victims of the wrongdoers' fraud.  At present, however, there are no limitations on recoveries in concurrent, private lawsuits even after the SEC has made a Fair Funds distribution, raising the possibility of a wasteful double-recovery by shareholders that would undermine the original purpose of Section 308 by permitting overcompensation and, likewise, over-deterrence.

Relying on its authority to "unconditionally exempt any person, security, or transaction from any provision [of the Exchange Act],"[52] the SEC should prohibit double recoveries against defendants by requiring that private damages awards be offset by any Fair Funds collections applied for victim compensation.  This proposal will encourage defendants to settle quickly any cases brought against them by the SEC.

## 3.  Prohibit "Pay-to-Play" Practices

If securities class actions do not truly benefit shareholders, why do shareholders bring them?  One possibility looms particularly large:  some plaintiffs may have private motives for bringing suit that they do not share with other shareholders.  Historically, securities class actions and derivative suits often have been filed by professional plaintiffs who appeared in hundreds of cases.[53]  Owning small quantities of stock in many companies, these plaintiffs positioned themselves to be able to serve as plaintiff in almost any case.  Few believe they did this gratuitously; instead, there is widespread suspicion that many of these plaintiffs have received under-the-table payments from the plaintiffs' attorneys that they served.  Such an alleged fact pattern underlies the recent indictment of the Milberg Weiss law firm, long the dominant plaintiffs' firm in the securities class-action industry.  On May 18, 2006, the law firm of Milberg Weiss, together with two of

---

50 *Id.* at 14.
51 *Id.* at 16.
52 Securities Exchange Act of 1934, § 36.
53 The best known of these were Harry Lewis and William Weinberger. A Delaware Chancellor once expressed the view in jest that Mr. Lewis appeared so frequently in his court that he must have been a "street name." See *Lewis v. Andersen*, 453 A.2d 474, 475 (Del. Ch. 1982).

its name partners, was indicted on conspiracy charges in connection with an alleged illegal kickback scheme in which the firm made secret payments to individuals for serving as named plaintiffs in lawsuits filed by Milberg Weiss.[54] The indictment charges Milberg Weiss with a conspiracy whose objects included obstruction of justice, perjury, bribery, and fraud, with three substantive counts of mail fraud with a conspiracy to commit money laundering, and with two counts of criminal forfeiture.[55]

The problem of "lawyers hiring the client" was addressed by the Private Securities Litigation Reform Act (PSLRA), which gave lead plaintiff status and control of the securities class action to the class member seeking that position who had the largest financial stake in the action. This change has resulted in the development of a new practice known as "pay-to-play." Plaintiff law firms contribute to the political campaigns of elected officials who hold control over decisions of pension funds (typically, state and municipal comptrollers). Possibly in return, the elected official picks the law firm as the pension fund's class counsel when the firm elects to serve as lead plaintiff. In one example, a leading plaintiffs' law firm contributed $100,000 to a state comptroller's campaign, and senior partners at the firm made additional contributions. Shortly after winning re-election, the comptroller appointed the contributing law firm to represent the state's public-employee pension fund in a shareholder class action lawsuit.

Although there may be little harm to the pension fund, pay-to-play practices are likely to result in some class actions being filed by pension funds that would not have been filed in the absence of such reciprocal arrangements. In those cases, the pension fund will be worse off to the extent it has paid attorneys' fees.[56] Although the extent to which pay-to-play practices permeate securities litigation is uncertain, there seems to be little downside in discouraging such practices. Reforms in this area should not have an effect on litigation in cases where an informed client truly wishes to sue.

The municipal bonds industry may provide a model for successful reform. In 1994, the Municipal Securities Rulemaking Board (MSRB)[57] adopted Rule G-37. Under this rule, when an investment bank makes a political contribution to any elected official (or undertakes to solicit others), it may not be hired for a period of two years thereafter to underwrite the municipal bonds of the political subdivision to which that official belongs. This rule has been upheld against constitutional attack.[58] In 1996, the MSRB adopted Rule G-38 in an effort to prevent investment banks from relying on third-party

---

54 Press Release, United States Attorney Central District of California, Milberg Weiss Law Firm, Two Senior Partners Indicted in Secret Kickback Scheme Involving Named Plaintiffs in Class-Action Lawsuits (May 18, 2006), *available at* http://online.wsj.com/public/resources/documents/milbergpress05182006.pdf.
55 *Id.*
56 Another variant on this practice has been reported by The Chicago Tribune in the case of union pension funds: the legal fees awarded by the court are shared by the class counsel with the in-house lawyers for the union fund on an undisclosed basis. Again, this may enable plaintiff's counsel to "rent the fund" when otherwise the fund would not appear in the action. Either way, the number of securities class actions filed may be inflated by such practices.
57 The MSRB is a self-regulatory body established by Section 15B(b) of the Securities Exchange Act of 1934.
58 See *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995).

consultants to do what they themselves could not do.  Under Rule G-38, investment banks were required to make quarterly disclosures about any consultant relationships they maintained.  In 2005, Rule G-38 was expanded even further and now prohibits direct or indirect payments to any person for solicitation of municipal securities business if that person is not an affiliated person of the dealer.[59]  Taken together, the MSRB's rules have largely put an end to the old pay-to-play practices in municipal underwriting.

A similar prohibition should apply to securities litigation attorneys.  When political contributions are made by lawyers to individuals in charge of a state or municipal pension fund, the attorneys should not be permitted to represent the fund as a lead plaintiff in a securities class action.  Following the lead of the municipal bonds industry, the securities litigation regulations should be comprehensive and should cover any direct contributions as well as indirect contributions (made through "consultant" or other, similar arrangements) and should likewise prohibit the practice of using "professional" plaintiffs (such as has been alleged in the Milberg Weiss indictment).  Although there is no equivalent to the MSRB to adopt a similar rule for attorneys, the Department of Labor could adopt a similar rule under ERISA or legislation simply could ban such practices.  At a minimum, the SEC, as an *amicus*, should ask courts to require disclosure of all political contributions or fee-sharing arrangements between class counsel and a lead plaintiff (or controlling individuals within the lead plaintiff organization).  This disclosure should occur prior to the court's appointment of either counsel or plaintiff and should be followed by a similar disclosure  at the fee award hearing.  Again, this would require an ongoing effort by the SEC, which has made similar recommendations to courts about the lead plaintiff's role.[60]

## II. Criminal Prosecutions

The prosecution of Arthur Andersen for obstruction of justice in the Enron affair aroused much controversy.  The almost instantaneous demise of Arthur Andersen at the indictment stage underscored how in the financial world a defendant can be financially ruined long before conviction.  In short, the market will convict and sentence an indicted financial services firm long before a court is able to do so.

## A. Scope of the Problem and Suggestions for Generalized Reform

The Justice Department's guidelines for federal prosecutors issued by then Deputy Attorney General Larry D. Thompson in 2003—the "Thompson Memorandum"—lays out nine factors for federal prosecutors to consider in deciding whether to bring charges against a firm.  The factors include the seriousness of the offense, the pervasiveness of wrongdoing, history of misconduct, and so forth.  Factor Four, "Cooperation and Voluntary Compliance," has drawn the most attention.  In particular, the commentary on this factor directs individual federal prosecutors to consider the "adequacy of a corporation's cooperation . . . including, if necessary, a

---

59 *Division of Market Regulation Outline*, 1531 PLI/CORP 719, 760 (2006).
60 *See, e.g.*, In re Baan Securities Litigation, 186 F.R.D. 214 (D.D.C. 1999) (SEC takes position on optimal size of lead plaintiff groups).

*Enforcement*

waiver of the attorney-client privilege and work product protections, both with respect to its internal investigation and with respect to communications between specific officers, directors and employees, and counsel" and "whether the corporation appears to be protecting its culpable employees and agents . . . [such as] through the advancing of attorneys fees."

### 1. Indict Entire Firms Only in Exceptional Circumstances

Except in truly exceptional cases, there is no independent benefit to be gained from indicting what is in fact an artificial entity. As the demise of Arthur Andersen attests, criminal indictments of entire companies—especially those in the financial services industry where reputation is so crucial—effectively results in the liquidation of the entire firm; with this comes the attendant disruption of the lives of many employees and stakeholders who are totally innocent of wrongdoing.

Extant guidelines of the U.S. Department of Justice (the "Thompson Memorandum") on whether to prosecute a firm fail to take account of the damage to innocent employees and shareholders and, in some cases, to the entire economy. The Committee recommends that the Justice Department revise its prosecutorial guidelines so that firms are only prosecuted in exceptional circumstances of pervasive culpability throughout all offices and ranks.

### 2. Modify Factor Four in the Department's Prosecutorial Guidelines

The major purpose behind Factor Four is to prevent corporations from using the payment of attorneys' fees and the attorney-client privilege to silence employees in a criminal investigation and thereby inhibit the conviction of guilty individuals within the company.

Two considerations must be balanced against this objective. First, because of the huge risks associated with criminal indictment, corporations under investigation have strong incentives under current guidelines to waive the privilege and not pay attorneys' fees for officers, directors, and employees, regardless of the presence of criminal wrongdoing. Second, because the cost of defending complex criminal prosecutions is so severe, a decision not to advance attorneys' fees effectively forces capitulation of individuals to prosecutorial demands, irrespective of guilt or innocence, thus burdening Fifth Amendment and Sixth Amendment rights. The Thompson Memorandum has been criticized by sources as various as the American Bar Association, the Chamber of Commerce, former high-ranking Department of Justice officials, key federal lawmakers, and a variety of commentators. The court in *United States v. Stein* explicitly held that the Justice Department's policy of pressuring firms not to pay legal fees of their current or former employees was unconstitutional.[61]

---

61 435 F. Supp. 2d 330 (S.D. N.Y., June 26, 2006). The Department's criminal investigation in this matter involved the creation and sale of tax shelters to clients by the accounting firm KPMG.

The Committee recommends that the Justice Department revise its prosecutorial guidelines to *prohibit* federal prosecutors from seeking waivers of the attorney-client privilege or the denial of attorneys' fees to employees, officers, or directors.

### 3. Gatekeeper Litigation: Auditors and Outside Directors

Litigation against "gatekeepers"—particularly auditors and directors—can also raise the costs of doing business in the United States. In the case of auditors, the costs may take the form of unnecessary auditing expenses motivated by the auditors' fear of liability, especially given their new obligations under Section 404 of the Sarbanes-Oxley Act. More fundamentally, such litigation could bankrupt another Big Four firm, with disastrous consequences for corporate governance worldwide. A major thrust of Sarbanes-Oxley was to look to auditors as a bulwark against wrongdoing. As for directors, the costs of liability exposure can lead to higher directors' fees and premiums on directors' liability insurance, in addition to greater difficulty in attracting qualified individuals.

### B. Auditor Liability

Following each of the major financial reporting scandals of the past decade, one question was always asked: Where were the auditors? Policymakers have attempted to address this question by imposing a combination of new regulation and oversight of the auditing profession by the Public Company Accounting Oversight Board (PCAOB) created by the Sarbanes-Oxley Act.[62] This new regulatory regime is in place to monitor auditor activity and deter misconduct. Its existence raises the question of whether exposure to civil liability of entire auditing firms or networks continues to serve any purpose.[63] One answer to this question may be that enterprise liability should give audit firms appropriate incentives to train and supervise their auditors and thus act as a deterrence mechanism. Another possible answer is that liability awards paid by audit firms, together with any liability insurance proceeds, help compensate investors who can prove injury from auditor misconduct.

These answers, however, must be tempered by several hard realities of the audit profession today that are discussed below. Among the hard realities is increasing limitation on consumer choice. Today, the accounting profession is highly concentrated among the four largest audit networks; public companies—which must have their financial statements audited every year—already have limited choice among auditors.[64] Effectively, choice was always somewhat restricted, because only certain audit firms acquired specialized knowledge about particular industries. But choice has been further limited by a series of mergers of major auditing firms over the past two decades; these limitations have been compounded by the disappearance of Arthur Andersen. Another

---

62 In particular, the PCAOB has the ability to impose fines or even permanently revoke an audit firm's registration—which effectively would put the firm out of business.
63 Most auditing firms are organized as networks of limited liability partnerships.
64 The four largest global networks audit well over 95 percent of the firms listed on U.S. exchanges. In some countries, the proportion is even higher.

*Enforcement*

factor contributing to concentration is that many public companies are multinational enterprises and require the services of the large, global audit networks. And many purely domestic companies are sufficiently large that they too require a large auditor. This feature makes it difficult for the smaller and mid-size auditors to enter the market, compounding the limitations on choice. Liability risk deters smaller and mid-size audit firms from seeking to audit larger companies, because they fear the exposure to larger potential claims that accompanies such work.

For the profession itself, there is consensus both inside and out that the demise of one of the remaining Big Four could have adverse consequences for audited companies and their shareholders. Many of Arthur Andersen's employees and partners found jobs in the remaining Big Four. However, the downfall of one of the Big Four would risk sending a severe chill through the remaining "Big Three." Many partners, fearing they could be next, may leave their firms, either to seek employment with clients or to pursue other careers. Such an outflow of personnel could significantly reduce audit capacity for the thousands of public companies that require audit services. Very likely, smaller and mid-size firms would be inhibited by the liability-induced failure of one of the Big Four from taking on some of its clients. Because auditors now are highly specialized by industry, many public companies may have only one or two auditors from which to choose.[65] In addition, because the Big Four are structured as global networks of partnerships, the failure of a U.S. firm could seriously affect its foreign affiliates and threaten the international capital markets as well. Even the risk of such a failure may affect the global competitiveness of the U.S.-based auditing networks.

The share of securities class actions targeting auditing firms is relatively small. However, some pending actions involve multi-billion dollar claims. Currently there are more than three dozen pending suits involving tens of billions of dollars of claimed potential damages. Claims under state law also seek recoveries of billions of dollars.[66] This liability exposure substantially exceeds the combined partner capital of the Big Four firms. Any future lawsuits would only aggravate the exposure problem. Large audit firms self-insure because third party insurance is unavailable. This results from the fact that the risk of a large audit firm going under is very concentrated—it involves only four firms.[67]

---

65 In May 2006, Japan's Financial Services Authority suspended PWC's Japanese network firm, Chuo Aoyama PwC, following an accounting scandal at one of its clients. The two-month suspension forced 2,300 companies to find a new or temporary auditor. Although PWC moved rapidly to set up a separate Japanese firm with stronger internal controls, it reportedly lost approximately 20 percent of its Japanese clients.

66 Based solely on public sources, Aon has identified 22 claims filed in recent years each seeking recovery of more than $1 billion. *See* Trueman (2006).

67 An independent study conducted for the European Commission and released in October, 2006 reaches these same conclusions for auditors in Europe. *See* Study on the Economic Impact of Auditors' Liability Regimes, MARKT/2005/24/F (September 2006), *available at* http://ec.europa.eu/internal_market/auditing/docs/liability/auditors-final-report_en.pdf [hereinafter EC Auditor Liability Study] *See also* Letter from Aon to U.S. Chamber of Commerce Commission on the Regulation of U.S. Capital Markets in the 21st Century (October 19, 2006).

In principle, the Private Securities Litigation Reform Act[68] (PSLRA), enacted by Congress in 1995, was intended to address the insurability problem for auditors. One of the Act's main reforms was to end "joint and several" liability for auditors, so that no auditor could be held responsible for the collective liability of other defendants in private securities actions. However, in this era of multi-billion dollar class action lawsuits, even a relatively small share of proportional liability exposes the largest firms to financial failure. The PSLRA clearly has not insulated the audit profession from very substantial liabilities.

Another reason arises for addressing auditor liability: because audit firms are exposed to financial ruin by liability lawsuits, they may understandably err on the side of caution. In practical terms, this means that auditors may have incentives to engage in "defensive auditing," just as doctors faced with potential financial ruin from medical malpractice cases practice "defensive medicine." As discussed in the section of this report dealing with audits of companies' internal controls under Section 404 of the Sarbanes-Oxley Act, many believe that defensive auditing may now have crossed the line where the marginal costs exceed the marginal benefits.

An additional consequence of the liability environment relates to the proliferation of rules-based accounting standards in the United States and the potential for divergent application of converged accounting standards in the future. These rules-based standards have not arisen solely due to potential liability. But the tendency of auditors to request narrow interpretations and detailed guidance from standards-setters and regulators in the United States is shaped, in part, by the liability environment. As standards converge in the future, there will be inevitable differences in application based on culture, history, and national bias. However, if the auditing profession in the United States exercises judgment on application of standards that is colored by the fear of catastrophic liability, it will tend to perpetuate an unduly conservative bias in accounting by U.S. companies. Taken to an extreme, this would impact the competitiveness of U.S. markets versus say, the European Union, even though the same standards are being used in a world of converged accounting principles.

## 1. Recommendations

The Committee recommends the following two measures to address the auditor liability problem:

*Congress Should Explore Protecting Auditing Firms from Catastrophic Loss.* The United States and the rest of the world are highly dependent on audit firms. They play a key role in ensuring the integrity of financial statements and the effectiveness of internal controls of public companies. The demise of another U.S. audit firm would impose huge costs to U.S. shareholders. Also, the prospect of catastrophic liability can have a significant impact on auditing costs through the adoption of overly conservative practices. Taken to an extreme, these practices will continue to impact the

---

68 Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in scattered sections of 15 U.S.C.).

*Enforcement*

competitiveness of the U.S. markets versus say, the European Union, even when worldwide accounting principles converge.

There are various approaches Congress could take in addressing this problem. One would be to create a safe harbor for certain defined auditing practices. Another approach would involve setting a cap on auditor liability in specified circumstances, an approach that some European countries already take and that the EU Commissioner for Internal Markets, Charlie McGreevy, has recommended that the EU pursue. Any protection from catastrophic loss should be premised on a firm's satisfying minimum capital levels as a condition for receiving this protection. After all, the purpose of this protection is removing the risk of catastrophic loss, not all liability.

Preventing damage awards against audit firms and their employees at a level that could destroy a firm would allow insurers to reenter this market. Insurance would be in the interest of both audit firms and shareholders. It would allow audit firms to price risk and create a source of recovery for shareholders.

The possible misconduct of auditors could encompass a range of culpable behavior, from negligence to intentional fraud, and could involve a few persons or many. Congress would have to consider which particular types of misconduct would permit a cap or safe harbor to be invoked. Any invocation of protection should automatically trigger a thorough investigation of the case by federal regulators. Those regulators would be required to impose appropriate sanctions on the audit firm or its employees, based on their findings. In a case involving systemic deficiencies in the audit firm's processes, management or personnel, that sanction should, depending on circumstances, include replacement of the audit firm's management with a monitor appointed by the regulator.

***Clarify Section 10A Liability.*** Section 10A of the Securities Exchange Act of 1934[69] requires auditors to undertake certain measures when they become "aware of information indicating that an illegal act . . . has or may have occurred." This provision has not to date resulted in auditor liability but has led auditors to require their issuer clients to conduct expensive and time-consuming investigations.

The language in Section 10A arguably is too broad and could be narrowed by Congress to focus on activities that pose a serious risk of harm to investors. In particular, the section could be amended as follows: (i) to apply only to *material* misstatements or omissions, which by definition are only those that affect investors' decisions;[70] (ii) to limit liability only to situations where the misstatement implicates management's integrity; and (iii) to require auditors to investigate potential illegalities only when they uncover information indicating a "substantial likelihood" that an illegal act has been committed (since currently the SEC's regulations under Section 10A do not distinguish

---

69 15 U.S.C. § 78a et seq. (hereinafter the Exchange Act or the 1934 Act.)
70 The SEC's staff has taken the position in Staff Accounting Bulletin (SAB) No. 99 that even an "intentional misstatement of immaterial items in a registrant's financial statements may violate Section 13(b)(2) of the Exchange Act and thus be an illegal act."

information by level of probability that an illegal act has occurred).[71] Such limited amendments would focus auditor responsibility under Section 10A on matters of true importance to investors.

## C. Outside Director Liability

In the wake of the recent financial scandals, Congress and the exchanges have placed greater emphasis on oversight of companies' financial reporting by independent directors. In particular, these rules now require a majority of public company boards to consist of independent directors, and only such directors may sit on audit, nominating, and compensation committees. Independent directors have long had strong reputational and monetary incentives to take their jobs seriously. As a legal matter, all directors also owe a fiduciary duty of care to their companies.[72]

In addition, Section 11 of the Securities Act of 1933[73] makes directors liable, subject to a due diligence defense, for misrepresentations in an issuer's registration statement. Given the potentially large claims arising from securities class actions, qualified individuals could be reluctant to assume directorships and put their personal wealth at stake without certain protections. Thus, corporate law statutes typically allow corporations to indemnify their directors from liability as long as they acted in good faith. However, the SEC has long taken the view that indemnification of directors for damages awarded in Section 11 actions is against public policy, and its rules require that issuers submit indemnification claims to a court of appropriate jurisdiction for determination of the public policy issue.[74] Corporations typically purchase D&O insurance policies that cover the corporation's indemnification costs and also cover directors and officers directly when corporate indemnification is unavailable. Directors, nonetheless, are not indemnified or insured against acts of willful misconduct, intentional fraud, or self-dealing. In addition, the damages claimed in large securities class actions now routinely exceed available D&O insurance coverage.

How exposed are directors to liability in securities class actions? Historically, securities class actions seldom named outside directors as defendants, and almost never recovered damages from them.[75] In 2006, however, the outside directors of Enron and WorldCom settled securities class actions by paying substantial sums out of their own personal pockets.[76] The natural question thus arises: is the prospect of *future* personal liability for independent directors now so great as to deter qualified individuals from

---

71 For example, the failure by a company to file a required quarterly or annual report with the Commission, which the SEC should know about as well as the auditor.

72 Under Delaware law, directors discharge their responsibilities according to the business judgment rule, under which directors are presumed to satisfy their duty of care as long as they are reasonably informed and act in good faith. Only upon a showing by plaintiffs of gross negligence will courts find that the directors have breached their duty of care.

73 15 U.S.C. § 77a et seq..

74 *See* Regulation S-K, 17 C.F.R. § 229.510, 512(h)(3) (2006).

75 *See* Black *et al.* (2006) (finding only 13 securities class action settlements since 1980 in which outside directors contributed).

76 In Enron, the outside directors personally paid approximately $13 million; in WorldCom, $18 million.

*Enforcement*

serving on corporate boards, at precisely the time when public policy has required boards to have many more such individuals as members and given them a more crucial role?  If so, this result could undermine a major objective of the recent corporate governance reforms that put emphasis on independent director oversight.  In addition, will the directors' settlements in the Enron and WorldCom cases deter some foreign companies from raising capital in U.S. markets for fear of exposing their directors to personal liability?

It is too early to tell whether these settlements have had either of these adverse consequences.  However, the high-profile treatment of the Enron and WorldCom matters could change the landscape going forward.

## 1. Recommendations

*Modify SEC Rule 176.*[77]  In 1933, when Section 11 of the Securities Act was adopted, the great majority of directors were insiders.  In that context, director liability was a useful proxy for prodding well-informed senior executives to search for misrepresentations in their company's registration statement.  Today, the overwhelming majority of directors of public compnies are corporate outsiders.  Whatever the benefits of imposing negligence-based liability on directors might have been in 1933, it is questionable, at best, whether they persist now.

Accordingly, the SEC should recognize this reality by modifying its Rule 176, issued pursuant to Section 11 of the Securities Act, to make an outside director's good-faith reliance on an audited financial statement or an auditor's SAS 100 review report conclusive evidence of due diligence.  Further, the modification could make good faith reliance by outside directors on representations of senior officers—after boardroom discussion—conclusive evidence of good faith as to other parts of the prospectus.

*Modify SEC Indemnification Policy.*  Outside directors who have acted in good faith should also be insulated against out-of-pocket damages through changes in indemnification policy.  The SEC could accomplish this by reversing its longstanding position that indemnification of directors for damages awarded in Section 11 actions is against public policy, at least insofar as the outside directors have acted in good faith.  This change would help ensure the continued recruitment of high quality independent directors who play such a crucial role in corporate governance.  This recommendation would not have the effect, however, of barring shareholder derivative suits against directors.

---

77 Rule 176, issued pursuant to the Securities Act, provides guidance for determining whether or not the conduct of a person subject to potential liability under Section 11 of the Act meets the standards required to establish a due diligence defense.

## References

Baker, Thomas and Sean Griffith. 2006. "Predicting Corporate Governance Risk: Evidence from the Directors' & Officers' Liability Insurance Market." Study (June 15, 2006, revised August 15, 2006) at 10 n. 28, *available at* http://ssrn.com/abstract=909346.

Black, Bernard, Brian Cheffins, and Michael Klausner. 2006. "Outside Director Liability." *Stanford Law Review* 58:1055.

Buckberg, Elaine, Todd Foster, and Ronald Miller. 2005. "Recent Trends in Shareholder Class Action Litigation: Are WorldCom and Enron the New Standard?" 6. Worldwide: NERA Economic Consulting.

Buckberg, Elaine, Todd Foster, and Ronald Miller. 2006. "Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?" Worldwide: NERA Economic Consulting.

Coffee, John C. Jr., forthcoming. "Reforming the Securities Class Action: An       Essay on Deterrence and Its Implementation." *Columbia Law Review.*

Dunbar, Frederick, Todd S. Foster, and Vinita Junjea, and Denise N. Martin. 1995. "Recent Trends III: What Explains Settlements in Shareholder Class Actions?" 9. Worldwide: NERA Economic Consulting .

Jackson, Howell E.  2005.  Discussion Paper No. 521, Variation in the Intensity of Financial Regulation: Preliminary Evidence and Potential Implications, Harvard Law School, *available* at http://www.law.harvard.edu/programs/olin_center.

PricewaterhouseCoopers 2005 Securities Litigation Study, *available at* http://www.pwc.com/extweb/pwcpublications.nsf/docid/7999A70324592B73852 5715C0059A948.

Savov, Sava. 2006. Regulatory Convergence in the EU and the Importance of the Enforcement Variable: Evidence form the U.K., Germany and Hungary**.** Paper Adviser: Professor Howell Jackson, *available at* http://www.law.harvard.edu/programs/pifs/LLMpapers/Sava%20Savov%203L%2 0final%20paper.pdf.

Trueman, Mary. 2006. "Mega-Claims 2006: Analysis of a Selection of Large Publicly Known Matters involving Auditors." Aon Study.

# SECTION IV: SHAREHOLDER RIGHTS

The strength of shareholder rights in publicly traded firms directly affects the health and efficient functioning of U.S. capital markets. Overall, shareholders of U.S. companies have fewer rights in a number of important areas than do their foreign competitors. This difference creates an important potential competitive problem for U.S. companies. If such rights enhance corporate value, capital will be invested, at the margin, in foreign companies, and in the foreign capital markets in which such foreign companies principally trade. The importance of shareholder rights also affects whether directors and management are fully accountable to shareholders for their actions.

Shareholder rights serve the critical function of reducing the agency costs associated with the potential divergence of interests between professional managers and dispersed public shareholders. Without adequate shareholder rights, rational investors will reduce the price at which they are willing to purchase shares, capitalizing into the stock price these expected agency costs. This discount implies reduced valuations for firms that are publicly traded and lower valuations than would otherwise be the case for firms considering an entrance into the public markets. Firms, therefore, would have an incentive either not to enter the U.S. public markets in the first place or to exit them in response to inadequate legal protection of shareholder rights. Indeed, firms that depend on the public capital markets for financing might find it prohibitively expensive to raise necessary capital for funding net present value projects. Even ignoring the entry and exit decisions of firms, public capital markets will be smaller as a result of inadequate shareholder rights, given the reduced valuations resulting from higher agency costs.

The Committee focuses on two areas where it is important to enhance shareholder rights: the adoption of takeover defenses and the selection of remedies to resolve disputes between shareholders and their companies. The Committee also supports majority rather than plurality voting. This section then comments on the need for the SEC to resolve the ballot access issue raised by a recent court decision and recommends further action on executive compensation be deferred until the effects of the SEC's recent disclosure rules can be studied.

## I. Takeovers

There are few areas in which shareholder rights can play a more productive role than in the takeover context. It is here that the potential divergence of professional managers and dispersed public shareholders is most acute. Shareholder rights can ensure that value-enhancing takeovers occur even when this is not in the self-interest of

incumbent management. As a result, shareholder rights can help ensure that a healthy market for corporate control exists in the U.S. capital markets.

There are four areas in which the allocation of authority between managers and shareholders has forcefully come to the fore in contemporary policy debates: (i) the use of takeover defenses; (ii) the requirement of majority voting; (iii) shareholder access to the proxy; and (iv) executive compensation. Should shareholder authorization in some form be necessary, at least under some circumstances, before management may use a takeover defense to block attractive offers for the company? Under what circumstances, if any, should shareholders be able to place their director nominees on the corporate proxy? Finally, have executive compensation practices, both in terms of size and composition, served or harmed the interests of shareholders, and should shareholders have a greater role in how boards make these decisions?

The Committee proceeds from the premise that sound policy changes in any of these areas can only be made with solid empirical evidence that document the shortcoming of the current regime that is supposedly being remedied—that is, that shareholder value would be enhanced by change. Perhaps the strongest evidence of a serious problem in the current allocation of power is the use of a particular type of takeover defense: the indefinite deployment by management of a "poison pill" in conjunction with a classified board of directors. It is therefore with respect to this type of takeover defense that this Report proposes policy action. Although there might well be potentially useful policy changes with respect to the use of other takeover defenses, the empirical evidence that would form a basis for policy recommendations is not as well-developed or consistent.

## A. Classified Boards and Shareholders Rights

### 1. Classified Boards as the Central Takeover Defense

To date there has not been a successful corporate takeover in which the target company has enacted and retained a shareholder rights plan (commonly referred to as a "poison pill"). As the Delaware Supreme Court aptly noted in its landmark *Unitrin* decision, "the emergence of the 'poison pill' as an effective takeover device has resulted in . . . a remarkable transformation in the market for corporate control . . . ."[78] A poison pill renders acquisition of a company prohibitively expensive for potential hostile acquirers, as pills are designed to grant target shareholders—with the exception of the potential acquirer—the right to purchase additional target shares below market price from the target company's treasury, thus diluting the excluded acquirer's holdings.[79] Poison pills can be a devastatingly effective weapon for a target board, especially as the boards of virtually all companies have the unilateral ability rapidly to adopt a poison pill at the last minute when threatened by a hostile bid—*without* shareholder approval. If, and only if, a majority of directors on the target company's board is willing to redeem a poison pill

---

78 Unitrin, Inc. v. American General Corp., 651 A.2d 1361, 1379 (Del.1995).
79  Some poison pills provide the target shareholders with the right to purchase shares of the bidder if the acquisition occurs.

that has been deployed—an action that may only be taken by the board itself—can a bid for the target company proceed. The key question therefore reduces to this: can a target company's shareholders replace in a timely manner those directors who persist in refusing to redeem a poison pill if the shareholders have concluded that retaining the pill in the face of a bid is not in their own best interests or those of the company?

The answer to this question is likely to be "no", *if* the target company has a classified board. A typical classified board (also referred to as a "staggered board") resembles the U.S. Senate in that in any given election year, a maximum of one-third of directors stands for reelection. The effect is that shareholders desiring to replace incumbent directors are unable to replace a majority of directors in a single election cycle. In the takeover context, shareholders will be unable to elect in a timely manner a majority of directors that is willing to redeem a pill and thereby allow a bid for the company to proceed, even if an overwhelming majority of shareholders conclude that this is in the best interests of the company. Approximately 53 percent of all publicly traded firms in the United States have classified boards.[80] In contrast, the *absence* of a classified board permits a bidder to support its own slate of director candidates in a proxy contest, which the target shareholders may elect if they so choose. Thus, the proxy contest is essentially transformed into a shareholder referendum on whether or not the bid should proceed. Indeed, even with a classified board, the success of a bidder's short slate director nominees can serve as a source of pressure on target management to redeem the pill.

The ability of top management to frustrate a bid without shareholder approval has the potential to create serious *ex ante* and *ex post* agency problems.[81] The *ex ante* agency problem results from the elimination of the hostile takeover as a disciplinary device for ineffective management of firm assets. There is some empirical support for the proposition that hostile takeovers are in fact directed at companies that perform poorly.[82] Also consistent with the notion that takeovers have desirable *ex ante* disciplinary effects is the fact that the introduction of anti-takeover statutes in New York reduced the value of New York firms, even firms that were not subject at the time to any bid.[83]

The *ex post* agency problem results from the well-known potential for a divergence of director and shareholder interests in the event that a bid is proffered. As the Delaware Supreme Court has noted, there exists an "omnipresent specter that a board may be acting primarily in its own interests" in the context of a takeover.[84] Even where a bid offers a substantial premium to the stock's market price, some directors, realizing that

---

80 The number of classified boards that may be viewed as truly classified is somewhat lower given the fact that some classified board provisions are easily circumvented by bidders and shareholders (Coates, 2001). For example, a board that is classified by a company's bylaws (as opposed to by a charter provision) can be quickly declassified so long as the shareholders are able to change the bylaws by majority vote. The percentage of classified boards has been dropping over the last three years from a high of 63 percent in 2002 (ISS 2006).

81 *See generally*, Jensen (1988).

82 *See* Mørck (1988); see also Berger & Olek (1996).

83 Schummann (1988).

84 Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954-55 (Del. 1985).

the top management and board of a target company are often replaced following a successful tender offer,[85] may consider their own interest in retaining the private benefits of corporate control in making the decision whether or not to redeem a pill (or whether to deploy a pill in the first place).

The substantial obstacle posed by classified boards to the efficient functioning of the market for corporate control is potentially quite serious. The takeover market is quite significant in terms of the impact it has on the allocation of assets under firm management.[86] Moreover, the reallocation of assets fostered by an active market for corporate control appears to create value on net for shareholders. Empirical studies indicate that takeovers generally create significant value for target shareholders, while bidder shareholder returns typically average to approximately zero.[87] A recent comprehensive study examining takeovers over the 1962–2001 period found that takeovers generated substantial value for shareholders.[88]

Merely observing that agency problems might exist for companies with classified boards is not the same as determining whether such problems in fact exist, or if so, the magnitude of the problem. Only empirical evidence can speak to these issues. Much empirical evidence has been produced to support the proposition that classified boards do indeed on average reduce firm valuation.

## 2. Empirical Studies of Classified Boards

*Firm Valuation and the Presence of a Classified Board.* Three recent studies have considered the effects of a classified board on firm valuation as measured by Tobin's $Q$ and stock returns. Bebchuk, Cohen, and Ferrell (2005) measured the effect of a variety of corporate governance provisions on firm valuation, including classified boards. For their sample of approximately 1,500 U.S. firms accounting for over 90 percent of total U.S. market capitalization in the 1990–2003 period, classified boards were shown to have a strongly negative and robust correlation with firm valuation. Bebchuk and Cohen (2005), in a study focusing solely on classified boards and firm valuation, reached the same result. Consistent with these studies, Faleye (2006) also reports a substantial and statistically significant negative association (controlling for a large number of other potentially relevant factors) between classified boards and firm valuation.

*Firm Valuation and the Adoption of a Classified Board.* Rather than measure the effect that the mere *presence* of a classified board has on firm valuation, an alternative approach is to measure the effect resulting from the decision to *adopt* a classified board. Three studies have analyzed the stock market effects of classified board announcements by firms. A fourth study examined the effect of a legislative change

---

85 *See* Agrawal & Walkling (1994).
86 *See* Mitchel & Mulherin (1996).
87 *See, e.g.*, Jensen and Ruback (1983); Franks & Harris (1989); and Andrade, Mitchell and Stafford (2001).
88 *See* Bhagat, Dong, Hirshleifer & Noah (2005).

*Shareholder Rights*

imposing the use of classified boards. The findings documented by all four studies are consistent with those that have focused solely on the effects of actually utilizing a classified board structure.

Faleye (2006) examined 159 classified board adoption announcements. He found statistically significant negative abnormal stock return reactions to such announcements. Mahoney and Mahoney (1993), using a sample of 192 announcements, likewise found that the announcements tended to cause a company's stock price to fall. Finally, Jarrell and Poulsen (1987) also found that classified board announcements were associated with lower stock prices, albeit for a sample size of only 28.

Swartz (1998) examined the stock market effect of Massachusetts' 1990 announcement that it would impose mandatory classified boards on companies incorporated in that state unless those companies explicitly opted-out of the law in their corporate charters. He found that this announcement resulted in a dramatic stock price decline of some 16 percent for those Massachusetts firms that did not already have classified boards.

***Managerial Entrenchment and Classified Boards.*** Three studies support the view that classified boards reduce firm value via exacerbating agency problems. The Faleye (2006) study documents three interesting findings on this score. First, forced CEO turnover is significantly reduced in firms that have classified boards. Second, the presence of a classified board significantly reduces the sensitivity of forced CEO turnover to firm performance. Third, CEO compensation at firms with classified boards is significantly less sensitive to firm performance.

Bebchuk, Coates, and Subramanian (2002) found that firms facing hostile bids made during the 1996-2000 period were far more likely to remain independent if they had a classified board, even where the firm's stock traded at a significant discount to a bidder's offer. Finally, Gompers, Ishii, and Metrick (2003) found that firms with more anti-takeover defenses, including classified boards, were more likely to engage in inefficient "empire-building"—that is, purchasing other companies that were not value-enhancing.

***Operating Performance and Classified Boards.*** Gompers, Ishii, and Metrick (2003) found that firms with more takeover defenses, including classified boards, experienced poorer operating performance. They found that these firms had lower net profit margins and sales growth than comparable firms with fewer defenses. A limitation of this study, however, is that the authors consider the cumulative effect of some 24 takeover defenses of which the classified board is but a single example.

***Correlation Does Not Imply Causation.*** A key issue for empirical studies of classified boards is the possibility that self-selection undermines the interpretation that classified boards cause poor firm performance. For example, one possible theory is that poorly performing companies are more likely to adopt classified boards in the first instance. Assuming this were true, a correlation between poor firm performance

(whether measured by valuation, stock returns, or some other metric) and the presence of a classified board would not imply that classified boards *cause* poor firm performance. Rather, the correlation would be the result of the fact that poorly performing firms happen to tend to adopt classified boards at a disproportionate rate.

Inconsistent with this explanation for the documented correlation, however, is the fact that when one controls for poor performance prior to adoption of a classified board structure or simply focuses on classified boards that have been in place for a significant length of time (thereby reducing the probability that what is reflected in empirical results is poor firm performance prior to the adoption of the classified board), the same finding emerges: classified boards are still associated with poor firm performance.

Moreover, as emphasized by Faleye (2006) and Swartz (1998), the imposition of classified boards by the state of Massachusetts on firms incorporated there was not the result of a voluntary decision to adopt a classified board by poorly performing firms; rather, it was the result of a political decision likely largely unrelated to the circumstances of most Massachusetts firms.  Nevertheless, both of these studies found a substantial negative association between the adoption of a classified board and reduced firm valuation as a result of the Massachusetts legislation.

Finally, when one focuses on classified boards that have been adopted many years and even decades earlier—and hence cannot have been adopted as the result of recent poor performance—the same result holds: classified boards are associated, with statistical significance, with lower firm valuation.

There is an important caveat to the empirical findings discussed above, namely that even if classified boards cause poor firm performance, it is still quite possible that classified boards may occasionally have positive effects.  This issue is taken up in the next section.

***Poison Pill Studies.***  There is a natural place to look to determine whether the use of poison pills reduces firm valuation, and in particular whether the use of poison pills by classified boards reduces firm valuation: that is in the empirical studies that examine whether the adoption of a poison pill is associated with lower stock prices.  The results of these studies, however, are mixed.  On the one hand, several poison pill event studies failed to find any statistically significant association between poison pill adoption and lower stock returns, at least for their full sample of poison pill adoptions.[89]  On the other hand, other poison pill event studies did document a negative statistically significant association.[90]

Whatever interpretation one gives to these results, all these studies suffer from a serious problem that severely limits their usefulness.  As Coates (2001) emphasizes, all firms, whether or not they have officially adopted a poison pill, have in effect a "shadow" pill due to the fact that a board can quickly and unilaterally adopt, usually within hours, a

---

89 *See* Jarrell & Ryngaert (1986); Jarrell & Poulsen (1986); Ryngaert (1988) and Margotta (1989).
90 *See* Malatesta & Walking (1988) and Mahoney, Sundaramurthy & Mahoney (1996).

*Shareholder Rights*

poison pill if it so desires.  As a result, firms that have adopted a poison pill are not really any more protected against unwanted takeovers than firms that have not.  This point is in sharp contrast to classified boards, as it is very difficult, if not impossible, for a board to classify itself given the need for shareholder approval for such a change.

### 3.  Potential Benefits of Classified Boards

The empirical findings discussed above do not suggest that classified boards never have important positive effects on firm performance.  The bulk of the empirical work to date has focused on measuring the average or median effects associated with the adoption or presence of a classified board.  The view that classified boards can be beneficial for some companies is entirely consistent with the view that the average or median effect is negative.  The positive effects enjoyed by some firms are simply overwhelmed by the negatives experienced by other firms.  The benefits of classified boards potentially include encouraging board continuity, attracting better directors through an offer of longer tenure, and greater independence.[91]

Of course, the claim that classified boards can have important positive effects on firm performance must also be empirically substantiated.  The limited evidence that exists at present is at best inconclusive.  For instance, Faleye (2006) reports that classified boards do not have greater board continuity as measured by director turnover.  Classified boards had the same level of director turnover as non-classified boards during the 1995–2002 period.  Nor has the purported ability to attract high-quality, independently-minded directors appeared in the data in the form of improved firm valuation, performance, or higher stock returns.

In any event, any policy recommendations that touch on the use of classified boards should be crafted so as to preserve whatever positive contributions classified boards may sometimes make while minimizing their documented harmful effects.

### B.  Other Takeover Defenses

In addition to poison pills used in conjunction with classified boards, there are a number of other takeover defenses that may be used to thwart unwanted bids.  These takeover defenses include:

- limitations on the ability of shareholders to call a special meeting;

- limitations on the ability of shareholders to act by written consent;

- supermajority voting requirements for mergers and acquisitions;

- recognition of director duties to non-shareholder constituencies;

---

91 *See generally*, Koppes, Ganske, & Haag (1999).

- fair price charter provisions; and

- golden parachutes.

There is a substantial literature that has examined whether these takeover defenses (among others) negatively affect firm performance.  Some important studies have found that adoption of takeover defenses is associated with modestly negative stock returns.[92]  Betrand and Mullainathan (2003) document that corporate total factor productivity is lower for firms covered by a business combination antitakeover statute.  Other studies, on the other hand, have failed to find any stock price reactions.[93]  Bebchuk, Cohen, and Ferrell (2004) found that, of the list of takeover defenses given above, only golden parachutes and supermajority voting requirements for mergers and acquisitions are negatively correlated with firm valuation.

Many of the existing empirical studies of the effects of takeover defenses, especially prior to the availability of the IRRC corporate governance database several years ago, study one or two takeover defenses in isolation and fail to control for other corporate governance provisions.  This feature makes the findings of these studies difficult to interpret given the important interactions that exist between different corporate governance provisions.  Given the somewhat mixed empirical evidence on other takeover defenses and the strong theoretical and empirical case for classified boards being of particular importance, the policy recommendation by the Committee will focus on the use of poison pills by classified boards.

## C.  A Point of Comparison: The City Code on Takeovers and Mergers

The majority of firms around the world, including those in continental Europe, have a controlling shareholder.[94]  This characteristic is important because managers' ability or inability to employ takeover defenses in a world of controlling shareholders is largely irrelevant.  One of the few other countries in the world to have dispersed shareholder ownership of publicly traded corporations is the United Kingdom.  This feature makes the United Kingdom's regulatory treatment of takeover defenses, largely embodied in the City Code on Takeovers and Mergers issued by the Panel on Takeovers and Mergers, a useful point of comparison.  Interestingly, the City Code on Takeovers and Mergers provides for far more shareholder input into the use of takeover defenses than that afforded under the corporate law of any U.S. state, including Delaware.

General Principle 3 of the City Code on Takeovers and Mergers establishes the broad principle that the board of a target company "must not deny holders of securities the opportunity to decide on the merits of the bid" made by an acquiror.  City Code Rule 21 bars a target company from taking "any action" which "may effectively result in any offer or bona fide possible offer being frustrated or in the shareholders being denied the opportunity to decide on its merits."  More specifically, City Code Rule 21 prohibits a

---

92 *See* Malatesta & Walking (1998); *see also* Ryngaert (1988).
93 *See, e.g.*, Heron & Lie (2006).
94 *See* La Porta, Lopez-de-Silanes, & Shleifer (1999).

*Shareholder Rights*

target company, in the absence of shareholder approval, from creating or issuing any securities carrying rights of conversion into shares. This prohibition effectively prohibits the use of poison pills without shareholder approval once the company becomes a target. More generally, the combination of General Principle 3 and City Code Rule 21 prohibits the adoption of any defense in the face of a bid that would have the effect of denying shareholders the opportunity to consider the offer on its merits.

Other aspects of the British regulatory regime further buttress its pro-shareholder approach. Directors must seek approval from a general meeting of shareholders for authority to issue shares, and when new shares are offered they must be offered to existing shareholders *pro rata*. Strikingly, staggered boards are largely irrelevant as a mechanism of management entrenchment, as shareholders have the statutory right to remove directors at any time.[95] Finally, British common law concerning the duties of target directors also takes a pro-shareholder stance. In the leading case of *Hogg v. Cramphorn*,[96] the court held that shareholders must ratify a new allotment of shares issued by the target company as a means of blocking an unwanted takeover.

The divergent treatment of takeover defenses in the United States and the United Kingdom is primarily the recent product of a series of Delaware corporate law cases decided during the 1985–1990 period, rather than deep-rooted legal differences. In the 1985 case of *Moran v. Household International, Inc.*, the Delaware Supreme Court reviewed the deployment of a poison pill.[97] While approving the creation of a poison pill by a firm given the specific facts in that case, including the availability of the proxy machinery to shareholders to remove directors for improper use of the pill, the court emphasized throughout its opinion that a board decision *not* to redeem a pill would be reviewable by the Delaware judiciary. Over the course of the next several years, the Delaware Chancery Court decided a series of cases that limited the use of takeover defenses, including the poison pill. An abrupt end came with the Delaware Supreme Court's seminal 1990 decision in *Paramount Communications, Inc. v. Time Inc.*, where the Supreme Court explicitly disavowed the Delaware Chancery Court's approach and, to a very substantial extent, embraced the open-ended use of takeover defenses without shareholder authorization.98 The impact of the *Time* decision was confirmed by the Supreme Court's subsequent decision a few years later in *Unitrin* to approve a target corporation's repurchase of its own stock in the face of a non-coercive tender offer.[99] It is perhaps not coincidental that 14 percent of all takeovers in the 1980s were hostile, as compared with only 4 percent in the 1990s.[100]

---

95  Companies Act 1985, section 303. *See generally*, Armour and Skeel (2006).
96  1967 Ch. 254.
97  500 A.2d 1346
98  571 A.2d 1140.
99  Unitrin, *supra* note 78, at 1367.
100  Andrade, Mitchell, & Stafford (2001). It is worth bearing in mind that distinguishing "hostile" from "friendly" deals can be somewhat arbitrary. (Schwert, 2000).

### D. Committee Recommendation on Takeover Defenses

A well-functioning market for corporate control is crucial to an efficient and competitive capital market. The combination of a poison pill and a staggered board effectively prevents hostile bids and thereby greatly impairs the market for corporate control. The Committee also observes that staggered boards, in their own right, quite apart from the market for corporate control, decrease shareholder value, and thus companies should have good reasons for adopting them.

The Committee recommends that classified boards of U.S. companies should be required, as a matter of course, to obtain shareholder authorization prior to the adoption of a poison pill, unless the company is the target of a takeover. In the latter event, a firm with a classified board may unilaterally adopt a poison pill but must obtain shareholder authorization within three months of the poison pill's adoption. In the absence of *ex post* shareholder ratification within the three-month period, the poison pill shall be automatically redeemed. The Committee further recommends that Delaware and other States adopt such a rule, or, failing such change, that exchanges make compliance with such a rule a condition for listing.

In these fast-moving takeover situations, it might well be the case that there would be insufficient time to arrange a shareholder vote on whether the target board should be allowed to adopt a poison pill. In addition, it is possible that the ability of a target board quickly and unilaterally to adopt a poison pill could on occasion be value-enhancing for two reasons. First, the presence of a pill, redeemable only by the target board, may force the would-be acquirer to negotiate with the target board and ultimately agree to a higher control premium. The target board, in other words, would be empowered to act as the agent of target shareholders in negotiations with the bidder as a result of the adoption of the poison pill. Second, if a change in control were undesirable for some reason, then the adoption of a poison pill could be value-enhancing for the target shareholders, for instance, if another offer with a higher control premium could easily be arranged.

There is always the danger, of course, that a classified board in a takeover situation would, given the *ex post* agency problems discussed earlier, adopt a poison pill that would not in fact be value-enhancing. As a result, the Committee would require that poison pills unilaterally adopted by classified boards in a takeover context would need to be approved by a shareholder vote within three months of their adoption. If the poison pill failed to receive shareholder support at such a vote, then the pill would be automatically redeemed even absent any action by the board of directors. The three-month period would be sufficient for target directors to articulate to shareholders the reasons for their decision to adopt the poison pill. Shareholders could then decide for themselves whether these reasons justify the continued presence of the pill. The three-month requirement would be sufficiently short that a determined bidder would have an incentive to remain on the scene and attempt to convince target shareholders to refuse authorization for the continued use of the pill.

The Committee's policy recommendation is guided by three basic principles:

(1) Any policy proposal should be firmly based on a substantial body of empirical evidence documenting a serious problem necessitating a policy response;

(2) Any policy change should take the form of empowering shareholders to adopt desirable change at the corporate level, rather than imposing a "one-size fits all" approach; and

(3) When firms have a choice of legal regime, any policy proposal should adopt as a default the option most favorable to shareholders, given the fundamental asymmetry of power between managers and shareholders.

The Committee's policy recommendation is consistent with these three principles. As to the first, the empirical case that classified boards often reduce firm valuation is convincing, especially in light of the recent findings by Faleye (2006). Accordingly, the policy recommendation of the Committee focuses on requiring shareholder approval, either *ex ante* or *ex post*, of the use of a poison pill by a classified board. In contrast, the use of the poison pill by non-classified boards presents a less compelling empirical and theoretical case for policy action. The poison pill event studies provide mixed results and are difficult to interpret. Moreover, it is theoretically more likely that the use of the poison pill is more problematic when the target board is classified, given the inability of a would-be acquirer successfully to run a proxy contest to replace a majority of the target board. This is not to imply that the unilateral use of poison pills by non-classified boards does not result in serious agency problems but rather that the overall case for policy action is stronger in the context of classified boards.

As for the second principle, the Committee's recommendation does not impose a "one-size fits all" approach on firms. First, the approximately half of all firms without classified boards may continue to afford directors the authority unilaterally to adopt and maintain pills. Moreover, if the shareholders of a firm with a classified board thought it important that the board have the unilateral ability to use a poison pill in the event of a takeover, they could simply vote to approve the adoption of a poison pill pre-bid. After such a vote, it would be left to the directors of the firm, consistent with their fiduciary obligations, to decide whether to redeem the pill in the event of a takeover. No further shareholder authorization would be necessary.

Another important benefit of the proposal is that firms would be able to retain their classified boards if they so chose. Some firms believe that a classified board structure produces important benefits, such as encouraging director independence, reducing board turnover, and improving the ability of the firm to attract high-quality directors through the offer of longer tenure. These firms could retain their classified boards and the associated benefits consistent with the Committee's recommendation. It is unlikely that any of these potential benefits would be compromised by requiring a shareholder vote on one discrete corporate action, the adoption or retention of a poison pill.

Finally, consistent with the third principle, the Committee's recommendation leaves open the possibility that a classified board of directors may continue to frustrate bids without shareholder approval, so long as shareholders explicitly desire the board to retain such authority by approving the adoption of a pill pre-bid. If shareholders find vesting such authority with a classified board attractive, nothing in the Committee's recommendation prevents it. Such a result, however, would be the product of shareholder action rather than occur by default.

The Committee's recommendation would move the United States closer to the pro-shareholder approach long adopted by the United Kingdom. Shareholders, as owners of the corporation, should at least as a default matter have the authority to pass on the merits of an offer for the company.

## E. Need for Legislation or New Listing Requirements

It is unlikely that this policy recommendation on takeover defenses could be implemented by the SEC within its statutory authority. Section 19(c) of the Exchange Act grants the SEC authority to impose rule changes on securities exchanges if such a change is "necessary or appropriate" to "insure the fair administration" of exchanges, to "conform" exchange rules with the requirements of the Exchange Act, or is otherwise "in furtherance of the purposes of" the Exchange Act. The D.C. Circuit Court of Appeals, in the seminal *Business Roundtable* decision, severely limited the ability of the SEC to use Section 19(c) to impose corporate governance listing requirements. The court explained that the discretion of the SEC in this area would be "quite limited," as corporate governance listing requirements generally did not implicate the fair administration of the exchanges, the need to conform exchange rules with the Exchange Act, or the need to further any Exchange Act purpose.[101]

As there are no other plausible sources of statutory authority to promulgate the corporate governance changes discussed in this report, two options remain. First, either federal or state legislation could implement the policy recommendation. If it were to be implemented at the state level, the most important state statute that would require amendment is the Delaware General Corporation Law.

Alternatively, the changes discussed could be adopted via amending the national securities exchanges' listing requirements, most importantly those of the New York Stock Exchange and Nasdaq. Section 19(b) of the Exchange Act provides that the SEC shall approve exchange rule changes so long as the rule change is "consistent with the requirements" of the Exchange Act. The discretion of exchanges under Section 19(b) to adopt corporate governance provisions is quite broad.[102] Both the New York Stock Exchange and Nasdaq have a long history of adopting corporate governance listing requirements, such as the requirement that shareholders vote on acquisitions in which the

---

101 See generally Special Study Group (2002).
102 *See* Special Study (2002).

company's shares increase by 20 percent or more.[103]  The exchanges imposed this voting requirement despite the fact that no such requirement exists under Delaware corporate law.

## II.  Majority Voting

Under the corporate law of most States, including Delaware, plurality shareholder voting for directors is the default.  This means that in an uncontested election, a nominee need only garner one shareholder vote in order to be elected to the board unless the firm's bylaws or charter opt out of the plurality voting default.  This is important both because most firms have not opted out of the plurality voting default, and because the vast majority of corporate elections are uncontested.  In an encouraging development, an increasing numbers of firms are amending corporate bylaws or charters to adopt majority voting in board elections in lieu of plurality voting.  Shareholders of Delaware corporations can now, as a result of a recent amendment to Delaware's corporate law, adopt a bylaw amendment prescribing a voting standard for director elections that cannot be altered or eliminated by the board.[104]  Adoption of majority voting for director elections provides an important source of leverage for shareholders.  If shareholders disagree with the nominees of the board, they can withhold their votes, and this might well result in a failure of these nominees to garner the necessary majority of shareholder votes, even where they have achieved a plurality.  The nominating committee of the board can no longer assume that its nominee will receive the necessary shareholder vote even when the election is uncontested.

The Committee believes that majority voting for directors, rather than plurality voting, must be the cornerstone of any system of shareholder rights.  Many companies have voluntarily adopted majority vote requirements, and some have done so at the insistence of shareholders.  Delaware law now permits such shareholder initiatives, and the Committee applauds this.  The Committee supports this trend as providing greater management and director accountability to shareholders.  Part of the basis for this view is that majority voting is the norm in other developed countries, including the United Kingdom, France, and Germany.

The implementation of majority voting for board elections has varied a great deal across firms along at least three important dimensions: (i) whether a majority of outstanding shares, a majority of shares present at the meeting for quorum purposes, *or* a majority of shares cast in the election is required; (ii) whether majority voting applies in the context of a contested election; and (iii) what procedures must be followed if a director fails to receive the necessary majority.  As for the first dimension, a majority of outstanding shares is a substantially higher threshold than the other majority requirements, and different firms have adopted different majority requirements according to their particular circumstances.  As to the second dimension, many commentators believe that plurality voting is appropriate in a contested election, but this conclusion

---

103  NYSE Rule 312.03(c).
104  8 Del. C. § 216 (2006).*See generally*, Klinsberg (2006) at 4.

raises difficult issues of what constitutes a "contested election" or what should occur if an election is initially contested but in the end is uncontested.[105] Finally, there is the question of whether a board may decide to permit a director to remain on the board when the director has failed to receive a majority. Even if so, the standards a board should use before reaching such a decision remain open to debate. A recent amendment to Delaware's General Corporation Law, section 141(b), establishes that Delaware will enforce an irrevocable resignation by a director conditional on the director failing to receive a majority of shareholder votes. The Committee will commission a study to determine which versions have led to the most improvement in shareholder value.

## III. Shareholder Ballot Access and Executive Compensation

### A. Ballot Access

The question of the ability of shareholders to place their own nominees for directors on the company's proxy has been a source of controversy. The Second Circuit's recent decision in *American Federation of State, County & Municipal Employees, Employees Pension Plan v. American International Group, Inc.*,[106] holding that in certain circumstances a company may *not* exclude under SEC Rule 14a-8 a shareholder proposal that would require the company to place candidates nominated by the shareholders on the company's proxy, has created much confusion. The SEC needs to address and resolve, in its upcoming hearings, appropriate access by shareholders to the director nomination process.

### 1. Broker Discretionary Voting

On October 24, 2006, the NYSE filed with the SEC proposed rule changes that would eliminate broker discretionary voting on the election of directors. Pursuant to NYSE Rule 452, brokers are currently allowed to vote shares held in client accounts on "routine" matters at their own discretion in the absence of instructions from the beneficial owners; such votes have in the past been universally cast in favor of management, a point of contention for many shareholders. Under the proposed rule change to Rule 452, an uncontested director election will no longer be deemed a "routine" matter. The rule change, if approved by the SEC, will be applicable to proxy voting by NYSE member-firm brokers beginning January 1, 2008. Given its application to NYSE member-firm brokers, the proposed rule change would affect not only NYSE-listed companies but the Nasdaq- and other non-NYSE-listed companies as well.

To the extent that brokers have used their discretion to vote in favor of management, garnering a majority will be more difficult—perhaps far more difficult. Moreover, if the majority requirement is a majority of votes cast, then shares held by brokers in client accounts, in the absence of instructions from the beneficial owners, will no longer count as voted shares. The Committee supports proposed Rule 452 to eliminate broker voting for directors as applied to corporate issuers in order to assure

---

105 *See generally*, Lesser and Romanek (May/June 2006).
106 462 F.3d 121 (2d Cir. 2006).

fairness in the majority vote process. The Committee also believes that the application of Rule 452 to voting by mutual fund shareholders should be reconsidered in light of the practicalities of such situations.

## 2. Falling Costs of Voting

It is probable that in the near future the costs to shareholders of voting will fall as electronic shareholder voting becomes a reality. Along these lines, the SEC has recently proposed regulations that would enhance the ability of firms to send electronic proxy materials to investors. The SEC has announced that it will consider a final rule for Internet proxy delivery at its meeting on December 13, 2006. There is much to be said for reducing the costs associated with communicating with shareholders by employing modern technology. Moreover, the Proxy Working Group established by the NYSE, which has already recommended the proposed changes to Rule 452, has established three subcommittees to review and make recommendations on improvements in the shareholder communication process, the fees and costs associated with proxy solicitation, and investor education on the importance of the proxy voting process.

## B. Executive Compensation

An important debate over shareholder rights concerns the proper role of shareholders in the setting and review of executive compensation packages. Informing the public debate, there is a large and rapidly growing body of academic research exploring the subject.

Before rendering any policy recommendations on the role of shareholder rights in the context of executive compensation, the Committee believes that it is necessary to assess the impact of three important recent regulatory changes on executive compensation practices: (i) the SEC's sweeping new executive compensation disclosure requirements; (ii) new stock option expensing requirements; and (iii) compensation process requirements. These new regulations, either individually or cumulatively, could well have an impact on executive compensation practices that should be evaluated before policy recommendations can be crafted. In addition, the new SEC executive compensation disclosure requirements will provide a substantially more accurate picture of both the composition and size of executive compensation packages that will provide a firmer foundation for any policy recommendations in this area.

## 1. New Disclosure Requirements

On August 29, 2006, the SEC published a final rule release entitled "Executive Compensation and Related Person Disclosure,"[107] thoroughly amending the disclosure requirements related to executive and director compensation. A new section entitled "Compensation Discussion and Analysis" ("CD&A"), similar to the "Management's Discussion and Analysis of Financial Condition and Results of Operations," must include

---

107  Executive Compensation and Related Person Disclosure, Release No. 33-8732A (Aug. 29, 2006) (the "Final Rule Release").

an analysis in plain English of "material factors underlying compensation policies and decisions reflected in the data presented in the [compensation] tables."[108]

Tabular and narrative disclosure shall be required of each of the following three categories of compensation:

- currently paid or deferred compensation for the past three fiscal years (including options, restricted stock, and other similar grants), as well as other compensation consisting of current earnings or awards that are part of a plan;[109]

- equity interests that are related to compensation or are potential sources of future gains, focusing on compensation-related interests awarded in prior years and the realization of such interests;[110] and

- retirement and other post-employment compensation (including retirement plans, deferred compensation plans, and other post-employment benefits).[111]

The required Summary Compensation Table and other tables are based upon the present model, with certain modifications:[112]

- all elements of compensation must be reflected in the tables, whereas under the previous system, items of compensation that did not fit neatly "in a box" could be excluded;

- in response to shareholder demand, disclosure of a *single figure* for Total Compensation is required and has been included on the sample Summary Compensation Table provided by the SEC; and

- narrative disclosure is required where necessary to explain items of tabular disclosure that may be unclear.

The new executive compensation regulations also amend certain Form 8-K requirements, including uncoupling the definition of material definitive contracts in Item 601 of Regulation S-K from the disclosure requirements of Form 8-K so that only unquestionably or presumptively material compensatory arrangements with executive officers and directors are required to be disclosed.[113] These rules also make substantial changes expanding and clarifying the various requirements to disclose related-person transactions set out in the predecessor 1982 release.[114] Finally, the separate disclosure

---

108 *Id.* at 12.
109 *Id.*
110 *Id.*. at 13.
111 *Id.*
112 *Id.*. at 18.
113 *Id.* at 136.
114 Disclosure of Certain Relationships and Transactions Involving Management. Release No. 33-6441 (December 2, 1982).

*Shareholder Rights*

requirement of management or director indebtedness has been combined with other disclosures of related-person transactions.[115]

As a result of these new disclosure requirements, shareholders and other market participants will have an improved ability to monitor and assess executive compensation practices.  To what effect, if any, they will use this increased ability is as yet unknown.  One new proposal for increasing shareholder rights in this area is for Compensation Committees to issue a Report to shareholders for an advisory vote, a practice now followed in the United Kingdom.

## 2.  Stock Option Expensing

Recently enacted stock option expensing rules might alter firms' stock option grants and thereby, at least potentially, alter both the composition and size of executive compensation packages.[116]  For instance, some have argued that the accounting treatment of stock options prior to the new expensing requirements discouraged the use of so-called "reduced windfall options," a type of option that more closely ties firm performance to managerial pay than conventional options, as this type of option had to be expensed while other types of options did not.  Under the new stock option expensing rules, both conventional and "reduced windfall options" must be expensed thereby eliminating this potentially harmful differential treatment.

## 3.  Compensation Process Requirements

NYSE requirements, adopted in November of 2004, mandate that listed firms' compensation committees must review and approve corporate objectives that touch on CEO compensation.  The compensation committee must disclose its processes and procedures for the consideration and determination of executive and director compensation.  Moreover, compensation committees must also state whether it has reviewed and discussed the CD&A with management.  The hope is that these requirements improve the quality and transparency of the executive compensation decision-making process.

The Committee believes that with respect to executive compensation, the impact of a number of recent regulatory changes—perhaps most importantly the SEC's new executive compensation disclosure requirements—should be assessed prior to making further policy changes in this area.

## IV.  Resolution of Disputes Between Shareholders and Companies

This Report has already discussed the circular shareholder effect of securities class actions.  Whether or not the remedy is really in the interests of shareholders is a matter of lively and important debate.  Given these uncertainties and the fact that

---

115 Executive Compensation and Related Person Disclosure. *supra* note 107, at 16.
116 *See* Financial Accounting Standards Board. Statement of Financial Accounting Standards No. 123 (revised 2004) (December 2004).

competitive market centers do not have such remedies, the Committee believes that shareholders should be able to choose their remedies. The Committee believes that the SEC should permit public companies to contract with their investors to provide for alternative procedures in securities litigations, including providing for arbitration (with or without class action procedures) or non-jury trials. If the market rewards issuers who choose alternative procedures, then it is likely more shareholders will choose to implement these features. The Commission should not force shareholders to accept the costs that go with class action securities litigation, particularly the substantial and unpredictable risk of large jury verdicts that effectively force settlement of what may well be non-meritorious claims, where those shareholders choose to forgo these rights.

Although the question whether securities litigation against an issuer can be brought to arbitration has not been decided by the Supreme Court, there is precedent for mandatory arbitration of claims under the securities laws in other circumstances. In *Shearson/American Express v. McMahon*[117] and *Rodriguez de Quijas v. Shearson/American Exp., Inc.,*[118] the Supreme Court held that a pre-dispute agreement to submit to arbitration claims based on the substantive rights of the Securities Exchange Act of 1934 (*McMahon*) or the Securities Act of 1933 (*Rodriguez*) does not violate the anti-waiver of rights provisions of either statute.

Since these decisions in the late 1980s, the vast majority of broker-dealers have incorporated arbitration agreements into their account management contracts, and arbitration is now the primary method of dispute resolution for broker-customer disputes.[119] In light of the Supreme Court's declaration that there is "a national policy favoring arbitration,"[120] and the fact that claims in the brokerage industry are frequently submitted to arbitration as a result of *McMahon and Rodriguez*, there seems little chance that securities law claims involving the corporate issuer would be held to be beyond arbitration.

It is even clearer that the inclusion of a clause waiving an investor's right to a jury trial in private securities litigation does not violate applicable law. Although the Seventh Amendment to the United States Constitution provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law," the Supreme Court has held that this guarantee of the right to a jury trial in a civil case can be waived.[121]

In both the case of binding arbitration clauses and waiver of jury trial clauses in a charter or bylaws, there is, to be sure, a question of enforceability. The Supreme Court has stated that "the arbitrability of the merits of a dispute depends upon whether the

---

117 482 U.S. 220 (1987).
118 490 U.S. 477 (1989).
119 *See, e.g.,* 4 LAW SEC. REG. § 14.15
120 Southland Corp. v. Keating, 465 U.S. 1, 10 (1984).
121 *See* In re Henderson's Distilled Spirits, 81 U.S. (14 Wall.) 44 (1872). The Delaware Constitution also provides for a right to a trial by jury in civil litigation, which may be waived by a plaintiff. *See* Del.Const., Art. I, §4. *See also,* Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908 (Del. 1989).

parties agreed to arbitrate that dispute . . . . When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[122]  Similarly, before giving effect to such a waiver of plaintiff's right to a trial by jury, courts will look for evidence that the contractual waiver was "knowing and intentional."[123]  In either case, the question of the enforceability of the contact turns on the totality of the circumstances surrounding the formation of the contract, including the arbitration or waiver clause was so inconspicuous in location and format as to be considered hidden in the contract to determine if the waiver or agreement to arbitrate was knowing and voluntary.  The enforceability of these provisions thus would turn on whether the purchase of a security after disclosure and notice in a company's prospectus, Exchange Act reports (10-K and 10-Q), or on its website of an arbitration or waiver of jury trial clause in a company's charter and bylaws is sufficient for a court to determine that the contract was made knowingly and voluntarily.

Historically, the general counsel's office of the SEC has taken the position that the decisions in *McMahon* and *Rodriguez* should not be extended to the context of issuer-shareholder disputes and has denied acceleration of registration to a company that included an arbitration clause in its charter.[124]  As a legal matter, however, there is nothing that would prevent the general counsel from reversing its policy decision and issuing an interpretation to clarify its views regarding the important features of any mandatory, pre-dispute arbitration agreement between a public company and its investors.  The SEC will have to consider, however, how to deal with shareholder choice when a company has a control owner.

The Committee recommends that the SEC should permit shareholders to adopt alternative procedures for resolving disputes with their companies.  These procedures might include arbitration (with or without class actions) or the waiver of jury trials (a waiver commonly made in a variety of circumstances).  The Committee recognizes the difficulties that will be faced by shareholders in deciding whether to adopt alternative procedures.  For example, arbitration usually does not permit summary judgment and there is no appeal.  These costs would have to be weighed against the possible benefits of reducing burdensome litigation.  Although the decisions may be difficult, the Committee believes that shareholders should have the right to choose, particularly given the current high cost to shareholders of litigation.

With respect to IPOs, there could be a vote on amending the corporate charter and by-laws at the first shareholder meeting after the IPO, which could be a special meeting.

---

122 First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995).  *See generally,* Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)).

123 *See* National Equipment Rental, Ltd. v. Hendrix, 565 F2d. 255, 258 (2d Cir. 1977).  Factors considered by state courts in the enforceability of clauses waiving jury trials vary from state to state.  In Delaware, a bylaw provision waiving a right to jury trial would be interpreted in accordance with the law of contracts of adhesion.  In Delaware, a contract of adhesion is enforceable if the agreement is unambiguous and the contract is not "so one-sided as to be oppressive."  Graham, *supra* note 122, at 912.

124 *See* Riesenberg (1990) at 2.

Requiring a vote on a charter amendment, rather than dealing with the issue through a covenant in the IPO, will help ensure that the issue receives the required attention apart from the multiplicity of factors that influence the decision to buy stock in an IPO. For existing companies, shareholders would be free to vote on alternative remedies at a properly called meeting.

## References

Agrawal, A. and R. Walkling. 1994. "Executive Careers and Compensation Surrounding Takeover Bids." *Journal of Finance* 49:985-1014.

Andrade, G., M. Mitchell, and Erik Stafford. 2001. "New Evidence and Perspectives on Mergers." *Journal of Economic Perspectives* 15:103-120.

Armour, J. and D. Skeel. 2006. "Who Writes the Rules for Hostile Takeovers, and Why? – The Peculiar Divergence of US and UK Takeover Regulation." Working Paper.

Bebchuk, L.A., J.C. Coates, and G. Subramanian. 2002. "The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy." *Stanford Law Review* 54:887-952.

Bebchuk, L.A., and A. Cohen. 2005. "The Costs of Entrenched Boards." *Journal of Financial Economics* 78:409.

Bebchuk, L.A., A. Cohen, and Allen Ferrell. 2005. "What Matters in Corporate Governance?" Harvard University Working Paper (September 2004, revised March 2005), *available at* http://www.law.harvard.edu/programs/olin_center/

Berger, P. and E. Ofek. 1996. "Bustup Takeovers of Value-Destroying Firms". *Journal of Finance* 51:1175-1200.

Betrand, Marianne and Mullainathan Sendhil. 2003. "Enjoying the Quiet Life? Corporate Governance and Managerial Preferences." *Journal of Political Economy* 111:1043-1075.

Bhagat, S., M. Dong, D. Hirshleifer, and R. Noah. 2005. "Do Tender Offers Create Value? New Methods and Evidence." *Journal of Financial Economics* 76:3-60.

Coates, J. 2001. "Explaining Variation in Takeover Defenses: Blame the Lawyers." *California Law Review* 89:1301-1422.

Faleye, O. 2006. "Classified Boards, Firm Value, and Managerial Entrenchment." forthcoming *Journal of Financial Economics*.

Franks, J. and R. Harris. 1989. "Shareholder Wealth Effects of Corporate Takeovers: The U.K. Experience 1955-1985." *Journal of Financial Economics* 23:225.

Gompers, P., J. Ishii, and A. Metrick. 2003. "Corporate Governance and Equity Prices." *Quarterly Journal of Economics* 118:107-155.

Heron, R. and E. Lie. 2006. "On the Use of Poison Pills and Defensive Payouts by Takeover Targets." *Journal of Business* 38:45-57.

Institutional Shareholder Services. 2006. "2006 Background Report: Classified Boards of Directors at U.S. Companies."

Jarrell, G.A. and A.B. Poulsen. 1986. "Shark Repellents and Poison Pills: Stockholder Protection – From the Good Guys or the Bad Guys?" *Midland Corp. Fin. J.* 4:39

Jarrell, G. A., and A.B. Poulsen. 1987. "Shark Repellents and Stock Prices: The Effects of Antitakeover Amendments Since 1980." *Journal of Financial Economics* 19:127-168.

Jarrell, G. A. and M. Ryngaert. 1986. "The Effects of Poison Pills on the Weath of Target Shareholders." Office of the Chief Economist of the SEC.

Jensen, M. 1988. "Takeovers: Their Causes and Consequences." *Journal of Economic Perspectives* 2:21-48.

Jensen, M. and R. Ruback. 1983. "The Market for Corporate Control: The Scientific Evidence." *Journal of Financial Economics* 11:5.

Klingsberg, Ethan. 2006. "Rise in Stockholder-Adopted Bylaws, Proxy Contest Nears." *New York Law Journal* (October 11, 2006), 4.

Koppes, R., L.Ganske, and C. Haag. 1999. "Corporate Governance Out of Focus: The Debate over Classified Boards." *The Business Lawyer* 54:1023.

La Porta, R., F. Lopez-de-Silanes, and A. Shleifer. 1999. "Corporate Ownership around the World." *Journal of Finance* 54:471-517.

Lesser, Henry and Broc Romanek. May/June 2006. "The Corporate Governance Adviser." Aspen Publishers.

Mahoney, J.M., and J.T. Mahoney. 1993. "An Empirical Investigation of the Effect of Corporate Charter Antitakeover Amendments on Stockholder Wealth." *Strategic Management Journal* 14:17-32.

Mahoney, J., C. Sundaramurthy, and J. Mahoney. 1996. "The Differential Impact on Stockholder Wealth of Various Antitakeover Provisions." *Management & Dec. Economics* 17:531.

Malatesta, P. and R. Walking. 1988. "Poison Pill Securities: Stockholder Wealth, Profitability, and Ownership Structure." *Journal of Financial Economics* 20:347-376.

Margotta G. 1989. "Takeover Premiums: With and Without Shareholder Rights Plans." Working Paper.

Mitchell, M., and J. Mulherin. 1996. "The Impact of Industry Shocks on Takeover and Restructuring Activity." *Journal of Financial Economics* 41(2):193-229.

Mørck, R., A. Shleifer, and R. Vishny. 1988. "Characteristics of Targets of Hostile and Friendly Takeovers." In *Corporate Takeovers: Causes and Consequences*, 101-29.

Riesesnberg, Thomas L. 1990. "Arbitration and Corporate Governance: A Reply to Carl Schneider." *Insights* 4:2.

Romano, R., 1993. *The Genius of American Corporate Law*. New York: AEI Press.

Ryngaert, M. 1988. "The Effect of Poison Pill Securities on Shareholder Wealth." *Journal of Financial Economics* 20:377.

Schumann, L. 1988. "State Regulation of Takeovers and Shareholder Wealth: The Case of New York's 1985 Takeover Statute." *Rand Journal of Economics* 19:557.

Schwert, W. 2000. "Hostility in Takeovers: In the Eyes of the Beholder?" *Journal of Finance* 55:2599-2640.

Special Study Group. 2002. "Special Study on Market Structure, Listing Standards and Corporate Governance." *Business Lawyer* 57:1487-1561.

Stanford Law School Securities Class Action Clearinghouse in Cooperation with Cornerstone Research, *available at* http://securities.stanford.edu/.

Swartz, J. 1998. "The Massachusetts Classified Board Law." *Journal of Economics and Finance* 22:29.

# SECTION V: SARBANES-OXLEY SECTION 404

The Sarbanes-Oxley Act of 2002 ("SOX") was a critical response to the accounting and corporate governance abuses that contributed to the corporate frauds at Enron, WorldCom, and other companies at the start of the decade. SOX has significantly strengthened the financial reporting and governance processes for public companies through a series of reforms that are broadly supported by the Committee. Key provisions of SOX include requiring that CEOs and CFOs certify the accuracy of financial statements (Section 302); requiring that independent audit committees of the board oversee the hiring of external auditors (Section 301); prohibiting loans to insiders (Section 402); restricting auditors from providing certain non-audit services to clients (Section 201); and introducing new criminal sanctions for certain knowing violations of the CEO and CFO certification requirements (Section 906).

The main policy debate over SOX, however, is focused on the implementation of a single provision, Section 404, which requires that public companies annually assess, and that their auditors attest to, the effectiveness of internal controls over financial reporting. The Committee believes that this section raises significant concerns relating to the competitiveness of the U.S. public capital market.

Section 404 is aimed at reducing the market impact from accounting "errors"—whether from fraud, inadvertent misstatements, or omissions—by assuring investors that public companies maintain effective controls over financial reporting. The key issue is not the statute's underlying objectives but whether the implementation approach taken by the SEC and the PCAOB (the independent board established under SOX to set standards for auditors of public companies) strikes the right cost-benefit balance. There is widespread concern that the compliance costs of Section 404 are excessive. In response to these concerns, the SEC and the PCAOB are currently working to revise the standards for Section 404 to make reviews more risk-based and cost-effective.

There are different views of the cost-benefit trade-off of current Section 404 implementation. Critics stress high compliance costs—which totaled an estimated $15-20 billion for issuers in 2004[125]—while supporters emphasize the intangible, or indirect, benefits from Section 404 implementation. In particular, supporters note a changed "tone at the top" among public companies when it comes to financial reporting, with a higher level of engagement from audit committees, CEOs, and CFOs on accounting issues. They also note that many of the control weaknesses uncovered in the early years of

---

125 See analysis in II, below.

Section 404 implementation have led to significant improvements in the control environment.

Much of the Section 404 debate centers on quantifying the benefits of Section 404. As reviewed below, the evidence on benefits is inconclusive at this stage. Yet the uncertainty surrounding the level of benefits, especially in light of compliance costs that are many multiples of the SEC's original estimates, argues in favor of a more cost-effective implementation approach. We certainly should adopt reforms that can obtain the same benefits for less cost. The Committee proposes specific recommendations that would improve the efficiency of Section 404 implementation without compromising SOX's fundamental objectives.

Part I of this section describes the current Section 404 implementation framework. Part II analyzes the costs and benefits of Section 404 based on the available evidence. Part III discusses policy options and the case for reforming the current Section 404 implementation approach, while Part IV sets forth the Committee's recommendations.

## I. The Section 404 Framework

It is worth stepping back briefly to put Section 404 in the context of the history surrounding passage of SOX. SOX was enacted by Congress in July 2002 to address a perceived crisis of confidence in U.S. equity markets following the spectacular failure of Enron in December 2001, the related allegations of misconduct by Arthur Andersen and the firm's criminal indictment and rapid implosion in June 2002, and the subsequent collapse of WorldCom in July 2002. Although there were several factors that contributed to the demise of Enron and WorldCom, the common denominator was allegations of high-level fraud and accounting abuses (other instances of fraud and accounting abuses emerged after passage of SOX, including Tyco, HealthSouth, and Adelphia). At the same time, the market atmosphere surrounding passage of SOX was gloomy: the economy in 2002 was in recession, the late 1990's equity bubble had burst, with market values on the NASDAQ in July 2002 trading at 76 percent below their 2000 peak,[126] and investor confidence, as reflected in the UBS Index of Investor Optimism, was at the lowest point since the inception of the index in 1996.[127]

The proposals that emerged as Section 404 had not been developed within the SEC or considered previously by Congress, although the focus on financial controls did have antecedents in the Federal Deposit Insurance Corporation Improvement Act of 1991 and the Foreign Corrupt Practices Act of 1977. The idea of requiring management assessment and auditor attestation of internal controls over financial reporting for all public companies was a new policy proposal that had not been subjected to extensive public scrutiny prior to SOX. Equally, there was no established market convention—either within the industry or the audit profession—on what constitutes effective controls over financial reporting. (While the Committee of Sponsoring Organizations of the Treadway Commission (COSO) issued guidance with respect to internal controls in 1992,

---

126 NASDAQ Composite Index.
127 UBS Index of Investor Optimism, 27 August 2002.

the COSO framework is a best practice standard that goes beyond financial reporting and was not widely adopted prior to SOX). Congress was essentially drawing on a blank slate when it enacted Section 404, or asking the SEC and the PCAOB to do so.

The statutory requirements of Section 404 are straightforward. Section 404(a) requires issuers of public securities subject to SEC registration to publish in their annual reports "an assessment . . . of the effectiveness of the internal control structure and procedures of the issuer for financial reporting."[128] Specifically, management must state whether the controls are effective and note any significant deficiencies or material weaknesses in internal controls. Section 404(b) adds an external safeguard. It requires the company's external auditor to "attest to, and report on, the assessment made by the management of the issuer" of the control environment, thus building in a level of added assurance or redundancy. Section 404(b) also directs the PCAOB to establish standards for auditor attestation of internal controls, subject to SEC approval. Separately, the CEO and CFO certification requirements in Section 302 of SOX apply to Section 404 reporting, and the Section 906 criminal sanctions against CEOs and CFOs for knowing material misrepresentations of financial information might be read as applying to Section 404 reporting as well.

Although the statute is easy to understand, the rules implementing Section 404 are more complex. Currently, there is no SEC standard for management's internal assessment under Section 404(a), although the SEC has recently announced that it will issue guidance for the management review in the near term. Instead, the PCAOB established a standard for the auditor attestation of management's review required by Section 404(b) in Auditing Standard No. 2 (AS2). In the absence of SEC guidance, AS2 is the operative standard that informs both the auditor attestation and internal management reviews (to which external auditors must attest).

In its current form, AS2 runs 125 pages and is supplemented by a PCAOB policy statement and 55 staff question and answers. AS2 establishes the scope of auditor reviews under Section 404 and the principles that determine the confidence interval, or degree of stringency, for the detection of control weaknesses.

AS2 requires auditors to provide "reasonable assurance" that "no material weaknesses exist" in a company's internal control over financial reporting.[129] The "material weakness" standard establishes a low threshold: A "material weakness" exists if there is "*more than a remote likelihood* that a material misstatement of the annual or interim financial statements will not be prevented or detected" (emphasis added). AS2 also requires management and auditors to look for "significant deficiencies," which can be evidence of a material weakness. Significant deficiencies are defined as deficiencies that result in "*more than a remote likelihood* that a misstatement of the company's annual or interim financial statements that is *more than inconsequential* will not be prevented or detected" (emphasis added). In terms of scope, the standard applies to "controls over all

---

128 Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.
129 PCAOB Bylaws and Rules – Auditing Standard No. 2, as of May 12, 2006.

relevant assertions related to significant accounts and disclosures" of both the annual financial statement and interim financial statements.

Although the statute operates at two levels—management review and auditor attestation—AS2 is careful to require that auditors reach an independent conclusion about the effectiveness of internal controls. Specifically, an auditor must obtain the "principal evidence" for this independent judgment on the basis of his or her own work. An auditor can rely on the work of others (including work by internal auditors) only to the extent consistent with forming an independent view.

The standards set by AS2 are currently in flux. In response to extensive feedback from market participants, most recently at a Roundtable on May 10, 2006, the SEC and the PCAOB have announced that they will amend AS2.[130] The amendments are intended to ensure that the auditor review is focused on areas that pose higher risk of fraud or material error, as opposed to less consequential accounting changes. This intent was underscored in recent testimony by SEC Chairman Christopher Cox and PCAOB Chairman Mark Olson to Congress; as noted above, the SEC will also issue guidance on control reviews directly to issuers.[131] The discussion below is based on the standards as they currently exist.

Ultimately, all public issuers subject to SEC registration must comply with Section 404, with the exception of registered investment companies. The SEC, however, has taken a phased approach to Section 404 implementation, beginning in 2004.[132] Currently, the SEC has deferred implementation for small companies—non-accelerated filers with less than $75 million of market capitalization—until December 15, 2007 for Section 404(a) management assessment and a year later for Section 404(b) auditor attestation.[133] Thus, the track record for Section 404 implementation is still very short. Knowledge of Section 404 is limited to larger companies and specifically to two years of implementation experience.

## II. Sizing the Benefits and Costs of Section 404

### A. Benefits

The starting point for evaluating the benefits of Section 404 is to be precise about the regulation's intended objectives. What benefits would we expect to see if Section 404 worked as intended?

---

130 Roundtable Discussion on Second-Year Experiences with Internal Control Reporting and Auditing Provisions, The United States Securities and Exchange Commission, May 10, 2006.
131 Testimony of Christopher Cox, Chairman of the SEC, Concerning the Impact of the Sarbanes-Oxley Act, Before the Committee on Financial Services, U.S. House of Representatives, September 19 , 2006.
132 U.S. accelerated filers (issuers with market capitalizations exceeding $75 MM) and foreign large accelerated filers (issuers with market capitalizations exceeding $700 MM) were required to comply with Section 404 for fiscal years beginning on or after November 15 2004. *See* SEC Release No. 33-8392, February 24, 2004; SEC Release No. 33-8545, March 2, 2005; SEC Release No. 33-8730a, August 9, 2006.
133 This timing for small issuers is currently an SEC proposal that awaits adoption. SEC Release No. 33-8731, August 9, 2006.

The primary objective of Section 404 would seem to be improved accuracy of financial reporting for public companies. Put another way, Section 404 is aimed at reducing the error rate from public company financial reporting. Because accounting errors, if material, are ultimately manifested in financial restatements, the Section 404 objective can be linked directly to reducing financial restatements. But not all accounting restatements are equivalent. Section 404 is particularly concerned with restatements that cause harm to investors—in other words, restatements that result in a material market impact. One measure of the direct benefit from Section 404 should therefore be a reduction in the negative market impact associated with financial restatements.

Alternatively, Section 404 can also be seen as reducing the cost of capital for companies with strong internal control environments. Lower information risk through more reliable financial reporting could translate into a cost of capital premium for companies with strong internal controls or a cost of capital penalty for companies with control deficiencies. A second measure of Section 404's direct benefits would be the cost of capital differential associated with a company's control environment—particularly for companies reporting internal control deficiencies post-SOX and Section 404 implementation. Evidence on each of these direct benefits is reviewed below.

There are also some unintended benefits from Section 404. In some cases, Section 404 control reviews appear to have acted as a catalyst for companies to improve the efficiency of financial management.[134] This change has led either to direct cost savings—for example, through rationalization of the payments process—or to improved loss avoidance, through enhanced security and safeguards. Section 404 has also served as a catalyst for some companies to develop Enterprise Risk Management programs, which address all sources of risk, not just financial reporting. In the future, Section 404 programs and the control environments they have fostered will be even more useful as companies embark on initiatives to provide investors with real-time and more customizable financial reporting information.[135] While these broader initiatives may be welcome, they are not the direct focus of the regulation.

## B. Market Impact of Financial Restatements

To return to direct benefits, a first-order measure of the economic harm that Section 404 is trying to prevent is the incidence (frequency) and market impact (severity) of accounting restatements by public companies. Although there is no single accepted methodology for estimating Section 404's benefits, quantifying the harm from accounting restatements could provide an upper limit on the direct benefits from Section 404. Under this view, if Section 404 reduced accounting restatements to zero, then the harm associated with accounting errors would be eliminated.

---

134 Wagner and Dittmar (2006) at 133.
135 Whether companies do this through Global XBRL (Extensible Business Reporting Language) mechanisms or other tools, 404 programs can ensure that this new brand of cutting-edge information is trustworthy.

A July 2006 analysis by the GAO provides estimates of both the frequency and severity of public company restatements.[136]  The GAO study attempted to assemble a comprehensive database of all public company restatements from July 2002 to September 2005 and reflects 1,061 restatements for 984 public companies.  An earlier GAO analysis, released in October 2002, examined restatements from 1997 to 2002, and the earlier results can be used to corroborate the more recent estimates.[137]

According to the July 2006 GAO report, the annual frequency of restatements nearly doubled from July 2002 to September 2005, from 3.7 percent to 6.8 percent of public companies over the three year period.  Many observers have indicated that the increase in restatements in 2004 and 2005 was directly attributable to the implementation of Section 404—that the first-time impact of control reviews led to a spike in the detection rate of financial errors and that the long-term rate is expected to subside.  As shown in Figure V.1, the more recent restatement rate was considerably higher than in the 1997–2002 period.

**FIGURE V.1**



*Through September

Sources:
"Financial Statement Restatements: Trends, Market Impacts, Regulatory Responses, and Remaining Challenges," GAO, October 2002.
"Financial Restatements: Update of Public Company Trends, Market Impacts and Regulatory Enforcement Activities," GAO, July 2006.

At the same time, the GAO analysis seeks to estimate the severity of restatements, or market impact, through an "event study" that analyzes the change in the stock price of restating companies, relative to market, in the period surrounding restatements.  As listed in Table V.1, the GAO examined different time windows for the event analysis:  a 3-day

136 United States Government Accountability Office (2006).
137 United States Government Accountability Office (2002).

window, a 40-day window, and a 120-day window.  The three-day window, in which the price of the stock the day before restatement is compared with the price of the stock the day after restatement, is the most immediate reflection of the effects of restatement on a company's market value, and has the largest impact.  Over the 2002–2005 period, the three-day market impact for restating companies averaged negative 1.9 percent, meaning that the average restating company lost 1.9 percent of its value relative to the market in the three-day window surrounding restatement.[138]

The GAO's frequency and market impact data can be combined to construct a top-down estimate of the total expected market impact from restatements.  The expected market impact from a restatement is the product of restatement frequency and severity.  Over 2002–2005, the annual restatement frequency averaged 4.5 percent, while severity averaged negative 1.9 percent, implying that the annual expected market impact from restatements was negative 8.5 basis points.  Taking 2004—the first year of Section 404 implementation—as a base year, the total domestic market capitalization of public companies was approximately $17 trillion.[139]  Thus, assuming an expected market impact from restatements of negative 8.5 basis points, the total expected value of restatement for 2004 was roughly $14.5 billion.

This top-down analysis of expected value is supported by the GAO's bottom-up calculation of market impact from restatements over both the 1997–2002 and 2002–2005 periods.  Figure V.2 shows the actual dollar amount of market impact calculated by the GAO for each year.  The total market impact over the 8.75-year period (the data for 2005 only runs through September) is $158.9 billion, implying an average annual market impact of 18.2 billion.[140]  The total market impact estimate over the longer time period is reasonably close to the top-down calculation above and suggests that $14.5 billion is a plausible measure for the expected market impact from restatements for 2004.

---

138 A study by the consulting firm Glass Lewis, (Glass, Lewis & Company, LLC, 2006), also performed a market impact analysis and purports to show a higher market impact from restatements.  The study singles out ten restatements by large companies that alone yielded, according to its calculations, a cumulative market impact of $82 billion (versus the GAO's cumulative market impact of $63 billion for 1,069 restatements over the July 2002 to September 2005 period).  However, unlike the GAO analysis, which defined a consistent window for analysis, the Glass Lewis study took the combination of the highest pre-restatement stock price and the lowest post-restatement stock price within a six month period for each company to determine the market impact.  The high/low combinations also were not adjusted for market movements.  Thus, anything that drove a company's stock to be higher before restatement and lower afterward–including ordinary market volatility–would influence their results.  The Committee believes the GAO study is a more comprehensive and rigorous application of "event" analysis over a similar period.
139 "Flow of Funds Accounts of the United States," Board of Governors of the Federal Reserve System, September 19, 2006.
140 The GAO is in the process of revising the dollar impact calculations of its most recent study, and the revisions will likely result in a lower calculation of cumulative market impact for 2002–2005.  The revisions, however, will not affect the frequency and severity estimates obtained from the GAO study.

**FIGURE V.2**



*Sources:*
*"Financial Statement Restatements: Trends, Market Impacts, Regulatory Responses, and Remaining*
    *Challenges," GAO, October 2002.*
*"Financial Restatements: Update of Public Company Trends, Market Impacts and Regulatory Enforcement*
    *Activities," GAO, July 2006.*

There are several caveats to using the GAO event study for assessing the market impact from restatements. First, the time window in the GAO analysis is defined by the actual restatement date. The window may not capture the market impact for companies that announce the intent to restate at an earlier date, but then file the restatement subsequently.[141] Second, even if the announcement occurs within the GAO time window, the market may over- or under-react to the news of the restatement. The long term market impact is difficult to isolate. Third, the event studies fail to reflect any indirect benefits from control improvements, such as a decrease in investors' perception of information risk or improved profitability for companies that have corrected control deficiencies.

Nevertheless, the top-down estimate from the restatement analysis, if accepted, places a ceiling on the direct benefit from Section 404: as noted above, the maximum direct benefit from Section 404 would be to reduce accounting errors to zero. This objective is unlikely to be attainable, however, because even a perfect control

---

141 It should be noted, though, that the GAO's 120-day window, which looks at the price movement in a stock both 60 days before and after restatement, does not show a larger effect, as might be expected if the market impact from restatements was triggered by an announcement within 60 days of the actual restatement.

*Sarbanes-Oxley Section 404*

environment will not prevent all restatements. While controls may be effective in preventing or detecting certain types of fraud and inadvertent errors or omissions that can result in restatements, restatements can also be triggered by causes that are unrelated to control failures. A major potential source of restatements that is unrelated to internal controls is differences in judgment or interpretation of accounting principles, as well as differences of interpretation of tax liabilities. Little empirical evidence appears to exist on the proportion of accounting errors that are linked to control failures versus other causes. But it is fair to assume that some portion of accounting error will be attributable to causes that are unrelated to control failures, so that the *attainable benefit* from Section 404 will be less than the total market impact from restatements.

At the same time, the market impact of restatements is highly skewed. Figure V.3 reconstructs the results of the GAO analysis at the individual company level. (These results were not reported by GAO, but were calculated by using the list of companies and restatement dates in the GAO analysis, and the GAO's market impact methodology). Only 38.3 percent of the analyzable number of restatements from July 2002 to September 2005 (1179) had a market impact greater than $5 million (the average cost of compliance, as discussed below). Table V.2 shows that a little more than half of restatements (53 percent) appear to have had either a negligible negative (less than one percent) or a positive impact on company market value, and only 12.6 percent of restatements had a major negative impact (over ten percent) on company market value. A key question in evaluating the efficiency of current regulation is whether it is appropriately targeted at high-impact restatements.

## FIGURE V.3

**Dollar Impact of Negative Restatements**



*Source: Mercer Oliver Wyman*

The Committee believes that the restatement analysis is useful but inconclusive with respect to Section 404 benefits. As noted above, the restatement analysis is subject to caveats relating to timing effects, market under or over-reaction, and possible indirect benefits. The market impact of restatements and the links between restatements and Section 404 controls are important issues that require further study.

## C. Cost of Capital Impact of Internal Controls

The second approach to estimating the benefits of Section 404 is to measure the degree to which effective internal controls reduce the cost of capital. The adequacy of the control environment could be linked to investors' perception of information risk, and affect the premium they require for holding a company's stock.

Two studies of cost of capital reach different conclusions. One recent study by Hollis Ashbaugh-Skaife, Daniel Collins, William Kinney, and Ryan LaFond ("ACKL paper"), examines the impact of the disclosure by 1,053 firms that reported internal control deficiencies ("ICDs") between November 2003 and September 2005.[142] The authors conclude that the cost of equity capital for firms reporting one or more ICDs in this period ranged from 50 to 150 basis points higher than firms that reported no ICDs. If this cost of capital differential were a benefit of improved controls that can be attributed to *all* firms under SOX, then the estimated capital differential would be worth $85-255 billion in 2004, given the 2004 market capitalization of $17 trillion.

However, another study by Ogneva, Raghunandan, and Subramanyan, using the same general approach but applying a different measure of cost of capital and a different sample finds no impact on cost of capital from the report of internal control deficiencies.[143]

The Committee believes that although the issues related to cost of capital are important, there are several reasons to be wary of drawing high-level policy conclusions from either cost of capital study. First, the measures of cost of capital in the studies are debatable; the sample sizes are quite small, and neither study fully treats any costs or benefits of firms that report no ICDs. In addition, because some of the ICDs were reported before the implementation of Section 404, these ICDs are not a reflection of the current regulatory approach.

Equally, to the extent that the ACKL paper finds a higher cost of capital for firms that announce ICDs, the conclusions are best understood in terms of the different costs of capital reported for companies with different market expectations of control deficiencies. These results, derived from the ACKL paper, can be summarized in a two-by-two matrix, as follows:

---

142 Ashbaugh-Skaife *et al.* (2006).
143 Ogneva *et al.* (2006).

**Change in Cost of Capital**

|  | ICD Revealed | No ICD Revealed |
|---|---|---|
| **Market Expectation of ICD** | 1. Increase in cost of capital (but not statistically significant) +0.49% | 2. Decrease in cost of capital −1.16% |
| **No Market Expectation of ICD** | 3. Increase in cost of capital +1.25% | 4. No significant change in cost of capital |

(1)  Market expects a control deficiency, and an ICD is revealed: +0.49% change in cost of capital (but not statistically significant)
(2)  Market expects a control deficiency, but no ICD is revealed: −1.16% change in cost of capital
(3)  Market does not expect a control deficiency, but an ICD is revealed: +1.25% change in cost of capital
(4)  Market does not expect a control deficiency, and no ICD is revealed: No significant change

Estimating the annual market impact would require knowing the number of firms in the two cells where the market is surprised—that is, where the revelation of ICD materially affects the cost of capital. In all likelihood, the annual market impact would be considerably less than the $85–255 billion arrived at by attributing the cost of capital differential to all firms in the market, since the majority of firms are likely to fall into fourth category above with no significant change in cost of capital.[144]

Furthermore, to the extent that the ACKL paper finds that the cost of capital is higher for firms that announce ICDs (beyond what could be known through other financial reports or other information), one must accept that these differences are appropriate and not the product of market over-reaction.[145]

For these reasons, the Committee believes that the cost of capital studies are also inconclusive with respect to SOX benefits. Further research is required to establish a strong measure of benefits.

**1. Costs**

Evaluating the costs of Section 404 is, in principle, easier than measuring the benefits. A number of surveys have evaluated how much companies spent on compliance with Section 404 in 2004 and 2005, the first two years of implementation. The surveys

---

144 The ACKL paper reports 1053 firms with ICDs over a 23 month period, implying 550 ICDs per year. This is less than 10 percent of exchange-listed public companies. Consequently, more than 90 percent of firms report no ICD.
145 There is a growing literature in behavioral finance premised on markets sometimes making mistakes, and over-reaction is not an uncommon mistake.

generally assess the average expenditure by individual companies. In order to arrive at a market total, the individual company amounts need to be scaled up across all companies in the relevant category.

Table V.3 lists the results of two leading cost surveys: one by Financial Executives International (FEI),[146] and another by Charles River Associates (CRA).[147] The FEI survey reports a single cost estimate for reporting member companies (ranging from less than $25 million in market capitalization to greater than $25 billion), while the CRA survey reports separate estimates for smaller companies (accelerated filers; $75-$700 million in market capitalization) and larger companies (large accelerated filers with more than $700 million in market capitalization).

In 2004, the first year of Section 404 implementation, the average cost per company in the FEI study was $4.36 million. This figure is midway between the two estimates reported in the CRA study: $1.24 million for smaller companies and $8.51 million for larger companies. Scaling up the survey results by the number of accelerated filers, the individual company estimates translate into a total market expenditure of between $15 billion (based on the FEI estimate) and $20 billion (based on the CRA estimate) on Section 404 implementation in 2004.

The actual implementation costs in 2004 can be compared with the SEC's original estimate, in 2003, of compliance costs for management attestation under Section 404(a). The SEC originally estimated that internal costs (exclusive of audit fees) would average $91,000 per issuer.[148] Audit costs are estimated to be roughly 25–30 percent of total Section 404 expenditures, meaning that internal costs in 2004 (based on a $5 million mid-range estimate) were on the order of $3.5 million per issuer. Thus, on a like-for-like basis, actual implementation costs in 2004 were *more than 35 times higher* than the SEC's original estimate.

The average costs per company mask significant differences at the individual company level. Although the largest companies are estimated to spend more than $33 million on SOX compliance, SOX costs are regressive.[149] According to CRA, compliance costs for firms with less than $700 million of market capitalization averaged 0.46 percent of revenues; this is more than five times greater on a relative basis than firms with greater than $700 million in market capitalization (0.09 percent of revenues).[150]

The cost studies also found that internal management costs were the largest expense incurred by companies (generally 70–75%) and varied extensively from company to company based on how companies approached the scope, documentation

---

146 Financial Executives International (2006).
147 Charles River Associates International (2006).
148 SEC Release No. 33-8238, June 5, 2003. This SEC estimate only covered 404(a), and the SEC did acknowledge that some commenters believed the costs of the 404(b) auditor attestation report would be significant.
149 Roundtable Discussion, May 10, 2006, *supra* note 131.
150 Charles River Associates International (2005).

requirements, and testing procedures in the standard. The annual attestation and audit costs for companies accounted for the remaining fraction (roughly 25–30%) of total costs.

The 2004 experience reflected the first year of implementation, which for many companies included significant start-up costs. Future costs on a per company basis are expected to decline. Early evidence for this can be seen in Table V.2, which shows that the expenditure by filers dropped from 2004 to 2005 by between 13 percent (FEI) and 30–43 percent (CRA). It is reasonable to anticipate further cost reductions as Section 404 reviews become more efficient. However, an offsetting factor is that non-accelerated filers will become subject to Section 404 reviews, and the additional costs for non-accelerated filers are not yet reflected in these figures.

## 2. Benefits and Costs Compared

The Committee believes that the costs of Section 404 are substantial—many multiples of the SEC's original estimate—and the precise quantification of benefits is uncertain. Provisional estimates based on market impact of restatements would suggest that the attainable benefits of Section 404 may be lower than current implementation costs, whereas estimates based on cost of capital cover a wide range. The uncertainty of benefits relative to high costs argues in favor of a more efficient approach to Section 404 implementation. Regardless of the level of benefit, the cost-benefit can only improve if the same impact can be achieved at lower cost.

## III.  Case for Reform

Even taking the most favorable view of the benefits of internal controls, the key questions are (i) whether the existing implementation of Section 404 is appropriately designed to uncover internal control deficiencies that have a material impact on a company, and (ii) whether it does so at the lowest reasonable cost. Concerns with the present Section 404 approach include the following:

(1)     *Lack of appropriate risk adjustment of control reviews.* Many commentators trace the root problem with the current implementation and compliance approach to the standard set by the PCAOB and the SEC in AS2 for auditor attestation, which, in the absence of direct guidance from the SEC for issuers, is also the *de facto* standard for management reviews under Section 404.

Although the SEC and the PCAOB have issued guidance on Section 404 audits, encouraging auditors to adopt a top-down, risk-based approach that employs auditor judgment and focuses on high-risk areas, these principles have not been effectively implemented as a result of the breadth and vagueness of the AS2 requirements described below.[151]

---

151 SEC commission statement 2005-74, 16 May 2005; PCAOB Release No. 2005-009, May 16, 2005.

(2)     *Materiality and scope.*  AS2's requirement that controls be effective in protecting against all but a "remote likelihood" of the potential for material misstatements in annual or interim financial statements suggests a very low tolerance for error, with little appeal to cost-benefit analysis.  The AS2 standard should be understood in terms of two related concepts:  the *probability* that a control weakness will be detected and the *impact* of the control weakness on the financial statement.  AS2's "remote likelihood" standard sets a low threshold for probability.  Impact, meanwhile, is defined as any "material misstatement" in the annual or interim financial statements, as those terms are used elsewhere in the accounting literature.

For many years, the rule of thumb was that, in determining the scope of an audit, a potential error exceeding five percent of annual pre-tax income would be considered material.  In evaluating a misstatement, an error that exceeded ten percent of pre-tax income was considered material, while the materiality of an error between five percent and ten percent of pre-tax income was assessed, based on various qualitative factors.

Over the past few years, this rule of thumb has eroded significantly, and preparers, audit committees, and auditors often focus on misstatements below that original five percent threshold.  This trend is attributable in part to SEC guidance on materiality that calls for the consideration of qualitative as well as quantitative factors in assessing materiality in Staff Accounting Bulletin No. 99.  In practice the application of qualitative factors has resulted in the determination that amounts less than five percent are material far more often than not.

The SEC has given guidance through Staff Accounting Bulletin No. 99 that any intentional error no matter the amount should be considered material.  In addition, materiality is often defined by the SEC relative to interim results rather than annual results of operations.  Interim materiality forces a lower threshold for auditors.

Conversely, the PCAOB in its May 2005 guidance attempted to address the auditor's materiality determination from a Section 404 perspective and encouraged a consideration of qualitative factors in determining significant accounts.  Specifically, the PCAOB statement in May 2005 inferred that the auditor (and presumably management) should take a top down approach to determine controls to test as it relates to Section 404.  A key statement from May 2005 makes clear that "the auditor should consider the overall risk to each significant account (presumably as determined by 'quantitative' materiality) to determine if he or she should alter the nature, timing and extent of testing of controls over that specific account."  This statement suggests that the auditor should consider qualitative factors in determining the significant accounts that he or she should or should not test.  Such factors could include history of fraud, internal audit findings, regulatory findings, management turnover, *etc.*

The trend in applying the concept of materiality in financial reporting to lesser amounts, which in many instances do not affect investor decisions, has in part influenced the reporting of internal controls under Section 404.  This trend has often resulted in restatements that do not have a significant impact on a Company's share price when the restatement is announced, suggesting that the restatement was not considered material by investors.  The SEC needs to revise its guidance so that materiality in financial reporting and internal controls is useful for investors, companies, and auditors.  In addition, the PCAOB and SEC need to consider guidance that reconciles and aligns the comments within the May 2005 PCAOB guidance and the requirements set forth in Staff Accounting Bulletin No. 99.

Although the SEC and the PCAOB have resisted efforts to quantify the AS2 materiality standard, former SEC Commissioner Joseph Grundfest has attempted to do so on the basis of the five percent rule:  He begins with the assertion that a five percent change in revenue (or, more accurately, five percent of pre-tax income) is a commonly accepted measure of materiality.  He notes that significant deficiencies which trigger a finding of a material weakness are defined in terms of a misstatement that is "more than inconsequential."  The boundary separating a "consequential" from an "inconsequential" misstatement in accounting literature is understood to be 20 percent of materiality—or one percent of revenues.  This calibration leads former Commissioner Grundfest to the following conclusion:

"[I]f we assume for the sake of argument only, and without any supporting literature, and against the PCAOB's direct instructions, that a probability of 5 percent or less would constitute less than remote probability, then the quantifiable implication of the preceding articulation of the definition of significant deficiencies implies that auditors have cause to search for and audit control processes with a five-percent probability of a one-percent implication for a firm's financial statements.  The expected value of a five-percent probability of a one-percent impact is, however, only 0.0005, or five hundredths of one percent."[152]

Grundfest's articulation is not without controversy, and several participants at the 2006 SEC/PCAOB Roundtable objected to his attempt to put numbers on a materiality concept that is meant to be judgment-based.[153]

At the same time, the lack of a quantitative standard makes it difficult for managers and auditors to know what the stopping point is:  What level of review or assurance is sufficient against an open-ended standard?  The review process asks management to prove a negative—that there is no significant deficiency or material weakness in a company's control framework.  The judgment-based materiality standard does little to ensure that reviews are appropriately risk-based and cost-effective.

---

152 Grundfest (2006) at 9.
153 Some Roundtable participants noted that application of Grundfest's test to their company results would produce amounts that were clearly significant, and thus worthy of monitoring.

(3)    *Impact of legal liability.*  The consequences of a low materiality threshold are compounded by the risk of management and auditor liability.  CEOs and CFOs are subject to criminal sanctions under Section 906 of SOX for knowing material misrepresentations in financial information and this might include Section 404. And although criminal cases will presumably be brought only in instances of outright fraud, there is the ever-present concern with civil liability from shareholder lawsuits—a concern shared by management more broadly, by directors, and, as a result of Section 11 of the 1933 Act, by auditors as well. The nature of the liability risk is asymmetrical, with significant downside from failing to uncover a control weakness, but constrained upside from greater efficiency.  As with the practice of defensive medicine, the result may be control reviews that are more comprehensive than is socially desirable.

(4)    *Impact on small firms.*  While the high cost of compliance is a burden shared by all public companies, it has particular consequences for small firms and foreign issuers.  For small firms, the problem is that compliance costs are regressive—they do not scale with company size.  As noted above, compliance costs for firms with less than $700 million of market capitalization average about 0.46 percent of annual revenues.  This amount is over five times greater on a relative basis than firms with greater than $700 million of market capitalization (0.09 percent of revenues).  The higher compliance burden for small firms may have a direct bearing on the decision of small firms to list in (or delist from) U.S. equity markets.  There is also, however, a corresponding risk to investors of smaller companies, which have a higher incidence of restatements and control weaknesses than larger firms.

(5)    *"Crowding out" effects.*  A further argument suggests that there might be a "crowding out" effect from the resources devoted to the implementation of Section 404.  Put simply, this argument asks whether the commitment of resources to Section 404 control implementation is diverting management attention from higher-return activities.  This effort was estimated at over 87,000 person hours for the average accelerated filer in the first year, although the initial effort included deferred maintenance for many issuers, and was reduced in subsequent years.[154]  Would some of the effort required to become Section 404 compliant be better spent on other productive activities?

(6)    *Necessary or sufficient?*  More fundamentally, some critics suggest that Section 404's focus on control reviews may be neither necessary nor sufficient to prevent the major accounting scandals that precipitated passage of SOX.  Turning over every link in the control chain may not be necessary to detect the relatively small proportion of financial restatements that result in significant market impact.  Recall that only 38 percent of restatements from July 2002 to September 2005 had a market impact in excess of $5 million—the average cost of compliance.  Only

---

154 Estimate using the FEI methodology of 2,000 work hours per year and $100,000 per year in wages and benefits.

12.6 percent of restatements resulted in a negative market impact of greater than 10 percent of company value.

At the same time, control reviews alone may not be sufficient to deter high-level fraud, aggressive accounting interpretations, or other features of the major Enron-era accounting scandals.[155] A broader point is that there is a dearth of empirical evidence on the link between internal controls and specific types of accounting failures. Without such evidence, it is hard to know which elements of Section 404 are necessary or sufficient to achieve the statute's intended objectives.

## IV.  Recommendations

The Committee is in favor of reducing the costs of Section 404 implementation without undermining the statute's fundamental objectives. Specifically, the Committee recommends the following modifications to the regulatory implementation of Section 404, none of which would require legislative changes:

### A.  Redefine a Material Weakness

The starting point for reform should be to revise the scope and materiality standards in Auditing Standard No. 2 ("AS2") to ensure that reviews are truly risk-based and focus on significant control weaknesses. This path has already been embraced by the SEC and the PCAOB.

The Committee recommends that the definition of materiality in AS2 be revised as follows: "A material weakness exists if it is reasonably possible that a misstatement, which would be material to the annual financial statements, will not be prevented or detected." The Committee's proposed formulation would change the probability threshold for the detection of control weaknesses from AS2's existing "more than remote likelihood" standard to "reasonably possible" that a material misstatement could occur. Recently, it has been reported that Chairman Cox also recommended that the PCAOB adopt a "reasonably possible" standard.

In terms of impact on the financial statements, the Committee believes that materiality for internal control reviews should be defined consistently with the definition of materiality in financial reporting. The Committee recommends, therefore, that the SEC revise its guidance on materiality for financial reporting so that scoping materiality is generally defined, as it was traditionally, in terms of a five percent pre-tax income threshold. This standard is consistent with the general risk-based approach of the Committee. In cases where the five percent test would not be meaningful, the SEC

---

155 As Robert Clark has observed; "The great scandals that led to SOX, like those in WorldCom and Enron, seem to have depended much more on extremely aggressive or irresponsible accounting judgments, estimates, and characterizations made by people at fairly high levels in affected organizations. The paradigmatic case is misclassification of very large expenditures as amortizable over time rather than as current expenses, not whether the company promptly prevents departing employees from having continued access to the computer system. It therefore remains to be seen whether America's freshly repainted internal control systems will deter more serious kinds of fraud on investors." (Clark, 2005).

should allow companies and their auditors to exercise reasoned judgment in choosing other measures to evaluate materiality that would be relevant to investors. The proposed standard also would clarify that materiality is defined relative to the annual, rather than interim, financial statements.

## B. Development of Enhanced PCAOB and SEC Guidance

The Committee recommends that the SEC and PCAOB further enhance guidance by:

- clarifying and permitting greater judgment as to the auditor's role in understanding and evaluating management's assessment process;

- confirming that auditors, in attesting to management's assessment, are not required to perform similar assessments to those needed in issuing their own opinions;

- reinforcing the appropriateness of the auditor's use of judgment throughout the audit of internal controls over financial reporting, including in the evaluation of strong indicators of material weakness;

- clarifying that the auditor attestation does not require the auditor to report separately on management's own internal control assessment process ; and

- incorporating the frequently-asked questions guidance into the text of AS2.

In addition, the PCAOB should pursue its announced change in focus in its inspection process to consider auditor efficiency in its evaluations and should continue to take steps to provide timely, targeted feedback regarding the application of AS2. The PCAOB should accelerate the development of an Audit Guide for smaller issuers and could consider other measures—particularly in instances where an auditor is required to issue an adverse report due to a material weakness in internal control—that could help improve efficiencies.

## C. Permit Multi-Year Rotational Testing and Increased Reliance on Work of Others

Consistent with the objective of focusing control reviews primarily on higher risk components of financial processes, the SEC and the PCAOB should give guidance to management and auditors to allow multi-year rotational testing, as part of an annual attestation. Critical components of financial processes and higher risk areas such as procedures for preparing the annual financial statements and related disclosures should be tested each year. For lower-risk components of financial processes and other areas, such as certain elements of the information technology environment, management and the auditor should be allowed to use a multi-year rotational testing approach.

The SEC and PCAOB should also confirm that auditors may increase reliance on the work of others and give guidance to both management and auditors regarding the auditor's maximum reliance on inputs from existing sources (for example, internal

auditors and management) in performing their control work.  Such guidance would help
eliminate redundancies and allow auditors to use more judgment and risk-based control
testing in their attestation, as opposed to repeating tests similar to those used in
management's assessment of internal controls.

### D. Small Companies Should Either Be Subject to the Same (Revised) Section 404 Requirements as Large Companies or Congress Should Reshape 404 for Small Companies

In the near-term, application of Section 404 to non-accelerated filers (companies
with less than $75 million of market capitalization) should continue to be deferred until
the changes in materiality, enhanced guidance, and multi-year rotational testing take
effect.  At such time, the SEC should reassess the costs and benefits of extending Section
404 to small companies.  To the extent that the SEC finds that, even with the proposed
reforms, the costs are still too high relative to the benefits, it should ask Congress to
consider exempting small companies from the auditor attestation requirement of Section
404 while at the same changing the management certification requirement to one
requiring reasonable belief in the adequacy of internal controls.  Without the comfort of
auditor attestation, management would not be able to make a stronger certification.

Conversely, the Committee does not believe that a "design-only" standard should be
adopted for small companies, under which outside auditors would generally assess the
overall adequacy of the design of controls and only test effectiveness in limited areas.  In
the Committee's view, such a standard is not workable because a reliable judgment about
design cannot be made without testing effectiveness.  To maintain otherwise risks
seriously misleading investors.  Further, available evidence suggests that small
companies have significantly more problems with internal controls than large companies.

### E. Do Not Apply Section 404 to Foreign Companies Subject to Equivalent Home Country Requirements.

The Committee would not apply Section 404 to foreign firms that could
demonstrate that they were subject to equivalent home country internal control
regulation.  The Committee also recommends that, in any event, the SEC should not
apply the Section 404 review to the U.S. GAAP reconciliation.  The Committee applauds
the fact that the SEC has publicly reassured all concerned that Section 404 would not
apply to a company listed only on an overseas exchange simply because that exchange is
owned by a company incorporated in the United States.

### F. Provide for More Data Collection and Ongoing Monitoring

With only two years of experience, the fact base relating to Section 404
implementation is still fairly limited.  The SEC and PCAOB should collect better and
more complete information relating to the costs and benefits of Section 404, including the
causal links between internal controls and accounting errors, restatement frequency and

severity, compliance costs for different sizes and types of firms, and possible competitive consequences.

## References

Ashbaugh-Skaife, Hollis, Daniel W. Collins, William R. Kinney, Jr., and Ryan LaFond. 2006. "The Effect of Internal Control Deficiencies on Firm Risk and Cost of Equity Capital." Study (April), *available at* http://ssrn.com/abstract=896760.

Charles River Associates International. 2005. "Sarbanes-Oxley Section 404 Costs and Implementation Issues: Survey Update." December 8.

Charles River Associates International. 2006. "Sarbanes-Oxley Section 404 Costs and Implementation Issues: Spring 2006 Survey." April 17.

Clark, Robert C. 2005. "Corporate Governance Changes in the Wake of the Sarbanes-Oxley Act: A Morality Tale for Policymakers Too." Harvard Law and Economics Discussion Paper No. 525 (December), *available at* http://ssrn.com/abstract=808244.

Financial Executives International. 2006. "FEI Survey on Sarbanes-Oxley Section 404 Implementation." March.

Glass, Lewis & Company, LLC. 2006. "Getting It Wrong the First Time." March.

Grundfest, Joseph A. 2006. "Fixing 404." Rock Center for Corporate Governance at Stanford Working Paper 06–01 (draft dated May 1), 9.

Ogneva, Maria, Kannan Raghunandan, and K. R. Subramanyan. 2006. "Internal Control Weakness and Cost of Equity: Evidence from SOX 404 Certifications." Study (July), *available at* http://ssrn.com/abstract=766104.

Pozen, Robert C. 2006. "Why Sweat the Small Stuff?" Wall Street Journal, April 5.

Romano, Roberta. 2005. "The Sarbanes-Oxley Act and the Making of Quack Governance." Yale Law Journal, May 1.

United States Government Accountability Office. 2002. "Financial Statement Restatements: Trends, Market Impacts, Regulatory Responses, and Remaining Challenges." October.

United States Government Accountability Office. 2006. "Financial Restatements: Update of Public Company Trends, Market Impacts, and Regulatory Enforcement Activities." July.

Wagner, Stephen, and Lee Dittmar. 2006. "The Unexpected Benefits of Sarbanes-Oxley." *Harvard Business Review* April, 133.

**TABLE V.1**
**GAO Analysis**

|  | Average Adjusted Market Impact of Restating Companies, July 2002–Sept. 2005 |
|---|---|
| **3-Day** | -1.9% |
| **40-Day** | -1.8% |
| **120-Day** | -1.7% |

*Source: "Financial Restatements: Update of Public Company Trends, Market Impacts and Regulatory Enforcement Activities," GAO, July 2006.*

**TABLE V.2**

| Company Level Market Impact of Restatements Within a 3-Day Window July 2002 – Sept. 2005 | | |
|---|---|---|
| **% Impact on Company Market Value** | **% of Restating Companies** | **Cumulative % of Restating Companies** |
| >0% | 41.65 | 41.65 |
| 0% to -1.0% | 11.37 | 53.01 |
| -1.0 % to -2.5% | 11.62 | 64.63 |
| -2.5% to -5% | 12.13 | 76.76 |
| -5.0% to -7.5% | 6.36 | 83.12 |
| -7.5% to -10% | 4.33 | 87.45 |
| <-10% | 12.55 | 100.00 |

*Source: Mercer Oliver Wyman.*

**TABLE V.3**

| Survey | Year 1 Per Company Cost Average | | Year 2 Per Company Cost Average | | Year 1 Implied Aggregate Cost Estimate | Year 2 Implied Aggregate Cost Estimate |
|---|---|---|---|---|---|---|
| **FEI** | $4.36 | | $3.80 | | $15,015 | $13,033 |
| **CRA** | **Smaller** | **Larger** | **Smaller** | **Larger** | $20,103 | $11,437 |
|  | $1.24 | $8.51 | $0.86 | $4.77 | | |

*Sources:*
*"FEI Survey on Sarbanes-Oxley Section 404 Implementation," Financial Executives International, March 2006.*
*"Sarbanes-Oxley Section 404 Costs and Implementation Issues: Spring 2006 Survey Update," CRA International, 17 April 2006.*